IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA



| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| PRODUCTS LIABILITY | * | |
| LITIGATION | * | Section L |
| | * | |
| | * | Judge Fallon |
| | * | Mag. Judge Knowles |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## PLAINTIFFS' BRIEF REGARDING EX PARTE CONTACTS
## BY DEFENDANT WITH PLAINTIFFS' TREATING PHYSICIANS

### I. INTRODUCTION:  The Issue Under Consideration.

The issue for consideration is whether the Defendant or anyone working on its behalf should be forbidden ex parte contact with healthcare providers who treated a given Plaintiff. The Court should prohibit such contacts.

### II. ARGUMENT

#### A. Ex Parte Contacts Would Prove Unmanageable and Would Run Substantial Risks of Violating Patient Confidentiality.

In complex coordinated litigation, courts routinely exercise their inherent powers to ensure efficient and orderly conduct of the case.  Courts have thus denied requests of the very sort at issue here for precisely those reasons.  *See Smith v. Am. Home Prods. Corp.*, 855 A.2d 608 (Sup. Ct. N.J. 2003); *In re Vioxx*, Case. No. 619 (Sup. Ct. N.D. 2004) (discussed below). Courts recognize that permitting ex parte contacts in complex cases raises a host of management problems for the parties and the court.  Those management problems are even

more acute in the context of MDL proceedings where the court must manage thousands of cases.

An example of such a unitary prohibition occurred in the Baycol MDL.  There, Judge Davis blanketly forbade ex parte contacts with treating physicians based upon the law of the forum state.  *See In re Baycol Prods. Litig.*, 219 F.R.D. 468 (D. Minn. 2003) (applying Minnesota law to all litigants and forbidding ex parte contacts between defense counsel and plaintiffs' treating physicians).  This reasoning could be applied here because in Louisiana filing suit waives the physician-patient privilege as to relevant medical information, but the privilege is waived *only* as to trial testimony or formal discovery.  Therefore, ex parte contacts of the sort Merck seeks here are expressly forbidden.  *See Coutee v. Global Marine Drilling Co.*, 895 So. 2d 631, 640-42 (La. App. Ct. 2005).

Although this case is not governed by the so-called Class Action Fairness Act, 28 U.S.C. § 1711 *et seq.*, MDL transferee courts in order to effectuate the intent and spirt of that Act will have to utilize the application of unitary law.  The *Baycol* court's application of unitary law is in line with this philosophy.

The core purpose of multidistrict litigation is to "promote the just and efficient conduct of such [transferred] actions."  28 U.S.C. § 1407(a).  As this Court recently observed, multidistrict litigation encourages "uniformity, consistency, and predictability in litigation . . . ."  *Scott v. Bayer Corp.*, 2004 WL 63978, at *1 (E.D. La. Jan. 12, 2004) (Fallon, J.).  This Court has a corresponding power and duty to govern these proceedings as it sees most fit to

achieve these aims.[1]  *See Link v. Wabash R.R. Co.*, 370 U.S. 626, 630-31, 82 S. Ct. 1386, 1388-89, 8 L. Ed. 2d 734 (1962) (courts possess an "'inherent power' governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases" ); *see also Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co.*, 771 F.2d 5, 11 (1st Cir. 1985) ("That the rules of civil procedure do not completely describe and limit the power of district courts seems to us long established, although only infrequently documented—possibly because the rules do take care of most situations.").

Additionally, the Federal Rules of Civil Procedure, and particularly Rule 16, give the court wide discretion in matters of case management.  According to *Buffington v. Wood*, "The clear dictate of this pretrial rule is to give the courts, through the issuance of pretrial orders, wide discretion and power to advance causes and simplify procedure before presentation of cases to juries." 351 F.2d 292, 299 (3d Cir. 1965) (upholding district court's authority to order the exchange of medical reports under Rule 16). *See also, e.g., Sherman*

---

[1] Fed. R. Civ. P. 26(b)(4) would prohibit ex parte contacts with physicians who have agreed to serve as experts, but here the issue involves routine treating physicians.  No federal rule directly addresses this question.  One potential exception is provided by Rule 23(d), which codifies the court's inherent authority to control communications with class members (certainly some of the doctors Merck seeks to contact are absent class members) through the use of procedural orders directed to the conduct of the action.  Because this MDL is still in its nascent stage, interceding between defendant's communications with physicians and other potential class members will preserve the status quo and permit the court to supervise communications with all class members. *See Gulf Oil Co. v. Bernard*, 452 U.S. 89, 101 (1981); *Kliener v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1202-03 (11th Cir. 1985).

