COPY IN CHAMBERS

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2005 APR 18 PM 4: 36

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MDL 05-1657

| | | |
|---|---|---|
| SHEILA COLLINS STALLWORTH, INDIVIDUALLY AND ON BEHALF OF HER DECEASED HUSBAND, WILLIAM ANTHONY STALLWORTH, AND JANE VADEN | * * * * * * | CIVIL ACTION NO. 05-0860 |
| VERSUS | * * | JUDGE SECTION "L" |
| MERCK & CO., INC., ALLEN DICKSON, INC., MORRIS & DICKSON CO., LLC, LOUISIANA WHOLESALE DRUG CO., INC., LANA R. WEEKLEY, KAREN A. BROWN and GARRETT CHIFICI | * * * * * | MAGISTRATE "3" |

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

## MOTION AND INCORPORATED MEMORANDUM TO REMAND

**NOW INTO COURT,** come Plaintiffs Sheila Collins Stallworth, individually and on

behalf of her deceased husband, William Anthony Stallworth, and Jane Vaden, through

undersigned counsel, who move this Court to remand their lawsuit to Orleans Parish Civil

District Court.

Plaintiffs are representatives of the putative class defined as "Louisiana residents

who have used the drug Vioxx (and/or their spouses, children, succession representatives,

and/or heirs), for the recovery of actual, manifest, physical and economic injuries,

damages, or other relief, including the collective necessity for continued medical monitoring

___ Fee_____
___ Process_____
_X_ Dktd_____
_V_ CtRmDep_____
___ Doc. No._____

though an equitable, class wide program to be funded by Defendants and administered under the supervision of the Court." Petition, ¶ 1.

## I.   INTRODUCTION.

Defendant Merck & Co., Inc., ("Merck") a New Jersey corporation, removed this matter to federal court alleging diversity jurisdiction.  Merck maintains that the Louisiana defendants (Morris & Dickson, Inc., Louisiana Wholesale Drug Company, Inc., Lana Weekley, Karen Brown, and Garrett Chifici) were fraudulently joined.  No state defendants joined in Merck's removal.

The state defendants were not fraudulently joined because the Petition alleges facts which, accepted as true, support state-law claims against them.  These state defendants may be divided into two categories.   The first category of state defendants are the Merck sales representatives:  Lana Weekley, Karen Brown, and Garrett Chifici.  The second category of state defendants is comprised of the Distributor–Wholesalers:   Louisiana Wholesale Drug Company, Inc., and Morris & Dickson Co., Inc.

The Petition states numerous causes of action against the salespersons.  Of all the claims against the salespersons, the most readily substantiated is for negligence.  The Petition alleges that the salespersons engaged in systematic misrepresentations of the effects of Vioxx to Plaintiffs' prescribing physicians, that the misrepresentations were a cause-in-fact of their harm, that the salespersons owed Plaintiffs a duty to supply correct information to the prescribing physician, and that Plaintiffs were harmed by these misrepresentations.  Under Louisiana law, this is sufficient.

2

The Petition states numerous causes of action against the Distributor-Wholesaler. Of all the claims against the Distributor–Wholesale, the most readily substantiated is for redhibition and warranty claims.  This Court has on many occasions recognized that a wholesaler and distributor may be liable in their respective roles.  The Louisiana Supreme Court has made this clear for the last 30 years.

## II.    BACKGROUND.

As previously noted, Plaintiffs Sheila Stallworth, individually and on behalf of her deceased husband, William Stallworth, and Jane Vaden are putative class representatives on behalf of Louisiana residents who were harmed directly or indirectly from ingesting Vioxx.

Plaintiffs ingested Vioxx.  Plaintiffs' physician prescribed Vioxx for Plaintiffs' use. William A. Stallworth consumed Vioxx on or about June, 1998 through June, 2000, and Jane Vaden consumed Vioxx on or about 2001 through April, 2003.

In June 2000, William A. Stallworth died from the effects of ingesting Vioxx.  In April, 2003, Jane Vaden suffered a stroke resulting in pain, suffering and physical permanent injury resulting in limitation and medical expenses.

### A.    Merck's manic misrepresentations of Vioxx.

Vioxx is the brand name of rofecoxib, one of a class of drugs called "prostaglandins," which work to reduce inflammation and pain by providing analgesic and anti-inflammatory benefits to persons with, among other conditions, arthritis and muscle pain.  Prostaglandins are COX (cyclooxygenase) inhibitors; COX enzymes metabolize arachidonic acid to produce prostaglandins.

3

Vioxx is a COX-2 inhibitor, which is designed to produce prostaglandins at inflammatory sites, and to produce prostacyclin, a vasodilator and an inhibitor of platelet aggregation.

Merck submitted an Application to Market a New Drug for Human Use ("NDA") for rofecoxib to the United States Food and Drug Administration ("FDA") on November 23, 1998, for tablets, at doses of 12.5 mg and 25 mg, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea. This application was denoted NDA 21-042 by the FDA.

Merck also submitted an Application to Market a New Drug for Human Use ("NDA") for rofecoxib to the United States Food and Drug Administration ("FDA") on November 23, 1998, for oral suspension, at doses of 12.5 mg/mL and 25 mg/mL, for relief of the signs and symptoms of oesteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea.  This application was denoted NDA 21-052 by the FDA.

On or about May 20, 1999, the FDA approved NDA 21-042 and NDA 21-052 (hereinafter the "NDA") for rofecoxib, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea.

At the time the drug was approved by the FDA the labeling for rofecoxib stated, in the section entitled "Special Studies – Upper Endoscopy in Patients with Osteoarthritis," "Treatment with VIOXX 25 mg daily or 50 mg daily was associated with significantly lower percentage of patients with endoscopic gastroduodenal ulcers than treatment with ibuprofen 2400 mg daily.  However, the studies cannot rule out at least some increase in the rate of endoscopic gastroduodenal ulcers when comparing VIOXX to placebo."  A copy of the label is attached as Exhibit "A" to Plaintiff's Petition.

