FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2005 MAY 27 PM 1:46

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to All Cases | * | |
| | * | MAGISTRATE JUDGE KNOWLES |

* * * * * * * * * * * * * * * * *

### DEFENDANT MERCK'S ADDITIONAL SUBMISSION REGARDING COMMUNICATIONS WITH PLAINTIFFS' HEALTHCARE PROVIDERS

In discussing counsel communications with plaintiffs' healthcare providers at the monthly status conference earlier this week, the Court correctly recognized that this litigation raises unique concerns because "some of the healthcare providers, particularly the ones who prescribed the drug, are potential defendants." (May 23, 2005 Transcript at 22:1-3.) According to the Court, "the question is should the plaintiffs have access to that individual, who is or may well be a defendant or a potential defendant in the lawsuit." (*Id.* at 22: 4-6.)

The briefing filed so far on this issue indicates that the opposing parties' concerns are a mirror image: Plaintiffs' counsel worry that if defense counsel are afforded unfettered *ex parte* access to the treating physicians, they may improperly influence the doctors' view of this litigation. Meanwhile, defense counsel worry that if plaintiffs' counsel are likewise afforded

___ Fee_____
___ Process_____
_X_ Dktd_____
___ CtRmDep_____
___ Doc. No._____

794218v.1

unfettered *ex parte* access to the treating physicians, plaintiffs' counsel may improperly influence the doctors.

Defendants' compromise proposal seeks to address the Court's stated concerns (as well as those of both plaintiffs' and defendants' counsel) by simply requiring that all contacts with physicians by either party take place with both parties present. In short, permitting opposing counsel's presence at informal interviews will serve as a check on any undue influence sought to be exerted by either party on these key witnesses.

In this supplemental filing, defendants offer three points:

***First***, in their opening brief, plaintiffs argued that this Court had full authority to bar completely defendants' access to treating physicians, even though many courts clearly would permit such access. According to plaintiffs, "[t]he Federal Rules of Civil Procedure, and particularly Rule 16, give the court wide discretion in matters of case management." (Pl. Br. at 3; *see also id.* at 3-4 (citing *Buffington v. Wood*, 351 F.2d 292, 299 (3d Cir. 1965) ("The clear dictate of [Rule 16] is to give the courts, through the issuance of pretrial orders, wide discretion and power to advance causes and simplify procedure before presentation of cases to juries."); *Sherman v. United States*, 801 F.2d 1133, 1135 (9th Cir. 1986) (Rule 16 is "broadly remedial and its purpose is to encourage forceful judicial management").) On this, plaintiffs are correct: "Rule 26 vests the trial judge with broad discretion to tailor discovery." *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998).

Now that the question is whether ***plaintiffs' counsel's*** access to physicians may be restricted, they have switched positions, urging that the Court lacks authority to impose such limitations. Plaintiffs had it right the first time. The Court has broad authority to supervise the

process of discovery and other fact development in these proceedings – authority that includes issuing an order requiring that all contacts with physicians take place with both parties present. *Cf. Shots v. CSX Transp., Inc.*, 887 F. Supp. 206, 208 (S.D. Ind. 1995) ("We believe that the Federal Rules of Civil Procedure leave to the district court the discretion whether to allow *ex parte* conferences [with physicians]."). Contrary to plaintiffs' apparent belief, this authority is not dependent on whether other courts, on different records, have barred such contact. (*See* Pl. Reply at 4.)  In none of the cases cited by plaintiffs was the court asked to bar *ex parte* physician contact by both sides in the litigation and, thus, none of those cases addresses the proposal offered here. More importantly, defendants are unaware of a single court that has permitted unfettered physician contacts in the face of a demonstrated record of potential abuses, such as what is before the Court in this instance. (*See* Def. Br. at 8-9; discussion, *infra*.) The wide discretion enjoyed by the courts is necessary precisely to deal with novel circumstances like those at hand, and clearly permits the Court to place limitations on all parties' access to key witnesses in order to reduce the risk of abuse or undue influence.

