FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2005 JUN -7  PH 4: 57

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: VIOXX | * | MDL NO. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | |
| | * | SECTION: L |
| | * | |
| THIS DOCUMENT RELATES TO | * | JUDGE FALLON |
| ALL CASES | * | |
| | * | MAG. JUDGE KNOWLES |

* * * * * * * * * * * * * * * * * * * * * * * * * * *

## STATE LIAISON COMMITTEE'S MEMORANDUM IN SUPPORT OF UNRESTRICTED DISCOVERY RELATED TO MERCK'S SALES REPRESENTATIVES

In accordance with the Court's instructions issued during the May 23, 2005, status conference in this matter, the State Liaison Committee ("SLC") hereby files this memorandum in support of unrestricted discovery related to Merck's sales representatives. More specifically, and without limitation, the SLC asserts that plaintiffs should be granted discovery into the identity of all sales representatives who promoted or marketed Vioxx and electronic databases, particularly the FACTS database, related to those sales representatives marketing and promotional activities. The SLC further asserts that such discovery should proceed without delay and on a global basis – that is, not in the piecemeal "one case, one sales representative fashion" posited by Merck. The SLC shall set out in some detail the reasons for these assertions in the body of this memorandum.

In short, however, granting unrestricted discovery related to Merck's sales representatives is proper and important because:



1)      Evidence related to the sales representative marketing and promotional efforts supports and is often mandatory to establish the elements of plaintiffs' tort claims (e.g., fraud, negligence, failure to warn) under various states' laws;

2)      Unrestricted discovery related to Merck's sales representatives has and will continue to be sought in state court actions around the country.  If this Court adopts a plan that restricts the Plaintiffs discovery related to the sales representative in scope and/or temporally, there is a risk that there will be inconsistent orders entered by state courts further creating a danger of redundancy and inefficiency;

3)      Experience in other litigation has taught us that any restriction that delays discovery related to the sales representatives will result in the loss or destruction of vital discoverable information, will reduce the accuracy and clarity witnesses' memories and will result in many other witnesses becoming unavailable; and

4)      Unrestricted discovery related to the sales representative will not place an undue burden on Merck.

For these reasons, the SLC urges the Court to adopt a discovery plan that does not limit the scope of Plaintiffs discovery related to the sales representatives and requires Merck to immediately proceed with the production of any such requested documents and information.

I.      **Sales Representative Discovery is Vital to Plaintiffs' Cases**

Sales representatives and other marketing employees are the main source of awareness for physicians in their decisions to prescribe pharmaceutical drugs, and the sales activities by the "detailers" are key to a pharmaceutical company's ability to promote its product, and convince physicians that the product is both safe and effective.  (*See Exhibit* A- Appendix of Sales and Marketing Employees Background Information.)

As Congressman Henry Waxman reported in his May 5, 2005 memorandum, "The Marketing of Vioxx to Physicians," to the Democratic members of the Government Reform Committee, the over 3,000 member strong sales force was the key for Merck in maintaining strong Vioxx sales despite the mounting evidence of cardiovascular risks associated with taking Vioxx. (*See Exhibit* B- Waxman Memorandum May 5, 2005.)   As Representative Waxman correctly pointed out, promotions targeting physicians account for the majority of all drug industry spending, and sales representatives are a key component of this physician promotion campaign.[1]

Pharmaceutical sales representatives, or "detail men" as they are commonly called, have been peddling drugs to physicians since 1850.  Only in the last ten years, however, has the sales force grown to such large proportions.  There are currently over 90,000 sales reps in the U.S. alone, three times as many as there were in 1990 (*See* Exhibit A-7 at p.1,  Hensley,  "As Drug Sales Teams Multiply…".)  The best estimates state that sales reps spend between $8,000 and $13,000 per physician each year (*See* Exhibit A-1 at p.2, Wazana, "Is a Gift Just a Gift?") There is nearly one salesperson and a budget of $100,000 for every eleven physicians practicing in the United States (*See* Exhibit A-34 at p.7, Whiteway, "Physicians and the Pharma Industry.")  Well over ninety percent of doctors see drug reps on a regular basis, an average of four to five times per week (*See* Exhibit A-2, Lexchin. "Therapeutic Education or Pharma Promotion.")  In most cases, doctors only see detailers for a short period of time, but according to physicians, interaction with sales reps is important in making a decision about prescriptions.  In fact, the largest percentage of information given to doctors, thirty-three percent, comes directly from

---

[1] Representative Waxman concluded that "Merck's sales representatives did not appropriately educate physicians about the research showing Vioxx's cardiovascular risks.  To the contrary, it appears Merck's highly trained sales force was instructed not to address the new research findings, but to emphasize outdated and misleading data that indicated Vioxx was safer than alternatives." (*See Exhibit* B- Waxman Memorandum at p.7.)

pharmaceutical detailers (*See* Exhibit A-3, Prosser, "Influence on GP's decision to Prescribe.") and sixty-two percent of doctors believe information from reps is "very important" in formulating their prescribing habits (*See* Exhibit A-4 at p.185, MeGettigan, "Prescribers prefer people.")

