FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2005 JUN 17  PM 3: 25

LORETTA G. WHYTE
CLERK

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| THIS DOCUMENT RELATES TO | * | |
| ALL CASES | * | |
| | * | |
| | * | MAG. JUDGE KNOWLES |

* * * * * * * * * * * * * * * * * * * * * * * *

### MERCK'S RESPONSE TO PLAINTIFFS' REQUEST FOR PRODUCTION OF THE FACTS DATABASE AND PROFESSIONAL REPRESENTATIVE INFORMATION

Defendant Merck & Co., Inc. submits this memorandum in opposition to plaintiffs' submissions seeking production of all VIOXX®-related information in the Field Activity and Customer Tracking Systems ("FACTS")[1] database, and requesting the names, contact information, and current employment of every Merck professional representative who ever detailed VIOXX®.  (*See* PSC's Position Paper Regarding Compulsion of Production of Merck's Sales Representative Database And Certain Detailer Information ("PSC Br.") and State

---

[1]   FACTS contains the call notes and call-related data recorded by professional representatives regarding visits and other contacts with physicians, as well as information related to Merck's educational programs (which is 95% duplicative of the data in another Merck database, iMED), information relating to personnel files, and Professional Information Requests, among other categories.

___ Fee_____
___ Process_____
_X_ Dktd_____
_V_ CtRmDep_____
___ Doc. No _____

- 1 -

Liaison Committee's Memorandum In Support Of Unrestricted Discovery Related to Merck's Sales Representatives ("State Br.").)[2]

As set forth below and as Judge Higbee has already ruled in the New Jersey Coordinated Proceeding, plaintiffs' request should be denied for several reasons. *First*, plaintiffs' requests are, at the same time, both irrelevant and duplicative. Information from the FACTS database and contact information for professional representatives are only relevant to these proceedings as they relate to specific plaintiffs' claims. For that reason, Merck has already offered to produce FACTS and professional representative data as part of Merck Profile Forms for those cases being considered as trial candidates. Moreover, to the extent that plaintiffs believe such information will establish some sort of "pattern and practice" of improper marketing – which Merck firmly denies – plaintiffs already have a sufficiently representative sampling of information from Merck's production in the New Jersey Coordinated Litigation, which includes VIOXX®-related information related to 1,000 physicians and 1,900 professional representatives and which Merck is willing to reproduce in these proceedings. Thus, they have no legitimate need for wholesale production of the database and contact information. *Second*, requiring production of all VIOXX®-related data in the FACTS database would impose an overwhelming burden on Merck that cannot be justified given the irrelevance of the information plaintiffs seek. *Third*, the FACTS database should be protected from disclosure because it

---

[2]     The PSC Brief limits the requested relief to production of "the entire FACTS database as it relates to Rofecoxib and/or Vioxx" as well as "the names, addresses and current employment of all the Vioxx sales representatives or detailers." (PSC Br. at 6.)  To the extent the State Brief purports to seek broader discovery, Merck treats the PSC request as operative, since the State Liaison Counsel are not authorized to serve discovery requests in this proceeding. (*See* State Br. at 15, n.14 (noting in a footnote that "[t]he immediate production by Merck of its marketing employee data and information should also include production of sales force emails").)

contains proprietary and confidential data that would threaten Merck competitively if released. *Finally*, plaintiffs' request for contact information for every Merck professional representative who ever detailed VIOXX® is clearly sought for an improper purpose – to obtain a ready-made list of non-diverse defendants to name in subsequently filed lawsuits in an effort to avoid the jurisdiction of this Court. For these reasons, plaintiffs' requests should be denied.

## ARGUMENT

Federal Rule of Civil Procedure 26 permits discovery of unprivileged information "relevant to the claim or defense of any party." Fed. R. Civ. P. 26(b)(1). But "discovery, like all matters of procedure, has ultimate and necessary boundaries." Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978). Accordingly, discovery may be denied if it is "unreasonably cumulative or duplicative" or if "the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(2). See also Gill v. Gulfstream Park Racing Ass'n, 399 F.3d 391, 400 (1st Cir. 2005) ("the trial court is required to balance the burden of proposed discovery against the likely benefit."). "Rule 26(b) is not a discovery blank check. It requires balancing and imposes on the court the obligation to rein in overly broad, potentially abusive discovery . . . ." BG Real *Estate Servs. v. Am. Equity Ins. Co.*, No. 04-3408, 2005 U.S. Dist. LEXIS 10330, at *8 (E.D. La. May 18, 2005). *See also Rowlin v. Ala. Dep't of Pub. Safety*, 200 F.R.D. 459, 461 (M.D. Ala. 2001) ("courts have the duty to pare down overbroad discovery requests under Rule 26(b)(2), which provides that information may sometimes be withheld, even if relevant"). The discovery requested by plaintiffs here is irrelevant and duplicative, overly burdensome, and potentially abusive. Accordingly, plaintiffs' requests should be denied.

