# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| IN RE Vioxx PRODUCTS LIABILITY LITIGATION | MDL No. 1657 |
|  | Section: L |
|  | Judge Fallon |
| This document relates to: |  |
|  | Jury Trial Demanded |
| *Aguero, et al. v. Merck & Co., Inc.* (05-0504 E.D. La.) (C.A. No. 04-cv-05341 (D.N.J.)) | **PURCHASE CLAIMS MASTER CLASS ACTION COMPLAINT** |
| *Anderson, et al. v. Merck & Co., Inc.* (C.A. 05-CV-3796)(D.N.J.) |  |
| *Benoit, et al. v. Merck & Co., Inc.* (05-1000 E.D. La.) (C.A. No. 04 CH 20216 (Cir. Ct., Cook County, Illinois) and (Case No. 05 C 0118 (N.D.Il.)) |  |
| *Biondillo, et al. v. Merck & Co., Inc.* (05-2270 E.D. La.) C.A. No. 1:05-CV) |  |
| *Cavalier Homes, Inc. v. Merck & Co., Inc.* (05-1075 E.D. La.) (C.A. No. 04-C-6373 (D.N.J.)) |  |
| *Cheeseman v. Merck & Co., Inc.* (05-0566 (E.D. La.) (C.A. No. 1:04-261 (D.Vt.) |  |
| *Commonwealth Care Alliance v. Merck & Co., Inc.* (05-cv-10931 (D. Ma.) (C.A. No.05-0644 (D. Mass.)) |  |
| *County of Suffolk, New York v. Merck & Co., Inc.* (C.A. No.05-CV-1582(E.D.N.Y.)) |  |
| *Fontanille, et al. v. Merck & Co., Inc.* (05-00447 E.D. La.) (C.A. No. 04-20727 CA 2 (Cir. Ct., 11th Judicial Cir. in and for Miami-Dade County, Fla.) and (Case No. 04-22799-Civ. (S.D. Fla.)) |  |

461385.1

|  | ) |
| --- | --- |
| *Frankenmuth Financial Services, et al. v. Merck & Co., Inc.* (05-2280 E.D. La.) (C.A. No. 05-cv-71577 (E.D. Mich.)) | ) ) ) ) ) |
| *Midwest Operating Engineers Health & Welfare Fund v. Merck & Co., Inc.* (05-cv-02525 (D.N.J.) | ) ) ) ) |
| *Saia v. Merck & Co., Inc.* (05-0488 E.D. La.) (C.A. No. 04-12166-RCL (D. Mass.)) | ) ) ) ) |
| *Seitz, et al. v. Merck & Co., Inc.* (05-749 E.D. La.) | ) ) ) |
| *Teamsters Local 237 Health & Welfare Fund, et al. v. Merck & Co., Inc.* (05-516 E.D. La.) | ) ) ) ) |
| *UFCW 1776 and Participating Employers Health and Welfare Fund, et al. v. Merck & Co., Inc.* (05-111 E.D. La.) (C.A. No. 05-CV0020 (E.D. Pa.)) | ) ) ) ) ) ) |
| *Wright v. Merck & Co., Inc.* (05-980 E.D. La.) (C.A. No. CV04-3037 (D. Ariz.)) | ) ) ) |

And all Purchase Claims Class Action complaints pending or subject to transfer to MDL 1657

## PURCHASE CLAIMS MASTER CLASS ACTION COMPLAINT

### INTRODUCTION

The below named Plaintiffs, by the undersigned counsel, on behalf of themselves and all others similarly situated, hereby set forth in this Purchase Claims Master Class Action Complaint ("Master Complaint") claims for equitable, injunctive, and declaratory relief, and compensatory and punitive damages, that raise questions of law and fact common to the

members of the Class and subclasses proposed herein.  This Master Complaint is submitted

pursuant to the Case Management Order of this Multidistrict Litigation ("MDL") Transferee

Court, to serve the administrative functions of efficiency and economy as described by this Court

more fully in *In re: Propulsid Product Liability Litig.*, 208 F.R.D. 133, 141 (E.D.La. 2002),  to

present certain common claims and common questions of fact and law for appropriate action by

this Court in the context of this Multidistrict proceeding.  This Master Complaint does not

include all claims asserted in all of the purchase claims actions that have been transferred to this

Court under 28 U.S.C. § 1407.  Those matters are set forth in the individual and class actions

filed by purchase claims Plaintiffs and served against Defendant.  This Master Complaint does

not constitute a waiver or dismissal of said actions or the claims asserted therein.

1.      This Class Action is brought by and on behalf of all Consumers and Third-

Party Payors (Consumers and Third-Party Payors are referred to herein collectively as

"Plaintiffs", "class members", and "End-Payors") who purchased or paid for the prescription

drug Vioxx® ("Vioxx"), an anti-inflammatory drug researched, manufactured, marketed,

promoted, advertised, sold, and distributed by Defendant Merck & Co., Inc. ("Merck" or

"Defendant").  Vioxx was widely prescribed to relieve pain and inflammation for osteoarthritis,

rheumatoid arthritis in adults and children, and menstrual pain and migraine headaches in adults.

2.      At all times relevant to this action, Defendant Merck intentionally,

recklessly, and/or negligently concealed, suppressed, omitted, and misrepresented the risks,

dangers, defects, and disadvantages of Vioxx, and advertised, promoted, marketed, sold, and

distributed Vioxx as a safe prescription medication when, in fact, Merck had reason to know and

did know that Vioxx was not safe for its intended purposes, for patients for whom it was

prescribed, and for whom it was sold; and that Vioxx caused serious medical problems, and in certain patients, catastrophic injuries and deaths.

3.     In public statements to the press, Merck estimates that 105 million U.S. prescriptions were written for Vioxx from May 1999, when Vioxx was first "launched," through September 30, 2004, when it was withdrawn from the worldwide market (the "Class Period"). Based upon this estimate, Merck estimates that the number of patients who have taken Vioxx in the United States since its May 1999 launch is approximately 20 million.

