113.    In response to information in 2001 demonstrating a significant increase in the risk of heart attack as a result of taking Vioxx, Merck spokeswoman Christine Fanelle continued to publicize the fiction that the statistic could be accounted for by the cardioprotective effect of comparator drugs.

## H.    Merck Continued To Withhold Accurate VIGOR Results From The Health Community and The Public.

114.    In March 2000, the results of the VIGOR Study came in, showing that Vioxx patients suffered fewer stomach problems than the naproxen group, but significantly more blood-clot-related problems – precisely the sort of result anticipated in the 1996-97 internal documents. The heart-attack rate in the Vioxx group appeared to be four times as high as the naproxen group. (Later analysis would show it to be five times as high.)

115.    Merck continued to purposefully withhold this information from the public.  In a news release that month, Merck said the VIGOR trial results were "consistent with" naproxen's favorable effects, implying that this could explain why Vioxx did not do as well.

116.    Similarly, the next month Merck issued another news release, headlined "Merck confirms favorable cardiovascular safety profile of Vioxx." While acknowledging the Vigor results, it said other trials and data had shown "NO DIFFERENCE in the incidence of cardiovascular events" between Vioxx and a placebo or between Vioxx and older painkillers.

117.    In April 2000, Merck responded to early news reports that Vioxx posed serious cardiovascular risks by simply denying that any such risks existed:  "Extensive review of data from the completed osteoarthritis trials and on-going clinical trials with Vioxx ... have shown *no difference* in the incidence of cardiovascular events, such as heart attack, among patients taking Vioxx . . . ." (emphasis in original).

118.   In June 2000, the same month that Merck released the results of the damaging VIGOR study to the FDA, Merck announced that the trial results were "consistent with" naproxen's cardio-protective effects.  Contrary to Merck's assertions, no clinical study had ever proven that naproxen had a cardio-protective effect.  According to a report from the FDA's Center for Drug Evaluation and Research released the day Vioxx was withdrawn from the market, naproxen would have had to be one of the most potent and effective cardio-protectants known in order to legitimize Merck's interpretation of the VIGOR results.  Thus, not only was Merck's justification baseless and incorrect, but the recent naproxen study further reveals that the opposite may be true.

119.   Also in June 2000, Merck minimized the results of the VIGOR study in a promotional conference by falsely asserting that Vioxx posed no greater risk of heart attacks than its competitor drug, Celebrex.  Merck's representative stated: "Now if you remember the crude [heart attack] rate of Vioxx in VIGOR that number was 0.4 percent which is basically the same or in fact a little bit less than the crude [heart attack] rate of Celebrex in [the Celebrex Long-Term Arthritis Safety Study] CLASS which is 0.5 percent."'  This comparison was false and misleading because the studies had different patient populations, with the Celebrex CLASS trial including patients at higher risk for heart attacks.

I.   **Merck Continues to Dodge Disclosure of Vioxx Cardiovascular Risks Even When Faced with Additional Pressure from the FDA.**

120.   In February 2001, the FDA presented its analysis of the VIGOR data to an FDA Advisory Committee.  The analysis showed that the number of people who had a digestive problem while taking naproxen was about double the figure for Vioxx takers – but that difference was almost exactly the same as the additional number of Vioxx users who suffered a cardiovascular problem.

121.    In February 2001, a full 19 months after Vioxx went on the market, the FDA published a Memorandum on the Vioxx cardiovascular safety data gathered during VIGOR.  In this Memorandum, the FDA concluded that there, "is an increased risk of cardiovascular thrombotic events, particularly [heart attacks], in the [Vioxx] group compared with the naproxen group."  The FDA considered and rejected each of the defenses raised by Merck to explain the statistically significant increase of cardiovascular incidents among Vioxx users.

122.    Merck immediately responded to the FDA's Memorandum with a press release announcing its confidence in "the excellent safety profile of Vioxx."

123.    In February 2001, the FDA also concluded that Merck should add a cardiovascular warning to its Vioxx packaging:  "it would be difficult to imagine inclusion of VIGOR results in the [Vioxx] labeling without mentioning cardiovascular safety results in the study description as well as the Warnings sections."  Merck responded immediately with a press release directly contradicting the FDA's findings by claiming that: "there was no difference in cardiovascular mortality between the groups treated with Vioxx or naproxen... [and] *no difference* in the incidence of cardiovascular events, such as heart attacks, among patients taking Vioxx . . . ." (emphasis in original).

124.    Behind closed doors, Merck entered into negotiations with the FDA concerning the warning language to be used in its Vioxx labeling.  FDA officials wanted to highlight the cardiovascular risk prominently on Vioxx's label.  Merck resisted, complaining that the FDA was putting more weight on the negative findings than on the positive gastrointestinal aspects.

125.    While these negotiations ensued, starting on May 22, 2001, Merck issued the first of a relentless series of publications publicizing the "favorable cardiovascular safety profile of Vioxx."  In the first release, disregarding the results of its own trial and the FDA's review, Merck repeated: "there was no difference in cardiovascular mortality between the groups treated with Vioxx or naproxen... [and] *no difference* in the incidence of cardiovascular events, such as heart attacks, among patients taking Vioxx . . . ." (emphasis in original).  These statements were repeated again and again in countless continuing medical education symposiums and complemented by numerous papers in peer-reviewed medical journals authored by Merck employees and paid consultants, all of which attempted to debunk concerns about the adverse cardiovascular effects of Vioxx.

126.    Simultaneously, Merck continued to instruct its sales representatives to ignore the safety risks.  For example, in June 2001, at the 119th Annual Meeting of the Maryland Pharmacists Association in Ocean City, Maryland, a sales representative attempted to explain away the VIGOR study's finding that Vioxx increased the risk of heart attack by stating that it was due to the fact that naproxen works like aspirin by inhibiting clotting and platelet aggregation.  This had no basis in fact.

127.    Similarly, at an Annual Meeting of the American Society of Health Systems Pharmacists in Los Angeles, California in June 2001, a Merck sales representative represented that Vioxx's greater rate of heart attacks in the VIGOR study was because of naproxen's cardioprotective properties.  Again, this had no basis in fact.

