

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: VIOXX | ) |
| PRODUCTS LIABILITY LITIGATION | ) MDL NO. 1657 |
| | ) |
| | ) SECTION: L |
| THIS DOCUMENT RELATES TO ALL | ) |
| CASES | ) JUDGE FALLON |
| | ) |
| | ) |

**MERCK & CO., INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL
ANSWERS TO MASTER SET OF INTERROGATORIES AND RESPONSES TO
MASTER SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS
(FOREIGN VIOXX RELATED ACTIVITIES)**

Defendant Merck & Co., Inc. ("Merck"), by and through its counsel, respectfully submits

this Opposition to plaintiffs' Motion to Compel Answers to Master Set of Interrogatories and

Responses to Master Set of Requests for Production of Documents (Foreign Vioxx Related

Activities).

Although Merck has already produced more than 12 million pages of documents in this

litigation, plaintiffs are seeking to compel answers to interrogatories and production of irrelevant

documents related to "the sale, marketing, testing, approval and labeling of Vioxx in foreign

countries."   (Plaintiffs' Motion to Compel Answers to Master Set of Interrogatories and

Responses to Master Set of Request for Production of Documents (Foreign Vioxx Related

Activities) ("Pls.' Mem.") at 4.)  Plaintiffs' motion should be denied for two reasons.  *First*, the

gravamen of plaintiffs' claims in this litigation is that Merck failed to adequately disclose the

___ Fee _____
___ Process _____
_X_/ Dktd _____
_/ CtRmDep _____
___ Doc. No. _____

alleged health risks associated with Vioxx® to the public and to prescribing physicians in the United States.  Thus, the only documents conceivably relevant to plaintiffs' failure-to-warn claims are those documents that could have been seen or heard by consumers and/or prescribing physicians in the United States.  Moreover, the great variation among regulatory standards in the many countries where Vioxx was sold renders any such information useless, as it sheds no light on Merck's compliance with legal and regulatory standards in the United States.  Put simply, what Merck said or did regarding Vioxx in foreign jurisdictions has nothing to do with plaintiffs' claims here in the United States.  *Second*, requiring production of all Vioxx-related documents maintained in Merck foreign offices would impose an overwhelming burden on Merck that cannot be justified given the marginal relevance – if any – of the information plaintiffs seek.  For these reasons, plaintiffs' motion should be denied.

## ARGUMENT

Federal Rule of Civil Procedure 26 permits discovery of unprivileged information "relevant to the claim or defense of any party."  Fed. R. Civ. P. 26(b)(1).  But "discovery, like all matters of procedure, has ultimate and necessary boundaries."  *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (quotations omitted).  Accordingly, discovery may be denied if it is "unreasonably cumulative or duplicative" or if "the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(2).  *See also Gill v. Gulfstream Park Racing Ass'n, Inc.*, 399 F.3d 391, 400 (1st Cir. 2005) ("the trial court is required to balance the burden of proposed discovery against the likely benefit").  "Rule 26(b) is not a discovery blank check.  It requires balancing and imposes on the court the obligation to rein in overly broad, potentially abusive discovery . . . ."  *BG Real Estate Servs., Inc. v. Am. Equity Ins. Co.*, Civil Action No. 04-3408 SECTION "A" (2), 2005 U.S. Dist. LEXIS 10330, at *8 (E.D. La.

787481v.1

May 18, 2005).  *See also Rowlin v. Ala. Dep't of Pub. Safety*, 200 F.R.D. 459, 461 (M.D. Ala. 2001) ("courts have the duty to pare down overbroad discovery requests under Rule 26(b)(2), which provides that information may sometimes be withheld, even if relevant").  The discovery requested by plaintiffs here is irrelevant and overly burdensome.  Accordingly, plaintiffs' motion should be denied.

## I.   PLAINTIFFS' MOTION SHOULD BE DENIED BECAUSE FOREIGN VIOXX-RELATED INFORMATION IS UTTERLY IRRELEVANT TO THESE CASES.

The Court should deny plaintiffs' motion because the foreign documents and information they seek are completely irrelevant to their claims.  Plaintiffs in these cases allege that Merck failed to warn them about alleged health risks associated with Vioxx.  They bring their claims under various states' laws, and they make no allegation that they were prescribed Vioxx, were exposed to Merck's advertising, or sustained a Vioxx-related injury outside the United States.[1] Thus, the only sales and marketing materials that are conceivably relevant to this case are those materials that were seen or heard by each plaintiff and his or her prescribing physician.  The Court should reject plaintiffs' request for irrelevant and highly burdensome discovery.

