

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2005 OCT 20   PM 3: 45

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| In re:  VIOXX<br>PRODUCTS LIABILITY LITIGATION<br><br>THIS DOCUMENT RELATES TO ALL<br>CASES | )<br>)<br>)<br>)<br>)<br>)<br>) | MDL NO. 1657<br><br>SECTION: L<br><br>JUDGE FALLON<br>MAG. JUDGE KNOWLES |

## MERCK & CO., INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS LISTED ON MERCK'S PRIVILEGE LOG

Defendant Merck & Co., Inc. ("Merck"), by and through its counsel, respectfully submits this opposition to plaintiffs' motion to compel production of documents listed on Merck's privilege log.

As set forth below and as Merck has previously informed plaintiffs, Merck is conducting a re-review of its privileged document designations that will reduce the number of documents on its privilege log, including some of the documents that plaintiffs have selected for a "random" privilege review.  Merck expects to complete that review within the next several weeks. Accordingly, while Merck has no objection to *in camera* review of a *truly random* selection of documents from its slimmed-down privilege log (*i.e.*, the type of review described by the Court at the September status conference), the Court – and not plaintiffs – should select the documents for review, and such a review would be premature at this time.

While *in camera* review should await production of Merck's revised log, the Court need not wait to address plaintiffs' proposals to categorically exclude certain types of documents from

___ Fee_____
___ Process_____
_X_ Dktd_____
___ CtRmDep_____
___ Doc. No._____
789151v.1

the protections of the attorney client privilege.  For the reasons set forth below, these proposals should be rejected.  *First,* plaintiffs are wrong that a document cannot be privileged merely because it  passes from a non-lawyer to a non-lawyer.  To the contrary, numerous courts (including Judge Higbee, who is presiding over the Vioxx® cases in New Jersey), have recognized that where – as here – such documents reflect legal advice, they are privileged.  *Second*, plaintiffs' suggestion that documents related to scientific studies, public relations, marketing, promotion, regulations, and labeling issues by definition fall outside the protections of the attorney-client privilege or work product doctrine is also wrong.  To the extent such documents reflect confidential communications between Merck and its attorneys, the fact that these documents are related to studies, marketing, or regulatory issues does not vitiate the applicable privileges.

## ARGUMENT

Plaintiffs' motion asks the Court to find that eight enumerated categories of documents are not privileged:

(1)    Entries where no author(s) and/or no recipient(s) are listed;

(2)    Entries where no legal personnel are listed as having authored or received the communication;

(3)    Entries that do not reveal that any legal advice was given or requested or where an attorney was merely copied on the communication;

(4)    Entries that deal with "STUDY ISSUES," "STUDY DATA," "STUDY," "DRAFT MANUSCRIPT," "MANUSCRIPT," "PROTOCOL" or any other topic concerning scientific issues;

789151v.1

(5)     Entries that deal with "PROMOTIONAL ACTIVITY," "PROMOTION," "MARKETING" and/or "PUBLIC RELATIONS."

(6)     Entries that deal with "LABELING," "REGULATION" or "REGULATORY ISSUES";

(7)     Entries where a non-party is an author and/or listed as receiving a copy; and

(8)     Entries that do not describe the subject matter of the communication, are too vague and/or are inconsistent with the information on the privilege log (including redacted documents not listed on the privilege log).

(Pls. Mem. at 3.)

As discussed below, Merck's counsel are currently undertaking a privilege re-review. As part of that renewed examination, Merck is correcting any inadvertent errors in prior privilege designations, including any non-Merck documents that were erroneously marked as privileged (Category 7). As part of its re-review, Merck will also provide more complete descriptions where necessary to address plaintiffs' concerns in Category 1 (no author and/or recipient listed), Category 3 (entries that do not reveal that legal advice was given or requested), and Category 8 (entries that do not describe the subject matter of the communication or are, according to plaintiffs, too vague). With regard to the remaining categories (2, 4, 5, and 6), the law is clear that:  (a) Merck employees *can* communicate privileged information to each other without waiving the privilege, and (b) the privilege extends to all communications made in confidence for the purpose of obtaining legal advice regardless of whether they involve studies, public relations, regulatory matters or any other aspect of Merck's business.

789151v.1

I.     **AS MERCK HAS INDICATED TO PLAINTIFFS, IT INTENDS SHORTLY TO PRODUCE A SUBSTANTIALLY REDUCED PRIVILEGE LOG.**

Merck has already produced approximately 1.4 million documents in this litigation, amounting to more than 11 million pages.  Given the scope of this production and the subject matter of the litigation, it should come as no surprise to plaintiffs that Merck possesses a substantial volume of privileged documents (although the percentage of documents designated as privileged is very low).  By the same token, the sheer size of the Vioxx document production and the pace with which these documents have been produced has inevitably resulted in errors and duplication.  For that reason, Merck has commenced a re-review of all the documents on its privilege log.  As part of that re-review, Merck expects to remove a number of documents from the privilege log.  Merck will also provide plaintiffs with a second version of the privilege log that does not include the duplicate documents designated as privileged, thereby enabling plaintiffs and the Court to more easily review the log.[1]  Merck expects that by the time it is finished with this project, the number of privileged documents will be substantially reduced.

As part of its privilege re-review, Merck is also endeavoring to address the following four types of entries identified in plaintiffs' motion:

**Category 1** – With regard to Category 1, documents where no author and/or recipient is listed, plaintiffs complain that "the term N/A is used approximately 3,600 times." (Pls. Mem. at 5 n.3.)  Plaintiffs fail to note, however, that many of these documents consist of notes and other types of documents for which there is no recipient.  In other instances, which are noted on the log, the documents at issue were attachments to emails and therefore did not include a to/from.

---

[1]     The original log will still allow plaintiffs to see from which files each version of a privileged document was withheld.

- 4 -

In addition, while plaintiffs are correct that some entries list the recipient as "Distribution" or "Project Team," those terms refer to *internal* distribution lists and project teams. While Merck could revise the log to include all the individuals' names for each document, it would be an extremely labor-intensive, time-consuming project that would slow down production of a new log and would not provide plaintiffs with any information that is relevant to the privilege determination since, as discussed in Section II below, these documents are privileged because they reflect internal Merck communications regarding legal advice – not because they are sent to or from a lawyer.

**Category 3** – With regard to Category 3 (entries that do not reveal that legal advice was given or requested), Merck believes that it has complied with its obligations by explaining the basis of its privilege designation for each document. However, Merck will review the privilege log in the event that it inadvertently failed to include this information on some entries.

**Category 7** – With regard to Category 7 (entries where a non-party is an author and/or listed as receiving a copy), Merck will de-designate as part of its re-review any documents erroneously included on the privilege log that were authored by or distributed to individuals not covered by the attorney-client privilege, or will indicate why disclosure to the non-party does not waive the privilege.

**Category 8** – Finally, as to Category 8 (entries that do not describe the subject matter of the communication at issue), Merck has endeavored, to the extent possible, to provide a basic description of each document identified on the log, consistent with Merck's obligations. *See* MANUAL FOR COMPLEX LITIGATION (FOURTH) §11.431 (2004) (privilege log should "identify[] documents or other communications by date and by the names of the author(s) and recipient(s), and describe their general subject matter (without revealing the privileged or protected

material)").  Once again, however, as part of its privilege re-review, Merck will seek to ensure that it corrects any insufficient entries it identifies in the log.

## II.    PLAINTIFFS' CATEGORIC OBJECTIONS TO MERCK'S PRIVILEGE LOG ARE CONTRARY TO ESTABLISHED LAW.

In addition to the entries which plaintiffs claim are insufficient to determine privilege, plaintiffs also object to several entire categories of documents included on the privilege log on the grounds that as a matter of law, they cannot be privileged.  As set forth below, plaintiffs' arguments seek to drastically narrow the attorney-client privilege and are contrary to a long line of cases recognizing that the privilege applies to all confidential communications with an attorney for the purpose of seeking legal advice, regardless of the topic.  *See, e.g., In re Ford Motor Co.*, 110 F.3d 954 (3d Cir. 1997) (minutes of meeting attended by top-level executives were protected by the attorney client privilege; "Even if the decision [that the corporate executives made following counsel's briefing at the meeting] was driven, as the district court seemed to assume, principally by profit and loss, economics, marketing, public relations, or the like, it was also infused with legal concerns, and was reached only after securing legal advice.").

Accordingly, the Court should deny plaintiffs' motion with regard to categories 2 (no legal personnel listed as having authored or received communication), 4 (documents that deal with studies), 5 (documents involving public relations), and 6 (documents involving regulatory issues).

### A.    Confidential Attorney-Client Communications Are Protected By Privilege Even If They Are Not Authored By Or Addressed To An Attorney.

Plaintiffs ask the Court for a sweeping order compelling production of all documents on the log "where no legal personnel are listed as having authored or received the communication." (Pls. Mem. at 3 – Category 2.)  In making this argument, plaintiffs fail to acknowledge that

789151v.1

documents between two non-lawyers within Merck reflecting privileged communications from an attorney to one of those non-lawyers are clearly privileged under well established law. They also fail to note that they have already lost a similar battle in the New Jersey Vioxx litigation. *See* Transcript of Monthly Meeting at 32, *In re Vioxx*, (N.J. Super. Ct. Law Div. May 19, 2005) (attached as Ex. 1) (ruling by Judge Higbee: "The crux of the matter is . . . one sentence in which [the author] says Merck's counsel has advised us of this - whether she spoke to [counsel] or not I don't know, but it is clear to me that it is attorney/client privilege, and the redaction should remain in place.").

The Supreme Court has ruled unequivocally that the attorney-client privilege protects all communications pertaining to legal advice made by and to all corporate employees as agents of the corporate client. *Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981). Under *Upjohn*, statements made by corporate employees to in-house counsel for the purpose of seeking legal advice are also protected by the attorney-client privilege. *Id.* at 394.

