**45**

Monthly Management Meeting 5/19/05

1  MDL that deal with tolling, and, frankly, if some group
2  of judges decided to do something like that I think
3  that we might like to have some input on whether or not
4  we feel that's appropriate or not for the State cases
5  in New Jersey.
6      MR. MAYER: What we would or wouldn't offer
7  on a tolling agreement is really Merck's decision, and
8  not something --
9      MR. LOCKS: There may be differing opinions
10 about whether it is something that is globally
11 acceptable that may be imposed here.
12      THE COURT: Well, let me just -- let me just
13 say this just to make it a little simpler, I don't
14 know, but it is not my attempt to go down there and
15 come out with joint orders immediately and then on
16 Monday you're going to read that we have agreed on X,
17 Y, Z. We're going to agree to assist each other.
18 There may be specific things that we want to
19 specifically agree on. If we do I'll bring them all
20 back to you before I sign them or agree to anything.
21 But there is no -- I mean, the Federal Court and myself
22 are not going to have joint orders. There is no
23 overlap of our jurisdictions. I have jurisdiction
24 here; they have jurisdiction there. We may coordinate
25 with each other, but, you know, there's not going to be

**46**

Monthly Management Meeting 5/19/05

1  like a joint order.
2      MR. LOCKS: I didn't -- all I wanted to make
3  sure was if something came up that we had a chance to
4  react to it.
5      THE COURT: Obviously, there's always things
6  in the background that the judge doesn't know, and
7  that's the way it should be. I don't want to know
8  everything you're thinking about because if you did,
9  who knows? I have enough to worry about with what you
10 want to formally present to me. The bottom line is
11 before I formally make decisions I will bring them back
12 to the group, all right?
13      MR. LOCKS: Thank you, your Honor.
14      THE COURT: There will be no formal decision
15 made. I will not commit to something without
16 discussing it with New Jersey counsel who are only in
17 New Jersey.
18      MR. BUCHANAN: Thank you, your Honor.
19      MR. WEISS: Thank you.
20      THE COURT: So there will be no formal
21 commitment made for anything until after I have a
22 chance to review it with Jersey counsel or not just
23 Jersey counsel but counsel who are involved in the
24 Jersey litigation, regardless of whether they are from
25 New Jersey or not. Okay?

**47**

Monthly Management Meeting 5/19/05

1      MR. WEISS: Thank you.
2      MR. BUCHANAN: I'm sorry, your Honor, there
3  is one thing that I would be remiss if I didn't raise,
4  and it is an issue we're going to talk with defense
5  counsel about and see if we can't work out a
6  stipulation or understanding, and it relates to the
7  dismissal of cases without prejudice where for one
8  reason or another the plaintiff or the plaintiff's
9  counsel has a consent of the client, but the client
10 doesn't want to pursue the case any more or for reasons
11 it shouldn't be pursued. We're going to try to
12 negotiate some kind of stipulation, if possible.
13      MR. WEISS: We did. My understanding, and I
14 spoke to some people around this room, and I spoke to
15 Ted that Merck is not opposed to allowing a young case
16 to be dismissed without prejudice, assuming the Court
17 agrees with the proviso if it is not a New Jersey
18 plaintiff if the plaintiff wants to refile that
19 plaintiff has to refile in the MDL, and the lawyers in
20 this room have agreed to that, and, your Honor, if
21 that's acceptable to you that is the stipulation that
22 has been agreed to by the parties.
23      MR. HETRICK: That's true.
24      MR. WEISS: There's no statute protection.
25 It is simply if for whatever reason the case is going

**48**

Monthly Management Meeting 5/19/05

1  to be dismissed it is going to be dismissed without
2  prejudice, and there's no statute saving, there's
3  nothing, but if it ever gets refiled and it is not a
4  New Jersey plaintiff it gets filed in the MDL.
5      THE COURT: I don't know that I could sign
6  that, and the reason is not that you can't agree to
7  that, but what if the plaintiff then changes lawyers
8  and files in New Jersey? I have to think about it.
9      MR. WEISS: That's what Mr. Mayer asked that
10 we consider, and the lawyers that I spoke to said that
11 was okay with them, and that was the concern that we
12 raised.
13      MR. BUCHANAN: Your Honor, there is a broader
14 contingency that may be affected by it. We should
15 probably circulate it and further discuss with defense
16 counsel.
17      MR. MAYER: This isn't written that nobody
18 has to agree to that. If somebody doesn't agree to
19 that then we can consider in that case whether we will
20 stipulate to discontinue, but what we have told Sol is
21 what we would do for cases in an early stage we would
22 basically, be willing, no questions asked, to agree on
23 this basis.
24      MR. BUCHANAN: We were thinking cases where
25 depositions hadn't been taken.

### Page 49

Monthly Management Meeting 5/19/05

1  MR. LOCKS: Isn't that a case with an
2  individual lawyer stipulating in a specific case, and
3  it doesn't require the Court to do any more than accept
4  the dismissal.
5  MR. WEISS: That's correct, but that was what
6  was asked.
7  MR. LOCKS: So there's no reason to circulate
8  it around as if it is, quote, some policy of the Court.
9  MR. MAYER: It doesn't have to be a policy of
10 plaintiffs' liaison counsel. It was a matter I was
11 indicating to Mr. Weiss that we would be willing to do
12 that.
13 THE COURT: I'm only concerned -- you're
14 absolutely right. Everybody has the right to do
15 whatever they want with their cases. They can dismiss
16 them. You can keep them. You can move them. Assuming
17 the other -- you can do what you want with your cases,
18 but he was asking whether I was going to sign an order
19 that says the plaintiff may not come back into New
20 Jersey, and I don't have a problem signing an order
21 saying the case is dismissed and your having
22 agreement --
23 MR. MAYER: I will tell you it is commonly
24 done in stipulations of dismissal for cases beyond the
25 point where the plaintiff can unilaterally dismiss and

### Page 50

Monthly Management Meeting 5/19/05

1  that conditions are imposed on refiling in that
2  situation.
3  THE COURT: Then it is a dismissal with
4  prejudice here.
5  MR. MAYER: Well, but it is without prejudice
6  to renew somewhere else.
7  THE COURT: If you want to submit a dismissal
8  with prejudice I could sign that, and you can have a
9  separate agreement that you can file somewhere else, I
10 guess maybe, right. What you're asking me for is a
11 dismissal without prejudice that really is with
12 prejudice to my jurisdiction.
13 MR. WEISS: That's correct, your Honor.
14 THE COURT: And I don't think that that's --
15 it depends on how it is worded and what you say, I
16 guess, but I have a problem with it.
17 MR. BUCHANAN: And it may be, your Honor,
18 that the way to handle that is the parties submit a
19 stipulation without prejudice, and the individual
20 plaintiff has an individual agreement with Merck that's
21 not in the form of order submitted to the Court with
22 regard to the conditions on refiling.
23 MR. MAYER: We'll think about that before we
24 actually enter into one of those and see if we have a
25 solution that will satisfy your Honor.

