FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2005 OCT 21 PH 3: 10

LORETTA G. WHYTE
CLERK

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 05-4046* | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| EVELYN IRVIN PLUNKETT | * | |
| as Personal Representative of the Estate of | * | |
| RICHARD IRVIN, JR., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MERCK & CO., INC.'S MEMORANDUM REGARDING VIOXX SCIENCE ISSUES

Defendant Merck & Co., Inc. ("Merck") respectfully submits this memorandum outlining the principal science issues relating to Vioxx®.

## I.   INTRODUCTION.

These multidistrict cases assert claims for personal injuries, medical monitoring, and economic losses arising from the use of Vioxx, a prescription nonsteroidal anti-inflammatory pain reliever developed, manufactured, and marketed by Merck.   The Food and Drug

___ Fee
___ Process
_X_ Dktd
___ CtRmDep _____ 789199v.1
___ Doc. No.

Administration ("FDA") approved Vioxx for sale in the United States on May 20, 1999.  The drug belonged to a new generation of anti-inflammatory drugs designed to deliver effective relief from inflammation and pain with lower risk of potentially severe gastrointestinal side effects associated with earlier anti-inflammatory pain relievers.  Vioxx gained widespread acceptance among physicians treating patients with arthritis and other conditions causing chronic or acute pain.

Merck voluntarily withdrew Vioxx from the market on September 30, 2004 when interim unblinded data from a long-term, randomized placebo-controlled clinical trial, known as the APPROVe[1] study, indicated that continuous daily use of Vioxx for longer than 18 months might increase the risk of cardiovascular thrombotic events such as myocardial infarctions (heart attacks), although the difference did not become statistically significant until at least approximately 30 months into the study.  Prior placebo-controlled clinical trials had not shown any such risk, either for short-term or long-term use of Vioxx.  The voluntary withdrawal has prompted many new lawsuits against Merck and has generated a great deal of negative and misleading publicity.  The facts, however, do not support plaintiffs' claims.  Throughout the relevant period, as information about the cardiovascular safety of Vioxx became known, Merck promptly and candidly disclosed that information to the FDA, the medical and scientific communities, and the public at large.  As discussed below, the scientific and medical evidence does not show that Vioxx caused plaintiffs' alleged injuries or exposed plaintiffs to increased risk of future injuries.

---

[1] "APPROVe" stands for Adenomatous Polyp Prevention On Vioxx. The study sought to assess whether Vioxx could help prevent the recurrence of precancerous colon polyps, and in fact, the recently compiled efficacy data from the study indicate a potential benefit.

## II.   MERCK.

Merck is a leading global pharmaceutical company headquartered in New Jersey.  More than 100 years old, Merck is well known in the industry for its commitment to rigorous scientific research.  The company's research arm, Merck Research Laboratories, employs thousands of scientists.  Over the years, Merck has developed numerous innovative medicines and vaccines, addressing the needs of patients with AIDS, cancer, high cholesterol, diabetes, river blindness, and many other diseases.

## III.   NON-STEROIDAL ANTI-INFLAMMATORY DRUGS.

Vioxx (known generically as rofecoxib) belongs to a class of pain relievers called non-steroidal anti-inflammatory drugs ("NSAIDs").  This class includes many familiar medications sold either over the counter – such as Advil® (ibuprofen) and Aleve® (naproxen) – or by prescription – such as Daypro® (oxaprozin) and Voltaren® (diclofenac).  Like aspirin, itself sometimes classified as an NSAID, traditional NSAIDs work by inhibiting cyclooxygenase (COX), an enzyme that stimulates synthesis of prostaglandins, chemicals in the body that promote inflammation and pain.  As the name implies, the class does not include anti-inflammatory corticosteroids, and it does not include drugs like Tylenol® (acetaminophen), which reduce pain but not inflammation.

Traditional NSAIDs have long been a mainstay of treatment for patients needing relief from chronic or acute inflammation and pain associated with osteoarthritis, rheumatoid arthritis, and other conditions.  Unfortunately, this relief does not come without significant adverse side effects.  Most notably, because prostaglandins also protect the stomach lining, traditional NSAIDs greatly increase the risk of gastrointestinal perforations, ulcers, and bleeds ("PUBs").  This is particularly true when they are taken at the high doses often necessary to address severe chronic or acute inflammation and pain.  Before the development of new generation NSAIDs

789199v.1

like Vioxx, scientists estimated that NSAID-induced PUBs caused more than 16,500 deaths and 100,000 hospitalizations annually in this country.[2]

In the early 1990s, scientists discovered that the COX enzyme had two forms, now called COX-1 and COX-2, which appeared to have several distinct functions. Scientists believed that, among other functions, COX-1 mediated the synthesis of prostaglandins responsible for protection of the stomach lining, while COX-2 mediated the synthesis of prostaglandins responsible for pain and inflammation. This led to a hypothesis that "selective" NSAIDs designed to inhibit COX-2, but not COX-1, could offer the same pain relief as traditional NSAIDs, but with greatly reduced risk of fatal or debilitating PUBs.[3] Scientists also hypothesized that such drugs might prove beneficial for the prevention or treatment of other conditions, such as Alzheimer's disease and certain cancers, where evidence suggested that inflammation may play a causative role.

