

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2005 OCT 21  PM 3: 03

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| **This document relates to** | * | |
| **Case No. 05-4046*** | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| **EVELYN IRVIN PLUNKETT** | * | |
| as Personal Representative of the Estate of | * | |
| **RICHARD IRVIN, JR.,** | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| **MERCK & CO., INC.,** | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MERCK & CO., INC.'S MOTION TO EXCLUDE
## TESTIMONY OF WAYNE A. RAY, PH.D

    Defendant Merck & Co., Inc. ("Merck"), through undersigned counsel, and pursuant to

Rule 702 of the Federal Rules of Evidence, hereby moves to exclude the testimony of plaintiff's

expert Wayne A. Ray., Ph.D.  The facts and law supporting this motion are more fully set forth

\_\_\_ Fee_____
\_\_\_ Process_____
_X\_ Dktd_____
\_\_\_ CtRmDep_____
\_\_\_ Doc. No._____

789236v.1

in the accompanying memorandum, declarations, and exhibits, which are incorporated as if fully set forth herein.

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
4041 Essen Lane
One United Plaza, Suite 501
Baton Rouge, Louisiana 70809
Phone:  225-490-8900
Fax:      225-490-8960

Defendants' Liaison Counsel

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:      312-494-4440

And

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone: (202) 434-5000
Fax:      (202) 434-5029

Attorneys for Merck & Co., Inc.

789236v.1

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Motion to Exclude Testimony of Wayne A. Ray, Ph.D. has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 21st day of October, 2005.

_Dorothy H. Wimber_

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | **MDL Docket No. 1657** |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| | * | **JUDGE FALLON** |
| **This document relates to** | * | |
| **Case No. 05-4046*** | * | |
| | * | **MAGISTRATE JUDGE KNOWLES** |
| **EVELYN IRVIN PLUNKETT** | * | |
| as Personal Representative of the Estate of | * | |
| **RICHARD IRVIN, JR.,** | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| **MERCK & CO., INC.,** | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM IN SUPPORT OF MERCK & CO., INC.'S MOTION
TO EXCLUDE TESTIMONY OF WAYNE A. RAY, PH.D.**

**I.     INTRODUCTION**

In his report, plaintiff's expert Professor Wayne A. Ray purports to offer opinions concerning three issues: (1) whether Vioxx® increased the risk of heart attacks or heart disease; (2) if so, what was the magnitude of that risk; and (3) if there was an increased risk, could it come from a use of Vioxx for less than 30 days.  In reality, Professor Ray opines on a much broader set of issues, as evidenced by the substance of his report and deposition testimony.

Professor Ray offers opinions regarding whether safer alternatives to Vioxx were available, how Merck should have acted given the knowledge he imputes to it, how Merck should have advised doctors to administer Vioxx, the failings of the FDA, the alleged bias of scientists involved in studies funded by Merck, and the "reprehensibility" of Merck's conduct.

Professor Ray's testimony should be excluded in its entirety. First, Professor Ray cannot opine on plaintiff's general causation theory – that using 25 mg Vioxx for less than 30 days can cause thrombotic cardiovascular events – because he identifies no reliable scientific evidence to support that theory. Second, he lacks reliable scientific evidence to opine that Vioxx accelerates atherosclerosis. Third, Professor Ray lacks qualifications to testify about "safer alternatives" to Vioxx, and he lacks reliable data for any such claim. Fourth, Professor Ray lacks the qualifications and knowledge necessary to opine on specific causation. Fifth, to the extent Professor Ray seeks to second-guess the FDA's decisions or question the adequacy of Merck's interactions and submissions to the FDA, such testimony is preempted by federal law. Finally, Professor Ray's views concerning what Merck *should have done* (as compared to what it was legally obligated to do) and his personal opinion regarding Merck's ethics, motives, or state of mind are not appropriate subjects for "expert" testimony.

## II.    THE LEGAL STANDARD

The admission of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

2

789237v.1

Once the proponent of the evidence proves that the offered testimony is based on sufficient facts or data, he or she must then "demonstrate that the expert's findings and conclusions are based on the scientific method and, therefore, are reliable." *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc). This process is governed by the Supreme Court's ruling in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). In *Daubert*, the Supreme Court made clear that district courts must act as gatekeepers to ensure that expert testimony is both relevant and reliable and identified the following non-exclusive factors a district court may consider in evaluating an expert's testimony: (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the theory or technique's degree of acceptance in the scientific community. *Daubert*, 509 U.S. 593-94; *Moore*, 151 F.3d at 275; *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d 603, 605-06 (E.D. La. 2003). In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) the Court explained that the overarching goal of *Daubert's* gatekeeping requirement is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."

As discussed below, Professor Ray's proposed expert testimony fails to meet these legal standards and therefore must be excluded.

