

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2005 OCT 21   PM 3: 03

LORETTA G. WHYTE
CLERK

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | JUDGE FALLON |
| This document relates to<br>Case No. 05-4046* | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| EVELYN IRVIN PLUNKETT<br>as Personal Representative of the Estate of<br>RICHARD IRVIN, JR., | * | |
| Plaintiff, | * | |
| vs. | * | |
| MERCK & CO., INC., | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### MERCK & CO., INC.'S MOTION TO EXCLUDE
### TESTIMONY OF WINSTON GANDY, JR., M.D.

Defendant Merck & Co., Inc. ("Merck"), through undersigned counsel, and pursuant to Rule 702 of the Federal Rules of Evidence, hereby moves to exclude the testimony of plaintiff's expert Winston Gandy, Jr., M.D.  The facts and law supporting this motion are more fully set

___ Fee_____
___ Process_____
_X_ Dktd_____
___ CtRmDep_____
___ Doc. No._____

789223v.1

forth in the accompanying memorandum, declarations, and exhibits, which are incorporated as if fully set forth herein.

Respectfully submitted,

*Phil Wittmann*
_____
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
4041 Essen Lane
One United Plaza, Suite 501
Baton Rouge, Louisiana 70809
Phone:  225-490-8900
Fax:      225-490-8960

Defendants' Liaison Counsel

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:      312-494-4440

And

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone: (202) 434-5000
Fax:     (202) 434-5029

Attorneys for Merck & Co., Inc.

789223v.1

789223v.1

## **CERTIFICATE OF SERVICE**

I hereby certify that the above and forgoing Motion to Exclude Testimony of Winston Gandy, Jr., M.D. has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 21st day of October, 2005.

_Phil Wittmann_

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 05-4046* | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| EVELYN IRVIN PLUNKETT | * | |
| as Personal Representative of the Estate of | * | |
| RICHARD IRVIN, JR., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * | | |

### MEMORANDUM IN SUPPORT OF MERCK & CO., INC.'S MOTION TO EXCLUDE TESTIMONY OF WINSTON GANDY, JR., M.D.

**I.   INTRODUCTION**

Plaintiff designated Dr. Winston Gandy to opine (a) that Vioxx 25 mg increases the risk of blood clots in short-term use, and (b) that Vioxx contributed to Mr. Irvin's sudden cardiac death. (Expert Report of Winston Gandy, Jr., M.D. ("Gandy Report"), attached as Ex. 34 to the Declaration of Phillip A. Wittmann in Support of Merck's Motions to Exclude Evidence

789224v.1

("Wittmann Decl. I" at 17-18.)  Neither of Dr. Gandy's opinions satisfies Federal Rule of Evidence 702.

First, Dr. Gandy's opinion that Vioxx 25 mg supposedly increases the risk of blood clots with short-term use was reached after an obviously insufficient investigation and is based upon unreliable scientific evidence.  Second, Dr. Gandy's opinions about the specific causes of Mr. Irvin's death are predicated upon speculation, guess-work and unproven assumptions.  For these reasons, Dr. Gandy's opinions do not satisfy Federal Rule of Evidence 702 and should be struck in their entirety.

## II. THE LEGAL STANDARD

The admission of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

Once the proponent of the evidence proves that the offered testimony is based on sufficient facts or data, he or she must then "demonstrate that the expert's findings and conclusions are based on the scientific method, and, therefore, are reliable." *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir.1998) (en banc).  This process is governed by the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).  In *Daubert*, the Supreme Court made clear that the district courts must act as gatekeepers to ensure that expert testimony is both relevant and reliable and identified the

2

789224v.1

following non-exclusive factors a district court may consider in evaluating an expert's testimony: (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the theory or technique's degree of acceptance in the scientific community.  *Daubert*, 509 U.S. 593-94; *Moore*, 151 F.3d at 275; *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d 603, 605-06 (E.D. La. 2003).  In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) the Supreme Court explained that the overarching goal of *Daubert*'s gatekeeping requirement is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."

As discussed below, Dr. Gandy's proposed causation testimony fails to meet these legal standards and therefore should be excluded.

