

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2005 OCT 21   PM 3: 01

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| **This document relates to** | * | |
| **Case No. 05-4046\*** | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| **EVELYN IRVIN PLUNKETT** | * | |
| as Personal Representative of the Estate of | * | |
| **RICHARD IRVIN, JR.,** | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| **MERCK & CO., INC.,** | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MERCK & CO., INC.'S MOTION TO EXCLUDE TESTIMONY OF COLIN M. BLOOR, M.D. AND JOSEPH L. BURTON, M.D.

Defendant Merck & Co., Inc. ("Merck"), through undersigned counsel, and pursuant to

Rule 702 of the Federal Rules of Evidence, hereby moves to exclude the testimony of Colin M.

Bloor, M.D. and Joseph L. Burton, M.D.  The facts and law supporting this motion are more

___ Fee_____
___ Process_____
_X_ Dktd_____
___ CtRmDep_____
___ Doc. No._____

789204v.1

fully set forth in the accompanying memorandum, declarations, and exhibits, which are incorporated as if fully set forth herein.

Respectfully submitted,

Phil Wittmann

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
4041 Essen Lane
One United Plaza, Suite 501
Baton Rouge, Louisiana 70809
Phone:  225-490-8900
Fax:      225-490-8960

Defendants' Liaison Counsel

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:      312-494-4440

And

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone: (202) 434-5000
Fax:      (202) 434-5029

Attorneys for Merck & Co., Inc.

789204v.1

## **CERTIFICATE OF SERVICE**

I hereby certify that the above and forgoing Motion to Exclude Testimony of Colin M. Bloor, M.D. and Joseph L. Burton, M.D. has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 21st day of October, 2005.

_Phil Wittmann_

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 05-4046* | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| EVELYN IRVIN PLUNKETT | * | |
| as Personal Representative of the Estate of | * | |
| RICHARD IRVIN, JR., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM IN SUPPORT OF MERCK & CO., INC.'S MOTION TO EXCLUDE TESTIMONY OF COLIN M. BLOOR, M.D. AND JOSEPH L. BURTON, M.D.

## I.    INTRODUCTION.

Plaintiff has retained Drs. Joseph Burton and Colin Bloor to render pathological opinions in this case in the field of pathology.   Both experts, however, purport to offer opinions concerning the alleged role of Vioxx® in Mr. Irvin's death.   For example, Dr. Burton's report indicates, among other things, "Richard Irvin, based on the currently available information, had

few risk factors that would have pre-disposed him to a sudden cardiac death except for his recent use of VIOXX for approximately 30 +/- days." (Expert Report of Joseph L. Burton, M.D. ("Burton Report"), attached as Ex. 32 to the Declaration of Phillip A. Wittmann in Support of Merck's Motions to Exclude Testimony ("Wittmann Decl. I") at 23; *see also id.* at 24 ("It is my opinion that there is a proximal and/or causal relationship between Mr. Irvin's use of the medication VIOXX for approximately 30 days prior to his death, apparently at a dose of 25 mg per day, and his sudden cardiac death which was precipitated by an acute coronary artery thrombus occurring in his left anterior descending coronary artery.") Dr. Bloor rendered similar opinions at his deposition (although he omitted them from his report), testifying that he believes Vioxx to be thrombogenic and that this alleged property caused Mr. Irvin's clot to form. (Deposition of Colin M. Bloor, M.D. ("Bloor Dep."), attached as Ex. 3 to Wittmann Decl. I at 96:11-23.)

While pathologists Burton and Bloor may be qualified to discuss the pathological process by which Mr. Irvin's thrombotic event occluded his coronary artery and caused his death, their deposition testimony demonstrates that they lack a reliable scientific basis for opining that Vioxx was a factor in Mr. Irvin's death. Neither doctor has a reliable scientific basis for their causation opinions concerning Vioxx as required under Federal Rule of Evidence 702 and *Daubert*. Their testimony concerning Vioxx must therefore be excluded.

