

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 05-4046* | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| EVELYN IRVIN PLUNKETT | * | |
| as Personal Representative of the Estate of | * | |
| RICHARD IRVIN, JR., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * | | |

### MERCK & CO., INC.'S MOTION TO EXCLUDE TESTIMONY OF THOMAS BALDWIN, M.D.

Defendant Merck & Co., Inc. ("Merck"), through undersigned counsel, and pursuant to Rule 702 of the Federal Rules of Evidence, hereby moves to exclude the testimony of plaintiff's expert Thomas Baldwin, M.D.  The facts and law supporting this motion are more fully set forth

789202v.1

in the accompanying memorandum, declarations, and exhibits, which are incorporated as if fully set forth herein.

Respectfully submitted,

*Phil Wittmann*

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
4041 Essen Lane
One United Plaza, Suite 501
Baton Rouge, Louisiana 70809
Phone: 225-490-8900
Fax:    225-490-8960

Defendants' Liaison Counsel

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone: 312-494-4400
Fax:    312-494-4440

And

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone: (202) 434-5000
Fax:    (202) 434-5029

Attorneys for Merck & Co., Inc.

789202v.1

## **CERTIFICATE OF SERVICE**

I hereby certify that the above and forgoing Motion to Exclude Testimony of Thomas Baldwin, M.D. has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 21st day of October, 2005.

_____Phil Wittmann_____

789202v.1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **In re: VIOXX** | * | **MDL Docket No. 1657** |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | **JUDGE FALLON** |
| This document relates to Case No. 05-4046* | * | |
| | * | **MAGISTRATE JUDGE KNOWLES** |
| **EVELYN IRVIN PLUNKETT** as Personal Representative of the Estate of **RICHARD IRVIN, JR.,** | * | |
| Plaintiff, | * | |
| vs. | * | |
| **MERCK & CO., INC.,** | * | |
| Defendant. | * | |

### MEMORANDUM IN SUPPORT OF MERCK & CO., INC.'S MOTION TO EXCLUDE TESTIMONY OF THOMAS BALDWIN, M.D.

**I.   INTRODUCTION**

Plaintiff's expert cardiologist, Dr. Thomas Baldwin, opines, among other things, that "Mr. Irvin's use of Vioxx for less than 60 days created an increased risk of a sudden cardiac death," and that "Vioxx® caused or substantially contributed to cause the development of an acute thrombosis which resulted in coronary occlusion, subsequent cardiac ischemia, a clinically

789203v.1

evolving acute myocardial infarction, and the sudden death of Mr. Irvin." (Expert Report of Thomas Baldwin, M.D. ("Baldwin Report"), attached as Ex. 30 to the Declaration of Phillip A. Wittmann in Support of Merck's Motions to Exclude Testimony ("Wittmann Decl. I") at 12.) Dr. Baldwin's own testimony, however, demonstrates that he has no reliable scientific evidence on which to base such opinions under Federal Rule of Evidence 702.

## II.   **THE LEGAL STANDARD**

The admission of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

Once the proponent of the evidence proves that the offered testimony is based on sufficient facts or data, he or she must then "demonstrate that the expert's findings and conclusions are based on the scientific method, and, therefore, are reliable." *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc). This process is governed by the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). In *Daubert*, the Supreme Court made clear that the district courts must act as gatekeepers to ensure that expert testimony is both relevant and reliable, and identified the following non-exclusive factors a district court may consider in evaluating an expert's testimony: (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory

when applied; (4) the existence and maintenance of standards and controls; and (5) the theory or technique's degree of acceptance in the scientific community. *Daubert*, 509 U.S. at 593-94; *Moore*, 151 F.3d at 275; *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d 603, 605-06 (E.D. La. 2003). In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999), the Supreme Court explained that the overarching goal of *Daubert*'s gatekeeping requirement is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."

As discussed below, Dr. Baldwin's proposed causation testimony fails to meet these legal standards and therefore must be excluded.

