

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2005 OCT 21  PM 2: 58

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 05-4046* | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| EVELYN IRVIN PLUNKETT | * | |
| as Personal Representative of the Estate of | * | |
| RICHARD IRVIN, JR., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MERCK & CO., INC.'S MOTION TO EXCLUDE
## TESTIMONY OF JOHN W. FARQUHAR, M.D.

Defendant Merck & Co., Inc. ("Merck"), through undersigned counsel, and pursuant to

Rule 702 of the Federal Rules of Evidence, hereby moves to exclude the testimony of plaintiff's

expert John W. Farquhar, M.D. The facts and law supporting this motion are more fully set forth

___ Fee_____
___ Process_____
_X_ Dktd_____
___ CtRmDep_____
___ Doc. No._____

789212v.1

in the accompanying memorandum, declarations, and exhibits, which are incorporated as if fully set forth herein.

Respectfully submitted,

_Phil Wittmann_

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
4041 Essen Lane
One United Plaza, Suite 501
Baton Rouge, Louisiana 70809
Phone:  225-490-8900
Fax:      225-490-8960

Defendants' Liaison Counsel

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:      312-494-4440

And

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone: (202) 434-5000
Fax:      (202) 434-5029

Attorneys for Merck & Co., Inc.

789212v.1

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Motion to Exclude Testimony of John W. Farquhar, M.D. has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 21st day of October, 2005.

Phil Wittmann

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| **This document relates to** | * | |
| **Case No. 05-4046*** | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| **EVELYN IRVIN PLUNKETT** | * | |
| as Personal Representative of the Estate of | * | |
| **RICHARD IRVIN, JR.,** | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| **MERCK & CO., INC.,** | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM IN SUPPORT OF MERCK & CO., INC.'S MOTION
## TO EXCLUDE TESTIMONY OF JOHN W. FARQUHAR, M.D.

### I.   INTRODUCTION

Plaintiff's expert Dr. John Farquhar, a cardiologist, intends to offer a broad opinion on general causation, asserting that Vioxx® "causes cardiovascular disease…, including heart attacks, strokes, transient ischemic attacks…, peripheral edema and congestive heart failure." (Expert Report of John W. Farquhar, M.D. ("Farquhar Report"), attached as Ex. 33 to the Declaration of Phillip A. Wittmann in Support of Merck's Motions to Exclude Evidence

("Wittmann Decl. I") at ¶18.)[1]  He also opines that Vioxx causes hypertension (*id.*) and asserts that the risk of heart attack associated with taking Vioxx begins when the patient first takes Vioxx and continues throughout the period of usage (*id.* at ¶¶ 176-183).  The Court should strike Dr. Farquhar's causation opinions in their entirety pursuant to Federal Rule of Evidence 702.  Dr. Farquhar's own testimony unequivocally demonstrates that such opinions are not based on reliable scientific evidence.

Dr. Farquhar also purports to opine on the state of Merck's knowledge and understanding of the risks allegedly associated with Vioxx and to make value judgments about the "appropriateness" of Merck's conduct.  (Farquhar Report at ¶¶ 21, 185-199.)  All testimony concerning what Merck knew should also be excluded under Rule 702.  Such testimony is without foundation, is not based on any specialized knowledge that Dr. Farquhar has, and will not assist the trier of fact.  Finally, Dr. Farquhar's subjective normative judgments must be excluded; such opinions are irrelevant and will not assist the jury in finding the facts necessary to determine whether Merck's conduct met the applicable legal standards.

## II.    THE LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  As a threshold matter, Rule 702 requires exclusion of testimony beyond a witness's expertise.  *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1050 (5th Cir. 1998) (trial court properly excluded property appraisal testimony since witness not a licensed appraiser or real estate broker and lacked training or formal schooling in appraisal methods).  Once the proponent of evidence

---

[1] Mr. Irvin had coronary artery disease – atherosclerosis – and he died suddenly.  Plaintiff claims Vioxx caused that death; Merck claims his coronary artery disease caused his death.  At no time has plaintiff contended that Mr. Irvin had a stroke, TIAs, edema, congestive heart failure, or high blood pressure.  Accordingly, Dr. Farquhar's opinions on the causation of these other medical conditions are irrelevant and inadmissible.  Merck will address such irrelevant testimony in a separate motion in limine.

789213v.1

proves that the offered testimony is based on sufficient facts or data and within the expert's actual expertise, he or she must then "demonstrate that the expert's findings and conclusions are based on the scientific method, and, therefore, are reliable." *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir.1998) (en banc).

The determination of reliability is governed by the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). There, the Supreme Court made clear that the district courts must act as gatekeepers to ensure that expert testimony is both relevant and reliable, and it identified the following non-exclusive factors a district court may consider in evaluating an expert's testimony: (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the theory or technique's degree of acceptance in the scientific community. *Daubert*, 509 U.S. 593-94; *Moore*, 151 F.3d at 275; *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d 603, 605-06 (E.D. La. 2003). In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999), the Supreme Court further explained that the objective of *Daubert*'s gatekeeping requirement is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."

As discussed below, Dr. Farquhar's proposed testimony fails to meet these legal standards and therefore must be excluded.

