# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

IN RE: VIOXX        :  **MDL NO. 1657**
   **PRODUCTS LIABILITY LITIGATION:**
             :  **SECTION: L**
             :
**This Document Relates To** O5-4046 :  **JUDGE FALLON**
**Evelyn Irvin Plunkett v. Merck & Co, Inc.** :  **MAG. JUDGE KNOWLES**

## PLAINTIFF'S SUMMARY SCIENCE BRIEF FILED IN
## CONNECTION WITH PLAINTIFF'S DAUBERT CHALLENGES

This brief is submitted by Plaintiff's Liaison Counsel on behalf of counsel for plaintiff, Evelyn Irvin Plunkett, and to accommodate such counsel.

## I. Introduction

Richard Irvin ingested Vioxx, 25 mg., for approximately 30 days in April and May of 2001. On May 15, 2001, Mr. Irvin had a clot that formed in the left anterior descending artery of his heart and caused his sudden cardiac death. This was confirmed through autopsy and in recent photomicrographs of the clot.

Mr. Irvin's cause of death is properly termed a thrombotic sudden cardiac death. The experts agree that Mr. Irvin's sudden cardiac death occurred in the presence of a deficiency of oxygen supply to the heart muscle that was triggered through the presence of the clot (also referred to as thrombus). The literature confirms that the cardiac events and deaths in Vioxx users in the relevant studies were thrombotic cardiac events.[1]

---

[1] *See e.g.,* Exhibit A which is attached and incorporated herein for all purposes, the APPROVe clinical trial publication at p. 3 wherein Bresalier et al state that "[t]hrombotic events included fatal and nonfatal myocardial infarction, unstable angina, sudden death from cardiac causes, fatal and nonfatal ischemic stroke, transient ischemic attack, peripheral arterial thrombosis, peripheral venous thrombosis, and pulmonary embolism." *See also* Exhibit B, which is attached and incorporated herein for all purposes, p. 955, from the Mukherjee et al meta analysis in the Journal of The American Medical Association, wherein the authors evaluated the VIGOR trial compared to placebo

On September 30, 2004, Merck & Co., Inc. ("Merck") withdrew Vioxx from the market worldwide due to results from its long-term placebo-controlled clinical trial (APPROVe) that showed significant increases in thrombotic cardiac events among users of Vioxx, 25 mg.

## A.   Vioxx Causes Thrombotic Sudden Cardiac Death

Merck's clinical trials and epidemiological studies of others have found an association between Vioxx ingestion and sudden cardiac death.   For example, in the APPROVe study, Bresalier et al state that, "[a]s compared with the placebo group, the rofecoxib (Vioxx) group had an increased risk of confirmed thrombotic events (relative risk, 1.92; 95 percent confidence interval, 1.19 to 3.11)."   *See* Exhibit A. In the APPROVe study, Table 2 is titled "Incidence of Adjudicated Thrombotic Adverse Events," and further shows as compared with the placebo group, that the rofecoxib group had an increased risk of confirmed cardiac events (myocardial infarction, fatal myocardial infarction, sudden death from cardiac causes and unstable angina pectoris) (relative risk, 2.80; 95 percent confidence interval, 1.44-5.45).   In fact, the APPROVe study shows at page 5 that there were 3 times as many sudden deaths from cardiac causes in the rofecoxib group as in the placebo group.   In addition to APPROVe, the Cleveland Clinic Study by Mukherjee, et al published in 2001 reported that "[t]he results from VIGOR showed that the relative risk of developing a confirmed adjudicated thrombotic cardiovascular event (myocardial infarction, unstable angina, cardiac thrombus, resuscitated cardiac arrest, sudden or unexplained death, ischemic stroke, and transient ischemic attacks) with rofecoxib treatment compared with naproxen was 2.38 (95% confidence interval, 1.39-4.00; P=.002).   *See* Exhibit B, p.954.   The FDA's analysis of VIGOR showed a 2.82 increased risk of serious coronary disease, including

and other NSAIDs and state that "....serious Thrombotic cardiovascular adverse events [defined as myocardial infarction, cardiac thrombus, resuscitated cardiac arrest, sudden or unexplained death, ischemic stroke, and transient ischemic attacks]."

W:\25000-29999\27115\000\PLD\Daubert\Plaintiff's Summary Brief Exhibits\Plaintiff's Summary Science Brief 2005-10-21.doc

2

sudden cardiac death.  In Merck's own meta-analysis, Konstam et al showed that "[t]he outcome measure used was the combined end point defined by the Antiplatelet Trialists' Collaboration (APTC). *See* Exhibit C which is attached. This end point consists of the combined incidence of: (1) CV, hemorrhagic, and unknown death; (2) nonfatal MI; and (3) nonfatal stroke." *Id.* at p. 4. Konstam et al further reported for the category, sudden/unknown cause of death, that there were 6 in the rofecoxib group and 3 in the placebo group. *Id.* at Table 6. When evaluated by Konstam et al at 50 mg, the relative risk of a confirmed APTC event, including sudden cardiac death, was 2.08 for rofecoxib patients as compared to those taking any other NSAID. *Id.* at Table 7. This was Merck's own pooled analysis following the VIGOR Trial.

Looking solely at Merck's own studies and its reports in peer-reviewed published literature, Mr. Irvin's sudden cardiac death is totally within the area of controversy related to Vioxx ingestion. Indeed, thrombotic sudden cardiac death is strongly associated with Vioxx by Merck's own randomized placebo controlled studies.

