FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2005 OCT 21  PM 4: 17

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to Case No. 05-4046 | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| EVELYN IRVIN PLUNKETT, | * | |
| as Personal Representative of the Estate of | * | |
| RICHARD IRVIN, JR., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

* * * * * * * * * * * * * * * * *

## DECLARATION OF NED STEPHEN BRAUNSTEIN, M.D., IN SUPPORT OF MERCK'S MOTIONS TO EXCLUDE EVIDENCE

Ned Stephen Braunstein, M.D., under penalty of perjury, declares:

1.      I have been asked by counsel for Merck to provide this declaration in support of Merck's Motions to Exclude Evidence.

2.      I am Senior Director, Special Projects, Merck Research Laboratories ("MRL"), a division of Merck & Co., Inc. ("Merck"), the company that discovered and developed the prescription medicine VIOXX® that I understand is at issue in this lawsuit.  I also am Adjunct Associate Professor of Medicine at Columbia University where I have taught since 1987, and where I see patients in a Rheumatology Clinic.  I have personal knowledge of many

___ Fee_____
___ Process_____
_X_ Dktd_____
___ CtRmDep_____
___ Doc. No._____

facts set forth in this declaration. The remaining statements are based on information communicated to me in the course of my work for Merck.

3. Merck is a leading global pharmaceutical company headquartered in New Jersey. Founded in 1891, Merck is well known in the industry for its commitment to rigorous scientific research. The company's research arm, Merck Research Laboratories, employs thousands of scientists. Over the years, Merck has developed numerous innovative medicines and vaccines addressing the needs of patients with AIDS, cancer, high cholesterol, high blood pressure, river blindness, arthritis, and many other diseases.

4. I joined Merck in September 1999 as a Director of Worldwide Editing and Labeling ("WE&L"). The WE&L department has responsibilities for the scientific review and editing of regulatory documents and serves as medical/scientific consultant to the Worldwide Product Labeling department.

5. I had four roles with respect to the submission of the VIOXX® Gastrointestinal Outcomes Research Study (VIGOR) study to the United States Food and Drug Administration ("FDA"). I was (1) the editor for the Clinical Study Report; (2) the editor for the cardiovascular ("CV") section of the supplemental New Drug Application ("sNDA"); (3) the editor for the proposed VIOXX® label that Merck submitted to the FDA; and (4) the author of the gastrointestinal ("GI") portion of the sNDA.

6. In September 2001, I began a transition to and in December I became Director, Domestic Regulatory Affairs and worked with the individuals responsible for communications between MRL and the FDA. In April 2002, I took over responsibility as the domestic Regulatory Liaison for VIOXX® responsible for all communications between MRL and the FDA.

7.      In April 2002, I became a member of the VIOXX® Medical Legal Board, a committee of two doctors and a lawyer that reviewed the VIOXX® promotional material and advertising in the United States.  I served on the Medical Legal Board for approximately six months.

8.      In September 2002, I became Senior Director, Global Strategic Regulatory Development.  Over time I assumed a more managerial role in VIOXX® communications.  In September 2003, I became the chair of the VIOXX® Product Development Team.

9.      I was one of the key people communicating with the FDA about the unblinding of Protocol 122 (APPROVe) and the voluntary withdrawal of VIOXX®.  I have also presented data concerning VIOXX® at the FDA advisory committee meeting on selective COX-2 inhibitors in February 2005, and to the Health Canada expert advisory panel in July 2005.

## Introduction

10.      On September 30, 2004, Merck announced that it had decided, on its own initiative, to withdraw VIOXX® from the market and that it would permit patients in possession of unused tablets to return them.

11.      The FDA never instructed Merck to cease the marketing of VIOXX®.

12.      The independent decision of Merck came following a clinical trial, APPROVe, which was commissioned and financed by Merck itself.

13.      As set forth more fully below, in the APPROVe trial, Merck observed an increased incidence of confirmed thrombotic cardiovascular events versus placebo beginning after 18 months of continuous daily use in study participants.  The explanation for the relative increase in the incidence of thrombotic cardiovascular events is not clear.  In APPROVe, patients took either 25 mg of VIOXX® or placebo once a day.  The study was terminated on September

30, 2004, approximately two months ahead of the planned date of completion, at the recommendation of the external safety-monitoring board and the steering committee. At the time of termination, a total of 877 patients in the VIOXX® group and 980 patients in the placebo group had completed the scheduled three years of treatment. The mean duration of treatment was 2.4 years in the VIOXX® group and 2.6 years in the placebo group. (Bresalier R, et al., "Cardiovascular events associated with rofecoxib in a colorectal adenoma chemoprevention trial," *N Engl J Med* 2005 Mar 17; 352(11):1092-102, attached hereto as Exhibit 1.)

       14.     Until the APPROVe trial in September 2004, the weight of the scientific evidence indicated that VIOXX® did not pose an increased risk of thrombotic cardiovascular events as compared with patients taking a placebo. There were unproven hypotheses regarding potential mechanisms of thrombotic cardiovascular injury, but the clinical trial data comparing VIOXX® with placebo and with traditional non-steroidal anti-inflammatory drugs ("NSAIDs") did not support those hypotheses, as the only difference observed was with high-dose naproxen. Merck nonetheless had implemented a cardiovascular standard operating procedure ("SOP") for adjudication of thrombotic events in 1999 and continued to monitor and analyze cardiovascular data from its ongoing clinical trials, including the APPROVe study, which Merck initiated in 2000.

       15.     Without regard to causality, the VIOXX® labeling in the U.S. reported adverse events experienced by patients taking VIOXX®. For example, with regard to cardiovascular events, the initial Package Insert approved by the FDA in May 1999 and distributed to physicians states as follows:

           Other serious adverse reactions which occur rarely (<0.1%), regardless of causality: The following serious adverse events have occurred rarely in patients taking VIOXX:   . . . .

> *Cardiovascular*: cerebrovascular accident, congestive heart failure, deep venous thrombosis, myocardial infarction, pulmonary embolism, transient ischemic attack, unstable angina.

(VIOXX® PI 9183800 dated May 1999, attached hereto as Exhibit 2.)

## **Regulatory Approval**

16.     To better understand the development and marketing of VIOXX®, it is necessary to understand that new medicines are carefully regulated in the United States by the FDA. The FDA focuses extensive effort on ensuring that it approves prescription drugs that are safe and effective when used in accordance with approved labeling. The FDA employs rigorous drug review, approval and post-marketing oversight processes, and it extensively regulates pharmaceutical companies and the manufacture and sale of prescription medications.

17.     In reviewing drug applications for innovative medicines, the FDA involves individuals with collective expertise from a variety of fields, including, but not limited to, chemistry, toxicology, pharmacology, medicine, clinical trial design, and statistics. The FDA provides an extensive regulatory framework and actively communicates with the sponsor (*i.e.,* the entity seeking permission to market the drug in the United States) during the development, review, and post-marketing oversight of such drugs. The FDA also employs outside experts to provide recommendations through its advisory committee process. The sponsor must perform the necessary testing pursuant to strict regulatory requirements to proceed through the various phases of drug development leading to review and possible approval. Once a drug is marketed, strict regulations govern the continued collection, review, and submission of safety data to the FDA.

18.     Prescription drug products go through a series of rigorous tests before they can be approved and marketed. These include pre-clinical trials (*e.g.,* animal) and clinical trials

(*i.e.*, human).  During the pre-clinical phase, new products are evaluated first *in vitro* (*e.g.*, using cells or extracts) and then tested in animals to determine whether they may be safely given to human subjects.  No more than 5 in 5,000 tested products pass these pre-clinical trials to reach the clinical trial phase.  ("FDA and the Drug Development Process:  How the Agency Ensures That Drugs are Safe and Effective," *available at* http://www.fda.gov/opacom/factsheets/justthefacts/17drgdev.html, attached hereto as Exhibit 3.)

19.     Prior to any clinical trial (*i.e.*, the administration of any new drug to any human being) in the United States, a drug sponsor must submit an Investigational New Drug Application ("IND") to the FDA.  Along with any available clinical information, this IND application contains extensive information on the manufacturing of the drug as well as the data on preclinical studies performed on the new product.  Based on this information, the FDA reviews the proposed protocols for studies in humans and it may allow these studies to proceed, or it may halt development, or it may require changes in the proposed development plan as a condition of allowing it to proceed.

20.     A new drug undergoes three phases of clinical trials before it is approved for marketing.  The FDA, or the sponsor, may also determine that Phase IV testing should continue post-marketing.  ("The FDA's Drug Review Process:  Ensuring Drugs are Safe and Effective," *available at* http://www.fda.gov/fdac/features/2002/402_drug.html, attached hereto as Exhibit 4.)

