UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 05-4046 | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| EVELYN IRVIN PLUNKETT | * | |
| as Personal Representative of the Estate of | * | |
| RICHARD IRVIN, JR., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

* * * * * * * * * * * * * * * *

**OPPOSITION OF MERCK & CO., INC. ("MERCK") TO PLAINTIFF'S MOTION
TO EXCLUDE OPINION TESTIMONY OF DR. DAVID SILVER**

Merck has designated David S. Silver, M.D., a board certified internist and rheumatologist, as one of its experts. Dr. Silver's extensive clinical experience and impeccable credentials qualify him as an expert on pain management in general and the use of COX-2 inhibitors in particular. These factors also qualify Dr. Silver to provide case-specific opinions regarding Mr. Irvin's use of Vioxx® and opinions regarding the adequacy of the Vioxx labeling. Further, Dr. Silver's reliance on peer-reviewed scientific literature and his own considerable

scholarship in his field – including his involvement over fifty clinical trials pertaining to arthritis and over twenty trials specifically pertaining to COX-2 inhibitors – supports his expert opinions regarding the clinical trials conducted on Vioxx.

Despite Dr. Silver's obvious qualifications to provide expert testimony, plaintiff moves to exclude his testimony in full, arguing without justification that Dr. Silver is not suited to provide either general or case-specific opinions in this case. (See Pl.'s Mot. to Exclude Opinion Testimony of Dr. David Silver ("Motion") at 4-6.) Plaintiff is wrong. Dr. Silver is well qualified to offer expert opinions, as even a cursory review of his *curriculum vitae* reveals. (*See generally* Expert Report of David S. Silver, M.D. ("Silver Report"), *Curriculum Vitae* ("C.V."), attached as Ex. 21 to Declaration of Phillip A. Wittmann in Support of Merck's Opposition Briefs ("Wittmann Decl.").) Accordingly, plaintiff's motion should be denied.

## I.   THE LEGAL STANDARD.

A trial court has "wide discretion in deciding whether or not a particular witness qualifies as an expert under the Federal Rules of Evidence." *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1050 (5th Cir. 1998) (citations and internal quotation marks omitted). In making this determination, the Court is guided by Federal Rule of Evidence 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702.

Under this standard, a party offering expert testimony must show, first, that the expert has sufficient knowledge and/or experience to provide an opinion on the particular subject at issue, *Hidden Oaks Ltd.*, 138 F.3d at 1050, and second, that the expert's testimony is relevant and

reliable, *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589 (1993); *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 275 (5th Cir. 1998); *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d 603, 605-06 (E.D. La. 2003). Reliability depends on whether the expert's "reasoning or methodology underlying the testimony is scientifically valid," meaning that such testimony is "derived by the scientific method" and "supported by appropriate validation – *i.e.*, 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590, 592-93. Relevance depends on whether the expert's "reasoning or methodology properly can be applied to the facts in issue." *Id.* at 593.

## II.   DR. SILVER'S QUALIFICATIONS.

Dr. Silver is board certified in both internal medicine and rheumatology.[1] (C.V. at 1.) He is licensed as a physician and surgeon in California and Illinois, and is on the National Board of Medical Examiners. (*Id.*) In addition, Dr. Silver has held numerous distinguished appointments. (*Id.* at 2-3.) For example, from 2000 to 2004, he served as the Clinical Chief of Rheumatology at the prestigious Cedars-Sinai Medical Center in Los Angeles – the largest clinical rheumatology program in the United States. (*Id.* at 1; Silver Report at 2.) Presently, Dr. Silver is Associate Clinical Professor of Medicine at the University of California at Los Angeles, Director of the Chronic Pain Rehabilitation Program at Cedars-Sinai, and Associate Director of the Osteoporosis Medical Center, a non-profit research center also located in Los Angeles. (C.V. at 2.) He is also a practicing physician who maintains a robust clinical practice and has cared for thousands of patients who suffer from arthritis, chronic pain, and primary care issues.

---

[1]   Rheumatology is a specialty within the broader discipline of internal medicine that primarily deals with problems involving the muscles or joints, including arthritis and autoimmune conditions. (*See* Silver Report at 2.)

3

(Deposition of David S. Silver, M.S. ("Silver Dep.") at 13:21-24, 14:14-15:6, attached as Ex. 11 to Wittmann Decl.; Silver Report at 1.)

