

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2005 NOV -2  PM 3: 35

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **In re:  VIOXX** | * | **MDL Docket No. 1657** |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| | * | **JUDGE FALLON** |
| **This document relates to** | * | |
| **Case No. 05-4046*** | * | |
| | * | **MAGISTRATE JUDGE KNOWLES** |
| **EVELYN IRVIN PLUNKETT** | * | |
| as Personal Representative of the Estate of | * | |
| **RICHARD IRVIN, JR.,** | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| **MERCK & CO., INC.,** | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### OPPOSITION OF MERCK & CO., INC. ("MERCK") TO PLAINTIFF'S MOTION TO EXCLUDE OPINION TESTIMONY OF DR. FRANK LANZA AND DR. MERLIN WILSON

## I.   INTRODUCTION.

In plaintiff's efforts to make this case solely about why Vioxx® is allegedly dangerous, she has completely overlooked the fact that Merck is entitled to defend itself by explaining why Vioxx is *good*.  Indeed, it is only by assessing Vioxx's benefits, as well as its supposed drawbacks, that the jury can assess plaintiff's claims of defective design, negligence, and breach of warranty.  The testimony of Dr. Lanza, a gastroenterologist, and

____ Fee_____
____ Process_____
_X_ Dktd_____
_√_ CtRmDep____789265v.1
____ Doc. No_____

Dr. Wilson, a rheumatologist, places the debate about Vioxx into a balanced context that is completely lacking in plaintiff's expert reports. It is relevant and reliable, and it should be allowed.

The core of Dr. Lanza's and Dr. Wilson's testimony is that Vioxx offers distinct, identifiable advantages over other drugs when treating acute or chronic pain. Traditional non-steroidal anti-inflammatory drugs (NSAIDs), such as Advil® and Aleve®, greatly increase the risk of gastrointestinal ("GI") perforations, ulcers, and bleeds. (Expert Report of Frank Lanza, M.D. ("Lanza Report") at 4, attached as Ex. 17 to Declaration of Phillip A. Wittmann in Support of Merck's Opposition Briefs ("Wittmann Decl.").) As Dr. Wilson testified in deposition, those serious GI problems result in approximately 16,000 deaths and 100,000 hospitalizations per year in this country. (*See* July 1, 2005 Deposition of Merlin Wilson, M.D. ("Wilson 7/1/05 Dep.") at 37:12-22, attached as Ex. 13 to Wittmann Decl.) Thus, for many patients, Vioxx was, put simply, the best and most appropriate medicine to relieve acute or chronic pain.[1]

Based in part on his experience in treating thousands of patients each year (and treating hundreds of those patients with Vioxx), and consistent with Merck's own findings in the VIGOR clinical trial, Dr. Wilson opines that Vioxx offers effective pain relief while significantly reducing the number of GI injuries and deaths. (*Id.* at 38:11-39:14.) Dr. Lanza, a gastroenterologist, shares this view based on VIGOR and his own substantial clinical experience treating patients. (Lanza Report at 3-4.)

These opinions are without question relevant. For example, plaintiff's design defect claim is based, in part, on her claim that Vioxx's harmful side effects outweighed any potential utility. (Compl. ¶ 122(c).) Dr. Lanza opines on this exact issue, but comes to the opposite

---

[1]  This point is also relevant to Mr. Irvin who, as discussed below, apparently took Vioxx after other pain medications were ineffective in relieving his pain.

conclusion:  even if Vioxx increased the risk of a heart attack, that risk is the lesser of two evils when compared with the greater GI risk.  (Deposition of Frank Lanza, M.D. ("Lanza Dep.") at 50:22-52:5, attached as Ex. 5 to Wittmann Decl.)  Dr. Lanza's testimony that Vioxx's GI benefits outweighed the possible risk of a heart attack is directly relevant to plaintiff's design defect claim, as well as to other claims.

