

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 05-4046* | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| EVELYN IRVIN PLUNKETT | * | |
| as Personal Representative of the Estate of | * | |
| RICHARD IRVIN, JR., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**OPPOSITION OF MERCK & CO., INC. ("MERCK") TO PLAINTIFF'S MOTION TO EXCLUDE OPINION TESTIMONY THAT MERCK COULD NOT PROVIDE RISK INFORMATION THROUGH LABELING OR MARKETING WITHOUT PRIOR <u>APPROVAL OF THE FEDERAL FOOD AND DRUG ADMINISTRATION</u>**

Citing two district court preemption cases, both decided on case-specific factual analyses, plaintiff seeks to preclude Merck from offering expert testimony on whether Merck needed prior FDA approval to change its label and whether Merck acted appropriately in connection with the proposed label modification for Vioxx®.  Setting aside whether those cases were correctly

decided, they do not govern the admissibility of the proposed expert testimony based on the facts of this case.

Here, the jury will decide, among other things, whether Merck acted reasonably in: (1) submitting the VIGOR trial results to the FDA and seeking prior approval for its proposed label change; and (2) disseminating information on the alleged risks of Vioxx while its application for a label change was pending before the FDA. The testimony offered by former FDA official Dr. Janet Arrowsmith-Lowe bears directly on those issues.[1]

## I. WHETHER MERCK NEEDED PRIOR FDA APPROVAL TO CHANGE THE VIOXX LABEL IS PROPERLY DETERMINED BASED ON THE SPECIFIC FACTS OF THIS CASE.

The FDA regulations governing labeling that were in effect in 2000 (when Merck was first unblinded to the VIGOR results) provided, subject to certain exceptions, that for "[a]ny change in labeling" a pharmaceutical company was required to "submit a supplement, and obtain FDA approval of it, before making the changes." 21 C.F.R. § 314.70(b)(3). The regulations further provided, as an exception to the general rule, that among the changes that could be made without first obtaining FDA pre-approval were changes "[t]o add or strengthen a contra-indication, warning, precaution, or adverse reaction." 21 C.F.R. § 314.70(c)(2)(i). This regulation is commonly referred to as the "Changes Being Effected" or "CBE" regulation.

Citing *Witczak v. Pfizer, Inc.*, 377 F. Supp. 2d 726 (D. Minn. 2005), and *Cartwright v. Pfizer, Inc.*, 369 F. Supp. 2d 876 (E.D. Tex. 2005), plaintiff argues that the CBE regulation established a hard-and-fast rule that, no matter what the nature or complexity of the safety

---

[1] Plaintiff's motion mentions Dr. David Silver's opinion on the adequacy of the warnings on the Vioxx label (Pl.'s Motion to Exclude Opinion Testimony That Merck Could Not Provide Risk Information Through Labeling or Marketing Without Prior Approval of the Federal Food and Drug Administration ("Mot.") at 3.) Since Dr. Silver does not opine on FDA requirements or what Merck could do, or on Merck's interaction with the FDA, there is nothing to exclude.

information at issue, a pharmaceutical company as a matter of law always could proceed to change its label to add or strengthen a warning or precaution without awaiting the FDA's agreement, and that Merck therefore should be precluded from presenting contrary evidence here.

The CBE regulation and cases cited by plaintiff do not bear the weight plaintiff places on them. Interpreting 21 C.F.R. § 314.70(c)(2)(1) to allow a pharmaceutical company to bypass the FDA approval process whenever it wanted to add or strengthen a warning or precaution would be contrary to the FDA's interpretation of the CBE regulation as reflected in its official guidance, the FDA's application of the CBE regulation in practice, and existing case law,. In fact, whether a pharmaceutical company may avail itself of the CBE procedure to change its label without first consulting the FDA is a fact-driven determination based on the circumstances of each individual labeling change.

