UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | JUDGE FALLON |
| This document relates to<br>Case No. 05-4046* | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| EVELYN IRVIN PLUNKETT<br>as Personal Representative of the Estate of<br>RICHARD IRVIN, JR., | * | |
| Plaintiff, | * | |
| vs. | * | |
| MERCK & CO., INC., | * | |
| Defendant. | * | |

* * * * * * * * * * * * * * * * * *

**OPPOSITION OF MERCK & CO., INC. ("MERCK") TO PLAINTIFF'S
MOTION TO EXCLUDE OPINION TESTIMONY THAT VIOXX®
IS THE SAME AS ALL NSAIDS REGARDING CARDIOTOXIC EFFECTS**

Plaintiff's motion to exclude expert testimony that Vioxx has the same cardiac effects as other NSAIDs has one goal: to keep the jury from learning certain conclusions contained in a recent "Decision Memorandum" published by the Food and Drug Administration.[1]  Specifically,

---

[1]   The FDA Memorandum, entitled "Analysis and recommendations for Agency action regarding non-steroidal anti-inflammatory drugs and cardiovascular risk," was written by Dr. John Jenkins, the Director of the FDA's office of New Drugs, and Dr. Paul Seligman, the Director of the FDA's Office of Pharmacoepidemiology and Statistical Science.  (April 6, 2005 FDA Memorandum ("FDA Memorandum") at 1, attached as Ex. 27 to Declaration of Phillip A. Wittmann in Support of Merck's Opposition Briefs ("Wittmann Decl.").)

plaintiff seeks to bar any reference or testimony to its conclusion that the available scientific data in their totality are best interpreted as being consistent with a "class effect" of an increased risk of serious adverse cardiovascular events for Cox-2 selective *and* non-selective NSAIDs, including not just Vioxx® and Celebrex®, but also common over-the-counter medications such as Ibuprofen. (FDA Memorandum at 1-2, 11.) As discussed below, this conclusion is reliable – it is based on a thorough review of the available science by the regulatory agency specifically charged with making such determinations – and it is likewise relevant because it relates directly to several of plaintiff's claims.

### I.  SUMMARY OF THE FDA MEMORANDUM.

On April 6, 2005, the FDA published a "Decision Memorandum," which contains the Agency's conclusions based on a "thorough review of the available data . . . regarding currently approved COX-2 selective and non-selective non-steroidal anti-inflammatory drugs (NSAIDs) and the risk of adverse cardiovascular (CV) events." (FDA Memorandum at 1.) The Memorandum is the FDA's analysis of the best available science with respect to NSAIDs, including selective COX-2 inhibitors. The Memorandum was issued after the FDA convened a three-day Advisory Committee hearing in which outside experts in the fields of rheumatology, cardiology, epidemiology, pharmacology, ethics, risk-benefit analysis, drug safety and biostatistics, among others, heard and considered scientific presentations and clinical trial data concerning COX-2 inhibitors and nonselective NSAIDs. Among the FDA's conclusions were:

> Data from large long-term controlled clinical trials that have included a comparison of COX-2 selective and non-selective NSAIDs do not clearly demonstrate that the COX-2 selective agents confer a greater risk of serious adverse CV events than non-selective NSAIDs.
>
> *and*
>
> Pending the availability of additional long-term controlled clinical trial data, the available data *are best interpreted as being consistent with a class effect of an*

*increased risk of serious adverse CV events for COX-2 selective and non-selective NSAIDs.*

(FDA Memo at 1-2 (emphasis added).) As a result of these findings, the FDA Memorandum recommends that labeling changes concerning cardiovascular risk apply to all NSAIDs, not just selective COX-2 inhibitors. (*Id.* at 2-3.)

## II.   EVIDENCE OF THE FDA'S DETERMINATION OF A "CLASS EFFECT" IS RELEVANT AND RELIABLE.

The evidence concerning the comparative safety of NSAIDs and COX-2 inhibitors, including Vioxx, is clearly reliable and relevant. It is rooted in the clinical trial data, as well as the position of the FDA based on its review of all currently available medical and scientific data on the subject.

