

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2005 NOV -2  PM 3: 37

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 05-4046* | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| EVELYN IRVIN PLUNKETT | * | |
| as Personal Representative of the Estate of | * | |
| RICHARD IRVIN, JR., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### OPPOSITION OF MERCK & CO., INC. ("MERCK") TO PLAINTIFF'S MOTION TO EXCLUDE OPINION TESTIMONY THAT VIOXX® CANNOT CAUSE ADVERSE THROMBOTIC CARDIAC EVENTS UNLESS INGESTED EIGHTEEN (18) MONTHS OR LONGER

## I.    INTRODUCTION.

Merck voluntarily withdrew Vioxx® from the market on September 30, 2004, when interim unblinded data from the APPROVe study – a long-term, randomized placebo-controlled clinical trial – indicated that continuous daily use of Vioxx for longer than 18 months might increase the risk of thrombotic cardiovascular events.  In that trial, the potential increased risk

1

___ Fee_____
___ Process_____
_X_ Dktd_____
_V_ CtRmDep_____
___ Doc. No _____

became statistically significant only after 30 months of continuous use. (Merck & Co. Inc.'s Memorandum Regarding Vioxx Science Issues ("Science Brief"), filed October 21, 2005, at 1, 16-17.) Other placebo-controlled clinical trials, however, had not shown any such risk, either for short-term or long-term use of Vioxx. Over the ensuing months, Merck scientists and consultants collected the APPROVe data and published it in January 2005 in the *New England Journal of Medicine*.[1] Plaintiff now seeks an order excluding any testimony that Vioxx cannot cause thrombotic cardiovascular events until after at least 18 months of continuous use. (Pl.'s Mot. to Exclude Opinion Testimony That Vioxx Cannot Cause Adverse Thrombotic Cardiac Events Unless Ingested Eighteen (18) Months or Longer ("Mot.") at 3.) The Court should deny plaintiff's Motion for three reasons.

First, plaintiff's motion proceeds from a false premise. In this trial, Merck need not proffer testimony on whether Vioxx can cause cardiovascular events after 18 months of continuous use. Mr. Irvin did not take Vioxx continuously for 18 months. It is undisputed that he took 25 mg of Vioxx for less than a month. Thus, the issue here is whether Mr. Irvin's short-term use of Vioxx could and did cause him to have a thrombotic cardiovascular event. In addressing *that* issue, Merck's experts are entitled to tell the jury that multiple studies, including APPROVe, consistently reveal no such short-term impact.

Second, plaintiff wrongly assumes that Merck has the burden of proof on causation. That burden belongs solely to plaintiff. If plaintiff intends to speculate that Mr. Irvin's short-term use of Vioxx increases the risk of thrombotic cardiovascular events, Merck is plainly entitled to challenge plaintiff's causal inference by presenting expert testimony explaining the results of the APPROVe study and why those results do not support plaintiff's theory.

---

[1]     Bresalier RS et al., *Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial*, 352 NEW. ENG. J. MED. 1092 (Mar. 17, 2005).

Third, none of plaintiff's specific criticisms of Merck's duration analysis of the APPROVe data has any merit. The analysis is not a flawed *post hoc* sub-group analysis. It was not undertaken for purposes of litigation. And, as explained more fully in Merck's Motion to Exclude Evidence of Plaintiff's Experts Regarding Causation (hereinafter "Causation Testimony Brief"), filed October 21, 2005, and the accompanying Appendix of Studies Relied on By Plaintiff's Experts attached to that motion, the APPROVe data are wholly consistent with other available clinical and observational data, which likewise reflect no increased risk of thrombotic cardiovascular events with the short-term use of 25 mg Vioxx.

## II.    THE LEGAL STANDARD.

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under this standard, a party offering expert testimony must show, first, that the expert has sufficient knowledge and/or experience to provide an opinion on the particular subject at issue.[2] *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1050 (5th Cir. 1998). Second, the expert's testimony must be relevant and reliable. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589

---

[2]    Plaintiff objects to the testimony of Drs. Michael Gaziano, Thomas Wheeler and David Silver. (Mot. at 3.) In the instant Motion, however, plaintiff does *not* challenge the qualifications of these experts to render the challenged opinions. Nevertheless, to the extent that plaintiff contends that Drs. Wheeler and Silver are not qualified to offer the challenged opinions, Merck addresses such arguments in its briefs in opposition to plaintiff's concurrently filed motions to exclude Dr. Wheeler's and Dr. Silver's testimony. In addition, Merck will address Dr. Gaziano's qualifications to offer the challenged testimony if and when plaintiff files a qualifications-related motion directed at Dr. Gaziano.

(1993); *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 275 (5th Cir. 1998); *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d 603, 605-06 (E.D. La. 2003). Reliability depends on whether the expert's "reasoning or methodology underlying the testimony is scientifically valid," meaning that such testimony is "derived by the scientific method" and "supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590, 592-93. Relevance depends on whether the expert's "reasoning or methodology properly can be applied to the facts in issue." *Id.* at 593.

