UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 05-4046* | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| EVELYN IRVIN PLUNKETT | * | |
| as Personal Representative of the Estate of | * | |
| RICHARD IRVIN, JR., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**OPPOSITION OF MERCK & CO., INC. ("MERCK") TO PLAINTIFF'S MOTION TO EXCLUDE OPINION TESTIMONY THAT NAPROXEN® IS SUFFICIENTLY CARDIOPROTECTIVE TO EXPLAIN EXCESS CARDIAC RISK IN VIGOR**

I.     **INTRODUCTION.**

In March 2000, Merck learned the preliminary results of VIGOR, an approximately 8,000 patient trial designed to assess the relative incidence of serious gastrointestinal events in rheumatoid arthritis patients treated with Vioxx® as compared to naproxen, a traditional non-steroidal anti-inflammatory drug ("NSAID").  Over treatment periods averaging nine months, half the study patients took daily doses of Vioxx 50 mg – double the highest recommended dose

1

and double the dose taken by Mr. Irvin – while the other half took twice-daily doses of naproxen 500 mg, a common therapeutic dose.  The VIGOR results confirmed that patients taking Vioxx suffered significantly fewer serious gastrointestinal perforations, ulcers and bleeds ("PUBs") than patients taking naproxen.  The data also showed, however, that the patients taking naproxen suffered significantly fewer serious cardiovascular thrombotic events.  Merck promptly disclosed the VIGOR results to the FDA, the medical community and the public.  Merck also participated in the November 2000 publication of the VIGOR results in the *New England Journal of Medicine*, a prestigious peer-reviewed journal.[1]  (Merck & Co., Inc.'s Memorandum Regarding Vioxx Science Issues ("Science Brief"), filed October 21, 2005, at 9-10.)  In that publication, the authors concluded that the VIGOR study's cardiovascular results "are consistent with the theory that naproxen has a coronary protective effect."[2]

Plaintiff now seeks an order excluding any testimony that naproxen is sufficiently cardioprotective to explain the cardiovascular results seen in the VIGOR study.  The Court should deny plaintiff's Motion for three independent reasons.

First, plaintiff alleges that Merck *believed* that the VIGOR results showed Vioxx increased the risk of thrombotic cardiovascular events, but that Merck attempted to conceal that risk.  On that basis, plaintiff asserts claims for, *inter alia*, failure to warn, fraudulent misrepresentation and fraudulent concealment.  Given those claims, plaintiff cannot suppress evidence that Merck in fact believed – reasonably – that the VIGOR results were instead consistent with a cardioprotective effect of naproxen.

---

[1] Bombardier C, et al., *Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis*, N. ENGL. J. MED. 2000;343(21):1520-28.

[2] *Id.* at 1527.

Second, plaintiff wrongly assumes that Merck has the burden of proof on causation. That burden belongs to plaintiff alone, and Merck is entitled to challenge any causal inference that plaintiff seeks to draw. In particular, Merck is entitled to present expert testimony that explains why the VIGOR study does not support plaintiff's theory of causation – including testimony that addresses the cardioprotective effect of naproxen.

Third, there is abundant scientific evidence that naproxen in fact can have a cardioprotective effect. That evidence is scientifically reliable and comes from several peer-reviewed clinical pharmacology studies and other basic science research. Several observational epidemiologic studies also have found a statistically significant cardioprotective effect of naproxen, corroborating the basic science research. The cardioprotective effect of naproxen is further consistent with extensive and uncontroverted data from randomized clinical trials of Vioxx against placebo. Plaintiff's assertion that there is no supporting scientific evidence is factually wrong. Moreover, whether naproxen is sufficiently protective to explain the VIGOR results in their entirety misstates the issue, as the VIGOR results may be explained at least in part by the effect of chance alone.

## II.     THE LEGAL STANDARD.

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under this standard, a party offering expert testimony must show, first, that the expert has sufficient knowledge and/or experience to provide an opinion on the particular subject at issue.[3] *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1050 (5th Cir. 1998). Second, the expert's testimony must be relevant and reliable. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589 (1993); *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 275 (5th Cir. 1998); *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d 603, 605-06 (E.D. La. 2003). Reliability depends on whether the expert's "reasoning or methodology underlying the testimony is scientifically valid," meaning that such testimony is "derived by the scientific method" and "supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590, 592-93. Relevance depends on whether the expert's "reasoning or methodology properly can be applied to the facts in issue." *Id.* at 593.

