UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| Evelyn Irvin Plunkett v. Merck & Co, Inc.* | | CASE NO. 02:05CV4046 |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO EXCLUDE
PROPOSED TESTIMONY OF THOMAS BALDWIN, M.D.**

Plaintiff Evelyn Irvin Plunkett, as Personal Representative of the Estate of Richard Irvin, Jr., deceased, by and through her undersigned counsel, hereby states as follows:

The Defendant has requested that this Court conduct a hearing, pursuant to Daubert v. Merrill Dow Pharmaceuticals, 509 U.S. 579 (1993) and Kumho Tire v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167 (1999), to establish the reliability of expert testimony the PSC intends to offer at trial in the area of cardiology and causation. The Defendant concedes that the PSC's expert cardiologist, Thomas Baldwin, M.D., is imminently qualified in his field of practice. However, the Defendant seeks to challenge the proffered testimony of Dr. Baldwin on a limited basis.

Pursuant to Rule 702 of the *Federal Rules of Evidence*, testimony of an expert witness should be permitted where the testimony would aid or assist the trier of fact and where the area of testimony requires scientific, technical, or other specialized knowledge. Unlike an ordinary lay witness, an expert witness is permitted wide latitude to offer opinions, including those that are not

based on firsthand knowledge or observation. See Rules 702 and 703, Fed. R.Evid.; Daubert, 509 U.S. at 592. The United States Supreme Courts, in Daubert and its progeny, established that the federal courts, principally through the United States District Court, shall act as "gatekeepers." This gatekeeper role requires the Court to permit the admission of evidence and testimony that will aid the jury, while excluding the admission of testimony that does not meet sufficient reliability standards. The District Court has wide discretion to determine what proffered expert testimony satisfies the tests of reliability and should be admitted into evidence. Daubert at 592. In reviewing proffered expert testimony, the Court is to consider the reliability of the testimony in light of the facts and circumstances of each particular case. Kumho Tire, 119 S.Ct. at 1179.

Contrary to the assertion of the Defendant, the Court in Daubert did not hold that the proffered expert testimony be based in whole on scientific principles that are so well-established as to be considered scientific law. Daubert at 592, note 11. The Court held that the requirements of Rule 702 should not be read to exclude the use of unconventional evidence but, rather, should be read to require that the tendered evidence be reliable in nature, while allowing for expert testimony that provides for methods or assumptions that are "generally accepted" in the relevant scientific community. Daubert at 597.

Furthermore, as recognized by the United States Court of Appeals for the Fifth Circuit in Pipitone v. Biomatrix, Inc., 288 F.3d 239 (5th Cir. 2002), the Daubert analysis is a flexible one. The Fifth Circuit wrote:

> Many factors bear on the inquiry into the reliability of scientific and other expert testimony. In Daubert, the Supreme Court offered an illustrative, but not an exhaustive, list of factors that district courts may use in evaluating the reliability of expert testimony. These factors include whether the expert's theory or technique: (1) can be or has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error or standards controlling its operation; and (4) is generally accepted in the relevant scientific community. In the later case of    Kumho Tire Co. v. Carmichael, the Supreme Court emphasized that the Daubert analysis is a "flexible" one, and that "the factors

>    identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." The district court's responsibility is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.
>
>    Id. at _____ (internal citations omitted)

The Defendant in the present case concedes that Dr. Baldwin, as a clinical and practicing cardiologist, is imminently qualified to testify regarding Richard ("Dicky") Irvin's specific cause of death. (Exhibit 1: CV of Thomas Baldwin, M.D.) The Defendant contends, however, that Dr. Baldwin's expert testimony should be precluded because: 1) Dr. Baldwin is not aware of "clinical trial data" proving that thirty days usage of Vioxx can cause death; and 2) Dr. Baldwin's reliance upon the prostacyclin-dimunition theory as one possible mechanism of action for Vioxx is not adequately supported.[1]

