FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2005 NOV -4  PM 2: 01

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 05-4046* | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| EVELYN IRVIN PLUNKETT | * | |
| as Personal Representative of the Estate of | * | |
| RICHARD IRVIN, JR., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MOTION OF MERCK & CO., INC. TO EXCLUDE EVIDENCE OF, OR REFERENCE TO, MARKETING AND PROMOTIONAL MATERIALS UNRELATED TO MR. IRVIN OR HIS PRESCRIBING PHYSICIAN

### (MOTION IN LIMINE NO. 1)

Defendant Merck & Co., Inc. ("Merck"), through undersigned counsel, and pursuant to

Federal Rules of Evidence 401, 402, and 403, hereby moves to exclude evidence of, or reference

to, marketing and promotional materials unrelated to Mr. Irvin or his prescribing physician.  The

___ Fee_____
___ Process_____
_X_ Dktd._____
_✓_ CtRmDep._____    790318v.1
___ Doc. No._____

facts and law supporting this motion are more fully set forth in the accompanying memorandum, declarations, and exhibits, which are incorporated as if fully set forth herein.

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone: 504-581-3200
Fax:    504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone: 312-494-4400
Fax:    312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone: (202) 434-5000
Fax:    (202) 434-5029

John H. Beisner
Charles C. Lifland
Richard B. Goetz
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone: (213) 430-6000
Fax:    (213) 430-6407

Attorneys for Merck & Co., Inc.

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Motion to Exclude Evidence of, or Reference to, Marketing and Promotional Materials Unrelated to Mr. Irvin or His Prescribing Physician has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 4th day of November, 2005.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 05-4046* | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| EVELYN IRVIN PLUNKETT | * | |
| as Personal Representative of the Estate of | * | |
| RICHARD IRVIN, JR., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

* * * * * * * * * * * * * * * * * * *

## MEMORANDUM IN SUPPORT OF MOTION OF MERCK & CO., INC. ("MERCK") TO EXCLUDE EVIDENCE OF, OR REFERENCE TO, MARKETING AND PROMOTIONAL MATERIALS UNRELATED TO MR. IRVIN OR HIS PRESCRIBING PHYSICIAN

### (MOTION IN LIMINE NO. 1)

In an effort to distract the jury and prejudice Merck, plaintiff hopes to recast this products

liability case as a misrepresentation or "overpromotion" claim. Rather than focus on the

traditional elements of a products liability claim, such as whether Vioxx was a substantial cause

of Mr. Irvin's death, and whether Merck's product label adequately warned physicians of any

known risk that Vioxx could cause the particular condition that ended Mr. Irvin's life, plaintiff hopes to divert the jury's attention to something else altogether: Merck's marketing of Vioxx.

Thus, plaintiff has included in her complaint an allegation of "overpromotion" in her negligence cause of action, as well as causes of action for fraudulent misrepresentation and fraudulent concealment. She also loaded up her exhibit list with Merck's direct-to-consumer advertising, internal memoranda and other documents related to Merck's marketing efforts, marketing materials, and the like. None of this evidence is relevant, however, because the prescribing physician, Dr. Christopher Schirmer, testified at deposition that he does not "recall ever reading and relying on any Merck promotional activities." (September 6, 2005 Deposition of Christopher Schirmer, M.D. ("C. Schirmer 9/6/05 Dep.") at 93:4-6, attached as Ex. 33 to Declaration of Phillip A. Wittmann in Support of Merck's Motions in Limine ("Wittmann Decl.").) Moreover, there is nothing to suggest that Mr. Irvin himself was ever exposed to any Vioxx marketing. Because plaintiff cannot show that any of Merck's marketing activities impacted Dr. Schirmer's decision to prescribe the drug, whether directly or indirectly, the evidence must be excluded on relevance grounds. In other words, because plaintiff cannot prove any causal link between this evidence and Dr. Schirmer's prescription, it is irrelevant. And even if it were relevant for some purpose, the prejudicial effect and undue consumption of time required to deal with this evidence so outweighs its probative value that it must be excluded under Rule 403.

Therefore, Merck requests that the Court exclude *in limine* the following categories of documents identified by plaintiff as potential trial exhibits, and any deposition testimony, testimony or argument related to the subject matter of these documents:

- Merck's direct-to-consumer advertising;

2

- Internal Merck marketing budgets, sales projections, and marketing research, including the marketing efforts reflected therein;

- Internal Merck communications concerning marketing strategies;

- Merck's marketing training materials;

- Promotional materials for Vioxx;

- Merck-sponsored educational programs;

- Notes from meetings between Merck representatives and physicians who were not involved in Mr. Irvin's treatment; and

- Any other materials not viewed by Dr. Schirmer but offered to prove that Merck improperly overpromoted Vioxx.

