FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2005 NOV -4  PM 2: 02

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 05-4046* | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| EVELYN IRVIN PLUNKETT | * | |
| as Personal Representative of the Estate of | * | |
| RICHARD IRVIN, JR., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

* * * * * * * * * * * * * * * * * *

## MOTION OF MERCK & CO., INC. ("MERCK") TO EXCLUDE SCIENTIFICALLY UNRELIABLE AND IRRELEVANT MEDICAL AND SCIENTIFIC EVIDENCE

### (MOTION IN LIMINE NO. 6)

Defendant Merck & Co., Inc. ("Merck"), through undersigned counsel, and pursuant to Federal Rules of Evidence 401, 402, and 403, hereby moves to exclude evidence or argument regarding scientifically unreliable, irrelevant, and unfairly prejudicial medical and scientific

___ Fee___
___ Process___
X  Dktd___
✓  CtRmDep___
___ Doc. No.___

790322v.1

evidence.  The facts and law supporting this motion are more fully set forth in the accompanying

memorandum, declarations, and exhibits, which are incorporated as if fully set forth herein.

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone: 504-581-3200
Fax:   504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois 60610
Phone: 312-494-4400
Fax:   312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Phone: (202) 434-5000
Fax:   (202) 434-5029

John H. Beisner
Charles C. Lifland
Richard B. Goetz
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone: (213) 430-6000
Fax:   (213) 430-6407

Attorneys for Merck & Co., Inc.

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Motion of Merck & Co., Inc. to Exclude Scientifically Unreliable and Irrelevant Medical and Scientific Evidence has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 4th day of November, 2005.

Dorothy H. Wimberly

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **In re: VIOXX** | * | **MDL Docket No. 1657** |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| | * | **JUDGE FALLON** |
| **This document relates to** | * | |
| **Case No. 05-4046*** | * | |
| | * | **MAGISTRATE JUDGE KNOWLES** |
| **EVELYN IRVIN PLUNKETT** | * | |
| as Personal Representative of the Estate of | * | |
| **RICHARD IRVIN, JR.,** | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| **MERCK & CO., INC.,** | * | |
| | * | |
| Defendant. | * | |
| | * | |

* * * * * * * * * * * * * * * * * *

**MEMORANDUM IN SUPPORT OF MOTION OF MERCK & CO., INC.
("MERCK") TO EXCLUDE SCIENTIFICALLY UNRELIABLE
AND IRRELEVANT MEDICAL AND SCIENTIFIC EVIDENCE**

**(MOTION IN LIMINE NO. 6)**

I.      **INTRODUCTION.**

Plaintiff apparently plans to inundate the record with non-probative medical and scientific "evidence" that is unreliable, irrelevant, unduly prejudicial and almost certain to confuse and mislead the jury. Specifically, the following evidence should be excluded:

- _Statistically Insignificant Data_.  Plaintiff's experts rely on scientific data that are not statistically significant to form their causation opinions.  This approach violates a basic tenet of scientific research:  that if experimental results do not reach a level of statistical significance, the possibility that the results were attributable to chance cannot reliably be excluded.

- _Investigator-Reported Data_.  Plaintiff's experts also rely on investigator-reported adverse-event data from clinical studies involving Vioxx to contradict adjudicated data from the same studies.   Where adjudicated data exist, however, investigator-reported data have no probative value, and their admission will cause undue delay and confusion and undue prejudice to Merck.  In clinical studies, field investigators report medical events that they believe may have occurred in their patients.  Their observations are equivalent to raw, unverified data.  In May 1998, Merck initiated a standard operating procedure for the independent adjudication of all cardiovascular investigator-reported adverse events.   Through this adjudication process, independent, external boards of medical experts conducted blinded, detailed medical evaluations to determine the true nature of reported events.  This process resulted in the identification of "confirmed" cardiovascular events.  There is no dispute among experts for either side that adjudicated data are superior to investigator-reported data.   Accordingly, plaintiff cannot properly present testimony or evidence of investigator-reported data where adjudicated data exist.

- _"All-Cause Mortality" Figures From Alzheimer's Disease Clinical Trials_. Plaintiff also intends to present to the jury, through her expert witness Dr. Farquhar and perhaps by other means, the mortality data, from all causes, from two long-term clinical trials that were conducted to determine the efficacy of Vioxx in preventing or slowing the progression of Alzheimer's Disease.  These figures include numerous deaths that had no possible association

2

with cardiovascular events, including deaths from such causes as electrocution, trauma and cancer. These deaths have no bearing whatsoever on whether Vioxx taken at any dose and for any duration can cause a heart attack or sudden cardiac death, let alone whether taking Vioxx at the 25 mg dose for less than a month, as Mr. Irvin did, can cause such events. These "all-cause" mortality figures are inflammatory on their face, and they have no probative value to any issue the jury must decide. Admitting these numbers into evidence would unfairly prejudice Merck by creating the risk that the jury would base its determinations on emotion and prejudice rather than the relevant facts.

- <u>Toxicological Data From Animal Studies</u>. Finally, plaintiff purports to rely on the results (some published and some not) of animal studies conducted by plaintiff's expert, Dr. Lucchesi, using various NSAIDs. Dr. Lucchesi relies on these studies to claim that Vioxx causes a host of adverse effects in humans – alleged results that are contrary to numerous and far superior human clinical trials. Animal studies do not provide a sufficient basis for establishing causation given the many differences between animals and human beings—especially when, as here, the animal studies contradict evidence from prospective clinical trials in humans. Further, the probative value of such studies, which are hypothesis-generating only, is far outweighed by the unfair prejudice and jury confusion that their admission likely will invoke.[1]

For the reasons discussed below, the Court should exclude such data and reports from evidence, as well as any lay or expert testimony predicated on such data or reports.

