IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA,
NEW ORLEANS DIVISION

| | |
|---|---|
| IN RE VIOXX PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) ) ) ) ) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

MDL DOCKET No. 1657

**PLAINTIFF'S RESPONSE TO DEFENDANTS MOTION TO
EXCLUDE PROPOSED TESTIMONY OF
OF WINSTON GANDY, M.D.**

COMES NOW Plaintiff Evelyn Irvin Plunkett, as Personal Representative of the Estate of Richard Irvin, Jr., by and through her attorneys, and responds to Merck's Motion to Exclude Proposed Testimony of Winston Gandy, M.D., as follows:

Defendant has requested that this Court conduct a hearing, pursuant to Daubert v. Merrill Dow Pharmaceuticals, 509 U.S. 579 (1993), and Kumho Tire v. Carmichael, 119 S. Ct. 1167 (1999), to establish the reliability of expert testimony relating to cardiology, Plaintiff intends to offer at trial.

Rule 702 of the *Federal Rules of Evidence* permits the admission of expert testimony where scientific, technical, or other specialized knowledge will assist the trier of fact. Unlike an ordinary lay witness, an expert witness is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation. Fed. R. Evid. 702 & 703; *see* Daubert, 509 U.S. at 592. In its role as "gatekeeper," this Court has wide discretion to decide whether an expert's testimony is reliable enough to be admitted. Id. The Court must determine the reliability

of expert testimony in light of the facts and circumstances of each particular case. Kumho Tire, 49 S. Ct. at 1179. Under Daubert, a Court need not find that an opinion be based in whole on scientific principles that are so well-established as to be considered scientific law. Daubert, 509 U.S. at 592, note 11. Rule 702 simply requires that the evidence used be reliable in nature and allows for the inclusion of methods or assumptions that are "generally accepted" in the relevant scientific community. Id. at 597. Furthermore, the Daubert analysis is a flexible one.

The Court of Appeals for the Fifth Circuit held, in Pipitone v. Biomatrix, Inc., 288 F.3d 239 (5th Cir. 2002), that:

> Many factors bear on the inquiry into the reliability of scientific and other expert testimony.[1] In Daubert, the Supreme Court offered an illustrative, but not an exhaustive, list of factors that district courts may use in evaluating the reliability of expert testimony.[2] These factors include whether the expert's theory or technique:
> (1) can be or has been tested; (2) has been subjected to peer review and publication (3) has a known or potential rate of error or standards controlling its operation; and (4) is generally accepted in the relevant scientific community.[3] In the later case of Kumho Tire Co. v. Carmichael,[4] the Supreme Court emphasized that the Daubert analysis is a "flexible" one, and that "the factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony."[5] The district court's responsibility is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.[6]

Dr. Gandy, a board certified cardiologist with extensive clinical experience, is imminently qualified to testify regarding Richard ("Dicky") Irvin's specific cause of death – sudden cardiac death due to a myocardial infarction. (Report of Winston Gandy, M.D. (Curriculum Vitae) (Ex. A). Indeed, the limited bases for the Defendants Motion are that Dr. Gandy's testimony should be

---

1 Daubert, 509 U.S. at 593; Skidmore v. Precision Printing and Packaging, Inc., 188 F.3d 606, 617 (5th Cir. 1999).
2 Daubert, 509 U.S. at 593.
3 Id. at 593-94; see also Moore v. Ashland Chem., 151 F.3d 269, 275 (5th Cir. 1998) (en banc).
4 526 U.S. 137 (1999).
5 Id. at 150

excluded because: 1) he is not aware of "clinical trial data" proving that thirty days usage of Vioxx can cause death; and 2) Dr. Gandy's reliance upon the prostacyclin diminution theory as one possible mechanism of action for Vioxx is, according to Merck, misplaced. To the contrary, there exist literally hundreds of articles describing the relationship between Cox-2 and prostacyclin. (Plaintiff provides a comprehensive sampling of articles in her previously filed Science brief and in her Response to Merck's Motion to Exclude Evidence of Expert Testimony Regarding Causation.)

