# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| Evelyn Irvin Plunkett v. Merck & Co, Inc. | * | CASE NO. 02:05CV4046 |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE TESTIMONY OF WAYNE RAY, PH.D.

TO THE HONORABLE JUDGE FALLON:

PLAINTIFF, Evelyn Irvin Plunkett, files this Memorandum in Opposition to Defendant's Motion to Exclude Opinion Testimony of Wayne Ray, Ph.D., and in support thereof would show unto the Court as follows:

## I.      INTRODUCTION

### A.  Factual Background

In April and May of 2001, Richard Irvin was a new user of Vioxx®. He ingested 25 mg. of Vioxx® for approximately 30 days before suffering sudden thrombotic cardiac death on May 15, 2001, at age 53. An autopsy revealed an unattached coronary thrombus (clot) in the left anterior descending (LAD) coronary artery. The unattached clot was grossly visible to the pathologist, was identified on the autopsy record, and has been further documented through photomicrographs. There is no dispute that Richard Irvin suffered a thrombotic cardiac event during a period of ingestion of Vioxx®.

1

Vioxx® was first marketed in the United States in May of 1999. By the end of 1999, Merck had completed its first large, randomized clinical trial (VIGOR) comparing Vioxx® to naproxen in rheumatoid arthritis patients to determine the effects of the medications on pre-specified gastrointestinal endpoints. An additional finding of the VIGOR clinical trial was a 5.0 increased relative risk for myocardial infarction among Vioxx® users and a 2.80 increased relative risk for serious coronary heart disease (myocardial infarction and sudden cardiac death).[1] It is not disputed that the full results of VIGOR were known throughout Merck by March of 2000, some 13 months before Richard Irvin ingested Vioxx.[2]

Based upon VIGOR, Merck sought to remove the gastrointestinal warnings accompanying Vioxx®. This indication was refused. Merck was able only to allege that at 50 mg compared to naproxen in the VIGOR trial, the gastrointestinal events were significantly fewer among Vioxx® users.[3]

On September 30, 2004, Vioxx® was withdrawn from the market worldwide based upon a long term placebo controlled trial that showed a significant excess of thrombotic cardiac events among Vioxx® users at 25 mg.

**B. Procedural Background**

Plaintiff designated Wayne A. Ray, Ph.D., as a testifying expert in this matter.  Dr. Ray is expected to testify regarding pharmacoepdemiologic issues related to the ingestion of Vioxx, including:  whether Vioxx causes an increased risk of myocardial infarctions and serious coronary heart disease; the magnitude of the risk presented by Vioxx; and whether that increased risk is

---

1   In the relevant epidemiology community, and in courts evaluating the magnitude of such risks, these relative risks correlate to attributable risks of 80.2 percent and 64.5 percent, respectively. *See* Expert Report of Wayne Ray, Ph.D. at § 5, attached as Exhibit A and incorporated herein for all purposes.
2   There is further no dispute that the VIGOR labeling changes to incorporate the adverse cardiac events were not made until April of 2002, almost a year after Richard Irvin's death.

present for short duration use.

Dr. Ray is qualified to render opinions in this matter.  The opinions offered by Dr. Ray are both scientifically reliable and relevant to the issues expected to be presented to a jury in this matter.  Therefore, Defendant's motion to exclude Dr. Ray's testimony must be denied.

## II.    LEGAL STANDARDS

The *Daubert* trilogy cases, *Daubert*, *General Electric Co. v. Joiner*, (522 U.S. 136, 118 S.Ct. 512, 517-519 (1997)  and *Kumho Tire Co. v. Carmichael*, (526 U.S. 137 (1999) have made the district judge the "gatekeeper who must pass on the reliability and relevance of proffered evidence pursuant to Federal Rule of Evidence 702."[4]  Rule 702 takes into account the trilogy and provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experiences, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  This Rule establishes general standards for the judge to use in determining the reliability of expert testimony.  The Rule "not only requires that the testimony be relevant, but also that it be based on sufficient facts or data, that it be the product of reliable principles and methods, and that the witness applied those principles and methods reliably to the facts of the case."[5]  Rule 702, as interpreted by the Supreme Court, requires that before an expert may be permitted to express an opinion on *any* issue, the following requirements must be satisfied:

---

3    *See* April 2002 Labeling attached as Exhibit B and incorporated herein for all purposes.
4    Manual for Complex Litigation. 472 (4th ED. 2004)

1.  The expert must be <u>qualified</u> to express the opinion;

2.  The expert's opinion must be <u>reliable</u>;

3.  The expert's opinion must be <u>relevant</u>; and

4.  The expert's opinion must be <u>otherwise admissible</u>.6.

Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure states the following:

> "Except as otherwise stipulated or directed by the court, this disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony, be accompanied by a written report prepared and signed by the witness.  The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness".

