UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| Evelyn Irvin Plunkett v. Merck & Co, Inc.* | | CASE NO. 02:05CV4046 |

<u>PLAINTIFFS' MEMORANDUM IN OPPOSITION TO MOTION TO EXCLUDE
TESTIMONY OF JOHN W. FARQUHAR, M.D.</u>

Plaintiff Evelyn Irvin Plunkett, as Personal Representative of the Estate of Richard

Irvin, Jr., deceased, by and through her undersigned counsel, hereby states as follows:

I.       <u>INTRODUCTION</u>

John W. Farquhar, M.D., Professor Emeritus (Active) at Stanford University,

has been a physician, scientist, researcher and teacher for over 50 years.  He is an

acknowledged world leader in the fields of cardiology and epidemiology.  Dr. Farquhar's

pioneering research showed that lower cholesterol reduced heart disease, helping to create the

field of preventive cardiology.  His scientific articles (which number over 200) continue to be

widely cited in the literature, including numerous references in recent textbooks edited or co-

authored by defense expert Michael Gaziano.  In response to questioning at his recent

deposition, Dr. Farquhar testified, "I live and breathe scientific method" (Ex. 1, Farquhar

Depo. Tr., at 10:1-7), and that he applied the same methodology in his Report on Vioxx as in

his published peer-reviewed articles.  (Tr. at 8:8-9:20.)  A review of Dr. Farquhar's

comprehensive Report demonstrates consistently reliable methodology and a high level of scholarship in the interpretation of the data concerning Vioxx and cardiovascular risk.

Merck's motion seeks to exclude Dr. Farquhar's testimony, based on a series of half-truths, untruths and omissions that do not add up to the whole truth. While Merck argues that Dr. Farquhar conducted *"post hoc"* analyses of data from the APPROVe study, the facts are to the contrary. Instead, as detailed below, the primary analyses in Dr. Farquhar's Report were (a) pre-specified by Merck's own study plans; (b) recommended in advance by the FDA; and/or (c) requested by the reviewers at the *New England Journal of Medicine* (*NEJM*) prior to publication of the APPROVe study. It is Merck that relies on a *"post hoc"* analysis of underpowered time-to-event data that contradicts its own Data Analysis Plan. It is Merck that refused requests to conduct or report analyses that would have contradicted its public position. And, finally, it is Merck that intentionally deleted pre-specified analyses from the APPROVe manuscript submitted to the *NEJM,* because they belied the claim of "no effect for 18 months."

The scientific evidence described by Dr. Farquhar supports the conclusions that Vioxx significantly increases the risk of MI, in both short and long-term use, and that the duration of use before an adverse event is dictated by the cardiovascular susceptibility of the individual patient. *See, e.g.*, FitzGerald, "Coxibs and Cardiovascular Disease," *NEJM* 2004, 351:1709-1710: "The *higher a patient's intrinsic risk* of cardiovascular disease, the *more likely* it would be that such a hazard would manifest itself *rapidly* in the form of a clinical event" (Ex. 2, emphasis added). Because Mr. Irvin had moderate to severe pre-existing atherosclerotic disease, he was more susceptible than other patients to the toxic effects of

Vioxx.  Dr. Farquhar's testimony reliably supports these conclusions, and Defendant's motion must be denied.

## II.   **SHORT-TERM RISK OF VIOXX IS SUPPORTED BY THE APPROVe DATA**

The Reference Manual on Scientific Evidence (Federal Judicial Center, 2000, hereinafter, "Reference Manual") states that the "gold standard" for proof of a cause-and-effect relationship is the randomized clinical trial ("RCT"), sometimes called a "true experiment." (Reference Manual at 338.)  "The randomized clinical trial (RCT) is the closest approximation in epidemiology to an experiment, and a well-run trial may confirm a causal relationship between an exposure and an outcome."  Lilienfeld and Stolley, *Foundations of Epidemiology* (3d ed. 1994) at 266(Ex. 3); Farquhar Report at ¶ 63.  The APPROVe study, a well-run RCT, is independently sufficient to demonstrate that Vioxx increases the risk of cardiovascular adverse events, with short-term and long-term use.[1]  Each of the following aspects of the study contribute to this conclusion:

A.    The statistically significant relative risks (RR) of 2.80 for cardiac events and 1.92 for "thrombotic" events apply to the entire exposure period, where the study was neither designed nor powered to detect differences in the rate of events over time, and where the pre-specified Data Analysis Plan directed that Kaplan-Meier plots of rates over time should be performed on a larger patient population of 3 combined studies.

B.    Dr. Farquhar analyzed time-to-event rates for "high-risk" populations, which were pre-specified by an FDA directive but not performed by Merck, and these analyses showed rapid, statistically significant increased adverse CV events in the Vioxx arm of the study.

---

[1] Consistent and supportive evidence from VIGOR and other trials is discussed in subsequent sections of this Memorandum.

   C.  The External Safety Monitoring Board (ESMB) for the APPROVe study requested time-to-event plots for the composite endpoint of thrombotic and congestive heart failure (CHF) events, which showed very early separation of adverse event rates, but Merck refused to provide that analysis to the *NEJM* in response to a reviewer's request.

   D.  The pre-specified end point of investigator-reported cardiovascular events showed immediate increase in the Vioxx arm and statistically significant difference by 18 months, but Merck deleted the analysis from a draft of the manuscript, and failed to restore it despite explicit requests from the reviewers.

   These items are addressed below.

**A.**  <u>The Statistically Significant Relative Risks of 2.80 for Cardiac Events and 1.92 for "Thrombotic" Events Apply to the Entire Exposure Period, Where the Study Was Neither Designed nor Powered to Detect Differences in the Rate of Events over Time</u>

   **1.**  <u>The Merck Authors Went "Out on a Limb" to Claim a Lack of Effect that Goes Beyond the Data of the Study.</u>

   Paid company employees and consultants who go "out on a limb" to advance a hypothesis that protects their employer's financial interests have not surmounted the "reliable methodology" hurdle imposed by *Daubert*. Yet, that is what Merck has admittedly done with regard to the claim of no effect during the first 18 months of Vioxx exposure. Dr. Konstam, a long-time Merck consultant and co-author of the APPROVe study, stated in an internal e-mail that the authors were "going out on a limb" by emphasizing the appearance of a difference in relative risks between the 0-18 month and 19-36 month segments of the study. (Farquhar Report, ¶ 78; Ex. 4.) Peer reviewers for the *NEJM* apparently agreed with Konstam's assessment when they rejected the initial manuscript, directing that the authors:

> Remove assertion that increased risk was observed only after 18 months, because the event curves for other adverse events separate early. Also, the focus on the first 18 months was not pre-specified and is a post-hoc analysis.

(Ex. 5 2005 NEJM 000013-14.)

> Another *NEJM* reviewer stated:

> 1. The "18 month hypothesis." The MS [Manuscript] aggressively promotes the safety of up to 18 months of use of rofecoxib. This goes beyond the data of the study. . . . Yusuf and colleagues (JAMA, 1991, 266:93) warn about the dangers of over-interpreting such subgroup analyses in clinical trials, noting that low power is of particular concern.

(Ex. 6, 2005 NEJM 276.)

Consistent with this well-established rule, Dr. Farquhar's Report states, "It is a fundamental principle of science and epidemiology that, unless the study is adequately powered to detect differences in event rates over an early time period as part of the pre-study design, the same relative risk determined when the study is over is presumed to apply throughout. Merck's post-hoc 'sub-group analysis' of 0-18 vs. 19-36 month time periods violates this principle and lacks any scientific basis. It is axiomatic that the early phase of any RCT is subject to statistical uncertainties, and the entire field of statistics was developed to create rules of judgment on when enough evidence is present to draw sound conclusions." (Report, ¶ 79.)

