UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| Evelyn Irvin Plunkett v. Merck & Co, Inc.* | | CASE NO. 02:05CV4046 |

**PLAINTIFF'S RESPONSE
TO DEFENDANT'S MOTION TO EXCLUDE THE
TESTIMONY OF RICHARD M. KAPIT, M.D.**

Plaintiff Evelyn Irvin Plunkett, as Personal Representative of the Estate of Richard Irvin, Jr., deceased, by and through her undersigned counsel, hereby opposes Merck's Motion to Exclude the Testimony of Richard M. Kapit, M.D.

Defendant Merck & Co., Inc seeks to preclude Plaintiff from presenting at trial the opinion testimony of Dr. Richard M. Kapit, a regulatory expert and former Medical Officer for the Food and Drug Administration (FDA). Defendant seeks to exclude the testimony in its entirety on the basis that Dr. Kapit's opinions are preempted by federal law and constitute improper expert testimony. Plaintiff hereby responds as follows:

**I.       LEGAL STANDARD**

Federal Rule of Evidence 702 is the standard for governing a Court's determination whether to admit scientific or other expert testimony. Rule 702 permits the admission of expert testimony where scientific, technical or other specialized knowledge will assist the

trier of fact. It incorporates principles established in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, (1993), General Electric Co. v. Joiner, 522 U.S. 136 (1997), and Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999). In these three cases, the U.S. Supreme Court charged trial courts with a gate keeping role to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert, 509 U.S. at 589. The court also has made clear that experts must provide adequate explanations for their conclusions, Joiner, 522 U.S. at 146 (mere *ipse dixit* will not do); and that the ultimate goal is to assure that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire, 526 U.S. at 152.

In its role as gatekeeper, a district court has wide discretion to decide whether an expert's testimony is reliable enough to be admitted. One of the fundamental tenets of Daubert is that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. Daubert, 509 U.S. at 592. Dr. Kapit's opinions are reliable and admissible under Rule 702 and the Daubert-Joiner-Kumho Tire trilogy.

## II.     QUALIFICATIONS FOR ADMISSIBILITY

### A.     Summary of Qualifications

Dr. Richard Kapit has been proffered to testify regarding the FDA Regulatory Process, FDA procedures and regulations governing labeling content, adequacy of warnings, post-marketing surveillance, and regulatory standards of conduct and compliance for drug safety. His testimony also encompasses his experience of how ethical pharmaceutical companies deal with and report safety issues.

Dr. Kapit is a medical doctor, board certified in Psychiatry and Neurology, with a

Masters degree in Public Health. Dr. Kapit was a Medical Officer with the FDA for sixteen years, serving in both the Division of Epidemiology and Division of Neuropharmacological Drug Products. At the time that Vioxx was approved for marketing in 1999, Dr. Kapit was working for the Division of Epidemiology, the division charged with the responsibility of evaluating and analyzing adverse drug reports. While serving as a Medical Officer, Dr. Kapit was responsible for the medical review of Investigational New Drug Applications (INDs), New Drug Applications (NDAs), supplemental NDAs (sNDAs) postmarket surveillance reports, data on clinical trials, and the evaluation and analysis of adverse reactions of licensed biological medicines and vaccines.[1]

In his capacity as a Medical Officer, Dr. Kapit developed expertise in FDA regulatory procedures and compliance. He was directly responsible for interacting and interfacing with pharmaceutical companies and making recommendations concerning the safety and efficacy of pharmaceuticals. He was the senior medical officer in charge of reviewing the NDA for Prozac. His duties as a Medical Officer required that he review drug submissions for safety and efficacy, to draft and evaluate label and warning content, to study and make recommendations concerning, post-market surveillance reports, and author FDA Guidances on post-market surveillance. During his tenure at the FDA, Dr. Kapit was frequently called upon to interpret and translate federal regulations governing drug submissions and to advise drug companies regarding information that should be submitted to the FDA for compliance purposes.[2]

---

[1] Report of Richard M. Kapit at 4-7 (Ex. A).
[2] CurriculumVitae of Richard M. Kapit (Ex. B).

