UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2005 NOV -3  AM 10: 39

LORETTA G. WHYTE
CLERK

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| Evelyn Irvin Plunkett v. Merck & Co, Inc.* | | CASE NO. 02:05CV4046 |

---

## PLAINTIFF'S OPPOSITION TO MOTION TO EXCLUDE EVIDENCE OF PLAINTIFF'S EXPERTS REGARDING CAUSATION

Plaintiff Evelyn Irvin Plunkett, on behalf of the Estate of Richard "Dicky" Irvin, Jr., by and through her undersigned counsel, hereby responds in opposition to Merck & Co.'s Motion to Exclude Evidence of Plaintiff's Expert Testimony Regarding Causation. For the reasons set out herein, Defendant's Motion should be denied.

### STATEMENT OF UNDISPUTED FACTS

In Spring 2001, Richard "Dicky" Irvin, Jr. was a healthy, active 53-year old male. *See* Dep. of Allesha Schirmer at 89; Autopsy of Richard Irvin, Jr. Mr. Irvin was a husband, father of 4 grown children – Allesha, Leslie, Ritchie and Ashley -- and a grandfather. Dep. of Evelyn Irvin Plunkett at 6. He served as a manager of a wholesale seafood distributor. Dep. of John Weeks at 9. As a part of his job, Mr. Irvin regularly unloaded shrimp and other seafood. Id. He was strong and characterized by his family as "healthy as a horse." Dep. of Allesha Schirmer at 89. While unloading a boat load of shrimp, Mr. Irvin strained a muscle in his back. Id. at 44-45. Mr. Irvin attempted to treat the pain associated with the muscle pull with Motrin and Tylenol, but with no success. Id. at 46-47.

Fee_____
Process_____
Dktd_____
CtRmDep_____
Doc. No _____

In early April, Allesha Irvin Schirmer visited her parents in St. Augustine, Florida some 3 ½ hours a way from her home in Boyton Beach, Florida. Id. at 43-44.  During Mrs. Schirmer's visit, Mr. Irvin shared that he was experiencing back pain and that he was unable to manage effectively with Motrin and Tylenol. Id. at 46-47.  Mrs. Schirmer testified that she encouraged her father to contact her husband to discuss with him a possible course of treatment. Id. at 49.  Mrs. Schirmer placed a call to her husband, Dr. Chris Schirmer, during which she described the difficulties that Mr. Irvin was experiencing. Id.  Mr. Irvin spoke with Dr. Schirmer that evening confirming Mrs. Schirmer's explanation of his symptoms. Id. Following the conversation, Dr. Schirmer called in two prescriptions, one for Vicoprofen for thirty days and one for Methocarbamol, a muscle relaxant, for seven days. Id. at 51-52.  Mr. Irvin filled those prescriptions after they were called in on April 10th.  On April 11th, Mrs. Schirmer returned home.

Although Mr. Irvin tried the medications, they made him nauseated and he discontinued taking them. Dep. of Evelyn Irvin Plunkett at 64.  Mr. Irvin described the back pain he was experiencing to a friend, Mr. Richard Aycock. Dep. of Richard Aycock at 32.  Mr. Aycock had been prescribed Vioxx for a shoulder injury.  Vioxx was an effective pain reliever for Mr. Aycock. Id. at 30.  Mr. Aycock offered two samples of Vioxx that he had received from his physician. Dep. of Evelyn Irvin Plunkett at 72.  Mr. Irvin took the Vioxx samples. The drug was effective in relieving Mr. Irvin's pain.

On April 15th, Mr. Irvin called the Schirmer residence. Dep. of Allesha Schirmer at 57. Mr. Irvin shared with Mrs. Schirmer that he had taken a couple of samples of Vioxx over the few days prior to his call and that it was effective in treating his back pain. Id.  Dr. Schirmer was at home at the time of the call.  Id.  Mr. Irvin spoke with Dr. Schirmer and asked if Dr.

Schirmer would call in a prescription of Vioxx until he could visit a doctor in St. Augustine. Dr. Schirmer called in a 30-day prescription for Vioxx on April 15th. Id. Mr. Irvin filled the prescription on April 22nd.

On May 15th, after taking 22 pills from the Vioxx prescription plus some samples, Mr. Irvin slumped over his desk in the early morning having died of sudden cardiac death.

## ARGUMENT

### I.     THE LEGAL STANDARDS

#### A.     Plaintiff's Burden of Proof on Causation Requires Only a Demonstration that Vioxx Was *a* Contributing Factor in Causing Mr. Irvin's Death

Merck is correct that, to satisfy its causation burden, the plaintiff need only establish that Vioxx was a substantial factor in causing the injury. Hart v. Stern, M.D., 824 So. 2d 927, 929-30 (Fla. App. 2002); *see* Asgrow-Kilgor Co. v. Mulford Hickerson Corp., 301 So. 2d 441, 443 (Fla. 1974) ("'A' material contributing cause will impose liability."). What Merck fails to acknowledge, however, is that plaintiff need not prove that Vioxx was the sole cause or affirmatively prove that other potential causes did not cause Mr. Irvin's death. Hart, 824 So.2d at 929-30 (citing Florida Std. Jury Instr. 5.1(b), which holds that the defendant's "negligence need not be the only cause").

The substantial factor test takes into account that other factors in addition to Vioxx—such as Mr. Irvin's medical condition—may have contributed to causing the injury. Where "two separate and distinct causes" operate (either simultaneously or sequentially) to produce a single injury, each of the concurrent causes is a substantial factor in bringing about the plaintiff's injury. Id. at 930. Such concurrent causes may occur where "a defendant's negligence operates in combination with the negligent act of another or a natural cause such as

the plaintiff's pre-existing physical condition to cause an injury." Id. In other words, "a wrongdoer remains liable for a consequent harm when the result is caused by a congruence of [its] own negligent act with a natural force or condition . . . such as the [plaintiff's] pre-existing physiological and anatomical status." Goodman v. Becker, D.D.S., 430 So. 2d 560, 561 (Fla. App. 1983). Thus, plaintiff is not required to show that except for the Vioxx exposure, Mr. Irvin's death would not have occurred or that the Vioxx alone resulted in his death. Rather, other factors may have contributed to Mr. Irvin's death, but Plaintiff will still prevail if it is demonstrated that his Vioxx usage was *a* substantial contributing factor. See Gooding v. University Hosp. Bldg., Inc., 445 So. 2d 1015, 1018 (Fla. 1984); Asgrow-Kilgore Co. v. Mulford Hickerson Corp., 301 So. 2d 441, 445 (Fla. 1974); Loftin v. Wilson, 67 So. 2d 185, 191 (Fla. 1953); *see* Barrow v. Bristol-Myers Squibb Co., 1998 U.S. Dist. LEXIS 23187, at *195-96 (D. Fla., Oct. 29, 1998); *see also* Fla. Stand. Jur. Instructions in Civ. Case 5.1 (adopting substantial-factor test in concurrent-cause situations).

