conclusions about the safety of Vioxx at the 25 mg dosing level stand in stark contrast to the

representations made by Merck and Dr. Gaziano to this Court:

> "Rofecoxib (25 or 50 mg) showed no overall safety advantage over naproxen. . .
> ." FDA Medical Officer Review, Executive Summary at 2.

> "Dosing: Large studies included in this application used the 25 mg dose.
> Cardiovascular thrombotic events, hypertension, edema and congestive heart
> failure-related findings at the 25 mg dose were consistent in trend with the
> rofecoxib 50 mg dose." FDA Medical Officer Review, Clinical Review Section
> at.3.

> "Consistent with VIGOR, there was a trend of excess in serious cardiac
> thrombotic events in the rofecoxib 25 mg group. . . ." Id. at 6.

> "If the cardiovascular findings in VIGOR were all explained by naproxen (sic)
> anti-platelet effect, a difference would not be expected between naproxen and
> rofecoxib in ADVANTAGE, when patients at risk in both treatment groups were
> already maximally protected by aspirin." Id. at 7.

> "The findings of the ADVANTAGE study are consistent with those of the
> VIGOR and the RA efficacy databases. The CV findings are of concern because
> this is only a 12-week study, the dose of rofecoxib used in this study is 25 mg/day
> (half the dose used in VIGOR), this was a different population of patients (OA
> instead of RA) and patients were allowed to use aspirin if indicated for
> cardiovascular prophylaxis." Id.

> "There is no adequate evidence that rofecoxib has a cardiovascular safety profile
> similar to placebo or other NSAIDs." Id.

The FDA's review of both the VIGOR and the ADVANTAGE trials clearly indicate

that, in regard to adverse cardiovascular events, there is absolutely no difference between the

25 mg and 50 mg doses. The FDA medical reviewer examining the hazards associated with

the 25 mg dosage in ADVANTAGE stated that: "Consistent with VIGOR, there was a trend of excess in serious cardiac thrombotic events in the rofecoxib 25 mg group. . . ." Id. at 6.

Although the safety signal of 25 mg of Vioxx over short- term periods of ingestion was clearly established prior to by 2001, Merck continued to examine the issue in an apparent attempt to explain away the early data. An August 4, 2003, email from Tom bold to Alise Reicin entitled "MI risk – short term use of rofecoxib" further establishes Merck's longstanding knowledge of the dangers associated with short term use of 25 mg of Vioxx. *See* MRK-AC0075897 (Ex. P).   An internal examination of reported adverse events on Vioxx revealed the following: ". . . . it can be said that the ratio of reports where the CAD/MI was reported within 7 days or less was similar for the 25 mg and 50 mg daily dose groups." Id. The report further noted that: "In the 25 mg group, 38 or 19.6% out of the 194 reports in total reported a CAD/MI event within 7 days. In the 50 mg group, 7 or 18.9% out of 37 reports in total reported a CAD/MI event within 7 days." Id. Thus, not only were the event rates similar (the 25 mg dosage was minimally higher), but nearly 1 out of 5 myocardial infarctions associated with Vioxx through adverse event reporting **occurred within 7 days of first ingestion**.

Merck also commissioned a study entitled "Cardiovascular Risk of Cox-2 Inhibitors and Other NSAIDs" that they fail to describe in their science memorandum. The so-called "Ingenix Study" was named for the third party that conducted the study. A draft of the study was first disseminated on November 25, 2003.  The findings were:

> There was not a clear trend with time since onset of use, though risks in the first 30 days of rofecoxib and Celebrex (sic) were elevated compared with periods of use of ibuprofen or diclofenac (RR of ACS for rofecoxib 1.70, 95% CI 1.13-2.54; RR of ACS for Celebrex 1.41, 95% CI 0.97 –2.05).[7]

---

[7] ACS is acute coronary syndrome which consists of either myocardial infarction or unstable angina.

Ingenix Study (MRK-ADC0032525) (Ex. Q).

The report further states that: "This report is a preliminary (draft) final report, to be followed by a revised final report after receipt of comments from Merck and discussion of these comments between Merck and Ingenix." Id.  After apparent "receipt of comments from Merck" a revised version of the report was presented in the form of a "Draft Manuscript" on October 1, 2004.  See MRK-AHC0007010–34 (Ex. R).  Interestingly, the results of the previous version of the study were "revised" to state:

> Compared with a combined reference group of ibuprofen or diclofenac use, the relative risk (RR) of confirmed MI/ACS during periods of current rofecoxib use was 1.35 (95% CI 1.09 – 1.68). For current use of Celebrex, the RR was 1.03 (95% CI 0.83 – 1.27). There was no trend with time since onset of use, though risk in the first 30 days of rofecoxib and Celebrex were modestly elevated.

