UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2005 NOV -3  AH 10: 33

LORETTA G. WHYTE
CLERK

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| Evelyn Irvin Plunkett v. Merck & Co, Inc.* | | CASE NO. 02:05CV4046 |

## PLAINTIFF'S RESPONSE TO DEFENDANTS MOTION TO EXCLUDE PROPOSED TESTIMONY OF COLIN M. BLOOR, M.D. AND JOSEPH L. BURTON, M.D.

Plaintiff Evelyn Irvin Plunkett, as Personal Representative of the Estate of Richard Irvin, Jr., deceased, by and through her undersigned counsel, hereby responds in opposition to Merck's Motion to Exclude the Proposed Testimony of Colin M. Bloor, M.D. and Joseph L. Burton, M.D. For the reasons set out below, Merck's motion is due to be denied.

Defendant has requested this Court conduct a motion, pursuant to Daubert v. Merrill Dow Pharmaceuticals, 509 U.S. 579 (1993), and Kumho Tire v. Carmichael, 119 S. Ct. 1167 (1999), to establish the reliability of expert testimony the PSC intends to offer at trial in the areas of pathology and cardiac pathology.

Rule 702 of the Federal Rules of Evidence permits the admission of expert testimony where scientific, technical, or other specialized knowledge will assist the trier of fact. Unlike an ordinary lay witness, an expert witness is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation. See Rules 702 and 703. Daubert, 509 U.S. at 592.  In its role as "gatekeeper," the District Court has wide discretion to decide whether

Fee_____
Process_____
Dktd_____
CtRmDep_____
Doc. No_____

an expert's testimony is reliable enough to be admitted. Id. at 592. The Court must determine the reliability of expert testimony in light of the facts and circumstances of each particular case. Kumho Tire, 119 S. Ct. at 1179. The Daubert Court never held, however, that the required assessment had to be based in whole on scientific principles that are so well-established as to be considered scientific law. Daubert at 592, note 11. The requirements of Rule 702 should not be read to exclude the use of unconventional evidence, but rather, it merely requires that the evidence used be reliable in nature, and allows for, but does not even require, the inclusion of methods or assumptions that are "generally accepted" in the relevant scientific community. Daubert, 509 U.S. at 597. Furthermore, the Daubert analysis is a flexible one.

The Court of Appeals for the 5th Circuit held, in  Pipitone v. Biomatrix, Inc., 288 F.3d 239 (5th Cir. 2002) that:

> Many factors bear on the inquiry into the reliability of scientific and other expert testimony.[1] In Daubert, the Supreme Court offered an illustrative, but not an exhaustive, list of factors that district courts may use in evaluating the reliability of expert testimony.[2] These factors include whether the expert's theory or technique: (1) can be or has been tested; (2) has been subjected to peer review and publication;(3) has a known or potential rate of error or standards controlling its operation; and (4) is generally accepted in the relevant scientific community.[3] In the later case of Kumho Tire Co. v. Carmichael,[4] the Supreme Court emphasized that the Daubert analysis is a "flexible" one, and that "the factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony."[5] The district court's responsibility is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[6]

Defendant Merck & Co. would have this Court believe that a pathologist must possess the

---

1 Daubert, 509 U.S. at 593; Skidmore v. Precision Printing and Packaging, Inc., 188 F.3d 606, 617 (5th Cir. 1999); Seatrax, 200 F.3d at 372.
2 Daubert, 509 U.S. at 593.
3 Id. at 593-94; see also Moore v. Ashland Chem., Inc., 151 F.3d 269, 275 (5th Cir. 1998) (en banc).
4 526 U.S. 137 (1999).
5 Id. at 150

expertise, not only of that of a physician, but also of a pharmacologist, an epidemiologist and a statistician in evaluating the pharmacokinetics of a drug and the 'raw data' behind each and every peer-reviewed published epidemiological study before he should be allowed to render an opinion about cause of death in a case that involves a pharmaceutical agent.  Merck specifically attacks Dr. Joseph L. Burton, a board-certified pathologist recognized by the Forensic Pathology Boards, for not being a "pharmacologist and….[for] relying on plaintiff's other experts to address Vioxx's pharmacological mechanisms."[7]   Dr. Colin Bloor, a Distinguished Professor of Pathology (Emeritus) at the University of California, San Diego School of Medicine, who is internationally recognized for his expertise in cardiac pathology,[8] is likewise criticized for not doing "research of his own" into the prothrombotic properties of Vioxx.[9]  This is a standard not required by the applicable rules of evidence or precedent, and which is both unreasonable and unrealistic.  To expect and require a pathologist to render an analysis on matters of statistics, epidemiology, and pharmacokinetics as a precondition to accepting his opinion on a matter of pathology is to ask, indeed, to *invite* him to extend his opinions beyond his expertise and training and thus to offer unreliable evidence to the trier of fact.

Dr. Burton and Dr. Bloor, are, in fact, employing that methodology generally employed by pathologists in determining cause of death when a drug is involved; that is, they are relying upon peer-reviewed medical literature and their 'knowledge, skill, experiences, training, or education'[10] to testify in the form of an opinion to a matter "generally accepted in the relevant scientific

---

6 Id. at 152.
7 Merck & Co., Inc.'s Motion to Exclude Testimony of Colin M. Bloor, M.D. and Joseph L. Burton, M.D. at 4.
8 In 2001, the **XVII World Congress of the International Society for Heart Research** held the ***Colin Bloor Symposium: Vascular Biology and Angiogenesis*** in Winnipeg, Manitoba, Canada, honoring Dr. Bloor's research achievements.  Colin M. Bloor CV.
9 Merck & Co., Inc.'s Motion to Exclude Testimony of Colin M. Bloor, M.D. and Joseph L. Burton, M.D. at 14.
10 Federal Rules of Evidence 702

community."[11] The sources on which they base their opinions have inherent indicia of reliability and thus do not undercut these experts' opinions, but rather, strengthen them. Surely a peer-reviewed medical journal is more reliable than what Merck ask for, which is essentially the untrained, untested epidemiological "research" of a pathologist. Drs. Bloor and Burton are entitled to rely on generally accepted principles and information from other sources for the basis of their opinions, so long as those other sources are reliable.

