UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| Evelyn Irvin Plunkett v. Merck & Co, Inc. | * | CASE NO. 02:05CV4046 |

---

## PLAINTIFFS' RESPONSE TO MERCK & CO., INC.'S MOTION TO EXCLUDE TESTIMONY OF BENEDICT R. LUCCHESI, M.D., PH.D., M.S., F.A.H.A.

The Vioxx MDL Plaintiffs' Steering Committee ("PSC"), by and through the undersigned counsel, responds as follows to Defendant Merck & Co., Inc.'s ("Defendant" or "Merck") Motion to Exclude Testimony of Benedict R. Lucchesi, M.D., Ph.D., F.A.H.A. and the memorandum in support thereof (the "Exclusion Memorandum").

I.    Introduction.

Professor Benedict R. Lucchesi is unquestionably one of the intellectual giants of both pharmacology (the science of drugs) and cardiology (the medical study of the structure, function, and disorders of the heart). Few if any people are better qualified to explain the impact of drugs on the cardiovascular system. He is the recipient of the Torald Sollmann Award, presented by the American Society for Pharmacology and Experimental Therapeutics ("ASPET") for "significant contributions over many years to the advancement and extension of knowledge in the field of pharmacology,"[1] and he is a past chairman of the ASPET Division for Cardiovascular Pharmacology. He is a fellow of the International Academy of

---

[1] ASPET website, http://www.aspet.org/public/awards/sollmann_award.html (accessed November 4, 2005).

1

Cardiovascular Scientists, and worked on the development of the first implantable pacemakers and on the nitroglycerin patch. [2]

Perhaps most importantly, Dr. Lucchesi has researched and published in the very areas of pharmacology that are at issue in this case.[3] His early worked definitively proved that cardiovascular adverse consequences would be associated with Cox-2 inhibition. Indeed, he even consulted with both Merck and Pfizer about his research and findings in this area.[4] To this day Dr. Lucchesi continues to be one of the premier researchers in this area.

Despite these outstanding credentials, and the well-reasoned conclusions Dr. Lucchesi has reached in this case, Merck has moved to exclude his testimony on a scattershot variety of grounds. The Exclusion Memorandum suggests his "report and . . . deposition testimony are rife with assertions of what Merck knew about the alleged cardiovascular risks associated with Vioxx and with value judgments on the propriety of 'the conduct of Merck . . . related to Vioxx." Exclusion Memorandum at 3. In fact, he reviewed documents containing complex scientific information unfavorable to Vioxx, explained what those documents meant, and contrasted Merck's response to this information to the responses of other drug researchers when their studies produced bad news about the drugs they were investigating.

Merck also suggests it would be wrong to allow Dr. Lucchesi to testify about possible mechanisms of causation, or conclusions based on animal studies or case reports. In fact, his testimony on these subjects is based on well-accepted science, and it must be considered along with testimony from other experts. The coherence and consistency of the testimony from all the experts proffered by the PSC is the important consideration, not whether any single expert

---

[2] October 18, 2005 deposition of Benedict R. Lucchesi ("October 18 Deposition) at 54:7-24.

[3] Hennan, et al., Effects Of Selective Cyclooxygenase-2 Inhibition on Vascular Responses and Thrombosis in Canine Coronary Arteries, Circulation 2001;104:820. See also, Publications listing in Lucchesi CV attached as Exhibit A.

[4] October 18 Deposition pp. 86-87.

by himself or herself provides every piece of the big picture. Dr. Lucchesi's opinions are reliable and they are relevant. That is exactly what the law requires.

Finally, Merck argues that Dr. Lucchesi cannot give any opinions about what caused Mr. Irvin's death because Mr. Irvin was so healthy before taking Vioxx that his medical record is too thin. What terrible alternative explanations might have lurked within his body if only he'd felt bad enough to go to the doctor for them to be discovered! This argument is so risible it barely warrants a response.

All of Merck's arguments fail, and should be rejected by this court. Dr. Lucchesi's testimony has already been admitted in two Vioxx trials (Ernst v. Merck in Texas and Humeston v. Merck in New Jersey), and it easily meets the standard established by Fed. R. of Evid. 702 and the U.S. Supreme Court's guidance in Daubert v. Merrell Dow Pharmaceuticals, Inc; 509 U.S. 579, (1993), General Electric Co. v. Joiner, 522 U.S. 136 (1997), and Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999).

