UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2005 NOV -7 PM 4: 29

LORETTA G. WHYTE
CLERK

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| Evelyn Irvin Plunkett v. Merck & Co, Inc.* | | CASE NO. 02:05CV4046 |

Motion in Limine No. 9

**PLAINTIFF'S MOTION IN LIMINE TO PRECLUDE MERCK
EMPLOYEE AND FORMER EMPLOYEE WITNESSES FROM OFFERING
OPINION TESTIMONY WHICH THEY ARE UNQUALIFIED TO OFFER,
WHICH HAS NOT PREVIOUSLY BEEN DISCLOSED, AND WHICH LACKS
APPROPRIATE SUPPORT UNDER *DAUBERT***

Plaintiff Evelyn Irvin Plunkett, as Personal Representative of the Estate of Richard

Irvin, Jr., deceased, by and through her undersigned counsel, hereby moves this Court for an

Order prohibiting Merck, it's attorneys, representatives or witnesses from eliciting or

attempting to elicit expert opinion testimony from individuals who were not disclosed or

designated as experts by Merck in this case, including Merck employees, former employees,

and/or advisors.

This Court's Pretrial Order required Merck to identify expert witnesses and submit

their reports by October 3, 2005.  Merck filed its witness list in accordance with the Court's

Pretrial Order on October 28, 2005.  Merck's witness list states that:

> "Merck anticipates eliciting fact testimony from Merck employees and/or
> advisors as well as opinion testimony related to their duties (which do regularly
> involve giving expert testimony)."



After this statement is made, Merck lists many witnesses, including names of Merck employees, former employees, and/or advisors from whom they may attempt to elicit expert opinion testimony during this trial. Several of the witnesses listed were designated as expert witnesses in Merck's disclosures that were filed on October 3, 2005, most were not. Other than those experts specifically designated on October 3, 2005, no expert reports have been filed on any of the individuals listed by Merck on their witness list. Merck has not provided the necessary disclosures about the opinions that these "undisclosed experts" intend to render as required by Federal Rules of Civil Procedure 26. Based on the Merck witness list, it is anticipated that Merck will attempt to elicit expert opinion testimony from some or all of their employees and/or advisors who have not been designated as experts in this trial.

In the trial of *Frederick Humeston v. Merck & Co., Inc.*, (ATL-L-2272-03MT ), currently pending in the Superior Court of New Jersey, Defendant Merck offered testimony from current Merck employee Dr. Briggs Morrison containing expert opinion testimony and purported facts about Vioxx: 1) which Dr. Morrison, as an oncologist, was patently unqualified to offer; 2) which had not previously been disclosed to the Plaintiff; and 3) about which Dr. Morrison lacked direct personal knowledge.

The most significant of these improper opinions related to Merck's purported understanding of the implications of selective inhibition of the enzyme cyclooxygenase-2 ("COX-2"). Dr. Morrison testified that Vioxx posed no cardiovascular risk because it does not inhibit prostacyclin production in blood vessels. Dr. Morrison served no report detailing his opinion, he was not deposed on the substance of the opinion, and no foundation for the testimony was laid during his direct examination.

The presiding judge in the Humeston case, the Honorable Carol E. Higbee, conducted

an inquiry, *sua sponte*, into the nature and basis of Dr. Morrison's testimony and ordered it stricken, in its entirety. See Transcript of Humeston v. Merck & Co., Inc., October 7, 2005, at 3348 (Ex.A). As support for its ruling, the court cited Merck's blatant disregard for New Jersey's rules and procedure, and described how it had repeatedly been misled by counsel for Merck during the direct examination of Dr. Morrison. Id. at 3336-8.

Dr. Morrison, a *fact* witness, offered opinions in pharmacology and vascular biology for which he lacked the requisite knowledge, skill, experience, training and education. Most critically, Dr. Morrison offered an ultimate opinion about the safety of Vioxx based on single animal study. While it seems unlikely that Merck will attempt to backdoor expert testimony through this witness a second time, it may revive the substance of his testimony with another witness.

The Defendant's witness list is littered with company employees, and former employees, some of whom possess medical and scientific credentials. But these witnesses should not be permitted to offer opinions outside their areas of expertise, and they ought not be permitted to foist upon Plaintiff new, undisclosed opinion testimony for the first time at trial.

For the foregoing reasons, Plaintiff respectfully requests that the Court enter an order precluding Defendant Merck & Co., Inc., from eliciting expert testimony from employee or former employee witnesses, where they lack the necessary expertise, where these opinions have not previously been disclosed to Plaintiff, and where they lack adequate support under the Federal Rules of Evidence and appropriate case law.

Respectfully submitted,

By: _P. Leigh O'Dell_

**Andy D. Birchfield, Jr., Esquire**
Paul J. Sizemore
P. Leigh O'Dell
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
(800) 898-2034 (telephone)
(334) 954-7555 (telecopier)

**Co-Lead Counsel**


**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
***Herman, Herman, Katz & Cotlar, LLP***
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
FAX: (504) 561-6024

**Temporary Office**
3411 Richmond Ave., Suite 460
Houston, TX 77046
PH: (713) 877-1843
FAX: (713) 871-9750

**PLAINTIFFS' LIAISON COUNSEL**

Christopher A. Seeger, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)

**Co-Lead Counsel**


Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
MEUNIER&WARSHAUER, L.L.C.
P.O. Box 960
191 East Second Street
New Roads, LA 70760
(225) 638-6137
(225) 638-8836 (fax)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Thomas R. Kline, Esquire
KLINE&SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Carlene Rhodes Lewis, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)


**PLAINTIFF'S STEERING COMMITTEE**

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced in accordance with Pre-Trial Order No. #8, on this 4th day of November, 2005.

P. Leigh O'Dell

10.07.05 nies.txt

Nies
page 3313

```
                        SUPERIOR COURT OF NEW JERSEY
                        ATLANTIC COUNTY/CIVIL DIVISION
                        DOCKET NO. ATL-L-2272-03MT
      -----------------------------x
FREDERICK HUMESTON, et al.,
                PLAINTIFFS,
              VS.              STENOGRAPHIC TRANSCRIPT
                              OF:
MERCK & CO.,INC.,
                                        - TRIAL -
                DEFENDANT.
      -----------------------------x
          PLACE:  ATLANTIC COUNTY CIVIL COURTHOUSE
                  1201 BACHARACH BOULEVARD
                  ATLANTIC CITY, NJ 08401
          DATE:   OCTOBER 7, 2005
B E F O R E :
      THE HONORABLE CAROL E. HIGBEE, P.J.Cv.
TRANSCRIPT ORDERED BY:
      DIANE P. SULLIVAN, ESQUIRE
      DAVID R. BUCHANAN, ESQUIRE
A P P E A R A N C E S :
      DAVID R. BUCHANAN, ESQUIRE
      CHRISTOPHER SEEGER, ESQUIRE
      SEEGER, WEISS, LLC
          ATTORNEYS FOR THE PLAINTIFFS
      DIANE P. SULLIVAN, ESQUIRE
      DECHERT, LLP
      STEPHEN D. RABER, ESQUIRE
      WILLIAMS AND CONNOLLY, LLP
      CHRISTY D. JONES, ESQUIRE
      BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC
          ATTORNEYS FOR THE DEFENDANT
            *        *        *        *        *
                    REGINA A. TELL, CSR-CRR-RPR
                    OFFICIAL COURT REPORTER
                    1201 BACHARACH BOULEVARD
                    ATLANTIC CITY, NJ  08401
```

page 3313
Nies
page 3314

```
 1                P R O C E E D I N G S
 2         THE COURT:  You can be seated.
 3         In addition to discussing this issue of
 4  Dr. Morrison's testimony on the record yesterday
 5  counsel met with the Court, we discussed it in chambers
 6  for a long period of time.  I stayed here late last
 7  night reviewing the transcript, rereading the
 8  transcript, rereading everything else that I have been
 9  given, anything I thought might be pertinent to the
10  issue, and this morning I was given about 85 pages of
11  additional information from the defendants in
12  opposition to plaintiffs' motion to strike, and I have
13  reviewed that, and, in addition, I have reviewed the --
14  although quickly skimming it really -- the deposition
15  of Dr. Gaziano.
16         All right.  At this point, counsel, do you
17  want to make your motion for relief and they can make
```

