UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re:  VIOXX ) | MDL Docket No. 1657 |
| ) | |
| PRODUCTS LIABILITY LITIGATION ) | SECTION L |
| ) | |
| ) | JUDGE FALLON |
| This document relates to: ) | |
| Case No. 05-4046 ) | |
| ) | MAGISTRATE JUDGE KNOWLES |
| EVELYN IRVIN PLUNKETT ) | |
| as Personal Representative of ) | |
| the Estate of ) | |
| RICHARD IRVIN, JR., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| MERCK & CO., INC., ) | |
| ) | |
| Defendant. ) | |

### PLAINTIFF'S MOTION TO EXCLUDE OPINION TESTIMONY OF DR. JANET ARROWSMITH-LOWE

I.  Introduction.

Defendant Merck & Co., Inc. ("Merck") has proffered Dr. Janet Arrowsmith-Lowe ("Arrowsmith-Lowe") as an expert witness on Merck's interactions with the Food and Drug Administration ("FDA") and on the company's communications with the medical community.[1]  In her Rule 26(a)(2)(B) expert report ("Arrowsmith-Lowe Report") she ventures

---

[1]  September 30, 2005 Rule 26(a)(2)(B) Expert Report of Dr. Janet Arrowsmith-Lowe ("Arrowsmith-Lowe Report") at 1 (Attached hereto as Exhibit A).



opinions on whether Merck (1) adequately tested the potential risks of its drug Vioxx;[2] (2) adequately disclosed potential risks of Vioxx;[3] (3) appropriately and timely disclosed cardiovascular findings from a study named VIGOR;[4] (4) properly and timely incorporated results from VIGOR into the product circular for Vioxx;[5] and (5) acted appropriately in response to interim findings in another study named APPROVe.[6] She also opines that Plaintiffs' expert, Dr. Kapit, misconstrued FDA regulatory actions involving Vioxx.[7]

The Arrowsmith-Lowe Report is a slim document with less than twelve pages of double spaced text. It provides only vague and conclusory statements about things like "adequacy" and "appropriateness," but barely a shred of explanation about how such conclusions were reached. Her deposition on October 28, 2005 made only more apparent her total lack of any meaningful analysis. Instead, she bases her opinions on her unalloyed faith in the quality of Merck's scientists and the FDA's review of their work. To the extent she attempted any in-depth explanation at the deposition she was blatantly making it up on the fly, and she was blatantly wrong. Her expertise is based on little more than her time spent at the FDA in areas not directly related to the issues in this case. Moreover, since she left the agency in 1996 it has changed in significant ways.

---

[2]   Arrowsmith-Lowe Report at 3.

[3]   Arrowsmith-Lowe Report at 5.

[4]   Arrowsmith-Lowe Report at 6.

[5]   Arrowsmith-Lowe Report at 7.

[6]   Arrowsmith-Lowe Report at 10.

[7]   Arrowsmith-Lowe Report at 9.

Thus Arrowsmith-Lowe's testimony falls far short of the standard set by Federal Rules of Evidence 702 and 703, and the U.S. Supreme Court's guidance in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc</u>; 509 U.S. 579, (1993), <u>General Electric Co. v. Joiner</u>, 522 U.S. 136 (1997), and <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137 (1999). In these cases the Court charged trial courts with a gate keeping role to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." <u>Daubert</u>, 509 U.S. at 589. The Court also has made clear that experts must provide adequate explanations for their conclusions, <u>Joiner</u>, 522 U.S. at 146 (mere <u>ipse dixit</u> will not do); and that the ultimate goal is to assure that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." <u>Kumho Tire</u>, 526 U.S. at 152.

Here Arrowsmith-Lowe simply declared that all Merck did was good and proper, and at her deposition she made up a completely erroneous and fabulous statistical explanation. Her credentials are thin at best, and her years of lucrative testimony for the pharmaceutical industry permeate her opinions with extreme litigation bias. Her testimony should be excluded in its entirety.

II.   <u>Grounds for Exclusion</u>.

   A.   Arrowsmith-Lowe's Expression of Faith in Work Done by Others Is Not Admissible Evidence.

All of Arrowsmith-Lowe's opinions necessarily involve an evaluation of the scientific information about Vioxx. Yet she conducted no analyses of the data or results from any of the studies she cites. Instead, she relies on her faith in the quality of Merck's scientists and the FDA's review of their work. At her deposition (the transcript is attached as Exhibit B) she was asked about the power of the various studies to detect cardiovascular adverse events, and if she was simply relying on the fact of FDA review to reach her conclusion that the studies

3

were adequate. In response she denied her opinions rested solely on the fact of FDA review. But what was she relying on instead? "I am saying that, as far as I'm concerned, with the power calculations, both the statistical group at the company and the statistical group at FDA are learned intermediaries. And I trust that their judgments are appropriate."[8] So any opinions about the adequacy of the studies to detect safety problems are really just the opinions of others that she's passing along.

