U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
FILED  NOV 1 4 2005
LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 05-4046* | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| EVELYN IRVIN PLUNKETT | * | |
| as Personal Representative of the Estate of | * | |
| RICHARD IRVIN, JR., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

* * * * * * * * * * * * * * * * * *

## DECLARATION OF J. PAUL WAYMACK, M.D., Sc.D.

1. I am a medical doctor, a transplant surgeon, a consultant in the area of drug development and drug safety, and a former medical officer at the United States Food and Drug Administration (FDA).

2. My training and experience include the following: I obtained a B.S. degree from Virginia Tech, an M.D. degree from the Medical College of Virginia, and an Sc. D. degree from the University of Cincinnati. I completed an internship at the Penn State University School of Medicine, a surgery residency at the University of Cincinnati, and a transplantation fellowship at the University of Cincinnati.

3. Following completion of my training, I served as the chief of surgical studies at the U.S. Army's Institute for Surgical Research at Fort Sam Houston, Texas. I subsequently served as an associate professor at both the University of Texas Medical Branch and at the New Jersey School of Medicine.

4. While at the FDA, I worked as a medical officer. During that time I was based in the Division of Medical Imaging Agents, Surgical and Dental

Products in the Center for Drug Evaluation and Research (CDER). I also spent time working in the Anti-Infectives division of CDER. While serving as a medical officer at the FDA, my responsibilities included the review of clinical trial protocols, Investigational New Drug Applications (INDs), New Drug Applications (NDAs), supplemental NDAs (SNDAs), and post marketing adverse events data.

5. I am currently employed as an independent consultant providing pharmaceutical companies with assistance in the development of experimental therapies – this includes drugs, biologics, and medical devices – and in the companies' interactions with the FDA. As part of my work in pharmaceutical development, my experience has included – though it has not been limited to – drafting and reviewing various regulatory submissions to the FDA including clinical trial protocols, clinical development programs, INDs, NDAs, and SNDAs. I have spent the last 10 years consulting for pharmaceutical companies, including substantial work in developing and submitting product labeling and labeling amendments.

6. Prior to the FDA approving an NDA, the sponsor must comply with the FDA's requests for the final version of the drug's labeling. This version is the optimal version from the FDA's standpoint: It best describes the drug's attributes including, among other things, its known and potential toxicities.

7. Following the drug's entry into the market, the sponsor and the FDA receive spontaneous adverse event reports related to the drug. Among other actions, both the FDA and the sponsor enter these data into a database. This database is analyzed on a regular basis to determine if changes should be made to the drug's labeling. Such changes could include changes to the adverse events, warnings, precautions, and contraindications sections of the labeling.

8. Typically, the new drug continues to undergo evaluations in clinical trials following its initial marketing approval. When these trials are completed, the data resulting from the trial are compiled and analyzed. Both the data and appropriate analyses are submitted to the FDA. When appropriate, the labeling is changed based upon the results obtained from these trials. Such changes could include changes to the adverse events, warnings, precautions, and contraindications sections, among others.

9. The FDA has classically divided the types of changes that can be made to labeling into three main categories. These are major, moderate, and minor. The moderate category is further subdivided into two groups.

10. Minor changes can be made to the label, with the FDA being informed at the time of the filing of the annual report to the approved NDA. These changes are generally trivial in nature and would in no way affect the safety of the drug.

11. Moderate changes are those that either can be reported to the FDA at the same time the change is made; this is referred to as changes being effected (CBE). Alternatively, they are submitted to the FDA and there follows a 30 day period during which the FDA reviews the sponsor's suggested changes. If the FDA does not object during this 30 day period, the sponsor can then make the desired changes to the labeling. Almost all of these moderate changes that are accomplished through the CBE 30-day procedure relate to the manufacturing of the drug.

12. Major changes must be submitted to the FDA, and the sponsor must then wait for the FDA to approve the labeling changes prior to changing the labeling to reflect these changes. These changes can include, but are not limited to, major changes to the manufacturing process, as well as significant changes to the clinical sections of the label reflecting data usually from new clinical trials.

13. When the proposed change to the labeling is the addition of an adverse event not previously listed, this is generally done as a CBE. This course of action is clearly justified by FDA administrative law (21 CFR 314.70), and by standards and accepted practices known to be permissible to the FDA.

