

U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED | NOV 1 4 2005

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re:  VIOXX | MDL Docket No. 1657 |
| PRODUCTS LIABILITY LITIGATION | SECTION L |
| This document relates to Case No. 05-4046 | JUDGE FALLON |
| EVELYN IRVIN PLUNKETT as Personal Representative of the Estate of RICHARD IRVIN, JR., | MAGISTRATE JUDGE KNOWLES |
| Plaintiff, | |
| vs. | |
| MERCK & CO., INC., | |
| Defendant. | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### REPLY MEMORANDUM IN SUPPORT OF MOTION OF MERCK & CO., INC. ("MERCK") TO EXCLUDE EVIDENCE OF PLAINTIFF'S EXPERTS REGARDING CAUSATION

**TABLE OF CONTENTS**

Page

I.      APPLICABLE LEGAL STANDARD ............................................................................. 3

II.     PLAINTIFF'S EXPERTS CANNOT ESTABLISH GENERAL CAUSATION
        UNDER ANY THEORY .......................................................................................... 5

        A.      Plaintiff Mischaracterizes Her Burden of Proof As To General Causation ........... 6

                1.      Plaintiff's experts cannot base their opinions on statistically
                        insignificant epidemiologic data ................................................................. 6

                2.      Plaintiff's experts cannot base their causation opinions on
                        epidemiologic studies involving dosages and durations of Vioxx
                        use not at issue here ................................................................................... 9

        B.      Plaintiff Cannot Establish Through Scientifically Reliable Expert
                Testimony That Mr. Irvin's Short-Term Use Of Vioxx Is Capable Of
                Causing Thrombotic Cardiovascular Events ....................................................... 11

                1.      No clinical trials establish that taking 25 mg Vioxx for less than a
                        month is capable of causing thrombotic cardiovascular events .............. 12

                        a.      The APPROVe study ................................................................. 13

                        b.      The VICTOR study .................................................................... 16

                        c.      The Alzheimer's Studies ............................................................ 16

                        d.      The VIGOR Study ...................................................................... 18

                        e.      The ADVANTAGE Study ........................................................... 20

                        f.      Dr. Watson's Internal Analysis ................................................. 20

                        g.      Dr. Shapiro's Meta-Analysis ...................................................... 22

                        h.      Protocols 010 and 090 ................................................................ 24

                        i.      The Thomas Bold Email ............................................................. 25

                2.      No observational studies establish that taking 25 mg Vioxx for less
                        than a month is capable of causing thrombotic cardiovascular
                        events .................................................................................................... 27

                3.      Plaintiff's experts cannot rely on inferior data from case reports,
                        animal studies or basic science research .................................................. 30

        C.      Plaintiff Cannot Establish Through Scientifically Reliable Expert
                Testimony The Mechanism Through Which Mr. Irvin's Short-Term Use
                Of Vioxx Supposedly Is Capable Of Causing Thrombotic Cardiovascular
                Events ................................................................................................................. 31

                1.      Plaintiff's experts cannot establish the mechanism by which Vioxx
                        supposedly has a thrombotic cardiovascular effect ................................. 33

                2.      Plaintiff's experts cannot establish the mechanism by which Vioxx
                        supposedly causes vasospasms ................................................................ 36

**TABLE OF CONTENTS**

(continued)

Page

|   |   | 3. | Plaintiff's experts cannot establish the mechanism by which Vioxx supposedly causes plaque ruptures ........................................................... 37 |
|---|---|---|---|
|   |   | 4. | Plaintiff's experts cannot establish the mechanism by which Vioxx supposedly accelerates atherosclerosis ..................................................... 39 |
| III. |   |   | PLAINTIFF'S EXPERTS CANNOT ESTABLISH SPECIFIC CAUSATION UNDER ANY THEORY .................................................................................................. 40 |
|   | A. |   | Plaintiff's Experts Cannot Opine to a Reasonable Degree of Medical Certainty That Vioxx Caused Mr. Irvin's Sudden Death Under Any Theory ........................................................................................................................ 41 |
|   |   | 1. | The thrombus theory is scientifically unreliable ...................................... 41 |
|   |   | 2. | The vasospasm theory is scientifically unreliable .................................. 42 |
|   |   | 3. | The plaque rupture theory is scientifically unreliable............................. 42 |
|   |   | 4. | The atherosclerosis acceleration theory is scientifically unreliable......... 44 |
|   | B. |   | Plaintiff's Experts Cannot Rule Out Other Possible Causes of Mr. Irvin's Death. ....................................................................................................................... 45 |
|   |   | 1. | Plaintiff's experts cannot rule out that Mr. Irvin's severe atherosclerosis was the sole cause of his death........................................ 47 |
|   |   | 2. | Plaintiff's experts cannot rule out the possibility that Mr. Irvin's sudden cardiac death resulted from a vasospasm unrelated to Vioxx...................................................................................................................... 49 |
| IV. |   |   | CONCLUSION............................................................................................................. 50 |

790745v.1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **In re: VIOXX** | * | **MDL Docket No. 1657** |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| | * | **JUDGE FALLON** |
| **This document relates to** | * | |
| **Case No. 05-4046*** | * | |
| | * | **MAGISTRATE JUDGE KNOWLES** |
| **EVELYN IRVIN PLUNKETT** | * | |
| as Personal Representative of the Estate of | * | |
| **RICHARD IRVIN, JR.,** | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| **MERCK & CO., INC.,** | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## REPLY MEMORANDUM IN SUPPORT OF MOTION OF MERCK & CO., INC. ("MERCK") TO EXCLUDE EVIDENCE OF PLAINTIFF'S EXPERTS REGARDING CAUSATION

As a gate-keeper of technical evidence, this Court must exclude the testimony of plaintiff's expert witnesses unless plaintiff can prove, by a preponderance of the evidence, that such testimony is both scientifically reliable and relevant.[1] Plaintiff has failed to meet her burden in this case. She has not come forward with any scientifically reliable and relevant

---

[1] Throughout this Reply Memorandum, plaintiff will refer back to its underlying Memorandum in Support of Motion to Exclude Evidence of Plaintiff's Experts Regarding Causation (hereinafter referred to as Merck's "Causation Testimony Brief").

evidence that Mr. Irvin's short-term use of Vioxx can, and in this case did, cause a sudden cardiac death.

First, plaintiff cannot establish general causation. In pharmaceutical and toxic tort cases, the law in the Fifth Circuit and elsewhere is clear that an expert cannot base a causation opinion upon inaccurate dosage and duration data. Instead, plaintiff's experts must establish through reliable science that *Mr. Irvin's* level of exposure – *i.e.*, 25 mg for less than a month – is capable of causing thrombotic cardiovascular events. They have not done so. They cannot point to *any* statistically significant supporting data from clinical or observational epidemiologic studies, nor can they derive scientifically reliable support from any other source. Nor can plaintiff's experts identify, to a degree of reasonable medical certainty, the mechanism by which the use of 25 mg Vioxx for less than a month supposedly can cause thrombotic cardiovascular events. While plaintiff would have it otherwise, the Fifth Circuit requires proof of mechanism. Such proof is especially important in cases where, as here, there is no scientifically reliable evidence that a plaintiff's particular dose and duration of exposure to a pharmaceutical product is capable of causing injury. Because plaintiff has no proof of mechanism, she cannot establish general causation.

