Vioxx during the first 30 days.[25]   (*Id.* at 19-20; Merck's Opposition to Plaintiff's 18-Month Use *Daubert* Motion at 17 & n.12.)

- The Hippisley-Cox study did not distinguish between Vioxx at the 25 mg and 50 mg dose, nor did it evaluate Vioxx at any dose during the first 30 days. Moreover, the results of this study are anomalous, internally inconsistent and subject to "bias and confounding," which the author admits she "cannot correct for." (Merck's Opposition to Plaintiff's 18-Month Use *Daubert* Motion at 18.)

- The Johnsen study also did not distinguish between Vioxx at the 25 mg and 50 mg dose. Moreover, its results also are anomalous, internally inconsistent, and may have been "inflated" by protopathic bias (*i.e.*, reverse causation) and confounding factors. (Appendix of Studies at 20-21; Merck's Opposition to Plaintiff's 18-Month Use *Daubert* Motion at 16-17 & n.11.)

- Finally, the Mukherjee meta-analysis provides no support whatsoever to plaintiff. Indeed, the authors conclude only that their findings "suggest a potential increase in cardiovascular event rates" for COX-2 inhibitors.[26] Despite their tentative conclusion, the authors admit that naproxen has an "antithrombotic" and "cardioprotective" effect, which "can . . . explain[]" the results of the VIGOR study, and that COX-2 inhibitors like Vioxx actually may *reduce* atherosclerosis by inhibiting inflammation.[27]

In short, none of the observational studies that plaintiff's experts variously rely on supports her theory that taking 25 mg Vioxx for less than a month is capable of causing thrombotic cardiovascular events. (Causation Testimony Brief at 30-34, Appendix of Studies at 10-23.) In fact, plaintiff cannot identify a *single* statistically significant observational study proving that use of 25 mg Vioxx more than doubles the risk of such events during the first month

---

[25] *See* Ingenix Epidemiology Report, *Cardiovascular Risk of COX-2 Inhibitors and Other NSAIDs*, Sept. 20, 2004 (Final Report, Revised) at 16. In her Opposition, plaintiff relies on interim and incomplete data from a draft report of the Ingenix study, which she says shows a statistically significant increased risk associated with use of Vioxx in the first 30 days. (Pl.'s Opp'n at 32-33.) Plaintiff's experts, however, cannot form scientifically reliable causation opinions by relying on interim and incomplete data from a draft report. *See, e.g.*, *Christophersen II*, 939 F.2d at 1114 (upholding exclusion of expert opinion that was based on inaccurate and incomplete exposure data).

[26] Mukherjee, D., et al., *Risk of Cardiovascular Events Associated With Selective COX-2 Inhibitors*, JAMA 2001: 286:954-59, at 958.

[27] *Id.* at 954, 957.

790745v.1

of use. (*Id.*) For this reason alone, plaintiff cannot prove that *Mr. Irvin's* short-term use of Vioxx more likely than not caused *his* death. (Causation Testimony Brief at 16-21, 30-34; *see also* Opp'n at 7 (relative risk of greater than 2.0 permits inference that an individual plaintiff's disease was more likely than not caused by agent).) Most of the observational studies that plaintiff's experts rely on did not purport to evaluate the alleged risk associated with 25 mg Vioxx during the first month of use, and many of the studies did not distinguish between Vioxx at the 25 mg or 50 mg doses – facts that plaintiff concedes are "limitations." (Causation Testimony Brief at 30-34, Appendix of Studies at 10-23; Pl.'s Summary Science Brief at 13.) Moreover, most of the studies that evaluated Vioxx at the 25 mg dose *found no statistically significant increased risk* when Vioxx was compared to placebo or its functional equivalent, a fact that completely undercuts plaintiff's claim. (Causation Testimony Brief at 30-34, Appendix of Studies at 10-23.) Indeed, two studies conducted by plaintiff's own expert, Professor Ray, found no statistically significant increased risk associated with the use of 25 mg Vioxx over any duration.[28] Accordingly, these observational studies are not only inconsistent and inconclusive for the dosage and duration of Vioxx use at issue in this case, but many actually support Merck's position. (Gaziano Decl. at ¶¶ 49-59, 95, 104; Rayburn Report at 20-24.) Finally, the observational studies that plaintiff relies on have numerous methodological flaws that render them scientifically unreliable for purposes of supporting a causation opinion. (Causation Testimony Brief at 30-34, Appendix of Studies at 10-23; Gaziano Decl. at ¶¶ 33-35, 49-59, 95, 104; Rayburn Report at 20-24.)

---

[28] *See* Appendix of Studies at 13-16 (discussing Ray and Graham studies). Professor Ray is a co-author of the Graham study.

### 3.  *Plaintiff's experts cannot rely on inferior data from case reports, animal studies or basic science research.*

In the absence of statistically significant and otherwise reliable epidemiologic data establishing that use of 25 mg Vioxx during the first 30 days is capable of causing thrombotic cardiovascular events, plaintiff's experts rely on a grab-bag of animal studies, case reports and basic science research. All of this so-called "evidence," however, is either seriously flawed or inconclusive, and it all of it falls below randomized clinical trials on the hierarchy of evidence that scientists typically consider when assessing general causation. (Causation Testimony Brief at 35-38; Gaziano Decl. at ¶¶ 26, 30.)

In her Opposition to the instant Motion, plaintiff does not attempt to redeem any of this scientifically inferior data. Instead, she simply cites more of it to the Court. Thus, she cites an animal study which acknowledges that whether Vioxx accelerates atherosclerosis is an unresolved "question," (Opp'n at 44);[29] she cites another animal study wherein the authors conclude that their data "may" be relevant to the cardiovascular effects of COX-2 inhibitors in humans but concede that "naproxen's cardioprotective effect . . . may be important in explaining" the results of the VIGOR study, (*id.*);[30] and she cites a basic science research article wherein the authors conclude that the suppression of prostacyclin by COX-2 inhibitors "may" elevate cardiovascular risk and then only during "extended dosing." (*Id.*)[31] For the reasons stated in Merck's Causation Testimony Brief, none of these studies provides a scientifically

---

[29] Kobayashi, et al., *Roles of Thromboxane A2 and Prostacyclin in the development of Atherosclerosis in apoE-deficient Mice*, J. CLIN. INVEST. 2004; 114:784-94.

