UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| Evelyn Irvin Plunkett v. Merck & Co, Inc. | * | CASE NO. 02:05CV4046 |

**Plaintiff's Memorandum in Opposition to Defendant's Motion in Limine to Exclude Evidence or Argument Pertaining to Conduct with No Nexus to Issues Being Tried in this Case**

*(Plaintiff's Opposition to Defendant's Motion in Limine No. 3)*

Plaintiff, Evelyn Irvin Plunkett, hereby opposes Defendant's Motion in Limine to exclude evidence pertaining to out of state conduct allegedly unrelated to Mr. Richard Irvin, Jr., or his prescribing physicians. The evidence Merck seeks to exclude is relevant and admissible at the trial of this case. Merck's arguments that this evidence is unduly prejudicial, and that its admission will result in the need for "mini-trials," have no basis in law or fact. As such, its motion is due to be denied.

## ARGUMENT

I. **EVIDENCE PERTAINING TO MERCK'S NOTICE OF, AND RESPONSE TO PHYSICIAN'S CONCERNS ABOUT THE SAFETY OF VIOXX AND THEIR PERCEPTION THAT MERCK WAS NOT DISCLOSING RELEVANT DATA**

In its motion papers, Merck seeks to exclude a number of highly relevant documents that pertain to Merck's practice of "neutralizing" or silencing those who criticized the drugs and which demonstrate that Merck was on notice of physicians concerns regarding both the

cardiovascular safety of the drug and their perception that Merck had failed to disclose relevant safety data.

At issue is a letter from Dr. James Fries ("Fries letter"), a California physician and professor at Stanford University's School of Medicine, to then-Merck CEO, Raymond V. Gilmartin. *See* P. 1.0176 (Ex. A). The letter expresses Dr. Fries' concerns that Merck is failing to disclose Vioxx safety data and is attacking academics that question the drug's safety. *See id.* at 4. Similarly, the author relates his impressions of a telephone call with a Merck employee, Dr. Louis Sherwood, during which Dr. Fries felt threatened and intimidated. *See id.* at 1-3. Additionally, Dr. Fries reported the results of his own investigation into Merck's conduct, through which he learned of similar incidents that were reported to him by other academics. *See id.*

Merck also seeks to exclude evidence concerning litigation Merck brought in Spain, against the publisher of a Spanish drug bulletin that had criticized the safety of the drug and Merck's handling of the data from its VIGOR trial. *See* P. 1.0368 (Ex. B). Merck lost the lawsuit after the Spanish Court concluded that the information contained in the bulletin was accurate and supported by other articles published in well-known, peer-reviewed journals, *The Lancet* and *The British Medical Journal*.

These documents are highly relevant to Plaintiff's claims that Merck failed to disclose or sought to minimize known cardiovascular risks associated with Vioxx. Further, the documents also concern Plaintiff's claims that Merck engaged in conduct violative of Louisiana's Protection Act. Moreover, the documents support Plaintiff's allegations that Merck executives—after having learned of Dr. Fries' allegations—failed to take any steps in response.

### A. The Fries Letter Should Be Admitted Because it Is Not Hearsay or in the Alternative Is Admissible under an Hearsay Exception

The Fries letter is not hearsay because Plaintiff offers it to show that: a) Defendant had notice that Dr. Fries had safety concerns and perceived Merck as reluctant to disclose negative safety data, and b) that he felt threatened and intimidated by a senior Merck employee. The same is true of Dr. Fries' description of his investigation into similar conduct relating to other physicians and academics who questioned the safety of Vioxx. Regardless of whether the concerns of these physicians were baseless—as Merck now suggests—the letter is admissible because it put Merck on notice that physicians were worried about the lack of information the company was providing about the safety of Vioxx and that the conduct of its employees was largely perceived as threatening.

Even if the Fries letter is hearsay—and Plaintiff does not concede that it is—it is admissible under the business record exception to the hearsay rule because it is a record of regularly conducted activity. Fed.R.Evid. 803(6). On its face, the letter was written at or near the time of observation, by a person with actual knowledge. The letter is written on the letterhead of Dr. Fries' place of employment, Stanford University and, as such, bears the indicia of correspondence regularly written and maintained in the academic, medical community. Contrary to Merck's claim, Dr. Fries mentions by name the physicians with whom he has spoken. Plainly, the letter is trustworthy, comes from a credible source, and was not written in anticipation of litigation. Indeed, in support of its claims that the Fries letter is confidential, Merck has previously submitted an affidavit from Dr. Fries that attested to the fact that he wrote the letter with the intention that Merck would be on notice of his concerns and respond accordingly.

