UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| Evelyn Irvin Plunkett v. Merck & Co, Inc.* | | CASE NO. 02:05CV4046 |

Plaintiff's Memorandum in Opposition to
Defendant's Motions in Limine to Scientifically Unreliable and Irrelevant Medical and
Scientific Evidence, David Graham Estimates, and Adverse Event Data

*(Plaintiff's Opposition to Defendant's Motions in Limine No. 6, 8, 11)*

Plaintiff Evelyn Irvin Plunkett, Personal Representative of the Estate of Richard Irvin, Jr.,

hereby opposes defendant Merck & Co. Motions in Limine No. 6, 8 and 11 to Exclude all

Evidence of and Reference to (1) Statistically Insignificant Data; (2) David Graham Estimates;

(3) Toxicological Data from Animal Studies; (4) Adverse Event Reports ("AERs"); (5)

Investigator-Reported Data; and (6) Alzheimer's Disease Clinical Trial Mortality Data.  The

evidence at issue is highly relevant and admissible under well-established Federal law.  For the

reasons described herein as well as for the reasons asserted by the Plaintiff in his response to

defendant's *Daubert* motions, this Court should deny Defendant's motion to exclude this

evidence.

## ARGUMENT

## I.   MOTIONS IN LIMINE ARE INAPPROPRIATE WHEN USED TO USURP THE JURY'S DUTY TO MAKE DETERMINATIONS ON QUESTIONS OF FACT

At the outset, Plaintiff notes that Merck's scattershot attempt to exclude broad categories of evidence in this case is entirely misplaced and inappropriate. Basically Merck has requested that the Court improperly exclude any and all relevant yet remotely harmful evidence remotely to the story it wishes to present at trial. This is not the purpose of the *in limine* motion. *See United States v. Posner,* 594 F.Supp. 923, 927-28 (S.D. Fla. 1984) (denying motion in limine as premature where court could not make a determination as to the admissibility of the evidence prior to knowing whether the witness would testify at trial); *Violette v. Armonk Assocs., L.P.,* 849 F. Supp. 923, 930-31 (S.D.N.Y.1994) (denying plaintiff's *in limine* motion without prejudice to its renewal on the ground that the circumstances under which such evidence would be introduced were unknown); *United States v. Feola,* 651 F. Supp. 1068, 1129 (S.D.N.Y.1987) ("It would be improper for this Court to speculate as to the circumstances that might surround the introduction of this evidence at trial, specifically, the adequacy of the foundation . . . , the probative value weighed against the potential prejudicial impact in light of the evidence presented, and the purpose for which such a statement will be introduced at the time."), *aff'd,* 875 F.2d 857 (2d Cir.1989).

The Fifth Circuit has noted: "[w]hen evidence is challenged solely on the ground that it is irrelevant, it is inadmissible only if it fails to meet the definition of Rule 401--it must be without probative value as to *any* fact of consequence to the determination of the action. If it is relevant as to any issue, it is relevant to the action and is not inadmissible under Rule 402". *See Chrysler Credit Corp. v. Whitney Nat'l Bank,* 824 F.Supp. 587, 599 (E.D.La.1993)(quoting *Lubbock Feed*

2

*Lots, Inc. v. Iowa Beef Processors,* 630 F.2d 250, 267 (5th Cir.1980)(emphasis in original). A

movant *in limine* has the burden of establishing that the evidence sought to be excluded on

relevancy grounds is *not* relevant to *any* issue in the case. It is not enough to establish that the

evidence *is* relevant to an issue which is *not* part of the case. *See Chrysler Credit Corp. v.*

*Whitney Nat'l Bank,* 824 F.Supp. 587, 599 (E.D.La.1993).

## II.   **TESTIMONY REGARDING THE STUDIES AND DATA AT ISSUE SHOULD NOT BE PRECLUDED; PARTICULARLY WHERE PLAINTIFFS' EXPERTS HAVE RELIED ON SUCH STUDIES IN FORMING THEIR OPINIONS**

Although the substantive aspects of this case are governed by Florida law, the Federal

Rules of Evidence control the admission of expert testimony. *Doddy v. Oxy USA, Inc.,* 101 F.3d

448, 459 (5th Cir.1996). Federal Rule of Evidence 702 governs the admission of expert

testimony and provides that "if scientific, technical, or other specialized knowledge will assist

the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as

an expert by knowledge, skill, experience, training, or education may testify thereto in the form

of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the

testimony is the product of reliable principles and methods, and (3) the witness has applied the

principles and methods reliably to the facts of the case." Fed. R. Evid. 702.

The expert testimony must be relevant, not simply in the sense that all testimony must be

relevant, Fed.R.Evid. 402, but also in the sense that the expert's proposed opinion would assist

the trier of fact to understand or determine a fact in issue. *Bocanegra v. Vicmar Services, Inc.,*

320 F.3d 581 (5th Cir 2003) (citing *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 591-92,

113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). Rule 702 "requires a valid scientific connection to the

pertinent inquiry as a precondition to admissibility." *Id.* At 584.

3

The Supreme Court has provided five, non-exclusive factors to consider when assessing whether a methodology is scientifically reliable. These factors are "(1) whether the expert's theory can be or has been tested, (2) whether the theory has been subject to peer review and publication, (3) the known or potential rate of error of a technique or theory when applied, (4) the existence and maintenance of standards and controls, and (5) the degree to which the technique or theory has been generally accepted in the scientific community." *Id.* at 584-85 (citing *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)); *Mathis v. Exxon Corp,* 302 F.3d 448 (5th Cir. 2002); *Moore v. Ashland Chem. Inc.,* 151 F.3d 269, 275 (5th Cir.1998) (en banc).

As the *Bocanegra* court stated, "the test for determining reliability is flexible and can adapt to the particular circumstances underlying the testimony at issue." *Id.* (citing *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). The party seeking to have the district court admit expert testimony must demonstrate that the expert's findings and conclusions are reliable, but need not show that the expert's findings and conclusions are correct. *Id.* at 585.

The Fifth Circuit has noted that "the *Daubert* analysis should not supplant trial on the merits." *Mathis,* 302 F.3d at 461 (quoting *Pipitone v. Biomatrix, Inc.,* 288 F.3d 239, 250 (5th Cir.2002)) . "[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (quoting *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786).

In addition, "whether an expert's testimony is reliable is a fact-specific inquiry." *See Burleson v. Texas Dep't of Criminal Justice,* 393 F.3d 577, 583-584 (5th Cir.2004)(citing *Skidmore v. Precision Printing & Pkg., Inc.,* 188 F.3d 606, 617-18 (5th Cir.1999)). The broad

4

generalization made by Merck in the motions in limine make such required factual inquiry impossible until trial, where the context and facts related to the evidence sought to be introduced may be analyzed by the Court.

The types of material that Merck seeks to exclude, published studies, clinical study data, and adverse event reports, are of the type that is regularly relied upon by experts and clearly admissible under Federal law. *See id.* Plaintiffs submit that the Court should permit their experts to testify and consider, in the overall context of their testimony, whether they have established that any text, article, clinical data or adverse event report that they rely on is "reliable." Without testimony establishing whether the evidence at issue is representative of that which experts in the field typically rely on, a ruling on whether this, or any other evidence should be excluded is premature.

## III.    EVIDENCE OF AND REFERENCE TO DR. GRAHAM'S ESTIMATES ARE RELEVANT AND SHOULD BE ALLOWED

Merck seeks to exclude evidence relating to or referencing findings from a retrospective nested case-control study conducted by Dr. David Graham, an FDA scientist, and others (hereinafter "Graham Study"), in which Dr. Graham found an increased risk of heart attacks and sudden death associated with the use of Vioxx as compared to Celebrex, even where such evidence has been relied upon by Plaintiff's experts, including Dr. Wayne Ray and Dr. Benedict R. Luchesi. *See* P. 2.0050 (Ex. A). This study was published in a peer-reviewed, medical journal. *See id.* Using the relative risks from randomized clinical trials and the background rates seen in NSAID risk studies, Dr. Graham suggests that an estimated 88,000 – 140,000 excess cases of serious coronary heart disease occurred over the market-life of Vioxx. *See id.* Dr. Graham observes that the United States national estimate of case-fatality rate (fatal acute

5

myocardial infarction plus sudden cardiac death) was 44%, and extrapolates from this that many

of the above mentioned excess cases attributable to Vioxx use were fatal. *See id.* at 6.

> **A.      Dr. Graham's Estimates of Excess Heart Attacks and Sudden
> Cardiac Deaths are Admissible to Show Notice, Causation,
> <u>Merck's Failure to Warn, and Its Disregard for Consumers</u>**

Merck has asked this Court to exclude all testimony and evidence related to Dr.

Graham's estimates of excess heart attacks and sudden cardiac death ("Graham's Estimates),

because Merck claims that such evidence relies on clinically insignificant data.  Such a request is

improperly overbroad because Dr. Graham's study, in its entirety, has its own independent basis

for admissibility.  Additionally, information as early November 1999 suggested that there was an

increased risk of serious cardiovascular events occurring in patients taking Vioxx compared to

naproxen.  The Graham Estimates bring forward the result of Merck's failure to properly warn

against the adverse reactions attributable to the ingestion of Vioxx.   The Graham Estimates are

derived from sound, well-founded methodology and, as indicated by the defendants in their

motion, supported by several experts in the field that have relied to some extent on his findings.

Thus, the Graham Study is sufficiently reliable under Federal law and is admissible.

Merck suggests that the Graham Estimates are irrelevant because Merck claims that the

Graham study did not show a statistically significant association  between 25 mg Vioxx and the

risk of serious coronary heart disease. This narrow-viewed approach to the important data found

in Dr. Graham's study is a perfect example of the myopic view taken by Merck in analyzing all

study data related to Vioxx and cardiovascular risk.  The Graham study data exemplify the total

potential impact of Merck's failure to warn, which denied Mr. Irvin of his right to give informed

consent.  Also, the data is relevant to Merck's duty, level of conscious disregard for the safety of

the consumer, and the unreasonableness of Merck's conduct when presented with such data.

