FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2005 NOV 14  AM 8: 48

LORETTA G. WHYTE
CLERK

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| Evelyn Irvin Plunkett v. Merck & Co, Inc.* | | CASE NO. 02:05CV4046 |

---

**Plaintiff's Memorandum in Opposition to Defendant's Motion in Limine to Exclude (1) Evidence of Interim or "Blinded" Data from Trials of Vioxx and (2) Evidence that Specific Studies of Vioxx Were Considered But Not Undertaken or that Completed Studies Were Inadequate**

*(Plaintiff's Opposition to Defendant's Motion in Limine No. 9)*

---

Plaintiff Evelyn Irvin Plunkett, as Personal Representative of the Estate of Richard Irvin, Jr., by and through her attorneys, hereby opposes Defendant's motion to exclude (1) evidence of interim or "blinded" data from trials of Vioxx and (2) evidence that specific studies of Vioxx were considered but not undertaken or that completed studies were inadequate

In its Motion in Limine No. 9, Merck seeks a broad ruling generally striking "two categories of evidence." Def. Mot. at 1-2. Specifically, Merck seeks to exclude evidence that (1) Merck may have known the results of some of its studies, including VIGOR and APPROVe, long before the studies became technically "unblinded" and, (2) that there were studies that Merck specifically avoided because they would have revealed more strongly the cardiovascular risks of Vioxx. Although Merck plucks "examples" of such evidence from Plaintiffs' Exhibit List, it notably fails to particularize the evidence it seeks to exclude. Nor does Merck attempt to identify

Fee _____
Process _____
X  Dktd _____
✓  CtRmDep _____
    Doc. No. _____

testimony, expert or otherwise—that bears upon these broad categories of evidence. Nevertheless, Merck seeks a broad and out-of-context ruling that would prohibit "*all evidence or argument* regarding blinded data and studies contemplated but never performed." *Id.* at 9. (emphasis added).

It is inappropriate to grant a motion where the Court has not had the opportunity to see how all of the evidence fits together, especially where, as here, Merck has not disclosed all of the evidence it seeks to exclude. Moreover, evidence that may fall within the ambit of Merck's overbroad and ill-defined motion may include some of the most highly probative evidence on, among other things, defective warning, general causation, and punitive damages. Despite the significance of the issues upon which these documents bear, Merck focuses only on whether the evidence is probative of what Merck actually "knew" at the time of Mr. Irvin's injury. However, as Merck well knows, this is only half of the legal liability equation and only one of the many issues in this case. What dangers Merck knew *or should have known* is equally damning to Merck. With respect to failure to warn, the duty arises when the defendant knew or should have known of the need to issue a warning. *See GHR Energy Corp. v. Carboline Co.*, 744 F.Supp. 1405, 1407 (E.D.La.1990). To establish duty to warn, the plaintiff has to impute to a manufacturer knowledge sufficient to trigger the duty to provide a warning of the harmful effects of its product. *See id.*

Evidence that Merck seeks to exclude also bears upon general causation, a hotly-contested issue in this case. Specifically, Merck has steadfastly maintained that the APPROVe trial must be considered without any reference to other causation evidence and that APPROVe demonstrates that there is absolutely no risk of cardiovascular injury associated with Vioxx

2

until a person is exposed for more than 18 months. In other words, Merck proposes that the almost immediate risk seen in the VIGOR study and in the observational studies conducted by it and other studies are simply not scientifically supportable in light of APPROVe. Unfortunately for Merck, the APPROVE ESMB minutes demonstrate that the risk starts far earlier than 18 months and are part of a large body of evidence that Plaintiffs may use to demonstrate that Merck's stilted interpretation of APPROVe is unscientific and manufactured for this litigation.

In short, these documents (and related testimony) are important to present the "whole Vioxx story" and will address numerous issues, not just what Merck knew at the time Mr. Irvin took Vioxx. This premature motion must be denied.

## FACTUAL BACKGROUND

### A.    ESMB Minutes from APPROVe and VIGOR

Illustrative of the first "category" of evidence that Merck seeks to exclude are documents related to the conduct of the VIGOR and APPROVe Study – two Merck clinical trials that demonstrated that Vioxx carried a serious risk of cardiovascular injury. These exhibits, which are minutes of Merck's VIGOR Data Safety Monitoring Board (DSMB) and APPROVe External Safety Monitoring Board (ESMB), illustrate issues that arose during the course of the studies of which Merck employees were aware and which are relevant to numerous issues. *See* documents identified from Plaintiff's trial exhibit list, P1.0195, P1.0390, P1.0394 and P1.0430 (Ex. A).

For example, Exhibit P1.430, the VIGOR DSMB noted in 1999 that the cardiovascular injuries trended against "treatment A." Testimony derived in discovery confirms that the members of the DSMB were aware that Treatment A was Vioxx. It is thus apparent that the

members were aware of that the results signaled a problem for Vioxx.  In fact, as Merck concedes in a footnote, one of its employees, Deborah Shapiro, was on the ESMB.  Similarly, the APPROVe  ESMB minutes of August 7, 2002 (Ex. P1.0195); November 26, 2004 (Ex. P1.0390); and November 24, 2003 (Ex. P1.0394) are probative of several issues central to this case – including causation.  As a preliminary matter, these minutes demonstrate that there were serious problems with the early conduct of the APPROVe trial.  *See* P1.0195 ("as of July 31. 15.4% of the patients discontinued from the study.  Actions are continuously taken to contact investigators to improve the conduct of the trial.").

