**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| Evelyn Irvin Plunkett v. Merck & Co, Inc.* | | CASE NO. 02:05CV4046 |

---

**Memorandum in Opposition to Defendant's Motion to Exclude Evidence of an Allegedly Privileged, Previously Excluded Confidential Memorandum of Invention**

**(Plaintiff's Opposition to Defendant's Motion in Limine No. 14)**

---

Plaintiff Evelyn Irvin Plunkett, as Personal Representative of the Estate of Richard Irvin, Jr., by and through her attorneys, responds in opposition to Merck & Co.'s motion in limine and seeks to admit into evidence a document, which, according to quotes from the document set forth by Merck in a brief written in litigation brought against it in New Jersey, puts into issue whether or not in 2000 Merck knew and was concerned that Vioxx caused an imbalance of enzymes in the blood that could thereafter cause a serious cardiovascular event such as a heart attack or stroke. Merck's extensive quotation of the allegedly confidential memorandum in the New Jersey brief, which is a public record not filed under seal, eliminates any possibility that the memorandum is privileged. In support thereof, plaintiff shows:

**I.    STATEMENT OF RELEVANT FACTS**

In April 2001, Richard Irvin began taking Vioxx to combat back pain. Mr. Irvin ingested 25 mg Vioxx for approximately 30 days before suffering sudden thrombotic cardiac death on May 15, 2001, at age 53. An autopsy of Mr. Irvin's body revealed an unattached

coronary thrombus (clot) in the left anterior descending coronary artery. The unattached clot was grossly visible to the pathologist, was identified on the autopsy record, and has been further documented through photomicrographs. There is no dispute that Richard Irvin suffered a thrombotic cardiac event during a period of ingestion of Vioxx.

Vioxx belongs to a class of pain relievers known as non-steroidal anti-inflammatory drugs (NSAIDs). This class includes many familiar pain relievers including ibuprofen, naproxen, and others. Traditional NSAIDs work by inhibiting cyclooxygenase (COX), an enzyme that stimulates synthesis of prostaglandins, which are chemicals in the body that promote pain and inflammation.

In the 1990s, scientists discovered that the COX enzyme has two forms: COX-1 and COX-2. Vioxx and other newer generation NSAIDs were developed in an attempt to reduce the risk of gastrointestinal problems associated with traditional NSAIDS by selectively inhibiting COX-2 (thought responsible for pain and inflammation), but not COX-1 (thought responsible for protecting the stomach lining). Inhibition of COX-1 is responsible for promoting synthesis of "thromboxane," a prostaglandin that facilitates platelet aggregation, or clotting and vasoconstriction. In May 1999, the FDA approved Vioxx for sale.

In March 2000, Merck received unblinded preliminary results of the VIGOR study, a study designed to compare the relative incidence of serious gastrointestinal adverse events in rheumatoid arthritis patients treated with Vioxx and with naproxen. The results of VIGOR showed that the Vioxx group suffered four to five times more serious cardiovascular ("CV") thrombotic events than the naproxen group.

In April 2000, the document at issue was prepared by Dr. Kathleen Metters, Vice President and Site Head for Merck Frosst Canada & Company and other Merck Frosst

scientists.  This document is titled Confidential Memorandum of Invention ("CMI") and has

been identified as MRK-AEG 0020364-70 and MRK-AEE 0000552-58 (identical copies).

Merck claims an attorney-client privilege for both of these documents in its revised privilege

log as presented to plaintiff's counsel on November 4, 2005, although the author is listed as

"Not Available" and the recipient listed as the "Patent Department" with no asterisk indicating

an Attorney, Legal Assistant, Administrative Assistant or Paralegal received the document.

