UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| Evelyn Irvin Plunkett v. Merck & Co, Inc. | * | CASE NO. 02:05CV4046 |

**Plaintiff's Memorandum in Opposition to Defendant's Motion in Limine to Exclude Evidence of or Arguments Made in Connection with Political Proceedings and Evidence of Verdicts from Other Litigation, Claims, or Government Proceedings**

*(Plaintiff's Opposition to Defendant's Motion in Limine No. 15)*

Plaintiff Evelyn Irvin Plunkett, as Personal Representative of the Estate of Richard Irvin, Jr., by and through her attorneys, hereby opposes Defendant's motion to exclude evidence or argument in connection with political proceedings and evidence of verdicts from other litigation, claims or government proceedings.

It is clear that statements contained in official writings made by public officials of acts done within the scope of the officials' duties are admissible under the Federal Rules of Evidence. Further, evidence of other litigation, claims, or government enforcement proceedings are admissible for two different purposes: to prove a pattern and practice of conduct for purposes of punitive damages and to rebut claims of "good character."

## ARGUMENT

**I.      THE MAY 5, 2005 MEMORANDUM REPORT OF THE HOUSE COMMITTEE
ON GOVERNMENT REFORM REGARDING MERCK'S MARKETING OF
VIOXX IS A PUBLIC RECORD ADMISSIBLE UNDER THE FEDERAL RULES
OF EVIDENCE**

Federal Rules of Evidence 803(8) provides, in part, for the admissibility of "... reports,

statements, or data compilations, in any form, of public offices or agencies, setting forth ... (C) in

civil actions ... factual findings resulting from an investigation made pursuant to authority

granted by law, unless the sources of information or other circumstances indicate lack of

trustworthiness."  Specifically, Merck objects to the May 5, 2005 Memorandum Report of the

House Committee on Government Reform ("Waxman Report").  As demonstrated below, the

statements contained therein clearly meets the requirements mandated under the Federal Rules of

Evidence and are, therefore, admissible.

### A.      The House Committee on Government Reform is Credible and Reliable

The House Committee on Government Reform ("HCGR") is a long-standing, well-

established Congressional committee and has existed in various forms since 1816. (See

"Background/History of the Committee on Government Reform." (Ex. A) (attached).  The

HCGR is comprised of 41 members of the House; currently 23 majority members

and 18 minority members.  (See About the Committee on Government Reform Minority Office"

(Ex. B) (attached).  The HCGR serves, specifically, as Congress' chief investigative and

oversight committee. (See Ex. A).  Pursuant to that mandate, the Committee has been granted

broad jurisdiction to investigate any federal program and any matter with federal policy

implications.

> [The Committee] is granted broad jurisdiction because of the
> importance of effective, centralized oversight. Because it
> authorizes on a few agencies and programs, it is able to review
> government agencies and programs with an unbiased eye.

Id. In performing these duties, the Committee adheres to the appropriate standards of scholarly responsibility and investigative integrity.

In addition to its investigative mandate, the HCGR has been the source of important legislation. Recent bills which have originated in the HCGR and have become law include a bill to prevent Congress from passing unfunded mandates, a bill involving the line-item veto granting the President authority to strike individual items from tax and spending bills, and a bill reducing the paperwork burden the federal government imposes on governmental entities, individuals and private businesses. The HCGR is not, as the Defendant alleges, without any support in fact, or some *ad hoc* committee thrown together to address some media created crisis.

1.     **The Merck Vioxx Marketing Investigation and Report**

The marketing and promotion of prescription drugs such as Vioxx obviously implicates federal policy.  Pursuant to its official investigative mandate, the HCGR conducted a thorough investigation to assess "how Merck trained its sales representatives, whether training was consistent with a primarily educational purpose for contacts with physicians, and whether Merck's sales representatives were instructed to discuss fairly and accurately the cardiovascular risks of Vioxx with physicians."  (See "Memorandum Regarding the Marketing of Vioxx" (May 5, 2005) ("Waxman Report") (Ex. C).

The investigation took six months and included numerous sources of information, primarily from Merck itself.  The Committee requested that Merck provide "all presentations,

training sessions, or materials given to Merck employees and agents who marketed Vioxx" and "all records of communication provided to healthcare providers and pharmacists concerning the safety and efficacy of the drug." Id.  Merck complied with this request and supplied the Committee with over 20,000 pages of internal company documents, including course curricula, bulletins to the field staff, training manuals, company talking points, memoranda among senior executives, and promotional materials for use with physicians. Id.  Additionally, the Committee received numerous documents related to Vioxx from the Food and Drug Administration. Id.  The Committee also conducted hours of interviews with the FDA and Merck regarding post-marketing surveillance. (See "Opening Statement of Chairman Tom Davis, Hearing Before the House Committee on Government Reform," 109[th] Cong., May 5, 2005 (Ex. D).  The Committee's exhaustive collection of data clearly demonstrates the thoroughness, trustworthiness and unbiased nature of its mission—particularly given the sources of its information.  Moreover, the HCGR investigation was conducted completely outside the scope of, and was unrelated to this or other Vioxx litigation.

