

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 05-4046* | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| EVELYN IRVIN PLUNKETT | * | |
| as Personal Representative of the Estate of | * | |
| RICHARD IRVIN, JR., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

* * * * * * * * * * * * * * * * * *

**REPLY MEMORANDUM IN SUPPORT OF MOTION OF MERCK & CO., INC.
("MERCK") TO EXCLUDE TESTIMONY OF BENEDICT R. LUCCHESI**

I.    **DR. LUCCHESI'S ANTICIPATED TESTIMONY ON ISSUES OTHER THAN
MEDICAL CAUSATION IS INADMISSIBLE.**

Plaintiff's opposition demonstrates exactly why it is essential that the Court exclude all

normative testimony from Dr. Lucchesi concerning Merck's conduct (whether expressed in

terms of ethical standards or in the guise of "scientific" terminology) and all testimony about

Merck's knowledge or state of mind.  Dr. Lucchesi stands ready to tell the jury what internal

Merck documents "mean," to tell the jury what Merck did or did not do in different factual

contexts, to tell the jury what Merck knew and provide other commentary on Merck's motive and state of mind, and to pass judgment on Merck's conduct. Plaintiff does not deny that her counsel will attempt to elicit testimony of this nature from Dr. Lucchesi.[1]  Instead, she attempts to justify the anticipated testimony by claiming that it is based on Dr. Lucchesi's "scientifically informed review" of internal Merck documents and that such testimony simply "explains and interprets complex scientific facts." (Plaintiff's Response To Merck & Co., Inc's Motion To Exclude Testimony Of Benedict R. Lucchesi ("Opp'n") at 4.)

Plaintiff's stance is at once disingenuous and insufficient to establish that Dr. Lucchesi's opinions are admissible.  The fact is that Dr. Lucchesi has not brought any "specialized knowledge" to bear on the matters he is prepared to address. *See* FED. R. EVID. 702. He is not qualified to provide expert testimony on those topics, and none of his anticipated testimony will assist the trier of fact. Even more fundamentally, his testimony on issues of fact – *i.e.,* what Merck knew, what Merck employees meant, what Merck did – patently lacks foundation. If he testified about these matters, Dr. Lucchesi would not be acting as an expert witness whose testimony would assist the trier of fact. Instead, he would be testifying as a paid advocate or an "oath-helper" whose real purpose is simply to tell the jury how to decide the case. *See In re Rezulin Prod. Liab. Litig. ("Rezulin"),* 309 F. Supp. 2d 531, 538 (S.D.N.Y. 2004) ("These 'experts' thus are loosely analogous to compurgators, also known as oath helpers, in that they lend their credentials and reputations to the party who calls them without bringing much if any

---

[1] For example, plaintiff states that Dr. Lucchesi reviewed email messages to and from Merck employees and concluded that Merck knew or should have known of alleged prothrombotic responses associated with Vioxx before placing it on the market (Opp'n at 5.). Performing that function, however, is the exclusive responsibility of the jury.

relevant knowledge to bear on the facts actually at issue.").[2]

A.   **Dr. Lucchesi's Anticipated Testimony Will Not "Assist The Trier Of Fact" Simply Because Much Of The Documentary Evidence In This Case Addresses Scientific Issues And Uses Scientific Terminology.**

Plaintiff argues simplistically that Dr. Lucchesi's testimony is admissible because it will help the jury understand the "complex scientific facts." (Opp'n at 4.) If that were all that plaintiff intended to ask Dr. Lucchesi to do, there might not have been a need for this motion. But it is clear that plaintiff's counsel are not just going to ask Dr. Lucchesi to explain in neutral terms how a COX-2 inhibitor works, for example, or what a thrombus is. Instead, as plaintiff's opposition makes perfectly clear, Dr. Lucchesi would be asked to assume the role of an additional trier of fact and to relate to the jury the inferences he has drawn from his review of documents admitted into evidence. (*See* Opp'n at 5.)

A sample of Dr. Lucchesi's testimony in the recently-concluded trial in *Humeston v. Merck* illustrates what is wrong with allowing an expert witness to make both factual assertions that have no foundation in personal knowledge and normative judgments, all in the guise of "interpreting" documents that may have complex subject matter. A February 25, 1997 email (part of the email chain plaintiff refers to in her opposition to this motion [Opp'n at 5]) stated: "And without COX-1 inhibition, you will get more thrombotic events and kill drug." Dr.

---

[2] Plaintiff insinuates that this Court should conduct a less rigorous analysis of Dr. Lucchesi's proffered testimony by noting that "Dr. Lucchesi's testimony has already been admitted in two Vioxx trials [Ernst and Humeston]." (Opp'n at 3.) That is simply of no consequence here, either with respect to the potential testimony of Dr. Lucchesi that is under discussion here or to his anticipated testimony on general and specific causation that is addressed in Section III *infra*. First, the unpublished decisions of two state court judges applying different legal standards have no precedential value in this federal case. Second, the two state actions involved different dosages and durations of Vioxx use. Moreover, contrary to plaintiff's representation, the *Humeston* court in fact excluded any testimony from Dr. Lucchesi on whether Merck met standards of ethical conduct. In addition, the *Ernst* court rejected theories that Dr. Lucchesi may attempt to advance here – that Vioxx allegedly can cause plaque ruptures and that it can accelerate atherosclerosis.

3

790950v.1

Lucchesi substituted the word "patient" for "drug" in that email message and then told the jury that the message revealed that Merck "[doesn't] mind killing patients." (Testimony of Benedict R. Lucchesi, M.D., Ph.D., M.S., F.A.M.A., *Humeston v. Merck*, No. 619 (N.J. Super. Ct. Law Div. filed August 19, 2003) ("Lucchesi *Humeston* Test.") of Sept. 15, 2004 at 683:16-685:1; 686:21-688:24, 688:12-24, attached as Ex. 13 to Declaration of Phillip A. Wittmann in Support of Merck's Oppositions to Plaintiff's Motions *in Limine* ("Wittmann Decl.").)   Dr. Lucchesi continued by opining on the motive that he contended the message revealed:

> A:      When I first read that, I must say, I personally became enraged.
>
> . . .
>
> Q:      You think they're doing something wrong?
>
> A:      Yes.
>
> Q:      What are they doing wrong?
>
> A:      Obviously putting profit before life.

(*Id*. at 686:21-687:17 (emphasis added).)   According to plaintiff, Dr. Lucchesi's "interpretation" of this evidence shows that even in early 1997, Merck had "knowledge of the risk of potential vascular response [to Vioxx] and predicted it in its own clinical study." (Opp'n at 5.)

