UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | JUDGE FALLON |
| This document relates to KNOWLES | * | MAGISTRATE JUDGE |
| Evelyn Irvin Plunkett v. Merck & Co, Inc. | * | CASE NO. 02:05CV4046 |

**Plaintiff's Memorandum in Opposition to Defendant's Motion *in Limine*
To Exclude Evidence of, or Reference To, Marketing and Promotional Materials
Unrelated To Mr. Irvin or His Prescribing Physician**

*(Plaintiff's Opposition to Defendant's Motion in Limine No. 1)*

Plaintiff Evelyn Irvin Plunkett, as Personal Representative of the Estate of Richard Irvin, Jr., by and through her attorneys, urges the Court to deny Defendant's Merck & Co.'s motion seeking to exclude evidence relating to Merck's marketing and over promotion of Vioxx.

Merck designed and initiated a marketing campaign that impacted physicians and consumers both directly and indirectly. Merck spent hundreds of millions of dollars assuring the medical community and the public that Vioxx was safe, while simultaneously minimizing concerns and negative data relevant to its cardiovascular risks. In doing so, Merck created widespread awareness of the drug in the medical community and among the public as well as knowledge of the characteristics emphasized in its advertising.

At the outset, Plaintiff notes that Merck's scattershot attempt to exclude broad categories of evidence in this case is entirely misplaced and inappropriate. Basically Merck has requested that the Court improperly exclude large categories of relevant and probative

evidence. This is not the purpose of the *in limine* motion. See *United States v. Posner*, 594 F. Supp. 923, 927-28 (S.D. Fla. 1984) (denying motion in limine as premature where court could not make a determination as to the admissibility of the evidence prior to knowing whether the witness would testify at trial); *Violette v. Armonk Assocs., L.P.*, 849 F. Supp. 923, 930-31 (S.D.N.Y.1994) (denying plaintiff's *in limine* motion without prejudice to its renewal on the ground that the circumstances under which such evidence would be introduced were unknown.

The Fifth Circuit has noted: "[w]hen evidence is challenged solely on the ground that it is irrelevant, it is inadmissible only if it fails to meet the definition of Rule 401--it must be without probative value as to *any* fact of consequence to the determination of the action. If it is relevant as to any issue, it is relevant to the action and is not inadmissible under Rule 402." See *Chrysler Credit Corp. v. Whitney Nat'l Bank*, 824 F. Supp. 587, 599 (E.D. La.1993) (quoting *Lubbock Feed Lots, Inc. v. Iowa Beef Processors*, 630 F.2d 250, 267 (5th Cir.1980)(emphasis in original). A movant *in limine* has the burden of establishing that the evidence sought to be excluded on relevancy grounds is *not* relevant to *any* issue in the case. It is not enough to establish that the evidence *is* relevant to an issue which is *not* part of the case. See *Chrysler Credit Corp. v. Whitney Nat'l Bank*, 824 F.Supp. 587, 599 (E.D. La.1993).

Merck wants this case to be tried in a vacuum; not because the evidence in question is not relevant, but precisely because it is probative of Merck's multi-million dollar efforts to foist a dangerous drug onto the market at the expense of patient safety, including the safety of Mr. Irvin. Granting Merck's motion would run afoul of federal law disfavoring orders *in limine*, while denying Plaintiff the opportunity to present relevant evidence to her claims under Florida law.

I. **MERCK'S MARKETING SCHEME FOR VIOXX**

In addition to other claims, Plaintiff asserts that Merck failed to adequately warn (and in so doing, affirmatively misled) consumers, physicians and other members of the medical community regarding the safety and efficacy of Vioxx. This goal was accomplished chiefly in two ways. First, Merck spent millions of dollars on direct-to-consumer advertising to generate a "buzz" about Vioxx and to insure that patients would request Vioxx prescriptions from their physicians.

Second, Merck promoted the drug directly to physicians. This campaign was fought on three fronts. On one front, Merck sought out highly respected physicians—who had influence in the medical community and with the FDA—to advocate the drug as part of its medical education program. On another front, Merck sought to use the financial gain and prestige associated with its medical programs, to influence individual physicians' opinions and prescribing habits with respect to the drug. Finally, Merck disseminated misleading sales and promotional materials—including its product labeling and product information circulars—directly to individual physicians.

