

U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED   NOV 18 2005

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
|  | * |  |
| **PRODUCTS LIABILITY LITIGATION** | * | SECTION L |
|  | * |  |
|  | * | JUDGE FALLON |
| This document relates to | * |  |
| Case No. 05-4046* | * |  |
|  | * | MAGISTRATE JUDGE KNOWLES |
| **EVELYN IRVIN PLUNKETT** | * |  |
| as Personal Representative of the Estate of | * |  |
| **RICHARD IRVIN, JR.,** | * |  |
|  | * |  |
| Plaintiff, | * |  |
|  | * |  |
| vs. | * |  |
|  | * |  |
| **MERCK & CO., INC.,** | * |  |
|  | * |  |
| Defendant. | * |  |
|  | * |  |

* * * * * * * * * * * * * * * * *

### MERCK & CO., INC.'S MOTION TO EXCLUDE EVIDENCE OF PLAINTIFF'S EXPERTS REGARDING CAUSATION

Defendant Merck & Co., Inc. ("Merck"), through undersigned counsel, and pursuant to Rule 702 of the Federal Rules of Evidence, hereby moves to exclude the evidence of plaintiff's experts regarding causation. The facts and law supporting this motion are more fully set forth in

___ Fee_____
___ Process_____
X   Dktd _____
___ CtRmDep_____
___ Doc. No._____

the accompanying memorandum, declarations, and exhibits, which are incorporated as if fully set

forth herein.

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
4041 Essen Lane
One United Plaza, Suite 501
Baton Rouge, Louisiana 70809
Phone:  225-490-8900
Fax:     225-490-8960

Defendants' Liaison Counsel
Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone: 312-494-4400
Fax:     312-494-4440

And

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone: (202) 434-5000
Fax:     (202) 434-5029

Attorneys for Merck & Co., Inc.

789229v.1

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Motion to Exclude Evidence of Plaintiff's Experts Regarding Causation has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 21st day of October, 2005.

*Dorothy H. Wimberly*

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **In re: VIOXX** | * | **MDL Docket No. 1657** |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| | * | **JUDGE FALLON** |
| **This document relates to** | * | |
| **Case No. 05-4046*** | * | |
| | * | **MAGISTRATE JUDGE KNOWLES** |
| **EVELYN IRVIN PLUNKETT** | * | |
| as Personal Representative of the Estate of | * | |
| **RICHARD IRVIN, JR.,** | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| **MERCK & CO., INC.,** | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### MERCK & CO., INC.'S MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE EVIDENCE OF PLAINTIFF'S EXPERTS REGARDING CAUSATION

# TABLE OF CONTENTS

**Page**

I.    BACKGROUND ...................................................................................................... 4

    A.    Undisputed Facts Surrounding Mr. Irvin's Short-Term Use of Vioxx .................. 4

    B.    Undisputed Facts Surrounding Mr. Irvin's Medical History ................................. 6

    C.    Undisputed Facts Surrounding Mr. Irvin's Sudden Cardiac Death ....................... 8

II.   LEGAL STANDARD .......................................................................................... 11

    A.    Plaintiff Bears the Burden of Proving Both General and Specific
        Causation through Admissible Expert Testimony .............................................. 11

    B.    Expert Causation Testimony Must Be Reliable and Relevant ............................. 13

    C.    To Establish General and Specific Causation, Plaintiff Must Proffer
        Scientifically Reliable Epidemiologic Data ........................................................ 16

III.  ARGUMENT ......................................................................................................... 21

    A.    Plaintiff's Experts Cannot Establish General Causation Under Any Theory ...... 23

        1.    The use of 25 mg Vioxx for less than one month is not associated
            with an increased risk of thrombotic cardiovascular events .................... 23

            a.    The dose-response relationship is critical in pharmaceutical
                cases ............................................................................................ 23

            b.    The best available science shows that Mr. Irvin's short-
                term use of Vioxx does not cause thrombotic
                cardiovascular events. ................................................................. 26

            c.    Plaintiff's experts cannot establish general causation by
                relying on equivocal, inconsistent and inferior data .................... 34

                (i)    Animal data is not reliable evidence of causation ........... 35

                (ii)   Case reports are not reliable evidence of causation ......... 36

                (iii)  In vitro studies are not reliable evidence of
                     causation ........................................................................ 37

            2.    Plaintiff's experts cannot identify the mechanism by which Vioxx
            supposedly causes sudden cardiac death ................................................ 37

            a.    Plaintiff's experts cannot establish the mechanism by
                which Vioxx supposedly has a thrombotic cardiovascular
                effect .......................................................................................... 40

            b.    Plaintiff's experts cannot establish the mechanism by
                which Vioxx supposedly causes vasospasms ............................. 44

            c.    Plaintiff's experts cannot establish the mechanism by
                which Vioxx supposedly causes plaque ruptures ........................ 45

789232v.1

# TABLE OF CONTENTS
## (continued)

Page

    d.    Plaintiff's experts cannot establish the mechanism by which Vioxx supposedly accelerates atherosclerosis .................. 47

B.    Plaintiff's Experts Cannot Establish Specific Causation Under Any Theory...... 48

    1.    Plaintiff's experts cannot opine to a reasonable degree of medical certainty that Vioxx caused Mr. Irvin's sudden death under any theory ................................................................................................... 49

        a.    The thrombus theory is scientifically unreliable........................... 50

        b.    The vasospasm theory is scientifically unreliable ....................... 52

        c.    The plaque rupture theory is scientifically unreliable.................. 53

        d.    The atherosclerosis acceleration theory is scientifically unreliable............................................................................................ 54

    2.    Plaintiff's experts cannot rule out other possible causes of Mr. Irvin's death ............................................................................................ 56

        a.    Plaintiff's experts cannot conduct a reliable causal analysis in the absence of a reasonably complete medical history. ........... 57

        b.    Plaintiff's experts cannot rule out vasospasm as a possible cause of Mr. Irvin's thrombus.......................................................... 58

        c.    Plaintiff's experts cannot rule out Mr. Irvin's coronary artery disease as a likely cause of his sudden death..................... 58

IV.    CONCLUSION.......................................................................................................62

789232v.1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 05-4046* | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| EVELYN IRVIN PLUNKETT | * | |
| as Personal Representative of the Estate of | * | |
| RICHARD IRVIN, JR., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

* * * * * * * * * * * * * * * * * *

## MEMORANDUM IN SUPPORT OF MERCK & CO., INC.'S MOTION TO EXCLUDE EVIDENCE OF PLAINTIFF'S EXPERTS REGARDING CAUSATION

This lawsuit is based on the unsupportable proposition that Richard Irvin's sudden

cardiac death was caused by his purported ingestion of a common, therapeutic dosage of Vioxx®

over a period of less than one month.[1]  Plaintiff's experts opine that Mr. Irvin's use of Vioxx

---

[1] As explained below (*see infra* Section I.B at 5-6), the record reveals that Mr. Irvin took Vioxx for at most 24 days.  Whether Mr. Irvin may have taken Vioxx on an undetermined number of additional days is irrelevant for purposes of this motion, however, as no one seriously contends that he took the drug for longer than one month.

