*Corp.*, 61 F. Supp. 2d 1354, 1359 (S.D. Fla. 1999); *Cerna v. S. Fla. Bioavailability Clinic*, 815 So. 2d 652, 654 (Fla. App. 2002).

Even the plaintiff's own experts agree that the dose at which a drug is ingested is important when evaluating the drug's alleged health effects. (Ray Report at 24 (conceding there is some evidence that the risk associated with Vioxx "increases with increasing dose" and noting that epidemiological studies show "a strong suggestion of a dose response relationship"); Trial Testimony of Dr. Benedict Lucchesi in *Ernst* ("Lucchesi Tr.") 8/2/05, attached as Ex. 46 to Wittmann Decl. I at 118:2-5 ("Q:  So the dose of a drug can make a difference with respect to its health effect.  Is that what you're telling us?  A:  Yes.").)

In short, plaintiff cannot establish general causation simply by proving that exposure to Vioxx at *some* dosage and duration may cause *some* adverse health effects.  Instead, she must offer scientifically reliable evidence that the use of 25 mg Vioxx for a period of less than one month is capable of causing thrombotic cardiovascular events – *i.e.*, the type of event that caused Mr. Irvin's death.  This plaintiff cannot do.

   b.   **The best available science shows that Mr. Irvin's short-term use of Vioxx does not cause thrombotic cardiovascular events.**

As explained in Merck's concurrently filed Science Brief, the clinical data available at the time of Mr. Irvin's death and today do not show any increased risk of adverse cardiovascular events for Vioxx taken at the 25 mg dose for a period of less than one month.  Before seeking FDA approval of Vioxx, Merck conducted over 55 clinical studies involving over 8,000 patients exposed either to Vioxx or to placebo or traditional NSAIDs for periods up to 86 weeks.  Notably, these comparisons revealed *no* statistically significant difference in the rate of adverse cardiovascular events.  (Science Brief at 4; Braunstein Decl. at ¶¶ 36.)  Moreover, after receiving FDA approval of Vioxx, Merck scientists conducted multiple pooled analyses of cardiovascular

789232v.1

data from over two dozen randomized clinical trials of Vioxx that had lasted longer than four weeks and that involved tens of thousands of patients and patient years.  Significantly, these pooled analyses revealed *no* statistically significant increased risk of cardiovascular adverse events for patients taking Vioxx, as compared to placebo or non-naproxen NSAIDs.  (Science Brief at 10-11, 13-14; Gaziano Decl. at ¶¶ 79-84, 87.)  The analyses revealed a relative increase in adverse cardiovascular events only in comparison to naproxen, and the data from the VIGOR study – a study comparing naproxen against Vioxx at the 50 mg dose, which is double the dose at issue in this case – accounted for this difference.[9]  (Science Brief at 10-11, 13-14; Gaziano Decl. at ¶¶ 79-84, 87.)

Against the backdrop of this extensive clinical data comparing Vioxx to placebo, plaintiff's experts rely on various studies which they claim show that use of 25 mg Vioxx for less than one month is capable of causing thrombotic cardiovascular events.  According to various of the plaintiff's experts, these studies include the VIGOR study, the APPROVe study, the ViP study, the VICTOR study, the ADVANTAGE study, the Alzheimer's studies, the Solomon study, the Juni study, the Ray study, the Graham study, the Kimmel study, the Levesque study, the Mamdani study, the Ingenix study, the Johnson study and the Nussmeier study.  For the Court's convenience, Merck has included in an appendix to this Motion a brief description of each of these studies.  *See* Appendix of Studies Relied on by Plaintiff's Experts (hereinafter the "Appendix of Studies").

As explained in the Appendix of Studies and in the accompanying Declaration of Dr. Gaziano, *none* of the studies relied on by plaintiff's experts supports the theory that Mr. Irvin's

---

[9] As discussed in the Science Brief, these analyses, combined with research and data suggesting that naproxen could have cardioprotective properties analogous to aspirin, led Merck's scientists to conclude that cardioprotective properties of naproxen best explained the VIGOR results.

789232v.1

short-term use of 25 mg Vioxx is capable of causing thrombotic cardiovascular events. (*See,* *e.g.,* Gaziano Decl. at ¶ 110 ("The only consistent interpretation of these data along with the data from the other VIOXX trials is that short-term use of 25 mg of VIOXX does not cause heart attacks or thrombotic cardiovascular events.").)

Consider the VIGOR study, for example. VIGOR involved patients taking Vioxx at the *50 mg dose* – twice the highest recommended dose and twice the dose purportedly ingested by Mr. Irvin – for a period of nine months. (*Id.* at. ¶ 60.) Accordingly, the results of VIGOR are simply inapplicable to this case. Indeed, because "[d]ose is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect," *McClain,* 401 F.3d at 1242, it stands to reason that the results of VIGOR, which involved the use of high-dose Vioxx, cannot and do not provide a generally accepted scientific basis for concluding that the use Vioxx at the *25 mg dose* was capable of causing Mr. Irvin's sudden death. In addition, according to plaintiff's own experts, there was no difference observed in the rate of confirmed thrombotic cardiovascular events between patients taking Vioxx and patients taking naproxen during the first month of use.[10]   (Expert Report of Professor Richard Kronmal ("Kronmal Report"), attached as Ex. 37 to Wittman Decl. I at 6 & Figure 1; Ray Report at 27.) Here, Mr. Irvin took Vioxx for less than one month. Accordingly, the results of VIGOR do not support the proposition that Mr. Irvin's short-term use of 25 mg Vioxx is capable of causing sudden death. Indeed, even plaintiff's own expert concedes this point. (Gandy Dep. at 152:24-153:8.) Moreover, as explained in the Appendix of Studies, because VIGOR compared Vioxx against naproxen rather than placebo, it is not possible to determine if the cardiovascular findings in VIGOR are attributable to Vioxx. (Gaziano Decl. at ¶¶ 62-63, 78.)

---

[10] Rofecoxib FDA Advisory Committee Background Information VERSION 5.1 at page 81 (21-Jan-2005).

Or consider the APPROVe study.  While the results showed an increased risk of adverse cardiovascular events that began *after* 18 months of continuous use of 25 mg Vioxx, the study did *not* detect a statistically significant risk, or even a trend, before the first 18 months of continuous use.  (Science Brief at 15; Gaziano Decl. at ¶¶ 68-69.)  Mr. Irvin did not use Vioxx for anywhere near 18 months; he used it for less than one month.  (*See supra* at 5-6.)  And even plaintiff's own experts concede that, based on a reanalysis of the APPROVe data, Vioxx was *not* associated with an increased incidence of heart attacks or sudden cardiac death during the first month of use.  (Kronmal Report at 20 & Figures 8 & 9; Ray Report at 29.)  Accordingly, whatever relevance the long term results of APPROVe may have in cases involving comparably long term use, those results have no relevance here and cannot establish to a reasonable degree of medical and scientific certainty that Mr. Irvin's much shorter term use of Vioxx was capable of causing a thrombotic cardiovascular event.[11]   *See, e.g., Christophersen*, 939 F.2d at 1114 (upholding exclusion of expert testimony based upon "inaccurate . . . duration data."); *Thompson*, 809 F.2d at 1169 (expert's opinion on dioxin as source of plaintiff's illness had "insufficient factual basis" in part because expert had no knowledge of duration of exposure); *Gulf S. Insulation*, 701 F.2d at 1146 (usefulness of epidemiological studies was diminished based on "failure to consider . . . length of time the workers were exposed to formaldehyde"); *Edwards*, 61 F. Supp. 2d at 1359 (excluding opinion of expert who was not aware of any studies which define the minimum duration of exposure to benzene necessary to be toxic).

As explained in the Appendix of Studies, none of the other clinical trials on which plaintiff's experts variously rely establishes that Mr. Irvin's short-term use of Vioxx is associated

---

[11] In addition, the FDA itself has noted that a single study, even if statistically significant, does not necessarily demonstrate increased risk, particularly where, as here, other studies do not reflect the increased risk. *See* April 6, 2005 FDA Decision Memo at 10.

with an increased risk of thrombotic cardiovascular events.  Plaintiff's experts try to discount

such clinical trial data by suggesting that the data are insufficiently powered to detect a short-

term risk.  (*See, e.g.*, Farquhar Report at ¶ 79.)  But this argument misplaced.  (Gaziano Decl. at

¶ 103.)  More importantly, it does not constitute *evidence* that the short-term use of 25 mg Vioxx

in fact *is* associated with an increased risk.  *Brumley v. Pfizer, Inc.*, 200 F.R.D. 596, 602 (S.D.

Tex. 2001) ("Dr. Polukoff may have pointed out an important void in the scientific literature, but

the lack of proof of a drug's safety does not prove it is dangerous.").  Nor is it appropriate merely

to *assume* without any factual support, as plaintiff's expert does, that an increased risk seen at a

study's conclusion necessarily applies throughout all periods of the study.  (Farquhar Report at ¶

79; Deposition of Dr. John Farquhar ("Farquhar Dep."), attached as Ex. 6 to Wittmann Decl. I at

194:14-196:24.)  Such an approach amounts to nothing more than extrapolating from what is

known to what is unknown, and it is scientifically unreliable under *Daubert*.  *Moore*, 151 F.3d at

279 (improper to "leap[] from an accepted scientific premise to an unsupported one"); *Claar v.

