## Appendix of Studies Relied on by Plaintiff's Experts

As explained in Merck's Motion to Exclude Evidence of Plaintiff's Experts Regarding Causation, plaintiff's experts rely on various studies which they claim show that use of 25 mg Vioxx for less than one month is capable of causing thrombotic cardiovascular events. According to various of the plaintiff's experts, these studies include the VIGOR study, the APPROVe study, the ViP study, the VICTOR study, the ADVANTAGE study, the Alzheimer's studies, the Solomon study, the Juni study, the Ray study, the Graham study, the Kimmel study, the Levesque study, the Mamdani study, the Ingenix study, the Johnson study and the Nussmeier study.

As explained below, **none** of the studies relied on by plaintiff's experts supports the theory that the use of 25 mg Vioxx for less than one month is capable of causing thrombotic cardiovascular events.  (*See, e.g.*, Declaration of J. Michael Gaziano, M.D., M.P.H., in Support of Merck's Motions to Exclude Evidence ("Gaziano Decl.") at ¶ 110 ("The only consistent interpretation of these data along with the data from the other VIOXX trials is that short-term use of 25 mg of VIOXX does not cause heart attacks or thrombotic cardiovascular events.").) Accordingly, plaintiff's experts' reliance on these studies is scientifically inappropriate under *Daubert* and Rule 702 of the Federal Rules of Evidence.

### A.   Plaintiff's Experts Cannot Point to Any Randomized Clinical Studies That Support Their Short-Term Use Theory.

As explained below, none of the randomized clinical studies upon which plaintiff relies prove that the use of 25 mg Vioxx for less than one month causes thrombotic cardiovascular events.

1.   **The VIGOR study.**

For example, plaintiff's experts cannot rely on the results of the VIGOR study[1] to show that the use of 25 mg Vioxx during the first 30 days is associated with an increased risk of thrombotic cardiovascular events. There are several reasons why that is so.

First, VIGOR involved patients taking Vioxx at the *50 mg dose* – twice the highest recommended dose and twice the dose purportedly ingested by Mr. Irvin – for a period of nine months. (Gaziano Decl. at ¶ 60.) Accordingly, the results of VIGOR are simply inapplicable to this case. Indeed, because "[d]ose is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect," *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1242 (11th Cir. 2005), it stands to reason that the results of VIGOR, which involved the use of high-dose Vioxx, cannot and do not provide a generally accepted scientific basis for concluding that the use Vioxx at the *25 mg dose* was capable of causing Mr. Irvin's sudden death. In addition, according to plaintiff's own experts, there was no difference observed in the rate of confirmed thrombotic cardiovascular events between patients taking Vioxx and patients taking naproxen during the first month of use.[2] (Expert Report of Richard Kronmal ("Kronmal Report"), attached as Ex. 37 to the Declaration of Phillip A. Wittmann in Support of Merck's Motions to Exclude Testimony ("Wittmann Decl. I") at 6 & Figure 1; Expert Report of Wayne A. Ray, Ph.D. ("Ray Report"), attached as Ex. 39 to Wittmann Decl. I at 27.) Here, Mr. Irvin took Vioxx for less than one month. Accordingly, the results of VIGOR do not support the proposition that Mr. Irvin's short-term use of 25 mg Vioxx is capable of causing sudden death. Indeed, even plaintiff's own expert concedes this point. (Deposition of Winston H. Gandy, Jr.,

---

[1] Claire Bombardier et al., *Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis*, 343 NEW. ENG. J. MED.1520 (Nov. 30, 2000).

[2] Rofecoxib FDA Advisory Committee Background Information VERSION 5.1 at page 81 (21-Jan-2005).

789233v.1

M.D. ("Gandy Dep."), attached as Ex. 7 to Wittmann Decl. I at 152:24-153:8.)

Second, the VIGOR study involved an elderly population with rheumatoid arthritis, a condition that put the study's patients at a significantly increased risk of death from cardiovascular problems.[3] (Gaziano Decl. at ¶ 75.) Here, Mr. Irvin did not have rheumatoid arthritis. Accordingly, the required "fit" between the results of the VIGOR study and Mr. Irvin's medical history is lacking. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591, 596 (1993).

Third, the VIGOR study did not compare Vioxx against placebo. It is thus impossible to determine based on the results of VIGOR whether the higher rate of thrombotic cardiovascular events seen in the Vioxx arm of the study reflect (1) a cardiovascular risk associated with high-dose Vioxx; (2) a cardio-protective effect associated with naproxen; or (3) the effect of chance, either in whole or in part. Motion Regarding Vioxx Science Issues ("Science Brief") at 9; (Gaziano Decl. at ¶¶ 62-63, 78). In the face of overwhelmingly contrary clinical trial evidence comparing Vioxx to placebo (*see* Motion to Exclude Evidence of Plaintiff's Experts Regarding Causation ("Causation Testimony Brief") at 28-29), plaintiff's experts cannot, consistent with sound scientific practice, rely on the VIGOR results to prove that Vioxx is capable of causing thrombotic cardiovascular events.

### 2. The APPROVe study.

Nor can plaintiff's experts rely on the results of the APPROVe study[4] to show that the use of 25 mg Vioxx during the first 30 days is associated with an increased risk of thrombotic

---

[3] Wolfe, *et al.*, *The Mortality of Rheumatoid Arthritis, Arthritis & Rheumatism* (08/19/93); Myllkangas-Luosujarvi, *et al.*, *Mortality in Rheumatoid Arthritis, Arthritis & Rheumatism* (12/95).

