## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2005 NOV 18 P 3: 40

LORETTA G. WHYTE
CLERK

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| Evelyn Irvin Plunkett v. Merck & Co, Inc. | * | CASE NO. 02:05CV4046 |

---

**Plaintiff's Reply in Support of Her Motion in Limine to Exclude Evidence and/or Argument that the FDA has Concluded there is a "Class Effect" for all Non-Steroidal Anti-Inflammatory Drugs ("NSAIDS")**

*(Motion in Limine No.5)*

---

Plaintiff Evelyn Irvin Plunkett, Personal Representative of the Estate of Richard Irvin, Jr., by and through her attorneys, urges the Court to preclude Merck & Co. from proffering testimony, documents, and argument that there is a "Class Effect" for all non-steroidal anti-inflammatory drugs.

Merck hopes to convince the jury in this case that: (1) Vioxx was not defectively designed because all non-steroidal anti-inflammatory drugs ("NSAIDS") increase the risk of heart attack and stroke and (2) using Vioxx for less than 18 months is not associated with heart attack and stroke. If Merck is successful in both those efforts, it will prevail in this case. For that reason, unreliable, confusing and/or prejudicial evidence that Merck would offer in support of its assertions must be closely scrutinized by this Court.

The April 6, 2005, Memorandum ("Memorandum") published on the Food and Drug

Fee
Process
X Dktd
CtRmDep
Doc. No.

Administration's ("FDA") website is all three of those things: unreliable, confusing and unfairly prejudicial. It is filled with contradictory, unreliable, and ambiguous statements. The Memorandum carries the force of an "official government" pronouncement on complex scientific questions, but the statements and the opinions contained therein, by the authors' admission, cannot withstand scientific scrutiny. Finally, there is no opportunity for the Plaintiff's to cross-examine the Memorandum's authors to demonstrate just how unreliable and scientifically questionable the statements contained therein really are. Given that Merck can proffer the same conclusions and opinions contained in the Memorandum through live witnesses subject to cross-examination, the probative value of the Memorandum - with its imprimatur of governmental authority - is substantially outweighed by the danger of unfair prejudice. For these reasons, as more fully set forth below, the Court should exclude the Memorandum, just as Judge Higbee did in *Humeston v. Merck & Co.* in New Jersey.

A.      **The Contradictory, Unreliable, Ambiguous Statements in the Memorandum**

The statements that Merck would like to pluck from the Memorandum in support of its defense in this matter are all inconsistent with other statements within the Memorandum, scientifically unreliable, qualified and/or ambiguous. These statements include the following:

1.      "**Pending the availability of additional long-term controlled clinical trial data**, the available data are **best interpreted** as being consistent with a class effect of an increased risk of serious adverse cardiovascular (CV) events for COX-2 selective and non-selective NSAIDs. Memorandum at 2 (emphasis added).

a.      The entire statement is qualified in that the authors acknowledge the need for additional data. The question that must be asked is how reliable is the

remainder of the sentence without that additional data?  Should Merck be allowed to tell the jury that the FDA has found that there is a class effect associated with NSAIDs based on this qualified statement?

i.     The question about the reliability of the statement is answered in the Memorandum: "Long-term placebo-controlled clinical trial **data are not available to adequately assess** the potential for the non-selective NSAIDs to increase the risk of serious adverse CV events." Memorandum at 2 (emphasis added).

ii.    Since the authors acknowledge that there is not sufficient data to adequately assess the risk of CV events associated with non-selective NSAIDs, what adequate, scientific, reliable basis can there possibly be to conclude that all NSAIDs increase the risk of serious adverse CV events?

iii.   In fact, the authors implicitly acknowledge that there is no scientific, reliable basis for such a conclusion.  The authors state: "Given our inability to conclude, based on the available data, that the COX-2 selective agents confer an increased risk of adverse CV events compared to non-selective NSAIDs, we believe that it is reasonable to conclude that there is a 'class effect' for increased CV risk for all NSAIDs pending the availability of data from long-term controlled clinical trials that more clearly delineate the true relationships." Memorandum at 11.

b.     The authors indicate that the available data are "best interpreted" as consistent

with a class effect.  The authors do not state or explain why or pursuant to what scientific principle or methodology the data are "best interpreted" as consistent with a class effect.  The interpretation of data - particularly data derived from complex scientific studies - ordinarily requires that the proponent establish a foundation that "the testimony is the product of reliable principles and methods," and that "the principles and methods [have been applied] reliably to the facts."  Fed. R. Evid 703.  Here, no such foundation has been laid.  And, because the authors are not subject to cross-examination, Plaintiff has no opportunity to inquire into what the phrase "best interpreted" means in the context of the Memorandum.

