UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 05-4046* | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| EVELYN IRVIN PLUNKETT | * | |
| as Personal Representative of the Estate of | * | |
| RICHARD IRVIN, JR., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MERCK'S RESPONSE TO PLAINTIFF'S MOTION FOR LEAVE
TO USE DEPOSITION TESTIMONY OF DR. ERIC TOPOL DURING TRIAL**

Plaintiff deposed Dr. Eric Topol on November 22, 2005, six days before trial in this case

and nearly two months after fact discovery closed.  Plaintiff included Dr. Topol on her general

witness list but not on her expert witness list.  Plaintiff has never disclosed him as an expert and

did not submit a report from him, as the Pretrial Order in this case requires.  Instead, plaintiff

sandbagged Merck by taking a direct examination of Dr. Topol as an all purpose expert.  He

testified about, among other things, general causation, Vioxx's warning labels, Merck's

marketing practices, and its state of mind and alleged misconduct.  Merck had no opportunity to

review an expert report in advance of the deposition, take a seven-hour discovery deposition of

Dr. Topol, file a *Daubert* motion challenging the reliability of his opinions, or retain experts to

refute his opinions.  Instead, Merck had no more than three-hours to cross-examine Dr. Topol on the fly.

Plaintiff's Motion for Leave to Use Deposition Testimony of Eric Topol, M.D. During Trial should be denied.

## I.      BACKGROUND

Trial in this case starts tomorrow.  Fact discovery closed on September 30, 2005. Deadlines have passed for expert disclosures, expert depositions, *Daubert* motions, motions *in limine*, deposition designations and objections, and exhibit lists and objections.  (*See* Pretrial Order, dated September 30, 2005, attached as Ex. B)  The Court issued rulings on *Daubert* motions, motions *in limine*, and objections to exhibits on November 18, November 20, and November 23, 2005.

After fact discovery closed, plaintiff filed a motion for leave to take the deposition of Dr. Topol.  The Court permitted the deposition to proceed but reserved ruling on whether Dr. Topol's testimony would be admissible in the Plunkett trial.   When she sought leave to take the deposition, plaintiff never said that she intended to take a direct examination of Dr. Topol as an expert witness.  Nor did the Court authorize her to do so.

Dr. Topol is Chairman of the Department of Cardiovascular Medicine at the Cleveland Clinic in Ohio.  (Dep. at 27:23-28:7, attached as Ex. A)[1]  While Vioxx was on the market, Dr. Topol wrote several articles about the potential cardiovascular risks of Cox-2 inhibitors.  For example, in August 2001, Dr. Topol published an article in the Journal of the American Medical Association about VIGOR and CLASS, Celebrex's outcome study.  In that article, Dr. Topol

---

[1] "Ex. A" refers to pages from Dr. Topol's November 22, 2005 deposition.  A complete transcript of that deposition is attached as Exhibit A.  As an aside, the transcript does not contain all of the bases for objections made during the deposition.  The parties agreed during the deposition that Merck's counsel can insert the grounds for his objections at a later time.  (Ex. A, at 164:6-19)

recommended that Merck and Pfizer conduct a cardiovascular outcome study focused on patients at high risk of heart disease.  (Ex. 4)[2]  Merck and Pfizer did not conduct that study.

After Vioxx's withdrawal, Dr. Topol became an outspoken critic of Merck.  Dr. Topol expressed his criticisms on 60 Minutes, in letters to medical journals, in newspaper editorials, and in private emails to Dr. David Graham and 60 Minutes, among others.  (*See, e.g.,* Exs. 16, 17, 18, 20, 21, 56)

Dr. Topol is listed on plaintiff's general witness list.  (Plaintiff's witness list, attached as Ex. C)  He is not a designated expert witness and has never submitted an expert report in this case.  (Plaintiff's Notice of Service of Expert Reports, attached as Ex. D)

## II.    DR. TOPOL'S UNDISCLOSED OPINIONS

Mr. Kline started the deposition by asking about Dr. Topol's qualifications and whether he considers himself an expert in cardiovascular medicine:

> Q.    Are you, sir, with this background, an expert in the field of cardiovascular medicine?
>
> A.    I believe I am, yes.

(Ex. A, at 26:13-38:2) (objection omitted)

Mr. Kline then elicited numerous undisclosed opinions from Dr. Topol, such as the following.

### A.    Merck's conduct and state of mind

Plaintiff elicited numerous opinions from Dr. Topol about Merck's conduct and state of mind.  For example:

---

[2] "Ex. __" refers to exhibits attached to the affidavit of Phillip A. Wittmann.  Numbered exhibits correspond to the exhibit numbers used in Dr. Topol's deposition.  Lettered exhibits refer to documents that were not used in Dr. Topol's deposition.

- Dr. Topol read into the record and then agreed with statements from an email he wrote to Dr. David Graham on November 22, 2004:

  > "I am bothered by the continued outrageous lies of Merck with their full page multiple ads that 'they published everything' and that they never had a trial which showed any harm of Vioxx until APPROVe, when, in fact, there were two by May 2000 . . . I am also upset that the story of their scientific misconduct for the VIGOR paper in the New England Journal of Medicine, that's NEJM, with errors of omission (deaths), erroneous data (MIs), or heart attacks, and incomplete data (more than 1/2 of the thrombotic events) has not received any attention whatsoever."

(Ex. A, at 50:6-51:1; Ex. 2)

- On December 30, 2004, the New England Journal of Medicine published a letter Dr. Topol wrote to the editor. Mr. Kline asked Dr. Topol to use the letter to "go through your criticisms of the VIGOR trial and what you think Merck did that constitutes scientific misconduct." (Ex. A, at 221:23-222:3) After describing alleged "untrue statements" in the VIGOR study and "gross discrepancies" between it and FDA documents, Mr. Kline asks Dr. Topol:

  > Q.     Before you get to issue number two, if you remember, how do you view that conduct? What word would you use to describe it?

  > A.     We're talking about deaths, and we're talking about false assurances that the mortality was the same in three prominent places in the manuscript.

  > Q.     Outrageous?

  > A.     I believe it's highly misleading.

(Ex. A, at 224:4-19) (objections omitted)

- On October 2, 2004, the New York Times published an editorial by Dr. Topol called "Good Riddance to a Bad Drug." (Ex. 17) Dr. Topol said he wrote the editorial because he was "extremely upset by the way this was being handled and the misinformation that was in the first 24 hours of the Vioxx withdrawal."

  > "What I'm trying to convey in this op/ed is that Vioxx had a risk that had never been adequately defined, that overall it was unacceptable, that the whole class of COX-2 inhibitors was suspect, and that we can't tolerate this sort of situation where a medicine is being mass marketed and it could

induce tens of thousands of heart attacks, and without the appropriate studies."

