703:20-706:3

Q. Let's go back, though, to that first drug, naproxen. That's something you and I can buy if we go down to the drug store, because it's come off of patent and because it's now over the counter. True?

A. That's true.

704

BY MR. LANIER:

Q. Syntex was a drug company, wasn't it?

A. Yes, it was.

Q. And today Syntex is owned by who?

A. Roche bought Syntex a number of years ago.

Q. Did it ever occur to your guys that if Syntex's drug was good for the heart, that Syntex would have been selling it for that reason and telling everybody and using all of their marketing people like you to get that drug out there and sell

705

more prescriptions because it's good for your heart, it will help stop heart attacks? Did it occur to you that maybe that would have been done if it were true?

MR. RABER: Objection to form.

THE WITNESS: I don't know the reasons that -- at the point in time that it was Syntex was many years ago, and I don't recall when the fact of aspirin being known to be cardioprotective was first acknowledged, and I don't know -- I have no idea whether at that time Syntex, the originator of naproxen, believed that that was an appropriate study to do. I have no information.

BY MR. LANIER:

Q. You didn't call them?

A. This was many years ago.

Q. Yeah. But I'm just saying, before you -- when your study shows that your Vioxx is causing more -- or associated, as you like to say,

**Deleted:** 1 Q Kind of like your Pepcid Right?¶
2 A That's correct ¶
3 Q But there was a day when naproxen had¶
4 to have a prescription, and it was being sold at¶
5 high prescription prices for profit because it was¶
6 under a patent Right?¶
7 A It was originally available only as a¶
8 prescription product, that's correct ¶
9 Q And what company made that drug and¶
10 made a bunch of money off of it as a prescription¶
11 drug?

**Deleted:** 12 MR RABER Objection to form ¶
13 THE WITNESS The originator of that¶
14 product was, I believe, Syntex

with more heart attacks and strokes than naproxen before you just pell-mell and go tell everybody, oh, naproxen is just good for your heart, did you bother to call the people who studied it and tested it and sold it for years and years and years and years, call them up and say, hey, did y'all ever do any

706

testing to see if this is good for your heart?
MR. RABER: Objection to form.
THE WITNESS: I don't know.

706:4-15

BY MR. LANIER:
Q. I mean, don't you think that would be a reasonable thing to do before you start telling everybody naproxen is good for your heart, you ought to call the people that invented it and sold it for years and ask them if they ever did any studies and if they knew?
A. I think what would be reasonable and what I know Merck did is reviewed the literature extensively in order to draw the conclusion. Whether that review included talking to the originator, I don't know.

706:16-708:13

Q. Yeah. But in that review, y'all never found one study that showed naproxen was good for your heart, did you?
A. There were no studies conducted with naproxen to show or not show that it was cardioprotective.
Q. Did you ever see those monkeys where one set of -- one monkey has got his eyes closed and the other monkey got his ears closed and the other monkey has his mouth -- with his hands over his

707

mouth?
A. Yes.
Q. You know, hands over the eyes. Hear -- see no evil, hear no evil, speak no evil. You've

seen those monkeys?

A. Yes, I have.

Q. That's what y'all were doing on this, is you were just closing your eyes, you didn't want to know if that naproxen was good or bad for the heart and you didn't want to know if your Vioxx was good or bad for the heart, and you were closing your ears because you didn't want to hear anybody tell you that. And you were closing your mouth, because you weren't going to ask anybody, were you?

A. I don't know that's a fair characterization of Merck's behavior at all.

Q. All right. Who did you ask if -- over -- anywhere? Who did you ask about studies to see if naproxen is good for the heart?

A. I was involved in meetings with our research people who presented the alternative explanations and presented the balance of evidence for Vioxx versus placebo, Vioxx versus non-naproxen NSAIDs, and also looked at all the data which appeared to support the naproxen hypothesis, as it's

708

called.

708:15-711:7

Q. Let me understand this. You're President of the Human Health part of Merck. Right?

A. Correct.

Q. And as President of the Human Health part of Merck, your responsibility is to see that this drug gets sold, sold, sold, sold, you have no responsibility for seeing that it's safe, safe, safe, safe, that's in a whole different division that doesn't even report to you. Is that right?

A. No, that is not correct.

710

BY MR. LANIER:

**Deleted:** Q. I'm not talking about people whose economic motivation is to see that Merck's stock price stays high so that they make their bonuses and they make their money. I'm talking about independent people outside of Merck, who did you go to outside of Merck and say, show me studies that say naproxen is safe?
MR. RABER: Objection to form.
BY MR. LANIER

**Deleted:** Q. Or good for the heart?
MR. RABER: Objection to form. You mean him or the company when you say you?

**Deleted:** BY MR. LANIER:
Q. You first, you're the President of Human Health.
A. My responsibilities do not include the research group.
Q. All right. Name anybody in the company. Your responsibilities do include going out and telling everybody, hey, this stuff is safe.
A. My responsibilities include presenting the product based on all of its benefits and risks to customers. The responsibility of the research group is to work wi ... [10]

**Deleted:** Q. All right. Then if you're in charge of seeing that it's safe as the President of Human Health, I want to know who you talked to to see if that naproxen is as wonderful for the heart as you were hoping it was.
MR. RABER: Objection to form.
THE WITNESS: It's not fair to ... [11]

**Deleted:** see if that naproxen was as wonderful for the heart as y'all were telling everybody it must be.
A. Thank you. Everybody at Merck has a responsibility for safety, but at the end of the day, it's our research people who have the responsibility for understanding the data and presenting it to the regulators ... [12]

Q. I'm trying to understand your answer. I need help here. I'm saying you're the President of Human Health, and you're telling me that, yes, you have responsibility for safety so you're out there peddling a drug that you're saying the whole reason that the drug is causing more heart -- or seems to be associated with more heart attacks and strokes is because this other drug is just really good for the heart. And if you're out there peddling that as the line for the company to make more sales, I want to know who you went to to talk to see if, in fact, naproxen was safer? Who outside

711

of your company?

MR. RABER: Objection to form.

THE WITNESS: I did not personally talk to people outside my company. But the people reporting to me were responsible for selling the product consistent with the benefits and risks set out for Vioxx.

712:1-25

712

Q. Sir, you know it's billions of pills you made, don't you?

A. It probably is. I don't know.

Q. All right. So y'all are marketing billions of these pills probably, and you're telling me as the President of Human Health, you didn't check with anybody outside the company to see if your line about naproxen is just healthy for your heart, to see whether or not that had any validity. Is that what you're telling me?

A. I did not do that because I knew that others who could make those determinations much better than I, were doing that.

**Deleted:** Q. Okay. So what are the names of¶
people who would have gone and asked folks about¶
naproxen? I need their names. Who -- if you're¶
going to pass the buck to someone else. I want to¶
know who that person is so I can talk to him ¶
MR. RABER: Objection to form ¶
THE WITNESS. I'm not passing the¶
buck. I'm simply acknowledging that people had¶
responsibility in our research group. Those people¶
are across different functions within our research¶
group and they, at the time, came under Dr. ¶
Scolnick, today are under Dr. Kim

Sustained

713:20-715:13

Q. All right. Now, where is our chart we were writing on? Here it is.

Also for marketing, y'all spent a

objxn - marketing, budget, irrelevant, 403

considerable amount of money for marketing Vioxx, didn't you?

A. Yes, we did.

714

Q. Do you have any clues, since you were the president over marketing and sales, how much money y'all spent on marketing Vioxx?

A. How do you define -- do you want to define marketing with representatives and promotion?

Q. Well, you're the head of marketing, so everything that's below you -- what was your budget, how much money did you spend?

A. It was -- I don't recall exact figures. There may be a year, one year where the promotion budget was two, $300 million plus --

Q. In one year?

A. In one year. Plus our representatives supporting the product.

Q. You're talking in addition to salaries for salespeople and all, y'all, one year, had over $200 million you spent to market that drug?

A. I believe that's correct.

Q. Well, that sort of lets you know that y'all were selling billions of pills, doesn't it?

A. There was a large group of physicians, over 100,000 physicians, and there were 60 to 80 million patients that could potentially benefit from Vioxx. That's a very large market.

Q. So it's safe -- it's safe for the

715

jury to assume that Vioxx was not a drug that could sell itself. Is that right?

MR. RABER: Objection to form.

THE WITNESS: The responsibility of marketing is to take our product to our customers and tell them of the benefits, tell them of the risks and see if it's an appropriate choice for the millions of patients that we thought could and did benefit from Vioxx.

BY MR. LANIER:

Deleted: 11 Q. That wasn't my question, sir ¶
12 MR. LANIER: Objection ¶
13 Nonresponsive

Sustained

715:15-716:2

BY MR. LANIER:
Q. You've heard of a product that's so good it sells itself, haven't you?
A. I've heard the expression. I don't know the product. I can't give you an example of a product.
Q. You can't think of one product that is so good, it sells itself?
A. I don't believe so.
Q. Wow. Well, at least if we were going to start listing products like that, we wouldn't put Vioxx on that list, would we?

