

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2005 DEC -2 P 4:01

LORETTA G. WHYTE
CLERK

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: | * | MDL Docket No. 1657 |
| | * | |
| **VIOXX PRODUCTS LIABILITY** | * | SECTION L |
| **LITIGATION** | * | |
| | * | |
| | * | JUDGE FALLON |
| This document relates to *Ivory Lindwedel v.* | * | |
| *Merck & Co., Inc., et al.*, no. 2:05-6199 | * | MAG. JUDGE KNOWLES |
| * * * * * * * * * * * * * * * * * | * | |
| | * | |

### MERCK'S OPPOSITION TO PLAINTIFF'S MOTION TO REMAND

Comes now Merck & Co., Inc. ("Merck"), and hereby submits its opposition to plaintiff's

Motion to Remand.  In support of its opposition, Merck states as follows:

### Background

This is a case involving the prescription drug Vioxx®.  In this case, plaintiff alleges that,

as a result of taking Vioxx, she had a stroke.  (Petition ¶ 14.)  Plaintiff alleges a variety of claims

against Merck arising out of her contention that "Vioxx is defectively designed, inadequately

tested, dangerous to human health, and lacked proper warnings as to the dangers associated with

its use."  (*Id.* at ¶ 16, 22, 42.)

In a transparent attempt to defeat Merck's removal rights, plaintiff also asserts a variety

of claims against the Medicine Shoppe.  Plaintiff bases these claims on the allegations that the

pharmacy filled her prescriptions for Vioxx and failed to warn her of the dangers associated with

Vioxx when she had her prescriptions filled.

__ Fee_____
__ Process_____
X Dktd_____
__ CtRmDep_____
__ Doc. No._____

As discussed below, the Court should strike plaintiff's motion to remand for failure to comply with the federal rules and the Local Rules of the Eastern District of Missouri.  Should the Court not strike plaintiff's motion, remand should nevertheless be denied because as a matter of law, the employee defendants are fraudulently joined, and their citizenship should thus be ignored for purposes of determining diversity.

<div align="center">**Argument**</div>

**I.      Plaintiff's Motion to Remand Should be Stricken.**

The Court should strike plaintiff's motion to remand.  As set forth in Merck's motion to strike (which Merck incorporates herein by reference), Merck removed this case to the Eastern District of Missouri on October 19, 2005.  Pursuant to 28 U.S.C. § 1447(c), a motion to remand a case "must be made within thirty days after filing of the notice of removal[.]"  Plaintiff filed her Motion to Remand on October 27, 2005, but did not file a memorandum in support of her motion.  Under Local Rule 7-4.01, a moving party "*shall* file with each motion a memorandum in support of the motion, including citations of any authorities on which the party relies."

Shortly after plaintiff filed her motion, counsel for Merck attempted to contact plaintiff's counsel to inform him of his failure to follow Local Rule 7-4.01.  Plaintiff's counsel did not return the call.  Thus, Merck's counsel again attempted to contact plaintiff's counsel, and informed plaintiff's counsel's secretary of plaintiff's failure to file the required memorandum.  Both of these notifications of plaintiff's failure to comply with the Local Rules occurred prior to the required date in which plaintiff could timely oppose the removal of this case.  Only after this time had run, and plaintiff still ignored her obligations under these rules, did Merck file its motion to strike.

<div align="center">2</div>

Plaintiff has still not responded to Merck's motion to strike.  Instead, plaintiff filed the instant untimely memorandum with absolutely no justification for the failure to comply with the federal and local rules.  Merck is not attempting to be hyper-technical.  The motion plaintiff filed contained virtually no argument whatsoever, failed to address any of Merck's assertions in its Notice of Removal, referred to a "memorandum" that did not exist at the time, and completely failed to give Merck notice of plaintiff's position on the issues.  The Rules are intended to prohibit just this type of conduct.  For these reasons alone, the Court can properly reject plaintiff's attempted opposition to Merck's proper removal of this case.

## II.  The Court Has Diversity Jurisdiction Over Plaintiff's Claims Because The Non-Diverse Defendant Has Been Fraudulently Joined.

Should the Court chose to reach the merits of plaintiff's motion, it should be denied because the Court has diversity jurisdiction over plaintiffs' claims.  Plaintiff does not dispute in her motion to remand that the amount-in-controversy requirement is satisfied.  Thus, the only question facing the Court is whether the Medicine Shoppe was fraudulently joined.  As set forth below, plaintiff has no intention of seeking relief from this defendant; nor could she if she so desired.  Accordingly, this defendant should be ignored for purposes of determining jurisdiction, and plaintiff's motion should be denied.

In the Eighth Circuit, "[j]oinder designed solely to deprive federal courts of jurisdiction is fraudulent and will not prevent removal."  *Anderson v. Home Ins. Co.*, 724 F.2d 82, 84 (8th Cir. 1984).  "The doctrine of fraudulent joinder is designed to prevent plaintiffs from naming parties of the same citizenship merely to avoid removal of an action to federal court."  *Kohl v. Am. Home Prods. Corp.*, 78 F. Supp. 2d 885, 889 (W.D. Ark. 1999).

