U. S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
FILED 12-3-05
LORETTA G. WHYTE
CLERK

Page 1

MDL-1657
Ref: 05-4046-L

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: VIOXX LITIGATION: MDL DOCKET NO. 1657

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF LOS ANGELES

- - -

Coordination Proceeding: CASE NO. JCCP
Special Title : JCCP NO. 4247
(Rule 1550(b)) :
:
This Document Applies :
To All :
VIOXX CASES

Plaintiff's Designations are in pink. Objections are red.

- - -

CONFIDENTIAL

SUBJECT TO PROTECTIVE ORDER

- - -

November 22, 2005

Defendant's Designations are in yellow. Objections in black.

- - -

Videotape deposition of ERIC J. TOPOL, M.D., held in the InterContinental Hotel, 9801 Carnegie Place, Cleveland, Ohio 44106, commencing at 9:41 a.m., on the above date, before Linda L. Golkow, a Federally-Approved Registered Diplomate Reporter and Certified Shorthand Reporter.

- - -

GOLKOW LITIGATION TECHNOLOGIES
Four Penn Center - Suite 1210
1600 John F. Kennedy Boulevard
Philadelphia, Pennsylvania 19103
1.877.DEPS.USA

Fee
Process
X Dktd
CtRmDep
Doc.No. 1978

405d92cd-4d0a-489f-87d2-231e2a1c3f6f

APPEARANCES:

KLINE & SPECTER, P.C.
BY: THOMAS R. KLINE, ESQUIRE
and
LISA DAGOSTINO, M.D., J.D.
and
LEE B. BALEFSKY, ESQUIRE
(By Telephone)
19th Floor
1525 Locust Street
Philadelphia, Pennsylvania 19102
(215) 772-1000
Counsel for Plaintiffs

SEEGER WEISS LLP
BY: DAVID R. BUCHANAN, ESQUIRE
Suite 920
550 Broad Street
Newark, New Jersey 07102
(973) 639-9100
Counsel for Plaintiffs

LEVIN SIMES & KAISER LLP
BY: STEVEN B. STEIN, ESQUIRE
One Bush Street - 14th Floor
San Francisco, CA 94104
(415) 646-7171
Counsel for Plaintiffs

THE BEASLEY FIRM LLC
BY: SCOTT D. LEVENSTEN, ESQUIRE
1125 Walnut Street
Philadelphia, Pennsylvania 19107
(215) 592-1000
Counsel for Plaintiffs

- - -

APPEARANCES: (Continued)

LEVIN FISHBEIN SEDRAN & BERMAN
BY: MICHAEL M. WEINKOWITZ, ESQ.
Suite 500 - 510 Walnut Street
Philadelphia, Pennsylvania 19106
(215) 592-1500
Counsel for Plaintiffs
(By Telephone)

MINTZ, LEVIN COHN FERRIS GLOVSKY AND POPPEO P.C.
BY: H. JOSEPH HAMELINE, ESQUIRE
One Financial Center
Boston, Massachusetts 02111
(617) 542-6000
Counsel for the Witness,
Eric J. Topol, M.D.

THE CLEVELAND CLINIC FOUNDATION
BY: VICTORIA L. VANCE, ESQUIRE
1950 Richmond Road
Lyndhurst, Ohio 44124
(216) 297-7067
Counsel for the Witness,
Eric J. Topol, M.D.

BARTLIT BECK HERMAN PALENCHAR & SCOTT, LLP
BY: ANDREW L. GOLDMAN, ESQUIRE
Courthouse Place
54 West Hubbard Street
Chicago, Illinois 60610
(312) 494-4400
Counsel for Merck & Company, Inc.

APPEARANCES: (Continued)

JOSEPH D. PIORKOWSKI, JR., ESQUIRE
910 17th Street, N.W.
Suite 800
Washington, DC 20006
(202) 223-5535
Counsel for Merck & Company, Inc.

HUGHES HUBBARD & REED
BY: JAMES C. FITZPATRICK, ESQUIRE
One Battery Park Plaza
New York, New York, 10004
(212) 837-6000
Counsel for Merck & Company, Inc.

CRUSE, SCOTT, HENDERSON & ALLEN
BY: JAY HENDERSON, ESQUIRE
7th Floor - 2777 Allen Parkway
Houston, Texas 77019-2133
(713) 650-6600
Counsel for Texas physicians
(By Telephone)

- - -

APPEARANCES (VIA INTERNET)

LOPEZ, HODES, RESTAINO, MILMAN & SKIKOS
BY: JOSEPH JANE, ESQUIRE
(Via Internet)

LEVIN PAPANTONIO THOMAS MITCHELL ECHSNER & PROCTOR, P.A
BY: TROY RAFFERTY, ESQUIRE
JASON TISDALE, ESQUIRE
(Via Internet)

SNAPKA & TURMAN, LLP
BY: KATHRYN SNAPKA, ESQUIRE
(Via Internet)

EVANS & ROWE
BY: NATHAN KETTERLING, ESQUIRE
(Via Internet)

CLARKE PERDUE ARNOLD & SCOTT
BY: D. ANDREW LIST, ESQUIRE
(Via Internet)

CRUSE SCOTT HENDERSON & ALLEN
BY: SHARON ALFORD, ESQUIRE
(Via Internet)

GIBBONS DEL DEO DOLAN GRIFFINGER & VECCHIONE
BY: VIK ADVANI, ESQUIRE
(Via Internet)

- - -

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

DEPOSITION SUPPORT INDEX

Direction to Witness Not To Answer
Page Line Page Line
(None)

Request For Production of Documents
Page Line Page Line
(None)

Stipulations
Page Line Page Line
(None)

Questions Marked
Page Line Page Line
(None)

\- - -

INDEX

| WITNESS | PAGE NO. |
|---|---|
| ERIC J. TOPOL, M.D. | |
| By Mr. Kline | 25, 555 |
| By Mr. Goldman | 316 |

\- - -

EXHIBITS

| NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| Topol-1 | Curriculum Vitae Eric Jeffrey Topol, M.D. TOPOLE 0000001 - TOPOLE 0000127 | 26 |
| Topol-2 | E-mails TOPOLE 0000450 | 45 |
| Topol-3 | "The sad story of Vioxx, and what we should learn from it," (Karha/Topol), Cleveland Clinic Journal of Medicine, Volume 71, Number 12, December 2004, 933-939 | 53 |

| NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| Topol-4 | "Risk of Cardiovascular Events Associated with Selective COX-2 Inhibitors," (Mukherjee, et al), JAMA, August 22/29, 2001 Vol 286, No. 8, 954-959 | 82 |
| Topol-5 | E-mails MRK-ABA0009274 | 87 |
| Topol-6 | E-mail 4-26-01, with attachment, "Selective COX-2 Inhibitors are Associated with An Increased Risk of Cardiovascular Events," (Mukherjee, et al) draft manuscript MRK-AAZ0001561 - MRK-AAZ0001593 | 89 |
| Topol-7 | E-mails, with attachment, "Selective COX-2 Inhibitors are Associated with An Increased Risk of Cardiovascular Events," (Mukherjee, et al) draft manuscript, MRK-ABA0009661 - MRK-ABA0009693 | 106 |

| NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| Topol-8 | Memo 2-1-01, "Consultation NDA 21-042, S-007 Review of cardiovascular safety database (Targum) (37 pages) | 115 |
| Topol-9 | Excerpt from "Risk of Cardiovascular Events Associated with Selective COX-2 Inhibitors," (Mukherjee, et al), JAMA, August 22/29, 2001 Vol 286, No 8, 956 | 126 |
| Topol-10 | "Raising a Cautionary Flag about COX-2 Use in High-Risk Heart Patients," Cleveland Clinic Heart Center (2 pages) | 167 |
| Topol-11 | "Lack of Cardioprotective Effect of Naproxen," Arch Intern Med/Vol 162, Dec 9/23, 2002 2637 | 173 |

Page 10

Topol-12 "Cyclooxygenase-2: Where are we in 2003? Cardiovascular risk and COX-2 inhibitors," (Mukherjee et al), Arthritis Research and Therapy 2003, Vol. 5, 8-11 181

Topol-13 "Pharmaceutical advertising versus research spending: Are profits more important than patients? (Mukherjee et al) American Heart Journal, October 2003, 563-564 187

Topol-14 "A coxib a day won't keep the doctor away," (Topol, et al), The Lancet Vol 364, August 21, 2004, 639-640 195

Topol-15 "Risk of cardiovascular events and rofecoxib: Cumulative meta-analysis," (Juni, et al) The Lancet, Vol. 364, December 4 2004, 2021-2029 201

Page 11

Topol-16 "Rofecoxib, Merck, and the FDA," (Kim et al), N Engl J Med 351;27 December 30, 2004, 2875 - 2878 225

Topol-17 "Good Riddance to a Bad Drug," (Topol) New York Times Reprint, October 2, 2004 (2 pages) 230

Topol-18 "Failing the Public Health - Rofecoxib, Merck, and the FDA (Topol) N Engl J Med 351;17 October 21, 2004 1707-1709 237

Topol-19 "Risk of acute myocardial infarction and sudden cardiac death in patients treated with cyclo-oxygenase 2 selective and non-selective non-steroidal anti-inflammatory drugs..." (Graham, et al), The Lancet, Vol. 365, February 5, 2005, 475-481 240

Topol-20 E-mails TOPOLE 0000438 245

Page 12

Topol-21 E-mails TOPOLE 0000333 250

Topol-22 Handwritten notes TOPOLE 0000469 265

Topol-25 "Cardiovascular System Clinical Profile in Osteoarthritis Studies," Cardiovascular Card, MRK-ABW0000243 - MRK-ABW0000248; MRK-ADB0009039 - MRK-ADB0009042; MRK-ACW0008375; MRK-ACZ0072955 - MRK-ACZ0072956 274

Topol-23 Handwritten notes TOPOLE 0000504 277

Topol-24 Handwritten notes TOPOLE 0000463 288

Topol-26 "Preliminary Questions - 60 Minutes" TOPOLE 0000465 300

Topol-27 Letter 10-7-04 with handwritten notes TOPOLE 0000462 303

Topol-28 Memo 10-17-04 TOPOLE 0000474 305

Topol-29 New York Daily News Reprint (3 pages) 319

Page 13

Topol-30 "Arthritis Advisory Committee NDA # 21-042/S007, Vioxx (Rofecoxib, Merck)" 2-8-01, 1-3; 210 351

Topol-31 E-mails MRK-AAZ0001594 367

Topol-32 "Rofecoxib in the Prevention of Ischemic Events in Patients with Acute Coronary Syndromes and Elevated Markers of Inflammation," (Bhatt, et al) MRK-ABA0003235 - MRK-ABA0003244 367

Topol-33 "Selective COX-2 Inhibition Improves Endothelial Function in Coronary Artery Disease," (Chenevard, et al) Circulation, January 28, 2003, 405-409 387

Topol-34 E-mails MRK-ABA0011062 410

Topol-35 E-mails TOP1PRO0000282 - TOP1PRO0000283 413

405c92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 14

Topol-36 E-mail 6-20-01, with attachment, "Risk of Cardiovascular Events Associated with Selective COX-2 Inhibitors," (Mukherjee, et al) Draft Manuscript, TOP1PRO0000285 - TOP1PRO0000311 — 417

Topol-37 E-mails TOP1PRO0000279 — 429

Topol-38 "Risk of Cardiovascular Events Associated with Selective COX-2 Inhibitors," JAMA August 22/29, 2001 Vol 286, No. 8, 954-958, MRK-ADJ0035003 - MRK-ADJ0035008 — 434

Topol-39 "A coxib a day won't keep the doctor away," (Topol, et al) The Lancet Vol 364 August 23, 2004, 639-640 — 444

Topol-39A Letter 10-16-01 EJT 000323 - EJT 000324 — 450

Page 15

Topol-40 "Systematic adjudication of myocardial infarction end-points in an international clinical trial," (Mahaffey, et al), Current Controlled Trials in Cardiovascular Medicine August 2001 Vol. 2 No. 4, (6 pages) — 455

Topol-41 E-mails EJT 000191 — 484

Topol-42 E-mails EJT 000192 — 494

Topol-43 E-mails EJT 000190 — 501

Topol-44 "MRL Clinical Study Report, Multicenter Study: A Randomized, Placebo-Controlled, Parallel-Group, Double-Blind Study to Evaluate the Efficacy and Safety of MK-0966 (Rofecoxib) 12.5 mg Versus Nabumetone 1000 mg in Patients with Osteoarthritis of the Knee (Protocol 090)," MRK-00420016832 - MRK-00420016849 — 513

Page 16

Topol-44A Memo 2-1-01 "Consultation NDA 21-042, S-007 Review of cardiovascular safety database," (Targum) with handwritten notes. EJT 000211 - EJT 000248 — 527

Topol-45 E-mail 10-17-01 EJT 000343 — 533

Topol-46 E-mails FDACDER 023057 - FDACDER 023058 — 538

Topol-47 Letter 4-11-02, with attached label EJT 000044; EJT 000050 - EJT 000065 — 543

Topol-48 "Dr. Topol's Analysis CV Events in Study 090," Chart (1 page) — 588

Topol-49 E-mail 3-9-00 MRK-ABH0016219 — 589

Topol-50 E-mails MRK-ABC0033809 — 592

Topol-51 E-mails TOPOLE 000149 - TOPOLE 000150 — 601

Page 17

Topol-52 "Cardiovascular Thrombotic Events in Controlled, Clinical Trials of Rofecoxib," (Konstam, et al), Circulation 2001;104:r15-r23 — 612

Topol-53 Letter 12-17-01 TOPOLE 0000511 — 619

Topol-54 Letter 1-7-02 TOPOLE 0000456 - TOPOLE 0000457 — 622

Topol-55 Letter 2-5-02 TOPOLE 0000452 — 625

Topol-56 E-mails MRK-AAC0152575 - MRK-AAC0152576 — 632

435d82cd-4d0a-489f-87d2-231e3a1c3f6f

DEPOSITION SUPPORT INDEX

Direction to Witness Not To Answer
Page Line Page Line
(None)

Request For Production of Documents
Page Line Page Line
(None)

Stipulations
Page Line Page Line
(None)

Questions Marked
Page Line Page Line
430

- - -

MR. GOLDMAN: Merck objects to the use of Dr. Topol's deposition in the upcoming Plunkett trial because, among other things, Dr. Topol has not been designated as an expert witness and has not submitted an expert report, and I expect that much of Dr. Topol's testimony today will be in the form of opinion testimony.

In Plunkett, also the deposition designations and exhibit lists have already been submitted, and the trial starts in six days.

MR. KLINE: Before we go on the video, we have a loose understanding worked out between myself and Mr. Goldman that I will examine for three hours, he will then -- we split the time four/three, four hours and three

hours of actual tape running time. We will attempt to finish sooner, if we can. Something tells me that won't happen.

There's going to be time kept on the record as to the actual running time, which will not include time taken for objections or time off of the record.

