-FRE 701/702: Topol is [not] qualified as an expert in warnings/labeling. Nor is this proper lay witness testimony
-FRE 602: Testimony re need for additional study is speculative and lacking in foundation.

π's response: See in re Diet Drug Product Liability Litigation holding that a medical + scientific expert can testify as to the medical + scientific accuracy of the label and whether it accurately reflects the state of medical knowledge

Page 166

and I ask you about them and there were objections and I'm not sure what came through or not, so, I'm going to do it again to be sure.

The warnings on this drug, were there adequate warnings on this drug, sir, in the '99 and 2002 labels?

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. As to cardiovascular risks?

THE WITNESS: In my opinion, both the original label and then the revision in April 2002 did not show adequate safety concerns about heart attacks, strokes and death that could occur from the medicine. So, it wasn't present at all in the first iteration in 1999, and it certainly was not adequately flagged in the 2002 revision.

MR. GOLDMAN: Move to strike, nonresponsive.

BY MR. KLINE:

Page 167

Q. You, sir, online at the Cleveland Clinic Heart Center, you apparently have online for your patients; correct? There's an online service called Cleveland Clinic Heart Center, and there was something in the winter '01 was actually posted on the website, what I see, "Raising a Cautionary Flag About COX-2 Use in High-Risk Heart Patients."

A. Yes.

Q. Do you see that, sir?

A. Yes, I do.

Q. I've marked it as an exhibit. I'll get you a copy, counsel for Merck. We'll mark it as the next exhibit number.

- - -

(Whereupon, Deposition Exhibit Topol-10, "Raising a Cautionary Flag about COX-2 Use in High-Risk Heart Patients," Cleveland Clinic Heart Center (2 pages), was marked for identification.)

Overruled

Page 168

- - -

BY MR. KLINE:

Q. And I'm going to ask you to identify it.

A. Yes. This is from the Cleveland Clinic Heart Center website.

Q. Right.

Having said what you've just told us, that there weren't adequate warnings on the drug, were you at least going to tell your patients certain things about the drug?

MR. GOLDMAN: Objection.

THE WITNESS: Yes.

BY MR. KLINE:

Q. As you understood it?

MR. GOLDMAN: Objection.

THE WITNESS: Well, this could be for patients or it could be for physicians, anyone who comes to the website. It's a public access website. So, it was anyone who wanted to go to the Cleveland Clinic Heart Center

Page 169

website would see our take and our further recommendations from the recent JAMA paper.

BY MR. KLINE:

Q. Is the information that's contained here, including, "Both researchers call for prudent use of COX-2 inhibitors among coronary patients until the potential risk can be fully addressed in prospective randomized multicenter trials," was that your advice to anyone who came to the website to read it?

MR. GOLDMAN: Objection.

THE WITNESS: Yes.

BY MR. KLINE:

Q. Was that being told to people by Merck in their label?

A. No.

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. "We'd like to see a study of patients at the highest cardiovascular risks in which they get either a combination of one of the coxibs and

Overruled

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

-FRE 602: Testimony re need for additional studies is speculative and lacking in foundation.

Pls response: Witness is a cardiologist and clinical trial and drug development expert. He has unique experience in the field of cardiology and drug development and can testify to when drug studies are appropriate.

Page 170

aspirin or aspirin alone, says Dr. Topol."

Is that a statement that's yours and fairly attributed to you?

MR. GOLDMAN: Objection.

THE WITNESS: Yes, it is.

BY MR. KLINE:

Q. "We think the aspirin and coxib combination would provide anti-platelet protection, and it may be even more protective than aspirin alone. But it could be worse, and that's what we need to find out." That's what you were telling people posted on the website of the Cleveland Clinic?

MR. GOLDMAN: Objection.

THE WITNESS: That's correct.

BY MR. KLINE:

Q. Dr. Nissen, your colleague, added, "It wouldn't be a hard trial to do." We can get "a study of 6,000 patients, and reach enrollment goals in as little as six months."

Page 171

Did Merck do that study?

A. No. That trial was not done.

Q. Should it have been done?

MR. GOLDMAN: Objection.

THE WITNESS: Any trial would have been helpful, but no trial was done.

BY MR. KLINE:

Q. Did you have to take it upon yourself to warn patients yourself without the adequate warnings that were being given by Merck, sir?

MR. GOLDMAN: Objection.

THE WITNESS: The website was one way in which we put our concerns out there beyond what was published in the medical literature.

BY MR. KLINE:

Q. I'd like to move in the period from -- move forward into the year 2002/2003/2004.

You wrote an editorial which

Page 172

was published in the Archives of Internal Medicine, December of '02, and apparently there were three or so articles that were funded by Merck -- I think you'll put this in context -- that were funded by Merck which were attempting to show the cardioprotective effects of naproxen.

If I've stated that wrong, I'm just trying to get through a lot with one simple concept. Is that what was going on and what you were responding to?

MR. GOLDMAN: Objection.

THE WITNESS: I'm not sure what you're referring to. Is it one of the publications that I've written?

BY MR. KLINE:

Q. Let me withdraw this and I'll go back.

I'm looking for a document, which I'll show you, which was December of '02, "Lack of Cardioprotective Effect of Naproxen," written by you.

A. Okay. Yes, yes.

Page 173

Q. (Handing over document.)

Put it in context. Now I won't get an objection to the question if I just say put this in context, sir.

A. Yes.

(Witness reviewing document.)

MR. KLINE: I've marked it as Exhibit Number 11.

- - -

(Whereupon, Deposition Exhibit Topol-11, "Lack of Cardioprotective Effect of Naproxen," Arch Intern Med/Vol 162, Dec 9/23, 2002 2637, was marked for identification.)

- - -

BY MR. KLINE:

Q. It says, "In summary, there remains currently no definitive evidence that naproxen has a cardioprotective effect." What were you responding to there?

A. So, there were three studies

Overruled

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

- Violates Court's Ruling - [illegible] relies on a 2002 epi[illegible] and two animal studies from 8/01 and 2002, all of which post-date Irvin's death
- 602/702 - Testimony re "things Merck tried to do to make a case for cardioprotective effect of naproxen" lacks foundation and improperly characterizes Merck's conduct

Page 174

in the archives that were published and an editorial. We were responding to that, that still there was no adequate data to show that naproxen has any cardioprotective effect, and that still remains the case today.

MR. GOLDMAN: Objection.

~~BY MR. KLINE:~~

Q. Sir, in the VIGOR study --

MR. GOLDMAN: Move to strike.

BY MR. KLINE:

Q. One thing I have not -- I haven't testified to --

MR. KLINE: Mr. Goldman, if you would just state your --

MR. GOLDMAN: Objection. Move to strike as nonresponsive.

MR. KLINE: Say it out loud anymore, because that way I can hear it. No sense hiding it.

MR. GOLDMAN: I'm not hiding it, Mr. Kline. I really don't want you to argue to the judge

Page 175

that you couldn't hear my objections. Okay?

MR. KLINE: I'm not going to argue that up until this point, but now I want to hear it, because I want to know what's said at this point.

What I find disruptive, honestly, is the talking, the whispering. I just find it disruptive. I'm not -- I'm just saying it is.

BY MR. KLINE:

Q. Now, let's move -- I lost my train of thought, so bear with me.

We were talking about naproxen and this whole thing, its cardioprotective effect. In VIGOR, Merck had made the point, as you well know, that they had no long-term randomized clinical trial to show that naproxen was cardioprotective. We've covered that point; correct?

MR. GOLDMAN: Objection.

Page 176

THE WITNESS: Yes, yes.

BY MR. KLINE:

Q. I'm just putting it in context.

A. No. There are no data to support in any definitive fashion or meaningful way that naproxen has a ~~cardioprotective effect.~~

Q. And what they did in the VIGOR paper was they went to comparing it to a flurbiprofen article which was done in some post-CABG patients, I believe, if you recall. How did you view that?

A. Well, there were several things that were done to try to make a case for a cardioprotective effect.

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. Tell me what things Merck tried to do to make a case for cardioprotective effect of naproxen.

MR. GOLDMAN: Objection.

THE WITNESS: Quoting the platelet biology effects of

Page 177

naproxen compared with other nonsteroidal anti-inflammatory drugs, other comparisons, but these were not randomized trials with clinical cardiovascular endpoints. So, there's no way to ascertain whether there's any cardioprotective effect with naproxen.

BY MR. KLINE:

Q. And, therefore, when you were writing here that "lack of cardioprotective effect of naproxen," were you saying that there was definitely no at all cardioprotective effect, or were you saying that a cardioprotective effect of naproxen could not explain the results in VIGOR?

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. Or something else?

MR. GOLDMAN: Objection.

THE WITNESS: No. It was the latter. That if there was a

Π's response:
- These studies refer to causation and to reasonableness of a Naproxen hypothesis which is not a time dependent inquiry

Overruled

Leading

Π overruled

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Overruled

cardioprotective effect, it was modest at best, and it could not explain the five-fold increase in heart attacks in the VIGOR trial.

BY MR. KLINE:

Q. Okay.

Now came the year 2003. ~~What was roughly going on?~~

A. Well --

MR. GOLDMAN: Objection. I'm sorry, Dr. Topol. Objection.

THE WITNESS: By 2003, now we had several of these so-called epidemiologic or observational studies. These were case-control studies, multiple studies in large populations published in various journals. And in these studies, there were, by 2003, I think probably five of them, four of which showed very concerning evidence of -- confirming our initial paper in JAMA, but not in a randomized trial like VIGOR,

but, rather, in these population studies, twofold or greater risk of Vioxx compared with other agents to be used for arthritis.

MR. GOLDMAN: Objection, move to strike as nonresponsive.

BY MR. KLINE:

Q. And by the fall of that year, actually, you have a paper that was received September '02; revisions, October '03; accepted '04 and published October 28, '02, so, it's late '02.

You actually wrote an article which said, "Where are we in 2003?" You actually -- it was an October 2002 publication that's projecting forward to 2003; correct?

MR. GOLDMAN: Objection.

THE WITNESS: Right.

BY MR. KLINE:

Q. Correct?

A. Right.

Q. So, if it would really be technically described, it would be, where

are we as of October 28, 2002?

A. That's correct.

Q. You already had New Year's planned for apparently; correct?

A. That's correct.

Q. And I want to look at that article with you so that you can tell the ~~members of the jury where you saw this~~ Vioxx situation as of that time.

A. Yes.

Q. And by the way, while we're getting the paper out and marked, we're marking it as the next exhibit number, which is Number 12, were you still concerned?

MR. GOLDMAN: Objection.

THE WITNESS: Our concern never went away, so, yes, just as in 2001 -- it actually got reinforced over time because of the other studies that I mentioned.

BY MR. KLINE:

Q. Now, what you --

- - -

(Whereupon, Deposition Exhibit Topol-12, "Cyclooxygenase-2: Where are we in 2003? Cardiovascular risk and COX-2 inhibitors," (Mukherjee et al), Arthritis Research and Therapy 2003, Vol. 5, 8-11, was marked for identification.)

- - -

MR. GOLDMAN: Mr. Kline, I didn't get a chance to insert my objection because the document was being handed to me. So, objection to the last question.

BY MR. KLINE:

Q. What you we stated here is in the second paragraph, "Given the results of several large clinical trials of COX-2 inhibitors, it is clear that theoretical concern for a prothrombotic effect is now transformed to a clinical reality."

A. Yes.

405d92cd-4d3a-489f-87d2-231e3a1c3f6f

MR. GOLDMAN: Where are you?
BY MR. KLINE:
Q. We are under "Conclusions," in the first sentence of the second paragraph saying, "Given the results of several large clinical trials of COX-2 inhibitors, it is clear that the theoretical concern for a prothrombotic effect is now transformed to a clinical reality."
Indeed it was; correct?
MR. GOLDMAN: Objection.
THE WITNESS: There is no question that we, at this point -- we had had adequate replication through multiple studies, and so this is a reality, yes.
BY MR. KLINE:
Q. You said, "The apparent hazard does not appear to be large and, in absolute terms, may be a fraction of 1 percent excess and may be confined to patients with an as yet undefined, specific genetic susceptibility. With

such an exceptionally large patient population at risk, however, it is imperative to determine the precise extent of the risk and the methods to avoid risk."
That's what you were after; is that correct?
MR. GOLDMAN: Objection.
THE WITNESS: Yeah, we -- this is exactly the theme for multiple years. In fact, we were underestimating the risk of less than 1 percent. It turned out, of course, it was more than 1 percent, but this is what -- we were trying to come up with the best way to process the data as of that point in time.
MR. GOLDMAN: Objection, move to strike as nonresponsive.
BY MR. KLINE:
Q. You then wrote, "The importance of the public health issue cannot be overstated. The class of

drugs...yet to be assessed in a single trial of patients with known atherosclerotic disease, who stand to be at the highest risk of adverse events."
Is that the nub of the problem?
MR. GOLDMAN: Objection.
THE WITNESS: That's a big --
MR. GOLDMAN: Dr. Topol, just give me one minute. Objection.
BY MR. KLINE:
Q. Please, sir.
A. I'm sorry.
That's a big part of it, because it already is a significant risk in people without heart disease. What's going to happen if you have heart disease? So, all the problems that have been registered and replicated are potentially magnified in a higher risk population.
Q. Now, you became interested

in something that I'm going to get into in the next article and wrote on in the medical literature, which is that you state here, "Ironically, the manufacturers of the first generation COX-2 inhibitors" -- that includes Merck; correct?
MR. GOLDMAN: Are you looking at a particular document?
MR. KLINE: I'm looking at the last sentence on the bottom of the first column of page -- of the last page of the exhibit.
BY MR. KLINE:
Q. "Ironically, the manufacturers of the first generation COX-2 inhibitors spent over $265 million in 2001 for direct-to-consumer advertising to promote their drugs, but have failed to conduct a prospective trial of COX-2 inhibitors in patients with cardiovascular disease." We have not -- "We will not have advanced in any meaningful way in 2003 unless such a

405d92cd-4d3a-489f-87d2-231e3a1c3f6f

trial is undertaken."

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. Couple of questions.

Are those words that you wrote?

MR. GOLDMAN: Objection.

THE WITNESS: They're absolutely words that I wrote, yes.

BY MR. KLINE:

Q. And did you take the time to actually look and find out what the manufacturers, including Merck, were spending advertising the drug?

MR. GOLDMAN: Objection, lacks foundation.

THE WITNESS: Yes, we did research the data for how much the direct-to-consumer advertising was costing for both Celebrex and Vioxx.

BY MR. KLINE:

Q. And were you asking for the

same thing, for Merck to do a cardiovascular endpoint study?

A. Yes, we were.

Q. And was it done?

A. No, it was not.

Q. And should it have been done?

MR. GOLDMAN: Objection.

THE WITNESS: Absolutely it should have been done.

