Page 338

```
1        MR. KLINE:  Objection to the
2    introduction.
3  BY MR. GOLDMAN:
4        Q.   Dr. Topol, was there a five
5    times difference in heart attacks in the
6    Vioxx group versus the naproxen group in
7    the VIGOR study?
8        MR. HAMELINE:  So, can I
9    just interject a comment here.
10    You're asking him very specific
11    questions about the data in the
12    VIGOR study without putting the
13    VIGOR study in front of him.  To
14    the extent that Dr. Topol has
15    memorized all of this or put it
16    into subsequent articles, that's
17    fine.  I'm just trying to make
18    sure that the answers are fair and
19    complete.
20        THE WITNESS:  Okay.
21  BY MR. GOLDMAN:
22        Q.   Let me back up, Dr. Topol.
23    I think you said in one of your previous
24    answers that there were 20 heart attacks
```

Page 339

```
1    seen in the Vioxx group and 4 heart
2    attacks seen in the naproxen group.
3    Right?
4        A.   That's correct.
5        Q.   That's a five times
6    difference; right?
7        A.   That's correct.
8        Q.   ... what percentage of the
9    patients in the Vioxx group had heart
10    attacks?
11        A.   That would be 20 of 4,047.
12    So, that would be approximately -- I
13    don't have a calculator, but it would be
14    approximately .5 percent.
15        Q.   One half of one percent?
16        A.   One half of one percent.
17        Q.   Do you know what the
18    percentage of heart attacks in the
19    naproxen group was?
20        A.   Well, that was 4 out of
21    4,029, which is less than .1 percent.
22        Q.   Or less than one-tenth of
23    one percent?
24        A.   That's correct.
```

Page 340

```
1        Q.   Because there was no placebo
2    group in the VIGOR study.  If you only
3    looked at the VIGOR study without looking
4    at any other data, you wouldn't be able
5    to tell the reason for the difference in
6    heart attacks in the Vioxx group versus
7    naproxen; is that right?
8        A.   I'm not sure that I
9    understand that question.
10        Q.   If you just look at the
11    VIGOR study --
12        A.   Yes.
13        Q.   -- at the time that it was
14    done and you don't consider any data
15    outside of the VIGOR study --
16        A.   Yes.
17        Q.   -- you don't know whether
18    the difference in heart attacks between
19    Vioxx and naproxen was due to Vioxx --
20        A.   Oh, I see.
21        Q.   -- naproxen or chance.
22        A.   Now I understand your
23    question.  Okay.  So, first --
24        Q.   Is that right?
```

Page 341

```
1        A.   Yes, you do know.  That is,
2    I reviewed this this morning, but just to
3    recap.  When you're doing clinical trials
4    with an experimental drug, in this case,
5    it's Vioxx, versus a drug that's been
6    around for 20 years, in this case,
7    naproxen, which is considered the control
8    arm, not a placebo, but a control arm,
9    and if you have an untoward event crop up
10    like occurred in the VIGOR trial, one has
11    to assume that it's the experimental drug
12    excess that's the problem rather than
13    what was introduced by Merck, which is
14    substantiated in the Targum report and
15    other places, which is that it was a
16    protective effect of naproxen which was
17    not documented.  The only appropriate
18    conclusion would have been that there was
19    a problem with the experimental drug,
20    which in this case was Vioxx.
21        Q.   Is it your testimony, Dr.
22    Topol, that when you reviewed the VIGOR
23    study, it was your conclusion that Vioxx
24    caused the difference in heart attacks
```

Page 342

1  and not naproxen and not chance?
2      A.   Yes.  That was our
3  conclusion, but we did not at that time
4  have the replication that was needed to
5  say that this drug should be taken off
6  the market or something drastic.  What we
7  did say, as we wrote in the JAMA paper,
8  as you well know and I reviewed earlier,
9  is that more data were needed, and
10  specific significant caution must be
11  exercised in using this medicine because
12  of the heart attack risk.
13      Q.   Did the Food & Drug
14  Administration hold a special Advisory
15  Committee meeting in February of 2001 to
16  discuss the question of whether COX-2
17  inhibitors cause heart problems?
18      A.   Yes.  They had, as I
19  mentioned this morning, a two-day
20  conference, one for each of the drugs,
21  Celebrex and Vioxx.
22      Q.   What is an FDA Advisory
23  Committee briefly, sir?
24      A.   Well, a panel of experts are

Page 343

1  brought in, and the data are reviewed,
2  and there's recommendations by the panel
3  to give to the FDA staff, and the FDA
4  staff can either accept or reject those
5  recommendations.  But this is a panel of
6  experts.  In this particular case, it was
7  predominantly rheumatologists.  There
8  were only two cardiologists who were
9  invited to the panel to review Vioxx and
10  Celebrex.
11      Q.   One of the cardiologists who
12  was on the Advisory Committee was your
13  colleague, Dr. Steven Nissen; is that
14  right?
15      A.   Yes.
16      Q.   He is a well-respected
17  cardiologist, correct, sir?
18      A.   Yes.
19      Q.   The FDA Advisory Committee
20  meetings that are held, those are open to
21  the public, aren't they, Dr. Topol?
22      A.   Yes.
23      Q.   The transcripts from the
24  Advisory Committee meetings are available

Page 344

1  on the FDA website; right?
2      A.   Yes.  And I have even
3  reviewed the transcript of this meeting
4  in depth, yes, in the past.
5      Q.   You also know then that the
6  presentations that are made during the
7  Advisory Committee meeting are also
8  available on the FDA website; right?
9      A.   That's correct.  And I've
10  reviewed the presentations as well.
11      Q.   During the Advisory
12  Committee meeting that your colleague,
13  Dr. Nissen, attended, Merck gave a
14  presentation; right?
15      A.   Merck gave a substantial
16  presentation, that's right.
17      Q.   Pfizer gave a presentation
18  about Celebrex; correct?
19      A.   That was on a different day,
20  yes.
21      Q.   The FDA made a presentation
22  as well; correct?
23      A.   Yes.
24      Q.   The FDA also prepared

Page 345

1  background materials for the Advisory
2  Committee, analyzing the clinical trials
3  that had been done on Vioxx and Celebrex;
4  correct, sir?
5      A.   That's correct.
6      Q.   After the presentations were
7  made, the Advisory Committee discussed
8  the issues, including the risk of --
9  cardiovascular risk that was potentially
10  associated with COX-2 inhibitors; right?
11      A.   In reviewing that,
12  transcripts and the presentations and
13  also discussing this with Dr. Targum, who
14  had the most important data, that is,
15  VIGOR, 085 and 090, she was given less
16  than five minutes to present her
17  findings, which were only really
18  understood by reviewing the report in
19  depth.  Her slides are on the FDA website
20  still.  They do not adequately convey the
21  concerns that she registered, and I'll be
22  happy to review some of the statements
23  that are in her report which are highly
24  disturbing and concerning.  So, in

Page 346

1  effect, Dr. Targum, who did the most
2  thorough review, cardiologist at the FDA,
3  never had her chance to express her views
4  at least as she's conveyed to me and
5  certainly as conveyed by reviewing the
6  FDA slides and her -- and the transcript
7  of that day.
8      Q.  Is it your testimony, Dr.
9  Topol, that Shari Targum of the FDA was
10 not permitted by the FDA to get up and
11 give a full presentation of what she
12 thought about the risks, if any,
13 associated with COX-2 inhibitors?
14     A.  She conveyed that to me in a
15 telephone conversation, exactly the sense
16 that she did not -- she was not able to
17 evoke enough concern among the two
18 cardiologists on the panel, even though
19 they recommended strong changes in the
20 language of the package insert and the
21 label of the drug.
22     Q.  Your colleague, Dr. Nissen,
23 was sitting through the presentation that
24 Miss Targum gave, correct, sir?

Page 347

1      A.  The brief presentation.
2  Approximately three minutes as he relayed
3  to me.
4      Q.  If Dr. Nissen wanted to hear
5  more from Shari Targum of the FDA, he
6  would have said to Ms. Targum, can you
7  tell me more, correct, sir?
8      A.  He didn't know there was
9  anything there to add.  Only later, after
10 the review of the data and the review of
11 her report on the website would it become
12 more evident that there were significant
13 concerns.
14     Q.  The Targum report that you
15 keep referring to is a report that was
16 actually presented to the Advisory
17 Committee members, correct, sir?
18     A.  She wrote it February 1st.
19 I don't know whether it was distributed
20 to the Advisory Committee before that
21 meeting. I don't know that.  You'd have
22 to ask Dr. Nissen that.
23     Q.  Shari Targum prepared a set
24 of materials for the benefit of the

Page 348

1  Advisory Committee; right, sir?
2      A.  I believe that's what -- she
3  did it for that advisory panel, but I
4  don't know -- what you're asking is, was
5  it distributed to the panelists in
6  advance?  I don't know that.  I wasn't
7  there. This was Dr. Nissen's first FDA
8  panel.
9      Q.  Did Dr. Nissen give a slide
10 presentation during the February 2001
11 Advisory Committee meeting?
12     A.  I'm not aware of that.
13     Q.  I thought you said a minute
14 ago you reviewed the transcript?
15     A.  I reviewed the transcripts
16 of the relevant sections. I did not go
17 through every slide presentation, and
18 it's been quite a while.  I mean, it's
19 been probably at least a year or a year
20 and a half since I reviewed that, but I
21 don't recall seeing a presentation by Dr.
22 Nissen on VIGOR.
23     Q.  Do you remember, Dr. Topol,
24 that Dr. Nissen had actually made a

Page 349

1  presentation to the other members of the
2  Advisory Committee specifically
3  addressing VIGOR, addressing the CLASS
4  trial or the Celebrex trial and
5  addressing an analysis he did of four
6  different aspirin trials?  Do you
7  remember that?
8      A.  That -- now, okay, you're
9  talking about a whole different FDA
10 panel.  This is not February of 2001.
11 Because the aspirin comparison was an
12 idea I had after he got back.  So, you
13 have the wrong FDA panel.
14     Q.  Dr. Topol, did Dr. Nissen
15 make a presentation at the Advisory
16 Committee meeting in February of 2001
17 where he discussed VIGOR, where he
18 discussed the CLASS trial, which was
19 Celebrex's outcome trial, and a trial
20 called the Primary Prevention Project?
21     MR. HAMELINE:  So, can I
22 just interject a comment here.
23     Dr. Nissen -- Dr. Topol has said
24 several times he was not at the

*[handwritten: I object. Hearsay. Dr. Nissen is not available for cross examination.]*

*[handwritten: overruled]*

---

Page 350

1    meeting. He's --
2        MR. GOLDMAN: I'm asking if
3    he knows.
4        MR. HAMELINE: He's reviewed
5    the website. If it's on the
6    website, why don't you show it to
7    him. You can ask him if he knows.
8    But I think he's already testified
9    that he doesn't.
10       THE WITNESS: You just
11   changed your question.
12   BY MR. GOLDMAN:
13       Q.   Dr. Topol, are you aware one
14   way or the other whether Dr. Nissen made
15   a presentation where he talked about
16   VIGOR, CLASS and a trial called the
17   Primary Prevention Project?
18       A.   That is possible, but I
19   certainly not the four trials that you
20   just asked about previously. That's not
21   possible.
22       Q.   Let me show you, sir, an
23   excerpt from the FDA Advisory Committee
24   meeting.

---

Page 351

1        MR. GOLDMAN: We'll mark
2    this as the next exhibit, 30.
3          - - -
4        (Whereupon, Deposition
5    Exhibit Topol-30, "Arthritis
6    Advisory Committee NDA #
7    21-042/S007, Vioxx (Rofecoxib,
8    Merck)" 2-8-01, 1-3; 210, was
9    marked for identification.)
10         - - -
11   BY MR. GOLDMAN:
12       Q.   Dr. Topol, do you see on
13   page 210 of the transcript that Dr.
14   Nissen is making comments during the
15   Advisory Committee meeting on February
16   8th?
17       A.   Yes. I'm familiar with this
18   comment. I reviewed this -- I remember
19   this -- I mean, it's just the one comment
20   on this one page, 210, but I do remember
21   it, yes.
22       Q.   Do you see that Dr. Nissen
23   was being asked about the label for Vioxx
24   and what it should say about any

---

Page 352

1    potential cardiovascular risks?
2        MR. HAMELINE: Objection. I
3    don't think he's being asked.
4    He's making a comment.
5    BY MR. GOLDMAN:
6        Q.   Dr. Topol, does Dr.
7    Nissen --
8        MR. KLINE: Objection.
9    BY MR. GOLDMAN:
10       Q.   -- make the following
11   statement to the Advisory Committee?
12   "Briefly, I think what I would say in the
13   label is that there was an excess of
14   cardiovascular events in comparison to
15   naproxen, that it remains uncertain
16   whether this was due to beneficial
17   cardioprotective effects of naproxen or
18   prothrombotic effects of the agent, and
19   leave it at that, that basically we don't
20   know the reason"?
21       MR. KLINE: Objection.
22   BY MR. GOLDMAN:
23       Q.   Do you see that, sir?
24       MR. KLINE: Objection,

---

Page 353

1    multiple reasons I'll fill in
2    later.
3    BY MR. GOLDMAN:
4        Q.   Do you see that?
5        A.   Yeah, I see it, and I
6    understand that completely. As of
7    February 8, 2001, which I believe was the
8    date of this -- and I also understand
9    that the consensus of the panel was like
10   this, that there needed to be a change in
11   the label about the cardiovascular risk.
12   So, this is consistent with that.
13       Q.   Did you agree with Dr. Topol
14   in February -- I'm sorry, withdrawn.
15       Did you agree with Dr.
16   Nissen in February of 2001 that it
17   remains uncertain whether the excess of
18   cardiovascular events compared to
19   naproxen was due to the beneficial
20   cardioprotective effects of naproxen or
21   prothrombotic effects of Vioxx?
22       MR. KLINE: Same objection.
23       THE WITNESS: We expressed
24   the same question in our JAMA

---

89 (Pages 350 to 353)

Page 354

1  paper that came out later in the
2  year, and the point being is that
3  we, after much more careful review
4  of the data, it was not at all
5  apparent that this could be
6  attributed to naproxen benefit.
7  At the time in February 8th of
8  2001 before we had a chance to
9  rake over the data, there was less
10  certainty.  It was more ambiguous.
11  Over time, as we had a chance to
12  review things, and certainly as
13  more studies came out beyond ours,
14  it became increasingly clear.  And
15  that's why in the JAMA paper Dr.
16  Nissen and I and Dr. Mukherjee
17  concluded about the cautionary use
18  of this drug.
19  BY MR. GOLDMAN:
20      Q.  Dr. Topol, I didn't ask you
21  anything about your opinion.
22          MR. KLINE:  Objection.
23  BY MR. GOLDMAN:
24      Q.  My question is whether --

Page 355

1          MR. KLINE:  Move to strike.
2  BY MR. GOLDMAN:
3      Q.  -- in February of 2001 you
4  agreed with Dr. Nissen that it was
5  uncertain whether the difference in heart
6  attacks that was seen between Vioxx and
7  naproxen was due to Vioxx, was due to
8  naproxen or chance?
9      A.  I did not see Dr. Nissen on
10  February 8th, 2001.  I saw him on
11  February 9th, 2001 when we both were back
12  in Cleveland, I was in Georgia, he was at
13  the FDA.  And he came to me and said I'm
14  quite concerned.  So, his concern wasn't
15  reflected by this statement.
16      Q.  I'll ask one more time, sir.
17          MR. KLINE:  Objection.
18  BY MR. GOLDMAN:
19      Q.  Did you agree in February of
20  2001 with Dr. Nissen that it was
21  uncertain whether the difference in
22  cardiovascular events seen between Vioxx
23  and naproxen was due to Vioxx, was due to
24  naproxen or chance?

