overruled

the ancillary analyses that was performed.

Q. This is an analysis on study 090; correct?

A. Study 090, but not on death, heart attack and stroke.

Q. I'm going to write down the numbers for October 25 of 2004.

A. These numbers do not correspond to death, heart attack and stroke.

Q. I understand that.

A. Okay. Well, I don't know what you're writing down because you're comparing apples and oranges now.

Q. 7 events on Vioxx.

A. They're different events.

MR. KLINE: Are you going to making a chart that's going to be displayed?

MR. GOLDMAN: All I'm doing is trying to keep track of the numbers, that's all.

MR. KLINE: But for your own

benefit?

THE WITNESS: You're making a table of events, of different types of events. These are events that are requiring cessation of drug with serious cardiovascular -- I'm more focused on my letter in the New England Journal and what I'm talking about with 60 Minutes and those things you're interested in on death, heart attack and stroke, and they're different numbers.

BY MR. GOLDMAN:

Q. The numbers that you're using here on October 25 have to do with the numbers of Vioxx patients who had to be discontinued in the 090 study; right?

A. With serious cardiovascular adverse events, different than death, heart attack and stroke. That's a different table.

Q. So, the numbers that you have are 7, 1 and 1.

overruled

A. Okay.

Q. And you ask Ms. Goormastic at the bottom, "Can you or someone run this and get back to me, the p values, RR, 95% CI?" Do you see that?

A. Yes.

Q. What you are asking her to do -- a p-value is a test for statistical significance; correct?

A. Yes. Yes.

Q. Relative risk is RR?

A. Yes.

Q. And CI is confidence interval, and that's another test for statistical significance; correct?

A. Yes.

Q. Ms. Goormastic writes back to you that same day above and says "The chisquare," that's a type of statistical test, correct, "including all 3 groups is p equals .06," and then here's the answer to your question: "For Vioxx versus nabumetone chisquare" p-value is ".03." Do you see that, sir?

overruled EF

A. Yes. I see that, but again, it's not related to my principal interest.

Q. The .03, just so the jury can understand and I can understand, if a p-value is less than .05, that means that it's statistically significant, the result; correct?

A. That's right.

Q. Here, this is showing a statistically significant result for .03; is that right?

A. That's correct, but you're comparing -- you don't even know what these events are. So, you're just looking at some numbers. You don't know what this analysis is about.

MR. GOLDMAN: Move to strike as nonresponsive.

BY MR. GOLDMAN:

Q. The next line says --

MR. KLINE: How can you possibly say that? How can you possibly say his answer is

overruled

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Overruled

nonresponsive?
BY MR. GOLDMAN:
Q. -- relative risk. Do you see you wrote "Relative risk for Vioxx is 7" -- I'm sorry, this is what Ms. Goormastic wrote -- "is 7." And then you have a confidence interval here that she writes ".9 - 56.9." Do you see that in the parenthesis?
A. Yes.
Q. And if the confidence interval that is described there includes the number 1, that is, if one falls within .9 to 56, that means that the result is not statistically significant; correct, sir?
A. That's correct.
Q. So, Ms. Goormastic writes: "I was puzzled why this confidence interval covers 1 when the p-value is less than .05. I think it's due to the small number of events" used. Do you see that?
A. Yes, I do.

Q. You had talked about the small number of events in your JAMA article; right?
A. That's correct.
Q. Then she says, "When I ran a logistic regression model" that's another way of calculating statistical significance, right, "I got very similar results, a relative risk of 7.1," and then the confidence interval there covers 1. Correct, sir?
A. That's correct.
Q. Ms. Goormastic is telling you that she's puzzled because she is seeing with one test there's a statistically significant difference and with another one there's not?
A. Yes, but this is really an immaterial look at the data. It's not on death, heart attack and stroke. And it's not with the final review of the events, as you've not allowed me to go through patient by patient of study 090 from Table 32 in the Targum report. You've

not allowed me to do that.
MR. GOLDMAN: Move to strike as nonresponsive.
BY MR. GOLDMAN:
Q. The reason that Ms. Goormastic is puzzled, Dr. Topol, is because one test shows that there's no statistically significant difference, and another test shows that there is; correct?
A. But it's not on the events of interest, Mr. Goldman.
Q. I'm not asking about the events of interest.
You wrote the e-mail here. Sir, you wrote an e-mail to your statistician in October of 2004 because you thought that this answer was important. Is that true?
A. No. This is not the e-mail of importance. You've picked this e-mail. There are other e-mails that are considerably more important with my statistician, and you just picked this

one.
Q. We'll get to that one, sir.
A. Okay.
Q. When you received this e-mail from Ms. Goormastic, it wasn't clear to you, sir, whether there was a statistically significant difference or not as reflected in Ms. Goormastic's e-mail; correct?
A. That really was not my focus. I see what you're saying here, but that was not my concern. The events here for death, heart attack and stroke were unclear. This is not what this refers to.
Q. What time did you write this e-mail? I'm sorry, what time -- withdrawn.
What time did Ms. Goormastic write her e-mail to you on October 25, 2004?
A. She wrote that at 4:42 p.m.
- - -
(Whereupon, Deposition

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Sustained

Page 494

Exhibit Topol-42, E-mails, EJT 000192, was marked for identification.)

- - -

BY MR. GOLDMAN:

Q. I'm going to show you an e-mail that I've marked as Exhibit 42. This came from your files, Dr. Topol, and I want to focus on the bottom e-mail. This is an e-mail from you to Michael Radutsky?

A. Radutsky.

Q. Who is that?

A. He's the producer for CBS 60 Minutes.

Q. What time did you write this e-mail to the producer of 60 Minutes?

A. 14 minutes or so later.

Q. You wrote this e-mail to 60 Minutes at 4:46 in the afternoon, correct?

A. Right.

Q. You received an e-mail from Ms. Goormastic at 4:42, four minutes

Page 495

earlier; correct?

A. That's right.

Q. And you write to 60 Minutes, "Michael, Great news on the Statistics for Study 090. The difference between Vioxx and nabumetone is significant, P equals .03." And then you continue. Do you see that, sir?

A. I see that. That's not the end of the story here, though.

Q. You forwarded --

A. You just have an ice pick view of this interaction.

Q. Dr. Topol, you forwarded -- do you see the forward "FW" in the subject line of your e-mail to 60 Minutes?

A. Yes.

Q. You forwarded the e-mail that Ms. Goormastic sent to you, correct, sir?

A. Yes, yes.

Q. But you didn't include what Ms. Goormastic said to you about being

Page 496

puzzled and about there being no statistically significant difference with respect to the confidence interval? You changed that and wrote that there was a statistically significant difference?

A. Where is that?

Q. Do you see in your e-mail to 60 Minutes after you say "Great news. The difference between Vioxx and nabumetone is significant" and you cite only the p-value. Do you see that, sir?

A. Yes.

Q. You didn't tell 60 Minutes in that e-mail that your statistician was puzzled about these numbers, did you?

A. They were not final numbers. As I already indicated you, these were not the final numbers for death, heart attack and stroke. And so I will take the opportunity to amplify here because you're trying to take this down the wrong path. On October 25th, the data were inconclusive because we did not have a chance to learn about these events in the

Sustained

Page 497

Targum table, these patients on death, heart attack and stroke. They were not reviewed. I did not have the details of any of those patients. So, these events that we're looking at were not the interested field of cardiovascular endpoints of deaths, of all cause, heart attack and stroke.

Q. You found it important enough to write to 60 Minutes four minutes after your statistician wrote to you to tell them about what you thought was great news, and you characterized --

A. This was the beginning of the analysis, only the beginning.

Q. Do you see that 60 Minutes --

A. This is a work in progress, and you're just taking one part of that work.

Q. Do you see that 60 Minutes writes back to you on the top and says "Remarkable" and then continues. "So then how does the company ignore numbers

405d92cd-4d0a-489f-87d2-231a3a1c3f6f

Sustained

Sustained

Page 498

like that? How does that not warrant further study?" Et cetera. And he says "How can they call the study 'statistically insignificant'?" Do you see that?

A. I see that.

Q. Did you ever write back to 60 Minutes and say that your statistician told you that under another test there was no statistically significant difference for 090?

A. I discussed this extensively with Michael Radutsky on the phone, and I told him that we needed -- before this could be wrapped up and before I could make any statements about study 090, I needed to have all the information regarding the patients with events, putative events of this trial, which I didn't have at this time. So, these data did not -- again, I've said it at least three or four times. These data did not reflect the final categorization of death, heart attack or stroke for study

Page 499

090.

Q. Did you in your e-mail to Doctor -- I'm sorry, withdrawn.

Did you in your e-mail to 60 Minutes say that your statistician was puzzled? Yes or no?

A. I discussed it on the phone.

Q. Your testimony is that you discussed your statistician being puzzled on the phone, but you told 60 Minutes that there was --

A. No.

Q. -- there was a significant difference here?

A. I discussed with Michael Radutsky that more work had to be done, that we can't use any of these numbers until we get all the details on these patients of this page 32 in the Targum report. So, all this was preliminary work, and we still didn't have a sense of where we were with the death, heart attack and stroke story. I discussed that with him.

Page 500

Q. You told 60 Minutes that this was great news about study 090 because you wanted to make Merck look bad. Isn't that true, sir?

A. All I wanted was the truth about this drug and the truth about study 090, and it was becoming increasingly clear, now we're in 2004, we're now five years into this whole story, and this trial has never been published. And we never ran the stats in the JAMA paper. We never actually did the statistics on 090 or 085. We didn't spend enough time going into the details of this, and then it became apparent that there were miscategorizations when this was carefully reviewed.

Q. You said in your JAMA paper that the numbers were too small for meaningful comparison for 090. Isn't that right, sir?

A. They were not statistically significant, but they were mischaracterized. So, how can one make a

Page 501

definite conclusion. We were working with erroneous categorization of endpoints.

MR. GOLDMAN: Move to strike as nonresponsive.

Let's take a break.

MR. HAMELINE: Sure.

THE VIDEOTAPE TECHNICIAN: Off the record, 5:18.

- - -

(Whereupon, a recess was taken from 5:18 until 5:28 p.m.)

- - -

THE VIDEOTAPE TECHNICIAN: Back on the record at 5:28.

- - -

(Whereupon, Deposition Exhibit Topol-43, E-mails, EJT 000190, was marked for identification.)

- - -

BY MR. GOLDMAN:

Q. Dr. Topol, I've handed you what I've marked as Exhibit 43 --

405d92cd-4d0a-489f-87d2-231e3a1c0f6f

Sustained

Sustained

Sustained

Page 502

A. Yes.
Q. -- which is an e-mail, November 12, 2004 from you to your statistician again, and this is now two days before you go on 60 Minutes. Correct?
A. That's right.
Q. Now you tell Ms. Goormastic to -- and you say regarding 60 Minutes coming up quickly, "can you run the difference between 5 out of 390 versus 1 out of 588 for odds ratio, 95 percent confidence interval, chi square and p-value." Do you see that?
A. Yes. These are the same numbers as in the New England Journal paper of December 30, 2004.
Q. So, these are the numbers that you say are the right numbers to analyze study 090; right?
A. That is, before we could finalize the appropriate numbers, we had to have all the information for each patient of whether they had an event or

Page 503

not from this original table, and this is now where they are all properly classified for death, heart attack or stroke.
Q. The information that you looked at, sir, when you came up with your numbers, 7,1,1, back in October, came from Ms. Targum's report, correct, sir?
A. The original information, and then we got all the details of each patient subsequently.
Q. You got the details of all the patients when you wrote that the numbers were 7, 1 and 1 --
A. No.
Q. -- in October of 2004?
A. No. We did not have the details. All I had was this table. There are multiple tables in the Targum report. I did not have the appropriate clinical history for each patient and how the endpoint was categorized until shortly before this e-mail.

Page 504

Q. So, the basis for your view that there are five events on Vioxx, 1 on nabumetone and none on placebo come from your review of Dr. Targum's report; correct?
A. No. No. That's only the beginning. Then we had -- not in Dr. Targum's report. There's a detailed account of each patient and how that diagnosis of coronary occlusion or congestive heart failure was made. And remember, the endpoint that is the principal endpoint for clinical trials is death, heart attack or stroke. So, the final determination of these events for study 090 was based on not just the Targum report, but all those details that were not available to us until we got the subsequent information.
Q. Now, you wrote "5 out of 390" and then you wrote "1 out of 588." Do you see that in your e-mail?
A. Yes. And that's exactly the same as the New England Journal

Page 505

Overruled

subsequent correspondence.
Q. The 588, which is the denominator here, that is calculated by taking the number of patients in the nabumetone group and adding them to the number of patients in the placebo group; correct?
A. Those are control groups for the trial, that's right. They're not experimental groups.
Q. So, what you did was you took 5 events on Vioxx, and you compared them to 1 event in placebo and nabumetone combined; correct?
A. That is how this analysis was performed with the appropriate categorization of the endpoints and the statistics.
Q. When you wrote your JAMA article, sir, on Page 955 --
A. Yes.
Q. -- you describe the events that occurred with 090 as 6, 2 and 1 --
A. Right.

405d92cd-4d3a-439f-87d2-231e3a1c3f5f

Overruled Sustain

Page 506

Q. -- and you didn't group the nabumetone and placebo groups, did you, sir?

A. And that's precisely because we had misinformation. We had atrial fibrillation as an event which shouldn't have been. We had congestive heart failure. We had coronary occlusion, which wasn't a heart attack, and it was very clear that the more meaningful way to analyze the trial, just as Juni had done, would be to compare controls with the experimental drug.

