MDL 1657 (05-4046 L)
Deposition of Dr. Eric J. Topol

Π counterdesignates 474:6 - 475:5 - D's response, violates courts order re evidence after Levins death; Rule 802; lacks foundation

Plaintiff Counterdesignations conditional

Overruled

Page 474

Q. You never mentioned the results of study 085 when the plaintiffs' lawyers were asking you questions, did you, sir?

A. I wasn't asked about 085.

Q. The truth is, when you wrote your JAMA article, you wrote that study 090 did not demonstrate the significant increase in cardiovascular event rates that you saw in VIGOR?

A. Only on more careful review of that data, data that was not accessible to us at that time, was I able to find out, to drill down on these events in 090. And let me just be perfectly clear that when these data were reviewed, and we can go back to the Targum report and I can take you through patient by patient why this misclassification had led us astray. If we had -- if this data were properly classified by Merck in what was transmitted to the FDA report, we would have had much more definitive

Page 475

conclusions, but we weren't able to get there. So, if I can go to the Targum report and go right to the table, which is really a critical table, and we can go over that data.

Q. We will do that, Dr. Topol. We're not going to do that right now, but we will do that, I promise you.

Dr. Topol, when you did your analysis before Vioxx was withdrawn in August of 2001, you found that study 090 did not demonstrate the significant increase in CV event rates, cardiovascular event rates that were seen in VIGOR; correct?

A. When we had incomplete access to the data, yes. I've already reviewed that.

MR. GOLDMAN: Move to strike as nonresponsive.

BY MR. GOLDMAN:

Q. Dr. Topol, I'm going to show you at Page 958 in the first column, second full paragraph, you say, second

Overruled

Page 476

sentence, "Two smaller studies (Study 085 and Study 090) of" Vioxx "that both allowed the use of low-dose aspirin did not demonstrate the significant increase in cardiovascular event rate noted in VIGOR." Did you write that, sir?

A. That was in our paper, again, from the wrong data that we did not have access to.

Overruled

Q. I want to know what data you had access to after this point that you didn't have access to in --

A. I'll be happy to go over that if you give me an opportunity.

Q. -- JAMA?

A. Page 32 of the Targum report.

Q. The Targum report you saw back in February 2001, sir?

A. Right, but then we had the details of these patients, for example, placebo, coronary occlusion, and we could say had nothing to do with a heart attack.

Page 477

Q. Dr. Topol, the Targum report that you are relying on now for your review that study 090 was a signal --

A. Yes.

Q. -- for cardiovascular risk is the same report that you cite in your JAMA article and that you relied on in your JAMA article. Is that true?

A. And we had the details of each of the patients.

Q. You had that also in February 2001?

A. I did not have access to it.

Q. Well --

A. That is, how these events were characterized, coronary occlusion, there was one called atrial fibrillation, there was one called congestive heart failure. When we looked and went through each -- when I looked and others looked going through each of these events, then the numbers changed.

Q. We'll talk about numbers changing in a minute. Did you write, Dr.

U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
FILED 12-3-05
LORETTA G. WHYTE
CLERK

Fee
Process
X Dktd
CtRmDep
Doc.No.

405d92cd-4d0a-489f-87c2-231e3a1c3f6f

π counterdesignates ~~474:6-475:5~~ 479:22-480:4 overruled

Goldman

DEF RESPONSE: No question; witness volunteers answer, 402, 403 lacks foundation

Page 478

Topol, in August of 2001, that two smaller studies -- withdrawn.

MR. KLINE: I apologize. Where are you reading from?

MR. GOLDMAN: First column of the JAMA article on Page 958.

MR. KLINE: Thank you.

BY MR. GOLDMAN:

Q. Dr. Topol, did you write in August of 2001 that "Two smaller studies (Study 085 and Study 090)...did not demonstrate the significant increase in cardiovascular event rate noted in VIGOR"? Did you write that?

A. That's correct.

Q. Did you also say in the next sentence, "However, these studies had smaller sample sizes, used only 25% of the dose of" Vioxx "used in VIGOR, and had few events for meaningful comparison." Did you write that then, sir?

