U. S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
FILED 12-2-05
LORETTA G. WHYTE
CLERK

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **In re: VIOXX** | * | **MDL Docket No. 1657** |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | **JUDGE FALLON** |
| **This document relates to** | * | **MAGISTRATE JUDGE KNOWLES** |
| **Evelyn Irvin Plunkett v. Merck & Co, Inc.** **CASE NO. 02:05CV4046** | * | |

**Plaintiff's Motion to Reconsider Ruling In Regard To the Testimony of Dr. Thomas Baldwin**

Evelyn Irvin Plunkett, as Personal Representative of the Estate of Richard "Dicky" Irvin, Jr., by and through her attorneys, moves the Court to reconsider its December 1, 2005 ruling precluding Dr. Thomas Baldwin from testifying "as to the part, if any, that Vioxx or Cox-2 inhibitors played in Mr. Irvin's death. I don't feel that he is qualified by virtue of experience [or] training to testify as to the specific causation of Mr. Irvin's death." [1]

These rulings reflect what Plaintiff believes are several misunderstandings regarding Dr. Baldwin's opinions and how he reached them. In fact, he is familiar with the literature on Cox-2 inhibitors in general and Vioxx in particular. He reviewed this literature as a regular part of his practice, (deposition of Dr. Thomas Baldwin at 15:21-25), and conducted further research in his role as an expert. At his deposition, he cited specific articles in support of

[1] Plaintiff must show that Mr. Irvin's death was proximately caused by the defective and unreasonably dangerous nature of Vioxx product. *West v. Caterpillar Tractor Co., Inc.*, 336 So. 2d 80, 87 (Fla. 1976). Florida law is equally clear that where two causes concur to bring about an event, and either one of them operating alone would have been sufficient to cause the identical result, then the issue of proximate cause is not resolved under a traditional "but for" test, but rather is modified or replaced by a "substantial factor" test.[5] See *Stahl v. Metropolitan Dade County*, 438 So. 2d 14, 17-19 (Fla. 3d DCA 1983) (citing *Loftin v. Wilson*, 67 So. 2d 185, 191 (Fla. 1953)). As such, both causes are deemed to be the proximate cause. See *Salazar v. Santos (Harry) and Co., Inc.*, 537 So. 2d 1048, 1050 (Fla.3d DCA 1989).

Fee
Process
X Dktd
CtRmDep
Doc.No.

specific positions. Depo. at 31-32, 90, 104-109. This knowledge, coupled with his knowledge of the cardiovascular system, provides ample basis for his opinions about Mr. Irvin. He has provided a well-reasoned and well-supported rational explanation, as follows:

- Mr. Irvin's death resulted from an occlusive thrombus. Depo. At 41:13-14. Dr. Baldwin knows this from Mr. Irvin's record and gross autopsy findings. Depo. at 41:7-9. Mr. Irvin experienced "[a]brupt onset of an event that caused sudden cardiac death. Depo. at 42:4.

- Thrombotic events are caused by platelet aggregation. Depo. at 139:1-3 ("anything that increases the likelihood of platelet aggregation can act as a trigger that causes a coronary thrombus"). This step in Dr. Baldwin's logic is fundamental part of his knowledge as a cardiologist. Indeed, the Court has already ruled that Dr. Baldwin can testify about "the formation of the clots [and] how they form." Transcript at 51 (rough cut).

- Vioxx causes clotting by disturbing the balance between thromboxane and prostycyclin. Baldwin Expert Report ("Report") at 11, ¶ 4. Dr. Baldwin knows this from his review of the literature cited in his report. Contrary to the Court's ruling this constitutes extensive knowledge about Vioxx.

- The propensity of Vioxx to cause the prostacyclin-thromboxane imbalance is further evidenced by the fact that it is known to inhibit Cox-2. In fact, that is its therapeutic function. If the therapeutic effects become manifest quickly, the adverse consequent of Cox-2 inhibition also should be expected to manifest quickly. Depo. at 42:16-43:6 ("So just from a basic scientific standard, rapid onset of symptoms associated with Cox-2 inhibition should correlate with rapid onset of effects that would be prothrombotic within the early time period.")

- Clinical trial evidence dovetails with the understanding of the prostacyclin-thromboxane imbalance. Depo. at 48:2-49:5.

- Dr. Baldwin's clinical experience is also consistent with his understanding of how disruption of the prostacyclin-thrombotic balance can lead to cardiovascular adverse events. My "clinical experiences have been that as time has evolved and we're treated patients with drugs that more significantly impact thromboxane reduction, that we clearly saw a reduction in . . . . adverse events." Depo. at 50:18-51:5.