*v. United States*, 801 F.2d 1133, 1135 (9th Cir. 1986) (Rule 16 is "broadly remedial and its purpose is to encourage forceful judicial management.").

The Court should exercise its inherent power to forbid all ex parte physician contacts in this case. The mere prospect of ex parte contacts raises a host of issues including whether notice would be required to the patient and/or physician; whether the patient or patient's attorney may attend the interview or conference; whether the physician has the right to refuse to speak and whether the patient or defense counsel may or must notify the physician in this regard; whether the physician may or must have counsel and whether the physician may be liable under state or federal law for the disclosure of improper information; what medical evidence might be deemed "relevant" to the case and thus subject to discussion; and what remedy is available to prohibit what a patient believes is an impermissible contact or one exceeding the permissible scope of an otherwise permissible contact. Each of these issues will arise in if contacts are permitted.

In the pharmaceutical (PPA) mass-tort case *Smith v. Am. Home Prods. Corp.*, 855 A.2d 608 (Sup. Ct. N.J. 2003), the court concluded that New Jersey's *Stempler* procedure[2] for ex parte interviews would require "extensive hearings" and that the "inherent complexity" of that mass tort case mandated a "practical recourse." The court denied ex parte interviews altogether. *Id.* at 625, 626-27. The *Smith* case involved only New Jersey law and 300 cases

___

[2]*See Stempler v. Speidell*, 495 A.2d 857 (N.J. 1985) (requiring among other things notice to the patients attorney, advance notice to the physician as to the scope of interview, and a patient's right to seek a protective order).

approaching trial. *Id.* at 625. This MDL is national in scope and potentially involves tens of thousands of cases. Only a uniform approach to such a complex docket makes sense from a standpoint of efficiency and certainty for the litigants.

Consistent with approach, in the currently-pending New Jersey Vioxx litigation, the presiding judge would not permit Merck ex parte communications with the plaintiffs' treating physicians. (See attached Exhibit "A", *In re Vioxx*, Memorandum Order on Plaintiffs' Motion to Prohibit *Ex Parte* Interviews, Nov. 17, 2004.) The court recognized that "given the large number of cases involved in this mass tort and even the larger number of doctors involved, the court would be unduly burdened by hearings to determine the permissible scope of each interview." (*Id.* at 7.) At the time the order was entered, approximately 193 cases were pending, all of which were subject to the law of one state, New Jersey.

"Other district courts have concluded that absent a plaintiff's express consent allowing ex parte discussions, defense counsel is limited to the formal methods of discovery authorized by state procedural rules. *Harlan v. Lewis*, 141 F.R.D. 107, 110 (E.D. Ark.1992) (stating that "an enlightened emerging consensus of states [are] adhering to the position that defense counsel is limited to the formal methods of discovery..."); *see also Neal v. Boulder*, 142 F.R.D. 325 (D. Colo. 1992); *Miles v. Farrell*, 549 F.Supp. 82, 84 (N.D. Ill. 1982); *Gobuty,* 795 F.Supp. at 281 (D. Minn.1992); *Alston v. Greater Southeast Community Hosp.*, 107 F.R.D. 35 (D.D.C.1988); *Weaver v. Mann*, 90 F.R.D. 443 (D.N.J.1981); *Garner v. Ford Motor Co.*, 61 F.R.D. 22 (D. Alaska 1973); *Horner*, 153 F.R.D. 597. These courts argue that