4

The "Warnings" section of the labeling for rofecoxib, at the time the drug was approved by the FDA, contains a section, "Gastrointestinal (GI) Effects – Risk of GI Ulceration, Bleeding, and Perforation."

Defendant Merck submitted sNDA-007 with the goal of establishing a gastrointestinal ("GI") safety claim for rofecoxib. In conjunction with the sNDA, Defendant Merck performed the Vioxx GI Outcomes Research (VIGOR) Protocol, No. 088-04, entitled "A Double-Blind, Randomized, Stratified, Parallel-Group Study to Assess the Incidence of PUBs During Chronic Treatment With MK-0966 or Naproxen in Patients With Rheumatoid Arthritis: U.S. Cohort." The VIGOR study was performed from January 6, 1999 through March 17, 2000.

The objectives of the VIGOR study were to (1) "determine the relative risk of confirmed PUB (Perforation, Ulcers, Bleeding) in patients taking MK-0966 50 mg daily compared to patients in the group taking naproxen 1000 mg/day." and (2) "study the safety and tolerability of MK-0966 in patients with rheumatoid arthritis."

In industry-sponsored studies presented at the European United League Against Rheumatism (EULAR), an organization in which Merck is a member and corporate sponsor, in June of 2000, it was shown that Vioxx use resulted in a statistically significant increase in hypertension and stroke. Not only did Merck do nothing to further accurately publish these studies, or warn consumers, but it denied the results with respect to hypertension in the official publication of the American Pharmaceutical Association, Pharmacy Today, *Spin War Aside, Lessons Emerge From COX-2 Trials*, in August 2000, page 3.

5

Merck continued to deny the ill health effects associated with Vioxx while at the same time reaping profits obtained through its non-disclosure and concealment. Merck engaged in a massive advertising and sampling program and gained continued increases in the market share, which enhanced Merck's financial stability to the detriment of its consumers. As a result of Merck's scheme, it reaped more than $2 billion in profit in the year 2000 alone, and appropriated approximately 23 percent share of the market.

Merck continued to profit from its scheme by withholding information from Plaintiffs, the consuming public, and the health care industry. For example, in November of 2000, Merck caused the publication of a study in the New England Journal of Medicine in which it knowingly downplayed and/or withheld the severity of cardiovascular risks associated with Vioxx consumption over naproxen consumption.

On or about August 29, 2001, the Journal of the American Medical Association (JAMA) published a peer-reviewed human epidemiologic study by the Cleveland Clinic Foundation, Cleveland, Ohio, Dr. D. Mukhisjee, et al., showing that Merck had concealed that the relative risk of developing a confirmed adjudicated thrombotic cardiovascular event (defined in the article as myocardial infarction, unstable angina, cardiac thrombus, resuscitated cardiac arrest, sudden or unexplained death, ischemic stroke, and transient ischemic attacks) among Vioxx users in Merck's trials, including VIGOR, at a 95% confidence interval ranged from 2.2 for event-free survival analysis, 2.38 compared to naproxen users, and 4.89 for developing serious cardiovascular events among aspirin-indicated patients. *See* Mukhisjee, D., et al, *Risk of Cardiovascular Events Associated With Selective Cox-2 Inhibitors*, J.A.M.A. 286:8, 954-959,

Aug. 22/29, 2001.  In addition, the annualized myocardial infarction rates for Vioxx users compared to placebo revealed a statistically significant increase among Vioxx users.

In the JAMA study, the authors stated that by decreasing PGI2 production [Vioxx] may tip the natural balance between prothrombotic thromboxane 2 and antithrombotic PGI2, potentially leading to an increase in thrombotic cardiovascular events.  *Id.* at 957.  In a follow-up peer-reviewed study reported in the Journal of the American College of Cardiology on or about February 6, 2002, Dr. Richard J. Bing conducted scientific testing and confirmed that the Cox-2 inhibitor tips the balance of prostacyclin/thromboxane in favor of thromboxane, leading to increased vascular and thrombotic events."  Bing, R., & Lomnicka, M., *Why Do Cyclo-Oxygenase-2 Inhibitors Cause Cardiovascular Events?*, J.A.C.C., 39:3, Feb. 6, 2002.  This is further supported by studies completed at the University of Pennsylvania.  Cheng, Y., et al., *Role of Prostacyclin in the Cardiovascular Response to Thromboxane A2*, Journal of Science, V. 296:539-541, Apr. 19, 2002.

On September 17, 2001, Thomas W. Abrams, R.Ph., MBA, Director of the FDA Division of Drug Marketing, Advertising, and Communications, issued a "Warning Letter" to Raymond V. Gilmartin, President and CEO of Defendant Merck, relating to "promotional activities and materials for the marketing of Vioxx (rofecoxib) tablets."  A copy of this letter is attached as Exhibit "B" to Plaintiffs' Petition.

The Warning Letter stated that Defendant Merck, individually and by and through the Distributor-Wholesaler Defendants and Detailer-Merck Servant Defendants, had "engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings

7

that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile for Vioxx." The letter further states: "Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (naproxen)."

The eight (8) page Warning Letter outlines, in detail, the conduct of Defendant Merck that supports the FDA's issuance of the Warning Letter, and makes the following "Conclusions and Requested Actions:": (1) Merck's promotional activities and materials improperly minimized the serious cardiovascular findings of the VIGOR study, (2) improperly minimized Vioxx's interaction with Coumadin, (3) include unsubstantiated comparative claims with other drugs, (4) promoted unapproved uses, and (5) lacked a fair balance. The FDA's letter required Merck to submit a response to the FDA including a comprehensive plan to disseminate corrective measures in order to remedy its "misleading messages." The FDA also required Merck to cease all violative promotional activitesm including disseminating violative promotional materials. Ultimately, the FDA required Merck to issue a "Dear HealthCare Provider" letter to "correct false or misleading impressions and information.