Plaintiffs' suggestion that such an order runs afoul of state law privilege principles is wrong. What is before the Court is not a privilege issue at all, since the filing of a lawsuit normally waives any treating physician privilege that may exist. *See, e.g., Langdon v. Champion*, 745 P.2d 1371 (Alaska 1987) (filing of personal injury lawsuit waives privilege); Kan. Stat. Ann. § 60-427(d) (no privilege in an action placing patient's medical condition at issue); Me. R. Evid. 503(e)(3) (there is "no privilege" when medical condition is put at issue in lawsuit). Instead, the Court presently confronts nothing more than a question of how information may be accessed – an issue governed by federal procedural law. *See, e.g., Shots*, 887 F. Supp. at

207 ("the issue of how discovery may be conducted is one of federal procedure"); *Felder v. Wyman*, 139 F.R.D. 85, 91 (D.S.C. 1991) ("the Federal Rules of Civil Procedure govern the discovery conducted in this case"). Clearly, the question whether *ex parte* contact with treating physicians should be permitted is a matter of federal procedure and inherent case management authority. It is thus entirely within this Court's discretion to enter orders necessary to ensure an efficient, fair discovery process.

**Second**, plaintiffs have not responded to defendants' assertion that allowing plaintiffs' lawyers *ex parte* access to treating physicians would raise ethical and fundamental fairness concerns at least as serious as any issues generated by *ex parte* defense counsel interviews. In fact, plaintiffs' counsel concede that giving them a "unilateral right to contact a plaintiff's treating physician may be a less than ideal situation." (Pl. Reply at 4.)

As Merck has explained, permitting plaintiffs' lawyers unfettered *ex parte* access to plaintiffs' physicians raises several significant red flags. In particular, as the Court already has perceived, "the nuance in this case is that some healthcare providers are defendants or potential defendants in the MDL." (*See* May 23, 2005 Minute Order at 5.)

Defendants' concerns about this issue are highlighted by a letter sent to Merck a few days ago by a Florida plaintiffs' lawyer threatening to sue 800 doctors because Merck refused to waive its right to remove future cases to federal court. (*See* May 23, 2005 letter from Marcus W. Viles to R. Michael Underwood, attached as Ex. A.) In the letter, plaintiffs' counsel demands that Merck promise not to remove his cases or he will tell doctors that Merck is to blame for their being named as defendants: "I merely want to confirm that Merck is herein advising me that the doctor is an essential necessary party in every case and must be joined or else I will face the

learned intermediary defense, the scapegoat-the-doctor-empty-chair defenses, and face guaranteed removal if I don't. . . . ***I will be sure to advise the defendant doctors why their joinder was so necessary.***" (*Id.* (emphasis added).) This blatant threat to sue physicians for tactical purposes (in this case, to avoid federal jurisdiction) is just one hint of what is to come absent balanced regulation of physician contacts.

Of course, this risk is heightened by the monumental importance plaintiffs have placed on the physicians' testimony. Clearly, plaintiffs' counsel believe that the treating physicians are the most critical witnesses in these actions and that convincing them to support plaintiffs' arguments is essential to their success. (*See* Ex. A to Defendant Merck's Submission Regarding Communications With Plaintiffs' Healthcare Providers ("Def. Br.") ("The only way a plaintiff will win a VIOXX case is if the treating physicians support plaintiffs' case."); ("The winner of the case will likely be the party who convinces the subsequent treating physician to support their case."); ("preparation of these critical witnesses is the key!"); ("If the treating physicians are supportive, you will have hit a home run!").) Counsel's perception that their cases rise and fall on the testimony of the treating physician could easily result in the implied or express exertion of improper pressure on a physician. For example, physicians who resist pressure from plaintiffs' counsel to agree that they would not have prescribed VIOXX had they been aware of "all the information that [they] have now seen for the first time in this litigation," *id.*, might understandably be concerned that such a view might lead to a malpractice suit – a concern that

could unfairly and unwittingly influence their views. The presence of defense counsel at physician interviews would go a long way toward preventing any such undue influence.[1]

In addition, as Merck has argued, plaintiffs would extract a large strategic advantage from the rule they propose – that only defense counsel be precluded from interviewing the most critical witnesses in these cases. (*See* Pl. Br. at 10; Pl. Reply Br. at 6.) Notably, plaintiffs do not even deny that they would receive a tactical advantage under their proposed rule or that they could use their exclusive access to their substantial advantage.