The direct correlation between sales rep-doctor interaction and prescriptions is evident in numerous studies.   Increased detailing visits lead to increased prescriptions and increased requests for drugs to be added to hospital formularies.  In a study published in the Journal for the American Medical Association (JAMA), there was a direct association between meetings with detailers and formulary addition requests.   These additions presented no advantage over the previous, and usually cheaper, alternative (*See* Exhibit A-1.)  A company's sponsorship of medical education courses, a major part of pharmaceutical marketing leads to increased prescriptions for that company's drug (*See* Exhibit A-11 at p.4.)  In the same JAMA study, interaction with reps was found to impact physician's number of prescriptions, cost to the patient, and a decreased prescription of generic drugs.   The study identified "some positive outcomes," but stated most were "negative outcomes associated with the interaction" (*See* Exhibit A-1.)  Frequent contact with drug reps leads to higher prescription costs (*See* Exhibit A-19.)  Physicians who were offered consultant fee, trips, or cash were much more likely to request drugs to be added to formularies (*See* Exhibit A-10.) [2]

While the sales representatives' influence on physicians' prescribing decisions is steadily growing, the accuracy of the information being conveyed is often questionable.  In a JAMA study, eleven percent of rep statements were inaccurate and all were favorable towards the drug

---

[2] Even non-physicians are being targeted by reps.  When a sales rep can't get in to see a doctor, they ask to see a nurse practitioner or physician assistant instead.  More than half of physician's assistants see reps more often than actual physicians do (*See* Exhibits A-20, Greene, Drug reps targeting non-physicians; and A-21, Lurie, "Pharma representatives in academic medical centers.")  Many companies, including have marketing plans to detail non-physician prescribers (*See* Exhibit A-20 at p.2.)

being promoted (*See* Exhibits A-23, Ziegler, "The accuracy of drug information..."; and A-33.) The World Health Organization reports that detailers "consistently fail to spontaneously talk about safety information regarding the drugs they are promoting" (*See* Exhibit A-24 at p.2, World Health Organization Drug Promotion Database.)  Sales representatives are forbidden from discussing unapproved statements with doctors, but it happens often.  The WHO reports that twenty-five percent of detail visits include unapproved statements by detailers (*See* Exhibit A-25 at p.5, WHO Drug Promotion Database.)  Adverse effects are only mentioned in twenty-seven percent of details, and any special warnings are only reported a mere five percent of the time (*See* Exhibit A-14 at pp.4-5.)  Detailers often know immediately about harmful reports, often before they reach the public or the physicians, and plan accordingly.  (*See id.*) When asked about harmful reports by doctors, detailers often discount or shrug off these reports.  (*See id.*) Sales representatives are required to refer questions of that nature to their corresponding medical departments as opposed to actually providing the physician with the information regarding the adverse report. (*See id.*) This policy by pharmaceutical companies, however, is not consistent with the law.  As Representative Waxman noted in his May 5, 2005 memorandum, "pharmaceutical representatives are permitted to discuss evidence of safety concerns with doctors, even if such data are not on the drug's label," citing 21 CFR 202.1.  (*See* Exhibit A.)

In this litigation, the central role of the sales representatives is apparent.  Congressman Waxman explained that the documents produced by Merck to his committee "may offer the most extensive account ever provided to Congress of a drug company's efforts to use its sales force to market to physicians and overcome health concerns." (*See* Exhibit B at p. 1.) The Vioxx sales force was provided with detailed information about physicians, their wives and recreational activities to assist in the promotional effort and the targeting of particular physicians.  (*See* Exhibit B at p. 13.)

Congressman Waxman concludes repeatedly that the Vioxx sales force was a key component, if not the key component in the marketing of Vioxx to physicians, and Merck's ability to increase sales, and avoid the consequence or "obstacle" of increasingly negative information regarding Vioxx's safety profile. (*See* Exhibit B.)

The importance of evidence related to the sales representatives is not limited to understanding the Vioxx story; it is essential to carrying Plaintiffs' burden on the elements of various state court claims. Where, for example, a plaintiff has asserted a claim of fraud, the plaintiff will be required to put on evidence regarding what was communicated to the plaintiff (through her prescribing physician) about the safety and efficacy of Vioxx. What the sales representative said, or failed to say, about the safety and efficacy is a necessary part of the plaintiff's case. But the inquiry does not end there. The plaintiff may also need to put on evidence as that the misrepresentation or omission was intentional and/or negligent. Without that evidence plaintiffs' claims may be dismissed.