**I.     PLAINTIFFS' REQUEST FOR THE FACTS DATABASE IS OVERREACHING AND SHOULD BE REJECTED.**

Plaintiffs' claim that they require all VIOXX®-related information maintained in the FACTS database, regardless of whether it relates to a particular plaintiff's claims, is their second bite at the apple.  In the New Jersey Coordinated Litigation, Judge Higbee rejected a nearly identical request[3] after finding that "the defense is making a good point that if you have the call notes and the documents for the doctors specifically in this case, and that focuses in on the issues in this case," no more should be required.  (September 9, 2004 Transcript, New Jersey Consol. Litig., at 59:12-15 ("Sept. 9 Tr.") (attached hereto as Ex. 2).)  Instead, Judge Higbee ordered precisely what Merck has urged in the ongoing debate over the Merck Profile Form – a limited FACTS production, restricted to information concerning prescribing physicians and their physician office-mates in the first group of cases slated for trial.  (*Id.* at 63:20-64:10; November 30, 2004 Order at 2 (attached hereto as Ex. 3).)[4]  Unsurprisingly, plaintiffs scarcely acknowledge Judge Higbee's decision, much less explain why this Court should find that she was wrong.  Rather, having lost on this issue in New Jersey, plaintiffs now advance the same arguments

---

[3]     *See, e.g.*, Plaintiff's Reply Mem. of Law in Further Support of their Mot. to Compel the Production of Documents by Defendant at 16-17 (arguing that sales representative information is relevant because it "go[es] directly to Merck's knowledge of VIOXX's tendency to cause harm") (attached hereto as Ex. 1).

[4]     Rather than acknowledging that the only VIOXX® court to have decided the issue goes the other way, the State Liaison Committee absurdly argues that this Court should order the broadest possible discovery merely because some court, somewhere, some day, may do so.  (*See* State Br. at 12.)  This "lowest common denominator" argument finds no support in caselaw, and is illogical on its face.  If adopted, this rationale would compel every court handling a mass tort to give plaintiffs a blank check on the theory that plaintiffs will prevail somewhere eventually.  To the contrary, as the MDL court presiding over this litigation, this Court's rulings will be watched closely by state court judges presiding over VIOXX® litigation.

before this Court in the hopes of obtaining a different result.  The Court should reject their request for irrelevant and highly burdensome discovery.

**A.      The Vast Majority Of Information In The FACTS Database Is Not Relevant To Plaintiffs' Claims.**

Plaintiffs demand comprehensive discovery of every recorded contact between a Merck professional representative and any physician related to VIOXX®, without regard for whether those physicians prescribed VIOXX® to any plaintiff before the Court – let alone any plaintiff whose claims are being considered for trial.  In attempting to justify this overreaching request, plaintiffs offer multiple arguments why global discovery from FACTS is necessary and appropriate.  The bulk of these theories fall into one of two categories:  (1) reasons why information conveyed to physicians by Merck through its professional representatives might be relevant (*see* PSC Br. at 15 ("[t]he sales call notes are direct evidence of what the medical community was being told about Vioxx")); and (2) reasons why information collected by Merck through its professional representatives might be relevant (*see id*. at 14 (Merck's conduct must be judged against "all information it possessed at various points in time, including information relayed to detailmen by physicians").  As explained below, neither argument compels a conclusion at odds with Judge Higbee's order in New Jersey.

**1.      Information In The FACTS Database Has No Relevance Unless It Relates To Plaintiffs' Prescribing Physicians.**

As Judge Higbee had already ruled, to the extent plaintiffs seek production of FACTS in order to determine what information Merck conveyed to physicians, these materials are not relevant unless they concern a specific plaintiff's prescribing physician.  (*See* Sept. 9 Tr. at 59:12-15 ("the defense is making a good point that if you have the call notes and the documents for the doctors specifically in this case, and that focuses in on the issues in this case," no more should be required).)

5

Judge Higbee's ruling is consistent with caselaw from other courts recognizing that general marketing information is not relevant to a particular plaintiff's claims.  For example, in the Norplant litigation, plaintiffs sought to admit evidence regarding the defendant's alleged overpromotion of the product at the expense of patient health.  The court rejected this effort, holding that "[a]bsent evidence that the [plaintiffs'] physicians were exposed" to them, "the promotional and advertising materials are not relevant evidence."  *In re Norplant Contraceptive Prods. Liab. Litig.*, MDL No. 1038, 1997 WL 81092, at *1 (E.D. Tex. Feb. 21, 1997).  *See also In re Orthopedic Bone Screw Prods. Liab. Litig.*, MDL No. 1014, 1995 WL 273597, at *11 n.13 (E.D. Pa. Feb. 22, 1995) (to prevail on claim that "defendants violated the law by actively promoting or marketing their medical devices in violation of FDA requirements . . . each plaintiff has the burden of showing that [defendant] promoted/marketed its medical device to plaintiff's particular doctor or surgeon . . . and that such promotion caused the surgeon to decide that surgical implantation of the particular device was the best procedure for improving plaintiff's condition"); *Chambers v. G. D. Searle & Co.*, 441 F. Supp. 377, 382 (D. Md. 1975) ("this case presents no issue on the question of overpromotion, as [the physician] did not rely on anything said to him by salesmen").  Indeed, plaintiffs' New Jersey counsel (David Buchanan of the Seeger Weiss firm) at one point seemed to recognize the wisdom of this approach.  (*See* July 16, 2004 Transcript, New Jersey Consol. Litig., at 16:2-6 ("I'm persuaded that the incident point that what we – a better approach would be to focus on sales rep discovery associated with cases.") (discussing discovery from sales representatives' files) (attached hereto as Ex. 4).)