4.     Pursuant to Rule 23(b)(1), 23(b)(2), 23(B)(3), and/or 23(c)(4)(A) of the Federal Rules of Civil Procedure, Plaintiffs will seek certification of a national End-Payor purchase claims class, through one or more actions transferred to this Court in the MDL 1657 litigation, consisting of:

> All End-Payors located in the United States, including Consumers and Third Party Payors,[1] who purchased and/or paid for Vioxx not for resale during the period from May 20, 1999 through September 30, 2004, when Vioxx was withdrawn from the market.[2]

5.     Alternatively, in the event that this Court determines that a national End-Payor purchase claims class would not satisfy the requirements for class certification pursuant to Fed. R. Civ. P. 23, Plaintiffs would move for the certification of individual state class actions, consisting of, as to each state for which certification is sought:

> All End-Payors located in [State], including consumers and Third Party Payors, who purchased and/or paid for Vioxx not for resale

---

[1] Third Party Payors include all entities that: (a) provide, sponsor or insure a healthcare plan, which includes prescription drug coverage to natural persons, and (b) purchase, pay or insure all or part of the cost of prescription drugs prescribed and dispensed to those persons pursuant to a health plan.

[2] Plaintiffs have named class representatives for the Class, but have not named class representatives for every jurisdiction. Should the Court so require or direct, Plaintiffs are prepared to name proposed class representative Plaintiffs for every jurisdiction, or for each statewide class.

during the period from May 20, 1999 through September 30, 2004,
when Vioxx was withdrawn from the market.

6.      In the event that Plaintiffs are directed to pursue the statewide class course
of action set forth in the forgoing paragraph, Plaintiffs intend to request the Panel for Multi-
District Litigation to remand, to its transferor forum, each state class action as to which Plaintiffs
seek certification, solely for purposes of addressing the class certification question.  Remand of
the class certification question will allow appellate review of the statewide class certification
question by the appropriate Circuit Court(s), thus ensuring that no party will have been
prejudiced by the Panel's random selection of a transferee forum whose procedural jurisprudence
would determine the class certification issue differently from that of the transferor forum that is
charged with its ultimate trial.  For purposes of uniformity and judicial efficiency, Plaintiffs
would further move the MDL Panel to appoint this Court to sit, by *ad hoc* designation, over the
class certification issue in each transferor court as to which such remand is sought.

7.      The extent to which a drug is paid for by third party payors is determined
by that drug's status on the third party payor's "formulary," which is a list of drugs that plan
participants are authorized to purchase for payment under the benefit plan.

8.      Placement of a prescription drug on the formularies of third party payors,
medical care organizations, and of prescription benefit managers (who are employed by the third
party payors to design or administer the benefit plans) is critical to the success of the drug.
Merck knew that preferred placement on these formularies would guarantee commercial success
for Vioxx.

9.      In an elaborate and sophisticated manner, Merck aggressively marketed
Vioxx directly to consumers and medical professionals (including physicians and leading
medical scholars) in order to leverage pressure on third party payors, medical care organizations,

461385.1                                    - 4 -

and large institutional buyers (*e.g.*, hospitals) to include Vioxx on their formularies. Faced with the increased demand for the drug by consumers and health care professionals that resulted from Merck's successful advertising and marketing blitz, third party payors were compelled to add Vioxx to their formularies. Merck's marketing campaign specifically targeted third party payors, physicians, and consumers, and was designed to convince them of both the therapeutic and economic value of Vioxx.

10.     Merck represented that Vioxx was similar to ibuprofen and naproxen but was superior because it lacked any of the common gastrointestinal adverse side effects associated with these and other non-steroidal anti-inflammatory drugs ("NSAIDS"). For instance, NSAIDS can, in certain patients, cause gastrointestinal perforations, ulcers and bleeding with long-term use. Merck promoted Vioxx as a safe and effective alternative that would not have the same deleterious and painful impact on the gut, but that would be just as effective, if not more so, for pain relief.

11.     Vioxx possessed dangerous and concealed or undisclosed side effects, including the increased risk of serious cardiovascular events, such as heart attacks, unstable angina, cardiac clotting, deep vein thrombosis, hypertension, and cerebrovascular events, such as strokes. In addition, Vioxx was no more effective than traditional and less expensive NSAIDs and, just like traditional NSAIDs, carried a risk of perforations, ulcers, and gastrointestinal bleeding. Merck chose not to warn about these risks and dangers.

12.     Merck knew of these risks before the U.S. Food and Drug Administration (the "FDA") approved Vioxx for sale on May 20, 1999, but Merck ignored, downplayed, suppressed, omitted, and concealed these serious safety risks and denied inefficacy in its promotion, advertising, marketing, and sale of Vioxx. Merck's omission, suppression, and

concealment of this important information enabled Vioxx to be sold to, and purchased, or paid for by, the End-Payors at a grossly inflated price.

13.     Internal Merck e-mails and marketing materials, as well as statements made by outside scientists, show that Merck fought for years to conceal and suppress safety concerns from the public so as to preserve the drug's commercial prospects and to sell Vioxx as a premium drug, when it was not.

14.     Because Merck engaged in a promotional and marketing campaign that featured an advertising blitz directly targeted to consumers, that touted Vioxx as a safer drug than other drugs in its class, while uniformly failing to disclose the health risks of Vioxx, Merck was able to justify pricing Vioxx at almost 100 times the cost of generic aspirin.  In reality, that price inflation was not justified.  Had Merck disclosed the truth about Vioxx, it would not and could not have reaped the billions of dollars in Vioxx sales that it achieved as a direct result of its concealment, omission, suppression, and obfuscation of the truth.

15.     It was not until September 30, 2004, that Merck finally acknowledged Vioxx's deleterious side effects and announced that it was withdrawing the drug from the worldwide market based on what it misleadingly termed "new" and "unexpected" evidence linking Vioxx to an increased risk of heart attacks and strokes.

16.     Throughout the Class Period, Merck intentionally, deliberately, knowingly, and actively concealed, omitted, suppressed, and obfuscated important and material information regarding the risks, dangers, defects, and disadvantages of Vioxx from Plaintiffs, the Class, the public, the medical community, and the regulators.  This concealment and omission was deliberate, knowing, active, and uniform, was intended to induce and maximize sales and purchases of Vioxx, and prevented Plaintiffs and the Class from obtaining all the material

information that would be important to their decisions as reasonable persons to purchase, pay for, and/or use Vioxx.

17.     Merck's systematic, active, knowing, deliberate, and uniform concealment, omissions, suppression, and conduct caused Plaintiffs and the Class to purchase, pay for, and/or use Vioxx; and caused Plaintiffs' and the Class' losses and damages as asserted herein.

18.     Merck's corporate decisions regarding promotion, marketing, and sale of Vioxx across the country were made and implemented from its New Jersey headquarters. Throughout the Class Period, Merck's actions were centrally conceived and executed in a cohesive, uniform, and disciplined fashion throughout the country.