128.    Finally, on September 17, 2001, the FDA's DDMAC issued a "WARNING LETTER" ("2001 Warning Letter") to Raymond Gilmartin, President and CEO of Merck, demanding that Merck correct false and misleading statements made in the course of its

Vioxx promotional campaign.  Specifically, the 2001 Warning Letter cited Merck's promotional

audio conferences, a press release and oral representations made by Merck's sales

representatives to promote Vioxx.  DDMAC stated that it had: "reviewed [Merck's] promotional

activities and materials and has concluded that they are false, lacking in fair balance, or

otherwise misleading" in violation of the FDCA and applicable regulations.

129.    Most, if not all, of the cited misrepresentations concerned Merck's failure

to apprise the public of Vioxx's danger of heart attacks.  The FDA-DDMAC charged:

> You have engaged in a promotional campaign for Vioxx that
> minimizes the potentially serious cardiovascular findings that were
> observed in the Vioxx Gastrointestinal Outcomes Research
> (VIGOR) study, and thus, misrepresents the safety profile of
> Vioxx.  Specifically, your promotional campaign discounts the fact
> that in the VIGOR study, patients on Vioxx were observed to have
> a four to five fold increase in myocardial infarctions (MIs)
> compared to patients on the comparator non-steroidal anti-
> inflammatory drugs (NSAID), Naprosyn (naproxen).

130.    The 2001 Warning Letter also cautioned; "Your minimizing these

potential risks and misrepresenting the safety profile for Vioxx raise significant public health and

safety concerns.  Your misrepresentation . . . is particularly troublesome because we have

previously, in an untitled letter, objected to promotional materials for Vioxx that also

misrepresented Vioxx's safety profile."

131.    The 2001 Warning Letter delineated the following misrepresentations

made by and/or on behalf of Merck about Vioxx:

a.    Merck minimized Vioxx's risk of heart attacks in Merck's

promotional audio conferences, including conferences held on June 8, 2000, June 13, 2000,

June 16, 2000 and June 21, 2000.  Merck misrepresented that the use of naproxen decreased the

chance of heart attack, as compared to Vioxx, because it thinned the blood.  However, as the

DDMAC observed, it could have just as easily been the case that Vioxx actually produced blood

clotting.  Moreover, Merck knew the difference between the heart attack outcomes for the Vioxx

users while the naproxen users' outcomes had not yet been determined.

        b.     Merck concealed Vioxx's possible pro-thrombotic properties,

which may reasonably explain the increase in adverse cardiac events.

        c.     Merck made inaccurate claims that the heart attack rate for

naproxen and Vioxx was .2% and .1 % respectively.  The 2001 Warning Letter declared that "the

[heart attack] rate for Vioxx in this subpopulation was 12 [heart attacks] among 3877 patients

(0.3%) as compared to 4 [heart attacks] among 3878 patients (0.1 %) for naproxen."

        d.     Merck made false statements comparing the heart attack rate

associated with the use of Vioxx in the VIGOR study to the crude heart attack rate of Celebrex in

another study.  Merck concealed the fact that the patient populations in the two studies were

different in that the VIGOR study excluded patients with heart problems, whereas the Celebrex

study did not.  Thus, it was more likely that the Celebrex study included patients with a higher

risk for myocardial infarctions prior to their ingestion of Celebrex.

        e.     Merck concealed the fact that Vioxx's less expensive alternative,

naproxen, caused half as many heart attacks.

        f.     Merck concealed the dangerous interaction of Vioxx with warfarin,

an anticoagulant.  For example, at an audio conference on June 16, 2000, Merck stated, "'if you

look at the thromboembolic events, it's very clear that these selective COX-2 inhibitors (of

which Vioxx is a member) have the benefit of not having platelet aggregation and bleeding time,

and therefore, can be used safely in terms of post-op and with Coumadin.'"  This statement

directly contradicts the precaution in the Package Insert and published in the Physicians' Desk

Reference, which states: "'[I]n post-marketing experience, bleeding events have been reported,

predominantly in the elderly, in association with increases in prothrombin time in patients receiving Vioxx concurrently with warfarin.'"

        g.     Merck concealed contraindications in patients who have experienced asthma, uticaria or allergic type reactions after taking aspirin or other NSAIDS.

        h.     Merck concealed the risk of serious GI toxicity such as bleeding, ulceration or perforation in patients taking Vioxx.

        i.     Merck concealed certain precautions for use in patients with liver and kidney disease, as well as failure to disclose information about which patient populations should not use Vioxx, including women in late-term pregnancy.

        132.    The FDA also warned Merck that its recent press releases: "confirming the favorable cardiovascular safety profile of Vioxx" were "simply incomprehensible" given the rate of heart attacks and "serious cardiovascular events compared to naproxen." Merck responded to this Warning Letter by pulling or revising the complained-of promotional materials, but persisted in refusing to include a cardiovascular warning in any of its direct-to-consumer advertisements. Merck's misleading statements had already infiltrated the market and influenced the ongoing demand for Vioxx.

        133.    The FDA expressed increasing concern about Merck's marketing of the drug to physicians and medical professionals. In the September 17, 2001 Warning Letter, the FDA expressed concern over the representations made in a Merck-sponsored presentation by a doctor in June 2000. The doctor had said that the VIGOR trial showed that naproxen was "a wonderful drug" for reducing the risk of heart problems – not that there was anything wrong with Vioxx. Such statements, the FDA said, "minimized the potentially serious cardiovascular findings" of VIGOR.

134.     In April 2002, after fourteen months of negotiations with the FDA, the new Vioxx label, which went into effect in April 2002, listed the good news about fewer upset stomachs first.  Then, the Product Insert listed in the Precautions section — not Warnings — two tables setting forth certain data from the VIGOR study concerning increased incidence of cardiovascular events observed in the VIGOR study.

135.     With the introduction of the April 2002 label, Merck issued a press release that minimized the importance of the risks it had been required to disclose:  "The significance of the cardiovascular findings from [the VIGOR study] is unknown . . . Merck is confident in the efficacy and safety profile of Vioxx."  Merck was still engaged in a campaign designed to deceive the average consumer and the medical community by downplaying and suppressing any association between Vioxx and any serious cardiovascular risk.