Plaintiffs' requests boil down to two categories:  (1) marketing documents; and (2) regulatory documents.  Plaintiffs argue, without analysis, that the marketing and regulatory information they seek is "clearly relevant" and will provide plaintiffs with "'state of mind' evidence" that will reveal "what Merck was telling the foreign public and foreign regulators." (Pls.' Mem. at 5.)  But plaintiffs fail to demonstrate that Merck's statements in foreign countries are relevant to resolution of their claims.  In fact, they are not.

---

[1]   Merck is not aware of any individual cases in the MDL proceeding brought on behalf of foreign plaintiffs. While there are some international purported class actions pending before the Court, plaintiffs did not include those cases in their master complaints, and do not rely on them here in arguing that the foreign documents are relevant to their claims.  In any event, Merck intends to move to dismiss those cases shortly on several grounds.

787481v.1

Contrary to plaintiffs' assertions, information pertaining to Merck's foreign marketing practices has nothing to do with any issue in these cases, which involve scientific studies concerning the safety and efficacy of Vioxx, the United States labeling of Vioxx, and the information available to plaintiffs' physicians in the United States about Vioxx.  Plaintiffs received prescriptions for Vioxx in the United States from doctors located in the United States. There are no allegations that plaintiffs or their doctors saw, or were influenced by, the marketing of Vioxx outside of the United States.

Other courts presiding over pharmaceutical MDLs have recognized that the only relevant marketing and promotional materials are those that were potentially seen or heard by plaintiffs' physicians, and therefore may have influenced prescribing decisions. *See, e.g., In re Norplant Contraceptive Prods. Liab. Litig.*, MDL No. 1038, 1997 WL 81092, at *1 (E.D. Tex. Feb. 21, 1997) (holding that "[a]bsent evidence that the [plaintiffs'] physicians were exposed" to them, "the promotional and advertising materials are not relevant evidence"); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, MDL No. 1014, Civ. A. 93-7074, 1995 WL 273597, at *11 n.13 (E.D. Pa. Feb. 22, 1995) (to prevail on claim that "defendants violated the law by actively promoting or marketing their medical devices in violation of FDA requirements . . . each plaintiff has the burden of showing that [defendant] promoted/marketed its medical device to plaintiff's particular doctor or surgeon . . . and that such promotion caused the surgeon to decide that surgical implantation of the particular device was the best procedure for improving plaintiff's condition").  If the only conceivably relevant marketing materials are those to which plaintiffs' prescribing physicians may have been exposed, it follows that foreign marketing documents cannot have any bearing on claims by plaintiffs in this country who do not allege that those materials caused them to take Vioxx.  Consistent with this limitation, for instance, the court in

- 4 -

787481v.1

the Meridia MDL expressly excluded from the scope of discovery documents relating to "marketing, distribution, and promotion" outside the United States. *See In re Meridia Prods. Liab. Litig.*, MDL 1481, slip op. at 17 (N.D. Ohio Aug. 22, 2002) (attached as Ex. 1). The same result should obtain here.

Moreover, marketing approaches differ from country to country because of the differences in culture, health care systems, and regulatory requirements. For example, direct-to-consumer advertising of prescription medicine is prohibited in Europe but permitted in the United States. *See* Council Directive 2001/83/EC, art. 88, 2001 O.J. (L 311) 92 (EC) (as amended). Accordingly, the foreign materials have no bearing on the propriety of Merck's marketing and promotional activities in this country. Nor do plaintiffs require this information in order to establish "what Merck knew, when Merck learned it, and what Merck was telling the foreign public." (Pls.' Mem. at 5.) Merck has produced millions of pages of documentation concerning the only marketing activities of any arguable relevance, *i.e.*, those it undertook in this country.[2] Plaintiffs make no attempt to explain why these documents are insufficient to allow them to explore the state of Merck's knowledge over time. Moreover, as explained above, there is no plausible argument that plaintiffs' claims are affected in the least by whatever Merck told the "foreign public."

The foreign regulatory materials fare no better. Whether Vioxx was approved for marketing in other countries, under what conditions, and with what labeling are all matters that have no bearing on whether Merck complied with FDA requirements for marketing and labeling of Vioxx in this country. Because the alleged wrongdoing in this action took place in the United States, only U.S. legal standards apply.