A corollary of that basic principle is that an agent of the corporation ***does not*** waive confidentiality when he or she communicates privileged information to another corporate agent. *Santrade, Ltd. v. Gen. Elec. Co.*, 150 F.R.D. 539, 545 (E.D.N.C. 1993). In *Santrade*, the court ruled that documents not authored or received by an attorney are nonetheless privileged if the documents "includ[e] communications involving corporate officers and agents who possessed the information requested by the attorney or who will act on the legal advice." *Id.* The court emphasized that communications between corporate agents do not constitute a waiver of confidentiality, noting that "[c]orporations may communicate privileged information at various levels without waiving the attorney-client privilege." *Id.*; *see also In re Grand Jury 90-1*, 758 F. Supp. 1411, 1413 (D. Colo. 1991) (letter to corporate board from company president was

- 7 -

privileged because it relayed legal advice from corporate counsel); *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437, 442 (S.D.N.Y. 1995) (attorney-client privilege "protects from disclosure communications among corporate employees that reflect advice rendered by counsel to the corporation"); *Eutectic Corp. v. Metco, Inc.*, 61 F.R.D. 35, 38 (E.D.N.Y 1973) (noting that the Federal Rules of Evidence do not require that "the attorney or his representative must be either the sender or recipient of a confidential communication, but only that the communication, if made between 'representatives of the client,' must be 'specifically for the purpose of obtaining legal services for the client'") (citations omitted).

The reason for this rule is self-evident. If privileged information could not be re-conveyed within a company, non-lawyer employees would not be able to act on legal advice when working with other non-lawyers at the company for fear of waiving the privilege. Instead, they would have to send all their co-workers back to the attorney who gave the advice in the first place so he or she could repeat the same advice over and over to each and every employee involved in carrying out the activities affected by the advice. Such an approach would be extremely cumbersome and undermine the very purpose of the privilege. *See N.C. Elec. Membership Corp. v. Carolina Power & Light Co.*, 110 F.R.D. 511, 514 (M.D.N.C. 1986) ("It is important for corporations not only to be able to act on advice but also to be able to communicate information held at every corporate level to counsel so that counsel can render informed advice.").

The cases on which plaintiffs rely do not support their effort to narrow privilege in this manner. For instance, while the court in *Guzzino v. Felterman*, 174 F.R.D. 59 (W.D. La. 1997) (Pls. Mem. at 7), refused to extend the privilege to cover a set of documents that were not authored or received by an attorney, the facts in that case do not support the overbroad

- 8 -

proposition that documents to or from an attorney are the *only* communications that are protected.  In *Guzzino*, the corporation claiming the privilege attempted to withhold documents relating to an investigation conducted in the ordinary course of business by an internal audit committee.  *Id.* at 60-61.  The court found that the communications were discoverable because there was no evidence that the corporation's attorney had engaged in any communications with the client regarding the investigation or that the investigation was related to informing or obtaining legal advice.  *Id.* at 61.  Thus, there were no privileged communications in the first place.  Merck's privilege log, however, makes clear that any communications between non-legal personnel were specifically related to obtaining, communicating or acting upon legal advice.[2]

Plaintiffs' other cases involve situations where privileged communications were shared with someone *outside* the company.  In *New Orleans Saints v. Griesedieck*, 612 F. Supp. 59 (E.D. La. 1985) (Pls. Mem. at 8), for example, the court held that the New Orleans Saints waived attorney-client privilege as to the transcript of a meeting in which corporate counsel provided legal advice, *because the conference was also attended by representatives of another corporation* with whom the Saints were in purchase negotiations – that is, persons who were outside the privilege circle.  *Id.* at 63.  Similarly, in *United States Postal Service v. Phelps Dodge Refining Corp.*, 852 F. Supp. 156 (E.D.N.Y 1994) (Pls. Mem. at 8), the privilege was waived when the defendant corporation shared protected documents with *an independent engineering firm* that was neither an employee nor an agent of the defendant.  *Id.* at 161.  Neither of these cases supports plaintiffs' bizarre suggestion that a company's employees must refrain from ever discussing any communications from the company's own attorneys or risk waiving the attorney-client privilege.

---

[2]     As set forth in Section I, *supra*, to the extent there are any errors in the designations of such documents, they will be corrected in the revised log that Merck expects to produce shortly.

789151v.1

In short, plaintiffs are asking the Court to drastically limit the attorney-client privilege in the corporate setting by holding that *any* communication between non-attorneys, even those who are employee-agents of the same corporate client, constitutes a waiver of confidentiality.  Such an extreme outcome is neither supported by the Supreme Court's holding in *Upjohn*, nor by any of the authorities relied upon in plaintiffs' own motion.  The Court should deny their request.

**B.      Documents Related To Studies Are Privileged If They Reflect Legal Advice Related To Those Studies.**

The documents designated privileged and referred to as "study" or "studies" on the privilege log are documents that reflect responses to questions from Merck's science team regarding aspects of clinical studies that implicate legal questions.   These documents are privileged because they reflect advice sought or received from Merck's lawyers regarding certain elements of each study or scientific document.  For example, among the study-related documents identified by Merck in the privilege log is a request by e-mail for legal advice and opinions related to a draft contract for a scientific study.

In considering whether privilege attaches to a document, the key question is not whether the document relates to a scientific study or some other technical issue, but rather whether it reflects confidential communications between client and attorney.  For example, in *AT&T Corp. v. Microsoft Corp.*, No. 02-0164 MHP (JL), 2003 WL 21212614, (N.D. Cal. Apr. 18, 2003), a patent case, the court upheld a document as privileged even though it was "technical in nature," because the document was drafted at the behest of attorneys and the drafter "was seeking the legal opinion or advice of attorneys" when the document was created.  *Id.* at *4.  *See also Saxholm AS v. Dynal, Inc.*, 164 F.R.D. 331, 336 (E.D.N.Y. 1996) (the fact "[t]hat the communication contains highly technical matter should not take it out of the domain of communications entitled to protection under the [attorney-client] privilege"); *Hydraflow, Inc. v.*

- 10 -

*Enidine, Inc.*, 145 F.R.D. 626, 630 ("[i]f the primary purpose of the communication was to receive legal advice or services, inclusion of scientific or technical information will not displace the [attorney-client] privilege"); *Smith v. Texaco, Inc.*, 186 F.R.D. 354, 357 (E.D. Tex. 1999) (interpretive material in internal study of race and employment was privileged because it "could well constitute confidential communication from client to counsel" that "may well have been made to elicit legal advice").

Plaintiffs' reliance on *Burroughs Wellcome Co. v. Barr Laboratories, Inc.*, 143 F.R.D. 611 (D.N.C. 1992) (Pls. Mem. at 13) is misplaced. In that case, the court refused to extend the privilege to technical information and drafts of patent applications submitted to an attorney and intended to be passed along to the Patent Trademark Office. *Id.* at 616. The court reached that decision after concluding that the material was not submitted to the attorney for purposes of seeking legal advice. At the same time, however, the court made clear that privilege *does* protect "any communication made to an attorney for the primary purpose of obtaining legal advice or legal opinion," *id.* – i.e., the very types of documents on Merck's privilege log.

In any event, numerous courts, including at least one in this District, have reached a contrary conclusion to the *Burroughs* court. In *Laitram Corp. v. Hewlett-Packard Co., Inc.*, 827 F. Supp. 1242 (E.D. La. 1993), for example, the court concluded that several documents, including drafts of patent applications, were protected under the attorney-client privilege. *Id.* at 1246-47. In contrast to the *Burroughs* court, the *Laitram* decision viewed technical information as part of an "ongoing dialogue" about various aspects of the patent application and recognized that attorneys make legal determinations regarding the technical information that they receive in communications with clients. *Id.* at 1246 (in considering technical information, the court should examine documents within the particular context of the attorney-client relationship "rather than

just examining a document in isolation"). As in *Laitram Corp.*, and consistent with established precedent in this District, Merck's communications with its attorneys involving technical and scientific information are clearly within the scope of the attorney-client privilege.

Nor does plaintiffs' reliance on *Burton v. R.J. Reynolds Tobacco Co.*, 170 F.R.D. 481 (D. Kan. 1997) (Pls. Mem. at 12) support their position. In *Burton*, a product liability action against a tobacco manufacturer, plaintiff filed a motion to compel discovery of documents relating to research conducted by an outside tobacco research organization. In rejecting the defendant's assertion of privilege, the court held that privilege does not attach simply because "an attorney is somehow referenced within a document or generates a document." *Id.* at 484. But that is not the case here. Merck does not contend that any documents are privileged merely because they were touched or seen by an attorney. Rather, Merck only asserts the privilege for documents that reflect privileged communications with counsel. In any event, the *Burton* decision focuses on the specific details surrounding the challenged communications – not their subject matter. Clearly, this case does not support plaintiffs' across-the-board assertion that study-related documents can never be privileged.

C.    **Documents Related To Marketing And Public Relations Are Privileged If They Reflect Legal Advice Related To Those Issues.**

Plaintiffs' position that Merck cannot sustain its claim of privilege over documents relating to public relations, marketing, and promotional materials fails for the same reasons. (Pls. Mem. at 13.) Again, to the extent Merck has designated such documents as privileged, it is because they reflect confidential communications between Merck employees and Merck lawyers for the purpose of seeking legal advice. At the risk of stating the obvious, the pharmaceutical industry is highly-regulated by the FDA. Advertising and other promotional activities often are subject to specific regulations and may also involve numerous other legal issues. Pharmaceutical

companies usually have processes in place to ensure that the legal department opines on such material, and Merck is no exception.  Plaintiffs do not cite any authority suggesting that such communications should be categorically excluded from the protections of the attorney-client privilege.