### Page 51

Monthly Management Meeting 5/19/05

1  THE COURT: And this has been something
2  somebody is just bringing up now, so I haven't had a
3  chance to look at it. It seems like -- there's no
4  question it can be done, you know, you guys can pretty
5  much do anything you want with your cases if you have
6  your client's authorization. It is just a question of
7  how I am going to handle it as far as dismissal. I
8  hate to do a dismissal. I just can't see signing a
9  dismissal without prejudice, but you can never bring it
10 back here.
11 MR. GALPERN: Your Honor, putting statute of
12 limitations concerns aside, if plaintiffs voluntarily
13 dismiss without prejudice to refiling elsewhere in the
14 MDL that effectively has to operate under the entire
15 Controversy Doctrine as a dismissal with prejudice
16 vis-a-vis the New Jersey court system, so everybody's
17 interests are advanced by working out a dismissal
18 without prejudice to refiling in the MDL or Alabama or
19 California or wherever under our common law it
20 effectively works as a dismissal with prejudice with
21 respect to New Jersey and then everybody's interests
22 are advanced.
23 MR. MAYER: I think that's correct. We'll
24 give the Court some help on this the next time we meet.
25 THE COURT: I don't know if I need help.

### Page 52

Monthly Management Meeting 5/19/05

1  Again, I guess I have to get out the federalists papers
2  in the constitution, but Judge Corodemus told me I have
3  to take them with me down there.
4  MR. WEISS: She had some experience.
5  THE COURT: But at any rate, the bottom line
6  is I don't know that I would sign -- I don't know that
7  I need help. I do need to think about it, and I do
8  need to see exactly what you're doing, and I understand
9  there are lots of things that facilitate settlements
10 and facilitate -- you probably would be shocked at the
11 number of things that I'm asked to sign to end cases
12 that I don't have any intention of signing, you know?
13 And if you want to send me an order to dismiss a case I
14 will sign it in a heartbeat, but orders to dismiss a
15 case with orders that it go here or there I don't think
16 I have that -- I don't think that's my job. I don't
17 think that that's going to be appropriate.
18 The fact that you may have a stipulation
19 somewhere else to do something is something different.
20 I'm throwing it out to you. Obviously, if you want to
21 submit something to me that says exactly what you said
22 along with a brief I'll read it and look at it. I'm
23 sure there's no law on it specifically. I can't
24 imagine a case that says -- there's probably nobody
25 else who has refused to sign it.

**Page 53 — Monthly Management Meeting 5/19/05**

1  MR. FERRARA: Your Honor, as a matter of
2  historical perspective Merck has been up to this point
3  kind enough to agree to allow cases to be dismissed
4  without prejudice on a case by case basis, so it's
5  being done, and everybody is happy, and I don't think
6  that it is really that -- I think what Sol proposed if
7  your Honor is uncomfortable with it we can have a side
8  agreement with defense counsel.
9  THE COURT: You can agree to anything you
10  want. I'm talking about what I sign. What I sign says
11  the case is dismissed -- dismissed without prejudice
12  dismissed with prejudice, and that's what I'm signing.
13  If you want to have some side agreement that you're
14  going to the MDL that's fine, if you want to have a
15  side agreement, but that's not going to be in my order.
16  MR. WEISS: Your Honor, I agree with you. I
17  only wanted to bring to your attention the discussions
18  that went back and forth this morning, and Merck has
19  been very reasonable as Mike Ferrara said in working
20  things out. It was a request they made and lawyers --
21  plaintiffs' lawyers thought it was not an unreasonable
22  request, and that's how it came up. I know your
23  concerns.
24  THE COURT: I don't think this is going to
25  wind up being a big issue because whatever you want to

**Page 54 — Monthly Management Meeting 5/19/05**

1  do can be done. It was just a question of semantics
2  and style. It is not a question of -- and I think it
3  is more than that. I think it is more than semantics
4  and style from my point of view, but the bottom line is
5  you can still accomplish what you want to accomplish
6  without me, okay?
7  MR. BUCHANAN: We understand, your Honor.
8  THE COURT: Class action people stay and
9  anybody who wants to participate in the iMED issue --
10  MR. BUCHANAN: Do you want to start with
11  Local 68 matters?
12  THE COURT: Yes. What do we have?
13  MR. BUCHANAN: I think both sides are a
14  little disappointed that we didn't make more progress
15  in terms of document production over the last month. I
16  certainly don't fault Mr. Judd. He has been
17  cooperative and provided me with information in the
18  last week or two in terms of the timing problems and
19  potential impediments to producing the documents that
20  we have requested, but by way of background we
21  requested documents in early March in connection with
22  the class cert motion that we have. There's -- I don't
23  know, there's three or four requests that we tried to
24  prioritize to see if we can expedite those, but that
25  was only last week after Jeff and I had an opportunity

**Page 55 — Monthly Management Meeting 5/19/05**

1  to talk about the timing problems. Plaintiffs are
2  concerned about delaying it any longer and don't intend
3  to.
4  We would like to the extent possible counsel
5  maybe can work with us on this to get all the documents
6  they have responsive to three, four and seven, I think,
7  Jeff, those were the ones I prioritized with you. If
8  we can get those by the end of next week we'll file our
9  papers two weeks from that Friday. We're not going to
10  take a deposition without a full production from them,
11  and we'll rely on the records hopefully.
12  THE COURT: Any problem with that production?
13  MR. JUDD: Unfortunately, the way that the
14  productions are obtained, frankly, makes that a little
15  difficult to do subjectwise. We can move custodians
16  because what we're doing and really by necessity have
17  to do it this way is as we identify individuals or
18  departments who were reasonably likely to possess
19  responsive documents we go and sweep documents but
20  sweep them broadly because in many cases there are
21  overlapping discovery requests. For instance, names
22  that come up in our investigation are the subject of
23  individual document demands already in the PI cases,
24  names like Dr. Silverstein and Dr. Goldberg, for
25  instance, and so we go actually -- Dechert goes and