In the wake of these scientific developments, Merck and several other pharmaceutical companies undertook to develop such drugs, which became known as "selective COX-2 inhibitors" (also known as "coxibs"). This new generation of NSAIDs includes not only Vioxx, but also Pfizer's Celebrex® (celecoxib) and Bextra® (valdecoxib), as well as several other coxibs not yet approved for sale in the United States.

## IV.     THE DEVELOPMENT AND FDA APPROVAL OF VIOXX.

As the Court is aware, the FDA extensively regulates the process of bringing prescription drugs to market in this country. Before a manufacturer can sell a new drug, the FDA must approve it as "safe and effective" for its indicated uses. 21 U.S.C. §§ 355(d), 393(b)(2)(B). The

---

[2] Wolfe, MM et al., *Gastrointestinal Toxicity of Nonsteroidal Anti-inflammatory Drugs*, N. ENGL. J. MED. 1999;340:1888-98.

[3] *See* Vane J, *Towards a Better Aspirin*, NATURE 1994;367:215-16.

4

FDA also closely regulates the drug's labeling – that is, the detailed information for prescribing physicians concerning the characteristics, risks, and benefits of the drug.  21 U.S.C. § 352(n).  If, as often occurs, new information about risks and benefits comes to light from ongoing studies or post-marketing experience, the FDA must approve any labeling changes needed to reflect such new information.  *See* 21 C.F.R. § 2314.70.

Typically, the process of bringing a new drug to market requires extensive preclinical laboratory and animal studies followed by a phased program of randomized clinical trials in humans.  Phase I trials assess the drug's safety in healthy volunteers, and Phase II and III trials assess safety, efficacy, and recommended dosages for target patient groups.  The FDA reviews the proposed program of clinical study and then examines all of the accumulated preclinical and clinical data in determining whether to approve the drug as safe and effective for its proposed uses.

Vioxx was no exception.  Merck studied Vioxx for over five years before submitting its New Drug Application (NDA) to the FDA.  Merck's submission included data from over 55 Phase I, II, and III studies involving over 8,000 patients exposed to Vioxx or comparators for periods up to 86 weeks.  The data compared the safety and efficacy of Vioxx against both placebo (*i.e.*, look-alike pills with no active ingredients) and traditional NSAIDs (predominantly ibuprofen, diclofenac, and nabumetone). Notably, none of these comparison studies revealed a statistically significant difference in the rate of myocardial infarctions (heart attacks) or cerebrovascular accidents (strokes).

The FDA reviewed Merck's submission for six months and also convened an Advisory Committee of outside experts to review the data and make a recommendation.  In April 1999, the Advisory Committee concluded that Vioxx had a favorable risk/benefit profile that warranted

approval.  On May 20, 1999, the FDA approved Vioxx as safe and effective for treatment of osteoarthritis pain, primary dysmenorrhea (menstrual pain), and acute pain.  In April 2002, after reviewing data from additional controlled studies, the FDA approved Vioxx as safe and effective for treatment of adult rheumatoid arthritis pain.  In 2004, the FDA further approved Vioxx for treatment of migraine headaches and juvenile rheumatoid arthritis pain.

## V.   CARDIOVASCULAR SAFETY DATA BEFORE FDA APPROVAL.

Neither the pre-approval clinical trial data described above nor prior published clinical trial data on traditional NSAIDs gave any indication that Vioxx might increase the risk of heart attacks.  Indeed, some scientists hypothesized that selective COX-2 inhibitors might reduce the risk of such events because inflammation can play an important role in bringing them about.[4]

At the same time, Merck understood that selective COX-2 inhibitors did not share the cardioprotective properties of aspirin.  Scientists have long known that aspirin, by inhibiting COX-1 activity in blood platelets, inhibits synthesis of thromboxane, a prostaglandin that facilitates platelet aggregation (clotting) and constriction of blood vessels.  For this reason, many physicians advise heart patients to take a daily low-dose aspirin as a cardioprotective measure.  By suppressing synthesis of thromboxane, aspirin effectively "thins" the blood, reducing the risk of a heart attack.  Studies conducted during Vioxx development confirmed that Vioxx, designed to inhibit COX-2 but not COX-1, does not inhibit clotting or affect bleeding time relative to placebo.  Accordingly, the drug's FDA-approved labeling noted that "VIOXX is not a substitute for aspirin for cardiovascular prophylaxis."[5]

---

[4]  *See, e.g.*, Ridker PM et al., *Inflammation, Aspirin and the Risk of Cardiovascular Disease in Healthy Men*, N. ENGL. J. MED. 1997;336:973-79.

[5]  *See* Vioxx Label No. 9183800 dated May 1999, attached as Ex. 49 to the Declaration of Phillip A. Wittmann in Support of Merck's Motions to Exclude Evidence ("Wittmann Decl. I").

Unlike COX-1, COX-2 does not occur in platelets. Some scientists believe, however, that in blood vessel walls COX-1 and possibly also COX-2 facilitate the synthesis of prostacyclin, a prostaglandin that does the opposite of thromboxane. When produced in the vessel walls, prostacyclin inhibits clotting and encourages dilation of blood vessels.