## III. PROFESSOR RAY DOES NOT HAVE A RELIABLE SCIENTIFIC BASIS TO OPINE ON PLAINTIFF'S GENERAL CAUSATION THEORY.

Professor Ray asserts that "the totality of the data demonstrate to a reasonable degree of scientific certainty that short-term use [of Vioxx], even use of under 30 days, confers increased

3

[cardiovascular] risk." (Expert Report of Wayne A. Ray, Ph.D. ("Ray Report"), attached as Ex. 39 to the Declaration of Phillip A. Wittmann ("Wittmann Decl. I") at 30.) Professor Ray claims four "lines of evidence" demonstrate an increased cardiovascular risk with use of Vioxx for less than 18 months: (1) biological plausibility; (2) short-term studies of other COX-2 inhibitors; (3) data from clinical trials of rofecoxib (Vioxx) for shorter periods of use; and (4) data from epidemiologic studies for shorter periods of use. (Ray Report at 26.) But these "lines of evidence" do not support the general causation theory plaintiff espouses in this case. None shows that Vioxx use at a dosage of 25 mg for less than 30 days can cause thrombotic cardiovascular events.

   A.   No Reliable Scientific Evidence Supports Professor Ray's Assumed Theory of Biological Plausibility.

Professor Ray is "not going to offer [him]self as an expert" on pharmacological mechanisms and the issue of biological plausibility. (7/13/05 Deposition of Wayne Ray taken in *Humeston v. Merck,* Case Code No. 619 (N.J. Super. Ct. Law Div. filed Aug. 19, 2003) ("Ray *Humeston* Dep."), attached as Ex. 20 to Wittman Decl. I at 114:18-115:20.) Instead, in his report, he simply relies on the "FitzGerald hypothesis" to support his claim in this regard. (Ray Report at 26.) But that hypothesis does not constitute reliable scientific evidence.

Dr. FitzGerald hypothesized in an article published in 1999 that *if* COX-2 inhibitors reduced prostacyclin levels in blood vessels – a question his study could neither assess nor determine – then such drugs *might* promote increased clotting and, therefore, increased cardiovascular risks since they do not simultaneously interfere with the normal production of thromboxane, a known vasoconstrictor.[1] (*See generally* Merck's Memorandum Regarding Vioxx Science Issues ("Science Brief"), filed concurrently herewith, at 7.) But, as explained in

───────────────

[1] Catella-Lawson et al., *Effects of Specific Inhibition of Cyclooxygenase-2 on Sodium Balance, Hemodynamics, and Vasoactive Eicosanoids*, J. PHARM. AND EXP. THERP. 1999; 289:735–741.

789237v.1

Merck's concurrently filed Motion to Exclude Evidence of Plaintiff's Experts Regarding Causation ("Causation Testimony Brief") and accompanying Appendix of Studies, the FitzGerald hypothesis remains just that – a hypothesis. (*See* Causation Testimony Brief at 40.) Dr. FitzGerald has so stated on multiple occasions since the 1999 publication, and plaintiff's experts do not dispute that the hypothesis remains unproven. (*Id.*) In fact, at deposition, Professor Ray claimed that there are "several" plausible mechanisms by which Vioxx could increase cardiovascular risk (Ray *Humeston* Dep. at 119:14-120:8), and he identified the FitzGerald hypothesis and hypertension as equally plausible mechanisms (*id.* at 126:5-23). Ultimately, Professor Ray testified that "[he] ha[s]n't read studies and do[es]n't know enough to distinguish between the various competing mechanisms . . . ." (*id.* at 119:14-120:8.)

Plaintiff's experts are not alone in conceding that the FitzGerald hypothesis remains unproven. The FDA confirmed this fact in April 2005. After observing that selective COX-2 inhibitors were associated with an increased risk of adverse cardiovascular events, the FDA addressed the FitzGerald hypothesis:

> *It remains unclear, however, that it is the presence of, or the degree of, COX-2 selectivity that accounts for these observations, as some have hypothesized.* As noted above, in various controlled clinical trials, COX-2 selective drugs have been indistinguishable from non-selective NSAIDs (i.e., ibuprofen, diclofenac) in studies of substantial size and duration. Further, although on theoretical grounds the addition of low-dose aspirin (a COX-1 inhibitor) to a COX-2 selective drug should resolve any increased CV risk caused by COX-2 selectivity, this effect has not in fact been observed in several studies in which such comparisons are possible. *Taken together, these observations raise serious questions about the so-called "COX-2 hypothesis," which suggests that COX-2 selectivity contributes to increased CV risk.*

(April 6, 2005 FDA Memo, attached as Ex. 50 to Wittmann Decl. I at 8 (emphasis added).) The FitzGerald hypothesis remains speculative, and it cannot form the basis for Professor Ray's biological plausibility assumption.