### III.  DR. GANDY DOES NOT HAVE A RELIABLE SCIENTIFIC BASIS TO RENDER OPINIONS ON GENERAL CAUSATION.

Dr. Gandy opines that Vioxx 25 mg increases the risk of blood clots in short term use. Dr. Gandy's opinion fails to satisfy Federal Rule of Evidence 702 for two reasons.  First, Dr. Gandy is not an expert on this issue and he has done virtually no investigation in order to attempt to answer the question of general cause.  Second, Dr. Gandy's general causation opinions rest upon scientifically unreliable evidence.  As a result, his "opinions" are mere speculation, and rely only on unproven assumptions and a selected subset of scientific literature which does not even support his hypothesis.

3

A. **Dr. Gandy's Professional Training And Experience Does Not Qualify Him To Opine On General Cause.**

Dr. Gandy is a cardiologist who specializes, in his own words, at reading echocardiograms (which are not at issue here). (Deposition of Winston Gandy, Jr. M.D. ("Gandy Dep."), attached as Ex. 7 to the Whittmann Decl. I 29:23-30:6.) Dr. Gandy is not a researcher. Dr. Gandy admits that that he has never done any research on NSAIDs prior to this case, nor has he ever done any research on COX-2 inhibitors specifically. (Gandy Dep. at 20:3-9.) Dr. Gandy has never published articles on sudden cardiac death. He has been a lead author in only two research publications in his entire career – neither of which bears on these topics – and further admits that he has not been primarily responsible for analyzing clinical data. (Gandy Dep. at 19:2-22.) As Dr. Gandy himself puts it, "by no means am I an expert on the analysis of data." (*Id.*)

> Q. Do you consider yourself an expert, sir, in the interpretation of clinical data?
>
> A. An expert, no, that's not what I'm an expert in. I'm a cardiologist.

(Gandy Dep. at 129:7-9.)

Nor has Dr. Gandy had extensive experience with Vioxx. He admits that he never read either the Physician's Desk Reference entry for Vioxx, or the label on the package itself. (Gandy Dep. at 57:8-58:8.) Additionally, he has never "prospectively" diagnosed an adverse event for a patient on Vioxx – that is, diagnosed a purportedly Vioxx-related event at the time it occurred. It was only after the withdrawal of Vioxx from the market that Dr. Gandy "felt" that one of his patient's events was caused by Vioxx because he could identify no other risk factors. (Gandy Dep. at 59:5-60:8.)

4

Therefore, at the outset of his retention in this case, Dr. Gandy had no particular expertise in the supposed pro-clotting pharmacology of Vioxx or even any background in the relative risk of cardiovascular adverse events associated with Vioxx.

### B. Dr. Gandy Has Not Undertaken The Necessary Study To Opine On General Causation.

Given his lack of experience with the subject matter when he took on this engagement, one would assume that Dr. Gandy would have done an exhaustive investigation into the question of general causation. Instead, Dr. Gandy has done virtually nothing. He admits that he spent only 10 to 15 hours reviewing materials and medical records prior to preparing his report. (Gandy Dep. at 46:16-47:16.) Moreover, the scientific literature he reviewed was hardly complete. Dr. Gandy testified that, in forming his opinions, he had read only a handful of medical articles. (Gandy Report at 4; Gandy Dep. at 52:10-54:25, 78:24-79:13, 143:20-144:19.) Of those studies, Dr. Gandy admitted that all of them had been provided by plaintiff's counsel, and that he did no independent literature review before formulating his opinions. (Gandy Dep. at 91:13-93:23, 94:1-8.) Necessarily, Dr. Gandy did not consider the vast majority of scientific information relevant to his opinions. Even though Dr. Gandy purports to opine as to the pharmacological mechanism of Vioxx, he has not reviewed any scientific data related to that topic. (Gandy Dep. at 116:10-24, 140:16-141:16.) Even though Dr. Gandy purports to opine as to supposed clinical adverse consequences associated with Vioxx, he reviewed only two of the clinical studies with Vioxx.

### C. Dr. Gandy's Opinion That Vioxx Causes A Prothrombotic State Is Not Based On Reliable Scientific Evidence.

Dr. Gandy testified that his opinion that Vioxx causes a prothrombotic state is based on his interpretation of the VIGOR results as well as his belief that COX-2 inhibitor drugs create an imbalance in the thromboxane and prostacyclin levels in the vasculature. (Gandy Dep. at 77:24-78:17, 107:2-108:2, 113:17-114:13.) Dr. Gandy's claim notwithstanding, VIGOR did not address, much less measure, prostacyclin and thromboxane levels in the participants and, as discussed below, neither it nor Dr. Gandy's assumptions concerning Vioxx provides the reliable scientific evidence necessary to support his opinion.