## II.    THE LEGAL STANDARD.

The admission of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon

2

sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. It is black-letter law that testimony beyond a witness's expertise should be excluded. *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1050 (5th Cir. 1998) (trial court properly excluded property appraisal testimony since witness not a licensed appraiser or real estate broker and lacked training or formal schooling in appraisal methods).

Once the proponent of the evidence proves that the offered testimony is based on sufficient facts or data and within the expert's ken, he or she must then "demonstrate that the expert's findings and conclusions are based on the scientific method, and, therefore, are reliable." *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir.1998) (en banc). This process is governed by the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). In *Daubert*, the Supreme Court made clear that the district courts must act as gatekeepers to ensure that expert testimony is both relevant and reliable, and identified the following non-exclusive factors a district court may consider in evaluating an expert's testimony: (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the theory or technique's degree of acceptance in the scientific community. *Daubert*, 509 U.S. 593-94; Moore, 151 F.3d at 275; *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d 603, 605-06 (E.D. La. 2003). In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999), the Court explained that the overarching goal of *Daubert*'s gatekeeping requirement is "to make certain that an expert, whether basing testimony upon professional

789196v.1

studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."

As discussed below, Dr. Burton's and Dr. Bloor's proposed causation testimony concerning Vioxx fails to meet these legal standards and therefore must be excluded.

## III.    DR. BURTON DOES NOT HAVE A RELIABLE SCIENTIFIC BASIS TO OPINE ON GENERAL CAUSE.

Dr. Burton's causation conclusions are remarkably expansive, and their breadth stands in stark contrast to the limited and insufficient foundation on which they are based. As Dr. Burton candidly admits, he has neither the background, nor has he undertaken the study required, to provide a reliable scientific basis for his testimony that short-term Vioxx use of less than thirty days can cause an increase in cardiovascular ("CV") events because of an imbalance in prostacyclin and thromboxane.

### A.    Dr. Burton Does Not Have The Necessary Training and Experience To Opine On General Causation.

Dr. Burton is a pathologist. That fact, however, does not qualify him to proffer opinions on a host of issues relating to Vioxx, ranging from its pharmacology to an assessment of clinical and epidemiological studies involving the medicine. The lack of Dr. Burton's expertise concerning Vioxx is palpable. During his career, Dr. Burton has not done any research on any NSAIDs generally, or COX-2 inhibitors in particular, nor has he ever published anything on sudden cardiac death. (Deposition of Joseph L. Burton, M.D. ("Burton Dep."), attached as Ex. 4 to Wittmann Decl. I at 23:24-24:17.)  Dr. Burton admits that he is not a pharmacologist and that he is relying on plaintiff's other experts to address Vioxx's pharmacological mechanisms. (Burton Dep. at 104:25-105:20, 113:12-17.)  Dr. Burton admits that he is no expert in clinical study design or statistics and that he is not qualified to analyze and interpret clinical and

4

epidemiological data concerning Vioxx – including the data concerning any relationship between

Vioxx and cardiac events:

> Q.      I take it you're not qualified, sir, to give an opinion as to what the data of the Advantage trial shows, with regards to Vioxx?

> A.      That can stand as a simple answer to all the questions about these clinical trials.  I'm not qualified to analyze the data from these trials.

> Q.      Okay.  Let's do it more broadly.  Would you agree, sir, that you're not qualified to analyze any of the clinical trials on Vioxx, and decide whether Vioxx is associated with an increased risk of cardiovascular events?

> A.      Based on the data analysis from those trials, yes.

> Q.      Yes, you would agree.

> A.      Yes.

> Q.      Would you agree, sir that you're not qualified to analyze any of the epidemiological studies with regards to Vioxx, and decide whether Vioxx is associated with an increased risk of cardiovascular events based on those studies?

> A.      Yes.  I think those analysis [sic] are best left to people who are more familiar with statistics, and analyses like that.  I don't do that.[1]

(Burton Dep. at 111:12-112:13, 95:14-22, 138:3-21, 141:25-142:11.)