### III. DR. BALDWIN IS NOT QUALIFIED TO RENDER OPINIONS ON GENERAL CAUSATION.

Dr. Baldwin is a cardiologist. However, his professional training and experience does not qualify him to speak on whether the short-term use (less than 30 days) of selective COX-2 inhibitors generally, or Vioxx in particular, increases cardiovascular ("CV") risk, nor has he done the requisite study and work necessary to create a reliable basis for such testimony. His general causation "opinions" are merely speculation, as they rely only on unproven assumptions and a selected subset of scientific literature which does not support his hypothesis.

#### A. Dr. Baldwin's Professional Training And Experience Does Not Qualify Him To Opine On General Causation.

Despite opining that the use of Vioxx for less than 60 days creates an increased risk of sudden cardiac death,[1] Dr. Baldwin has little experience with Vioxx. He admits that he has never done any research on NSAIDs generally, or on COX-2 inhibitors specifically. (Deposition

---

[1] The duration at issue here is less than 30 days use. To the extent Dr. Baldwin purports to opine on longer durations, his opinions are irrelevant and should not be admitted.

3

of Thomas Baldwin, M.D. ("Baldwin Dep."), attached as Ex. 2 to Wittmann Decl. I at 16:23-17:3.) Moreover, he has never treated a patient who he believes suffered a myocardial infarction or sudden cardiac death because of Vioxx, nor can he recall having any Vioxx patient who had taken Vioxx and suffered a thrombotic event. (Baldwin Dep. at 27:4-25.) In short, in his practice he has never seen what he alleges occurred here: a person taking Vioxx and suffering from a fatal thrombotic event.

Fatal thrombotic events themselves, however, are quite common for white men in their 50s – people just like Mr. Irvin. Dr. Baldwin acknowledges that thrombotic sudden death is the largest cause of death in the United States, and it is probably the most common cause of death in that group. (Baldwin Dep. at 118:8-17.) Given the unfortunately common fact that tens of thousands of Americans die from thrombotic events each year, and that Dr. Baldwin admits that there is no signature "Vioxx clot" which can be used to distinguish a potentially Vioxx-related thrombotic event from any other, one must look to whether there is relevant and reliable clinical and epidemiological data to support a causal connection. (Baldwin Dep. at 142:9-18.) As discussed below, however, Dr. Baldwin himself admits that this necessary data is lacking.

### B. Dr. Baldwin Admits That Clinical And Epidemiological Data Does Not Support His Hypothesis Of An Increased CV Risk With Less Than 30 Days Of Vioxx Use.

Although Dr. Baldwin has opined that short-term Vioxx use increases CV risk, he can point to no clinical data supporting that view. (Baldwin Dep. at 63:18-64:2, 105:13-20.) Nevertheless, Dr. Baldwin believes that based on the "totality" of the evidence he can opine that such an increased risk exists:

> Q. And you can – you can testify to that under oath, even though you cannot show me a single piece of clinical trial data that has been demonstrated, an increased risk of heart attack due to Vioxx in less than 30 days of use, correct?

      A.      When you say "clinical trial data," I will agree to that, but I think that, as previously stated, that there's strong evidence in totality that – that I can make that connection.

(Baldwin Dep. at 128:16-24.)  But when the "totality" of Dr. Baldwin's evidence is actually examined it is apparent that he has no basis to make such a connection.

In an attempt to gloss over his admitted lack of supporting randomized clinical trial data, Dr. Baldwin purports to rely on several epidemiologic (or observational) studies.  Dr. Baldwin cites two studies referenced in the expert report of Dr. Ray – the first by Solomon entitled "Relationship Between Selective Cycloxygenase-2 Inhibitors and Acute Myocardial Infarction In Older Adults;" and a second by Johnsen, entitled "Risk of Hospitalization for Myocardial Infarction Among Users of Rofecoxib, Celocoxib, and other NSAIDs." (Baldwin Dep. at 89:8-90:21.)  The deficiencies of these studies (such as the fact that Solomon found no statistically significant increased risk associated with Vioxx when compared to no NSAID use, NSAID use generally, use of ibuprofen, and use of naproxen) are addressed at length in Merck's Motion To Exclude Evidence of Plaintiff's Experts Regarding Causation, filed concurrently herewith, and need not be repeated here.  For present purposes it is sufficient to note that, when questioned about the specifics of these articles, Dr. Baldwin admitted that he could not recall whether he had actually read either article, and was in fact relying on Dr. Ray's report on them.  (Baldwin Dep. at 93:3-94:11, 159:14-160:3.)[2]