## III.   DR. FARQUHAR'S OPINIONS ON GENERAL CAUSATION DO NOT HAVE A RELIABLE SCIENTIFIC BASIS.

Dr. Farquhar's opinion that short-term use (less than 30 days) of Vioxx increases the risk of a thrombotic cardiovascular event lacks a reliable scientific basis. Although his report is

3

lengthy and refers to numerous studies, Dr. Farquhar admitted that no data from clinical studies

support his opinion that Vioxx carries an elevated risk of thrombotic cardiovascular events when

used for a period of two months or less:

> Q.    Did your analysis looking only at the end points of MI, sudden
> death and unstable angina produce in your words a statistically significant
> separation of the event curves at two months or less?
>
> A.    At two months or less?
>
> Q.    Yes, sir.
>
> ....
>
> [A.]    *I really have to say if one is trying to find separations statistically
> significant at two months, you have to design a study that will allow you to
> see it with the statistical power that you do at the beginning, and unless
> you do that, asking a question about what did something show at two
> months is really going out on a limb.*
>
> [Q.]    Well, Doctor, let me rephrase the question.... Do you have any
> evidence, based upon your review of the adjudicated data, that there was a
> statistically significant increased risk for MI, MI at two months use of
> Vioxx or less?
>
> ....
>
> A.    And I'm trying to say that – well, I can't ask you any questions,
> *but I know that no study has been designed to answer statistically what is
> going on in two months.*
>
> *But there's a generalization that when you end up with a relative risk at
> the end of the trial, you assume it applies throughout.*

(Deposition of John W. Farquhar ("Farquhar Dep."), attached as Ex. 6 to Wittmann Decl. I at

194:14-196:24 (emphasis added; objections and colloquy omitted).)  As this testimony makes

clear, Dr. Farquhar has "assume[d]" the existence of a risk from short-term use of Vioxx; no data

reflecting two months of use actually support his view.  Assuming that a short-term risk exists

when no data so indicate does not constitute reliable scientific evidence.

4

In an effort to overcome the absence of clinical trial data to support his opinion, Dr. Farquhar attempts to focus on investigator-reported events from the Vioxx clinical trials rather than the data as adjudicated by independent, blinded outside committees of experts.[2]  But Dr. Farquhar's shift of focus and his attendant reinterpretation (and misinterpretation) of data cannot compensate for the fundamental absence of reliable scientific support for his opinion.

A.     **Dr. Farquhar's Opinion That Short-Term Use Of Vioxx Causes Cardiovascular Disease Is Based On A Misinterpretation Of Merck's Clinical Studies And Therefore Lacks A Reliable Scientific Basis.**

Dr. Farquhar testified that his opinion that Vioxx causes cardiovascular disease is based primarily on his analysis of the results of the APPROVe trial and other clinical trials that Merck conducted.  (*See, e.g.,* Farquhar Report at ¶¶ 71-157, 200.)  However, Dr. Farquhar misinterprets the data from the trials upon which he purports to rely, ignores data from those same studies that contradict his opinion, and relies on studies that do not even attempt to measure the risk associated with the short-term use of Vioxx at the 25 mg dose.  As a result, there is no reliable scientific basis for his opinion.

**APPROVe.**  Dr. Farquhar testified that, looking only at the *high risk* patients in the APPROVe trial – those with symptomatic atherosclerotic disease or diabetes – one can see a statistically significant increased risk for cardiovascular events within the first 18 months. (Farquhar Dep. at 187:7-188:16.)  Dr. Farquhar's reliance on these two post hoc subgroups is wrong for a host of independent reasons.

---

[2] "Investigator-reported events" are essentially raw data.  They are medical events that field investigators involved in a clinical trial observe in trial subjects and report.  (Farquhar Dep. at 139:15-24.)  "Adjudicated" data or events are those that have been reviewed by experts in the appropriate field to determine that they were in fact cardiovascular events, for example – a "good process," according to Dr. Farquhar, "that should always be done."  (*Id.* at 139:25-140:10.)

First, as discussed in greater detail in Merck's Background Science Brief ("Science Brief"), its Memorandum In Support Of Motion To Exclude Testimony of Plaintiff's Experts Regarding Causation ("Causation Testimony Brief"), and the accompanying Appendix of Studies, all filed concurrently herewith, the overall results of APPROVe do not show that such short-term use of Vioxx is associated with an increased risk of thrombotic cardiovascular events. Although the results showed an increased risk of adverse cardiovascular events that began *after* 18 months of continuous use and that became statistically significant *after* 30 months,[3] the study did *not* detect a statistically significant risk, or even a trend,[4] during the first 18 months of continuous use. (Science Brief at 16.) Mr. Irvin did not use Vioxx for anywhere near 18 months; he used it for less than one month. Whatever relevance the APPROVe data may have in cases involving comparable long-term use, they cannot establish to a reasonable degree of medical and scientific certainty that the short-term use of Vioxx (for less than 30 days, in Mr. Irvin's case) can cause a thrombotic cardiovascular event.

Second, on the relevant issue of the effect of short-term use of Vioxx on cardiac events, Dr. Farquhar admits that there was no statistically significant difference in APPROVe between the Vioxx group and the placebo group during the first 18 months of use:

> Q.    ...[W]ill you agree that there is no statistically significant separation of those events between Vioxx and placebo within the first eighteen months?
> ....