**B.     The Relevant Science Shows and Scientists Agree Vioxx Causes Thrombotic Sudden Cardiac Death**

There is little dispute in the relevant science or among the relevant scientific community that Vioxx causes thrombotic sudden cardiac death.

Merck's APPROVe Trial showed a significant risk at 25 mg compared to placebo for cardiac events that include sudden cardiac death.  *See* Exhibit A. The dispute Merck frames in its expert designations is the belief that APPROVe does not show the increased risk for short term use. As shown above and herein, from all viewpoints, there is a significant excess risk of sudden cardiac death from Vioxx ingestion at 25 mg for short term use. Namely:

1.      There was a significant excess of adjudicated thrombotic cardiovascular events in Merck's APPROVe clinical trial that included thrombotic sudden death;

2.      The cardiac events in APPROVe were constant throughout the study, regardless of duration;

3.      There was a significant excess of serious coronary heart disease, including thrombotic sudden cardiac death, in Merck's clinical trial, VIGOR, that had an average use of less than 9 months;

4.      There was an excess in epidemiologic studies in myocardial infarction and sudden death;

5.      There was a significant excess in Merck's own *meta analysis* of serious coronary heart disease after ingestion of Vioxx for 4 weeks or more, that included cardiac death[2];

6.      The FDA found a significant excess of cardiac events in VIGOR that included sudden death;

7.      The FDA Advisory Committee, in February of 2005, voted 32-0 that Vioxx was cardio-toxic;

8.      In a Merck sponsored study, Dr. Daniel Solomon and colleagues found an increased risk for cardiac events among Vioxx users in the first 1-90 days[3];

---

[2]        (Konstam et al. Circulation 2001). Five authors on the study were employed by Merck and the statistical analysis was done by Dr. Deborah Shapiro at Merck. As noted in the article, "[t]he major outcome measure was the combined end point used by the Antiplatelet Trialists' Collaboration, which includes **CV**, hemorrhagic, and unknown **deaths**; nonfatal myocardial infarctions; and nonfatal strokes." Emphasis added. The relative risk for the APTC events when the comparator was all NSAIDs was 2.08 at 50 mg and exceeded 1.16 for 25 mg. as seen in Table 7. The authors state that "[t]his end point was chosen for this analysis because it is the most common and widely accepted end point used in quantifying the overall CV impact of antithrombotic compounds in clinical trials." The duration of Vioxx ingestion for this analysis was 4 weeks or more.

9.     A large epidemiological study showed that Vioxx ingestion among new users (1-30 days) shows a significantly increased risk for heart attacks[4];

10.    The Attributable Proportion for the risk of sudden cardiac death from ingestion of Vioxx, 25 mg., for the comparable duration here, is a 64 percent (64%) likelihood;

11.    Merck pulled Vioxx from the market worldwide on September 30, 2004 because of the risks of thrombotic cardiovascular events, including sudden death to all who were ingesting Vioxx;

12.    Dr. Peter Juni conducted a meta analysis published in Lancet in November of 2004, revealing that the reliable clinical and epidemiologic data showed by 2000 that Vioxx at all doses and for all durations increased the risk of cardiac events among Vioxx users[5];

13.    The results of Merck's unpublished clinical trial, VICTOR, revealed a significant excess risk of thrombotic cardiac events among users of Vioxx, 25 mg, with the risks being apparent within a few months;

14.    The results of Merck's unpublished observational study, INGENIX, revealed an up to 1.5 times elevated risk for cardiac events, including sudden cardiac death, among Vioxx users at the 25 mg dose within the first 30 days of use; and

15.    So accepted is the risk of Vioxx ingestion and sudden cardiac death that these words even appear in titles of papers in reputable medical journals post-withdrawal of Vioxx. For example, David Graham's study published in *The Lancet* in February of 2005 is entitled "*Risk of acute myocardial infarction and*

---

[3]     Solomon et al., attached as Exhibit D and incorporated herein for all purposes.
[4]     Johnsen et al, attached as Exhibit E and incorporated herein for all purposes.
[5]     Juni et al, attached as Exhibit F and incorporated herein for all purpose.

W:\25000-29999\27115\000\PLD\Daubert\Plaintiff's Summary Brief Exhibits\Plaintiff's Summary Science Brief 2005-10-21.doc

5

*sudden cardiac death in patients treated with cyclo-oxygenase 2 selective and non-selective non-steroidal anti-inflammatory drugs: nested case-control study."* As does Merck and others in their papers, Dr. Graham refers to myocardial infarction and sudden cardiac death as serious coronary heart disease. *See* Exhibit G which is attached. As concluded by Dr. Graham and colleagues in the study:

> We should assess the potential public-health effects of failure [by Merck] to take earlier action. From 1999 to September, 2004, an estimated 106.7 million rofecoxib prescriptions were dispensed in the USA, of which 17.6% were high-dose. In two Merck-sponsored randomized clinical trials, relative risks for acute myocardial infarction of 5 for high-dose rofecoxib and 2 for the standard dose were recorded. The background rate for acute myocardial infarction among control groups from studies of cardiovascular risk in NSAID users varied from 7.9 per 1000 person-years in CLASS to 12.4 per 1000 person-years in TennCare. Using the relative risks from the above-mentioned randomized clinical trials and the background rates seen in NSAID risk studies, an estimated 88,000-140,000 excess cases of serious coronary heart disease probably occurred in the USA over the market-life of rofecoxib. The US national estimate of the case-fatality rate (fatal acute myocardial infarction plus sudden cardiac death) was 44%, which suggests that many of the excess cases attributable to rofecoxib were fatal.