21.     Phase I clinical studies test the drug's safety and tolerability, metabolic and pharmacologic actions, and pharmacokinetics associated with increasing doses on a small number of healthy volunteers.  The number of subjects typically ranges from 20 to 80.  ("The FDA's Drug Review Process:  Ensuring Drugs are Safe and Effective," *available at*

http://www.fda.gov/fdac/features/2002/402_drug.html, attached hereto as Exhibit 4; "FDA and the Drug Development Process:  How the Agency Ensures That Drugs are Safe and Effective," *available at* http://www.fda.gov/opacom/factsheets/justthefacts/17drgdev.html, attached hereto as Exhibit 3; and "The CDER Handbook", *available at* http://www.fda.gov/cder/handbook, attached hereto as Exhibit 5.)

22.     Based on initial safety information from the first studies in humans, the drug sponsor conducts more extensive Phase II clinical trials to establish the effectiveness of the product in the intended population.  Safety continues to be studied, through looking at such things as short-term side effects and risks associated with the drug.  Typically, the number of subjects ranges from a few dozen to several hundred.  ("The FDA's Drug Review Process: Ensuring Drugs are Safe and Effective," *available at* http://www.fda.gov/fdac/features/2002/402_drug.html, attached hereto as Exhibit 4;  "FDA and the Drug Development Process:  How the Agency Ensures That Drugs are Safe and Effective," *available at* http://www.fda.gov/opacom/factsheets/justthefacts/17drgdev.html, attached hereto as Exhibit 3; and "The CDER Handbook", *available at* http://www.fda.gov/cder/handbook, attached hereto as Exhibit 5.)

23.     The drug sponsor continues to submit protocols for subsequent Phase III clinical trials to the FDA, and the FDA may allow, halt, or request modification of these studies as appropriate.  Phase III clinical trials gather additional information about a drug's safety, effectiveness, and dosage.  The number of subjects usually ranges from several hundred to several thousand.  The FDA continues to monitor the clinical trial program, and reviews and analyzes the results of the clinical trials as they become available.  ("The FDA's Drug Review Process:  Ensuring that Drugs are Safe and Effective," *available at*

http://www.fda.gov/fdac/features/2002/402_drug.html, attached hereto as Exhibit 4; "FDA and

the Drug Development Process: How the Agency Ensures That Drugs are Safe and Effective,"

*available at* http://www.fda.gov/opacom/factsheets/justthefacts/17drgdev.html, attached hereto

as Exhibit 3; and "The CDER Handbook", *available at* http://www.fda.gov/cder/handbook,

attached hereto as Exhibit 5.)

        24.    When a sponsor believes that it has sufficient data to demonstrate that the

drug is safe and effective if used as intended, the sponsor submits to the FDA a New Drug

Application ("NDA") containing these data gathered during the pre-clinical and clinical trials

and proposed prescribing information. The NDA contains voluminous information regarding the

drug product, including a summary of the efficacy and safety data, integrated assessments of

benefit and risk, and proposed labeling. The application is required to contain reports of all

investigations of the drug product sponsored by the applicant, and all other information about the

drug pertinent to an evaluation of the application that is received or otherwise obtained by the

applicant from any source. (Code of Federal Regulations, Title 21, Vol. 5, 21 C.F.R. § 314.50,

attached hereto as Exhibit 6.) The vast majority of drugs studied in humans fail to make it to the

NDA stage.

        25.    An FDA review team (comprised of individuals with collective expertise

in a variety of fields, including chemistry, toxicology, pharmacology, medicine, clinical trial

design, and statistics) critically analyzes and evaluates all of the information provided in the

NDA, including the proposed prescribing information. In comparison to the individual sponsor,

the FDA, which often has data on similar medicines that are not available to an individual

pharmaceutical company or among competitors, is in the best position to evaluate the safety and

efficacy of drugs. The FDA makes the final determination on the content, placement, and

language of the information in the prescribing information in the interests of public health and in accordance with the regulations. After approval, the FDA continuously reevaluates the prescribing information and may require revisions based on new safety and/or efficacy information. ("The FDA's Drug Review Process: Ensuring that Drugs are Safe and Effective," *available at* http://www.fda.gov/fdac/features/2002/402_drug.html, attached hereto as Exhibit 4, and "The CDER Handbook", *available at* http://www.fda.gov/cder/handbook, attached hereto as Exhibit 5.)

26.    The FDA has extensive authority to take action concerning a drug and its labeling after it has been approved. If the FDA determines that new information demonstrates that a drug is no longer safe or effective, the FDA can order the drug to be removed from the market by withdrawing its approval. If the FDA determines that the prescribing information is no longer current and must be revised to incorporate new safety or effectiveness information, it instructs the sponsor to revise its prescribing information. If a sponsor does not comply with the FDA's instruction, the FDA can withdraw its approval of the drug and/or take actions to declare the drug misbranded.

## Background on NSAIDs

27.    VIOXX® (known generically as rofecoxib) belongs to a class of pain relievers called non-steroidal anti-inflammatory drugs (NSAIDs). This class includes many familiar pain relievers sold either over the counter in many countries – such as Advil® (ibuprofen) and Aleve® (naproxen) – or by prescription – such as Daypro® (oxaprozin) and Voltaren® (diclofenac). Like aspirin (acetylsalicylic acid), itself sometimes classified as an NSAID, traditional NSAIDs work by inhibiting cyclooxygenase (COX), an enzyme that

stimulates synthesis of prostaglandin – chemicals in the body that promote pain and inflammation.

28.     Traditional NSAIDs have long been a mainstay of treatment for patients needing relief from chronic or episodic pain or inflammation associated with osteoarthritis (OA), rheumatoid arthritis (RA), and other conditions. Unfortunately, this relief does not come without significant adverse side effects. Most notably, because prostaglandins also protect the stomach lining, traditional NSAIDs greatly increase the risk of gastroduodenal perforations, ulcers, and upper gastrointestinal bleeds ("PUBs"). This is particularly true when they are taken at the high doses often necessary to address severe chronic or episodic pain or inflammation. Although less frequent, they can also have effects on the lower gastrointestinal tract. Before the development of a new generation of NSAIDs like VIOXX®, scientists estimated that NSAID-induced PUBs caused more than 16,500 deaths and 100,000 hospitalizations annually in the United States of America. (Wolfe M, et al., "Gastrointestinal toxicity of nonsteroidal antiinflammatory drugs," *N Eng J Med* 1999 Jun 17;340(24):1888-1899, attached hereto as Exhibit 7.)

29.     In the early 1990s, scientists discovered that the COX enzyme had two forms, now called COX-1 and COX-2, which appeared to have several distinct functions. Scientists believed that, among other functions, COX-1 stimulated the synthesis of prostaglandins responsible for protection of the stomach lining, while COX-2 stimulated the synthesis of prostaglandins responsible for pain and inflammation. This led to a hypothesis that NSAIDs designed to inhibit only COX-2 could offer the same pain relief as traditional NSAIDs, but with greatly reduced risk of fatal or debilitating PUBs. (Vane J, "Towards a better aspirin," *Nature* 1994; 367:215-16, attached hereto as Exhibit 8.)

30.     Shortly thereafter, Merck Research Laboratories began a program to make a selective COX-2 inhibitor, which would give patients significant advantages as compared with using the traditional NSAIDs by selectively inhibiting COX-2 without affecting COX-1 and thus sparing GI side effects.  Merck invested extensive resources in this activity and was a pioneer in this field.  The project proceeded, and in 18 months Merck had development candidates.  One of these turned out to be VIOXX®, which was a significant medical breakthrough.

## VIOXX® Approval

31.     In initial clinical studies, VIOXX® was shown to alleviate dental pain, thus showing for the first time in humans that a selective COX-2 inhibitor had efficacy.  (Ehrich EW, et al., "Characterization of rofecoxib as a cyclooxygenase-2 isoform inhibitor and demonstration of analgesia in the dental pain model," *Clin Pharmacol Ther* 1999;65(3):336-347, attached hereto as Exhibit 9.)  Initial gastrointestinal upper endoscopy studies demonstrated that as much as 250 mg of VIOXX® once a day for 7 days in 51 subjects produced many fewer gastroduodenal erosions than 2400 mg of ibuprofen. (MRL Clinical Study Report MK-0966 (Protocol 009) dated October 1997 at 13, attached hereto as Exhibit 10.)  Thus, initial studies showed that VIOXX® had promise as an efficacious pain reliever with a potentially significant gastrointestinal benefit.  Merck appropriately investigated the safety profile of VIOXX® and conducted extensive pre-clinical and clinical studies both before and after the FDA approved VIOXX®.  Moreover, Merck worked with the FDA in designing the clinical trials program for VIOXX®.