Dr. Silver has also distinguished himself as a researcher. He is currently the beneficiary of over fifteen research grants, including a grant from the National Institutes of Health. (*Id.* at 2-3.) In addition, he has been involved in over fifty clinical trials involving arthritis, including more than twenty pertaining specifically to COX-2 inhibitors. (Silver Report at 2.) Dr. Silver has authored a number of peer-reviewed and other publications (*id.* at 3-5), and has spoken nationally on the treatment of chronic pain (*id.* at 5-8). In fact, he has given over 200 lectures on the subject of NSAIDs and COX-2 inhibitors over the course of his career. (Silver Report at 2.)

Faced with these impressive credentials, plaintiff makes a series of broad-brush arguments in an attempt to discredit Dr. Silver's testimony. Plaintiff asserts that, because Dr. Silver is not a cardiologist, pharmacologist, biostatistician, neurologist, regulatory expert, hematologist/clot expert, or pharmacoepidemiologist, "any testimony in these areas" is "outside his area of expertise." (Mot. at 4-5.) Plaintiff also suggests Dr. Silver is unqualified to testify as an expert because of prior work he did for Merck and other pharmaceutical companies – a fact that is completely irrelevant to whether he possesses sufficient knowledge or experience to provide expert testimony.[2] (*See id.* at 4.) Plaintiff's attempts to disqualify Dr. Silver cannot mask the fact that he is eminently qualified to testify about relevant matters.

---

[2] Indeed, Dr. Silver rarely receives compensation for his work with the Osteoporosis Medical Center, a non-profit organization that is "usually…lucky to break even." (Silver Dep. at 28:25-29:7; *see also id.* at 54:21-55:3.)

789946v.1

III.   **PLAINTIFF'S UNSUPPORTED GROUNDS FOR EXCLUDING DR. SILVER'S EXPERT TESTIMONY HAVE NO MERIT.**

Plaintiff asserts several grounds in support of her motion to exclude Dr. Silver's testimony, none of which is supported by law or evidence. Four independent bases require denial of plaintiff's motion. First, Dr. Silver is an expert in pain management and the use of COX-2 inhibitors to treat pain. Second, Dr. Silver's years of clinical experience qualify him to provide case-specific opinions on Mr. Irvin's medical condition and the cause of his death. Third, this practical experience makes Dr. Silver qualified to address the adequacy of the Vioxx labeling. Finally, Dr. Silver's training and involvement in a significant number of clinical trials provides a reliable scientific basis for his testimony regarding clinical trials involving Vioxx.

A.   **Dr. Silver is Qualified to Provide Expert Testimony on Chronic Pain and the Benefits of COX-2 Inhibitors.**

As discussed above, Dr. Silver is an eminently qualified and board certified rheumatologist with a substantial clinical practice. Because a majority of the patients he treats suffer from chronic pain (Silver Report at 2), he has a depth of experience both studying and prescribing NSAIDs and is very familiar with the benefits and risks of COX-2 inhibitors as compared to other pain management therapies. (*See generally* Silver Report at 2-14.) Given this background, Dr. Silver is absolutely qualified to proffer expert testimony concerning chronic pain generally and the risk/benefit calculus for COX-2 inhibitors specifically.

Dr. Silver's expert report explains, among other things, the challenges of treating chronic pain. He describes the risks and debilitating effects of not dealing with this condition (Silver Report at 3-4) and the potentially life-threatening side effects – including gastrointestinal bleeds – associated with traditional NSAID therapies (*id.* at 4-5). He also explains the benefits of COX-2 inhibitors such as Vioxx, especially in relieving the pain of osteoarthritis ("OA") and rheumatoid arthritis ("RA"). (*Id.* at 4-9.) He will testify concerning the safety and efficacy of

Vioxx, including how "[t]he addition of COX-2 inhibitors to clinical practice represented a major step forward in our ability to treat patients." (*Id.* at 5.) He will also describe how Vioxx is especially beneficial because of its reduction in the rate of dsypepsia and its clinically-proven lower rate of gastrointestinal bleeds. (*Id.* at 8-9.) According to Dr. Silver, these benefits are of great value to patients who suffer from chronic pain: "The reduced GI risk of Vioxx allowed doctors to give patients who were previously considered too high of a GI risk for regular NSAID therapy an opportunity to treat their arthritis and pain syndromes with less concern about the potentially fatal GI toxicities. This afforded their patients better pain relief and an improved quality of life." (*Id.* at 9.)