As discussed below, Dr. Lanza's and Dr. Wilson's proposed testimony concerning Vioxx is well-grounded in reliable science, and it complies with the relevant legal standards.  Plaintiff's broad request to exclude all opinion testimony from these physicians should be denied.

## II.   DR. LANZA AND DR. WILSON ARE WELL QUALIFIED TO OPINE ON RELEVANT ISSUES.

Plaintiff does not (and cannot) seriously challenge the credentials of either Dr. Lanza or Dr. Wilson.  Both are well qualified to opine on the safety and efficacy of Vioxx.

Dr. Lanza is currently a Clinical Professor of Medicine in the Department of Gastroenterology at the Baylor College of Medicine, and he is the Chief Emeritus for the Endoscopic Training Program at Ben Taub Hospital in Houston, Texas.  (*See* Lanza Report, *Curriculum Vitae* of Frank Lanza, M.D. ("Lanza C.V."); Lanza Report at 1.)  Dr. Lanza also is currently involved in clinical research in gastroenterology with the Houston Institute for Clinical Research.  (Lanza Dep. at 6:9-18.)

In addition to being a medical professor and conducting clinical research, Dr. Lanza is board-certified in both internal medicine and gastroenterology.  (Lanza Report at 1.)  He currently maintains an active gastroenterology practice in Houston, Texas (Lanza Report at 1), and he spends approximately fifteen hours per week seeing patients.  (Lanza Dep. at 8:8-13.)

As a gastroenterologist, Dr. Lanza is qualified to opine on the relevant issues.  Indeed, as plaintiff acknowledges (Plaintiff's Motion to Exclude Opinion Testimony of Dr. Frank Lanza

- 3 -

and Dr. Merlin Wilson ("Mot.") at 2-3), he has been involved with at least three separate studies to determine the safety of Vioxx on the GI tract. (Lanza Dep. at 8:24-9:21.) Dr. Lanza has also conducted studies on other COX-2 inhibitors, including Celebrex and Bextra. (Lanza Dep. at 13:6-11.) Dr. Lanza has testified before the FDA regarding using another drug in conjunction with NSAIDs to act as a protective agent against NSAID injuries to the GI tract. (Lanza Dep. at 32:1-9.) He is fully qualified to render an expert opinion concerning Vioxx's efficacy as a pain-relief medication and to its safety with respect to GI adverse events.

Likewise, plaintiff cannot seriously challenge the qualifications of Dr. Wilson, a clinical professor at both Tulane University School of Medicine and LSU School of Medicine. (*See* Expert Report of Merlin Robert Wilson, M.D. ("Wilson Report"), *Curriculum Vitae* of Merlin Robert Wilson, M.D. ("Wilson C.V."), attached as Ex. 23 to Wittmann Decl.) Dr. Wilson is also a practicing physician who sees approximately 80 patients per week. (Wilson 7/1/05 Dep. at 7:18-19.)

Dr. Wilson is board-certified in rheumatology, a subspecialty of internal medicine in which physicians treat patients with rheumatic diseases, including osteoarthritis, rheumatoid arthritis, and lupus. As an expert in treating chronic pain, Dr. Wilson treats thousands of patients per year with a variety of pain medications, and he treated hundreds of patients per year with Vioxx before it was withdrawn from the market last year. (April 13, 2005 Deposition of Merlin Wilson, M.D. ("Wilson 4/13/05 Dep.") at 9:4-13, attached as Ex. 15 to Wittmann Decl.) He is familiar with the clinical data and medical literature concerning the risks associated with Vioxx. Dr. Wilson is well qualified to render an expert opinion concerning Vioxx's efficacy as a pain-relief medication, as well as its overall risk/benefit profile compared to other pain relief medications.