First, the FDA's official guidance document interpreting the CBE regulation is at odds with plaintiff's interpretation. The FDA's official guidance addressing labeling changes for an existing drug, issued in November 1999, divides proposed labeling changes into three categories: "major," "moderate," and "minor." (FDA, *Guidance for Industry; Changes to an Approved NDA or ANDA* ("Guidance") at 24-25, attached as Ex. 32 to Declaration of Phillip A. Wittmann in Support of Merck's Opposition Briefs ("Wittmann Decl.").) "Major" changes to the label include, but are not limited to, changes based on post-marketing study results (including changes associated with new indications and usage) and changes to the clinical pharmacology or clinical studies section of the label. Major changes may not be made using the CBE procedure, but instead *must* be submitted as a prior approval supplement and FDA approval obtained before the

label change is made. (*Id.* at 24; Declaration of J. Paul Waymack, M.D. ("Waymack Decl.") at ¶ 12.)

The Guidance provides that it is only the more "moderate" changes that may be made using the CBE procedure, including changes to add to the label safety information that does not fall within the scope of a "major" change. (Guidance at 24-25.). *See also* Brief for the FDA as *Amicus Curiae* Supporting Respondents at 5-6, *Dowhal v. SmithKline Beecham Consumer Healthcare*, 122 Cal. Rptr. 2d 246 (Ct. App. 2002) (No. A094460), ("Unless the proposed changes are minor, an applicant typically submits labeling changes in a pre-approval supplement. . . . [I]n actual practice, only minor product labeling changes, like an editorial change, deletion of an ingredient affecting only the color of a drug product, or changes in the container or closure system for the drug product are generally made without FDA's prior approval."), *rev'd*, 32 Cal. 4th 910 (2004); *id.* at 24 ("[A] drug manufacturer's use of the 'changes being effected' supplement is generally limited to circumstances involving noncontroversial labeling changes.").[2] Thus, the FDA Guidance interpreting the CBE regulation flatly contradicts plaintiff's reading of the CBE regulation that a pharmaceutical company always is free to add or strengthen a warning or precaution using the CBE regulation; instead, whether a prior approval supplement or a CBE is appropriate depends on the type of change at issue.[3]

Second, plaintiff's argument that a pharmaceutical company always is free to use the CBE regulation to bypass FDA pre-approval to add or strengthen a warning or precaution is inconsistent with the FDA's application of the CBE procedure in practice. For example, Merck's

---

[2] Minor changes – those that are trivial and in no way affect drug safety – can be made to the label without FDA pre-approval and reported on an annual basis. (Guidance at 25; Waymack Decl. at ¶ 10.)

[3] The current FDA regulations governing labeling actually adopt the categories of "major," "moderate," and "minor" changes in the text of the labeling regulations themselves. *See* 21 C.F.R. §314.70.

own prior experience with the FDA on a separate Vioxx labeling issue demonstrates that a pharmaceutical company is *not* always permitted to use the CBE regulation to strengthen its label without prior FDA approval. On October 6, 1999, five months before the VIGOR data was unblinded to Merck, Merck submitted to the FDA a CBE labeling change that would have strengthened the Precautions section of the Vioxx label to include information from its post-marketing experience with the concurrent administration of Vioxx and Warfarin, a blood-thinning drug. (Declaration of Lisa D. Rarick, M.D. ("Rarick Decl.") at ¶ 9; *see* Oct. 6, 1999 NDA 21-042: Vioxx (rofecoxib tablets), Special Supplement – Changes Being Effected, from Eric A. Floyd, PhD., Merck Research Laboratories, to the Food and Drug Association, attached as Ex. 30 to Wittmann Decl.) On October 28, 1999, the FDA rejected Merck's CBE submission stating: "Changes of the kind that you have proposed *are not the kind of changes permitted by regulation to be put into effect prior to approval of a supplement*." See Oct. 28, 1999 Letter from Anthony Zeccola, Food and Drug Administration, to Eric A. Floyd, PhD., Merck Research Laboratories (emphasis added), attached as Ex. 31 to Wittmann Decl. Thus, the FDA's statement about Merck's proposed Warfarin CBE confirms what is reflected in the case law, in the FDA's interpretation of its own regulation in its official guidance, and in its application of the CBE regulation in practice – the regulation is not appropriate for any and all safety labeling changes, but instead, only for those that are minor and non-controversial. (Rarick Decl. at ¶¶ 9, 12.)