### A.   The Finding Regarding a "Class Effect" In The FDA Memorandum Is Based On Reliable Scientific Evidence.

It is undisputed that the FDA, in its "Decision Memorandum," made a specific finding on the very issue that plaintiff seeks to exclude. It concluded: "Pending the availability of additional long-term controlled clinical data, *the available data are best interpreted as being consistent with a class effect of an increased risk of serious adverse CV events for COX-2 selective and non-selective NSAIDs.*" (FDA Memorandum at 2.) Despite this finding, plaintiff argues that "[o]ffering the opinion that all NSAIDs are the same based upon this limited, unpublished, non-peer-reviewed data is contrary to studies comparing Vioxx® with other selective and non-selective NSAIDs and contrary to the standards for reliable expert testimony." (Plaintiff's Motion to Exclude Opinion Testimony that Vioxx is the Same as All NSAIDs Regarding Cardiotoxic Effects ("Mot.") at 3-4.) Plaintiff is demonstrably wrong.[3]

---

[3]   Indeed, plaintiff's own expert, Dr. Lucchesi, has testified that all NSAIDs increase the risk of adverse events, including myocardial infarction.   *See* Testimony of Dr. Benedict

3

789971v.1

The FDA Memorandum clearly describes the large body of data the expert advisory panel reviewed in reaching its conclusions. For example, the FDA Memorandum states that "new data prompted the agency to conduct a comprehensive review of the available data," and that "CDER [the FDA's Center for Drug Evaluation and Research][4] conducted a thorough internal review of the available data regarding cardiovascular (CV) safety issues for COX-2 selective and non-selective non-steroidal anti-inflammatory drugs (NSAIDs)." (FDA Memorandum at 3.) The participants in the CDER review included staff from the Division of Anti-Inflammatory Analgesic and Ophthalmologic Drug Products, the Division of Over-the Counter Drug Products, the Offices of Drug Evaluation II and V, the Office of New Drugs, the Office of Drug Safety, the Office of Biostatistics, the Office of Pharmacoepidemiology and Statistical Science, the Office of Medical Policy, the Office of Regulatory Policy, and the Office of the Center Director. (FDA Memorandum at 3.) This group's comprehensive review drew on materials from a wide range of sources:

> [T]he regulatory histories and the NDA [New Drug Application] and postmarketing databases of the various NSAIDs, FDA and sponsor background documents prepared for the Advisory Committee meeting, all materials and data submitted by other stakeholders to the Advisory Committee meeting, presentations made at the Advisory Committee meeting, the discussions held by the Committee members during the meeting, and the specific votes and recommendations made by the joint Committee.

(FDA Memorandum at 3-4.) The FDA Memorandum itself analyzes the results of numerous clinical trials and epidemiological studies concerning various NSAIDs that the Advisory Committee reviewed in reaching its conclusion regarding a "class effect." For example, with

---

Lucchesi, *Humeston v. Merck*, No. 619 (N.J. Super. Ct. Law Div. filed Aug. 19, 2003) at 953:14-955:17, attached as Ex. 26 to Wittmann Decl.)

[4] The CDER is charged with carrying out the FDA's mandate to analyze and determine the safety and efficacy of prescription drugs.
*See* http://www.fda.gov/opacom/factsheets/justthefacts/ 3cder.html.

4

789971v.1

respect to Celebrex® (celecoxib), another COX-2 inhibitor, the Advisory Committee reviewed data from a placebo-controlled clinical trial designed to determine whether Celebrex could prevent colorectal adenoma. The study, which also examined cardiovascular endpoints in over 2,000 patients, found that persons on a long-term regimen twice daily of 400 mg Celebrex had a statistically significant increased risk of death from cardiovascular causes compared to placebo.[5] Notably, however, the Kaplan-Meier curve for composite cardiovascular deaths did not separate from placebo, much less become statistically significant, until well after six months of use.[6]

For plaintiff to claim that conclusions drawn from this wealth of data by an impartial government agency experienced in and specifically charged by Congress with evaluating the safety and efficacy of pharmaceuticals is nonsense. Evaluating a broad range of studies across several different types of medications as the FDA did is precisely how one properly evaluates whether a common "class effect" exists for NSAIDs.