## III. WHETHER VIOXX USE FOR MORE THAN ONE MONTH MAY CAUSE THROMBOTIC CARDIOVASCULAR EVENTS IS NOT AT ISSUE IN THIS CASE.

In pharmaceutical and toxic tort cases, a plaintiff must prove general causation before proving specific causation.[3] *See, e.g., McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1239 (11th Cir. 2005); *Kelley v. Am. Heyer-Schulte Corp.*, 957 F. Supp. 873, 881-82 (W.D. Tex. 1997); *Liggett Group Inc. v. Engle*, 853 So. 2d 434, 453 (Fla. App. 2003), *review granted*, 873 So. 2d 1222 (Fla. 2004); RESTATEMENT (THIRD) OF TORTS: Liability for Physical Harm § 28 cmt. c (Tentative Draft Nov. 3, 2003); Saks *et al.*, Federal Judicial Center, ANNOTATED REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (2d ed. 2004) ("Reference Manual on Scientific Evidence") at 637. Moreover, given the importance of the dose-response relationship in such cases (*see* Causation Testimony Brief at 23-25), a plaintiff cannot establish general causation merely by showing "that a certain chemical agent sometimes causes the kind of harm that he or she is complaining of." *Wright v. Willamette Indus., Inc.*, 91 F.3d 1105, 1107 (8th Cir. 1996).

---

[3]   General causation concerns whether an agent can cause the type of harm alleged by a plaintiff, whereas specific causation concerns whether a particular exposure was the cause of harm in a specific individual. If a plaintiff cannot prove general causation, he or she may not present evidence regarding specific causation. (*See supra* at 4 (authorities cited).)

Instead, the plaintiff must present evidence that he or she was "exposed to levels of that agent that are known to cause the kind of harm" that he or she allegedly suffered. *Id.*; *see also In re Hanford Nuclear Reservation Litig.*, 292 F.3d 1124, 1133 (9th Cir. 2002) ("[T]he appropriate understanding of generic causation is . . . whether exposure to a substance for which a defendant is responsible, such as radiation at the level of exposure alleged by plaintiffs, is capable of causing a particular injury or condition in the general population.").

The Fifth Circuit repeatedly has reaffirmed the requirement that courts scrutinize the dose-response relationship in pharmaceutical and toxic tort cases, both when assessing the admissibility of expert testimony under *Daubert* and the Federal Rules of Evidence and when assessing the legal sufficiency of causation evidence generally. *See, e.g., Allen v. Penn. Eng'g Corp.* 102 F.3d 194, 199 (5th Cir. 1996) ("Scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiff's burden in a toxic tort case."); *Moore*, 151 F.3d at 278 (excluding opinion of expert who "offered no scientific support for his general theory that exposure to Toluene solution at any level could cause RADS" and who "had no support for the theory that the level of chemicals to which Moore was exposed caused RADS"); *Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1114 (5th Cir. 1991); *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987); *Thompson v. S. Pac. Transp. Co.*, 809 F.2d 1167, 1169 (5th Cir. 1987); *Gulf S. Insulation v. U.S. Consumer Prod. Safety Comm'n*, 701 F.2d 1137, 1146 (5th Cir. 1983).

Here, it is undisputed that Mr. Irvin took Vioxx at the 25 mg dose for less than a month and that he died from a thrombotic cardiovascular event. (*Compare* Causation Testimony Brief at 4-6 *with* Mot. at 1.) Thus, the threshold issue to be decided is whether Mr. Irvin's use of 25 mg Vioxx for less than a month is capable of causing the type of injury that he suffered. Expert

testimony regarding the APPROVe study is unquestionably relevant to that issue. The APPROVe study involved more than 2000 patients and failed to detect an increased risk of thrombotic cardiovascular events in the first 18 months of 25 mg Vioxx use. Moreover, the APPROVe data are only part of a larger body of reliable clinical trial data that shows no increased risk with the short-term use of Vioxx. (Causation Testimony Brief at 26-30, App. at 1-10.) But whether the use of Vioxx for *longer* durations up to or exceeding 18 months is capable of causing such an injury is not at issue in this case, and it is not an issue that the Court needs to address. *Cf. Christophersen*, 939 F.2d at 1114 (upholding exclusion of expert testimony based upon "inaccurate . . . duration data"); *Thompson*, 809 F.2d at 1169 (expert's opinion on dioxin as source of plaintiff's illness had "insufficient factual basis" in part because expert had no knowledge of duration of exposure); *Gulf S. Insulation*, 701 F.2d at 1146 (usefulness of epidemiological studies was diminished based on "failure to consider . . . length of time the workers were exposed to formaldehyde"); *Edwards v. Safety-Kleen Corp.*, 61 F. Supp. 2d 1354, 1359 (S.D. Fla. 1999) (excluding opinion of expert who was not aware of any studies which define the minimum duration of exposure to benzene necessary to be toxic).