## III.   BACKGROUND OF THE VIGOR STUDY.

The VIGOR study was a clinical trial involving 8,076 patients in which half the patients took daily doses of Vioxx 50 mg while the other half took twice-daily doses of naproxen 500 mg over treatment periods averaging nine months. The VIGOR results showed that naproxen users suffered significantly fewer serious cardiovascular thrombotic events compared to Vioxx users, adjudicated in accordance with Merck's cardiovascular standard operating procedure. Vioxx users experienced 45 such events compared to 19 events among naproxen users, with non-fatal myocardial infarctions – 20 on Vioxx compared to 4 on naproxen – accounting for most of the difference. (Declaration of J. Michael Gaziano, M.D., M.P.H. in Support of Merck's Motions to Exclude Evidence ("Gaziano Decl."), filed October 21, 2005, at ¶ 61; Declaration of Ned

---

[3] Plaintiff objects to the testimony of Drs. Silver, Rayburn and Gaziano. (Pl.'s Mot. to Exclude Opinion Testimony That Naproxen® Is Sufficiently Cardioprotective to Explain Excess Cardiac Risk in VIGOR ("Mot.") at 7.) In the instant Motion, however, plaintiff does *not* challenge the qualifications of these experts to render the challenged opinions.

Stephen Braunstein, M.D. in Support of Merck's Motions to Exclude Evidence ("Braunstein Decl."), filed October 21, 2005, at ¶ 56.) Although the additional number of events on Vioxx was not large in relation to the size of the treatment group (26 incremental events among 4,000 patients) and the confidence interval was wide (1.39 – 4.00), the numerical difference in events was statistically significant. (Gaziano Decl. at ¶¶ 61, 63; Braunstein Decl. at ¶¶ 56, 60.)

The VIGOR study, however, was not a placebo-controlled randomized clinical trial. Instead, it compared two active agents – Vioxx and naproxen. Because VIGOR compared Vioxx directly against naproxen without a placebo arm,[4] the study's results could not in themselves explain whether the disparity in cardiovascular adverse event rates reflected an increased risk associated with Vioxx, a decreased risk associated with naproxen, a chance finding, or some combination of those alternatives. (Science Brief at 10-11.) Experts for both plaintiff and Merck agree to this basic truism. (*Compare* Deposition of John W. Farquhar ("Farquhar Dep.") at 90:19-91:7, 93:18-94:5, attached as Ex. 3 to Declaration of Phillip Wittmann in Support of Merck's Opposition Briefs ("Wittmann Decl."), *and* July 13, 2005 Deposition of Wayne A. Ray, Ph.D. at 147:2-20, attached as Ex. 8 to Wittmann Decl., *with* October 12, 2005 Deposition of Barry K. Rayburn, M.D. at 69:18-70:8, 81:23-82:11, attached as Ex. 9 to Wittmann Decl. *and* Gaziano Decl. at ¶¶ 34-35, 62-63, *and* Testimony of J. Michael Gaziano, M.D., M.P.H., *Humeston v. Merck*, No. 619 (N.J. Super. Ct. Law Div. filed Aug. 19, 2003) of Oct. 26, 2005 at 5567:11-5568:24, attached as Ex. 25 to Wittmann Decl.) In February 2001, the FDA convened an external Advisory Committee to analyze and evaluate the VIGOR results and, in April 2002, the FDA approved revised labeling for Vioxx after considering those proceedings and the available

---

[4] A placebo arm, while scientifically desirable, would have been ethically and practically problematic in a study of rheumatoid arthritis patients requiring relief from severe chronic pain over a nine-month period. (Braunstein Decl. at ¶ 82.)

scientific data.  (Braunstein Decl. at ¶¶ 69-75.)  The revised labeling approved by the FDA advised physicians that the "significance of the [VIGOR cardiovascular data] is unknown," and that they should consider the data and exercise caution when deciding whether to prescribe Vioxx to patients with a medical history of ischemic heart disease.[5]

As explained in Merck's Science Brief and below, analysis of the available scientific data concerning both Vioxx and naproxen led Merck's scientists and others to conclude that the best explanation for the VIGOR results was the demonstrable cardioprotective effect of naproxen. (Science Brief at 11-15.)

## IV.   OPINION TESTIMONY ON THE CARDIOPROTECTIVE EFFECT OF NAPROXEN IS DIRECTLY RELEVANT TO PLAINTIFF'S CLAIMS.

Plaintiff argues that the Court should not allow Merck to present opinion testimony on the naproxen hypothesis – *i.e.*, that the VIGOR results can be explained by the cardioprotective effect of naproxen – because of a purported lack of reliable scientific evidence supporting that view.  This argument is baseless.