The Defendant's assertions are inconsistent with the facts and evidence in this case. To begin with (as set forth in more detail in the Plaintiff's Science Brief submitted to this Court) there are countless articles describing the relationship between COX-2 and prostacyclin, specifically the ability of Vioxx to suppress prostacyclin and, thus, to upset the homeostasis between thrombaxane and prostacyclin in the vasculature. The available data to support the prostacyclin-suppression theory, which in part forms the basis of Dr. Baldwin's proffered expert opinions, establishes that Vioxx causes or contributes to the clotting of the blood in the cardiac arteries which, in turn, leads to heart attacks and deaths. The Defendant would have this Court believe that a cardiologist must possess expertise in the fields of cardiology, pharmacology, epidemiology, and statistics, and be

---

[1] Merck & Co., Inc.'s Motion to Exclude Testimony of Thomas Baldwin, M.D. pages 4 & 7.

qualified to assess the pharmacokinetics of a drug and the 'raw data' behind each and every peer-reviewed published epidemiological study as a prerequisite to admission of his testimony on causation. There is no precedence for such an untenable position, either as expressed by <u>Daubert</u> and its progeny, or as set forth in the Federal Rules of Evidence.

It is not the intention of the Plaintiff to rehash the issues set forth in the Science Brief. It is important, however, for this Court to realize that <u>Merck's own studies</u> establish the basis of Dr. Baldwin's opinions (i.e., that Vioxx increases the risk of thrombotic myocardial infarction following short-term use of the drug). For example, the Adenomatous Polyp Prevention on Vioxx study ("APPROVe"), as reported in the New England Journal of Medicine by Bresalier, et al., established that, "[a]s compared with the placebo group, the rofecoxib [Vioxx] group had an increased risk of *confirmed thrombotic events* (relative risk, 1.92; 95 percent confidence interval, 1.19 to 3.11)."[2] (Emphasis added) Similarly, in an article by Bombardier, et al., reported in the New England Journal of Medicine, discussing the results of the VIGOR study,[3] it was revealed that significantly *more* patients in the rofecoxib (Vioxx) group suffered heart attacks than those in the naproxen group. As established in more detail in Plaintiff's Opposition to Merck's attack on Plaintiff's experts' causation testimony, these studies and others show that there is a statistically significant increase of a risk of myocardial infarction from the use of Vioxx both from long-term and short-term use of the drug.

In addition, the results of the internal Merck studies have been confirmed and replicated by

---

[2] Bresalier, R.S., et al., *Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial*, N. Eng. J. Med. 2005; 352: 1092-1102, at 1096.

[3] Bombardier, C., et al., *Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis*, N.Eng.J.Med 2000;343:1520-8.

outside, independent experts as it relates to the increased risks of adverse events associated with COX-2 inhibitors, including Vioxx.[4] These investigators have shown that COX-2 inhibitors increase the risks of cardiovascular events, which include myocardial infarction and sudden cardiac death.[5]

A recent LexisNexis search revealed that 125 articles in the general lay press have been published regarding Vioxx *in the last six months* alone. While such articles from the lay press do not necessarily establish a scientific basis upon which an expert may render an opinion, the sheer volume of articles does show the acceptance by the public, as well as the scientific community, that Vioxx increases the risks of cardiovascular events. These articles of a lay nature are amply supported by the medical literature, which shows that COX-2 drugs generally, and Vioxx in particular, create a dangerous prothrombotic situation in those who ingest the drugs. The Defendant seems to be critical of Dr. Baldwin, as it is with other Plaintiff's experts, for not reading every single article available in the medical literature. Dr. Baldwin conceded he has not done so, nor should he be expected to do so. The question is not whether he can cite text and verse for articles, publications and studies that support his position, but rather that the data exists and he is familiar with it. Dr. Baldwin adequately set forth scientific data to support his opinions with respect to what caused the formation of a thrombus or blood clot in the cardiac vessel of Dicky Irvin. His opinion is more than adequately supported by the authority he references, by the other scientific authority he does not reference, and by numerous other qualified experts in the areas of science involved in the Vioxx cases, including cardiology, pharmacology, epidemiology,

---

[4] Solomon, S.D., et al., *Cardiovascular Risks Associated with Celecoxib in a Clinical Trial for Colorectal Adenoma Prevention*, N.Eng.J.Med. 2005 352:1071 – 1080.

[5] Id at 1077.

statistics, and pharmacokinetics. In other words, undeniably, Dr. Baldwin is not on an island in the opinions he has expressed relative to the prothrombotic nature of Vioxx and the effects of the drug upon the vasculature of the human body. Apparently, since the Defendant cannot attack Dr. Baldwin's qualifications and position in the medical community, it has chosen to attack his failure to read all articles on COX-2 inhibitors.