These documents have one thing in common: Dr. Schirmer did not see or rely upon them when he wrote Mr. Irvin's Vioxx prescription. Some did not even exist, and some were not in use, when Dr. Schirmer wrote that prescription in April 2001. In addition, plaintiff does not have any evidence that Mr. Irvin himself ever saw or relied upon these materials. It therefore has no probative value and will be offered solely to inflame the jury.

Even a cursory glance at plaintiff's pre-trial filings thus far reveals the scope of the distraction that would be caused by admitting these materials. Of the greater than 1,500 documents plaintiff listed on her exhibit list, literally hundreds of them deal with sales and marketing issues. Many, many hours of videotaped depositions deal with sales and marketing, including nearly 16 hours plaintiff designated from the deposition of a single senior Merck sales and marketing employee. The irrelevant sales and marketing evidence threatens to swallow the trial. Accordingly, the Court should exclude it.

## I.   DR. SCHIRMER DID NOT RELY ON MERCK'S MARKETING MATERIALS WHEN HE PRESCRIBED VIOXX FOR MR. IRVIN.

Mr. Irvin began taking Vioxx in April 2001. (Deposition of Evelyn Irvin Plunkett ("Plunkett Dep.") at 72:14-17, attached as Ex. 26 to Wittmann Decl.) He suffered from back

790321v.1

pain (*id.* at 54:12-24; Deposition of Allesha Schirmer ("A. Schirmer Dep.") at 44:14-45:2, attached as Ex. 32 to Wittmann Decl.), and found that other medications were ineffective. (Plunkett Dep. at 59:2-8, 76:9-24; C. Schirmer 9/6/05 Dep. at 87:21-88:3; A. Schirmer Dep. at 46:14-47:1). On April 9, 2001, Mr. Irvin's daughter, Allesha Schirmer, telephoned her husband, Dr. Christopher Schirmer, who is an emergency room physician, and asked that he prescribe Mr. Irvin some medication for his pain. (C. Schirmer 9/6/05 Dep. at 47:19-48:20; A. Schirmer Dep. at 48:14-49:14.)

Dr. Schirmer had treated Mr. Irvin "informally" prior to this time (C. Schirmer 9/6/05 Dep. at 39:18-25), but had never taken a medical history of Mr. Irvin (*id.* at 40:5-7), had never reviewed any of his medical records (*id.* at 43:2-5), and had never ordered any laboratory testing for Mr. Irvin (*id.* at 40:8-15). In his words, he had only a "general Gestalt" of Mr. Irvin's medical condition at the time. (*Id.* at 39:12-17.) He nonetheless agreed to prescribe Vicoprofen and a muscle relaxant to Mr. Irvin (*id.* at 35:5-38:7). Mr. Irvin only took these drugs for a couple of days, because they upset his stomach and did not relieve his back pain. (Plunkett Dep. at 63:17-64:23; C. Schirmer 9/6/05 Dep. at 52:12-19, 56:15-20.)

Irvin first obtained a Vioxx sample not from a doctor, but from his friend, Richard Aycock. Aycock had been given samples by his doctor, and when Irvin mentioned to him that he had a backache, Aycock gave one sample (containing one or two pills) to Irvin. (Deposition of Richard Aycock ("Aycock Dep.") at 29:21-30:15, attached as Ex. 3 to Wittmann Decl.) Irvin did not request Vioxx by name from Aycock, and the two of them never discussed Vioxx commercials. (*Id.* at 30:22-31:19, 34:1-20.) In fact, there is no evidence that Irvin had ever heard of Vioxx before that time. (Plunkett Dep. at 79:5-8, 79:20-23.)

790321v.1

Vioxx made him feel better. (Aycock Dep. at 33:9-14; Plunkett Dep. at 76:18-21, 77:3-9, 86:4-12.) Sometime between April 9, 2001 and April 15, 2001, Irvin either telephoned his son-in-law to request a Vioxx prescription, or spoke to his daughter, who relayed his request to her husband. (C. Schirmer 9/6/05 Dep. at 51:17-52:24.) Mr. Irvin said that he had been given some samples of Vioxx by a friend that helped ease his back pain (*id.* at 51:17-52:24), and asked that Dr. Schirmer "call in" a prescription of Vioxx for him "until he could get to see his doctor" (*id.*; *see also* December 7, 2004 Deposition of Dr. Christopher Schirmer ("C. Schirmer 12/7/04 Dep.") at 12:5-15, attached as Ex. 34 to Wittmann Decl.)

Dr. Schirmer agreed to prescribe Vioxx, not because of a vast marketing campaign on the part of Merck, but because his wife or father-in-law asked him to do so. Dr. Schirmer phoned in a prescription of thirty 25 mg tablets of Vioxx for Mr. Irvin on April 15, 2001. (C. Schirmer 9/6/05 Dep. at 51:1-16, 52:20-24; C. Schirmer 12/7/04 Dep. at 14:21-25.) Dr. Schirmer had reviewed the Vioxx package insert at some earlier point (C. Schirmer 9/6/05 Dep. at 32:12-33:3), but does not recall having discussed the potential risks of Vioxx with Mr. Irvin or having provided him with any written materials on the risks and benefits of the medication (*id.* at 58:18-59:2).