---

[1] Examples of documents reflecting inadmissible data in one or more of these categories include plaintiff's exhibits no. 1.0014, 1.0016, 1.0025, 1.0039, 1.0075, 1.0076, 1.0077, 1.0078, 1.0079, 1.0080, 1.0110, 1.0120, 1.0121, 1.0171, 1.0191, 1.0192, 1.0217, 1.0218, 1.0247, 1.0248, 1.0255, 1.0257, 1.0268, 1.0275, 1.0277, 1.0278, 1.0279, 1.0308, 1.0311, 1.0312, 1.0399, 1.0421, 1.0444, 1.0461, 1.0487, 1.0490., 1.0491, 1.0499, 1.0500, 1.0515, 1.0536, 1.0543, 1.0719, 1.0758, 1.0759, 1.0999, 1.1007, 1.1008, 1.1009, 1.1024, 1.1197, 1.1206, 1.1207, 1.1210, 1.1211, 1.1213, 1.1214, and 1.1235

790325v.1

## II.   THE COURT SHOULD EXCLUDE ALL EVIDENCE OF STATISTICALLY INSIGNIFICANT DATA AND ALL TESTIMONY THAT IS BASED ON SUCH DATA.

Underscoring the weakness of plaintiff's claim, plaintiff's experts repeatedly rely on data that all parties agree are statistically *in*significant.  For example, Professor Ray relies on a retrospective observational study by Dr. David Graham[2] (hereinafter the "Graham Study") for the proposition that 25 mg or less of "rofecoxib [Vioxx] increases the risk of serious coronary heart disease."  (March 31, 2005 Deposition of Wayne A. Ray ("Ray 3/31/05 Dep.") at 83:07-85:03, attached as Ex. 28 to Declaration of Phillip A. Wittmann in Support of Merck's Motions in Limine ("Wittmann Decl.").)[3]   Professor Ray admitted, however, that Graham and his colleagues found *no* statistically significant association between Vioxx at the 25 mg dose and the risk of serious coronary heart disease.  Graham Study at 4 (showing adjusted odds ratio of 1.23, with a confidence interval of 0.89 – 1.71).  (*See also* Ray 3/31/05 Dep. at 87:18-21 (acknowledging that "[t]he value 1.23 with the confidence interval 0.89 to 1.71 is not statistically significant").)

Another of plaintiff's experts, Dr. Farquhar, similarly relies on statistically insignificant data.  (*See* Expert Report of John W. Farquhar, M.D. ("Farquhar Report") at ¶ 131, attached as Ex. 41 to Wittmann Decl.)  In the case of one study, Dr. Farquhar could point only to "a numerical increase in cardiac events" given the absence of "statistical difference between the rates of confirmed thrombotic cardiovascular events."  (*Id.*)

---

[2] *See* David J. Graham, et al., *Risk of acute myocardial infarction and sudden cardiac death in patients treated with cyclo-oxygenase 2 selective and non-selective non-steroidal anti-inflammatory drugs: nested case-control study.*

[3] Dr. Benedict R. Lucchesi, another of plaintiff's experts, also relies on the flawed Graham study for the proposition that Vioxx has been "linked . . . to more than 27,000 heart attacks or sudden cardiac deaths nationwide from the time it came on the market in 1999 through 2003."  (Expert Report of Benedict R. Lucchesi ("Lucchesi Report") at 29-30, attached as Ex. 45 to Wittmann Decl.)  Merck has moved separately to exclude evidence of and reference to this study because it is irrelevant and unduly prejudicial.

These are only two examples of the ubiquitous reliance by plaintiff's experts on data that are not statistically significant.  Merck moves to exclude all evidence of or reference to such statistically insignificant scientific data, including argument, testimony, and expert opinion relying on such data.

As a general matter, results that yield a probability value ("p-value") of less than .05 are deemed statistically significant.[4]  *See Cano v. Everest Minerals Corp.*, 362 F. Supp. 2d 814, 821 (W.D. Tex. 2005) ("[T]o support causation, an epidemiological study must be statistically significant at the 95% confidence level . . . ." (citing *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 723-24 (Tex. 1997)).  That means that a statistical analysis, to be significant, must find that there is a 95% chance that the true result falls within the upper and lower confidence intervals demonstrated by a particular study and did not occur due to random error.[5]  An additional method of expressing statistical significance is a confidence interval that does not include within its range the value of 1.0.  For example, a 95% confidence interval that does not include 1.0 represents a statistically significant result.  By contrast, were the confidence interval includes the value 1.0, the data is statistically *insignificant*.[6]

---

[4] As the Reference Manual of Scientific Evidence states in the chapter on Epidemiology: "Thus, an outcome is statistically significant when the observed p-value for the study falls below the preselected significance level.  The most common significance level, or alpha, used in science is .05.  A .05 value means that the probability is 5% of observing an association at least as large as that found in the study when in truth there is no association."  Saks et al., Federal Judicial Center, Annotated Reference Manual on Scientific Evidence (2d ed. 2004), at 498.

[5] Some analyses, such as retrospective data analysis or data mining, create a greater risk of falsely generating a correlation.  Therefore, a more stringent p-value (*e.g.*, .01) may be appropriate in such cases.  The Supreme Court indirectly referred to this practice in *Castaneda v. Partida*, 430 U.S. 482, 496, n.17 (1977) and *Hazelwood School District v. United States*, 433 U.S. 299, 311, n.17 (1977) (describing the null hypothesis as "suspect to a social scientist" when statistics from "large samples" fall more than "two or more standard deviations" from their expected value).  Two or three standard deviations roughly translate to p-values of .05 and .01 in a normally distributed sample.