Defendant Merck argues that Dr. Gandy should have engaged in independent research on Cox-2 inhibitors. For that matter, Merck would have this Court believe that a cardiologist must possess the expertise, not only of that of a cardiologist, but also of a pharmacologist, an epidemiologist and a statistician in evaluating the pharmacokinetics of a drug and the 'raw data' behind each and every peer-reviewed, published epidemiological study before he should be allowed to render an opinion about the cause of death in a case that involves a pharmaceutical agent.

As Plaintiff has asserted in numerous submissions to the Court, **Merck's own studies prove the risk of thrombotic myocardial infarction after short-term use.** For example, reporting the data from Adenomatous Polyp Prevention on Vioxx study ("APPROVe") in the New England Journal of Medicine, Dr. Bresalier and others stated that, "[A]s compared with the placebo group, the rofecoxib (Vioxx) group had an increased risk of *confirmed thrombotic events* (relative risk, 1.92; 95 percent confidence interval, 1.19 to 3.11)."[7] Bombardier et al., published *Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with*

---

6 Id. at 152.
7 Bresalier, R.S. Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial. N. Eng J. Med. 352: 1092-1102, at 1096 (2005).

*Rheumatoid Arthritis* in the New England Journal of Medicine[8] wherein *more* patients in the Vioxx group suffered heart attacks than those in the naproxen group. As is described more fully in Plaintiff's Opposition to Merck's Motion to Exclude Plaintiff's Experts' Testimony regarding causation, APPROVe proved that both long term and short term use of Vioxx increased the risk of myocardial infarction.

The results of this internal Merck study have been confirmed and replicated by outside, independent experts. Solomon et al. published **Cardiovascular Risk Associated with Celecoxib in a Clinical Trial for Colorectal Adenoma Prevention** in the New England Journal of Medicine in 2005.[9] These investigators reiterated that the VIGOR trial reported a higher risk of myocardial infarction among patients receiving Vioxx.[10]

Furthermore, in addition to these publications in the world's foremost medical journal, on September 30, 2004, in a move that garnered national media attention, Merck withdrew Vioxx from the worldwide market due to results from its APPROVe study, which showed significant increases in *thrombotic cardiac events* among users of Vioxx.[11]

A LexisNexis search revealed that 125 articles in the general media have been published regarding Vioxx *in the last six months* alone. While such articles from the lay press do not necessarily establish a scientific basis upon which an expert may render an opinion, the sheer volume of articles does show the acceptance by the public, as well as the scientific community, that Vioxx increases the risks of cardiovascular events. These lay articles are amply supported by the medical literature, which shows that COX-2 drugs generally, and Vioxx in particular, create a

---

8 Bombardier C. Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis. N Eng J Med; 343:1520-8 (2000).
9 Soloman, SD. Cardiovascular risk associated with celecoxib in a clinical trial for colorectal adenoma. prevention. N Eng J med. 2005 352:1071 – 1080.
10 Id at 1077.

dangerous prothrombotic situation in those who ingest the drugs. The Defendant seems to be critical of Dr. Gandy for not reading every single article available in the medical literature. Dr. Gandy conceded he has not done so, nor should he be expected to do so.

Dr. Gandy need not possess all "background" information and data regarding Vioxx, nor must he be required to conduct research on non-steroidal anti-inflammatory medications, nor must he be required to have published on sudden cardiac death in order to render a reliable opinion as to the cause of death in this particular case. He need not be a pharmacologist, but is allowed to rely upon the opinions of pharmacologists as to a drug's mechanism of action. He need not be an expert in clinical design or statistics but may rely upon published epidemiological studies. Dr. Gandy possesses every qualification required to render an opinion as to the specific cause of Mr. Irvin's death. The applicable standard does *not* require him to second guess the epidemiologists and biostatisticians. Daubert does not require Dr. Gandy to reevaluate the raw data from the VIGOR or APPROVe studies, with their markedly increased rate of cardiovascular events.

Defendant Merck also intimates to this Court that Dr. Gandy has never witnessed the adverse side effects of Vioxx in his own patients. This is false. Dr. Gandy previously concluded that Vioxx increased the risk of myocardial infarction.