The *Daubert* Court went on to identify several considerations that might bear on whether the testimony in question is scientifically valid and trustworthy, including:

1.  whether the theory or technique has been tested;

2.  whether the theory or technique can be or has been peer reviewed or published;

3.  the known or potential error rate;

4.  the 'existence and maintenance of standards controlling the technique's operation'; and

5.  the general acceptance by the relevant scientific community and the testimony's degree of acceptance therein.[7]

However, following both the *Joiner* and *Kuhmo* decisions, the considerations to be evaluated by the district judge were expanded in order to assist in determining the reliability of expert

---

5   *Id.* at 484.
6   *See* Fed. R. Evid. 702; *Daubert*, 509 U.S. 579, 588, 590-95.
7   <u>Manual for Complex Litigation</u>, supra, at 476-77 (footnote omitted).

testimony.  The following are some examples:

1.  Whether the expert is testifying about matters growing naturally and directly out of research independent of litigation;

2.  Whether the expert has engaged in any improper extrapolation, for example, drawing an unsupported conclusion from animal studies to humans;

3.  Whether the expert has taken into account all possible alternative explanations;

4.  Whether the expert has been as careful as she would be in her regular professional work as in paid litigation;

5.  Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give;

6.  Whether the expert has relied on anecdotal evidence, such as case studies, or whether the expert has relied on other types of scientifically reliable evidence;

7.  Whether there is a temporal relationship between the exposure event and the subsequent injury;

8.  The relationship of the technique used by the expert to established methodologies;

9.  The expert's qualifications to use the methodology; and

10. The non-litigation uses to which the methodology has been put.

The person seeking to admit expert testimony bears the burden of proving reliability and relevance by a preponderance of the evidence. *Moore v. Ashland Chemical, Inc.*, F.3d 269, 276 (5th Cir. 1998) (en banc).

The current version of Rule 702 was enacted in response to the Supreme Court's opinion in the *Daubert* case. The trial court was charged with assessing the reliability of the methodology used by the proffered expert in addition to the relevance of the expert's proposed testimony.  The trial

5

court was affirmed as a 'gatekeeper' and the Advisory Committee Notes accompanying Rule 702 provided general standards that the trial court must use to assess the reliability and helpfulness of the proffered expert testimony.[8]

Dr. Ray is qualified to render opinions in this matter. Dr. Ray's opinions are reliable, relevant and would aide the jury in understanding the issues in this case. Therefore, Defendant's motion to exclude Dr. Ray's testimony should be denied.

## III.   ARGUMENT

Dr. Ray is qualified to render opinions regarding the subjects on which he proposes to testify. Dr. Ray's opinions are based upon scientifically reliable evidence.

### A.      Dr. Ray is Qualified to Opine About General Causation.

Dr. Ray is a Professor of Preventative Medicine at Vanderbilt University School of Medicine in Nashville, Tennessee. *See* Exhibit A. Dr. Ray is Director of the Division of Pharmacoepidemiology and of the Master of Public Health programs. *Id.* Dr. Ray holds a doctoral degree in Computer Sciences from Vanderbilt, a master's degree in Biostatistics and a bachelor's degree in Mathematics from the University of Washington. *Id.* Dr. Ray has conducted pharmacoepidemiologic research for thirty years and is actively involved in the design, execution and analysis of numerous pharmacoepidemiologic studies. *Id.*

Dr. Ray is a Fellow of the International Society for Pharmacoepidemiology (ISPE). He is the Principal Investigator for Vanderbilt Center for Education and Research on Therapeutics, funded by a grant from the federal Agency for Health Care Quality and Research. He is also the Principal Investigator for a Cooperative Agreement with the FDA. *Id.*

Dr. Ray is familiar with evaluating and critiquing scientific methods for peer-reviewed

---

8    Advisory Committee Notes, FED. R. EVID. 702.

6

journals.  Dr. Ray has, himself, published more than 150 manuscripts in peer reviewed literature, including articles addressing Vioxx specifically.  *Id.*  Dr. Ray also reviews manuscripts for leading medical journals, such as:  The New England Journal of Medicine; Journal of the American Medical Association; The Lancet; The Annals of Internal Medicine; Science; British Medical Journal; Circulation; American Journal of Medicine; American Journal of Epidemiology; Journal of Clinical Epidemiology; Journal of the American Geriatrics Society; Journal of Gerontology; Medical Sciences; The Gerontologist; American Journal of Public Health; Statistics in Medicine; Medical Care; Chest; Bone and Mineral Research; and Neuron.  *Id.*