Merck's motion to exclude Dr. Farquhar's testimony provides no basis to challenge this scientific principle, but instead argues that Plaintiff must present a study showing statistically significant increased risk of MI within a two-month period in order to support causation. If that were the applicable scientific principle, the *NEJM* reviewers would not have admonished the authors for "aggressively promoting" an argument that went "beyond

the data of the study," nor would Merck's own co-author, Dr. Konstam, have stated that the authors went "out on a limb" by making that claim.

Defendants cite no cases supporting the narrow interpretation of epidemiologic evidence which they proffer. Instead, as this Court has noted, "where it exists, the strongest evidence of a cause-effect relationship between a factor and a disease is epidemiological data, derived from studies carefully constructed to eliminate bias, demonstrating a positive, statistically significant exposure-response relationship." *Vice v. Northern Telecom, Inc.*, No. 94-1235, 1996 WL 200281 (E.D. La. April 23,1996).[2] The APPROVe study constitutes such evidence here, and it provides ample basis for testimony surpassing the *Daubert* standard of admissibility as to causation.

2.    **The Pre-Specified Data Analysis Plan Instructed That Kaplan-Meier Plots of Event Rates Over Time are "Unstable" and Should Not Be Used for the Number of Patients at Risk in the APPROVe Study.**

a.    **The Kaplan-Meier analysis was intended for the larger population of three combined studies.**

Merck sought and received FDA approval for Protocol 203 as a vehicle for determining cardiovascular risk (Ex. 7; Letter from FDA (Goldkind) to Merck Research Laboratories, 12/19/02), and Merck's statistical Data Analysis Plan ("DAP") for Protocol 203 called for the analysis of the combined data from the APPROVe, VICTOR and ViP studies (Protocols 122, 145 and 201, respectively). (DAP, Ex. 8, MRK-AFL0015451-484.) The combined studies were planned to include approximately 24,000 patients, and 10-20% were planned to be on low dose aspirin (ASA) for cardiovascular protection, which would allow assessment in patients with "a spectrum of cardiovascular risk." (*Id.* at MRK-AFL0015481.)

---

[2] The Court held in that case that expert testimony was not necessarily rendered unreliable merely because it did not rely on epidemiologic data. *Id.* Where, as here, such supportive evidence exists, the testimony is all the more admissible.

The DAP was based on the prediction that there would be 611 cardiovascular events and over 38,000 patient years of exposure for analysis of relative risk of the primary specified endpoint, by sometime in 2006, and the statistical methods and calculations were based upon these large figures. (*Id.* at MRK-AFL0015466-69.)

Merck's argument of "no effect for 18 months" relies almost entirely upon a Kaplan-Meier ("KM") graph of events over time, claiming that this analysis was "pre-specified" rather than "*post hoc.*"  However, the KM method was *not* pre-specified in the single, smaller APPROVe DAP (Ex. 9), but instead appears only in Protocol 203 for the combined analysis of 3 large studies.  Further, Protocol 203 actually instructed that the KM method *should not have been used under the circumstances that prevailed*, because of the far smaller numbers in the single study, and the resulting inherent instability of the data.  It is indicative of Merck's "ends justify the means" approach that this limitation was ignored, in order to "aggressively promote" the hypothesis of no effect for 18 months.

Instead of 611 confirmed events for analysis, as anticipated by the DAP, APPROVe provided only 72 (46 Vioxx versus 26 placebo).  Instead of 24,000 patients for the combined studies, the APPROVe study involved less than 11% of that figure (1,287 in the Vioxx arm, and 1,299 in the placebo arm) at the beginning of the study, and only about 6.5% remained when APPROVe was terminated (727 in the Vioxx arm, and 835 in the placebo arm).  (Ex. 10; MRK-AHD0075779; Figure 2).

The DAP for Protocol 203 states:

It should be noted that the Kaplan-Meier estimate can be unstable or imprecise when the number of patients at risk becomes small, as it does at the end of the study.  Given the large size of this trial, sufficient numbers of patients are expected to be at risk at the end of the trial.  However, in the case that there are less than 1,000 patients left at risk in either

> the rofecoxib or placebo group, then the graphical displays and
> cumulative incidence estimates will be <u>truncated at the time
> point at which there are still at least 1,000 patients left at risk in
> each of the treatment groups</u>.

(Ex. 8, DAP, at MRK-AFL0015475.) (emphasis added).  Thus, the data for APPROVe alone

started at a level marginally above the specified cut point for truncation of the Kaplan-Meier

analysis, and fell beneath that line in the Vioxx arm between 12 and 18 months into the study

(Ex. 10; Figure 2, cited above).  If Merck had followed its own DAP, it would not have

performed the KM analysis, because of the small number of patients at risk and the inherent

instability of the data.  Arguably, under the DAP, Merck could have truncated the Kaplan-

Meier curve at the point between twelve and eighteen months when the patients at risk in the

Vioxx arm dropped below 1000.  However, that course would have resulted in the paradox of

reporting statistically significant doubling of relative risk, yet displaying a KM curve showing

little or no difference up to the point of truncation.  Such a contradiction highlights the fact

that the DAP itself favored the statistical analysis of relative risk rather than the KM analysis

over time, especially where the patient population is reduced.  See Ex. 8, DAP, MRK-

AFL0015474:  "<u>Relative risk</u> (i.e., the hazard rate ratio) and associated CI, will be used as the

<u>primary measure for estimating the comparative effects between treatment groups</u>" (emphasis

added).  Accordingly, the overall relative risks of 1.92 for "thrombotic" events and 2.80 for

"cardiac events" are the "primary measures" of Vioxx's increased risk of harm, and the KM

curve does not provide a reliable indicator of risk variance over time.

       The instability of a reduced population sample is further demonstrated by the

inconsistencies of the relative risks for the three periods of 6 months that make up the first 18

months; such analyses were also a pre-specified analysis[3] that Merck failed to mention in

either the published APPROVe study or its voluminous pleadings.  This analysis <u>showed</u>

<u>elevated relative risk for Vioxx patients in the 0 to 6 month period and the 12 to 18 month</u>

<u>period</u> with respect to the primary endpoint of confirmed thrombotic cardiovascular events,

RR = 1.45, 95% CI .40, 5.78) (Ex. 10, MRK-AHD0075781, Table 6a.)  In fact, the relative

risk was elevated for Vioxx patients in 5 of the 6 intervals; the placebo rate exceeded the

Vioxx rate <u>only</u> in the 6 to 12-month interval, by a mere 7 events to 5.  It cannot reasonably be

concluded from these data that Vioxx is harmful in the first 6 months, protective in the next 6

months, and harmful in every 6-month period thereafter.  To the contrary, the statistically

reliable conclusion attributes the outlier interval to the instability of small numbers, and the

overall relative risk remains the "primary measure" of the hazard for the study as a whole.

> **b.**     **The Pre-specified KM Plot for the 3 Combined studies would show early separation, based on larger numbers of patients and events.**

Merck has never provided a <u>combined</u> KM plot for the APPROVe, VICTOR

and ViP studies, despite the facts that (1) Protocol 203 requires it, and (2) the total patients at

risk would reach the acceptable cut point of 1,000 patients per treatment arm, through

approximately 24 months.  While Merck has not yet provided Plaintiffs with the statistical

files that would be needed to perform the complete KM analysis for VICTOR and ViP, visual

inspection of the data demonstrate that a KM curve for the three combined studies would show

early and continuous separation, contradicting Merck's entire theory of the case.

---

[3] ("The Log HR [Hazard Ratio] within each successive 6-month time interval with confidence limits will also be calculated and plotted.  Such plots will provide an indication of any time effect on the HR."  Ex. 8, MRK-AFL0015476.)