B.  **Summary of Opinions**

In providing his expert opinion concerning the adequacy of Merck's response to and dissemination of information regarding cardiovascular risks associated with Vioxx, Dr. Kapit has testified that while he was at the FDA, he relied upon the well-established affirmative obligation of pharmaceutical companies to comply with FDA regulations that govern drug labeling and warnings. Based upon Dr. Kapit's expertise in the regulatory field and his first hand knowledge of the federal regulations, FDA Guidances and pharmaceutical industry standards, he will opine that FDA regulations are generally minimum standards of conduct and compliance with those standards and regulations is not conclusive as to whether a warning is adequate or the standard of appropriate conduct for a pharmaceutical company. See Hill v. Searle Labs., 884 F.2d 1064, 1068 (8th Cir. 1989); Wells v. Ortho Pharm. Corp., 788 F.2d 741, 746 (11th Cir. 1986).

His review and application of the federal regulations inform his opinion that the regulations do not prevent a drug manufacturer from adding additional warnings as soon as there is reasonable evidence of a serious hazard with the drug: a causal relationship need not have been proved. 21 C.F.R § 201.57. Dr. Kapit interprets this regulation to mean the following:

> "[R]easonable evidence doesn't have to be proof, and it doesn't –its more than pure random association, but this is –this is a broad term that's put into FDA labeling specifically to be quite wide in what it means…"
>
> . . . .
>
> "…[A]nd let me say that in dwelling upon reasonable evidence, we're kind of missing the points of this regulation. I mean, sure, reasonable evidence is an important thing in the sense that there's evidence, but the point of this regulation is not really this phrase, reasonable evidence, so much as let's get the warnings out there. If there's a problem and there's

a good reason to think that this problem is associated with the drug and it's a serious problem, let's get this warning out there as soon as we can. And that's what this regulation is really about. It's really not about quibbling about what's reasonable and what's not."[3]

Moreover, FDA regulations permit a manufacturer to unilaterally change and strengthen its warning label at any time without prior regulatory approval. 21 C.F.R. 314.70(C)(6) (iii (A).[4] These "changes being effected" or "CBE" regulations were promulgated precisely to allow drug makers to unilaterally strengthen label warnings when evidence of new side effects are discovered. *See* 44 Fed. Reg. 993 (Jan. 30, 1965). The regulations also permit drug manufacturer to strengthen drug warnings without FDA pre-approval. *See* 44 Fed. Reg. 37447(June 26, 1979). When promulgating these regulations in 1979, the FDA Commissioner stated:

> [D]rug labeling does not always contain the most current information and opinion available to physicians about a drug because advances in medical knowledge and practice inevitably precede formal submissions of proposed new labeling by the manufacturer and approval by the FDA…[L]abeling regulations do not prohibit a manufacturer … from warning health care professionals whenever possibly harmful adverse effects associated with the use of a drug are discovered . The addition to labeling and advertising of additional warnings … is not prohibited by these regulations…[P]racticing physicians will welcome such information so they can make their best informed medical judgments in the care of their patients.

44 Fed. Reg. 37434 (June 26, 1979).

Dr. Kapit has also testified that during his tenure at the FDA he was intimately familiar with the FDA Guidances for post-market regulations. The purpose of these Guidances is to provide recommendations to holders of NDAs and INDAs regarding post market changes. Dr. Kapit testified that not only was he familiar with the Guidances, but that he was one of the authors of the Guidances.

---

[3] Dep. of Richard M. Kapit at 196 (Ex. C).
[4] Report of Richard M. Kapit at 10.