**B.     The Daubert Standard is a Flexible One that Favors Admissibility of Expert Testimony**

A trial judge sits as a "gatekeeper" in evaluating the admissibility of expert scientific testimony under the Federal Rules of Evidence. Daubert v. Merrell Dow Pharm., 509 U.S. 579, 597 (1993). Expert testimony is admissible under Rule 702 if: (1) the proposed testimony is based on scientifically valid methodology; and (2) the testimony will assist the trier of fact to understand the evidence or determine a fact in issue. Daubert, 509 U.S. at 592-93. In other words, the Court must determine whether the proposed testimony is both reliable and relevant.

The U.S. Supreme Court has listed four non-exclusive factors to consider in determining whether scientific evidence is reliable: (1) whether the theory or technique has

been tested; (2) whether the theory or technique has been subject to peer review and publication; (3) whether a particular technique has a known potential error rate; and (4) whether the theory or technique is generally accepted within the relevant scientific community. Daubert, 509 U.S. at 593-94; Burleson v. Texas Dept. of Criminal Justice, 393 F.3d 577, 584 (5th Cir. 2004). Publication and peer review alone can satisfy Daubert's reliability prong. Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311, 1318-19 (9th Cir. 1995); Ruiz-Troche v. Pepsi Cola, 161 F.3d 77, 84 (1st Cir. 1998); Bocanegra v. Vicmar Servs., Inc., 320 F.3d 581, 585-87 (5th Cir. 2003), Vice v. Northern Telecom, 1996 U.S. Dist. LEXIS 5987, at *24 (E.D. La., April 24, 1996). That the research is accepted for publication in a reputable scientific journal after being subjected to peer review is a significant indication that it is taken seriously by other scientists, i.e., that it meets at least the minimal criteria of good science. Daubert, 509 U.S. at 593.

The Daubert factors give the trial judge "broad latitude" to determine an expert's reliability. Tolliver v. Naor, No. 99-0586, 2001 WL 1345735, *2 (E.D. La. Nov. 1, 2001) (citations omitted) (J. Fallon). Thus, the reliability analysis is a flexible inquiry; not every Daubert factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant. Kumho Tire Co. v. Carmichael, 526 U.S. 129, 151 (1999); St. Martin v. Mobil Exploration & Producing U.S. Inc., 224 F.3d 402, 406 (5th Cir. 2000) (permitting scientific testimony even where no peer reviewed articles relied upon because "[t]he Daubert factors are non-exclusive and need not be rigidly applied in every case") (citations omitted); Tanner v. Westbrook, 174 F.3d 542, 547 (5th Cir. 1999) ("The test of reliability is flexible and bends according to the particular circumstances of the testimony at issue.").

Scientific evidence is reliable if it is grounded in the methods of science – the focus is on principles and methodology, not conclusions. Daubert, 509 U.S. at 595-96; In re Propulsid, 261 F. Supp. 2d 603, 606 (E.D. La. 2003). A court's review "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is . . . valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 592-93. The objective of the gate-keeping function, therefore, "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999). The U.S. Supreme Court has recognized that there is a range in which experts might reasonably differ on issues of science, and that such conflicting evidence should be admitted to aid the jury in deciding those issues. See Kumho Tire, 526 U.S. at 153.

When determining the admissibility of expert testimony, "the district court should approach its task 'with proper deference to the jury's role as the arbiter of disputes between conflicting opinions. As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.'" United States v. 14.38 Acres of Land, 80 F.3d 1074, 1077 (5th Cir. 1996) (citation omitted). In "borderline questions, it is more appropriate for a judge to admit the evidence than to exclude it from the fact finder because '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional, and appropriate means of attacking shaky but admissible evidence.'" Tolliver v. Naor, No. 99-0586, 2001 WL 1345735, *2 (E.D. La. Nov. 1, 2001) (citations omitted) (J. Fallon). Moreover, where—as here—the connection between Vioxx and heart

attacks is strong and well documented, the <u>Daubert</u> analysis of general causation is less

rigorous. <u>See</u> <u>McClain v. Metabolife Intern., Inc.</u>, 401 F.3d 1233, 1239 (11th Cir. 2005)

("The court need not undertake an extensive <u>Daubert</u> analysis on the general toxicity question

when the medical community recognizes that the agent causes the type of harm a plaintiff

alleges.").

**C.      Plaintiff's Experts Can Reliably Testify About General Cause**

Plaintiff's experts base their opinions on Merck's clinical trials and extensive

epidemiological studies by others finding an unequivocal association between Vioxx ingestion

and sudden cardiac death.  Indeed, there is little dispute in the relevant science or among the

relevant scientific community, including among Merck's own experts, that Vioxx causes

thrombotic sudden cardiac death.

**1.      There Is Extensive, Reliable Epidemiological Evidence that Vioxx
Increases the Risk of Thrombotic Sudden Cardiac Death**

Merck's clinical trials and published epidemiological studies have consistently found

an association between Vioxx ingestion and adverse cardiovascular events like that suffered

by Mr. Irvin.  Many of these studies show a statistically significant doubling of the risk

associated with Vioxx use and adverse cardiovascular events.

For example, the Merck-sponsored VIGOR and APPROVE clinical trials demonstrate

a statistically significant relative risk in excess of 2.0 for adverse cardiovascular events

associated with Vioxx.  Randomized, clinical trials, of course, are the "gold standard" in

epidemiology and "are the most reliable sources for determining causality."  Farquhar Rpt, p.

18.  "A relative risk greater than 2.0 would permit an inference that an individual plaintiff's

disease was more likely than not caused by the implicated agent.  A substantial number of

courts in a variety of toxic substances cases have accepted this reasoning." Reference Manual on Scientific Evidence 384 (2d ed. 2000).

In addition to the randomized clinical trials, there are a variety of other peer-reviewed studies of the observational nature demonstrating an increase in the number of adverse cardiovascular events, even with very short duration use of Vioxx. The more relevant observational studies are discussed in Section II C of this memorandum. Thus, these data consistently demonstrate an excess of adverse cardiovascular events associated with Vioxx use, but with differing significance levels and incidence rates.

Merck reacts to this evidence by arguing that *every* study Plaintiff's experts' rely upon must be "statistically significant" and "show[] that the drug more than doubles the relative risk of injury." Merck's Causation Brief at 18-19. Otherwise, according to Merck, plaintiff's causation testimony is unreliable and must be excluded. [1] But Merck fails to cite a *single* case handing down such draconian relief where, like here, there is abundant statistically significant evidence demonstrating an increased relative risk in excess of 1.0 *and* 2.0.

Merck's contention that a "study must be statistically significant" in order to be reliable comes mainly from cases involving Bendectin. *See* Merck's Memorandum in Support of Motion to Exclude Evidence of Plaintiff's Experts Regarding, at 18-19 (citing Brock v. Merrell Dow Pharms., Inc., 874 F.2d 307 (5th Cir. 1989) (Bendectin litigation) and LeBlanc v.