Id. at 0007011 – 12.

The results of Ingenix studies, showing an increased risk of myocardial infarction on Vioxx within the first 30 days of use, were replicated within another Merck sponsored study. The study titled, "Relationship Between Selective Cyclooxygenase – 2 Inhibitors and Acute Myocardial Infarction in Older Adults" has been referred to as the "Solomon Study." Solomon, et al., "Relationship Between Selective Cyclooxygenase – 2 Inhibitors and Acute Myocardial Infarction in Older Adults" Circulation 2004; 109:2068-2073 (Ex. S).

This Solomon study was sponsored by Merck and employed a Merck epidemiologist (Carolyn Cannuscio) as a principal participant.  The study revealed that: ". . . current rofecoxib use was associated with an elevated relative risk of AMI [acute myocardial infarctions] compared with celecoxib use and no NSAID use. Dosages of rofecoxib > 25 mg were associated with a higher risk than dosages [less than or equal to] 25 mg. The risk was elevated

in the first 90 days of use but not thereafter." Id. After discovering that the study it sponsored would portray Vioxx in an unfavorable light, Merck forced it's epidemiologist to withdraw as a participant in the study and removed her name as an author. The epidemiologist's participation was revealed, however, when Merck forgot to remove her name in a footnote in the original submission. This oversight was quickly rectified and any reference to a Merck employee's participation in the study was erased.

2.      **The APPROVe study disproves the "18 month hypothesis"**

Both Merck and Dr. Gaziano repeatedly refer to the APPROVe study as justification for their belief in the 18 month hypothesis. APPROVe was a randomized, placebo-controlled trial designed to examine the effect of Vioxx treatment on the risk of recurrent neoplastic polyps of the large bowel. Bresalier, et al., Cardiovascular Events Associate With Rofecoxib in a Colorectal Adenoma Chemoprevention Trial, N. Eng. J. Med. 2005' 352" 1092-1102 (Ex. T). Numerous Merck employees and scientists are co-authors of the above clinical report.

APPROVe was not designed as a cardiovascular safety study nor was the examination of the long-term cardiovascular safety, as opposed to short-term safety, of Vioxx a predetermined endpoint of the study.

The APPROVe study was halted due to a statistically significant increase in cardiovascular risk associated with Vioxx usage. More specifically, the "Conclusions" section of the study report states: "Among patients with a history of colorectal adenomas, the use of rofecoxib was associated with an increased cardiovascular risk." Id. at 102. This conclusion does not state that there is only an increased risk after 18 months of usage.

Initially, it should be noted that the 18-month hypothesis is the result of a small, post hoc, sub-group analysis. Id. at 6. Dr. Gaziano himself questions the validity of such a post hoc analysis: "According to Dr. Gaziano, however, cutting the data to look at the effect during the first 90 days was arbitrary and any finding from such a small post-hoc subgroup analysis may simply be the result of chance." Merck Science Memorandum at 31; see Gaziano Decl. ¶ 53. It is disingenuous that Dr. Gaziano discounts Dr. Solomon's study finding an increased risk with short-term usage of Vioxx based upon the fact that it is a post-hoc analysis, yet unquestioningly accepts as valid the same type of analysis conducted by Merck.

It is important to note that the litigation related 18-month hypothesis is contrary to Merck's earlier (and as will be discussed below, current) studies. Protocols 010, 023, 090, ADVANTAGE and VIGOR (as discussed above) all evidenced a hazard with Vioxx usage at a much shorter term than 18 months. More importantly, APPROVe itself evidences a near immediate onset of cardiovascular risks associated with Vioxx.

The Cardiovascular Safety Report for APPROVe establishes that collection and examination of "investigator-reported CV events" was a "secondary endpoint" of APPROVe. See "Cardiovascular Safety Report for APPROVe" at 11 (Ex. U). A Kaplan-Meier Curve for investigator-reported cardiovascular events was prepared by Merck. Id. at 36. This Kaplan-Meier curve shows early separation of the Vioxx and placebo arms (i.e., the rate of cardiovascular serious adverse events was different for Vioxx and placebo after only short term exposure).