Foremost amongst 'other reliable sources' is the peer-reviewed medical literature. Foremost amongst the peer-reviewed medical literature is the New England Journal of Medicine. Reporting for the Adenomatous Polyp Prevention on Vioxx study ("APPROVe") in the New England Journal of Medicine, Bresalier et al. stated that, "[a]s compared with the placebo group, the rofecoxib (Vioxx) group had an increased risk of *confirmed thrombotic events* (relative risk, 1.92; 95 percent confidence interval, 1.19 to 3.11)"[12] (emphasis added). Bombardier et al., published ***Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis*** ("VIGOR") in the New England Journal of Medicine in 2000[13] wherein *more* patients in the rofecoxib group suffered heart attacks than those in the naproxen group. Solomon et al. published ***Cardiovascular Risk Associated with Celecoxib in a Clinical Trial for Colorectal Adenoma Prevention*** in the New England Journal of Medicine in 2005.[14] Therein, these investigators reiterated that the VIGOR trial reported a higher risk of myocardial infarction among patients receiving rofecoxib.[15] Garret A. FitzGerald M.D., and Carlo

---

11 <u>Daubert</u> at 593-94.; see also <u>Moore v. Ashland Chem., Inc.</u>, 151 F.3d 269, 275 (5th Cir. 1998) (en banc).
12 Bresalier, R.S.  Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial. N Eng J Med 2005; 352: 1092-1102, at 1096.
13 Bombardier C.  Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis. N Eng J Med  2000;343:1520-8.
14 Soloman, SD.  Cardiovascular risk associated with celecoxib in a clinical trial for colorectal adenoma. prevention. N Eng J med. 2005 352:1071 – 1080.
15 Id at 1077.

Patrono, M.D., published ***The Coxibs, Selective Inhibitors of Cyclooxygenase-2***, also in the New England Journal of Medicine. (Ex. A).   These authors wrote "…thrombosis would be expected to occur in patients who are already at increased risk because of other underlying conditions", e.g., underlying cardiovascular atherosclerosis.[16]

Furthermore, in addition to these publications in the world's foremost medical journal, on September 30, 2004, in a move that garnered national media attention, Merck & Co., Inc. ('Merck') withdrew Vioxx from the worldwide market due to results from its APPROVe study, which showed significant increases in *thrombotic cardiac events* among users of Vioxx.[17]

A Lexis Nexis search revealed that 125 articles in the general lay press have been published regarding Vioxx *in the last six months* alone.  A pathologist would have to be practicing on another planet for the last 5 years to not be aware of the fact that Vioxx is considered be the relevant scientific community to be a 'prothrombotic' drug associated with sudden cardiac death, cardiac thromboses and myocardial infarction and was removed from the market for causing these very disorders.  To somehow expect that the average, reasonable pathologist, let alone an expert pathologist or internationally-acclaimed cardiac pathologist, would disregard this evidence, published in the peer-reviewed medical literature and within the lay press, or to demand that he personally evaluate the raw data for each and every epidemiological study, or conduct his own research into the mechanism of action of Vioxx, is ludicrous. Drs. Burton and Bloor *are* both entitled to rely upon their education, training and experience as to how to perform an autopsy and *upon what* to rely upon in making a determination as to cause of death.  In fact, the defense's own proposed pathology expert, Dr. Thomas M. Wheeler testified that:

---

16 FitzGerald, GA and C. Patrono.  The coxibs, selective inhibitors of cyclooxygenase-2.  N Eng J Med. (2001) 345:433-442.

17 APPROVe was a long-term, multi-center, randomized, placebo-controlled, double-blind clinical trial – the

...part of doing the autopsy is correlating the finding of the autopsy with the clinical, and **the clinical is, in large part, what the medication history is and how those might interact with what we find in autopsy.** So, if we were doing a sudden cardiac death and the patient were [sic] taking a non-steroidal, I'm sure it would come up during our discussion what role, if any, not only that particular class of drugs but any other class of drugs might have in the final terminal event.[18]

Dr. Wheeler was further questioned regarding a hypothetical patient suffering a cardiac event after ingesting cocaine, a drug whose overdosage can result in a fatal event.[19] Dr. Wheeler has personally never diagnosed a case of cocaine-induced death, but is "...generally familiar" with the medical literature on cocaine-induced death, opining that these cases "frequently die of a cardiac death."[20] Although Dr. Wheeler admits that he is not familiar with cocaine overdose as a cause of death by personal experience he states generally that the pre-existence of atherosclerosis does not preclude the pharmaceutical agent as a cause of death:[21]

---

'gold standard' of epidemiology.
18 Dep. of Thomas M. Wheeler, MD at 16-17 (emphasis added).
19 Id. at 113.
20 Id. at 113.
21 From the deposition of Dr. Wheeler:

>Q   Now, if a patient presented for an autopsy to you and the report from the emergency room was that this individual had overdosed on cocaine and died with a cardiac arrhythmia, in doing the autopsy you notice the presence of pre-existing atherosclerosis. Would you attribute the patient's death to the pre-existing atherosclerosis?

>A   Depends on the extent of the atherosclerosis and the nature of the      atherosclerosis. If I remember correctly, I believe that the coronary spasm may play a role in cocaine-induced death. That's an area of forensic pathology that we don't do in the hospital because any patient dying like that would go to the medical examiner's office. So, I'm not as familiar with it by personal experience other than just my general learning about it as part of my training and education. If the lesion were not calcified, the atherosclerosis, and it were high grade, it could be that spasm might be much more obstructive to that vessel than a vessel which was completely normal. So, depending upon the nature of the atherosclerosis, whether it was calcified or not, also depending upon the extent of luminal narrowing that one would impose spasm on top of, it may enter into my decision about whether the atherosclerosis was, indeed, not the primary cause but a contributing cause of death.