In Daubert the Court held that scientific evidence must be both reliable and relevant, 509 U.S. at 589, and suggested four factors trial judges might consider in applying these tests.[5] The inquiry, it emphasized, must be flexible. Id. at 594. The Court also has made clear that experts must provide adequate explanations for their conclusions, Joiner, 522 U.S. at 146 (mere ipse dixit will not do); and that the ultimate goal is to assure that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire, 526 U.S. at 152. The Kumho Tire Court re-emphasized the admonition in Daubert that the inquiry into admissibility must be flexible, Id. at 141, and

---

[5] The factors are: (1) testability and whether the expert's theory has been tested; (2) peer review and publication; (3) error rate and the existence of standards; and (4) acceptance in the scientific community. Daubert, 509 U.S. at 593-594. The first factor derives directly from the writings of the philosopher Karl Popper, id. at 593, who in the very reference cited also wrote that (1) there "are no ultimate sources of knowledge. Every source, every suggestion, is welcome;" and that (2) in connection with the examination of whether assertions are true "all kinds of arguments may be relevant." Karl R. Popper, Conjectures and Refutations: The Growth of Scientific Knowledge (5th Edition (revised) 1989) at 27 (these two considerations are among ten "theses" Popper listed at the end of his introductory chapter).

Justice Breyer, who authored the opinion in the case, has since written that the "search is not a search for scientific precision. We cannot hope to investigate all the subtleties that characterize good scientific work."[6]

II.     **Dr. Lucchesi's Opinions on What Merck Knew or Should Have Known and How Merck Should Have Acted on This Knowledge Are Based on His Scientifically Informed Review of Merck Documents and His Experience With the Conduct of Other Drug Companies.**

   A.     Dr. Lucchesi's Testimony Is Exactly the Kind of Assistance for the Trier of Fact Contemplated by the Federal Rules of Evidence.

Few if any jurors will understand the scientific meaning and significance of scientific articles, or of other documents like patents or e-mails exchanges among scientists about scientific issues. Dr. Lucchesi can provide the explanation the jury will need to understand. As he testified at his deposition when asked about the documents upon which he relies, "I understand the scientific rationale. I hope to translate that information to a jury so they can make a decision. That's why I'm here."[7] And that is exactly why his testimony is eminently admissible; indeed necessary. The Advisory Committee Notes on Rule 702 make it crystal clear that there "is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute."[8]

   B.     Dr. Lucchesi's Testimony Explains and Interprets Complex Scientific Facts.

Drawing upon his 45 years of professional experience, and his review and analysis of confidential, internal Merck documents, Dr. Lucchesi explained in his Rule 26 Expert Report

---

[6]     Stephen Breyer, Introduction to the Federal Judicial Center's Reference Manual on Scientific Evidence (2nd Ed. 2000) at 4. To illustrate his point, Justice Breyer tells the story of a famous physicist who was asked by a colleague whether a certain scientific paper was wrong. The physicist replied "That paper isn't even good enough to be wrong!" Id. In other words, only flat earth assertions so absurd as to be beyond the range of normal scientific discourse should be excluded.

[7]     October 18 Deposition at 178:7-12.

[8]     Notes to Fed. R. Evid. 702, citing Mason Ladd, Expert Testimony, 5 Vand.L.Rev. 414, 418 (1952).

("Lucchesi Report") that Merck "either actually or should have been aware based on available scientific literature, of the potential vascular and hemostatic (prothrombotic) responses associated with Vioxx before placing this product on the market."[9]  Among other things, he reviewed and developed opinions based on a series of emails, from B. Daniel to E. Ehrich, T. Simon, B. Morrison and E. Reicin that revealed the extent of Merck's knowledge of the risk of potential vascular response and predicted it in its own clinical study.

In assessing what Merck knew or should have known, he also considered a patent filed by a Merck employee in 1998, and subsequent patents filed by other Merck employees, all of which "describe a method for preventing platelet dependent arterial thrombosis in patients being treated with a COX-2 inhibitor.  A reading of the inventions indicates that Merck was attempting to develop one or more adjunctive agents to be used in combination with a COX-2 inhibitor to prevent arterial thrombus formation"[10]

How is the jury to understand what is being discussed in these highly technical documents if left solely to its own devices?  To suggest that an expert like Dr. Lucchesi cannot interpret documents like the patents to explain to the jury what the authors or recipients knew or should have known given the factual content is absurd.  That is especially so given the steps he took to verify and confirm his opinions by researching the published peer-reviewed medical literature.  He reviewed the Ebert and DuBois article published in 1995, Feng et al's article published in 1993[11] – all well before VIGOR.[12]

---

[9]   Lucchesi Report at 9.
[10]  Lucchesi Report at 11-12.
[11]  Feng et al., Cloning Two Isoforms of Rat Cyclooxygenase: Differential Regulation of Their Expression, Archives of Biochemistry and Biophysics 1993;2:361-8.
[12]  Eberhart CE and Dubois, RN, Eicosanoids and the Gastrointestinal Tract.  Gastroenterology 1995; 109:285-301.