Page 1



EXHIBIT
A
tabbies

10.07.05 nies.txt

18    their opposition?
19           MR. BUCHANAN:  Yes, Your Honor.  The
20    arguments have been fairly well laid out orally both
21    privately and on the record earlier yesterday.  The
22    concern, Your Honor is fundamentally whether the
23    witness -- whether we had notice of what the witness
24    was going to be testifying to in these arenas.  You
25    have seen the testimony and the highlights plaintiffs

page 3314
⬜Nies
page 3315

 1    have provided in that area.  He was asked specifically
 2    about what studies supported his conclusions on
 3    particular issues at deposition.  None of the testimony
 4    that was elicited yesterday was ever elicited in
 5    response to those questions.  I'm referring
 6    specifically to his deposition on December 18th, 2003,
 7    Page 72, 73 where he was asked about the prostacyclin
 8    hypothesis and whether it had been refuted or accepted.
 9    He stated that it has never been confirmed, and I would
10    suggest at least with regard to VIOXX its been refuted.
11    The witness was asked what studies refuted that
12    hypothesis.  Then he went on to highlight the clinical
13    data on VIOXX, as we have gone through the entire
14    development program has never shown at least any
15    increased thrombotic risk to patients who take VIOXX,
16    the impression clearly because the witness with respect
17    to the viability of the so-called
18    prostacyclin/thromboxane hypothesis turned on at least
19    in his eyes the reflection in the clinical trial
20    results of any increased risk of cardiovascular events.
21           That's certainly not what we heard yesterday.
22    And we didn't hear in any of his prior testimony an
23    extrapolation from animal studies in bunny hearts and
24    people that there's no COX-2 in the endothelial lining
25    of humans or that, therefore, VIOXX would not be

page 3315
⬜Nies
page 3316

 1    expected to have an impact on the human vasculature.
 2    We provided the specific sites to Your Honor from the
 3    prior transcripts.  There's also a reference from the
 4    February 16th, 2005 transcript.  We highlighted
 5    yesterday -- I'll highlight it again.  Page 165 and 166
 6    where there was the discussion about plaque ruptures,
 7    what role plaque ruptures have in the formation of a
 8    thrombus.  And he basically disqualified himself as
 9    somebody knowledgeable in this area and said, again, so
10    this is not my area of expertise, so I'm giving you
11    sort of what I remember from cardiovascular physiology
12    from 10 years ago.
13           He then goes on later in the same page on 166
14    and, again, talking about the formation of clots via
15    prostacyclin and thromboxane he said, again, outside my
16    area of expertise.  I don't think the jury is left with
17    the impression yesterday that any of what he was
18    talking about was beyond his area of expertise, and
19    this is right in the same area that he was examined on
20    only six months ago.

                           Page 2

                              10.07.05 nies.txt
21            As Your Honor is aware, too, in our
22   conversations yesterday about this matter you know both
23   as side-bar and privately we were certainly left with
24   the impression that the particular studies he was
25   testifying to there were three animal studies that he

page 3316
ꗐNies
page 3317

 1   walked through from the '98 -- maybe it was '97 but
 2   '98, '99 time frame prior to approval.  We were led to
 3   believe that the witness actually had personal
 4   knowledge about those, and that he was not testifying
 5   as an expert in this litigation that this was, in fact,
 6   information that he was familiar with prior to the time
 7   that he came into this court.  Of course, we were
 8   surprised it hadn't been elicited in prior testimony.
 9   The suggestion was we hadn't asked the right questions,
10   but --
11            THE COURT:  Mary, can you take this back to
12   Chris?  Go ahead.  I'm sorry.
13            MR. BUCHANAN:  That's fine, Your Honor.  We
14   heard, you know, through Your Honor's voir dire, and,
15   frankly, we were surprised to hear that the studies
16   that he highlighted, you know, the first two or three
17   of those were those that were shown to him subsequent
18   to his deposition and in preparation for testimony.
19   Um, that's expert testimony, Your Honor.  There should
20   have been an expert disclosure if they intended to use
21   even somebody who may have fact testimony, but they
22   wanted to extend him as an expert, we were entitled to
23   expert disclosure as to his opinions, and, frankly,
24   entitled to probe them of that particular witness.
25   We're entitled to know what he is going to say and the

page 3317
ꗐNies
page 3318

 1   pertinent issues to this case, and, frankly, given his
 2   prior testimony we thought the scope of his knowledge
 3   had been neatly confined to the preapproval period and
 4   certainly not animal studies or mechanism of action
 5   items that he expressly disclaimed knowledge of in his
 6   deposition.
 7            Your Honor, this is further complicated, I
 8   think, by the fact that Mr. Morrison is highlighted in
 9   defendant's opening statement as the face of Merck.  He
10   sat here for three weeks.  He is called as the first
11   witness.  They extend the first witness beyond his
12   scope of knowledge while on the VIOXX team to animal
13   studies.  They use him to expressly rebut an expert
14   which was improper.  They use him as an expert, period,
15   on areas that are beyond his area of expertise, and the
16   prejudicial effect of it is substantial.  It shouldn't
17   have happened.  We tried to raise that, and I think,
18   Your Honor, plaintiffs, frankly, until the voir dire
19   were under the impression that he was, in fact, exposed
20   to these animal studies as part of his role in the
21   project team.  And I think we're all surprised to learn
22   that that wasn't the case.
23            He doesn't have personal knowledge.  There's
                              Page 3

10.07.05 nies.txt
24   a 601 problem testifying as to matters that he did not
25   observe, wasn't a witness to, doesn't have personal

page 3318
⬜Nies
page 3319

1    knowledge to.  Then if you want to extend that to the
2    702 issue whether he is an expert there's been no
3    disclosure of expert opinion in the case.  There was no
4    opportunity to explore this with him and he has done
5    things, frankly, that are beyond what other witnesses
6    in the case who are pharmacologists have done.
7            So from a surprise perspective, Your Honor,
8    we took depositions, we probed into his areas of
9    expertise.  We thought we understood what the basis of
10   his views on particular issues were.  It is pretty
11   clear that his views are now different.  That's a
12   surprise.  It is also pretty clear that they have used
13   him as an expert in this case, which was improper
14   without an expert disclosure.  Now the defendants have
15   raised one other issue, and that's that, you know this
16   is lay opinion, and this may be the proper subject of
17   lay opinion.
18           Well, you know, the classic examples of lay
19   opinion, Your Honor, somebody observing a speeding car,
20   well, you know, how fast do you think he was going,
21   okay, based on things that you witnessed at the time.
22   Extrapolating personal observations to an opinion based
23   on personal observations.  This, Your Honor, is taking
24   information that the witness testified to he was shown
25   three months ago in preparation for today in drawing

page 3319
⬜Nies
page 3320

1    conclusions about it.  He took animal studies even --
2    let's take the rabbit study because that's one I think
3    he said he was exposed to in 2000 or 2001.  What he did
4    yesterday was he extrapolated expressly or impliedly
5    the conclusions of that to humans.  He said that that
6    rabbit study shows an absence of COX-2 in normal
7    endothelium, and there may be some in dysfunctional
8    endothelium or endothelium that's got atherosclerosis.
9    But, in fact, when you put VIOXX in the test tubes with
10   this endothelium you don't see a result, you don't see
11   an effect.  So from that we know VIOXX doesn't affect
12   prostacyclin in the endothelium.  Then if you remember
13   at the conclusion of the morning he got up on the board
14   and he said, okay, so we're going to look at other
15   organ systems where this prostacyclin metabolite in the
16   urine must have been from, okay.  He extrapolated from
17   the rabbit study to humans to go through, and let's
18   rule out where else it is coming from.
19           Remember he had the lung, he had, I think, it
20   was the uterus or the ovaries.  He had some other organ
21   systems on the board that he was going to go to, next I
22   assume, after lunch, but he plainly extrapolated from
23   an animal study that he was exposed to in 2000 or 2001
24   to what Merck's next steps were in this process.  He is
25   telling the story of what Merck did when he wasn't

10.07.05 nies.txt

page 3320
⬜Nies
page 3321

```
 1    involved in it.  That's not lay opinion.  It is not
 2    proper.  It is expert testimony.  It should have been
 3    in a disclosure, and his testimony should be stricken,
 4    Your Honor.
 5              Thank you.
 6              MR. RABER:  Good morning, Your Honor, I don't
 7    want to repeat everything we said yesterday or
 8    everything that's in our brief, and I don't intend to
 9    do that.  I want to address a couple of things that
10    Mr. Buchanan has said, however.
11              On the notice question Mr. Buchanan pulled
12    out Pages 73 and 74 from the December 18th, 2003
13    deposition and said that the witness was asked -- let
14    me make sure I get this right, he was asked
15    specifically about studies that supported the view that
16    the prostacyclin in the endothelium doesn't come from
17    COX-1, and I would like to look at what the transcript
18    actually says because the right questions were clearly
19    not asked.
20              On Page 73 this is the page Mr. Buchanan was
21    referring to, the question is, Has that hypothesis ever
22    been confirmed or refuted.  It has never been
23    confirmed, and I would suggest that at least with
24    regards to VIOXX it's been refuted.  Question, what
25    studies have refuted that hypothesis?  Answer, all of
```