Additional questions revealed still further how she depended on the "highly qualified people" at the FDA and Merck. When asked if it was the FDA people she relied on for her conclusions about the safety of Vioxx she answered as follows: "No. You've really misunderstood what I was talking about when I talked about processes. That includes not only FDA, and frankly it's not just the people at FDA, it's the regulations that they – that they enforce and adhere to. It's the framework of the regulations. Also it has exact requirements on companies. I know that, you know, I'm convinced of the competency of many of the people whose memoranda I have read from the company. I mean I'm not restricting this as I said before to just what I consider the competencies at FDA. I also consider the investigators, the contract research organizations, the company."[9]

Merely vouching for the work of others and the quality of government regulations is woefully inadequate under Rules 702 and 703 and the <u>Daubert</u>, <u>Joiner</u>, <u>Kumho Tire</u> Trilogy.[10]

---

[8]   Deposition at 152:15-19.

[9]   Deposition at 165:22-166:9.

[10]  Indeed, the sufficiency of the FDA's regulations and regulatory authority has been called into serious question recently. Senator Charles Grassley has stated that the "evidence is overwhelming that the FDA must change to better protect the American people." July 18, 2005 Statement from U.S. Senate Committee on Finance (available at http://finance.senate.gov/press/ Gpress/2005/prg071805a.pdf, attached hereto as

4

It is exactly the kind of ipse dixit proscribed by Joiner. As the Supreme Court held more than sixty years ago, "[e]xpertise is a rational process and a rational process implies expressed reasons for judgment." FPC v. Hope Natural Gas Co., 320 U.S. 591, 627 (1944). See also Mid-State Fertilizer Co. v. Exch. Nat. Bank of Chicago, 877 F.2d 1333, 1339 (7th Cir. 1989) (testimony not admissible when expert "presented nothing but conclusions – no facts, no hint of an inferential process, no discussion of hypotheses considered and rejected."); Lang v. Kohl's Food Stores, Inc., 217 F.3d 919, 923-924 (7th Cir. 2000) (rejecting testimony of expert in employment discrimination case because he had simply listed the duties of various employees and declared the requirements of their positions "virtually identical in terms of their basic function."); In re James Wilson Associates, 965 F.2d 160, 172-173 (7th Cir. 1992) (holding under Fed. R. Evid. 703 that an expert can't circumvent the rules of evidence by simply relying on others).

When an expert relies on someone else's compilations of data, it gives rise to a "common-sense skepticism" regarding the expert's conclusions. Munoz v. Orr, 200 F.3d 291, 301 (5th Cir. 2000). Here Arrowsmith-Lowe simply assumes the validity and accuracy of the work done by Merck and reviewed by the FDA. This kind of circular reasoning is the antithesis of admissible expertise.

  B. Arrowsmith-Lowe's One Attempt to Provide a Reasoned Explanation for Her Opinions Regarding the Adequacy of the Vioxx Clinical Trials Was a Blatantly Irrational Fabulation.

---

Exhibit C). Dr. Sandra Kweder, a senior FDA Medical Officer, testified earlier this year that the FDA does not have the authority to dictate label changes to pharmaceutical companies once their drugs are on the market. March 1, 2005 testimony before the U.S. Senate Committee on Health, Education, Labor, and Pensions, at page 24 of transcript (relevant excerpts of the hearing transcript are attached as Exhibit D).

At her deposition Arrowsmith-Lowe was asked repeatedly about the adequacy of the Vioxx clinical trials to detect a doubling of the risk for myocardial infarctions and other cardiovascular problems.  Epidemiologists and biostatisticians address this question by determining something called the statistical power of a study.  Arrowsmith-Lowe agreed that "power is the probability of detecting a difference of specified magnitude at a specified level of [statistical] significance."[11]  She also recognized that in designing studies investigators use the power concept to determine how many study participants are required for the study to have a reasonably good chance of detecting an increased risk with a drug.  As she put it, "the whole point of the power calculation is to tell you how many observations you need to have.  And, if it's a clinical trial, that means how many people do you have to have enrolled."[12]

So far, so good, but when she was asked a specific question about how many people would have to be in a study to detect a doubling of the incidence rate from one in a thousand to two in a thousand, she betrayed woeful ignorance of both statistics and epidemiology.  Worse yet, she attempted to deflect the question with a smoke and mirrors fabulation that she made up on the fly.  She went from an estimate of 1,500 people to admitting she had no way of knowing whether it might be as many as 47,000 people (which, in fact is the right answer).[13]  The truthful response would have been "I don't know how to calculate that," and if

---

[11]   Deposition at 107:22-108:3.