14. In contrast to changes based upon spontaneous adverse event reports – that is changes based upon limited data – changes based upon data from clinical trials require more in depth analyses: both by the sponsor and the FDA. This is due to the vast quantity of data contained within a clinical trial as opposed to the limited data contained within spontaneous adverse event reports. As a result of the complexity of such data, for changes to the labeling based upon results – results other than isolated adverse events – from clinical trials, the FDA's accepted position on the proper method of changes being made to capture such data is to submit proposed changes to the FDA as major changes. This course of action is justified for at least two reasons. First, the FDA has stated that it is the ultimate authority as to the labeling of all drugs: "…the decision as to whether a warning is legally required for the labeling of a drug must rest with the agency" (Federal Register, Vol. 44, June 26, 1979). Second, the sponsor only possesses a complete set of data for their drug. In contrast the FDA has a complete set of data not only for the sponsor's drug, but also for all other drugs within the same class. Since class effects are common, this

enables the FDA better to put into perspective the new data. To that end, the FDA is in the best position to know what should go into revised labeling, especially for a drug that is part of a class of drugs. These conclusions have been formally stated by the FDA: "FDA's legal authority over drug labeling and advertising is broad, and its expertise is unmatched…" (Daniel Troy, Chief Counsel of the FDA, www.fdli.org, January/February 2003).

15. To further put into perspective the dangers of making alterations to the contraindications, warnings, and precautions sections of the labeling, based upon clinical trials, without first obtaining FDA approval, one need only consider the consequences if this became the accepted standard for drugs that were part of a class. As was previously mentioned, drugs within a class generally share similar traits, both with respect to efficacy and toxicities. If every sponsor began, without first obtaining FDA approval, to alter the warnings, contraindications, and precautions sections of their particular drug's labeling, then the various drugs within a single class would appear to have very different characteristics from each other. This would lead to confusion among prescribing physicians, and more importantly could lead physicians to a false sense of safety when using one drug over the others in the class. Such a false sense of security could lead to inadequate monitoring of patients. It could also lead to physicians failing to prescribe what would be the more optimal choice of drug for a patient: They might choose to prescribe one with lesser efficacy because of a false belief of greater safety.

16. To summarize, the FDA's accepted standard for making changes to labeling based upon data obtained from clinical trials is to have these submitted as major changes. Such changes require FDA approval prior to their being incorporated in the labeling. Failure to do so could diminish the quality of care in this country, primarily by bypassing the FDA's expertise.

17. With respect to Vioxx and the labeling changes that resulted from the VIGOR study, several points should be emphasized. First, these were changes based upon a postmarketing clinical trial. Second, Vioxx was not the only COX-2 inhibitor on the market at the time of the VIGOR trial: Vioxx was part of a class of drugs. It was therefore to be expected that studies with other COX-2 inhibitors would have generated scientific data that could have provided important insight into the VIGOR data. Furthermore, only the FDA possessed the data from all COX-2 inhibitor studies. Finally, data reflecting a difference in cardiovascular events between Vioxx and naproxen treated patients from the VIGOR study, had not previously been observed. Therefore, in order optimally to analyze the

data, one would especially need to review the data from clinical studies of other COX-2 inhibitors as well as data from clinical trials of naproxen and other nonsteroidal anti-inflammatory drugs. Only the FDA had the capability for conducting such an analysis.

18. Following completion of the VIGOR trial, for all of the reasons listed in paragraph 17, the correct course of action for Merck was to follow the generally accepted course of action for such a situation, and to file the proposed changes to the labeling, not as a CBE or as a CBE after 30 days, but rather as a major change. This was both scientifically and clinically an optimal choice as well as the correct choice based upon the FDA's accepted practice that changes based upon postmarketing clinical studies be filed as a major change.

19. Based upon my experience working at and with the FDA, if Merck had attempted to submit changes to the Vioxx labeling, as a CBE, based upon the VIGOR trial results, the FDA would have rejected these changes and would have informed Merck that they considered these changes to constitute a major change to the labeling that required pre-approval by the FDA.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November _1_, 2005

_J. Paul Waymack_