Second, plaintiff cannot establish specific causation. Plaintiff's experts can point to no reliable scientific evidence that Mr. Irvin's short-term use of Vioxx caused his sudden cardiac death through any hypothesized mechanism. Nor can they rule out other possible causes of his death – as the Fifth Circuit and this Court require. For example, it is undisputed that heart disease is the leading cause of death in the United States; that atherosclerosis is responsible for 80% of sudden cardiac deaths and 90% of all cases of heart disease; and that Mr. Irvin had moderate to severe atherosclerosis *before* taking Vioxx. Plaintiff's experts ignore these facts.

790745v.1

They do not and cannot rule out Mr. Irvin's pre-existing atherosclerosis as a likely cause of his death. There is no medical evidence to distinguish his unfortunate death from the hundreds of thousands of similar sudden cardiac deaths that occurred before Vioxx entered the market and that continue today. Nor can plaintiff's experts rule out the possibility that the thrombus observed in Mr. Irvin's coronary artery was caused by an undetected vasospasm – *i.e.*, a contraction of a coronary artery – that was unrelated to his short-term use of Vioxx.

## I.     APPLICABLE LEGAL STANDARD.

As explained in Merck's Causation Testimony Brief, to establish liability, plaintiff must provide, at a minimum, substantial evidence proving to a reasonable degree of medical certainty that Vioxx caused Mr. Irvin's sudden cardiac death. *Donohue v. State of Florida*, 801 So. 2d 124, 126 (Fla. 2001); *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984). Merck agrees that plaintiff need not prove that Vioxx was the *sole* cause of Mr. Irvin's death. That said, plaintiff is simply mistaken when she claims that she need not prove that Mr. Irvin would not have died "except for the Vioxx exposure." (Pl.'s Opposition to Motion to Exclude Evidence of Plaintiff's Experts Regarding Causation ("Opp'n") at 4.)

Even in concurrent cause cases, a plaintiff must prove that the defendant's conduct was a *but for* cause of the plaintiff's injury. *See, e.g., Jones v. Utica Mut. Ins. Co.*, 463 So. 2d 1153, 1156 (1985) ("In the ordinary negligence context, a defendant is liable for injury produced or substantially produced in a natural and continuous sequence by his conduct, such that 'but for' such conduct the injury would not have occurred. Such liability is not escaped in the recognition that the injury would not have occurred 'but for' the concurrence or intervention of some other cause as well. The defendant is liable when his act of negligence combines with some other concurring or intervening cause in the sense that, 'but for' the other cause as well, injury would not have occurred."); *Tampa Elec. Co. v. Jones*, 190 So. 26, 27 (Fla. 1939) ("In suits for personal

3

injuries alleged to have resulted from the negligence of another, . . . it must be shown that such negligent act caused, or contributed to, the result which inflicted the injury.  The negligence must be the proximate cause of the injury. . . . A proximate cause produces the results in continuous sequence, and without which the result would not have occurred.").

Thus, plaintiff must prove, through admissible expert testimony, that Mr. Irvin would not have died but for his brief exposure to Vioxx.  To satisfy her burden, plaintiff must *first* prove general causation and then must prove specific causation.  *See, e.g., McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1239 (11th Cir. 2005); *Kelley v. Am. Heyer-Schulte Corp.*, 957 F. Supp. 873, 881-82 (W.D. Tex. 1997); *Liggett Group Inc. v. Engle*, 853 So. 2d 434, 453 (Fla. App. 2003), *review granted*, 873 So. 2d 1222 (Fla. 2004).  Unless plaintiff first proves general causation, she may not offer evidence of specific causation.  *Kelley*, 957 F. Supp. at 882 ("In the absence of any evidence regarding general causation, the Court will not permit Dr. Espinoza to testify as to specific causation."); *accord Hollander v. Sandoz Pharms. Corp.*, 289 F.3d 1193, 1211 (10th Cir. 2002); *Nat'l Bank of Commerce v. Associated Milk Producers, Inc.*, 22 F. Supp. 2d 942, 963 (E.D. Ark. 1998); *Wynacht v. Beckman Instruments, Inc.*, 113 F. Supp. 2d 1205 (E.D. Tenn. 2000); *Cavallo v. Star Enter.*, 892 F. Supp. 756 (E.D. Va. 1995), *aff'd in part, rev'd in part*, 100 F.3d 1150 (4th Cir. 1996); RESTATEMENT (THIRD) OF TORTS:  Liability for Physical Harm § 28 cmt. c (Tentative Draft Nov. 3, 2003); Saks *et al.*, Federal Judicial Center, ANNOTATED REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (2d ed. 2004).

## II.  PLAINTIFF'S EXPERTS CANNOT ESTABLISH GENERAL CAUSATION UNDER ANY THEORY.

Plaintiff does not dispute that she must prove general causation before proving specific causation.  Instead, she urges the Court to conduct a "less rigorous" general causation analysis,

4

citing the Eleventh Circuit's recent decision in *McClain*.[2] (Opp'n at 6-7.) *McClain*, however, does not support plaintiff's view. The *McClain* court merely recognized that, in the interests of judicial economy, courts need not conduct an extensive *Daubert* analysis in cases where medical doctors "routinely and widely" recognize that the plaintiff's exposure to a toxic agent is capable of causing the injuries the plaintiff alleges. 401 F.3d at 1239 & n.5. Such cases involve undisputable allegations such as "cigarette smoking causes lung cancer and heart disease, too much alcohol causes cirrhosis of the liver, and that ingestion of sufficient amounts of arsenic causes death." *Id.* at 1239 n.5.

By contrast, plaintiff alleges in this case that Mr. Irvin's sudden cardiac death resulted from his exceptionally brief exposure to a common therapeutic dose of an FDA-approved medication. There is no reliable scientific evidence that taking Vioxx at the 25 mg dose for less than a month is capable of causing thrombotic cardiovascular events such as sudden cardiac death. Accordingly, this Court must conduct a "rigorous" general causation analysis. And in fact, that is precisely what the Eleventh Circuit did in *McClain*, which involved similar allegations that an herbal weight loss supplement caused plaintiffs' ischemic strokes and heart attacks.

---

[2] Plaintiff also urges the Court to conduct a "less rigorous" *Daubert* analysis because two state courts – in the *Ernst* and *Humeston* cases – supposedly already determined that the proposed testimony of her experts is scientifically reliable. (Opp'n at 21.) There is no basis for plaintiff's request. First, the unpublished, oral decisions of two state court judges applying different legal standards have no precedential value (or any value) in this Federal proceeding. And second, the state court proceedings cited by plaintiff involved different dosages and durations of Vioxx use. Moreover, contrary to plaintiff's representation, the court in the *Ernst* case actually *rejected* many of the theories advanced by plaintiff's experts here – to wit, that Vioxx allegedly can cause vasospasms and plaque ruptures and that it can accelerate atherosclerosis.

### A.    Plaintiff Mischaracterizes Her Burden of Proof As To General Causation.

In her Opposition, plaintiff makes two, fundamentally incorrect statements about her burden of proof as to general causation.  First, she claims that her experts properly may base their opinions on statistically insignificant epidemiologic data.  Second, she claims that her experts properly may base their opinions on studies that evaluated the effects of Vioxx when taken at dosages and durations that are not at issue here.  Plaintiff is wrong as to each claim.