[30] Cheng, FitzGerald, et al., *Role of Prostacyclin in the Cardiovascular Response to Thromboxane A2*, J. SCIENCE 2002; 296:539-41, at 541.

[31] Rudic, FitzGerald, et al., *Cox-2 Derived Prostacyclin Modulates Vascular Remodeling*, CIRC. RES. 2005; 96:1240-47.

790745v.1

reliable basis for a causation opinion under *Daubert*.[32]  (Causation Testimony Brief at 35-38.)

**C.    Plaintiff Cannot Establish Through Scientifically Reliable Expert Testimony The Mechanism Through Which Mr. Irvin's Short-Term Use Of Vioxx Supposedly Is Capable Of Causing Thrombotic Cardiovascular Events.**

What has been said above is sufficient to show that plaintiff's experts can point to no scientifically reliable evidence that the use of 25 mg Vioxx for less than a month – *i.e.*, the only dose and duration at issue here – is associated with an increased risk of thrombotic cardiovascular events.  Thus, plaintiff cannot establish general causation.  There is a second, independent reason why plaintiff cannot establish general causation: her experts cannot identify, to a reasonable degree of medical certainty, the mechanism by which Mr. Irvin's short-term use of Vioxx supposedly is capable of causing thrombotic cardiovascular events.

In her Opposition, plaintiff argues that "Merck confuses the issue of mechanism of action with biological plausibility."  (Opp'n at 38.)  According to plaintiff, she need not establish the "mechanism by which Vioxx causes cardiovascular events, only that it is plausible."  (*Id.* at 39.)  Plaintiff's argument proceeds from a false premise for two reasons.  First, the concepts of mechanism and biological plausibility are not "distinct," as plaintiff claims.  (Opp'n at 38.)  Indeed, biological plausibility "depends upon existing knowledge about *the mechanisms* by which the disease develops."  (Reference Manual on Scientific Evidence at 522 (emphasis added).)  Second, while plaintiff may wish it otherwise, the Fifth Circuit *requires* proof of mechanism in pharmaceutical and toxic tort cases.  That is the court's unequivocal holding in *Black v. Food Lion, Inc.*, 171 F.3d 308 (5th Cir. 1999):

---

[32] Plaintiff also cites several literature reviews and commentaries, which, by their vary nature, do not rise to the level even of basic science research.  (*See* Pl.'s Opp'n at 43-45 (*citing* the Jones, Fosslien and FitzGerald 2004 articles).  Thus, none of these articles has any bearing on the Court's *Daubert* analysis.  (Gaziano Decl. at ¶ 25-36; Fed. R. Evid. 702 (expert testimony admissible only if based on "sufficient facts or data").)

> *The underlying predicates of any cause-and-effect medical testimony are that medical science understands the physiological process by which a particular disease or syndrome develops and knows what factors cause the process to occur. Based on such predicate knowledge, it may then be possible to fasten legal liability for a person's disease or injury.*

*Id.* at 314 (emphasis added).  Courts in this circuit must – and do – follow the holding of *Black*.[33]

> *In this case, at best, Drs. Shell and Eckberg have discovered an agent, but not a cause.  They fail to identify the exact mechanism by which a person's QT interval can become permanently prolonged well after that person has ceased taking Propulsid. . . . They have theories but they have no proof to support those theories. . . . Under the prevailing logic of Daubert and Black, their testimony is unreliable.*

*Propulsid*, 261 F. Supp. 2d at 617 (emphasis added).  Courts in other circuits likewise follow *Black*.  *McClain*, 401 F.3d at 1253 (expert must offer a "reliable explanation of the physiological process by which [the agent] causes [the alleged harm]").

The rule announced in *Black* makes perfect sense.  Unless one knows *how* an agent can cause a disease, one cannot opine to a reasonable degree of medical certainty that the agent in fact *does* cause the disease.  That is especially true in cases where, as here, there is a lack of scientifically reliable evidence linking a pharmaceutical product to a particular injury when taken at a low dose over an exceptionally brief period of time.  *Accord In re: Phenylpropanolamine Prods. Liab. Litig.*, 289 F. Supp. 2d at 1247 ("'[n]ot knowing the mechanism whereby a particular agent causes a particular effect'" can be "'fatal to a plaintiff's claim'" where there is no "'sufficiently compelling proof that the agent must have caused the disease *somehow*'") (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1314 (9th Cir. 1995).  Thus, an

---

[33] Plaintiff does not cite a single decision from any court in the Fifth Circuit holding that *Black* does not apply to facts analogous to those here.  Instead, she cites decisions from courts in *other* jurisdictions.  None of these foreign decisions, however, can trump the Fifth Circuit's holding in *Black*.  Moreover, as explained above, two of the decisions cited by plaintiff – *In re: Phenylpropanolamine Products Liability Litigation* and *Daubert* – actually support Merck.  And a third – *Berry v. CSX Transportation, Inc.*, 709 So. 2d 552 (Fla. App. 1998) – is simply irrelevant, as it was decided under the *Frye* standard, which does not apply in Federal courts.

32

expert's mere assertion that he or she "knows" that Vioxx can cause sudden death is scientifically unreliable in the absence of an "explanation of why or how it happen[ed]." *Propulsid*, 261 F. Supp. 2d at 616.

In this case, plaintiff's experts propose four alternative and conflicting theories for how Mr. Irvin's short-term use of Vioxx supposedly could have, and in this case may have, caused his death: the prostacyclin/thromboxane imbalance theory; the vasospasm theory; the plaque rupture theory; and the acceleration of atherosclerosis theory. (Causation Testimony Brief at 39-40.) Merck has shown that none of these theories is based on scientifically reliable evidence. (*Id.* at 40-48.) Moreover, plaintiff has come forward with no evidence to the contrary.

### 1. Plaintiff's experts cannot establish the mechanism by which Vioxx supposedly has a thrombotic cardiovascular effect.