Moreover, it is inconsistent for Merck to argue that the letter is inadmissible because Dr. Fries is an untrustworthy author, while at the same time complaining that he will unduly prejudice the company because he comes from such a well-known and respected medical institution. Based upon the foregoing, the Fries letter is admissible as an exception to the hearsay rule under Fed.R.Evid. 803(6).

### B. Evidence Regarding "Attacks" Or Similar Conduct By Merck Employees Should be Admitted Because It Is Relevant

Merck claims that both the Fries letter and the newspaper articles are irrelevant if offered to show that Merck was "attacking" critics of its drug, Vioxx. In making this argument, Merck fails to disclose the full nature of the documents. First, the Fries letters is a four-page document which makes no mention of "attacks" by Merck employees until the last page. The letter is primarily devoted to alerting Merck of the serious concerns Dr. Fries and other notable research physicians have about the company's disclosure of Vioxx clinical data. The letter gives specific examples regarding the lack of information Merck has provided about the safety of Vioxx, following the VIGOR study, and explains that several investigators and speakers have felt harassed by Merck employees when they raised safety concerns with respect to the drug.

The search for truth is fundamental to the U.S. system of justice. *Latiolais v. Whitley*, 93 F.3d 205, 207 (5th Cir. 1996). "An essential correlative to that end is the proposition that all evidence relevant to the issues in controversy be admitted, unless its admission would transgress some *paramount* policy of society and the law." *Reilley v. Keswani*, 137 N.J. Super. 553 (App. Div. 1975) (emphasis added). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Campbell v. Keystone Aerial Surveys, Inc.*, 138 F.3d 996, 1004 (5th Cir. 1998); *U.S. v. Chavful*, 100 Fed.Appx. 226, 231 (5th Cir. 2004); Fed.R.Evid. 401.

4

"Thus, if probative of *any* fact that is of consequence to the determination of the action, evidence is relevant within the meaning of the Federal Rules, and is therefore admissible." *Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.*, 630 F.2d 250, 267 (5th Cir. 1980) (internal quotation omitted) (emphasis added). To say that evidence is irrelevant in the sense that it lacks probative value therefore means that it does not justify *any* reasonable inference as to the fact in question. *See* McCormick on Evidence, § 185 at 544 (3ed.1984) (emphasis added). Conversely, if evidence does support the existence of a specific fact, even obliquely, it is relevant.

Whether Mr. Irvin and his physicians read certain letters or newspaper articles is not the issue; rather, the question is whether Merck had a duty to warn people like Mr. Irvin and his physician, whether Merck knew the safety information was not reaching its target audience, *see Walls v. Armour Pharmaceutical Co.*, 832 F.Supp. 1467, 1484-85 (M.D. Fla. 1993) (failure to deliver warning eliminates learned intermediary) and whether Merck directly or indirectly put misinformation about the risks associated with Vioxx into the marketplace, *see Zanzuri v. G.D. Searle & Co.*, 748 F.2d 1511, 1518 (S.D.Fla. 1990) (where misinformation promoted by the drug manufacturer, learned intermediary does not apply). With respect to failure to warn, the duty arises when the Defendant knew or should have known of the need to issue a warning. *See Johns-Manville Sales Corp. v. Janssens*, 463 So.2d 242, 251 (Fla. 1st DCA 1984) ("A duty to warn attaches, not when scientific certainty is established, but whenever a reasonable man would want to be informed of the risk in order to decide whether to expose himself to it."); *GHR Energy Corp. v. Carboline Co.*, 744 F.Supp. 1405, 1407 (E.D.La.1990). To establish duty to warn, the plaintiff must prove a manufacturer had knowledge of the harmful and dangerous nature of the drug. *See id.* Plaintiff anticipates Merck will defend this case by arguing it fully discharged its duty to warn. As such, Plaintiff should be permitted to offer evidence showing that Merck was on notice that

members of the medical community thought the company was failing to disclose safety data related to Vioxx, and that the safety data was not reaching the people who needed it to make informed prescribing decisions. Both the Fries letter and the newspaper article at issue demonstrate such notice to Merck, and as such are relevant and admissible.