6

Merck had a continuing duty to warn about all adverse events, including death. If the true extent of the risks had been disclosed, doctors would not have continued to prescribe these drugs in such rapid numbers and Mr. Irvin would have had knowledge of his increased risk for myocardial infarction or death. Moreover, if Merck had disclosed its knowledge sooner, the Graham Study would not have been supplied with the data sufficient to generate the damning estimates Merck now seeks to avoid. Finally, listings of death suggest the fact that Merck was inaccurate in its measurement of the rate of MI with Vioxx.

Merck argues that the Graham Estimates are flatly inconsistent with the findings of APPROVe and VIGOR, and, therefore, are irrelevant. This assumption is incorrect. First, Dr. Graham clearly relies on additional data and studies in reaching his conclusion. As stated on page six of his study, his estimates evolved from the total estimated number of Vioxx prescriptions dispensed in the USA, indicated by IMS Health, combined with the use of relative risks generated in the APPROVe and VIGOR clinical trials, together with the background rates seen in NSAID risk studies.

Merck argues that the Graham Study found no statistically significant increased risk of heart attacks or deaths associated with Vioxx use at the 25 mg dose. From this, Merck alleges that the Graham study data is inconsistent and pure chance. To support its argument, Merck cites the fact that some Texas courts have held that epidemiological data must demonstrate an odds ratio of 2.0 or greater to be reliable. Merck is incorrect in its assertion that this Court is bound by or should even find persuasive Texas substantive law on the question of reliability. To the extent that the matter is one of substantive, rather than procedural law, Florida law should apply. In Florida and in federal courts throughout the country epidemiological evidence involving odds ratios below 2.0 is admissible and consistent with a plaintiff's recovery at trial. *See Berry v. CSX*

7

*Transp. Inc.*, 709 So. 2d 552, 569 (Fla. 1st DCA 1998).  The Second Circuit has held that a

"qualified expert may view the epidemiological studies and factor out other known risks . . .

which might enhance the remaining recognized risks, even though the risk in the study fell short

of the 2.0 correlation." *In re Joint E. & S. District Asbestos Litig.*, 964 F.2d 92, 97 (2d Cir.

1992).  Where plaintiff's experts use epidemiological studies as one basis for an expert opinion

but do not rely solely on epidemiological evidence, epidemiological evidence of a certain

magnitude need not be provided because the expert does not rely on those studies alone.  *Id.*;

*Berry*, 709 So. 2d at 568-70.  As stated above, Dr. Graham considers several bases for his

estimates and any suggestion by Merck that his estimates are inconsistent with his data should

not be determinative for the admissibility of this evidence. The Graham Study is supported by

sound methodology and expert support, and admissible under Federal law.

It is well settled that there are at least 10 kinds of evidence that can support a causal

connection between a drug and its adverse reactions.  These lines of evidence include, but are not

limited to, case reports in series, adverse event reports, animal studies, case reports that are

published in peer reviewed medical literature, chemical structure, studies based on

pharmacological classes similar to the drug at issue, textbooks, and literature on similar drugs of

the same class that have the same mechanisms of action. *See In Re: Phenylpropanolamine*

*(PPA),* 2003 WL 22417238 *26 (N.J. Super. 2003)  For this reason, and all those stated above,

Defendant's final argument to exclude the Graham study data is also unpersuasive.

This evidence is relevant to Plaintiff's claims that Merck had notice of the adverse risks

associated with Vioxx and failed to adequately study and test the drug before selling it on the

market.  If Merck had responded appropriately to earlier findings, and had taken into

consideration the material analyzed by Dr. Graham, the vast injuries suffered by many people,

8

including Mr. Irvin, could have been avoided.  Instead, Merck delayed and postponed studies until the true consequences of the ingestion of this drug could no longer be concealed.

> **B.**    **Estimates Of Excess Number Of Heart Attack Or Death Has Substantial Probative Value Which Is Not Substantially Outweighed By Any Potential Prejudice To Merck, Nor Will Such Evidence Confuse Or Mislead The Jury**

The probative value of the Graham study data is clearly shown in the previous section. Any prejudicial effect felt by Merck hardly reaches the level of "unfair."  "Direct proof of a claim does not create the *unfair* prejudice that Rule 403 intended to avoid. The touchstone for excluding evidence under Rule 403 is not prejudice, but *unfair* prejudice, which must substantially outweigh the probative value of the evidence. This Court does not view Rule 403 as a tool designed to permit the trial court to "even out" the weight of the evidence.  "Instead, there is a place in the courtroom where the skill and acumen of professional trial lawyers should be brought to bear. Indeed, the motion practice presaging the subject jury trial admits that the trial lawyers in this case are keenly aware of the points of contest, and quite capable of fairly evening-out the score at trial on the merits and paring down any inaccuracy or exaggeration, such that it more closely comports with the truth." *Soll v. Provident Life & Acc. Ins. Co.*, 2002 WL 1461891 at 6 (E.D.La. July 5, 2002)

The Fifth Circuit in *United States v. Pace,* 10 F.3d 1106 (5th Cir.1993), *cert. denied,* 511 U.S. 1149, 114 S.Ct. 2180, 128 L.Ed.2d 899 (1994) observed that the exclusion of evidence under Rule 403 should occur only sparingly.  *Id.*  Relevant evidence is inherently prejudicial; but it is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403. "Unless trials are to be conducted on scenarios, on unreal facts tailored and sanitized for the occasion, the application of Rule 403

9

must be cautious and sparing. Its major function is limited to excluding matter of scant or

cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *Id.*

"As to such, Rule 403 is meant to relax the iron rule of relevance. It is not designed to permit

the court to 'even out' the weight of the evidence, to mitigate a crime, or to make a contest

where there is little or none ." *Id.* at 1115-16 (quoting *United States v. McRae,* 593 F.2d 700,

707 (5th Cir.), *cert. denied,* 444 U.S. 862, 100 S.Ct. 128, 62 L.Ed.2d 83 (1979)).

Relevant evidence may be excluded under Rule 403 if its probative value is

substantially outweighed by the risk of undue prejudice. *United States v. Adair,* 2005 WL

2990586 (5th Cir. 2005). Once evidence has been established as being relevant, the burden is

on the party urging exclusion of evidence to convince the court that Rule 403 considerations

should control. *State v. Jones,* 891 So. 2d 760, 767 (La. App. 4 Cir. 2004). It should be

emphasized, however, that exclusion of relevant evidence pursuant to Rule 403 "is an

extraordinary measure that should be used sparingly." *Campbell v. Keystone Aerial Surveys,*

*Inc.,* 138 F.3d 996, 1004 (5th Cir.1998).

The evidence Merck seeks to exclude exemplifies the impact that Merck's failure to

warn had on its consumers—failure to warn of knowledge possessed by Merck since at least

1999. Further, limiting instructions are available to reduce any possibility of jury confusion.

## IV.     EVIDENCE AND TESTIMONY RELATED TO DATA UNDERLYING ANY STUDIES RELIED ON BY PLAINTIFF'S EXPERTS SHOULD BE ALLOWED

Plaintiffs' experts use epidemiological studies as one basis for opinions but will not

rely solely on epidemiological evidence; thus, plaintiff does not need to provide

epidemiological evidence of a certain magnitude for the evidence to be sufficiently reliable.

*See In Re Joint E. & S.,* 964 F. 2d at 97.

Though most of these arguments will likely be resolved during the Court's *Daubert* hearings, Merck argues that to be statistically significant, an epidemiology study must be reach the 95% confidence level.  Merck improperly relies on the case of *Cado v Everest Minerals Corp.*, 362 F.Supp.2d 814, 821 (W.D. Tex. 2005), where the Court based its opinion not on the procedural Federal Rules of Evidence, or any of the progeny of cases applying Rule 702, but instead on the substantive law of Texas, as announced by the Texas Supreme Court in the infamous *Havner* decision.  *Cado*, 362 F.Supp.2d at 814 (citing *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 723-24 (Tex 1997)).

Even if this Court were to adopt the determination that substantive law, not procedural, governed the admissibility of epidemiological evidence, it is certain that in the present case this Court would not look to Texas law, but rather to Florida law.  Under Florida law as under federal standards, such evidence would be admissible and not properly excluded under any evidentiary grounds.  *See Castillo v. E.I. Dupont De Nemours & Co., Inc.*, 854 So. 2d 1264 , 1270 (Fla. 2003) (epidemiology studies not necessary for party to meet its burden of showing causal connection).

In light of the forgoing facts and law in this Circuit, Plaintiffs' experts should not be precluded from testifying as to their opinions, which may or may not involve data deemed by the defendant to be insignificant.

**V.    ALL EVIDENCE OF AND TESTIMONY RELATED TO TOXICOLOGICAL DATA FROM ANIMAL STUDIES SHOULD BE ALLOWED**

Similarly, Merck claims that "animal studies are not a sufficient basis for establishing causation"and that "the probative value of such studies is…outweighed by the potential prejudice…likelihood of confusing the issues and misleading the jury".  However, Plaintiff's

experts, including Dr. Lucchesi, *do not rely on animal studies alone*; rather, they rely on both human and animal reactions. Cases cited by Merck do not hold that evidence from animal studies cannot be considered along with other types of evidence to prove causation, but rather, that animal studies alone cannot prove causation in humans. Federal Rule of Evidence 703 allows an expert to testify "if facts or data are of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed.. R. Evid. 703.

A.     **Animal Toxicity Studies Are Relevant and Should be Allowed**

Merck argues that animal studies are at the bottom of the scientific hierarchy and therefore should not be considered in determining whether there is a causal link between a drug and its effect in humans.[1]  This is a very interesting argument in light of Merck's recent reliance on a study involving rabbits. See *Humeston v. Merck & Co.,* Testimony of Dr. Briggs Morrison, Transcript at 3266-3267 (Ex. B).