More importantly, however, the ESMB materials demonstrate an early "trend" of Vioxx related cardiovascular events long before the study had reached 18 months.  *See* P1.0390 at 3; *see also* P1.0394 at p. 2 ("Treatment differences were notes in many categories of [Adverse Events] including all reported CV events...").  That is, of course, contrary to the time that Merck now claims is the earliest time by which a patient could have a Vioxx-related cardiovascular event.

The importance of this point cannot be overstated for the issue of causation.  These exhibits undercut a lynchpin of Merck's key litigation claims on causation and support Plaintiff's claims that the cardiovascular risk begins long before the 18-month exposure time advocated by Merck, a matter observed by others not involved in this litigation.

**B.**     **Documents Relating to Studies that Merck Refused to Conduct**

Illustrative of the second category of evidence that Merck seeks to exclude (evidence of "studies not conducted") are those documents identified by Defendant as Plaintiff's trial exhibits P1.0211 and P1.0239.  (Ex. B).  These documents are part of a larger body of documents and testimony that illustrates a pattern central to Plaintiff's liability and punitive

damage claims: that is, every time a more definitive study was proposed to answer questions about the cardiovascular risks of Vioxx, Merck chose to either turn a blind eye or design a weaker study which could later be explained away.  Incredibly, Merck attempts to explain that this admitted pattern of "studies not conducted" was innocent and motivated by "ethical concerns." *See* Def. Mot. at 7.  Merck further posits that "plaintiffs have no basis for impugning" Merck's motives.  *Id.* at 6.  At trial, Plaintiffs will demonstrate that Merck's so-called "innocent explanation" is undercut by Merck's own internal documents.  For example, following the VIGOR study—at a time when many scientists both internal and external to Merck were concerned about perceived cardiovascular risks associated with the drug—Merck management elected not to run a large, cardiovascular safety study because "there was no compelling marketing need" and because the "implied message would not be favorable." In short, these "studies not conducted" documents illustrate a pattern which supports Plaintiff's contention that Merck was more concerned with sowing the seeds of scientific doubt about Vioxx than in finding the truth.

## ARGUMENT

### I.  MERCK'S MOTION FAILS TO PARTICULARIZE THE EVIDENCE IT CHALLENGES AND THUIS MUST BE DENIED

In the instant motion, Merck seeks to strike whole "categories" of evidence without defining all of the evidence it seeks to exclude.   In so doing, Merck asks the Court to make a pre-trial ruling in an evidentiary vacuum which is wholly improper.  Such motions are further disfavored where, as here, the moving party fails to squarely define the scope of its motion such that the court is required to engage in an analysis of credibility or of evidence yet to be presented. The threshold question of whether Merck's ill-defined and out-of-context motion

should even be considered is not an academic one.  In this case, Merck seeks to exclude evidence that it does not completely identify (except by "example") and that Plaintiff has not yet presented in the context of her case.  Rather, Merck suggests that the Court enter a "blanket" prohibition against "*all evidence or argument* regarding blinded data and studies contemplated but never performed." Def. Mot. at 9.  (emphasis added).

Such overreaching motions contravene the notions of proper use of the pre-trial motion practice and should be denied.  Respectfully, the Court should hold its ruling on these issues until it is offered in the context of facts adduced at trial.

## II.     EVIDENCE OF WHAT MERCK "KNEW OR SHOULD HAVE KNOWN" IS AT THE HEART MERCK'S LIABILITY IN THIS CASE

Merck pretends that sole liability issue is Merck's "knowledge of the alleged risks of Vioxx and the adequacy of the warnings of those risks at the time Dr. Schirmer prescribed Vioxx to Mr. Irvin..." Def. Mot. at 2.   This is simply not the law.  Whether applying the common law of the transferee jurisdiction in Florida or the transferor jurisdiction of Louisiana, the established law regarding failure to warn claims is:

> Florida: Under the theory of strict products liability in Florida, adopted in *West v. Caterpillar Tractor Co.,* 336 So.2d 80 (Fla.1976), a product may be defective by virtue of a design defect, a manufacturing defect, or an inadequate warning.  As to the failure to warn claim, In the failure-to-warn context, an "otherwise safe product" may be "defective" solely by virtue of an inadequate warning. *See Giddens v. Denman Rubber Mfg. Co.,* 440 So.2d 1320, 1323 (Fla. 5th DCA 1983). The rules of strict liability require a plaintiff to prove only that the defendant did not adequately warn of a particular risk that was known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of manufacture and distribution. *Ferayorni v. Hyundai Motor Co.,* 711 So.2d 1167 (4th DCA 1998).

> 5th Circuit Law: With respect to failure to warn, the duty arises when the
> defendant knew <u>or should have known</u> of the need to issue a warning. *See
> GHR Energy Corp. v. Carboline Co.*, 744 F.Supp. 1405, 1407 (E.D.La.1990).

Thus, the jury may consider not only what Merck actually knew *but what it could have known but refused to learn.* To illustrate the point, Merck seeks to exclude evidence of studies it either abandoned or refused to do. Merck urges that its admitted pattern of avoiding recommended studies is easily and innocently explainable. Merck may be able to present such evidence at trial.