The CMI at issue describes Merck's interest in patenting a new drug, invented by

Merck scientist Edward Scolnick, which would combine COX-2 inhibitors with compounds

designed to inhibit the body's production of thromboxane.  As set forth at page five of

Merck's brief filed in the New Jersey litigation entitled *Brief in Further Support of Merck &*

*Co., Inc.'s Motion for a Protective Order Prohibiting Use or Prohibiting Use or Disclosure of*

*Inadvertently Produced Privileged Documents and Compelling Plaintiffs to Return All Copies*

*of the Documents* ("Merck's New Jersey Brief"), the authors of the CMI explained that such a

combination drug might achieve the "'**therapeutic benefit of COX-2 inhibitors with the**

**additional benefit of reducing the risk of cardiac and cerebral adverse effects** . . . .'  The

authors also noted a theory that has come to be known as the FitzGerald hypothesis - that

because COX-2 inhibitors have been observed to reduce urinary metabolites of prostacyclin

(an anti-platelet agent), '**this may reflect reduced prostacyclin in vivo,**' which '**may result**

**in an altered ratio of prostacyclin to thromboxane (TX)A$_2$,**' which in turn '**may cause**

**increased risk of cardiac and cerebral adverse events**'" [emphasis added to indicate quotes

from the CMI].  In other words, the document at issue sets forth Merck scientists' suspicion in

April 2000 that Vioxx altered the prostacyclin/thromboxane balance, causing Vioxx users to

become prothrombotic.  Merck, as evidenced by this document, suspected that this equilibrium change caused the increase in the risk of CV events as shown in the VIGOR study.

This hypothesis, first postulated by Dr. Garrett FitzGerald and other Merck consultants *prior* to Vioxx's approval, is central to this litigation.  This same hypothesis has been vehemently denied by Merck in the testimony of its corporate representatives, publications, and press releases.  Merck asserts that the prostacyclin/thromboxane imbalance theory was merely an unsubstantiated hypothesis at the time that Vioxx was developed and marketed, and that by the end of March 2000, it had concluded that the theory had no merit.

Contrary to the defendant's assertions, the document at issue illustrates that as of mid-April 2000, Merck was still very concerned about Vioxx's potential to cause adverse cardiac and cerebral adverse events.  Again, according to Merck's Brief, page five, "because COX-2 inhibitors have been observed to reduce urinary metabolites of prostacyclin (an anti-platelet agent), '**this may reflect reduced prostacyclin in vivo**' which '**may result in an altered ratio of prostacyclin to thromboxane (TX)A$_2$**,' which in turn '**may cause increased risk of cardiac and cerebral adverse events**'" [emphasis added to indicate quotes from the CMI].

Merck argued in New Jersey state court that plaintiff should be precluded from making any use of the document at issue on the basis that it contained a privileged attorney-client communication, after having actually produced the document, *in duplicate*.  During a deposition of then-CEO of Merck, Raymond Gilmartin, plaintiff's counsel attempted to question the witness about the factual circumstances and motivations related to Merck's attempts to develop a combination drug and presented the document at issue.  For the first time, at that moment, Merck's counsel asserted the attorney-client privilege.  Plaintiff agreed to make no use of the document at that point and continued to honor its agreement by

refraining from questioning any witnesses about the CMI or Merck's efforts to develop a combination drug. Despite Merck's claim of privilege and plaintiff's agreement not to inquire about the combination drug, Merck asked its own witness, scientist Edward Scolnick, in his June 1, 2005, New Jersey litigation deposition that was cross-noticed in the MDL about the FitzGerald hypothesis and Merck's response in developing a new compound. In response to questioning, Scolnick stated that his intention in developing the new compound "was to come up with a non-irritative substitute for aspirin, because Vioxx was so much better on the gastrointestinal tract, it seemed rather counterproductive if one had to use aspirin in higher risk patients to then reproduce – to produce again some degree of gastric irritation, and I was looking for a way in the longer run to not have to do that." This is in direct contradiction to the description of the invention described in the CMI document at issue, as directly quoted by Merck in its New Jersey brief in support of a protective order prohibiting use of this document in that litigation.

On June 16, 2005, Judge Higbee in the New Jersey Superior Court filed a *Memorandum of Decision on Motion*, granting Merck's motion for protective order. It is important to note that Judge Higbee was presented with different arguments than those set forth herein. Plaintiff in that litigation argued that any privilege that may have attached to the document was waived because the document had been inadvertently produced on two occasions in that litigation and fell under the crime-fraud exception to privilege.