The Waxman Report memorializes the Committee's findings after a six-month investigation of Merck's sales practices. As such, the Report, meets the requirement of Fed. R. Evid. 803(8) in that it is the record of "factual findings resulting from an investigation made pursuant to authority granted by law."  The fact that the Report may contain "opinion" findings does not alter its admissibility.  In Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 162 (1988), the United States Supreme Court held that "factually based conclusions or opinions are not on that account excluded from the scope of Rule 803(8)(C)."  The Court went further to endorse the inclusion of "opinion" alongside factual findings when it stated,

4

"... the language of the Rule does not state that 'factual findings' are admissible, but that 'reports... setting forth ... factual findings" (emphasis added [by the Court]) are admissible. On this reading, the language of the rule does not create a distinction between 'fact' and 'opinion' contained in such reports."

Beech, 488 U.S. at 164.

Clearly, because of the thorough, fair and extensive nature of the HCGR report on Merck's activities with regard to Vioxx, the report was prepared pursuant to the law and contains findings of fact that fall within the Rule 803(8) exception.

### 2.      The Waxman Report Is Trustworthy

A governmental report compiled in a scholarly and thorough manner is presumed to be admissible under Fed. R. Evid. 803(8)(C) and the party challenging the admissibility of an official public record bears the burden of proving that the particular record challenged is not trustworthy. See Marini v. United States, 80 F.Supp.2d 352, 360 (M.D. Pa. 1999) *cert. denied,* 531 U.S. 1010 (2000) (It is assumed public officials perform their duties properly and investigatory reports encompassed in the rule are presumed trustworthy and the burden is placed upon the party opposing admission to "demonstrate a lack of reliability."). Merck has clearly not met that burden here.

Defendant characterizes the Committee's six-month investigation and analysis of more than 20,000 pages of internal Merck documents as a "political statement," and argues for a novel "blanket exception" for Congressional committee reports. This characterization is nothing more than a mere allegation unsupported by any facts. Further, Merck mischaracterizes the Committee's functions and duties. The alleged "blanket exception" sought by defendant is not the law. If Congressional reports, as a class of official statements, were "untrustworthy," the

Rule would explicitly exclude such reports. It obviously does not. Having failed to meet its burden, defendant's motion to exclude must be denied.

Moreover, assuming *arguendo*, that Merck has met its threshold burden, the facts establish that the Waxman Report meets the requirements of Fed. R. Evid. 803(8)(C). As the main investigative committee in the U.S. House of Representatives, the HCGR was acting within the scope of its duty when it conducted its six-month long investigation into Merck's practice of marketing prescription drugs. The trustworthiness of the report is indicated by the Committee's unbiased motive in conducting the investigation, *ab initio*. The Report itself states that its objective was to assess Merck's knowledge of the cardiovascular safety risks of Vioxx, and whether it accurately informed the public and physicians of the risk.

The cases cited by Merck in support of its motion to exclude, are inapposite. Most of the cases cited by Merck preceded the decision in <u>Beech</u>, which specifically held the "narrow interpretation" of Fed. R. Evid. 803(8)(C) exhibited by the holdings in those cases was overruled. For example, in <u>Baker v. Firestone Tire & Rubber Co.</u>, 793 F.2d 1196,1199 (11th Cir. 1986), the court found that the particular subcommittee report at issue there was the result of "the rather heated conclusions of a politically motivated hearing." No such evidence exists here. The defendant has not shown that the six-month investigation of Merck's marketing practices, and resulting scholarly analysis of data contained in the Waxman Report was the result of any political motivation. In <u>Anderson v. City of New York</u>, 657 F. Supp 1571 (S.D.N.Y. 1987), the report at issue merely summarized two open session hearings on the misconduct of the New York City Police Department. Further, that subcommittee engaged in no analysis of any data of any kind. The court found the report lacking, "the ordinary indicia of reliability." <u>Id</u>. at 1580. Here, Merck has not come close to any similar showing.

6

The point to be made here is that in determining the admissibility of evidence under what has become known as the public records exception, "each case must be judged under its own particular facts taking into account the specific purposes for which this type of evidence is submitted." Robbins v. Whelan, 653 F.2d 47 (1st Cir.), *cert. denied,* 454 U.S. 1123 (1981) (ruling that exclusion of a Department of Transportation report in a negligence action arising out of an automobile collision was more than harmless error and warranted remand). Congressional committee reports are not inherently unreliable.  Courts themselves have relied upon these types of reports to supply background factual information.  See Sims v. Central Intelligence Agency, 642 F.2d 562, 564 (D.C. Cir 1980) (relying upon a Congressional committee report to state as fact that the CIA sponsored extensive research concerning chemical, biological and radiological materials for use in secret operations to control human behavior).

Investigative Congressional committee reports are clearly admissible unless deemed to be so unreliable as to not be trustworthy.  For example, portions of a Senate committee investigative report into FBI domestic intelligence operations were admissible in Hobson v. Wilson, 556 F. Supp. 1157 (D.D.C. 1982), *aff'd in part, rev'd in part,* 737 F.2d 1 (D.C. Cir. 1984), *cert. denied,* 470 U.S. 1084 (1985). The United States District Court for the Middle District of Pennsylvania found admissible, over hearsay objections, a Minority report prepared by the Congressional Committee on Governmental Affairs following an investigation into campaign financing in Mariani v. United States, 80 F.Supp.2d 352 (M.D. Pa 1999).