In fact, the evidence demonstrates exactly the opposite.  As explained by Dr. Alise Reicin, a Merck scientist actually involved in the February 1997 email exchange that Dr. Lucchesi purported to "interpret," Merck was then planning a large scale gastrointestinal outcomes trial of Vioxx against one or more traditional NSAIDs (similar to the later VIGOR trial).  Contrary to Dr. Lucchesi's assertion, Merck at that time had no information suggesting that Vioxx might, even in theory, be pro-thrombotic. (Testimony of Alise Reicin, *Humeston v. Merck*, No. 619 (N.J. Super. Ct. Law Div. filed August 19, 2003) (Reicin *Humeston* Test.") of

4

Oct. 11, 2005 at 3417:13-3418:3.)[3]   Rather, as Merck's contemporaneous documents unambiguously state, Merck believed that Vioxx would be neutral on the heart, providing neither aspirin-like cardioprotection (because it did not block COX-1) nor any increased risk.  (*Id.*; *see also* Defense Exhibit 35, *Humeston v. Merck*, No. 619 (N.J. Super. Ct. Law Div. filed August 19, 2003) at 4, attached as Ex. 14 to the Wittmann Decl. (11/96 clinical trial planning memorandum stating Merck's assumption that "[p]atients treated with the selective COX-2 inhibitor will experience neither a reduction nor an increase in CV events associated with this therapy").)

At the same time, scientists at Merck believed that traditional NSAID comparators, because they *did* block COX-1, could provide aspirin-like cardioprotection.  (*Id.* (stating Merck's assumption that "[p]atients treated with standard NSAIDs will experience antiplatelet effects similar and resultant CV protection similar to that produced by aspirin").)  Reflecting this possibility, Dr. Reicin noted in the draft GI outcomes trial protocol attached to the February 1997 email exchange that "the NSAID group will be getting cardioprotection that the 966 [Vioxx] group will not." (Defense Exhibit 817, *Humeston v. Merck*, No. 619 (N.J. Super. Ct. Law Div. filed August 19, 2003) at  12, attached as Ex. 15 to the Wittmann Decl.; *see also id.* at 7-8.) Thus, as Dr. Reicin explained at trial, the concern under discussion in the February 1997 emails was not that clinical trial patients on Vioxx might experience increased cardiovascular risk, but that standard NSAIDs would have cardioprotective effects that, in a large trial, might lead to differential cardiovascular event rates that could easily be misinterpreted.  (Reicin *Humeston* Test. of Oct. 11, 2005 at 3428:12-3433:16, 3437:6-3441:20.)

Dr. Lucchesi's foundationless speculation to the contrary was totally improper.  He had

---

[3] Indeed, at that time, Merck had not even received the results of the urine study (Protocol 023) from which Dr. Fitzgerald *hypothesized* a potential prothrombotic effect.  (*Id.* at 3433:17-25.)

790950v.1

no personal knowledge of the email messages or the subject that they addressed, ignored the contemporaneous Merck documents demonstrating that his purported "interpretation" of the emails was incorrect, and in essence contradicted the authors of the emails on a purely factual matter (Merck's motive).[4]   That is patently *not* the type of testimony that should be admitted to assist the jury under Rule 702, and it is disingenuous of plaintiff (or her counsel) to suggest that it is.  Case after case has unequivocally held that experts cannot offer opinions on a corporation's state of mind because that "is a classic jury question and not one for experts."  *Rezulin,* 309 F. Supp. 2d at  547 (rejecting expert testimony "on the intent, motives or states of mind of corporations" because they "have no basis in any relevant body of knowledge or expertise").  *See, e.g., New Mexico Sav.  & Loan Assoc. v. U.S. Fid. & Guar. Co.,* 454 F.2d 328, 335 (10th Cir. 1972) (affirming district court's exclusion of opinions regarding state of mind because such "inquiry [is] not properly the subject of expert testimony"); *First Am. Bank v. Western DuPage Landscaping, Inc.,* No. 50 C 4026, 2005 U.S. Dist. LEXIS 20732, at *4 (N.D. Ill. Sep. 19, 2005) (permitting plaintiff's experts to "assist the jury in understanding specific, technical concepts," but ruling that the experts could "not opine as to what the author meant or intended to say" because the "question of what [defendant] meant or intended is . . . a question for the jury"); *Jamsports & Entertainment, LLC v. Paradama Prods., Inc.,* No. 02 C2298, 2005 U.S. Dist. LEXIS 59, at *30 (N.D. Ill. 2005) (rejecting expert economist's testimony on defendant's intent because this factual determination is for the jury and the expert would not be assisting the trier of fact); *Robinson v. Hartzell Propeller, Inc.,* 326 F. Supp. 2d 631, 648 (E.D. Pa. 2004) (excluding expert testimony that defendant manufacturer knew product was defective); *Sec. & Exch.*

---

[4] Plaintiff in this case intends to seek the same sort of testimony from Dr. Lucchesi.  Her opposition states that Dr. Lucchesi reviewed and formed opinions on the basis of the same email thread that was the subject of the testimony in *Humeston* that is quoted in the text (Opp'n at 5.)

790950v.1

*Comm'n v. Lipson*, 46 F. Supp. 2d 758, 763 (N.D. Ill. 1998) (expert accountant was not "specially equip[ped] to divine what [defendant] truly believed" about reliability of financial reports; at best, any opinions offered in that regard are "credibility choices that are within the province of the jury"). Plaintiff, by contrast, has been unable to cite a single case that would support the admission of such testimony.

## B. Dr. Lucchesi's Beliefs About What Actions Merck Should Or Should Not Have Taken Are Not Admissible.

Plaintiff's opposition asserts that Dr. Lucchesi may properly tell the jury what Merck "should' have done or refrained from doing in various contexts because he would simply be providing testimony "about the logical consequences of scientific facts." (Opp'n at 6.) That is plainly not an accurate characterization of the testimony that Dr. Lucchesi is prepared to give. To take just two examples from his Report, Dr. Lucchesi anticipates opining (1) "that Vioxx should have undergone more extensive study at the basic level prior to initially marketing Vioxx, as well as post-marketing," and (2) that "Merck should have avoided direct to consumer marketing." (Expert Report of Benedict R. Lucchesi, M.D., Ph.D., M.S., F.A.H.A. ("Lucchesi Report") at 18.)[5] This testimony and other similar testimony that Merck addressed in its motion are not helpful to the jury and constitute inadmissible normative testimony. *See Rezulin.*, 309 F. Supp. 2d at 542-45 (finding expert testimony on subjective ethical standards was "unhelpful to the fact-finder because irrelevant in a case where liability is premised on legal, not ethical, standards"); *id.* at 557 (testimony on legal obligations would "usurp . . . the role of the trial judge