Inherent in this scheme is the understanding that physicians do not develop their opinions about the safety and efficacy of drugs in a vacuum. Although information received directly from the manufacturer's labeling, promotional, and educational programs are clearly factors, physicians also rely on a dialogue and an exchange of ideas and experience with other doctors to formulate their opinions about a particular drug. Merck understood this and relied upon this knowledge to develop their marketing scheme.

In its motion, Merck makes much of the fact that Dr. Schirmer cannot remember being visited by a Merck sales representative or remember relying on Merck's promotional materials. Dr. Schirmer did testify, however, that he relied on the other physicians in the

medical community for information. (Dep. of Dr. Christopher Schirmer at 19-20). Merck understood this and relied upon this knowledge to develop their marketing scheme. Just because Dr. Schirmer was not a direct recipient of these marketing tactics does not mean he was not affected by others who were.

With respect to sales and promotional materials used by Merck detailers or that were disseminated directly to physicians, Merck's approach to dealing with individual physicians was uniform. The information provided to all physicians—whether national thought leaders or local doctors—and Merck's attempts to influence opinions and prescribing habits of individual physicians, are central to Merck's overall scheme to inform and control the dialogue in the medical community about the cardiovascular safety of Vioxx. Evidence relating to this marketing plan is central to Plaintiff's allegations; particularly their failure to warn claims.

## II. THE SPECIFIC DOCUMENTS MERCK SEEKS TO EXCLUDE ARE RELEVANT

Each of these specific categories of evidentiary items is relevant and probative of Plaintiff's case and should be admitted at trial. Plaintiff treats each category in turn.

### A. Internal Marketing Communications

Merck here again suggests that because Dr. Schirmer was never exposed to these communications, they are necessarily irrelevant. Merck suggests that these materials are "perfectly innocuous" but that they will be mischaracterized by plaintiffs' counsel. The *jury* should decide whether these documents are innocuous or whether they are (as indeed they are) probative of Merck's reckless approach to the promotion of Vioxx despite its knowledge of the drug's dangers. The evidence speaks for itself,

The specific documents at issue include: (1) a memo in which Merck executive Susan

4

Baumgartner identified physicians Merck should "neutralize" with respect to the CV risks of Vioxx as well as "related communications" ;[3] (2) a memo in which key Vioxx player David Anstice sought to "rally the troops" at Vioxx's market launch (P1.0140); (3) a memo from Louis Sherwood to David Anstice pertaining to Merck's widely-publicized efforts to intimidate academics who dared to publicly suggest the cardiovascular risks of Vioxx; and (4) a detailed memo from Ms. Baumgartner to Louis Sherwood that serves as a virtual dossier on Gurikpal Singh, M.D., a doctor critical of Merck's approach to the cardiovascular problems associated with Vioxx.[1]

As with the marketing materials discussed generally above, these specific documents are relevant first as a backdrop—corporate character and "state of mind" evidence (and Merck's "state of mind" indisputably is at issue with respect to plaintiffs' negligence and fraud-based claims.) More specifically these are core documents revealing Merck's reaction to any suggestion that Vioxx carried cardiovascular risks. As such, the documents serve a number of relevant purposes. First they suggest the existence of CV risks (for why would Merck go to such lengths to thwart discussion of a non-existent concern?). They reveal Merck's knowledge of those CV risks by virtue of its attempts to thwart all discussion on the subject. And the communications reveal Merck's highest-level corporate policy of callous, reckless, fraudulent, and grossly negligent efforts to cover up the known CV risks. And to the extent these efforts succeeded, they are relevant to demonstrating why Dr. Schirmer (as well as the medical community at large and general consumer population) knew little or nothing of the CV risks associated with Vioxx. Dr. Schirmer testified in his deposition that he was not

---

[3] Merck's suggestion that "neutralizing" physicians involved Merck's altruistic efforts to "share reliable, accurate data" with them and bring them to a "more balanced position" is at best disingenuous. (Def. Mot. at 15.)

aware of the cardiovascular risks associated with Vioxx . (Dep. of Christopher Schirmer at 71, 75.)