caused, through a variety of hypothesized mechanisms, the formation of a thrombus – *i.e.*, a blood clot – in his left anterior descending coronary artery and that this thrombus resulted in a loss of blood flow to his heart that in turn triggered his death.  They contend that Mr. Irvin's 24 days of Vioxx use – and not his longstanding coronary artery disease – caused his death.  There is no reliable scientific evidence to support this claim, however.  Concurrently with this motion, Merck & Co., Inc. ("Merck") has filed a brief outlining the state of the science on the potential cardiovascular side-effects of Vioxx.  *See* Merck's Background Science Brief ("Science Brief").  As explained in that brief, there is *no* evidence that the use of Vioxx at the 25 mg dose for a period of less than one month is associated with an increased risk of thrombotic cardiovascular events.  In fact, according to the Food and Drug Administration's recent analysis of all the available data, Vioxx is associated with an increased risk of cardiovascular events only after "prolonged use."  (April 6, 2005 FDA Memorandum, attached as Ex. 51 to the Declaration of Phillip A. Wittmann in Support of Merck's Motions to Exclude Testimony ("Wittmann Decl. I") at 10.)  The FDA further concluded that there may be no difference in cardiovascular risk between Vioxx and other traditional anti-inflammatory drugs.  (*Id.*)

Accordingly, through this Motion, Merck seeks to exclude any testimony by plaintiff's causation experts – namely, Drs. Thomas Baldwin, Colin Bloor, Joseph Burton, John Farquhar, Winston Gandy, and Benedict Lucchesi, in addition to Professors Wayne Ray and Richard Kronmal[2] – that the short-term use of Vioxx at the 25 mg dose could have, and in this case did, cause Mr. Irvin's sudden death.  As explained below, the testimony of these witnesses is not based on scientifically reliable principles and is thus inadmissible under Federal Rule of

---

[2] On October 17, the Court ordered plaintiff to produce Professor Kronmal for deposition.  As of the date of this filing, plaintiff has yet to comply with that order.  Merck reserves the right to file a supplemental brief in support of this Motion if an when Professor Kronmal is deposed.

789232v.1

Evidence 702 and *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993)**Error! Bookmark not defined.**.

To prevail on her claims, plaintiff must establish both general and specific causation. Specifically, plaintiff must establish that the short-term use of Vioxx at the 25 mg dose *can cause* thrombotic cardiovascular events and that, in this case, such use of Vioxx *did cause* Mr. Irvin's death.  Plaintiff cannot meet either burden.

Plaintiff fails to prove general causation for two reasons.[3]  First, there is no scientifically reliable evidence that the use of Vioxx at the 25 mg dose for a period of less than one month is capable of causing thrombotic cardiovascular events.  Plaintiff cannot compensate for this lack of data by relying on alleged health effects associated with the use of Vioxx at different doses and durations.  In pharmaceutical cases, dose and duration are among the most critical facts in any causal analysis, and these facts do not support the plaintiff in this case.  Second, none of plaintiff's experts can identify, to a reasonable degree of medical certainty, the specific mechanism by which Vioxx supposedly caused Mr. Irvin's death.  While they identify several "possible" and competing theories, each theory is speculative and thus inadmissible under *Daubert* and the Federal Rules of Evidence.

Plaintiff also fails to prove specific causation for two reasons.[4]  First, plaintiff's experts cannot prove to a reasonable degree of medical certainty that, in this case, Vioxx in fact caused Mr. Irvin's death under any of the speculative theories that they advance.  Second, they cannot rule out other possible causes of Mr. Irvin's sudden death.  For example, the near complete lack of a documented medical history for Mr. Irvin precludes any expert opinion that Vioxx, as

---

[3] Drs. Baldwin, Farquhar, Gandy, Lucchesi, Bloor and Burton, and Professors Ray and Kronmal purport to opine on general causation.

[4] Drs. Baldwin, Gandy, Bloor, Burton and Lucchesi purport to opine on specific causation.

789232v.1

opposed to something else, was the most likely cause of his death. In addition, plaintiff's experts cannot eliminate the possibility that the thrombus observed in Mr. Irvin's coronary artery was caused by an undetected vasospasm – *i.e.*, a contraction of a coronary artery – that was unrelated to his short-term use of Vioxx. Finally, and perhaps most significantly, an autopsy of Mr. Irvin confirmed that he had moderate to severe atherosclerosis – *i.e.*, narrowing of his coronary arteries due to the chronic buildup of plaque – in addition to a ruptured plaque in his left anterior descending coronary that likely caused the thrombus to develop. By the admissions of plaintiff's own experts, Vioxx cannot and did not contribute to Mr. Irvin's atherosclerotic disease or to the rupture of his coronary plaque. And plaintiff's experts do not know whether and to what extent Mr. Irvin's short-term use of Vioxx supposedly contributed to the formation of his naturally occurring thrombus. In contrast, it is uncontroverted that atherosclerosis is associated with 80 percent of sudden cardiac deaths, which from 1989 through 1998 (*i.e.*, before Vioxx was ever sold) killed an estimated 450,000 Americans annually.[5] There simply is no medical evidence to distinguish Mr. Irvin's unfortunate death from the hundreds of thousands of similar sudden cardiac deaths that occurred before Vioxx entered the market and that continue today. Accordingly, plaintiff cannot come forward – as she must – with substantial evidence that Vioxx more likely than not caused Mr. Irvin's death. The opinions of her experts on specific causation are speculative and inadmissible.

---

[5] Zheng et al., *Sudden Cardiac Death in the Untied States, 1989 to 1998*, 104 Circulation 2158, 2161 (2001); Myberg et al., *Cardiac Arrest and Sudden Death*, in BRAUNWALD'S HEART DISEASE: A TEXTBOOK OF CARDIOVASCULAR MEDICINE 865, 870 (Zipes et al., eds. 2005).