Burlington N.N.R.*, 29 F.3d 499, 502-03 (9th Cir. 1994) ("Coming to a firm conclusion first and

then doing research to support it is the very antithesis of [the scientific] method."); *Propulsid*,

261 F. Supp. 2d at 616 ("Sound scientific method does not support an extrapolation from one

substance to another without some *showing* of identity or at least close similarity." (emphasis

added)).

        In the absence of any supporting clinical trial data, plaintiff's experts point to a grab-bag

of observational studies.  As explained in the Appendix of Studies and the Affidavit of Dr.

Gaziano, however, *none* of the observational studies upon which plaintiff's experts variously rely

supports the theory that use of 25 mg Vioxx for less than one month is capable of causing

thrombotic cardiovascular events.

Consider, for example, the 2003 study conducted by Dr. D.H. Solomon on which Dr. Farquhar and Professor Ray rely.[12]  This study, which was based on a review of patient records in a Medicare database, does not support plaintiff.  (Gaziano Decl. at ¶¶ 53-54, 58, 104.) Solomon found *no* statistically significant increased risk and *no* doubling of the risk when Vioxx at all doses was compared to non-use of NSAIDs (OR = 1.14, CI = 1.00-1.31).[13]  Nor did he report any statistically significant risk associated with the use of Vioxx at the 25 mg dose when compared to non-use of NSAIDs.  Moreover, Solomon anomalously found that Vioxx "*may* include a period of elevated risk" for cardiovascular events during the first 30 days of use, but not after 90 days, when compared to Celebrex.[14]  According to Dr. Gaziano, however, cutting the data to look at the effects during the first 90 days was arbitrary and any finding from such a small post-hoc subgroup analysis may simply be the result of chance.  (Gaziano Decl. at ¶ 53.) At any rate, this finding conflicts with literally years of randomized *placebo*-controlled clinical data showing no increased risk associated with the short-term use of Vioxx – including data from the APPROVe study and other clinical trials.  (*See* Motion for Order Excluding Evidence of Plaintiff's Experts Regarding Causation at 25-26; Gaziano Decl. at ¶¶ 53-54.)

Beyond these inconsistencies, Solomon's study has many limitations.  (Gaziano Decl. at ¶ 54.)  For example, Solomon himself concedes that there are "important potential limitations" to his study, including "the potential for bias by unmeasured confounders" as well as "residual confounding by factors that were incompletely assessed in this administrative database, such as

---

[12] Daniel Solomon et al., "Relationship between selective cyclooxygenase-2 inhibitors and acute myocardial infarction in older adults," *Circulation* 2004 May; 109:2068-2073.

[13] *Id.* at Table 2.

[14] *Id.* at 2072 ("The findings of our study *suggest* that the first 30 days of use *may* include a period of elevated risk.") (emphasis added).

789232v.1

severity of cardiovascular risk factors."[15]   Indeed, retrospective studies such as this one, which frequently rely on incomplete data that was collected for other purposes, are typically subject to confounding.  (*Id..* at ¶ 32.)   Additionally, Solomon found no decreased risk of acute heart attacks associated with statins, and found decreased risk associated with hormone replacement therapy.  (*Id.* at ¶ 54.)   These results contradict the findings from randomized clinical trials and are further evidence that results from this study are highly confounded.  (*Id.*)   These limitations, combined with the study's other flaws, make it unreasonable for plaintiff's experts to rely on it for their causation opinions.  *See, e.g., Kelly*, 957 F. Supp. at 877.

Plaintiff's experts rely on several other observational studies.  But none of these other studies support their theory either.  For the Court's convenience, the essential findings of these additional studies are presented in the chart:

### Chart of Observational Studies Relied on by Plaintiff's Experts

| STUDIES | DOSAGE | DURATION EVALUATED | RELATIVE RISK | CONFIDENCE INTERVAL | COMPARATOR |
|---|---|---|---|---|---|
| Juni (2004) | 25 mg | Unspecified | 1.37 | 0.52 – 3.61 | Placebo and all NSAID use |
| Ray (2002) | ≤ 25 mg | average use of 12 months | 1.02 | 0.76-1.37 | Non use of NSAIDs |
| Graham (2005) | 25 mg | mean duration of use of 4 months | 1.23 | 0.89 – 1.71 | Remote use of NSAIDs |
| Kimmel (2005) | 25 mg and 50 mg | 3 – 12 months | 1.16 | 0.70-1.93 | Non use of NSAIDs |
| Levesque (2005) | 25 mg | 12 months | 1.24 | 1.02 – 1.43 | Non use of NSAIDs |
| Mamdani (2003) | 25 mg and 50 mg | 6 months | 1.0 | 0.8-1.4 | Non use of NSAIDs |

---

[15] *Id.* at 2069, 2072.

| STUDIES | DOSAGE | DURATION EVALUATED | RELATIVE RISK | CONFIDENCE INTERVAL | COMPARATOR |
|---------|--------|--------------------|---------------|--------------------|------------|
| Ingenix (2004) | 25 mg and 50 mg | first 30 days | 1.51 | 0.98 – 2.34 | Ibuprofen/ Diclofenac |
| Johnsen (2005) | 25 mg and 50 mg | not specified | 1.8 | 1.47-2.21 | Nonusers of nonaspirin NSAIDs |
| Nussmeier (2005) | Bextra + placebo | 10 days | 2.0 | 0.5-8.1 | placebo |
| | Dynastat + Bextra | 10 days | 3.7 | 1.0-13.5 | placebo |

As the chart demonstrates, most of the additional studies upon which plaintiff's experts rely are not statistically significant for the comparisons presented. For this reason alone, such studies are insufficient to support a causation opinion. *LeBlanc*, 932 F. Supp. at 783 & n.3 (study not statistically significant if confidence interval includes 1.0 or below). In addition, none of the studies involving Vioxx show more than a doubling of the risk for the comparisons presented.[16] This fact is significant for two reasons. First, it is generally accepted that small relative risks (*i.e.*, < 2.0) in observational studies may easily arise due to confounding or bias. (Gaziano Decl. at ¶ 57.) Second, as explained above, because plaintiff cannot point to a single observational study that shows more than a statistically significant doubling of the risk associated with use of 25 mg Vioxx during the first 30 days, she cannot prove that Vioxx more likely than not caused Mr. Irvin's death and thus cannot establish her legal burden of proof in this case. *See supra* at 17-20.

Regardless of the foregoing failings, the observational studies relied on by plaintiff's experts are insufficient to support a causation opinion for other reasons. As explained in the

---

[16] The Nussmeier study did not evaluate 25 mg Vioxx; instead, as explained in the Appendix of Studies, it evaluated different dosages of different drugs in a unique patient population from which extrapolations to the general population cannot reliably be made. In any event, the reported findings of the study are not statistically significant and thus are of no moment here.

789232v.1

Appendix of Studies and the Declaration of Dr. Gaziano, the studies suffer from numerous methodological flaws and they are internally inconsistent, inconsistent with each other, and inconsistent with the best clinical data that is available. *See supra* at 25-26; (Gaziano Decl. at ¶¶ 33-35, 49-59, 79-84, 87, 95, 104.) Given these additional failings, plaintiff's experts cannot rely on any of the observational studies for their causation opinions consistent with *Daubert* and the Federal Rules of Evidence.

Finally, what has been said above is consistent with the FDA's recent independent analysis of the available scientific data regarding the risk of adverse cardiovascular events associated with COX-2 selective inhibitors and non-selective NSAIDs. On April 6, 2005, the FDA published a memorandum in which it concluded, based on its analysis of the data, that the short-term use of Vioxx and other NSAIDs does *not* appear to be associated with an increased risk of serious adverse cardiovascular events.[17] Here is what the FDA concluded in its recent memorandum: "*Short-term use of NSAIDs to relieve acute pain, particularly at low doses, does not appear to confer an increased risk of serious adverse CV events . . . .*" (April 6, 2005 FDA Memorandum at 2 (emphasis added).)

In sum, because plaintiff's experts can point to *no* supporting clinical trial data -- which they concede is the "most reliable" proof of causation (*see* Ray Report at 25, Farquhar Report at ¶ 59) -- and because they likewise can point to *no* supporting observational data, they cannot establish causation. In the absence of any reliable evidence that the use of 25 mg Vioxx for less than one month is capable of causing thrombotic cardiovascular events, the causation opinions of

---

[17] The memo, entitled "Analysis and recommendations for Agency action regarding non-steroidal anti-inflammatory drugs and cardiovascular risk," was written by Dr. John Jenkins, the Director of the FDA's office of New Drugs, and Dr. Paul Seligman, the Director of the FDA's Office of Pharmacoepidemiology and Statistical Science (hereinafter the "April 6, 2005 FDA Memorandum"). It represents the culmination of the FDA's analysis of the best available science with respect to NSAIDs.

789232v.1

plaintiff's experts are speculative and scientifically unreliable, and the Court should exclude them now. *See, e.g., Propulsid*, 261 F. Supp. 2d at 615 ("The Court is aware that the future may shed more light on this matter. Medical science may one day determine with sufficient reliability that a causal relationship exists . . . but it is not there yet and may never be. A trial court must function in the present assessing evidence that presently exists.") (citation omitted); *Brock*, 874 F.2d at 315 ("speculation unconfirmed by epidemiological proof cannot be the basis for causation in a court of law"); *Moore*, 151 F.3d at 276; *Cano*, 362 F. Supp. 2d at 858. "[T]he courtroom is not the place for scientific guesswork . . . . Law lags science; it does not lead it." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996).

c.    **Plaintiff's experts cannot establish general causation by relying on equivocal, inconsistent and inferior data.**

In the absence of statistically significant and otherwise reliable epidemiological data proving that use of 25 mg Vioxx during the first 30 days is capable of causing thrombotic cardiovascular events, plaintiff's causation experts rely on a grab-bag of animal studies and case reports. All of this so-called "evidence," however, is either seriously flawed or inconclusive. And all of it falls below randomized clinical trials on the hierarchy of evidence that scientists typically consider when assessing general causation. (Gaziano Decl. at ¶¶ 26, 30.)