[4] Bresalier RS et al., *Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial*, 352 NEW. ENG. J. MED. 1092 (Mar. 17, 2005).

789233v.1

cardiovascular events.  While the results showed an increased risk of adverse cardiovascular events that began *after* 18 months of continuous use, the study did *not* detect a statistically significant risk, or even a trend, before the first 18 months of continuous use.  Science Brief at 15; (Gaziano Decl. at ¶¶ 68-69).  Mr. Irvin did not use Vioxx for anywhere near 18 months; he used it for less than one month.  *See* Causation Testimony Brief at 5-6.  And even plaintiff's own experts concede that, based on a reanalysis of the APPROVe data, Vioxx was *not* associated with an increased incidence of heart attacks or sudden cardiac death during the first month of use.  (Kronmal Report at 20 & Figures 8 & 9; Ray Report at 29.)

Accordingly, whatever relevance the long term results of APPROVe may have in cases involving comparably long term use, those results have no relevance here and cannot establish to a reasonable degree of medical and scientific certainty that Mr. Irvin's much shorter term use of Vioxx was capable of causing a thrombotic cardiovascular event.[5]  *See, e.g., Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1114 (5th Cir. 1991) ("If the . . . duration of exposure to [substance is] the type[] of information upon which experts reasonably rely when forming opinions on the subject, then the district court was justified in excluding Dr. Miller's opinion that is based upon critically incomplete or grossly inaccurate . . . duration data."); *Thompson v. S. Pac. Transp. Co.*, 809 F.2d 1167, 1169 (5th Cir. 1987) (expert's opinion on dioxin as source of plaintiff's illness had "insufficient factual basis" in part because expert had no knowledge of duration of exposure); *Gulf S. Insulation v. U.S. Consumer Prod. Safety Comm'n*, 701 F.2d 1137, 1146 (5th Cir. 1983) (usefulness of epidemiological studies was diminished based on "failure to consider either the length of time the workers were exposed to formaldehyde"); *Edwards v.*

_____

[5] In addition, the FDA itself has noted that a single study, even if statistically significant, does not necessarily demonstrate increased risk, particularly where, as here, other studies do not reflect the increased risk. *See* April 6, 2005 FDA Memorandum, attached as Ex. 50 to Wittmann Decl. I at 10.

789233v.1

*Safety-Kleen Corp.*, 61 F. Supp. 2d 1354, 1359 (S.D. Fla. 1999) (excluding opinion of expert who was not aware of any studies which define the minimum duration of exposure to benzene necessary to be toxic).

### 3.    The ViP and VICTOR studies.

In addition, plaintiff cannot rely on the ViP or VICTOR studies, which were underway at the time Merck voluntarily withdrew Vioxx from the market in September 2004. The ViP study was designed to analyze the potential benefit of 25 mg Vioxx in reducing the risk of prostate cancer, while the VICTOR study was designed to evaluate whether 25 mg Vioxx might prevent colorectal cancer. Neither study supports plaintiff here.

The ViP study, for example, did not detect any statistically significant differences in the number of thrombotic cardiovascular events, heart attacks and sudden deaths in a population of 4,741 randomly assigned patients receiving 25 mg Vioxx or placebo over an average of between five to 16 months. (Expert Report of Barry K. Rayburn ("Rayburn Report"), attached as Ex. 40 to Wittmann Decl. I at 19; Gaziano Decl. at ¶ 72.) Based on his reanalysis of the ViP data, plaintiff's biostatistician expert, Richard Kronmal,[6] agrees that the number of heart attacks and sudden cardiac deaths in the two patient groups was equal. (Tr. 09/22/05 (trial testimony of R. Kronmal in *Humeston*), attached as Ex. 46 to Wittmann Decl. I at 1593:24-1595:12.) Although not yet published, final results from the ViP study have been presented to the FDA. (Rayburn Report at 19.)

And insofar as the VICTOR study is concerned, only incomplete, interim data are available. (*Id.*; Gaziano Decl. at ¶ 72.) For this reason alone, the VICTOR study cannot provide

---

[6] In connection with the briefing of this Motion, Merck has sought the deposition of Professor Kronmal. Merck reserves its right to file a supplement brief in support of this Motion if and when Professor Kronmal is deposed.

789233v.1

a scientifically reliable basis for an opinion that the short-term use of Vioxx is capable of causing thrombotic cardiovascular events. *See, e.g., Christophersen*, 939 F.2d at 1114 (upholding exclusion of expert opinion that was based on inaccurate and incomplete exposure data). But even the interim data do not support plaintiff. Based on the most recent reporting, there have been 14 confirmed thrombotic cardiovascular events in patients receiving Vioxx versus 5 confirmed thrombotic cardiovascular events in the patients receiving placebo. (Rayburn Report at 19.) This difference in confirmed events is not statistically significant and thus does not support the theory that Vioxx is associated with an increased risk of heart attacks or sudden cardiac death. (Ernst Tr. 8/10/05 (trial testimony of A. Reicin), attached as Ex. 45 to Wittmann Decl. I at 32:2-13; Rayburn Report at 19.) Moreover, the average duration of Vioxx use in those patients who had a heart attack or died suddenly is approximately one year. (*Id.*)

### 4.   The ADVANTAGE study.

The ADVANTAGE study[7] similarly does not support plaintiff. Like VIGOR, the ADVANTAGE study compared Vioxx against naproxen, not placebo. The absence of a placebo comparator means that plaintiff's experts cannot render scientifically reliable opinions on the basis of ADVANTAGE. (Gaziano Decl. at ¶ 34.) In any event, the study revealed no statistically significant disparity of such events, even against naproxen. (Deposition of Thomas Baldwin, M.D. ("Baldwin Dep."), attached as Ex. 2 to Wittmann Decl. I at 97:16-98:12, 100:13-21; Gaziano Decl. at ¶ 96.)