c.       While the Memorandum suggests no scientific principle or methodology underlying the "best interpreted" qualifier, the Memorandum does suggest that an entirely different principle – erring on the side of caution to protect the public safety – was the real motivation for the "class effect" statement.

   i.       "The inability to reliably estimate the absolute magnitude of the increased risk of serious adverse CV events for individual COX-2 agents, combined with the **inability to reliably draw conclusions about the risk of COX-2 agents compared to one another or to other NSAIDs highlights the conundrum the Agency faces** in making decisions on appropriate regulatory actions."  Memorandum at 10 (emphasis added).

   ii.      "**There is an urgent public health need to make appropriate regulatory decisions** because the adverse events at issue are serious

and a very large number of patients use selective and non-selective
NSAIDs to treat chronic pain and inflammation." Memorandum at 10
(emphasis added).

   iii.   "Although the currently available data are not definitive, **the Agency**
**cannot await more definitive data**, which may take years to
accumulate from studies that have not even begun, before taking
action." Memorandum at 10 (emphasis added).

d.   While the Plaintiff takes no issue with the FDA erring on the side of caution to
protect the public safety, that principle does not carry with it indicia of
scientific reliability or trustworthiness. In fact, as demonstrated above, the
"class effect" conclusion is based on a logical fallacy.

2.   "Taken together, these observations raise serious questions about the so called 'COX-2
hypothesis' which suggests that COX-2 selectivity contributes to CV risk."
Memorandum at 8.

a.   This statement is based on the authors' interpretation of data from studies
where COX-2 inhibitors are compared with non-selective NSAIDs.

   i.   Whether the authors interpretation of that data is scientifically sound
and reliable is unclear. As with all the statements in the Memorandum,
the Plaintiff has no opportunity to cross-examine the authors on the
soundness of their interpretations.

   ii.   The lack of any opportunity to assess the reliability of the authors'
interpretation is particularly troubling where, as here, the authors
acknowledge questions about the validity of the data coming from the

studies: "The validity of combining the two lumiracoxib groups for purposes of the primary analysis is debatable . . . It is unfortunate that the study design did not call for randomization of treatment assignment across the entire study, which would have allowed for a much more powerful comparison of lumiracoxib to the two non-selective NSAIDs." Memorandum at 6.

iii.   It is significant to note that the one study with clear results on this issue - VIGOR - indicated that Vioxx was associated with an increased risk of CV events compared with non-selective NSAIDs (Naproxen). "Only VIGOR clearly indicates such a difference." Memorandum at 8.

b.   The phrase "raise serious questions" is ambiguous at best.

i.   The authors do not elaborate on what these "serious questions" are or how they relate to the issues in this case. Similarly, the phrase "serious questions" has no inherent or obvious meaning, particularly in the context of the interpretation of the highly technical study data discussed in the Memorandum.

ii.   Any attempt by Merck to argue that, based on this statement, that the FDA has concluded that there are doubts about the Fitzgerald Hypothesis or that it is wrong, would be misleading. The authors do not discuss whether, on a theoretical level, COX-2 inhibition might lead to increased risk of CV events. They do not discuss whether such an increased risk is bio-mechanically plausible. On the contrary, we have no idea what the authors might say about these concepts because, once

again, they are not available to be examined.

3.      "Short-term use of NSAIDs to relieve pain, particularly at low doses, does not appear

to confer an increased risk of serious adverse CV events . . . ."  Memorandum at 2.

     a.      The authors fail to define "short term."  Without further definition, and without

an opportunity to examine what the authors intended the phrase to mean in

relation to Vioxx, the jury is left to guess at the significance of this statement

and its relevance to the issues in this trial.

     b.      The statement is qualified by the phrase  "particularly at low doses."  The

authors do not define what a "low dose" is for any NSAID and, more

importantly, what the term means in relation to Vioxx.  Any argument from the

parties as to what the phrase means, without opportunity to examine the

authors, would be pure speculation.  Thus, once again, if the Memorandum is

admitted the jury will be forced to guess what the statement means in the

context of this case.

     c.      This statement suffers the same infirmity as the COX-2 hypothesis statement.