(Ex. A, at 229:14-230:3; 232:5-233:10)

- Dr. Topol testified about handwritten notes prepared after the withdrawal of Vioxx and "in concert with the discussion with Michael Radusky, the producer at 60 Minutes." Dr. Topol's notes refer to his opinion about "What, When Merck knew" and "Compelling evidence of Merck/Vioxx knowledge of serious risks." (Exs. 22-23) Dr. Topol testified about those issues as well as what he believes "should have been widely known" by Merck senior management:

> MR. KLINE: Have you discussed with us today to your satisfaction what and when Merck knew things?
>
> Q.      If not, I want [you] to have an opportunity to expand. That's one of my purposes of this line of questioning.
>
> A.      I did touch on this earlier, that is, study 090 was completed in May 1999, and the VIGOR trial data and safety monitoring board alert was in November 1999. So, already by 1999 there were very significant issues, and this should have been widely known to the senior management at Merck.

(Ex. A, at 266:24-267:23; Ex. 22) (objections omitted)

- Dr. Topol offered his opinion that his handwritten note -- "Deception, falsifying, and suppression of data" -- applies to Merck and Vioxx:

> Q.      Now, in the middle of the page, or more or less in the middle of the page, you write three words, "Deception/Falsifying/Suppression of Data." Do they apply -- do all three of those words apply to Merck?
>
> A.      I have reviewed elements of each in this deposition that fulfill those terms.
>
> Q.      As they apply to Merck; correct?
>
> A.      As they apply to the studies and the data of Vioxx.
>
> Q.      Those would be words, filling in the details from what you've told us earlier, that would describe Merck's conduct; correct?
>
> A.      That's correct.

5

Q.      And then you list underneath this the sort of laundry list of things that fit in the category of deception, falsifying and suppression of data; correct?

A.      Yes.  The only thing I hadn't mentioned was the symposia that would be done at each of the national meetings, where they would have these Merck consultants giving lectures, taking apart our data, like the JAMA paper, and assuring the medical community like cardiologists or internists, doctors, that there was nothing wrong with the safety of Vioxx, that it was an illusion of the Cleveland Clinic authors of the JAMA paper.

(Ex. A, at 269:6-270:22; Ex. 22) (objections omitted)

- After confirming that Dr. Topol wrote the word "deception" on a list of questions by 60 Minutes, Mr. Kline asked:

    Q.      Did you, sir, believe there was deception?

    THE WITNESS:  As I reviewed throughout this deposition, I thought there were many points of highly misleading errors of omission and what could be considered the false conveyance of data and findings.

    Q.      And would those things that you just described fall under the category of deception?"

    THE WITNESS:  I think that that's certainly a term that could be used to apply to this pattern.

(Ex. A, at 302:19-303:13) (objections omitted)

- Dr. Topol testified that he learned from a New York Times article about Merck's alleged "ghostwriting" and misclassifying events in an article about the ADVANTAGE study.  "They had e-mails in the [New York Times] article which showed, amazingly enough, how a death, a sudden death was classified as a hypertensive event, which is quite extraordinary."  (Ex. A, at 262:11-263:17)

    Q.      I want you to assume that all of the things that you just said that were reported are things that could be independently established and confirmed from firsthand sources.  How, then, would you view that type of conduct?

    A.      The conduct is totally in continuum with the other concerns that I registered earlier, like the suppression of 090, like the erroneous issues about VIGOR and now with misclassifications of

deaths and events in ADVANTAGE.  These are all very similar types of things.

Q.      Is this serious business, Dr. Topol?

A.      This is totally inadequate and highly misleading clinical science.

Q.      Does it amount to serious scientific misconduct by Merck?

A.      I think that if this were to be adjudicated by an academic medical center in an unblinded way for whether there was scientific misconduct, this would fulfill the definition of scientific misconduct.

(Ex. A, at 263:19-265:4) (objections omitted)

- Dr. Topol testified that Merck has "made life absolute hell for people who criticize them" and that "there have been retaliation and actions taken to make life extremely difficult for people who have objected to their work, to their studies or to the lack of studies."  (Ex. A, at 251:6-20) (objection omitted)

- Dr. Topol testified that he agrees with a statement in the Wall Street Journal that "Merck sought to downplay the cardiac issue."  (Ex. A, at 148:19-149:5)

- Dr. Topol:  "Vioxx's risk has been evident since trials were conducted in 1999 and all the way through the time of withdrawal in September 30, 2004."  (Ex. A, at 59:20-60:7)  He "doesn't think Merck wanted to accept that there was a cardiovascular risk."  (Ex. A, at 153:8-154:4)

- Dr. Topol testified that:  "I believe there was considerable biased literature that was published with authors of either for Merck or consultants of Merck."  (Ex. A, at 194:4-13)  In addition, Dr. Topol expressed his views about how Merck allegedly "trashed" Juni's November 2004 article and its "vehement response" to every study that was published.  (Ex. A, at 204:13-205:7)

**B.      General Causation**

Dr. Topol repeatedly testified that Vioxx allegedly causes an increased risk of heart

attacks, stroke, and death, regardless of dose or duration of use.

- Dr. Topol opined that "there's a pretty strong case that the risk of Vioxx for heart attacks can occur at any time after the initiation of the medicine."

MR. KLINE:  One thing that Merck said from the APPROVe study was that there was an increased risk after 18 months.  Do you recall that claim?

A.      Yes.

Q.      How did you see that in the context of the full picture of the articles?

A.      This was another extremely concerning part of that dissemination on the day of withdrawal, that it took 18 months for there to be any risk, because that's not true.

In fact, as I reviewed earlier in this deposition, there were four trials that showed that the timeline for that was considerably quicker.  In VIGOR, with four to six weeks, there was separation. In ADVANTAGE, within 12 weeks.  In VICTOR, this was immediate.  And in study 090, within six weeks.

And in all of these trials, there were no heart disease patients.  So, it could have been much worse than -- in the days or weeks.  And beyond all that, there's the issue of a problem of statistical power, that is, you have to do a very large trial if you're not expecting adequate number of events, and so none of the trials were adequately powered from a time perspective.

But, given all those things, that is, statistical power, lack of cardiovascular patients, and four randomized trials, in addition to the Juni analysis, there's a pretty strong case that the risk of Vioxx for heart attacks can occur at any time after the initiation of the medicine.