716

A. I don't -- I don't think such a list will be put together.

719:14-23

Q. All right. Well, just assume for me that I'm going to come up with a long list of products that are so good that they basically sell themselves. They don't need hundreds of millions of dollars behind them. Would you want to put Vioxx on that list?
A. I would not put any of our products on that list because I think all of the products that we sell require our marketing and sales support to maximize the benefit to patients.

Objection – DTC advertising irrelevant, 403 – no evidence that Mr. Irvin or Dr. Schirmer saw or relied on any DTC adv't.

719:24-722:9

Sustained

Q. Okay. So y'all are going to spend hundreds of millions of dollars, that's just in one year?
A. The number I gave you was for one year.
Q. Did you know that's more than Budweiser spends in a year advertising their product?
A. No, I don't know what Budweiser

**Deleted:** Q. You got to pay Dorothy Hamill to get¶
on TV and in Time Magazine doing a loop-de-loop so¶
¶
720¶
that people will buy Vioxx?¶
A. So that people will know Vioxx is¶
available and will know that the pain that they're¶
presently suffering may have another way of treating¶
it, and that they should then go to their doctor and¶
have a discussion about whether Vioxx would be¶
helpful to them

spends.
Q. Did you know that's more than Pepsi-Cola spends advertising their products?
A. I don't know what they spend.
- - -
(Exhibit Anstice 113 marked for identification.)
- - -
BY MR. LANIER:

721

Q. I'm going to give you a document that's marked Exhibit 113. It's entitled Prescription Drugs and Mass Media Advertising for the year 2000. A research report by the National Institution of Health Care Management, Research and Educational Foundation. Do you see that?
A. Yes, I do.

Ex 113 also hearsay + improper foundation.

Sustained

**Deleted:** Q Are you familiar with that¶
foundation?¶
A No, I am not.¶
Q Well, if you'll look at page 5, do¶
you see where it says, "Drug Ad Spending In¶
Context"?¶
A Yes, I see that.¶
Q If you look at the second paragraph,¶
it says, " the most heavily advertised¶
prescription drugs - those with ad spending of

722:10-723:9

Q. Direct to consumer ad spending of $160 million. Did I read that correctly?
A. You read that correctly, yes.
Q. In the year 2000, y'all spent more money advertising to consumers, that's not doctors. Right?
A. This is consumers.
Q. Y'all spent more money advertising to consumers who can't even go out and buy your drug, unless a doctor will tell him it's okay, than Pepsi-Cola spent advertising Pepsi?
A. That's what this document says.
Q. Look at the next bullet point. It says, "Vioxx also beat out Budweiser beer, with an ad spending of $146 million in 2000." Do you see where it says that?

**Deleted:** around $60 million and up ." let's pause there.¶
Do you see where I read that?¶
A Yes, I do.¶
Q The most heavily advertised¶
prescription drugs, ads spending around 60 million.¶
y'all blew that away one year, didn't you, with over¶
200 million in one year?¶
A This is referring to direct to¶
¶
722¶
consumer. The number I gave you a moment ago was a¶
broader budget.¶
Q All right. Well, let's keep looking¶
at it for direct consumer. It says, for example,¶
Pepsi-Cola spent $125 million advertising its¶
premier product Pepsi - less than the top promoted¶
drug Vioxx with DTC, that's direct to consumer.¶
isn't it?¶
A That's correct.¶

723

A. Yes, I do.
Q. If you look at the fourth bullet point, you beat out Nike's ad budget of $78 million. You more than doubled that, didn't you?
A. That's what these figures say, yes.

**Deleted:** Q Next bullet point, you exceeded¶
Campbell Soup advertising by almost three times,¶
didn't you?¶
A That's what it says

723:10-724:20

Q. Okay. So spent marketing money, we'll just put hundreds of millions of dollars. And that will be true. Correct?
A. Correct.
~~Q. And that is direct to consumers?~~
A. Right.
Q. But you also spent marketing money targeting doctors as well, didn't you?
A. We promote our products to physicians, yes.
Q. And you have another whole category you do beyond that, you target hospitals, don't you?
A. We sell our products to hospitals.
Q. But you put -- spend marketing dollars to try and get your products in hospitals, don't you?

724

A. Yes. We spend marketing dollars with our representatives who visit hospitals.

A. Some purchasers have formularies, yes.
Q. So y'all spend marketing money trying to get the users to buy it, trying to get the doctors to sell it and trying to get the hospitals to stock it. Right?
A. We spend money to support our marketing to all three areas, yes.

Sustained

objxn - money spent on marketing

754:24-757:5

754

756

BY MR. LANIER:
Q. The amount of money you spent studying the drug isn't anywhere near close to the

**Deleted:** Q. Right, but you don't just do it through hospitals, you do it through group purchasing organization, y'all call them GPOs. Right? A. That's one of the channels for hospitals, yes. Q. Because there are a lot of hospitals that are only going to stock one or two different kinds of COX-2 inhibitors, for example, and you want to make sure yours is one of them. Right?

**Deleted:** Q. Okay. Let's go back to our chart that you had on things you did to determine if there 755 was a cardiovascular risk versus things you did to market Vioxx. The last one we had was y'all spent marketing money direct to consumers, target doctors and hospitals. Do you remember that? A. Yes, I do. Q. By the way, did you ever do a comparison of how much money y'all spent in marketing Vioxx versus how much you spent in studying its safety? A. Did we do a study? Q. Yes. No, I mean, did you ever do any comparison, did you ever look at the numbers? A. We looked at the numbers separately. We didn't look at them together. Because the -- Q. Well, for example, how much money do you think y'all have spent studying -- on these studies for Vioxx safety? A. Well, the studies for Vioxx that we talked about yesterday, I don't -- I just don't know what the total cost of that is. Q. Bet you it wasn't anywhere near what you spent marketing the drug, wouldn't you agree? ... [13]

**Deleted:** had MR. LANIER: Well, sir, that wasn't my question. So I'll object as nonresponsive

amount of money y'all spent trying to sell the drug and market it. True?

A. That may be true. But the amount of money spent on the studies is relevant to the studies. The amount of money spent on marketing relates to the total effort required to take the product to our customers.

Q. Sir, if we were to continue down the list of things y'all did in marketing -- by the way, have you compared the number of people at Merck who are in charge of research to the number of people in Merck who are in charge of sales?

A. No, I have not done that comparison.

Q. I bet you you got a ton more salesmen than you do research scientists on Vioxx, don't you?

A. Yes. But the reason for that is, we have the scientists supporting Vioxx sufficient for the needs there and we have the sales reps sufficient to support the marketing effort across

757

the audience of physicians and others that we were covering.

Overruled

Deleted: MR. LANIER Objection ¶
4 Nonresponsive. Object to the nonresponsive part of¶
5 the reason

757:6-758:2

BY MR. LANIER:

Q. In addition to the eight reasons we've -- or eight items we've listed here under marketing, a ninth thing y'all did in marketing, y'all would have marketing consultant meetings where y'all would meet with consultants and discuss the marketing plans. True?

A. There were market research consultant meetings, yes.

Q. And in addition to that, y'all had -- you spent a surplus or an extra amount of FMC money, right, but you didn't remember what FMC meant, did you?

A. Yes, the people in the field had a budget with their customers, yes.

Deleted: Q. Would that be part of the money we¶
22 already put down there for marketing money, though?¶
23 A. That -- yes That would be with¶
24 the -- well, that would be with the salespeople.¶
25 Q. All right The RSP program, what is¶
¶
758¶
1 that?¶
2 A. RSP?

758:14-760:3

BY MR. LANIER:
Q. Look at your speech there on 103.
A. Yes. I don't see --
Q. If you look on page 6 under your -- when you're doing the Letterman Top 10 reasons, reason number three, your commitment of HEL dollars has never been larger, another four million was just made available, including extra FMC money and RSP program. Do you see that?
A. Yes.
Q. What is an RSP program?
A. I don't recall.

759

Q. Okay. Evidently it's something you were doing to market, though, is that safe to say?
A. Yes.
Q. All right. We'll put in RSP program. Now, y'all also hired speech givers. You paid people to give speeches.
A. We had --

759

Q. True?
A. We had a program of medical education with physicians who were contracted with us to speak to physician audiences, yes.

objxn - refers back to launch party speech to reps - no connection to prescriber in this case.