Plaintiff's motion to remand misstates the standard for determining whether a party has been fraudulently joined to defeat diversity.  Plaintiff repeatedly states throughout her brief that

3

the non-diverse defendant is not fraudulently joined because there is "arguably a reasonable basis for predicting that Missouri law *might* impose liability" on the non-diverse defendants. *See* Pltf. Mem. at 4-9. But this is not the proper test: rather, under Eighth Circuit law, "[j]oinder is fraudulent and removal is proper where there exists *no reasonable basis in fact and law* supporting a claim against the resident defendants." *Wiles v. Capitol Indem. Corp.*, 280 F.3d 868, 871 (8th Cir. 2002) (emphasis added). The Eighth Circuit has emphasized that the "paramount consideration" in fraudulent joinder determinations is "the *reasonableness* of the basis underlying the claim." *Filla v. Norfolk S. Rwy. Co.*, 336 F.3d 806, 809-11 (8th Cir. 2003) (explicitly rejecting alternative standards for determining fraudulent joinder) (emphasis added).

As set forth below, based on the facts alleged in plaintiff's petition, there is no reasonable basis supporting any claims against the Medicine Shoppe.

**A.      The Medicine Shoppe is Fraudulently Joined.**

Plaintiff has sued the Medicine Shoppe, alleging that it is a citizen of Missouri, on the grounds of strict product liability (Count F), negligent failure to warn (Count G), breach of continuing duty to warn (Count H), and the Missouri D.T.P.A. (Count I). The Medicine Shoppe was fraudulently joined for several reasons.

**1.      The Medicine Shoppe is Fraudulently Joined Because The Claims Against It Cannot Be Reconciled With The Gravamen Of Plaintiff's Petition – That Merck Withheld Information About Alleged Vioxx Risks From Everyone Including The "Health Care Industry."**

First, the Medicine Shoppe is fraudulently joined because plaintiff's claims against it are wholly inconsistent with the gravamen of her allegations: that Merck misled the public and

physicians regarding the safety of Vioxx.  (Petition ¶¶ 17, 29, 31, 34, 54, Counts A-E.)[1/]  After all, plaintiff repeatedly asserts in her Petition that Merck misled and withheld information regarding the safety of Vioxx from plaintiff herself, "the consuming public" generally, and even from "the health care industry."  At the same time, plaintiff also alleges that the Medicine Shoppe – a mere service provider who fills prescriptions made by doctors – was sufficiently aware of the risks associated with Vioxx that its failure to disclose those risks breached a duty to plaintiff.  The incompatibility of these two theories has been acknowledged by several hundred plaintiffs in similar Vioxx cases.  *See* July 21, 2005 Order and Memorandum, p. 2, *In re VIOXX Prods. Liab. Litig.*, MDL No. 1657 (E.D. La. July 21, 2005), attached hereto as Exhibit A (the MDL plaintiffs generally will not be asserting claims against the prescribing doctors because such a claim would "undermine" the plaintiffs' "main theory . . . that Merck failed to disclose known risks of heart attacks to the medical community[.]").  Plaintiff's allegations against the Medicine Shoppe are irreconcilable with the core allegation in her Petition not only because they completely depend on the proposition that the Medicine Shoppe knew information which plaintiff alleges Merck withheld from it, but also because these allegations necessarily posit that the Medicine Shoppe somehow had more information about the risks of Vioxx than plaintiff's own prescribing physician.

In similar circumstances, courts around the country have ruled that non-diverse defendants were fraudulently joined.  *See, e.g., In re Rezulin Prods. Liab. Litig.* ("*Rezulin I*"), 133 F. Supp. 2d 272, 295 (S.D.N.Y. 2001) (finding that non-diverse physicians were fraudulently joined because the plaintiffs' allegations that the drug manufacturer had concealed the drug's risks from everyone "refutes the assumption that . . . [the] physicians had knowledge of [the

---

[1/]   Under the learned intermediary doctrine, plaintiff can only recover against Merck if she can demonstrate that Merck withheld information from the medical community.  *Doe v. Alpha Therapeutic Corp.*, 3 S.W.3d 404, 419-20 (Mo. App. 1999); *West v. Searle & Co.*, 806 S.W.2d 608, 613-14 (Ark. 1991).

drug's] harmful effect"); *Wiggins v. Am. Home Prods. Corp.*, 2001 WL 34013629 (N.D. Ala. Oct. 2, 2001) (in-state pharmacy was fraudulently joined where plaintiff made no specific allegation against the pharmacy), *aff'd mem.*, No. 02-10528, 2002 WL 1276993 (11th Cir. May 29, 2002); *In re Diet Drug Prods. Liab. Litig.*, 220 F. Supp. 2d 414, 424 (E.D. Pa. 2002) (in-state physician fraudulently joined).