I've also advised Mr. Goldman that I'm going to reserve an hour. So, I'm going to do three hours, hopefully I'll get through everything, and then we'll do an hour -- or we'll do his examination, I'll come back and do redirect, and then he will do limited recross, if needed, to the areas that I examine. He and I have agreed that we will limit our redirect and our recross very specifically to the rules of evidence as you would do a

redirect and a recross, rather than open up new areas.

I think that's our basic understanding, and we've agreed to attempt to agree on as much as possible today.

We've also agreed that we'll go off the video record for any objections. So, if there's an objection, we'll go off the record if there's something to be added other than the word "objection." Is that fair enough?

MR. GOLDMAN: Well, if I state the basis for some of the objections, you don't expect to go off the record for those. So, for example, if I say "objection, opinion testimony" --

MR. KLINE: No.

MR. GOLDMAN: Okay.

MR. KLINE: That's fine. But if you have some longer objection, then go. It is either

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 22

objection, two or three words or objection, off the record. And I'll do the same if there's something longer to be said.

MR. GOLDMAN: Fair enough.

MR. KLINE: Thomas R. Kline for plaintiffs. This deposition is being taken pursuant to the federal litigation pending in the MDL.

I'm here with Lisa Dagostino, M.D., J.D., and she will be assisting me.

MR. BUCHANAN: Dave Buchanan, Seeger Weiss, also for plaintiffs in the MDL litigation.

MR. STEIN: I'm Steve Stein. I'm here for the California plaintiffs in the state proceedings, state coordination proceeding, which has been cross-noticed -- which was cross-noticed for this deposition.

My understanding from Jim

Page 23

O'Callahan, liaison counsel, is that Merck also cross-noticed it in the California state proceeding. So, we're here for the California state plaintiffs in the JCCC coordination.

Steve Stein, Levin Simes & Kaiser, San Francisco, California.

MR. LEVENSTEN: Scott Levensten, The Beasley Firm, Philadelphia.

MR. GOLDMAN: My name is Andy Goldman. I represent Merck.

MR. PIORKOWSKI: Joseph Piorkowski, I represent Merck.

MR. FITZPATRICK: Jim Fitzpatrick, I represent Merck.

MR. HAMELINE: My name is Joseph Hameline. I'm with the law firm of Mintz Levin, and I'm here on behalf of Dr. Topol.

MS. VANCE: Vicki Vance, in-house counsel at the Cleveland Clinic Foundation, associate

Page 24

counsel.

MR. BALEFSKY: Lee Balefsky, Kline & Specter.

MR. HENDERSON: Jay Henderson, Houston, Texas, pursuant to an agreement with Merck for some Texas physicians.

MR. STEIN: Linda, I've provided you the notice that was served. Can we have that entered as part of the record, our California state notice?

THE COURT REPORTER: Yes.

THE VIDEOTAPE TECHNICIAN: We're on the video record. The time is 9:41. The date is November 22, 2005.

This is the videotape deposition of Eric Topol, M.D. in the matter of In Re: Vioxx Products Liability Litigation in the U.S. District Court, Eastern Division, District of Louisiana, MDL Number 1657.

Page 25

The court reporter, would you please swear in the witness.

- - -

ERIC J. TOPOL, M.D., after having been duly sworn, was examined and testified as follows:

- - -

EXAMINATION

- - -

BY MR. KLINE:

Q. Dr. Topol, good morning. Nice to meet you, sir.

A. Good morning.

Q. I have four hours, three of which I'm going to take to do your direct examination. I have a lot of material to cover with you, so, I want to be very direct and hopefully elicit your testimony, but I want to keep moving to accomplish that.

Are you prepared to do that with me, sir?

A. Yes.

Q. Okay, good.

N/O*

* N/O, used throughout, means "no objection". = MERCK'S COUNTER-DESIGNATIONS

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

N/O

Page 26

And if you'd speak up just a little bit, I think that would be helpful.

A. Certainly.

Q. That would be good.

I [illegible] briefly the highlights of your background.

You have a curriculum vitae. I'm marking it as Exhibit 1 for this deposition.

- - -

(Whereupon, Deposition Exhibit Topol-1, Curriculum Vitae Eric Jeffrey Topol, M.D., TOPOLE 0000001 - TOPOLE 0000127, was marked for identification.)

- - -

BY MR. KLINE:

Q. The version that I have is what I understand to be an abridged version of 127 pages. Suffice it to say, you have a very substantial curriculum

Page 27

vitae outlining your background and experience; correct?

A. Yes.

Q. You are -- what is your current position, sir?

A. I'm Provost of the Cleveland Clinic Lerner College of Medicine, Chief Academic Officer of the Cleveland Clinic, and also the chairman of the Department of Cardiovascular Medicine of the Cleveland Clinic.

Q. Take them one at a time. Identify each one of those positions, and tell me very briefly what they entail.

A. The Provost of the medical college is providing the oversight of this college of medicine, which had its beginning just three years ago, and it's part of Case Western Reserve University.

The chief academic officer responsibility is responsible for all research and education here at this academic medical center, and I've been chairman of the department of

Page 28

cardiovascular medicine since 1991, and this is a large department, one of the largest departments in cardiovascular medicine in the country.

Q. My understanding, sir, that this -- and you are a cardiologist; is that correct?

A. That's right.

Q. Trained as a cardiologist; correct?

A. That's exactly right.

Q. You did your undergraduate degree at the University of Virginia, your medical school at the University of Rochester, a residency at the University of California, San Francisco, a fellowship at Johns Hopkins in cardiology, and then you became Board Certified in internal medicine and in cardiology. All correct?

A. That's all correct.

Q. And then you practiced medicine and eventually worked yourself up to become the top person in the

Page 29

department of cardiovascular medicine at the Cleveland Clinic; correct?

MR. GOLDMAN: Object to form.

THE WITNESS: That's correct, yes. As of 1991, I came to Cleveland Clinic.

BY MR. KLINE:

Q. And when did you become chairman of the department of cardiovascular medicine?

A. On my arrival.

Q. Oh, right on your arrival?

A. Yes. That was why I was recruited here.

Q. Where were you previously?

A. University of Michigan, where I directed the cardiocatheterization laboratory, and I was a professor of medicine there.

Q. And you've spent your entire career as a practicing cardiologist, sir?

A. Yes. I continue to practice cardiology with patients.

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

N/O

Q. And how many years have you been a cardiologist?

A. 20 years.

Q. You also -- it mentioned that you're the Provost of the Cleveland Clinic, and that involves overseeing the entire medical college?

~~A. The medical college, which I~~ founded with Case Western Reserve University back in 2001.

Q. In addition -- oh, and I might add, the Cleveland Clinic, sir, give us a sentence or two on what is the Cleveland Clinic, especially in heart medicine.

A. Well, in the field of heart medicine, it's been ranked by the U.S. News & World Report as the number one center for the last 11 years consecutively.

Q. You have been a clinical investigator on many clinical studies; is that correct?

A. That's right.

Q. Tell us about it briefly, a few sentences.

A. Well, I've chaired a number of clinical trials over the past 20 years. The most widely known are the so-called GUSTO trials of heart attack. All these trials had something to do with heart attack prevention or better treatment.

The cumulative 200,000 patients were enrolled, the largest heart attack trials ever performed in the United States, coordinated. I've been the chair of all of those trials. They've been multinational trials, involving 40 different countries around the world, and these trials have had, I think, a substantial impact on clinical practice in the field of cardiology and for patients.

MR. GOLDMAN: Move to strike as nonresponsive.

BY MR. KLINE:

Q. You hold two patents; is

that correct, sir?

A. I think the patents have been applied for. I'm not -- yes, yes.

Q. Now, in addition, you are on the editorial board of a number of peer-review journals; is that correct?

A. Yes.

~~Q. Would you explain them?~~ Well, let me tick them off. I think it could be done more quickly.

Circulation, JACC, American College -- American Journal of Cardiology, American Journal of Medicine, among others; is that correct?

A. That's right.

Q. And what does that involve, sir, very briefly?

A. Well, that means being a peer reviewer for manuscripts, work, research that's being conducted elsewhere, and to provide reviews and input and at times editorials, to help advance the field insofar as biomedical research and literature.

Q. You have been an investigator, according to your vitae, on many NIH projects, National Institutes of Health. Briefly, a few sentences, tell us about that.

MR. GOLDMAN: Objection to form.

THE WITNESS: Well, the main one is at a specialized center of clinically-oriented research, which is the flagship grant of the NIH, which I was awarded a year ago. It's a five-year grant for nearly $18 million to support our work in genetics and genomics of coronary artery disease and heart attack, and that's been the main research interest that I've had over the past five years, has been in the genetics and genomics of heart attack.

BY MR. KLINE:

Q. You've been a manuscript reviewer for a number of journals, peer

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

N/0

review, including Nature, Science, the New England Journal of Medicine, JAMA, Lancet and many other prestigious journals; correct?

MR. GOLDMAN: Object to form.

THE WITNESS: Yes.

BY MR. KLINE:

Q. I have by count, and I'm doing all of this, I might say, just to save time, to get through all of this, you have by my count, 909 original publications in the scientific literature. Does that sound about right?

A. That's about right.

Q. You have 36 collaborative group-authored papers, meaning papers where a group is mentioned, not you, but you really were a major contributor. Is that also correct?

MR. GOLDMAN: Object to form.

THE WITNESS: That's correct.

BY MR. KLINE:

Q. You are -- you have 39 articles submitted for publication at the time that the curriculum vitae you handed us was. In other words, these are not even yet published, they're in the mill; is that correct?

MR. GOLDMAN: Object to form.

THE WITNESS: Yes.

BY MR. KLINE:

Q. Again, by my count, an author or co-author on 30 books?

MR. GOLDMAN: Objection to the form.

THE WITNESS: That's correct.

BY MR. KLINE:

Q. 164 book chapters?

MR. GOLDMAN: Same objection.

THE WITNESS: That's correct.

BY MR. KLINE:

Q. And these all deal in the field of cardiology, sir?

A. Virtually all are cardiology pieces of work, yes.

Q. And there was a recent article, and I'd like you to tell me if this is correct, it sort of pulls some things together, on November 11th in the Associated Press which says, "One medical journal index service ranked Topol as the eighth most cited medical researcher among its index publications in the past ten years with his 498 papers cited by colleagues, 21,050 times."

Is that about correct?

MR. GOLDMAN: Object to form.

THE WITNESS: That's correct. The ISI ranks medical researchers, and in the last ten years, I'm ranked number eight of the most widely cited medical researchers in the world. So, that's correct.

BY MR. KLINE:

Q. Let me ask it in a different way just to be sure.

How does the -- what is the ISI, and how does it rank you as someone who is cited by others in the medical field?

A. That means that if you publish a paper and that paper is cited by others, that's the cumulative tally of citations of your impact in the medical literature, in the medical community, and so that is the most highly regarded authority for collating that data. And in the ten-year cumulative tally, as you mentioned, somewhere around 500 manuscripts were published, and that was the eighth leading, I believe, citation tally in the rankings.

Q. Are you, sir, with this background, an expert in the field of cardiovascular medicine?

MR. GOLDMAN: Object to the form.

405d92cd-4d0a-489f-87d2-231e3a1c3f6f


THE WITNESS: I believe I am, yes.
BY MR. KLINE:
Q. I see here your either notepad or a prescription pad says "The Cleveland Clinic Foundation, A National Referral Center and International Health Resource.
Is that a correct description?
A. Yes, it's correct.
Q. And it says, "Eric Topol, M.D., Provost and Chief Academic Officer, Chairman, Department of Cardiovascular Medicine," listing your address. Is that a correct description of your title at this institution?
A. Yes.
Q. Sir, at some point in time you became interested in the drug Vioxx; is that correct?
A. Yes.
Q. And that would have been sometime around what year?

A. Well, it was February 2001.
Q. Okay.
Now, I want to fast forward before going to February 2001, which I'll go back.
Between February 2001 and today, sitting here today, which is November --
MS. VANCE: 22.
BY MR. KLINE:
Q. -- 22nd of 2005, have you expressed certain opinions publicly and in the academic literature, as well as privately in e-mails and writings, relating to your beliefs and opinions regarding the drug Vioxx?
A. Yes, certainly.
MR. GOLDMAN: Objection, calls for expert testimony, and Dr. Topol has not been designated as an expert.
MR. KLINE: Let's go off the record.
THE VIDEOTAPE TECHNICIAN:

Off the record at 9:52.
MR. KLINE: The only thing I would ask is so we can have the ground rules from the beginning, if we're going to go off the record, let's go off the record. If we're going to just state objection, a word or two, then let's do it that way per our agreement. Is that fair.
MR. GOLDMAN: Sure.
MR. KLINE: Okay. I appreciate it.
THE VIDEOTAPE TECHNICIAN: Back on the record at 9:52.
BY MR. KLINE:
Q. The opinions and conclusions which you reached, were they formed within the scope and context of your practice of cardiology, as well as your interest as a researcher and in your responsibilities to patients and to this institution?
A. Yes.

MR. GOLDMAN: Object to the form, calls for expert testimony.
MR. KLINE: Let's go off the record again.
THE VIDEOTAPE TECHNICIAN: Off the record at 9:53.
MR. KLINE: I'm just trying to figure out a shorthand way to handle it.
MR. GOLDMAN: It was just a few words.
MR. KLINE: But if that's going to be the objection all of the time, why don't you say objection, expert testimony, and then I'll know what it is, and any judge who reads it will know what it is, and that way I don't have to constantly hear the disruption of it.
Or we can do it another way, which is, to the extent that you believe that there's expert testimony, which I think is going

405d92ed-4d0a-49bf-97d2-371e3a1e3f6f

Overruled

Page 42

to be your objection all day, Mr. Goldman, why don't we just reserve that as an objection, and then you don't have to say it all of the time. It will be one of those reserved objections.

MR. GOLDMAN: I will reserve the objection, but I also have to make it as often as I hear it, because it's unclear in many states whether or not reserving an objection is recognized as actually preserving it. So, I'm going to have to make the objection.

What I will do, though, is when it calls for expert testimony, I will say objection, opinion testimony.

MR. KLINE: As far as I'm concerned, you can say objection to any objection and state the basis at some time when it is being argued in front of a court

Page 43

unless it is something that has to be off the record. That way I don't have the disruption all day. Is that agreeable?

MR. GOLDMAN: Mr. Kline, I'm just telling you what I'll do is what you said a minute ago, and that is, when you are asking for opinion testimony, I will say objection, opinion testimony.

MR. KLINE: That's the best I can do with you?

MR. GOLDMAN: Yes.

MR. KLINE: Let's go back on the record. I'm sorry for the interruption, Dr. Topol.

THE VIDEOTAPE TECHNICIAN: Back on the record at 9:55.

BY MR. KLINE:

Q. Okay.

I believe you answered the last question, which was, you have formed opinions in the scope and context of your duties and responsibilities to your

overruled

overruled

Page 44

patients, your research in this institution; is that correct?