BY MR. KLINE:

Q. Now, I want -- you actually wrote later an article called, "Pharmaceutical advertising versus research spending: Are profits more important than patients?" Did you write that?

A. Yes.

Q. Were you becoming increasingly more frustrated, Dr. Topol?

MR. GOLDMAN: Objection.

- - -

(Whereupon, Deposition Exhibit Topol-13, "Pharmaceutical

advertising versus research spending: Are profits more important than patients? (Mukherjee et al) American Heart Journal, October 2003, 563-564, was marked for identification.)

- - -

BY MR. KLINE:

Q. Exhibit 13.

A. The frustration level was clearly rising over time, yes.

Q. And in this particular editorial, which you published -- where did you publish it, sir?

A. American Heart Journal.

Q. American Heart Journal.

Is that a major journal, peer-reviewed journal?

A. It's one of the four leading heart journals in the United States.

Q. You state here, sir, "We would like to call on the leaders" -- I'm in the last paragraph of the article.

"We would like to call on

the leaders of the medical community to voice their concern regarding the adverse effects of direct-to-consumer advertising, whose sole aim is to sell drugs without other considerations."

Did you write that?

MR. GOLDMAN: Objection, and lacks --

THE WITNESS: Yes, sir, I did write that.

BY MR. KLINE:

Q. Were you thinking of Vioxx and Merck when you stated that?

MR. GOLDMAN: Objection.

THE WITNESS: There isn't any question. In fact, in the figure of that article, we showed how Vioxx had $160 million of advertising in the year compared to Budweiser, 140 odd and Pepsi, 125 million, and Nike, 70 million.

So, in fact, Vioxx exceeded all these consumer products in that very year that we looked at.

MR. GOLDMAN: Objection, move to strike as nonresponsive.
BY MR. KLINE:
Q. You're referring to Figure 1, which will be displayed, where you compare the amount of money that was being spent by Vioxx -- by Merck to do this.
You're an academic cardiologist. Let me understand this. What takes you to the -- what takes you to analyze something like this? Why are you doing it and why are you saying this to your colleagues?
A. Well --
MR. GOLDMAN: Objection.
THE WITNESS: -- there's many reasons. Firstly, our patients come in, my patients come and see me and they say, Doctor, I saw the commercial on the Vioxx or the Celebrex, I would like that medicine. That looks like a good medicine.

Or I watch television sometimes, and I might see the advertisement and say, that's concerning, because here we have registered our concerns about heart attack risk, and there's nothing on television to transmit that.
And beyond all those, it's the idea that we are responsible for public health. I mean, that's what medical research is about, is to improve public health, and here we're trying to prevent heart attacks and we've got this countercurrent, this stream of marked promotion, aggressive promotion of a medicine with an unsure safety profile.
In fact, we've moved -- migrated from unsure to pretty darn sure that it's unsafe, at least in some patients. So, that is a recipe for trouble.

BY MR. KLINE:
Q. Were you, sir --
MR. GOLDMAN: Objection, move to strike as nonresponsive.
BY MR. KLINE:
Q. Were you, sir, back here, sitting here in the position as the chairman of the department of cardiovascular medicine of the Cleveland Clinic and the Provost of the Cleveland Clinic and the chief academic officer here, were you here saying to yourself or worried that direct-to-consumer advertising was having an effect on the health and safety of patients when they were taking the drug Vioxx?
MR. GOLDMAN: Objection.
THE WITNESS: Yes. That back in '97 was when the laws were changed to allow for direct-to-consumer advertising, and so essentially the COX-2 era, the COX-2 inhibitor era, these new medicines, Celebrex and Vioxx,

were really the first medicines launched in the direct-to-consumer advertising new era.
And the concern there is how many millions of people could rapidly take a medicine without an adequately established safety profile.
BY MR. KLINE:
Q. You said here, "Editors of major cardiology journals." That at one time was you; correct? Have you been an editor of a major cardiology journal?
A. Not one of the top journals.
Q. I see.
So, you were saying, "Editors of major cardiology journals also need to be more cognizant of the effects of publishing biased literature, since this may significantly influence the prescribing habits of practicing physicians."
Did you make that statement?
MR. GOLDMAN: Objection.

405d82cd-4d0a-489f-87d2-231a3a1c3f6f

Page 194

THE WITNESS: Yes.
MR. GOLDMAN: Objection.
BY MR. KLINE:
Q. Was the literature published, in particular, the Vioxx VIGOR trial as published by Merck, biased literature?
MR. GOLDMAN: Objection.
THE WITNESS: I believe there was considerable biased literature that was published with authors either for Merck or consultants of Merck.
BY MR. KLINE:
Q. Finally moving ahead, there is a comment that you had in the Lancet. Lancet is a British journal?
A. Yes.
Q. And of the highest caliber; correct?
A. Yes. It's one of the top three medical journals, the New England Journal, JAMA and the Lancet, yes.
Q. Those are the three?

Page 195

A. Yes.
Q. And you wrote an article called, "A coxib a day won't keep the doctor away"?
A. Yes.
MR. KLINE: I marked it as Exhibit Number 14.
- - -
(Whereupon, Deposition Exhibit Topol-14, "A coxib a day won't keep the doctor away," (Topol, et al), The Lancet Vol 364, August 21, 2004, 639-640, was marked for identification.)
- - -
THE WITNESS: Yes.
BY MR. KLINE:
Q. I want to look on Page 2. There's a lot here, but I want to particularly talk about Page 2, all the way at the bottom of the column, after footnote 18 where you reach a conclusion. And you say, "The continued commercial availability of rofecoxib, without a

Page 196

black-box warning for cardiovascular patients is indeed troubling. The coxib debate will not go away until safety and efficacy questions are answered; if only a small fraction of the direct-to-consumer advertising costs or revenue were appropriately channeled for clinical trials, we might be able to have an enhanced perspective and make sound recommendations for our patients."
MR. GOLDMAN: Objection.
BY MR. KLINE:
Q. Did you write that?
MR. GOLDMAN: Objection.
THE WITNESS: Yes, absolutely I wrote that. I wrote that with Dr. Gary Falk, who is here as a colleague at Cleveland Clinic.
BY MR. KLINE:
Q. Okay.
Sir, when you did that, were you talking about Merck and their conduct in particular on the drug Vioxx?

Page 197

MR. GOLDMAN: Objection.
THE WITNESS: Yes.
BY MR. KLINE:
Q. And you did believe at that time that the drug needed a black box warning; correct?
MR. GOLDMAN: Objection.
THE WITNESS: Yes. We're now in August of 2004 publishing this.
BY MR. KLINE:
Q. Yes, sir.
A. And the extraordinary amount of evidence, not just from VIGOR, but from various other trials and studies, was really quite excessive in my opinion, and that's why the black box warning was long overdue in August 2004.
Q. Do you have a sense of when it was due by?
MR. GOLDMAN: Objection.
THE WITNESS: It could have easily been imposed as of February 2001, or if we go back to the Juni

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Overruled

- Violates Court's Order: pertains to Topol's 8/04 opinions which post-date Irvin's death
- 702: Topol is not qualified to testify re warnings and regulation

π's response: This is not his 2004 opinion, but an opinion he held from VIGOR and from "various other trials" virtually all of which were available to Merck before π's death

π's Additional response - As a expert in drug development and clinical trial presentation he can testify as to black box which was published in the peer-reviewed literature (Lancet)

- 402/403/602: testimony re Merck "PR attacks" is speculative, irrelevant, and unfairly prejudicial

T's response: Testimony concerning Juni article is relevant because it analyzes all clinical trial data that existed before Mr. Irvin's death and were available to Merck. In fact, the point of the article is the fact that the information first being reported by Juni was available to Merck years before T's death.

- As an author who published on Vioxx and who was a peer reviewer for the Juni article, Dr. Topol possesses unique first-hand knowledge of Merck's response to unfavorable medical literature (i.e. PR text)

Overruled

Page 198

analysis in the Lancet, also published in the Lancet, it could have been back in year 2000. So, somewhere between 2000 and 2001 there was more than adequate confirmation.

Essentially all you need is ~~VIGOR and study 090 together, and~~ I could take you through the Juni analysis in the Lancet, but that basically crosses the line for proven hazard of heart attacks.

BY MR. KLINE:

Q. Did you observe any pattern of conduct by Merck every time or any time an investigator like yourself or Juni did a critical analysis and questioned the safety of the drug Vioxx?

MR. GOLDMAN: Objection.

THE WITNESS: Each time we published a paper or a study was also published by other investigators questioning the safety of Vioxx, there would be

Page 199

immediately a PR attack on the report. Merck would refute the findings and/or they would have consultants of theirs refute the findings. So, there was a published and then anti force that would occur without any question.

BY MR. KLINE:

Q. Juni article, when it was published, first of all, where was it published?

A. The Juni article was published in November of 2004 in the Lancet.

Q. And who was Juni?

A. Juni, I don't know him, I've never met him, but he's a very highly regarded investigator in Europe out of Switzerland. Peter Juni and colleagues, and they published, I think, quite an important cumulative meta-analysis, where they just looked at the data as it was coming out. And I think that's a very important figure to go at, to look at. I

Page 200

believe it's Figure 2 or Figure 3 in that paper, if we can.

Q. Yes. I actually was trying to get it in front of us. I didn't have my copy handy, but let's see if we can find it.

MR. KLINE: Let's go off the ~~record for a minute.~~

THE VIDEOTAPE TECHNICIAN: Off the record, 11:55.

- - -

(Whereupon, a recess was taken from 11:55 a.m. until 11:58 a.m.)

- - -

THE VIDEOTAPE TECHNICIAN: Back on the record, 11:58.

BY MR. KLINE:

Q. I wanted to find out what you believed was significant about the Juni article. You pointed us to --

MR. GOLDMAN: I'm sorry, are we on the record? Start over.

MR. KLINE: Are we back on

Page 201

the record?

THE VIDEOTAPE TECHNICIAN: Yes.

- - -

(Whereupon, Deposition Exhibit Topol-15, "Risk of cardiovascular events and rofecoxib: Cumulative meta-analysis," (Juni, et al) The Lancet, Vol. 364, December 4, 2004, 2021-2029, was marked for identification.)

- - -

BY MR. KLINE:

Q. I referred you to the Juni article as part of our continuing discussion. You mentioned that the Juni article contained a figure which is worthy of discussion, given the fact that that's what you believe is significant or part of the significant findings.

I assume you are referring to the figure which shows the relative risks of myocardial infarction based upon

Overruled

Overruled

Overruled

-Violates Court's Order: Testimony re Juni article, which post-dates Irvin's death, is impermissible

- 402/403/602/702: Commentary on what Juni analysis shows lacks foundation and is prejudicial as is testimony re Merck's alleged ... of Juni

- see objections at bottom of previous page; same apply here

Π's response: see prior page

many studies that had been done of the drug, clinical trials; is that correct?

MR. GOLDMAN: Objection.

THE WITNESS: I'm referring to Figure 3, which is the so-called cumulative meta-analysis, and what this does is each study as it's done, and these are all studies in patients with arthritis, each study as it's done is put in, and then as the next one comes in, it adds to that, adds to that. So, you have basically the readout of all the data cumulatively as it's being accrued in the various randomized trials of Vioxx. And what's interesting here is that up until 2000 in the first entry, there's 5,193 patients, which is about what was in at the time of the May '99 approval.

Then comes the VIGOR trial, which jumps from 5,193 patients to

13,269 patients. And you can see what happens here is that we're almost at a statistically significant two-fold excess of heart attacks and events.

But what is interesting is, the next addition is the 978 patients. That's study 090. And what happens with study 090 is that now we have truly statistically crossed the line, and now no longer are the confidence limits spanning or crossing the line of identity.

So, now, if one were to ask when should the drug have not been either on the market or should have been a black box warning because of definitive risks, the Juni meta-analysis answers that, because once you have VIGOR and 090, statistically it's proven, without any question, from this analysis.

overruled

MR. GOLDMAN: Objection, move to strike, nonresponsive opinion testimony.

BY MR. KLINE:

Q. Now, this was published in the Lancet?

A. Yes, in November of 2004.

Q. So, not only could physicians see it, but Merck could see it as well; correct?

A. Yes.

Q. Okay.

Did they go about trashing Juni?

Improper and argumentative

Π's response: witness was not influenced by the question

MR. GOLDMAN: Objection.

THE WITNESS: As I mentioned earlier, every time a study was published, there was a vehement response to that to try to provide an antidote or a negation of the results, whether it was our study or whether it was other reports.

This would have been -- in this case, they said that Dr. Juni

and his colleagues didn't include the right trials, and they had all sorts of criticism that I believe was largely unfounded, and there was quite a bit of correspondence in the Lancet that followed this up subsequently.

overruled

BY MR. KLINE:

Q. I guess one thing that comes to mind, was Juni --

MR. GOLDMAN: Objection, move to strike, nonresponsive.

BY MR. KLINE:

Q. Was Juni independent of Merck, from what you knew?

A. Juni was, as best I know, fully independent of Merck.

Q. Now, the drug -- one day you woke up and found that Merck took the drug off the market; correct?

A. Yes. I think it'd be helpful to review that morning what happened.

Q. Tell me.

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

-402/403: Testimony re Topol's conversation with a colleague on the morning of the Vioxx withdrawal is irrelevant and would only confuse the jury.

π's response: An admission by the defendant or its agent that Dr. Topol is "right" is admissible and relevant to the central question.

Page 206

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. What happened the morning that you got up that Merck took the drug off the market?

MR. GOLDMAN: Objection.

THE WITNESS: On September 30, 2004, just over a year ago, I came into work here at the clinic and, oh, somewhere about 8:30 in the morning, later after being here for a while, I got a call from Dr. Richard Pasternak. Dr. Pasternak, who I knew as a cardiologist and only recently had joined Merck, in fact, I didn't even know he joined Merck until that morning, was calling me somewhere between 8:30 and 9:00 to say that Merck is going to withdraw Vioxx from the market and that we, that is, the Cleveland Clinic team, was right.

And I said, well, Richard,

Page 207

can you tell me what were the data? What was the incidence of the APPROVe trial, which I didn't know much about APPROVe, the colon cancer, colon polyp trial, what were the data? And he did explain to me that it was 3.5 percent of heart attacks in the Vioxx arm and 2.6 -- let's see. I'm trying to remember the numbers now. Excuse me. It was 1.6 excess. So, it was 1.9 and 3.5. So, 1.9 percent heart attacks in the placebo arm and 3.5 percent heart attacks in the APPROVe Vioxx arm.

And he said, we decided to take the drug off the market and that our work had been prescient, that is, work back three, four years ago.

BY MR. KLINE:

Q. This is someone from Merck?

A. Yes. I hadn't heard from anyone from Merck in quite a long time.

Page 208

So, that morning I got a phone call from Dr. Pasternak.

Q: And did I hear your words that he said to you that the Cleveland Clinic was right and Merck was wrong?