Page 356

1      A.  I've answered that several
2  times earlier today, that it's in the
3  manuscript.  We didn't know for sure at
4  that point, and that is pointed out in
5  our JAMA paper on several, at least two,
6  if not three times in that manuscript.
7      Q.  Is the answer to my question
8  yes, Doctor?
9          MR. KLINE:  Objection.
10          THE WITNESS:  With the one
11  trial of VIGOR and the very
12  staunch defense of this naproxen
13  hypothesis offered by Merck
14  without independent replication,
15  without any other studies, one
16  could not make definitive -- and
17  we said that in the JAMA paper,
18  not make definitive conclusions.
19  That's true.
20      Q.  You said on direct
21  examination, Dr. Topol, that a black box
22  warning could easily have been imposed by
23  February of 2001.  Do you remember

Page 357

1  testifying to that?
2      A.  Yes.
3      Q.  Did anybody at the Advisory
4  Committee meeting suggest that a black
5  box warning be put on the Vioxx label?
6      A.  No.  And that's because the
7  correct data for study 090 were not
8  presented.
9      Q.  ... we're going to talk a lot
10  about 090, Dr. Topol.
11      A.  Good.  I'll be happy to.
12  Look forward to it.
13      Q.  Dr. Topol, my question is
14  whether anybody at the Advisory Committee
15  meeting in February of 2001, including
16  your colleague, Dr. Nissen, suggested
17  that a black box warning be added to the
18  Vioxx label?
19      A.  I don't know the answer to
20  that.  I don't recall the transcript
21  enough to be able to say whether anyone
22  registered that concern.  I know there
23  are only two cardiologists there, so,
24  that's one issue.  But I don't know.

Page 358

1    Q.   Do you see in the excerpt
2  that I provided to you that Dr. Nissen
3  doesn't say anything about a black box
4  warning?  Correct, sir?
5    A.   You provided one page of a
6  1,000 page transcript.  That's not -- I
7  mean, that's not a full disclosure here.
8  It's not very comprehensive, so, I can't
9  say.
10   Q.   Based on the excerpt that I
11 did provide you, do you see that in that
12 answer Dr. Nissen is not saying anything
13 about a black box warning on Vioxx?
14   A.   I certainly don't see that
15 in that excerpt, no.
16
17         proposed cardiovascular outcome study;
18 correct?
19   A.   I discussed that we were
20 invited by Dr. Reicin --
21   Q.   No.
22   A.   That's what you're talking
23 about.
24   Q.   That's not what I was

Page 359

1  talking about.
2         On direct examination, Dr.
3  Topol, you were asked a bunch of
4  questions about your cardiovascular
5  outcomes study; correct?
6    A.   I addressed that earlier
7  today, yes.
8    Q.   You proposed a
9  cardiovascular outcomes study to both
10 Merck and Pfizer; true?
11   A.   I did not propose any
12 cardiovascular outcome trial to Pfizer,
13 and Dr. Bhatt is the one who picked up
14 the ball and proposed this to Merck.  And
15 I knew about it.  I told them about it,
16 but I wasn't the one that made any
17 proposal to either company.
18   Q.   Do you think, Dr. Topol,
19 back at the time that you were suggesting
20 that both Merck conduct a cardiovascular
21 outcome trial and Pfizer conduct one?
22   A.   I thought that would be
23 appropriate given the uncertainty about
24 this heart attack risk, yes.

Page 360

2    Q.   Do you agree, Dr. Topol,
3  that your suggested approach, the
4  cardiovascular outcomes study, was not
5  the only way to address the question of
6  whether there was a potential
7  cardiovascular risk associated with COX-2
8  inhibitors?
9    A.   I had stated earlier today
10 that the only way to get the answer
11 definitively in patients who have heart
12 disease is to do a trial in patients with
13 heart disease.
14                          the clinical trials that were done on
15 Vioxx did not involve patients who either
16 had heart disease or were at risk of
17 heart disease.  Was that your testimony?
18   A.   No.  My testimony was with
19 heart disease.
20   Q.   Dr. Topol, you do know that
21 in the clinical trials for Vioxx, there
22 were people who actually were at risk of
23 heart disease?
24         MR. HAMELINE:  Objection.

Page 361

1  Are you talking about all the
2  clinical trials?
3         THE WITNESS:  "At risk" is
4  not the same as having heart
5  disease.  The number of patients
6  with actual bona fide documented
7  heart disease is vanishingly
8  small, almost nonexistent in these
9  trials.  They were almost
10 systematically excluded.  There's
11 a different matter about whether
12 someone has risk for heart
13 disease, a number of risk factors,
14 but I'm talking about documented
15 coronary artery disease.
16 BY MR. GOLDMAN:
17   Q.   Dr. Topol, you do know that
18 there were patients who participated in
19 Vioxx's clinical trials who did have
20 documented cardiovascular disease; right?
21   A.   As I just said, the numbers
22 of those patients are vanishingly small,
23 perhaps as low as one percent and in some
24 trials, zero.

Page 362

1    Q.   Do you believe, Dr. Topol,
2  that your proposed study, your proposed
3  cardiovascular outcomes study was the
4  only way to -- withdrawn.
5         Do you believe, Dr. Topol,
6  that your proposed cardiovascular
7  outcomes study was the only reasonable
8  way to address the potential risk
9  associated with Vioxx and Celebrex
10 concerning cardiovascular disease?
11   A.   First of all, I would go
12 back to our JAMA paper.
13   Q.   I'm not asking about the
14 JAMA paper. I'm asking you --
15   A.   But you're asking about the
16 cardiovascular trial.
17   Q.   Dr. Topol, I'm asking you,
18 as you sit here today, do you believe
19 that your proposed cardiovascular outcome
20 trial was the only way to assess the
21 potential for cardiovascular risk in
22 patients who took Vioxx and Celebrex?
23   A.   I answered your question
24 earlier. In patients -- if we wanted to

Page 363

1  know about patients with coronary artery
2  disease, and as I reviewed this morning,
3  40 to 50 percent of the patients, of the
4  20 million taking Vioxx or by various
5  registries and surveys, had established
6  coronary artery disease, the only way to
7  find out about those patients and their
8  quantifiable risk is in a study, a trial
9  dedicated to only enter patients with
10 established coronary artery disease, and
11 there's no other way to do that, no.
12 That's the only way to do such a trial.
13   Q.   Do you agree, Dr. Topol,
14 that all clinical trials must offer
15 potential benefits to patients?
16   A.   One can never do a trial
17 with just testing the side effects
18 without at least a putative equal or
19 better benefit.
20   Q.   Is the answer to my question
21 yes, all clinical trials must offer
22 potential benefit to patients?
23        MR. HAMELINE: I think he
24    just answered your question. He's

Page 364

1  given you a fulsome, complete
2  response.
3        THE WITNESS: Can you read
4  back my answer, please.
5  BY MR. GOLDMAN:
6    Q.   I'm not interested in your
7  answer. I'm asking you a separate
8  question.
9    A.   I want to see if I answered
10 the question adequately because you
11 challenged that I didn't.
12   Q.   Dr. Topol, can you answer
13 this question yes or no?
14        Do all clinical trials have
15 to have some potential benefit offered to
16 patients?
17   A.   All clinical trials should
18 have a therapeutic potential, yes, a
19 benefit, yes.
20   Q.   You can't give patients
21 medicine in a clinical trial just to see
22 if they get sick; right?
23        MR. HAMELINE: Can I just
24    read what's in the order for the

Page 365

1  MDL, which is that "Once the
2  witness has fully answered a
3  question, that same or
4  substantially the same question
5  should not be asked again." I
6  think this has been violated for
7  the fourth -- I know you want to
8  get at concrete issues here, but I
9  do think that he's answering and
10 answered that question fully the
11 first time.
12 BY MR. GOLDMAN:
13   Q.   Dr. Topol --
14        MR. KLINE: Can we adopt Mr.
15 Goldman's rule for the Merck
16 witnesses as his approach to --
17        MR. GOLDMAN: I'd really not
18 have a speech on the record, Mr.
19 Kline. If you have an objection,
20 please state it.
21        MR. KLINE: We would be
22 really advanced in this
23 litigation.
24 BY MR. GOLDMAN:

*π objects
Asked
and
answered*

Page 366

```
 1      Q.   Dr. Topol --
 2      A.   Yes.
 3      Q.   -- you can't give patients
 4  medicine just to see if they have a heart
 5  attack or die, correct, sir?
 6      A.   I would never be involved in
 7  a clinical trial or advocate doing a
 8  trial where there was just testing for
 9  harm.  You have to have -- you don't put
10  patients -- experiment on patients unless
11  you're looking at benefit and also, of
12  course, always assaying the risk as well.
13      Q.   You sent a copy of your
14  proposed protocol to Merck in May of
15  2001; correct?
16      A.   That's incorrect.  I did not
17  send anything to Merck.
18      Q.   Did --
19      A.   Dr. Bhatt sent a proposal to
20  Merck, and I was only relaying Merck's
21  interest to Dr. Bhatt.
22      Q.   Does Dr. Bhatt work at the
23  Cleveland Clinic, sir?
24      A.   Yes, he does.  He works in
```

Page 367

```
 1  my department, but I did not send this
 2  protocol to Merck.
 3          - - -
 4          (Whereupon, Deposition
 5      Exhibit Topol-31, E-mails,
 6      MRK-AAZ0001594, was marked for
 7      identification.)
 8          - - -
 9          (Whereupon, Deposition
10      Exhibit Topol-32, "Rofecoxib in
11      the Prevention of Ischemic Events
12      in Patients with Acute Coronary
13      Syndromes and Elevated Markers of
14      Inflammation," (Bhatt, et al)
15      MRK-ABA0003235 - MRK-ABA0003244,
16      was marked for identification.)
17          - - -
18  BY MR. GOLDMAN:
19      Q.   I've marked as Exhibit 31
20  and 32 two documents.  The first is Bates
21  stamped -- this is 31, MRK-AAZ0001594.
22  Exhibit 32 is MRK-ABA0003235 to 3244.
23          Do you see, Dr. Topol, on
24  the first exhibit, Exhibit 31 on May 2nd,
```

Page 368

```
 1  2001 -- is it Dr. Bhatt?
 2      A.   Dr. Bhatt, Deepak Bhatt.
 3      Q.   Dr. Bhatt is sending an
 4  e-mail to Dr. Reicin and says, "Hello.
 5  As Dr. Topol promised, here is our
 6  protocol regarding the use of Vioxx in
 7  acute coronary syndromes."  Do you see
 8  that?
 9      A.   I see that, and I already
10  discussed that this morning.  And what I
11  said, if I can go back --
12      Q.   My question was just, do you
13  see that?
14      A.   I see that, yes.
15      Q.   The protocol that Dr. Bhatt
16  sent to Merck is Exhibit 32, isn't it?
17      A.   That's what you just gave
18  me, yes.
19      Q.   Do you see on the second
20  page, top left corner, there's a date,
21  May 2nd, 2001?  Do you see that, sir?
22      A.   Yes.  This was two weeks
23  after it was requested from Dr. Reicin
24  when she visited Cleveland Clinic.
```

Page 369

```
 1      Q.   I want to talk about the
 2  specifics of your proposed outcomes
 3  study.  Okay?
 4      A.   Dr. Bhatt authored this
 5  study.  You probably should talk to him.
 6      Q.   This is a study, Dr. Topol,
 7  that you, on the first page, and Dr.
 8  Bhatt put together; is that right?
 9      A.   Well, he put it together.
10  He put my name on it.  And he sent it to
11  Merck.  But I did not go over the study.
12  This was a request by Merck.  I didn't
13  have any particular interest in doing
14  this trial, and I asked Dr. Bhatt if he
15  was interested and he followed up on it.
16      Q.   It's your testimony, Dr.
17  Topol, that you were not interested in
18  conducting the cardiovascular outcomes
19  study that you suggested be done?
20      A.   I wasn't interested in doing
21  the trial per se.  I had been outspoken
22  about the need to do a trial.  I didn't
23  think it would be appropriate if I did
24  the trial per se.
```

Page 370

1    Q.  Well, you -- withdrawn.
2        The protocol for your trial,
3  by "your," I mean the Cleveland Clinic --
4    A.  Right.
5    Q.  -- includes Dr. Bhatt's
6  name and your name; correct?
7    A.  He put my name on it, but
8  that doesn't mean that I was involved in
9  this. This is a protocol sketch, and I
10  guess he was looking for feedback from
11  Merck. But I did not go over this in
12  terms of, did I think this was the
13  appropriate design. This was a brief
14  conversation I had with Dr. Bhatt, and I
15  don't recall all the details. It's back
16  four years ago in May 2001, but I did not
17  author this protocol, and my name was
18  loosely attached to it. I was not
19  interested in running a trial personally
20  on this because I didn't feel that was
21  appropriate. I thought it should be
22  done, but I should not necessarily be
23  involved with it.
24    Q.  Dr. Topol, did the Cleveland

Page 371

1  Clinic send a protocol to Merck outlining
2  what the Cleveland Clinic believed would
3  be an appropriate cardiovascular outcomes
4  study for Vioxx?
5    A.  Dr. Bhatt did, yes.
6    Q.  How many patients did you
7  believe should participate in a
8  cardiovascular outcomes study?
9    A.  Do I believe or did Dr.
10  Bhatt put in the protocol? I'm not sure
11  if I understand your question.
12    Q.  The question was, do you
13  believe that -- withdrawn.
14        Dr. Topol, did the Cleveland
15  Clinic, when it sent this protocol to
16  Merck, believe that it was the
17  appropriate cardiovascular outcomes study
18  to conduct?
19    A.  I don't -- I would have to
20  read the protocol now if you'd like me
21  to.
22    Q.  Sure.
23    A.  (Witness reviewing
24  document.)

Page 372

1    MR. GOLDMAN: We can go off
2  the video while Dr. Topol is doing
3  that.
4    MR. HAMELINE: Again, I
5  don't mean to take this out on
6  your time, but if you want to ask
7  him questions about particular
8  issues, this is going to be a very
9  long day for Dr. Topol. And so
10  he's going to read through this
11  quickly and will try to answer
12  your questions directly. So, I
13  don't think it's fair that we go
14  off the record and not count time.
15    MR. GOLDMAN: We've gone off
16  the record several times for the
17  plaintiffs and not counted the
18  time --
19    MR. KLINE: Not to review --
20    MR. GOLDMAN: -- so, I would
21  appreciate the same courtesy.
22    MR. KLINE: Not to review
23  documents. Not to sit and review
24  documents. I provided no

Page 373

1  documents where the witness was
2  then asked off the record to sit
3  and review them.
4    MR. HAMELINE: I want to be
5  fair to both sides. We're just
6  trying to get through this. I
7  recognize this. You know, if Dr.
8  Topol can review it quickly, let's
9  just move on.
10    (Witness reviewing
11  document.)
12  BY MR. GOLDMAN:
13    Q.  Did you review now, Dr.
14  Topol, the protocol that has your name on
15  it and that was sent to Merck on May 2nd
16  of 2001?
17    A.  I've had a chance to breeze
18  through this. I would hardly call this a
19  protocol. This is a concept sheet.
20  There's nothing about sample size.
21  There's nothing about event rates. This
22  is as minimal as one could ever imagine.
23  I would not call this a protocol. This
24  is a concept. There's not even the most

Page 374

1  important salient features of a true
2  clinical trial in this document.
3      Q.   Do you agree with the
4  concept that's being expressed in Exhibit
5  32 which has your name on it?
6      A.   The concept of studying
7  Vioxx in patients with acute coronary
8  syndromes who have elevated C-reactive
9  protein is a concept that I discussed
10  with Dr. Reicin and Dr. Demopoulos when
11  they visited Cleveland just two weeks
12  prior to this point on April 14, I
13  believe, of the same year.
14      MR. GOLDMAN: Objection,
15      move to strike, nonresponsive.
16  BY MR. GOLDMAN:
17      Q.   Dr. Topol, if you'd turn to
18  Page 6 of the concept that Cleveland
19  Clinic sent to Merck, do you see on the
20  top, the criteria for inclusion in this
21  proposed study was that participants be
22  male or female, 18 years or older?  Do
23  you see that?
24      A.   Uh-huh.