Q. When you wrote your JAMA article and the events were 6, 2 and 1, you wrote that those numbers were too small for meaningful comparison; correct?

A. With the erroneous data, they were not appropriate to make a final judgment.

Q. The numbers, 6, 2 and 1 were so small that they couldn't be used for meaningful comparison. Correct?

A. I wouldn't use the term

Page 507

exactly, no. That's not the term that we use.

Q. Well, if we look back at your JAMA article, page --

A. It says, "had few events for meaningful comparison." "Few events." That's right.

Q. So, when the events were 6, 4 -- I'm sorry, withdrawn.

When the events were 6, 2 and 1 as you analyzed them in your JAMA article for Vioxx, nabumetone and placebo, you considered that to be few events for meaningful comparison; correct?

A. Well, there was no significant difference. So, that means there's no meaningful difference, yes.

Q. So now in November of 2004, when you say the numbers now are 5 for Vioxx, 1 for nabumetone and 0 for placebo, there's actually fewer events in your analysis from November of 2004 than there were in your analysis in JAMA;

Overruled

Page 508

correct?

A. Correct. But the events are correct now, and they are the appropriate irrevocable endpoints of death, heart attack and stroke and not admixed with things like atrial fibrillation or a chronic occlusion that had nothing to do with a heart attack. Now we had a difference of 1.3 versus 0.2 percent. And what I showed in the letter in the correspondence in the New England Journal with those numbers is that with the exact same Vioxx incident, 1.3 percent with those five events that you just cited was exactly the same as in the VIGOR trial, 1.2 percent for death, heart attack and stroke. And there was a 7.6, that's 760 percent excess compared with the controls, whether it be naproxen in VIGOR or nabumetone and placebo in the current study 090 that we're discussing.

MR. GOLDMAN: Move to strike everything after the answer to my question.

Overruled

Page 509

BY MR. GOLDMAN:

Q. Dr. Topol --

MR. KLINE: Move to include as very responsive.

BY MR. GOLDMAN:

Q. Dr. Topol, the reason you asked your statistician to compare the number of events on Vioxx to the number of events on nabumetone and placebo combined is because you know that if you compare the number of events on Vioxx to just the number of events on nabumetone, there is no statistically significant difference?

A. That's not the appropriate comparison. We already went through this, that is, when you have drugs that are a control arm that are widely accepted and have been around for 10 or 20 years, and you have an experimental drug, it is appropriate, just as Juni did in his analysis in the Lancet, and just as we did here, to compare the control arms with the experimental arm, which in

Overrule

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Overruled

Page 510

this case was Vioxx.

Q. You didn't do that in your JAMA article, did you, sir?

A. We didn't do it in the JAMA article, but we didn't have the right data. So, of course, we couldn't do it in the JAMA paper. We had erroneous categorization of endpoints.

Q. The reason that you combined nabumetone and placebo and compared that to Vioxx is because you know that if you compare the number of events on Vioxx to placebo for study 090, there is no statistically significant difference; correct?

A. That is not the reason why that analysis was performed that way.

Q. Am I correct, sir, that if you compare 5 events on Vioxx to 0 events on placebo, there's no statistically significant difference?

A. I don't know. We'd have to run the statistics on that.

Q. You never ran that, did you?

Page 511

A. I don't remember that we ran it. I don't have it at hand.

Q. The investigators who conducted study 090 did not compare Vioxx against nabumetone and placebo, did they, sir? They kept the three arms separate?

A. Maybe you can tell me, Mr. Goldman, why was this paper with this extent of harm to patients, why was it never published?

Q. Can you answer my question, sir?

A. I'm just asking you, can you help me to understand why the paper was never published six years later on nearly 1,000 patients?

MR. GOLDMAN: I have half an hour left. Can you please ask your witness not to ask any questions.

MR. KLINE: I think the answer is a rhetorical question. I move to include it. Simply rhetorical.

Page 512

BY MR. GOLDMAN:

Q. Dr. Topol --

A. I just want to point out that's what has made it so difficult for us to do an analysis, because we never had the paper, the manuscript written on 1,000 patients. So, we had to work in a very difficult way, and that's what you're trying to get at, is why didn't you do this or why didn't do that. We didn't have the data at hand because it was never published.

Q. Dr. Topol, the investigators who conducted study 090 did not compare Vioxx to placebo and nabumetone combined, they compared Vioxx to just placebo or nabumetone; is that right?

A. How would we ever know that? How did you know that? I've never seen any paper. How can you say something like that? Can you show me that evidence?

Q. Do you know, sir, that the protocol for study 090 called for pair

Page 513

wise comparisons?

A. Who has ever seen the protocol?

Q. Well, let me show it to you.

A. Okay.

Q. This is Exhibit 44.

MR. KLINE: See, you got discovery from them.

THE WITNESS: This will be interesting.

- - -

(Whereupon, Deposition Exhibit Topol-44, "MRL Clinical Study Report, Multicenter Study: A Randomized, Placebo-Controlled, Parallel-Group, Double-Blind Study to Evaluate the Efficacy and Safety of MK-0966 (Rofecoxib) 12.5 mg Versus Nabumetone 1000 mg in Patients with Osteoarthritis of the Knee (Protocol 090)," MRK-00420016832 - MRK-00420016849, was marked for identification.)

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 514

- - -

BY MR. GOLDMAN:

Q. This is the clinical study report for study 090. Do you see that, sir?

A. This was not in the FDA database.

MR. KLINE: Objection. It's a piece of the study. It's not the whole study.

MR. GOLDMAN: That's correct. This is a piece.

THE WITNESS: Table of contents.

MR. KLINE: I'm suggesting to Dr. Topol's counsel to have him see the whole report.

MR. GOLDMAN: That's fair, Dr. Topol.

MR. KLINE: Like everything that was provided to you today.

THE WITNESS: I've never seen the report of this study.

BY MR. GOLDMAN:

Page 515

Q. Dr. Topol, I'm showing you an excerpt, that's true, an excerpt of the clinical study report --

A. Okay.

Q. -- and if you'd turn to the 14th page and the 15th page, do you see that the investigators kept the Vioxx nabumetone and placebo groups separate in the chart at the bottom of Page 14?

MR. HAMELINE: Let me just note the objection. We're not here on behalf of either party. What Dr. Topol wants to do is give a fair and complete explanation of the research that he produced in this field, and you're giving him a document.

MR. GOLDMAN: He asked for a document.

MR. HAMELINE: Well, he asked for this document six years ago. You've given him a piece of the document you're asking him to read in a brief period of time.

Page 516

That's my objection.

THE WITNESS: This is very simple. Mr. Goldman, the problem with this -- you're talking about efficacy. And it's fine if you want to look at efficacy if you'd like on each column, rofecoxib, 12-and-a-half milligrams, Vioxx a low dose, and you want to look at the nabumetone and placebo, where is the safety, but where is the heart attack data in this report. And why isn't that combined? That's a legitimate and a vital comparison that needs to be made on the data.

BY MR. GOLDMAN:

Q. If you'd turn to Page 16, do you see that the safety information, the clinical adverse experiences were broken down by Vioxx, nabumetone and placebo and not combined?

A. Are you on Page 16 or which page are you on here? 16?

Page 517

Q. Yes.

A. Now, I don't see anything with death, heart attack and stroke here.

Q. Can you answer my question, sir? Do you see that the safety information maintained by the investigators was broken down, Vioxx, nabumetone and placebo?

MR. KLINE: Objection. May I have an objection to the line of questioning?

MR. GOLDMAN: Yes.

MR. KLINE: He doesn't even have the whole document.

BY MR. GOLDMAN:

Q. Do you see that, sir?

A. I see how it's displayed. I don't agree with that as being the only analysis that should be done also with respect to controls, nabumetone and placebo as compared to the experimental arm, Vioxx. It should have been done that way. That doesn't mean -- if Merck wants to present the data this way and

- Violates courts order. Relates to time period after Irvins death
- Specifically, discusses 2004 events (Rule 402)
- testimony about published study 085 is irrelevant because it was published in 2004 and had no impact on Irvins Vioxx use

Page 518

manipulate the data that way, that's their prerogative. That doesn't mean it's correct.

MR. GOLDMAN: Object to the form -- I'm sorry, move to strike as nonresponsive.

BY MR. GOLDMAN:

Q. Can you answer my question, sir?

A. I'll be happy to.

Q. Does the table that you looked at on Page 16 reflect that the safety information was maintained in three different columns, Vioxx, nabumetone and placebo?

A. The safety information I'm interested in that I've been writing about --

Q. That's not my question.

A. -- that I've been concerned about this drug is not included in that table, and just because it's displayed under the little excerpt of this report which has never been published for the

Page 519

medical community to see doesn't mean that it's the only way and the proper way to -- I don't accept that.

Q. Dr. Topol, you have said on several occasions that study 090 was not published; correct?

A. That's correct.

Q. You knew that study 090 was not published when you wrote your JAMA article, didn't you, sir?

A. Well, I already pointed out earlier in our discourse, in our discussion, it was 2001 -- well, it was March of 2001 when we wrote that paper, and the study, we didn't even know when it was done, study 090. So, we give some allowance for when it might be published. But now in 2004, something is very concerning because it's now multiple years later, it's nearly 1,000 patient trial, it's not a trivial cohort, and it still hasn't shown up in the literature. So, there's a big difference between March of 2001 a year or so, two years

Page 520

after the study was completed versus six years after the study was completed. That's a big gap.

MR. GOLDMAN: Move to strike as nonresponsive.

BY MR. GOLDMAN:

Q. Dr. Topol, did you know in August of 2001 when you wrote your JAMA article that study 090 was not published?

A. Well, I didn't know it was published. So, we have to assume that since we couldn't cite it directly, we only could cite the FDA -- we assumed it was a manuscript in review, soon to be published -- at the time when we published that paper, we didn't know of its publication.

Q. You also know that Merck didn't publish study 085 either; right?

A. They did publish 085. In fact, there is a publication, and I can get that for you if you'd like. It was published indeed. It was 1,000 patient similar, but I guess Merck was happy with

Page 521

the results, but it was published.

Q. Well, if you can show me today where Merck published study 085 but not 090, I'd like to see that.

A. It's published in the Juni paper.

Q. That's not a publication, sir.

A. No. What I'm saying is it's cited in the Juni paper.

Q. Let's look at the Juni paper.

A. I believe it's cited in there. It's an osteoarthritis trial, so, I don't remember the first author, but it was in his analysis, and so it was 1,000 patients. I'm trying to remember the exact number, 085. It was -- we have to back it out. 085 had 1,042 patients, and somewhere in this table of Figure 3, that is, there's 1,042 patient trial that's included in here and it's cited. I just don't --

Q. Dr. Topol, that 1,042 that

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Continuation of previous page. Refers to 2004 publication of Study 085 Violates court's order by relating to events after Irvin's death

Page 522

you're referring to in Table 1 of Juni's paper which is on Page 2023 is the same 1,042 number that you have in your JAMA article --

A. Right.

Q. -- when you described a number of patients in 085. Correct, sir?

A. No. But I'm trying to find the reference for that now, sir, that is, the publication. There's a publication based on these -- on this trial, 085. Let me see if I can find it in here. 085, it's by Kivitz, et al, 2004. What's that number, Joe?

MR. HAMELINE: 22.

THE WITNESS: Reference 22. Okay. Here it is. It was published in the Journal of American Geriatric Society in 2000 and -- Reference Number 22, 2004, Volume 52. It's by Kivitz, et al. "Efficacy and safety of rofecoxib 12-and-a-half milligrams versus nabumetone 1,000 milligrams in

Page 523

patients with osteoarthritis of the knee: A randomized control trial." So it was indeed was published --

BY MR. GOLDMAN:

Q. Dr. Topol --

A. -- unlike study 090.

Q. Dr. Topol, what you are looking at is a publication after withdrawal; correct?

MR. KLINE: Which means when?

THE WITNESS: No. It was published before the withdrawal. That was published in early 2004 in the Journal of the American Geriatric Society. It's an eight-page manuscript published by Kivitz and Colley before the withdrawal.

BY M

Q. I don't have that here, Dr. Topol.

MR. GOLDMAN: I'm objecting.

Page 524

lack of foundation.

THE WITNESS: It's right here. (Indicating.)

MR. GOLDMAN: I don't see the date.

BY MR. GOLDMAN:

Q. But Dr. Topol, let me ask you something. Withdrawn. When you wrote your article in JAMA in August of 2001, you knew 090 was not published, and you didn't say in your article that it should be, did you, sir?

A. We assumed every trial, particularly when it gets to 1,000 patients, it's going to be published. That's -- this is -- we're talking about human experimentation. And you don't experiment on 1,000 patients and not publish the results for the rest of the medical community to see. That's not acceptable medical research.

Q. Did you ever write the FDA in August of 2001 when you knew that 090

Page 525

was not published and say that this study should be published because it's important?

A. We give trials or sponsors an allowance of time.

Q. Did you do that, sir?

A. How would we know that they weren't intending to ever publish the trial?

Q. You knew that study 090 was not published in August 2001. Did you ever write the FDA, did you ever write Merck, did you ever write anybody and say study 090 should be published?

A. We assumed that it was going to be published. It was soon after --

Q. That wasn't my question.

Did you ever write the FDA, Merck or anybody else before this medicine was withdrawn and say that study 090 should be published?

A. I have a simple answer for that question. Why would we do that?

Q. Is your answer to my

Overruled

Overruled

Actions in August 2001 are irrelevant because they are after Irvin's death.