A. That's right.

Q. You didn't say that on 60

Page 479

Minutes?

MR. HAMELINE: Can I just note an objection. I know you want to move through these quickly, but raising your voice --

MR. GOLDMAN: I don't mean to raise my voice.

MR. HAMELINE: I know you don't. I'm just noting that for the record. I think it's late in the afternoon, and we all get involved in the deposition.

MR. GOLDMAN: I promise you if I I'm raising my voice, I apologize, but that's not my intent at all.

THE WITNESS: You're also not allowing me to adequately respond.

MR. HAMELINE: That is his intent. That's different.

THE WITNESS: And you continue to drill ahead, and I don't have a chance to give you

Page 480

the data that's objectionable. We were erroneously misled. Not only was the suppression of 090 never published that trial --

BY MR. GOLDMAN:

Q. You knew that --

MR. HAMELINE: Could you let him finish?

THE WITNESS: The trial was completed in 1999. In 2001 we could give a couple of years to a near thousand patient trial not being published. But now we're in 2004, and the study is still not published, and we didn't have the data to go into the table of Targum until 2004 to find out that the events that we misclassify in our JAMA paper were actually very different than what we had estimated and what Targum even had estimated. She never spent time on this, and it's not a trivial matter. This is a 978 patient

Page 481

trial with statistically significant results of excess of heart attacks.

BY MR. GOLDMAN:

Q. Dr. Topol --

MR. GOLDMAN: Move to strike as nonresponsive.

BY MR. GOLDMAN:

Q. Dr. Topol, did you write back when you were writing to doctors in your JAMA article that study 090 had small sample sizes, used only 25 percent of the dose and had few events for meaningful comparison? Was that your statement in your article?

A. That was the statement based on the data we had at the time, yes.

Q. I want to try to keep track of the numbers that you've used over time for study 090, and so I'm going to give you a chart and ask you to confirm that this is correct.

In your August 2001 JAMA article for study 090, you said that

405d92cd-4d0a-469f-87d8-231e3a1c3f6f

overruled

there were 6 cardiovascular events in the Vioxx group, correct?

A. Right.

MR. KLINE: What page are we looking at here, Mr. Goldman?

BY MR. GOLDMAN:

Q. 2 in the nabumetone group?

MR. GOLDMAN: It's the JAMA article.

MR. KLINE: Where are you pointing to?

MR. GOLDMAN: I'm pointing to Page 956, second column, second paragraph.

THE WITNESS: Last sentence of that paragraph, Study 090, 6, 2 and 1.

BY MR. GOLDMAN:

Q. So, when you wrote your JAMA article, you wrote that there were 6 cardiovascular events on Vioxx, 2 on nabumetone, 1 on placebo; correct, sir?

A. That's what we thought at the time, unfortunately.

Q. Within a month after withdrawal, you started to write 60 Minutes various e-mails; correct?

A. Well, I had interaction with Michael Radutsky, the producer, yes.

Q. You talked about study 090 in those e-mails, didn't you, sir?

A. Yes, I did.

Q. What you told 60 Minutes about Study 090 was different from what you wrote in your JAMA article. Isn't that true, sir?

A. By having had a chance to review these data, and I already had mentioned this morning I was asked about, did I get a letter from Mr. Myers and Bill Moyers, and when I got that, he sent me this report to look over, and I started to wonder about these events that we, unfortunately, had not had adequate detail on Page 32 of the Targum report. And it turns out, the numbers, when you characterize each of these patients appropriately, are different. Less

events in the Vioxx and less events in the placebo as well. It changes. And it's a very important change.

MR. GOLDMAN: Move to strike as nonresponsive.

- - -

(Whereupon, Deposition Exhibit Topol-41, E-mails, EJT 000191, was marked for identification.)

- - -

BY MR. GOLDMAN:

Q. Dr. Topol, I'm going to hand you what I've marked as Exhibit 41. This is an e-mail that came from your files that has a Bates Number at the bottom, EJT 191. Do you see that?