- With regard to onset of adverse events within 30 days, several peer reviewed publications provide support. Depo. at 92:12-93:22 (listing several publications and also relying on Dr. Ray's report). The article published by Juni et al in The Lancet is particularly relevant because it showed no statistically significant change in relative risk over time or dosage. Peter Juni et

al, *Risk of Cardiovascular Events and Rofecoxib*, The Lancet, November 5, 2004 (accessed on line) at 4, Table 2. Depo. at 72:21-24; 75:9-18.[2]

- With regard to Mr. Irvin, there are several mechanisms that could have initiated his fatal thrombus. Whatever initiated it, however, Vioxx, by increasing the propensity of platelets to aggregate, made it more likely to form and grow to a size that would cause occlusion. "Likely it started with either spontaneous spasm of the coronary artery, or a small irregularity split, or fissure in the atherosclerotic plaque when platelet aggregation being catalyzed by the effects of Vioxx." Depo. at 115:23-116:1. Thrombus formation "is a culmination of . . . plaque rupture . . . coronary spasm . . . or platelet deposition. . . You don't get coronary thrombus without platelet deposition, so platelet deposition is key." Depo. at 120:18-19.

- Mr. Irvin's circumstances made it unlikely he would have experienced a fatal myocardial infarction without the influence of Vioxx, which "creates an increased risk of clotting, resulting in the exact type of acute cardiac event [he suffered] – a thrombus resulting in an acute LAD occlusion, sudden ischemia, and resulting sudden cardiac death." Report at 11, ¶ 4. Dr. Baldwin "rarely see[s] a patient 53 [years old with Mr. Irvin's] clinical background [and who] presents with an acute myocardial infarction. His risk of death from acute myocardial infarction, given his background, is low, so it would be unusual to see him present with a myocardial infarction. We do see 53-year old men who have infarcts. Those men typically have much more advanced atherosclerotic disease, and they typically have other risk factors that contributed to that." Depo. at 121:4-12.

- Mr. Irvin had atherosclerosis, but even if he suffered plaque rupture, it is doubtful he would have had a myocardial infarction without Vioxx. Depo. at 122:18-23. ("Because the . . . balance of procoagulable and anticoagulable tendencies . . . of platelets specifically are such that . . . most plaque ruptures do not yield a flow limiting occlusion, and what minimal thrombus or platelets that adhere to that rupture eventually resolve without causing an occlusive structure.")

- Vioxx, by changing the prostacyclin thromboxane balance "lowers the threshold by which . . . a catastrophic event occurs. It is a catalytic-type process that ramps up the relative stickiness and likelihood of platelet to form a large enough clump that induces thrombotic occlusion." Depo. at 123:17-21.

---

[2] Discussion of this article consumed more than twenty pages of the 160 pages in Dr. Baldwin's deposition, and it is clear from the transcript that counsel for Merck did not understand Dr. Baldwin's answers, but counsel's failure to understand does not mean Dr. Baldwin did not understand how to interpret the study. In fact, he did.

Dr. Baldwin's well-reasoned and well-supported rational explanation for his differential diagnosis and conclusion is eminently admissible under *Daubert.* Perhaps the most apposite case is the Fifth Circuit's ruling in *Pipitone v. Biometrix, Inc.*, 288 F.3d 239 (5th Cir. 2002), which involved a set of facts so unique no expert could possibly have been found who would meet the kind of specific qualification requirements this Court would impose on Dr. Baldwin. The plaintiff in *Pipitone* developed a salmonella infection in his knee after it was injected with Synvisc, "a replacement synovial fluid manufactured by [the defendant]." *Pipitone*, 288 F.3d at 241.

Synvisc is rendered from rooster combs, *id.,* a known source of salmonella. *Id.* at 246. The plaintiff's expert concluded the injection was in fact the cause of the plaintiff's infection because of this logical link and because he was able to eliminate other possible causes and explanations. One possibility was ingestion of salmonella, but the plaintiff never suffered the gastroenteritis that would have accompanied this route of infection. *Id.* At 248.

Another possibility was entry through a wound, but that would have entailed bacteremia, which, again, the plaintiff did not have. *Id.* Still another possibility was the unsterile technique used when he received his injection, but the expert could find no report in the literature that unsterile injection had ever led to salmonella in a joint. *Id.* At 248-49.

Finally, the expert rejected the defendant's argument that other syringes in the lot from which the syringe at issue came were tested and were free of salmonella. Based on "basic epidemiologic principles and his experience . . . [studying] incidents of contamination related to various batched medicines," *id.* At 249 n. 33, the expert stated that "while he expected other samples of Synvisc in the same manufacturing lot to be contaminated, the absence of salmonella in those few other samples tested did not undermine his conclusion." *Id.* at 249.