discovery limitations protect the doctor/patient confidences which are not relevant to the lawsuit, thereby protecting "society's interest in safeguarding the 'unique and confidential nature of the physician-patient relationship." ' *Harlan*, 141 F.R.D. at 111, *quoting, Crist v. Moffatt*, 326 N.C. 326, 389 S.E.2d 41, 46 (N.C. 1990).  The courts also have expressed fear that the use of ex parte interviews could encourage improper discussions or collusion between doctors and the attorneys defending their colleagues. See *Manion v. N.P.W. Medical Center of N.E. Pa., Inc.*, 676 F.Supp. 585, 593 (M.D. Pa.1987) (noting that an ex parte interview could develop into a discussion of the impact of a jury's award upon a physician's professional reputation, [or] the rising cost of malpractice insurance premiums ...."). A prohibition on ex parte interviews, these courts assert, does not prevent defense counsel from obtaining relevant material, it simply insures that only privileged information will be acquired. *See Harlan*, 141 F.R.D. at 111.  Finally, these courts explain that the application of state privilege discovery procedures in federal litigation will discourage forum shopping that could result from disparate rules. *Gobuty*, 795 F. Supp. at 288 ("[T]here is no reason to afford the physician-patient relationship less protection in federal proceedings than in state proceedings.")." *Johns v. United States of America*, 1997 WL 695608 (E.D.La.1997).

Merck seeks to conjure a 50-headed hydra of state law inquiries that this court can avoid with one uniform order.  Considering the tens of thousands of potential Plaintiffs, all of whom have numerous treating physicians, there is no practical solution but to forbid all such

contacts, as courts previously have done in far less onerous circumstances. Otherwise, Plaintiffs' privacy rights are jeopardized by the ad hoc procedure that necessarily would be created to accommodate Merck. In the interests of preserving Plaintiffs' privacy rights, and for the sake of judicial efficiency, this Court should deny Merck's request to do the impossible.

B. Ex Parte Interviews Would Violate HIPAA.

Not only would ex parte contacts prove unmanageable and inefficient, but they would violate federal HIPAA law.

In 1996 Congress enacted the Health Insurance Portability and Accessibility Act of 1996, 42 U.S.C. § 1320d, *et seq.* ("HIPAA"). One of HIPAA's goals was to "ensure the integrity and confidentiality of [patients'] information" and to protect against "unauthorized uses or disclosures of the information." 42 U.S.C. § 1320d-2(d)(2)(A) & (B)(ii).

At the direction of Congress, the Secretary of the Department of Health and Human Services promulgated the "Standards for Privacy of Individually Identifiable Health Information" ("Privacy Rule") to govern transactions under HIPAA. 65 Fed. Reg. 82462, 82462-63 (Dec. 28, 2000). The regulation has three major purposes:

> 1) To protect and enhance the rights of consumers by providing them access to their health information and controlling the inappropriate use of that information; 2) to improve the quality of health care in the U.S. by restoring trust in the health care system among consumers, health care professionals, and the multitude of organizations and individuals committed to the delivery of care; and 3) to improve the efficiency and effectiveness of health care delivery by creating a national framework for health privacy protection that builds on efforts by states, health systems, and individual organizations and individuals.

*Id.* at 82463. The Secretary noted that "[p]rivacy is a fundamental right" and that "[a]mong different sorts of personal information, health information is among the most sensitive." *Id.* at 82464. The rules, consequently provide

> a set of basic national privacy standards and fair information practices that provides all Americans with a basic level of protection and peace of mind that is essential to their full participation in their care. The rule sets a floor of ground rules for health care providers, health plans, and health care clearinghouses to follow, in order to protect patients and encourage them to seek needed care. The rule seeks to balance the needs of the individual with the needs of the society. It creates a framework of protection that can be strengthened by both the federal government and by states as health information systems continue to evolve.

*Id.* at 82464.

HIPAA rules, absent certain defined exceptions, expressly preempt any contrary provision of state law, 42 U.S.C. § 1320d-7(a)(1); 45 C.F.R. § 160.203, unless the state law "relates to the privacy of individually identifiable health information" and is "more stringent" than the HIPAA rules. 45 C.F.R. § 160.203(b). *See also Law v. Zuckerman,* 307 F. Supp. 2d 705, 708-09 (D. Md. 2004); *Smith,* 855 A.2d at 621.