On April 11, 2002, the FDA approved a supplemental application for the use of Vioxx (rofecoxib) for rheumatoid arthritis, adding this indication to the previously approved indications for osteoarthritis and pain. The FDA also approved new labeling, a "Dear Doctor" letter, and a new patient package insert. A copy of the "Dear Doctor" letter is attached as Exhibit "D" to

Plaintiffs' Petition.  The labeling and the "Dear Doctor" letter contained information concerning the results of the VIGOR study.  The revised labeling further states that the administration of Vioxx 50 mg, was associated  with a higher incidence of gastrointestinal symptoms.  A copy of the revised labeling is attached as Exhibit "C" to Plaintiffs' Petition.

However, the revised "Patient Information" sheet does not add any information about the results of the VIGOR study." A copy of the revised "Patient Information Sheet" is attached as Exhibit "E" to Plaintiffs' Petition.  The "Patient Information" sheet is the only written document that is provided to a patient for whom Vioxx is prescribed.

**B.    The Petition's factual and legal allegations against Merck's salespersons and Distributor-Wholesalers.**

Plaintiffs' 200 paragraph, 41 page Petition contains numerous specific factual allegations against Merck's salespersons and Wholesaler-Distributors.  The Petition alleges, in part, the following:

> The distributor defendants participated in active concealment of the dangers and lack of safety inherent in Vioxx with full knowledge that physicians, nurses, hospitals, pharmacies, learned journal editors and others would be misled to the ultimate detriment of consumers in Louisiana.
>
> The negligence and breaches of warranty by and fair dealing Louisiana distributors of Vioxx and Merck Distributors and Detailers substantially increased the sales of Vioxx to consumers and distributor defendants actively encouraged the expenditure by Merck of $500,000,000 in advertising and promotions.  Much of detailing, advertisement and promotion constituted a consistent scripted pattern of misconduct and misrepresentation in which distributors and detailers and other marketeers were hired by Merck and taught to misrepresent to healthcare providers, pharmacies and others the lack of safety, risk and danger which they knew Vioxx posed to their customers' and patients' heart, vascular and other physical systems and organs.

Distributors participated, aided and abetted the manufacturers in keeping Vioxx on the market as long as possible and, through their trade associations and networks, assisted in suppressing harmful information.

Distributors and Merck Detailer Defendants assisted Merck representatives in setting up, hosting or otherwise contributing to healthcare provider meetings and conferences in Louisiana where accurate information about the safety and dangers of Vioxx was repressed and intentionally avoided.

Distributors and Merck Detailer Defendants cooperated with Merck in providing discounts, free samples and other incentives in Louisiana to pharmacists and healthcare providers to expand the market for a seriously dangerous drug with undisclosed dangers in Louisiana.

Distributors and Merck regional distributors, retail persons and employees and detailers not only attended conferences and meetings in Louisiana for the exploitation of Vioxx and other Merck drugs, but regularly interfaced and communicated in Louisiana with HMOs or similar groups regarding Vioxx.

Class Action Petition, ¶¶ CLIXV-CC.

The Petition also specifically provides notice to defendant salespersons and Distributor-Wholesalers of the causes of action levied against them. The Petition alleges the following causes of action against the sales representatives: (1) negligence, (2) strict products liability, (3) breach of express and implied warranties, (4) violation of the New Jersey Consumer Fraud Act, (5) violation of the Louisiana Unfair Trade Practices Act, (6) unjust enrichment, and (7) redhibition.[1]

---

[1] In its Notice of Removal, Merck argues that the claim for medical monitoring is not supported by the Petition. However, medical monitoring is a type of relief, not a separate cause of action. See LA. CIV. CODE art. 2315. As such, it is not discussed in this motion.

The Petition specifically alleges the following causes of action against the Distributor-Wholesalers:  (1) negligence, (2) strict products liability, (3) breach of express and implied warranties, (4) violation of the New Jersey Consumer Fraud Act, (5) violation of the Louisiana Unfair Trade Practices Act, (6) unjust enrichment, and (7) redhibition.

As will be shown below, the Petition's factual allegations taken as true establish a cause of action sufficient to overcome a Rule 12(b) challenge.

## III. THE STATE DEFENDANTS HAVE NOT BEEN FRAUDULENTLY JOINED BECAUSE THE ALLEGATIONS IN THE PETITION, TAKEN AS TRUE, SUPPORT VIABLE CAUSES OF ACTION UNDER LOUISIANA LAW.

The Fifth Circuit, sitting en banc, finally established a uniform standard for determining whether a defendant has been fraudulently joined to defeat diversity jurisdiction.   The Fifth Circuit "recognized two ways to establish improper joinder: (1) actual fraud in the pleading of jurisdictional facts, or (2) inability of the plaintiff to establish a cause of action against the non-diverse party in state court." Smallwood v. Illinois Central Railroad Co., 385 F.3d 568, 570 (5th Cir. 2004).

After concerning itself with only the second basis for fraudulent joinder (like this case), the Fifth Circuit stated the standard as follows:

> [T]he test for fraudulent joinder is whether the defendant has demonstrated that there is no possibility of recovery by the plaintiff against an in-state defendant, which stated differently means that there is no reasonable basis for the district court to predict that the plaintiff might be able to recover against an in-state defendant. To reduce possible confusion, we adopt this phrasing of the required proof and reject all others, whether the others appear to describe the same standard or not.

Id. at 573.

The Fifth Circuit then looked for guidance for the district courts to determine when a plaintiff would have "no possibility of recovery" against an in-state defendant or when "no reasonable basis for the district court" exists for recovery against an in-state defendant. The Fifth Circuit found guidance from Rule 12 and Rule 56:

> A court may resolve the issue in one of two ways. The court may conduct a Rule 12(b)(6)-type analysis, looking initially at the allegations of the complaint to determine whether the complaint states a claim under state law against the in-state defendant. Ordinarily, if a plaintiff can survive a Rule 12(b)(6) challenge, there is no improper joinder. That said, there are cases, hopefully few in number, in which a plaintiff has stated a claim, but has misstated or omitted discrete facts that would determine the propriety of joinder. In such cases, the district court may, in its discretion, pierce the pleadings and conduct a summary inquiry.

Id. at 573 (emphasis supplied).