***Finally***, Merck's compromise proposal has the added benefit of ameliorating any concerns regarding inadvertent disclosure of privileged information. As plaintiffs point out, some courts have restricted *ex parte* defense counsel access to treating physicians, even where the privilege is deemed waived by plaintiffs filing a lawsuit and putting such matters at issue, because they worry the physician might accidentally disclose privileged information unrelated to the medical condition placed at issue in the lawsuit.[2] As one court put it, the "danger of ex parte interviews of a doctor by adverse counsel is that the plaintiff's lawyer is afforded no opportunity to object to the disclosure of medical information that is remote, irrelevant, or compromising in a context other than the lawsuit at hand." *Kitzmiller v. Henning*, 437 S.E.2d 452 (W. Va. 1993) (Pl. Br. at 2 n.7); *see also* Pl. Reply at 2 n.1 (citing the "thorny issue of inadvertent disclosure of irrelevant information").) However, the presence of plaintiffs' counsel contemplated by Merck's compromise proposal would adequately guard against any accidental disclosure of privileged

---

[1] Merely requiring plaintiffs' counsel to advise doctors in advance of an interview that their statements could be used against them in a malpractice action would not address defendants' concerns. Indeed, such a warning could itself have the very coercive effect upon treating physicians about which defendants are concerned.

[2] In reality, the danger of such disclosure is probably overstated. *See Felder v. Wyman*, 139 F.R.D. 85, 88-89 (D.S.C. 1991) (noting that defendants "have no interest in discovering information irrelevant to the [plaintiff's] medical condition and treatment as put at issue by [the] lawsuit," and "the non-party treating physicians . . . have no incentive for irrelevant disclosures").

information. Counsel could certainly intervene and object to any questions or responses that strayed from the medical issues relevant to the litigation.

Moreover, it is apparent that all parties have a greater interest in interviewing physicians with respect to unprivileged information, rather than patient information that may have been subject to a privilege before being waived by the initiation of litigation. Both sides agree that the most critical information possessed by the treating physicians is their own knowledge of the product. That information was never subject to any privilege. Indeed, while the physician's opinion regarding whether VIOXX caused a particular plaintiff harm is significant, the physician's own product knowledge may be of far greater significance to the learned intermediary doctrine and proximate cause defenses. *See* Barbara Podlucky Berens, *Defendants' Right to Conduct Ex Parte Interviews with Treating Physicians in Drug or Medical Device Cases*, 73 MINN. L. REV. 1451, 1483-84 (1989). Plaintiffs' counsel have similarly identified the physician's product knowledge as the most significant issue in these cases. (*See* Def. Br., Ex. A at 13 (preparing physicians to testify that "[b]ased on all the information that [they] have now seen for the first time in this litigation" they would not prescribe VIOXX).) Accordingly, under defendants' proposal, all parties will have equal access to the critical information they need to prepare their cases.

In the end, the Court is faced with two conflicting strands of cases motivated by competing policy concerns. <u>Stewart v. Women in Cmty. Serv., Inc.</u>, No. CV-N-97-234-DWH <u>(PHA), 1998 U.S. Dist. LEXIS 17741,</u> at *7 (D. Nev. Sept. 11, 1998) (noting "two competing lines of cases"). Plaintiffs have cited cases barring defense counsel from *ex parte* communications with treating physicians out of a concern for potential undue influence by

defense counsel and inadvertent disclosure of privileged information unrelated to the medical condition at issue in the lawsuit. (*See* Pl. Br. at 5-6.) On the other hand, defendants have cited a line of cases permitting unfettered access to all parties out of a concern for fairness and equality of access to critical witnesses, as well as the potential for undue influence on the part of plaintiffs' counsel. *See, e.g.*, *Stewart*, 1998 U.S. Dist. LEXIS 17741, at *10; *In re Orthopedic Bone Screw Prods. Liab. Litig.*, MDL No. 1014, 1996 WL 530107, at *2 (E.D. Pa. Sept. 16, 1996); *Shots*, 887 F. Supp. at 207-08; *Bryant v. Hilst*, 136 F.R.D. 487, 492 (D. Kan. 1991); *Felder v. Wyman*, 139 F.R.D. 85, 91 (D.S.C. 1991); *Doe v. Eli Lilly & Co.*, 99 F.R.D. 126 (D.D.C. 1983). The alternative proposed by defendants is a true compromise of these competing cases and policies, providing equal access to all parties while guarding against the accidental disclosure of privileged information and reducing the risk of undue influence by any party.

## Conclusion

Defendants' compromise proposal – permitting opposing counsel's presence at all informal interviews with physicians – provides the fairest, most practical way for the Court to address concerns regarding the potential undue influence of physicians in this matter. Defendants respectfully request that the Court order the parties to develop a proposed order

requiring that all communications with physicians be conducted jointly and establishing a protocol for such communications.