Limiting discovery to the particular sales representative and particular doctor implicated in a particular plaintiff's case will deny plaintiffs the opportunity to obtain this essential evidence. Sales techniques, promotional messages, or sampling patterns used by representatives in other geographic areas or to other physicians may be highly relevant to the claims against Merck in a particular case. Records of contemporaneous conversations any particular sales representative had with any physicians (not just the plaintiff's physician) about Vioxx provide insight into that representative's knowledge of the risks associated with the drug as well as the knowledge that existed within Merck at that time. If, for example, a Merck sales representative in Oregon began warning Oregon physicians of the increased cardiovascular risk associated with Vioxx in early 2000, yet the rest of Merck's sales representatives said nothing to doctors about increased cardiovascular risk until years later, discovery into how and when that Oregon sales

representative learned about that risk would clearly be relevant to plaintiffs with claims filed around the country.[3]

Discovery related to sales representatives beyond those who detailed a particular doctor in a particular plaintiff's case is also important to plaintiffs' ability to test the accuracy and completeness of Merck's discovery responses.  An example from the diet drug ("fen-phen") litigation is illustrative.  In that litigation, defendant manufacturer Wyeth claimed in various discovery responses (interrogatories, requests for production and requests for admission) that its sales force members were never told, nor did they ever promote the off-label combination use of the diet drugs Pondimin or Redux, with phentermine, the second half of the fen-phen combination.  This issue was a key issue in the case.  The deposition of a sales representative taken in 2004, seven years after the drug's market withdrawal, resulted in testimony and the production of documents that directly contravened Wyeth's earlier discovery responses on this critical issue.  (*See* Exhibit E- Excerpts of Deposition of Kathy Senn.)

Finally, limiting discovery related to the sales representatives to a particular sales representative in a particular plaintiff's case denies the plaintiff the opportunity to learn about the

---

[3]A second hypothetical example further illustrates the need for unrestricted discovery.  Suppose that Merck had implemented a sales strategy in a particular geographic territory, requiring sales representatives to use a sales strategy whereby they would systematically dodge any questions related to studies indicating Vioxx efficacy was no better than Naproxen, a strategy called "Efficacy Dodge Ball." Suppose that in this local sales strategy, the detailers were given an "Efficacy Card" that cited to old and misleading data related to efficacy.  Finally, suppose that detailer John Doe had called on a particular plaintiff's prescribing physician, Dr. Smith, on multiple occasions regarding Vioxx, as indicated, but the call notes related to Dr. Smith did not reflect that John Doe had used this "Efficacy Card" strategy or playing "Efficacy Dodge Ball."

Under Merck's suggested discovery limitations (the one sales representative, one prescribing physician, one plaintiff proposal) the Plaintiff in this hypothetical would have no reason to suspect that detailer John Doe might have used those strategies in detailing Dr. Smith, and might not ask any questions regarding those strategies in deposition, or present any such evidence at trial.  In this scenario that plaintiff's lawyer would certainly want to question such representative and prescribing physician about the detailer's use of the hypothetical "Efficacy Card" in the detail visits with Dr. Smith, and even if the sales representative were to deny using that strategy, the lawyer would be entitled to cross-examine the detailer with those other call notes and documents, and then ask the jury to infer through this circumstantial evidence that the detailer did in fact also use the "Efficacy Card" when detailing Dr. Smith, in support of the plaintiff's claims under whichever particular state law would apply. Obviously, evidence of the use of the Efficacy Card would be critical to the plaintiff's claim.

sales and marketing techniques and messages being used by Merck and, consequently, denies the plaintiff the ability to effectively investigate (through carefully crafted discovery and cross-examination) the knowledge, intent, and/or recklessness of the defendants in this matter with respect to the information about safety and efficacy that was conveyed to plaintiffs through their prescribing physicians.  Only Merck knows all of the various sales programs and strategies in effect or used for the promotion of Vioxx.[4]  Only through unrestricted discovery related to the sales representative can plaintiffs hope to be on equal footing with Merck and effectively prosecute their claims.

Among the most important windows into Merck's sales, marketing and promotional efforts are its sales representative electronic sales call databases.  As with any discovery related to the sales and marketing employees, production in full, in the same format as used by the Merck sales force, of the electronic sales call databases is a critical piece of the discovery puzzle.

Databases (particularly the FACTS database) contain relevant information related to Plaintiffs' claims against Merck for its over-promotion of Vioxx and its failure to warn of the risks of serious cardiovascular events.   These databases are readily available, discoverable in their entirety and have never been produced.   Without being required to produce the entire database in its original format, both federal and state Plaintiffs will be prejudiced in bringing their claims.

Production of the FACTS database used by Merck sales representative would place Plaintiffs in an equal position with Merck in terms of understanding how the sales force was able to continue to increase Vioxx sales, despite the growing body of information which placed

---

[4] Representative Waxman's May 5, 2005 report  cited some of these sales strategy programs such as "Project XXceleration" or "Project Offense".  (*See* Exhibit B.)  Undoubtedly, a full production by Merck would reveal the existence of multiple other programs and strategies, both national and regional, designed by Merck management and used by the sales force to promote Vioxx.