Plaintiffs offer numerous rationales for why company-wide evidence of promotional and marketing materials might be relevant.  But as just explained, those materials have no relevance in individual cases unless they can be tied in some direct fashion to a plaintiff

or his or her prescribing physician. Indeed, although plaintiffs assert that this data will prove relevant to a number of issues, almost all are inherently individualized questions that will depend upon testimony of the plaintiff's prescribing physician and perhaps the professional representatives who detailed that physician. For instance, the issues of fraud, misrepresentation, adequacy of warnings, failure to warn, causation, the learned intermediary doctrine, and impeachment (*see generally* PSC Br.) are all highly case-specific and will turn on the information that was conveyed to the prescribing physician for a ***particular*** plaintiff, as well as other individualized facts pertaining to a particular case. (*See also* State Br. at 6 (acknowledging that where "a plaintiff has asserted a claim of fraud, the plaintiff will be required to put on evidence ***regarding what was communicated to the plaintiff (through her prescribing physician)*** about the safety and efficacy of Vioxx") (emphasis added).) Accordingly, to the extent this information is relevant at all, it is only relevant in relation to a plaintiff's prescribing physician, and global production is not warranted.

> 2. **Any Information Reflecting Merck's Alleged Knowledge Of Adverse Experiences Obtained Through Professional Representatives Has Already Been Produced To Plaintiffs.**

Plaintiffs argue that all FACTS data are critical because any time "any physician told a detailman about a Vioxx related heart attack or stroke, that evidence may be probative as to notice, defect and/or causation." (PSC Br. at 11.) In the same vein, plaintiffs contend that FACTS information is relevant to due care and breach of duties because "records of other incidents are relevant to the issue of due care." (*Id.* at 12-14.) These arguments also have

already been rejected by Judge Higbee[5] – and for good reason:  plaintiffs already have this type of information.

As plaintiffs' counsel is aware, all adverse experience information, regardless of its source, is reported in a separate database called Worldwide Adverse Experience System ("WAES") that is specifically designed for that purpose.  (Declaration of Terry R. Jacklin ("Jacklin Decl.") ¶ 8.)  Since this database has already been produced to plaintiffs in New Jersey, their argument that they are entitled to the FACTS database as a means of establishing Merck's knowledge of adverse events rings hollow.  In fact, New Jersey counsel (who are also Lead Plaintiffs' Counsel in this proceeding) have acknowledged they have no further need for this information.  (*See* Plaintiffs' Omnibus Memorandum of Law in Opposition to Defendant Merck & Co., Inc.'s Motion for a Protective Order, N.J. Cons. Litig., at 7 ("To the extent that Cornerstone contains information used or replicated in [adverse experience] reports, plaintiffs have no interest in the database—particularly where such data implicates personal privacy concerns.  Merck has already produced its [adverse experience] database and copies of [adverse experience] reports from other sources.") (attached hereto as Ex. 5.)[6]  Moreover, because FACTS is not designed to track adverse experience data, it could not possibly provide an accurate or complete picture of this information.  Accordingly, plaintiffs have no need for the FACTS

---

[5]   *See* Sept. 9 Tr. at 56:8-10 (plaintiffs' counsel unsuccessfully arguing that "all of the sales force interactions with physicians concerning this drug put the defendant, Merck, on notice.").

[6]   Plaintiffs' assertion that they need to see all adverse experience information in order to "determine[] whether or not Merck was complying with its obligations [to the FDA] and accurately reporting this information" (PSC Br. at 14-15) is equally unavailing.  As just noted, plaintiffs have admitted they have all adverse event information, and have offered no reason to believe that Merck falsified information submitted to the FDA.

database in order to establish Merck's alleged knowledge of health effects in patients taking VIOXX®.

**B.     Merck Has Produced, And Continues To Produce, Sufficient Evidence From Which Plaintiffs Can Pursue Their Allegations.**

Plaintiffs' argument that they need the FACTS database in order to prove a pattern or practice of allegedly fraudulent promotion and marketing is similarly unavailing. (*See* PSC Br. at 5-6 ("Merck's nation-wide pattern and practice of deception is at the core of the fundamental issues of these cases.").)

Even assuming *arguendo* that plaintiffs' request for marketing information to support their "pattern and practice" allegations were appropriate (which Merck strongly disputes), Merck has already produced substantial amounts of such materials from its headquarters.[7]   Specifically, Merck has already produced all of the domestic promotion materials, press releases, adverse experience reports for the types of experiences being alleged, documents provided to the sales representatives that were approved for use and distribution to doctors and other health care providers, the headquarters-based material used to train all Merck professional representatives (both the general training materials used to train all Merck professional representatives and the VIOXX®-specific training materials) and custodial files of

---

[7]     Plaintiffs rely on a number of far-fetched hypotheticals in an effort to demonstrate why they must obtain all FACTS data.  In one, plaintiffs invent a fictional marketing strategy involving an "Efficacy Card," only to argue that without access to the entire FACTS database, counsel "might not ask any questions regarding [specific] strategies in deposition, or present any such evidence at trial."  (State Br. at 7 n.3.)  Even if plaintiffs were correct in their premise that all marketing techniques are recorded in FACTS, they do not bother to explain why counsel would be prevented from asking the professional representative and the prescribing physician to describe any and all marketing strategies and materials that were employed, or why he would not be aware of the Card by virtue of documentary discovery from the representative's files, which have been produced on a limited basis in New Jersey.

headquarters-based employees in Merck's sales department. This mountain of information provides a much more complete picture of what was being conveyed to doctors than the FACTS call notes, which provide only cursory, after-the-fact accounts of contacts between professional representatives and healthcare providers. And even if FACTS alone could provide an accurate portrayal of all of Merck's communications with physicians (which it cannot), Merck is already producing a substantial subgroup of FACTS data on a continuing basis in New Jersey and has offered to produce still more in these proceedings. This is more than enough to provide plaintiffs with a representative pool of information from which to pursue their arguments – production of the entire database is not required. In Judge Higbee's words, "if you wind up having 100 different reps and call notes from those reps[,] . . . then you really are going to start to get the picture at least of what kind of things were being said." (Sept. 9 Tr. at 59:19-22.)