19.     This is a Class Action filed on behalf of a national Class (or, in the alternative, statewide classes) of End-Payors in the United States who paid for Vioxx prescriptions for themselves or, in the case of Third Party Payors, for purchases of Vioxx by their members, participants, and beneficiaries ("the Class," as defined further below).  This action seeks injunctive and declaratory relief, damages, restitution, and disgorgement arising out of Merck's wrongful misconduct in connection with the research and development, manufacture, promotion, marketing, advertising, sale, and distribution of Vioxx.  The Class members reserve all rights, claims and interests regarding subrogation for the costs of diagnosing and treating present and future known and unknown health effects allegedly caused by Vioxx.

## JURISDICTION

20.     The Court has subject matter jurisdiction of this class action pursuant to 28 U.S.C. § 1332(d), pursuant to the Class Action Fairness Act ("CAFA"), because this class action includes Plaintiffs and Class members who are of  diverse citizenship to the primary defendant;

and, the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.

## PARTIES

21.     Plaintiff Brenda Aguero, who filed Civil Action No. 04-cv-05341 (D. N.J.), is a citizen of the State of Washington and paid for Vioxx during the Class Period.  She seeks the certification of a national End-Payor Class through the conduct of a choice of law determination under New Jersey law and the application of New Jersey substantive law to the class claims.

22.     Plaintiff Christie Anderson, who filed a nationwide class action in the District of New Jersey, (Civil Action No. 05-CV-3796), is a citizen of the State of Kentucky and paid for Vioxx during the Class Period.  She seeks certification of a national End-Payor Class via through the conduct of a choice of law determination under New Jersey law and the application of New Jersey substantive law to the class claims.

23.     Plaintiffs Marilyn Benoit and Coleen Lowery, who filed Civil Action No. 04 CH 20216 (Cir. Ct., Cook County, Illinois), which was then removed to federal court in the Northern District of Illinois (Case No. 05-C-0118 (N.D. Il.)), are citizens of Illinois and paid for Vioxx during the Class Period.  They seek certification of said action, transferred to this Court under 28 U.S.C. §1407;  the conduct of a choice of law determination under New Jersey law; and, the application of New Jersey substantive law to the claims of the national class.

24.     Plaintiff Michelle Biondillo and Plaintiff Stephen Keisker, who filed Civil Action No. 1:05-CV-508 (S.D. In.), are citizens of Indiana and paid for Vioxx during the Class Period.

25.     Plaintiff Cavalier Homes, Inc., who filed Civil Action No. 04-C-6373 (D.N.J.), is a Delaware corporation with its principal place of business in Alabama.  Plaintiff

paid for Vioxx for its participating employees under its pharmacy benefit plan during the Class Period. Cavalier Homes, Inc. seeks certification a national End-Payor Class action through the conduct of a choice of law determination under New Jersey law and the application of New Jersey substantive law to the class claims.

26.     Plaintiff Sara Cheeseman, who filed Civil Action No. 1:04-261 (D. Vt.), is a citizen of Vermont and paid for Vioxx during the Class Period.

27.     Plaintiff Commonwealth Care Alliance ("CCA"), who filed Civil Action No. 05-0644 (D. Mass.), is a prepaid care system contracting with Medicare and Massachusetts Medicaid to provide comprehensive care to vulnerable populations. Its offices are located in Boston, Massachusetts. CCA is third-party payor that paid for Vioxx on behalf of its beneficiaries during the Class Period, and was injured by the illegal conduct described in this Master Complaint. CCA has standing to bring this action on behalf of itself and all other third-party payors who paid for or purchased Vioxx in the Commonwealth of Massachusetts during the Class Period.

28.     Plaintiff Clara Fontanilles, who filed Civil Action No. 04-20727 CA 2 (Cir. Ct., 11th Judicial Cir. in and for Miami-Dade County, Fla.), which was then removed, Case No. 04-22799-CIV (S.D. Fla.), is a citizen of Florida and paid for Vioxx during the Class Period.

29.     Plaintiff Frankenmuth Financial Services ("Frankenmuth"), who filed Civil Action No. 05-cv-71577 (E.D. Mich.), is a citizen of the State of Michigan, maintaining its principal place of business at Frankenmuth, Michigan. Frankenmuth has paid for purchases of Vioxx totaling more than $41,000.

30.     Plaintiff Linda A. Watters, Commissioner, Offices of Financial and Insurance Services for the State of Michigan, who filed Civil Action No. 05-CV-71577 (E.D.

Mich.), in her capacity as Rehabilitator of The Wellness Plan and in her capacity as Liquidator of

Michigan Health Maintenance Organization Plans, Inc., formerly known as OmniCare Health

Plan, Inc., is a Michigan official whose function is to collect and liquidate all assets and

liabilities of the former private third party payers Wellness Plan and OmniCare.  At all times

relevant to this Complaint, Wellness Plan and OmniCare were private third party payers who

function was to assume the risk of payment of medical and prescription costs on behalf of the

participants in its plan.  Wellness Plan paid for purchases of Vioxx totaling more than $136,000

during the Class Period.

   31. Plaintiff Midwest Operating Engineers Health and Welfare Fund

("Midwest Operating Engineers") who filed Civil Action No. 05-2525 (D.N.J.), is a joint union-

employer Taft-Hartley Trust Fund, organized and operated in the State of Illinois that purchased

and/or reimbursed Plaintiff's members for purchasing Vioxx during the Class Period.   Plaintiff

Midwest Operating Engineers seeks certification of a national End-Payor action through the

conduct of a choice of law determination under New Jersey law; and, the application of New

Jersey substantive law to the class claims.

   32. Plaintiff Frank Saia, who filed Civil Action No. 04-12166-RCL (D.

Mass.),  is a citizen of Massachusetts and paid for Vioxx during the Class Period.

   33. Plaintiff Christine Seitz, who filed Civil Action No. 05-0749 (E.D. La.), is

a citizen of Michigan and paid for Vioxx during the Class Period.

   34. Plaintiff American Federation of State, County and Municipal Employees,

AFL-CIO ("AFSCME"), who filed Civil Action No. 05-0749 (E.D. La.), is a labor union that

represents approximately 1.5 million public and private sector employees.  Its headquarters are

located at 1635 L Street, N.W., in Washington, D.C.  AFSCME's objectives are to promote the

welfare of its members through the collective bargaining process.  During the Class Period, AFSCME and its members paid for Vioxx, manufactured, marketed, sold, and distributed by Merck at inflated prices, and were injured by the illegal conduct alleged herein.