## J.     Merck Attempts to Silence its Critics

136.     During its ongoing effort to conceal the negative cardiovascular effects of Vioxx, Merck officials repeatedly lashed out against and threatened dissenting voices within the medical community.

137.     In October 2000, a prominent COX-2 expert, Dr. Gurkipal Singh of Stanford University, who frequently gave lectures sponsored by Merck, repeatedly and publicly pressed Merck for more cardiovascular data on Vioxx.  Merck responded by canceling several of Dr. Singh's presentations that it had been scheduled to sponsor.  Still not satisfied, a senior Merck official, Louis Sherwood, called James Fries, MD, a Stanford University Medical School professor, to complain that Dr. Singh's lectures were "irresponsibly anti-Merck and specifically anti-Vioxx."  According to Dr. Fries' letter to Mr. Gilmartin dated January 9, 2001, Sherwood threatened that, "if this continued, Dr. Singh would flame out and there would be consequences for [Dr. Fries] and for Stanford."  Dr. Fries responded by writing a letter to Merck CEO,

Raymond Gilmartin, complaining about a consistent pattern of intimidation of investigators by Merck on Vioxx.

138.    In that same letter, Dr. Fries reported that he had learned of repeated other incidents where employees of Merck had attempted to intimidate critics of Vioxx, and reported what he had learned to Mr. Gilmartin.

139.    Perhaps the most aggressive action taken by Merck to attack its critics was against Dr. Joan-Ramon Laporte of the Catalan Institute of Pharmacology in Barcelona, Spain. In the summer of 2002, a publication of the Catalan Institute edited by Dr. Laporte criticized Merck's handling of Vioxx's cardiovascular risks.  Soon after, Merck officials sent Dr. Laporte a "rectification" to publish, but Dr. Laporte refused to print a correction.  After repeated efforts to correct the study, Merck filed suit in a Spanish court against Dr. Laporte and the Institute under a Spanish law that allows plaintiffs to demand a public correction of inaccurate published information.  In January 2004, a judge ruled that Dr. Laporte's publication accurately reflected the medical debate about the cardiovascular safety of Vioxx, and ordered Merck to pay court costs.  To punish Dr. Laporte, Merck withdrew funding for a pharmaceutical conference in Spain, which it had financed for the previous eight years, because the organizer would not remove Dr. Laporte from the list of speakers.

K.    **Merck Wrestles With Additional Studies Exposing Vioxx's Safety Concerns.**

140.    Following the VIGOR trial, Merck was confronted with study after study that demonstrated increasing evidence of Vioxx's serious and significant health risks.

2.    **The JAMA Study**

141.    Despite Merck's efforts to prevent negative information about Vioxx from seeing the light of day, some continued to question Vioxx's safety profile.  The concerns that Vioxx significantly increased cardiovascular risk in Vioxx users were described by Drs.

Mukherjee, Nissen and Topol in their August 2001 *Journal of the American Medical Association* ("JAMA") article. The authors specifically highlighted the dangerous cardiovascular adverse event profile of COX-2 inhibitors, particularly Vioxx.

142.     In August 2001, Merck again publicly denied the validity of the adverse cardiovascular results of the VIGOR study, while persistently touting the gastrointestinal safety profile demonstrated by VIGOR. In two press releases, Merck attempted to refute the Mukherjee study, and repeatedly stated: "Merck stands behind the cardiovascular safety profile of Vioxx." Merck indicated in its August 21, 2001 press release:

143.     ". . . Merck believes that extensive cardiovascular data already exist on Vioxx and that these data — which were not incorporated into the Cleveland Clinic's analysis – suggest that there is no increase in the risk of cardiovascular events as a result of treatment with Vioxx."

144.     The day before the Mukherjee JAMA article was published, Merck stated in a Bloomberg News piece: "We have additional data beyond what [Topol and the Cleveland Clinic study] cite, and the findings are very, very reassuring. . . . Vioxx does not result in any increase in cardiovascular events compared to placebo."

145.     The August 2001 JAMA published a peer-reviewed human epidemiological study by the Cleveland Clinic Foundation, Cleveland, Ohio, Dr. D. Mukherjee, et al. (the "JAMA Study"). The JAMA Study demonstrated that Merck had concealed the relative risk of developing a "confirmed adjudicated thrombotic cardiovascular event" (defined in the article as "myocardial infarction, unstable angina, cardiac thrombus, resuscitated cardiac arrest, sudden or unexplained death, ischemic stroke, and transient ischemic attacks") among Vioxx users in Merck's trials, including VIGOR. The VIGOR trial, at 95% confidence interval,

ranged from 2.2 for event-free survival analysis, 2.35 compared to naproxen users, and a 4.89 for

developing serious cardiovascular events among aspirin-indicated patients. *See* Mukherjee, D.,

et al., *Risk of Cardiovascular Events Associated with Selective COX-2 Inhibitors*, JAMA, 286.8.

954-959, August 22/29, 2001.  The myocardial infarction rates for Vioxx users compared to

placebo revealed a statistical increase among Vioxx users.

146.    In the JAMA Study, the authors stated that "by decreasing PGI 2

production [Vioxx] may tip the natural balance between prothrombotic thromboxane A2 and

antithrombotic PGI 2, potentially leading to an increase in thrombotic cardiovascular events."

*Id.* at 957.

147.    On August 23, 2001, the day after the JAMA article was published, Merck

stated in another press release:  "The Company stands behind the overall ... cardiovascular

safety profile of Vioxx."

148.    Merck asked the Cleveland Clinic to run a rebuttal to this article.  When it

refused, Merck sent "Dear Doctor" letters to thousands of physicians nationwide that "strongly

supported the cardiovascular safety profile" of Vioxx.  Merck also sent "Dear Patient" letters to

thousands of consumers nationwide (identified from a prescription database) wherein it

specifically minimized the risk of "heart attacks and strokes" and emphasized that Vioxx was

"innovative, effective and safe."

### 3.    The Advantage Study

149.    In 1999, Merck's marketing department commissioned its own 12 week

clinical trial, as a promotional tool, to show that Vioxx caused fewer stomach problems than

naproxen.  This trial, called Advantage, also revealed a link between Vioxx and an increased risk

of heart attacks and stroke.  Faced with yet another threat to Vioxx's commercial success, senior

Merck officials pressured their own researchers to change the trial results, so as to avoid concerns over the adverse cardiovascular effects of Vioxx.