---

[2]   Merck has already produced *domestic* promotion and advertising materials relating to Vioxx.

787481v.1

Each country has its own regulatory agency that applies its own laws and policies in deciding which drugs to approve and under what conditions, what information the label should contain and how those labels should appear, how and when and for what indications the drug is to be used, and at what dosages. *See, e.g.,* DES Action Canada in Collaboration with Women and Health Protection, *How Safe Are Our Medicines? Monitoring the Risks of Drugs After They Are Approved for Marketing* (2d ed. 2003), *available at* http://www.whp-apsf.ca/en/documents/how_safe.html (discussing the process of bringing a drug to market in Canada, and comparing the secrecy of that process with the more open process in the United States) (attached as Ex. 2). Likewise, each foreign regulatory body independently decides what prescribing information may or must be provided to physicians and/or patients, and what sorts of marketing materials will be permitted.

Foreign regulatory action often is driven by factors arising from each country's unique political, social, and economic situation. *See, e.g.,* Minute Entry at 4, *In re Propulsid Prods. Liab. Litig.*, MDL No. 1355 (E.D. La. May 11, 2001) ("*Propulsid* Order") ("the application requirements to regulatory agencies may be different; also, stress, diet, custom usage, and other factors may well differ greatly from country to country"). Because of the diverse factors underlying each country's approach to drug regulation, and the complex analysis required to balance the risks and benefits of a medication, different countries sometimes reach different conclusions about prescription drug approvals. *See Doe v. Hyland Therapeutic Divs.*, 807 F. Supp. 1117, 1129 (S.D.N.Y. 1992) ("The forum whose market consumes the product must make its own determination as to the levels of safety and care required."). These differences influence the ways in which each agency would evaluate the data provided by Merck regarding potential risks, the process of developing a label, the respective roles of the agency and Merck in that

- 6 -

787481v.1

process, and the final decisions reached about the contents of the label. *See, e.g., Harrison v. Wyeth Labs.*, 510 F. Supp. 1, 4-5 (E.D. Pa. 1980), *aff'd*, 676 F.2d 685 (3d Cir. 1982).

Because of these differences, evidence pertaining to foreign regulatory schemes and actions is not relevant to issues regarding drugs approved by the FDA. As explained in *Harrison*, a pharmaceutical manufacturer's liability must be judged solely based on its actions in the country where the alleged injury occurred, because each country applies its own standards:

> Each government must weigh the merits of permitting the drug's use and the necessity of requiring a warning. Each makes its own determination as to the standards of degree of safety and duty of care. This balancing of the overall benefits to be derived from a product's use with the risk of harm associated with that use is peculiarly suited to a forum of the country in which the product is to be used. Each country has its own legitimate concerns and its own unique needs which must be factored into its process of weighing the drug's merits, and which will tip the balance for it one way or the other. . . . [F]airness to the defendant mandates that defendant's conduct be judged by the standards of the community affected by its actions.

510 F. Supp. at 4-5. *See also Deviner v. Electrolux Motor, AB*, 844 F.2d 769, 771 n.2 (11th Cir. 1988) ("Swedish Standards are not relevant in a U.S. product liability case"); *Hurt v. Coyne Cylinder* Co., 956 F.2d 1319, 1327 (6th Cir. 1992) (excluding British legal standards as evidence in a product liability case); *Jones v. Lederle Labs.*, 785 F. Supp. 1123, 1127 (E.D.N.Y. 1992) (because of the less stringent testing standards of vaccine in Japan, testimony regarding the vaccine's experience in Japan was not acceptable evidence to support plaintiff's claim that a safer vaccine existed), *aff'd*, 982 F.2d 63 (2d Cir. 1992).[3]

---

[3] *See also Garman v. Cincinnati, Inc.*, No. 02A01-9203-CV-00033, 1993 WL 190923, at *3 (Tenn. Ct. App. June 4, 1993) (finding that foreign regulatory "rules and standards not having the force and effect of law" were not admissible in a product liability case); *Tews v. Husqvarna, Inc.*, 390 N.W.2d 363, 367 (Minn. Ct. App. 1986) (affirming trial court's exclusion of testimony on foreign regulatory requirements because "legal standards in other jurisdictions" are not relevant); *Alba v. Ford Motor Co.*, 111 A.D.2d 68, 69 (N.Y. App. Div. 1985) (striking interrogatories "which seek information about defendant's knowledge of insurance requirements and governmental standards in [] five foreign countries for the placement of safety devices on tractors").