Courts have held that documents related to public relations materials *are* subject to protection under the attorney-client privilege where such documents reflect confidential communications for the purpose of seeking legal advice.  For example, in *In re Grand Jury Subpoenas Dated March 24, 2003 Directed to (A) Grand Jury Witness Firm and (B) Grand Jury Witness*, 265 F. Supp. 2d 321 (S.D.N.Y. 2003), the Court found that legal advice with regard to media relations is privileged.  In reaching this decision, the court noted that one of an attorney's "most fundamental client functions" is "advising the client of the legal risks of speaking publicly and of the likely legal impact of possible alternative expressions." *Id.* at 331.  As the court aptly noted:  "Questions such as whether the client should speak to the media at all, whether to do so directly or through representatives, whether and to what extent to comment on specific allegations, and a host of others can be decided without careful legal input only at the client's extreme peril." *Id.*

Other courts have reached the same conclusion.  In *Macario v. Pratt & Whitney Canada*, Civ. A. No. 90-3906, 1991 WL 6117 (E.D. Pa. Jan. 17, 1991), the court held that a press-release draft was covered by the privilege because "the release was contingent on [the attorney's] approval and subject to his revision . . . [indicating that the client] intended the document to remain confidential until a final draft was achieved." *Id.* at *1.  Similarly, in *In re Adobe Systems, Inc. Securities Litigation*, Master File No. C-90-2453 SBA (FSL), 1991 U.S. Dist. LEXIS 15929 (N.D. Cal. Oct. 23, 1991), the court extended the privilege to several draft press-

- 13 -

releases which included handwritten notations by attorneys, finding that "the information contained in the drafts is legal advice, not factual information." *Id.* at *11. *See also In re Copper Market Antitrust Litig.,* 200 F.R.D. 213, 219 (S.D.N.Y. 2001) (upholding attorney-client privilege protection for documents in possession of public relations firm; under the circumstances of this case, court found that the agency was the functional equivalent of an in-house department of Sumitomo and thus part of the "client").

Perhaps recognizing that their legal arguments are weak, plaintiffs mischaracterize the documents in the privilege log that relate to public relations and marketing activities as involving predominantly business (not legal) advice. As the privilege log makes clear, however, the documents at issue are confidential communications for the purpose of seeking legal advice on issues related to public relations and marketing. For example, among the documents at issue are:

- o   Emails imparting legal advice and opinions regarding compliance with FDA regulatory obligations in public relations activities, including comments on draft press releases.

- o   Emails requesting legal advice on compliance with FDA regulatory obligations in promotional materials.

- o   An e-mail from regulatory counsel communicating instructions, revised by counsel, for Merck employees in their public relations activities.

Plaintiffs also argue that Merck's documents relating to public relations issues cannot possibly be protected because Merck intended ultimately to release these documents to the public. However, this contention is also contrary to law. Privilege protects drafts even if the final product is ultimately disseminated. *See, e.g., In re Kidder Peabody Sec. Litig.*, 168 F.R.D. 459, 474 (S.D.N.Y. 1996) ("[P]ublic release of [a document] does not waive the privilege for the drafts if they were otherwise protected by the privilege. A client may intend to direct or permit the release of the final version of a document while still intending that his communications with his attorney prior to the finalization of the document remain confidential.").

- 14 -

Finally, the cases cited by plaintiffs do not support their position. In *Calvin Klein Trademark Trust v. Wachner*, 124 F. Supp. 2d 207 (S.D.N.Y. 2000) (Pls. Mem. at 13), for example, the court concluded after *in camera* review that attorney-client privilege did not attach to a draft press release because the document was prepared by a public relations firm rather than a lawyer and because it did not contain legal advice, disclose confidential client confidences, or include communications made for the purpose of seeking legal advice. *Id.* at 209-10. That decision does not amount to a categorical finding that legal advice on public relations issues is not privileged. To the contrary, if that were the case, there would have been no need to review the document *in camera*.

### D.   Documents Related To Regulatory Issues Are Privileged If They Reflect Legal Advice Related To Those Issues.

Plaintiffs' arguments with respect to "labeling" and "regulatory" documents (Pls. Mem. at 14) fare no better.

It should come as no surprise that Merck's attorneys were heavily involved in reviewing and revising materials related to the dense regulatory framework within which pharmaceutical companies such as Merck operate. Contrary to plaintiffs' claims, however, courts have consistently safeguarded such communications between clients and their attorneys regarding regulatory issues. For example, in *In re Buspirone Antitrust Litigation*, MDL Docket No. 1413, 2002 U.S. Dist. LEXIS 23463 (S.D.N.Y. Dec. 10, 2002), the court recognized as privileged memoranda and letters authored by outside counsel in connection with the client's obtaining Food and Drug Administration (FDA) approval for a generic drug. The court reasoned that the communications in question, which pertained to regulatory issues and "[did] not explicitly solicit legal advice from the attorneys," were nonetheless protected "because they consist of 'information [sent] to corporate counsel in order to keep them appraised of ongoing business

- 15 -

789151v.1

developments, with the expectation that the attorney will respond in the event that the matter raises important legal issues.'" *Id.* at *12 (citations omitted) (second alteration in original); *see also Andritz Sprout-Bauer, Inc. v. Beazer E., Inc.*, 174 F.R.D. 609, 635-36 (M.D. Pa. 1997) (holding, in environmental cleanup litigation, that documents "explaining or interpreting technical data so as to allow counsel to provide legal advice" related to "demands or requests from state or federal regulators, are protected under the attorney client privilege"); *Andritz*, 174 F.R.D. at 635 ("Drafts of required reports to state regulators circulated among the environmental consultants and attorneys for comment and review are protected under the attorney client privilege *if* the drafts contain comments or notations of counsel for Andritz and contain information or provisions not included in the final version.") (emphasis in original); *McCaugherty v. Siffermann*, 132 F.R.D. 234, 238-39 (N.D. Cal. 1990) (communications between a corporation's outside consultants and attorneys about various regulatory issues involved in a bank merger were privileged).

The same is true here. Merck is obviously subject to complicated FDA and other regulations, and Merck attorneys frequently seek the advice of counsel with regard to those regulations. Among the documents on Merck's privilege log that fall in this category are the following:

- A handwritten memorandum from a Merck attorney to a Merck doctor providing legal advice to be taken into consideration as protocols for comparative testing of Vioxx were developed.

- An email in which a Merck scientist is seeking legal advice on the final version of a request to the FDA regarding a proposed amendment to a previous written request regarding Vioxx.

Clearly, advice from Merck attorneys related to the comprehensive FDA regulations that affect nearly every aspect of Merck's business falls squarely within the attorney-client privilege. *See Upjohn Co. v. United States*, 449 U.S. 383, 392 (1981) (extending attorney-client protection

- 16 -

to communications between agents of corporate employees and corporate counsel where the corporate client's business requires understanding and compliance with "the vast and complicated array of regulatory legislation confronting the modern corporation").

*      *      *

For these reasons, the Court should deny plaintiffs' request to strike the privilege designation from documents that fall within categories 2, 4, 5 and 6.  Instead, as more fully described below, Merck suggests the Court proceed exactly as it suggested it would, by reviewing a random sample of documents within various categories challenged by plaintiffs.

## III.  RANDOM *IN CAMERA* REVIEW IS AN APPROPRIATE WAY TO RESOLVE DISCOVERY DISPUTES, BUT THE COURT SHOULD SELECT THE DOCUMENTS TO BE REVIEWED – NOT PLAINTIFFS.

Merck agrees with the Court's statement at the September 29th status conference that "random" *in camera* review of contested documents is the best way to resolve outstanding privilege issues.  However, given that Merck is about to produce a revised log, it would be premature to conduct that review at this point.  Moreover, the Court should reject plaintiffs' suggestion that they be the ones to select the documents for *in camera* review.

Plaintiffs' proposal that they select the documents to be viewed by the Court *in camera* is contrary to the prevailing approach, which is that the ***Court*** select the sampling of documents for *in camera* review.  *See United States v. KPMG LLP*, 237 F. Supp. 2d 35, 38 (D.D.C. 2002) (court selected a random sample of documents falling within each category of the privileges asserted in log); *State ex rel Humphrey v. Phillip Morris Inc.*, 606 N.W.2d 676, 694 (Minn. Ct. App. 2000) (court appointed special master to randomly select and review documents and allowed defendant to decide which category each contested document belonged to).

A similar request was presented – and rejected – by the Seventh Circuit in *American National Bank & Trust Co. v. Equitable Life Assurance Society* , 406 F.3d 867 (7th Cir. 2005).

There, the court held that a magistrate judge conducting *in camera* review acted arbitrarily by basing the court's assessment of a privilege log containing over four hundred documents on a sample of twenty documents selected by the party contesting the claim of privilege. *Id.* at 879. In reversing the magistrate judge's order to compel production, the appellate court noted, "there is no reason to believe that the twenty documents selected were representative of the entire log. In fact, it is likely that the sample was unrepresentative because, given the possibility of a windfall, [the contesting party] had every incentive to cherry-pick the most vulnerable documents." *Id.*

Plaintiffs here have the same incentives to "cherry-pick" documents with the potential for great prejudice to Merck. After all, as in *American National Bank*, plaintiffs stand to gain a windfall of thousands of documents based on a relatively small sample. If plaintiffs are allowed to select the sample, Merck may be forced to turn over thousands of legitimately privileged documents based on a skewed selection of thirty documents that the plaintiffs have carefully chosen to reflect only the communications they feel are the most vulnerable to challenge. Accordingly, as this Court suggested at the September 29, 2005 status hearing, the best way to proceed – if *in camera* review is still necessary upon Merck's production of the revised log – is for the Court to review a truly "random, statistically accurate sampling" of documents, rather than a handful carefully selected by plaintiffs. (*See* Hr'g Tr. 12, Sept. 29, 2005.)

## CONCLUSION

Plaintiffs' motion to compel asks the Court to categorically deny Merck the protection of the attorney-client privilege for large swaths of documents that fall squarely within the confines of that privilege. Moreover, plaintiffs' motion is based on a version of the privilege log that will very shortly be replaced by a revised log that Merck anticipates will address many of plaintiffs'

789151v.1

concerns.  Accordingly, Merck requests that the Court deny plaintiffs' motion and defer any *in camera* review until Merck produces a revised privilege log.

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
Stone Pigman Walther Wittmann L.L.C.
One United Plaza
4041 Essen Lane, Suite 501
Baton Rouge, Louisiana  70809
Phone:  225-490-8900
Fax:  225-490-8960

Defendants' Liaison Counsel

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Opposition Memorandum has been served on Liaison Counsel, Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pretrial Order No. 8, on this 20th day of October, 2005.

- 19 -

**1**

SUPERIOR COURT OF NEW JERSEY
ATLANTIC COUNTY
CASE TYPE NO. 619

---------------------------x
IN THE MATTER OF IN RE:

VIOXX
                          STENOGRAPHIC TRANSCRIPT
                          OF:
---------------------------x  - MONTHLY MEETING -

     PLACE:  ATLANTIC COUNTY CIVIL COURTHOUSE
             1201 BACHARACH BOULEVARD
             ATLANTIC CITY, NJ  08401

     DATE:  MAY 19, 2005

B E F O R E:

     THE HONORABLE CAROL E. HIGBEE, J.S.C.