**Page 56 — Monthly Management Meeting 5/19/05**

1  sweeps an individual completely and then that starts a
2  process to identify, you know, privilege documents and
3  documents that are completely irrelevant to VIOXX
4  matters, but what happens is at the end of the day each
5  custodian may have a variety of subject matters within
6  their collection and as a practical matter we have to
7  process that at one time, and we're really not able to
8  at that point in the process identify responsive
9  documents by the subject matter that's in the subpoena
10  and pull those out and move those to the head of the
11  line. The entire custodial collection gets processed
12  and Mr. Barnett can tell you in far greater detail what
13  all is involved with that, but it takes a number of
14  weeks to get all of the various processing of a
15  custodian's collection done, at which point it is
16  transferred to O'Melveney, and we are looking at the
17  custodian's collection and identifying responsive
18  documents from that.
19  Bottom line, when we have to produce the
20  entire custodian collection that's what gets processed
21  and produced as opposed to a subset, which may be
22  responsive to the engineers' subpoena, and it is,
23  frankly, that process itself which is causing the
24  delay.
25  At the last conference I sat here and said

```
                                                        57
                Monthly Management Meeting 5/19/05
 1   that I thought we would be able to produce documents by
 2   5/13, and that was my error. I thought I had spoken
 3   with everyone. I thought I had understood everything
 4   that I needed to know in order to make that
 5   undertaking, and I made a mistake.
 6            THE COURT: Now, what time frame can you have
 7   it done in?
 8            MR. JUDD: I'm actually going to turn that
 9   over to the Dechert folks.
10            MR. BARNETT: David requested -- or Mr.
11   Buchanan had requested a schedule sort of upcoming
12   productions in terms of New Jersey productions and
13   engineers, and I don't know how that accords, Dave,
14   with what you have requested.
15            MR. BUCHANAN: I don't know either. I mean,
16   I don't know what these people were responsible for.
17   There's a list of, you know, a dozen or so people,
18   maybe more, 15, that they have gathered documents for
19   in connection with the engineers' matter. The
20   production rolls out until mid July.
21            THE COURT: That's way too long.
22            MR. BARNETT: In Mr. Judd's defense, given
23   the volume of documents that we're dealing with not
24   only for the products liability litigation but for
25   engineers and other matters we have huge number of
```

```
                                                        58
                Monthly Management Meeting 5/19/05
 1   folks that are doing this. Right now in order to speed
 2   up the engineers' production we have effectively an
 3   entire review center in Philadelphia that is working
 4   solely on engineers. It is a substantial number of
 5   custodians. It is a substantial number of documents.
 6   I sent an e-mail this morning asking to get some sort
 7   of estimate with what we were looking at so I can tell
 8   Mr. Buchanan, and I'm still waiting to get that back.
 9            What we can try to do is maybe caucus with
10   Mr. Judd and Mr. Buchanan and look at this schedule,
11   and if there are particular custodians that we have got
12   on this schedule that would be potentially responsive
13   to his request we can try to alter this batting order
14   and try to move people up so that it doesn't have an
15   impact on the briefing schedule that Mr. Buchanan has
16   outlined.
17            MR. BUCHANAN: This is just you can just see
18   some of these are pretty generic topics, and,
19   obviously, completeness is ideal. I don't think it is
20   realistic right now based on what I have heard. I
21   can't ascribe fault. I don't think that's productive
22   at this point. The three that I think I put in a
23   square, your Honor, are the ones that I suggested to
24   Mr. Judd in a telephone conference that we prioritize.
25   Three, four and seven.
```

```
                                                        59
                Monthly Management Meeting 5/19/05
 1            THE COURT: You got two, three, four and
 2   seven?
 3            MR. BUCHANAN: Two is actually a second
 4   traunch. That was training materials. But three, four
 5   and seven were ones that I hoped we would have in our
 6   hands with sufficient time to analyze for our reply
 7   brief.
 8            MR. JUDD: And I believe that specifically on
 9   the three, four and seven categories the productions
10   that we're looking at 5/27 and 6/2 I can't represent is
11   going to be the universe of responsive documents in
12   those three categories, but it is my understanding, and
13   I can say this very -- with a high degree of certainty,
14   that the production on 5/27 at least the Wisman, in
15   particular, has many of the most responsive documents
16   in those documents, as well as on 6/2 the U.S. Medsa
17   category referring to formulary dossiers and
18   communications with managed care entities.
19            So I think in large part we have attempted to
20   respond to the conference that Mr. Buchanan and I had
21   to try to move up those categories of departments and
22   custodians that have those documents that Mr. Buchanan
23   has identified as most important, but I can say without
24   qualification that that will not be exhaustive, that
25   there will be other custodians, other departments that
```

```
                                                        60
                Monthly Management Meeting 5/19/05
 1   have some responsive documents.
 2            I think that's the best I can say at this
 3   point. What I can do, though, is do what Mr. Barnett
 4   suggests and look more closely at the balance of these
 5   and see if there are any below the 6/2 schedule that we
 6   could move up that would, you know, that would give us
 7   a better coverage for those three categories that
 8   Mr. Buchanan has identified.
 9            MR. BUCHANAN: Your Honor, there is a concern
10   that is difficult for me to articulate because I have
11   the utmost respect for defense counsel and also for the
12   Federal Court, Judge Fallon, who is hearing the MDL
13   proceedings. My concern, and it is supported by some
14   filings for the defense here, is that the production
15   delays are less, say, technical and procedural and more
16   technical associated with a desire to allow the MDL
17   class action to catch up, and, in fact, in a filing
18   with the Federal Court defense counsel here invited
19   Judge Fallon to hear class certification issues
20   relating to engineers and the quote, which is puzzling
21   to me, and I wouldn't presuppose why Judge Fallon would
22   do that here given how advanced this proceeding is and
23   how long the class cert motion has been on file. The
24   quote is, "two courts," meaning this court and the MDL
25   court "should not be hearing identical cases brought by
```

## Page 61 — Monthly Management Meeting 5/19/05

1  the same counsel on behalf of identical claimants.
2  Merck respectfully submits that these nationwide
3  classes, particularly the class certification questions
4  presented thereby should be heard by this MDL court."
5  I don't know how that invitation could be extended to
6  Judge Fallon, particularly given the posture of this
7  particular litigation being as advanced as it is, and I
8  wouldn't presume to know how he would respond to that
9  request, but I'm concerned about the delay on
10 production requests that was served on March 3rd.
11        THE COURT: How many custodians do you have?
12        MR. BUCHANAN: There's probably 30 on the
13 list, your Honor. I'm not sure how many go into the
14 categories of four and seven.
15        THE COURT: How many documents are we talking
16 about?
17        MR. BARNETT: I'm trying to get an estimate.
18        MR. JUDD: I know it is well in excess of
19 several hundred thousand at least swept documents, see,
20 but, again, one of the things that --
21        THE COURT: Are these custodians of records
22 that have already been reviewed?
23        MR. BUCHANAN: No.
24        THE COURT: These are all different people.
25        MR. BUCHANAN: These are all different

## Page 62 — Monthly Management Meeting 5/19/05

1  people.
2        MR. BARNETT: If I could just respond to what
3  Mr. Buchanan said, until he had read that statement I
4  quite frankly, obviously, counsel to Merck I was
5  unaware that that position had been taken. The issues
6  that have existed as to production at least to my
7  knowledge are in no way tied to any sort of a strategic
8  position that Merck may be taking with the MDL, and I
9  think Mr. Judd was quite kind in assuming some
10 responsibility for the projected production dated, but
11 the reality is a lot of the delay has just been the
12 fact that you have got two firms who for the first time
13 are working together for production issues and there
14 was confusion as to who needed to talk to who and that
15 sort of thing. It was examples sort of
16 miscommunication and potentially some
17 misunderstandings. It was not a deliberate device to
18 sort of slow down production in favor of the MDL. That
19 is not the case at all.
20        THE COURT: Well, I need a deadline, and I
21 need a deadline that's not July. I need an earlier --
22 much earlier deadline than that. I need to know if you
23 need another two weeks, another three weeks and then
24 you can produce it, but I'm not going to delay these
25 things.