In late 1997, as the Vioxx Phase III clinical trials neared completion, University of Pennsylvania scientist Dr. Garret FitzGerald observed in a clinical pharmacology study jointly conducted with Merck scientists that urine of patients treated with Vioxx contained lower levels of a metabolite of prostacyclin than urine of patients on placebo.

Hypothesizing that at least some of this difference reflected partial inhibition of COX-2 promoted prostacyclin synthesis in blood vessels – an assumption the urine study could neither confirm nor assess – Dr. FitzGerald raised the possibility that, if Vioxx reduced the balance of prostacyclin relative to thromboxane in the bloodstream, it might have a net prothrombotic effect.

Merck reacted to Dr. FitzGerald's research in several ways. First, in order to evaluate the potential clinical significance of any such effect – if in fact one existed – Merck reanalyzed all of its Vioxx clinical trial data. None of this data disclosed an elevated risk of thrombotic cardiovascular events for study participants on Vioxx as compared to participants on placebo or traditional NSAIDs. Second, to ensure that the FDA and its Advisory Committee could fully consider Dr. FitzGerald's research, Merck included the data from the urine study in its November 1998 NDA submitted to the FDA. Third, to ensure that the study would become available to the medical profession at large, Merck scientists and Dr. FitzGerald arranged for its

7

publication in a peer-reviewed medical journal, which accepted the study in December 1998 and published it in May 1999.[6]

Fourth, researchers at Merck Frosst laboratories conducted a series of animal studies to test Dr. FitzGerald's hypothesis that Vioxx-induced reduction of prostacyclin metabolites in urine might reflect a reduction of prostacyclin in the blood vessels. The results did not support the hypothesis. For example, in a rabbit study completed in early 1999 and later published in the peer-reviewed literature, the Merck Frosst researchers observed that COX-1, not COX-2, appeared responsible for prostacyclin synthesis in the arteries.[7]   Vioxx, which inhibits only COX-2, did not reduce arterial prostacyclin. *Id.*

Finally, Merck presented the questions raised by Dr. FitzGerald's study to an independent Board of Scientific Advisors. On the Board's advice, Merck in May 1998 initiated a standard operating procedure for independent blinded adjudication (*i.e.*, detailed medical evaluation) of all thrombotic cardiovascular events occurring in future Vioxx clinical trials. Merck adopted this procedure for the express purpose of facilitating rigorous scientific analysis, on an ongoing basis, of all competing hypotheses about potential cardiovascular risks or benefits of Vioxx.

As of May 1999, however, when the FDA approved Vioxx, the scientific and clinical data did not support a conclusion that use of Vioxx presented a clinically significant risk of thrombotic cardiovascular adverse events. Accurately reporting the results of the clinical trials,

---

[6]   Catella-Lawson F, et al., *Effects of Specific Inhibition of Cyclooxygenase-2 on Sodium Balance, Hemodynamics and Vasoactive Ekosanoids*, J. PHARMACOL. EXP. THE. 1999 May; 289(2):735-41.

[7]   Wong E et al., *Effects of COX-2 Inhibitors on Aortic Prostacyclin Production in Cholesterol-Fed Rabbits*, ATHEROSCLEROSIS 2001 Aug;157(2):393-402.

the FDA-approved prescribing information stated that heart attacks and strokes in patients taking Vioxx were among serious adverse events that "occur rarely (<0.1%), regardless of causality."[8]

## VI.   POST-APPROVAL CARDIOVASCULAR SAFETY DATA FROM THE VIGOR AND ALZHEIMER'S TRIALS.

Following the May 1999 approval, Merck continued its program of randomized, double-blinded clinical trials designed to assess the safety and efficacy of Vioxx for additional patient populations to explore whether the drug might prove beneficial in the prevention or treatment of Alzheimer's disease and certain cancers.[9]  In March 2000, Merck learned the preliminary results of the VIGOR trial, an 8,000 patient trial designed to assess the relative incidence of serious gastrointestinal adverse events in rheumatoid arthritis patients treated with Vioxx as compared to naproxen, a traditional NSAID.[10]  Over treatment periods averaging nine months, half the study patients took daily doses of Vioxx 50 mg (double the highest recommended dose for continuous use), while the other half took twice-daily doses of naproxen 500 mg (a common therapeutic dose).

The VIGOR results confirmed that patients taking Vioxx suffered significantly fewer serious gastrointestinal PUBs than patients taking naproxen.  The data also showed, however, that the naproxen group suffered significantly fewer serious cardiovascular thrombotic events – adjudicated in accordance with Merck's standard operating procedure.  Vioxx users experienced

---

[8]  *See* Vioxx Label No. 9183800 dated May 1999.

[9]  Consistent with good scientific practice, Merck conducted its Vioxx clinical trials on a blinded basis to avoid bias in the medical treatment or assessment of study participants and to maximize the integrity of the resulting data.  In a "double blinded" trial, Merck, the physician investigators, and the patients themselves do not know which patients received Vioxx and which received placebo or a comparator drug.  Only an external data safety monitoring board charged with overseeing patient safety has access to unblinded data during the course of the trial. Unless the safety monitoring board deems it necessary to terminate a trial early, Merck learns of the results of a trial only after the "unblinding" of the data at the end of the trial.

[10]  VIGOR, an acronym, stands for **V**ioxx **GI O**utcomes **R**esearch study.