5

B.   Short-Term Studies of *Other* COX-2 Inhibitors Do Not Constitute Reliable Scientific Evidence.

Professor Ray next points to data involving COX-2 inhibitors other than Vioxx – celecoxib, lumiracoxib, and valdecoxib/parecoxib – and asserts that "[i]t now appears that the suppression of [prostacyclin] synthesis" (*i.e.*, the FitzGerald hypothesis) "is a class effect of the coxibs"; "there also is a class effect with regard to increased risk of serious cardiovascular disease." (Ray Report at 27.) Professor Ray further identifies two placebo-controlled trials of parecoxib, in conjunction with valdecoxib, and declares that the "data *conclusively* demonstrate that the increased risk of serious cardiovascular disease conferred by a coxib can occur with very short duration of use . . . ." (Ray Report at 27.) But this "line of evidence" about drugs *other than Vioxx* cannot support Professor Ray's opinion concerning Vioxx for several reasons.

First, as set forth above, the Fitzgerald hypothesis is speculative and cannot form the basis for Professor Ray's "class effect" premise.

Second, Professor Ray opines that "plausible mechanisms . . . may vary according to the individual coxib." (Ray Report at 10.) In such circumstances, an increase in cardiovascular risk with one drug hardly means that a different drug – operating in a different way – is associated with an increased risk.

Third, the Supreme Court has held that data involving one drug cannot prove that a different drug causes harm. *See, e.g., Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 145-46 (1997) (where issue was whether PCBs caused lung cancer, rejecting studies finding increases in lung cancer deaths associated with exposure to particular type of mineral oil and not mentioning PCBs); *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1246 (11th Cir. 2005) (excluding expert's opinion that ephedrine causes vasospasms based on analogy to different drug and noting that "even small differences in chemical structure can sometimes make very large differences in

6

the type of toxic response that is produced" (internal quotation marks and citation omitted));
*Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1201 (11th Cir. 2002). Studies involving
patients taking different drugs, at different dosages and for different durations, are not a reliable
basis on which to opine that 25 mg Vioxx taken for less than 30 days has a prothrombotic effect.

  C.  No Randomized Clinical Trial Demonstrates an Increased Cardiovascular Risk
    Associated With Vioxx 25 mg Use For Less Than One Month.

  Professor Ray also claims that clinical trials show an increased cardiovascular risk with
short-term use of Vioxx, relying on Professor's Kronmal's re-analysis of Merck's clinical trial
data. (Ray Report at 27-29.) But that re-analysis, even if scientifically reliable (which it is not),
does not demonstrate that 25 mg of Vioxx can cause thrombotic cardiovascular events during the
first month of use.

  Professor Kronmal's re-analysis was conducted for purposes of this litigation; it has not
been published, and it has not been peer-reviewed by others in the field. These facts alone
render it unreliable under *Daubert*. *See, e.g.*, *Daubert v. Merrell Dow Pharms.*, 951 F.2d 1128,
1130-31 (9th Cir. 1991), *overruled on other grounds by* 509 U.S. 579 (1993) (overruling *Frye*)
("[T]he reanalysis of epidemiological studies is generally accepted by the scientific community
only when it is subjected to verification and scrutiny by others in the field. . . . Plaintiffs'
reanalyses do not comply with this standard; they were unpublished, not subjected to the normal
peer review process, and generated solely for use in litigation." (citation omitted)); *Kelley v. Am.
Heyer-Schulte Corp.*, 957 F. Supp. 873, 879 (W.D. Tex. 1997) (excluding expert testimony
based on unpublished reanalysis).

  Moreover, as explained in greater detail in Merck's *Daubert* Motion, Professor Kronmal
admits that he found *no* statistically significant proof that 25 mg Vioxx causes thrombotic
cardiovascular events during the first month of use. (Causation Testimony Brief, App. of Studies

at 4.)[2]  Professor Ray's report similarly concedes this fact.  (Ray Report at 27, 29 (recognizing that re-analysis of VIGOR and APPROVE data does not show an increased cardiovascular risk during first month of use).)

>   D.   No Reliable Epidemiologic Studies Demonstrate An Increased Cardiovascular
>        Risk Associated With Vioxx 25 mg Use For Less Than One Month.

Finally, Professor Ray identifies five epidemiologic studies that he claims support his opinion on short-term use:  (1) Solomon, (2) Johnsen, (3) Kimmel, (4) Graham, and (5) Levesque.  As explained in Merck's *Daubert* Motion, none of these retrospective observational studies is adequate to support plaintiff's general causation theory that use of Vioxx for less than a month increases cardiovascular risk.  (Causation Testimony Brief, App. of Studies at 11-12, 14, 16-18, 20-21.)  Notably, Professor Ray himself published studies in 2002 and 2005 in peer-reviewed journals based on administrative records from two different patient databases finding that "there was no evidence of a raised risk" of coronary heart disease in patients taking Vioxx "at doses of 25 mg of less" over an average of nearly one year.[3]

## IV.   PROFESSOR RAY CANNOT PROPERLY OPINE THAT VIOXX ACCELERATES ATHEROSCLEROSIS.

Professor Ray recognizes that no one has identified the mechanism by which Vioxx allegedly increases the risk of serious coronary disease.  (Ray Report at 10.)  Yet, relying on the unproven FitzGerald hypothesis, Professor Ray opines that Vioxx is capable of accelerating the

---

[2] As the Court is aware, as of the time of this filing, Merck has not had an opportunity to fully depose Professor Kronmal on his analysis.  Merck reserves the right to supplement its briefing on this issue as necessary following his deposition.