#### 1. VIGOR Does Not Support Dr. Gandy's Prothrombotic Opinion.

As discussed in detail in Merck's Memorandum Regarding Vioxx Science Issues and its brief in support of its Motion To Exclude Evidence Of Plaintiff's Experts Regarding Causation (both of which are filed concurrently herewith), VIGOR was designed to assess the relative incidence of serious gastrointestinal adverse events in rheumatoid arthritis patients treated with Vioxx as compared to naproxen, a traditional NSAID. Over treatment periods averaging nine months in duration, half the study patients took daily doses of Vioxx 50 mg (double the highest recommended dose for continuous use and double what Mr. Irvin was prescribed), while the other half took twice-daily doses of naproxen 500 mg (a common therapeutic dose). Although the Vioxx patients reported significantly fewer serious adverse GI events than the naproxen group, the data also showed that naproxen users suffered significantly fewer serious thrombotic cardiovascular events than Vioxx users.[1] The study did not, however, discuss Dr. Gandy's proposed mechanism – the potential that Vioxx could be prothrombotic as a result of an alleged

---

[1] *See* Bombardier C, et al., *Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis,* N. ENGL. J. MED. 2000; 343(21):1520-28.

imbalance between prostacyclin and thromboxane, a fact Dr. Gandy seems unwilling to concede.[2] Dr. Gandy testified:

> Q. On what basis do you have to opine that COX-2 drugs create a clinically relevant imbalance between prostacyclin and thromboxane?
>
> A. There were more events in the Vioxx group, and that from clinical perspective, something is clinically relevant if it has a clinical event; therefore, by default, the fact that you had more events in the Vioxx group, that this imbalance is clinically relevant.
>
> Q. You're talking about the VIGOR results again?
>
> A. Yes, sir.
>
> Q. Why do the VIGOR results tell you that the mechanism is what you've described in terms of thromboxane/prostacyclin imbalance?
>
> A. That's what the drug does.

(Gandy Dep. at 109:21-110:11.) On its face, this reasoning is entirely circular. When asked for his basis for opining as to Vioxx's pharmacological mechanism, Dr. Gandy points only to VIGOR clinical trial data. When asked how VIGOR supports his opinion, he answers "That's what the drug does." That is not an accepted analysis – it is a conclusion without support.

Additionally, VIGOR was not a placebo-controlled study; rather the comparison at issue was between Vioxx and an active comparator, Naproxen. Thus, as the VIGOR article itself discusses, it is possible that the CV results were the result of a cardioprotective effect of naproxen rather than a cardiotoxic effect of Vioxx – a possibility Dr. Gandy discounts without any basis. Dr. Gandy testified that he believes that the theory that naproxen is cardioprotective is "ridiculous" and "unrealistic." (Gandy Dep. at 80:7- 81:23, 84:9-14.) He admits, however, that he has done nothing to investigate the naproxen explanation for the VIGOR results, and his only basis for rejecting the naproxen hypothesis was his assumption that for it to be true, naproxen

---

[2] *Id.*

would have to be more efficacious than aspirin. But Dr. Gandy has not researched the potential cardiovascular benefit of aspirin, the pharmacological action of naproxen, or any comparison of the two drugs in the relevant population.[3]

For example, Dr. Gandy says that in order to explain the VIGOR outcome, naproxen would have to be several times more effective than aspirin in reducing CV risk, but he testified that he does not know how much aspirin actually reduces CV risk in any given type of patient, nor can he cite any study or reference comparing the relative cardioprotective potential of aspirin and naproxen (also known as Naprosyn). (Gandy Dep. at 86:3-88:6, 88:13-24.):

> Q. Did you review any of the basic science research on Naprosyn regarding its degree of platelet inhibition?
>
> A. I recall that I may have seen some information on that, but I don't specifically recall.
>
> Q. Do you recall how Naprosyn's degree of platelet inhibition compares to that which has been shown with aspirin?
>
> A. I don't specifically recall.

(Gandy Dep. at 90:11-19.) Dr. Gandy did no research whatsoever concerning naproxen and its cardioprotectiveness apart from reading the VIGOR study:

> Q. What research did you do about Naprosyn independently as it relates to its role in the Vioxx stuff?
>
> A. I did not do any independent research looking specifically at Naprosyn.