Indeed, Dr. Burton's deposition testimony reflects that his current specialty is testifying

as a professional witness providing litigation testimony for plaintiffs, primarily in automobile

rollover cases.  (Burton Dep. at 11:11-12:21.)  Dr. Burton testified that he averages 100

depositions and 25 trials per year.  (Burton Dep. at 10:22-11:4, 27:6-10.)  Given this full

schedule, it is no surprise that Dr. Burton admits that he reviewed no Vioxx literature or studies

---

[1]  For example, Dr. Burton admitted that he was not qualified to independently opine that the difference in the cardiovascular event rates in the two arms of the VIGOR study was due to the effects of Vioxx rather than the cardioprotective effects of naproxen.  (Burton Dep. at 102:22-103:13.)  Indeed, he testified that it was not his role in the case to decide whether the VIGOR comparators were valid, or how they pharmacologically worked, or whether the statistical analysis was valid.  (Burton Dep. at 99:14-24.)

789196v.1

for this case other than what was provided to him by plaintiff's counsel, and that he undertook no investigation or literature search of his own concerning Vioxx.  (Burton Dep. at 46:4-13.)

**B.      Dr. Burton's Speculative General Causation Opinions Are Not Supported By The Scientific Literature On Which He Relied.**

Dr. Burton opined that the short-term use of Vioxx for approximately 30 days causes an imbalance between prostacyclin and thromboxane in the vasculature, and that that imbalance can result in an increased risk of CV events.  (Burton Dep. at 67:12-71:8.)  That opinion, however, is wholly unsupported.

For example, Dr. Burton testified that he was not aware of any scientific literature which has shown that Vioxx can decrease prostacyclin production in the vascular system, and agrees that he has no basis to say that Vioxx creates a clinically relevant imbalance between prostacyclin and thromboxane.  (Burton Dep. at 76:20-77:1, 126:25-127:6.)  Nor could he opine that Vioxx use, much less at the short duration and low dose at issue in this case, increases the risk of CV events.   In fact, Dr. Burton agreed that there is there is no clinical trial or epidemiological study showing an increased risk of sudden cardiac death on Vioxx.  (Burton Dep. at 259:19-260:2.)   Dr. Burton admitted that his opinions concerning Vioxx, its pharmacological mechanisms, and its effects are merely an assumption or "hypothetical" on his part, derived wholly from other experts:

> Q.      But, sir, there's a disconnect between understanding the inhibition of COX2, and then saying that, "Well, that inhibition of COX2 must mean that there's an increased risk of cardiovascular events."  You're not making that –
>
> A.      I agree with you there.
>
> Q.      You're not making that link, are you?
>
> A.      No.
>
> Q.      Okay.

6

A.      I'm just saying the two are consistent.  Not making the link.

Q.      And you're not giving the opinion that the link is there, are you?

A.      I'm basing my opinion the link is there on other people's opinions, a hypothetical.
. . . .
Q.      Well, we've agreed sir, that you're not giving the opinion that the pharmacological activity of Vioxx actually causes an increased risk of cardiovascular decease [*sic*], are you?

A.      I'm giving an opinion that based on other people's work, that I've adopted that opinion, not as an independent opinion.  I think we've clearly established that.

(Burton Dep. at 149:20-150:3, 150:21-151:13, 119:17-120:2.)

Dr. Burton's evidence in support of the assertion that there is an increased CV risk with thirty day of Vioxx use is similarly absent.  Dr. Burton could cite but one article – by Solomon – for this proposition.  Its deficiencies are addressed at length in Merck's Motion to Exclude Testimony of Plaintiff's Experts Regarding Causation, filed concurrently herewith.  In any event, Dr. Burton admitted that he is not qualified to analyze the Solomon study, and does not know if Solomon's conclusions are right or wrong.  (Burton Dep. at 138:3-21, 145:5-19, 123:12-14.)  Dr. Burton further admitted that he can cite no clinical trial showing increased CV risk with short-term use of Vioxx, and zero epidemiological evidence of increased risk with short-term use compared to placebo:

Q.      You can't cite me any clinical trial evidence that Vioxx is associated with an increased risk of cardiovascular events, in less than 30 days' use, correct?