Dr. Baldwin also testified that he was relying on the findings of a study by Juni, "Risk of cardiovascular events and rofecoxib: cumulative meta-analysis." (Baldwin Dep. at 64:18-65:5, 66:2-8.)  But Dr. Baldwin admitted that Juni does not actually address 30-day use, but believes

---

[2] It is perhaps unsurprising that Dr. Baldwin could not recall reviewing the studies given that he had spent only 20-30 hours on the case, 10 of which came after forming his opinions and writing his report. (Baldwin Dep., 9:19-10:1, 11:3-23.)

its findings "suggest" a flat risk associated with Vioxx (*i.e.*, not dependent on duration). (Baldwin Dep. at 104:12-105:11.)

Apart from the fact that Juni unquestionably does not address short-term use (comparing only relative risk longer and shorter than 6 months),[3] Dr. Baldwin's conclusions regarding the Juni findings are fatally flawed and demonstrate a lack of understanding of basic statistical principles. For example, when asked whether Table 2 (on page 4) of the Juni study, which sets forth the relative risk of myocardial infarction when comparing Vioxx to controls, demonstrates that there was no statistical difference at the 25 mg dose, Dr. Baldwin disagreed despite the fact that the reported confidence interval for the results (CI .52-3.61) fell below 1.0. (Baldwin Dep. at 73:3-9, 76:9-78:6, 80:11-81:8.) He testified that, even where the confidence interval falls below 1.0, the issue of whether such a result is statistically significant depends on the comparator at issue and the size of the study. (*Id.*) Dr. Baldwin's position on this basic issue flies in the face of both science and law. *See* Saks et al., *Annotated Reference Manual on Scientific Evidence* (2d ed. 2004) at 500 (discussing the fact that a relative risk with a confidence interval below 1.0 is not statistically significant).[4] *See also LeBlanc v. Merrell Dow Pharms.*, 932 F. Supp. 782, 783 n.3 (E.D. La. 1996) ("To be 'statistically significant,' an epidemiological study must conclude. . . . that the confidence interval is not so great as to include 1.0"). Ultimately, Dr. Baldwin was forced to admit that, although he purportedly relied on the study for his opinion that there is a short-term risk associated with Vioxx, he does not understand how to interpret Juni's results with respect to the 25 mg dose. (Baldwin Dep. at 81:9-83:6.) His confusion may stem in part from the fact that since his fellowship he has not, with the exception of a single article he

---

[3] Juni P et al., *Risk of cardiovascular events and rofecoxib: cumulative meta-analysis*, LANCET 2004 Dec 4-10;364(9450):2021-9, 4.

[4] *See* Deposition of Dr. Barry Rayburn, 182:2-184:1 (discussing the lack of statistical significance of Juni's results for 25 mg Vioxx for periods less than 6 months).

authored in 1993, had the responsibility for analyzing data from clinical research studies. (Baldwin Dep. at 14:3-6, 15:17-16:6.)

Dr. Baldwin also alluded to another epidemiological study, and a clinical study of an experimental COX-2 inhibitor which he believed supported his view that Vioxx carries short-term increased CV risks. Despite repeated requests, however, he was unable to identify the purported studies nor was he able to provide any details concerning them. (Baldwin Dep. at 88:2-89:16, 106:11-107:19, 144:8-145:7.)

### C. Dr. Baldwin's Has No Reliable Scientific Evidence Supporting The Hypothesized Mechanism By Which Vioxx Could Cause Sudden Cardiac Death.

Faced with the lack of clinical and epidemiological data supporting his short-term risk hypothesis, Dr. Baldwin also relies on what he believes to be the pharmacology of Vioxx to provide support for a hypothetical mechanism of action by which it could cause sudden cardiac death. Specifically, Dr. Baldwin believes that Vioxx's inhibition of COX-2 causes prostacyclin levels to drop, leading to an imbalance with thromboxane levels, resulting in a prothrombotic state with increased vasoconstriction and platelet aggregation. (Baldwin Dep. at 42:11-43:23.) This theory often is referred to as the "FitzGerald hypothesis" or the "imbalance theory."