---

[3] Dr. Farquhar analyzed the data from APPROVe only for the incidence of heart attack, sudden death, and unstable angina, and he acknowledged that he did not find a statistically significant difference between the rates of occurrence of those events in the Vioxx and placebo groups until after *close to three years* (Farquhar Dep. at 270:24-271:15) – a period much longer than the extremely short time period in which Mr. Irvin took Vioxx.

[4] A "trend" is different from an effect that is "statistically significant." (Farquhar Dep. at 147:9-23.)

789213v.1

> [A.]   Well, Mr. Parker, there's no statistically significant difference, but there is a difference, and the relative risk is 1.18 at six months.

(Farquhar Dep. at 190:16-23.)  Similarly, Dr. Farquhar's own Kaplan-Meier curve of these data from APPROVe shows *no difference* at one month of use, the duration at issue in this case. (Farquhar Report at 34.)

Third, Dr. Farquhar confirmed that the data pertaining to the selective post hoc subgroup of "high risk" patients on which he focused do not support any conclusion relevant to Mr. Irvin. It "would be difficult" to place Mr. Irvin in that subgroup:

> [A.]   What I do know about Mr. Irvin is that he had serious coronary disease, but I have no information whether or not he had diabetes.  I know he was overweight.  That's common in diabetics, and there seems to be no evidence of prior heart attack or stroke, and so one is left with some autopsy data on some fairly severe coronary artery disease, and as one looks at the Approve data as the prototype basis for high-risk conferring higher risk, you—from what I know about Mr. Irvin, it would be difficult to place him in either of those two categories that we examined.
>
> [Q.]   Those being diabetes or history of ischemic heart disease?
>
> [A.]   That's right.

(Farquhar Dep. at 257:16-258:4.)  In other words, whatever increased risk occurred in these two post hoc subgroups, Mr. Irvin was not in these subgroups and that risk does not apply to him.

Fourth, with respect to the other categories of patients that Dr. Farquhar did not analyze and within which Mr. Irvin would fall, Dr. Farquhar could not identify any that showed a statistically significant increased risk during the first 18 months of the study.  (Farquhar Dep. at 258:5-17.)

Fifth, Dr. Farquhar's analysis of "high risk" APPROVe participants – *i.e.*, those with a prior history of symptomatic atherosclerotic disease or diabetes – does not even support his

7

opinion.[5]  Although this "high risk" subgroup chose a higher relative risk than the overall stud

population, Dr. Farquhar acknowledged that the confidence interval for even this subgroup falls

below 1.0 *at 18 months*, which means that any increased risk is *not* statistically significant.

(Farquhar Report at 32 n.3.)

Sixth, notably absent from Dr. Farquhar's report is any assertion of increased risk for any

patient population – "high risk" or otherwise – with one month of use of Vioxx.[6]  Apparently

recognizing that results of the APPROVe study upon which he places his greatest reliance do not

support an opinion of increased risk with short-term use, Dr. Farquhar falls back on the

"generalization" – described at page 4 *supra* – that when there is an outcome that shows a

relevant risk at the end of a study, one may assume that the relevant risk that is disclosed applies

throughout the course of the study.  (Farquhar Dep. at 196:18-24.)  But this "generalization" is

not only contrary to fact – it is also not "scientific knowledge" and cannot establish legal

causation. *See Daubert*, 509 U.S. 579, 589-90 ("The adjective 'scientific' implies a grounding in

the methods and procedures of science.  Similarly, the word 'knowledge' connotes more than

subjective belief or unsupported speculation."). *Cf. Anderson v. Bristol Myers Squibb Co.*, No.

H-95-0003, 1998 U.S. Dist. LEXIS 23259, at *15-16 (S.D. Tex. Apr. 17, 1998) (rejecting

argument that medical expert's opinions should be excluded only if unreliable and irrelevant in

light of theories and techniques within the physician's clinical discipline).

---

[5] Dr. Farquhar's attempt to use this inapplicable subgroup analysis to support an unworkable
causation theory is but one example of his attempt to cherry pick data.  Another illustration of
Dr. Farquhar's highly selective approach to the data he relied on is provided by his studious
avoidance of the pooled analysis of the cardiovascular data from the Vioxx clinical trials. (*See*
Farquhar Dep. at 176:19-177:24.)

[6] Dr. Farquhar lacks a foundation for testifying at trial about any statistical analysis.  He is not a
statistician (Farquhar Dep. at 12:15-14:10), and he did not personally review the statistical files
for the program that was used to analyze data.  Instead, a statistician reviewed the files for him.
(*Id.* at 12:15-14:10, 15:17-21.)