Outside of Merck, the implications of the short term and long term cardiovascular toxicity of Vioxx are more gravely characterized. For instance, in an Editorial entitled "Cox-2 Inhibitors – Lessons in Drug Safety" and published in the prominent medical journal, The New England Journal of Medicine, on February 15, 2005, the authors said:

> After millions of Americans have used COX-2 inhibitors, which were intended to avert the gastrointestinal complications common to other nonsteroidal anti-inflammatory drugs (NSAIDs), serious adverse cardiovascular events have now been reported for three members of the class. **Physicians are dismayed, pharmaceutical**

> **companies are embarrassed and financially threatened, and
> patients are injured.** Indeed, the integrity of the American drug-
> safety system has been questioned. How did such problems arise,
> and how can they be prevented in the future?

*See* Exhibit H which is attached. (emphasis added).

Merck further alleges through its experts that it was not until Merck received the preliminary results of the APPROVe study in September 2004 that there was statistically significant evidence of increased cardiovascular risks posed by long-term Vioxx use, and that it decided to withdraw Vioxx from the market only after that study raised questions. Merck's own expert, Dr. Wilson, had begun advising most of his own patients of the drug's increased heart attack risks after the November 2000 publication of an article discussing the VIGOR study – *nearly four years earlier.*[6] In addition, Dr. Edward Scolnick, in Senior Management at Merck, wrote an e-mail on March 9, 2000, that the adverse cardiac events were clearly there and were mechanism based as Merck worried they were.[7]

For those physicians who believed Merck's marketing campaign that the cardiovascular events significantly occurring in VIGOR were uniquely related to naproxen rather than Vioxx, the APPROVe revelations have been described as "sobering." Specifically, Dr. Jeffrey Drazen, in an Editorial in the New England Journal of Medicine on March 17, 2005 in conjunction with the publication of the APPROVe results said:

> It is a sobering thought that although the number of deaths
> and cardiovascular events attributable to COX-2 inhibitors remains
> in dispute, had trials designed to test the question of cardiovascular
> toxicity directly been launched in 1999 and executed with urgency,
> substantial morbidity and perhaps a substantial number of deaths
> could have been prevented. As we apply new science to develop

---

[6]      Deposition of Dr. Merlin Wilson, Int'l Engineers v. Merck, p. 57, l. 15 – p. 60, l. 15. Exhibit I which is attached and incorporated herein for all purposes. Dr. Wilson is designated to testify for Merck regarding use of Vioxx in his practice as a rheumatologist.

[7]      Exhibit J which is attached and incorporated herein for all purposes.

new medicines, we must not forget that our first job is to do no
harm.

*See* Exhibit K which is attached.

Addressed herein is a brief look at some of the epidemiological evidence, including
clinical trials, the relative risk and attributable risk of sudden cardiac death, epidemiologic
investigations other than clinical trials, Merck's meta analysis, sudden cardiac death in clinical
trials and duration of use. Separately covered is the mechanism of sudden cardiac death, and the
naproxen defense used by Merck to defend its failure to remove Vioxx from the market after the
complete VIGOR results were made available to Merck in 2000 – more than a year before Mr.
Irvin's sudden cardiac death.

## II.    The Epidemiological Evidence

The epidemiologic evidence addresses exposure to Vioxx at dose levels comparable to
that used by Richard Irvin for exposures that occurred before the injuries at issue and in the
range of duration consistent with that by Mr. Irvin.

### A.    Published Clinical Trials

There are two large, adequately powered, randomized clinical trials (VIGOR and
APPROVe) conducted by Merck. An evaluation of these trials has been put forth by Dr. Wayne
Ray, whose Report is attached as Exhibit L. VIGOR and APPROVe demonstrated that Vioxx
increases the risk of serious coronary heart disease, including sudden cardiac death. In these
studies the relative risks of serious coronary heart disease are 2.82 and 2.80, respectively and
were statistically significant. *See* Exhibit L at §3,.

#### 1.    VIGOR

In the VIGOR Trial, patients with rheumatoid arthritis were expected to receive NSAID
therapy for up to 1 year and were randomized to receive either 50 mg of Vioxx or 1000 mg of

naproxen daily. There was no acetaminophen arm, often recommended for patients with chronic musculoskeletal disease who are a high risk of NSAID gastropathy. *Id.* at §3.1.  In the Vioxx arm, there was an excess of adjudicated cardiac events that included sudden death. *Id.* This excess was statistically significant. There were many more events not confirmed by adjudication. For example, the Targum (FDA) memorandum of February 1, 2001, notes that there were a total of 65 and 33 serious cardiovascular events for Vioxx and naproxen, respectively, referred to adjudication, of which 46 (45 patients) and 20 were confirmed. *Id.* To the extent that a failure to adjudicate an event was based upon incomplete information, often the case in large clinical trials, this will cause the rates of adjudicated cases of cardiovascular events to underestimate the truer rates. *Id.* Also important is the manner in which the risk ratios are calculated. For instance, as explained by Dr. Ray and as generally accepted in the medical community, the increased risk of myocardial infarction in VIGOR was 5-fold. Merck reported the risk as a .4 decrease in myocardial infarction in naproxen users and understated the finding based upon inverted calculations. *Id.* at §3.2.