32.     During Merck's study of VIOXX® in late 1997, University of Pennsylvania scientist Dr. Garret FitzGerald observed in a clinical pharmacology study jointly conducted with Merck scientists that urine of patients treated with VIOXX® contained lower

levels of a metabolite of prostacyclin than urine of patients on placebo. Dr. FitzGerald

hypothesized that at least some of this difference reflected partial inhibition of prostacyclin

synthesis in blood vessels – an assumption the urine study could neither confirm nor assess.

Dr. FitzGerald raised the possibility that if VIOXX® reduced the balance of prostacyclin relative

to thromboxane in the bloodstream, it might lead to a prothrombotic state.

      33.    Merck responded to Dr. FitzGerald's research in several ways. First, in

February 1998, to evaluate the potential clinical significance of any such effect – if in fact one

existed – a Merck epidemiologist, Dr. Douglas Watson, conducted an analysis of the data Merck

had in thousands of patients in clinical trials. At this point, the clinical trials were ongoing and

therefore the analysis was based on a blinded review of the trial databases. Dr. Watson

concluded that the "CVD SAE incidence rates in trials of VIOXX® appear roughly consistent

with what would be expected in the general population and there is no clear evidence of

consistently elevated risk compared to age-adjusted placebo controls from PROSCAR and

FOSAMAX trials." (Watson D, "Final results of an analysis of the incidence of cardiovascular

SAEs in the phase IIb/III VIOXX® osteoarthritis clinical trials," February 2, 1998 at 14, attached

hereto as Exhibit 11.) Second, after the studies were later unblinded, Merck then prepared an

Integrated Summary of Safety, which included an unblinded analysis of the thromboembolic

cardiovascular events in the VIOXX® osteoarthritis clinical trial database, broken out by length:

six weeks or less, six weeks to six months, and six months to 86 weeks. This analysis concluded

that VIOXX® has a similar incidence of thromboembolic cardiovascular adverse experiences

compared with placebo and NSAID comparators (i.e., diclofenac, ibuprofen, and nabumetone).

Merck included the Integrated Summary of Safety in the VIOXX® New Drug Application

submitted to the FDA in November 1998. Third, to ensure that the FDA and its advisory

committee could fully consider Dr. FitzGerald's research, Merck included the data from the urine study in its November 1998 NDA.  Finally, to ensure that the study would become available to the medical profession at large, Merck scientists and Dr. FitzGerald arranged for its publication in a peer-reviewed medical journal, which accepted the study in December 1998 and published in May 1999.  (Catella-Lawson F, et al., "Effects of specific inhibition of cyclooxygenase-2 on sodium balance, hemodynamics, and vasoactive ekosanoids," *J Pharmacol Exp Ther* 1999 May; 289(2):735-41, attached hereto as Exhibit 12.)

34.     On the advice of an independent Board of Scientific Advisors to which Merck presented both the questions raised by Dr. FitzGerald's study and the company's preliminary analysis of those questions, Merck in May 1998 determined to develop and apply a standard operating procedure for independent blinded adjudication (*i.e.*, detailed medical evaluation) of all potential thrombotic cardiovascular events reported to Merck in future VIOXX® clinical trials.  Merck adopted this procedure for the express purpose of facilitating rigorous scientific analysis.  At this time, both Merck and outside scientists had been engaged in scientific discussion that involved two hypotheses relating to the potential cardiovascular risk profile of VIOXX®: that VIOXX® could lead to thrombotic cardiovascular events by suppressing prostacyclin, and that VIOXX® could reduce thrombotic cardiovascular events by reducing inflammation associated with atherosclerosis.

35.     In November 1998, Merck provided to the FDA the NDAs for VIOXX® and submitted the Safety Update Report ("SUR") for VIOXX® four months later.  Merck's initial NDA submission alone included data from over 57 Phase I, II, and III clinical trials involving over 8500 patients exposed to VIOXX® or comparators for periods up to 86 weeks. All together, the NDAs and SUR consisted of data from 60 clinical trials involving

approximately 10,000 patients and including information from approximately 1400 patients who

had taken VIOXX® for over six months, approximately 800 patients who had taken VIOXX®

for one year or longer and approximately 100 patients who had taken VIOXX® for more than

two years.  The NDAs for VIOXX® included substantially more information than typically is

provided with NDAs for other new drugs, both in terms of the breadth of the total database and

in terms of the numbers of long-term users.  Guidelines for the NDAs for new drugs set by the

International Conference for Harmonization state that it is anticipated that the total number of

individuals treated with a new drug will be about 1500 and that 100 patients exposed for one

year or more should be adequate.  The VIOXX® NDAs far exceeded these standards.

("Guideline for Industry:  The Extent of Population Exposure to Assess Clinical Safety:  For

Drugs Intended for Long-term Treatment of Non-Life Threatening Conditions," ICH-E1A. 95–

4958, 11269–11271; 1995, attached hereto as Exhibit 13.)

     36.     The trials included in the NDAs that contributed to the analysis of

thrombotic cardiovascular events included up to 86 weeks of data comparing VIOXX® to

traditional NSAIDs.  VIOXX® was compared to a placebo for up to 16 weeks.  In all these data,

no significant difference was observed between the subjects from the point of view of the risk of

occurrence of thrombotic cardiovascular events including both myocardial infarctions (heart

attacks) and cerebrovascular accidents (strokes).  The data did not suggest that VIOXX® had an

unusual cardiovascular safety profile.  The FDA's medical reviewer, at the February 2005

combined Arthritis and Drug Safety Advisory Committee Meeting, commented that in the

original NDA VIOXX® looked similar to the other NSAIDs with respect to CV events and that

it was a pretty large database.  (Arthritis and Drug Safety Advisory Committee Meeting Minutes,

dated February 16, 2005, *available at* http://www.fda.gov/ohrms/dockets/ac/05/transcripts/2005-4090T1.pdf.)

37.    During the Phase III OA development program, studies were performed to assess and prove in humans that the doses to be used chronically (12.5 mg and 25 mg) as well as a dose 2- to 4-times higher, 50 mg, were actually safer than traditional NSAIDs with regard to gastroduodenal ulcers.  A pooled analysis of data on these 3 doses from the Phase IIb/III OA program showed an incidence of confirmed PUBs as lower with rofecoxib compared with combined NSAIDs.  (Langman MJ, et al., "Adverse upper gastrointestinal effects of rofecoxib compared with NSAIDs," *JAMA* 1999; 282(20):1929-33, attached hereto as Exhibit 14.  *Later updated in* Watson DJ, et al., "The upper gastrointestinal safety of rofecoxib vs. NSAIDs: an updated combined analysis," *Curr Med Red Opin* 2004; 20(10):1539-48, attached hereto as Exhibit 15.)  Special studies were also done to assess safety for the intestines since it was known that NSAIDs could also cause intestinal problems in humans.  The studies were done using both 25 and 50 mg doses and were consistent with the hypothesis that this drug would cause less intestinal damage than traditional NSAIDs.

38.    Merck also performed two Phase III upper GI endoscopy studies with a total of 1427 patients which showed a reduction in gastroduodenal ulcers compared to the traditional NSAID ibuprofen.  (Hawkey C, "Comparison of the effect of rofecoxib (a cyclooxygenase 2 inhibitor), ibuprofen, and placebo on the gastroduodenal mucosa of patients with osteoarthritis:  a randomized, double-blind, placebo-controlled trial," *Arthritis Rheum* 2000;43(2):370-7, attached hereto as Exhibit 16.)  This data was included in the initial approved label for VIOXX®.  The results indicated a clear and large difference between each of the highest approved chronic dose of VIOXX® (25 mg) and the 50 mg dose compared to a commonly prescribed chronic clinical dose

of ibuprofen (2400 mg) over three time intervals: (1) a 6-week period which included placebo, (2) a 12-week period which included placebo, and (3) a 24-week period. These endoscopy studies showed a large statistically significant reduction in the risk of gastroduodenal ulcers among VIOXX® patients compared to ibuprofen patients.

39.     The clinical trials program of VIOXX®, for the purpose of its approval in both the United States and Europe, complied with the respective regulatory directives in the United States and in Europe in connection with the research that is required in drugs of this type.

40.     On April 20, 1999, the Arthritis Advisory Committee was convened, at the request of the FDA, to discuss Merck's application for the approval of VIOXX®. This Committee, an integral part of the discussion of the drug's safety, reviewed cardiovascular information that had been received from the results of the trials. The Committee recommended that VIOXX® be approved for marketing for the indications sought. (Arthritis Advisory Committee Meeting Minutes, dated April 20, 1999, *available at* http://www.fda.gov/ohrms/dockets/ac/99/minutes/3508m1.pdf.)