In an effort to preclude this relevant testimony concerning the safety and efficacy of Vioxx, plaintiff makes two arguments, neither of which is relevant to Dr. Silver's qualifications to proffer expert testimony. First, she claims Mr. Irvin was never diagnosed with osteoarthritis or rheumatoid arthritis. (Mot. at 5.) Second, she asserts that "there were no gastrointestinal issues relating to Mr. Irvin's use of Vioxx that warrant opinion testimony here by Dr. Silver." (*Id.*) Plaintiff is incorrect on both counts.[3] However, even if plaintiff's counter-factual assertions were true, her arguments still would fail.

---

[3] First, the uncontroverted evidence shows that Mr. Irvin in fact had gastrointestinal issues. He suffered severe gastrointestinal side effects while on Vicoprofen, and switched to Vioxx in part because it eased his pain without upsetting his stomach. (Deposition of Evelyn Irvin Plunkett at 63:17-64:23, 76:18-21, 77:3-9, 86:4-12, attached as Ex. 6 to Wittmann Decl.; Sept. 6, 2005 Deposition of Christopher Schirmer, M.D. ("Schirmer 9/6/05 Dep.") at 52:12-17, 55:22-25, 56:15-20, attached as Ex. 10 to Wittmann Decl.) Second, while Mr. Irvin's medical records do not reflect a diagnosis of arthritis – because he did not have regular physical exams and rarely consulted a medical professional – his son-in-law Dr. Christopher Schirmer, who prescribed his Vioxx, testified at deposition that he spoke with Mr. Irvin "about having arthritis type pain." (Schirmer 9/6/05 Dep. at 38:4-7.) Dr. Schirmer also testified that it "made sense" that Vioxx would be more
*(continued on next page)*

Whether or not Mr. Irvin had gastrointestinal problems or arthritis, Dr. Silver's testimony regarding the treatment of chronic pain and the safety and efficacy of Vioxx is both *reliable* and *relevant*. *See Daubert*, 509 U.S. at 589. Many of the clinical trials involving Vioxx were conducted with populations of arthritis patients. Given his experience treating this patient population, Dr. Silver is well qualified to review and comment on these studies, and his testimony regarding the studies will assist the trier of fact to understand the scientific evidence that the parties will adduce concerning the risks and benefits of Vioxx. Moreover, understanding the gastrointestinal benefits of Vioxx – for OA, RA, and other patient populations – is critical to understanding the overall benefits of the drug and comparing those benefits to the known risks of the drug. Dr. Silver's testimony on this point is based on sound scientific evidence and is thus reliable:

> Q:  ... What is your conclusion? ...
>
> A:  That the COX-2 inhibitor has provided a GI safety advantage for patients based on the data that we have available, and that they lowered the risk of GI complications of NSAID therapy, and in terms of those complications, presented a benefit to patients.
>
> Q:  Well, when you are coming to those conclusions, do you balance in the risks for CV events?
>
> A:  Of course.
>
> Q:  Okay. And as you look at all of the literature right now, how do you balance in the literature regarding CV events with this perceived benefit that you see with, say Vioxx for the GI risks?

---

effective than Vicoprofen in treating Mr. Irvin's pain, because "if his pain was purely a bad flare-up of the arthritis," Vioxx was "better directed at arthritic pain." (*Id.* at 58:5-17.) This testimony by a medical professional regarding Mr. Irvin's physical condition negates plaintiff's contention that Mr. Irvin did not experience arthritic pain.

789946v.1

> A:   As I have reviewed the literature, along with my clinical experience with patients, along with reading what the FDA has had to say on the statement, it is my opinion that the COX-2 do provide a benefit.

(Silver Dep. at 104:2-19; *see also id.* at 100:11-14 (noting that the ADVANTAGE trial data suggest "there was improved GI tolerability to a statistical significance on patients taking Vioxx versus Naproxen").)