789965v.1

III.   **DRS. LANZA AND WILSON RELY ON RELEVANT CLINICAL DATA AND MEDICAL LITERATURE SHOWING VIOXX HAS A SAFER GI PROFILE THAN TRADITIONAL NSAIDS.**

In forming their opinions, Drs. Lanza and Wilson relied on substantial published, peer-reviewed medical literature proving that Vioxx has a safer GI profile compared to traditional NSAIDs.  Indeed, the *raison d'être* for developing COX-2 inhibitors in the 1990s was that traditional NSAIDs were causing a substantial number of serious, life-threatening GI events, including perforations, ulcers, and bleeds.  Incredibly, plaintiff claims that Vioxx is no safer on the GI tract than traditional NSAIDs.  (Mot. at 6.)  But the evidence plaintiff cites does not support her claim, and she simply ignores the overwhelming contrary evidence.  Published, peer-reviewed medical literature, as well as findings by the FDA, confirm that plaintiff is wrong and that Drs. Lanza and Wilson are correct:  Vioxx, in fact, has a safer GI profile than traditional NSAIDs.

It is well-recognized that traditional NSAIDs cause a significant number of serious, life-threatening GI events, and that NSAID use in the United States has resulted each year in tens of thousands of hospital admissions and thousands of deaths.  (Lanza Report at 2; Wilson Report, Ex. 1 at 2-3; Wilson 7/1/05 Dep. at 37:12- 37:22; Declaration of J. Michael Gaziano, M.D., M.P.H. in Support of Merck's Motions to Exclude Evidence ("Gaziano Decl."), filed Oct. 21, 2005, at ¶ 39; Declaration of Stephen Braunstein, M.D. in Support of Merck's Motions to Exclude Evidence ("Braunstein Decl."), filed Oct. 21, 2005, at ¶ 28.)  Traditional NSAIDs work by inhibiting both the COX-1 and COX-2 enzymes.  (Lanza Report at 2; Gaziano Decl. at ¶¶ 37-39; Braunstein Decl. at ¶ 29.)  Scientists believe that inhibiting the COX-1 enzyme leads to these GI problems, as it strips the stomach of its protective mechanisms.  (Lanza Report at 2; Gaziano Decl. at ¶¶ 37-39; Braunstein Decl. at ¶ 29.)  These side effects are particularly common among arthritis sufferers and those with

789965v.1

other musculoskeletal disorders who must take NSAIDs on a daily basis to treat their pain. (Wilson Report, Ex. 1 at 2; Braunstein Decl. at ¶ 28.)

This understanding of COX-1 and COX-2 caused scientists to research whether they could inhibit the production of the COX-2 enzyme that causes pain without inhibiting production of the COX-1 enzyme that protects the GI tract. Against this backdrop, in the 1990s, pharmaceutical companies began to develop a new class of NSAIDs called COX-2 inhibitors, which were developed to provide efficacy in pain relief similar to nonselective NSAIDs but with an improved GI safety profile. (Lanza Report at 2-3; Gaziano Decl. at ¶ 39; Braunstein Decl. at ¶¶ 29-30.) Merck was one of those companies, and one of the COX-2 inhibitors it developed was Vioxx.

Since Vioxx's development, reliable scientific evidence has demonstrated that patients taking Vioxx have fewer adverse GI events than those taking traditional NSAIDs. Specifically, in March 2000, Merck completed and released the results of the VIGOR clinical trial. While plaintiff relies on VIGOR to make claims about an increased risk of cardiovascular events with Vioxx, she studiously avoids discussing the GI results from this study, which Merck experts Dr. Lanza and Dr. Wilson rely on. VIGOR confirms that Vioxx (even at 50 mg, which is twice the recommended chronic dose)[2] is associated with significantly fewer GI perforations, ulcers, and bleeds ("PUBs") compared to standard doses of the traditional NSAID naproxen. (Wilson Report, Ex. 1 at 3-4; Gaziano Decl. ¶¶ at 60-61; Braunstein Decl. at ¶ 56.) The trial data in VIGOR reflected a statistically significant 54% reduction in lower-GI events in users of Vioxx compared to users of naproxen. (Lanza

---

[2]   The 50 mg dose in VIGOR was twice the 25 mg dose that Mr. Irvin allegedly took. One reasonably would expect more GI events at this stronger dose than from a lower dose.