Merck has submitted testimony from three former FDA medical officers, with a combined 30+ years of experience at the FDA in applying FDA's labeling regulations (in addition to many years working as consultants to pharmaceutical companies interacting directly with the FDA on labeling issues), that the CBE regulation is not appropriate for all labeling

changes that would add safety information to a label and, indeed, could not have been used on the facts of this case to incorporate the VIGOR results into the Vioxx label. Dr. Janet Arrowsmith-Lowe was a medical epidemiologist and medical review officer at the FDA for approximately 11 years, and was acting Director of the Office of Surveillance and Biometrics, Center for Devices and Radiologic Health at FDA for another 3 years. (Expert Report of Janet Arrowsmith-Lowe, M.D., F.A.C.P. ("Arrowsmith-Lowe Report") at 2, attached as Ex. 15 to Wittmann Decl.) Dr. Lisa Rarick worked for 15 years at the FDA as, among other positions, a medical review officer, Division Director, Deputy Director, and Associate Director for Quality Assurance in the Office of the Center Director. (Rarick Decl. at ¶ 2.) Dr. Paul Waymack worked as a medical review officer at the FDA and has been employed for the last 10 years as a consultant to pharmaceutical companies, including work developing and submitting product labeling and labeling amendments. (Waymack Decl. at ¶¶ 4-5.)

All of these former FDA officials agree that use of the CBE procedure is not appropriate in all circumstances where labeling needs to be changed to incorporate new safety information. (*See* Arrowsmith-Lowe Report at 8 ("There are narrow circumstances in which a manufacturer is permitted to change its labeling without FDA's prior approval but those circumstances were not present here. The VIGOR trial presented a highly complex data set, involving thousands of patients, from multiple clinical sites in a patient population for which Vioxx did not yet have an approved indication and with a dose that had not yet been approved for chronic use."); Rarick Decl. at ¶¶ 5-6 ("Based on my experience, the CBE process is intended to implement relatively minor changes or changes that do not require the analysis or interpretation of data. If a proposed label change requires an amendment that incorporates the interpretation or analysis of data, the FDA wants that type of change submitted as a prior approval supplement, not a CBE.");

Waymack Decl. at ¶14 ("In contrast to changes based upon spontaneous adverse event reports – that is changes based upon limited data – changes based upon data from clinical trials require more in depth analyses: both by the sponsor and the FDA. . . . As a result of the complexity of such data, for changes to the labeling based upon results – results other than isolated adverse events – from clinical trials, the FDA's accepted position on the proper method of changes being made to capture such data is to submit proposed changes to the FDA as major changes.").)

Third, the case law does not support plaintiff's reading of the CBE regulation. The cases plaintiff cites do not establish a sweeping rule that safety information always may be added to a label without the permission of the FDA. To the contrary, a number of courts, on the facts of their specific cases, have held that pharmaceutical companies could not unilaterally have changed their labels. For example, in *Ehlis v. Shire Richwood, Inc.*, the court concluded that "[t]he FDA dictates the contents of the label" and that "defendants were prohibited from changing [the drug label] without prior approval from the FDA, except in limited circumstances for a limited period of time." 233 F. Supp. 2d 1189, 1198 (D.N.D. 2002); *see also Brooks v. Howmedica, Inc.*, 273 F. 3d 785, 796 (8th Cir. 2001) (considering analogous provision governing label changes for medical devices and concluding that the drug company "may not unilaterally make such changes [to add new safety information to its labeling] under federal law"). Similarly, the court in *Kanter v. Warner-Lambert Co.*, citing the same regulations as the *Witczak* and *Cartwright* courts, recognized that "changes in the labeling generally require a supplementary application and approval by the FDA" and "Warner-Lambert also was not free to devise any label of its choosing." 99 Cal. App. 4th 780, 793-94 (2002); *See also Reiter v. Zimmer Inc.*, 897 F. Supp. 154, 157 (S.D.N.Y. 1995) (finding the manufacturer "could make no change in the design, manufacture or label affecting the safety of [the medical device] without