In addition to the comprehensive review of the scientific data evident from the document itself, the facts surrounding the creation, purpose, and use of the FDA's Decision Memorandum provides additional assurance of its scientific reliability. Dr. Lisa Rarick, an expert in regulatory affairs who spent 15 years at the FDA before retiring in 2003,[7] testified in another Vioxx matter that the Memorandum's findings were created, reviewed, and agreed to by the pertinent regulators at the Agency and that, based on those findings, the FDA took several regulatory actions. Dr. Rarick noted that the two authors of the FDA Memorandum, Dr. Jenkins (Director

---

[5] See Solomon et al., *Cardiovascular Risk Associated With Celecoxib in a Clinical Trial for Colorectal Adenoma Prevention*, N. ENGL. J. MED. 2005:352:1-10; (FDA Memorandum at 4).

[6] Solomon *et al.*, at 7.

[7] Dr. Rarick's FDA experience included years as a medical officer responsible for reviewing the safety profile of various drugs. (*See Curriculum Vitae* of Lisa Dale Rarick, M.D., attached as Ex. 29 to Wittmann Decl.)

of the Office of New Drugs) and Dr. Seligman (Director of the Office of Pharmacoepidemiology and Statistical Science), are responsible for the approval of new drugs and post-marketing monitoring of safety concerns, respectively. (Testimony of Dr. Lisa Rarick, *Humeston v. Merck*, No. 619 (N.J. Super. Ct. Law Div. filed Aug. 19, 2003) of October 21, 2005 ("Rarick *Humeston* Test.") at 5026:15-5027:5, attached as Ex. 25 to Wittmann Decl.)  Additionally, the Memorandum was published through their supervisor, Dr. Steven Galson, the Acting Director of the Center for Drug Evaluation and Research, who had to review and endorse its findings. (FDA Memorandum at 1; Rarick *Humeston* Test. at 5028:3-13.)  Nor is there any doubt that the Memorandum represented a final decision setting forth the FDA's official position on these issues. (Rarick *Humeston* Test. at 10/21/05 5040:22-5041:8, 5054:4-7.)  Indeed, the FDA's own website, where the FDA published the Memorandum shortly after issuing it, refers to it as a "Decision Memo." *See* http://www.fda.gov/cder/drug/infopage/cox2/.

Moreover, the FDA believed the findings and conclusions described in its Decision Memorandum were sufficiently reliable to warrant significant regulatory action. As the FDA website describes, in the wake of the Advisory Committee meeting and Decision Memorandum:

> The Food and Drug Administration (FDA) has issued supplemental request letters to sponsors of all non-steroidal anti-inflammatory drugs (NSAID) requesting that they make labeling changes to their products. These letters include recommended proposed labeling for both the prescription and over-the-counter (OTC) NSAIDs and a medication guide for the entire class of prescription products.
> . . . .
> Manufacturers of **non-prescription** (over-the-counter) NSAIDs are being asked to revise their labeling to provide more specific information about the potential CV and GI risks of their individual products and remind patients of the limited dose and duration of treatment of these products in accordance with the package instructions.

*See* http://www.fda.gov/cder/drug/infopage/cox2/; (*see also* Rarick *Humeston* Test. at 5038:21-5039:20). The FDA would not have taken these actions *with respect to all NSAIDs* if it did not believe that its analysis, findings, and conclusions were based on reliable scientific evidence.

6

789971v.1

Indeed, the Medication Guide that the FDA created to accompany prescription NSAIDs, which was based on the Advisory Committee's work, is required by law to be "scientifically accurate." *See* 21 CFR 208.20(a)(2); (Rarick *Humeston* Test. at 5057:13-16, 5099:16-5100:2).