Moreover, contrary to plaintiff's claim, Merck's experts have not opined that Vioxx is capable of causing thrombotic cardiovascular events when ingested for 18 months or longer. (Declaration of J. Michael Gaziano, M.D., M.P.H., in Support of Merck's Motions to Exclude Evidence and for Summary Judgment ("Gaziano Decl."), filed October 21, 2005, at ¶¶ 102-03; Deposition of Dr. Thomas M. Wheeler ("Wheeler Dep.") at 127:9-128:2, attached as Ex. 12 to the Declaration of Phillip A. Wittmann in Support of Merck's Opposition Briefs ("Wittmann Decl.").) Instead, as plaintiff acknowledges, they have opined merely that the APPROVe study

6

did not detect an increased risk of such events during the first 18 months of Vioxx use.  (Mot. at 3.)  Those opinions are directly related to the threshold issue in this case.

In short, plaintiff's Motion is a red herring.  It seeks to exclude testimony on the central issue in this case.  The Court should deny it.

## IV.   PLAINTIFF WRONGLY ASSUMES THAT MERCK HAS THE BURDEN OF PROOF ON CAUSATION.

The Court should deny plaintiff's Motion for a second, independent reason:  plaintiff wrongly assumes that Merck bears the legal burden of proof on causation.  Thus, plaintiff criticizes Merck for failing to identify a biologically plausible mechanism by which Vioxx supposedly becomes harmful "only after 18 months."  (Pl.'s Summary Science Brief, filed Oct. 21, 2005, at 15.)  Plaintiff similarly criticizes Merck for supposedly failing to identify studies proving "that Vioxx usage is safe until more than 17 months have passed."  (*Id.*; *see also* Mot. at 4, 10.)

The burden of establishing causation, however, rests squarely with *plaintiff*, not Merck. *See, e.g., Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984).  Plaintiff, for example, bears the burden of identifying, to a reasonable degree of medical certainty, the biological mechanism by which Mr. Irvin's use of 25 mg Vioxx for less than a month supposedly is capable of causing thrombotic cardiovascular events.  *See, e.g., Black v. Food Lion, Inc.*, 171 F.3d 308, 314 (5th Cir. 1999) ("The underlying predicates of any cause-and-effect medical testimony are that medical science understands the physiological process by which a particular disease or syndrome develops and knows what factors cause the process to occur."); *McClain*, 401 F.3d at 1253 (excluding expert testimony where plaintiffs' experts have not "offered a reliable explanation of the physiological process by which Metabolife causes heart attacks and ischemic strokes, i.e., establish general causation"); *In re Propulsid Prods. Liab. Litig.*, 261 F.

7

Supp. 2d at 616-17 (excluding testimony of plaintiff's experts because they "fail to identify the exact mechanism by which a person's QT interval can become permanently prolonged well after that person has ceased taking Propulsid").  Likewise, plaintiff bears the burden of identifying scientifically reliable epidemiologic evidence[4] that Mr. Irvin's use of 25 mg Vioxx for less than a month is capable of causing thrombotic cardiovascular events.  *See, e.g., Allen v. Penn. Eng'g Corp.* 102 F.3d at 197 (epidemiologic studies are "[u]ndoubtedly . . . the most useful and conclusive type of evidence" of causation); *Chambers v. Exxon Corp.*, 81 F. Supp. 2d 661, 664 (M.D. La. 2000) ("Epidemiological studies are necessary to determine the cause and effect relationship between an agent, in this case exposure to benzene, and a disease, CML."); *Thomas v. Hoffman-La Roche, Inc.*, 731 F. Supp. 224, 227-28 (N.D. Miss. 1989) ("conclusive epidemiological proof [is] essential to the plaintiff's case in a toxic tort pharmaceutical drug setting").  As explained in Merck's Causation Testimony Brief, plaintiff has not met her burden of proof on these issues.  Moreover, by urging the Court to shift her burden of proof to Merck, plaintiff is inviting reversible error.  *Curtis Pub. Co. v. Fraser*, 209 F.2d 1, 8-9 (5th Cir. 1954) (trial court committed reversible error by shifting to defendant plaintiff's burden of proving malice under Florida law).

---

[4]     There are two types of epidemiolgic studies – randomized clinical trials and observational studies. (Causation Testimony Brief at 16-17.)  Experts for both plaintiff and Merck agree that randomized clinical trials are at the top of the hierarchy of data that scientists typically consider when assessing whether a particular dose of a drug is capable of causing a specific injury. (Gaziano Decl. at ¶¶ 28, 34-35; Expert Report of Wayne A. Ray, Ph.D. ("Ray Report") at 25 (randomized clinical studies provide "the most reliable estimate of the magnitude of a drug's effect"), attached as Ex. 19 to Wittmann Decl.; Expert Report of John W. Farquhar, M.D. ("Farquhar Report") at ¶ 59 (same), attached as Ex. 16 to Wittmann Decl.)  Observational epidemiological studies occupy the next level down on the hierarchy of scientific evidence. (Gazianio Decl. at ¶ 28; Farquhar Report at ¶ 60 (observational studies are "weaker" than randomized clinical trials in "assigning causality").)