Plaintiff alleges that, after learning the VIGOR results, Merck failed to provide adequate warnings that Vioxx allegedly is capable of causing thrombotic cardiovascular events, and that Merck instead wrongly advised the medical community that naproxen is cardioprotective.[6] (Compl. at ¶¶ 40-59, 75-80.)  On that basis, plaintiff asserts claims for, *inter alia*, failure to warn, fraudulent misrepresentation and fraudulent concealment.  (*Id.* at 4 and ¶¶ 105-17, 175-209.) Having made these allegations and asserted these claims, plaintiff cannot preclude Merck from offering opinion testimony that naproxen in fact is cardioprotective.  There are two reasons why that is so.

---

[5] *See* Vioxx Label No. 9183810 dated April 2002, attached as Ex. 27 to Wittmann Decl.; Braunstein Decl. at ¶¶ 74-75.

[6] It is not disputed that Mr. Irvin died from a thrombotic cardiovascular event.

First, plaintiff *herself* has put the cardioprotective effect of naproxen at issue. She has alleged that Merck advocated a scientifically unsupportable explanation of the VIGOR results. (*See, e.g.*, Compl. at ¶ 47 ("Merck ignored the causal relationship between Vioxx and this significantly increased rate of cardiovascular events in the VIGOR study. Instead, Merck seized upon and widely and continuously disseminated the post hoc rationalization that the VIGOR study showed that Naproxen reduced cardiovascular risk . . . not that Vioxx posed a serious cardiovascular hazard.").) Merck is entitled to defend itself by presenting evidence to rebut that allegation. *See, e.g., Curtis Pub. Co. v. Fraser*, 209 F.2d 1, 6-8 (5th Cir. 1954) (trial court erred in precluding defendant from "show[ing] the truth of the statements it had made" and thus "deprive[d] the defendant of the right to defend itself"); *Robinson v. Texas Auto. Dealers Ass'n*, 387 F.3d 416, 420 n.9, 426 (5th Cir. 2004) ("each Defendant has the absolute right to individually defend itself by presenting direct evidence of noninvolvement in any alleged conspiracy") (internal quotation marks omitted).

Given the complexity of the science involved, Merck necessarily must present expert testimony to rebut plaintiff's allegation and to establish that Merck proposed a scientifically sound explanation of the VIGOR results. *See, e.g., Beaty v. Kawasaki Motors Corp., U.S.A.*, No. 3:04CV92-D-A, 2005 WL 1529995, at * 2 (N.D. Miss. June 28, 2005) ("complex product liability claims . . . must be supported by expert testimony"); *In re Norplant Contraceptive Prods. Liab. Litig.*, 215 F. Supp. 2d 795, 830 (E.D. Tex. 2002) (evidence of general causation in pharmaceutical drug case "must be provided in the form of expert testimony"); *Newton v. Roche Labs., Inc.*, 243 F. Supp. 2d 672, 682 (W.D. Tex. 2002) ("an expert must demonstrate" specific causation in pharmaceutical drug case); *Houghton v. Bond*, 680 So. 2d 514, 523 (Fla. App. 1996); *Osceola County Comm'rs v. Hand*, 458 So. 2d 1134, 1135 (Fla. App. 1984).

Second, Merck's knowledge regarding the alleged cardiotoxic properties of Vioxx is an essential element of the claims that plaintiff chose to plead. *Advance Chem. Co. v. Harter*, 478 So. 2d 444, 447 (Fl. App. 1985) ("One who claims a negligent failure to warn of an inherent danger has the burden to prove that the manufacturer or seller knew, or by the exercise of reasonable care should have known, of the potential danger in the use of the product . . . ."); *Thor Bear, Inc., Crocker Mizner Park, Inc.*, 648 So. 2d 168, 172-73 (Fla. App. 1995) (defendant's knowledge at time of alleged misrepresentation is element of fraudulent misrepresentation claim); *Billian v. Mobil Corp.*, 710 So. 2d 984, 988-89 (Fla. App. 1998) (defendant's liability for fraudulent concealment depends on whether defendant failed to disclose known material facts).

Plaintiff's own experts agree that at the time Merck learned the VIGOR results, the possible cardioprotective nature of naproxen provided a plausible explanation for those results. (Farquhar Dep. at 90:19-91:7, 93:18-94:5; Ray 07/13/05 Dep. at 147:2-20.) In fact, Dr. Farquhar concedes that, even now, scientists cannot discount the cardioprotective effect of naproxen and that Merck was reasonable in pursuing it.    (Farquhar Dep. at 95:14-21, 96:10-22 (*cardioprotective effect of naproxen* "*should have been put on the table and it's still on the table*"; "*I certainly agree that it was reasonable to explore it.*" (emphasis added).)  Accordingly, even if there were no scientific support today for a cardioprotective effect of naproxen – and as explained below, there is abundant support – plaintiff cannot preclude evidence of what Merck actually believed at the time of any alleged failure to warn.  While plaintiff may challenge the *reasonableness* of Merck's actions based on what it knew, she may not preclude Merck from presenting expert testimony regarding the *basis* of its knowledge.