Merck also attempts to intimate to this Court that Dr. Baldwin has never experienced the rampant adverse side effects of Vioxx in his own patients. This is patently false. In fact, Dr. Baldwin testified in his deposition that he has advised between 20 and 100 of his own patients to stop using Vioxx due to its "increased risk of MI." (Baldwin depo p. 29)  Dr. Baldwin also testified that he concluded, as far back as 2000, that Vioxx increased the risk of myocardial infarction.

> Q. Okay. In your clinical practice, have you ever diagnosed a [sic] adverse event in any patient as a result of Vioxx?
>
> A. No.... Adverse event I probably ought to qualify. I haven't seen any life threatening event associated with Celebrex. Adverse events, I have seen with both Vioxx and Celebrex in that, especially patients that have developed congestive heart failure and/or had exacerbation of hypertension and renal insufficiency due to those drugs.

(Exhibit 1: Deposition of Dr. Thomas Baldwin at 26.)

> Q. Okay. Have you ever advised a patient, prior to the voluntary withdrawal of Vioxx from the market, to discontinue the drug?
>
> A. Yes.
>
> Q. Was that due to hypertension?
>
> A. It was due to hypertension in some instances.

. . . . . .

Q. Other than for increases in hypertension, did you ever advise a patient to discontinue Vioxx?

A. Yes.

Q. For what reason?

A. For exacerbation of congestive heart failure, and because of what I perceived to be a, at least suggestion, of increased risk of myocardial infarction and cardiac events.

Q. And when did you -- on how many occasions did you advise patients to discontinue Vioxx due to a suggestive increased risk of MI?

A. It would be greater than 20 and less than 100.

Q. Upon reviewing Exhibit 3, the November, 2000, publication of the VIGOR trial, did you personally come to the conclusion that there was a suggestion of increased risk of MI with Vioxx use?

A. Yes.

. . . . . . .

Q. And after your review of the VIGOR trial results in the New England Journal, you advised patients to discontinue Vioxx because of your assessment of the potential risk of MI?

A. Yes.

Q. Did you do that for all the patients for whom you knew they were taking Vioxx, or just some of them?

A. I tried to do it for everyone, keeping in mind that I'm not the person that's prescribing that medication. And so they were to return to the primary care physician and have additional discussions about that. And my recommendations were typically for patients that were on Vioxx, and for that matter, any COX-2 inhibitor, to consider discontinuing that medication until further data was

available.

(Exhibit 1: Deposition of Dr. Thomas Baldwin at 28-32.)

It is clear from this testimony that Dr. Baldwin is not only familiar with the major clinical literature concerning Vioxx, but that he is aware of the hazards associated with Vioxx. Further, Dr. Baldwin incorporated this knowledge into his clinical decisions and practice.

As to the "short-term usage" attack by Merck, one must again look at the facts in the case. It is generally accepted within the scientific community that Vioxx is prothrombotic. The drug was removed from the market worldwide *because* it is prothrombotic. If a drug is known to be cardiotoxic, and is proven to be cardiotoxic by epidemiological analysis, the toxicity of the drug is not necessarily bound by the four corners of an individual epidemiological study. Science looks at the totality of the evidence. The APPROVe study conclusively demonstrated the increased risk of sudden cardiac death conferred by Vioxx. Merck asserts that the risk was confined to persons who ingested Vioxx for more than 18 months, but this claim is based upon Merck's analysis of a subgroup of APPROVe patients that used Vioxx for no more than 18 months.[6] The study itself identifies that this is a *post hoc subgroup analysis*.[7] Such an analysis, as indicated by Merck's own expert Dr. Gaziano, is inherently weak and unreliable.[8]

The Plaintiff has filed a motion seeking to have this Court disregard Merck's unreliable post-hoc analysis of APPROVe. Indeed, one of the authors for APPROVe wrote Merck an email

---

6 See the Rule 26(2)(B) report of plaintiff's expert, Wayne Ray, ¶ 24.

7 Bresalier, R.S., et al., *Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial*, N.Eng.J.Med. 2005; 352: 1092-1102.