Dr. Schirmer did not rely on any of the marketing evidence proffered by plaintiff in making his decision to prescribe Vioxx. Although there is some indication that he may have been visited by a Merck representative in 1999, Dr. Schirmer does not recall the meeting and is not at all sure it even occurred. (C. Schirmer Dep. at 16:16-17:1.) He does not recall receiving any Merck "literature, handouts or material of whatever nature." (*Id.* at 16:24-17:23.) Nor does he recall receiving samples from Merck. (*Id.*) In fact, the only "conference" relating in any way to any Cox-2 inhibitor drug that Dr. Schirmer recalls attending before writing Mr. Irvin's Vioxx

790321v.1

prescription was a dinner arranged not by Merck, but by Merck's competitor, Pfizer. The subject discussed at that dinner was not Vioxx, but Pfizer's drug Celebrex. And about the only thing Dr. Schirmer seems to recall about that dinner is the menu. (*Id*. at 20:19-22:7.)

One thing he does remember clearly is this: he has never seen any internal documents from a pharmaceutical company. (*Id*. at 92:3-9.) Internal Merck documents constitute the vast bulk of plaintiff's proposed marketing exhibits. Because Dr. Schirmer never saw them, he could not have relied on them in writing Mr. Irvin's prescription.

Nor is there any evidence that Mr. Irvin himself ever saw, much less relied on, any Merck advertising. As noted above, his friend, Mr. Aycock, testified that Mr. Irvin did not ask him for Vioxx. Mr. Irvin never indicated that he had heard of Vioxx before Ayock gave him the sample. (Aycock Dep. at 31:20-22, 44:19-45:5.) They did not discuss Vioxx commercials. (*Id*. at 34:18-20.) The plaintiff -- Mr. Irvin's widow -- testified that the first time she ever heard of Vioxx, and the first time Mr. Irvin ever mentioned the drug to her, was when he called to say he was picking up his prescription. (Plunkett Dep. at 75:3-75:14.) Neither she nor any other witness has any evidence that Mr. Irvin ever saw any Vioxx advertising. (*Id*. at 84:4-18.)

## II. THE COURT SHOULD EXCLUDE ALL PROMOTIONAL AND MARKETING MATERIALS NOT RELIED ON BY AND OTHERWISE UNRELATED TO MR. IRVINE AND DR. SCHIRMER UNDER RULES 401, 402, AND 403.

Evidence is irrelevant, and therefore inadmissible, unless it has a tendency to make the "existence of any *fact that is of consequence* to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401 (emphasis added); *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 275 (5th Cir. 1998); *Jackson v. Johns-Manville Sales Corp.*, 750 F.2d 1314, 1318 (5th Cir. 1985). Proposed evidence must give rise to more than a surmise or suspicion and must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *United States v. Tucker*, 345 F.3d 320, 327 (5th Cir. 2003)

6

(quoting *United States v. Downing,* 753 F.2d 1224, 1242 (3d Cir. 1985)); *Moore,* 126 F.3d at 687. "Evidence which is not relevant is inadmissible." FED. R. EVID. 402; *United States v. Hays,* 872 F.2d 582, 586 (5th Cir. 1989).

As discussed below, plaintiff's marketing evidence is not relevant to any "consequential fact" because it was not relied upon by Dr. Schirmer and did not influence his decision to prescribe Vioxx. Moreover, even if it were relevant, it would be unduly prejudicial and would consume too much time. The Court should exclude it.

A.      **The Marketing Evidence Is Not Relevant To The Overpromotion Claim Because Plaintiff Cannot Show It Influenced Dr. Schirmer's Decision To Prescribe Vioxx.**

As is true in most states, Florida holds that a prescription drug manufacturer's duty to warn runs to the physician, not the patient. *Upjohn Co. v. MacMurto,* 562 So. 2d 680, 683 (Fla. 1990); *Felix v. Hoffman-Laroche, Inc.,* 540 So. 2d 102, 104 (Fla. 1989). "This is so because the prescribing physician, acting as a 'learned intermediary' between the manufacturer and the consumer, weighs the potential benefits against the dangers in deciding whether to recommend the drug to meet the patient's needs." *Felix,* 540 So. 2d at 104. "Stated simply, under Florida law, prescription drug manufacturers are charged with warning physicians of the risks associated with their product, who in turn are charged with warning their patients of those risks that the physician, in his or her professional judgment, determines the patient needs to know." *Cornellius v. Cain,* No. CACE 01-020213(02), 2004 WL 48102, at *3 (Fla. Cir. Ct. Jan. 5, 2004). When the manufacturer's package insert adequately warns the physician about known risks associated with the medication, the manufacturer cannot be liable for failure to warn. *Id.* at *2.