[6] *See, e.g., Brock v. Merrell Dow Pharms.*, 874 F.2d 307, 312 (5th Cir. 1989) (data is statistically insignificant where confidence interval includes 1.0); *Babin v. Ecolab, Inc.*, No. 2:04-CV-1595,

The Court should not permit plaintiff to use data that do not meet these criteria for statistical significance for at least two reasons.  First, such evidence is irrelevant to any issue that the jury will decide in this case.  Thus, the Court should exclude it under Federal Rules of Evidence 401 and 402.  Second, the Court should exclude such evidence under Federal Rule of Evidence 403 because of the danger of unfair prejudice to Merck.[7]

## A.    Statistically Insignificant Data Are Irrelevant and Should Be Excluded.

Statistically insignificant data are simply not relevant.  By their very nature, such data cannot tend to make any fact at issue in a case more or less probable.  Statistically insignificant evidence of difference is the same as no evidence of difference:  there is no reliable, scientific basis to assert that the study would detect any difference if conducted again.  Multiple courts have determined that statistically insignificant data is scientifically untrustworthy and insufficient to establish causation.[8]  *See, e.g., Brock v. Merrell Dow Pharms.*, 874 F.2d at 167 (finding plaintiffs' "failure to present statistically significant epidemiological proof that Bendectin causes limb reduction defects to be fatal to their case"); *In re Norplant Contraceptive Prods. Liab. Litig.*, 215 F. Supp. 2d 795, 831 (E.D. Tex. 2002) (finding "epidemiological data that is not 'statistically significant' cannot provide a scientific basis for an opinion on causation."); *Chambers v. Exxon Corp.*, 81 F. Supp. 2d 661, 665 (M.D. La. 2000) (excluding

---

2005 WL 1629947, at * 3 (W.D. La. July 5, 2005) (same); *Cano v. Everest Minerals Corp.*, 362 F. Supp. 2d 814, 821 (W.D. Tex. 2005) (same); *Kelley v. Am. Heyer-Schulte Corp.*, 957 F. Supp 873, 878-79 (W.D. Tex. 1997) (same); *LeBlanc v. Merrell Dow Pharms., Inc.*, 932 F. Supp. 782, 784 n.3 (E.D. La. 1996) (same)."

[7] For the purpose of this motion, statistically insignificant data include raw data, or data that have not yet been analyzed for significance, because there generally is no way to know whether such data are significant.

[8] Plaintiff's experts (Drs. Burton, Farquhar and Baldwin) all agree that, in the absence of statistical significance, one cannot rule out the possibility that a study's findings are attributable to chance.  (*See* Merck's Memorandum In Support Of Motion To Exclude Evidence Of Plaintiff's Experts Regarding Causation ("Causation Brief") at 18 n. 8.)

expert's testimony based on absence of "statistically significant . . . epidemiological proof");
*LeBlanc v. Merrell Dow Pharms., Inc.*, 932 F. Supp. at 784 (granting summary judgment in
Bendectin litigation given absence of "statistically significant epidemiological studies").

The admission of statistically insignificant evidence would allow plaintiff to proffer
almost any conceivable scientific theory, regardless of whether it is corroborated by reliable
scientific evidence.  When tested scientifically, an incorrect hypothesis of association between
any drug and any side effect may yield a statistically insignificant p-value.  The Court should not
permit plaintiff's experts to rely on such flimsy results (which cannot be distinguished from
chance) and then opine that an association exists.  According to sound science, such results do
not afford a sufficiently reliable basis on which to opine about causation.  The Fifth Circuit has
so held.  *See, e.g., Burleson v. Tex. Dep't of Crim. Justice*, 393 F.3d 577, 584-86 (5th Cir. 2004)
(barring expert testimony because it did not rely on a scientific study demonstrating a statistically
significant causal relationship); *see also Cano v. Everest Minerals Corp.*, 362 F. Supp. 2d 814,
822 (W.D. Tex. 2005) (expert testimony "that will not assist the trier of fact by advancing an
element of the plaintiff's case should be excluded").   Statistically insignificant data are
irrelevant, and the Court should exclude such evidence under Federal Rules of Evidence 401 and
402.[9]

---

[9] Merck recognizes that data that are statistically insignificant can be combined with additional
data and that the combined result may rise to the level of statistical significance. (*See* Reference
Manual on Scientific Evidence at 538-39; *see also* Declaration of J. Michael Gaziano, M.D.,
M.P.H. ("Gaziano Decl.") at ¶ 36, filed October 21, 2005.)  For example, several small studies
may, under proper conditions, be combined into a single pooled analysis to determine whether a
significant result arises.  This process, called a pooled- or meta-analysis, must be done in a
statistically and scientifically rigorous manner, and it still only supports a hypothesis if in fact the
end result of the combined study has a significant p-value.  Merck does not seek to exclude such
statistically significant data here.

**B.    The Court Should Exclude Statistically Insignificant Data Under Rule 403 Because Their Admission Would Cause Unfair Prejudice to Merck, Undue Delay and Confusion.**

The probative value of potentially confusing evidence must outweigh its tendency to confuse before such evidence is admissible.  *See* FED. R. EVID. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.").  The admission of statistically insignificant data, particularly where the data contradict the conclusions of a study's authors, easily can confuse and mislead the jury and cause it to disregard study results that are statistically meaningful.  The jury would need to reconcile such discrepancies, which likely would distract it from resolving the core factual issues in this case.  In cases such as this one, which require expert testimony on complicated scientific issues, courts have a special obligation to exclude misleading and scientifically unreliable evidence that will confuse the jury. *Daubert*, 509 U.S. at 595 (fact that "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it" makes it imperative that "the judge . . . exercises more control over experts than over lay witnesses"); *Allison v. McGhan Med. Corporation*, 184 F.3d 1300, 1311-12 (11th Cir. 1999) (as a gate-keeper, trial court must exclude scientifically unreliable information "because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value").

Additionally, if the Court were to allow plaintiff to rely on statistically insignificant data, Merck would be forced to introduce expert and third-party testimony to explain and interpret this irrelevant data.  Merck, for example, would need to present testimony addressing such issues as how to form proper scientific hypotheses, how to develop proper statistical methodologies and how properly to interpret statistical tests in the context of various study designs.  The net result

8

would be a substantial lengthening of trial and an even greater risk of jury confusion. *See Lowry v. Seaboard Airline R. Co.*, 171 F.2d 625, 627 (5th Cir. 1949) (noting that if "evidence be admitted of a prior [incident] the company would have the right to show, if it could, that its servants were not to blame and three cases would have to be tried instead of one").