> Q. Have you ever in your clinical practice diagnosed an adverse event due to Vioxx?
>
> A. Not prospectively.
>
> Q. What do you mean by "not prospectively"?
>
> A. I took care of a couple of individuals who prior to the recall of the drug and subsequent knowledge of the increased risk of cardiovascular events in patients taking Vioxx who had no other risk

---

11 APPROVe was a long-term, multi-center, randomized, placebo-controlled, double-blind clinical trial – the "gold standard" of epidemiology.

factors for presentation with acute infarction, and then subsequent to the recall in retrospect, looking back, his event I felt was caused by Vioxx being the only thing. He had no risk factors of hypertension or diabetes. He didn't smoke. No family history. And the only thing he had was a knee issue, and was on Vioxx.

. . . . .

Q. Let me rephrase. Prior to the time that the drug was withdrawn, did you ever recommend to a patient that they discontinue Vioxx?

A. Probably five or ten, somewhere in there.

Q. For what reasons did you recommend in those cases that the patients discontinue the Vioxx?

A. They had known coronary disease, also risk factors such as diabetes, cigarette smoking, and felt that they were at very high risk. They previously had been controlled on other agents without any untoward effects and had been placed on it because it was new.

Q. When you say that they had been controlled on other agents, were those anti-inflammatory agents?

A. Some. I found it in connection with being on statins, for the most part. Once I held the statin and the arthritis went away, I would subsequently stop the drug, or both.

Q. And for what reasons did you recommend in those five to ten cases that the patients discontinue Vioxx?

A. Some because I felt that the etiology of their pain was not an arthritity, and on a couple of occasions it was people with unstable angina and we were looking to try to maximize their medical regimen, and with the understanding of the physiology, was concerned that perhaps that was contributing to their unstable angina and discontinuing the drug.

Dep. of Winston Gandy, M.D. at 59, 65-67 (Ex. B).

It is clear from this testimony that Dr. Gandy is not only familiar with the major clinical literature concerning Vioxx, but that he is aware of the hazard associated with Vioxx. Further, Dr. Gandy incorporated this knowledge into his clinical decisions. Dr. Gandy is clearly qualified to offer opinion testimony regarding the specific causation of Mr. Irvin's death.

Merck argues that the results of the VIGOR study do not support the opinion that Vioxx is prothrombotic. One must again look at the facts. It is generally accepted within the scientific community that Vioxx is prothrombotic. The drug was removed from the market worldwide *because* it is prothrombotic. If a drug is known to be cardiotoxic, and is proven to be cardiotoxic by epidemiological analysis, the toxicity of the drug is not necessarily bound by the four corners of an epidemiological study. Science looks at the totality of the evidence. The APPROVe study conclusively demonstrated the increased risk of sudden cardiac death conferred by Vioxx. Merck asserts that the risk was confined to persons who ingested Vioxx for more than 18 months, but this claim is based upon Merck's analysis of a subgroup of APPROVe patients that used Vioxx for no more than 18 months.[12] The study itself identifies that this is a *post hoc subgroup analysis*.[13] Such an analysis, as indicated by Merck's expert Dr. Gaziano, is inherently weak and unreliable.[14] To require plaintiff's expert, to rely upon a form of epidemiological analysis that is universally discounted would, in fact, take Dr. Gandy into the realm of science disfavored by Daubert and its progeny.

---

12 Report of Wayne Ray ¶ 24.
13 Bresalier, R.S. Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial. N. Eng. J. Med. 2005; 352: 1092-1102.
14 The inherent weaknesses of post hoc subgroup analyses are addressed in both the Rule 26(2)(B) report of plaintiff's epidemiology expert, Dr. Wayne Ray, within the plaintiff's submitted Science Brief, and within

Plaintiff has filed a motion seeking to have this Court disregard Merck's unreliable post-hoc analysis of APPROVe. Indeed, one of APPROVe's authors, Dr. Marvin Konstam, sent Merck an email stating that "we are already going out on a limb by emphasizing the 18 months issue [in APPROVe]." (Exhibit 2: 1/31/2005 email by Dr. Marvin Konstam). If the lead author of a previous Merck meta-analysis believes Merck is "going out on a limb by emphasizing the 18 month issue," Merck cannot reasonably attack Dr. Gandy's opinion that short-term exposure to Vioxx is associated with cardiovascular events. Plaintiff urges the Court to turn its attentions to Plaintiff's Science brief and the report of Plaintiff's cardiology/epidemiology expert, John Farquhar, MD for further evidence that Vioxx increases the risk of cardiovascular adverse events after short-term exposure to the drug.