Dr. Ray meets regularly with FDA officials from the Center for Drug Studies relating to adverse drug reactions and assessment of medicines.  *Id.*  He has served as an advisor to the FDA and on *ad hoc* committees.  *Id.*  Dr. Ray has been the Principal Investigator on 27 research grants funded by federal agencies, non-profit organizations and pharmaceutical companies, and has been a co-investigator on numerous other grants.  *Id.*  Dr. Ray has conducted numerous studies of the gastrointestinal safety and cardiovascular safety of non-steroidal anti-inflammatory drugs and coxibs. *Id.*

Dr. Ray's education, training and experience demonstrate that he is imminently qualified to render opinions regarding pharmacoepdemiologic issues related to the ingestion of Vioxx, including: whether Vioxx causes an increased risk of myocardial infarctions and serious coronary heart disease; the magnitude of the risk presented by Vioxx; and whether that increased risk is present for short duration use.  Defendant's motion to exclude is simply an attempt to further suppress the safety concerns raised by ingestion of Vioxx, especially in the case of Mr. Irvin.

**B.      Dr. Ray's Opinions Are Based Upon Scientifically Reliable Evidence.**

Contrary to the representations made by Merck in its motion, Dr. Ray's opinions are based upon scientifically reliable evidence.  Scientifically reliable evidence indicates that Vioxx causes an increased risk of serious coronary heart disease with short duration usage.

Defendant Merck does not dispute that there is a clinical link between Vioxx and increased risks for cardiovascular events.  Defendant Merck would prefer, however, to limit the window for such increased risks to persons who ingest Vioxx for at least eighteen (18) months.

As presented in Plaintiff's Memorandum in Support of Motion to Exclude Opinion Testimony that Vioxx® Cannot Cause Adverse Thrombotic Events Unless Ingested Eighteen (18) Months or Longer, there is ample, scientifically reliable, evidence that Vioxx causes an increased risk of serious coronary heart disease with short duration usage.

The 18-month hypothesis is a *post hoc* subgroup analysis that is not generally accepted by relevant epidemiological and scientific community.  In addition, the *post hoc* subgroup analysis is underpowered and has an error rate that gives the 18-month hypothesis an only 1 in 5 (20%) chance of accurately detecting the risk of cardiac events by duration in this subgroup. Based upon these critical failings, the factual bases, data, principles, methods and applications employed by Merck's experts in offering the 18-month hypothesis are not reliable.

The results of the *post hoc* subgroup analysis are inconsistent with the results of prior and subsequent clinical trials and epidemiological studies.  Thus, the analysis is so contrary to the available data that there is too large an analytical gap between the data and the opinion offered.  Moreover, no Merck expert has offered support for the biological plausibility of an 18-month threshold as no evidence exists in the entire body of published cox-2 scientific research to support it.

A *post hoc* subgroup analysis is particularly susceptible to misleading interpretations. One seminal article addressing this issue was published in the Journal of the American Medical Association in 1991.[9]   According to the authors, a subgroup analysis, even if relatively large, leads to comparisons concerning individual subgroups that are woefully lacking in power. *Id.*  Power refers to the probability of a statistical analysis to detect an effect.  *See* Exhibit A at § 6.  As noted by Dr. Ray, it is a generally accepted precept of clinical research that reliable analyses should have a power of at least 80% or better so that, given an effect exists, the analysis will detect it at least 4 times out of 5.  Failure of sufficient power renders any such analysis unreliable.  *Id.* at § 7.  Merck's own proffered cardiology expert, Dr. Craig Pratt, testified that APPROVe was not powered to answer the question of duration.[10]

In addition to Dr. Ray, others have challenged Merck's "duration" argument.  Dr. Peter Juni, and colleagues published in the medical journal, Lancet, that the 18-month hypothesis by Merck had only a 20% power to detect an increased risk of 2 or greater.[11]  At 20%, the hypothesis would have an only 1 in 5 chance to detect an effect and falls well short of the generally accepted methodology of a minimum power of 80% for a reliable analysis.

Unlike Merck's ill-conceived efforts to shield itself from liability, Dr. Ray's opinions regarding increased risk with short term duration are based upon scientifically reliable evidence.  Increased risk following short term duration of Vioxx is biologically plausible.  Studies confirm that

---

9      Yusuf S, Wittes J, Probstfield J, Tyroler HA, Analysis and interpretation of treatment effects in subgroups of patients in randomized clinical trials. JAMA 1991; 266:93-98.

10     *See* Deposition Testimony of Craig Pratt, MD, 115: 2- 116: 2:

      Mr. Honnold:    Do you believe APPROVe was adequately powered to say that there actually is a difference in cardiovascular events for usage that's less than 18 months versus usage that's greater?...

      Dr. Pratt:    Well, I mean, certainly the trial wasn't powered to answer that question.... So, in that question – in that sense, no.