The basic shape of the combined KM curve can be predicted from the separate curves, shown below, and from the combined event totals over time. At the two-month cutoff, there were 12 total events in the Vioxx arms of APPROVe, VICTOR and ViP, compared to 6 events in the placebo arm. Furthermore, the events in VICTOR occurred rapidly in the Vioxx arm (4 reported events in 27 days, and 7 events in 76 days) resulting in immediate separation of the Vioxx and placebo incidence curves. (Ex. 11, MRK-AFK0190651; Farquhar Report at ¶ 129.) Relative risks were even higher than the ratios of raw data, because the Vioxx arms had smaller denominators due to larger numbers of dropouts (i.e., smaller patient years of exposure due to a shrinking population). As shown in the table below, incidence of confirmed events in the combined studies remained higher in the Vioxx arm throughout the study:

**Confirmed Thrombotic Events; Protocol 203**

|  | Vioxx Arm | | | Placebo Arm | | | Total | |
|---|---|---|---|---|---|---|---|---|
|  | APPROVe | VICTOR | ViP | APPROVe | VICTOR | ViP | Vioxx | Placebo |
| 0-2 months | 2 | 4 | 6 | 2 | 0 | 4 | 12 | 6 |
| 0-4 months | 5 | 7 | 10 | 4 | 2 | 9 | 22 | 15 |
| 0-6 months | 7 | 8 | 12 | 5 | 3 | 10 | 27 | 18 |
| 0-12 months | 12 | 10 | 14 | 12 | 3 | 15 | 36 | 30 |
| 0-18 months | 22 | 14[4] | 14 | 20 | 4 | 15 | 50 | 39 |
| 0-24 months | 29 | 14 | 14 | 23 | 4 | 15 | 57 | 42 |
| 0-36 months | 46 | 14 | 14 | 26 | 4 | 15 | 74 | 45 |

Data Sources: APPROVe:   SAS file of time to event data, Ex. 12;
VICTOR:   MRK-40096441, MRK-AFK0651, Ex. 13, 11;
ViP:   MRK-40096416, Ex. 13.

The pooled analysis required by Protocol 203 yielded 10,563 patient years of exposure, 119 confirmed events, and a statistically significant increased relative risk (RR = 1.67, 95% CI 1.15, 2.43), with a higher RR for cardiac events (2.34, 95% CI 1.39, 4.07) and a p-value of 0.0008.  (Ex. 14, Braunstein Slide #53 presented to FDA Advisory Committee (AC), February 2005;[5] Farquhar Report at ¶ 131.)  The larger data set provides a highly stable

---

[4] Total of 14 confirmed events in Vioxx arm appears at page MRK-18940096441 (Ex. 13), "Final" as of 7/28/05.  Interim analysis had confirmed 12 Vioxx events as of 2/05; events were determined over time from KM plot at MRK-AFK0190651 (Ex. 11).  Two additional confirmed events emanated from the "investigator-reported" events at pages MRK-18940096443-44 (Ex. 13), which occurred in less than 18 months from the date of initial exposure.

[5] Although the data were "interim" as of 2/05, comparable event totals were reported in the "Final" VICTOR data (14 v 4 instead of 12 v 4; 7/28/05, at MRK-18940096441 (Ex. 13); 14 v 15 instead of 14 v 14 for ViP (MRK-AFL0015454 (Ex. 8)), and such minor variations would have little effect on the relative risk for a data set of this size.

result, and the p-value of 0.0008 means there is a <u>less than 1 in 1,000 likelihood that the result</u> <u>is due to chance</u>.

In summary, the Court should not accept the validity of Merck's "no effect" claim, which is based on analysis of unstable data from a single trial, in contravention of Merck's own pre-specified, FDA-approved plan. Instead, the Court should direct Merck to prepare and publish the KM curve for the combined APPROVe, VICTOR and ViP studies as required by Protocol 203. Alternatively, Merck's failure to do so should entitle Plaintiff to an adverse inference that the evidence, if provided, would show the Vioxx incidence curve above placebo throughout the study, supporting Plaintiff's contention in the litigation, that is, the risk of Vioxx begins when exposure to Vioxx begins.

3.      <u>The "18 Month" Hypothesis Depends On An Erratic, Biologically</u> <u>Implausible Incidence Curve In The Placebo Group.</u>

At his deposition, Dr. Farquhar introduced a series of peer reviewed journal articles that included KM curves of cardiovascular event rates over time among sizeable placebo groups, in randomized trials of pharmaceutical products such as statins and anti-hypertensive medications, which are designed to reduce event rates. In each case, including a Merck-sponsored statin study, the placebo rate was essentially linear. *See, e.g.*, Exs. 15 at p. 14 and Ex. 16 at p. 1154. It is significant that Merck's position concerning the alleged delay in the cardiotoxic effects of Vioxx is based on a comparison of a relatively constant Vioxx arm incidence curve to an erratic placebo rate that appears higher than the average rate in one segment of the study, and lower than the average rate in another segment. (See Figure 2, Ex. 10). The weight of the evidence, cited by Dr. Farquhar and not refuted by Merck, is that true rates of CV events in a placebo group are linear, and the nonlinear placebo rate in the

APPROVe trial is an outlier.  It is unscientific for Merck to rely on an implausible placebo curve to claim that the relative risk of Vioxx varied over time.

The primary explanation for the variability in the placebo rate is, as pointed out in Merck's own DAP, the instability of small numbers, which prohibited use of the KM curve for this very reason.  (See Section II.A.2.a, above).  Secondarily, as explained in Dr. Farquhar's Report (¶ 95), there was an unusual disparity in the rate of confirmation of reported events in the placebo arm, but not in the Vioxx arm, over time.  Thus, during the 0-18 month period, 22 of 39 reported cardiovascular events fell within the narrow definitions of "thrombotic" events as defined by Merck (56.4%) while in the placebo arm 20 of 25 reported events (80%) fell into these categories.  In contrast, during the 19-36 month periods, 24 of 38 (63.2%) of the reported events in the Vioxx arm were confirmed "thrombotic" while only 6 of 19 (32%) were "confirmed thrombotic" in the placebo arm.  (See Ex. 10, Tables 6b and 12b, MRK-AHD0075781, 794.)  "There is no biologically plausible explanation for this discrepancy, which instead appears to be either a statistical anomaly or the result of excessively restricted criteria for adjudication of events, or both."  (Farquhar Report at ¶ 95).

These effects of unstable small numbers provide further support for the rule in the DAP that the KM curve should not have been used to assess purported rate differences under these conditions, and that the overall relative risk is the primary measure that defines the hazard for the Vioxx population throughout the study.

### 4.    Publication of Bad Science Does Not Cure Its Defects.

The mere fact of publication of the APPROVe study with the claim of "no effect" for 18 months does not substantiate its validity.  The record shows an extraordinarily condensed process of review of the APPROVe manuscript, which lasted only 9 days.  The initial manuscript was submitted to *NEJM* on February 6, 2005 (Ex. 17), rejected on

February 9, 2005 (Ex. 5, 2005 NEJM 0000013-14), yet published only 6 days later, on

February 15, 2005.  The *NEJM* rejection letter shows that the process was expedited for

reasons that precluded extensive review, *i.e.*, the "timely nature and the public health

importance of the topic," and, in particular, to allow for simultaneous publication of the

studies regarding Vioxx, Celebrex, and Bextra in the *NEJM* issue published online on

February 15, 2005, the day before the FDA Advisory Committee met to consider such drugs

on February 16, 2005.  The *NEJM* rejection letter sought substantial revisions of the

manuscript, and the end result appears to have been negotiated rather than the editors

prevailing on every point.  The *NEJM* editors explicitly rejected the validity of the claim of no

apparent effect for the first 18 months, and it would be reasonable to infer they were willing to

publish the article with that claim included, to advance the goal of presenting the basic data to

the public.[6]

**B.**     **Dr. Farquhar analyzed time-to-event rates for "high-risk" populations which
were pre-specified by an FDA directive, but not performed by Merck, and these
analyses showed rapid, statistically significant increased adverse CV events in the
Vioxx arm of the study.**

Merck inappropriately criticizes Dr. Farquhar's Report concerning high-risk

groups as a "*post hoc*" analysis, when in fact such analysis was directed by the FDA when it

approved Protocol 203 at the outset.  On December 19, 2002, FDA official Lawrence

Goldkind responded to a series of questions from Merck Research Laboratories concerning the

request for approval of the plan to combine cardiovascular events from three studies for

statistical analysis.  Dr. Goldkind's response specifically directed Merck to "*do appropriate*

---

[6] If the editors had been provided with the deleted data showing continuously elevated risk of
investigator-reported events in the Vioxx arm, it is likely that such data contradicting Merck's
position would also have been published.  *See* Section II.D, below.