> Q. "...[H]ave you reviewed any FDA Guidances about when it's appropriate to make CBE label changes?
>
> A. No, I have not
>
> Q. Let me just look over my notes, Bert. I'm just about done.
>
> A. Now, I might just add in response to your last question that there was a Guidances in—on post-marketing information that was published--it was revised in the late 90s, and actually, **I was one of the authors of it, and so my knowledge of it-- of the labeling is based on the fact that I'm very familiar with that. I actually participated in writing some of the Guidances about that.** When you asked me that question, I assumed that I had in mind that you were talking about Guidances that came after that, after 2000, but if you talking about the Guidances that were in effect while I was still at the FDA, I was aware of those Guidances on post-marketing regulations and fact, participated in authoring one.

Dep. of Richard M. Kapit at 274-275.

It should be noted, that 1999 and 2004 FDA Guidance documents make explicit that the Agency expects pharmaceutical companies to use the CBE mechanism proactively to keep the medical community informed of potential risks. The 1999 document states that "changes being effected supplement should be submitted for any labeling change that (1) adds or strengthens a contraindication, warning, precaution or adverse reaction."[5] The 2004 document is even more emphatic. "Under § 314.70(c)(6)(iii), a changes being effected supplement must be submitted for any labeling change that (1) adds or strengthens a contraindication, warning, precaution or adverse reaction."[6]

In addition to his opinions concerning Merck's duty to warn, Dr. Kapit will also offer

---

[5] FDA, Guidance for Industry: Changes to an Approved NDA or ANDA, November 1999 at 25 (available at http://www.fda.gov/cder/guidance/2766fnl.pdf).

[6] FDA, Guidance for Industry: Changes to an Approved NDA or ANDA, November 2004 at 25 (available at http://www.fda.gov/cder/guidance/3516fnl.pdf).

testimony regarding Merck's regulatory interactions, conduct and communications with the FDA concerning Vioxx. These testimonial matters are within his particular discipline and require specialized knowledge in an area of federal drug regulation that is beyond the understanding of the lay jury. These opinions are not the subjective beliefs or unsupported speculation of a witness but opinions and testimony which will assist the trier of fact. Daubert, 509 U.S. at 591.

### III.   ARGUMENT

Merck seeks to preclude Dr. Kapit from testifying regarding Merck's submissions, communications and interactions with the FDA regarding labeling, warning content and adverse event reports and disclosures. They do so because Merck argues that Dr. Kapit opinions are prohibited by federal preemption and fail to meet the reliability requirements of Rule 702.    The issue of whether a FDA regulatory official is qualified to provide reliable testimony concerning FDA regulations and procedures for governing drug submissions and communications, labeling and warning, and adverse event reporting has been previously addressed in the setting of another pharmaceutical litigation. The MDL Court in Diet Drugs held that Dr. John Gueriguian, a medical doctor, and former Medical Officer for the FDA, with expertise in FDA regulations and procedures was qualified to testify about how information should be communicated to the FDA and what information should be reflected in labels as mandated by applicable regulations. *See* In re: Diet Drugs, (Phentermine, Fenfluramine, Dex Fenfluramine), No. MDL 1203, 2001 WL 454586, at 18-19 (E.D.Pa. Feb. 1, 2001). The Court concluded that Dr. Gueriguian's expertise in the regulatory field gained from his vast experience in matters relating to drug development, safety surveillance, adverse

event monitoring, label drafting and knowledge of the federal regulations qualified him to provide expert opinion regarding information that should be communicated by drug companies concerning the risks and benefits of drugs. The Court also held that a Medical Officer was qualified to testify regarding what a reasonable FDA official, such as one in the position of the FDA's chief medical officer, would have done had certain adverse events been reported. In re: Diet Drugs, 2001 WL 454586, at *18-19. The Court specifically distinguished this type of testimony based on scientific and regulatory knowledge from testimony that is speculative and inadmissible. The exact same standards imposed pursuant to Rule 702 apply in the circumstance of Dr. Kapit's testimony. Daubert, 509 U.S. at 590. Like Dr. Gueriguian, Dr. Kapit possesses specialized knowledge and expertise in the regulatory field that qualifies him to opine on matters within the scope of his regulatory expertise which includes, issues of labeling, adverse event reporting, drug safety, post market surveillance, and Merck's conduct in the manufacturing and marketing of Vioxx as governed by the federal regulations.