---

[1] Epidemiology, while "most useful," is not essential for an expert opinion to be admissible under Daubert. Pick v. Am. Med. Sys., Inc., 958 F. Supp. 1151, 1158 (E.D. La. 1997) (epidemiological studies – though they fulfill the Daubert criteria – are not a necessary requirement in a toxic tort case); see Pipitone v. Biomatrix, Inc., 288 F.3d 239, 246 (5th Cir. 2002).

Merrell Dow Pharms., Inc., 932 F. Supp. 782, 784 (E.D. La. 1986) (same)).[2]  But every

epidemiologic study of Bendectin has found *no* relationship with birth defects.  In fact, the

Fifth Circuit has expressly declined to extend Brock, thus arguably limiting it to the Bendectin

context.  *See* Christophersen v. Allied-Signal Corp, 902 F.2d 362, 367 (5th Cir. 1990); *see* also

Werlein v. United States, 746 F. Supp. 887 (D. Minn. 1990) ("The Court in Christopherson

noted the Fifth Circuit's earlier decision in Brock. . . but referred to the case as an "exception"

applicable only to the drug Bendectin."), *vacated on other grounds*, 793 F. Supp. 898 (D.

Minn. 1992).  In stark contrast to the Bendectin cases, there is expansive peer-reviewed

epidemiological evidence to support an association between Vioxx and adverse cardiovascular

events.

    "The use of 'statistical significance' to reject an epidemiological study has been

roundly criticized by the experts in the field."  Berry v. CSX Transp., Inc., 709 So. 2d 552,

570 (Fla. App.), *rev. denied*, 718 So. 2d 167 (Fla. 1998).  Professor Green, the lead author of

the Epidemiology chapter in the Reference Manual on Scientific Evidence, concludes that

rejecting studies based on statistical significance is foolish:

> The Brock decision, in ascribing wondrous powers to the concept of statistical
> significance, contributes to doubts that these matters are ones that reasonably
> can be mastered by generalist judges.  Statistical significance addresses only
> random error due to the sampling inherent in any epidemiologic study.  It
> cannot and does not speak to systematic error, which requires an informed
> review of the methodology employed in conducting the study.  Moreover,
> statistical significance is merely an instrument for assisting in evaluating a
> study, not a truth serum that can be simplistically prescribed.

---

[2] Merck also cites American Heyer-Schulte Crop. V. Kelley, 957 F. Supp. 873, 878
(W.D. Tex. 1997), a breast implant case where the studies relied upon by the expert were
considered biased by the authors and In re Norplant Litig., 215 F. Supp.2d 795, 833 (E.D. Tex.
2002), where plaintiffs had "not produced a shred of evidence or expert testimony that
supports an association between Norplant and any of the exotic conditions."

Michael D. Green, <u>Expert Witnesses and Sufficiency of Evidence in Toxic Substance Litigation: The Legacy of Agent Orange and Bendectin Litigation</u>, 86 N.W.U. L. Rev. 643, 681-82 (1992). Skepticism about significance testing has also been expressed in this district: "products liability law does not preclude recovery until a 'statistically significant' number of people have been injured or until science has had the time and resources to complete sophisticated laboratory studies of the chemical." <u>Pick v. American Med. Systems, Inc.</u>, 958 F. Supp. 1151, 1158 (E.D. La. 1997) (citations omitted).

Thus, the better course is to permit these studies into evidence and then let the jury decide, after cross-examination, the weight they should be given. *See* <u>In re Joint Eastern & So. Dist. Asbestos Litigation</u>, 52 F.3d 1124, 1134 (2d. Cir. 1995) (refusing to set a floor on statistical significance, finding instead that it is "far preferable for the district court to *instruct* the jury on statistical significance and then let the jury decide whether many studies over the 1.0 mark have any significance in combination").

Nor is a study unreliable and inadmissible, as Merck claims, because it shows an increased risk, but not in the magnitude of 2.0. Again, in arguing that only studies involving a doubling of the risk may be considered, Merck relies upon cases where there was: (1) a total lack of any epidemiological evidence supporting a causal connection or (2) an overwhelming number of studies finding no such correlation. *See* <u>DeLuca v. Merrell Dow Pharms., Inc.</u>, 911 F.2d 941, 943 (3rd Cir. 1990) ("no published study has concluded that Bendectin increases the risk of birth defects"); <u>Merrell Dow Pharms., Inc. v. Havner</u>, 953 S.W.2d 706, 708 (same); <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 43 F.3d 1311, 1321 (9th Cir. 1995) (same); <u>Allison v. McGhan Med. Corp.</u>, 184 F.3d 1300, 1315 (11th Cir. 1999) ("over twenty other epidemiological studies which found no statistical correlation between silicone breast implants

and systemic disease, strong evidence that a consensus exists in the general scientific

community that no correlation exists"); Chambers v. Exxon Corp., 81 F.Supp.2d 661, 664-65

(M.D. La. 2000) ("[P]laintiff's experts have not offered an epidemiological study that

conclusively establishes a statistically significant risk of contracting CML from exposure to

benzene. . . . [E]xperts offered by Exxon have produced a number of scientifically performed

studies which demonstrate no association between exposure to benzene and development of

CML.").

But anytime the relative risk is greater than 1.0 "[t]here is a positive association

between exposure to the agent and the disease, which could be causal." Reference Manual on

Scientific Evidence 349 (2d ed. 2000). Thus, courts regularly find – including in this district

– that a relative risk of 2.0 is not a prerequisite to an expert relying on that study to show

causation. For example, in Pick v. American Medical Systems, Inc., 958 F. Supp. 1151 (E.D.

La. 1997), this district concluded that an observational study showing a "small" increased risk

(i.e. < 2.0)  between silicone implants and autoimmune disease—even in the presence of other

studies finding no connection—was  relevant and admissible:

> Evidence is admissible, however, if it has "any tendency" to prove or disprove a fact of
> consequence in the case. Fed. R. Evid. 401. A relative risk above 1.0 is statistically
> significant, even if not sufficient, by itself, to establish causation by a preponderance of
> the evidence.

Pick, 958 F. Supp. at 1160; see In re Joint Eastern & Southern District Asbestos Litigation,

964 F.2d 92, 97 (2d Cir. 1992) (scientific expert may rely on epidemiological study with

relative risk less than 2.0 and such study may be sufficient to prove causation); In re Hanford

Nuclear Reservation Litigation, 292 F.3d 1124, 1135-36 (9th Circ. 2002) (district court erred

when it required plaintiffs to show that their radiation exposure doubled the risk of suffering

the alleged injury); Grassis v. Johns –Manville Corp., 591 A.2d 671, 676 (N.J. App. 1991) (refusing to apply relative risk factor limitation of 2.0 on studies relied upon by plaintiff's expert in forming causation opinion).