This Kaplan-Meier curve showing early separation between the Vioxx and placebo arms was not included by Merck in the data reported in the New England Journal of Medicine. Merck also fails to present this relevant data to the Court.

Dr. Konstam, one of the lead authors of the APPROVe study and a Merck consultant, stated that he was "deeply concerned about mentioning the notion" of characterizing the APPROVe results as indicating that cardiovascular risks increase only after 18 months. *See* MRK-AHD0075708–11 (Ex. V). Dr. Konstam goes on to write that: ". . . we are already going out on a limb by emphasizing the 18 month issue. I feel that mentioning this 'flattening' issue, will subject us to the accusation that we are trying to minimize the key finding – an adverse effect of rofecoxib." Id. at MRK-ADH0075708.

The short-term hazards associated with Vioxx were further proven by a study that ran concurrently with APPROVe, the VICTOR study. VICTOR was a randomized, placebo-controlled trial of Vioxx 25 mg versus placebo. Data on adverse cardiovascular events were collected from this study and Merck investigators found that "there was a difference in the rates of confirmed thrombotic and APTC events in favor of placebo. . . ." Overview of

Cardiovascular Events in the VICTOR Study at 1 (Ex. W).  A Kaplan-Meier curve for Confirmed Thrombotic CV Events for VICTOR was prepared. This plot established near instantaneous separation of the placebo and Vioxx curves, evidencing an early hazard associated with Vioxx.  The investigators noted that the confirmed thrombotic serious adverse events result were statistically significant.



*See* Preliminary VICTOR CV counts and KM graph (Ex. X).

### B. Merck's Internal Studies Allow Plaintiff's Experts' To Testify To A Reasonable Degree Of Medical Certainty That Vioxx Caused Or Substantially Contributed To Mr. Irvin's Death.

Plaintiff will not revisit all of the above studies and literature addressing the clear cardiovascular risks associated with Vioxx. That Vioxx even after short-term use increases the risk of an adverse cardiovascular event is a proven medical fact.  The conclusion section of Merck's own APPROVe study clearly states that: ". . . the use of rofecoxib was associated

with an increased cardiovascular risk." *See* Bresalier, et al., *supra,* at 1092.  Thus, unlike in other mass torts, Merck, the manufacturer, has admitted in clinical literature that Vioxx causes the very injury at issue in this case.  Furthermore, the FDA has conclusively established the risk associated with Vioxx usage.

In Merck's Science Memorandum, the impression is given that the FDA has not specifically addressed the hazards associated with Vioxx usage.  More specifically, Merck represents that the FDA concluded, "based on its analysis of the data, that the short-term use of Vioxx and other NSAIDs does not appear to be associated with an increased risk of serious adverse cardiovascular events." Merck's Science Memorandum at 34.  What Merck fails to state is that the primary finding of the FDA's review was that: "The three approved cox-2 selective NSAIDs (i.e., celecoxib, rofecoxib, and valdecoxib) are associated with an increased risk of serious adverse CV events compared to placebo." FDA Advisory Committee Memorandum of April 6, 2005 ("Analysis and Recommendations for Agency Action Regarding Non-steroidal Anti-inflammatory Drugs and Cardiovascular Risk") (Ex. Z).  The FDA did not conclude that Vioxx "may be" or "could be" associated with an increased risk; the FDA concluded that Vioxx, Celebrex and Bextra "are associated with an increased risk of serious adverse CV events. . . ." Id.  Plaintiff's experts should be permitted to express their opinions to the jury that are consistent with this finding.

C.   **Plaintiff's Experts Have Presented Reliable Evidence That Vioxx Caused Mr. Irvin's Death**

Merck confuses the issue of mechanism of action with biological plausibility. These concepts are distinct both in science and under law. Biological plausibility is defined as the consideration of existing knowledge about human biology and disease pathology in order to

provide a judgment about the plausibility that an agent causes a disease. *See* Reference Manual on Scientific Evidence 388 (2nd ed. 2000). Biologic plausibility lends credence to an inference of causation. Id. Mechanism of action, on the other hand, explains precisely how an agent causes a disease. There is no need for plaintiff to prove the precise mechanism by which Vioxx causes cardiovascular events, only that it is plausible. Kennedy v. Collagen Corp., 161 F.3d 1226, 1230, 1330 (9th Cir. 1998) (causation can be proven when we do not know precisely how the damage occurred).