>Q   (By Mr. Restaino) Would you also agree that there may very well be cases, as you just cited, where there is not clinically significant calcification, clinically insignificant plaque formation, but existing atherosclerosis in an individual who dies of a cardiac arrhythmia secondary to cocaine?
>A.   Well, if I think I understand your question, would there be circumstances where the atherosclerosis was so minimal and not calcified that perhaps spasm was the primary mechanism, it's possible that a small degree of atherosclerosis would not be significant at all in that death.

Dep. of Thomas Wheeler, M.D. at 113.

Q     (By Mr. Restaino) If you were -- if you were teaching a group of residents on particular autopsy and the report from the ER was that the patient had overdosed on cocaine, would you teach your residents to include cocaine in the listing of causes of death?

A     Yes, provided that it independently verified with toxicology and autopsy or at least from a blood sample from the patient prior, not just on hearsay or word of mouth. We would like some objective that there's a toxic level of cocaine in the blood.

Q.     And if it was recorded that the terminal event was a cardiac arrhythmia prior to the patient's demise, would you consider that a primary or secondary cardiac arrhythmia?

A     I would consider it secondary to the cocaine.[22]

As such, neither Dr. Burton nor Dr. Bloor must possess all "background" information and data regarding Vioxx, nor must they be required to conduct research on non-steroidal anti-inflammatory medications, nor must they be required to have published on sudden cardiac death in order to render a reliable opinion as to the cause of death in this particular case. They need not be pharmacologists but are entitled to rely upon the opinions of pharmacologists as to a drug's mechanism of action. They need not be experts in clinical design or statistics to rely upon a published epidemiological study, nor must they possess the qualifications to analyze and interpret the raw clinical and epidemiological data – including the data concerning any relationship between Vioxx and cardiac events. As pathologists they possess every qualification required to render an opinion as to the cause of death in this case. The applicable standard does *not* require them to second guess the epidemiologists and biostatisticians or to reevaluate the raw data from the VIGOR study, with its markedly increased rate of cardiovascular events.

They are, however, entitled to rely upon the peer-reviewed medical literature for, as Dr. Wheeler testified, the peer reviewer for a submitted article holds expertise in the subject matter

---

22 Id.

submitted for publication, and is recognized as having that expertise by his peers.[23] Drs. Burton and Bloor are not required by <u>Daubert,</u> or any of its progeny, to possess *that* level of expertise in order to read and rely upon a published article; they *are* required to have the qualifications to understand that which they read and to apply that newly-acquired knowledge to their medical opinions.

Defendant's attack against Dr. Burton for reviewing that Vioxx literature provided to him by Plaintiff's counsel and "that he undertook no investigation or literature search of his own concerning Vioxx" is puzzling, to say the least. There is, in fact, a finite amount of literature published regarding the prothrombic properties of Vioxx. There are a finite number of epidemiological studies and Dr. Burton does not have the ability to procure from the defendant itself its confidential internal documents. There is *no claim* or allegation that Dr. Burton was provided with an inadequate number of articles or that Dr. Burton was only shown articles favorable to the Plaintiff's allegations. Instead, the sole argument was that the Plaintiff's counsel, having been involved in this litigation for over 5 years, shared with Dr. Burton the wealth of articles in counsel's possession.

The defense also attacks Dr. Burton's opinion that the short-term use of Vioxx for approximately 30 days causes an imbalance between prostacyclin and thromboxane in the vasculature, and that this imbalance can result in an increased risk of cardiovascular events.[24] In fact, Dr. FitzGerald, the recognized expert in the relevant scientific community, agrees with Dr. Burton. In his paper ***Coxibs and Cardiovascular Disease***, Dr. FitzGerald states that "...a single mechanism...might...predispose patients receiving coxibs to an exaggerated thrombotic response

---

23 Id. at 55.
24 Merck & Co., Inc.'s Motion to Exclude Testimony of Colin M. Bloor, M.D. and Joseph L. Burton, M.D. at 6.

to the rupture of an atherosclerotic plaque"[25]  (Ex. B).

As to the "short-term usage" attack by Merck, one must again look at the facts in the case. It is generally accepted within the scientific community that Vioxx is prothrombotic.  The drug was removed from the market, worldwide, *because* it is prothrombotic.  Dr. Burton and Dr. Bloor are entitled to rely upon this designation as described above.  Defense pathology expert Dr. Thomas M. Wheeler was asked at his deposition to name "any drug…recognized as…having the potential to cause a heart attack that requires 18 months of usage or longer prior to manifesting its effects" and Dr. Wheeler stated "I can't think of one as I sit here today".[26]  Dr. Burton is entitled to a similar extrapolation within his own mind.  If a drug is known to be cardiotoxic, and is proven to be cardiotoxic by epidemiological analysis, the toxicity of the drug is not necessarily bound by the four corners of the epidemiological study.  Science looks at the totality of the evidence.  The APPROVe study conclusively demonstrated the increased risk of sudden cardiac death conferred by Vioxx. Merck asserts that the risk was confined to persons who ingested Vioxx for more than 18 months, and potentially only at 30 months, but this claim is based upon Merck's analysis of a subgroup of APPROVe patients that used Vioxx for no more than 18 months.[27]  The study itself identifies that this is a *post hoc subgroup analysis*.[28]   Such an analysis is inherently weak and unreliable.[29]  To require plaintiff's pathology expert, Dr. Burton, to rely upon a form of epidemiological analysis that is universally frowned upon would, in fact, take Dr. Burton into the realm of science disfavored by <u>Daubert</u> and its progeny.

---

25 FitzGerald, G., Coxibs and Cardiovascular Disease. New Eng. J, Med (2004) 351; 1709-1711 at 1709.
26 Dep. of Thomas Wheeler, M.D. at 222.
27 Rule 26(2)(B) report of Plaintiff's Expert Wayne Ray, ¶ 24.
28 Bresalier, R.S., Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial. N Eng J Med 2005; 352: 1092-1102.
29 The inherent weaknesses of post hoc subgroup analyses are addressed in both the Rule 26(2)(B) report of plaintiff's epidemiology expert, Dr. Wayne Ray and within the Plaintiff's submitted Science Brief.