C.    Dr. Lucchesi Properly Explains What Actions Were Appropriate in View of Merck's Knowledge.

Just as the jury could not, on its own, understand documents like the e-mails and patents, neither could it understand without expert assistance the actions Merck should have taken based on the information evidenced in those documents.  As a matter of science, what would be the reasonable next step?  For Dr. Lucchesi to address these questions and what further scientific work the information indicated should be done is not a matter of personal opinion, but valid and reliable testimony about the logical consequences of scientific facts.

The truth is Merck did not "undertake and/or sponsor the necessary tests to determine the vascular response of their drug before they put the drug on the market . . . did not conduct, or if it conducted did not publish, the necessary testing and its failure to do so was and is beneath the standard of care, contrary to industry standards and good clinical practice."[13] Again, these opinions are not a matter of baldly unsupported personal opinion.  Quite the contrary.  In his report, Dr. Lucchesi cited examples of how in other instances adverse findings in studies led to prompt and complete disclosure.  "Many well-known industry examples support the need [for Merck] to have stopped [the VIGOR study and to [have informed] prescribing physicians and the public of the vascular risks.  Two examples include the Cardiac Arrhythmia Suppression Trial (CAST), and certain Hormone Replacement Therapy [HRT] trials."[14]

---

[13]    Lucchesi Report at 10.

[14]    Lucchesi Report at 14-15.  These two studies were initiated by government entities: the National Heart, Lung ,and Blood Institute (CAST) and the National Institutes of Health Women's Health Initiative (HRT), but surely Merck cannot claim it has the right to take less care than government researchers when it comes to acting quickly on unexpected bad news in medical research.

D.      Much of What Merck Complains About Are Opinions Taken Out of Context Or That Don't Appear in Dr. Lucchesi's Report, But Which Were Elicited By Merck's Counsel At Dr. Lucchesi's Deposition.

Not content to attack the opinions Dr. Lucchesi stated in his report, Merck's more or less random assault on his testimony is often directed at snippets from his report and/or his deposition.  By way of illustration, Merck claims "Dr. Lucchesi repeatedly passes judgment on the propriety of a broad array of Merck's decisions and practices relating to the development, testing, and marketing of Vioxx..."[15] using, as an "example", his 'assertion' that "the DSMB [i.e., Data Safety Monitoring Board] minutes in the VIGOR trial show that Merck had actual knowledge before November of 1999 that vascular risks were present in Vioxx users"[16]

Because the DSMB oversaw the VIGOR trial, the study results had to be known to Merck at that time.  That fact, not bald opinion, supports Dr. Lucchesi's conclusion that Merck should have "stopped the VIGOR study and that its failure to do so 'was below the standard of care."[17]  Again, as discussed above, Dr. Lucchesi is uniquely qualified as an expert to testify that Merck's failure to prematurely terminate the Vigor Trial (as it later did with APPROVe) violated industry standards and good clinical practice.  Merck would have this court believe that Dr. Lucchesi's opinion in this regard is "subjective" and based upon "on subjective ethical standards"[18] but in fact, the opposite is true.  Dr. Lucchesi relies upon his education, training and, most importantly, the knowledge gleaned from his years of experience as a pharmacologist, physician and consultant to pharmaceutical companies regarding cardiovascular pharmacology, and related issues, including cardiotoxicity.  The language of Fed. R. Evid. 702 makes explicit that a witness may give expert testimony based on knowledge, skill, education or experience.

---

[15]     Exclusion Memorandum at 7.

[16]     Id.

[17]     Expert (Rule 26) Report of Benedict R. Lucchesi, October 6, 2005 at page 14-15.

[18]     Defendant Merck's Memorandum in Support of Motion of Merck & Co., Inc. to Exclude the testimony of Benedict R. Lucchesi, MD, PhD, MD, F.A.H.A, at 7.