page 3321
⬜Nies
page 3322

```
 1    the data.  If you combine all of the studies that have
 2    ever been done with VIOXX, and he goes on and answers
 3    the question that way.  Here is what's interesting.
 4    Here's what's interesting on the next page.  On Page
 5    74.  He said, So I would say the hypothesis that was
 6    put in place at least with regards to partial
 7    inhibition of prostacyclin has been refuted.  Then the
 8    question is, To your knowledge has Merck designed or
 9    begun conducting a study to test that hypothesis
10    specifically.  Your Honor, that's the right question.
11    That's the right question, but look what happens.  We
12    have an objection to form.  The witness says, Maybe you
13    can ask that question again, and the questioner gives
14    up.  Let me ask it a different way.  I'm kind of
15    jumping ahead, and he goes on and he never asks the
16    question.  He never asks the question that he started
17    to ask there.  And the witness clearly does not have an
18    obligation in a deposition to volunteer information.
19    He goes on and he says, Let me do it this way, and he
20    puts in front of him an exhibit, and it is Exhibit
21    Number 5, and he starts talking about something called
22    the pink sheet, changes the subject and moves on.
23              So I don't think the description of what
24    happened at that deposition is in accord with what's
25    actually in the transcript.
```

page 3322
⬜Nies
page 3323

Page 5

10.07.05 nies.txt

```
 1              The second thing we have is this suggestion
 2    that no pharmacologist could testify that as to what
 3    Dr. Morrison said yesterday and that they were hearing
 4    it for the first time in the trial and that they were
 5    surprised.  Well, on April 1st of 2005 we deposed
 6    Dr. Alan Nies, and there's no dispute that Alan Nies is
 7    a pharmacologist.  He was the head of pharmacology at
 8    the University of Colorado Medical School for several
 9    years before he came to Merck.  He wrote sections of
10    the textbook on pharmacology that medical students like
11    Dr. Morrison studied, and Dr. Morrison, as he said
12    yesterday, learned pharmacology from Alan Nies in his
13    job.
14              Dr. Nies was asked Page 429 to 431 whether
15    Merck ever sponsored or supported any studies that were
16    along the lines of those suggested by FitzGerald, Oates
17    and Patrono he says, Well, Merck did studies.  There's
18    a lab in Montreal that was equipped to do the types of
19    measurements.  He said Merck did studies in animal
20    models in that laboratory and those were actually
21    ongoing at this time, meaning 1998, 1999.  How are
22    those studies similar or different?  He goes on to say
23    that we were trying to directly look at the blood
24    vessel to see whether the lining of the blood vessel,
25    the endothelium it is called, was the source of
```

page 3323
☐Nies
page 3324

```
 1    prostacyclin that was made by COX-2.  That's -- and he
 2    says in animals you can actually get those blood
 3    vessels and look at them directly.  He is talking about
 4    the rabbit study there.  What those animal studies
 5    show.  Witness says, In normal animals the major
 6    source, if not the only source, of prostacyclin in the
 7    endothelium is from COX-1 that was not touched by
 8    VIOXX.
 9              I submit, Your Honor, that is almost
10    identical to what Dr. Morrison said when he was
11    describing the results of the rabbit study.  Granted,
12    there was a question that said a hypothetical that
13    said, well, if there was a plaque rupture what effect
14    would prostacyclin -- how would prostacyclin or how
15    would VIOXX affect that, and he said there would be no
16    effect.
17              But I'll note that there was no objection to
18    that question at the time it was made, and so we're
19    faced with a situation where -- excuse me, we're in a
20    prejudicial spot, Your Honor, where having no objection
21    to that question, the jury goes home, we revisit the
22    issue, and we have gone out on this limb and to have
23    the limb cut off behind us would be extremely
24    prejudicial.
25              I would also note that when I asked to put up
```

page 3324
☐Nies
page 3325

```
 1    the specific rabbit slide I said are those results
 2    summarized anywhere in Defense Exhibit 316?  That is
```

10.07.05 nies.txt

3    the rabbit study, and the chart that we looked at.  I
4    said, Any objection to putting this on the Elmo?  I'm
5    sorry which document are you talking about?  Exhibit
6    316.  Then he says, Well, Your Honor, I have the same
7    objection to the extent it is with this witness, but,
8    you know, I'm not sure that gets resolved by putting it
9    up on the Elmo.  This study he is at least involved
10   with.  This one he isn't -- he can talk about it.
11   Defense counsel -- or plaintiffs' counsel said he can
12   talk about it.  So we put it up on the slide.  Your
13   Honor said, Is this a VIOXX study?  Yes.  I'll allow it
14   by Merck.
15           So, Your Honor, it would be extremely
16   prejudicial under these circumstances to after these
17   questions have been asked after plaintiffs' counsel has
18   said it is okay to talk about it, after it has been
19   ruled that we can talk about it to then let
20   Dr. Morrison and me walk out to the end of that limb
21   and have it sawed off behind us, and I fear that the
22   prejudicial impact would be great to us, and that there
23   clearly is no surprise.  Dr. Morrison was asked
24   questions about these issues, but there was no specific
25   follow-up to say, well, tell me about the animal

page 3325
 Nies
page 3326

1    studies or tell me what specific studies you're talking
2    about.  If there's any foundation question about
3    Dr. Morrison we can clearly cure that with other
4    witnesses, Dr. Gertz, for example, whose name is on all
5    those memos, who can establish that that information
6    was known to the VIOXX project team when those memos
7    were done in 1998 and 1999.
8            And, finally, to the extent there's any
9    question, any question about Dr. Morrison's
10   qualifications to talk about pharmacology I think he
11   pointed out very clearly yesterday what his role is and
12   working for a pharmaceutical company that's what you
13   do, you do pharmacology.  And I would also note that
14   Dr. Morrison has a patent for a COX-2 inhibitor to
15   treat prostate cancer, and that patent clearly involves
16   and relies on the pharmacology of a COX-2 inhibitor.
17           So I think this notion that Dr. Morrison is
18   not qualified or has no knowledge of pharmacology,
19   again, is not supported by the records.  And as he
20   pointed out he did see the rabbit study
21   contemporaneously, and with regard to the other three
22   studies he said he did not see the data when it came
23   out but that he had communications and conversations
24   with the project team members at that time and knew
25   about those results.

page 3326
 Nies
page 3327

1            So for all those reasons, Your Honor, we
2    believe that his testimony is not expert testimony.  It
3    is permissible fact testimony about what Merck did and
4    what the information told Merck.  It comes in under
5    Rule 701 as an opinion from somebody who has personal
Page 7

10.07.05 nies.txt

```
 6    knowledge based on either conversations or looking at
 7    the data, and the other side clearly had notice of this
 8    issue, and it would be extremely prejudicial to
 9    instruct the jury in any manner to disregard any
10    portion of his testimony.
11              MR. BUCHANAN:  Your Honor, just a couple more
12    points.  Specifically, turning back to the December 18,
13    2003 transcript of Dr. Morrison the question that was
14    asked was, Has the hypothesis, the
15    prostacyclin/thromboxane hypothesis ever been confirmed
16    or refuted?  He said, It has never been confirmed, and
17    I would suggest at least with regard to VIOXX it has
18    been refuted.  He then noted what studies have refuted
19    that hypothesis, and he said, All of the data.  If you
20    combine all the studies that have ever been done with
21    VIOXX which from biochemical studies we had done, okay,
22    biochemical and then he continues to talk about
23    clinical data.  Not an animal study referenced in that
24    answer.
25              Counsel is criticizing a lack of follow-up.
```

page 3327
☐Nies
page 3328

```
 1    There's no reference to animal studies.  That's what he
 2    is saying refutes it.  That's what he testified to
 3    yesterday, that there's nothing in the blood -- there's
 4    no COX-2 in the endothelium.  Now, look, if they want
 5    to call Dr. Nies, if they want to play his videotape
 6    deposition testimony that's all fine, okay, it really
 7    comes down to this particular witness, what his scope
 8    of knowledge is, whether he had that scope of knowledge
 9    from at the time, okay, not two months ago getting
10    ready for today, okay, what was in his wheel house of
11    information getting ready as an employee of Merck, not
12    as a corporate representative who they want to walk
13    through the whole VIOXX story.  And that's precisely
14    what they did yesterday, and it was improper.
15              And I want to highlight the comment by
16    counsel that an absence of an objection and because of
17    that now they're on a limb getting ready to be sawed
18    off.  We were all under the impression that this was
19    based on his experience in the project team in '98 and
20    '99.  We raised those objections early on.  They were
21    highlighted on several occasions.  The Court was
22    assured by representations implicitly that that was the
23    case, and it wasn't the case.  We learned that on voir
24    dire at 4:00 yesterday.  We didn't learn that in
25    chambers when we spoke for an hour and a half yesterday
```

page 3328
☐Nies
page 3329

```
 1    about it.  We learned it here from the witness.
 2              I'm sure that defense counsel was aware of
 3    that when the questions were being asked.  We weren't
 4    aware of that, and Your Honor wasn't aware of that, and
 5    now they want to use that as a basis to permit improper
 6    testimony to go to the jury.  That's not the right
 7    result.  It is prejudicial.  It absolutely is
 8    prejudicial.  They're the only ones who knew the
```