[12]   Deposition at 108:8-14.

[13]   See Deposition at 143:15-17 (answer is 1,500); Deposition at 151:1-17 (when asked if she had any reason to disagree the number was 47,000, she responded "I have no way to answer that.").  For the correct answer, see Brian L. Strom (editor), Pharmacoepidemiology (3rd Ed. 2000) at 826 (table showing that to have an 80% chance of detecting a doubling of the incidence from 0.001 to 0.002 at the 5% significance level, 23,518 people would have to be administered the drug and an equal number would have to be taking a placebo or some other comparator).  The table from

6

she had spoken the truth there might still be some small kernel of expertise about which she could testify. But her attempt at deception casts serious doubt on the reliability of all her opinions.

Her tortured and illogical testimony began in response to a straightforward hypothetical. "Now, if the MI rate in a control population were one in 1,000 and if you had an equal number of people taking Vioxx and on whatever the control substance was, how many total patients would be required to have a study with an 80 percent chance of finding a doubling of the relative risk at the 5 percent significance level?"[14] This set of factors was taken from a simple list that appears in the third edition of a book on pharmacoepidemiology – a book for which Arrowsmith-Lowe had written a chapter in an earlier edition.[15] Yet she was apparently totally ignorant of these fundamental parameters.

She tried to answer the question by invoking a "rule of thumb" used to address another question: how many people have to be in a sample from a population to have a ninety-five percent chance of seeing at least one case of a disease. For very straightforward mathematical reasons, there is a "rule of three," which means one needs about 30 people to have a ninety five percent chance of seeing a problem that occurs in one of ten people; 300 people to detect something that occurs in one in a hundred; 3,000 to detect something that occurs in one in a

---

Pharmacoepidemiology and Chapter 3, which discusses sample size considerations, are attached hereto as part of Exhibit E (excerpts from the book).

[14] Deposition at 142:16-22.

[15] See page 32, Table 3.1 in Chapter 3 of Strom, attached as part of Exhibit E. Also See Arrowsmith-Lowe's CV, which is appended to the Arrowsmith-Lowe Report (Exhibit A to this Memorandum in Support).

7

thousand, and so forth.[16] This rule is not just a matter of epidemiological lore, as Arrowsmith-Lowe seemed to think, but a straightforward calculation that's covered in almost any elementary book on statistics.[17] She, however, could not grasp it, and totally misapplied it. Her willingness to guess and speculate rather than admit ignorance, and her inability to understand the proper statistical explanation when she was confronted with it, completely undermine the reliability of all her analyses.

---

[16] Strom, at p. 31 (3,000 subjects are usually exposed to a drug to be 95% certain of detecting an adverse effect that occurs in one in a thousand exposed individuals.") See Exhibit E.

[17] One need look no further than the Schaum's Outline of Statistics, excerpts from the 1961 edition of which are attached as Exhibit F. It explains that the probability of several independent events is equal to the product of their individual probabilities. Exhibit F at 100. To give a simple example, if one draws a sample of five ping pong balls from a large basket containing ten percent black balls and ninety percent white, the probability all ten will be white is equal to $0.9^5$, or 59%. That is the same as the probability of finding no black balls in a sample of five drawn from a basket in which ten percent are black, and one minus this probability (41%) is the probability of seeing at least one black ball.

Forty-one percent would also be the probability of seeing at least one case in a sample of five people drawn from a population in which ten percent of the people have a certain disease. An epidemiologist would have to look at a sample of 29 to have less than a five percent chance of missing the disease entirely – or put the other way, a 95% chance of seeing at least one case. Of course, 29 is about three times ten, which is where the "rule of three" cited by Arrowsmith-Lowe comes from. If the disease occurred in one of a hundred people, the sample size required would be 299, which is about three times one hundred.

The point here is that the foregoing is simple, basic undergraduate statistics, and Arrowsmith-Lowe didn't understand it at all. When she was taken through the analysis at her deposition she mixed up the concept of raising a number to a power with the concept of factorials. She was asked "[w]hat is chance of drawing two consecutive that are white?" She answered "[t]hat's a factorial as I recall. And I – I don't remember how to do that calculation." Deposition at 147:24-148:5. The only problem with this testimony is that factorials have nothing to do with the question she was asked. Four factorial, for example, is equal to four times three times two times one, or twenty four, Exhibit F at 103, which has nothing to do with raising a number to a power.

8

  C. Arrowsmith-Lowe Has Thin Qualifications at Best and Is Clearly Driven by Litigation Bias.

Perhaps the best explanation for Arrowsmith-Lowe's lack of any valid explanation is her thin qualifications. Her willingness to try to create an explanation out of nothing likely derives from her long and lucrative track record of testifying for drug company defendants.