#### 1.    Plaintiff's experts cannot base their opinions on statistically insignificant epidemiologic data.

Plaintiff does not seriously dispute that epidemiologic studies are "[u]ndoubtedly . . . the most useful and conclusive type of evidence" of causation.[3]  *See, e.g.*, *Allen v. Pa.. Eng'g Corp.* 102 F.3d 194, 197 (5th Cir. 1996); *Brock v. Merrell Dow Pharms., Inc.*, 874 F.2d 307, 311 (5th Cir. 1989).  The fact is that epidemiologic studies provide the "strongest evidence" of a causal relationship – especially where, as here, epidemiologic data repudiating such a relationship exist. *Vice v. N. Telecom, Inc.*, No. Civ. A 94-1235, 1996 WL 200281, at * 7 (E.D. La. Apr. 23, 1996); *see also Chambers v. Exxon Corp.*, 81 F. Supp. 2d 661, 664 (M.D. La. 2000) ("Epidemiological studies are necessary to determine the cause and effect relationship between an agent, in this case

---

[3] There are two types of epidemiologic studies – randomized clinical trials and observational studies.  (Causation Testimony Brief at 17.)  Experts for both plaintiff and Merck agree that randomized clinical trials are at the top of the hierarchy of data that scientists typically consider when assessing whether a particular dose of a drug is capable of causing a specific injury. (Declaration of J. Michael Gaziano, M.D., M.P.H. in Support of Merck's Motions to Exclude Evidence ("Gaziano Decl.") at ¶¶ 28, 34-35, filed Oct. 21, 2005; Expert Report of Wayne A. Ray, Ph.D., ('Ray Report") at 25, attached as Ex. __ to the Declaration of Phillip A. Wittmann in Support of Merck's Motions to Exclude Evidence ("Wittmann 10/21/05 Decl."), filed Oct. 21, 2005 (randomized clinical studies provide "the most reliable estimate of the magnitude of a drug's effect"); Expert Report of John W. Farquhar, M.D. ("Farquhar Report") at ¶ 59, attached as Ex. 33 to Wittmann 10/21/05 Decl. (randomized clinical trials are "gold standard" for assessing causation).  Observational epidemiological studies occupy the next level down on the hierarchy of scientific evidence.  (Gaziano Decl. at ¶ 28; Farquhar Report at ¶ 60 (observational studies are "weaker" than randomized clinical trials in "assigning causality").)

6

exposure to benzene, and a disease, CML."); *Thomas v. Hoffman-La Roche, Inc.*, 731 F. Supp. 224, 227-28 (N.D. Miss. 1989) ("conclusive epidemiological proof [is] essential to the plaintiff's case in a toxic tort pharmaceutical drug setting").

Instead, plaintiff argues that her experts properly may rely on statistically *in*significant epidemiologic data to support their general causation opinions.   (Opp'n at 8-9.)   Plaintiff's argument is insupportable.   In *Brock v. Merrell Dow Pharms., Inc.*, 874 F.2d 307 (5th Cir. 1989), the Fifth Circuit reversed a verdict in the plaintiffs' favor based on their failure to identify a statistically significant study concluding that Bendectin is a human teratogen.   *Id.* at 313, *modified on reh'g*, 884 F.2d 166.

Plaintiff proposes that the Court disregard the holding of *Brock* based on the Fifth Circuit's subsequent decision in *Christophersen v. Allied-Signal Corporation*, 902 F.2d 363 (5th Cir. 1990) [hereinafter *Christophersen I*].   Plaintiff cites *Christophersen I* for the proposition that the requirement of statistical significance announced in *Brock* is limited to the Bendectin context. (Opp'n at 9.)   Plaintiff is mistaken for four reasons.

First, the Fifth Circuit's decision in *Christophersen I* was superseded by its *en banc* decision in *Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106 (5th Cir. 1991) [hereinafter *Christophersen II*].   *Christophersen I* thus has no precedential value.   *See, e.g., United States v. Pineda-Ortuno*, 952 F.2d 98, 102 (5th Cir.1992) (once rehearing en banc is granted, "panel decision is vacated and of no precedential value").   Second, *Christophersen II* does not limit the rule announced in *Brock* to the Bendectin context.   939 F.2d 1106.   Third, the *Brock* court anticipated that courts in "subsequent toxic tort cases" outside the Bendectin context would require that epidemiologic data be statistically significant to support a causation opinion.   884 F.2d 166.   And fourth, consistent with the *Brock* court's holding, numerous courts in the Fifth

7

Circuit in fact have excluded or otherwise disregarded expert testimony in non-Bendectin cases where the testimony was not based on statistically significant epidemiologic data.[4]  As one court held in a non-Bendectin toxic tort case, it is "unreasonable as a matter of law" for an expert to base causation opinions on statistically insignificant data.  *Kelley v. Am. Heyer-Schulte Corp.*, 957 F. Supp. 873, 878 (W.D. Tex. 1997).

Plaintiff's claim that her experts properly may rely on statistically insignificant epidemiologic data when opining on general causation is wrong as a matter of law.  The Court should exclude any evidence of statistically insignificant data and any testimony based on such data.  (*See also* Merck's Motion in Limine To Exclude Scientifically Unreliable and Irrelevant Medical and Scientific Evidence Motion In Limine No. 6) at 1-8.

---

[4] *See, e.g., Burleson v. Texas Dep't of Crim. Justice*, 393 F.3d 577, 585-86 (5th Cir. 2004) (excluding testimony of plaintiff's expert, who offered "no studies which demonstrate a statistically significant link between thorium dioxide exposure in dust or fumes and [plaintiff's] type of lung or throat cancer"); *Allen*, 102 F.3d at 195 (excluding testimony of plaintiff's expert as scientifically unreliable in part because "no epidemiological study has found a statistically significant link between EtO exposure and human brain cancer"); *Babin v. Ecolab, Inc.*, No. 2:04-CV-1595, 2005 WL 1629947, at *3, *5 (W.D. La. July 5, 2005) (study failed to support conclusion of plaintiff's expert that exposure to glycol ethers causes anencephaly where "no statistically significant association . . . was found"); *Cano v. Everest Minerals Corp.*, 362 F. Supp. 2d 814 (W.D. Tex. 2005) (in case involving exposure to uranium ore, holding that, "to support causation, an epidemiological study must be statistically significant"); *In re Norplant Contraceptive Prods. Liab. Litig.*, 215 F. Supp. 2d 795, 831 (E.D. Tex. 2002) (in case involving prescription contraceptive device, holding that "epidemiological data that is not 'statistically significant' cannot provide a scientific basis for an opinion on causation"); *Chambers*, 81 F. Supp. 2d at 664-65 (excluding expert's causation testimony in benzene exposure case based on absence of "statistically significant epidemiological data"); *Vice*, 1996 WL 200281, at *7 (confirming in case involving repetitive stress disorders that "strongest evidence" of causal relationships comes from "statistically significant" epidemiologic data); *Thomas*, 731 F. Supp. at 228 (testimony of plaintiff's experts in case involving prescription acne medication amounted to "speculation" because "there is a total absence of any statistically significant study to assist the jury in its determination of the issue of causation").

790745v.1

**2.     Plaintiff's experts cannot base their causation opinions on
epidemiologic studies involving dosages and durations of Vioxx use not
at issue here.**

Plaintiff also proposes that her experts may offer general causation opinions based on

studies that involved use of Vioxx at doses and durations not at issue here.  (Opp'n at 14-15.)

Plaintiff, however, cites absolutely *no* authority for this proposition.  There is none.  In any

pharmaceutical or toxic tort case, the threshold causal inquiry is whether the plaintiff was

exposed to a harmful amount of particular substance.    That inquiry necessarily requires

consideration of the plaintiff's specific dose and duration of exposure.

As the court in *McClain* recently confirmed, "[d]ose is the single most important factor to

consider in evaluating whether an alleged exposure caused a specific adverse effect."  *McClain*,

401 F.3d at 1242.  A plaintiff cannot establish general causation merely by showing "that a

certain chemical agent sometimes causes the kind of harm that he or she is complaining of."