In its Causation Testimony Brief, Merck established four critical facts, all of which undermine the reliance of plaintiff's experts on the FitzGerald hypothesis, which assumes that Vioxx creates a prothrombotic state by reducing prostacyclin relative to thromboxane in the human vasculature: (1) plaintiff's experts are aware of *no* studies establishing that Vioxx does inhibit prostacyclin in the vasculature as opposed to other parts of the body; (2) on the other hand, there is evidence that the production of prostacyclin in the vasculature is associated with COX-1, not COX-2, which suggests that Vioxx, which does not inhibit COX-1, also does not inhibit prostacyclin in the vasculature; (3) plaintiff's experts have *no* evidence of the degree to which Vioxx supposedly upsets the balance between prostacyclin and thromboxane; and (4) they have *no* evidence regarding the level of prostacyclin inhibition that is necessary to achieve a clinically relevant result. (Causation Testimony Brief at 40-44.) Plaintiff does not and cannot dispute any of these facts. Nor does she dispute that the FDA considers the FitzGerald hypothesis to be speculative science. (April 6, 2005 FDA Memorandum at 8 ("*Taken together,*

33

*these observations raise serious questions about the so-called "COX-2 hypothesis," which suggests that COX-2 selectivity contributes to increased CV risk."*) (emphasis added).) In fact, plaintiff does not attempt even to explain Dr. FitzGerald's own speculative statements regarding his hypothesis that COX-2 inhibitors may be prothrombotic. (Causation Testimony Brief at 41.)

Instead, plaintiff relies on a handful of articles that prove nothing. For example, plaintiff relies on Protocol 023, which is the clinical trial conducted by Dr. FitzGerald and Merck researchers wherein it was observed that the urine of patients treated with Vioxx contained lower levels of a metabolite of prostacyclin than urine of patients on placebo. (Opp'n at 24-25.)[34] Protocol 023, however, does not help plaintiff. This study did not establish that Vioxx reduced prostacyclin levels in the human vasculature as opposed to elsewhere in the body, and her own expert admits as much.[35] (Causation Testimony Brief at 40-41; Gaziano Decl. at ¶ 42, 44-45; Burton Dep. at 81:18-82:3, 84:10-14.) Moreover, Dr. FitzGerald did not purport to detect a

---

[34] The results of Protocol 023 were published in May 1999. *See* Catella-Lawson et al., "Effects of Specific Inhibition of Cyclooxygenase-2 on Sodium Balance, Hemodynamics, and Vasoactive Eicosanoids," J. PHARM. AND EXP. THERP. 1999; 289:735–741.

[35] Plaintiff suggests that Dr. Oates, a Merck consultant, agreed in 1997 that the results of Protocol 023 were explained by a reduction of prostacyclin in the vasculature. (Pl.'s Opp'n at 23.) But plaintiff misquotes the document upon which she relies for that proposition. In that document, Dr. Oates states only that the results of Protocol 023 are probably not attributable *solely* to a reduction in renal prostacyclin. (Opp'n. at Ex. C.) That conclusion is fully consistent with animal studies which suggest that Vioxx-induced reduction of urinary prostacyclin metabolites may reflect reduced prostacyclin production in the lungs. (Merck's Science Brief at 13-14 & n. 19.) Significantly, Dr. Oates did *not* state that COX-2 inhibition reduces prostacyclin in the vasculature as opposed to elsewhere in the body – a proposition that, in fact, is refuted by animal studies finding that COX-1, rather than COX-2, is responsible for the production of prostacyclin in the vasculature. (Opp'n at Ex. C.; Merck's Science Brief at 8, 13; Gaziano Decl. at ¶ 44.) Moreover, the study that Dr. Oates proposed (Opp'n at 23, Ex. B), which he subsequently completed and published, sheds no additional light on the subject. That study merely replicated the results of Protocol 023, finding that COX-2 inhibition decreased prostacyclin metabolites in the urine. (*See* McAdam, B., Oates, J. et al., *Contribution of Cyclooxygenase-2 to Elevated Biosynthesis of Thromboxane A2 and Prostacyclin in Cigarette Smokers*, CIRCULATION 2005; 1024-29.)

thrombus in any clinical trial patient.[36]  Accordingly, Protocol 023 plainly does not prove that Vioxx has a "nearly immediate" thrombotic effect, as plaintiff claims.  (Opp'n at 25.)

Plaintiff also cites a 2004 commentary in which Dr. FitzGerald concluded only that the inhibition of prostacyclin "might" lead to thrombotic events.  (Opp'n at 44-45.)  But Dr. FitzGerald's commentary by its very nature does not constitute even basic science research and thus cannot support a causation opinion.  (Gaziano Decl. at ¶ 25-36; FED. R. EVID. 702 (expert testimony admissible only if based on "sufficient facts or data").)  Moreover, plaintiff's experts may not reasonably rely on Dr. FitzGerald's tentative conclusion, as it is speculative and thus inadmissible under *Daubert*.  *See, e.g., Moore*, 151 F.3d at 279.

Plaintiff also cites an article by Jones for the proposition that the inhibition of prostacyclin "purportedly" promotes thrombosis.  (Opp'n at 43.)  But the Jones article also states that "[p]hysiologic mechanisms other than the prostacyclin to thromboxane hypothesis may be acting as culprits."[37]  This article on its face does not establish the scientific reliability of the FitzGerald hypothesis.

Next, plaintiff cites the APPROVe study for the proposition that COX-2 inhibition "could increase the risk of cardiovascular disease" by reducing prostacyclin levels.  (Opp'n at 41.)  But this stray comment in a study that did not purport to evaluate whether Vioxx reduces prostacyclin levels in the human vasculature hardly constitutes proof that the FitzGerald hypothesis is correct.  In fact, the APPROVe study also notes that "predicting the consequences

---

[36] *See supra* n. 34.

[37] Jones, C., *Relative Thromboembolic Risks Associated with COX-2 Inhibitors*, ANNALS PHARMACOTHERAPY 2005: 39:1249-59, at 1257.