### C. The Fries Letter and Any Other Evidence Raising Similar Allegations Will Not Cause Unfair Prejudice, Jury Confusion, or Undue Delay

The evidence that Merck seeks to exclude is not unduly prejudicial under Federal Rules of Evidence 403. Evidence is unduly prejudicial only when "its probative value is *substantially* outweighed by the danger of unfair prejudice." *U.S. v. Delgado,* 903 F.2d 1495, 1503-04 (11th Cir. 1990); *see also U.S. v. Cerullo,* 435 F.2d 142, 143 (5th Cir. 1970). "'Unfair prejudice' cannot be simplistically defined as evidence having adverse effects on a party's case; rather, it is an undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one." *See Cauchon v. United States,* 824 F.2d 908, 914 (11th Cir. 1987) (citations omitted); *see also Delgado,* 903 F.2d at 1504. Defendant claims that admission of Dr. Fries' letter is prejudicial because "Dr. Fries is a physician and medical researcher from a well-known, respected institution." (Def. Mot. at 7.) Merck is correct in its assessment of Stanford University; however, this observation does not support exclusion of the Fries letter. Indeed, the letter is relevant and admissible precisely because it is the sort of ordinary correspondence drug companies routinely receive, expressly designed to provide feedback from the target audience for drug safety data—physicians. This evidence is relevant and admissible under applicable law.

For the foregoing reasons, the letters and newspaper article, whether or not 0viewed by Mr. Irvin or his physicians, are admissible under Federal Rules of Evidence 401, 402, and 403.

6

II.  **THE COURT SHOULD ADMIT EVIDENCE RELATED TO MERCK'S RELATIONSHIPS WITH AUTHORS OF PUBLISHED ARTICLES AND LETTERS ABOUT VIOXX.**

Although it fails to identify a single document or exhibit proposed by Plaintiff, Merck seeks to exclude broad categories of evidence relating to its financial relationships with authors of Vioxx-related articles and letters that were published in medical journals. Orders in limine granting this sort of non-specific relief are not only impractical to fashion, but improper to award. Such requests are antithetical to the very notion of an in limine ruling, for the Court can hardly rule in limine that it will bar some ill-defined category of evidence where it has not even seen any of the evidence at issue. *See U.S. v. Posner,* 594 F.Supp. 923, 927-28 (S.D. Fla. 1984) (denying motion in limine as premature where court could not make a determination as to the admissibility of the evidence prior to knowing whether the witness would testify at trial); *Violette v. Armonk Assocs., L.P.,* 849 F. Supp. 923, 930-31 (S.D.N.Y.1994) (denying plaintiff's in limine motion without prejudice to its renewal on the ground that the circumstances under which such evidence would be introduced were unknown); *United States v. Feola,* 651 F. Supp. 1068, 1129 (S.D.N.Y.1987) ("It would be improper for this Court to speculate as to the circumstances that might surround the introduction of this evidence at trial, specifically, the adequacy of the foundation, . . . the probative value weighed against the potential prejudicial impact in light of the evidence presented, and the purpose for which such a statement will be introduced at the time."), *aff'd,* 875 F.2d 857 (2d Cir.1989).

Plaintiff alleges that Merck affirmatively misled the medical community—including Mr. Irvin's prescribing physician—about the cardiovascular safety of Vioxx. Any evidence that Merck sought to exercise control or influence over the content of published articles or letters relating to the safety of Vioxx—particularly where those publications appeared in journals widely

read by physicians—is plainly relevant to Plaintiff's claims that Merck failed to warn of known safety risks. Whether Mr. Irvin or his prescribing physician read the articles or not, Merck is well aware that such articles helped generate positive hype for Vioxx which reached prescribing physicians all over Florida and the United States. The probative value of the evidence is not outweighed by its prejudicial effect. The evidence should be admitted.

### III.  THE COURT SHOULD NOT EXCLUDE EVIDENCE OF FOREIGN REGULATORY MATTERS

As Plaintiff noted earlier, where decision on the in limine motion itself requires an analysis of evidence yet to be presented, or upon a determination of credibility, motions should ordinarily be denied until a sufficient predicate is established. Merck has offered no direction about precisely what foreign regulatory documents it wants the Court to exclude. Instead, Defendant has requested that the Court exclude all foreign regulatory documents without any opportunity for the Court to see, during the presentation of Plaintiff's case, how each particular document is relevant to the facts of the case. Defendant's motion should be denied.

#### A.  Evidence Of Foreign Regulation of Vioxx is Relevant

Evidence of foreign regulatory activities is relevant[1] to numerous issues in this case, including: Merck's state of mind; the state of knowledge about the risks and benefits of Vioxx; whether certain warnings were feasible; and standard of care. Such information reveals what

---

[1] F.R.E 401 reads: "Relevant Evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Black's Law Dictionary defines "relevant evidence" as: [e]vidence tending to prove or disprove an alleged fact. Evidence having *any tendency* to make the existence of *any fact* that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Evidence is "relevant" if it tends to make the existence of a material fact more or less probable. BLACK'S LAW DICTIONARY 1291 (6th ed. 1990).