However, the authority cited by Merck rejects animal studies only when offered to controvert overwhelming epidemiological evidence. Here, no such overwhelming evidence exists. Furthermore, there is no support for Merck's argument that animal studies should be completely excluded where, in their opinion, "more reliable human data" is available. (p. 15). To disregard relevant toxicological animal data based solely on Merck's unsupported opinion is improper. Animal studies are admissible along with other evidence to prove causation. *See* Lopez v. W*yeth-Ayerst*, 139 F.3d 905 (9th Cir. 1998) ("animal studies can contribute to an expert's scientific conclusions as to causation…") (citations omitted). *See also* Reference Manual on Scientific Evidence at 405 (2d ed. Federal Judicial Center 2000) ("Toxicological research often involves exposing animals… to chemicals, monitoring the outcomes, and

---

[1] Of interest, Merck has identified countless animal studies in its lists of exhibits it intends to offer into evidence at trial. No doubt, Merck intends to do what it attempts to convince this Court is contrary to law—rely on animal studies to support its expert's opinions.

comparing the outcome with those from unexposed control groups."). *See In re: Phenylpropanolamine* (PPA), 2003 WL 22417238 (N.J. Super. July 21, 2003) (the court allowed expert testimony that it considered of the type that experts in the medical and toxicological communities generally use, including case reports, operations, retrospective reviews, perspective studies, clinical studies, and **animal studies**, realizing that humans are not rats or mice, but that "there is some relationship and if there is a problem in rats or mice, there may be a similar problem in humans". Further, the court allowed the expert to "extrapolate from one subpopulation to another so long as he has an objective basis for doing so and that such expert testimony of causation be admitted because it supports and complements other scientific knowledge, e.g., animal studies, case reports."); *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717 (3rd Cir. 1994) (The district court abused its discretion in excluding expert testimony regarding "animal studies that, although their 'fit' to proof of causation in humans was in dispute, all experts acknowledged that the studies were of some use at least in eliminating those chemicals not likely to cause disease in humans.").

     **B.**     **Rule 403 Does Not Bar Evidence Of And**
              **Testimony Related to Toxicological Data From Animal Studies**

     Merck argues that animal studies have no probative value because large-scale blinded clinical trials of humans already exist.  However, as stated above, animal studies are not excluded simply because human studies or trials exist, rather, animal studies may be relied on in addition to such evidence.  *See In re Paoli R.R Yard PCB Litigation*, 35 F.3d at 781 (it was an abuse of discretion for the district court to conclude that the "probative value of the animal studies was substantially outweighed by unfair prejudice and waste of time…there was significant evidence in the record from other sources that the evidence was probative".  Thus,

the lower court's decision to choose between opinions was rejected and the animal studies were allowed as one source by which plaintiffs could prove their case.).[2]

**VI.    EVIDENCE OF AND REFERENCE TO ADVERSE EVENT REPORTS INVESTIGATOR REPORTED DATA, AND ALL-CAUSE MORTALITY FIGURES FROM ALZHEIMER'S CLINICAL TRIALS ARE HIGHLY RELEVANT AND HAVE PROBATIVE VALUE THAT FAR OUTWEIGHS THEIR PREJUDICIAL VALUE**

Merck also argues that adverse event reports ("AERs") including data reported by clinical investigators, as well as mortality data from certain Alzheimer's clinical trials, be excluded on the basis of relevancy, hearsay, and Federal Rule of Evidence 403. This contention may be attacked on many of the same grounds as that of the previous section.

Two primary issues in this case are Merck's notice of adverse events associated with Vioxx and, in light of its knowledge, Merck's failure to properly warn about the dangerous side effects associated with Vioxx. The role of AER, including reports made by clinical investigators, are central to the issues in this case, namely, notice to the company of adverse events and Merck's continuing duty to monitor and warn about these events. Clinical trial adverse event investigation and post-marketing surveillance are critical components of all pharmaceutical companies' duties in maintaining a safety profile of a specific drug for meeting the company's responsibilities to physicians and patients as well as reporting to the FDA.

**A.    Evidence of Adverse Event Reports are Admissible**

AERs and clinical trial investigator reports do not fall within the definition of hearsay under Rule 801 to the extent that they are not being offered to prove the truth of the matter asserted. Primarily, Plaintiffs intend to offer AERs and investigator data reports to prove

_____

notice and Merck's failure to warn or properly investigate, evaluate, and resolve cardiovascular safety risk.

Merck's suggestion that the FDA has cautioned about the reliability of AERs and other anecdotal reports does not negate the fact that Merck had knowledge of such AERs, similar to the injury suffered by Mr. Irvin which resulted in his death, and failed to exercise its duty to investigate such claims. Furthermore, Merck's assertion that AERs or investigator data are scientifically unreliable and inadmissible, and that opinion testimony based on such reports should also be inadmissible, is unfounded. Merck proceeds in its motion to string cite cases that ostensibly stand for this proposition. However, its effort, as with the animal studies, is dubious at best.

In the cases cited by Merck, AERs or case reports were excluded as evidence where the AERs or case reports were scant in number or were the sole support for the expert's testimony. Neither situation is at issue in the present case because there are countless AERs and/or case reports on point. Case reports have long-standing use as evidenced by publication of such reports in peer-reviewed scientific journals. *Reference Manual on Scientific Evidence,* supra, at 469. See also *Caraker v. Sandoz Pharmaceuticals Corp.,* 172 F. Supp. 2d 1046, 1050 (S.D. Ill. 2001) (where the court declined to allow an expert to rely solely on a scant number of case reports, but acknowledged that an overwhelming amount of case reports, [without additional support] showing a temporal proximity between a very specific drug and a very specific adverse event might be enough to make a general causation conclusion sufficiently reliable).

Moreover, the AERs and Clinical Investigator data kept by Merck are also admissible under the business records exception to the hearsay rule and as admissions by a party. See

generally *Martinkovic v. Bangash,* 1987 WL 28400 (explaining that receipt of adverse event reports and records maintained of them are admissible against defendants as either records of regularly conducted business under Fed.R. Evid. 803(6) or as Defendant's admissions under Fed. R. Evid. 801(d)(2)).  For purposes of notice, the reports in Merck's database are sufficiently trustworthy to fall within the exceptions to the hearsay rule.

Additionally, AERs are admissible as an exception to the hearsay rule for statements made for purposes of medical diagnosis or treatment, because an important purpose of the AER program or  clinical investigator reports is to identify whether the cause of an adverse reaction is due to the ingestion of a drug.  Rule 803(4).

**B.    Adverse Event Reports are Admissible When They Involve Incidents Sufficiently Similar to Place Defendant on Notice of Danger.**

The requirement of similarity of circumstances is relaxed where evidence, such as AERs or clinical investigator reports, is offered to show that a defendant had notice of a danger rather than where the prior incidents are directed at proving actual negligence.  *Kehm v. Procter & Gamble Manufacturing Co.*, 724 F.2d 613, 626 (8th Cir. 1983) (explaining how it is up to the jury to decide what weight to give complaints from other customers).  Further, "[u]nder Fed. R. Evid. 401, evidence of similar occurrences 'might be relevant to the defendant's notice, magnitude of the danger involved, the defendant's ability to correct a known defect, the lack of safety for intended uses, [or] the standard of care, and causation.'" *Ramos v. Liberty Mut. Ins. Co.*, 615 F.2d 334, 338-39 (5th Cir. 1980), *cert. denied*, 449 U.S. 1112 (1981)).  To the extent experts rely on the numbers of AERs, the defendants will have ample opportunity to counter this evidence and explain dissimilarities.

## C.    Adverse Event Reports Are More Probative than Prejudicial

Given the fact that the AERs including investigator reports are being presented by plaintiffs as admissible non-hearsay, as well as hearsay that falls within the exceptions above, AERs are relevant evidence a jury should be permitted to consider in determining the issue of notice.  Merck is free to offer testimony regarding the importance and underlying procedure involved with AERs or with their self-proclaimed "adjudication process" begun in 1998.  *See Bendi v. McNeil-P.P.C., Inc.,* 6 F.3d 1378, 1385 (4th Cir. 1995) (explaining how the probative value of these reports was not outweighed by the danger of unfair prejudice, because the reports were highly probative on the issue of notice and the Defendant was free to offer testimony rebutting their significance).   Similarly, Plaintiffs will be able to show that the 1998 adjudication program, was not a method for assessing causation, but instead was part of Merck's pattern of ignoring its duty to properly investigate cardiovascular risk, and burying any such evidence.  That Merck would now seek to hide behind this self-preservation adjudication process as a basis for excluding evidence of the actual cardiovascular adverse event reports during the clinical trials is not surprising, but it should not be countenanced.  Specifically, such evidence is directly relevant and admissible to support Plaintiff's challenge of Merck's adjudication process and how it handled these early signals of the cardiovascular risk.

Merck argues that a jury may accord more weight to AERs simply because they are collected by a federal agency and might confuse the jury by placing Merck in a bad light.  As noted above, there is a relaxed standard for admitting AERs and other anecdotal evidence, including testimony based on such evidence when used to show notice on behalf of the defendant rather than to prove negligence.  To the extent the evidence may be considered by

the jury for one purpose but not another, the issuance of a limiting instruction at trial can resolve any potential concern of prejudice or confusion. *See O.L. Maudlin v. Upjohn Co.*, 697 F.2d 644, 648 (5th Cir. 1983) (explaining how a limiting instruction by the Court as to the use of AERs in determining notice, prevented possible jury confusion and/or prejudice with regard to AERs which report injuries other than the one at issue). Further, the time and testimony that would be necessary for Merck to deny notice of voluminous AERs would be minimal, at best, and not meet the level of undue delay under Rule 403. The fact that Merck received and kept records of investigator reports and AERs relating to the ingestion of Vioxx goes directly to the issue of awareness of the dangerous propensities of its prescription drug.