However, the jury is entitled to consider an alternative explanation – that Merck knew what the answer would be but did not want to confirm it with definitive problem. This is more than "speculation" about Merck's motive. This is the explanation reasonably drawn in Merck's own documents.

## III.   THE DSMB AND ESMB MINUTES ARE RELEVANT TO MERCK'S LEGAL CLAIM THAT VIOXX CANNOT CAUSE CARDIOVASCULAR EVENTS DURING THE FIRST 18 MONTHS OF USE

Merck's central legal defense to "general causation," *i.e.,* whether Vioxx is capable of causing a heart attack is that there is no evidence that Vioxx can cause cardiovascular events unless the patient was continuously exposed to Vioxx for greater than 18-months. Merck can only reach this conclusion by urging the Court (and the jury) to ignore its other clinical trials (including VIGOR) and other study evidence.

Even if the Court or the jury were to consider APPROVe in a vacuum, however, the ESMB minutes dispel the myth that the cardiovascular events related to Vioxx only appeared after 18 months, Specifically, the minutes of even the first ESMB (No. 1.0195–August 7, 2002) demonstrates that there was an almost immediate trend of serious cardiovascular events

in patients taking Vioxx as compared to placebo. The subsequent ESMB minutes (Nos. 1.0390 and 1.0394) demonstrate that the trend against Vioxx was sustained throughout the conduct of the study. This is obviously contrary to the "18 month hypothesis" that Merck posits.

Merck may try to suggest that these trends seen by the APPROVe ESMB are scientifically irrelevant and that the jury in this case should not hear such evidence. However, no less than the editors and peer-reviewers of the New England Journal of Medicine did not think so when they reviewed the APPROVe manuscript. *See supra*, n.2. Indeed, the Editor of the New England Journal and several peer-reviewers urged Merck to inform readers of this "early separation" of the curves between Vioxx and placebo seen by the ESMB. *See id.*; *see also id.* at 15 (Comments from Reviewer "D": "Much has been made has been made of the lack of a safety signal on thrombotic events until 18 months [but] it is clear that the heart failure and pulmonary edema plots *do show such a separation from the beginning. It is hard to see why that data was omitted*").

Clearly, the ESMB's observations were relevant to the editors and reviewers of the New England Journal of Medicine. As such, it would be preposterous to suggest that it would be less relevant to the jury in this case.

<strong><u>CONCLUSION</u></strong>

For all the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendant's motion to exclude (1) evidence of interim or "blinded" data from trial of Vioxx and (2) evidence that specific studies were considered but not undertaken or that completed studies that were inadequate in its entirety.

8

Respectfully submitted,

By: _P. Leigh o'Dell_

**Andy D. Birchfield, Jr.**
Paul J. Sizemore
P. Leigh O'Dell
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
(800) 898-2034 (telephone)
(334) 954-7555 (telecopier)
**Co-Lead Counsel**

**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
FAX: (504) 561-6024
**Temporary Office**
3411 Richmond Ave., Suite 460
Houston, TX 77046
PH: (713) 877-1843
FAX: (713) 871-9750

**PLAINTIFFS' LIAISONCOUNSEL**

Christopher A. Seeger, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)

**Co-Lead Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH,BENJAMIN,DAVID,
MEUNIER&WARSHAUER, L.L.C.
P.O. Box 960
191 East Second Street
New Roads, LA 70760
(225) 638-6137
(225) 638-8836 (fax)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Thomas R. Kline, Esquire
KLINE&SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Carlene Rhodes Lewis, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced in accordance with Pre-Trial Order No. #8, on this **11th** day of November, 2005.

B. Leigh oLee

Restricted
R  Confidential
limited access

## APPROVe ESMB MEETING MINUTES

### Mtg Date: 7-August- 2002

**Open Session**

Attendees: David Bjorkman, Marvin Konstam, Richard Logan, James Neaton, Hui Quan, Jim Bolognese, Susan Loftus, Alise Reicin, Tom Simon, Janet van Adelsberg

In the open session, Dr. Tom Simon first updated the status of the APPROVe trial. As of July 31, 15.4% of the patients have discontinued from the study. Actions are continuously taken to contact investigators to improve the conduct of the trial.  The percentage of patients for whom a 12 month colonoscopy is available is not currently available but the information is being assembled for future review.  Also, as of July 31, there are a total of 64 reported thrombotic events.  Among them, 54 have been adjudicated, 2 are currently being adjudicated and 8 are waiting for adjudication.

The possible expansion of the DSMB for other trials was discussed. There is a plan to combine the CV data from the Victor, APPROVe and the up coming Prostate Cancer Prevention trials as an alternative to a CV outcomes study for Vioxx. The objective of the combined analysis  is to show the non-inferiority of Vioxx compared to placebo. The pooled analysis will have 90% power to establish if the upper bound of the confidence interval for the Vioxx/Placebo ratio for CV events is less than 1.3.  The proposal is to expand the responsibilities of the  ESMB for the APPROVe trial to include being the DSMB for the Prostate Cancer Prevention Trial and the monitoring board for reviewing the combined CV data of the Victor, APPROVe and Prostate Cancer Prevention trials. The ESMB would be expanded by adding another cardiologist and an oncologist/urologist.  A report documenting the timelines for the trials, protocols and monitoring plan will be prepared by MRL. Dr. Jim Neaton will write a  letter to inform MRL of the ESMB's willingness to take on these additional responsibilities.