## II.     ARGUMENT

In determining whether Merck's Motion in Limine should be denied, plaintiff respectfully suggests that the Court must decide whether the document at issue is privileged

and, if so, whether that privilege has been waived or whether the document falls within an exception to the privilege.

### 1.    Choice of Law

Merck, in its motion, incorrectly states that Florida's privilege laws are applicable to this matter.  While Federal Rule of Evidence 501 provides that in diversity cases privilege issues "shall be determined in accordance with State law," Merck fails to take the next step to determine **which state's privilege laws Florida would apply**.  *See Anas v. Blecker*, 141 F.R.D. 530, 531 (M.D. Fla. 1992).  "'In determining the applicable law, a federal court hearing a non-federal claim must apply the law of the State in which it sits, including the State's choice of law rules.'"  *Id.* (quoting *Civic Assocs. v. Security Ins. Co.*, 749 F. Supp. 1076, 1079 (D. Han. 1990)).

". . . Florida courts have consistently applied the Restatement (Second) of Conflict of Laws in other tort cases where a choice of law issue has arisen."  *Id.* at 532 (citing *Bishop v. Florida Specialty Paint Co.*, 389 So. 2d 999 (Fla. 1980); *Proprietors Ins. Co. v. Valsecchi*, 435 So. 2d 290 (Fla. 3dDCA 1983); *Hertz Corp. v. Piccolo*, 453 So. 2d 12 (Fla. 1984); *Stallworth v. Hospitality Rentals, Inc.*, 515 So. 2d 413 (Fla. 1st DCA 1987)).  Section 139 Restatement (Second) of Conflict of Laws provides:

§ 139 Privileged Communications

(1) Evidence that is not privileged under the local law of the state *which has the most significant relationship with the communication* will be admitted, even though it would be privileged under the local law of the forum, unless the admission of such evidence would be contrary to the strong public policy of the forum.

(2) Evidence that is privileged under the local law of the state *which has the most significant relationship with the communication* but which is not privileged under the local law of the forum will be admitted unless there is

some special reason why the forum policy favoring admission should not be given effect.(emphasis added).

"Comment (e) to section 139 explains that the 'state with the most significant relationship will usually be the state where the communication took place, which as used in the rule of this Section, is the state where . . . *a written statement was received .* . . .'" *Anas*, 141 F.R.D. at 532 (emphasis added).  Were it not for this rule, Merck would be subject to different privilege laws in possibly all 50 states, and would face the possibility of conflicting decisions regarding privilege in as many states.  Therefore, the law, fairness, and common sense all dictate that the privilege law of New Jersey, the principal place of business of Merck, should apply.

### 2.    Attorney-Client Privilege

New Jersey has codified the attorney-client privilege. See N.J. Stat. Ann. § 2A:84A-20, N.J.R. Evid. 504.  Rule 504 grants a privilege to confidential communications between an attorney and his client made in professional confidence in the course of their legal relationship. It further confers upon the client the privilege to refuse to disclose those communications and to prevent the attorney or any other witness from disclosing the communications. *See* N.J.R. Evid. 504(1).  The privilege, however, is not absolute. *United Jersey Bank v. Wolosoff*, 483 A.2d 821, 823 (NJ Sup. Ct. App. Div. 1984); *Kinsella v. Kinsella*, 696 A.2d 556 (1997).  With regard to the limitations to the attorney-client privilege, the *United Jersey Bank* Court stated:

> The attorney-client privilege advances secrecy. It thus "runs counter to the fundamental theory of our judicial system that the fullest disclosure of the facts will best lead to the truth." Id.; *In re Selser*, 15 N.J. 393, 405 (1954). The underlying theories are patently antithetical. In seeking to accommodate these competing policies, we recognize that they are not static. "The social policy that will prevail in many situations" will run afoul in others of more important societal concerns, competing for supremacy. *Clark v. United States*, 289 U.S. 1,

13, 53 S.Ct. 465, 469, 77 L.Ed. 993, 999 (1933). "It is then the function of a court to mediate between them, assigning, so far as possible, a proper value to each."