**B.      The Waxman Report Is Admissible Under Fed. R. Evid. 803(6)**

Fed. R. Evid. 803(6) provides for the admissibility of a  "memorandum, report, record

or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the regularly conducted business activity ...." The Waxman Report is also, independently, admissible under this rule.

Many statements admissible pursuant to Rule 803(8)(C) are also admissible as records of a regularly conducted activity pursuant to Rule 803(6). The Waxman Report was made in the regular course of the Committee's operations and it is the Committee's practice to generate such reports. Moreover, the sources of the information, as well as the motive duty and interest of the Committee in preparing the report, and the fact that neither the investigation nor the resulting report was completed in anticipation of litigation indicate that the report is trustworthy.

### C. The Waxman Report is Clearly Relevant and More Probative than Unfairly Prejudicial

The Waxman Report addresses a variety of areas going to the heart of the issues in this case including, but not limited, the adequacy of Merck's training of its sales representatives, the reasonableness of Merck's sales, marketing and promotional activities, the willfulness and/or deliberateness of Merck's conduct, and the sufficiency of Merck's efforts to inform physicians about the risks associated with Vioxx. While Merck may not like what the Waxman Report has to say about these issues, that does not make the Report's probative value outweighed by the danger of unfair prejudice. Virtually all evidence is prejudicial or it isn't material. The prejudice must be 'unfair.' Dollar v. Long Manufacturing, N.C., Inc., 561 F.2d 613, 618 (5th Cir. 1977).

Once evidence has been established as being relevant, the burden is on the party urging exclusion of evidence to convince the court that 403 considerations should control. *State v. Jones,* 891 So.2d 760, 767 (La. App. 4 Cir. 2004). It should be emphasized, however, that exclusion of relevant evidence pursuant to Rule 403 "is an extraordinary measure that should be used sparingly." *Campbell v. Keystone Aerial Surveys, Inc.,* 138 F.3d 996, 1004 (5th Cir.1998).  Here, Merck's suggestion that the introduction of the evidence in question would lead to juror confusion or the prolonging the trial is mere speculation.  Its generic argument on these issues can be made equally to any evidence that is adverse to its position (e.g., to rebut the evidence we will have to call witnesses and put on other evidence).  Again, the mere fact that Merck does not like what is in the report does not make it unfairly prejudicial.

.   **II.     EVIDENCE OF "BAD ACTS" IS ADMISSIBLE AS EVIDENCE OF REPREHENSIBLE MISCONDUCT AND TO REBUT CLAIMS OF "GOOD CHARACTER"**

        **A.     Evidence of The Harm And Potential Harm Caused By Defendant's Conduct-- Including Injuries to Others -- Is Specifically Admissible With Respect to Plaintiffs' Punitive Damages Claims**

Plaintiff seeks recovery of punitive damages as the result of the egregiousness of defendant's conduct.  Rule 405(b) specifically provides that evidence of character is admissible when that character or trait of character is an element of a claim or defense. The "bad character" of Merck is an element of plaintiff's punitive damage claim.

Moreover, in order to support punitive damages claims, the United States Supreme Court not only authorizes, but demands evidence showing that a defendant engaged in a pattern and practice of misconduct and evidence proving the potential harm or actual harm caused to others as the result of that conduct.  Indeed, in TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 461-462 (1993), the Supreme Court not only approved the

admission of extensive evidence and argument regarding the potential harm to others that might have occurred as a result of the defendant's misconduct, it quoted extensively from the arguments of counsel to that effect.  Additionally, and more recently, the Supreme Court confirmed that evidence of the effect of defendants' misconduct on others is required as part of the reprehensibility analysis in determining whether the amount of punitive damages awarded is constitutional:

> " '[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct.' [BMW of North America, Inc. v.] Gore supra, [517 U.S. 559] at 575, 116 S.Ct. 1589. We have instructed courts to determine the reprehensibility of a defendant by considering whether the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.  State Farm Mut. Auto Ins. Co. v. Campbell, 538 U.S. 408, 419 (2003)

In BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996),  the Supreme Court also noted that "evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law." Id. at 577.

Thus, under TXO, Gore and Campbell, a highly relevant consideration for punitive damages purposes is evidence of the harm or potential harm caused to others as the result of the defendants' misconduct.  As such, evidence that numerous other people have potentially been injured as the result of defendant's marketing of a dangerous product is directly relevant to plaintiffs' claims for punitive damages.

      **B.**    **Evidence of Defendant's "Bad Acts" Are Admissible in Rebuttal to Any Evidence Or Claim Made That Merck Is a Reputable Company of Good Character**

To the extent Defendant attempts to assert to the jury, or submit evidence, to the effect that Merck is a responsible, reputable and conscientious company (i.e., that it is of "good character"), Plaintiff is entitled to rebut any such contention with evidence demonstrating that, in fact, it is not.  Defendant simply cannot contend that any evidence of "bad acts" on its part must be wholly excluded from this case, where it attempts to claim to the jury that it is a reputable, conscientious and responsible company.

Thus, to the extent that Defendant argues, or their witnesses are allowed to testify,[1] that Merck is a company of "good character," Plaintiff is entitled to rebut that evidence with evidence demonstrating that it is, in fact, not reputable, law-abiding, or conscientious. Under Rule 404 (a) (1), to the extent that the Defendant introduces evidence of "good character," the evidence that Merck is the target of a criminal investigation by the U.S. Department of Justice, a formal investigation by the U.S. Securities and Exchange Commission, and has been sued by a State Attorney General would be admissible rebuttal evidence.