---

[5] Even if Dr. Lucchesi is one of the "intellectual giants of both pharmacology …and cardiology " (Opp'n at 1), he is not qualified to render opinions on these matters, an additional reason why they are inadmissible. He is, in fact, not a cardiologist, and has never been licensed as a physician in any state. He is not an expert in the design and implementation of clinical trials involving human subjects. Nor is he an expert in the regulation, labeling, marketing, promotion, or advertising of prescription drugs. (Mot. at 7-10.)

in instructing the jury as to the applicable law [and] the role of the jury in applying that law to the facts before it"); *DiBella v. Hopkins*, No. 01 Civ. 11779 (DC), 2002 U.S. Dist. LEXIS 20856, at *12 (S.D.N.Y. Oct. 30, 2002) ("business ethics" expert testimony inadmissible in commercial dispute because the "dispute here is not over what is ethical . . . [r]ather, the dispute is over what happened."), *aff'd*, 403 F.3d 102 (2d Cir. 2005); *In re Welding Fume Prods. Liab. Litig.*, No. 1:03-CV-17000, MDL 1535, 2005 WL 1868046, at *18, *20 (N.D. Ohio Aug. 8, 2005) (Order) (stating "the critical question for the jury in this case is whether [defendants] did what the law *required* them to do, not whether, from a societal perspective, they did what an 'ethical corporation' *should have done.* [The expert's] opinions regarding the latter, accordingly, will tend to misdirect the finder of fact") (emphasis in original). Appending the term "scientific" to testimony of this nature, which is plaintiff's sole response to Merck's assertion that such normative testimony is inadmissible, does not change the analysis.

### C.   The Court Should Exclude All Improper Opinions Of Dr. Lucchesi Regardless Of Whether They Are Stated In His Report Or Were Revealed Only In Response To Questions At His Deposition.

Plaintiff makes the puzzling argument that this motion is not well taken because it seeks exclusion of opinions of Dr. Lucchesi that were not given in his report but were elicited in response to deposition questions. (*See* Opp'n at 7-10.) If this is a "concocted problem" (*id.* at 8), it is one that has been created by Dr. Lucchesi himself. If Merck were seeking exclusion of opinions that Dr. Lucchesi had in his depositon unambiguously disclaimed any intent to offer, plaintiff's argument might make some sense. But that is not the case. Repeatedly, Dr. Lucchesi gave an improper opinion in his deposition but refused to confirm that he did not intend to give such an opinion at trial, stating instead that he would give the opinion "if asked." In fact, Dr. Lucchesi made it clear that he is eager to offer opinions on Merck's state of mind and whether Merck acted properly that are not necessarily in his report:

790950v.1

> Q:   Is it your intent, sir, to tell the jury at trial what you believe Merck's motives are with respect to any event that went on with Vioxx?
>
> A:   If you ask me about Dodge Ball Vioxx, I will tell the jury.  If you ask me about the cards, I will tell them about that.  If you ask me about some of the e-mails, I will tell them about that, yes.
>
> Q:   Well, I won't ask you if plaintiff's counsel is not going to ask you.
>
> A:   Well, I hope he will –
>
> Q:   Okay.
>
> A:   – because that's the only way the truth is going to come out.

(October 26, 2005 Deposition of Benedict R. Lucchesi, M.D., Ph.D., M.S., F.A.M.A. ("Lucchesi 10/26/05 Dep.") at 147:16-148:3, attached as 5 to Wittmann Decl.)  Dr. Lucchesi's ongoing refusal to define clearly which opinions he anticipated giving at trial is in itself a reason why this motion is necessary and should be granted.

This motion is also well taken because Dr. Lucchesi has in prior trial testimony made it clear that he will not hesitate to interject the inferences he has drawn from his personal review of Merck documents.  Here, for example, is his testimony from the recently-concluded trial in *Humeston v. Merck* in which, without even being asked, he interjects mention of a Merck marketing training game to insinuate that Merck did not accurately report data from the VIGOR clinical trial:

> Q.   This e-mail we're looking at is one day after the press release where Merck tells the medical community that Naproxen was the reason for the difference in heart attacks.  Have you ever seen a retraction printed of that press release?
>
> A.   I personally have not seen a retraction, but, worse than that, I have seen – I have seen attempts, and I do have the documents –
>
>      …
>
>      I'm not referring to press releases.  I'm referring to mailings I have received from Merck.  As a physician I get the same mailings that all of the physicians get from the company assuring me that this drug is safe. *I'm also aware of the dodge ball program.*

(Lucchesi *Humeston* Test. of Sept. 19, 2005 at 806:15-807:15 (emphasis added).)

790950v.1

Finally, if, as this argument suggests, plaintiff's counsel actually agree that certain lines of questions to Dr. Lucchesi would be objectionable – as to marketing issues, for example (Opp'n at 9) –there can be no valid objection to entry of an order excluding any such testimony from Dr. Lucchesi, and no harm to plaintiff if in fact there was no intent to elicit such testimony at trial.

## II.   PLAINTIFF CANNOT DEMONSTRATE THAT DR. LUCCHESI MAY PROPERLY OPINE ON GENERAL CAUSATION.

The Court cannot permit Dr. Lucchesi to testify as to general causation.  As Merck explained in its Opening Memorandum, there is no scientifically reliable data from clinical trials or from any other source establishing that the use of 25 mg Vioxx for less than a month – *i.e.*, the only dose and duration of Vioxx use at issue here – is capable of causing thrombotic cardiovascular events.

### A.   Plaintiff Fails to Identify Any Supporting Epidemiologic Evidence.

In her Opposition, plaintiff claims she has filed papers showing "extensive epidemiological evidence supporting . . . causation in patients who took 25 mg Vioxx tablets for short periods."  (Opp'n at 11.)  But that claim simply is not true, as Merck has established. None of plaintiff's so-called epidemiologic "evidence" establishes that the use of Vioxx at the 25 mg dose for less than a month can cause thrombotic cardiovascular events.  No clinical trial data show that.  And no observational epidemiologic study shows that.[6]  (Mot. at 11; Causation

---

[6] There are two types of epidemiologic studies – randomized clinical trials and observational studies.  (Causation Testimony Brief at 17.)  Experts for both plaintiff and Merck agree that randomized clinical trials are at the top of the hierarchy of data that scientists typically consider when assessing whether a particular dose of a drug is capable of causing a specific injury. (Declaration of J. Michael Gaziano, M.D., M.P.H. in Support of Merck's Motions to Exclude Evidence ("Gaziano Decl.") at ¶¶ 28, 34-35, filed Oct. 21, 2005; Expert Report of Wayne A. Ray, Ph.D., ('Ray Report") at 25, attached as Ex. 39 to the Declaration of Phillip A. Wittmann in Support of Merck's Motions to Exclude Evidence ("Wittmann 10/21/05 Decl."), filed Oct. 21, 2005 (randomized clinical studies provide "the most reliable estimate of the magnitude of a
*(footnote continued on next page)*

790950v.1

Testimony Brief at 23-39; Appendix of Studies at 1-23; Reply Memorandum in Support of

Motion of Merck to Exclude Evidence of Plaintiff's Experts Regarding Causation at 6-30.)