B.   **Internal Training Materials**

This section addresses a few specific materials used to train Merck drug representatives. As with the documents discussed in the preceding section, Merck asks this Court to declare that the documents have only one possible interpretation—that offered by Merck—and that the documents are irrelevant as interpreted. But it is the function of a jury to interpret the significance of documentary evidence unless Merck can establish that under any possible interpretation the documents are irrelevant or so prejudicial that their relevance is nullified. Merck cannot make such a showing.

The specific documents Merck seeks to exclude are: (1) a presentation made to Merck's sales near the time of Mr. Irvin's ingestion of Vioxx; (2) documents pertaining to the "Dodge Ball" training game (P1.0007); (3) a bulletin forbidding drug reps to proactively discuss press coverage regarding the CV risks of Vioxx (P1.0061); and (4) a "generic sales technique" training manual.[2] (P1.0062)

These documents demonstrate the uniformity of Merck's messages to the medical community, the emphasis placed upon and sophistication of its delivery system, and specific techniques that sales representatives were trained to employ in order to keep "on message." The bulletin, for example, reveals Merck's favored method of "obstacle handling"—a euphemism for avoiding tough questions posed by prescribing physicians while returning to Merck's "core message" of efficacy. This particular bulletin addresses CV safety concerns in the wake of the VIGOR study. Fully aware that the study would raise concerns about CV safety, Merck chose to downplay those concerns and this bulletin spells out exactly how its

reps were to handle "obstacles" to sales such as <u>safety</u> issues raised by doctors.

The "Dodge Ball" training technique was a variation on this theme, instructing sales reps in how best to skirt safety issues while emphasizing efficacy. Likewise, the training manual is probative by the very fact that it is, in Merck's words, "generic." Merck demanded absolute obedience to its techniques and messages.

In short, Merck chose to handle the CV safety concerns about Vioxx in this way. These and other documents addressed in Merck's motion and this response portray a profit-driven company willfully ignorant of obvious safety.

C.  **Promotional Materials**

This section addresses yet another collection of marketing-related documents that Merck alleges has no connection to this case. As elsewhere in its motion, Merck essentially demands that the Court adopt its myopic view of the documents and then agree with Merck that they could have no bearing on a jury's consideration of what Merck knew or how it reacted to that knowledge.

Specifically, Merck seeks to exclude: (1) three internal marketing communications, and (2) two internal documents "suggesting responses to questions posed by doctors" in the field.[4] The first marketing document, portrays, as do the other marketing materials discussed throughout this response, Merck's corporate focus in the face of known CV risks attending Vioxx use. The document is a management committee briefing that depicts market "opportunities" based upon Vioxx's efficacy, while treating CV risks as a "threat" to sales, suggesting that Merck must "break [the] link to CV outcomes." In addition to demonstrating Merck's sophistication (suggesting its ability to learn of, and then manipulate the perception

---

[2]

7

of, CV risks), this document, like so many others, proves that at its highest echelons, Merck was actually aware of CV risk, perceived it as more of a threat to profits than to patient safety, and acted accordingly to minimize perceptions of that risk.

Contrary to Merck's charitable characterization of the exercise, it does not "suggest" responses to physicians; it directs sales reps on specifically how they are to answer anticipated questions by physicians, including directly relevant and misleading admonitions such as "VIOXX has no effect on platelet aggregation."

Again, in addition to providing general context for the jury, these materials not only demonstrate Merck's overarching principle of "sales over safety" but they specifically target the central issue in this action: the cardiovascular risks associated with Vioxx ingestion. Merck argues that such materials are irrelevant because "there is no evidence that Dr. Schirmer ever saw them," but that misses entirely the purposes discussed throughout this response. The promotional and marketing materials are relevant.

D.     **Evidence of Direct-to-Consumer ("DTC") Advertising**

Merck's final effort in its attempt to sanitize this trial of any marketing and promotional materials is its suggestion that its DTC campaign is irrelevant. (Def. Mot. at 13.) Merck specifically identifies five DTC-related documents that it believes should be excluded.[3] These documents are generally relevant for the same reasons the other marketing-related documents are relevant. They are more so here because they speak to the specific issue of whether Merck adequately warned Mr. Irvin or his physician of the cardiovascular risks associated with Vioxx.[5]

---

[5] While the industry refers to "direct to consumer" advertising, it would be more properly characterized as "direct to everyone" advertising. Patients and physicians alike were continuously exposed to Merck's extensive and sophisticated "DTC" campaign.