789232v.1

## I.     BACKGROUND.

### A.     Undisputed Facts Surrounding Mr. Irvin's Short-Term Use of Vioxx.

Mr. Irvin was a 53-year old man with severe lower back and joint pain.  (Deposition of Allesha Schirmer ("A. Schirmer Dep."), attached as Ex. 24 to Wittmann Decl. I at 44:14-45:2; Deposition of Christopher Schirmer ("C. Schirmer 9/06/05 Dep."), attached as Ex. 25 to Wittmann Decl. I at 46:6-20, 47:2-11.)  He tried without success to treat his pain with over-the-counter medications, including Tylenol.  (Deposition of Evelyn Irvin Plunkett ("Plunkett Dep."), attached as Ex. 19 to Wittmann Decl. I at 55:23-56:17.)  Accordingly, on April 9, 2001, Mr. Irvin's daughter, Allesha Schirmer, telephoned her husband, Dr. Christopher Schirmer, who is an emergency room physician, and asked that he prescribe Mr. Irvin something for his pain.  (C. Schirmer 9/06/05 Dep. at 37:9-38:7, 47:19-48:20.)  At the time his wife made this request, Dr. Schirmer had never conducted a medical examination of Mr. Irvin, had never seen his medical records, had never ordered any laboratory testing for Mr. Irvin, and had essentially no understanding of his medical history other than "a general Gestalt of it." (*Id.* at 38:17-40:21, 41:24-43:8, 44:25-45:2, 46:6-20.)  Nevertheless, Dr. Schirmer acquiesced in his wife's request and prescribed Mr. Irvin Vicoprofen, a narcotic pain medication that contains ibuprofen, a non-steroidal anti-inflammatory, as well as methocarbamol, a muscle relaxant.  (*Id.* at 35:5-37:24.) Dr. Schirmer did not talk to Mr. Irvin about the risks associated with this prescription, however, nor did he advise Mr. Irvin to consult a doctor regarding his pain.  (*Id.* at 48:24-49:1, 50:3-25.) In fact, Dr. Schirmer does not remember talking to Mr. Irvin about these medications at all before prescribing them.  (*Id.* at 37:25-38:1.)  Ultimately, Mr. Irvin took the medication for only a couple days, as it did not relieve his pain and instead resulted in adverse side-effects, including nausea and vomiting.  (*Id.* at 52:12-19; 56:15-20; Plunkett Dep. at 63:17-64:23.)

A few days later, Mr. Irvin took one or two samples of 25 mg Vioxx, which he received from a friend. (Deposition of Richard Aycock ("Aycock Dep."), attached as Ex. 1 to Wittmann Decl. I at 29:3-30:21; Deposition of Christopher Schirmer 12/07/04 ("C. Schirmer 12/07/04 Dep."), attached as Ex. 26 to Wittmann Decl. I at 12:1-7, 14:13-17; C. Schirmer 9/06/05 Dep. at 53:5-11, 56:15-20; Plunkett Dep. at 65:13-23, 72:14-24.)   Unlike Vicoprofen, Vioxx significantly relieved Mr. Irvin's pain without causing any adverse side effects. (C. Schirmer 12/07/04 Dep. at 12:1-9; C. Schirmer 9/06/05 Dep. at 55:22-56:3; 56:15-20, 57:15-24; Plunkett Dep. at 77:6-9.) Accordingly, Mr. Irvin called his daughter to request that Dr. Schirmer write him a prescription for Vioxx. (Plunkett Dep. at 82:13-18; C. Schirmer 9/06/05 Dep. at 52:2-24.) Dr. Schirmer again acquiesced and, again, does not remember speaking to Mr. Irvin.   (C. Schirmer Dep. at 51:1-52:4.) Without evaluating Mr. Irvin or reviewing his medical history, Dr. Schirmer prescribed him 30 tablets of 25 mg. Vioxx.[6]  (C. Schirmer 9/06/05 Dep. at 51:1-14, 52:5-24; C. Schirmer 12/07/04 Dep. at 14:21-25, 24:14-25:3.)  Mr. Irvin filled this prescription on April 22, 2001. (*See* Flagler Hospital Emergency Room Records, attached as Ex. 42 to Wittmann Decl. I.)  When Mr. Irvin died 23 days later, on May 15, 2001, there were eight Vioxx tablets remaining in his prescription bottle. (Plunkett Dep. at 88:2-6.)

Based on these facts, it is undisputed that Mr. Irvin used 25 mg Vioxx for at most 24 days.  Accordingly, the issue before the Court is whether such use of Vioxx is capable of causing a thrombotic cardiovascular event and, if so, whether it caused Mr. Irvin's death.  As will be explained in this Motion, Vioxx neither can nor did have such an effect in this case.

---

[6] Dr. Schirmer did not provide Mr. Irvin with any Vioxx samples. (C. Schirmer 12/07/04 Dep. at 24:9-10.)

789232v.1

**B.      Undisputed Facts Surrounding Mr. Irvin's Medical History.**

Virtually nothing is known about Mr. Irvin's medical history due to the fact that he rarely went to the doctor. In fact, according to the deposition testimony of Mr. Irvin's family members and the few pages of medical records that have been produced in this case, Mr. Irvin sought medical care on just a handful of occasions over the last approximately 30 years of his life. In the 1970s, Mr. Irvin visited a doctor regarding a possible kidney stone. (Plunkett Dep. at 39:17-22.) Then, in approximately 1990, he had cyst removed from his wrist. (*Id.* at 38:5-17.) A few years later, in approximately 1994, Mr. Irvin underwent a stress test at the suggestion of his daughter, who was concerned that he was at risk for cardiovascular disease.[7] (*Id.* at 41:20-42:4; A. Schirmer Dep. at 26:12-28:4, 37:4-12.) No documents reporting the results of this test can be found, however. In any event, a stress test cannot predict the likelihood of future cardiovascular problems. (*Id.* at 34:23-25.) Then, in 1998, Mr. Irvin visited the Emergency Room for a laceration to his finger. (*See* Flagler Hospital Emergency Room Records.) According to the medical records relating to that visit and his subsequent death, Mr. Irvin was obese. (*Id.*; Autopsy Report of Richard Irvin ("Autopsy Rpt."), attached as Ex. 44 to Wittman Decl. I; *see also* Deposition of Dr. Joseph Burton ("Burton Dep."), attached as Ex. 4 to Wittmann Decl. I at 194:24-195:3.) Furthermore, a test showed that his blood pressure was elevated. (*Id.*) Since there are no other blood pressure readings for Mr. Irvin, however, it is not known whether his blood pressure was elevated before or during his brief use of Vioxx. Finally, medical records relating to Mr. Irvin's death suggest that he had elevated cholesterol. (Deposition of Dr. Colin Bloor ("Bloor Dep."), attached as Ex. 3 to Wittmann Decl. I at 90:11-22.)

---

[7] A stress test involves elevating a patient's heart rate through exercise, usually on a treadmill, and then evaluating whether the patient suffers from ischemia – *i.e,* a lack of oxygen to the heart muscle caused by reduced blood flow through the coronary arteries -- or other potentially adverse cardiovascular conditions. (A. Schirmer Dep. at 28:12-32:5.)

Other than these isolated facts, Mr. Irvin's family knows essentially nothing about his medical history. For example, no one knows of any other specific occasion where Mr. Irvin had seen a doctor since the late 1960s – other than, perhaps, for a cold. (Plunkett Dep. at 40:6-11; Deposition of Ashley Irvin ("A. Irvin Dep."), attached as Ex.  to Wittmann Decl. I at 47:16-18, 70:23-25; Deposition of Leslie Goldstein ("Goldstein Dep."), attached as Ex. 8 to Wittmann Decl. I at 20:24:21:2; C. Schirmer 9/06/05 Dep. at 40:22-41:6; A. Schirmer Dep. at 25:2-26:11.) Neither Mr. Irvin's wife nor Dr. Schirmer knows if he ever had a physical examination. (Plunkett Dep. at 40:12-14; C. Schirmer 9/06/05 Dep. at 42:17-21.) If such an examination ever took place, the results are not known today. And no one knows whether Mr. Irvin ever had his blood pressure or cholesterol levels checked or whether he had any diagnostic testing other than the stress test in 1994. (Plunkett Dep. 45:23-46:7; C. Schirmer 9/06/05 Dep. at 41:24-42:16; A. Schirmer Dep. at 37:13-38:3; A. Irvin Dep. at 72:23-73:12; Deposition of Richard Irvin ("R. Irvin Dep."), attached as Ex. 10 to Wittmann Decl. I at 56:25-57:14; Goldstein Dep. at 21:24-22:6.)