(i)    **Animal data is not reliable evidence of causation.**

Consider, for example, Dr. Lucchesi's reliance on animal data. As explained in the Affidavit of Dr. Gaziano, animal studies are generally viewed as an insufficient basis for inferring causation in humans – particularly where, as here, such studies are inconsistent with data from clinical studies. (Gaziano Decl. at ¶ 26.) Moreover, one of the animal studies conducted by Dr. Lucchesi involved the use of drugs *other than* Vioxx. (Lucchesi Tr. at 40:19-23.) It stands to reason that animal studies involving drugs other than Vioxx are not reliable

bases for opinions concerning whether Vioxx supposedly has a thrombotic effect in humans. *See, e.g., Joiner*, 522 U.S. at 145-46 (where issue was whether PCBs caused lung cancer, rejecting studies finding increases in lung cancer deaths associated with exposure to particular type of mineral oil and not mentioning PCBs); *McClain*, 401 F.3d at 1246 (excluding expert's opinion that ephedrine causes vasospasms based on analogy to different drug and noting that "even small differences in chemical structure can sometimes make very large differences in the type of toxic response that is produced").

Nor can Dr. Lucchesi derive any more support from his unpublished animal data involving Vioxx.  (Deposition of Dr. Benedict Lucchesi 8/26/03 ("Lucchesi 8/26/03 Dep."), attached as Ex. 15 to Wittmann Decl. I at 41:9-13.)  In fact, when confronted with questions of toxicity, the Fifth Circuit has held that animal studies have "very limited usefulness." *Brock*, 874 F.2d at 313 (rejecting animal studies given high doses involved and difficulty extrapolating results to humans); *Allen*, 102 F.3d at 195, 197-98 & n.5 (excluding expert opinion based in part on "inconclusive" and "unreliable" animal studies); *Gulf S. Insulation*, 701 F.2d at 1146. Moreover, the fact that his animal data has been neither published nor peer reviewed weighs against it as well.  After all, whether data has been published and peer-reviewed is an important factor that trial courts should consider in determining the data's scientific reliability. *Black*, 171 F.3d at 313; *Propulsid*, 261 F. Supp. 2d at 605.  Dr. Lucchesi himself concedes that he does not want to disclose his unpublished data because he "think[s] the data should be peer reviewed before it's dispensed and considered valid. . . . Because that's the way science works." (Lucchesi 8/26/03 Dep. at 41:17-42:10.)

### (ii)     Case reports are not reliable evidence of causation.

Similarly, Dr. Lucchesi's reliance on a case report written by Dr. Leslie Crofford, involving four patients with connective tissue disease who were taking the drug Celebrex, cannot

36

be considered reliable evidence of causation.[18]   Expert Report of Dr. Benedict Lucchesi

("Lucchesi Report"), attached as Ex. 39 to Wittmann Decl. I at 39.)   To begin with, studies

involving different drugs, including Celebrex, cannot prove that Vioxx causes adverse health

effects.  *Joiner*, 522 U.S. at 145-46; *McClain*, 401 F.3d at 1246.  In addition, case reports are not

evidence of causation.  They describe a single individual or a series of individuals who have

coincident exposure and diseases.   Although they can be useful in generating testable

hypotheses, case reports cannot establish a cause and effect relationship.  (Gaziano Decl. at ¶

30.)  This is because case reports do not – and cannot – control for the role of chance, bias or

confounding.  (*Id.*)

Accordingly, in case after case, courts routinely reject anecdotal evidence like case

reports as proof of general causation.  *See, e.g., Black*, 171 F.3d at 312 & n.2 (reasoning that

"case series or case reports" are "insufficient to establish causal relationships"); *McClain*, 401

F.3d at 1250, 1254 ("Uncontrolled anecdotal information offers one of the least reliable sources

to justify opinions about both general and individual causation. . . . Simply stated, case reports

raise questions; they do not answer them."); *Newton*, 243 F. Supp. 2d at 679-80 (reliance on case

reports rendered expert's opinion "well below" the "standards of scientific validity"); *Castellow

v. Chevron USA*, 97 F. Supp. 2d 780, 787 (S.D. Tex. 2000); *Glastetter v. Novartis Pharms.

Corp.*, 252 F.3d 986, 989-90 (8th Cir. 2001); *Haggerty v. UpJohn Co.*, 950 F. Supp. 1160, 1165-

66 (S.D. Fla. 1996); *Casey v. Ohio Med. Prods., Inc.*, 877 F. Supp. 1380, 1385 (N.D. Cal. 1995).

Indeed, Dr. Crofford herself agrees that her case report -- which also did not involve Vioxx --

does not and cannot establish causation:   "[a] causal relationship between the initiation of

---

[18]  Leslie Crofford et al., "Thrombosis in patients with connective tissue diseases treated with
specific cyclooxygenase 2 inhibitors. A report of four cases," *Arthritis Rheum.* 2000, 43:1891-6,
attached as Exhibit 19 to the Notice of Filing, filed concurrently herewith.

789232v.1

treatment with a specific COX-2 inhibitor and these thrombotic events ***cannot be established*** on the basis of the available evidence . . . ."[19]

### (iii)     In vitro studies are not reliable evidence of causation.

Likewise, while *in vitro* studies can generate hypotheses for future research, they are insufficient evidence for purposes of proving general causation.  (Gaziano Decl. at ¶ 26.)  As the Fifth Circuit held in *Allen*, *in vitro* studies showing that a drug may have an adverse effect are "the beginning, not the end of the scientific inquiry and prove[] nothing about causation without other scientific evidence."  102 F.3d at 198; *see also Brock*, 874 F.2d at 313-14; *Richardson v. Richardson-Merrell, Inc.*, 857 F.2d 823, 830 (D.C. Cir. 1988).  Extrapolating from *in vitro* experiments to opine on a drug's effects "is not methodologically sound or accepted."  *Cerna v. S. Fla. Bioavailability Clinic, Inc.*, 815 So. 2d 652, 656 (Fla. App. 2002)

### 2.     Plaintiff's experts cannot identify the mechanism by which Vioxx supposedly causes sudden cardiac death.

As explained above, plaintiff's experts cannot point to any scientifically reliable evidence that supports their theory that use of 25 mg Vioxx for less than one month is capable of causing thrombotic cardiovascular events.  Accordingly, plaintiff cannot establish general causation.  But even if the Court were to allow plaintiff's experts to base their opinions on scientifically unreliable evidence, plaintiff cannot establish general causation for an additional, independent reason.  Specifically, plaintiff cannot identify to a reasonable degree of medical certainty the mechanism by which the short-term use of Vioxx supposedly is capable of causing sudden cardiac death.

To establish causation in a pharmaceutical case, the trial court's "task" is to determine whether the expert's opinion "tied" the defendant's product "by some specific train of medical

---

[19] *Id.* (emphasis added).

evidence" to the alleged injury.  *Black*, 171 F.3d at 314.  To accomplish this task, an expert must

offer a "reliable explanation of the physiological process by which [the agent] causes [the alleged

harm]."  *McClain*, 401 F.3d at 1253.  The Fifth Circuit explained this requirement as follows:

> *The underlying predicates of any cause-and-effect medical testimony are*
> *that medical science understands the physiological process by which a*
> *particular disease or syndrome develops and knows what factors cause the*
> *process to occur.  Based on such predicate knowledge, it may then be*
> *possible to fasten legal liability for a person's disease or injury.*

*Black*, 171 F.3d at 314 (emphasis added).

Based on the Fifth Circuit's reasoning in *Black*, an expert's mere assertion that he or she

"knows" that Vioxx can cause sudden death is scientifically unreliable in the absence of an

"explanation of why or how it happen[ed]."  *Propulsid*, 261 F. Supp. 2d at 616.  Indeed, without

a reliable explanation of the specific mechanism by which Vioxx supposedly causes sudden

cardiac death, plaintiff's experts cannot conclude to any degree of medical certainty that Vioxx

has this effect.  As this Court explained:

> *In this case, at best, Drs. Shell and Eckberg have discovered an agent, but*
> *not a cause.  They fail to identify the exact mechanism by which a person's*
> *QT interval can become permanently prolonged well after that person has*
> *ceased taking Propulsid. . . . They have theories but they have no proof to*
> *support those theories. . . . Under the prevailing logic of Daubert and Black,*
> *their testimony is unreliable.*

*Propulsid*, 261 F. Supp. 2d at 617 (emphasis added); *see also McClain*, 401 F.3d at 1253

(excluding expert testimony where plaintiffs' experts have not "offered a reliable explanation of

the physiological process by which Metabolife causes heart attacks and ischemic strokes, i.e.,

establish general causation").

In this case, plaintiff's experts propose alternative and conflicting theories for how Mr.