### 5.   The Alzheimer's studies.

Merck conducted two randomized clinical studies in elderly patients to assess whether 25

---

[7] Lisse JR et al., *Gastrointestinal Tolerability and Effectiveness of Rofecoxib versus Naproxen in the Treatment of Osteoarthritis. A Randomized, Controlled Trial*, ANN. INTERN, MED. 2003;139:539-546.

789233v.1

mg Vioxx could slow the onset and progression of Alzheimer's disease.  As with Merck's other clinical studies, the Alzheimer's studies do not support plaintiff, as there was no increase or decrease in cardiovascular risk associated with Vioxx.  (Gaziano Decl. at ¶ 65.)  In fact, the combined relative risk for confirmed thrombotic cardiovascular events was 1.01 and was statistically insignificant (CI = 0.67-1.53).   (Gaziano Decl. at ¶¶ 65, 103.)   In the first Alzheimer's study – which lasted one year – the number of confirmed serious vascular events was greater in the placebo group than in the Vioxx group by a margin of 11 to 4.[8]  This finding is significant given that, with an average age of over 75 years, the patients in the study were at an increased risk of adverse cardiovascular events and yet patients receiving Vioxx experienced fewer events.[9]  (Expert Report of John W. Farquhar, M.D. ("Farquhar Report"), attached as Ex. 33 to Wittmann Decl. I at ¶ 52; Expert Report of Colin M. Bloor, M.D. ("Bloor Report"), attached as Ex. 31 to Wittman Decl. I at ¶ 33.)  This study thus does not support a finding that 25 mg Vioxx causes thrombotic cardiovascular events in the first 30 days of use.  In the second Alzheimer's study, which involved over 1400 patients and use of Vioxx over a median duration of 94 weeks, there were just 17 heart attacks and two cardiac arrests in the Vioxx group compared to 13 heart attacks and zero cardiac arrests in the placebo group.[10]  Plaintiff's experts, however, have no evidence that these differences are statistically significant.

6.     **Professor Kronmal's reanalysis of Merck's clinical data.**

Finally, plaintiff's experts also rely on a statistical reanalysis of Merck's clinical data performed by Professor Kronmal.  This reanalysis purportedly shows that the relative risk of

---

[8] Reines SA et al., *Rofecoxib, No effect on Alzheimer's disease in a l-year, randomized, blinded, controlled study*, NEUROLOGY 2004; 62:66-71, at 71.

[9] *Id.* at 62.

[10] Thal LJ *et al.*, *A Randomized, Double-Blind, Study of Rofecoxib in Patients with Mild Cognitive Impairment*, NEUROPSYCHOPHARMACOLOGY (2005) 30:1204-1215, 1207, 1210-11.

789233v.1

adverse of cardiovascular events associated with Vioxx is constant over time – *i.e.*, meaning that there supposedly is no difference in cardiovascular risk based on dose and duration of exposure. (Kronmal Report at 14.)  But Professor Kronmal's reanalysis proves no such thing.

First, his reanalysis was conducted for purposes of this litigation, has not been published and has not been peer-reviewed by others in the field.  (Kronmal Report at 2-3.)  These facts alone render it unreliable under *Daubert*.  *See, e.g., Daubert*, 951 F.2d at 1130-31 ("[T]he reanalysis of epidemiological studies is generally accepted by the scientific community only when it is subjected to verification and scrutiny by others in the field. . . . Plaintiffs' reanalyses do not comply with this standard; they were unpublished, not subjected to the normal peer review process, and generated solely for use in litigation."); *Kelley v. Am. Heyer-Schulte Corp.*, 957 F. Supp. 873, 879 (W.D. Tex. 1997) (excluding expert testimony based on unpublished reanalysis).

Second, Professor Kronmal admits he found *no* statistically significant proof that 25 mg Vioxx causes thrombotic cardiovascular events during the first month of use.  For example, after re-analyzing the VIGOR data, Professor Kronmal purports to find a statistically significant risk of heart attacks with 50 mg Vioxx over approximately nine months of use.  (Kronmal Report at 5.)  After re-analyzing the data from the Konstam meta-analysis, he purports to find a marginally significant relative risk for heart attacks (CI = of 1.18 to 3.08) for a wide range of doses and durations.  (*Id.* at 14.)  After re-analyzing the APPROVe data, he purports to find a statistically *in*significant relative risk for heart attacks (CI = of 1.0 to 4.29) and a marginally significant relative risk for "coronary heart disease"[11] (CI = of 1.12 to 4.23) over approximately 8 months of 25 mg Vioxx use.  (*Id.* at 20.)  Finally, after re-analyzing the data from the Alzheimer's studies,

---

[11] As defined by Professor Kronmal throughout his report, the category "coronary heart disease" includes data for both heart attacks and sudden cardiac deaths.

Kronmal purports to find a statistically *insignificant* relative risk for heart attacks (CI = of 0.84 to 3.16), a marginally significant risk for coronary heart disease (CI = of 1.16 to 3.59), and a statistically significant risk of mortality from coronary heart disease (CI = 1.61 to 11.66) over an average period of between 12 to 48 months of 25 mg Vioxx use.[12]   (*Id.* at 17-18 & Table 2.)