The statement is a conclusion apparently based on the interpretation of an

assortment of complex scientific data.  The Memorandum fails, however, to

establish that the interpretation of that data is reliable and/or based on sound

scientific principles and methodology.  As a result, the statement lacks any

indicia of trustworthiness and reliability.

**B.  The Memorandum Is Not Trustworthy and, Therefore, Is Not Admissible**
**Pursuant to Federal Rule of Evidence 803(8)(C)**

Under Federal Rule of Evidence 803(8)(c) public records are excepted from the rule

excluding hearsay "unless sources of information or other circumstances indicate lack of

trustworthiness." Fed. R. Evid 803(8)(c).  The admissibility of a document pursuant to Rule 803(8) is permissive, not mandatory and should be allowed only after an independent determination of the trustworthiness of the document is made.  Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 264 (4th Cir. 2005).  In the Fifth Circuit, the determination of whether a document is trustworthy requires the Court to consider the reliability of the document.  See Moss v. Ole South Real Estate, Inc., 933 F.2d 1300, 1307-08 (5th Cir. 1991). While the focus is on whether the document is reliable, the Court should not ignore the document's conclusions.  "If reasonable jurors could not accept the report's conclusions, then there is no reason to admit the report."  Moss, 933 F.2d at 1307 n.5.  In this case, as demonstrated above, the class effect statement is premised on a logical fallacy.  A conclusion premised on such flawed logic is, by definition, unreliable.  "An invalid conclusion cannot be reliable."  Christopherson v. Allied-Signal Corp., 939 F.2d 1106, 1111 n.9 (5th Cir. 1991) (quoting Bert Black, A Unified Theory of Scientific Evidence, 56 Fordham L. Rev. 595 (1988)).

The Memorandum is unlike the typical public record admitted pursuant to Rule 803(8). The Memorandum does not contain factual observations of a government agency and statements and/or opinions drawn therefrom; instead, the Memorandum purports to be an analysis and interpretation of data compiled by third parties.  The statements and conclusions contained in the Memorandum are premised not on the observation or inquiry of officers of the FDA, but of work performed by persons unconnected with the FDA.  That work is not contained within the Memorandum and there is no inherent indicia of reliability associated with the work of the private entities that performed the studies relied upon.  The fact that the statements and conclusions in the Memorandum are based upon other documents which are

themselves hearsay, renders the Memorandum untrustworthy and inadmissible.  See Hickson v. Norfolk So. Ry. Co., 124 Fed. Appx. 336, 345 (6th Cir. 2005).

The real focus of the reliability inquiry, the Moss Court explained, is methodology: "We have held that reliability focuses on the methodology behind the report."  Moss, 933 F.2d at 1307-08.  One of the fundamental problems with the Memorandum is that there is essentially no information disclosing the methodology the authors used to make the statements in the Memorandum.  There is absolutely nothing to suggest that "the [statements in the Memorandum are] the product of reliable principles and methods," and that "the principles and methods [have been applied] reliably to the facts."  The lack of such evidence weighs heavily against any conclusion that the Memorandum is trustworthy.  See Dale v. Ala Acquisitions I, Inc., 2005 WL 2894615 *3 (S.D. Miss. Aug. 19, 2005).  What we can tell from the Memorandum is that the authors' conclusions appear to be driven by concerns of public safety rather than scientific principles or reliable methodology.  In light of the logical fallacies contained in the  Memorandum's conclusions and without any basis to discern and test the validity of the methodology employed by the Memorandum's authors, the Memorandum lacks trustworthiness and should not be admitted pursuant to Federal Rule of Evidence 803(8)(c).

## C.   The Probative Value of the Memorandum is Substantially Outweighed by the Danger of Unfair Prejudice, Confusion of the Issues, or Misleading the Jury

While statements in the Memorandum may be "relevant" to issues in this case, the extent of their probative value is questionable.  As demonstrated above, many of the statements that Merck would like to rely upon in the Memorandum are qualified by terms or phrases which are undefined and which lack any inherent definition or meaning.  Because the authors of the Memorandum are not available for examination, there is no way to provide

further definition to those qualifying terms and phrases short of speculation by the parties. Obviously, such speculation is impermissible. As a result, if the Memorandum is admitted, the jurors will be left to guess at the meaning and significance of key statements in the Memorandum in the context of the facts and circumstances of this case. Plaintiff respectfully suggests that if the jurors must guess at the significance of the statements under the facts and circumstances of this case, such statements have little "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence." Fed. R. Evid. 401.