(Ex. A, at 214:16-216:5)

- Dr. Topol:  "There isn't any question in my mind" that there has been "replication of untoward significant excess of events of heart attack, death and stroke in multiple trials."  (Ex. A, at 60:9-18)

- Dr. Topol claimed that the Kaplan-Meier curve in the VIGOR study showing divergence at four to six weeks and has been "replicated in four randomized trials . . . Study 090, which was a six-week trial, which had a 760 percent excess within the six weeks . . . The VIGOR trial I just mentioned . . . The ADVANTAGE trial, which was a 12-week trial that showed a significant excess in the 12-week time frame.  And the VICTOR trial, which has not yet been published, which is a colon cancer trial of 2,300 patients coordinated out of

Oxford, which has been at least commented on by the investigators having immediate excess in heart attack risk."

(Ex. A, at 126:23-127:10; 127:24-128:17)

- Dr. Topol opined that four or five observational studies show a "twofold or greater risk of Vioxx compared with other agents to be used for arthritis." He later said that Drs. Ray, Solomon, Graham, Kimmel, and Leveseque conducted studies showing an increased risk of heart attacks from Vioxx. (Ex. A, at 178:7-179:4; 216:17-218:9)

- Dr. Topol also testified repeatedly about Dr. Juni's December 2004 article from the Lancet. For example, Dr. Topol said: "The paper that I reviewed actuarially, the Juni paper . . . shows in 2000, when VIGOR and 090 are put together, that's when you cross the line of statistical significance and that's the definition of a dangerous drug." (Ex. A, at 220-21, Ex. 20) Dr. Topol also claimed that Dr. Juni's study shows "no dose relationship" and "no duration relationship" between Vioxx and the risk of heart attacks. (Ex. A, at 577:19-179:11)

- Dr. Topol read into the record the following portion of an email he wrote Dr. David Graham on November 15, 2004: "I think this [attached analysis of Study 090 and VIGOR], along with the Juni paper, nails this down as to when there was confirmatory evidence that rofecoxib was dangerous drug." (Ex. A, at 245:19-247:19; Ex. 20) Mr. Kline then asked:

> Q.     "A dangerous drug," you say. It nails down "when there was confirmatory evidence." So, I have to ask you, what is that date that you can nail down, your private words to David Graham, safety officer of the FDA, when can you nail down when there was confirmatory evidence that Vioxx was a dangerous drug?

> A.     The paper that I reviewed earlier, the Juni paper that shows that time cumulative analysis, shows in 2000, when VIGOR and 090 are put together, that's when you cross the line of statistical significance, and that's the definition of a dangerous drug.

(Ex. A, at 247:4-19) (objections omitted)

- Dr. Topol also testified that Vioxx "carried a far greater risk of heart attack and stroke" than other Cox-2 inhibitors:

> Q.     Couple more points. In your editorial, your op/ed piece, you wrote, there's only a sentence, I won't put it in front of you, "Vioxx has repeatedly carried a far greater risk of heart attack and stroke," you're saying, I'm reading through it, "than the other COX-2 inhibitors?"

A.      (Witness nods.)

Q.      Do I have your opinion or your views, your conclusions basically correct when I state that?

THE WITNESS:  The point here is that all the COX inhibitors have to be implicated, the class, but within that class there appears to be a gradient where Vioxx appears to be worse, consistently worse than Celebrex, and somewhere in between perhaps or perhaps closer to Vioxx is Bextra, and there are other agents in this class as well.

(Ex. A, at 311:17-312:16) (objections omitted)

## C.      The Naproxen Hypothesis

Dr. Topol opined about whether the cardioprotective effects of Naproxen can explain the cardiovascular results in the VIGOR trial.  For example:

- Dr. Topol:  "There was no basis for the naproxen hypothesis . . ."  (Ex. A, at 94:19-95:8)  Later, Mr. Kline asked Dr. Topol "what he thinks" about the Naproxen hypothesis:

    Q.      So, what do you think of this naproxen hypothesis that was put forward by Merck to justify the results in VIGOR?

    A.      It doesn't justify -- I mean, as I mentioned earlier, the problem is you have an experimental drug which is not fully defined, and you compare it to a drug that's been known for 20 years.  To all of a sudden to ascribe some type of magical protective effect without any basis is not acceptable.

(Ex. A, at 133:1-16) (objection omitted)

- Dr. Topol also read from a portion of his December 30, 2004 letter to the New England Journal of Medicine editor in which he called the Naproxen hypothesis "mathematically indefensible."  (Ex. A, at 226:22-227:20; Ex. 16)

## D.      Merck's marketing practices

Dr. Topol gave his opinions about Merck's direct-consumer-marketing of Vioxx and other marketing practices.

- Dr. Topol read from one of his articles stating that Merck and other Cox-2 manufacturers spent "over 265 million in 2001 for direct-to-consumer advertising to promote their drugs, but have failed to conduct a prospective trial of COX-2 inhibitors in patients with cardiovascular disease." (Ex. A, at 185:15-186:10; Ex. 12)

- Dr. Topol read from another article he wrote called "Pharmaceutical Advertising Versus Research Spending: Are Profits More Important Than Patients?" (Ex. 13) In this article, "we showed how Vioxx had $160 million of advertising in the year compared to Budweiser, $140 odd and Pepsi, $125 million, and Nike, $70 million." Dr. Topol said he was "thinking of Vioxx and Merck" when he wrote:

  > "We would like to call on the leaders of the medical community to voice their concern regarding the adverse effects of direct-to-consumer advertising, whose sole aim is to sell drugs without other considerations."

(Ex. A, at 188:24-189:24; Ex. 13)

- Dr. Topol explained one of his post-withdrawal handwritten notations called "Marketing and Sales."

  > "Well, the marketing and sales has been very much demonstrated in the Waxman report, the Congressional report of the cardiovascular card. This is where it was a card that was distributed by the sales team throughout the country, 3,000, I believe, sales reps for Merck that had a card that showed that there was somehow an eight to ten-fold protection of Vioxx compared to other non-steroidals. So, this was quite extraordinary, these sorts of sales tactics that were going on by the specially-trained Merck sales reps."

(Ex. A, at 272:19-273:11; Ex. 22)

**E.     Vioxx's warning labels**

Dr. Topol opined that the warning labels for Vioxx did not adequately convey the alleged cardiovascular risks associated with Vioxx.

- Dr. Topol:  "In my opinion, both the original label and then the revision in April of 2002 did not show adequate safety concerns about heart attacks, strokes and death that could occur from the medicine . . ." (Ex. A, at 166:5-21)

- During Merck's examination, Dr. Topol also volunteered that his "New England Journal of Medicine invited editorial" states that Merck's alleged 14-month delay in getting a label change was "unacceptable." (Ex. A, at 542:16-543:5)

- Dr. Topol opined that a black box warning "could have easily been imposed" in 2000.