Sustained

760:21-764:22

760

Q. Now, the marketing efforts that you did, and by you here, I mean Merck. The marketing efforts Merck did got them in some trouble with the FDA, didn't it?
A. We received a warning letter from the

761

FDA, yes.
Q. Well, you got more than one, didn't you?
A. With regard to Vioxx?

objection: relates to untitled DDMAC letter from 1½ yrs. prior to injury; materials never approved by Merck

Overruled

Deleted: Q. All right. So I've added 10. RSP 13 program. 11. paid speech givers. By the way, did 14 y'all ever hire anybody to write any of the papers 15 that y'all did? Did y'all ever go to anybody 16 outside for speech papers or anything like that that 17 were presented at conferences? 18 MR. RABER: Objection to form.

Deleted: THE WITNESS: To write, are we 20 talking clinical papers? 21 BY MR. LANIER: 22 Q. Yes, sir. 23 A. It's possible some clinical papers 24 could be prepared in different places. 25 Q. Do you know? 760 1 A. I believe that they could be prepared 2 within Merck, they could be -- I don't know for 3 sure.

Q. Yes, sir.
A. I know we received a warning letter, and I think there had been an earlier complaint about homemade detail pieces.
Q. Yes. Let's look at that one first. This is Exhibit 114.
- - -
(Exhibit Anstice 114 marked for identification.)
- - -
BY MR. LANIER:
Q. You got it in front of you now?
A. Yes, I do.
Q. This is from the FDA, the Food and Drug Administration, isn't it?
A. Yes. Yes, it is.
Q. And it went to Ellen Westrick, the executive director, office of medical/legal. Is that right?
A. That's correct.
Q. Is she a lawyer?

762

A. No, she is not a lawyer.
Q. She's the executive director in the medical/legal office of Merck?
A. That's correct.
Q. This was an FDA letter you've seen before, haven't you?
A. I may have. I don't recall. It's quite possible.
Q. Well, you sure would hope someone would bring it to your attention if it slams the marketing you're the president of?
A. I'm sure it was -- I'm sure the issue was brought to my attention.
Q. Look at what it complains about on the second sentence. Well, first of all, look at the first sentence, Reference is made to Merck's letters in response to letters from the FDA dated November 12 and December 1. So this is now our third letter from the FDA on this issue, isn't it?
A. I don't know that it's in regard to this issue.
Q. Well, look at it. It says, our letters dated November 12.

A. In response to letters.
Q. Yeah. "...concerned the alleged

763

dissemination."
A. Yes. Yes, it appears to.
Q. All right. So what you've got in front of you now is your third letter from the FDA concerned about what y'all were doing. Right?
A. This seems to be a third letter, right.
Q. And the FDA said, "Our letters concerned the alleged dissemination of two 'homemade' promotional pieces, entitled 'TEN REASONS WHY VIOXX IS BETTER THAN CELEBREX.'" Did I read that right?
A. Yes, you did.
Q. You don't think that is the same top ten reason type speech writer that homemade that one that made your speech of the top ten, do you?
A. I don't know. I would be speculating.
Q. Well, did you ever investigate to see to what extent these homemade pieces were used to promote Vioxx?
A. Yes, that was investigated by our people at Merck.
Q. All right. Who was doing it?
A. It was done by this group in

764

conjunction with our legal group.
Q. Okay. Who within Merck was handing out promotional pieces entitled "TEN REASONS WHY VIOXX IS BETTER THAN CELEBREX"?
A. I don't know.
Q. Well, how did you investigate it if you don't know who did it?
A. It was investigated at a level below me.
Q. Well, who investigated it? Who did you hand that off to?
MR. RABER: Objection to form.
THE WITNESS: I didn't hand it off. This person, Ellen Westrick, is responsible for office of medical/legal. She would have immediately

worked with our legal group to investigate it and determine what happened and take steps to stop it.

BY MR. LANIER:

Q. All right. Let me see if I understand this. You're the head of marketing and advertising, right, you're the president?

A. I am, correct.

---

764:23-765:2

Q. And you're getting multiple -- Merck is getting multiple letters from the FDA complaining about marketing, promotional pieces being handed out on your biggest selling drug. Right?

766:1-13

Q. Well, if I'm understanding Merck's position, though, this was a renegade group of pieces being handed out, you've got people already violating your procedures in an effort to try and sell this drug. Did you bother to check to see who?

MR. RABER: Objection to form.

THE WITNESS: No. Nor would I expect to check at this level. If there were more than 2,000 sales representatives supporting Vioxx, then I would expect that consistent with our policies and procedures in the system, that somebody would address this situation and take the appropriate action.

Overruled

766:14-769:24

BY MR. LANIER:

Q. So your company gets written up three times here by the FDA for wrong dissemination of promotional pieces that are out of line, and your position on that is I'm sure somebody is going to handle that, I don't need to?

A. Well, I believe the three times would relate, it seems, based on a quick look at this letter, to one incident. And, yes, I believe our organization is well equipped, has been and is well equipped to address these issues and take the appropriate action.

Sustained

Q. Well, sir, but it says we've reviewed these promotional pieces and have determined they're false or misleading. They contain misrepresentations of Vioxx's safety profile. Unsubstantiated comparative claims. They're lacking in fair balance. And it also says that these pieces were being handed out, "in their respective geographic regions," plural. Now, did you bother to go find out where they were handed out and try to fix the false and misleading data that the FDA said y'all were passing around?

MR. RABER: Objection to form. No foundation.

THE WITNESS: I did not do that. The reason I did not do that is homemade detail pieces, which is a phrase which means that the pieces, just to be clear about that, were not approved through our medical/legal system, were it seems in this case, produced by one sales representative, and I am sure that this issue was settled, that these are clearly against Merck's policies, to do -- to do any material that doesn't go through our medical/legal approval.

BY MR. LANIER:

Q. That's what I'm surprised at. You

got somebody out there who had multiple geographic regions, is handing out stuff that you now say was against your policy, and, A, you never figured out who it was; and B, you never did any backtracking to try and fix all of the bad things or improper things they were saying. Am I right?

A. Let me explain. In my position, I would not expect to take action at my level against -- in an issue like this. I know that our people who are responsible for conducting all of our affairs appropriately will have addressed the situation. So I feel very comfortable that this was done.

Q. Well, sir, if you've got renegade people out there doing things that are against policy and you're getting multiple letters from the government about it, the FDA, don't you think at your level you ought to at least do some follow-up and make sure that this was handled right?

Sustained

A. I believe this was handled correctly.
Q. You got a third letter coming on it right here.
MR. RABER: Objection to form.
BY MR. LANIER:
Q. Don't you?

769

. This seems -- yes, this is the third letter relating to this issue.
Q. And there are some pretty serious things being talked about in this letter, aren't there?
A. I'm sure that the homemade detail piece was inappropriate as stated here. These are homemade promotional pieces, and they're totally wrong versus our policies and procedures and those of the FDA, and that's not acceptable.
Q. Well, who in your organization were you relying on to handle this for you so you didn't have to do it yourself?
A. I was relying on the people in this office and our legal counsel and the supervisor of the people that would have been engaged in this activity.
Q. Give me names. I want to know who you're relying on to get your salespeople in line and to fix their mistakes?
A. I'm relying on their management in sales.
Q. Names?
A. I'm relying on the -- I don't know --

770:9-770:25

THE WITNESS: The responsibility for investigating this matter would have been dealt with between Ellen Westrick, the name on this letter, and our regulatory legal counsel at the time, Mr. Ron Henshall.
BY MR. LANIER:
Q. So you're going to get the lawyers involved with supervising your salespeople when they do something wrong?
A. They are investigating the matter. They're not supervising the salespeople. They're investigating the matter and they would then draw to

Sustained

the attention of the relevant manager, the sales representative has a business manager, and that person, there would be a discussion with that person about the eventual findings and the discussion about what the appropriate disciplinary action is.

798:14-800:6

OBJECTION:
· irrelevant
· no nexus w/ physician
· 403
(untitled letter; superiority vs. Celebrex)

798

BY MR. LANIER:
Q. No, sir. I want you to look at the exhibit I just handed you, 130. This is a senior management discussion on a Vioxx sales update. Do you see this?
A. Yes, I do.
Q. And this is a document that came out from you, isn't it?
MR. RABER: Take your time.
A. Certainly --
MR. RABER: Take your time.
BY MR. LANIER:
Q. Look on the front page where it says

799

To Wendy/Marty from DWA. Isn't that you?
A. Yes, that is me.
Q. Look at the very first page when you turn it over, so I guess it's the second page. "Success in 2001 for Vioxx." Do you see that?
A. Yes, I do.
Q. Under "Disproportionate growth of Vioxx vs. Celebrex," the second bullet point from the bottom, do you see that?
A. Yes.
Q. You have down here that you were handing out "Superior efficacy." Do you see that?
A. Yes, I see it.
Q. And that's the very falsehood that your company was getting written up for that you were putting the blame onto, quote, renegade sales reps for, isn't it? Very same language?
A. May I just take a moment with this document?
Q. You take all the time you want, sir.
A. This is a document, I'm not sure who

Sustained

prepared it, which states, Target performance for 2001 is dependent on. And the third bullet "Disproportionate growth of Vioxx vs. Celebrex."
I believe what this is referring to

800

is -- this is a set of assumptions behind the sales forecast for 2001, and this is building on an image or perception but is not building on any data because we did not have superiority data. But this is not a document to sales representatives. So this could not mislead our sales representatives.