<div style="margin-left:2em">

**2.      The Medicine Shoppe Is Also Fraudulently Joined Because There Is No Reasonable Possibility That Plaintiff Would Prevail On Any Of Her Claims Against It.**

**a.      Plaintiff Has No Reasonable Basis For Her Failure To Warn Claim Under Missouri Law.**

</div>

Plaintiff seeks to pursue a negligence action against the Medicine Shoppe based upon its alleged failure to provide adequate warnings regarding the potential dangers associated with the use of Vioxx. (Petition Count G.)  As discussed above, plaintiff accuses the Medicine Shoppe of failing to warn plaintiff even though the essence of plaintiff's entire Petition is premised on the claim that Merck allegedly failed to disclose these very same risks and consequences to the community at large, including the health care industry. (*See id.* at¶ ¶ 17, 29, 31, 34, 54, Counts A-E.)  Because Missouri law does not permit a failure-to-warn claim against a pharmacy as alleged here, plaintiff's claim fails as a matter of law.

Although a pharmacy has a duty to fill prescriptions correctly, it is well-recognized that "pharmacies generally have no common-law or statutory duty to warn customers of the risks associated with the drugs they purchase." *Kohl v. Am. Home Prods. Corp.*, 78 F. Supp. 2d 885, 893 (W.D. Ark. 1999).  Plaintiff's allegations against the Medicine Shoppe likewise fail under Missouri law. *See Doe v. Alpha Therapeutic Corp.*, 3 S.W.3d 404, 419 (Mo. App. 1999) (*citing Krug v. Sterling Drug, Inc.*, 416 S.W.2d 143, 146 (Mo. 1967) *and Kirsch v. Picker Int'l, Inc.*, 753 F.2d 670 (8th Cir. 1985) (applying Missouri law)) (recognizing that Missouri follows the

learned intermediary doctrine).  Plaintiff attempts to circumvent Missouri's learned intermediary doctrine by citing *Horner v. Spallito*, 1 S.W.3d 519 (Mo. App. 1999), a case in which a Missouri appellate court found that a pharmacy could be negligent for filling a prescription for what the pharmacist knew to be a lethal dose outside recommended dosage guidelines.  However, as the court in *Rezulin I* recognized, such a cause of action does not abrogate the learned intermediary doctrine or prevent a finding of fraudulent joinder in a case such as plaintiffs'; *Horner* merely "dealt with the unquestioning provision of addictive drugs over lengthy periods."  133 F. Supp. 2d at 289-90 (finding claims against pharmacies to be fraudulent joinder notwithstanding possibility that Mississippi would agree with *Horner*).

At the same time, *Horner* validated the fundamental proposition that the *physician* is in a "superior position to judge the propriety of a particular patient's drug regimen."  *Id.* at 524 n. 5. Indeed, *Horner* relied extensively upon the landmark case *McKee v. American Home Products*, 782 P.2d 1045 (Wash. 1989), which held that a pharmacist is not required to "warn customers of the hazardous side effects associated with a drug" selected by the physician.  *Horner*, 1 S.W.3d at 524, n. 5.  *Horner* left open the question of whether this pharmacist had an additional obligation – such as inquiring about clearly excessive dosages of a "strong hypnotic drug" – but it never took issue with *McKee*'s conclusions regarding a duty to warn.  *Horner* simply does not create a unique "Missouri rule" that pharmacists have a duty to warn that other states have rejected.

Plaintiff also claims that Missouri courts might recognize a negligent failure to warn cause of action against the Medicine Shoppe because Missouri has adopted the *Restatement (Second) of Torts* § 388.  (Pltf. Mem. at 6-7.)  However, no Missouri court has allowed claims such as plaintiff raises in her Petition based upon § 388.  Whether Missouri courts recognize a

negligent failure to warn claim in some other theoretical context is irrelevant here.  The issue is whether such a claim can be brought against a pharmacy that properly filled a doctor-prescribed prescription.  Because Missouri has adopted the learned intermediary doctrine (*see Doe*, 3 S.W.3d at 419), it is the doctor, not the pharmacy who advises regarding prescription medication. Plaintiff's cleaning solvent case does nothing to change that, and nothing in Restatement § 388 abrogates the learned intermediary doctrine.