MR. GOLDMAN: Objection, opinion testimony.

THE WITNESS: That's correct.

BY MR. KLINE:

Q. Now, you also formed opinions relating to the conduct of the pharmaceutical company, Merck, and its conduct of research and its marketing and its making available to the public the drug Vioxx; is that correct?

MR. GOLDMAN: Objection, opinion testimony and form.

THE WITNESS: That's correct.

BY MR. KLINE:

Q. And those opinions were expressed in many forms, and they would include places such as 60 Minutes, ranging from 60 Minutes to the New York Times, to the Journal of the American Medical Association; is that correct?

Page 45

MR. GOLDMAN: Object to the form, opinion testimony.

THE WITNESS: Yes.

BY MR. KLINE:

Q. What I would like to do is to show you a document which is from November 24, '04, marked as Exhibit Number 2.

- - -

(Whereupon, Deposition Exhibit Topol-2, E-mails, TOPOLE 0000450, was marked for identification.)

- - -

BY MR. KLINE:

Q. It's an e-mail from you to David Graham. Who is David Graham?

A. David Graham is a safety officer at the Food & Drug Administration.

Q. You wrote an e-mail to him on November 22nd, 2004 following what were Senate hearings relating to the drug Vioxx; is that correct?

-402 - personal opinions about Merck's "conduct" irrelevant

-602 - no personal knowledge

-701/702 - improper lay or expert witness testimony (based on speculation)

TT response: - he is an expert on clinical trials and that is "conduct" that is being referred to - has personal knowledge - interacted w/ Merck - no speculation

-Violates Court's Order - email post-dates Irvin death, also impermissible "state of mind" testimony

-402/403 - opinions re being "bothered" by Merck's "lies" and "misconduct" are irrelevant and unfairly prejudicial

(cont.)...

Sustained 403

405d92fd-4d0a-489f-87d2-231e3a1c3f6f

...(cont.) -602/701/702 - opinions re Merck's "lies" and "errors" are purely speculative and thus improper lay or expert witness testimony

Response: these events occurred in Vigor and APPROVe occurred before Irvin death, refers to causation and therefore not time dependant issues - the misconduct is scientific misconduct and is within experts ken

Sustained

Overruled

Page 46

MR. GOLDMAN: Objection, opinion testimony.

THE WITNESS: That's correct.

BY MR. KLINE:

Q. When did you write this to him?

A. It's November 22nd at 10:00 p.m.

Q. And when was it in the context of? What was it after? I'm asking you in a non-leading fashion.

A. It was -- he had testified on the 18th of November at Senator Grassley's hearings on Vioxx --

Q. Does this --

A. -- and I wrote to him after that.

Q. Does this e-mail --

MR. GOLDMAN: I move to strike opinion testimony.

BY MR. KLINE:

Q. Does this e-mail reflect some of the opinions and conclusions that

Page 47

you reached relating to Merck's conduct of its scientific studies and its marketing of the drug Vioxx over the past four years since you have become involved in the matter?

A. Yes.

MR. GOLDMAN: Objection, opinion testimony.

And, Tom, we can go off the record for a second.

THE VIDEOTAPE TECHNICIAN: Off the record at 9:57.

MR. GOLDMAN: Can I have a standing objection to Exhibit 2 and any discussion about Exhibit 2 on the ground that it also is irrelevant, and it calls for opinion testimony?

MR. KLINE: Yes.

\- - -

(Whereupon, an off-the-record discussion was held.)

\- - -

Page 48

MR. KLINE: Before we go back on the record, let's ask, is there a reason for relevancy objections on the record? I mean, it's a discovery dep.

MR. HAMELINE: Can I just note on the record here that Dr. Topol is, as you've seen from his resume, a very busy man, he's treating patients, he has academic and professional obligations at the clinic. He's here pursuant to the deposition notice and also pursuant to The Court order which regulates these depositions.

MR. KLINE: Yes.

MR. HAMELINE: He's here for the seven-hour period. I understand your concern about working these issues out off the record or at least off the videotape. However, if this goes on, we're going to count the seven hours as seven hours, and we're

Page 49

going to give you some leeway, we want to get this done in a fair and appropriate fashion, but we've been going now for about 25 minutes, 15 of which seem to have been off the record.

MR. KLINE: I agree.

MR. HAMELINE: Just so I note my concern up front.

MR. KLINE: They are off the video record. I agree fully. I would like to ask him questions. I've asked Merck's counsel if they will simply agree with me to say the word "objection," and they can say all the objections they want to any court, any time in the country.

MR. HAMELINE: Fine. Let's just go ahead.

THE VIDEOTAPE TECHNICIAN: Back on the record at 9:59.

BY MR. KLINE:

Q. Okay.

Overruled

405d92cd-4d0a-4S9f-87d2-231e3a1c3f6f

- Violates [illegible] to establish that [illegible] post-date Irvin's death, contains impermissible questions/argument from counsel
- Counsel's questions are leading and improper
- 602/701/702 - testimony re Vioxx approval is not based on personal knowledge; thus improper lay or expert witness testimony

Page 50

Sir, I'm looking at the part where you say, "I am bothered." Do you see where you say to David Graham -- is Graham a physician?

A. Yes.

Q. So, you're saying to Dr. Graham, "I am bothered." Would you read that for us, please?

A. "I am bothered by the continued outrageous lies of Merck with their fullpage multiple ads that 'they published everything' and that they never had a trial which showed any harm of Vioxx until APPROVe, when, in fact, there were two by May 2000."

Q. Continue.

A. "I am also upset that the story of their scientific misconduct for the VIGOR paper in" the New England Journal of Medicine, that's "NEJM, with errors of omission (deaths), erroneous data (MIs)," or heart attacks, "and incomplete data (more than 1/2 of the thrombotic events) has not received any

Page 51

attention whatsoever."

Q. Okay. Did you believe --

MR. GOLDMAN: I'm going to object, Tom, to the form, and all of this calls for opinion testimony.

BY MR. KLINE:

Q. Did you believe what you wrote in that e-mail to Dr. Graham?

A. Yes, I did believe this.

MR. GOLDMAN: Same objection.

THE WITNESS: I was privately expressing it to Dr. Graham, but I certainly stand by that and believe it, yes.

BY MR. KLINE:

Q. Okay.

You believed it then, and do you believe it now?

MR. GOLDMAN: Same objection.

THE WITNESS: Yes, I certainly do.

Page 52

BY MR. KLINE:

Q. Do you believe that there were, in the context of what Merck did, "outrageous lies" by Merck?

MR. GOLDMAN: Objection, opinion testimony, leading.

THE WITNESS: I believe that the data has been seriously misrepresented, yes.

BY MR. KLINE:

Q. You said in the next to last sentence there, "This," the words, "This cannot." Do you see it in the very last sentence?

A. This cannot?

Q. "This cannot stand and the truth about Vioxx needs to come out."

MR. GOLDMAN: Object to the form, leading.

THE WITNESS: Yes, yes. That's what I wrote.

BY MR. KLINE:

Q. Would you read the last sentence of this, please?

Page 53

MR. GOLDMAN: Same objection, opinion testimony, form.

THE WITNESS: "This cannot stand and truth about Vioxx needs to come out."

BY MR. KLINE:

Q. And today, sir, are you prepared to tell what you believe to be the truth about Vioxx?

A. Absolutely.

(Whereupon, Deposition Exhibit Topol-3, "The sad story of Vioxx, and what we should learn from it," (Karha/Topol), Cleveland Clinic Journal of Medicine, Volume 71, Number 12, December 2004, 933-939, was marked for identification.)

\- - -

BY MR. KLINE:

Q. Let me show you an article which was in the Cleveland Clinic Journal

40 6/1a & c

Π's Response:
- Not leading and defendant fails to object to form and to give opportunity to cure evidence
- Does not post-date death document refers to pre-Irvin studies and conduct
- Testimony is based on personal knowledge of events that occurred in which witness was involved

Overruled

Overruled

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

– Violates Court's order re article (Ex. 3) from 12/04, which is well after Irvin's death
– Counsel's questions are impermissibly leading and improper
– 602/701/702 – testimony re Vioxx approval is not based on personal knowledge; is thus inadmissible lay or expert witness testimony
– 802 – Ex. 3 is hearsay

Π's response: Does not violate order, refers to events that pre-dated Irvin's death in which witness was involved. Defendant failed to make objections to leading questions and waived objection.

Overruled

Page 54

in December of 2004. December of 2004, there's an article which was written, you'll have it in your hands in a moment, called "The sad story of Vioxx, and what we should learn from it." Did you co-author that article?

A. Yes, I did.

Q. What is the Cleveland Clinic Journal of Medicine?

A. That's the medical journal of this institution, which is widely circulated, has a circulation of nearly 100,000 physicians and paraprofessional staff.

Q. Did you -- that just goes over there, if you would please, sir. Anywhere is fine.

What I'd like you to do -- and do you consider this to be -- Is this a road map to the saga or the story of Vioxx, as you see it as a researcher and prominent physician in cardiology?

MR. GOLDMAN: Object to the

Page 55

form. Can I have a standing objection on this document and testimony about it calls for opinion testimony.

BY MR. KLINE:

Q. Please, sir.

A. I believe it's certainly part of trying to get the facts straight about this very sad story, yes.

BY MR. KLINE:

MR. GOLDMAN: Tom, I have a question. Can I have a standing objection to this document and any testimony about it on the ground that it calls for opinion testimony?

MR. KLINE: Yes. You can have a standing objection to anything that you say objection to that doesn't take my time in asking questions during this deposition. I want three hours of direct examination of this witness, and I've had around ten

Page 56

minutes so far.

BY MR. KLINE:

Q. Sir, I'd like to walk this through, if you would, please. I want to look at your thing.

You said the story starts in 1999. I don't want you to read the article, but I want you to use this as a basis to tell us the story.

A. Yes.

Q. Tell us the story as you understand it as it happened in 1999 based on what you know, and tell us how you knew it and what you know and how the story began.

MR. GOLDMAN: Object to the form.

THE WITNESS: Well, in 1999 --

MR. GOLDMAN: Calls for opinion testimony.

THE WITNESS: -- in May, the FDA approved Vioxx for commercial use, so, that is an important

Page 57

time, timeline. That was also at the time when the FDA had a formal review of the medicine, where the primary reviewer already had expressed in her document, Dr. Villalba, that there was a concern regarding clotting events with Vioxx even at the time of approval in May 1999.

BY MR. KLINE:

Q. You write here that, "The approval was based on data from trials lasting 3 to 6 months and involving patients at low risk for cardiovascular illness." Do you see that?

MR. GOLDMAN: Object to the form, lacks foundation.

THE WITNESS: That's right.

BY MR. KLINE:

Q. What is the significance of that fact?

MR. GOLDMAN: Object to the form.

THE WITNESS: Well, this is

Overruled

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

- See previous page; the objections apply
- additionally, testimony re "multiple tests" (see 60:9-18) pertains to studies that clearly post-date Irvin's death. This testimony violates the Court's Order and is irrelevant.

Overruled

Page 58

one of the most significant parts of the whole clinical development of the Vioxx medicine, and that is that patients with heart disease were not tested in any meaningful way, and we know from multiple databases and surveys that at least 40 to 50 percent of the patients who actually took this medicine when it was in clinical use actually did have known heart disease.

MR. GOLDMAN: Move to strike as nonresponsive --

BY MR. KLINE:

Q. Why --

MR. GOLDMAN: -- and calls for opinion testimony.

BY MR. KLINE:

Q. Why, as you view it, is that an important fact?

MR. GOLDMAN: Objection, calls for opinion testimony.

THE WITNESS: Well, it's

Page 59

important because if the medicine has a clotting risk in arteries such that it could induce heart attacks, strokes or death, the patients who are most liable to suffer as a consequence of that would be patients with preexisting or known atherosclerotic artery disease.

BY MR. KLINE:

Q. And did this medicine or does this medicine, in your opinion, have such a risk?

MR. GOLDMAN: Objection, calls for opinion testimony.

THE WITNESS: There isn't any question about the medicine's risk in this regard.

BY MR. KLINE:

Q. When you say there's no question, sir, can you give us broadly, and then I'll get into details with you later, broadly why you say that?

MR. GOLDMAN: Objection,

Overruled

Page 60

opinion testimony.

THE WITNESS: Well, the medicine's risk, Vioxx's risk, has been evident since trials conducted in 1999 and all the way through the time of withdrawal in September 30, 2004.

BY MR. KLINE:

Q. Have there been multiple tests and multiple studies that have, in your opinion, proven that fact?

MR. GOLDMAN: Objection, calls for opinion testimony.

THE WITNESS: There's been replication of untoward significant excess of events of heart attack, death and stroke in multiple trials. That's right.

BY MR. KLINE:

Q. Okay.

Do you have any doubt about this in your mind, sir?

MR. GOLDMAN: Object to the form, calls for opinion testimony.

Page 61

THE WITNESS: There isn't any question in my mind about that.

BY MR. KLINE:

Q. I didn't say in the beginning of this deposition. You were subpoenaed for this deposition; is that correct, sir?

A. That's correct.

Q. And you have not been -- you are not serving here as an expert witness for any party; is that correct?

A. No, I'm not.

N/O

[illegible] ask you all day long about things that are in your writings.

The things that you're telling us today, tell me if there's something that hasn't been said in your writings, because I'm going to ask you about things at least that I found in your writings. Okay?

MR. GOLDMAN: Objection to form.

Π's response: See previous response in addition all studies relied upon were clinical trials which were complete or near-complete at the time of Irvin's death; these were clearly pre-approval studies and were submitted as part of the pooled analysis put together by Merck in 2000 before Irvin's death

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

• Violates court order
• JAMA article published in August 2001

Page 62

THE WITNESS: Yes.

BY MR. KLINE:

Q. Now, there was a study called VIGOR; is that correct?

A. Yes.

Q. And you eventually became familiar with this study called VIGOR; correct?

A. Yes.

Q. Did you participate in it?

A. No, not at all.

Q. Who did that study?

A. This study was done by rheumatologists, the doctors looking after patients with rheumatoid arthritis. It was a large trial by a network of rheumatologists and patients, about 8,000 patients with rheumatoid arthritis.

Q. Who funded the study?

A. Merck.

Q. Who conducted the study?

A. Merck.

Q. By the way, back to 1999 for a moment. Before the drug was even

Page 63

studied clinically in patients, were there, to your knowledge, signals and issues relating to the drug from a pharmacological perspective that would indicate that the drug had any significant cardiovascular risks of any kind? Yes or no?

MR. GOLDMAN: Objection, opinion testimony and form.

THE WITNESS: There have been published papers, for example, by Dr. Garret FitzGerald, antedating the trials, which raised a concern regarding suppression of prostacyclin, which, of course, could be linked to the risk of heart attack, but it had not been demonstrated in a definitive way in clinical trials at the time of the approval in May 1999.