MR. GOLDMAN: Objection.

THE WITNESS: He didn't say that Merck was wrong. He said, you got it right or you were right, something like that. He was being supportive. And he had been an acquaintance and friend for some time, and I believe he only, at that point, had only, within weeks or very recently had

BY MR. KLINE:

Q. What was your next involvement? Tell me the story as it progressed through your eyes.

MR. GOLDMAN: Objection.

THE WITNESS: Well, as the day unfolded, in some ways it was kind of like a nightmare coming

Page 209

true. Who would want to be right about this? Why would we want to be right that the heart attacks were being engendered by a medicine? All we wanted were trials to be done and get to the definitive story here. We didn't want there to be -- this type of thing to occur, not by any means. But what then started to happen was, the same type of what I viewed as unacceptable publicity about Vioxx was now being disseminated, and this was quite disconcerting, to say the least.

BY MR. KLINE:

Q. What are you referring to, sir?

MR. GOLDMAN: Objection, move to strike nonresponsive opinion testimony.

BY MR. KLINE:

Q. Dr. Topol, what are you referring to?

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 210

A. Well, what was being done here is to say, number one, that this was the first time that the company was ever aware of the heart attack risk.
Q. You're referring to Merck's press release?
A. Yes. That, in fact, that the problems with this drug had never been seen against placebo --
MR. GOLDMAN: Objection to last question.
THE WITNESS: -- or other non-steroidals, only naproxen, which is untrue.
BY MR. KLINE:
Q. Sir, I didn't focus, and I apologize.
What was the second thing you said?
A. The second point was that they made the claims on that day of withdrawal and subsequently that they had never seen a problem with Vioxx in any trial except against naproxen.

Page 211

And that was not true, because in study 090, which was never published, as I've already reviewed, there was a significant 760 percent excess, which somehow or another has been forgotten about.
Now, beyond that, they also used numbers that were not being communicated adequately to the public. So, instead of saying 3. -- 1. -- what's the number? 1.5 percent and 3. -- let's see, 1.9 and 3.5 percent, that is -- I can't write it down because I'm not allowed to have any numbers here in front of me. But instead of saying what the numbers really were in APPROVe, so that the public would know there was a 1.6 per 100 or 16 per thousand, no, no, the numbers that were communicated, like in the New York Times that day, were .75 and 1.5 per thousand patient years.
And reporters, journalists, could not understand those numbers and thought the excess was a fraction of what

Page 212

it really was.
Q. Did that disturb you?
A. Yes, it disturbed me, because I spoke to the journalist that day. Virtually all of them called of the major newspapers, Gina Colata -- Barbara Martinez of the Wall Street Journal, Gina Colata of the New York Times and various others, and they said well, there's not very much difference. I said, wait a minute, I talked to Dr. Pasternak. Because they said, well, where did you get your information? This morning. And the numbers I have suggest a 1.6 per hundred or 16 per thousand excess of heart attacks, which is very different.
MR. GOLDMAN: I tried to make an objection before. I object to that last answer as nonresponsive. It calls for opinion testimony, and the previous answer, too.
Okay, Tom?
MR. KLINE: Yes. Not that

Page 213

you -- just to the fact that you have objected, and they're preserved.
BY MR. KLINE:
Q. Are you saying that the effect here was to distort the data so that it would be both difficult to understand and it would lessen the true impact and nature of the problem?
MR. GOLDMAN: Objection.
THE WITNESS: That's an adequate summary of how I felt that day, yes.
MR. KLINE: All right.
Let's take just a brief break, like two to three minutes.
THE VIDEOTAPE TECHNICIAN: Off the record at 12:08.
- - -
(Whereupon, a recess was taken from 12:08 p.m. until 12:18 p.m.)
- - -
THE VIDEOTAPE TECHNICIAN:

405d92cd-4d0a-489f-87d2-231e3a1c3f5f

* - Violates Court Order — Prohibits ... [illegible] 2005, after Irvin's death. π's response: Misinterpretation of court's order - general evidence of causation (including post-death studies) are relevant

ENTIRE PAGE

Page 214

Back on the record at 12:18. Tape Number 3.

BY MR. KLINE:

Q. Dr. Topol, thanks for hanging in there. We're now in the third hour of examination on the subject.

One thing that Merck said from the APPROVe study was that there was an increased risk after 18 months. Do you recall that claim?

A. Yes.

Q. How did you see that in the context of the full picture of the articles?

MR. GOLDMAN: Objection.

THE WITNESS: This was another extremely concerning part of that dissemination on the day of withdrawal, that it took 18 months for there to be any risk, because that's not true.

In fact, as I reviewed earlier in this deposition, there were four trials that showed that

Page 215

the timeline for that was considerably quicker. In VIGOR, with four to six weeks, there was separation. In ADVANTAGE, within 12 weeks. In VICTOR, this was immediate. And in study 090, within six weeks.

And in all of these trials, there were no heart disease patients. So, it could have been much worse than -- in the days or weeks. And beyond all that, there's the issue of a problem of statistical power, that is, you have to do a very large trial if you're not expecting adequate number of events, and so none of the trials were adequately powered from a time perspective.

But, given all those things, that is, statistical power, lack of cardiovascular patients, and four randomized trials, in addition to the Juni analysis,

Page 216

there's a pretty strong case that the risk of Vioxx for heart attacks can occur at any time after the initiation of the medicine.

MR. GOLDMAN: Objection, move to strike, nonresponsive, opinion.

BY MR. KLINE:

Q. What you've stated to us is your conclusion, based on your review of all of the information which you cited; is that correct?

MR. GOLDMAN: Objection.

THE WITNESS: Yes.

BY MR. KLINE:

Q. By that time or by the time -- by today, by today there were studies done by -- let's see, there was a study done by Ray, correct, in Lancet, in '02, the Ray study?

A. Yes.

Q. I'm talking epidemiology studies.

Page 217

A. There were two Ray studies in the Lancet.

Q. Did that show an increased risk of heart attacks?

MR. GOLDMAN: Objection.

THE WITNESS: Yes.

BY MR. KLINE:

Q. There was a study by Solomon in Circulation in 2004. I'm talking just the epidemiological studies. Did that show an increased risk of heart attacks?

MR. GOLDMAN: Objection.

THE WITNESS: Yes.

BY MR. KLINE:

Q. There was a study by Graham in Lancet in 2005, which we'll get to. Did that show an increased risk of heart attacks?

MR. GOLDMAN: Objection.

THE WITNESS: Yes.

BY MR. KLINE:

Q. There was a study by Kimmel in the Annals of Internal Medicine published, I'm not sure when. Did that

Leading — Leading — Leading — Leading — Leading

π's response: Counsel is properly orienting the witness

Overruled — Overruled

- see objection at top of previous page; same applies here —

Π's response: counsel is properly orienting the witness.

show an increased risk of heart attacks?
MR. GOLDMAN: Objection.
THE WITNESS: Yes.
BY MR. KLINE:
Q. There was a study by Levesque, L-E-V-E-S-Q-U-E. Did that show an increased risk of heart attacks?

Leading

MR. GOLDMAN: Objection.
THE WITNESS: Yes.
BY MR. KLINE:
Q. Now, I'd like to go back to VIGOR because I didn't cover this, and I think it's essential.
In VIGOR, you have a series of criticisms of VIGOR about the data and about -- and I had that in the memo that you wrote to Graham originally. You cited scientific misconduct in the VIGOR trial, and I think I glossed over this, and I don't want to miss it.
You said there were errors of omissions --
MR. GOLDMAN: Do you have a document?

Overruled

MR. KLINE: I'm back to the Graham thing, which is Exhibit 2.
BY MR. KLINE:
Q. You said there were "errors of omission (deaths)." Please explain. You're talking about what Merck did that constituted scientific misconduct. That's the point I'm at.
MR. GOLDMAN: Objection, and can I have the same standing objection about this document that I had before?
MR. KLINE: Yes.
BY MR. KLINE:
Q. Scientific misconduct in VIGOR by Merck. First of all, you said there were "errors of omission." Please explain concisely.
MR. GOLDMAN: Objection.
THE WITNESS: I summarized this in the letter in the New England Journal, which goes through the VIGOR correct data, as compared to the data that was in

the manuscript from November of 2000.
BY MR. KLINE:
Q. Is that a good place to go to find it?
MR. GOLDMAN: Objection.
THE WITNESS: I really believe you should get this document to look at --
BY MR. KLINE:
Q. Let's.
A. -- because together we can take you through this quickly.
Q. Fine.
Let's look at the New England Journal of Medicine editorial.
A. No, letter.
Q. I'm sorry, letter.
A. December 30, 2004.
Q. December 30, 2004.
A. Right. It's a correspondence based on the editorial.
Q. Okay.
Let me get that in my hand.

Overruled

We have it.
A. Good.
Q. How many articles and editorials have you published in the medical literature, Dr. Topol, relating to the Vioxx and the COX-2s?
A. There have been 16 articles and editorials published.
Q. And what you've done in those is to put your views out in front of the medical world at large to let them know what you're thinking?
MR. GOLDMAN: Objection.
THE WITNESS: Yes. And a few of those were actually directed to the lay public.
BY MR. KLINE:
Q. Okay.
Do you have the reply in front of you?
A. Yes.
Q. All right.
Now, my purpose is to go through your criticisms of the VIGOR

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

-Violates Court's Order pertaining to studies and articles that post-date Irvin's death

Π's response: These studies pertain to general causation.

-602/702/802 - Testimony re conversations with NEJM editors is improper. If Topol is a lay witness, the testimony is improper; if he is an expert, he may not relate the substance of what he learned from the NEJM.

Leading and argumentative question.

Π's response: Expert can properly testify to information communicated to him by the witness.

Overruled

Overruled

Page 222

trial and what you think Merck did that constitutes scientific misconduct. Can you do so, sir?

MR. GOLDMAN: Objection.

THE WITNESS: Yes.

BY MR. KLINE:

Q. Please.

MR. GOLDMAN: Objection.

THE WITNESS: Okay.

So, what I cited here in this correspondence is how the article in the New England Journal -- this goes back to what we discussed earlier today, which is when the paper was published in November 2000 as compared to the FDA documents that we have a chance to review in February of 2001, there was -- there were gross discrepancies, which is why we had contacted Merck in the first place about this manuscript.

Then, finally, we had the ability to work with the New

Page 223

England Journal of Medicine editors, Dr. Curfman, Dr. Drazen, and to figure out what was going on.

Now, as it turns out, in the VIGOR manuscript, in the New England Journal in 2000, in three times in the paper, this is first authored by Bombardier, and three times it says that the mortality was the same between naproxen and Vioxx. And that was untrue.

In fact, there was a 46 percent difference. There were 22 deaths in the Vioxx arm versus 15 deaths in the naproxen arm. And so instead of presenting the deaths as they should, the authors only used percentages, rounded them off, but moreover, they asserted strongly in three different places that the mortality was the same. So, that's issue number one.

Page 224

Issue number two with that manuscript --

BY MR. KLINE:

Q. Before you get to issue number two, if you remember, how do you view that conduct? What word would you use to describe it?

MR. GOLDMAN: Objection.

THE WITNESS: We're talking about deaths, and we're talking about false assurances that the mortality was the same in three prominent places in the manuscript.

BY MR. KLINE:

Q. Outrageous?

MR. GOLDMAN: Objection.

THE WITNESS: I believe it's highly misleading.

BY MR. KLINE:

Q. Go ahead.

A. The second issue was the false data regarding heart attacks. So, instead of a five-fold increase, which we

Page 225

know is true at the bare minimum, because there wasn't the right adjudication in this trial as we learned and I reviewed earlier from the Targum report, but now we're talking about that the authors knew the correct number of heart attacks.

They could have fixed the galley proofs, and this is told to me by the editors of the New England Journal, but they decided to give the correct numbers in the published New England Journal paper. So, they had a four-fold increase in heart attacks rather than a five-fold increase in heart attacks.

And that is erroneous, and that appears to be, best I can reconstruct with the New England Journal editors, an error of commission.

MR. GOLDMAN: Objection, move to strike as nonresponsive.

BY MR. KLINE:

Q. And the third?

A. The third is, rather than report any of the other clotting events.

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

- see objections previous page; same applies here

- 402/403 - Topol's personal opinions on risk/benefit analysis are irrelevant and unfairly prejudicial

Pl's response: Dr. Topol is expressing an opinion he expressed in the peer reviewed literature, further, as one of the world's leading cardiologists and clinical trial experts he can clearly opine to risk/benefit particularly since his opinions were published in the peer-reviewed literature.

Page 226

like strokes, like transient ischemic attacks, like unstable angina, like peripheral arterial thrombosis, like venous thrombosis, like pulmonary embolism, none of these were reported in the New England Journal of Medicine paper.

Q. You also state on the top of a column on Page 2878 of your correspondence, which is now marked as exhibit --

MR. HAMELINE: 16.

- - -

(Whereupon, Deposition Exhibit Topol-16, "Rofecoxib, Merck, and the FDA," (Kim et al), N Engl J Med 351;27 December 30, 2004, 2875 - 2878, was marked for identification.)

- - -

BY MR. KLINE:

Q. -- 16, thank you.

You state here, something we talked about earlier, which is, "We

Page 227

indeed" -- top of the second column, 2878.

"We indeed acknowledged that naproxen may have a cardioprotective effect, but the magnitude of the effect would be unlikely to exceed that of aspirin, at a 25 percent reduction of heart attacks. Instead, in the VIGOR trial, there was a 500 percent increase in heart attacks. This makes any 'naproxen hypothesis' of cardioprotection mathematically indefensible." Correct? Your words?

MR. GOLDMAN: Objection and, Tom, I didn't get the chance to object to the previous answer.

MR. KLINE: You have the objection.

THE WITNESS: I wrote this. These are my words, absolutely.

BY MR. KLINE:

Q. And you said in this article or this correspondence, putting out there for the public, for the medical

Page 228

community, a little further down, "There were no differences in the rate of perforation (0.1 percent in...rofecoxib and naproxen groups)."

Your words, "It is hard to imagine that the small protection from gastric or duodenal ulcers in the VIGOR trial is an acceptable trade-off as compared with twice the incidence of death, heart attacks, and strokes."

Did you write those words?

MR. GOLDMAN: Objection.

THE WITNESS: Yes, I certainly did.

BY MR. KLINE:

Q. And were you doing a risk/benefit analysis there in your mind?

MR. GOLDMAN: Objection.

THE WITNESS: Yes.

BY MR. KLINE:

Q. And were you weighing the risk of pain medication versus the risk of dying from a disease that -- let me start again.

Page 229

Were you weighing the risk of pain relief versus death?

MR. GOLDMAN: Objection.

THE WITNESS: We were weighing -- I was weighing, when I wrote that statement, the risk of heart attacks principally versus the small protection from significant stomach complications.

BY MR. KLINE:

Q. Okay.

Let me move on. So much to cover.