Page 375

1      Q.   And then point 2, "Being
2  admitted for acute coronary syndrome.
3  The patient was admitted to an inpatient
4  facility with an acute coronary syndrome
5  defined as:  Ischemic discomfort at rest
6  lasting at least five minutes."  Do you
7  see that, sir?
8      A.   Yes.
9      Q.   Can you briefly, sir,
10  describe what acute coronary syndrome is?
11      A.   It's either a threatened or
12  actual heart attack, that is,
13  inflammation in the arteries that are
14  leading to a crack in the artery wall
15  with a blood clot potentially, and these
16  are patients who could have a small or a
17  threatened heart attack.
18      Q.   So, the concept that
19  Cleveland Clinic was proposing to Merck
20  involved taking patients who were
21  threatened with a heart attack or who had
22  a heart attack to participate in this
23  study; correct?
24      MR. HAMELINE: Could I just

Page 376

1  note a continuing objection that
2  this is not the Cleveland Clinic's
3  concept, it's Dr. Bhatt's, and I
4  think we've made that abundantly
5  clear.
6  BY MR. GOLDMAN:
7      Q.   Dr. Topol, the concept that
8  has your name and Dr. Bhatt's name on it
9  describes these criteria for inclusion,
10  and as you described acute coronary
11  syndrome, the concept was that patients
12  who either were threatened with a heart
13  attack or who had a heart attack would
14  participate in the study.  Is that right?
15      A.   That's correct.  But you're
16  leaving out one important element.  And
17  as in the title of this concept sheet,
18  "Elevated Markers of Inflammation," and
19  in the inclusion criteria on Page 6 that
20  we are now reviewing, you see Item Number
21  3, it says, "AND Item Number 3, elevated
22  high-sensitivity C-reactive protein"
23  known as CRP "greater than .2."  So, they
24  had to have arterial inflammation, and

Page 377

1  that was the whole point of the concept,
2  was that rofecoxib, as well as celecoxib,
3  have been shown to reduce inflammation.
4  So, in fact, it could be a benefit to
5  these patients to suppress subsequent
6  heart attacks.
7      Q.   I want to talk about that in
8  one minute, Dr. Topol.
9      Do you see, sir, that the
10  concept that you were proposing to Merck
11  calls for the study to last a minimum of
12  one year?
13      A.   Where is that?
14      Q.   If you look on Page 5 under
15  study design, it says, "This study is a
16  multicenter double blind randomized" and
17  it continues "comparing the effects of"
18  Vioxx "versus placebo administered in
19  conjunction with standard therapy
20  (including aspirin...) for a minimum of
21  one year to patients who have suffered an
22  episode of an acute coronary syndrome,"
23  and it goes on.
24      A.   Again, this is a concept

Page 378

1  sheet. This is not a protocol. This
2  does not have anything about events rates
3  that are anticipated. It doesn't have
4  anything about sample size. It doesn't
5  have the number of triggered events to
6  stop a trial. One year is just a very
7  loose term, that it has to have some
8  long-term followup. So, I see it, but,
9  again, it reinforces how sketchy -- this
10 could not be called a protocol. This is
11 a very early rudimentary design concept
12 sheet.
13     Q.   The concept that you were
14 proposing to Merck, you and Dr. Bhatt --
15         MR. HAMELINE:  Again,
16     objection. It's Dr. Bhatt's
17     concept sheet.
18 BY MR. GOLDMAN:
19     Q.   Dr. Topol, the concept sheet
20 that has your name on it and Dr. Bhatt's
21 name on it calls for a study that would
22 last a minimum of one year; correct?
23     A.   Very loosely defined, yes.
24     Q.   The concept sheet that has

Page 379

1  your name on it and Dr. Bhatt's name on
2  it also calls for patients to be followed
3  up for a minimum of one year. Do you see
4  that, sir?
5      A.   That's what it says.
6      Q.   The concept sheet also
7  refers on Page 7, sir, to certain
8  criteria for exclusion. Do you see that?
9      A.   Yes.
10     Q.   This is another way of
11 saying these are the type of patients who
12 will not be allowed to participate in the
13 study according to this concept sheet;
14 correct?
15     A.   That's correct.
16     Q.   If you look at Number 4, do
17 you see that the concept that Dr. Bhatt
18 was proposing to Merck says that, under
19 4, "Any need for COX-2 inhibitors." So,
20 if a patient wanted to participate in
21 this study, they couldn't do so if they
22 actually needed COX-2 inhibitors; is that
23 right?
24     A.   You'll have to ask Dr. Bhatt

Page 380

1  about this since he wrote it, but my
2  interpretation is if they didn't have any
3  other relief of their problem without a
4  COX-2 inhibitor, that they couldn't be --
5  that is, they would have to be willing to
6  be randomized. So, yes, if they had to
7  take a COX-2 inhibitor for some reason,
8  they obviously wouldn't be a suitable
9  candidate for the trial, the way he's
10 written this up.
11     Q.   So, anybody who needed a
12 COX-2 inhibitor like Vioxx could not
13 participate in this concept study that
14 Dr. Bhatt proposed to Merck; correct?
15         MR. KLINE:  Objection.
16     Repetitive and misstates and
17     mischaracterizes.
18         MR. HAMELINE:  Again, this
19     is the same statement that I just
20     read in the MDL which is "Once the
21     witness has fully answered a
22     question, that same or
23     substantially same question --
24         MR. GOLDMAN:  He's not

Page 381

1  answering the question --
2          MR. HAMELINE:  -- shall not
3      be asked again." That is exactly
4      the same question.
5          MR. GOLDMAN:  He's not
6      answering --
7          THE WITNESS:  If this was a
8      real protocol, you would define
9      what is a need for a COX-2
10     inhibitor particularly since the
11     whole issue about this was we
12     don't know if it's safe and we
13     don't know if it's beneficial.
14     That's why this is so rudimentary.
15     It doesn't define these things
16     adequately. Any need for a COX-2
17     inhibitor has to have objective
18     criteria laid out, and they're not
19     there.
20 BY MR. GOLDMAN:
21     Q.   Does the rudimentary concept
22 that Dr. Bhatt sent to Merck say that
23 patients who need COX-2 inhibitors would
24 need to be excluded from the proposed

Page 382

1  study?
2      A.   It says that in the very,
3  what I would consider, loose language
4  without adequate definition. Because
5  it's a circular reasoning in a sense.
6  That is, the trial is trying to
7  understand this safety and need, and then
8  you're putting it in as exclusion
9  criteria. It wouldn't be suitable unless
10  it was much more rigidly defined.
11      Q.   On the first page of this
12  concept, Dr. Topol --
13      A.   It only has seven pages.
14  The rest is references. So, it isn't
15  particularly -- there's not a whole lot
16  here.
17      Q.   On Page 2 of this
18  rudimentary concept, do you see the first
19  sentence under the introduction
20  "Inflammatory cells play a significant
21  role in atherosclerosis"?
22      A.   I agree with that. I see
23  it, and I agree with it.
24      Q.   In the next paragraph, the

Page 383

1  concept sheet says, "Aspirin, by virtue
2  of its preferential COX-1 inhibitory
3  effect, provides minimal
4  anti-inflammatory action." Do you see
5  that?
6      A.   I see that.
7      Q.   And then further down in
8  that second paragraph -- in that second
9  paragraph, the concept sheet says, "The
10  administration of" Vioxx "may provide a
11  direct approach to reduce coronary
12  inflammation resulting in fewer
13  cardiovascular recurrent ischemic events
14  in patients presenting with acute
15  coronary syndromes." Do you see that?
16      A.   Yes.
17      MR. KLINE:  What page are
18  you on?
19      MR. GOLDMAN:  2.
20      MR. KLINE:  Thank you.
21  BY MR. GOLDMAN:
22      Q.   Can you explain how it is
23  that Vioxx could actually prevent
24  recurrent ischemic events?

Page 384

1      A.   Right.  So, there have been
2  several studies now with the different
3  COX-2 inhibitors in patients to look at
4  whether C-reactive protein is reduced,
5  whether endothelial function, which is
6  the lining of the artery cells, that
7  whether or not that critical layer of the
8  artery wall functions better and whether
9  the inflammation is reduced. And indeed
10  these mechanistic studies have supported
11  the concept that there could be an
12  improvement in this process by
13  suppressing inflammation with COX-2
14  inhibitors.
15      Q.   So, the theory that you had,
16  Dr. Topol, when you were suggesting a
17  cardiovascular outcomes study was that if
18  Vioxx was given to patients, it might
19  actually help their heart?
20      A.   It could, and that's put in
21  the JAMA paper.  In all the papers -- I
22  can go through my publications, but that
23  concept is laced throughout, that there's
24  a possible -- there's a putative benefit

Page 385

1  here that can't be summarily dismissed
2  whatsoever.
3      Q.   In May of 2001 you believed
4  that Vioxx could actually help prevent
5  heart attacks; correct?
6      A.   I felt that that was an
7  important mechanism, inflammation of the
8  artery wall, and this is a potent class
9  of anti-inflammatories, and certainly
10  there was that possibility. And other
11  studies suggested that potential.
12      Q.   You would never have
13  suggested a cardiovascular outcomes study
14  for patients at high risk of
15  cardiovascular disease if you thought
16  that Vioxx would actually cause them
17  heart attacks or worse, cause them to
18  die, correct, sir?
19      A.   You just asked about high
20  risk. I assume you're not talking about
21  patients with coronary artery disease
22  proven. Is that correct?
23      Q.   Dr. Topol, the study that
24  you were suggesting in May of 2001 to

Page 386

1  Merck was suggested because you thought
2  Vioxx might provide a benefit to patients
3  at risk of heart failure -- withdrawn.
4          Am I right, Dr. Topol, that
5  in the concept sheet that Dr. Bhatt sent
6  to Merck in May of 2001, anticipated that
7  Vioxx would actually prevent heart
8  attacks and not cause them?
9      A.   In patients who had active
10 inflammatory coronary disease.
11     Q.   Did you agree with Dr. Bhatt
12 that in May of 2001, patients who had
13 active inflammatory coronary disease
14 might be benefited by taking Vioxx
15 because it could help their heart?
16     A.   I already answered that
17 question affirmatively.
18     Q.   Other scientists shared that
19 view, Dr. Topol, that COX-2 inhibitors
20 could be beneficial to patients who have
21 cardiovascular disease; is that right?
22          MR. KLINE:  Objection,
23 misstatement.
24          THE WITNESS:  I already

Page 388

1  COX-2 Inhibition Improves Endothelial
2  Function in Coronary Artery Disease."
3  And it was published in Circulation in
4  2003.  Do you see that, sir?
5      A.   Yes.
6      Q.   The author is Remy
7  Chenevard?
8      A.   Chenevard.  I'm familiar
9  with this study.  I've cited it many
10 times in my work.
11     Q.   Do you see in the conclusion
12 of the abstract, Dr. Topol, that the
13 paper says, "This is the first study to
14 demonstrate that selective COX-2
15 inhibition improves endothelium-dependent
16 vasodilation and reduces low-grade
17 chronic inflammation and oxidative stress
18 in coronary artery disease."  Do you see
19 that?
20     A.   Yes, I do.
21     Q.   The next sentence I think is
22 even clearer when it says, "Thus,
23 selective COX-2 inhibition holds the
24 potential to beneficially impact outcome

Page 387

1  mentioned that there were several
2  studies published, and I've cited
3  them in my work, that that indeed
4  was a potential benefit of COX-2
5  inhibitors in patients with
6  arterial disease.
7  BY MR. GOLDMAN:
8      Q.   And those were the patients
9  you were suggesting be studied; correct?
10     A.   Patients with inflammatory
11 proven artery disease, yes.
12          -  -  -
13          (Whereupon, Deposition
14     Exhibit Topol-33, "Selective
15     COX-2 Inhibition Improves
16     Endothelial Function in Coronary
17     Artery Disease," (Chenevard, et
18     al) Circulation, January 28,
19     2003, 405-409, was marked for
20     identification.)
21          -  -  -
22 BY MR. GOLDMAN:
23     Q.   I've handed you Exhibit 33,
24 which is an article titled "Selective

Page 389

1  in patients with cardiovascular disease."
2  Do you see that?
3      A.   Yes.  And to put it in
4  context, this is a very small study of 26
5  total patients, and it's with celecoxib
6  versus placebo.  But I believe that their
7  findings and the way they made their
8  conclusions based on that data is very
9  reasonable.
10     Q.   Because you've actually
11 cited this article?
12     A.   Yes, and others like it.
13 They're small studies, they're with both
14 of the coxibs, and there is evidence of
15 some salutary effect.
16     Q.   From May of 2001 through the
17 time that Vioxx was withdrawn in
18 September of 2004, you continued to
19 suggest that Merck or Pfizer conduct a
20 cardiovascular outcomes study; right?
21     A.   That's right.
22     Q.   During that entire time
23 period --
24          MR. HAMELINE:  Can you allow

Page 390

```
 1     him to answer the question in the
 2     way that he feels is appropriate
 3     and complete?
 4          THE WITNESS: I would like
 5     to make a comment.
 6   BY MR. GOLDMAN:
 7     Q.   Sure.
 8     A.   Because there are other
 9   reasons besides just this to continue to
10   advance that notion.
11     Q.   Dr. Topol --
12     A.   If you'd allow me to make
13   the comment.
14     Q.   I'll allow you to make the
15   comment in one minute.  If you could just
16   answer my questions, and then you can
17   certainly comment.  Okay?
18     A.   Okay.
19     Q.   From May of 2001 through the
20   time that Vioxx was withdrawn in
21   September 2004, you continue to suggest
22   that Merck and/or Pfizer conduct your
23   cardiovascular outcomes study; correct?
24     A.   Not ours, but a.  And I do
```

Page 391

```
 1   have it in the public statements and
 2   newspapers that it didn't matter who did
 3   the trial, it just should be done.  It
 4   wasn't our trial.  And this is a concept
 5   sheet.  It isn't a trial.  I would never
 6   try to pass this thing off that you've
 7   been reviewing as a trial.
 8          MR. KLINE:  You now told him
 9     you were going to let him finish
10     the last concept.
11          MR. GOLDMAN:  Let me finish
12     --
13          MR. KLINE:  Are you going to
14     ask him a question and then let
15     him finish?  Now you're telling
16     him he can't do it.
17          MR. GOLDMAN:  Move to strike
18     the last answer as nonresponsive.
19          MR. KLINE:  You said you
20     would give him a chance to finish.
21   BY MR. GOLDMAN:
22     Q.   Dr. Topol, I'm not asking
23   whether it was your cardiovascular study
24   or some other person's.  Okay?
```

Page 392

```
 1     A.   A cardiovascular.
 2     Q.   Am I right, Dr. Topol --
 3          MR. KLINE:  Now, does he get
 4     a chance to finish the answer?
 5     You said you were going to ask one
 6     question and let him finish and
 7     now you've asked two.
 8          MR. GOLDMAN:  Tom, I'll let
 9     him finish in a minute.
10   BY MR. GOLDMAN:
11     Q.   Dr. Topol, am I right that
12   from May of 2001 through the time that
13   Vioxx was withdrawn in September of 2004,
14   you were suggesting that either Merck or
15   Pfizer conduct a cardiovascular outcomes
16   study; correct?
17     A.   Yes.
18     Q.   During that entire time
19   period, you believed that Vioxx or
20   Celebrex might actually prevent heart
21   attacks or other cardiovascular events.
22   Is that right?
23     A.   That's one issue that was
24   pertinent, yes.  But there's another one
```

Page 393

```
 1   I would like to get into if you give me
 2   an opportunity.
 3     Q.   Why don't you go ahead and
 4   tell me what you want to tell me.
 5     A.   Well, this goes along with
 6   an e-mail exchange with Alastair Wood
 7   that's in the documents that you have.  I
 8   can retrieve it if you'd like.
 9          Alastair Wood is probably
10   one of the most highly regarded
11   pharmacologists and physicians.  He's at
12   the Vanderbilt University, and he's
13   frequently chairing the FDA advisory
14   panels.  So one of the things that we
15   exchanged our views on was the fact that
16   if you have half the people in the United
17   States with established coronary disease
18   taking rofecoxib or celecoxib, that means
19   that there's a lot of people out there
20   that is a complete random exposure to a
21   drug, millions and millions of people
22   taking a drug without knowledge of
23   whether it's providing a harm, no less a
24   benefit.  So, the point being I'm trying
```

Page 394

1  to get to is this issue of equipoise.
2  That is, if you have a drug that's so
3  widely used in the population in half the
4  people, and we don't know -- that is, you
5  can justify a cardiovascular trial even
6  without the putative mechanism of
7  benefit, and I'd be happy to draw -- Dr.
8  Wood.
9      Q.   Dr. Topol, I've let you
10  answer now for some time.  Are you
11  finished now?
12      A.   Well, if I've gotten my
13  point across.
14      Q.   Okay.
15          From May of 2001 through the
16  time that Vioxx was withdrawn in
17  September of 2004, you believed that if a
18  cardiovascular outcomes study were done,
19  it could show that Vioxx and Celebrex
20  actually helped protect the heart;
21  correct?
22      A.   That's one possibility, yes.
23      Q.   Do you know Dr. Lucchesi?
24      A.   Yes, I do I was at the

Page 395

1  University of Michigan previous to coming
2  to Cleveland Clinic, and he was on the
3  faculty there.
4      Q.   Are you aware that Dr.
5  Lucchesi has been retained as an expert
6  witness for the plaintiffs in some of the
7  Vioxx cases?
8      A.   I saw that in the newspaper.
9  I've not spoken to him, but I saw that,
10  yes.
11      Q.   I'll mark as -- actually,
12  I'm not going to mark this as an exhibit,
13  but I'm going to show you a portion of
14  Dr. Lucchesi's deposition testimony and
15  ask you a question about it.  Okay?
16          MR. KLINE:  Objection, off
17  the record.
18          THE VIDEOTAPE TECHNICIAN:
19  Off the record at 3:44.
20          MR. GOLDMAN:  I --
21          MR. KLINE:  How long are we
22  on the record on cross?
23          THE VIDEOTAPE TECHNICIAN:
24  An hour and five minutes.