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

- Admits that opinions about 090 are based on data obtained in 2004
- Violates courts order
- Non-responsive

Overruled

Plaintiffs response:

Page 526

question no, you didn't?
A. Yes. Why would we even think of doing it?
Q. Dr. Topol, if you thought that study 090 was that important and the events were so important that they should be publicized, did you ever write the FDA, Merck, or anybody else and say you should publish Study 090?
A. Now, Mr. Goldman --
Q. Can you answer that yes or no?
A. You're confusing everything now. It was only in '04, October/November '04 that we got the straight data. We couldn't get to the data. So how could we have known that it was statistically significant with a 760 percent excess of heart attack in '02, in '01. We didn't have the data. There was no way of knowing that.
Q. Dr. Topol, can you answer my question yes or no or not?
MR. KLINE: Objection. He

Page 527

answered your question.
BY MR. GOLDMAN:
Q. Can you answer it yes or no or not?
MR. KLINE: He answered your question.
THE WITNESS: I believe I answered your question. You could play it back and listen to it.
MR. KLINE: There are 14 minutes left.
BY MR. GOLDMAN:
Q. Dr. Topol, I want to ask you about Ms. Targum's analysis that you have referred to so many times today.
A. Yes.
MR. GOLDMAN: And I'm going to mark it for my purposes as 44.
THE WITNESS: Okay.
- - -
(Whereupon, Deposition Exhibit Topol-44A, Memo 2-1-01 "Consultation NDA 21-042, S-007 Review of cardiovascular safety

Page 528

database," (Targum) with handwritten notes, EJT 000211 - EJT 000248, was marked for identification.)
- - -
BY MR. GOLDMAN:
Q. This is an analysis by Ms. Targum, February 1st --
A. Dr. Targum.
Q. I'm sorry.
Exhibit 44 is the analysis from Dr. Targum dated February 1st of 2001; correct, sir?
A. Correct.
Q. Do you see on Page 28 of the document that Dr. Targum spends seven pages studying 090?
A. Yes.
Q. Do you see that Dr. Targum also spends four pages studying 085?
A. Yes.
Q. Starting on pages --
A. I remember that, yes.
Q. The information that you

Page 529

obtained to come up with your numbers, 5,1,0 came from this document that Dr. Targum prepared in February of 2001, and that has been on the website ever since; correct?
A. That's not true. I've already stated unequivocally that we had the details of each patient before we could make the final determination of the 5, 1 and 0.
Q. If you'd turn to Page 32 of the document, Dr. Topol --
A. That's right.
Q. -- do you see that you have written at the bottom 5, 1 and 0? Do you see that, sir?
A. Yes, but that's not solely on the basis of this table. That's notes that I wrote after having access to the clinical details of all the events, the 6, the 2 and the 2, that is 10 events, 10 putative events. I didn't have the details. So, for example, the placebo patient called coronary artery occlusion,

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

which could have been a heart attack, only did I find out during the details was that, in fact, this was a man who had had a chronically occluded artery for many years. It wasn't a heart attack. So, I couldn't possibly have made a determination about heart attack just on the basis of this table. That's just an example.

Q. Dr. Topol, do the numbers 5, 1 and 0 --

MR. GOLDMAN: Move to strike the last answer.

BY MR. GOLDMAN:

Q. Do the numbers 5, 1 and 0 that you wrote down on Page 32 appear on the page that Dr. Targum wrote in February of 2001?

A. Her numbers are 7 --

Q. Her numbers -- that's actually a good point.

A. Cardiovascular system are 7, 1 and 1.

Q. Well, let's actually go up

to the top, Dr. Topol. Do you see that Dr. Targum, who did this analysis, says at the very top, "Below is a listing of serious cardiovascular adverse events. In the" Vioxx "group, a total of 6 serious cardiovascular adverse events were reported; in the nabumetone group, there were 2, and in the placebo group," there were 1. Do you see that, sir?

A. Yes.

Q. Those are the numbers that you used in your JAMA article; correct?

A. We took our JAMA straight without any questions because we didn't have access to the details.

Q. This same table down below that you referred to before where you came up with 7, do you see that, sir, of the 7 in the Vioxx group?

A. Yes. But they --

Q. In the middle?

A. The 7 doesn't correspond to the table above.

Q. The 7, sir, is the number

that you used in October of 2004 when you wrote to your statistician --

A. Right.

Q. -- correct?

A. Right. So, what we were doing --

Q. My only question was, is that correct?

A. We accepted Dr. Targum's data in proxy for the real data. That was the whole point. We accepted Dr. Targum before we were getting the details. We accepted her data. She apparently didn't do the statistical analysis, not presented here. In fact, I discussed this with Dr. Targum, and I have e-mails back and forth to Dr. Targum that she did not do the statistical analysis that should have been done, but we accepted her numbers before we got the real numbers.

MR. GOLDMAN: Move to strike as nonresponsive.

BY MR. GOLDMAN:

Q. Dr. Topol, the 6, 4 and 2 that you wrote in your JAMA article came from a document that Dr. Targum wrote in February of 2001, correct, sir?

A. The JAMA paper, if we can get back to that, was taking that table with the things that were completely erroneous like atrial fibrillation, heart failure, we took those en face. We didn't know the details. We just accepted her numbers. That's why it corresponds to numbers of 6, 2 and 1. That's exactly how the table is laid out, 6, 2 and 1. Do you follow me on that?

MR. GOLDMAN: Move to strike as nonresponsive.

BY MR. GOLDMAN:

Q. Dr. Topol, you were asked a question before about an exhibit, another e-mail that you wrote to 60 Minutes.

- - -

(Whereupon, Deposition Exhibit Topol-45, E-mail 10-17-04, EJT 000343, was marked

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 534

for identification.)

- - -

BY MR. GOLDMAN:

Q. Dr. Topol, this is an exhibit I'll mark as Exhibit 45. Mr. Kline asked you -- this is another e-mail, October 17, you're writing to 60 Minutes, 2004; correct?

A. Right.

Q. And you were asked about the statement in the first paragraph "We can now confirm that the famous study '090' of Merck was NEVER published, that it was part of the FDA pivotal registration packet leading to the May 1999 approval, and that it showed a striking risk of heart attack and stroke before the drug ever got commercialized." Do you see that?

A. Yes.

Q. The reason you told 60 Minutes that is because you wanted to make it look like Merck had information before Vioxx was approved about an

Page 535

increased cardiovascular risk; correct?

A. That is absolutely incorrect.

Q. You know, Dr. Topol, that it's false that the study 090 was not part of the pivotal registration packet, which is the NDA, because study 090 wasn't completed by the time Merck submitted the NDA?

A. There was no way of us knowing that from the FDA documents. There were no dates in here about when the study was done, and only later did we find out that 085, 090 and VIGOR were in this pivotal supplement to get expanded application -- expanded indication for VIGOR. So, it wasn't in the original approval packet, and I only learned that subsequent to this e-mail.

Q. Do you see if you look at Dr. Targum's report --

A. Yes.

Q. -- that we talked about, do you see your handwriting there in the top

Page 536

left, "Study 090 September 1998 - May 1999"? Do you see that?

A. Yes.

MR. GOLDMAN: Page 1.

MR. KLINE: Page what?

MR. GOLDMAN: 1.

BY MR. GOLDMAN:

Q. Dr. Topol, you agree with me that the information that you gave to 60 Minutes which you confirmed that Merck submitted study 090 with the NDA was not true?

A. It was because we didn't have the information. It was the best I could do. But just like the numbers that we finally got corrected for 5, 1 and 0 on Page 32, I finally did get the dates of the conduct of study 090, and I wrote them down on this report, but I didn't have it at the time and certainly in mid October. I only got that information well into November.

Q. You confirmed to 60 Minutes without knowing whether or not Merck's

Page 537

090 study was part of the NDA. You confirmed that fact with 60 Minutes?

A. I had no idea when the study was performed. And there's no way of telling in this document when this study was performed.

Q. Dr. Topol, when you wrote to 60 Minutes, we now can confirm that study 090 was part of the NDA leading to the May 1999 approval, you didn't know whether that was true; correct?

A. I thought it was true, but I only found out later it was a mistake. Because, again, dealing with a study that's never been published, and dealing with FDA documents -- and, actually, I called Shari Targum, I sent e-mails to her, I even sent e-mails to Maria Villalba asking them, and they would not release the dates to me. So, I tried very hard to do the best I could to get the dates of the trial. I finally got the dates, but, again, it was extremely difficult because they're not on the FDA

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

conditional

website.
Q. Do you know, Dr. Topol, that the FDA -- withdrawn.
MR. GOLDMAN: Let me show you two documents, sir. Let's go off the record while I get these if that's okay.
THE VIDEOTAPE TECHNICIAN: Off the record at 5:56.
- - -
(Whereupon, a recess was taken from 5:56 p.m. until 5:57 p.m.)
- - -
THE VIDEOTAPE TECHNICIAN: Back on the record at 5:57.
- - -
(Whereupon, Deposition Exhibit Topol-46, E-mails, FDACDER 023057 - FDACDER 023058, was marked for identification.)
- - -
BY MR. GOLDMAN:
Q. Dr. Topol, I've handed you

Exhibit 46, which is an e-mail exchange within the FDA. And I want to point your attention to November 1st, 2004. Do you know who the author is?
A. Dr. Villalba, yes, primary reviewer of this application.
Q. Dr. Villalba of the FDA writes "Study 090 was conducted between September 1998 and May 1999. This one showed more CV thrombotic events on Vioxx than nabumetone or placebo. Topol was not interested in study 085 which had identical design and duration (6 weeks) and approximately same size, but showed," and he underlines this, "no differences in CV thrombotic events." Do you see that, sir?
A. I see it, and I want to point out that a clinical trial is for 20 years.
Q. Doctor --
A. You look for signals and you don't disregard certain trials and look at certain trials.

MR. GOLDMAN: Move to strike as not nonresponsive.
BY MR. GOLDMAN:
Q. In the next e-mail on November 8 of 2004, Doctor --
MR. HAMELINE: Let me note my objection here. Again, you are putting in front of him documents that someone else has authored to another third party. You're asking him to agree or disagree with statements that they are making and not allowing him to concern. If you have a question for Dr. Topol about these documents, ask him. But he's not here to simply be a parrot about what other people have said.
THE WITNESS: Yes, I mean --
MR. GOLDMAN: Dr. Topol, I'm not going to use up my time getting into arguments. I have a few more questions. Let me ask them.

Overruled

THE WITNESS: Well, it's funny how you don't have the statements about what they said about why Merck should have submitted these data earlier, attributing it to me, but --
BY MR. GOLDMAN:
Q. Dr. Topol, you see that Dr. Villalba of the FDA writes on November 8 of 2004, "Merck might have submitted study 090 results to the Agency sometime earlier than June 2000, but I do not think we would have done anything with it, since the number of events was small and there was a twin study (085) with identical size and duration, conducted at approximately the same time, that showed no difference in CV thrombotic events as compared to placebo and nabumetone." Do you see that, sir?
A. I see that.
Q. This was written after the drug was withdrawn; correct?
A. Yes. And still I was not

Conditional

Π objects Hearsay; improper use of document

counter-designation 541:22-542:1

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Π counterdesignates 539:22-24

NON-RESPONSIVE

Π objects. ~~Hearsay~~ hearsay and improper use of document

informed of these dates.

Q. Dr. Topol, I have a few more questions.

A. And the other issues as well.

Q. Dr. Topol, you talked about the warning label for Vioxx; correct?

A. Yes.

Q. You're not an expert in warnings and labeling under the Food & Drug Administration guidelines, are you, sir?

A. Well, I'm certainly familiar with them. I wouldn't call myself an expert, no.

Q. You said that the warning label that was approved by the FDA in April of 2002 was inadequate. Is that your testimony?

A. I not only said it was inadequate, but I also wrote in my New England Journal of Medicine invited editorial that it was unacceptable about the delay from the time the committee

met, FDA, in February 2001 with the consensus recommendation that the label be changed until April of 2002, a delay unacceptable of 14 months for the label to have a minimal change.

Q. Merck sent you the label that was approved by the FDA in April of 2002, didn't they, sir?

A. Yes.

- - -

(Whereupon, Deposition Exhibit Topol-47, Letter 4-11-02, with attached label, EJT 000044; EJT 000050 - EJT 000065, was marked for identification.)

- - -

BY MR. GOLDMAN:

Q. I'm marking Exhibit 47 for identification, and this is a letter from Tracy Mills of Merck to you, April 11, 2002. "Dear Dr. Topol: As an advisor and consultant to Merck we wanted to bring to your attention the revised Prescribing Information for Vioxx" and

then encloses the revised label. Correct, sir?

A. Yes.

Q. Did you ever write back to Merck and say you thought this label was inadequate back in April of 2002?

A. Well, the first point I just made is the time delay was not appropriate, and it's too late at that point.

Secondly --

Q. Did you --

MR. STEIN: Let him finish.

THE WITNESS: We're talking about the package insert?

BY MR. GOLDMAN:

Q. My question, Dr. Topol, was very simple. It was, did you ever call Merck in April of 2002 to tell them that you thought the label was inadequate? Yes or no?

MR. KLINE: Please finish the answer that you are being cut off from, sir.

BY MR. GOLDMAN:

Q. Can you answer that question?

A. Are we talking about the package insert or this?

Q. The package insert. Did you ever write to Merck --

A. I did not write to Merck.

Q. Did you ever write to the FDA and say, I think that the package insert that you just approved for Vioxx was inadequate in April of 2002?

A. I discussed it with the FDA, and I believe it's in some of my writings as well. And it may be even in correspondence to the FDA, yes.