A. Yes.

Q. This is an e-mail at the bottom that you wrote to Marlene Goormastic on October 25, 2004; correct?

A. Yes.

Q. Is that your statistician?

A. That's the statistician,

that's right.

Q. And you're writing to Ms. Goormastic on October 25, this is a month after withdrawal, to do some statistical analysis; correct?

A. Yes. There was subsequent to this as well, but this is one of the interactions we had.

Q. You ask Marlene at the bottom, "I need to do a test comparing three treatment arms - Vioxx versus nabumetone and then Vioxx versus the other two combined," meaning nabumetone and placebo. "Here are the data. Vioxx, 7 out of 390 events."

A. Right.

Q. "Nabumetone 1 out of 392 events. Placebo, 1 out of 196 events." Is that what you wrote to her?

A. These are events that are not death, heart attack or stroke. These are events requiring cessation of the drug. This is a different part of the Targum report. But, yes, this is one of

Sustained 403

405d92?d-4d?a-489f-87d2-23?e3a1c3f5f

overruled

the ancillary analyses that was performed.

Q. This is an analysis on study 090; correct?

A. Study 090, but not on death, heart attack and stroke.

Q. I'm going to write down the numbers for October 25 of 2004.

A. These numbers do not correspond to death, heart attack and stroke.

Q. I understand that.

A. Okay. Well, I don't know what you're writing down because you're comparing apples and oranges now.

Q. 7 events on Vioxx.

A. They're different events.

MR. KLINE: Are you going to making a chart that's going to be displayed?

MR. GOLDMAN: All I'm doing is trying to keep track of the numbers, that's all.

MR. KLINE: But for your own

benefit?

THE WITNESS: You're making a table of events, of different types of events. These are events that are requiring cessation of drug with serious cardiovascular -- I'm more focused on my letter in the New England Journal and what I'm talking about with 60 Minutes and those things you're interested in on death, heart attack and stroke, and they're different numbers.

BY MR. GOLDMAN:

Q. The numbers that you're using here on October 25 have to do with the numbers of Vioxx patients who had to be discontinued in the 090 study; right?

A. With serious cardiovascular adverse events, different than death, heart attack and stroke. That's a different table.

Q. So, the numbers that you have are 7, 1 and 1.

overruled

A. Okay.

Q. And you ask Ms. Goormastic at the bottom, "Can you or someone run this and get back to me, the p values, RR, 95% CI?" Do you see that?

A. Yes.

Q. What you are asking her to do -- a p-value is a test for statistical significance; correct?

A. Yes. Yes.

Q. Relative risk is RR?

A. Yes.

Q. And CI is confidence interval, and that's another test for statistical significance; correct?

A. Yes.

Q. Ms. Goormastic writes back to you that same day above and says "The chisquare," that's a type of statistical test, correct, "including all 3 groups is p equals .06," and then here's the answer to your question: "For Vioxx versus nabumetone chisquare" p-value is ".03." Do you see that, sir?

overruled

A. Yes. I see that, but again, it's not related to my principal interest.

Q. The .03, just so the jury can understand and I can understand, if a p-value is less than .05, that means that it's statistically significant, the result; correct?

A. That's right.

Q. Here, this is showing a statistically significant result for .03; is that right?

A. That's correct, but you're comparing -- you don't even know what these events are. So, you're just looking at some numbers. You don't know what this analysis is about.

MR. GOLDMAN: Move to strike as nonresponsive.

BY MR. GOLDMAN:

Q. The next line says --

overruled

MR. KLINE: How can you possibly say that? How can you possibly say his answer is

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Overruled

nonresponsive?
BY MR. GOLDMAN:
Q. -- relative risk. Do you see you wrote "Relative risk for Vioxx is 7" -- I'm sorry, this is what Ms. Goormastic wrote -- "is 7." And then you have a confidence interval here that she writes ".9 - 56.9." Do you see that in the parenthesis?
A. Yes.
Q. And if the confidence interval that is described there includes the number 1, that is, if one falls within .9 to 56, that means that the result is not statistically significant; correct, sir?
A. That's correct.
Q. So, Ms. Goormastic writes: "I was puzzled why this confidence interval covers 1 when the p-value is less than .05. I think it's due to the small number of events" used. Do you see that?
A. Yes, I do.