The district court excluded this testimony, but the Fifth Circuit reversed. The kind of rational, well-explained differential diagnosis easily met the requirements of *Daubert*. This kind of focus on reasoning and methodology is exactly the kind of analysis *Daubert* requires, and an expert who provides such opinions should not be excluded because he or she lacks some narrowly defined credential or bit of experience that would never trouble fellow doctors or scientists.

In *Carroll v. Morgan*, 17 F.3d 787 (5th Cir. 1994), the plaintiff claimed his brother had died as a result of malpractice committed by the defendant doctor. *Id.* at 790. The plaintiff challenged the admissibility of testimony from the defendant's expert witness, a cardiologist. One challenge related to testimony about the cause of death. The plaintiff argued that the cardiologist was not qualified because he was not a pathologist. The Fifth Circuit ruled that cause of death does not fall exclusively within the confines of pathology and affirmed the admissibility of the expert's testimony. Furthermore, although the experts in the case disagreed as to the cause of death, the court concluded, "the conflict among the expert testimony was grist for the jury." *Id.* Here, Dr. Baldwin's experience and knowledge are not at question, rather the scope of his proffered testimony, which under *Carroll v. Morgan* can easily extend to the relationship between Vioxx and Mr. Irvin's death. *See also Kelley v. American Heyer-Schulte Corp.*, 957 F. Supp. 873, 876 (W.D. Tex. 1997 (testimony admissible when "grounded in the methods and procedures of medical science").

Precedents like *Pipitone* and *Carroll v. Morgan* are clearly controlling in the present case, and decisions such as *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269 (5th Cir. 1998), are not. In *Moore* the *en banc* Fifth Circuit affirmed the trial court's exclusion of differential diagnosis testimony that the plaintiff's reactive airways dysfunction syndrome ("RADS") was caused by exposure to fumes from a solvent spill. The expert based his

conclusion on (1) a material safety data sheet that said exposure to the solvent solution could be harmful to the lungs; (2) plaintiff's onset of symptoms shortly after exposure; (3) a single article called to his attention by counsel; (4) his training and experience; and (5) his examination of the plaintiff, including test results. *Id.* at 277. He had previously treated other patients for RADS who had been exposed to much stronger chemicals, but he "made no attempt to explain how any of the other chemicals . . . had properties similar to the [solvent solution at issue]." *Id* at 273

This lack of explanation permeated every aspect of the expert's opinion. He "gave no reason why [his training and experience or the examination and test results] were helpful in reaching his conclusions on causation." *Id.* at 277-78. "With respect to the . . . article . . . the authors made it clear that their conclusions were speculative because of the limitations of the study. Also, in the single study involving exposure to [similar] fumes, the level and duration of the exposure were several times greater than [the plaintiff's] exposure." *Id.* at 278.

Thus "the bases for [the expert's] causation opinion [were] reduced to the following: (1) the . . . MSDS from which [he] could have gleaned that the contents of the drum [from which the solvent spilled] were irritating to the lungs at some level of exposure; and (2) the relatively short time between [the plaintiff's] exposure to the chemicals and the onset of his breathing difficulty." *Id.* Such paucity of explanation is certainly not a problem with regard to Dr. Baldwin's opinion about Mr. Irvin. Nor is there a similar lack of citation to scientific literature or a similar question about exposure levels.

A reasonable comparison of *Pipitone* and *Moore v. Ashland* with the facts in the present case clearly mandates application of the *Pipitone* precedent, which would allow Dr. Baldwin to testify about how Vioxx related specifically to Mr. Irvin's myocardial infarction

and death. Plaintiff respectfully requests this court to make this comparison and to reconsider its decision to preclude such testimony from Dr. Baldwin.

Respectfully submitted,

By:______________________

**Andy D. Birchfield, Jr.**
Paul J. Sizemore
P. Leigh O'Dell
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160

**Co-Lead Counsel**

Bert Black
Elizabeth Odette
LOCKRIDGE GRINDAL NAUEN
100 Washington Avenue South
Minneapolis, MN 55401

**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
***Herman, Herman, Katz & Cotlar, LLP***
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
FAX: (504) 561-6024
**Temporary Office**
3411 Richmond Ave., Suite 460
Houston, TX 77046
PH: (713) 877-1843
FAX: (713) 871-9750

**PLAINTIFFS' LIAISON COUNSEL**

Christopher A. Seeger, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
MEUNIER&WARSHAUER, L.L.C.
P.O. Box 960
191 East Second Street
New Roads, LA 70760
(225) 638-6137
(225) 638-8836 (fax)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telefonee)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Thomas R. Kline, Esquire
KLINE & SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Arnold Levin, Esquire
Fred S. Longer
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Carlene Rhodes Lewis, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced in accordance with Pre-Trial Order No. #8, on this the 2nd day of December, 2005.