HIPAA restricts the ways in which medical information can be disclosed: "A covered entity may not use or disclose protected health information, except as permitted or required by this subpart or by subpart C of part 160 of this sub-chapter." 45 C.F.R. § 164.502(a). *See also Law,* 307 F. Supp. 2d at 708 ("HIPAA clearly regulates the methods by which a physician may release a patient's health information, including 'oral' medical records."). Absent authorization, HIPAA provides for only two methods for disclosure of protected medical information: 1) "[i]n response to an order of a court or administrative tribunal,

provided that the covered entity disclosed only the protected health information expressly authorized by such order;" or 2) "[i]n response to a subpoena, discovery request, or other lawful process[.]" 45 C.F.R. § 164.512(e)(1)(I), (ii). *See also Law,* 307 F. Supp. 2d at 711.

HIPAA does not authorize ex parte interviews of a plaintiff's doctors by defense counsel. *Crenshaw v. MONY Life Ins. Co.*, 318 F. Supp. 2d 1015, 1029 (S.D. Cal. 2004). ("HIPAA does not authorize ex parte contacts with healthcare providers."); *see also Law*, 307 F. Supp. 2d at 707 (HIPAA "prohibits" ex parte interviews treating physicians "in the absence of strict compliance with HIPAA"). Indeed, ex parte interviews of a plaintiff's treating physicians by defense counsel during the course of litigation "appear to conflict with the purposes and procedures of HIPAA." *Crenshaw*, 318 F. Supp. 2d at 1028.

Faced with the issue of whether HIPAA prevents defense counsel from conducting ex parte interviews, courts have ruled that it does. In *Law*, the court held that although a Maryland medical information privacy statute mandated disclosure of patient records without authorization from the patient in a medical malpractice action, it was not more stringent than HIPAA's requirements. HIPAA gave each patient more control over the dissemination of their medical record; thus, for purposes of medical malpractice action, HIPAA preempted Maryland state law and governed all ex parte communications between defense counsel and patient's treating physician. *See Law,* 307 F. Supp. 2d at 707. In *Crenshaw,* the court held that, absent a suitable protective order, an insurer's attorney's ex parte contact with plaintiff's physician would violate HIPAA. *Crenshaw*, 318 F. Supp. 2d at 1028-29.

Thus, HIPAA's privacy concerns lend further weight to a prohibition on ex parte communications with physicians.

III..   <u>CONCLUSION.</u>

To permit ex parte contacts with Plaintiffs' treating physicians would entangle the Court with diversionary satellite litigation pertaining to improper communications with plaintiffs' physicians.  To permit the ex parte contacts would also run afoul of HIPAA.  The procedure thus would be unworkable and legally misguided.  Accordingly, the Defendant should be forbidden from ex parte contacts with Plaintiffs' healthcare providers.

Respectfully submitted,

**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA  70113
PH:    (504) 581-4892
FAX:  (504) 561-6024
**Plaintiffs' Liaison Counsel**

| | |
|---|---|
| Richard J. Arsenault, Esq.<br>P.O. Box 1190<br>2220 Bonaventure Court<br>Alexandria, LA  71309-1190<br>PH:  (318) 487-9874<br>FAX:  (318) 561-2591 | Gerald E. Meunier, Esq.<br>Energy Centre<br>1100 Poydras Street, Suite 2800<br>New Orleans, LA  70163-2800<br>PH:  (504) 522-2304<br>FAX:  (504) 528-9973 |
| Andy D. Birchfield, Esq. (**Co-Lead Counsel**)<br>P.O. Box 4160<br>234 Commerce Street<br>Montgomery, AL  36103-4160<br>PH:  (800) 898-2034<br>FAX:  (334) 954-7555 | Troy Rafferty, Esq.<br>316 S. Baylen Street, Suite 400<br>Pensacola, FL  32502<br>PH:  (850) 435-7000<br>FAX:  (850) 497-7059 |