Whatever the inquiry, it is Merck's burden, and it is a heavy one. "[T]he burden of proving fraudulent joinder is a heavy one and unless it is clear that the non-diverse defendants have been fraudulently joined the case should be remanded to the state court from which it was removed." McKee v. Kansas City Southern Railway, Co., 358 F. 3d 329, 337 (5th Cir. 2004). See also Travis v. Irby, 326 F. 3d 644, 649 (5th Cir. 2003).

### A.   The Petition alleges facts which, taken as true, establish Louisiana causes of action against the salespersons.

Plaintiffs' claims withstand Rule 12(b)(6) scrutiny.  Plaintiffs' Petition provides factual support under Louisiana law against the salespersons for the causes of action of (1)

12

negligence, (2) strict products liability, (3) breach of express and implied warranties, (4) violation of the New Jersey Consumer Fraud Act, (5) violation of the Louisiana Unfair Trade Practices Act, (6) unjust enrichment, and (7) redhibition.[2]

> **1.  The salespersons' pattern of misconduct, as alleged in the Petition, supports a claim of negligence.**

Louisiana employs the duty/risk analysis to determine negligence. <u>Bonin v. Ferrellgas</u>, 877 So.2d 89, 93 (La. 2004). To maintain a cause of action for negligence in Louisiana based on the Petition, the Plaintiff must demonstrate, at least facially, that defendant's conduct was a cause-in-fact of plaintiff's injury, that defendant owed plaintiff a duty, that the duty was breached, and that the plaintiff sustained harm. <u>Id.</u>

All of these elements are present in the Petition. First, the salespersons actions (misrepresentations and failure to warn) were a cause-in-fact of the named Plaintiffs' injuries. The Petition alleges that Vioxx was a dangerous drug as promoted by the salespersons. The Petition alleges that Vioxx caused Plaintiffs to suffer numerous health ill-effects, including the death of Plaintiff William Stallworth. <u>Petition</u>, at ¶¶ XI, XXXIX, XL, XLI. The Petition alleges that the salespersons "actively encouraged the expenditure by Merck of $500,000,000 in advertising and promotions." <u>Petition</u>, at ¶ CLIXVI. The Petition alleges that the salespersons

---

[2] Plaintiffs do not limit themselves to these causes of action. Under Louisiana's factual pleading requirement, Plaintiffs are only required to allege facts. Defendants will be liable for all causes of action which may be based on those facts, regardless of whether a cause of action was specifically pled.

followed a "scripted pattern of misconduct" in order to "misrepresent to healthcare providers . . . the lack of safety, risk, and danger which they knew Vioxx posed to [Plaintiffs] vascular and other physical systems and organs." Id. The Petition alleges that the salespersons established and participated in meetings and conferences in Louisiana where they misrepresented the safety and dangers of Vioxx.    Petition, at ¶ CLIXVIII.   The Petition alleges that the salespersons conduct resulted in the expansion of use of Vioxx within Louisiana. Petition, at ¶ CLIXIX.  The Petition alleges that the salespersons misconduct included communications with HMOs in Louisiana.  Petition, at ¶ CC.

Second, the Petition alleges that the salespersons owed Plaintiffs the duty to truthfully inform the healthcare providers of Vioxx's health effects.  Petition, ¶ XLIV.

Third, the Petition alleges that the salespersons breached this duty to Plaintiffs.  The Petition provides a litany of allegations of those breached duties:

> Failed to effectively warn Plaintiffs and physicians that numerous other methods of reducing or relieving pain and inflammation of osteoarthritis, relief of the pain and inflammation of rheumatoid arthritis, management of short term pain, and treatment of migraine headache attacks, including non-drug methods, should be the first or exclusive method of reducing those signs and symptoms, particularly for certain high risk individuals;
>
> Failed to provide adequate training and instruction to medical care providers for appropriate use of the drug Vioxx;
>
> Failed to warn Plaintiffs, prior to actively encouraging the sale of Vioxx, either directly or indirectly, orally or in writing, about the following:  1) the need for a battery of diagnostic tests to be performed on the patient prior to ingesting Vioxx to discover and ensure against potentially fatal side effects; or 2) the need for

14

comprehensive, regular medical monitoring to ensure early discovery of potentially fatal side effects;

Failed to warn that the risks associated with the ingestion of Vioxx exceeded the risks of other comparable forms of medication;

Negligently marketed Vioxx despite the fact that the risks of the drug were so high and the benefits of the drug were so speculative that no reasonable pharmaceutical company, exercising due care, would have done so;

Recklessly, falsely, and deceptively represented or knowingly omitted, suppressed, or concealed material facts regarding the safety and efficacy of Vioxx from prescribing physicians and the Plaintiffs, and that had prescribing physicians and the Plaintiffs known of such facts, the drug Vioxx would never have been prescribed to, or used by, Plaintiffs;

Remained silent despite their knowledge of the growing public acceptance of misinformation and misrepresentations regarding both the safety and efficacy of Vioxx, and did so because the prospect of huge profits outweighed health and safety issues, all to the significant detriment of Plaintiffs;

Failed to have reasonable and meaningful warnings regarding the significant risk of cardiac problems associated with Vioxx. The warnings given by the Defendants did not accurately reflect the existence of the risk, let alone the evidence, symptoms, scope or severity of such injuries;

Failed to perform their post-manufacturing and continuing duty to warn which arose when they knew, or with reasonable certainty should have known, that their drug was being prescribed in a fatal or injurious combination or manner;

Marketed and sold a drug no reasonable pharmaceutical company exercising due care would have because the drug was ineffective for its intended use and produced enormous risk of life threatening complications;

15

> Engaged in a scheme to market Vioxx as a relatively harmless, effective drug, when in fact its use carried serious risks, and the drug was only minimally efficacious; and
>
> Were otherwise careless, negligent, grossly negligent, reckless, and acted with willful, wanton and a malicious disregard for the rights of Plaintiffs.

Petition, at ¶ XLVIII(c)(e)(f)(g)(h)(i)(j)(n)(o)&(p).