Respectfully submitted,

*Dorothy H. Wimberly*

Phillip A. Wittmann, 13625
Anthony M. DiLeo, 4942
Dorothy H. Wimberly, 18509
Stone Pigman Walther Wittmann L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone: 504-581-3200
Fax:    504-581-3361

Defendants' Liaison Counsel

## CERTIFICATE

I hereby certify that a copy of the above and foregoing Defendant Merck's Additional Submission Regarding Communications With Plaintiffs' Healthcare Providers has been served upon Liaison Counsel, Russ Herman and Phillip Wittmann, by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pretrial Order No. 8, on this 27th day of May, 2005.

*Dorothy H. Wimberly*



Marcus W. Viles
*Board Certified Civil Trial Lawyer*
*Also licensed in TX*

Michael L. Beckman

Mark C. Menser

Kelly K. Huang
*Also licensed in NY & TX*

Robert Geltner
*Also licensed in DC & IL*

Paul Christian Sullivan
*of Counsel*
*Also licensed in MD, WV, PA & DC*

**VILES & BECKMAN, P.A.**

May 23, 2005

RECEIVED

MAY 25 2005

R. Michael Underwood, Esquire
Steel Hector & Davis LLP
215 South Monroe Street
Suite 601
Tallahassee, Florida 32301-1804

    RE:    Vioxx

Dear Mr. Underwood:

Thank you for forwarding Merck's extremely prompt response to my inquiry concerning Merck's formal position regarding the role physicians must play in the Vioxx litigation to follow. I respectfully submit that Merck's abbreviated response both greatly simplifies and even trivializes the problem, and may very well reveal a hidden agenda.

As indicated, as a former medical malpractice defense attorney, I have never relished medical malpractice claims and almost always refrain from taking one on as Plaintiff except in the most heinous cases, or where *absolutely necessary*. I believe that most physicians strive to deliver quality health care in an increasingly complex environment. I believe that physicians should have the right to rely upon the representations of their pharmaceutical suppliers, such as Merck.

Unfortunately, Merck is going around the countryside advocating the "learned intermediary defense" and other defenses which, when stripped to their basics, are nothing more than a pure "blame the doctor" defense. With analysts predicting a $10 – $20 billion dollar (or more) exposure, Merck is positioning its customer / physicians as the fall guys for its problem. Moreover, the learned intermediary and other defenses create empty chair scapegoats out of physicians who are not made Defendants. That is, Merck's policies as stated in your letter make the joinder of physicians *absolutely necessary*. This strategy works a cruel hardship on patients and physicians alike.

In my particular instance, I have over 800 Vioxx cases that are in development. That means 'Notices of Intent' to initiate a medical malpractice claim must now go out to at least 800 health care providers. Why? -- because Merck is insisting on making the doctors a scapegoat at each trial. Being that you are in Tallahassee, you are surely aware that in Florida, under the new "three strikes" doctrine, being named a defendant in a

R. Michael Underwood, Esquire
May 23, 2005
Page 2

medical malpractice case harbors for the physician an ominous and grave consequence. Even a minimal finding of a few percentage points of negligence could very well lead to the physician *losing his license*. When Merck's best customers start getting named in 20, 30 or 40 medical malpractice cases and ask me why, I am going to show them this correspondence revealing that Merck has made the physician a necessary defendant in every case.

Further, to the extent federal removal carries the specter of the higher *Daubert* standards, rather than the slightly more relaxed *Frye* standard, what Merck is saying is that if I don't join the doctor, not only will I face the empty chair and other scapegoat defenses, but Merck has guaranteed in writing that they will remove me to federal Court, every time I don't join the doctor.

I merely wanted to confirm that Merck is herein advising me that the doctor is an essential necessary party in every case and must be joined or else I will face the learned intermediary defense, the scapegoat-the-doctor-empty-chair defenses, and face guaranteed removal if I don't. I think your position is unfortunate both for Merck, and for the doctors, but if Merck truly intends to argue these defenses (even in the face of the DODGEBALL VIOXX memorandum), then I suppose Merck will be the author of its own misfortune. I will be sure to advise the defendant doctors why their joinder was so necessary. Should Merck wish to reconsider its position, please immediately advise as the notices are going out the door as we speak.

Very truly yours,

VILES & BECKMAN, P.A.

Marcus W. Viles
MWV/ty