Merck on notice that Vioxx carried significant cardiovascular risks.    Experiences in similar litigation illustrate the importance of complete production of the electronic sales call databases.

In the diet drug litigation, important information about the sales and marketing practices of the defendants was learned for the first time, five years after the initiation of litigation, after obtaining the sales representative database.  Wyeth used pre-printed prescription pads as a major gift to physicians during the promotion of Pondimin and Redux.[5] Only after obtaining the sales representative databases was it discovered that on a company wide basis, Wyeth sales reps engaged in extensive gift giving during their promotional detail visits with doctors regarding Pondimin and/or Redux .  (*See* Exhibit A-35-Report of Sales Rep notes related to "gift.")  Wyeth sales reps also sponsored numerous free medical education courses (CME's), required classes for doctors, which often cost thousands of dollars (*See* Exhibit A-42, Wyeth Financial Support Request.)

This information was only discovered 5 years into the litigation, when Wyeth was finally ordered to produce the data in an electronic format.  While Wyeth failed to produce the data in its true relational database format, after considerable expense on the part of Plaintiffs, the piecemeal data produced over a five-year period was put together in a database format that allowed complex queries and searches which revealed sales and marketing techniques that were company wide practices.  If Merck's suggested limitations on discovery were the rule in the diet

---

[5] (*See* Exhibits Appendix A-40, Florida Detail Notes Containing "pre-printed pads"; and A-41), *Heichle v. A.H.Robins*, et al., 1997 WL 317054 (Tex.App.-Hous.(1 Dist.))(A.H. Robins sales rep provided pre-printed prescription pads to physician to use for prescribing Pondimin with another diet drug similar to phentermine called Tenuate, an off-label use).  Without this discovery as ordered five years into the litigation, the Plaintiffs in any particular individual cases would not have even known to ask about the pre-printed prescription pads which promoted off-label use of the drugs.  Further, plaintiffs did not learn, and could not have learned until after the full sales call notes database was ordered to be produced that Wyeth also promoted Redux and Pondimin by offering free dinners to doctors and sometimes their wives (*See* Exhibit A-37, Florida Detail Notes Containing "dinner.") Redux and Pondimin prescribers who were not satisfied with free dinner would be given free tickets to sporting events of their choice (*See* Exhibit A-39, Detail Notes Containing "tickets.")

drug litigation, the Plaintiffs would not have been able to use such evidence in their cases, because it would have continued to have remained buried.

During the years Wyeth sold Pondimin and Redux, its sales forces used several databases to document interactions with physicians.   At the beginning of diet drug litigation in 1997 through 1999, Wyeth produced limited sales call records from some of its fully searchable, fully relational databases, in *printed form only*.[6] Over the next several years, Plaintiffs made repeated discovery requests in various state courts around the country to varying degrees of success. Finally, in 2002, over three years after the initial production of the printed reports, Judge Joseph Tarbuck, First Judicial Circuit of Florida, ordered the immediate production by Wyeth of the entire electronic sales databases.   Specifically, Judge Tarbuck found that such discovery was relevant and discoverable if it existed, and that Wyeth had misled the court and Plaintiffs regarding the existence of the electronic versions of the databases. *See* Exhibit C- Order in *King v. Wyeth, et al.*[7]

The lesson learned from the diet drug experience is that sales force automation databases should be produced in the electronic format in which they exist when used by the company, and should not be limited in any artificial manner, as such limitations only serve to frustrate the

---

[6] Naturally, these millions of unsearchable, unorganized, printed documents were useless to plaintiffs.  These documents also contained only approximately 19 of the over 1000 fields of data kept by Wyeth in its databases.

[7] Despite Judge Tarbuck's order, Wyeth again failed to produce the electronic databases, further hindering Plaintiff's efforts to develop the case against Wyeth for the overpromotion, off-label promotion, and misleading promotion of the diet drugs by Wyeth.  Instead, Wyeth hired an outside consulting firm to scan the printed discovery forms, and then have those OCR'd (optical character recognition), to provide to Plaintiff's counsel.  These OCR'd forms were virtually unusable, as the OCR technology was inadequate, and the data contained on the forms was not in any way searchable, linked, or otherwise organized in a meaningful way.  In order to attempt to have Wyeth actually comply with Judge Tarbuck's order, Plaintiffs' counsel sought copies of the electronic data from the third party, Synavant Corporation, who had maintained the databases for Wyeth as a consulting firm during the time the diet drugs were marketed.  Finally, Wyeth relented, or so they claimed, and agreed to provide the data.  Still, instead of producing the electronic databases as they existed, Wyeth only produced electronic spreadsheets containing limited information and fields.  Over the next couple of years, various Plaintiffs and their counsel sought more complete production from Wyeth in various courts, including unredacted copies of previously produced information, resulting in various and inconsistent discovery opportunities and obligations from state to state.