As noted above, Judge Higbee ordered the production of FACTS information related to prescribing physicians, and their officemates, in the first 130 cases scheduled to go to trial in New Jersey. After accounting for all the physicians in the offices, and the fact that multiple professional representatives may visit a single doctor or office, Merck ultimately produced VIOXX®-related FACTS data pertaining to 1,000 physicians and 1800 professional representatives. (*See* Jacklin Decl. ¶¶ 13, 17.) Merck is currently in the process of producing information in New Jersey for a second wave of cases that will include another 6,000 physicians (*id.* ¶ 17), a process that is expected to be completed in September. Finally, Merck has agreed in this proceeding to produce Merck Profile Forms with FACTS information for the pool of cases that are candidates for early trials and will produce that information for a broader pool of cases should the Court so order. In light of this wide-ranging production of marketing and sales representative information, it is absurd for plaintiffs to argue that Merck's proposal "denies the

10

plaintiff the opportunity to learn about the sales and marketing techniques and message being used by Merck." (State Br. at 7-8.) To the extent plaintiffs seek knowledge about "programs and strategies, both national and regional, designed by Merck management and used by the sales force to promote Vioxx" (*id.* at 8 n.4), they have already been provided with more than enough information on that issue.

In short, plaintiffs will obtain an ample amount of FACTS data without putting Merck to the excessive burden of global production (discussed in Section II, *infra*) for the sake of materials that have no bearing on the claims of any plaintiff before this Court. For this additional reason, plaintiffs' request should be denied.

## II.   PRODUCTION OF THE FACTS DATABASE WOULD IMPOSE AN OVERWHELMING BURDEN ON MERCK THAT IS NOT JUSTIFIED BY THE MARGINAL RELEVANCE OF THE INFORMATION.

Plaintiffs' request for production of the FACTS database should also be denied because the prohibitive burden and expense of production would clearly outweigh any marginal benefit to plaintiffs.

As set forth in the accompanying, detailed declaration of Terry R. Jacklin, the Executive Director of Sales Information Services, United States Human Health and Merck Vaccines Division, the cost and inconvenience of undertaking such a production would be staggering. In weighing those burdens against any potential benefit to the plaintiffs, the Court must do more than consider whether the information sought is relevant. It must also consider whether "the burden or expense of the proposed discovery outweighs its likely benefits." Fed. R. Civ. P. 26(b)(2)(iii). Under this principle, the potential benefit of the information sought by plaintiffs here – all of which is marginal at best and most of which plaintiffs already have in other formats – cannot outweigh the enormous burden that would be imposed on Merck. To the contrary, it is apparent that "having to produce all of the information related to VIOXX® from

11

this database would be extraordinarily burdensome on Merck because of the time and resources that would have to be devoted to this task, as well as the expenses involved." (Jacklin Decl. ¶ 2.) *See Cummings v. GMC.*, 365 F.3d 944, 954 (10th Cir. 2004) (affirming order denying database access because the "proposed computer database searches are overly broad in scope, duplicative of prior requests and unduly burdensome"); *Jones v. Goord*, No. 95 CIV 8026(GEL), 2002 WL 1007614, at *11 (S.D.N.Y. May 16, 2002) (denying request for database where "[t]he defendants estimate that the cost of the efforts required by plaintiffs' requests would be in excess of $100,000, not including the burden of . . . shifting expert computer personnel from operational duties").

The FACTS database is the "nexus through which Merck manages data relating to many of the activities of its sales force involving approximately 50 different pharmaceutical products." (Jacklin Decl. ¶ 5.)  Quite simply, the database is enormous – it contains records relating to approximately 1.4 million medical professionals, including VIOXX®-related data with respect to at least 500,000 of them, and likely many more; includes approximately 600 tables, 7,000 columns of data, and 837 million rows; and contains approximately 180 gigabytes of data, or the equivalent of approximately nine million pages in paper form.  (*Id.*)  A large volume of this data is unrelated to VIOXX®.  (*Id.* ¶ 6.)  Merck employs approximately 8,000 professional representatives in the United States, many of whom do not have responsibility for VIOXX®, and employed around 10,000 professional representatives who detailed VIOXX® while it was on the market.  (*Id.* ¶¶ 6, 17.)  Those representatives who did have responsibility for VIOXX® typically also had responsibility for other Merck drugs.  Thus, "FACTS contains data on 48 Merck products other than VIOXX® and on hundreds of thousands of doctors and other

healthcare providers, many of whom were not called upon by Professional Representatives with respect to VIOXX®." (*Id.* ¶ 6.)

But the size of the database is only part of Merck's objection to plaintiffs' request. More importantly, plaintiffs' suggestion that Merck could just press a button and provide plaintiffs with the information they seek reflects a fundamental misunderstanding of the nature of this database – FACTS just is not designed for the reporting functions that plaintiffs desire. As Ms. Jacklin explains, the FACTS database "is a transactional, rather than a reporting, database." (*Id.* ¶ 7.) This "critical" distinction "makes production of the database enormously complicated and burdensome," because transactional databases do not "allow users to cull and organize information easily; rather, they are designed to process individual transactions quickly and efficiently.[8] (*Id.*) In this case, "FACTS is designed to move data between approximately seventy other databases and applications." (*Id.* ¶ 8.)