35.     Plaintiff New York StateWide Senior Action Council ("StateWide"), who filed Civil Action No. 05-0749 (E.D. La.), is a grassroots membership organization made up of individual senior citizens and senior citizen clubs from all parts of the State of New York. Its headquarters are located at 275 State Street, Albany, New York.  During the Class Period, StateWide's members purchased Vioxx that was manufactured, marketed, sold, and distributed by Merck, made inflated payments or co-payments for Vioxx, and were injured by the illegal conduct alleged herein. As an unincorporated association, StateWide has standing to pursue this action under Fed. R. Civ. P. 17(b)(1).

36.     Plaintiff United Senior Action of Indiana, Inc. ("United Senior Action"), who filed Civil Action No. 05-0749 (E.D. La.), is a not-for-profit corporation organized under and by virtue of the laws of Indiana.  Its offices are located at 324 W. Morris St., Suite 114, Indianapolis, Indiana.  United Senior Action includes more than 14,000 seniors and over 100 senior clubs in Indiana.  During the Class Period, United Senior Action's members purchased Vioxx manufactured, marketed promoted, sold and distributed by Merck, made inflated payments or co-payments for Vioxx, and were injured by the illegal conduct alleged herein.

37.     Plaintiff UFCW Local 1776 and Participating Employees Health and Welfare Fund ("UFCW Fund"), who filed Civil Action No. 05-CV0020 (E.D. Pa.), is a citizen of the Commonwealth of Pennsylvania, maintaining its offices at 3031B Walton Road, Plymouth Meeting, Montgomery County, Pennsylvania.  The UFCW Fund has paid for purchases of Vioxx totaling more than Nine Hundred Thousand Dollars ($900,000.00) during the Class Period.

38.     Plaintiff Painters District Council No. 30 Health and Welfare Fund ("Painters Fund"), who filed Civil Action No. 05-CV0020 (E.D. Pa.), is a citizen of Illinois, maintaining its principle place of business at 3813 Illinois Avenue, St. Charles, Kane County, Illinois.  The Painters Fund has paid for and/or reimbursed for purchases of Vioxx totaling more than One Hundred Thousand Dollars ($100,000.00).

39.     Plaintiff Melvin Williams and Plaintiff Sharon Murphy, who filed Civil Action No. 05-50 (S.D. Ill.), are citizens of Illinois and paid for Vioxx during the Class Period.

40.     Plaintiff Edward W. Wright, who filed Civil Action No. CV04-3037 (D. Ariz.), is a citizen of Arizona and paid for Vioxx during the Class Period.

41.     Plaintiff Emily Feinberg, who filed Civil Action No. 05-0644 (D. Mass.), is a citizen of Massachusetts and paid for Vioxx during the Class Period.

42.     Plaintiff Health Care for All ("HCFA"), who filed Civil Action No. 05-644 (D. Mass.), is a consumer health advocacy organization that has led the fight in Massachusetts to expand access to affordable, quality health care since 1985.  HCFA's offices are located in Boston, Massachusetts.  HCFA's members purchased and have purchased Vioxx during the Class Period, and were injured by the illegal conduct described in this Master Complaint.  HCFA has standing to bring this action on behalf of itself and all consumers in the Commonwealth of Massachusetts.

43.     Plaintiff, the County of Suffolk, New York ("Suffolk County"), who filed Civil Action No. 05-CV-1582, is a citizen of the State of New York.  Suffolk County comprises ten towns in eastern Long Island, New York, and administers a wide range of services on behalf of its residents, including parks, services for families and children, health centers, public assistance, and housing services.  It is one of the largest employers on Long Island, employing

more than 14,000 people in 22 departments.  Suffolk County funds its own health insurance plan

for the benefit of its employees and their eligible dependents, through which it pays part, or all,

of the purchase price for their prescriptions drugs, including Vioxx.

44.    Plaintiff Teamsters Local 237 Welfare Fund, who filed Civil Action No.

04-CV-9248 (S.D.N.Y.) is a welfare fund.  Plaintiff Teamsters Local 237 Welfare Fund has its

office and principal place of business located at 216 West 14th Street, New York, New York,

10011.

45.    The above-named Plaintiffs assert their claims in their individual capacity

and on behalf of all other similarly-situated individuals and entities throughout the United States

who purchased and/or paid for Vioxx in the United States during the period from its approval for

sale by the United States Food and Drug Administration (the "FDA") on May 20, 1999, through

its worldwide withdrawal on September 30, 2004 (the "Class Period").  As set forth in the Class

Action Allegations section of this Master Complaint, Plaintiffs seek a national class (with

subclasses as appropriate) under New Jersey law, or, in the alternative, statewide classes for the

unitary adjudication of all common questions of law and fact.

46.    Merck, a New Jersey corporation, is a pharmaceutical manufacturing and

sales company with headquarters at 1 Merck Drive, Whitehouse Station, New Jersey.  At all

times relevant, Merck was and continues to be engaged in the business of testing, manufacturing,

labeling, licensing, marketing, advertising, distributing, promoting, and selling, either directly or

indirectly through third parties or related entities, the prescription drug Vioxx, which it

developed, and marketed primarily from its New Jersey headquarters and facilities.  Merck does

business throughout the United States of America.

47.     At all times relevant hereto, Merck manufactured, advertised, promoted, marketed, sold, and distributed Vioxx in interstate commerce throughout the United States and worldwide.

## FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS

### A.     Background

48.     On May 20, 1999, the FDA approved the sale and distribution of Vioxx, the brand name for rofecoxib, by Merck.

49.     Vioxx is a member of a class of pain relievers called non-steroidal anti-inflammatory drugs ("NSAIDs").

50.     Other pain relievers in this class of drugs include, among others, aspirin, naproxen (such as ALLEVE®), ibuprofen (such as ADVIL® and MOTRIN®), and diclofenac (such as VOLTAREN®).

51.     NSAIDs act to relieve pain and inflammation by inhibiting production of an enzyme called prostaglandin G/H synthase.  This enzyme consists of two similar forms, cyclooxygenase-1 ("COX-1") and cyclooxygenase-2 ("COX-2").  In the medical and pharmacological literature, COX-2 is generally associated with effects on pain and inflammation; and COX-1 is associated with, among other things, platelet aggregation and the integrity of the gastrointestinal tract.  Traditional NSAIDs inhibit both COX-1 and COX-2 enzymes.  Traditional NSAIDs have been associated with negative gastrointestinal side effects including perforations, ulcers, and bleeding in the gastrointestinal ("GI") tract.