150.     Merck intentionally distorted and omitted data from the Advantage study so that it could continue marketing and selling Vioxx without an FDA warning regarding its known cardiovascular risks.  Any such warning would have made Vioxx far less commercially attractive when compared to its closest competitor, Celebrex, which does not list heart risks on its label.

151.     In October 2003, more than three years after the study's completion, Merck reported the results of the flawed Advantage study in the *Annals of Internal Medicine*. Although the report stated that five patients taking Vioxx had suffered heart attacks, the report failed to mention three additional heart-related deaths.

### 4.     The Kaiser Permanente Study

152.     In August of 2004, Dr. David Graham, Associate Director for Science, Office of Drug Safety, FDA Center for Drug Evaluation and Research, together with Dr. Wayne Ray and co-authors, presented an observational study at an international medical meeting, which evaluated the rate of cardiovascular events in patients taking Vioxx versus Celebrex versus non-selective NSAIDs.  This analysis was a retrospective study of the Kaiser Permanente database and was funded by the FDA.  The results of this study were published in February 2004 in the *Lancet*.

153.     On August 25, 2004, Dr. David Graham reported that based on his study, Vioxx increased the chance of heart attacks in patients. This was the result of a retrospective study in which Dr. Graham and a team of researchers reviewed the medical records for approximately 1.4 million patients belonging to Kaiser-Permanente California HMO.  Of these

patients, 27,000 were taking Vioxx, and 40,000 were taking Celebrex.  Other patients were taking other NSAIDs such as aspirin, ibuprofen and naproxen.

154.    Dr. Graham studied the cardiovascular risks of Vioxx in his review. According to Dr. Graham's findings, which were reported at the international conference in Bordeaux, France:

a.    Patients taking over 25 mg of Vioxx daily had a three-fold risk of suffering a heart attack or sudden cardiac death;

b.    Patients taking lower doses of Vioxx were more likely to suffer serious cardiac problems compared to those taking Celebrex and other NSAIDs;

c.    Naproxen increased the risk of serious cardiac events by 18%; and

d.    Celebrex and ibuprofen had no effect on the risk of serious cardiac events.

155.    In fact, Dr. Graham and his collaborators linked Vioxx to more than 27,000 heart attacks or sudden cardiac deaths nationwide from the time it was introduced on the market in 1999 through 2003.

156.    Shortly after the Graham-Ray study was presented at the international medical meeting, Merck issued a press release that it: "strongly disagrees with the conclusions of the observational analysis presented at the international medical meeting:  Merck stands behind the efficacy, overall safety and cardiovascular safety of Vioxx."

157.    Despite Merck's strenuous objections to the findings published from the Kaiser Permanente study, asserting that it was not definitive because it was not a full-blown clinical trial, one month later, Merck did an "about face" when its own clinical trial largely confirmed the results of Dr. Graham's study.

158.    In the interim, Merck had failed to conduct a planned study to directly investigate Vioxx's cardiovascular toxicity, but instead chose to collect cardiovascular event data from studies designed for other purposes.  In particular, Merck collected information about adverse events from trials to support applications to the FDA to expand the approved uses of Vioxx including the study that ultimately and belatedly caused the drug to be withdrawn.

### 5.      The APPROVe Study

159.    The Adenomatous Polyp Prevention on Vioxx ("APPROVe") Study was a multi-center, randomized, placebo-controlled study investigating the effects of Vioxx on the recurrence of neoplastic large bowel polyps in 2600 patients with a previous history of colorectal adenoma.  Commencing in 2000, the APPROVe trial studied these 2,600 patients to evaluate whether Vioxx 25 mg doses prevented the recurrence of colorectal polyps in patients with a history of colorectal adenomas. The primary purpose of the study was to add another indication for the use of Vioxx and thereby increase the market potential of Vioxx for previously unapproved uses.  However, during the trial, Merck collected data concerning adverse events experienced by the subjects.  As in other clinical trials, high-risk patients were intentionally excluded, which weakened the ability to detect significant differences in cardiovascular event rates.

160.    In mid-September 2004, APPROVe was halted suddenly when the data showed that Vioxx caused a marked increase in the risk of heart attacks and strokes. In fact, patients taking Vioxx had double the risk of heart attacks as compared to patients taking placebo. APPROVe revealed 15 cases of heart attack, stroke or blood clots over one year for Vioxx users as compared to 7.5 cases per year for those on placebo.

161.    Merck has claimed since the release of the APPROVe results in September, 2004, that the risk of heart attack and stroke did not appear until after subjects had

taken Vioxx for more than 18 months, based on so-called "adjudicated" events. However, Merck has concealed from the public its internal analysis of "investigator reported" cardiovascular events, which showed that the Vioxx rate exceeded placebo throughout the entire period of the study. Furthermore, Merck has concealed its internal analysis of such events showing a statistically significant increased risk for Vioxx versus placebo in the 0 to 18 month segment as well as the 19 to 36 month segment of the study. In a graph of the "Kaplan-Meier cumulative rate curves" for Vioxx versus placebo, the Vioxx curve begins to exceed the placebo curve at approximately 2 to 3 months, and separates from the placebo incidence curve by an increasing margin for the remainder of the 36 month study. Merck's concealment of this data has been willful, intentional, deliberate, and designed to minimize its potential liability to Plaintiffs and the public.