The United States Food & Drug Administration is the exclusive authority over drug safety regulations in the United States and, as such, has instituted rigorous labeling standards for prescription drugs in this country.  To the extent that plaintiffs are arguing that the labeling for Vioxx failed to contain adequate warnings or disclosures, it is FDA regulations, and not foreign laws, that will resolve that issue.  And the feasibility and necessity of different warnings and the applicable standard of care are plainly issues to be determined under the law of this country – not under legal requirements or standards imposed by other countries or by Merck's response to the actions of foreign regulatory bodies.  Moreover, it would be impossible to understand the action or findings of any foreign regulatory agency without also understanding the regulatory system under which that agency operates.  Accordingly, foreign regulatory schemes and actions are completely irrelevant to this case.

Plaintiffs' arguments to the contrary are unavailing.  First, plaintiffs' novel approach to MDL discovery – in which the Court "*must* permit discovery to broadly capture evidence that may be relevant . . . under the substantive law of even one state over which this Court has jurisdiction" (Pls.' Mem. at 7-8 (emphasis added)) – finds no support in law or logic.  Quite obviously, discovery parameters are a matter of procedure, not substance.  Accordingly, in this federal MDL, federal discovery standards govern this dispute, not state standards.  *See, e.g., Exxon Corp. v. Burglin*, 42 F.3d 948, 950 (5th Cir. 1995) (citing *Cates v. Sears, Roebuck & Co.*, 928 F.2d 679, 687 (5th Cir. 1991)) ("Federal courts apply state substantive law 'when adjudicating diversity-jurisdiction claims, but in doing so apply federal procedural law to the proceedings.'").  Likewise, federal courts look to federal case law to interpret the Federal Rules of Civil Procedure.  *See, e.g., Cole v. Elliott Equip. Corp.*, 653 F.2d 1031, 1033 (5th Cir. 1981) ("In federal court, including cases based on diversity jurisdiction, the Federal Rules of Civil

787481v.1

Procedure, and the decisions of the federal courts interpreting these rules, control as to procedural matters."). Even more troubling is the fact that plaintiffs are essentially encouraging the Court to adopt a "lowest common denominator" approach to their discovery requests. If accepted, this rationale would compel every court handling a mass tort to give plaintiffs a blank check on the theory that plaintiffs may be entitled to the discovery somewhere, someday. That plainly is not the proper role for an MDL court, and plaintiffs are unable to cite any legal authority supporting their claim that the Court "must" allow them to conduct any discovery they see fit to pursue.

In any event, the decisions cited by plaintiffs -- both state and federal -- are inapposite to the present case. For instance, *In re Novartis Pharmaceuticals Corp. v. Abbott Laboratories*, 203 F.R.D. 159 (D. Del. 2001) (cited in Pls.' Mem. at 6-7), was a patent infringement case, and plaintiff sought foreign sales and marketing materials in order to establish the existence and extent of its damages. The defendant objected primarily on the basis that the motion was untimely, and the discovery was granted. *Id.* at 164. Plainly, the foreign documents and information sought in this case bear far less relevance to plaintiffs' claims than did the foreign sales documents in *Novartis* to the asserted economic harm from patent infringement. Moreover, in the same decision, the court refused to require defendant to produce its "entire foreign regulatory files and related correspondence" where the "core foreign regulatory filings" had been produced, concluding that that "further production would be burdensome." *Id.* at 163-64. In short, *Novartis* simply does not stand for the proposition that plaintiffs may demand unfettered access to any and all foreign documents, regardless of their relevance to the particular issues in a given case. In addition, many of plaintiffs' cases address the admissibility of foreign evidence of a safer alternative design in a design defect case. *See Cantrell v. Hennessy Indus., Inc.*, 829

787481v.1

S.W.2d 875, 877 (Tex. App. 1992); *Sherry v. Massey-Ferguson, Inc.*, No. 1:96-CV-76, 1997 WL 480893, at *2 (W.D. Mich. June 5, 1997). To the extent such evidence is relevant at all, it does not support plaintiffs' overbroad and burdensome requests here because plaintiffs do not contend that the foreign documents will provide evidence of a safer alternative design.