TRANSCRIPT ORDERED BY:

     DAVID BUCHANAN, ESQ. AND THEODORE MAYER, ESQ.

A P P E A R A N C E S:

     DAVID BUCHANAN, ESQUIRE
     SEEGER, WEISS
     ATTORNEYS FOR THE PLAINTIFFS

     DAVID JACOBY, ESQUIRE
     SOL WEISS, ESQUIRE
     ANAPOL, SCHWARTZ, WEISS, COHAN, FELDMAN & SMALLEY
     ATTORNEYS FOR THE PLAINTIFFS

     LEE BALEFSKY, ESQUIRE
     KLINE & SPECTER
     ATTORNEYS FOR THE PLAINTIFFS


               REGINA A. TELL, CSR-CRR
               OFFICIAL COURT REPORTER
               1201 BACHARACH BOULEVARD
               ATLANTIC CITY, NJ  08401

**2**

APPEARANCES CONTINUED . . .

     NAVAN WARD, JR., ESQUIRE
     BEASLEY, ALLEN, CROW, METHVIN, PORTIS, MILES, P.C.
     ATTORNEY FOR THE PLAINTIFFS

     WENDY FLEISHMAN, ESQUIRE
     LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
     ATTORNEY FOR THE PLAINTIFFS

     GARRY SOLOMON, ESQUIRE
     DAVIS, SAPERSTEIN & SALOMON, P.C.
     ATTORNEY FOR THE PLAINTIFFS

     DAVID COHEN, ESQUIRE
     THEODORE M. LIEVERMAN, ESQUIRE
     SPECTOR, ROSEMAN & KODROFF, P.C.
     ATTORNEY FOR THE PLAINTIFFS

     MICHAEL GALPERN, ESQUIRE
     GENE LOCKS, ESQUIRE
     CHRISTINE KLIMCZUK, ESQUIRE
     LOCKS LAW FIRM
     ATTORNEYS FOR THE PLAINTIFFS

     MICHAEL FERRARA, ESQUIRE
     THE FERRARA LAW FIRM
     ATTORNEY FOR THE PLAINTIFFS

     RICK MEADOW, ESQUIRE
     THE LANIER LAW FIRM
     ATTORNEY FOR THE PLAINTIFFS

     THERESA CORSON, ESQUIRE
     LEVY, ANGSTREICH
     ATTORNEY FOR THE PLAINTIFFS

     GREG SHAFFER, ESQUIRE
     WILENTZ, GOLDMAN & SPITZER
     ATTORNEY FOR THE PLAINTIFFS

     BRIAN L. CONDON, ESQUIRE
     KASOWITZ, BENSON, TORRES & FRIEDMAN
     ATTORNEY FOR THE PLAINTIFFS

     BENEDICT MORELLI, ESQUIRE
     MORELLI & ASSOCIATES
     ATTORNEY FOR THE PLAINTIFFS

**3**

A P P E A R A N C E S   C O N T I N U E D . . .

     RONALD JONAS, ESQUIRE
     SANFORD, WITTELS & HEISLER
     ATTORNEY FOR THE PLAINTIFFS

     JOHN P. KAPESKY, ESQUIRE
     SHELLER, LUDWIG
     ATTORNEY FOR THE PLAINTIFFS

     MICHELE A. DiMARTINO, ESQUIRE
     MILLER & ASSOCIATES
     ATTORNEYS FOR THE PLAINTIFFS

     SUSANNE SCOVERN, ESQUIRE
     ALEXANDER, HAWS, AUDET
     ATTORNEY FOR THE PLAINTIFFS

     JOSEPH MONACO, ESQUIRE
     TRIEF & OLK
     ATTORNEY FOR THE PLAINTIFFS

     ROBERT DASSOW, ESQUIRE
     HOVDE, DASSOW & DEETS
     ATTORNEY FOR THE PLAINTIFFS

     MOIRA G. LOPEZ, ESQUIRE
     NAGEL, RICE & MAZIE
     ATTORNEY FOR THE PLAINTIFFS

     ROB SACKS, ESQUIRE
     SHRAGER, SPIVEY & SACKS
     ATTORNEY FOR THE PLAINTIFFS

     JERRY KRISTAL, ESQUIRE
     WEITZ & LUXENBERG
     ATTORNEY FOR THE PLAINTIFFS

     RICHARD KITRICK, ESQUIRE
     MCCRINK, NELSON & KEHLER
     ATTORNEY FOR THE PLAINTIFFS

     PATRICK RANDAZZO, ESQUIRE
     ATTORNEY FOR THE PLAINTIFFS

     THEODORE V.H. MAYER, ESQUIRE
     WILFRED CORONATO, ESQUIRE
     CHARLES W. COHEN, ESQUIRE
     HUGHES, HUBBARD & REED, LLP
     ATTORNEYS FOR THE DEFENDANT, MERCK

**4**

A P P E A R A N C E S   C O N T I N U E D . . .

     JOSEPH HETRICK, ESQUIRE
     PHIL YANNELLA, ESQUIRE
     BEN BARNETT, ESQUIRE
     HEATHER BROWN, ESQUIRE
     DECHERT, LLP
     ATTORNEYS FOR THE DEFENDANT, MERCK

     JEFFREY JUDD, ESQUIRE
     O'MELVENY & MEYERS, LLP
     ATTORNEY FOR THE DEFENDANT, MERCK

---

**5**

Monthly Management Meeting 5/19/05

1   P R O C E E D I N G S
2   THE COURT: Stay seated. Okay. It is my
3   understanding you have resolved a lot of issues. So
4   why don't we go down and see what you have left or
5   first what you have resolved.
6   MR. WEISS: That's easy to do. I think you
7   should take the defendant's agenda first, your Honor.
8   THE COURT: Okay.
9   MR. WEISS: Give me a minute to --
10  MR. BUCHANAN: Do you want to go through in
11  sequence or just what we have resolved?
12  THE COURT: Let's go first to what's
13  resolved.
14  MR. WEISS: Four has been resolved.
15  MR. BUCHANAN: Four is documents considered
16  by experts.
17  MR. WEISS: That's been resolved, and they
18  have these documents.
19  THE COURT: Four is resolved?
20  MR. HETRICK: Yes.
21  MR. WEISS: Five, I think Ted wants to make a
22  statement, but it is resolved.
23  MR. HETRICK: Five really is in many ways
24  sort of moot. I want to bring to your Honor's
25  attention that a recent decision by Judge Walsh in

---

**7**

Monthly Management Meeting 5/19/05

1   room to try to hash this out and if there's particular
2   milestones your Honor wants to hit, but the parties
3   didn't have everybody they needed to try and hammer out
4   some deadlines we could present to the Court. If
5   that's okay or we can try to do it telephonically, and
6   come back to your Honor at a break.
7   THE COURT: Okay. So your thought is you're
8   going to be able to just submit that for my review?
9   MR. BUCHANAN: For your review and whatever
10  your Honor --
11  THE COURT: It is not going to change the
12  trial date?
13  MR. BUCHANAN: No.
14  MR. WEISS: Number nine, number nine we're
15  going to submit for your Honor's consideration a CMO on
16  expert discovery.
17  THE COURT: Okay.
18  MR. BUCHANAN: And the concept with that,
19  your Honor, is to eliminate the expert interrogatories
20  and substitute a report when the cases are set for
21  trial, and the report would also be accompanied with
22  documents considered by the expert,
23  compensation-related information, CV's, but we can work
24  out the terms of that stipulation, and we'll submit
25  something to the Court later.

---

**6**

Monthly Management Meeting 5/19/05

1   connection with Stempler interviews, but really it has
2   no application here. We have deposed the doctors in
3   the first -- the test cases, so it really is -- it has
4   no applicability at the moment. I just wanted to bring
5   the Court's attention to the new decision.
6   THE COURT: You sent me a copy of it.
7   MR. HETRICK: So that's it for number five.
8   MR. WEISS: Number six we have resolved, and
9   in the future all requests will be funneled through
10  liaison counsel. Even though we approve these we'll
11  actually send them, and now they're being taken up as
12  if we did.
13  Number seven there's going to be a proposed
14  Stipulation of Order for your Honor.
15  THE COURT: Okay.
16  MR. WEISS: We're working on the final
17  details of that. Number eight we would like to discuss
18  with the Court next week.
19  THE COURT: What do you mean next week?
20  MR. BUCHANAN: What we're trying to do --
21  MR. COHEN: We're trying to get together to
22  make a proposal.
23  MR. BUCHANAN: What we would like to do is
24  we're trying to hash out a schedule, and we had to take
25  into account schedules of people who weren't in the

---

**8**

Monthly Management Meeting 5/19/05

1   MR. WEISS: Number 10 we worked out. We're
2   going to have a master set that will be on file, your
3   Honor, both the request and responses.
4   THE COURT: So 10 is worked out. Going back
5   to nine, this is the one issue that I want to talk
6   about today is scheduling of the other than the first
7   five, the other cases and where we're going to -- and I
8   don't think I can do it today, but scheduling deadlines
9   for expert reports for each of them, scheduling or at
10  least taking a group of the first 20 and giving us the
11  deadlines and then moving to another, and I'm not sure
12  whether I'm going to just take a group of heart attack
13  cases first and/or how I'm going to group them, but I
14  want to make sure the oldest cases are obviously done,
15  you know, moving, and I don't know exactly which cases
16  deps have been taken in by defendants of plaintiffs.
17  Has it only been the test cases?
18  MR. WEISS: No, there's a lot of deps taken.
19  THE COURT: A lot of deps, then the doctors
20  deps have not been taken that much?
21  MR. WEISS: There's been a fair amount of
22  doctors' deps taken.
23  THE COURT: Great.
24  MR. BUCHANAN: Primarily in the cases filed
25  prior to September 30th.