## Page 63 — Monthly Management Meeting 5/19/05

1        MR. BARNETT: You want a firm deadline for
2  the entire engineers' production?
3        THE COURT: For the production of three, four
4  and seven.
5        MR. MAYER: And just to -- I think what
6  Mr. Buchanan said is he understands that may not be
7  complete, but he wants --
8        MR. BUCHANAN: I don't need to prove my case
9  on a class cert matter. I get my reasonable
10 inferences. The documents don't need to be all of
11 them. If you can identify -- do your best job to
12 identify the people who you think have the most
13 responsive material, and I would really like to get
14 that super expedited so that we're not so --
15        THE COURT: We want three, four and seven
16 produced as quickly as possible. I mean, that's what I
17 want, and I want -- maybe we should be looking at
18 reducing the number of custodians.
19        MR. BUCHANAN: That's fine. I can't pick
20 them because I don't know them.
21        MR. JUDD: Well, as I indicated, your Honor,
22 we're already on track, I think, to produce the lion's
23 share of documents responsive to three, four and seven
24 by June 2nd, but I can't make that representation.
25        THE COURT: That would be as to all these

## Page 64 — Monthly Management Meeting 5/19/05

1  custodians.
2        MR. JUDD: With respect to those who are
3  listed down through 6/2. What I'm saying is those
4  custodians that are listed for production on 5/27 and
5  6/2 based on what I know about the documents that --
6        THE COURT: Let me see it.
7        MR. JUDD: -- that were swept from them, and
8  the departments -- it is my belief that certainly less
9  than 100 percent, how much less I don't know, but that
10 a substantial quantity of the documents that are
11 focused in those requests three, four and seven will be
12 produced by 6/2.
13        Now, the problem that I have is I can't sit
14 here and look at the remainder of the custodians and
15 identify them in the abstract. I need to talk to some
16 other people to say are there any others that we might
17 have to move up in the cue because they're reasonably
18 likely to have very responsive documents.
19        What I don't want to do is be in a position
20 of being accused of sandbagging counsel because there
21 may be relatively few documents in one of the
22 custodians' that's currently scheduled for a later
23 production date, which may be important. I don't know
24 that because I haven't looked at the documents yet.
25 But I don't want to be in a position of making a

## Page 65

Monthly Management Meeting 5/19/05

1  representation about what it is that can be produced by
2  6/2 because I don't know what's in the balance of the
3  custodian's documents, and that's the problem I face is
4  that until we look at them and that takes a lot of time
5  I just don't know, but based on what I know about the
6  people.
7      THE COURT:  5/19 are these two individuals on
8  the list?
9      MR. BUCHANAN:  The 5/19 folks, your Honor,
10 are people who were general witnesses in New Jersey as
11 I understand the chart.
12     MR. BARNETT:  That's right.
13     MR. BUCHANAN:  Where it says for New Jersey
14 those are productions that are being done for the
15 general product liability claims.  The engineers
16 parenthetical is for those --
17     THE COURT:  First thing that's due is 5/27?
18     MR. JUDD:  Correct.
19     THE COURT:  And they're one, two, three, four
20 custodians.
21     MR. JUDD:  Correct.
22     THE COURT:  Do we know if those custodians
23 are the ones who are most likely to have the most
24 records?
25     MR. JUDD:  I can sit here today and say that

## Page 66

Monthly Management Meeting 5/19/05

1  Wisman has many what we have seen are the most
2  responsive documents in those three categories.  I can
3  also sit here today and say in the next traunches these
4  June 2nd traunches the U.S. Medsa has substantial
5  amount of a very -- the most responsive documents to
6  three, four and seven.  The communications -- sales
7  communications to managed care entities.
8      MR. BUCHANAN:  Is there any way to push up
9  the 6/2 production?
10     MR. JUDD:  I don't know.  I have to.
11     MR. BUCHANAN:  I was surprised to read the
12 statement in your submission to Judge Fallon concerning
13 the desires or intents with respect to this action, and
14 I don't want to slow this down.  We have waited a long
15 time, and to the extent you guys can accommodate some
16 accelerated production of the 6/2 production we can get
17 our brief in two weeks after we get the documents, your
18 Honor.
19     THE COURT:  So you want to do deps following
20 this?
21     MR. BUCHANAN:  No, your Honor.  For purposes
22 of this motion -- I mean, it is not a trial.  We do get
23 our reasonable inferences.  The documents are fine.
24 Without a complete production I'm afraid it would be an
25 incomplete deposition and not particularly worthwhile.

## Page 67

Monthly Management Meeting 5/19/05

1      MR. JUDD:  We have issues, you know, putting
2  up a deponent without having a complete production
3  first anyway.
4      MR. BUCHANAN:  I suspected that would be your
5  position.
6      MR. BARNETT:  Your Honor, again, just to be
7  clear, the decisions that are driving the production,
8  which, frankly, we're working with Mr. Judd's firm on a
9  daily basis, I have no tie in with whatever, was
10 submitted to Judge Fallon.  Secondly, I can talk to the
11 production people and see if there is a way to move up
12 those productions, but at some point it just becomes a
13 question of what is humanly possible.  We have already
14 devoted one -- we have two review centers, one in New
15 York and one in Philadelphia, and the one in
16 Philadelphia is focused solely right on engineers and
17 trying to get it produced as quickly as possible.  Even
18 if I went back today and said we have got this deadline
19 we need to hire 50 or 100 more contract lawyers by the
20 time I get them trained in a sufficient way that they
21 can actually be helpful in the process we would be on
22 that deadline.
23     MR. BUCHANAN:  Are there any people we can
24 pull -- are there some people like KMDR and PLC that's
25 on this as a line item can we push that back to

## Page 68

Monthly Management Meeting 5/19/05

1  facilitate the engineers' production?
2      MR. BARNETT:  I'm happy -- I mean I can step
3  out now and try to reach the production folks that I
4  work with and see if we rejuggle the order whether that
5  will allow us to move things up and I'll be happy to do
6  that.
7      MR. BUCHANAN:  Are there particular groups
8  in the 6/2 traunches, Mr. Judd, that you think would be
9  the hottest priority that we can get the week earlier?
10     MR. JUDD:  I need to look at the list.  I can
11 tell you that the two, four, six different departments
12 there are at least in the aggregate what I would say
13 all of them comprise the, you know, the juiciest stuff,
14 the most responsive stuff.
15     THE COURT:  The June 2nd production?
16     MR. BUCHANAN:  How about switching the June
17 2nd production for the 5/27 production?
18     MR. JUDD:  I suspect -- it is my
19 understanding that everything from 5/27 is in the
20 pipeline, and everything for 6/2 is behind it and that
21 it's -- I just don't even think it is possible as a
22 practical matter to put a hold on 5/27 and move 6/2
23 ahead of it.  I mean, this really is a linear process,
24 as I understand it.
25     And I just want to say for the record, your

### Page 69

Monthly Management Meeting 5/19/05

1  Honor, and Mr. Barnett can attest to this, I have been
2  very vocal with co-counsel with Dechert about
3  expediting this and moving ahead, and I have been very
4  aggressive trying to get this moved forward, and I'm
5  satisfied that Dechert is doing what is possible within
6  the existing structure, which is substantial for
7  producing documents. You know, if you're interested
8  Mr. Barnett can tell you about a very substantial
9  enterprise that does nothing other than process and
10 produce documents in huge quantities, and I'm not happy
11 with what I have been told, but I'm satisfied that they
12 have pulled out whatever stops can be pulled out, and
13 for weeks now my team in San Francisco has been
14 conferring and trying to expedite --
15       THE COURT: But we have been getting
16 documents faster than that in the past.
17       MR. BUCHANAN: My sense is there are other
18 things that got prioritized.
19       THE COURT: This is what I want you to do is
20 make a phone call and find out how quickly -- what's
21 the last possible date they can move up June 2nd. The
22 June 2nd -- it looks like the June 2nd production is
23 the key production. Of course, we have got May 27, so
24 we're only talking about --
25       MR. HETRICK: It is a week.