789199v.1

45 such events compared to 19 events in naproxen users, with non-fatal myocardial infarctions (20 on Vioxx compared to 4 on naproxen) accounting for most of the difference. Although the additional number of events on Vioxx was not large in relation to the size of the treatment group (26 incremental events in 4,000 patients) and the confidence interval was wide, the numerical difference in events was statistically significant.

Merck quickly disclosed these cardiovascular results to the FDA and commenced an internal analysis of the possible reasons for the disparity. Merck also promptly disclosed the VIGOR results to the medical community and the public. On March 23, 2000, two weeks after it received the unblinded VIGOR data, Merck faxed a summary of the results to the FDA. On March 27, 2000 Merck issued a press release disclosing both the gastrointestinal and cardiovascular findings. Merck presented the VIGOR data at major medical conferences held in May, June, and October 2000, and Merck participated in the November 2000 publication of the VIGOR study results in the *New England Journal of Medicine.*[11] In July 2000, Merck sent the FDA a proposed label change incorporating the VIGOR results. Merck requested expedited review, but the FDA assigned Merck's labeling application a "standard" review classification and ultimately elected to convene an Advisory Committee to review all the relevant data and recommend any needed revisions.

Because VIGOR compared Vioxx directly against naproxen (an active comparator) without a placebo arm,[12] the study's results could not in themselves explain whether the disparity in cardiovascular adverse event rates reflected an increased risk associated with Vioxx, a decreased

---

[11] *See* Bombardier C, et al., *Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis*, N. ENGL. J. MED. 2000;343(21):1520-28.

[12] A placebo arm, while scientifically desirable, would have been ethically and practically problematic in a study of rheumatoid arthritis patients requiring relief from severe chronic pain.

789199v.1

risk associated with naproxen, a chance finding, or some combination of those alternatives. Analysis of the available clinical and scientific data concerning both Vioxx and naproxen persuaded Merck's scientists that the explanation most consistent with the VIGOR data was a cardioprotective effect of naproxen.

As a starting point, Merck conducted a comprehensive review of the growing body of data from randomized, controlled studies that *did* compare Vioxx against placebo. Notably, this review included data from two large-scale placebo-controlled studies underway to evaluate the effects of Vioxx on patients with Alzheimer's disease. These ongoing trials provided a large, previously unavailable dataset comparing Vioxx against placebo in an elderly patient population already at increased risk for serious thrombotic cardiovascular events. Analyses of interim data from these trials, performed in March 2000 and again in September 2000, showed no increase in cardiovascular event rates for patients on Vioxx.

In September 2000, Merck scientists and consultants also prepared a comprehensive pooled analysis of all of Merck's Vioxx clinical trial data. This analysis incorporated all available data from studies of four weeks or longer comparing Vioxx against both placebo (including the interim data from the Alzheimer's studies) and traditional NSAIDs – a dataset encompassing 23 controlled clinical trials involving over 28,000 patients representing over 14,000 patient-years of exposure. The results showed no difference between cardiovascular thrombotic event rates for Vioxx and either placebo or traditional NSAIDs *other than* naproxen ("non-naproxen NSAIDs"). Later published in the peer-reviewed journal *Circulation*,[13] this analysis also strongly supported the conclusion that the VIGOR results likely reflected a decreased risk associated with naproxen, not an increased risk of Vioxx.

---

[13] Konstam MA et al., *Cardiovascular Thrombotic Events in Controlled, Clinical Trials of Rofecoxib*, CIRCULATION 2001 Nov;104:2280-88.

At the same time, Merck scientists examined the available scientific literature and data concerning naproxen. This literature indicated that naproxen in fact has potent aspirin-like antiplatelet effects if taken continuously in the manner prescribed for patients participating in the naproxen arm of the VIGOR trial. Indeed, data from VIGOR itself indicated that the patients on naproxen experienced adverse symptoms associated with aspirin-like inhibition of platelet aggregation – such as bruising and nosebleeds – at double or triple the rates than patients on Vioxx experienced such symptoms.[14] Further, an earlier study conducted by Merck scientists and consultants showed that among the traditional NSAIDs ibuprofen, diclofenac, and naproxen, *only* naproxen taken at 500 mg twice daily – the dosage in VIGOR – inhibited platelet activity across its entire dosing interval to nearly the same degree as aspirin.[15]

Merck provided all of this data to the FDA, which convened an Advisory Committee in early February 2001 to consider the results of the VIGOR study. The committee concluded that the VIGOR cardiovascular results could not be generalized, and recommended further study. The committee also noted the importance of VIGOR's unambiguously favorable gastrointestinal results, which no other coxib had demonstrated (or has since demonstrated) in a controlled clinical trial.

Later in February 2001, Merck submitted a supplemental NDA requesting FDA approval of Vioxx for treatment of rheumatoid arthritis pain in adults. In June 2001, in response to FDA

---

[14] Bombardier C et al., *Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis*, N. ENGL. J. MED. 2000; 343(21):1520-28.