[3] Ray W et. al, *Cox-2 selective non-steroidal anti-inflammatory drugs and the risk of serious coronary heart disease:  an observational cohort study*, THE LANCET 2002: 360:1071-73; Graham D et. al, *Risk of acute myocardial infarction and sudden cardiac death in patients treated with cyclo-oxygenase 2 selective and non-selective non-steroidal anti-inflammatory drugs: nested case-control study*, THE LANCET, 2005: 365:475-481, 478.

rate of atherosclerosis. (*Id.* at 11.) But even plaintiff's other experts do not agree with this speculation. As explained above and in detail in Merck's *Daubert* Motion, the FitzGerald hypothesis is entirely speculative and scientifically unreliable. It, therefore, cannot form the basis for this acceleration opinion.[4]

## V.   PROFESSOR RAY CANNOT OPINE ON WHAT DOCTORS SHOULD PRESCRIBE TO PATIENTS.

Professor Ray also opines that there were safer alternatives than Vioxx for reducing gastrointestinal (GI) risks associated with naproxen and other NSAIDs, and that those alternatives "tipp[ed] the overall balance of benefit versus risk in favor of naproxen." (Ray Report at 15.) In particular, Professor Ray claims that "given the findings of the VIGOR study, a much less risky strategy for patients would be to use naproxen with a drug such as a PPI [proton pump inhibitor]." (*Id.*) But Professor Ray lacks both the qualifications and reliable scientific evidence necessary to support this opinion.[5]

Professor Ray is not a medical doctor; he is not a gastroenterologist, rheumatologist, internist, or other doctor who prescribes a pain reliever like Vioxx. Rather, he is an epidemiologist with a doctorate in computer science. (9/2/04 deposition of Ray taken in *Stubblefield v. Merck,* Case Code No. H-02-CV-3139 (U.S. District Court for the Southern District of Texas) at 5:14-19.) Professor Ray is not qualified to opine on the risk-benefit analysis medical doctors make when determining whether to prescribe any medication to a particular

---

[4] In his most recent deposition, Professor Ray testified that he would not offer opinions about the mechanisms by which Vioxx may increase cardiovascular risk. (Ray *Humeston* Dep. at 114:18-24.) The Court should preclude Professor Ray from opining on the acceleration theory, particularly given the absence of reliable supporting data.

[5] In addition, to the extent that Professor Ray is attempting to second-guess the FDA's decisions about Vioxx post-VIGOR, his testimony is preempted by *Buckman Co. v. Plaintiff's Legal Comm.* 531 U.S. 341 (2001). *See* Section VII, *infra.*

789237v.1

patient.   He acknowledges that he does not and cannot make decisions regarding patient treatment.

> Q: You're not a medical doctor, correct?
>
> A: That's completely correct.
>
> Q: You can't – you don't practice medicine, correct?
>
> A: No, I don't.
>
> Q: You're not licensed to practice medicine, correct?
>
> A: No.
>
> Q: You're not allowed to make medical decisions regarding the treatment of patients; is that correct?
>
> A: Regarding individual patients, I never make a decision regarding their treatment with the possible exception of myself or members of my family, of course.
>
> ….
>
> Q: Do you go to – for your own treatment, do you utilize physicians for your own medical treatment?
>
> A: Yes, I do.

(Ray *Stubblefield* Dep. at 119:7-19; 121:2-4.)  Indeed, decision-making concerning the risks and benefits of a particular medication for a particular patient lies at the heart of medical education and training; physicians balance risks and benefits of every medical treatment as applied to an individual patient.  Professor Ray is completely lacking in such training, and he cannot supplant the medical judgment of medical doctors and the thousands of physicians who, aware of the VIGOR results, continued to prescribe Vioxx.

In addition, Professor Ray has no scientifically reliable basis for his opinion that use of a PPI with naproxen, or any NSAID, would reduce the GI risk.  He cannot point to a single study that supports his theory.

10

Q: Doctor, are there any studies that you're aware of that demonstrate that use of a PPI with naproxen, or any NSAIDs for that matter, would reduce the risk of lower gastrointestinal bleeding, lower tract gastrointestinal bleeding?

A: I'm not aware of any such studies.

(Ray *Humeston* Dep. at 155:4-10.)

Professor Ray does not have the requisite training, knowledge, or experience, or a reliable scientific basis to opine about whether any patient should have been prescribed Vioxx, naproxen, or any other NSAID with a PPI.