---

[3] Rheumatoid arthritis patients, like those enrolled in VIGOR, are widely recognized to have a substantially higher risk of developing cardiovascular diseases and related deaths than the general population. (See Declaration of J. Michael Gaziano, M.D., Ph.D. In Support of Merck's Motions to Exclude Evidence, ¶ 75.) Thus, it is inappropriate to compare, as Dr. Gandy seems to do, the potential cardio-protective effect of naproxen in the high-risk population in VIGOR with the effect of aspirin in the general population. Aspirin would demonstrate a larger cardio-protective effect in a high-risk population, such as the patient population in VIGOR, than in the general population, thus negating Dr. Gandy's unfounded assertion that naproxen would have to have cardio-protective qualities superior to aspirin in order to explain the VIGOR results.

> Q. Did you do any review about the cardio-protective effects of Naprosyn in connection with this case?
>
> A. Not specifically, no.
>
> Q. Did you do so generally?
>
> A. It was contained in the information that I had before me and stuff that I've previously read.
>
> Q. And you can't recall any specific literature citation that discusses the cardio-protective effects of Naprosyn other than the VIGOR publication itself?
>
> A. No, sir.

(Gandy Dep. at 95:9-25.) Given his admitted lack of study and data, Dr. Gandy is certainly in no position to evaluate the potential cardio-protective effects of naproxen, or opine as to whether or not it is a reasonable explanation for the VIGOR results.

### 2. Dr. Gandy Does Not Have A Reliable Scientific Basis To Opine That Vioxx Causes A Prostacyclin/Thromboxane Imbalance.

Much like his testimony concerning naproxen, Dr. Gandy's opinion that Vioxx causes an imbalance in prostacyclin and thromboxane levels is rendered without supporting evidence or data.[4] Indeed, Dr. Gandy admits as much. To begin with, he testified that he is not aware of any basic science research demonstrating that Vioxx has an impact on prostacyclin production in the vascular system, admitting that he has not even reviewed the basic pharmacological research on Vioxx:

> Q. But you can't recall any actual research or study or piece of literature that you have read that actually measures Vioxx's impact on prostacyclin production, correct?

---

[4] As discussed at length in Merck's Motion To Exclude Evidence Of Plaintiff's Experts Regarding Causation, the prostacyclin imbalance theory remains unproven. Plaintiff's experts cannot point to a single human study demonstrating that Vioxx inhibits vascular prostacyclin production, nor even how much inhibition is necessary to cause clinically relevant effects.

9

> A. If it's present, I can't – I can't quote you the name of the study, no.
>
> Q. Do you recall whether in fact you did read such an article?
>
> A. I don't know that it was an article that I read.
>
> Q. I'm trying to understand, sir, whether you are testifying that you recall somewhere someone discussed the prostacyclin theory in an article or whether you can recall actually reading research on the basic science of the drug. Do you recall which it is?
>
> A. No, I don't.
>
> Q. Okay. So as you sit here today, you can't testify that you in fact have ever reviewed basic science pharmacology research on Vioxx, correct?
>
> A. Not that I recall.

(Gandy Dep. at 116:10-24, 140:16-141:16.) Dr. Gandy likewise admits that he can not recall any studies or research done on the platelet aggregation characteristics of Vioxx. (Gandy Dep. at 134:18-135:4.) Dr. Gandy ultimately testified that he could not recall a study actually demonstrating a decrease in prostacyclin production in the vasculature system as a result of Vioxx use. (Gandy Dep. at 157:20-158:13.) Given this lack of foundation, Dr. Gandy's testimony regarding the purported prothrombotic properties of Vioxx cannot meet the *Daubert* threshold and should be excluded.

### D. Dr. Gandy Does Not Have A Reliable Scientific Basis To Opine That His Alleged Thrombotic Mechanisms Of Injury Are Caused By Vioxx.