A.      At clinical trial, no.

Q.      You can't cite me any epidemiological evidence that Vioxx is associated with an increased risk of cardiovascular events relative to placebo, in less than 30 days' use, correct?

A.      I personally can't, no.  I defer to the pharmacologist, if such exists.

7

(Burton Dep. at 131:23-132:9, 109:3-9, 145:20-146:2.)  Additionally, Dr. Burton admitted that published studies, such as the study by Konstam, which pooled Merck's data on Vioxx from 23 controlled clinical trials encompassing more than 28,000 patients,[2] do not indicate any increased CV risk with Vioxx at thirty days.  (Burton Dep. at 97:12-98:14, 109:10-110:7.)  Dr. Burton candidly admitted that, considering the scientific evidence as a whole, the weight of that evidence suggests that Vioxx is not associated with an increased CV risk in short-term use:

> Q.    Can you at least admit, sir, that the weight of the clinical trial and epidemiological evidence, suggests that Vioxx is not associated with an increased risk in short-term use?
>
> A.    As you've worded your question, I can agree with that, yes.

(Burton Dep. at 251:17-23.)

It is plain that Dr. Burton's opinion that Mr. Irvin's Vioxx use for less than thirty days caused or contributed to his death rests on a completely unreliable foundation and, in fact, is contrary to the weight of the scientific evidence according to Dr. Burton himself.  Under Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert,* Dr. Burton's testimony concerning Vioxx must be excluded.

### C.    Dr. Burton Has No Reliable Scientific Evidence Supporting The Hypothesized Mechanisms By Which He Believes Vioxx Could Cause Sudden Cardiac Death.

In addition to the absence of clinical and epidemiological evidence supporting Dr. Burton's general causation opinion, he has no reliable scientific evidence supporting the mechanisms by which he contends Vioxx could cause a thrombotic sudden cardiac death, specifically vasospasm and/or vasoconstriction and plaque rupture.

---

[2] *See* Merck & Co. Inc.'s Memorandum Regarding Vioxx Science Issues, filed concurrently herewith, at 8-9; Declaration of J. Michael Gaziano at ¶¶ 79-81.

789196v.1

Dr. Burton believes that the hypothesized imbalance between prostacyclin and thromboxane caused by COX-2 inhibitors can cause vasospasm or vasoconstriction but, like much of his testimony, he cannot cite to any reliable scientific evidence supporting this opinion.[3] For example, Dr. Burton admits that he is unaware of any evidence showing any association between Vioxx and vasospasm:

> Q.    Would you agree with me, sir, that there's no evidence to suggest that Vioxx increases the incidence of vasospasm?
>
> A.    That's fair.
> . . . .
> Q.    Okay. But isn't vasospasm, a specific clinical event?
>
> A.    Yes.
>
> Q.    And you would agree with me that there's no evidence to suggest that Vioxx increases the incidence of vasospasm, correct?
>
> A.    I think I stated that I'm not aware of the literature that specifically addresses vasospasm in Vioxx.

(Burton Dep. at 131:13-17, 170:12-20.)  Dr. Burton is similarly unaware of reliable evidence associating Vioxx with vasoconstriction:

> Q.    Prior to the break, the question that we were asking, you had stated that COX2 inhibitors had caused vasoconstriction in laboratory animals. And I asked which study had shown that, and then that's what started this process.
>
> A.    Right. And I haven't found the study that's talking about the laboratory animals yet.
>
> Q.    Okay. So would you agree that at least in humans, there has been no study to show, physiologically, that COX2 inhibitors like Vioxx, in fact cause vasoconstriction?
>
> A.    That's right. Not by direct effect, that's correct.