The lack of reliable scientific support for the FitzGerald hypothesis is discussed in detail in Merck's Motion to Exclude Testimony of Plaintiff's Experts Regarding Causation, filed concurrently herewith, and need not be repeated here. Putting aside the overall lack of reliable scientific support for the FitzGerald hypothesis, it is certain that Dr. Baldwin should not be allowed to opine as to the legitimacy of that mechanism. Specifically, Dr. Baldwin cannot cite a single study that shows that Vioxx inhibits prostacyclin production within the human vascular

system. (Baldwin Dep. at 45:16-46:5.) Rather, it is his "general belief" that it does.[5] Nor can he quantify the degree to which he believes Vioxx inhibits prostacyclin, or the level of inhibition necessary to become clinically relevant. (Baldwin Dep. at 51:14-52:14, 52:16-18, 54:3-10.) Moreover, he admits that he does not know what percentage of Vioxx users suffered from a clinically relevant imbalance, or what Mr. Irvin's prostacyclin and thromboxane levels were on the day he died. (Baldwin Dep. at 150:20-151:25, 126:4-13.)

Given this absence of data supporting the existence, much less the quantification, of the prostacyclin imbalance theory, Dr. Baldwin's assertion that Mr. Irvin must have had an imbalance, simply because he took Vioxx, cannot withstand *Daubert* and its progeny:

> Q.   Do you have any way to know, sir, whether Mr. Irvin had a thromboxane/prostacyclin imbalance?
>
> A.   I don't, other than the fact that he was taking a drug that I believe causes that imbalance.
>
> . . . .
>
> Q.   You know he had a prostacyclin/thromboxane imbalance?
>
> A.   Yes.
>
> . . . .
>
> Q.   And you're prepared to say that under oath, even though you can't point me to a single study that has ever been done to show a clinically relevant imbalance of prostacyclin and thromboxane due to Vioxx, correct?
>
> A.   Correct.

(Baldwin Dep. at 125:25-126:3, 128:1-3, 128:11-15.) This type of unfounded testimony is precisely what a court, exercising its gatekeeping function, should exclude when it examines the

---

[5] When questioned further, he testified that he believed there may be a human study that examined whether COX-2s could cause some imbalance in prostacyclin and thromboxane, but he could not recall whether it involved Vioxx, which area of the vasculature was examined, or exactly what was being measured. (Baldwin Dep. at 111:4-115:4.) In fact, there is no such human study examining prostacyclin levels in the vasculature.

8

basis for an expert's opinion. *See Tanner v. Westbrook*, 174 F.3d 542, 548 (5th Cir. 1999) (admission of an expert's opinion was an abuse of discretion when the doctor's testimony leaped from the area of his expertise to a matter in which he had no specialized knowledge or other supporting authority); *see also Black v. Food Lion, Inc.*, 171 F.3d 308, 314 (5th Cir. 1999) (admission of expert testimony was abuse of discretion when particular opinion had no apparent underlying support).

### IV. DR. BALDWIN CANNOT PROVE, TO A REASONABLE DEGREE OF MEDICAL CERTAINTY, THAT MR. IRVIN'S DEATH WAS CAUSED BY HIS SHORT-TERM USE OF VIOXX.

Dr. Baldwin agrees that the vast majority of Vioxx users suffered no adverse cardiovascular effects, and he testified that, even for those who suffered from a sudden cardiac death while on Vioxx, Vioxx did not necessarily contribute to it. (Baldwin Dep. at 117:20-118:7.) This admission is not surprising given that Dr. Baldwin also acknowledges that thrombotic sudden death is the largest cause of death in the United States. (Baldwin Dep. at 118:8-17.) Moreover, tens of thousands of these deaths occur in individuals, like Mr. Irvin, who have no evidence of prior ischemic events. (Baldwin Dep. at 118:25-125:19.)