8

Nor is such an approach consistent with the scientific method. A scientist's failure to proceed from a null hypothesis before arriving at his conclusion "invert[s] the scientific method" and "undermines the reliability" of his work. *In re Diet Drugs*, MDL Docket No. 1203, 2001 U.S. Dist. LEXIS 1174, at *42 (E.D. Pa. Feb. 1, 2001*); see also Claar v. Burlington N. R. R.*, 29 F.3d 499, 502-03 (9th Cir. 1994) ("Coming to a firm conclusion first and then doing research to support it is the very antithesis of [the scientific] method."); *Castellow v. Chevron USA,* 97 F. Supp. 2d 780, 786 (S.D. Tex. 2000) ("From that conclusion [plaintiffs' experts] have 'worked backward' to find medical and scientific support. Such a practice cannot withstand *Daubert* scrutiny and is not due any credence in a court of law."). Dr. Farquhar's highly selective reliance on post hoc subgroups from APPROVe that he acknowledged Mr. Irvin was *not in* strongly suggests that he was simply seeking to confirm what he already believed – that use of Vioxx over a period as short as one month carries with it an increased risk of cardiovascular events. Accordingly, his methodology was not consistent with the scientific method.[7]

In short, APPROVe provides no scientifically reliable evidence that Vioxx use for approximately one month can cause a fatal cardiovascular event.

**VIGOR.** Dr. Farquhar also cannot look to the VIGOR study to support his opinion. The VIGOR participants took Vioxx only at the 50 mg dose – twice the dose Mr. Irvin took. There was no difference in the rate of confirmed thrombotic cardiovascular events between participants who took Vioxx and those who took the active comparator naproxen during the first month of the trial. The VIGOR participants comprised an elderly population with rheumatoid arthritis, itself a risk factor for fatal cardiovascular events, as Dr. Farquhar acknowledged. (*See* Farquhar Dep. at

---

[7] The fact that Dr. Farquhar reached conclusions before reviewing all of the data is uncontroverted. He testified that, *before* he had completed his review of the data from the Vioxx clinical trials or his report in this case, he met with plaintiffs' attorneys to advised them which Vioxx cases they should retain and seek to try. (Farquhar Dep. at 259:2-261:24 .)

789213v.1

98:21-99:12, 126:22-127:10.) Finally, VIGOR did not compare Vioxx to placebo but instead to naproxen, making it impossible to determine whether the higher rate of cardiovascular events seen in the Vioxx arm by the end of the study was attributable to the prolonged use of Vioxx at the 50 mg dosage, a cardioprotective effect of naproxen, or chance. *See* Causation Testimony Brief, App. of Studies at 2-3.

**ViP and VICTOR.** Both of these studies were ongoing when Merck voluntarily withdrew Vioxx from the market in September 2004, and both were terminated on September 30, 2004. ViP did not reveal any statistically significant differences in the number of thrombotic cardiovascular events, heart attacks, and sudden deaths suffered by participants in the Vioxx and placebo arms, a conclusion with which Richard Kronmal, plaintiff's expert in biostatistics, essentially agrees. *See* Causation Testimony Brief, App. of Studies at 4 (citing Rayburn Report at 19), 5 (citing trial testimony of Richard Kronmal in *Humeston v. Merck & Co., Inc.*). Only incomplete interim data regarding confirmed cardiovascular events are currently available from VICTOR, but those data do not show a statistically significant increased risk of heart attacks or sudden death associated with Vioxx. *Id.* (citing Rayburn Report at 19). Moreover, the average duration of Vioxx usage by patients who suffered a heart attack or sudden death was close to one year, many times longer than the duration of Mr. Irvin's Vioxx use. Causation Testimony Brief, App. of Studies at 4-6.

**Alzheimer's Studies.** In the first of these two studies, the number of confirmed serious cardiovascular events was greater in the placebo arm than in the Vioxx arm – an outcome that plainly does not support Dr. Farquhar's opinion. Causation Testimony Brief, App. of Studies at 6-7. The second study, in which the median duration of Vioxx usage was 94 weeks, did not

reveal a statistically significant difference in the number of heart attacks and cardiac arrests that occurred within the Vioxx group as compared to the placebo group. *Id.*

**ADVANTAGE.**  Like VIGOR, this study compared Vioxx to naproxen, not placebo, and it did not reveal a statistically significant disparity in the incidence of thrombotic cardiovascular events that occurred in the Vioxx and naproxen groups, as Dr. Farquhar himself acknowledges. (Farquhar Dep. at 296:4-297:18; Causation Testimony Brief, App. of Studies at 6.)

**B.      The Observational Studies That Dr. Farquhar Reviewed Do Not Supply A Reliable Scientific Basis For His Opinions.**

Dr. Farquhar also relies, to a much lesser extent, on data from five observational studies that he contends "amplify, complement, and verify the conclusions reached from the [randomized clinical trials]."[8]  (Farquhar Report at ¶¶ 158-64.)  Those studies do not supply a scientifically reliable basis for Dr. Farquhar's opinion on cardiovascular risk, for the reasons summarized below and stated in more detail in Merck's Causation Testimony Brief and the Appendix of Studies that accompanies it.

**Solomon.**  Dr. Farquhar relies on a retrospective observational study, conducted by Dr. D. H. Solomon in 2003, that was based on a review of patient records in a Medicare database. There are several reasons why the Solomon study does provide support for Dr. Farquhar's opinion regarding short-term use,  including the following:

- It did not report a statistically significant increased risk of myocardial infarction from Vioxx at any dose as compared to no current NSAID use or NSAID use generally.

---

[8] Dr. Farquhar himself was dismissive of the significance of these studies in particular and observational studies in general. He testified that "[a]nything that is involved in observational epidemiology has less relevance [than] different kinds of data that comes out of the randomized control trials...." (Farquhar Dep. at 16:14-17:16.) He also observed that he "was not interested in being pinned down on observational epidemiology.  It's not [an] important part of my total report." (*Id.* at 290:2-4.)