**2.      APPROVe**

The APPROVe trial compared 25 mg of Vioxx to placebo in a study of prevention of recurrence of colonic polyps. Patients in the Vioxx arm had a 1.92 fold increased risk of adjudicated serious cardiovascular disease that included sudden cardiac death, and a 2.80 fold increased risk of serious coronary heart disease that included sudden cardiac death. *Id.* at §3.5. Both of these increased relative risks were statistically significant. *Id.*

**3.      Relative Risk and Attributable Risk From Published Clinical Trials.**

The large, randomized clinical trials sponsored by Merck (VIGOR and APPROVe) have conclusively demonstrated that Vioxx increases the risk of sudden cardiac death. *Id.* at §3.

Speculations as to the etiology of the sudden cardiac death, i.e., whether the death is due to a "thrombotic arrhythmia", are not pertinent because all types of sudden cardiac death were included in the standard endpoints used in VIGOR and APPROVe. *Id.* As recognized by Merck, the arguments attempting to differentiate between subtypes of sudden cardiac death are in a class of evidence that is considerably less reliable than clinical trial findings that conclusively demonstrate the increased risk of serious coronary heart disease associated with Vioxx. *Id.* Thus, to a high degree of medical and scientific certainty, Vioxx produces a 2.8-fold increased risk of serious coronary heart disease, including sudden cardiac death. *Id.* As noted by the Texas Supreme Court in *Havner* and identified above, this is best explained in the attributable proportion of the risk. The attributable risk demonstrates that in 64% of Vioxx users (including both 25 mg and 50 mg) who experienced sudden cardiac death, Vioxx is the cause of the death. *Id.* A generally accepted principle of clinical research is that these findings apply to all the patients studied, unless there is strong evidence to the contrary. *Id.*

**B.     Other Clinical Trials**

The Meta Analysis of Peter Juni and colleagues addressed the question of the totality of the clinical trials and epidemiologic studies and was published in *The Lancet* on December 4, 2004. *See* Exhibit F. The meta analysis identified all randomized controlled trials with publicly available data in adult patients with chronic musculoskeletal disorders (the only approved indication for non-short-term use of rofecoxib) that compared rofecoxib in doses of 12.5 to 50 mg with placebo or other NSAIDs. *See* Exhibit L at § 3.4. Juni and colleagues excluded trials for short term acute pain and those where therapy was experimental, such as in Alzheimer's and cancer chemoprevention. *Id.* Eighteen randomized controlled trials met the study criteria and demonstrated that prior to the APPROVe trial the totality of the available data demonstrated that

Vioxx produced a 2.24-fold increased risk of acute myocardial infarction (p.007). *Id.* This was evident by mid-2000, when the relative risk for Vioxx became statistically significant. *Id.* As succinctly stated by Dr. Juni and colleagues in *The Lancet*:

> Our cumulative meta-analysis of randomized controlled trials indicates that an increased risk of myocardial infarction was evident from 2000 onwards. At the end of 2000, the effect was both substantial and unlikely to be a chance finding. We found an increased risk of myocardial infarction in trials of both short and long duration, which is in contrast to the [then] unpublished results from the APPROVe trial. Our findings thus indicate that patients are at risk even if rofecoxib is taken for a few months only. Therefore, the reassuring statement by Merck, that there is no excess risk in the first 18 months, is not supported by our data. Similarly, we recorded no evidence to support the notion that rofecoxib's cardiovascular toxicity is dependent. The reported increase in risk was greater in trials with an external endpoints committee (relative risk 3.9), suggesting that misclassification of coronary events could have biased results in trials that did not include external appraisal of safety outcomes.

*See* Exhibit F.

## C.    Published Epidemiologic Investigations

Epidemiologic investigations have been published and show the increased risk of myocardial infarction/sudden cardiac death with Vioxx ingestion. Most notable is Merck's own commissioned study by Dr. Solomon at Harvard in which Merck pulled its own epidemiologist from identification on the study on the day it was to be published because the study showed an increased risk in myocardial infarction among Vioxx users, in particular in the first 90 days of exposure. Exhibit D to Dr. Ray's Report (Solomon et al, Circ. 2004; 109:2068-2073). Merck's attempts were uncovered only because the Merck epidemiologist's name was inadvertently left in the footnote of the online version of the article published a day before the article appeared without her name on it in the journal, *Circulation*, the following day. The Solomon study noted that the risk associated with use of 1-30 days and 31-90 days was significantly greater than that

for longer duration use. This finding provides strong evidence that the increased risk of Vioxx is not limited to durations longer than 18 months. *See* Exhibit L at §§ 4, 5 and 6. Three additional studies provide evidence that the risk is increased and present for short-term users. Kimmel et al conducted an analysis that excluded persons with >12 months of use and found "the difference between celecoxib and rofecoxib was unchanged... (p=.01)". *Id.* In Kimmel's study, published in the *Annals of Internal Medicine* on February 1, 2005, the ingestion of 12.5 and 25 mg Vioxx for 3 months (but no longer than 12 months) or more was associated with a statistically significant higher odds (2.72, p=.01) of myocardial infarction compared with the use of celecoxib. Both Graham et al and Levesque et al calculated the mean duration of rofecoxib use, which was 113 days and 5.3 prescriptions, respectively. *Id.* Both studies found the short duration consistent with a risk that requires only short periods of exposure. *Id.* On May 9, 2005, Johnsen et al published a population based case control study in the *Archives of Internal Medicine* and found that new users (0-30 days) of Vioxx (including 25 mg) had a 2.52 adjusted relative risk (95% CI) for myocardial infarction. *See* Exhibit E. The risk was 1.80 for all current Vioxx users who filled a prescription within the past 30 days and the authors stated that "[t]he highest ARRs in both the low and high risk MI groups were found among current users of rofecoxib (2.77 and 1.58, respectively)...." *Id.* at Table 2 and p. 981.  In addition, in a study published June 11, 2005, in the *British Medical Journal*, the authors concluded that the increased risk with Vioxx in the VIGOR study was genuine and that the risk was increased for those who ingested Vioxx within 3 months of the index date. *See* Exhibit M which is attached. In this study, the unadjusted odds ratio for patients who ingested Vioxx (including the 25 mg dose) within 3 months was 1.67 (p=.005). *Id.* Dr. Ray presents pre-APPROVe studies in Table 6 appended to his Report.