41.     On May 20, 1999, the FDA approved VIOXX® as safe and effective and gave its approval to Merck to market VIOXX® in the USA in three indications:  (a) as a drug for the relief of symptoms of osteoarthritis (OA), in a dosage of 12.5 or 25 mg, once a day; (b) as a drug for the management of acute pain, in a dosage of 50 mg, once a day; and (c) treatment of primary dysmenorrhea, in a dosage of 50 mg, once a day.   Subsequently and based on the review of additional studies, the FDA approved VIOXX® as safe and effective: (d) for the relief of the signs and symptoms of rheumatoid arthritis in adults; (e) for the relief of the signs and symptoms of pauciarticular or polyarticular course Juvenile Rheumatoid Arthritis (JRA) in

patients 2 years and older and who weigh 10 kg (22 lbs) or more; and (f) for the acute treatment of migraine attacks with or without aura in adults.

42.     Also on May 20, 1999, the FDA approved the wording of the package insert, which includes directions and warnings for use. On the package insert, it was noted that VIOXX® is not a substitute for the cardiovascular protection typical of aspirin. In addition, the package insert stated, among other things, that the recommended initial dose of VIOXX® for the management of acute pain and treatment of primary dysmenorrhea is 50 mg once daily. Subsequent doses should be 50 mg once daily as needed. "Use of VIOXX for more than 5 days in management of pain has not been studied." (VIOXX® PI 9183800 dated May 1999, attached hereto as Exhibit 2.)

43.     As of May 1999, however, when the FDA approved VIOXX®, the available scientific and clinical data did not warrant a conclusion that use of VIOXX® presented a clinically significant increased risk of thrombotic cardiovascular adverse events. Accurately reporting the results of the clinical trials, the FDA-approved prescribing information stated that heart attacks and strokes in patients taking VIOXX® were among serious adverse events that "occur rarely (<0.1%), regardless of causality." (VIOXX® PI 9183800 dated May 1999, attached hereto as Exhibit 2.)

44.     VIOXX® was approved by the FDA at the end of the full exhaustion of the process described above. The professional team at Merck that was involved in the research and development worked in cooperation with the responsible officers at the FDA and acted in accordance with their directives and requests. At every stage of its development, VIOXX® was considered to be a drug with an important breakthrough in connection with the difficult problem that was endangering the lives of the users of traditional NSAIDs. For this reason, the FDA

decided that the original VIOXX® NDAs met regulatory requirements to be given priority in terms of its handling time (over concurrent new drug applications).  It is clear that the preference in terms of the time has no effect or influence regarding the material requirements (as described) that constitute the conditions for the approval of the drug.  VIOXX® succeeded in tests, trials, and studies of the most stringent standard and was proven to be a drug with a profile of being safe to use as directed.

45.     Neither the pre-approval clinical trial data described above nor prior published clinical trial data on traditional NSAIDs supported hypotheses that VIOXX® might increase the risk of heart attacks.  Indeed, some scientists hypothesized that selective COX-2 inhibitors might reduce the risk of such events because inflammation can play an important role in bringing them about.  (Baker CS, et al., "Cyclooxygenase-2 is widely expressed in atherosclerotic lesions affecting native and transplanted coronary arteries and colocalizes with inducible nitric oxide synthase and nitrotyrosine particularly in macrophages," *Arterioscler Thromb Vasc Biol* 1999;19:646-655, attached hereto as Exhibit 17; Burleigh ME, et al., "Cyclooxygenase-2 promotes early atherosclerotic lesion formation in LDL receptor-deficient mice," *Circulation* 2002 Apr;105:1816-1823, attached hereto as Exhibit 18.)

46.     At the same time, Merck understood that selective COX-2 inhibitors did not share the cardioprotective properties of aspirin.  Scientists have long known that aspirin, by inhibiting COX-1 activity in blood platelets, inhibits synthesis of thromboxane, a prostaglandin that facilitates platelet aggregation (clotting) and constriction of blood vessels.  For this reason, many physicians advise heart patients to take a daily low-dose aspirin as a cardioprotective measure.  By suppressing synthesis of platelet thromboxane, aspirin effectively "thins" the blood, reducing the risk of a heart attack.  Studies conducted during VIOXX® development confirmed

that VIOXX®, designed to inhibit COX-2 but not COX-1, does not inhibit clotting or affect bleeding time relative to placebo.  Accordingly, the drug's FDA-approved labeling noted that "VIOXX® is not a substitute for aspirin for cardiovascular prophylaxis."  (VIOXX® PI 9183800 dated May 1999, attached hereto as Exhibit 2.)

## VIGOR

47.     Clinical trials of VIOXX® in osteoarthritis patients showed significant reductions in the rate of endoscopic ulcers in patients on VIOXX® compared to those on the traditional NSAID ibuprofen and the FDA approved labeling for VIOXX® that described these reductions.  It was Merck's understanding that the FDA would require a gastrointestinal outcomes study before it allowed Merck to state that VIOXX® reduced the risk of clinically significant PUBs.

48.     Merck put considerable effort into designing such a study.  Among the important issues in the design of such a study were what the comparator drug should be, what patient population should the drug be tested in, at what dose, what exclusion criteria should be used, etc.  The FDA requested that the dose would be 50 mg, twice the maximum recommended chronic dose.

49.     A number of comparators were considered.  Ultimately, naproxen was chosen.

50.     Another important consideration in the study design that was considered was the exclusion criteria.  Exclusion criteria are an important part of all clinical trials.  There are many important considerations in determining which patients to exclude.  For instance, it is important to exclude patients who would be too sick to complete the study.  Patients who are contraindicated for the study drug must be excluded.  Also, patients on drugs that might

confound the results must be excluded. The scientific purpose of the study was to test the hypothesis that use of a drug that selectively inhibits COX-2 would be associated with fewer PUBs than use of a drug that inhibits both COX-1 and COX-2. Since aspirin inhibits COX-1, if participants in the study were on aspirin that would confound the ability to meaningfully test the scientific hypothesis. Therefore, excluding patients indicated for prophylactic aspirin was a sensible exclusion.

51.     An additional concern in designing a GI outcome trial comparing a selective COX-2 inhibitor to a non-selective NSAID was the potential to generate data that would be difficult to interpret. This was particularly true with respect to cardiovascular data. For example, aspirin is known to reduce the risk of myocardial infarctions ("MIs"). It is believed that the basis for this reduction is because it permanently inactivates platelet COX-1, the enzyme that produces thromboxane, a chemical that leads to platelet aggregation forming the clots that cause strokes and heart attacks. All traditional NSAIDs inhibit COX-1 to some degree. Therefore, theoretically any traditional NSAID might, like aspirin, reduce the risk of heart attacks. In contrast, COX-2 selective inhibitors do not inhibit COX-1 and have no effect on platelet aggregation.

52.     It was a concern early in the development of a GI outcomes study that if VIOXX® was compared to an aspirin-like NSAID, a disparity in cardiovascular events might be observed caused by the NSAID's aspirin-like cardioprotection. This disparity, although caused by a cardiovascular benefit from the NSAID rather than a detrimental effect of VIOXX®, would be difficult to interpret. (Unfortunately, this is exactly what occurred when Merck compared VIOXX® to naproxen, which has effects on platelets at the dose studied in VIGOR).

53.     Internally, Merck discussed how to design the study.  This discussion included how to use exclusion criteria to maximize the likelihood that the data would be interpretable.

54.     Merck settled on a design for a large clinical GI outcome trial.  The final exclusion criteria for VIGOR, the GI outcome study, were determined for scientifically appropriate reasons.  The trial was planned, from its early phases, in close cooperation with the FDA professionals.

55.     In the VIGOR trial, the drug VIOXX® was compared, at a dosage of 50 mg  (once a day) to the drug naproxen (an NSAID of the traditional type) at a dosage of 1000 mg (500 mg twice a day), among approximately 8,000 patients suffering from rheumatoid arthritis. The dosage of VIOXX® was double the highest recommended dose for chronic use, while the dosage of naproxen was a common therapeutic dose.  The median duration was 9 months.  As stated, the purpose of the trial was to examine on a large scale whether VIOXX® reduced, in a significant manner, as compared to a traditional NSAID, the risk of PUBs.  In January 1999, the first of the participants were recruited and the trial began.  (Bombardier C, et al., "Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis," *N Engl J Med* 2000 Nov 23; 343(21):1520-1528, attached hereto as Exhibit 19.)