Dr. Silver's testimony is also highly relevant. To the extent plaintiff argues that the risks of Vioxx outweighed its benefits or that its principal purpose was to generate revenue for Merck, Merck is entitled to an opportunity to counter these allegations with evidence and testimony that show the proven benefits and advantages of Vioxx as compared to its alleged risks. Plaintiff alleges, in part, that: (i) Vioxx was defectively designed because "[t]he drug caused harmful side effects which outweighed any potential utility . . ." (Compl. at ¶ 122(c)); and (ii) Merck committed fraud by "represent[ing] that Vioxx was safer than other alternative medications and fraudulently conceal[ing] information which demonstrated that Vioxx was not safer than alternatives available on the market" (Compl. at ¶ 197(b)). Dr. Silver's testimony regarding the challenges of treating patients with chronic pain, the "effective relief" provided by Vioxx, and how the drug's benefits outweighed its know risks directly addresses these allegations. (Silver Report at 8.) The testimony is also directly responsive to the issues plaintiff has pled. Accordingly, plaintiff's motion should be denied, insofar as it seeks to limit Dr. Silver's testimony regarding the treatment of chronic pain or the utility of COX-2 inhibitors.

789946v.1

### B. Dr. Silver's Years of Clinical Experience Support His Case-Specific Opinions.

Dr. Silver also opines, based on the undisputed facts concerning Mr. Irvin's medical history, that Vioxx did not contribute to Mr. Irvin's death.[4] (Silver Report at 14.) Plaintiff seeks to exclude this testimony as well, claiming that "nothing about Dr. Silver's practice or medical experience uniquely qualifies him to testify as to the specific cause of Mr. Irvin's thrombotic cardiac event and death." (Mot. at 6.) Plaintiff ignores the fact that Dr. Silver is a board certified internist, with years of experience in treating his patients' cardiac conditions. (*See* Silver Dep. at 130:11-131:19 ("Depending on the nature and what the heart problem is, as a primary care doctor rheumatologist, I will often treat those problems.").) Plaintiff also ignores the fact that Dr. Silver has reviewed the relevant published, peer-reviewed medical literature thoroughly, having followed it actively before his engagement in this case. He is thus well qualified to render case-specific expert opinions.

Dr. Silver's testimony regarding whether Vioxx could have caused Mr. Irvin's death is based on concrete and scientifically reliable information:

> Q: ... I am saying, is it medically possible that the Vioxx worked together with [Mr. Irvin's] moderate coronary artery disease to bring about this [myocardial infarction]?
>
> . . .

---

[4] In reaching this opinion, Dr. Silver notes that Mr. Irvin's autopsy showed that he had a clot in his left anterior descending artery. (Silver Report at 14.) Plaintiff attacks this statement on the ground that "[t]he presence or absence of a clot in Mr. Irvin's arteries is . . . outside of Dr. Silver's area of expertise . . . ." (Mot. at 5.) But the existence of the clot is undisputed, and Dr. Silver's observation of this background fact should be uncontroversial. Plaintiff's reason for challenging Dr. Silver's reference to the fact is thus unclear.

>       A.      Based upon my review of the literature, based upon my clinical
>       experience, my discussions with colleagues, et cetera, I do not believe the
>       literature supports that, no.

(Silver Dep. at 129:13-24; *see generally id.* at 129:2-130:2.) Dr. Silver's testimony regarding whether there is a mechanism by which Vioxx can cause cardiovascular events generally is similarly grounded in the published, peer-reviewed scientific literature. (*Id.* at 126:10-17, 127:21-128:6 ("What I am saying is I don't believe, based on present clinical data, that one can state there is any difference between non-selective NSAIDs and Vioxx . . . that the data does not support any risk in the short term.").) Dr. Silver's case-specific opinion testimony thus satisfies the requirements of Rule 702 and should be permitted.

> C.      **Dr. Silver is Qualified to Testify About the Adequacy of Vioxx Labeling.**

To the extent plaintiff seeks to exclude Dr. Silver's testimony regarding the adequacy of Vioxx labeling, her motion should be denied as well.[5] In addressing the import of the VIGOR clinical trial, Dr. Silver concludes: "Given the inconclusiveness of the VIGOR cardiovascular data in light of all of the other evidence, the label for Vioxx was appropriate with regard to cardiovascular safety both before and after the April, 2002 revision." (Silver Report at 11.) Dr. Silver cites a number of facts that support this conclusion, including the findings of the February, 2001 FDA Advisory Committee convened to evaluate the VIGOR results and the final views of the FDA on this subject as reflected in the label that the FDA approved. (*Id.* at 10-11.) His opinion is also informed by his experience as a routine prescriber, researcher, and primary care physician with years of practice treating patients, following the relevant scientific literature, and

---

[5]    Plaintiff does not specifically move to exclude Dr. Silver's testimony on this ground. (*See generally* Mot. at 4-6.) However, "adequacy of labeling for Vioxx" is listed among his purportedly objectionable opinions. (Mot. at 2.)