789965v.1

Report at 4; Braunstein Decl. at ¶ 56.)  The VIGOR trial provides Dr. Lanza and Dr. Wilson with a scientifically reliable basis for their opinions concerning Vioxx's GI safety profile.[3]

In addition, the FDA agrees that Vioxx has been shown to reduce the risk of serious GI adverse events.  On April 6, 2005, the FDA's Center for Drug Evaluation and Research issued a "Decision Memorandum" setting forth a comprehensive analysis of the available data on COX-2 inhibitors and traditional NSAIDs in support of the regulatory actions the agency had decided to take.[4]  This Decision Memorandum was based on an analysis of all of the data provided to the Advisory Committee that the FDA convened in February 2005, as well as additional data available only to the FDA, including the entire regulatory histories and data contained in the files and post-marketing databases for all NSAIDs.  Scientists across nearly a dozen divisions and offices of the FDA participated in this comprehensive review and analysis.  (*See* April 6, 2005 FDA Memorandum at 3.)   Importantly, among the FDA's principal conclusions were the findings that:

- ***Only Vioxx is clinically proven to reduce serious GI bleeding:***  As a group, coxibs reduce the incidence of GI ulcers as compared to traditional NSAIDs, but only Vioxx has been shown to reduce the risk of serious GI bleeding as compared to traditional NSAIDs.

- ***Improved GI tolerability justifies continued availability of selective COX-2 inhibitors:***  Because "[i]mproved GI tolerability of NSAIDs is an important issue from an individual patient and public health perspective,"

---

[3]  As discussed below, Dr. Lanza's and Dr. Wilson's years of clinical experience is wholly consistent with VIGOR.  For example, Dr. Wilson testified how non-selective NSAID treatment was often intolerable for patients, and they would complain about the GI side effects and seek other treatment:

> "In my practice, dealing with nonsteroidals since Indocin came out in 1969, you can almost set your watch by the three weeks that patients would call and say, I'm just – I cannot take Indocin or I cannot take Voltaren.  With the COX-2 inhibitors, we didn't see that much of that."

(Wilson 4/16/05 Dep. at 98:16-22.)

[4]  April 6, 2005 FDA Memorandum, attached as Ex. 27 to Wittmann Decl.

> this provides "a valid rationale for maintaining a range of options in the
> NSAID class from which physicians and patients may choose."

(*Id.* at 11-12.) In other words, the FDA concluded that not only is Vioxx clinically proven to reduce GI bleeding, but it is the only COX-2 inhibitor that has been shown to have this benefit.

Despite the clinical trial data and the FDA's findings, plaintiff argues that Vioxx is no safer on the GI tract than traditional NSAIDs. (Mot. at 6.) Plaintiff cites two documents for this proposition: (1) a retrospective observational study, and (2) a letter from Merck. Plaintiff is wrong on both counts, as neither item supports her contention.

Plaintiff cites one study that she claims supports her contention that COX-2 inhibitors do not decrease the incidence of serious GI bleeds.[5] (Mot. at 6 n.9.) But there are a number of problems with this study. First, it lumped together data from all COX-2 inhibitors, not just Vioxx. (Mot., Ex. F at 550-51.) As the FDA concluded, however, Vioxx is the only COX-2 inhibitor to have been shown to reduce the risk of serious GI bleeding. Thus, this study is consistent with these FDA findings and says nothing about Vioxx's ability to reduce adverse GI events (*i.e.,* when not pooled with other, perhaps less efficacious COX-2 inhibitors).