the prior review and approval of the FDA"); *Dusek v. Pfizer, Inc.*, No. Civ.A. H-02-3559, 2004 WL 2191804, at *9 (S.D. Tex. Feb. 20, 2004) (concluding that the label could not unilaterally have been changed to include a warning of a causal relationship between the drug and an adverse event).

Finally, the FDA regulations are clear – and plaintiff does not dispute – that even if a pharmaceutical company is permitted to make a labeling change without prior FDA approval using the CBE regulation, it simultaneously must submit the change to the FDA. *See* 21 C.F.R. § 314.70(c) ("An applicant shall submit a supplement at the time the applicant makes any kind of change listed below in the conditions in an approved application. . . ."). The FDA then has the ability to reject the CBE, and require that the pharmaceutical company submit the labeling change as a prior approval supplement, just as it did with Merck's Warfarin CBE. (*See* Rarick Decl. ¶8 ("During my 15 years at FDA, I never saw a company successfully submit new clinical trial data unilaterally through the CBE process. Indeed, the few times when companies attempted to make such changes unilaterally, the FDA rejected the new labels and required the submission of a prior approval supplement.").) Plaintiff advances no argument – because there is none – that expert testimony that the FDA would have rejected any attempt to include the VIGOR results in the Vioxx label through a CBE somehow is inconsistent with FDA law or regulation. To the contrary, the law is crystal clear that the FDA at all times remains the ultimate arbiter of the contents of the label.

II.     **MERCK'S EXPERT TESTIMONY WILL ASSIST THE JURY IN DETERMINING WHETHER MERCK ACTED APPROPRIATELY IN CONNECTION WITH THE PROPOSED LABEL MODIFICATION.**

Court decisions such as the *Witczak* and *Cartwright* decisions cited by plaintiff, which analyze whether entire claims are preempted, do not purport to address what expert testimony should be admissible at trial. Generally, the FDA's labeling decisions and the pharmaceutical

8

company's disclosures to the FDA cannot be second-guessed by a plaintiff or the jury. *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350, 353 (2001) (claims of fraud on the FDA preempted by FDCA). To the extent plaintiff is going to be permitted to question the FDA's labeling decisions for Vioxx, Merck must be allowed to present expert evidence on the reasonableness of its actions. Dr. Arrowsmith-Lowe's testimony will be of assistance to the jury in assessing Merck's conduct in light of the FDA regulations.

Dr. Arrowsmith-Lowe will testify that the FDA regulates virtually every aspect of the research, development, marketing, and promotion of prescription drugs in the United States. Based on her nearly 15 years of work at the FDA, Dr. Arrowsmith-Lowe undisputedly has the expertise to assist the jury in understanding the process by which the FDA "extensively regulates the contents and wording" of a drug's label. *See Hurley v. Lederle Labs.*, 863 F.2d 1173, 1179 (5th Cir. 1989). Under a complex and detailed framework, most changes to a drug's label require prior approval from FDA. (Arrowsmith-Lowe Report at 3.) Dr. Arrowsmith-Lowe's testimony will assist the jury with the complex factual issues that it will need to analyze – for example, the jury will need to determine whether adding a description of the VIGOR trial to the Vioxx package insert was a "major" change requiring the FDA's advance approval or a "moderate" change that could be made without first consulting the FDA.