Plaintiff cites no precedent holding that a finding or conclusion by a government agency charged by Congress with making that assessment is inadmissible or unreliable because it is not absolute or is based "only" on "available" data. Indeed, any such argument would defy common sense, as all properly-derived scientific conclusions are based on currently known facts. The proper test under Rule 702 and *Daubert* is whether the type and amount of those scientific facts are sufficient to form reliable conclusions. Here, the FDA has published its conclusion that the best available interpretation of the scientific data is that a "class effect" exists both among COX-2 inhibitors and between COX-2 inhibitors and NSAIDs generally, and that this conclusion is sufficiently reliable to institute significant regulatory change. Given the depth and extent of the FDA's review of the available data as detailed in the FDA Memorandum, and the regulatory action taken based on that review, plaintiff cannot credibly claim that these conclusions do not meet the requirements of Rule 702.

Moreover, in making her claim for exclusion, plaintiff applies a radically different standard to the FDA Memorandum than other documents generated by the FDA. As plaintiff's Exhibit List indicates, plaintiff believes she is entitled to introduce documents written by various FDA personnel, including "Warning Letters" from individuals at the FDA to Merck. (*See, e.g.,* Plaintiff's Ex. 1.0006.)[8] Indeed, plaintiff and her experts rely on and seek to introduce the preliminary analysis and conclusions of individual FDA reviewers (such as Dr. Targum)

---

[8] Merck disputes the admissibility of these letters since, unlike the Memorandum, they do not represent an official determination by the FDA. However, they do underscore plaintiff's inconsistent legal positions.

concerning the VIGOR results.[9] Plaintiff cannot credibly argue that preliminary statements by individual FDA personnel based on incomplete data are sufficiently reliable to be admitted, but that the FDA's conclusion of a "class effect," made after considering all of the available scientific data, should be excluded as unreliable. Plaintiff's express belief that the former is sufficiently reliable to present to the jury forecloses any attempt to claim that the latter is unreliable. There is no rational reason that plaintiff can present evidence of internal, interim individual reviewer comments concerning Vioxx and simultaneously seek to exclude a published agency "Decision Memorandum" reached after carefully considering all available evidence. Finally, if plaintiff claims that Vioxx carries some unique risk among NSAIDs based on the FDA's requirement of precautionary language regarding cardiovascular risks on the Vioxx label, Merck is entitled to introduce contradictory evidence to show that the FDA now requires cardiovascular warnings for all NSAIDs. To hold otherwise would improperly allow plaintiff to misrepresent to the jury the FDA's position.

B.  **Evidence Of Class Effect is Relevant.**

Nor can plaintiff claim that the FDA Memorandum is irrelevant. Plaintiff herself squarely and explicitly raised the issue of the comparative safety of Vioxx to other NSAIDs in her Complaint where, in support of her strict liability defective design claim, she alleged:

> When placed in the stream of commerce, [Vioxx] was defective in design and formulation, making use of the drug more dangerous than an ordinary consumer would expect *and more dangerous than other risks associated with over-the-counter NSAIDs*.

(Compl. ¶ 122(a).) (emphasis added.) Merck is entitled to respond to plaintiff's allegation that Vioxx increased Mr. Irvin's risk of an adverse event compared to other NSAIDs, including by

---

[9] *See* Expert Report of Wayne A. Ray, Ph.D. at 13, note (a), attached as Ex. 19 to Wittmann Decl.; Plaintiff's Summary Science Brief, filed October 21, 2005, at 9.

introducing evidence that plaintiff's claim is diametrically opposed to the analysis and findings of the FDA.