Even if plaintiff had some evidence that Mr. Irvin's short-term use of Vioxx might be capable of causing thrombotic cardiovascular events – and she has none – Merck would be entitled as a matter of law to introduce evidence challenging the causal inference that plaintiff seeks to draw. Merck, for example, would be entitled to demonstrate the shortcomings of the studies on which plaintiff relies and to explain how the results of those studies are inconsistent with the results of other data, including data from the APPROVe study. After all, assessing causation requires consideration of *all* the available epidemiologic data. *See, e.g.*, Michael J. Saks et al., REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 472 (2d. ed. 2004) ("[I]t should be emphasized that *an association is not equivalent to causation.* An association identified in an epidemiological study may or may not be causal. Assessing whether an association is causal requires an understanding of the strengths and weaknesses of the study's design and implementation, as well as a judgment about how the study findings fit with other scientific knowledge."). Indeed, the absence of consistent findings in epidemiologic studies "is a strong indication" that the existing research "does not support a causal interpretation." *Id.* at 521-22; (*see also* Gaziano Decl. at ¶¶ 33-35). Merck is thus entitled to present expert testimony regarding the results of the APPROVe study (and other studies) so that the Court or jury can decide whether the *totality* of scientific evidence supports plaintiff's theory that Mr. Irvin's use of 25 mg Vioxx for less than a month is capable of causing thrombotic cardiovascular events.

Moreover, as plaintiff's own experts acknowledge, blinded, randomized placebo-controlled clinical trials such as the APPROVe study are at the top of the hierarchy of data that scientists typically consider when assessing whether a particular dose of a drug is capable of causing a specific injury. (*See supra* at 7 n.4.) Based on the statements of plaintiff's own

experts, it stands to reason that Merck's experts should be allowed to testify about the results of the APPROVe study and why those results do not support plaintiff's theory of causation.

## V.    NONE OF PLAINTIFF'S SPECIFIC CRITICISMS REGARDING MERCK'S DURATION ANALYSIS OF THE APPROVe DATA HAS ANY MERIT.

Finally, none of plaintiff's specific criticisms regarding Merck's duration analysis of the APPROVe data has any merit.  The analysis is not a flawed *post hoc* sub-group analysis.  It was not undertaken for purposes of litigation.  And it is not inconsistent with the available epidemiologic data, which likewise fail to establish that Mr. Irvin's use of 25 mg Vioxx for less than a month is capable of causing thrombotic cardiovascular events.

### A.    The APPROVe Duration Analysis Is Not Scientifically Unreliable *Post Hoc* Analysis.

Plaintiff contends that the duration analysis contained in the APPROVe study is scientifically unreliable "post hoc" analysis. (Mot. at 6-7.)  Her contention is baseless.

Federal and state courts have criticized the admission of "post hoc" testimony by physicians who assumed without scientific basis that problems experienced by their patients were side effects of previously ingested medications.  *McClain*, 401 F.3d at 1243 ("[S]imply because a person takes drugs and then suffers an injury does not show causation.  Drawing such a conclusion from temporal relationships leads to the blunder of the *post hoc ergo propter hoc* fallacy."); *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 719-20 (Tex. 1997); *see also Black*, 171 F.3d at 313 (expert's testimony that plaintiff's fibromyalgia had to be due to fall was exercise in "the fallacy of *post-hoc propter-hoc* reasoning, which is as unacceptable in science as in law").  While this criticism aptly describes the speculative approach of plaintiff's experts in this case (*see, e.g.*, Causation Testimony Brief at 49-52)[5], it does not describe the APPROVe

---

[5]    For example, plaintiff's expert, Dr. Farquhar, has conducted a *post-hoc* sub group analysis of "high-risk" patients in the APPROVe study to argue for an alleged short-term

duration analysis. The APPROVe duration analysis was "post hoc" only in the sense that it involved application of a standard statistical analysis to a dataset gathered over the course of a long-term randomized trial. The analysis in question – known as a "Kaplan-Meier survival analysis" – is a generally accepted method for plotting and analyzing the comparative rates of adverse events over time.[6] (Gaziano Decl. at ¶ 103; Deposition of Craig Pratt, M.D. ("Pratt Dep.") at 109:1-3, attached as Ex. 7 to Wittmann Decl.) Moreover, the use of Kaplan-Meier curves to analyze events over time was pre-specified in the APPROVe study protocol.[7]

Plaintiff also criticizes the APPROVe duration analysis by claiming that the APPROVe study was insufficiently powered to detect a short-term risk of thrombotic cardiovascular events. (Mot. at 7-8; Ray Report at 29; Farquhar Report at ¶ 79.) Specifically, plaintiff claims that the