8

## V.   PLAINTIFF WRONGLY ASSUMES THAT MERCK HAS THE BURDEN OF PROOF ON CAUSATION.

Plaintiff's motion fails for a second, independent reason:  she wrongly assumes that Merck bears the legal burden of proof on causation.  Thus, plaintiff criticizes Merck for supposedly failing to present "reliable epidemiologic evidence to support the naproxen hypothesis." (Mot. at 5.)

The burden of establishing causation, however, rests with *plaintiff*, not Merck.  *See, e.g.*, *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984).  Plaintiff bears the burden of identifying scientifically reliable epidemiologic evidence that Mr. Irvin's short-term use of Vioxx – *i.e.*, 25 mg for less than a month – is capable of causing thrombotic cardiovascular events.[7]  *See, e.g.*, *Allen v. Penn. Eng'g Corp.* 102 F.3d 194, 197 (5th Cir. 1996) (epidemiologic studies are "[u]ndoubtedly . . . the most useful and conclusive type of evidence" of causation); *Chambers v. Exxon Corp.*, 81 F. Supp. 2d 661, 664 (M.D. La. 2000) ("Epidemiological studies are necessary to determine the cause and effect relationship between an agent, in this case exposure to benzene, and a disease, CML."); *Thomas v. Hoffman-La Roche, Inc.*, 731 F. Supp. 224, 227-28 (N.D. Miss. 1989) ("conclusive epidemiological proof [is] essential to the plaintiff's case in a toxic tort pharmaceutical drug setting").  As explained in

---

[7] There are two types of epidemiologic studies – randomized clinical trials and observational studies.  (Merck's Motion to Exclude Evidence of Plaintiff's Experts Regarding Causation ("Causation Testimony Brief"), filed October 21, 2005, at 16-17.)  Experts for both plaintiff and Merck agree that randomized clinical trials are at the top of the hierarchy of data that scientists typically consider when assessing whether a particular dose of a drug is capable of causing a specific injury. (Gaziano Decl. at ¶¶ 28, 34-35; Expert Report of Wayne A. Ray, Ph.D. ("Ray Report") at 25 (randomized clinical studies provide "the most reliable estimate of the magnitude of a drug's effect"), attached as Ex. 19 to Wittmann Decl.; Expert Report of John W. Farquhar ("Farquhar Report") at ¶ 59 (same), attached as Ex. 16 to Wittmann Decl.)  Observational epidemiological studies occupy the next level down on the hierarchy of scientific evidence. (Gaziano Decl. at ¶ 28; Farquhar Report at ¶ 60 (observational studies are "weaker" than randomized clinical trials in "assigning causality").)

Merck's Causation Testimony Brief and accompanying Appendix of Studies, plaintiff has not met her burden of proof. (Causation Testimony Brief at 26-34, App. at 1-23.) Moreover, by urging the Court to shift her burden of proof to Merck, plaintiff is inviting reversible error. *Curtis Pub. Co.*, 209 F.2d at 8-9 (trial court committed reversible error by shifting to defendant plaintiff's burden of proving malice under Florida law).

Even if plaintiff had some evidence that Mr. Irvin's short-term use of Vioxx might be capable of causing thrombotic cardiovascular events – and she has none – Merck would be entitled as a matter of law to introduce evidence challenging the causal inference that plaintiff seeks to draw. Merck, for example, would be entitled to demonstrate the shortcomings of the studies on which plaintiff relies. Thus, if plaintiff relies on the VIGOR study, Merck would be entitled to demonstrate why the excess cardiovascular risk seen in that study was attributable to the cardioprotective effect of naproxen and/or chance rather than to Vioxx. In addition, Merck would be entitled to present expert testimony on the epidemiologic and other scientific evidence supporting the cardioprotective effect of naproxen. After all, assessing causation requires consideration of *all* the available scientific data. *See, e.g.*, Saks *et al.*, Federal Judicial Center, ANNOTATED REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 472 (2d ed. 2004) ("Reference Manual on Scientific Evidence") ("[I]t should be emphasized that *an association is not equivalent to causation.* An association identified in an epidemiological study may or may not be causal. Assessing whether an association is causal requires an understanding of the strengths and weaknesses of the study's design and implementation, as well as a judgment about how the study findings fit with other scientific knowledge."). Merck is thus entitled to present expert testimony concerning the cardioprotective effect of naproxen so that the Court or jury can decide

whether the VIGOR study, when considered in light of the *totality* of scientific evidence, supports plaintiff's claim.