8 The inherent weaknesses of post hoc subgroup analyses are addressed in both the Rule 26(2)(B) report of plaintiff's epidemiology expert, Dr. Wayne Ray. and within the plaintiff's submitted Science Brief.

stating that "we are already going out on a limb by emphasizing the 18 months issue [in APPROVe]." (Exhibit 2: 1/31/2005 email by Dr. Marvin Konstam). If the lead author of a previous Merck meta-analysis believes they are "going out on a limb by emphasizing the 18 month issue," how can the Defendant, with a seemingly straight-face, attack an expert for holding a reasonable belief that short-term exposure may plausibly be associated with cardiovascular events? (As to other weaknesses in the defense attack regarding short-term exposure, the Court is directed to the Plaintiff's Opposition to Merck's Motion to Exclude causation Testimony and the Rule 26(2)(B) report of Plaintiff's cardiology/epidemiology expert, John Farquhar, MD.)

The Defendant is also critical of Dr. Baldwin for allegedly not having any reliable scientific evidence supporting the mechanism by which he contends Vioxx could cause a thrombotic sudden cardiac death. The Defendant confuses mechanism of action with biological plausibility. These concepts are distinct both in science and under law. Biological plausibility is defined as the consideration of existing knowledge about human biology and disease pathology in order to provide a judgment about the plausibility that an agent causes a disease.[9] Biological plausibility lends credence to an inference of causation.[10] Mechanism of action, on the other hand, explains precisely how an agent causes a disease. The Plaintiff is not required to prove the precise mechanism by which Vioxx causes cardiovascular events; rather, the plaintiff is required only to prove that its theory is plausible. See <u>Kennedy v. Collagen Corp.</u>, 161 F.3d 1226, 1230, 1330 (9th Cir. 1998) (Causation can be proved even when it is not precisely known how the damage occurred.). The United States Supreme Court stressed that it would be unreasonable to conclude

---

9 Reference Manual on Scientific Evidence at 388 (2nd ed. 2000).

10 <u>Id</u>.

that the subject of scientific testimony must be known to a certainty, because, arguably, there are no certainties in science.[11] Thus, this Court need only consider whether it is biologically plausible that Vioxx is capable of causing cardiovascular events, not whether the precise mechanism of action has been demonstrated.

The Plaintiff does not bear the burden to prove what *is* the mechanism of action; rather, the Plaintiff must only show that his theories are biologically plausible. As to the "biological plausibility" of Vioxx causing cardiovascular events in individuals such as Mr. Irvin, this point was recently discussed at a recent scientific gathering - *Editor's Round Table: Cyclooxygenase-2 Inhibitors and Cardiovascular Risk.*[12] The participants included a Professor and Chairman of the Department of Gastrointestinal, Medicine and Nutrition, from the University of Texas, MD Anderson Cancer Center, Houston, Texas; a Professor of the Department of Family and Community Medicine at the Baylor College of Medicine in Houston, Texas; the Medical Director of the Baylor Heart and Vascular Institute, Baylor University Medical Center, Dallas, Texas; the Editor-in-Chief of the American Journal of Cardiology; the Dean of the A. Webb Roberts Center for Continuing Medical Education of Baylor Health Care System, Dallas, Texas; the Chairman of the Department of Medicine, Scripps Clinic, Medical Group; and the Vice President of Medicine Services and Academic Affairs of the Scripps Clinic Foundation in La Jolla, California. The participants discussed, *inter alia*, the "most important question in all of these trials is the mechanism for the increased risk for cardiovascular events in these various patient populations.

---

11 Daubert 509 U.S. at 590.

12 http://www.sciencedirect.com/science?_ob=ArticleURL&_udi=B6T10-4HCN79F-8&_coverDate=10%2F21%2F2005&_alid=327128823&_rdoc=1&_fmt=&_orig=search&_qd=1&_cdi=4876&_sort=d&view=c&_acct=C000006078&_version=1&_urlVersion=0&_userid=75682&md5=f2db80ada9476638519e9154f92a21e3#sec2.1.