To prevail in a failure to warn claim, "a plaintiff must prove that the manufacturer's failure to warn the physician was the proximate cause of the injuries to the plaintiff. In other

words, the plaintiff must show that the physician would not have used the device [or drug] in question if he or she had been warned by the manufacturer of its risks." *Edgar v. Danek Medical, Inc.,* No. 96-2451-CIV-T-24A, 1999 WL 1054864, at *6 (M.D. Fla. Mar. 31, 1999); *see also Christopher v. Cutter Laboratories,* 53 F.3d 1184, 1192 (11th Cir. 1995) (plaintiff must establish a causal link between his injury and the failure to warn of alleged adverse side effects).[1] Some states have recognized claims of "overpromotion" as a way for a plaintiff to overcome otherwise adequate warnings by a pharmaceutical company.[2]   In an "overpromotion" case, the plaintiff alleges that the manufacturer can be held liable even though it provided the physician with an adequate warning, on the theory that its promotional activities caused the prescribing physician to overlook or disregard that warning. *See, e.g. Moses v. Danek Medical, Inc.,* No. CV-S-95-512 PMP RLH, 1998 WL 1041279, at *5-6 (D. Nev. Dec. 11, 1998).

Allegations of "overpromotion," however, do not relieve the plaintiff of the need to prove causation, *i.e.,* that the promotional activities reached the physician and changed his or her prescribing decision.   For example, in *Moses,* plaintiff sued for injuries allegedly caused by implantation of a medical device.   The court granted summary judgment for the defendant, even though the plaintiff argued "that the learned intermediary doctrine does not apply in this case because Defendant overpromoted the use of its product and provided inadequate warnings." *Id.* at *5.  The court said, "[a]lthough plaintiff attempts to support this argument by asserting that

---

[1] Under the learned intermediary rule, a manufacturer's failure to provide a physician with an adequate warning is not the proximate cause of a patient's injury if the physician had independent knowledge of the risk the warning would have communicated. *Felix,* 540 So. 2d at 105.  This is because the causal link is broken when the physician had substantially the same knowledge as would have been communicated by an adequate warning. *Christopher,* 53 F.3d at 1192.  Even where a warning is inadequate, unless the plaintiff can prove that an adequate warning would have affected the outcome, the manufacturer is not liable. *See, e.g., Metus v. Pfizer,* 196 F. Supp. 2d 984, 995-98 (C.D. Cal. 2001), *aff'd,* 358 F.3d 659 (9th Cir. 2004).

Defendants sponsored numerous symposiums or conferences, this claim is devoid of any evidence that Dr. Delamarter [plaintiff's surgeon] attended any of Defendant's conferences or was in any way influenced by such activity." *Id*; *see also, Motus,* 196 F. Supp. 2d at 998-99 (In granting summary judgment for Pfizer, court notes plaintiff's overpromotion claim was untenable because, "most important[ly], Dr. Trostler did not rely on any statements from Pfizer."); *Huntman v. Danek Medical, Inc.,* No. 97-2155-IEG RBB, 1998 WL 663362, at *5-6 (S.D. Cal. July 24, 1998) (Plaintiff alleged that defendant "overpromoted" the use of a medical device for an unapproved use. But, "[i]n the absence of evidence that a doctor made the decision to use a product in an 'off-label' manner in reliance on a manufacturer's misrepresentations, claims for failure to warn, fraud and breach of warranty cannot stand."); *Love v. Wolf,* 226 Cal. App. 2d 378, 399-400 (1964) ("Of course, if such over prescription by the doctor was not caused by the over promotion of Parke-Davis then, however negligent such over promotion may have been, Parke-Davis could not be held liable. Its negligence would not have been an inducing, or proximate, cause of the resulting injuries.")

Thus, federal courts across the country consistently have held that marketing and promotional materials never seen nor relied upon by the prescribing physician are to be excluded as irrelevant. *See, e.g., In re Norplant Contraceptive Prods. Liab. Litig.,* No. MDL 1038, 1997 WL 81092, at *1 (E.D. Tex. Feb. 21, 1997) (granting defendants' motion in limine to exclude internal marketing and promotional materials and holding that "[a]bsent evidence that the physicians were exposed to [such materials]," they are not relevant); *see also Miller v. Pfizer, Inc.,* 196 F. Supp. 2d 1095, 1123 n.92 (D. Kan. 2002) (observing in failure-to-warn case that

---

[2] Florida is not one of them; whether Florida would recognize a claim of overpromotion is an open question.

9

court previously granted motion in limine to exclude marketing material not relied on by prescribing physician), *aff'd*, 356 F.3d 1326 (10th Cir. 2004), *cert. denied*, 125 S. Ct. 40 (2004).

While Florida has never recognized an "overpromotion" claim, it is abundantly clear that – if it were to do so – it would require proof that the promotional activity actually influenced the physician to prescribe the drug when he or she otherwise would not have done so. Florida requires proof of "legal cause" in products liability cases. Florida Standard Jury Instructions in Civil Cases, Causation 5.1-5.2 (April 2003). "Legal cause" means proximate cause. *Id.,* Causation, Comment 1 to Instruction 5.1.