## III. THE COURT SHOULD EXCLUDE ALL EVIDENCE OF AND TESTIMONY RELATED TO INVESTIGATOR-REPORTED DATA WHERE ADJUDICATED DATA EXIST.

Plaintiff's experts also rely on preliminary, investigator-reported adverse-event data from clinical studies involving Vioxx to contradict adjudicated, confirmed data from the same studies. This approach is scientifically unreliable.

In clinical studies, field investigators report medical events that they believe may have occurred in their patients. When doing so, they rely on their unique medical training, experience and judgment. Different investigators may report events using different diagnostic techniques. In addition, they may report events based only on second-hand information relayed by patients without conducting medical evaluations or even reviewing the patients' medical records. Field investigators sometimes can make mistakes by, for example, characterizing what is in fact an upper gastrointestinal event as a cardiovascular event. For these reasons, investigator-reported events are essentially raw and unverified data. (*See, e.g.*, June 22, 2004 Deposition of Alice Reicin ("Reicin 6/22/04 Dep.") at 120:12-125:8, taken in *Garza v. Heart Clinic, P.A.*, No. DC-03-84 (Dist. Ct. Starr County Tex. filed Mar. 10, 2003), attached as Ex. 31 to Wittmann Decl.; April 29, 2004 Deposition of Deborah Shapiro, Ph.D. ("Shapiro 4/29/04 Dep.") at 101:20-102:19, taken in *Garza v. Heart Clinic, P.A.*, No. DC-03-84 (Dist. Ct. Starr County Tex. filed Mar. 10, 2003), attached as Ex. 36 to Wittmann Decl.)

In May 1998, Merck initiated a standard operating procedure ("SOP") for the adjudication of all thrombotic cardiovascular events occurring in future clinical trials involving

9

Vioxx.  The purpose of the SOP was to standardize the evaluation of cardiovascular serious adverse experiences and to improve diagnostic accuracy among field investigators having different clinical specialties and practices.  Through this adjudication process, independent boards of medical experts conducted detailed medical evaluations, on a blinded basis,[10] to determine by objective, scientific measures the true nature of reported events and whether an event that had been reported in fact occurred.  This process results in the identification of "confirmed" cardiovascular adverse-events.  (*See, e.g.*, MRK-AAB0029224 *et seq.* (Standard Operating Procedure for the Surveillance, Monitoring and Adjudication of Acute Thromboembolic Vascular Events in Clinical Trials of COX-2 Specific Inhibitors); Farquhar Dep. at 138:23-140:9; Declaration of Ned Stephen Braunstein, M.D. ("Braunstein Decl.") at ¶ 34, filed October 21, 2005; April 21, 2005 Deposition of Peter S. Kim ("Kim 4/21/05 Dep.") at 116:8-117:16, taken in connection with *Ernst v. Merck*, No. 19961*BH02 (Dist. Ct. Brazoria County Tex. filed May 24, 2002), attached as Ex. 22 to Wittmann Decl.; Reicin 6/22/04 Dep. at 120:12-125:8; Shapiro 4/29/04 Dep. at 100:17-102:19; February 14, 2005 Deposition of Deborah S. Shapiro, Ph.D. ("Shapiro 2/14/05 Dep.") at 605:4-606:18, taken in connection with *Humeston v. Merck*, No. 619 (N.J. Super. Ct. Law Div. filed August 19, 2003), attached as Ex. 37 to Wittmann Decl.)

Plaintiff's own expert, Dr. Farquhar, concedes that adjudication is "a good process" that "should always be done."  (Farquhar Dep. at 139:8-140:3.)  He likewise concedes that adjudication results in "better" data than investigator-reported events.  (*Id.*)  Nevertheless, when

---

[10] When "blinded," the adjudicators would not know which patients received Vioxx and which received placebo or a comparator drug.  (Deposition of John W. Farquhar ("Farquhar Dep.") at 139:2-139:18, attached as Ex. 12 to Wittmann Decl.)  Blinding helps eliminate the effect of bias during the adjudication process and thus maximizes the integrity of the resulting data. (Deposition of Barry K. Rayburn, M.D. ("Rayburn Dep.") at 55:9-56:5, attached as Ex. 29 to Wittmann Decl.)

790325v.1

adjudicated data exist, plaintiff's experts ignore them and rely, instead, on investigator-reported data to support their causation opinions.  Consider, for example, the reliance of plaintiff's experts on the APPROVe study, a long-term, randomized placebo-controlled clinical trial.  Adjudicated data from APPROVe showed an increased risk of adverse cardiovascular events that began only *after* 18 months of continuous 25 mg Vioxx use and that became statistically significant after approximately 30 months of continuous use.  (Merck's Memorandum Regarding Vioxx Science Issues ("Science Brief") at 16, filed October 21, 2005; Gaziano Decl. at   ¶¶ 68-69.)  Dr. Farquhar, however, flatly ignores this confirmed, adjudicated data and, instead, relies on investigator-reported data from APPROVe that purportedly show an increased risk of serious cardiovascular events during the first 18 months of 25 mg Vioxx use.  (Farquhar Rep. at ¶¶ 85-95.)  In other words, Dr. Farquhar uses investigator-reported data expressly to contradict adjudicated data.

The reliance of plaintiff's experts on investigator-reported data when adjudicated data exists is scientifically inappropriate.  In such circumstances, investigator-reported data has no probative value, and its admission will unduly confuse the jury and unduly prejudice Merck.