Defense next attacks Dr. Gandy for allegedly not having reliable scientific evidence supporting the mechanism by which he contends Vioxx caused Mr. Irvin's thrombotic sudden cardiac death. Defendant confuses mechanism of action with biological plausibility. These concepts are distinct both in science and under law. Biological plausibility is defined as the consideration of existing knowledge about human biology and disease pathology in order to provide a judgment about the plausibility that an agent causes a disease.[15] Biologic plausibility lends credence to an inference of causation.[16] Mechanism of action, on the other hand, explains precisely how an agent causes a disease. There is no need for Plaintiff to prove the precise mechanism by which Vioxx causes cardiovascular events, only that it is plausible. Kennedy v. Collagen Corp., 161 F.3d 1226, 1230, 1330 (9th Cir. 1998) (Causation can be proved when we do not know precisely how the damage occurred.) The U.S. Supreme Court stressed that it would be

---

Plaintiff's Opposition to Merck's Motion to Exclude Evidence of Plaintiff's Experts Regarding Causation.
15 Reference Manual on Scientific Evidence. 388 (2nd ed. 2000).
16 Id.

unreasonable to conclude that the subject of scientific testimony must be known to a certainty, because arguably there are no certainties in science.[17] This Court need only consider whether it is biologically plausible that Vioxx is capable of causing cardiovascular events, not whether the precise mechanism of action has been demonstrated.

As to the "biological plausibility" of Vioxx causing cardiovascular events in individuals such as Mr. Irvin, the point is made by the participants in an '*Editor's Round Table: Cyclooxygenase-2 Inhibitors and Cardiovascular Risk*, published as an "**Uncorrected Proof,**" online and accessed on October 24, 2005.[18] The participants included a Professor and Chairman of the Department of Gastrointestinal, Medicine and Nutrition from the University of Texas, MD Anderson Cancer Center, Houston, Texas; a Professor of the Department of Family and Community Medicine at the Baylor College of Medicine in Houston, Texas; the Medical Director of the Baylor Heart and Vascular Institute, Baylor, University Medical Center, Dallas, Texas; the Editor-in-Chief of the American Journal of Cardiology; the Dean of the A. Webb Roberts Center for Continuing Medical Education of Baylor Health Care System, Dallas, Texas; the Chairman of the Department of Medicine, Scripps Clinic, Medical Group and the Vice President of Medicine Services and Academic Affairs of the Scripps Clinic Foundation in La Jolla, California.

These participants discussed, *inter alia*, the "…most important question in all of these trials is the mechanism for the increased risk for cardiovascular events in these various patient populations. The **most common explanation is a prothrombotic effect,** which Garrett Fitzgerald has written about extensively." The Chair of the Department of Medicine of the Scripps Clinic

---

17 Daubert, 509 U.S. at 590.
18 http://www.sciencedirect.com/science?_ob=ArticleURL&_udi=B6T10-4HCN79F-8&_coverDate=10%2F21%2F2005&_alid=327128823&_rdoc=1&_fmt=&_orig=search&_qd=1&_cdi=4876&_sort=d&view=c&_acct=C000006078&_version=1&_urlVersion=0&_userid=75682&md5=f2db80ada9476638519e9154f92a21e3#sec2.1.

Medical Group, Dr. Gary Williams, MD, Ph.D., described this "popular hypothesis" as suggesting "that a prothrombotic state is possible, since the COX-2 inhibitors block, at least partially, vascular prostacycline but have no effect on platelet thromboxane."[19] Furthermore, Dr. Williams states that, "[T]he prothrombotic hypothesis implies clot formation to most clinicians." In other words, Vioxx causes clots. It is not the plaintiff's burden to prove what *is* the mechanism of action. The plaintiff must only show that his theories are biologically plausible. The Medical Director of the Baylor Heart and Vascular Institute, William C. Roberts, MD, while acknowledging that the prothrombotic hypothesis "is at work in some of these patients."[20] This *is* 'biological plausibility' generally accepted by the scientific community and rightfully relied upon by Dr. Gandy.