11     Juni P, et al., Discontinuation of Vioxx, Lancet 2005; 265(January 1):23-28, Exhibit ____ hereto.

there is a significant decrease in $PGI_2$ within fourteen (14) days of ingestion of Vioxx. *Id.* The risk of serious coronary heart disease conferred by Vioxx is present within days of usage. I*d.*

The increased risk for serious cardiovascular disease is consistent in other Coxibs. *Id.* at § 6.2. Defendant cites to *Gen. Elec. Co. v. Joiner*, 522 U.S.136, 145-46 (1997) to suggest that information regarding other Coxibs is inappropriate and inapplicable. In *Joiner*, the court determined that the studies cited by the experts were dissimilar in that the dosage and causation were not identical. *Id.* at 144-46. The studies cited by Dr. Ray are not "so dissimilar to the facts presented in this litigation". Dr. Ray cites to short-term studies of celecoxib, lumiraxocib and valdecoxib/parecoxib, all of which are indicated to reduce pain and all of which demonstrate an increased risk for serious cardiovascular disease. *See* Exhibit A at § 6.2.

Defendant cites to *Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1201 (11th Cir. 2002) for the proposition that Dr. Ray does not have scientifically reliable evidence of an increased risk of cardiovascular disease following ingestion of Vioxx. Unlike plaintiffs in *Rider*, 295 F.3d at 1199-1200, Dr. Ray does not merely rely upon case reports for patients who suffered injuries subsequent to taking Vioxx. Dr. Ray relies upon peer-reviewed, scientifically sound clinical trials to demonstrate a clear cause and effect relationship between ingesting Vioxx and suffering an increased risk for serious cardiovascular disease. *See* Exhibit A at § 6.2 and 6.3. In fact, Dr. Ray relies upon Merck's VIGOR study to indicate that there is a profoundly increased risk for serious cardiovascular disease caused by short durations of use. *Id.* Time to event curves within VIGOR results indicate a divergence, within two-months, for acute MIs. *Id.* Similarly, pooled analyses of twenty-three (23) clinical trials for Vioxx reveal an increased risk within the first month of usage. *Id.*

In addition, epidemiologic studies for Vioxx demonstrate a strong relationship between Vioxx and increased risk for serious cardiovascular risks during short term duration. Two

10

epidemiologic studies that had sufficient sample size to assess duration of Vioxx® use were conducted by Dr. Daniel Solomon and colleagues and Dr. Soren Johnsen and colleagues.[12] Solomon, in a study funded by Merck, showed that the risk associated with Vioxx ingestion was highest within the first 90 days.[13] Johnsen reported that the risk for new users, those within 1-30 days, was 2.52. These findings provide strong evidence that the risk is not limited to durations of 18 months or longer.[14] In addition, three other published studies show that the risk is present for short-term users.[15]

Merck simply cannot run away from this scientifically reliable evidence. Dr. Ray has provided support for his opinions with sufficient data or reliable principles. *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1240-46. Dr. Ray's opinions are reliable, relevant and would aide the jury in understanding the issues in this case. Therefore, Defendant's motion to exclude Dr. Ray's testimony should be denied.

## IV.   CONCLUSION

For the reasons stated herein, Dr. Ray's opinions meet the scientific standards for expert testimony. Dr. Ray's opinions are reliable, relevant and would aide the jury in understanding the issues in this case. Plaintiff respectfully requests that the Court deny Defendant's motion to exclude Dr. Ray's testimony and for such other and further relief to which Plaintiff may be entitled.

---

12   Exhibits B and C.
13   *Id.* and *supra* at n. 16, Section 6.4.
14   *Id.*
15   *Id.* citing to Kimmel et al, Graham et al, and Levesque et al.

11

Respectfully submitted,

By: _____

**Andy D. Birchfield, Jr., Esquire**
Paul J. Sizemore
P. Leigh O'Dell
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
(800) 898-2034 (telephone)
(334) 954-7555 (telecopier)

**Co-Lead Counsel**


**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
***Herman, Herman, Katz & Cotlar, LLP***
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
FAX: (504) 561-6024

**Temporary Office**
3411 Richmond Ave., Suite 460
Houston, TX 77046
PH: (713) 877-1843
FAX: (713) 871-9750

**PLAINTIFFS' LIAISONCOUNSEL**

Christopher A. Seeger, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)

**Co-Lead Counsel**


Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
MEUNIER&WARSHAUER, L.L.C.
P.O. Box 960
191 East Second Street
New Roads, LA 70760
(225) 638-6137
(225) 638-8836 (fax)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Thomas R. Kline, Esquire
KLINE&SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Carlene Rhodes Lewis, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)


**PLAINTIFF'S STEERING COMMITTEE**

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on Liaison Counsel,
Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically
uploading the same to Lexis-Nexis File & Serve Advanced in accordance with Pre-Trial Order No. #8, on this **31**[st] day of
October, 2005.



# SEE RECORD FOR

# EXHIBITS

# OR

# ATTACHMENTS

# NOT SCANNED