*secondary analyses for evaluating time related-risk estimates for patients who are at high risk for CV events...*" (*Id.* at p. 4 (Ex. 7), emphasis added.)[7]

Merck's DAP for Protocol 203 identified categories of high-risk patients, which included those with prior MI, stroke, TIA, coronary artery bypass graft (CABG) or other symptomatic conditions, as well as patients diagnosed with diabetes. (Ex. 8, DAP at p. 4.) In the published APPROVe study, the Merck authors reported extraordinarily high and statistically significant increased relative risks of 9.59 and 6.10 for the symptomatic atherosclerotic disease and diabetic subgroups, respectively. However, Merck failed to present the time-to-event analysis for the high-risk groups. (Ex. 18, Bresalier, 352 *NEJM* at 1097.) Furthermore, the *NEJM* reviewers specifically requested a separate time to event analysis of the high-risk patients. (Ex. 6, 2005 NEJM 000280.) The Merck authors declined to perform the analyses requested by FDA and the *NEJM* reviewers, on the basis that the relatively small number of events would not be "informative." (Ex. 19, at MRK-AHP 0000075.) However, as Dr. Farquhar's Report states, the power to detect a significant effect depends upon both the magnitude of the effect and the size of the population. Because the effect was large, a significant difference was observed even with relatively few events. (Farquhar Report at ¶¶ 80-83.) Thus, Dr. Farquhar's Report provides important information responsive to an analysis request that was pre-specified by FDA, but which Merck failed to provide.

The time-to-event rate for susceptible patients is highly relevant in this litigation. Increased susceptibility of high-risk patients was a longstanding subject of concern for Merck and the FDA with regard to Vioxx. Merck itself first raised the issue in the

---

[7] Merck has not yet provided data on time-to-event rates for high risk patients in VICTOR or V.P., precluding pooled analysis.

aftermath of the VIGOR study, by pointing out the disproportionate increased relative risk of MI and other thrombotic events among patients for whom cardio-protective aspirin would have been recommended, but who were not in fact taking aspirin. (Ex. 20, Targum Memorandum, February 1, 2001 at p. 21.) Later in 2001, the FDA proposed a label for Vioxx that included a warning to use Vioxx with "caution" in patients at risk for thrombotic cardiovascular events, including those with prior MI, stroke, hypertension and/or congestive heart failure, but Merck refused to accept that language in the label. (Ex. 21, Merck response to FDA labeling proposal, October 15, 2001.) Thus, the FDA directive for specific analysis of high-risk patients in Protocol 203 was an appropriate step on the basis of prior data and regulatory concern and Merck's failure to provide the analysis is not adequately explained by the claim that it is "*post hoc*," when in fact it was pre-specified by the FDA.

After APPROVe, Merck itself proposed a label for possible reintroduction of Vioxx to the market which included (1) contraindications for post-CABG surgery patients, (2) black box warnings against use by other patients with cardiovascular risk factors, and (3) an admission that Vioxx increases the risk of cardiovascular thrombotic events. (Ex. 22; Post-APPROVe label proposal.) Such warnings would have been justified following VIGOR as well, and if they had been given, the drug would not have been appropriate to prescribe to patients like Mr. Irvin, who had coronary atherosclerotic disease.

Merck's arguments concerning statistical significance contradict scientific principles and its own DAP. (Merck Memo. at 6.) In particular, Merck argues that the overlapping confidence intervals for the KM curve show a lack of statistically significant difference between Vioxx and placebo until 3 years into the APPROVe study. However, the DAP explicitly states that "non-parametric methods such as the log-rank test will be utilized to

compare the survival curves." (Ex. 8, DAP, at MRK-AF10015475.) The log-rank test was used by Dr. Farquhar to show statistical significance of the RR of 3.49, p=0.04, which is below the generally accepted level of p<0.05, with regard to the high-risk group for 0 to 18 months. (Farquhar Report, ¶ 83, n.3.) Merck also claims that the result for the high risk group is not statistically significant because the 95% confidence interval (CF) lower bound is .97 rather than 1.0. However, Merck introduced no evidence to refute the fact that the p value is precise, while the CI is an estimate, and that the p value of 0.04 is "the most reliable indicator of statistical significance." (Farquhar Report at ¶ 83, n.3.)

Merck contends that the elevated relative risks and early onset of disease found in the high-risk populations of APPROVe and VIGOR are inapplicable to Mr. Irvin's claim, simply because he had not been diagnosed with symptomatic disease nor diabetes. This is an antiscientific interpretation of the data. As Dr. FitzGerald appropriately points out, the risk of rapid manifestation of the risk of Vioxx in the form of a clinical event depends upon the degree of intrinsic (underlying) risk of the individual patient, regardless of the particular diagnosis giving rise to the increased risk. It is undisputed in this case that Mr. Irvin suffered from moderate to severe coronary artery disease, and this condition made him susceptible to rapid onset of a clinical adverse event due to the effects of Vioxx in increasing hypertension, triggering plaque rupture, and promoting occlusive thrombosis after the plaque has ruptured. Dr. Farquhar's report and deposition testimony are consistent with this view:

"There is compelling evidence in the RCTs that Vioxx multiplied the potential impact of underlying risk factors, to increase the likelihood of a serious event. Therefore, while all patients exposed to Vioxx were at increased risk of cardiovascular disease, a patient with such pre-existing risk factors as hypertension, high cholesterol, prior heart attack or

stroke, diabetes, obesity, or other known risk factors, was at particularly high risk of serious

heart disease as a result of exposure to Vioxx." (Ex. 1, Farquhar Report at ¶ 58). Dr. Farquhar

further stated that the data demonstrate "consistency with mechanisms of damage acting

rapidly upon the most susceptible," including "prothrombotic and hypertensive mechanisms."

(*Id.* at ¶ 97).

> **C.**  **The External Safety Monitoring Board (ESMB) for the APPROVe study requested time-to-event plots for the composite end points of thrombotic and congestive heart failure (CHF) events, which showed very early separation of adverse event rates, but Merck refused to provide that analysis to the *NEJM* in response to a reviewer's request.**

Merck claims that the only relevant endpoints are "thrombotic" events, but the

External Safety Monitoring Board ("ESMB") and NEJM reviewers disagreed.  In

September 2004, the ESMB suggested that an appropriate composite endpoint would include

the combination of thrombotic events and congestive heart failure.  Merck performed such an

analysis, which showed early and continuous separation, with the Vioxx incidence rate above

placebo throughout the period of the study.  (Ex. 37, pg. MRK-AAD0357814; Farquhar

Report at ¶ 104).  A reviewer for *NEJM* was critical of Merck's definition of the relevant

endpoint.  "'Thrombotic cardiovascular serious events' contains a long list of heterogeneous

events, including venous thrombosis and pulmonary embolism....The use of a composite

endpoint that includes 'noise' will reduce power.  Based on known biologic mechanisms of

COX-2 inhibitors, heart failure might have been a better choice as an element of the primary

composite outcome than venous thrombosis." (Ex. 6, 2005 NEJM000272).  Merck had this

analysis readily available, but declined to provide it to the *NEJM* reviewer.