      Merck next seeks to exclude Dr. Kapit's opinions by asserting a federal preemption challenge. The preemption challenge to the admissibility of Dr. Kapit's testimony is based upon Buckman Co. v Plaintiffs' Legal Comm., 531 U.S. 341, 350, which held that claims of fraud on the FDA are preempted. Defendant argues that to the extent Dr. Kapit's testimony addresses Merck's dealings with the FDA or FDA's decision making with respect to Vioxx, this testimony is preempted by federal law. Simply put, the Defendant's arguments fail. This is so because there is no claim in plaintiff's case of fraud on the FDA. Secondly, as we will now show, courts who have addressed this issue post Buckman have concluded that evidence relating to Defendant's conduct or representations in the course of FDA proceedings is

admissible in support of plaintiffs' state-law product liability or tort causes of action. In Globetti v Sandoz Pharmaceutical Corp., 2001 WL 41960 (N.D. Ala. March 2001), a pharmaceutical liability case, defendants filed a motion in limine to preclude "any evidence relating to defendant's communications with the FDA." The Globetti court concluded that Buckman did not preempt plaintiff's case of misrepresentation, suppression, negligence, and inadequate warning under state law. In so holding, the district court concluded while plaintiff may not offer evidence simply to show misrepresentations or concealment from the FDA, such evidence may be relevant to show the defendant's knowledge relating to the adequacy of the warning or the truth of information represented to or concealed from Plaintiff or her physician." Id at 3. Similarly, in another pharmaceutical matter, the court in Eve v. Sandoz Pharmaceutical Corp., 2002 WL 181972 (S.D. Ind. Jan 28, 2002), concluded that evidence of the pharmaceutical company's interaction with the FDA would be pertinent to proving the Plaintiffs' failure to warn claims, and were not precluded by Buckman.

> Aside from whether the FDA approved the package insert based on misrepresented or suppressed information, [Plaintiffs assert] that the warning was not reasonably adequate to alert physicians and their patients to risks associated with prescribing Parlodel"… Thus , evidence of [Defendants' ] interaction with the FDA may be pertinent to proving the Eves' claim, but it is not the basis for the claim itself.

Id. at *3 (quoting Globetti); see Bouchard v American Home Prods. Corp. 213 F.Supp 2d. 802, 812(N.D. Ohio 2002) ("If, as Bouchard has stated, her claims are based on direct fraud against her and her healthcare provider, rather then the FDA, then her claims are not preempted, and evidence concerning what information was and was not provided to the FDA might still be relevant.")

Merck's challenge to Dr. Kapit's testimony mischaracterizes the substance of his report and testimony. Dr. Kapit's opinions are informed by his knowledge and experience as a FDA regulatory official with responsibility for interacting with the pharmaceutical industry on issues of drug safety. As previously mentioned, the federal regulations make special provisions for warning the medical profession when there is a serious question about the safety of the drug; indeed a causal relationship need not be proved for the pharmaceutical industry to warn of an adverse event associated with their drug. 21.C.F.R. § 201.57.[7] Based upon this regulation, Dr. Kapit opined here that once the VIGOR trial results were made known, Merck had an obligation to inform the medical profession of a serious medical question regarding the safety of Vioxx.[8], Dr. Kapit opined that a finding of a five-fold increase in heart attacks in the Vioxx patient population was a serious adverse event finding which required a warning to the medical profession. It is Dr. Kapit's opinion that in addition to making a public statement through Dear Doctor Letters, Merck was also required by the regulations to change the label to warn that patients ingesting Vioxx were at increased risk of suffering a cardiovascular thrombotic event.[9] According to the federal regulations, a pharmaceutical manufacturer can unilaterally add to or strengthen a contraindication, warning, precaution, or adverse reaction on the product labeling without FDA approval. 21 C.F.R. § 314.70(c)(6)(iii)(A). Based upon this regulation, it is Dr. Kapit's opinion that Merck should have initiated the label change to Vioxx to warn of the risk for cardiovascular thrombotic events but failed to do so.[10]