Merck's complaints about flaws in the Solomon study, infra, and the other observational studies cited by plaintiff's experts are just that, complaints.  So long as methodologically sound, any flaws in the study go to the weight afforded it, **not** its admissibility.  In re Phenylpropanolamine (PPA) Products Liability Litigation, 289 F.Supp.2d 1230, 1240 (W.D. Wa. 2003); In re Joint Eastern & Southern District Asbestos Litigation, 52 F.3d 1124, 1135 (2d Cir. 1995) ("[T]o the extent that none of the studies is flawless or dispositive, their relative merits seems to us to be a classic question for the jury.  Trial courts should not arrogate the jury's role in 'evaluating the evidence and the credibility of expert witnesses' by 'simply cho[o]s[ing] sides in [the] battle of the experts.'") (citing Christophersen v. Allied Signal Corp., 902 F.2d 362, 366 (5th Cir. 1990)); see Reference Manual on Scientific Evidence 337 (2d ed. 2000) ("It is important to emphasize that most studies have flaws.  Some flaws are inevitable given the limits of technology and resources.").

Nor does the fact that certain of plaintiff's experts have re-analyzed Merck clinical data to add further support to their causation opinions undermine their testimony.  Merck argues that reanalysis is permitted only where it is published, peer reviewed and not generated for litigation.[3]  But it is clear in this district that an expert may "extrapolate his opinions from existing data."  In re Propulsid, 261 F.Supp. 2d 603, 616 (E.D. La. 2003).  The Manual for

---

[3]   Merck relies again on a Bendectin case to argue that reanalyses of data must always be peer-reviewed and published before being admissible.  Merck's Memorandum in Support of Motion to Exclude Evidence of Plaintiff's Experts Regarding Causation at 22.  The Supreme Court in Daubert rejected that contention.  Daubert, 509 U.S. at 593 ("Publication (which is but one element of peer review) is not a *sine qua non* of admissibility; it does not necessarily

Complex Litigation provides that, so long as the reanalysis of existing data is based on scientifically valid principles, this technique "may be both credible and reliable, even though it has neither grown 'naturally and independent of litigation,' nor yet been published." Manual for Complex Litigation § 23.274  (4th ed. 2004); see also In re Paoli R.R. Yard Litig., 916 F.2d 829, 857 (3d Cir. 1990) (stating that "[t]here is some evidence that 'half the time you shouldn't believe meta-analysis,' but that does not mean that meta-analyses are necessarily in error. It means that they are, at times, used in circumstances in which they should not be." (citation omitted)).  Meta-analysis is also appropriate to pool randomized experimental trials. Reference Manual on Scientific Evidence 380 (2d ed. 2000).  This is especially true when the reliability of the meta-analysis is shown though peer-review and publication.  See e.g. Juni, et al., Risk of cardiovascular events and rofecoxib, cumulative evidence,  Lancet, November 5, 2004, at p. 1 (based upon "all randomized clinical trials that compare rofecoxib with another NSAID or placebo").

> **2.      There Is Extensive, Reliable Scientific Evidence that a Dose of 25 mg of Vioxx for One Month or Less Is Associated With An Increased Risk of Thrombotic Sudden Cardiac Death**

There is also reliable and sufficiently powered epidemiological evidence to support causation at the dose and for the duration of use by Richard Irvin in this case, i.e., 25 mg Vioxx for one month.  This reliable scientific evidence is discussed in detail in Seciton II of this memorandum.

---

correlate with reliability."").  Moreover, in the Bendectin cases, the reanalysis methodology offered by the experts was particularly problematic in light of the massive weight of the original published epidemiological studies, which concluded that no causal connection existed. See Brock, 874 F.2d at 312-13.  Just the opposite is true here.

Nonetheless, Merck argues Plaintiff's experts must be excluded because they offer no scientifically reliable evidence that the use of Vioxx for less than one month is capable of causing an adverse cardiovascular event.  But Merck cites no case holding that only studies of patients given the exact dose as a plaintiff can form the basis of an expert's causation opinion. Merck's cases hold simply that there must be evidence of the dose to which plaintiff was exposed in order for an expert to opine such exposure caused disease.  In Christopherson v. Allied Signal Corp., 939 F.2d 1106 (5th Cir. 1991), the Fifth Circuit held that  "[a]s a general rule, questions regarding the scientific bases of an expert's opinion "affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration."  Christopherson, 939 F.2d at 1113 (quoting Viterbo v. Dow Chemical Co., 826 F.2d 420, 422 (5th Cir. 1987)).

Christopherson and other cases cited by Merck simply hold that the dose and duration by which a person is exposed to a substance is the type of information experts typically rely upon when forming opinions about whether the substance causes harm.  Christopherson, 939 F.2d at 1115.  When that information is missing or inaccurate, an expert lacks one necessary factual basis.  Id. ("If the dosage of the harmful substance and the duration of exposure to it are the types of information upon which experts reasonably rely when forming opinions on the subject, then the district court was justified in excluding Dr. Miller's opinion that is based upon critically incomplete or grossly inaccurate dosage or duration data."); see also Allen v. Penn. Engineering Corp., 102  F.3d 194, 199 (5th Cir. 1996) ("[I]n this case, there is no direct evidence of the level of Allen's exposure to EtO . . . . the experts' background information concerning Allen's exposure to EtO is so sadly lacking as to be mere guesswork.  The experts did not rely on data concerning Allen's exposure that suffices to sustain their opinions under

R. 703."); Thompson v. Southern Pacific Transp. Co, 809 F.2d 1167, 1169 (5th Cir. 1987) ("[T]he engineer did not testify, however, about Thompson's degree of exposure to dioxin; he did not know where Thompson worked at Luling or the amount of time Thompson spent at the plant site.").

It is well-established in this District that an expert may extrapolate his opinions from existing data. In re Propulsid, 261 F.Supp.2d at 616; Manko v. United States, 636 F. Supp. 1419 (W.D. Mo. 1986) (finding causation based upon expert's cohort analysis of all existing epidemiological data in order to determine the relative risk for those contracting Guillian-Barre Syndrome ("GBS") 11-16 weeks after vaccination).  Here, Plaintiff's experts do not make an "*ipse dixit*" jump to a conclusion, rather their opinions are supported by peer-reviewed published data.