The opinions from Daubert and its progeny emphasize that causation need not be established to a high degree of certainty for expert testimony to be admissible under Rule 702. The Supreme Court stressed that, "[i]t would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science." Daubert, 509 U.S. at 590. Directly on point to the issues in the instant case, the Kennedy Court stated: "Not knowing the mechanism whereby a particular agent causes a particular effect is not always fatal to a plaintiff's claim. Causation can be proved even when we do not know precisely how the damage occurred, if there is sufficiently compelling proof that the agent must have caused the damage somehow." Kennedy at 1330 citing Daubert 43 F.3d at 1314.

Nevertheless, both Merck and Dr. Gaziano make various outlandish statements in their memorandum and declaration, respectively, concerning both mechanism of action and causation. A short, by no means exhaustive, compilation of the various contorted versions of the truth provided by Merck and Dr. Gaziano follows:

> "[T]here is no evidence that Vioxx supposedly inhibits prostacyclin in the vasculature as opposed to other parts of the body." Merck Memo. p. 42.

"There are no published studies establishing that Vioxx is capable of causing coronary plaque ruptures." Id. at 46.

"[T]he Fitzgerald hypothesis, which assumes that Vioxx may be pro-thrombotic, is speculative and scientifically unreliable." Id. at 46.

"Dr. Fitzgerald's hypothesis, however, remains just that – a hypothesis, that while interesting, has not been proven." Id. at 41; Gaziano Decl. ¶¶ 42-46, 100-1, & 112.

These statements are incorrect and have been repudiated by both internal Merck studies and independent research. These false predicates lead Merck to make the following bold assertion which essentially summarizes Merck's entire challenge to the plaintiff's experts:

> First, plaintiff's experts theorize that Vioxx may lead to an imbalance in prostacyclin and thromboxane in Mr. Irvin's vasculature, thereby triggering the formation of a thrombus that occluded his left anterior descending coronary artery. Second, Drs. Bloor and Lucchesi hypothesize that Vioxx may have caused a vasospasm – i.e., a contraction of a coronary artery – which in turn triggered the thrombus that precipitated Mr. Irvin's death. Third, Dr. Gandy hypothesizes that Vioxx may have caused an atherosclerotic plaque in Mr. Irvin's artery to rupture, thereby leading to the thrombus. Fourth, Drs. Ray and Lucchesi opine that Vioxx can accelerate the rate of atherosclerosis and suggest that this mechanism may have had something to do with Mr. Irvin's death. As explained below, however, none of these theories is based upon scientifically reliable evidence.

Id. at 40 (internal citations omitted)

Upon reading Merck's descriptions of and commentary upon the plaintiff's experts' specific causation opinions, one is left with the incorrect impression that there is no scientific research or literature constituting a basis for plaintiff's experts' opinions. While the above review of relevant internal Merck research into these issues is dispositive of these assertions, additional support for these propositions are given by Merck researchers in the APPROVe

study. For example, the authors state: "Cox-2 inhibition has several effects that could increase the risk of cardiovascular disease, including **reducing prostacyclin levels**, increasing blood pressure, decreasing angiogenesis, and **destabilizing plaque**." See supra, Bresalier at 1093 (emphasis added)

Thus, the authors, many of which are Merck scientists and employees, explicitly acknowledge that Vioxx, through Cox-2 inhibition, can cause cardiovascular problems by either decreasing prostacyclin levels or by destabilizing atherosclerotic plaques and causing ruptures. Such important conclusions by Merck scientists apparently warranted repeating within the Bresalier article as the authors further stated:

> Cox–2 is the chief source of systemic prostacyclin synthesis, and Cox–2 inhibitors may increase the cardiovascular risk by shifting the functional balance of these vasoactive eicosanoids toward the promotion of thrombosis or **atherogenesis**. Cox–2 inhibition combined with thromboxane-receptor antagonism may also lead to the **destabilization of atheromatous plaque**.