The defense also uses "the study by Konstam[30], which pooled Merck's data on Vioxx from 23 controlled clinical trials encompassing more than 28,000 patients"[31] to attack Dr. Burton's opinion regarding duration of exposure. However, despite being aware of Dr. Konstam's true opinion regarding the risk of CV events with less than 18 months exposure, the defense DID NOT share with Dr. Burton that on January 31, 2005, Dr. Konstam wrote an email stating that "[A]nalysis of shapes of curves are laden with hazards to begin with, and **we are already going out on a limb by emphasizing the 18 month issue**." (Ex. C) (Emphasis added). If the lead author of the aforementioned meta-analysis believes they are "going out on a limb by emphasizing the 18 month issue," how dare the defense attack an expert for holding a reasonable belief that short-term exposure may plausibly be associated with cardiovascular events? As to other weaknesses in the defense attack regarding short-term exposure, the court is directed to the Plaintiff's submitted Science Brief and the Rule 26(2)(B) report of Plaintiff's cardiology/epidemiology expert, John Farquhar, M.D.

Defense next attacks Dr. Burton for allegedly not having any reliable scientific evidence supporting the mechanism by which he contends Vioxx could cause a thrombotic sudden cardiac death, specifically vasospasm and/or vasoconstriction and plaque rupture.

Defendants confuse mechanism of action with biological plausibility. These concepts are distinct both in science and under law. Biological plausibility is defined as the consideration of existing knowledge about human biology and disease pathology in order to provide a judgment about the plausibility that an agent causes a disease.[32] Biologic plausibility lends credence to an

---

30 Konstam, MA et al., Cardiovascular thrombotic events in controlled, Clinical trials of rofecoxib. Circulation. (2001) 104:2280-2288.

31 Merck & Co., Inc.'s Motion to Exclude Testimony of Colin M. Bloor, M.D. and Joseph L. Burton, M.D., page 8.

32 Reference Manual on Scientific Evidence. 2nd Ed. (2000) at 388.

inference of causation.[33] Mechanism of action, on the other hand, explains precisely how an agent causes a disease. There is no need for Plaintiff to prove the precise mechanism by which Vioxx causes cardiovascular events, only that it is plausible. *See also* Kennedy v. Collagen Corp., 161 F.3d 1226, 1230, 1330 (9th Cir. 1998) (Causation can be proved when we don't know precisely how the damage occurred). The U.S. Supreme Court stressed that it would be unreasonable to conclude that the subject of scientific testimony must be known to a certainty, because, arguably, there are no certainties in science.[34] This Court need only consider whether it is biologically plausible that Vioxx is capable of causing cardiovascular events, not whether the precise mechanism of action has been demonstrated.

As to the 'biological plausibility' of Vioxx causing cardiovascular events in individuals such as Mr. Irvin, the point is made by the participants in an '***Editor's Round Table: Cyclooxygenase-2 Inhibitors and Cardiovascular Risk***, published as an "**Uncorrected Proof**", online and accessed on October 24, 2005.[35] (Ex. D) The participants included a Professor and Chairman of the Department of Gastrointestinal, Medicine and Nutrition, from the University of Texas, MD Anderson Cancer Center, Houston, Texas; a Professor of the Department of Family and Community Medicine at the Baylor College of Medicine in Houston, Texas; the Medical Director of the Baylor Heart and Vascular Institute, Baylor, University Medical Center, Dallas, Texas; the Editor-in-Chief of the American Journal of Cardiology; the Dean of the A. Webb Roberts Center for Continuing Medical Education of Baylor Health Care System, Dallas, Texas; the Chairman of the Department of Medicine, Scripps Clinic, Medical Group; and the Vice

---

33 Id.
34 Daubert, 509 U.S. at 590.
35 http://www.sciencedirect.com/science?_ob=ArticleURL&_udi=B6T10-4HCN79F-
8&_coverDate=10%2F21%2F2005&_alid=327128823&_rdoc=1&_fmt=&_orig=search&_qd=1&_cdi=4876&_s
ort=d&view=c&_acct=C000006078&_version=1&_urlVersion=0&_userid=75682&md5=f2db80ada9476638519

President of Medicine Services and Academic Affairs of the Scripps Clinic Foundation in La Jolla, California. This is not only a representative sample of the general 'scientific community' but it is noteworthy that four of the roundtable's participants are located within Houston, Texas and two of them are from Baylor itself, home university of defense pathology expert, Thomas M. Wheeler.

These participants discussed, *inter alia*, the "…most important question in all of these trials is the mechanism for the increased risk for cardiovascular events in these various patient populations. The **most common explanation is a prothrombotic effect,** which Garret Fitzgerald has written about extensively." Id. (citations omitted) (emphasis added). The Chair of the Department of Medicine of the Scripps Clinic Medical Group, Dr. Gary Williams, MD, PhD, described this "popular hypothesis" as suggesting "that a prothrombotic state is possible, since the COX-2 inhibitors block, at least partially, vascular prostacyclin but have no effect on platelet thromboxane."[36] Furthermore, Dr. Williams states that,"[T]his prothrombotic hypothesis implies clot formation to most clinicians." In other words, Vioxx causes clots. It is not the Plaintiff's burden to prove what *is* the mechanism of action. The Plaintiff must only show that her theories are biologically plausible. The Medical Director of the Baylor Heart and Vascular Institute, William C. Roberts, MD, while acknowledging that the prothrombotic hypothesis by itself can't be the entire explanation notes that "it is at work in some of these patients.[37]" This *is* 'biological plausibility' generally accepted by the scientific community and rightfully relied upon by Dr. Burton. As such, the defense's attack on Dr. Burton must be denied.

---

e9154f92a21e3#sec2.1.
36 Id.
37 Id.

The defense's attack on Dr. Burton's opinion, regarding, in a hypothetical sense, the effect of Vioxx on a pre-existing plaque, must also fail for this opinion is also generally accepted within the scientific community. This issue is also indirectly discussed by the **Editor's Roundtable** of experts. Dr. Williams states, "This imbalance in prostacycline and thromboxane contributes to a so-called 'prothrombotic state' and, in patients with existing atherosclerotic disease or perhaps increased cardiovascular risk factors, an enhanced vulnerability to cardiovascular events."[38] (emphasis added). An atherosclerotic plaque *is* "existing atherosclerotic disease", and the plaque vulnerability discussed within the Burton deposition is, in fact, described by Dr. Williams and published within the peer-reviewed medical literature. This attack on Dr. Burton's opinions, therefore, must also be denied.