Merck's efforts to exclude opinion testimony which was not stated within Dr. Lucchesi's Rule 26 report is truly hard to fathom. Merck's counsel asked questions at Dr. Lucchesi's deposition and did not receive the expected answers. That's the chance they took. Now, Merck apparently wants to force him to give answers favorable to its position or no answers at all. Specifically, Merck insinuates that Dr. Lucchesi, despite a complete lack of any such statement within his report, would, if allowed, "make inferences and draw conclusions from the documents about what Merck knew and 'other aspects of Merck's state of mind,'" whatever that might mean.[19]

Merck does not suggest in the Exclusion Memorandum how it expects Dr. Lucchesi to "make these inferences" and, instead, lists case law supporting its position on the opinions he expressed in response to questions from its counsel. As an example of this wholly concocted problem, Merck calls the court's attention to deposition testimony wherein defense counsel asked Dr. Lucchesi "And I would be happy, sir, if you would confine your opinions to those that are within your area of scientific interest. But you are telling me that you are intending to comment at trial on FDA regulation of pharmaceutical marketing." Dr. Lucchesi, who is an expert on the safety of drugs, responded thusly: "Well, I think I can – I can simply look at this letter [from a division of the FDA to the former Merck CEO] and read the second paragraph and get a flavor of what is happening here, and I think I – I can interpret that for a jury."[20] Such "opinion testimony" on regulatory matters is not contained within Dr. Lucchesi's Rule 26 report and, instead, is nothing more than a "dialog" or "conversation" with defense counsel during a deposition.

In effect Merck is attempting proactively to strike testimony elicited by a question the witness states he could answer, if it was asked of him at the time of trial. This is not "opinion

---

[19] Id at 6.
[20] Id.

testimony" that warrants exclusion pursuant to a <u>Daubert</u> motion.  Rather, it should be handled at the time of trial by an appropriate objection.  Merck also uses the following example of what it describes as the "subjective judgments" of Dr. Lucchesi that it hopes this court will strike under a <u>Daubert</u> ruling:

> Q.      Sir, <u>if you're asked and allowed to testify at trial</u> about Dodge Ball, that it reflects improper training of sales representatives, what standard of care are you, Dr. Lucchesi, applying? (emphasis added)
>
> A.      My standard of care what I believe to be ethical behavior.

Merck would have this court use the shield of <u>Daubert</u> to obviate even the asking of potentially objectionable questions at the time of trial, and that is not the role of the gatekeeper as envisioned by the <u>Daubert</u> court.

Merck also attempts to have this court strike testimony which it <u>admits</u> Dr. Lucchesi does not "expressly opine...or comment [upon]."[21]  Merck states "While he did not expressly opine (or 'comment') that the Vioxx package insert contained false information (citation) Dr. Lucchesi did offer specific recommendations on the content, placement, and even color of warnings about Vioxx that he believes should be carried in physician information, patient package inserts, and direct-to-consumer advertising."[22]   To the extent Dr. Lucchesi does in fact provide such opinions, there is no basis for believing his testimony should be precluded under Rule 702 or the <u>Daubert</u>-<u>Joiner</u>-<u>Kumho Tire</u> Trilogy.  As a pharmacologist and physician and consultant to pharmaceutical companies, Dr. Lucchesi may properly be asked his opinions regarding label content, blackbox warnings and, yes, even the color of the warning.

It would be appropriate to ask Dr. Lucchesi, at the time of trial, to suggest what he thinks should be in an adequately informative label and warning.  Whether or not there is a

---

[21]      <u>Id.</u> at 9.

[22]      <u>Id.</u>

negative implication regarding the existing Vioxx label is, rightfully, left to the jury to decide. Merck now attempts to use <u>Daubert</u> to shield itself from a hypothetical "negative implication." Again, this is not a proper use of the <u>Daubert</u> standard.

In sum, all of Merck's Rule 702 evidentiary objections to testimony about what it knew or should have known, or about how it should have acted on its knowledge, must be rejected. Dr. Lucchesi is eminently qualified to give such opinions. His testimony would be both relevant and reliable; and unquestionably admissible.

III.   <u>Dr. Lucchesi's Opinions on Causation Are Well-Founded, and His Reliance on Animal Studies and Case Reports Constitutes Mainstream Accepted Science.</u>

Merck's argument in support of striking Dr. Lucchesi's testimony regarding general causation must also be denied. Most of this argument has already been addressed and fully briefed in Plaintiff's Science Brief. Dr. Lucchesi, at the time he reached his conclusions and prepared his report, performed the same type of analysis with the same intellectual rigor and methodology he generally employs within his professional and academic practice. He relied on published, peer-reviewed medical articles, his education, training and experience and internal documents provided to him through the discovery process to derive the opinions as elucidated within his report. Plaintiff's counsel will not burden the Court with yet another full briefing on the abundance of scientific evidence supporting an etiological role for the 25 mg Vioxx tablets Mr. Irvin ingested.