Page 8

10.07.05 nies.txt

```
 9  circumstances through which he had the information he
10  did.  They exploited it on the stand with an absence of
11  knowledge on our part and Your Honor's part, and they
12  shouldn't be entitled to benefit from it now because
13  the questions have been asked and answered.
14          There's one other point, I think, Your Honor.
15  The extrapolation that Dr. Morrison did yesterday from
16  particular animal studies that he may have been aware
17  of to humans, okay, and the ticking through the
18  different organ systems as they were ruling things out
19  as they were doing that there's no testimony he was
20  involved in that process at Merck for these particular
21  trials.  That's information based on studies and now he
22  is telling the story.  That is expert testimony.  It is
23  summary testimony from a witness who wasn't involved in
24  that tick list at the time.  He couldn't have been.  He
25  was off the project team at that point in time, and he
```

page 3329
□Nies
page 3330

```
 1  was using studies that he was just shown for the first
 2  time two, three months ago.  That is expert testimony,
 3  not lay opinion testimony and not fact testimony.  It
 4  is expert testimony, and it needed to be disclosed.
 5  This isn't the right witness for it.  It should be
 6  stricken.
 7          MR. RABER:  Two things, Your Honor.  He did
 8  have personal knowledge.  He told you although he was
 9  not on the VIOXX project team after the drug was
10  approved he continued working on another COX-2
11  inhibitor and kept abreast of what was going on with
12  VIOXX, and in that context learned about and reviewed
13  the rabbit study in either 2000 or 2001.
14          And as to extrapolation to humans, you know,
15  I suppose they could infer that they could cover that
16  on cross-examination, but I did not ask him anything
17  about humans.  I have gone back and looked at the
18  transcript.  It doesn't talk about humans.  It is clear
19  in the transcript he is talking about the rabbit study,
20  what the rabbit study showed, the dog study, what the
21  dog study showed.  And, you know, again, I would just
22  point out that their entire expert testimony on this
23  issue from Dr. Lucchesi comes from a doctor who has
24  never been licensed to treat any patient, any human
25  being in the world ever, and all of his studies are in
```

page 3330
□Nies
page 3331

```
 1  dogs, so I don't understand this talk about how you can
 2  object to using data from animal studies for
 3  mechanistic purposes when their only expert relies
 4  entirely on animal data.  They can use animal data, we
 5  can't.  That doesn't make sense to me, Your Honor.
 6          MR. BUCHANAN:  Your Honor, just one point.
 7  I'm sorry to keep doing this, but, first of all, the
 8  issue isn't Dr. Lucchesi.  He served expert reports.
 9  They were offered depositions of Dr. Lucchesi on his
10  expert opinions, okay?  They had the opportunity to
11  discover what the bases were, whether they disagree
```
Page 9

10.07.05 nies.txt

12   with them or not, they had the opportunity to explore
13   his extrapolation from animal studies to humans, okay,
14   so let's just take that off the table.
15               But the one thing that does highlight it is
16   expert testimony.  That's exactly what that highlights.
17   That testimony came in in plaintiffs' case through an
18   expert.  Here it is coming in through, quote, "a fact
19   witness" which isn't proper, and I want to note, Your
20   Honor, they say he got this information through his
21   involvement on another project team in 2000, 2001.  I
22   don't think it was until April or May of this year that
23   we even got documents on another COX-2.  There was a
24   motion for a protective order, a motion to compel that
25   was filed in the summer of 2004 relating to other Merck

page 3331
□Nies
page 3332

1   drugs.  If we had inquired as to, well, what did you
2   learn in the other project teams in February of 2005
3   would we have gotten those answers?  It wasn't until
4   April of this year that any Arcoxia information was
5   produced.  I don't know if that's the other -- I do
6   remember he testified it was, but now we're charged
7   with not having asked questions about a subject matter
8   that was foreclosed at the time of his deposition.
9   That's not proper either.
10               MR. RABER:  Your Honor, that's just not a
11   fair characterization.
12               MR. BUCHANAN:  It is.
13               MR. RABER:  I have a Bates stamped document
14   that was produced two years ago that the subject is
15   Rabbit Aorta Prostacyclin Study dated March 16th, 1999
16   circulated to the VIOXX project team.  This document
17   was given to them in discovery more than a year ago, so
18   the idea that they say they didn't have this stuff
19   that's just not true.  It is just not true.  They had
20   it.  These documents have been on our exhibit list from
21   day one.  They have had this information.  They just
22   didn't ask him the right questions about it.
23               MR. BUCHANAN:  Your Honor, the issue is not
24   the document.  Nobody takes issue with what is in the
25   medical literature.  It is his use of the document as a

page 3332
□Nies
page 3333

1   person who, frankly, shouldn't be using it as a
2   nonexpert extrapolating from it and telling the jury
3   what it means.
4               I mean, I appreciate counsel's statement that
5   they didn't elicit a specific question to suggest that
6   it was humans you could extrapolate to, but, come on,
7   if the word "human" didn't appear in that testimony we
8   all knew what we were talking about.  He extrapolated
9   to it, and he went through all the organ systems, we
10   could rule out the endothelium.  We could rule out
11   there's COX-2 in the rabbit's endothelium, what was the
12   next testimony?  Talking about lungs were we ruling out
13   there was COX-2 in the rabbit's lungs is the next
14   question?  They were talking about people.  It is not
                        Page 10

10.07.05 nies.txt

```
15   really -- it is not really consistent with the
16   testimony to suggest that Dr. Morrison wasn't trying to
17   get the jury to infer that those rabbit findings
18   directly applied to human endothelium, which is expert
19   testimony.
20              THE COURT:  Do you have the Lucchesi -- I
21   couldn't find where you gave the documents to Lucchesi.
22   Do you have that?
23              MR. RABER:  I have some of that.  I don't
24   have -- I couldn't find in the record the listing of
25   the various documents, but --
```

page 3333
□Nies
page 3334

```
1              THE COURT:  I just want to know if you saw
2    it.
3              MR. RABER:  Yes, but I do have where he did
4    testify a little bit about some of the studies.
5              THE COURT:  The dog studies.
6              MR. RABER:   Mr. Seeger said, I have a
7    handful of these, I'm not going to ask you about all of
8    them, I want to ask you about a couple of them.  That's
9    what the transcript says.  I have got it right here.
10             THE COURT:  I saw that.
11             MR. SEEGER:  We're not disputing --
12             THE COURT:  Yesterday you were saying I gave
13   him this and gave the number, but I didn't see it in
14   the record, but that doesn't mean it didn't happen,
15   okay.
16             MR. SEEGER:  It wasn't handed to me.  I'm not
17   disputing it is on the rabbit study.  It was not one of
18   the studies I was given.
19             MR. RABER:  I would dispute that.
20             MR. SEEGER:  I'm not going to argue about
21   that, but it was the dog studies, and if you remember
22   Dr. Lucchesi's testimony I handed him the stack and he
23   said all of these, A, don't involve VIOXX and, B, don't
24   test for thrombosis, and I had him go through the
25   studies.  Those were the ones I was given, but, again,
```

page 3334
□Nies
page 3335

```
1    I'm not disputing it was on the exhibit list.  Can I
2    just say one brief statement because to the extent we
3    have a courtroom full of people and counsel continues
4    to refer to Dr. Lucchesi as somebody who never treated
5    patients, he is a man who has received 38 years of
6    continuous funding from the United States government,
7    spent 10 years as a merit award winner, I think he
8    earned his stripes in pharmacology and doesn't deserve
9    to be torn down.
10             THE COURT:  This case was filed in 2003, and
11   we have spent -- I have spent a lot of time since then
12   with the attorneys for defense and the attorneys for
13   the plaintiffs.  We have had monthly meetings with you.
14   We have gone through all of the discovery, and we spent
15   all that time up until the day of the trial because the
16   purpose of this trial was to make sure that we had a
17   fair trial under the New Jersey standards.  And the New
```