  1. Thin Qualifications.

Arrowsmith-Lowe lacks the necessary qualifications to provide expert testimony on the regulatory aspects of this case and the adequacy of the clinical trials submitted to the FDA by Merck. "Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." Viterbo v. Dow Chem. Co., 826 F.2d 420, 424 (5th Cir. 1987). Arrowsmith-Lowe has not been at the FDA since 1996.[18] While there she was never a Medical Officer in charge of reviewing a new drug application,[19] or a supplemental NDA.[20] She never designed a randomized clinical study.[21] And she never engaged in direct negotiation with a sponsor over drug labeling.[22] Since that time, she has not been an active participant in the industry. Rather, she reads articles and public records pertaining to the drug industry and occasionally exchanges e-mails or sees former colleagues at professional meetings. She has such contacts perhaps twice a year.[23]

---

[18] Deposition at 11: 2-5.

[19] Deposition at 11:25-12:4.

[20] Deposition at 14:11-15.

[21] Deposition at 120:22-121:18.

[22] Deposition at 126:15-24.

[23] Deposition at 173:21-177:20.

Moreover, since Arrowsmith-Lowe's departure, the FDA has changed significantly. Congress has passed legislation that significantly changed the policies and mission of the agency, specifically with regard to drug approval – the very area in which Merck is presenting her as an expert. The Prescription Drug User Fee Act (PDUFA I) of 1992, Pub. L. No. 102-571, 106 Stat. 4491 (1992) started this shift. However, it was not until the reauthorization of PDUFA ("PDUFA II") in 1997, renewed as an addendum to the Food and Drug Administration Modernization Act of 1997 ("FDAMA") that the full impact of the legislation was felt. With those changes the FDA was required to refund fees to drug companies for any aspect of their fee going toward drug approvals not matched by the FDA.[24] Because it was not until after Arrowsmith-Lowe left that those changes were enacted, she has no basis with which to hold herself out as an expert. She also completely fails to recognize the intrinsic limitations of FDA standards. As Harvard professor Jerry Avorn recently stated in the New England Journal of Medicine, the agency simply does not ask the right questions. "The sloppiness resides not in the quality of execution the FDA requires, which is high, but in the questions it asks."[25]

    2.    Litigation Bias.

Arrowsmith-Lowe's willingness to fabulate under oath is doubtless a result of her clear litigation bias. She has testified more than forty times, and her consulting company makes $500,000 annually primarily by providing testimony on behalf of pharmaceutical companies in

---

[24] 21 U.S.C. 379h(f).

[25] Jerry Avorn, FDA Standards – Good Enough for Government Work:, 353 New England J. Med. 969, 969 (2005).

drug litigation.[26] This direct line from testimony to income leaves no room for an unbiased determination of the facts. She has provided testimony by trial or deposition at least thirty-six times in the last four years.[27] That's a trial or deposition just about every six weeks.

III.     Conclusion.

Arrowsmith-Lowe has not provided any analysis of the studies she cites as adequate and appropriate, and merely expresses her deep and abiding faith in Merck, the FDA, and the regulatory process. Her attempt to explain how many people would have had to be in a study to detect a doubling of the risk for a disease from one in a thousand to two in a thousand would be farcical were it not for the serious issues at stake in this case. Her experience does not provide a current or adequate basis for her opinions, and her years as a testifier for drug companies makes her clearly biased. This court should exclude her testimony in its entirety.

---

[26]    Deposition at 46:1-20 and 47:17-20.

[27]    Arrowsmith-Lowe Report (see Exhibit B to the report).

Respectfully submitted,

By: /s/ Paul S.

Andy D. Birchfield, Jr., Esquire
J. Paul Sizemore
P. Leigh O'Dell
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
(800) 898-2034 (telephone)
(334) 954-7555 (telecopier)

Bert Black
Elizabeth R. Odette
Lockridge Grindal Nauen P.L.L.P
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401

**Co-Lead Counsel**

**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
FAX: (504) 561-6024

**Temporary Office**
3411 Richmond Ave., Suite 460
Houston, TX 77046
PH: (713) 877-1843
FAX: (713) 871-9750

**PLAINTIFFS' LIAISON COUNSEL**

Christopher A. Seeger, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)

**Co-Lead Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
MEUNIER&WARSHAUER, L.L.C.
P.O. Box 960
191 East Second Street
New Roads, LA 70760
(225) 638-6137
(225) 638-8836 (fax)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Thomas R. Kline, Esquire
KLINE&SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Carlene Rhodes Lewis, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced in accordance with Pre-Trial Order No. #8, on this **3rd** day of November, 2005.

# SEE RECORD FOR

# EXHIBITS

# OR

# ATTACHMENTS

# NOT SCANNED