*Wright v. Willamette Indus., Inc.*, 91 F.3d 1105, 1107 (8th Cir. 1996).  Instead, the plaintiff must

present evidence that he or she was "exposed to levels of that agent that are known to cause the

kind of harm" that he or she allegedly suffered.  *Id.*; *see also In re Hanford Nuclear Reservation

Litig.*, 292 F.3d 1124, 1133 (9th Cir. 2002) ("[T]he appropriate understanding of generic

causation is . . . whether exposure to a substance for which a defendant is responsible, such as

radiation at the level of exposure alleged by plaintiffs, is capable of causing a particular injury or

condition in the general population.").

While plaintiff would have it otherwise, the Fifth Circuit repeatedly has reaffirmed the

requirement that courts scrutinize the dose-response relationship in pharmaceutical and toxic tort

cases, both when assessing the admissibility of expert testimony under *Daubert* and the Federal

Rules of Evidence and when assessing the legal sufficiency of causation evidence generally.

*See, e.g., Burleson v. Texas Dep't of Crim. Justice*, 393 F.3d 577, 586-87 (5th Cir. 2004)

(excluding opinions of expert that were based on improper dose assumptions because "dose is critical to an evaluation of causation"); *Allen v. Pa.. Eng'g Corp.* 102 F.3d at 199 ("Scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiff's burden in a toxic tort case."); *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 278 (5th Cir. 1998) (excluding opinion of expert who "offered no scientific support for his general theory that exposure to Toluene solution at any level could cause RADS" and who "had no support for the theory that the level of chemicals to which Moore was exposed caused RADS").

Nor may plaintiff's experts formulate scientifically reliable causation opinions by relying on studies that involve durations of Vioxx use not at issue here. *See, e.g.*, *Christophersen II*, 939 F.2d at 1114 (upholding exclusion of expert testimony based upon "inaccurate . . . duration data"); *Thompson v. S. Pac. Transp. Co.*, 809 F.2d 1167, 1169 (5th Cir. 1987) (expert's opinion on dioxin as source of plaintiff's illness had "insufficient factual basis" in part because expert had no knowledge of duration of exposure); *Gulf S. Insulation v. U.S. Consumer Prod. Safety Comm'n*, 701 F.2d 1137, 1146 (5th Cir. 1983) (usefulness of epidemiological studies was diminished based on "failure to consider . . . length of time the workers were exposed to formaldehyde"); *Edwards v. Safety-Kleen Corp.*, 61 F. Supp. 2d 1354, 1359 (S.D. Fla. 1999) (excluding opinion of expert who could not identify any studies defining the minimum duration of exposure to benzene necessary to be toxic). The court's decision in *In re Phenylpropannolamine (PPA) Products Liability Litigation*, 289 F. Supp. 2d 1230 (W.D. Wash. 2003), which plaintiff cites throughout her opposition, supports this view. In that case, the court specifically rejected as scientifically unreliable the general causation opinions of plaintiffs' experts that drug-related strokes and other injuries can occur more than three days after taking

10

PPA.  *Id.*  In so holding, the court reasoned that the study relied upon by plaintiffs' experts evaluated the effects of PPA only within the three-day window and that no plaintiff alleged an injury occurring outside that window.  *Id.*

Here, it is undisputed that Mr. Irvin took 25 mg Vioxx for less than a month and that he died from a thrombotic cardiovascular event.  To establish general causation, plaintiff must present scientifically reliable expert testimony that the use of 25 mg Vioxx for less than a month is capable of causing thrombotic cardiovascular events.  In fact, plaintiff understands that this is her burden, because she devotes approximately one-third of her Opposition brief to attempting to meet it.  (Opp'n at 21-37.)  As explained in Merck's Causation Testimony Brief and below, however, plaintiff has not met her burden of proof.

**B.     Plaintiff Cannot Establish Through Scientifically Reliable Expert Testimony That Mr. Irvin's Short-Term Use Of Vioxx Is Capable Of Causing Thrombotic Cardiovascular Events.**

As demonstrated in Merck's Causation Testimony Brief and the Appendix of Studies Relied on By Plaintiff's Experts ("Appendix of Studies"), which is attached thereto, plaintiff can point to *no* data from clinical trials or observational studies establishing that the use of 25 mg Vioxx for less than a month is capable of causing thrombotic cardiovascular events.  If plaintiff had any such data, she would have presented it in her Opposition.  But she has none.  Instead, she relies on data that are statistically insignificant; that are based on dosages and durations of Vioxx use not at issue here; and that are not relevant to any injury suffered by Mr. Irvin.  Moreover, plaintiff's experts cannot compensate for the lack of scientifically reliable and relevant epidemiologic data by relying on inferior and facially inconclusive data from case reports, animal studies and basic science research.

The absence of any scientifically reliable data supporting plaintiff's theory of causation is consistent with the FDA's recent independent analysis of the available scientific data regarding

790745v.1

the risk of adverse cardiovascular events associated with COX-2 selective inhibitors and non-selective NSAIDs. As the FDA concluded in its April 6, 2005 memorandum, the short-term use of Vioxx and other NSAIDs does not appear to be associated with an increased risk of serious adverse cardiovascular events: *"Short-term use of NSAIDs to relieve acute pain, particularly at low doses, does not appear to confer an increased risk of serious adverse CV events . . . ."* (April 6, 2005 FDA Memorandum at 2 (emphasis added), attached as Ex. 50 to Wittmann 10/21/05 Decl.). And, conversely, the FDA found that COX-2 inhibitors appear to be associated with an increased risk of serious adverse cardiovascular events only *"with reasonably prolonged use."* (*Id.* at 10.) Indeed, with an exception not applicable here, the FDA concluded that an increased risk of serious adverse cardiovascular events in controlled clinical trials of COX-2 inhibitors *"only became apparent after months to years of treatment."* (*Id.* at 13 (emphasis added).). While plaintiff cites to other portions of the FDA's memorandum in her Opposition, she ignores the FDA's conclusion that the short-term use of Vioxx does *not* appear to be associated with an increased risk of serious adverse cardiovascular events. (Opp'n at 38.)

> ### 1.   *No clinical trials establish that taking 25 mg Vioxx for less than a month is capable of causing thrombotic cardiovascular events.*

As explained in Merck's Causation Testimony Brief, extensive data from over 55 pre-approval clinical trials involving over 8,000 patients failed to detect a statistically significant increased risk of thrombotic cardiovascular events among patients taking Vioxx for periods up to 86 weeks. (Causation Testimony Brief at 26-27.) Similarly, multiple pooled analyses of data from over two dozen randomized clinical trials of Vioxx that had lasted longer than four weeks and that involved tens of thousands of patients and patient years also revealed no statistically significant increased risk of cardiovascular adverse events for patients taking Vioxx as compared to placebo. (*Id.*)

In the face of this irrefutable data, plaintiff attempts to establish that use of 25 mg Vioxx for less than a month is capable of causing thrombotic cardiovascular events by cherry-picking data from a handful of clinical trials, interim analyses and other documents. None of this clinical trial data supports plaintiff. Because plaintiff's experts concede that clinical trial data are the gold standard for determining causation (*see supra* at note 3), plaintiff cannot establish general causation in this case.