790745v.1

COX-2 inhibition on cardiovascular disease is not a straightforward proposition" and that COX-2 inhibitors may prevent atherosclerosis.[38]

Finally, in her briefs in opposition to Merck's expert-specific *Daubert* motions, plaintiff relies heavily on a document entitled "*Editor's Round Table: Cyclooxygenase-2 Inhibitors and Cardiovascular Risk.*" (*See, e.g.*, Pl.'s Response to Defendant's *Daubert* Motion re Bloor/Burton 11.) But again, this document does not establish that the FitzGerald hypothesis is scientifically reliable for purposes of *Daubert*. In fact, it establishes just the opposite. For example, one of the participants in the "round table discussion" observed that the FitzGerald hypothesis "can't be the entire explanation."[39] Another participant observed that: "The failure of aspirin to decrease this risk is one of the biggest issues working against the concept that this is just a prothrombotic event. If thrombosis were the right explanation, it should be reversible with aspirin."[40] And yet another observed that "[t]here is so much variation among the studies that *the mechanism remains open to discussion.*"[41]

Based on the foregoing, plaintiff's experts have not established that the FitzGerald hypothesis is scientifically reliable. The Court can and should preclude them from relying on this speculative hypothesis. *See, e.g.*, *Moore*, 151 F.3d at 279; *Black*, 171 F.3d at 313; *Propulsid*, 261 F. Supp. 2d at 616.

### 2.   *Plaintiff's experts cannot establish the mechanism by which Vioxx supposedly causes vasospasms.*

Plaintiff apparently has given up on her vasospasm theory. In her voluminous briefing in

---

[38] Bresalier, R.S., et al., *Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial*, 352 NEW. ENG. J. MED. 2005: 352:1092-1102, 1093.

[39] Bresalier, R., et al., *Editor's Round Table: Cyclooxygenase-2 Inhibitors and Cardiovascular Risk*, AM. J. CARD. 2005 (on-line version) at 8.

[40] *Id.*

[41] *Id.* (emphasis added.)

opposition to Merck's *Daubert* motions, plaintiff *nowhere* seeks to defend this theory, nor does she even acknowledge it.  Moreover, as explained in Merck's Causation Testimony Brief, the theory has no legs.  There never has been a single study in humans that has found an association between Vioxx and vasospasms.  And plaintiff's own experts concede that there is *no* evidence that Vioxx increases the risk of vasospasm.  (Causation Testimony Brief at 44-46.)  Plaintiff's vasospasm theory is thus entirely speculative and cannot support a scientifically reliable causation opinion under *Daubert*.  *See, e.g., Moore*, 151 F.3d at 279; *Black*, 171 F.3d at 313; *Propulsid*, 261 F. Supp. 2d at 616.

### 3.    *Plaintiff's experts cannot establish the mechanism by which Vioxx supposedly causes plaque ruptures.*

Nor can plaintiff be allowed to present evidence on a plaque rupture theory.  According to plaintiff, none of her experts intends to opine that Mr. Irvin had a plaque rupture.  (Opp'n to Merck's *Daubert* Motion re Bloor/Burton at 20, 23.)  Plaintiff's contention belies the record, because her own expert, Dr. Burton, testified unequivocally that Mr. Irvin in fact *did* have a ruptured plaque.  (Burton Dep. at 180:7-13 ("Q:  Now Mr. Irvin showed signs of a ruptured plaque, correct?  A:  Yes.")  But regardless of Dr. Burton's testimony, plaintiff's *contention* that Mr. Irvin did not have a plaque rupture precludes the admission of any expert testimony that Vioxx is capable of causing such events.  After all, testimony that an agent can cause an injury that is *not* alleged to be at issue is not relevant to proving that the agent can cause a different type of injury that *is* at issue.  *See, e.g., McClain*, 401 F.3d at 1445-46 (excluding expert testimony that drug caused plaintiffs' ischemic strokes where testimony was based on data suggesting that different drug may cause hemorrhagic strokes); *Rider*, 295 F.3d at 1202 ("Evidence . . . suggest[ing] that [a chemical] may cause ischemic stroke does not apply to situations involving hemorrhagic stroke.  This is 'a leap of faith' supported by little more than the fact that both

790745v.1

conditions are commonly called strokes.").

Putting aside plaintiff's contention that Mr. Irvin did not have a plaque rupture, Merck established in its Causation Testimony Brief that plaintiff has no scientifically reliable evidence that Vioxx causes plaque ruptures. (Causation Testimony Brief at 46-47.) In fact, her own experts *admit* that this theory is speculative and that they are unaware of any studies showing that Vioxx increases the risk of plaque rupture. (*Id.*; *see also* October 18, 2005 Deposition of Benedict R. Lucchesi, M.D., Ph.D., M.S., F.A.H.A., ("Lucchesi 10/18/05 Dep.") at 331:21-332:6, attached as Ex. 10 to Wittmann Decl.) Plaintiff cannot redeem her experts' admitted lack of scientific support by citing to a stray comment from the APPROVe study to the effect that COX-2 inhibition "may" lead to the destabilization of atheromatous plaque. (Opp'n at 41.) Moreover, the authors of the APPROVe study relied on a single animal study for that tentative statement.[42] In that animal study, the authors stated only that their data "suggest" that COX-2 inhibition "may" lead to plaque destabilization.[43] Significantly, this observation was based *not* on the administration of Vioxx alone, but on the *concurrent* administration of Vioxx and a thromboxane receptor antagonist – a therapy regime not at issue in this case.[44] In addition, the authors noted that atherosclerotic plaques behave differently in mice than in humans.[45] For all of these reasons, this animal study plainly provides an insufficient basis upon which to base a scientifically reliable causation opinion. In fact, animal data occupies the bottom rung on the hierarchy of scientific evidence. (Gaziano Decl. at ¶ 26.) When confronted with questions of

---

[42] Bresalier, R.S. et al., *Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial*, 352 NEW. ENG. J. MED. 2005: 352:1092-1102, 1099 & n. 12.

[43] Egan, K., *Cyclooxygenases, Thromboxane, and Atherosclerosis: Plaque Destabilization by Cyclooxygenase-2 Inhibition Combined with Thromboxane Receptor Antagonism*, CIRCULATION 2005: 111:334-42, at 341.

[44] *Id.* at 334.