8

Merck knew, when Merck knew it, and what Merck was disclosing to the public, the FDA, and other foreign regulators.

A number of courts have held that the findings of foreign regulatory agencies are admissible at trial. For example, in *In re Rezulin Products Liability Litigation,* 309 F. Supp. 2d 531 (S.D.N.Y. 2004), the pharmaceutical company defendant sought to preclude the introduction at trial of any evidence relating to its foreign activities and to subject of foreign regulatory actions. As in the instant case, the pharmaceutical Defendant produced all such evidence in discovery but sought to exclude it at trial arguing that it was irrelevant as a matter of law in a United States product liability litigation governed by United States law. The defendants also argued that the evidence was only marginally relevant at best and that its potential for undue prejudice, confusion, and waste of time warranted exclusion under Rule 403. In rejecting the pharmaceutical company's argument, the court found no legal basis upon which to rule that testimony regarding foreign regulatory actions was irrelevant as a matter of law in a United States products liability case governed by U.S. law. *Id* at 552. The court also noted that the authorities cited by the defendants did not stand for this broad proposition, but rather reflected decisions by various courts to exercise their discretion, in particular cases, to admit or exclude testimony on foreign standards or practices. *Id.*

Similarly, in *Blevins v. New Holland North America, Inc.,* 128 F. Supp.2d 952 (W.D.Va. Jan 12, 2001), Defendant New Holland sought to exclude testimony related to "foreign safety standards," and "tests performed in the furtherance of such standards." The testimony was not excluded and the court opined:

> "[Testimony related to foreign safety standards and tests performed in furtherance thereof] may or may not be admissible, but at this point I cannot make that determination. I know of no legal doctrine--nor has any been cited to me--that would make such evidence inadmissible under any circumstances. Both engineering principles and human nature

9

transcend national boundaries, and thus under certain circumstances proof of foreign standards may be relevant and helpful to a jury in determining the issues."

*Id.*, at 958.

It is impossible for the Court to try at this point to make a decision about the admissibility of foreign regulatory evidence, as Merck has not identified any particular document it seeks to exclude. Moreover, evidence of this sort is clearly relevant and, when presented at trial in the appropriate context, will be admissible to prove Plaintiff's claims. Rofecoxib sold in the U.S. was the same as rofecoxib sold in every other country in the world. The effects of the drug on the cardiovascular system were seen by Merck in countries all over the world and are clearly relevant to show the knowledge and notice Merck had of the hazards of its drug.

### B. Evidence Of Foreign Regulation Of Vioxx Will Not Unfairly Prejudice Merck, Confuse The Jury, Or Unnecessarily Delay The Trial

The jury will not be confused, nor will Merck be unfairly prejudiced, by the introduction of foreign regulatory evidence. In our adversary system, parties generally offer evidence to help their cause and prejudice that of an adverse party. *Matter of S. L. E. Inc.*, 674 F.2d 359, 364 (5th Cir. 1982). "'[U]nfair prejudice' as used in Rule 403 is not to be equated with testimony simply adverse to the opposing party. Virtually all evidence is prejudicial or it isn't material. The prejudice must be 'unfair.' *Dollar v. Long Mfg., N.C., Inc.*, 561 F.2d 613, 618 (5th Cir. 1977), *cert. denied*, 435 U.S. 996 (1978). *See also U.S. v. 0.161 Acres of Land, more or less, situated in City of Birmingham, Jefferson County, Ala.*, 837 F.2d 1036 (11th Cir. 1988) (quoting *Dollar* for same proposition).

The jury will not be required as Merck claims "to process information about multiple diverse and complex regulatory schemes. . . ." (Def. Mot. at p.12). The evidence is relevant to prove that Merck was on notice that Vioxx posed an increased risk of cardiovascular

10

events and disclosed that knowledge to foreign regulators. The foreign regulatory information that Plaintiff may present in this case will not be so prejudicial as to inflame or confuse the jury. Instead, it will help the jury see how Merck chose to ignore repeated and credible warnings about the safety of the drug and/or elected to omit or disclose certain data to foreign regulatory agencies.