**D.    All AERs , Investigator Reports, and Mortality Data from Clinical Trials Are Relevant To Show Merck's Course of Conduct and Conscious Disregard for the Safety Of The Consumer**

This Court should allow AERs and Investigator data received by Merck into evidence, at least up to the date of Mr. Irvin's death. Events up to this date show Merck's awareness and continuing failure to warn doctors and consumers about the injuries suffered by Mr. Irvin, including his death. AERs not only serve as a monitoring function for the pharmaceutical manufacturer, but proper notation and forwarding of the information found in the AERs serves as a tool for doctors in determining when to prescribe and how to monitor the prescription drug in question. The fact that all of the AERs do not relate to Mr. Irvin's death does not negate the fact that every AER, especially those related to cardiovascular injuries and stroke, could and would be used in a doctor's analysis as related to the prescribing and monitoring of those ingesting the drug. And the investigator data is relevant to many issues including Merck's duty to investigate, Merck's duty to warn in its initial product labeling, and Merck's motive to manipulate other trials. Further, the Alzheimer's disease clinical trial data related to

mortality is highly relevant to issues of notice, a duty to investigate, a duty to warn, and the unreasonableness of Merck's conduct in marketing and selling the drug.

Furthermore, AERs relating to Vioxx are relevant to Merck's course of conduct and conscious disregard of the safety of the consumer. Where punitive damages are sought, evidence of events occurring subsequent to the incident in question is highly probative on the issue of conscious disregard for the safety of others. Despite the fact that a defendant's conduct may not have had a possible effect on the particular plaintiff, evidence of related conduct by the defendant, which amounted to a conscious disregard for the safety of others is entirely relevant to the issue of punitive damages.

## CONCLUSION

For the foregoing reasons, Merck's motions to exclude all Evidence of and Reference to (1) Dr. Graham's Estimates and Statistically Insignificant Data; (2) Toxicological Data from Animal Studies; and (3) Adverse Event Reports, Investigator Reports, and Alzheimer's disease clinical trials mortality data should be denied.

Respectfully submitted,

By: _____
**Andy D. Birchfield, Jr.**
Paul J. Sizemore
P. Leigh O'Dell
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
(800) 898-2034 (telephone)
(334) 954-7555 (telecopier)

**Co-Lead Counsel**

**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
***Herman, Herman, Katz & Cotlar, LLP***
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
FAX: (504) 561-6024
**Temporary Office**
3411 Richmond Ave., Suite 460
Houston, TX 77046
PH: (713) 877-1843
FAX: (713) 871-9750
**PLAINTIFFS' LIAISONCOUNSEL**

Christopher A. Seeger, Esquire
 SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
MEUNIER&WARSHAUER, L.L.C.
P.O. Box 960
191 East Second Street
New Roads, LA 70760
(225) 638-6137
(225) 638-8836 (fax)

Carlene Rhodes Lewis, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Thomas R. Kline, Esquire
KLINE&SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)
**PLAINTIFF'S STEERING COMMITTEE**

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced in accordance with Pre-Trial Order No. #8, on this **11th** day of November, 2005.

**Articles**

# Risk of acute myocardial infarction and sudden cardiac death in patients treated with cyclo-oxygenase 2 selective and non-selective non-steroidal anti-inflammatory drugs: nested case-control study

David J Graham, David Campen, Rita Hui, Michele Spence, Craig Cheetham, Gerald Levy, Stanford Shoor, Wayne A Ray



## Summary

**Background** Controversy has surrounded the question about whether high-dose rofecoxib increases or naproxen decreases the risk of serious coronary heart disease. We sought to establish if risk was enhanced with rofecoxib at either high or standard doses compared with remote non-steroidal anti-inflammatory drug (NSAID) use or celecoxib use, because celecoxib was the most common alternative to rofecoxib.

**Methods** We used data from Kaiser Permanente in California to assemble a cohort of all patients age 18–84 years treated with a NSAID between Jan 1, 1999, and Dec 31, 2001, within which we did a nested case-control study. Cases of serious coronary heart disease (acute myocardial infarction and sudden cardiac death) were risk-set matched with four controls for age, sex, and health plan region. Current exposure to cyclo-oxygenase 2 selective and non-selective NSAIDs was compared with remote exposure to any NSAID, and rofecoxib was compared with celecoxib.

**Findings** During 2 302 029 person-years of follow-up, 8143 cases of serious coronary heart disease occurred, of which 2210 (27·1%) were fatal. Multivariate adjusted odds ratios versus celecoxib were: for rofecoxib (all doses), 1·59 (95% CI 1·10–2·32, p=0·015); for rofecoxib 25 mg/day or less, 1·47 (0·99–2·17, p=0·054); and for rofecoxib greater than 25 mg/day, 3·58 (1·27–10·11, p=0·016). For naproxen versus remote NSAID use the adjusted odds ratio was 1·14 (1·00–1·30, p=0·05).

**Interpretation** Rofecoxib use increases the risk of serious coronary heart disease compared with celecoxib use. Naproxen use does not protect against serious coronary heart disease.

Published online
January 25, 2005
http://image.thelancet.com/
extras/05art1005web.pdf

Office of Drug Safety, Center
for Drug Evaluation and
Research, Food and Drug
Administration, Rockville, MD,
USA (D J Graham MD); The
Permanente Medical Group
(D Campen MD, S Shoor MD),
Pharmacy Outcomes Research
Group (R Hui PharmD,
M Spence PhD,
C Cheetham PharmD), and
Southern California
Permanente Medical Group
(G Levy MD), Kaiser
Permanente, Oakland, CA, USA;
Department of Preventive
Medicine and Center for
Education and Research on
Therapeutics, Vanderbilt
University School of Medicine,
Nashville, TN, USA
(Prof W A Ray PhD); and
Geriatric Research, Education,
and Clinical Center, Nashville
Veterans Administration
Medical Center, Nashville, TN,
USA (Prof W A Ray)

Correspondence to:
Dr David J Graham
GRAHAMD@cder.fda.gov

## Introduction

Cyclo-oxygenase 2 (COX2) selective non-steroidal anti-inflammatory drugs (NSAIDs) are prescribed for the treatment of arthritis and other musculoskeletal complaints because of the reduced occurrence of gastrointestinal toxic effects compared with non-selective NSAIDs.[1,2] Questions about cardiovascular risk with these COX2-selective drugs were raised by the finding of a five-fold difference in incidence of acute myocardial infarction between patients treated with rofecoxib 50 mg/day and naproxen 1000 mg/day in a large randomised clinical trial (Vioxx Gastrointestinal Outcomes Research; VIGOR),[3] and by a meta-analysis of clinical trials of celecoxib and rofecoxib.[4] Because the VIGOR trial did not have a placebo group, its findings could have suggested either an adverse effect of rofecoxib, an adverse effect of coxibs in general, or a hitherto unrecognised protective effect of naproxen.[3,5] In view of the high use of COX2 drugs in the USA, even a small increase in adverse cardiovascular events would have substantial public-health effects.

Several observational studies have sought to clarify the findings of the VIGOR trial. High-dose rofecoxib (>25 mg/day) has been reported to enhance the risk of adverse cardiovascular events relative to non-users of any NSAID[6] or users of celecoxib.[7] In one study, no increased risk was noted with rofecoxib compared with other NSAIDs, but high-dose rofecoxib was not assessed separately.[8] Studies investigating the effect of naproxen on cardiovascular risk have yielded conflicting results. In three cohort studies, no reduction in risk was reported with naproxen use,[6,9] whereas a cardioprotective effect was noted in three other studies.[10–12] We sought to address these important questions about the cardiovascular effects of NSAIDs.

## Methods

Kaiser Permanente is a national integrated managed care organisation providing comprehensive health care to more than 6 million residents in the state of California.[13] The enrolled population varies with respect to age, educational attainment, family income, and ethnic origin. The organisation maintains computer files of eligibility for care, outpatient visits, admissions, medical procedures, emergency room visits, laboratory testing, and outpatient drug prescriptions for all its members. Mortality status, including underlying cause of death are recorded on death certificates, is periodically updated with data obtained from the California Department of Health, Center for Health Statistics. This study was approved by the institutional review boards of both the northern and southern divisions of Kaiser Permanente in California.

1

P2.0050

MRK-ACO0144158

EXHIBIT
A
tabbies

**Articles**

We assembled a cohort of NSAID-treated patients to undertake a nested case-control study. From Jan 1, 1999, to Dec 31, 2001, we identified all individuals age 18–84 years who filled at least one prescription for a COX2 selective (celecoxib or rofecoxib) or non-selective (all other) NSAID. Those with at least 12 months of health plan coverage before the date of that first NSAID prescription were entered into the cohort if they had no diagnoses of cancer, renal failure, liver failure, severe respiratory disease, organ transplantation, or HIV/AIDS during the screening interval. We followed up cohort members from this entry date until the end of the study period (December, 2001) or until occurrence of an acute myocardial infarction or death, whichever came first.

The study outcome was incident serious coronary heart disease, defined as acute myocardial infarction requiring admission or sudden cardiac death. We identified acute myocardial infarction requiring admission with the international classification of diseases, 9th revision, clinical modification (ICD-9-CM) code 410 (acute myocardial infarction) or 411·1 (intermediate coronary syndrome, as long as laboratory documentation was available of acute myocardial infarction—ie, raised creatine kinase MB fraction or troponin I). We classified outpatient deaths as sudden cardiac death if the underlying cause of death listed hypertensive heart disease, ischaemic heart disease, conduction disorders, dysrhythmias, heart failure, atherosclerotic heart disease, sudden death, or death from an unknown cause.[x] In validation studies of computerised hospital data, a principal diagnosis code for acute myocardial infarction has a positive predictive value between 92%[x] and 95%[x] and a sensitivity of 94%.[x] Furthermore, we used computerised laboratory data, from which we noted that 87·4% of patients admitted with acute myocardial infarction had cardiac enzyme concentrations that confirmed diagnosis. Although there is probably more misclassification of the out-of-hospital sudden cardiac deaths, their inclusion is important (and routine in clinical trials), because coronary artery disease frequently manifests as sudden death outside of the hospital.[x]

For every case, we randomly selected four controls from individuals under observation in the study cohort on the date of the case event (index date), and matched them for age (year of birth), sex, and health plan region (north or south).[x] A given cohort member selected as a control for a case on one date could become a control for another case occurring on a later index date, as long as he or she remained in the study cohort and was therefore also at risk of becoming a case. Thus, a control could subsequently become a case. We excluded potential cases and controls if they were not enrolled on the index date and for at least 11 of the 12 preceding months. During the study period, pharmacy benefits persisted for enrolment lapses of up to 1 calendar month.