# P1.0195

MRK-ABS0442894



Restricted
Confidential
limited access

## APPROVe ESMB MEETING MINUTES

## Mtg Date: 26-November- 2002

**Open Session**

Attendees: David Bjorkman, Marvin Konstam, Richard Logan, James Neaton, Hui Quan, Jim Bolognese, Tom Simon, Ray Joseph, Bettina Oxenius, John Baron, Albert Leung, Celia Harms, Jennifer Ng, Deborah Shapiro, Janet van Adelsberg

**1. APPROVe**

In the open session, Dr. Oxenius first updated the status of the APPROVe trial. As of middle November, 18.1% of the patients have discontinued from the study. There were a total of 17 PUBs, 16 deaths and 636 reported serious adverse events. Thirty-one of the reported serious adverse events were drug-related. Whether a serious adverse event is drug-related or not relies upon local investigator's judgement based on the definition provided in the protocol. Also, there were a total of 78 reported thrombotic events. Among them, 67 had been adjudicated, and 11 were waiting for adjudication. Dr. Oxenius also presented the tentative timelines for Year 1 interim analysis: the file for analysis will be frozen on April 21; statistical analyses will be completed by May 5; and results will be ready for ESMB review by May 12, 2003.

The ESMB sent a letter to MRL in August informing them of the overall percent of patients experiencing hypertension and requested that procedures be put in place (if not already established) for such patients. Dr. Joseph indicated that a letter from MRL was sent out to all investigators in September to remind them of hypertension as a possible side effect of NSAIDs including VIOXX. Additionally, the letter reminded the investigators that Vioxx might interfere with the control of hypertension. Finally, the letter recommended procedures to be followed for following hypertensive patients in the study. Subsequently, Dr. Joseph clarified the use of the term "hypertension-related" adverse events, and the reporting requirements for any AEs in the study. Then, Dr. Joseph briefly reviewed the six cases that were deemed hypertension SAEs – of a total of six cases five were hospitalized, and the other patient had systolic readings in excess of 200 associated with dizziness. Only two of the six cases had no prior history of hypertension. All six patients were treated, and three continued in the study.

Merck and FDA have been communicating regarding the design of the study. In a recent communication regarding APPROVe, FDA indicated that 3- year data are not sufficient to fully study cardiac and other adverse events, including mortality. The FDA also indicated that follow-up after stopping treatment is necessary to assess rebound (the recurrence rate of the active treatment group would be higher than that of the placebo group). The FDA proposed to extend the treatment period to 5 years, with colonoscopies at Years 1, 3, and 5 (on-drug), followed by another colonoscopy at Year 6 (after 1 year

P1.0390



off drug). The protocol team's current thinking is that the pre-planned cardiovascular combined analysis of three trials including APPROVe would provide a more meaningful safety assessment than continuation of the colon polyp study, because it would provide much greater power. Therefore, the team is considering addressing the rebound concern with a 1 year off-drug follow-up colonoscopy (at year 4), and addressing the safety concern with the pre-planned cardiovascular combined analysis. This proposal is still under discussion within MRL.

## 2. Prostate Cancer Prevention Trial

Dr. Leung presented the VIOXX prostate cancer prevention protocol. He summarized the design, the patient population, the endpoint, and the inclusion/exclusion criteria for the study. The ESMB for APPROVe will be expanded to include a cardiologist and an oncologist/urologist and will serve as the ESMB for the prostate cancer prevention trial. Dr. Shapiro will be the blinded statistician and Dr. Ng will the unblinded statistician for the prostate cancer trial. FDA is currently reviewing the protocol. The study will be started in January 2003 if FDA approves the protocol.

## 3. CV Combined Analysis

Dr. van Adelsberg then presented the plan for a prospective combined analysis of CV data from three VIOXX trials: APPROVe, Victor (an on going study conducted by Oxford University and sponsored by Merck with approximately 7000 patients, 2 and 5 year active treatment periods) and the prostate cancer prevention trial. The primary objective of the combined analysis is to show the non-inferiority of Vioxx compared to placebo with respect to CV events. Patients in these trials will have a spectrum of baseline cardiovascular risk and will be exposed to rofecoxib or placebo on a chronic basis. These patients may be skewed toward male sex and thus have increased incidence of CV events compared to the general OA or RA patients. The ESMB for the APPROVe and prostate cancer prevention trial will serve as the ESMB for this combined analysis. The analysis will be performed after the accrual of 611 events. Thus, the timeline of the analysis will mainly depend on the enrollment of the prostate cancer prevention trial along with other factors, and probably will occur near the end of 2005. Currently, there is no plan to combine CV data from these three trials with those of other VIOXX trials for another meta analysis. This analysis is designed as a stand-alone, independent, prospectively designed assessment of non-inferiority of VIOXX in comparison to placebo. The protocol will be ready for ESMB review after incorporating FDA's comments. Certain stopping rules may be employed during the monitoring of the CV data. These stopping rules will be drafted and then reviewed by the ESMB before reviewing interim results.