*Id.* at 824-25.

The person asserting the privilege thus bears the burden to prove it applies to any given communication. *Horon Holding Corp. v. McKenzie*, 341 N.J. Super. 117, 125, 775 A.2d 111 (App. Div. 2001); *Guzzino v. Felterman*, 174 F.R.D. 59, 61 (W.D.La. 1997); Moore's Federal Practice, § 26.49.

### 3. The CMI Is Not Protected by the Attorney-Client Privilege

A communication that pertains to mere instructions on what services the attorney is to perform is not protected by the attorney-client privilege. *In re Pabst Licensing GmbH Patent Litigation*, 2001 U.S. Dist. Lexis 15667, at 6 (E.D.La. 2001). In April 2000, the CMI was prepared by Dr. Kathleen Metters and describes Merck's interest in patenting a new drug, invented by Merck scientist Edward Scolnick, which would combine COX-2 inhibitors with compounds designed to inhibit the body's production of thromboxane. The CMI was received by the patent department for purposes of beginning the process of drafting a patent application. The CMI was essentially administrative in nature and conveyed instructions to the Patent Department's attorneys and staff. As such, it should not be protected by the attorney-client privilege.

### 4. If protected, Merck Waived Its Attorney-Client Privilege by Quoting Portions of the CMI in a Brief it Filed in New Jersey

Under New Jersey law, a party waives the privilege if, "without coercion and with knowledge of his right or privilege, [he] made disclosure of any part of the privileged matter or consented to such a disclosure made by anyone." N.J. Stat. Ann. § 2A:84A-29, N.J.R. Evid. 530. "It is axiomatic that any voluntary disclosure by the holder of such a privilege waives the

privilege." *Leonen v. Johns-Manville,* 135 F.R.D. 94, 99 (D.N.J. 1990) (drawing from federal common law in applying New Jersey law). The voluntary disclosure of any significant portion of confidential communication waives the privilege as to the whole. *Leonen v. Johns-Manville,* 135 F.R.D. 94, 99 (D.N.J. 1990); *In re Pabst Licensing GmbH Patent Litigation,* 2001 U.S. Dist. Lexis 15667 (E.D.La. 2001); *see Nguyen v. Excel Corp.,* 197 F. 3d 200, 207 (5th Cir. 1999).

In *In re Pabst,* the Court ruled that privilege had been waived because the party claiming the privilege revealed privileged communications when its associate general counsel included in a declaration, attached in a response to a motion for summary judgment, revealing communications that were directly related to the asserted privilege. The Court stated that the disclosure was not inadvertent, as "it was intentionally included in a sworn declaration," which was attached to a pleading. *In re Pabst,* 2001 U.S. Dist. Lexis 15667, at 7 – 10.

Further, "the attorney client privilege does not attach where the content of the communication was already known or deducible by third parties, *United States v. Buljubasic,* 808 F.2d 1260, 1268 (7th Cir. 1987), or where the communication pertains to mere instructions on what services the attorney is to perform." *In Re Pabst,* 2001 U.S. Dist. Lexis 15667, at 6.

In the present case, in a pleading filed in the New Jersey proceeding, Merck specifically cites details of the CMI document at issue as follows:

> In April, 2000, Dr. Kathleen Metter, Vice President and Site Head for Merck Frosst Canada & Company ("Merck Frosst), and other Merck Frosst scientists prepared the CMI now at issue. The CMI described an idea for a new drug combining COX-2 inhibitors with compounds designed to inhibit production or action of thromboxane. The authors explained that such a combination drug might achieve "therapeutic benefit of COX-2 inhibitors with the additional benefit of reducing the risk of cardiac and cerebral adverse effects" for "at risk populations" CMI at 2. The authors also noted a theory that has come to be known as the Fitzgerald hypothesis – that because COX-2 inhibitors have been observed to reduce urinary metabolites of prostacyclin (an anti-platelet agent),

"this may reflect reduced prostacyclin in vivo" which "may result in an altered ratio or prostacyclin to thromboxane (TX)A2" which in turn "may cause increased risk of cardiac and cerebral events."