Clearly, since there are varying grounds for admissibility of the types of evidence that may relate to or be derived from other lawsuits, no blanket order can properly issue. The determination of whether particular evidence is admissible must be made at the time such evidence is actually presented and in response to an appropriate and timely objection from Defendant.

## CONCLUSION

For the reasons set forth herein, Plaintiff urges the Court to deny Defendant's Motion to Exclude Evidence or Argument Regarding (1) Statements and Made in Connection with

11

Political Proceedings and Debate Regarding Vioxx and (2) Evidence of other Litigation,

Claims, Actions or Government Proceedings.

Respectfully submitted,

By: _P. Leigh O'Dell_

**Andy D. Birchfield, Jr.**
Paul J. Sizemore
P. Leigh O'Dell
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
(800) 898-2034 (telephone)
(334) 954-7555 (telecopier)

**Co-Lead Counsel**


**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
FAX: (504) 561-6024
**Temporary Office**
3411 Richmond Ave., Suite 460
Houston, TX 77046
PH: (713) 877-1843
FAX: (713) 871-9750

**PLAINTIFFS' LIAISON COUNSEL**

---

[1] Plaintiff's Motion in Limine No. 4 seeks to exclude this type of evidence.

Christopher A. Seeger
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
MEUNIER&WARSHAUER, L.L.C.
P.O. Box 960
191 East Second Street
New Roads, LA 70760
(225) 638-6137
(225) 638-8836 (fax)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Thomas R. Kline, Esquire
KLINE&SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Carlene Rhodes Lewis, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced in accordance with Pre-Trial Order No. #8, on this **11th** day of November, 2005.

# EXHIBIT A

# Committee on Government Reform

## *Background/History*

The Committee on Government Reform has existed in varying forms since 1816. It first appeared as the Committee on Expenditures in the Executive Departments, which was created in 1927 by consolidating the 11 Committees on Expenditures previously spread among the various departments of the government to oversee how taxpayer monies were spent.

The Committee's immediate predecessor, the Committee on Government Operations, was established in 1952. The name change was intended to communicate to the outside world the primary function of the committee: to study "the operations of Government activities at all levels with a view to determining their economy and efficiency." It is the Committee's government-wide oversight jurisdiction that sets it apart from other House committees.

On January 4, 1995, Republicans assumed control of the House of Representatives for the first time in over 40 years. Republicans immediately implemented several internal reforms of the House, including one that applies all of the laws the rest of America lives under to Congress, and another that downsizes the congressional committee system.

Perhaps more than any other committee, the Government Reform Committee embodied the changes that occurred. The Committee's name was changed to highlight the Republican view that the federal government needs to be reformed to ensure accountability.

The Committee on Government Reform is unlike most other committees in that its jurisdiction has grown. While retaining the agenda of the former Committee on Government Operations, the Committee also has the responsibilities of the former Committee on Post Office and Civil Service and the Committee on the District of Columbia. The Committee now has seven subcommittees responsible for the same jurisdiction previously covered by 3 full committees and 14 subcommittees. This consolidation has resulted in hundreds of millions of dollars in budget savings and a nearly 50 percent cut in staff.

The Committee's government-wide oversight jurisdiction and expanded legislative authority make it one of the most influential and powerful committees in the House. The Committee serves as Congress' chief investigative and oversight committee, and is granted broad jurisdiction because of the importance of effective, centralized oversight. Because it authorizes on a few agencies and programs, it is able to review government agencies and programs with an unbiased eye.

Thirty-eight percent of the "Contract With America" moved through the Committee in the 104th Congress under Chairman Bill Clinger. The Committee and its subcommittees conducted 252 hearings during the 105th Congress.

Three pieces of the "Contract With America" legislation that originated in this Committee became law during the 104th Congress: a bill to stop Congress from passing unfunded mandates; line-item veto legislation granting the President authority to strike individual items from tax and spending bills; and a bill reducing the paperwork burden the federal government imposes on governments, individuals, and private businesses.

In addition, the Committee crafted historic legislation authored by then-District of Columbia Subcommittee chairman Tom Davis (the full Committee's current chairman) to bring the District of Columbia out of its financial crisis.

Also in the 104th Congress, the Committee investigated the improper firings of White House Travel Office employees, and the White House's controversial handling of FBI files. During the 105th Congress under Chairman Dan Burton, the Committee was charged with investigating millions of dollars in illegal foreign contributions that flowed into Presidential campaigns.

Committee alumni include distinguished, well-known national leaders: Abraham Lincoln, Bob Dole, Denny Hastert, Dick Armey, Donald Rumsfeld, Dan Quayle, Jim Wright and John McCormack, to name a few.

Currently, the Committee is chaired by Congressman Tom Davis. Congressman Henry Waxman serves as the Committee's Ranking Member.

Chairman Davis has served as a member of the Committee since his freshman term in the 104th Congress, when he began his six-year tenure as Chairman of the Subcommittee on the District of Columbia.