In fact, plaintiff essentially concedes the absence of supporting epidemiologic data,

because she argues that "expert testimony need not be based" on such data. (Opp'n at 11.) In

dismissing the importance of epidemiologic data, however, plaintiff ignores binding Fifth Circuit

law holding that epidemiologic studies are "[u]ndoubtedly . . . the most useful and conclusive

type of evidence" of causation. *See, e.g., Allen v. Penn. Eng'g Corp.*, 102 F.3d 194, 197 (5th

Cir. 1996); *Brock v. Merrell Dow Pharms., Inc.*, 874 F.2d 307, 311 (5th Cir. 1989). As this

Court recognizes, epidemiologic studies provide the "strongest evidence" of a causal relationship

-- especially where, as here, epidemiologic data repudiating such a relationship exist. *Vice v. N.*

*Telecom, Inc.*, No. Civ. A 94-1235, 1996 WL 200281, at * 7 (E.D. La. Apr. 23, 1996); *see also*

*Chambers v. Exxon Corp.*, 81 F. Supp. 2d 661, 664 (M.D. La. 2000) ("Epidemiological studies

are necessary to determine the cause and effect relationship between an agent, in this case

exposure to benzene, and a disease, CML."); *Thomas v. Hoffman-La Roche, Inc.*, 731 F. Supp.

224, 227-28 (N.D. Miss. 1989) ("conclusive epidemiological proof [is] essential to the plaintiff's

case in a toxic tort pharmaceutical drug setting").

Plaintiff cites two out-of-circuit decisions – *Kennedy v. Collagen Corp.*, 161 F.3d 1226

(9th Cir. 1998) and *Benedi v. McNeil-P.P.C. Incorp.*, 66 F.3d 1378 (4th Cir. 1995) – for the

proposition that epidemiologic studies are unnecessary, but each is easily distinguishable. In

*Kennedy*, the court explained it would have been "almost impossible to perform"

---

drug's effect"); Expert Report of John W. Farquhar, M.D. ("Farquhar Report") at ¶ 59, attached
as Ex. 33 to Wittmann 10/21/05 Decl. (randomized clinical trials are "gold standard" for
assessing causation).  Observational epidemiological studies occupy the next level down on the
hierarchy of scientific evidence. (Gaziano Decl. at ¶ 28; Farquhar Report at ¶ 60 (observational
studies are "weaker" than randomized clinical trials in "assigning causality").)

epidemiological studies concerning the drug at issue. *Kennedy*, 161 F.3d at 1229 (observing that epidemiologic studies linking increased incidence of atypical systemic lupus erythematosus to collagen injections would be almost impossible to perform because, when problems arise following injections, patients normally consult injecting doctors, who are not typically trained to recognize autoimmune or immune disorders, and causal connection thus goes unrecognized). That is not true here. And in *Benedi*, the court was quick to note that "[u]nder the *Daubert* standard, epidemiological studies are not necessarily required to prove causation, *as long as the methodology employed by the expert in reaching his or conclusion is sound*." *Benedi*, 66 F.3d at 1384 (emphasis added). Here, plaintiff cannot show that Dr. Lucchesi's methodology is sound, as it depends on making unreliable inferences from inferior and inconclusive data.

### B. Plaintiff Fails to Demonstrate that Dr. Lucchesi's Animal Data and Clinical Reports Are Adequate to Support His Proffered Testimony.

In its Opening Memorandum, Merck explained that case reports, which are hypothesis-generating only, are not evidence of causation. (Mot. at 13-14 (citing numerous cases showing that courts routinely reject case reports as proof of general causation).) Merck also explained that the specific case report by Dr. Crofford on which Dr. Lucchesi relies is particularly unreliable because (a) it involves a drug *other* than Vioxx and (b) Dr. Crofford herself agrees that it does not and cannot establish causation. (*Id.* at 13.) In response, plaintiff does not explain how Dr. Crofford's case report has any relevance to Mr. Irvin, nor does she even mention the case report anywhere in her Opposition. Instead, plaintiff argues generally that "Dr. Lucchesi's . . . reliance on . . . case reports constitutes mainstream accepted science." (Opp'n at 10 (section heading).) But such a cursory response is insufficient to meet plaintiff's burden of proof at the *Daubert* stage. The mere fact that some scientists may rely on some case reports for some purposes does not establish that Dr. Crofford's case report (or any other case report) may serve

790950v.1

as the basis of a reliable scientific opinion in *this* case.

Apparently recognizing this fact, plaintiff argues next that expert testimony need not be based even on case reports to prove causation. (Opp'n at 11.) Instead, plaintiff argues that Dr. Lucchesi may rely on animal studies because reliance on such studies is "universally accepted in the scientific community." (*Id.*) In making this sweeping statement about the supposed usefulness of animal studies, however, plaintiff ignores binding Fifth Circuit law holding that animal studies, in fact, have "very *limited* usefulness." *Brock v. Merrell Dow Pharms., Inc.*, 874 F.2d at 313 (rejecting animal studies given high doses involved and difficulty extrapolating results to humans) (emphasis added); *Allen*, 102 F.3d at 197-98 & n.5 (excluding expert opinion based in part on "inconclusive" and "unreliable" animal studies); *Gulf S. Insulation v. U.S. Consumer Prod. Safety Comm'n*, 701 F.2d 1137, 1146 (5th Cir. 1983). Plaintiff also ignores the fact that animal studies, which are hypothesis-generating only, are particularly unreliable where, as here, they are inconsistent with data from randomized clinical trials. (Gaziano Decl. at ¶ 26.) Because no clinical trial data show an increased risk of thrombotic cardiovascular events associated with the use of 25 mg Vioxx for less than a month, any animal study purporting to suggest something contrary would be inherently unreliable.