8

### III. The Learned Intermediary Defense Does Not Apply

Merck claims documents related to direct-to-consumer advertising are irrelevant because "[w]hether Merck adequately warned Plaintiffs is . . . not relevant here." (Def. Mot. at 13.) It bases this conclusion on the learned intermediary doctrine.

Whether brought under a strict liability theory or a negligence theory, Florida law holds that the manufacturer's duty to warn of drug's dangerous side effects is directed to the physician rather than the patient. See <u>Buckner v. Allergan Pharmaceuticals, Inc.,</u> 400 So. 2d 820 (Fla. 5th DCA), *rev. denied*, <u>407 So.2d 102 (Fla.1981)</u> (strict liability theory); *Givens v. Lederle*, 556 F.2d 1341, 1345 (5th Cir. (Fla) 1977) (negligence theory). "A duty to warn attaches, not when scientific certainty is established, but whenever a reasonable man would want to be informed of the risk in order to decide whether to expose himself to it." <u>Johns-Manville Sales Corp. v. Janssens</u>, 463 So.2d 242, 251 (Fla. 1st DCA 1984). Where a manufacturer provided no warning, the learned intermediary does not apply. *Zanzuri v. G.D. Searle & Co.*, 748 F.2d 1511 (S.D.Fla. 1990); see *Felix v. Hoffmann-Laroche, Inc.*, 540 So.2d 102, (Fla. 1989).

Defendant has failed to carry its burden to prove its learned intermediary defense where the evidence fails to show that the prescriber knew or should have known of these risks. *Barrow v. Bristol*, 1998 WL 812318 ,*31 (M.D.Fla. 1998). In 2001, Merck did not warn the medical community or individuals like Mr. Irvin who were ingesting Vioxx. Dr. Schirmer testified in his deposition that he was not aware of the cardiovascular risks associated with Vioxx. (Dep. of Christopher Schirmer at 71, 75.) The learned intermediary doctrine is an *affirmative defense*, the burden of proving which falls upon the defendant manufacturer. <u>Walls</u>

v. Armour Pharmaceutical Co., 832 F. Supp. 1467, 1482 (M.D. Fla. 1993). Merck has failed to meet its burden. The learned intermediary doctrine does not preclude the introduction of these otherwise relevant materials.

### IV.     All Evidence is Relevant to Plaintiff's Claim for Punitive Damages

To recover punitive damages, Plaintiff must prove that Defendant has actual knowledge of the wrongfulness of the conduct and the high probability that individuals would be injured. Fla. Stat. § 768.72(a) (2005). Florida law allows punitive damages "when a defendant engages in conduct which is fraudulent, malicious, deliberately violent or oppressive, or committed with such gross negligence as to indicate a wanton *disregard for the rights and safety of others*." Owens-Corning Fiberglas Corp. v. Ballard, 749 So. 2d 483, 486 (Fla.1999). The Florida Court of Appeals held in Johns-Manville Sales Corp. v. Janssens, 463 So.2d 242 (Fla.App.Dist. 1984) that:

> [a] legal basis for punitive damages is established in product liability cases where the manufacturer is shown to have knowledge that its product is inherently dangerous to person or property and that its continued use is likely to cause injury or death, but nevertheless continues to market the product without making feasible modifications to eliminate the danger or make adequate disclosure and warnings of such danger. Especially is this so when evidence is susceptible to the inference that the manufacturer not only refused to warn for the user's protection, but intentionally took steps to cover up the known danger in order to protect continued marketing of the product for its own economic advantage.

Janssens, 463 So. 2d at 249.

The Florida court's decision is perfectly applicable to this instance. Merck knew of the cardiovascular risks associated with Vioxx. Rather than inform the medical community and those ingesting the drug, Merck taught their sales representatives how to "dodge" questions regarding cardiovascular risks, spent millions of dollars in direct-to-consumer advertising, all

the while never warning those who might be injured by the drug. The marketing documents at issue in this motion are evidence that Merck intentionally took steps to cover up the dangers associated with Vioxx in order to continue marketing it. The holding in Janssens makes it clear that evidence of marketing efforts that took place following the date of injury is relevant to the issue of punitive damages under Florida law.