In short, Mr. Irvin's medical history is largely a mystery. Given the lack of available information, plaintiff's experts cannot opine to a reasonable degree of medical certainty that Mr. Irvin's short-term use of 25 mg. Vioxx – as opposed to something else – was responsible for his death.

**C.    Undisputed Facts Surrounding Mr. Irvin's Sudden Cardiac Death.**

After arriving at work on the morning of May 15, 2001, Mr. Irvin received a telephone call from his employer, John Weeks.  During that conversation, Mr. Irvin indicated that he was not feeling well.  (Deposition of John Weeks ("Weeks Dep."), attached as Ex. 27 to Wittmann Decl. I at 118:7-19, 51:10-52:23.)  Shortly after this telephone call, Mr. Irvin's co-workers found him at approximately 7:10 a.m., slumped over his desk and unconscious.  (*Id.* at 17:6-19:13; Deposition of Daniel Pacetti ("Pacetti Dep."), attached as Ex. 18 to Wittmann Decl. I at 34:21-11.)  Efforts to resuscitate Mr. Irvin were unsuccessful and paramedics then transported him to the Emergency Room, where resuscitation attempts continued.  (*See* Flagler Hospital Emergency Room Records.)  Ultimately, these additional efforts failed and Mr. Irvin was pronounced dead at 9:02 a.m.  (*Id.*)

On May 16, 2001, the coroner performed an autopsy of Mr. Irvin.  The major findings of the autopsy concerned Mr. Irvin's heart.  According to plaintiff's own expert, the autopsy revealed that Mr. Irvin had advanced heart disease as evidenced by "moderate to severe" atherosclerosis in multiple coronary arteries.  (Bloor Dep. at 77:4-7; Expert Report of Dr. Colin Bloor ("Bloor Report"), attached as Ex. 31 to Wittmann Decl. I at ¶ 37.)  Atherosclerosis is characterized by a hardening and narrowing of the coronary arteries due to the build-up of plaque.  (Bloor Report at ¶ 26.)  It is a disease that takes decades to develop.  (*Id.* at ¶ 27.)  According to the autopsy report, Mr. Irvin had "generalized moderate arteriosclerosis" with areas that were between 20% and 40% occluded by moderately calcified atherosclerotic plaque.  (Autopsy Rpt.)  The autopsy further revealed a 1 cm thrombus proximal to an area of between 60% and 70% occlusion in the left anterior descending coronary artery.  (Autopsy Rpt.; Declaration of Dr. Thomas Wheeler ("Wheeler Decl.") at ¶ 2.)  The left anterior descending coronary artery is associated with a "high" incidence of sudden cardiac death in the general

9

population and especially in men.  (Deposition of Dr. Benedict Lucchesi ("Lucchesi 4/25/05 Dep."), attached as Ex. 14 to Wittmann Decl. I at 49:20-50:21; Bloor Dep. at 56:14-25.)  Based on the autopsy findings, the coroner concluded that Mr. Irvin died of "ventricular fibrillation due to arteriosclerotic coronary artery disease" and listed the manner of death as "natural."  (Autopsy Rpt.)

According to Dr. Burton, plaintiff's expert pathologist, an examination of the microscopic slides from the autopsy reveals that the thrombus in Mr. Irvin's left anterior descending coronary artery was located at the site of a ruptured plaque.  (Burton Dep. at 180:7-13.)  This finding is significant because, according to Dr. Bloor, approximately 70% of acute ischemic events – *i.e.*, sudden decreases or loss of blood flow to a portion of the heart – are caused by a rupture of atherosclerotic plaque, which then triggers the formation of a thrombus. (Bloor Report at ¶ 28.)  In other words, the formation of a thrombus is a natural response to ruptured plaque.  (*Id.* at ¶¶ 29-30.)  Moreover, as explained below, plaintiff's experts concede that there is no scientifically reliable evidence that the ingestion of Vioxx at any dose or duration is capable of causing plaque ruptures.

The pathological evidence that Mr. Irvin had coronary artery disease indicates that, during life, he had certain risk factors for the development of that disease.  (Bloor Report at ¶ 27 (development of atherosclerosis "is influenced" by risk factors).)  Although Mr. Irvin's medical history is not well documented, there is evidence in this case that Mr. Irvin had the following risk factors for the development of his coronary artery disease:  (1) a family history, (2) a poor diet, (3) a lack of cardiovascular exercise, and (4) obesity.  (Declaration of J. Michael Gaziano, M.D., M.P.H., in support of Merck's Motions to Exclude Evidence ("Gaziano Decl.") at ¶ 8; Burton Dep. at 191:20-192:10, 194:24-195:3; Bloor Dep. at 38:22-39:20; Deposition of Dr. Thomas

Baldwin ("Baldwin Dep."), attached as Ex. 2 to Wittmann Decl. I at 134:6-8; Bloor Report at ¶ 33; Expert Report of Dr. John Farquhar ("Farquhar Report"), attached as Ex. 33 to Wittmann Decl. I at ¶¶ 51, 53; Pl.'s Response to Interrogatory No. 3, attached as Ex. 48 to Wittmann Decl. I; Plunkett Dep. at 48:24-49:14; A. Schirmer Dep. at 39:6-22, 40:1-7; A. Irvin Dep. at 73:21-74:11, 89:19-90:7; R. Irvin Dep. at 67:13-15; Weeks Dep. at 52:7-16, 53:7-9; Pacetti Dep. at 64:13-24, 65:8-12.) In addition, as indicated above, plaintiff's expert Dr. Bloor was able to infer from the autopsy findings that Mr. Irvin had elevated cholesterol. (Bloor Dep. at 90:11-22.)

However the plaque formed in Mr. Irvin's coronary arteries, none of plaintiff's experts seriously suggests that Vioxx in any way contributed to that plaque formation. (Baldwin Dep. at 138:15-18; Bloor Dep. at 77:8-15; Burton Dep. at 196:3-20, 234:19-22; Lucchesi 4/25/05 Dep. at 289:8-20, 293:13-294:3; Bloor Report at ¶¶ 27, 37.) In addition, both plaintiff's and defendant's experts agree that Mr. Irvin's moderate to severe coronary artery disease was a but-for cause of his sudden cardiac death. (*Compare* Bloor Report at ¶ 37 ("[A]n acute event occurred near the time of death that resulted in sudden narrowing of an already narrowed vessel lumen. This change would result in significant restriction of blood flow to the myocardium leading to myocardial ischemia and increasing the risk of cardiac arrhythmias.") *and* Expert Report of Dr. Joseph Burton ("Burton Report"), attached as Ex. 32 to Wittmann Decl. I at 22 ("It is my opinion the cause of death of Mr. Richard Irvin was an acute coronary thrombosis occurring in the left anterior descending coronary artery associated with coronary artery atherosclerosis."), *with* Wheeler Decl. at ¶ 2 & Ex. A at 1 (Mr. Irvin's "death was secondary to ventricular fibrillation, which was the result of coronary thrombosis of the left anterior descending . . . coronary artery, which ultimately was secondary to coronary atherosclerosis.") *and* Gaziano Decl. at ¶ 4 ("Mr. Irvin died of a sudden cardiac arrest due to an abnormal heart rhythm brought on by a blocked

11

coronary artery resulting from long standing coronary heart disease, which was the result of cardiovascular risk factors.").)