Irvin's short-term use of Vioxx supposedly could have, and in this case may have, caused his

death.  First, plaintiff's experts theorize that Vioxx may have led to an imbalance in prostacyclin

and thromboxane in Mr. Irvin's vasculature, thereby triggering the formation of a thrombus that occluded his left anterior descending coronary artery. (*See, e.g.,* Baldwin Report at ¶ 4.) Second, Drs. Burton and Lucchesi hypothesize that Vioxx may have caused a vasospasm – *i.e.*, a contraction of a coronary artery – which in turn triggered the thrombus that precipitated Mr. Irvin's death. (*See, e.g.,* Burton Dep. at 123:22-19, 239:11-240:11.) Third, Dr. Gandy hypothesizes that Vioxx may have caused an atherosclerotic plaque in Mr. Irvin's artery to rupture, thereby leading to the thrombus. (*See, e.g.,* Gandy Dep. at 229:8-10.) Fourth, Drs. Ray and Lucchesi opine that Vioxx can accelerate the rate of atherosclerosis and suggest that this mechanism may have had something to do with Mr. Irvin's death. (*See, e.g.,* Ray Report at 11.) As explained below, however, none of these theories is based on scientifically reliable evidence. Moreover, to the extent that plaintiff's experts contend that one or more of these hypothesized mechanisms, even if not caused by Vioxx, somehow set the stage for a Vioxx-induced clotting event to occur, that theory likewise is speculative. Accordingly, pursuant to *Black* and this Court's decision in *In re Propulsid Products Liability Litigation*, the Court should not allow plaintiff's experts to testify about any of these theories.

a.      **Plaintiff's experts cannot establish the mechanism by which Vioxx supposedly has a thrombotic cardiovascular effect.**

The "thrombus theory" espoused by plaintiff's experts is based on the "FitzGerald hypothesis." As explained in Merck's concurrently filed Science Brief, Dr. FitzGerald hypothesized in an article published in 1999 that *if* COX-2 inhibitors reduced prostacyclin levels in blood vessels – a question his study could neither assess nor determine – then such drugs *might* promote increased clotting and, therefore, increased cardiovascular risks since they do not

40

interfere with the normal production of thromboxane, which is a known vasoconstrictor.[20]  Dr. FitzGerald's hypothesis, however, remains just that – a hypothesis that, while interesting, has not been proven.[21]  (Gaziano Decl. at ¶¶ 42-46, 100-01, 112.)

Dr. Fitzgerald has admitted as much on multiple occasions.  For example, in his 1999 article, Dr. FitzGerald cautioned that "the implications of prostacyclin suppression in vivo are *unclear*."[22]  In a follow-up article published in 2002, Dr. FitzGerald further explained that "[t]he clinical sequela of inhibiting prostacyclin activity in the absence of concomitant inhibition of [thromboxane] *are not currently clear*" and that "for the present, the *perception* of a cardiovascular hazard in humans exceeds the evidential basis for this notion."[23]  Even plaintiff's own experts concede that the FitzGerald hypothesis remains unproven.  For example, Dr. Ray concedes that this hypothesis is not even the most plausible mechanism.  (Deposition of Wayne Ray 7/13/05 ("Ray 7/13/05 Dep."), attached as Ex. 20 to Wittmann Decl. I at 126:5-14.)  Likewise, Dr. Burton concedes that the FitzGerald hypothesis is surrounded by "controversy." (Burton Dep. at 84:2-14.)

Aside from the concessions of Dr. FitzGerald and plaintiff's own experts, there are three basic reasons why the FitzGerald hypothesis is scientifically unreliable for purposes of *Daubert*.

---

[20]  Catella-Lawson et al., "Effects of Specific Inhibition of Cyclooxygenase-2 on Sodium Balance, Hemodynamics, and Vasoactive Eicosanoids," *J. Pharm. and Exp. Therp.* 1999; 289:735–741.

[21]  Dr. FitzGerald's hypothesis was based on his observation that urine of patients treated with Vioxx contained lower levels of a metabolite of prostacyclin than urine of patients on placebo. Significantly, Vioxx is not the first drug that has been shown to reduce the level of a prostacyclin metabolite in urine without decreasing thromboxane.  Tylenol has been shown to have the same effect.  Briggs 2/18/05 Dep. (*New Jersey Coordinated Proceeding*) at 611:5-15.  No one, however, seriously argues that Tylenol is prothrombotic.

[22]  *Id.* at 740 (emphasis added).

[23]  FitzGerald, GA, "Cardiovascular Pharmacology of Nonselective Nonsteroidal Anti-inflammatory Drugs and Coxibs: Clinical Considerations," *Am J Cardiol* 2002;89 (suppl):26D, 32D (emphasis added).

789232v.1

First, there is no evidence that Vioxx supposedly inhibits prostacyclin in the vasculature as opposed to other parts of the body. In fact, Drs. Burton, Gandy and Baldwin were unable to identify *any* studies showing that Vioxx has such an effect. (Burton Dep. at 76:20-77:1 ("Q: Are you aware of any scientific literature which has shown that Vioxx can decrease prostacyclin production in the vascular system? A: Directly in the vascular system? Where they've isolated blood vessels and checked the levels basically? No."); Gandy Dep. at 116:10-18 ("Q: Are you aware of any basic science research that has demonstrated any impact on prostacyclin production in the vascular system because of Vioxx? . . . A: Well – I guess as asked, no."); Baldwin Dep. at 45:16-46:5, 114:8-115:4.) On the other hand, there is evidence from both human and animal studies that the production of prostacyclin in the vasculature is associated with COX-1, not COX-2. (Gaziano Decl. at ¶ 44; Burton Dep. at 81:18-82:3, 84:10-14.) Because Vioxx does not inhibit COX-1, such evidence suggests that Vioxx does not inhibit prostacyclin in the human vasculature as the FitzGerald hypothesis assumes. Moreover, even though COX-2 has been associated with the production of prostacyclin in the human vasculature, it is undisputed that prostacyclin is produced in *other* areas of the body as well. (Burton Dep. at 76:7-10; Gaziano Decl. at ¶ 42.) This fact is significant because, as plaintiff's own expert concedes, there is no reason to expect that a risk of thrombosis in the vasculature would be affected by the inhibition of prostacyclin that is produced *elsewhere* in the body. (*Id.* at 76:7-19.)

Second, the FitzGerald hypothesis assumes that there is a critical balance between prostacyclin and thromboxane that is upset by Vioxx. But plaintiff's experts have *no* evidence of the degree to which Vioxx supposedly upsets that balance. As Dr. Baldwin concedes:

> Q:    And I take it you don't know what degree of prostacyclin inhibition is associated with Vioxx, correct?
>
> A:    I don't, at this juncture.

. . .

> Q:    And you don't know what level of prostacyclin inhibition is
>       allegedly associated with Vioxx, correct?
>
> A:    Correct.

(Baldwin Dep. at 52:16-18, 54:8-10.) Without such evidence, plaintiff's experts cannot opine to

a reasonable degree of medical certainty that Vioxx is capable of having a prothrombotic effect.

*See, e.g., Allen*, 102 F. 3d at 199 ("Scientific knowledge of the harmful level of exposure to a

chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts

necessary to sustain the plaintiff's burden in a toxic tort case."); *Moore*, 151 F.3d at 278;

*Thompson*, 809 F.2d 1167.

And third, plaintiff's experts admittedly have no evidence regarding the level of

prostacyclin inhibition that is necessary to achieve a clinically relevant result. According to Dr.

Burton, there is a threshold level of prostacyclin that is necessary "to give you protection, and

below which . . . you don't have protection." (Burton Dep. at 82:22-83:1.) But plaintiff's

experts admittedly have no idea what that threshold level is. As Dr. Baldwin conceded: "At this

juncture, I don't have specific clinical trial information that would allow me to have an opinion

about a specific percentage change [in prostacyclin] and its impact on outcomes." (Baldwin

Dep. at 52:11-14; *see also id.* at 51:14-52:10, 54:3-7.) Or as Dr. Lucchesi conceded:

> Q:    Doctor, in your view, would a reduction in prostacyclin synthesis
>       via COX-2 inhibitor of 50 or 60 percent be clinically significant?
>
> A:    If you continue to pose the question that way I have to say I can't
>       answer it. It depends upon the site, it depends upon the degree of
>       pathology that exists, and a small reduction could be disastrous or
>       may require a larger reduction. And so the way you're asking the
>       question I cannot give you yes or no.

43

Q:    Have you ever studied the degree to which any reduction in prostacyclin synthesis, small or large, was clinically significant in patients?

A:    Once again, I am not concerned with the degree.  I am concerned with the mechanism and the concept.

(Deposition of Dr. Benedict Lucchesi 10/3/02 ("Lucchesi 10/3/02 Dep."), attached as Ex.16 to Wittmann Decl. at 95:23-96:11.)   Without knowing the level of prostacyclin inhibition that supposedly is necessary to produce a clinical result, plaintiff's experts cannot testify to a reasonable degree of medical certainty that Vioxx is capable of having a pro-thrombotic effect in any case.  *See, e.g., Allen*, 102 F. 3d at 199; *Moore*, 151 F.3d at 278; *Thompson*, 809 F.2d 1167.