In *each* instance, however, Professor Kronmal admits he has *no* statistically significant proof that these purported relative risks apply during the first 30 days of use.   (*Id.* at 6 & Figure 1 (no "statistically significant" difference in incidence of death seen in VIGOR and no difference in event-rate for heart attacks during first 30 days); *id.* at 14 (reanalysis of data from the Konstam meta-analysis showed no statistically significant evidence that relative risk remained constant over time; *id.* at 18 & Figure 6 (time-to-event data from Alzheimer's studies "suggests that MI events [*i.e.*, heart attacks] separated later in time than in the earlier analyses" and shows no difference in death rate from coronary heart disease during first 30 days); *id.* at 20 & Figures 8-9 (time-to-event data for APPROVe study shows no difference in heart attacks and coronary heart disease during first 30 days); *see also* Ray Report at 27, 29 (conceding that Professor Kronmal's reanalysis of VIGOR and APPROVe does not show increased cardiovascular risk during first 30 days).)   In fact, at a recent trial, Professor Kronmal admitted that his hypothesis that the cardiovascular risk associated with Vioxx remains constant over time is *not* necessarily true and

---

[12]   Professor Kronmal's reanalysis of the Alzheimer's data is particularly unreliable.   For example, his purported findings regarding the relative risks associated with fatal and non-fatal coronary heart disease include data on adverse events that occurred *after* patients ceased taking Vioxx or placebo, including 12 events that occurred *48 weeks after* treatment was discontinued. Thal LJ, et al., *A Randomized, Double-Blind, Study of Rofecoxib in Patients with Mild Cognitive Impairment*, NEUROPSYCHOPHARMACOLOGY (2005) 30, 1204-1215, 1210.   In addition, he purports to find a statistically significant increase in death from "all causes" over a period of between 12 to 48 months notwithstanding that this reanalysis admittedly includes data on patients who died from causes *unrelated* to Vioxx.   (Kronmal Report, Table 2; Tr. 09/22/05 (Kronmal trial testimony in *Humeston*) at 1570:1-9; Tr. 09/23/05 (Kronmal trial testimony in *Humeston*) at 1751:6-1752:4; *see also* Gaziano Decl. at ¶ 98.)

is *not* supported by sufficient data:

> I tested the hypothesis that the rate was constant, basically, the difference in the relative rates between the two treatments was constant over time.  And the test did not reject that hypothesis.  *That doesn't mean it's necessarily true.  It just means there is not enough data to say that there is a difference in rates with time.*

(Tr. 9/22/05 (*Humeston*) at 1580:17-:1582:11 (emphasis added).)  This lack of supporting scientific evidence renders his hypothesis unreliable under *Daubert.  Brock v. Merrell Dow Pharms., Inc.*, 874 F.2d 307, 315 (5th Cir. 1989); *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d 603, 615 (E.D. La. 2003).  Accordingly, any expert opinions based on Professor Kronmal's reanalysis are speculative and amount only to an expert's *ipse dixit*, which this Court can and should reject.  *Id.* at 616.

\*\*\*

As explained above, *none* of the clinical studies upon which plaintiff's experts variously rely shows that the use of 25 mg Vioxx for less than one month is associated with an increased risk of thrombotic cardiovascular events.  Because plaintiff's experts can point to *no* supporting clinical trial data – which they concede is the "most reliable" proof of causation (*see* Ray Report at 25, Farquhar Report at ¶ 59) – plaintiff cannot establish general causation in this case.

### B.   Plaintiff's Experts Cannot Point to Any Observational Studies that Support Their Short-Term Use Theory.

Having failed to identify any clinical trial data to support their hypothesis that the use of 25 mg Vioxx for less than one month is associated with an increased risk of thrombotic cardiovascular events, plaintiff's experts rely on a grab bag of inconsistent and inconclusive observational epidemiological studies.  But none of these studies support the hypothesis of plaintiff's experts either.  For example, none of these studies shows that the short-term use of 25 mg Vioxx is associated with *both* a greater than doubling of the risk for thrombotic cardiovascular events *and* a statistically significant increased risk.  In addition, each of the

10

studies contains a variety of other limitations that render it unreasonable for plaintiff's experts to rely on them for their causation opinions. Finally, to the extent that any of the studies in isolation suggests that Mr. Irvin's short-term use of Vioxx may be associated with an increased risk of thrombotic cardiovascular events, such studies are flatly inconsistent with the best available clinical data and are thus of no help to plaintiff here.

### 1. The Solomon study.

For example, Dr. Farquhar and Professor Ray rely on a retrospective, observational study conducted by Dr. D.H. Solomon in 2003, which was based on a review of patient records in a Medicare database.[13] This study, however, does not support plaintiff. (Gaziano Decl. at ¶¶ 53-54, 58, 104.) Solomon found *no* statistically significant increased risk and *no* doubling of the risk when Vioxx at all doses was compared to non-use of NSAIDs (OR = 1.14, CI = 1.00-1.31).[14] Nor did he report any statistically significant risk associated with the use of Vioxx at the 25 mg dose when compared to non-use of NSAIDs. Moreover, Solomon anomalously found that Vioxx "*may* include a period of elevated risk" for cardiovascular events during the first 30 days of use, but not after 90 days, when compared to Celebrex.[15] According to Dr. Gaziano, however, cutting the data to look at the effects during the first 90 days was arbitrary and any finding from such a small post-hoc subgroup analysis may simply be the result of chance. (Gaziano Decl. at ¶ 53.) At any rate, this finding conflicts with literally years of randomized *placebo*-controlled clinical data showing no increased risk associated with the short-term use of Vioxx -- including data from the APPROVe study and other clinical trials. *See* Causation Testimony Brief at 27-28;

---

[13] Daniel Solomon et al., *Relationship between selective cyclooxygenase-2 inhibitors and acute myocardial infarction in older adults*, CIRCULATION 2004 May; 109:2068-2073.