Putting aside the question of whether the statements in the Memorandum are, in some broad sense, relevant to issues in this case, the Memorandum clearly presents a great danger of unfair prejudice, confusing the issues and/or misleading the jury. It bears repeating that the issues on which Merck would like to introduce the statements in the Memorandum lie at the heart of Plaintiff's case and Merck's defenses. Plaintiff will prove that Vioxx was defectively designed - Merck would like to show that Vioxx is no different than other NSAIDs. Plaintiff will prove that Mr. Irvin's use of Vioxx caused his heart attack - Merck would like to show that Mr. Irvin did not take Vioxx for a long enough period of time for Vioxx to have caused his heart attack.

Merck would like to tell the jury that statements in the Memorandum, including those discussed above, establish that the FDA agrees with Merck's position on these critical issues. While that is not the case, evaluating the scientific reliability of the statements in the Memorandum and understanding their limitations, ambiguities and inconsistencies and is both a complex and highly technical task. The key statements in the Memorandum appear to be premised on the authors' interpretation and analysis of data from a number of studies.

10

Because there is no explanation of the scientific principles and methodology used by the authors to reach their conclusions, the jury has no ability to evaluate the credibility of the statements contained in the Memorandum.  Because Plaintiff is denied any right of cross-examination, she loses her chance to demonstrate the flaws and limitations in the authors' interpretation and analysis of the data.

Both parties, on the other hand, have the opportunity to put on witnesses who can present and interpret data from the same studies considered in the Memorandum,[1] set forth the methodology and bases upon which they premise their conclusions, and have their methodologies and conclusions subjected to cross-examination.  The admission of ambiguous, unprincipled and scientifically unsound statements attributable to the FDA based on those same studies with no opportunity for cross-examination is would be the height of unfair prejudice.  This is particularly so because of the natural tendency to place an exaggerated emphasis on statements that come with the stamp of governmental authority.

Moreover, there is a real danger of jury confusion and an even larger danger that Merck will attempt to use the statements in the Memorandum to mislead the jury.  Any suggestion by Merck that the FDA has concluded that all NSAIDs pose an increased risk of adverse CV events would be misleading; any suggestion by Merck that the FDA has concluded that Vioxx does not pose a greater risk of adverse CV events than other NSAIDs such as Naproxen would be misleading; any suggestion by Merck that the FDA has concluded that the Fitzgerald hypothesis was false or invalid would be misleading; and any suggestion by Merck that the FDA has concluded that Mr. Irvin did not take Vioxx for a sufficient amount of time for Vioxx to have caused his heart attack would be misleading.  It is, in part, because the

---

statements in the Memorandum are so ambiguous and confusing that there is so great a danger that they will be used to mislead the jury.

Merck suggests that all the shortcomings in the Memorandum simply go to the weight that the document should be afforded by the jury. That suggestion misses the boat where, as here, the statements in the document lack any indicia of scientific reliability, contain undefined qualifying terms and phrases, and there is absolutely no opportunity to cross-examine the authors on the bases for and meaning of the statements. An out-of-court statement which lacks indicia of reliability should not be admitted into evidence. <u>See</u> Fed. R. Evid. 803(8)(c).

### Conclusion

For the reasons stated herein, Plaintiff respectfully requests that the Court exclude the Memorandum from evidence in the trial of this matter.

Respectfully submitted,

By: _____
**Andy D. Birchfield, Jr.**
Paul J. Sizemore
P. Leigh O'Dell
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
(800) 898-2034 (telephone)
(334) 954-7555 (telecopier)

**Co-Lead Counsel**

**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
FAX: (504) 561-6024
**Temporary Office**
3411 Richmond Ave., Suite 460
Houston, TX 77046
PH: (713) 877-1843
FAX: (713) 871-9750

Christopher A. Seeger, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)

**Co-Lead Counsel**

**PLAINTIFFS' LIAISONCOUNSEL**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
MEUNIER&WARSHAUER, L.L.C.
P.O. Box 960
191 East Second Street
New Roads, LA 70760
(225) 638-6137
(225) 638-8836 (fax)

Carlene Rhodes Lewis, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Thomas R. Kline, Esquire
KLINE & SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced in accordance with Pre-Trial Order No. #8, on this **17th** day of November, 2005.