> MR. KLINE:  Do you have a sense of when [a black box warning] was due by?
>
> A.      It could have easily been imposed as of February 2001, or if we go back to the Juni analysis in the Lancet, also published in the Lancet, it could have been back in year 2000.  So, somewhere between 2000 and 2001 there was more than adequate confirmation.  Essentially all you need is VIGOR and study 090 together, and I could take you through the Juni Analysis in the Lancet, but that basically crosses the line for proven hazard of heart attacks."

(Ex. A, at 197:19-198:12) (objections omitted)

**F.      Vioxx's withdrawal**

Dr. Topol opined that Vioxx should have been withdrawn years earlier and described his

personal reaction to the withdrawal.

- Dr. Topol said he agrees with following statement from Dr. Juni's December 2004 Lancet article: "Vioxx should have been withdrawn several years earlier." (Ex. A, at 579:13-580:10)

- Dr. Topol added his personal views about the day Merck withdrew Vioxx from the market: "the day of withdrawal was like a "nightmare coming true...But then what started to happen was, the same type of what I viewed as unacceptable publicity about Vioxx was now being disseminated, and this was quite disconcerting, to say the least." (Ex. A, at 208:18-209:15)

- After receiving telephone calls from "virtually all" of the major newspapers following the withdrawal, Dr. Topol felt "the effect here was to distort the data so that it would be both difficult to understand and it would lessen the true impact and nature of the problem." (Ex. A, at 212:2-16; 213:5-13)

### G.   Dr. Topol's interview on 60 Minutes

Dr. Topol appeared on 60 Minutes on November 14, 2004.  Mr. Kline played three video

clips of that interview to find out if Dr. Topol agreed with his own remarks.  For example, Mr.

Kline played the following clip:

> "Whenever you find a problem and you are thinking maybe it's not
> a problem, you want to see if there's independent replication.  So,
> if you have study 090 and you want to discount that somehow,
> then you have VIGOR, we've got two trials now, you have
> essentially lightning striking twice.  That's independent
> replication.  That's really serious confirmation.  This is
> unequivocal.  This is a problem."

(Ex. A, at 257:13-258:15)

Dr. Topol testified that he "believed then" and "still believes today" the statements he

made on 60 Minutes.  (Ex. A, at 261:15-262:1)[3]

### ARGUMENT

This Court should deny Plaintiff's Motion for Leave to Use Deposition Testimony of Dr.

Topol for six reasons.

First, plaintiff violated the Court's Pretrial Order by not disclosing Dr. Topol as an expert

and not submitting an expert report from him.  Plaintiff's failure to disclose Dr. Topol as an

expert also violates Federal Rule of Civil Rule 26(a)(2)(A).  Therefore, his testimony should be

excluded under Federal Rule of Civil Procedure 37(c)(1).

Second, Merck was prejudiced by having to cross-examine Dr. Topol in just three hours,

without the benefit of a discovery deposition.

---

[3] Merck has not included in this brief every undisclosed, improper opinion rendered by Dr. Topol in his deposition.
For example, Dr. Topol opined, among other things, that Merck "should have" conducted certain studies and
"should have" published Study 090.  (*See, e.g.,* Ex. A, at 97:23-98:23; 281:17-285:6; 562:16-563:11)

Third, Merck cannot challenge Dr. Topol's opinions under *Daubert* because the deadline for *Daubert* motions has passed.

Fourth, Dr. Topol's testimony about Merck's alleged misconduct and state of mind is inadmissible under Federal Rules of Evidence 702, 801, 402, and 403.

Fifth, Dr. Topol repeatedly testified in response to leading questions that lacked foundation.

Finally, to the extent Dr. Topol gave any fact testimony, it should be excluded because the deposition occurred after the close of fact discovery in this case.

## I.   DR. TOPOL'S UNDISCLOSED TESTIMONY SHOULD BE EXCLUDED UNDER THIS PRETRIAL ORDER AND FEDERAL RULE OF CIVIL PROCEDURE 37

This Court's Pretrial Order required plaintiff to identify experts and submit reports by September 26, 2005.  (Ex. B.)  Plaintiff has never identified Dr. Topol as an expert witness.  (Ex. D)  Instead, she identified Dr. Topol on her general witness list.  (Ex. C)  Because plaintiff did not comply with the expert disclosure and expert report provisions of the Pretrial Order, she should not be allowed to introduce Dr. Topol's opinion testimony in this case.

Plaintiff argues that Merck allegedly had notice of Dr. Topol's opinions and cannot claim prejudice or surprise because: "On October 31, plaintiff designated all of Dr. Topol's deposition testimony to play at trial." (Mem. at 1, 7)[4]  That designation, however, is no disclosure whatsoever.  At the time plaintiff designated Dr. Topol's deposition (October 31, 2005), the deposition had not yet occurred.  The deposition took place on November 22, 2005.  Merck had no way of knowing in October 2005 that Dr. Topol would be a plaintiff's expert witness, let alone the subject matter of his testimony.

---

[4] "Mem." refers to the Memorandum in Support of Plaintiff's Motion for Leave to Use Deposition Testimony of Eric Topol, M.D. during trial, filed earlier today.

Plaintiff claims that "Dr. Topol's testimony in large part is composed of his account of his personal role researching the dangerous nature of Vioxx and conveying to the medical community and to the general public the dangerous propensities of the drug." (Mem. at 8) Merck is not sure what plaintiff means by "his account of his personal role," but it is apparent that plaintiff is trying to pigeonhole Dr. Topol's opinion testimony into Federal Rule of Evidence 701. However, Rule 701 prohibits the admission of opinion testimony that is based on scientific, technical, or other specialized knowledge. Fed. R. Evid. 701(c); *Doddy v. Oxy U.S.A., Inc.*, 101 F.3d 448, 460 (5th Cir. 1996) ("[A] person may testify as a lay witness only if his opinions or inferences do not require any specialized knowledge and could be reached by any ordinary person"); *Bank of China v. NBM, LLC*, 359 F.3d 171, 182 (2nd Cir. 2004) (holding that a bank employee's testimony regarding the business community's standards in the context of international commercial transactions was not admissible as lay opinion where the employee's testimony was based on specialized knowledge in international banking, and the bank had not disclosed the employee as an expert).