800:23-804:19

800

Q. Can you see right down there where it says, sir, this claim suggests Vioxx is more efficacious? Do you see that?

801

A. Yes, I do.
Q. You and I talked about that earlier and you said that's false. And we need to stop people from saying that. And when the FDA wrote us up, I'm confident that the right people would have dealt with that. Do you remember?
MR. RABER: Object to the form.
THE WITNESS: Yes.
BY MR. LANIER:
Q. Okay. You were handing out later, even the next year, superior efficacy of Vioxx versus Celebrex. You were doing the very thing you said you'd stop, weren't you?
MR. RABER: Objection to form.
THE WITNESS: These are two very different situations. This is a detail piece, homemade, being used by representatives in the field by doctors. That is wrong. That cannot be done. This is a document which appears to be a document for internal discussion, this is not a document or a message for our salespeople and is not suggesting, at all, that they would go out and make a claim for superior efficacy.
BY MR. LANIER:
Q. Sir, the whole point of this Vioxx

lines 2-8 objection to compound question — witness answer is just that he remembered prior discussion.

Sustained

802

sales update is why y'all were having success in 2001 for Vioxx?

A. It's talking about what the success versus the targets would be attributable to.

Q. And the success is superior efficacy. It's a claim of superior efficacy, the very thing --

MR. RABER: Objection to form.

BY MR. LANIER:

Q. -- the FDA told you -- slapped you on the wrist for a couple of years earlier. Right?

MR. RABER: Objection to form.

THE WITNESS: This is not a claim for superior efficacy with customers.

BY MR. LANIER:

Q. Sir, if it's superior efficacy, if it's not for customers, who do you think it's for? Is it for the man in the moon?

A. This is a document being discussed at a senior management level, which is discussing -- I believe, it's not in these comments here, is discussing the perception, again, from market research, which physicians had generally in the community, based on their experience with Vioxx, that it offered very important pain relief, and in their experience was superior to other products in

Sustained

803

this category. So this is reporting back what physicians perceive. It is not a statement, and I do not believe beyond the detail piece that's referenced that there would be any ability for our representatives to misconstrue our intentions here.

Q. Sir, this wasn't just for that. This very piece is going to the senior sales teams for them to make sure the message gets out. Right?

A. I do -- I do not believe that this document was directed to the sales representatives. The discussion -- the two people are people -- senior people in sales and marketing.

Q. Sir, but if you look below that, that first asterisk, you said -- that's your handwriting, isn't it?

A. This is my handwriting, yes.

Q. In your own handwriting, you actually

wrote, this is one you actually wrote, "Critical to convey the sense of urgency on Vioxx at this week's meetings involving the senior sales team." Do you see where it says that?

A. Yes, I do.

Q. So this update that you are sending out there is one with critical urgency involving the senior sales team. Right?

804

A. That's correct.

Q. Not only that, you said it's critical to elaborate specific actions in the next bullet point in your own handwriting, didn't you?

A. That is my handwriting.

Q. And so you send this out to people with the critical to do it, critical to convey it, and your very statement for success in 2001 is, we will disproportionately grow Vioxx against Celebrex with "superior efficacy." That's what it says, isn't it?

MR. RABER: Objection to form.

THE WITNESS: Let me just deal with the two comments here. The first comment, "Critical to convey the sense of urgency on Vioxx...," relates -- is a very general comment. It is not making any connection to the statement on the next page. It is not asking anybody to promote Vioxx versus Celebrex as having superior efficacy.

804:21-806:1

BY MR. LANIER:

Q. Sir, look on the next page, right under superior efficacy, the very next bullet point says, "Increased sales force effort critical to market drivers." This whole thing is targeted to the sales force. That's what it says, doesn't it?

805

MR. RABER: Objection to form.

THE WITNESS: "Increased sales force effort...," I don't know exactly what this was referring to, but the general use of effort would be the total number of visits to doctors made by our

sales representatives.
BY MR. LANIER:

Deleted: 8 Q. Sir, it says target -- at the top of
this page, "Target performance for 2001 . ." which
was $2.9 billion, ". . is dependent on " Do you see
where it says that?
A. Yes

Q. So you're hitting your target is dependent on these four bullet points. Right?
A. These four sets of assumptions. Correct.

805

Q. Yeah. And so these four bullet points is the key to you hitting your target. Right?
MR. RABER: Objection to form.
THE WITNESS: These are assumptions that were built into the target performance. This is not -- I think we have to separate here between assumptions underlying a sales forecast and actual behaviors in the field. This is not telling the

806

field to promote Vioxx inappropriately.

806:2-807:22

BY MR. LANIER:
Q. Sir, your target performance, making your target, that's part of what your bonus is based on, isn't it?
A. Making our target is an obligation we accept at the beginning of each year.
MR. LANIER: Objection. Nonresponsive.
BY MR. LANIER:
Q. Sir, part of your bonus, dollars in your bank account is based on making your targets. Right?
A. Yes.
Q. All right. So you getting those dollars in your bank account and you making your target, is dependent on, in your own words, dependent on these four things. And the third one is disproportionate, that means more growth for Vioxx than Celebrex. Right?
A. That's what that means, yes.
Q. And the way y'all were going to do that is with the -- whether perception or reality, of superior efficacy. Right?
MR. RABER: Objection to form.

objection - motive + executive comp. Ct has granted MIL #2.

Sustained

THE WITNESS: But let me distinguish between the actions that we're taking here are not to promote Vioxx as having superior efficacy. At no time this year did we promote it because we did not have comparative studies and could not do it. So this is not a request to the sales force, this is an assumption underlying a sales forecast, and it relates to perceptions of the product.

BY MR. LANIER:

Q. So you think that people were perceiving that you were superior efficacy, but not because y'all were telling them, because y'all would never tell them that because you knew it wasn't true, you were just going to ride that false perception as far as you could to the bank?

A. A perception is a perception. It's not -- it's not false or true. It's what an -- the perception comes not from what we were saying. The perception comes from physicians' use and experience with the product in the patients. And they had -- in the market research tests, they had assessed Vioxx as having very strong efficacy.

Sustained

807:23-808:24

Q. You never gave this to the FDA, did you?

A. But this is not a document that was

used with customers.

MR. LANIER: Objection. Nonresponsive.

BY MR. LANIER:

Q. You never gave this to the FDA, did you?

A. This is not a document that we would ever need to send to the FDA.

MR. LANIER: Objection. Nonresponsive.

BY MR. LANIER:

Q. You never gave this document to the

FDA, did you?

A. We did not give this document to the FDA nor would there be a reason that we would need to.

Q. There's a reason not to. They'd probably get you in trouble and say, it wasn't a renegade salesman, it came from the president. True?

MR. RABER: Objection to form.

THE WITNESS: No, I don't believe they would regard this as a relevant document for them to receive at all.

objxn — evidence re alleged neutralizing of Drs. irrelevant, 403. No connection to the prescriber in this case.

Sustained

296:6-16

Q. Do you agree with me to neutralize well respected opinion leaders who have put in the press or written articles that cast the other side of the naproxen story was wrongful conduct on the part of Merck?

MR. RABER: Objection to form.

THE WITNESS: I believe that our efforts to take our data to opinion leaders and put it fairly in front of them and have them understand our side of the story was reasonable behavior by Merck.

328:15-329:1

Formatted

328

MR. WEISS: I'm going to mark as the next exhibit, which I think is 36; right?

MR. RABER: Yes.

MR. WEISS: An e-mail with attachment that starts at AF 10201415. It's from Susan Baumgartner to a number of people.

- - -

(Whereupon, Deposition Exhibit Anstice-36, E-mail, 7-23-99, with attachment, MRK-AFI0201415 - MRK-AFI0201442, was marked for

329

identification.)

also, this appears to be out of sequential order.

remainder of cuts out of sequential order

339:14-342:5

Q. If you go to the next page, in quotes it says, "Show me the money."

"Funding a $50,000 rheumatology fellowship program." Is that what it says?

A. Those words are on the page.

Q. Now, I want you to look at John Condemi. That's the next page. It says he was neutralized as well. Do you see that?

MR. RABER: Objection to form.

THE WITNESS: That word appears under his name. I see that.

BY MR. WEISS:

Same objection - Dr. Condemi not in this case

Sustained

Q. Is it a fair reading of the document that the writer of this document says that John Condemi was neutralized?

A. In that left-hand column, that's the word that's there, yes.

Q. Go to the next page. He was a speaker and advocate for Searle?

A. He was an investigator and a speaker advocate for Searle, yes.

Q. Searle made Celebrex; correct?

A. Correct.

Q. Let's go to the next page. You gave him some work in a clinical trial. You put him on a panel with Dr. Singh of Stanford, another physician that Merck neutralized?