Plaintiff next asserts that Missouri regulations impose a duty to warn on the pharmacies under MO. CODE REGS. ANN. tit. 4, § 220-2.190.  (Pltf. Mem. at 7.)   Contrary to plaintiff's assertions, however, nothing in § 220-2.190 imposes on a pharmacist a general duty to warn about the dangers of prescription drugs.  Rather, § 220-2.190 merely requires a pharmacist to "offer" to "discuss" with and "counsel" the purchaser upon receipt of a prescription drug. MO. CODE REGS. ANN. tit. 4, § 220-2.190(1).  Nowhere in plaintiff's voluminous Petition or lengthy memorandum does she contend that the Medicine Shoppe did not offer to counsel or discuss Vioxx with her.  Additionally, the purpose of this "counseling" is not to give warnings, but instead to help the patient achieve the "maximum therapeutic outcomes." *Id*.  Furthermore, § 220-2.190(1) provides that the counseling shall be "consistent with applicable state laws." *Id*. As discussed above, neither Missouri law nor the overwhelming majority of jurisdictions impose on pharmacies a generalized duty to warn of the dangers of prescription drugs, and such a duty would in fact be contrary to Missouri's learned intermediary doctrine. *See Doe*, 3 S.W.3d at 419.

Plaintiff also specifically claims in her memorandum (not her petition) that the Medicine Shoppe violated these Missouri regulations by failing to warn plaintiff "of the dangers of Vioxx that it knew about, despite knowing Plaintiff's respective medical history."  (Pltf. Mem. at 7.) Plaintiff then states, with no factual support, that "Vioxx was contraindicated or not advisable for

8

plaintiff." (*Id.*)   However, plaintiff did not allege anywhere in her Petition that the Medicine Shoppe actually knew of the medical history of this particular plaintiff, or knew that Vioxx was contraindicated for this plaintiff because of her medical history, or even that Vioxx was actually contraindicated for this plaintiff because of her medical history. *See Malone v. Schapun, Inc.*, 965 S.W.2d 177, 184-85 (Mo. App. 1998) (in order to be liable in negligence for failure to warn, a seller must know or have reason to know of information regarding the allegedly dangerous nature of the product).   Plaintiff's vague allegation of knowledge on the part of the Medicine Shoppe, with no factual support whatsoever, falls well short of stating a cause of action for failure to warn, even under the Federal Court's notice pleading standard. (*See* Petition ¶¶ 99.)

Plaintiff further argues that because the Medicine Shoppe has voluntarily undertaken to provide customers with information or warnings about the prescription drug, the pharmacies have assumed a duty of care limited to the extent of their undertaking. (Pltf. Mem. at 6-7.) *See Hoover's Dairy, Inc. v. Mid-Am. Dairymen*, 700 S.W.2d 426, 432 (Mo. banc 1990); *Strickland v. Taco Bell Corp.*, 849 S.W.2d 127, 132 (Mo. App. 1993). Plaintiff is wrong. First, the cases on which she relies have nothing to do with pharmacies filling prescriptions. On that issue, Missouri courts have clearly held no duty to warn exists. *See Doe*, 3 S.W.3d at 419. Second, plaintiff makes no allegation of any "undertaking" on behalf of the pharmacy in her Petition. *See Petition* Counts G & H. Moreover, even if the Medicine Shoppe had provided warnings as to some of the possible side effects of a drug, that does not mean that it assumed a duty to warn plaintiff about *all* possible side effects of the drug. *See, e.g., Kasin v. Osco Drug, Inc.*, 312 Ill. App. 3d 823, 829 (2d Dist. 2000) ("By voluntarily undertaking to list some of the drug's side effects, [the pharmacy] did not assume a duty to list all possible side effects").

Finally, plaintiff contends that the learned intermediary doctrine does not apply here because **Merck**, not the pharmacies, advertised Vioxx directly to the public. (Pltf. Mem. at 7-8.) Plaintiff states that "[i]f *manufacturers* want to directly deal with consumers in promoting their pharmaceutical drugs and conveying information directly to them, than (*sic*) normal common law rules of failure to warn should apply as would be the case with over-the-counter drugs." (*Id.*)   Regardless of whether there is any merit to this argument as it relates to Merck, it obviously is not relevant to *the Medicine Shoppe*, who is not alleged to have done any such direct marketing of Vioxx.

The allegations here cannot withstand this well-reasoned law.  As discussed above, courts in Missouri and across the country agree that pharmacies simply are not required to, and indeed should not be, second-guessing plaintiff's doctor concerning whether Vioxx should be prescribed or what discussion of side effects should take place, as plaintiff alleges.  Plaintiff makes no allegation that the Medicine Shoppe failed to fill her prescriptions according to the physician's instructions, failed to label the bottles accurately, or otherwise failed to exercise due care in filling her prescriptions for Vioxx.  Because a pharmacy has no duty to warn of risks and side effects of a prescription drug under Missouri law, and because plaintiff has not alleged any facts supporting the application of any exception to that general rule, plaintiff cannot make out a negligence claim against the Medicine Shoppe.    Accordingly, the Medicine Shoppe is fraudulently joined and the Court should disregard its citizenship when evaluating removal.