But what was interesting is that in May 1999, there already was the VIGOR trial, the very

- Leading question
Π's response: Not a leading question

Overrule

Page 64

largest -- the largest trial of Vioxx that was ongoing and heading towards completion, but nonetheless, the drug had been approved in May 1999, knowing that this trial would be forthcoming in a matter of months.

BY MR. KLINE:

Q. Let me jump ahead for a moment.

There came a point in time -- did there come a point in time where you published a study in the Journal of the American Medical Association?

A. Yes.

Q. Okay.

And what did that study involve briefly? I'm going to explore it a lot later, but I want to put it in context right now.

A. Well, the JAMA paper was the first published work to call out that there was indeed a significant risk of heart attack in the VIGOR trial and that

Page 65

this needed a whole reset of our thinking of the safety of not just Vioxx, but also this whole class of COX-2 medicines. We also had the data for Celebrex to analyze from their so-called CLASS trial and all the studies that had been recently completed.

And so the main conclusion was that we were concerned about risk and that patients with heart disease needed to be appropriately studied.

Q. In order to --

MR. GOLDMAN: Objection, calls for opinion testimony.

BY MR. KLINE:

Q. In order to look at -- in order to write that article -- and you were a co-author; correct?

A. Yes.

Q. -- did you need at that point in time in 2001, which would obviously be true today, to learn and understand the mechanism of action of the drug as well as the clinical trials, as

① [illegible]

SAME OBJECTION RE AUGUST 2001 JAMA ARTICLE - AFTER IRVING DEATH

well as the animal and in vivo studies that were done?

MR. GOLDMAN: Object to form, opinion testimony.

THE WITNESS: Well, in order to write the article, and I was a senior author, so, I was the person held responsible for the article, I had to be familiar with all those points, that is, the experimental animal data, the pharmacokinetics, the pharmacology of the drug, the background of the drug and, of course, what clinical data were available. It mostly, of course, centered around the VIGOR trial.

BY MR. KLINE:

Q. And how did you educate yourself on that, sir?

A. Well, Dr. Mukherjee, who was our fellow at the time, was pulling all the studies together. I was also reviewing the literature, as well as Dr.

N/O

Nissen. So, the three of us worked together to put this analysis and then subsequently the paper together.

Q. Okay.

Following our broad outline in the article that you wrote in the Cleveland Clinic Journal of Medicine in December of 2004, you indicate that "VIGOR's strong evidence that rofecoxib" -- that's the name for Vioxx?

A. Yes.

Q. -- "increases the risk of MIs," and it came out of that study; correct?

A. That's right.

MR. GOLDMAN: Object to the form.

BY MR. KLINE:

Q. You also say that "The incidence of MIs was higher in the rofecoxib group than in the naproxen group." Is that correct?

MR. GOLDMAN: Object to the form.

Overruled

THE WITNESS: That's correct.

BY MR. KLINE:

Q. All right.

Now, also -- well, let's look at the -- let's talk some more. Let's talk about VIGOR now.

A. Yes.

Q. VIGOR was, I think you described, I don't think it's as controversial, is the first -- let me step back.

VIGOR, the study, when did you become familiar with it?

A. Well, I only became aware of it, not when it was published in November of 2000, although going back, I reviewed that publication. But I only became aware of it in February 2001 at the time of the FDA special Advisory Committee to review the data from the VIGOR trial with respect to concerns on cardiovascular risk.

Q. What did the VIGOR trial

say? What did Merck say that the VIGOR trial showed relating to cardiovascular risks?

MR. GOLDMAN: Object to the form.

THE WITNESS: Right. Well, I remember it very well, because the day that that panel had reviewed all the data, and one of the panelists was my colleague, Dr. Steven Nissen, I read -- I was actually at the medical college of Georgia, I was a visiting professor, I was reading the USA Today that morning, and it said that this was due to naproxen, that the VIGOR problems of heart attack was an issue of naproxen being beneficial rather than Vioxx being detrimental.

So, I was a little puzzled by that, but I didn't think too much of it until I got back to Cleveland, and the next day met

Overruled

802/602: Testimony lacks foundation and is based on hearsay / π's response: not based on hearsay, this is based on Dr. Topol's original analysis of VIGOR published in peer reviewed.

-802/602- testimony ● Advisory Committee is based, here, on conversations with colleagues, which are hearsay. Topol lacks personal knowledge.

π's response: Not hearsay, this evidence is coming in for notice as to why Dr. Topol began doing independent research, the FDA advisory committee and the comments that flowed from it were the impetus for Dr. Topol's original research.

Overruled

Page 70

with Dr. Nissen and Dr. Mukherjee about the FDA proceedings. And Dr. Nissen explained he didn't think it was just so simple as the naproxen hypothesis, as we later termed it, and we started to drill down on the data and concluded ~~that it was quite concerning.~~

MR. GOLDMAN: Objection. Move to strike, nonresponsive.

BY MR. KLINE:

Q. Okay.

What did you find was concerning about the VIGOR data?

A. Yes. Well, there were several things that were particularly bothersome. Number one, that if naproxen was protective, it had not ever been proven, that is, it didn't -- we didn't know for sure it had an aspirin-like effect. And so even if we could give -- assign naproxen the same magnitude of protection as aspirin, that would be at maximum a 25 percent reduction in heart

Page 71

attacks, which has been very carefully studied for aspirin.

So, if naproxen was as good as aspirin, that could be 25 percent reduction. But on the other hand, in VIGOR, we saw a 500 percent, that is, a 20-fold increase in heart attacks. So, the order of magnitude was greatly in excess of anything that aspirin could do.

Furthermore, the second point, in that if you have a randomized trial and you have an experimental arm, which is a new drug which hasn't been studied extensively, still a lot of things that need to be discovered about it, and you have an anchor drug, naproxen, that had been available for 20 years, and if you then do a comparison and you say, there's more than five-fold heart attacks and two-fold excess of cardiovascular serious events, how could you possibly conclude that it was the naproxen being beneficial? The only appropriate conclusion from that would be

Page 72

that there's a problem with the experimental drug Vioxx.

And beyond those concerns was that this trial was done in patients with rheumatoid arthritis without heart disease, and so whatever was being seen in the VIGOR trial could be far worse in ~~patients with heart disease.~~

[illegible]

as nonresponsive, opinion testimony.

BY MR. KLINE:

Q. Now, what you've described to us in the previous answer, is that something that -- is that a capsule of what you were thinking, you and your colleagues were thinking, but you in particular, when you saw the VIGOR trial published in the New England Journal?

MR. GOLDMAN: Object to the form.

THE WITNESS: Well, I didn't even take notice of the VIGOR trial when it was in the New

Page 73

England Journal. It wasn't on my radar screen, and it didn't really catch, I believe, the cardiology community, because the heart attack part of that publication was not -- it was not featured, it was the protection from the gastrointestinal side effects that was the main conclusion, but only looked back at that paper after the FDA review of the VIGOR data and also of the celecoxib data. There were two days of FDA reviews. One day was devoted to Celebrex, and one day was dedicated to Vioxx.

BY MR. KLINE:

Q. To put it in context, the VIGOR trial was published sometime in the year 2000; correct?

MR. GOLDMAN: Objection, opinion testimony.

THE WITNESS: VIGOR was published November, I believe,

Overruled

405d92cd-4d0a-489f-87d2-231a3a1c3f6f

Overruled

Page 74

November 22nd, 2000.

BY MR. KLINE:

Q. And then the FDA hearings were early next year in February of '01?

MR. GOLDMAN: Objection, opinion testimony.

THE WITNESS: February 8, 2001.

BY MR. KLINE:

Q. And it was after the hearings in '01 where this, would it be fair to say -- I hope there's not an objection -- got on your radar screen?

A. Yes. It was only after the FDA hearing and Dr. Nissen coming back and Dr. Mukherjee going through the data, getting it all collated and three of us meeting, did this become something of an area of interest. It certainly was nothing in medicine that I had any interest in. It wasn't in my field of research up until that point in time.

Q. Was it an area of concern?

MR. GOLDMAN: Objection to

Page 75

form.

N/O

Q. Was it something that concerned you?

MR. GOLDMAN: Objection to form.

THE WITNESS: As soon as we looked at -- well, as soon as I read about the FDA panel, as I said, that morning, in the newspaper, I was concerned. But that concern was magnified after starting to review the data with my colleagues at the Cleveland Clinic.

BY MR. KLINE:

Q. Okay.

Were you alarmed?

MR. GOLDMAN: Object to form.

THE WITNESS: I don't know --

MR. GOLDMAN: Opinion testimony.

Page 76

THE WITNESS: -- if I would use the word "alarmed," but I was significantly concerned that there was a medicine that was gaining increased wide scale use. There already was, of course, extensive advertisements and popularity of the medicine, and could something be wrong. That was a concern. I would say it was a significant concern.

BY MR. KLINE:

Q. Okay.

What did you decide to do?

A. So, we decided we would put together a manuscript to pull all the data that we could together, because there had not yet been one, there had not yet been a registration in the medical literature to the medical community that this was potentially a big deal.

Q. Is that the kind of thing that you do as an independent academic physician and scientist?

Page 77

MR. GOLDMAN: Object to the form.

THE WITNESS: That's an obligation that we have, is to process data that's out there, try to make it available to our colleagues in the medical community, and in the interest of patients and caring for patients in the optimal way. This is the sort of thing that is critical.

BY MR. KLINE:

Q. Did you undertake what you did with any axe to grind towards Merck or towards the drug Vioxx?

MR. GOLDMAN: Object to the form.

THE WITNESS: I had absolutely no axe to grind. I had an excellent relationship with Merck. I had done clinical trials with Merck. In fact, I had just completed a very large trial called TARGET of over 6,000

Overruled

π's response: questioning is proper, it is appropriate for π to ask whether a witness was alarmed moreover defendant has asserted that Dr. Topol has a bias and an "ax to grind", π is entitled to ask whether that is true.

- Counsel's questioning (re whether Topol was "alarmed" and whether he had an "axe to grind") is inflammatory and improper

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Overruled

Page 78

patients published in the New England Journal of Medicine. And so I actually, for many years, enjoyed a very good relationship with Merck. So, I do not believe there was any axe to grind whatsoever.

Q. Do I hear you correctly that you actually were a clinical researcher who had done a major clinical trial for Merck?

A. Yes. We had collaborated with Merck to do a trial in patients with coronary intervention, that is, getting stents or balloon angioplasty, and we were testing a medicine that they made called Aggrastat and comparing it with another medicine called Abciximab, and it

N/O

Q. So, you and your colleagues went about the project that you've just described to me, which is collecting essentially everything you could find

Page 79

about the drug Vioxx that was in clinical trials?

MR. GOLDMAN: Object to form.

THE WITNESS: Yes. All that we could find, which was in the FDA database, as well as whatever publications were available.

BY MR. KLINE:

Q. All right.

Tell me what you did then. I mean, what process did you follow, briefly?

A. Well, we culled all the data together, which did appear in the JAMA. It didn't have much in the way of changes from our initial submission to the actual publication in August. But the one concern that came up along the way was that the data were different in the New England Journal of Medicine paper published in November 2000 and the FDA database that was available in February 2001.

Leading

π's response. Appropriate re-orientation question

Overruled

Page 80

So, at that point, while we were ready to submit and did submit the paper to JAMA for consideration, I sent the paper to Merck, my colleague, Dr. Laura Demopoulos, who I had worked on this so-called TARGET trial, to see why there were discrepancies in the data between the published paper and the FDA database.

Q. Now, it appears --

MR. GOLDMAN: Move to strike, opinion testimony.

BY MR. KLINE:

Q. You actually went through the process of getting the information together and then drafting the paper; is that correct?

A. That's correct.

Q. And did the papers represent largely your findings and your conclusions?

A. Yes.

Q. And were those findings and conclusions critical of the VIGOR trial,

Page 81

as well as raising some concerns relating to the drug Vioxx?

MR. GOLDMAN: Object to the form, opinion testimony.

THE WITNESS: There is no question they were critical of the concern about the safety. But I think the most important statement that we made, which appears in the article, was about how there's a mandate to do the appropriate clinical trials which had not been done and wrote, "definitive evidence of such an adverse effect will require a prospective randomized clinical trial." "It is mandatory to conduct a trial specifically assessing cardiovascular risk and benefit of these agents. Until then, we urge caution in prescribing these agents to patients at risk for cardiovascular morbidity."

BY MR. KLINE:

POST DATES IRVIN'S Death

SAME OBJECTION RE AUGUST 2001 JAMA ARTICLE

Page 82

Q. Okay.
And I'm going to mark a copy of your JAMA article as the next exhibit number. While it's being marked, let me save time so we can keep the ball rolling. I'll mark it.

\- - -

(Whereupon, Deposition Exhibit Topol-4,"Risk of Cardiovascular Events Associated with Selective COX-2 Inhibitors," (Mukherjee, et al), JAMA, August 22/29, 2001 Vol 286, No. 8, 954-959, was marked for identification.)

[Handwritten: Leading; Same objection Re August 2001 / JAMA Article]

\- - -

BY MR. KLINE:
Q. Before it -- you've read to me from your published article; correct?
A. Yes.
Q. It was published in the Journal of the American Medical Association; correct?
A. Yes.

Page 83

Q. It underwent peer review?
A. Absolutely.
Q. And it was published and then out there for the world to see; is that correct?
A. Yes, yes.

[Handwritten: Leading; π's response: Appropriate to lead witness in foundational questions]

Q. Now, along the way, I want to go through with you a couple of steps along the way. I don't want to spend a lot of time on it, but I do want to get the process. Before you published it, you said to me, and I'm just recapping, that you talked to Dr. Demopoulos?
MR. GOLDMAN: Object to form.
THE WITNESS: Yes.
BY MR. KLINE:

[Handwritten: Leading; π's response: same as above]

Q. You actually -- and I have a copy of this. You actually sent to her the manuscript; correct?
A. Yes.
Q. In advance?
A. Yes.

[Handwritten: Leading; π's response: Same as above]

Q. And what was the purpose of

Page 84

sending her the manuscript, as you viewed it?
A. The main purpose was to reconcile the differences in data that had been published in the New England Journal of Medicine and what was appearing in the FDA database. There were some significant discrepancies.
Q. The FDA database was made available after the February 2001 hearing to the public; is that correct?
A. That's right.
Q. Posted on the website?
A. Posted on their website.
Q. Available to anyone to see?
A. Absolutely.