The drug is withdrawn September 30th of 2004. You told me what happened when you knew then. You put paper to pen and you did an op/ed piece for the New York Times; correct?

A. That's correct.

Q. Couple of sentences. Why?

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. Why did you do that?

A. I was extremely upset by the

overruled

overruled

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 230

way this was being handled and the misinformation that was in the first 24 hours of the Vioxx withdrawal.

Q. Was it a reaction to Merck's public statements, which you've described and critiqued for the jury already?

A. Yes.

MR. GOLDMAN: Objection.

THE WITNESS: Yes, that, in fact, the word that this was the first time they had ever known that this was a problem and that the incidence not be reported in a responsible -- for the public fashion that they could understand and all the other things that we had already reviewed.

\- - -

(Whereupon, Deposition Exhibit Topol-17, "Good Riddance to a Bad Drug," (Topol) New York Times Reprint, October 2, 2004, (2 pages), was marked for identification.)

Page 231

\- - -

BY MR. KLINE:

Q. While you're testifying, we'll show this to the jury. It's a document which is entitled, "Good Riddance to a Bad Drug."

Let me start with this, sir, because I've seen this in your writings.

Was Vioxx and is Vioxx a dangerous drug?

MR. GOLDMAN: Objection.

THE WITNESS: Let me first start off by saying I didn't title this, New York Times op/ed. I learned, since this was the first op/ed I had in the New York Times, that you don't get a right to pick your title.

My title was "Vioxx Vanquished," but the editor of the New York Times of the op/ed picked this one, and I didn't know it until it was actually published.

BY MR. KLINE:

Page 232

Q. Did you approve it?

MR. GOLDMAN: Objection. I'm sorry. Objection, nonresponsive.

THE WITNESS: It was probably different than what I was trying to convey, because what I'm trying to convey in this op/ed is that Vioxx had a risk that had never been adequately defined, that overall it was unacceptable, that the whole class of COX-2 inhibitors was suspect, and that we can't tolerate this sort of situation where a medicine is being mass marketed, and it could induce tens of thousands of heart attacks and without the appropriate studies. So, the FDA is involved in this as well, in this op/ed.

So, there are many things, but alerting the public who read the New York Times about that it

Page 233

is not safe necessarily for any COX-2 inhibitor, which is in here, about naproxen and Aleve, Motrin, all these other possible alternatives, and some of the lessons that we need to learn from this, and most importantly was the statement that our two most common deadly diseases should not be caused by a drug.

MR. GOLDMAN: Objection, move to strike as nonresponsive.

BY MR. KLINE:

Q. Is that what you were trying to convey, what you just said?

A. Yes.

Q. And when you conveyed it, on the second page you listed two points and you say, "Second, and what may be more alarming, is that despite studies showing the magnitude of the public health problem, for several years Merck did nothing to investigate."

Is that the message you

405d92cd-4d0a-489f-87d2-751a3a1c3f6f

Page 234

wanted to convey as well?

MR. GOLDMAN: Objection.

THE WITNESS: That was a critical message that probably was conveyed innumerable times over these last five years.

BY MR. KLINE:

Q. You stated, "This surely represents a conflict between the interests of the public and the interests of a company with a blockbuster drug that had sales of 2.5 billion in 2003."

Did you write that in the -- for the New York Times?

MR. GOLDMAN: Objection.

THE WITNESS: Yes.

BY MR. KLINE:

Q. You stated, "At the same time, Merck spent at least $100 million a year for direct-to-consumer Vioxx advertising, while the company's employees and their consultants published several papers in medical journals rebutting studies reporting Vioxx's heart

Page 235

attack risk."

Did I read that correctly?

MR. GOLDMAN: Objection.

THE WITNESS: Yes, you did.

BY MR. KLINE:

Q. And you describe this as "the Vioxx debacle." Were those your words?

MR. GOLDMAN: Objection.

THE WITNESS: That is my phrase, "As the Vioxx debacle shows," yes.

BY MR. KLINE:

Q. You, later in 2004 in that Cleveland Clinic article, and I'm trying to put it in front of me, described this whole thing as the rofecoxib debacle, same language; correct?

MR. GOLDMAN: Objection.

THE WITNESS: Yes.

BY MR. KLINE:

Q. Now, let's move on.

You then move to publishing an editorial in the New England Journal

Page 236

of Medicine; correct?

A. Yes.

Q. Now, you've stated what you believe for the lay consumption. Now you're stating it in the medical literature; correct?

MR. GOLDMAN: Objection.

THE WITNESS: Yes. The New England Journal editors read my op/ed in the New York Times and called me that weekend on that Saturday.

BY MR. KLINE:

Q. They called you?

A. They called me at home and said, would you be kind enough to write an editorial for the medical community now that you've written one for the public? And I said I'd be happy to do that.

MR. GOLDMAN: I'll try to insert an objection to the last question.

MR. KLINE: Preserved.

Page 237

BY MR. KLINE:

Q. Continue.

Do you have anything else on that?

A. So, by the invitation of the New England Journal, I wrote this editorial that was posted on their website in early October, just days after the op/ed.

\- - -

(Whereupon, Deposition Exhibit Topol-18, "Failing the Public Health - Rofecoxib, Merck, and the FDA (Topol) N Engl J Med 351;17 October 21, 2004, 1707-1709, was marked for identification.)

\- - -

BY MR. KLINE:

Q. I want to run through a number of things. Let's try to tick them off as points. I just have to cover so much.

You talked about the fact

Page 238

that a trial was never done; correct?
MR. GOLDMAN: Objection.
THE WITNESS: Yes.
MR. GOLDMAN: Doctor, if you would please.
THE WITNESS: I'm sorry.
BY MR. KLINE:
Q. Meaning a large scale randomized study; correct?
MR. GOLDMAN: Objection.
THE WITNESS: Yes.
BY MR. KLINE:
Q. Just wait for him, he'll undoubtedly object, you'll then get to give your answer.
You then got to talk about the Merck message and how Merck conveyed a message that the drug was safe; correct?
MR. GOLDMAN: Objection.
THE WITNESS: Yes.
BY MR. KLINE:
Q. And you disapproved of that; correct?

Page 239

MR. GOLDMAN: Objection.
THE WITNESS: Yes.
BY MR. KLINE:
Q. On Page 1708 of the article, in the first full paragraph, you say, and we've covered this in a different form, you actually say it in print here, "Each time a study was presented or published, there was a predictable and repetitive response" by "Merck, which claimed that the study was flawed and that only randomized, controlled trials were suitable for determining whether there was any risk. But if Merck would not initiate an appropriate trial and the FDA did not ask them to do so, how would the truth ever be known?"
Was that your --
MR. GOLDMAN: Objection.
BY MR. KLINE:
Q. Was that your thinking at that point in time?
A. Yes.
MR. GOLDMAN: Objection.

Page 240

BY MR. KLINE:
Q. Is that still your thinking today?
MR. GOLDMAN: Objection.
THE WITNESS: Unquestionably.
- - -
(Whereupon, Deposition Exhibit Topol-19, "Risk of acute myocardial infarction and sudden cardiac death in patients treated with cyclo-oxygenase 2 selective and non-selective non-steroidal anti-inflammatory drugs..." (Graham, et al), The Lancet, Vol. 365, February 5, 2005, 475-481, was marked for identification.)
- - -
BY MR. KLINE:
Q. You then cited the Graham study. Now, I started this deposition by some discussion that you had with David Graham, who was at the FDA; correct?
A. Yes.

Page 241

MR. KLINE: Whoa, we had a question without an objection. Hallelujah.
BY MR. KLINE:
Q. And what did Graham conclude?
MR. GOLDMAN: Objection.
THE WITNESS: He concluded from a very large population study done with the Kaiser Foundation that there was a very high risk of heart attacks with Vioxx, especially in higher doses, but across the board compared to the other conventional nonsteroidal agents.
BY MR. KLINE:
Q. Were you in contact with Graham in the period of time in late 2004?
A. Yes. I had some phone discussions and a couple of e-mails back and forth in that time frame.
Q. From what you learned in

405d92cd-4d0a-489f-87d2-23...

- 402 / 802 - Conversations with Graham are based on hearsay.
- Violates Courts Order - testimony re studies published in late 2004 is improper.
- 602 / 403 - Testimony about Merck's alleged pressure on scientists is lacking foundation and unfairly prejudicial

Π's response: Communication with FDA relevant for notice and pattern of practice by Merck in suppressing scientific information.

Sustained

Page 242

e-mails and phone discussions, was he under pressure not to publish his results?

MR. GOLDMAN: Objection.

THE WITNESS: He conveyed that to me aptly.

BY MR. KLINE:

Q. What did you learn, sir?

MR. GOLDMAN: Objection.

THE WITNESS: I learned that the FDA, his superiors, did not want him to publish that particular paper, which eventually appeared in Lancet, and according to him and according to the reports about this, and according to the editor at Lancet, FDA tried to suppress that publication.

BY MR. KLINE:

Q. It was published by Lancet? Was it published by Lancet?

A. Yes.

Q. And was it one more piece of evidence that you were -- that was now in

Page 243

your knowledge bank?

MR. GOLDMAN: Objection.

THE WITNESS: It was one of seven epidemiologic studies published to this point in time, and all but one of them showing a very significant excess of heart attacks with Vioxx.

BY MR. KLINE:

Q. Was everyone --

MR. GOLDMAN: Objection, move to strike as nonresponsive.

BY MR. KLINE:

Q. And was every one of those seven studies done by someone who was not affiliated with Merck?

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. Those epidemiological studies?

A. Well, some of the authors could have been affiliated with Merck. Like, for example, the Solomon paper, there had been a Merck statistician,

Page 244

epidemiologist, Carolyn Cannuscio, who was involved, but then she was deleted at the request of Merck, and I spoke about that with Carolyn, but she had to have her name taken off the paper in Circulation, which was one of the epidemiologic studies.

MR. GOLDMAN: Objection, move to strike, nonresponsive.

BY MR. KLINE:

Q. What did she tell you, if anything, about why her name was removed?

MR. GOLDMAN: Objection.

THE WITNESS: She told me in a phone conversation in October of '04 that she was very distraught about the fact that she had done extensive work with the team in Boston, at Harvard, and that at the last minute, after having been on the paper, manuscript submission, she had to have her name taken off at the request of Merck, because they did not agree

Page 245

with the conclusions of the study.

BY MR. KLINE:

Q. Okay.

I want to show you an e-mail that you had between yourself and David Graham. We covered this way earlier, but I want to make sure that whoever hears this knows who Graham was. Please. Who is Graham?

A. David Graham is a safety officer at the FDA.

\- - -

(Whereupon, Deposition Exhibit Topol-20, E-mails, TOPOLE 0000458, was marked for identification.)

\- - -

BY MR. KLINE:

Q. I'm marking this as Exhibit Number 20. It's an e-mail between yourself and Graham, and you say in yours on the bottom, it's an e-mail dated November 15, 2004, you say, "David, I attach my analysis of the 2 trials

405d92cd-4d0a-489f-87c2-231a3a1c3f6f

-see objections previous page; same apply here

submitted to FDA as part of Supplement 007."

What are you referring to?

MR. GOLDMAN: Objection.

THE WITNESS: That's the FDA supplement of the three trials, 090, 085 and VIGOR.

BY MR. KLINE:

Q. One never published, that referring to 090?

A. 090 never published.

Q. "I'd be interested in your thoughts as I think this, along with the Juni paper, nails this down as to when there was confirmatory evidence that rofecoxib was," to use your words, "a dangerous drug."

Did you write that?

MR. GOLDMAN: Objection. Can I have a standing objection to the use of this document and the testimony about it?

MR. KLINE: Yes. You can have a standing objection.

Whether it be successful is another story.

BY MR. KLINE:

Q. "A dangerous drug," you say. It nails down "when there was confirmatory evidence." So, I have to ask you, what is that date that you can nail down, your private words to David Graham, safety officer of the FDA, when can you nail down when there was confirmatory evidence that Vioxx was a dangerous drug?

A. The paper that I reviewed earlier, the Juni paper that shows that time cumulative analysis, shows in 2000, when VIGOR and 090 are put together, that's when you cross the line of statistical significance, and that's the definition of a dangerous drug.

Q. Now --

MR. GOLDMAN: I'm sorry. Objection, move to strike as nonresponsive.

BY MR. KLINE:

Q. If you look at David Graham's response, he says to you in the second paragraph, "Each day the issue gets more and more complicated and fishy smelling. Apparently, Merck was heavily lobbying the members of the Finance Committee to cancel the hearing today, and our acting center director, Dr. Galson, has reportedly refused to appear before the Committee."

Skipping down a little bit. Anyone who wants to fill in later, may.

"But it does make you wonder, why is everyone afraid and what are they trying to hide?"

That was his response to you.

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. Did you receive that response?

A. Yes.

Q. And did you recognize that it was coming from a safety officer at

the FDA?

A. Certainly.

Q. And did you essentially have those same sentiments?

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. Did you share his sentiments?

A. I shared Dr. Graham's sentiments in this regard.

Q. David Graham had written to you that -- and I'm showing you another document, which is marked as 000333, which I will mark, but it's a sentence or two, so, I'll read to keep this thing going.

He says -- there was some thought that he would go on 60 Minutes, and you were aware of that fact; correct?

A. Yes.

Q. You ended up -- did you end up publicly speaking on 60 Minutes?

A. Yes.

Q. Did you consider it was

important to participate in public information to the general public regarding the drug Vioxx?

MR. GOLDMAN: Objection.

THE WITNESS: Yes. Just as in writing the New York Times op/ed, it was the same thing about getting the public fully informed, appropriately informed.

MR. KLINE: Can I have 0333?

MS. DAGOSTINO: I just gave it to you.

- - -

(Whereupon, Deposition Exhibit Topol-21, E-mails, TOPOLE 0000333, was marked for identification.)

- - -

BY MR. KLINE:

Q. That's marked now as Exhibit Number 21.

He writes to you, "Eric, My perspective and resolve are unchanged. If I went public on 60 Minutes, I think

the retaliation I would experience would be blistering."

Skipping down below.

"Internally, the last 2 weeks have been absolute hell."

By the way, sir, if I can pause for a minute. Has Merck made life absolute hell for people who criticize them?

MR. GOLDMAN: Objection, and can I have a standing objection to the use of this document?

MR. KLINE: Yes.

THE WITNESS: I believe that is the case, that is, there have been retaliation and actions taken to make life extremely difficult for people who have objected to their work, to their studies or to the lack of studies.

BY MR. KLINE:

Q. Now, let me switch gears and talk to you about what you did in connection with 60 Minutes.

MR. KLINE: Can someone tell me about how much time is left? About a half an hour?

THE VIDEOTAPE TECHNICIAN: About half an hour.

MR. KLINE: Okay, good.

BY MR. KLINE:

Q. Now, let me move ahead.

There were Senate hearings; correct?