Page 396

1          MR. KLINE:  You are on the
2  record an hour and five minutes on
3  cross.  I haven't --
4          MR. GOLDMAN:  Go ahead.
5          MR. KLINE:  Now I'm asking
6  off the video record.
7          What the witness is being
8  asked to do now is comment --
9          MR. GOLDMAN:  I do not want
10  you talking in front of the
11  witness.
12          MR. KLINE:  Then have him go
13  out of the room.  I'm just going
14  to state an objection, which is, I
15  object to the witness being shown
16  another expert's -- let me start
17  again.
18          He's not designated as an
19  expert.  Merck has said he's not
20  an expert.  And even if he were an
21  expert, under the federal rules he
22  would not be allowed to be shown
23  one person's opinion testimony and
24  be asked to comment on it.  So,

Page 397

1  it's all objectionable.  Having
2  said that, it may be withdrawn
3  after Dr. Topol looks at it and
4  answers.
5          You can go back on the video
6  record.
7          THE VIDEOTAPE TECHNICIAN:
8  Back on the record at 3:45, Tape
9  Number 5.
10  BY MR. GOLDMAN:
11      Q.   This is an excerpt from
12  testimony that Dr. Lucchesi gave in a
13  trial in New Jersey.  Directing your
14  attention to Page 909, line 23, do you
15  see that he's being asked questions about
16  your proposed study concerning acute
17  coronary syndrome?
18          MR. HAMELINE:  Again, feel
19  free to read as much as you need
20  for context, and while you're
21  doing that, let me just note that
22  Dr. Topol, again, here is coming
23  to this deposition as a very busy
24  academic, as a very busy person in

Page 398

1   the institution and with patients
2   that he has to treat.  It's fine
3   to ask him any opinions that he
4   has about what he put in his
5   record in his own documents, et
6   cetera.  I think it's
7   inappropriate to ask him about
8   third-party experts.
9   BY MR. GOLDMAN:
10  Q.   Dr. Topol, do you see that
11  --
12        MR. KLINE:  And I would also
13  object.  You are asking a witness
14  to comment on the comments that
15  somebody else made about what he
16  did.
17  BY MR. GOLDMAN:
18  Q.   Do you see that Dr. Lucchesi
19  in his testimony thought that the study
20  that you were proposing for acute
21  coronary syndrome would be a bad idea?
22  A.   I see that, and I have a
23  couple of comments I can offer here --
24  Q.   Do you see that --

Page 399

1   A.   -- if you'll allow me to.
2   Q.   Do you see that Dr. Lucchesi
3   actually compliments Merck on its
4   decision not to do the study you were
5   suggesting?
6   A.   I saw that.  Can I make my
7   further remark about that?
8   Q.   Actually, I'd rather you do
9   that when Mr. Kline asks you questions.
10        MR. HAMELINE:  Let me note
11  very vehemently my objection to
12  putting a document in front of Dr.
13  Topol, showing it to him, reading
14  it to him about someone who is not
15  present.  Dr. Topol is not here as
16  an expert.  He's not trying to
17  take sides in the litigation, and
18  you're showing this to him and not
19  asking a question about it.
20  That's just inappropriate.
21        THE WITNESS:  Well, it's
22  also extraordinary that Dr.
23  Lucchesi is not a clinical
24  trialist.  He's a pharmacologist,

Page 400

1   and he hasn't worked on patients
2   in probably the last 20 or 30
3   years.  He also doesn't know that
4   the protocol that was never
5   written up that talks about a
6   concept sheet, and it was about
7   inflammatory arterial markers.
8   None of that is in that -- so,
9   you're about -- you're asking Dr.
10  Lucchesi in this deposition about
11  things that are just completely
12  foreign to him to make comment.
13  It's quite remarkable, actually.
14  BY MR. GOLDMAN:
15  Q.   Do you think that Dr.
16  Lucchesi is not competent to be
17  testifying about cardiovascular disease
18  associated with Vioxx, sir?
19        MR. KLINE:  Objection.
20        MR. HAMELINE:  Again, coming
21  very close to --
22        MR. GOLDMAN:  Withdrawn.
23  I'll ask another question.
24  BY MR. GOLDMAN:

Page 401

1   Q.   Are you familiar with the
2   drug Reopro?
3   A.   Yes, I am familiar with
4   Reopro, abciximab, yes.
5   Q.   Did Dr. Lucchesi play a role
6   with you in the development of Reopro?
7   A.   He did some experiments with
8   a colleague of mine, Dr. Bates, when I
9   was at University of Michigan in dogs.
10  Most of his work has been experimental
11  models in dogs.
12  Q.   Would you credit Dr.
13  Lucchesi with the development of Reopro?
14  A.   No.  I would not credit him.
15  He did some contributory work.  No, there
16  were many people, and he was just one of
17  the investigators that worked in this
18  field.
19  Q.   I want to talk to you, Dr.
20  Topol, about your JAMA article that you
21  published in August of 2001.  Okay.
22  A.   Sure.
23  Q.   You said on direct
24  examination that you sent the manuscript

Page 402

1  or the draft of the JAMA article to Merck
2  to see where there were discrepancies in
3  the data between the published paper that
4  you were publishing and the FDA database.
5  Do you remember that?
6      A.   That's correct.  I sent the
7  paper to Dr. Demopoulos, and we already
8  went through about, whether it was a
9  paper version, and then Dr. Reicin
10  requested an electronic version.  We went
11  through that this morning.
12      MR. HAMELINE:  Just a
13      note, I think you said that this
14      discrepancy is between the
15      published version, which is not
16      Dr. Topol's article, but the
17      published version and the FDA.
18      You're talking about three
19      different articles here.
20      THE WITNESS:  The New
21      England Journal --
22  BY MR. GOLDMAN:
23      Q.   Dr. Topol, you met with
24  Merck employees in April of 2001;

Page 403

1  correct?
2      A.   That was a meeting I
3  referred to when they came to Cleveland.
4      Q.   Is that the meeting where
5  you said Dr. Reicin came on quite strong,
6  and that you would consider her comments
7  to be brazen?
8      A.   I considered her remarks
9  about how we would be embarrassed if we
10  published it to be inappropriate, yes.
11      Q.   Did Dr. Reicin or Dr.
12  Demopoulos ever exert any pressure or
13  influence on you during that meeting?
14      A.   Well, it's Dr. Demopoulos,
15  and as I conveyed -- I mean, we
16  summarized this morning, but there were
17  some definite difficult issues that were
18  confronted, and there was no quid pro quo
19  in terms of intimidation.  They didn't
20  say, if you don't pull this paper out and
21  not take it out of its submission phase,
22  such and such would happen.  But it was
23  not what I would consider a pleasant
24  discussion.

Page 404

1      Q.   Actually, isn't it true, Dr.
2  Topol, that you enjoyed meeting with Dr.
3  Reicin and Dr. Demopoulos?
4      A.   Dr. Demopoulos and I are
5  colleagues, and we worked on a trial
6  together, and I had no problem with Dr.
7  Demopoulos.
8      I did have a problem with
9  Dr. Reicin, who I had not met before, who
10  used Dr. Demopoulos as an access point,
11  who came to visit, and as I said, told me
12  that we would regret publishing the paper
13  because we did not have the data that
14  Merck had, that we didn't understand that
15  rheumatoid arthritis patients had more
16  heart attacks, and that we would -- we
17  were making a mistake.  Those were
18  comments that I did not find enjoyable
19  whatsoever.
20      Q.   Do you have Exhibit 5 in
21  front of you that the plaintiffs used?
22      MR. HAMELINE:  We will.
23  BY MR. GOLDMAN:
24      Q.   Do you see Exhibit 5, sir?

Page 405

1      A.   Yes.
2      Q.   This is an exhibit that the
3  plaintiffs used and didn't ask you about
4  the e-mail dated April 20 of 2001 from
5  you to Dr. Reicin.  Do you see that in
6  the middle of the page?
7      A.   Yes, I do.
8      Q.   Do you tell Dr. Reicin on
9  April 20: "I enjoyed the meeting with you
10  and Laura and will have my assistant,
11  Donna Bressan, forward you an electronic
12  copy of the JAMA paper."
13      A.   Yes.  I certainly said that,
14  and I was trying to be politically
15  correct and smooth over the difficulties
16  we had during the meeting.
17      Q.   Was it true what you wrote,
18  Dr. Topol, that you enjoyed the meeting
19  with Laura and Dr. Demopoulos?
20      MR. KLINE:  Objection,
21      violation of Judge Fallon's order.
22      THE WITNESS:  To be exact, I
23      did not enjoy some of the
24      interactions, but I tried to be

*- Violates courts order by referring to WSJ Article AFTER Irvins death*
*- WSJ Article And testimony ABout*
*  it is hearsay under 802*

**Page 406**

1 correct about keeping things on an
2 upbeat -- when I wrote that, it
3 was definitely to convey a sense
4 of, let's not have any bad
5 feelings, and I tried to convey an
6 upbeat sense. That's what that
7 is.
8 BY MR. GOLDMAN:
9    Q.   On direct examination, Mr.
10 Kline read to you a quote from a Wall
11 Street Journal article that came out when
12 you published your article in JAMA. Do
13 you remember that, sir?
14    A.   Yes, I do, August 22nd.
15    Q.   And the quote that Mr. Kline
16 read to you was the following:
17          "Merck sought to downplay
18 the cardiac issue."
19          Do you remember that?
20    A.   Yes. That's what the
21 reporter wrote, Tom Burton and Gardiner
22 Harris. The reporters wrote "Merck
23 sought to downplay."
24    Q.   You said in response to Mr.

**Page 407**

1 Kline's question that "I do believe
2 that's true because" of the "ulterior
3 purpose of the visit." Do you remember
4 testifying to that on direct examination?
5    A.   Let me be perfectly clear,
6 Mr. Goldman. It is unquestionable in my
7 mind that the reason why Dr. Reicin came
8 to Cleveland was to downplay the cardiac
9 risks of Vioxx and try to get this
10 manuscript to be toned down. There isn't
11 any question about that.
12          MR. GOLDMAN: Move to strike
13 as nonresponsive.
14 BY MR. GOLDMAN:
15    Q.   Dr. Topol --
16          MR. HAMELINE: He can move
17 to strike. It doesn't mean it's
18 going to be stricken.
19 BY MR. GOLDMAN:
20    Q.   Dr. Topol, what the Wall
21 Street Journal said about Merck trying to
22 downplay the cardiac issue was entirely
23 accurate, correct, sir?
24    A.   It was entirely accurate in

**Page 408**

1 my view. In fact, Mr. Goldman, Thomas
2 Burton, who interviewed me for that
3 article, asked me what was going on that
4 day in April 2001 when Dr. Reicin and Dr.
5 Demopoulos visited me. And he asked me,
6 were there any quid pro quos,
7 intimidations. And I said, well, it was
8 obvious why she came to Cleveland. I
9 never had met her before. I had
10 forwarded the manuscript in advance, and
11 it was obvious what the purpose of that
12 trip was. And it's obvious that the
13 reporter, Thomas Burton, accurately
14 reported what I told him.
15    Q.   It's your testimony, sir,
16 that Merck actually pressured you or
17 tried to influence you about your JAMA
18 article?
19    A.   I wouldn't call it pressure.
20 I would call it, you don't know about the
21 other data, you don't know about the
22 Alzheimer trial patients, you're going to
23 be embarrassed if you publish it. You
24 know, I can deal with all of these

**Page 409**

1 things. I don't consider that -- the
2 word you used was what?
3    Q.   Did either Dr. Reicin or Dr.
4 Demopoulos --
5    A.   Demopoulos.
6    Q.   Yes. I'm sorry.
7          -- ever put any pressure or
8 influence on you when they met with you
9 in April of 2001?
10          MR. HAMELINE:
11 the same question you keep coming
12 back with. Is there some
13 different take that you've given
14 here? He's already answered the
15 question.
16          THE WITNESS: I believe that
17 -- pressure -- you know, it's an
18 ambiguous term, but it was very
19 obvious why they met with me, and
20 they subsequently met with Dr.
21 Nissen for the same purpose, which
22 is to reduce the claims that we
23 had, the worries that we had
24 regarding the cardiac risk of

Page 410

```
 1     Vioxx.
 2          MR. GOLDMAN:  I want to mark
 3     the next exhibit.
 4               - - -
 5          (Whereupon, Deposition
 6     Exhibit Topol-34, E-mails,
 7     MRK-ABA0011062, was marked for
 8     identification.)
 9               - - -
10     BY MR. GOLDMAN:
11          Q.   Dr. Topol, do you see that
12     Exhibit 34 is an e-mail on the top from
13     you to, is it Peter DiBattiste?
14          A.   Yes, Dr. DiBattiste.
15          Q.   Of Merck?
16          A.   Yes.
17          Q.   And this is August 30 of
18     2001; right?
19          A.   Yes.  So, it's after these
20     articles have come out, yes, the JAMA and
21     the Wall Street Journal, yes.
22          Q.   So, you're writing to Merck
23     after the Wall Street Journal comes out,
24     the one that said that Merck tried to
```

Page 411

```
 1     downplay the cardiac issue; correct?
 2          A.   That's right.  I'm writing
 3     to Peter DiBattiste.  I'm not writing to
 4     Merck in general, yes.
 5          Q.   You wrote, sir, "I'd like to
 6     talk to you about the COX-2 post-mortem
 7     to straighten out any issues.  I hope you
 8     know that I never mentioned your name,
 9     Laura's or anyone else and never felt a
10     sense of pressure or influence."  Do you
11     see that, sir?
12          A.   Yes, I do.
13          Q.   Was that true?
14          A.   Well, as we just discussed,
15     there was no overt pressure and
16     intimidation, but there certainly was an
17     obvious motive of this trip to come to
18     Cleveland, yes.  There's a difference
19     here, and it's a matter of semantics.
20          Q.   Is the statement that you
21     wrote to Dr. DiBattiste true?
22          A.   I think -- well, I wrote it
23     to Peter, who I viewed as a colleague
24     like Laura Demopoulos, and I certainly
```