Q. I would like you to find, Dr. Topol, because you just said that you wrote to the FDA, I'd like you to find for me where you wrote them in April of 2002 or any time in 2002 or any time in 2003 or any time in 2004 before the withdrawal where you told the FDA you thought that the warning label that they

approved was inadequate?

A. I said -- firstly, I would go back to my statement. I discussed this with the FDA. I don't recall for sure whether I sent correspondence. Certainly I didn't send a separate letter, but I did discuss it with them that I thought that by not -- the gastrointestinal benefits were highlighted in the new package insert. But the cardiovascular toxicity, although in the package insert, was way down, it was in small print, it wasn't highlighted, not in bold face. It was certainly not a flag for the consumer and for the physician.

MR. GOLDMAN: Move to strike as nonresponsive.

BY MR. GOLDMAN:

Q. Did you ever write any article, Dr. Topol, in any journal in April of 2002 after you saw the FDA-approved label to say, I think this label is inadequate and should be

changed?

A. I wrote about the timing being adequate in the peer-reviewed literature. I did not write -- I do not recall writing in any medical literature that the package insert was inadequate.

MR. GOLDMAN: Two more questions, and I'll reserve whatever time I have, if I have any.

MR. KLINE: You have none.

BY MR. GOLDMAN:

Q. Dr. Topol, you referenced the Juni article. Do you remember that?

A. Yes, certainly.

Q. The Juni article shows that there's no increased risk associated with Vioxx at the 25 milligram dose, correct, sir?

A. No. No. That's not at all an appropriate interpretation of that study.

Q. Do you want to look at the table with me?

A. Yes. I'm happy to, because that's a subgroup analysis, which is unacceptable if you're trying to make that. What they show is lack of differences between the doses. It doesn't mean that one dose is not significant. Here it is right here. And for you to be able to interpret that is --

MR. HAMELINE: Identify the table.

THE WITNESS: -- is absurd. Table 2 in the Juni paper in the Lancet. What it says is that the risk of 12 and a half milligrams was 271 percent. And that wasn't quite statistically significant, although close. The 50 milligrams was indeed statistically significant at 2.83 or 283 percent increase. And then what you're trying to say is that 25 milligrams was not statistically significant because it was 1.37.

Well, you can't make those conclusions. The analysis is done on the drug. There's no --

BY MR. GOLDMAN:

Q. Dr. Topol --

A. There's no interaction. The p-value for the interaction of the dose is not significant.

Q. Dr. Topol, does Table 2 of the Juni article show that there's no increased risk associated with Vioxx at 25 milligrams versus placebo?

A. It absolutely does not convey that.

Q. Can I see the article for a second?

A. Yes, certainly.

(Handing over document.)

Q. Do you see, Dr. Topol, that in Table 2, under "Daily dose ,"25 milligrams has a relative risk of 1.37 and a confidence interval of .52 to 3.61, so the number 1 falls within the confidence interval, and there's no

Violates court order

Overruled

Juni Article is from 2004, years after Irvin died.

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

- Violates court order - post dates Irvin's death
- Lacks personal knowledge under Rule 602

statistically significant difference in cardiovascular risk associated with the 25 milligram dose.

A. You missed on the most important next part of that same --

Q. Can you say whether that's true or false and then you can --

MR. HAMELINE: Well, you have the table.

THE WITNESS: The p-value for the interaction, that is, is .69. So, you can't say anything about statistical significance about any of the doses. You can't say anything about it.

BY MR. GOLDMAN:

Q. Doctor --

A. It's an overall conclusion.

Q. Dr. Topol --

A. You're making an illegitimate subgroup, and you can't look at the confidence interval and interpret that.

Q. Dr. Topol, when you look at

the 25 milligram dose for Vioxx in Table 2, do you see the confidence interval covers 1, which means that the 25 milligram dose, there's no statistically significant difference in -- withdrawn.

Do you see, Dr. Topol, that in Table 2 of Juni's article with the 25 milligram dose that the difference in cardiovascular events -- I'm tired. I'm sorry.

A. If you read the paper, it will --

Q. I don't want to read the paper. I want to look at the data.

Dr. Topol --

A. I'm with you, Mr. Goldman.

Q. Dr. Topol, if you look at table 2 at the 25 milligram dose, do you agree that because the confidence interval covers 1, there's no statistically significant difference in cardiovascular risk between Vioxx and placebo?

A. If there was a significant

interaction on dose, you could make that assertion, but with a p-value that's insignificant for interaction, you cannot make that conclusion.

Q. Do you also see, Dr. Topol, that in trial duration, do you see that in less than six months there's no statistically significant difference in increased cardiovascular risk in the Juni study?

A. I'm afraid the problem is that you're not interpreting these data properly because the concept -- and I can explain it if you'd like, about heterogeneity and interaction. What this table shows, and the most important aspect of the table is this column for P for interaction. And what this shows is that the duration, there's no difference. 217 percent excess for less than six months. 233 percent excess for heart attack for greater than six months. The same thing for dose. Only if there's a p-value for interaction. And the only

one there was, interestingly, was on the external endpoint committee, which is a topic I would have loved to address with you. But that is the only one that was significant. And that's the only thing you can say about this table.

Q. Let me ask one more time.

A. Yes.

Q. Without looking at the p-value that you just looked at, do you agree that Table 2 of the Juni study shows that there's no statistically significant difference in cardiovascular risk associated with the Vioxx 25 milligram dose?

A. It does not show that there is no statistically significant difference, that there's no statistically significant -- there's nothing you can say about any of the doses higher or lower based on this analysis and the data.

MR. GOLDMAN: I don't have any more questions right now, Dr.

405d92cd-4d0a-489f-87d2-231a3a1c3f6f

Page 554

Topol.

Can we take a break?

MR. HAMELINE: We can. Off the record.

THE VIDEOTAPE TECHNICIAN: Off the record at 6:07.

- - -

(Whereupon, a recess was taken from 6:07 p.m. until 6:24 p.m.)

- - -

THE VIDEOTAPE TECHNICIAN: Back on the record at 6:24.

MR. GOLDMAN: Tom, to be clear for the record, when I just say objection, I can work out exactly what the basis for the objection is and tell Linda, the court reporter, after the deposition?

MR. KLINE: Yes. With the presumption that it's a few words, not a paragraph, which I assume it will be.

Page 555

MR. GOLDMAN: It is not going to be a paragraph. It's going to be either lack of foundation or opinion --

MR. KLINE: You --

MR. GOLDMAN: -- testimony or form.

MR. KLINE: You and I are together. Say objection, say it loud and clear so we hear it.

- - -

EXAMINATION

- - -

BY MR. KLINE:

Q. Dr. Topol, nice to see you again.

A. Yes.

Q. And I want to ask you a couple of questions that the Merck lawyer may not have -- in fact, I know didn't ask you.

First of all, I didn't know that he was making a chart of the CV event analysis. Apparently he was

Page 556

writing numbers. Do you recall when he was writing numbers and you were disagreeing that those numbers were comparing apples and apples?

MR. GOLDMAN: Objection.

THE WITNESS: Yes.

BY MR. KLINE:

Q. Well, no, he was disagreeing, that it was comparing apples and apples. You are saying it was like comparing two different fruits?

MR. GOLDMAN: Objection.

THE WITNESS: Yes.

BY MR. KLINE:

Q. All right.

I see here that he prepared and marked something called Exhibit 48, and what he says here, I'll put it in front of us, that in August of '01, JAMA, he says Vioxx -- help me with that.

A. Nabumetone.

Q. -- nabumetone, placebo.

A. Right.

Q. And he has August, '91,

Page 557

JAMA, 6, 2, 1?

A. Right.

Q. Vioxx, nabumetone, placebo for October 25th, 7, 1, 1?

A. Those are Dr. Targum's numbers, but the basis of them was uncertain. So, that's what we were going on, until we could zoom in on each and every patient and figure out whether they had a heart attack, a death or a stroke.

Q. Understood.

And then in November 12, it's 5, 1, 0?

A. That was after the final review of each patient's detailed clinical history.

Q. This is 090; correct?

A. That's 090.

Q. That study for Merck was bad; correct?

MR. GOLDMAN: Objection.

THE WITNESS: Well, let's put it this way. I only learned, you know, back in November of '04

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 558

that it was finished in 1999. So, now it's 2005, it's six years later, it hasn't been published, and as far as I know, it's the only significant large trial in nearly 1,000 patients that has not been published in the Vioxx trial.

BY MR. KLINE:

Q. Do you recall the questioning when the Merck lawyer showed you an e-mail, and he suggested to you that somebody suggested, so, therefore, he, the Merck lawyer, was suggesting that you weren't interested in 085?

MR. GOLDMAN: Objection.

THE WITNESS: Right, yeah. And that is a really important point, because when you are reviewing a profile of a drug or a device or a biotechnology product, you can't ignore a signal from any given trial. Each trial in itself is a compartment. So, if you have a significant excess of events,

Page 559

serious events, we're talking here about death, heart attack and stroke, and you see it in two independent compartments, that's the whole story. It's right there.

It doesn't mean that you had another trial that was very similar, in this case, 085, it doesn't mean that that trial is wrong or right or -- the important point here, and this is a critical thing for interpretation of clinical trials in a field, is signals. And once you have replication in two compartments, two independent trials, that's the story. That's basically what I was communicating at the time of the 60 Minutes interview.

MR. GOLDMAN: Objection, move to strike, nonresponsive.

BY MR. KLINE:

Q. If there were one of the two

Page 560

studies -- Merck published 085; correct?

A. Yes.

Q. Good for them; correct?

MR. GOLDMAN: Objection.

THE WITNESS: Well, it --

BY MR. KLINE:

Q. Good, at least it appeared to be good as far as cardiovascular risks were concerned; correct?

MR. GOLDMAN: Objection.

THE WITNESS: It didn't have, as best I can tell, any heart attack and death and stroke, but it took a long time. It got published in 2004 by Kivitz and colleagues, as we saw, but that's a very long time lag. I don't know when that trial was completed, but I assume it was sometime in '99, and that's still a very long time lag.

BY MR. KLINE:

Q. Putting aside the time lag, they published 085, which has some good

Page 561

data in them, and they did not publish 090, which is bad for them; correct?

MR. GOLDMAN: Objection.

THE WITNESS: That was why 090 became a source of increasing concern over time, the fact that it didn't show up, the fact that when Dr. Juni and his colleagues did their analysis, as I reviewed with you, Mr. Kline, this morning.

BY MR. KLINE:

Q. Yes, sir.

A. It was that 090 that took VIGOR across the line and made it what they considered a drug that was suitable for withdrawal. So, this study 090 becomes much more important, the fact that it wasn't published, but also the fact that it was a replication of VIGOR.

Q. Is that why you were interested --

MR. GOLDMAN: Objection, move to strike, nonresponsive.

BY MR. KLINE:

405d92cd-4d0a-439f-87d2-231e3a1c3f6f

· Dr. Topol's opinion on which study - 090 or 085 should be published has no probative value and is irrelevant under Rule 402.

π's response: Dr. Topol's opinions on 085 and 090 are well-documented in the peer-reviewed medical literature and there is perhaps no academic cardiologist who is more qualified than Dr. Topol to testify as to what studies need to be published. Moreover, Merck's possession of information not shared with the medical community is central to plaintiff's failure to warn claim.

Page 562

Q. Do you consider yourself to be in this whole Vioxx affair a -- strike that, I'm going to start again.

Do you consider in looking at the Vioxx safety, do you consider yourself to be independent, sir?

MR. GOLDMAN: Objection.

THE WITNESS: I don't know how I could be more independent. I certainly wasn't involved in the trials, but on the other hand, I'm looking at it as a seasoned clinical trialist, so, yes, I believe I'm an independent viewer.

BY MR. KLINE:

Q. Which of the two studies, if they had to pick one, should have been published, and why?

MR. GOLDMAN: Objection.

THE WITNESS: Well, study 090 should have been published as soon as possible, and that was the concern that I registered. And, of course, that was that Mr.

Page 563

Goldman's e-mail that I first saw, internal FDA, they talked about, should they have done something with that data much earlier. But that one was the one of concern. And just because there's another trial of similar size and design that doesn't show the problem, doesn't negate, it doesn't make you in any way not seriously concerned about 090.

BY MR. KLINE:

Q. These data, even looking at them the way he compares them, 6 Vioxx to 3 when you combined nabumetone and placebo, or 7 versus 2 or 5 versus 1, are any of those numbers, sir, reassuring that Vioxx is safe?

MR. GOLDMAN: Objection.

THE WITNESS: They're not at all reassuring. We're running on a relatively low event, but they are an imbalance of events no matter how you look at study 090.

Page 564

And then in the wake of VIGOR, or, actually, it preceded VIGOR by many months, but when you put the two together, you have a large trial of 8,000 patients, you have a trial of 1,000 patients, which is a respectable number, it's not so small, you see the same problem in both trials, that's when you have to make a conclusion that there's a significant problem.

MR. GOLDMAN: Objection, move to strike, nonresponsive.

BY MR. KLINE:

Q. Now, when you were running the statistical significance and you were going to your statistician, was that a statistician at Cleveland Clinic?

A. Yes.

Q. Okay.

Were you trying to be accurate and correct, sir?

A. Yes. I mean, I've been doing this for a long time, and I don't

Page 565

ever want to put my name associated with data -- with the wrong data. And I regret that we could not, back in 2001, get to the right data for 090, because we could have found -- we could have identified this problem a lot earlier.

Q. Now, let's go to that point, if I may.

MR. GOLDMAN: Objection, move to strike, nonresponsive.