Q. You had talked about the small number of events in your JAMA article; right?
A. That's correct.
Q. Then she says, "When I ran a logistic regression model" that's another way of calculating statistical significance, right, "I got very similar results, a relative risk of 7.1," and then the confidence interval there covers 1. Correct, sir?
A. That's correct.
Q. Ms. Goormastic is telling you that she's puzzled because she is seeing with one test there's a statistically significant difference and with another one there's not?
A. Yes, but this is really an immaterial look at the data. It's not on death, heart attack and stroke. And it's not with the final review of the events, as you've not allowed me to go through patient by patient of study 090 from Table 32 in the Targum report. You've

not allowed me to do that.
MR. GOLDMAN: Move to strike as nonresponsive.
BY MR. GOLDMAN:
Q. The reason that Ms. Goormastic is puzzled, Dr. Topol, is because one test shows that there's no statistically significant difference, and another test shows that there is; correct?
A. But it's not on the events of interest, Mr. Goldman.
Q. I'm not asking about the events of interest.
You wrote the e-mail here. Sir, you wrote an e-mail to your statistician in October of 2004 because you thought that this answer was important. Is that true?
A. No. This is not the e-mail of importance. You've picked this e-mail. There are other e-mails that are considerably more important with my statistician, and you just picked this

one.
Q. We'll get to that one, sir.
A. Okay.
Q. When you received this e-mail from Ms. Goormastic, it wasn't clear to you, sir, whether there was a statistically significant difference or not as reflected in Ms. Goormastic's e-mail; correct?
A. That really was not my focus. I see what you're saying here, but that was not my concern. The events here for death, heart attack and stroke were unclear. This is not what this refers to.
Q. What time did you write this e-mail? I'm sorry, what time -- withdrawn.
What time did Ms. Goormastic write her e-mail to you on October 25, 2004?
A. She wrote that at 4:42 p.m.
- - -
(Whereupon, Deposition

405d92cd-4d0a-489f-87d2-231e3a1c3f5f

Sustained

Exhibit Topol-42, E-mails, EJT 000192, was marked for identification.)

- - -

BY MR. GOLDMAN:

Q. I'm going to show you an e-mail that I've marked as Exhibit 42. This came from your files, Dr. Topol, and I want to focus on the bottom e-mail. This is an e-mail from you to Michael Radutsky?

A. Radutsky.

Q. Who is that?

A. He's the producer for CBS 60 Minutes.

Q. What time did you write this e-mail to the producer of 60 Minutes?

A. 14 minutes or so later.

Q. You wrote this e-mail to 60 Minutes at 4:46 in the afternoon, correct?

A. Right.

Q. You received an e-mail from Ms. Goormastic at 4:42, four minutes

earlier; correct?

A. That's right.

Q. And you write to 60 Minutes, "Michael, Great news on the Statistics for Study 090. The difference between Vioxx and nabumetone is significant, P equals .03." And then you continue. Do you see that, sir?

A. I see that. That's not the end of the story here, though.

Q. You forwarded --

A. You just have an ice pick view of this interaction.

Q. Dr. Topol, you forwarded -- do you see the forward "FW" in the subject line of your e-mail to 60 Minutes?

A. Yes.

Q. You forwarded the e-mail that Ms. Goormastic sent to you, correct, sir?

A. Yes, yes.

Q. But you didn't include what Ms. Goormastic said to you about being

puzzled and about there being no statistically significant difference with respect to the confidence interval? You changed that and wrote that there was a statistically significant difference?

A. Where is that?

Q. Do you see in your e-mail to 60 Minutes after you say "Great news. The difference between Vioxx and nabumetone is significant" and you cite only the p-value. Do you see that, sir?