| | |
|---|---|
| Elizabeth Cabraser, Atty.<br>Embarcadero Center West<br>275 Battery Street, 30th Floor<br>San Franciso, CA  94111-3339<br>PH:  (415) 956-1000<br>FAX:  (415-956-1008 | Drew Ranier, Esq.<br>1419 Ryan Street<br>Lake Charles, LA  70601<br>PH:  (337) 494-7171<br>FAX:  (337) 494-7218 |
| Thomas Kline, Esq.<br>1525 Locust St.<br>19th Floor<br>Philadelphia, PA  19102<br>PH:  (215) 772-1000<br>FAX:  (215) 772-1371 | Mark Robinson, Esq.<br>620 Newport Center Drive<br>7th Floor<br>Newport Beach, CA  92660<br>PH:  (949) 720-1288<br>FAX:  (949) 720-1292 |
| Arnold Levin, Esq.<br>510 Walnut Street<br>Suite 500<br>Philadelphia, PA  19106-3875<br>PH:  (215) 592-1500<br>FAX:  (215) 592-4663 | Christopher Seeger, Esq. (**Co-Lead Counsel**)<br>One William Street<br>New York, NY  10004<br>PH:  (212) 584-0700<br>FAX:  (212) 584-0799 |
| Carlene Rhodes Lewis, Atty.<br>2200 Texaco Heritage Plaza<br>1111 Bagby<br>Houston, TX  77002<br>PH:  (713) 650-0022<br>FAX:  (713-650-1669 | Christopher Vincent Tisi, Esq.<br>2000 L Street, NW<br>Suite 400<br>Washington, DC  20036-4914<br>PH:  (202) 783-6400<br>FAX:  (307) 733-0028 |

## PLAINTIFFS' STEERING COMMITTEE

## CERTIFICATE OF SERVICE

    I hereby certify that the above and foregoing Plaintiffs' Brief Regarding Ex Parte Contacts By Defendant With Plaintiffs' Treating Physicians has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced in accordance with Pre-Trial Order No. #8, on this 5th day of May, 2005.



FILED

NOV 17 2004

CAROL E. HIGBEE, J.S.C.

**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE COMMITTEE ON OPINIONS**

## SUPERIOR COURT OF NEW JERSEY
### COUNTIES OF
### ATLANTIC AND CAPE MAY

CAROL E. HIGBEE, J.S.C.

1201 Bacharach Boulevard
Atlantic City, NJ 08401-4527
(609) 343-2190

### MEMORANDUM OF DECISION ON MOTION
#### Pursuant to Rule 1:6-2(f)

| | |
|---|---|
| *CASE:* | **In re VIOXX®** |
| *DOCKET #:* | **Case No. 619** |
| *DATE:* | **November 17, 2004** |
| *MOTION:* | **Plaintiffs' Motion to Prohibit *Ex Parte* Interviews** |
| *ATTORNEYS:* | **Christopher Seeger and David R. Buchanan – Plaintiffs** |
| | **Diane P. Sullivan – Defendants** |

Having carefully reviewed the papers submitted and any response filed, I have ruled on the above Motion as follows:

Plaintiffs bring this motion in order to prohibit *ex parte* interviews of Plaintiffs' doctors by defense counsel.

### BACKGROUND

This matter arises from damages Plaintiffs claim to have incurred from the manufacture, sale, distribution and/or use of the drug VIOXX®, produced by Defendant Merck & Co., Inc. Due to the large number of cases that had been filed regarding the drug (approximately 193 as of the date of this order), on May 20, 2003, the New Jersey Supreme Court ordered that all litigation in this matter be designated a mass tort before this court.

*"The Judiciary of New Jersey is an equal Opportunity/Affirmative Action Employer"*

EXHIBIT "A"

Because the cases in this mass tort involve personal injuries allegedly sustained from use of VIOXX®, Defendant seeks to interview Plaintiffs' physicians in order to obtain informal discovery. Early on in this litigation, Plaintiffs executed and delivered to Defendant authorizations for the release of Plaintiffs' medical information. The authorizations were tendered in accordance with the New Jersey Supreme Court decision in Stempler v. Speidell, 100 N.J. 368 (1985).