Louisiana courts have repeatedly held that similar allegations will defeat exceptions of no cause of action – the Louisiana equivalent to a Rule 12(b)(6) motion. See, e.g., Lejeune v. Rayne Branch Hosp., 556 So.2d 559 (La. 1990) (overruling defendant's exception of no cause of action where the allegations in the petition satisfied the duty/risk analysis); Conerly v. State, 858 So.2d 636 (La. App. 1st Cir. 2003); Nelson v. Williams, 707 So.2d 436 (La. App. 5th Cir. 1997); Craft v. Allstate Ins. Co., 663 So.2d 116 (La. App. 3d Cir. 1995).

In its Notice of Removal, Merck argues that the Petition's allegations fail because the salespersons do not owe a duty to Plaintiffs.  Merck argues that the learned intermediary doctrine dictates that the salespersons' only duty is to the prescribing doctor, not the patient.

Merck is mistaken for a few reasons.  First, as a threshold matter, it is unclear whether Louisiana has in fact adopted the learned intermediary doctrine.  Neither the Louisiana Supreme Court nor the Louisiana Fourth Circuit Court of Appeal have ever addressed the issue. The cases cited by Merck are intermediate appellate court cases or federal cases which erroneously relied upon those intermediate appellate court cases. Only the Louisiana First and Fifth Circuit Courts of Appeal have found that the learned intermediary applies in Louisiana.

16

See, e.g., Cobb v. Syntex Laboratories, Inc., 444 So.2d 203, 205 (La. App. 1st Cir. 1983);

Kinney v. Hutchinson, 468 So.2d 714, 716-18 (La. App. 5th Cir. 1985).   As a result, the law is

undecided, and any doubt should be resolved in favor of Plaintiffs.   See Gray v. Beverley

Enterprises-Mississippi, Inc., 390 F.3d 400, 405 (5th Cir. 2004) ("Critically, [in deciding a motion

to remand] all disputed questions of fact and all ambiguities in state law must be resolved in

favor of the plaintiff.").

　　　　Second, even assuming it is a viable defense in Louisiana, the learned intermediary

doctrine is a factual inquiry which is inappropriate to decide under a Rule 12(b)(6) standard

when the petition alleges that the warning was inaccurate, unclear, or ambiguous.   Bealer v.

Hoffman-La Roche, Inc., 729 F. Supp. 43, 44-45 (E.D. La. 1990); Calhoun v. Hoffman-La

Roche, Inc., 768 So.2d 57, 61-62 (La. App. 1st Cir. 2000).   Every case cited by Merck which

applied the learned intermediary doctrine reviewed the issue pursuant to a motion for summary

judgment, not Rule 12(b) or under the Louisiana exception of no cause of action.   See Willett

v. Baxter Int'l, Inc., 929 F.2d 1094 (5th Cir. 1991); Stahl v. Novartis Pharm Corp., 283 F.3d 254

(5th Cir. 2002).

　　　　Not only does the Petition clearly allege facts which, taken as true, establish that Vioxx's

warning was inaccurate, unclear, and ambiguous, but the Petition quotes a letter from the FDA

to Merck ordering it to amend Vioxx's warning to better reflect its dangerousness.

　　　　Especially important is that the Petition specifically includes another warning letter from

the FDA to Merck which specifically criticizes and finds that Meck's marketing campaign is rife

with misrepresentations.  On September 17, 2001, Thomas W. Abrams, R.Ph., MBA, Director of the FDA Division of Drug Marketing, Advertising, and Communications, issued a "Warning Letter" to Raymond V. Gilmartin, President and CEO of Defendant Merck, relating to "promotional activities and materials for the marketing of Vioxx (rofecoxib) tablets."  A copy of this letter is attached as Exhibit "B" to Plaintiffs' Petition.

The Warning Letter stated that Defendant Merck, individually and by and through the Distributor-Wholesaler Defendants and Detailer-Merck Servant Defendants, had "engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile for Vioxx."  The letter further states: "Specifically, your promotional campaign discounts the fact that in the  VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (naproxen)."

The eight (8) page Warning Letter outlines, in detail, the conduct of Defendant Merck that supports the FDA's issuance of the Warning Letter, and makes the following "Conclusions and Requested Actions:": (1) Merck's promotional activities and materials improperly minimized the serious cardiovascular findings of the VIGOR study, (2) improperly minimized Vioxx's interaction with Coumadin, (3) include unsubstantiated comparative claims with other drugs, (4) promoted unapproved uses, and (5) lacked a fair balance.  The FDA's letter required Merck

18

to submit a response to the FDA including a comprehensive plan to disseminate corrective measures in order to remedy its "misleading messages."  The FDA also required Merck to cease all violative promotional activitesm including disseminating violative promotional materials.  Ultimately, the FDA required Merck to issue a "Dear HealthCare Provider" letter to "correct false or misleading impressions and information."

With such specific allegations (and support) for Vioxx's warning as inaccurate, unclear, and ambiguous, it would be impossible for this court to determine the issue of learned intermediary without delving into the merits of this case.  See Travis v. Irby, 326 F.3d 644, 651 n.3 (5th Cir. 2003).  Such a merits inquiry on a motion to remand was especially warned against by the Fifth Circuit:

> While the decision regarding the procedure necessary in a given case must lie within the discretion of the trial court, we caution that a summary inquiry is appropriate only to identify the presence of discrete and undisputed facts that would preclude plaintiff's recovery against the in-state defendant. In this inquiry the motive or purpose of the joinder of in-state defendants is not relevant. We emphasize that any piercing of the pleadings should not entail substantial hearings. Discovery by the parties should not be allowed except on a tight judicial tether, sharply tailored to the question at hand, and only after a showing of its necessity. Attempting to proceed beyond this summary process carries a heavy risk of moving the court beyond jurisdiction and into a resolution of the merits, as distinguished from an analysis of the court's diversity jurisdiction by a simple and quick exposure of the chances of the claim against the in-state defendant alleged to be improperly joined. Indeed, the inability to make the requisite decision in a summary manner itself points to an inability of the removing party to carry its burden.