Plaintiffs' discovery efforts both financially and logistically, result in extended piecemeal discovery, and potentially inconsistent rulings from court to court.[8]

The seven year struggle which is still occurring in the diet drug litigation can be avoided in the Vioxx MDL (and in the state court litigations) by requiring Merck to undertake a full and complete production of the relational sales force automation databases used by Merck and their sales force, particularly the FACTS database. Only the full databases as maintained by Merck, and its agents, will allow Plaintiffs to have the discoverable information now available only to Merck and its lawyers. [9]  Without the full production, Plaintiffs are unable to write database queries, examine data from various geographical regions, compare sales visit data from one time period to another, or one region to another, or one sales rep to another, all of which could provide valuable insight and evidence in any particular case, or in the litigation as a whole regarding the promotional activities of the Merck sales force, or any particular sales representative in a particular case.   Without the ability to use the data as Merck can, the

---

[8] The sales call data that was eventually produced by Wyeth, over the next 2 years, after further motions to compel in various state courts, had been extracted from Wyeth's databases and manipulated or limited in an unknown manner. The spreadsheets were in such a form that they were unreadable and impossible to search or otherwise use to discover information related to the sales techniques and sales plans used by the Wyeth sales forces. Wyeth failed to provide any of the key fields that would allow Plaintiffs' counsel to link many of the notes fields to specific doctors, or link sales representative identification codes to actual sales representatives. Plaintiffs' counsel around the country were forced to hire a computer consulting firm to convert the electronic spreadsheets created by Wyeth for the litigation into an actual database, at a significant cost. The data still remains incomplete, unmatched, and otherwise unusable in many respects.

[9] In the diet drug litigation, Wyeth's removal of the data from its original form, that of a relational database, and manipulation of that data, deprived plaintiffs of crucial and highly relevant information. For example, using the new electronic records created by Wyeth's lawyers, plaintiffs could not link with absolute certainty sales call records (or notes written at any sales visit) with any particular sales representative, despite Wyeth clearly having the ability to make this connection using its original databases. (*See* Exhibit D-1, Transcript of Deposition of Wyeth sales representative Eric Lofstrom, March 10, 2004 p. 97-98), (Counsel for Wyeth, Mr. Joseph Cohen, representing that certain records of sales calls reflect activities of Mr. Lofstrom). Wyeth also freely uses this capacity against plaintiffs. (*See* Exhibit D-2, Transcript of Deposition of Dr. James Brinton, July 10, 2003, p. 38), *Sonja Hutchings v. Wyeth, et. al.*, P.C.C.P. November Term 2002, Cause No. 0211-0537 (Counsel for Wyeth, Mr. David Gersh, asking Dr. Brinton if he would dispute records authored by Wyeth sales representative Robert McCann reflecting that Mr. McCann and Dr. Brinton discussed the risk of PPH associated with Redux).

plaintiffs are at an inferior informational position in this litigation contrary to the goals of Rule 26 of the Federal Rules of Civil Procedure.

## II.   LIMITATIONS ON THE SCOPE OF SALES REPRESENTATIVE DISCOVERY INCREASE THE RISK OF INCONSISTENT STATE COURT ORDERS, REDUNDANCY AND INEFFICIENCY

For the reasons set forth above, broad discovery related to the sales representatives has and will continue to be sought in state court actions around the country.[10]  If this Court were to adopt a narrow approach to sales representative discovery such as that proposed by Merck, the likelihood that there will be an inconsistent order entered by a state court is almost assured.[11]  If that happens, Merck will be in the position of producing documents, information and witnesses on one schedule in the MDL and a completely different schedule in various state court actions. If, on the other hand, this court crafts an omnibus discovery order related to the sales representative that requires the production of all discoverable information in a timely manner, the risk of inconsistency and inefficiency will be substantially diminished.  From there, the SLC in its role will seek to coordinate with state court counsel to insure that the sales representative information produced in this Court is accessible and to coordinate the scheduling of depositions which will likely follow.[12]

## III.   The Sales Representative Discovery Should Be Produced Without Delay

---

[10] The SLC is presently seeking information on the status of discovery requests related to this issue from state court counsel.

[11] In the fen-phen litigation, for example, Wyeth refused to produce its sales-call database in total, instead producing what it asserted were the call notes for a particular plaintiffs physician.  After more than three years of litigation, a state court judge, after hearing argument along the lines of that set forth above, ordered the production of the entire sales call database.  (See Exhibit C- Order in King v. Wyeth, et al.)  Had such an order been entered at the outset of the litigation, the piecemeal approach that took years to produce discoverable information would have been avoided.

[12] While it is unrealistic to believe that there will never be any tension between state court litigants seeking sales representative discovery and the discovery taking place in this court, the broader the discovery in this court, the less opportunity there is for a state court litigant to complain that he or she was denied access to discoverable information.  A broad discovery order in this regard also allows this Court to monitor the production of this information and insure that all parties are heard and treated fairly throughout the process.