The distinction between reporting and transactional databases is important because transactional databases like FACTS "cannot be viewed in the manner that one would, for example, view an Excel spreadsheet, or Access or other familiar reporting database." (*Id.*) Neither does FACTS have a "comprehensive front-end application that would allow the data to be queried or reported," like one might use when running a search on LEXIS or Westlaw, or even other Merck databases like WAES. (*Id.*) "Rather, the data in FACTS is queried or reported

---

[8] The major difficulties associated with producing a transactional database reflect not just the judgment of Ms. Jacklin, but are recognized throughout the industry. As explained in one treatise,

> [A] query involving several large tables of a million rows or more simply will not return results[,] [making it] laughable to let end users construct their own queries in such a database. For queries that span many records or many tables, entity relation diagrams are too complex for users to understand and too complex for software to navigate. In fact, this is such an important result that we need to state it unequivocally: Entity relation data models are a disaster for querying because they cannot be understood by users and they cannot be navigated usefully by [database management systems] software....

Ralph Kimball, *The Data Warehouse Toolkit* 9 (1996).

by the seventy other databases and applications that FACTS supports." (*Id.*)  In addition, "[w]hile FACTS is far more complex than a simple repository of 'call notes,' it is not the official record for the vast majority of the data that it stores or transacts." (*Id.* ¶ 9.)  A simplified chart attached to Ms. Jacklin's declaration as Exhibit 1 demonstrates the principal data flowing to and from FACTS.

Importantly, since FACTS is not designed as a reporting database, "data is not stored in a way that facilitates easy extraction or review in its native format." (*Id.* ¶ 10.)  As a result, seemingly simple queries are "actually rather complicated," and may produce inaccurate results.  (*Id.*)[9]  While writing program to extract data is possible, it "presents extremely significant challenges." (*Id.*)

Additional hurdles are created by the fact that FACTS is a living database used on a daily basis, and to which there have been hundreds of system modifications since VIOXX® was first marketed.  (*Id.* ¶ 11.)  Accordingly, different kinds of data have been collected at different times.  (*Id.*)  Because of the number of changes to the system and to the doctor identification processes, it would be difficult to summarize all of the data from the time VIOXX® was on the market so that it could be accurately summarized and related to a particular physician or other search criteria.  (*Id.*)

The large-scale, global production from FACTS contemplated by plaintiffs has never been performed previously.  Nonetheless, the lessons learned in the much smaller New Jersey production provide guidance as to the burdens that would be imposed by plaintiffs'

---

[9] Ms. Jacklin explains why, for example, the task of querying for a particular physician is quite difficult: "[T]he same customer is often entered into FACTS multiple times by various representatives.  It is difficult to ensure that all references to a physician have been identified, and that all the various entries do in fact refer to the same physician.  So, for example, a search for John Doe, M.D. would not necessarily return results for the same physician, identified elsewhere as J. Doe, M.D. " (*Id.*)

requested production. In New Jersey, Merck was required to produce data extracts for only 130 healthcare providers and their office mates, which resulted in a universe of approximately 1,000 healthcare providers. (*Id.* ¶ 13.) Plaintiffs there selected 85 tables in FACTS from which Merck provided data relating to the relevant doctors in a database form. Even for this more limited production, it took Merck staff approximately three months, and considerable expense, to develop queries capable of accurately pulling the data for these 1,000 doctors. (*Id.*)

Although these queries have already been developed, and thus would not present as great a hurdle in subsequent production, the much more difficult and time-consuming challenge is the "up front process to define the criteria for identifying VIOXX®-related activity." (*Id.*) Merck would have to build entirely new functionality in order to identify all VIOXX®-related data in FACTS. (*Id.*) "Put simply, this is not what FACTS is designed to do, and it is the primary reason plaintiffs' request will take so long." (*Id.*) Naturally, the amount of time necessary to extract data will still vary with the number of physicians requested. (*Id.*)

In addition, the tables would have to be "translated" in order to ensure that the data would be accurate and usable. (*Id.* ¶ 14.) As Ms. Jacklin explains, "this means that, for example, everywhere in a table where a particular medical professional is designated by a number (really, a series of numbers), those numbers would have to be replaced by the name of the medical professional in order for the data to be intelligible." (*Id.*) Once this process was completed in New Jersey, the tables were put in a report format and produced in a Microsoft Access database. (*Id.* ¶ 15.) In order to permit plaintiffs to query the database, Merck created a Database Model to enable them to draw logical relationships among fields, and provided plaintiffs with a Data Dictionary. (*Id.*) Contrary to plaintiffs' presumptions, it is critical to understand that "the form in which the data was provided to plaintiffs in the New Jersey

Litigation was created specifically for that litigation; it is not how the data is ever viewed, let alone used, by anyone at Merck." (*Id.*) (*Cf.* State Br. at 8, 10 (plaintiffs' demand for production of the FACTS database "in the same format as used by the Merck sales force" and "by the company"; *id.* at 11 (demanding the ability to perform complex queries, providing plaintiffs "the ability to use the data as Merck can").).)[10]