52.     Merck distinguished Vioxx from other NSAIDs as a selective COX-2 inhibitor, that only targets and inhibits the COX-2 enzyme to control pain and inflammation. Merck's working hypothesis and market theory was that Vioxx would decrease the GI complications commonly associated with traditional NSAIDs because of it did not alter the

COX-1 enzymes, and reduce pain and inflammation by selectively inhibiting the COX-2 enzymes.

53.     Vioxx continued to pose a risk of adverse GI side effects, including perforations, bleeds, and ulcers in the GI tract.  Unlike other members of the NSAID class of drugs, Vioxx contributes to the aggregation of blood platelets, thereby increasing blood clotting. Most significantly, unlike other NSAIDs, Vioxx significantly increases the incidence of adverse cardiovascular and cerebrovascular events, such as myocardial infarctions (heart attacks), ischemic strokes, hypertension, and deep vein thrombosis.

**B.      Merck Knew and Concealed the Risks of Serious Adverse Events Associated with the Use of Vioxx When Planning Its Vioxx Pre-Marketing Clinical Trials.**

54.     On December 16, 1994, Merck filed an Investigational New Drug Application (an "IND") for Vioxx with the FDA.  This IND included data and analyses from approximately two years worth of pre-clinical testing.

55.     In May 1996, Merck announced that it was developing a selective COX-2 inhibitor, publicizing it as miracle drug for arthritis sufferers.  At the time, Merck faced patent expirations on three of its ten most successful drugs—Mevacor®, Pepcid®, and Prilosec®, which represented $4 billion a year in U.S. drug sales, *Vioxx the Victor* (Med Ad News, February, 2000); and Gloria Lau, *Merck Promises to Remain Healthy Even As Blockbuster Patents Expire*, Investor's Bus. Daily, at 1 (November 16, 2000).

56.     At the same time, Merck faced significant competitive threats from Monsanto and Pfizer, who were, in combination, developing a competitive selective COX-2 inhibitor, Celebrex® ("Celebrex"), scheduled to hit the market months ahead of Vioxx.  Merck understood its precarious financial position—if Vioxx could not go to market quickly, Merck would face serious financial constraints.  "If those first two [Vioxx] compounds had failed . . .

we would be a very different company." Gardiner Harris, *The Cure: With Big Drugs Dying, Merck Didn't Merge—It Found New Ones*, Wall Street Journal, Jan. 10, 2001, quoting, Dr. Edward Scolnick, then President of Merck Research Laboratories.

57.     To corner the huge NSAID market, Merck recognized the crucial need to demonstrate that Vioxx had significant superiority over the competition.

58.     In 1996, Merck announced the initiation of its clinical trials for MK-966, the internal designation for Vioxx.

59.     After learning that Pfizer was initiating a large outcome study to support a post-launch label change indicating the GI superiority of Celebrex, Merck was forced to reconsider its own studies.  Ultimately, Merck proposed a large-scale, long-term, double-blind study of gastrointestinal toxicity in patients taking Vioxx.  That study was intended to mimic the large-scale Celebrex clinical trial to be conducted by Pfizer.  This Vioxx G.I. Outcomes Trial ("VIGOR") was designed specifically to demonstrate the GI superiority of Vioxx as compared to another of the NSAID competitors, naproxen.

60.     In the VIGOR planning stages, Merck suspected that Vioxx might cause cardiovascular problems.  On November 21, 1996, a Merck internal memorandum, discussing the design of the VIGOR trial, suggested that participants be permitted to use aspirin during the study to moot the cardiovascular risks of Vioxx because, "there is a substantial chance that significantly higher rates" of cardiovascular problems would be seen in the Vioxx group.

61.     On February 25, 1997, Merck scientist Briggs Morrison sent another internal email about the design of the VIGOR trial.  In that email, Morrison suggested that VIGOR participants be allowed to take aspirin to avoid flagging the cardiovascular risks of

Vioxx. Unless patients in the Vioxx group could take aspirin, he warned, "without COX-1 inhibition you will get more thrombotic events and kill drug [*sic*]."

62.     Merck researcher Alise Reicin, now a Merck Vice President for clinical research, responded in an internal Merck email that Merck was in a "no-win situation":

> This is a no win situation! The relative risk of [adverse GI events with] even low dose aspirin may be high as 2-4 fold. Yet, the possibility of increased CV events is of great concern (I just can't wait to be the one to present those results to senior management!). What about the idea of excluding high risk CV patients – *i.e.* those that have already had an MI, CABG, PTCA? This may decrease the CV event rate so that a difference between the two groups would not be evident. The only problem would be – Would we be able to recruit any patients?

63.     Therefore, even years before approval of the drug, Merck met with the FDA officials to determine what type of studies would be necessary to demonstrate that Vioxx really possessed the safety benefits that Merck claimed the drug promised. (Minutes of End-of-Phase II Conferences with the FDA (May 22, 1996)). Senior FDA representatives advised Merck that in order to get the label it wanted, Merck would have to demonstrate the safety of the drug as compared to a placebo, or sugar pill, in a large scale outcomes trial.

64.     At first, Merck contemplated comparing the safety of Vioxx to Tylenol (acetaminophen), because of Tylenol's placebo-like safety perception. However, two Merck executives, "questioned the advisability of an acetaminophen arm, because the findings could highlight the favorable properties of acetaminophen." (COX-2 Inhibitor Consultants' Meeting Minutes (September 28, 1996)). As a result, Merck quickly scrapped the recommendation to compare Vioxx to Tylenol in such a trial.

65.     In October 1997, Merck sponsored one of the clinical studies in healthy human subjects lead by Dr. Garrett FitzGerald from the University of Pennsylvania. The study was known as protocol 023. During the study, Dr. FitzGerald observed that patients taking

Vioxx had significantly lower levels off prostacyclin metabolites in their urine than patients taking placebo.   In the medical literature, it is believed that prostacyclin in the bloodstream inhibits platelet aggregation (i.e., blood clotting).   Dr. Fitzgerald suggested to Merck that if Vioxx, a selective COX-2 inhibitor, was causing reduced prostacyclin levels in blood vessels, as well as in urine, then COX-2 inhibitors are likely to cause increased blood clots and associated cardiovascular events.