### L.    Merck's Belated Withdrawal of Vioxx

162.    On September 30, 2004, the Center for Drug Evaluation and Research of the FDA issued a Memorandum concluding that Vioxx has adverse cardiovascular effects, which were evident long before Merck's withdrawal of the drug:

> Rofecoxib [Vioxx] increases the risk of serious coronary heart disease defined as acute myocardial infarction and sudden cardiac death . . . The observation of an increased risk was first noted with the VIGOR trial, where a 5-fold difference in risk was found between high-dose rofecoxib and naproxen. The manufacturer attributed this difference to a never before recognized protective effect of naproxen. To explain a 5-fold difference, naproxen would have had to be one of the most potent and effective cardio-protectants known. Three cohort studies and the present nested case-control study found no evidence of cardio-protection with naproxen. The three case-control studies that reported a protective effect were misleading. When analyzed in a manner comparable to

the present study, no protective effect is shown.[4]

163.    On that same day, September 30, 2004, Merck issued a press release announcing the withdrawal of Vioxx based on "new" data indicating an increased risk of cardiovascular events, such as heart attack and stroke for those taking the drug eighteen months or longer.[5]  The decision came after the Data Safety Monitoring Board for the APPROVe trial recommended that the study be stopped early for safety reasons based on the first three years of results.[6]

164.    However, the totality of information available to Merck suggests that Vioxx should have been taken off of the market years before Merck's recall.  In fact, an article in *The Lancet*, a respected British medical journal, pointed out that the "voluntary withdrawal of rofecoxib by its manufacturer, Merck, on the basis of a fairly small trial that was designed for a different purpose raises several questions."[7] The critical question is why Merck waited so long to pull from the market a drug that it knew was associated with an unacceptably high risk of adverse cardiovascular and cerebrovascular events, such as heart attack and stroke.

165.    *The Lancet* set out to find its own answers by conducting a meta-analysis of randomized controlled trials and observational studies.  It concluded that:

> Our cumulative meta-analysis of randomized controlled trials
> indicates that an increased risk of myocardial infarction was
> evident from 2000 onwards.  At the end of 2000, the effect was

---

[4] David J. Graham, MD, MPII, Associate Director for Science, Office of Drug Safety, Center for Drug Evaluation and Research, FDA, *Risk of Acute Myocardial Infarction and Sudden Cardiac Death in Patients Treated with COX-2 Selective and Non-selective NSAIDs* 13 (Sept. 30, 2004).
[5] Merck, Merck Announces Voluntary Withdrawal of Vioxx, available at http://www.Vioxx.con/Vioxx/documents/english/Vioxx_press_release.pdf (accessed Nov. 5, 2004).
[6] FDA, *FDA Public Health Advisory: Safety of Vioxx*, available at http:/www.fda.gov/cder/drug/infopage/Vioxx/PHA_Vioxx.htm (accessed Nov. 5, 2004).
[7] Peter Juni, et al., *The Lancet*, "Risk of Cardiovascular Events and Rofecoxib: Cumulative Meta-Analysis 4" (Nov. 5, 2004).

both substantial and unlikely to be a chance finding.  We found an increased risk of myocardial infarction in trials of both short and long duration, which is in contrast to the unpublished results from the APPROVe trial . . .

[T]he reassuring statement by Merck, that there is no excess risk in the first 18 months, is not supported by our data. ... [D]ata from these studies indicate that if a protective effect of naproxen exists, it is . . .not large enough to explain the findings of VIGOR.  By contrast to our findings, two earlier meta-analyses from Merck Research Laboratories showed no evidence of a rise in cardiovascular risk or an increase in risk that was restricted to trials comparing rofecoxib with naproxen . . .

To clarify the reasons behind the misleading results of Merck's meta-analysis of cardiovascular events in clinical trials of rofecoxib will be important . . .if Merck's statement in their recent press release that 'given the availability of alternate therapies, and the questions raised by the data, we concluded that a voluntary withdrawal is the responsible course to take' was appropriate in September, 2004, then **the same statement could and should have been made several years earlier, when the data summarized here first became available.  Instead, Merck continued to market the safety of rofecoxib**.[8]

166.    In 2005, Dr. Levesque and her colleagues at McGill University published their study in the online edition of the *Annals of Internal Medicine*, to be followed by the print edition in April 2005.  The McGill University study examined pharmacy prescriptions and cardiovascular adverse events among users of Vioxx and other pain medications in a large population of more than 100,000 elderly persons (mean age of 75; 55 years at entry).

167.    Dr. Levesque reported that there were 5 times as many Vioxx-exposed case patients with MIs as reported by Dr. Juni in his study, and that Vioxx users had a significantly higher relative risk for MIs as compared to other NSAID users.  The large size of the Levesque study database increases the reliability of the analysis, and these results provide strong, confirmatory evidence that the use of Vioxx is associated with an increased risk for an

---

[8] Peter Juni, et al., *The Lancet*, "Risk of Cardiovascular Events and Rofecoxib: Cumulative Meta-Analysis 5-7" (Nov. 5, 2004) (emphasis supplied).

acute MI.  The magnitude of the risk observed for users of Vioxx was even higher for individuals

prescribed a dosage greater than 25 mg per day.  However, even the patients who took lower

doses of Vioxx had an elevated risk of a cardiovascular event.  Further, Dr. Levesque wrote that,

"[w]e have also shown that the cardio toxic effect of Rofecoxib previously observed in older and

sicker populations extends to a healthier elderly population."

168.   According to Dr. Levesque, "the totality of the current evidence confirms

the increased cardiovascular risk associated with Rofecoxib and the sagacity of its withdrawal."

These results were consistent with the results of the VIGOR study and the APPROVe results, as

well as the studies of Ray (2002), and Graham and Ray (2005).

169.   In November 2004, the United States Senate Finance Committee held

hearings on Vioxx and related drugs approved by the FDA and then withdrawn because of

significant health risks.  Dr. David Graham testified about his experience with Vioxx:

> Graham:  "Prior to approval of Vioxx a study that was performed
> by Merck, named 090, which found a nearly seven-fold increase in
> heart attack risks with low-dose Vioxx.  The labeling at approval
> said nothing about these heart attack risks.  In November 2000,
> another Merck trial named VIGOR found a five-fold increase in
> heart attack risk with the high-dose form Vioxx.
>
> About 18 months after the VIGOR results were published, FDA
> made a labeling change about heart attack risk.  But it did not place
> this in the "Warnings" section of the labeling.  Also, it did not ban
> the high dose formulation and its use.
>
> I believe such ban should have been implemented.
>
> *   *   *
>
> In March 2004, another epidemiology study reported that those
> high- and low-dose Vioxx increased heart attack risks compared to
> CELEBREX, Vioxx's leading competitor.  Our study found similar
> results.
>
> A study report describing our work was put on the FDA website.
> This report estimated that nearly 28,000 excess cases of heart

attack and sudden cardiac deaths have been caused by Vioxx.