In short, plaintiffs' own allegations make clear that the Vioxx at issue in this proceeding is only Vioxx that was sold, marketed, tested, approved, and labeled in the United States. Thus, information regarding Merck's registration, marketing and sale of Vioxx in foreign jurisdictions is simply irrelevant to plaintiffs' allegations. For this reason alone, plaintiffs' motion should be denied.

## II.   PLAINTIFFS' REQUEST FOR ALL DOCUMENTS AND INFORMATION MAINTAINED IN MERCK'S FOREIGN OFFICES IS UNDULY BURDENSOME.

Plaintiffs' request for the production of documents maintained abroad should also be denied because, to the extent any of it is relevant at all, the prohibitive burden and expense of production would clearly outweigh any marginal benefit to plaintiffs.

As noted above, plaintiffs seek all documents and information related to "the sale, marketing, testing, approval and labeling of Vioxx in foreign countries," (Pls.' Mem. at 4), a request that necessarily includes documents scattered all over the globe. As this Court recognized in the *Propulsid* litigation, the burdens of undertaking the international document production sought by plaintiffs would vastly exceed any marginal benefit of such documents to plaintiffs' litigation of their claims.

In *Propulsid*, as in this case, plaintiffs sought production of "documents from entities under the control of defendants Johnson & Johnson and Janssen Pharmaceutica." *Propulsid* Order at 1. Defendants agreed to produce documents located in the United States and those maintained by one foreign office, but objected to the balance of the requests on relevance and

burden grounds. *Id.* at 39.  The Court first remarked that the relevance objection had merit because to the extent that "application requirements to regulatory agencies" and other factors such as "stress, diet, custom usage . . . differ greatly from country to country," such factors "support[] a claim of irrelevancy." *Id.* at 40.  After observing that Propulsid was approved and marketed abroad years before its approval and introduction to the U.S. market, potentially buttressing plaintiffs' claim of relevance, *id.*, the Court went on to address the burden imposed by plaintiffs' requests.  "An MDL case involving perhaps several million documents, costing many million s of dollars to produce, with potential likelihood of business interruption presents peculiar problems." *Id.* at 41.  Noting the unique considerations presented by foreign discovery, the Court observed that American courts "should exercise special vigilance" in pretrial proceedings "to protect foreign litigants from the danger of unnecessary or unduly burdensome discovery." *Id.* at 42.  Accordingly, the Court concluded that "it is not appropriate to conduct the broad based discovery that the plaintiff now seeks," and the motion to compel was denied. *Id.* at 42-43.  Consistent with this Court's holding in the *Propulsid* litigation, plaintiffs' motion – which seeks foreign documents scattered all over the globe – should be denied.

As set forth in the accompanying declaration of Sandra L. Simpson, Senior Director, Regulatory Affairs International, for Merck, the cost and inconvenience of undertaking such a production would be staggering.  In weighing those burdens against any potential benefit to the plaintiffs, the Court must do more than consider whether the information sought is relevant.  It must also consider whether "the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(2)(iii).  Under this principle, the potential benefit of the information sought by plaintiffs here cannot outweigh the enormous burden that would be imposed on Merck.  To the contrary, it is apparent that "producing this information would be

- 11 -

extremely burdensome."  (Declaration of Sandra L. Simpson ("Simpson Decl.") ¶ 2 (attached as Ex. 3).)

First, the volume of documents sought by plaintiffs' request is enormous.  Merck has more than one hundred foreign operating subsidiaries and other offices in more than 50 different countries worldwide.  (*Id.* ¶ 3.)   Vioxx was approved for marketing in approximately 80 countries.  (*Id.*)  To put the size of the proposed production in context, Merck has already produced to plaintiffs over 10 million pages of documents from the United States alone.  (*Id.*)  Thus, "[t]he number of marketing and regulatory documents located outside the United States – in more than one hundred locations in more than 50 countries around the world – would be staggering."  (*Id.*)  Indeed, Ms. Simpson estimates that many thousands of custodial files would need to be searched, and millions of documents would have to be produced.   (*Id.* ¶ 5.) Accordingly, the sheer size of the contemplated production would impose an onerous burden on Merck.