**9**

Monthly Management Meeting 5/19/05

1    MR. HETRICK:  I think they were the old first
2  and second wave cases, there have been depositions
3  taken in those of plaintiffs and some treating doctors
4  and prescribers, as well.
5        THE COURT:  All right.  And what we're going
6  to have to do is, you know, have the plaintiffs in
7  those early cases, the counsel in those early cases --
8  expert reports are going to have to be provided,
9  obviously, they're case specific, and we need to set
10  deadlines for that.  Is that what you're talking about
11  here?
12        MR. BUCHANAN:  This is a general thing not in
13  terms of timing.  What we're trying to do --
14        THE COURT:  Procedure.
15        MR. WEISS:  Procedure.
16        MR. BUCHANAN:  Defendant provided an expert
17  interrogatories that were largely encompassed by a
18  prior agreement that we had to provide an expert
19  report, documents considered, CV, compensation-related
20  information in the first five cases -- now four cases
21  what we were talking about -- was memorializing that
22  and eliminating the general expert rogs that would have
23  applied to all 1,800 cases that are currently on file
24  and make that expert obligation apply in the setting of
25  a trial case or in a case that, you know, had a

**10**

Monthly Management Meeting 5/19/05

1  specific expert discovery cutoff.  We hadn't proposed
2  discussing scheduling on the second waves, but I would
3  be happy to sit down with counsel next week and do it.
4        MR. HETRICK:  I think what we envisioned is
5  actually what is covered on our agenda item number
6  eight for the first case was to try to come up with a
7  schedule that incorporated some milestone dates and
8  then if we could use that as a model, apply it to the
9  remaining cases that would be the ideal, I would think.
10        MR. BUCHANAN:  Okay.  So getting back to
11  8(b).
12        MR. WEISS:  Going forward, your Honor, if it
13  worked out in the first few cases it would become a
14  model.  If it needed to be changed we would change it,
15  but at least for the first five cases the CMO would be
16  flexible enough so that it would fit into any time
17  schedule the Court would come up with later on.
18        THE COURT:  That's good.  I guess hopefully
19  by next time I'll be able to be in a better position to
20  try to start scheduling those deadlines.  I mean, we
21  have to have case-specific experts provided by counsel,
22  and you can't just schedule a case and if it goes away
23  then we have nothing left.  We have to move along.
24        MR. BUCHANAN:  The sense, your Honor, I guess
25  I have gotten in the last couple conferences you want

**11**

Monthly Management Meeting 5/19/05

1  to start thinking about the cases after the cases that
2  have already been set for trial.  I saw your request
3  for information.
4        THE COURT:  And I'm trying to look at what
5  we're going to have as our second, third and fourth and
6  fifth case, and I don't want to wait until August 1st
7  to just say we're just doing Humeston and all the
8  sudden there's a void, and we have to keep moving
9  everything else because the oldest cases, and,
10  unfortunately, some of the oldest cases are
11  gastrointestinal cases, which haven't really been --
12        MR. WEISS:  They haven't been worked on.
13        THE COURT:  They haven't been prepped for
14  general causation.
15        MR. BUCHANAN:  General liability side on
16  the gastro cases has not been developed in the same way
17  that the heart attack cases have been.
18        THE COURT:  So, you know, which is fine,
19  except that we're going to have to address that soon.
20  Okay.  And there's some people here, you know, if you
21  have one or two cases you're going to have to be
22  getting your experts and doing what you're going to do
23  now.
24        MR. BUCHANAN:  I think what we're trying to
25  do, you know, and counsel, Joe, specifically next week

**12**

Monthly Management Meeting 5/19/05

1  is trying to iron out a specific pretrial calendar for
2  obviously the Humeston case, but, also, try and develop
3  some kind of guideposts for, I guess, those other
4  earlier cases or we can talk about other alternatives.
5        MR. HETRICK:  I think that's fine.
6        THE COURT:  I'll wait to hear from you as to
7  what your thoughts are, and probably we should set up
8  another meeting before the next monthly meeting just
9  with liaison counsel or, you know, just to try to get a
10  more limited group and look at the next group of cases.
11        MR. BUCHANAN:  That's fine.
12        THE COURT:  But all of you should be aware if
13  you look at your docket numbers what are the older
14  docket numbers, where does your case fall in the mix,
15  when are you going to be expected to produce reports
16  and things if you filed early.  I guess if you just
17  filed you can sort of -- I would not want you to sit
18  back, but probably being what it is you will be sitting
19  back a little bit, but I'm more focused on the
20  beginning because I have to move things, but I don't
21  want to do things just by docket numbers, so if we're
22  focusing on heart attacks and we're moving heart
23  attacks it behooves you to start looking at your own
24  plaintiffs and your own doctors and who are you going
25  to use as experts on causation.

13

Monthly Management Meeting 5/19/05

1  MR. BUCHANAN:  To some extent in sitting down
2  with defense counsel it will be helpful to have your
3  Honor's thoughts on the next traunches of cases your
4  Honor is interested in seeing for trial so we can try
5  to prioritize among the cases that are on file.
6  THE COURT:  And I'm trying to work that out.
7  What I should do here -- I'm not sure if I want to do
8  the next, you know, two, three and four cases and five
9  cases.  I, too, want to have groups of them, obviously.
10  I don't know if we just want to remain with Humeston
11  and then go to the next 10 cases or whether we want
12  to -- or five cases that are going to -- and we have
13  dates assigned.  If Humeston settles -- I shouldn't
14  even put that on the record because it is not, I'm
15  assuming it won't -- but if it settles or a group
16  settle or -- you know, I don't want to just be in a
17  void, okay, now we're another year away or another six
18  months or even three months away.  I want to move right
19  to the next thing and keep moving along.
20  MR. BUCHANAN:  There's a lot of people in the
21  room that share your view.
22  MR. WEISS:  We want to get your proposal on
23  that.
24  THE COURT:  I want to have two and three and
25  four and five lined up so we're ready to go along.  If

14

Monthly Management Meeting 5/19/05

1  you settle one we go to two.  If you settle two we go
2  to three.  If you settle three we go to four.  And if
3  in the meantime you settle another loop of them great,
4  but I want to be moving them.  So I have to look at
5  those deadlines, and I have to look at how we should
6  group them and whether we should focus because we have
7  causation you have general causation on heart attack
8  whether we should just move on the heart attack cases
9  and just give some slack to the others at this point so
10  we can bring them up to speed or whether we should try
11  to move older cases, whether we should try to focus on
12  the diverse mix of different plaintiffs' lawyers having
13  an opportunity to present their cases or focus on those
14  people who file the first cases or the liaison
15  counsel's -- obviously, there's certain law firms that
16  have worked on the general causation and experts
17  primarily and it would make sense to try those cases in
18  the first wave, but --
19  MR. MAYER:  As part of the discussion we have
20  before the next conference we'll talk about whether
21  other injury categories should be moved up next in
22  line.
23  THE COURT:  And that may be.  Maybe we should
24  start focusing on when are these gastrointestinal cases
25  going to be tried, when are the stroke cases going to

15

Monthly Management Meeting 5/19/05

1  be tried, and when are we going to get them worked up.
2  All right.  So I'll wait to hear from you
3  until the end of next week either a phone conference or
4  letters from you, and then I'll try to set up a
5  conference with you in person which will be somewhat
6  short.
7  MR. BUCHANAN:  It may be that a telephonic
8  conference may guide our discussions so that we can
9  present something, you know, more definitive after
10  having gone back to our contingencies.
11  THE COURT:  Right now I'm just trying to
12  get -- I did send out that request that you sent me the
13  information on your clients, so I can have somebody who
14  knows a lot more than I do put them in an access
15  database and so I can have them organized and try to
16  find things.
17  MR. WEISS:  Which brings up a good point.  I
18  gave a chart to -- our chart to Carmen this morning and
19  then she said have someone e-mail, which is a better
20  idea, so I think people should e-mail the spread sheets
21  to Carmen, that way they can access them better.  Is
22  that a problem with the Court?
23  MR. BUCHANAN:  Or, alternatively, maybe we
24  should send a disk to the Court with whatever filing
25  letters so you have something more permanent in the

16

Monthly Management Meeting 5/19/05

1  event there's any issue.  It is your preference.
2  MR. WEISS:  It is your preference.
3  MR. BUCHANAN:  Hard copy with a disk.
4  THE COURT:  I'll tell you what, it is really
5  not me that's going to be entering these, so let me
6  talk to Carmen and we'll see what we're going to do.
7  It is not going to be Carmen that is doing the data
8  entering, but I actually have Dennis Nedwick from
9  Middlesex creating an access base for me, and he has
10  already done that, and now we just need to input, and
11  let me talk to them about what they want.
12  MR. BUCHANAN:  It may be, your Honor --
13  THE COURT:  Actually, Dennis is going to be
14  coming down in a couple days so to say that we can --
15  what we can move in from --
16  MR. BUCHANAN:  If there's a way we can do
17  this in a standard way and we have a lot of plaintiffs'
18  firms who filed cases here, just knowing a little bit
19  about databases and how you try and track this
20  information, if your folks on the IT side can decide
21  how they want to, you know, treat different types of
22  information, you know, if you don't want MG to indicate
23  milligrams in the dosage field that may mess up your
24  database, so if you can have your IT folks get in touch
25  with liaison we can get rules out to the group so that

---

**17**

Monthly Management Meeting 5/19/05

1  people can provide information in a standard way so
2  that you can actually dump it into your database and be
3  usable.
4       THE COURT:  Okay.  Dennis is going to be
5  coming down soon, and, as I said, he created it.  He
6  has given it to us.  Our next step is to get the
7  information and input it, and you're right probably how
8  we get the information is going to be important.
9       MR. BUCHANAN:  If we can develop a standard
10  format it will probably make it easier on his end when
11  he receives it.  If you want to patch either Mr. Weiss
12  or me into the call we would be happy to do that.
13       THE COURT:  Okay.  All right.  I'll get
14  someone from the other side, too.  It should be, I
15  guess, Charlie.
16       MR. COHEN:  I'll do it.
17       MR. WEISS:  Item 10 has been resolved.  A CMO
18  document for the Court.  Item 11, a schedule is being
19  worked on.
20       MR. BUCHANAN:  We're going to work to get the
21  dates by the end of May.
22       MR. HETRICK:  We're hoping to have the
23  experts generic and case specific by the end of May.
24       MR. BUCHANAN:  In terms of reciprocally how
25  long do you think it will take you to get your dates to