### Page 70

Monthly Management Meeting 5/19/05

1        MR. BUCHANAN: Honestly, your Honor.
2        THE COURT: Mr. Buchanan really wants to
3  spend Memorial Day weekend doing this.
4        MR. BUCHANAN: We'll be reviewing the 5/27
5  one first. I think it is going to come in waves.
6        MR. BUCHANAN: So we can start getting
7  whatever they have ready immediately. This is one of
8  those things, too, your Honor, that has been dragging
9  for a while.
10       THE COURT: This is what I'm going to say.
11 You can produce them by June 2nd, but I want them all
12 produced by June 2nd in those top categories.
13       MR. BARNETT: For the ones listed for
14 production?
15       THE COURT: For 5/27 and June 2nd everything
16 has to be produced by June 2nd, and I don't want to
17 hear any reason why you couldn't do it. All right?
18 And then the briefs will be due. Plaintiffs' briefs
19 will be due two weeks from June 2nd.
20       MR. BUCHANAN: Can we have the Friday of that
21 week?
22       THE COURT: What date is that?
23       MR. BUCHANAN: June 17th.
24       THE COURT: How long do you need for their
25 briefs?

### Page 71

Monthly Management Meeting 5/19/05

1        MR. BUCHANAN: They're done.
2        MR. JUDD: Unless you're going to invite a
3  surreply.
4        MR. BUCHANAN: There will be no invitation on
5  a reply brief for surrebuttal.
6        THE COURT: June 17th that would be the last
7  brief, and then we'll schedule a hearing. Okay? Shall
8  we do that now?
9        MR. BUCHANAN: I'm happy to do it now.
10 That's going to be a busy month with expert discovery.
11 I would rather fix it in connection with the trial case
12 that you're familiar with. I would just as soon fix it
13 and plan other things around it.
14       THE COURT: How long are you expecting it to
15 take, this hearing?
16       MR. JUDD: Well, let me say first of all that
17 I don't know if Mr. Buchanan is intending on supporting
18 his reply brief with any additional experts or
19 anything.
20       MR. BUCHANAN: We have spoken to one. I'm
21 not sure. It depends on what is in the documents we
22 get. If we do I would be happy to make them available
23 for you for a deposition and coordinate that, and we'll
24 make sure it is within a week after June 17th. I'll
25 check his vacation schedule. If we don't use them we

### Page 72

Monthly Management Meeting 5/19/05

1  don't use them.
2        MR. JUDD: I'm looking at my calendar.
3  Please bear with me.
4        MR. BUCHANAN: I would think, your Honor,
5  just based on past experience with class certification
6  arguments that each side when there's a factual record
7  like there is in this case could probably spend an
8  hour.
9        MR. JUDD: I was going to say an afternoon, I
10 think, on a calendar, a three-hour block.
11       MR. BUCHANAN: A three hour block would
12 probably be sufficient. We don't intend to proffer
13 live testimony. I don't know if you do.
14       MR. JUDD: That would not be our -- you know,
15 typically we would not. All right. So we'll
16 reschedule it for what does June 28 look like?
17       MR. BUCHANAN: That's a great day for me.
18 Tuesday.
19       MR. JUDD: My only concern is if we do have a
20 deposition to take.
21       THE COURT: You should be able to get it done
22 between June 17th and June 28th.
23       MR. JUDD: I know we can get the deposition
24 done, but it may raise issues that we want to research
25 or develop something that we want to talk about at the

### Page 73 — Monthly Management Meeting 5/19/05

1 hearing, and I don't want to be hamstrung that I have
2 only got a day or two days to do that. Could we do it
3 the following week?
4     MR. BUCHANAN: That's a vacation week for me.
5 I would prefer to try and accommodate your request to
6 get our expert's deposition between the 20th and 22nd.
7     MR. JUDD: Could we do it on the 30th?
8     MR. BUCHANAN: That's fine for me if it works
9 for the Court.
10    THE COURT: What day of the week is that?
11    MR. BUCHANAN: Thursday the 30th.
12    MR. LIEVERMAN: And, frankly, your Honor, we
13 would prefer it as well even though it is not our
14 motion we very much want to attend.
15    THE COURT: All right. I need to look at the
16 calendar to see if the 30th is okay. I can get back to
17 you on that. Tentatively if I don't have something
18 else. Chris, why don't you check -- we may have HRT
19 scheduled or Accutane. We have been doing them on
20 Thursdays.
21    THE COURT: We'll go with June 30th then.
22    MR. BUCHANAN: Either is fine for us.
23    MR. JUDD: Being a west coaster can we do the
24 afternoon?
25    THE COURT: 1:30 June 30th. Mr. Buchanan,

### Page 74 — Monthly Management Meeting 5/19/05

1 submit an order with those dates.
2     MR. BUCHANAN: I'll submit an order.
3     THE COURT: You got June 2nd for all record
4 production for the items that are listed for 5/27 and
5 June 2nd. Keep it as 5/27 and June 2nd two
6 productions. June 17th for your brief you'll produce
7 if you need to produce an expert report you'll produce
8 it by June 17th, also.
9     MR. BUCHANAN: It will accompany the brief,
10 and we'll make our expert available the following week.
11    THE COURT: And June 30th -- at 1:30 on the
12 30th.
13    MR. LIEVERMAN: On the Klineman class action
14 for the individual consumers we don't really have any
15 issues to bring up today. We have been conferring with
16 Merck's counsel on discovery that concerning our motion
17 for class certification which had been filed. We will
18 work through those issues, and if we have a problem
19 we'll present to it the Court for expeditious
20 resolution, and, otherwise, I think we're good to go.
21    THE COURT: Okay. So we can deal with it at
22 the next management meeting or if you have an issue
23 that comes up before then that you want resolved call
24 my secretary and we can schedule you to come in or just
25 do it by phone.