[15] Van Hecken A et al., *Comparative Inhibitory Activity of Rofecoxib, Meloxicam, Diclofenac, Ibuprofen and Naproxen on COX-2 and COX-1 in Healthy Volunteers*, J. CLIN. PHARMACOL. 2000;40:1-12. As in the case of aspirin, the effect derives from inhibition of COX-1 activity in platelets and consequent suppression of thromboxane synthesis. Unlike aspirin, however, traditional NSAIDs do not persistently inhibit platelet activity at low and discontinuous doses, and the effect depends on the dosage and continuity of exposure to the particular NSAID. Therefore, the protective effect in a clinical trial, where compliance with a dosage regimen is high, is likely to be greater than in everyday use which is more sporadic.

789199v.1

follow-up requests, Merck updated its pooled analysis of Vioxx clinical trial results to incorporate data available from additional recently completed trials or extensions of trials. Merck's scientists and consultants updated the pooled analysis again in 2002 and published the data in the *American Heart Journal* in 2003.[16] The data continued to show no difference in the cardiovascular event rates between Vioxx, placebo, and non-naproxen NSAIDs.

In April 2002, after conducting a detailed review of the updated data, the FDA approved Vioxx as safe and effective for treatment of adult rheumatoid arthritis. The FDA also approved labeling changes incorporating the VIGOR gastrointestinal data, the VIGOR cardiovascular data, and the interim results of the two large Alzheimer's trials. The revised label included a precaution advising physicians that the "significance of the [VIGOR and Alzheimer's cardiovascular data] is unknown," but also advising them to consider the data and to exercise caution when using Vioxx in patients with a medical history of ischemic heart disease.[17]

Merck continued through this period, in coordination with other researchers, to investigate the hypothesis that Vioxx might encourage thrombosis by reducing prostacyclin levels in the blood vessels. As noted above, whereas Dr. FitzGerald had found that inhibition of COX-2 reduced the level of prostacyclin metabolites in urine, researchers at Merck Frosst laboratories observed in a rabbit study that COX-1, not COX-2, appeared responsible for prostacyclin production in the blood vessels.[18] In a canine study, the Merck Frosst researchers found that prostacyclin synthase, another enzyme involved in producing prostacyclin, was locally associated with COX-1 rather than COX-2 in the blood vessels, again suggesting that

---

[16] Weir MR et al., *Selective COX-2 Inhibition and Cardiovascular Effects: A Review of the Rofecoxib Development Program*, AM. HEART J. 2003;146:591-604.

[17] *See* Vioxx Label No. 9183810 dated April 2002, attached as Ex. 48 to Wittmann Decl. I.

[18] Wong E et al., *Effects of COX-2 Inhibitors on Aortic Prostacyclin Production in Cholesterol-Fed Rabbits*, ATHEROSCLEROSIS 2001 Aug;157(2):393-402.

789199v.1

COX-1 rather than COX-2 is responsible for prostacyclin production in the blood vessels.[19]  And in an arm laceration study conducted on human volunteers, outside researchers observed that Vioxx did not reduce the level of prostacyclin in the blood at the site of the injury.[20]  These researchers similarly concluded that COX-1, not COX-2, appears to be the source of prostacyclin in the blood vessels.  *Id.*

All of these results cast serious doubt on Dr. FitzGerald's assumption that Vioxx, which inhibits COX-2 but not COX-1, would decrease prostacyclin production in human arteries.  In an article co-authored in September 2004 immediately prior to Vioxx's withdrawal, Dr. FitzGerald himself stated that "there is currently little evidence in humans to support a prothrombotic effect for coxibs."[21]  To this day, the origin of COX-2 dependent systemic prostacyclin remains unestablished, and the effect of selective COX-2 inhibition on the balance of prostacylin and thromboxane in human vasculature remains unclear.

Merck also continued to investigate the hypothesis that naproxen has cardioprotective effects.  Although retrospective epidemiological studies have provided predictably mixed conclusions because of the inability to control for non-continuous use (*see supra* n.18), three such studies, all published in 2002, found that naproxen reduced the risk of cardiovascular

---

[19]  Singer II et al., *COX-1 Is the Major Isoform of Cyclooxygenase Co-Localized with Prostacyclin Synthase in Normal Dog Aortic Endothelium*, INFLAMM. RES. 2003; 52:588, IS/18 (abstract).  This study also found that prostacyclin synthase *was* locally associated with COX-2 in lung cells, suggesting that Vioxx-induced reduction of urinary prostacyclin metabolites may reflect reduced prostacyclin production in the lungs.  *Id.*

[20]  Tuleja E et al., *Effects of Cyclooxegenases Inhibitors on Vasoactive Prostanoids and Thrombin Generation at the Site of Microvascular Injury in Healthy Men*, ARTERIOSCLER. THROMB. VASC. BIOL. 2003 Jun 1;23(6):1111-15.

[21]  Patrono C and FitzGerald G et al., *Platelet-Active Drugs:  The Relationships Among Dose, Effectiveness, and Side Effects*, CHEST September Supplement 2004;234S-265S at 246S.