## VI.   PROFESSOR RAY MAY NOT TESTIFY OR OPINE ABOUT MR. IRVIN OR SPECIFIC CAUSATION.

Given his lack of medical training, Professor Ray has no basis to testify about the specific cause of Mr. Irvin's death.  Indeed, his expert report is completely silent on Mr. Irvin and the cause of his death.  As Professor Ray testified in his most recent deposition in a Vioxx-related case, he does not claim to be offering opinions on specific causation:[6]

Q: Doctor, do you intend to offer any opinions in this case with respect to whether or not Vioxx was a contributing cause, the sole cause, or any cause of the cardiovascular events suffered by any individual plaintiff in the New Jersey litigation?

[objections and commentary by counsel]

A: I believe I may offer the opinion that, for any individual patient, the best data we have showed this is the probability that an event was caused by rofecoxib, but that will be based upon statistical and epidemiologic calculations from available studies, *it won't be based upon an analysis of any clinical information on the individual patient*.

(Ray *Humeston* Dep. at 241:9-242:13 (emphasis added).)  Professor Ray is therefore barred from offering any opinions or testimony concerning Mr. Irvin or specific causation.

---

[6] Plaintiff's counsel also represented that Professor Ray will not offer specific cause testimony and, on that ground, Merck agreed not to depose Professor Ray in connection with the *Plunkett* matter.

789237v.1

## VII.   PROFESSOR RAY MAY NOT TESTIFY REGARDING HIS DISAPPROVAL OF THE ACTIONS TAKEN BY THE FDA.

To the extent Professor Ray plans to testify that the availability of alternative therapies should have caused the FDA to remove Vioxx from the market after learning the VIGOR results in 2000 or that the handling of Vioxx shows "weaknesses of the present drug regulatory system in the U.S." (Ray *Humeston* Dep. at 73:15-74:8), he is doubly unqualified.  First, Professor Ray is not an expert in FDA regulatory matters.  Second, he is not entitled to supplant the judgment of the FDA in balancing the benefits and risks of drugs from the regulatory perspective. *Buckman Co. v. Plaintiffs' Legal Comm.* 531 U.S. 341, 350, 353 (2001); *see also Horn v. Thoratec Corp.*, 376 F.3d 163, 178 (3d Cir. 2004) (identifying dangers of allowing a jury to second-guess the regulatory decisions of the FDA in holding that plaintiff's claims were preempted by the FDCA).  Third, Professor Ray does not address in any meaningful way the range of considerations that would properly inform such a decision by the FDA, rendering any opinion he might offer on the subject wholly unreliable.

It is uncontroverted that the FDA never sought to restrict the availability of Vioxx after learning the VIGOR results.  (Declaration of Ned Stephen Braunstein, M.D. ("Braunstein Decl."), in Support of Merck's Motions to Exclude Evidence at ¶ 11.)  Merck provided all of the data concerning VIGOR to the FDA, and in February 2001 the FDA convened an Advisory Committee of outside experts to consider this data.  (*Id.* at ¶¶ 65, 69.)  The Advisory Committee concluded that the VIGOR cardiovascular results could not be generalized and recommended further study.  (*Id.* at ¶ 70; Arthritis Advisory Committee Meeting Minutes, dated February 8, 2001, *available at* http://www.fda.gov/ohrms/dockets/ac/01/transcripts/3677t2.rtf.)  The committee also noted the importance of the unambiguously favorable gastrointestinal results from VIGOR, and the fact that no other Cox-2 inhibitor had demonstrated such results in a controlled clinical trial.  *See* Arthritis Advisory Committee Meeting

789237v.1

Minutes, dated February 8, 2001, *available at* http://www.fda.gov/ohrms/dockets/ac/01/
transcripts/3677t2.rtf.  Later in February 2001, Merck submitted a supplemental NDA to the FDA
requesting approval of Vioxx for the treatment of rheumatoid arthritis pain in adults.  (Braunstein Decl.
¶ at 72.)  In June 2001, in response to follow-up requests for information from the FDA, Merck updated
its pooled analysis of Vioxx clinical trial results to incorporate additional data available from recently
completed trials or extensions of earlier trials.  Merck's scientists and consultants updated the pooled
analysis again in early 2002 and published the data in 2003 in the *American Heart Journal*.[7]  (Gaziano
Decl. at ¶ 82.)  The data continued to show no difference in the cardiovascular event rates for Vioxx,
placebo, and NSAIDs other than naproxen.  In April 2002, after conducting a detailed review of the
updated data, the FDA approved Vioxx as safe and effective for treating adult rheumatoid arthritis.
(Braunstein Decl. at ¶ 73.)  The FDA also approved labeling changes incorporating the VIGOR
gastrointestinal data, the VIGOR cardiovascular data, and the interim results of the two large
Alzheimer's trials.  (*Id.* at ¶¶ 74, 75 (*quoting* Vioxx label No. 9183811, dated April 2002).)  The revised
label included a precaution advising physicians that the "significance of the [VIGOR and Alzheimer's
cardiovascular data] is unknown," and advising physicians to consider the data and exercise caution
when using Vioxx in patients with a medical history of ischemic heart disease.  (*Id.* at ¶ 75.)