Like many of the plaintiff's experts, Dr. Gandy proposes several alternative mechanisms by which he believes Vioxx might cause or contribute to a thrombotic event as a result of a hypothesized prostacyclin/thromboxane imbalance. Specifically, he testified that he believed Vioxx contributed to two processes that resulted in Mr. Irvin's clot. First, Dr. Gandy believes Vioxx inhibited prostacyclin, resulting in increased vasoconstriction and "shearing forces" at the junction between dysfunctional and normal endothelium in the artery. This shearing force, he

789224v.1

maintains, caused a breach in the endothelium at the site of the plaque or near it, which he describes as a plaque crack or disruption. Second, Dr. Gandy believes that, once the breach occurred, the reduction in prostacyclin in Mr. Irvin's vasculature caused a full-blown clotting cascade which resulted in the thrombus. (Gandy Dep. at 166:18-169:21.) Dr. Gandy has no evidence supporting this hypothesized chain of events, however.

As an initial matter, Dr. Gandy admits that he is unaware of any data supporting his theory that Vioxx increases vasospasm or vasoconstriction:

> Q. You're not aware of any scientific evidence to suggest Vioxx increases the risk of vasospasm, are you, sir?
>
> A. In the form of a study?
>
> Q. In the form of any study, article, research, literature, anything?
>
> A. I don't specifically recall seeing that, no.
>
> . . . .
>
> Q. Has it ever been shown in any physiological animal or clinical model that Vioxx contributes to vasoconstriction?
>
> A. To the best of my recollection, and I would defer to my earlier answer to that same question if there's any discrepancy, I do not recall.
>
> . . . .
>
> Q. No because we already know what your view on vasospasm is. You're telling me that Mr. Irvin – that Vioxx may have contributed to some vasoactivity through vasoconstriction that would have lead to plaque rupture, and I'm asking you how can you possibly testify to that under oath to a reasonable degree of medical certainty?
>
> A. The explanation I gave earlier as to the imbalance between the prostacyclin and thromboxane, in addition to the tendency to clot, there's a tendency to vasoconstrict.
>
> Q. That's never been shown, sir, has it?
>
> A. I'm just giving you my opinion.
>
> Q. It's a theory right? It's a theory without data, would you agree with that?
>
> A. I don't know that the data doesn't exist.

789224v.1

> Q. You're opining as to a theory today about vasoconstriction for which you have no data, correct?
>
> A. **Not before me, correct.**

(Gandy Dep. at 184:13-20, 209:16-21, 211:20-212:17 (emphasis added).) Similarly, while Dr. Gandy testified that he believes Vioxx contributed to Mr. Irvin's plaque rupture, he has no evidence that Vioxx increases the risk of rupture. (*Id.* at 227:10-14, 229:8-10.)

> Q. Are you aware of any scientific evidence that Vioxx increases the risk of plaque rupture?
>
> A. **I have not seen it.**

(*Id.* at 183:16-18.) Indeed, Dr. Gandy admits that he does not even know whether or not Mr. Irvin even had a plaque rupture, and he has never reviewed Mr. Irvin's microscopic autopsy slides (although he testified he would "be more than interested in looking at this point"). (*Id.* at 201:1-15.) Thus, Dr. Gandy is in no position to testify as to any alleged mechanism by which plaintiff alleges Vioxx could have caused Mr. Irvin's death.

### E. Dr. Gandy Has No Evidence That Vioxx, At The Dose And Duration Used By Mr. Irvin, Causes Increased Cardiovascular Risk.

In addition to the absence of data supporting any of Dr. Gandy's opinions regarding Vioxx's alleged prothrombotic effect, or the mechanism by which he alleges it could have caused Mr. Irvin's death, Dr. Gandy has no reliable scientific evidence supporting his opinion that taking 25 mg Vioxx for less than 30 days causes an increased risk of CV events. In fact, Dr. Gandy cannot even recall how long Mr. Irvin took Vioxx, although he believes it was less than 60 days. (Gandy Dep. at 77:8-23.) Dr. Gandy cannot point to a single scientific study which

supports his view that short-term Vioxx use increases CV risk. (Gandy Dep. at 118:15-120:2.) For example, Dr. Gandy admits that VIGOR does not speak to the issue[5]:

> Q.   All right.  Would you agree with me that the VIGOR data does not comment one way or another on the safety of the drug in short-term use?
>
> A.   I don't recall it commenting on short- or long-term use.

(Gandy Dep. at 153:4-8.)  Dr. Gandy similarly admits that the APPROVe study does not demonstrate an increased short-term risk. (Gandy Dep. at 148:23-149:8.)