---

[3]  As described in Merck's Motion to Exclude Testimony of Plaintiff's Experts Regarding Causation, filed concurrently herewith, a coronary vasospasm is a sharp contraction of a coronary artery. Like vasospasm, vasoconstriction also refers to the contraction of an the artery, although one that does not necessarily occur as rapidly.

9

. . . .

Q.     Thank you.  Vasoconstriction from Vioxx, is a theoretical consequence of the COX2 inhibition, correct?

A.     That's what these papers imply, yes.

(Burton Dep. at 176:16-177:12.)  Even at a theoretical level, Dr. Burton concedes that the issue of whether Vioxx can cause vasoconstriction is controversial and that there are competing views in the medical literature on the subject.  (Burton Dep. at 177:22-178:7.)

Dr. Burton's opinions with respect to Vioxx and plaque rupture are the same; he has no expertise in or basis on which to opine that Vioxx causes or contributes to plaque rupture:

Q.     Would you agree with me that Vioxx played no role in rendering his plaque any more vulnerable than it was?

A.     I'll agree that I personally don't know how that would have happened, but I can't say that I know enough about it, pharmacologically, to absolutely rule it out.

Q.     You will not be opining at trial that Vioxx contributed to rendering Mr. Irvin's plaque more vulnerable, correct?

A.     Yes.  That's correct.
. . . .
Q.     So you're not going to come to trial and opine that Vioxx contributes to the disruptor, or rupture of plaque, correct?

A.     No, sir.  It would be one of those things I'd have to depend on a hypothetical or someone else's prior testimony.

(Burton Dep. at 271:11-21, 295:8-13.)  In the end, Dr. Burton cannot establish, by reliable scientific evidence, that the short-term use of Vioxx causes increased CV risks, nor does he have reliable scientific evidence of the mechanism by which such a hypothetical process would occur. His unreliable and unsupported testimony concerning general causation should be excluded under Federal Rule of Evidence 702 and *Daubert*.

10

## IV.   DR. BURTON DOES NOT HAVE RELIABLE SCIENTIFIC EVIDENCE TO OPINE ON SPECIFIC CAUSATION.

The absence of a reliable evidentiary foundation for Dr. Burton's unsupported general causation opinions likewise infects his specific causation opinions concerning the cause of Mr. Irvin's death.  As a pathologist, Dr. Burton may be qualified to opine that a thrombus formed in Mr. Irvin's artery, and that thrombus led to a sequence of events which resulted in Mr. Irvin's death.  But this is wholly different than the ability to opine that, to a reasonable degree of medical certainty, the thrombus was *caused by* Mr. Irvin's Vioxx use.  As to the latter subject, Dr. Burton's own deposition testimony makes clear that he is no expert on the subject and that he does not (and cannot) hold those opinions to a reasonable degree of medical certainty.

Dr. Burton admitted that heart disease is the most common cause of death of white men in their 50s by a wide margin, and had been so long before Vioxx was ever sold.  (Burton Dep. at 159:24-160:6.)  Indeed, he testified that it is a common occurrence for vasospasm-induced clots to lead to sudden cardiac death, and that these events probably happen tens of thousands of times in the United States each year.  (Burton Dep. at 185:20-186:9.)  Given that such events are regrettably common, Dr. Burton must demonstrate that Vioxx, as opposed to Mr. Irvin's preexisting heart disease or other risk factors, caused or contributed to his death.  Dr. Burton comes nowhere close to doing that.

To begin with, Dr. Burton admitted that he does not know whether Vioxx even caused an imbalance in the prostacyclin and thromboxane levels in Mr. Irvin:

> Q.    You don't know one way or another, whether Vioxx in fact caused a prostacyclin imbalance in Mr. Irvin, correct?
>
> A.    Correct.

(Burton Dep. at 180:2-6.)  Nor could Dr. Burton say that, but for this hypothesized imbalance, Mr. Irvin would not have died.  (Burton Dep. at 243:23-244:5.)