Despite the lack of evidence differentiating Mr. Irvin's death from any other thrombotic death, Dr. Baldwin nevertheless believes that Mr. Irvin's Vioxx use somehow resulted in a blood clot which obstructed a major coronary artery, causing a clinically evolving acute myocardial infarction and the sudden death of Mr. Irvin. (Baldwin Report at 12; Baldwin Dep. at 38:17-39:3.) Dr. Baldwin is far less certain, however, of the mechanism by which this thrombus formed, and the role Vioxx played in its creation. Dr. Baldwin testified that Mr. Irvin's clot

could have formed as the result of either vasospasm, plaque rupture, or platelet aggregation, but he cannot determine which mechanism was responsible.[6] (Baldwin Dep. at 115:12-117:19.)

> Q: Now, with – with respect to which mechanism you believe caused Mr. Irvin's death, you've given me three possibilities. Vasospasm in a coronary artery, plaque rupture, or platelet deposition, correct?
>
> A. Yes.
>
> Q. Do you have a view as to which of those three is the most likely?
>
> A. No idea, could be a combination of two or three.

(Baldwin Dep. at 129:13-21.) Dr. Baldwin admits that he is not aware of any evidence which indicates that Vioxx causes an increased risk of vasospasm and plaque rupture:

> Q. Okay. There was a lot of may's in there, so let me see if I can ask this question. You're not aware of any study, literature, or clinical trial that has demonstrated an increased risk of plaque rupture associated with Vioxx, correct?
>
> A. Correct.
>
> Q. Now, with respect to vasospasm, you're not aware of any literature, data, study, or clinical trial that demonstrates an increased risk of vasospasm associated with Vioxx, correct?
>
> A. Correct, clinical study, correct.
>
> Q. Or – are you aware of any other study which shows an increased risk of vasospasm?
>
> A. I'm not aware of one.

(Baldwin Dep. at 139:7-20.) Although Dr. Baldwin admits that vasospasms, plaque ruptures, and clots can form in the absence of Vioxx, he nevertheless theorizes, based solely on his unsupported belief that Mr. Irvin suffered from a prostacyclin/thromboxane imbalance, that his Vioxx use caused or contributed to his death. (Baldwin Dep. at 122:24-125:12.) Dr. Baldwin

---

[6] Dr. Baldwin admits that he never reviewed the reports of the pathologists in this case, nor has he reviewed the microscopic slides of Mr. Irvin's autopsy. (Baldwin Dep. at 40:17-23, 123:3-13.)

789203v.1

makes this speculative statement despite the fact that his only "evidence" that Mr. Irvin suffered an imbalance, much less a clinically relevant one, is that he was taking Vioxx at or near the time of his sudden thrombotic death – he has no proof of Mr. Irvin's actual prostacyclin levels or how much of an imbalance would be needed. (Baldwin Dep. at 125:25-126:3, 154:22-155:4.) He can point to no clinical or epidemiological study of Vioxx demonstrating that this imbalance even exists, much less that it is clinically relevant. In light of the lack of scientific support for Dr. Baldwin's imbalance theory, Dr. Baldwin cannot rule out, to a reasonable degree of medical certainty, that factors entirely unrelated to Vioxx, such as Mr. Irvin's known atherosclerosis, obesity, and sedentary lifestyle, caused his death – much like they do each year for tens of thousands of American men in their 50s who have never taken Vioxx. *See Donohue v. State of Florida*, 801 So. 2d 124 (Fla. 2001).

## V.   CONCLUSION

For all the forgoing reasons, Merck respectfully requests that the Court grant its motion to exclude Dr. Baldwin's testimony in its entirety.

Respectfully submitted,

*Phil Wittmann*

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
4041 Essen Lane
One United Plaza, Suite 501
Baton Rouge, Louisiana 70809
Phone:  225-490-8900
Fax:     225-490-8960

Defendants' Liaison Counsel

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:     312-494-4440

And

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone: (202) 434-5000
Fax:     (202) 434-5029

Attorneys for Merck & Co., Inc.

789203v.1

## **CERTIFICATE OF SERVICE**

I hereby certify that the above and forgoing Memorandum in Support of Merck & Co., Inc.'s, Motion to Exclude Testimony of Thomas Baldwin, M.D. has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 21st day of October, 2005.

*Phil Wittmann*

789203v.1