11

- It anomalously found that Vioxx "may include a period of elevated risk" for cardiovascular events, when compared to Celebrex®, during the first 30 days of use, but not after 90 days.

- Its findings conflict with years of randomized controlled clinical data showing no increased risk associated with the short-term use of Vioxx – including data from APPROVe and other studies. *See* Declaration of J. Michael Gaziano, M.D., M.P.H. in Support of Merck's Motions to Exclude Evidence, at ¶ 54.

- Dr. Solomon himself concedes that there are "important potential limitations" to his study, including "the potential for bias by unmeasured confounders" as well as "residual confounding by factors that were incompletely assessed in this administrative database, such as severity of cardiovascular risk factors."

Causation Testimony Brief, App. of Studies at 10-12.

**Graham.**  Dr. Farquhar cites a 2005 study by Graham that purports to find an increased risk of heart attacks and sudden cardiac death associated with the use of Vioxx as compared to Celebrex.  But Graham's analysis is deeply flawed[9] and cannot apply to this case for at least the following reasons:

- Most significantly, the Graham study found no increased risk of heart attack from taking Vioxx at the 25 mg dose.  (Farquhar Dep. at 290:14-19.)

- Graham did not purport to evaluate the relative risk associated with Vioxx in the first 30 days of use.  Instead, the mean duration of Vioxx use prior to the occurrence of a study event was almost four months.

- Graham acknowledged that, because of the limited power of his study, he was "unable to fully address whether the cardiovascular risk associated with rofecoxib varied by duration of use."

- Graham's estimates of the excess number of fatal and non-fatal heart attacks supposedly attributable to Vioxx are inconsistent with results of

---

[9] Dr. Farquhar admitted that he has a "generic objection" to observational studies such as that done by Graham that consist of a retrospective analysis of data obtained from insurance companies, for example.  (Farquhar Dep. at 132:8-23.)  Such studies, unlike randomized clinical trials, "are subject to confounding" and do not supply the same degree of assurance as clinical trials.  (*Id.*)

the APPROVe study, which show no increased risk of adverse cardiovascular events or death associated with the use of Vioxx at the 25 mg dose during the first 18 months, and with the results of the VIGOR study, which show no increased risk of heart attacks associated with the use of Vioxx at the 50 mg dose during the first month of use.

- Graham's estimates also are inconsistent with the findings of his own study, which likewise show no statistically significant increased risk of adverse cardiovascular risks associated with the use of 25 mg Vioxx (odds ratio of 1.23, with a confidence interval of 0.89 – 1.71).

Causation Testimony Brief, App. of Studies at 14-16.

**Ray.** This 2002 observational study found *no* increased cardiovascular risk from taking Vioxx at the 25 mg dose – the dose that Mr. Irvin took. *See* Causation Testimony Brief, App. of Studies at 13-14. Not only does this study not provide reliable scientific support for Dr. Farquhar's opinion, but it flatly contradicts his opinion.

**Levesque.** This 2005 study found only a marginal 1.24 elevated risk of myocardial infarction, with a confidence interval ranging from 1.02 to 1.43 – a result that under *Daubert* is insufficient to support causation testimony. *See* Causation Testimony Brief, App. of Studies at 17-18. The authors themselves noted that the use of the study was limited for various reasons, including the lack of control for significant risk factors. *See id.*

**Mamdani.** This 2003 study likewise does not support Dr. Farquhar's opinion in this case; indeed, the findings are directly contrary to Dr. Farquhar's opinion:

- The study did not find a statistically significant difference in the number of heart attacks between new users of Vioxx compared to non-users of other NSAIDs. Indeed, Mamdani notes that "[t]he findings of this observational study suggest no increase in the short-term risk of [acute] MI among users of selective cyclooxygenase 2 inhibitors as commonly used in clinical practice."

- Mamdani did not distinguish between patients taking Vioxx at the 25 mg or 50 mg dose. Thus, it cannot be determined whether the study has any relevance to Mr. Irvin, who took Vioxx at the 25 mg dose only.

789213v.1

- It appears that the participants in this study took Vioxx for an average of six months, which far exceeds Mr. Irvin's brief exposure.

Causation Testimony Brief, App. of Studies at 18-19.

**Ingenix.** Dr. Farquhar also inappropriately relies on the Ingenix study:

- The study did not distinguish between individuals who took Vioxx at the 25 mg or 50 mg doses during the first 30 days when compared against use of ibuprofen/diclofenac, making it inapplicable to a purely 25 mg cases, such as Mr. Irvin's.

- Even this combined dose comparison was statistically insignificant for heart attacks and sudden cardiac death (CI = 0.98-2.34).

- The study's author notes that the study has several "limitations," including reliance on pharmacy records to determine exposure levels and "[r]esidual confounding by other unmeasured factors such as smoking, body mass index, diet and exercise."

Causation Testimony Brief, App. of Studies at 19-20.