### D. Merck's Meta Analysis

On direct examination by Merck's counsel last week, Merck's statistician, Deborah Shapiro said she confirms her conclusions reached in the Konstam/Shapiro meta analysis by Merck published in *Circulation* in 2001.[8] Two important conclusions by Dr. Shapiro's meta analysis (despite the admitted limitations that it compares Vioxx across all dosing intervals for all durations and is not repeatable outside of Merck) are that the authors were not able to conclude that naproxen had a cardioprotective effect[9] and the data showed in analysis 2 that Vioxx at 25 mg and 50 mg compared to all NSAIDs in studies 4 weeks or more had an increased relative risk of APTC events that included cardiac death (1.16 and 2.08, respectively at 95% CI). *See* Exhibit N, p. 7 and Table 7. As Dr. Shapiro et al note in the analysis, the APTC end point that includes cardiac death "is the most common and widely accepted end point used in quantifying the overall CV impact of antithrombotic compounds in clinical trials." *Id.* at p. 4.

### E. Sudden Cardiac Death in Clinical Trials

Sudden cardiac death is usually defined as a sudden death from cardiac causes in the absence of any other immediate factor (e.g., external trauma) that would explain the death. *See* Exhibit L at § 3. Sudden cardiac death has a rate in some populations of approximately 1 per 1000 persons per year (Clin Pharmacol Ther. 2004 Mar; 75(3):234-41). *Id.* Because of its rarity

---

[8]    The deposition has not yet returned and this Brief will be supplemented with citation to this testimony.

[9]    Shapiro et al wrote that "[a]lthough the data are suggestive, neither the VIGOR results nor the current analysis provide sufficient evidence to establish the potential Cardioprotective benefits of naproxen. Therefore, patients at risk for CV thrombotic events who are prescribed a COX-2 inhibitor or an NSAID should receive appropriate antiplatelet thereapy as clinically indicated." The final sentence in the article, in the conclusions section, states that the "data suggest, but are insufficient to ascertain, the Cardioprotective benefits of naproxen."

W:\25000-29999\27115\000\PLD\Daubert\Plaintiffs Summary Brief Exhibits\Plaintiff's Summary Science Brief 2005-10-21.doc

and etiology, it is standard practice in randomized clinical trials and epidemiologic studies to study sudden cardiac death as part of a composite end point. A composite endpoint is a group of several specific diseases that share a common etiology. An illustration of this standard practice is seen in the Targum (FDA) analysis of the VIGOR study as well as the Bresalier et al report of the APPROVe trial. *Id.* In each of these categories, "cardiac disease" (referred to by Dr. Ray as serious coronary heart disease, reflecting the common etiology), included fatal and non-fatal myocardial infarction, sudden cardiac death (or, synonymously, sudden death from cardiac causes), and unstable angina. *Id.* Composite endpoints are used to improve the power of clinical trials to detect differences. A major limitation of clinical trials is that if either the sample size or period of observation is limited, the trial will be unable to detect effects of drugs, even when they are present. *Id.* Findings for a composite endpoint are presumed to apply to all of the endpoints, unless there is scientifically reliable evidence to the contrary. *Id.* For example, a drug shown in a clinical trial to reduce the occurrence of a composite endpoint consisting of both fatal and nonfatal myocardial infarctions is presumed to prevent each type of myocardial infarction, unless there is an adequately powered study demonstrating the contrary. *Id.* The best presently available evidence, including the clinical trials and epidemiological studies, demonstrate that Vioxx increases the risk of sudden cardiac death. *Id.* at § 7.

**F.     Duration**

      **1.     Post Hoc Analysis is Speculative**

      APPROVe conclusively confirmed the increased risk of sudden cardiac death conferred by Vioxx, 25 mg., evidenced by earlier clinical trials and epidemiologic studies. Merck now asserts that the risk was confined to persons who ingested Vioxx for more than 18 months and potentially only at 30 months. This claim is based upon Merck's analysis of a subgroup of

APPROVe patients that used Vioxx for no more than 18 months. *Id.* at §§ 3, 4 and 5. The study itself identifies that it is a post hoc subgroup analysis.