56.     On March 9, 2000, Merck was advised of the VIGOR results.  The results showed that the people taking VIOXX® had a significantly lower risk of PUBs.  (*Id.*)  The risk of PUBs was 54% less.  The risk of complicated PUBs (gastroduodenal perforations, obstructions, and major upper gastrointestinal bleeds) was 57% less.  A later analysis also showed better safety for VIOXX® in the lower GI tract.  (Laine L, et al., "Serious lower gastrointestinal clinical events with nonselective NSAID or coxib use," *Gastroenterology* 2003

Feb;124:288-292, attached hereto as Exhibit 20.)  The results also showed that there were fewer confirmed thrombotic cardiovascular events among patients who had taken naproxen than among patients who had taken VIOXX® (19 of the patients taking naproxen, out of 4029, compared to 45 of the patients taking VIOXX®, out of 4047).  The VIOXX® label provides that "[t]his finding was largely due to a difference in the incidence of myocardial infarction between the groups."  (VIOXX® PI 9183811 dated April 2002, attached hereto as Exhibit 21.)  Other safety findings in VIGOR were consistent with previous studies on the chronic use of VIOXX® 50 mg and with the approved labeling.

   57. The cardiovascular data from VIGOR were difficult to interpret for a variety of reasons and were not a sufficient basis to form the belief that VIOXX® caused thrombotic cardiovascular events.  First, VIGOR compared VIOXX® to naproxen rather than placebo.  In the absence of a placebo control, one cannot tell from VIGOR alone if VIOXX® increased the risk or if naproxen decreased the risk of thrombotic cardiovascular events.  Therefore, Merck immediately examined data from two large ongoing placebo-controlled trials, which were examining a hypothesized benefit of VIOXX® in the treatment and prevention of Alzheimer's Disease (a hypothesis which has not been supported by the clinical trial data).  These data were from a population of elderly patients at increased risk for developing or for having Alzheimer's Disease, who because of their age and mostly male gender, were a group at elevated risk for thrombotic heart disease.  The study design was 25 mg VIOXX®, as an anti-inflammatory versus placebo.  A relatively large patient database was available with only 2 arms to the trial, group A and group B.  Because these studies were ongoing, the results were blinded.  However, because of the importance of the question, Merck looked at the blinded CV data in these studies.  The data did not suggest a difference or pattern of differences between group A

and group B.  These data strongly suggested that VIOXX® did not increase the risk of thrombotic cardiovascular events.

58.     Second, Merck reanalyzed the data from its Phase IIb and III osteoarthritis studies using statistical approaches similar to those used to analyze the VIGOR data and based on the same set of serious adverse experience terms used to identify potential thrombotic events for adjudication in VIGOR, the difference between the OA and VIGOR data being that the potential events in the OA IIb/III studies did not undergo adjudication.  These studies included 5,435 osteoarthritis patients who participated in 8 double-blind, placebo-controlled and active comparator studies.  In these studies, there were similar rates of thrombotic cardiovascular adverse events among patients taking VIOXX®, placebo, and comparator NSAIDs (ibuprofen, diclofenac, or nabumetone).  Thus, the first major studies conducted with VIOXX® did not suggest a difference in thrombotic cardiovascular risks when comparing VIOXX® with placebo or the NSAIDs ibuprofen, diclofenac, or nabumetone, even with a retrospective analysis.  The Phase IIb and Phase III data had been submitted to the United States Food & Drug Administration as part of the New Drug Application for VIOXX® and specifically reviewed at a public meeting of the FDA Arthritis Advisory Committee.

59.     Because these data did not suggest an increased risk of thrombotic cardiovascular events associated with VIOXX®, Merck looked to whether or not an effect of naproxen could explain the cardiovascular results of VIGOR.  Basic research and human pharmacological studies indicated that naproxen may have cardioprotective properties.  An animal study by Smith et al. found that naproxen significantly reduced arachidonic acid-induced platelet aggregation and prevented an increase in thromboxane levels during myocardial ischemia.  (Smith EF, et al., "Stabilization of cardiac lysosomal and cellular membranes in

protection of ischemic myocardium due to coronary occlusion: efficacy of the nonsteroidal anti-inflammatory agent, naproxen," *Am Heart J* 1981 Apr;101(4):394-402, attached hereto as Exhibit 22.) Van Hecken, et al. published a placebo-controlled ex vivo blood assay study of a number of nonselective NSAIDs and COX-2 inhibitors, which found that naproxen sodium at 550 mg (equivalent to 500 mg of naproxen) twice daily caused inhibition of thromboxane during the entire dosing interval at a level comparable to that of aspirin, an effect not seen with either ibuprofen or diclofenac. (Van Hecken A, et al., "Comparative inhibitory activity of rofecoxib, meloxicam, diclofenac, ibuprofen, and naproxen on COX2 versus COX1 in healthy volunteers," *J Clin Pharmacol* 2000 Oct; 40:1109-1120, attached hereto as Exhibit 23.) Consistent with its ability to provide prolonged and profound inhibition of platelet aggregation, the naproxen label provides that "[n]aproxen may decrease platelet aggregation and prolong bleeding time." (NAPROSYN® label dated May 2003, attached hereto as Exhibit 24.) There was a higher incidence of epistaxis (nose bleeds) and ecchymoses (bruises) with naproxen compared to VIOXX® in VIGOR. These properties of naproxen are consistent with the ability to provide cardioprotection. Indeed, clinical studies have demonstrated that other agents with these properties can be cardioprotective. A randomized placebo-controlled trial of flurbiprofen, a long-acting NSAID that, like naproxen, has potent anti-platelet effects, found that it was effective in preventing rethrombosis after cardiac angioplasty. (Brochier ML, "Evaluation of flurbiprofen for prevention of reinfarction and reocclusion after successful thrombolysis or angioplasty in acute myocardial infarction" *Eur Heart J* 1993 Jan; 87:951-7, attached hereto as Exhibit 25.) Another randomized placebo-controlled trial found that indobufen, another nonselective NSAID, significantly reduced the risk of serious cardiovascular events in patients with heart disease. (Fornaro G, et al., "Indobufen in the prevention of thromboembolic

complications in patients with heart disease: a randomized, placebo-controlled, double-blind study," *Circulation* 1993 Jan; 87:162-64, attached hereto as Exhibit 26.) Therefore, the hypothesis that naproxen has a cardioprotective effect could not be dismissed as an explanation for the cardiovascular results in VIGOR. Subsequent data from a large clinical trial of another COX-2 selective inhibitor, lumiracoxib, provided further support for this hypothesis. (Farkouh M, et al., "Comparison of lumiracoxib with naproxen and ibuprofen in the therapeutic arthritis research and gastrointestinal event trial (TARGET), cardiovascular outcomes: randomised controlled trial," *Lancet* 2004;364:675-84, attached hereto as Exhibit 27.) Indeed, the weight of the evidence supported and continued to support that in VIGOR naproxen provided a cardioprotective effect.

60.      Further, the number of adjudicated thrombotic cardiovascular events experienced by patients in VIGOR was low. The wide confidence interval around the relative risk estimate ranged from a lower bound estimate of 1.39 to an upper bound estimate of 4.0. ("Rofecoxib: FDA Advisory Committee Background Information," *available at* http://www.fda.gov/ohrms/dockets/ac/05/briefing/2005-4090B1_02_MERCK-Vioxx.pdf, at 79, attached hereto as Exhibit 28.) Thus, although the data are consistent with a difference from naproxen, they cannot be used to reliably estimate the magnitude of that difference.

61.      Studies have suggested that aspirin has a larger relative benefit in higher risk patients. In the Physician's Health Study, the risk reduction of myocardial infarction ranged from 13.9% in the quartile of patients with the lowest level of C-reactive protein (CRP) to 55.7% in the quartile with the highest CRP levels. (Ridker PM, et al., "Inflammation, aspirin, and the risk of cardiovascular disease in apparently healthy men," *N Engl J Med* 1997;336(14):973-9, attached hereto as Exhibit 29.) The patients in VIGOR all had rheumatoid arthritis, rheumatoid

arthritis patients generally have higher CRP levels than patients without inflammatory disease, and rheumatoid arthritis patients have an increased risk of coronary artery disease and are a recognized high-risk group for coronary artery disease. Thus, it is reasonable to anticipate that rheumatoid arthritis patients would experience a larger reduction in the risk of thrombotic CV events with an anti-platelet agent than would patients without inflammatory disease. This further confounds any ability to draw conclusions based on the magnitude of the difference between VIOXX® and naproxen in thrombotic CV events seen in VIGOR.