789946v.1

prescribing pain medications. Given this vast reservoir of experience, Dr. Silver is eminently qualified to offer an opinion on the adequacy of Vioxx labeling. His opinion is grounded in both scientific evidence and real-world experience. It is plainly admissible under Rule 702 and *Daubert*.

### D. Dr. Silver's Experience With Clinical Trials Qualifies Him to Testify About the Clinical Trials Conducted on Vioxx.

Finally, in two concurrently filed motions, plaintiff challenges the substance of Dr. Silver's testimony regarding clinical trials involving Vioxx. (*See* Pl.'s Mot. to Exclude Opinion Testimony That Vioxx Cannot Cause Adverse Thrombotic Cardiac Events Unless Ingested Eighteen (18) Months or Longer, filed Oct. 21, 2005; Pl.'s Mot. to Exclude Opinion Testimony That Vioxx Is The Same As All NSAIDs Regarding Cardiotoxic Effects, filed Oct. 21, 2005.)[6]

It is unclear whether plaintiff is arguing that Dr. Silver is not qualified to offer opinions regarding the alleged cardiovascular risks associated with short-term use of Vioxx or how Vioxx compares to other NSAIDs in terms of cardiovascular risk. To the extent that plaintiff intends to make such an argument, however, Dr. Silver's qualifications and testimony prove otherwise. To reiterate: Dr. Silver has participated in a substantial number of clinical trials involving COX-2s, including Vioxx. (Silver Report at 2.) He has direct, extensive, first-hand knowledge concerning the design, implementation, and interpretation of clinical trials of NSAIDs. His analysis of the clinical trials involving Vioxx will assist the jury to understand the methodology,

---

[6] Merck has addressed plaintiff's substantive arguments in briefs in opposition to these motions, filed concurrently herewith. (*See* Opposition of Merck & Co., Inc. to Plaintiff's Motion to Exclude Opinion Testimony That Vioxx Cannot Cause Adverse Thrombotic Cardiac Events Unless Ingested Eighteen (18) Months or Longer; Opposition of Merck & Co., Inc. to Plaintiff's Motion to Exclude Opinion Testimony That Vioxx Is The Same As All NSAIDs Regarding Cardiotoxic Effects.)

11

appropriateness, and significance of these trials. Moreover, his conclusions are backed not only by his extensive experience but also by the published, peer-reviewed scientific literature.[7] Therefore, Dr. Silver should be permitted to testify at trial on VIGOR, APPROVe, and other clinical trials regarding Vioxx.

## IV.   CONCLUSION.

For the reasons stated above, Merck respectfully requests that plaintiff's Motion To Exclude Opinion Testimony of Dr. David Silver be denied in its entirety.

Respectfully submitted,

*/s/ Phil Wittmann*

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone: 504-581-3200
Fax:    504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone: 312-494-4400
Fax:    312-494-4440

---

[7] For example, Dr. Silver cited approximately two dozen published, peer-reviewed articles at his deposition to support his opinion that naproxen taken regularly at certain doses (such as in the VIGOR trial) is cardioprotective. (Silver Dep. at 105:12-109:21 (citing articles no. 3, 5, 13, 24, 29, 30, 44, 45, 50, 51, 52, 57, 61, 66, 69, 70, 76, 79, 84, 86, 94, 99, 104, 106, 107, 127, 138, 140, 141 from his bibliography).)

789946v.1

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Phone: (202) 434-5000
Fax:    (202) 434-5029

And

John H. Beisner
Charles C. Lifland
Richard B. Goetz
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone: (213) 430-6000
Fax:    (213) 430-6407

Attorneys for Merck & Co., Inc.

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Opposition of Merck & Co., Inc. to Plaintiff's Motion to Exclude Opinion Testimony of Dr. David Silver has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 2nd day of November, 2005.

_____
Phil Wittmann

789946v.1