Additionally, the study's authors admit to its critical shortcoming – the lack of randomization of patient groups. (*Id.* at 556.) As a result of that failure to randomize, a majority (or even all) of the patients most at risk for GI events may well have been in the COX-2 group, thereby increasing the frequency at which that group reported GI events:

> Because patients were not randomized to treatment group, there exists the
> potential for selection bias between the COX-2 inhibitor and nonselective NSAID
> cohorts. Physicians may have decided to prescribe COX-2 inhibitors instead of
> nonselective NSAIDs for their higher-risk patients.

---

[5] Stockl et al., *Gastrointestinal Bleeding Rates Among Managed Care Patients Newly Started on COX-2 Inhibitors or Nonselective NSAIDS*, JMCP 11:7 (550-558) (September 2005).

(*Id.*) Doctors would naturally prescribe a medicine thought to have a safer GI profile for patients with a higher risk of GI events.[6] Thus, a study trying to compare GI events in the COX-2 group with GI events in the non-selective NSAID group is nonsensical. Based on these shortcomings, one cannot reliably conclude that Vioxx is no safer on the GI tract than traditional NSAIDs, and this observational study certainly does not undercut the sound science, clinical trial data, and vast clinical experience supporting Dr. Lanza's and Dr. Wilson's opinions on this issue.

Plaintiff's only other basis for challenging Vioxx's proven GI benefit compared to traditional NSAIDs is a letter from a doctor at Merck (Dr. Sherwood). (Mot., Ex. G.) Plaintiff argues that this letter somehow constitutes an admission that Vioxx was not safer than NSAIDs with respect to GI bleeds. (Mot. at 6.) But all this letter said is what everyone knew: Vioxx did not completely eliminate GI side effects in all patients. (*See* Wilson 4/16/05 Dep. at 87:10-88:2.) As Dr. Wilson testified, "There's always going to be a background baseline of ulceration, perforation, or bleeding." (*Id.*) The failure to eliminate all GI events in every patient, however, does not mean that Vioxx is no safer than traditional NSAIDs, particularly given the scientific evidence to the contrary.

In short, plaintiff has no legitimate basis to claim that Vioxx is no safer on the GI tract than traditional NSAIDs. Quite the opposite, Dr. Lanza's and Dr. Wilson's contrary opinions are based on sound, reliable science.

---

[6]    *See, e.g.*, Wilson 7/1/05 Dep. at 66:9-18 ("When it first came out, we used it if patient had just had gastrointestinal side effects. And there was a reason:  that you would not want them to have an ulcer. As that progressed – I started using it earlier on, but that's because the patients had already been through – the noneffectiveness of the nonselectives, to some extent, would be a reason that we would want to use it, and I thought it was better tolerated.").

789965v.1

## IV.   DR. LANZA'S AND DR. WILSON'S CLINICAL EXPERIENCE IS RELEVANT AND ADMISSIBLE.

Plaintiff seeks to preclude Dr. Lanza and Dr. Wilson from testifying about their decades of clinical experience with patients and how that experience is consistent with the published, peer-reviewed scientific literature finding that Vioxx is significantly safer on the GI tract than traditional NSAIDs.  (*See* Mot. at 3-5.)  This type of confirmatory testimony derived from clinical experience, however, is both relevant and admissible.

First, the proposed testimony is relevant and, indeed, vital to Merck's defense that, contrary to plaintiff's design defect claim (Compl. ¶ 122(c)), Vioxx's utility outweighed its allegedly harmful side effects.  As Dr. Lanza testified:

> Q.   Going to the second complete paragraph there, your last sentence, you indicate based on the totality of scientific information available on Vioxx and other COX-2 inhibitors, as well as my 35 years of clinical experience, these drugs provide an effective treatment for pain and inflammation without the sometimes devastating adverse GI events associated with the traditional NSAID use.
>
> A.   Yes.
>
> Q.   Do you see that?
>
> Does that statement take into account the cardiovascular risks that have been discovered with regard to Vioxx and other COX-2 drugs?
>
> ....
>
> A.   Yes.  I -- I believe it does take that into consideration.  *I think that the risk of GI bleeding and perforation with the stomach is far greater than the risk of myocardial infarction.  And choosing the lesser of two evils, you know, I would go with the -- getting rid of the -- getting rid of the GI risk and accepting the cardiac risk.*