Dr. Arrowsmith-Lowe will testify that the proposed changes based on the VIGOR trial fall squarely within the category of major changes requiring FDA prior approval. (Arrowsmith-Lowe Report at 8-9; *see also* Waymack Decl. at ¶ 18; Rarick Decl. at ¶ 8.) As described by Dr. Arrowsmith-Lowe, "the VIGOR trial involved a highly complex data set, involving thousands of patients, from multiple clinical sites in a patient population for which VIOXX® did not yet have an approved indication and with a dose that had not yet been approved for chronic use." It

would not have been appropriate for Merck to craft a label conveying this complex data without the FDA's input. (Arrowsmith-Lowe Report at 8; *see also* Rarick Decl. at ¶ 7.) Expert testimony will assist the jury in understanding this complicated process, including why the proposed labeling change was a major change, the multiple variables that Merck and the FDA needed to consider when analyzing any proposed label change, and why Merck acted reasonably and appropriately in the circumstances presented.

In addition, Dr. Arrowsmith-Lowe will explain that in order for the cardiovascular results of the VIGOR trial to be meaningful to physicians – *i.e.,* useful for making informed prescribing decisions – they required explanation in the label. It was, for example, necessary to describe the design of the VIGOR study, including the fact that VIGOR was a GI Outcomes trial that was primarily designed to compare the effects of Vioxx and naproxen on the gastrointestinal system. It was likewise important to explain that VIGOR compared twice the dose of Vioxx approved for chronic use with a common therapeutic dose of naproxen and that the study was conducted in a rheumatoid arthritis population. *Id.* Without including this information in the label, the cardiovascular findings would have been meaningless and, arguably, misleading to physicians. Brief for the United States as *Amicus Curiae* Supporting Defendant-Appellee and Cross-Appellant at 18-19, *Motus v. Pfizer,* 358 F.3d 659 (9th Cir. 2004) (Nos. 02-55372, 02-55498) ("The manufacturer's inclusion of a false or misleading warning misbrands the product *per se.*"). Inclusion of this important contextual information in the package insert required prior FDA approval, providing an independent reason why use of the CBE procedure would have been

inappropriate here. *Id.* at 18; (*see* Arrowsmith-Lowe Report at 8-9; Waymack Decl. at ¶¶ 14-18.)[4]

Dr. Arrowsmith-Lowe also will opine that the precise significance of the VIGOR data was not easily discernable. (*See* Arrowsmith-Lowe Report at 8.) The FDA required time to analyze the data to ensure that its significance was portrayed correctly in the label. Merck promptly submitted the VIGOR results to FDA in March 2000, within two weeks of learning the results itself. The FDA did not request that Merck submit a CBE or take other regulatory action to disseminate the VIGOR results. Indeed, in May 2000, an FDA official stated that Vioxx was labeled appropriately, indicating that there was no need to change the label on an expedited basis. After Merck submitted a proposed revised label in June 2000, FDA, in fact, rejected Merck's request for a more rapid, priority review of the proposed revised label. (*Id.* at 9.) In February, 2001, the FDA convened an Advisory Committee of outside experts to assist it in evaluating the data from the VIGOR trial and a trial involving another drug in Vioxx's class,