The FDA Memorandum also is relevant to issues of medical causation, including the fact that the FDA has concluded that there are "serious questions" about the "FitzGerald hypothesis" that selective COX-2 inhibition contributes to cardiovascular risk. (FDA Memorandum at 8.) Plaintiff's experts have opined that Vioxx increased Mr. Irvin's risk of cardiovascular event by selectively inhibiting COX-2, and they have speculated that the "COX-2" or "FitzGerald" hypothesis is the biological mechanism by which that may have occurred. The FDA Memorandum directly undercuts that speculation, as it observes that the available data – which has failed to detect a difference in cardiovascular risk between selective and non-selective NSAIDs, and has not shown a reduced risk when COX-2s are combined with low-dose aspirin – "raise serious questions about the so called 'COX-2 hypothesis.'" (FDA Memorandum at 8.)

The FDA Memorandum also is highly relevant to the issue of general causation, including whether Vioxx is capable of causing adverse cardiovascular events when used on a short-term basis – *i.e.*, for less than a month. The FDA Memorandum notes that the APPROVe study did not indicate any increased risk until after 18 months of use, and that Alzheimer's studies involving Vioxx also did not show a significant difference in CV events between 25 mg Vioxx and placebo. (FDA Memorandum at 5.) If plaintiff is allowed to present evidence and argue that there is an increased risk from the short-term use of Vioxx, Merck is entitled to defend itself by introducing contrary evidence, including the scientific data that reflects no such risk and the fact that the FDA's understanding of that scientific data is the same as Merck's. Unless plaintiff is willing to stipulate to the propriety of Merck's interpretation of the scientific data regarding short-term use, Merck is entitled to tell the jury that it is not alone in that understanding and that, in fact, the FDA – the federal agency charged with reviewing these

matters – has reached the same conclusion based on its independent review of all the data. Having placed this issue directly in controversy, plaintiff cannot properly seek to exclude the evidence on it. Merck is entitled to defend itself against a claim by plaintiff that its interpretation of the data is incorrect, including by showing that it is not alone in its interpretation, and the jury is entitled to be made aware of these facts when assessing the strength or weakness of plaintiff's causation evidence.

Finally, the FDA's conclusion from the scientific data that there may be a "class effect" common to all NSAIDs and that warning labels should be modified accordingly is also relevant to whether Dr. Schirmer would have prescribed something other than Vioxx given Mr. Irvin's need for pain relief.[10] The existence of a possible "class effect" means that a cardiovascular risk warning for Vioxx may not have differed materially from the warning the FDA now believes should have appeared on alternative pain medications. This evidence seriously undermines plaintiff's suggestion that Mr. Irvin's prescribing physician would not have prescribed Vioxx had it carried a different warning.

---

[10] The record indicates that Mr. Irvin could not tolerate Vicoprofen (another NSAID), and he did not obtain adequate pain relief from over-the counter medication such as Tylenol. (*See* Deposition of Evelyn Irvin Plunkett at 55:23-56:17, 63:17-64:23, attached as Ex. 6 to Wittmann Decl.; September 6, 2005 Deposition of Christopher Schirmer, M.D. at 35:5-37:24, 52:12-19, 56:15-20, attached as Ex. 10 to Wittmann Decl.)

789971v.1

### III.    CONCLUSION.

For the reasons stated above, Merck respectfully requests that this Court deny, in its entirety, Plaintiff's Motion To Exclude Opinion Testimony That Vioxx® Is The Same As All NSAIDs Regarding Cardiotoxic Effects.

Respectfully submitted,

*Phil Wittmann*

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone: 504-581-3200
Fax:    504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:    312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone: (202) 434-5000
Fax:    (202) 434-5029

789971v.1

And

John H. Beisner
Charles C. Lifland
Richard B. Goetz
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone: (213) 430-6000
Fax:    (213) 430-6407

Attorneys for Merck & Co., Inc.

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Opposition of Merck & Co., Inc. to Plaintiff's Motion to Exclude Opinion Testimony that Vioxx® is the Same as All NSAIDs Regarding Cardiotoxic Effects has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 2nd day of November, 2005.

_/s/ Paul Wittmann_

789971v.1