---

effect associated with Vioxx. (Farquhar Report at ¶¶ 81-82.) Not only did Dr. Farquhar conduct his *post-hoc* analysis in anticipation of this litigation (*see id.* at ¶ 82), the subgroup at which he looked was not pre-specified in the study protocol for APPROVe. (MK-0966 CV Outcomes Data Analysis Plan (Study 203).) As plaintiff admits and courts have held, these facts underscore the unreliability of Dr. Farquhar's *post-hoc* analysis. (Mot. at 8); *Newton v. Roche Labs., Inc.*, 243 F. Supp. 2d 672, 678 (W.D. Tex. 2002). Indeed, use of non-prespecified subgroups in this way is referred to as data mining and raises a problem in statistics known as the multiple comparison problem whereby the more statistical comparisons that are made, the less reliable they become. (Gaziano Decl. at ¶ 99.) In any event, Dr. Farquhar acknowledges that the confidence interval for his *post hoc* subgroup analysis falls below 1.0 *even at 18 months* (Farquhar Report at 32 n.3.), which means that there is no statistically significant increased risk and the analysis thus does not establish causation. *LeBlanc v. Merrell Dow Pharms., Inc.*, 932 F. Supp. 782, 783 & n.3 (E.D. La. 1996). Furthermore, Dr. Farquhar does not report any increased risk for even "high risk" participants after one month of use. Finally, the data concerning this selective subset of "high risk" patients do not support any conclusion relevant to Mr. Irvin, as Dr. Farquhar admits that "it would be difficult" to place Mr. Irvin in the subgroup of "high risk" patients. (Deposition of John W. Farquhar, M.D. ("Farquhar Dep.") at 256:24-257:12, attached as E. 3 to Wittmann Decl.)

[6]  *See, e.g.*, Elandt-Johnson and Johnson, *Survival Models and Data Analysis* (Wiley 1980) at 172-174; Cox, DR and Oakes, D, *Analysis of Survival Data* (Chapman and Hall 1984).

[7]  *See* MK-0966 CV Outcomes Data Analysis Plan (Study 203).

APPROVe study had only a 20% power to detect a risk in excess of 2.0.  (Mot. at 7-8.)  Her argument is misplaced for at least three reasons.

First, the only "evidence" plaintiff cites for her claim that the APPROVe study had only a 20% power to detect a risk greater than 2.0 is a recent letter-to-the-editor in the "Correspondence" section of the journal *The Lancet*.  (Mot. at 8 & n.15; Ray Report at 29 & n. 48.)  But according to *The Lancet*, such submissions typically are not peer-reviewed.[8]  And plaintiff has offered no evidence that this letter-to-the-editor was peer-reviewed.  Whether data has been peer-reviewed is an important factor that courts consider when determining the data's scientific reliability.  *Black*, 171 F.3d at 313; *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d at 605.

Second, even assuming that the APPROVe study had limited power to detect an increased risk with short-term Vioxx use, the fact remains that no difference was seen in the first 18 months.  Any claimed lack of power does not constitute *evidence* that the short-term use of 25 mg Vioxx in fact *is* associated with an increased risk.  *Brumley v. Pfizer, Inc.*, 200 F.R.D. 596, 602 (S.D. Tex. 2001) ("Dr. Polukoff may have pointed out an important void in the scientific literature, but the lack of proof of a drug's safety does not prove it is dangerous.").  Nor is it appropriate to *assume* without factual support, as plaintiff's expert does, that the increased risk seen at the conclusion of the APPROVe study applies throughout all periods of the study.  (Farquhar Report at ¶ 79; Farquhar Dep. at 193:22-196:7.)  Such an approach is nothing more than extrapolating from what is known to what is unknown, and it is scientifically unreliable under *Daubert*.  *Moore*, 151 F.3d at 279 (improper to "leap[] from an accepted scientific premise to an unsupported one"); *Claar v. Burlington N.R.R.*, 29 F.3d 499, 502-03 (9th Cir. 1994)

---

[8]     *See*  http://www.thelancet.com/authors/lancet/authorinfo  (visited  Oct.  27,  2005) ("Correspondence letters are not usually peer reviewed . . . .").

("Coming to a firm conclusion first and then doing research to support it is the very antithesis of [the scientific] method."); *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d at 616 ("Sound scientific method does not support an extrapolation from one substance to another without some *showing* of identity or at least close similarity." (emphasis added)).