## VI. THERE IS ABUNDANT RELIABLE SCIENTIFIC EVIDENCE THAT NAPROXEN IS CARDIOPROTECTIVE.

Finally, plaintiff argues that the cardioprotective effect of naproxen is "fabricated" and has no scientific support. (Pl.'s Mot. at 8.) That argument is preposterous. It completely mischaracterizes the scientific record.

First, reliable scientific evidence from clinical pharmacological studies shows that if taken continuously in the manner prescribed for patients participating in the naproxen arm of the VIGOR trial, naproxen has a potent anti-platelet – *i.e.*, anti-clotting – effect similar to aspirin, which is known to prevent thrombotic cardiovascular events like heart attacks in susceptible patients.[8] For example, a peer-reviewed study published by Merck scientists and consultants in 2000 showed that naproxen taken at 500 mg twice daily – *i.e.*, the same dosage given in VIGOR – inhibited platelet activity across its entire dosing interval to nearly the same degree as aspirin.[9] A peer-reviewed study published in 2004 confirms this result.[10] As the Fifth Circuit and this Court have recognized, whether data has been published and peer-reviewed is an important factor that courts consider in determining the data's scientific reliability. *Black v. Food Lion,*

---

[8] As with aspirin, the cardioprotective effect of naproxen derives from inhibition of COX-1 activity in platelets and consequent suppression of thromboxane synthesis. (Gaziano Decl. at ¶ 41; Braunstein Decl. at ¶ 63.)

[9] Van Hecken A et al., *Comparative Inhibitory Activity of Rofecoxib, Meloxicam, Diclofenac, Ibuprofen and Naproxen on COX-2 and COX-1 in Healthy Volunteers*, J CLIN. PHARMACOL. 2000 (demonstrating a 94.9% inhibition of thromboxane with naproxen).

[10] Capone et al., *Clinical Pharmacology of Platelet, Monocyte, and Vascular Cyclooxygenase Inhibition by Naproxen and Low Dose Aspirin in Healthy Subjects*, CIRCULATION 2004; 109:1468-71 ("In conclusion, the present study demonstrates the pharmacodynamic plausibility of a COX-1-dependent cardioprotective effect of naproxen and contributes to the interpretation of the VIGOR cardiovascular findings.").

*Inc.*, 171 F.3d 308, 313 (5th Cir. 1999); *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d at 605.

Second, numerous other clinical and basic research studies suggest that naproxen has a cardioprotective effect similar to aspirin.[11]  In fact, plaintiff's own expert, Dr. Lucchesi, fully agrees with this proposition.  (Testimony of Dr. Benedict Lucchesi, *Humeston v. Merck*, No. 619 (N.J. Super. Ct. Law Div. filed Aug. 19, 2003) of September 20, 2005 ("Lucchesi *Humeston* Test.") at 980:1-8, 984:4-12 ("Q:  And so Merck wasn't just making this up . . . when they said that Naproxen inhibits thromboxane like aspirin, when they said this in March of 2000, they weren't just making that up because it was known before that, right?  A:  That is true."), attached as Ex. 25 to Wittmann Decl.)  And data from the VIGOR study itself indicate that the patients on naproxen experienced adverse symptoms associated with aspirin-like inhibition of blood clotting – such as bruising and nosebleeds – at double or triple the rates as patients on Vioxx.[12]  Indeed, naproxen's own label warns that the drug may reduce platelet aggregation and prolong bleeding