The **most common explanation is a prothrombotic effect,** which Garret FitzGerald has written about extensively." (Emphasis added) The Chair of the Department of Medicine of the Scripps Clinic Medical Group, Dr. Gary Williams, MD, PhD, described this "popular hypothesis" as suggesting "that a prothrombotic state is possible, since the COX-2 inhibitors block, at least partially, vascular prostacyclin but have no effect on platelet thromboxane."[13] Furthermore, Dr. Williams stated that "[t]he prothrombotic hypothesis implies clot formation to most clinicians." In other words, the panel opined that Vioxx promotes clot formation. The Medical Director of the Baylor Heart and Vascular Institute, William C. Roberts, MD, acknowledged that the prothrombotic hypothesis "is at work in some of these patients."[14] As expressed by these learned scientists, this "biological plausibility" is widely and generally accepted by the scientific community and, thus, rightfully relied upon by Dr. Baldwin.

Dr. Baldwin will testify at trial, as he did in his deposition, that Dicky Irvin's taking of Vioxx for approximately 30 days "substantially contributed to" his death. (Exhibit 3: Deposition of Dr. Thomas Baldwin at 38) He best summarized his opinion in his deposition, when he testified that he believed that a prostacyclin-thrombaxane imbalance occurred in Dicky Irvin which led to a thrombus and his ultimate death. He stated that his opinion, in this respect, was based upon "the totality of the information that [he had] reviewed, [his] clinical experience as a cardiologist, and the fact that [he] believe[d] that ... Vioxx not only causes the events, but .... That the mechanism for that event is likely an impact on the prostacyclin versus thrombaxane axis." (Exhibit 3: Deposition of Dr. Thomas Baldwin at 127-28) He expanded upon this opinion by stating:

---

13 Id.

> Q. In giving the opinions, sir, that Mr. Irvin -- Mr. Irvin's sudden cardiac death was caused by Vioxx, are you also giving the opinion that Vioxx, in fact, can cause sudden cardiac death in less than 30 days of use?
>
> A. That is my opinion.
>
> Q. And can you describe for me, in full, your analysis in reaching the conclusion that Vioxx can cause sudden cardiac death in less than 30 days of use?
>
> A. That opinion is based on several -- several levels of evidence. And number one is COX-2 inhibitors have relatively rapid onset of effects within hours -- certainly within the first day of taking COX-2 inhibitors. Therapeutic effects also correlate with COX-2 inhibition; henceforth, there is a reduction of cyclooxygenase, and the effects of that cause prostacyclin levels to drop. Prostacyclin helps counteract thromboxane, and in that prostacyclin causes vaso dilatation and reduces platelet aggregability. And thromboxane does the opposite. It increases the likelihood of vasoconstriction, and it increases platelet activity and likelihood to aggregate. So just from a basic science standard, rapid onset of symptoms associated with COX-2 inhibition should correlate with rapid onset of effects that would be prothrombotic within the early time period.

(Exhibit 3: Deposition of Dr. Thomas Baldwin at 42-43.)

> Q. Do you have an opinion as to how that clot formed?
>
> A. Yes.
>     ........
>
> A. That it formed in the coronary artery, causing an occlusion leading to myocardial infarction, sudden cardiac death.
>
>     ....
>
> A. Likely it started with either a spontaneous spasm of the coronary artery, or small irregularity split, or fissure in the atherosclerotic plaque, with platelet aggregation being catalyzed by the effects of Vioxx.

14 Id.

(Exhibit 3: Deposition of Dr. Thomas Baldwin at 115-16.)

> Q. And you can't say, sir, that but for the presence of Vioxx in Mr. Irvin -- whatever that cascade that started on May 15th, that but for the presence of Vioxx, Mr. Irvin still wouldn't have had a sudden cardiac death, can you?
>
> A. Yes, I can.
>
> Q. How can you say but for the presence of Vioxx, that this completely independent cascade of events wouldn't have caused a sudden cardiac death?
>
> A. Because looking at all the details of this gentleman's clinical status, the fact that he did not have severe occlusive coronary artery disease, his likelihood of developing a myocardial infarction with his lack of risk factors, at his age, it was very low. So the fact that he had an event is (a), number one, rare, and (b), occurred a short time after starting Vioxx, which I believe substantially contributed to this gentleman's infarct.

(Exhibit 3: Deposition of Dr. Thomas Baldwin at 132.)