Under the learned intermediary rule, promotional materials such as direct-to-consumer advertising seen by patients would be relevant only to the extent they somehow caused the physician to prescribe the drug. Here, because there is no evidence that Mr. Irvin saw any such material, it is not relevant.

**B.     For The Same Reason, The Marketing Evidence Also Is Not Relevant To Plaintiff's Fraud Claims.**

Because there is no evidence to show that either Dr. Schirmer or Mr. Irvin relied on Merck's marketing activities, the marketing evidence also is inadmissible to prove plaintiff's fraudulent misrepresentation and fraudulent concealment causes of action. The elements required to establish a claim of fraudulent misrepresentation are: (1) a knowingly false statement; (2) an intent that the statement will be acted on; and (3) detrimental reliance on the statement by the plaintiff. *State Farm Mut. Auto. Ins. Co. v. Novotny,* 657 So. 2d 1210, 1213 (Fla. Dist. Ct. App. 1995); *Nicholson v. Kellin,* 481 So. 2d 931, 935 (Fla. Dist. Ct. App. 1985); *Blake v. Munce,* 426 So. 2d 1175, 1177 (Fla. Dist. Ct. App. 1983); *Amazon v. Davidson,* 390 So. 2d 383, 385 (Fla. Dist. Ct. App. 1980).

Where, as here, detrimental reliance is missing, the claim cannot be sustained. *See*

*generally, Stev-Mar, Inc., v. Matvejs,* 678 So. 2d 834, 838 (Fla. Dist. Ct. App. 1996) (quoting Restatement (Second) of Torts § 546, which states that "[t]he maker of a fraudulent misrepresentation is subject to liability for pecuniary loss suffered by one who justifiably relies upon the truth of the matter misrepresented, *if his reliance is a substantial factor in determining the course of conduct that results in his loss.*") (emphasis in original); *State Farm Mut. Auto Ins. Co.,* 657 So.2d at 1213-14; *McConnell v. Eastern Air Lines, Inc.,* 499 So. 2d 68, 69 (Fla. Dist. Ct.App. 1986); *Tippett v. Frank,* 238 So. 2d 671, 673 (Fla. Dist. Ct. App. 1970); *Bibb v. Bickford,* 149 So. 2d 592, 594 (Fla. Dist. Ct. App. 1963).

Similarly, a claim of fraudulent concealment requires proof of detrimental reliance on a material misrepresentation. *Soler v. Secondary Holdings, Inc.,* 771 So. 2d 62, 69 (Fla. Dist. Ct. App. 2000); *Humana, Inc. v. Castillo,* 728 So. 2d 261, 264-65 (Fla. Dist. Ct. App. 1999); *Gutter v. Wunker,* 631 So. 2d 1117, 1118 (Fla. Dist. Ct. App. 1994); *see also,* 27 FLA. JUR. 2d FRAUD & DECEIT §32.

## C.     The Marketing Evidence Also Should Be Excluded Under Rule 403.

In addition to being inadmissible on relevance grounds, Merck's promotional and marketing materials should also be excluded under Rule 403. If these materials were admitted, Merck would be forced to defend itself against plaintiff's prejudicial attacks by introducing testimony to put the various marketing and promotional documents into context – explaining industry-wide practices and delineating the purposes and practices behind particular categories of documents. That would result in needless delay and unfair prejudice to Merck. *See* FED. R. EVID. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.")

790321v.1

Evidence is unfairly prejudicial if it has an "undue tendency to suggest decision on an improper basis, commonly, although not necessarily, an emotional one." FED. R. EVID. 403 (advisory committee note). Such evidence "'appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish,' or otherwise 'may cause a jury to base its decision on something other than the established propositions in the case.'" *Carter v. Hewitt*, 617 F.2d 961, 972 (3d Cir. 1980) (citation omitted). Because the only reason to introduce the marketing evidence is to divert the jury's focus from the core issues of this case, all such evidence should be excluded under Federal Rule of Evidence 403.

Courts have specifically recognized that such documents – even when they have some degree of relevance, which these documents do not – carry such an "overwhelming" danger of unfair prejudice that they must be excluded. *La Plante v. Am. Honda Motor Co., Inc.*, 27 F.3d 731, 740 (1st Cir. 1994); *see also Miller*, 196 F. Supp. 2d at 1123 n.92 (recognizing the prejudicial impact of marketing materials not relied on by prescribing physicians). In *La Plante*, plaintiff sought to turn the success of a commercial product against its manufacturer by introducing internal marketing materials and arguing that the manufacturer had been unduly driven by marketing and profit concerns. The court held that the materials were inadmissible because the "risk that the jury would be prejudiced by this reference to the enormous profitability [from sales of the product] was almost inescapable." 27 F.3d at 740. The same reasoning applies here.