A.     **Where Adjudicated Data Exist, The Court Should Exclude Evidence Of Or Reference To Investigator-Reported Data.**

Evidence is irrelevant and inadmissible when it does not tend to make any fact at issue in a case more or less probable.  *See* FED. R. EVID. 401 & 402.  That is the case here.  Plaintiff's own expert agrees that adjudication is a "good process," that "it should always be done" and that it results in "better" data by weeding out investigator-reported events that, in fact, are false positives.  (Farquhar Dep. at 139:8-140:3.)  In the case of Vioxx clinical trials, investigator-reported data, which include non-cardiovascular events, necessarily provide a less accurate estimate of cardiovascular risk when compared to adjudicated data, which includes only

11

confirmed cardiovascular events. Accordingly, where, as here, the cardiovascular risk associated with a pharmaceutical product is at issue, investigator-reported data do not – and cannot – tend to make any material fact more or less probable when compared against adjudicated data.[11]

The APPROVe study is a prime example. According to Dr. Farquhar, investigator-reported data from APPROVe shows a statistically significant increased risk during the first 18 months of Vioxx use. (Farquhar Report at ¶ 89.) But that data encompasses events that, in fact, are false positives. Indeed, the Vascular Events Committee ("VEC")[12] for the APPROVe study reviewed all investigator-reported events to determine whether they were true cardiovascular events. (Barr 1/28/05 Dep. at 119:21-120:2.) The VEC determined that almost 50% of the 121 events could not be confirmed as true cardiovascular events.[13] By contrast, the confirmed, adjudicated data from APPROVe showed an increased risk of adverse cardiovascular events that began only *after* 18 months of continuous use and that became statistically significant after 30 months of such use. (Merck's Science Brief at 16; Gaziano Decl. at ¶¶ 68-69.) Accordingly, when compared against the adjudicated data, the investigator-reported data do not provide an accurate estimate of the cardiovascular risk seen in APPROVe and thus have no probative value in this case.

Dr. Farquhar's reliance on investigator-reported data from the APPROVe study is doubly irrelevant because there is no "fit" between that data and the facts of this case. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 591-93 (1993) (scientific testimony is relevant only if

---

[11] Of course, in circumstances where confirmed, adjudicated data are lacking, one cannot say that investigator-reported data are irrelevant. In that instance, investigator-reported data provide the only yardstick for measuring risk and thus have probative value.

[12] The VEC was a group of external, blinded cardiologists, neurologists and vascular specialists who were experts in the treatment of ischemic syndromes as well as the medical aspects of clinical trials. (*See* MRK-AAB0029228.)

[13] Bresalier RS et al., *Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial*, N. ENGL. J. MED. 2005;352 (11) 1092-1102, 1096.

790325v.1

expert's "reasoning or methodology properly can be applied to the facts in issue"); *In re Propulsid Prods. Liab. Litig.*, [hereinafter "*Propulsid*"], 261 F. Supp. 2d 603, 606 (E.D. La. 2003). Mr. Irvin took 25 mg Vioxx for less than a month. Dr. Farquhar, however, admits that his reanalysis of data from APPROVe does *not* reveal an increased risk of thrombotic cardiovascular events during the first month of 25 mg Vioxx use. (Farquhar Dep. at 193:22-196:7.)[14]

## B. Where Adjudicated Data Exist, Reliance On Investigator-Reported Data Will Result In Undue Delay and Confusion.

Even assuming that investigator-reported data had some probative value when compared against adjudicated data – and they do not – any probative value of such evidence does not outweigh its tendency to confuse. *See* FED. R. EVID. 403 ("[R]elevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."). Admitting evidence of investigator-reported events in addition to adjudicated data from a single study undoubtedly will confuse and mislead the jury as to the study's actual results. That is especially true where, as in the APPROVe study, the investigator-reported data contradict the adjudicated data. In such circumstances, the jury will have to reconcile apparent discrepancies in the data. That is an unreasonable and unfair demand to place on a jury that likely will have limited, if any, knowledge of how to interpret complicated scientific data. In that event, there is an

---

[14] In fact, Dr. Farquhar does not report any increased risk for even "high risk" patients after one month of Vioxx use. His *post-hoc* sub group analysis of such patients failed to detect a statistically significant increased risk *even at 18 months*. (Farquhar Report at p.32 n.3 (confidence interval includes 1.0); *LeBlanc v. Merrell Dow Pharms., Inc.*, 932 F. Supp. 782, 783 & n.3 (E.D. La. 1996) (data not statistically significant where confidence interval includes 1.0).) In any event, the data concerning this selective subset of "high risk" patients do not support any conclusion relevant to Mr. Irvin, as Dr. Farquhar admits that "it would be difficult" to place Mr. Irvin in the subgroup of "high risk" patients. (Farquhar Dep. at 256:24-257:12.)

13

overwhelming danger that plaintiff will confuse and mislead the jury as to which set of data provides the most accurate estimation of the study's results:  the field investigators' initial impressions of observed medical events, or the careful evaluation of such events by a highly-qualified group of independent, blinded experts applying uniform, standardized and objective guidelines.

In addition, if plaintiff were allowed to introduce evidence regarding investigator-reported events when adjudicated data is available, Merck in turn would need to introduce testimony from expert and third-party witnesses to interpret and explain irrelevant and confusing data.  Merck, for example, would need to present testimony on such tangential issues as clinical trial data collection and reporting procedures.   Merck also would need to present detailed medical testimony to justify the decisions of the adjudication committees as to the appropriate classification of individual investigator-reported events.   The net result will be a substantial lengthening of trial and an even greater risk of jury confusion.  *See, e.g., Lowry v. Seaboard Airline R. Co.*, 171 F.2d 625, 627 (5th Cir. 1949) (noting that if "evidence be admitted of a prior [incident] the company would have the right to show, if it could, that its servants were not to blame and three cases would have to be tried instead of one").

### C.   Where Adjudicated Data Exist, Reliance On Investigator-Reported Data Will Result In Undue Prejudice to Merck.

Finally, even relevant evidence is subject to exclusion where the danger of undue prejudice outweighs its probative value. *See* FED. R. EVID. 403.  Again, that is the case here.  If plaintiff were allowed to introduce evidence regarding investigator-reported events when adjudicated data is available, Merck would be unfairly prejudiced in at least two ways.