More importantly, Merck attempts to insinuate that Dr. Gandy has testified that he has no basis, from either clinical/epidemiological standpoint or his own clinical experience, for his opinions that Vioxx can cause short term events.[21] Instead of relying upon Merck's "interpretations" of Dr. Gandy's testimony, let us review actual quotes:

> Q.  I take it you're of the view that Vioxx in fact can cause an increased risk in cardiovascular events even after 30 days?
>
> A.  And before, yes.
>
> Q.  What do you base that on?
>
> A.  The physiology of the mechanism of action, in that the -- very shortly after going on the drug, you create the imbalance in the prostacyclin/thromboxane equilibrium, and risk is

---

19 Id.
20 Id.
21 Id.

> increased at that point and continues to increase until steady state with the drug.
>
> Q. On what basis do you say, sir, that very shortly after going on the drug, you create a prostacyclin and thromboxane imbalance?
> A. Well, from a clinical perspective, at that point which the drug becomes effective in terms of pain relief, being that it's a COX-2 inhibitor, by definition, it's doing its job if the patient achieves some degree of pain relief. And the maximum amount of pain relief would be expected at the time the drug was at steady state.
>
> ---
>
> Q. Can you tell us whether you have an opinion to a reasonable degree of medical certainly as to whether or not Vioxx caused or contributed to cause to Dicky Irvin's heart attack and death?
>
> A. To a reasonable degree of medical certainty, I believe that Vioxx either caused or was a significant contributing factor to his acute coronary event resulting in his death on that day.

Dep. of Winston Gandy, M.D. at 131-132, 203.

It is clear from Dr. Gandy's testimony that he bases his opinions in this case upon his experience, his clinical practice, clinical research, and epidemiological research on Vioxx. As such, under Daubert, Dr. Gandy's opinions should be found reliable and be admitted into evidence.

Finally, the Defense attacks the basis for Dr. Gandy's specific causation opinions by arguing that he is unable to opine as to whether or not Mr. Irvin did, in fact, have an imbalance in the prostacyclin and thromboxane levels at the time of his death. Again, let us review the Dr. Gandy's testimony:

>Q. Doctor, do you know whether or not Vioxx actually caused an imbalance in prostacyclin and thromboxane in Mr. Irvin's vascular system?
>
>A. As stated earlier, the physiology associated with COX-2 inhibitors, that would be my belief, yes.

Id. at 171.

As described above, the prostacyclin/thromboxane imbalance theory, as proffered by Dr. FitzGerald, is discussed within the medical literature as the "most common explanation" for Vioxx's prothrombotic effect. If the esteemed participants of an Editor's Roundtable published within the American Journal of Cardiology can rely upon this imbalance within the body without a single case report or epidemiological study documenting such an imbalance, Dr. Gandy should reasonably be able to do the same.

In conclusion, Dr. Gandy has a valid scientific, clinical, epidemiological and professional experience basis for each of his opinions. His opinions, as evidenced above, are clear, concise and well supported. Accordingly, Dr. Gandy's testimony should be admitted into evidence as reliable and reasonably calculated to assist the jury in the trial of this case.

Respectfully submitted,

By: /s/ P. Leigh O'Dell
**Andy D. Birchfield, Jr., Esquire**
Paul J. Sizemore
P. Leigh O'Dell
BEASLEY, ALLEN, CROW,
METHVIN,
PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
(800) 898-2034 (telephone)
(334) 954-7555 (telecopier)

**Co-Lead Counsel**


**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
***Herman, Herman, Katz & Cotlar, LLP***
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
FAX: (504) 561-6024

**Temporary Office**
3411 Richmond Ave., Suite 460
Houston, TX 77046
PH: (713) 877-1843
FAX: (713) 871-9750

**PLAINTIFFS' LIAISONCOUNSEL**

Christopher A. Seeger, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)

**Co-Lead Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
MEUNIER&WARSHAUER, L.L.C.
P.O. Box 960
191 East Second Street
New Roads, LA 70760
(225) 638-6137
(225) 638-8836 (fax)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Thomas R. Kline, Esquire
KLINE&SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Carlene Rhodes Lewis, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**


## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced in accordance with Pre-Trial Order No. #8, on this **2nd** day of November, 2005.

_____

# SEE RECORD FOR

# EXHIBITS

# OR

# ATTACHMENTS

# NOT SCANNED