Thus, Merck's claim of no effect in the first eighteen months is based upon exclusion of relevant adverse events from the endpoint. When such events are considered, the rapid toxic effects of the drug are clear.[8]

### D. "Investigator-Reported" Events Comprise An Important, Pre-Specified Secondary Endpoint Of Cardiovascular Illnesses That Were Statistically Significantly Higher In The Vioxx Arm Of APPROVe Throughout The Entire Period Of The Study

Merck claims that only "confirmed thrombotic events" are pertinent, and argues that investigator reported cardiovascular events are merely "raw data" that were superceded by the process of event adjudication and confirmation. (Merck Memorandum re Dr. Farquhar, at p. 5, n.2.) This is incorrect on many levels, as detailed below.

#### 1. Investigator-reported events are a scientifically appropriate means of assessing toxicity through different cardiovascular outcomes.

The "investigator-reported" category is not co-extensive with "thrombotic" events, but instead includes a larger set of cardiovascular illnesses that are plausibly associated with a cardiotoxic drug. Thus, the investigator-reported event category includes not only the so-called "thrombotic" events such as MI and ischemic stroke, but also numerous illnesses associated with hypertension and atherosclerotic disease. The difference between investigator-reported and confirmed events is *not* that the former are "raw data" while the latter are "real" events, but instead that *thrombotic events are a subset of investigator-reported events*. This is clearly demonstrated by a simple comparison of the confirmed event list in

---

[8] Merck's prepared response to the *NEJM* reviewer also stated, "the numbers of venous thromboembolic events were small; their inclusion or exclusion does not materially affect the findings." (Ex. 19, MRK-AHD0000065). However, this is incorrect. 25% of the placebo arm events (5/20) during the first eighteen months of the APPROVe study were peripheral venous or pulmonary embolism events which the *NEJM* reviewer suggested should not be included. (*Id.*) In comparison, only two of the 22 Vioxx arm events in the first eighteen months were in this subcategory. Thus, excluding such events would have resulted in 20 versus 15 confirmed thrombotic events for Vioxx versus placebo in the first eighteen months, and the incidence curves would have clearly separated by that time.

APPROVe, 352 *NEJM* 1092 at 1096, Table 2 (Ex. 18), with Table 11 of the Cardiovascular

Safety Report (Exhibit 10, pp. MRK-AHD0075790-791.)  The "thrombotic" category includes

eight basic event types,[9] while the "investigator-reported" category includes all of the

"thrombotic" endpoints, plus such additional diagnoses as angina pectoris, coronary artery

disease and myocardial ischemia, which are well-known to be associated with hypertension.

In turn, hypertension is well-known to be caused by Vioxx.

Merck takes the internally inconsistent positions that (a) only "thrombotic"

events are relevant, yet (b) there is no evidence that Vioxx is pro-thrombotic.  Both of these

contentions are incorrect.  The adverse effects cannot be pigeon-holed into predicted

categories of "thrombotic" events only, but instead must be interpreted on the basis of the

actual events that occur.  Otherwise, safety signals would be inappropriately dismissed simply

because they did not conform to expectations.  The fact is that investigator-reported events

showed a statistically significant increased relative risk for Vioxx versus placebo, RR = 1.90,

95% CI 1.31, 2.76, and the p value was 0.001, which means that there was only a *one in one*

*thousand likelihood that the result was due to chance.*  A "gold standard" randomized clinical

trial reporting statistically significant increased relative risk cannot be ignored on the basis that

the event categories do not fit Merck's preconceived notion that there is only one mechanism

for the harm that the drug can cause.

Furthermore, Merck's own internal, unpublished report of investigator-reported

events shows that "the curve of the rofecoxib treatment group was above the curve of the

placebo treatment group during the entire study (Exhibit 24, MRK-AFV042639), and that

---

[9] Myocardial infarction (fatal and non-fatal); sudden cardiac death; unstable angina; ischemic
cerebrovascular stroke (fatal and non-fatal); transient ischemic attack; pulmonary embolism;
peripheral arterial thrombosis; and peripheral venous thrombosis.  Bresalier, *NEJM* 2005;
352:1096 (Ex. 18).

there was a statistically significant increased risk for Vioxx in both the 0-18 month and

19-36 month periods of the study (Exhibits 10, p. MRK-AHD0075794). Accordingly, it is

improper for Merck to cite only the "confirmed thrombotic" event curve based on smaller

numbers and an implausibly erratic placebo incidence curve, while omitting the larger data set

which demonstrated a biologically plausible, linear placebo rate of events, and a significant

constantly elevated relative risk of Vioxx.

           2.       **The importance of the investigator-reported event data is highlighted by the efforts Merck has undertaken to suppress these data.**

      As described in Dr. Farquhar's report (¶¶ 85-95), data analysis showing

statistically significant increased risk of investigator-reported events was included in a draft

manuscript of the APPROVe article, yet these results were deleted from the draft less than one

week before its submission to the *NEJM*. The omitted draft retained the notation above the

table, "SUGGESTION IS TO DELETE INVESTIGATOR-REPORTED EVENTS"

(Exhibit 17, emphasis in original; 2005 NEJM 000317). The suggestion to delete the

investigator-reported data was made by a Merck employee with an equity stake in the

company. (Exhibit 25, 2005 NEJM 000008; MRK-AHD0075698 (Ex. 4)). The rejection

letter for the APPROVe manuscript included the directive, "Restore the investigator-reported

events category to Table 2." (Exhibit 5, 2005 NEJM 000013). Merck failed to provide the

investigator-reported data, but instead prepared a misleading response that "the relative risk

[for investigator-reported events] is similar to that for confirmed events," while failing to

disclose that the *shapes* of the incidence curves differed in a critical way, such that the data

analysis and KM curves contradicted Merck's claim that there was no apparent difference in

event rates until after 18 months of exposure (Exhibit 19, MRK-AHD0000077; Farquhar

Report, ¶ 91-95).

Merck's response to *NEJM* took the position that it would have been improper to publish investigator-reported data when confirmed data were available. (Ex. 19.) However, this claim does not withstand scrutiny. If it had been thought improper to publish, why was the data analyzed and included in a draft in the first place, and why did it remain there until a week before submission for peer review? Why would the DAP have specified a secondary endpoint for analysis if the data were only to be suppressed? Why would the authors have left the secondary endpoint of "APTC events"[10] in the draft, but deleted the investigator-reported events which had co-equal status? The answers to these questions are clear: the secondary endpoint of investigator-reported events had a valid scientific purpose in the DAP, to test the relative risk of Vioxx versus placebo for a related but non-identical cardiovascular endpoint. The data were analyzed because the pre-specified plan required it. After the analysis showed a result that Merck did not like, the data were deleted from the draft, not to improve "clarity" as stated in the Merck employee's email recommending the deletion (Ex. 4, MRK-AHD0075698), but because the statistically significant increased risk in the 0-18 month segment of the study contradicted Merck's position of "no effect" for 18 months. It is no coincidence that Merck deleted data which would, if accepted by the courts, protect the company from the potential for liability to substantial numbers of patients, like Mr. Irvin, who took the drug for less than 18 months.

The Court should give substantial weight to the comments of the independent reviewers of the *NEJM*, who criticized Merck for "aggressively promoting the 18 month hypothesis with the goal [of] defending the manufacturer's conduct in the entire rofecoxib

---

[10] APTC events, or "Antiplatelet Trialist Collaboration" endpoints, include hemorrhagic strokes, as well as MI and ischemic stroke, while excluding unstable angina and peripheral events.

affair.'" (Ex. 6, 2005 NEJM 000276-277.) "The internal 'hand' of the study sponsor is too

evident throughout the manuscript, which is written consistently in a fashion designed to

support the company's public positions. In the process, the scientific integrity of the

manuscript is compromised." *Id.* at 2005 NEJM 000282. If the investigator-reported events

had been disclosed, the reviewers would have been informed that there was data contradicting

the "18 months" hypothesis. Given their intense interest in the topic, it is highly likely that the

reviewers would have required such data to appear in the final article.

### 3. The excess cardiovascular events in the Vioxx arm of the investigator-reported category are plausibly related to Vioxx.