The issue of whether pre–approval of the FDA was necessary before Merck could have changed the label to communicate the risk of cardiovascular thrombotic events

---

[7] Report of Richard M. Kapit at 9-10; see Dep. of Richard M. Kapit at 194-197.
[8] Report of Richard M. Kapit at 13, 16.
[9] Id. at 17; see Dep. of Richard M. Kapit at 248-249l.
[10] Report of Richard M. Kapit at 17.

associated with Vioxx was recently addressed by the courts in <u>Witczak v. Pfizer,</u> 377 F. Supp.2d 726 (D. Minn. 2005), and <u>Cartwright v. Pfizer,</u> 369 F. Supp. 2d 876 (E. D. Tex. 2005). In <u>Witczak,</u> the Court denied summary judgment in a pharmaceutical case where the defendant drug manufacturer claimed federal preemption barred the plaintiff's state law failure to warn claim. In <u>Witczak,</u> the FDA approved label for Zoloft did not warn of a causal association between Zoloft and suicidality. Instead the drug's label mentioned suicide as a risk of depression in the "Precaution" section. The defendant drug company claimed that the plaintiffs state law failure to warn claim was preempted by the FDCA and FDA regulations that required the drug company to use the label specified by the FDA and alternatively, that the failure to warn claim conflicted with the Agency's goal of providing scientifically accurate drug label information. The court found that federal labeling laws are minimum standards and do not necessarily shield manufacturers from state law liability. <u>Witczak</u>, 377 F.Supp.2d at 9 (citing <u>Hill v. Searle Laboratories,</u> 884 F.2d 1064 (8th Cir.1989); <u>Wells v. Ortho Pharm. Corp.,</u> 788 F.2d 741,746(11th Cir. 1986) ("An FDA determination that a warning is not necessary may be sufficient for federal regulatory purposes, but still not be sufficient for state tort law purposes"). In <u>Witczak,</u> the court determined that the manufacturer could have strengthened its warning at any time without FDA approval and therefore comply with both state and federal requirements. <u>Id</u>. at 10.

Dr. Kapit's testimony concerning Merck's obligation to revise and strengthen their labeling is consistent with the FDA's regulatory scheme governing the safety of drugs.

> "I want to talk about the obligation that Merck had to put the Vigor study information in labeling as the advisory committee recommended unanimously...: "there was a real question about the [drug's]safety"[11]

When expressly asked to give his opinion on whether Merck should have unilaterally changed the Vioxx label to reflect the results of the Vigor trial, Dr. Kapit he based his opinion on federal regulations governing label changes, not normative speculation as Merck complains.

> "It[Merck] could have done that, and actually, I think it should have done that...we're talking about myocardial infarctions here, and Merck—Merck could have put—Merck could have used warnings or even precautions if—I mean, I think it should have been in warnings, as the cardiovascular reviewer did, but even putting it in precautions, you know, I mean, we're talking about heart attacks here.[12]

The basis for these opinions is premised on Dr. Kapit's background, expertise, and knowledge of the regulations governing the safety of drugs. These are not personal and subjective opinions but rather opinions derived from scientific and specialized knowledge of a former FDA medical officer, who has extensive regulatory experience in interpreting and applying federal regulations and Guidances as they pertain to standards of conduct in the pharmaceutical industry. It is respectfully submitted that this expert knowledge will serve to assist the trier of fact. <u>Daubert</u>, 509 U.S. at 591.