### D.  Plaintiff's Experts Can Reliably Testify About Specific Causation

Merck's argument that Plaintiff's experts cannot testify that Vioxx caused Richard Irvin's fatal heart attack rests on two bases.  Merck argues that no such testimony is allowed because Plaintiff cannot prove the specific mechanism by which Vioxx causes a heart attack and that the experts must, but cannot, rule out every other cause.  Plaintiff's experts provide reliable, peer-reviewed and published, evidence of mechanism.  In any event, as shown below, such evidence is not necessary where the cumulative evidence  shows both general causation and that it is biologically plausible that Vioxx caused Mr. Irvin's heart attack.  In addition, Plaintiff's experts have, as Merck concedes, negated other causes by use of a differential diagnosis.   This method is a reliable, accepted method of establishing specific causation

Merck overstates Plaintiff's burden.  Given the powerful studies establishing a clear

casual link between Vioxx and heart attacks, there is an inference that Mr. Irvin's fatal heart

attack was caused by Vioxx.   Landrigan v. Celotex Corp., 605 A.2d 1079, 1087 (N.J. 1992)

(relative risk greater than 2.0 "support[s] an inference that the exposure was the probable

cause of the disease in a specific member of the exposed population"); *see* Berry v. CSX

Transportation, Inc., 709 So. 2d 552, 569 n. 13 (Fla. App. 1998) (applying Florida law) ("there

are certainly a number of cases that suggest a relative risk greater than 2.0 can permit an

inference that an individual's disease was more likely than not caused by exposure to the toxic

agent"); *see also*  Reference Manual on Scientific Evidence 384 (2d ed. 2000) ("A relative risk

greater than 2.0 would permit an inference than individual plaintiff's disease was more likely

than not caused by the implicated agent.  A substantial number of courts in a variety of toxic

substances cases have accepted this reasoning.").   Here, published, peer-reviewed science

shows that Vioxx increases the relative risk of heart attack by more than 2, regardless of dose

and duration.  *See* sections II A-C of this opposition.


**E.      Plaintiff's Experts Need Not Identify a Specific Mechanism of Action**

There is no requirement, as Merck claims, that Plaintiff's "must identify the "specific

mechanism by which Vioxx caused Mr. Irvin's death."  See Merck's Causation Memo., p. 3.

As described above, "[t]he fact that the mechanism remains unclear does not call the reliability

of the [expert] opinion into question."  In re Phenylpropanolamine (PPA) Products, 289

F.Supp.2d at 1247;  *see* Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1314

(9th Cir. 1995) ("Not knowing the mechanism whereby a particular agent causes a particular

effect is not always fatal to a plaintiff's claim.  Causation can be proved even when we don't

know precisely *how* the damage occurred, if there is sufficiently compelling proof that the agent must have caused the damage *somehow*.").   As the Fifth Circuit opined in <u>Moore v. Ashland Oil Inc</u>, 151 F.3rd 269, 275 (5th Cir. 1998), "[o]f course, it would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science."

Typically, courts will require evidence of mechanism of action only when other evidence, such as epidemiological evidence, is not present.  But where, as here, there are numerous epidemiological studies demonstrating an increased risk of heart attacks from Vioxx, a plaintiff is not required to prove the precise mechanism by which Vioxx causes heart attacks.  <u>See</u>  <u>Grassis v. Johns-Manville Corp.</u>, 591 A.2d 671, 675 (N.J. Super. App. Div. 1991) ("Where, however, study after study has shown some positive correlation, although not to the factor of 2.0, it might be said that asbestos is at least a producing factor in some colon cancers, <u>even if the precise biological process has not yet been defined</u>.") (emphasis added). <u>Jahn v. Equine Services PSC</u>, 233 F.3d 382, 390 (6th Cir. 2000) ("by implying that specific knowledge of the precise physiological cause of Night Passage's death is a prerequisite to admissibility, we believe that the district court held the experts up to entirely too strict a standard when considering the admissibility of their testimony");   <u>Berry v. CSX Transp., Inc.</u>, 709 So. 2d 552, 561 (Fla. Ct. App. 1998) (admitting expert testimony even though the expert was "uncertain of the exact biological 'mechanism' by which" the solvents in question caused harm since he offered a biologically plausible explanation).

The cases Merck cites do not support its argument that Plaintiff's experts must establish by minutia the biological mechanism of Vioxx.  The <u>Allen</u> decision does not support Merck's argument that Plaintiff's expert must prove the threshold at which a prostacyclin-

thromboxane imbalance could cause a blood clot.  <u>Allen</u> simply requires evidence of the dose to which plaintiff was exposed.   Merck's reliance on <u>Thompson v. Southern Pacific RR,</u> 809 F.2d 1167 (5th Cir. 1987), for the proposition that unless Plaintiff shows the threshold amount of prostacyclin imbalance necessary to cause a thrombus, there can be no reliable showing of causation is unfounded.  <u>Thompson</u> holds that where there is no evidence of the dose of a toxin to which plaintiff was exposed, an expert's testimony may be unreliable.  <u>Thompson,</u> 809 F.2d at 1169.   Finally, <u>In re Propulsid,,</u> 261 F.Supp.2d 603 (E.D. La. 2003), does not support Merck.  In that case, plaintiffs' experts blandly admitted that the mechanism by which Propulsid purportedly caused Q-T interval prolongation was "unknown at this time." <u>Id.</u> at 616.  Plaintiffs' experts also failed to make a proper showing that causation was even biologically plausible and there was an utter lack of supporting medical literature (<u>id.</u> at 614), all of which, taken together, rendered the expert opinions unreliable.  (<u>Id.</u> at 614)  Unlike in <u>Propulsid,</u> the science related to Vioxx is well developed and there is myriad scientific data available supporting the opinions of plaintiff's experts.

Thus, there is no need for Plaintiff to prove the precise mechanism by which Vioxx causes thrombotic sudden cardiac death, only that it is plausible.  <u>Berry v. CSX Transp., Inc.,</u> 709 So. 2d 552, 561 (Fla. Ct. App. 1998) (admitting expert testimony even though the expert was "uncertain of the exact biological 'mechanism' by which" the solvents in question caused harm since he offered a biologically plausible explanation); <u>Kennedy,</u> 161 F.3d at 1330 ("Causation can be proved when we don't know precisely <u>how</u> the damage occurred.").

This Court need only consider whether it is biologically plausible that Vioxx is capable of causing thrombotic sudden cardiac death, not whether the precise mechanism of action has been demonstrated.  As will be discussed more fully below, multiple lines of evidence support

biological plausibility, including human clinical trials, epidemiological studies, animal studies, and the pharmacology of Vioxx.

F.    **Plaintiff's Experts Can, Given the Strong Epidemiological Links between Vioxx and Heart Attack, Rely on a Differential Diagnosis To Establish Specific Causation**

Merck fundamentally misstates the applicable standard when it argues Plaintiff's experts must rule out every possible alternative cause.  Viterbo v. Dow Chemical, 826 F.2d 420 (5th Cir. 1987) rejects Merck's argument.  There, the Fifth Circuit affirmed exclusion of an expert's opinion for which the expert that had no basis other than plaintiff's word, but held:

> We do not hold, of course, that admissibility of an expert opinion depends upon the expert disproving or discrediting every possible cause other than the one espoused by him.