Id. at 7 (emphasis added)

For Merck and Dr. Gaziano to now come before this Court and misrepresent both the science underlying this drug and Merck's own findings through numerous internal studies is troubling. Perhaps the most troubling example of this behavior is as follows. Merck and Dr. Gaziano first attack Dr. Lucchesi (a National Institute of Health Merit Award winner) for relying upon data collected through Dr. Lucchesi's animal studies. Merck states that: "Animal data is not reliable evidence of causation." Merck Science Memorandum at 35. Dr. Gaziano is then quoted via affidavit as saying that: "animal studies are generally viewed as an insufficient basis for inferring causation in humans – particularly where, as here, such studies are inconsistent from clinical studies." Id.; Gaziano Decl. ¶26.

Next, after discrediting animal data, Dr. Gaziano is quoted as representing that:

On the other hand, there is evidence from both human and animal studies that the **production of prostacyclin in the vasculature is associated with Cox-1**, not Cox-2. Because Vioxx does not inhibit Cox-1, such evidence suggests that Vioxx does not inhibit prostacyclin in the human vasculature as the Fitzgerald hypothesis assumes. Moreover, even though **Cox-2 has been associated with the production of prostacyclin in the human vasculature**. . . .

Id. at 42; Gaziano Decl. ¶¶ 44 and 42 (emphasis added)

This type of illogic underlies the entirety of both Merck's Memorandum and Merck's defense in this case. Merck's very employees and scientists have acknowledged the scientific validity and reliability of the various mechanisms at issue in this case. Dr. Gaziano's role is apparently to contradict Merck's scientists and to confuse the scientific issues in the case. Such behavior should not be allowed to serve as the foundation for Merck's scientific challenges.

**D.      Independently Supported Research Has Established A Scientifically Reliable Hazard Associated With Vioxx Usage**

Plaintiff will not attempt to review the entirety of the wealth of literature examining the hazards associated with Vioxx ingestion and the various mechanisms of action associated therewith.  However, it is important for the Court to understand that independent researchers have conclusively established that Vioxx, utilized for even short periods of time, can cause the exact type of event that killed Mr. Irvin. A short synopsis of the more relevant literature is provided below.

- Mukherjee, et al., <u>Risk of Cardiovascular Events Associated With Selective Cox-2 Inhibitors</u>, JAMA 2001; 286: 954-59:  This study finds that "The available data raise a cautionary flag about the risk of cardiovascular events with cox-2 inhibitors." It is further noted that ". . . selective Cox-2 inhibitors decrease vascular prostacyclin (PGI2) production and may affect the balance between prothrombotic and antithrombotic eicosanoids. Unlike the platelet

inhibition afforded by Cox-1 inhibitors, Cox-2 inhibitors do not share this salutary antithrombotic property. In contrast, by decreasing vasodilatory and antiaggregatory PGI2 production, Cox-2 antagonists may tip the balance in favor of prothrombotic eicosanoid (e.g., thromboxane A2) and may lead to increased cardiovascular thrombotic events."

- Solomon, et al., <u>Relationship Between selective Cyclooxygenase-2 inhibitors and Acute Myocardial Infarction in Older Adults</u>, Circulation 2004;109:2068-2073 "In this study, current rofecoxib use was associated with an elevated relative risk of AMI compared with celecoxib use and no NSAID use. Dosages of rofecoxib > 25 mg were associated with a higher risk than dosages [less than or equal to] 25 mg. The risk of use is elevated in the first 90 days of use but not thereafter."

- Johnsen, et al., <u>Risk of Hospitalization for Myocardial Infarction Among Users of Rofecoxib, Celebrex, and Other NSAIDs</u>, Arch Intern Med. 2005;165:978-984. The study found that "Current users of rofecoxib had an elevated risk estimate for hospitalization for MI compared with nonusers for any category of non-aspirin NSAIDs (adjusted relative risk [ARR}, 1.80; 95% confidence interval [CI], 1.47-2.21)." Moreover, "[t]he highest ARRs were found among new users of all examined drug categories." "Conclusions: Current and new users of all classes of non-aspirin NSAIDs had elevated risk estimates for MI."[8]

- Jones, Christopher, <u>Relative Thromboembolic Risks Associated with Cox-2 Inhibitors</u>, Ann Pharmacotherapy 2005; 39:1249-1289:  This study is a meta-analysis of published cox-2 literature. "Cox-2 inhibitiors purportedly alter the prostaglandin biosynthesis pathway to selectively inhibit the production of prostacyclin, a protective entity with regard to clot formation, thus allowing the physiological effects of thromboxane to predominate, promoting platelet adhesion and vasoconstriction." The author concludes that ". . . it can be surmised that cox-2 inhibitors are associated with increased cardiovascular risks."