The defense next turns its attention to the basis for Dr. Burton's specific causation opinions beginning with a laughable attack upon his inability to opine as to whether or not Mr. Irvin did, in fact, have an "imbalance in the prostacyclin and thromboxane levels" at the time of his death.[39] Dr. Burton, appropriately, never claimed to offer such an opinion. How could he? No blood test was run at the time of the autopsy measuring the blood prostacyclin and thromboxane levels. However, the *absence of evidence is not evidence of absence* and Dr. Burton is, in effect, asked to prove a negative. However, as described above, the prostacyclin/thromboxane imbalance theory, as proffered by Dr. FitzGerald, is still, as of October 24, 2005, discussed within the medical literature as the "most common explanation" for the prothrombotic effect. Surely, if the participants of an Editor's Roundtable published with the American Journal of Cardiology can rely

---

38 Id.
39 Merck & Co., Inc.'s Motion to Exclude Testimony of Colin M. Bloor, M.D. and Joseph L. Burton, M.D. at 11.

upon this imbalance within the body without a single case report or epidemiological study documenting such an imbalance, Dr. Burton is entitled to do the same.

Furthermore, along similar lines of argument, the defense cannot be permitted to rely upon Dr. Burton's inability to "detect whether Mr. Irvin actually had a vasospasm or vasoconstriction" just prior to his death. Spasm or constriction of an artery is accomplished within the muscular layer of the artery itself. Death brings to an end the body's ability to function, including an artery's ability to constrict or dilate. Thus, when death occurs, any evidence of constriction or dilatation of the vessel necessarily disappears. Typically, the pathologist does not perform an autopsy until after death has occurred. Therefore, Dr. Burton could not possibly have "detected whether Mr. Irvin actually had a vasospasm or vasoconstriction." The defense would, somehow, have Dr. Burton see and rely upon not only the impossible, but also a violation of the very rules of nature. As such, this argument must be rejected.

Having run out of any and all attacks on Dr. Burton's opinions which are based in the natural sciences, the defense turns its attention to Dr. Colin Bloor, a 'Distinguished Professor of Pathology (Emeritus)' who, as described above, is internationally renowned as an expert in cardiovascular pathology. The defense begins its unwarranted attack by mentioning that Dr. Bloor did not use the words "Vioxx" and "COX-2" within his Rule 26(2)(b) report.[40] The defense, both in the *Ernst* trial and in their post-verdict public relations blitz,[41] emphasized that Vioxx did not cause a thrombosis and that Mr. Ernst did, in fact, die as a result of a cardiac arrhythmia, despite the testimony of the coroner that performed the autopsy on Mr. Ernst (Exhibit E). Examination of

---

[40] Id at page 13.
[41] New York Times, '*Jury calls Merck Liable in Death of Man on Vioxx*. Saturday, August 20, 2005. ("Merck's defense in the case was centered on the fact that Mr. Ernst's autopsy found that he died of an arrhythmia, or irregular heartbeat. Clinical trials have not linked Vioxx to arrhythmias.")

the autopsy report in the *Irvin* matter demonstrated that the coroner performing the post-mortem examination on Mr. Irvin stated that "Cause of Death" was "[V]ventricular fibrillation due to arteriosclerotic coronary heart disease"(Exhibit F).

Ventricular fibrillation is, in a fact, a form of *cardiac arrhythmia*. In fact, the Merck Manual, published on-line, in its section entitled '***Cardiac Abnormalities – Arrhythmias***' defines ventricular fibrillation as "[a] rapid irregular ventricular rhythm due to multiple reentrant activity associated with essentially zero cardiac output."[42]  (Ex. G).  Therefore, Plaintiff's attorneys reasonably expected the defense to attempt to obfuscate the *Irvin* matter as they did with the *Ernst* matter, by attempting to show that Mr. Irvin died from a ventricular fibrillation instead of the thrombus within his coronary artery.  As such, Plaintiff's attorneys retained Dr. Colin Bloor as an expert in cardiac pathology to review the histopathology slides from the *Irvin* matter along with the autopsy report.  Dr. Bloor was, in fact, NOT retained to opine on the causality of Vioxx in Mr. Irvin's death, but to testify that Mr. Irvin *did not* die from a 'cardiac arrhythmia' and did not develop his thrombosis from a ruptured atherosclerotic plaque.[43]

As such, Dr. Bloor, upon completion of his review of the histological slides made available to him prior to his writing of his Rule 26(2)(B) report on September 24, 2005, stated that:

> "...at the time of death there was no evidence of ischemic injury in the myocardium on both gross and microscopic examination indicating the degree of coronary artery disease present had not yet progressed to causing clinical disease, for example myocardial ischemia or myocardial infarction. The presence of hemorrhage within an atheromatous plaque and the acute thrombus in the lumen of the L.A.D. indicate that **an acute event occurred near the time of death that resulted in sudden severe narrowing of an**

---

42 http://www.merck.com/mrkshared/mmanual/section16/chapter205/205i.jsp. (accessed October 24, 2005).
43 It is to be noted that we *all* eventually die from a 'cardiac arrhythmia'. As defense pathologist, Thomas M. Wheeler testified during his deposition, "In nearly all final end points in death -- you know, the exception is massive trauma occurring at one time -- the final -- or having someone's head cut off as in execution -- the final terminal event is usually cardiac ventricular fibrillation." Dep. of Thomas Wheeler, M.D., at 109.

**already narrowed vessel lumen. This change would result in significant restriction of blood flow to the myocardium leading to myocardial ischemia and increasing the risk of cardiac arrhythmias.** The lack of findings at autopsy consistent with myocardial ischemia indicates the duration of ischemia was not sufficient for the changes to occur and further suggest that an arrhythmia occurred as a result of the ischemia."[44] (emphasis added).