A.   False Attack on Animal Studies.

Merck next attacks Dr. Lucchesi for pointing to data from animal studies he conducted and a case report written by Dr. Leslie Crofford, claiming "neither amounts to reliable scientific evidence of causation."[23]  Merck attempts to obfuscate the <u>totality</u> of the evidence supporting a prothrombotic role for Vioxx across the spectrum of duration. As Karl Popper,

---

[23]   <u>Id</u> at 12

the eminent philosopher of science cited in <u>Daubert</u>, once wrote, there "are no ultimate sources of knowledge. Every source, every suggestion, is welcome."[24] In this instance Merck blithely ignores several critical points. First, expert testimony need not be based on epidemiologic or case studies to prove causation. <u>See</u> <u>Benedi v. McNeil-P.P.C., Inc.</u>, 66 F.3d 1378, 1384 (4th Cir. 1995); and <u>Kennedy v. Collagen Corp.</u>, 161 F.3d 1226, 1230, 1330 (9th Cir. 1998).

Second, the use of information derived from animal studies is a methodology universally accepted in the scientific community. The Federal Judicial Center's Reference Manual on Scientific Evidence makes this point abundantly clear. Its chapter on toxicology unequivocally recognizes that toxicology models based on animal studies may be used to determine adverse effects in humans.[25] Third, as briefed extensively in the Plaintiff's Science Brief and Plaintiff's Opposition to Motion to exclude Evidence of Plaintiff's Expert's Regarding Causation, there is extensive epidemiological evidence supporting the Plaintiffs' position in this case <u>and</u> the epidemiological evidence on which Merck relies for its argument that there is no causation with less than 18 months' use of Vioxx is fatally flawed. In this case the epidemiological evidence fully supports causation in patients who took 25 mg Vioxx tablets for short periods.

Finally, consistent with the Popper view of science embraced by the Supreme Court in <u>Daubert</u>, the animal studies and the epidemiological evidence are mutually corroborative. That kind of coherence among various lines of reasoning is the essence of good science, and every element of evidence is admissible, as well as the total picture the various elements collectively provide. Thus, Merck's argument to exclude this animal study evidence must be denied.

      B.      False Argument Regarding Mechanism.

---

[24]   <u>See</u> Popper, note 3, <u>supra</u>.

[25]   Reference Manual on Scientific Evidence (2nd Ed. 2000) at 483.

Merck, once again, attacks the supposed failure of plaintiffs' experts to identify, to a reasonable degree of medical certainty the mechanism by which the short-term use of Vioxx causes sudden cardiac death.[26]   In fact, Merck would have this Court establish an entirely new standard when it states that "Dr. Lucchesi admits that each potential mechanism he proffers – e.g., the FitzGerald imbalance hypothesis, plaque rupture, acceleration of atherosclerosis, and ischemic preconditioning – is <u>unproven</u>"[27] (emphasis added) Defendants continue to confuse mechanism of action with biological plausibility. These concepts are distinct both in science and under law.  Biological plausibility is defined as the consideration of existing knowledge about human biology and disease pathology in order to provide a judgment about the plausibility that an agent causes a disease.[28]  Biologic plausibility lends further credence to an inference of causation established through epidemiology, animal studies, and other evidence.[29] There is no need for plaintiffs to prove the precise mechanism by which Vioxx causes cardiovascular events, only that it is plausible.  <u>See</u>, <u>Kennedy v. Collagen Corp.</u>, 161 F.3d 1226, 1230, 1330 (9th Cir. 1998) (Causation can be proved when we don't know precisely how the damage occurred).  The U.S. Supreme Court stressed that it would be unreasonable to conclude that the subject of scientific testimony must be known to a certainty, because, arguably, there are no certainties in science.[30]   This Court need only consider whether it is biologically plausible that Vioxx is capable of causing cardiovascular events, not whether the precise mechanism of action has been demonstrated, let alone "<u>proven</u>."  Thus, it is important to note that Merck's own studies and consultants have concluded that: "the use of rofecoxib was associated with and increased cardiovascular risk."[31]

---

[26]      Exclusion Memorandum at 7.

[27] <u>Id.</u> at 15.

[28] Reference Manual on Scientific Evidence. (2nd Ed. 2000) at 388.

[29] <u>Id.</u>

[30] <u>Daubert</u> 509 U.S. at 590.

[31] Bresalier, et al., <u>Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial</u>, N. Engl. J Med 2005; 352:1092-1102.