Page 11

10.07.05 nies.txt

18    Jersey standards -- and it is not the same in every
19    state.  Some states allow a lot more than we do as far
20    as surprise, but in New Jersey everything is supposed
21    to be disclosed.  You have to identify your expert
22    witnesses.  You have to identify their reports.  You
23    have to say what they're going to testify to.  They're
24    deposed on their reports.  The other side has the
25    opportunity to hire other experts to counter expert

page 3335
□Nies
page 3336

1    reports.  There's very specific rules that are designed
2    for one purpose and one purpose only, and that is so
3    that everybody knows what everybody else is going to be
4    able to produce at trial, and there's no question that
5    that's basic.
6             In this case we have Dr. Morrison coming on
7    as the first witness.  And I have looked at the
8    information that was provided today by counsel.
9    Yesterday on the record counsel acknowledged that
10    there were -- plaintiffs' counsel said there was really
11    no expert that could address this issue.  Defense
12    counsel on the record said that they agreed that none
13    of their nine experts mentioned this issue.  This
14    morning they have shown me where one of their experts
15    did, in fact, refer to it, referred to an article about
16    it.  And that's in the volumes of stuff I got.
17             And in the millions of documents that were
18    produced these animal studies were produced along with
19    those other documents, and they were included on the
20    exhibit list with hundreds of other exhibits.  It has
21    been consistently through the case Dr. Scolnick
22    testified, plaintiffs played different people's
23    testimony, that there was a FitzGerald hypothesis, and
24    the plaintiffs and Dr. Lucchesi and their experts one
25    after another have basically said that that hypothesis

page 3336
□Nies
page 3337

1    came to fulfillment, and they have based their entire
2    case on that.
3             The defense has taken the position, it
4    appears to me, through everything I have seen over the
5    last year and a half, that it is just a hypothesis,
6    nothing is confirmed, that it was possible but not
7    necessarily -- it wasn't proven.  It was proven -- some
8    things prove it, some things don't prove it, and they
9    can't prove that this hypothesis is true.
10             Yesterday Dr. Morrison took the stand, and it
11    was never represented at any time that he was an expert
12    witness, and, in fact, counsel for the defense
13    repeatedly told me he wasn't an expert witness.  He was
14    a fact witness.  He was the project manager for VIOXX
15    up until 1999.  He was to testify about what Merck knew
16    and didn't know about the risks of VIOXX.  He was going
17    to testify about the e-mail that he wrote and what he
18    meant by it and what he said.  And, certainly, he had
19    the right to do those things.
20             But what he did was go way beyond that, and,
Page 12

10.07.05 nies.txt
```
21   quite frankly, I felt sick yesterday afternoon, and I
22   felt sick last night when I looked over the transcript
23   and I talked about this with counsel, and I realized
24   how I had gotten sucked into this because my job as a
25   judge is to make sure that there's a fair field here.
```

page 3337
□Nies
page 3338

```
 1   That's all I have to do.  I have to make sure that the
 2   right evidence gets in and the witnesses that are
 3   called to testify within the realm of evidence and
 4   within the realm of what's fair under the Court rules,
 5   and I feel that I was mislead repeatedly yesterday
 6   during that testimony.  And because I was mislead
 7   repeatedly I allowed in things that never should have
 8   come in, and that really makes me -- it doesn't even
 9   make me angry, it makes me sad.
10           A case where everybody supposedly wanted to
11   try this case on the science, everybody wanted to get
12   here and try this case on the facts.  Nobody, you know,
13   please, Judge, don't let in any evidence that shouldn't
14   come in, and I have been very scrupulous in trying to
15   keep out evidence that both sides wanted in, and I have
16   ruled out both sides.  I have kept out lots of things
17   that the plaintiffs wanted in, lots of things that the
18   defense wanted in that I thought weren't focused and
19   weren't on the evidence and weren't proper under the
20   rules for various reasons.  It is not a free for all.
21   You don't get to just throw in anything you want into
22   the pot.  You have to have given notice to the other
23   side, and you have to have informed the Court and your
24   adversary of what you're doing.
25                 In the case of Summit Trust versus Baxt,
```

page 3338
□Nies
page 3339

```
 1   B-A-X-T, the Supreme Court states that the mandate of
 2   New Jersey court rules is that fair dealing with
 3   opposing parties is an absolute requirement even in an
 4   adversary system.  There has to be fair dealing.  There
 5   has to be fair representations.  I have to rely on the
 6   attorneys who make representations to me that they're
 7   officers of the Court, that they're making true
 8   representations, that they're letting me know what the
 9   facts are, and that I'm making my rulings based on what
10   they say to me.
11                 So what happened in this case?   Mr. Morrison
12   gets called as defense's first witness.  Before he gets
13   called defendants have allowed him to be deposed.
14   Plaintiffs have taken his deposition.  In his
15   deposition, which I had not read in its entirety, he
16   had said repeatedly that he was not qualified as an
17   expert in pharmacology, that his -- that his physiology
18   training was 10 years old -- was from back when he was
19   in school basically was what he was saying, 10 years
20   ago.  He said that he wasn't qualified to give opinions
21   on things like these studies, and he talked about the
22   hypothesis, and as far as I'm concerned he was
23   specifically asked what he knew about that hypothesis,
```
                            Page 13

```
                        10.07.05 nies.txt
24    what he knew about studies that didn't -- and, you
25    know, when you try to argue to me, counsel, that at one

page 3339
☐Nies
page 3340

 1    point he says all the data, well, when he took his dep
 2    he didn't know about all the data.  He didn't know
 3    about all the data because he had never even seen the
 4    animal studies he testified to yesterday, and there was
 5    no way I had a hint of that until after the jury was
 6    sent home.
 7             As a matter of fact, in the transcript
 8    yesterday as soon as he started testifying Mr. Seeger
 9    objected.  Well, you know, a lot of times attorneys
10    object for a lot of reasons, so he comes over to the
11    bench, and I'm like what are you objecting to and he
12    says, I expect this witness to testify on documents.  I
13    don't expect him to come in here and try to pass
14    himself off as a pharmacological expert.  They have
15    their expert witnesses.  He should limit his testimony.
16    Mr. Raber responds, He is here to testify as to what he
17    thought at the time.  Why he wrote what he did and what
18    we're talking about why he wrote what he did in the
19    nineties.  The e-mail that he wrote in the nineties.
20    He is here to testify as to what he thought at the
21    time.
22             Well, that's certainly appropriate testimony,
23    so I basically told Mr. Seeger that I wasn't going to
24    let him use the pharmacological book because he wasn't
25    an expert, so he couldn't lecture on pharmacology but

page 3340
☐Nies
page 3341

 1    that he could answer questions.
 2             And Mr. Raber goes on in the next page he
 3    needs to be able to testify as to what was in his mind
 4    when he was writing the e-mail.  He has to say what he
 5    meant.  He has to testify as to what he meant and what
 6    was in his mind.  Okay.  So now I'm assuming that his
 7    testimony is based on what he knew in the nineties and
 8    what he was thinking in those -- at that time.  And
 9    that is certainly relevant testimony, and it is
10    important testimony.
11             Then again later in the deposition he is
12    asked about studies, and Mr. Seeger says he doesn't do
13    these type of studies, he wasn't involved with that
14    Page 29.  This is the other transcript.  He wasn't
15    involved with that.  And Mr. Raber says to the witness,
16    Do you have personal knowledge of the protocols that
17    were done at Merck such as bleeding time, and he says,
18    I have personal knowledge.  I have reviewed all of that
19    data as I gave talks about it at Merck.
20             And then Mr. Seeger says he shouldn't be
21    allowed to give an expert opinion, and Mr. Raber says
22    I'm not asking for an expert opinion, he is just being
23    called as a fact witness to testify to the facts of
24    what Merck was considering, what it knew, what it did
25    and didn't do.
```

Page 14

10.07.05 nies.txt
page 3341
⬜Nies
page 3342

```
 1              And then later he is asked a question which
 2     seems like an innocuous question, it is not objected
 3     to.  You say, Without COX-1 inhibition you'll get more
 4     thrombotic event and kill the drug, what are you
 5     referring to there?  And then he starts on a long
 6     answer, and as part of that answer he says -- he goes
 7     on to talk about the studies and the -- and he says
 8     there's no pharmacological reason why VIOXX would cause
 9     this.  Later he talks about there's a number of things
10     that led me to believe what I said when I wrote the
11     e-mail.  He starts criticizing what Dr. Lucchesi said.
12     And then he goes on basically to describe the studies,
13     animal studies and the rabbit study and in great detail
14     with charts and diagrams and drawings to explain to the
15     jury not only that this was only a hypothesis, but that
16     it has been absolutely proven false what the plaintiffs
17     have tried to prove and that everything that they had
18     testified to in their case is untrue based on my review
19     of these animal studies, the dog and rabbit studies.
20     He basically says nothing Lucchesi said is accurate, he
21     was wrong, dead wrong, and he was wrong because there
22     is no COX-2 in the endothelium.  There is no -- or
23     COX-2 isn't responsible for prostacyclin being produced
24     in the endothelium, and, as a matter of fact, he says
25     repeatedly there's no COX-2 machinery in the blood
```