> **a.      The APPROVe study.**

Consider, for example, the reliance of plaintiff's experts on the APPROVe study. While the results of APPROVe showed an increased risk of adverse cardiovascular events that began *after* 18 months of continuous use of 25 mg Vioxx, the study did *not* detect a statistically significant risk, or even a trend, before the first 18 months of continuous use. (Science Brief at 15; Gaziano Decl. at ¶¶ 68-69.) Mr. Irvin did not use Vioxx for anywhere near 18 months; he used it for less than one month. Whatever relevance the long term results of APPROVe may have in cases involving comparably long term use, those results have no relevance here and cannot establish to a reasonable degree of medical and scientific certainty that Mr. Irvin's much shorter term use of Vioxx was capable of causing a thrombotic cardiovascular event.

Plaintiff criticizes the APPROVe duration analysis as an improper *post-hoc* sub-group analysis.[5] (Opp'n at 35.) She also criticizes the APPROVe study as insufficiently powered to

---

[5] In that regard, plaintiff flatly misrepresents an email wherein Dr. Konstam, one of the authors of the APPROVe study, discussed his "concerns" about a draft manuscript of the study. (Pl.'s Opp'n at 36, Ex. T (MRK-AHD0075708).) As the text of the email makes plain, Dr. Konstam was concerned about (1) remarking on the potential implications of the flattening of the placebo curve in the Kaplan-Meier graph, and (2) overstating conclusions from certain subgroup analyses. Dr. Konstam obviously endorsed the 18-month duration analysis, as he did not suggest deleting it, and the peer reviewers at the *New England Journal of Medicine* did not find it scientifically flawed, since the analysis remained in the published article. The FDA also reached conclusions consistent with the 18-month duration analysis. Indeed, the FDA relied on it in addition to a similar analysis from the APC study – a long-term randomized, placebo-controlled

13

detect a short-term risk associated with Vioxx.[6]  (Pl.'s 18-Month Use *Daubert* Motion at 8.)

Plaintiff's arguments, however, are beside the point.  The burden of establishing causation rests

squarely with *plaintiff*, not Merck.  *See, e.g., Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d

1015, 1018 (Fla. 1984).  Plaintiff cannot establish her burden of proof by criticizing data that do

not confirm her theory of causation.  *Brumley v. Pfizer, Inc.*, 200 F.R.D. 596, 602 (S.D. Tex.

2001) ("Dr. Polukoff may have pointed out an important void in the scientific literature, but the

lack of proof of a drug's safety does not prove it is dangerous.").  Instead, plaintiff must come

forward with *evidence* that the APPROVe data in fact show a statistically significant increased

risk of thrombotic cardiovascular events among patients who have taken 25 mg Vioxx for less

than a month.

She has not and cannot come forward with any such evidence.  As plaintiff admits, there

were two confirmed thrombotic events in patients taking Vioxx and two such events in patients

taking placebo after two months of therapy.  (*See* Pl.'s Opp'n to Merck's Motion to Exclude

Testimony of John W. Farquhar at 11.)   Such data obviously show *no* difference in

cardiovascular risk, let alone a statistically significant difference.  Moreover, even if the Court

were to allow plaintiff to present evidence of inferior investigator-reported adverse event data

from APPROVe,[7] such data still does not support plaintiff in this case.  As the Kaplan-Meier

---

trial involving Celebrex that found an increased risk of serious cardiovascular events after 12
months of continuous exposure (*see* Gaziano Decl. at ¶ 70) – when it concluded that there was
evidence of an increased risk associated with COX-2 inhibitors after "reasonably prolonged use,"
but not after "short-term use."  (April 6, 2005 FDA Memorandum at 2, 4-5, 10.)

[6] Merck has addressed plaintiff's arguments in its Opposition to her Motion to Exclude Opinion
Testimony That Vioxx Cannot Cause Adverse Thrombotic Cardiac Events Unless Ingested (18)
Months or Longer (hereinafter "Plaintiff's 18-Month Use *Daubert* Motion").  So as not to
overburden the Court, Merck incorporates its opposition herein by reference.

[7] As explained in Merck's Motion in Limine to Exclude Scientifically Unreliable and Irrelevant
Medical and Scientific Evidence (Motion in Limine No. 6 at pages 2 and 8-15, it is scientifically

curve at page 36 of plaintiff's Opposition confirms, any risk associated with Vioxx based on the inferior investigator-reported event data does not become apparent until well *after* one month of continuous Vioxx use and does not become statistically significant until after almost *36 months* of such use. (Pl.'s Opp'n at 36.) Plaintiff's own experts do not dispute these conclusions. Instead, they agree with them. (Ray Report at 29 (reanalysis of APPROVe data shows "time-to-event curves separate by three months for serious coronary heart disease); Deposition of John Farquhar, M.D. ("Farquhar Dep.") at 269:17-270:25, attached as Ex. 7 to Declaration of Phillip A. Wittmann in Support of Merck's Reply Briefs ("Wittmann Decl.") (reanalysis of APPROVe data for incidence of heart attack, sudden death and unstable angina shows no statistically significant difference in risk until after close to three years).)

Plaintiff's reanalysis of the APPROVe data contradicts her theory that taking 25 mg Vioxx for less than a month is capable of causing thrombotic cardiovascular events. Given this, it is inappropriate to *assume*, as plaintiff's expert does, that the increased risk seen at the conclusion of the APPROVe study applies throughout all periods of the study. (Farquhar Report at ¶ 79; ("Farquhar Dep.") at 193:22-196:7.) Such an approach is nothing more than extrapolating from what is known to what is unknown, and it is scientifically unreliable under *Daubert*. *Moore*, 151 F.3d at 279 (improper to "leap[] from an accepted scientific premise to an unsupported one"); *Claar v. Burlington N.R.R. Co.*, 29 F.3d 499, 502-03 (9th Cir. 1994) ("Coming to a firm conclusion first and then doing research to support it is the very antithesis of [the scientific] method."); *cf. Propulsid*, 261 F. Supp. 2d at 616 ("Sound scientific method does not support an extrapolation from one substance to another without some *showing* of identity or at least close similarity.") (emphasis added.)

---

improper to rely on investigator-reported adverse event data where – as here – confirmed, adjudicated data exist.

15

### b.    The VICTOR study.

Plaintiff's experts cannot reasonably rely on the VICTOR study.  (Opp'n at 36-37.)  As explained in the Appendix of Studies, only incomplete, interim data are available.  Expert Report of Barry K. Rayburn, M.D. ("Rayburn Report") at 19, attached as Ex. 40 to Wittmann 10/21/05 Decl.; Gaziano Decl. at ¶ 72.)  For this reason alone, the VICTOR study cannot provide a scientifically reliable basis for an opinion that the short-term use of Vioxx is capable of causing thrombotic cardiovascular events.  *See, e.g., Christophersen II*, 939 F.2d at 1114 (upholding exclusion of expert opinion that was based on inaccurate and incomplete exposure data).  But even the interim data do not support plaintiff.  Based on the most recent reporting – which plaintiff ignores in her Opposition – there have been 14 confirmed thrombotic cardiovascular events in patients receiving Vioxx versus 5 confirmed thrombotic cardiovascular events in the patients receiving placebo.  (Rayburn Report at 19.)  While plaintiff would have it otherwise, this difference in confirmed events is not statistically significant and thus does not support the theory that Vioxx is associated with an increased risk of heart attacks or sudden cardiac death.  (Testimony of Alise Reicin, *Ernst v. Merck*, No. 19961*BH02 (Dist. Ct. Brazoria County Tex. filed May 24, 2002) at 32:2-13, attached as Ex. 12 to Wittmann Decl.; Rayburn Report at 19.)  Moreover, the average duration of Vioxx use in those patients who had a heart attack or died suddenly is approximately one year, which is well in excess of the exceedingly brief period of time during which Mr. Irvin took Vioxx.  (*Id.*)

### c.    The Alzheimer's Studies.

Plaintiff's experts also rely on a "Mortality Analysis" for Vioxx users in Merck's Alzheimer's clinical trials.  (Opp'n at 24.)  But these trials do not support plaintiff.  As an initial matter, the trials did not show any statistically significant difference in the rates of adverse cardiovascular events experienced by patients taking Vioxx as compared to placebo.  (Appendix

16

of Studies at 6-7; Gaziano Decl. at ¶¶ 65, 103.)  Moreover, the "mortality data" are irrelevant to this case for multiple reasons.