[45] *Id.* at 339.

toxicity, the Fifth Circuit has held that animal studies have "very limited usefulness." *Brock*, 874

F.2d at 313 (rejecting animal studies given high doses involved and difficulty extrapolating

results to humans); *Allen*, 102 F.3d at 195, 197-98 & n.5 (excluding expert opinion based in part

on "inconclusive" and "unreliable" animal studies); *Gulf S. Insulation*, 701 F.2d at 1146.

Based on the foregoing, any opinion by plaintiff's experts that Vioxx can cause plaque

ruptures would amount to nothing more than *ipse dixit*, which this Court need not and should not

accept. *Propulsid*, 261 F. Supp. 2d at 616.

### 4.      *Plaintiff's experts cannot establish the mechanism by which Vioxx supposedly accelerates atherosclerosis.*

Finally, plaintiff's atherosclerosis acceleration theory fails.  Merck has established that

this theory, like plaintiff's other theories, is speculative in the extreme.  (Causation Testimony

Brief at 47-48.)  Indeed, Dr. Lucchesi reluctantly admitted that "[t]he theory is that, just theory."

(Lucchesi 10/18/05 Dep. at 318:14-23.)  Based on Dr. Lucchesi's admission alone, the Court can

and should exclude any testimony regarding this theory.  *Propulsid*, 261 F. Supp. 2d at 616

(excluding expert testimony that amounts to "mere theory").  Moreover, Dr. Lucchesi admitted

that this theory is based on studies performed in test tubes, not in humans or even animals, and

that he has "never seen a peer-reviewed piece of medical literature that demonstrates that [any]

selective COX-2 inhibitor [including Vioxx] accelerates the formation of plaque in a coronary

artery."  (*Id.* at 307:6-308:13, 314:20-315:1, 315:19-316:10, 320:1-321:18.)  The Court should

exclude any testimony regarding plaintiff's acceleration of atherosclerosis theory for these

additional reasons.  *See, e.g., Black*, 171 F.3d at 313 (courts should consider whether studies

have been peer-reviewed); *Allen*, 102 F.3d at 198 (*in vitro* studies showing that a drug may have

an adverse effect are "the beginning, not the end of the scientific inquiry and prove[] nothing

about causation without other scientific evidence"); *Richardson*, 857 F.2d at 830; *Cerna*, 815 So.

2d at 656.

Plaintiff has not come forward with any convincing argument for why the Court should accept this theory. While she cites a 2004 commentary by FitzGerald and a 2005 literature review by Fosslien for the proposition that COX-2 inhibition "might" accelerate atherosclerosis (*see* Opp'n at 44-45), these articles do not constitute even basic science research and thus lend no support to plaintiff. (Gaziano Decl. at ¶ 25-36; FED. R. EVID. 702 (expert testimony admissible only if based on "sufficient facts or data").)

***

Based on the foregoing, plaintiff's experts have not identified any mechanism by which Mr. Irvin's short-term use of Vioxx supposedly can cause sudden cardiac death. Plaintiff's experts cannot establish general causation premised on a hypothesized mechanism. Accordingly, the Court should exclude their speculative causation opinions. *Black*, 171 F.3d at 314; *McClain*, 401 F.3d at 1253; *Propulsid*, 261 F. Supp. 2d at 617. As Judge Posner stated in *Rosen*: "[T]he courtroom is not the place for scientific guesswork, even of the inspired sort. Law lags science; it does not lead it." 78 F.3d at 319.

## III.   PLAINTIFF'S EXPERTS CANNOT ESTABLISH SPECIFIC CAUSATION UNDER ANY THEORY.

As explained above, plaintiff's experts cannot establish general causation under any theory. Because proof of general causation is a prerequisite to the admissibility of expert testimony on specific causation (*see supra* at 4) – a point that plaintiff does *not* dispute in her Opposition – the Court can and should exclude any and all testimony from plaintiff's experts that Vioxx somehow caused Mr. Irvin's death. But even assuming that plaintiff's experts somehow could establish general causation, they still cannot establish specific causation for two reasons.

First, plaintiff's experts cannot opine to a reasonable degree of medical certainty that, in

this case, Vioxx in fact caused Mr. Irvin's sudden death by triggering a thrombus, a vasospasm or a plaque rupture or by accelerating his atherosclerotic disease. With respect to each of these hypothesized mechanisms, their testimony is purely speculative and is thus unreliable, irrelevant and inadmissible. Second, plaintiff's experts cannot rule out other possible explanations for Mr. Irvin's sudden death – as they *must* under binding Fifth Circuit precedent.

A.     **Plaintiff's Experts Cannot Opine to a Reasonable Degree of Medical Certainty That Vioxx Caused Mr. Irvin's Sudden Death Under Any Theory.**

As explained above, plaintiff's experts advance alternative and competing theories for how Vioxx supposedly may have caused or contributed to Mr. Irvin's death. That they advance so many inconsistent theories only proves their inability to identify – to a reasonable degree of medical *certainty* – the "specific train of medical *evidence*" by which Vioxx supposedly led to Mr. Irvin's death. *Black*, 171 F.3d at 314. In short, the theories of plaintiff's experts "are based on unproven assumptions and improper scientific methodology" and thus fail the test for admissibility under *Daubert* and the Federal Rules of Evidence. *Propulsid*, 261 F. Supp. 2d at 618.

1.     *The thrombus theory is scientifically unreliable.*

In its opening brief, Merck established the following facts: (1) a thrombus supposedly caused by Vioxx would be indistinguishable from one caused through other means; (2) a thrombus can form even in the absence of an imbalance in prostacyclin and thromboxane; (3) plaintiff's experts have *no* data regarding the level of imbalance needed to cause a clinically relevant thrombus; and (4) they have *no* knowledge regarding the relative levels of prostacyclin or thromboxane in Mr. Irvin's vasculature either before or after he began taking Vioxx. (Causation Testimony Brief at 50-52.) Plaintiff does not and cannot dispute any of these facts. (*See*, *e.g.*, Pl.'s Opp'n to Merck's Motion to Exclude Testimony of Benedict R. Lucchesi at 13.)