      **C.    The Evidence Of Foreign Regulation of Vioxx Is Admissible As An <u>Exception To Hearsay</u>**

Defendant again makes a broad statement that the foreign regulatory documents constitute inadmissible hearsay. But without looking at each document Merck seeks to exclude, the Court has no way of telling whether any particular document is hearsay and, if so, whether it falls under one of the numerous hearsay exceptions. Federal Rule of Evidence 803(6) provides is the hearsay exception for "records of regularly conducted activity." This rule expressly permits the admission of opinions and diagnoses contained in business records. The rule contains a proviso that permits exclusion of the record if the sources of information or the method or circumstances of its preparation indicate that it is untrustworthy. Without knowing which foreign regulatory documents Merck wants to exclude, it is impossible to tell if a foundation for trustworthiness can be laid.

The admissibility of reports of government agencies is governed by Rule 803(8) (a). This rule makes admissible "records, reports, statement, or data compilations, in any form, of public offices or agencies, setting forth the activities of the office or agency, or matters observed pursuant to duty imposed by law as to which matters there was a duty to report . . . ." Fed. R. Evid. 803 (8) (a). A governmental report compiled in a scholarly and thorough manner is presumed to be admissible under Rule 803(8) (C) and the party challenging the admissibility of an official public record bears the burden of proving that the particular record challenged is not trustworthy.

*See Marini v. United States*, 80 F.Supp.2d 352, 360 (M.D.Pa. 1999) *cert. Denied,* 531 U.S. 1010 (2000) (It is assumed public officials perform their duties properly and investigatory reports encompassed in the rule are presumed trustworthy and the burden is placed upon the party opposing admission to "demonstrate a lack of reliability."). Merck has clearly not met that burden here. The unspecified foreign regulatory reports Merck wishes to exclude could very well be admissible under this exception. Because there is not a specific document being challenged and Plaintiff has not yet attempted to lay a foundation for any such document, any discussion of the application of this rule or this business records exception is meaningless. Without reviewing the evidence and hearing testimony presented at trial, it is impossible for the Court to determine whether these documents are business or government records, whether a proper foundation can be laid, and whether they would fall under one of the hearsay exceptions. As such, the Court should deny Merck's motion and defer ruling on admissibility of this evidence until trial.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Merck's motion.

Respectfully submitted,

By: *[signature]*
**Andy D. Birchfield, Jr.**
Paul J. Sizemore
P. Leigh O'Dell
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
(800) 898-2034 (telephone)
(334) 954-7555 (telecopier)

**Co-Lead Counsel**

**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
FAX: (504) 561-6024
**Temporary Office**
3411 Richmond Ave., Suite 460
Houston, TX 77046
PH: (713) 877-1843
FAX: (713) 871-9750
**PLAINTIFFS' LIAISONCOUNSEL**

Christopher A. Seeger, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
MEUNIER&WARSHAUER, L.L.C.
P.O. Box 960
191 East Second Street
New Roads, LA 70760
(225) 638-6137
(225) 638-8836 (fax)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Thomas R. Kline, Esquire
KLINE&SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Carlene Rhodes Lewis, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced in accordance with Pre-Trial Order No. #8, on this **11th** day of November, 2005.

_C. Leigh O'Dell_



Confidential Document

**STANFORD UNIVERSITY MEDICAL CENTER**
STANFORD, CALIFORNIA 94305

PRIVILEGE REDACTION

STANFORD UNIVERSITY SCHOOL OF MEDICINE
DEPARTMENT OF MEDICINE
Division of Immunology and Rheumatology
1000 Welch Road, Suite 203
Palo Alto, CA 94304
(650) 723-6003
(650) 723-9656 (Fax)

RAYMOND V. GILMARTIN
JAN 1 9 2001

PRIVILEGE REDACTION

January 9, 2001

Mr. Raymond Gilmartin
Chief Executive Officer
Merck and Co.
One Merck Drive
Whitehouse Station, New Jersey 08889

Dear Dr. Gilmartin,

A series of serious events involving certain employees of, and possibly a policy of, Merck & Co. has come to my attention rather accidentally and I wanted to relay these events which might have substantial implications and complications. The result is harmful to the traditionally very fine Merck public image and is counter-productive to the Vioxx sales effort. My perspective is that of the Principal Investigator of ARAMIS (Arthritis, Rheumatism, and Aging Medical Information System). This NIH-funded national data bank first identified and quantitated the stealth epidemic of NSAID gastropathy, quantitated differences in toxicity among NSAIDs, and ARAMIS investigators have worked hard for a long time to find and implement ways of reducing the frequency of serious GI adverse events with NSAIDs. I believe that the Cox-1 sparing agents are our best approach toward better drug safety in this area.