We established the NSAID exposure status of cases and controls at the case index date. We based exposure classification on the duration, or days of drug supply, dispensed in the NSAID prescription. Patients were current users if the duration of the NSAID prescription closest to and preceding the index date overlapped with the index date. Remote users were those whose drug supply ended more than 60 days before the index date. We judged these patients unlikely to be taking the prescription NSAID on the index date and thus they were the reference category in several analyses. Recent users were individuals whose NSAID prescription ended between 1 and 60 days before the index date. We classified these patients separately for several reasons. The effects of NSAIDs on cardiovascular risk might persist a short time after the last dose. Because of dosing as required or incomplete compliance, some recent users might have been taking the drug after the nominal end of the dispensed supply. Thus, we created a separate category to avoid the misclassification that would arise by regarding these patients as either current or remote users.

We initially classified rofecoxib exposure as either standard (≤25 mg/day) or high (>25 mg/day) dose on the basis of the dispensed tablet strength. However, review of computerised patients' prescription histories showed inconsistencies between the instructions for use, days supply, and frequency of refills. For example, some patients dispensed the 25 mg strength were taking two tablets per day, whereas others who were dispensed the 50 mg strength were taking a half tablet per day. To address this potential misclassification, computerised printouts of all NSAID prescriptions for all rofecoxib-treated patients, covering the entire study period, were reviewed by a panel masked to case or control status (DC, RH, MS, CC). We reclassified patients with respect to rofecoxib dose status only if there was unanimous consensus among panel members.

For the 365-day period before the index date, we obtained data for potential risk factors for the occurrence of serious coronary heart disease. These included: cardiovascular admissions, as defined by diagnosis-related group coding (acute myocardial infarction, coronary revascularisation, angina, congestive heart failure, other ischaemic heart disease, cardiac arrhythmias, cerebrovascular accidents, peripheral vascular disease); emergency room visits for cardiovascular reasons and outpatient diagnosis for tobacco use, as defined by ICD-9-CM coding; and cardiovascular prescription drug use (thiazide diuretics, loop diuretics, angiotensin-converting-enzyme inhibitors or angiotensin-receptor blockers, calcium-channel blockers, β blockers, digoxin, nitrates, antiarrhythmics, 3-hydroxy-3-methyl-glutaryl coenzyme A reductase inhibitors, fibrates, nicotinic acid, antiplatelet drugs [ticlopidine, clopidogrel], anticoagulants [warfarin, low molecular weight heparin], insulin, oral hypoglycaemics). We also obtained data for non-cardiovascular admissions and emergency room visits, same-day admissions for medical procedures, outpatient diagnoses of alcohol dependence, rheumatoid arthritis,

MRK-ACO0144159

and prescription use of hormone replacement therapy, oral prednisone (>1000 mg in the past year) or disease-modifying antirheumatic drugs.

To control for potential differences in cardiovascular disease between study exposure groups, we calculated a cardiovascular risk score for cases and controls.[33,34,35] The score was estimated from a logistic regression analysis of the effects of the above factors on the odds of serious coronary heart disease for unexposed (remote or recent use) patients. We used the coefficients from this regression to calculate every participant's predicted probability of serious coronary heart disease—the risk score. This score then was categorised into ten values, with the lowest value representing patients with no diagnosed or treated cardiovascular disease and the remaining nine representing approximate quantiles of the controls. A 12·1-fold difference in risk was present between the lowest (0) and highest (9) value of the score, with a progressive increase in risk with every increasing score value. The results thus obtained were virtually identical to those from more complex models that included the individual components of the risk score. For example, the odds ratio for recent users, the largest exposure group in our study, was 1·140 (95% CI 1·062–1·223) with the complex model and 1·109 (1·034–1·190) with the cardiovascular risk score, a difference of 0·031. Similarly, for ibuprofen users, the largest currently exposed drug group in our study, the odds ratio with the complex models was 1·074 (0·969–1·191) and with the score-based model it was 1·059 (0·956–1·174), a difference of 0·015, less than 2%. Of note, the risk score produced slightly more conservative point estimates and lower bounds for the CIs than did the complex models.

We used conditional logistic regression to compare current exposure to a specific NSAID with remote exposure to any NSAID. We obtained estimates of the odds ratio and 95% CIs from the regression. An a-priori aim of the study was to compare current exposure to either standard-dose or high-dose rofecoxib with current exposure to celecoxib. The same regression model was rerun with celecoxib as the reference to obtain odds ratio estimates for standard-dose and high-dose rofecoxib. We did analyses with Stata version 7.0 (College Station, TX, USA).

To assess the potential for confounding from low-dose aspirin use, over-the-counter NSAID use, smoking history, and family history of acute myocardial infarction, we undertook a standardised telephone survey of a random sample of controls currently exposed to celecoxib, ibuprofen, naproxen, or rofecoxib, or controls with remote exposure to a NSAID.

### Role of the funding source

A document describing portions of this study was prepared for the US Food and Drug Administration (FDA) by the lead author (DG), and the FDA posted this on its website on Nov 2, 2004.[6] This document was preliminary,

|  | Cases (n=8143) | Controls (n=31 496) |
|---|---|---|
| Age (years) | 66·8 (11·6) | 67·0 (11·5) |
| Men | 5031 (62%) | 19 399 (62%) |
| Cardiovascular admission in past year* | 3153 (34%) | 962 (3%) |
| Myocardial infarction or revascularisation | 207 (2%) | 133 (<1%) |
| Angina | 230 (3%) | 271 (1%) |
| Heart failure | 287 (4%) | 160 (<1%) |
| Other ischaemic heart disease | 354 (4%) | 192 (1%) |
| Cardiac arrhythmia | 186 (2%) | 204 (1%) |
| Peripheral vascular disease | 45 (1%) | 35 (<1%) |
| Stroke | 173 (2%) | 143 (<1%) |
| Cardiovascular drug use in past year* | 6626 (89%) | 18 774 (58%) |
| Angiotensin-converting-enzyme inhibitor | 2838 (35%) | 6787 (22%) |
| Angiotensin-receptor blocker | 372 (5%) | 595 (2%) |
| Antiarrhythmic drug | 710 (9%) | 345 (1%) |
| Anticoagulant drug | 495 (6%) | 301 (1%) |
| β blocker | 3162 (39%) | 6939 (22%) |
| Calcium-channel blocker | 2196 (27%) | 4685 (14%) |
| Digitalis glycoside | 808 (10%) | 1176 (4%) |
| Hypoglycaemic drug | 2196 (27%) | 3725 (12%) |
| Lipid-lowering drug | 3800 (34%) | 6050 (19%) |
| Loop diuretic | 1515 (21%) | 2214 (7%) |
| Nitrate | 2382 (29%) | 2658 (8%) |
| Platelet inhibitor | 412 (5%) | 434 (1%) |
| Thiazide diuretic | 2018 (24%) | 6757 (21%) |
| Other medical care in past year |  |  |
| Non-cardiovascular admission | 1368 (17%) | 2514 (8%) |
| Cardiovascular emergency room visit* | 337 (4%) | 276 (1%) |
| Non-cardiovascular emergency room visit* | 3729 (34%) | 6931 (22%) |
| Oestrogen use by women | 3167 (14%) | 5325 (16%) |
| Smoking-related diagnosis | 5521 (%) | 1013 (3%) |
| Alcohol dependence | 63 (1%) | 163 (1%) |
| Treated by rheumatologist | 166 (2%) | 524 (2%) |
| Diagnosis of rheumatoid arthritis | 35 (1%) | 139 (<1%) |
| Disease-modifying antirheumatic drug use | 191 (2%) | 516 (2%) |
| Prednisone use (>1000 mg) | 378 (5%) | 693 (2%) |

Data are mean (SD) or number of participants (%). *Totals lower than the sum of the contributing subcategories because patients could contribute to more than one subcategory. †Visits not resulting in admission.

**Table 1: Characteristics of cases and matched controls from a base population of 1 394 764 users of COX2 selective and non-selective NSAIDs, 1999–2001**

and has been a source of controversy within the FDA. With respect to the study described here, which has been revised from that previously posted to correctly apply enrolment criteria for cases and controls, Kaiser Permanente and FDA management had no role in study design, data collection, data analysis, data interpretation, or writing of the report. The corresponding author had full access to all the data in the study and had final responsibility for the decision to submit for publication.

### Results

A total of 1 394 764 people contributed 2 302 029 person-years of observation time to the study cohort of NSAID users. Patients received various NSAIDs, including celecoxib (n=40 405), ibuprofen (991 261), naproxen (435 492), and rofecoxib (26 748). From this cohort, we identified 8199 cases of serious coronary heart disease and 12 796 matched controls. Of these, we excluded 56 cases and 1300 controls who did not meet the enrolment criteria, resulting in 8143 cases and 31 496 controls.