## Closed Session -- Not for Sharing Outside of the ESMB

Attendees: David Bjorkman, Marvin Konstam, Richard Logan, James Neaton, Hui Quan

Confidential - Subject To Protective Order

MRK-AFF0000092



Results of updated safety data up to 11/11/02 were reviewed. There were still some trends noted in adjudicated/confirmed thromboembolic CV combined with CHF AEs, hypertension-related AEs, edema- related AEs and AEs of cardiovascular system. On the other hand, there was a continued reduction of the treatment difference in overall serious clinical AEs.

More patients on treatment are experiencing stage 2 hypertension during follow-up. As mentioned in the minutes for open session, a letter from MRL has been sent out to all investigators to remind them of hypertension as a possible side effect of NSAIDs including VIOXX.

The number of CV adverse events is still small and treatment differences for the primary and secondary outcomes are not nominally significant. Although there appear to be clear differences in BP and edema events between treatments, treatment differences for serious clinical AEs, which number 300 total, have become smaller. Therefore, the ESMB recommends the study continue as planned.

The ESMB will meet again face-to-face in Boston on May 15, 2003 to review the Year 1 interim analysis results and updated safety data.

Confidential - Subject To Protective Order



**APPROVe ESMB MEETING MINUTES**

**Mtg Date: 24-November- 2003**

**Open Session**

Attendees: David Bjorkman, Marvin Konstam, Richard Logan, James Neaton, Hui Quan, Jim Bolognese, Tom Simon, Ray Joseph, Bettina Oxenius, John Baron, Alise Reicin, Ned Braunstein

**1. Regulatory Issues Related to ESMBs**

In order to protect the integrity of its studies, MRL had requested waivers from the FDA not to unblind treatment assignment in safety reports of adverse experiences that involve cardiovascular endpoints in the Arcoxia and Vioxx cardiovascular outcomes studies. Dr. Braunstein updated the ESMB on issues related to the FDA's response requesting to review data from the Arcoxia CV Outcomes Study. The FDA told MRL that whatever approach is agreed on for the Arcoxia outcome trials will apply to the Vioxx outcome trials. MRL will inform the APPROVe ESMB about any future developments on this matter and will ask an ESMB representative to participate should there be discussions related to providing data by treatment group.

**2. APPROVe**

Dr. Oxenius updated the ESMB on the status of the APPROVe trial. As of November 2003, there have been 985 reported serious adverse events and 25 reported deaths (three of them occurred before randomization and therefore were not included in any analyses). There have been a total of 38 reported PUBs, 35 of them had been adjudicated. Also, there have been a total of 133 reported thrombotic events. Among them, 115 had been adjudicated. Among the 633 (24%) discontinued patients, 200 patients discontinued due to withdrawal of consent (175) or lost to follow up (25). Questions were raised whether safety or efficacy data could be obtained from these patients after their discontinuations. All discontinued patients are offered the opportunity to come back for their scheduled colonoscopy. Some of them may come back and some of them may not. Also, based on the protocol, the investigators were required to report all serious AEs which occurred within 14 days after discontinuation of study therapy. AEs including deaths which occurred more than 14 days after discontinuation may be spontaneously reported. A letter from Dr. Neaton will be sent to MRL to suggest to systematically collect mortality data for all participants until the end of the trial.

The FPI for off-drug extension of the trial occurred in August 2003. It is estimated that around 600 patients per treatment group will be available to assess between-treatment difference in Year 4 adenoma recurrence rates.

Confidential - Subject To Protective Order



Dr. Joseph discussed the closure of Site 128. The site screened 25 patients and randomized 21 patients. Two patients discontinued prior to Visit 5. Subsequently, 18 were dispensed the wrong medication at Visit 5 and Visit 6 (Year 1). An APPROVe Team monitoring visit revealed further allocation errors involving Visits 7 and 9. The validity of the data from this site can not be ascertained. Thus, the primary modified ITT analysis will not include data from the site. However, these results along with a detailed explanation will be provided in an appendix of the study report. Additionally, since the number of randomized patients from the site (21) is small and all patients at the site are to be dropped, it is unlikely that any bias would result from including or excluding these patients. Nonetheless, these patients will be included in the safety analyses.

### 3. Updated Vioxx CV Data

Dr. Reicin presented updated Vioxx CV data from the Alzheimer trials. There are three placebo-controlled Alzheimer trials (Protocols 078, 091 and 126). Since Protocol 126 was terminated early and only had small amount of short term safety data, per FDA's request, Protocol 126 was not included in the update. Based on data from Protocols 078 and 091, the relative risk for thrombotic CV events for Rofecoxib 25 mg versus placebo was 1.010. The corresponding relative risk for APTC events was 1.03. Both relative risks were very close to one. Dr. Reicin briefly reviewed the results of the all cause mortality analysis.

The ESMB would like to see the full safety reports for these two studies combined including results of deaths, SAEs, edema-related AEs and hypertension-related AEs when they are available.

Currently, only around 600 patients have been enrolled into the ViP trial. CV data from the Victor trial may not be available for the May (2004) combined analysis of CV data due to the departure of programmer for the Victor study. Thus, the updated CV data for the planned May 2004 face-to-face meeting will probably include data from APPROVe and ViP only.

### Closed Session -- Not for Sharing Outside of the ESMB

Attendees: David Bjorkman, Marvin Konstam, Richard Logan, James Neaton, Hui Quan

Cumulative safety data up to 11/11/03 were reviewed. Treatment differences were noted in many categories of AEs including all reported CV events excluding non-CVD deaths, adjudicated/confirmed APTC/thromboembolic CV combined with CHF AEs , drug-related AEs, serious AEs, drug-related serious AEs, hypertension-related AEs, edema-related AEs, reported PUBs, AEs of cardiovascular system and AEs of renal and urinary disorders. In addition, as before, more patients on treatment are experiencing stage 2 hypertension during follow-up.