(Brief in Further Support of Merck & Co., Inc.'s Motion for A Protective Order Prohibiting Use of Disclosure of Inadvertently Produced Privileged Documents and Compelling Plaintiffs to Return all Copies of the Documents, Superior Court New Jersey Law Division, Civil Action No. 619, at 5).

The disclosure of these "significant portions" of the CMI document constitutes a waiver of the attorney-client privilege. *See Leonen*, 135 F.R.D. at 99; *In re Pabst*, 2001 U.S. Dist. Lexis 15667, at 6.  Additionally, the attorney-client privilege should not attach to this document because the "content of the communication was already known or deducible by third parties." *See In Re Pabst*, 2001 U.S. Dist. Lexis 15667, at 6.  Consider Merck's own brief filed in the New Jersey proceeding wherein it states:

> "The hypothesis originated with Dr. Garret Fitzgerald, a Merck consultant who, with Merck's scientists conducted the urine study on which the hypothesis is based. Contrary to plaintiffs' unfounded assertion that Merck suppressed this hypothesis, Merck included the study in its FDA New Drug Application and arranged for the study's May 1999 publication in a peer reviewed medical journal."

Based upon the fact that Merck had already publicly revealed the "content" of the CMI document, there is no confidential aspect of the document, and thus, the confidentiality element of privilege is not satisfied. This Fitzgerald theory as described in the CMI document was common knowledge and was submitted in Merck's NDA and for publication in a peer reviewed journal.

**5. Plaintiff Is in Substantial Need of this Document as it Is the Only Source of Information Available to Contradict Merck's Assertion That by the End of March 2000 it Had Concluded That the Prostaglandin/Thromboxane Imbalance Theory Had No Merit**

The attorney-client shield may be pierced when confidential communications are made a material issue by virtue of the allegations in the pleadings and where such information cannot be secured from any less intrusive source. *United Jersey Bank*, 483 A.2d at 823. According to the *New Jersey Bank* Court:

> The factors of analysis involved with the piercing of the attorney-client shield were described by our Supreme Court in *In re Kozlov*, 79 N.J. 232 (1979). There, the Court adopted a tripartite test in determining whether the privilege must yield to other important societal concerns. First, "[t]here must be a legitimate need . . . to reach the evidence sought to be shielded." ... Second, "[t]here must be a showing of relevance and materiality of that evidence to the issue before the court." ... Lastly, the party seeking to bar assertion of the privilege must show "by a fair preponderance of the evidence including all reasonable inferences that the information [cannot] be secured from any less intrusive source."

*United Jersey Bank*, 483 A.2d at 826.

"The typical setting in which the attorney-client privilege has not been sustained by the New Jersey Supreme Court in *In re Kozlov*, 79 N.J. 232 (1979), is where the party claiming the privilege has implicitly waived it by putting the confidential communications 'in issue' in the litigation.  Most jurisdictions recognize implicit waiver of the attorney-client privilege 'where the plaintiff has placed in issue a communication which goes to the heart of the claim in controversy.'" *Kinsella*, 696 A.2d at 568 - 569; Developments in the Law, Privileged Communications, supra, 98 Harv. L. Rev. at 1637-38; 81 Am. Jur. 2d Witnesses § 348, at 323 (1992)[1].

---

[1]In the event that the Court determines that Florida law applies to the analysis of Merck's asserted privilege, Florida law compels the same result. *See Savino v. Luciano*, 92 So. 2d 817, 819 (Fla. 1957) (where party puts subject of privileged communication into dispute, privilege is waived);  *First Southern Baptist Church of Mandarin, Florida, Inc. v. First Nat. Bank of Amarillo*, 610 So. 2d 452, 454 (Fla. 1st DCA 1992) ("If a party has injected into the litigation issues going to the very *heart* of the litigation, such party cannot avoid discovery into such issues by invoking the attorney-client privilege.") (internal quotation omitted).