As Chairman of the D.C. Subcommittee, Davis' first action was to craft a legislative solution to the District's fiscal woes, the "District of Columbia Financial Responsibility and Management Assistance Act of 1995" (P.L. 104-8). This law created a "Control Board" to eliminate the District's severe budget deficits and cash shortages, assist the District in restructuring and reforming the delivery of critically dysfunctional city services, and ensure the future economic viability of the District. P.L. 104-8, required the District to produce four consecutive balanced budgets and eliminate the city's debt before the Control Board's powers would be returned to elected city officials.

Once the Control Board was established and began to instill much-needed fiscal discipline into the city's budget process, the Subcommittee pursued the next phase of reforms, the "National Capital Revitalization and Self-Government Improvement Act of 1997" (included in P.L. 105-33). D.C. government agencies were required to develop and implement management reform plans in the areas of asset management, information resources management, personnel, and procurement. This law helped to restructure and

improve the complex relationship between the Federal government and the District of Columbia and included incentives for economic development and private sector job creation.

Seven year later, thanks to vigorous and continuous oversight by the D.C. Subcommittee, the Nation's Capital is in much better financial shape.  The District has stronger internal controls and budgeting processes, better monitors for expenditures, and acts in a more 'fiscally responsible fashion.  The District paid off its accumulated debt and submitted four consecutive balanced budgets for Congressional approval.  Therefore, the Control Board was dissolved, and the mayor and city council now retain the authority they ceded in 1995.  Today, the city's population is stabilizing, the real estate market is up, suburban residents are making more leisure trips into the city, and jobs have increased dramatically.

Under Davis' leadership, the Subcommittee held oversight hearings to examine the status of three of the city's agencies that were in federal court-ordered receivership as the result of on-going lawsuits.  This included several hearings examining the troubled D.C. Child and Family Services Agency and the challenges it has faced in ensuring the safety and well-being of children in its care.  With the help of Majority Leader Tom DeLay, the Subcommittee helped shine a needed light on an agency that was literally placing the lives of the District's most vulnerable residents at risk.

Other major legislation Davis authored included the bipartisan "D.C. College Access Act of 1999" (P.L. 106-98) to allow recent high school graduates in D.C. to pay in-state tuition at public colleges in Maryland and Virginia.  It gives D.C. graduates more choices, and provides an incentive for more families to remain in the nation's capital.

In January 2000, Davis became the Chairman of the newly created Subcommittee on Technology and Procurement Policy, where he worked to ensure the passage of legislation that addresses many of the critical challenges faced by the federal government.  This includes:

- H.R. 3844, the Federal Information Security Management Act of 2002 will permanently authorize a government-wide risk-based approach to information security by eliminating the Government Information Security Reform Act's two-year sunset.  It will further strengthen Federal information security by requiring compliance with minimum mandatory management controls for securing information and information systems, clarifying and strengthening current management and reporting requirements, and strengthening the role of NIST.  This bill was included in the Homeland Security bills passed by the Committee on Government Reform and the House.
- H.R. 3925, the Digital Tech Corps Act of 2002, creates training opportunities in information technology management through the Digital Tech Corps, an exchange of eligible mid-level staff between leading-edge private sector organizations and governmental agencies.  The Digital Tech Corps program will invigorate the current

IT workforce and help position the Federal government as a desirable employer in the IT arena.

- H.R. 3947, the Federal Asset Management Reform Act, which is part of the President Bush's management agenda, provides Federal departments and agencies with new authorities and incentives to manage their real and personal property assets, including the use of public-private partnerships, subleases, property exchanges or transfers property with other Federal agencies and agreements with non-Federal entities to exchange or sell property as a means of acquiring replacement property better suited for mission purposes.
- H.R. 2458, the bipartisan "Electronic Government Act of 2002," provides a new framework for managing the Federal government's information resources and increasing the availability of information to citizens through electronic government initiatives.

Additionally, Davis maintained an active hearing schedule examining issues integral to federal government operations, such as improvements in the services acquisition process, outsourcing issues including OMB Circular A-76, the General Services Administration's Federal Technology Schedule and Federal Supply Schedule, federal property management, and telecommuting programs for federal employees. Davis was successful in bringing together unions and government agencies to focus on federal employees' issues, and in particular to seek solutions to the federal government's human capital management crisis. This is the sort of active oversight that reflects the Republican agenda of crafting a more efficient and effective federal government.

# EXHIBIT B

Government Reform Minority Office - democrats.reform.house.gov

# About the Committee on Government Reform Minority Office

## Rep. Henry A. Waxman
Rep. Waxman represents the 30th District of California and has served as ranking member of the Committee on Government Reform since 1997.

## Members and Subcommittees
There are 23 majority (Republican) members and 18 minority (Democratic and Independent) members on the Committee on Government Reform.

## Rules and Jurisdiction
The Committee on Government Reform is the main investigative committee in the U.S. House of Representatives. It has jurisdiction to investigate any federal program and any matter with federal policy implications.

## Legislation

## Special Investigations Division
In 1998, Rep. Waxman formed the Special Investigations Division of the minority staff to conduct investigations into issues that are important to the minority members of the Government Reform Committee and other members of Congress.