Nor has plaintiff offered any explanation for why the animal studies upon which Dr. Lucchesi proposes to rely are in any way relevant to an explanation of Mr. Irvin's death. For example, plaintiff ignores the fact that much of Dr. Lucchesi's animal work involves a drug *other* than Vioxx. (Mot. at 12-13.) Plaintiff does not attempt to explain how animal data involving a drug other than Vioxx is relevant to proving whether Mr. Irvin's brief use of Vioxx somehow contributed to his death. The Court thus has no way of determining whether Dr. Lucchesi's reliance on such studies is scientifically appropriate under *Daubert*. Moreover, to the

790950v.1

extent the animal data on which Dr. Lucchesi proposes to rely suggest that COX-2 inhibitors are potentially pro-thrombotic,[7] such data are inconsistent with other animal studies which have found that COX-1, rather than COX-2, is responsible for the production of prostacyclin in the vasculature. (*See* n.7, *supra*; *see also* Merck's Science Brief at 8, 13-14; Gaziano Decl. at ¶ 44.) Because Vioxx does not inhibit COX-1, these other animal studies suggest that Vioxx does not have a pro-thrombotic effect.

Plaintiff tries to bolster Dr. Lucchesi's unreliable animal data by arguing that they "corroborate" available epidemiologic data. (Opp'n at 11.) But this argument makes no sense. As explained, no epidemiologic data shows that use of 25 mg Vioxx for less than a month can cause thrombotic cardiovascular events. Dr. Lucchesi's animal data thus does not "corroborate" any epidemiologic data relevant to this case. And plaintiff's argument is doubly illogical to the extent that Dr. Lucchesi relies on statistically *in*significant and otherwise unreliable epidemiologic data.

In short, plaintiff has not remotely shown that the isolated case reports and inconclusive animal data upon which Dr. Lucchesi relies add up to a scientifically reliable basis for an opinion on causation. Absent such a showing, Dr. Lucchesi's may not properly testify about animal

---

[7] The results of Dr. Lucchesi's own animal research are inconclusive at best. In the study cited in plaintiff's opposition (footnote 3), Dr. Lucchesi electrically damaged the vasculature of dogs and computed the time it took for the dogs to develop occlusive thrombi. The study found only that administration of celecoxib (a selective COX-2 inhibitor) slowed the effects of aspirin in reducing the time to occlusion. (Hennan, J., Lucchesi, B., et al., *Effects of Selective Cyclooxygenase-2 Inhibition on Vascular Responses and Thrombosis in Canine Coronary Arteries*, CIRCULATION 2001; 104:820-825, 821-22.) Notably, a later peer-reviewd study has questioned the validity of Dr. Lucchesi's results, pointing out that he failed to account for known variations in the rate at which different dog populations metabolize celecoxib. (Gross, G., *Effect of COX-1/COX-2 Inhibition versus Selective COX-2 Inhibition on Coronary Vasodilator Responses to Arachidonic Acid and Acetylcholine*, PHARMACOLOGY 2004: 71:135-142 at 141.) The Gross study also found, contrary to Dr. Lucchesi's hypothesis but consistent with animal studies performed by Merck Research Labs (*see* Merck's Science Brief at 8, 13-14), that selective COX-2 inhibition did *not* appear to affect prostacyclin mediated activity in dog vasculature. *Id.* at 137-41.

790950v.1

studies and case reports before the jury, and his purported general causation opinion is both unreliable and inadmissible.

**C.    Plaintiff Fails to Demonstrate That Dr. Lucchesi Can Properly Opine on Any of the Purported Mechanisms By Which Vioxx Supposedly Is Capable of Causing Thrombotic Cardiovascular Events.**

Dr. Lucchesi cannot testify as to general causation for another, independent reason:  he cannot identify, to a reasonable degree of medical certainty, the mechanism by which Mr. Irvin's short-term use of 25 mg Vioxx can cause a thrombotic cardiovascular event.

Plaintiff argues that Merck "confuse[s] the issue of mechanism of action with biological plausibility." (Opp'n at 12.)  According to plaintiff, she need not establish the "mechanism by which Vioxx causes cardiovascular events, only that it is plausible." (*Id.*)  As explained in greater detail in Merck's Reply Causation Testimony Brief, however, plaintiff's argument proceeds from a false premise for two reasons. (*See* Reply Causation Testimony Brief at 31-33.)

First, the concepts of mechanism and biological plausibility are not "distinct," as plaintiff claims. (Opp'n at 12.)  Indeed, biological plausibility "depends upon existing knowledge about *the mechanisms* by which the disease develops." (*See* Reply Causation Testimony Brief at 31 (citing Reference Manual on Scientific Evidence (emphasis added)).)  Second, while plaintiff may wish it otherwise, the Fifth Circuit *requires* proof of mechanism in pharmaceutical and toxic tort cases.  That is the court's unequivocal holding in *Black v. Food Lion, Inc.*, 171 F.3d 308 (5th Cir. 1999):

> The underlying predicates of any cause-and-effect medical testimony are that medical science understands the physiological process by which a particular disease or syndrome develops and knows what factors cause the process to occur. Based on such predicate knowledge, it may then be possible to fasten legal liability for a person's disease or injury.

*Id.* at 314 (emphasis added).  Courts in this circuit must – and do – follow the holding of *Black*.

15

> *In this case, at best, Drs. Shell and Eckberg have discovered an agent, but not a cause. They fail to identify the exact mechanism by which a person's QT interval can become permanently prolonged well after that person has ceased taking Propulsid. . . . They have theories but they have no proof to support those theories. . . . Under the prevailing logic of Daubert and Black, their testimony is unreliable.*

*Propulsid*, 261 F. Supp. 2d at 617 (emphasis added).  Courts in other circuits likewise follow

*Black. McClain*, 401 F.3d at 1253 (expert must offer a "reliable explanation of the physiological

process by which [the agent] causes [the alleged harm]").

Plaintiff does not cite a single decision from any court in the Fifth Circuit holding that

*Black* does not apply to facts analogous to those here.  Instead, she cites *Kennedy*, 161 F.3d at

1230, for the proposition that "[c]ausation can be proved when we do not know precisely how

the damage occurred."  (Opp'n at 12.)  Significantly, plaintiff neglects to quote the remaining

portion of the sentence where that statement appears: "*if* there is *sufficiently compelling proof*

that the agent must have caused the damage somehow." *Id.* (emphasis added).  Plaintiff has no

such proof here.[8]  Moreover, "'[n]ot knowing the mechanism whereby a particular agent causes a

particular effect'" can be "'fatal to a plaintiff's claim'" where there is no "'sufficiently

compelling proof that the agent must have caused the disease *somehow*.'"  *In re:*

*Phenylpropanolamine Prods. Liab. Litig.*, 289 F. Supp. 2d 1230, 1247 (W.D. Va. 2003)

---

[8] According to plaintiff, "Merck's own studies and consultants have concluded that: 'the use of rofecoxib was associated with and [sic] increased cardiovascular risk.'"  (Opp'n at 12 (citing 2005 Bresalier article reporting APPROVe study results).)  The quoted study, however, concluded only that the use of rofecoxib was associated with an increased cardiovascular risk "*[a]mong patients with a history of colorectal adenomas*," a population that does not include Mr. Irvin. (Bresalier, R.S., et al., *Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial*, 352 NEW. ENG. J. MED. 2005: 352:1092-1102, 1092 (emphasis added).)  More importantly, as Merck has elsewhere discussed at length, the increased risk reported in APPROVe become apparent only after 18 months of continuous Vioxx use -- a period far in excess of the less-than-one-month period Mr. Irvin took Vioxx. (*Id.*)

(emphasis in original) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1314 (9th Cir. 1995)). That is the case here.