V.   **Marketing and Promotional Evidence Should Not Be Excluded Under Rule 403**

Merck's alternative argument, that this marketing evidence should be excluded under Rule 403, should also be rejected. Virtually all evidence is prejudicial or it is not material. The prejudice must be "unfair." *Dollar v. Long Manufacturing, N.C., Inc.*, 561 F.2d 613, 618 (5th Cir. 1977). Unfair prejudice within the context of Rule 403 "means an undue tendency to suggest (a) decision on an improper basis, commonly, though not necessarily, an emotional one." Notes of the Advisory Committee on Proposed Federal Rules of Evidence, Rule 403 at 102. Just because the evidence is damaging or prejudicial to Defendant's case does not mean that the evidence should be excluded. *United States v. McRae*, 593 F.2d 700, 707 (5th Cir. 1979).

In relevant part, Federal Rule of Evidence 403 directs that relevant evidence is inadmissible if its probative value is *substantially* outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence. Fed. R. Evid. 403. The careful use of "substantially" demonstrates the emphasis placed on this balancing test, and "Rule 403 is an extraordinary remedy that should be used sparingly because it allows the court to exclude admittedly probative evidence." *United States v. Ross*, 33 F.3d 1507, 1524 (11th Cir. 1994). Moreover, slight prejudice is insufficient to warrant granting a motion in limine. *Gross v. Black & Decker (U.S.), Inc.*, 695 F.2d 858, 863

11

(5th Cir. 1983) (quoting, *United States v. Hearod, 499 F.2d 1003 (5th Cir.1974)*).  Given this weight, it is difficult to make a pre-trial determination on these evidentiary issues without a substantive background.  See *Hines v. Consolidated Railroad Corporation*, 926 F.2d 262, 274 (3d Cir. 1991) ("Excluding evidence under Fed.R.Evid. 403 at the pretrial stage is an extreme measure.").

Plaintiff asserts that evidence of marketing is admissible under Rule 403.  It is premature to determine the importance of much of the evidence defendant seeks to exclude in this motion in limine.  Defendant, however, is free to raise whatever objections it deems appropriate during trial and once the Court has an opportunity to evaluate the relevancy, probativeness, and prejudicial nature, if any, in context.

## **CONCLUSION**

Merck targets a handful of "smoking gun" documents with dubious arguments that because neither Mr. Irvin nor Dr. Schirmer ever saw the documents, they could not be relevant for any purpose.  As demonstrated above, these internal communications, marketing and promotional materials are relevant not only as general contextual evidence but for the jury's consideration of what Merck knew or should have known regarding CV risks, how it reacted to that knowledge, and whether that response is a basis for liability, including punitive damages.  The evidence goes to Merck's state of mind, its corporate indifference to patient safety, its predisposition to seek profits even at the risk of patient health, and the necessity for punitive damages.  Merck's motion is due to be denied in its entirety.

Respectfully submitted,

By: /s/ P. Leigh O'Dell
**Andy D. Birchfield, Jr.**
Paul J. Sizemore
P. Leigh O'Dell
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
(800) 898-2034 (telephone)
(334) 954-7555 (telecopier)
**Co-Lead Counsel**

**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
FAX: (504) 561-6024
**Temporary Office**
3411 Richmond Ave., Suite 460
Houston, TX 77046
PH: (713) 877-1843
FAX: (713) 871-9750

Christopher A. Seeger, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

**PLAINTIFFS' LIAISONCOUNSEL**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
MEUNIER&WARSHAUER, L.L.C.
P.O. Box 960
191 East Second Street
New Roads, LA 70760
(225) 638-6137
(225) 638-8836 (fax)

Carlene Rhodes Lewis, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Thomas R. Kline, Esquire
KLINE&SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced in accordance with Pre-Trial Order No. #8, on this **11th** day of November, 2005.

_P. Leigh O'Dell_

# SEE RECORD FOR

# EXHIBITS

# OR

# ATTACHMENTS

# NOT SCANNED