It is against this back-drop of Mr. Irvin's serious and pre-existing risk factors and documented coronary artery disease that his short-term use of Vioxx must be evaluated.

## II.   LEGAL STANDARD

### A.   Plaintiff Bears the Burden of Proving Both General and Specific Causation through Admissible Expert Testimony.

To establish liability, plaintiff must provide, at a minimum, substantial evidence proving to a reasonable degree of medical certainty that Vioxx caused Mr. Irvin's fatal heat attack. *Donohue v. State of Florida*, 801 So. 2d 124, 126 (Fla. 2001) (confirming that "reasonable medical certainty" standard applies); *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984) (requiring "evidence which affords a reasonable basis for the conclusion that it is more likely than not" defendant's conduct "was a substantial factor in bringing about the result."); *Florida E. Coast Ry. Co. v. McElroy*, 72 So. 459, 459 (Fla. 1916); *O'Neal v. Pine Island Fish Camp, Inc.*, 403 So. 2d 980, 982 (Fla. App. 1979). Causation opinions based on a "mere possibility" are insufficient, and when the matter remains one of "speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." *Gooding*, 445 So. 2d at 1018 (quoting Prosser, Law of Torts § 41 (4th Ed. 1971)).

Proving causation involves a two step process:  plaintiff *first* must prove general causation and then must prove specific causation. *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1239 (11th Cir. 2005); *Kelley v. Am. Heyer-Schulte Corp.*, 957 F. Supp. 873, 881-82 (W.D. Tex. 1997); *see also Liggett Group Inc. v. Engle*, 853 So. 2d 434, 453 (Fla. App. 2003). General causation is concerned with whether an agent can cause the type of harm alleged by a

plaintiff, whereas specific causation is concerned with whether a particular exposure was the cause of harm in a specific individual. *McClain*, 401 F.3d at 1239; *Liggett Group Inc.*, 853 So. 2d at 453. Both require admissible, scientifically reliable expert testimony. *In re Norplant Contraceptive Prods. Liab. Litig.*, 215 F. Supp. 2d 795, 830 (E.D. Tex. 2002); *Newton v. Roche Labs., Inc.*, 243 F. Supp. 2d 672, 682 (W.D. Tex. 2002); *Houghton v. Bond*, 680 So. 2d 514, 523 (Fla. App. 1996); *Osceola County Comm'rs v. Hand*, 458 So. 2d 1134, 1135 (Fla. App. 1984).

Courts in the Fifth Circuit require that an expert prove general causation *before* opining that specific causation exists. *Kelley*, 957 F. Supp. at 882 ("In the absence of any evidence regarding general causation, the Court will not permit Dr. Espinoza to testify as to specific causation."). So do most other courts and commentators that have considered the issue. *See, e.g., Hollander v. Sandoz Pharms. Corp.*, 289 F.3d 1193, 1211 (10th Cir. 2002); *Nat'l Bank of Commerce v. Associated Milk Producers, Inc.*, 22 F. Supp. 2d 942, 963 (E.D. Ark. 1998); *Wynacht v. Beckman Instruments, Inc.*, 113 F. Supp. 2d 1205 (E.D. Tenn. 2000); *Cavallo v. Star Enter.*, 892 F. Supp. 756 (E.D. Va. 1995), *aff'd in part, rev'd in part*, 100 F.3d 1150 (4th Cir. 1996); Restatement (Third) of Torts: Liability for Physical Harm § 28 cmt. c (Tentative Draft Nov. 3, 2003) ("[E]vidence of general causation is a prerequisite to proof of specific causation."); Saks *et al.*, Federal Judicial Center, ANNOTATED REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (2d ed. 2004) ("Reference Manual on Scientific Evidence") at 637 (The "majority position" is that experts "must 'rule in' the substance, i.e., show that it is capable of causing the harm under consideration in some people, before they will be permitted to 'rule out' other possible causes of the harm. This is the better rule.").

**B.**    **Expert Causation Testimony Must Be Reliable and Relevant.**

Federal Rule of Evidence 702 allows for the admission of scientific, technical and other expert evidence to "assist the trier of fact to understand the evidence or to determine a fact in

13

issue." Such evidence is admissible only "if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. Congress enacted the current version of Rule 702 in response to the Supreme Court's opinion in *Daubert*, 509 U.S. 579, which held that trial courts cannot admit scientific testimony without first determining that the testimony is both "reliable" and "relevant" to the facts at issue. *Id.* at 589; *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 275 (5th Cir. 1998); *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d 603, 605-06 (E.D. La. 2003) [hereinafter *Propulsid*].

Scientific testimony is reliable only if "the reasoning or methodology underlying the testimony is scientifically valid," meaning that such testimony is "derived by the scientific method" and "supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 592-93. Scientific testimony is relevant only if the expert's "reasoning or methodology properly can be applied to the facts in issue." *Id.* at 593. In other words, relevance requires an appropriate "fit" between the scientific testimony and the specific facts of the case. *Id.* at 591-92; *Propulsid*, 261 F. Supp. 2d at 606. By contrast, scientific testimony is irrelevant when there is "too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). In this motion, Merck challenges both the reliability and relevance of plaintiff's expert testimony.

As the sponsor of scientific evidence, plaintiff has the burden of proving by a preponderance of the evidence that the testimony of her proffered experts is both relevant and reliable. *Moore*, 151 F.3d at 275-76; *Propulsid*, 261 F. Supp. 2d at 615. Moreover, as the "gatekeeper" of technical evidence, the trial court has a special obligation to ensure that any and all expert testimony meets these standards. *Daubert*, 509 U.S. at 596; *Moore*, 151 F.3d at 276;

789232v.1

*Propulsid*, 261 F. Supp. 2d at 605. As such, the court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. In making that assessment, the trial court is not required to "'tak[e] the expert's word for it.'" *McClain*, 401 F.3d at 1244 (*quoting* Fed. R. Evid. 702 advisory committee's note (2000)). "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to the existing data only by the *ipse dixit* of the expert." *Propulsid*, 261 F. Supp. 2d at 616 (*quoting Joiner*, 522 U.S. at 146). Instead, when expert testimony is demonstrated to be speculative and lacking scientific validity, trial courts "are encouraged" to exclude it. *Moore*, 151 F.3d at 279.