Finally, the FDA confirmed as recently as April 2005 that the FitzGerald hypothesis is based on speculative and unproven science.  After noting that COX-2 selective inhibitors were associated with an increased risk of adverse cardiovascular events, the FDA had this to say on the subject of the FitzGerald hypothesis, which it referred to as the "COX-2 hypothesis":

> *It remains unclear, however, that it is the presence of, or the degree of, COX-2 selectivity that accounts for these observations, as some have hypothesized.* As noted above, in various controlled clinical trials, COX-2 selective drugs have been indistinguishable from non-selective NSAIDs (i.e., ibuprofen, diclofenac) in studies of substantial size and duration.  Further, although on theoretical grounds the addition of low-dose aspirin (a COX-1 inhibitor) to a COX-2 selective drug should resolve any increased CV risk caused by COX-2 selectivity, this effect has not in fact been observed in several studies in which such comparisons are possible.  *Taken together, these observations raise serious questions about the so-called "COX-2 hypothesis," which suggests that COX-2 selectivity contributes to increased CV risk.*

(April 6, 2005 FDA Memorandum at 8 (emphasis added).)

### b.    Plaintiff's experts cannot establish the mechanism by which Vioxx supposedly causes vasospasms.

Nor can plaintiff prove her vasospasm theory.  This hypothesized mechanism is entirely speculative.  (Gaziano Decl. at ¶ 113.)  There has never been a single study in humans that has

789232v.1

found an association between Vioxx and vasospasms.[24]  Even plaintiff's own experts concede that there is *no* evidence that Vioxx increases the risk of vasospasm.[25]  (Burton Dep. at 131:13-17, 170:15-20 ("Q:  . . . Would you agree with me, sir, that there's no evidence that Vioxx increases the risk of vasospasm?  A:  That's fair."); Baldwin Dep. at 139:13-20 ("Q:  Now, with respect to vasospasm, you're not aware of any literature, data, study, or clinical trial that demonstrates an increased risk of vasospasm associated with Vioxx, correct?  A:  Correct, clinical study, correct.  Q:  Or -- are you aware of any other study which shows an increased risk of vasospasm?  A:  I'm not aware of one.); Gandy Dep. at 184:13-20, 185:12-16 ("Q:  . . . [A]re you aware of any evidence that has demonstrated that Vioxx increases the risk of vasospasm?  A: No, sir.").)  In fact, Dr. Burton admits that in most cases, science does not know what causes vasospasms.  (Burton Dep. at 184:13-24.)  Given this admitted lack of evidence, the vasospasm opinions of plaintiff's experts are speculative and wholly insufficient to identify "the specific train of medical evidence" that is needed to establish general causation to a reasonable degree of medical certainty.  *See, e.g., Moore,* 151 F.3d at 279; *Black,* 171 F.3d at 313; *Propulsid,* 261 F. Supp. 2d at 616; *Gooding,* 445 So. 2d at 1018.

Finally, to the extent that plaintiff's experts hypothesize that Vioxx can make a vasospasm-induced thrombus worse, they cannot prove that hypothesis.  According to Dr. Burton, tens of thousands of patients die every year from vasospasm-induced thrombi that are

---

[24] Dr. Diane Zwicke, an expert cardiologist who testified on behalf of another Vioxx plaintiff in a case pending in Alabama state court simply dismisses the vasospasm theory altogether and insists that Vioxx does *not* cause vasospasms.  (Deposition of Diane Zwicke ("Zwicke Dep."), attached as Ex. 29 to Whittmann Decl. I at 174:3-4, 175:25-176:2.)

[25] While Dr. Burton testified that Vioxx supposedly causes vasoconstriction as opposed to vasospasms, he likewise conceded that there is no scientific evidence that Vioxx causes vasoconstriction in humans and that this mechanism of action is only "theoretical."  (Burton Dep. at 168:13-20, 176:25-177:12.)  He also conceded that it is impossible to determine if Mr. Irvin experienced vasoconstriction, which is an acute, fleeting event.  (*Id.* at 178:12-15, 216:24-217:11.)

789232v.1

unrelated to Vioxx.  (Burton Dep. at 185:20-186:14.)  Plaintiff's experts, however, have no evidence that Vioxx can contribute substantially (or at all) to the formation of such naturally occurring thrombi.  *Gooding*, 445 So. 2d at 1018.  As explained above, the FitzGerald hypothesis, which *assumes* that Vioxx may be pro-thrombotic, is speculative and scientifically unreliable.  Moreover, plaintiff's experts admittedly do not know the extent to which Vioxx supposedly affects the balance between prostacyclin and thromboxane nor how much of an imbalance between these chemicals is supposedly necessary to cause a clinical event.  In the absence of such evidence, plaintiff's experts cannot establish general causation on their vasospasm theory.

      c.      **Plaintiff's experts cannot establish the mechanism by which Vioxx supposedly causes plaque ruptures.**

Plaintiff also cannot prove her plaque rupture theory.  Dr. Burton refers to this mechanism merely as a "potential" explanation.  (Burton Report at 24.)  Speculative opinions such as Dr. Burton's, however, are insufficient to establish causation and are inadmissible under *Daubert.  See, e.g., Moore*, 151 F.3d at 279; *Black*, 171 F.3d at 313; *Propulsid*, 261 F. Supp. 2d at 616; *Gooding*, 445 So. 2d at 1018.  Dr. Burton's speculative opinion also is without *any* scientific support.  (Gaziano Decl. at ¶ 113.)  There are no published studies establishing that Vioxx is capable of causing coronary plaque ruptures.  Plaintiff's experts do not dispute this fundamental proposition.  Instead, they agree with it.  (Baldwin Dep. 139:7-12 ("Q:  . . . You're not aware of any study, literature, or clinical trial that has demonstrated an increased risk of plaque rupture associated with Vioxx, correct? A:  Correct."); Bloor Dep. at 116:2-9 ("Q:  Okay. So I guess what I'm really getting at is:  Are you aware of any study that shows that Vioxx makes atherosclerotic plaque more vulnerable or more unstable?  A:  I am not aware of any such study being done. Q:  Okay.  So the answer is no?  A:  Yes."); Gandy Dep. at 183:16-18 ("Q:  Are you

789232v.1

aware of any scientific evidence that Vioxx increase the risk of plaque rupture?  A:  I have not seen it.").)  Because expert opinion testimony is admissible *only* if it is based on "sufficient facts or data" (*see* Fed. R. Evid. 702), and because plaintiff's experts concededly have no supporting data, plaintiff cannot establish general causation under her plaque rupture theory.

Finally, plaintiff's experts cannot prove that Vioxx somehow can make a thrombus worse in response to a naturally occurring plaque rupture.  According to Dr. Bloor, the rupture of an atherosclerotic plaque typically leads to the formation of a thrombus.  (Bloor Report at ¶ 28.) Plaintiff, however, have no evidence that Vioxx can substantially contribute to such naturally occurring thrombi, which is what she would need to show in order to meet her legal burden of proof.  *Gooding*, 445 So. 2d at 1018.  As explained above, the FitzGerald hypothesis is speculative, and plaintiff's experts admittedly do not know the extent to which Vioxx supposedly affects the balance between prostacyclin and thromboxane nor how much of an imbalance between these chemicals is supposedly necessary to cause a clinical event.  In the absence of such evidence, plaintiff's experts cannot establish general causation on their plaque rupture theory.

d.     **Plaintiff's experts cannot establish the mechanism by which Vioxx supposedly accelerates atherosclerosis.**

Finally, apart from advancing the theory that Vioxx is capable of accelerating the rate of atherosclerosis, plaintiff has not demonstrated that it is supported by reliable scientific evidence. For example, in his report, Professor Ray relies on the FitzGerald hypothesis as support for this theory.  (Ray Report at 11.)  But as explained above, the FitzGerald hypothesis is entirely speculative and thus scientifically unreliable.  *See supra* at 39-43.  Accordingly, Professor Ray's opinion regarding the purported ability of Vioxx to promote atherosclerosis is similarly unreliable.  In any event, Professor Ray recently conceded that he is not an expert in, and does

47

not have expert opinions regarding, any hypothesized mechanisms by which Vioxx supposedly may increase cardiovascular risk.   (Ray 07/13/05 Dep. at   113:9-114:7, 114:18-115:20.) Accordingly, his purported opinion that Vioxx supposedly can increase the rate of atherosclerosis is plainly inadmissible.

For his part, Dr. Lucchesi admits that the theory that Vioxx can accelerate the rate of atherosclerosis remains unproven.   (Lucchesi Dep. at 305:6-14 ("The theory is that, just theory").)   For this reason alone, the Court should exclude Dr. Lucchesi's opinion on this issue. *Propulsid*, 261 F. Supp. 2d at 616 (excluding expert testimony that amounts to "mere theory"). Moreover, Dr. Lucchesi concedes that this theory has not been tested in a human or animal model.   (*Id.* at 299:11-18, 301:14-21, 305:15-21.)   Instead, he bases his opinion regarding this theory on studies that were performed in test tubes.   (*Id.* at 301:14-302:8; Lucchesi 4/25/05 Dep. at 89:1-12.)   To apply, as Dr. Lucchesi suggests, the results of *in vitro* studies to humans is scientifically improper.   (Gaziano Decl. at ¶ 26.)   That, in fact, is the law, as the Fifth Circuit has held that *in vitro* studies generally provide an improper basis for opining about general causation. As explained by the court in *Allen*, *in vitro* studies showing that a drug may have an adverse effect are "the beginning, not the end of the scientific inquiry and prove[] nothing about causation without other scientific evidence."   102 F.3d at 198; *see also Richardson*, 857 F.2d at 830; *Cerna*, 815 So. 2d at 656.