[14] *Id.* at Table 2.

[15] *Id.* at 2072 ("The findings of our study *suggest* that the first 30 days of use *may* include a period of elevated risk.") (emphasis added).

789233v.1

(Gaziano Decl. ¶¶ 53-54).

Beyond these inconsistencies, Solomon's study has many limitations. (Gaziano Decl. at ¶ 54.) For example, Solomon himself concedes that there are "important potential limitations" to his study, including "the potential for bias by unmeasured confounders" as well as "residual confounding by factors that were incompletely assessed in this administrative database, such as severity of cardiovascular risk factors."[16]  Additionally, the study found no decreased risk of acute heart attacks associated with statins, and found decreased risk associated with hormone replacement therapy.  (*Id.* at ¶ 54.)  These results contradict the findings from randomized clinical trials and are further evidence that results from this study are highly confounded.  (*Id.*) These limitations, combined with the study's other flaws, make it unreasonable for plaintiff's experts to rely on it for their causation opinions. *See, e.g., Kelley*, 957 F. Supp. at 877-78.

### 2.   The Juni study.

Professor Ray and Dr. Baldwin also rely on a 2004 meta-analysis by Juni.[17]  This study, however, is of no help to plaintiff for multiple reasons. (Gaziano Decl. at ¶ 85.)  In fact, the data from this study are *directly contrary* to the conclusions of plaintiff's experts.   First, after examining pooled clinical trial data by dose, Juni found that, when compared against placebo and all NSAID comparators, Vioxx at the 25 mg dose -- *i.e.*, the only dose at issue in this case -- neither doubled the risk for heart attacks nor resulted in a statistically significant increased risk (RR = 1.37, CI = 0.52-3.61) -- a fact that plaintiff's own expert concedes.[18]  (Ray Report at 22 & Table 6); *LeBlanc v. Merrell Dow Pharms., Inc.*, 932 F. Supp. 782, 783 & n.3 (E.D. La. 1996)

---

[16] *Id.* at 2069, 2072.

[17] Juni, P., *et al.*, *Risk of cardiovascular events and rofecoxib: cumulative meta-analysis*, THE LANCET Nov. 5, 2004 (online); 1.

[18] *Id.* at Table 2.

789233v.1

(study not statistically significant if confidence interval includes 1.0 or below).  Second, even when Juni compared Vioxx at all doses against placebo, Juni again found that Vioxx neither doubled the risk of heart attacks nor resulted in a statistically significant increased risk (RR = 1.04, CI = 0.34-3.12).[19]  Third, Juni sought to evaluate the relative risk associated with Vioxx during and after six months of use, not during the first 30 days.  Even then, however, Juni found that the use of Vioxx at all doses during the first six months was *not* associated with a statistically significant increased risk of heart attacks (CI = 0.90-6.03).[20]  In short, the Juni study does not show that Mr. Irvin's short-term use of 25 mg Vioxx is capable of causing thrombotic cardiovascular events like heart attacks.  This fact is significant given that the study was inexplicably skewed against Vioxx inasmuch as Juni selectively omitted placebo-controlled clinical trial data from the Alzheimer's studies.[21]  (Gaziano Decl. at ¶ 85.)

### 3.     The Ray study.

Plaintiff's own expert, Professor Ray, conducted a retrospective cohort study based on records in a Tennessee Medicaid database for over 24,000 Vioxx users.[22]  This study does not support plaintiff, however.  (Gaziano Decl. at ¶¶ 50, 58.)  According to the published study, "there was no evidence of a raised risk" of coronary heart disease in patients taking Vioxx "at doses of 25 mg or less" over an average of nearly one year.[23]  Moreover, Professor Ray has admitted on multiple occasions that his study does not support a finding that the use of Vioxx at the 25 mg dose is associated with a statistically significant increased risk of adverse

---

[19] *Id.* at Table 2.

[20] *Id.* at Table 2

[21] *Id.*

[22] W. Ray et. al, *Cox-2 selective non-steroidal anti-inflammatory drugs and the risk of serious coronary heart disease: an observational cohort study*, THE LANCET 2002: 360:1071-73.

[23] *Id.* at 1071-72.

789233v.1

cardiovascular events.   (3/31/05 Deposition of Wayne A. Ray, Ph.D. ("Ray Dep. (*Ernst*)"),

attached as Ex. 21 to Wittmann Decl. I at 78:18-80:5; 9/2/04 Deposition of Wayne A. Ray, Ph.D.

("Ray Dep. (*Stubblefield*)"), attached as Ex. 22 to Wittmann Decl. I at 32:25-33:7.)  In fact, he

can state only that his study is consistent with a "the possibility of such an increased risk." (Ray

Dep. (*Stubblefield*) at 32:15-24.)  As explained above, however, such speculative testimony is

inadmissible under *Daubert* and insufficient to establish causation.  *See, e.g., Moore v. Ashland

Chem., Inc.*, 151 F.3d 269, 279 (5th Cir. 1998); *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp.

2d at 616; *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984).