Dr. Topol's testimony is prohibited by Rule 701 because it is clearly based on specialized, scientific knowledge. Dr. Topol testified extensively about Vioxx's alleged increased cardiovascular risks, regardless of dose or duration of use. He offered his interpretation of clinical and epidemiological studies, and expressed opinions about complex scientific theories. Testimony about these issues certainly requires specialized, scientific knowledge. In fact, plaintiff admits that "Dr. Topol does offer opinions that are based on his specialized knowledge as a cardiologist." (Mem. at 9) This is why Mr. Kline spent much time asking Dr. Topol about his qualifications and attempted to qualify him as "an expert in the field of cardiovascular medicine." (Ex. A, at 26:13-38:2) Plaintiff also has designated several

purported experts in the areas of epidemiology, pathology, pharmacology, and cardiology to address the same subjects about which Dr. Topol opines.

Because Dr. Topol's testimony is not proper subject matter for lay witness testimony, the only basis for its admission is under Rule 702, which governs the admissibility of expert testimony. However, Dr. Topol's testimony is inadmissible under Rule 702 because plaintiff did not designate Dr. Topol as an expert witness pursuant to Federal Rule of Civil Procedure 26.

Federal Rule of Civil Procedure 26(a)(2)(A) states that "a party shall disclose to other parties the identity of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence." The designation requirement under Rule 26(a)(2)(A) applies to all testifying experts, regardless of whether an expert witness is retained in the case. *Hamburger v. State Farm Mut. Automobile Ins. Co.*, 361 F.3d 875, 882 (5th Cir. 2004) Also, as plaintiff acknowledges in her brief, Rule 26(a)(2)(C) requires that she disclose Dr. Topol's expected testimony at trial and identify documents and exhibits expected to be offered. Plaintiff claims that she has met these requirements "in substance." (Mem. at 10) Rule 26(a)(2)(C) does not say that parties need to satisfy it "in substance." Either a party satisfies the rule or it does not. Here, plaintiff did not satisfy the rule at all.

First, while plaintiff did list Dr. Topol's name on her general witness list, she did not designate Dr. Topol as an unretained expert. In fact, plaintiff's expert disclosure makes no mention of Dr. Topol. Plaintiff argues that Merck "has been on notice that Dr. Topol could potentially be an expert in this litigation since April 2001" when its employees met with Dr. Topol. (Mem. at 12) It is impractical, unfair, and inconsistent with the disclosure requirements of Rule 26 to force Merck to anticipate expert testimony based on a meeting that occurred with a witness over four years ago.

Second, plaintiff did not inform Merck of the nature of Dr. Topol's testimony that she intended to present at trial.  Plaintiff argues that Merck should have known about Dr. Topol's opinions because "he has been a vocal critic of Merck privately in discussions with Merck and publicly through leading medical journals and major newspapers." (Mem. at 10)  This argument must fail.  Pointing to a witness's public criticism of a defendant is not close to the type of disclosure contemplated by Rule 26.  If it were, defendants would be forced to anticipate expert testimony from every individual listed on a witness who has criticized defendants in the media.  And just because a witness is critical of Merck in the media, does not mean he will be an expert witness in a Vioxx case.

Finally, plaintiff did not provide Merck with any of the documents or exhibits she intended to use during his examination.  The fact that plaintiff does not control Dr. Topol or that he "has not cooperated in the least with plaintiff" does not absolve her of the requirements of Rule 26(2)(C).  (Mem. at 11)  Plaintiff knew exactly what documents she intended to use before taking the deposition of Dr. Topol.  Yet, like her decision not to disclose Dr. Topol's opinions in advance, plaintiff never told Merck what documents she would use.

A party cannot escape the requirements of Rule 26 by "simply calling an expert witness in the guise of a layperson."  Fed. R. Evid. 701 Advisory Committee's Notes; *See* Joseph, Emerging Expert Issues Under the 1993 Disclosure Amendments to the Federal Rules of Civil Procedure, 164 F.R.D. 97, 108 (1996) (noting that "there is no good reason to allow what is essentially surprise expert testimony," and that "the Court should be vigilant to preclude manipulative conduct designed to thwart the expert disclosure and discovery process").

Plaintiff's reliance on *Gomez v. Rivera Rodriguez*, 344 F.3d 103 (1st Cir. 2003) is misplaced.  In that case, former municipal employees of the Commonwealth of Puerto Rico sued

the municipality, its new mayor, and new human resource director alleging politically discriminatory discharge under 42 U.S.C. § 1983. The mayor's decision to terminate plaintiffs' employment was based on an advice he received during a single meeting with an attorney. In a "joint Pretrial order," the attorney was identified by both parties as a fact witness. The Pretrial order specifically stated the witness would "testify regarding the meeting with the mayor…and the guidance requested by the mayor regarding the former employees." *Id.* at 112. The attorney was not designated as an expert and did not submit a report. The district court granted plaintiff's motion *in limine* to bar the attorney's testimony under Rule 26.

The First Circuit Court of Appeals reversed because the attorney "was a direct participant in the events at issue, and the "record confirms that his testimony was offered to that end**."** (*Id.* at 113) The Court also held that "a party need not identify a witness as an expert so long as the witness played a personal role in the unfolding of the events and issue and the anticipated questioning seeks *only* to elicit the witness's knowledge of those events." (*Id.* at 113-14) (emphasis added)

Here the facts are much different. Plaintiff does not seek to introduce only evidence of discussions he had with Merck. In fact, Dr. Topol testified about *one meeting* he had with Merck in April 2001. The meeting occurred in April 2001. It involved a discussion about an article Topol eventually published in JAMA in August 2001 and a cardiovascular outcome study that Dr. Topol suggested. (Ex. 4; Ex. A, at 100:10-106:13) Mr. Kline spent only 6 pages of the deposition asking about this meeting. (*Id.*)

It would be one thing if plaintiff sought only to introduce Dr. Topol's testimony about the April 2001 meeting between Dr. Topol and Merck. But she seeks to introduce much more than that. She seeks to introduce evidence of Dr. Topol's opinions he formed after the April 2001

meeting all the way to the present.   Dr. Topol's one meeting with Merck does not catapult him into a "direct participant" in all the events covered in his deposition such that he can be considered a fact witness like the attorney in *Gomez*.

Under Rule 37, "[a] party that without substantial justification fails to disclose information required by Rule 26 . . . is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." Fed. R. Civ. P. 37(c)(1).  As one court has noted, Rule 37's "sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless."  *Salgado v. General Motors Corp.*, 150 F.3d 735, 742 (7th Cir. 1998); *see also Lohnes v. Level 3 Commc'ns, Inc.*, 272 F.3d 49, 59-61 (1st Cir. 2001) (holding that the plaintiff's failure to timely disclose an expert witness justified the district court's decision to disregard the witness's affidavit); *Sears Roebuck & Co. v. Goldstone & Sudalter*, 128 F.3d 10, 18 n.7 (1st Cir. 1997) (affirming the district court's exclusion under Rule 37(c) of expert testimony because the proffering party failed to disclose the expert's identity at the beginning of the litigation).