MR. RABER: Objection to form.

THE WITNESS: The heading of this says "Recommendations," and there are a variety of suggestions. I cannot tell from this document what, if any, work was done with Dr. Condemi.

BY MR. WEISS:

Q. If, in fact, the giving out of clinical trials and research grants were done on the

basis of trying to influence thought leaders to change their positions about their perceptions of

341

Vioxx or Merck, that's inappropriate, isn't it, Mr. Anstice? That's not proper conduct?

MR. RABER: Objection, asked and answered.

THE WITNESS: Well, the way you're posing that is that that would be the purpose. To be consistent with our policies, which I assume our people would follow, it would be reasonable for physicians, if there was a clinical study which they could participate in, to participate in that. If that helped them better understand treatments in the area, that would be appropriate.

If there were other activities at their institution which, again, were consistent with grants, proposals, are consistent with the medical and educational criteria we include and it went through the proper process, that could be appropriate.

MR. BALEFSKY: Objection, move to strike, nonresponsive.

BY MR. WEISS:

Q. Now, would it be appropriate, according to you, to give financial support to a physician in his private practice in order to make that person an advocate for Vioxx?

342

A. Based on the facts as you present them to me, my personal view -- and if that's the only set of facts, my personal view is that that may not be appropriate, but you'd have to consider all of the relevant facts.

Sustained

455:1-5

455

Q. For the record, let me identify it as MRK-AAR 0019773 through 786.

Sir, you've seen this document before; correct?

456:16-457:1 [No answer given]

objxn to the testimony and to this document coming in through this witness, who lacks personal knowledge. The Ct preadmitted the document. We object to the document itself under 402/403.

456

Q. If this were a document used in training sales reps at your company, are you horrified by the title?
A. Not necessarily.
Q. That doesn't bother you? Do you know the game of Dodge Ball? Did you play that as a kid?
~~A. No, I did not.~~
Q. Well, let me explain it to you. Maybe you don't know what the game is.
A. Somebody has explained it to me since

457

the article in the press.

459:22-462:25

459

You're the head of Merck marketing; correct?
A. Yes.
Q. What's your reaction to that

460

document?
A. I don't understand what the particular purpose of the document is, and until I understand that, I can't answer that question.
Q. You're okay with the fact your sales reps played a game called Dodge Ball in connection with their training on how to sell your drug Vioxx? You're okay with that?
MR. RABER: Objection to form.
THE WITNESS: My understanding is that that is their training. And part of their training is to learn answers to commonly asked questions. And so if there's a training technique which uses a commonly understood game, that can be very -- that can be acceptable.
Q. Well, let me ask you this.
Go to the second page. Doctor

461

says -- here's a question from a doctor; correct?

Sustained

Deleted: 16 BY MR. SEEGER
17 Q. How do you ensure the integrity of
18 what your sales reps tell doctors without you seeing
19 these materials?
20 A. Because people in our organization
21 get training materials, they are consistent with our
22 label, and the training people send them out based
23 on all of the procedures that we have

Can we agree that's a doctor's question?
MR. RABER: Objection to form.
THE WITNESS: It says that --
BY MR. SEEGER:
Q. At the bottom.
A. It is a comment, yes.
Q. That's a comment. Let me read the comment, as you describe it. "I am concerned with the potential edema that occurs with Vioxx." At the top of the page it says, "Dodge Ball." Did I read that correctly?
A. Yes.
Q. We agreed that Dodge Ball is when the kids are in the gymnasium and you throw a ball and you dodge it; correct?
A. That's my understanding.
Q. So, tell me, how does a responsible sales rep, how does a responsible company use a document like this to teach its sales reps how to answer doctors' questions?
MR. RABER: Objection to the form.
THE WITNESS: But if this was simply the training technique to ensure that representatives were adequately equipped to answer

this question, that could be quite acceptable. This is not an instruction, at least as I understand it. This is not an instruction to our representatives to not answer questions.
BY MR. SEEGER:
Q. All right. Let me just help you with that one.
Can you go back to the first page? We can spend all day on this one. Do you see the word at the very bottom with the exclamation point. Could you please tell the jury what that says at the bottom in big, black bold letters. What's that word?
A. "Dodge."
Q. You're comfortable. So, if you had seen this in 1999, if this were a document being used by the company in 1999, you would be perfectly comfortable with this?
MR. RABER: Objection to the form of the question. You are asking him about an

Sustained

incomplete document.
MR. SEEGER: Yes.
THE WITNESS: I just don't have the context. I may or may not have been comfortable with it.

464:23-469:23

Sales training not relevant, 403. No evidence that prescriber met with or relied on reps.

464

Q. Sir, can I ask you to take a look at what I've just marked as Exhibit 50. It is Bates stamped for the record MRK-AAR0007638 through 7699.

465

BY MR. SEEGER:
Q. At the top it says, "To all field personnel with responsibility for Vioxx." Correct?
A. Yes.
Q. And can you just turn to the second page of that document, sir? What's it say at the top there? You've got it. That's the right page.
A. "Obstacle Response Guide Vioxx."
Q. "Obstacle Response Guide Vioxx," and below that there's a symbol; correct?
A. Correct.
Q. What's the symbol?
A. The symbol is two Xs.
Q. What does that mean?
A. That's taking the last two letters out of the trademark Vioxx.
Q. And at the top it says, "Victory." At the bottom it says, "In it to win it." Correct?
A. Correct.
Q. This is a document, again, I just want to be clear, it went to your sales force?
A. Yes.

467

Q. Part of their training materials; correct?
A. Yes.
Q. This is a document that you approved?

Sustained

**Deleted:** MR. SEEGER We're going to try to¶
find you copies.¶
BY MR. SEEGER:¶
Q. Prior to today, you've seen this¶
document before, correct, sir?¶
A. No, I have not seen this document¶
before today.¶
Q. Well, see --¶
MR. SEEGER: Steve.¶
(Handing over document.)¶
MR. RABER: Thank you

**Deleted:** Q. Now, who are field personnel? Just¶
so we're clear on who we are talking to.¶
A. I assume that means all of our¶
professional representatives involved with¶
responsibility for Vioxx.¶
Q. And responsibilities would be -- I¶
mean, the field personnel are the salespeople?¶
A. People who sell Vioxx to customers.¶
Q. And then "From: Market Integration¶
Team for Vioxx, do you see that there?¶
¶
466¶
A. Yes, I do.¶
Q. Who is the market integration team?¶
A. I believe that was a particular part¶
of, I think, the sales area, but I'm not sure.¶
Q. And that's part of your division,¶
correct?¶
A. That is correct.¶

A. I don't believe I approved this.
Q. But you take responsibility for the person who did?
A. I accept responsibility if it came through my group.
Q. Now, what's an obstacle?
A. An obstacle is a question that a customer has, which until they get an answer, a reasonable answer to it, it may limit or even stop their usage of the product.
Q. Well, can we work with the second part of that? An obstacle, in terms of common every day usage, is something that blocks you; correct?
A. It's an objection or possibly -- yes.
Q. Well, if I can't go down 18th Street here in Philadelphia because it's blocked off, that's an obstacle to getting down 18th Street; correct?
A. Correct.
Q. I would have to go around.
A. Correct.

468

Q. You train your salespeople to call doctors' questions obstacles?
A. This has been a word used in our vocabulary for decades and is commonly used to refer to questions, concerns that customers may have, yes.
Q. Sir, when you tell 21-year-old salespeople that doctors' questions are obstacles, what message are you sending to that sales rep?
A. Actually, I believe that the message we're sending to the rep is that people, customers, do have genuine issues and questions they want answered. And part of your responsibilities as a professional salesperson is to be trained to understand what is the appropriate response consistent with the label.
Q. Well, that's not --
A. And that that's a very important part of the work you do, because all customers have questions, some of them are stated, some of them are unstated. And I think it's very important for our professional representatives to actually try and understand what the questions are.
Q. These questions are obstacles to

Sustained

selling the drug; correct?
A. They're because somebody doesn't have

469

enough information or they don't understand something clearly. So, yes, they are something which is a barrier to adoption or use by a customer.

BY MR. SEEGER:
Q. Does that dignify the question the doctor could be asking?
A. I think it's one that's been used in our culture for so long, I think it's acceptable.
Q. When you say "our culture," you don't mean my culture, you mean Merck's culture?
A. No. Within Merck we've used this term for many, many years.
Q. You could understand somebody seeing the word obstacle to a doctor's question, expressing some concern about that? That's understandable; isn't it?
A. I'm not looking at it through that lens. It may be that people take exception to that.