### b.  Plaintiff's Strict Liability Claim Against the Medicine Shoppe Also Fails

Plaintiff also attempts to state a claim against the pharmacy under strict liability for the sale of a defective product.  (*See* Petition Count F, Pltf. Mem. at 8.)  Plaintiff makes a one sentence argument to support this cause of action.  "A seller of a defective product can be held

liable to plaintiffs [sic] under a theory of strict liability." (Pltf. Mem. at 8.)   However strict liability claims against health care providers are barred under Missouri law.   *See Budding*, 19 S.W.3d at 680-82; *Redfield v. Beverly Health & Rehab. Servs., Inc.*, 42 S.W.3d 703, 714 n. 3 (Mo. App. 2001) (noting that "the statutory products liability provisions under Sections 537.760 to 537.765, . . . , are inapplicable to health care providers").   Under Revised Statute of Missouri § 538.205(4) and *Beuke v. Pharmacia & Upjohn Co.* pharmacists and pharmacies are classified as health care providers.   *Beuke*, 2000 WL 34430453.   In addition, the sale of a product to a patient "incidental or pursuant to the practice of the health care professional's profession" is classified as health care services.   Rev. Stat. Mo. § 538.205(5).

The Eastern District of Missouri has specifically held that *Budding* precluded a pharmacy from being held strictly liable.   *Beuke*, 2000 WL 34430453.   *Beuke* is precisely on point.   A Missouri plaintiff brought suit against a New Jersey drug manufacturer and a Missouri pharmacy, claiming that they both were strictly liable for failing to provide warnings about an allegedly defective prescriptive medication.   The drug manufacturer removed the case to federal court on the grounds that plaintiff could not state a claim against the pharmacy and the pharmacy was fraudulently joined.   Plaintiff filed a motion to remand.   *Id.* at *1.   The Court denied remand, finding the pharmacy was fraudulently joined: "Because, under Missouri law, defendant [pharmacy] is a health care provider, it cannot be sued under a theory of strict liability."   *Id.* at *2.[2/]

---

[2/]   While plaintiff is correct that *Keener v. Dayton Elec. Mfg. Co.*, 445 S.W.2d 362 (Mo. 1969), recognizes a cause of action for strict liability, *Keener* does not state that a cause of action for strict liability can be maintained against a *pharmacy*, and thus does not contradict Merck's argument.

3.    **Merck Did Not Argue Fraudulent Misjoinder.**

Finally, plaintiff asserts in her memorandum that remand should be granted because this Court and the Eighth Circuit "have not adopted the theory of fraudulent misjoinder." (Pltf. Mem., 9-10.)   However, Merck did not argue in its notice of removal that the removal of this case is proper because plaintiff had fraudulent misjoined her claims with any other plaintiffs. *See* Notice of Removal.  Nor would Merck have made this argument as there is only one plaintiff named in this case.  Rather, Merck contended that the case is properly removed because plaintiff, as demonstrated above, has fraudulently *joined* the Medicine Shoppe as a defendant for the sole purpose of defeating diversity.

## Conclusion

For all of the foregoing reasons, and for the reasons set forth in Merck's briefing with respect to its Motion to Strike, Merck respectfully requests that the Court strike plaintiff's motion to remand in its entirety.  If the Court decides to rule on the merits of plaintiff's motion to remand, the Court should deny the motion for the reasons set forth above.

Respectfully submitted,

Phillip A. Wittman, 13625
Dorothy H. Wimberly, 18509
Carmelite M. Bertaut, 3054
Stone Pigman Walther Wittmann L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone:  504-581-3200
Fax:  504-581-3361

Defendants' Liaison Counsel

Dan H. Ball
Robert T. Ebert, Jr.
Stephen G. Strauss
Bryan Cave LLP
One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, Missouri 63102
Phone:  314-259-2000
Fax:  314-259-2020

Counsel for Merck & Co., Inc.

### CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Merck's Opposition to Plaintiff's Motion to Remand has been served on Liaison Counsel, Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8, on this 2 day of December, 2005.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: VIOXX | : | MDL NO. 1657 |
| PRODUCTS LIABILITY LITIGATION | : | SECTION: L |
| | : | JUDGE FALLON |
| | : | MAG. JUDGE KNOWLES |

THIS DOCUMENT RELATES TO ALL CASES

### ORDER AND REASONS

On June 29, 2005, the Court heard oral argument on Plaintiffs' Motion to Modify the Court's June 6, 2005 Order and Reasons. For the following reasons, the Plaintiffs' motion is GRANTED and the Court's June 6, 2005 Order and Reasons is modified to apply to the Plaintiffs in circumstances where the prescribing physician has been named as a defendant.

I.   Plaintiffs' Motion to Modify

In an Order issued June 6, 2005, this Court ruled that any attorney or representative of any party wishing to interview a Plaintiff's prescribing physicians must serve Liaison Counsel for the opposing party with five days notice of such interview. According to the Order, opposing counsel would then be permitted to attend and participate in the noticed interview, but if opposing counsel decided not to participate in the interview, the noticing party could conduct said interview without opposing counsel's presence. The Plaintiffs have moved the Court to modify this Order by limiting the applicability of the Order as it applies to Plaintiffs' counsel to circumstances in which the treating physician actually has been named as a defendant. Plaintiffs

-1-

**EXHIBIT A**

seek this modification for several reasons:

First they argue that the Court's order is unprecedented and inconsistent with practice in other major venues of the Vioxx litigation. The Plaintiffs point to other MDLs as well as Vioxx litigation in various states in which courts have allowed Plaintiffs' counsel to contact treating physicians without the presence of defense counsel.