[Handwritten: Leading; π's response: Defendant fails to timely object to form or to give opportunity to cure]

Q. And Merck, did you have access to their internal data?
A. No, we did not.
Q. Did you want to get it?
A. Well, that's one of the reasons that I tried to reach out to Dr. Demopoulos. Since I had worked with her, we had a very good relationship in our

Page 85

other trial that we had done, I know she did not do research in this area of COX-2 inhibitors, but I thought she could be helpful to get these concerns about data inconsistencies straightened out.
Q. Was the data forthcoming?
A. We --
MR. GOLDMAN: I'm sorry. Objection, move to strike as nonresponsive.
THE WITNESS: We never received any revisions from anyone from Merck. That was never sent to us, any suggestions, changes of data. There was never anything sent back to me or to my colleagues.
BY MR. KLINE:
Q. Was there any suggestions of the changes in the -- to be made in the manuscript?
A. No, there were no changes. The only thing was that there was a visit of the Merck researchers to Cleveland

405d92cd-4d0a-489f-87d2-231e3a1c3f5f

SAME OBJECTION RE AUGUST 2001 JAMA ARTICLE

Page 86

Clinic, but there was nothing sent.
Q. I want to talk to you about that. You say they came and saw you at the Cleveland Clinic?
A. Yes. On April 14, 2001.
Q. Let me hold that. April 14, 2001?
A. That's right.
Q. The JAMA article was published when?
A. August 22nd, 2001.
Q. And did they come to see you after you sent them the draft transcript?
A. Yes. It was a manuscript. We don't call it a transcript, but yes.
Q. I'm sorry. I live in the world of transcripts.
A. That's okay.
Q. We actually occasionally have a manuscript. There's probably a couple of them on the Vioxx story being written right now.
What I'd like to ask you is, at some point in time did someone from

Page 87

Merck ask you for an electronic copy of the -- of your document?
A. I don't recall if I sent an electronic copy. It's possible, but I just don't recall.
Q. I'm going to show you an e-mail. I will mark it as the next exhibit number. I'm going to put it in the record, it's brief, to save some -- you know what, I can put it right in front of you. Exhibit Number 5.

\- - -

(Whereupon, Deposition Exhibit Topol-5, E-mails, MRK-ABA0009274, was marked for identification.)

\- - -

BY MR. KLINE:
Q. You'll see here it says, "It was great to have the opportunity to meet you in person." This was after you met with them. "We appreciate the time you took," and it is a request from a woman by the name of Alise Reicin. Do you know

Page 88

who Alise Reicin was?
A. She was one of the people who visited me. I had not met her previous to this.
Q. Did you know that her brother was an investment fellow at Morgan Stanley?
MR. GOLDMAN: Object to the form. Lacks foundation.
THE WITNESS: No, I had no idea of that.
BY MR. KLINE:
Q. Have you ever heard that?
A. No.
MR. GOLDMAN: Same objection.
BY MR. KLINE:
Q. Okay.
The story is, or what happens here is she says -- she wants you to send an electronic copy of the paper. It appears from documents that I have that that was done. Do you recall doing it?

Page 89

A. After reading this e-mail, I now think, yes, I must have sent a paper copy to Dr. Demopoulos, which prompted their visit, but then subsequently I probably complied and sent an electronic version.
Q. I just have a few questions about the electronic version. I'm going to mark an exhibit. It's an internal Merck document. I don't think you're familiar, would be familiar with it, but I want to ask you just a couple of questions about it.
MR. GOLDMAN: You can ask, but I'll object, lacks foundation.
MR. KLINE: Go ahead.

\- - -

(Whereupon, Deposition Exhibit Topol-6, E-mail 4-26-01, with attachment, "Selective COX-2 Inhibitors are Associated with An Increased Risk of Cardiovascular Events," (Mukherjee, et al) draft manuscript, MRK-AAZ0001561 -

overruled

overruled

overruled

602 - testimony lacks foundation; Topol is unfamiliar with this document (Ex. 6)

π's response: Topol is not unfamiliar with document it is a mark-up of his ~~published work~~ manuscript that he sent to Laura Demopolis and Alise Reicin

802 - testimony is based on hearsay document (Ex. 5)

π's response: Email falls within the exception to the hearsay rule as it is a statement of a party-opponent Alise Reicin, a Merck Vice President, was writing to Dr. Topol in her official capacity as agent for Merck

405d92cd-4d0a-489f-87d2-231a3a1c3f6f

-602- all testimony on this page lacks foundation. Topol is unfamiliar with this document and had no idea Merck was redlining his paper
-402- the testimony is also irrelevant — it has no impact on any issues in this case

π's response: This is Relevant to defendant's state of mind concerning the publication of a pivotal scientific article and his manuscript.

overruled

Page 90

MRK-AAZ0001593, was marked for identification.)

- - -

BY MR. KLINE:

Q. Now, it's a copy of -- I would like you to identify it, the front page of it. There's an e-mail that says it's from Alise Reicin to Laura Demopoulos. It says, "Did this in the middle of the night -- not sure it makes sense."

By the way, are you aware of the fact, Dr. Topol, that the Merck higher-ups did a lot of work at night on Vioxx?

MR. GOLDMAN: Object to form, lacks foundation.

THE WITNESS: No.

BY MR. KLINE:

Q. Oh, okay. Well, they did. And it says here, it basically transmits back Alise Reicin's markup, electronic markup of your document. Are you familiar with it?

Page 91

MR. GOLDMAN: Objection, lacks foundation.

THE WITNESS: I've never seen this.

BY MR. KLINE:

Q. Okay.

I want you to turn to Page 8, sir. I want to find out if this is something that was ever suggested to you.

If you'd look at the front page, please, first. Front page.

A. Oh, yes.

Q. Sorry.

A. Yes.

Q. If anyone who listens to this or sees this some day feels that I'm rushing, it's because I have a lot to cover in a short time under a time frame. I want to try to get as much as I can out.

"Selective COX-2 Inhibitors Are Associated With an Increased Risk of Cardiovascular Events."

MR. GOLDMAN: Where are you

overruled

Page 92

reading from?

MR. KLINE: I'm reading from the cover page.

MR. HAMELINE: Second page.

MR. KLINE: The first page of the document, underneath the Reicin to Demopoulos markup. It is Merck -- MRK-AAZ0001562.

BY MR. KLINE:

Q. Do you see it?

A. Yes.

Q. Okay.

Wait till you see this one.

Under "Results" --

MR. GOLDMAN: Object to the form, sidebar.

BY MR. KLINE:

Q. This is your paper; correct?

A. Yes. Well, I mean, this was the one that apparently was worked over.

Q. Correct.

A. This is not our paper.

Q. Were you aware of the fact that Merck was working over your paper?

Counsel's question is improper and argumentative

π's response: This is a proper question

overruled

Page 93

MR. GOLDMAN: Object to the form, lacks foundation.

THE WITNESS: I had no idea until this very moment.

BY MR. KLINE:

Q. Look under "Results" on Page 8. Do you see -- I'd like you to look at the -- don't look at the underlined sentence yet. Look at the last -- the sentence that begins, "The results of the event-free survival analysis on the 66 cases showed that the relative risk of developing a cardiovascular event in rofecoxib treatment arm was 2.37" percent.

That's something you eventually told people in your JAMA paper; correct?

A. Yes.

Q. Did you know or did they suggest it directly to you that according to Dr. Reicin, "we prefer to flip the data and say it was reduced on naproxen"?

MR. GOLDMAN: Object to the

Counsel is leading

π's response: π is asking for comments on a specific passage in a document - it is an appropriate orientation question.

overruled

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

- see objections at top of previous page; all apply here
- Counsel's questions regarding "flipping" data are leading and argumentative
- Π's response: This is not argumentative. The term "flipping the data" was the term used in the document itself and written by a Merck employee.

Page 94

form.

THE WITNESS: It's amazing. Yes, I see it here, but it's amazing. It certainly didn't appear in our manuscript.

BY MR. KLINE:

Q. Are you, sir -- have you ever heard of a medical researcher flipping data?

MR. GOLDMAN: Object to the form.

THE WITNESS: No. I mean, you don't -- research and flipping data, that doesn't -- no.

BY MR. KLINE:

Q. But the naproxen hypothesis, sir --

A. Yes.

Q. -- wasn't that really a way that Merck, the way Dr. Reicin says here, flipped the data?

MR. GOLDMAN: Object to form.

THE WITNESS: Well, I do

Page 95

believe there was no basis for the naproxen hypothesis, and that was one of the really significant problems in what happened from VIGOR, all the way through from, you know, 2000, when that paper was published, all the way through to the drug's withdrawal.

BY MR. KLINE:

Q. Sir, your JAMA article --

MR. GOLDMAN: Move to strike as nonresponsive, opinion testimony.

BY MR. KLINE:

Q. Sir, your JAMA article, I think you read to me that your conclusion was to call for a full large-scale study; correct?

A. That's right.

Q. Did you want a primary cardiovascular endpoint study performed?

A. Not only did it need to have cardiovascular endpoints, but it had to have cardiovascular patients. Patients

Page 96

had been excluded essentially from all of these studies, and so that was a patient group that we were most worried about, because they would have the highest predisposition to life-threatening events.

Q. Why was it important to study patients who were at high risk for cardiovascular events when taking the drug Vioxx and COX-2s generally?

A. Well, we already knew that a large proportion of patients who have heart disease have concomitant arthritis. And, in fact, in my practice, the vast majority of patients who have come to see me with heart disease, they also have arthritis. But there was the Ray paper in Lancet, the Tennessee Medicaid database, there was the other papers that I have referred to where 45, 50 percent or higher percent of patients taking Vioxx or other medicines in this class had established known coronary heart disease. So, these patients were

Page 97

essentially the highest risk for having a life-threatening event.

MR. GOLDMAN: Move to strike as nonresponsive, opinion testimony.

BY MR. KLINE:

Q. So, did your study, what you were proposing, was it to study the drug in those people who were the logical people who were going to take the drug?

A. Yes. The only way we could get to the answer here, was it safe for people with heart disease who have arthritis to take the medicine, was to do a trial in these particular patients who had been completely neglected in the development of Vioxx.

Q. What did you think --

MR. GOLDMAN: Object to the form. Move to strike the nonresponsive opinion testimony.

BY MR. KLINE:

Q. -- when you got into this sir, in 2001, what did you think of

- This testimony re a 2002 Lancet article violates the Court's Order, which prohibits testimony re events that post-date Irvin's death
- Π's response: Refers to a causation question which is not a time dependent inquiry

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Overruled

Page 98

Merck's failure to study patients, the very patients in whom the drug was going to be taken?

MR. GOLDMAN: Objection, opinion testimony.

THE WITNESS: Well, there're a couple of possible explanations, but one is that they didn't want to know or they didn't want to do the trials that were obviously, as we said, mandated. They didn't want to do the trials.

BY MR. KLINE:

Q. Did you believe that they should have?

MR. GOLDMAN: Objection.

THE WITNESS: Absolutely. And both, not just Merck, but also Pfizer, and any manufacturer of a COX-2 inhibitor. It wasn't just about a Merck problem, although clearly the VIGOR trial was the one that was most concerning.

BY MR. KLINE:

Page 99

Q. If you'd look at the last sentence of the paper on Page 18, there's more, but I don't have time to go through it all. Maybe we can furnish you a copy, and you can see how they were marking your paper up, sir. I've provided a copy to your counsel. Would you at some point, after this deposition, like to see how they marked up your paper internally?

MR. GOLDMAN: Objection to the foundation.

THE WITNESS: No. I am just reading some, and it's very disturbing, but, yes.

BY MR. KLINE:

Q. Look at Page 18.

A. Yes.

Q. "Until then," and this ended up in your paper, "we urge caution in prescribing these agents to patients at risk for cardiovascular morbidity." Your words?

A. That's the words that's here in the paper that are published, yes.

Page 100

Q. The underlined words are Dr. Reicin's, according to her e-mail which she wrote. Did you see what she said?

A. Yes.

Q. "Conclusion needs to be toned down."

MR. GOLDMAN: Objection, lacks foundation.

BY MR. KLINE:

Q. By the way, you met with Dr. Reicin; correct?

A. Yes.

Q. She came out to see you?

A. Yes. With Dr. Demopoulos.

Q. I see.

You knew Dr. Demopoulos before; correct?

A. Yes.

Q. Did you know Dr. Reicin?

A. No, I'd never met her before.

Q. Did anyone introduce or did you know, sir, at the time that her personnel file, her actual personnel file

Page 101

described her as the "tenacious defender of the Vioxx franchise"? Did you know that fact?

MR. GOLDMAN: Object to the form, lacks foundation.

THE WITNESS: Well, it has become -- I didn't know that, but certainly over time, that's become increasingly and abundantly clear.

BY MR. KLINE:

Q. Is she even a cardiologist, sir?

MR. GOLDMAN: Objection, lacks foundation.

THE WITNESS: I don't believe so, no.

BY MR. KLINE:

Q. And when she came to see you, sir, did you believe that one of the purposes was to neutralize you and your opinion?

MR. GOLDMAN: Object to the form, lacks foundation.

THE WITNESS: Well,

Sustained 403 602

-602 - this testimony lacks foundation; Topol is unfamiliar with the email

-402 - further, testimony is not probative of any issues of consequence

-Counsel's questions are leading

π's response: Defendant fails to make form objection to give opportunity for cure

-Refers to his manuscript which is something uniquely within his personal knowledge

-Relevant to defendant's state of mind in minimizing communication of risk

-Counsel's question is argumentative and violates the Court's Order

π's response: See next page

Overruled

Aug. 2001 JAMA Article dated AFTER IRVIN'S Death

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

- 802 - testimony is based, in large part, on hearsay statements attributed to Dr. Reicin and others

- 402/403 - Topol's testimony here is irrelevant to the issues of this case – Merck's alleged "pressure" on him has nothing to do with what Merck knew and when. Moreover, the testimony would be unfairly prejudicial.

π's response: Testimony is exception to hearsay rule in that Dr. Reicin is an agent of defendant and her statement of a party opponent - These contacts and communicating are relevant to the central issues of the case including attempts to suppress unfavorable evidence and intimidate leading scientists from making any statement that would inform doctors of risk.

Overruled

Overruled

EF

Page 102

certainly. The comments she made at that meeting would go along with that. I mean, she basically said that -- I remember the conversation. It actually was supposed to be three people coming to visit, which was unusual, to discuss a manuscript, but because of our prior relationship with Merck and Dr. Demopoulos and Dr. DiBattiste, I had reluctantly agreed to this meeting. But Dr. DiBattiste didn't show up, it was supposed to be the three of them, and the meeting started out with that we got it wrong, that we would be embarrassed.

BY MR. KLINE:

Q. "We" meaning?

A. Dr. Nissen, Dr. Mukherjee and I.

Q. Three physicians at the Cleveland Clinic?

A. Right.

Page 103

Q. Got it wrong?

A. Got it wrong, that we would be embarrassed if we published this paper.

Q. Her word?

A. That's the word. The word is "embarrassed." And I thought that was harsh. And she came across as kind of arrogant, I thought. But we talked it through, and I explained to her that, you know, we don't feel that way at all, and we will stand by our data. We only wanted the input on inconsistencies of data. We did not ask to them -- for Dr. Reicin or colleagues to opine about our perspective.