MR. GOLDMAN: Objection.

THE WITNESS: The 60 Minutes was before the Senate hearings.

BY MR. KLINE:

Q. 60 minutes was before --

A. It was a Sunday --

MR. KLINE: So, that only goes to show you, the objection was to being a leading question, and I had the leading question wrong.

MR. GOLDMAN: There were several bases for the objection.

BY MR. KLINE:

Q. Go ahead.

A. Sunday, the 14th, was the 60 Minutes segment, and Thursday, the 18th, it was coordinated between the Senator Grassley staffers and the 60 Minutes.

Q. I see.

And you appeared on 60 Minutes, as we know; correct?

A. Yes.

MR. KLINE: I'm asking Lisa, how difficult is it to show the clip?

MS. DAGOSTINO: Not difficult. Can we switch over? Give me a second, please.

MR. KLINE: We're going to need to do a little bit of a switch, and then I want to talk to you about what you said.

Do you want to pause the tape until we get set up?

THE VIDEOTAPE TECHNICIAN: Off the record at 12:47.

- - -

405d92cd-4d0a-459f-87d2-231a3a1c3f5f

Page 254

(Whereupon, a recess was taken from 12:47 p.m. until 12:48 p.m.)

- - -

THE VIDEOTAPE TECHNICIAN: Back on the record at 12:48.

BY MR. KLINE:

Q. Okay.

You were both filmed in your duties at the Cleveland Clinic. I believe there's some footage of you actually in the capacity of doing clinical work, and then you were interviewed in New York; is that correct?

A. That's right.

Q. Okay.

Let me show you clip number 1.

(Whereupon the following was played:

"MR. BRADLEY: Dr. Eric Topol, chief of cardiovascular medicine of the Cleveland Clinic was Merck's first and most

Page 255

persistent critic. In 2001, he conducted a statistical analysis of all the available data about Vioxx. His study was published in the Journal of the American Medical Association.

"And specifically, your study that came out after the VIGOR study found what?

"DR. TOPOL: That study which looked at all the data available for both the medicines of these COX-2 inhibitors and all other medicines, including aspirin, that were available, showed a very substantial worry risk of heart attacks and strokes across the board from the VIGOR trial and about Vioxx."

BY MR. KLINE:

Q. Confirm for me that you made those statements and that that appears -- and that that is an accurate representation of what you said to

Page 256

millions of people. Is that correct?

MR. GOLDMAN: Can I have a standing objection to the use of the 60 Minutes --

MR. KLINE: Yes. I'll rephrase the question.

MR. GOLDMAN: -- and any questions about it?

BY MR. KLINE:

Q. Is that what you said on 60 Minutes, sir?

A. It certainly was.

Q. And did you mean it then?

MR. GOLDMAN: Objection.

THE WITNESS: I stand by the statement.

BY MR. KLINE:

Q. And did you feel it necessary to be on that show and to tell the public what you thought?

MR. GOLDMAN: Objection.

THE WITNESS: Without any question.

MR. KLINE: Next clip.

Page 257

(Whereupon the following was played:

"DR. TOPOL. Merck took on any study that questioned the safety of Vioxx with respect to the heart attacks and strokes, any study.

"MR. BRADLEY: But can't they say, on the other hand, okay, there are always dissenters, we've got these other studies that say the drug is fine?

"DR. TOPOL: Whenever you find a problem and you're thinking maybe it's not a problem, you want to see if there's independent replication. So, if you have study 090 and you want to discount that somehow, then you have VIGOR, you've got two trials now, you have essentially lightning striking twice. That's independent replication. That's really serious confirmation. This

405d92cd-4d0a-459f-87d2-231e3a1c3f6f

is unequivocal. This is a problem.

"MR. BRADLEY: Did you ever talk to Merck officials about that?

"DR. TOPOL: I tried. I called Mr. Gilmartin, the CEO, and the director of research, Dr. Peter Kim, on multiple occasions asking to discuss this, but the calls were never returned."

BY MR. KLINE:

Q. Did you make those statements on 60 Minutes as well?

A. I certainly did.

Q. Dr. Gilmartin and Dr. Kim, tell me about that.

I'm sorry.

Mr. Gilmartin, the M.B.A., and Dr. Kim, the Ph.D., did you call -- neither are medical doctors, I might add.

Did you talk to -- in fact, I think Dr. Kim started medical school but didn't finish. A little side point.

Here's the question.

Did Dr. --

Tell me about when you called Dr. Kim and Mr. Gilmartin.

MR. GOLDMAN: Objection.

THE WITNESS: So, in 2001, when we started to get very uncomfortable about the data, I started attempting to reach either Mr. Gilmartin or, at the time, it was Dr. Scolnick, and then later he was replaced by Dr. Kim as the chief scientific officer, and I did not get any responses.

I worked with a friend at Merck named Durga Bobba, who I knew very well from this clinical trial we had done, and also I talked with other researchers like Dr. Demopoulos, Dr. DiBattiste, but I never could get any communication established. No calls were responded -- would be returned from Merck.

BY MR. KLINE:

Q. Why were you, a head person at the Cleveland Clinic, not received by either Mr. Gilmartin or by the top Merck researcher, Dr. Kim, and do you think -- would the ordinary course of who you were and who they were have necessitated them to take your call?

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. Go ahead.

A. I don't know any pharmaceutical company CEO that wouldn't return my call, this was unprecedented, no less the chief scientific officer. I know most of the large pharma and device company CEOs, they know me, and they would return my calls as a courtesy. Maybe not within minutes, but certainly within hours or a day or two.

MR. KLINE: Let's play the third clip, and then I have a number of things to cover.

(Whereupon the following was

played:)

"DR. TOPOL. I'm trying for now two decades in my career to try to prevent heart attacks and treat heart attacks. To have a medicine that's causing heart attacks and strokes is something that can't be tolerated. These are the two biggest, most important killers in our society, and then it's important that we never have something like this happen again."

BY MR. KLINE:

Q. On all three clips that I showed, Dr. Topol, for evidentiary purposes, would you simply confirm and authenticate that that is you, and you made those statements on that day?

A. It's authentic.

Q. And it's what you believed then?

MR. GOLDMAN: Objection.

THE WITNESS: I still

495d92ed-4d0a-489f-87d2-231a3a1c3ff5

Page 262

believe today, yes.
BY MR. KLINE:
Q. Now, there is an e-mail -- let's switch gears.
I want to talk about some notes that you made, because I think it provides a road map to discuss some things. Topol Bates Number 0000469 and 504 are what I'm looking for. I'll start with 469.
While we're getting those, maybe I can talk about the study called ADVANTAGE. Did you come into possession of information regarding a study called ADVANTAGE that was performed by Merck?
A. I didn't come into anything special. I just read the New York Times article when it came out about that trial.
Q. What did you learn?
MR. GOLDMAN: Objection.
THE WITNESS: That there had been misclassification of events and that the FDA had records that

Page 263

there was, by their tally, a significant excess of events, but in the manuscript published by Lisse and colleagues, the New York Times demonstrated that it was ghostwritten, that he had never participated in the writing of the article or the trial, and that he had somehow been made the first author of the paper and that the events were misclassified, and they had e-mails in the article which showed, amazingly enough, how a death, a sudden death was classified as a hypertensive event, which is quite extraordinary.
BY MR. KLINE:
Q. I want you to assume that all of the things that you just said that were reported are things that could be independently established and confirmed from firsthand sources. How, then, would you view that type of conduct?

Page 264

MR. GOLDMAN: Objection.
THE WITNESS: The conduct is totally in continuum with the other concerns that I registered earlier, like the suppression of 090, like the erroneous issues about VIGOR and now with misclassifications of deaths and events in ADVANTAGE. These are all very similar types of things.
BY MR. KLINE:
Q. Is this serious business, Dr. Topol?
MR. GOLDMAN: Objection.
THE WITNESS: This is totally inadequate and highly misleading clinical science.
BY MR. KLINE:
Q. Does it amount to serious scientific misconduct by Merck?
MR. GOLDMAN: Objection.
THE WITNESS: I think that if this were to be adjudicated by an academic medical center in an

Page 265

unblinded way for whether there was scientific misconduct, this would fulfill the definition of scientific misconduct.
BY MR. KLINE:
Q. Now, sir, I want to look at your notes, which relate to -- let me show you an exhibit marked Topol-22.
- - -
(Whereupon, Deposition Exhibit Topol-22, Handwritten notes, TOPOLE 0000469, was marked for identification.)
- - -
BY MR. KLINE:
Q. Topol-22 appear to be handwritten notes. Are they in your handwriting, sir?
A. This is my handwriting.
Q. And when were these notes made?
A. These notes were made in October 2004, you know, shortly after the withdrawal, my op/ed, and at the time

- 401/403: Topol's opinions on Merck's conduct have no probative value and are unfairly prejudicial
Π's response: Topol's opinion about the scientific integrity of Merck's reporting of scientific data is clearly within his scientific and medical expertise. His opinions on studying this have appeared in the peer-reviewed literature.

- Violates Ct.'s Order: documents post-date Irvin's death
401/403 - Notes are Topol's irrelevant and prejudicial personal opinions

- 602 - Testimony lacks foundation; underlying article isn't referenced
Π's response: documents post dated Mr Irvin's death the information contained within pre-dated Mr. Irvin's death.

...(cont.) - 402/403 - Notes pertain to documents (Waxman report, Juni, etc.) that post date Irvin's death. The testimony violates the Court's Order.

π's response: Testimony does not violate court order because it refers to data available in 2000 and 2001 to Merck

when I was putting together the New England Journal and talking to the producer at 60 Minutes.

Q. What do they represent in terms of what you have down on this paper?

MR. GOLDMAN: Objection, and, Tom, can I have a standing objection to the use of this document and testimony about it?

MR. KLINE: You have a standing objection.

THE WITNESS: These are the salient points that I've reviewed in this deposition, the data safety monitoring board, the study 090, the Juni paper, the naproxen that was untenable, and then the suppression issues of what appeared to be deception and falsifying. All these things are enumerated here.

BY MR. KLINE:

Q. And it's being displayed or

will be displayed and incorporated in a final package so everyone sees it, but you start off by saying, "'What,' 'when' Merck knew."

Have you discussed with us today to your satisfaction what and when Merck knew things?

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. If not, I want to have an opportunity to expand. That's one of my purposes of this line of questioning.

MR. GOLDMAN: Objection.

THE WITNESS: I did touch on this earlier, that is, study 090 was completed in May 1999, and the VIGOR trial data and safety monitoring board alert was in November 1999. So, already by 1999 there were very significant issues, and this should have been widely known to the senior management at Merck.

MR. GOLDMAN: Objection.

nonresponsive, move to strike.

BY MR. KLINE:

Q. You then say, "Study 090," you've discussed that at length with us; correct? The "DSMB November 18, 1999." We've discussed that at length; correct?

A. (Witness nods.)

Q. I need an audible answer.

A. Yes.

Q. Thank you.

And for study 090, have we discussed that at length to your satisfaction in terms of telling what you know or what you think someone should know about it?

MR. GOLDMAN: Objection.

THE WITNESS: Yes.

BY MR. KLINE:

Q. Okay.

I'm using this as a wrapup.

"Lancet," you mentioned the Juni paper, and we've discussed that at length; correct?

A. Yes.

403

Q. "Position, 'naproxen,'" you wrote the word in your handwriting, "Untenable." You've told us about that today; correct?

A. Yes.

Q. Now, in the middle of the page, or more or less in the middle of the page, you write three words, "Deception/Falsifying/Suppression of Data." Do they apply -- do all three of those words apply to Merck?

MR. GOLDMAN: Objection.

THE WITNESS: I have reviewed elements of each in this deposition that fulfill those terms.

BY MR. KLINE:

Q. As they apply to Merck; correct?

A. As they apply to the studies and the data of Vioxx.

Q. Those would be words, filling in the details from what you've told us earlier, that would describe

426d02-d 4d0a 4895 87d2 231a3a1a3f6f

-see objections previous page; same apply here

Page 270

Merck's conduct; correct?

MR. GOLDMAN: Objection.

THE WITNESS: That's correct.

BY MR. KLINE:

Q. And then you list underneath this the sort of laundry list of things that fit in the category of deception, falsifying and suppression of data; correct?

A. Yes. The only thing I hadn't mentioned was the symposia that would be done at each of the national meetings, where they would have these Merck consultants giving lectures, taking apart our data, like the JAMA paper, and assuring the medical community like cardiologists or internists, doctors, that there was nothing wrong with the safety of Vioxx, that it was an illusion of the Cleveland Clinic authors of the JAMA paper.

MR. GOLDMAN: Objection, move to strike as nonresponsive.

Page 271

BY MR. KLINE:

Q. Did you believe, sir, looking at your list, that no publication of 090, which we've discussed, the Bombardier paper, which is the VIGOR paper, where there were deaths and incomplete information, the multiple publications by Reicin and Konstam -- what does that refer to?

A. The Merck people, whether they were Dr. Reicin or Dr. Konstam, who was a consultant, published multiple articles, and Dr. Konstam published an article in Circulation just a few months after our JAMA paper to challenge it with a so-called meta-analysis of their data which had considerable issues, did not provide the results per trial. It did, in fact, show a statistically significant excess of heart attacks compared to naproxen.

So, the Konstam paper was out there. There were multiple papers that Merck authored in different journals

Page 272

to take the data that we published on as well as other case-control studies that I had touched on earlier.

MR. GOLDMAN: Objection, move to strike, nonresponsive.

BY MR. KLINE:

Q. What you're suggesting is that they would assault any publication that was against the safety of the drug Vioxx prior to the time that they withdrew it from the market; correct?

MR. GOLDMAN: Objection.

THE WITNESS: Yes.

BY MR. KLINE:

Q. And even today; correct?

MR. GOLDMAN: Objection.

THE WITNESS: Yes.

BY MR. KLINE:

Q. "Marketing and sales." What did you mean there?

A. Well, the marketing and sales has been very much demonstrated in the Waxman report, the Congressional report of the cardiovascular card. This

Page 273

is where it was a card that was distributed by the sales team throughout the country, 3,000, I believe, sales reps for Merck that had a card that showed that there was somehow an eight to ten-fold protection of Vioxx compared to other non-steroidals.

So, this was quite extraordinary, these sorts of sales tactics that were going on by the specially-trained Merck sales reps.

Q. Well, assuming --

MR. GOLDMAN: I'm sorry, objection, move to strike. And, again, Tom, I can go fill in, as you said before, the nature of these objections?

MR. KLINE: Yes.

BY MR. KLINE:

Q. Assuming that the drug was -- assuming what you said -- what you just told us was being said about the cardioprotective effects, are you with me so far, that would not only be, I forget

Sustained 403 602

-602/402/403: Testimony re marketing and sales lacks foundation, is irrelevant and unfairly prejudicial

π's response: Relevant in that "sales and marketing" that Dr. Topol refers to is regarding the communication of CV risk which is a scientific question.