Page 412

```
 1     felt -- we had a relationship that
 2     extended over years doing clinical trials
 3     together, and I was trying to be
 4     appropriate and accurate.  Yes, I believe
 5     that I'm conveying what I felt at that
 6     time.
 7          Q.   If you skip down to the
 8     sentence that starts, "Unfortunately, a
 9     co-author of the paper had a different
10     perspective and used names and painted a
11     very different picture.  I pleaded with
12     Burton, the reporter, that this wasn't
13     the case but you can see how much that
14     influenced his story."  Do you see that,
15     sir?
16          A.   Yes.  I see that.  I also
17     remember having a phone discussion with
18     Dr. Demopoulos in advance of this, and I
19     knew that both she and he were very
20     upset.  I also know that they were very
21     upset about the COX-2 inhibitor program
22     at Merck, as they conveyed to me, but,
23     yes, I certainly see this.
24          MR. GOLDMAN:  Move to strike
```

Page 413

```
 1     as nonresponsive after yes.
 2     BY MR. GOLDMAN:
 3          Q.   Dr. Topol, you actually
 4     thought that it would be great to get
 5     Merck's input on the JAMA article;
 6     correct?
 7          A.   I didn't think it would be
 8     great.  I thought it would be -- because
 9     of being colleagues with Merck, because
10     of having a relationship with Drs.
11     DiBattiste and Demopoulos in another
12     trial, I thought it was appropriate that
13     we give them an opportunity to review the
14     manuscript and the data.
15          MR. HAMELINE:  So, we're
16     done with Exhibit 34?
17          MR. GOLDMAN:  Yes.
18          MR. HAMELINE:  Can we go off
19     the record and take a short break.
20          MR. GOLDMAN:  After we
21     finish this document, yes.
22               - - -
23          (Whereupon, Deposition
24     Exhibit Topol-35, E-mails,
```

Page 414

1    TOP1PRO0000282 - TOP1PRO0000283,
2    was marked for identification.)
3    - - -
4    BY MR. GOLDMAN:
5        Q.   Dr. Topol, I've handed you
6    Exhibit 35, which is a series of e-mails
7    starting at the bottom. It's Laura
8    Demopoulos writing to you, Dr. Topol,
9    on April 28, 2001. Do you see that, sir?
10       A.   Yes.
11       Q.   She writes to you "Hi, just
12   wanted to let you know that Pete and I"
13   -- that's Pete DiBattiste -- "will be
14   working with Alise to try to incorporate
15   some of the data we discussed during our
16   visit into the JAMA manuscript." Do you
17   see that, sir?
18       A.   Yes. I see it. I can read
19   it very well, yes.
20       Q.   You wrote back to Laura on
21   April 28 and you said, "Hi, Laura. That
22   will be great to get your input." Do you
23   see that, sir?
24       A.   Yes. But don't cut off the

Page 415

1    sentence, "we haven't heard from JAMA
2    yet." That is, the paper was already
3    under review at JAMA. Okay? So, the
4    input was, and I told this to Laura on
5    the phone, and it's not conveyed in the
6    e-mail, the input was about data on the
7    manuscript and the discrepancies that
8    we're concerned about. And I want to be,
9    again, perfectly clear. We never
10   received any manuscript recommendations,
11   data changes from Merck, from Dr.
12   Demopoulos, Dr. DiBattiste or Dr. Reicin.
13       Q.   We'll talk about that issue
14   in a minute.
15       A.   Yes.
16       Q.   Dr. Topol, was it true what
17   you wrote to Laura Demopoulos, that you
18   thought it would be great to get her
19   input on your manuscript?
20       A.   I was the one who offered
21   the manuscript to get the input, of
22   course.
23       Q.   You actually found some of
24   Merck's comments to be insightful, and

Page 416

1    you wanted to incorporate them. Isn't
2    that right, sir?
3        A.   No. I didn't get any
4    comments. We never got any comments.
5        MR. HAMELINE: So --
6        THE WITNESS: The
7    manuscript --
8        MR. GOLDMAN: We can take a
9    break now.
10       MR. HAMELINE: That's fine.
11       THE VIDEOTAPE TECHNICIAN:
12   Off the record at 4:02.
13       - - -
14       (Whereupon, a recess was
15   taken from 4:02 p.m. until
16   4:15 p.m.)
17       - - -
18       THE VIDEOTAPE TECHNICIAN:
19   Back on the record at 4:15.
20   BY MR. GOLDMAN:
21       Q.   Dr. Topol, did Merck ever
22   provide comments to you on your JAMA
23   paper that you subsequently published in
24   August of 2001?

Page 417

1        A.   I'm not aware of any
2    comments.
3        Q.   You actually said on direct
4    examination that Merck "never sent...us
5    any suggestions, changes of data. There
6    was never anything sent back to me
7    or...my colleagues. Was that your
8    testimony?
9        A.   I referred to the documents
10   that were presented to me this morning
11   when I never saw those before. These
12   revised manuscripts from internal --
13   I've never seen those before.
14       Q.   Did Merck send you any
15   revised comments about your manuscript?
16       A.   I don't recall ever getting
17   any revised comments.
18       - - -
19       (Whereupon, Deposition
20   Exhibit Topol-36, E-mail 6-20-01,
21   with attachment, "Risk of
22   Cardiovascular Events Associated
23   with Selective COX-2 Inhibitors,"
24   (Mukherjee, et al) Draft

Page 418

1    Manuscript, TOP1PRO0000285 -
2    TOP1PRO0000311, was marked for
3    identification.)
4    - - -
5  BY MR. GOLDMAN:
6    Q.   Let me hand you what I've
7  marked as Exhibit 35.  This is an e-mail
8  dated June 20 of 2001 from Pete
9  DiBattiste to you, and it attaches your
10  manuscript for the JAMA paper, doesn't
11  it, sir?
12    A.   Yes.
13    Q.   Do you see that Dr.
14  DiBattiste is saying this to you in this
15  e-mail, "Laura and I have had a chance to
16  review the most recent version of the
17  COX-2 manuscript.  Thanks for sharing it
18  with us.  We've made a few comments,
19  embedded in the text."
20    Do you see that, sir?
21    A.   Yes.
22    Q.   Then if you flip the pages,
23  you can see that on occasion, Merck made
24  some suggestions to your paper.  Do you

Page 419

1  see that, sir?
2    A.   Yes.  There's just
3  limited -- okay, I see them now, yes.
4    Q.   And I want to just point to
5  an example of the type of suggestion that
6  Merck made to you.  Do you see on page --
7  that ends --
8    MR. HAMELINE:  Can you just
9  establish that he received this?
10  BY MR. GOLDMAN:
11    Q.   The e-mail was written to
12  you, wasn't it, Dr. Topol?
13    A.   The e-mail's written to me,
14  but I don't recall ever having seen this
15  document or the e-mail.
16    Q.   Do you have any reason to
17  dispute that you actually received an
18  e-mail from Dr. DiBattiste on June 20 of
19  2001?
20    A.   Well, this looks unfamiliar
21  to me.  I don't remember seeing it
22  before.  So, it's certainly something
23  that I'm not familiar with.
24    Q.   My question was, do you have

Page 420

1  any reason to dispute that you actually
2  received it.
3    MR. HAMELINE:  He's answered
4  the question.
5    THE WITNESS:  Maybe it was
6  sent, and I never got it.  Maybe
7  there was a problem.  I don't
8  know.  But I don't remember seeing
9  it previously.
10  BY MR. GOLDMAN:
11    Q.   Dr. Topol, if you'd turn to
12  the page that ends with a Bates Number at
13  the bottom TOP1PR and then several zeros,
14  294?
15    A.   294.  Yes.
16    Q.   Do you see that?
17    A.   Sure.
18    Q.   And here Merck is providing
19  some input, and you see what's underlined
20  there are their suggested comments.  Do
21  you see that?
22    A.   Where it says "These
23  results"?
24    Q.   Yes.

Page 421

1    A.   Okay.
2    Q.   And in the section about
3  study 085 and 090, Merck says "These
4  results" that you describe, "while
5  important, are incomplete.  Would you
6  consider" --
7    MR. KLINE:  Page?
8    MR. GOLDMAN:  Bates stamp
9  that ends 294.
10  BY MR. GOLDMAN:
11    Q.   "Would you consider
12  substituting the following section to
13  provide more robust data?"  Do you see
14  that, sir?
15    A.   Yes.
16    Q.   That's a question that Merck
17  is asking you about whether you think it
18  would be a good idea to include the
19  language that follows; correct?
20    MR. HAMELINE:  Again, note
21  my objection that he doesn't
22  recall having seen this, so your
23  statement is --
24    MR. GOLDMAN:  You have that

→ π counterdesignates   426: 6–17 – Δ's RESPONSE: Violates court ORDER
RE: EVIDENCE AFTER
IRVIN's
Death
(e.g. Konstam
article)

---

Page 422

1   objection.
2       MR. KLINE: Can I have a
3   continuing objection as well?
4       MR. GOLDMAN: Sure.
5       MR. HAMELINE: Your
6   statement -- your question is
7   misleading then.
8       THE WITNESS: Well, I also
9   want to point out, we sent this
10  paper -- I sent it to Laura in
11  March, I believe, and submitted it
12  to the JAMA, and this is the 20th
13  of June. So, this is months after
14  I had sent it to them, but anyway,
15  please.
16  BY MR. GOLDMAN:
17      Q.   Does Merck write here "To
18  further evaluate the relationship of"
19  Vioxx "to adverse cardiac events, a
20  meta-analysis of all Phase II through V"
21  Vioxx "studies using either placebo or
22  NSAID comparators was performed. This
23  included over 28,000 patients in 23
24  studies in osteoarthritis, rheumatoid

Page 423

1   arthritis, chronic low back pain, and
2   Alzheimer's disease. In the" Vioxx
3   "meta-analysis (which includes VIGOR),
4   the relative risk for a cardiovascular
5   event was 1.69...when comparing" Vioxx
6   "to naproxen." That's not statistically
7   significant; correct, sir?
8       A.   That is statistically
9   significant. 1.69 --
10      Q.   That's right. I'm sorry.
11  You're right.
12      A.   By the way, this is the
13  Konstam paper. She's summarizing a paper
14  that subsequently came out in
15  Circulation. We didn't incorporate any
16  of these data in our paper.
17      Q.   Let me withdraw the question
18  for a second.
19          Dr. Topol, do you see that
20  Merck is writing here at the bottom of
21  598 or 294 to 295 that there are studies
22  of over 28,000 patients in 23 studies in
23  osteoarthritis, rheumatoid arthritis,
24  chronic low back pain and Alzheimer's

Page 424

1   disease and then describes what the
2   relative risk for cardiovascular events
3   was. Do you see that?
4       A.   I see it.
5       Q.   And do you see that when
6   comparing Vioxx to nonnaproxen NSAIDs,
7   ibuprofen, diclofenac and nabumetone that
8   the relative risk was .79. Do you see
9   that, sir?
10      A.   This is a summary of data
11  across many different trials and
12  indications, and that's what the data
13  indicate that's being supplied, you know,
14  in this paper that I don't recall ever
15  having received or seen. Yes, I see it.
16      Q.   Do you see that there's no
17  statistically significant difference
18  between Vioxx and nonnaproxen NSAIDs when
19  you look at those 23 studies?
20      A.   The 23 studies includes a
21  statistically significant difference of
22  169 percent increased risk against
23  naproxen.
24      Q.   Right.

Page 425

1       A.   Which is exactly what we
2   were concerned about in this issue, yes.
3       Q.   I'm not talking about
4   naproxen.
5       A.   Okay.
6       Q.   I'm asking you whether the
7   results that were being reported here of
8   the 23 studies including Alzheimer's
9   showed that there was no statistically
10  significant difference in cardiovascular
11  events between Vioxx and NSAIDs other
12  than naproxen.
13      A.   I recognize this passage
14  from the Konstam paper that's published
15  subsequently in Circulation after our
16  JAMA paper. It looks almost identical to
17  that.
18      Q.   That's accurate, isn't it,
19  sir?
20      A.   I would not say the data are
21  accurate, but I recognize the passage,
22  and I also recognize that these are the
23  things that Alise Reicin told me during
24  that April 2001 visit that, for example,

Page 426

1  you don't know about the 28,000 patients
2  and Alzheimer's and all these other
3  things. You don't have the data. So,
4  she did tell me about this stuff when she
5  came to visit with Dr. Demopoulos.
6      Q.   Dr. Topol, do you have any
7  reason to dispute whether the results of
8  the 23 studies that are described here in
9  OA patients, in rheumatoid arthritis
10  patients, in Alzheimer's patients showed
11  that there was no statistically
12  significant difference between Vioxx and
13  NSAIDs other than naproxen?
14      A.   Yes, I have -- I have
15  concerns regarding how this analysis was
16  done, and I can review that with the
17  Konstam paper if you would like.
18      Q.   Have you ever said, sir,
19  that the comments -- withdrawn.
20          All that Merck is doing
21  here, by the way, is saying to you, would
22  you consider including this language;
23  correct?
24          MR. HAMELINE: Again,

Page 427

1      objection.
2          THE WITNESS: Well, yes. I
3      guess that's what they're saying
4      in this, but we certainly didn't
5      include, but I don't remember ever
6      seeing this.
7  BY MR. GOLDMAN:
8      Q.   The next comment that Merck
9  makes here is "To further evaluate the
10  risk of sustaining a cardiovascular event
11  on" Vioxx "in an elderly patient
12  population, an interim analysis was
13  performed of two ongoing large placebo
14  controlled studies in elderly patients
15  with Alzheimer's and mild cognitive
16  impairment. The relative risk of
17  sustaining a thrombotic event on" Vioxx
18  "versus placebo was .65," and that's not
19  statistically significant; correct, sir?
20      A.   That is an unacceptable
21  analysis.
22      Q.   Is that number, sir,
23  statistically significant? That's my
24  only question.

Page 428

1      A.   Interim results of trials
2  that one should not be doing interim
3  results for looking at something like
4  this and putting in a report? No.
5      Q.   Do you see that the .65 is
6  not statistically significant because
7  when you look in the parenthesis, the
8  number I actually falls within the range
9  .45 and 1.19?
10          MR. KLINE: Page?
11          THE WITNESS: From the
12      standpoint of confidence
13      intervals, that's not
14      statistically significant. But
15      that doesn't mean that the data
16      are authentic or meaningful.
17  BY MR. GOLDMAN:
18      Q.   If you remember, Dr. Topol,
19  you actually felt that Merck's comments
20  to you were insightful about the JAMA
21  paper?
22      A.   No. I didn't say that.
23  Okay?
24      Q.   I know that's not what you

Page 429

1  said today. Let me show you an e-mail,
2  sir, that I'll mark as the next exhibit,
3  which is 36? Sorry, 37.
4          - - -
5          (Whereupon, Deposition
6      Exhibit Topol-37, E-mails,
7      TOP1PRO0000279, was marked for
8      identification.)
9          - - -
10  BY MR. GOLDMAN:
11      Q.   This is an e-mail from you
12  back to Dr. DiBattiste, June 22nd of
13  2001. Do you see that, sir? At the top?
14      A.   Okay. Yes, I see that.
15      Q.   Do you see that you wrote to
16  Dr. DiBattiste, "Thanks - your comments
17  on the paper came back after it was
18  resubmitted and now we have final
19  acceptance and will try to weave some of
20  the insightful points into the galleys."
21  Do you see that, sir?
22      A.   Yes. It's nice to have this
23  e-mail to help remember the interaction.
24  Yes. I do remember this.

Page 430

1     Q.   So, you now remember getting
2 comments and reviewing them, correct,
3 sir?
4     A.   No. I'll tell you what I
5 remember exactly. The galleys -- the
6 paper had been accepted, the galleys had
7 already been sent back, and then after
8 the fact we got this -- you know, three
9 months after submitting it to Merck, we
10 got these comments. I had basically
11 disregarded them because the paper was
12 complete, so I really never went into it.
13     Q.   Did you say to Dr.
14 DiBattiste on June 22nd, 2001 that you
15 would try to weave in some of the
16 insightful points into the paper?
17     A.   Just like when I said to
18 Doctor --
19     Q.   Can you answer that yes or
20 no?
21     A.   It's not as simple as that.
22 Mr. Goldman --
23     Q.   I asked you what the e-mail
24 says.