BY MR. KLINE:

Q. Bear with me. I've got to find some notes that I had, which I've got here.

Okay. Let's move to that data.

You looked to the Targum memo from the FDA to find out information that you couldn't find publicly. Is that the gist of what you were telling us?

A. Yes.

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. And the fact of the matter

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Overruled

- ALL LEADING QUESTIONS
- violates court's order by relating to events that ARE AFTER Irvin's death, such as APPROVe, Advantage studies

T's response: ADVANTAGE data was available prior to π's death, however all studies bear upon 1. general causation 2. overall risk/benefit

Overruled

Page 566

is, when you looked at that information, did you find things that were troubling? Is that the nub of it?

MR. GOLDMAN: Objection, foundation.

THE WITNESS: Without any question, yes.

~~BY MR. KLINE:~~

Q. And I think you said maybe three times, four times, five times, that you wanted to look at Page 32 and give an explanation. Is that correct?

A. Yes, I did.

Q. Okay.

A. Because 32 is the beginning of where the problem lies. Because on Page 32, there's --

Q. Let me just put it in context, because the jury and whoever is looking at this now, juries in particular, are going to be looking at -- let me start again.

Jurors will be looking at this for quite a while at this point in

Page 567

~~the day.~~

~~This is the Targum memo by~~ an FDA reviewer, and the memorandum is dated February 1, 2001; correct?

A. Yes.

Q. But the information is about a study that was done two years earlier; correct?

A. That's correct.

Q. And you now, two years later, are looking at that data as an independent eye and saying, what was really in that study; correct?

MR. GOLDMAN: Objection.

THE WITNESS: Right. Three years later.

BY MR. KLINE:

Q. Three years later.

And that study hadn't been published yet?

MR. GOLDMAN: Objection.

THE WITNESS: That's right.

BY MR. KLINE:

Q. And you're saying to

Page 568

yourself, what does this show me against this problem that was in VIGOR, which now has a lot of attention in the medical community; correct?

MR. GOLDMAN: Objection.

THE WITNESS: That's correct. ~~And moreover, there's APPROVe in colon polyp patients,~~ not heart patients. There's also ADVANTAGE in osteoarthritis for 12 weeks. There's other trials now that we have access to and you say, well, wait a minute, where was the signal really there? That's what this is about. Where was the first signal really there? Why didn't we get the right data, the drilled down data on the study 090?

~~MR. GOLDMAN: Objection, move to strike, nonresponsive.~~

BY MR. KLINE:

Q. Now, recognizing -- I'll put it in a different form to make sure we

Page 569

get it.

Were you looking for the drilled down data, what you call drilled down data?

A. Yes.

Q. What is -- I've heard that term today.

What is drilled down data?

A. Well, basically this table is the bare bones. It says coronary artery conclusion for the placebo patient on Page 32.

Q. Look at the table.

A. Yes.

Q. Recognize that I have 20 other areas I want to cover in less than 40 minutes.

A. Okay.

~~Q. Would you tell the members~~ of the jury with this displayed in front of them what it is that you wanted to communicate to them when you were answering questions by Merck's counsel when he was challenging you, like Merck

LEADING, Argumentative, Inflammatory

Overruled

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 570

challenges everyone, please?

MR. GOLDMAN: Objection.

THE WITNESS: The point being, I gave this example, but the coronary artery occlusion, without having any details, the table just says placebo, coronary artery occlusion. Dr. Targum concluded that was a heart attack when, in fact, it wasn't a heart attack when we reviewed the details of this 48-year-old gentleman. He didn't have any heart attack.

BY MR. KLINE:

Q. You adjudicated the individuals yourselves?

MR. GOLDMAN: Objection.

THE WITNESS: We had all the information, we had the electrocardiogram, we had the angiogram. We had all the information that isn't displayed in this report, and then we knew

Page 571

that it was never -- this patient never had a heart attack. So, he was miscategorized. And that's just one example.

BY MR. KLINE:

Q. But if you look at it no matter which way it comes out displaying 48, does this study demonstrate anything different in terms of a signal when it's combined with the VIGOR study?

MR. GOLDMAN: Objection.

THE WITNESS: The point about this is, if one is looking at this with an open mind and wanting the best for patients, looking at the data and trying to look at, is there a signal here of worry, you would be worried if you were the manufacturer of this drug or you were the clinical trialist doing this drug. You would be worried. And that's data that's available in mid-'99.

And you would be even more

Page 572

worried later in 1999 when you have a trial where you have an excess of deaths and serious cardiovascular events.

And, finally, when the VIGOR trial is cracked in March 2000, if you looked at these data objectively, you would say, we've got two trials, one 1,000 patients, one 8,000 patients, we don't need any more trials, we have a problem, we need to have restriction of the use of this drug, particularly in patients with known heart disease, and we need to do the right trials to get this drug, which works well for arthritis, but it's got this noxious side effect problem, and we've got to do something about it.

MR. GOLDMAN: Objection, move to strike, nonresponsive.

BY MR. KLINE:

Page 573

Q. So, what we're displaying to this jury in terms of this exhibit, Page 32 of the Targum memo, what that really is is, you're showing us that there were a series of patients, for example, patient 2695, a 63-year-old with myocardial infarction, you then looked at each individual --

A. Yes.

Q. -- made your own determination and then calculated the numbers yourself?

MR. GOLDMAN: Objection.

THE WITNESS: This was a bona fide heart attack, but the patient that was listed for 2683 with atrial fibrillation. That was not a thrombotic event. So, each one of them required a very careful review, which we only were able to get that data, you know, of course, late October/early November of '04.

BY MR. KLINE:

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

AMBIGUOUS QUESTION AND NON-RESPONSIVE ANSWER
Π's response: Π is allowed to rehabilitate witness after defendant argues that Dr. Topol was biased and waged a personal war against Merck.

Page 574

Q. Now, I want to ask you a question because it was suggested three times in the testimony.
Were you doing this or any of your other activities to get Merck?

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. That's what they suggested to you.

MR. GOLDMAN: Objection.

THE WITNESS: I find that highly objectionable, because I worked very closely with Merck. I did the courtesy of sending the manuscript to Merck for input, meeting with Merck, which I didn't have to do, with Dr. Reicin and Dr. Demopoulos. I did everything I could, bent over backwards to be collaborative, and it's really extraordinary to suggest that I was trying to have an objective to come at Merck in any way.

I was just trying to do the

Sustained

Page 575

best, what we can with this data and for patients, and I think our work was ultimately validated exceptionally well.

MR. GOLDMAN: Objection, move to strike the nonresponsive portion.

BY MR. KLINE:

Q. What was your work a piece of in this process? What ultimately was the result here of down the road of what you started, sir?

MR. GOLDMAN: Objection.

THE WITNESS: When we published that first paper in JAMA in August of 2001, we certainly -- that was the first demonstration in man, in patients, that there was a significant problem that was requiring further study. So, that started the concern.

But, unfortunately, it was met with deaf ears at Merck and with Pfizer with respect to their

Sustained

Page 576

unwillingness to do the right trials, and although their data weren't as worrisome, there certainly were some data that were concerning.

But the manufacturers of these drugs, and particularly Merck, where the data was most concerning, did not do the right thing for patients, and that's the concern.

MR. GOLDMAN: Objection, move to strike, nonresponsive.

MR. KLINE: I think it was exactly responsive.

BY MR. KLINE:

Q. Next question. Got a bunch of stuff I've got to get through with you.

In the Juni article you went back and forth. First of all, Juni, you pointed out to the Merck lawyer, the Juni article cited the 085 study; correct?

MR. GOLDMAN: Objection.

Sustained

Page 577

THE WITNESS: Yes, it did.

BY MR. KLINE:

Q. It didn't cite the 090 study because it wasn't published?

A. Interestingly, and this was --

MR. GOLDMAN: Objection.

THE WITNESS: We didn't mention this before, but the study 090 was cited in the FDA report and the Geba abstract, the one where he only presented the efficacy with no safety data at an American Geriatrics Society. So, there was no paper to reference. So, he referenced the Targum report and the abstract.

BY MR. KLINE:

Q. Now, remember when you were back and forth with the Merck lawyer about when you were telling him that you couldn't show that there was no dose relation?

A. Yes.

NOT ARTICLE HE RELIED ON

• Beyond scope of cross
LEADING, Violates court's order by relating to events (Juni paper) after Irvin's death.
Π's response: Juni data preexisted death of Π.
→ Also non-responsive and lacks foundation and hearsay
• Beyond scope of cross designated for trial

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

• Compound question; non-responsive; lacks foundation
• Rule 403 - unfairly prejudicial
• Violates court's order by relating to events after Irvin's death

Π's response: appropriate summary question

• ALL LEADING
• violates courts order as after levin's death, such as Juni Article and NEJM correspondence

Π's response: Articles refer to information that pre-existed Mr. Irvin's death appropriate rebuttal testimony

Page 578

Q. And I think that's what the points were that were being made; correct?

A. Yes.

Q. And that it's not dose or duration dependent, the gist of what you were saying was that Vioxx is a problem at various doses at various durations?

MR. GOLDMAN: Objection.

THE WITNESS: Well --

BY MR. KLINE:

Q. And that it was confirmed by Juni?

MR. GOLDMAN: Objection.

THE WITNESS: Yeah. Not only did Dr. Juni say in the paper that there's no dose relationship, no duration relationship, but going back to the importance of study 090, remember, that was at a dose of 12-and-a-half milligrams to see the over seven-fold excess of heart attack. So, dose does not appear to be a vital aspect of

Page 579

the cardiotoxicity.

BY MR. KLINE:

Q. And as you told us earlier, nor does duration?

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. It could be short or long?

MR. GOLDMAN: Objection.

THE WITNESS: We reviewed the duration aspects many times earlier.

BY MR. KLINE:

Q. Now, the Juni article, I believe it has a number which it was given. I have underlined what Juni's -- you went back and forth with the Merck lawyer, but I want to highlight the first and underline in red. I have it for you here, you can read it to the jury. The first line of the "Interpretation," that's the bottom line; correct?

A. Yes. That would be the conclusion of the abstract.

"Our findings indicate that

Page 580

rofecoxib should have been withdrawn several years earlier."

Q. True statement?

MR. GOLDMAN: Objection.

THE WITNESS: They make -- I cited that in the New England Journal correspondence. I certainly agree with their systematic analysis. That was the appropriate conclusion.

BY MR. KLINE:

Q. Okay.

Now, let's move right along.

Let's talk about statistical analysis.

As far as your statistical analysis is concerned, did you at all times, sir, conduct a statistical analysis consistent with good and sound scientific practice?

A. That's the only way I would know how to do, is to do the best we can with the data and the statistics and the analysis, yes.

Page 581

Q. Okay.

Was that also Merck's obligation, to do the same thing?

MR. GOLDMAN: Objection.

THE WITNESS: Any medical research should be done in that way, yes.

BY MR. KLINE:

Q. Okay.

Now, have you had a chance now to explain adequately what you wanted explained to the jury about the Targum memo and what you did in terms of drilling down the data and what you were after?

A. I believe so.

Q. Anything else that you think has to be covered to get the full import of it out?

MR. GOLDMAN: Objection.

THE WITNESS: Well, I mean, I think the other points that Dr. Targum made in her conclusion of her report about the fact that

ALL LEADING, Beyond scope of designated cross

Overruled

Calls for legal conclusion

Calls for narrative, vague

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Overruled EF

- Violates court order ... 2005.
- Beyond scope of designated cross
- Leading by simply having witness read from hearsay document

π's response: Information in Targum memo was available in 1999 + 2000 and Targum memo itself pre-existed π's death.

the --

BY MR. KLINE:

Q. Page?

A. Page 34, "The sponsor claims that the difference in heart attacks between the groups is primarily due to the anti-platelet effects of naproxen."

Q. Yes.

A. I've already discussed that, that that was an untenable conclusion.

Q. Well, wait. But what does she say?

MR. GOLDMAN: Objection, nonresponsive.

BY MR. KLINE:

Q. Does she say something that disagrees with you?

A. Yes. She says, "The hypothesis is not supported by any prospective placebo-controlled trials with naproxen."

Q. It's the same thing you told us earlier?

A. That's right.

Q. And she says here, and you highlighted this next point or put an asterisk next to it, "The sponsor claims that the majority of cardiovascular events in the VIGOR study occurred in those patients who should have been on aspirin for cardioprotection."

And what does she say?

MR. GOLDMAN: Objection.

THE WITNESS: Well, this claim has not convinced this medical reviewer, it certainly did not convince me, and so this is not a reasonable conclusion from the data.

BY MR. KLINE:

Q. She notes that "The sponsor claims that the patients with rheumatoid arthritis are at increased risk for cardiovascular events."

What does she say?

MR. GOLDMAN: Objection.

THE WITNESS: Well, there's some literature. She agrees with

it, I agree with it, there's some literature, but it is actually a very modest amount of literature. And actually, the most recent data from 2005, which we didn't have back then, would suggest that there is an increased incidence of heart attacks, but it's not particularly striking.

MR. GOLDMAN: Objection, move to strike the nonresponsive portion.

BY MR. KLINE:

Q. And does it explain, does that point explain the results of VIGOR?

A. Not in any way.

Q. VIGOR, when combined with 090, combined now with all the epidemiologic studies, where does VIGOR fit into the scheme of things?

MR. GOLDMAN: Objection.

THE WITNESS: The VIGOR was in many ways the front runner. That one is the one that really

predicted what was going to happen, not only in the epidemiologic studies, but, of course, in the subsequent randomized trials.