A. Yes.

Q. You didn't tell 60 Minutes in that e-mail that your statistician was puzzled about these numbers, did you?

A. They were not final numbers. As I already indicated you, these were not the final numbers for death, heart attack and stroke. And so I will take the opportunity to amplify here because you're trying to take this down the wrong path. On October 25th, the data were inconclusive because we did not have a chance to learn about these events in the

Sustained

Targum table, these patients on death, heart attack and stroke. They were not reviewed. I did not have the details of any of those patients. So, these events that we're looking at were not the interested field of cardiovascular endpoints of deaths, of all cause, heart attack and stroke.

Q. You found it important enough to write to 60 Minutes four minutes after your statistician wrote to you to tell them about what you thought was great news, and you characterized --

A. This was the beginning of the analysis, only the beginning.

Q. Do you see that 60 Minutes --

A. This is a work in progress, and you're just taking one part of that work.

Q. Do you see that 60 Minutes writes back to you on the top and says "Remarkable" and then continues. "So then how does the company ignore numbers

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

Sustained

Sustained

Page 498

like that? How does not warrant further study?" Et cetera. And he says "How can they call the study 'statistically insignificant'?" Do you see that?

A. I see that.

Q. Did you ever write back to 60 Minutes and say that your statistician told you that under another test there was no statistically significant difference for 090?

A. I discussed this extensively with Michael Radutsky on the phone, and I told him that we needed -- before this could be wrapped up and before I could make any statements about study 090, I needed to have all the information regarding the patients with events, putative events of this trial, which I didn't have at this time. So, these data did not -- again, I've said it at least three or four times. These data did not reflect the final categorization of death, heart attack or stroke for study

Page 499

090.

Q. Did you in your e-mail to Doctor -- I'm sorry, withdrawn.

Did you in your e-mail to 60 Minutes say that your statistician was puzzled? Yes or no?

A. I discussed it on the phone.

Q. Your testimony is that you discussed your statistician being puzzled on the phone, but you told 60 Minutes that there was --

A. No.

Q. -- there was a significant difference here?

A. I discussed with Michael Radutsky that more work had to be done, that we can't use any of these numbers until we get all the details on these patients of this page 32 in the Targum report. So, all this was preliminary work, and we still didn't have a sense of where we were with the death, heart attack and stroke story. I discussed that with him.

Page 500

Q. You told 60 Minutes that this was great news about study 090 because you wanted to make Merck look bad. Isn't that true, sir?

A. All I wanted was the truth about this drug and the truth about study 090, and it was becoming increasingly clear, now we're in 2004, we're now five years into this whole story, and this trial has never been published. And we never ran the stats in the JAMA paper. We never actually did the statistics on 090 or 085. We didn't spend enough time going into the details of this, and then it became apparent that there were miscategorizations when this was carefully reviewed.

Q. You said in your JAMA paper that the numbers were too small for meaningful comparison for 090. Isn't that right, sir?

A. They were not statistically significant, but they were mischaracterized. So, how can one make a

Page 501

definite conclusion. We were working with erroneous categorization of endpoints.

MR. GOLDMAN: Move to strike as nonresponsive.

Let's take a break.

MR. HAMELINE: Sure.

THE VIDEOTAPE TECHNICIAN: Off the record, 5:18.

- - -

(Whereupon, a recess was taken from 5:18 until 5:28 p.m.)

- - -

THE VIDEOTAPE TECHNICIAN: Back on the record at 5:28.

- - -

(Whereupon, Deposition Exhibit Topol-43, E-mails, EJT 000190, was marked for identification.)

- - -

BY MR. GOLDMAN:

Q. Dr. Topol, I've handed you what I've marked as Exhibit 43 --

405d92cd-4d0a-489f-87d2-231e3a1c3f5f

Sustained

Sustained

Sustained

A. Yes.
Q. -- which is an e-mail, November 12, 2004 from you to your statistician again, and this is now two days before you go on 60 Minutes. Correct?
A. That's right.
Q. Now you tell Ms. Goormastic to -- and you say regarding 60 Minutes coming up quickly, "can you run the difference between 5 out of 390 versus 1 out of 588 for odds ratio, 95 percent confidence interval, chi square and p-value." Do you see that?
A. Yes. These are the same numbers as in the New England Journal paper of December 30, 2004.
Q. So, these are the numbers that you say are the right numbers to analyze study 090; right?
A. That is, before we could finalize the appropriate numbers, we had to have all the information for each patient of whether they had an event or

not from this original table, and this is now where they are all properly classified for death, heart attack or stroke.
Q. The information that you looked at, sir, when you came up with your numbers, 7,1,1, back in October, came from Ms. Targum's report, correct, sir?
A. The original information, and then we got all the details of each patient subsequently.
Q. You got the details of all the patients when you wrote that the numbers were 7, 1 and 1 --
A. No.
Q. -- in October of 2004?
A. No. We did not have the details. All I had was this table. There are multiple tables in the Targum report. I did not have the appropriate clinical history for each patient and how the endpoint was categorized until shortly before this e-mail.

Q. So, the basis for your view that there are five events on Vioxx, 1 on nabumetone and none on placebo come from your review of Dr. Targum's report; correct?
A. No. No. That's only the beginning. Then we had -- not in Dr. Targum's report. There's a detailed account of each patient and how that diagnosis of coronary occlusion or congestive heart failure was made. And remember, the endpoint that is the principal endpoint for clinical trials is death, heart attack or stroke. So, the final determination of these events for study 090 was based on not just the Targum report, but all those details that were not available to us until we got the subsequent information.
Q. Now, you wrote "5 out of 390" and then you wrote "1 out of 588." Do you see that in your e-mail?
A. Yes. And that's exactly the same as the New England Journal

Overruled

subsequent correspondence.
Q. The 588, which is the denominator here, that is calculated by taking the number of patients in the nabumetone group and adding them to the number of patients in the placebo group; correct?
A. Those are control groups for the trial, that's right. They're not experimental groups.
Q. So, what you did was you took 5 events on Vioxx, and you compared them to 1 event in placebo and nabumetone combined; correct?
A. That is how this analysis was performed with the appropriate categorization of the endpoints and the statistics.
Q. When you wrote your JAMA article, sir, on Page 955 --
A. Yes.
Q. -- you describe the events that occurred with 090 as 6, 2 and 1 --
A. Right.

405d92cd-4d0a-439f-87d2-231e3a1c3f5f

Overruled
Sustained

Page 506

Q. -- and you didn't group the nabumetone and placebo groups, did you, sir?

A. And that's precisely because we had misinformation. We had atrial fibrillation as an event which shouldn't have been. We had congestive heart failure. We had coronary occlusion, which wasn't a heart attack, and it was very clear that the more meaningful way to analyze the trial, just as Juni had done, would be to compare controls with the experimental drug.

Q. When you wrote your JAMA article and the events were 6, 2 and 1, you wrote that those numbers were too small for meaningful comparison; correct?

A. With the erroneous data, they were not appropriate to make a final judgment.

Q. The numbers, 6, 2 and 1 were so small that they couldn't be used for meaningful comparison. Correct?

A. I wouldn't use the term

Page 507

exactly, no. That's not the term that we use.

Q. Well, if we look back at your JAMA article, page --

A. It says, "had few events for meaningful comparison." "Few events." That's right.

Q. So, when the events were 6, 4 -- I'm sorry, withdrawn.

When the events were 6, 2 and 1 as you analyzed them in your JAMA article for Vioxx, nabumetone and placebo, you considered that to be few events for meaningful comparison; correct?

A. Well, there was no significant difference. So, that means there's no meaningful difference, yes.

Q. So now in November of 2004, when you say the numbers now are 5 for Vioxx, 1 for nabumetone and 0 for placebo, there's actually fewer events in your analysis from November of 2004 than there were in your analysis in JAMA; ??

Overruled

Page 508

correct?