On October 8, 2004, Defendant's counsel provided Plaintiffs' counsel with notice that they would be conducting an *ex parte* phone interview with one of plaintiff, Larry Boyer's doctors in compliance with the Stempler decision. On October 12, 2004, plaintiff Larry Boyer revoked his consent to the interviews, as was his right under the terms of the initial authorization form.

Plaintiffs now claim that *ex parte* interviews that defense counsel has with Plaintiffs' doctors (hereinafter Stempler interviews) should be prohibited because they violate privacy rights protected by the Health Insurance Portability and Accountability Act of 1996 (HIPAA). Defendant claims that HIPAA does not conflict with the Stempler decision and that the Act does not, and was not intended to apply to personal injury litigation where a party has put his or her medical condition at issue.

## ANALYSIS

### A. Stempler v. Speidell

In 1985, the New Jersey Supreme Court held that in personal injury litigation, a defendant's counsel could conduct informal interviews with a plaintiff's physician and that authorization for these interviews could be compelled from a plaintiff by a court order. Stempler, 100 N.J. at 382. Stempler involved a medical malpractice and wrongful death action

brought by a decedent's estate against one of the decedent's doctors who was the attending physician at the time the decedent died. Id. at 370-371.

The defendant sought to compel unrestricted authorizations that would permit the defendant's counsel to personally interview the decedent's treating physicians. The plaintiffs opposed the authorizations claiming that depositions were the only appropriate form of discovery to be used that wouldn't create an undue risk of disclosing confidential information that was not related to the litigation.

The Court weighed the interests in protecting the patient-physician privilege and the privacy interests of the plaintiffs in such cases against the defendant's right to interview a plaintiff's treating physicians instead of being restricted to formal, expensive, and inconvenient discovery methods, such as depositions and other procedures provided for by the Court Rules. Id. at 381. The Court concluded that these *ex parte* interviews, as well as other informal means of discovery that reduce the cost and time of trial preparation should be encouraged. Id. at 382. Consequently, the Court held that because a physician would not participate in such an interview without the consent of the plaintiff, the authorization could be compelled. Id. The Court made efforts to preserve the plaintiff's privacy interests and the patient-physician privilege by requiring defendants to provide reasonable notice of the time and place of the proposed interviews. Id. The authorizations also required defendant's counsel to "provide the physician with a description of the anticipated scope of the interview, and communicate with unmistakable clarity the fact that the physician's participation in an *ex parte* interview is voluntary." Id.

Further, the Court held that a plaintiff could seek and obtain a protective order, if an *ex parte* interview threatens to cause substantial prejudice to the plaintiff. Id. at 383. The protective order could either require that plaintiff's counsel be present during the interview or "in extreme cases," require that the defendant conduct a formal deposition. Id. The Court believed

3

that "the flexibility afforded by our decision will permit trial courts and counsel to fashion appropriate procedures in unusual cases without interfering unnecessarily with the use of personal interviews in routine cases." Id.

**B. HIPAA, the Privacy Rule, and <u>Smith v. American Home Products Corp. Wyeth-Ayerst Pharmaceutical</u>**

In 1996, Congress enacted the Health Insurance Portability and Accessibility Act, 42 U.S.C. § 1320d, *et seq.* It is Plaintiffs contention that HIPAA preempts the <u>Stempler</u> decision and prohibits the <u>Stempler</u> interview. The matter of whether the <u>Stempler</u> decision was preempted by HIPAA was directly addressed by the Honorable Judge Corodemus, J.S.C. in the case of <u>Smith v. American Home Products Corp. Wyeth-Ayerst Pharmaceutical</u>, 372 <u>N.J. Super.</u> 105 (Law Div. 2003) as an issue of first impression.

The <u>Smith</u> case involved a mass tort against manufacturers of the drug phenylpropanolamine ("PPA"). The plaintiffs in that case challenged the defendants' request for <u>Stempler</u> authorizations claiming that the informal discovery procedures were preempted by HIPAA. <u>Smith</u>, 372 <u>N.J. Super.</u> at 109. The <u>Smith</u> court ultimately found that HIPAA does not conflict with New Jersey's patient-physician privilege under <u>N.J.S.A.</u> 2A:84A-22.4 or with the informal discovery techniques permitted under <u>Stempler</u>. <u>Id.</u> at 110.