Smallwood, 385 F.3d at 574 (emphasis supplied) (footnotes omitted).

19

Third, Merck's contention that a salesperson does not owe a duty to supply correct information is flat wrong.  Louisiana law specifically provides that a person will be held responsible for misrepresentations relied upon by a third party if it was reasonable for the third party to rely upon the misrepresentation and if the person making the misrepresentation knew or should have known that a third party would rely upon the misrepresentation.  Barrie v. Exterminators, Inc., 625 So.2d 1007 (La. 1993).

This is especially true in this case when the salespersons' misconduct was systematic and relentless.  In a document generated by Vioxx, Merck demonstrated to what length it wanted its salespersons to go to misrepresent Vioxx.  The document, entitled "Dodge Ball Vioxx," provides 14 possible questions prescribing doctors may ask of the Merck salespersons.  "Dodge Ball Vioxx," attached as Exhibit "A".[3]  Each question is referred to as an "obstacle" for a Merck salesperson to avoid.  Below are a list of some of the "obstacles" a salesperson may run into when speaking with a doctor:

> "I am concerned with the potential **edema** that occurs with Vioxx"
>
> "I am concerned with dose-related increases in **hypertension** with Vioxx."
>
> "I am concerned about the **cardiovascular** effects of Vioxx?"
>
> "The competition has been in my office telling me that the incidence of **heart attacks** is greater with Vioxx than Celebrex."

---

[3] The "Dodge Ball Vioxx" document was initially designated as confidential in the New Jersey litigation.  Since then, the New Jersey Court has declassified it.  Plaintiffs referred to the Dodge Ball Vioxx document in their Initial Position Paper previously filed with this Court.

Vioxx cannot be used for longer than five days when treating

patients for acute pain?"

"I use Celebrex.  I'm concerned about the **safety profile** with

Vioxx?"

"Searle/Pfizer just presented me with data which showed

Celebrex 800 mg daily did not exhibit dose dependent increases

in side effects compared to the OA and RA doses, and that Vioxx

exhibited dose dependent **increases in side effects** with the 50

mg dose."

Dodge Ball Vioxx, "Obstacles" 1,2, 4, 5, 7, 8 & 10 (emphasis supplied).

The last four pages of the document instruct the salespersons to respond to these concerns (or "obstacles") in only one way:  **DODGE! DODGE! DODGE! DODGE!**

In following Merck's instruction, the salespersons misrepresented the facts.  In the course of its misrepresentations, the salespersons knew that they were making misrepresentations.  The salespersons knew they were misrepresenting Vioxx's safety profile because Merck told them to do it.  The "Dodge Ball Vioxx" document establishes the connection.  Merck instructed its salespersons to misrepresent Vioxx's safety, and Merck provided the salespersons with the discretion to use a misrepresentation of their choosing.

Accordingly, Plaintiffs' Petition states facts which taken as true support a claim for negligence against the salespersons.  See Leboeuf v. Shell Oil Co., 2004 U.S. Dist. LEXIS

21

17145 (E.D. La. 2004) (Engelhardt, J.) (remanding case to state court after finding that state defendant was not fraudulently joined where Plaintiffs' Petition satisfied the duty/risk analysis under Louisiana law of negligence); Bright v. No Cuts, Inc., 2003 U.S. Dist. LEXIS 19123 (E.D. La. 2003) (Africk, J.) (same); Cager v. Norfolk S. R.R., 2003 U.S. Dist. LEXIS 4842 (E.D. La. 2003) (Knowles, M.J.) (same).

This Court should pretermit a review of Plaintiffs' other causes of action and order remand on this finding alone.  Green v. Amerada Hess Corp., 707 F.2d 201, 208 (5th Cir. 1983) ("If even one of [the plaintiff's] many claims might be successful a remand to state court is necessary.").  Nonetheless, Plaintiffs' Petition more than aptly provides support for its other causes of action against the salespersons.

> **2.    The Petition alleges sufficient facts to support claims under the Louisiana Products Liability Act, for breach of warranty, and redhibition against the salespersons.**

Although the salespersons are neither sellers nor manufacturers of Vioxx, the Petition states a cause of action under the Louisiana Products Liability Act, La. Rev. Stat. § 9:2800.52, ("LPLA"), for breach of warranty, and redhibition because  the salespersons distributed free samples to Plaintiffs.

The Petition alleges that the salespersons provided free samples and discounts of Vioxx to healthcare providers and that these free samples were then distributed to the putative class members. Petition, at CLXIX.  While no "sale" occurred, the free distribution of Vioxx acted as the functional equivalent to a sale.  This distribution placed Vioxx into the stream of

commerce in Louisiana just as any sale would.  Merck, in its capacity as manufacturer, gave the salespersons the free samples of Vioxx to disseminate.  The salespersons were merely acting as Merck-the-manufacturer's agent.  As such, the salespersons are liable to Plaintiffs under the theory of respondeat superior.  See LA. CIV. CODE art. 2320.  The technical requirement of a manufacturer is therefore met.

The Petition's breach of warranty and redhibition claims against the salespersons are even stronger.  Not only did the salespersons place Vioxx into the stream of commerce in Louisiana by distributing free samples, they did so with active and affirmative misrepresentations concerning the drugs safety and efficacy.  As discussed above, the salespersons engaged in systematic misrepresentations to induce Plaintiffs to purchase Vioxx.

> **3.    The Petition alleges facts which could support a court's finding that the salespersons would be liable to Plaintiffs under the New Jersey Consumer Fraud Act.**

In its Notice of Removal, Merck argues that a court would not apply the New Jersey Consumer Fraud Act under the Louisiana conflicts of law provision of LA. CIVIL CODE art. 3542. Merck argues that  Louisiana interests outweigh New Jersey's.  Importantly, Merck does not argue if a Louisiana court applied New Jersey law whether the salespersons would be liable.