The key to the production of the Sales and Marketing Employee discovery and the sales force automation databases is that the complete and full production be required at this time, without any significant delay or limitations.  Merck's current proposal to limit the production to only case specific discovery would result in the delayed production of vital and important sales and marketing information regarding the Vioxx promotional and marketing efforts.  Such delay again would only serve to place the parties on unequal footing, and would likely result in the loss or destruction of this highly relevant material.

Experience in other large-scale pharmaceutical litigation has taught us that delay in the production of this crucial discovery will result in the loss or destruction of critical pieces of evidence, eroding memories, and a piecemeal approach to the discovery which will frustrate the goals of efficiency.  This litigation is perhaps the largest mass-tort pharmaceutical case ever.  As a result, it will necessarily take an extended period of time for individual cases to work their way through the system.  Merck's proposal to limit sales representative discovery to the particulars of an individual case will, therefore, necessarily result in a substantial delay in the production of sales representative discovery.  Despite the best of intentions and the most well-crafted preservation orders, a substantial delay in discovery will result in the loss of vital information.  Documents in the sales representatives' possession may be lost or destroyed.  Some sales representatives will become unavailable.[13]  Memories will fade.

A recent example in the diet drug litigation, seven years after the diet drugs were removed from the market illustratesthe point most effectively.  Throughout the diet drug litigation, Wyeth had claimed that its sales force members were never told, nor did they ever promote the off-label combination use of the diet drugs Pondimin or Redux, with phentermine,

---

[13] Some will move on to new careers and their whereabouts will be unknown.  Others may pass away.  Experience has taught that the more time that passes, the harder it will be to find the sales representatives.

the second half of the fen-phen combination. This issue was a key issue in the case. In fact, Wyeth often produced affidavits from sales representatives and sales managers attesting to these facts. However, in 2004, seven years after the drug's market withdrawal, plaintiffs' counsel was able to identify and take the deposition of a sales representative who had detailed multiple physicians in Alabama. (*See* Exhibit E- Excerpts of Deposition of Kathy Senn.)  At her deposition, the Wyeth sales representative Kathy Senn produced new documents which she had kept in her own possession for several years. The documents were Wyeth company documents, authored by sales management, instructing sales representatives from the Alabama and Georgia region to push the off-label combination use of the diet drugs on doctors. These documents had never been produced before by Wyeth in seven years of litigation, and prior to this deposition the existence of these documents was completely unknown to any diet drug plaintiff or plaintiffs' counsel.   Had Wyeth been required to produce information related to their marketing employees and detailers early on in the litigation, the diet drug plaintiffs would have had the opportunity to discover these key documents much earlier, conduct further discovery related to this off-label promotional directive, and perhaps dramatically effect the diet drug litigation.   Unfortunately, the documents came at the wane of the diet drug litigation.   There are multiple other examples in the diet drug litigation which demonstrate that early and timely discovery of the marketing employees is crucial to the preservation of key evidence.[14]

---

[14] Louisiana sales representative, Ed Guillory, admitted he had destroyed many of his own personal documents after being taken off Redux detailing.  Despite having received the company memorandum regarding preservation of documents, Mr. Guillory had discarded important detailing documents which could never be replaced. (*See* Exhibit F- Excerpts of Deposition of Ed Guillory.)  (*See also* Exhibit G- Excerpts of Testimony of Robert Scott (State Government Relations Manager for Wyeth admitted he threw piles of documents away after drug withdrawal when moving despite knowing that many of the documents contained key safety and efficacy information about the drugs which he was sharing with physicians and government officials).)  Another example is sales representative Lisa Harrelson, who testified that she had returned her personal retention file to Wyeth after receiving the company memorandum to do so.  Wyeth however failed to produce any documents belonging to Harrelson. *See* Exhibit H-Excerpts form Deposition of Lisa Harrelson, and Letter from Wyeth's Counsel regarding retention files produced for various sales representatives.

IV.    **Unrestricted Discovery Related to the Sales Representatives will not Place an Undue Burden on Merck**

The information requested by the PSC is highly relevant to all Plaintiffs' claims, both federal and state, and crucial to the discovery effort being undertaken in this MDL and in the state court litigations.  As in most pharmaceutical litigation, Merck has argued that the requests are overly burdensome and unnecessary.   The truth, however, is that this production of sales force employee information is no more burdensome than any other produced information in the litigation.  Actually, while being one of the most relevant pieces of the discovery puzzle in pharmaceutical litigation, the production of a majority of the marketing employee information is actually one of the cheapest and easiest forms of production for the manufacturer.

---

The immediate production by Merck of its marketing employee data and information should also include production of sales force emails. Email systems are exceptionally vulnerable to loss of data, lost email attachments, written over back-up tapes, and purge policies, all of which would suggest that immediate production of sales force emails would better serve all parties.  Again, the lessons learned from other pharmaceutical litigation support the need for quick production of these materials.