In addition to the translation process just described, the production process is further complicated by the presence of free text data in FACTS that is not limited by product, and that can only be segregated manually. In other words, "extracting just the VIOXX® information from FACTS is not simply a question of selecting certain fields and deselecting others." (Jacklin Decl. ¶ 16.) (*Cf.* State Br. at 16 (assuming that "[t]he exports can be limited by time, scope, fields of information, and any other limitations the Court would deem appropriate through simple and easy query options and export functions.").) Nor is there a "simple or automated way of electronically redacting references to other Merck drugs in narrative text fields" due to variations in the ways professional representatives enter their notes. (Jacklin Decl. ¶ 16.) Ms. Jacklin estimates that there are more than 34 million free test fields in FACTS, approximately 17 million of which are associated with VIOXX® calls, each of which potentially contains VIOXX® data, interspersed with non-VIOXX® data which would have to be manually

---

[10]     To the extent plaintiffs are actually seeking direct, unfettered access to Merck's database, plaintiffs are not entitled to such access as a matter of law. In *In re Ford Motor Co.*, the Eleventh Circuit made clear that a party is not permitted direct access to an opposing party's databases. Rule 34(a), the court noted, permits parties to ask the other party "produce and permit the party making the request . . . to inspect and copy, any designated documents (including writings, drawings, graphs, charts, photographs, phonorecords, and other data compilations from which information can be obtained, translated, if necessary, by the respondent through detection devices into reasonably usable form)." 345 F.3d 1315, 1316 (11th Cir. 2003) (quoting Fed. R. Civ. P. 34(a)). However, that Rule "does not grant unrestricted, direct access to a respondent's database compilations. Instead, Rule 34(a) allows a requesting party to inspect and to copy the product – whether it be a document, disk, or other device – resulting from the respondent's translation of the data into a reasonably usable form." *Id.* at 1316-17. The court clarified that Rule 34(a) "allows the responding party to search his records to produce the required, relevant data," but it "does not give the requesting party the right to conduct the actual search." *Id.* at 1317. That sort of access is only justified in extreme circumstances, such as when prior improper conduct counsels permitting the requesting party to check the data compilation. *Id.*

segregated or redacted. (*Id.*) Plaintiffs dismiss Merck's concerns about the burden of redactions by noting that Merck would have to do so for rolling production anyway. (*See* State Br. at 16.) But surely it is obvious that redacting at least 17 million records is exponentially more burdensome than redacting smaller subsets of records on a rolling basis.

Production of the VIOXX®-related information concerning 1,000 physicians in New Jersey was completed in February 2005, but Merck's staff is already working on data extractions to supplement that production for approximately 6,000 other physicians. (Jacklin Decl. ¶ 17.) The first of the productions yielded VIOXX®-related call data, including notes, for approximately 1800 of the approximately 10,000 professional representatives who detailed VIOXX® during the time it was on the market; the supplemental production is estimated to produce information for a significant number of additional representatives, perhaps as many as double. (*Id.*) The initial project alone involved significant guidance from Ms. Jacklin and her senior staff, took more than three months, and required her team to miss deadlines in other projects despite working hundreds of hours of overtime, resulting in an inability to respond to business-related requests that report sales activity and guide decisionmaking. (*Id.* ¶ 24.)

As the production in New Jersey makes clear, even limited extractions of the type already conducted, and the type Merck has offered here, would be extremely costly and time-consuming. But it must be emphasized that despite these enormous hurdles, the method of production outlined in Ms. Jacklin's affidavit, and utilized in New Jersey, is the only viable alternative. "The proposed alternative of simply handing over the FACTS data in its native format to plaintiffs," who lack the years of experience and familiarity with FACTS of Merck's IS staff, "would be useless at best and result in a distortion of the information in the database at worst." (*Id.* ¶ 4.) The translation process "is the only technically feasible way to provide the

17

VIOXX® data that plaintiffs seek in an accurate and 'usable' database form." (*Id.* ¶ 18.)

Contrary to plaintiffs' supposition (*see* State Br. at 16), "'[d]umping' the data in its native form

into an Oracle database . . . would result in a set of tables that would be virtually unintelligible,

even to a sophisticated IT professional with access to the Database Model and Data Dictionary."

(Jacklin Decl. ¶ 18).  Nor could plaintiffs be taught how to query FACTS in its native form.

First, proper querying of the database requires a high level of familiarity with the data that even

Merck personnel require months to develop.  (*Id.* ¶ 19.)  Second, plaintiffs' unfamiliarity with

this complicated data, combined with the inherent limitation in querying a transactional database,

would likely result in queries returning inaccurate information.  (*Id.*)

Repeating the process used in New Jersey for a project on the scale contemplated

by plaintiffs – extracting *all* data related to VIOXX® for *all* physicians – would be enormously

expensive and time-consuming.  Ms. Jacklin would have to devote between six and eight

members of her staff to the project, many of whom are already occupied full-time with their

regular projects and tasks, including the continued development and enhancement of the FACTS

system.  (*Id.* ¶ 20.)  Other members of her staff are already working full-time on production of

other data for the VIOXX® litigation, which would be delayed if Merck were ordered to produce

the data requested by plaintiffs.  (*Id.*)

All of this would result in a "very significant burden" on department staff, who

"would be required to work many hundreds of hours of overtime in an effort to minimize the

potentially serious disruption to ongoing business commitments."  (*Id.* ¶ 24.)   And the

complicated nature of the database means that only a "limited number" of Ms. Jacklin's staff

have "a sufficient knowledge base to query the data accurately."  (*Id.*)  Moreover, the strain

could "only be minimally alleviated by hiring temporary employees, because it would take

months to train them" – the vast majority of the work would have to be done by permanent staff. (*Id.*)