66.     In December 1997, Merck appointed a "Task Force" to investigate the incidence of cardiovascular serious adverse events in the ongoing Vioxx clinical trials.   The reason for the investigation was the unexpected result of an early clinical trial, which showed a decline in the levels of PGI 2, the most potent of all inhibitors of platelet aggregation, but no inhibition of systemic thromboxane, in the urinalysis of patients on Vioxx.   This imbalance triggered a concern over the potential for thrombotic events.

67.     The Task Force agreed to investigate the incidence of thrombotic events by analyzing the ongoing osteoarthritis ("OA") trials.   Because the trials were still blinded as to treatment groups, it could not be determined whether the adverse events in the database had occurred in the Vioxx, placebo, or compared to drug populations.   Therefore, the Task Force designed a study in which cardiovascular events from all arms of the OA trials would be added together, and the combined groups' incidence rate would be compared to placebo patients from trials of other Merck drugs.   An expedited time frame was established for completion of the analysis, because of the rush to get Vioxx to market ahead of competitors.

68.     In January 1998, the analysis pursuant to the Task Force plan showed a statistically significant increased relative risk of 2.16 for females in the Vioxx study versus the placebo group selected by Merck for comparison.   These results constituted a clear signal of

cardiovascular toxicity that should have triggered immediate investigation and concern. Instead, Merck made an after-the-fact claim that the placebo comparison group must have had an "atypically low" incidence of cardiovascular events, such that the higher rate in the Vioxx group was downplayed. Further, Merck changed the rules after the game had been played, by deciding to compare the rate in the Vioxx group to a so-called "background" rate, even though no such comparison was stated in the plan for the study. Merck intentionally chose an inappropriate "background" rate for comparison, from a published study of older patients at high risk of cardiovascular disease. Based upon the result of this comparison, Merck incorrectly dismissed the signal as of no concern. Merck failed to disclose the results of this pre-marketing analysis, and instead, has misrepresented that it had no indication of cardiovascular risk before Vioxx was marketed.

   69. Merck knew that due to the mechanism by which the drug inhibited COX-2, but not COX-1, use of Vioxx could result in increased platelet aggregation (blood clotting) and, thus, could cause increased rates of heart attacks and strokes. However, key to the successful marketing of Vioxx was the ability to claim that Vioxx was just as effective but safer than traditional NSAIDs and safer than Celebrex. This superior modeling would allow Merck to steal market share from Pfizer, which had beaten Merck to market with their own COX-2 inhibiting drug, Celebrex.

   70. Merck failed to conduct any study prior to FDA approval demonstrating that Vioxx reduced the incidence of clinically meaningful side effects of NSAID therapy. At the time of approval, the FDA required that Vioxx carry the traditional warning concerning GI safety risks that accompanied all NSAIDs.

71.     Even without a label that allowed Merck to legitimately claim superior safety, Merck and its representatives and agents misrepresented the safety profile of Vioxx to consumers, the medical community, healthcare providers, and third party payors.  (December 16, 1999 Warning Letter from FDA to Merck, concerning misrepresentation of safety information for Vioxx.)  Merck promoted, marketed, sold, and distributed Vioxx as a much safer and more effective pain reliever than other NSAIDs, such as aspirin, naproxen, and ibuprofen.

C.     **Merck's Pre-Market Knowledge of Vioxx's Cardiotoxicity and Prothrombotic Effects.**

72.     The potential for cardiovascular risk of selective COX-2 inhibitors was known to Merck long before the FDA granted market approval in May of 1999.  By 1997, and prior to the submission of the New Drug Application (the "NDA") for Vioxx, Merck was aware that, by inhibiting COX-2, Vioxx altered the homeostatic balance between prostacylcin synthesis and thromboxane and thereby, increased the prothrombotic effects of the drugs, causing blood clots to form in those who ingested it. Although all COX-2 inhibitors have this mechanism of action, Vioxx was the most selective COX-2 inhibitor on the market in 1999.  Accordingly, it had the greatest potential to cause adverse cardiovascular and cerebrovascular events.

73.     Nevertheless, on November 23, 1998, Merck submitted an NDA to the FDA for Vioxx, omitting information about the extent of the risks associated with Vioxx. Without a complete picture of the potential hazards associated with the drug, the FDA approved Vioxx on or about May 20, 1999.

**D.  Merck Engaged in Unconscionable and Deceptive Marketing Practices in Connection With the Marketing and Sale of Vioxx.**

    **1.  Merck's Pre-Release Marketing Campaign Catapulted Vioxx Into Blockbuster Status.**

74.     In anticipation of approval, Merck put into place one of the most massive marketing campaigns in pharmaceutical history.  Once the drug was approved, scores of sales representative fanned out across the country with samples, asserting that Vioxx had a better safety profile than other NSAIDs.  At the time the drug was approved, Merck's labeling indicated that Vioxx, taken at the 12.5 mg., 25 mg., and 50 mg. daily dosage, "was associated with a significantly lower percentage of patients with endoscopic gastroduodenal ulcers than with treatment with ibuprofen 2400 mg daily."

75.     From 1996 through 1998, Merck issued dozens of public statements that pre-publicized the efficacy and gastrointestinal safety of Vioxx.  Merck's pre-release marketing campaign conveyed the uniform message that Vioxx provided safe and effective pain relief while omitting any mention of cardiovascular risks.

76.     Merck galvanized its army of sales representatives.  In the *Merck & Co., Inc. 1998 Annual Report*, CEO Raymond Gilmartin wrote that. "[i]n 1998, to prepare for the introduction of Vioxx, as well as to meet other marketing challenges, we began adding 700 new and talented professional representatives to our already strong U.S. sales force."

77.     Merck targeted consumers and third party payors.  In order to achieve formulary status/access for Vioxx which was equal or better than Celebrex and branded NSAIDS,  Merck recognized that the placement on the formularies of the third party payors was critical to successful market share.

78.     The pre-launch price of Vioxx was 800% more than the competing non-selective NSAIDs that were equally as effective in alleviating pain and inflammation associated

with arthritis.  Therefore, in order to get and keep Vioxx on the formularies of the third party

payors, despite this extreme overpricing, Merck authored studies designed to demonstrate that

Vioxx was more cost-effective than other NSAIDs as a result of its decreased GI toxicity.  Merck

sent summaries of its positive clinical findings to formularies to demonstrate that the increased

cost of Vioxx would be more than offset by the decreased expenses in treating negative GI side-

effects associated with traditional NSAIDs.