I must emphasize to the committee that this is an extremely conservative estimate.

FDA always claims that randomized clinical trials provide the best data.

If you apply the risk level seen in the two Merck clinical trials, VIGOR and APPROVe, you obtain a more realistic and likely range estimates for the number of excess cases.

This estimate ranges from 88,000 to 139,000 Americans. Of these, 30 to 40% probably died; for the survivors, their lives were changed forever.

This range does not depend at all on the data from our Kaiser-FDA study. Indeed, Dr. Eric Topol at the Cleveland Clinic recently estimated 160,000 cases in the article that was published in the New England Journal of Medicine."

170.    In February 2005, a 32-member FDA Advisory Panel conducted hearings to determine whether or not COX-2 inhibiters should be made available to the public and, if so, on what terms. The Panel criticized the label changes made by Merck in 2002, which the Panel deemed insufficient to warn the public about the cardiovascular risks of Vioxx use.

171.    During the Panel hearings, the senior director of Merck Research Laboratories, Dr. Ned Braunstein, tried to portray Vioxx's dangerous effects as a class effect of all COX-2 inhibitors. This attempt to characterize the dangers of Vioxx as a class effect represents a critical admission of the risk of Vioxx use that directly contradicts Merck's prior statements and omissions about the safety and the unique characteristics of its product.

172.    At the conclusion of the hearings, the members of the Advisory Panel, a third of whom had worked for Merck in the past, voted by the narrowest of margins (17-15) to recommend that Vioxx be allowed to return to the market, with severe limitations on use. If the panelists who had not previously worked for a pharmaceutical company had not voted, Vioxx

would have been prevented from returning to the market by a margin of 14-8.  To date, the FDA has not accepted the Panel's recommendations.

173.   Merck publicly acknowledged on its website that it is responsible to reimburse patients for their unused portions of Vioxx.  To this end, Merck has instituted a reimbursement program that is fundamentally flawed, does not fully and effectively reimburse End-Payors, and does not make them whole.

**M.**     **Merck's Continued Fraudulent Marketing Campaign Caused Active Concealment of Vioxx' Deficiencies and Inflated Payments by End-Payors for Vioxx.**

174.   As a result of Merck's claims, Plaintiffs and members of the Class purchased and/or paid for Vioxx even though, at $72 for a monthly supply (in 1999), Vioxx was much more expensive than other NSAIDs, which sold for $9 or less for the same month's supply.

175.   To justify the disparity of Vioxx's pricing as compared to other NSAIDs and to ensure that physicians would prescribe and that End-Payors would purchase and pay for the drug, Merck misrepresented the safety and efficacy of Vioxx and omitted, concealed, and suppressed the risks, dangers, and disadvantages of the drug.  Consequently, Vioxx captured a large market share of anti-inflammatory drugs prescribed for and used by patients.  In 2000 alone, sales of Vioxx exceeded $2 billion, which represented 23% of the total NSAIDs market, despite the significantly higher cost of Vioxx as compared to other pain relievers in the same family of drugs.

176.   Merck's deceptive and misleading marketing campaign concealed, omitted, and suppressed resulted in inflated payments by consumers and third party payors, such as Plaintiffs and the Class, for, in whole or in part, the costs of Vioxx.  Millions of End-Payors, including consumers and third party payors, have already paid for, and/or purchased and consumed Vioxx at prices based on the proposed wholesale price, which was about one hundred

times the cost of a generic aspirin. These End-Payors paid more than they would have or should have because Vioxx was promoted and advertised as a premium drug with reduced side effects for the purpose of deceiving consumers and end-payors about Vioxx's adverse cardiovascular and cerebrovascular effects.

177.    In fact, the economic effects of being required by the FDA to disclose the side effects and cardiovascular risks of Vioxx were known to Merck. In its internal documents, Merck calculated and included the expected losses in Vioxx sales and market share that could be anticipated to result when Merck would be required to include the risks in the Vioxx label. The projections estimated, at least, a $229 million loss in sales in 2002 and a loss in market share of, at least, 10 to 20 percent. Merck continued its game of deception well into 2004, finally withdrawing Vioxx from the market on September 30, 2004, years after it knew of, but omitted, suppressed, and concealed the increased serious health risks associated with Vioxx use.

## FRAUDULENT CONCEALMENT

178.    Throughout the Class Period, Merck affirmatively and fraudulently concealed its unlawful conduct from Plaintiffs and the Class.

179.    Plaintiffs and the Class did not discover, and could not discover through the exercise of reasonable diligence, that Merck had unlawfully concealed, omitted, and suppressed the serious adverse effects of Vioxx until September 30, 2004, when Merck withdrew Vioxx from the market. Merck conducted its unlawful activities in secret, concealed the nature of its unlawful conduct, and attempted to confine information concerning the adverse effects of Vioxx. Merck attempted to withhold such information from Plaintiffs and members of the Class, the medical community, regulators and the public. Merck fraudulently concealed its activities through various means and methods designed to avoid detection.

180. Plaintiffs and the Class could not have discovered Merck's unlawful conduct at an earlier date through the exercise of reasonable diligence because Merck actively and purposefully concealed its unlawful activities.

181. Merck engaged in a successful, illegal fraud on consumers, third party payors and the general public, by which it deliberately and affirmatively concealed material information on the risks, dangers, defects, and disadvantages of Vioxx, in at least the following respects:

a. By failing to disclose adverse effects of Vioxx to Plaintiffs, the Class, the medical community, regulators, and the public;

b. By failing to warn Plaintiffs, the Class, the medical community, regulators, and the public of those adverse effects;

c. By agreements among senior Merck officials in meetings and in communications not to discuss publicly, or otherwise reveal, the totality of the adverse effects caused by Vioxx, Merck's concealment of those adverse effects, and the nature and substance of other acts and communications in furtherance of Merck's illegal scheme; and

d. By giving false and pretextual reasons for the existence of apparent adverse effects in studies of Vioxx, including, for example, by claiming that naproxen's cardioprotective effect was responsible for a noted increase in cardiovascular events in the VIGOR study in Vioxx versus naproxen patients, when, in fact, Vioxx was the cause of the reported increased incidence of cardiovascular effects.