Second, compliance with such broad requests would require "many thousands" of Merck employees to be "substantially diverted from their normal projects and tasks, all at extraordinary cost to Merck."  (*Id.* ¶ 4.)  These employees are already occupied full-time with their usual projects and tasks, including the maintenance of Merck's international regulatory filings and product registrations or the marketing and sales of Merck's products worldwide.  (*Id.*)  The loss of this valuable staff time would impose a substantial and unwarranted cost on Merck, and disrupt Merck's usual operations on a global basis.

Finally, it is not just the size and scope of the production that poses a significant burden for Merck, but also the unique difficulties associated with producing foreign documents. Substantial numbers of these documents "will not be in English and thus will require review by

787481v.1

teams of U.S. and foreign lawyers working together." (*Id.* ¶ 6.) The documents would have to be reviewed "under the supervision of the English-speaking U.S. attorneys who are far more familiar with the U.S. Vioxx litigation than any of their foreign counterparts," and would have to be reviewed by U.S. and foreign lawyers for privilege. (*Id.* ¶ 7.) Such an undertaking would require a huge investment of time and resources on the part of Merck. Indeed, Ms. Simpson estimates that it would involve "hundreds of U.S. attorneys working in conjunction with hundreds more foreign attorneys in the relevant countries for, we estimate, at least one or more years." (*Id.* ¶ 8.)[4]

Though plaintiffs blithely contend that compliance with their requests would not be unduly burdensome due to "the nature of the claims, number of claims, scope of the litigation and amount in controversy" (Pls.' Mem. at 5), such speculation cannot be taken seriously in light of Ms. Simpson's first-hand testimony, based on her considerable experience working with Merck's international subsidiaries. Moreover, as discussed above, the nature of plaintiffs' claims, which arise under U.S. law and involve alleged injuries occurring in the U.S., render marginal (at best) the potential benefit of such foreign documents and information. Put simply: the mere fact that this litigation is large and complex does not give plaintiffs a blank check with which they can pile on burdensome and irrelevant discovery requests. For this additional reason,

---

[4] In addition to these burdens, foreign discovery of the type proposed by plaintiffs here "imposes issues of comity between nations" as well as "key issues of enforceability." *Propulsid* Order at 42. Because these documents are located abroad, they are subject to various foreign privileges and other foreign statutes that restrict production. *See, e.g.,* Article L.1110-4, French Health Public Code ("every person treated by a professional, an establishment, a health network or any organisation that participates in prevention and medical care should have his private life respected and information that concerns him should be confidential"); Sec. 4, para 1, Federal Data Protection Act *(Bundesdatenschutzgesetz, BDSG)* (under German law, the collection, processing and use of personal data is admissible only if permitted or prescribed by statutory law or if the data subject has given its written consent thereto). Thus, it is unclear whether the foreign subsidiaries would be permitted under their countries' laws to produce the requested documents. *See, e.g.,* RESTATEMENT (THIRD) OF FOREIGN REL'NS LAW § 442. In any event, the foreign documents would need to be reviewed for foreign, as well as U.S., privilege. Given the marginal relevance of the documents plaintiffs have requested, the specter of yet another lengthy discovery dispute weighs heavily in favor of denying plaintiffs' motion.

plaintiffs' motion should be denied.[5]

## CONCLUSION

In asking the Court to order production of all documents related to Merck's foreign activities with respect to Vioxx, plaintiffs seek discovery that is irrelevant to the litigation and would be extremely burdensome to produce. For the foregoing reasons, the Court should deny their motion.

Respectfully submitted,

Phil Wittmann

Phillip A. Wittmann, 13625
Anthony DiLeo, 4942
Dorothy H. Wimberly, 18509
Stone Pigman Walther Wittmann L.L.C.
One United Plaza
4041 Essen Lane, Suite 501
Baton Rouge, Louisiana  70809
Phone:  225-490-8900
Fax:  225-490-8960

Defendants' Liaison Counsel

---

[5] In light of the exorbitant expense associated with plaintiffs' request, Merck requests that if the Court were to order such a global production, it consider some type of cost-shifting arrangement. *See, e.g., Zubulake v. UBS Warburg LLC*, 216 F.R.D. 280 (S.D.N.Y. 2003).

787481v.1

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Opposition has been served on Liaison Counsel, Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pretrial Order No. 8, on this 26th day of September, 2005.

Phil Wittmann

787481v.1

SEE RECORD FOR

EXHIBITS

OR

ATTACHMENTS

NOT SCANNED