---

**18**

Monthly Management Meeting 5/19/05

1  us ?
2       MR. HETRICK:  Once we get yours we can have
3  them to you probably within 10 days.
4       MR. BUCHANAN:  Okay.  Thanks.
5       MR. WEISS:  Item 12, whatever is in arrears
6  will be paid.
7       MR. HETRICK:  Yes, that's done.
8       MR. WEISS:  Item 13 we have worked out a
9  process for the facts sheet issues.  I will discuss it
10  with somebody each week generally from Dechert, and I
11  can tell you that Dechert's been pretty good in giving
12  extensions on the plaintiffs' side and the plaintiffs
13  have been pretty good in trying to get better
14  information on the facts sheets.  Some of it is just
15  time issues.  You just don't have all the information
16  when the facts sheet is due, and we're working through
17  it, and if some firms need assistance liaison counsel
18  will help in that process.  But we hope this way we'll
19  have less work for the Court to deal with.
20       THE COURT:  Okay.  Everybody agrees that "see
21  plaintiff's medical records" is not a response to a
22  facts sheet.
23       MR. BUCHANAN:  In some cases, your Honor, the
24  plaintiffs are waiting for, you know, the selected
25  medical records from earlier periods, and we understand

---

**19**

Monthly Management Meeting 5/19/05

1  that's one of the larger delays.
2       MR. WEISS:  So we have gone through that.
3  That's now finished today at least.  I think that's it
4  on the --
5       THE COURT:  So the (b) where there's specific
6  ones listed, you're going to handle that?
7       MR. WEISS:  I have been getting stuff.  I
8  have been talking with plaintiffs' counsel and Dechert,
9  and the Dechert folks are very amenable to talking with
10  the plaintiffs' lawyers directly, as well, in working
11  things out.
12       THE COURT:  Okay.
13       MR. CORONATO:  One issue we didn't discuss,
14  Sol, out there was the issue of the authorization
15  requests and that last chart that's on Pages 8 and 9.
16       MR. WEISS:  You're right.  We didn't talk
17  about that.
18       MR. CORONATO:  This is, your Honor, when
19  we're requesting an authorization that wasn't provided
20  with the facts sheet and your Honor has indicated that
21  counsel should provide that within three business days
22  of a request that chart on Page 9 and 10 sets forth
23  some of the deficiencies there in responding within a
24  three-day time period.
25       MR. BUCHANAN:  Will, I don't know if all the

---

**20**

Monthly Management Meeting 5/19/05

1  effective lawyers are in the room for this, but I think
2  liaison will be happy to try to help you with this
3  issue, as well.
4       MR. WEISS:  But you have gotten most of the
5  authorizations.
6       MR. CORONATO:  That's true, but we have a
7  court order in place that says three business days, but
8  we can work with you on that if you can provide us with
9  assistance on that that would be great.
10       MR. BUCHANAN:  Absolutely.  One of the things
11  that's hard to do is identify whether all these have
12  specifically been dealt with, and we'll be happy to
13  work with you offline.  If it doesn't work we'll take
14  it back to the Court.
15       MR. CORONATO:  Okay.
16       MR. WEISS:  Thanks for bringing that up.  We
17  did not talk about that.  And the first three items of
18  the agenda were not covered by liaison counsel, I
19  believe; is that correct, Dave?
20       THE COURT:  These are the class
21  certifications, so let's go to plaintiffs' list before
22  we go to those.
23       MR. BUCHANAN:  We're in pretty good shape on
24  ours as well.  You can skip one.  You can skip one.
25  That's one we have to discuss, one that we need to

**21**

Monthly Management Meeting 5/19/05

1  discuss at least.  Production of Merck related
2  databases there's, of course, the iMED motion on
3  calendar for today that both parties briefed.  There's
4  separately an issue with the FACTS database.  I'll just
5  outline what that is.  I think we have reached an
6  agreement on it.  There's some technical issues with
7  the production.  I understand they're going to make one
8  of their IT folks available to work with the technical
9  issues, and there's a scope issue in terms of bringing
10  that current to reflect all of the sales-related calls
11  and other information and facts for the cases that were
12  filed after September 30th.  We're going to talk and
13  see if we can't get that worked out.  We targeted
14  Monday to get a firm process and procedure.
15         There's, obviously, a number of other
16  plaintiffs' lawyers in the case that were in cases
17  prior to 9/30.  They're anxious to find the
18  sales-related information from their cases.  They want
19  assurances they're going to get that well before
20  prescribers are deposed and before the fact discovery
21  cutoffs arise, and we're going to try to set some
22  milestones to get that updated production out, and I
23  understand counsel for the defense is in a position to
24  do that today, but we are going to set a firm schedule
25  next week to get that done.

**22**

Monthly Management Meeting 5/19/05

1         THE COURT:  Okay.
2         MR. BUCHANAN:  Other database-related issues
3  there are three document databases; as you may recall
4  SPiDER and two others that escape me.  We met and
5  conferred.  They're being processed for production.
6  They are not the subject of any motion as you may have
7  noticed in the database motion papers.  CORNERSTONE,
8  the parties have pulled off the disputed category.
9  We're conferring over that, and to expedite the FACTS
10  production plaintiffs have agreed to put the expedited
11  FACTS production in front of whatever CORNERSTONE
12  production will be made to help prioritize that because
13  we think the FACTS production needs to be made.  It is
14  a real priority.
15         THE COURT:  Okay.
16         MR. BUCHANAN:  Three, outstanding requests
17  concerning confidential information, that has been
18  resolved.  We think we dealt with all of those issues
19  as it relates to the informal requests of counsel that
20  have been made since the last status conference as of
21  this morning.  If there's an exception it is a minor
22  exception at this point.  It is not encompassed by this
23  paragraph.
24         THE COURT:  You didn't resolve the two issues
25  as to the e-mail and to the -- or did you?

**23**

Monthly Management Meeting 5/19/05

1         MR. BUCHANAN:  I'm sorry?
2         MR. COHEN:  It is all taken care of.  The
3  only issue left now is the order for the going forward
4  we have competing proposals on the order of when things
5  go into the public file.  I just don't know if your
6  Honor had a chance to look at that yet.
7         MR. BUCHANAN:  The parties had a different
8  proposal with regard to how we're going to deal with
9  filing of papers under seal when defendant maintains
10  documents notwithstanding be in a filing should be
11  filed under seal.
12         We're in the disputed portion of the agenda.
13  We don't have an agreement on that issue, but
14  plaintiffs' view was what we understand your Honor
15  wanted to do we file our papers with your Honor only as
16  a courtesy copy; we don't file them with the clerk.
17  They then have a week to get back with us and either
18  tell us that they object to the content to filing the
19  disputed documents not under seal or they'll give us
20  their consent, and if they object it was our
21  understanding -- and, candidly, your Honor, it is my
22  understanding your Honor from hearing you in other
23  contexts on the procedure to be used for final
24  documents under seal is that a motion for protective
25  order was supposed to be promptly filed at that same

**24**

Monthly Management Meeting 5/19/05

1  date within seven days.  We're not on the same page
2  with the defense as to the process that should be
3  employed as to challenging or addressing the filing of
4  documents under seal with respect to a motion in that
5  window of time.
6         MR. COHEN:  Basically, I just think as a
7  matter of actual practicality and not setting up an
8  order that we're never going to be able to comply with
9  in seven days if it turns out there's a marketing
10  documents, a sales document, a science document, to get
11  three certifications on different issues it is not
12  going to work in seven days.  What I proposed was we
13  promptly, immediately call the Court for a briefing
14  schedule on it, and we can address it, and if for any
15  reason something has to be tremendously expedited
16  plaintiffs will ask your Honor to make a very expedited
17  schedule and you order that I will do it on an
18  expedited schedule, but if it is something I can do on
19  a regular schedule I can do that on a regular schedule
20  because your Honor will already have the papers because
21  it won't slow down the underlying motion; it's just
22  what ends up in the public file.
23         So I think the only difference is I just want
24  to call the Court and get a briefing schedule, and
25  we'll do it on a motion by motion basis and not say

### 25

Monthly Management Meeting 5/19/05

1  immediately I have to file a motion because, otherwise,
2  all I'll be doing is calling the Court every time I
3  can't do it and asking for an extension, and maybe we
4  actually agree -- we probably will agree most of the
5  time on a briefing schedule and we will say, your
6  Honor, does that work for you, and it will be done, and
7  if there's a dispute we don't have to do anything.
8        MR. BUCHANAN:  One thing this litigation has
9  been frequently addressed, the confidential issue in
10  this litigation.  I don't think there's any case that's
11  been unturned in New Jersey on confidential standards
12  law filing.  We're not writing new briefs.  Really
13  fundamentally what we're talking about are the specific
14  facts that need to be presented to the Court to make
15  the case that we're talking about the trade secret for
16  Coke or something near equivalent to the trade secret
17  for Coke.
18        And we have heard, your Honor, this is going
19  to be the vehicle through which the Court is going to
20  address the documents that were not unsealed through
21  their rereview process.  We're a little concerned about
22  creating monster briefing challenges with every
23  submission we file or corollary issues.  I think the
24  Court is pretty familiar with the law at this point,
25  and there's not a lot of new twists and turns we're

### 26

Monthly Management Meeting 5/19/05

1  going to present to the Court, other than if there's an
2  affidavit that needs to be made to make the case then
3  they do have seven days to make that letter
4  submissions, frankly, are probably sufficient as it
5  relates to the law, and a certification to support
6  those would be sufficient.
7        MR. COHEN:  Two things on that.  First, just
8  as an example of how this works beautifully in
9  practice, I had with Mr. Cohen's office the Klineman
10  brief.  We sent within the seven days a notice saying
11  we objected to one document.  Then we had a meet and
12  confer, which was a couple days later.  During the meet
13  and confer we determined that, in fact, he was only
14  citing a particular portion of the only one document
15  that I thought had confidential information.  That
16  particular portion itself wasn't confidential, so what
17  we agreed to do was we agreed to stipulate that they
18  were accurately getting the information from that
19  document, they were quoting it properly, and then they
20  didn't have to attach the rest of the document, and it
21  took care of the whole problem and your Honor never has
22  to get involved.  That takes a couple days.
23        So with that plus the just saying when do I
24  get the certifications I think we're going to need the
25  certifications because it is, unfortunately, possible