### Page 75 — Monthly Management Meeting 5/19/05

1     MR. LIEVERMAN: That would be fine.
2     THE COURT: So if there's something you want
3 me to resolve -- anything else we need to do other than
4 the iMED argument?
5     MR. BUCHANAN: I had one question, Mr. Judd,
6 and that is related to the reproduction of documents.
7     MR. JUDD: Yes. I'm sorry. I was traveling
8 and got hung up yesterday. I will give you some
9 designation -- I'll get those to you tomorrow.
10    MR. BUCHANAN: That's perfect. That works
11 fine. You also indicated in your agenda there would be
12 production of new documents on the 23rd in conduction
13 with engineers.
14    MR. JUDD: That's the one that's been pushed
15 to the 27th.
16    MR. BUCHANAN: I see. Okay. I think that's
17 it on class action issues, your Honor.
18    THE COURT: Okay. And then the last issue we
19 have to address is the production of iMED.
20    MR. BARNETT: Right.
21    MR. BUCHANAN: Right.
22    MR. BARNETT: Your Honor, there's been,
23 obviously, two rounds of briefing on this, so I'm sure
24 your Honor is familiar with the issues, so I won't go
25 over them in detail, but based on the records of the

### Page 76 — Monthly Management Meeting 5/19/05

1 two rounds of briefing there's unrebutted evidence that
2 the national production that the plaintiffs are seeking
3 of iMED would place a substantial burden on Merck and
4 is not balanced by the limited information available on
5 iMED that isn't otherwise -- has already been produced
6 and which will be produced in the FACTS production.
7     You have got the affidavit attached to our
8 original from Terry Jacklin, who was involved in doing
9 the FACTS productions and sample of a database that
10 that was developed for Merck not for litigation
11 purposes. The FACTS --
12    THE COURT: There's a problem with that now
13 though FACTS is what you're working out technically.
14    MR. BUCHANAN: I think we have been working
15 out the technical issues.
16    MR. BARNETT: That's certainly -- we stand by
17 our -- you know, we, obviously, will produce what we
18 have agreed to produce in FACTS and to the extent
19 there's problems they will be resolved, but it gives
20 you sort of firsthand experience the complexities
21 involved in trying to basically extract data from a
22 nonlitigation database.
23    In any event, the request on iMED really
24 includes two databases; one is iMED and its predecessor
25 MESA. It is going to take from Miss Jacklin's estimate

### Page 77

Monthly Management Meeting 5/19/05

1  it is going to take anywhere from two to four months to
2  do. It will involve four Merck IS employees
3  effectively working full time on this project, and,
4  unfortunately, they're going to be the same folks who
5  have been working on FACTS presumably will be spending
6  time not only cleaning up the FACTS production to the
7  extent it needs to be done, but, also, dealing with the
8  supplemental FACTS production that we, obviously, need
9  to move on, and at the end of the day it is going to
10 cost Merck in excess of $90,000 to do this.
11      And the problem with all that is it is a
12 limited universe of information that exists in iMED
13 that relates to VIOXX and roughly 10 percent of the
14 data on iMED and MESA relate to VIOXX; the rest of it
15 has nothing to do with VIOXX, and somehow if we are
16 forced to do the production we're going to have to be
17 able to pull that data out and not produce the stuff
18 that would be relevant in the litigation.
19      As Miss Jacklin indicated in the affidavit 95
20 percent of the data that's in iMED and MESA is in
21 FACTS, and, therefore, it is a small sliver of data
22 that would, in fact, be produced or would be
23 nonduplicative, and there seems to be no reason why we
24 would have to duplicate data that has been produced or
25 which will be produced in the FACTS production, and

### Page 78

Monthly Management Meeting 5/19/05

1  given the large cost to Merck in terms of time and
2  resources and money for that small amount of data our
3  view is no production from iMED is warranted.
4       If you view the matter differently and feel
5  like the plaintiffs are entitled to some form of
6  production our view is it ought to be done the same way
7  that FACTS was done, that there's no reason for us to
8  produce data related medical educational programs that
9  occurred in Albuquerque which no prescribing physician
10 in New Jersey ever attended or participated in, and to
11 that extent if there is an iMED production to be done
12 it ought to be limited to the same sort of prescribers
13 and the office mates of prescribers in which hasn't
14 been previously produced in the FACTS production.
15      THE COURT: Okay.
16      MR. BUCHANAN: Your Honor, I think it is
17 important in thinking about this database or this
18 database and its predecessor database to understand how
19 it differs from FACTS first of all. This database
20 tracks medical education programs, okay. They're
21 called educational programs. Not all of them are
22 accredited educational programs. They're primarily
23 promotional programs. It tracks thought leaders. It
24 tracks Merck advocates. It tracks those people on a
25 national basis and on a regional basis. It talks about

### Page 79

Monthly Management Meeting 5/19/05

1  what they're saying, what the programs are. They're
2  speaking on the slide sets they use and the evaluation
3  of their performance relative to those slide sets.
4       There's substantial information that relates
5  to the information that from the top down Merck
6  advocates, thought leaders, national and regional are
7  disseminating to physicians everywhere, okay? This is
8  the Merck message. This is one of the primary ways --
9  okay, there's certainly sales representatives that
10 communicate with physicians. There's also the Merck
11 message that comes down on high and filters down, and
12 you saw our references in our brief to a cascade
13 approach. That's what it is. The advocates get
14 information. They're influential people. They affect
15 regional advocates. They affect thought leaders, and
16 their job is to convey Merck's message, consistent with
17 Merck's message. We have attached documents to our
18 papers, and the focus, again, is on the message, the
19 focus is on these people were they conveying Merck's
20 message, what was Merck's message through the thought
21 leaders, not just relative to the label, okay, not just
22 relative to what the label said and what the sales
23 representatives were allowed to say or not allowed to
24 say relative to the label or physician, what are they
25 PIR's -- they call them professional information