789199v.1

events.[22]  A peer reviewed study published in 2004 confirmed the result of Merck's 2000 study that naproxen has potent anti-platelet effects comparable to aspirin.[23]  And again Dr. FitzGerald, writing in 2004, acknowledged that such effects, in combination with the play of chance, could explain the VIGOR findings: "[w]hile the cause of the apparent excess risk of MI in [VIGOR] cannot be conclusively established, a combination of some cardioprotective effect of naproxen and the play of chance does seem to offer a plausible explanation for these unexpected findings."[24]

Finally, in response to FDA requests, Merck continued to provide updated cardiovascular data from completed clinical trials, including the large Alzheimer's trials, which ended in 2003. The final Alzheimer's data, published in 2004 and 2005,[25] showed no difference in the rate of cardiovascular thrombotic events with Vioxx as compared with placebo.  Merck's final pooled analysis of clinical trials, completed in April 2004, encompassed up to four years of follow-up in more than 32,000 patients collectively representing over 19,300 patient-years of exposure to Vioxx and comparators.  Like the previous analyses, this analysis showed no differences in the cardiovascular risks associated with Vioxx, placebo, or non-naproxen NSAIDs.  Finally, as noted

---

[22] Solomon, et al., *Non-Steroidal Anti-Inflammatory Drug Use and Acute Myocardial Infarction*, ARCH. INT. MED. 2002;162:1099-1104; Watson et al., *Lower Risk of Thromboembolic Cardiovascular Events with Naproxen Among Patients with Rheumatoid Arthritis*, ARCH. INT. MED. 2002;162:1105-10; Rahme et al., *Association Between Naproxen Use and Protection Against Acute Myocardial Infarction*, ARCH. INT. MED. 2002;162:1111-15.

[23] Capone et al., *Clinical Pharmacology of Platelet, Monocyte, and Vascular Cyclooxygenase Inhibition by Naproxen and Low Dose Aspirin in Healthy Subjects*, CIRCULATION 2004; 109:1468-71.

[24] Patrono C and FitzGerald G, et al., *supra* n.24.

[25] Reines, S et al., *Rofecoxib: No effect on Alzheimer's disease in a 1-year, randomized, blinded, controlled study*, NEUROLOGY 2004: 62:66-71; Thal, L. et al., *A Randomized, Double-Blind, Study of Rofecoxib in Patients with Mild Cognitive Impairment*, NEUROPSYCHOPHARMACOLOGY (2005) (e-publication ahead of print).

above, the FDA in 2004 approved Vioxx as safe and effective for two additional indicated uses –

migraine headaches and juvenile rheumatoid arthritis pain.

## VII.   CARDIOVASCULAR SAFETY DATA FROM THE APPROVE TRIAL.

After learning the VIGOR results in March 2000, Merck evaluated the possibility of

conducting a clinical study specifically designed to assess the cardiovascular effects of Vioxx.

The purpose of such a study would be to confirm what the data from the ongoing Alzheimer's

trials suggested and Merck scientists believed – that Vioxx would be similar to placebo in the

rate of cardiovascular thrombotic events in a controlled clinical trial.   The contemplated study

raised ethical concerns, however, because in a population that required pain relief, the patients in

the placebo arm would receive no pain medication.   Alternatively, in a healthy population that

did not require pain relief, the patients in the Vioxx arm would receive no benefit from the

medication.

Ultimately, in consultation with the FDA, Merck designed a study protocol for systematic

analysis of adjudicated cardiovascular safety data from three large scale, long-term, placebo-

controlled trials designed to assess the utility of Vioxx in the prevention and treatment of colon

or prostate cancer.   Confident of the drug's safety, Merck had begun the first of these trials,

known as APPROVe, back in February 2000.   Designed to assess whether Vioxx could help

prevent the recurrence of precancerous colon polyps, APPROVe was a blinded, randomized,

placebo-controlled clinical trial supervised by an external safety monitoring board.   Under the

study protocol, Merck had no access to interim data unless the board chose to disclose them in

carrying out its duties.   On September 23, 2004, with the study nearing completion, the external

safety monitoring board recommended that Merck terminate the study early in light of interim

data the board had received the preceding week.   The interim data indicated that, after 18 months

of continuous daily use, study participants on Vioxx 25 mg began to experience a gradually

16

increasing rate of confirmed adverse cardiovascular events as compared to study participants on placebo. This difference did not become statistically significant until most patients in the study had completed approximately 30 months of continuous Vioxx use.

Notably, the data showed no difference in the rate of adverse cardiovascular events in the first 18 months of use, a result consistent with – and confirming of – the findings of Merck's previous clinical trials of Vioxx against placebo and non-naproxen NSAIDs.[26] The unexpected 18-36 month findings, however, raised unanswered questions about the cardiovascular risk profile of Vioxx when used on a continuous long-term basis. The reasons for the APPROVe result are not understood, and the biological mechanism involved – if indeed there is one – has not been identified.

Merck believed that it could permissibly have continued to market Vioxx with appropriate disclosure of this new information. But because the data raised questions and alternative therapies were available, Merck concluded at that time that it would best serve patients' interests to withdraw Vioxx from the market. Merck voluntarily withdrew Vioxx on

---

[26] In the last several years, a handful of retrospective observational studies have claimed to detect the existence of cardiovascular risks associated with less than 18 months of continuous use. The purported findings of these studies are inconsistent with other retrospective observational studies that have detected no such risks, and are, in some cases, statistically insignificant, poorly supported, and internally inconsistent. Perhaps most important, these retrospective observational studies conflict with the overwhelming weight of the clinical trial evidence, including APPROVe. As all scientists recognize, randomized, controlled clinical trials are more reliable than observational studies. *See* Fed. Judicial Ctr., *Reference Manual on Scientific Evidence* 338 (2d ed. 2000). Retrospective observational studies, by contrast, can never eliminate the possibility that purported findings reflect confounding differences in the unrandomized groups under observation. While such studies have potential utility for hypothesis formulation and particularized inquiries such as the potential causes of unique or unusual events, they have little or no utility for determining causation of common events, like heart attacks or strokes, with many possible causes.