Professor Ray may disagree with the findings of the FDA's Advisory Committee or the
conclusions of the FDA itself, or believe that the FDA should have acted differently in 2001.
His disagreement with the findings and conclusions of a federal regulatory body expressly
charged with making such determinations, however, is not proper testimony.  Such decisions are
expressly delegated by Congress to the specialized regulatory judgment of the FDA, and

---

[7] Weir MR et al., *Selective COX-2 Inhibition and Cardiovascular Effects:   A Review of the Rofecoxib Development Program*, AM HEART J 2003; 146:591-604.

789237v.1

criticisms of such judgments are not properly the subject of expert testimony.  Moreover, any

such criticism would be beyond Professor Ray's expertise.[8]

## VIII.  PROFESSOR RAY'S TESTIMONY CONCERNING MERCK'S ALLEGED FAILURE TO MEET SUBJECTIVE NORMATIVE STANDARDS IS NEITHER RELEVANT NOR RELIABLE UNDER RULE 702.

In his report and past testimony, Professor Ray has opined as to what Merck *should have*

done based on his subjective standards of what standards *should* be followed by pharmaceutical

companies.  For example, in his report, Professor Ray writes:

> When the VIGOR findings were revealed, the most prudent interpretation of the data was that rofecoxib increased the risk of serious coronary heart disease. . . .  Even if this had not been proven conclusively at the time of the VIGOR findings were released, the principle of acting conservatively to protect patient health would require assuming rofecoxib had potential adverse cardiovascular effects until reliable data demonstrated otherwise.
>
> * * *
>
> Trials could have been rapidly initiated in patients at high risk of cardiovascular disease to clarify this matter. . . .  Following the "first do no harm" principle, rofecoxib use should have been severely curtailed while these studies were being conducted.

(Ray Report at 18-20.) (emphases added).

This type of subjective normative testimony is unreliable under *Daubert*.  In *In re*

*Welding Fume Products Liability Litigation*, the federal court addressed this exact question of

whether to allow expert testimony regarding whether defendants had acted as they "*should*

*have*." Order, *In re Welding Fume Prods. Liab. Litig.*, No. 1:03-CV-1700, MDL 1535, 2005 WL

1868046, at *18 (N.D. Ohio Aug. 8, 2005).  The proffered expert purported to identify principles

---

[8] Professor Ray does not explicitly claim that Merck withheld information from the FDA, although he did testify that he thought Merck's characterization of the ADVANTAGE trial "appeared to be a deliberate withholding of data, deplorable conduct." Ray *Humeston Dep.* at 55:20-56:7.  To the extent he is referring to an alleged withholding of data from the FDA, such testimony would be directly barred by *Buckman*, in which the Supreme Court found that the issue of whether disclosures to the FDA are sufficient and issues of alleged fraud on the FDA are within the exclusive province of the FDA. *Buckman*, 531 U.S. at 350.

"to which ... all modern businesses should adhere," and the court refused to allow the testimony:

> No right-minded person would disagree with the aspirational character of [the expert's] ethical principles. But the critical question for the jury in this case is whether the defendant corporations did what the law *required* them to do, not whether, from a societal perspective, they did what an "ethical corporation" *should have* done. [The expert's] opinions regarding the latter, accordingly, will tend to misdirect the finder of fact.

*Id.* at *20. The court held that the subjective standards articulated by the expert "set[] out a standard in excess of what the law requires; this is unlikely to 'assist the trier of fact to understand the evidence or to determine a fact in issue'" as required by Rule 702. *Id.*

Professor Ray also proffers inflammatory characterizations of Merck's failure to follow his subjective standards, calling Merck's conduct "reprehensible," "deplorable," and "ethic[ally] questionable." For example, in another Vioxx-related case, Professor Ray testified:

Q: And do you recall in any of those academic contexts that you've just listed giving or expressing an opinion about the conduct of Merck with respect to Vioxx?

A: Yes, I do.

Q: And what have you said?

A: *That their conduct was deplorable*.

Q: And what was your basis for that opinion or that statement?

A: The aggressive -- what *I consider to be* the biased presentation of the VIGOR data and the failure to heed the signal that came out of VIGOR, and the aggressive marketing despite the strong signal of cardiovascular risk.

(Ray *Humeston* Dep. at 55:4-12 (emphasis added).)

In addition to being inflammatory, this type of testimony is irrelevant to the issue the jury must decide -- whether Merck met its *legal* obligations to plaintiffs. Testimony by an expert about whether conduct meets his proposed standard of morality does nothing to advance fact-finding concerning whether that conduct conformed to the requirements of the law. As the court

15

in *In re Rezulin* explained: "While the defendants may be liable in the court of public opinion, or

before a divine authority for any ethical lapses, expert opinion as to the ethical character of their

actions simply is not relevant to these lawsuits." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp.