IV.  **DR. GANDY IS NOT QUALIFIED TO OPINE ON SPECIFIC CAUSATION.**

Dr. Gandy's opinion on general causation – that Vioxx causes a prothrombotic state because of prostacyclin imbalance – is inextricably linked with his specific causation opinion that Vioxx caused or contributed to Mr. Irvin's death. However, the obvious deficiencies in Dr. Gandy's general causation opinions, combined with his inability to rule out non-Vioxx related causes, means that he cannot opine, to a reasonable degree of medical certainty, that Vioxx caused Mr. Irvin's death.

Apart from the fact that Mr. Irvin took Vioxx for a short period of time, Dr. Gandy cannot point to any fact that distinguishes his unfortunate death from similar deaths which frequently occur each year in the United States. Dr. Gandy admits that Mr. Irvin died of the most common cause of death in the country – an obstruction of a coronary artery resulting in acute coronary ischemia (lack of oxygen) and cardiac dysrhythmia (electrical imbalance). (Gandy Dep. at 160:8-162:11.) Dr. Gandy also agrees that Mr. Irvin had coronary artery disease – which is indisputably a risk factor for developing an occlusion leading to sudden cardiac death – and that each year thousands of people like Mr. Irvin who have no prior symptoms of

---

[5] In addition, as discussed above, VIGOR was not placebo-controlled, and in any case involved 50 mg Vioxx, twice the dose Mr. Irvin took.

789224v.1

CAD nonetheless have a heart attack. (Gandy Dep. at 164:4-14, 178:18-179:7, 189:24-190:5.) Dr. Gandy likewise admits that an imbalance in prostacyclin and thromboxane is not needed to cause a clot, and that thousands of people a year suffered clots before Vioxx was ever sold. (Gandy Dep. at 179:23-180:6.) Moreover, Dr. Gandy acknowledges that there are people who were on Vioxx who would have had an occlusion leading to death whether or not they were on the drug. (Gandy Dep. at 173:7-16.)

Against this backdrop, it is hardly surprising that Dr. Gandy cannot not rule out the possibility that Mr. Irvin's coronary artery disease could have caused Mr. Irvin's death in the absence of Vioxx:

> Q: It's certainly the case, sir, that given Mr. Irvin's coronary artery disease, that he could have developed sudden cardiac death completely apart from Vioxx, correct?
>
> A. Well, we'll never know that. He had Vioxx and had sudden cardiac death, so – I mean, one could probably imagine there was a possibility.

(Gandy Dep. at 187:4-10.) Indeed, Dr. Gandy admitted that he could not quantify the amount of risk represented by Vioxx, or even testify that, but for Vioxx, Mr. Irvin would have lived:

> Q. Well, you can't say, sir, that but for Vioxx, whatever happened to Mr. Irvin on May 15th wouldn't have itself led to sudden cardiac death, can you?
>
> A. Perhaps the little bit that – or the amount that the Vioxx contributed to propagation of the clot was just enough to make it go from 99 percent to 100 percent occluded, which potentially could have afforded him more time. But the fact that he had it and we have no way of quantifying how much was a result of the Vioxx, we just don't have the opportunity to know that, but he certainly would have been better off not on it than on it.

(Gandy Dep. at 192:5-17.)

Dr. Gandy's specific causation opinion boils down to his assumption that Vioxx increases the risk of blood clots, even in less than 30 days, and his unsupported speculation that Vioxx

contributed to Mr. Irvin's death. But F.R.E. 702 and *Daubert* were designed to preclude opinions, such as Dr. Gandy's, that rely on assumptions and guesswork.

## V. **CONCLUSION.**

For all the forgoing reasons, Merck respectfully requests that the Court grant its motion to exclude Dr. Gandy's testimony in its entirety.

Respectfully submitted,

*Phil Wittmann*

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
4041 Essen Lane
One United Plaza, Suite 501
Baton Rouge, Louisiana 70809
Phone:  225-490-8900
Fax:      225-490-8960

Defendants' Liaison Counsel

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:      312-494-4440

And

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone: (202) 434-5000
Fax:     (202) 434-5029

Attorneys for Merck & Co., Inc.

789224v.1

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Memorandum in Support of Merck & Co., Inc.'s Motion to Exclude Testimony of Winston Gandy, Jr., M.D. has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 21st day of October, 2005.

_Phil Wittmann_

789224v.1