11

Furthermore, Dr. Burton testified that there is no way to detect whether Mr. Irvin actually had a vasospasm or vasoconstriction. (Burton Dep. at 167:10-16, 178:8-19.) And Dr. Burton testified that he cannot determine the sequence of events that led to the thrombus' formation; he testified that there were signs of plaque rupture, but he does not know its cause, and whether the rupture preceded or resulted from the clot. (Burton Dep. at 180:7-182:20.) As for the clot itself, Dr. Burton does not know how it formed, and he admits that there is no "signature" Vioxx-induced clot which allows it to be differentiated from a clot formed by other causes. (Burton Dep. at 180:19-181:20, 244:6-23.)

Given these uncertainties, and the fact that Mr. Irvin suffered from significant coronary artery disease as well as other risk factors such as obesity, it is hardly surprising that Dr. Burton acknowledges that, if his assumption that Vioxx increases short-term risk is wrong, he cannot opine that Mr. Irvin's death was due to Vioxx. (Burton Dep. at 192:16-193:10, 196:3-20, 291:10-24.)

> Q.    Can you admit that if there's not an increased risk of sudden cardiac death associated with Vioxx, in less than 30 days of use, that therefore Vioxx did not contribute to Mr. Irvin's death?
>
> A.    Yes, sir.

(Burton Dep. at 256:22-257:2.) In short, Dr. Burton simply assumes, without expertise in the subject or evidentiary proof, that Vioxx can cause a prothrombotic state and increase short-term CV risk. Having made that unsupported assumption, he concludes that Vioxx must have been a precipitating factor which, combined with Mr. Irvin's preexisting coronary artery disease, caused his death. But assumption is not science, and it is not permitted to substitute for scientific proof under Federal Rule of Evidence 702 and *Daubert*.

789196v.1

## V.   DR. BLOOR DOES NOT HAVE A RELIABLE SCIENTIFIC BASIS FOR HIS OPINIONS.

As with Dr. Burton, Dr. Bloor relies on unproven assumptions, rather than reliable scientific evidence, to support his opinions on general causation.  Like Dr. Burton, Dr. Bloor candidly admits that he has no expertise in the relevant area and has not done the work necessary to render his general causation opinions.  And like Dr. Burton, Dr. Bloor cannot opine to a reasonable degree of medical certainty that Mr. Irvin, given his preexisting risk factors, died because of his short-term use of Vioxx.

### A.     Dr. Bloor Does Not Have Reliable Scientific Evidence On Which To Opine On General Cause.

Dr. Bloor is a pathologist.  He, therefore, may be qualified to opine on the mechanisms of thrombotic sudden cardiac death – that is, how a clot may form after the rupture of an atherosclerotic plaque, how it may occlude blood flow, and how it may result in death.  Indeed, Dr. Bloor's report describes this process in detail.  (*See* Expert Report of Colin M. Bloor, M.D. ("Bloor Report"), attached as Ex. 31 to Wittmann Decl. I at 12-13.)   But having the qualifications to offer that opinion is completely different from being able to opine that Vioxx played some part in causing sudden cardiac death generally, or Mr. Irvin's death in particular.  Indeed, the words "Vioxx" and "COX-2," the drug and category of drug at issue in this case, do not appear anywhere in Dr. Bloor's report in this case, reflecting Dr. Bloor's awareness at the report-writing stage of the limited scope of his expertise.  (*See generally* Bloor Report.)

Dr. Bloor himself further admits that has he not done the work necessary to opine on issues relating to general causation.  He testified that he spent only 15-16 hours total on Vioxx matters, including drafting his 18-page report (a report written with the plaintiff's attorney present and actively participating in the drafting).  (Bloor Dep. at 17:21-18:9, 28:23-29:10.)