**Nussmeier.** This 2005 study has nothing to do with Vioxx. It did not evaluate Vioxx at the 25 mg dose (or any other dose). Instead, it evaluated different dosages of different drugs – valdecoxib and parecoxib. Causation Testimony Brief, App. of Studies at 21. A study involving different dosages of different drugs is plainly not a reliable basis for an opinion that Vioxx at the 25 mg dose supposedly has a thrombotic effect.[10]

---

[10] Insofar as valdecoxib and parecoxib are concerned, the Nussmeier study did not even show a statistically significant difference in the rate of cardiovascular adverse events between patients receiving one or both of these therapies and patients receiving placebo (confidence intervals include 1.0). Causation Testimony Brief, App. of Studies at 21. Thus, not only does the study have nothing to do with Vioxx; it does not permit a finding of causation of adverse cardiovascular events even with respect to the actual NSAIDs under examination.

14

**C.    Dr. Farquhar's Causation Opinion Is Inadmissible Because He Does Not Offer A Scientifically Valid Explanation For The Mechanism By Which He Contends That The Short-Term Use Of Vioxx Causes Cardiovascular Disease.**

Dr. Farquhar's opinion that short-term usage of Vioxx causes a prothrombotic state rests upon the unproven assumption that Vioxx ingestion, by selectively inhibiting COX-2, results in an imbalance between prostacyclin and thromboxane. (Farquhar Report at ¶ 58.)  Nothing in his background or experience, however, allows him to render such an opinion.  Dr. Farquhar admits that that he does not consider himself an expert on the issue of prostacyclin/thromboxane imbalances. (Farquhar Dep. at 63:18-21.)  Nor is he prepared to examine the scientific evidence in support of prostacyclin thromboxane imbalances, which is also known as the "FitzGerald hypothesis." (Farquhar Dep. at 67:6-24 (objections omitted).)

When pressed, Dr. Farquhar attempts to explain this knowledge shortfall by claiming that, as an epidemiologist, he does not need to know the internal mechanism for thrombus formation:

> Q.   Okay.  Doctor, does the term "Fitzgerald hypothesis" have any meaning to you?
>
> A.    I'm going to give you a fairly long answer on that.
>
> Q.   The first question is yes or no.
>
> A.    Yes.  It has a lot of meaning to me.
>
> Q.   All right.
>
> A.    I think the main point I want to get across as an epidemiologist, *I need not spend a lot of time on the question of the internal mechanisms by which a thrombus appears.*
>
> *It isn't – it isn't part of the data that I'm examining to – examining to draw conclusions that are relevant to – to Vioxx.*
>
> I – I have great respect for Dr. Fitzgerald.  I – I agree with the proposition that there is very likely a propensity for thrombosis induced by Vioxx, but just to

make the – the point clear, cardiologists when they think about coronary artery disease and its complications, they don't start with the word thrombosis, thrombogenesis.

They start with the atherosclerosis and atherosclerotic plaques and hemorrhage into such plaques or erosion of such plaques with the idea that thrombus formation is secondary to the primary event.

So the data I have in front of me has to do with principally the appearance of serious heart disease and its complications.

(Farquhar Dep. at 59:5-60:7 (emphasis added).)    But Dr. Farquhar is wrong.  To give the causation testimony he seeks to give, Dr. Farquhar must provide a reliable explanation of the physiological process by which he contends Vioxx forms thrombi.

To establish causation in a pharmaceutical case, the trial court's "task" is to determine whether the expert's opinion "tied" the defendant's product "by some specific train of medical evidence" to the alleged injury. *Black v. Food Lion, Inc.*, 171 F.3d 308, 314 (5th Cir. 1999).  To accomplish this task, an expert must offer a "reliable explanation of the physiological process by which [the agent] causes [the alleged harm]." *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1253 (11th Cir. 2005).  The Fifth Circuit explained this requirement as follows:

> The underlying predicates of any cause-and-effect medical testimony are that medical science understands the physiological process by which a particular disease or syndrome develops and knows what factors cause the process to occur. Based on such predicate knowledge, it may then be possible to fasten legal liability for a person's disease or injury.

*Black*, 171 F.3d at 314.

Thus, an expert's mere assertion that he or she "knows" that Vioxx can cause sudden death is scientifically unreliable in the absence of an "explanation of why or how it happen[ed]." *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d 603, 616 (E.D. La. 2003).  Indeed, without a reliable explanation of the specific mechanism by which Vioxx supposedly causes sudden

16

cardiac death, plaintiff's experts cannot conclude to any degree of medical certainty that Vioxx

has this effect.  As this Court explained:

> In this case, Drs. Shell and Eckberg have discovered an event, but not a cause.
> They fail to identify the exact mechanism by which a person's QT interval can
> become permanently prolonged well after that person has ceased taking Propulsid.
> . . . They have theories but they have no proof to support those theories. . . .
> Under the prevailing logic of Daubert and Black, their testimony is unreliable.

*In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d at 617; *see also McClain*, 401 F.3d at 1253

("Here, [plaintiffs' experts have not] offered a reliable explanation of the physiological process

by which Metabolife causes heart attacks and ischemic strokes, *i.e.,* establish general

causation. . . .  In the absence of such a foundation for a differential diagnosis analysis, a

differential diagnosis generally may not serve as a reliable basis for an expert opinion on

causation in a toxic tort case.").  Because Dr. Farquhar has no reliable scientific basis to describe

the mechanism by which he claims Vioxx increases cardiovascular risk after short term use, his

testimony on medical causation must be excluded.