In a seminal article that addressed this topic, Yusuf and colleagues said that "[g]enerally, trials adequate for detecting an overall treatment effect cannot be expected to detect effects within even relatively large subgroups." *Id.* at § 3-7. This is because the subgroup analyses often lead to comparisons that are lacking in power. *Id.* Power refers to the capacity of a statistical analysis to detect an effect. *Id.* It is generally accepted among epidemiologists that reliable analyses should have a power of at least 80% or better. *Id.* That is, given that an effect exists, the analysis will detect it at least 4 times out of 5. *Id.* Lower powered analyses are considered unreliable. *Id.* Juni and colleagues reported that the APPROVe subgroup analysis had only 20% power to detect an increased risk of 2 or greater and would thus have only a 1 in 5 chance of detecting it. *Id.* and Juni, Exhibit F. As reported above, the available and reliable evidence on duration is presented by the short duration apparent in the clinical trials and epidemiologic studies addressed above. In particular, these include no finding by any study author outside of the post hoc analysis in APPROVe that Vioxx-induced harm only occurred after long-term use. To the contrary, the APPROVe hypothesis of 18 months has been discounted by, among others, Juni, Solomon, Johnsen, Graham, Ray, as well as Merck's own clinical trials and studies outside of APPROVe.

Not only does the conclusion of this post hoc analysis fly in the face of all prior studies, it lacks biological plausibility. No scientific evidence of a mechanism by which Prothrombotic properties of Vioxx became harmful only after 18 months has been offered by Merck, nor can one be found in the scientific literature. Similarly lacking is any evidence that Vioxx usage is safe until more than 17 months have passed. The weight of the evidence is to the contrary. In

W:\25000-29999\27115\000\PLD\Daubert\Plaintiff's Summary Brief Exhibits\Plaintiff's Summary Science Brief 2005-10-21.doc

15

addition to Merck's clinical trials (VIGOR, VICTOR, and ADVANTAGe) and observational studies (Solomon and Ingenix), there are two refereed epidemiological studies with sufficient sample size to assess short term duration of Vioxx and the risk of cardiac events including sudden cardiac death. These include the Solomon study and the study by Soren Johnson and colleagues. Solomon noted the elevated risk within the first 1-90 days. [Ray Report, Section 6.4]. Johnsen and colleagues found a significant increased risk in the first 30 days. *Id.* Three of the other studies that provide additional evidence that the risk is present for short term users include a study by Kimmel et al that concluded the elevated risk was present at both greater than and less than 12 months ingestion; the study by Dr. Graham where the mean ingestion time was 113 days; and a study by Levesque et al, where the mean ingestion was 5.3 prescriptions. Both Graham and Levesque reported that injury was consistent with short duration of exposure. *Id.*

## III.    Mechanism of Action

The evidence from clinical trials and epidemiologic studies is overwhelming that Vioxx causes sudden cardiac death.  The mechanism for this dire consequence is the same as that for the functional equivalent of sudden cardiac death, myocardial infarction.  Both are caused by an acute ischemic event triggered by occlusion, vasoconstriction, or both.  Vioxx selectively inhibits Cox-2, rather than inhibiting both Cox-1 and Cox-2 as do other NSAIDs.  The mechanism for increasing the risk of sudden cardiac death and myocardial infarction most favored relates to the imbalance created by differentially suppressing the synthesis of thromboxane A2 and prostacyclin.  Very simply stated, thromboxane promotes platelet aggregation, vessel constriction, and proliferation of smooth muscle cells.  Prostacyclin opposes the action of thromboxane by inhibiting platelet aggregation, facilitating vasodilation, and preventing proliferation of smooth muscle cells.  Cox 2 is the dominant source of prostacyclin; therefore,

inhibition of Cox 2 favors thrombogenesis, hypertension and promotion of atherosclerosis. Each of these effects, alone or in concert, can cause sudden cardiac death. Garret Fitzgerald concluded in 2004, "Thus, a single mechanism, depression of prostaglandin i2 formation, might be expected to elevate blood pressure, accelerate atherogenesis, and predispose patients receiving coxibs to an exaggerated thrombotic response to the rupture of an atherosclerotic plaque."

This Fitzgerald hypothesis has become the most commonly identified mechanism for Vioxx injury and is commonly referred to as an imbalance between prostacyclin, an antithrombotic agent, and thromboxane, a prothrombotic agent brought about by a decrease in prostacyclin production (which depends on COX-2 activity) by the COX-2 inhibitory property of Vioxx. (Fig. 1).



Fig.

The COX-2 enzyme is essential for normal endothelial synthesis of prostacyclin. Prostacyclin participates in the regulation of 'vasomotor tone' by regulating vasodilatation in

order to assure adequate blood flow.  Prostacyclin is also critical in the regulation of platelet activity; it reduces intravascular platelet aggregation and thrombosis formation.

Thromboxane $A_2$ is prostacyclin's 'counter-weight': it is vasoconstrictive and pro-platelet aggregation, e.g., prothrombotic. A decrease in prostacyclin production without a concomitant decrease in thromboxane $A_2$ production within the vasculature increases the potential for occlusive thrombosis formation.   Occlusive thrombosis formation may cause myocardial ischemia, angina, myocardial infarcts and/or Sudden Cardiac Death.  By selectively inhibiting COX-2, Vioxx allows COX-1 activity to remain unaltered resulting in an imbalance between prostacycline and thromboxane $A_2$ in favor of a prothrombotic state.

Thus, the most likely triggering mechanisms of sudden cardiac death secondary to exposure to Vioxx includes thrombogenesis, spasm, or a combination of the two. *See* Exhibit N, Dr. Lucchesi Report, which is attached, at ¶ 9.   These events and the supportive medical texts and literature are further explained in the Report of Dr. Lucchesi.  The relation of these events to Vioxx ingestion is also explained by Dr. Lucchesi at ¶s 38-50, with citations to the relevant and peer-reviewed publications as well as the basic medical texts. In addition, Dr. Bloor reports that an acute thrombus, without histological evidence of endothelization organization, in the lumen of an artery indicates an acute event occurring near the time of death resulting in sudden severe narrowing of an already narrowed vessel lumen.  *See* Exhibit O which is attached.  This change would result in significant restriction of blood flow to the myocardium leading to myocardial ischemia and increasing the risk of cardiac arrhythmias.