62.     On the advice of an outside independent scientific consultant, Merck also conducted a pooled analysis of the cardiovascular events from 23 studies with VIOXX® involving more than 28,000 patients, representing more than 14,000 patient years to enhance the power and precision of Merck's analyses. In this analysis, the data did not suggest an increased risk of thrombotic cardiovascular events for VIOXX® compared to placebo or VIOXX® compared to non-naproxen NSAIDs. There was, however, a reduction on naproxen compared to VIOXX®. Because only when compared to naproxen did the data show a difference in the rate of thrombotic cardiovascular events, Merck felt that it was inappropriate to combine all the data from naproxen and other comparators into a single group. Merck presented this analysis at major scientific conferences. Ultimately, Konstam et al. published this analysis in *Circulation*. (Konstam M, et al., "Cardiovascular thrombotic events in controlled clinical trials of rofecoxib," *Circulation* 2001; 104:2280-2288, attached hereto as Exhibit 30.)

63.     A careful review of all of Merck's data suggested that the best explanation for the CV results in VIGOR was that naproxen had been cardioprotective. This theory was based on naproxen's ability, when taken as 500 mg twice daily, to provide potent and sustained inhibition of COX-1. Data from clinical pharmacology studies showed that this derived from

naproxen's potency and its long half-life in the circulation. This effect of naproxen reverses after naproxen has left the bloodstream and platelets are restored to their original function. This is in contrast to aspirin which irreversibly inhibits platelets for the entire approximate 14 day life of platelets. But because naproxen inhibits platelet COX-1 reversibly and not irreversibly like aspirin, naproxen could not be expected to inhibit platelet COX-1 for a 24 hour period without also inhibiting stomach COX-1 for a 24 hour period, which produces many serious GI side effects.

64.    Given the available data, Merck concluded that it was likely that naproxen had been cardioprotective. Alternative explanations could not be formally excluded, but the explanation appeared to explain all the available data.

## Disclosure of VIGOR Results

65.    Merck promptly informed the FDA of the VIGOR results. Merck conveyed the cardiovascular results for VIGOR to the FDA via telephone within two weeks of initially learning the results. On March 23, 2000, Merck submitted a written report to the FDA providing the preliminary cardiovascular data from VIGOR.

66.    Merck also took steps to inform physicians and patients of the results immediately. Merck decided that the fastest way to make all the available data known was to issue a press release and to send a letter to every investigator conducting any trial with VIOXX®. This would occur immediately and thus be broadly known while a full FDA submission was prepared and reviewed. The press release was issued and the investigator letters were received on March 27. The investigator letter pointed out the cardiovascular findings in the VIGOR trial, and put forth the naproxen cardioprotective hypothesis. Additionally, the press release provided that:

> ... Significantly fewer thromboembolic events were observed in patients taking naproxen in this GI outcomes study, which is consistent with naproxen's ability to block platelet aggregation. This effect on these events had not been observed previously in any clinical studies for naproxen.

(Merck Press Release dated March 27, 2000, "Merck Informs Investigators of Preliminary Results of Gastrointestinal Outcomes Study with VIOXX®", attached hereto as Exhibit 31.) Thus, Merck disseminated the data just 18 days after the VIGOR trial had been unblinded.

67.     Despite the fact that VIGOR was a large trial involving 8,076 patients, by June 29, 2000, less than four months after Merck first learned of the results, Merck formally filed a sNDA and requested a priority review as well as proposed labeling reflecting the new data obtained from VIGOR, which included the gastrointestinal and cardiovascular data.

68.     In November 2000, the VIGOR data were published in the widely-read *New England Journal of Medicine* by the group of researchers who conducted the VIGOR trial, led by Dr. Claire Bombardier, MD. It was stated that: "[t]he rate of myocardial infarction was significantly lower in the naproxen group than in the rofecoxib group." (Bombardier C, et al., "Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis," *N Engl J Med* 2000 Nov 23;343(21):1520-1528, attached hereto as Exhibit 19.)

69.     Merck cooperated with the FDA efficiently and quickly in response to all Agency requests. In February 2001, the FDA convened a public advisory committee to consider the results of VIGOR and a trial conducted by Pharmacia (now Pfizer) on CELEBREX® – another COX-2 inhibitor drug that was developed concurrently (a trial known as CLASS).

70.     The Arthritis Advisory Committee, a public committee on the treatment of arthritis patients, spent a day discussing the results of the VIGOR trial in connection with the method of use of VIOXX®. The Advisory Committee noted that one cannot draw conclusions

based on the CV findings and that the data should be presented in the label for prescribers to interpret. (Arthritis Advisory Committee Meeting Minutes, dated February 8, 2001, *available at* http://www.fda.gov/ohrms/dockets/ac/01/transcripts/3677t2.rtf.) The committee recommended changing the wording on the VIOXX® package insert to reflect the reduced risk of stomach-related side effects and to include the cardiovascular data from the VIGOR trial.

71.     Promptly after the Advisory Committee, Merck again proposed new labeling incorporating the VIGOR results and taking into account the Advisory Committee recommendations.  Also after the Advisory Committee, Merck continued to respond to numerous FDA requests, including requests for data from ongoing clinical trials.

72.     In addition, in February 2001, Merck submitted a sNDA for the use of the 25 mg dose of VIOXX® for the relief of the signs and symptoms of rheumatoid arthritis.  The FDA examined the possibility of rewording the package insert and extending the approval for the use of VIOXX® to rheumatoid arthritis patients as well.

73.     The FDA and Merck worked together to craft new labeling that would accurately reflect the data.  Indeed, in April 2002 an updated wording for the package insert was approved.  At the same time, the FDA approved Merck's sNDA finding that VIOXX® was safe and effective when used as indicated for the relief of the signs and symptoms of rheumatoid arthritis in adult patients.

74.     The April 2002 package insert displayed, in tabular form, detailed and annotated results of the VIGOR trial in connection with thrombotic cardiovascular events.  In addition, a precaution was added indicating that caution should be exercised in prescribing the drug for patients with a history of ischemic heart disease.  The package insert then provided CV data from VIGOR and from two placebo-controlled studies that did not show an increased risk

with VIOXX®, concluding that the significance of the cardiovascular findings indicated on the

package insert is "unknown."  In addition, the new package insert contained a recommendation

not to use VIOXX® in a dosage of 50 mg for chronic treatment.  Additional changes were also

incorporated to the CLINICAL PHARMACOLOGY, CLINICAL STUDIES, INDICATIONS

AND USAGE, WARNINGS, PRECAUTIONS, ADVERSE REACTIONS, and DOSAGE AND

ADMINISTRATION sections.

    75.    The package insert stated that:

### CLINICAL STUDIES

* * *

*Other Safety Findings:  Cardiovascular Safety*
    The VIGOR study showed a higher incidence of adjudicated serious
cardiovascular thrombotic events in patients treated with VIOXX 50 mg once
daily as compared to patients treated with naproxen 500 mg twice daily (see Table
2). This finding was largely due to a difference in the incidence of myocardial
infarction between the groups (see Table 3.) (See PRECAUTIONS,
*Cardiovascular Effects*.)  Adjudicated serious cardiovascular events (confirmed
by a blinded adjudication committee) included: sudden death, myocardial
infarction, unstable angina, ischemic stroke, transient ischemic attack and
peripheral venous and arterial thromboses.

Moreover, in the continuation, the label repeated the information related specifically to

precautions for using the drug:

### PRECAUTIONS

* * *

*Cardiovascular Effects*
    The information below should be taken into consideration and caution
should be exercised when VIOXX is used in patients with a medical history of
ischemic heart disease.
    In VIGOR, a study in 8076 patients (mean age 58; VIOXX n=4047,
naproxen n=4029) with a median duration of exposure of 9 months, the risk of

developing a serious cardiovascular thrombotic event was significantly higher in patients treated with VIOXX 50 mg once daily (n=45) as compared to patients treated with naproxen 500 mg twice daily (n=19). In VIGOR, mortality due to cardiovascular thrombotic events (7 vs 6, VIOXX vs naproxen, respectively) was similar between the treatment groups. (See CLINICAL STUDIES, *Special Studies, VIGOR, Other Safety Findings: Cardiovascular Safety.*) In a placebo-controlled database derived from 2 studies with a total of 2142 elderly patients (mean age 75; VIOXX n=1067, placebo n=1075) with a median duration of exposure of approximately 14 months, the number of patients with serious cardiovascular thrombotic events was 21 vs 35 for patients treated with VIOXX 25 mg once daily versus placebo, respectively. In these same 2 placebo-controlled studies, mortality due to cardiovascular thrombotic events was 8 vs 3 for VIOXX versus placebo, respectively.  The significance of the cardiovascular findings from these 3 studies (VIGOR and 2 placebo-controlled studies) is unknown. Prospective studies specifically designed to compare the incidence of serious CV events in patients taking VIOXX versus NSAID comparators or placebo have not been performed.