(Lanza Dep. at 50:22-51:17 (emphasis added.)  Where, as here, plaintiff alleges that the principal purpose of Vioxx was to generate profits for Merck, Merck is entitled to an opportunity (through qualified expert witnesses such as Drs. Lanza and Wilson) to offer

789965v.1

testimony describing the proven benefits of Vioxx in order to refute such claims. In addition, this testimony is relevant in rebutting plaintiff's negligence claim (Compl. ¶¶ 106-107), as it tends to prove that Merck did not breach a duty of care because Vioxx's benefits outweighed its risks. Moreover, this testimony is directly relevant to plaintiff's claim that Vioxx was unfit for its ordinary purposes. (Compl. ¶ 164.)

Notwithstanding her own claims in this case, plaintiff alternatively argues that this testimony is irrelevant to Mr. Irvin, because he did not have a GI injury or suffer from rheumatoid or osteoarthritis. (Mot. at 4.) That is simply factually incorrect. The evidence is uncontroverted that Mr. Irvin suffered severe GI side effects while on Vicoprofen (which contains another NSAID), and he switched to Vioxx in part because it eased his pain without upsetting his stomach. (Deposition of Evelyn Irvin Plunkett at 63:17-64:23, 76:18-21, 77:3-9, 86:4-12, attached as Ex. 6 to Wittmann Decl.; September 6, 2005 Deposition of Christopher Schirmer, M.D. ("Schirmer 9/6/05 Dep.") at 52:12-19, 55:22-25, 56:15-20, attached as Ex. 10 to Wittmann Decl.) Moreover, although Mr. Irvin did not have regular physical examinations and rarely consulted a medical professional, and there are therefore no medical records reflecting a diagnosis of arthritis, his son-in-law who prescribed his Vioxx (Dr. Christopher Schirmer) testified about a conversation he had with Mr. Irvin "about having arthritis type pain." (Schirmer 9/6/05 Dep. at 38:4-7.) Dr. Schirmer also testified that it "made sense" to him that Vioxx would be more effective than Vicoprofen in treating Mr. Irvin's pain, because "if his pain was purely a bad flare-up of the arthritis," Vioxx was "better directed at arthritic pain." (*Id.* at 58:5-17.) Thus, the proposed expert testimony by Drs. Lanza and Wilson regarding the efficacy of Vioxx is relevant to the specific facts of this case.

789965v.1

Second, there is no question that this type of testimony is admissible.  Federal courts repeatedly have held that testimony concerning a doctor's clinical experience is admissible if that experience is consistent with otherwise scientifically reliable evidence.  *See Cantrell v. GAF Corp.*, 999 F.2d 1007, 1014 (6th Cir. 1993); *Hopkins v. Dow Corning Corp.*, 33 F.3d 1116, 1125 (9th Cir. 1994) (holding that experts could testify based on scientific data and techniques in addition to experience); *see also Estate of Aitken v. Shalala*, 986 F. Supp. 57, 64 (D. Mass. 1997) (anecdotal clinical evidence supported granting of preliminary injunction).  As the Sixth Circuit explained in *Cantrell*:  "*Nothing in Rules 702 and 703 or in Daubert prohibits an expert witness from testifying to confirmatory data, gained through his own clinical experience,* on the origin of a disease or the consequences of exposure to certain conditions." *Cantrell*, 999 F.2d at 1014 (emphasis added).  In such cases, *Daubert* is satisfied by the Court's antecedent determination that the background science underlying the physician's testimony is relevant and reliable, which is plainly the case here.  As for plaintiff's concern that such testimony is based on the subjective recall of the physician (Mot. at 5-6), that is easily addressed by plaintiff's opportunity to cross-examine the physician concerning his clinical experience.