---

[4] Plaintiff also argues that the VIGOR test findings should have been included as a "warning." (*See* Mot. at 5.) A warning is required for "serious adverse reactions and potential safety hazards" with a drug. 21 C.F.R. § 201.57(e). The FDA, however, placed the new cardiovascular data in the "precautions" section of the Vioxx label when it approved the new package insert, and described their "significance" as "unknown." Plaintiff therefore should be precluded from arguing that the VIGOR results should have been reflected in the "warnings" section of the label. To the extent plaintiff is permitted to argue that Merck and the FDA were wrong and that the VIGOR results should have been included in the warnings section, the jury would benefit from expert testimony on this complicated issue. A package insert must be revised to include a warning as soon as there is "reasonable evidence of an association of a serious hazard with a drug." *Id.* The VIGOR trial did not provide such evidence. It involved two arms with active ingredient treatments, both arms consisted of patients in a population for which Vioxx was not approved for use, and the Vioxx arm was receiving twice the normal therapeutic dose. It was widely accepted that the circumstances of the trial made it impossible to determine whether the disparity in myocardial infarction rates resulted from a cardiovascular risk of one product or a cardioprotective benefit of the other. The findings therefore did not satisfy the legal standard for a "warning," and expert testimony can help clarify this point.

Celebrex. (Rarick Decl. at ¶ 7), and thereafter requested emerging data from ongoing Vioxx trials. The resulting label, approved in April 2002, reflected extensive revisions to several different sections of the label.

In sum, Dr. Arrowsmith-Lowe will testify that, although the FDA regulations do provide a procedure for making changes to a drug label in certain circumstances without prior FDA approval, that procedure was not appropriate here. (Arrowsmith-Lowe Report at 8; *see also* Waymack Decl. at ¶ 18.) Merck is entitled to offer such expert opinions regarding the appropriateness of its actions. *See Feldman v. Lederle Labs.*, 625 A.2d 1066, 1070 (N.J. 1993) (Although FDA regulations did not prevent the defendant from placing a warning on the drug label while awaiting FDA approval, defendant's "attempt to comply with existing FDA regulations still bears on the reasonableness of its conduct. The fact issue for the jury was whether a reasonable drug manufacturer with the same knowledge [the drug manufacturer] had [at the time] would have placed a … warning on [the drug's] packaging in addition to corresponding with the FDA."); *see also McNeil Pharm. v. Hawkins*, 686 A.2d 567, 582-83 (D.C. Ct. App. 1996) (explaining importance of expert testimony for interpretation and application of the regulations in a drug labeling case).

Finally, Dr. Arrowsmith-Lowe will testify that federal law also governed what Merck could say about Vioxx while its labeling application was pending with the FDA. She will offer her opinion, base on her experience at the FDA and as a consultant to the pharmaceutical industry, that Merck disseminated the VIGOR results in appropriate ways. Merck presented the data at scientific conferences, issued several press releases, and provided the data in response to unsolicited questions from healthcare professionals. Significantly, a group of researchers published the study in the New England Journal of Medicine, a peer-reviewed medical journal

article that is widely read by physicians. (Arrowsmith-Lowe Report at 6-7; *see also* Expert Report of David S. Silver, M.D. at 12-13 (discussing ways that the VIGOR test results were disseminated throughout the medical community), attached as Ex. 21 to Wittmann Decl.) Merck is entitled to present expert testimony regarding whether these disclosures were appropriate in light of FDA regulations. Jurors cannot reasonably be expected to analyze these complex issues without the assistance of an expert in the field.

### III. CONCLUSION.

For all of the foregoing reasons, Merck respectfully requests that the Court deny Plaintiff's Motion to Exclude Opinion Testimony that Merck Could Not Provide Risk Information Through Labeling or Marketing Without Prior Approval of the Federal Food and Drug Administration.

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone: 504-581-3200
Fax:   504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois 60610
Phone: 312-494-4400
Fax:   312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Phone: (202) 434-5000
Fax:    (202) 434-5029

And

John H. Beisner
Charles C. Lifland
Richard B. Goetz
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone: (213) 430-6000
Fax:    (213) 430-6407

Attorneys for Merck & Co., Inc.

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Opposition of Merck & Co., Inc. to Plaintiff's Motion to Exclude Opinion Testimony That Merck Could Not Provide Risk Information Through Labeling or Marketing Without Prior Approval of the Federal Food and Drug Administration has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 2nd day of November, 2005.

*/s/ Phil Wittmann*