Third, Merck's experts do not rely solely on the APPROVe results when opining about the absence of scientific evidence supporting plaintiff on the threshold issue of general causation in this case.  On the contrary, consistent with sound science, they formed their opinions after considering the *totality* of available clinical evidence, which fails to show any increased risk with the use of 25 mg Vioxx for less than a month. (*See, e.g.*, Gaziano Decl. at ¶¶ 102-03; Pratt Dep. at 26:19-27:7, 41:22-42:7, 122:6-19.)  Plaintiff's experts have not suggested that the available clinical data, when considered in their totality, lack sufficient power to detect an increased risk with the short-term use of Vioxx.  And were plaintiff's experts belatedly to offer that new opinion, Merck still would be entitled to present expert testimony regarding such data to rebut the causal inference that plaintiff seeks to draw.  (*See supra* at 8-9.)

## B.   The APPROVe Duration Analysis Was Not Undertaken for Purposes of Litigation.

Plaintiff also urges the Court to "assume" that the APPROVe duration analysis was developed solely for litigation and is thus scientifically unreliable. (Mot. at 8.)  To support that claim, plaintiff contends that the subgroup analysis was not "pre-specified" and was conducted only after lawsuits had been filed against Merck concerning Vioxx. (*Id.* at 8.)  Again, plaintiff's argument is contrary to fact.

The use of Kaplan-Meier curves to analyze events over time *was* pre-specified in the APPROVe study protocol. (*See supra* at 10-11 & n.7.)  In addition, the results of this analysis have been published in *The New England Journal of Medicine*, one of the country's top peer-

13

reviewed medical journals. (*See supra* at 1 & n.1.)  As the Fifth Circuit and this Court have

recognized, whether data has been published and peer-reviewed is an important factor that courts

consider when determining the data's scientific reliability.  *Black*, 171 F.3d at 313; *In re*

*Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d at 605.  The mere fact that these results were

published after some lawsuits had been filed against Merck does not remotely warrant an

*assumption* that the duration analysis was conducted for purposes of litigation.  Plaintiff has *no*

evidence that the authors of the APPROVe study were motivated by any lawsuit or that their

analysis was in any related to any lawsuit.

## C.    The APPROVe Duration Analysis Is Consistent with the Available Epidemiologic Data.

Finally, plaintiff argues that the APPROVe duration analysis is inconsistent with the

findings of various clinical trials and observational studies, including the VIGOR, VICTOR and

ADVANTAGE trials and the Solomon, Juni, Ray, Graham, Kimmel, Levesque, Mamdani,

Ingenix, Johnson, Nussmeier and Hippisley-Cox studies.  (Mot. at 9-10 & n.24; Pl.'s Summary

Science Brief at 8-12, 15-16.)  Again, plaintiff's argument is just wrong.

The available scientific data do not support the proposition that Mr. Irvin's use of 25 mg

Vioxx for less than a month is capable of causing thrombotic cardiovascular events.  In fact, the

FDA came to this exact conclusion in its recent independent analysis regarding the risk of

adverse cardiovascular events associated with COX-2 selective inhibitors and non-selective

NSAIDs.  On April 6, 2005, the FDA published a memorandum in which it concluded, based on

its analysis of all the data, that the short-term use of Vioxx and other NSAIDs does *not* appear to

be associated with an increased risk of serious adverse cardiovascular events.[9]  (April 6, 2005

---

[9]    The memorandum, entitled "Analysis and recommendations for Agency action regarding non-steroidal anti-inflammatory drugs and cardiovascular risk," was written by Dr. John Jenkins, the Director of the FDA's office of New Drugs, and Dr. Paul Seligman, the

FDA Memorandum at 2, attached as Ex. 26 to Wittmann Decl.)   Here is what the FDA concluded in its recent memorandum:   "*Short-term use of NSAIDs to relieve acute pain, particularly at low doses, does not appear to confer an increased risk of serious adverse CV events . . . .*" (*Id.* (emphasis added).)

A reanalysis of the APPROVe data by plaintiff's own experts confirms the conclusions of the FDA.   Indeed, Dr. Farquhar and Professor Ray concede that the APPROVe data did not reveal an increased rate of heart attacks or sudden cardiac deaths in the first month of Vioxx use, either in low-risk or high-risk patients. (Farquhar Report at 34; Ray Report at 29; *see also supra* at 10 & n.5.)   In addition, Dr. Farquhar concedes that there was no statistically significant increased risk in the Vioxx group during the first 18 months and that he did not find a statistically significant difference until *after close to three years* – a period much longer than the extremely short time in which Mr. Irvin took Vioxx. (Farquhar Dep. at 189:24-190:6, 270:7-23.) These results are entirely consistent with the clinical data available at the time of Mr. Irvin's death and today, which do not show an increased risk of thrombotic cardiovascular events during the first month of 25 mg Vioxx use.