---

[11] *See, e.g.*, Tuleja E et al., *Effects of Cyclooxygenases Inhibitors on Vasoactive Prostanoids and Thrombin Generation at the Site of Microvascular Injury in Healthy Men*, ARTERIOSCLER. THROMB. VASC. BIOL. June 2003; 1-5, at 1 ("In healthy men, naproxen exerts an antithrombotic effect at least as potent as aspirin, whereas Rofecoxib [*i.e.*, Vioxx] does not affect hemostatic balance."); Leese P et al., *Valdecoxib Does Not Impair Platelet Function*, J. EMERGENCY MED. July 2002;20(4):275-81, at 279 (naproxen "produced significant decreases in platelet aggregation at recommended doses"); Leese P et al., *Effects of Celecoxib, a Novel Cyclooxygenase-2 Inhibitor, on Platelet Function in Healthy Adults:  A Randomized, Controlled Trial*, J. CLIN. PHARMACOL. 2000; 40:124-32, at 124 ("[N]aproxen produced statistically significant reductions in platelet aggregation and serum $TxB_2$ [*i.e.*, thromboxane] levels and increased bleeding time."); Smith E et al., *Stabilization of cardiac lysosomal and cellular membranes in protection of ischemic myocardium due to coronary occlusion:  Efficacy of the nonsteroidal anti-inflammatory agent, naproxen*, AM. HEART. J. 1981; 101(4):394-402, at 400 ("The results of this study demonstrate that naproxen significantly protects the myocardium from ischemic damage.").

[12] Bombardier C et al., *Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis*, N. ENGL. J. MED. 2000;343(21):1520-28; *see also* Braunstein Decl. at ¶ 59.

times.[13]

Third, multiple observational epidemiologic studies have detected a statistically significant lower rate of cardiovascular events for patients taking naproxen.[14]  These studies – none of which plaintiff even mentions in her Motion – corroborate the findings of the studies mentioned above, which found naproxen to be cardioprotective, and are to that extent worth considering.[15]  (Mot. at 8)  To be sure, some observational studies have failed to find a statistically significant cardioprotective effect associated with naproxen use, as plaintiff notes. (*Id.* at 4-5; Ray Report at 16 & Table 3.)  But such inconsistent findings are predictable.  Unlike

---

[13]  *Available at* www.fda.gov/cder/foi/label/2004/17581s99,100,18164s50,51,18965s9,10, 20067s4,6lbl.pdf.

[14]  Kimmel S et al., *The Effects of Nonselective Non-Aspirin Non-Steroidal Anti-Inflammatory Medications on the Risk of Nonfatal Myocardial Infarction and Their Interaction with Aspirin*, J. AM. COLLEGE CARDIOLOGY 2004; 43:985-990, at 987 (finding that naproxen was associated with statistically significant lower odds of heart attack among non-users of aspirin); Solomon et al., *Non-Steroidal Anti-Inflammatory Drug Use and Acute Myocardial Infarction*, ARCH. INT. MED 2002; 162:1099-1104, at 1099 & Table 3 ("[U]se of naproxen was associated with a significant reduction in the risk of AMI [*i.e.*, heart attacks]."); Watson et al., *Lower Risk of Thromboembolic Cardiovascular Events with Naproxen Among Patients with Rheumatoid Arthritis*, ARCH. INT. MED. 2002; 162:1105-10, 1107-08 & Table 3 (finding that patients with rheumatoid arthritis currently using naproxen "have a lower risk" for thrombotic cardiovascular events relative to those with no naproxen use in past year); Rahme et al., *Association Between Naproxen Use and Protection Against Acute Myocardial Infarction*, ARCH. INT. MED. 2002; 162:1111-15, at 1112-13 (confirming that naproxen has "a particularly effective antithrombotic potential").  In fact, in a recent meta-analysis of 11 observational studies, Juni found a statistically significant cardioprotective effect associated with naproxen.  Juni P *et al.*, *Risk of cardiovascular events and rofecoxib: cumulative meta-analysis*, THE LANCET Nov. 5, 2004 (online); 1, at 4.

[15]  Placebo-controlled randomized clinical trials provide the best epidemiologic evidence of causation.  (Gaziano Decl. at ¶¶ 28, 34-35.)  But observational studies, which are hypothesis-generating, also can be useful in assessing causal relationships where, as here, they corroborate the findings of other, reliable scientific data.  (Expert Report of Barry K. Rayburn, M.D. at 6-7, attached as Ex. 20 to Wittmann Decl.)  Moreover, if plaintiff's position is that randomized clinical trials constitute the *only* "valid" form of epidemiologic evidence (*see* Mot. at 8 & n.6), then the Court ought to dismiss plaintiff's lawsuit now.  As explained in Merck's Causation Testimony Brief and the Appendix of Studies, *no* randomized clinical trial ever has shown that the use of 25 mg Vioxx for less than a month – *i.e.*, the only dose and duration of Vioxx use at issue here – is associated with an increased risk of thrombotic cardiovascular events.  (Causation Testimony Brief at 26-30, App. at 1-10.).