> Q. And previously, you've given the opinion that Mr. Irvin was in the group of people who had a clinically significant imbalance between prostacyclin and thromboxane due to Vioxx use, correct?
>
> A. I believe he did.
>
> Q. And is there anything that -- is there anything upon which you form that opinion other than that Mr. Irvin died from sudden cardiac death due to a thrombus?
>
> A. Again, looking at his entire -- the entire scenario, his medical history, his risk factors, the degree of coronary atherosclerosis, and the information that I've previously eluded to, combination of clinical trials, basic science, intuitive knowledge of -- or understanding of prostaglandin and prostacyclin, epidemiologic studies, and results of other clinical trials with COX-2 agents.

(Exhibit 3: Deposition of Dr. Thomas Baldwin at 153)

A. Well, it is a fair comment in that even if you, hypothetically, and say that platelet prostaglandin mechanism is not present, we know from clinical trials, from meta-analysis, from epidemiologic data that patients that take Vioxx have an increased frequency of events. And so even without the link of -- of what I believe to be pretty clear physiologic changes associated with the drug, there is an increased frequency of events, and it's not a small increase.

Q. But the increased frequency of events that you say exist does not show itself in less than 30 days of use.

A. I think that's incorrect, because I think there's epidemiologic data to suggest that it does, and I've already given you my thought process in that the assessment of risk of pre -- of before or after six months was unchanged, and I think that -- that one can draw from those studies, and from those epideem -- from those meta-analysis, and from those epidemiologic studies, and from other short-term use of COX-2 inhibitors, that it's very easy to come to the conclusion that short-term use of Vioxx would, as well, increase risk of events.

(Exhibit 3: Deposition of Dr. Thomas Baldwin at 156-57.)

Dr. Baldwin testified that his opinions were supported by the available science:

Q. Sir, are you aware of any evidence that Vioxx inhibits prostacyclin production in the vascular system?

A. Yes.

Q. And what evidence is that?

A. Well, it has to do with its effects on COX-2. And we know that COX-2 is -- manifests on -- on endothelial tissues and platelets, and COX-2 inhibition is -- does have negative effects on the balance between prothrombotic and antithrombotic forces.

Q. How do you know that, sir?

A. It's basic physiology.

Q. Are you aware of any study, piece of literature, trial, that has ever shown that Vioxx inhibits

        prostacyclin production in the vascular system?

A.     It inhibits COX-2, and by virtue of that, we know that it inhibits prostacyclin within the vasculature.

(Exhibit 3: Deposition of Dr. Thomas Baldwin at 45.)

Dr. Baldwin's opinions *are also supported* by his awareness of studies:

A.     I don't know if it's associated with clinical trial, but certainly there's baseline research that demonstrates in animal models an increased prothrombotic effect of Vioxx and other COX-2 inhibitors.

Q.     What animal model study are you thinking of?

A.     I don't recall if it's a mouse or a rabbit, but looking at time to inclusion following endothelial injury.

(Exhibit 3: Deposition of Dr. Thomas Baldwin at 46.) He further testified that he recalled reading "a clinical trial in an animal model where administration of COX-2 inhibitors adversely effect [the] time to thrombosis." (Exhibit 3: Deposition of Dr. Thomas Baldwin at 102.)

        His knowledge of the science in this area is bolstered by his clinical experience and his experiential knowledge of the workings of the cardiac vasculature:

Q.     If I understand your opinions, you're looking at the clinical trial data and opining as to the pharmacological mechanism that explains that clinical trial data; is that correct?

A.     I'm not just looking at the clinical trial data. I'm -- I have an opinion based on -- based on the clinical experience and all the factors and researches that we've discussed to this point.

Q.     How does your clinical experience relate to your opinion about the pharmacological mechanism of Vioxx?

A.     Well, if we're talking, and we are talking about platelets and the relative mismatch between thromboxane

>  and prostacyclin, and my clinical experience has been that as time has evolved and we've treated patients with drugs that more significantly impact thromboxane reduction, that we clearly saw a reduction in myocardial events, unstable angina, acute myocardial –
>
>  ……..
>
>  THE WITNESS: Cardiac events. Excuse me, adverse cardiac events, via myocardial infarction, unstable angina, or sudden cardiac death. So I'm very cognitive as a clinician that anything that upsets that mismatch does impact a patient risk.

(Exhibit 3: Deposition of Dr. Thomas Baldwin at 50-51.)