Other documents, as described above, were created after the time that Dr. Schirmer prescribed Vioxx to Mr. Irvin. Admission of that evidence would be highly prejudicial and all documents falling into this category should be excluded. *Arnold v. Riddell, Inc.*, 882 F. Supp. 979, 993 (D. Kan. 1995) (evidence of a video made after plaintiff's injury was inadmissible

790321v.1

because it would have been unfairly prejudicial).

If the marketing materials were to be admitted, the jury's attention almost certainly would be diverted from the question properly before it: whether Vioxx caused Mr. Irvin's death and whether Dr. Schirmer was warned of Vioxx's then-known risks. The result would be a significant likelihood of juror confusion, and also a substantial lengthening of the trial. Evidence of Merck's various marketing and promotional materials, wholly unrelated to either Mr. Irvin or Dr. Schirmer, would thus divert the jury's focus from "the core claims" of this case and "be a time consuming distraction, with real potential for unfair prejudice and essentially no potential to contribute to an accurate decision." *Pivot Point Int'l, Inc. v. Charlene Prods., Inc.*, 932 F. Supp. 220, 224 (N.D. Ill. 1996).

## III.   DESCRIPTION OF MARKETING MATERIALS THAT SHOULD BE EXCLUDED.

For the reasons set forth above, the Court should exclude the following categories of documents, and any testimony relating to the subjects discussed below:

### A.   Direct-To-Consumer Advertising.

Plaintiff seeks to introduce direct-to-consumer advertisements that appeared in various media outlets and sought to foster dialogue between physicians and patients. These include television commercials, print ads, and ads from other media sources – all of which are irrelevant to this case. (*See, e.g.*, Pl.'s Exs. 1.0225, 1.0331, 1.0337, 1.0338, 1.0805, 1.0806, 1.0807, 1.0811, 1.0812, 1.0813.) The Dorothy Hamill agreement, Plaintiffs' Exhibit No. 1.0337, is especially irrelevant because the particulars of the agreement do not even have any bearing on the content of any advertisement and are completely remote from the issues of this case. Introducing evidence of how much Ms. Hamill was paid to appear in an advertisement can only be introduced to arouse the suspicions and prejudice of the jury. Further, Exhibits 1.0225,

13

1.0805-1.0807 and 1.0811-1.0813 all post date Mr. Irvin's death and cannot, therefore, be relevant here. Additionally, any reference to television appearances by Ms. Hamill or Bruce Jenner, such as their appearances on Larry King Live, would be improper.

**B.      Internal Marketing Budgets, Sales Projections, And Marketing Research.**

Merck's internal marketing budgets, sales projections, and marketing research were for internal use only and were not made available to physicians. They are speculative forecasts of costs of marketing and promotion and forecasts of ranges of anticipated sales of Vioxx if certain assumptions hold true. Dr. Schirmer testified that he never saw internal documents from any pharmaceutical company. (C. Schirmer 9/6-5 Dep. at 92:3-9.) (*See, e.g.*, Pl.'s Exs. 1.0009, 1.0127, 1.0150, 1.0166, 1.0316, 1.0317, 1.0319, 1.0331, 1.0365, 1.1250 and 1.1258; a number of these exhibits post-date Mr. Irvin's death, including Exhibit Nos. 1.0166, 1.1250 and 1.1258.)

**C.      Internal Communications Concerning Marketing Strategies.**

There is similarly no evidence that Dr. Schirmer was ever exposed to or influenced by Merck's internal communications regarding marketing strategies or decisions. Plaintiff nonetheless is attempting to introduce a selected sampling of these irrelevant internal communications, including the following:

- A memorandum written by Susan Baumgartner, dated July 1, 1999, titled "Physicians to Neutralize" ("Baumgartner Memorandum") and related communications to and from Susan Baumgartner. (Pl.'s Exs. 1.0013, 1.0406, 1.0407, 1.0408, 1.0409, 1.0410, 1.0414, 1.0415, 1.0420, 1.1251; *see also*, February 25, 2005 Deposition of Susan L. Baumgartner ("Baumgartner Dep.") at 28:23-41:3, attached as Ex. 6 to WittmanN Decl.). This document is accompanied by a list including some physicians who Merck believed may have negative views of Vioxx. Merck hoped to share reliable, accurate data with those

790321v.1

physicians, bringing them to a more balanced or "neutral" position about the medication. Dr. Schirmer is not on the list and there is no evidence that he was in contact with any doctor who was on the list.

- Memorandum from David Anstice, dated February 23, 1998. This document, Plaintiff's Exhibit 1.0140, reflects an effort to generate enthusiasm and "rally the troops" at the time of Vioxx's introduction to the market. This purely internal Merck communication was not seen by Dr. Schirmer or Mr. Irvin and should be excluded as irrelevant. (Also to be excluded is any deposition testimony referring to the document. *See, e.g.*, March 16, 2005 Deposition of David W. Anstice, ("Anstice Dep.") at 191:2-14, 193:18-196:19, attached as Ex. 1 to Wittmann Decl.)