First, the jury likely would conclude that investigator-reported data is entitled to equal scientific weight as confirmed, adjudicated data.  It is unreasonable to assume that a lay jury with

14

no expertise in the interpretation of complicated, scientific data will be able to make a reasoned distinction between these two types of data. Accordingly, there is a very real likelihood that the jury would ascribe to Vioxx a cardiovascular risk that, in fact, is not supported by the superior, adjudicated data. Such an outcome would be extremely unfair and prejudicial to Merck. In cases involving complicated scientific issues, courts have a special obligation to exclude misleading and unreliable evidence that will confuse the jury. *Daubert*, 509 U.S. at 595; *Allison*, 184 F.3d at 1311-12.

Second, as Dr. Farquhar observed, Merck does not publish analysis of investigator-reported data where confirmed, adjudicated data exists. (Farquhar Dep. at 252:13-253:12.) This approach makes sense because, as Dr. Farquhar testified, adjudicated data is "better" than investigator-reported data. (*Id.* at 139:8-140:3.) Nevertheless, plaintiff will argue that Merck sought "to conceal investigator-reported event analysis" from the medical community. (Farquhar Report at 94.) If the Court admits investigator-reported data where confirmed adjudicated data exist, the jury likely may conclude that Merck sought to do just as plaintiff suggests. Such an inference is highly prejudicial. It also is contrary to fact. For example, Dr. Farquhar conceded that Merck provided investigator-reported event data from the APPROVe study to the FDA for its review. (Farquhar Report at ¶ 85 n.4.) He likewise admitted he has no knowledge that the external journal editors of the APPROVe study did not agree with the decision to publish only confirmed, adjudicated data. (Farquhar Dep. at 250:21-251:20.)

## IV. MORTALITY DATA FROM THE MERCK ALZHEIMER'S DISEASE CLINICAL TRIALS ARE IRRELEVANT, INFLAMMATORY AND INADMISSIBLE.

Merck conducted two long-term, randomized clinical trials that were designed, respectively, to test whether Vioxx was effective in preventing and treating the symptoms of

790325v.1

Alzheimer's Disease.[15]  Neither trial showed any statistically significant difference in the rates of adverse cardiovascular events experienced by participants in the Vioxx group and in the control (placebo) group.  *See, e.g.,* Gaziano Decl. at ¶ 65;  Thal, L.J. *et al., A Randomized, Double-Blind Study of Rofecoxib in Patients with Mild Cognitive Impairment,* NEUROPSYCHOPHARMACOLOGY (2005) 30:1212. ("Elderly patients are at increased risk for serious vascular events. Rofecoxib did not appear to increase the risk in this study, since the number of confirmed serious thrombotic vascular events was similar in each treatment group.").  The figures on cardiovascular events from those trials thus provided strong evidence that Vioxx does not cause heart attacks and other thrombotic cardiovascular events.

Undoubtedly recognizing that the cardiovascular events data undermine plaintiff's medical causation case, Dr. Farquhar, plaintiff's general causation expert, attempts to attach significance to the overall mortality figures from those trials, which encompass deaths from all causes, including causes that have no relation whatsoever to the cardiovascular system. (*See* Farquhar Report at ¶ 133; Farquhar Dep. at 282:15-283:1.)[16]  The Court should exclude these "all-cause" mortality data, as well as any expert testimony predicated on such data.  Those figures are completely irrelevant to any issue to be decided in this case. They could be linked to this case only by pure conjecture and speculation.  Moreover, such data are highly inflammatory and, if admitted, would unfairly prejudice Merck and profoundly confuse the jury.

---

[15] These trials, designated Protocol 078 and Protocol 091, respectively, are discussed in more detail in the Appendix of Studies Relied on by Plaintiff's Experts, filed concurrently with the Causation Brief, at 6-7.

[16] Dr. Farquhar relies on a reanalysis of data from the Alzheimer's trials done by Richard Kronmal, whom plaintiff designated as an expert witness but has since withdrawn.

A.      **The Mortality Figures From The Alzheimer's Trials Are Irrelevant.**

The mortality data from the Alzheimer's trials attributable to all causes are irrelevant and thus inadmissible because they are not probative of any fact that must be determined in this case. *See* FED. R. EVID. 401 & 402. To prevail on her claims, plaintiff must prove that taking Vioxx at the 25mg dose for less than a month can, and in Mr. Irvin's case did, cause a sudden cardiac death. The mortality data have no bearing on that issue. While there were more deaths in the groups of trial participants who took Vioxx than in the placebo groups, there was no pattern to those deaths that supports an inference that they were caused by Vioxx. For example, included in the mortality figures were deaths attributable to such events as electrocution and trauma and to such diseases as cancer and pneumonia. *See* Thal et al., *supra,* at 1210. Moreover, a significant number of the deaths (for example, eleven of the deaths in the Vioxx group of Protocol 078) occurred more than *forty-eight weeks* after treatment had been discontinued – further confirmation that those deaths had nothing to do with Vioxx. *Id.* And, patients who had taken Vioxx, as opposed to placebo, were on average evaluated for a longer period after treatment ended – an additional reason why the number of deaths reported in the Vioxx groups is not a reliable indication of causation. *Id.* at 1213. These deaths from disparate causes cannot be linked to the conclusion that plaintiff wants to reach – *i.e.,* that taking Vioxx increases the risk of adverse cardiovascular events – by any means other than speculation or *ipse dixit.* But "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to the existing data only by the *ipse dixit* of the expert." *Propulsid*, 261 F. Supp. 2d at 616 (*quoting Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

Even if Dr. Farquhar or plaintiff's other experts somehow could make a connection between the all-cause mortality figures and an increased cardiovascular risk associated with Vioxx, the all-cause mortality figures still would be irrelevant. Mr. Irvin died after taking Vioxx

17

for less than a month. Dr. Farquhar states in his report that Professor Kronmal purportedly found a statistically significant increased risk for all-cause mortality. (Farquhar Report at ¶ 133) Putting aside the question of whether Dr. Farquhar may reasonably rely on that analysis[17], Professor Kronmal's analysis does not reflect any statistically significant increase in risk for all-cause mortality when Vioxx is taken for *one month*. Figure 7 in his report illustrates that uncontroverted fact, as there is no separation in the Kaplan-Meier curve for all-cause mortality until some time well *after* one month. (*See* Export Report of Richard A. Kronmal ("Kronmal Report") at 19, figure 7, attached as Exhibit 44 to Wittmann Decl.)