As noted above, the investigator-reported category included atherosclerotic and

hypertension-related diseases, in addition to those involving thrombotic occlusion of a blood

vessel. Garret FitzGerald, M.D., a leading scientist who testified to the FDA Advisory

Committee in February, has written that "a single mechanism, depression of prostaglandin $I_2$

formation, might be expected to elevate blood pressure, accelerate atherosclerosis, and

predispose patients receiving coxibs to an exaggerated thrombotic response to the rupture of

an atherosclerotic plaque. The higher a patient's intrinsic risk of cardiovascular disease, the

more likely it would be that such a hazard would manifest itself rapidly in the form of a

clinical event." *NEJM* 2004; 351:1709-1710 (Ex. 2). Thus, the significantly higher rate of

investigator-reported events is relevant to show the multiple likely mechanisms of harm.

### 4. Merck has often relied upon investigator-reported events.

Merck's credibility as to the reason for deleting the investigative reported data

suffers when its pattern of reporting other investigated reported data is considered. First, in

APPROVe itself, the endpoint of congestive heart failure ("CHF"), pulmonary edema and

cardiac failure was entirely "investigator reported," in that these endpoints were not

adjudicated at all, yet the *NEJM* reviewers insisted upon publication of the statistical analysis showing increased relative risk of 4.6 versus placebo, and Merck complied.  (Exhibit 19, MRK-AHD0000061; Exhibit 18, Bresalier, 352 *NEJM* at 1097.)  Second, in the VIGOR publication, the Merck authors provided statistical analysis of both confirmed and investigator reported gastrointestinal adverse events.  (Exhibit 26, Bombardier, "Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis, *NEJM* 2000; 343:1520-8, at 1521, 1525 (Table 4).  In a submission to the FDA, Merck described the analysis of "investigator-reported" events as a "secondary endpoint," which "were consistent with and support the reductions seen in the primary and key secondary endpoints."  (Ex. 27 FDA Advisory Committee Background Information, 2/8/01, at 19-20.) Merck authors also published a study of thrombotic events based entirely on investigator-reported data, Reicin, "Comparison of Cardiovascular Events," *etc.*, American Journal of Cardiology 2002; 89:204-209 (Ex. 28).  It is improper for Merck to rely on investigator reported data in some studies but to delete such data from the APPROVe manuscript, particularly where the *NEJM* reviewers specifically asked to have it restored.

## III.    VIGOR, ADVANTAGE AND THE RHEUMATOID ARTHRITIS STUDIES SUPPORT CAUSATION IN THIS CASE.

Merck argues that the VIGOR study does not apply to Mr. Irvin because it involved a 50 milligram dose, a comparison to naproxen rather than placebo, and a rheumatoid arthritis population.  These claims are not persuasive.  Dose is relevant but not controlling. The naproxen cardioprotection theory has been "discredited."  To the extent rheumatoid arthritis played a role, it simply shows that patients with pre-existing risk factors for MI are at greater risk when they take Vioxx.

### 1.    The Dose in VIGOR is Relevant to Mr. Irvin

Merck argues that the 50 mg dose in VIGOR makes the study irrelevant to Mr. Irvin because he took 25 mg Vioxx.  That position is unfounded.  The difference between a 25 milligram dose and a 50 milligram dose is well within the metabolic difference attributable to individual patient factors.  *See*, for example, testimony of Garrett FitzGerald at the Advisory Committee hearings in 2005 to the effect that a low dose for one patient would be a high dose for another, because of differences in susceptibility and metabolism , and that there is no assurance of safety in taking a lower dosage of COX-2 inhibitors.  (Ex. 30; AC Transcript, 2/16/05 at 120.)

In addition, the FDA medical officer review found that the results were consistent between the 25 mg dose ADVANTAGE study and the VIGOR 50 mg study. Despite the brief duration of ADVANTAGE (average 69 days exposure), there were ten cardiovascular events (MI, sudden cardiac death and unstable angina) in the Vioxx arm compared to only three for placebo.  (Farquhar Report, ¶¶ 123-128.)  Thus, VIGOR and ADVANTAGE provide consistent support for the conclusion that both the 25mg and 50mg doses increase the risk of MI for patients on Vioxx, and that such effects are seen in even brief periods of exposure.

### 2.    The Naproxen Theory Is Unreliable

Neutral reviewers for the *NEJM* criticized Merck's reliance upon the naproxen caridioprotection hypothesis to explain the VIGOR results in the APPROVe manuscript.  The reviewers used strong language, stating that the naproxen theory was "discredited" and that Merck's position on naproxen protection argument was "really a stretch."  (Ex. 6, 2005 NEJM 274.)

It is undisputed that there has never been a randomized clinical trial of naproxen versus placebo, and thus there is no reliable evidence of a cardioprotective effect. Defense expert Gaziano has written on numerous occasions that treatment effects in the small to moderate range of 10 to 50% cannot be reliably determined through observational studies, because of "uncontrolled and uncontrollable confounding" factors. *See, e.g.*, Kurth, Gaziano, et al., "Aspirin, NSAIDs, and Cox-2 Inhibitors in Cardiovascular Disease," *Curr. Rheum. Reports* 2004; 6:351-356 at 351 (Ex. 31).

There have been no observational studies finding a difference between naproxen and no use of an NSAID outside of this "small to moderate" range, and Merck has not cited any. When all the observational studies are within the range of confounding error, they are inherently incapable of reliably showing a true difference. In fact, some studies have actually reported *increased* CV event rates with naproxen use, which is clearly contradictory to a claim of protective effect. The few studies claiming some marginal reduced rate of events cannot possibly explain the statistically significant five-fold increase in MI in the VIGOR study. (*See* Farquhar Report, ¶ 116.)[11]

### 3. The increased risk in rheumatoid arthritis patients applies to all patients with increased susceptibility to cardiovascular events.

The FDA medical reviewer dismissed the notion that the VIGOR results could be limited to rheumatoid arthritis patients. Instead, it was appropriately pointed out that "given the premise that rheumatoid arthritis patients are at increased risk, could one not extend this argument to any patient at increased risk of cardiovascular events?" (Ex. 20, Targum Report at 35.) Further, since both treatment arms started at comparable risk, the finding of a

---

[11] Most absurd is Merck's claim that "chance" dictated the result in VIGOR. That is what significance testing is for. The p value of 0.001 for thrombotic events in VIGOR means there is only a 1 in 1000 possibility that the result was due to chance.

large and statistically significant difference between the naproxen and Vioxx groups means

that the presence of rheumatoid arthritis alone did not cause the increased risk in the Vioxx

group.  *Id.* The increased risk in the APPROVe study merely confirms that the finding is

generalized to different populations.

### 4.    Consistent increases were found in the rheumatoid arthritis (RA) studies conducted by Merck.

As summarized in Dr. Farquhar's Report, there was a consistent increase in

cardiovascular events in the Vioxx group versus naproxen and placebo in the series of studies

conducted by Merck with respect to the rheumatoid arthritis supplemental marketing

application in 2000-2001, and those studies involved 25 mg doses. (Farquhar Report, ¶¶ 118-

122.)

### 5.    The naproxen cardioprotection theory is disproved by APPROVe.

If the difference between VIGOR and naproxen MI rates had been explained by

the protective effect of naproxen in VIGOR, logically there would have been no difference in

the event rates when Vioxx was compared to placebo in APPROVe.  The strong, statistically

significant increased risk in APPROVe was consistent with the result in VIGOR, which

reasonably supports the conclusion that the difference in VIGOR was due to the toxicity of

Vioxx, just as in the APPROVe study versus placebo.

### 6.    The VIGOR patients were not "elderly."

In a simply mistaken argument, Merck claims that the VIGOR study is

inapplicable to Mr. Irvin because the VIGOR patients were "elderly."  The data show that the

mean age of the subjects in VIGOR was 58 years, with a standard deviation of 9.5, meaning

that two-thirds of the patients fell between the ages of 47.5 and 67.5.  Mr. Irvin is well within

the range of ages of the VIGOR subjects, and Merck's argument is incorrect.  (Exhibit 20,

Targum Report at p. 8.)