Defendants further challenge Dr. Kapit's opinions by alleging that his testimony purports to address his views on Merck's state of mind and corporate intent. This characterization is incorrect as Dr. Kapit is not attempting to divine the mental thoughts of persons within Merck as to their motives or state of mind, but rather to translate for the jury the significance of certain documents and how these documents fit into the complex regulatory

---

[11] Dep. of Richard M. Kapit at 204, 245.
[12] <u>Id.</u> at 248, 250.

scheme which governs the conduct of pharmaceutical companies. Can Dr. Kapit testify to these matters? Yes, he can as Dr. Kapit is particularly qualified to give these opinions in light of his knowledge and expertise of FDA procedures, regulations, and regulatory Guidances as well as his first hand knowledge of a pharmaceutical company's obligations and required disclosures regarding their drugs. In his particular discipline as a regulatory expert, Dr. Kapit has direct experience with drug manufacturers seeking regulatory approval of their drugs. As a medical officer for the FDA he reviewed daily communications and submissions from drug companies both pre- and post-approval of drugs. His duties as a Medical Officer required that he perform a review and analysis of the information provided by the drug companies to evaluate the safety and efficacy of the drug. His knowledge and understanding of what was to be provided in drug submissions and throughout the post-market surveillance process informs his opinions regarding Merck's conduct and actions in the manufacturing and marketing of Vioxx. As a former FDA Officer, he is uniquely positioned to interpret and translate for the jury the flow of correspondence, communications and required scientific, medical and regulatory documentation that is exchanged between a drug company and the FDA in the context of the regulatory environment and opine on Merck's conduct.[13] In addition to Dr. Kapit providing a regulatory context to the flow of information, he is also able to interpret the arcane jargon contained in the FDA regulations and thereby, assist the understanding of the jury. Dr. Kapit is engaged here in the same type of review process in formulating his opinions in this case as he did as a Medical Officer for the FDA with responsibility for reviewing and making recommendations concerning drug safety. Dr. Kapit testified that in preparation for

---

[13] In re: Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine), 2000WL 876900,*9 The Court specifically noted that its ruling did not preclude the Plaintiffs from introducing evidence on the intent of the [manufacturers]
leadership or personnel. In fact, the Court recognized that such evidence could be relevant and admissible.

formulating his opinions he reviewed correspondence between Merck and the FDA, scientific studies regarding Vioxx, Merck manuals (excerpts), Medical Officer reviews, FDA briefing documents, Dear Doctor letters, DDMAC letters, internal company documents, labeling documents, promotional materials, federal regulations, and conducted a search for medical and scientific articles.[14]  Plaintiff submits that Dr. Kapit's review of relevant company and FDA documents, his vast regulatory expertise as a Medical Officer and his understanding of the standards governing the pharmaceutical industry qualifies him to provide reliable expert regulatory testimony concerning the adequacy of Merck's response to and dissemination of information concerning the cardiovascular risks associated with Vioxx.

### III.     CONCLUSION

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests that Merck's Motion to Exclude the Testimony of Richard M. Kapit, M.D. be denied.

Respectfully submitted,

By:_____
**Andy D. Birchfield, Jr., Esquire**
Paul J. Sizemore
P. Leigh O'Dell
BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
(800) 898-2034 (telephone)
(334) 954-7555 (telecopier)

**Co-Lead Counsel**

---

[14] Dep. of Richard M. Kapit at pp. 164-168.

Russ M. Herman (Bar No. 6819)
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
FAX: (504) 561-6024
**Temporary Office**
3411 Richmond Ave., Suite 460
Houston, TX 77046
PH: (713) 877-1843
FAX: (713) 871-9750
**PLAINTIFFS' LIAISONCOUNSEL**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
MEUNIER&WARSHAUER, L.L.C.
P.O. Box 960
191 East Second Street
New Roads, LA 70760
(225) 638-6137
(225) 638-8836 (fax)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Thomas R. Kline, Esquire
KLINE&SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

Christopher A. Seeger, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Carlene Rhodes Lewis, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced in accordance with Pre-Trial Order No. #8, on this **31st** day of October, 2005.



# SEE RECORD FOR

# EXHIBITS

# OR

# ATTACHMENTS

# NOT SCANNED