Id. at 424.  Here, given the powerful data tying Vioxx to heart attacks, Viterbo supports Plaintiff's experts.  McClain v. Metabolife Int'l, 401 F.3rd 1233 (11th Cir. 2005), cited by Merck throughout its Memorandum, also validates the approach by Plaintiff's experts.  Metabolife does not require that an expert absolutely rule out alternative causes, only that an expert take account of them in his/her methodology. Id. at 1244 (". . . if Plaintiffs could show that taking Metabolife increases the risk of heart attack and ischemic stroke beyond the usual incidence of these common diseases, that would support their methodology in this case.).  That is exactly what plaintiff's experts do through their meticulous use of the scientific data.

Merck also ignores the fundamental tenet that there can be more than one cause of an injury.  As shown above, under Florida law, "a wrongdoer remains liable for a consequent harm when the result is caused by a congruence of his own negligent act with a natural force

or condition, often called an "Act of God, "such as Goodman's pre-existing physiological and anatomical status." Goodman v. Becker, 430 So. 2d 560, 561 (Fla. Dist. Ct. App. 1983) (citing Davis v. Ivey, 93 Fla. 387, 112 So. 264 (1927); 57 Am.Jur.2d Negligence § 181 (1971); see also Morton Roofing, Inc. v. Prather, 864 So. 2d 64, 69 (Fla. App. 2003) (""If a defendant's negligence operates in combination with the negligent act of another or a natural cause such as the plaintiff's pre-existing physical condition to cause an injury," causation can still be found). Here, the mere fact that Mr. Irvin had a moderate atherosclerosis does not excuse Merck from the fact that Vioxx caused the clot that led to the fatal MI.

## II.     APPLICATION OF LEGAL PRECEDENT TO UNDISPUTED FACTS

Merck has filed this motion to exclude predicated upon two equally misguided premises: 1) that Plaintiff cannot prove general causation; and 2) that Plaintiff cannot prove specific causation.

Regarding general causation, Merck incorrectly asserts that: 1) "there is no scientifically reliable evidence that the use of Vioxx at the 25 mg dose for a period of less than one month is capable of causing thrombotic cardiovascular events;" and 2) "none of the plaintiff's experts can identify, to a reasonable degree of medical certainty, the specific mechanism by which Vioxx supposedly caused Mr. Irvin's death." Merck Memorandum in Support of Motion to Exclude Evidence of Plaintiff's Experts Regarding Causation at.3.

Regarding specific causation, Merck incorrectly asserts: 1) "plaintiff's experts cannot prove to a reasonable degree of medical certainty that, in this case, Vioxx in fact caused Mr. Irvin's death under any of the speculative theories that they advance;" and 2) "they cannot rule out other possible causes of Mr. Irvin's sudden death." Id. at 3.

Plaintiff will address each of these arguments in turn; however, it is imperative to note at the outset that the issue of the reliability of both Plaintiff's experts proposed testimony and the reliability of the asserted mechanisms of action have already been established in two state court proceedings <u>Ernst v. Merck & Co., Inc</u> and <u>Humeston v. Merck & Co., Inc.</u>   Indeed, some of the very experts challenged by Merck here were allowed to testify and offer the very testimony at issue.

**A.     There Is An Abundance Of Evidence Establishing That Usage Of 25 mg Of Vioxx Over Short Periods Of Time (including less than 30 days) Causes An Increased Risk Of Serious Cardiovascular Events**

Merck summarizes it's argument concerning what it characterizes as a lack of evidence of increased cardiovascular events at the 25 mg dosing level during short-term usage on page 34 of it's supporting memorandum: "In sum, because plaintiff's experts can point to *no* supporting clinical trial data – which they concede is the 'most reliable' proof of causation – and because they can point to *no* supporting observational data, they cannot establish causation." <u>Merck's Memorandum in Support of Motion to Exclude Evidence of Plaintiff's Experts Regarding Causation</u> at 34 (emphasis in original).  As shown below, this assertion is untrue.

Initially, Plaintiff respectfully requests that this Court review her previously submitted Science Brief for a general understanding of Vioxx's catastrophic pharmacological mechanisms of action as well as an overall review of the clinical literature on this subject. Plaintiff will, in this response, attempt to summarize some of the more relevant clinical data unequivocally establishing that Vioxx 25 mg utilized for any period of time increases the risk of serious cardiovascular events. This review is merely illustrative of the universe of

information establishing Vioxx's deadly propensities and by no means is an exhaustive review of the troubling medical and pharmacological evidence establishing the hazards associated with Vioxx.

1.    **Merck's own studies establish the deadly nature of "short term" Vioxx 25 mg usage**

For the general public, the hazards associated with Vioxx did not become apparent until the results of the VIGOR trial were completely revealed. Merck, however, was aware of the deadly nature of Vioxx when used at low doses and over short periods of time well before the VIGOR trial was completed. The Pilot Osteoarthritis of the Knee study (Protocol 010) was a randomized, placebo-controlled clinical trial comparing 125 mg and 25 mg of Vioxx to placebo. The total length of the study was only 6 weeks. The results of this study revealed a clear hazard associated with Vioxx. There were 4 cardiovascular adverse events in the 125 mg group, 3 in the 25 mg group and 0 in the placebo group. *See* Ex. B (Clinical Investigator's Confidential Information Brochure MK-0966 Highly Selective Cox-2 Inhibitor Experience Summary of Information, 9/28/94, revised 4/24/97, at p. 27.)

As this document indicates, "As of 1997, the largest unblinded multiple-dose experience with MK-0966 [Vioxx] comes from the pilot osteoarthritis study (Protocol 010)." Id. Without question then, the potential hazard was known to Merck as early as 1997. Indeed, Merck had been warned by members of its scientific advisory board before 1997 that such adverse events would likely occur with Vioxx usage.

More specifically, in October, 1997, Dr. John Oates, who is the former Chairman of the Department of Medicine at Vanderbilt University, the Thomas F. Frist Professor of Medicine and the past director of Vanderbilt's Center for Clinical Pharmacology and Drug

Toxicology, as well as a long-time Merck consultant, wrote to Merck scientist Dr. Alan Nies about his concerns regarding the implications of selective COX-2 inhibition. Ex. C (Oates correspondence). Based upon his understanding that the endothelium of human umbilical vein endothelial cells contain both COX-1 and COX-2, and thus, that selective inhibition of COX-2 would act to decrease levels of vascular prostacyclin, Dr. Oates recommended that Merck: (1) focus further research on the vascular endothelium and its interaction with platelets; and (2) study the implications of Vioxx's inhibition of prostacyclin biosynthesis and examine circumstances in which COX-2 might be the predominant source of prostacyclin in the endothelium.

Shortly thereafter, in November 1997, Dr. Oates further confirmed his concerns about selective inhibition of COX-2. He communicated to Merck the results of his study which indicated that Vioxx decreased urinary output of prostacyclin's metabolite, PGI-M, and suggested that selective COX-2 inhibition decreased vascular prostacyclin because "it is well established that [prostacyclin] is made throughout the body (e.g. in the vascular endothelium)." Ex. D (Merck review of Oates data). In fact, Dr. Oates's study specifically refuted Merck's theory that Vioxx was simply reducing renal prostacyclin. Dr. Oates conveyed to Dr. Nies that "he doubt[ed] that the kidney accounts for the...observation [that Vioxx decreases urinary output of PGI-M]." Id.