- Juni, et al., <u>Risk of Cardiovascular Events and Rofecoxib: Cumulative Meta-analysis</u>, Lancet 2004; 364:2021-9.  This study is a cumulative meta-analysis of available literature on Vioxx. The authors conclude:   "Our findings thus indicate that patients are at risk even if rofecoxib is taken for a few months only."  In addition, the authors found that "[b]y the end of 2000 . . . the relative risk from randomize controlled trials [for Vioxx was 2.30 (95% CI 1.22-4.33, p=0.010), and 1 year later . . . it was 2.25 (1.24 – 4.02, p=0.007). There was little evidence that the relative risk differed depending on the control group (placebo, non-naproxen NSAIDs, or naproxen; p=0.41) or trial duration (p=0.82).  In observational studies, the cardioprotective effect of naproxen was

---

[8] "Current users" were defined in this study as having filled a prescription within 0-30 days.  "New users" (a subset of current users) were defined as having filled their first prescription within 0-30 days.  Mr. Irvin would have been classified as a new user.

small (combined estimate 0.86 [95% CI 0.75-0.99]) and could not have explained the findings of the VIGOR trial."

- Hippisley-Cox, et al., <u>Risk of Myocardial Infarction in Patients Taking Cyclo-oxygenase – 2 inhibitors or Conventional Non-steroidal Anti-inflammatory Drugs: Population Based Nested Case-control Analysis,</u> BMJ 2005;330:xxx "These results suggest an increased risk of myocardial infarction associated with current use of rofecoxib, diclofenac, and ibuprofen despite adjustment for many potential confounders. No evidence was found to support a reduction in risk of myocardial infarction associated with use of naproxen."

- Rubic, Fitzgerald, et al., <u>Cox-2 Derived Prostacyclin Modulates Vascular Remodeling,</u> Circ. Res. 2005;96:1240-1247. "Suppression of prostacyclin (PGI2) biosynthesis may explain the increased incidence of myocardial infarction and stroke which has been observed in placebo controlled trials of cyclooxygenase (cox)-2 inhibitors." "Cox-2 inhibitors suppress biosynthesis of PGI2 without concomitant inhibition of thromboxane (Tx)A2 which derives predominantly from platelet cox-1. Suppression of this pathway would afford a mechanism by which the hazard of drug-induced thrombosis would relate to the patient's underlying risk of cardiovascular disease." "These consequences of PGI2 suppression, elevations of blood pressure, acceleration of atherogenesis and modulation of the vascular response to hemodynamic stress, may converge to alter vascular architecture and elevate cardiovascular risk during extended dosing with selective inhibitors cox-2."[9]

- Cheng, Fitzgerald, et al., <u>Role of Prostacyclin in the Cardiovascular Response to Thromboxane A2,</u> Science 2002;296: 539-541. "[D]ata support the hypothesis that PGI2 modulates platelet activity by TXA2 in vivo." "Our data establish that endogenous PGI2 modulates the CV actions of TXA2 in vivo."

- Kobayashi, et al., <u>Roles of Thromboxane A2 and Prostacyclin in the development of Atherosclerosis in apoE-deficient Mice,</u> J. Clin. Invest. 2004;114:784-794. "Thus, PGI2 appears to exert important inhibitory actions on the initiation and progression of atherosclerosis, and the reduction in PGI2 in the presence of normal TXA2 formation is likely to lead (sic) an increased risk of atherosclerosis and thrombosis. Currently, an important question concerning cox-2 inhibitors is whether the selective reduction in PGI2 increases the risk of atherogenesis. Our findings support that conclusion."

- Fitzgerald, Garret A., <u>Coxibs and Cardiovascular Disease,</u> N. Engl. J. Med. 2004; 351:1709-1711: "[S]uppression of the cox-2 dependent formation of prostaglandin I2 by coxibs might predispose patients to myocardial infarction or thrombotic stroke. Thus, a single mechanism, depression of prostaglandin I2

---

[9] Based upon the statements of Dr. Fitzgerald in this summer of 2005 article, it does not appear that Dr. Fitzgerald has abandoned support for his PGI2 imbalance theory as represented by Merck and Dr. Gaziano.

formation, might be expected to elevate blood pressure, accelerate atherogenesiss, and predispose patients receiving coxibs to an exaggerated thrombotic response to the rupture of and atherosclerotic plaque." "[T]he APPROVe study has shifted the burden of proof. We now have clear evidence of an increase in cardiovascular risk that revealed itself in a manner consistent with a mechanistic explanation that extends to all coxibs."