Dr. Bloor's clearly stated-opinion is that "an acute event occurred" and this "acute event" led to the ischemia which, in and of itself, led to the "risk of cardiac arrhythmias." Dr. Bloor was asked *during his deposition* by the defense the following question:

> Q   So you do not believe the thrombus in this case is in any way related to Mr. Irvin's atherosclerosis?
> A   I think that the thrombus – the initiation of the thrombus formation is due to other -- another factor.

Dep. of Colin M. Bloor at 96.  An answer not inconsistent with what he opined to within the corpus of his Rule 26(2)(B) report.  However, the questioning defense attorney then asked a follow-up question opening the door for Dr. Bloor to testify that:

> Q   And what is that factor?
> A   That he was taking an agent, namely Vioxx, at this time, and it's known to be thrombogenic.

Realizing that he then opened a previously-closed door, defense attorney then asks,

> Q   Okay.  Is that opinion anywhere in your report, sir?
> A   No, it is not.[45]

Now, after questioning Dr. Bloor regarding an opinion he did not place within his Rule 26(2)(B) report and did not intend to offer at the time of trial and opening the door for such testimony, the defense attacks Dr. Bloor for answering the questions that were posed to him during his deposition.  This is not a valid use of a Rule 26(2)(B) report to corral an expert's opinions.  This was, from the defense perspective, poorly planned questioning that allowed Dr. Bloor to

---

44 Report of Colin Bloor, M.D. at 17 (emphasis added).

testify in the manner that he did.

Dr. Bloor is then criticized for not doing "the work necessary to opine on issues relating to general causation." He testified that he spent only 15 -16 hours total on Vioxx matters, including drafting his 18-page report ("a report written with the Plaintiff's attorney present and actively participating in the drafting").[46] Nevertheless, Dr. Bloor spent an *appropriate* amount of time reviewing slides and those articles *he* deemed necessary for the bases of his opinions.

The defense then attempts to 'taint' Dr. Bloor's Rule 26(2)(B) report by stating that it is "a report written with the plaintiff's attorney present and actively participating in the drafting."[47] First, this attack is unwarranted for, while the report must be "prepared and signed by the witness," the 1993 Advisory Committee Notes say that this requirement "does not preclude counsel from providing assistance to experts in preparing the report."[48] After <u>Daubert</u>, the truth is that even the best-educated and most literate of experts will need to confer with counsel to ensure that their reports satisfy <u>Daubert's</u> requirements. The bottom line, according to the Advisory Committee Notes, is that the report "should be written in a manner that reflects the testimony to be given by the witness" at trial—a prescription that makes lawyer participation a virtual requirement.

Furthermore, Dr. Bloor clearly delineated the roles played during the writing of his Rule 26(2)(B) report:

> Q   Okay.  And did you do the typing on this report?
> A    Actually, I prepared this on my own computer, you know, and we printed out a copy afterwards which I signed and gave to him.
> Q   Okay.  Did you do the typing or did somebody else type at your computer?
> A   No, I type at my computer all the time.

---

45 Dep. of Colin M. Bloor at 96.
46 Merck & Co., Inc.'s Motion to Exclude Testimony of Colin M. Bloor, M.D. and Joseph L. Burton, M.D. at 13.
47 Id. at 13.
48 Fed. R. Civ. P. Advisory Committee Notes (1993).

Q   Fair enough. And did you type this report up?
A   Yes.
Q   Okay.  And you said as you were typing this report, Mr. Restaino was with you?
A   Yes.
Q   And y'all were discussing the various aspects of the report that it would cover --
A   Yes.
Q   -- and things like that? And I assume that Mr. Restaino made suggestions on certain topics that should be covered and things like that?
MR. RESTAINO:  Objection.
A   Yes.  He had some suggestions, and I had my own suggestions, too.
Q   (By Mr. Tomaselli)  Sure.  But, I mean, as far as, you know, let's have a paragraph on how ischemia turns into ventricular tachycardia and ventricular fibrillation which can lead to sudden cardiac death, those are all things that –
A   That type of scenario would be something I would suggest, because he was giving me a broad overview of what the major heading should be.
Q   Okay.
A   And then I was telling him in my view what topics I thought should be covered in that.


Dep. of Joseph Burton, M.D. at 28-29.

The defense next attacks Dr. Bloor for "assuming" that Vioxx was "prothrombotic".[49] Dr.

Bloor DID NOT "assume" that Vioxx was prothrombotic – he reasonably relied upon the expert

opinions of the physician/pharmacologist, Dr. Lucchesi, whom he has professionally known for a

long period of time, as well as the APPROVe study which, itself, clearly states "In our

randomized, placebo-controlled trial, we found an increased risk of confirmed thrombotic

events….."[50]

Q.      What is the basis for your opinion that Vioxx is thrombogenic?

A       Well, in terms of the mechanisms by which this would occur, I would defer to experts in pharmacology, like Dr. Lucchesi, whose report I have seen, and I have also known professionally for a long period of time and have high respect for his work, or also epidemiologists, and I believe it is the -- there's also the APPROVe Study that has indicated increased risk of no -- of cardiovascular events occurring in patients on Vioxx.[51]

49 Merck & Co., Inc.'s Motion to Exclude Testimony of Colin M. Bloor, M.D. and Joseph L. Burton, M.D. at 14.
50 Bresalier, R.S. et al., *supra,* at 1100.
51 Dep. of Colin M. Bloor, M.D. at 101-102.

As to the association of short-term exposure to Vioxx and cardiovascular events, Dr.

Bloor, a cardiac pathologist, would appropriately defer to an epidemiologist for the interpretation

of the epidemiological data.[52] One can only imagine the challenge that would have been filed had

Dr. Bloor testified that he had the expertise in epidemiology to analyze the data himself.