IV.    Dr. Lucchesi's Opinions on the Cause of Mr. Irvin's Death Are Fully Explained and
       Well-Supported.

Merck attempts to attack the basis for Dr. Lucchesi's specific causation opinions by

insinuating that, despite his qualifications as a Ph.D. and medical doctor, and his long

experience as a researcher and investigator, he has not practiced clinical medicine.   Dr.

Lucchesi is, in fact, a renowned research scientist and physician who is uniquely qualified to

opine on those matters within his realm of expertise, including specific causation in the Irvin

matter.    Dr. Lucchesi is well qualified to discuss the various biologically plausible

mechanisms by which Vioxx could have caused and/or contributed to the development of the

fatal thrombus within Mr. Irvin's coronary artery.

Merck, however, would have this court believe that Dr. Lucchesi has no reliable

scientific basis upon which to testify that Mr. Irvin actually suffered an imbalance of

prostacyclin and thromboxane because of Vioxx.  Dr. Lucchesi, appropriately, never claimed

to offer such an opinion.  How could he?  No blood test was run at the time of the autopsy

measuring the blood prostacyclin and thromboxane levels, nor are such tests ever run in

normal medical practice.  However, the absence of evidence is not evidence of absence.  The

court's attention is directed to an Editor's Round Table on Cyclooxygenase-2 Inhibitors and

Cardiovascular Risk, published as an "Uncorrected Proof", online and accessed on October

24, 2005.[31]    The participants included a Professor and Chairman of the Department of

Gastrointestinal, Medicine and Nutrition, from the University of Texas, MD Anderson Cancer

Center, Houston, Texas, a Professor from the Department of Family and Community Medicine

at the Baylor College of Medicine in Houston, Texas, the Medical Director of the Baylor

---

[32]    http://www.sciencedirect.com/science?_ob=ArticleURL&_udi=B6T10-4HCN79F-
       8&_coverDate=10%2F21%2F2005&_alid=327128823&_rdoc=1&_fmt=&_orig=search&_qd=1&_cdi=
       4876&_sort=d&view=c&_acct=C000006078&_version=1&_urlVersion=0&_userid=75682&md5=f2db
       80ada9476638519e9154f92a21e3#sec2.1.

Heart and Vascular Institute, Baylor, University Medical Center, Dallas, Texas, the Editor-in-Chief of the American Journal of Cardiology, the Dean of the A. Webb Roberts Center for Continuing Medical Education of Baylor Health Care System, Dallas, Texas, and the Chairman of the Department of Medicine, Scripps Clinic, Medical Group and the Vice President of Medicine Services and Academic Affairs of the Scripps Clinic Foundation in La Jolla, California.

Among other issues, these distinguished participants discussed the "... most important question in all of these trials is the mechanism for the increased risk for cardiovascular events in these various patient populations. The most common explanation is a prothrombotic effect, which Garret Fitzgerald has written about extensively" (citations omitted) (emphasis added). The Chair of the Department of Medicine of the Scripps Clinic Medical Group, Dr. Gary Williams, MD, PhD, described this "popular hypothesis" as suggesting "that a prothrombotic state is possible, since the COX-2 inhibitors block, at least partially, vascular prostacyclin but have no effect on platelet thromboxane."[32]  Furthermore, Dr. Williams stated that "[T]he prothrombotic hypothesis implies clot formation to most clinicians."  In other words, Vioxx causes clots.

The Medical Director of the Baylor Heart and Vascular Institute, William C. Roberts, MD, while acknowledging that the prothrombotic hypothesis by itself cannot be the entire explanation, noted that "it is at work in some of these patients.[33]"  Surely, if the participants of an Editor's Roundtable published with the American Journal of Cardiology can rely upon this imbalance within the body without a single case report or epidemiological study documenting such an imbalance, Dr. Lucchesi is entitled to do the same.

---

[32] Id.

[33] Id.

It is curious that Merck repeatedly attempts to cast doubt upon whether Vioxx decreases prostacyclin level within the body when Merck's own studies reveal that it does so. Protocol 023 was developed by Merck in response to repeated warnings by Merck consultants, including Dr. Garret Fitzgerald, that Cox-2 inhibition by Vioxx would decrease prostacyclin production in vivo and would create a prothrombotic state within users.[34]   To test this hypothesis Merck conducted Protocol 023 to test whether prostacyclin levels would indeed be decreased in Vioxx users.