page 3342
⬜Nies
page 3343

```
 1     vessels.
 2              And that strikes at the very heart of
 3     plaintiffs' case.  It is critical information which is
 4     brought which if brought out by the proper expert with
 5     proper notice might be perfectly appropriate but was
 6     certainly not appropriate with this witness, unless he
 7     was talking about what he knew at the time and what his
 8     thoughts were at the time.  And, again, on Page 74 when
 9     we're nearing the end Mr. Seeger is objecting again, He
10     is not an expert in this field, judge, using this
11     article wouldn't be appropriate.  This is proper to
12     show what Merck did in response to the FitzGerald
13     theory, what they considered.  It explains their
14     conduct, Mr. Raber said to me.
15              Mr. Seeger again later they're trying to do
16     stuff with him that they can't do with an expert and
17     that's what the problem is.  And then we get to the
18     objection, and I think at this point we're actually
19     talking about the rabbit study, and he says, Mr. Seeger
20     says, You need to have an expert.  I can cross his
21     expert, but what am I going to do with him?  And Mr.
22     Raber says, This is something he looked at.  This is
23     what he did.
24              And then he was asked did Merck do any tests
25     in animals, yes.  And then he asks him, And what
```

page 3343
⬜Nies
page 3344

10.07.05 nies.txt

```
 1   questions were you trying to answer about the urine
 2   cup.  We were trying to figure out -- he says, We were
 3   trying to figure out, now I find out he wasn't involved
 4   in the studies at all, didn't do them and not only
 5   didn't do them, which was really revealed during his
 6   testimony, but he didn't even see them.  He had never
 7   seen them in the 1990's.  He had never seen them until
 8   2005 for most of them.  And for the one study he had
 9   seen it when he was working on something other than
10   VIOXX.  He was the project manager for VIOXX, and these
11   animal studies were never shown to him, and these
12   animal studies were never shown to him, none of them
13   were shown while he was the project manager.
14            And I understand counsel for defense has said
15   today, Oh, he was told about them, he had conversations
16   about them.  Well, I asked the witness about that.  I
17   asked him did you ever see any documents, how were you
18   told about the studies, did you get memos about them.
19   I mean, I didn't ask him just did you see the raw data.
20   I asked him did you see the data, did you see the
21   studies, did you get anything, how did you get it.
22   well, I had some conversations with some people who
23   told me they were doing some kind of animal studies,
24   and that's a heck of a lot different than him saying he
25   knew what it was.
```

page 3344
□Nies
page 3345

```
 1            The impression he gave -- not the impression,
 2   his statements yesterday confirmed that he really had
 3   never looked at these animal studies until right before
 4   the trial.  And the rabbit study was something he had
 5   never looked at until after he was sent over to do a
 6   different COX, so it has nothing to do with what the
 7   VIOXX team knew or didn't know when they were working
 8   on VIOXX.
 9            Did Merck do animal studies to try to answer
10   this question?  Yes, and then he goes through each of
11   the studies.  And, again,  Mr. Seeger objects.  Your
12   Honor, could he just establish that he had involvement
13   in it and I allow him to testify because I believe him
14   that he has involvement at least to the degree that if
15   he is not doing the study, which I knew he didn't do at
16   least I assume he is talking about it and has memos on
17   it and has been discussing it and has the study itself
18   and has looked at it because if this is the key study
19   that proves that VIOXX is safe wouldn't you think the
20   VIOXX project team wouldn't have known about it?  I
21   mean, he testified he didn't see it.
22            I mean, I think it was a reasonable
23   assumption for me to assume, and I don't think it was
24   just an assumption, I think I was told repeatedly that
25   he was involved.  And, again, when Mr. Seeger later
```

page 3345
□Nies
page 3346

```
 1   says we need some foundation, I need to know what he
 2   knows about this.  Mr. Raber says, Your Honor, this
```

10.07.05 nies.txt

```
 3   witness is a co-author on the paper, he is a co-author
 4   on the FitzGerald paper, he is talking about the study
 5   Merck did to answer the questions that were raised.
 6   What more foundation do we need?  And, again, that
 7   leads me to believe he is talking about what he knew as
 8   a fact witness at that time.
 9           Repeatedly in this transcript Mr. Raber says
10   he is not an expert, we're not calling him as an
11   expert, he is a fact witness.  And his ultimate opinion
12   that there's no way that VIOXX can affect this blood
13   vessel because it doesn't even have COX-2 machinery
14   appears to be far beyond anything that any expert has
15   said or any other witness has said, and I understand
16   that counsel has other quotes in here and I have read
17   them from people who -- from Nies or Nies and from
18   Gertz, but none of them have the strong language that
19   he has, the guy who didn't even see these studies.  And
20   then Mr. Raber says to him after he is done talking
21   about all these studies, Okay, and when did the
22   scientists at Merck actually have this data.  Early in
23   1999.  Well, I guess some scientists in Merck had the
24   data in early 1999, but Dr. Morrison didn't.  Dr.
25   Morrison hadn't seen any of that data in 1999.  This
```

page 3346
□Nies
page 3347

```
 1   question certainly suggests to the jury that he had.
 2           It certainly suggests to the jury that the
 3   scientists at Merck working on VIOXX of which he was
 4   the project manager knew about this, and, yet,
 5   afterwards he admits to me, and, candidly, and I don't
 6   really fault Dr. Morrison, he was shown these studies
 7   and asked to testify to them.  But to try to present to
 8   the jury the idea that these were known to him in 1999
 9   or at least -- and that's what the implication is in
10   the testimony, and that's what the implication was to
11   me, and that's why it was allowed to go to the jury
12   because it was supposed to be what Merck factually knew
13   or didn't know at the time, and what it really was was
14   expert testimony elicited after the fact by someone who
15   was never named as an expert whose testimony was never
16   provided.
17           His testimony differs very substantially from
18   his deposition.  Referring to the Supreme Court case
19   2001 of Gerald McKenny versus Jersey City Medical
20   Center in this case a witness a defense counsel found
21   out a witness was going to change her testimony and say
22   something different than she said in deposition.  The
23   Supreme Court of our state stated as recently as 2001,
24   A party has a continuing duty to disclose the opinions
25   of its experts.  Where an attorney knows his client or
```

page 3347
□Nies
page 3348

```
 1   a material witness, which this certainly is, intends to
 2   deviate from his deposition testimony in a crucial way,
 3   which this certainly was, the attorney has an ethical
 4   obligation to convey that fact to his adversary.  New
 5   Jersey's procedures for discovery are designed to
```
                                Page 17

10.07.05 nies.txt

```
 6   eliminate surprise at trial requiring a litigant to
 7   disclose the fact upon which a cause of action or
 8   defense is based.  The search for truth is paramount.
 9   The outcome of litigation should depend on the merit --
10   on its merits in light of all the available facts, not
11   on the craftiness of the parties or the guideline of
12   their counsel.  An attorney is under a duty to apprise
13   his adversary where he obtains information upon the
14   basis of which he knows that his witness' prior dep was
15   incorrect or while it was correct will no longer be
16   true, and certainly where it is going to -- and it
17   basically talks about differing from what they were
18   going to say before.
19            I have considered the case law, I have
20   considered the transcript.  I have talked to counsel
21   for hours.  I have considered the new submissions, and
22   it is my ruling that the entire testimony of
23   Dr. Morrison will be stricken from the record, that the
24   jury will be advised that they cannot consider any of
25   his opinions and we'll proceed.  If you want to call
```

page 3348
⏑Nies
page 3349

```
 1   Dr. Morrison as a witness you're going to have to play
 2   his deposition.  That's the only way you'll be able to
 3   present his testimony as it existed before he was shown
 4   things and reviewed studies that he had never reviewed
 5   before this case started.  The only way to be fair to
 6   try to figure out how to do this I was going to
 7   consider having you start over and call him back to the
 8   stand.  That won't work.  You can't do that now based
 9   on what's happened.  The only way you could present
10   Morrison's testimony is to produce his video
11   deposition.  If you want to play his deposition for the
12   jury then they can see every single thing that was his
13   opinion before this trial started, and that's fair.
14   They can see what defense counsel and what plaintiffs'
15   counsel knew he was going to say before he came to
16   court, which is fair.
17            What he won't be allowed to say is a bunch of
18   additional things that were not revealed to counsel,
19   that are outside the scope of his testimony, so you
20   have a choice at this point that Dr. Morrison is not
21   going to testify in this case again except by his
22   videotape.
23            So you have two choices, counselor.  You
24   either call Dr. Morrison by videotape now or you call
25   your next witness, and I'm going to take a short break
```

page 3349
⏑Nies
page 3350

```
 1   so you can decide.
 2            MR. RABER:  May I be heard?
 3            MS. SULLIVAN:  We would like to make a
 4   record, your Honor.
 5            THE COURT:  No, you may not.
 6            MS. SULLIVAN:  Your Honor, we need to make a
 7   record.
 8            THE COURT:  No, counselor, you don't need to
                        Page 18
```