First, while there were more deaths among trial participants who took Vioxx as compared to placebo, there was no pattern to those deaths that supports an inference that they were caused by Vioxx.  For example, included in the mortality figures were deaths attributable to such events as electrocution, trauma, cancer and pneumonia.  (Thal, L.J. *et al.*, *A Randomized, Double-Blind Study of Rofecoxib in Patients with Mild Cognitive Impairment,* NEUROPSYCHOPHARMACOLOGY (2005) 30:1210.)  These deaths have no bearing whatsoever on whether Vioxx taken at any dose and for any duration can cause a heart attack or sudden cardiac death, let alone whether taking Vioxx at the 25 mg dose for less than a month, as Mr. Irvin did, can cause such events.  Moreover, a significant number of the deaths (eleven in one of the trials alone) occurred more than *forty-eight weeks* after treatment had been discontinued – further confirmation that those deaths had nothing to do with Vioxx.  (*Id.*)  And, patients who had taken Vioxx, as opposed to placebo, were on average evaluated for a longer period after treatment ended – an additional reason why the number of deaths reported in the Vioxx groups is not a reliable indication of causation.  (*Id.* at 1213.)  Plaintiff cannot link these deaths from disparate causes to the conclusion that she wants to reach – *i.e.,* that taking Vioxx increases the risk of adverse cardiovascular events – by any means other than speculation or an expert's *ipse dixit.*  But "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to the existing data only by the *ipse dixit* of the expert." *Propulsid*, 261 F. Supp. 2d at 616 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

Even if plaintiff's experts somehow could make a connection between the all-cause mortality figures and an increased cardiovascular risk associated with Vioxx, the all-cause

17

mortality figures still would be irrelevant. Plaintiff's expert, Dr. Farquhar, states in his report that he relied on a reanalysis of the Alzheimer's data by Professor Kronmal,[8] who purportedly found a statistically significant increased risk for all-cause mortality. (Farquhar Report at ¶ 133) Putting aside the question of whether Dr. Farquhar may reasonably rely on that analysis,[9] Professor Kronmal's analysis does not reflect any statistically significant increase in risk for all-cause mortality when Vioxx is taken for less than a month – *i.e.*, the only duration of Vioxx use at issue here. Figure 7 in Professor Kronmal's report illustrates that uncontroverted fact, as there is no separation in the Kaplan-Meier curve for all-cause mortality until some time well *after* one month. Expert Report of Richard Kronmal ("Kronmal Report") at 19, Figure 7, attached as Ex. 37 to Wittmann 10/21/05 Decl.)

In short, plaintiff cannot escape the fact that the data from the Alzheimer's trials that are relevant here are those pertaining to cardiovascular events, which are statistically *in*significant and thus insufficient to support a causation opinion. The Court should not permit plaintiff to deflect attention from the relevant data by introducing irrelevant data that have no bearing on causation or any other issue.

### d.   The VIGOR Study.

Plaintiff's experts' reliance on the VIGOR study also is misplaced. (Opp'n at 28-29.) As explained in Merck's Appendix of Studies, plaintiff's experts cannot properly base their causation opinions on the results of VIGOR, because VIGOR (1) involved patients taking Vioxx at the 50 mg dose, not the 25 mg dose, (2) compared Vioxx against naproxen, not placebo, and

---

[8] Plaintiff designated Professor Kronmal as an expert witness but withdrew him after the Court ordered his deposition.

[9] In fact, Dr. Farquhar may not properly rely on Professor Kronmal's analysis. As explained in Merck's Appendix of Studies at pages 7-10, Professor Kronmal's analysis is not scientifically reliable. For that reason alone, Dr. Farquhar may not reasonably rely on it. *See* FED. R. EVID. 703.

(3) involved an elderly population with rheumatoid arthritis, a condition that Mr. Irvin did not have and one that put the study's patients at a significantly increased risk of death from cardiovascular problems.  (Appendix of Studies at 2-3; *see also* Merck's Opp'n to Pl.'s Mot. to Exclude Opinion Testimony that Naproxen Is Sufficiently Cardioprotective To Explain Excess Cardiac Risk in Vigor at 14-16.)   In fact, leading researchers who are not involved in this litigation agree that the results of VIGOR are likely due to a combination of chance and a cardioprotective effect of naproxen.  As stated in an article published just last year by Drs. Carlo Patrono and Garret FitzGerald:

> While the cause of the apparent excess risk of MI in [VIGOR] cannot be conclusively established, *a combination of some cardioprotective effect of naproxen and the play of chance does seem to offer a plausible explanation for these unexpected findings.*

Patrono, FitzGerald et al., *Platelet Active Drugs:  The Relationships Among Dose, Effectiveness, and Side Effects,*" CHEST 2004; 126:234S-264S (emphasis added).[10]

Moreover, it is entirely irrelevant that one-third of the heart attacks observed in VIGOR supposedly occurred during the first four months of the study, as plaintiff claims.  (Pl.'s Opp'n at 29.)  Plaintiff's own expert, Professor Ray, admits that there was *no* difference observed in the rate of confirmed thrombotic cardiovascular events between patients taking Vioxx and patients taking naproxen during the first month of use.  Expert Report of Wayne A. Ray, Ph.D. ("Ray Report") at 27, attached as Ex. 39 to Wittmann 10/21/05 Decl.)

### e.       The ADVANTAGE Study.

Also unavailing is the reliance of plaintiff's experts on the ADVANTAGE study.  (Opp'n

---

[10] Dr. Lucchesi concedes that Dr. Patrono is one of the world's leading experts on the study of platelets.  (Testimony of Benedict R. Lucchesi, *Humeston v. Merck*, No. 619 (N.J. Super. Ct. Law Div. filed August 19, 2003) ("Lucchesi Test.) of September 20, 2005 at 948:16-949:2, 949:6-16.) attached as Ex. 13 to Wittmann Decl.

at 30-31.)  First, as plaintiff concedes, the ADVANTAGE study did not evaluate the health effects of Vioxx in the first 30 days of use.  (*Id.* at 30.)  Second, the ADVANTAGE study compared Vioxx against naproxen, not placebo.  The absence of a placebo comparator means that plaintiff's experts cannot render scientifically reliable opinions on the basis of ADVANTAGE.  (Gaziano Decl. at ¶ 34.)  And third, as plaintiff's own experts admit, the study revealed *no* statistically significant disparity in thrombotic cardiovascular events, even against naproxen.  (Deposition of Thomas Baldwin, M.D., ("Baldwin Dep.") at 97:16-98:12, 100:13-21, attached as Ex. 2 to Wittmann Decl.; Lucchesi *Humeston* Test. of 9/19/05 at 923:14-924:13; Gaziano Decl. at ¶ 96.)  Moreover, while plaintiff claims that ADVANTAGE showed a "trend" in such events in patients taking Vioxx (*see* Opp'n at 31), a "trend" is different from an effect that is "statistically significant."  (Farquhar Dep. at 146:17-147:23.)