41

It is plain, therefore, that her experts cannot establish a "specific train of medical *evidence*" linking Vioxx to the thrombus in Mr. Irvin's left anterior descending coronary artery. *Black*, 171 F.3d at 314; *see also Propulsid*, 261 F. Supp. 2d at 617-18 ("Further, no tests show [plaintiff's] QTc intervals before taking Propulsid. . . . The experts have no baseline on which to rely. To properly show causation in this case, the experts must demonstrate that Brock did not suffer from a prolonged QT prior to taking Propulsid."). The Court can and should exclude any testimony that Mr. Irvin's brief use of Vioxx may have caused the thrombus that led to his sudden cardiac death.

### 2.    The vasospasm theory is scientifically unreliable.

Nor can plaintiff's experts establish to a reasonable degree of medical certainty that Vioxx caused a vasospasm, which, in turn, led to Mr. Irvin's death. As Merck has established, plaintiff's experts (1) cannot even agree whether a vasospasm is a likely cause of Mr. Irvin's sudden death; (2) admit that it is impossible to determine from an autopsy whether someone had a vasospasm; (3) admit they have no evidence that Mr. Irvin had a vasospasm, let alone that Vioxx caused one; and (4) concede that "[t]here's no way to know" if Mr. Irvin had a vasospasm. (Causation Testimony Brief at 53-54; Burton Dep. at 167:10-22, 178:8-11, 187:3-8.) Again, plaintiff does not dispute any of these facts. Instead, she argues that because her experts have no evidence that Mr. Irvin had a vasospasm, the Court should allow her experts to testify that Mr. Irvin in fact may have had one. (Pl.'s Opp'n to Merck's Motion to Exclude Testimony of Colin M. Bloor and Joseph L. Burton at 14.) Plaintiff's argument is not good enough even to be frivolous. This Court can and should reject such speculative reasoning. *See, e.g.*, *Moore*, 151 F.3d at 279; *Black*, 171 F.3d at 313; *Propulsid*, 261 F. Supp. 2d at 616.

### 3.    The plaque rupture theory is scientifically unreliable.

Nor can plaintiff be allowed to present evidence that Vioxx caused a plaque to rupture in

Mr. Irvin's coronary arteries.  As explained above, plaintiff has taken the position that none of her experts intends to opine that Mr. Irvin had a plaque rupture.  (Pl.'s Opp'n to Merck's Motion to Exclude Testimony of Colin M. Bloor and Joseph L. Burton at 20, 23.)  Because plaintiff contends that Mr. Irvin did not have a plaque rupture, the Court should not allow her to present testimony that Vioxx caused a plaque rupture in this case.  Any such testimony would not be relevant to proving that Vioxx somehow caused Mr. Irvin's death through some other means.  *See, e.g., McClain*, 401 F.3d at 1445-46; *Rider*, 295 F.3d at 1202.

Even if plaintiff did not contend that Mr. Irvin did not have a plaque rupture, she still would have no basis to present expert testimony that Vioxx caused one here.  As Dr. Burton acknowledged in his deposition, he cannot testify that Vioxx caused or contributed to Mr. Irvin's plaque rupture.  (Burton Dep. at 294:19-295:13.)  In fact, he concedes that something "besides Vioxx" was responsible for its occurrence.  *Id.* at 220:9-221:22 ("So I don't know what the other factor is, but I'm assuming there's some other factor there.").  According to Dr. Burton, the "most likely" cause of Mr. Irvin's ruptured plaque is a vasospasm or vasoconstriction, conditions that he admits are not even linked to Vioxx by any reliable scientific evidence.  (*Id.* at 131:13-17, 168:13-20, 170:15-20, 176:25-177:12, 215:2-11, 237:3-14.)  In addition, Dr. Burton concedes that Mr. Irvin's plaque had a number of well-established characteristics that predisposed it to rupture, including a lipid-rich core and moderate calcification.  (*Id.* at 232:19-233:18.)  Again, plaintiff does not dispute any of these facts.

Plaintiff's plaque rupture theory suffers from the same flaws as her thrombus and vasospasm theories.  It is wholly speculative and not supported by the facts.  Pursuant to *Daubert*, this Court thus should exclude any expert testimony that Mr. Irvin's short-term use of Vioxx caused a coronary plaque rupture.  *Moore*, 151 F.3d at 275; *Propulsid*, 261 F. Supp. 2d at

43

605.

### 4.    *The atherosclerosis acceleration theory is scientifically unreliable.*

Finally, plaintiff's atherosclerosis acceleration theory also fails.  Plaintiff does not dispute

that there is *no* data available as to when Mr. Irvin's atherosclerosis began to form or at what rate

it accumulated, either prior to or after he began taking Vioxx.  It is axiomatic that with no

baseline, it is impossible to judge acceleration, if indeed it occurred, at a single point in time.

*Propulsid*, 261 F. Supp. 2d at 617-18  ("The experts' bald assertion that cisapride caused Brock's

prolonged QT interval lacks any reliability because the experts themselves cannot show that

Brock did not have the condition before taking Propulsid.  The experts have no baseline on

which to rely.  To properly show causation in this case, the experts must demonstrate that Brock

did not suffer from a prolonged QT prior to taking Propulsid.").

Nor can plaintiff dispute the conclusions of her own experts, who agree that Mr. Irvin's

atherosclerosis developed over a period of years and who likewise admit that his exceedingly

brief Vioxx usage did *not* contribute to his coronary artery disease.  (Baldwin Dep. at 138:15-18

("Q:  . . . Do you have any reason to opine that Vioxx contributed to the plaque formation of Mr.

Irvin? A:  I don't."); Deposition of Colin M. Bloor, M.D., ("Bloor Dep.") at 77:8-15, attached as

Ex. 3 to Wittmann Decl. (confirming that "Mr. Irvin's atherosclerosis developed over a period of

many years"); Burton Dep. at 196:3-20, 234:19-22 ("Q:  Would you agree with me that Vioxx

did not contribute to the formation of the plaque in Mr. Irvin?  A:  I would."); Expert Report of

Colin M. Bloor ("Bloor Report") at ¶¶ 27, 37, attached as Ex. 31 to Wittmann 10/21/05 Decl.