My accidental involvement: On Saturday October 28th I received a call at home from Dr. Louis Sherwood of Merck Pharmaceuticals. Dr. Sherwood complained that Dr. Gurkirpal Singh of our group had an anti-Merck bias and was giving lectures that were irresponsibly anti-Merck and specifically anti-Vioxx. Dr. Singh was held to have used a slide which depicted a person hiding data under the covers, had called Merck the "Firestone of the drug industry", and had requested data from Merck which was not appropriate for him to have. Dr. Sherwood suggested that if this continued Dr. Singh would "flame out" and there would be consequences for myself and for Stanford. Dr. Sherwood had previously called Dr. Judith Swain, Chair of our Department, and subsequently called Dr. Edward Harris, Chair of our Division, with similar complaints. I agreed to look into the matter and to take appropriate action and indicated that it is not our policy to bias any presentation in any direction. I asked him to provide me with full details of any such transgression that occurred after this date.

Confidential Document

I spoke with Dr. Singh and reviewed the slides of his presentation. The talk was mainly about the frequency and severity of NSAID Gastropathy and secondly about the advantages of the new Cox-1 sparing agents, of which Vioxx is one. Equal numbers of slides were devoted to Celebrex and to Vioxx. The talk was strongly in favor of broad use of the new Cox-1 sparing agents. Data were mainly from the standard studies, although three slides were from a presented but not yet published randomized renal toxicity study of Celebrex and Vioxx by Andrew Whelton comparing side-by-side renal and cardiovascular toxicity which was not in favor of Vioxx. The little man under the covers was not in the sequence, having been removed when Dr. Singh succeeded in getting the requested data (again not favorable to Vioxx), from Merck. Dr. Singh clearly did not understand the "Firestone" reference and indicated that he had not made the statement. I asked Dr. Singh to be certain to be rigorously balanced in future presentations and he agreed, although stressing that he had also been balanced in the past. I talked with three people who had been in Dr. Singh's audience; one thought the presentation contained humor directed at Merck but that the data were balanced and the other two found the presentations completely unremarkable.

The much broader issues, which surfaced at the American College of Rheumatology meetings, were most disturbing and involve suppression of data by Merck and a consistent pattern of intimidation of investigators by Merck staff, principally Dr. Sherwood but also others on his staff.

A number of physicians have concerns that Vioxx may have some serious and under-emphasized drug toxicity problems, particularly at the 50 mg dose approved for pain control—these concerns are shared by the FDA renal reviewer. Vioxx has been reported to have more frequent peripheral edema problems, more aggravated hypertension, more congestive heart failure, and more heart attacks than other NSAIDs, especially Celebrex. Some 0.4 % of Vioxx subjects had heart attacks compared with 0.1 % in the naproxen arm in the Merck-sponsored VIGOR study and this was statistically significant. Some of these data have been described in the Wall Street Journal and may have affected stock prices but there has been little information presented to date in the medical literature. Merck presented two posters on the VIGOR trial at the recent ACR meetings which did not contain data on the side effects of interest; the posters were very well attended, with everyone wanting to know about the data on these points, but it was not available. I tried unsuccessfully to get the data myself; it is hard to judge these areas without the numerical details. Yet, one could not avoid the conclusion that because of the interest in these issues the data would have been presented had they been favorable. There was a lot of muttering and a lot of people with concerns. The publication of the VIGOR trial recently in the NEJM did not contain the data on edema and fluid retention at all, and dismissed the heart attack data with weak arguments.

Even worse were the allegations of Merck damage control by intimidation, often with a pattern of going to the Dean or Department Head with complaints of anti-Merck bias and always alleging unbalanced anti-Vioxx presentations. This has happened to at least eight investigators: Dr. Singh; Dr. Peter Lipsky, now research chief at the Arthritis Institute;

MRK-ABO0000251

Confidential Document

Dr. Andrew Whelton of Hopkins; Dr. Michelle Petri of Hopkins; Dr. David Yocum of Tucson, currently head of the FDA advisory panel; Dr. Lee Simon of Harvard; Dr. James McMillen; and Dr. Thomas Stillman. I suppose I was mildly threatened myself, although I have never spoken or written on these issues.

I documented the intimidation of the individuals listed above by personally speaking with each of them. Dr. Simon believes that one of his two academic appointments has been jeopardized. Dr. McMillen believes that his VCF appointment at Hershey was revoked because of these accusations. Dr. Petri had a speaking engagement unprofessionally cancelled by Merck and an unrenowned speaker substituted; he was also bothered by phone calls from Merck persons alleging unbalanced presentations. Dr. Singh had a speaking engagement cancelled and the audience was told that he had been fired. Dr. David Yocum had similar experiences. Dr. Lipsky, while at Southwestern, was forced to do a slide by slide justification of a CME program felt to be critical of Vioxx. These are respected investigators with long experience and high integrity. I also spoke with several past Merck employees who asked to remain anonymous but who confirmed the existence of a pattern of intimidation through the Department Chairs or the equivalent, often with the hint of loss of Merck funding to the institution.