MRK-ACO0144160

Articles

| | Celecoxib (n=491) | Ibuprofen (n=2573) | Naproxen (n=1409) | Rofecoxib (n=196) | Remote use (n=18 720) |
|---|---|---|---|---|---|
| Age (years) | 73.4 (8.5) | 66.9 (13.3) | 68.4 (10.9) | 72.1 (9.9) | 66.4 (11.7) |
| Men | 245 (50%) | 1591 (62%) | 801 (57%) | 91 (46%) | 11 807 (63%) |
| Cardiovascular risk score | 4.21 (3.74) | 3.11 (3.14) | 3.23 (3.15) | 3.14 (3.16) | 2.91 (3.16) |
| Cardiovascular admissions in past year | 31 (6%) | 59 (2%) | 53 (4%) | 5 (3%) | 581 (3%) |
| Cardiovascular drug use in past year | 371 (76%) | 1535 (60%) | 876 (62%) | 129 (66%) | 10 388 (55%) |
| Angiotensin-converting-enzyme inhibitor | 140 (29%) | 517 (20%) | 301 (21%) | 43 (22%) | 3555 (19%) |
| Angiotensin-receptor blocker | 29 (6%) | 33 (1%) | 28 (2%) | 2 (1%) | 314 (1%) |
| Antiarrhythmic drug | 11 (2%) | 29 (1%) | 19 (1%) | 3 (2%) | 674 (4%) |
| Anticoagulant drug | 46 (9%) | 38 (1%) | 27 (2%) | 35 (8%) | 624 (6%) |
| β blocker | 155 (31%) | 589 (23%) | 318 (22%) | 50 (26%) | 3074 (23%) |
| Calcium-channel blocker | 111 (23%) | 351 (14%) | 231 (16%) | 31 (16%) | 2537 (14%) |
| Digitalis glycoside | 40 (8%) | 74 (3%) | 44 (3%) | 9 (5%) | 679 (4%) |
| Hypoglycaemic drug | 78 (16%) | 324 (13%) | 182 (13%) | 38 (9%) | 2152 (12%) |
| Lipid-lowering drug | 130 (26%) | 489 (19%) | 282 (20%) | 48 (24%) | 3505 (19%) |
| Loop diuretic | 82 (17%) | 166 (6%) | 122 (9%) | 19 (10%) | 1239 (7%) |
| Nitrate | 64 (13%) | 243 (9%) | 128 (9%) | 23 (12%) | 1461 (8%) |
| Platelet inhibitor | 9 (2%) | 77 (3%) | 39 (3%) | 1 (1%) | 778 (4%) |
| Thiazide diuretic | 127 (26%) | 605 (24%) | 357 (25%) | 56 (29%) | 3658 (20%) |
| Other medical care in past year | | | | | |
| Non-cardiovascular admission | 49 (10%) | 176 (7%) | 97 (7%) | 35 (8%) | 1524 (8%) |
| Non-cardiovascular emergency room visit* | 100 (20%) | 537 (21%) | 268 (18%) | 39 (10%) | 4152 (22%) |
| Oestrogen use by women | 102 (23%) | 434 (17%) | 157 (17%) | 53 (27%) | 2771 (15%) |
| Smoking-related diagnosis | 8 (2%) | 88 (3%) | 49 (5%) | 7 (3%) | 610 (3%) |
| Treated by rheumatologist | 18 (4%) | 39 (2%) | 41 (3%) | 17 (7%) | 254 (1%) |
| Disease-modifying antirheumatic drug use | 58 (6%) | 60 (2%) | 46 (3%) | 9 (5%) | 218 (1%) |
| Prednisone use (>1000 mg) | 72 (4%) | 56 (2%) | 59 (3%) | 13 (6%) | 108 (2%) |

Data are mean (SD) or number of controls (%). *Visits not resulting in admission.

**Table 2: Characteristics of controls currently exposed to celecoxib, ibuprofen, naproxen or rofecoxib, or remotely exposed to an NSAID.**

Of the 8143 cases of serious coronary heart disease, 6635 were admitted with acute myocardial infarction and 1508 had sudden cardiac death. Laboratory confirmation (raised creatine kinase MB fraction or troponin I) was present in 5799 (87%) patients admitted with acute myocardial infarction. Of all admitted cases, 762 (11%) died. As expected, the prevalence of previous cardiovascular admission, emergency room visits, and drug use was uniformly increased in cases (table 1).

To establish if risk factors for cardiovascular disease varied by NSAID use, we investigated the distribution of these factors in controls (table 2). Controls exposed to ibuprofen or naproxen, and those with remote exposure to any NSAID, were similar with respect to age, sex, and most covariates, although anticoagulant drug use was more common in the remotely exposed group than in the other groups. Rofecoxib-exposed controls were older, more likely to be women and to be treated by a rheumatologist, and more likely to have used anticoagulants or oral prednisone than controls exposed to ibuprofen, naproxen, or a remote NSAID. Celecoxib-treated controls had more cardiovascular admissions in the preceding year and had a higher frequency of use for various cardiovascular drugs than those exposed to rofecoxib. Cardiovascular risk scores were significantly greater for controls treated with celecoxib than for those from all other groups including rofecoxib (p=0.0001, rofecoxib vs celecoxib).

When all current users of rofecoxib were compared with remote users of NSAIDs, the risk of serious coronary heart disease was enhanced 1.34-fold (p=0.066; table 3). Risk fell slightly with celecoxib (odds ratio 0.84) and rose a little with standard-dose rofecoxib

| | Cases | Controls | Unadjusted odds ratio (95% CI) | Adjusted* odds ratio (95% CI) | p |
|---|---|---|---|---|---|
| Compared with remote use | | | | | |
| Remote use | 6648 | 18 720 | 1.00 | 1.00 | |
| Current use | 1720 | 6458 | 1.17 (1.09, 1.20) | 1.11 (1.01, 1.19) | 0.001 |
| Current use | | | | | |
| Celecoxib | 176 | 491 | 1.01 (0.86, 1.28) | 0.84 (0.67, 1.04) | 0.12 |
| Ibuprofen | 670 | 2573 | 1.07 (0.98, 1.18) | 1.06 (0.96, 1.16) | 0.17 |
| Naproxen | 467 | 1409 | 1.07 (0.95, 1.21) | 1.14 (1.00, 1.30) | 0.05 |
| Rofecoxib (all doses) | 68 | 196 | 1.29 (1.05, 1.81) | 1.32 (0.98, 1.80) | 0.066 |
| Rofecoxib ≤25 mg/day | 58 | 176 | 1.21 (0.92, 1.66) | 1.23 (0.89, 1.71) | 0.21 |
| Rofecoxib >25 mg/day | 10 | 8 | 3.93 (1.48, 12.76) | 3.00 (1.09, 8.31) | 0.03 |
| Other NSAIDs | 514 | 1849 | 1.16 (1.07, 1.37) | 1.13 (1.01, 1.27) | 0.03 |
| Compared with celecoxib use | | | | | |
| Celecoxib use | 176 | 491 | 1.00 | 1.00 | |
| Remote use | 6648 | 18 720 | 1.02 (0.87, 1.31) | 1.32 (1.06, 1.62) | 0.015 |
| Current use | 1720 | 6458 | 1.02 (0.87, 1.31) | 1.32 (1.06, 1.62) | |
| Current use | | | | | |
| Ibuprofen | 670 | 2573 | 1.07 (0.87, 1.32) | 1.26 (1.00, 1.60) | 0.004 |
| Naproxen | 467 | 1409 | 1.02 (0.83, 1.28) | 1.36 (1.06, 1.74) | 0.005 |
| Rofecoxib (all doses) | 68 | 196 | 1.31 (0.94, 1.85) | 1.59 (1.10, 2.37) | 0.015 |
| Rofecoxib ≤25 mg/day | 58 | 176 | 1.17 (0.82, 1.62) | 1.47 (0.99, 2.17) | 0.054 |
| Rofecoxib >25 mg/day | 10 | 8 | 4.78 (1.84, 12.76) | 3.58 (1.27, 10.11) | 0.016 |
| Other NSAIDs | 514 | 1849 | 1.13 (0.93, 1.41) | 1.35 (1.06, 1.71) | 0.015 |

*Adjusted for age, sex, and health plan region, cardiovascular risk score, admission for non-cardiac-related disorders and same-day procedures, emergency room visits for non-cardiac reasons, hormone replacement therapy, and high-dose prednisone.

**Table 3: Risk of acute myocardial infarction with use of selected NSAIDs compared with remote use of a NSAID or current use of celecoxib**

MRK-ACO0144161

**Articles**

| | Celecoxib use (n=369) | Ibuprofen use (n=190) | Naproxen use (n=193) | Rofecoxib use (n=81) | Remote use (n=885) | Total (n=817) | p |
|---|---|---|---|---|---|---|---|
| Aspirin use | 32 (19%) | 43 (23%) | 53 (28%) | 19 (23%) | 44 (24%) | 191 (23%) | 0.43 |
| Over-the-counter NSAID use (≥2 days a week for >1 year) | 26 (15%) | 18 (9%) | 23 (17%) | 11 (14%) | 24 (13%) | 102 (17%) | 0.55 |
| Smoking history | | | | | | | |
| Current | 15 (9%) | 17 (9%) | 22 (11%) | 6 (7%) | 20 (11%) | 80 (10%) | 0.80 |
| Past | 72 (43%) | 100 (57%) | 78 (41%) | 35 (43%) | 89 (48%) | 374 (46%) | 0.14 |
| Family history of acute myocardial infarction | | | | | | | |
| First-degree relative | 65 (37%) | 90 (47%) | 89 (46%) | 14 (17%) | 84 (45%) | 362 (44%) | 0.45 |
| First-degree at early age* | 27 (15%) | 34 (18%) | 34 (18%) | 13 (16%) | 29 (16%) | 137 (17%) | 0.97 |

Data are number of controls (%). *Men age <55 years, women age <60 years.

Table 4: Aspirin use, over-the-counter NSAID use, smoking history, and family history of acute myocardial infarction in 817 randomly selected controls with remote NSAID exposure or current exposure to celecoxib, ibuprofen, naproxen, or rofecoxib

(1·23). When all current users of rofecoxib were compared with current users of celecoxib, risk was increased 1·59-fold (p=0·015, table 3). For high-dose rofecoxib, the odds ratio was 3·58 (p=0·016) and for standard-dose rofecoxib it was 1·47 (p=0·054). Compared with remote use, risk of serious coronary heart disease was amplified with recent use of any NSAID, current use of naproxen, and current use of other NSAIDs. The increased odds ratio for other NSAIDs was attributable to the effects of diclofenac (odds ratio 1·60 [95% CI 0·92–2·79]; p=0·09) and indometacin (1·30 [1·06–1·59]; p=0·01).

A random sample of 1015 controls with current exposure to celecoxib, ibuprofen, naproxen, or rofecoxib or with remote exposure to a NSAID was contacted by telephone to complete a brief questionnaire; 817 (80%) participated. Controls were generally comparable with respect to cardiovascular disease risk factors, although low-dose aspirin use was somewhat lower in celecoxib-exposed controls than in the other groups (table 4).

## Discussion

The data from the present study provide further evidence that rofecoxib increases the risk of serious coronary heart disease.