Confidential - Subject To Protective Order



The ESMB recommended the tabulation of discontinuation rates due to withdrawal of consent and lost to follow up by treatment group in the future updates. Adjudicated PUB results should also be provided. In addition, the ESMB would like to see some kind of assessment of the relationship between blood pressure levels and CV events.

The number of primary CV adverse events (APTC) was still small and the between-treatment difference was not statistically significant. For these "harder" clinical events there was no convincing evidence of a safety problem; however, the trend for the APTC hard endpoints and the differences for the other safety outcomes noted above were worrisome and the ESMB felt close monitoring of accumulating data was important.

The ESMB recommended the study continue as planned with one exception. The ESMB would like MRL to consider the collection of mortality data on all participants through the end of the trial irrespective of whether the participants are taking study treatment, discontinue from the trial or stay in the trial.

The ESMB plans to meet by teleconference on February 18, 2004 to review updated safety data from APPROVe and the data analysis plan for the ViP trial.

Confidential - Subject To Protective Order

## CONFIDENTIAL

**DATE:**      December 22, 1999

**TO:**        Drs. David Bjorkman, James Neaton, Deborah Shapiro, Alan Silman, Roger Sturrock

**FROM:**      Dr. Michael Weinblatt

**SUBJECT:**   Cardiovascular Safety Analysis of VIGOR - Unblinded Minutes

---

On December 20, 1999, the Data Safety and Monitoring Board of VIGOR convened by teleconference to discuss the interim cardiovascular safety analysis update for the VIGOR trial. Attendees were Drs. David Bjorkman, James Neaton, Deborah Shapiro (non-voting), Alan Silman, Roger Sturrock and Michael Weinblatt.

The purpose of this additional analysis was to update the experiences with deaths and cardiovascular adverse experiences. The members noted that the trends previously observed continued at this update. Examination of subgroup results showed the expected higher rate of events in higher risk patients in both treatment groups, very similar relative risks in all the groups examined, and consequently greater excess risks in the higher risk patients. Curiosity was expressed on the relationship of age with the analyzed events. Tables 1 to 3 attached shows the previous subgroup results along with two additional subgroups, age<70 and age≥70 years. Again, the differential treatment effect was similar for all subgroups, ie, none of the treatment by subgroup interaction effects were significant.

None of the members believed that the trial should be stopped based on these results and members expressed the belief that the differences may be due to a cardioprotective effect of Treatment B. However, all members believed that these results are important in evaluating the risks and benefits of Treatment A. Interest focused on the analysis plan for the serious vascular events. Dr. Shapiro explained that certain serious vascular events were being adjudicated in a blinded fashion by an committee external both to Merck and to the VIGOR trial. They are adjudicating events in VIGOR and all other VIOXX® studies. While the VIGOR Data Analysis Plan states that a data analysis plan would be developed for these events in both VIGOR and the VIOXX® program as a whole, this has not yet taken place. The DSMB agreed that it is important that this analysis plan be developed before the plan's authors are unblinded to the cardiovascular results. In order to accomplish this goal, Drs. Weinblatt and Shapiro drafted a letter (attached) addressed to Dr. Alise Reicin.

Members did not feel it appropriate to bring this issue to the Advisory Committee since we are not recommending a change to the trial conduct, simply that a prespecified plan be accomplished. Also since the vascular adjudication committee is not specific to VIGOR, this request seems to be outside the purview of the VIGOR Advisory Committee. *Post*

1

P1.0430

Confidential - Subject To Protective Order

MRK-AFL0000899

*Meeting Note: The letter was provided to Drs. Reicin and Capizzi on December 21, 1999. Dr. Reicin provided assurance that a plan will be developed before unblinding.*

The Board next discussed concerns regarding the eventual publication of VIGOR results. It will be important that any report on gastrointestinal protection include a discussion of the cardiovascular results. After study unblinding, one or more members of the DSMB may be invited to join the Publications Committee. A letter may be written to the Executive Committee after unblinding noting the need for their careful review of the cardiovascular events. Dr. Shapiro will update the Board when such unblindings will take place.