In the present case, the attorney client shield should be pierced, as there is no other source of evidence to contradict Merck's repeated and public assertions that they were no longer concerned about a mechanism-based risk of increased cardiovascular events with Vioxx. The CMI document describes Merck's interest in obtaining a new patent for a new drug combination that would pair Vioxx with another drug compound that would inhibit the body's production of thromboxane. As the Court is aware, plaintiffs have alleged, in part, that ingestion of Vioxx—which inhibits production of prostacyclin but not thromboxane—may lead to an imbalance of enzymes in the circulatory system. This imbalance causes Vioxx users to become prothrombotic, resulting in an increased risk of heart attack and stroke. In short, Plaintiff contends that this risk is "mechanism based."

This theory postulated by Dr. Garret FitzGerald and other Merck consultants prior to the approval of Vioxx is obviously central to the Plaintiff's case as is the denial thereof in Merck's defense as alleged in its pleadings, testimony of its corporate representatives, publications, and press releases. Consider the timing of the relevant facts. Merck asserts that the prostacyclin/thromboxane imbalance theory was merely an unsubstantiated hypothesis at the time that Vioxx was developed and marketed, and that by the end of March, 2000, it had concluded that the theory had no merit. In particular, both Dr. Scolnick (former head of Merck Research Laboratories) and former Merck CEO, Raymond Gilmartin, have testified that by March 27, 2000—the date on which Merck promulgated a press release reassuring the public and medical community of the drug's cardiovascular safety - they were no longer concerned about a mechanism-based risk of increased cardiovascular events for Vioxx.

Contrary to Merck's assertion on this key issue, the CMI document clearly illustrates that as of mid-April 2000, and after the time that Merck released public statements that the drug carried no cardiovascular safety risk, Merck was very concerned about Vioxx's potential to cause a prostacyclin/thromboxane imbalance. As stated in the CMI:

> COX-2 inhibitors reduce prostacyclin urinary metabolites. This may reflect reduced prostacyclin in vivo. This may result in an altered ratio of prostacyclin to thromboxane $(TX)A_2$. The increase in thromboxane relative to prostacyclin may cause increased risk of cardiac and cerebral adverse events. Treatment with a ... thromboxane synthase inhibitor would reduce the risk..."

In addition to noting the above referenced time frames, it is important to focus on the fact the Dr. Scolnick, who stated that Merck was no longer concerned with the "mechanism based" risks of Vioxx, is listed on the patent as the inventor of the "Combination Therapy using Cox-2 Selective Inhibitor and Thromboxane Inhibitor and Compositions Therefor."

The information contained in the CMI is a "material issue by virtue of the allegations in the pleadings", and further, it cannot be secured from any less intrusive source.

## III.   CONCLUSION

Accordingly, for the reasons set forth hereinabove, Plaintiff respectfully requests that this Court deny Merck's Motion in Limine, and further, order the production of the CMI document which is bates numbered MRK-AEG 0020364-70, and/or an identical copy of this document that is bates numbered MRK-AEE 0000552-58.

Respectfully submitted,

By: _P. Leigh O'Dell_

**Andy D. Birchfield, Jr.**
Paul J. Sizemore
P. Leigh O'Dell
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
(800) 898-2034 (telephone)
(334) 954-7555 (telecopier)

**Co-Lead Counsel**


**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
FAX: (504) 561-6024
**Temporary Office**
3411 Richmond Ave., Suite 460
Houston, TX 77046
PH: (713) 877-1843
FAX: (713) 871-9750

**PLAINTIFFS' LIAISON COUNSEL**

Christopher A. Seeger
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
MEUNIER&WARSHAUER, L.L.C.
P.O. Box 960
191 East Second Street
New Roads, LA 70760
(225) 638-6137
(225) 638-8836 (fax)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Thomas R. Kline, Esquire
KLINE&SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)
Carlene Rhodes Lewis, Esquire

GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced in accordance with Pre-Trial Order No. #8, on this **11th** day of November, 2005.