## Contact Us
Contact the Committee on Government Reform Minority Office.

# EXHIBIT C

ONE HUNDRED NINTH CONGRESS

# Congress of the United States

## House of Representatives

COMMITTEE ON GOVERNMENT REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

http://reform.house.gov

## MEMORANDUM

### May 5, 2005

**To:**　　**Democratic Members of the Government Reform Committee**

**From:**　**Rep. Henry A. Waxman**

**Re:**　　**The Marketing of Vioxx to Physicians**

On November 9, 2004, the Committee on Government Reform requested that Merck provide the Committee with a wide range of documents related to the anti-inflammatory drug Vioxx. The request expressly sought "all presentations, training sessions, or materials given to Merck employees and agents who marketed Vioxx" and "all records of communication provided to healthcare providers and pharmacists concerning the safety and efficacy of the drug."[1] In response to this request, Merck provided the Committee with over 20,000 pages of internal company documents, including course curricula, bulletins to the field, training manuals, company talking points, memoranda among senior executives, and promotional materials for use with physicians. The Committee also received documents from FDA related to Vioxx.

These documents provide an extraordinary window into how Merck trained its sales representatives and used them to communicate to physicians about Vioxx and its health risks. In fact, the documents may offer the most extensive account ever provided to Congress of a drug company's efforts to use its sales force to market to physicians and overcome health concerns.

To assist members in their preparation for the May 5, 2005, hearing on FDA and Vioxx, this memorandum summarizes the key documents received by the Committee. It assesses how Merck trained its sales representatives, whether this training was consistent with a primarily educational purpose for contacts with physicians, and whether Merck's sales representatives were instructed to discuss fairly and accurately the cardiovascular risks of Vioxx with physicians.

---

[1] Letter from Chairman Tom Davis to Merck Chief Executive Officer Ray Gilmartin (Nov. 9, 2004).

The Committee did not receive documents from Pfizer related to its anti-inflammatory drugs Celebrex and Bextra, nor has the Committee received or reviewed documents from other drugs companies related to the marketing of other drugs. Thus, this memorandum cannot assess whether Merck's practices are better or worse than or the same as those of other drug companies.

*****************************************************

## TABLE OF CONTENTS

EXECUTIVE SUMMARY ................................................................................................2

I.   INTRODUCTION ................................................................................................4

II.  HOW MERCK TRAINED ITS SALES REPRESENTATIVES ...........................................7
     A. General Sales Techniques ............................................................................7
     B. Specific Marketing Strategies .....................................................................12

III. COMMUNICATIONS ABOUT VIOXX AND ITS RISKS .................................................16
     A. The VIGOR Trial .......................................................................................16
     B. The FDA Advisory Committee Meeting.........................................................20
     C. The *New York Times* Article ......................................................................23
     D. *JAMA* Study ...........................................................................................25
     E. Changes to the Vioxx Label .......................................................................26

IV. CONCLUSION.....................................................................................................29

*****************************************************

## EXECUTIVE SUMMARY

By the time Merck voluntarily withdrew the anti-inflammatory drug Vioxx from the market in September 2004, more than 100 million prescriptions had been dispensed in the United States. Yet the vast majority of these prescriptions were written by physicians after evidence of Vioxx's risks had already surfaced. Even as evidence mounted that use of Vioxx was associated with heart attacks and strokes, physicians continued to prescribe Vioxx to millions of patients. How could this have happened?

A partial answer may be found by examining the strategies that Merck used to market Vioxx to physicians. Based on a review of the Merck documents, it appears that Merck sent over 3,000 highly trained representatives into doctor's offices and hospitals armed with misleading information about Vioxx's health risks. The documents indicate that Merck instructed these representatives to show physicians a pamphlet indicating that Vioxx might be 8 to 11 times safer than other anti-inflammatory drugs, prohibited the representatives from discussing contrary studies (including those financed by Merck) that showed increased risks from Vioxx, and launched special marketing programs — named "Project XXceleration" and "Project Offense" — to overcome the cardiovascular "obstacle" to increased sales.

The documents reveal that Merck exhaustively trained its representatives on how to persuade doctors to prescribe Vioxx and other Merck products. No interaction with physicians appears to have been too insignificant for instruction. Merck representatives were taught how long to shake physicians' hands (three seconds), how to eat their bread when dining with physicians ("one small bitesize piece at a time"), and how to use "verbal and non-verbal" cues when addressing a physician to "subconsciously raise[] his/her level of trust." Merck instructed its representatives on the various personality types of doctors (including "technical," "supportive," and "expressive") and recommended targeted sales techniques for each type. And Merck rewarded its sales force with thousands of dollars in cash bonuses for meeting sales goals. The company assigned individual doctors a "Merck potential" and graded them on how often they prescribed Merck products.

The documents describe in detail how Merck used this highly trained sales force to respond to reports of Vioxx's safety risks. The first public indication that Vioxx posed a heightened risk of heart attack and stroke came in March 2000, when Merck's VIGOR study showed a five-fold increase in the risks of heart attacks in patients on Vioxx compared to patients on naproxen. This study was followed by cautionary discussions of the cardiovascular risks of Vioxx at a meeting of an advisory committee to the Food and Drug Administration in February 2001, in a *New York Times* article in May 2001, and in a paper in the Journal of the American Medical Association in August 2001.

After each of these developments, Merck sent bulletins or special messages to its sales force, directing them to use highly questionable information to assuage any physician concerns.