Dr. Lucchesi proffers four alternative and conflicting theories for how Mr. Irvin's short-term use of Vioxx supposedly could have, and in this case may have, caused his death:  the prostacyclin/thromboxane imbalance theory (*i.e.*, the FitzGerald hypothesis); the plaque rupture theory; the acceleration of atherosclerosis theory; and the ischemic preconditioning theory. (Mot. at 15-19.) But plaintiff ignores a fundamental problem that precludes any such testimony: Merck has shown that none of these theories is based on scientifically reliable evidence. (*Id.*) And plaintiff has come forward with no evidence to the contrary.

        1.      Dr. Lucchesi Cannot Establish The Mechanism By Which Vioxx Supposedly Has A Thrombotic Effect.

The FitzGerald hypothesis assumes that Vioxx creates a prothrombotic state by reducing prostacyclin relative to thromboxane in the human vasculature. Significantly, plaintiff concedes that Dr. Lucchesi cannot identify "a single case report or epidemiological study documenting such an imbalance" occurs because of Vioxx. (Opp'n at 14.) Instead, she argues that Protocol 023 "'proved conclusively' that Vioxx decreases systemic prostacyclin production while leaving thromboxane levels within the body at normal limits." (Opp'n at 15.) Plaintiff's argument is flatly wrong.

Protocol 023 is the clinical trial conducted by Dr. FitzGerald and Merck researchers wherein it was observed that the urine of patients treated with Vioxx contained lower levels of a metabolite of prostacyclin than urine of patients on placebo.[9] (Opp'n at 15.) As noted in

---

[9] The results of Protocol 023 were published in May 1999. (*See* Catella-Lawson et al., "Effects of Specific Inhibition of Cyclooxygenase-2 on Sodium Balance, Hemodynamics, and Vasoactive Eicosanoids," J. PHARM. AND EXP. THERP. 1999; 289:735–741.) Plaintiff claims that Merck conducted Protocol 023 "in response to repeated warnings . . . that Cox-2 inhibition by Vioxx would decrease prostacyclin production in vivo and would create a prothrombotic state." (Opp'n
*(footnote continued on next page)*

790950v.1

Merck's Opening Memorandum, Dr. FitzGerald's work did not establish that Vioxx inhibits prostacyclin levels in the *vasculature*. (Mot. at 15 (citing Causation Testimony Brief).) In fact, peer-reviewed and published animal studies have found that COX-1, rather than COX-2, appears to be responsible for the production of prostacyclin in the vasculature. (Merck's Science Brief at 8, 13-14; Gaziano Decl. at ¶ 44; n.7, *supra*.) Because Vioxx inhibits COX-2, not COX-1, these studies tend to refute the FitzGerald hypothesis. Moreover, even if it were assumed that Vioxx caused "nearly immediate" reduction of prostacyclin in the vasculature (*see* Opp'n at 15), this would prove only that any such effect has no clinical significance, since Dr. FitzGerald did not observe any thrombotic cardiovascular event in the Protocol 023 study itself, and since there is no evidence anywhere that Vioxx increases the risk of thrombotic cardiovascular events in the first 30 days.

There are other reasons why the FitzGerald hypothesis is scientifically unreliable for purposes of *Daubert*. Dr. Lucchesi, for example, has no knowledge about the degree to which Vioxx supposedly upsets the balance between prostacyclin and thromboxane, nor does he have any knowledge about the level of prostacyclin inhibition that is supposedly necessary to achieve a clinically relevant result. (Mot. at 8.) In fact, Dr. Lucchesi admits as much:

> Q: Have you ever studied the degree to which any reduction in prostacyclin synthesis, small or large, was clinically significant in patients?
>
> A: Once again, I am not concerned with the degree. I am concerned with the mechanism and the concept.

(Oct. 3, 2002 Deposition of Benedict Lucchesi at 96:7-11.) Plaintiff says nothing in

---

at 15.) Plaintiff's allegation is simply false. As Dr. FitzGerald himself makes plain, Protocol 023 "was undertaken to assess the renal effects" of Vioxx by measuring urinary sodium excretion. (*See* Catella-Lawson (1999) at 735-36.) And according to Dr. FitzGerald, his "finding" that COX-2 inhibition may suppress the biosynthesis of extrarenal prostacyclin was "unexpected." (*Id.* at 739.)

response to Dr. Lucchesi's admission.  Nor does she dispute that the FDA considers the FitzGerald hypothesis to be speculative science.  (Mot. at 16; Reply Causation Testimony Brief at 33; (April 6, 2005 FDA Memorandum at 8 ("*Taken together, these observations raise serious questions about the so-called "COX-2 hypothesis," which suggests that COX-2 selectivity contributes to increased CV risk.*") (emphasis added).)

Instead, plaintiff emphasizes a recent "roundtable discussion" where it was noted that the FitzGerald theory of a prothrombotic effect "is possible" and is the "most common explanation" for any increased risk of cardiovascular events from use of COX-2 inhibitors.  (Opp'n at 14.) But the substance of the reported discussion is that the data do not support FitzGerald's theory, and most notably that the "[f]ailure of the APPROVe data to show protection from aspirin also suggests that thrombosis is not the consequence of COX-2 inhibition."[10]  In fact, one participant of the discussion observed that "[t]here is so much variation among the studies that *the mechanism remains open to discussion.*"[11]  For plaintiff to suggest that this roundtable discussion somehow proves that "Vioxx causes clots" is absurd.  (Opp'n at 14.)

In short, neither plaintiff nor Dr. Lucchesi can establish that the FitzGerald hypothesis is anything more that theory.  As such it does not provide a scientifically reliable basis for an opinion on general causation, and any proffered testimony premised on that hypothesis is inadmissible.  *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984) (causation opinions based on a "mere possibility" are insufficient; when matter remains one of "speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant").

---

[10] Bresalier, R., et al., *Editor's Round Table:  Cyclooxygenase-2 Inhibitors and Cardiovascular Risk*, AM. J. CARD. 2005 (on-line version) at 8:84-85.