The Supreme Court in *Daubert* identified a non-exclusive list of factors for a district court to consider in determining the scientific reliability of expert testimony:

- whether the theory has been tested;

- whether the theory has been subject to peer review and publication;

- the known or potential rate of error;

- whether standards and controls exist and have been maintained with respect to the technique; and

- the general acceptance of the methodology in the scientific community.

509 U.S. at 593-95; *Moore*, 151 F.3d at 275; *Propulsid*, 261 F. Supp. 2d at 605. Whether some or all of these factors apply in a particular case depends on the facts, the expert's particular expertise and the subject of his testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 138 (1999).

After considering the *Daubert* factors, trial courts may consider additional factors when assessing the scientific reliability of expert testimony. *Black v. Food Lion, Inc.*, 171 F.3d 308,

15

312 (5th Cir. 1999).  For example, in pharmaceutical and toxic tort cases, courts in the Fifth

Circuit, including this Court, have identified the following additional factors:

- whether the expert's opinion is based on incomplete or inaccurate dosage or duration data, *Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1114 (5th Cir. 1991);

- whether the expert has identified the specific mechanism by which the drug supposedly causes the alleged disease, *Propulsid*, 261 F. Supp. 2d at 617 (*citing Black*, 102 F.3d at 314);

- whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion, *Moore*, 151 F.3d at 278-79;

- whether the expert has adequately accounted for alternative explanations, *Propulsid*, 261 F. Supp. 2d at 618; *Newton*, 243 F. Supp. 2d at 683-84; and

- whether the expert proposes to testify about matters growing directly out of research he or she has conducted independent of the litigation, *Newton*, 243 F. Supp. 2d at 678.

Applying these standards, courts in the Fifth Circuit routinely exclude purported expert

testimony that ultimately amounts to speculation or conjecture.  *See, e.g., Moore*, 151 F.3d at

279; *Black*, 171 F.3d at 313; *Propulsid*, 261 F. Supp. 2d at 616.  As explained below, plaintiff's

proffered expert testimony amounts to just that -- speculation and conjecture.  It is thus

inadmissible and the Court must exclude it.

### C.    To Establish General and Specific Causation, Plaintiff Must Proffer Scientifically Reliable Epidemiologic Data.

For causation opinions in pharmaceutical and toxic tort cases, there are additional

*substantive* requirements for legal sufficiency.  In such cases, the Fifth Circuit has held that

epidemiologic studies are "[u]ndoubtedly . . . the most useful and conclusive type of evidence"

of causation, even if they are not necessarily required in every case.  *See, e.g., Allen v. Penn.*

*Eng'g Corp.* 102 F.3d 194, 197 (5th Cir. 1996); *Brock v. Merrell Dow Pharms., Inc.*, 874 F.2d

307, 311 (5th Cir. 1989); *see also Chambers v. Exxon Corp.*, 81 F. Supp. 2d 661, 664 (M.D. La.

2000) ("Epidemiological studies are necessary to determine the cause and effect relationship

16

between an agent, in this case exposure to benzene, and a disease, CML."); *Thomas v. Hoffman-La Roche, Inc.*, 731 F. Supp. 224, 227-28 (N.D. Miss. 1989) ("conclusive epidemiological proof [is] essential to the plaintiff's case in a toxic tort pharmaceutical drug setting").

Epidemiologic studies examine the pattern of disease in human populations. Reference Manual on Scientific Evidence at 476. As such, they are critical to determining causation in cases where, as here, there is a high background rate associated with the plaintiff's particular injury (*i.e.*, in the case of Mr. Irvin, sudden cardiac death from atherosclerotic disease). *See, e.g., Alcan Aluminum Corp. v. BASF Corp. d/b/a/ Delaware New Corp.*, 133 F. Supp. 2d 482, 494 n.6 (N.D. Tex. 2001); *In re Breast Implant Litig.*, 11 F. Supp. 2d 1217, 1230 (D. Colo. 1998); *In re Agent Orange Prods. Liab. Litig.*, 611 F. Supp. 1223, 1250 (E.D.N.Y. 1985).

There are two broad categories of epidemiologic studies: randomized clinical studies and observational epidemiologic studies. Reference Manual on Scientific Evidence at 476. As set forth more fully in the Declaration of J. Michael Gaziano, M.D., M.P.H. -- and as plaintiff's own experts admit -- randomized clinical trials are at the top of the hierarchy of data that scientists typically consider when assessing whether a particular dose of a drug is capable of causing a specific injury. (Gaziano Decl. at ¶ 28; Expert Report of Dr. Wayne Ray ("Ray Report"), attached as Ex. 39 to the Wittmann Decl. I at 25 (randomized clinical studies provide "the most reliable estimate of the magnitude of a drug's effect"); Farquhar Report at ¶ 59 (same).) By randomly assigning participants to different treatment groups, these studies can be designed to eliminate bias and reduce confounding factors. (Gaziano Decl. at ¶ 34; *See also* Reference Manual on Scientific Evidence at 476. Moreover, *placebo-controlled* randomized clinical studies are the "gold standard" for determining causal relationships because they allow the researcher to determine whether the observed findings are attributable to the drug of interest as

789232v.1

opposed to the comparator agent. (Gaziano Decl. at ¶¶ 34-35); *See also* Reference Manual on

Scientific Evidence at 476. In determining complex issues like medical causation, scientists

generally must conduct randomized placebo-controlled clinical trials before they can state -- to a

medical and scientific degree of certainty -- that a particular dose of a drug is capable of causing

a specific injury. (Gaziano Decl. at ¶ 34.)

Observational epidemiological studies occupy the next level down on the hierarchy of

scientific evidence. (*Id.* at ¶ 28; Farquhar Report at ¶ 60 (observational studies are "weaker"

than randomized clinical trials in "assigning causality").) Because the study subjects are not

randomized, observational studies generally are hypothesis-generating only and cannot eliminate

the possibility that purported findings reflect confounding differences in the observed groups.

(Gaziano Decl. at ¶¶ 31-33.)

Before a plaintiff can rely on an epidemiological study to satisfy her legal burden of

proof, the study must meet two independent, threshold requirements. First, the study must be

statistically significant, meaning that the confidence interval does not include a value of 1.0 or

below.[8] *Brock*, 874 F.2d at 313, *modified on reh'g*, 884 F.2d 166 (reversing verdict in Bendectin

litigation given plaintiff's failure to present statistically significant epidemiological proof);

*LeBlanc v. Merrell Dow Pharms., Inc.*, 932 F. Supp. 782, 784 (E.D. La. 1996) (granting

summary judgment in Bendectin litigation given absence of "statistically significant

---

[8] Plaintiff's experts agree that, in the absence of statistical significance, one cannot rule out the
possibility that a study's findings are attributable to chance. (Burton Dep. at 140:4-8, 141:9-15
(conceding that statistical significance is needed to determine if study results "are real");
Farquhar Report at ¶ 70 ("Statistically significant results indicate that an association was
probably not due to chance alone."); Trial Testimony of Richard Kronmal in *Humeston*
("Kronmal Tr.") 9/22/05, attached as Ex. 47 to Wittmann Decl. I at 1449:12-15 ("[T]o assess
whether what you observe is a real effect versus one that's due to chance, you need to apply the
tools of statistics and probability."); Baldwin Dep. at 68:22-24 ("And so statistical significance
tries to take into account whether or not the difference – differences seen are great enough to be
considered a valid conclusion.").)