Finally, plaintiff's other experts are not aware of any science or research that supports this theory.   (*See, e.g.*, Gandy Dep. at 178:11-17.)   Given this dearth of reliable data, Drs. Ray's and Lucchesi's opinions on the supposed association between Vioxx and the progression of atherosclerosis cannot be considered reliable and should not be admitted.

*** 

48

789232v.1

Based on the foregoing, plaintiff's experts have not identified any mechanism by which Mr. Irvin's short-term use of Vioxx supposedly can cause sudden cardiac death. Plaintiff's experts cannot establish general causation premised on a hypothesized mechanism. Accordingly, the Court should exclude their speculative causation opinions. *Black*, 171 F.3d at 314; *McClain*, 401 F.3d at 1253; *Propulsid*, 261 F. Supp.2d at 617. As Judge Posner stated in *Rosen*: "[T]he courtroom is not the place for scientific guesswork, even of the inspired sort. Law lags science; it does not lead it." 78 F.3d at 319.

### B.      Plaintiff's Experts Cannot Establish Specific Causation Under Any Theory.

As explained above, plaintiff's experts cannot establish general causation under any theory. Because proof of general causation is a prerequisite to the admissibility of expert testimony on specific causation (*see supra* at 11-12), the Court can and should exclude any and all testimony from plaintiff's experts that Vioxx somehow caused Mr. Irvin's death. But even assuming that plaintiff's experts somehow could establish general causation, they still cannot establish specific causation for two reasons.

First, plaintiff's experts admittedly cannot opine to a reasonable degree of medical certainty that, in this case, Vioxx in fact caused Mr. Irvin's sudden death by triggering a thrombus, a vasospasm or a plaque rupture or by accelerating his atherosclerotic disease.[26] Nor can they prove that Vioxx substantially contributed to any thrombus that otherwise could have occurred in response to a vasospasm or plaque rupture. Accordingly, with respect to each of these alternative and competing theories, their testimony is purely speculative and is thus

---

[26] Moreover, plaintiff's specific causation experts merely *assume* that Vioxx is cardiotoxic; they have no independent basis for testifying that the use of 25 mg Vioxx for less than one month can cause sudden cardiac death. (*See, e.g.*, Bloor Dep. at 101:15-103:10, 131:20-25; Burton Dep. at 84:15-85:1.) Accordingly, they cannot reliably testify with any degree of medical certainty that Vioxx in fact caused Mr. Irvin's death.

789232v.1

unreliable, irrelevant and inadmissible. Second, plaintiff's experts cannot rule out other possible explanations for Mr. Irvin's sudden death. The failure to rule out other potential causes is a hallmark of scientifically unreliable and irrelevant testimony.

1. **Plaintiff's experts cannot opine to a reasonable degree of medical certainty that Vioxx caused Mr. Irvin's sudden death under any theory.**

As explained above, plaintiff's experts advance alternative and competing theories for how Vioxx supposedly may have caused or contributed to Mr. Irvin's death. They variously hypothesize that Vioxx caused Mr. Irvin's death by triggering a thrombus, a vasospasm or a plaque rupture or by somehow promoting the development of his atherosclerotic disease. The mere fact that plaintiff's experts advance so many inconsistent theories only proves their inability to identify – to a reasonable degree of medical *certainty* – the specific mechanism by which Vioxx supposedly led to Mr. Irvin's death. Moreover, all of "[t]heir theories are based on unproven assumptions and improper scientific methodology" and thus fail the test for admissibility under *Daubert* and the Federal Rules of Evidence. *Propulsid*, 261 F. Supp. 2d at 618.

a. **The thrombus theory is scientifically unreliable.**

Consider, for example, plaintiff's thrombus theory. Plaintiff's experts admittedly cannot prove that Mr. Irvin's short-term use of Vioxx in fact caused the thrombus that was found at autopsy in his left anterior descending coronary artery. In fact, they uniformly agree that a thrombus supposedly caused by Vioxx would be indistinguishable from one caused through other means. (Bloor Dep. at 115:11-18 ("I'm not aware of that studies have been done to show that certain types of thrombi are related to Vioxx . . . ."); Baldwin Dep. at 142:9-18 ("Q: Well, if I understand, you would agree, sir, there's no signature blood clot associated with Vioxx, correct? A: I think that's probably correct."); Burton Dep. at 244:6-14 ("There will not be a

signature lesion"); Burton Report at 25 ("There is no 'marker' for individuals who die as a consequence of having taken Vioxx . . . .").)  In another case, Dr. Burton admitted that it is not possible to identify Vioxx as the causative agent. (Deposition of Dr. Joseph Burton in *Rogers* ("Burton *Rogers* Dep."), attached as Ex. 5 to Wittmann Decl. I at 97:6-11 ("If there were a million cases like this, let's say there are a million cases and you did a million autopsies on the people who died of sudden cardiac deaths, *in no single case ever will there be a footprint that says Vioxx did this*.") (emphasis added).)

Moreover, the FitzGerald hypothesis, upon which plaintiff's experts rely for their "thrombus theory," *assumes* that Vioxx leads to an imbalance in prostacyclin and thromboxane in the vasculature.  As explained earlier, this assumption is important because prostacyclin is produced elsewhere in the body and because there is no reliable science establishing that Vioxx inhibits its production in the vasculature as opposed to somewhere else.  Even if the Court were to credit this assumption as scientifically reliable – and there is no basis on which to do so – plaintiff still cannot establish specific causation.  After all, Dr. Baldwin concedes that thrombi can form even in the *absence* of an imbalance in prostacyclin and thromboxane. (Baldwin Dep. at 128:25-129:12.)  He likewise has "no idea" if an imbalance in prostacyclin and thromboxane triggered the thrombus that lead to Mr. Irvin's death.  (*Id.* at 128:5-129:21.)   In addition, plaintiff's experts admittedly have *no* data regarding the level of imbalance needed to cause a clinically relevant thrombus in the first instance.  (Lucchesi 10/3/02 Dep. at 95:23-96:11; Baldwin Dep. at 51:14-52:14, 52:16-18, 54:3-10.)  The absence of such threshold data precludes a finding of specific causation in this case. *See, e.g., Allen*, 102 F. 3d at 199; *Moore*, 151 F.3d at 278; *Thompson*, 809 F.2d 1167.

789232v.1

Nor do plaintiff's experts have *any* data regarding the relative levels of prostacyclin or thromboxane in Mr. Irvin's vasculature either before or after he began taking Vioxx.  (Burton Dep. at 243:23-244:5 ("I don't know that he has such an imbalance. . . . [T]hat goes without saying."); Baldwin Dep. at 125:25-126:9, 126:4-13 ("I have no measurement of his thromboxane and prostacyclin.").)  Without such evidence, plaintiff's experts cannot opine to a reasonable degree of medical certainty that Vioxx led to an imbalance in these chemicals, thereby causing the thrombus in Mr. Irvin's left anterior descending coronary artery.  *See, e.g., Propulsid*, 261 F. Supp. 2d at 617-18 ("Further, no tests show [plaintiff's] QTc intervals before taking Propulsid. . . . The experts have no baseline on which to rely.  To properly show causation in this case, the experts must demonstrate that Brock did not suffer from a prolonged QT prior to taking Propulsid.").

Under these circumstances, plaintiff's claim boils down to the proposition that Vioxx must have caused Mr. Irvin's thrombus because Mr. Irvin developed a thrombus while taking Vioxx.  But such reasoning is not methodologically sound, as it substitutes tautology and conjecture for proof.

> Expert causation theories based solely on the temporal proximity between an ingested pharmaceutical and the resulting injury are not methodologically sound.  An opinion based on such methodology is akin to a rooster's belief that because dawn breaks shortly after he stands on the weathercock and sounds his morning crow, he, the rooster, causes the sun to rise each day.  What the rooster doesn't know is that temporal proximity alone does not prove causation.

*Cerna*, 815 So. 2d at 655-56.  In short, the assertion by plaintiff's experts that Mr. Irvin's short-term use of Vioxx caused his death by triggering a thrombus is untested and conjectural, and amounts to nothing more than the experts' *ipse dixit*.  The Court can and should exclude such testimony.  *Moore*, 151 F.3d at 275; *Propulsid*, 261 F. Supp. 2d at 605.

b.    **The vasospasm theory is scientifically unreliable.**

Nor can plaintiff prove specific causation under her vasospasm theory.  As an initial matter, plaintiff's experts cannot even agree whether a vasospasm is a likely cause of Mr. Irvin's sudden death.  (*Compare* Burton Dep. at 237:3-14 ("Well, if I had to pick one [cause that precipitated his sudden cardiac death] above all others, it's vasospasm."), *with* Bloor Dep. at 107:1-4 ("Q:  . . . So it's possible, but you're not willing to say it's medically probable that he had a vasospasm?  A:  That's correct.").)  Given this disagreement among her own experts, plaintiff cannot prove to a reasonable degree of medical certainty that Vioxx caused a vasospasm in Mr. Irvin.