### 4.   The Graham study.

Dr. Farquhar and Professor Ray also cite a 2005 study by Graham[24] in which the author

Graham purports to find an increased risk of heart attacks and sudden cardiac death associated

with the use of Vioxx as compared to Celebrex.  (*See e.g.* Ray Dep. (*Ernst*), at 184:23-185:4;

192:6-10; 192:23-193:17; 202:5-21.)  As to the central issue posed in this case, however, the

Graham study does not provide a scientifically reliable basis for the causation opinions of

plaintiff's experts.  (Gaziano Report at ¶¶ 55, 58.)  First, consistent with all the data described

above, Graham found *neither* a doubling of the risk *nor* a statistically significant increased risk

associated with the use of 25 mg Vioxx when compared to remote use of NSAIDs (OR = 1.23,

CI = 0.89-1.71).[25]  (*See also* Ray Dep. (*Ernst*) at 87:18-21 (acknowledging that findings for 25

mg Vioxx are "not statistically significant")); *LeBlanc*, 932 F. Supp. at 783 & n.3 (study not

statistically significant if confidence interval includes 1.0 or below).   Second, Graham

---

[24] David J. Graham, *et al.*, *Risk of acute myocardial infarction and sudden cardiac death in patients treated with cyclo-oxygenase 2 selective and non-selective non-steroidal anti-inflammatory drugs:    nested    case-control    study,    available    at* http://image.thelancet.com/extras/05art1005web.pdf (Jan. 25, 2005) (hereinafter the "Graham Study") at 1.

[25] *Id.* at Table 3.

specifically acknowledged that because of the limited power of his study, he was "unable to fully address whether the cardiovascular risk associated with rofecoxib varied by duration of use."[26] In fact, the mean duration of Vioxx use prior to the occurrence of a study event was almost four months.[27] Here, Mr. Irvin took 25 mg Vioxx for less than one month. Based on the foregoing, nothing in the Graham study provides a reliable basis upon which plaintiff's experts can opine about a supposed increased risk associated with the short-term use of 25 mg Vioxx.

In addition, Graham concedes that his study has "several limitations."[28] For example, the study's data are based on dispensing of prescriptions as recorded in a medical database with no available measure of patient compliance.[29] (Rayburn Report at 21-22.) In addition, the study did not control for important cardiovascular risk factors such as smoking and family history of heart attacks.[30] Furthermore, Graham's estimates of the excess number of fatal and non-fatal heart attacks supposedly attributable to Vioxx are based in part on data from the APPROVe and VIGOR studies. Yet his estimates are inconsistent with results of the APPROVe study, which show no increased risk of adverse cardiovascular events or death associated with the use of Vioxx at the 25 mg dose during the first 18 months, and with the results of the VIGOR study, which show no increased risk of heart attacks associated with the use of Vioxx at the 50 mg dose during the first month of use.[31] Courts look with disfavor on the reanalysis of study data that results in a conclusion different than that proposed by the study's authors. *See, e.g., Missouri*

---

[26] *Id.* at 5.

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] Bresalier RS et al., *Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial*, 352 NEW. ENG. J. MED. 1092 (Mar. 17, 2005) at figure 2.

789233v.1

*Pac. R.R. Co. v. Navarro*, 90 S.W.3d 747, 757 (2002); *Merrell Dow Pharms., Inc. v. Havner*, 953

S.W.2d 706, 720 (Tex. 1997).

     5.     **The Kimmel study.**

     Professor Ray also relies on a 2005 study by Kimmel.[32]  (Ray Report Table 8.)  Again,

however, this study does not support plaintiff.  (Gaziano Decl. at ¶ 55.)  The study did not

purport to evaluate the relative risk of 25 mg Vioxx during the first 30 days of use.  Indeed,

Kimmel concedes that "[a]nalysis of Cox-2 inhibitors by dosage or duration was not possible

because of small numbers."[33]   In fact, no one in the study took Vioxx for less than three months,

and the exposure of most study participants was between three and 12 months.[34]  Accordingly,

Kimmel concedes that he cannot evaluate any purported risk associated with Vioxx or other Cox-

2 inhibitors during the first three months.[35]  In addition, the study did not distinguish between

individuals who took Vioxx at the 25 mg or 50 mg doses when compared against non-use of

NSAIDs, making it impossible to determine whether the study is relevant to Mr. Irvin's case.[36]

Furthermore, the relative risk associated with Vioxx at all doses (1.16) as compared to non-use

of NSAIDs is well below the required doubling of the risk and, in any event, is not statistically

significant (CI = 0.70-1.93).[37]  *LeBlanc*, 932 F. Supp. at 783 & n.3.  Thus, the Kimmel study

cannot support a finding of causation here.

---

[32] Kimmel, *et al., Patients Exposed to Rofecoxib and Celecoxib Have Different Odds of Nonfatal Myocardial Infarction*, ANN. INTERN. MED. 2005 Feb 1;142(3):157-64.

[33] *Id.* at 159.

[34] *Id.*

[35] *Id.* at 159-160.

[36] *Id.* at Table 3.

[37] *Id.* at Table 3.  Professor Ray misleadingly lists the relative risk reported by Kimmel as 2.7.  (Ray Report Table 8.)  This finding, however, was the association reported for Vioxx as compared to Celebrex, another Cox-2 inhibitor.  Moreover, the study authors expressly note that this finding "could have occurred by chance."  (*Id.* at 157.)

789233v.1

Finally, given the nature of the study design (a telephone survey), Kimmel concedes that "the possibility of recall bias and uncontrolled confounding . . . limit the ability to make definitive conclusions."[38]  Kimmel also concedes he could not rule out the possibility that non-participation bias may have skewed the study's results.[39]  In fact, in discussing another study by Kimmel that also involved a telephone survey, Professor Ray conceded that such a study design is "flawed by . . . recall bias and non-participation bias."  (Ray Dep. (*Stubblefield*) at 229:16-19.)  Having made that concession, Professor Ray cannot reasonably rely on Kimmel's 2005 study for his causation opinions.