Generally, courts will not impose Rule 37's exclusionary sanction if the infraction was minor and complete exclusion would be "unduly harsh."  Fed. R. Civ. P. 37.  Minor infractions include "the inadvertent omission from a Rule 26(a)(1)(A) disclosure of the name of a potential witness known to all parties; the failure to list as a trial witness a person so listed by another party" or where the objecting party has had substantial notice that the expert will testify and has the documents upon which the expert will rely.  *Id.*; *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 563-564 (5th Cir. 2004) (holding no abuse of discretion when trial court allowed expert to testify, despite failure to submit expert report, because defendant's had six

months notice that expert would testify and copies of documents upon which he would rely);

*Verzwyvelt v. St. Paul Fire & Marine Ins. Co.*, 204 F.R.D. 309, 311 (D. La. 2001) (holding that

any potential prejudice to moving party created by failure to submit expert report by discovery

deadline was curable because more than three months remained before trial, giving "more than

ample time to prepare rebuttal testimony and argument").

Here, plaintiff's failure to comply with the Court's Pretrial Order and Rule 26 was far

from a minor infraction. Plaintiff sought leave from this Court to take a deposition of Dr. Topol

after the close of discovery. Plaintiff did not give the Court or Merck any indication that she

would use the untimely deposition to elicit undisclosed expert testimony. Plaintiff did not

provide Merck with the documents upon which Dr. Topol would rely for his opinions. In fact,

Merck learned about Dr. Topol's opinions during plaintiff's examination of him – the same day

Merck had to cross-examine him and *six days before trial*.

Failure to disclose Dr. Topol as an expert witness is a serious violation of Rule 26 and the

Court's Pretrial Order. It is not minor, harmless error. Finally, excluding Dr. Topol's testimony

in this trial would not be a "harsh" remedy because his testimony is merely cumulative of

opinions plaintiff will attempt to elicit from her other purported experts.

## II.    DR. TOPOL'S BELATED EXPERT TESTIMONY PREVENTS MERCK FROM CHALLENGING ITS RELIABILITY UNDER *DAUBERT*

In order to be admissible under Rule 702, Dr. Topol's testimony must satisfy *Daubert*

and its progeny. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *In re*

*Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d 603, 605 (E.D. La. 2003) (holding that "before an

expert is allowed to testify the trial court must assess the reliability of the methodology used by

the proposed expert and the relevance of the testimony to the facts at issue"). *Daubert* requires

that district courts act as gatekeepers to ensure that expert testimony is both relevant and reliable.

509 U.S. at 593-94; *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 275-76 (5th Cir. 1998); *In re Propulsid*, 261 F. Supp. 2d at 605. When expert testimony is proffered the district court must hold a *Daubert* hearing. 509 U.S. at 593-94; *Moore*, 151 F.3d at 275-76; *In re Propulsid*, 261 F. Supp. 2d at 605. [5]

The Court's Pretrial Order required that the parties file *Daubert* motions by October 21, 2005. (Ex. B, at 2) Merck filed ten *Daubert* motions directed to experts, who, unlike Dr. Topol, were properly designated and did submit reports. This Court held a hearing on those motions on November 14-15, 2005, and issued rulings on November 18, 2005.

Thus, even if Merck were able to discern the bases and methodology behind Dr. Topol's opinions (a nearly impossible task without an expert report or discovery deposition), it is too late for Merck to file a *Daubert* motion challenging the reliability of Dr. Topol's opinions. [6]

## III.   MERCK WAS PREJUDICED BY HAVING TO CONDUCT A BLIND CROSS-EXAMINATION OF DR. TOPOL IN THREE HOURS

Federal Rule of Civil Procedure 26(b)(4)(A) provides that: "A party may depose any person who has been identified as an expert whose opinions may be presented at trial. If a report from the expert is required . . . the deposition shall not be conducted until after the report is provided." Fed. R. Civ. P. 26(b)(4)(A). Under the Court's Pretrial Order, Merck had to complete depositions of plaintiff's experts by October 10, 2005. (Ex. B, at 1-2)

---

[5] Plaintiff may not evade *Daubert* or the reliability requirements under Federal Rule of Evidence 702 simply by labeling Dr. Topol a "fact witness." Fed. R. Evid. 701 Advisory Committee's Notes ("Rule 701 has been amended to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing"); *Garcia*, 413 F.3d at 215 ("The purpose of [Rule 701(c)] is to prevent a party from conflating expert and lay opinion testimony thereby conferring an aura of expertise on a witness without satisfying the reliability standard for expert testimony set forth in Rule 702").

[6] It is also too late for Merck to file motions *in limine* or objections to plaintiff's exhibits. Those respective deadlines were November 4 and 11, 2005. (Ex. B, at 2)

Merck took discovery depositions of every expert witness properly designated by plaintiff. Again, Merck did not notice Dr. Topol's deposition because plaintiff did not identify him as an expert witness or submit his expert report.

Plaintiff noticed Dr. Topol's deposition herself. Even though the deposition occurred after fact discovery closed and six days before trial, this Court authorized the deposition and ordered the parties to confer about allocating time to examine Dr. Topol. The parties agreed that plaintiff could use four hours and Merck could use three. If Merck had known, however, that plaintiff would spend virtually the entire deposition eliciting undisclosed expert testimony, Merck never would have agreed to a three-hour time limit for its examination of Dr. Topol. Instead, Merck would have exercised its right to take a seven-hour discovery deposition of him.

## IV.   DR. TOPOL OPINIONS ABOUT MERCK'S ALLEGED MISCONDUCT ARE INADMISSIBLE EXPERT TESTIMONY, BASED ON HEARSAY, AND ARE IRRELEVANT AND UNDULY PREJUDICIAL

As described in Section II-A above, Dr. Topol testified at length about his views of Merck's conduct and state of mind. This Court has already indicated it will proactively restrain "expert" testimony of this sort. But no one was there to restrain Dr. Topol.