Deleted: 4 Q. Does that question provide the¶ 5 appropriate amount of dignity to a doctor's question¶ 6 that ought to be afforded to a doctor who has a¶ 7 serious concern about a side effect?¶ 8 MR. RABER: Objection to form

477:16-478:1

477

Did you even go to find out if it was used while you were the president of Merck US?
A. No, I didn't.
Q. So, you did nothing to satisfy yourself that that document was being either appropriately used or inappropriately used; correct?
A. I did not.
Q. And you have no reaction to the fact that your salespeople are being trained using a document playing a game called Dodge Ball?

478

MR. RABER: Objection to form.

Same objection as before to testimony relating to the Dodgeball document & sales training. No nexus to this case.

Sustained

478:15-480:11

THE WITNESS: I have two reactions.
BY MR. SEEGER:
Q. Go ahead.



A. One is, if it was used in the context of an internal document, it may be appropriate. If in any way it was used to convey to our representatives that they should avoid doctors' questions, that would be totally inappropriate.

480

11

484:24-486:2 — OUT OF SEQUENTIAL ORDER.

484

Q. Just tell the story a little bit more. Where were you when you got that letter, when

485

you were first told about Dr. Fries' letter?

A. I think I was in my office here in Pennsylvania.

Q. Just so the jury knows what we're talking about, the Dr. Fries' letter said basically what?

A. The Dr. Fries' letter addressed to our chairman and copied to me made two assertions. One was that -- and he was referencing discussions he had had with a number of colleagues, he's the professor of medicine at Stanford.

Q. Right.

A. One assertion was that in talking to his colleagues, he said that he believed that a number of them regarded Merck as not fully disclosing all of the information about Vioxx.

The second assertion was that, and he cited his own interaction with Dr. Sherwood, that Dr. Sherwood had been, in his view, guilty of attempting or actually intimidating a number of doctors about presentations they were making in medical meetings.

Q. In fact, he went a little further. He accused Merck of intimidating doctors; correct?

A. And he, therefore, said that he

objxn — Fries letter is hearsay + has add'l hearsay w/in (double hearsay) 402, 403 — whole incident has no nexus to Schirmer, inflammatory (Letter is not marked but the questioner asks Mr. Anstice to describe what it said.)

Sustained

**Deleted:** 23 Q. And that's a big "if" that you did¶ 24 nothing to satisfy yourself" You don't have an¶ 25 answer to that "if" sitting here today, do you?¶ ¶ 479¶ 1 MR. RABER Objection to form.¶ 2 THE WITNESS I simply understood¶ 3 this to be a historical document.¶ 4 BY MR. SEEGER.¶ 5 Q Of the two reactions you just gave to¶ 6 the jury, sitting here today, you have no idea which¶ 7 one is correct, that it was used appropriately or¶ 8 inappropriately?¶ 9 A I believe from what I heard that it¶ 10 was used within Merck. Therefore, I believe that it¶ 11 may have been appropriate.¶ 12 Q You believe it was used within Merck.¶ 13 therefore, you believe it may have been¶ 14 inappropriate?¶ 15 MR. RABER No.¶ 16 THE WITNESS Appropriate.¶ 17 BY MR. SEEGER.¶ 18 Q Appropriate. Why? Are you just¶ 19 guessing at that?¶ 20 A. Because that's what I heard.¶ 21 Q Who did you hear it from?¶ 22 A On the webcast. I heard it was¶ 23 described as this was an internal training exercise¶ 24 with the representatives.¶ 25 Q. So, the president of Merck marketing

**Deleted:** 1 relies on others to tell him -- you're relying on¶ 2 others -- strike that.

**Deleted:** 3 You're relying on what people are¶ 4 telling you now? Is that what you're saying?¶ 5 MR. RABER Objection to form.¶ 6 THE WITNESS. Correct.¶ 7 BY MR. SEEGER.¶ 8 Q And you did nothing to satisfy¶ 9 yourself other than relying --¶ 10 A I did not go and ask questions about¶ this document

486

wondered if Merck had a practice of intimidating doctors.

486:3-488:18

486

489:9-490:10

489

Q. You would have to also agree it's a big thing writing a letter to a pharmaceutical company like Merck to make the kind of complaint that he did in this letter?
A. I agree, very important letter.
Q. You wouldn't think that's something that a man like Dr. Fries would do lightly; correct?
A. Correct.
Q. He makes serious allegations. He suggests that Dr. Sherwood intimidated not just him, but a number of scientists; correct?
A. That's correct.
Q. Dr. Singh was one of the scientists that he --
A. That's correct.
Q. He says that also Merck, he believed, was keeping data from these scientists?

490

A. Right.
Q. That's part of the allegation or two as you said?
A. Right.
Q. Also one of his allegations, do you recall from his letter, was that Merck did not fully

Sustained

**Deleted:** Q What did you do exactly to¶
4 investigate whether, in fact, there was any truth to¶
5 those allegations that were alleged by Dr Fries"¶
6 A I phoned Dr Fries very promptly¶
7 after I received the letter, and I had a fairly¶
8 lengthy phone call with him that was over half an¶
9 hour, as I recall, and maybe up to one hour. And he¶
10 commented on the contents of the letter I don't¶
11 recall if I had already -- I gave a copy of the¶
12 letter to, I believe, or certainly showed the letter¶
13 to head of sales, head of marketing at the time, and¶
14 I gave a copy of Dr Fries' letter to Dr Sherwood ¶
15 And I asked Dr Sherwood to ... [14]

**Deleted:** 19 Dr. Scolnick, and I forget, but that was perhaps a¶
20 brief discussion, and said that since one of the¶
21 issues related to the disclosure of information, I¶
22 wanted to work with people in his group to deal¶
23 directly with Dr Fries on that So, that led to me¶
24 also calling on the phone Dr Douglas Greene, then¶
25 head of clinical research ¶
487¶
1 Q He was head of clinical research?¶
2 A As head of clinical research, I asked¶
3 him to separately contact Dr Fries, I'm not clear¶
4 on the order here, and to add ... [15]

**Deleted:** 15 report, and I now had a version of reports from Dr ¶
16 Fries, I had a version from Dr Sherwood, and what I¶
17 concluded is that there were certainly some¶
18 differences between the versions Dr Sherwood, who¶
19 I've worked with for a long time and who I have¶
20 great respect for as a physician, was of the view¶
21 that he may have had some heated exchanges, but was¶
22 acting appropriately ¶
23 I concluded that this was certainly¶
24 not a good situation for Merck. I concluded that I¶
25 would not derive further benefit from talking to the
488¶ ... [16]

disclose hypertension data in its New England Journal of Medicine article. Do you recall that?

A. I don't recall that particularly, but I'm not disputing it.

491:11-494:3

491

Q. So, does that help refresh your recollection?

A. Yes.

Q. Because you read this letter at the time it came in?

A. Yes. Several times.

Q. Part of what he says is that he alleges there was a pattern of intimidation?

A. Correct.

Q. And a pattern, you understand it to be, he's saying a companywide policy to do this; correct?

A. Well, one conclusion would be that the pattern would be broader than one person, yes, I understood that to be an assertion about Merck. I

492

don't believe it about Merck, but, yes.

Q. I understand. But that's a serious allegation, and you acknowledged that in your answer before?

A. Yes.

Q. He also says that he felt threatened himself by a phone call that he got from Dr. Sherwood; correct?

A. He references the phone call, yes.

Q. So, your investigation of this incident, based upon your testimony as I understand it, was that you had a phone call with Dr. Fries; correct?

A. Two or three.

Q. Two or three phone calls with Dr. Fries?

A. Yes.

Q. You spoke with Dr. Sherwood?

A. Right.

same objxn - this is continuing discussion of Fries

Sustained

Q. You had Dr. Sherwood actually write up his account of it to you; correct?
A. Correct.
Q. And what else did you do?
A. I spoke with Dr. Greene and asked him to provide information in response to the disclosure

493

of information to --
Q. Did Dr. Greene write you a letter where he embodies the information?
A. There were several phone call exchanges at the time. And I know that he made contact with Dr. Fries because Dr. Fries confirmed that. And I know that data, either one or two lots of data was sent to Dr. Fries.
Q. When somebody makes an allegation like this, as serious as these allegations are, against somebody in your department -- and Dr. Sherwood is in your department; correct?
A. Right.
Q. Did you consider bringing in a private investigator or somebody to look into what's going on?
A. No, I did not consider that.
Q. Did you hire any investigators that may work for Merck, some internal investigators, to conduct an investigation of what went on?
A. No, I did not.
Q. Did it ever occur to you to do that?
A. At the time, I remember thinking that I should go straight to Dr. Sherwood. His response seemed to me to be clear that these were a set of

494

discussions he had had. I did not believe that this was more broadly based, and, therefore, I dispensed with the idea of doing any broader investigation.

Sustained

494:4-11

Q. You dispensed with the idea of doing any broader, and you did more than that. You didn't even note in Dr. Sherwood's file that he had been accused of intimidating doctors; did you?

same objection

MR. RABER: Objection to the form of the question.