Second, Plaintiffs suggest that the Court's decision has discouraged participation in the MDL.

Third, Plaintiffs argue that the Court's concern about Plaintiffs' contact with physicians who are potential defendants is not needed because there is no evidence of impropriety on the part of Plaintiffs' counsel with regard to communications with physicians. The Plaintiffs further state that amendments to add physicians are unlikely because the Plaintiffs' main theory is that doctors were never allowed to become learned intermediaries since Merck failed to disclose known risks of heart attacks to the medical community. Therefore, adding doctors as defendants in most circumstances would undermine this theory by suggesting that the doctors are at fault. Accordingly, the Plaintiffs believe that the Court's June 6, 2005 Order should be modified to conform with the Court's policy reasons for denying the ex parte communications for any party, and only should apply to the Plaintiffs where the treating physician has an interest in the litigation because he or she has been named as a defendant.

Merck opposes such modification, claiming that the Plaintiffs have used the motion for reconsideration to rehash previous arguments. Merck argues that the Court's concerns regarding Plaintiffs' communications with doctors is not unfounded. To support this position, Merck points to a letter in which a plaintiffs' lawyer threatened to name doctors as defendants in Vioxx

-2-

suits and to tell the doctors that it was Merck's fault because Merck refused to waive its right to remove Vioxx cases to federal court. Further, Merck points to a plaintiffs' attorney working for a firm represented on the PSC who, at a Vioxx conference, encouraged other plaintiffs' lawyers to sway physicians to accept plaintiffs' theories in Vioxx cases. Merck questions why Plaintiffs cannot obtain factual information from doctors in the presence of a defense attorney. According to Merck, the real concern regarding undue influence is with physicians who have not already been sued, because those who have been sued will be represented by counsel. Further, Merck argues that the Court should not skew the law in order to encourage more federal court filings, as Merck believes the Plaintiffs are advocating.

After considering the briefs and arguments of counsel the Court revisits its prior ruling and tests its theoretical basis, its basis in logic, and its practical effect.

II.   <u>Analysis</u>

A motion to reconsider should be granted only where the movant demonstrates: (1) intervening change in controlling law, (2) the availability of new evidence not previously available, or (3) the need to correct a clear error of law or to prevent injustice.[1] "Reconsideration of an order is an extraordinary remedy which courts should use sparingly."[2] Further, motions for reconsideration are not to be used "to re-debate the merits of a particular

---

[1] *Freeport-McMoran Sulphur LLC v. Mike Mullen Energy Equip. Resource, Inc.*, 2004 U.S. Dist. LEXIS 12183, *4 (E.D. La. June 30, 2004), citing *Motiva Enters. LLC v. Wegmann*, 2001 U.S. Dist. LEXIS 3049 (E.D. La. Mar. 12, 2001).

[2] *Schildkrant v. Bally's Casino New Orleans, LLC*, 2004 U.S. Dist. LEXIS 21412, *1 (E.D. La. Oct. 20, 2004).

motion."[3]

In the instant case, the Plaintiffs have not satisfied requisites (1) or (2) of the standard for motions to reconsider. However, the Plaintiffs have claimed that the Court's order should be modified to prevent injustice. Therefore, the Plaintiffs have filed a valid motion for reconsideration. In fact, the Plaintiffs have characterized their motion as a motion to modify rather than a motion for reconsideration because the Plaintiffs have not taken issue with the Court's reasoning. Rather, the Plaintiffs argue that the Court's reasoning need not lead to such a broad prohibition against Plaintiffs' contacts with their own prescribing physicians.

At the outset, the Court's notes that the purpose of the June 6, 2005 opinion and order was to put Plaintiffs and Defendants on an equal footing with respect to interviewing the prescribing physicians. While the logic and reasoning of the opinion are sound, the practical effect has created unintended consequences that can cause more problems than it sought to solve. This is of concern and causes the Court to reevaluate its prior approach.

It is important to recognize that the current issue is a discovery issue and not a substantive one. Discovery is intended to assist counsel for all parties to prepare for trial. It is not intended to make life more difficult or to distract them from the primary issues of the litigation. If or when it does, the discovery method needs to be reevaluated. This observation is not intended to trivialize discovery; it is an essential part of a case, but it has to be kept in perspective.

With this principle in mind, the Court turns to the issues raised by the Plaintiffs.

---

[3]*Freeport-McMoran Sulphur LLC,* 2004 U.S. Dist. LEXIS 12183 at *4; *see also Schildkraut,* 2004 U.S. Dist. LEXIS 21412 at *2.