But the discussion ended up okay. You know, she came about the naproxen hypothesis, which I dismissed as the explanation. She came with the rheumatoid arthritis -- that patients with rheumatoid arthritis, you know, Dr. Topol, have much higher rates of heart attack. And I said, well, that doesn't

Page 104

explain it, because all the patients had rheumatoid arthritis. So, if there's a gradient of heart attack, it can't just be from that explanation.

She also came with the notion that there were lots of data that we didn't know about, Dr. Nissen, Dr. Mukherjee and I, that was in the Merck files that the FDA had, but we didn't have access. And I said, well, we can't comment on data we don't have access to, and I'm sorry.

So, the meeting probably went on about an hour-and-a-half. It ended cordially. And at times she said that Merck was considering doing a trial in heart patients, and if we had any ideas, she welcomed us to forward a proposal, protocol, and that seemed to be -- I got the sense it was a gesture. I didn't really think that Dr. Reicin was serious about it, but nonetheless, I thought that we probably should at least send some type of protocol sketch if they

Page 105

would like to see what our ideas were for pursuing this question.

MR. GOLDMAN: Move to strike the nonresponsive testimony.

BY MR. KLINE:

Q. Let me use a characterization, and you can agree or disagree.

Did you think that her attempts were to intimidate you?

A. I don't know if I would at that point use the word "intimidation," but she was quite strong. In some respects, I would even consider her comment brazen. But she didn't say, if you publish this, we're going to do such and such. You know, it was nothing like that.

I think she knew when she left that we were going to publish this paper without any change in the types of things that she was interested in. There was no quid pro quo.

Q. There appears to have been

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

- Violates Courts Order - pertains to a draft article that post-dates Irvin's death
- 602 - Topol has no personal knowledge of the edited manuscript; the testimony thus lacks foundation
- ~~402 - The testimony is irrelevant to the facts of this case~~

Page 106

-- there appears to have been some revisions that were made to the draft after it was submitted to JAMA; is that correct?

A. Well, the reviewers of the paper certainly had some revisions requested, but I don't believe anything substantive was changed in the review process. The process was already -- had started when that visit in April had occurred, and that independent review was something that we had to attend to, of [illegible]

Q. Let me just briefly show you another document. It's a Merck document, Exhibit Number 7.

\- - -

(Whereupon, Deposition Exhibit Topol-7, E-mails, with attachment, "Selective COX-2 Inhibitors are Associated with An Increased Risk of Cardiovascular Events," (Mukherjee, et al) draft manuscript, MRK-ABA0009661 -

Page 107

MRK-ABA0009693, was marked for identification.)

\- - -

BY MR. KLINE:

Q. Very briefly. And, again, I don't have the time to have you sit and read the whole thing, but I want you to look at the front page.

Apparently the manuscript was further worked on internally at Merck. Are you aware of that fact?

A. No.

MR. GOLDMAN: Objection to the characterization.

THE WITNESS: I had no knowledge of that.

BY MR. KLINE:

Q. And there's an e-mail from Dr. Demopoulos to a number of people, including Alise Reicin. And they took a crack at revising it, and if you look at the last sentence of the e-mail, "We recognize that the revised" transcript "does not completely neutralize the

Page 108

potential negative impact of the publication, but...it is substantially removed from the original. We" feel "that revising it further to more completely present a Merck perspective might alienate the authors and" thus "jeopardize our opportunity to contribute at all."

Did you know that's what was going on?

MR. GOLDMAN: Objection, and object --

THE WITNESS: This is remarkable. I didn't know --

MR. GOLDMAN: -- to the use of the document.

THE WITNESS: -- this was going on at all.

MR. GOLDMAN: Dr. Topol, let me just insert an objection.

Lacks foundation, and can I have a standing objection to your use of documents that Dr. Topol's never seen?

Page 109

BY MR. KLINE:

Q. Dr. Topol --

MR. GOLDMAN: Can I have that, Mr. Kline?

MR. KLINE: Yes.

BY MR. KLINE:

Q. You've now seen it. What do you think of that kind of conduct?

MR. GOLDMAN: Object to the form, opinion testimony.

THE WITNESS: I'm actually appalled by this. Yes, to say that, you know, this was trying to "neutralize the potential negative impact" and "jeopardize our" "ability to contribute." We didn't ask them to contribute. We asked them to reconcile the data inconsistencies.

BY MR. KLINE:

Q. Is part of the academic process -- you've worked --

You've done studies for large pharmaceutical companies, Merck?

- Counsel is leading the witness

Π's response: These comments were attempts to suppress unfavorable information about the drug contained in Dr. Topol's original research - Does not violate court order in that article and information contained in the article is relevant to causation

Overruled except for section circled

402/403 - Topol's personal opinions re Merck's "conduct" are irrelevant; his response is unfairly prejudicial

Π's response: Dr. Topol is commenting upon his reaction to his paper which was prepared based on data available in 2000 and analyzed by Dr. Topol well before Irvin's death.

Overruled

Sustained 403

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

-Violates Courts Order - pertains to emails that post-date Irvin's death
-Further, Counsel's questions about Merck "neutralizing" papers are leading, argumentative, and improper
-602: The testimony lacks foundation; Topol had no knowledge of these emails

Page 110

A. Yes.
Q. Is part of the process to get the scientific facts in the medical literature, or is the real objective, or is part of the objective to get the, quote, drug company perspective?
MR. GOLDMAN: Objection.
THE WITNESS: Well, you know, I had been trying to have an intellectually fulfilling and collaborative relationship with people at Merck, and that was something that I think we enjoyed up until this sort of thing, which is obviously a departure from that, but --
BY MR. KLINE:
Q. Is it --
A. -- it's unfortunate.
Q. Is it a departure --
MR. GOLDMAN: Move to strike as nonresponsive.
BY MR. KLINE:
Q. -- from sound academic and

Page 111

scientific practice to attempt to neutralize papers and try to inject a particular perspective, rather than what is the down the middle truth?
MR. GOLDMAN: Objection, lacks foundation, opinion testimony.
THE WITNESS: Yes. I mean, I think that the role of academic medicine is to publish a highly objective independent processing of data and perspective, and anything to try to warp that or twist it is unacceptable.
BY MR. KLINE:
Q. Is that how you view these e-mails that I've just shown you --
MR. GOLDMAN: Move to strike the nonresponsive portion.
BY MR. KLINE:
Q. -- for the first time?
MR. GOLDMAN: Objection, lacks foundation, opinion testimony.

overruled

Sustained 401

Page 112

THE WITNESS: Yes, I'm quite bothered by this.
BY MR. KLINE:
Q. Those e-mails, sir, clearly do relate to you and your paper, and they have attached your paper; correct?
A. Yes.
Q. And there're markups of your paper; correct?
A. Yes.
Q. Which did not make their way into the New England Journal; correct?
A. No, JAMA.
Q. I'm sorry.
A. They didn't even make their way to me. I've never -- I've not seen these.
Q. [illegible]
Now, let's move to your JAMA article itself.
A. Yes.
Q. I think we're moving along, I hope.
I want to stop at this point

Sustained 401

Page 113

and say I've now covered that pre-JAMA period. Is there anything in your mind significant that's been missed in the story leading up to the publication of the JAMA article? If so, I'd like to know.
MR. GOLDMAN: Object to the form, opinion testimony.
THE WITNESS: Well, I think there were --
MR. KLINE: It can't be an opinion. I just asked him to tell me what he knows, please.
THE WITNESS: Chronologically, if we were to look at the VIGOR trial, there are some concerning things that were not incorporated in JAMA that I only tuned in to later. I don't know if you would like to get into that now from the Targum FDA report or whether you'd like to get into that subsequently. But it's about the VIGOR trial in

overruled

overruled

Π's response: Relevant in that it pertains to information and clinical trial data available in 2000, before Irvin's death.
-Defendant's reaction to Topol's analysis is relevant to state of mind of Merck and plaintiff's theory that Merck suppressed data and manipulated data and silenced critics.
-Topol can comment on defendant's reaction to his original manuscript.

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

- Violates Court's Order: Topol's opinions re the Targum memo were clearly formed after Irvin's death (see 116:7-16). They are thus improper. Moreover, they are irrelevant.

Π's response: Targum memo was published and available in February 2001, before the plaintiff's death and he is commenting on the defendant's state of knowledge before the plaintiff's death

Information contained in Targum memo was available years before 2001 to Merck.

- Relevant refers to clinical trial data available to Merck between 1999 and 2001, and further refers to FDA analysis of data in 2001 before death of plaintiff.

Page 114

December and November of 1999.

BY MR. KLINE: [redacted]

Q. Please tell us.

MR. GOLDMAN: That's why I objected on opinion testimony grounds. Move to strike, opinion testimony.

[redacted]

the Targum report. It was in the document submitted, but I have a copy that I brought.

BY MR. KLINE:

Q. You actually -- I think I've seen in your file, you have the Targum memo in your file produced us, and you marked it up?

A. Yes. I marked it up, but I have a clean copy here that I wanted to refer to. Here it is. Because this was while the VIGOR trial was being conducted. And this is an independent FDA review of the data from VIGOR. It also, in this report, includes the data from two other trials, VIGOR -- trial 090

Overruled

Page 115

and trial 085.

- - -

(Whereupon, Deposition Exhibit Topol-8, Memo 2-1-01, "Consultation NDA 21-042, S-007 Review of cardiovascular safety database (Targum) (37 pages), was marked for identification.)

- - -

BY MR. KLINE:

Q. I'm marking, and those who see this will be familiar with this, the February 1, 2001 memo of Shari L. Targum of the Division of Cardiorenal Drug Products at the FDA --

A. Yes --

Q. -- correct?

A. Yes.

MR. GOLDMAN: Exhibit number 8?

MR. KLINE: Exhibit number 8.

BY MR. KLINE:

Q. You've interacted with Dr.

Page 116

Targum?

A. Yes. I know Dr. Targum.

Q. Okay.

Please tell us the significance to you.

A. Well, this --

Q. You did not have this at the ~~time that you published the JAMA article~~ or you did?

A. No. Well, Dr. Mukherjee had, I think, reviewed this online, but I had not. I only had reviewed the data that he presented to Dr. Nissen and I, but I went back to this report and found many things that still had not even yet surfaced that are quite concerning.

Q. Which are?

MR. GOLDMAN: Objection, move to strike the opinion testimony.

BY MR. KLINE:

Q. What are the concerning parts to you that were known and flagged in the Targum report dated February 1,

Page 117

2001?

MR. GOLDMAN: Object to form, opinion testimony.

THE WITNESS: On Page 5 it talks about the DSMB, which is the data and safety monitoring board.

MR. GOLDMAN: I'm sorry, what page?

THE WITNESS: Page 5.

BY MR. KLINE:

Q. Yes.

A. And the first thing it says is during -- this is at the bottom of the page, the last paragraph, "During the November 18, 1999 meeting, discussion and focus on the 'excess deaths and cardiovascular adverse experiences in group A compared to group B'...In this report, there were 40 and 17 patients that discontinued the study because of cardiovascular adverse events," and then there's a blood pressure. And it's pretty easy to tell which is group A and group B.

Overruled

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

- same objection as previous page

Same response as previous page

Page 118

This is November 18, 1999. This is highly concerning, that there's excess deaths in a trial and the DSMB is noting in the course of the VIGOR trial.

Q. You said November 18, 1999?

MR. GOLDMAN: Object to the form opinion testimony.

~~THE WITNESS: Yes. This~~ would be a time when any concerns about the drug, and, of course, now already the 090 trial, which I presume we'll get into, that already was known in May of 1999.

So, now we have the largest trial ever of the drug, and it's causing, in the midst of the trial, excess deaths and serious cardiovascular events. So, this did not apparently lead to the alert that I would have thought in the course of a large scale trial of 8,000 patients.

MR. GOLDMAN: Move to strike opinion testimony, nonresponsive.

Overruled

Page 119

BY MR. KLINE:

Q. What are you saying to us? Are you saying that in the period by the year 2001 that there were a series of things that were known to Merck?

MR. GOLDMAN: Object to the form, opinion testimony, lacks foundation.

THE WITNESS: Well, what's evident here is it calls out the 53 versus 29 serious excess deaths in cardiovascular events as early as November of 1999. In the wake of another trial, they had a 760 percent excess of heart attacks.

BY MR. KLINE:

Q. What study was the 53 deaths, for instance?

A. That's the VIGOR trial.

Q. The VIGOR trial?

A. At this juncture, at this interim analysis by the safety and monitoring board.

Q. That's what I wanted to

Page 120

establish.

A. And it actually then goes on in this document by Dr. Targum, and it's highly concerning because it says on Page 6, it says that, "The DSMB recommended development of a separate analysis plan for adjudicated events," this is in the ~~first full paragraph. "One concludes"~~ this is the last sentence of that paragraph. "One concludes from this statement that the DSMB," the Data Safety Monitoring Board, "received unadjudicated adverse event data," and that there had been -- further along, the last sentence of this, "At the time," this is now the next interim analysis, December of 1999, "no cardiovascular analysis plan was in place" for this trial, which is quite concerning, to say the least.

MR. GOLDMAN: Move to strike nonresponsive opinion testimony.

Overruled

BY MR. KLINE:

Q. Is what you're saying that the Targum memo, to put it in

Page 121

perspective --

Is what you're saying is that the VIGOR -- you learned from seeing this document that the VIGOR data had been analyzed, as you would expect, going along at various stages?

A. Yes.

Q. And that at various stages, were there red flags that you can see in this data?

A. Exactly.

MR. GOLDMAN: Object to the form, opinion testimony.

THE WITNESS: Exactly. And the point is, is that later we're told that the first time they ever knew about any problem was well into 2000, which couldn't possibly be true. Someone of the sponsor had to be alerted by this DSMB concern of excess deaths and serious cardiovascular events.

MR. GOLDMAN: Move to strike, nonresponsive, lacks

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

- Violates Court's Order. Topol's opinions and analysis of 085, 090, and Vigor, as described here (see 122:10-19), were clearly formed after Irvin's death.

Page 122

foundation.

BY MR. KLINE:

Q. Now, let's talk about VIGOR, because that was some focus of what you were doing when you retrospectively looked at VIGOR and also a number of other studies including 090.

~~A. Yes.~~

Q. Okay.

You looked at, I think, a study called 085, 090, VIGOR. Any other?

A. Those are the principal ones. I think all the studies, but those are the ones that we focused on the most.

MR. GOLDMAN: Can you set a time frame for this, please?

MR. KLINE: Yes. For the JAMA article of 2001. That's what I'm back to and referring to.

THE WITNESS: Right.

That --

BY MR. KLINE:

Q. I think while we've jumped around a little bit, we've done a pretty

Page 123

good job of keeping things straight so far.

A. Well, we tried --

Q. But the beauty will be in the eyes of beholder of somebody who sees this.

A. Right. I was just trying to, while commenting on VIGOR, trying to incorporate that there were problems in the conduct during the trial, which have not really surfaced, as far as I know.