405d92cd-4d0a-489f-87d2-231e3a1c3f5f

402/403/602 - Testimony re marketing lacks foundation, is irrelevant (Topol's personal views on the subject are not probative) and unfairly prejudicial

the word you used, extraordinary, that would just be plain false; correct?

MR. GOLDMAN: Objection.

THE WITNESS: If you look at the cardiovascular card, it's very clear that the data that are being presented are highly misleading.

BY MR. KLINE:

Q. You've seen it?

MR. GOLDMAN: Objection.

THE WITNESS: Yes.

MR. KLINE: I don't want to take the time to do it. We'll simply mark it and we'll put it up when we incorporate it in the exhibit. We'll reserve number 25 for it.

- - -

(Whereupon, Deposition Exhibit Topol-25, "Cardiovascular System Clinical Profile in Osteoarthritis Studies," Cardiovascular Card, MRK-ABW00000243 - MRK-ABW0000248;

MRK-ADB0009039 - MRK-ADB0009042; MRK-ACW0008375; MRK-ACZ0072955 - MRK-ACZ0072956, was marked for identification.)

- - -

BY MR. KLINE:

Q. You said, "Did not do" an "appropriate trial." We know what that means. And they made the claim of 18 months post and they paid consultants.

Tell me about this thing, "paid consultants on 'Independent DSMB.'" How does that fit in the deception, falsifying and suppression of data category?

Argumentative question

MR. GOLDMAN: Objection.

THE WITNESS: Well, I mean, Dr. Konstam, for example, who is a consultant for Merck, has been for many years, he is the cardiologist on the APPROVe trial, DSMB, Data and Safety Monitoring Board. And he's also an author of the paper.

So, he's an author, he's on

the so-called independent data and safety monitoring board, but he's a consultant. So, it's hard to be independent when you're being paid by the sponsor of the trial in a separate way, and this is quite irregular.

Normally to do clinical trials, which I've been engaged in for a couple of decades, you would not have a person on your data and safety monitoring committee who was a consultant for the company.

BY MR. KLINE:

Q. Kind of like having one of the coaches from the sidelines put on a striped shirt?

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. Yes?

A. I have no comment.

Q. I want you to look at Number 504. Let's mark it as the next exhibit number. I have about 10 or 15 minutes

left. I want to use them.

- - -

(Whereupon, Deposition Exhibit Topol-23, Handwritten notes, TOPOLE 0000504, was marked for identification.)

- - -

BY MR. KLINE:

Q. There is a document which we're displaying which, again, is your notes, part of your 60 Minutes notes. These are also your notes. I want to go through it quickly. I think anyone who sees this now will know what you're saying. "Compelling evidence of Merck/Vioxx knowledge of serious risk." Was this part of the notes that you made in preparation, sir?

MR. GOLDMAN: Objection. Can I have a standing objection to this document?

MR. KLINE: Yes. You have a standing objection to this one and the next handwritten one I used as

901/602: Topol did not authenticate this exhibit. In fact, it is not an accurate copy of the document it purports to be.

The response Defendant is incorrect

Sustained

- Violates Court's Order - improper testimony re Merck's "state of mind" (pertains to Ex 23, on the subject)
- 802: Testimony is based in large part on hearsay

Page 278

well.

THE WITNESS: These notes were later, because it was only later that I learned about the VALOR trial in February 2005, and this was -- these were notes by me, but they were done at a later point in time.

BY MR. KLINE:

Q. You have a list of "Compelling evidence of Merck/Vioxx knowledge of serious risks." Here's the compelling evidence: 1. Study 090, seven times risk of MIs and strokes. Correct?

A. Yes.

Q. VIGOR: Two times to five times. What's the two times number?

A. The two times corresponds to overall cardiovascular events, and the five-fold is the heart attack excess.

Q. And then ADVANTAGE trial, which is mis -- you said, "ADVANTAGE trial, misclassifications of deaths,"

Page 279

that's all stuff that we've talked about; correct?

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. Yes?

A. Yes.

Q. "APPROVe trial, heart failure" in "30 days."

Have we discussed that?

MR. GOLDMAN: Objection.

THE WITNESS: No. We had been discussing heart attacks in the first days, but the trials like APPROVe and others also demonstrate things like heart failure in the first 30 days, but that's not necessarily the same as a heart attack, of course.

BY MR. KLINE:

Q. By the way, there was -- and last thing is VALOR study 2002 was cancelled.

What was the VALOR study?

MR. GOLDMAN: Objection,

Page 280

lacks foundation.

THE WITNESS: I only learned about that trial through the New York Times, but Bryan Myers, the reporter, called Dr. Bhatt, who actually had authored a protocol. That was the one, remember when Dr. Reicin and Dr. Demopoulos visited in April of 2001?

BY MR. KLINE:

Q. Yes.

A. And she said, well, why don't you send us a protocol?

Q. Yes.

A. So, I spoke to my colleague, Dr. Bhatt, and just a couple of weeks later, around the 2nd of May, we submitted a protocol, actually Dr. Bhatt did, to Dr. Reicin and Dr. Demopoulos.

That protocol was testing in patients with so-called acute coronary syndrome, unstable angina, or heart attack, who had abnormal inflammation blood protein markers to test a study of

Page 281

Vioxx versus placebo on top of the other normal medicines. So, that was a proposal. It was a mini proposal, but that was sent.

And then what we found out later was that there was a trial called VALOR reported in the New York Times, a 70-page protocol, had extensive network development, and somewhere along the line, the trial that we initially had proposed, apparently, didn't get very far, we never heard back about that, but that trial was, indeed, being planned by Merck, and at some point the plug was pulled, and that's what that New York Times article was about.

Q. You proposed to them to do a study in the people that were high risk patients who had cardiovascular disease who were susceptible. Do I have it right?

A. Yes.

Q. And your point was to try to see if these people -- look at those

- 802: Hearsay
π's response: expert can rely on the kinds of materials experts typically rely on, including hearsay.

- 802 - Hearsay

- Dr. Topol has personal knowledge of these incidents that, as he said, occurred in his office in 2001

- 802 - hearsay

- Same objections as previous page
- Violates Court Order - pertains to studies that post-date Irvin's death

Response: Pertains to studies whose data existed before and were known to Merck.

Page 282

people with a specified endpoint to see if those people were going to fall victim to Vioxx; is that correct?

MR. GOLDMAN: Objection.

THE WITNESS: No. No. The trial that we had proposed, and it was Dr. Bhatt who wrote this and sent it to Merck at their request, it was a trial looking at people who had abnormal artery inflammation.

So, they had to have high C-reactive protein, which is a blood test. They could derive benefit from Vioxx or COX-2 inhibitors, just as they could potentially be exposed to risk. So, here we were looking at trade-offs, could we reduce subsequent heart attacks or could we potentially exacerbate the course of patients?

So, this was a very reasonable way to study the

Page 283

problem. And VALOR was a very reasonable construct for a trial.

MR. GOLDMAN: Objection, move to strike as nonresponsive.

BY MR. KLINE:

Q. But it wasn't done?

A. It wasn't done.

Q. And it should have been done?

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. Should it have been done?

A. Any trial to establish the risk in patients with heart disease should have been done.

Q. Was it an adequate substitute to look at cardiovascular endpoints in the studies that weren't designed by Merck to assess cardiovascular risk?

MR. GOLDMAN: Objection.

THE WITNESS: This was another part of the concern at the point of the withdrawal, saying

Page 284

that the trials that had been done for colon polyps were indeed to assess heart risk. That could not have been further from the truth. In fact, they were to establish new indications for the drug.

BY MR. KLINE:

Q. Okay.

Now, was it an adequate substitute to look at CV events in studies to which the primary endpoint was something else?

MR. GOLDMAN: Objection.

THE WITNESS: It's more the population of patients. It's not about patients of population who had colon polyps with no heart disease. It's about the population of patients who have one of the most common diseases of American society, which is coronary disease, established coronary disease. That's where there was a gap, that's where 40

Page 285

to 50 percent of patients taking the drug of the 20 million estimated had never been studied as to what would happen, would they derive a benefit, or would they incur harm? Unknown.

BY MR. KLINE:

Q. Switching gears, Dr. Topol.

Before we switch gears, I have asked you a lot of questions today.

MR. GOLDMAN: I'm sorry, I meant to introduce an objection to the last answer as nonresponsive.

Start over, Tom.

MR. KLINE: Would you at the end of the deposition -- I will gladly pay Golkow Litigation Technologies for this. Would you at the end of the day count up and put in the transcript the number of times that Merck, through its lawyer, objected to this testimony today so that I don't have to do the counting up? It's

- 602/402/403 - Testimony re what Merck "should have done" is speculative, irrelevant, and highly prejudicial

Page 286

extraordinary. Astonishing.
THE WITNESS: I also would like to say it's very hard to answer the questions and have to be in rhythm with the objections. It's disruptive for my train of thought.
MR. KLINE: That's a good question, Doctor. Thank you for suggesting it to me.
MR. GOLDMAN: Well --
MR. KLINE: Stop it.
BY MR. KLINE:
Q. Was it disruptive for you, sir, to, for almost every question that was asked today, have an objection interposed, and how, if at all, did that affect your train of thought?
MR. GOLDMAN: Objection.
THE WITNESS: It has affected my train of thought many times along the way.
MR. GOLDMAN: Because you just made that statement, Mr.

Page 287

Kline, I'm going to be forced to ask Dr. Topol's lawyer, who spoke with me at a break, to see if Dr. Topol's lawyer thinks that I've been intrusive and my objections have been in any way an effort to affect the deposition here today.
MR. KLINE: Okay. Let's go on.
MR. GOLDMAN: Can you represent, sir, that --
MR. KLINE: We're going to just simply take his deposition. I'll tell you what. You can --
MR. HAMELINE: Let me just say this --
MR. KLINE: You can take his deposition --
MR. HAMELINE: Let me just say this. I'm not here to talk for Dr. Topol and whether Dr. Topol was inconvenienced. I recognize that what you've done is try to be as accommodating as

Page 288

possible in terms of the level and tone of your objections. The repetitiveness of them, et cetera, is none of my truck in this case.
MR. GOLDMAN: Right.
MR. KLINE: That sounds like a no comment to me.
BY MR. KLINE:
Q. Now, a couple of things and we'll finish up. Switch gears.
I don't want to switch gears. I have got to cover one more thing.

- - -

(Whereupon, Deposition Exhibit Topol-24, Handwritten notes, TOPOLE 0000463, was marked for identification.)

- - -

BY MR. KLINE:
Q. Here's some more notes. They're now put on the screen. Tell me when those notes were written, if you would, sir.

Page 289

A. These notes were done in concert with the discussion with Michael Radutsky, the producer at 60 Minutes.
Q. Okay.
You were taking --
MR. GOLDMAN: Tom, this is the handwritten document which you said I can have a standing objection to?
MR. KLINE: It is.
MR. GOLDMAN: And there's testimony about?
MR. KLINE: Yes. We've already agreed that you can have a standing objection to these three documents.
BY MR. KLINE:
Q. First of all, you talk about Merck suppression of 090, and you talk about FDA's suppression. Correct, as to both of them, sir?
A. Yes.
Q. And you talk about deceptive, falsifying data, and we've

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 290

discussed that as well; is that correct?

A. Yes.

Q. Okay.

Now, a couple of things I want to switch gears on to finish up.

I think somewhere along the way I saw in documents that you were involved as an advisor to some kind of a stock or bond fund. Is that correct, sir?

A. It was an investment fund known as Great Point Partners.

Q. What did that involve, and how does that affect anything that either you've said here today or your views, if at all?

MR. GOLDMAN: Objection.

THE WITNESS: I do not believe it has any effect on what I've said, but it has, in an article in Fortune, in a contrived way, been made to give a perception of a conflict of interest, which did not exist.

Page 291

BY MR. KLINE:

Q. Did you ever have a conflict of interest when you stated your views publicly either back when you published the JAMA article or up to today when you testified under oath?

MR. GOLDMAN: Objection.

THE WITNESS: I do not believe I've had any conflict of interest whatsoever in all the articles that we've written or even the matter cited regarding this investment fund serving as a medical adviser.

BY MR. KLINE:

Q. Now, a couple of additional points here and there.

You mentioned that you couldn't get ahold of Dr. Gilmartin. That raised in my mind the question, did Merck or anyone -- let me start it this way.

Merck -- does Merck -- let me start again.

Page 292

You mentioned that you had done a study for Merck; correct?

A. With Merck, yes, the TARGET trial, yes.

Q. Yes.

And what drug was that, by the way?

A. That was a drug, the commercial name is known as Aggrastat, tirofiban.

Q. Were you actually paid by Merck?

A. No. I was not paid. I did do the trial.

Q. Was there funding provided to the institution here, the Cleveland Clinic, by Merck?

A. There was funding to the Cleveland Clinic and to the 60 sites that participated in the trial, yes.

Q. Did the Cleveland -- it raises the question that, has anyone from Merck, to your knowledge, either contacted anyone at the Cleveland Clinic

Page 293

or your colleagues or anyone relating to your writings or your public statements relating to Vioxx in any way? And if so, what is it, if anything?

MR. GOLDMAN: Objection.

THE WITNESS: I was told by a colleague here at the clinic on October 14th, the chairman of the board of trustees, Mr. Mal Mixon, was contacted.

BY MR. KLINE:

Q. His name is?

A. Mal, Malachi Mixon, chairman of our board of trustees.

Q. Current?

A. Yes, of the Cleveland Clinic. That he was contacted directly by Raymond Gilmartin in October of 2004, and that Mr. Gilmartin said to Mr. Mixon, what has Merck ever done to the Cleveland Clinic to warrant this? And this was relayed by a colleague who spoke to Mr. Mixon.

Q. Who was that colleague, sir.

435d92cd-4d0a-489f-87d2-231e3a1c3f6f

overruled

Violates Court's Order - contains study that post-dates Irvin's death

P's response: Defendant's conduct in attempting to suppress, dissent and intimidate scientists is an essential element in this case.

- 802: conversation is hearsay within hearsay

- 402/403: testimony re conversation has no probative value and is unfairly prejudicial

- 802: conversation is hearsay within hearsay
- 602 & 402/403: testimony re conversation is not probative, is based on speculation, and is unfairly prejudicial

Page 294

MR. GOLDMAN: Objection, move to strike as nonresponsive.

THE WITNESS: His name is Richard Rudick.

BY MR. KLINE:

Q. Who is he?

A. He is the director of clinical research.

Q. Rudick was told by Mixon that Mixon was contacted by Gilmartin. Is that what you're telling me?

MR. GOLDMAN: Objection.

THE WITNESS: Yes. That he was further told that Mr. Gilmartin and Mr. Mixon were colleagues together at Harvard M.B.A. school, they were old friends, and that Mr. Mixon understood that Mr. Gilmartin was very upset when he called in October '04.