Page 431

1     A.   I'm sorry, Mr. Goldman, but
2 things are not quite as simple as you're
3 trying to make them out to be. Just like
4 with the communication to Dr. Reicin
5 where I said I enjoyed the meeting, when
6 it wasn't enjoyable throughout --
7     Q.   I'm not asking you about
8 that, please, Dr. Topol. Can you please
9 focus on my question the way that you did
10 for the plaintiffs' lawyers? Can you
11 just focus on my question?
12         MR. HAMELINE: He answered
13 questions --
14         MR. KLINE: Let him finish,
15 and I object to the comment.
16         MR. HAMELINE: He answered
17 questions to the plaintiffs'
18 lawyers by trying to give his
19 understanding and comments and
20 beliefs, and that's what he's
21 trying to do here.
22 BY MR. GOLDMAN:
23     Q.   Dr. Topol, do you see that
24 on June 22 --

Page 432

1         MR. KLINE: I think he still
2 has an answer pending.
3 BY MR. GOLDMAN:
4     Q.   Dr. Topol, do you see on
5 June 22 --
6         MR. KLINE: I object. He
7 was answering a question. You cut
8 him off. You didn't let him
9 finish, and now you are going to
10 ask a question again. I insist
11 that the question be read back and
12 he be allowed to finish the answer
13 to the question.
14 BY MR. GOLDMAN:
15     Q.   Dr. Topol, I'm conducting
16 this deposition.
17         MR. STEIN: You interrupted
18 him.
19         MR. KLINE: No, you're not.
20 You're not conducting this
21 deposition with impunity. He was
22 answering the question. He told
23 you he was answering the question,
24 and you cut him off, and you won't

Page 433

1 let him answer. That's wrong.
2 BY MR. GOLDMAN:
3     Q.   Dr. Topol, I'm going to ask
4 you another question, and if you want to
5 explain, feel free.
6         MR. KLINE: Let him finish
7 the other answer to the question
8 that's pending.
9         MR. STEIN: Read back the
10 question --
11         MR. GOLDMAN: No.
12         MR. STEIN: Read back the
13 question and answer that was asked
14 when he was cut off in the middle.
15         MR. GOLDMAN: You know what,
16 you're not participating in this
17 deposition.
18         MR. STEIN: I am
19 participating in this deposition,
20 and you don't have a right to cut
21 off a witness in the middle of a
22 statement.
23         MR. KLINE: Please read back
24 the answer to the last question

π objects. Asked and answered, document speaks for itself
One rule

Page 434

1  where the witness was.
2      MR. HAMELINE:  Can we just
3  move forward.  We'll get all this
4  on the record.
5      MR. KLINE:  Would you tag
6  the question and answer, Linda?
7      MR. GOLDMAN:  Fine.
8  BY MR. GOLDMAN:
9      Q.   Dr. Topol, did you write to
10  Dr. DiBattiste on June 22nd of 2001 that
11  you would try to weave some of the
12  insightful points into the galleys?
13      A.   In a polite way after it was
14  already finished, that was a
15  communication I apparently made to Dr.
16  DiBattiste, who I regarded as a long-term
17  colleague, yes.
18      ~~Let me hand you what I'll~~
19  mark as Exhibit 38.
20          - - -
21      (Whereupon, Deposition
22  Exhibit Topol-38, "Risk of
23  Cardiovascular Events Associated
24  with Selective COX-2 Inhibitors,"

Page 435

1  JAMA August 22/29, 2001 Vol 286,
2  No. 8, 954-958, MRK-ADJ0035003 -
3  MRK-ADJ0035008, was marked for
4  identification.)
5          - - -
6  BY MR. GOLDMAN:
7      Q.   This is your JAMA paper.
8      A.   Uh-huh.
9      Q.   That was published in August
10  of 2001, isn't it, sir?
11      A.   Yes.
12      Q.   JAMA is a peer-reviewed
13  publication, isn't it?
14      A.   That's correct.
15      Q.   It is a top journal?
16      A.   One of the top journals.
17      Q.   It's widely reviewed by
18  doctors?
19      A.   That's correct.
20      Q.   When you wrote this article
21  in JAMA, it reflected your and Dr.
22  Nissen's best medical judgment about the
23  potential cardiovascular risks associated
24  with COX-2 inhibitors, correct, sir?

Page 436

1      A.   And Dr. Mukherjee and the
2  input of the reviewers and the editors.
3      Q.   You both had reviewed, Dr.
4  Nissen and you, lots of data concerning
5  COX-2 inhibitors before writing this
6  paper, correct, sir?
7      A.   Yes.
8      ~~Q.   Among the articles~~
9  reviewed and Dr. Nissen reviewed are the
10  VIGOR study, the CLASS study, study 090,
11  study 085, aspirin trials; correct?
12      A.   Yes.
13      Q.   And very scientific
14  literature, right, sir?
15      A.   That's correct.
16      Q.   Isn't it true, sir, that
17  when you wrote this paper, you found that
18  the difference in cardiovascular events
19  seen in VIGOR was unexpected?
20      A.   Well, I don't know if I
21  would qualify it like that.  I would say
22  that it was significantly different, and
23  that we -- there was a biologic
24  mechanism.  So, I don't know that you

Page 437

1  would want to say it was unexpected.  We
2  already knew that prostacyclin was
3  suppressed, a critical constituent for
4  blood clots and normal artery function,
5  and so I don't know that you can say it
6  was unexpected.  It wasn't expected by
7  the trialist per se, but it wouldn't be
8  at all biologically implausible.
9      Q.   If you'd turn to the page in
10  your paper, 958.
11      A.   Yes.
12      Q.   Second column, last
13  paragraph.  Do you write in your paper
14  "Our analysis has several significant
15  limitations.  The increase in
16  cardiovascular events in these trials was
17  unexpected."  Is that what you wrote?
18      A.   That's the statement I'm
19  trying to put in context.
20      Q.   You say --
21      A.   It says, "and evaluation of
22  these end points was not prespecified,"
23  so that's part of -- it's interdependent.
24  If you don't anticipate the endpoints and

— Conditional

To complete designation

CONDITIONAL BASED ON COURT'S RULINGS

Conditional    overruled

Page 438

1  some of the issues are unexpected, it's
2  not a matter of biologic expectation,
3  it's a matter of whether the trial is
4
5       Q.   You said on direct
6  examination that you felt there was no
7  basis for the naproxen hypothesis. Was
8  that your testimony?
9       A.   That on the course of how
10 this played out from 2001 when that
11 naproxen hypothesis was first touted by
12 Merck and put in the Targum report to the
13 present, over time it was very clear that
14 that could not be tenable.
15      Q.   You said on direct
16 examination "The only appropriate
17 conclusion...would be that there's a
18 problem with the experimental drug
19 Vioxx." Right, sir?
20      MR. KLINE: Objection.
21 BY MR. GOLDMAN:
22      Q.   Is that your testimony?
23      MR. KLINE: Objection.
24   Misstates, mischaracterizes.

Page 439

1 BY MR. GOLDMAN:
2      Q.   Do you remember testifying
3  to that?
4      A.   I remember testifying, and I
5  remember the statement is very clear,
6  comparing a well-accepted historical
7  anchor, naproxen, versus an experimental
8  new drug and making the conclusion that
9  the only reasonable conclusion as a
10 clinical trialist is to say the
11 experimental arm has a problem.
12      Q.   Well, let's see what
13 conclusion you reached when you wrote
14 this paper in August of 2001. If you'd
15 turn to Page 957, the first column, last
16 paragraph, "The results of the VIGOR
17 study can be explained by either a
18 significant prothrombotic effect from"
19 Vioxx "or an antithrombotic effect from
20 naproxen (or conceivably both)." Do you
21 see that, sir?
22      A.   Not only do I see it, but I
23 acknowledged this several times earlier
24 today, that that's a possibility. We

Page 440

1  wouldn't just dismiss what Merck put
2  forth. It's certainly a possibility.
3  And we acknowledge it. I mentioned at
4  least twice if not three times in the
5  paper. I put that in the deposition --
6  in the testimony earlier today.
7       Q.   The reason that you felt
8  that naproxen and its cardioprotective
9  effects could explain the results in
10 VIGOR is that naproxen had significant
11 anticlotting effects, doesn't it, sir?
12      A.   That's what Merck was
13 advancing, that notion, but whether or
14 not that was clinically meaningful was
15 not ever determined.
16      Q.   If you look two sentences
17 down, "Naproxen has significant
18 anti-platelet effects" which mean
19 platelet -- "with mean platelet
20 aggregation inhibition of 93 percent
21 compared with platelet aggregation
22 inhibition of 92 percent for those taking
23 aspirin." Do you see that, sir?
24      A.   Yes. We referenced where

Page 441

1  that data came from.
2       Q.   You referenced where that
3  data came from. That was an FDA
4  document, correct, sir?
5       A.   Right.
6       Q.   When you wrote this article
7  in JAMA, you believed that naproxen has
8  significant anti-platelet effects,
9  correct, sir, or you wouldn't have put it
10 in the article?
11      A.   No. Let me just put --
12 you're asking about context. Okay?
13      Q.   No, I'm not.
14      A.   Anti-platelet effects and
15 does that explain off the concerns of
16 Vioxx are different things.
17 Anti-platelet effects doesn't mean that
18 you can ascribe the problems of Vioxx to
19 naproxen's cardioprotective effect. And
20 that's why in the last sentence of the
21 paper we urge caution in prescribing
22 these agents to patients at risk for
23 cardiovascular morbidity. If we were so
24 confident about the platelet effect being

Conditional

*Conditional*

Plaintiff's counsel objects - pertains to Ex. 39 written in August 2004,
After Irving's death
- 602/701/702 - INADMISSIBLE FOR LACK OF PERSONAL KNOWLEDGE
- 802. ~~research~~ ARTICLE ~~depos~~ - is hearsay EDITORIAL

**Page 442**

1 clinically transferable, we wouldn't have
2 come to that conclusion.
3     Q. Do you see in the second
4 column of your article on Page 957 you
5 also say that "naproxen, but not
6 ibuprofen or diclofenac resulted in a
7 high level of platelet aggregation
8 inhibition similar to that achieved with
9 aspirin." Do you see that, sir?
10     A. Yes.
11     Q. Then you write about
12 flurbiprofen, which is something that the
13 plaintiffs lawyer asked you about; right?
14     A. Yes.
15     Q. You wrote in JAMA, "There is
16 clinical evidence that flurbiprofen, 50
17 milligrams twice daily for 6 months,
18 reduced the incidence of MI by 70 percent
19 compared with placebo." Isn't that what
20 you wrote, sir?
21     A. Yes.
22     Q. Then you say "Indobufen,
23 another NSAID, was as effective as
24 aspirin in preventing" and then you

**Page 443**

1 continue, correct, sir?
2     A. Yes.
3     Q. Then you say, "Because of
4 the evidence for an anti-platelet effect
5 of naproxen, it is difficult to assess
6 whether the difference in cardiovascular
7 event rates in VIGOR was due to a benefit
8 from naproxen or to a prothrombotic
9 effect from" Vioxx. Do you see that?
10     A. As I said, this was
11 acknowledged at least two to three times
12 in the manuscript, yes.
13     Q. In fact, sir, isn't it true,
14 that as late as August of 2004, you
15 believed that it was uncertain as to
16 whether the heart attacks in VIGOR were
17 caused by Vioxx or naproxen?
18     A. I don't know how you could
19 ever come to that conclusion.
20     Q. I want to show you an
21 article that you were asked about earlier
22 today, and this is the ~~explained~~
23     A. The TARGET editorial, "A
24 coxib a day won't keep the doctor away,"

**Page 444**

1     - - -
2     (Whereupon, Deposition
3 Exhibit Topol-39, "A coxib a day
4 won't keep the doctor away,"
5 (Topol, et al) The Lancet Vol 364
6 August 23, 2004, 639-640, was
7 marked for identification.)
8     - - -
9 BY MR. GOLDMAN:
10     Q. I'm going to mark 39, which
11 is a comment that you wrote --
12     A. Right.
13     Q. -- in the Lancet. Do you
14 see that, sir?
15     A. Yes, I do.
16     Q. Directing your attention to
17 the first column, in the last sentence:
18 "It has remained unclear whether this
19 striking increase in myocardial
20 infarctions was related to" Vioxx
21 "directly, or the comparator agent,
22 naproxen, had significant anti-thrombotic
23 effects." Do you see that, sir?
24     A. Which paragraph are you on?

**Page 445**

1     Q. The left column, first
2 paragraph, do you see that you wrote "In
3 particular," Vioxx "was associated with
4 an unanticipated five-fold increase in
5 myocardial infarctions compared with
6 naproxen. It has remained unclear
7 whether this striking increase in
8 myocardial infarctions was related to"
9 Vioxx "directly, or the comparator agent,
10 naproxen, had significant anti-thrombotic
11 effects." Did you write that?
12     A. Absolutely.
13     Q. Do you see that you wrote
14 that on August 21st, 2004?
15     A. Yes. But I -- you haven't
16 given me a chance to put this in context.
17 The point being is that the TARGET trial
18 is the largest trial ever done with a
19 COX-2 inhibitor.
20     Q. Sir, I'm actually -- I just
21 asked if you wrote it. That's all I
22 asked.
23     MR. KLINE: You did not.
24 You absolutely did not. Let him

→ SAME OBJECTIONS TO AUGUST 2004 JCARSAJ editorial AS on previous page

Page 446

1  finish his answer.
2      MR. HAMELINE: So, let him
3  finish his answer.
4      THE WITNESS: Okay. You've
5  just taken the snippets that you
6  like out of this editorial, but if
7  you read the editorial carefully
8  and the TARGET paper which I was
9  asked by the Lancet to comment on,
10  which is the largest COX-2
11  inhibitor trial ever performed,
12  and it compared uniquely the
13  lumericoxib to naproxen or to
14  diclofenac. And what it showed is
15  there was a small protective
16  effect of naproxen. And what
17  you're not -- what you're
18  discounting, and that's why I
19  said, how could you possibly come
20  to this conclusion, is because in
21  the same editorial --
22  BY MR. GOLDMAN:
23      Q.  Well, you wrote it?
24      A.  -- that I conclude that "The

Page 447

1  continued commercial availability of
2  rofecoxib, without a black-box warning
3  for cardiovascular patients is indeed
4  troubling." And that's because the
5  TARGET trial was the most definitive
6  trial that's ever been performed in this
7  field to establish naproxen having a
8  mild, only mild, less than half the
9  benefit of aspirin. So, instead of a 25
10  percent reduction, we're talking about
11  maybe 10 or 12 percent reduction. So,
12  instead of the 500 percent protection
13  which would have been required for the
14  naproxen hypothesis, this blew it apart.
15  The TARGET trial and the commentary that
16  I wrote put this in perspective. It
17  completely took that premise about the
18  naproxen hypothesis and it blew it up.
19      MR. GOLDMAN: Move to
20  strike.
21      THE WITNESS: It was no
22  longer tenable at that point.
23      MR. GOLDMAN: Move to strike
24  as nonresponsive.