There was one last point in this report that I think deserves to be underscored, and it says, "The sponsor recommends use of low-dose aspirin in conjunction with rofecoxib in those at risk for cardiovascular events."

There are no data whatsoever to substantiate that. Dr. Targum agrees with that and, again, we're talking about millions of patients in the United States and beyond, and to recommend taking aspirin without having any proof of that, without any data, without any meaningful trial, is really, I believe, unacceptable.

BY MR. KLINE:

Q. Moving along.

– Again refers to studies that post-date Irvin's death. Also non-responsive

Overruled

Overruled

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

This begins series of questions concerning Emails Topol has never seen. Lacks personal knowledge under 602; improper expert testimony under 701/702. Uses documents not used in cross or direct. So, beyond scope of designated cross.

Page 586

MR. GOLDMAN: Objection, move to strike.

BY MR. KLINE:

Q. You were asked questions about the article that you wrote where you said the findings were unexpected?

A. Yes.

Q. Okay.

Now, did you have access to the Merck e-mails and the Merck internal thinking?

A. Not at all. In fact, in the October 2004 New England Journal of Medicine editorial, I asked for congressional review so we could get out that stuff that we could never get to.

MR. GOLDMAN: Objection, move to strike. Hold on, Tom. Objection, move to strike, nonresponsive.

BY MR. KLINE:

Q. Did you presume that the --

Was that a presumption on your part, that the findings were

Page 587

unexpected?

MR. GOLDMAN: Objection.

THE WITNESS: I don't really know. In retrospect, as you try to reconstruct this, you wonder how unexpected it was. Because if you go back to 1999 with Dr. Villalba's express concern in the FDA documents that there appears to be an excess of clotting events, you wonder how unexpected it really was.

BY MR. KLINE:

Q. Did you know at the time you wrote that whether at the highest levels of Merck they were worried that it was a mechanism-based problem when they got the VIGOR result?

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. Did you know that at the time you wrote your article?

A. I certainly did not know that.

Page 588

- - -

(Whereupon, Deposition Exhibit Topol-48, "Dr. Topol's Analysis CV Events in Study 090," Chart (1 page), was marked for identification.)

- - -

BY MR. KLINE:

Q. Okay.

Let me show you an exhibit.

MR. GOLDMAN: Tom, you are not going to be using documents you didn't use before.

MR. KLINE: Well, sure I am. You've challenged -- it has nothing to do with documents.

MR. GOLDMAN: Tom, you are supposed to limit your redirect to the scope of the cross --

MR. KLINE: I am.

MR. GOLDMAN: -- not introduce new --

MR. KLINE: I am limiting to show -- you cross-examined him on

Page 589

whether it was unexpected. I'm now asking him whether this would change his opinion as to whether it was unexpected.

BY MR. KLINE:

Q. I want you to look, sir, very briefly, I have two documents --

- - -

(Whereupon, Deposition Exhibit Topol-49, E-mail 3-9-00, MRK-ABH0016219, was marked for identification.)

- - -

BY MR. KLINE:

Q. I want you to look, sir, very briefly. I have two documents --

MR. GOLDMAN: I --

MR. KLINE: You can have an objection to save time.

MR. GOLDMAN: I'll object --

MR. KLINE: You can have an objection, you can fill it in.

BY MR. KLINE:

Q. Sir --

Merck's counsel was given no chance to ask re-cross concerning these documents.

Documents speak for themselves and Topol's interpretation of them is irrelevant.

π's response: Defendant is not entitled to re-cross examination. Not a valid objection.

– Same objection as above

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

- More testimony based on new documents Topol has never seen
- Rule 402
- Improper expert testimony under 701/702
- Leading questions throughout

Π's response: Appropriate rebuttal testimony to show the witness Scolnick (President of Merck Research Lab) agreed with witness.

Page 590

MR. GOLDMAN: I'll object to this.

BY MR. KLINE:

Q. Sir, this says Edward Scolnick.

MR. GOLDMAN: I'll object to this as opinion testimony and beyond the scope.

BY MR. KLINE:

Q. Did you know him?

A. I had known Dr. Scolnick, yes.

Q. Okay.

He's been described, sir, by his own colleagues as unsteady. Did you ever hear that?

MR. GOLDMAN: Objection.

THE WITNESS: I heard that from his colleagues, yes.

BY MR. KLINE:

Q. And in the middle paragraph, I'm going to put a red marker on here, put your eyes to this, and I'll hand it to you.

Page 591

A. Yes.

Q. "It's a shame," this is after VIGOR and they had the results, and he wrote, "It's a shame, but it's low incidence and it's mechanism based as we worried it was."

Did you know when you said, well, it was unexpected to these folks that there were actually documents in their own things that they acknowledged that they worried about it before?

MR. GOLDMAN: Objection.

THE WITNESS: I didn't know that.

BY MR. KLINE:

Q. Incredible, isn't it --

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. -- seeing that document?

A. It --

Q. For a person in your position?

MR. GOLDMAN: Objection.

THE WITNESS: Well, that's

Sustained

Page 592

about the discussion I earlier pointed out, about open mindedness and looking at the data in an objective way and not turning back -- you know, turning your back on the data of the trial.

(Whereupon, Deposition Exhibit Topol-50, E-mails, MRK-ABC0033809, was marked for identification.)

\- - -

BY MR. KLINE:

Q. Another document, 50, very quickly, sir.

Again, focusing on Mr. Goldman's questions about when you wrote, well, it was unexpected and, oh, it was unexpected, you didn't expect to see it and nobody expected to see it. Were you privy to this document, sir, out of the Merck files from Edward M. Scolnick to Alise Reicin? You know who both of those folks are, don't you?

Page 593

MR. GOLDMAN: Objection.

THE WITNESS: Yes, I do.

BY MR. KLINE:

Q. And right here he says -- and do you know what was going on on April 12, 2000? That was right after the VIGOR results were known.

MR. GOLDMAN: Objection. Can I have a standing objection to your use of documents that you didn't use before --

MR. KLINE: There's only two, and they go directly, so I have a record --

MR. GOLDMAN: I'm sorry.

-- and that the witness has never seen before.

MR. KLINE: -- they go directly to this.

BY MR. KLINE:

Q. You've never seen these, have you?

A. I've not seen these, no.

Q. I'm going to ask you if you

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Sustained

- Same objections ● seeing documents never seen ● it's response see above
- beyond scope of designated cross
- Improper expert testimony 701/702

Page 594

would have written that it was unexpected in your New England Journal if Edward Scolnick, Alise Reicin or Merck had shown you what was really on their minds? If you want to -- if you think you had an opinion about scientific misconduct before, wait till you see this one.

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. And here it goes. It says here, right here, I'm on the "Hi Alise" thing.

A. Okay.

Q. 10:42 at night. They were working late those nights.

It says here, "I will tell you," now, remember, this is after they told everyone that it was the naproxen hypothesis.

A. Right.

Q. Naproxen explains it.

A. Right.

Q. Did you know, sir --

MR. GOLDMAN: Objection.

Page 595

BY MR. KLINE:

Q. -- that Edward Scolnick was telling Alise Reicin at 11:00 at night that he was in "minor agony" and that his "worry quotient is high"? Did you know that when you wrote the article, sir?

MR. GOLDMAN: Objection.

THE WITNESS: No, I surely didn't.

BY MR. KLINE:

Q. And look what he said, sir. He said, "What I really want to do is a 10,000 versus 10,000 patient study in mild, moderate OA Tylenol versus Vioxx with PRN low dose ASA for those judged who need it. Safety first, primary endpoint and efficacy second or co-primary." All caps. "WE WILL NOT KNOW FOR SURE WHAT IS GOING ON UNTIL WE DO THIS STUDY. PLEASE THINK HARD ABOUT THE DESIGN BEFORE THE PAC MEETING."

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. Did you have access to that

Page 596

document when you said it was unexpected?

A. I certainly had no access.

Q. Do you think you would have written that it was unexpected had you seen that?

A. It wouldn't have been unexpected any longer --

MR. GOLDMAN: Objection.

THE WITNESS: -- and you wonder why the trials to follow up like Dr. Scolnick is suggesting weren't mounted immediately.

MR. GOLDMAN: Belated objection, and objection, move to strike, nonresponsive.

BY MR. KLINE:

Q. Were these studies that you were suggesting, sir?

A. Well, this would have helped. In April 2000, to do a trial like he's suggesting certainly would have illuminated a lot of the problems that were around then.

MR. GOLDMAN: Objection, move to strike as nonresponsive.

Page 597

BY MR. KLINE:

Q. They asked you questions about whether you, sir, took Vioxx?

A. Yes.

Q. First of all, did you take Vioxx regularly or did you just take it intermittently?

A. I took it once a week or every couple, few weeks. It was very sporadic. A single dose as needed for knee pain.

Q. Did you have any special circumstances that you thought that you could tolerate the risk?

A. Well, I mean, I started taking it when I was -- in '99, so, that was -- I was 45. I had had an exercise stress test. I had no risk factors for coronary disease or heart disease. I'm fit, so, I didn't think that, particularly as we learned more about the risk profile of the drug, that I was one of the people who would, I think, be

405d92cd-4d0a-489f-87d2-231e3a1c3f5f

Page 598

worried about the risk of the drug relative to an older person with any risk factors for heart disease.

MR. GOLDMAN: Objection, move to strike as nonresponsive.

BY MR. KLINE:

Q. By the way, does Merck recommend that you get a stress test before you take the drug?

MR. GOLDMAN: Objection.

THE WITNESS: No, no, not at all.

BY MR. KLINE:

Q. Are the common users of the drug the chief of the cardiovascular division at the number one institute for hearts in America?

MR. GOLDMAN: Objection.

THE WITNESS: Well, there's no recommendations because the drug isn't available now, but, no.

BY MR. KLINE:

Q. Okay, next.

I want to talk to you about,

Page 599

there was a mention in the testimony, it was pointed out to you by the Merck lawyer, that you suggested that it was -- that Vioxx, in your JAMA paper, could have an anti-inflammatory effect for patients who had known heart disease. Do you remember that?

A. Yes.

Q. I want to talk to you about apples and oranges here for a minute because I think you guys may have been talking by each other.

Is there a difference when you suggest that it has known -- that it could be anti-inflammatory as opposed to having these prothrombotic qualities which really cause the problems, and would you explain that whole concept directly and simply, sir?

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. Please.

A. So, the problem here, there's this very important equilibrium

Page 600

between so-called prostacyclin and thromboxane. And we've known about this for 40 years in medicine. And if you tip that balance and you inhibit thromboxane, you can inhibit clotting, or you rev up thromboxane, you can have more clotting. On the other hand, if you tip prostacyclin production or expression, you could have just the opposite with inflammation. So, this is this balance. And the question is, where would one of those COX-2 inhibitors in a trial of patients with heart disease, where would that balance be? Would it be that in some patients there would be a prevention of heart attack, and in others there would be a promotion of heart attack? This is what we didn't know.

But we also knew, and I tried to make this point earlier but I was suppressed, that millions of people with established heart disease were taking Vioxx and were taking Celebrex every day. We had this information from

Page 601

the Ray paper in Lancet, we had it from other papers that I've cited in my writings, and the important point is that if we have millions of people taking a drug, it's already out there and it is being done in a random way, so, we need to study this, and we need to get that information as quickly as possible.

MR. GOLDMAN: Objection, move to strike, nonresponsive.

BY MR. KLINE:

Q. Okay. Now, and, in fact, in that regard, you were asked about --

MR. KLINE: How much time?

THE VIDEOTAPE TECHNICIAN: A little under 15 minutes.

MR. KLINE: Okay. I've got to hustle here.

- - -

(Whereupon, Deposition Exhibit Topol-51, E-mails, TOPOLE 000149 - TOPOLE 000150, was marked for identification.)

- - -

No objections

BY MR. KLINE:
Q. You were asked about this Alastair Wood memo?
A. Yes, yes.
Q. Again, I've got about a dozen things to cover here. Each one is going to get a minute. That's just the way the rules break down.
A. Fine.
Q. There is this Alastair Wood thing, and let me just put my hand on what I want to point out to you. You may know other stuff.
What was the discussion you were having with defense counsel about, as you understood it?
MR. GOLDMAN: Objection.
THE WITNESS: Yeah, I wanted to bring out the point that one of the highest regarded trialists, and in this field in particular, Dr. Wood, probably the most revered pharmacologist and trialists in the country, he

completely agreed and said that -- about the fact that we needed a trial and the fact that his statement he had was really quite perfect.
Basically he's saying it was unethical not to do a trial, and the statement here, he says, "Such a study would have been undoable because of the size and time requirements." This is what Merck has been saying. And "I am surprised that gets repeated so frequently without challenge from the data." And he basically in this back and forth e-mail agrees that there's so many patients that are getting the therapy today, Vioxx, with heart disease, that we have to resolve this problem.
MR. GOLDMAN: Objection.
THE WITNESS: And it was only -- the irony is that it's only ethical to do the trial, not

to back off from not doing it.
MR. GOLDMAN: Objection, move to strike as nonresponsive.
Can I have a standing objection --
BY MR. KLINE:
Q. Back to the point --
MR. GOLDMAN: Tom, let me just make an objection? Can I have a standing objection?
MR. KLINE: Not on my time on the record.
Yes, you have a standing objection. Yes, sir.
MR. GOLDMAN: Standing objection to using documents you haven't used before?
MR. KLINE: Yes, sir, you do.
BY MR. KLINE:
Q. The fact of the matter is, that if I can go back to the -- with Wood, you and he were back and forth having a discussion, a scientific discussion; is that correct?