A. Correct. But the events are correct now, and they are the appropriate irrevocable endpoints of death, heart attack and stroke and not admixed with things like atrial fibrillation or a chronic occlusion that had nothing to do with a heart attack. Now we had a difference of 1.3 versus 0.2 percent. And what I showed in the letter in the correspondence in the New England Journal with those numbers is that with the exact same Vioxx incident, 1.3 percent with those five events that you just cited was exactly the same as in the VIGOR trial, 1.2 percent for death, heart attack and stroke. And there was a 7.6, that's 760 percent excess compared with the controls, whether it be naproxen in VIGOR or nabumetone and placebo in the current study 090 that we're discussing.

MR. GOLDMAN: Move to strike everything after the answer to my question.

Overruled

Page 509

BY MR. GOLDMAN:

Q. Dr. Topol --

MR. KLINE: Move to include as very responsive.

BY MR. GOLDMAN:

Q. Dr. Topol, the reason you asked your statistician to compare the number of events on Vioxx to the number of events on nabumetone and placebo combined is because you know that if you compare the number of events on Vioxx to just the number of events on nabumetone, there is no statistically significant difference?

A. That's not the appropriate comparison. We already went through this, that is, when you have drugs that are a control arm that are widely accepted and have been around for 10 or 20 years, and you have an experimental drug, it is appropriate, just as Juni did in his analysis in the Lancet, and just as we did here, to compare the control arms with the experimental arm, which in

Overruled

405d92cd-4d0a-489f-87d2-231e3a1c3f6f

overruled

this case was Vioxx.

Q. You didn't do that in your JAMA article, did you, sir?

A. We didn't do it in the JAMA article, but we didn't have the right data. So, of course, we couldn't do it in the JAMA paper. We had erroneous categorization of endpoints.

Q. The reason that you combined nabumetone and placebo and compared that to Vioxx is because you know that if you compare the number of events on Vioxx to placebo for study 090, there is no statistically significant difference; correct?

A. That is not the reason why that analysis was performed that way.

Q. Am I correct, sir, that if you compare 5 events on Vioxx to 0 events on placebo, there's no statistically significant difference?

A. I don't know. We'd have to run the statistics on that.

Q. You never ran that, did you?

A. I don't remember that we ran it. I don't have it at hand.

Q. The investigators who conducted study 090 did not compare Vioxx against nabumetone and placebo, did they, sir? They kept the three arms separate?

A. Maybe you can tell me, Mr. Goldman, why was this paper with this extent of harm to patients, why was it never published?

Q. Can you answer my question, sir?

A. I'm just asking you, can you help me to understand why the paper was never published six years later on nearly 1,000 patients?

MR. GOLDMAN: I have half an hour left. Can you please ask your witness not to ask any questions.

MR. KLINE: I think the answer is a rhetorical question. I move to include it. Simply rhetorical.

BY MR. GOLDMAN:

Q. Dr. Topol --

A. I just want to point out that's what has made it so difficult for us to do an analysis, because we never had the paper, the manuscript written on 1,000 patients. So, we had to work in a very difficult way, and that's what you're trying to get at, is why didn't you do this or why didn't do that. We didn't have the data at hand because it was never published.

Q. Dr. Topol, the investigators who conducted study 090 did not compare Vioxx to placebo and nabumetone combined, they compared Vioxx to just placebo or nabumetone; is that right?

A. How would we ever know that? How did you know that? I've never seen any paper. How can you say something like that? Can you show me that evidence?

Q. Do you know, sir, that the protocol for study 090 called for pair

wise comparisons?

A. Who has ever seen the protocol?

Q. Well, let me show it to you.

A. Okay.

Q. This is Exhibit 44.

MR. KLINE: See, you got discovery from them.

THE WITNESS: This will be interesting.

- - -

(Whereupon, Deposition Exhibit Topol-44, "MRL Clinical Study Report, Multicenter Study: A Randomized, Placebo-Controlled, Parallel-Group, Double-Blind Study to Evaluate the Efficacy and Safety of MK-0966 (Rofecoxib) 12.5 mg Versus Nabumetone 1000 mg in Patients with Osteoarthritis of the Knee (Protocol 090)," MRK-00420016832 - MRK-00420016849, was marked for identification.)

405d92cd-4d0a-489f-87d2-231e3a1c3f6f