In rendering her decision, Judge Corodemus provided a detailed description of the history and purposes of HIPAA and the Privacy Rule. The Privacy Rule is a collection of regulations created by the Department of Health and Human Services that came effective in April of 2003 and sets forth the standards and procedures regarding the collection and disclosure of "protected health information" ("PHI"). <u>Id.</u> at 111. Judge Corodemus noted that a primary purpose of both HIPAA and the Privacy Rule is to control the dissemination of a patient's private medical information through electronic transmission. <u>Id.</u> at 123. The Judge also noted that both New

4

Jersey law and HIPAA provide exceptions to the patient-physician privilege in the instance of civil litigation. Id. at 125. Specifically, 40 C.F.R. § 164.512(e) allows for disclosure in the course of any judicial proceeding in response to a court order or in response to a subpoena, discovery request, or other lawful process, provided that certain requirements listed in the regulation are met. N.J.S.A. 2A:84A-22.4 provides:

> There is no privilege under this act in an action in which the condition of the patient is an element or factor of the claim or defense of the patient or of any party claiming through or under the patient or claiming as a beneficiary of the patient through a contract to which the patient is or was a party or under which the patient was insured.

HIPAA specifically provides that the Act supersedes any contrary provision of State law. 42 U.S.C. § 1320d-7(a)(1). State law is not preempted if it provides for additional protections beyond those afforded by federal regulations regarding patient health information. See 42 U.S.C.A. § 1320d-7(a)(1); 45 C.F.R. § 160.203. While HIPAA does not specifically authorize ex parte communications with plaintiffs' physicians, there is no explicit prohibition of such communications in the Act either. Law v. Zuckerman, 307 F.Supp.2d 705, 708 (D. Md. Feb. 27, 2004); see also Smith, 372 N.J. Super. at 132. After making this same observation, Judge Corodemus concluded that New Jersey law, should govern the courts and "ex parte interviews as a form of informal discovery may proceed as permitted under Stempler." Smith, 372 N.J. Super. at 132.

Although Judge Corodemus found that Stempler interviews were not prohibited by HIPAA, she also found that Stempler safeguards for disclosure authorizations were beneath the requirements set by HIPAA. Additionally, recognizing that mass tort cases may sometimes fall within the Stempler Court's meaning of "extreme cases," Judge Corodemus found that allowing ex parte interviews is not mandatory, but rather up to the court's discretion and in mass tort cases, formal discovery proceedings can be ordered. Id. at 131-133.

Ultimately, Judge Corodemus denied the use of *ex parte* interviews in the <u>Smith</u> case because of the large number of cases that had been filed and the very short period of time before trial was scheduled to begin.  While the use of <u>Stempler</u> interviews was not allowed in <u>Smith</u>, Judge Corodemus specifically noted that they were not prohibited from future mass tort cases, "but rather, given the intricacy of such cases, special hearings early during case management for the design of HIPAA-compliant authorization forms may become the custom for conduct of <u>Stempler</u> interviews in future mass tort litigation." <u>Smith</u>, 372 <u>N.J. Super.</u> at 136.

### C. <u>Bonanno v. American Home Product</u>

In a Case Management Conference on January 2, 2004, the Honorable Judge Charles J. Walsh, J.S.C. determined that <u>Stempler</u> interviews would not be allowed in the New Jersey diet drug mass tort.  Judge Walsh declined to say whether he believed <u>Stempler</u> interviews were preempted by HIPAA.

Judge Walsh noted that it would be very difficult to control and administer cases by allowing <u>Stempler</u> interviews in that particular mass tort.