The question at issue in this motion to remand is not whether a Louisiana court would in fact apply New Jersey law against the salespersons but merely whether New Jersey has enough interests in this matter such that a Louisiana court "would have a basis" for applying Louisiana law against the salespersons.  After all, if this Court ultimately remands this matter, the determination of whether to in fact apply New Jersey law would fall to the state court.

In this case, the Petition alleges more than enough facts for a Louisiana court to apply New Jersey law against the salespersons.  First, Merck is a New Jersey corporation, incorporated under the laws of New Jersey with its principal place of business located in New Jersey.  Second, the salespersons are Merck employees and, as such, act as an extension of this New Jersey corporation.  Third, New Jersey has a strong public policy in favor of enforcing its laws against resident corporations. NL Industries, Inc. v. Commercial Union Ins. Co., 65 F.3d 314 (3d Cir. 1995); J. Josephson, Inc. v. Crum & Forester Ins. Co., 679 A.2d 1206 (N.J. App. Div. 1996).  Fourth, as the Petition alleges, the salespersons followed scripted misrepresentation which were generated at Merck's corporate offices in New Jersey. Petition, at CLIXVI ("Much of detailing, advertisement, and promotion constituted a consistent scripted pattern of misconduct and misrepresentations . . . .").  Consequently, the tortious conduct actually originated in New Jersey and was carried out in Louisiana.

New Jersey's significant interests in enforcing its own law against a resident corporation and its agents is found in the New Jersey Consumer Fraud Act itself.  New Jersey's Consumer Fraud Act is specific and severe.  The New Jersey Fraud Act reads as follows:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

N.J.S.A § 56:8-1.

24

The New Jersey Fraud Act proscribes any person's knowing misrepresentations connected to the sale of merchandise.  Id.  It would no doubt apply to the salespersons.  If a defendant is found guilty of this violation, it "shall be liable for a refund of all monies acquired by means of any practice declared herein to be unlawful."  N.J.S.A. § 56:8-2.  The Petition alleges that Merck expended approximately $500,000,000 in the marketing and advertising of Vioxx.  The portion attributable to Louisiana class members would be substantial.

With so many significant interests in favor of New Jersey, a Louisiana court could reasonably apply New Jersey's Consumer Fraud Act.  In re Propulsid Liab. Litig, 208 F.R.D. 133, 140 (E.D. La. 2004) (Fallon, J.) (denying class certification, in part, because of the possibility of so many different states' substantive laws applying).

### 4.   The Petition alleges facts sufficient to support a LUTPA claim and an unjust enrichment claim against the salespersons.

Merck contends that the Petition does not allege specific facts to support a LUTPA claims against the salespersons and that Plaintiffs are not consumers of the salespersons. Merck does not specify exactly how the Petition lacks specificity.

LUTPA provides for a private cause of action for anyone "who suffers any ascertainable loss of money . . . as a result of the use or employment by another person of an unfair or deceptive method, act or practice."  LA. REV. STAT. § 15:1409(A).  LUTPA claimants must be consumers or competitors.  Id. § 15:1405.

The Merck salespersons distributed free samples to Louisiana healthcare providers who in turn gave these samples to putative class members.  The putative class members

25

then ingested these free samples.  Distributing these free samples led Plaintiffs to fill prescriptions of Vioxx.  Merck erroneously equates "consumer" with actual sale.  This is simply too narrow a designation.

The salespersons were part of Merck's overall marketing scheme to misinform the public.   The salespersons were Merck's agents and made misrepresentations to physicians, knowing that it would induce the physician to prescribe Vioxx to patients.  The salespersons' contact with the physicians was an extension of Merck's overall marketing scheme of reaching its consumers through prescribing physicians.

As for Merck's lack of specificity argument, the Petition amply alleges facts which, taken as true, establish liability under LUTPA against the salespersons.  As previously stated, the Petition identifies the deceptive practices, identifies who carried out the deceptive practices, identifies the means by which the deceptive practices were carried out, and identifies how Plaintiffs were harmed by the deceptive practices.  This is enough to satisfy a claim under LUTPA.  LA. CODE CIV. PROC. art. 926(5).

Similarly, the Petition specifically states a claim for unjust enrichment.  The Petition alleges:  (1) Merck became enriched through the salespersons' misconduct; (2) Plaintiffs became improvishered by relynig upon the salesperons' misrepresentations to purchase Vioxx; (3) Merck's enrichment via the salespersons was achieved through deceit; and (4) Plaintiffs have no other remedy at law.  Industries Cas. v. Durbin, 837 So.2d 1207, 1214 (La. 2003).

**B.**     **The Petition alleges facts which, taken as true, support causes of action against the Distributor-Wholesaler defendants.**

The Petition specifically alleges the following causes of action against the Louisiana distributor-wholesalers Morris & Dickson Co., LLC, and Louisiana Wholesale Drug Company, Inc.:  (1) negligence, (2) strict products liability, (3) breach of express and implied warranties, (4) violation of the New Jersey Consumer Fraud Act, (5) violation of the Louisiana Unfair Trade Practices Act, (6) unjust enrichment, and (7) redhibition.

In its Notice of Removal, Merck summarily argues that the Petition fails to state a cause of action against the Distributor-Wholesale defendants.  (Merck's argument is focused on defendants Allen Dickson, Inc. and Morris & Dickson Co, LLC.  However, Allen Dickson, Inc. is a Texas Corporation and its presence does not destroy diversity.  Merck apparently forgot to argue that defendant Louisiana Wholesale Drug Company (a Louisiana Corporation) was fraudulently joined.  For purposes of this motion, Plaintiffs are addressing the causes of action as levied against the Louisiana defendants Allen Dickson, Inc., and Louisiana Wholes Drug Company.)

**1.**     **This Court has recognized time and time again that Louisiana recognizes redhibition and warranty claims against wholesalers and Distributors.**

This Court has recognized numerous times that a wholesaler may be liable under Louisiana law for claims of redhibition and breach of warranty.  See, e.g., Walker v. Philip Morris, inc., 2003 U.S. Dist. LEXIS 14017 (E.D. La. 2001); Scott v. R.J.R. Tobaccos Company, 2001 U.S. Dist. LEXIS 10014 (E.D. La. 2001); Lanzas v. Am. Tobacco Co.,

2001 U.S. Dist. LEXIS 5968 (E.D. La. 2001); Murphy v. R.J. Reynolds, 171 F.Supp.2d 636

(E.D. La. 2001) (Fallon, J.); Cooper v. Brown & Williamson Tobacco Corp., 2001 U.S. Dist.