Sales force email systems allow the company to communicate important information about the drugs to the sales force, such as label changes, new medical literature available about a drug, sales techniques, and other information critical to the sales representative's ability to convince Plaintiffs' prescribing physician's to prescribe the drugs, despite the risks known to the sales force.  (*See* Exhibit K- Excerpts of Deposition of Roger Kinard at p. 3.)

In the diet drug cases, Wyeth never produced copies of the electronic mail messages or emails sent or received by the Wyeth Sales Force.  Through the discovery efforts of counsel, it soon became apparent that Wyeth had not ensured that such emails were preserved, saved, archived, stored, backed up, or other otherwise protected from destruction. (*See* Exhibit F, Transcript Excerpts from the deposition of Roger Kinard on January 30, 2003.) By September 17, 1997, Wyeth and its lawyers had instructed all of its sales force to cease and desist from the regular destruction, archiving, purging, or deletion of any documents, electronic or otherwise, related to the diet drugs Pondimin and Redux. (*See* Exhibit I- Memo to All Employees from Wyeth lawyer dated September 17, 1997.) The memo specifically instructed the sales forces not to destroy, delete, or erase any electronic mail messages. *See id.* Further Wyeth had been engaged in multiple lawsuits related to the drugs' dangerous side effects, and were specifically ordered to retain all electronic data and documents.  (*See* Exhibit J, *Linnen Spoliation Order.*) In *Linnen*, a Massachusetts court ultimately found that Wyeth destroyed emails in violation of a prior preservation order and subsequent diet drug document request.

Wyeth hired a company called Synavant, the same company that hosted the Electronic Sales Force Database LEAPFROG, in Atlanta, Georgia to host the sales force GroupWise emails at their facilities. (*See id.* at 3.) Synavant regularly backed up these sales force email servers. (*See id.)* As with the Leapfrog database, Synavant typically recycled the back-up tapes, meaning the tapes would be written over.  The most troubling aspect of this recycling policy, however, is that Synavant, at Wyeth's instruction, continued to recycle these tapes until as late as early 2000, nearly three years after the diet drugs were pulled from the market. (*See id.)*  This example illustrates just how vulnerable this critical information is to a delay in production.

Nearly all of the information requested by the PSC would be kept by Merck in an electronic format, specifically the sales force automation database or databases used by Merck and the sales force. Production of such information can be done in the form of electronic data dumps or database exports.[15] The exports can be limited by time, scope, fields of information, and any other limitations the Court would deem appropriate through simple and easy query options and export functions.

Finally, the limitations raised by Merck's counsel regarding the need to review such production for privilege, and relevance, are an insufficient basis for limiting the production at this time. First, Merck has already admitted that the information requested is relevant and discoverable, having offered to produce such information in a "piecemeal" basis in specific cases as they are filed or in litigation, as Merck is doing in New Jersey. (*See* Joint Report #3 of the PLC and DLC.)   Any review for privilege and/or relevance would be conducted for these "piecemeal" productions in any event.

Second, any complaint regarding the burden of reviewing for privilege and/or relevance is hollow, in that the defendant in any litigation has the right and opportunity to so review all discovery productions. Merck certainly will not be able to point to any reason why the sales and marketing employee information, documents, and databases would contain more privileged information than other documents. Rather, it is extremely unlikely that any sales representative documents or database entries would contain privileged information, as such information would typically be regarding the sales representatives communications and related activities with third

---

[15] Should the court wish to hear expert testimony on this issue, the SLC certainly would be pleased to abide by the Court's request, and in coordination with the PSC, the Expert Committee, and the Sales and Marketing Committee make such testimony available.   In general the testimony of Merck's own internal employees would likely reveal the ease in which such data could be produced.   (*See* Exhibit L- Deposition Excerpts of Julia Cumberbatch, Director of Sales Force Automation for Wyeth; Exhibit K- Deposition Excerpts of Roger Kinard, and Exhibit C-Order Compelling production of Electronic Sales Force Databases in *King v. Wyeth, et al.*)

party physicians.[16]   Any review for relevance and/or redactions in that regard is also equally

unnecessary.[17]   Any concerns by Merck regarding this issue are unfounded.   The Plaintiffs'

counsel have agreed to strict confidentiality orders regarding all discovery productions.

Discovery of the marketing employees and sales representative efforts in the promotion

of drugs other than Vioxx during the relevant time periods is highly relevant to Plaintiffs' claims,

and would likely result in the discovery of admissible evidence at trial regarding Merck's failure

to warn the medical community or a particular prescribing physician about the increasing

information related to cardiovascular risks.   The highly probative value substantially outweighs

any burden on Merck to produce the materials.   Pharmaceutical companies often make this

"relevance" argument related to other drugs.   Wyeth contended that records of sales calls relating

to non-diet drugs were not discoverable.   In diet drugs, Plaintiffs' counsel argued for years that

such discovery was highly relevant, and only when Wyeth finally produced the pieces to the

puzzle could it be fully demonstrated.   For example, the fact that Wyeth sales representatives

visited physicians after the public disclosure of the association between diet drugs and valvular

heart disease, failed to talk about that new disclosure, and instead talked only of other products

---

[16] If any privileged documents or information exists due to a sales representatives participation in currently pending Vioxx cases, Merck and its counsel is certainly already well aware of such documents or information, and it can readily be identified by privilege log and properly redacted.