Boiling all of the above down into more concrete terms, and without accounting for unforeseen difficulties that are likely to arise, Ms. Jacklin estimates that a full production from the FACTS database could take six to nine months and cost a quarter of a million dollars. (*Id.* ¶ 23.) These figures could rise significantly if plaintiffs here seek information beyond the 85 tables requested in New Jersey. (*Id.* ¶ 21.) Moreover, these figures do not reflect "the enormous time and expense that will be needed to manually redact, in electronic form, references to other Merck drugs that exist within at least 17 million free text fields in the FACTS database that may contain VIOXX® data." (*Id.* ¶ 22.) In fact, "[i]t is not an exaggeration to suggest that the redaction process alone could take many, many months to complete." (*Id.*)

In the face of Ms. Jacklin's first-hand testimony, based on years of experience with the FACTS database, State Liaison Counsel's unsubstantiated speculation that the production requested is "actually one of the cheapest and easiest forms of production for the manufacturer" (State Br. at 15) cannot be taken seriously. To the contrary, it would be inordinately expensive and time-consuming for Merck to extract and produce all information related to VIOXX® from the FACTS database – an expense that cannot be justified by any legitimate need for the information plaintiffs are seeking. For this additional reason, plaintiffs' request should be denied.[11]

---

[11]    In light of the exorbitant expense associated with plaintiffs' request, Merck requests that if the Court were to order such a global production, it consider some type of cost-shifting arrangement. *See, e.g., Zubulake v. UBS Warburg LLC*, 216 F.R.D. 280 (S.D.N.Y. 2003).

### III.   PLAINTIFFS ARE NOT ENTITLED TO THE ENTIRE FACTS DATABASE BECAUSE IT IS PROPRIETARY AND CONFIDENTIAL.

The FACTS database should also be protected from wholesale disclosure because it includes proprietary and confidential data related to Merck's sales and marketing strategy. *See Master Tech Prods., Inc. v. Prism Enters., Inc.*, 2002 WL 475192, at *5 (N.D. Ill. Mar. 27 2002) (finding that defendant's "customer base; design and development information . . .; cost structure and pricing; financial problems associated with the product; research and development; and marketing strategy" could constitute trade secrets). As other courts have recognized, the existence of a protective order should not allow plaintiffs unfettered access to proprietary information – particularly when it is of marginal relevance. *See, e.g., Wear-Guard Corp. v. Van Dyne-Crotty Corp.*, 1990 WL 209298, at *4 (E.D. Pa. Dec. 13, 1990) (finding customer lists beyond the scope of discovery in trademark case, despite existence of protective order).

As noted above, FACTS contains information relating to the calls that Merck's professional representatives have with doctors and other medical professionals, including information about the products that the professional representative discussed with the doctor, the professional representative's subjective assessment of the doctor and the doctor's beliefs about Merck's products. (*See* June 23, 2004 Certification of Hal J. Petrimoulx, submitted in the New Jersey Coordinated Litigation in support of Merck & Co., Inc.'s Br. in Opp. to Pls.' Mot. to Compel, ¶ 3) (attached hereto as Ex. 6). Merck's professional representatives use this information to develop and execute marketing strategies – to plan their calls, to select the medical professionals on whom they will call and to prioritize their efforts. (*Id.* ¶ 4.)

Disclosure of this information to Merck's competitors would seriously harm Merck's business. (*Id.* ¶ 5.) Viewing the information as a whole would enable Merck's competitors to ascertain how Merck implemented its sales and marketing strategies for

VIOXX®.  (*Id.* ¶ 6.)  This kind of information is of key importance for a sales organization.  (*Id.*)  Pharmaceutical companies are able to ascertain how many prescriptions each doctor writes – but they do not know what their competitors did to achieve those results and whether their competitors' efforts were effective.  (*Id.*)  If this information were revealed to Merck's competitors, they could shape their future marketing and sales campaigns to compete much more effectively against Merck.  (*Id.*)[12]  Moreover, concerns about disclosures in this matter are far from hypothetical; it appears that material produced in VIOXX® litigation has been leaked to the media – despite the existence of a protective order in all VIOXX® cases.

In short, not only is the information plaintiffs seek irrelevant and burdensome, but wholesale production of the FACTS database would give plaintiffs access to substantial proprietary information and potentially result in competitive harm to Merck.

## IV.  PLAINTIFFS HAVE NO LEGITIMATE NEED FOR THE NAMES AND CONTACT INFORMATION OF MERCK'S PROFESSIONAL SALES REPRESENTATIVES.

Plaintiffs' request for the names, contact information, and current employment of every professional representative who ever detailed VIOXX® raises yet another concern – that this information will be improperly used by plaintiffs' lawyers in an attempt to keep their cases in state court.

---

[12]  FACTS also includes prescription data, which Merck licenses from third-party vendors, such as IMS.  (*Id.* ¶ 7.)  These licenses contain strict confidentiality provisions that prohibit Merck from sharing data with others, and Merck takes significant measures to comply with these confidentiality provisions. (*Id.*)  Among other things, Merck policy prohibits its professional representatives from disclosing IMS data to physicians. (*Id.*)  In fact, the professional representatives sign an agreement not to disclose the data and are automatically reminded of the disclosure prohibition when they view the data on their laptop and PDA. (*Id.*)

Plaintiffs make no effort to explain why they legitimately need personal information regarding approximately 10,000 present and former professional representatives who detailed VIOXX® over the life of the drug. (Jacklin Decl. ¶ 17.) Nor could they. Obviously, they do not intend to interview or depose each and every one of the thousands of representatives at issue. Rather, the only legitimate need for this information would be to interview or depose specific professional representatives who visited specific plaintiffs' doctors as part of the trial preparation process – a need that will be more than satisfied by Merck's agreement to provide professional representative information on Merck Profile Forms for all the cases being considered for trial.