79.    None of the materials and summaries of clinical studies sent to third party

payors, medical care organizations or prescription benefit managers even remotely raised the

potentially devastating cardiovascular and cerebrovascular side effects.

80.    Merck's pre-release marketing campaign showed positive results.  Sales

projections for Vioxx based on early orders and inquiries surpassed $2 billion per year.  Merck

based this calculation on a proposed wholesale price of $2.02 per tablet — about one hundred

times the cost of a generic aspirin.

E.     **FDA Approval of Vioxx**

81.    On November 23, 1998, Merck submitted a New Drug Application for

Vioxx to the FDA.  The FDA gave priority to the review of Merck's Vioxx submission,

including through its Arthritis Drugs Advisory Committee ("the Advisory Committee").

82.    On April 20, 1999, the Advisory Committee recommended approval of

Vioxx for the relief of the signs and symptoms of osteoarthritis and acute pain but, in light of

Merck's failure to substantiate its claims of the GI superiority of Vioxx, required that its package

insert bear the same GI warnings as traditional NSAIDs.

83.     On May 20, 1999, the FDA accepted the Advisory Committee's recommendations and approved Vioxx for the relief of signs and symptoms of osteoarthritis[3], for the management of acute pain in adults and for the treatment of primary dysmenorrhea.

84.     On April 11, 2002, the FDA approved an additional indication for the use of Vioxx: relief of the signs and symptoms of rheumatoid arthritis in adults, which afflicts over two million Americans.

85.     On March 26, 2004, the FDA approved a third indication for the use of Vioxx: relief of the signs and symptoms of migraine headaches in adults.

86.     On August 19, 2004, the FDA approved a fourth indication for the use of Vioxx: treatment of the signs and symptoms of juvenile rheumatoid arthritis in patients aged 2 to 17 years of age.

**F.     Merck's Unprecedented Post-Launch Marketing Campaign**

87.     Within days of receiving market approval to launch the drug, Merck began to aggressively promote Vioxx. 4,500 Merck sales representatives were sent to detail the drug to physicians. Merck had a huge budget for targeting physicians and consumers. Merck recognized the need to increase public demand for the drug by convincing consumers and medical professionals of the purported superior safety profile—and effectiveness. Merck's message was clear: Vioxx was safer than- and just as effective as- traditional NSAIDs.

88.     In 2000, Merck spent nearly $161 million on direct-to-consumer advertising for Vioxx — more than PepsiCo spent to advertise Pepsi Cola. Over the next few years, until market withdrawal, Merck spent an unprecedented $100 million a year to continue to market Vioxx directly to consumers. As stated by U.S. Senator Grassley of Iowa, Chairman of

---

[3] It is estimated that over 20 million Americans currently suffer from osteoarthritis, a chronic swelling and painful joint disease affecting one or more joints.

the Senate Committee on Finance at a congressional hearing on Vioxx held on November 18,

2004: "It's been said that in the history of pharmaceutical advertising, Vioxx was one of the

most directly-marketed-to-consumers prescription drugs ever."

89.     Merck marketed Vioxx as a safe and effective pain reliever, while

conspicuously omitting any mention of increased cardiovascular or cerebrovascular risk.

Merck's promotional campaign falsely touted Vioxx's benefits while concealing its true health

risks through false and misleading direct-to-consumer advertisements, sales promotions, press

releases, and lectures at professional conferences.

90.     From the beginning of this post-launch campaign, Merck was on notice of

the fraudulent nature of its marketing tactics.

91.     On July 16, 1999, the FDA's Division of Drug Marketing, Advertising,

and Communications ("FDA-DDMAC") issued a letter to Merck, warning that its advertisements

failed to provide adequate risk information.  The FDA-DDMAC informed Merck that certain of

its Vioxx promotional materials were "lacking in fair balance or otherwise misleading."

92.     For example, Merck's direct-to-consumer print ad for Vioxx, which

appeared in the July 7, 1999 issue of *El Nuevo Dia*, failed, *inter alia*,: "to include risk

information" or to provide "necessary information related to side effects, contraindications, and

effectiveness."  The FDA-DDMAC concluded that the materials violated the Federal Food,

Drug, and Cosmetic Act and its implementing regulations, and it urged Merck to cease making

such representations immediately.

93.     Merck's massive and misleading campaign continued unabated.

94.     On December 16, 1999, the FDA-DDMAC issued another letter to Merck,

stating that its promotional pieces entitled "TEN REASONS WHY Vioxx IS BETTER THAN

CELEBREX" and "Vioxx vs. Celebrex Poem" were "false or misleading because they contain misrepresentations of Vioxx's safety profile, unsubstantiated comparative claims, and are lacking in fair balance." For example, Merck claimed that Vioxx was safer than placebo in the incident rate of gastroduodenal ulcers. FDA-DDMAC observed that: "this claim is in direct contrast with the approved product labeling (PI)," which showed that there was an increased risk of ulcers with Vioxx use as compared to placebo. The FDA-DDMAC: "object[ed] to this claim because it minimizes the GI warning associated with Vioxx and is inconsistent with the data in the PI."

95.     With respect to Merck's "TEN REASONS WHY Vioxx IS BETTER THAN CELEBREX," the December 16, 1999 letter stated that the promotional material contained several unsubstantiated comparative claims of Vioxx with Celebrex, including the assertion that Vioxx was more effective and safer than Celebrex, even though this claim had "not been demonstrated by substantial evidence." The FDA-DDMAC concluded that Merck's claims were "misleading."

96.     The FDA-DDMAC December 16, 1999 letter asserted that Merck had failed entirely in its promotional materials to include a "fair balance with respect to the content and presentation of risk information related to the use of Vioxx." The FDA-DDMAC uncategorically stated that, in these materials, Merck had "not presented any risk information concerning the contraindications, warnings, precautions, or adverse events associated with Vioxx's use."

97.     Merck's internal documents also reveal its massive efforts to blitz doctors' offices with promotional material, while expertly training its sales representatives to dodge any questions regarding the safety of Vioxx.

98.     "Dodge Ball Vioxx," was another Merck sales representative training bulletin. In "Dodge Ball Vioxx," there was a list of hypothetical questions doctors might ask the sale representative about Vioxx, such as: "I am concerned about the cardiovascular effects of Vioxx" or "the competition has been in my office telling me that the incidence of heart attacks is greater with Vioxx than with Celebrex." Merck's instructions to be followed in response to these questions consisted of but a single word: "DODGE!"