182. As a result of Merck's fraudulent concealment, Plaintiffs and the Class purchased and/or paid for Vioxx and could not reasonably have discovered Merck's misconduct

regarding Vioxx prior to September 30, 2004.  Plaintiffs and the Class therefore assert the tolling

of any applicable statute of limitations affecting the rights of action of Plaintiffs and the Class.

## CLASS ACTION ALLEGATIONS

183.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs

seek certification of a national Class defined as follows:

> All End-Payors located in the United States, including Consumers
> and Third Party Payors,[9] who purchased and/or paid for Vioxx not
> for resale during the period from May 20, 1999 through September
> 30, 2004, when Vioxx was withdrawn from the market.
>
> Excluded from the proposed Class are (i) Defendant, any entity in
> which Defendant has a controlling interest or which has a
> controlling interest in Defendant, and Defendant's legal
> representatives, predecessors, successors and assigns; (ii) the
> judicial officers to whom this case is assigned; and (iii) any
> member of the immediate families of excluded persons.[10]

184.    The End-Payor class actions included in this Master Complaint encompass

cases filed in and transferred from the District of New Jersey that seek national class

certification, through classwide application of New Jersey law.  The utilization of New Jersey's

choice of law rules, or any choice of law analysis based upon constitutionally permissible

significant contacts, governmental interest, comparative impact and/or the *Restatement (Second)*

*Conflicts of Law* principles, will result in the application of New Jersey law to the class claims,

establishing the commonality of all issues of law and facilitating class certification by this Court.

---

[9] Third Party Payors include all entities that: (a) provide, sponsor or insure a healthcare plan,
which includes prescription drug coverage to natural persons, and (b) purchase, pay or insure all
or part of the cost of prescription drugs prescribed and dispensed to those persons pursuant to a
health plan.

[10] Plaintiffs have named class representatives for the Class, but have not named class
representatives for every jurisdiction. Should the Court so require or direct, Plaintiffs are
prepared to name proposed class representative Plaintiffs for every jurisdiction, or for each
statewide class, and for each subclass the Cour tmay designate.

185.    All states have an interest in protecting their citizens from consumer fraud and commercial misconduct, and in promoting and regulating the companies that choose to centralize their business operations there.  A comparison of the contacts of Merck's conduct as between New Jersey and other states, and of New Jersey's resulting interests in this matter, compared to that of other states, demonstrates that New Jersey's contacts are most significant, its interests are strongest, and that no other state's policies would be frustrated by the application of New Jersey law to the Class' claims if failure to do so left Class members without an effective remedy.  Facts pertinent to this choice of law analysis include: Merck's status as a New Jersey corporation that is headquartered in Whitehouse Station, New Jersey.  Development of Vioxx originally began at Merck Frosst in Canada, but was "largely completed" at Merck's facility in Rahway, New Jersey.  Merck's Human Health Product Approval Committee ("HHPAC"), which oversees broad development of all Merck's products and gives final approval on plans and activities related to the product (including Vioxx) met on a monthly basis, often in New Jersey, including on March 20, 2001, when the Vioxx Program Review was discussed.  Merck issued press releases from its New Jersey headquarters about Vioxx-related developments.  Much of the decision making about the marketing and testing of Vioxx was done in New Jersey.  Communications regarding the labeling of Vioxx took place between the FDA and Merck employees based in New Jersey.  Merck had no comparable intensive contacts with any other state.

186.    Should this Court determine that a national End-Payor Class would not satisfy the applicable requisites for class certification, Plaintiffs propose the certification of appropriate subclasses as required by the Court, or of statewide classes for each of the states, defined as:

> All End-Payors located in [State], including consumers and Third
> Party Payors, who purchased and/or paid for Vioxx not for resale
> during the period from May 20, 1999 through September 30, 2004.
>
> Excluded from the proposed Class are (i) Defendant, any entity in
> which Defendant has a controlling interest or which has a
> controlling interest in Defendant, and Defendant's legal
> representatives, predecessors, successors and assigns; (ii) the
> judicial officers to whom this case is assigned; and (iii) any
> member of the immediate families of excluded persons.

187.    In the event that Plaintiffs are directed to pursue the statewide class course

of action set forth in the forgoing paragraph, Plaintiffs intend to request the Panel for Multi-

District Litigation to remand, to its transferor forum, each state class action as to which Plaintiffs

seek certification, solely for purposes of addressing the class certification question.  Remand of

the class certification question will allow appellate review of the statewide class certification

question by the appropriate Circuit Court(s), thus ensuring that no party will have been

prejudiced by the Panel's random selection of a transferee forum whose procedural jurisprudence

would determine the class certification issue differently from that of the transferor forum.  For

purposes of uniformity and judicial efficiency, Plaintiffs would further move the MDL Panel to

appoint this Court to sit, by *ad hoc* designation, over the class certification issue of each

transferor court as to which such remand has been sought while remaining in the District Court

of the Eastern District of Louisiana.

188.    The Class and all potential subclasses consist of many thousands of

persons and entities throughout the United States, making individual joinder of all class members

impractical.

189.    All class members share a united interest in the fair, just and consistent

determination of the questions of law and fact necessary to the adjudication of Merck's liability,

which predominate over questions affecting only individual members. These key common liability questions include:

    a.    whether Vioxx poses an increased risk over traditional NSAIDS of blood clots, heart attack, stroke, unstable angina, cardiac clotting and hypertension;

    b.    whether and when Defendant knew or should have known of Vioxx's dangerous side effects;

    c.    whether defendant knowingly, recklessly, or negligently concealed, suppressed or failed to disclose the health risks of Vioxx from the medical community, regulators, and the public;

    d.    whether Defendant made material misrepresentations or material omissions about the cardiovascular risks associated with using Vioxx and regarding the effectiveness of Vioxx;

    e.    whether Defendant targeted End-Payors through advertising to induce Vioxx prescriptions and usage and to induce Plaintiffs and the Class to purchase or authorize the purchase of Vioxx;

    f.    whether Defendant's conduct violated state consumer protection statutes and state fraud and deceptive trade practices acts;

    g.    whether Defendant breached its implied warranties covering Vioxx;

    h.    whether Defendant acted negligently in its sale and promotion of Vioxx;

    i.    whether Defendant unjustly enriched itself at the expense of Plaintiffs and members of the Class;

j.      whether the unitary application of New Jersey's law to the national

Class is appropriate;

k.      whether application of New Jersey law to the claims of citizens of

states without statutory consumer class action laws of their own is appropriate to avoid unfair or

inconsistent adjudication of identical issues, or a gap in the accountability of Defendant for its

conduct; and

l.      whether a national class, statewide classes, and/or other subclasses,

are superior, within the requirements of Rule 23(b)(3), on any of the Class Claims.