### 27

Monthly Management Meeting 5/19/05

1  with the confidential information thing it should just
2  be on the record.  I know plaintiffs' counsel likes to
3  have -- I should say plaintiffs' counsel expressed an
4  interest in having things in the record appropriately
5  should any other kind of action be needed, and I agree
6  with that, and I think that all I'm saying is instead
7  of putting a specific time on when the motion has to be
8  filed as soon as we reach an agreement we'll pick up
9  the phone and say here's a briefing schedule we
10  propose, and if we mostly agree -- it is going to be
11  mostly the fact-specific information, but, you know,
12  there could be in the brief itself, sure, there will be
13  some section on the case law that will be the same, but
14  you'll have to apply it to the facts.  It could be
15  completely different kind of information.  I think it
16  is going to get less and less as it goes along.  I
17  already worked the first one out.  I think there may be
18  one or two that we're going to tee up pretty quickly,
19  which he can check to get some resolution on some of
20  the substance of this, but the difference we have is
21  very narrow, do you put a specific time frame on it
22  ahead of time or do we just call for a briefing
23  schedule, and I think that realistically even if you
24  went the first way half the time I would have to call
25  you and say can I get an extra week, and why don't we

### 28

Monthly Management Meeting 5/19/05

1  see if I can work it out with plaintiffs' counsel
2  first, as I just did, and, if not, just call up and say
3  what is going to work.  If you already have a motion on
4  file to be heard and we can throw it on the same day --
5  we can work things out.  We have been doing that pretty
6  well here.
7        MR. BUCHANAN:  There's one practical problem,
8  your Honor, and what happens is that we filed a motion
9  to compel the production of databases pursuant to one
10  of your Honor's earlier orders back in March, and
11  through, frankly, just oversight it was filed with your
12  Honor, it is not in the Court record.  You know, it is
13  not in the file, and there's no good reason for it not
14  to be in the file.
15        Two months has lapsed, and it is through no
16  fault of defense counsel.  It is just the process that
17  was created that didn't require the filing of the
18  motion and the specific period of time to address
19  confidential information, and now we're in a position
20  where two months has lapsed and the Court file doesn't
21  reflect what is really happening what has happened,
22  and, you know, I take personal responsibility for that
23  because our firm filed a motion.  We filed it with your
24  Honor.  We conferred with defense counsel.  They
25  identified those that they didn't think were

**29**

Monthly Management Meeting 5/19/05

1  confidential, and we should be in a position to file
2  that with the Court, and now --
3      THE COURT:  Why don't we revamp our procedure
4  a little bit.  If we want to address that issue
5  probably plaintiffs should be able to file their motion
6  with the clerk's office with a courtesy copy to me, and
7  the motion to the clerk's office should include a cover
8  letter that says this includes everything except those
9  items which have been marked confidential which are
10 being provided to the Court and a courtesy copy, and if
11 counsel objects within -- doesn't object within seven
12 days we'll supplement the court -- the official court
13 record by sending those documents to the clerk.  If, in
14 fact, the clerk doesn't -- if, in fact, you object I
15 think you should file within seven days a formal notice
16 of motion, the notice of motion for a protective order,
17 but you do not have to include briefs.
18     You file a motion for a protective order.
19 You don't have to include certifications.  You just
20 have to file a formal motion.  I think for this it
21 makes sense because I do think we'll start to them, but
22 you don't have to have your supporting papers.  Send
23 the motion and request it be returnable on short notice
24 directly to the clerk and with a request that the Court
25 set up a phone conference, and then we'll at that point

**30**

Monthly Management Meeting 5/19/05

1  I'll have the document.  I'll be able to look at it.
2  I'll know what your motion is.  There will be something
3  formal on both sides, but at that point we may wind up
4  with a briefing schedule or time for a facts
5  certification.  I may look at it and say clearly should
6  be attorney/client privilege or, you know, whatever or
7  vice versa.  I may look at it and say I don't know how
8  you're ever going to convince me, what are you going to
9  give me and you can tell me.
10     MR. COHEN:  Basically, Judge, just the notice
11 of motion saying we're filing this and then all the
12 supporting papers will be done.
13     THE COURT:  So we're sort of changing the
14 procedure.
15     MR. BUCHANAN:  That's fine.  That makes
16 sense, your Honor.
17     MR. COHEN:  I was just going to suggest if
18 you wanted to put within three days I have to call the
19 Court and get the schedule I could do that, too, but
20 putting in a piece of paper as a place holder it is not
21 a problem.
22     THE COURT:  I think it is probably good.
23     MR. BUCHANAN:  It is good for the file, I
24 think, your Honor.
25     THE COURT:  Okay.

**31**

Monthly Management Meeting 5/19/05

1      MR. COHEN:  So we'll have to redo our
2  proposals.  Maybe we can get that put together.
3      MR. BUCHANAN:  I think we understand what you
4  want to do.  We'll be able to change that language.
5      THE COURT:  Can you try to submit one order
6  on that?
7      MR. COHEN:  Yes.  I brought the printer with
8  me.
9      THE COURT:  Now, there hasn't been a ruling
10 though on the two documents that were submitted, right?
11 Or have you resolved those?
12     MR. COHEN:  We resolved those.
13     THE COURT:  The e-mail and the Gilmartin?
14     MR. COHEN:  That's privileged, not
15 confidentiality.  Privilege, that was pending before
16 your Honor, and that was not the subject of either
17 side's agenda.  That is a brief -- you have a motion
18 you just have under advisement.  That's attorney/client
19 privilege.
20     THE COURT:  So you have not resolved those
21 issues?
22     MR. BUCHANAN:  No, they have not been
23 resolved.
24     THE COURT:  I have resolved the e-mail issue,
25 and I don't think I'm going to even write it up.  If

**32**

Monthly Management Meeting 5/19/05

1  the plaintiffs file an appeal then I'll write
2  something, but I don't think that it is necessary,
3  otherwise there's an e-mail from Deborah -- or from --
4  yes, it is from Shapiro to Scolnick dated February 11,
5  2000.  There is one long sentence that's been deleted
6  and redacted.  Counsel has claimed it is
7  attorney/client privilege.  Defendants have claimed it
8  is attorney/client privilege.  Plaintiffs have said
9  that they don't understand how that can be because Miss
10 Shapiro in her deposition said she didn't consult with
11 counsel, et cetera.
12     The crux of the matter is it is one sentence
13 in which she says Merck's counsel has advised us of
14 this -- whether she spoke to them or not I don't know,
15 but it is clear to me that it is attorney/client
16 privilege, and the redaction should remain in place.  I
17 know it is always hard to argue against something when
18 you can't see it.  That's the problem with these in
19 camera things, but that's all I'm going to say.
20     MR. BUCHANAN:  We understand the ruling, your
21 Honor.
22     THE COURT:  If there's an issue then I'll
23 write it up, but I don't intend to write it up.
24     The other one I haven't made a decision on
25 yet, but I'll try to get that out to you this week or

**33**

Monthly Management Meeting 5/19/05

1  next week within the next couple days where that was
2  the patent pending thing.
3      MR. BUCHANAN:  That's right.  Just in terms
4  of milestones obviously that document arose -- the
5  privilege assertion with respect to that document arose
6  during the deposition of Mr. Gilmartin.  Counsel who
7  was defending the deposition represented they would not
8  discuss the particular document with Mr. Gilmartin in
9  the intervening period until the issue was resolved
10  with the Court.  His deposition has not yet been set,
11  but I understand we're targeting a day.
12      THE COURT:  He is not done?
13      MR. MAYER:  We have had three days of him,
14  but the last day is going to be --
15      MR. BUCHANAN:  He was cross-noticed in other
16  jurisdictions.
17      MR. MAYER:  And various dates offered.
18      THE COURT:  I should be able to have that to
19  you within the next two or three days.
20      MR. BUCHANAN:  I wanted to apprise you of
21  that situation.
22      THE COURT:  Yes, because you do want it
23  before that dep.
24      MR. BUCHANAN:  If it is going to be found not
25  to be privileged I should know.

**34**

Monthly Management Meeting 5/19/05

1      THE COURT:  Okay.  I should have a decision
2  to you before then.  All right?
3      MR. BUCHANAN:  Outstanding document
4  production requests, that's the next item on plaintiffs
5  agenda.  There are a number of items that have been
6  requested.  We received a status report this morning
7  from defense counsel which traunches productions in
8  waves, and what we're going to do is just go back to
9  our list, go back to our office and verify the timing
10  and the sequence of requests and work with defense
11  counsel if there's any concerns so I can have an
12  opportunity to raise those with you in an intervening
13  teleconference, but I think we have worked it out.
14      THE COURT:  Where are we at now?
15      MR. BUCHANAN:  Up to the deposition of the
16  Merck detailer in Mr. Humeston's case.
17      THE COURT:  Is there an issue about that?
18      MR. BUCHANAN:  I think we have worked it out.
19  We're going to be deposing Jennifer Brown.
20      THE COURT:  So that takes care of everything,
21  except really the class action.  I need from counsel
22  just to clarify where we are at, what your
23  understanding is of what else is outstanding that I
24  haven't decided just for the reasons you have said
25  because we deal with things, things are filed then we

**35**

Monthly Management Meeting 5/19/05

1  address it in a management conference, address it again
2  in a management conference and make a ruling, and I
3  just don't want to have things out there and you're
4  waiting for a decision and don't know where it is and
5  don't want to, you know -- of course you certainly
6  could call the clerk and ask, but I just want to know
7  what your understanding is of anything else that's out
8  there that hasn't been addressed.
9      MR. BUCHANAN:  The one issue that would jump
10  to my mind is iMED, we still need to argue that.  I'm
11  told the deposition protocol was signed.  I hadn't seen
12  it come through yet, but I'm told the deposition
13  protocol was signed.
14      THE COURT:  I believe I did sign it.
15      MR. BUCHANAN:  That was a precursor for the
16  next document, which was the protocol for internet
17  depositions.  I think there was a trigger date.
18      THE COURT:  Is there a dispute about that
19  one?
20      MR. BUCHANAN:  We have it worked out, but we
21  needed the deposition protocol signed first so that
22  will be an order that will be forthcoming to your
23  Honor.
24      MR. CORONATO:  I submitted it by Lexis Nexis,
25  the internet protocol.