### Page 80

Monthly Management Meeting 5/19/05

1  requests, the formal Merck statement, what was going
2  out through the advocates? What was going out
3  national?
4       As your Honor was, aware Peter Holt was an
5  advocate for Merck. He was out there talking about
6  VIOXX. The company got in trouble for it. The company
7  got a warning letter related to Peter Holt's
8  activities. I think it was a relatively unprecedented
9  occurrence. At Merck at least several witnesses have
10 said that. That's the speaker program. That's the
11 advocate program. There's evaluations, and, frankly,
12 Merck distanced themselves from Peter Holt. They said
13 he was off the reservation. He wasn't our guy, okay?
14 Well, they have got a database that tracks the guys who
15 weren't their guys. They have got a database that
16 tracks the Peter Holts and what they're saying and
17 whether it is on message or off message, how the
18 audience received it. They also list who attended,
19 okay? They list the physicians who attend these
20 things. They might list the name of Merck
21 representatives who might attend these things.
22      In that respect there's a prescribing
23 physician element to it, okay? I concede that.
24 There's 10 attendees from around the country who attend
25 programs that Merck sponsors around the country, and

```
                                       81
            Monthly Management Meeting 5/19/05
 1   that's documented in this database, as well. There's
 2   the overlap, okay? I don't see anything in the FACTS
 3   database that we have received, it is 95 percent
 4   overlap that's been discussed that talks about the
 5   compensation for the advocates that talks about the
 6   message they're communicating, the script, the slide
 7   sets, all that information.
 8        Now, having said that, if there's duplication
 9   I don't need it twice. Plaintiffs don't need it twice.
10   There's complexity of these databases. I concede that.
11   We worked with it. We have gotten them up and running
12   in several instances, but we don't need the same data
13   twice, but we definitely need it, and what I hear the
14   argument being saying let's throw the baby out with the
15   bath water because we have already done a piece of this
16   before we shouldn't have to do it at all.
17        THE COURT: Why don't we addresses that.
18   What is wrong with producing your 10 percent that
19   relates to VIOXX that hasn't already been produced
20   before? Isn't that what you're saying 10 percent of it
21   relates to VIOXX?
22        MR. BARNETT: 10 percent of iMED and MESA
23   relate to VIOXX.
24        THE COURT: So you eliminate 90 percent of
25   the database.
```

```
                                       82
            Monthly Management Meeting 5/19/05
 1        MR. BARNETT: But that -- in effect, that in
 2   and of itself is a huge undertaking because
 3   particularly for MESA where most of the VIOXX
 4   information is because it was --
 5        THE COURT: What's the transfer year?
 6        MR. BARNETT: 2003. Most of the data related
 7   to VIOXX is going to be in MESA, and there is a free
 8   text field that exists in MESA that doesn't exist in
 9   iMED, and that basically requires a manual review for
10   people to go through and see if there's anything, you
11   know, does it relate to VIOXX, does it relate to other
12   Merck drugs. It has to be reviewed. It is an
13   extremely burdensome process, and my understanding, and
14   I appreciate that we don't want to do duplication, that
15   makes perfect sense, but my understanding was the
16   request was to go nationally with this production, and,
17   again, the question is if, in fact, you know, absent
18   some indication under New Jersey prescribing physician
19   attended one of these conferences why would there be an
20   obligation to produce that data? Whether cascading
21   was -- whether sending out Merck's message or not,
22   whether they wanted to try to cascade it with these
23   thought leaders, if there's no indication that a
24   particular physician heard that message it is not
25   relevant in the lawsuit, and it would be burdensome for
```

```
                                       83
            Monthly Management Meeting 5/19/05
 1   us to produce that.
 2        THE COURT: If that's your argument you're
 3   not going to win on that argument because that argument
 4   goes to admissibility really not the relevance of trial
 5   as opposed to potentially relevant information.
 6        MR. BARNETT: But respectfully that was the
 7   same issue that was considered regarding the FACTS
 8   database where that issue was thoroughly briefed and
 9   discussed by the parties, and your Honor made a
10   decision saying, you know, I don't think you should
11   have to produce all this information if there's no tie
12   in to the prescribing physician. Same situation exists
13   here. The fact that Peter Holt may have gone off
14   message, unless there's a prescribing physician that
15   heard the message that Peter Holt was or was not
16   delivering there's no indication that that ultimately
17   just drove that doctor's decision to prescribe VIOXX
18   for her patients.
19        MR. BUCHANAN: I'll make the relevancy
20   argument. I think it is pretty clear if Merck has --
21   if Merck has an advocacy group or a speaker program
22   that encourages people to say something other than what
23   the FDA has authorized Merck to say either on label or
24   otherwise they have got a problem. It is a general
25   problem. It is not a problem specific to a case. It
```

```
                                       84
            Monthly Management Meeting 5/19/05
 1   is a problem that applies to all cases. I mean, that
 2   is a pattern of failing to warn or going contrary to
 3   the warnings that I think we're entitled to develop
 4   certainly in the discovery phase.
 5        There are two aspects to this motion, though,
 6   your Honor. There is the scope, should we get all of
 7   the records in the database. Well, I agree, 10 percent
 8   of the records I'll accept their representation 10
 9   percent of the records concern VIOXX. How did they
10   figure that out? You know how they do that? There's a
11   field that talks about the product that that particular
12   program was about. That's the only way you can come up
13   with that calculation. That's the way databases work.
14   It would be incredible to contend, I think, that the
15   MESA database doesn't even have a field that reflects
16   that the program was associated with a particular Merck
17   product. I submit, your Honor, the way they figured
18   out that 10 percent related to VIOXX was they searched
19   that particular field, and they found that how many
20   medical programs related to VIOXX. That's 10 percent.
21        Now, if they want to review that 10 percent
22   to say, well, certain aspects of this relate to other
23   products, well, that's, you know, your Honor has
24   allowed them to do that, but that's a burden that I
25   think they're assuming and shouldn't be a justification
```

85

Monthly Management Meeting 5/19/05

1  to defeat production of the database in the first
2  instance.
3      Getting back to the broader question, not
4  just the 10 percent issue should it be a national
5  production, in other words, should they be required to
6  produce information about the programs they sponsored,
7  the speakers who spoke with them, the compensation to
8  those speakers, that's information that's nowhere in
9  FACTS should they be required to provide us that
10 information regardless of whether a prescriber actually
11 sat in that meeting or whether a prescriber from --
12 whether a physician in that prescriber's office
13 actually attended that meeting?
14     Your Honor, we're in a very different place
15 today in this litigation than we were back in
16 September. Maybe it was July of last year, I think,
17 when we argued the FACTS motion. We had some 300
18 cases, maybe not even that many, maybe 180. There are
19 now 1,800 -- 1,800 cases here, and I'll tell you, it is
20 a lot more work I have to think to go through and fish
21 through every prescribing physician in those 1,800
22 cases to see if they're in the FACTS database or iMED
23 and all the other physicians in their office and go
24 through that whole process to figure out specifically
25 what records we should be entitled to than to review

86

Monthly Management Meeting 5/19/05

1  the entirety of them.
2      Now, it is a very different situation today
3  than it was a year ago as it relates to the scope of
4  this litigation. The burden they're contending exists
5  with respect to the production of this the $90,000,
6  they're now 1,800 cases here. They're getting the
7  benefit of consolidated discovery in this action as it
8  relates to this database. They're not having to do
9  this in multiple jurisdictions around the country. If
10 they do it here undoubtedly they'll make it available
11 to Judge Fallon's litigants in the federal proceedings.
12 There's really just no reason to parse this thing
13 because even if it is true that there's this physician
14 element and who attended the specific programs there's
15 this much broader impact here. We quoted several
16 aspects of the cascade approach, but, you know, the
17 behavioral objectives for advocates were to educate
18 other thought leaders and prescribers on Merck's
19 scientific platform through a cascade approach, top
20 down, message communicating grass roots, whatever you
21 want to call it, and expand access to VIOXX by
22 influenced managed care formularies, another issue that
23 has some relevance in the broader litigation that's
24 before your Honor.
25     It is very clear that the information that's

87

Monthly Management Meeting 5/19/05

1  contained in the database reflects more -- has greater
2  relevance than simply the attendance of a particular
3  prescriber and a particular products liability claim
4  case as compared to the broader litigation. I mean, I
5  do think that the burden argument, which is really the
6  only real argument here, $90,000, 1,800 cases that are
7  currently litigating in this compared to the burden
8  that they're not telling you about of going through and
9  searching for the prescribing physician and the
10 prescribers and the prescribing physicians' office in
11 1,800 cases. I mean, that has got to be more of a
12 burden than reviewing the entirety of the thing and
13 producing the entirety of the thing.
14     The other thing that's important is -- well,
15 I'll stop at that, your Honor. I think from a burden
16 perspective the data can be unloaded relatively
17 cleanly. What they did with FACTS is they combined a
18 lot of different tables, and they ran into some
19 technical issues and we're trying to view it. I'm told
20 it is not a technical issue, it is our lack of
21 understanding on the plaintiffs side, and that can be
22 resolved with some communication, but other databases
23 that were produced by the defendants, the CTS database
24 you're familiar with there was a lot of discussion
25 about the complexity of that database, and it contained