September 30, 2004.[27]   Over the next several months, Merck scientists and consultants completed the collection of the APPROVe data and in February 2005 published it in the *New England Journal of Medicine*.[28]

## VIII.   THE FDA'S SPECIAL ADVISORY COMMITTEE PROCEEDINGS ON COX-2 INHIBITORS.

The scientific evidence concerning the potential effects of selective COX-2 inhibition on cardiovascular events remains unsettled.   To cite but one example, in August 2004 – shortly before Merck voluntarily withdrew Vioxx from the market – Dr. Peter Bogaty published a peer reviewed study of the effects of prolonged selective COX-2 inhibition on inflammation and endothelial function in patients with ischemic heart disease and high levels of C-reactive protein (CRP).[29]   The study found that prolonged selective COX-2 inhibition attenuated CRP levels and did not impair endothelial function, providing a rationale for exploring possible *clinical benefits* of selective COX-2 inhibition in patients with ischemic heart disease.   *Id.*[30]

On February 16-18, 2005, the FDA convened Special Advisory Committee hearings to obtain recommendations on future regulatory treatment for the entire class of selective COX-2

---

[27] Merck also stopped the other two ongoing placebo-controlled studies (VICTOR and ViP), which were examining the potential benefit of Vioxx in treating and preventing colon and prostate cancer.   Preliminary data, which Merck presented to the FDA Special Advisory Committee in February 2005, indicate that the number of CV events in both studies was small. In ViP (the larger of the two studies), no difference was observed between Vioxx and placebo. In VICTOR, more events were observed in the Vioxx arm than in the placebo group, but the interim results do not demonstrate a statistically significant increase in risk from short-term use.

[28] Bresalier RS et al., *Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial*, N. ENGL. J. MED. 2005;352 (11) 1092-102.

[29] Bogaty P et al., *Impact of Prolonged Cyclooxygenase-2 Inhibition on Inflammatory Markers and Endothelial Function in Patients with Ischemic Heart Disease and raised C-Reactive Protein: A Randomized Placebo-Controlled Study*, CIRCULATION 2004;110: 934-939.

[30] Likewise, recent animal studies support the hypothesis that selective COX-2 inhibition with Vioxx could play a role in deterring early atherosclerosis.   Burleigh ME et al., *Cyclooxygenase-2 Promotes Early Atherosclerotic Lesion Formation in ApoE-Deficient and C57BL/6 Mice*, J. MOL. CELL. CARDIOL. 2005 Sep.;39(3):443-52.

789199v.1

inhibitors. The Committee consisted of leading scientists and clinicians in the relevant fields from throughout the country. During its hearings, the Committee scrutinized the entire existing body of scientific research on coxibs, including the final APPROVe data and more recently unblinded data from long-term, placebo-controlled trials involving Celebrex and other coxibs. The Committee also examined available data on traditional NSAIDs, and heard presentations from scientists, physicians, pharmaceutical companies, government regulators, and members of the public.

The Committee concluded that, while selective COX-2 inhibitors do pose cardiovascular risks, they also provide sufficient benefit to warrant their continued sale and use. The Committee's action also emphasized that: (a) all prescription drugs pose some risks, and treating physicians must, therefore, assess the potential benefits and risks of any recommended course of treatment for each patient individually; and (b) coxibs have received far more scientific study than traditional NSAIDs, and the relative risks of traditional NSAIDs are not thoroughly understood; and finally (c) a majority of the Committee believed that Vioxx could be once again made available for prescription.

On April 6, 2005, FDA's Center for Drug Evaluation and Research issued a "Decision Memorandum" setting forth a comprehensive analysis of the available data on coxibs and traditional NSAIDs in support of the regulatory actions the agency had decided to take.[31] This Decision Memorandum was based on an analysis of all of the data provided to the February 2005 Advisory Committee as well as additional data available only to the FDA, including the entire regulatory histories and data contained in the NDA files and post-marketing databases for all NSAIDs. Scientists across nearly a dozen Divisions and Offices of the FDA participated in this

---

[31] April 6, 2005 FDA Memorandum, attached as Ex. 50 to Wittmann Decl. I.

789199v.1

comprehensive review and analysis.  *See* April 6, 2005 FDA Memorandum at 3.  Among the

FDA's principal conclusions were:

- *No evidence of short term risks:*  Short-term use of coxibs and traditional NSAIDs to relieve acute pain, particularly at low doses, does not appear to confer an increased risk of adverse cardiovascular (CV) events.  Decision Memorandum at 2.

- *Uncertain evidence long term risks due to lack of replication and lack of basis for reliable estimation:*  While data from APPROVe and a similar long-term clinical trial of Celebrex against placebo provide evidence that *both* Vioxx and Celebrex are associated with an increased risk of adverse cardiac events after long-term continuous use, long-term data from the Vioxx Alzheimer's trials and other long-term Celebrex trials "did not replicate" these results, making it impossible "to reliably estimate the absolute magnitude of the increased risk of serious adverse CV events" for these drugs.  *Id.* at 10.  Likewise, "[t]he available data do not permit a rank ordering of these drugs with regard to CV risk." *Id.* at 2.