2d 531, 542-45 (S.D.N.Y. 2004) (excluding expert testimony on subjective ethical standards

because it was: "(1) unreliable because purely speculative; (2) unhelpful to the fact-finder

because irrelevant in a case where liability is premised on legal, not ethical, standards; and (3)

likely to prejudice and confuse fact-finders concerning the pertinent legal standards"); *id.* at 557

(testimony on legal obligations would "usurp ... the role of the trial judge in instructing the jury

as to the applicable law [and] the role of the jury in applying that law to the facts before it"); *see*

*also Black v. Food Lion, Inc.*, 171 F.3d 308, 314 (5th Cir.1999) (admission of expert testimony

was abuse of discretion when particular opinion had no apparent underlying support); *DiBella v.*

*Hopkins*, No. 01 Civ 11779 (DC), 2002 U.S. Dist. LEXIS 20856, at *12 (S.D.N.Y. Oct. 30,

2002) ("business ethics" expert testimony inadmissible in commercial dispute because "dispute

here is not over what is ethical. Rather, the dispute is over what happened."), *aff'd* 403 F.3d 102

(2d Cir. 2005).

Here, there is no scientific "reasoning or methodology underlying" Professor Ray's

assertions concerning Merck's purported moral "reprehensibility" or to support Professor Ray's

prescription about what Merck *should have done*. As Professor Ray admitted in deposition, his

personal opinions have no basis in any peer-reviewed scientific literature:

> Q: . . . According to generally accepted practice, the risk ratios should have been
> calculated in the same manner for serious coronary heart disease and
> myocardial infarctions. ***Doctor, with respect to that last sentence that I just***
> ***read you, which begins with according to generally accepted practice, what***
> ***is the basis for your statement?***
>
> A: My more than 25 years experience as an epidemiological researcher.
>
> Q: ***Can you point me to peer reviewed literature or treatises that make the***

789237v.1

*statement you make, in words or substance?*

A: *I cannot.*

(Ray *Humeston* Dep. at 155:21-156-10 (emphasis added).)

Indeed, not only does Professor Ray admit that his opinions are lacking in scientific reasoning or methodology, but they are not even based on his own interpretation of the relevant facts. Professor Ray admitted that his opinions about Merck's allegedly "deplorable conduct" are formed in part by media accounts of Merck's activities. (Ray *Humeston* Dep. at 55:20-56:7.) He admitted that he formed his opinion based on appearance and conjecture – *i.e.*, what media sources suggested had "appeared" to be "deliberate withholding." (Ray *Humeston* Dep. at 55:20-56:7.) When asked for the basis of his opinion that "the ethics of the VIGOR trial were questionable," he acknowledged that it was based only one Merck employee's characterization of the VIGOR study as "a human animal study experiment." (Ray *Humeston* Dep. at 67:9-23.)

Professor Ray's opinions of what the FDA or Merck should have done, and his subjective characterizations of Merck's actions, have no place in this litigation. Expert testimony concerning subjective ethical and normative standards is inadmissible under Rule 702 and *Daubert*. Accordingly, Professor Ray's testimony in this regard should be excluded.

## IX. PROFESSOR RAY MAY NOT TESTIFY AS TO MERCK'S STATE OF MIND, MOTIVE, OR PERCEIVED "BIAS."

Throughout his report, Professor Ray, explicitly and by implication, asserts opinions as to Merck's state of mind and, specifically, on what Merck knew or must have known about the alleged risks of Vioxx. On their face, the comments included may appear factual. (*See* Ray Report at 4 (claiming "widespread concern" about Vioxx's safety was raised in 2000); Ray Report at 9 ("Even prior to rofecoxib's withdrawal, serious questions were raised about its

17

safety.”); Ray Report at 16 (“more than two years before rofecoxib was withdrawn from the market, a large, published study provided data that raised substantial doubt about the ‘naproxen hypothesis’”); Ray Report at 25 (asserting that results of studies demonstrating increased risk were available to Merck “prior to the decision to withdraw rofecoxib”).) But Professor Ray’s factual assertions are themselves conclusions, which he then uses to imply that Merck knew or should have known facts related to the risks of Vioxx and yet it misled the public through biased studies and misinformation.[9]

Professor Ray then uses that imputed knowledge to claim that Merck acted in bad faith by not removing Vioxx from the market earlier or, at a minimum, reducing its availability: “Following the ‘first do no harm’ principle, [Vioxx] use should have been severely curtailed while these studies were being conducted.” (Ray Report at 20.) Similarly, Professor Ray uses that same assumption – that Merck knew or must have known about the risks of Vioxx – to opine that scientists involved in Merck-funded studies were biased and that Merck improperly influenced results of test studies, essentially opining that Merck committed scientific fraud:

> Q: *Are you suggesting, apart from Juni, are you suggesting in separating out the studies that were funded by Merck or which you say have funding from Merck, are you suggesting that those studies are somehow biased or tainted because of the presence of funding from the company, from Merck?*
>
> A: *I'm suggesting that's a possibility that must be considered.*
>
> Q: Do you have personal knowledge, sir, or do you have any knowledge that Dr. Kimmel, the lead author on one of the studies listed on your chart was in any way biased in favor of Merck in conducting the study which is reflected on your chart?
>
> A: *The study analysis is biased in a way that would favor the naproxen hypothesis, and that's explained in a subsequent section of my report, so whether that bias was a result of Merck funding or other factors, I don't*

---

[9] Professor Ray’s conclusions regarding the information he asserts was widely known is inconsistent with plaintiff's failure to warn claim, since if the information was widely known in the medical community, no one would have needed specific warnings from Merck.