789196v.1

Moreover, Dr. Bloor admits that he simply "assumed" that Vioxx was prothrombotic for the purposes of his opinion – he did not do research of his own:

> Q.    Would you agree that – and I just want to know what I've got to get into. Are you assuming that Vioxx is thrombogenic based upon the people – other people in the case, for example, Dr. Lucchesi, and that's an assumption that you have, and if he's wrong, then – then you might be wrong; but you haven't done your own analysis to come up with that opinion –
>
> A.    No, I have –
>
> Q.    – is that what I understand?
>
> A.    – I have not.  I've assumed on the basis of reading his report.
>
> Q.    Okay.  So you're not – you're not here today saying, I've reviewed all the literature.  I have come to the opinion myself that under a general causation theory, Vioxx is thrombogenic.  I am assuming that, and then using that piece of information to interpret the slides of Mr. Irvin; is that fair?
>
> A.    That's correct.

(Bloor Dep. at 102:15-103:10, 131:20-132:6.)  The lack of reliable evidence supporting claims by Dr. Lucchesi and plaintiff's experts that short-term Vioxx use can cause increased CV risk is addressed at length in Merck' Motion to Exclude Evidence of Plaintiff's Experts Regarding Causation, filed concurrently herewith.  Dr. Bloor plainly should not be permitted to opine on these issues based solely on an assumption of general causation.[4]

**B.    Dr. Bloor Has No Reliable Scientific Evidence That Mr. Irvin's Thrombotic Event Was Caused By Vioxx Rather than His Preexisting Coronary Artery Disease Or Other Risk Factors.**

Dr. Bloor's own report discusses how coronary artery disease and resulting sudden cardiac death resulting from it is common in the United States.  He states that "Sudden Cardiac

---

[4] Other courts have found that Dr. Bloor's expertise does not lie in providing such causation testimony and have excluded him on that basis.  Dr. Bloor's causation testimony was specifically excluded in the Phen-Fen MDL proceeding.  *In re Diet Drugs Prods. Liab. Litig.*, No. MDL 1203, 2001 WL 454586, at *12-16 (E.D. Pa. Feb. 1, 2001).

Death, a form of heart disease, is reported to claim between 300,000 and 400,000 lives a year in the United States," and proceeds to describe how "some 80% of patients suffering a SCD are reported to have preexisting coronary artery disease." (Bloor Report at 11.) In fact, Dr. Bloor testified that coronary artery disease is among the most common causes of death in the United States, including for men in their 50s like Mr. Irvin. (Bloor Dep. at 32:12-33:1.) There is no question that Mr. Irvin had what Dr. Bloor termed "significant" coronary artery disease, with the maximum stenosis, or narrowing, in the left anterior descending ("L.A.D.") artery where the clot was found. (Bloor Dep. at 76:6-77:7.) Dr. Bloor testified that it is "very well known that if you have a high grade stenosis in the L.A.D. artery, those patients are at an increased risk for developing sudden arrhythmic events" and that with respect to thrombotic sudden cardiac deaths, that thrombus is usually found near the site of maximal stenosis. (Bloor Dep. at 56:14-57:9.) Additionally, Dr. Bloor admits that "vulnerable plaques" (those with a thin fibrous cap with a lipid rich core more likely to rupture) can occur at 50-60% stenosis, similar to the level found in Mr. Irvin, and that the characteristics of Mr. Irvin's lesion were consistent with vulnerable plaque. (Bloor Dep. at 51:3-53:19, 59:7-10, 78:14-18.) In short, nothing in the circumstances of Mr. Irvin's death differentiates it from the tens of thousands of similar sudden cardiac deaths each year.

Yet, in his deposition, Dr. Bloor for the first time opined that Vioxx somehow made Mr. Irvin's death different. This opinion was completely absent from his written report. Dr. Bloor testified that, despite Mr. Irvin's "significant" atherosclerosis, his thrombus did not result from a rupture of his pre-existing plaque; Dr. Bloor claims to have found no evidence of plaque rupture. (Bloor Dep. at 85:19-86:7.) Rather, Dr. Bloor testified the thrombus was caused by the thrombogenic properties of Vioxx, not plaque rupture. (Bloor Dep. at 85:19-86:7, 95:19-96:20.)