## IV.   TESTIMONY FROM DR. FARQUHAR ADDRESSING THE STATE OF MERCK'S KNOWLEDGE OR WHETHER MERCK ACTED "APPROPRIATELY" SHOULD BE EXCLUDED UNDER RULE 702.

As noted, Dr. Farquhar has not confined himself to opinions on medical causation.  He is

also poised to give his personal views on the state of Merck's knowledge and understanding of

alleged risks associated with Vioxx and on the appropriateness of Merck's actions.  For example,

in his report he asserts:

> By no later than December 1997, *Merck knew* that Vioxx caused
> an imbalance in the levels of chemicals in the body that regulate
> clotting (platelet aggregation) and the dilation or contraction of
> blood vessels.  In particular, *Merck learned* that Vioxx reduced the
> production of prostacycline, which inhibits platelet aggregation,
> without reducing, and possibly increasing, the level of
> thromboxane, a chemical that promotes clotting.

(Farquhar Report at ¶ 21 (emphasis added); *see also id.* at ¶¶ 185-199 (purporting to describe

789213v.1

what Merck knew and understood and to opine on allegedly "inappropriate" conduct on the part of Merck in connection with the Vioxx New Drug Application).)  Courts routinely exclude opinion testimony that addresses state of mind or makes normative judgments, and this Court should do so here.

### A.     Dr. Farquhar's Proposed Testimony Regarding The State of Merck's Knowledge Is Inadmissible Under Rule 702.

Rule 702 allows opinion testimony from a witness with "scientific, technical, or other specialized knowledge" that will "assist the trier of fact." Fed. R. Evid. 702.  It does not permit "opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d at 616 (*citing Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Expert witnesses are routinely prohibited from providing testimony regarding the "intent, motives or states of mind of corporations, regulatory agencies and others," because they "have no basis in any relevant body of knowledge or expertise." *In re Rezulin*, 309 F. Supp. 2d at 546.   Here, the Court should likewise exclude Dr. Farquhar's subjective testimony regarding Merck's knowledge or state of mind.   Not only does Dr. Farquhar have no qualifications to provide such testimony, but his subjective opinions on the subject are completely irrelevant and unreliable.

Dr. Farquhar opines throughout his report that Merck "knew of an excess of CV events in the Vioxx pre-marketing clinical trials (Farquhar Report at p. 86 [heading]), but that the company "inappropriately dismissed the importance of the signal" (*id.* at p. 88 [heading]).  He has no basis for these and other similar assertions.  As one court reasoned when rejecting similar expert testimony regarding a pharmaceutical manufacturer's intent and state of mind:

> The witnesses are qualified in particular scientific disciplines. These disciplines do not include knowledge or even experience in the manner in which corporations and the pharmaceutical

18

> marketplace react, behave or think regarding their nonscientific goals of maintaining a profit-making organization that is subject to rules, regulations, standards, customs and practices among competitors and influenced by shareholders or public opinion.

*In re Diet Drugs*, No. MDL 1203, 2000 U.S. Dist. LEXIS 9037, at *28-29 (E.D. Pa. June 20, 2000). The same is true here. Dr. Farquhar's personal opinion regarding Merck's knowledge of the alleged risk of increased cardiovascular events is just that: his opinion. Because it is not based on scientific reasoning or methodology, it fails to meet the requirements of Rule 702 and must be excluded.

Moreover, Dr. Farquhar bases his opinions regarding Merck's state of mind entirely on a review of selected internal Merck documents produced in this litigation and selected deposition testimony. (*E.g.*, Farquhar Dep. at 56:20-57:13.) The jury will hear the testimony and examine many, if not all, of the same documents, along with the numerous relevant documents that Dr. Farquhar did not examine. It is exclusively the role of the jury to decide the facts, and the jury does not need Dr. Farquhar's assistance to understand this evidence. *See In re Rezulin*, 309 F. Supp. 2d at 546 (excluding expert testimony addressing corporate state of mind because otherwise experts would "improperly … assume the role of advocates for the plaintiffs' case"); *see also In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d at 616; *Tanner*, 174 F.3d at 548. It is especially important that any credibility determinations regarding Merck be reserved for the jury and not supplanted by a paid "expert." *See Sec. & Exch. Comm'n v. Lipson*, 46 F. Supp. 2d 758, 763 (N.D. Ill. 1998) (expert accountant was not "specially equip[ped] to divine what [defendant] truly believed" about reliability of financial reports; any opinions offered in that regard are "at worst, rank speculation" and at best, "credibility choices that are within the province of the jury").

19

Any testimony from Dr. Farquhar suggesting that Merck attempted to conceal or obscure scientific data must be excluded for the same reasons. (*See, e.g.,* Farquhar Dep. at 249:11-253:4; Farquhar Report at ¶¶ 82, 91, 177.) As the *In re Rezulin* court explained, purported "expert" testimony on data suppression, like testimony on state of mind generally, "pertains to lay matters which a jury is capable of understanding and deciding without the expert's help." 309 F. Supp. 2d at 554. Lacking any "first-hand knowledge of the circumstances underlying [any] charge of data-suppression" (*id.*) Dr. Farquhar has nothing to add to the jury's consideration of the evidence, and he should not be allowed to suggest that Merck attempted to conceal scientific data.[11]

In short, Dr. Farquhar's views on what Merck knew or understood lack foundation and fail to meet the fundamental requirement laid out in Rule 702 that expert testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." For those reasons, the Court should exclude all such testimony.