## IV.    Case Specific Pathological Issues Regarding Richard Irvin

Richard Irvin ingested Vioxx, 25mg. for approximately 30 days in April and May of 2001. On May 15, 2001, Mr. Irvin had a clot form in the left anterior descending artery of his

heart and which caused his SCD. This was confirmed through autopsy. Mr. Irvin's cause of death is properly termed a thrombotic SCD. The experts agree that Mr. Irvin's SCD occurred in the presence of a deficiency of oxygen supply to the heart muscle that was triggered through the presence of the clot (also referred to as thrombus). The 'terminal event' in Mr. Irvin's life was, in fact, the cardiac arrhythmia, ventricular fibrillation which is the typical terminal event in non-traumatic, instantaneous death. There should be no confusion as to whether or not Mr. Irvin expired secondary to the thrombosis or a cardiac arrhythmia.

Mr. Irvin suffered a fatal occlusion of his left anterior descending artery at a point of maximum narrowing of the artery. Plaintiff's cardiac pathology expert Colin M. Bloor also reviewed a series of histological slides and determined that these sections showed atheroma within the vessel walls consistent with the gross description of 20-40% occlusion in the autopsy report. Dr. Bloor also found an acute thrombus in the vessel lumen consistent with the acute thrombus described in the autopsy report. This thrombus is a recent event since there is no evidence of adhesion or incorporation into the vessel wall at this time. *See* Exhibit O. There is no evidence of endothelization of the clot; there is no evidence of organization of the clot.

Richard Irvin's experience was consistent with the epidemiology of and mechanism of Vioxx injury.

## V.   The Naproxen Hypothesis

Merck has set forth the hypothesis that alleged cardioprotective effects of naproxen are sufficient to explain the increases in myocardial infarction and serious coronary heart disease in Vioxx both during and after the VIGOR clinical trial.

There is no epidemiological support for this hypothesis.

W:\25000-29999\27115\000\PLD\Daubert\Plaintiff's Summary Brief Exhibits\Plaintiff's Summary Science Brief 2005-10-21.doc

19

The VIGOR study demonstrated statistically significant excesses in myocardial infarction and cardiac events that included sudden death. *See* Exhibit L at § 3. Merck attributes these findings to a pronounced protective effect of naproxen. *Id.* The VIGOR trial publication obscured the risk associated with rofecoxib. *Id.* For gastrointestinal outcomes, the relative risk ratios used rofecoxib as the numerator and naproxen as the denominator, resulting in ratios less than 1 indicating the expected lower rate of gastrointestinal disease in the rofecoxib arm. *Id.* According to generally accepted practice, the risk ratios should have been calculated in the same manner for serious cardiac events and myocardial infarctions. *Id.* Had this been done, they would have shown, for example, the 5-fold increased risk. *Id.* Instead, the risk ratios were inverted, with naproxen as the numerator and rofecoxib as the denominator. *Id.* This yielded a number less than 1, with the finding described by Merck as a protective effect of naproxen. *Id.* Subsequent publications with funding from Merck proffered the interpretation that the VIGOR findings were due to a cardio-protective effect of naproxen. *Id.* Merck continued this practice until rofecoxib was withdrawn from the market and, even following withdrawal, continued to support the "naproxen hypothesis". *Id.* This was primarily in the area of marketing Vioxx to physicians and consumer rather than in peer reviewed publications and Merck was issued a rare Warning Letter from the FDA in September of 2001 for falsely asserting that naproxen explained the VIGOR cardiac events. *See* Exhibit P which is attached. Following the publication of VIGOR, the hypothesis tested in epidemiologic studies. *See* Exhibit L at § 3-4. A protective effect of a magnitude sufficient to explain the VIGOR findings would be manifested as relative risks of 0.20 and 0.35 for myocardial infarctions and serious coronary heart disease, respectively. *Id.* This is a much more pronounced effect than that of aspirin, which was seen in epidemiologic studies long before clinical trials were conducted. *Id.* Thus, if naproxen had a cardio-protective

effect of sufficient magnitude to explain the VIGOR findings, epidemiologic studies would be capable of detecting it. *Id.* In January of 2002, Dr. Ray published the findings of a large epidemiologic investigation of naproxen in *The Lancet. Id.* Merck's in house senior epidemiologist, Doug Watson, wrote an internal e-mail stating that the overall quality of Dr. Ray's study was excellent. *See* Exhibit Q. Between VIGOR and APPROVe publications, there were 11 published studies assessing the cardio-protective effect of naproxen. *See* Exhibit L at § 3-5. These were reviewed in a meta-analysis of Juni and colleagues. With the exception of the 3 studies supported by Merck, the studies found no significant protective effect of naproxen for myocardial infarction or sudden cardiac death. *Id.* Even if Merck-sponsored studies are included (as indicated in Dr. Ray's Report), the small protective effect of naproxen (about 14%) is insufficient to explain the VIGOR findings. *Id.*

In the publication of VIGOR in the New England Journal of Medicine, the Merck consultants and employee authors concluded that "[t]he finding that naproxen therapy was associated with a lower rate of myocardial infarction needs further confirmation in larger studies." *See* Exhibit R which is attached, at p. 1527. Merck's meta-analysis that followed (Exhibit F) in Circulation stated that "[a]lthough the data are suggestive, neither the VIGOR results nor the current analysis provide sufficient evidence to establish the potential cardioprotective benefits of naproxen. Therefore, patients at risk for CV Thrombotic events who are prescribed a COX-2 inhibitor or an NSAID should receive appropriate antiplatelet therapy as clinically indicated." The same study concluded as the last sentence of the meta-analysis that '[t]he data suggest, but are insufficient to ascertain, the cardioprotective benefits of naproxen."