   **Because of its lack of platelet effects, VIOXX is not a substitute for aspirin for cardiovascular prophylaxis.**  Therefore, in patients taking VIOXX, antiplatelet therapies should not be discontinued and should be considered in patients with an indication for cardiovascular prophylaxis. (See CLINICAL STUDIES, *Special Studies, Platelets;* PRECAUTIONS, *Drug Interactions, Aspirin.*)  Prospective, long-term studies on concomitant administration of VIOXX and aspirin evaluating cardiovascular outcomes have not been conducted.

*Fluid Retention, Edema, and Hypertension*
   Fluid retention, edema, and hypertension have been reported in some patients taking VIOXX.  In clinical trials of VIOXX at daily doses of 25 mg in patients with rheumatoid arthritis the incidence of hypertension was twice as high in patients treated with VIOXX as compared to patients treated with naproxen 1000 mg daily.  Clinical trials with VIOXX at daily doses of 12.5 and 25 mg in patients with osteoarthritis have shown effects on hypertension and edema similar to those observed with comparator NSAIDs; these occurred with an increased frequency with chronic use of VIOXX at daily doses of 50 mg.  (See ADVERSE REACTIONS.)  VIOXX should be used with caution, and should be introduced at the lowest recommended dose in patients with fluid retention, hypertension, or heart failure.

* * *

## DOSAGE AND ADMINISTRATION

*Osteoarthritis*
   The recommended starting dose of VIOXX is 12.5 mg once daily.  Some patients may receive additional benefit by increasing the dose to 25 mg once daily.  The maximum recommended daily dose is 25 mg.

*Rheumatoid Arthritis*
        The recommended dose is 25 mg once daily.  The maximum
recommended daily dose is 25 mg.
*Management of Acute Pain and Treatment of Primary Dysmenorrhea*
        The recommended dose of VIOXX is 50 mg once daily.  The maximum
recommended daily dose is 50 mg.  Use of VIOXX for more than 5 days in
management of pain has not been studied.  Chronic use of VIOXX 50 mg daily is
not recommended.  (See ADVERSE REACTIONS, *Clinical Studies in OA and
RA with VIOXX 50 mg*).

(VIOXX® PI 9183811 dated April 2002, attached hereto as Exhibit 21.)

        76.     From the period from 2000 to 2004, many other articles referring to the

VIGOR trial were also published in leading scientific journals.  Thus, it can be seen that the

cardiovascular results of the VIGOR trial were on the public agenda and were not hidden from

the medical and scientific communities.

## Warning Letter

        77.     On September 17, 2001, Merck received a Warning Letter from the FDA

that addressed promotional activities and materials for the marketing of VIOXX®.  The Warning

Letter was not a blanket condemnation of Merck's marketing policies.  Rather, it addressed

specific events.  The Warning Letter should not eclipse the overall fair, balanced, and

appropriate marketing policies in place at Merck.  The Warning Letter alleged that a single

speaker, Dr. Peter Holt, hired by Merck to conduct several audio conferences in the United States

had made unbalanced presentations stating only the naproxen explanation for the VIGOR study,

that U.S.-based Merck Professional Representatives had made unbalanced statements at two

domestic pharmacy conventions, and that Merck's press release defending the "favorable

cardiovascular safety profile" of VIOXX® was "simply incomprehensible," given the safety

questions raised by the VIGOR trial.  (Warning Letter from the FDA dated September 17, 2001,

attached hereto as Exhibit 32.)

78.     Merck took the FDA's allegations very seriously and undertook a thorough investigation. At the time, there were appropriate marketing policies in place at Merck. As noted in Merck's response to the FDA on October 1, 2001, Merck had in place "policies and procedures designed to ensure compliance" with the FDA's 1997 Guidance for Industry. Merck policies "specifically instruct its employees that, for all speaker programs, all materials, whether written or verbally communicated, shall be consistent with, and not contrary to, the labeling for Merck products." Merck policy further dictates that speakers "are required to use and to follow slide sets that are approved by the appropriate Medical/Legal Board," and are contractually obligated to "provide fair balance in their presentations." Merck informed the FDA that it had discontinued hiring Dr. Holt, who was using unapproved slides in his presentation. (Merck's Response to the FDA dated October 1, 2001, attached hereto as Exhibit 33.)

79.     Merck's reply also addressed its May 22, 2001 press release entitled, "Merck Confirms Favorable Cardiovascular Safety and Profile of Vioxx." Merck stressed that the FDA "must recognize the context in which the press release is issued." An analyst issued a report stating that disclosures from the Advisory Committee Meetings contain "disturbing data" about the VIGOR study. The analyst also put forth his view that naproxen is not cardioprotective. On May 22, 2001, the New York Times subsequently ran a story citing the analyst's report and while it acknowledged Merck's position that the difference observed in VIGOR was consistent with the cardioprotective effect of naproxen, the article focused on the alternative explanation. The New York Times article was picked up by other media. The letter stated that Merck believed it had the "right to respond under these circumstances with information that is truthful and not misleading," and that it was exactly these kinds of inaccurate

press reports to which Merck's press release was responding. Following Merck's response, the FDA required no corrective action with regard to the press release.

80. With respect to the other activities, Merck issued a corrective letter on November 19, 2001. One version of the letter went to the attendees of the audio conferences. The other version of the letter went to the attendees of the pharmacy conventions. The letters included language that corrected the promotional messages used at the conferences and conventions:

> Alternative interpretations have been proposed for the difference in the rates of myocardial infarctions (MI) in the Vioxx treatment group in comparison with the naproxen treatment group. Possible explanations include that Vioxx increased the MI rate or naproxen decreased the MI rate. The underlying reason for the difference has not been established in prospectively designed clinical studies.

(Merck corrective letter dated November 19, 2001, attached hereto as Exhibit 34.)

81. In response to Merck's corrective letter on November 19, 2001, and also Merck's action plan that included training of Professional Representatives to reinforce the standards on educational programs and the need to conduct discussions in strict conformance with the labeling, the FDA sent a letter to Merck on January 2, 2002 in which it concluded that "this matter has been satisfactorily resolved and is considered closed." (FDA's response letter to Merck dated January 2, 2002, attached hereto as Exhibit 35.)

## The APPROVe Trial

82. After learning of the VIGOR results in March 2000, Merck evaluated the possibility of conducting a clinical study specifically designed to assess the cardiovascular effects of VIOXX®. The purpose of such a study would be to prove what the Alzheimer's data had suggested and Merck scientists believed – that VIOXX® would be similar to placebo in the rate of thrombotic cardiovascular events in a controlled clinical trial. However, for ethical

reasons, Merck could not conduct a placebo-controlled study in a population that required pain medicine (because patients in the placebo arm would receive no pain relief) nor in a healthy population that required no medication (because patients would receive no benefit from VIOXX®).

83.     Ultimately, in consultation with the FDA, Merck designed a study protocol for the systematic analysis of cardiovascular safety data from three large scale, long-term, placebo-controlled trials, including APPROVe, that were planned or underway.

84.     APPROVe was a blinded, randomized, placebo-controlled clinical trial supervised by an External Safety Monitoring Board (the "ESMB"). Under the study protocol, Merck had no access to interim data unless the ESMB chose to disclose them in carrying out its duties. On September 23, 2004, with the study nearing completion, the ESMB voted to recommend that Merck terminate the study early in light of interim data the board had reviewed the preceding week. The interim data indicated that after 18 months of continuous daily use, study participants on VIOXX® 25 mg began to experience a gradually increasing rate of confirmed thrombotic cardiovascular serious adverse experiences as compared to study participants on placebo.

85.     On September 24, 2004, Merck was informed by the Steering Committee for the APPROVe trial and the ESMB about the interim results in the APPROVe study.

86.     Notably, the CV data in APPROVe showed similar rates of confirmed thrombotic cardiovascular serious adverse experiences in the first 18 months of use between patients taking VIOXX® and patients taking placebo, a result consistent with – and confirming of -- the findings of Merck's previous clinical trials of VIOXX® against placebo and non-naproxen NSAIDs. However, an increased incidence of thrombotic cardiovascular events

appeared starting after 18 months of continuous usage. This was the first randomized controlled

trial to show a statistically significant increased rate of adverse thrombotic cardiovascular events

with VIOXX® compared to placebo and raised questions about the cardiovascular risk profile of

VIOXX® when used on a continuous long-term basis. The reasons for the APPROVe result are

not understood, and a biological mechanism consistent with all of the data has not been

identified.

87.    Merck believed that it would have been permissible to continue to market

VIOXX® with appropriate disclosure of this new information. But because the data raised

questions and alternative therapies were available, Merck concluded at that time that it would

best serve patients' interests to withdraw VIOXX® from the market.