Moreover, the proffered testimony will help the jury grapple with key issues.  For example, Dr. Wilson's extensive rheumatology practice gives him a broad perspective on the importance of medications like Vioxx which, as Dr. Wilson testified, was crucial for certain patients.  As Dr. Wilson explained, his patients have typically run out of options for treating their chronic pain by the time they see him:

> Well, let me describe my practice a little bit to you.  I'm the end of the road.  I'm where the patients come after the orthopedic says, "I can't operate on you anymore."  The internal medicine doctor says, "I've run out of ideas, okay."
>
> So now they are in my camp and we're asking.  So the choice for me is not, "Sorry, you've got all of this pain; you can't get up; you can't do this; you can't do that; so let me give you nothing."  It's, "What can I do for you?"  And by the

time they've run out of – or let's say by the time they've run up to the COX-2s, if those don't work, then you have to go to the next level. The next level is steroids. The next level could be Plaquenil in some of these patients. That's what we have been trying lately.

So we're talking about medications that we're switching these people off of to medications that have more side effects.

(Wilson 4/13/05 Dep. at 31:16-32:11.)

Plaquenil, the so-called "next level" to which Dr. Wilson testified, is a toxic anti-malarial drug with serious side effects, such as blindness. (Wilson 4/13/05 Dep. at 26:22-28:7.) Doctors have been prescribing this drug "off label" to treat arthritis.[7] (*Id.*) Other options for treating chronic pain include corticosteroids and narcotics, which also can have severe side effects. For example, narcotics are addictive and corticosteroids cause diabetes, cataracts, osteoporosis, ulcers, aseptic necrosis of the hips, hypertension, and diabetes. (Wilson Report at 9; Wilson *Eng'rs* Dep. at 32:19-33:12.) And, as Dr. Wilson points out, these debilitating side effects are not isolated; they occur in everyone who takes the drugs:

And they don't just cause it in one or two people. If I put you on steroids right now, within about two months, you would have most of those problems. *Everybody gets it if you take it long enough.*

(Wilson 4/13/05 Dep. at 33:8-12 (emphasis added).) Indeed, because of Vioxx's withdrawal, Dr. Wilson has had to prescribe these more toxic treatments more frequently. (Wilson Report at 9.)

It is this type of relevant clinical experience that Dr. Lanza and Dr. Wilson will seek to convey to the jury to help them understand why COX-2 inhibitors such as Vioxx were such a critical treatment option for physicians in their fields. This clinical experience is supportive of

---

[7]     "Off label" use is the physician practice of prescribing a drug or medical device for a purpose different from one of the indications for which the product is approved by the FDA. As the FDA and most courts recognize, off label use is widespread in the medical community and is often essential to providing patients with optimal medical care. *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 351 & n.5 (2001).

789965v.1

and consistent with the published, peer-reviewed scientific data, including the VIGOR trial. There is nothing controversial or unreliable about it.

In sum, the testimony of Dr. Lanza and Dr. Wilson concerning their clinical experience is both relevant and reliable. There is no reason to exclude it.

## V.      CONCLUSION.

For the foregoing reasons, plaintiff's Motion to Exclude Opinion Testimony of Dr. Frank Lanza and Dr. Merlin Wilson should be denied.

Respectfully submitted,

Phil Wittmann

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone: 504-581-3200
Fax:     504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone: 312-494-4400
Fax:     312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone: (202) 434-5000
Fax:     (202) 434-5029

789965v.1

And

John H. Beisner
Charles C. Lifland
Richard B. Goetz
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone: (213) 430-6000
Fax:    (213) 430-6407

Attorneys for Merck & Co., Inc.

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Opposition of Merck & Co., Inc. to

Plaintiff's Motion to Exclude Opinion Testimony of Dr. Frank Lanza and Dr. Merlin Wilson has

been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and

e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically

uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order

No. 8, on this 2nd day of November, 2005.

_Phil Wittmann_

789965v.1