For example, before seeking FDA approval of Vioxx, Merck conducted over 55 clinical studies involving over 8,000 patients exposed either to Vioxx or to placebo or traditional NSAIDs for up to 86 weeks.   These comparisons revealed *no* statistically significant difference in the rate of adverse cardiovascular events. (Science Brief at 4; Declaration of Ned Stephen Braunstein in Support of Merck's Motions to Exclude Evidence, filed October 21, 2005, at ¶¶ 36.)   After receiving FDA approval of Vioxx, Merck scientists conducted multiple pooled

---

Director of the FDA's Office of Pharmacoepidemiology and Statistical Science.   It represents the culmination of the FDA's analysis of the available science with respect to NSAIDs.

analyses of cardiovascular data from over two dozen randomized clinical trials that lasted longer than four weeks and that involved tens of thousands of patients and patient years. These pooled analyses similarly revealed *no* statistically significant increased risk of cardiovascular adverse events for patients taking Vioxx, as compared to placebo or non-naproxen NSAIDs. (Science Brief at 10-11, 13-14; Gaziano Decl. at ¶¶ 79-84, 87.) The analyses revealed a relative increase in adverse cardiovascular events only in comparison to naproxen, and the data from the VIGOR study – a study comparing naproxen against 50 mg Vioxx, which is double the dose at issue here – accounted for this difference.[10] (Science Brief at 10-11, 13-14; Gaziano Decl. at ¶¶ 79-84, 87.) In addition, as explained in Merck's Causation Testimony Brief and Appendix of Studies, *none* of the clinical trials that plaintiff cites shows that the use of 25 mg Vioxx for less than a month is associated with an increased risk of thrombotic cardiovascular events. (Causation Testimony Brief at 26-30, App. at 1-10.)

Nor do the observational studies that plaintiff cites support her theory that taking 25 mg Vioxx for less than a month is capable of causing thrombotic cardiovascular events. (Causation Testimony Brief at 30-33, App. at 10-23.) In fact, plaintiff cannot identify any statistically significant observational study proving that use of 25 mg Vioxx more than doubles the risk of such events during the first month of use.[11] (*Id.*) For this reason alone, plaintiff cannot prove

---

[10]   As discussed in Merck's Science Brief, these analyses, combined with research and data indicating that naproxen had cardioprotective properties analogous to aspirin when regularly taken in certain doses, led Merck's scientists to conclude that the cardioprotective properties of naproxen best explained the VIGOR results.

[11]   Plaintiff cites one study – the Johnsen study – for the proposition that Vioxx use was associated with a relative risk of 2.52 in patients with 1 to 30 days of exposure. But the Johnsen study did not distinguish between patients receiving Vioxx at the 25 mg and 50 mg doses. There is thus no way to determine whether its results are applicable to Mr. Irvin. *Daubert*, 509 U.S. at 591-92 (expert testimony inadmissible if lacking appropriate "fit" to specific facts of the case); *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d at 606, 618. Moreover, the results of this study are anomalous. Indeed, Johnsen reports that

16

that Mr. Irvin's short-term use of Vioxx more likely than not caused his death. (Causation

Testimony Brief at 16-21, 30-34.) Most of the observational studies that plaintiff cites did not

purport to evaluate the alleged risk associated with 25 mg Vioxx during the first month of use,[12]

and many of the studies did not distinguish between Vioxx at the 25 mg or 50 mg doses – facts

that plaintiff concedes are "limitations." (Causation Testimony Brief at 30-33, App. at 10-23;

Pl.'s Summary Science Brief at 13.) Moreover, most of the studies that evaluated Vioxx at the

25 mg dose *found no statistically significant increased risk* when Vioxx was compared to

placebo or its functional equivalent, a fact that completely undercuts plaintiff's claim.

(Causation Testimony Brief at 30-33, App. at 10-23.) Indeed, two studies conducted by

---

the purported risk associated with Vioxx *decreases* with increased duration of use and
that Vioxx is *safer* for patients at a higher risk for cardiovascular disease compared to
patients at a lower risk. Johnsen SP et al., *Risk of Hospitalization for Myocardial
Infarction Among Users of Rofecoxib, Celecoxib, and Other NSAIDs, A Population-
Based Case-Control Study*, ARCH. INTERN. MED. 2005;165:978-984, at 981-82 & Tables
3, 4. In addition, Johnsen concedes that the reported findings for new users may have
been "inflated" by protopathic bias and confounding factors. *Id.* at 981. Protopathic bias,
also known as "reverse causation," refers to a situation where a pre-existing medical
condition gives rise to a drug prescription. Horwitz R et al., *The Problem of
"Protopathic Bias" in Case-Control Studies*, AM. MED. J. 1980; 68:255-258, at 258
(protopathic bias can result in a "spuriously high causal association" being "incorrectly
inferred between the pharmaceutical agent and the disease"); Cullinan P et al., *Early
prescriptions of antibiotics and risk of allergic disease in adults: a cohort study*,
THORAX 2004; 59:11-15. Additional reasons why the Johnsen study is scientifically
unreliable for purposes of supporting a causation opinion are set forth in the Appendix of
Studies attached to Merck's Causation Testimony Brief. (Causation Testimony Brief,
App. at 20-21.)