aspirin, naproxen does not persistently inhibit platelet activity at low and discontinuous doses; instead, the effect of platelet inhibition depends on the dosage and continuity of exposure to naproxen. (Gaziano Decl. at ¶ 41; Braunstein Decl. at ¶ 63.) By their very nature, observational studies in which people take varying doses of a drug as needed cannot ensure compliance with the persistent dosage regimen of naproxen (*i.e.*, 500 mg twice-daily) that is needed to inhibit platelet activity. (Gaziano Decl. at ¶ 32.) Thus, the conflicting results of observational studies "may reflect markedly different rates of compliance and regular use" of naproxen.[16]

Fourth, the results of the TARGET study – a recent clinical trial of naproxen against lumiracoxib, a selective COX-2 inhibitor like Vioxx – lend further support to the observation that naproxen has a cardioprotective effect.[17]  TARGET consisted of two sub-trials:  one comparing lumiracoxib to ibuprofen and second comparing lumiracoxib to naproxen.  In the sub-trial comparing lumiracoxib to naproxen, there were 18 myocardial infarctions in the lumiracoxib arm compared to 10 in the naproxen arm.  For the composite cardiovascular endpoint, there were 40 cardiovascular events in the lumiracoxib arm compared to 27 in the naproxen arm.  While these results did not reach statistical significance, the pattern is similar to the comparison of Vioxx and naproxen in the VIGOR study, and it suggests consistency with the

---

[16] Capone et al., *Clinical Pharmacology of Platelet, Monocyte, and Vascular Cyclooxygenase Inhibition by Naproxen and Low Dose Aspirin in Healthy Subjects*, CIRCULATION 2004; 109:1468-71, 1470.

[17] Farkouh et al., *Comparison of Lumiracoxib with Naproxen and Ibuprofen in the Therapeutic Arthritis Research and Gastrointestinal Event Trial (TARGET), Cardiovascular Outcomes: a Randomised Controlled Trial*, THE LANCET 2004; 364:675-84.  Of course,  Merck agrees that studies concerning drugs other than Vioxx cannot, standing alone, provide reliable evidence of the effects of Vioxx.  This principle invalidates, for example, the testimony of plaintiff's expert Dr. Lucchesi, who predicates nearly all his assertions about Vioxx on animal studies and case reports concerning Celebrex. (*See* Merck's Motion to Exclude Testimony of Benedict Lucchesi, filed October 28, 2005, at 11-14, 17-19.) But the principle does not preclude consideration of the TARGET trial in connection with the cardioprotective effect of naproxen, because naproxen was, in fact, one of the drugs tested in that trial.

14

cardioprotective effect of naproxen.  (Gaziano Decl. at ¶ 66.)

In the face of the wealth of reliable scientific evidence establishing that naproxen has a cardioprotective effect, plaintiff resorts to arguing that naproxen cannot "account entirely" for the VIGOR results.  (Mot. at 5.)  But plaintiff's argument proceeds from a false premise for two reasons.

First, as explained above, the number of adverse cardiovascular events in the VIGOR study was very small, and the statistical confidence interval was very wide.  (Gaziano Decl. at ¶¶ 61, 63; Braunstein Decl. at ¶¶ 56, 60.)  The width of a study's confidence interval "reflects random error" – *i.e.*, chance.[18]  Reference Manual for Scientific Evidence at 536, 540.  Where, as here, a study's confidence interval is wide and the number of events observed is small, the study's results are imprecise and likely due to chance.  *Id.* at 244 & n. 120 ("broad" confidence interval "signals that random error is substantial"); *Soldo v. Sanchez Pharms. Corp.*, 244 F. Supp. 2d 434, 456 (W.D. Pa. 2003) ("the confidence intervals are extremely wide which suggest . . . huge amounts of uncertainty in the data") (internal quotations omitted); *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 606 (D.N.J. 2002) ("[T]he confidence interval of that study was so wide that even Plaintiff's statistical expert acknowledged that the results were unstable and imprecise."); (*see also* July 19, 2005 Deposition of J. Michael Gaziano ("Gaziano 7/19/05 Dep.") at 87:6-88:7, attached as Ex. 4 to Wittmann Decl.; Testimony of J. Michael Gaziano, M.D., M.P.H., *Humeston v. Merck*, No. 619 (N.J. Super. Ct. Law Div. filed Aug. 19, 2003) of Oct. 24, 2005 at 5309:3-17, attached as Ex. 25 to Wittmann Decl).

---

[18] The Reference Manual on Scientific Evidence defines the term "confidence interval" as follows:  "A range of values calculated from the results of a study within which the true value [*i.e.*, the true relative risk] is likely to fall . . . .  The width of the confidence interval provides an indication of the precision of the point estimate or relative risk found in the study . . . ." (*Id.* at 536.)