Dr. Baldwin further supported his opinions by stating:

> Q. I take it you're of the opinion that the clinical trial data shows an association between Vioxx and cardiac risk?
>
> A. It shows an association between Vioxx and -- Vioxx use and cardiac events.
>
>  ……
>
> A. I believe it's not only supported by clinical trials, I think there's -- there's registered data, there's epidemiologic studies that would suggest that the risks are increased, and I think that, again, the totality of that information would suggest that it is an imbalance between prostacyclin and thromboxane.
>
>  . . . . .
>
> Q. Is there any other clinical trial evidence that you have that supports your opinion that Vioxx is associated with an increased risk of MI or sudden cardiac death in less than 30 days of use?
>
> A. Well, again, there is some basic science information that suggests that negative effects that increase risk of vascular clotting with fairly short-term use. In addition to that, there's the Juni article as described, and then there's also information looking at clinical trials of other COX-2 inhibitors that were used for short-term use,

> specifically a COX-2 inhibitor that was used in post-MI
> patients that showed a very rapid increase in myocardial
> infarction, stroke, falling -- excuse me, post-bypass
> patients -- pardon me, post-bypass surgery. So there is
> supporting information from basic science, from
> meta-analysis, and from other clinical trials where there's
> COX-2 inhibition demonstrating that it need not be present
> for long-term.[15]

(Exhibit 3: Deposition of Dr. Thomas Baldwin at 58-59, 88.) Dr. Baldwin also specifically referenced the valdecoxib study, a study involving another COX-2 inhibitor, which showed a significant increase of cardiovascular events following surgical procedures in humans within 30 days to support his position that COX-2 inhibitors have short-term effect.[16] (Exhibit 3: Deposition of Dr. Thomas Baldwin at 91.)

Dr. Baldwin also noted that one of the primary reasons that a 30-day nexus was not clear was because most of the studies were not "powered" or designed to identify the issue of whether there was an increased risk of cardiovascular events in the first 30 days of usage. Instead, the studies, especially those designed by, Merck, were focused more on long-term use or on other issues, such as what effect the drug had on various disease processes, such as colon polyps, Alzheimer's, arthritis, etc. (Exhibit 3: Deposition of Dr. Thomas Baldwin at 63, 105-07)

It is, therefore, clear from Dr. Baldwin's testimony that he bases his opinions in this case upon his experience, his clinical practice, clinical research, and epidemiological research on Vioxx. As such his well substantiated opinions are reliable and should be allowed in this case.

---

15 Dr. Baldwin noted that the Juni article did not specifically address the effects of usage less than 30 days, but he believed the meta-analysis showed no difference between usage less than six months and longer than six months. (Exhibit 3: Deposition of Dr. Thomas Baldwin at 104.)

16 Dr. Baldwin also noted that he reviewed the ADVANTAGE data. (Exhibit 3: Deposition of Dr. Thomas Baldwin at 95.)

**CONCLUSION**

In conclusion, Dr. Baldwin has a valid scientific, clinical, epidemiological and professional experience basis for each of his opinions. His opinions, as evidenced above, are clear, concise and well supported. Accordingly, Dr. Baldwin's testimony should be deemed sufficient to comply with the *Daubert* scrutiny.

Respectfully submitted,

By: *[signature]*
**Andy D. Birchfield, Jr., Esquire**
J. Paul Sizemore
P. Leigh O'Dell
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
(800) 898-2034 (telephone)
(334) 954-7555 (telecopier)

**Co-Lead Counsel**

**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
***Herman, Herman, Katz & Cotlar, LLP***
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
FAX: (504) 561-6024

**Temporary Office**
3411 Richmond Ave., Suite 460
Houston, TX 77046
PH: (713) 877-1843
FAX: (713) 871-9750

**PLAINTIFFS' LIAISONCOUNSEL**

Christopher A. Seeger, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)

**Co-Lead Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
MEUNIER&WARSHAUER, L.L.C.
P.O. Box 960
191 East Second Street
New Roads, LA 70760
(225) 638-6137
(225) 638-8836 (fax)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Thomas R. Kline, Esquire
KLINE&SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Carlene Rhodes Lewis, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced in accordance with Pre-Trial Order No. #8, on this ~~1st~~ 2nd day of November, 2005.

_____
B. Leigh O'Dell