- Memorandum From L.M. Sherwood to D.W. Anstice re:  Academic Interactions. This memo, dated January 23, 2001, Plaintiff's Exhibit 1.0160, addresses alleged company interactions with eight different physicians. Dr. Schirmer is not on this list.   Neither is there anyone on this list with whom Dr. Schirmer ever communicated or relied upon in making his treatment decisions. Therefore, this document is irrelevant to the issues presented and should be excluded.[3] (*See also*, Anstice Dep. at 296:18-300:25.)

- Memorandum From Susan Baumgartner to Lou Sherwood re: Gurkipal Singh. (Pl.'s Exs. 1.0329; Baumgartner Dep. at 62:5-69:11.) Because Dr. Singh has no involvement in the facts of this case, this memo concerning Dr. Singh's

---

[3] For similar reasons, Plaintiff's Exhibit 1.0418 (Memo from R. Landenberger to J. Glasmire) should be excluded.

790321v.1

relationship with Merck is of no relevance.  Moreover, there is no evidence that Dr. Schirmer saw the memo, or that he or anyone he spoke to about Vioxx was aware in any conceivable way of the events described in the memo when he prescribed Vioxx to Mr. Irvin.

(*See also*, by way of example only, Pl.'s Exs. 1.0138, 1.0139, 1.0140, 1.0143 and 1.0157.)

### D.   Internal Training Materials.

Plaintiff seeks to introduce training materials that are entirely irrelevant.  Most were created or implemented after Mr. Irvin was prescribed Vioxx, and there is no evidence that any of them were ever even seen, much less relied upon, by Dr. Schirmer.  These irrelevant training documents include, by way of example only:

- "Be The Power" presentation materials.  These materials, Plaintiff's Exhibit No. 1.0060, if viewed at all, were viewed only at internal gatherings of Merck's sales force.  These materials did not become available to Merck field personnel until June 2001, well after Mr. Irvin was prescribed Vioxx by Dr. Schirmer and after Mr. Irvin's death.  Therefore, these materials could not possibly have had any impact on Dr. Schirmer's prescribing decision.

- "Dodge Ball."  "Dodge Ball," Plaintiff's Exhibit No. 1.0007 (*see also* March 17, 2005 Deposition of David W. Anstice ("Anstice 3/17/05") at 455:12-463:20, attached as Ex. 2 to Wittmann Decl.; May 17, 2005 Deposition of Edward M. Scholnick, M.D. ("Scholnick Dep.") at 636:6-645:3, attached as Ex. 36 to Wittmann Decl.), was a training game that taught sales representatives to provide accurate answers to substantive questions likely to be posed in the field by prescribing physicians.  Trainees drew cards; cards that said "dodge" were free passes, meaning that the trainee did not have to answer a question during that

16

round. All other cards raised important questions, or "obstacles," that physicians might ask in the field. According to the rules of the game, the players were required to respond properly, fully, and substantively in order to win points. Contrary to the inflammatory spin plaintiff is likely to adopt, "Dodge Ball" did not train Merck representatives to "dodge" physician questions. Indeed, the game had the opposite intent and effect. In any event, Dr. Schirmer never saw it.

- <u>Bulletin for VIOXX: VIOXX Gastrointestinal Outcomes Research Study and CLASS Study for Celebrex</u>. This document, dated May 25, 2001, Plaintiff's Exhibit No. 1.0061, post-dates Dr. Schirmer's decision to prescribe Vioxx.

- <u>Needs Based Selling, Basic Training Leader's Guide and the Cardio-Vascular Card</u>. These generic sales technique materials (*see, e.g.*, Pl.'s Exs. 1.0067 and 1.0066) are not even related to the sale of Vioxx and are irrelevant to the adequacy of the warning provided to Dr. Schirmer regarding Vioxx. Furthermore, the so-called "CV card" that plaintiff will allege evidences some sort of misleading sales pitch made by Merck sales representatives is irrelevant because there is no evidence it was shown to Dr. Schirmer. (*See* Pl.'s Exs. 1.0008 and 1.0062; *see also* Scholnick Dep. at 600:19-635:20.)

**E.    Other Promotional Materials With No Nexus To This Case.**

For similar reasons, all promotional materials produced or distributed after the time of Mr. Irvin's death, directed to physicians other than Dr. Schirmer, or otherwise never seen or relied upon by Dr. Schirmer, are irrelevant and should be excluded. Plaintiff is seeking to introduce a number of such irrelevant promotional materials, including :

- <u>Records of various internal Merck communications relating to promotional or marketing activities</u>. These materials include notes of telephone calls from

17

consumers or Merck representatives and internal communications about advertising and marketing issues, and other activities that took place after Mr. Irvin died. (*See, e.g.*, Pl.'s Exs. 1.0164, 1.0237, 1.0238, 1.0250 and 1.1272 .)