In short, plaintiff cannot escape the fact that the data from the Alzheimer's trials that are relevant here are those pertaining to cardiovascular events. The Court should not permit plaintiff to deflect attention from the relevant data by introducing irrelevant data that have no bearing on causation or any other issue.

B.   **The Mortality Figures From The Alzheimer's Trials Are Highly Inflammatory, And Admitting Such Data Would Unfairly Prejudice Merck.**

Even if these all-cause mortality figures had any probative value, their exclusion still would be warranted under Rule 403. Presenting to the jury evidence about these deaths would plainly entail the danger of "unfair prejudice, confusion of the issues, or misleading the jury. . . ." FED. R. EVID. 403.

Evidence having an "undue tendency to suggest decision on an improper basis, commonly, although not necessarily, an emotional one," should be excluded as unfairly prejudicial. FED. R. EVID. 403 advisory committee's note. Thus, evidence is unfairly prejudicial

---

[17] In fact, Dr. Farquhar may not  properly rely on Professor Kronmal's analysis. As explained in Merck's Causation Brief, at 8, Professor Kronmal's analysis is not scientifically reliable. For that reason alone, Dr. Farquhar may not reasonably rely on it. *See* FED. R. EVID. 703.

where it "'appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish,' or otherwise 'may cause a jury to base its decision on something other than the established propositions in the case.'"  *Carter v. Hewitt*, 617 F.2d 961, 972 (3d Cir. 1980) (quoting 1 J. Weinstein & M. Berger, WEINSTEIN'S EVIDENCE 403(03), at 403-15 to 403-17 (1978)).

The all-cause mortality figures are inherently inflammatory and precisely the type of evidence that is calculated to appeal to jurors' sympathies and to cause them to base their decision on "something other than the established propositions in the case."  *Id.*  The danger that the jury would decide issues based on emotion and prejudice is exacerbated by the fact that these death figures would be presented through an expert witness.  *Daubert*, 509 U.S. at 595 (fact that "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it" makes it imperative that "the judge . . . exercises more control over experts than over lay witnesses").  The likelihood of juror confusion is equally great.  The jurors would be hard-pressed to understand why they were being asked to decide whether Vioxx can cause a sudden cardiac death on the basis of information about deaths from such causes as electrocution, trauma and cancer.  Excluding the all-cause mortality data is plainly warranted under Rule 403.

## V.  THE COURT SHOULD EXCLUDE ALL EVIDENCE OF AND TESTIMONY RELATED TO TOXICOLOGICAL DATA FROM ANIMAL STUDIES.

Plaintiff's experts also rely on inadmissible data from animal studies.  For example, Dr. Lucchesi has conducted experiments in dogs using various NSAIDs and purports to use these results, published or not, as a basis to opine that Vioxx causes a host of adverse effects in humans – results that have not been shown in numerous, and far superior, human clinical trials. (*See* Lucchesi Report at 39-40.)

790325v.1

Data from such animal studies are inadmissible for two reasons: (1) animal toxicity studies are not a sufficient basis for establishing causation given the many differences between animals and human beings – especially when the animal studies contradict evidence from prospective clinical trials in humans – and should be excluded under Federal Rules of Evidence 401 and 402; and (2) the probative value of such studies – which can only generate scientific hypotheses, not answer them – is far outweighed by the potential prejudice to Merck and the likelihood of confusing the issues and misleading the jury, and the Court should exclude them under Federal Rule of Evidence 403.

## A.   Animal Toxicity Studies Are Irrelevant and Should Be Excluded.

All scientific data are not created equal.[18]  In making a causal analysis, scientists typically consider a hierarchy of data when assessing whether a particular dose of a drug taken for a particular duration is capable of causing a specific adverse event.  *See* Saks et al., Federal Judicial Center, Annotated Reference Manual on Scientific Evidence at 476-84.  At the top of the evidentiary pyramid, the most reliable data are from randomized, human, placebo-controlled studies.  Such studies can be designed to eliminate bias and reduce confounding factors by randomly assigning participants to different treatment groups.  (*Id.* at 476; *see also* Gaziano Decl. at ¶¶ 28, 34; Farquhar Report at ¶ 59; Expert Report of Wayne A. Ray, Ph.D. ("Ray Report") at 25, attached as Ex. 46 to Wittmann Decl.)  Because of their limitations in ruling out confounding factors, data from observational or retrospective epidemiological studies are placed below data from randomized placebo-controlled studies.[19]  (Annotated Reference Manual on

---

[18] The "hierarchy" of scientific data used in determining causation is discussed at length in Merck's Science Brief.  *See* Science Brief and Causation Brief.

[19] There are two types of epidemiolgic studies – randomized clinical trials and observational studies.  (Causation Brief at 16-17.)  As explained, randomized clinical occupy a higher level on the hierarchy of scientific evidence than observational studies.

Scientific Evidence at 477-82; Farquhar Report at ¶ 60.)  Next come data from case reports,

which, while useful to generate hypotheses or research possibilities, cannot be used as evidence

of causation because, among other things, they lack a control group for comparison.  (Gaziano

Decl. at ¶ 30.)