### 7.   Increased risk began early and remained continuously throughout the VIGOR study.

Merck argues (p. 13) that there was no increased risk in the VIGOR study in

the first month.  However, the KM plot in fact shows that the event curves began to separate at

approximately four to six weeks.  (Exhibit 20, Targum Report at p. 17.)  Furthermore, since

the study was not designed or powered to detect differences in the first month, the post-hoc

subgroup analysis by time intervals is inherently underpowered and inappropriate, and instead

the relative risk of 5.0 for MI applies to the entire study.

### IV.   DR. FARQUHAR IS WELL QUALIFIED TO TESTIFY AS TO BIOLOGICALLY PLAUSIBLE MECHANISMS AND THE RESULTS OF STATISTICAL ANALYSES THAT HE DIRECTED

Dr. Farquhar stated in his Report, and testified at this deposition, that

biologically plausible mechanisms of action for increased risks of cardiovascular events due to

Vioxx have been described in peer-reviewed literature, including acceleration of disease by

hypertension and increased likelihood of thrombus formation due to the imbalance of

prostacycline and thromboxane attributable to Vioxx.  (Report, ¶¶ 58, 67, 75-76; Deposition

Transcript at Ex. 1.)

As a cardiologist and epidemiologist, Dr. Farquhar is qualified to address

plausible mechanisms described in the literature.  He does not need to be one of the relatively

few card-carrying thromboxane/prostacycline experts in the world in order to have admissible

opinions.  The Reference Manual includes "biological plausibility" among the factors

considered by epidemiologists in the assessment of cause and effect relationships, and

Dr. Farquhar's report also included this among the so-called "Hill factors."  (Reference

Manual at 378; Farquhar Report at ¶¶ 61, 67.)  Epidemiologists need not be pharmacologists

in order to testify, nor do pharmacologists need to be epidemiologists, and no such

requirements appear in the case law interpreting *Daubert*.  Plaintiffs' overall presentation of

experts includes complementary testimony from related fields, as appropriate.

   Additionally, Merck completely omits reference to Dr. Farquhar's opinion that

hypertension contributes to the increased incidence of adverse cardiovascular events observed

in APPROVe, VIGOR and other studies.  *See, e.g.*, Dr. Farquhar's Report, ¶¶ 75-76, as well as

the following deposition testimony:

> Q.  Doctor, have you formulated a firm opinion in your mind to a reasonable
>
>   degree of medical probability as to the mechanism that you believe
>
> Vioxx      increases the risk for a heart attack?

> A.  Well, there are aspects to this where I have consider --
> considerable degree of medical certainty and there are aspects
> here I realize some uncertainty still exists.

> So we're -- what I'm sure of is that there is no doubt at all that
> Vioxx increases hypertension, and I know that that would be
> sufficient to usher in a whole series of bad events.

> I know to a reasonable degree of medical certainty that it's likely
> that in addition to the hypertension effects, there is probably a
> prothrombotic effect, but as I said earlier, I don't need that in
> order to understand and explain the entirety of the consequences
> of Vioxx.

(Farquhar Deposition Transcript at 60:3-20.)

   A recently published article on the subject of plaque rupture provides additional

support for Dr. Farquhar's opinions.  *See* Fuster, "Atherothrombosis and High-Risk Plaque,"

American Journal of Cardiology 2005; 46:937-54 (Ex. 29).  In this authoritative review, the

authors cite "physical forces . . . particularly the <u>impact of flow on the proximal aspect of the

plaque</u>" as one of two mechanisms that trigger plaque rupture.  *Id.*, at 944-45 (emphasis

added).  As noted in Dr. Farquhar's report, greater stress associated with high blood pressure creates additional impact that triggers plaque rupture in susceptible individuals.  (Report at ¶¶ 21, 75-76).  Furthermore, patients on Vioxx were twice as likely to suffer spikes in hypertension compared to patients on placebo, and among those who suffered such spikes, there was a statistically significant relative risk of 3.82 for confirmed thrombotic events.  (*Id.*)

Thus, there is a clear and direct link between a known mechanism of action for plaque rupture and the data from APPROVe showing significantly increased relative risk of the type of events expected to result from this mechanism among Vioxx-exposed patients. Dr. Farquhar's entire career has involved the study of hypertension and other risk factors for cardiovascular disease, including MI, and he is particularly well-qualified to offer testimony concerning epidemiologic evidence of increased risk due to hypertension found in the Vioxx groups.

Merck is similarly misguided in its claim that Dr. Farquhar is not qualified to comment on the statistical analyses in his report.  Dr. Farquhar used the same methods as in his published articles, directing and consulting with a biostatistician who ran the computer software.  (Ex. 1, Farquhar Tr. at 12:19-13:8).

Merck argues that hypertension is not related to thrombotic events, but this is yet another example of selective reference to the data.  The published APPROVe study refers to the *mean* changes in blood pressure, across a population of approximately 2,600 patients, some of whom were susceptible to the adverse hypertensive effects of Vioxx, while others were not.  Such an analysis inevitably results in background noise that obscures the relationship.  As noted above and in Dr. Farquhar's report, when the analysis was limited to

those who suffered adverse hypertensive events, the association to thrombotic events was clear, strong and significant.

Defendant mistakenly relies on this Court's decision in *In re Propulsid Prods. Liab. Litigation*, 261 F. Supp. 2d at 617. There, plaintiffs lacked any epidemiologic evidence that the claimed injury "exists with regularity and that it is caused by Propulsid. They have theories, but they have no proof to support their theories. Furthermore, their theories have not been tested or subjected to peer review and publication." *Id.* at 617. Here, Dr. Farquhar relies on peer reviewed, published literature, showing large and statistically significant increased risk of MI due to Vioxx. This is the very type of evidence that this Court has called the "strongest evidence of a cause-effect relationship between a factor and a disease." *Vice, supra.*

As observed in a recent *Daubert* decision in the PPA litigation:

> The fact that the mechanism remains unclear does not call the reliability of the opinion into question. "Causation can be proved even when we don't know precisely *how* the damage occurred, if there is sufficiently compelling proof that the agent must have caused the damage *somehow*."

*In re Phyenylpropanolamine (PPA) Products Liability Litigation*, 289 F. Supp. 2d 1236, 1247 (W.D. Wash. 2003), quoting *Daubert II*, 43 F.3d at 1314. Plaintiffs submit that the epidemiologic and other scientific evidence in this case far exceed the single study and plausible mechanisms proffered in PPA.

There is a consensus that Vioxx is cardiotoxic. The epidemiologic evidence was sufficient to have caused Merck to remove the drug from the market. The FDA stated that the evidence of risk of Vioxx is "stronger" than for any other NSAID or COX-2. (Ex. 36; Minutes 5/3/05). Numerous randomized and observational studies have reported statistically significant increased risks. Accordingly, the presence of plausible mechanisms of action for Vioxx's harm to the cardiovascular system, in conjunction with statistically significant

increased risks in well-run randomized trials, far exceeds the standard for admissibility of

causation evidence under *Daubert*.

**V.      RANDOMIZED TRIALS OF OTHER COX-2 INHIBITORS, FDA COMMENTARY,
AND OBSERVATIONAL STUDIES SUPPORT INCREASED RISK OF SHORT
DURATION EXPOSURE.**

              In the *Daubert* analysis, it is relevant that Dr. Farquhar's opinions on risks of

relatively brief Vioxx exposure are supported by numerous neutral observers and peer-

reviewed articles.  A sample of such evidence is set forth below:

              1.      David Graham, FDA official and author of a leading, peer-reviewed

study of Vioxx, testified to the Advisory Committee (AC) that "*risk of myocardial infarction

with rofecoxib begins when rofecoxib use begins.*"  (Transcript, AC Hearing, 2/17/05 at 63-65,

emphasis added); cited at Farquhar Report, ¶ 176 (Ex. 32).)  Dr. Graham further stated that

approximately half of the MI cases in the Vioxx subjects of a large Medicaid database study

occurred within two to three months, and that the lack of significant differences in the early

part of some Vioxx studies is due to the lack of sufficient power and population size.