The specific risks of a decrease in vascular prostacyclin were well-known to Merck. In 1998, a full year before Vioxx was offered for sale in the United States, Merck's Scientific Advisory Board reported to Merck in unambiguous terms of its theory that prostacyclin biosynthesis in the vasculature was inhibited by Vioxx. Ex. E (Scientific Advisors' Meeting May 3 – 6, 1998). The Scientific Advisory Board cautioned Merck that "[b]y removing

[prostacyclin] this potent inhibitor of platelet aggregation, the probability that a coronary plaque rupture would lead to myocardial infarction or ischemic ventricular fibrillation is enhanced." Id. It is odd that Merck now conveniently seeks to distance itself from this theory.

Actual clinical evidence of the Vioxx hazard continued to manifest itself in Protocol 090. This randomized, placebo-controlled clinical trial compared Vioxx 12.5 versus nabumetone 500 mg versus placebo for a mere 6 weeks. The results of this short term trial are troubling in that they revealed 6 Vioxx, 2 nabumetone and 1 placebo adverse cardiovascular events. Further, for myocardial infarction and acute myocardial infarction, there were 3 Vioxx, 1 nabumetone and 0 placebo events. "Report of Protocol 090," at 114, table 37 (Ex. F).

The stark difference in adverse events in this low dose, short-term trial is troubling. More illuminating, however, is the sudden onset of acute myocardial infarctions from this trial. We know that there were a total of 4 MI/AMI events in 090. Merck documentation regarding this trial reveals that all 4 occurred within the first 16 days of either Vioxx or nabumetone usage with 3 of the 4 events occurring within the first 8 days of usage. See MRK-NJ0128190 (Merck's internal email) (Ex. G).

The hazards associated with Vioxx became even more evident when Merck conducted a "Mortality Analysis" for Vioxx users in the Merck's Alzheimer's trials. See "Mortality Analysis" (MRK-ABY0030000-30) (Ex. H). This analysis reveals that users of Vioxx were at a 4.43 fold (i.e., 443%) increased risk of dying than were non-users of Vioxx. This information has never been provided to the FDA. Dep. of Edward Scolnick at 556-557 (May 17, 2005) (Ex. I).

In an apparent effort to discover if Vioxx did indeed decrease systemic prostacyclin levels, Merck conducted Protocol 023. Protocol 023 was developed by Merck in response to

repeated warnings by Merck consultants, including Dr. Garret Fitzgerald, that Cox-2 inhibition by Vioxx would decrease prostacyclin production in vivo and would create a prothrombotic state within users.[4]   The test involved measuring systemic prostacyclin and thromboxane levels within the body of Vioxx users by measuring the urinary metabolite excretion levels of these two enzymes.  The study was extremely short with a duration of only 2 weeks.  The results of this study proved conclusively that Vioxx decreased systemic prostacyclin production while leaving thromboxane levels within the body at normal limits. This imbalance caused by Vioxx and proven by Protocol 023 eliminates any credible argument Merck might make asserting that Vioxx does not decrease prostacyclin levels within the body.  This study also substantiates prostacyclin imbalance model of thrombotic events.[4]

It is imperative to note that the decrease in systemic prostacyclin levels in Vioxx users in Protocol 023 was noted within hours of first ingestion. This proves that the mechanism of thrombogenesis associated with Vioxx is nearly immediate.  Any argument by Merck that Vioxx does not increase the risk of adverse cardiovascular events after short term use fails because of this internal study.

Protocol 023 confirmed to Merck scientists that there was a potential hazard associated with Vioxx.  As a result of this recognized hazard Merck, in 1997, developed a "Cardiovascular SAE [serious adverse events] Surveillance Task Force" to begin collecting information about the adverse cardiovascular events from Merck's internal studies.

D. Watson explained that the group was formed as a result of an assignment stemming from recommendations made at a recent meeting of the Board of Scientific Advisors. The task force is charged with formulating a plan to monitor

---

[4] This is the very process about which Dr. Oates warned Merck.

[4] Protocol 023 is replicated by the work of Dr. Fitzgerald in "Systemic Biosynthesis of Prostacyclin by cyclooxygenase (cox)-2: The Human Pharmacology of Selective Inhibitor of Cox-2," Proc. Natl. Acad. Sci. 1999; 96:272-277

the occurrence of CVD SAEs of a thrombotic nature in recently begun and future trials. (MRL, CDO, CDSP) of Vioxx and MK-0633. The plan is to apply to all studies of >4 weeks duration.

D. Watson summarized a theoretical safety concern regarding these events. In MK-0966 Protocol 023 (Double-Blind, Placebo-Controlled, Parallel-Group Study to Evaluate and Compare the Effects of L-748,731 [MK-0966]), Indomethacin, and Placebo on Urinary Sodium Excretion and Other Parameters of Renal Function in Subjects Consuming a 200 mEq Sodium Diet), VIOXX (50 mg daily), and indomethacin (50mg 3 times daily) were both found to significantly reduce the urinary excretion of PGI-M compared to placebo. However, VIOXX had no effect on systemic thromboxane production (largely platelet derived) as assessed by measurements of serum TxB2 and the urinary metabolite, 11-dehydro-thromboxane B2. It was felt that the reduction in urinary PGI-M likely reflects both a reduction in renal PGI2 generation, as supported by an observed decrease in urinary 6-keto PGI1a, and to some undefinable extent a decrease in systemic PGI2 synthesis. PGI2 is synthesized ubiquitously in blood vessel walls from arachidonate derived from either the vessel wall or platelet. It is the most potent of all inhibitors of platelet aggregation, and has vascular dilatory properties as well. Conversely, TXA2, a potent platelet aggregator and vasoconstrictor, is synthesized primarily by the platelet. The clinical implications of partially inhibiting the production of PGI2 without inhibiting thromboxane generation systemically are unknown. These findings raised concern about the potential for VIOXX to predispose to thrombotic cardiovascular (CV) events."

CV SAE Surveillance Task Force Meeting Minutes May 15, 1998 (Ex. J).

The Surveillance Task Force accumulated information about the cardiovascular adverse events from ongoing Vioxx trials. However, in an effort to minimize the apparent hazard associated with Vioxx, the Task Force pooled the cardiovascular information for Vioxx with the cardiovascular information from both active and inactive comparators. Dr. Watson noted in his final report on February 2, 1998, that:

Because the trials being conducted with Vioxx are ongoing, patients treated with placebo and active comparators were included in the estimation of CV SAE incidence rates. If the actual CV SAE incidence rate in the comparator treated patients was very low, a real increase in the incidence of events in patients treated with Vioxx would not be apparent.