- Fosslien, Egil, <u>Cardiovascular Complications of Non-Steroidal Anti-Inflammatory Drugs</u>, Ann. Clin. Lab. Sci. 2005 (online version). "In animal models, selective inhibition of Cox-2 promotes hypertension, atherogenesis, and formation of thrombi, all risk factors for acute myocardial infarction." "[T]herapeutic doses of coxibs can increase the risk of thrombosis by reducing endothelial cell synthesis of prostacyclin (PGI2), a vital vasodilator and platelet inhibitor. This disrupts the normal balance between prostacyclin and Cox-1 derived thromboxane (TXA2), a vasoactive eicosanoid that promotes platelet aggregation and thrombus formation." "This scenario is supported by clinical findings: administration of rofecoxib to patients reduced systemic prostacyclin synthesis to one-half or less of normal levels. This mechanism may, at least in part, explain the hypertension and increased rates of thromboembolic events observed in rofecoxib clinical studies."[10]

E.      **Plaintiff's Experts Testified That To A Reasonable Degree Of Medical Certainty That Vioxx Caused Or Substantially Contributed To Mr. Irvin's Death**

Merck has filed individual challenges to each of the Plaintiff's causation experts in addition to the challenges addressed herein. Plaintiff does not wish to revisit the same issues that are addressed in the individual motions and oppositions; however, it should be noted that each of Plaintiff's challenged experts have opined that, to a reasonable degree of medical certainty, Vioxx caused or contributed to cause Mr. Irvin's death. The challenged experts' reports, as well as the attachments to their depositions, also contain materials and literature relied upon by the experts in formulating their opinions. It is further clear from a review of the expert reports and the depositions that the experts relied upon the expertise and testimony of the other individual experts involved in this case in formulating their opinions. Indeed, it

would be difficult not to rely upon the expertise of someone of Dr. Benedict Lucchesi's stature who has researched and published within this area of medicine and pharmacology with great acclaim for over 40 years.

Moreover, the deposition testimony of Plaintiff's causation experts makes clear their opinions are reliable and are further based upon the individual expert's various clinical experiences, individual research and/or published medical literature. For example, Dr. Baldwin testified in his deposition that he has personally treated patients who suffered adverse events from Vioxx usage and that he "advise[d] patients to discontinue Vioxx due to suggestive (sic) increased risk of MI" between 20 and 100 times in his clinical practice. Dep. of Dr. Thomas Baldwin at 29 (Ex. AA). Baldwin testified that it was his opinion that Vioxx "caused or contributed to cause" Mr. Irvin's death. Id. at 38. When asked about the basis of his opinion, Dr. Baldwin responded:

> That opinion is based on several – several levels of evidence. And number one is Cox-2 inhibitors have relatively rapid onset of effects within hours – certainly within the first day of taking Cox-2 inhibitors. Therapeutic effects also correlate with Cox-2 inhibition; henceforth, there is a reduction of cyclooxygenase, and the effects of that cause prostacyclin levels to drop. Prostacyclin helps counteract thromboxane, and in that prostacyclin causes dilatation and reduces platelet aggregability. And thromboxane does the opposite. It increases the likelihood of vas[o] constriction, and it increases platelet activity and likelihood to aggregate. So just from a basic science standard, rapid onset of symptoms associated with Cox-2 inhibition should correlate with rapid onset of effects that would be prothrombotic within the early time period.

Id. at 42-43.

As is more fully outlined in the individual response to Merck's motion to exclude his testimony, Dr. Baldwin goes on to state that his clinical experience, knowledge of clinical

---

[10] Please see Addendum A to this Opposition containing a collection of the referenced clinical literature.

data, knowledge of epidemiological data and familiarity with the prostacyclin/thromboxane relationship all provide a reliable scientific background for his opinions. However, instead of revisiting the individual oppositions filed by the Plaintiff, a summary of important testimony from the subject experts may prove illuminating to the Court.