The defense then turns its attention to Dr. Bloor's 'Case Specific' opinions. They spend an

inordinate amount of time repeating his testimony regarding atherosclerosis, without challenging

any of it, somehow, believing that because so many people in this country have atherosclerosis and

suffer from sudden cardiac death there can never be another cause of death in any of these

individuals. The defense exhibits their lack of understanding of the principle of 'causation' by

stating that, because of the pre-existing atherosclerotic plaque, Mr. Irvin's thrombosis *must have*

occurred secondary to it. This fallacy is aptly dispelled by Drs. Kenneth J. Rothman and Sander

Greenland, co-authors of the textbook *Modern Epidemiology,* and the peer-reviewed article

entitled *Causation and Causal Inference in Epidemiology:*

> . . . . A given disease can be caused by more than one causal mechanism, and every causal
> mechanism involves the joint action of a multitude of component causes. Consider as an
> example the cause of a broken hip. Suppose that someone experiences a traumatic injury
> to the head that leads to a permanent disturbance in equilibrium. Many years later, the
> faulty equilibrium plays a causal role in a fall that occurs while the person is walking on an
> icy path. The fall results in a broken hip. Other factors playing a causal role for the
> broken hip could include the type of shoe the person was wearing, the lack of a handrail
> along the path, a strong wind, or the body weight of the person, among others. The
> complete causal mechanism involves a multitude of factors. [53]

The defense, again, refers to Dr. Bloor's "threshold impropriety" of "attempting to offer

opinions not expressed in his expert report" when, as described above, it was the question asked

---

52 Id. at 125.

53 Rothman, KJ and Greenland, S.  Causation and causal inference in epidemiology. Am J Public Health. (2005)
95:S150.doi:10.2105/AJPH.2004.059204 (Ex. H).

by defense attorney which opened the door for Dr. Bloor to offer an opinion that he was not prepared to offer on September 24, 2005 when he wrote his Rule 26(2)(B) report. Inasmuch as the door was opened by the defense, Dr. Bloor's opinion regarding the causal association with Vioxx should be allowed notwithstanding the fact that he did not intend to offer such an opinion when he wrote the report.

Interestingly, the defense then attempts to portray Dr. Bloor's opinion regarding the absence of a rupture of the fibrous cap over the pre-existing plaque as being "diametrically opposite" to findings of "multiple experts" – assuming the "multiple experts consist of Drs. Burton and Bloor.[54] The defense attempts to obfuscate the opinions of each expert by confusing and inappropriately interchanging its discussion rupture of the atherosclerotic *plaque* and rupture of the fibrous *cap* over the plaque.

There is no confusion regarding the atherosclerotic plaque. Dr. Bloor *is* of the opinion that the plaque itself was disrupted and sustained a hemorrhage.[55] He would agree that Mr. Irvin's plaque was not disrupted into the lumen and that it was a "vulnerable plaque"[56]; importantly, it is Dr. Bloor's opinion that the fibrous cap is not ruptured.

> Q    Okay. You would agree that Mr. Irvin's plaque near the thrombus was vulnerable and unstable?
> A    Well, it had the features that had been -- that term has been applied, but there was no disruption into the lumen at that site or flap of tissue or cap into the lumen.[57]

And,

> Q    When you looked at Mr. Irvin's histopathology slides of his heart under the microscope, did you see that Mr. Irvin's plaque in the area of the thrombus had a thin cap?

---

54 Merck & Co., Inc.'s Motion to Exclude Testimony of Colin M. Bloor, M.D. and Joseph L. Burton, M.D. at 16.
55 Dep. of Colin Bloor M.D. at 77.
56 Id. at 78.
57 Id.

A    Oh, there is some thinning of the cap at that point, but it also is intact throughout.[58]

And,

Q    Okay.  Are there -- is -- is there, in your opinion, any rupture of the actual plaque, the thin cap of the plaque?
A    No, there is not.  I think if you follow the thin cap all the way around it, you see it's intact all the way over to this surface, and there is no open communication between the plaque core and the lumina of the vessel.[59]

And,

Q    It is also your opinion that Mr. Irvin's plaque did not fissure, true?
A    And by "fissure," you're meaning cracking of the fibrous cap leading -- no, again, would lead to continuity between the inner core and the lumen of the vessel, no, it did not.[60]

Now let's look at the testimony offered by Dr. Burton. *Ab initio,* we must look at his opinions as stated within his Rule 26(2)(B) report.  The defense excoriated Dr. Bloor's ostensible "threshold impropriety" of "attempting to offer opinions not expressed in his expert report" and then *they* attempt to offer opinions by Dr. Burton "not expressed in his expert report."  A careful analysis of Dr. Burton's report reveals a marked *similarity* between Dr. Burton's findings and opinions and Dr. Bloor's findings and opinions.

What Dr. Burton *does* state within his Rule 26(2)(B) report is as follows:

CORONARY ARTERIES:  Two sections containing five cuts through coronary     vessels reveal 30 to 50% ± narrowing with chronic atheroma with focal calcification.      In one section of slide labeled number 8 there is a 50% narrowing of a large vessel          which I take to be the left anterior descending coronary artery based on the gross     description by the pathologist of the autopsy specimen.  **There is a disrupted       plaque.**  There are remnants of a clot in the residual remaining lumen.  There is a       crescent shaped area of chronic inflammatory cells in the perimeter.[61] (emphasis added).

---

58 <u>Id.</u> at 77.
59 <u>Id.</u> at 85, 96.
60 <u>Id.</u> at 111.
61 Report of Joseph Burton, M.D. at 19.

And,

**It is my opinion the cause of death of Mr. Richard Irvin was an acute coronary thrombosis occurring in the left anterior descending coronary artery associated with coronary artery atherosclerosis.**

**Support for this opinion can be found in the following:**

- The previously noted autopsy indicates 20 to 40% occlusion by atheromatous deposits in the coronary vessels.  There is an area of 60% occlusion in the left anterior descending branch at 2.2 cm.  Proximal to this there is an acute thrombosis for 1.0 cm that  is  not attached.
- Microscopic evaluation of the sections taken at the time of Mr. Irvin's autopsy confirms the above.[62]

And,

**It is my opinion that Richard Irvin, based on the currently available   information, had few risk factors that would have pre-disposed him to a sudden cardiac death, except for his recent use of VIOXX for approximately 30 ± days.**

**Support for this opinion can be found in the following:**

Except for focal moderate to severe coronary atherosclerosis none of the autopsy findings including the microscopic evaluation of vessels of the various organs of Mr. Irvin's body disclosed any significant atherosclerotic process.  This would be consistent with a man whose cholesterol and triglyceride levels were not significantly elevated.[63]

And,

**It is my opinion that there is a proximal and/or causal relationship between Mr. Irvin's use of medication VIOXX for approximately 30 days prior to his death, apparently at a dose of 25mg per day, and his sudden cardiac death which was precipitated by an acute coronary artery thrombus occurring in his left anterior descending artery.**

**Support for this opinion can be found in the following:**

The coronary thrombosis was unattached, and there is no evidence in the sections  of myocardium submitted for microscopic analysis of an infarct indicating that this thrombosis and the associated fatal arrhythmia were an acute event.