The test involved measuring systemic prostacyclin and thromboxane levels within the body of Vioxx users by measuring the urinary metabolite excretion levels of these two enzymes. Of note is the fact that the study was of extremely short duration (i.e., 2 weeks). The results of this study proved conclusively that Vioxx decreases systemic prostacyclin production while leaving thromboxane levels within the body at normal limits. This relative imbalance caused by Vioxx and proven by Protocol 023 eliminates any suggestion by Merck that Vioxx does not decrease prostacyclin levels within the body as well as provides substantiation for the prostacyclin imbalance model of thrombotic events.[35]   This is exactly kind of empirically supported rational explanation scientists expect and Daubert requires.

It is imperative to note that the decreases in systemic prostacyclin levels in Vioxx users were noted within hours of first ingestion. This proves that the mechanism of thrombogenesis associated with Vioxx is nearly immediate. Any argument by Merck that Vioxx does not increase the risk of short term cardiovascular adverse events is contradicted by this study. Protocol 023 confirmed to Merck scientists that there was a potential hazard associated with

---

[34]   This is also the scenario Dr. Oates warned of above.

[35]   Protocol 023 is replicated by the work of Dr. Fitzgerald in Systemic Biosynthesis of Prostacyclin by cyclooxygenase (cox)-2: The Human Pharmacology of Selective Inhibitor of Cox-2, Proc. Natl. Acad. Sci. 1998; 96:272-277..

Vioxx. Dr. Lucchesi will testify that Vioxx was a contributing factor leading to Mr. Irvin's untimely death from a myocardial infarction.

Merck next argues that "Dr. Lucchesi is not in position to testify about whether Mr. Irvin suffered a plaque rupture." Plaintiff's attorneys do not disagree. In an effort to streamline Dr. Lucchesi's testimony, counsel stipulated that Dr. Lucchesi would not testify regarding the presence or non-presence of plaque rupture.[36] Dr. Lucchesi is an experienced cardiovascular pharmacologist and research physician, but he is not a pathologist. For plaintiff's attorneys to ask Dr. Lucchesi to "read" a pathology slide and render an "expert opinion" in this regard would, in fact, subject Dr. Lucchesi to an adverse <u>Daubert</u> ruling on this point.

Plaintiff's attorneys have not asked Dr. Lucchesi to step into the shoes of Dr. Bloor or Burton, notwithstanding Dr. Lucchesi's testimony that the science of COX 2 inhibition informed his opinion that Vioxx contributes to the formation and rupture of plaques in individuals. He is not being offered in this case to testify as to whether there was a plaque rupture in Mr. Irvin's situation.[37] This "attack' against Dr. Lucchesi is not only unwarranted, but also a waste of judicial time. Plainiff's counsel <u>stipulated</u> that Dr. Lucchesi would <u>not</u> render an expert opinion regarding whether or not the fibrous cap atop Mr. Irvin's atherosclerotic plaque was ruptured.[38] In light of this stipulation, Merck's attack against Dr. Lucchesi in this regard is all the more puzzling.

Merck next states that "Dr. Lucchesi cannot opine on whether Vioxx contributed to the formation of plaque in Mr. Irvin's coronary arteries," stating that it is "undisputed that Mr. Irvin had preexisting, <u>severe</u> atherosclerosis."[39] (emphasis added) First, it is <u>not</u> undisputed

---

[36]   October 18, 2005 Lucchesi Deposition at 329.
[37]   October 18, 2005 Lucchesi Deposition at 323-324.
[38]   October 18, 2005 Lucchesi Depositioni, at 329.
[39]   Defendant Merck's Memorandum in Support of Motion of Merck & Co., Inc. to Exclude the testimony of Benedict R. Lucchesi, MD, PhD, MD, F.A.H.A, at 20.

that Mr. Irvin had "preexisting severe atherosclerosis." Defendant's own proffered expert in cardiac pathology, Dr. Thomas M. Wheeler, testified during his deposition that, based upon his review and analysis of Mr. Irvin's cardiac histopathology slides, Mr. Irvin had "moderate" atherosclerosis.[40]

> Q.    Subjectively would you describe Mr. Irvin's atherosclerosis as mild, moderate, or severe?

> A.    Moderate.

As to the "high suspicion" that Vioxx contributed to the plaque formation, Dr. Lucchesi testified, with reasonable scientific certainty, that Vioxx contributed to the formation of plaque in Mr. Irving.[41] "[G]iven the right individual under the right conditions, knowing what COX 2 inhibition means, one can come to a reasonable conclusion based on good, you know scientific facts that there's a likelihood that this [Vioxx] contributed to the formation of that plaque."[42] Dr. Lucchesi, as a pharmacologist and fully trained physician, does have the requisite expertise necessary to develop a differential diagnosis as to the cause of a patient's morbidity and/or mortality.