10.07.05 nies.txt

```
 9   make a record.
10              MS. SULLIVAN:  Yeah, we do, Your Honor.
11              THE COURT:  You made a record for hours.
12   Counsel, you talk before I speak not after.
13              MS. SULLIVAN:  Your Honor, you have permitted
14   them to testify.
15              THE COURT:  You talk before I speak, not
16   after.
17              MS. SULLIVAN:  You have allowed plaintiffs'
18   experts to talk about things over our objection beyond
19   the scope of their expert report.  Dr. DePace talked
20   about the prostacyclin/thromboxane hypothesis --
21              THE COURT:  Miss Sullivan, Miss Sullivan --
22              MS. SULLIVAN:  -- over our objection, even
23   though it is outside the scope of his expert report.
24              THE COURT:  Miss Sullivan, sit down and be
25   quiet.
```

page 3350
☐Nies
page 3351

```
 1              MS. SULLIVAN:  Your Honor, you talk about --
 2              THE COURT:  Miss Sullivan, sit down.
 3              MS. SULLIVAN:  -- fairness and fair hearing.
 4   What is going on here is not fair, and it is not right.
 5              THE COURT:  Miss Sullivan, sit down.
 6              MS. SULLIVAN:  You talk about Dr. Kronmal as
 7   an expert --
 8              THE COURT:  Miss Sullivan, sit down.
 9              MS. SULLIVAN:  Dr. Kronmal talked --
10              THE COURT:  Sit down.
11              MS. SULLIVAN:  -- about opinions way beyond
12   the scope of his report --
13              THE COURT:  Miss Sullivan, sit down or I will
14   have you taken out of the courtroom.
15              MS. SULLIVAN:  -- over objections.
16              THE COURT:  Sit down.  Miss Sullivan, I gave
17   you an opportunity to argue.  I gave you all the
18   opportunity you wanted.  I sat here and said tell me
19   what you want to tell me about this issue.  I looked at
20   85 pages of your submission.  I listened to you
21   yesterday for hours.  You have every right to tell me
22   anything you want and to make your record before I
23   rule.  You have no right to do it afterwards.  Once I
24   rule it is over and then you can make your record to
25   the Appellate Division.
```

page 3351
☐Nies
page 3352

```
 1              MR. RABER:  Your Honor, I just would like to
 2   address the ethical issues that were raised.
 3              THE COURT:  We can address them in the back.
 4              MR. RABER:  I would like to do it on the
 5   record.
 6              THE COURT:  You can put it on the record
 7   later.
 8              (Break taken.)
 9              THE COURT:  You can be seated.  Counsel you
10   want to put something on the record?
11              MS. SULLIVAN:  Yes.  In light of Your Honor's
```

Page 19

10.07.05 nies.txt

12  ruling to strike Dr. Morrison's testimony Merck with
13  like to move for reconsideration and request that the
14  Court reconsider its ruling, given the foundation that
15  Mr. Morrison did lay.  There is no dispute that Merck
16  did these animal studies.  Dr. Morrison testified he
17  specifically reviewed the rabbit study and he was in
18  discussions concerning the other two as part of the
19  VIOXX development team as it relates to the other two.
20         We think the Court's ruling is
21  disproportionate in light of the fact that
22  Dr. Morrison -- his testimony involved matters in
23  addition to the animal studies, and to strike the
24  entirety of his testimony, including testimony about
25  e-mails and things unrelated to the animal studies is

page 3352
Nies
page 3353

1  disproportional, and precluding his testimony is a
2  drastic and unfair and materially prejudice sanction,
3  so we would ask the Court to reconsider its ruling.
4         If the Court is not inclined to do that, Your
5  Honor, we would ask the Court stay its ruling so Merck
6  can take an emergent appeal to the Appellate Division
7  this afternoon or over the weekend so the Appellate
8  Division can rule whether any striking or sanction is
9  appropriate, and, if so, what the appropriate remedy
10  would be.
11         We also would ask, Your Honor, that Merck be
12  permitted to submit an offer of proof as to what
13  Dr. Morrison's additional testimony would be beyond the
14  animal studies he talked about.  We would like to put
15  Dr. Morrison back on the stand as a Merck scientist as
16  part of a project development team, so that he can in
17  defense of the serious charges against Merck talk to
18  the jury about some of the things Merck did and what
19  Merck knew and what the science was at the time.  And
20  to prevent Merck from doing that, and to prevent Merck
21  from defending itself by putting on one of the
22  scientists involved in the VIOXX development program is
23  material prejudice, Your Honor, so we would like at
24  least to put on an offer of proof as to what
25  Dr. Morrison's testimony would have been in that

page 3353
Nies
page 3354

1  regard.
2         And, Your Honor, if the Court is going the
3  refuse to reconsider and also refuse the request for
4  the stay we would like to ask for a mistrial in view of
5  the material prejudice to Merck that an instruction to
6  this jury striking the entirety at Dr. Morrison's
7  testimony presents.
8         Thank you, Your Honor.
9         MR. BUCHANAN:  Your Honor, it is, indeed, a
10  drastic remedy and an appropriate remedy.  Substantial
11  prejudice here is that the testimony was allowed to go
12  to the jury based on the explicit and implicit
13  representations that he had knowledge that he did not.
14  Then his subsequent testimony on expert issues
                                Page 20

10.07.05 nies.txt
15  extrapolating from animal studies to human studies only
16  served to further highlight the expert nature of the
17  testimony of which plaintiffs have no knowledge at the
18  time prior to trial this testimony would be elicited
19  based on both his deposition testimony and the absence
20  of any expert report on the topic.
21          The remedy is drastic.  It is appropriate.
22  There's no way to shield the jury, I think,
23  notwithstanding the instruction, from that improper
24  testimony.  Your Honor's remedy, I think, is the
25  appropriate one and really the best we can do at this

page 3354
ONies
page 3355

1   point.  The plaintiffs believe we have been prejudiced.
2   We hope the curative instruction will ameliorate that,
3   but, frankly, there's no basis to soften that in any
4   way by allowing Mr. Morrison to testify to other
5   matters of which he was not present for or to the
6   extent that he was present for matters that should come
7   in through his videotaped deposition because he has
8   been, frankly, taking the VIOXX role over the last
9   several months, and that's the proper subject of expert
10  testimony not fact testimony.  The motion for
11  reconsideration should be denied.  And you have already
12  afforded the defense an opportunity to play excerpts of
13  his deposition testimony to the extent they wish to do
14  so.  That's an appropriate remedy.
15          THE COURT:  There's no question it is a
16  strong remedy, and there's no question that it took me
17  a long time to reach it, and that's why we recessed
18  yesterday, and I thought about it overnight.  There's
19  no question there's some prejudice to Merck.  I think
20  there's been more prejudice to Mr. Humeston, and that
21  in the end there's been a lot more prejudice to the
22  plaintiff by the testimony than there will be to the
23  defense if the testimony is stricken.
24          And I really don't think I have any other
25  option at this point, other than to strike the

page 3355
ONies
page 3356

1   testimony.  I did indicate this morning that -- and I
2   can't pick through it, I tried to try to pick sections
3   that I can tell the jury -- I don't even know how I
4   would do it.  I would have to read them the transcript
5   and say, you can remember this and then read them
6   another part and say you can't remember this.  It just
7   really wouldn't work.  I considered that.
8           The only alternative I think I have at this
9   point is to strike the testimony.  I do -- I have
10  indicated that you could play Dr. Morrison's testimony.
11  I will consider -- the only other thing that I'm
12  willing to reconsider is that, and I'm willing to
13  consider whether there's anything that's not in his
14  deposition that he needs to testify to, something
15  that's not covered by his deposition that you intended
16  to cover with him, and if that's the case I'll consider
17  what it is and how important it is and whether it can
Page 21