### f. Dr. Watson's Internal Analysis.

Plaintiff's experts also can derive no support from Dr. Watson's interim analysis.[11]  (Pl.'s Opp'n at 26-27.)  After Merck became aware of the FitzGerald hypothesis in late 1997, but prior to submitting the New Drug Application ("NDA") for Vioxx, Dr. Watson conducted a preliminary analysis of cardiovascular data from the entire Vioxx clinical trial program in a cautionary effort to determine, on an interim basis, whether the program was producing a worrisome number of cardiovascular events.  (Reicin *Humeston* Test. of 10/14/2005 at 3913:18-3914:3.)

Significantly, Dr. Watson's analysis did not involve a direct comparison of Vioxx against placebo or other NSAIDs.  At the time, Merck had not completed its pre-NDA clinical trials, so it had access only to *blinded* data – that is, Merck had data concerning the overall number of

---

[11] *See* MRK-NJ0281185-1208 (Watson, D., *Final Results of an Analysis of the Incidence of Cardiovascular SAEs in the Phase IIb/III VIOXX Osteoarthritis Clinical Trials* (Feb. 2, 1998).)

cardiovascular events experienced by all patients in the clinical trial program, but it did not know how many of those events had occurred in patients taking Vioxx, how many in patients taking placebo or how many in patients taking comparator NSAIDs. (Reicin *Humeston* Test. of 10/17/2005 at 4134:5-4135:24, 4136:6-13.) Dr. Watson compared the incidence of thrombotic cardiovascular events among *all* patients in the Vioxx clinical trials – whether those patients were on Vioxx, placebo or comparator NSAIDs – with the incidence of such events among patients receiving placebo in unrelated studies involving of two other Merck drugs, Proscar and Fosamax.

As Dr. Reicin explained, this comparison was crude and imprecise. Its purpose was simply to take a snapshot of the available data to determine if there was a "large signal" – *i.e.*, a "five to tenfold difference" – that overall cardiovascular events in the then-blinded Vioxx clinical trials might be elevated. (Reicin *Humeston* Test. of 10/14/2005 at 3913:18-3914:15.) In fact, however, Dr. Watson's analysis found *no such signal*. The incidence rate of thrombotic cardiovascular events among all men in the Vioxx trials was "roughly consistent with what would be expected in the general population" based on the placebo data from the Proscar trial.[12] In fact, Dr. Watson found *no* statistically significant difference in the relative risk of such events for men in the Vioxx trials.[13] It was only when Dr. Watson analyzed the incidence of thrombotic cardiovascular events among all *women* in the Vioxx trials, as compared to placebo data from the Fosamax trial, that he found an elevated risk – although even then the risk dwarfed the large signal that the analysis was designed to detect.[14] In any event, this finding of an elevated risk in *women* does not support plaintiff for two reasons.

---

[12] *Id.* (MRK-NJ0281186.)

[13] *Id.*

[14] *Id.*

790745v.1

First, Dr. Watson's analysis did not compare Vioxx against anything. Instead, as explained above, it compared the incidence of thrombotic cardiovascular events among *all* women in the Vioxx clinical trials – whether those women were on Vioxx, placebo or a comparator NSAID – with the incidence of such events in patients receiving placebo in the Fosamax trial. Accordingly, the elevated risk observed for *all* women in the Vioxx trials cannot be ascribed to the *subset* of those women who took Vioxx. Second, Dr. Watson observed that the anomalous finding of an increased risk for all women but not all men in the Vioxx trials was "driven" by the "very low" and thus "atypical" rates of such events among patients receiving placebo in the Fosamax trial.[15] Based on these facts, Dr. Watson concluded – appropriately – that the available interim data did not suggest an elevated cardiovascular risk from Vioxx.[16]

For the foregoing reasons, Dr. Watson's analysis lends no support to plaintiff. It simply did not purport to evaluate the cardiovascular risk for patients taking Vioxx only, let alone for patients taking Vioxx at the 25 mg dose for less than a month.

### g. Dr. Shapiro's Meta-Analysis.

Nor can plaintiff's experts derive any support from Dr. Shapiro's "Vioxx Preliminary Cardiovascular Meta-analysis."[17]  (Opp'n at 27.)  This meta-analysis sought to compare the incidence of thrombotic events and myocardial infarctions (*i.e.*, heart attacks) among patients in Merck's clinical trials who took Vioxx at the 25 mg *and* 50 mg dose for longer than four weeks,

---

[15] *Id.*

[16] *Id.* (MRK-NJ0281201.)  Importantly, when Merck completed its pre-NDA trials and unblinded the results – so that the incidence of cardiovascular events experienced on Vioxx could be determined and compared directly with the incidence of cardiovascular events on comparator NSAIDs and placebo – the unblinded data confirmed the absence of any negative cardiovascular signal. In other words, the final data from the pre-NDA trials confirmed the conclusion of Dr. Watson's interim analysis. (Pl.'s Ex. 1.0532 (*Humeston*); Def.'s Ex. 71 (*Humeston*).)

[17] *See* MRK-NJ0070364-97.

as compared to both placebo and pooled data on other NSAIDs, *including* naproxen. Because Dr. Shapiro, like Dr. Watson, did not purport to evaluate the cardiovascular risk among patients who took Vioxx at the 25 mg dose for less than a month, her analysis has no applicability here.

Even so, the results of Dr. Shapiro's meta-analysis do not support plaintiff. The primary endpoint of the meta-analysis was APTC events, a grouping that includes myocardial infarctions, strokes and other types of thrombotic events. The secondary endpoint was myocardial infarctions only. When evaluating the primary endpoint of APTC events, Dr. Shapiro found *no* statistically significant increased risk of thrombotic events among patients taking Vioxx as compared to placebo (RR = 0.85, CI = 0.52-1.39) or other NSAIDs (RR = 1.44, CI = 0.98-2.13).[18] When evaluating the secondary endpoint of myocardial infarctions, Dr. Shapiro likewise found *no* statistically significant increased risk among patients taking Vioxx as compared to placebo.[19] It was only when she compared patients taking Vioxx against other NSAIDs *including* naproxen that she found an elevated risk of myocardial infarctions.[20] But this elevated risk clearly was driven by the results of the VIGOR study, which accounted for approximately half of the patient-years involved in the analysis and which yielded the *only* statistically significant comparison of Vioxx against another NSAID.[21] Moreover, when comparing the Vioxx group against the other-NSAIDs group, Dr. Shapiro found that the two patient populations failed the test of heterogeneity (*i.e.*, they were significantly different), thus making any statistical

---

[18] *See* MRK-NJ0070374, MRK-NJ0070382.

[19] *See* MRK-NJ0070390.

[20] *See* MRK-NJ0070395.

[21] *Id.* As explained in Merck's Opposition to Plaintiff's Motion to Exclude Opinion Testimony That Naproxen® Is Sufficiently Cardioprotective to Explain Excess Cardiac Risk in Vigor at pages 10-17, the results of the VIGOR study are best explained by a cardioprotective effect of naproxen and/or chance, rather than a cardiotoxic effect of Vioxx. The results of Dr. Shapiro's meta-analysis lend further support to that conclusion.

23

comparison between the two groups inappropriate.[22]   (Reicin *Humeston* Test. of 10/12/2005 at 3591:14-3592:7.)

As explained by Dr. Gaziano, comparisons of a drug against placebo, as opposed to an active comparator, provide the most useful information for determining causal relationships. (Gaziano Decl. at ¶¶ 34-35.)  Because each of the placebo comparisons in Dr. Shapiro's meta-analysis failed to detect a statistically significant increased risk of thrombotic events among patients taking Vioxx, the results of her meta-analysis support Merck, not plaintiff.