("Atherosclerosis is a disease process requiring typically decades to develop, typically beginning

in childhood. . . . Richard Irvin had *pre-existing* coronary artery disease as evidenced by the

moderate to severe stages of atheroma development in his major coronary arteries . . . .")

(emphasis added).)

Inexplicably, plaintiff claims Dr. Lucchesi testified that Vioxx "more likely than not" contributed to the formation of Mr. Irvin's plaque. (Opp'n to Merck's Motion to Exclude Testimony of Benedict R. Lucchesi at 17-18.)   Plaintiff completely mischaracterizes Dr. Lucchesi's testimony. At his deposition, Dr. Lucchesi was asked whether Mr. Irvin would have developed a thrombus in response to a plaque rupture regardless of his brief Vioxx use. (Lucchesi 10/18/05 Dep. at 337:5-13.) In response to *that* question, Dr. Lucchesi testified that, in his opinion, Vioxx "more likely than not" played a contributory role. (*Id.*) Dr. Lucchesi's testimony on this point constitutes inadmissible *ipse dixit* given the undisputed facts in this case. (*See supra* at 37-38, 42-43)   More importantly, it has *nothing* to do with whether Vioxx supposedly contributed to the formation of Mr. Irvin's atherosclerotic plaque. As to that issue, Dr. Lucchesi's testimony is clear. While he "suspects" that Vioxx may have contributed to Mr. Irvin's plaque formation, he concedes that this is only a "possibility" and that he "can't prove [his] point." (Lucchesi 10/18/05 Dep. at 317:5-17, 321:20-23, 322:7-16.) Dr. Lucchesi's "suspicions" do not rise to the level of reasonable medical certainty that is needed to establish specific causation. *Moore*, 151 F.3d at 279; *Gooding*, 445 So. 2d at 1018. His testimony is thus inadmissible and the Court must exclude it.

**B.      Plaintiff's Experts Cannot Rule Out Other Possible Causes of Mr. Irvin's Death.**

What has been said above shows that plaintiff cannot identify the "specific train of medical *evidence*" by which Vioxx supposedly led to Mr. Irvin's death and thus cannot establish specific causation. *Black*, 171 F.3d at 314. Plaintiff also cannot establish specific causation for another, independent reason:  she cannot rule out other possible causes of Mr. Irvin's sudden cardiac death.

While plaintiff would have it otherwise, binding Fifth Circuit precedent *requires* that her

45

experts rule out possible alternative causes of Mr. Irvin's sudden cardiac death before their opinions can be admitted. *Moore v. Ashland Chem. Inc.*, 151 F.3d at 283 (excluding testimony of expert who failed to rule out alternative causes of plaintiff's condition); *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987) (excluding testimony of expert who failed to rule out alternative causes and, instead, "simply pick[ed] the cause that is most advantageous to [plaintiff's] claim"); *see also Propulsid*, 261 F. Supp. 2d at 618 (excluding experts' opinions because experts "cannot show that Propulsid caused Brock's symptoms, as they have failed to exclude other possible symptoms"). Plaintiff cannot evade this requirement by arguing that Vioxx need not be the *sole* cause of Mr. Irvin's death. (Opp'n at 19-20.) Instead, her experts must explain why Mr. Irvin's death is not attributable to causes other than his brief use of Vioxx.

Contrary to plaintiff's suggestion, Merck has not taken the position that plaintiff's experts must rule out every conceivable alternative cause, no matter how unlikely. (Opp'n at 19.) At a minimum, however, they must rule out Mr. Irvin's pre-existing cardiovascular disease, which both sides agree is *the leading cause* of death in the United States. They also must rule out other possible causes that *they* contend may explain Mr. Irvin's death. Plaintiff's experts have done neither.[46] Nor can they in light of the near complete absence of information regarding Mr. Irvin's medical history. (Causation Testimony Brief at 57-58.) Accordingly, their opinions are scientifically unreliable and inadmissible under *Daubert*.

---

[46] According to plaintiff, Merck supposedly conceded that her experts negated other causes by conducting a differential diagnosis. (Opp'n at 15.) Merck conceded no such thing. Instead, Merck simply noted that, even if it could be *assumed* that plaintiff's experts conducted a differential diagnosis, any differential diagnosis would not be sufficient to prove causation. (Causation Testimony Brief at 56-57.) As Merck explained, a differential diagnosis allows a doctor to eliminate the possibility that a plaintiff suffers from other potential *conditions*; it does *not* allow a physician to establish cause. (*Id.* at 56 & n.27.)

790745v.1

### 1.    Plaintiff's experts cannot rule out that Mr. Irvin's severe atherosclerosis was the sole cause of his death.

The American Heart Association estimates that 70 million people in the United States suffer from some form of cardiovascular disease. (Gaziano Decl. at ¶ 24.)  Cardiovascular disease is *the leading cause of death in the United States*, accounting for two out of every five deaths, and also is the leading cause of death for Caucasian males in their '50s, like Mr. Irvin. *Id.*; (Burton Dep. at 159:24-160:1.)  In fact, every minute of every day, someone will die in this country from an adverse cardiac event. (Gaziano Decl. at ¶ 24.)

According to plaintiff's experts, the most common form of heart disease in Western countries is coronary artery disease secondary to atherosclerosis. (Bloor Report at ¶ 21; Bloor Dep. at 30:25-31:8.)  In fact, over 90% of all heart disease is caused by atherosclerosis. (Farquhar Report at ¶ 40.)  Moreover, every year, anywhere from 300,000 to 400,000 people die from sudden cardiac death. (Bloor Report at ¶ 25; April 25, 2005 Deposition of Benedict R. Lucchesi, M.D., Ph.D., M.S., F.A.H.A., ("Lucchesi 4/25/05 Dep.") at 43:8-10, attached as Ex. 11 to Wittmann Decl.)  Of these individuals, a "significant number" never have had any previous cardiac symptoms. (Lucchesi 4/25/05 Dep. at 43:12-16.)