An ironic result of all this is that Vioxx is getting more scrutiny of its salt and water toxicity than if the data had been clearly presented, and Merck is taking a big public relations hit among rheumatologists. The investigators whose balance was criticized are prominent and several advise the FDA—a role not often given to unbalanced presenters. In the view of most rheumatologists including myself, Vioxx (and Celebrex) represent a major medical advance in terms of improving GI safety, which is the dominant toxicity of NSAIDs and is the most common serious adverse event of NSAIDs. These drugs should on balance, save a substantial number of lives. The fluid retention and related problem data are actually not all that bad, and the cover-up is a worse problem than the side effects of fluid retention and hypertension and CHF, which could be handled by stronger labeling for at risk patients, or by other means. Else, there is a risk of case reports of seriously complicated congestive heart failure or other serious adverse reactions, which could threaten the drug approval. The heart attack data, of course, need to be confirmed or refuted by further study, as do the data on comparative renal toxicity between Cox-1 sparing agents.

I spoke with Dr. Sherwood at length on November 22 and aired the above concerns directly. He defended by saying that Merck was a great company and, therefore, could not be doing anything inappropriate. He said that he had been with Merck for 13 years and had never noticed anything that was not appropriate. He noted that he had previously been a Department Chair and that he knew what was appropriate and what was not, and that he knew how to get things done through the network. He said that if he heard about something that was alleged to be anti-Vioxx that it was his right to call anyone he wanted to about it. When told that each of the investigators maintained that presentations had been balanced he said he didn't want to get into "he said, she said" kinds of discussions. He said that there weren't any problems with the drug and that anyway they only occurred at high dose. When told that an ex-Merck employee had quoted him as saying

MRK-ABO0000252

"we only have three problems, Whelton, Simon, and McMillen, and Simon has been taken care of" there was a long pause and then he said that he "did not remember" saying that. When told that while both I and the people I had talked with had often had differences in viewpoint with one or another drug firm, none of us had ever heard of harassment of investigators through their institutions he did not have a response but said that he "heard me."

From the discussions above I make three conclusions. First, some investigators at some times probably do make statements that may seem seriously unbalanced to those vested or instructed in opposite opinions and that close attention to strict impartiality is essential for any person making presentations on any such subject. Second, Merck has been attempting to systematically downplay some unusual side effect patterns of Vioxx. I would hesitate to use the term "hiding data" but Merck has certainly not been forthcoming with data and has made access to the data difficult. Finally, and most importantly, Merck employees have systematically attacked those investigators or speakers who expressed what Merck staff felt were critical opinions in a manner which seriously impinges on academic freedom.

I believe that these are serious matters and that Merck should take care of them internally, in its own interest, and in the interest of patients. I will appreciate your response to the issues raised here and to learning about actions which have been taken.

Sincerely,

James F. Fries, MD/jr

James F. Fries, M. D.
Professor of Medicine

cc: Mr. David Anstice, President Merck U. S. Human Health
   Dr. Ed Skolnick, President Merck Research Labs

MRK-ABO0000253

According to Dr Haruna Kaita, the head of the medical team that conducted the test in India, the vaccines contain "undeclared contaminants that can cause malfunctioning of the testes and cause infertility in women." The team also found "some toxic substances."

"Polio controversy started long ago," said Dr Kaita. "What these people [proponents of the vaccine] are saying is unethical, illegal, and criminal, and they know that these things are contaminated and they have the potential to cause human hazards."

But another medical delegation sent by the Nigerian government to South Africa to carry out tests on the vaccine has challenged the report, which it says is false and alarming, claiming that its own findings shows the vaccines to be safe. (See News Extra at bmj.com)
Abiodun Raufu *Lagos*

## Reducing homocysteine levels does not prevent stroke recurrence

Among patients with a previous stroke, reducing levels of the amino acid homocysteine in the blood with high dose vitamin therapy does not reduce the risk of recurrent stroke.

Previous studies have shown an association between raised levels of total homocysteine and the risk of stroke and heart disease (*Stroke* 2004;35:169-74). Folic acid, pyridoxine (vitamin B-6), and cobalamin (vitamin B-12) are known to reduce plasma homocysteine levels, but the effectiveness of homocysteine lowering therapy to reduce the risk of stroke has not been confirmed by randomised trials.