Our study has several limitations. NSAID exposure was established from records of filled prescriptions and thus would not include data for drugs obtained over the counter. A telephone survey of a random sample of controls established that use of over-the-counter NSAIDs did not differ by prescription NSAID use status. Therefore, any misclassification of exposure should be non-differential and would not account for the study findings.

Although we adjusted for a wide range of recognised and potential cardiovascular risk factors, we did not have information on important factors such as smoking, family history of myocardial infarction, and use of low-dose aspirin. However, the findings of the telephone survey showed these factors were not differentially distributed with respect to NSAID exposure and thus such confounding is unlikely to account for study findings. These survey results accord with those of other

studies, in which low-dose aspirin use or smoking behaviour did not differ by specific NSAID. In an analysis of data from a nationwide in-home survey of US Medicare beneficiaries, patients treated with celecoxib, rofecoxib, or non-selective NSAIDs did not differ with respect to body-mass index, smoking behaviour, aspirin use, or educational level.

Although we studied serious coronary heart disease in a population of 6 million people, sample size was limited for some comparisons. Relatively few people in the study base were exposed to high-dose rofecoxib. Nevertheless, the sample size was sufficient to show a substantially higher risk for high-dose use than for either remote NSAID use or celecoxib use. Our findings accord with those of the two other published epidemiological studies that have analysed use of rofecoxib in doses greater than 25 mg.

Because of limited power, we were unable to fully address whether the cardiovascular risk associated with rofecoxib varied by duration of use. This issue arose after interpretation of data for a study of 2586 patients randomly allocated either rofecoxib 25 mg/day or placebo, who were followed up for 3 years for the development of colon polyps (Adenomatous Polyp Prevention on Vioxx; APPROVe). 25 cardiovascular events arose in the placebo group and 45 in the rofecoxib group, and the difference in incidence became significant only after 18 months on the drug. An entirely plausible explanation for these results is insufficient statistical power before 18 months of study time. Indeed, inadequate sample size and low power of tests of interaction make it unlikely that true differences could be found when assessing the subgroup of events occurring early in the study.

In our study, the mean duration of use before occurrence of a study event was 113 days (range 4–688) with standard-dose rofecoxib and 112 days (8–262) with high-dose use (p=0·96), consistent with the idea that risk begins early in treatment. Furthermore, analysis by the FDA of data from the VIGOR trial showed that the survival curve for acute myocardial infarction risk with high-dose rofecoxib began to diverge from the naproxen curve after 1 month of rofecoxib use. The absence of divergence during the first month could be attributable to the few events in either study group, leading to inadequate

5

MRK-ACO0144162

statistical power." Thus, these results cannot be viewed as evidence that the first month is free of risk. Indeed, in this same FDA review, analysis of a Merck-sponsored postapproval randomised clinical trial (study 090) of very short-term use of the 12·5 mg rofecoxib dose showed substantial differences in cardiovascular risk between rofecoxib and naproxen." Moreover, findings of three reports—two large nested case-control studies and a cumulative meta-analysis of rofecoxib clinical trials—strongly suggest that cardiovascular risk begins early with both standard-dose and high-dose rofecoxib treatment.

The present study provides data relevant to several other active controversies about the cardiovascular safety of NSAIDs. In current users of celecoxib, a slightly reduced risk of serious coronary heart disease was noted; in other studies, a similar diminished risk with celecoxib was seen." Indeed, in several studies," potentially beneficial effects of celecoxib on endothelial function and coronary-artery blood flow have been reported, and findings of a case-control study published online in December, 2004, showed that celecoxib protected against the occurrence of non-fatal myocardial infarction compared with non-use of NSAIDs or rofecoxib use. However, the US National Cancer Institute halted its Adenoma Prevention with Celebrex (APC) trial" after the data safety monitoring board reported a 2·5-fold greater risk of acute myocardial infarction and stroke in patients treated with celecoxib 400 mg/day and a 3·4-fold increase in risk with 800 mg/day.

Findings of other studies raise concerns about a COX2 class effect. Higher rates of acute myocardial infarction, stroke, and death have been recorded in patients treated with valdecoxib after coronary-artery bypass surgery than in those given opioid treatment for postoperative pain." These increases were not significant but the study was small. The manufacturer of valdecoxib announced the results of a second study," in which an increased risk of serious coronary heart disease was again noted in patients treated with the drug after bypass surgery. In a large clinical trial," the rate of acute myocardial infarction was increased in individuals treated with another COX2-selective drug, lumiracoxib, compared with naproxen, especially in those not taking low-dose aspirin. This difference was not significant and was not present when compared with ibuprofen use. Additional data from clinical trials in patients with baseline cardiovascular disease" would be useful."

After publication of the VIGOR trial findings, considerable speculation arose that naproxen reduced the risk of coronary heart disease." However, our findings, like those of some" but not all" others, suggest this drug does not have cardioprotective effects. Indeed, the present data show the possibility of a small increased risk of serious coronary heart disease, and a US National Institutes of Health trial was stopped after preliminary analysis suggested a 50% increase in risk of acute

myocardial infarction and stroke in patients treated with naproxen." The lack of a protective effect of naproxen is important, because the drug frequently is a comparator in clinical trials of new coxibs." Thus, findings from such studies showing that the new drug has an increased risk of cardiovascular disease relative to naproxen should alert doctors and patients to potential cardiotoxic effects.

While this report was in preparation, rofecoxib was withdrawn from the market by the manufacturer." Many would argue that, in view of the findings of the VIGOR trial" and subsequent observational studies," withdrawal or restriction of rofecoxib should have happened much earlier."

We should assess the potential public-health effects of failure to take earlier action. From 1999 to September, 2004, an estimated 106·7 million rofecoxib prescriptions were dispensed in the USA, of which 17·6% were high-dose." In two Merck-sponsored randomised clinical trials," relative risks for acute myocardial infarction of 5 for high-dose rofecoxib and 2 for the standard dose were recorded. The background rate for acute myocardial infarction among control groups from studies of cardiovascular risk in NSAID users varied from 7·9 per 1000 person-years in CLASS" to 12·4 per 1000 person-years in TennCare." Using the relative risks from the above-mentioned randomised clinical trials and the background rates seen in NSAID risk studies, an estimated 88000–140000 excess cases of serious coronary heart disease probably occurred in the USA over the market-life of rofecoxib." The US national estimate of the case-fatality rate (fatal acute myocardial infarction plus sudden cardiac death) was 44%," which suggests that many of the excess cases attributable to rofecoxib use were fatal.

In the future, when trials such as VIGOR show that a new treatment confers a greater risk of a serious adverse effect than a standard treatment, we must be much more careful about allowing its unrestrained use.

**Contributors**
D J Graham had the idea for the study, was responsible for protocol development, study supervision, statistical analysis, data interpretation, and survey design, and wrote the first draft of the manuscript. D Campen shared in study conception and contributed to protocol development, study supervision, data interpretation, and critical revision of the manuscript. R Hui and M Spence contributed to protocol development, data extraction, quality assurance, data interpretation, and critical revision of the manuscript. C Cheetham contributed to protocol development, survey design and execution, quality assurance, data interpretation, and critical revision of the manuscript. C Levy and S Shoor contributed to protocol development, data analysis, data interpretation, and critical revision of the manuscript. W A Ray contributed to protocol development, statistical analysis, data interpretation, quality assurance, and critical revision of the manuscript.

**Conflict of interest statement**
W A Ray acted as a consultant to Pfizer and to plaintiffs' attorneys regarding rofecoxib. S S has undertaken research funded by Amgen and is on the speakers' bureau for Abbott Laboratories. All other authors declare that they have no conflict of interest.

**Acknowledgments**
We thank Prof Gurkirpal Singh for helpful suggestions relating to data analyses. This work was supported by Kaiser Permanente, CA, USA, and

MRK-ACO0144163

a contract with FDA. WAR was supported by cooperative agreements from the FDA (FD-U-001641) and the Agency for Healthcare Research and Quality, Centers for Education and Research in Therapeutics (HS1-0334). The views expressed are those of the authors and do not necessarily reflect those of the FDA.

## References

1. Silverstein FE, Faich G, Goldstein JL, et al. Gastrointestinal toxicity with celecoxib vs nonsteroidal anti-inflammatory drugs for osteoarthritis and rheumatoid arthritis: the CLASS study—a randomised controlled study. JAMA 2000; 284: 1247–55.

2. Bombardier C, Laine L, Reicin A, et al. Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis. N Engl J Med 2000; 343: 1520–28.

3. Mukherjee D, Nissen SE, Topol EJ. Risk of cardiovascular events associated with selective COX-2 inhibitors. JAMA 2001; 286: 954–59.

4. Weir MR, Sperling RS, Reicin A, Gertz BJ. Selective COX-2 inhibition and cardiovascular effects: a review of the rofecoxib development program. Am Heart J 2003; 146: 591–604.

5. Konstam MA, Weir MR, Reicin A, et al. Cardiovascular thrombotic events in controlled, clinical trials of rofecoxib. Circulation 2001; 104: 2280–88.

6. Ray WA, Stein CM, Daugherty JR, Hall K, Arbogast PG, Griffin MR. COX-2 selective non-steroidal anti-inflammatory drugs and risk of serious coronary heart disease. Lancet 2002; 360: 1071–73.

7. Solomon DH, Schneeweiss S, Glynn RJ, et al. Relationship between selective cyclooxygenase-2 inhibitors and acute myocardial infarction in older adults. Circulation 2004; 109: 2068–73.

8. Mamdani M, Rochon P, Juurlink DN, et al. Effect of selective cyclooxygenase 2 inhibitors and naproxen on short term risk of acute myocardial infarction in the elderly. Arch Intern Med 2003; 163: 481–86.

9. Ray WA, Stein CM, Hall K, Daugherty JR, Griffin MR. Non-steroidal anti-inflammatory drugs and risk of serious coronary heart disease: an observational study. Lancet 2002; 359: 118–23.

10. Solomon DH, Glynn RJ, Levin R, Avorn J. Nonsteroidal anti-inflammatory drug use and acute myocardial infarction. Arch Intern Med 2002; 162: 1099–104.