Michael Weinblatt, MD

2

Confidential - Subject To Protective Order

MRK-AFL0000900

Table 1
Summary of Analysis of Death

| Subgroup | Trmt | N | Cases | PYR[1] | Rates[2] | Proportionality Assumption p-value | Relative Risk[3] Estimate | 95% CI | p-value |
|---|---|---|---|---|---|---|---|---|---|
| Overall | A | 4051 | 17 | 2083 | 0.82 | 0.717 | 1.88 | (0.84, 4.21) | 0.127 |
|  | B | 4031 | 9 | 2067 | 0.44 |  |  |  |  |
| History of any CVD | A | 1856 | 12 | 948 | 1.27 | 0.778 | 2.91 | (0.94, 9.01) | 0.065 |
|  | B | 1809 | 4 | 916 | 0.44 |  |  |  |  |
| No history of any CVD | A | 2195 | 5 | 1135 | 0.44 | . | 1.01 | (0.23, 4.41) | 0.982 |
|  | B | 2222 | 5 | 1151 | 0.43 |  |  |  |  |
| History of significant CVD | A | 187 | 1 | 91 | 1.09 | . | 0.46 | (0.01, 8.74) | 0.498 |
|  | B | 166 | 2 | 83 | 2.40 |  |  |  |  |
| No history of significant CVD | A | 3864 | 16 | 1991 | 0.80 | 0.791 | 2.28 | (0.94, 5.54) | 0.069 |
|  | B | 3865 | 7 | 1984 | 0.35 |  |  |  |  |
| History of Hypertension | A | 1187 | 8 | 601 | 1.33 | 0.657 | 1.92 | (0.58, 6.38) | 0.287 |
|  | B | 1138 | 4 | 573 | 0.70 |  |  |  |  |
| No history of any Hypertension | A | 2864 | 9 | 1482 | 0.61 | 0.984 | 1.82 | (0.61, 5.42) | 0.285 |
|  | B | 2893 | 5 | 1494 | 0.33 |  |  |  |  |
| Age 70+ years | A | 508 | 6 | 247 | 2.43 | . | 1.56 | (0.37, 7.53) | 0.487 |
|  | B | 546 | 4 | 257 | 1.56 |  |  |  |  |
| Age < 70 years | A | 3543 | 11 | 1836 | 0.60 | 0.578 | 2.17 | (0.75, 6.25) | 0.151 |
|  | B | 3485 | 5 | 1810 | 0.28 |  |  |  |  |

[1] Patient-years at risk
[2] Per 100 PYR
[3] Relative risk of Treatment A with respect to Treatment B from unstratified Cox model where the number of cases is at least 11, otherwise relative risk is ratio of rates and p-value is from discrete logrank distribution.

3

Confidential - Subject To Protective Order

MRK-AFL0000901

Table 2

Summary of Analysis of Death or Serious Cardiovascular Adverse Events

| Subgroup | Trmt | N | Cases | PYR[1] | Rates[2] | Proportionality Assumption p-value | Relative Risk[3] Estimate | 95% CI | p-value |
|---|---|---|---|---|---|---|---|---|---|
| Overall | A | 4051 | 73 | 2076 | 3.52 | 0.304 | 2.07 | (1.39, 3.10) | <0.001 |
| | B | 4031 | 35 | 2063 | 1.70 | | | | |
| History of any CVD | A | 1856 | 51 | 943 | 5.41 | 0.484 | 2.06 | (1.27, 3.35) | 0.003 |
| | B | 1809 | 24 | 913 | 2.63 | | | | |
| No history of any CVD | A | 2195 | 22 | 1133 | 1.94 | 0.341 | 2.03 | (0.99, 4.19) | 0.055 |
| | B | 2222 | 11 | 1150 | 0.96 | | | | |
| History of significant CVD | A | 187 | 17 | 90 | 18.94 | 0.704 | 2.24 | (0.93, 5.41) | 0.072 |
| | B | 166 | 7 | 83 | 8.48 | | | | |
| No history of significant CVD | A | 3864 | 56 | 1986 | 2.82 | 0.319 | 2.00 | (1.27, 3.14) | 0.003 |
| | B | 3865 | 28 | 1981 | 1.41 | | | | |
| History of Hypertension | A | 1187 | 33 | 597 | 5.52 | 0.439 | 2.26 | (1.21, 4.22) | 0.011 |
| | B | 1138 | 14 | 572 | 2.45 | | | | |
| No history of any hypertension | A | 2864 | 40 | 1479 | 2.70 | 0.522 | 1.92 | (1.13, 3.26) | 0.015 |
| | B | 2893 | 21 | 1492 | 1.41 | | | | |
| Age 70+ years | A | 508 | 21 | 245 | 8.57 | 0.667 | 1.83 | (0.90, 3.72) | 0.095 |
| | B | 546 | 12 | 256 | 4.69 | | | | |
| Age < 70 years | A | 3543 | 52 | 1831 | 2.84 | 0.171 | 2.23 | (1.37, 3.65) | 0.001 |
| | B | 3485 | 23 | 1807 | 1.27 | | | | |

[1] Patient-years at risk
[2] Per 100 PYR
[3] Relative risk of Treatment A with respect to Treatment B from unstratified Cox model.

Confidential - Subject To Protective Order

MRK-AFL0000902

Table 3

Summary of Analysis of Death or Serious Cardiovascular Adverse Events
or Cardiovascular Adverse Events Leading to Discontinuation