For example, the Merck documents show:

3

and strokes than those on a placebo. On the same day, Merck voluntarily withdrew Vioxx from

At the time of Vioxx's withdrawal, more than 2 million patients around the world were taking the drug.[3] Since May 1999, when Vioxx was approved by the Food and Drug Administration, more than 100 million prescriptions had been dispensed in the United States alone.[4] Vioxx is considered safer for the stomach than aspirin and other anti-inflammatory drugs. Yet recent research indicates many, if not most, patients on Vioxx were at low or very low risk of stomach problems and would have done well on standard medications.[5]

When exposure to a drug is so widespread, even a small safety problem can have major public health consequences. A recent study estimated that as many as 88,000 to 140,000 Americans may have suffered Vioxx-related heart attacks, strokes, and other serious medical complications.[6]

The vast majority of Vioxx prescriptions were written after serious safety questions were first raised. In March 2000, less than a year after approval, Merck announced the results of a clinical trial in which Vioxx was associated with significantly more heart attacks and strokes than another anti-inflammatory drug.[7] Paradoxically, following the announcement of these results, Vioxx's sales soared. The drug reached $2 billion in sales faster than any other drug in Merck's history.[8]

Vioxx sales remained strong even as other reports of Vioxx's dangers emerged. These included new data presented at an FDA advisory committee in February 2001,[9] a major exposé in the *New York Times* in May 2001,[10] an article in the *Journal of the American Medical*

---

[3] *Merck: Vioxx Withdrawal a Harsh Blow to Drug Giant*, Chicago Tribune (Oct. 3, 2004).

[4] D. Graham et al., *Risk of Acute Myocardial Infarction and Sudden Cardiac Death in Patients Treated with Cyclo-oxygenase 2 Selective and Non-Selective Non-Steroidal Anti-Inflammatory Drugs: Nested Case-Control Study*, Lancet, 475–481 (Feb. 5, 2005).

[5] Carolanne Dai, Randall S. Stafford, G. Caleb Alexander, *National Trends in Cyclooxygenase-2 Inhibitor Use Since Market Release*, Archives of Internal Medicine, 171-177 (Jan. 24, 2005).

[6] *Id.*

[7] *Merck Informs Investigators of Preliminary Results of Gastrointestinal Outcomes Study with VIOXX(R)*, PR Newswire (Mar. 27, 2000).

[8] Merck, *Merck Annual Report 2001, We're Strengthening Our Arthritis Franchise* (2002) (online at http://www.anrpt2001.com/4.htm).

[9] Food and Drug Administration, *Arthritis Advisory Committee* (Feb. 8, 2001) (online at http://www.fda.gov/ohrms/dockets/ac/01/briefing/3677b2.htm).

[10] *Doubts Are Raised on the Safety of Two Popular Arthritis Drugs*, New York Times (May 22, 2001).

*Association* in August 2001,[11] and changes to the Vioxx label in April 2002.[12] Despite growing concern over Vioxx's dangers, sales in 2003 reached $2.5 billion.[13]

This memorandum summarizes key Merck documents that shed light on why clinicians continued to prescribe so much Vioxx even as evidence of harm began to mount. Based on a review of over 20,000 pages of internal company documents, it focuses on an aspect of the drug industry that has historically been hidden from public view: promotional activities directed at physicians.[14]

Promotions targeting physicians account for the majority of drug industry spending on marketing and promotion. In 2003, pharmaceutical companies spent $9 billion on marketing and promotion. Of this amount, $5.7 billion (over 60%) was aimed at physicians.[15] As many as ninety thousand sales representatives meet with physicians about their companies' products every day.[16]

Vioxx was no exception. According to Merck, the company assigned over 3,000 company representatives across the country to engage in face-to-face discussions with physicians about Vioxx.[17]

According to the Pharmaceutical Research and Manufacturers Association of America, an industry trade group, the efforts of pharmaceutical representatives are "essential for

---

[11] D. Mukherjee, S. Nissen, and E. Topol, *Risk of Cardiovascular Events Associated with Selective Cox-2 Inhibitors*, Journal of the American Medical Association, 954–9 (Aug. 22–29, 2001).

[12] Food and Drug Administration, *FDA Approves New Indication and Label Changes for the Arthritis Drug, Vioxx*, FDA Talk Paper (Apr. 11, 2002).

[13] *Merck Withdraws Arthritis Medication*, Washington Post (Oct. 1, 2004).

[14] Other factors beyond the scope of this report have been cited as contributors to robust Vioxx sales. These include Merck's $300 million direct-to-consumer advertising campaign and FDA's failure to strongly and promptly warn the public and physicians of cardiovascular risks. *See New Study Criticizes Painkiller Marketing*, Washington Post (Jan. 25, 2005); Daniel H. Solomon, Jerry Avorn, *Coxibs, Science, and the Public Trust*, Archives of Internal Medicine, 158-160 (Jan. 24, 2005);

[15] According to the Pharmaceutical Research and Manufacturers Association, drug companies spent $5.7 billion on office promotion, hospital promotion, and journal advertising in 2003, compared to $3.3 billion in direct-to consumer advertising. They also spent an additional $16.3 billion in providing samples of medications to physicians. PhRMA, *Pharmaceutical Research and Promotion* (Nov. 2004).

[16] *It's All in the Detail*, Med Ad News (Oct. 1, 2004).