[11] *Id.*  (emphasis added.)

790950v.1

2.   Dr. Lucchesi Cannot Establish The Mechanism By Which Vioxx
     Supposedly Causes Plaque Ruptures.

As Merck explained in its Opening Memorandum, Dr. Lucchesi admitted that there is no

proof -- even in an animal model -- that Vioxx contributes to plaque rupture.[12]   (Mot. at 17.)   In

response, plaintiff concludes merely that "the science of COX-2 inhibition informed" Dr.

Lucchesi's opinion that Vioxx supposedly contributes to plaque ruptures, although she points to

*no* testimony of Dr. Lucchesi to support this conclusion.   (Opp'n at 16.)   Merely concluding that

an expert's opinion is "informed" by "science" amounts to nothing more than *ipse dixit*, which

the Court need not and should not accept.   *In re Propulsid Liab. Litig.*, 261 F. Supp. 2d 603, 616

(E.D. La. 2003) ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district

court to admit opinion evidence that is connected to the existing data only by the *ipse dixit* of the

expert.") (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).)   Because Dr. Lucchesi

admitted he is aware of no evidence that Vioxx causes plaque ruptures, the Court should

preclude him from offering any testimony that it can or does have such an effect.

3.   Dr. Lucchesi Cannot Establish The Mechanism By Which Vioxx
     Supposedly Accelerates Atherosclerosis.

Nor should the Court allow Dr. Lucchesi to testify that Vioxx can accelerate the rate of

atherosclerosis.   As Merck explained in its Opening Memorandum, Dr. Lucchesi conceded (1)

that his atherosclerosis acceleration theory "is that, just theory;" and (2) that his theory has not

been tested in either an animal or a human model and that he has "never seen a peer-reviewed

piece of medical literature that demonstrates that [any] selective COX-2 inhibitor [including

Vioxx] accelerates the formation of plaque in a coronary artery."   (Mot. at 17-18.)   Plaintiff

---

[12]  In fact, Dr. Lucchesi testified in another case regarding research by Italian scientists, which
found that the inhibition of COX-2 actually *reduces* the likelihood of plaque rupture.  (Mar. 13,
2005 Lucchesi Dep. (*Rogers*) at 106:19-107:12.)

790950v.1

cannot avoid these concessions. Nor can plaintiff explain how such a theory, which is based on inconclusive studies performed in test tubes, can support a scientifically reliable causation opinion. It cannot. As the Fifth Circuit explained in *Allen*, *in vitro* studies showing that a drug may have an adverse effect are "the beginning, not the end of the scientific inquiry and prove[] nothing about causation without other scientific evidence." 102 F.3d at 198.

        4.    <u>Dr. Lucchesi Cannot Establish The Mechanism By Which Vioxx Supposedly Impacts Ischemic Preconditioning.</u>

Finally, Merck demonstrated in its Opening Memorandum that any testimony Dr. Lucchesi may proffer on his theory of ischemic preconditioning would be scientifically unreliable and therefore inadmissible. (Mot. at 18-19.) Again, plaintiff essentially concedes the point, as she failed even to mention "ischemic preconditioning" in her Opposition.

***

As explained above, Dr. Lucchesi cannot provide scientifically reliable opinions on any hypothesized mechanism. Accordingly, the Court should not allow Dr. Lucchesi to opine as to general causation.

## III.    PLAINTIFF CANNOT DEMONSTRATE THAT DR. LUCCHESI MAY PROPERLY OPINE ON SPECIFIC CAUSATION.

The Court also should not allow Dr. Lucchesi to opine as to specific causation. As an initial matter, he is not qualified to offer such opinions. While plaintiff refers to Dr. Lucchesi as a "medical doctor," the bottom line is that Dr. Lucchesi is not a cardiologist, is not a licensed physician, has never been licensed to practice medicine and has never treated a patient as a licensed physician. (Mot. at 19.) The fact that Dr. Lucchesi graduated from medical school over forty years ago and studies animals does not make him qualified to opine on what caused Mr. Irvin's sudden cardiac death.

Nor are the opinions that Dr. Lucchesi proposes to give scientifically reliable. As already

21

explained, Dr. Lucchesi has no scientifically reliable basis for testifying that Mr. Irvin's short-term use of Vioxx supposedly triggered his sudden cardiac death by (1) causing an imbalance in prostacyclin and thromboxane in his vasculature or (2) contributing to the formation of his atherosclerosis.[13]  (Opp'n at 17).  Without such a basis, he cannot reliably "rule in" Vioxx as a possible cause of Mr. Irvin's death.  And even if there were a scientific basis for ruling Vioxx in, Dr. Lucchesi still could not offer a specific causation opinion because he does not and cannot rule out other more likely causes of Mr. Irvin's death.

First, plaintiff concedes that Dr. Lucchesi has no way to tell whether Mr. Irvin had reduced prostacyclin in his vasculature, and if so, whether any such reduction had clinical significance.  (Opp'n at 13.)  Plaintiff complains that such proof would be impossible, but that is precisely the point.  Plaintiff admits that pathology -- a field in which Dr. Lucchesi has no expertise in any event (Opp'n at 16) -- cannot demonstrate that such a mechanism was at work. It follows that any assumption to that effect by Dr. Lucchesi would be rank speculation, incapable of supporting a reliable causation opinion.  Plaintiff cannot change this result by noting that participants in a "roundtable discussion" have debated the FitzGerald hypothesis even in the absence of "a single case report or epidemiologic study" supporting that hypothesis.  (Opp'n at 14.)  The rules for admissibility of opinions in an academic setting are decidedly different than those applicable in Federal court.  Nor can plaintiff legitimately complain that "the absence of evidence is not evidence of absence."  (Opp'n at 13.)  After all, plaintiff has the burden of proof on causation.  *See, e.g., Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d at 1018.  She must present *evidence* to support her theory of causation, and she admits that Dr. Lucchesi has none.

---

[13] Plaintiff expressly concedes that Dr. Lucchesi will not testify as to whether Mr. Irvin suffered a plaque rupture. (Opp'n at 16.)