789232v.1

epidemiological studies"); *Chambers*, 81 F. Supp. 2d at 228 (excluding expert's testimony based on absence of "statistically significant . . . epidemiological proof"); *In re Norplant Contraceptive Prods. Liab. Litig.*, 215 F. Supp. 2d at 831 (same).

Second, where, as here, a plaintiff must prove that a drug more likely than not caused his injuries (*see Gooding*, 445 So. 2d at 1018), an epidemiologic study cannot establish causation unless it also shows that the drug more than doubles the relative risk of injury. *See, e.g., Deluca v. Merrell Dow Pharms., Inc.*, 911 F.2d 941, 958-59 (3d Cir. 1990) ("[A] relative risk of '2' means that, on the average, there is a fifty per cent likelihood that a particular case of the disease was caused by the event under investigation and a fifty per cent likelihood that the disease was caused by chance alone."); *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 718-23 (Tex. 1997) (statistically significant epidemiological studies showing doubling of risk required to prove causation); Reference Manual on Scientific Evidence at 529.

Consistent with these principles, an expert's proffered testimony should not be admissible when it is based on epidemiologic data that does not show more than a doubling of the risk. That was the Ninth Circuit's holding following the Supreme Court's remand in *Daubert*:

> For an epidemiological study to show causation under a preponderance standard, "the relative risk of limb reduction defects arising from the epidemiological data . . . will, at a minimum, have to exceed '2'." *DeLuca, 911 F.2d at 958.* That is, the study must show that children whose mothers took Bendectin are more than twice as likely to develop limb reduction birth defects as children whose mothers did not. While plaintiffs' epidemiologists make vague assertions that there is a statistically significant relationship between Bendectin and birth defects, none states that the relative risk is greater than two. These studies thus would not be helpful, and indeed would only serve to confuse the jury, if offered to prove rather than refute causation. A relative risk of less than two may suggest teratogenicity, but it actually tends to *dis*prove legal causation as it shows that Bendectin does not double the likelihood of birth defects.

19

*Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1321 (9th Cir. 1995) (footnotes omitted).

The Eleventh Circuit came to a similar conclusion in *Allison v. McGhan Medical Corp.*, 184

F.3d 1300 (11th Cir. 1999), when it excluded expert testimony based in part on an

epidemiological study that showed a relative risk of only 1.24:

> The threshold for concluding that an agent more likely than not caused a
> disease is 2.0. A relative risk of 1.0 means that the agent has no causative
> effect on incidence. A relative risk of 2.0 thus implies a 50% likelihood that
> the agent caused the disease. Risks greater than 2.0 permit an inference that the
> plaintiff's disease was more likely than not caused by the agent. . . . [W]e do
> not think the district court abused its discretion in finding a 1.24 risk minimal
> in terms of causation. Moreover, showing *association* is far removed from
> proving *causation.*

*Id.* at 1315 & n.16. At least one court in the Fifth Circuit also has excluded expert testimony

where there was no epidemiological proof that exposure to an agent more than doubled the risk

of injury. *Chambers*, 81 F. Supp. 2d at 665 ("'What is significant in this case is that the

substantial body of epidemiological evidence demonstrates that [exposure to benzene] [does] not

double the risk of [CML].'") (quoting *In re Breast Implant Litig.*, 11 F. Supp. 2d at 1228

(holding that expert testimony under *Daubert* must demonstrate that exposure to breast implants

more than doubles risk of injury)).

There is good reason to require that epidemiologic studies be statistically significant and

show more than a doubling of the risk before an expert is allowed to offer causation opinions

based on such studies. First, this approach is consistent with Rule 702 of the Federal Rules of

Evidence, which requires that a plaintiff's proffered scientific evidence must "assist the trier of

fact to . . . determine a fact in issue." Where, as here, the pertinent inquiry is whether a

defendant's product more likely than not caused a plaintiff's injury, expert witnesses would tend

to confuse, rather than help, juries if they were permitted to testify that an epidemiologic study

shows a statistically significant causal relationship even though the relative risk is less than two.

789232v.1

*Daubert*, 43 F.3d at 1320; *see generally Cano v. Everest Minerals Corp.*, 362 F. Supp. 2d 814,

(W.D. Tex. 2005) (expert testimony "that will not assist the trier of fact by advancing an element

of the plaintiff's case should be excluded"); *Eason v. Velsicol Chem. Corp.*, No. 89-188, 1991

WL 220955, at *2 (E.D. La. Oct. 23, 1991) ("Since Dr. Miller was unable to state in his

deposition that plaintiffs had a greater than 50% chance of contracting cancer, his testimony will

not assist the trier of fact . . .") (internal quotations and citation omitted).

Second, in cases such as this one that involve complicated issues of medical causation, it

is especially important that a court scrutinize an expert's proffered testimony given the large

number of potential causal factors that are unrelated to the defendant's conduct.

> Determining the cause of human disease in cases such as *Daubert* and *Havner*
> is particularly difficult. The interaction between the human body and various
> environmental factors is incredibly complex, and there are a large number of
> possible causes the effects of which may be extremely difficult to isolate and
> validate, not to mention limitations due to ethical concerns prohibiting direct
> experimentation in some instances. The resulting uncertainty encourages the
> assertion of myriad causal factors based on little more than an expert's
> subjective opinion, requiring the court's most diligent exercise of its
> gatekeeping function.

*Alcan*, 133 F. Supp. 2d at 494 n.6.

Finally, regardless of whether the purported findings of an epidemiological study are

statistically significant and show more than a doubling of the risk, *no* study is admissible under

any circumstance in the absence of *additional* reliable scientific evidence supporting the causal

inference to be drawn from it. *See, e.g., Kelley*, 957 F. Supp. at 878-79 (plaintiff's expert could

not reasonably rely on statistically significant epidemiological study given presence of

"confounding factors"); *Havner*, 953 S.W.2d at 718 ("[E]pidemiological studies only show

association. There may in fact be no causal relationship even if the relative risk is high"). Other

criteria must be considered, including the study design, the possibility of confounding factors,

789232v.1

the presence of bias, the strength of association, whether the study's results have been replicated, and the plausibility of the causal inference. *Kelley*, 957 F. Supp. at 878-89; *Havner*, 953 S.W.3d at 718-19; Reference Manual on Scientific Evidence at 495-514. And of course, a party may not establish the requisite causal inference with expert evidence that fails to pass the *Daubert* reliability criteria. *See, e.g., Daubert v. Merrell Dow Pharms.*, 951 F.2d 1128, 1130-31 (9th Cir. 1991), *overruled on other grounds by* 509 U.S. 579 (1993) ("[T]he reanalysis of epidemiological studies is generally accepted by the scientific community only when it is subjected to verification and scrutiny by others in the field. Plaintiffs' reanalyses do not comply with this standard; they were unpublished, not subjected to the normal peer review process and generated solely for use in litigation.") (citation omitted).