More fundamentally, plaintiff's experts have no evidence that Mr. Irvin had a vasospasm in the first instance, let alone that Vioxx caused one.  The autopsy report does not indicate that Mr. Irvin had a vasospasm. (Autopsy Rpt.)  In addition, plaintiff's own experts admit that this theory is speculative.  Dr. Burton admits, for example, that it is impossible to determine from an autopsy whether someone had a vasospasm.  (Burton Dep. at 167:10-22.)  In fact, he concedes that "[t]here's no way to know" if Mr. Irvin had one.  (*Id.* at 167:10-22, 178:8-11, 187:3-8.)  Dr. Bloor also is unable to testify to a reasonable degree of medical certainty that Mr. Irvin had a vasospasm.   (Bloor Dep. at 106:18-107:4.)   Instead, he concedes merely that this was a "possibility":

Q:    Do you believe that Mr. Irvin had, in reasonable medical probability, a vasospasm that caused his thrombus?

A:    *It is possible*, but in that event, it would have to be triggered in some way which could be, you know, through metabolic pathways for which I have no anatomic evidence at this time.

Q:    Okay.  So it's possible, but you're not willing to say it's medically probable that he had a vasospasm?

A:    That's correct.

789232v.1

(*Id.*)  Like Drs. Burton and Bloor, Dr. Gandy does not know "one way or another whether [Mr. Irvin] had vasospasm or not."  (Gandy Dep. at 198:12-14.)  Finally, Dr. Baldwin likewise testified that Mr. Irvin's death "possibly" may have resulted from a vasospasm, although he has "no idea" if this explanation is likely.  (Baldwin Dep. at 129:13-21.)

As with plaintiff's thrombus theory, her vasospasm theory is untested and conjectural. Any expert testimony based on this theory is thus inadmissible under *Daubert* and the Federal Rules of Evidence.  *Moore*, 151 F.3d at 275; *Propulsid*, 261 F. Supp. 2d at 605.

c.     **The plaque rupture theory is scientifically unreliable.**

In addition, plaintiff cannot prove that Vioxx caused Mr. Irvin's coronary plaque to rupture.  As an initial matter, plaintiff's experts cannot even agree whether Mr. Irvin had a ruptured plaque.  (*Compare* Burton Dep. at 180:7-9 ("Q:  Now Mr. Irvin showed signs of a ruptured plaque, correct?  A:  Yes.") *with* Bloor Dep. at 85:19-22 ("Q:  Okay.  Are there -- is -- is there, in your opinion, any rupture of the actual plaque, the thin cap of the plaque?  A:  No, there is not.").)  The basic disagreement between plaintiff's own experts over this basic threshold fact precludes plaintiff from proving to a reasonable degree of medical certainty that Vioxx somehow caused a plaque rupture in this case.

Moreover, while Dr. Burton acknowledges that Mr. Irvin had a plaque rupture, he admittedly cannot testify that Vioxx caused or contributed to it.  (Burton Dep. at 294:19-295:13.) In fact, he concedes that something "besides Vioxx" was responsible for its occurrence.  *Id.* at 220:9-221:22 ("So I don't know what the other factor is, but I'm assuming there's some other factor there.").  According to Dr. Burton, the "most likely" cause of Mr. Irvin's ruptured plaque is a vasospasm or vasoconstriction, conditions that he admits are not even linked to Vioxx by any reliable scientific evidence.  (*Id.* at 131:13-17, 168:13-20, 170:15-20, 176:25-177:11, 215:2-11, 237:3-14.)  In addition, Dr. Burton concedes that Mr. Irvin's plaque had a number of well-

54

established characteristics that predisposed it to rupture, including a lipid-rich core and moderate calcification. (*Id.* at 232:19-233:18.)

Accordingly, plaintiff's plaque rupture theory suffers from the same flaws as her thrombus and vasospasm theories. It is wholly speculative and not supported by the facts. Pursuant to *Daubert*, this Court thus should exclude any expert testimony that Mr. Irvin's short-term use of Vioxx caused a coronary plaque rupture. *Moore*, 151 F.3d at 275; *Propulsid*, 261 F. Supp. 2d at 605.

### d. The atherosclerosis acceleration theory is scientifically unreliable.

Finally, while Dr. Lucchesi and Professor Ray hypothesize that Vioxx may lead to the acceleration of atherosclerotic disease -- a proposition that, as explained above, is scientifically unsupportable – there is no evidence to suggest that *Mr. Irvin's* short-term use of Vioxx caused his death by contributing to the progression of his atherosclerosis. There is no data available as to when Mr. Irvin's atherosclerosis began to form or at what rate it accumulated, either prior to or after he began taking Vioxx. It is axiomatic that with no baseline, it is impossible to judge acceleration, if indeed it occurred, at a single point in time. *Propulsid*, 261 F. Supp. 2d at 617-18 ("The experts' bald assertion that cisapride caused Brock's prolonged QT interval lacks any reliability because the experts themselves cannot show that Brock did not have the condition before taking Propulsid. The experts have no baseline on which to rely. To properly show causation in this case, the experts must demonstrate that Brock did not suffer from a prolonged QT prior to taking Propulsid.").

That said, it is undisputed that Mr. Irvin's atherosclerosis developed over a period of years, and no expert for plaintiff has suggested that his exceedingly brief Vioxx usage contributed in any way to his coronary artery disease. (Baldwin Dep. at 138:15-18 ("Q: . . . Do

789232v.1

you have any reason to opine that Vioxx contributed to the plaque formation of Mr. Irvin? A: I don't."); Bloor Dep. at 77:8-15 (confirming that "Mr. Irvin's atherosclerosis developed over a period of many years"); Burton Dep. at 196:3-20, 234:19-22 ("Q: Would you agree with me that Vioxx did not contribute to the formation of the plaque in Mr. Irvin? A: I would."); Bloor Report at ¶¶ 27, 37 ("Atherosclerosis is a disease process requiring typically decades to develop, typically beginning in childhood. . . . Richard Irvin had *pre-existing* coronary artery disease as evidenced by the moderate to severe stages of atheroma development in his major coronary arteries . . . .") (emphasis added).) For his part, Dr. Lucchesi "suspects" that Vioxx may have contributed to Mr. Irvin's plaque formation, although he concedes that this is only a "possibility" and that he "can't prove [his] point." (Lucchesi Dep. at 285:8-16, 303:22-304:10, 319:1-9.) As explained above, Dr. Lucchesi's "suspicions" do not rise to the level of reasonable medical certainty that is needed to establish specific causation. *Moore*, 151 F.3d at 279; *Gooding*, 445 So. 2d at 1018. It is thus inadmissible and the Court must exclude it.

2.      **Plaintiff's experts cannot rule out other possible causes of Mr. Irvin's death.**

While plaintiff's experts purport to have conducted a differential diagnosis in Mr. Irvin's case, this process, even if done properly, is designed for treatment, not to determine cause. A differential diagnosis allows a doctor to eliminate the possibility that a patient suffers from other potential *conditions*; it does not allow a physician to establish cause.[27] By contrast, a causal analysis focuses on whether there are alternate competing causes *after* a condition has been identified through a differential diagnosis. *In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398,

---

[27] While some courts have conflated the concepts of differential diagnosis and a subsequent causal analysis, the definition of differential diagnosis makes clear the distinction between the two. Steadman's Medical Dictionary (26th ed.), defines differential diagnosis as "the determination of which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a systematic comparison and contrasting of her clinical findings."

789232v.1

435-37 (S.D.N.Y. 2005).    Thus, even assuming that plaintiff's experts conducted proper differential diagnoses, these, while a necessary first step, are by no means sufficient to prove causation.

Both the Fifth Circuit and this Court have confirmed that it is crucial for purposes of *Daubert* that an expert witness rule out possible alternative causes of a plaintiff's injury. *Viterbo*, 826 F.2d at 424 (expert cannot, in the face of multiple "potential" causes, "simply pick[] the cause that is most advantageous to [plaintiff's] claim[s]"); *Moore*, 151 F.3d at 279; *see also Propulsid*, 261 F. Supp. 2d at 618 (excluding experts' opinions because experts "cannot show that Propulsid caused Brock's symptoms, as they have failed to exclude other possible symptoms").

a.    **Plaintiff's experts cannot conduct a reliable causal analysis in the absence of a reasonably complete medical history.**

A "reliable" causal analysis "typically is performed after 'physical examinations, the taking of medical histories, and the review of clinical tests, including laboratory tests." *See, e.g., Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 609 (D.N.J. 2002); *In re Silica Prods. Liab. Litig.*, No. MDL 1553, 2005 WL 1593936, at *21 (S.D. Tex. June 30, 2005) (to rule out alternative causes, "it is vitally important for a physician to take a thorough occupational/exposure history and medical history"); *see also* Gaziano Decl. at ¶ 117.

As explained above, virtually nothing is known about Mr. Irvin's medical history. According to the testimony of family members, Mr. Irvin visited the doctor on just a few occasions during the approximately 30 years prior to his death.  It is not clear that he ever had a physical examination, and if he did the results of any such examination are not known.  While he apparently had a cardiac stress test in 1994, the results of that test are not available.  The only other diagnostic test for Mr. Irvin appears to have been an elevated blood pressure reading taken

in 1998, when he visited the Emergency Room for a finger laceration. And other than the small number of medical documents related to his death, there are essentially no documents setting forth Mr. Irvin's prior medical history. *See supra* at 6-7.