      6.    **The Levesque study.**

Professor Ray also relies on a 2005 study by Levesque.[40]  Ray Report Table 8.  Again, however, this study does not support plaintiff.  (Gaziano Decl. at ¶ 56.)  It does not show that the use of 25 mg Vioxx for less than one month is associated with a greater than doubling of the risk of heart attacks or sudden cardiac death.[41]  Instead, the relative risk associated with 25 mg Vioxx when compared to no NSAID use (1.21) was only marginally significant (CI = 1.02-1.43) and is equivalent to what the Eleventh Circuit recently found insufficient under *Daubert*. *Allison v. McGhan Medical Corporation*, 184 F.3d 1300, 1315 & n.16 (11th Cir. 1999).  In addition, the case-patients in the study received approximately six Vioxx prescriptions over one year, which is far in excess of the single prescription that Mr. Irvin received in one month.[42]

---

[38] *Id.* at 157, 163.

[39] *Id.*

[40] Levesque, L.E., *The Risk for Myocardial Infarction with Cyclooxygenase-2 Inhibitors:  A Population Study of Elderly Adults*, ANN. OF INTERN. MED. 2005; 142:481-489.

[41] *Id.* at 483-84.

[42] *Id.* at 483.

In addition, Levesque notes several "limitations" in his study.[43]  First, he concedes that the study's findings may be based on "incomplete" and "missing" data regarding the number of heart attacks and sudden cardiac deaths experienced in the study population in addition to a potential "misclassification" of the patients' exposure to the drugs being studied.[44]  This fact renders the study of dubious value.  *Christophersen*, 939 F.2d at 1114 (upholding exclusion of expert opinion that was based on inaccurate and incomplete exposure data).  Second, he concedes that the study did not control for a number of significant and potentially confounding risk factors, including but not limited to obesity, physical activity, and family history of cardiovascular disease.[45]  And third, he concedes that "the observational nature of our study limits the ability to assign causality."[46]  When combined with the low level of statistical significance reported by Levesque, these "limitations" make it unreasonable for plaintiff's experts to offer causation opinions based on this study.  *Kelley*, 957 F. Supp. at 877-78 (excluding expert opinion based on "combined" effect of study's "confounding factors" and "low level of statistical significance," based on a confidence interval of 1.08 to 1.41).

### 7.    The Mamdani study.

Dr. Farquhar and Professor Ray also rely on a 2003 study by Mamdani.[47]  This study does not help plaintiff, however.  (Gaziano Decl. at ¶ 51.)  First, the study did not find a statistically significant difference in the number of heart attacks between new users of Vioxx

---

[43] *Id.* at 487.

[44] *Id.*

[45] *Id.*

[46] *Id.* at 488.

[47] Mamdani M, *et al.*, *Effect of selective cyclooxygenase 2 inhibitors and naproxen on short-term risk of acute myocardial infarction in the elderly*, ARCH. INTERN. MED. 2003 Feb 24;163(4):481-6.

789233v.1

compared to non-users of other NSAIDs.  (Ray Report at Table 8 (confidence interval includes 1.0)); *LeBlanc*, 932 F. Supp. at 783 & n.3 (study not statistically significant if confidence interval includes 1.0 or below).)  Indeed, Mamdani notes that "[t]he findings of this observational study suggest no increase in the short-term risk of [acute] MI among users of selective cyclooxygenase 2 inhibitors as commonly used in clinical practice."[48]  In addition, Mamdani did not distinguish between patients taking Vioxx at the 25 mg or 50 mg dose.  Notwithstanding that the results of the study are statistically *in*significant, it is thus unclear whether the study has any relevance to Mr. Irvin, who took Vioxx at the 25 mg dose only.  Finally, it appears that the participants in this study took Vioxx for an average of six months, which far exceeds Mr. Irvin's brief exposure.[49]  Accordingly, there is no "fit" between the study and the facts of this case.  *Daubert*, 509 U.S. at 591-92; *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d 606.

### 8.   The Ingenix study.

Dr. Farquhar also relies on the Ingenix study.[50]  (Farquhar Report at ¶ 175.)  This study, however, does not support plaintiff.  First, the study did not distinguish between individuals who took Vioxx at the 25 mg or 50 mg doses during the first 30 days when compared against use of ibuprofen/diclofenac.   Second, even this combined dose comparison was statistically insignificant for heart attacks and sudden cardiac death (CI = 0.98-2.34).  Finally, the author notes that the study has several "limitations," including reliance on pharmacy records to determine exposure levels and "[r]esidual confounding by other unmeasured factors such as

---

[48] *Id.* at 481.

[49] *Id.* at 483.

[50] Ingenix Epidemiology Report, *Cardiovascular Risk of COX-2 Inhibitors and Other NSAIDs*, Feb. 16, 2004.

789233v.1

smoking, body mass index, diet and exercise."[51]   Combined with the study's lack statistical

significance, these "limitations" make it scientifically unreasonable for plaintiff's experts to rely

on this study for their causation opinions – especially in light of the extensive and contrary

clinical data, discussed above, that shows no increased risk associated with Vioxx.  *See, e.g.,*

*Kelley,* 957 F. Supp. at 877-78.