Dr. Topol's testimony about Merck's alleged misconduct and state of mind is also inadmissible under Federal Rules of Evidence 802, 402, and 403. Dr. Topol's views about theose issues are based primarily on hearsay documents that he or others wrote. For example:

Topol Exhibit 2 is an email from Dr. Topol to Dr. David Graham dated November 22, 2004. Dr. Topol read into the record portions of his email such as Merck's alleged "continued outrageous lies of Merck" and "scientific misconduct." (Ex. 2; Ex. A, at 50:1-51:1)

Topol Exhibit 3 is a Commentary co-authored by Dr. Topol and published in his hospital's medical journal in December 2004. The title is: "The sad story of Vioxx, and what we

should learn from it." Mr. Kline asked Dr. Topol to use this document "as a basis to tell us the story." (Ex. 3; Ex. A, at 53:23-54:6; 56:3-15)

Topol Exhibit 16 is a letter from Dr. Topol to the editor of the New England Journal of Medicine dated December 30, 2004. Mr. Kline read portions of this document into the record, and Dr. Topol confirmed that he wrote them. (Ex. 16; Ex. A, at 226:22-229:9)

Topol Exhibit 17 is an editorial Dr. Topol reported in the New York Times on October 2, 2004. Mr. Kline read portions of this editorial and asked Dr. Topol if he wrote them and to explain what he was "trying to convey." (Ex. 17; Ex. A, at 230:19-235:18)

Topol Exhibit 18 is an editorial published in the "Perspective" section of the New England Journal of Medicine on October 21, 2004. Mr. Kline read various passages from this document, and then asked if "that was your thinking at that point in time" and "is it still your thinking today?" Dr. Topol answered "yes" and "unquestionably." (Ex. 18; Ex. A, at 237:11-240:6)

Topol Exhibit 20 is another email exchange between Dr. Topol and Dr. David Graham in November 2004. Mr. Kline read certain language from these emails and asked Dr. Topol whether he wrote them. Dr. Topol said he did and further testified that he "shared Dr. Graham's sentiments." (Ex. 20; Ex. A, at 245:19-249:20)

Topol Exhibit 21 is an email from Dr. Graham to Dr. Topol dated November 1, 2005. Mr. Kline read into the record Dr. Graham's concern about going on 60 Minutes and fear of retaliation. Mr. Kline then asked Dr. Topol: "By the way, sir, if I can pause for a minute. Has Merck made life absolute hell for people who criticize them?" Dr. Topol's answer: "I believe that is the case, that is, there have been retaliation and actions taken to make life extremely

difficult for people who have objected to their work, to their studies or to the lack of studies."
(Ex; 21; Ex. A, at 250:20-251:20)

Topol Exhibit 22 is a document with Dr. Topol's handwritten notes written in October
2004 "shortly after the withdrawal, my op/ed, and at the time when I was putting together the
New England Journal and talking to the producer at 60 Minutes." Mr. Kline asked Dr. Topol
about what he meant by "what/when Merck knew"; "Deception/Falsifying/Suppression of Data";
and "Marketing and sales." (Ex. 22; Ex. A, at 265:10-274:7)

Topol Exhibit 23 is a document with Dr. Topol's handwritten notes he wrote "later,
because it was only later that I learned about the VALOR trial in February 2005 . . ." Dr. Topol
then explained some of the items listed under a section he wrote called: "Compelling evidence of
Merck/Vioxx knowledge of serious risks." (Ex. 23; Ex. A, at 277:9-280:9)

Topol Exhibit 24 is a document with Dr. Topol's handwritten notes that "were done in
concert with the discussion with Michael Radutsky, the producer at 60 Minutes." Among other
things, Mr. Kline either read or asked Dr. Topol to explain his entries about "Merck suppression
of 090," "FDA suppression," "deceptive, falsifying data." (Ex. 24; Ex. A, at 288:15-290:2)

Topol Exhibit 26 is a document titled "Preliminary Questions - 60 Minutes" on which Dr.
Topol wrote the word "deception." Mr. Kline asked: "Did you, sir, believe there was
deception?" Dr. Topol's answer: "As I reviewed throughout this deposition, I thought there were
many points of highly misleading errors of omission and what could be considered the false
conveyance of data and findings . . . I think that's certainly a term that could be used to apply to
this pattern." (Ex. 26; Ex. A, at 300:20-303:13)

Topol Exhibit 27 is a letter from the show "Now with Bill Moyers" dated October 7,
2004. It contains handwritten notes that Dr. Topol wrote because he had to contact Bill Moyers

to "to convey what I thought were the principal findings" of a document prepared by FDA's Dr. Shari Targum. When asked to describe "the bottom line" from his handwritten notes, Dr. Topol testified "The more I reviewed this particular supplement or Targum report, the more disturbing it became. I had not ever delved into it as I did at that point in time, and this is, of course, after the drug withdrawal." (Ex. 27; Ex. A, at 303:15-305:19)

Topol Exhibit 28 is an email from Dr. Topol to the producer of 60 Minutes dated October 17, 2004. Among other things, Dr. Topol reads from this email his claim that: (1) the Juni study shows "unequivocally that the data on Vioxx had crossed the line by 2001 for heart attack risk;" (2) Study 090 showed a "striking risk of heart attack and stroke before the drug ever got commercialized;" and (3) the 60 Minutes producer should contact Dr. Roy Vagelos, Merck's former CEO, who "hates [Ray] Gilmartin and thinks he is an idiot (may be accurate)...he might open up and say Merck should have done the right thing immediately in 1998 when Study 090 showed a more than 6-fold heart attack risk at low dose (12.5 mg) of Vioxx." (Ex. 28; Ex. A, at 305:21-311:13)

*     *     *

All of the above documents and Dr. Topol's testimony about them are inadmissible hearsay under Rule 801. Dr. Topol's emails, editorials, letters to the editor, and handwritten notes are all being offered for the truth of the matters asserted in them. No hearsay exception applies.

The documents and Dr. Topol's testimony about them are also irrelevant under Federal Rule of Evidence 402. The documents were written after Vioxx was withdrawn and years after Mr. Irvin used Vioxx. The opinions Dr. Topol expressed in his emails, editorials, letters to the editor, and handwritten notes are just that – his personal opinions. Whether Dr. Topol believes

25

that Vioxx causes heart attacks or that Merck is a bad company does not make either of those

alleged facts any more likely than without evidence of Dr. Topol's opinions.

Finally, to the extent Dr. Topol's opinions about studies or other documents have any

probative value, it is substantially outweighed by the danger of unfair prejudice and needless

presentation of cumulative evidence. Fed. R. Evid. 403. The unfair prejudice is clear from the

nature of the comments Dr. Topol makes in his writings. He accuses Merck of engaging in a

pattern of deceit, misleading doctors and patients, putting profits over the safety of patients, and

now claims Vioxx should have been withdrawn years earlier. Needless presentation of

cumulative evidence will occur if Dr. Topol is permitted to testify about the same issues (such as

general causation and warnings) that are the subject of testimony by plaintiff's other purported

expert witnesses.

## V.   THE MAJORITY OF MR. KLINE'S QUESTIONS ARE LEADING AND LACK FOUNDATION

Mr. Kline repeatedly asked leading questions during his direct examination of Dr. Topol

or questions that lacked foundation. On numerous occasions, Mr. Kline led Dr. Topol by using

documents as a prop or guide from which Dr. Topol would testify. Such documents include Dr.