THE WITNESS: I did not. I did not note in his personnel file this correspondence, no.

1473:17-23

So, let me just be clear on what your testimony is.

I'm asking you about the sales reps right now.

A. Yes.

Q. Sales reps were not allowed to engage the doctors on VIGOR, you said; correct?

objection to testimony relating to CV Card (the Court precluded the document, over our objections.) Testimony here relates to sales training + obstacle handling, which is relevant in this case.

1473:25-1474:23

THE WITNESS: What I said was our
01474
representatives were asked to not initiate discussions on VIGOR. That's what I said.
BY MR. SEEGER:

Overruled

1478:11-1480:7

Look, my question is this: You're aware that Merck used in connection with training its sales representatives something called a cardiovascular card; correct?

A. Yes.

**Deleted:** 4 Q Okay
5 And if they were asked questions
6 about VIGOR, they couldn't answer them, but they had
7 to refer -- they had to get in touch with the
8 company, that would send out a letter to doctors"
9 A What I testified to is that
10 immediately after the release of the VIGOR results,
11 they were equipped in the field with the physician [... [17]]

**Deleted:** 21 could submit that question back to our medical
22 group, who would, in turn, respond to that [... [18]]

**Deleted:** 16 Q Okay
17 And the sales representatives were
18 trained when they are speak [... [19]]

**Deleted:** 1 already had familiarity with the VIGOR results,
2 which many did because this was in their public [... [20]]

**Deleted:** 20 A Because our field force was reporting
21 that they were getting numerous questions from [... [21]]

**Deleted:** 3 information in the public domain, what support do
4 you have for it?
5 A I don't have supp [... [22]]

**Deleted:**
1481 19-1482 5

Q Take a look at what I've pu [... [23]]

**Deleted:** 22 committee at Merck on August 22nd, 2001 approved its
23 use for an additional year, would you have any [... [24]]

**Deleted:**

1483 10-21
10 Q All right [... [25]]

**Deleted:**
1483 22-1484 2
22 Q Okay
23 And in this docum [... [26]]

**Deleted:** 1484 4-12

BY MR SEEGER
5 Q Do you see that ta [... [27]]

**Deleted:** 7 Q Now, April of 2000 is after the
8 company has had the VIGOR results, correct? [... [28]]

**Deleted:** 1484 14-24

BY MR SEEGER
13 Q The cardiovascul [... [29]]

**Deleted:** ¶
1484 1486:24¶
25 Do you see the table there at the top¶
01485¶
1 of the page?¶
2 A Yes ¶
3 Q. Do you see where it says "Total¶
4 mortality," and it shows Vioxx and "N=3,395"?¶
5 That's the number of patients in the studies that¶ ... [30]

**Deleted:** 22 A Yes, I do ¶
23 Q And then it says, "NSAIDs, 0.8""¶
24 A Right ¶
25 Q That shows Vioxx ... [31]

**Deleted:** 11 statistical significance ¶
12 Q Well, you think drawing that¶
13 comparison is not designed to give doctors comfort¶ ... [32]

**Deleted:** 1487:5-23¶
5 Q Well, this doesn't include the VIGOR¶
6 data, does it?¶
7 A No, it doesn't. Bu ... [33]

**Deleted:** 11 This was -- these were the data which were in the¶
12 new drug application and in the subsequent approval¶
13 for the product, and this was ... [34]

**Deleted:** 1487:25-1490 18¶
¶
25 THE WITNESS This table simply says¶
01488¶ ... [35]

**Deleted:** 3 safety --¶
4 Q Well, does it say anywhere in here --¶
5 A -- of Vioxx ¶
6 Q -- doctor, in additi ... [36]

**Deleted:** 01490¶
1 Q And the sales representative, in¶
2 fact, could go back to the company and say, could¶ ... [37]

**Deleted:** 5 A If it wasn't in the label, yes ¶
6 Q Now, I want to focus on something¶
7 that you says used in your tr ... [38]

**Deleted:** 1490 20-1491 8¶
¶
THE WITNESS But this is not the¶
21 communication to the representative That's a¶ ... [39]

**Deleted:** Q All right Let's be clear on this¶
2 then ¶
3 The sales representatives were also¶ ... [40]

1498:7-1499:21

Q. Okay.

Now, I would like to also mark or show you what I've just marked as 165.

- - -

(Whereupon, Deposition Exhibit Anstice-165, "Bulletin for Vioxx: New Resource: Cardiovascular Card," MRK-AAR0007383 - MRK-AAR0007388, was marked for identification.)

- - -

BY MR. SEEGER:

Q. For the record, it is Bates stamped MRK-AAR0007383 through 388.

This is another one of those bulletins that you're talking about; right?

A. Yes, that's right.

Q. And this is dated April 28th; 2000; correct?

A. Correct.

01499

Q. Now, if you go to where it says "Background." Well, first of all, the "to." "All field personnel with responsibility for Vioxx," that's all the sales reps selling the drug; right?

A. Yes. That's all the people involved in selling Vioxx, that's correct.

Q. Okay.

Below that there's a paragraph, and in the middle of the paragraph there is bold

overruled

language. I would just like to read it so we can move through this. "The Cardiovascular Card is an obstacle handling piece and should only be used with physicians in response to their questions regarding the cardiovascular effects of VIOXX." Correct? Is that correct?
A. That's what it says.
Q. Is it correct?
A. It's read -- you read it correctly, yes.
Q. But is that correct, what I read?
A. Well, I think --

1499:23-1500:18

BY MR. SEEGER:
Q. Not that I read it correctly. Now I'm asking, is that correct?
01500
A. But I think there's a -- there's a broader context of instructions to representatives that needs to be --
Q. Where is that in here?
A. If you go to the third page.
Q. I'm there.
A. The CV -- I'm going to read the first two sentences underneath the black diagram. "The CV card will assist you with addressing your HI COXIB or HI NSAID physician's questions about the cardiovascular effects of VIOXX. Use this resource as an obstacle handling tool only, when your physicians ask you about the cardiovascular effects of VIOXX or express concern regarding the cardiovascular effects of VIOXX based on the VIOXX GI Outcomes Research trial."
Q. Well, Mr. Anstice, you misread that statement. Did you do it intentionally?

1500:23-1501:11

THE WITNESS: Can I reread -- no, I didn't, I believe --
BY MR. SEEGER:
01501
Q. Well, you left out an important word.

Overruled

1501:4-11

THE WITNESS: I'll reread it. It was not intentional.
BY MR. SEEGER:
Q. I just want to ask you, when you read that sentence you read, "Use this resource as an obstacle handling tool only."
MR. RABER: Excuse me, do you have an extra copy?

1501:22-1503:4

Q. Is there any reason you left the word "only" out?
A. No. I'm happy to reread it.
Q. Go ahead. Finish your answer.
01502
A. And this is the bulletin that accompanies the cardiovascular card that we've talked about a moment ago.
Q. Gotcha.
A. There is also a preceding bulletin after February 9th before April 28th which was in existence which related to how the reps were instructed around VIGOR. So, this was specifically designed for discussions beyond the VIGOR results to deal with, as this says, "when your physicians ask you about the cardiovascular effects of VIOXX or express concern regarding the cardiovascular effects based on" not about, but based on the VIGOR findings.
Q. I understand.
Mr. Anstice, will you now turn to the CV card, please?
A. Yes.

overruled

Deleted: 19 Q Now, let's go back to that table¶
20 Okay? Now, let me ask you this Let me get you one¶
21 more exhibit¶
22 Now, before I give you this next¶
23 exhibit, I want to ask you a question¶
24 The information with regard to the OA¶
25 studies that's reflected in this table in the CV¶
01503¶
1 card that you were just talking about, you testified¶
2 earlier that's the data from the OA study trials,¶
3 right?¶
4 A Right.

1503:5-7

Q. Now, you're aware at this time that the FDA had serious concerns about this data; correct?

1503:9-1504:6

See objns, plus witness's lack of personal knowledge

THE WITNESS: About which data?
BY MR. SEEGER:
Q. The OA data that's reflected in the CV card.
A. No, I am not aware of that.
Q. Okay.
Well, why don't we go ahead and take another look back at that FDA briefing document which I marked earlier. We'll do this as quickly as we can. It's right there on top.
A. Which is dated February 8, 2001?
Q. Exactly.
A. Because we're talking about a time period here which is April/May 2000.
Q. Are you testifying now that this card was not in effect in February of 2001?
A. No, no, I'm not. I'm simply saying

01504

that this -- the discussion we were having about the card related to its introduction.
Q. No, put the bulletins aside. Now we're talking about a card that was in use from April of 2000 to April of 2002. Okay.
In February --

1504:17-1505:20

BY MR. SEEGER:
Q. In February of 2001, the FDA did an analysis or, I'm sorry, your attorney doesn't like that.
The FDA medical reviewer took a look at the original data from Merck's NDA, which is, you would agree, is this OA, this osteoarthritis trial data; correct?
A. Yes.