Plaintiffs point out that in determining whether to take or keep a case, it is often important for a plaintiff's counsel to interview the plaintiff's treating physician regarding the plaintiff's personal medical history.  The approach taken in the Court's previous Order presents an obstacle to this important process.  Furthermore, the Court's initial approach has had a chilling effect on the MDL process, which was designed to coordinate litigation in one forum.  While an adverse effect on the MDL process should not be determinative in the Court's decision on how to handle communications with physicians, it is not an irrelevant issue for MDL transferee judges.  The Court's original approach has also interfered with the objective of the MDL process by placing Plaintiffs' counsel in a potential malpractice conundrum.  Plaintiffs' counsel has to choose between filing their clients' cases in this MDL where they could not engage in private discussions with the plaintiff's treating physician, filing their cases in state courts that would allow them to have ex parte communications with the physicians, or first filing in state court in order to interview doctors and then removing to federal court and becoming part of the MDL.  The effects of these decisions would leave the MDL with cases where some physicians previously have undergone interviews with Plaintiffs' counsel while others have not and now cannot.  Clearly these unintended consequences can have a destructive effect on the efficient handling of this litigation and become problematic to both sides as well as to the Court.  Another approach is called for.

One option would be to allow both sides to have unfettered ex parte access to the Plaintiffs' treating physicians.  The advantage of this approach is that it too treats each side the same.  Furthermore, the Defendants make the argument that the treating physicians in this case are really fact witnesses and both sides should have equal access to fact witnesses for ex parte

conferences. The treating physicians in this case are in a different role than the treating

physician in a typical personal injury case. In a typical tort or product liability case the

physician has had no contact or had nothing to do with the event that allegedly caused the

claimed injury. In the present case, however, the treating physician does play a role in the event

complained of by the Plaintiffs. Specifically, the physician is the one who prescribed the

medication that allegedly caused the Plaintiffs' injuries and resultant damages.

    At first blush, the treating physicians in this case seem more like "fact" witnesses than

expert witnesses. On closer scrutiny, however, it is clear that the physicians are both fact and

expert witnesses. However, with regard to the former, the "facts" that the treating physician has

knowledge of were discovered during the time of a private, privileged relationship. To release

this information without the approval of the patient, other than in a deposition or pursuant to a

court order, would be in direct conflict with the time honored doctor-patient confidential

relationship which has been recognized and protected in both Western and Eastern civilization

for over 2000 years.

    The special relationship which exists-and some would insist, must exist- between a

patient and his or her doctor was first recognized by Hippocrates of Cos in the fifth century B.C.

and is codified in the Hippocratic oath. The classical version of the Hippocratic Oath reads in

pertinent part: "What I may see or hear in the course of the treatment or even outside of the

treatment in regard to the life of men, which on no account one must spread abroad, I will keep

to myself, holding such things shameful to be spoken about."[4] The principles set forth in the

---

[4] Translation from the Greek by Ludwig Edelstein, *From The Hippocratic Oath: Text, Translation, and Interpretation* (Johns Hopkins Press, 1943).

ancient Hippocratic Oath were formally introduced to modern Western society in 1803 with

Thomas Percival's publication of *Medical Ethics*.[5]  The American Medical Association

("AMA") adopted Percival's precepts in 1847 in its first Code of Ethics.[6]  The modern AMA

rule, promulgated by the AMA's Council on Ethical and Judicial Affairs in 1998, states that

"information disclosed to a physician during the course of the relationship between physician

and patient is confidential to the greatest possible degree."[7]  Today, most graduates of medical

schools in this country recite a modern version of the Hippocratic Oath upon matriculation.[8]

The importance of the physician-patient relationship is not limited to Western medicine.

An Oath of Initiation, required of practitioners of Ayurvedic medicine in India since the fifth

century B.C., stresses confidentiality of the physician-patient relationship as well.[9]  In China,

Sun Ssu-Miao, a pioneer of Chinese medicine, authored the "Thousand Golden Remedies" in the

seventh century A.D.[10]  The text outlines the decorum and discretion required of physicians,

especially with regard to their dealings with patients.  The physician-patient relationship is also

---

[5]John W. Clark, *Confidential Communications in a Professional Context: Attorney, Physician, and Social Worker*, 24 J. Legal Prof. 79, 91 (Spring 2000).

[6]*Id.*

[7] *Id.* at 92, citing Council on Ethical and Judicial Affairs, Am. Medical Ass'n, Code of Medical Ethics: Current Opinions with Annotations VII, Rule 5.05 (1998).

[8]The modern version of the Hippocratic Oath, as modified in 1946 by Louis Lasagna, Academic Dean of the School of Medicine at Tufts University, reads in pertinent part: "I will respect the privacy of my patients, for their problems are not disclosed to me that the world may know."

[9]V. Balakrishna Panicker, et al., *Indian Contributions to Science*, Swadeshi Science Movement, pp. 8-9 (2002); *see also* Clark at 90-91 n.76.