But regarding the JAMA paper, the August 2001 --

Q. You mean not surfaced to this date?

A. To this date.

MR. GOLDMAN: Objection, most to strike, nonresponsive, opinion testimony, lacks foundation.

THE WITNESS: I'm not aware that this concern regarding the data and safety monitoring board has been registered. I've been

Page 124

concerned about it, but I have not -- and I've discussed it with the FDA, but I've not gotten an adequate response.

MR. GOLDMAN: Same objections.

BY MR. KLINE:

~~Q. I see. Okay.~~

Go ahead.

A. Back to the JAMA paper, though --

Q. Yes.

A. -- we really zoomed in on three trials of Vioxx, study 085, study 090 and VIGOR.

Q. Okay.

You looked at the VIGOR trial, and you made some determinations there; correct?

A. That's right.

Q. Okay.

What did you -- I would like you to list out sequentially. If you've covered it already, list it so we have it

Page 125

in a list.

What were your major findings as you looked independently back at the VIGOR trial?

MR. GOLDMAN: Objection, lack of foundation.

THE WITNESS: I think the most important finding is summarized in Figure 1 of that paper, which comes right from the FDA Targum report. And basically what that figure, first time now published to the medical community, it shows that there's a divergence of the heart attack and serious event curves. The event curves is Figure 1, whereby starting at four to six weeks after the start of the medicine, Vioxx compared to naproxen, there is an over two-fold risk of serious events.

BY MR. KLINE:

Q. That Kaplan-Meier curve,

Π's response: Dr. Topol's opinions refer to data and clinical studies available in 1999 and 2000 long before Irvin's death - His opinions reflect opinions that Merck should have concluded from the same studies long before 2001, moreover Dr. Topol testified that he reviewed the information on 085 and 090 (contained in the Targum memo) which were communicated to him by Dr. Nissen in March 2001.

↓ overruled ↓

405d92cd-4d0a-489f-87[illegible]-2813a1c3f6f

overruled

Overruled

Overruled

Page 126

which will be marked -- we don't have to display it right now, but I want to mark it so that it's part of an exhibit to be displayed as part of this transcript. We will put a number 9 on table -- on Figure 1 of the Topol JAMA article.

(Whereupon, Deposition Exhibit Topol-9, Excerpt from "Risk of Cardiovascular Events Associated with Selective COX-2 Inhibitors," (Mukherjee, et al), JAMA, August 22/29, 2001 Vol 286, No. 8, 956, was marked for identification.)

- - -

MR. GOLDMAN: Haven't you already marked the JAMA article?

MR. KLINE: I did, but I want to mark Figure 1 as a separate exhibit.

Q. That Figure 1, which is the Kaplan-Meier curve showing the time to

Page 127

cardiovascular adverse events, the line separated how many days?

A. Between four and six weeks these curves diverge.

MR. GOLDMAN: Move to strike the opinion testimony.

BY MR. KLINE:

Q. Is this, by the way, something that has been replicated in other studies?

MR. GOLDMAN: Objection, move to strike.

THE WITNESS: It's been replicated in four randomized trials.

BY MR. KLINE:

Q. That it separates at an early time?

MR. GOLDMAN: Objection.

THE WITNESS: That's right.

BY MR. KLINE:

Q. Okay.

And what are those studies?

A. Study 090, which was a

Page 128

six-week trial, which had a 760 percent excess within the six weeks.

Q. Yes.

A. The VIGOR trial I just mentioned.

Q. Yes.

A. The ADVANTAGE trial, which was a 12-week trial that showed a significant excess in the 12-week time frame.

And the VICTOR trial, which has not yet been published, which is a colon cancer trial of 2,300 patients coordinated out of Oxford, which has been at least commented on by the investigators having immediate excess in heart attack risk.

Q. What then, sir --

MR. GOLDMAN: Objection, move to strike nonresponsive opinion testimony, lacks foundation.

BY MR. KLINE:

Q. What, then, sir, opinion and

Page 129

conclusion have you reached -- let me strike it and start again.

What conclusion have you reached, Dr. Topol, relating to the increased risk of cardiovascular events, heart attacks and strokes relating to short-term usage of the drug?

MR. GOLDMAN: Objection, opinion testimony.

THE WITNESS: Well, there is -- I should also add the four randomized trials, there's the cumulative analysis by Dr. Juni published in the Lancet which shows no relationship between duration of therapy and heart attack excess.

But interestingly, all four of these trials, and the cumulative Juni analysis, was on patients without heart disease. So, the risk of it being immediate and early could actually be much more exaggerated in patients with

- Violates Court's Order - testimony re studies that post-date Irvin's death (VICTOR, Advantage, Juni, etc.) are impermissible

Π's response: Refers to defendant's state of mind in reacting to unfavorable studies. ADVANTAGE is also relevant to Dr. Topol's causation opinions which are not time-dependent

- Violates Court's Order - testimony is based on studies that post-date Irvin's death

Π's response: Same as above.

Overruled

Overruled

Additional: ADVANTAGE data available in 2000, but Merck chose not to publish until 2003. Relevant as to what defendant knew.

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

-Violates Court's Order. testimony re trials that post date Irvins death is impermissible and irrelevant to the facts of this case.

π's response: Refers to VIGOR which occurred before π's death Published study appeared in November 2000 before π's death

heart disease.

BY MR. KLINE:

Q. Any doubt --

MR. GOLDMAN: Objection, move to strike the nonresponsive testimony.

BY MR. KLINE:

Q. -- about it in your mind?

A. There isn't any question about this. To see it replicated across four trials in patients who don't even have heart disease is quite an important finding.

MR. GOLDMAN: Objection to opinion testimony in the last question.

BY MR. KLINE:

Q. In this particular Kaplan-Meier curve for the VIGOR trial, that was not published in the New England Journal of Medicine; is that correct?

A. No. As I mentioned earlier, the New England Journal of Medicine paper featured the gastrointestinal side

effects and benefit, but it did not show in any graphic form, and there are other irregularities of this paper, but it certainly did not highlight the heart attack problems.

Q. Okay.

Now, I want to do findings. Then I want to go to what you've described as irregularities --

MR. GOLDMAN: Move to strike as nonresponsive.

BY MR. KLINE:

Q. -- because you have a perspective on both of those issues; correct?

A. Yes.

Q. Okay.

Let's talk about the findings.

You mentioned already that there was an increased risk of cardiovascular events starting at the six-week period in this study; correct?

A. Yes.

Q. Replicated by other studies we now know later?

MR. GOLDMAN: Objection to the opinion testimony.

THE WITNESS: Three other randomized trials.

BY MR. KLINE:

Q. Yes.

A. Yes.

Q. And by the way, I'm going to get to naproxen. On this naproxen theory, has there ever been a randomized clinical trial demonstrating that naproxen is cardioprotective?

A. There is no -- there are no data that I am aware of to show that naproxen in any randomized trial is cardioprotective.

Q. Do you think that if there were such a study, you would know about it?

A. I would think so.

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. So, what do you think of this naproxen hypothesis that was put forward by Merck to justify the results in VIGOR?

MR. GOLDMAN: Objection, opinion testimony.

THE WITNESS: It doesn't justify -- I mean, as I mentioned earlier, the problem is you have an experimental drug which is not fully defined, and you compare it to a drug that's been known for 20 years. To all of a sudden to ascribe some type of magical protective effect without any basis is not acceptable.

BY MR. KLINE:

Q. I don't have the document in front of me, but I think I've read in the many documents that I've had in front of me a comment by you to the effect that if Merck's view were true, it would be the wonder drug of wonder drugs or something like that. Did you say something like

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 134

that at some point?

MR. GOLDMAN: Object to the form, opinion testimony.

THE WITNESS: I don't think I did, but probably some other person who astutely made that statement, but that wasn't me.

BY MR. KLINE:

Q. Would that be a correct statement?

MR. GOLDMAN: Time out. Object to the form, lacks foundation. You're now asking him to comment about a statement that somebody else might have made.

Q. Would it be a correct statement that naproxen would be the wonder drug of wonder drugs if the Alise Reicin/Merck hypothesis were true?

MR. GOLDMAN: Object to the form, opinion testimony, lacks foundation.

THE WITNESS: Well, as I

Page 135

mentioned earlier, to have a 20-fold benefit over aspirin, which is a very important part of our armamentarium for preventing heart attacks, to be 20-fold better than that, that would be quite remarkable.

MR. GOLDMAN: Move to strike, nonresponsive.

BY MR. KLINE:

Q. Okay.

So, your opinion formed in the context of reviewing this Merck data and Merck study in VIGOR, was that the naproxen hypothesis was tenable or untenable?

MR. GOLDMAN: Objection, opinion testimony.

THE WITNESS: Well, in the manuscript, back in 2001, we tried to present that that's a possible explanation. We actually pointed that out in a couple of points in the paper. But at the end, our

Page 136

cautionary statement was because we didn't believe that this was an acceptable explanation.

BY MR. KLINE:

Q. Tell me, Dr. Topol, as you wrote it in JAMA and as you believed it then and today, the significance of 090, the study 090. What was that study? When was it performed? Just tell me what it was and what its significance was to you.

MR. GOLDMAN: Objection, opinion testimony.

THE WITNESS: To me, that study has been overlooked. It has, in many ways, extraordinary significance in the clinical development of Vioxx. And the reason is is that this study had 978 patients. And within the 978 patients, they were randomly assigned, they had the typical arthritis, osteoarthritis so-called, they were randomly

Page 137

assigned to Vioxx, a medicine called nabumetone or known as Relafen, which isn't used very much, or placebo.

And so what they had were these three arms tested with only 12-and-a-half milligrams of Vioxx. So, it's a very low dose of Vioxx relative to these other trials that we've been discussing.

BY MR. KLINE:

Q. 090 being a 12.5 milligram, as opposed to VIGOR, which was 50?

A. That's right.

Q. Okay.

A. And what is so striking about this trial is that it has, at the end of six weeks of therapy, a statistically significant 760 percent excess of heart attacks. Now, it's not quite 1,000 patient trial, but certainly that can't be minimized. And the point being is that if you see that trial in replication with the problems with VIGOR.

[Handwritten annotations:]

Improper; argumentative

π's response: Not argumentative question; is distinguishing between Merck's stated opinion and the alternative hypothesis

Sustained 401, 403

– Testimony re 090 violates court's order: opinions and analysis re study were clearly formed after Irvin's death (see 122:10-19)

π's response: Data from 090 and 085 were available years before π's death. His opinions were reached in the spring of 2001 shortly after the advisory committee, also all before Irvin's death

Overruled

Overruled

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 138

you have a very serious problem.
But moreover, what is the misleading statements that have been made, is that there have been no trials ever done with Vioxx, before APPROVe, comparing the drug except for naproxen, in which there was a risk. In fact, ~~there was study 090, which compared to~~ placebo or nabumetone, which showed a highly significant excess risk.
MR. GOLDMAN: Move to strike nonresponsive opinion testimony.
BY MR. KLINE:
Q. Was there a public -- the Merck lawyer keeps objecting as nonresponsive. He just simply doesn't like what he hears.
MR. GOLDMAN: Object to the sidebar.
BY MR. KLINE:
Q. Was there, as you view this and as you viewed it back then in 2001, a real public health threat out there in the form of the drug Vioxx?

Page 139

MR. GOLDMAN: Objection, opinion testimony.
THE WITNESS: Yes. When we published our article in August 2001, there was an accompanying article in the Wall Street Journal, an A1 article, in which I stated just precisely that, that we're staring a public health -- I don't know if I used the word "disaster," but it was a significant word, that this is a major public health issue, yes.
BY MR. KLINE:
Q. Why did you state it in those blunt terms, sir?
A. Because it obviously was a public --
MR. GOLDMAN: Objection, opinion testimony.
THE WITNESS: Here you have a possible five-fold increase in heart attacks in patients without heart disease; you have a drug

802: hearsay
Π's response: He is referring to a statement he made that reflects his views at the time.

Page 140

that's being given to -- tens of millions of prescriptions, millions of people are taking it, and it could be much worse in patients with heart disease; we've got direct-to-consumer advertising unleashed with the most successful ~~launch of prescription medicines~~ in the history of pharmaceutical development; we have a major significant jeopardy, yes.
BY MR. KLINE:
Q. And at that point in time --
MR. GOLDMAN: Move to strike as nonresponsive.
BY MR. KLINE:
Q. At that point in time, all you're asking Merck to do was what?
A. All --
MR. GOLDMAN: At what point in time?
MR. KLINE: 2001.
THE WITNESS: All we wanted --

602: Testimony re DTC and launch lacks foundation
402: Testimony
Π's response: Testimony refers to relevant consideration of positive advertising and the lack of fair balance based on science the witness is personally aware of

Page 141

BY MR. KLINE:
Q. I'll rephrase the question. As of -- give me the date of your article again. It would be August 22, 2001.
As of August 22, 2001, all you were asking Merck to do was what?
A. To do an appropriate trial, to acknowledge that there may be risks, and that didn't occur, but to also do an appropriate trial in patients with heart disease.
Q. You made a big point in your paper about the fact that the trials that were done, I think you already told us, weren't done in patients who were at risk for cardiovascular disease. Correct so far?
A. Yes.
Q. Those would be the real patients you'd have to really worry about; correct?
MR. GOLDMAN: Object to the form.
THE WITNESS: Exactly. The

Overruled
Leading
Π's response: Appropriate questions to orient the witness
Leading

Overruled EF

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Overruled

Page 142

patients with heart disease had been completely excluded from these trials.

MR. GOLDMAN: Opinion testimony.

BY MR. KLINE:

Q. You needed to study them; correct?

Leading

MR. GOLDMAN: Object to the form.

THE WITNESS: That's correct.

BY MR. KLINE:

Q. And you also say in your paper that you needed to do an evaluation of endpoints which were specific. We have two minutes left on this video before we go to the second video.

Tell me why that was so important, to do specific cardiovascular endpoints. First of all, had that study ever been done by Merck?

MR. GOLDMAN: Objection, opinion testimony, lacks

Page 143

foundation.

BY MR. KLINE:

Q. Had that study ever been done by Merck up until this point?

MR. GOLDMAN: Same objection.

THE WITNESS: As far as I know, there had not been a trial -- as I reviewed from the Targum report, there had not been a trial with a cardiovascular analysis plan with an external review, adjudication of the events. No, it had not been done.

BY MR. KLINE:

Q. Had anything that is called a prespecified cardiovascular endpoint study, has it ever been done by Merck?

A. It has never been done in my mind to this day.

Q. Did it need to be done?

MR. GOLDMAN: Objection, opinion testimony.

THE WITNESS: Absolutely.

Page 144

And we called for it innumerable times.

BY MR. KLINE:

Q. And here's the question. Why? And why is that different than what we've heard -- we hear from Merck that, well, we studied, and we went back and we looked at the end points. Why, sir -- you can tell us, why?

MR. GOLDMAN: Objection to form.

THE WITNESS: Well, as I put you to the letter in the New England Journal, which responded to that point.