This was relayed on October 14th to Dr. Rudick. I don't know exactly what date. I believe it

Overruled

Page 295

was the day prior, October 13th, but I can't know for sure.

MR. GOLDMAN: Objection, lacks foundation.

BY MR. KLINE:

Q. And where does October 14 fit on our chronology? What event does that relate to?

A. That was eight days after the New England Journal paper, of my editorial, and about 13 or 12 days after the New York Times op/ed.

Q. And from your perspective, assuming we pin all of that down that that, indeed, happened -- first of all, you believe that if called to testify, that's what Dr. Rudick would tell us? Is that what you're saying?

MR. GOLDMAN: Objection.

THE WITNESS: Yes. I've confirmed this with Dr. Rudick, yes.

BY MR. KLINE:

Q. And what -- how do you view

Page 296

all of this?

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. How do you view this event that you've just described for me?

MR. GOLDMAN: Same objection.

~~THE WITNESS: I find it~~ entirely repulsive.

BY MR. KLINE:

Q. Do you know what was said by -- is it Dr. Mixon?

A. No, Mr. Mixon.

Q. No. He's an M.B.A. like Gilmartin?

A. That's correct.

Q. Have you talked to Dr. -- Mr. Mixon about it?

A. He's never told me about it directly, and I've not questioned him about it.

~~MR. KLINE: Let's take a~~ very brief break.

THE VIDEOTAPE TECHNICIAN:

Overruled

Page 297

Off the record at 1:22.

- - -

(Whereupon, there was a luncheon recess from 1:22 p.m. until 2:18 p.m.)

- - -

THE VIDEOTAPE TECHNICIAN: Back on the record at 2:18. Tape Number 4.

BY MR. KLINE:

Q. Dr. Topol, a few more questions from me, and I'll conclude my examination.

~~In the VIGOR trial, we had~~ mentioned the DSMB earlier. Do you know if there was any cardiologist on the DSMB?

A. I'm not aware --

MR. GOLDMAN: Objection, lacks foundation.

THE WITNESS: I'm not aware of any -- who the members of that safety monitoring board were, so, I don't know.

- 602: no foundation

Sustained

- 402 / 702: no probative value to testimony we need for a cardiologist; improper expert testimony

It's response: has probative value in that it impeaches Merck's clinical trial program i.e., that it had no independent cardiologists to assist in analyzing the clinical data.

overruled

overruled

Page 298

BY MR. KLINE:

Q. Would it make a difference in your mind if you knew that there was no cardiologist on the DSMB that was addressing any cardiovascular safety issues and what would you have expected?

MR. GOLDMAN: Objection.

THE WITNESS: It's much easier to see you.

Yes, I would be concerned if no cardiologist was on the committee and they were adjudicating -- remember that point I made earlier about November 19, 1999 when they had excess deaths and serious cardiovascular events, and that does need a cardiologist trained in clinical trials to help interpret that signal.

BY MR. KLINE:

Q. And when Dr. Reicin came to visit you, did she identify herself as an internist who was actually an infectious

Page 299

disease doctor, rather than a cardiologist?

MR. GOLDMAN: Objection.

THE WITNESS: Dr. Reicin didn't describe her background. She just told us or told me when she came that she was the director of the Vioxx and the COX-2 inhibitor program. That's all I knew.

BY MR. KLINE:

Q. Did you know that the director of the COX-2 program at Merck was an infectious disease doctor who had limited experience prior to coming to Merck just a few years earlier?

MR. GOLDMAN: Objection.

THE WITNESS: I did not know that.

BY MR. KLINE:

Q. Does that surprise you hearing that today?

MR. GOLDMAN: Objection.

THE WITNESS: I would have

Page 300

thought rheumatologists would have worked in that space, but, you know, I can't really comment beyond that.

BY MR. KLINE:

Q. The next thing I'd like to show you is an exhibit which was Bates stamped 462, and I'd like to have it marked and handed to you, if I can.

Instead of going to 462 because it doesn't matter the order, I'm going to go to 465, which was -- which will be the next exhibit, the next exhibit number being --

MR. KLINE: Are we at 26?

THE COURT REPORTER: Yes.

MR. KLINE: That's what it says, 26.

- - -

(Whereupon, Deposition Exhibit Topol-26, "Preliminary Questions - 60 Minutes," TOPOLE 0000465 and EJT 000334, was marked for identification.)

Page 301

- - -

BY MR. KLINE:

Q. Let me hand it to you, your counsel, Merck's counsel.

Apparently there were preliminary questions from 60 Minutes. Would you tell me how this document came about very briefly?

MR. GOLDMAN: Objection. Can I have a standing objection to this document and any testimony about it?

MR. KLINE: Yes. For those who are viewing this, there's a little bit different configuration in the room. That's why Dr. Topol now may be looking over to me while we finish this examination.

THE WITNESS: So, this was a list of questions that Michael Radutsky, the producer of CBS 60 Minutes, was providing me. He basically gave me these questions over the phone, and then my

assistant typed them up.
BY MR. KLINE:
Q. You only wrote in your handwriting one word on that document; correct?
A. Yes.
Q. What is the one word that you wrote on the document?
A. The word is "deception."
Q. What did you mean, sir?
MR. GOLDMAN: Objection.
THE WITNESS: I think that this was about the conversation I had with Michael Radutsky at CBS and what he was particularly cued into regarding concern about deception of Merck.
BY MR. KLINE:
Q. Did you, sir, believe there was deception?
MR. GOLDMAN: Objection.
THE WITNESS: As I reviewed throughout this deposition, I thought there were many points of

highly misleading errors of omission and what could be considered the false conveyance of data and findings.
BY MR. KLINE:
Q. And would those things that you just described fall under the category of deception?
MR. GOLDMAN: Objection.
THE WITNESS: I think that that's certainly a term that could be used to apply to this pattern, yes.

- - -

(Whereupon, Deposition Exhibit Topol-27, Letter 10-7-04 with handwritten notes, TOPOLE 0000462, was marked for identification.)

- - -

BY MR. KLINE:
Q. All right. I'm showing you Exhibit 27, hand it to you, your counsel and Merck's counsel.

I'm only concerned with the handwriting on the document. It happens to be made on a note of -- with the Bill Moyers show. It's dated October 7, 2004. Sir, you have key points. Are these the points that you were raising regarding the November 18 findings of the preliminary data that was coming out on the VIGOR trial?
MR. GOLDMAN: Objection.
THE WITNESS: This is the points that I put after -- this fellow, Bryan Myers and Bill Moyers forwarded me the Targum report, which I had never reviewed. Once I reviewed it, these were the summary points that I made because then I was asked to contact Mr. Myers and Bill Moyers to convey what I thought were the principal findings.
BY MR. KLINE:
Q. The principal findings from what?

A. The VIGOR and -- well, that whole supplement. I forgot the number of it, but it's the combination of VIGOR, 090 and 085, which I've been calling the Targum report.
Q. I understand. If you can summarize in two or three words, what was your bottom line from all this data that you have handwritten there?
MR. GOLDMAN: Object to form.
BY MR. KLINE:
Q. Please.
A. The more I reviewed this particular supplement or Targum report, the more disturbing it became. I had not ever delved into it as I did at that point in time, and this is, of course, after the drug withdrawal.

- - -

(Whereupon, Deposition Exhibit Topol-28, Memo 10-17-04, TOPOLE 0000474, was marked for identification.)

405d92cd-4d0a-439f-87d2-231e3a1c3f6f

- - -

BY MR. KLINE:

Q. Sir, I previously marked an exhibit -- I believe I marked this.

MS. DAGOSTINO: You did not mark it yet.

MR. KLINE: I did not?

BY MR. KLINE:

Q. I'm showing you -- I guess I did not -- 474, Bates Number 474, which I will mark as Exhibit Number 28 which covers a lot of territory. It's an e-mail from you to Mike Radutsky from 60 Minutes. I would like to ask you to confirm for me that some of these things were said.

You say, "I was asked to review a paper for the Lancet written by well regarded, independent researchers from Europe." Did I read it correctly?

A. Yes.

Q. Indeed, was it important to you that these folks were independent?

MR. GOLDMAN: Objection.

THE WITNESS: Yes.

BY MR. KLINE:

Q. "Their study proves," and you used the word "unequivocally that the data on Vioxx had 'crossed the line' by 2001 for heart attack risk." What I've read to you, is that a correct statement --

MR. GOLDMAN: Objection.

BY MR. KLINE

Q. -- that you made in this e-mail?

A. Yes, and I reviewed what that line meant earlier today, yes.

Q. That's what I wanted to know as well.

Finally you go on to say in the middle of this paragraph, "We can now confirm that the famous study '090'" -- you used the word "famous," but would you tell me in other correspondence you actually refer to it as "infamous."

A. Yes. What I'm referring to is, it's buried, that is, "famous" was

being somewhat sarcastic. It never got to the light of day. It only could be found in the Targum report. It was never published, and the only abstract about it, it was presented by Dr. Geba at a geriatrics meeting, and it only presented the -- he only presented the efficacy side on arthritis. He did not present the cardiovascular events.

Q. You say that -- let me just find it here with my eyes.

"We now can confirm that the famous...'090' of Merck was NEVER published, that it was part of the FDA pivotal registration packet leading to the May 1999 approval."

Do you see that?

A. Yes.

Q. You then say "and" -- that's not what I want to ask you about.

I want to ask you about this: "And that it showed a striking risk of heart attack and stroke before the drug ever got commercialized."

Is that a correct statement?

A. Well, as it turns out, the dates were wrong because they were not provided in the Targum report. As it turned out, that data, I guess, was -- May 1999 was when it was finalized, and so already the drug had been approved. So, I was mistaken that study 090 was available before approval. That data must have been available coincident, right around the time of approval.

BY MR. KLINE:

Q. I see.

A. But I can't say for sure because I don't have all the 090 documents to back that up.

Q. You say, "The cumulative meta-analysis of 21,432 patients also proves that the heart toxicity was not at all dose or duration related." Correct?

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. That's what you said.

A. That's citing the Juni

405c92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 310

paper, which was a systematic cumulative meta-analysis.

Q. If you look at 3, you say "One more angle," number 3, your writing, "the former CEO of Merck, Dr. Roy Vagelos, an honorable, capable man. He hates Gilmartin and thinks he is an idiot (may be accurate). He would be a good person for you to call - Gilmartin replaced him. Vagelos is incredibly well respected in the medical and business community, of the highest integrity and ethical standards. I think he might open up and say - 'Merck should have done the right thing immediately in 1998 when study 090 showed a more than 6-fold heart attack risk at low dose (12.5 milligrams) of Vioxx."

Did you make that statement in that document back in October 17 of 2004?

MR. GOLDMAN: Objection.

THE WITNESS: I made that statement. By happenstance, I

Page 311

happened to have had dinner with Dr. Vagelos just a couple of days before the Vioxx withdrawal, and I actually -- we spoke, it was such a coincidence, about the whole Vioxx issue, about his relationship with Ray Gilmartin, and it was actually quite an extraordinary coincidence just a couple of days later to have this whole drug withdrawal and that dinner discussion that evening come back.

MR. GOLDMAN: Objection, move to strike as nonresponsive.

BY MR. KLINE:

Q. Couple more points.

In your editorial, your op/ed piece, you wrote, there's only a sentence, I won't put it in front of you, "Vioxx has repeatedly carried a far greater risk of heart attack and stroke," you're saying, I'm reading through it, "than the other COX-2 inhibitors?"

Page 312

A. (Witness nods.)

Q. Do I have your opinion or your views, your conclusions basically correct when I state that?

MR. GOLDMAN: Objection.

THE WITNESS: The point here is that all the COX inhibitors have to be implicated, the class, but within that class there appears to be a gradient where Vioxx appears to be worse, consistently worse than Celebrex, and somewhere in between perhaps or perhaps closer to Vioxx is Bextra, and there are other agents in this class as well.

BY MR. KLINE:

Q. That's what I wanted to --

MR. GOLDMAN: Move to strike the nonresponsive portion.

BY MR. KLINE:

Q. That's what I wanted to know. That's what I wanted to find out.

MR. KLINE: Dr. Topol, thank

Page 313

you for answering my questions. I may have more questions after Merck counsel examines you.

THE VIDEOTAPE TECHNICIAN: Off the record at 2:31.

MR. LEVENSTEN: I'm here on behalf of the Pennsylvania cases. Our Discovery Order Number 1 permits me to examine the witness today. I've informed Mr. Goldman that I intend to conduct an examination of the witness today. I've offered to do it at the conclusion of Mr. Kline's direct examination. Mr. Goldman's position is that I cannot go forward with -- well, I'll allow him to state his. I don't want to misstate his position. Go ahead.

MR. GOLDMAN: I'm not taking any position at all, Mr. Levensten, on whether you can ask questions. I understand that the MDL plaintiffs' lawyers think that

Sustained

Overruled

π's response: Dr. Topol's opinions of the relative risks of Vioxx vs. the relative benefits of Vioxx is relevant and he has unique experience to offer this opinion

- Violates Court's Order - pertains to a newspaper article Topol wrote
- 402/602 - Topol's personal opinions on the relative risk of Vioxx are speculative + irrelevant

405d92cd-4d0a-489f-87d2-231e3a1c3f8f

the seven-hour rule applies in the MDL and that we should be splitting our time. So, if you want to coordinate with the plaintiffs' lawyers, that's fine. But I don't take a position one way or the other.

MR. LEVENSTEN: Well, then, can I go forward now?

MR. GOLDMAN: Let's go off the record for a second.

- - -

(A discussion off the record occurred.)

- - -

MR. WEINKOWITZ: While we're on a break, can I enter my appearance?

Mike Weinkowitz, W-E-I-N-K-O-W-I-T-Z, from Levin Fishbein Sedran & Berman here in Philadelphia.

MR. GOLDMAN: Mr. Levensten has spoken with Mr. Kline, and

they're going to talk about what questions they might want to ask. I do want to make clear that I don't know whether this deposition has been cross-noticed in New Jersey, and so the record will speak -- or Pennsylvania. The record will speak for itself on that.

MR. LEVENSTEN: Just so I'm clear on that record, we have a discovery order entered that says that this deposition is deemed taken in Pennsylvania. The order also talks about how we're allowed to ask questions that aren't duplicative at depositions, and I just need to protect my record today. Whether or not it's cross-noticed, I don't even know that it's relevant considering the discovery order.

THE VIDEOTAPE TECHNICIAN: On the record at 2:39.

- - -

EXAMINATION

- - -

BY MR. GOLDMAN:

Q. Good afternoon, Dr. Topol.

A. Good afternoon.

Q. [illegible] seconds about cardiovascular disease. Is it the leading cause of death in the United States?

A. Yes, it is.

Q. Is cardiovascular disease the leading cause of death by far?

A. Well, it's significantly greater than the second leading cause of cancer, so, yes.

Q. Is cardiovascular disease the number one killer in the United States and has it been since 1900?

A. Yes.

Q. Do you know that approximately every 34 seconds somebody dies of heart disease in this country?

A. That's, I think, from the

American Heart Association, and I can't vouch for the calculation, but that's out there, yes.