Page 448

1  BY MR. GOLDMAN:
2      Q.  Directing your attention
3  back to your JAMA article, sir:
4      MR. KLINE: It was responsive.
5      THE WITNESS: Yes.
6  BY MR. GOLDMAN:
7      Q.  I want to talk about Figure
8  3 for just a minute, Page 957, Figure 3.
9      A.  JAMA article?
10      Q.  Yes.
11      A.  Figure 3?
12      Q.  Do you see that?
13      A.  Yes. I'm with you, yes.
14      Q.  Let me see if I understand
15  this and your analysis here.
16      What you did in your paper
17  was to take a placebo group and the rate,
18  annualized rate of MIs or heart attacks
19  in a placebo group, and you obtain those
20  numbers from four different aspirin
21  trials. Is that right?
22      A.  No.  Actually, the trials
23  were pulled together by a British heart
24  journal paper, and we took that, which is

Condmonal

Page 449

1  the largest data set we could find, to
2  have as an anchor or reference to the
3  COX-2 inhibitor trials, yes.
4      Q.  Then you compared the
5  annualized rate of myocardial infarctions
6  in those four trials to the MI rate in
7  VIGOR and in CLASS, the Celebrex trial,
8  correct, sir?
9      A.  Yes.
10      Q.  And according to Figure 3,
11  this shows that Celebrex has a higher
12  annualized myocardial infarction rate
13  than VIGOR. Is that right, sir?
14      A.  That's right, but they're
15  very close. They're both .80, .74, yes.
16      Q.  You agree, sir, that there
17  are significant flaws in the analysis
18  that you conducted here in your JAMA
19  article, don't you?
20      A.  There are limitations.  I
21  think flaws is a little strong, but
22  absolutely we acknowledge those
23  limitations.
24      Q.  One of the limitations in

Overuled

Page 450

1   your analysis is that the aspirin trials
2   where you were looking at the MI rate in
3   the placebo group did not have any
4   patients who had rheumatoid arthritis;
5   correct?
6       A.   Right.  But the CLASS trial
7   was osteoarthritis as well.  And the
8   incidence of myocardial infarction in
9   rheumatoid arthritis is not well
10  characterized.
11      Q.   The FDA called your analysis
12  invalid and plainly inappropriate,
13  haven't they, sir?
14          MR. KLINE:  Objection.
15          THE WITNESS:  That's a very
16  broad interpretation of a letter
17  that Bob Temple sent to me
18  personally.
19          MR. GOLDMAN: Let me mark the
20  next exhibit, 39.
21              - - -
22          (Whereupon, Deposition
23  Exhibit Topol-39A, Letter
24  10-16-01, EJT 000323 - EJT

Page 451

1   000324, was marked for
2   identification.)
3               - - -
4           THE WITNESS:  Yes.
5   BY MR. GOLDMAN:
6       Q.   This is the letter that the
7   Food & Drug Administration wrote to JAMA
8   addressing your article, correct?  The
9   first sentence says, "The question,
10  addressed recently in JAMA."
11      A.   I would like to --
12          MR. KLINE:  Do I have a
13  line, continuing line?
14          MR. GOLDMAN:  Yes, you do.
15          THE WITNESS:  This letter
16  was not published in JAMA.  It was
17  forwarded to me from JAMA, and it
18  was from Dr. Temple.  It was not
19  -- it's Dr. Temple writing this.
20  It is not the FDA.
21  BY MR. GOLDMAN:
22      Q.   Is Dr. Temple somebody who
23  works for the FDA?
24      A.   Yes.  And I know him very

Page 452

1   well.  Yes.
2       Q.   Does Dr. Temple write to
3   JAMA on the first page, third paragraph,
4   last sentence, "Indeed, merely examining
5   the AMI rates" that's annualized
6   myocardial infarction rates "in the
7   control groups of the studies in the
8   meta-analysis shows the invalidity of
9   this approach."  Do you see that, sir?
10      A.   Which sentence are you?
11      Q.   Last sentence in the third
12  paragraph.
13      A.   Oh, yes, I see it, yes.
14      Q.   And then Dr. Temple shows
15  that in the aspirin studies that you
16  looked at, there were varying MI rates;
17  correct?
18      A.   Yes.
19      Q.   And says that "The placebo
20  rates in the various studies vary by more
21  than a factor of 3."  Do you see that,
22  sir?
23      A.   Yes.
24      Q.   On the next page, Dr. Temple

Page 453

1   writes "These highly variable results
2   suggest that this is probably a poor case
3   for any meta analysis."  And then he
4   continues.  Do you see that?
5       A.   Yes.
6       Q.   "The weakness of this
7   comparison goes well beyond being
8   'problematic,' the authors' term; it is
9   plainly inappropriate."  Do you see that,
10  sir?
11      A.   I certainly do, and I
12  responded to him.  And I also got a
13  response from him.  If you'd like to just
14  take this out of context.  Are we going
15  to go further into this, or are we just
16  going to leave it at that?
17      Q.   In the JAMA article --
18      A.   Dr. Temple sent me a letter
19  saying --
20          MR. GOLDMAN:  Can you please
21  instruct your witness to answer my
22  question?
23          MR. KLINE:  He's answering
24  your question.

*(handwritten)* - VAGUE - ASKS FOR OPINION RELATES TO TIME PERIOD AFTER 12/01/1000
- NON-RESPONSIVE ANSWER

**Page 454**

1       MR. GOLDMAN: It's not a
2 time to go on with a speech. If
3 plaintiffs' lawyers want to ask
4 questions, that's fine. I'm
5 asking questions here.
6       MR. HAMELINE: He has
7 answered your questions. You're
8 asking him questions. He's here
9 as a third-party witness.
10       MR. GOLDMAN: Fine.
11       MR. HAMELINE: You're asking
12 him what somebody else said,
13 wasting his time, unless you are
14 going to ask him more detail about
15 it in his personal testimony. If
16 you want to just show this to
17 somebody and authenticate it by
18 Dr. Temple, you can do that. If
19 you want to ask Dr. Topol what he
20 thinks about it or his concerns or
21 his response, that's appropriate
22 deposition testimony. But for you
23 to cut him off without allowing
24 him to testify about is the

**Page 455**

1 inappropriate step here, just to
2 put it in total context.
3       MR. STEIN: So, can he
4 finish what he's trying to say?
5       MR. GOLDMAN: No, he cannot.
6       - - -
7       (Whereupon, Deposition
8 Exhibit Topol-40, "Systematic
9 adjudication of myocardial
10 infarction end-points in an
11 international clinical trial,"
12 (Mahaffey, et al), Current
13 Controlled Trials in
14 Cardiovascular Medicine August
15 2001 Vol. 2 No. 4, (6 pages), was
16 marked for identification.)
17       - - -
18 BY MR. GOLDMAN:
19       Q. I'm handing you an exhibit
20 that I marked as 40, and this is an
21 article, Dr. Topol, that I think you're a
22 co-author of. Do you recognize this,
23 sir?
24       A. Yes.

**Page 456**

1       Q. It's called "Systematic
2 adjudication of myocardial infarction
3 endpoints in an international clinical
4 trial." Do you see that?
5       A. Yes.
6       Q. And you published it in
7 August of 2001; right?
8       A. Yes.
9       Q. This is about the
10 adjudication process or the evaluation by
11 an independent committee of adverse
12 events that are reported by investigators
13 in clinical trials; correct? Yes?
14       A. Yes.
15       Q. Do you see that in your
16 conclusion here, Dr. Topol? You say
17 "End-point adjudication by a CEC" -- what
18 is that?
19       A. That's a clinical event
20 committee.
21       Q. -- "is important, to provide
22 standardised, systematic, independent,
23 and unbiased assessment of end-points
24 particularly in trials that span

**Page 457**

1 geographic regions and clinical practice
2 settings." Do you see that, sir?
3       A. Yes, I do.
4       Q. Do you agree that the
5 process that is used to adjudicate or
6 evaluate cardiovascular events is an
7 important one?
8       A. I agree with that
9 completely, and there's also other issues
10 regarding CEC, clinical event committees,
11 that this statement doesn't encompass.
12       Q. The JAMA article that you
13 published prompted debate in the
14 scientific community. Is that fair?
15       A. I don't know about
16 scientific debate. There was debate in
17 the media with Merck consultants. There
18 wasn't much scientific debate that I'm
19 aware of. I guess there was some, but
20 most of the studies, as we reviewed this
21 morning, came out, the case control
22 studies, six out of seven, came out with
23 a significant adverse profile of Vioxx in
24 these large epidemiologic studies.

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

*[Handwritten at top:] ~~Also~~ Violates courts order - pertains to time period And studies (such as Juni) conducted after Irvin died.*

*[Handwritten:] Studies are Also hearsay under 802*

---

## Page 458

1   MR. GOLDMAN:  Move to strike
2   as nonresponsive.
3   BY MR. GOLDMAN:
4   Q.   Did you issue a press
5   release after you published your JAMA
6   article?
7   A.   You mean with the article?
8   Q.   Yes.
9   A.   Possibly with the article.
10   Q.   Did you hold a press
11   conference after you published the
12   article?
13   A.   We did not hold any press
14   conference.
15   Q.   Was your article picked up
16   by various newspapers including the Los
17   Angeles Times, the New York Times, the
18   New York Daily News, Newsweek and others?
19   A.   I don't remember all the
20   places it was picked up, but it was
21   certainly covered.  And I've already
22   mentioned the Wall Street Journal article
23   that came out that day.
24   Q.   Did you appear on television

## Page 459

1   on NBC Nightly News and the Today Show to
2   talk about your JAMA article?
3   A.   I certainly remember the
4   Today Show, possibly the other one, but I
5   do remember the Today Show interview.
6   ... examination, sir, that "Vioxx's risk has
7   examination, sir, that "Vioxx's risk has
8   been evident since trials in 1999 and all
9   the way through the time of withdrawal"
10   in September of 2004.  Do you remember
11   saying that?
12   A.   Yes.
13   Q.   Then you said -- you said
14   that "There's been replication of
15   untoward significant excess of events of
16   heart attack, death and stroke."  Do you
17   remember testifying to that, sir?
18   A.   Yes, I do.
19   Q.   And you said that based on
20   that -- let me ask you this.
21   The studies that you're
22   referring to are VIGOR and 090.  Is that
23   right, sir?
24   A.   No.  I'm referring to the

## Page 460

1   Juni cumulative meta analysis in which on
2   all of those randomized trials, I believe
3   there were something like 18 of them, it
4   was after VIGOR and 090 that had crossed
5   the line statistically where the drug was
6   proven to be hazardous for heart attack
7   excess, and that's when Juni and his
8   colleagues concluded that the drug should
9   have been withdrawn.
10   MR. GOLDMAN: Move to strike
11   as nonresponsive.
12   BY MR. GOLDMAN:
13   Q.   Did you at any point --
14   MR. HAMELINE: He can move
15   to strike anything that he wants
16   to.  It doesn't mean it's going to
17   be stricken.  It's his comment.
18   BY MR. GOLDMAN:
19   Q.   Did you at any point, Dr.
20   Topol, write an article before Vioxx was
21   withdrawn saying that it should be
22   withdrawn?
23   A.   The article that I cited
24   about the August 2004 black box warning

## Page 461

1   was as far as I got in terms of the
2   recommendation.
3   Q.   You never recommended that
4   Merck withdraw Vioxx at any point while
5   it was on the market, correct, sir?
6   A.   I did not recommend its
7   withdrawal.
8   ... Let's talk about study 090.
9   I believe you said on direct, "All you
10   need to know is VIGOR and 090 for a
11   proven hazard of heart attack."  Was that
12   your testimony?
13   A.   As I pointed out just a
14   moment ago, that was in the context of
15   not only the two trials together which I
16   reviewed in that letter to the New
17   England Journal, but also the Juni
18   analysis, as I cited, where those two
19   studies on top of every other randomized
20   trial crossed the line in 2000 for
21   recommending that the drug had a
22   significant excess of heart attacks.
23   Q.   The Juni article that you
24   keep referring to is an article that was

*[Handwritten right margin:]*
*A's response*
*402 = irrelevant*
*403 Non Responsive*

*π counter-designates 460:19 - 461-2*

*[Handwritten at bottom:] overrule*

*Violates Court Order - Relates to 60 Minutes Interview*
*Irrelevant under Rule 402*
*Unfairly prejudicial under Rule 403*

**Page 462**

1 written after withdrawal, correct, sir?
2    A.   It was written before -- I
3 think the data was done before the
4 withdrawal.
5    Q.   The article was published
6 after withdrawal?
7    A.   The article was published
8 shortly after withdrawal, yes.
9    Q.   Is it your position, sir,
10 that -- withdrawn.
11        You were shown a clip from
12 60 Minutes where you said the following:
13 "Whenever you find a problem and you're
14 thinking, maybe it's not a problem, you
15 want to see if there's independent
16 replication.  So, if you have study 090
17 and you want to discount that somehow,
18 then you have VIGOR.  You've got two
19 trials now, you have essentially
20 lightning striking twice.  That's
21 independent replication.  That's really
22 serious confirmation.  This is
23 unequivocal.  This is a problem."  Is
24 that what you said on national TV?

**Page 463**

1    A.   I said that, and I stand by
2 that, and that is, when you have two
3 trials --
4    Q.   I just asked you if you said
5 it on TV.
6    A.   Okay.
7        MR. HAMELINE:  Again, if all
8 you're going to do is ask him
9 whether he said something which is
10 already in the record from this
11 morning and not allow him to
12 follow up or you're not going to
13 ask him a question about this,
14 this is a complete waste of time.
15 BY MR. GOLDMAN:
16    Q.   Did you say --
17        MR. HAMELINE:  If it's a
18 foundation or an introductory
19 question, that's fine.
20        MR. STEIN:  It is rude to
21 this witness who is not a party to
22 the case.  He doesn't have to be
23 cut off.  It's just not the right
24 thing to do.

**Page 464**

1 BY MR. GOLDMAN:
2    Q.   Did you say, Dr. Topol, on
3 national TV that you believe that study
4 090 and VIGOR was essentially lightning
5 striking twice?
6    A.   That was independent
7 replication, and I made the analogy to
8 lightning striking twice as far as a
9 signal and as far as how important that
10 would be, yes.
11    Q.   Did you also say on national
12 TV that study 090 and VIGOR was
13 independent replication, serious
14 confirmation and an unequivocal problem?
15    A.   All that has to do with
16 replication, which is absolute -- yes
17
18 for me, sir.
19    A.   Yes.  And I know exactly
20 what's going to be your line of
21 questioning here.
22    Q.   If you'd turn to Page 956 --
23    A.   Yes.
24    Q.   -- do you see in the middle

**Page 465**

1 column you devote a whole section to
2 study 085 and study 090?  Do you see
3 that, sir?
4    A.   That's right.
5    Q.   Yes?
6    A.   Yes.
7    Q.   And you talk about study 090
8 and 085 in this article, don't you, in
9 August of 2001?
10    A.   Yes.
11    Q.   You obtained information
12 about study 090 from the FDA's website,
13 correct, sir?
14    A.   Yes, but not thoroughly
15 enough at this time.
16    Q.   Did you say anything in your
17 JAMA article about study 090 being a
18 lightning strike?
19    A.   The only -- after more
20 careful review of 090 with the
21 misclassifications that Merck had in the
22 FDA document, it was obvious that the
23 data were wrong and that the correct data
24 are published in the New England Journal

*403*

*Conditional*

- Testimony is based on 60 Minutes comments, which post-date
  Irving death
- That study 090 was not published in Non-Responsive

Page 466

1  December 2004 correspondence that I put.
2      Q.   Did you say anything in
3  August of 2001 when you were writing your
4  article that study 090 was a lightning
5  strike?
6      A.   The data in this
7  paragraph --
8      Q.   I'm just asking if you said
9  it in the article.
10     A.   -- are using incorrectly
11 classified data from Merck.
12     Q.   I don't know what you're
13 relying on for that, but I'm not asking
14 you about that right now.
15     A.   Okay.
16     Q.   My question to you is
17 whether anywhere in this article you said
18 that study 090 was a lightning strike?
19     A.   No. Because we didn't have
20 the right data at that time.
21     Q.   Did you say anywhere in this
22 article that study 090 and VIGOR were
23 independent replication?
24     A.   Again, we didn't have the

Page 467

1  correct 090 data at that time, and,
2  again, the study was finished a long time
3  before that and still has not yet been
4  published five years later -- six years
5  later now, I should say.
6      Q.   Did you say anywhere in your
7  JAMA --
8          MR. GOLDMAN:  Move to strike
9      as nonresponsive.
10 BY MR. GOLDMAN:
11     Q.   Did you say anywhere in your
12 JAMA article that study 090 and VIGOR was
13 serious confirmation of an unequivocal
14 problem?
15     A.   Again, the --
16     Q.   Did you say that in your
17 article?
18     A.   It would not be possible
19 without having access to the correct
20 data.
21     Q.   Did you say that in your
22 article?
23     A.   It couldn't be said in the
24 article.