A. That's right.
Q. Anything sinister going on, anything critical going on that was putting you down or anything bad going on?
MR. GOLDMAN: Objection.
THE WITNESS: Not at all. Not at all. We were in total agreement about what should be done.
BY MR. KLINE:
Q. Now, Wood chaired the Advisory Committee in 2005, I believe, the FDA Advisory Committee?
A. That's right. He's chaired all the over-the-counter, anti-inflammatory, aspirin panels. He's chaired most of the FDA panels related to this topic.
MR. GOLDMAN: Objection, move to strike as nonresponsive.
BY MR. KLINE:
Q. Did the anti-inflammatory effects which you described and wrote

405d92cd-4d9a-489f-87d2-231e3a1c3f6f



Page 606

about at length in the article, picking that out, Merck's lawyer picking that out, how does that -- is that an explanation to say -- were you saying to the world, I think Vioxx is safe?

MR. GOLDMAN: Objection.

THE WITNESS: No, no, no. What we were saying is that there was a good rationale to do the trial. There were, you know, millions of people taking Vioxx with arthritis and heart disease, and there was potential benefit that should have been studied, and there was, of course, this worry, significant worry about potential harm. All of these things factored into the call, the mandate for a trial.

BY MR. KLINE:

Q. Next.

Labeling.

You've told us the label is inadequate; correct?

Page 607

MR. GOLDMAN: Objection.

THE WITNESS: Yes.

BY MR. KLINE:

Q. I think you had a question about whether you were a, quote, labeling expert. So, you're a practicing cardiologist; correct?

A. That's correct.

Q. As a practicing cardiologist, and as a clinician and a researcher, have you learned and determined what the facts are about Vioxx?

MR. GOLDMAN: Objection.

THE WITNESS: I certainly have.

BY MR. KLINE:

Q. And have you made a determination as to whether the words contained in the document that is given to physicians who prescribe it called a label, whether those words are inadequate?

MR. GOLDMAN: Objection.

Page 608

THE WITNESS: I -- they didn't have any heart risk in '99, and then in 2002, when the label was revised, the package insert revised, it was not adequately incorporated.

BY MR. KLINE:

Q. Do you have the expertise and background to make that determination? I would think you would, and if so, would you tell us?

MR. GOLDMAN: Objection.

THE WITNESS: Well, I don't know. There is a group at the FDA, the label group, package insert group, but outside of that small sphere, I don't know that there's anybody who is better equipped to review this sort of information than the actual practicing physician.

BY MR. KLINE:

Q. Who do they go to, the, quote labeling group, who do they ask,

Page 609

who do they consult with?

MR. GOLDMAN: Objection.

THE WITNESS: They do talk to physicians. And, you know, I don't think that there's any differentiation in the medical community.

BY MR. KLINE:

Q. People like yourself?

MR. GOLDMAN: Objection.

THE WITNESS: I would think so, yes.

BY MR. KLINE:

Q. All right.

Now, you told me Demopoulos was concerned about the COX-2 program. Do you remember?

A. Yes, yes.

Q. She was an important person at Merck, and she told you she was concerned about the COX-2 program at Merck. Briefly, do it in a minute, because then I can have more time.

MR. GOLDMAN: Objection.

153 (Pages 606 to 609)

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Sustained

Sustained

Sustained

LEADING

Sustained atty testifying

LEADING. Beyond scope of designated cross, No answer designated

Beyond scope of designated cross
LEADING questions throughout
Rule 702 - not qualified to testify about labeling of warning label

Π's response: See In re Diet Drugs Product Liability Litigation expert can opine on medical accuracy of warning label.

Page 610

THE WITNESS: Well, she left Merck. She went back to the University of Pennsylvania. She was very upset about how this whole thing was handled, and she told me that.

Dr. DiBattiste also left Merck, he was also concerned about how all this was handled with the COX-2 Vioxx program.

So, both of them related to me in conversations that they were not pleased about this whole clinical development of Vioxx.

BY MR. KLINE:

Q. You were asked repeatedly --

MR. GOLDMAN: Objection, move to strike.

BY MR. KLINE:

Q. You were asked repeatedly what you knew, what you saw, what you didn't have access to. Was your problem you were having, pure and simply, you never had full and complete access to the

Page 611

data?

MR. GOLDMAN: Objection.

THE WITNESS: That's right.

BY MR. KLINE:

Q. Did you ask for it?

A. Well, I certainly did. But, you know, we only were smart enough to ask for it at times like -- for example, when we wrote the JAMA paper, I wish we had been smart enough to get all the data on study 090 at that time. But we just didn't know what was lurking in there.

Q. Next, the Konstam paper.

You told the Merck lawyer that you could review the Konstam paper, you didn't get to talk about it. I have it here. Is there a minute or two way through it?

A. Yeah. Well, this --

MR. GOLDMAN: Objection.

THE WITNESS: This paper, the actual reprint I have, this has very significant problems in trying to interpret it. So, for

Page 612

example, here, study 090, the data are included in this amalgamation --

MR. KLINE: I've marked it as the next exhibit. Number? What is it?

MR. HAMELINE: 52, 52.

MR. KLINE: 52.

- - -

(Whereupon, Deposition Exhibit Topol-52, "Cardiovascular Thrombotic Events in Controlled, Clinical Trials of Rofecoxib," (Konstam, et al), Circulation 2001;104:r15-r23, was marked for identification.)

- - -

THE WITNESS: Yes. This was published shortly after our -- there's a lot of interesting things about this paper. It was received on October 2nd and accepted the next day and published very rapidly. But the

Page 613

paper includes the trials of Vioxx that were available, and what it does is it never reports the actual individualized data of the trial.

So, for example, here's a chance that since Merck hadn't published the data for study 090, why not present it here.

MR. GOLDMAN: Objection, move to strike.

BY MR. KLINE:

Q. They're his consultant, he's their consultant; right?

MR. GOLDMAN: I'm sorry. Objection, move to strike, nonresponsive.

THE WITNESS: All the other doctors are Merck employees on the paper except for Dr. Konstam, who is a consultant. But the important thing is, they don't present the individual trial data. And this is the thing that's

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Violates court order as — pertains to events after Irvin's death — LEADING QUESTIONS

Overruled

Overruled

AND Non-responsive answer

Π's response: Refers to causation (Konstam paper) which is not a time dependent inquiry.

Beyond scope of designated cross

Violates court order as ~~beyond scope~~ relating to events AFTER IRVIN DIED (e.g. Konstam paper)

Overruled

Same objections concerning Konstam's article as post Irvin's death

Π's response: See above.

Page 614

grossly overlooked.
They present, just as Mr. Goldman reviewed earlier, that 1.69 risk, that's 169 percent, comparing Vioxx with naproxen. So, what's striking here is that they show statistical significance, they basically confirm the VIGOR paper, they confirm study 090, and they basically are then trying to conclude that there isn't a problem, when it's statistically significant, 169 percent excess of risk.

BY MR. KLINE:

Q. How do you do that? How do you do tat?

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. How do you get to that result?

MR. GOLDMAN: Objection.

THE WITNESS: I just can't imagine.

Page 615

BY MR. KLINE:

Q. And this is the same Dr. Konstam who was an independent consultant and -- I'm sorry, Dr. Konstam, who was a consultant, and a member of the DSMB, which is supposed to be neutral?

MR. GOLDMAN: Objection.

THE WITNESS: That's correct. On the approved DSMB.

BY MR. KLINE:

Q. How can that be?

MR. GOLDMAN: Objection.

THE WITNESS: I don't know.

BY MR. KLINE:

Q. Is that, once again, like the coach from one team wearing the striped shirt?

MR. GOLDMAN: Objection.

THE WITNESS: It's certainly in my mind irregular.

BY MR. KLINE:

Q. Sir, I want to again --

MR. KLINE: How much time do

Page 616

I have, sir?

THE VIDEOTAPE TECHNICIAN: Four minutes.

MR. KLINE: Four minutes. Anyone who is watching this will be happy to know that, probably Dr. Topol the most, who is not watching, but participating.

BY MR. KLINE:

Q. I want to do something quick.

This whole issue about they gave you, whether you received or remembered getting comments from Merck, and it appears that you now do now that you were shown a document from four years ago. Does that change anything here, sir?

MR. GOLDMAN: Objection.

THE WITNESS: Well, I mean, I think the important thing is the reason I had forgotten ever getting the comments was because it was after we had already

Page 617

finalized the paper and the galley proofs, and so I just never factored any of that in. And so I forgot it because I probably never even opened up the e-mail, the attachment, frankly.

BY MR. KLINE:

Q. Does it change your opinions or your views?

MR. GOLDMAN: Objection, move to strike, nonresponsive.

THE WITNESS: It doesn't change my views whatsoever. That is completely immaterial.

BY MR. KLINE:

Q. Did they come out to see you anyway, met you face-to-face? Did you give them an audience?

A. I certainly gave them --

Q. Did you get an audience with Ray Gilmartin when you asked for one?

A. No. Mr. Gilmartin never returned the calls.

Q. But you gave them an

Beyond scope of designated cross

Rule 402

Leading, irrelevant

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 618

audience?
A. I even offered to go to Whitehouse Station and meet with Mr. Gilmartin, meet with Dr. Kim. They wouldn't even allow me to go visit.
Q. Maybe they were busy.
MR. GOLDMAN: Objection.
BY MR. KLINE:
Q. Do you think so?
A. I don't know. They didn't want to talk about it.
Q. Two more areas, and they are going to both be about two minutes, I promised counsel.
The first one is Temple.
A. Yes.
Q. They showed you one letter, that letter that the editor -- where Temple was critical of you. Do you remember?
A. Yes.
Q. All right.
First of all, that letter was submitted to JAMA; correct?

Page 619

A. And it was rejected by JAMA.
Q. It wasn't even an article?
MR. GOLDMAN: Objection, move to strike, nonresponsive.
BY MR. KLINE:
Q. It was a letter; correct?
A. That's right.
\- - -
(Whereupon, Deposition Exhibit Topol-53, Letter 12-17-01, TOPOLE 0000511, was marked for identification.)
\- - -
BY MR. KLINE:
Q. He sends a letter to JAMA, and JAMA sends him back a polite letter saying no thanks; correct?
A. That's right.
MR. GOLDMAN: Objection.
BY MR. KLINE:
Q. It takes a lot to get an article published in a medical journal like JAMA; correct?
A. That's correct.

Page 620

Q. It takes much less to get a letter published; correct?
A. Less, but it's still not easy, yes.
Q. They didn't publish his letter?
A. That's right.
Q. Now, what you weren't shown by Merck -- by the way, have you ever heard the term, sir, "cherry picking data"?
MR. GOLDMAN: Objection.
THE WITNESS: Yes, I certainly have.
BY MR. KLINE:
Q. And "cherry picking documents"?
A. Yes.
Q. When you were examined here today, sir, did you see some of that right before your eyes?
MR. GOLDMAN: Objection.
THE WITNESS: Some of the best examples I've seen in my

Page 621

career were today, yes.
BY MR. KLINE:
Q. When you were asked questions by Merck; correct?
A. That's correct.
MR. GOLDMAN: Objection.
BY MR. KLINE:
Q. Was that exemplar of the kind of conduct that you also saw with them in their clinical trials, sir?
MR. GOLDMAN: Objection.
THE WITNESS: Well, what it is is an ice pick view of the data and not looking at the texture and the whole pattern. That's what being an open minded, objective clinical trialist and clinical development is all about.
BY MR. KLINE:
Q. And in fact, early on, sir, were you about as tepid and about as -- tepid is the wrong word.
Were you about as open minded as you can be when you wrote that

countered
π's response: see above.
• LEADING Qs
• Conduct opinion is improper expert testimony viol. 701/702
• Violates court order by covering ? time period unknown
• LACKS foundation
sustained

405d92cd-4d0a-489f-87d2-231e3a1c3f6f



Page 622

JAMA article in 2001?

A. Basically we tried to tone it down. We didn't want to engender any scare. We just basically wanted to register the concern. And we actually thought, because in the prior year of Merck they had been quite diligent, we thought they would follow up and do the right trial and do the right thing.

MR. GOLDMAN: Objection, move to strike, nonresponsive.

BY MR. KLINE:

Q. Temple wrote to you -- I have this, and I have one more document and I'm done.

- - -

(Whereupon, Deposition Exhibit Topol-54, Letter 1-7-02, TOPOLE 0000456 - TOPOLE 0000457, was marked for identification.)

- - -

BY MR. KLINE:

Q. Temple wrote to you a letter, correspondence, and you wrote

Page 623

back to him?

A. Yes.

Q. You had a good relationship with Temple?

A. An excellent relationship with Dr. Temple.

Q. Do you still?

A. I haven't talked to him in a while, but I hope so, yes.

Q. Did you have a healthy, constructive-type, scientific dialogue with him?

A. Yes, we did.

Q. And was it an open dialogue?

A. Yes, it was.

MR. GOLDMAN: Tom, can I have a standing objection to the use --

MR. KLINE: Yes.

MR. GOLDMAN: I'm sorry. -- to the use of a document that you never used before.

MR. KLINE: Yes. But it's the document that he asked to see

Page 624

when you -- in his testimony, and you wouldn't show it to him, but you have an objection.

BY MR. KLINE:

Q. Yes, sir.

Tell us what this document said and what the gist of this was --

A. Well, I was --

Q. -- what I call the full story?

A. Right. I had tried to introduce this earlier, because it was that ice picked view, if you want to talk about cherry picking one letter or one sentence. But here was a letter of my response to Dr. Temple addressing all of his concerns. And then he responded to me yet again.