### CONCLUSION

In their Memorandum of law in support of this motion, Plaintiffs assert three basic arguments.  First, Plaintiffs claims that in this litigation, *ex parte* interviews would violate HIPAA.  This argument is not supported by the language of HIPAA, or the case law interpreting the Act.  Judge Corodemus clearly found, after a diligent evaluation of the legislative history and intent of HIPAA that the Act does not preclude *ex parte* interviews allowed by the <u>Stempler</u> decision.  New Jersey law is not contrary to the federal objectives regarding privacy protections of patient health information.  Indeed, Defendant's Memorandum of Law in opposition to this motion points out some areas where the <u>Stempler</u> decision provides for more protections of

6

health information than HIPAA.  Consequently, this court agrees with the findings of <u>Smith</u> in

that HIPAA does not preclude informal discovery techniques set forth in <u>Stempler</u>.

Most of Plaintiffs claims in support of the argument that *ex parte* interviews in this

litigation would violate HIPAA deal more with case management and practicality issues than

they do with the legal permissibility of the informal discovery techniques.  Plaintiffs assert that

allowing *ex parte* interviews would be a practical nightmare because of the difficulty in drafting

authorizations and protective orders.  They further claim that given the large number of cases

involved in this mass tort and the even larger number of doctors involved, the court would be

unduly burdened by hearings to determine the permissible scope of each interview.  While, as

previously mentioned, this does not impact the legality of whether the interviews can be held, it

does relate directly to the second main point of Plaintiffs' argument.

The second main argument that Plaintiffs' raise in support of their motion, is that the

authorization signed by many of the Plaintiffs early on in the litigation is not HIPAA compliant.

The current authorizations that Plaintiffs seek to withdraw provides that each plaintiff "release

all existing medical records and information regarding the [plaintiff's] medical care, treatment,

physical condition, and/or medical expenses revealed by observation or treatment past, present,

and future," to Defendant's counsel.  While this authorization complies with some of the

requirements set forth in <u>Stempler</u>, it clearly does not comply with either the intent or the express

language of HIPAA and it must be changed.  The current authorization allows for disclosure of

information completely unrelated to the litigation at hand which is something that even <u>Stempler</u>

discouraged.  In order for *ex parte* interviews to even be considered as a possibility in this

litigation, a new authorization must be drafted that fully conforms to the requirements set forth in

40 C.F.R. § 164.512(e) and 45 C.F.R. §164.508, and any other regulations under HIPAA that

might narrow the scope of <u>Stempler</u>.

7

An authorization would be required that is in compliance with Stempler, HIPAA, and the Privacy Rule regulations for the disclosure of *ex parte* medical information.  A proper scope for each interview must be determined.  This explains why Judge Walsh decided that *ex parte* interviews were not allowed in the diet drug mass tort.  The decision must be based upon the difficulty in managing such informal discovery methods in hundreds of cases at once, and not upon whether such interviews are preempted.  While Defendant correctly points out that reliance on unpublished opinions and informal procedures such as transcripts from a management conference is disfavored by the Court Rules, this court is not relying on legal conclusions reached by Judge Walsh, but rather an acknowledgment that we face similar practical problems.

Stempler interviews were designed to allow a simpler, cheaper, more efficient and informal means of discovery than depositions.  None of these will be achieved by *ex parte* interviews in this case.  Counsel in oral argument acknowledged that some treating doctors even require their own lawyers at these interviews.  Both counsel agreed maybe doctors needed to be advised as to their own possible liability for HIPPA violations and of the right to have their counsel present.  The trial courts were given discretion to forbid Stempler interviews in "extreme cases."  VIOXX® cases are not the basic personal injury case.  The Court orders that the defendant proceed with depositions of doctors in lieu of Stempler interviews.  Counsel acknowledged that depositions, at least as to prescribing doctors depositions, would almost always be required even if there were Stempler interviews.

The defendant also argues that in the interest of fairness if the defendant's counsel can't do an *ex parte* interview with plaintiffs' doctors, then plaintiffs' counsel should not be able to speak to their clients' own doctors either.  There is no decision known to this court where a Judge has restrained counsel from talking to their client's own doctors.

Plaintiff's motion is granted.

_____
CAROL E. HIGBEE, J.S.C.

<u>XXXX</u>   Order is attached.

This decision will be posted on the judiciary website and can be viewed at
http://www.judiciary.state.nj.us/decisions.htm for a period of six weeks from the
motion return period.

9