7855 (E.D. La. 2001).

        In recognizing Louisiana's acceptance of redhibitory and warranty claims against

wholesalers, this Court was merely following Badon v. R. J. R. Nabisco, Inc., 236 F.3d 282

(5th Cir. 2002), in which the Fifth Circuit held: "We conclude that there is arguably a

reasonable basis for predicting that plaintiffs might establish redhibition or article 2475

liability against the Louisiana wholesalers under Louisiana law as it stands today . . . ." Id.

at 286.   The Fifth Circuit recognized that there is no privy requirement in Louisiana and

remanded the matter to state court.

        Bradon was following the Louisiana Supreme Court which for over 30 years has

followed the same rule: "Louisiana has aligned itself with the consumer-protection rule, by

allowing a consumer without privity to recover, whether the suit be strictly in tort or upon

implied warranty." Media Production Consultants, Inc. v. Mercedes-Benz of North America,

Inc., 262 So.2d 371, 380 (La. 1972).

        In Media Production, the Louisiana Supreme Court confronted the following

scenario:

> Media [the plaintiff purchaser] asserts that MBNA [the
> distributor] occupies the position of manufacturer and, under
> sound legal theory, no privity of contract is required for a
> consumer to bring an action in warranty against a
> manufacturer of a defective product . . . .

> The maker of Media's vehicle is a foreign [German] corporation, not qualified to do business in the United States. In its distribution agreement, MBNA assumes the total responsibility for marketing the cars in the United States and for selling, servicing, and establishing franchise dealerships. Its name appears upon the Dealers Claims Policies and Procedures Manual, the owner's service policy, and the owner's automobile manual.
>
> It operates a vehicle distribution center and inspects, adjusts, and prepares the automobiles for placement in the hands of a dealer for retail sale.
>
> Insofar as the American consumer is concerned, MBNA occupies the position of manufacturer. We hold, therefore, that the liability of MBNA to the American consumer is that of the manufacturer of a defective vehicle.

Id.

In Louisiana, a plaintiff is allowed to recover from the distributor and the wholesaler for claims of redhibition and implied warranty. As reasoned by Louisiana's Second Circuit:

> The 1993 Revision Comments to Article 2545, again, written after the enactment of the LPLA, reflect that Media's and Rey's broad interpretation of the Code's redhibition principles still apply to a manufacturer who is not the immediate vendor of the plaintiff/vendee. Comment (i) states that "the assembler of things manufactured by another is a seller in bad faith." Comment (d) states that "the buyer may bring action against all sellers in the chain of sales back to the primary manufacturer to rescind a sale for breach of implied warranty." See also La. C.C. art. 2548. The jurisprudence cited in support of the Revision Comments reflects that Ranger, as an alleged assembler/manufacturer without direct privity with Bearly, is nevertheless subject to claims in redhibition. Spillers v. Montgomery Ward & Co., Inc., 294 So. 2d 803 (La. 1974); Womack and Adcock v. 3M Business Products Sales, Inc., 316 So. 2d 795 (La. App. 1st Cir. 1975); see also LeGros v. ARC Services, Inc., 03-918 (La. App. 3d Cir. 2/25/04), 867 So. 2d 63 and De Atley v. Victoria's Secret Catalogue, LLC, 04-0661 (La. App. 4th Cir. 5/14/04), 876 So. 2d 112.

<u>Bearly v. Brunswick Mercury Marine Div.</u>, 888 So. 2d 309, 314 (La.  App. 2d Cir. 2004).

Merck's argument fails.  There is no privy requirement.  A distributor and wholesaler can be liable to the purchaser under Louisiana law for the claims of redhibition and implied and express warranty.  It has been the law in Louisiana for over 30 years.  As a result, this matter should be remanded to state court.

> **2.      The Petition states a cause of action under Louisiana law for negligence, LUTPA, LPLA, New Jersey Consumer Fraud Act, and unjust enrichment.**

In its Notice of Removal, Merck argues that the Petition does not state any claim against the Distributor-Wholesalers for the same reasons it argues that the Petition does not state a claim against Merck's salespersons.

Plaintiffs respond in kind and adopt all preceding reasons for arguing that the allegations in the Petition, taken as true, establish claims under Louisiana law for negligence, LUTPA, LPLA, and unjust enrichment.  Plaintiffs further maintain that based upon the aforementioned, it is possible that a Louisiana court would apply New Jersey's Consumer Fraud Act.

## IV.     CONCLUSION.

For the foregoing reasons, Plaintiffs respectfully request that this matter be remanded to the Civil District Court for the Parish of Orleans.

Respectfully submitted,

_____

**RUSS M. HERMAN**, La. Bar No. 6819
**LEONARD A. DAVIS**, La. Bar No. 14190
**STEPHEN J. HERMAN**, La. Bar No. 23129
**SOREN E. GISLESON**, La. Bar. No. 26302
**HERMAN HERMAN KATZ & COTLAR, LLP**
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Telephone: (504) 581-4892
Fax No. (504) 561-6024

And

**BOB F. WRIGHT**, La. Bar No. 13691
**JAMES P. ROY**, La. Bar No. 11511
DOMENGEAUX WRIGHT ROY & EDWARDS
556 Jefferson Street, Suite 500
P.O. Box 3668
Lafayette, LA 70502
Telephone: (337) 233-3033
Fax: (337) 232-8213

31

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that the foregoing has been served on all counsel of record by placing a copy of same in the U.S. Mail, postage prepaid, properly addressed, this  18th  day of  April, 2005.

SOREN E. GISLESON

SEE RECORD FOR

EXHIBITS

OR

ATTACHMENTS

NOT SCANNED