[17] In the diet drug cases, another major issue was the multiple redactions contained within the electronic data as produced. As discussed above, Wyeth actually maintained three if not more sales call databases, at least two of which, EAGLE and LEAPFROG, allowed sales representatives to keep detailed notes. Wyeth's redactions were beyond their proper scope as was made clear by a view of the redactions from each database. When Wyeth switched from the EAGLE and CRS databases to LEAPFROG in 1996, Wyeth imported a limited amount of information from those databases into LEAPFROG, including the notes fields for many sales calls. Before Wyeth produced the electronic spreadsheets, however, from EAGLE and LEAPFROG, they had different groups of attorneys redact the sales call notes fields. What Wyeth apparently forgot, however, is that due to the importing of the EAGLE data into LEAPFROG, both spreadsheets contained many of the same duplicate notes. With two teams of lawyers redacting those notes, the redactions came out quite different. (*See* Exhibit M (A printout of selected, inconsistent redactions from the EAGLE and LEAPFROG data as produced by Wyeth).) This Exhibit demonstrated that the redactions had nothing to do with privilege or confidentiality, as argued by the defendant, but typically were directly related to the sales representative's discussion with a physician about the subject drugs, Pondimin or Redux. Even more troubling was that the duplicate note redactions reveal that Wyeth actually *deleted* many sales notes in their entirety. The only

would obviously be strong evidence of Wyeth's failure to warn of the risk of valvular heart disease. Unless Wyeth was required to produce the records of sales calls of other drugs during that highly relevant time period, Plaintiffs could not fully demonstrate that Wyeth failed to inform the medical community and specific physicians about this serious cardiovascular risk.[18]

It is crucial in this case that the original production by Merck include such data related to other detailed products in Merck's sales force databases. Without such production, it would prejudice Plaintiffs, both federal and state, in proving their claims that Merck intentionally avoided informing physicians of the increasing CV risk information for Vioxx.

## V. CONCLUSION

For the foregoing reasons, the SLC respectfully urges this Court to allow discovery related to the sales representatives free from the unnecessary and potentially destructive restrictions proffered by Merck.

---

way those deletions could have ever been discovered was because of the duplicate notes contained in the LEAPFROG and EAGLE databases.

[18] After finally being successful in requiring Wyeth to produce some of the electronic sales call data for those time periods, Plaintiffs' counsel discovered that in may regions of the country, sales call visits for the diet drugs, or at least Wyeth's recording of those visits, virtually ceased when the Mayo clinic findings regarding VHD were made known. This evidence is a crucial piece in the diet drug Plaintiffs' failure to warn claims against Wyeth, however, this highly relevant evidence was outside of Plaintiffs' grasps until very late in the diet drug litigation when complete sales representative discovery was finally ordered to be produced.

Respectfully Submitted,

STATE LIAISON COMMITTEE

By: _____

Dawn M. Barrios
*Barrios, Kingsdorf & Casteix, L.L.P.*
701 Poydras St., Ste. 3650
New Orleans, LA 70139-3650
Tel: 504.524.3300
Fax: 504.524.3313

Turner W. Branch
*Branch Law Firm*
2025 Rio Grande Blvd., NW
Albuquerque, NM 87104

Michael S. Burg
*Burg, Simpson, Eldredge Hersh & Jardine*
40 Inverness Dr. East
Englewood, CO 80112

Thomas V. Girardi
*Girardi and Keese*
1126 Wilshire Blvd.
Los Angeles, CA 90017

Barry M. Hill
*Hill, Toriseva & Williams, PLLC*
89 Twelfth St.
Wheeling, WV 26003

W. Mark Lanier
*The Lanier Law Firm*
6810 FM 1960 West
Houston, TX 77069

W. James Singleton
*Singleton Law Firm*
4050 Linwood Ave.
Shreveport, LA 71108

Sol H. Weiss
*Anapol, Schwartz, Weiss, Cohan, Feldman and Smalley, PC*
1900 Delancey Pl.
Philadelphia, PA 19103

Justin Witkin
*Aylstock, Witkin & Sasser, PLC*
P. O. Box 1147
Gulf Breeze, FL 35262

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing pleading has been served upon all counsel of record through the Plaintiffs' Liaison Counsel, Russ Herman, via electronic service on June 7, 2005.

_____
DAWN M. BARRIOS
State Liaison Counsel Member

# SEE RECORD FOR

# EXHIBITS

# OR

# ATTACHMENTS

# NOT SCANNED