There is only one explanation for why Merck's offer does not satisfy plaintiffs – their desire to name professional representatives in future VIOXX® cases and seek to evade diversity jurisdiction. Plaintiffs' lawyers in VIOXX® cases have already gone to great lengths in their efforts to evade this MDL proceeding by naming non-diverse doctors, pharmacies, wholesale distributors and professional representatives, all in an effort to keep their cases in state court. Professional representatives are named as defendants in approximately 200 of the pending VIOXX cases. *See, e.g., Kimani v. Merck & Co., Inc.*, No. CV-05-480 (Ala. Cir. Ct. Apr. 13, 2005) (naming professional representative; filed by Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.); *Stallworth v. Merck & Co., Inc.*, No. CV-05-2118 (naming professional representative; filed by Herman, Herman, Katz & Cotlar, LLP). In many of these cases, plaintiffs have randomly sued professional representatives whose contact information they were able to obtain, regardless of whether the representatives had any involvement in the particular case. In some Florida cases, for example, plaintiffs named sales representatives from another part of the state, then sought expedited discovery to determine which representatives had actually

visited the plaintiffs' doctors, and then sought to amend their complaints post-removal with the newly obtained information. *See, e.g.*, Order, *Merced-Torres v. Merck & Co., Inc.*, No. 6:05-cv-449-Orl-19DAB (M.D. Fla. May 17, 2005) (attached hereto as Ex. 7) (denying expedited discovery and staying case). *See also* Plaintiff's Motion to Compel Depositions of Gena Ortega, John E. Kilkenny, and Merck's Corporate Representative with the Most Knowledge of the Identity of the Supervising Sales Representatives and Local Sales Representatives for Florida, *White v. Merck & Co., Inc.*, No. 8:05-cv-773-T-27MAP (M.D. Fla. June 16, 2005) (seeking expedited depositions of two professional representatives after the court found they were fraudulently joined, as well as the deposition of a corporate representative who can identify other professional representatives for purposes of adding them to future VIOXX® cases) (attached hereto as Ex. 8). Needless to say, this is not a proper use of discovery. *Cf. Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 353, n.17 (1978) ("In deciding whether a request comes within the discovery rules, a court is not required to blind itself to the purpose for which a party seeks information. Thus, when the purpose of a discovery request is to gather information for use in proceedings other than the pending suit, discovery properly is denied."); *see also* PSC Br. at 3 (acknowledging that discovery is sought "for the benefit of not only present but future prospective litigants").

The practice of naming sales representatives to defeat diversity jurisdiction has been widely criticized by federal courts as a prime example of fraudulent joinder. As one federal court has noted, "in almost every case analyzing the joinder of sales reps, the court denied remand due to fraudulent joinder."[13] *Faison v. Wyeth, Inc.*, 353 F. Supp. 2d 1273, 1277-78 (S.D. Ga. 2004) )

---

[13]     While the issues of fraudulent joinder and manipulative pleading tactics can be addressed by the Court in the context of remand motions, this Court should take every precaution to protect the efficiencies of the MDL and to prevent such abuses before they occur.

(denying remand and finding consumers fraudulently joined sales representatives because there is no liability for a sales representative's failure to warn based upon the alleged omissions by the employer/manufacturer); Walker v. Medtronic, Inc., No. 1:03CV74-D-D, 2003 WL 21517997, at *3-4 (N.D. Miss. June 4, 2003) (denying remand and dismissing claims against sales representative because a sales representative has no duty to warn) (applying learned intermediary doctrine); In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig., MDL No. 1203, 220 F. Supp. 2d 414, 424-25 (E.D. Pa. 2002) (finding fraudulent joinder of sales representatives because the learned intermediary doctrine shields them from fraud and misrepresentation claims brought by consumer); In re Rezulin Prods. Liab. Litig., 133 F. Supp. 2d 272, 282 (S.D.N.Y. 2001) ("Rezulin I"); Johnson v. Parke-Davis, 114 F. Supp. 2d 522, 524-26 (S.D. Miss. 2000) (motion for remand denied).  Requiring Merck to produce the names, contact information, and current employment of all VIOXX® professional representatives would be an open invitation to plaintiffs' counsel throughout the country to engage in this manipulative pleading tactic.  (Cf. PSC Br. at 25 ("In some cases individually responsible detailmen may be named as defendants.").)  The Court should decline to issue that invitation.

### Conclusion

In asking the Court to order production of all VIOXX®-related information in the FACTS database and the names and addresses of all professional representatives who ever detailed VIOXX®, plaintiffs seek discovery that is irrelevant to the litigation, duplicative of the material sought in the Merck Profile Form, extremely burdensome to produce and likely to result

in abusive pleading tactics.  For the foregoing reasons, the Court should deny their request.

Respectfully submitted,

Phillip A. Wittmann, 13625
Anthony M. DiLeo, 4942
Dorothy H. Wimberly, 18509
Carmelite M. Bertaut, 3054
Stone Pigman Walther Wittmann L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone: 504-581-3200
Fax:    504-581-3361

Defendants' Liaison Counsel

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Merck's Response To Plaintiffs' Request For Production Of The Facts Database And Professional Representative Information has been served on Liaison Counsel, Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8, on this 17 day of June, 200[5].

# SEE RECORD FOR

# EXHIBITS

# OR

# ATTACHMENTS

# NOT SCANNED