99.     Merck's most egregious attempt to deceive physicians was through a pamphlet called the "Cardiovascular Card," which was also given to sales representatives to convince physicians that Vioxx did not pose any health risks. The Cardiovascular Card indicated that patients on Vioxx were 11 times less likely to die than patients on standard anti-inflammatory drugs, and 8 times less likely to die from heart attacks. However, the card did not present any statistical tests of significance that are standard within the medical community, nor did it mention the VIGOR study. Instead, the information used on the Cardiovascular Card was pooled from pre-approval clinical trials that were conducted to test the efficacy of the drug to treat pain, not to assess whether the drug caused heart attacks.

100.    The FDA also expressed "serious concerns" about the data on the Cardiovascular Card. An FDA medical reviewer said that the relevance of Vioxx's pre-approval studies to the drug's cardiovascular safety was "nonexistent" and that it would be "ridiculous" and "scientifically inappropriate" to present this data to physicians. As new evidence continued to surface showing the cardiovascular risks of Vioxx, Merck relentlessly pressured its field representatives to push the faulty data on the Cardiovascular Card.

101.    In October, 2001, Merck learned of the publication of an article stating that there was a higher reporting rate for adverse events relating to renal and cardiovascular

effects in Vioxx as compared to Celebrex. Merck responded by conducting an internal analysis of reported adverse events for Vioxx and Celebrex. Merck's analysis showed a greater reporting rate of myocardial infarction, as well as congestive heart failure and related illnesses, for Vioxx in comparison to Celebrex. Merck disregarded this signal of cardiovascular toxicity and failed to disclose it to the public. Instead, Merck blamed the result on an alleged discrepancy in the number of events entered into the regulatory database for the two drugs. As in the case of the Task Force analysis of 1997 and the VIGOR study of 2000, Merck once again searched for and found a reason to exonerate Vioxx in order to omit, suppress, and conceal material information about Vioxx's safety risks to keep it on the market.

102. In 2001, after the FDA Advisory Committee voted in favor of informing doctors of the increased incidence of cardiovascular events seen in the VIGOR study, Merck disregarded the vote and instead, instructed its sales representatives to continue to use the Cardiovascular Card – with its inaccurate data intact.

103. U.S. Congressman Henry A. Waxman described Merck's total disregard for the FDA Arthritis Drug Committee's unanimous vote that physicians should have been made aware of Vioxx's cardiovascular results. In the *New England Journal of Medicine*, Congressman Waxman wrote:"[t]he next day, Merck sent a bulletin to its refocoxib sales force of more than 300 representatives. The bulletin ordered, 'DO NOT INITIATE DISCUSSIONS ON THE FDA ARTHRITIS ADVISORY COMMITTEE . . . OR THE RESULTS OF THE . . . VIGOR STUDY.' It advised that if a physician inquired about VIGOR, the sales representative should indicate that the study showed a gastrointestinal benefit and then say, 'I cannot discuss the study with you.'" 6/23/05 *N.Eng. J. Med.* 2576, 2005 WLNR 9915749.

### G.    The VIGOR Trial

#### 1.    The Vioxx Gastrointestinal Research ("VIGOR") Study

104.    In early 1999, Merck initiated the Vioxx Gastrointestinal Outcomes Research ("VIGOR") study comparing Vioxx's efficacy and GI safety profile to a traditional NSAID, naproxen, in more than 8,000 rheumatoid arthritis patients.

105.    By early November 1999, there were indications in the VIGOR study that Vioxx carried serious cardiovascular risks.  Merck's preliminary internal calculations demonstrated a four-fold increase of acute myocardial infarction ("MI") with once-daily 50 mg doses of Vioxx compared with twice daily 500 mg doses of naproxen (0.4% compared with 0.1% with naproxen).  In fact, retrospective analysis of the data demonstrated a five fold increase in heart attacks in patients taking Vioxx versus those taking naproxen.

106.    Merck's scientists understood that the difference in cardiovascular events was so great that it could not have arisen by chance, and that it had to involve some sort of risk inherent to Vioxx.

107.    Rather than acknowledge the increased risk associated with Vioxx demonstrated by the study, the Merck apologists hypothesized that the reason for the results was not that Vioxx increased the risk of heart attacks, but that naproxen reduced the risk of cardiovascular events by having a cardioprotective benefit, similar to (but far more powerful than) aspirin.  The final conclusion of the article emphasized the GI benefits of Vioxx over other NSAIDS, instead of acknowledging important information about the increased cardiovascular risks.

108.    In the months that followed the publication of the VIGOR results, Merck continued to maintain in many different forums and diverse ways that Vioxx had a satisfactory cardiovascular safety profile.  Through direct-to-physician sales representative speeches to

physicians, Merck spun the VIGOR results by claiming that they were either a result of chance or the result of the "cardioprotective effect of naproxen."

109.    Despite having information regarding the cardiotoxicity of Vioxx, Merck did not mention the VIGOR results in its label for over two years.  Further, Merck strongly objected to the warning language proposed by the FDA, and instead, lobbied and battled with the FDA to obtain the least restrictive label.  Direct-to-consumer advertising continued unabated and undisturbed, failing to disclose the true risk-benefit profile of Vioxx.

110.    In June of 2000, at the pharmaceutical industry-sponsored studies presented to the European United League Against Rheumatism ("EULAR"), Merck scientist Dr. Claire Bombardier presented the VIGOR study.  Her presentation highlighted the beneficial GI profile of Vioxx, and buried the critical evidence of Vioxx users' statistically significant increased hypertension and myocardial infarction rate compared to naproxen users.

111.    Merck continued to deny the ill health effects associated with Vioxx while at the same time reaping the financial rewards of its deception and concealment.  Merck engaged in a massive advertising campaign designed to increase its market share.  As a result of this scheme, Merck reaped more than $2 billion in profits in the year 2000 alone.

112.    Merck continued to profit from its failure to disclose crucial health information for years after the last VIGOR study participant had ceased taking the medication. In November 2000, Merck physicians published a study in the New England Journal of Medicine that again knowingly downplayed the severity of cardiovascular risks associated with Vioxx consumption.  Then, on May 22, 2001, Merck issued a PR Newswire press release that selectively stated:  "In response to news and analyst reports of data the Company released a year ago, Merck & Co., Inc., today reconfirmed the favorable cardiovascular safety profile of Vioxx."