190.    The Class is also united on fundamental questions regarding its members'

entitlement to damages and equitable relief, including:

a.      whether members of the Class are entitled to damages and/or

equitable relief based on their payments for Vioxx, and, if so, the appropriate scope, extent and

measure of damages and equitable relief that should be awarded;

b.      the appropriate scope, extent and measure of damages and

equitable relief that should be awarded;

c.      whether the degree of reprehensibility of Merck's conduct warrants

the imposition of punitive damages under controlling authority; and

d.      whether class members are entitled to attorneys' fees, prejudgment

interest and costs of suit.

191.    Plaintiffs' claims and defenses are typical of the claims and defenses of

the Class, because Defendant uniformly misrepresented that Vioxx is safer and more effective

than traditional NSAIDs, and uniformly and actively suppressed, concealed and failed to disclose

the material cardiovascular risks associated with Vioxx and the other dangers, defects and

disadvantages of Vioxx. Defendant's uniform conduct deprived Plaintiffs and all members of the Class of their ability to make an informed decision about whether to use and/or pay for Vioxx.

192.    Plaintiffs and their counsel will fairly and adequately assert and protect the interests of all members of the Class, because Plaintiffs have retained counsel competent and experienced in complex class action litigation, including Third-Party Payor and Consumer litigation, and have no interest adverse to those of any absent class members, with respect to the key common issues of Defendant's product, knowledge, conduct and duty, and resulting liability therefore.  All members of the Class share a common interest in the determination of all factual and legal issues pertinent to Merck's liability and to the fair reallocation of the economic costs associated with Vioxx as between its manufacturer and its End-Payors, through the disgorgement and restitution of Vioxx revenue unjustly obtained by Merck. Plaintiffs' Counsel have filed Third Party Payor and Consumer class actions against Merck that have been coordinated in these MDL 1657 proceedings.  Plaintiffs will request the designation of appropriate subclasses, representatives and counsel to maintain the structural assurance of fair and adequate representation of the legitimate interests of the diverse groups and individuals included in the Class to address circumstances that raise issues with respect to, *inter alia*, the allocation or distribution of damages or equitable relief within the Class, or the assertion of claims unique to a specific segment of the Class, thus assuring the continuing protection of the legitimate interests of both the Class as a whole, and all those within it.

193.    Class certification is proper under Federal Rule of Civil Procedure 23(b)(1)(A), because the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual members of the Class and establish incompatible standards of conduct for Defendant.

194.    Class certification is proper under Federal Rule of Civil Procedure 23(b)(1)(B), because the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to individual Class members which would, as a practical matter, be dispositive of the interest of the other members not parties to these adjudications and/or substantially impair their ability to protect these interests.

195.    Class certification is proper under Federal Rule of Civil Procedure 23(b)(2), because Defendant has acted, or refused to act, on grounds generally applicable to the Class, thereby making final injunctive relief or corresponding declaratory relief appropriate for the Class and Subclasses.

196.    Class certification is proper under Federal Rule of Civil Procedure 23(b)(3), because common issues of law and fact predominate over any questions affecting only individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Class adjudication is superior to individual litigation, which would foreclose the ability of most class members to litigate their claims, impose an undue burden on the courts, and result in inconsistent determinations of common issues.  The Court may employ issue certification under Rule 23(c)(4)(A), and designate subclasses under Rule 23(c)(4)(B), to address any variation of law, fact, or interest, which procedure is superior, from the standpoint of fairness, efficiency, and economy, to the denial of class treatment and reversion to repetitive and piecemeal individual litigation.

197.    Plaintiffs seek a class certification decision that, regardless of the applicable subsection of Rule 23 under which class treatment is granted, (1) preserves the right of Class Members to exclude themselves from the Class under Rule 23(c)(2)(B), unless the Court makes a finding that Defendant's available assets and insurance constitute a traditional "limited

fund" under the meaning of *Ortiz v. Fibreboard*, 527 U.S. 815, 816 (1999); (2) if appropriate, grants class certification with respect to particular issues under Rule 23(c)(4)(A); and, (3) reserves the right of Class Members to pursue any subrogation or related rights or claims they may have for the costs of treating Vioxx-related injuries, in this litigation or elsewhere.

198.    The need for class-wide notice presents no barrier to certification, because notice can be effectively disseminated to the Class by techniques customarily used in consumer class actions.  Notice may be provided to Class Members under the requirements of Fed.R.Civ. P. 23(c)(2) by such combination of print publication, broadcast publication, internet publication, and/or first class mail that this Court determines best comports with modern Fed R.Civ.P. 23(c)(2) class notice form, content, and dissemination techniques, as used in other medical products liability cases and as recommended by the *Manual for Complex Litigation, 4th*, and the Federal Judicial Center.

## FIRST CLAIM FOR RELIEF
### (Violations of New Jersey Consumer Fraud Act (N.J.S.A. § 56:8-1, *et seq.*))

199.    Plaintiffs incorporate by reference the preceding paragraphs as if they were fully set forth herein.

200.    At all relevant times material hereto, Defendant Merck conducted trade and commerce within the meaning of the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1, *et seq.* ("CFA").

201.    Plaintiffs and the Class and Defendant Merck are "persons" within the meaning of the New Jersey CFA, N.J.S.A. § 56:8-1.

202.    Section 56:8-1 of the New Jersey CFA provides that unconscionable and deceptive conduct in connection with the sale or marketing of a product is unlawful, *e.g.*:

> The act, use or employment by any person of any unconscionable
> commercial practice, deception, fraud, false pretense, false