**36**

Monthly Management Meeting 5/19/05

1      THE COURT:  So that will be signed.
2      MR. BUCHANAN:  That is on consent.  There's
3  no objection.
4      THE COURT:  I'll get that signed today.
5      MR. BUCHANAN:  Okay.
6      THE COURT:  Anything else that anyone knows
7  is outstanding that they need a ruling on?
8      MR. BUCHANAN:  There may have been some
9  disputed provisions in our competing Case Management
10  Orders.
11      THE COURT:  Oh, the April order.
12      MR. BUCHANAN:  The April order has not been
13  addressed.  You have the defendant's initial proposal,
14  their supplemental proposal and our letter.
15      THE COURT:  There were four.
16      MR. BUCHANAN:  We only sent one.
17      THE COURT:  I have them in a pile on my desk.
18  I'll look at those.  Okay.  They're not major
19  differences.
20      MR. BUCHANAN:  I don't think so.
21      THE COURT:  One of the differences might have
22  been this.
23      MR. BUCHANAN:  It was the confidentiality
24  issue.
25      THE COURT:  Was the issue of what to do with

**37**

Monthly Management Meeting 5/19/05

1  those, so that part I may cross out and let you submit
2  the revised order from today as opposed to entering
3  anything on that, and that may resolve 90 percent of
4  what that issue was.
5       MR. BUCHANAN:  We can probably work out a
6  stand alone order for filing of documents that we can
7  provide to your Honor.
8       THE COURT:  Before you leave, Charlie, I'll
9  pull that order back and maybe we can retype it.
10      MR. COHEN:  Give me your side, and I'll get
11  the printer.
12      THE COURT:  Is there anything else other than
13  the class action so that everybody else can leave?  I
14  guess one of the things I also want to throw out to you
15  is whether there's any -- does everybody feel as far as
16  the plaintiffs do you have any -- so far with liaison
17  counsel it is working out, they are being able to
18  contact everybody?
19      MR. BUCHANAN:   Mr. Weiss is doing a great
20  job.
21      THE COURT:  We get more people in.  If any of
22  the people that have lesser cases -- no case is lesser,
23  but less number of cases quantitywise feel that they're
24  not -- their issues aren't being addressed or they're
25  not -- you know, you're just going to have to let me

**38**

Monthly Management Meeting 5/19/05

1  know.  You can do it by letter or you can do it here.
2  The best way to do it would be to first send a letter
3  to Sol and say to him that I have concerns about this
4  and this and I need to meet with you or I need to
5  address this.  If it is not addressed and you want
6  to -- you know, I want to make sure that everybody if
7  there's any problems I want to make sure we get them
8  ironed out, and I don't want any plaintiffs' counsel
9  who maybe don't have a huge number of cases who are
10  feeling that some of their issues aren't addressed --
11      MR. BUCHANAN:  Your Honor, just to give you a
12  sense of a little bit of our inner workings without
13  going into too much detail, as a general matter the
14  agendas for the status conferences are if people have
15  requested they have any items they would like to put on
16  the agenda -- we occasionally do get additional items,
17  and we incorporate those and attempt to advocate on
18  behalf of those people who don't come to the
19  conferences.  People are here to handle their issues.
20  They handle them separately, and at the suggestion of
21  some of the others in the New Jersey group we started
22  having a call among plaintiffs' counsel and will
23  continue to do that to get everybody's feedback and
24  make sure that we're steering the right course for the
25  New Jersey litigants.

**39**

Monthly Management Meeting 5/19/05

1       To the extent people take exception to
2  certain of those issues they're, obviously, free to
3  raise them here, but so far I think it is working out
4  okay.
5       THE COURT:  I'm not suggesting there is a
6  problem, but I don't want there to be something under
7  there or somebody who felt they really weren't sure to
8  express or when to express, but as Mr. Buchanan said as
9  long as you contact Mr. Weiss with your concern and
10  then if you need to ask to have something on the
11  agenda --
12      MR. JACOBY:  I can also say, and maybe we
13  should say it again for everybody, we take calls -- our
14  office and I'm sure David's office every day of the
15  week from counsel all over the country.  We always make
16  sure we call them back that day, answer their
17  questions.  I haven't heard any complaints.  No one has
18  told us, well, I called you Monday and you didn't call
19  me back till Friday.  We try to address everybody's
20  concerns informally and, things I think, have been
21  working out pretty well, but there has been a lot of
22  telephone communication.
23      THE COURT:  Good.  I assume everything is
24  working well.  I want to make sure.  Okay.  I am going
25  to be going to -- you know, I assume there is no

**40**

Monthly Management Meeting 5/19/05

1  objection -- if there is any objection tell me now
2  because Monday I'm going to be in New Orleans with the
3  federal judge, the Texas judge and the Alabama state
4  court judge.  I believe everyone is fully aware of
5  that, but just to make sure everybody knows so there's
6  no objection to it if there is one I need to know
7  before I go.  And we're hoping that, you know, we can
8  work somewhat together so we can coordinate things
9  whatever we can work together on we can do so that
10  things go more smoothly.  I think things have gone
11  smoothly already, but go smoothly in the future, so
12  hopefully everybody is -- we can address some of the
13  different needs that people have because of the
14  competing states' calendar issues and the federal
15  judges issue, and, you know, I have spoken to all three
16  individuals.  The Texas judge is Judge Hardin, Judge
17  Rochester from Alabama and Judge Fallon from the
18  Federal Court, and everybody, I think, wants to work
19  together, so I think it will work.
20      MR. JUDD:  All we need is a judge in
21  California.
22      THE COURT:  Have they replaced the judge yet?
23      MR. GALPERN:  She sent a letter admitting she
24  took VIOXX, and they're expecting a motion at any time
25  to disqualify her.

**41**

Monthly Management Meeting 5/19/05

1  THE COURT: I never took VIOXX. We can go
2  on.
3  MR. FERRARA: Your Honor, a number of lawyers
4  around the country were debating whether to file here
5  in New Jersey or to file in the MDL, and when they went
6  through that analysis I assured them that this case was
7  well on track and has been, what excellent job that
8  liaison counsel had been doing and what your Honor has
9  been doing, and their fear -- just the issue came up
10  when you mentioned you were going to be meeting with
11  Judge Fallon -- is that somehow this case is going to
12  be slowed down to accommodate Judge Fallon and his
13  requests, and I would just like to be able to reassure
14  the folks around the country that your Honor is going
15  to proceed with this case as you have told us in the
16  past and not -- you know, the people who have made the
17  decision to be here don't now want to be bogged down
18  with the MDL and the MDL politics and all that stuff.
19  I don't have a question to ask, but I want to raise the
20  concern that these folks have raised. Does that make
21  any sense?
22  THE COURT: Obviously, I haven't met these
23  people in person to be able to talk to them or hear
24  their concerns and my concerns and share views, so to
25  say what I am going to do or not do 100 percent after I

**42**

Monthly Management Meeting 5/19/05

1  speak to everybody certainly, hopefully, we'll be able
2  to help each other coordinate with each other and work
3  together. I have absolutely no intention of delaying
4  my list for one day.
5  MR. FERRARA: That's what they wanted to
6  hear.
7  MR. MAYER: Just for the record, Merck's view
8  is we want the MDL to move along quickly, too. So we
9  are looking for everybody to work together.
10  THE COURT: And I'm hoping that happens, too,
11  but I just -- you know, I don't intend to -- I'm not
12  going there with the idea, and Judge Fallon hasn't
13  asked me to delay my case, and, actually, from what I
14  understand he never really asked the Texas judge to
15  delay his case. When I spoke to the Texas judge that
16  request had never been made. There was some banter
17  that that had been done, that the State court judges
18  had been asked to delay their cases, but that hasn't
19  actually happened. Judge Fallon hasn't asked me to
20  delay anything. He hasn't asked Texas to delay
21  anything. I think he did contact the Alabama judge,
22  but I think that was with counsel's -- almost at
23  counsel's request or not request but agreement,
24  knowledge on both sides, and, you know, it is not a
25  question of -- you know, I feel comfortable that I'm

**43**

Monthly Management Meeting 5/19/05

1  going to well represent the State of New Jersey down
2  there. I may be a little bit of a fish out of water
3  since there's going to be three Southerners, all
4  gentlemen, but I think it will be fine.
5  I want to look at this as hopefully we're
6  going to be able to coordinate everything. I am hoping
7  to move things together as quickly as possible is my
8  goal. I don't intend to be held back at all in order
9  to -- that's not my plan. My plan is we all try to
10  move together as fast as we can to try to resolve all
11  the cases.
12  MR. FERRARA: Thank you, your Honor.
13  MR. LOCKS: Your Honor, without identifying
14  any issue or two, but I'll be glad to if you push me,
15  there might be some issues discussed that might require
16  some decision making that might -- that we might feel
17  that we would like as counsel in New Jersey to have
18  input in before a decision is made if you meet with
19  Judge Fallon, and, hopefully, that discussions won't
20  result in certain decisions that we might feel that we
21  would like to have input in.
22  Now having been obtuse that way I might be
23  more descriptive if you'd like. I don't know if
24  they're going to come up. We have heard lots of
25  rumors, and there have been certain things discussed as

**44**

Monthly Management Meeting 5/19/05

1  I understand the last day or two that if they were
2  going to be judicially decided we might collectively or
3  individually have some opposite positions on.
4  THE COURT: I haven't been advised of an
5  agenda or anybody's -- other than just generally
6  talking about cooperation. If you have a specific
7  concern that you want me to keep in mind, I mean, I
8  think Mr. Ferrara has just put in the concern that he
9  has that the New Jersey cases not be slowed down, and I
10  can assure him I share that concern, and, you know, I
11  can't say I share that concern because it isn't a
12  concern to me. I'm going to move my cases, you know?
13  I'm not concerned about that. My cases are going to
14  move.
15  MR. LOCKS: I wasn't referring to that. I
16  understand there have been some discussions in the MDL
17  on subjects that haven't been discussed in the State
18  system yet. Now, whether or not those are going to be
19  asked to be coordinated, I think, at least --
20  THE COURT: You're going to have to tell me
21  what they are then so I can think about them before
22  next week.
23  MR. LOCKS: I understand there's issues about
24  tolling agreements where Merck may or may not agree to
25  tolling agreements or have something involved in the