88

Monthly Management Meeting 5/19/05

1  clinical trial data from 200 something trials, dozens
2  and dozens and dozens of tables. That data was
3  unloaded from the corporate database, big Oracle thing,
4  unloaded, put on a tape and sent to us within two days
5  of the Appellate Division denying the appeal. There
6  was no processing of the data.
7      They searched for VIOXX clinical trials.
8  They unloaded it and they gave it to us. They can
9  search for VIOXX medical programs, unload the data and
10 give it to us. If they choose to further process the
11 data that's a choice, okay, and that's not something
12 that should be used in support of a burden argument as
13 to why we shouldn't get it. That's all I have, your
14 Honor.
15     THE COURT: Anything else?
16     MR. BARNETT: Yes. I think it is important
17 to remember that there are no two databases the same
18 and that the fact that we were able to do effectively a
19 data dump for CTS doesn't necessarily mean doing a
20 production of iMED would be as simple as Mr. Buchanan
21 suggests, and to that point, you know, when you set the
22 original briefing schedule for the databases you said
23 very specifically that you wanted specific evidence as
24 to the burden that would be imposed by doing this, and
25 we took your instructions very seriously. We got the

**89**
Monthly Management Meeting 5/19/05

1  affidavit. We have given estimates in terms of time
2  and the money involved and what we have from the
3  plaintiffs is a generic declaration that doesn't
4  reflect any sort of familiarity with this specific
5  system, and instead arguments that this should be very
6  relatively easy to do. The evidence of the record
7  makes clear it won't be, and it will be exceedingly
8  costly for Merck to do.
9      There's a significant issue between
10 identification of fields and extracts of those fields.
11 It may be easy to identify in a field structure what
12 are the VIOXX records. It is a wholly different matter
13 to try to extract those out into a new database and to
14 review them and to produce them. Moreover, it is clear
15 from the volume of exhibits that have been attached to
16 the plaintiffs' oppositions they have these documents.
17 They have a document reflecting who was on a speaking
18 program and who was paid. They have a lot of what they
19 claim that they need, and they have it both in the
20 custodial productions as well as the fact that they
21 have the FACTS production, and the information as far
22 as attendees and speakers if the plaintiffs don't
23 already have it that's what we have agreed to produce,
24 and that will be produced. My understanding is that
25 was produced, and if there are issues as to the

**90**
Monthly Management Meeting 5/19/05

1  production, you will have that information.
2      THE COURT: That information is useless. The
3  speakers and the attendees, unless you know what was --
4      MR. BARNETT: What?
5      THE COURT: That's useless information
6  without the rest of the information, isn't it?
7      MR. BARNETT: Such as.
8      THE COURT: The speakers and the attendees
9  you're saying --
10     MR. BARNETT: Right. I mean, if the question
11 is what -- if a prescribing physician spoke at a
12 conference they will have that information. If they're
13 trying to find out whether a prescribing physician
14 attended conferences they will have that information,
15 as well, and they can develop their arguments about
16 whether these prescribing -- the decisions by those
17 physicians were driven by the Merck message or the
18 cascade system that they cite in their brief.
19     THE COURT: How can they do that without
20 knowing what the Merck message was?
21     MR. BARNETT: We have produced substantial
22 marketing materials which reflect clearly what the
23 Merck message was.
24     MR. BUCHANAN: Your Honor, just to deal first
25 of all with the burden issue, Miss Frederickson we

**91**
Monthly Management Meeting 5/19/05

1  submitted her declaration. She reviewed the testimony
2  of Terry Jacklin and others, as well as a certification
3  confirmed that the platform that the databases were in
4  was a database platform that could be readily unloaded
5  in a similar manner in which the other database
6  productions have been done. Data could be searched,
7  and that was confirmed through deposition testimony, so
8  the power of the computers could be used to processed
9  this data expediently.
10     I submit, your Honor, this is not about
11 discovery burden it is really discovery censorship, and
12 it is trying to narrow the production in a way to
13 prejudice us, and this data -- sure we put exhibits in
14 our papers that reflected a reference that was
15 extracted from the database or information that was
16 garnered from the database. That's a small sliver of
17 the entire data set that's composed in each of these
18 systems. I just don't see -- there's not a strong
19 relevancy challenge, and there's not a strong burden
20 challenge, and absent that the database should be
21 produced.
22     THE COURT: All right. The Court finds that
23 the database should be produced. How long is it going
24 to take you to produce it? It appears to me that the
25 only argument that you have is that it is burdensome,

**92**
Monthly Management Meeting 5/19/05

1  and it is not that relevant, but the Court finds that,
2  in fact, under the liberal rules of New Jersey
3  discovery it may be relevant or it may lead to relevant
4  information, and I think it is appropriate that it be
5  produced. It is limited to VIOXX material, so you're
6  only talking about 10 percent of the databases. And
7  you don't have to copy if you can sort it out anything
8  that you have already provided.
9      MR. BARNETT: In the FACTS production or
10 otherwise?
11     THE COURT: As long as it is the identical
12 thing. If it is in FACTS and in this don't produce it
13 twice.
14     MR. BUCHANAN: Your Honor, the one thing I
15 would ask if there's going to be that type of
16 reconciliation between the two productions they provide
17 some way for us to reconcile it, as well.
18     THE COURT: It might be easier for you to
19 produce it and let them sort it, but if you want to
20 produce it go ahead.
21     MR. BARNETT: All right.
22     THE COURT: How long do you think it is going
23 to take you? I hate to throw that into the mix right
24 now.
25     MR. BARNETT: The estimates from Miss Jacklin

```
                                                        93
              Monthly Management Meeting 5/19/05
 1   were anywhere from two to four months, so I think at
 2   this point I would rather not commit to a date today.
 3   I would rather be able to go back and figure out
 4   consistent with the discussion about the FACTS
 5   production previously what it is that we can do and the
 6   time frame for doing that.
 7           THE COURT: Why don't you contact your people
 8   and deal with your people, find out the time. Start it
 9   right away, and, hopefully, I'm hoping by July 1st
10   you'll be able to have it. That's two months.
11           MR. BUCHANAN: That would still provide us
12   with the ability to use it at trial.
13           MR. BARNETT: Again --
14           THE COURT: At this point July 1st -- did I
15   say July 1st? That will be the tentative date, but if
16   you need more time, you know, let me know, but we're
17   talking about still at this point an August 1st trial
18   date, and they have to have time to look at it and show
19   it to people, so July 1st is probably the time frame
20   we'll need. All right?
21           MR. BARNETT: Thank you, your Honor.
22           MR. BUCHANAN: I think that's the agenda.
23           (End of proceedings.)
24
25
```

```
                                                        94
                     C E R T I F I C A T I O N


    I, REGINA A. TELL, C.S.R., C.R.R., License Number
30X100161000, an Official Court Reporter in and for the
State of New Jersey, do hereby certify the foregoing to
be prepared in full compliance with the current
Transcript Format for Judicial Proceedings and is a
true and accurate compressed transcript to the best of
my knowledge and ability.


                          _____05-23-05
                          Regina A. Tell, CSR-CRR
                          Official Court Reporter
                          Atlantic County Courthouse
                          Mays Landing, New Jersey
```