- *Class effect for all NSAIDs except aspirin and possibly naproxen:*  Data from long-term controlled clinical trials comparing Vioxx and Celebrex with traditional NSAIDs do not clearly demonstrate that Vioxx and Celebrex confer a greater risk of serious adverse CV events than traditional NSAIDs except aspirin (for which long-term trials have shown a cardioprotective effect) and possibly also naproxen (for which the data are "not entirely consistent").  *Id.* at 10.  Therefore, "it is reasonable to conclude that there is a 'class effect' for increased CV risk for all NSAIDs pending the availability of data from long-term controlled clinical trials that more clearly delineate the true relationships."  *Id.* at 11.

- *No support for FitzGerald hypothesis:*  Low-dose aspirin (which inhibits COX-1) has not been observed to resolve any increased CV risk associated with Vioxx and Celebrex (which selectively inhibit COX-2).  Together with the overall inability to conclude that traditional NSAIDs have lower CV risk than coxibs, this casts serious doubt on the FitzGerald hypothesis that selective inhibition of COX-2 is responsible for any such increased risk.  *Id.* at 8.

- *No consistent or reliable results from retrospective studies:*  Available CV data from retrospective observational studies of coxibs and traditional NSAIDs are not consistent and often fail to reach statistical significance, reflecting differing study designs, strengths, and weaknesses.  *Id.* at 7-8.

- *Only Vioxx is clinically proven to reduce serious GI bleeding:*  As a group, coxibs reduce the incidence of GI ulcers as compared to traditional NSAIDs, but only Vioxx has been shown to reduce the risk of serious GI bleeding as compared to traditional NSAIDs.

789199v.1

- *Improved GI tolerability justifies continued availability of selective COX-2 inhibitors:* Because "[i]mproved GI tolerability of NSAIDs is an important issue from an individual patient and public health perspective," this provides "a valid rationale for maintaining a range of options in the NSAID class from which physicians and patients may choose." *Id.* at 11-12.

Based on these conclusions, the FDA determined that Celebrex had a favorable risk-benefit profile and should remain on the market. The agency also determined that it would review any proposal by Merck to resume marketing of Vioxx. *Id.* at 18.[32] Finally, although it conceded it could not reliably determine the magnitude of any increased cardiothrombotic risk suggested by long term clinical trial data, the agency concluded based on available data that any increased cardiothrombotic risk appeared to be a "class effect" common to both coxibs and traditional NSAIDs (other than aspirin and possibly naproxen). The agency accordingly determined that all NSAIDs on the market (other than aspirin), not just coxibs, should now include a warning about a possible increased risk of adverse cardiovascular thrombotic events. *Id.* at 13-16.[33]

## IX. CONCLUSION.

The recent FDA findings confirm that plaintiffs cannot scientifically substantiate their claims against Vioxx. The available data concerning cardiovascular risks associated with NSAIDs – both selective COX-2 inhibitors and traditional non-selective, NSAIDS – are very much in flux. As new information has emerged, however, Merck has always taken appropriate steps to analyze it and disclose it to the FDA, doctors, the scientific community, and the public at large. The most current and comprehensive data disclose no increased cardiothrombotic risk

---

[32] In contrast, the FDA determined that Bextra, another approved coxib, should not remain on the market. This was not, however, due to CV risks, but rather to its unique risk of fatal skin disorders coupled with a lack of demonstrated benefit over other approved coxibs. *Id.* at 17-18.

[33] *See also* http://www.fda.gov/cder/drug/infopage/COX2/NSAIDRxTemplate.pdf (standard language for required warning that, *inter alia*, "NSAIDs *may* cause an increased risk of serious cardiovascular thrombotic events") (emphasis added).

789199v.1

from use of Vioxx for less than 18 months.  One randomized placebo controlled clinical trial (APPROVe) has suggested an association between longer-term continuous use of Vioxx and increased risk of adverse cardiothrombotic events, but other randomized placebo-controlled clinical trials (Alzheimer's trials) have detected no such association.  As a whole, therefore, the data do not permit reliable estimation of the magnitude of any such long-term risk.  Further, the FDA has concluded that Vioxx poses no greater cardiothrombotic risk than other NSAIDs (except aspirin and perhaps naproxen), but that only Vioxx has demonstrated a reduced risk of gastrointestinal bleeding.  In short, the data underlying the present scientific debate concerning Vioxx and other NSAIDs do not support plaintiffs' claims.

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
4041 Essen Lane
One United Plaza, Suite 501
Baton Rouge, Louisiana 70809
Phone:  225-490-8900
Fax:      225-490-8960

Defendants' Liaison Counsel

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:      312-494-4440

And

789199v.1

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone: (202) 434-5000
Fax:    (202) 434-5029

Attorneys for Merck & Co., Inc.

789199v.1

## **CERTIFICATE OF SERVICE**

I hereby certify that the above and forgoing Memorandum Regarding Vioxx Science Issues has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 21st day of October, 2005.

_Phil Wittmann_

789199v.1