789237v.1

> *know, but the bias is there and it favors the naproxen hypothesis supported by Merck.*

Q: Same question for Dr. Rahme?

A: Same answer.

Q: How about Dr. Watson, his staff, is it your testimony that the funding of that study by Merck improperly influenced the results?

A: I have reservations about some of the methods of that study.  To the extent to which that was influenced by the funding source, I have no personal knowledge, but I do have reservations about the methods.

. . .

A: *What I'm saying is this.   There is a bias in the study that favors the naproxen hypothesis promoted by Merck, and that the study was partially funded by Merck, so that's what I'm saying.*

(Ray *Humeston* Dep. at 166:5-167:12, 169:1-5 (emphasis added).)  Even aside from the facial absurdity of Professor Ray's argument, it is belied by the fact that the September 2004 Adenomatous Polyp Prevention on Vioxx (APPROVe) study, which led to Merck's September 30, 2004 withdrawal of Vioxx from the market, was funded by Merck.  (Ray Report at 9, 23.)

Rule 702 provides for introduction of "scientific, technical, or other specialized knowledge" that will "assist the trier of fact."  Professor Ray has no qualifications or "specialized" expertise in divining a company's knowledge or state of mind (or the state of mind of authors of studies).  As the federal court in another failure-to-warn case against a pharmaceutical manufacturer reasoned when rejecting similar expert testimony regarding corporate intent and state of mind:

> The witnesses are qualified in particular scientific disciplines.  These disciplines do not include knowledge or even experience in the manner in which corporations and the pharmaceutical marketplace react, behave or think regarding their nonscientific goals of maintaining a profit-making organization that is subject to rules, regulations, standards, customs and practices among competitors and influenced by shareholders or public opinion.

*In re Diet Drugs*, No. MDL 1203, 2000 U.S. Dist. LEXIS 9037, at *28-29 (E.D. Pa. June 20,

789237v.1

2000); *see also In re Rezulin*, 309 F. Supp. 2d at 546 (rejecting expert testimony "on the intent, motives or states of mind of corporations, regulatory agencies and others" because they "have no basis in any relevant body of knowledge or expertise").

Expert testimony permitted under Rule 702 and *Daubert* must have an objective and empirical foundation; it cannot consist of subjective, moralistic conjecture by an expert.  As the Supreme Court explained in *Kumho Tire*, the goal is to "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  526 U.S. at 152; *Daubert*, 509 U.S. at 594.  Subjective, moralistic testimony lacks the same assurances of relevance and reliability that empirically verifiable specialized knowledge provides.  When expert testimony lacks this reliability -- when it strays from specialized knowledge and lacks supporting authority -- it is properly excluded.  *See, e.g., Tanner v. Westbrook*, 174 F.3d 542, 548 (5th Cir.1999).  Not only is it irrelevant, but it presents a threat of unfair prejudice and jury confusion because an expert often appears inherently credible to a jury and, therefore, the jury more readily accepts the testimony.  *Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997) (holding that expert testimony offered by attorney as to legal questions was inadmissible because the "mystique" surrounding the term "expert" made the jury "susceptible to adopting the expert's conclusion rather making its own decision"); *United States v. Fosher*, 590 F.2d 381, 383 (1st Cir. 1979) (noting that several courts have expressed a fear that "proffered expert testimony [will] create a substantial danger of undue prejudice and confusion because of its aura of special reliability and trustworthiness").

Professor Ray has no reliable bases for his conclusions regarding Merck's state of mind, motives, or his perceived bias in certain Merck scientific studies.  Therefore, his testimony fails to satisfy Rule 702 and must be excluded.

789237v.1

## X.    **CONCLUSION.**

For all the forgoing reasons, Merck respectfully requests that the Court grant its motion to exclude Professor Ray's testimony in its entirety.

Respectfully submitted,

*Dorothy N. Wimberly*

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
4041 Essen Lane
One United Plaza, Suite 501
Baton Rouge, Louisiana 70809
Phone:  225-490-8900
Fax:     225-490-8960

Defendants' Liaison Counsel

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:     312-494-4440

And

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone: (202) 434-5000
Fax:     (202) 434-5029

Attorneys for Merck & Co., Inc.

789237v.1

## **CERTIFICATE OF SERVICE**

I hereby certify that the above and forgoing Memorandum in Support of Merck & Co., Inc.'s Motion to Exclude Testimony of Wayne A. Ray, Ph.D. has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 21st day of October, 2005.

*Dorothy H. Wimberg*

789237v.1