15

Dr. Bloor admitted that this opinion was nowhere set forth in his report.  (Bloor Dep. at 96:21-23.)  Setting aside the threshold impropriety of an expert attempting to offer opinions not expressed in his expert report, Dr. Bloor's opinion that Mr. Irvin had no plaque rupture is contrary to the testimony of both plaintiff's expert pathologist, Dr. Burton, and defendant's expert pathologist, Dr. Thomas Wheeler.[5]  As Dr. Burton, plaintiff's own pathologist expert, testified:

> Q.    Now, Mr. Irvin showed signs of ruptured plaque, correct?
>
> A.    Yes.  A plaque that, at least in one cut, has a small amount of hemorrhage beneath the plaque, which means that the hemorrhage could have caused the rupture, or the rupture could have caused the hemorrhage.
>
> . . . .
>
> Q.    Okay.  So the evidence of hemorrhage and the rupture in Mr. Irvin's LAD, in your mind, could have been the cause of the thrombosis, or the result of the thrombosis?
>
> A.    Either one.

(Burton Dep. at 180:7-13, 181:21-25; Expert Report of Thomas M. Wheeler, M.D. ("Wheeler Report"), attached as Ex. 41 to Wittmann Decl. I at 1.)  Plaintiff should not be allowed to pick and choose among diametrically opposite findings of its multiple experts in the exact same discipline on a fundamental factual issue such as whether Mr. Irvin's plaque ruptured.  The opinion of plaintiff's own pathology expert undercuts the foundation for Dr. Bloor's opposite conclusion.

Moreover, apart from his unproven assumption that Vioxx is thrombogenic, Dr. Bloor cannot explain the mechanism by which Vioxx could have caused Mr. Irvin's death.  Dr. Bloor testified that, while Mr. Irvin could have had a vasospasm, he has no evidence that a vasospasm

---

[5] In addition to Dr. Burton, the report of Dr. Frist, another pathology consultant retained by the plaintiff for the express purpose of obtaining an "independent evaluation" of Mr. Irvin's microscopic slides, notes that Mr. Irvin suffered a plaque rupture in the L.A.D.  (Burton Dep. at 277:25-280:3, *id.* at Ex. 14 (Report of Dr. Frist).)

789196v.1

occurred.  (Bloor Dep. at 106:18-107:4.)  As for plaque rupture, Dr. Bloor admits that no study

shows that Vioxx use makes plaque more vulnerable or unstable.  (Bloor Dep. at 115:19-116:9.)

And, like Dr. Burton, Dr. Bloor cannot point to anything that differentiates a purportedly Vioxx-

induced clot from a clot formed by any other cause.  (Bloor Dep. at 115:11-18.)  Dr. Bloor does

nothing except rely on the assumption that Vioxx could cause a thrombotic event, and opine *ipse*

*dixit* that it must have done so here.  As Dr. Bloor admits, without this central assumption, his

opinion regarding Mr. Irvin does not stand.   (Bloor Dep. at 107:5-109:8.)   Given these

admissions, Dr. Bloor's opinions cannot meet the requirements of Federal Rule of Evidence 702

and *Daubert*, and they must be excluded.

## VI.    CONCLUSION.

For the foregoing reasons, Merck's Motion to Exclude Testimony of Colin M. Bloor,

M.D. and Joseph L. Burton, M.D. should be granted.

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
4041 Essen Lane
One United Plaza, Suite 501
Baton Rouge, Louisiana 70809
Phone:  225-490-8900
Fax:     225-490-8960

Defendants' Liaison Counsel

17

789196v.1

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:     312-494-4440

And

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone: (202) 434-5000
Fax:     (202) 434-5029

Attorneys for Merck & Co., Inc.

18

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Memorandum in Support of Merck & Co., Inc.'s Motion to Exclude Testimony of Colin M. Bloor, M.D. and Joseph L. Burton, M.D. has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 21st day of October, 2005.

Phil Wittmann