**B.     Testimony To The Effect That Merck Failed To Meet Dr. Farquhar's Subjective Normative Standards Is Neither Relevant Nor Reliable And Thus Should Be Excluded Under Rule 702.**

Dr. Farquhar's report is replete with inflammatory remarks regarding his personal views on the propriety of Merck's actions. He repeatedly characterizes Merck's actions as "inappropriate," "indefensible," and "unjustifiable." (Farquhar Report at ¶¶ 191-94, 196, 197, 199.) He also suggests that Merck "altered" a 1997 cardiovascular adverse event study design without justification – asserting that "[i]t was wrong to change the study design, wrong to dismiss the result of the statistical analysis v. Fosamax placebo, and wrong to ignore the signal of

---

[11] While critical in his report of the manner in which VIGOR data was reported in the 2000 New England Journal of Medicine (Farquhar Report at ¶ 106), Dr. Farquhar withdrew that criticism in his deposition, testifying that he did not in fact have an objection to the manner in which the results were reported and that the contrary suggestion in his report had probably been a "superfluous comment" (Farquhar Dep. at 120:21-121:11).

789213v.1

Vioxx's toxic effects on the heart." (*Id.* at ¶ 194.)  His rhetoric reaches a fevered pitch when he states: "At each juncture where evidence of cardiotoxicity of Vioxx appeared, Merck chose to disregard it, and instead to adopt a highly dubious hypothesis that incorrectly absolved Vioxx of blame for the excess cardiovascular illnesses that it caused." (*Id.* at ¶ 199; *see also id.* at ¶ 204.) Such hyperbole, devoid of factual basis, has no place at trial.

Dr. Farquhar's subjective views on whether Merck's conduct was appropriate are irrelevant and thus inadmissible, as case after case has held.  *See, e.g., In re Rezulin*, 309 F. Supp. 2d at 542-45  (expert testimony on subjective ethical standards was "(1) unreliable because purely speculative; (2) unhelpful to the fact-finder because irrelevant in a case where liability is premised on legal, not ethical, standards, and (3) likely to prejudice and confuse fact-finders concerning the pertinent legal standards"); *id.* at 557 (testimony on legal obligations would "usurp ... the role of the trial judge in instructing the jury as to the applicable law [and] the role of the jury in applying that law to the facts before it"); *see also Black v. Food Lion, Inc.*, 171 F.3d  at 314 (admission of expert testimony was abuse of discretion when particular opinion had no apparent underlying support); *DiBella v. Hopkins*, No. 01 Civ. 11779 (DC), 2002 U.S. Dist. LEXIS 20856, at *12 (S.D.N.Y. Oct. 30, 2002) ("business ethics" expert testimony inadmissible in commercial dispute because the "dispute here is not over what is ethical...[r]ather, the dispute is over what happened."), *aff'd*, 403 F.3d 102 (2d Cir. 2005).

Moreover, to be reliable under Rule 702, the "reasoning or methodology properly" must be applied to the "facts in issue."  *Vogler v. Blackmore*, 352 F.3d 150, 155 (5th Cir. 2003) (citing *Daubert*, 509 U.S. at 592-93).  By definition, subjective normative testimony is unreliable under *Daubert. Cf. In re Welding Fume Prods. Liab. Litig.*, No. 1:03-CV-17000, MDL 1535, 2005 WL 1868046, at *18, *20 (N.D. Ohio, Aug. 8, 2005) (Order) ("[T]he critical question for the jury in

this case is whether the defendant corporations did what the law required them to do, not whether, from a societal perspective, they did what an "ethical corporation" should have done. [The expert's] opinions regarding the latter, accordingly, will tend to misdirect the finder of fact.").

Expert testimony that is admissible under *Daubert* and Rule 702 relies on objective, empirical, ascertainable, and verifiable bases, not on subjective notions of propriety, or morality, or appropriateness. The goal in admitting expert testimony is to "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.,* 526 U.S. at 152; *see also Daubert*, 509 U.S. at 594. Subjective and normative testimony does not have the same assurances of relevance and reliability that empirically verifiable specialized knowledge provides. Expert testimony that lacks this reliability, that strays from specialized knowledge and lacks supporting authority, may not be admitted. *See Tanner*, 174 F.3d at 548.

## V.   <u>CONCLUSION</u>

For all the forgoing reasons, Merck respectfully requests that the Court grant its motion to exclude Dr. Farquhar's testimony in its entirety.

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
4041 Essen Lane
One United Plaza, Suite 501
Baton Rouge, Louisiana 70809
Phone:  225-490-8900
Fax:     225-490-8960

Defendants' Liaison Counsel

789213v.1

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:     312-494-4440

And

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone: (202) 434-5000
Fax:     (202) 434-5029

Attorneys for Merck & Co., Inc.

789213v.1

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Memorandum in Support of Merck & Co., Inc.'s Motion to Exclude Testimony of John W. Farquhar, M.D. has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 21st day of October, 2005.

Phil Wittmann

789213v.1