In the most recent study to address the naproxen hypothesis, the authors, not affiliated with Merck, said:

We found no evidence to support the hypothesis, proposed by the authors of the VIGOR trial, that naproxen actually lowers the risk of a myocardial infarction. This lack of a cardioprotective effect for naproxen in our study is consistent with other studies that have failed to find any protective effect for naproxen and a recent meta-analysis. We found one study that suggested a weak protective effect of naproxen for acute myocardial infarction, but the detailed analysis failed to show any proximity-response relation between exposure to naproxen and acute myocardial infarction….. Lastly, we found no evidence to support a reduction in risk of myocardial infarction associated with naproxen."

*See* Exhibit M, Hippisley-Cox and Coupland, *Risk of myocardial infarction in patients taking cyclo-oxygenase-2 inhibitors or conventional non-steroidal anti-inflammatory drugs: population based nested case-control analysis*, Brit. Med. J. 2005:330;1366-1372 (June 11, 2005).

## VI.    Conclusion

The scientific evidence of the role of Vioxx ingestion in sudden cardiac death is overwhelming. There is reliable and sufficiently powered epidemiological evidence to support causation at the dose and for the duration of use by Richard Irvin in this case. The relative risk and attributable risk support causation. The mechanism is established and related to Vioxx ingestion. The defensive hypothesis Merck sets forth relating to naproxen is implausible and unsupported in science. The peer-reviewed relevant scientific literature is consistent. Merck knew about the sudden death risks to persons such as Mr. Irvin before Vioxx was put on market

W:\25000-29999\27115\000\PLD\Daubert\Plaintiff's Summary Brief Exhibits\Plaintiff's Summary Science Brief 2005-10-21.doc

22

and at all times after it was sold by Merck prior to its worldwide withdrawal of Vioxx from the market in September of 2004.

Respectfully submitted,

**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA  70113
PH:    (504) 581-4892
FAX:  (504) 561-6024

Temporary address:

3411 Richmond Ave., Suite 460
Houston, TX  77046
PH:    (713) 877-1843
FAX:  (713) 871-9750
**Plaintiffs' Liaison Counsel**

| | |
|---|---|
| Richard J. Arsenault, Esq.<br>P.O.Box 1190<br>2220 Bonaventure Court<br>Alexandria, LA  71309-1190<br>PH: (318) 487-9874<br>FAX: (318) 561-2591 | Gerald E. Meunier, Esq.<br>Energy Centre<br>1100 Poydras Street, Suite 2800<br>New Orleans, LA  70163-2800<br>PH: (504) 522-2304<br>FAX: (504) 528-9973 |
| Andy D. Birchfield, Esq. **(Co-Lead Counsel)**<br>P.O. Box 4160<br>234 Commerce Street<br>Montgomery, AL  36103-4160<br>PH: (800) 898-2034<br>FAX: (334) 954-7555 | Troy Rafferty, Esq.<br>316 S. Baylen Street, Suite 400<br>Pensacola, FL  32502<br>PH: (850) 435-7000<br>FAX: (850) 497-7059 |
| Elizabeth Cabraser, Atty.<br>Embarcadero Center West<br>275 Battery Street, 30th Floor<br>San Francisco, CA  94111-3339<br>PH: (415) 956-1000<br>FAX: (415-956-1008 | Drew Ranier, Esq.<br>1419 Ryan Street<br>Lake Charles, LA  70601<br>PH: (337) 494-7171<br>FAX: (337) 494-7218 |
| | Mark Robinson, Esq.<br>620 Newport Center Drive<br>7th Floor<br>Newport Beach, CA  92660<br>PH: (949) 720-1288<br>FAX: (949) 720-1292 |

| | |
|---|---|
| Thomas Kline, Esq.<br>1525 Locust St.<br>19th Floor<br>Philadelphia, PA 19102<br>PH: (215) 772-1000<br>FAX: (215) 772-1371<br>Arnold Levin, Esq.<br>510 Walnut Street<br>Suite 500<br>Philadelphia, PA 19106-3875<br>PH: (215) 592-1500<br>FAX: (215) 592-4663<br><br>Carlene Rhodes Lewis, Atty.<br>2200 Texaco Heritage Plaza<br>1111 Bagby<br>Houston, TX 77002<br>PH: (713) 650-0022<br>FAX: (713-650-1669 | Christopher Seeger, Esq. **(Co-Lead Counsel)**<br>One William Street<br>New York, NY 10004<br>PH: (212) 584-0700<br>FAX: (212) 584-0799<br><br>Christopher Vincent Tisi, Esq.<br>2000 L Street, NW<br>Suite 400<br>Washington, DC 20036-4914<br>PH: (202) 783-6400<br>FAX: (307) 733-0028 |

## PLAINTIFFS' STEERING COMMITTEE

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleadings has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced in accordance with Pre-Trial Order No. #8, on this 21st day of October, 2005.

SEE RECORD FOR

EXHIBITS

OR

ATTACHMENTS

NOT SCANNED