88.    On September 28, 2004, Merck also informed the FDA of its decision to

stop marketing the drug worldwide, on its own initiative. Merck voluntarily withdrew VIOXX®

on September 30, 2004.[1]

89.    In a press release, Mr. Raymond Gilmartin, Chairman and CEO of Merck,

was quoted as saying:

> We are taking this action because we believe that it best serves the interests of
> patients. Although we believe it would have been possible to continue to market
> VIOXX® with labeling that would incorporate these new data, given the
> availability of alternative therapies, and the questions raised by the data, we
> concluded that a voluntary withdrawal is the responsible course to take.

---

[1]    Merck also stopped the other two ongoing placebo-controlled studies, which were examining the potential
benefit of VIOXX® in treating and preventing colon and prostate cancer. The finalized data from one of these
trials, which has not yet been published, shows no numerical difference in confirmed thrombotic cardiovascular
serious adverse experiences in patients taking VIOXX® when compared to placebo. In preliminary data from
the other study, there were more confirmed thrombotic CV events in the rofecoxib group than the placebo
group; final data are pending. One needs to be careful not to over interpret limited data such as these from
prematurely terminated studies as they do not necessarily predict the final data that the study had been designed
to capture.

(Merck Press Release dated September 30, 2004, "Merck Announces Voluntary Worldwide Withdrawal of VIOXX®", attached hereto as Exhibit 36.)

90.     On February 16, 2005, the cardiovascular results of APPROVe were published in the *New England Journal of Medicine.*

91.     It has been argued – incorrectly – that the APPROVe results are simply confirmation of an increased risk of cardiovascular events that the VIGOR study first showed. This is not correct. The APPROVe results are very different from the results of VIGOR. As discussed above, it was hypothesized that the disparity in thrombotic cardiovascular events was caused either by a prothrombotic effect of VIOXX® or an antithrombotic effect of naproxen. Other drugs that affect thrombosis have acute effects on cardiovascular event rates, and the VIGOR results were consistent with an acute effect of some type. However, the APPROVe results are not consistent with an acute effect since the disparity in APPROVe only starts to appear after 18 months of daily regular use. Although it was hypothesized that VIOXX® might have an acute prothrombotic effect because of its selective COX-2 inhibition, the FDA recently pointed out that the data do not support the hypothesis that COX-2 selectivity contributes to increased cardiovascular risk. (Memorandum from John K. Jenkins, Director, Office of New Drugs, and Paul J. Seligman, Director, Office of Pharmacoepidemiology and Statistical Science to Steven Galson, "Analysis and recommendations for agency action regarding non-steroidal anti-inflammatory drugs and cardiovascular risk," April 6, 2005, attached hereto as Exhibit 37.) It pointed to a significant body of clinical trial data comparing COX-2 selective inhibitors to traditional NSAIDs that show no difference in terms of thrombotic events. *Id.* at 5-6, 8, 10.

92.     Additional studies subsequent to APPROVe raise the question of a risk for all COX-2 inhibitors and overall the data suggest that all NSAIDs may have an increased

cardiovascular risk with long-term use.  A long-term randomized, placebo-controlled study trial designed to test the effectiveness of CELEBREX® in preventing colon cancer found an increased risk of serious cardiovascular events associated with CELEBREX® that did not appear until approximately 12 months of continuous exposure.  (Solomon SD, et al., "Cardiovascular risk associated with celecoxib in a clinical trial for colorectal adenoma prevention," *N Engl J Med* 2005 Mar 17;352(11):1071-80, attached hereto as Exhibit 38.)  Data on valdecoxib (BEXTRA®) further support that COX-2 inhibition does not have an acute effect on thrombosis in the general patient population.  However, data suggest that valdecoxib and parecoxib (a prodrug of valdecoxib) increased the risk of thrombotic events in immediately post-operative coronary artery bypass graft patients.  (Nussmeier NA, et al., "Complications of the COX-2 inhibitors parecoxib and valdecoxib after cardiac surgery," *N Engl J Med.* 2005 Mar 17;352(11):1081-91, attached hereto as Exhibit 39.)

## The FDA's Special Advisory Committee Proceedings On COX-2 Inhibitors

93.     On February 16, 2005, the FDA convened a Special Advisory Committee that held three days of hearings to obtain recommendations on future regulatory treatment for the entire class of selective COX-2 inhibitors.  The committee consisted of leading scientists in the field from throughout the United States.  During its hearings, the committee scrutinized the entire existing body of scientific research on coxibs and heard presentations from scientists and physicians from the academic community, pharmaceutical companies, government regulators, and members of the public.

94.     The committee concluded that, while selective COX-2 inhibitors do pose cardiovascular risks, they also, as a class of pain relievers, provide sufficient benefit to warrant their continued sale and use.  The committee's action also emphasized that:  (a) all prescription

drugs pose some risks, and treating physicians must therefore assess for each patient individually whether the potential benefits of treatment with a particular drug are likely to exceed the risks; and (b) coxibs, as a class of painkillers, have received far more scientific study than traditional NSAIDs, and the relative risks of traditional NSAIDs are not thoroughly understood; and (c) a majority of the committee believed that VIOXX® could be once again made available for prescription.

## The FDA's April 6, 2005 Memo re: Analysis and recommendations for Agency action regarding non-steroidal anti-inflammatory drugs and cardiovascular risk

95.     After a thorough review of data from VIOXX® clinical studies, including results of the APPROVe study, Merck concluded that its data do not support the hypothesis first posited by Dr. Garret FitzGerald that by selectively inhibiting COX-2, COX-2 selective inhibitors would cause an imbalance between thromboxane and prostacyclin that would lead to a prothrombotic state. Merck believes that Merck's pursuit of research into the cardiovascular effects of COX-2 inhibitors, and VIOXX® in particular, has made an important contribution to the scientific investigation of the effects of COX-2 inhibition. It now appears that Merck's research has raised questions of cardiovascular effects of all NSAIDs, both selective COX-2 inhibitors and traditional and non-selective NSAIDs. To this end, Merck has collected substantially more data on the cardiovascular effects of VIOXX® than was collected with respect to the older generation of agents that have been on the market for much longer.

96.     The FDA, after a thorough review of all the available data on COX-2 as described above, agreed that any suspected cardiovascular risk did not appear to be linked to selective COX-2 inhibition. The FDA stated that "[t]he available data do not permit a rank ordering of these drugs [CELEBREX®, VIOXX®, and BEXTRA®] with regard to CV risk."

Subsequent to the Special Advisory Committee hearing, the FDA recommended that Pfizer withdraw BEXTRA® from the market on the basis that BEXTRA® was associated with potentially life-threatening skin reactions and the fact that BEXTRA® was not proven to be more effective than other NSAIDs.  (Memorandum from John K. Jenkins, Director, Office of New Drugs, and Paul J. Seligman, Director, Office of Pharmacoepidemiology and Statistical Science to Steven Galson, "Analysis and recommendations for agency action regarding non-steroidal anti-inflammatory drugs and cardiovascular risk," April 6, 2005, attached hereto as Exhibit 37.)  The FDA also emphasized that it "remains unclear to what extent the COX-2 selectivity of an individual drug predicts the drug's potential for an increased risk of adverse CV events compared to drugs that are less COX-2 selective."  (*Id.*, at 8.)

97.     Health Canada, the regulator of prescription medicines in Canada, like the FDA recently assembled a panel of experts to review the data on the cardiovascular safety of COX-2 selective inhibitors.  The Panel reviewed a pooled analysis of the cardiovascular data for the COX-2 selective inhibitors BEXTRA®, CELEBREX®, VIOXX®, ARCOXIA®, and lumiracoxib.  The Panel voted 12 to 1 that the available information justifies marketing VIOXX® in Canada.  The Panel felt that the COX-2 selective inhibitors VIOXX® and CELEBREX® could be marketed because  "a) the increased risk of cardiovascular disease caused by [COX-2 selective inhibitors] appears similar to that of most NSAIDs, b) the risk of gastrointestinal harm caused by [COX-2 selective inhibitors] appears less than most NSAIDs, and c) patients benefit from having a variety of drugs to choose from for pain relief."  ("Report of the Expert Advisory Panel on the Safety of COX-2 Selective Non-steroidal Anti-Inflammatory Drugs (NSAIDs)," *available at* http://www.hc-sc.gc.ca/dhp-mps/prodpharma/activit/sci-consult/cox2/sap_report_gcs_rapport_cox2_e.html, attached hereto as Exhibit 40.)

I declare under penalty of perjury that the foregoing is true and correct.


Executed in Rahway, New Jersey on October 20, 2005.

**NED STEPHEN BRAUNSTEIN, M.D.**

SEE RECORD FOR

EXHIBITS

OR

ATTACHMENTS

NOT SCANNED