[12]   Plaintiff cites the Ingenix study for the proposition that use of 25 mg Vioxx was
associated with an elevated risk of 1.5 during the first 30 days of use. (Pls.' Science
Summary Brief at 5.) In fact, the Ingenix study did not report any increased risk with the
use of 25 mg Vioxx during the first 30 days. Instead, it reported on the risk supposedly
associated with "new, current use" of 25 mg Vioxx, which is not defined as use of one
month or less. Ingenix Epidemiology Report, *Cardiovascular Risk of COX-2 Inhibitors
and Other NSAIDs*, Sept. 20, 2004 (Final Report, Revised) at 11-12, 17. On the other
hand, the Ingenix study did report on the combined risk associated with use of Vioxx at
the 25 mg *and* 50 mg doses during the first 30 days, and the findings were *statistically
insignificant*. *Id.* at 16; (Causation Testimony Brief at 32, App. at 19-20.)

plaintiff's own expert, Professor Ray, found no statistically significant increased risk associated with the use of 25 mg Vioxx over any duration.[13]  Accordingly, these observational studies are not only inconsistent and inconclusive for the dosage and duration of Vioxx use at issue in this case, but many actually support Merck's position.  (Gaziano Decl. at ¶¶ 49-59, 95, 104; Expert Report of Barry K. Rayburn, M.D. ("Rayburn Report") at 20-24, attached as Ex. 20 to Wittmann Decl.)  Finally, the observational studies that plaintiff relies on have numerous methodological flaws that render them scientifically unreliable for purposes of supporting a causation opinion.  (Causation Testimony Brief at 30-33, App. of Studies at 10-23; Gaziano Decl. at ¶¶ 33-35, 49-59, 95, 104; Rayburn Report at 20-24.)

Consider, for example, plaintiff's reliance on the Hippisley-Cox study.[14]  This study does not establish that Mr. Irvin's use of 25 mg Vioxx for less than a month is capable of causing thrombotic cardiovascular events.  First, Hippisley-Cox sought to evaluate the relative risk associated with Vioxx during and after three months of use, not during the first 30 days.  Second, Hippisley-Cox did not distinguish between patients taking Vioxx at the 25 mg or 50 mg dose.  It is thus impossible to determine whether the results of this study are applicable to Mr. Irvin's case.  *Daubert*, 509 U.S. at 591-92 (expert testimony inadmissible if lacking appropriate "fit" to specific facts of the case); *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d at 606, 618.  Moreover, the results of this study are anomalous.  Indeed, while Hippisley-Cox purported to find a low and only marginally significant increased risk with use of Vioxx during the first three months (RR = 1.32, CI = 1.09-1.61), she found essentially no increased risk after three months of

---

[13]  *See* Appendix of Studies at 13-16 (discussing Ray and Graham studies).  Professor Ray is a co-author of the Graham study.

[14]  Hippisley-Cox et al., *Risk of hospitalization for myocardial infarction in patients taking cyclo-oxygenase-2 inhibitors or conventional non-steroidal anti-inflammatory drugs: population based nested case-control analysis*, BRITISH. MED. J. 2005;330.

use and even then her findings were statistically insignificant (RR = 1.05, CI = 0.89-1.24).[15] Finally, Hippisley-Cox concedes that her anomalous findings are "at risk of bias and confounding" that she "cannot correct for."[16]

In short, plaintiff's experts can point to *no* observational study to support their theory that the use of 25 mg Vioxx for less than a month is capable of causing thrombotic cardiovascular events; they concede that the "most reliable" proof of causation comes from randomized clinical trials (*see* Ray Report at 25, Farquhar Report at ¶ 59), which likewise show no increased risk with the short-term use of 25 mg Vioxx; and the FDA reached this exact conclusion when analyzing the same data.  Under these circumstances, plaintiff cannot credibly contend that the APPROVe duration analysis is scientifically unreliable or inconsistent with the existing scientific data.

## IV.    CONCLUSION.

For the forgoing reasons, Merck respectfully requests that the Court deny plaintiff's Motion to Exclude Opinion Testimony That Vioxx® Cannot Cause Adverse Thrombotic Cardiac Events Unless Ingested Eighteen (18) Months or Longer.

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone: 504-581-3200
Fax:    504-581-3361

Defendants' Liaison Counsel

---

[15]    *Id.* at 2-3 & Table 3.

[16]    *Id.* at 5-6.

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois 60610
Phone: 312-494-4400
Fax:    312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Phone: (202) 434-5000
Fax:    (202) 434-5029

And

John H. Beisner
Charles C. Lifland
Richard B. Goetz
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone: (213) 430-6000
Fax:    (213) 430-6407

Attorneys for Merck & Co., Inc.

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Opposition of Merck & Co., Inc. to Plaintiff's Motion to Exclude Opinion Testimony That Vioxx® Cannot Cause Adverse Thrombotic Cardiac Events Unless Ingested Eighteen (18) Months or Longer has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 2nd day of November, 2005.

_Phil Wittmann_