Consistent with these scientific principles, the effects of chance, in addition to the cardioprotective effect of naproxen, likely explain the VIGOR results. (Gaziano Decl. at ¶ 63.) As stated in an article published just last year by Drs. Carlo Patrono and Garret FitzGerald, two leading researchers in the study of platelets:

> While the cause of the apparent excess risk of MI in [VIGOR] cannot be conclusively established, *a combination of some cardioprotective effect of naproxen and the play of chance does seem to offer a plausible explanation for these unexpected findings*.

Patrono, FitzGerald et al., *Platelet Active Drugs: The Relationships Among Dose, Effectiveness, and Side Effects,*" CHEST 2004; 126:234S-264S (emphasis added).[19]   Indeed, even plaintiff's own expert cannot discount the role of chance in explaining the VIGOR results. (Farquhar Dep. at 93:18-94:5.)

Second, plaintiff suggests that to account for the VIGOR results, naproxen must have a more pronounced cardioprotective effect than aspirin. (Pl.'s Summary Science Brief at 20-21.) Because observational studies have failed to detect such an effect for naproxen, plaintiff claims, the evidence of naproxen's cardioprotective effect must be scientifically unreliable. (*Id.*) But plaintiff ignores the patient population in the VIGOR study.   VIGOR involved an elderly population with rheumatoid arthritis, a condition that put the study's patients at a significantly

---

[19] Dr. Lucchesi concedes that Dr. Patrono is one of the world's leading experts on the study of platelets. (Lucchesi *Humeston* Test. at 948:16-949:2, 949:6-16.)   In addition, as the Court will recall, plaintiff's experts rely heavily on the research of Dr. FitzGerald for their opinions that Vioxx supposedly is pro-thrombotic. (Causation Testimony Brief at 40-44.)   That being so, they cannot dismiss other research by Dr. FitzGerald relating to the same subject that does not support plaintiff's theory of causation. *Cf. Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987) (expert cannot, in the face of multiple "potential" causes, "simply pick[] the cause that is most advantageous to [plaintiff's] claim[s]").

increased risk of death from cardiovascular problems.[20]  (Gaziano Decl. at ¶ 75.)  Plaintiff has failed to address the possibility that naproxen may have had a more pronounced cardioprotective effect in the high-risk VIGOR patients.  (Braunstein Decl. at ¶ 61.)

Finally, the cardioprotective effect of naproxen as seen in the VIGOR study is strongly supported by the abundant and uncontradicted data from randomized clinical trials of Vioxx against placebo.  These data reveal *no* statistically significant increased risk of thrombotic cardiovascular events from use of Vioxx for periods of less than 18 months.  (Causation Testimony Brief at 26-30, App. at 1-10.)  Since patients in the VIGOR study took Vioxx for an average of only nine months, the logical inference, once again, is that a cardioprotective benefit of naproxen – or a combination of naproxen and chance – was responsible for the disparity of myocardial infarctions observed in the VIGOR study.

In short, abundant reliable scientific evidence supports the cardioprotective effect of naproxen.  Plaintiff has no basis to exclude the expert opinions of Drs. Silver, Rayburn or Gaziano (or any of Merck's other experts) that the cardioprotective effect of naproxen represents a plausible and indeed likely explanation of the VIGOR results.

## IV.   CONCLUSION.

For the forgoing reasons, Merck respectfully requests that the Court deny plaintiff's Motion to Exclude Opinion Testimony That Naproxen® Is Sufficiently Cardioprotective to Explain Excess Cardiac Risk in Vigor.

---

[20] Wolfe et al., *The Mortality of Rheumatoid Arthritis, Arthritis & Rheumatism* (08/19/93); Myllkangas-Luosujarvi et al., *Mortality in Rheumatoid Arthritis, Arthritis & Rheumatism* (12/95).

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
4041 Essen Lane
One United Plaza, Suite 501
Baton Rouge, Louisiana 70809
Phone:  225-490-8900
Fax:      225-490-8960

Defendants' Liaison Counsel

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:      312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone: (202) 434-5000
Fax:      (202) 434-5029

And

John H. Beisner
Charles C. Lifland
Richard B. Goetz
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone: (213) 430-6000
Fax:      (213) 430-6407

Attorneys for Merck & Co., Inc.

## **CERTIFICATE OF SERVICE**

I hereby certify that the above and forgoing Opposition of Merck & Co., Inc. to Plaintiff's Motion to Exclude Opinion Testimony that Naproxen® is Sufficiently Cardioprotective to Explain Excess Cardiac Risk in VIGOR has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 2nd day of November, 2005.

*Dorothy H. Wimberly*