- <u>Draft press releases</u>.  Drafts of Merck press releases, especially those drafted after the time Dr. Schirmer prescribed Vioxx to Mr. Irvin, are irrelevant.  As internal drafts, Dr. Schirmer could not have seen or relied on them, and they therefore could not have affected his prescribing decisions regarding Mr. Irvin.

- <u>Various internal documents suggesting responses to questions posed by doctors in the field</u>.  (*See, e.g.*, Pl.'s Exs. 1.0063, 1.0064, 1.0065 and related testimony; Anstice 3/17/05 Dep. at 464:23-470:18.)  Examples include documents not tied to Dr. Schirmer or Mr. Irvin that were used for training and marketing purposes and posed hypothetical questions and answers for the use of company field representatives.  Many of these documents were generated and used, if at all, only after Mr. Irvin's death.

- <u>Documents used to detail or inform physicians other than Dr. Schirmer</u>.  These include promotional documents and materials that may have been seen by physicians other than Dr. Schirmer, but undisputedly not by Dr. Schirmer himself.  Many of these materials were not created until after the time that Mr. Irvin was prescribed Vioxx by Dr. Schirmer.  Even if they were in contemporaneous use, however, they should be excluded because there is no evidence that Dr. Schirmer ever saw them – either before or after Mr. Irvin's death.  (*See, e.g.*, Pl.'s Exs. 1.0061 and 1.0062.)

18

- • <u>Other marketing materials never seen or relied upon by Dr. Schirmer</u>. Finally, plaintiff seeks to introduce marketing materials of which Dr. Schirmer had no knowledge, including internal communications between Merck employees about promotional or marketing efforts or materials given to field representatives but never seen by Dr. Schirmer. These have no relevance because plaintiff cannot proffer evidence that Dr. Schirmer knew about or was indirectly influenced by them. (*See, e.g.*, Pl.'s Exs. 1.0125 and 1.0140.)

**F.    Evidence Of Merck's Educational Programs That Did Not Impact Dr. Schirmer.**

Plaintiff also is likely to attempt to introduce evidence of industry-standard educational programs that could not possibly have impacted Dr. Schirmer's decision to prescribe Vioxx to Mr. Irvin. These programs allow physicians to hear and interact with knowledgeable medical speakers on a variety of subjects. Because Dr. Schirmer did not attend any Merck-sponsored "health education liaison" programs before prescribing Vioxx for Mr. Irvin, any evidence of those programs, and the information presented at them to other physicians, is irrelevant. (*See, e.g.*, Pl.'s Exs. 1.0058 and 1.0066.)

There is no evidence that, before Mr. Irvin's death, Dr. Schirmer ever attended any Merck educational program, or ever relied on or considered any information that may have communicated to any other physician at any so-called "Dine and Dash," "Lunch and Learn," or other Merck program. Therefore, evidence of or reference to any Merck-sponsored health education liaison program would add nothing of relevance to these proceedings. This Court should preclude any reference to Merck's array of educational symposia, discussion, or other health education liaison programs – including reference to the terms "Dine and Dash," "Lunch and Learn," and other similar phrases.

19

G.    **Notes From Meetings With Uninvolved Physicians.**

Finally, plaintiff proposes to introduce notes of meetings between Merck (often through various field representatives) and physicians who never saw, never treated, never prescribed Vioxx to, and never even met Mr. Irvin. These "call notes," and other communications, are irrelevant to the issues in this case. They have no relevance to whether Merck accurately disseminated information to Mr. Irvin's treating physician. (*See, e.g.*, Pl.'s Ex. 1.0285.)

IV.    **CONCLUSION.**

For the reasons stated above, Merck respectfully requests that the Court exclude all evidence of:

1.    Direct-to-consumer advertising, including evidence of any study regarding the purported effect on patient care of such advertising;

2.    Merck's internal marketing budgets, sales projections and marketing research, including the marketing efforts detailed therein;

3.    Merck's internal communications concerning marketing strategies or decisions;

4.    Merck's internal training materials;

5.    Merck's education programs;

6.    Notes of meetings between various Merck sales representatives and physicians with no involvement in this case or with this patient; and

7.    All other promotional materials, including evidence of any promotional materials (a) produced or distributed after Mr. Irvin was prescribed Vioxx, (b) directed to physicians other than Dr. Schirmer, and/or (c) never seen or relied upon by Dr. Schirmer.

20

790321v.1

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone: 504-581-3200
Fax:    504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:    312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone: (202) 434-5000
Fax:    (202) 434-5029

And

John H. Beisner
Charles C. Lifland
Richard B. Goetz
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone: (213) 430-6000
Fax:    (213) 430-6407

Attorneys for Merck & Co., Inc.

21

790321v.1

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Memorandum in Support of Motion of Merck & Co., Inc. To Exclude Evidence Of, Or Reference To, Marketing And Promotional Materials Unrelated To Mr. Irvin Or His Prescribing Physician has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 4th day of November, 2005.

_Dorothy H. Wimberly_

790321v.1