At the bottom of the hierarchy are animal studies.  (Annotated Reference Manual on

Scientific Evidence at 483-84.)  Like case reports, animal toxicological data may be useful to

generate hypotheses for scientists when considering the potential design of placebo-controlled or

epidemiological studies that can address causation.  They are insufficient, however, to establish a

causal link between a drug and a biological effect in humans.  *See Brock v. Merrell Dow

Pharms.*, 874 F.2d 307, 313 (5th Cir. 1989) (emphasizing that epidemiological data are preferred

to animal studies in attempting to demonstrate causation); *Maurer v. Heyer-Schulte Corp.*, No.

Civ.-K-92-3485, 2002 WL 31819160, *3-4 (E.D. La. Dec. 13, 2002) (noting that the "Fifth

Circuit holds that epidemiological studies are the most effective and conclusive type of evidence

in cases where a court addresses causation of a disease" and in contrast that the Circuit "frowns

upon the use of animal studies to predict carcinogenicity in humans").  Moreover, because of

differences between animals and humans, animal studies have a methodological weakness not

shared with case reports, which results in their being placed below case reports on the hierarchy

of scientific evidence.  *See, e.g., Allen v. Pennsylvania Engineering Corp.*, 102 F.3d 194, 197

(5th Cir. 1996) (rat studies, which did not even accurately predict how mice would respond to

exposure to the chemical at issue, could not establish that the same effect would occur in

humans); *Wade-Greaux v. Whitehall Labs., Inc.*, 874 F. Supp. 1441, 1480 (D.Virgin Islands

1994) (extrapolation from animal studies to humans to prove causation is "scientifically invalid"

because, among other reasons, "different species can react differently to the same agent"), *aff'd,*

790325v.1

46 F.3d 1120 (3d Cir. 1994); *In re "Agent Orange" Prod. Liab. Litig.*, 611 F. Supp. 1223, 1241 (E.D.N.Y. 1985) (finding animal studies inadmissible in an action alleging health problems arising from exposure to herbicide "because they [the animal studies] involve different biological species").

Put simply, Dr. Lucchesi's dogs are not people, and dogs may not necessarily respond to medication the same way that people do. (Annotated Reference Manual on Scientific Evidence at 483-84.) In addition, Dr. Lucchesi also used a 25 mg dose in some of his experiments, which is equivalent to a much higher dose in humans and which makes comparisons even more difficult. Thus, given their methodological weaknesses, animal studies provide an inappropriate basis for proving causation, particularly where, as here, the data from those studies are inconsistent with the results obtained in far more reliable human clinical trials. (Gaziano Decl. at ¶ 26.) *See also Richardson v. Richardson-Merrell, Inc.*, 857 F.2d 823, 830 (D.C. Cir. 1988) (refusing to allow expert witness to base his testimony on *in vivo* and *in vitro* animal studies because: "[s]tudies of this kind, singly or in combination, are not capable of proving causation in human beings *in the face of the overwhelming body of contradictory epidemiological evidence*") (emphasis added); *Lynch v. Merrell-Nat'l Labs.*, 830 F.2d 1190, 1194 (1st Cir. 1987) (district court properly excluded expert testimony that prescription drug could cause limb reduction, as the proffered testimony was based on conclusions derived from "*in vivo* animal studies, *in vitro* animal studies, and the study of 'analogous' chemicals"; stating "[s]tudies of this sort, singly or in combination, do not have the capability of proving causation in human beings in the absence of any confirmatory epidemiological data").

Given the state of the science and the existence of more reliable human data, the animal data on which plaintiff's experts intend to rely are irrelevant and inadmissible.

790325v.1

**B.**     **The Court Should Exclude Evidence of Animal Toxicological Data Under Rule 403 Because Its Admission Would Cause Unfair Prejudice to Merck, and Undue Delay and Confusion.**

As discussed above, plaintiff's proffered animal studies have no probative value here because large-scale, blinded clinical trials in humans already exist.  These small animal studies also are unreliable because, by their very design, they cannot control for confounding variables such as species differences, thus resulting in suspect data.

The probative value of potentially confusing evidence, such as plaintiff's proffered animal studies, must outweigh its tendency to confuse before it is admissible.  (FED. R. EVID. 403.)  That is not the case with plaintiff's animal studies, which, especially since they contradict human clinical trials, can lead only to jury confusion.  The jury, for example, might be swayed into believing that animal and human studies should be given the same weight, or into concluding that the fact that a dog suffered a consequence of Vioxx ingestion necessarily means that Mr. Irvin did as well – a conclusion that has no basis in reliable science.

The potential for juror confusion is especially great here, since Dr. Lucchesi intends to rely on his unpublished animal data even though he admits it is unreliable and has refused to produce it.  (October 18, 2005 Deposition of Benedict R. Lucchesi, M.D., Ph.D., M.S., F.A.H.A ("Lucchesi 10/18/05 Dep.") at 115:2-11, 115:24-116:3, 117:15-21, 118:25-119:1, attached as Ex. 24 to Wittmann Decl.).  In addition, if the Court does not prohibit reliance on such animal studies, Merck will be forced to introduce expert and third-party testimony to explain and interpret irrelevant data by addressing such issues as proper experimental design, variations in animal versus human physiology, and the difficulties in extrapolating animal data to humans. The net result would be a substantial lengthening of trial and an even greater risk of jury confusion.

790325v.1

## VI.   CONCLUSION.

For the reasons stated above, Merck respectfully requests that the Court exclude all evidence of and reference to scientifically unreliable and irrelevant medical and scientific evidence.

Respectfully submitted,

_Dorothy H. Wimberly_

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone: 504-581-3200
Fax:    504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:    312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone: (202) 434-5000
Fax:    (202) 434-5029

790325v.1

And

John H. Beisner
Charles C. Lifland
Richard B. Goetz
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone: (213) 430-6000
Fax:     (213) 430-6407

Attorneys for Merck & Co., Inc.

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Memorandum in Support of Motion of Merck & Co., Inc. to Exclude Scientifically Unreliable and Irrelevant Medical and Scientific Evidence has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 4th day of November, 2005.

_Dorothy H. Wimberly_

790325v.1