(Transcript, AC Hearing, 2/17/05, at 64-65.)

              2.      Early increased risk of CV events due to COX-2 inhibition is strongly

supported by a study of Bextra (valdecoxib) and Dynastat (parecoxib), two other COX-2

inhibitors among patients who had recently undergone coronary artery bypass grafting

(CABG).  In that RCT the authors found that "short-term COX-2 inhibition is associated with

a significant risk of thromboembolic events in patients at high risk for such events."

Nussmeier, et al., "Complications of the COX-2 Inhibitors Parecoxib and Valdecoxib After

Cardiac Surgery," New England Journal of Medicine, 2005; 352:1081-91 at 1086 (Ex. 33).

The patients were exposed to such drugs for only 10 days, with a 30-day follow-up period, yet

despite this relatively brief exposure, a statistically significant increased risk was demonstrated

for the occurrence of "cardiovascular events" including MI, sudden cardiac death, stroke, and TIA. Nussmeier at 1087, Table 3 (RR = 3.7, p = 0.03, 95% CI 1.0, 13.5). These results strongly support the conclusion that the risk of COX-2 inhibitors, including Vioxx, can and does appear within the first days after exposure among high-risk populations.

3.      A published study by Solomon, et al. (See Hypertension, 44: 140-145, 2004 (Ex. 34)) reported that there was an increased risk of MI during the first 30 days of exposure to Vioxx, and in the 31-90 day period, compared to Celebrex. The difference between Vioxx and comparator drugs after 91 days was not significant. The AAC Backgrounder at MRK-AAD0408535 shows that in the Solomon study the p. value was 0.054 for MI in the Vioxx group versus no NSAID use. Merck simply states that there was no significant difference, without mentioning that the p-value was at the border of significance. A p-value of 0.054 is relevant and shoult not simply be dismissed as "insignificant."

4.      In the Merck-sponsored Ingenix study, the authors reported in a 2003 draft that there was a statistically significant increased incidence of MI among Vioxx users compared to diclofenac or ibuprofen users in the United Health Group database of prescriptions and adverse event records, for the 0-30 day exposure period (Adjusted Rate Ratio = 1.86, 95% CI 1.14, 3.04). (MRK-ADC0032557 (Ex. 35).) This study has not been published.[12]

5.      Merck omits reference to a large study of all Aetna, Inc., administrative health care databases that showed a statistically significant increase in MI admissions over a

---

[12] Merck claims that the Ingenix study does not show significant differences because a later version had a lower bound of the confidence interval at 0.98, marginally below 1.0. This argument actually shows, yet again, that Merck altered a draft to delete adverse data, since the earlier, internal version showed a statistically significant increase in MI during the 0-30 day period, (Farquhar Report at ¶ 183), while the later version cited by Merck omitted that finding.

two-year period, in both 1 to 14 day and 1 to 90 day treatment windows (Odds Ratio=1.5, 95%

C.I. 1.1, 1.7, in the 1-14 day window; "similar results were seen in sensitivity analyses and in

the analyses that used the 1 to 90 day exposure window.")  (Ex. 38; MRK-AAD0408536-37.)

## VI.     MERCK'S MISCELLANEOUS ATTACKS ON DR. FARQUHAR AND HIS OPINIONS ARE UNFOUNDED.

### A.     Discussion of Individual Cases with Plaintiffs' Counsel is Appropriate

Merck makes the remarkably hypocritical argument that Dr. Farquhar's

opinions concerning the toxicity of Vioxx are somehow tainted by his consultation with

plaintiffs' counsel concerning individual cases of Vioxx users.  If that were true, it would also

apply to Merck's expert Dr. Gaziano, who has consulted and testified concerning both general

issues and individual plaintiffs since 2002 (Exhibit 39, Gaziano Deposition Testimony,

July 19, 2005 at 212-213).  There is no rationale for Merck's position.  It is clearly consistent

for an expert familiar with the general principles relating to the issue at hand to offer opinions

applying the evidence to particular patients.

### B.     Dr. Farquhar Considered the Meta Analyses and Found the Randomized Clinical Trials of Large Populations More Persuasive, Consistent With the Position of the FDA.

Merck falsely asserts that Dr. Farquhar avoided consideration of meta analyses,

upon which it relies to claim the purported absence of a toxic effect of Vioxx.  However,

Dr. Farquhar provided his list of reliance materials, which included all of the published Merck

meta analyses, as well as the Juni meta analysis which contradicted Merck's findings.

Dr. Farquhar's Report indicates his opinion that the randomized clinical trial is the "gold

standard" for determination of cause and effect relationships between exposure and disease,

and his reliance on such studies as APPROVe and VIGOR is supported by the similar

preference stated in the Reference Manual (p. 338).  FDA medical reviewers expressed similar

doubts about the validity of Merck's meta analyses, which combined studies of different durations, doses and populations, compared to the more reliable results of individual, substantial randomized clinical trials of comparable populations exposed to the same dose, such as APPROVe and VIGOR.  (Exhibit 40; Humeston v. Merck & Co. Trial Testimony, October 26, 2005, at 5617-5619).

C.   **Dr. Farquhar offers no opinions concerning "ethics," and his testimony concerning misinterpretation of scientific data is admissible.**

Merck argues that Dr. Farquhar should be prohibited from testifying about the ethics of its conduct.  Plaintiffs do not intend to have Dr. Farquhar testify concerning business ethics.  Instead, Dr. Farquhar's testimony is limited to the scientific data and the reasonable inferences thereon.  In the course of such testimony, it is appropriate to comment that, from a scientific standpoint, unreasonable and unsupported interpretations of the data were made.  For example, it is reasonable for Dr. Farquhar to comment on Merck's reliance on the "naproxen cardioprotection theory," when neutral reviewers for the New England Journal of Medicine have called that theory "discredited."  Similarly, the testimony offered by Dr. Farquhar concerning Merck's pre-marketing analysis of the ostheoarthritis trials is based on Merck's departure from the scientific method, not its business ethics, and such testimony is appropriate and admissible.

## CONCLUSION

Dr. Farquhar applied reliable scientific methods to evaluate the data, performing pre-specified analyses that Merck failed to do, and that FDA and/or New England Journal reviewers requested.  The bulk of the data support increased risk throughout the period of exposure.  Merck's claim of "no effect" in 18 months goes "out on a limb," is not grounded in scientific principles, and depends on a restrictive endpoint to artificially limit the data for

analysis.  Dr. Farquhar's testimony meets the *Daubert* test, and Merck's motion should be

denied.


Date:   November 2, 2005

<div style="margin-left: 50%;">

Respectfully submitted,


By:  *C. Leigh oDell*

**Andy D. Birchfield, Jr., Esquire**
Paul J. Sizemore
P. Leigh O'Dell
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
(800) 898-2034 (telephone)
(334) 954-7555 (telecopier)

**Co-Lead Counsel**



**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
FAX: (504) 561-6024

**Temporary Office**
3411 Richmond Ave., Suite 460
Houston, TX 77046
PH: (713) 877-1843
FAX: (713) 871-9750

**PLAINTIFFS' LIAISONCOUNSEL**

</div>

Christopher A. Seeger, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
MEUNIER&WARSHAUER, L.L.C.
P.O. Box 960
191 East Second Street
New Roads, LA 70760
(225) 638-6137
(225) 638-8836 (fax)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Thomas R. Kline, Esquire
KLINE&SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)(215) 592-4663
(telecopier)

## PLAINTIFF'S STEERING COMMITTEE

Carlene Rhodes Lewis, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced in accordance with Pre-Trial Order No. #8, on this **2nd** day of November, 2005.

484275.4