"Final Results of an Analysis of the Incidence of Cardiovascular SAEs in the Phase IIb/III

Vioxx Osteoarthritis Clinical Trials," at 11 (Ex. K).

This pooled Vioxx plus comparator information was then compared to the

cardiovascular adverse event rates from the PROSCAR and FOSAMAX databases in an

attempt to observe relative differences in the rates of cardiovascular adverse events among

these databases. Despite the fact that the true hazard of Vioxx was obscured by pooling with

comparators, Dr. Watson concluded:

> The overall, pooled incidence rate for men in the Vioxx program was not
> statistically significantly different from PROSCAR placebo controls (age and
> time period at risk adjusted rate ratio 1.28, 95% CI 0.53 –2.82). The overall
> incidence rate for women was elevated compared to FOSAMAX placebo controls
> (adjusted rate ratio 2.16, 95% CI 1.14 – 3.94).

Id. at p. i.

Thus, despite the fact that the true hazard rate with Vioxx was artificially lowered by

Merck scientists, this internal Merck test revealed a clear, statistically significant elevated

danger with Vioxx. In Merck's memorandum to the Court, this study is curiously absent.

Merck's pattern of omission involves only internal studies that are harmful to Merck's

position in this case.  These studies contradict the representations made to this Court by Dr.

Gaziano. Another example of Merck and Dr. Gaziano's failure to provide this Court with

complete information is their omission of information regarding Merck's "Vioxx Preliminary

Cardiovascular Meta-analysis." "Vioxx Preliminary CV Meta-analysis" (Ex. L).

This meta-analysis pooled the data from numerous Vioxx studies, including 069, non-

rheumatoid arthritis trials, rheumatoid arthritis trials, ADVANTAGE and VIGOR. The meta-

analysis was designed to examine the specific endpoint at issue in this case, myocardial

infarction. The meta-analysis for the endpoint of myocardial infarction in trials of Vioxx

versus NSAIDs for all patients revealed a statistically significant 2.02 relative risk (95% CI 1.14 – 3.55). Id. at MRK-NJ0070395.   The results of Merck's own investigation into the connection between Vioxx and heart attacks stands in stark contrast to the representations made by Merck and Dr. Gaziano in their Science Memorandum: "Significantly, these pooled analyses revealed no statistically significant increased risk of cardiovascular adverse events for patients taking Vioxx, as compared to placebo or non-naproxen NSAIDs." This representation is misleading. See Merck's Memorandum in Support of Motion to Exclude Evidence of Plaintiff's Experts Regarding Causation at p. 27; see also Gaziano Decl. at ¶¶ 79-84 and ¶ 87.

The above meta-analysis included the results of the VIGOR trial. Both Plaintiff and Merck acknowledge that VIGOR established a five fold increase in Vioxx users for the exact type of event suffered by Mr. Irvin.  Merck and Dr. Gaziano attempt to distance the VIGOR trial from applicability in this case by stating that VIGOR was a long term study and therefore only establishes problems with long term usage.  Once again, however, Merck's own analysis disproves such an assertion.[5]

In September 2001, Merck conducted an analysis of "Confirmed Serious Thromboembolic Events Over Time In VIGOR." See MRK-NJ0168797 – 806 (Ex. M). This analysis was performed because the ". . . Vioxx clinical group was asked to examine the types of confirmed, potentially thromboembolic serious cardiovascular adverse experiences observed early as opposed to late in the VIGOR trial." Id. at MRK-NJ0168797.

---

[5] As Merck questions the ability of plaintiff's experts to opine on the mechanism of action underlying Vioxx's known hazard, it is of note that after the VIGOR data was unblinded to Dr. Edward Scolnick President of Merck Research Labs.  In analyzing the data, Dr. Scolnick stated that "The CV events are clearly there."  He further noted that "... it is mechanism based as we worried it was. Oates and Alan and barry (sic) were right about the metabolite meanings in urine Pg data." March 9, 2000 Email of Edward Scolnick (Ex. N).  The "metabolite

The conclusions of this analysis are illuminating:

**CONCLUSIONS:**
- The different types (sic) events were distributed across the entire study-time course; no differential clustering of different specific thromboembolic experiences (based on adjudicated term) occurred early vs. late in the trial.
- No temporal (early vs. late) differential clustering across the different events was observed in patients with specific underlying risk factors.
- **Fatal outcomes were atypical, but occurred both early and late in the study course**.

Id. at MRK-NJ0168798 (emphasis added).

The analysis split the VIGOR trial into thirds and examined the number of myocardial infarctions occurring in each period. (See graphs below) One third of the events occurred in the "0 – 4 months" period under examination. Moreover, more events occurred in the "0 – 4 months" period than did in the "4 – 8 months" period. Id. Merck's own internal analysis proves that the "18 month hypothesis" is a fabrication by Merck.[6]

---

meanings" is a reference to the 023 protocol discussed above as well as Dr. Oates' warnings about the dangers associated with Cox-2 inhibition.

6 This study also reveals that "An analysis showing constant overall thromboembolic event rates has been previously conducted by BARDS . . . ." Id. at MRK-NJ0168797. This further substantiates that the "18 month hypothesis" is false.

Table 1.  Summary of Specific Cardiovascular Events in VIGOR, Categorized By Exposure Time (at Occurrence) and Treatment Group

|  | 0 – 4 months | | 4 – 8 months | | 8 - 12 months | |
|---|---|---|---|---|---|---|
|  | VIOXX | naproxen | VIOXX | naproxen | VIOXX | naproxen |
| Myocardial infarction | 7 | 3 | 5 | 1 | 8 | 0 |
| Unstable angina | 4 | 2 | 1 | 0 | 0 | 1 |
| Non-hemorrhagic stroke | 3 | 3 | 4 | 4 | 3 | 1 |
| TIAs | 1 | 0 | 0 | 0 | 1 | 0 |
| Hemorrhagic stroke | 1 | 0 | 1 | 1 | 0 | 0 |
| Peripheral thromboses | 1 | 1 | 2 | 0 | 3 | 0 |
| Sudden, unexplained death | 1 | 1 | 1 | 1 | 1 | 3 |



## VIGOR:  Myocardial Infarctions Over Time

* Individual events labeled by study day
* Heavy outline = aspirin-indicated patient
* Above timeline = VIOXX
* Below timeline = naproxen

One of Merck's largest studies involving Vioxx was ADVANTAGE. This study was conducted on a near concurrent schedule with VIGOR. ADVANTAGE was a randomized controlled study of 12-week duration involving approximately 2700 patients comparing Vioxx 25 mg to naproxen 1000 in patients with osteoarthritis. The mean patient duration of exposure was a mere 69 days.  Aspirin usage for cardioprotection was allowed in both groups.

The FDA conducted a Medical Officer Review of ADVANTAGE between July 12, 2001 and November 28, 2001. *See* FDA Medical Officer Review (Ex. O).   The FDA's