Dr. Lucchesi testified in his deposition that "…Vioxx interferes with the healing process and would contribute to plaque rupture" " …Vioxx more likely than not had a role in the plaque rupture if, indeed, that's what happened." That a plaque rupture is "More likely to occur in the presence of Vioxx." "The scientific facts say that Cox-2 inhibition established – establishes the conditions for a prothrombotic state." "I think I said it's more likely that, more likely than not that Vioxx had a contributory role here." Dep. of Dr. Benedict Lucchesi at 330, 333, 335, & 337 (Ex. BB).

Dr. Bloor testified that he believes there was a natural progression leading up to the formation of the thrombus, but that he did not observe from the histopathology slides "the changes that [he] would expect to make the connection between the rupture of the plaque and exposure of its core that would initiate the thrombosis. So [he is] left with the conclusion that it's another process by which the thrombus is formed." "I think that the . . . initiation of the thrombus formation is due to . . . another factor. . . "[t]hat he was taking an agent, namely Vioxx, at [the] time, and it's known to be thrombogenic." "And the fact that he's on an agent which is know to be thrombogenic, I would have to say that was the initiating factor for the thrombus formation." Dr. Bloor further notes that he relies upon the expertise of Dr. Lucchesi and other in the field of pharmacology to support his opinion that Vioxx is thrombogenic. Dep. of Dr. Colin Bloor at 96, 98, 101, & 103 (Ex. CC).

Dr. Burton opined in his deposition that Mr. Irvin's usage of Vioxx for less than 30 days contributed to his sudden cardiac death. "[B]ased on my reading of the literature, and based on my understanding of the pharmacology of Vioxx, I think it would be nonscientific to conclude that it could not cause death with someone using it within less than 30-day period." Dep. of Dr. Joseph. Burton at 66 (Ex. DD). "But I am basically depending upon the pharmacologist to … address specific pharmacological aspects of Vioxx. . . ." Id. at 68-69. "I've looked at the literature, I've looked at the pharmacology. And to me, the literature and pharmacology, given the fact that this man, unlike a lot of these people, unless you want to speculate, has no real risk factors for sudden cardiac death, other than the fact of taking Vioxx." Id. at 70. "I'm giving an opinion that based on my interpretation of the literature which I have referenced, that there is an association between the consumption or use of Vioxx, and an increased risk of cardiovascular death. . . ." Id. at 120.

Dr. Gandy testified in his deposition that, "I arrived at my opinions based on taking into consideration the information that was available to me as well as my clinical experience, my clinical knowledge, and general understanding with regard to the subject matter. Dep. of Dr. Winston Gandy, M.D. at 53 (Ex. EE). Moreover, Dr. Gandy testified that Vioxx was a substantial contributing cause to Mr. Irvin's death: "To a reasonable degree of medical certainty, I believe that Vioxx either caused or was a significant contributing factor to his acute coronary event resulting in his death on that day." Id. at 203-204.

## CONCLUSION

In conclusion, the testimony of Plaintiff's causation experts is based upon clinical experience, applicable medical literature, applicable medical records and justified reliance upon the other experts involved in this case. The opinions expressed by the Plaintiff's experts

are scientifically reliable and easily sustain <u>Daubert</u> based scrutiny.   Accordingly, Merck's

Motion to Exclude Plaintiff's Experts Testimony Regarding Causation should be denied.

Respectfully submitted,

By: _____
**Andy D. Birchfield, Jr., Esquire**
Paul J. Sizemore
P. Leigh O'Dell
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
(800) 898-2034 (telephone)
(334) 954-7555 (telecopier)

**Co-Lead Counsel**

**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
***Herman, Herman, Katz & Cotlar, LLP***
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
FAX: (504) 561-6024

**Temporary Office**
3411 Richmond Ave., Suite 460
Houston, TX 77046
PH: (713) 877-1843
FAX: (713) 871-9750

**PLAINTIFFS' LIAISON COUNSEL**

Christopher A. Seeger, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)

## Co-Lead Counsel

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
MEUNIER&WARSHAUER, L.L.C.
P.O. Box 960
191 East Second Street
New Roads, LA 70760
(225) 638-6137
(225) 638-8836 (fax)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Thomas R. Kline, Esquire
KLINE&SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Carlene Rhodes Lewis, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

## PLAINTIFF'S STEERING COMMITTEE

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced in accordance with Pre-Trial Order No. #8, on this **2nd** day of November, 2005.

# SEE RECORD FOR

# EXHIBITS

# OR

# ATTACHMENTS

# NOT SCANNED