Since the pathological findings of an acute thrombus, a potentially unstable plaque in the

---

62 Id. at 22.
63 Id. at 23 – 24.

same area, a heart that shows no previous evidence of ischemic injury in the same area, a heart that shows no previous evidence of ischemic injury clearly establishes that the pathological findings and the clinical presentations of Mr. Irvin's death is clearly "textbook" with what has been described in the literature as to the physiological responses of the body to COX-2 inhibitors such as VIOXX and the potential acute and fatal consequences of such use.[64]

*Nowhere* does Dr. Burton describe a rupture of the atherosclerotic plaque's cap, exposing the blood to the thrombogenic material within the plaque. He *does* describe a **"disrupted plaque,"** NOT a ruptured fibrous cap of the plaque, which is consistent with Dr. Bloor's observation of a "hemorrhage" into the plaque. The defense attempts to, again, obscure his opinions through their questioning of Dr. Burton. As cited within their challenge itself, Dr. Burton *does*, in his deposition alone, describe the 'plaque' as "ruptured" with the hemorrhage described but this one inartful description by Dr. Burton does not warrant the totality of his testimony being excluded, especially when viewed in the context of his Rule 26(2)(B) report opinions.

Furthermore, there is even consistency between Dr. Bloor, Dr. Burton and defense expert Dr. Wheeler in there being no rupture of the plaque itself for despite Dr. Wheeler stating that two of the sections of coronary artery show "a portion of the fibrous cap is infiltrated by macrophages, acute hemorrhage into the lipid rich core, and **focal rupture of the thin fibrous cap,"**[65] Dr. Wheeler did NOT, in fact, observe the rupture he states was present *at the time he wrote his report.*

Dr. Wheeler was specifically asked the following question:

Q    I'm reading from your report. It states, "A portion of the thin fibrous cap is infiltrated by macrophages. There is acute hemorrhage into the lipid-rich core and focal rupture of the thin fibrous cap." Can you mark for us on the – that which you saw on

---

64 Id. at 24 – 25.
65 Report of Thomas M. Wheeler at 2.

or before September 28th which is the focal rupture of what you spoke?[66]

To which Dr. Wheeler admitted:

A     Okay.  Do you want me to mark the other things that I mentioned or just the focal rupture....Okay.  The focal rupture is the fact that in order to get the thrombus, which is right here, in between the fibrous cap and the cholesterol core, there had to be a rupture of the cap in this area here.  **I don't actually see a site of rupture**, but it's -- in my way of thinking and analyzing this case, the way the clot got in there is that there had to be rupture somewhere so that the blood was exposed to the fibrous -- I'm sorry -- to the lipid-rich core and formed a thrombus.  **In other words, I don't see a way to have the fibrous cap, the thrombus, and the lipid-rich core without having this cap having ruptured**[67] (Emphasis added).

The defense then also attacks Dr, Bloor for not being able to do the impossible, that is, provide evidence that a dead person had vasospasm.  For the reasons discussed above, this ludicrous challenge must also be disallowed.

Finally, the defense is left with nothing but the absurd.  Dr. Bloor admits that "no study shows that Vioxx use makes plaque more vulnerable or unstable".[68]  But this is not in any way relevant to Dr. Bloor's opinions, which are clearly elucidated in his Rule 26(2)(B) report; to wit, that the plaque, itself, did not cause Mr. Irvin's fatal thrombosis.  And, while it is completely irrelevant to the facts of this case and to the opinions of Drs. Burton and Bloor that neither expert can "point to anything that differentiates a purportedly Vioxx-induced clot from a clot formed by any other cause", truth be told, Dr. Wheeler cannot point to any feature of the clot which would indicate that it was induced by the plaque. We must not lose sight of the Court's gatekeeping function—to filter unreliable expert testimony away from the trier of fact. The opinions of Drs. Burton and Bloor are reliable, and should be therefore be allowed.

---

66 Dep. of Thomas M. Wheeler, M.D. at 219.
67 Id. at 219-220.
68 Merck & Co., Inc.'s Motion to Exclude Testimony of Colin M. Bloor, M.D. and Joseph L. Burton, M.D. at 17.

Respectfully submitted,

By:_____
**Andy D. Birchfield, Jr., Esquire**
Paul J. Sizemore
P. Leigh O'Dell
BEASLEY, ALLEN, CROW,
METHVIN,
PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
(800) 898-2034 (telephone)
(334) 954-7555 (telecopier)

**Co-Lead Counsel**



**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
***Herman, Herman, Katz & Cotlar, LLP***
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
FAX: (504) 561-6024

**Temporary Office**
3411 Richmond Ave., Suite 460
Houston, TX 77046
PH: (713) 877-1843
FAX: (713) 871-9750

**PLAINTIFFS' LIAISONCOUNSEL**

Christopher A. Seeger, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)

**Co-Lead Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
MEUNIER&WARSHAUER, L.L.C.
P.O. Box 960
191 East Second Street
New Roads, LA 70760
(225) 638-6137
(225) 638-8836 (fax)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Thomas R. Kline, Esquire
KLINE&SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Carlene Rhodes Lewis, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced in accordance with Pre-Trial Order No. #8, on this **31**st day of October, 2005.

# SEE RECORD FOR

# EXHIBITS

# OR

# ATTACHMENTS

# NOT SCANNED