In fact, Dr. Lucchesi testified that: "Based on the fact that he (Mr. Irvin) had a productive healthy life which ended suddenly and unexpectedly without symptoms and anything that suggested cardiac disease, it is my opinion that with a high suspicion that Vioxx had a role in the event." Progression of preexisting atherosclerotic plaque is but one of several biologically plausible mechanisms of action. The fact that Dr. Lucchesi has a "high suspicion" (perhaps the defense would prefer "more likely than not"?) that Vioxx may have contributed to plaque progression is nothing more than valid, acceptable expert opinion regarding a biologically plausible mechanism of action. Perhaps in the end, however, Dr.

---

[40]    Deposition, Dr. Thomas M. Wheeler, at page 144, lines 18 – 20.
[41]    October 18, 2005 Lucchesi Deposition at 324
[42]    October 18, 2005 Lucchesi Deposition at 323.

Lucchesi states it best: "I think I said it's more likely that, more likely than not that Vioxx had a contributory role here."[43]

Defendant erroneously states that Dr. Lucchesi – "like plaintiff's other experts – cannot rule out other causes of Mr. Irvin's death"[44] As stated in plaintiff's Response to Motion to Strike the testimony of Dr. Burton and Bloor, each pathologist has already ruled out the role of the atherosclerotic plaque in causing Mr. Irvin's death.  Dr. Lucchesi can, and should, defer to the pathologists in this case in order to rule out histopathological evidence of "other causes."  As to other causes, neither Daubert nor its progeny require an expert to embark upon a fishing expedition in order to rule out every conceivable cause of a patients death.

Did Dr. Lucchesi rule out a pre-existing hypercoagulability?  No, for there is not a scintilla of evidence that one existed.

Did Dr. Lucchesi rule out preexisting viral or bacterial infections which have been implicated in the atherosclerotic process?  No, for there is not a scintilla of evidence of such infectious processes occurring. What Dr. Lucchesi did was, based upon existing medical records, "rule in" a role for a known prothrombotic agent, Vioxx, proven epidemiologically to causes thrombosis formation and Sudden Cardiac Death, stating that "more likely than not" Vioxx had a contributory role.[45]

Finally, Merck claims that Mr. Irvin had "very scanty medical records," as though overall good health is now, a negative factor in a personal injury lawsuit.  Of course, had Mr. Irvin's past medical history been robust, with a plethora of medical conditions examined and treated and documented in voluminous medical records, Merck would now be before this Court pleading that Dr. Lucchesi's opinions should be excluded because he cannot rule out each and every preexisting condition afflicting Mr. Irvin.  Perhaps the lack of medical records

---

[43]   Deposition, Benedict Lucchesi at 337.
[44]   Exclusion Memorandum at 20.
[45]   Deposition, Benedict Lucchesi, at 337 and 338.

might have to do with the fact that Mr. Irvin did not complain of any symptomology associated with his alleged "severe atheroscleroris".  Again, perhaps Merck should look at the opinion of their own expert in pathology, Dr. Thomas Wheeler when he described Mr. Irvin's preexisting atherosclerosis as "moderate."  Is it deep within the realm of liklihood that a healthy, middle-aged man, with asymptomatic "moderate' atherosclerosis not only did not seek out medical care, leading to medical documentation, but just did not <u>need</u> medical care until he ingested Vioxx.  Then, however, it was too late.

V.    Conclusion.

For the reasons stated above, Merck's motion to exclude Dr. Lucchesi's opinions and conclusions should be rejected and his testimony admitted in its entirety.

Respectfully submitted,

By: _____
**Andy D. Birchfield, Jr., Esquire**
J. Paul Sizemore
P. Leigh O'Dell
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
(800) 898-2034 (telephone)
(334) 954-7555 (telecopier)

**Co-Lead Counsel**

**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
FAX: (504) 561-6024

**Temporary Office**
3411 Richmond Ave., Suite 460
Houston, TX 77046

19

PH: (713) 877-1843
FAX: (713) 871-9750

**PLAINTIFFS' LIAISONCOUNSEL**

Christopher A. Seeger, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)

**Co-Lead Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
MEUNIER&WARSHAUER, L.L.C.
P.O. Box 960
191 East Second Street
New Roads, LA 70760
(225) 638-6137
(225) 638-8836 (fax)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Thomas R. Kline, Esquire
KLINE&SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Carlene Rhodes Lewis, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced in accordance with Pre-Trial Order No. #8, on this **5**$^{th}$ day of November, 2005.



# SEE RECORD FOR

# EXHIBITS

# OR

# ATTACHMENTS

# NOT SCANNED