10.07.05 nies.txt
```
18    be covered by other witnesses or, most important, if it
19    is not covered in his deposition, and in that case I
20    may allow him to resume the stand and tell the jury
21    that they should consider his testimony at this point
22    as part of the evidence, the testimony that they hear
23    at that point.  So I'll consider that.
24              The request for a stay is denied.  We're
25    going to proceed.  You can certainly go to the
```

page 3356
☐Nies
page 3357

```
 1    Appellate Division at the end of the day.  This is not
 2    the kind of issue the Appellate Division usually deals
 3    with, quite frankly, but you can certainly try.  I'm
 4    not going to hold up the trial for it.  I'm going to
 5    order that the testimony be stricken and that the jury
 6    disregard it.  The motion for a mistrial is denied,
 7    and, as I said, I'm sure you're going to need an order
 8    to go to appeal.  At the next break I'll file an order,
 9    and if you want to take a written appeal you can do so.
10              You can bring the jury in.
11              THE COURT:  You can be seated.  Ladies and
12    gentlemen, I apologize for the delay.  I know you have
13    been here a long time.  I hope you found -- I know you
14    enjoy each other's company, Mary tells me, so at least,
15    hopefully, you're not having a terrible time sitting in
16    there waiting for us.  There's legal issues.  It is not
17    anybody's fault.  It is just things come up, and I have
18    to spend time on them.
19              I made a legal determination about the
20    testimony yesterday of Dr. Briggs Morrison should be
21    stricken from the record.  You, therefore, are not to
22    consider any of his testimony.  Any testimony that I
23    strike from the record is not evidence.  It should not
24    be considered by you in your deliberations.  This means
25    that even though you may remember the testimony you
```

page 3357
☐Nies
page 3358

```
 1    should not use it in your deliberations or even in your
 2    own thought process as far as analyzing what the
 3    verdict should be.  You have to disregard that
 4    testimony.  You shouldn't consider why.  It doesn't
 5    matter.  It is a legal decision.  And you shouldn't --
 6    I am trusting you'll be able to do that.  It is sort of
 7    a difficult instruction to follow, obviously.  We know
 8    that you can't forget something, but I believe that if
 9    you're instructed by me to not consider it as part of
10    the evidence that you'll do that.  And that's my
11    instruction.
12              All right.  We'll proceed, and counsel is
13    going to call a witness at this time.
14              MS. SULLIVAN:  Yes, Your Honor.  Merck would
15    like to call Merck scientist, Dr. Alan Nies, by video.
16              (Whereupon, the video was played for the
17    jury.)
18              THE COURT:  We don't have his picture.  Is
19    this Dr. Scolnick?
20              MR. RABER:  No.
                              Page 22
```

10.07.05 nies.txt
```
21            THE COURT:  No problem.  Take a minute and
22  deal with it.
23            (Whereupon, the videotape is played for the
24  jury.)
25            MR. RABER:  Can we stop?  This is the wrong
```

page 3358
⬛Nies
page 3359

```
 1  document.  It may be the top of an e-mail chain.
 2            THE COURT:  All right.  Why don't we take a
 3  break and you can fix it.
 4            (Break taken.)
 5            THE COURT:  You can be seated.  You got it
 6  fixed, counselor?
 7            MR. RABER:  Yes.  What it was we have an
 8  e-mail that has a message on top and not below.  We
 9  fixed it, and we're going to start again with the
10  document.
11            THE COURT:  Okay.  You can bring in the jury.
12            MR. RABER:  And one more about scheduling, we
13  have -- there's probably only another minute left of
14  this and maybe 10 minutes of theirs, and we're at a
15  point with Scolnick where we haven't quite worked out
16  all of the things that need to go to Your Honor, so
17  given the hour, I don't know if we want to end today
18  with 10 -- the remaining 10 minutes here.  We're
19  prepared to have a live witness on Tuesday, Tuesday
20  morning.
21            THE COURT:  How long is Scolnick?
22            MR. RABER:  He is at least an hour and 15
23  minutes.
24            MR. BUCHANAN:  Probably it could take the
25  typical 20 minutes for us to work out the objections
```

page 3359
⬛Nies
page 3360

```
 1  with Your Honor and then the 10 minutes to fix the
 2  tape, so, realistically, the jury wouldn't start
 3  hearing it until --
 4            MR. RABER:  4:00 probably.
 5            MR. BUCHANAN:  45 minutes from now.
 6            THE COURT:  Okay.  We'll do it Monday, I
 7  guess.  So who is your witness Monday?
 8            MR. RABER:  We're not sure exactly who, but
 9  we'll let them know 48 hours is what we have been
10  operating on before Tuesday.
11            MR. BUCHANAN:  We'll be on pins and needles
12  until Sunday morning, Your Honor.
13            THE COURT:  You can bring the jury in.
14            (The jury enters the courtroom.)
15            THE COURT:  You can be seated.
16            MR. RABER:  Okay.  We have squared away our
17  technical problem, and we're going to start with the
18  document again, Your Honor.
19            THE COURT:  Okay.
20            (Whereupon, the videotape is played for the
21  jury.)
22            MR. RABER:  Your Honor, that concludes our
23  portion.  I understand the plaintiff has some video
```
Page 23

```
                           10.07.05 nies.txt
24    they wish to play, as well.
25                MR. SEEGER:  Your Honor, it is only about

page 3360
☐Nies
page 3361

 1    four or five minutes.
 2                (Whereupon, the videotape is played for the
 3    jury.)
 4                THE COURT:  That's it?
 5                MR. SEEGER:  That is it.
 6                THE COURT:  Okay.  You can get the lights.  I
 7    hate to do this, but counsel has advised me that we'll
 8    have a full day on Tuesday, and we'll start with a live
 9    witness on Tuesday hopefully.
10                MS. SULLIVAN:  Yes, Your Honor.
11                THE COURT:  But there's another tape that
12    they need to edit and a couple other things we have to
13    do, so I'm going to let you go for the day.  I'll ask
14    you to report on Tuesday at 9:30.  It is a long weekend
15    but I hope you enjoy it, and don't talk to anybody
16    about the case.  Enjoy your weekend.  We'll see you
17    9:30 on Tuesday.
18                (The jury leaves the courtroom.)
19                MR. RABER:  I would like a moment to address
20    a couple things from this morning.
21                THE COURT:  You can.
22                MR. RABER:  Your Honor, as Your Honor knows,
23    I was admitted especially to practice in this court
24    under the pro hac vice procedures in New Jersey, and I
25    consider it a privilege to be here.

page 3361
☐Nies
page 3362

 1                I also want to assure Your Honor that I take
 2    my duties as an Officer of the Court very seriously,
 3    and I feel that some of the statements that were made
 4    this morning suggesting conduct on my part, I don't
 5    think there's a basis for that, Your Honor, with all
 6    due respect, and the gist of it seemed to be that there
 7    was somehow misleading statements about the witness'
 8    personal knowledge of the events about which he
 9    testified, and, Your Honor, this morning said that
10    Dr. Morrison was the head of the VIOXX project team and
11    that it was, therefore, unusual that he wouldn't get
12    documents in that capacity.  He was not the head of the
13    VIOXX project team; Alan Nies was.  Dr. Morrison worked
14    for Barry Gertz.  He worked for Dr. Nies, and so I
15    think the suggestion that someone in Dr. Morrison's
16    position would necessarily have gotten those documents
17    I don't think is supported, Your Honor, by the position
18    that he had at that time.
19                THE COURT:  I stand corrected on that point.
20    I don't think it makes any difference in anything I
21    ruled.
22                MR. RABER:  I also note that when Your Honor
23    described the basis for Dr. Morrison's lack of personal
24    knowledge he testified yesterday that his first
25    exposure to the results were in conversations with
```

10.07.05 nies.txt
page 3362
◻Nies
page 3363

```
 1    other Merck scientists, Dr. Nies, Dr. Gertz and they
 2    described to me that in follow-up to Garret's paper
 3    some of the basic scientists were doing additional
 4    animal experiments to understand where the urinary
 5    PGI-M came from, and they explained, and, obviously, I
 6    was an author on the paper.  We knew what the
 7    possibilities were, and they explained to me that there
 8    were scientists in the pharmacology group doing animal
 9    experiments to rule out those possibilities that we had
10    hypothesized, and they conveyed to me at that point it
11    looked like those were all being ruled out.  And then
12    the next question they were working out is where in the
13    body does the prostacyclin come from.  So that was
14    communicated to me in day-to-day business working at
15    Merck with Dr. Gertz and Dr. Nies.
16             Your Honor, that's what the transcript says.
17    I know Your Honor has an interpretation of how strong
18    that is.  I would simply state that that is a clear
19    statement from the witness of personal knowledge based
20    on his day-to-day work at Merck, his day-to-day
21    communication with his supervisors, and the suggestion
22    that there was no factual basis for me asking him
23    questions on the grounds that he had no personal
24    knowledge I do not think is supported by the record,
25    and I can assure Your Honor that I'm here taking my
```

page 3363
◻Nies
page 3364

```
 1    duties as an officer of the Court seriously.  I will
 2    contend to conduct myself in that matter, and I
 3    appreciate having the opportunity to say these things.
 4             THE COURT:  Okay.  I'll see you Tuesday, and
 5    if you can do the -- if you can come back with anything
 6    on Scolnick so we can get that done that would be
 7    helpful.
 8             MR. BUCHANAN:  We'll come right back, Your
 9    Honor.
10             (End of proceedings.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

page 3364
◻Nies
page 3365

Page 25

10.07.05 nies.txt

C E R T I F I C A T I O N
    I, REGINA A. TELL, C.S.R., C.R.R., License Number
30x100161000, an Official Court Reporter in and for the
State of New Jersey, do hereby certify the foregoing to
be prepared in full compliance with the current
Transcript Format for Judicial Proceedings and is a
true and accurate compressed transcript to the best of
my knowledge and ability.
                        _____ 10-7-05
                        Regina A. Tell, CSR-CRR
                        Official Court Reporter
                        Atlantic County Courthouse
                        Mays Landing, New Jersey

page 3365
〇

Page 26