### h.      Protocols 010 and 090.

In addition, plaintiff's experts can derive no support from Protocols 010 and 090.  (Opp'n at 22, 24.)  Protocol 010 did not involve *any* instances of heart attacks or sudden cardiac death. (A. Reicin *Ernst* Test. 08/10/05 at 52:10-55:12.)  Instead, cardiovascular events observed in Protocol 010 included such things as high blood pressure.  (*Id.*)  Here, plaintiff's experts contend that Mr. Irvin did *not* have high-blood pressure.  (Baldwin Dep. at 137:2-4; Deposition of Joseph Burton, M.D. ("Burton Dep.") at 207:7-9, attached as Ex. 4 to Wittmann Decl.; Deposition of Winston Gandy ("Gandy Dep.") at 185:20-186:1, attached as Ex. 6 to Wittmann Decl.; Deposition of Benedict R. Lucchesi, M.D., Ph.D., M.S., F.A.H.A., ("Lucchesi 10/26/05 Dep.") at 389:21-25, attached as Ex. 9 to Wittmann Decl.)  The results of Protocol 010 thus have no relevance to this case.  *Daubert*, 509 U.S. at 591-92 (relevance requires an appropriate "fit" between the scientific testimony and the specific facts of the case); *Propulsid*, 261 F. Supp. 2d at 606; (*see also* Merck's Motion to Exclude Irrelevant Medical Conditions (Motion in Limine No. 7) at 1-5).  Moreover, any evidence that Vioxx can cause high blood pressure is not relevant to proving that Vioxx can cause different conditions, such as thrombotic cardiovascular events.

---

[22] *See* MRK-NJ0070396.

790745v.1

*See, e.g., McClain*, 401 F.3d at 1445-46 (excluding expert testimony that drug caused plaintiffs' ischemic strokes where testimony was based on data suggesting that different drug may cause hemorrhagic strokes); *Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2002) ("Evidence . . . suggest[ing] that [a chemical] may cause ischemic stroke does not apply to situations involving hemorrhagic stroke. This is 'a leap of faith' supported by little more than the fact that both conditions are commonly called strokes."). Accordingly, Protocol 010 provides plaintiff no support.

Nor can plaintiff derive any support from Protocol 090. This trial involved over 1000 osteoarthritis patients treated with 12.5 mg Vioxx, 100 mg Nabumetone or placebo for six weeks. It was not designed to assess cardiovascular risk. (February 26, 2003 Deposition of Alise Reicin ("Reicin 2/26/03 Dep.") (*Calcaterra*) at 54:3-6, attached as Ex. 11B to Wittmann Decl.) There were no deaths in any of the treatment groups and only a small number of adverse cardiovascular thrombotic events. Even then, there was no statistically significant difference in the rate of adverse cardiovascular events in patients taking Vioxx versus placebo or Vioxx versus Nabumetone (June 8, 2005 Deposition of Peter S. Kim, Ph.D., ("Kim 6/8/05 Dep.") (*Ernst*) at 982:7-984:1, 1019:2-11, 1035:22-1037:3, 1039:22-1040:14, attached as Ex. 8 to Wittmann Decl.). This trial cannot support plaintiff's theory of causation.

### i.    The Thomas Bold Email.

Finally, plaintiff argues that data in an August 4, 2003 email from Dr. Thomas Bold to Dr. Alise Reicin somehow establishes a cardiovascular risk associated with the short-term use of Vioxx.[23] (Opp'n at 32.) As an initial matter, it is not clear that any of plaintiff's experts actually relies on this email. Thus, plaintiff's lawyer arguments regarding the contents of the email have

---

[23] *See* MRK-ACO0075897.

790745v.1

no bearing on the Court's *Daubert* analysis. That said, nothing in the email supports plaintiff's theory that use of Vioxx at the 25 mg dose for less than a month is capable of causing thrombotic cardiovascular events.

According to plaintiff, the email supposedly shows that one out of five myocardial infarctions occur within seven days after ingesting Vioxx. Plaintiff, however, totally misrepresents the email. In the email, Dr. Bold recounts that he conducted a database search of investigator-reported events with the designation of "CAD/MI." As Dr. Bold explains, the designation "CAD/MI" refers to coronary artery disease, myocardial infarctions, angina, chest pain and various other conditions. Significantly, not all of these events are necessarily thrombotic or even cardiovascular in nature.[24] Accordingly, when Dr. Bold reported in his email that approximately 20% of the investigator-reported "CAD/MI" events for Vioxx occurred within seven days, it is impossible to determine (a) what type of events were reported in the seven-day window, (b) whether those events were cardiovascular in nature and (c) whether the events were thrombotic events. The data in Dr. Bold's email simply cannot provide a scientifically reliable basis for an expert opinion on causation, even assuming that any of plaintiff's experts rely on the email.

Moreover, relying on reports of individual adverse reactions to draw conclusions about causation, as plaintiff proposes to do, is scientifically unreliable. *See, e.g., See, e.g., Black*, 171 F.3d at 312 & n.2 (reasoning that "case series or case reports" are "insufficient to establish causal relationships"); *McClain*, 401 F.3d at 1250, 1254 ("Uncontrolled anecdotal information offers one of the least reliable sources to justify opinions about both general and individual causation. .

---

[24] For example, the term "myocardial infarction" refers merely to necrosis of the heart muscle. Stedman's Med. Dictionary (27th ed. 2000) at 894-95. Myocardial infarctions can result from thrombotic or non-thrombotic events. (*Id.* at 895.) Similarly, the term "angina" refers simply to a severe, often constricting pain; it can be cardiovascular in nature or not. (*Id.* at 80.)

. . Simply stated, case reports raise questions; they do not answer them."); *Newton*, 243 F. Supp. 2d at 679-80 (reliance on case reports rendered expert's opinion "well below" the "standards of scientific validity").

>    **2.    *No observational studies establish that taking 25 mg Vioxx for less than a month is capable of causing thrombotic cardiovascular events.***

As explained above, plaintiff's experts can cite to no data from any clinical trial establishing that 25 mg Vioxx increases the risk of thrombotic cardiovascular events in the first month of use.   Because they concede that clinical trial data are the "gold standard" for determining causation (*see supra* at note 3), they cannot establish general causation in this case. Nor can plaintiff's experts derive any support for their opinions from observational studies, which Dr. Farquhar admits are "weaker" than randomized clinical trials in their ability to detect causal relationships.  (*Id.*)

In fact, in her Opposition, plaintiff chose not to discuss many of the observational studies upon which her experts variously rely, including the Ray, Graham, Kimmel, Levesque, Mamdani and Nussmeier studies. As explained in Merck's Causation Brief and Appendix of Studies, none of these studies show that the use of 25 mg Vioxx for less than a month is capable of causing thrombotic cardiovascular events.   Nor can plaintiff derive any support from any of the studies that she does cite in her Opposition. (Opp'n at 32-33, 43-44.)

- The Solomon study found *no* statistically significant increased risk and *no* doubling of the risk when Vioxx at all doses was compared to non-use of NSAIDs, nor did it report any statistically significant risk associated with the use of Vioxx at the 25 mg dose when compared to non-use of NSAIDs. (Causation Testimony Brief at 31-32.)

- The Juni study found that when compared against placebo and all NSAID comparators, Vioxx at the 25 mg dose neither doubled the risk for heart attacks nor resulted in a statistically significant increased risk.  (Appendix of Studies at 12-13.)

- The Ingenix study found a statistically *in*significant risk associated with use of

27