Plaintiff tries to downplay the extent of Mr. Irvin's atherosclerosis by suggesting that it was only "moderate." (Opp'n to Merck's Motion to Exclude Testimony of Benedict R. Lucchesi at 16-17.)  But plaintiff's *own* pathology expert agrees that, based on the autopsy report, Mr. Irvin had long-standing cardiovascular disease, evidenced by *moderate to severe* atherosclerotic plaque in multiple coronary arteries.[47]   (Bloor Depo. at 77: 4-7; Bloor Report at ¶ 37.)  The

---

[47] As explained in Merck's Causation Testimony Brief and above, plaintiff's experts concede that Mr. Irvin's short-term use of Vioxx was unrelated to his coronary artery disease and that his atherosclerosis is consistent with the many risk factors that he had for the disease. (Causation Testimony Brief at 9-12, 60-61; *see supra* at 43-45.)  Given the high background rate of sudden

microscopic slides from the autopsy reveal that he also had a 60% to 70% occlusion in his left anterior descending coronary artery. (Autopsy Rpt., attached as Ex. 44 to Wittmann 10/21/05 Decl.; Wheeler Decl. at ¶ 2 & Ex. A at 2.) According to plaintiff's experts, the left anterior descending coronary artery is associated with a "high" incidence of sudden cardiac death in the general population and especially in men. (Lucchesi 4/25/05 Dep. at 49:20-50:21; Bloor Dep. at 56:14-25.) Moreover, the degree of occlusion in Mr. Irvin's left anterior descending coronary artery is significant because, as Dr. Farquhar acknowledges, an occlusion of as little as 50% can lead to a sudden loss of essential blood flow to the heart. (Farquhar Report at ¶ 42.) Where, as here, an individual has an occlusion of 60% to 70%, death is not uncommon. Indeed, Dr. Burton concedes that "thousands" of individuals with Mr. Irvin's disease profile likely die every year from sudden cardiac death. (Burton Dep. at 228:25-229:13.)

In addition, after examining the microscopic slides from the autopsy, experts for *both* plaintiff *and* Merck agree that the thrombus in Mr. Irvin's left anterior descending coronary artery was located at the site of a ruptured plaque. (*Compare* Burton Dep. at 180:7-13 *and* Gandy Dep. at 167:11-15, 200:17-21 *with* Wheeler Decl. at ¶ 2 & Ex. A at 2 *and* Gaziano Decl. at ¶ 7.) Plaintiff cannot explain away Dr. Burton's testimony on this critical point as an "inartful description." (Pl.'s Opp'n to Merck's Motion to Exclude Testimony of Colin M. Bloor and Joseph L. Burton at 23.) His testimony is unequivocal and it is fatal to plaintiff's case. According to Dr. Bloor, approximately 70% of acute ischemic events – *i.e.*, sudden decreases or loss of blood flow to a portion of the heart – are caused by a rupture of atherosclerotic plaque, which then triggers the formation of a thrombus. (Bloor Report at ¶ 28.) In other words, in cases such as this, the formation of a thrombus is a *natural* response to ruptured plaque. (*Id.* at ¶¶ 29-

_____

cardiac death in individuals with Mr. Irvin's disease profile, there can be no dispute that Mr. Irvin's atherosclerosis and many risk factors presented a serious health risk.

30.) Moreover, plaintiff's experts cannot reliably opine that Mr. Irvin's short-term use of Vioxx contributed in any substantial manner to the formation of his naturally occurring thrombus because, as explained above, they have literally *no* evidence regarding how much of an imbalance in prostacyclin and thromboxane it supposedly would take to cause a clinical event or whether Mr. Irvin had such an imbalance prior to his death. (*See supra* at 33-36, 41; *see also* Causation Testimony Brief at 40-44, 50-52.).

Under these circumstances, plaintiff's experts cannot reliably opine that Mr. Irvin's unfortunate death was attributable to anything other than his pre-existing cardiovascular disease, which, as explained above, is *the leading cause* of death in the United States. Plaintiff's experts simply ignore that Mr. Irvin's long-standing atherosclerosis and ruptured plaque provide a more plausible explanation for his sudden cardiac death than his short-term use of Vioxx. Their causation opinions are thus speculative and unreliable and fail the test of *Daubert*. The Court should exclude them. *See, e.g., Moore*, 151 F.3d at 279; *Viterbo*, 826 F.2d at 424; *Propulsid*, 261 F. Supp. 2d at 618.

### 2.    *Plaintiff's experts cannot rule out the possibility that Mr. Irvin's sudden cardiac death resulted from a vasospasm unrelated to Vioxx.*

In addition, although plaintiff's experts cannot reliably testify, to a reasonable degree of medical certainty, that Mr. Irvin in fact experienced a vasospasm or that Vioxx caused one (*see supra* at 36, 42), they also cannot rule out the possibility that the thrombus in Mr. Irvin's left anterior descending coronary artery resulted from a vasospasm unrelated to Vioxx. Indeed, plaintiff's *own* pathology experts, Drs. Burton and Bloor, concede that a vasospasm may have triggered Mr. Irvin's thrombus. (Bloor Dep. at 105:14-107:4; Burton Dep. at 129:22-130:1, 165:16-166:23.) In fact, according to Dr. Burton, tens of thousands of patients die every year from vasospasm-induced thrombi, and in the majority of these cases there is no known cause of

49

the vasospasm. (Burton Dep. at 185:20-186:14.) Given the very real possibility – acknowledged by plaintiff's own experts – that a vasospasm of unknown etiology caused Mr. Irvin's thrombus, plaintiff's experts cannot reliably testify that Vioxx caused his death. Plaintiff failed even to acknowledge this issue in her Opposition.

## IV.    CONCLUSION.

For the forgoing reasons, Merck respectfully requests that the Court grant its motion to exclude testimony of plaintiff's experts regarding causation in its entirety.

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130-3588
Phone:  504-581-3200
Fax:     504-581-3361

Defendants' Liaison Counsel

790745v.1

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:      312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone: (202) 434-5000
Fax:    (202) 434-5029

And

John H. Beisner
Charles C. Lifland
Richard B. Goetz
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone: (213) 430-6000
Fax:      (213) 430-6407

Attorneys for Merck & Co., Inc.

790745v.1

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Reply Memorandum in Support of Motion of Merck & Co., Inc. to Exclude Evidence of Plaintiff's Experts Regarding Causation has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 9th day of November, 2005.

_Dorothy H. Wimberly_

790745v.1