Dr James Toole of Wake Forest University School of Medicine, Winston-Salem, North Carolina, and colleagues conducted a double blind, randomised controlled trial from September 1996 to May 2003 to determine whether high doses of folic acid, vitamin B-6, and vitamin B-12 reduce the risk of an additional stroke over a two year period, compared with low doses of these vitamins (*JAMA* 2004;291:621-2).

The chance of an event, including stroke and death, within two years was 18% in the high dose group and 18.6% in the low dose group.
Scott Gottlieb *New York*

## Doctors reluctant to work on child protection committees, survey shows

Paediatricians in England and Wales are being frightened away from child protection work by fears of complaints from parents, says the Royal College of Paediatrics and Child Health.

Each primary care trust is supposed to appoint a paediatrician as a "designated doctor" to serve on the area child protection team. But the college has discovered that 30% of these posts are unfilled. Similar problems affect the "named doctor" programme in hospital trusts. Both roles are unpaid.

Professor Alan Craft, president of the college, said that paediatricians have never felt more isolated than they do now. The paediatrician Professor Sir Roy Meadow will face charges of serious professional misconduct before the General Medical Council this summer, over evidence he gave in the trial of Sally Clark, wrongly accused of killing her two children (*BMJ* 2003; 326:304).

The government has announced a review of 258 cases in which a parent was convicted of murder, manslaughter, or infanticide, to find out in which cases medical expert witnesses disagreed and natural causes could not be ruled out as a possibility (24 January, p 183).

Professor Craft told the *BMJ* that paediatricians were demoralised by the GMC case against Professor Meadow: "When they see a former president of this college accused of misconduct, naturally they are inclined to feel that nobody understands them."
Owen Dyer *London*

## Spanish drug editor wins case brought by Merck, Sharp & Dohme

Liza Gibson *London*

A victory for all independent drug bulletins was declared last week when Professor Joan-Ramon Laporte, the editor of Spain's *Butlletí Groc*, won a district court case brought against it by the pharmaceutical company Merck, Sharp & Dohme.

The multinational firm had sued the editor and the publisher of the bulletin, the Catalan Institute of Pharmacology, over an article that the bulletin had published in 2002. The company said that the article had contained false and inaccurate information about the trial of one of its drugs, the Vioxx gastrointestinal outcomes research (VIGOR) trial, which looked at the safety of its arthritis drug, rofecoxib (24 January, p 188).

The company had wanted a statement—which it had prepared—to be published in the bulletin and on the institute's website under Spain's 1984 "rectification" legislation, which allows anybody the right to rectify any information they consider to be incorrect and whose distribution could cause them harm.

However, the judge, Maria Victoria Salcedo, rejected the demands of the company, absolved Professor Laporte and the institute, and demanded that the company pay the court costs.

In her judgment on 27 January, she said the contents of the bulletin were accurate as they were based on a series of articles published in journals such as the *Lancet* and the *BMJ*, which had mentioned the irregularities surrounding the publication of the VIGOR trial, including a commentary that had said the company knew of the cardiovascular risks in relation to rofecoxib and suggested a bias in the selection process of the trial.

However, one aspect of the bulletin's article was found to be not correct. Judge Salcedo said the institute had not supplied enough evidence to show that distorted information on rofecoxib had been submitted to the EU regulator, the European Agency for the Evaluation of Medicinal Products, unlike that presented to the US Food and Drug Administration. But she said this had taken up only a few lines in the



Joan-Ramon Laporte

bulletin's article, while the company's rectification text was twice as long as the article, making this disproportionate.

The judge also said the company's text did not limit itself to the contents of the article, and its coverage exceeded what it wanted rectified. The text said, for example, that rofecoxib had better gastrointestinal safety compared with other drugs, but the bulletin had looked only at cardiovascular risk; it had also claimed that Merck, Sharp & Dohme had an ethical tradition, but this too had not been questioned in the bulletin.

Professor Laporte said the judgment "echoes the international debate which took place (in the literature) regarding the irregularities in the VIGOR trial and the omission of cardiovascular adverse effects in MSD's promotional materials."

The Catalan Institute of Pharmacology said the judgment was a "victory for all those involved in independent information on medicines and therapeutics."

A spokesman for Merck, Sharp & Dohme said after the ruling, which the company is reviewing, that the bulletin's article was almost completely based on a commentary that appeared in the *Lancet* in 2002 (360:100-1) on the design and conduct of the VIGOR trial. It claims that there were several inaccuracies in the commentary, but a letter to the *Lancet*'s editor spelling these out was not published.  ☐