11. Watson DJ, Rhodes T, Cai B, Guess HA. Lower risk of thromboembolic cardiovascular events with naproxen among patients with rheumatoid arthritis. Arch Intern Med 2002; 162: 1105–10.

12. Rahme E, Pilote L, LeLorier J. Association between naproxen use and protection against acute myocardial infarction. Arch Intern Med 2002; 162: 1111–15.

13. Sidney S, Petitti DB, Soff GA, Cundiff DL, Tolan KK. Quesenberry CP. Venous thromboembolic disease in users of low-estrogen combined estrogen-progestin oral contraceptives. Contraception 2004; 70: 3–10.

14. Fisher ES, Whaley FS, Krushat WM, et al. The accuracy of Medicare's hospital claims data: progress has been made, but problems remain. Am J Public Health 1992; 82: 243–48.

15. Rawson NSB, Malcolm E. Validity of the recording of ischaemic heart disease and chronic obstructive pulmonary disease in the Saskatchewan health care database. Stat Med 1995; 14: 2627–43.

16. Levesque CP, Hurst JW. The natural history of atherosclerotic coronary heart disease: an historical perspective. In: Alexander RW, Schlant RC, Fuster V, O'Rourke RA, Roberts R, Sonnenblick EH, eds. Hurst's the heart, 9th edn. New York: McGraw-Hill Medical Publishing Division, 1998: 1127–35.

17. Rothman KJ, Greenland S. Case-control studies. In: Rothman KJ, Greenland S, eds. Modern epidemiology, 2nd edn. Philadelphia: Lippincott-Raven Publishers, 1998: 93–114.

18. Ray WA, Meredith S, Thapa PB, Meador KG, Hall K, Murray KT. Antipsychotics and the risk of sudden cardiac death. Arch Gen Psychiatry 2001; 58: 1161–67.

19. Ray WA, Meredith S, Thapa PB, Hall K, Murray KT. Cyclic antidepressants and the risk of sudden cardiac death. Clin Pharmacol Ther 2004; 75: 234–41.

20. Ray WA, Murry KT, Meridith S, Narasimhulu SS, Hall K, Stein CM. Oral erythromycin and risk of sudden death from cardiac causes. N Engl J Med 2004; 351: 1089–96.

21. Graham DJ. Memorandum to the Acting Director of the Office of Drug Safety, Center for Drug Evaluation and Research. US Food and Drug Administration. http://www.fda.gov/cder/drug/infopage/vioxx/vioxxgraham.pdf (accessed Nov 9, 2004).

22. Griffin MR, Piper JM, Daugherty JR, Snowden M, Ray WA. Nonsteroidal anti-inflammatory drug use and increased risk for peptic ulcer disease in elderly persons. Ann Intern Med 1991; 114: 257–63.

23. Smalley WE, Ray WA, Daugherty J, Griffin MR. Nonsteroidal anti-inflammatory drug use and colorectal cancer incidence: a population-based study. Arch Intern Med 1999; 150: 161–66.

24. Griffin MR, Yared A, Ray WA. Nonsteroidal anti-inflammatory drugs and acute renal failure in elderly persons. Am J Epidemiol 2000; 151: 488–96.

25. American College of Rheumatology. Vioxx cardiovascular safety data from the APPROVe study. http://www.rheumatology.org/annual/press/APPROVe/section_annouce.asp (accessed Nov 10, 2004).

26. Yusuf S, Witter J, Probsfield J, Tyroler HA. Analysis and interpretation of treatment effects in subgroups of patients in randomized clinical trials. JAMA 1991; 266: 93–98.

27. Targum SL. Review of cardiovascular safety database for Vioxx. Feb 1, 2001. http://www.fda.gov/ohrms/dockets/ac/01/briefing/3677t2_06_cardio.pdf (accessed Nov 10, 2004).

28. Kimmel SE, Berlin JA, Reilly M, et al. Patients exposed to rofecoxib and celecoxib have different odds of nonfatal myocardial infarction. Ann Intern Med 2005; 142. Published early online Dec 7, 2004. http://www.acponline.org/journals/annals/myo_infar.pdf (accessed Dec 10, 2004).

29. Juni P, Nartey L, Reichenbach S, Sterchi R, Dieppe PA, Egger M. Risk of cardiovascular events and rofecoxib: cumulative meta-analysis. Lancet 2004; 364: 2021–29.

30. Chenevard R, Hurlimann D, Bechir M, et al. Selective COX-2 inhibition improves endothelial function in coronary artery disease. Circulation 2003; 107: 405–09.

31. Hermann M, Camici G, Fratton A, et al. Differential effects of selective cyclooxygenase-2 inhibitors on endothelial function in salt-induced hypertension. Circulation 2003; 108: 2308–11.

32. Kaufman M. Celebrex trial halted after finding of heart risk: FDA chief urges patients to ask about alternatives. Washington Post, Dec 18, 2004: A1.

33. Ott E, Nussmeier NA, Duke PC, et al. Efficacy and safety of the cyclooxygenase-2 inhibitors parecoxib and valdecoxib in patients undergoing coronary artery bypass surgery. J Thorac Cardiovasc Surg 2003; 125: 1481–92.

34. Pfizer. Pfizer provides information to health care professionals about its COX-2 medicine Bextra (valdecoxib). http://www.pfizer.com/are/news_releases/2004mr/mn_2004_1015.html (accessed Oct 15, 2004).

35. Farkouh MF, Kirshner H, Harrington RA, et al. Comparison of lumiracoxib with naproxen and ibuprofen in the Therapeutic Arthritis Research and Gastrointestinal Event Trial (TARGET), cardiovascular outcomes: randomised controlled trial. Lancet 2004; 364: 675–84.

36. Topol EJ. Failing the public health—rofecoxib, Merck and the FDA. N Engl J Med 2004; 351: 1707–09.

37. Harris G. Study links a fourth painkiller to an increase in heart problems. New York Times Dec 21, 2004: A1.

38. Merck. Merck announces voluntary worldwide withdrawal of Vioxx. http://www.merck.com/newsroom/press_release/product/2004_0930.html (accessed Sept 30, 2004).

39. IMS Health. National Prescription Audit Plus Time period 1999 to September 2004, extracted October 2004. Plymouth Meeting, PA, 2004.

40. McAlister FA, Straus SE, Guyatt GH, Haynes RB, for the Evidence-based Medicine Working Group. Users' guide to the medical literature: XX. Integrating research evidence with the care of the individual patient. JAMA 2000; 283: 2829–36.

41. American Heart Association. Heart disease and stroke statistics: 2004 update. http://www.americanheart.org/downloadable/heart/1072362290961DSStats2004Update-REV3-19-04.pdf (accessed Oct 19, 2004).

MRK-ACO0144164

3266

Morrison - Direct

1  A.  Well, these experiments would say that at least in

2  blood vessels both normal and atherosclerotic blood

3  vessels there's no effect on prostacyclin.  In fact,

4  one would conclude from this that VIOXX essentially is

5  neutral on blood vessels.

6      Q.  So if a plaque were to rupture in a blood

7  vessel what effect would VIOXX have on that plaque?

8  A.  It should have no effect on the prostacyclin

9  production at all.  It should have no effect on the

10  ability of that blood vessel to form a clot.

11      Q.  And why is there prostacyclin still in the

12  blood vessel?

13  A.  Because it is coming from COX-1.

14      Q.  And is COX-1 affected in any way by VIOXX?

15  A.  No.

16      THE COURT:  Is this a good time to break,

17  counselor, or do you want to go a couple minutes

18  longer?

19      MR. RABER:  It is up to everybody.

20      THE COURT:  It is up to you.  We're going to

21  break for lunch soon.  You can either take another five

22  minutes --



EXHIBIT
B
tabbies

23        MR. RABER:  If I can take another five

24   minutes I might be able to get to a good ending point.

25   Is that okay with everybody?


                              3267
                        Morrison - Direct
1         THE COURT:  Go ahead.

2    BY MR. RABER:

3        Q.  Now, this rabbit study you have just told us

4    about I see a publication date there of 2001.  Do you

5    see that?

6    A.  Oh, yes.

7        Q.  Okay.  When did the scientists at Merck

8    actually have this data, these results?

9    A.  Early in 1999.

10       Q.  Before or after VIOXX came on the market?

11   A.  Before.

12       Q.  So after we do this rabbit study what's the

13   unanswered question or where are we left?

14   A.  Well, the good news about the rabbit study is,

15   remember, I said the results from the study with Garret

16   were unexpected because we didn't think prostacyclins

17   in the blood vessels were coming from COX-2.  So that

18   was reassuring.  The problem we're left with is where

19  is this prostacyclin coming from because clearly in the

20  study we saw a decrease in the production of

21  prostacyclin.  So let me just show you the other places

22  the body makes prostacyclin.  What did I do with my

23  marker?  Oh, there it is.

24       So prostacyclin what we're looking for we're

25  trying to figure out where in the body does COX-2 make


                        3268
                  Morrison - Direct
1  prostacyclin.  So we want COX-2 prostacyclin.  And the

2  choices are the places that prostacyclin are made.  So

3  prostacyclin is made in the lung.  Prostacyclin is made

4  in the stomach.  It is actually part of that protective

5  layer I told you about in the stomach.  It is made in

6  the uterus, which is the big muscular structure where

7  the baby grows.  It is made in blood vessels.  It is

8  made in the brain.

9       Okay.  So we're trying to figure out where is

10  there COX-2 prostacyclin.  Well, we can rule out the

11  uterus for the simple reason that in a study we did

12  with Garret there were both men and women.  And the

13  prostacyclin goes down in the urine in both men and

14  women.  So it is not going to go down in men if it is

15   coming from the uterus.  We just ruled out blood

16   vessels as the source based on the experiments that I

17   just went through with the rabbit.  And so now we're

18   left trying to figure out, well, which of the remaining

19   ones is the likely source.

20       Q.  And did Merck do a study to try to answer

21   that question?

22   A.  Yes, they did.

23       Q.  I want to show you a document that is Defense

24   Exhibit 415.

25   A.  Yes.  This is a summary of experiments they were