| Subgroup | Trmt | N | Cases | PYR[1] | Rates[2] | Proportionality Assumption p-value | Relative Risk[3] Estimate | Relative Risk[3] 95% CI | p-value |
|---|---|---|---|---|---|---|---|---|---|
| Overall | A | 4051 | 100 | 2074 | 4.82 | 0.937 | 2.43 | (1.69, 3.49) | <0.001 |
|  | B | 4031 | 41 | 2063 | 1.99 |  |  |  |  |
| History of any CVD | A | 1856 | 67 | 942 | 7.11 | 0.864 | 2.33 | (1.50, 3.62) | <0.001 |
|  | B | 1809 | 28 | 913 | 3.07 |  |  |  |  |
| No history of any CVD | A | 2195 | 33 | 1132 | 2.91 | 0.914 | 2.58 | (1.36, 4.90) | 0.004 |
|  | B | 2222 | 13 | 1150 | 1.13 |  |  |  |  |
| History of significant CVD | A | 187 | 19 | 90 | 21.19 | 0.903 | 2.19 | (0.96, 5.01) | 0.062 |
|  | B | 166 | 8 | 82 | 9.70 |  |  |  |  |
| No history of significant CVD | A | 3864 | 81 | 1985 | 4.08 | 0.920 | 2.45 | (1.64, 3.68) | <0.001 |
|  | B | 3865 | 33 | 1981 | 1.67 |  |  |  |  |
| History of Hypertension | A | 1187 | 44 | 596 | 7.38 | 0.771 | 2.64 | (1.49, 4.68) | <0.001 |
|  | B | 1138 | 16 | 572 | 2.80 |  |  |  |  |
| No history of any Hypertension | A | 2864 | 56 | 1478 | 3.79 | 0.883 | 2.26 | (1.41, 3.63) | <0.001 |
|  | B | 2893 | 25 | 1492 | 1.68 |  |  |  |  |
| Age 70+ years | A | 508 | 28 | 245 | 11.45 | 0.305 | 2.46 | (1.25, 4.83) | 0.009 |
|  | B | 546 | 12 | 256 | 4.69 |  |  |  |  |
| Age < 70 years | A | 3543 | 72 | 1830 | 3.94 | 0.701 | 2.45 | (1.59, 3.77) | <0.001 |
|  | B | 3485 | 29 | 1807 | 1.60 |  |  |  |  |

[1] Patient-years at risk
[2] Per 100 PYR
[3] Relative risk of Treatment A with respect to Treatment B from unstratified Cox model.

5

Confidential - Subject To Protective Order

MRK-AFL0000903

To:         Reines, Scott A.
From:       Lawson, Francesca
Cc          Simon, Thomas J.
Bcc:
Date:       2002-01-03 22:15:15
Subject:    RE: NSAID plus aspirin

---

Scott,
Thanks for your comment. Yesterday we discussed this issue with Tom at our MD staff meeting. Basically, I agree with Laura that an ibuprofen/asa study could be performed from an ethical point of view because my study was a clin pharm study and not an outcome study. However, I think that with all the media coverage and the AHA recommendation, it would be extremely difficult to get the study approved by the IRBs and to find investigators and patients willing to participate. Also, I think that it would be in vioxx's interest to "promote" my study as legally possible and obviously Merck cannot do that while planning two ibuprofen/asa studies. Finally, I think that the results of an ibuprofen/asa study will be disregarded as "not clinically relevant" because they will be based on a drug combination which will not be commonly recommended by physicians. In contrast, a naproxen/asa study would be ethically acceptable and a likely winner in terms of endoscopic results because it would support the results from 136 meaning that 136 showed (I guess) that vioxx plus aspirin is sligthly, but not significantly better than an NSAID alone and 158 would show that vioxx plus aspirin is significantly better than an NSAID plus aspirin.

As I told Tom and Barry, I think that the naproxen/asa combination should also be used in the outcome study in patients with recent AMI. I have significant concerns about comparing vioxx plus aspirin versus aspirin alone in these high risk patients, assuming that I understood correctly and this is the planned study design. If so, the vioxx patients will have complete inhibition of prostacyclin while the patients on aspirin alone will be protected by the antiplatelet effects of prostacyclin during the acute events. I understand the rationale for looking at the antinflammatory role of vioxx in atherosclerosis, but these patients will be highly unstable and any new thrombotic episode could be triggered by platelet thrombi which normally would be blocked by prostacyclin. We showed long time ago in the NEJM that prostacyclin goes up during chest pain of cardiac origin as a negative feed back attempt to shut down the activated platelets and Lucchesi has recently confirmed in an animal model of thrombosis the importance of the protective effects of prostacyclin during acute thrombosis. If we compare vioxx plus aspirin versus naproxen plus aspirin, both groups will have the same inhibition of prostacyclin. It would also be easier to enroll patients in such a study, as all patients would need asa and an NSAID.

In conclusions, my recommendation would be to do an endoscopic (#158) and an outcome (so called Topol's study) study with naproxen plus aspirin versus vioxx plus aspirin in patients at high CV risk and one study of ibuprofen versus eterocoxib in patients who don't need aspirin.

Francesca


Francesca C. Lawson, MD
Merck Research Laboratories
Merck & Co., Inc.
BL 1-4
P.O. Box 4
West Point, PA 19486
Tel 484 344 7748
Fax 484 344 2956
Internet: francesca_lawson@merck.com

-----Original Message-----
From:   Reines, Scott A.
Sent:   Thursday, January 03, 2002 10:28 AM
To:     Lawson, Francesca

**P1.0211**

Confidential - Subject To Protective Order

MRK-ABS0344100

| | |
|---|---|
| To: | Kim, Peter S |
| From: | Scolnick, Edward M. |
| Cc | Frazier, Kenneth C.; Gilmartin, Raymond V; Schechter, Adam H; Greene, Douglas Alan |
| Bcc: | |
| Date: | 2002-06-09 11:47:22 |
| Subject: | thought |

Peter   How would you feel about running an RA study celebrex vs naproxen .? Their new label is silent on it.Of all the things we could do, this may be the  killer experiment? They have no Cv risk so no asa required in the study./ Ed

P1.0239

MRK-ABX0042064