[17] Teleconference briefing by Merck for staff of the Government Reform Committee (Apr. 25, 2005).

physicians, allowing physicians to have sufficient information about new drugs so they can prescribe them appropriately."[18]  The trade group also has stated, "Many physicians learn about new drugs — indeed, about ongoing research in their areas of specialization — largely through information provided by the companies that market new products."[19]

In fact, the documents suggest that Merck's sales representatives did not appropriately educate physicians about the research showing Vioxx's cardiovascular risks.  To the contrary, it appears that Merck's highly trained sales force was instructed not to address the new research findings, but to emphasize outdated and misleading data that indicated Vioxx was safer than alternatives.  The documents thus raise serious questions about the role played by Merck's representatives in physician prescribing of a risky drug.

## II.    HOW MERCK TRAINED ITS SALES REPRESENTATIVES

The documents reveal that the 3,000-person sales force Merck used to promote Vioxx to physicians was extraordinarily well trained.  Virtually every possible interaction with physicians — from the act of shaking hands to navigating through complex hospital power struggles — is addressed in some portion of the Merck materials.  The overriding goal of the training appears clear:  to maximize sales of Merck products.

This part of the memorandum describes the general training Merck provided to its sales representatives.  This training instructed the representatives in techniques thought to enhance "professional presence" and "captivate the customer."  It also addressed sensitive subjects such as medical reprints, physician targeting, hospital dynamics, and physician education.  Although not addressed here, Merck representatives were also required to attend numerous courses and exercises covering a variety of medical topics, including pharmacology, anesthesiology, rheumatology, and pain management.[20]

The next part of this memorandum (part III) examines how Merck used this highly trained sales force to communicate with physicians about the risks of Vioxx.

### A.    General Sales Techniques

Merck provided its representatives with extensive training in sales techniques.  This training emphasized that "gaining access and building relationships … are key to providing you

---

[18] PhRMA, *Marketing and Promotion of Pharmaceuticals* (Oct. 23, 2000) (online at http://www.phrma.org/publications/quickfacts/23.10.2000.184.cfm).

[19] *Id.*

[20] *See, e.g.,* Merck, *Analgesic and Anti-Inflammatory Training,* Modules 1-8 (undated).

the opportunity to influence your customers' behaviors."[21]  Merck's sales staff were instructed that a successful career can depend upon "how you present yourself professionally."[22]

Some of the training materials addressed the basic elements of a visit with physicians. For example, the course *Selling Skills* instructed representatives to begin by "painting a word picture that describes a patient type that can benefit from the Merck product." *Selling Skills* then advised that representatives ask "strategic questions" about the physician's approach to the patient that "help you influence and control the discussion," which should be followed by a transition to a "compelling message" for the Merck product.  The fourth step in the process involved "obstacle handling," which addresses overcoming physician concerns about the product.  Finally, *Selling Skills* instructed representatives that the last step of a visit is "closing," which involves summarizing "the point(s) you want the customer to remember," checking for agreement, asking for "a specific, realistic, measurable action," and "follow-up to ensure action."[23]

Other training materials taught more sophisticated and subtle techniques.  For example, one Merck course, entitled "Access Success," advised representatives to master nonverbal cues to communicate effectively with doctors.[24]  See Figure 1.

**Figure 1:  Merck Instruction on Face-to-Face Communication**

| Verbal (7%) What someone says when listening... | Vocal (38%) How they say something when listening... | Visual (55%) What they're doing when listening... |
| --- | --- | --- |
| • Hmmm, Yes, Okay, I see | • Sound interested | • Nod head |
| • Acknowledge | • Mimic or match vocal behavior of speaker | • Eye contact |
| • Ask questions | • Use voice inflection and energy | • Smile (if appropriate) |
| • Summarize | • Use empathetic voice | • Don't interrupt |
| • Stay open to ideas | | • Take notes |
| • Short periods of silence | | • Openness in gestures |

---

[21] Merck, *Professional Presence* (undated).

[22] *Id.*

[23] Merck, *Selling Skills for Hospital Representatives & HIV Specialists* (undated).

[24] Merck, *Access Success* (Apr. 2000).

8

Similarly, the course "Captivating the Customer" recommended that field staff learn nonverbal techniques involving the eyes, head, fingers and hands, legs, overall posture, facial expression, and mirroring.[25]   Curriculum notes for leaders of the course explained the last concept further:

> Mirroring is the matching of patterns; verbal and non-verbal, with the intention of helping you enter the customer's world.  It's positioning yourself to match the person talking.  It subconsciously raises his/her level of trust by building a bridge of similarity.[26]

In a course entitled "Champion Selling," Merck sought to teach staff to "employ a variety of selling skills and techniques to more effectively handle challenging selling situations."[27]  One such technique was to analogize the "defining moments" of selling Merck drugs to critical points in the lives of "champions" in other fields, including Helen Keller, Martin Luther King, Tiger Woods, and even George Washington.[28]  See Sidebar.

Another important technique emphasized in "Champion Selling" was to assess the personality of doctors in order to determine what type of information would be most convincing to them.  For a doctor with a "technical" personality, sales representatives were taught to "use figures, percentages" in their pitches; for a doctor with a "supportive personality," representatives were advised to "focus on benefits to patients"; and for a doctor with an "expressive personality," representatives were told to "show enthusiasm; appeal to his/her ego."[29]

---

[25] Merck, *Captivating the Consumer* (June 2001).

[26] *Id.*

[27] Merck, *Champion Selling: Milestone Leader's Guide* (Jan. 2002).

[28] *Id.*

[29] *Id.*