790950v.1

Second, plaintiff argues that "Dr. Lucchesi testified, *with reasonable scientific certainty*, that Vioxx contributed to the formation of plaque in Mr. Irvin." (Opp'n at 17.) But that is a gross mischaracterization of Dr. Lucchesi's testimony. Dr. Lucchesi testified that he "just . . . [has] a high suspicion" that Vioxx contributed to plaque formation in Mr. Irvin, although he admitted he does not know "one way or the other" whether it did. (Opp'n at 20.) While plaintiff would have it otherwise, a "high suspicion" is not enough to render an expert's opinion admissible.[14] In fact, Dr. Lucchesi expressly conceded that there is no way to know whether Vioxx accelerated Mr. Irvin's atherosclerosis:

> Q:    How do you know *Mr. Irvin* was that special individual in those special circumstances in which a selective COX-2 inhibitor would accelerate the formation of plaque?
>
> A:    All right. *We can't predict that this would accelerate his plaque.*

(Mot. at 20 (citing Lucchesi 10/18/05 Dep. at 326:23-327:3 (emphasis added)).) Plaintiff does not address these concessions in her brief. Instead, she cites snippets of testimony taken out of context.[15] Given Dr. Lucchesi's unequivocal testimony, the Court cannot permit him to opine that Vioxx accelerated Mr. Irvin's atherosclerosis.

---

[14] Dr. Lucchesi's suspicion boils down to the proposition that Vioxx must have contributed to Mr. Irvin's death because Mr. Irvin died while taking Vioxx. (Opp'n at 17.) But this is an exercise in inadmissible *post hoc* reasoning. *See, e.g., McClain*, 401 F.3d at 1243 ("[S]imply because a person takes drugs and then suffers an injury does not show causation. Drawing such a conclusion from temporal relationships leads to the blunder of the *post hoc ergo propter hoc* fallacy."); *Black*, 171 F.3d at 313 (expert's testimony that plaintiff's fibromyalgia had to be due to fall was exercise in "the fallacy of *post-hoc propter-hoc* reasoning, which is as unacceptable in science as in law").

[15] For example, plaintiff claims Dr. Lucchesi testified that Vioxx "more likely than not" contributed to the formation of Mr. Irvin's plaque. (Opp'n at 17-18.) But that completely mischaracterizes Dr. Lucchesi's testimony. At his deposition, Dr. Lucchesi was asked whether Mr. Irvin would have developed a thrombus in response to a plaque rupture regardless of his brief Vioxx use. (Lucchesi 10/18/05 Dep. at 337:5-13.) In response to *that* question, Dr. Lucchesi gave his usual inadmissible *ipse dixit* answer Vioxx "more likely than not" played a contributory role. (*See supra* at 15-18, 20.) The cited testimony has *nothing* to do with whether Vioxx supposedly contributed to the formation of Mr. Irvin's atherosclerotic plaque.

790950v.1

Finally, Dr. Lucchesi has failed to rule out other likely causes of Mr. Irvin's sudden cardiac death. Binding Fifth Circuit precedent, however, *requires* that Dr. Lucchesi do so before his opinions can be admitted. (*See* Reply Causation Testimony Brief at 45-46.) Contrary to plaintiff's suggestion, Merck has not taken the position that Dr. Lucchesi must rule out every conceivable alternative cause, no matter how unlikely. (Opp'n at 18.) At a minimum, however, Dr. Lucchesi must rule out Mr. Irvin's pre-existing cardiovascular disease, which both sides agree is *the leading cause* of death in the United States.[16] (Reply Causation Testimony Brief at 46-47.) But Dr. Lucchesi has not done so.

Plaintiff argues that Dr. Lucchesi can rule out Mr. Irvin's atherosclerosis as a cause of his death by relying on the opinions of plaintiff's pathologists. (Opp'n at 18.) Plaintiff's problem, however, is that not even her pathologists can properly rule out Mr. Irvin's atherosclerosis as a likely cause of his death. Indeed, their testimony establishes that Mr. Irvin had moderate to severe atherosclerosis that developed over a period of years and that was unrelated to his brief use of Vioxx. (Bloor Dep. at 77: 4-15; Deposition of Joseph Burton, M.D. ("Burton Dep.") at 196:3-20, 234:19-22, attached as Ex. 2 to the Wittmann Decl.) In addition, Dr. Burton testified that that the thrombus in Mr. Irvin's left anterior descending coronary artery was located at the site of a ruptured plaque. (Burton Dep. at 180:7-13.) This admission of Dr. Burton is fatal to plaintiff's case. According to Dr. Bloor, approximately 70% of acute ischemic events – *i.e.*, sudden decreases or loss of blood flow to a portion of the heart – are caused by a rupture of atherosclerotic plaque, which then triggers the formation of a thrombus. (Bloor Report at ¶ 28.)

---

[16] Plaintiff tries to downplay the extent of Mr. Irvin's atherosclerosis by suggesting that it was only "moderate." (Opp'n at 16-17.) But plaintiff's *own* pathology expert agrees that, based on the autopsy report, Mr. Irvin had long-standing cardiovascular disease, evidenced by *moderate to severe* atherosclerotic plaque in multiple coronary arteries. (Deposition of Colin M. Bloor, M.D. ("Bloor Dep.") at 77: 4-7, attached as Ex. 1 to the Wittmann Decl.; Bloor Report at ¶ 37.)

In other words, in cases such as this, the formation of a thrombus is a *natural* response to ruptured plaque. (*Id.* at ¶¶ 29-30.)

Given these admissions of plaintiff's own pathologists, Dr. Lucchesi cannot properly rely on their testimony to rule out Mr. Irvin's atherosclerosis as a cause of his death.[17]   And even if Dr. Lucchesi were a practicing physician qualified to rule out other causes (which he is not), the near complete absence of information regarding Mr. Irvin's medical history would preclude him from reliably doing so. (Causation Testimony Brief at 57-58.)   His purported specific causation opinion must be excluded.

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone: 504-581-3200
Fax:    504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP

---

[17] Plaintiff's argument that Dr. Lucchesi "ruled in" Vioxx as a cause of Mr. Irvin's death also is insufficient to establish specific causation.  The process of ruling in potential causes is related to the *general* causation analysis, *not* the specific causation analysis.  See, e.g., Saks *et al.*, Federal Judicial Center, ANNOTATED REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (2d ed. 2004) ("Reference Manual on Scientific Evidence") at 637 (The "majority position" is that experts "must 'rule in' the substance, i.e., show that it is capable of causing the harm under consideration in some people, before they will be permitted to 'rule out' other possible causes of the harm. This is the better rule.").

790950v.1

54 West Hubbard Street, Suite 300
Chicago, Illinois 60610
Phone: 312-494-4400
Fax:    312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Phone: (202) 434-5000
Fax:    (202) 434-5029

And

John H. Beisner
Charles C. Lifland
Richard B. Goetz
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone: (213) 430-6000
Fax:    (213) 430-6407

Attorneys for Merck & Co., Inc.

790950v.1

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Reply Memorandum In Support of Motion of Merck & Co., Inc. to Exclude Testimony of Benedict R. Lucchesi has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 11th day of November, 2005.

790950v.1