## III.   ARGUMENT.

Plaintiff's causation experts propose several shifting theories for how Mr. Irvin's short-term use of Vioxx supposedly could have caused his sudden cardiac death. According to their principal theory, Vioxx may have led to an imbalance in prostacyclin and thromboxane in Mr. Irvin's vasculature, thereby contributing to the formation of a thrombus that, in turn, triggered his sudden cardiac death. (*See, e.g.*, Expert Report of Dr. Thomas Baldwin ("Baldwin Report"), attached as Ex. 30 to Wittmann Decl. I at ¶ 4.) Plaintiff's experts also propose a grab-bag of alternative theories. For example, Drs. Burton and Lucchesi hypothesize that Vioxx may have caused a vasospasm – *i.e.*, a contraction of a coronary artery – which, when combined with Vioxx's alleged prothrombotic effect, triggered the thrombus that precipitated Mr. Irvin's death. (*See, e.g.*, Burton Dep. at 123:22-124:19, 239:11-240:11.) For his part, Dr. Gandy hypothesizes that Vioxx may have caused an atherosclerotic plaque in Mr. Irvin's left anterior descending coronary artery to rupture, thereby leading to the thrombus. (*See, e.g.*, Deposition of Dr. Winston Gandy ("Gandy Dep."), attached as Ex. 7 to Wittmann Decl. I at 229:8-10.) Finally,

22

Drs. Ray and Lucchesi theorize that Vioxx may have increased the rate of Mr. Irvin's atherosclerotic disease, thereby creating a favorable environment for the clotting event to occur. (*See, e.g.*, Ray Report at 11.)   Plaintiff's experts also postulate multiple, interchangeable scenarios whereby Vioxx may have caused Mr. Irvin's sudden death through a "cascade of events" involving one or more of these hypothesized mechanisms, even if Vioxx did not precipitate each mechanism. (*See, e.g.*, Baldwin Dep. at 129:13-131:13; Gandy Dep. at 168:22-169:24.)

The fact that plaintiff's experts propose alternative and competing theories of causation only underscores that their theories have no reliable scientific basis and that they cannot opine to the requisite reasonable degree of medical *certainty* that Vioxx caused or contributed to Mr. Irvin's death.  Regardless of which theory they pursue, plaintiff's experts cannot establish either general or specific causation.  Accordingly, the causation opinions of plaintiff's expert witnesses are inadmissible under *Daubert* and Rule 702 of the Federal Rules of Evidence, and the Court must exclude them.

### A.   Plaintiff's Experts Cannot Establish General Causation Under Any Theory.

As explained above, to establish general causation, plaintiff must produce substantial and scientifically reliable evidence proving that the use of Vioxx at the 25 mg dose for a period of less than one month is capable of causing thrombotic cardiovascular events.  Plaintiff cannot satisfy this threshold burden for two reasons, however.  First, there is no scientifically reliable evidence that Mr. Irvin's short-term use of Vioxx can have such an effect.  Second, plaintiff's experts cannot identify to a reasonable degree of medical certainty the specific mechanism by which Vioxx supposedly is capable of causing a sudden cardiac death.

789232v.1

1.      **The use of 25 mg Vioxx for less than one month is not associated with an increased risk of thrombotic cardiovascular events.**

In pharmaceutical cases, the dose and duration at which a plaintiff is exposed to a drug are among the most critical facts in any causal analysis.  As explained above, Mr. Irvin used a common therapeutic dosage of Vioxx (25 mg) for a period of less than one month.  There is no scientifically reliable evidence that the use of Vioxx at this dosage and duration is capable of causing thrombotic cardiovascular events.  Accordingly, the general causation opinions of plaintiff's experts are scientifically unreliable and irrelevant.  Pursuant to its gate-keeping function, the Court should exclude them.

a.      **The dose-response relationship is critical in pharmaceutical cases.**

The dose-response relationship – *i.e.*, the relationship between the effect of a drug and the dose and duration at which it is ingested – is "the hallmark of basic toxicology." *McClain*, 401 F.3d at 1242 (internal citations omitted) (excluding expert's opinion based in part on failure to provide dose-response evidence).  Indeed, "[d]ose is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect." *Id.* (internal citations omitted).  This is especially true in cases where, as here, the plaintiff claims injury from ingestion of a drug at a low dosage over a brief period of time.  The court in *McClain* explained these "essential principals of toxicology" as follows:

> Often low dose exposures—even for many years—will have no consequence at all, since the body is often able to completely detoxify low doses before they do any damage.  Furthermore, for most types of dose response relationships following chronic (repeated) exposure, thresholds exist, such that there is some dose below which even repeated, long-term exposure would not cause an effect in any individual.

*Id.* at 1242-43 (internal citations omitted).  Given the importance of the dose-response relationship, it is "not enough for a plaintiff to show that a certain chemical agent sometimes

789232v.1

causes the kind of harm that he or she is complaining of." *Wright v. Willamette Indus., Inc.*, 91 F.3d 1105, 1107 (8th Cir. 1996). Instead, plaintiffs in pharmaceutical and toxic tort cases must present *evidence* that they were "exposed to levels of that agent that are known to cause the kind of harm" that they allegedly suffered. *Id.*

The Fifth Circuit repeatedly has reaffirmed the need to scrutinize the dose-response relationship in pharmaceutical and toxic tort cases, both when assessing the admissibility of expert testimony under *Daubert* and the Federal Rules of Evidence and when assessing the legal sufficiency of causation evidence in general. *Allen*, 102 F.3d at 199 ("Scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiff's burden in a toxic tort case."); *Moore*, 151 F.3d at 278 (excluding opinion of expert who "offered no scientific support for his general theory that exposure to Toluene solution at any level could cause RADS" and who "had no support for the theory that the level of chemicals to which Moore was exposed caused RADS"); *Christophersen*, 939 F.2d at 1114; *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987); *Thompson v. S. Pac. Transp. Co.*, 809 F.2d 1167, 1169 (5th Cir. 1987); *Gulf S. Insulation v. U.S. Consumer Prod. Safety Comm'n*, 701 F.2d 1137, 1146 (5th Cir. 1983).

Other federal and state courts also have confirmed the importance of the dose-response relationship in cases such as this one. *See, e.g., Downs v. Perstorp Components, Inc.*, 26 Fed. Appx. 472, 476 (6th Cir. 2002) ("Another significant flaw in Dr. Kilburn's method was the fact that he made no attempt either to determine the dose to which Downs was exposed or to identify independently what dose of Rubiflex . . . is necessary to cause the conditions that he observed in Downs."); *Gen. Elec. Co.*, 3 F.3d 329, 333 (9th Cir. 1993); *Abuan v. Edwards v. Safety-Kleen*