Given this near complete absence of information regarding Mr. Irvin's medical history, plaintiff's experts have no way of reliably ruling out possible alternative causes for his sudden cardiac death. *See, e.g., In re Silica Prods. Liab. Litig.*, 2005 WL 1593936, at *56 (excluding causation opinions of plaintiff's experts because "the medical histories, physical examinations and other tests were either nonexistent or cursory"). (Gaziano Decl. at ¶ 117.) That is particularly true since it is undisputed, based on the autopsy report, that Mr. Irvin had moderate to severe atherosclerosis, a disease that is known to cause heart attacks and sudden death. (Autopsy Rpt.; Bloor Report at ¶¶ 25-28; Farquhar Report at ¶¶ 40-43.) Accordingly, the specific causation opinions of plaintiff's experts are inherently unreliable and inadmissible under *Daubert. In re Silica Prods. Liab. Litig.*, 2005 WL 1593936, at *62 ("As discussed above, the reliance of both doctors on inadequate and unreliable histories renders the entire diagnosis and accompanying testimony inadmissible.").

    b.  **Plaintiff's experts cannot rule out vasospasm as a possible cause of Mr. Irvin's thrombus.**

As explained above, plaintiff bears the burden of ruling out *possible* alternative causes of Mr. Irvin's death. *Viterbo*, 826 F.2d at 424; *Propulsid*, 261 F. Supp. 2d at 618. While plaintiff's experts cannot reliably testify, to a reasonable degree of medical certainty, that Mr. Irvin in fact experienced a vasospasm or that Vioxx caused one, they also cannot rule out the *possibility* that the thrombus in Mr. Irvin's left anterior descending coronary artery resulted from a vasospasm unrelated to Vioxx. *See supra* at 43-44, 51-52. Indeed, both Drs. Burton and Bloor concede that a vasospasm may have triggered Mr. Irvin's thrombus. (Bloor Dep. at 105:14-107:4; Burton

58

789232v.1

Dep. at 129:22-130:1, 165:16-166:23.)  In fact, according to Dr. Burton, tens of thousands of patients die every year from vasospasm-induced thrombi, and in the majority of these cases there is no known cause of the vasospasm.  (Burton Dep. at 185:20-186:14.)  Given the possibility that a vasospasm of unknown etiology caused Mr. Irvin's thrombus, plaintiff's experts cannot reliably testify that Vioxx caused his death.

c.     **Plaintiff's experts cannot rule out Mr. Irvin's coronary artery disease as a likely cause of his sudden death.**

While little is known about Mr. Irvin's prior medical history (and while it cannot be known if Mr. Irvin had a vasospasm), the autopsy in this case *did* reveal that Mr. Irvin had advanced heart disease as evidenced by "moderate to severe" atherosclerosis in multiple coronary arteries.  (Bloor Dep. at 77:4-7; Bloor Report at ¶¶ 36-37; Autopsy Rpt.)  The autopsy findings are significant because they explain why Mr. Irvin's short-term use of Vioxx had nothing to do with his death.

The American Heart Association estimates that 70 million people in the United States suffer from some form of cardiovascular disease.  Gaziano Decl. at ¶ 24.  Cardiovascular disease is the leading cause of death in the United States, accounting for two out of every five deaths, and also is the leading cause of death for Caucasian males in their '50s, like Mr. Irvin.  *Id.*; (Burton Dep. at 159:24-160:1.)  In fact, every minute of every day, someone will die in this country from an adverse cardiac event.  (Gaziano Decl. at ¶ 24.)

According to plaintiff's experts, the most common form of heart disease in Western countries is coronary artery disease secondary to atherosclerosis.  (Bloor Report at ¶ 21; Bloor Dep. at 30:25-31:8.)  In fact, over 90% of all heart disease is caused by atherosclerosis. (Farquhar Report at ¶ 40.)  Moreover, every year, anywhere from 300,000 to 450,000 people die from sudden cardiac death.  (Bloor Report at ¶ 25; Lucchesi 4/25/05 Dep. at 43:8-10.)  Of these

59

789232v.1

individuals, a "significant number" never have had any previous cardiac symptoms. (Lucchesi 4/25/05 Dep. at 43:12-16.)

Mr. Irvin had long-standing cardiovascular disease, evidenced by moderate to severe atherosclerotic plaque in multiple coronary arteries. The microscopic slides from the autopsy reveal that he also had a 60% to 70% occlusion in his left anterior descending coronary artery. (Autopsy Rpt.; Wheeler Decl. at ¶ 2 & Ex. A at 2.) According to plaintiff's experts, the left anterior descending coronary artery is associated with a "high" incidence of sudden cardiac death in the general population and especially in men. (Lucchesi 4/25/05 Dep. at 49:20-50:21; Bloor Dep. at 56:14-25.) Moreover, the degree of occlusion in Mr. Irvin's left anterior descending coronary artery is significant because, as Dr. Farquhar acknowledges, an occlusion of as little as 50% can lead to a sudden loss of essential blood flow to the heart. (Farquhar Report at ¶ 42.) Where, as here, an individual has an occlusion of 60% to 70%, death is not uncommon. Indeed, Dr. Burton concedes that "thousands" of individuals with Mr. Irvin's disease profile likely die every year from sudden cardiac death. (Burton Dep. at 228:25-229:13.) Moreover, plaintiff's experts agree that Mr. Irvin's atherosclerosis was a but-for cause of his sudden cardiac death. (Bloor Report at ¶ 37 ("[A]n acute event occurred near the time of death that resulted in sudden narrowing of an already narrowed vessel lumen. This change would result in significant restriction of blood flow to the myocardium leading to myocardial ischemia and increasing the risk of cardiac arrhythmias."); Burton Report at 22 ("It is my opinion the cause of death of Mr. Richard Irvin was an acute coronary thrombosis occurring in the left anterior descending coronary artery associated with coronary artery atherosclerosis.").)

Because atherosclerosis takes years to develop, plaintiff's experts concede that Mr. Irvin's short-term use of Vioxx was unrelated to his coronary artery disease. (Baldwin Dep. at

789232v.1

138:15-18; Burton Dep. at 196:3-20, 234:19-22; Bloor Dep. at 77:8-15; Bloor Report at ¶¶ 27, 37.)  In fact, Mr. Irvin's atherosclerosis is consistent with the many risk factors that he had for the disease.  According to plaintiff's experts, there are many risk factors for the development of coronary artery disease, including but not limited to obesity, a poor diet high in saturated fat, high cholesterol, a sedentary lifestyle, a lack of cardiovascular exercise and a family history of coronary artery disease.  (Burton Dep. at 191:20-192:4; Bloor Dep. at 38:22-39:20; Baldwin Dep. at 134:6-8; Bloor Report at ¶ 33; Farquhar Report at ¶¶ 51, 53.)  As explained above, it is undisputed that Mr. Irvin suffered from each of these risk factors.  *See supra* at 9-10.  Given the high background rate of sudden cardiac death in individuals with Mr. Irvin's disease profile, there can be no dispute that Mr. Irvin's atherosclerosis and many risk factors presented a serious health risk.  Indeed, plaintiff's own expert, Dr. Farquhar, concedes that Mr. Irvin's risk factors increase the likelihood of developing a thrombus.  (Farquhar Report at ¶ 54 ("Risk factors increase the likelihood of [coronary heart disease] by narrowing the arteries, promoting thrombosis, or both.").)

In addition, after examining the microscopic slides from the autopsy, experts for *both* plaintiff *and* Merck agree that the thrombus in Mr. Irvin's left anterior descending coronary artery was located at the site of a ruptured plaque.  (*Compare* Burton Dep. at 180:7-13 *and* Gandy Dep. at 167:11-15, 200:17-21, *with* Wheeler Decl. at ¶ 2 & Ex. A at 2 *and* Gaziano Decl. at ¶ 7.)  This finding is significant because, according to Dr. Bloor, approximately 70% of acute ischemic events – *i.e.*, sudden decreases or loss of blood flow to a portion of the heart -- are caused by a rupture of atherosclerotic plaque, which then triggers the formation of a thrombus.  (Bloor Report at ¶ 28.)  In other words, in cases such as this, the formation of a thrombus is a natural response to ruptured plaque.  (*Id.* at ¶¶ 29-30.)  Moreover, plaintiff's experts cannot

61

reliably opine that Mr. Irvin's short-term use of Vioxx contributed in any substantial manner to the formation of his naturally occurring thrombus because, as explained above, they have *no* evidence regarding how much of an imbalance in prostacyclin and thromboxane it supposedly would take to cause a clinical event or whether Mr. Irvin had such an imbalance prior to his death. *See supra* at 39-43, 49-51.

In short, plaintiff's experts simply ignore the possibility that Mr. Irvin's long-standing atherosclerosis and ruptured plaque provide more plausible explanations for his sudden cardiac death than his short-term use of Vioxx. Under these circumstances, their causation opinions are speculative and unreliable and fail the test of *Daubert. Moore*, 151 F.3d at 279; *Propulsid*, 261 F. Supp. 2d at 618.

## IV.   CONCLUSION.

For the forgoing reasons, Merck respectfully requests that the Court grant its motion to exclude testimony of plaitniff's experts regarding causation in its entirety.

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
4041 Essen Lane
One United Plaza, Suite 501
Baton Rouge, Louisiana 70809
Phone:  225-490-8900
Fax:     225-490-8960

Defendants' Liaison Counsel

789232v.1

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois 60610
Phone: 312-494-4400
Fax:    312-494-4440

And

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Phone: (202) 434-5000
Fax:    (202) 434-5029

Attorneys for Merck & Co., Inc.

789232v.1

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Memorandum in Support of Merck & Co., Inc.'s Motion to Exclude Evidence of Plaintiff's Experts Regarding Causation has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 21st day of October, 2005.

*Dorothy H. Wimberly*

789232v.1