### 9.    The Johnsen study.

Professor Ray also relies on a 2005 study by Johnsen, which analyzed the risk of heart

attacks associated with the use of various NSAIDs based on data from foreign hospital

registries.[52]   (Ray Report at Table 8.)  This study, however, does not support plaintiff for several

reasons.  First, like the Solomon and Mamdani studies, the Johnsen study does not distinguish

between patients receiving Vioxx at the 25 mg and 50 mg doses.  *(Id.)*  There is thus no way to

determine whether the results of this study are applicable to Mr. Irvin's case.  Second, even

assuming that the study has some relevance to this case, it fails to show more than a doubling of

the risk for Vioxx (RR = 1.80, CI = 1.47-2.21).[53]   (Ray Report at Table 8.)  Third, the study

contains a number of anomalous findings, including that the purported risk associated with

Vioxx decreases with increased duration of usage and that Vioxx is safer for patients at a high

risk for cardiovascular disease compared to patients at a lower risk.[54]   Fourth, the study could not

have controlled for numerous cardiovascular risk factors, including exercise and diet, as such

---

[51] *Id.* at 19.

[52] Johnsen SP et al., *Risk of Hospitalization for Myocardial Infarction Among Users of Rofecoxib, Celecoxib, and Other NSAIDs, A Population-Based Case-Control Study,* ARCH. INTERN. MED. 2005;165:978-984.

[53] *Id.* at Table 2.

[54] *Id.* at 981-82, Tables 3 & 4.

789233v.1

information was not included in the database.[55]  Finally, Johnsen notes that the increased risk

associated with Vioxx may not be attributable to the drug and that further study "appears

warranted."[56]  Taken together, these findings make it unreasonable for plaintiff's experts to rely

on this study.  *See, e.g., Kelley,* 957 F. Supp. at 877-78.

> 10.   **The Nussmeier study.**

Finally, Dr. Farquhar relies on a 2005 study by Nussmeier.[57]  This study, however, does

not help plaintiff for two reasons.  (Gaziano Decl. at ¶ 71.)  First, the study did not evaluate

Vioxx at the 25 mg dose (or any other dose).  Instead, it evaluated different dosages of different

drugs -- Bextra (valdecoxib) and Dynastat (parecoxib) -- in patients following coronary artery

bypass surgery ("CABG").  Even then, the study did not show a statistically significant

difference in the rate of cardiovascular adverse events between patients receiving one or both of

these therapies and patients receiving placebo (confidence intervals include 1.0).[58]  *LeBlanc,* 932

F. Supp. at 783 & n.3 (study not statistically significant if confidence interval includes 1.0 or

below).  Accordingly, not only does the study have nothing to do with Vioxx, but it does not

permit a finding of causation even with respect to the drugs that it did analyze.

Second, the data from this study are at odds with data from a short-term placebo-

controlled trial in *general* surgery patients, which did not show an increased risk.  (Gaziano Decl.

at ¶ 71.)  According to the FDA, the data from these studies "may suggest that in the absence of a

predisposing condition, such as recent CABG surgery, the CV risk of short-term use of NSAIDs

is very small, if any."  (April 6, 2005 FDA Memorandum.)  Where, as here, the available studies

---

[55] *Id.* at 981.

[56] *Id.* at 983.

[57] Nussmeier, *et al., Complications of the Cox-2 Inhibitors Parecoxib and Valdecoxib after Cardiac Surgery,* N. ENGL. J. MED. (2005); 352.

[58] *Id.* at Table 3.

21

789233v.1

are inconsistent, the data is insufficient to infer a causal relationship. (Gaziano Decl. ¶ 33.) That is especially true here, given the substantial placebo-controlled clinical trial data which does not find any increased cardiovascular risk associated with the short-term use of Vioxx. (Gaziano Decl. at ¶¶ 79-84, 87.)

Finally, Nussmeier concedes that CABG patients are a unique group of patients.[59] This type of surgery disrupts the proper functioning of their arteries. (Gaziano Decl. ¶ 71.) As a result, such patients may develop spontaneous thrombi. (*Id.*) It would thus be improper to extrapolate from this unique group of patients to patients as a whole. (*Id.*)

***

As explained above, *none* of the observational studies upon which plaintiff's experts variously rely supports the theory that use of 25 mg Vioxx for less than one month is capable of causing thrombotic cardiovascular events. In fact, plaintiff's experts cannot identify a single statistically significant study proving that Vioxx more than doubles the risk of such events during the first month of use. The data from these studies, at best, are inconsistent and inconclusive for dosages and durations of Vioxx use that are not at issue in this case. (*See, e.g.*, Gaziano Decl. at ¶ 58.) And insofar as Mr. Irvin's dose and duration of Vioxx use is concerned – *i.e.*, 25 mg for less than one month – many of these studies in fact found *no* statistically significant increased risk. Moreover, the hypothesis of plaintiff's experts that the short-term use of Vioxx is capable of causing thrombotic cardiovascular events is at odds with Merck's extensive clinical data comparing Vioxx to placebo, which fails to show an increased risk during the first month of use. *See* Causation Testimony Brief at 27-28; (Gaziano Decl. at ¶¶ 79-84, 87.) This inconsistency

---

[59] *Id.* ("Myocardial tissue may be particularly susceptible to ischemia during and after CAGB because of underlying coronary artery disease, perioperative hemodynamic instability, inadequate myocardial protection during bypass, coronary arterial embolization, or technical complications, such as spasm or kinking of the graft").

789233v.1

renders the observational data relied upon by plaintiff's experts insufficient for purposes of establishing causation. (*Id.* at ¶¶ 33-35, 95). Because plaintiff's experts can point to *no* supporting epidemiologic data, and because they concede that the "most reliable" proof of causation comes from randomized clinical studies (*see* Ray Report at 25, Farquhar Report at ¶ 59), plaintiff cannot establish general causation in this case.

789233v.1