Topol's emails, editorials, handwritten notes, and even documents written by others such as Dr.

Graham or newspaper reporters. (*See, e.g.,* Ex. A, at 50:6-53:11; 231:5-236:12; 237:20-240:6;

245:19-249:20; 306:3-312:16)

At other times, Mr. Kline asked questions that were leading or lacked foundation. For

example:

> Q.    Now, you also formed opinions relating to the conduct of the
> pharmaceutical company, Merck, and its conduct of research and its
> marketing and its making available to the public the drug Vioxx; is that
> correct?

(Ex. A, at 44:8-13)

* * *

Q.      In the VIGOR trial, we had mentioned the DSMB earlier.  Do you know if there was any cardiologist on the DSMB?

A.      I'm not aware of any -- who the members of that safety monitoring board were, so, I don't know.

Q.      Would it make a difference in your mind if you knew that there was no cardiologist on the DSMB that was addressing any cardiovascular safety issues and what would you have expected?

A.      . . . Yes, I would be concerned if no cardiologist was on the committee and they were adjudicating -- remember that point I made earlier about November 19, 1999 when they had excess deaths and serious cardiovascular events, and that does need a cardiologist rained in clinical trials to help interpret that signal.

(Ex. A, at 297:14-298:20) (objections omitted)

* * *

Q.      Did you know that the director of the COX-2 program at Merck was an infectious  disease doctor who had limited experience prior to coming to Merck just a few years earlier?

A.      I did not know that.

Q.      Does that surprise you hearing that today?

THE WITNESS:  I would have thought rheumatologists would have worked in that space, but, you know, I can't really comment beyond that.

(Ex. A, at 299:12-300:4) (objections omitted)

* * *

Q.      Did you know that [Dr. Alise Reicin's] brother was an investment fellow at Morgan Stanley?

A.      No, I had no idea of that.

(Ex. A, at 88:5-11) (objection omitted)

* * *

Q.      By the way, are you aware of the fact, Dr. Topol, that the Merck higher-ups did a lot of work at night on Vioxx?

A.      No.

Q.      Oh, okay.  Well, they did.  And it says here, it basically transmits back Alise Reicin's markup, electronic markup of your document.  Are you familiar with it?

A.      I've never seen this . . .

Q.      Were you aware of the fact that Merck was working over your paper?

A.      I had no idea until this very moment.

(Ex. A, at 90:12-91:4; 92:23-93:4) (objections omitted)

                              *        *        *

Q.      And there's an e-mail from Dr. Demopoulos to a number of people, including Alise Reicin.  And they took a crack at revising it, and if you look at the last sentence of the e-mail, "We recognize that the revised" transcript "does not completely neutralize the potential negative impact of the publication, but . . . it is substantially removed from the original.  We "feel that revising it further to more completely present a Merck perspective might alienate the authors and thus jeopardize our opportunity to contribute at all."  Did you know that's what was going on?

THE WITNESS:  This is remarkable.  I didn't know . . . this was going on at all.

Q.      You've now seen it.  What do you think of that kind of conduct?

A.      I'm actually appalled by this.  Yes, to say that, you know, this was trying to   neutralize the potential negative impact and jeopardize our ability to contribute.  We didn't ask them to contribute.  We asked them to reconcile the data inconsistencies.

Q.      Is that how you view these e-mails that I've just shown you -- for the first time?

THE WITNESS:  Yes, I'm quite bothered by this.

(Ex. A, at 107:18-109:19; 111:16-112:2) (objections omitted)

                              *        *        *

Q.      I don't have the document in front of me, but I think I've read in the many documents that I've had in front of me a comment by you to the

effect that if Merck's view were true, it would be the wonder drug of wonder drugs or something like that.  Did you say something like that at some point?

A.      I don't think I did, but probably some other person who astutely made that statement, but that wasn't me. . . .

Q.      Would it be a correct statement that naproxen would be the wonder drug of wonder drugs if the Alise Reicin/Merck hypothesis were true?

A.      Well, as I mentioned earlier, to have a 20-fold benefit over aspirin, which is a very important part of our armamentarium for preventing heart attacks, to be 20-fold better than that, that would be quite remarkable.

(Ex. A, at 133:18-135:7) (objections omitted)

## VI.    TO THE EXTENT DR. TOPOL GAVE ANY FACT TESTIMONY, IT SHOULD BE EXCLUDED AS UNTIMELY

Dr. Topol did occasionally provide fact testimony in his deposition.  For example, Dr. Topol testified about his August 2001 article in the Journal of the American Medical Association.  (Ex. A, 82:2-89:6; 95:15-97:2)  He also testified about certain meetings and communications he had with Merck about that article and the cardiovascular outcome study he believed Merck should conduct.  (*Id.* at 85:19-89:6; 100:10-106:13)

This fact testimony, however, should be excluded in this case because fact discovery closed on September 30, 2005, nearly two months before Dr. Topol's deposition.  (Ex. B, at 1) As this Court noted, the Pretrial "Order establishes a schedule for the trial of the *Plunkett v. Merck* matter to ensure that this case is prepared and tried in this Court in an expeditious manner."  (*Id.*)  Pretrial deadlines also give both parties a fair opportunity to prepare for trial. Allowing one party to violate those deadlines – such as by taking fact depositions six days before trial – prejudices the opposing party's ability to prepare for trial.  Merck has already submitted its witness list, deposition designations, and exhibit lists.  Its expert witnesses have already submitted their reports and testified by deposition.  Merck should not have to revise these

29

submissions and its litigation strategy based on plaintiff's last minute deposition of a witness she has known about for years.

## CONCLUSION

For the foregoing reasons, Merck respectfully requests that the Court deny Plaintiff's Motion for Leave to Deposition Testimony of Eric Topol, M.D. During Trial.

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER WITTMANN L.C.
4041 Essen Lane
One United Plaza, Suite 501
Baton Rouge, Louisiana 70809
Phone:  225-490-8900
Fax:      225-490-8960
Defendants' Liaison Counsel

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR &
        SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:      312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone: (202) 434-5000
Fax:    (202) 434-5029

And

John H. Beisner
Charles C. Lifland
Richard B. Goetz
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone: (213) 430-6000
Fax:    (213) 430-6407
Attorneys for Merck & Co., Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and forgoing Merck's Response to Plaintiff's Motion for Leave to Use Deposition Testimony of Dr. Eric Topol During Trial has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 28th day of November 2005.

_Phil Wittmann_

# SEE RECORD FOR

# EXHIBITS

# OR

# ATTACHMENTS

# NOT SCANNED