Overruled

01505

Q. I'll find it for you in one second.
If you'd turn to Page 19. Do you see where it talks about "Study 058" at the top?
A. Yes.
Q. Okay.
And then in italics it says, "Because of the small size and short duration, this study is inadequate to detect differences in clinically

relevant adverse events between rofecoxib," which is Vioxx, "and nabumetone." Did I read that correctly?
A. Yes, you did.
Q. Anywhere in this circular or any of the training materials that you gave to your people, did you, at this point in time and after, February 2001, tell them that the FDA had reservations about this trial?
MR. RABER: I'm going to object to the form. The FDA approved the label. This is one person --
THE WITNESS: This is one --

Same objections, plus Again, witness lacks personal knowledge.

1507:4-1508:2

Q. I have just a couple of quick questions.
The medical reviewer in this document made that comment about that trial. Has the fact that this medical reviewer found that this particular trial, the 058 trial, was inadequate to detect relevant, clinically relevant adverse events between Vioxx and the drugs it was compared to, did that make its way into any of your sales materials?
A. I don't know. I just point out a reference to study 058, and I do not know how many patients were in study 058 is different from the data presented here, which is across nine double blind studies, 6,000 OA patients, and so it is a very different data set.
Q. How about study 069, do you know anything about that?
A. No.
Q. Well, do you know that was a pooled analysis of many different trials that were done and provided to the FDA? Does that refresh your recollection?
01508
A. I don't remember the details of it.
I've heard the number certainly.

Overruled

1508:3-1509:6

Q. Were you aware in February of 2001 of this comment made by the medical reviewer where it

says, "The Division," and in this instance she's not talking about her, she says, "The Division has serious concerns with the combined analysis of studies of different length and dosing regimens." And it says, "Furthermore, combining multiple different drugs within a single comparator arm may not be reflective of the risk of any one drug." Did that material get disclosed to your sales representatives who were selling the drug?

MR. RABER: Objection to form.

THE WITNESS: I don't know the answer to that. It would not be usual for us to present comments from FDA reviewers or divisions in our material to representatives. We would give our representatives material that Merck believed to be accurate and balanced and consistent without our total knowledge of the product. That's what we gave our representatives.

BY MR. SEEGER:

Q. And you didn't provide them with concerns or discussions going on within the FDA

01509

about --

A. We provided them with what we thought were appropriate --

Q. Okay.

A. -- sets of information related to the data that we gave them.

Overruled

1509:7-13

Q. All right.

Now, Mr. Anstice, let me just ask you to take a look at what I've marked as 166. For the record, it's Bates stamped MRK-ACW0008375. Do you recognize this chart? I'll represent to you that it is a table from -- reflecting the mortality data from VIGOR. If you read above, you'll see.

1509:15-1511:12

THE WITNESS: I see that it is represented as data from VIGOR. I don't know the source of the table, the broader context.

BY MR. SEEGER:

Q. Now, you know this data was available to Merck in March of 2000. We've said that many times today; correct?

A. Yes, and quickly made available to the regulatory authorities as well.

Q. Absolutely.

But it never made its way into the CV

01510

card, did it, the data that we're looking at?

A. The purpose of the CV card was not to discuss the VIGOR study, but to discuss the total results from the OA studies. That was the purpose of the CV card.

Q. But let me just back up for a second.

Did you ever go to the FDA at any point in time and say, we'd like to incorporate the VIGOR mortality data in our training materials?

A. I don't know.

Q. Would there have been anything that would have prevented you from doing that?

A. I don't know.

Q. So, doctors who were prescribing the drug, let's say, in September of 2001, while this was in use, if the only information they received was from the sales rep and they didn't ask for a pamphlet, would not have received the VIGOR data, the mortality data from VIGOR from your sales representatives; correct?

A. Well, it's a -- sorry, could you just restate the question?

Q. Doctors prescribing -- excuse me one second.

Doctors prescribing this drug --

01511

A. Right.

Q. -- let's say in September of 2001.

A. Right. September of 2001.

Q. September of 2001.

A. Right.

Q. Where this card was in use.

A. Right.

Q. And they didn't receive any other information from the company, they just had discussions with the sales rep, would not have been advised about the mortality data from VIGOR;

Same objections, plus lack of personal knowledge

Overruled

correct?

1511:14-22

THE WITNESS: In the hypothetical situation where that particular physician had no contact with the many other diverse ways in which the information about VIGOR was being dispersed in the medical community, they would not have had VIGOR data from a Merck rep other than through a physician information request. But if they had wanted it, it would have been available through that vehicle.

1511:22-1512:7

BY MR. SEEGER:

Q. And is there anything that you're aware of, any rule or regulation that would have prevented you from going to the FDA and saying we

01512

would like to include the VIGOR data in our sales training material?

A. I don't know of any such rule.

Q. So, the doctors would not have gotten the VIGOR material from your sales representative, they would have had to get it from somewhere else; correct?

1512:9-17

THE WITNESS: No, that's not what I said. A doctor could ask for the VIGOR data from our sales representative and get it through a PIR. So, they did have access through our representatives. They also had access through other forms.

BY MR. SEEGER:

Q. And the Alzheimer's data as well, you know that was unblinded in April of 2001; correct?

1512:19-1513:22

THE WITNESS: I don't recall the month. I know it was unblinded very quickly after the VIGOR results.

BY MR. SEEGER:

Overruled

Q. And in the chart I just showed you from VIGOR, at the very top, do you see where it says, "All deaths"?

01513

A. Yes, I do.

Q. It shows 22 deaths from Vioxx; correct?

A. Yes.

Q. And 15 deaths from people taking naproxen in this trial; correct?

A. Right.

Q. And cardiovascular deaths, it shows, if you look down a couple more, it shows 28 deaths of people on Vioxx and 16 on naproxen; correct?

A. Right. Right.

Q. You are also aware from the Alzheimer's data, aren't you, that there were more people -- that mortality was higher in people taking Vioxx versus people taking placebo? Are you aware of that?

A. I don't recall the numbers.

Q. Do you recall if at any point in time the Alzheimer's mortality data was included in the CV card?

A. I don't know if it was subsequently added.

1597:11-23

Q. Well, we looked at the CV card before, and I think we both agreed or you agreed that it did not contain any information about the VIGOR trial at least prior to April of 2002; correct?

A. Yes. And I also stated that it was for a reason. Its purpose was to provide information on the existing cardiovascular data, and it did not, therefore, include VIGOR, as I believe it didn't include the Alzheimer's data either.

Q. But there was nothing preventing you from adding the VIGOR trials to your training materials; correct?

1597:25-1599:6

THE WITNESS: Well, training

overruled

01598

materials is a separate thing from a brochure going to a doctor.

BY MR. SEEGER:

Q. I'm talking about the materials used to train sales reps.

A. All right.

Q. There was nothing that prevented Merck from training their sales reps to answer questions about VIGOR?

A. Yes, there was. Because we had -- first of all, we had an instruction to them to not initiate discussions.

Q. I understand.

A. We also have a standard practice still in place today, I believe, although I'm no longer responsible for the U.S. business, of longstanding, which is our representatives are asked not to discuss information relating to our drugs that's outside the label or inconsistent with the current label.

Q. Well, based upon --

A. That is our practice at Merck.

Q. Based upon this new important data that came to light in March of 2000, did you go to the FDA and ask the FDA for permission to begin to

01599

train your sales reps on that data?

A. No, but that's consistent with -- that's not our practice or approach.

Q. But nothing would have prevented you from going to the FDA and seeking that approval; correct?

1599:8

THE WITNESS: I don't know.

1599:9-20

BY MR. SEEGER:

Q. There's nothing in that card, that card that we discussed, the CV card, it doesn't contain any information about the ADVANTAGE trial, the date of which also became available in March of 2000; correct?

Same Objections

Overruled EF

A. I don't know the answer. It deals with OA studies. ADVANTAGE was an OA study. I don't know if those data were included in the card.
Q. The OA studies that you discussed in the CV card represented studies involving about 3,500 clinical trial patients; correct?

1599:22-1600:14

---

THE WITNESS: For Vioxx, I think 6,000 patients in all, about 3,500 on Vioxx, that's correct.
BY MR. SEEGER:
01600
Q. 3,500 on Vioxx, fair objection. I think we cured it.
The VIGOR trial had about 8,000 patients in it; right?
A. Yes.
Q. And ADVANTAGE had another few thousand patients in it; correct?
A. Yes, several thousand.
Q. So, between VIGOR and ADVANTAGE, really they were much, much larger when you combine those two studies than the OA studies that you used in the CV card; correct?
A. Well, certainly VIGOR was more than the OA patients in the card, yes.

Same objection

Overruled

**Anstice Sales and Marketing Depo Cuts**