[10]*See id.* at 91 n.78; *see also* T'ao Lee, *Medical Ethics in Ancient China*, Bulletin of the History of Medicine 13, pp. 268-77 (1943).

described in the Oath of Asaph, required of practitioners of Hebrew medicine since approximately the sixth century A.D.[11] In particular, the Oath of Asaph requires physicians to "not divulge the secret of a man who has trusted you."[12]

The physician-patient privilege has transfigured from a code of ethics into a matter of law in most states in this Union. In 1776, the English case of Elizabeth, Duchess of Kingston, established that the physician-patient privilege did not exist as a matter of English common law.[13] However, in 1828, New York passed a statute codifying the physician-patient privilege.[14] Forty states and the District of Columbia have since similarly codified the physician-patient privilege.[15]

The ethical rules and attendant laws regarding the relationship between a physician and a patient serve both utilitarian and fairness purposes. Confidentiality reduces the stigma attached to seeking treatment for some infectious diseases and invites patients to provide information about previous ailments with greater candor.[16] This effect allows physicians to provide more

---

[11]*See Clark at 91 n.77.*

[12]Shlomo Pines, *The Oath of Asaph the Physician and Yohanan Ben Zabda: Its Relation to the Hippocratic Oath and the Doctrina Duarum Viarum of the Didache*, Proceedings of the Israel Academy of Sciences and Humanitis 9, pp. 223-264 (1975).

[13]*Rex. v. Duchess of Kingston*, 20 How. St. Tr. 355, 572-73 (1776).

[14]Daniel W. Shuman, *The Origins of the Physician-Patient Privilege and Professional Secret*, 39 Sw. L.J. 661, 676 (June 1985) citing N.Y. Rev. Stat. 1829 II, 406, part III, tit. 3, ch. VII, art. VIII, § 79.

[15]Shuman at 677.

[16]*Developments in the Law – Privileged Communications*, 98 Harv. L. Rev. 1530, 1532-33 (May 1985).

thorough preventative care.  Moreover, because "[a]lmost every member of the public is aware of the promise of discretion contained in the Hippocratic Oath, [] every patient has a right to rely upon this warranty of silence."[17]  Impairing the relationship between a physician and a patient would therefore not only be unfair to patients that have provided information to their physicians in confidence, but could reduce the quality of medical care provided.

In this litigation, the information imparted to the physicians by the Plaintiffs was given to the doctors while they were in the course of their well-established confidential relationship with the Plaintiffs.  Therefore, this confidential relationship and the effect that counsels' communications would have on that relationship are very relevant concerns for the Court in fashioning appropriate guidelines for communications with the Plaintiffs' prescribing physicians.  The Court also has to consider the Health Insurance Portability and Accessibility Act of 1996, 42 U.S.C. §1320d, et seq. ("HIPAA"), which is intended to "ensure the integrity and confidentiality of [patients'] information" and to protect against "unauthorized uses or disclosures of the information."[18]  Further, this MDL case involves the separate laws of fifty states, some of which provide for a broader physician-patient privilege than others.  The Court realizes that the physicians in this litigation are in a different position than in the typical personal injury case.  This peculiarity, however, does not justify destroying the physician-patient relationship and all of the concerns that arise because of that relationship.

The Court, upon further reflection, now feels that the just option in this case is to protect the relationship between a doctor and patient by restricting defendants from conducting ex parte

---

[17]*Hammonds v. Aetna Cas. & Sur. Co.*, 243 F.Supp. 793, 801 (N.D. Ohio 1965).

[18] 42 U.S.C. §1320d-2(d)(2)(A) & (B)(ii).

communications with Plaintiffs' treating physicians but allowing Plaintiffs' counsel to engage in ex parte interviews with those doctors who have not been named as defendants. This approach appears, at first glance, to be one sided and unfair. However, in actuality and as a practical matter, it is not. This modification does not leave the Defendants without any access to information. The Defendants still are entitled to all of the medical records of the Plaintiffs as well as the Plaintiff Profile Forms setting forth each Plaintiff's detailed medical history. The Defendants can also continue to exercise their right to depose the Plaintiffs' treating physicians or confer with them in the presence of Plaintiffs' counsel. Furthermore, as a practical matter, the Defendants already have information, including documentation, regarding what its representatives told the treating physicians about Vioxx. Therefore, the Defendants do not need the doctors to tell them in ex parte conferences what they already know.

III.    Conclusion

For the aforementioned reasons, IT IS ORDERED that the Court's June 6, 2005 Order and Reasons be modified with respect to the Plaintiffs to apply only to circumstances where the prescribing physician has been named as a defendant. As the Court mentioned at oral argument, this modification is not set in stone. If future progress of this litigation indicates any trend toward the improper use of ex parte communications with physicians, the Court will revisit this issue.

New Orleans, Louisiana, this  21st  day of  July , 2005.

UNITED STATES DISTRICT JUDGE

-10-