BY MR. KLINE:

Q. Or just tell us, if you can.

A. Yeah. The main thing is that Merck was saying that they were doing trials to look at cardiovascular endpoints like APPROVe, like VICTOR and a prostate cancer trial. These were not being done for a cardiovascular endpoint. They were done in patients without heart

Page 145

disease.

These were trials being done to extend the indications for the drug to new areas, such as prevention of colon polyps or prevention of prostate cancer. They had nothing to do with assuring safety from a cardiovascular standpoint. That could only be done in trials of patients with heart disease.

Q. Any doubt about that, sir?

MR. GOLDMAN: Move to strike as nonresponsive.

THE WITNESS: There is no doubt whatsoever about that statement.

MR. GOLDMAN: Objection, opinion testimony.

BY MR. KLINE:

Q. Did they do what they should have done here?

MR. GOLDMAN: Objection, opinion testimony.

THE WITNESS: They did not do what was needed to be done,

— 802: Testimony re NEJM letter is inadmissible hearsay.

— Violates Court's Order: Testimony re studies that post date Irvin's death is improper

Π's response Refers to causation which is not a time dependent inquiry Does not violate court order

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

— 402: Testimony that Merck has never done a CV endpoint study and "should have" is irrelevant. Topol is not a regulatory expert.

Π's response: Dr. Topol's opinions are scientific not regulatory based upon years of work in clinical trials.

Page 146

which we called for in our JAMA paper.

MR. KLINE: Okay.

We'll move to the next videotape, and we will take a two-minute break to do it.

THE VIDEOTAPE TECHNICIAN: Off the record, 11:05.

- - -

(Whereupon, a recess was taken from 11:05 a.m. until 11:17 a.m.)

- - -

THE VIDEOTAPE TECHNICIAN: Back on the record, 11:17 a.m. Tape Number 2.

BY MR. KLINE:

Q. Dr. Topol, in the believe it or not category, I want to pick up speed. I want to try to go through a lot of things that you've said and done, and we're using time up quickly.

You mentioned -- first of all, what you've told us so far are the

Page 147

various conclusions that you reached, those which you formed during the process of gathering information, learning about this drug and researching this matter.

MR. GOLDMAN: Object to the form.

THE WITNESS: Yes.

BY MR. KLINE:

Q. Okay.

Now, let me go.

After your study came out in JAMA, did it raise a public health concern in the lay press?

MR. GOLDMAN: Object to the form.

THE WITNESS: I believe there was a concern that was brought out by the paper and then many subsequent studies as well.

MR. GOLDMAN: Move to strike, nonresponsive.

BY MR. KLINE:

Q. Okay.

First of all, in The Wall

Page 148

Street Journal there's a quotation attributed to you. You said, "Either they are moving at glacial speed," referring to Merck or, "they are waiting to see what the fallout will be from this and other reports. We're staring at a major public health issue."

A. Yes.

Q. Is that a quote that could be attributed to you?

MR. GOLDMAN: Object to form, opinion testimony.

THE WITNESS: That certainly was, and that was the one I was referring to a little earlier about this public health concern, yes.

BY MR. KLINE:

Q. It says that "Merck sought to downplay the cardiac issue." Is that true?

A. That's what the reporter said.

MR. GOLDMAN: Object to the

Page 149

form.

THE WITNESS: But I do believe that's true, because that was, I think, the ulterior purpose of the visit in April.

MR. KLINE:

Q. Apparently at some point, Merck, according to the published report here says, that they asked Dr. DeAngelis at JAMA -- who is he?

A. It's a woman.

Q. I'm sorry, I apologize.

A. Cathy DeAngelis, and she's the editor-in-chief of JAMA.

Q. And that they wanted to have a rebuttal right to your article when it was published?

MR. GOLDMAN: Object to the form.

THE WITNESS: Yeah, this was quite extraordinary. I had not heard of something like this before. This was because we had been, I think, decent and

π's response: Testimony not based upon hearsay witness has knowledge of Merck's rebuttal to his study - Relevant to defendant's attempts to reject and critique any criticism of their drug.

-802: Testimony is based on inadmissible hearsay -402: This testimony has no probative value. Whether Merck publishes a response in JAMA is irrelevant, and post-dates the death in this case. -403: Also unfairly prejudicial

overruled EF

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

- Violates Court's Order. Testimony regarding studies that post date Mr. Irvin's death (such as APPROVe) is improper and irrelevant.
- 403 - Testimony regarding Merck allegedly accusing and pressuring scientists is unfairly prejudicial

Π's response: APPROVe is relevant to issues of causation not a time dependent issue

Overruled

Overruled

Page 150

collegial to let Merck know about the paper, now they wanted to publish their own paper at the same time and an editorial as a simultaneous publication in JAMA.

BY MR. KLINE:

Q. Why was --

~~MR. GOLDMAN: Move to~~ strike, nonresponsive.

BY MR. KLINE:

Q. -- as you saw it, the incremental risk of increased risk of heart attacks and strokes so important, and how did it relate to the numbers of people who were taking it?

MR. GOLDMAN: Object to the form, opinion testimony.

THE WITNESS: Well, if one thinks about the risk here, if it's -- if we use the APPROVe data in colon cancer patients without heart disease, it's 16 per thousand patients, and you can just do the math about -- if you

Page 151

have millions of people, 16 per thousand having a heart attack, that's an extraordinary risk for the population.

MR. GOLDMAN: Move to strike as nonresponsive.

BY MR. KLINE:

Q. Okay.

Merck took after you, sir?

MR. GOLDMAN: Object to the form, leading.

THE WITNESS: The problems that occurred after August 22nd, 2001 were quite profound in many respects. So, not only did they have consultants that they communicated to the media, like Dr. Konstam and Dr. FitzGerald, accusing us of having tortured the data and manipulated the data, but they also sent out an overnight mail to every healthcare provider in the country that was commented on -- Dr. Sherwood, he was the

Page 152

doctor who sent it, and it was in the JAMA letter correspondence about our article, that one of the doctors was complaining, having received this overnight with the five-page taking on the Mukherjee/JAMA paper, and so it ~~certainly unleashed a very robust~~ response from Merck and its consultants.

MR. GOLDMAN: Objection, move to strike as nonresponsive.

BY MR. KLINE:

Q. Did you ever hear of them refer to Dr. Sherwood as the enforcer?

A. I hadn't heard that, but he certainly --

MR. GOLDMAN: Object to the form --

THE WITNESS: -- was the person --

MR. GOLDMAN: -- lack of foundation.

THE WITNESS: -- whose

Page 153

signature is attached to the letter that went out to, I don't know how many, apparently tens of thousands of doctors following our article.

BY MR. KLINE:

Q. Okay.

Did you believe the attacks were ad hominem?

MR. GOLDMAN: Object to form, lacks foundation --

THE WITNESS: I don't believe --

MR. GOLDMAN: -- opinion testimony.

THE WITNESS: -- that they were directed personally. I don't think that Merck wanted to accept that there was a cardiovascular risk. They also said there was no need to do any trial because there was no cardiovascular risk.

That, to us, was unthinkable, but I don't believe

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 154

it was a personal directed -- anyone who wrote the paper would have probably had the same type of response, I imagine.

MR. GOLDMAN: Move to strike as nonresponsive.

BY MR. KLINE:

Q. Did you keep your scientific focus, sir?

A. Without any question, we stayed on point regarding the need to press on the clinical science and the research.

Q. In a reply to a series of letters written by folks associated with Merck, did you say, "Since publication of our meta-analysis" -- was your study a meta-analysis?

MR. GOLDMAN: Object to form.

THE WITNESS: Well, it's one form of meta-analysis. That's a term that's very loose. Any time you're pooling data and looking at

Page 155

multiple trials, you can term it a meta-analysis. But yes, that was basically the best we could do with the data that were available at that time.

BY MR. KLINE:

Q. You said, "Several basic research studies have supported the potential thrombotic effect of COX-2 inhibitors," and you cited various studies; correct?

MR. GOLDMAN: Object to the form, lacks foundation, opinion testimony.

THE WITNESS: Yes.

BY MR. KLINE:

Q. And you were speaking there not only of COX-2s generally, but a thinking of -- were you thinking of Vioxx in particular, sir?

MR. GOLDMAN: Same objection.

THE WITNESS: Vioxx appeared in the continuum to be the one

Page 156

associated with the highest risk as an outlier.

MR. GOLDMAN: Same objection as before.

THE WITNESS: But it certainly, as we raised in the JAMA paper, could have easily been ascribed as a concern with Celebrex as well.

[illegible]

Q. Now, there was a label --

MR. GOLDMAN: Objection, move to strike as nonresponsive.

BY MR. KLINE:

Q. -- on Vioxx at the time; correct?

A. Yes, there was a package insert, yes, and a label.

Q. Right.

And the label which would be in the PDR as well as in the package insert, did it in any way warn of the cardiovascular risks which were, as I think your testimony would be fairly

Page 157

described, obvious to you?

MR. GOLDMAN: Objection to the opinion testimony.

MR. HAMELINE: Again, if you need to look at the document, let us know. If you have memorized it...

BY MR. KLINE:

Q. You know generally the label?

MR. GOLDMAN: Object to form.

THE WITNESS: Yeah, I'm familiar with the two different -- the initial and then the April 2002, I'm familiar with them. At least I couldn't recite it, but I've reviewed them in the past.

The initial label, package insert, did not mention any cardiovascular risk. And only in April 2002, which is considerably long after the FDA panel requested that there be a label change, was

FRE 701/702: Topol is not qualified to testify as an expert in warnings and labeling. Nor is this proper lay witness testimony

602: Topol has no foundation on which to comment on the timing of the Vioxx label change.

Sustained 602

Π's response: One of world's leading experts in cardiology and clinical trials and CV risk is capable of testifying to the medical and scientific accuracy of CV data presented in the Vioxx label and whether the label accurately reflects the state of the scientific literature see in re: Diet Drug product liability litig

405d92cd-4d0a-489f-37d2-231e3a1c3f65

- see objections on previous page; same apply here

Π's response: see plaintiff's responses on the previous page.

Page 158

there an insertion about the risk and some of the data, but it is certainly not prominently featured in the new label. It's actually in a very small print and, in my mind, not adequately highlighting the risk for patients and for the medical community.

MR. GOLDMAN: Objection, move to strike, nonresponsive opinion testimony.

BY MR. KLINE:

Q. So, in your opinion, the label, as you now understood the data as it pertained to the '99 label when you learned about this in 2001 and as you understand it today based on the '99 and 2002 labels --

A. Yes.

Q. -- those labels, did they provide adequate warnings and information relating to the real risk of patients taking Vioxx?

MR. GOLDMAN: Objection,

Page 159

opinion testimony.

MR. HAMELINE: Wait for his objections.

THE WITNESS: I'm sorry.

MR. KLINE: Yes. For those who hear the constant stream of talking, it's Merck's lawyer objecting the entire deposition.

MR. GOLDMAN: Mr. Kline, I'm whispering, as the court reporter can confirm. I'm intentionally whispering into the microphone so she can hear me. I'm not trying to interrupt the deposition at all. You're asking him for clear opinion testimony, and that's my objection.

MR. KLINE: I don't know why we can't simply agree that you have a standing objection to form and opinion, and I'm willing to do it.

MR. GOLDMAN: And I told you before, sir, that's not --

Page 160

MR. KLINE: Let's go off the record. I don't want to take any time on this.

THE VIDEOTAPE TECHNICIAN: Off the record, 11:25.

- - -

(A discussion off the record occurred.)

- - -

MR. KLINE: I, again, invite counsel to make any objection to form or opinion testimony, which I believe 90 percent of them are, and now I can't even hear the objections because they're just being whispered, so, I don't have a chance to correct anything that might be to the form because I haven't heard the ones that are being whispered.

I invite them to give Mrs. Golkow at the end of the deposition all of the bases of the objections so I don't have to hear

Page 161

them. They object to everything Merck says. It's as clear as it can be. Or everything that Dr. Topol says. Let's go back.

MR. GOLDMAN: Mr. Kline, to be clear, I'm saying the objections loud enough for you to hear and if for some reason if you want me to say them louder, I'm happy to do that.

MR. KLINE: Yes.

MR. GOLDMAN: But don't say later on that you did not hear my objections.

MR. KLINE: What you want to do -- what you clearly want to do, and I didn't want to get to this point today, Andy, but what you clearly want to do is object to every single question. I don't understand how it's not preserved if I say to you I agree on behalf of all of the parties taking the deposition in this case, the

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 162

thousands of people who have sued Merck in this litigation in the MDL, that I will agree that for that purpose you can go back and fill it in. I'm sure if we call Judge Fallon, which I don't want to do, that's what he would say. It's as clear as can be. You have the objection.

MR. STEIN: I make that agreement for the people in California, the state cases in California that I represent. You can have a standing objection.

MR. GOLDMAN: Are there any other cross notices in this deposition?

MR. KLINE: No.

MR. GOLDMAN: Well, with all due respect, I don't know how the judge is going to rule on that later, and I can't just preserve my objection, Mr. Kline. I will do my best to do it in a

Page 163

non-disruptive way. I've tried to do that.

I don't want to hear later that you couldn't hear my objections, because that's not true.

MR. KLINE: I couldn't.

MR. GOLDMAN: And if Dr. Topol just gives me a second to make the objection, then we wouldn't have the problem.

MR. KLINE: But then we're still going to end up with a transcript that is this and that. But you know what, some day we'll play it, and I'll ask for an instruction from the judge that this is what Merck was doing during the deposition because they didn't want to hear what Dr. Topol said.

Let's go.

THE COURT REPORTER: I just have one quick question or

Page 164

suggestion. Can you just say objection, period? Do you have to state the basis each time?

MR. KLINE: I asked that, too.

MR. GOLDMAN: You want to me to say objection period, and then later I can go in and put in what the objection is?

MR. KLINE: Yes. If it is to form or opinion, you can go back in and Linda can fill it in.

MR. GOLDMAN: Fine. I will do that. That is fair.

Just for the record, I will object just by saying "objection," and after the deposition I will contact Linda and tell her what the basis for that objection is.

MR. KLINE: You have to say any other objection out loud. If it is form or opinion, which 99 percent of this is, I'm fine. If it's something else, you've got to

Page 165

let me know.

MR. GOLDMAN: Like what?

MR. KLINE: I don't know.

MR. GOLDMAN: What objection would you like me to make now?

MR. HAMELINE: Foundation is the only other objection you've been making, so, let's keep that in the three.

MR. KLINE: We'll keep that in the three. Foundation is in the three.

If there's anything other than those three, state it.

MR. GOLDMAN: Sounds good.

MR. KLINE: Let's go.

THE VIDEOTAPE TECHNICIAN: Back on the record at 11:30.

MR. KLINE: Okay.

We're back on the record; correct?

THE COURT REPORTER: Yes.

BY MR. KLINE:

Q. We have the warning labels,

405d92cd-4d0a-489f-87d2-231e3a1c3f6f