Q. You also note, Dr. Topol, that every 45 seconds somebody dies of a stroke in the United States?

A. Again, I think that's an AHA fact, but I can't -- I was not involved at all with the calculation, but I've seen that written, yes.

Q. Have you also seen that 700,000 Americans will die of a stroke in 2005?

A. That number would correspond to heart attacks, 700,000. Stroke number is not that high.

Q. Do you know that approximately 700,000 Americans will have a stroke in 2005?

A. That may well be the case, but they wouldn't die from the stroke. The number would be too high.

Q. Is it true, Dr. Topol, that every year 400,000 -- 460,000 people die

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

There is no impeachment value if one supports VIOXX & takes it. If one is very critical of VIOXX & takes it there is some impeachment value

Overruled 401 607

Page 318

of heart disease in the emergency room or before even getting to the hospital?

A. That number may be about right. There's a lot of out of hospital sudden death, yes.

Q. Did you take Vioxx, Dr. Topol?

A. Yes, I took Vioxx.

Q. You took Vioxx for years, didn't you?

A. I took it occasionally. I have knee arthritis. I've had multiple knee surgeries, so, I would take it on demand, you know, whether it be every -- once, a couple, every few weeks, that sort of thing.

Q. The reason you took Vioxx is because you had serious knee pain, and traditional NSAIDs were bothering your stomach. Is that true?

A. I think the medicines that I had taken actually didn't bother my stomach. I haven't had any things that really bothered my stomach very much, but

Page 319

I can't recall that so much as I thought I had better relief of my arthritis than by taking a Motrin or some other over-the-counter preparation.

Q. Vioxx helped relieve your knee pain better than the traditional NSAIDs. Is that fair?

A. The ones that I had tried, yes.

- - -

(Whereupon, Deposition Exhibit Topol-29, New York Daily News Reprint (3 pages), was marked for identification.)

- - -

BY MR. GOLDMAN:

Q. Let me show you what I'll mark as the next exhibit. Let's see if I can refresh your recollection on whether you suffered any stomach problems on traditional NSAIDs. This is Exhibit 29, and it is an excerpt from the New York Daily News. Directing your attention, Dr. Topol, to the paragraph, do you see

Page 320

it highlighted there?

A. No. What page are you on?

Q. Let me have it back, sir.

A. (Handing over document.)

Q. On the third page, I'll read it to you, and you tell me if it's accurate. This is quoting you: "Vioxx and Celebrex are 'great medicines,' adds the Queens born cardiologist who is 47. He takes them for knees wrecked playing college basketball. 'I used to have a lot of stomach problems and I don't challenge the stomach benefit,' says Topol."

A. Well, I haven't seen the thing, and it'd be nice if I could see it.

MS. DAGOSTINO: Where is the quote? I'm sorry.

MR. GOLDMAN: It's on Page 3, the third column to the right, second full paragraph.

THE WITNESS: (Witness reviewing document.)

Page 321

Okay.

BY MR. GOLDMAN:

Q. Is that correct or not?

A. I don't remember ever saying I used to have a lot of stomach problems, so, I don't believe that's correct.

Q. Is it true, Dr. Topol, that newspapers sometimes report things that aren't true?

A. I would assume that not everything in the newspaper is absolutely correct, yes.

MR. HAMELINE: Can we get a copy of that?

MR. GOLDMAN: Sure. (Handing over document.)

BY MR. GOLDMAN:

Q. You have pointed out on several occasions on your direct examination that you read newspaper articles, and you formed opinions in this case based on what you've read in newspaper articles. Is that true, sir?

A. There are only two newspaper

Π objects. Evidence is irrelevant. All Vioxx use has been excluded thus far & evidence of Dr. Topol's use is irrelevant.

405d92cd-4d0a-489f-87d2-231a3a1c3f6f

articles that I mentioned today that were not substantiated by medical literature that was peer reviewed. One was the ADVANTAGE trial which was supplementary to the Annals of Internal Medicine paper by Lisse et al. The other was the VALOR trial which, of course, has not been published, it never was done. Otherwise, all my comments were derived from the literature that was published in medicine in leading peer-reviewed journals.

Q. Let's talk about the VIGOR study. When did you first learn about the VIGOR results, Dr. Topol?

A. The VIGOR trial, to my -- really learning about it was not until, as I mentioned this morning, February 2001.

Q. Was the VIGOR trial published in the New England Journal of Medicine?

A. Yes. As I mentioned, the November 22nd, 2000.

Q. Is the New England Journal

of Medicine a top medical journal?

A. It's the leading impact journal in biomedicine today.

Q. Do you read it regularly?

A. I read articles -- it's impossible to keep up with all the medical literature, but I read all articles that are pertinent to my specialty, which is coronary artery disease, which is -- with the primary focus on the heart, yes.

Q. Is the New England Journal of Medicine a peer-reviewed journal?

A. Yes.

Q. That means that before the New England Journal of Medicine will publish an article, doctors who are knowledgeable in the field that's being described in the article review the article for accuracy.

A. "Peer review" means that the data are reviewed, and certainly the conclusions are -- yes, that's what peer review is all about.

Q. Peer reviewed is a standard process that medical journals use to ensure the quality of the articles that they publish; correct?

A. Correct.

Q. I want to talk briefly about how the VIGOR trial was conducted, and then we'll discuss the results. Okay?

A. Yes.

Q. Do you know that VIGOR tested whether Vioxx was safe at treating pain suffered by patients who had rheumatoid arthritis?

A. Yes. I mentioned that earlier today.

Q. And one of the things that the VIGOR trial sought to test was whether the patients who had rheumatoid arthritis could have relief from their pain without causing them as many stomach problems as naproxen; correct?

A. The primary, I think, endpoint of the study was the relief of gastrointestinal complications. That

was, I think, why the sample size and the power of the trial was set up, to detect whether or not rofecoxib/Vioxx would have an advantage over naproxen in that regard.

Q. Are patients with rheumatoid arthritis at higher risk of heart attacks?

A. As I mentioned this morning, yes, patients with RA, rheumatoid arthritis, do have higher event rates for heart attacks.

Q. In the VIGOR trial, patients who participated either used Vioxx 50 milligrams once a day or naproxen, 500 milligrams twice per day. Is that right?

A. That's correct.

Q. The dosage for Vioxx that was used is actually twice the highest recommended dose in the label for Vioxx, correct, sir?

A. That's correct, although I must say it was an 8,000 patient trial, so, it was a very large trial, and that's

405d92cd-4d0a-489f-87d2-231a3a1c3f6f

the dose that was picked by the trialist and the sponsor, yes.

Q. The dose that was picked was also approved by the FDA; correct, sir?

A. The dose approved by the FDA at the time was not approved for rheumatoid arthritis. It was approved for osteoarthritis, and I believe the doses were 12-and-a-half milligrams to 25 milligrams or up to 50 milligrams.

Q. I wasn't clear, sir.

The 50 milligram dose that was used in the VIGOR trial was approved by the FDA to be used in the VIGOR trial, correct, sir?

A. Well, that's not the way it works. You don't get doses approved by the FDA to use in a trial. There's an approval mechanism for a drug now that's on the market. The VIGOR trial, I believe, had started long before the drug was approved. So, what would be here would be a protocol that would be reviewed by the FDA. If that's what the

sponsor wants to use as a dose, then certainly the FDA isn't going to take issue with that.

Q. Does the FDA approve protocols before clinical trials can be conducted, sir?

A. The FDA reviews the protocols, and in general, unless there's something that's particularly an outlier regarding the design, the FDA will go along with what the sponsor's wishes are as long as there's no concern regarding overt safety and ethical issues. The sponsor is the one that would be responsible for picking the appropriate dose.

Q. You're not critical, Dr. Topol, of Merck's decision to use naproxen as the drug to compare Vioxx to, are you, sir?

A. No. I think naproxen, being a widely used nonsteroidal agent for arthritis, all types of arthritis, was a very suitable comparator.

Q. None of the patients in the VIGOR trial used placebo, did they?

A. The VIGOR trial did not test placebo. It was a so-called active comparison, that is, comparing one active anti-inflammatory versus another.

Q. A placebo is another word for a sugar pill. Is that right?

A. That would be an inactive drug, yes.

Q. You agree, sir, that it would have been unethical and inappropriate to conduct a study on patients with rheumatoid arthritis and give half of the group Vioxx and the other half a sugar pill?

A. No, I don't agree with that whatsoever. That is, you could do a trial, as long as you had some pain medicine, anti-inflammatory, that all the patients were getting to relieve their symptoms. And then on top of that, you could do Vioxx versus placebo on top of that. So, no, I don't agree with that.

Q. Would it be ethical, Dr. Topol, if half of the patients in the VIGOR study who had rheumatoid arthritis only took a placebo?

A. If they had no other relief for their rheumatoid arthritis symptoms?

Q. Yes.

A. No, that would not be proper.

Q. The VIGOR trial showed that Vioxx was an effective treatment for pain; correct?

A. The VIGOR trial showed there was no difference in pain relief between naproxen and Vioxx.

Q. That wasn't my question, Dr. Topol.

I asked you whether Vioxx was shown in the VIGOR trial to be an effective treatment for pain.

A. Effective compared with what, Mr. Goldman?

Q. Effective, period, sir.

A. No. You can't make --

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

effective, you have to have a reference. Here the reference was naproxen. It was shown to be no more effective than naproxen. So then you could say it's equally effective to naproxen, then I would say yes, for pain relief.

Q. Do you agree then, sir, [illegible] Vioxx worked to reduce pain that rheumatoid arthritis patients were experiencing in the VIGOR trial?

A. It reduced pain, as far as I understand from the data, equally, as well as naproxen at the doses that were administered with the 50 milligrams of Vioxx, yes.

Q. The results of VIGOR also showed that Vioxx significantly reduced the risk of stomach bleeds compared to naproxen; correct?

A. Yes. As reviewed earlier today, the risk of reduction of stomach bleeds was small, but statistically significant, and it was very much in keeping with the magnitude of the excess

of heart attacks and strokes.

Q. Dr. Topol, if you could try to just answer my questions directly --

MR. KLINE: Objection.

BY MR. GOLDMAN:

Q. -- and not add anything on to them, that would be helpful. My only question, sir --

MR. KLINE: Does the same rule apply to Merck? Let's redact Alise Reicin's deposition.

You should answer the questions fully and completely.

BY MR. GOLDMAN:

Q. Dr. Topol, did Vioxx significantly reduce the risk of stomach bleeds compared to naproxen in the VIGOR trial?

A. I believe I answered that question to the best of my ability.

Q. Is the answer yes?

A. As I had previously answered the question in context.

Q. Is the answer yes?

MR. HAMELINE: I think he's already answered the question. If you don't like the answer, that's a different issue.

BY MR. GOLDMAN:

Q. Dr. Topol, I'm asking you a very simple question.

Did Vioxx in the VIGOR trial substantially reduce or significantly reduce the risk of stomach bleeds compared to naproxen?

MR. KLINE: Objection, asked and answered.

THE WITNESS: Can you read my answer back, my initial answer, please.

\- - -

(Whereupon, the court reporter read the pertinent part of the record.)

\- - -

BY MR. GOLDMAN:

Q. Was there a 54 percent reduction in the risk of perforations,

ulcers and bleeds in the Vioxx group compared to the naproxen group, sir?

A. I had to go back to the paper and put that in. I have to look at the data if you'd like me to answer that. I don't memorize statistics about the gastrointestinal bleeding. That's not my field of expertise.

Q. Do you want to take a minute to look at it?

A. I don't have the VIGOR paper. If you'd like to produce it.

Q. What I'll do, Dr. Topol, is show this to you at a break so that you can read it for me rather than do it on the record. Is that okay?

A. Whatever you would like.

MR. HAMELINE: Let me just note that Dr. Topol is here for one day of deposition. And we've taken this morning, and I know that it's not your issue, but this morning we've gone off the record repeatedly and not counted that or

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

at least the argument is not counted that against his running time. If you're going to ask him questions about an exhibit, why don't you show it to him. We'll try to cooperate off the record if we can, but I don't want this to be an off-the-record issue which prolongs this day unduly.

MR. KLINE: I would like him to look at it now, rather than at some break.

MR. GOLDMAN:

Q. Let's talk about the cardiovascular results of VIGOR. Okay, Doctor?

We saw in the VIGOR trial that there were more cardiovascular events in the Vioxx group than in naproxen; correct?

A. That's correct. And I did review that this morning. I'll be happy

Q. So, you reviewed the data

about the cardiovascular events in VIGOR this morning, but you didn't review the data about the reduction in stomach bleeds.

A. No. I did review in my letter of December 30, 2004 correspondence in the New England Journal. I commented about the gastrointestinal complications, as well as, but I did not cite the particular bleeding figure, percentage that you just asked me about.

Q. Was the difference in cardiovascular events in the Vioxx group mostly due to a five times difference in heart attacks compared to the naproxen group?

A. Well, let me just be very clear about that. Okay? There were 22 deaths in the Vioxx group and 15 deaths, as I reviewed, in the naproxen group. There were 20 heart attacks versus -- in the Vioxx group versus 4. So, there was an excess of deaths. That was a 46

percent excess of deaths, which is similar, if your number is right, with respect to the bleeding complications. If we're talking about percentages, 46 percent increase in death and 46 percent increase in bleeding complication, if that's correct. We have a five fold, 500 percent increase in heart attack. And then we have also an increase in stroke, 11 versus 9.

So, according to the correct data, which was not published in the New England Journal paper by Bombardier in November 22, 2000, there was 53 of these events, death, heart attack or stroke versus 28. The largest portion of those in terms of numerical were heart attack, but there was a consistent excess across each, death, heart attack and stroke.

MR. GOLDMAN: Move to strike as nonresponsive.

BY MR. GOLDMAN:

Q. Dr. Topol, first of all, the deaths that you just described, the 22

versus 15, those weren't all heart attack deaths or cardiovascular deaths, were they, sir?

A. Predominantly they were, yes, as reported in the study report in the FDA, yes.

Q. Is it your testimony under oath, Dr. Topol, that the majority of the 22 deaths and the majority of the 15 deaths reported in VIGOR were heart attacks?

A. Not heart attacks, but they were cardiovascular deaths, and I'd be happy to go to the Targum report where they're enumerated in tables if you would like.

Q. My question actually was not about the deaths, Dr. Topol. My question was about whether or not in VIGOR the difference in cardiovascular events was attributed mostly because there was a five times more -- five times greater difference in heart attacks versus naproxen.

405d92cd-4d0a-489f-87d2-231e3a1c3f6f