Page 468

1      Q.   Dr. Topol, it's a very
2  simple question.
3          Did you say in JAMA anywhere
4  whether or not study 090 and VIGOR
5  represented a serious confirmation,
6  unequivocal problem?
7      A.   As I said, we could not have
8  possibly said it at that time --
9      Q.   Is that a no?
10     A.   -- with the data that we
11 had. That's right, no.
12     Q.   You said the things that you
13 said about lightning striking twice,
14 serious confirmation, unequivocal problem
15 about 090 because you wanted to make
16 Merck look bad on TV. Isn't that true,
17 sir?
18     A.   That is completely untrue.
19     Q.   Do you see in your JAMA
20 article when you were writing to doctors,
21 you wrote about study 085 and study 090
22 together; right?
23     A.   Yes.
24     Q.   You did that, sir, in JAMA

Conditional

Page 469

1  because study 085 was a twin study, an
2  identical study to study 090; correct?
3      A.   It is not a twin study when
4  one turns out to come out differently
5  than the other.
6      Q.   I'm talking about the
7  design, not the result. It was a twin
8  study, wasn't it, sir?
9      A.   No. There were significant
10 differences in the design as well. They
11 were both in osteoarthritis, but study
12 085 and 090 had differences, for example,
13 in the dose, and there was aspirin used.
14 There were different -- I don't remember
15 all the details, but 085 and 090 were not
16 identical.
17     Q.   Let's look at what you wrote
18 back at the time in JAMA. Do you see
19 that study 085, you say, was "a
20 randomized, double-blind
21 placebo-controlled trial" versus -- and
22 that's the 12.5 milligram dose. Do you
23 see that?
24     A.   Yes.

Conditional

Page 470

1    Q.   "Versus nabumetone," the
2    thousand milligram dose. Do you see
3    that, sir?
4    A.   Yes.
5    Q.   That's the identical dose of
6    Vioxx and nabumetone that was used in
7    study 090; correct?
8    A.   Yes. But as it turns out,
9    there are differences, and I have to go
10   to the Targum report.
11   Q.   Is this what you wrote in
12   your article, sir?
13   A.   That is what's in the
14   article. But you're asking about whether
15   they are twin studies and the same, and
16   they're not all the same, no.
17   Q.   Do you see that study 085
18   involved an evaluation of the treatment
19   of Vioxx in osteoarthritis patients who
20   had knee problems? Do you see that?
21   A.   Yes.
22   Q.   That's the same with 090,
23   correct?
24   A.   Yes. The patient complaint

Page 471

1    of knee arthritis is the same.
2    Q.   The duration of the trials
3    085 and 090 were also the same, six
4    weeks; correct?
5    A.   That's what it says here.
6    I'd like to go back to the Targum report
7    to verify that.
8    Q.   Do you see that in your
9    article that you wrote, patients in 085
10   were allowed to take low dose aspirin for
11   cardioprotection, and for 090, aspirin
12   for cardioprotection was also allowed.
13   Do you see that, sir?
14   A.   That's what it says in the
15   article. Again, we had limited access to
16   090.
17   Q.   Well, the access you had to
18   090, sir, is referenced on the last page
19   of your article in footnote 22; correct?
20   A.   Which is the FDA website.
21   Q.   You went to the FDA website
22   to find information from the FDA about
23   study 085 and 090, correct?
24   A.   That's right, but that's not

Page 472

1    complete information. That's the
2    problem.
3    Q.   Let me point out, sir, that
4    when you wrote your article at the time,
5    do you see that you wrote for study 085
6    that there were three total
7    cardiovascular events in the trial, one
8    for Vioxx, two for nabumetone, and none
9    for the placebo group? Is that what you
10   wrote in your JAMA article?
11   A.   For study 085.
12   Q.   Did you write for study 090
13   that there were 9 cardiovascular events,
14   6 for Vioxx, 2 for nabumetone and 1 for
15   placebo?
16   A.   That's what it says in the
17   article.
18   Q.   It was important to provide
19   information about 085 and 090 because you
20   wanted to give the people who read this
21   article information about both studies;
22   correct?
23   A.   Well, we concentrated mainly
24   on VIGOR, so we gave the other two

Page 473

1    studies, 085 and 090, which at that time
2    we weren't as concerned, we didn't make
3    much of these two studies. That's true.
4    MR. HAMELINE: Do you
5    need -- you were looking for a
6    letter.
7    THE WITNESS: Yes. The
8    letter -- the letter in the New
9    England Journal that I am
10   referring to -- I just have to --
11   it's number 11 in the packet.
12   BY MR. GOLDMAN:
13   Q.   Go ahead and look for it,
14   Dr. Topol. I'm going to keep asking you
15   questions because I have a time limit
16   here.
17   A.   Go ahead.
18   Q.   You never mentioned the
19   results of study 085 when you were on 60
20   Minutes, did you, sir?
21   A.   No. Because all I'm talking
22   about is replication. I'm not talking
23   about other trials. There are many other
24   trials of Vioxx, of course.

*objects
counsel
is
testifying*

*[Handwritten annotations at top:]* π cas'd a designates 474:6 – 475:5 – D's response, violates courts order re evidence after Irving Death; Rule 802; Lacks Foundation

*[Handwritten:]* conditional

*[Handwritten:]* Overruled

*[Handwritten:]* Overruled

**Page 474**

1   Q.   You never mentioned the
2   results of study 085 when the plaintiffs'
3   lawyers were asking you questions, did
4   you, sir?
5   A.   I wasn't asked about 085.
6   Q.   The truth is, when you wrote
7   your JAMA article, you wrote that study
8   090 did not demonstrate the significant
9   increase in cardiovascular event rates
10  that you saw in VIGOR?
11  A.   Only on more careful review
12  of that data, data that was not
13  accessible to us at that time, was I able
14  to find out, to drill down on these
15  events in 090.  And let me just be
16  perfectly clear that when these data were
17  reviewed, and we can go back to the
18  Targum report and I can take you through
19  patient by patient why this
20  misclassification had led us astray.  If
21  we had -- if this data were properly
22  classified by Merck in what was
23  transmitted to the FDA report, we would
24  have had much more definitive

**Page 475**

1   conclusions, but we weren't able to get
2   there.  So, if I can go to the Targum
3   report and go right to the table, which
4   is really a critical table, and we can go
5   over that data.
6   Q.   We will do that, Dr. Topol.
7   We're not going to do that right now, but
8   we will do that, I promise you.
9   Dr. Topol, when you did your
10  analysis before Vioxx was withdrawn in
11  August of 2001, you found that study 090
12  did not demonstrate the significant
13  increase in CV event rates,
14  cardiovascular event rates that were seen
15  in VIGOR; correct?
16  A.   When we had incomplete
17  access to the data, yes.  I've already
18  reviewed that.
19  MR. GOLDMAN:  Move to strike
20  as nonresponsive.
21  BY MR. GOLDMAN:
22  Q.   Dr. Topol, I'm going to show
23  you at Page 958 in the first column,
24  second full paragraph, you say, second

**Page 476**

1   sentence, "Two smaller studies (Study 085
2   and Study 090) of" Vioxx "that both
3   allowed the use of low-dose aspirin did
4   not demonstrate the significant increase
5   in cardiovascular event rate noted in
6   VIGOR." Did you write that, sir?
7   A.   That was in our paper,
8   again, from the wrong data that we did
9   not have access to.
10  Q.   I want to know what data you
11  had access to after this point that you
12  didn't have access to in --
13  A.   I'll be happy to go over
14  that if you give me an opportunity.
15  Q.   -- JAMA?
16  A.   Page 32 of the Targum
17  report.
18  Q.   The Targum report you saw
19  back in February 2001, sir?
20  A.   Right, but then we had the
21  details of these patients, for example,
22  placebo, coronary occlusion, and we could
23  say had nothing to do with a heart
24  attack.

**Page 477**

1   Q.   Dr. Topol, the Targum report
2   that you are relying on now for your
3   review that study 090 was a signal --
4   A.   Yes.
5   Q.   -- for cardiovascular risk
6   is the same report that you cite in your
7   JAMA article and that you relied on in
8   your JAMA article.  Is that true?
9   A.   And we had the details of
10  each of the patients.
11  Q.   You had that also in
12  February 2001?
13  A.   I did not have access to it.
14  Q.   Well --
15  A.   That is, how these events
16  were characterized, coronary occlusion,
17  there was one called atrial fibrillation,
18  there was one called congestive heart
19  failure.  When we looked and went through
20  each -- when I looked and others looked
21  going through each of these events, then
22  the numbers changed.
23  Q.   We'll talk about numbers
24  changing in a minute.  Did you write, Dr.

*[Handwritten at bottom:]* Overruled

405d92cd-4d0a-489f-87c2-231e3a1c3f6f

*π counterdesignates* *474:6 – 475:5*
*overule* *479:22 – 480:4*   *cond'mod'l*

*No question;*
*Witness*
*volunteers*
*Answer,*

*402, 403*
*lacks*
*foundation*

Page 479

1  Topol, in August of 2001, that two
2  smaller studies -- withdrawn.
3          MR. KLINE: I apologize.
4  Where are you reading from?
5          MR. GOLDMAN: First column
6  of the JAMA article on Page 958.
7          MR. KLINE: Thank you.
8  BY MR. GOLDMAN:
9      Q.   Dr. Topol, did you write in
10 August of 2001 that "Two smaller studies
11 (Study 085 and Study 090)...did not
12 demonstrate the significant increase in
13 cardiovascular event rate noted in
14 VIGOR"? Did you write that?
15     A.   That's correct.
16     Q.   Did you also say in the next
17 sentence, "However, these studies had
18 smaller sample sizes, used only 25% of
19 the dose of" Vioxx "used in VIGOR, and
20 had few events for meaningful
21 comparison." Did you write that then,
22 sir?
23     A.   That's right.
24     Q.   You didn't say that on 60

Page 480

1  the data that's objectionable. We
2  were erroneously misled. Not only
3  was the suppression of 090 never
4  published that trial --
5  BY MR. GOLDMAN:
6      Q.   You knew that --
7          MR. HAMELINE: Could you let
8  him finish?
9          THE WITNESS: The trial was
10 completed in 1999. In 2001 we
11 could give a couple of years to a
12 near thousand patient trial not
13 being published. But now we're in
14 2004, and the study is still not
15 published, and we didn't have the
16 data to go into the table of
17 Targum until 2004 to find out that
18 the events that we misclassify in
19 our JAMA paper were actually very
20 different than what we had
21 estimated and what Targum even had
22 estimated. She never spent time
23 on this, and it's not a trivial
24 matter. This is a 978 patient

Page 479

1  Minutes?
2          MR. HAMELINE: Can I just
3  note an objection. I know you
4  want to move through these
5  quickly, but raising your voice --
6          MR. GOLDMAN: I don't mean
7  to raise my voice.
8          MR. HAMELINE: I know you
9  don't. I'm just noting that for
10 the record. I think it's late in
11 the afternoon, and we all get
12 involved in the deposition.
13         MR. GOLDMAN: I promise you
14 if I'm raising my voice, I
15 apologize, but that's not my
16 intent at all.
17         THE WITNESS: You're also
18 not allowing me to adequately
19 respond.
20         MR. HAMELINE: That is his
21 intent. That's different.
22         THE WITNESS: And you
23 continue to drill ahead, and I
24 don't have a chance to give you

Page 481

1  trial with statistically
2  significant results of excess of
3  heart attacks.
4  BY MR. GOLDMAN:
5      Q.   Dr. Topol --
6          MR. GOLDMAN: Move to strike
7  as nonresponsive.
8  BY MR. GOLDMAN:
9      Q.   Dr. Topol, did you write
10 back when you were writing to doctors in
11 your JAMA article that study 090 had
12 small sample sizes, used only 25 percent
13 of the dose and had few events for
14 meaningful comparison? Was that your
15 statement in your article?
16     A.   That was the statement based
17 on the data we had at the time, yes.
18     Q.   I want to try to keep track
19 of the numbers that you've used over time
20 for study 090, and so I'm going to give
21 you a chart and ask you to confirm that
22 this is correct.
23         In your August 2001 JAMA
24 article for study 090, you said that

405d92ed-4a0a-4894-9e32-23f63a1c3f6f

*overule*

Page 482

1  there were 6 cardiovascular events in the
2  Vioxx group, correct?
3      A.   Right.
4          MR. KLINE: What page are we
5  looking at here, Mr. Goldman?
6  BY MR. GOLDMAN:
7      Q.   2 in the nabumetone group?
8          MR. GOLDMAN: It's the JAMA
9  article.
10         MR. KLINE: Where are you
11  pointing to?
12         MR. GOLDMAN: I'm pointing
13  to Page 956, second column, second
14  paragraph.
15         THE WITNESS: Last sentence
16  of that paragraph, Study 090, 6, 2
17  and 1.
18  BY MR. GOLDMAN:
19     Q.   So, when you wrote your JAMA
20  article, you wrote that there were 6
21  cardiovascular events on Vioxx, 2 on
22  nabumetone, 1 on placebo; correct, sir?
23     A.   That's what we thought at
24  the time, unfortunately.

Page 483

1      Q.   Within a month after
2  withdrawal, you started to write 60
3  Minutes various e-mails; correct?
4      A.   Well, I had interaction with
5  Michael Radutsky, the producer, yes.
6      Q.   You talked about study 090
7  in those e-mails, didn't you, sir?
8      A.   Yes, I did.
9      Q.   What you told 60 Minutes
10  about Study 090 was different from what
11  you wrote in your JAMA article. Isn't
12  that true, sir?
13     A.   By having had a chance to
14  review these data, and I already had
15  mentioned this morning I was asked about,
16  did I get a letter from Mr. Myers and
17  Bill Moyers, and when I got that, he sent
18  me this report to look over, and I
19  started to wonder about these events that
20  we, unfortunately, had not had adequate
21  detail on Page 32 of the Targum report.
22  And it turns out, the numbers, when you
23  characterize each of these patients
24  appropriately, are different. Less

Page 484

1  events in the Vioxx and less events in
2  the placebo as well. It changes. And
3  it's a very important change.
4          MR. GOLDMAN: Move to strike
5  as nonresponsive.
6              - - -
7          (Whereupon, Deposition
8  Exhibit Topol-41, E-mails, EJT
9  000191, was marked for
10  identification.)
11             - - -
12  BY MR. GOLDMAN:
13     Q.   Dr. Topol, I'm going to hand
14  you what I've marked as Exhibit 41. This
15  is an e-mail that came from your files
16  that has a Bates Number at the bottom,
17  EJT 191. Do you see that?
18     A.   Yes.
19     Q.   This is an e-mail at the
20  bottom that you wrote to Marlene
21  Goormastic on October 25, 2004; correct?
22     A.   Yes.
23     Q.   Is that your statistician?
24     A.   That's the statistician,

Page 485

1  that's right.
2      Q.   And you're writing to Ms.
3  Goormastic on October 25, this is a month
4  after withdrawal, to do some statistical
5  analysis; correct?
6      A.   Yes. There was subsequent
7  to this as well, but this is one of the
8  interactions we had.
9      Q.   You ask Marlene at the
10  bottom, "I need to do a test comparing
11  three treatment arms - Vioxx versus
12  nabumetone and then Vioxx versus the
13  other two combined," meaning nabumetone
14  and placebo. "Here are the data. Vioxx,
15  7 out of 390 events."
16     A.   Right.
17     Q.   "Nabumetone 1 out of 392
18  events. Placebo, 1 out of 196 events."
19  Is that what you wrote to her?
20     A.   These are events that are
21  not death, heart attack or stroke. These
22  are events requiring cessation of the
23  drug. This is a different part of the
24  Targum report. But, yes, this is one of

22 (Pages 482 to 485)

Sustained.
403