Q. Oh, yeah.

MR. GOLDMAN: Objection.

THE WITNESS: And this was a very important short letter that he sent me.

BY MR. KLINE:

Page 625

Q. Is that the letter where he said, "Dear Eric," Exhibit Number --

MS. DAGOSTINO: 55.

- - -

(Whereupon, Deposition Exhibit Topol-55, Letter 2-5-02, TOPOLE 0000452, was marked for identification.)

- - -

BY MR. KLINE:

Q. -- 55. "Thanks for the note. I assure you I am not a devotee of the 'naproxen is good, we're not bad' hypothesis. But as a card-carrying empiricist, I am not prepared to guarantee that all COX-2 selective agents are the same, any more than all non-selective NSAIDs are. I just thought using the meta-analytic placebo data was beyond 'strained' and inappropriate. I still do."

So, you and he have a difference of agreement?

A. Yes.

Page 626

And he goes on to say, "You're correct, of course, about the Merck study," which is the VIGOR trial we wrote about.

And Dr. Temple has said to me before he wrote this letter, since this letter, that he was very worried about the VIGOR trial, and I had expressed to him I was surprised that the FDA didn't do more, knowing their concerns.

MR. GOLDMAN: Objection, move to strike, nonresponsive.

BY MR. KLINE:

Q. Hang on a second. He said -- put that right back in front of you. It's now up in front of the jury.

He said two things to you. He is "not a devotee of the 'naproxen is good, we're not bad'" thing. That's one thing he told you; correct?

MR. GOLDMAN: Objection.

THE WITNESS: That is basically like I was saying, the

Page 627

naproxen hypotheses is untenable.

BY MR. KLINE:

Q. Right. Is it a correct position to be a devotee of the naproxen hypothesis, sir?

MR. GOLDMAN: Objection.

THE WITNESS: I was surprised by the term.

BY MR. KLINE:

Q. Would those people be somewhere in the -- if you're a devotee, would that be someone who is looking in the wrong direction for the answer?

MR. GOLDMAN: Objection.

THE WITNESS: Well, I mean, that's certainly one interpretation.

BY MR. KLINE:

Q. And he says here, "You're correct...about the Merck study." The bottom line of the bottom line of the answer back to you is, "You're correct... about the Merck study." Correct?

MR. GOLDMAN: Objection.

Page 628

THE WITNESS: Right. And I was --

BY MR. KLINE:

Q. And your bottom line was, "Only more data will get the answer," and that was his bottom line?

MR. GOLDMAN: Objection.

THE WITNESS: That's right. But he had more of a way to push for it than I did.

BY MR. KLINE:

Q. Yes, because he's in the FDA?

MR. GOLDMAN: Objection.

THE WITNESS: Yes.

BY MR. KLINE:

Q. You're sitting out here in Cleveland?

A. Right. And we have no authority, and we did the best we could.

Q. Right. Voice in the wilderness?

MR. GOLDMAN: Objection.

BY MR. KLINE:

Page 629

Q. Correct?

A. That's correct.

Q. Voice in the wilderness.

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. Last point, very last point. This is the last thing, I promise. It's four, five, six questions, and I go over a half a minute, and here it goes.

You talked about Pasternak, you were cross-examined about Pasternak. Remember that?

MR. GOLDMAN: No, he wasn't.

MR. KLINE: Yeah. It came up during the examination.

MR. GOLDMAN: No, it didn't.

MS. DAGOSTINO: He mentioned it during direct. It took --

MR. GOLDMAN: You mentioned it, I didn't.

MS. DAGOSTINO: We could not get this document.

THE VIDEOTAPE TECHNICIAN: I need to change the tape.

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Page 630

MR. KLINE: Oh, this is the document we couldn't get. This is the document we couldn't get.
Yes, change the tape, please.
THE VIDEOTAPE TECHNICIAN: Off the record at 7:09.
- - -
(Whereupon, a recess was taken from 7:09 p.m. until 7:11 p.m.)
- - -
THE VIDEOTAPE TECHNICIAN: Back on the record at 7:11.
MR. KLINE: Here we go. We'll give it to you in a second. We'll give it to you like when Merck would give it to you. Same thing.
BY MR. KLINE:
Q. Sir, do you remember that you testified -- this is my last area of questioning. I've heard cheers.

Page 631

examination, and we couldn't find this document, that on the day of the withdrawal of the drug, September 30, '04, you received a call from Richard Pasternak at Merck, and he said to you, you were right.
MR. GOLDMAN: Objection.
BY MR. KLINE:
Q. Do you remember?
A. I remember it very well.
Q. Okay.
Did you know whether there was actually confirmation of what he told you in Merck documents?
MR. GOLDMAN: Objection.
THE WITNESS: I would never have known that. I wouldn't have any access to Merck documents.
BY MR. KLINE:
Q. Okay.
Now, your editorial in the New York Times, sir, was forwarded around at Merck. Did you know that?
A. I had no idea of that.

Page 632

Q. It wouldn't surprise you, would it?
MR. GOLDMAN: Objection.
THE WITNESS: I guess not.
BY MR. KLINE:
Q. And you got the attention of everyone from Ken Frazier, the legal counsel, to Peter Kim, the chief of the Merck Laboratories. See, they were reading. How about that?
A. (Witness nods.)
MR. GOLDMAN: Objection.
- - -
(Whereupon, Deposition Exhibit Topol-56, E-mails, MRK-AAC0152575 - MRK-AAC0152576, was marked for identification.)
- - -
BY MR. KLINE:
Q. And then there was an e-mail to -- an e-mail from a woman, Elizabeth Stoner, to Pasternak, and then from Pasternak back to Stoner.
MR. KLINE: We can give it

Page 633

to you, and we'll give it to the Merck lawyer.
MR. GOLDMAN: Can I have an objection to you using a document that was never used before?
MR. KLINE: No. It was used on direct, and we had said and agreed that it was part of the Pasternak thing. We couldn't get it printed or found.
MR. GOLDMAN: During your direct, not on my direct.
MR. KLINE: Yes, I agree with you. I will take my changes that a judge will --
MS. DAGOSTINO: You brought the name up during direct.
MR. KLINE: I did. We couldn't find the document then. It's one document.
BY MR. KLINE:
Q. Here goes, sir.
The e-mail says -- this is a couple of days after you talked to him.

Handwritten margin notes: Lacks foundation and personal knowledge. / Π's response: Statement by agent of defendant is a statement of admission that Dr. Topol was right and is admissible as a statement by a party opponent.

Handwritten annotations: Stricken / Stricken / Stricken / Stricken

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

• All sections above are beyond scope of designated cross
• Call w/ Pasternak is irrelevant, unfairly prejudicial and violates the Courts order because it occurred after Irvin died.
• Hearsay concerning NYT article.

Page 634

"The wrath" --

Q. By the way, the e-mails, Dr. Topol, are very colorful at Merck. They pride themselves on colorful e-mails.

MR. GOLDMAN: Tom --

BY MR. KLINE:

Q. And --

MR. GOLDMAN: Tom --

MR. KLINE: Yes, sir.

MR. GOLDMAN: Let me interrupt you. You are six minutes over.

MR. KLINE: Yes.

MR. GOLDMAN: And are you going to do me the courtesy of allowing me to ask some followup questions?

MR. KLINE: No, sir.

MR. GOLDMAN: What?

MR. KLINE: No.

MR. GOLDMAN: Then you are not going to ask any questions --

BY MR. KLINE:

Q. "The wrath of a lover" --

Page 635

MR. GOLDMAN: Your time is up.

BY MR. KLINE:

Q. "The wrath of a lover" scorned.

MR. GOLDMAN: Tom, your time is up. It's six minutes over.

BY MR. KLINE:

Q. "The wrath of a lover" scorned. "Instead of starting at baseline (with Eric), I'll have to start in the basement. Nevertheless, I think it is worth starting again with him for two reasons: (1) people listen to him." That's you?

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. "(2) we," Merck, "have something to learn."

A. Uh-huh.

MR. GOLDMAN: Objection.

BY MR. KLINE:

Q. Did you know that existed?

A. I had no idea. It's

Page 636

gratifying to see that at least one person at Merck was positive and open-minded.

MR. GOLDMAN: Objection, move to strike.

BY MR. KLINE:

Q. They didn't listen to you before the drug was withdrawn, did they?

MR. GOLDMAN: Tom, you are over.

THE WITNESS: They didn't listen to our concerns for years.

MR. KLINE: Thank you, sir. Thank you.

MR. GOLDMAN: Objection, move to strike as nonresponsive.

MR. KLINE: Thank you for being of assistance.

MR. GOLDMAN: Because Mr. Kline asked questions about documents and brought up issues that were not brought up on my cross, I do have some questions about Mr. Kline's additional

Page 637

areas. Can I ask --

MR. KLINE: The only area that I brought up that you didn't cover was this area with Pasternak, and you are correct, that you have -- that at least in my view, I don't know what Merck's counsel's view is, you have a right to cross-examine there. Everything else was within right square in the scope of redirect.

But I do agree on the Pasternak memo, the lover scorned memo, the "you were right memo," that you have a right to question if you'd like to.

MR. GOLDMAN: Is that the only area you're going to allow me to --

MR. KLINE: Yes, absolutely.

MR. GOLDMAN: -- ask some questions about?

MR. KLINE: Yes, absolutely.

MR. GOLDMAN: Is that true

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Sustained

Sustained

- Leading
- Foundation
- Loved time period after having died
- Unfairly prejudicial under Rule 403

- Leading
- Lacks foundation
- Beyond scope of designated cross.
- No probative value under Rule 402

Π's response: See above. ~~Defendants agreed to allow~~ Π Plaintiff's counsel informed defendant that they had trouble printing, defense agreed Π could come back to document.

Page 638

for Dr. Topol's counsel too?

MR. HAMELINE: We're here because we were subpoenaed. We're not part and parcel of the rules and regulations in the MDL. If you want to go ahead and ask about Exhibit 56, why don't you go ahead. Let's get those questions on the record, and then we'll take a break and talk about whatever else you want to ask about. But it is 7:15. It's been a very long day.

MR. GOLDMAN: I'm not going to talk about Exhibit 57 or whatever the --

MR. HAMELINE: 56.

MR. GOLDMAN: 56. But there are several other documents and several other things that Dr. Topol said that I would like to get into, and we can raise this with the judge later, but I'm going to object to most of Mr.

Page 639

Kline's examination as beyond the scope, and until I have an opportunity to do recross, and that may have to happen at a later time, so, I'm going to leave the deposition open.

MR. KLINE: I'll take my chances with the judge. Everything is within the fair scope of cross-examination -- redirect. We're done.

MR. HAMELINE: Do you want to make a proffer as to what documents you would ask about or what topics they are?

MS. VANCE: Let's have a list of what the --

MR. GOLDMAN: Each of the exhibits that Mr. Kline used in his redirect that he did not use in his direct examination.

MR. KLINE: Those exhibits were clearly --

MR. HAMELINE: Let him

Page 640

finish.

MR. KLINE: I'm sorry. I thought you were done, Andy. I apologize.

MR. GOLDMAN: No. And testimony about those.

MR. KLINE: Those exhibits were merely redirect of areas which were left wide open, and each occasion I basically said, Dr. Topol, you were shown this but you weren't shown that.

In the case of the Temple letter, he himself said, may I show you the Temple letter.

In the case of the Targum memo, he said, I want to talk about the Targum memo.

In the case of -- you made a big point that he, himself, conceded that they were unexpected, and the fact of the matter is, that they were documents that Merck had that he

Page 641

had never seen, which, frankly, I had to impeach him on and change his opinion that he would have known -- he only wishes he knew differently.

So, I respectfully, Andy, disagree with you. In my view, we're done. If you think you can convince a judge to the contrary, I guess it will be on my dime to come back to Cleveland. But I'm done.

Dr. Topol, thank you, sir.

MS. VANCE: Is there anything else, Andy?

MR. GOLDMAN: Nothing else.

MR. HAMELINE: Again, we're here because we were subpoenaed. We're a third party. I don't want to be involved in the dispute over timing and issues. I see what's in the court order, and I guess it's an issue of whether the judge is going to let the additional

405d92cc-4d0a-489f-87d2-231e3a1c3f6f

redirect in or not. That's the way I look at this. So, therefore, I think we're done. It's been a very long day.

MR. KLINE: Thank you, sir.

MR. HAMELINE: Thank you very much.

MR. KLINE: Thank you for your cooperation. Dr. Topol, thank you.

We're off the video record.

THE VIDEOTAPE TECHNICIAN: Off the record at 7:18.

- - -

(Whereupon, the deposition concluded at 7:18 p.m.)

- - -

CERTIFICATE

I, LINDA L. GOLKOW, a Notary Public and Certified Shorthand Reporter of the State of New Jersey, do hereby certify that prior to the commencement of the examination, ERIC J. TOPOL, M.D. was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

LINDA L. GOLKOW, CSR
Notary Number: 1060147
Notary Expiration: 1-2-08
CSR Number: 30XI176200

ACKNOWLEDGMENT OF DEPONENT

I, ______________________, do hereby certify that I have read the foregoing pages, 1 - 642, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

ERIC J. TOPOL, M.D. DATE

Subscribed and sworn to before me this day of , 20 .

My commission expires:

Notary Public

405c92cd-4d9a-489f-87d2-231e3a1c3f6f

------

ERRATA

------

| PAGE | LINE | CHANGE |
| --- | --- | --- |

LAWYER'S NOTES

| PAGE | LINE |
| --- | --- |

405d92cd-4d0a-489f-87d2-231e3a1c3f6f