U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
FILED 12-5-05
LORETTA G. WHYTE
CLERK

SCOLNICK_EDWARD_PLAINTIFF_AFFIRMATIVES

A: No, I don't think the VALOR trial was run.
Q: Why not?
A: I don't remember why the VALOR trial wasn't run. This sounds like a pretty complicated trial to me, and I don't remember why it wasn't run.
Q: Was money an issue?
A: I don't remember why the VALOR trial wasn't run. As I said, this seems like a fairly complicated paragraph here from Dr. Patrono to Dr. Braunwald, so, I'm not able to figure this out quickly.
Q: Do you see the third paragraph? It reads, 'I have serious reservations about the role of the Sponsor.' The sponsor would be Merck?
A: Presumably.
Q: 'I have serious reservations about the role of the Sponsor in monitoring and termination of the study, as well as in the statistical analysis of the results.' Do you see that?
A: I do.

*Same objection* — *Overruled*

| 229 | 302:16 - 303:5 | Scolnick, Edward 2005-04-29 | 00:00:53 | 01:36:08 | 02:54:33 |
|---|---|---|---|---|---|

Q: We've talked a few times today about the Advisory Committee in 2001. There were a few Advisory Committees for Vioxx; right?
A: There was one in 2001.
Q: One in 2005?
A: Yes. There was one recently about all COX-2 NSAIDs in 2005.
Q: And one also in 1999, in connection with the approval of the drug?
A: Oh, yes, sure. I'm sorry. Yes.
Q: Do you recall reading that several of the Advisory Committee members in 2005 who voted in favor of keeping Vioxx on the market actually had financial ties to the pharmaceutical industry and Merck?

*Objection — incomplete, calls for hearsay, relevance, 403.*

*π - we need to insert line 7-14; mistakenly cut out. Lines 7-14 Testimony attached*

| 230 | 304:12 - 304:15 | Scolnick, Edward 2005-04-29 | 00:00:13 | 01:37:01 | 02:53:40 |
|---|---|---|---|---|---|

Q: Well, sir, do you endorse the practice of not publicly disclosing ties to industry by Advisory Committee members in connection with Advisory Committee decisions?

*Objection - argumentative, lacks foundation, assumes facts not in evidence* — *Overruled*

| 231 | 304:18 - 304:21 | Scolnick, Edward 2005-04-29 | 00:00:10 | 01:37:14 | 02:53:27 |
|---|---|---|---|---|---|

___ Fee ___
___ Process ___
X Dktd ___
___ CtRmDep ___
___ Doc.No. ___

Page 303:7-303:14 303:7-303:14

THE WITNESS: I don't recall reading that.
BY MR. BUCHANAN:
Q. You never heard that?
A. I saw articles about members of the Advisory Committee having ties to the pharmaceutical industry. I do not recall to which companies those ties were alleged.

Total Length - 00:00:15

THE WITNESS: We could have. We
thought it was -- and I thought it was a completely
inaccurate and inadequate label. It totally ignored
all of the gastrointestinal data that had been in
the VIGOR trial, and to the best of my recollection,
it totally ignored all the Alzheimer's data.

---

**237** **308:11-308:14** Scolnick, Edward 2005-04-29 00:00:08 01:38:59 02:51:42

So, in March 2000 you have the
results from VIGOR. Shortly thereafter, Merck filed
a supplemental NDA application; true?
A: Very shortly. 8,000 patients in

*[handwritten: read complete answer]*

*[handwritten: π - agree; lines 14-17 attached]*

---

**238** **308:18-308:22** Scolnick, Edward 2005-04-29 00:00:12 01:39:07 02:51:34

Q: So, Merck was able to digest all the
data from that VIGOR trial, crunch it, put it in a
supplemental new drug application and file it with
the FDA by June of 2000; is that right?
A: That's correct.

---

**239** **309:17-310:2** Scolnick, Edward 2005-04-29 00:00:18 01:39:19 02:51:22

Thereafter, the FDA started to
evaluate the data you gave them; right?
A: They received the package, they
started to review it.
Q: They convened an Advisory Committee;
right?
A: They did. That was for February '01.
Q: Okay.
Merck participated in the Advisory
Committee?
A: Of course.

---

**240** **311:21-314:18** Scolnick, Edward 2005-04-29 00:03:05 01:39:37 02:51:04

Q: I want to pass you over what we just
marked as Exhibit 11 to your deposition. It's an
e-mail dated January 31st, 2001 from you to Mr.
Gilmartin and Mr. Anstice. The subject is 'Monday
MC.' Do you see that?
A: Yes.
Q: 'MC' refers to management committee?
A: Yes.
Q: It is Bates stamped MRK-ACR0008985.
You write, I guess it's the second
sentence or so: 'The Vigor meeting is next
thursday. On Monday I will show you the essence, an
update, of the data that supports Vioxx is safe in
the Cv sense. But I want to point out to all of you

*[handwritten: objection - cumulative; this email is covered earlier by a different examiner. π where? π - not fully covered]*

*[handwritten: overruled]*

Page 308:14-308:17 308:14-308:17

308:14 A. Very shortly. 8,000 patients in
308:15 three months.
308:16 Q. Filed it in June of 2000?
308:17 A. That's right.

Total Length - 00:00:05

THE WITNESS: I think that for any Advisory Committee or editorial board, if something is being reviewed, disclosure should be part of the review process.

---

**232** **304:23 -305:2** Scolnick, Edward 2005-04-29 00:00:12 01:37:24 02:53:17

Q: And by the same token, if Merck is paying Advisory Committee members, you know, on a consulting basis for some other purpose, that's something that should be disclosed to the other Advisory Committee members; true?

---

**233** **305:4 -305:13** Scolnick, Edward 2005-04-29 00:00:20 01:37:36 02:53:05

THE WITNESS: I think in a review process, disclosure of any kind of financial background that could be perceived as influencing the process should be disclosed. Yes, I endorse that.

BY MR. BUCHANAN:

Q: That's something that should be disclosed to the FDA; right?

A: It certainly should be publicly disclosed, including the FDA.

---

**234** **305:15 -306:1** Scolnick, Edward 2005-04-29 00:00:31 01:37:56 02:52:45

Following the Advisory Committee in 2001, a series of negotiations took place with FDA concerning the label for Vioxx; right?

A: Yes, a very long time before we actually got a label from them.

Q: Well, the way the labeling process works with FDA, it is not that the FDA gets to dictate the label, do they?

A: They have the power to dictate the label. They can -- they can tell you what they absolutely want or not.

Q: You have to the power to filibuster?

---

**235** **306:5 -306:12** Scolnick, Edward 2005-04-29 00:00:14 01:38:27 02:52:14

THE WITNESS: We have the power to discuss it with them, yes.

BY MR. BUCHANAN:

Q: You have the power --

A: We have the right to discuss it with them.

Q: You could have accepted the label the FDA gave you in October 2001, couldn't you?

---

**236** **306:14 -306:19** Scolnick, Edward 2005-04-29 00:00:18 01:38:41 02:52:00

at one time that 1. there is no way to prove that in patients with rheumatoid arthritis that,' and you put this in all caps, 'ALL of the difference between Vioxx and naproxen is due to the benefit of naproxen.' Do you see that.
A: I do.
Q: Then you continue. 'IT IS IMPOSSIBLE TO PROVE THIS.' That's all caps; right?
A: Yes.
Q: And you continue further. 'IT IS IMPOSSIBLE TO KNOW THIS WITH CERTAINTY.' That's what you wrote; right?
A: I did.
Q: And that was -- that was your feeling as of January 31st, 2001?
A: Yes. That's just what I've just told you again.
Q: A week before the Advisory Committee?
A: Yes.
Q: Now, I want to focus on the statement here at the bottom. You say, 'There will be great adverse publicity at the meeting. Sidney Wolfe now is on the agenda after both of us and the FDA on our day.' Who is Sidney Wolfe?
A: He's a consumer advocate who frequently comes to FDA Advisory Committee meetings.
Q: Is that a bad thing, to be a consumer advocate?
A: No, it's not.
Q: Do you respect Sidney Wolfe?
A: I think he's played a positive role at times, yes.
Q: Can you answer my question? Do you respect him?
A: I respect him.
Q: You continue. 'In any case we need to face the reality of the situation and manage it.' What's the 'reality of the situation'?
A: That there will be adverse publicity as opposed to the data.
Q: You continue, 'Knowing what is about to happen, managing the short term fall out, and facing and managing any longer term consequences.' 'Short term fall out,' what are you thinking about there?
A: When all the data is presented again,

This portion is irrelevant, 403

П - Knowledge, Notice; admission re CV events

Sustained EF

Overruled

people will raise questions whether we can prove the negative completely and, therefore, will question whether they should use Vioxx or not.

Q: 'Short term fall out' also refers to potential impact on Merck stock; right?

A: I don't know. I think I had in mind just the effects on Vioxx.

Q: Well, the effects of Vioxx would include decreased sales of Vioxx; true?

A: Yes.

Q: I mean, that's why you were making this presentation to the management committee; right?

objection — assumes facts not in evidence profit motive, relevance, 403

overruled

241 **314:20-315:24** Scolnick, Edward 2005-04-29 00:01:01 01:42:42 02:47:59

THE WITNESS: I wanted them to understand all the Vioxx data and what potential labeling would be about that so that they could plan their communications to physicians about Vioxx.

BY MR. BUCHANAN:

Q: And you wanted to communicate the potential financial implications of what might happen at the Advisory Committee to the management committee; right?

A: That is not what my memo says.

Q: That's not what it says, but that's what you were doing; right?

A: No, that's not what I was doing. I was trying to tell them what to expect so that they could plan their communications based on what I've said that the labeling would include.

Q: Well, did you think that negative labeling for Vioxx would have an adverse effect on Vioxx sales?

A: Certainly.

Q: Did you think that if there was a CV warning for Vioxx, that that would have a negative effect on Vioxx sales?

A: Certainly, but I didn't expect a CV warning based on the data.

Q: Did you think that if there was a CV warning on Vioxx, that would also have an effect on Merck stock?

A: Certainly. But as I've said, I did not expect a CV warning.

242 **322:6-325:17** Scolnick, Edward 2005-04-29 00:03:21 01:43:43 02:46:58

Q: And you really thought it was a challenge in your team to convince the FDA and the Advisory Committee that Vioxx didn't have a cardiovascular problem; true?
A: We had all the data which said that we didn't have a problem, and we wanted to make sure we could present all that data, sure.
Q: But it wasn't just a challenge, it was almost impossible; right?
A: It was impossible to prove the negative, which I pointed out in my e-mail note. It was possible to present all the data which supported our position.
Q: Well, the Advisory Committee went well from your perspective; true?
A: Yes. Quite well.
Q: Your team did a fantastic job; true?
A: Yes.
Q: And they made the FDA look like 'grade d high school students.' Isn't that what you said?
A: I did in an e-mail note, yes. I regret those words, but we did a good job.
Q: You meant them when you wrote it?
A: It was -- I meant them. It was an allusion to something that had happened a few years ago, but I did write those words.
Q: This is the same FDA that you respect?
A: Yes.
Q: This is the same FDA that's responsible for the public safety?
A: That's correct.
Q: This is the same FDA that's responsible for evaluating the cardiovascular data concerning your drug?
A: Yes.
Q: And you were proud that your team made the FDA look like grade D high school students; true?
A: I wrote those words. I regret the choice of words. I wrote those words.
MR. BUCHANAN: Let's mark as Exhibit 12, I think, the e-mail you were referring to, sir.
- - -
(Whereupon, Deposition Exhibit

relevance, 403 to Grade D high school students testimony + exhibit. the court has reserved ruling on the document.

π - relevant to FDA defense; we cooperate w/ FDA etc

Overruled

Scolnick-12, E-mails, MRK-ACT0018064, was marked for identification.)

- - -

THE WITNESS: Yes.

BY MR. BUCHANAN:

Q: Dr. Scolnick, I just passed you over Exhibit 12 to your deposition. It is an e-mail, two e-mails, the earliest of which is an e-mail from you to several folks, subject, 'Today.' It's Bates stamped MKR-ACT0018064. It's dated Thursday, February 8, 2001, 9:10 p.m. is the time. Do you see that?

A: Yes, I do.

Q: You wrote this the day of the February 2001 Advisory Committee?

A: I don't remember the date of the meeting.

Q: You wrote 'To ALL' --

A: It looks like it is the same day.

Q: 'To ALL: I bit my nails all day.' You're referring to you listening to the Advisory Committee?

A: Either listening or being there. I don't remember whether I was there or I viewed it.

Q: If you didn't go, you did listen?

A: Yes.

Q: You said, 'You all were FANTASTIC.' You wrote that in all caps; right?

A: Yes.

Q: You then wrote that 'You made them look like grade d high school students.' Right?

A: That's what the memo says.

Q: You say, 'and you won big huge and completely.' True?

A: That's what I said.

Q: You wrote that?

A: Yes.

Q: You note at the end of this that your team should, 'enjoy and bask in the warmth of having done an impossible job superbly.' Is that right?

A: That's what I wrote.

---

243 **326:7-326:10** Scolnick, Edward 2005-04-29 00:00:15 01:47:04 02:43:37

You agree it is not very flattering to refer to the agency responsible for protecting the public health as it relates to drugs as 'grade d

326: 10 high school students.'

**244** **326:12-326:16** Scolnick, Edward 2005-04-29 00:00:10 01:47:19 02:43:22

326: 12 THE WITNESS: No, it is not
326: 13 flattering. As I said, it came from an allusion to
326: 14 an earlier event related to the crux of an Advisory
326: 15 Committee meeting, and it was inappropriate in this
326: 16 context.

**245** **328:14-329:1** Scolnick, Edward 2005-04-29 00:00:41 01:47:29 02:43:12

328: 14 Q: Did you ever express any regret about
328: 15 this e-mail to anybody who you sent this e-mail to?
328: 16 A: I didn't even remember sending the
328: 17 e-mail until it came up during one of the
328: 18 preparations for the deposition.
328: 19 Q: So, you regretted sending this e-mail
328: 20 for the first time when you were shown it in a
328: 21 litigation setting?
328: 22 A: I regret the -- had I been shown it
328: 23 in any setting, I would have regretted my language.
328: 24 I would not have regretted congratulating my group.
328: 25 Q: When you wrote this, you didn't think
329: 1 anybody in litigation would ever see it, did you?

Overruled

plus, argumentative,

Sustained

**246** **329:4-329:6** Scolnick, Edward 2005-04-29 00:00:06 01:48:10 02:42:31

TT- agree to remove

329: 4 THE WITNESS: I never thought about
329: 5 litigation when this e-mail was written. We were
329: 6 totally confident in the safety of Vioxx.

**247** **329:10-329:24** Scolnick, Edward 2005-04-29 00:00:49 01:48:16 02:42:25

329: 10 Q: So, after this Advisory Committee in
329: 11 February of 2001, you got a letter from the FDA
329: 12 saying that they were conditionally approving
329: 13 Merck's supplemental new drug application; right?
329: 14 A: At some point we got a letter back
329: 15 from them, yes.
329: 16 Q: You didn't like the tone of the
329: 17 letter, though, did you?
329: 18 A: We didn't like the tone, and we
329: 19 didn't like the content. As I said earlier, they
329: 20 ignored all the GI data. They completely left it
329: 21 out. They left out the Alzheimer's data, and they
329: 22 had a warning, despite what had happened at the
329: 23 Advisory Committee, where no warning was suggested
329: 24 based on all the data, or voted for.

**248** **331:9-332:25** Scolnick, Edward 2005-04-29 00:02:00 01:49:05 02:41:36

331: 9 MR. PERSCHETZ: Is this 13?
331: 10 MR. BUCHANAN: Yes.

BY MR. BUCHANAN:
Q: For the record, Dr. Scolnick, I've just passed you what we've marked as Exhibit 13 to your deposition. It's a two-page series of e-mails Bates stamped MRK-ACR0009151 to 9152. Doctor, you are, in fact, an author and recipient on several of these e-mails; true?
A: Yes.
Q: You're having an e-mail exchange back and forth with Doug Greene, among others?
A: Yes.
Q: If you look at the oldest in time e-mails on the second page, it's dated Friday, April 6th, 2001?
A: Yes.
Q: It says, subject: 'Vigor approvable letter.' Correct?
A: Yes.
Q: What's an approvable letter?
A: An approvable letter states that your drug is approvable, your supplement is approvable, contingent upon additional information or contingent upon some additional action by the sponsor.
Q: You didn't like the tone of the approvable letter you got from Merck's supplemental NDA; true?
A: That's correct. I don't remember what was in it at this point, so, it's very hard to respond to your question.
Q: I'll just read the first sentence. 'To ALL: I am sure you imagine my reaction to the tone of the letter. The open ended request for safety updates is a filibuster.' Do you see that?
A: Yes.
Q: What's a filibuster?
A: It's a delaying tactic.
Q: So, you thought the FDA was trying to delay approval of your supplemental NDA request to get safety information?
A: That's what I wrote.

---

| 249 | 333:11-334:12 | Scolnick, Edward 2005-04-29 | 00:00:52 01:51:05 02:39:36 |
|---|---|---|---|

Q: You viewed this is as a delay tactic by the FDA? Is that your testimony?
A: That's what I was worried about.
Q: Then you state, 'When will you find

out what they have done for our competitor? If by any chance they get a better label now and we are asked for this much more data, I will be in Janet's office the next day.' Do you see that?
A: Yes.
Q: Your competitor would be Celebrex?
A: Yes.
Q: The manufacturer of Celebrex?
A: Yes.
Q: Okay.
You were concerned that the manufacturers of Celebrex were going to get an approved label before Vioxx was going to get an approved label?
A: For GI outcomes, yes, that's what I think I was concerned about.
Q: And if that happened, you were going to go down there to the FDA and see Janet the next day; is that right?
A: That is what I said in the memo.
Q: Who is Janet?
A: Janet was Janet Woodcock, who was, I believe, the head of the drug part of the FDA.

---

250 **335:1 -335:4** Scolnick, Edward 2005-04-29 00:00:08 01:51:57 02:38:44

THE WITNESS: I don't know exactly what I was thinking. I certainly wanted to advocate on Merck's behalf if this were to happen. That's what this memo says.

---

251 **336:1 -336:15** Scolnick, Edward 2005-04-29 00:00:42 01:52:05 02:38:36

Q: So, in other words, if the FDA perchance decided to give the Celebrex manufacturers the label they had sought before you got it, you were going to go down to the, what's this, the head of drug approval and complain? Is that your testimony?
A: That was -- that's what this note implies.
Q: Then you continue, you say, 'I am going in 2 weeks to an FDA Science Board I am on and I have been asked to give a talk on how they can keep their scientists up to date.' Do you see that?
A: Yes.
Q: Those would be the grade D scientists you were referring to the month before?

argumentative

IT - goes directly to FDA defense

---

**SCOLNICK_EDWARD_PLAINTIFF_AFFIRMATIVES**

252 **336:17 -336:22** Scolnick, Edward 2005-04-29 00:00:08 01:52:47 02:37:54

THE WITNESS: It just says scientists. It has no allusions to anything else.
BY MR. BUCHANAN:
Q: It's your view, though, that the FDA scientists aren't really kept up to date on medical developments, sir?

---

253 **336:24 -338:19** Scolnick, Edward 2005-04-29 00:02:03 01:52:55 02:37:46

THE WITNESS: The purpose for this science advisory board, which I was a member of, was something actually that the FDA started in order to ask outside scientists how their scientists could keep up to date better than they were currently doing.
BY MR. BUCHANAN:
Q: So, at this point in time, 2001, the FDA convened a science advisory board to address a problem within the FDA; true?
A: That's my recollection. That's the best of my recollection.
Q: And the problem was that the FDA scientists weren't keeping up to date with scientific developments in the medical community?
A: As well as the FDA felt that they might. I know that was the purpose for the board. I don't recall all the details about how it got set up.
Q: You then continue. 'I have already told them I think their review system is an' -- that's a big word. What's that say?
A: 'Anachronism.'
Q: What's that mean?
A: It's out of date.
Q: So, you say, 'I have already told them I think their review system is' out of date 'because they cannot possibly keep up with science given their hiring constraints.' Do you see that?
A: I do.
Q: What are the hiring constraints you're referring to?
A: They always have limits on the number of persons they can hire because of government ceilings and the salary constraints they have in hiring scientists compared to universities and industry.

relevance 403; this has no connection to Vioxx

π - goes to FDA defense

Overruled

Q: So, the FDA doesn't have as many
people working on the review of a drug than, say,
Merck does in preparing the data for the FDA to look
at; right?
A: I don't know that. I don't know how
many people are assigned to review a given drug.
I'm making a general statement about the problems
that the FDA have in keeping up with the volume of
applications and the staff they need to do that.

---

254 **339:17-340:19** Scolnick, Edward 2005-04-29 00:01:07 01:54:58 02:35:43

Π-same

Overruled

Q: I see.
And the FDA allowed you to speak to
them about this particular issue; right?
A: Yes. They encouraged me at this --
in fact, now I'm recalling that Dr. Woodcock was a
member of this committee, and that's why I was on a
first-name basis with her.
Q: So, you were on a first-name basis
with her?
A: Yes. I remember that. I had
forgotten about this committee.
Q: Okay.
You wrote here, 'If I need to I will
see Janet that day.' You're referring to seeing
Janet about this particular approvable letter that
you objected to; true?
A: If the situation alluded to above had
transpired.
Q: You say, 'If I need to.' What do you
mean 'need'?
A: If the situation requires it.
Q: Okay.
So, in other words, if you thought a
competitor might get an advantage in terms of
getting a more favorable label, you were going to
raise the issue with Janet when you were down there
to talk to the FDA science board in a couple of
weeks? Is that what you are saying?

---

255 **340:21-341:20** Scolnick, Edward 2005-04-29 00:00:43 01:56:05 02:34:36

THE WITNESS: That's what this -- I
think that's what this says.
BY MR. BUCHANAN:
Q: You said that you weren't just going
to stop with Janet; right?
A: That's what this says.

341: 2 Q: You said you'd go beyond if you
341: 3 needed to with other contacts you'd made in HHS;
341: 4 right?
341: 5 A: That's what this says.
341: 6 Q: You had other friends at HHS?
341: 7 A: I don't remember who I was referring
341: 8 to here.
341: 9 Q: What's HHS?
341: 10 A: Health and human services.
341: 11 Q: That's a division of the FDA?
341: 12 A: That's a department of the
341: 13 government, or a --
341: 14 Q: FDA is a department within --
341: 15 A: Within HHS.
341: 16 Q: HHS, I see.
341: 17 So, you'd go over Janet's head if you
341: 18 needed to?
341: 19 A: In order to make scientific points
341: 20 which I felt strongly about.

---

256 **342:9-342:10** Scolnick, Edward 2005-04-29 00:00:10 01:56:48 02:33:53

342: 9 Q: If you didn't get the result that you
342: 10 needed from Janet, you could go to her boss; right?

---

257 **342:12-344:1** Scolnick, Edward 2005-04-29 00:01:04 01:56:58 02:33:43

342: 12 THE WITNESS: The statement is here
342: 13 that I made, that I would go to other people to
342: 14 argue our case.
342: 15 BY MR. BUCHANAN:
342: 16 Q: That's not entirely clear to me.
342: 17 That's why I'm asking questions, sir.
342: 18 When you say you'd go to HHS, those
342: 19 people are Janet's boss; right?
342: 20 A: Somewhere in HHS is Janet's boss.
342: 21 Q: So, you would go to the boss of the
342: 22 director of medical review within the FDA if you
342: 23 didn't get what you wanted; is that right?
342: 24 A: That's what this implies.
342: 25 Q: Okay.
343: 1 I see the last sentence here you say,
343: 2 'I have never seen being nice to the FDA-except on
343: 3 rare occasions-pay off.' You wrote that?
343: 4 A: Yes.
343: 5 Q: You meant it?
343: 6 A: Yes.
343: 7 Q: It's a true statement?
343: 8 A: It was my feeling.

Q: True statement when you wrote it,
sir?
A: It is my feeling when I wrote it.
Q: Okay.
And you wrote this e-mail to a bunch
of folks who were going to be dealing with the FDA;
right?
A: Yes.
Q: Doug Greene, he's one of them?
A: Uh-huh, yes.
Q: David Blois?
A: Yes.
Q: And Bonnie Goldmann; right?
A: Yes.
Q: All three of them were going to be
dealing with the FDA in connection with the
supplemental new drug application?
A: Yes.

---

258 **344:15-344:21** Scolnick, Edward 2005-04-29 00:00:16 01:58:02 02:32:39

Q: So, you just wrote a statement in
this e-mail to the three people who were going to be
dealing with the FDA on the supplemental new drug
application for Vioxx, you just said, 'I have never
seen being nice to the FDA-except on rare
occasions-pay off.' Right, that's what you wrote?
A: That's what I wrote.

---

259 **345:21-345:23** Scolnick, Edward 2005-04-29 00:00:09 01:58:18 02:32:23

Q: You were telling them if they wanted
to get what Merck needed, they couldn't be nice to
the FDA. Isn't that right?

---

260 **345:25-346:7** Scolnick, Edward 2005-04-29 00:00:12 01:58:27 02:32:14

THE WITNESS: I wasn't telling them
they couldn't be. I was telling them they might
have to argue very strongly and not be viewed as
being nice to the FDA.
BY MR. BUCHANAN:
Q: But if you treated them with respect
and were nice, Merck wouldn't get what it wanted;
right?

---

261 **346:9-346:13** Scolnick, Edward 2005-04-29 00:00:38 01:58:39 02:32:02

THE WITNESS: I didn't say that, and
I didn't mean that.
BY MR. BUCHANAN:
Q: To be clear, sir, what you were

Asked and answered

346: 13 saying was being nice to the FDA doesn't pay off?

**262** **346:16-346:17** Scolnick, Edward 2005-04-29 00:00:02 01:59:17 02:31:24

346: 16 THE WITNESS: I answered your
346: 17 question.

**263** **347:16-348:3** Scolnick, Edward 2005-04-29 00:00:31 01:59:19 02:31:22

347: 16 Q: 'I have never seen being nice to the
347: 17 FDA-except on rare occasions-pay off.' Do you see
347: 18 that?
347: 19 A: I do.
347: 20 Q: 'I have never seen.' True, you wrote
347: 21 that?
347: 22 A: I did.
347: 23 Q: Did you get any response from these
347: 24 three individuals saying that, Dr. Scolnick, we
347: 25 don't think we should treat an organization
348: 1 responsible for the health and welfare of Americans
348: 2 taking drugs, we don't think we should talk to them
348: 3 about -- talk to them in that tone?

Π - FDA defense; asked and answered; argumentative; Overruled; Sustained

**264** **348:7-348:7** Scolnick, Edward 2005-04-29 00:00:01 01:59:50 02:30:51

348: 7 THE WITNESS: I don't recall. I

Incomplete

**265** **349:1-351:9** Scolnick, Edward 2005-04-29 00:02:24 01:59:51 02:30:50

349: 1 Q: It was your view, sir, that the
349: 2 division that was responsible for evaluating this
349: 3 supplemental new drug application was devious; isn't
349: 4 that right?
349: 5 A: I didn't say they were devious. I
349: 6 said they had ignored all of our data. Abundant
349: 7 endoscopy data, two replicable trials, the GI
349: 8 outcomes study, they had completely ignored that in
349: 9 the approvable letter.
349: 10 Q: Did you think at any moment, sir,
349: 11 that maybe they just weren't satisfied with the
349: 12 information you provided them as it related to the
349: 13 safety of the drug? Did you consider that for a
349: 14 moment?
349: 15 A: In my view with that data, and I
349: 16 would submit that to any number of scientists, that
349: 17 was an impossible position to take. The data was
349: 18 absolutely convincing and rigorously done in a large
349: 19 replicative trial, and it had been ignored.
349: 20 Q: In fact, sir, your view was that this
349: 21 particular division was devious and antagonistic;
349: 22 isn't that true?
349: 23 A: I don't know whether they were

devious. I did not think that they were doing a good job reviewing our application on the GI data.
Q: Is that another word you wrote but didn't mean, 'devious'?
A: I don't remember.
Q: Can you turn to the first page, sir? Can I see your copy just to make sure we have the same one?
A: (Handing over document.)
Q: Sir, there's an e-mail in the middle of your page.
A: I see the e-mail.
Q: From you to Doug Greene?
A: Yes.
Q: Again, it is in the same e-mail thread, right, or the same sequence of e-mails; true?
A: It is the next day.
Q: The next day. Doug Greene had responded to you; right?
A: Yes.
Q: And you responded to Doug, 'Doug, Janet is the only' resource 'in the absence of Lumpkin.' Who is Lumpkin?
A: 'Recourse.' Lumpkin was Janet's boss, I think.
Q: So, you're saying I didn't read it correctly. Let me read that again. You wrote here, sir, 'Doug, Janet is the only recourse in the absence of Lumpkin.' True?
A: That's what I wrote.
Q: Okay. And Lumpkin was whom?
A: At one point, Dr. Lumpkin, Mac Lumpkin was Janet's boss. He was higher up in the FDA than she was.

---

266 **352:5-352:16** Scolnick, Edward 2005-04-29 · 00:00:22 02:02:15 02:28:26

Q: And so it was your view that in the absence of Lumpkin, Janet was the only recourse?
A: That's what I wrote.
Q: Apart from the HHS people that you highlighted earlier; right?
A: I wrote what I said here.
Q: Then you wrote, 'This division is devious and antagonistic.' You wrote that; right?

A: I did.
Q: You meant it when you wrote it?
A: I must have meant it because I wrote it.

---

267 **353:12-354:8** Scolnick, Edward 2005-04-29 00:00:49 02:02:37 02:28:04

Q: Then you say, 'One cannot deal with them in a rational way.' Right?
A: That's what I said.
Q: And rational way was your way; right?
A: No. Rational way was the way we had been trying to deal with them when we submitted the supplemental NDA, with all of the data that was supported at the Advisory Committee meeting.
Q: Right. To be clear, what the FDA was asking for was additional safety information in their approvable letter; true?
A: That's what the memo implies. I do not know nor recall what was in that request.
Q: And you are saying it was irrational for the FDA to want additional safety data; right?
A: I do not recall what they were asking for, so, I can't answer your question.
Q: It is not irrational for a government body looking out for the safety of the American public to ask for safety data on a drug that it's charged with evaluating, is it?

602 - foundation
70 - FDA defense; Cross examination
Overruled
argumentative
Sustained

---

268 **354:10-354:19** Scolnick, Edward 2005-04-29 00:00:21 02:03:26 02:27:15

THE WITNESS: I don't know what they were asking about, and so I can't answer whether it was rational or irrational unless I saw the content of the letter, in my opinion.
BY MR. BUCHANAN:
Q: The bottom line is that the FDA, looking for additional data on Vioxx in connection with your supplemental NDA request, jeopardized your ability to get the label you wanted in the marketplace; true?

---

269 **354:21-355:5** Scolnick, Edward 2005-04-29 00:00:21 02:03:47 02:26:54

THE WITNESS: They were retarding the process in my opinion.
BY MR. BUCHANAN:
Q: And you needed that process to move quickly; right?

A: That was our goal. We wanted it to move quickly. We had submitted our application very quickly, and it still had been almost a year after the application was submitted, and we didn't yet have a label back.

---

270 **355:16 -355:19** Scolnick, Edward 2005-04-29 00:00:12 02:04:08 02:26:33

You were concerned that in the COX-2 market, the company that had the better label for its drug would sell more of that drug; true?
A: True, if the data supported that.

---

271 **355:23 -357:17** Scolnick, Edward 2005-04-29 00:01:15 02:04:20 02:26:21

Q: You did get a label at some point in time in connection with your supplemental new drug application for Vioxx; true?
A: Yes.
Q: You got that in the fall of 2001?
A: I don't recall the exact date. It was certainly after this in 2001.
Q: Had a CV warning?
A: Yes.
Q: CV means cardiovascular; right?
A: Yes.
Q: In the warnings section of the label?
A: Yes.
Q: That's different than the adverse event section of the label; right?
A: Yes.
Q: It's different than the precautions section of the label; right?
A: Yes.
Q: Because there's multiple sections of the label; right?
A: Correct.
Q: And there also can be a black box on a label; right?
A: Yes.
Q: Sometimes that black box is right up front; right?
A: Correct.
Q: And that's the most serious warning you can have on any drug; right?
A: That is correct.
Q: The label you got from the FDA had a cardiovascular warning in the warnings section; true?

401, 402, 403 object to email – ruling on PX 1.02 is reserved

A: I believe so.
Q: You thought it was ugly?
A: I did.
Q: You thought it was ugly cubed?
A: I did.
Q: That's ugly times ugly times ugly; right?
A: Ugly cubed is exactly what you've stated.
Q: Ugly three times over; right?
A: Right.

Overruled

272 **357:18 -357:20** Scolnick, Edward 2005-04-29 00:00:11 02:05:35 02:25:06

Q: What's so ugly about telling doctors about the cardiovascular data that was received by Merck in the VIGOR trial?

273 **357:23 -358:8** Scolnick, Edward 2005-04-29 00:00:34 02:05:46 02:24:55

TT – goes to FDA defense; Failure to warn relevance; Knowledge / Notice

THE WITNESS: It is not ugly to tell doctors about that. We had wanted to do that and had been doing that. What was ugly was the way it was presented, given that it wasn't clear that Vioxx caused it, in fact, it was much clearer that naproxen had protected the heart, and all of the other data in our Alzheimer's trial had been left out of the label that they had sent us. And the GI section of the label had not been changed to reflect our GI data. And that was my response to that preliminary label we got from them.

274 **358:10 -359:8** Scolnick, Edward 2005-04-29 00:01:31 02:06:20 02:24:21

g CV risk and FDA interpretation of data and need to warn

Q: So, you got this draft label from the FDA in, what, October 2001? Does that sound right?
A: I don't recall the exact date. As I told you, it was somewhere later than this, May -- it was later than May. I don't remember exactly when we got it.
Q: You sent it off to David Anstice?
A: I don't think I -- I don't know whether I sent the label to David Anstice or he received it from somebody else and communicated with me. I don't -- I don't remember.
Q: You told David, 'David Be assured' there's no way we will 'accept this label.' Right?
A: Yes, I did.
Q: You had the ability to do that; right?

A: We had the ability to sit down with the FDA and argue our position vigorously based on our data.
Q: You had --
A: The label did not reflect that.
Q: You had the ability to not accept the warning that the FDA told you you should put on Vioxx; true?

---

275 **359:11-360:8** Scolnick, Edward 2005-04-29 00:00:55 02:07:51 02:22:50

THE WITNESS: If the FDA had absolutely wanted that warning, they had the ability to impose that on Merck. What I was saying was that unless that happened, I would not accept the label that they had sent us because it didn't accurately reflect our data.
BY MR. BUCHANAN:
Q: Well, in fact, what you said was you wouldn't accept that label, and if the FDA didn't relent and give you the label you wanted, you'd insist on an Advisory Committee; true?
A: I did say that. I would have been happy to take it back to an Advisory Committee because they had already said the data didn't justify that.
Q: So, if the FDA insisted on a particular label, you still had a recourse; right?
A: I didn't know whether we did, but we could ask for one. That was what I was saying in the letter.
Q: So, Merck could filibuster until the FDA finally relented and required an Advisory Committee to get the label; true?

---

276 **360:10-361:4** Scolnick, Edward 2005-04-29 00:00:33 02:08:46 02:21:55

THE WITNESS: Merck wouldn't filibuster. Merck would ask for an additional scientific review and ask the FDA -- ask an external committee with no ties to Merck whether they agreed or disagreed with the FDA label as it had been presented to us.
- - -
(Whereupon, Deposition Exhibit Scolnick-14, E-mails, MRK-ABW0004799, was marked for identification.)
- - -
BY MR. BUCHANAN:

Object to all questions on this exhibit — 401, 402, 403

Q: Sir, I'm going to pass over what
we've just marked as Exhibit 14 to your deposition.
It is a series of e-mails, three of them in
particular, from October 2001. For the record, it
is Bates stamped MRK-ABW0004799.
Sir, you've seen this document
before; right?
A: Yes, I have.

---

277 **361:14-362:12** Scolnick, Edward 2005-04-29 00:00:35 02:09:19 02:21:22

overly prejudicial

Π – goes to FDA defense; Failure to warn; Knowledge notice of CV risks and FDA interpretation of data and need to warn;

Q: It is from October 15th, 2001?
A: Yes.
Q: You said --
A: October 16th.
Q: You said, 'David.' That's David
Anstice; right?
A: Yes.
Q: He's the president of U.S. human
health?
A: Yes.
Q: That was the group within Merck
responsible for all the marketing of Vioxx?
A: The domestic marketing of Vioxx.
Q: You told him, 'Be assured we will not
accept this label.' Right?
A: That's what my memo says.
Q: David was concerned about this label;
right?
A: Yes.
Q: Okay.
Thought it put you at a competitive
disadvantage; right?
A: Yes. And it didn't accurately
reflect our data.

Overruled

---

278 **362:13-363:2** Scolnick, Edward 2005-04-29 00:00:34 02:09:54 02:20:47

Q: You were telling David that I'm going
to do what I can to make sure we don't get that
label; right?
A: Yes.
Q: I'm going to do what I can to make
sure there's no CV warning in the Vioxx label;
right?
A: That isn't what this says. It says,
'We will not accept this label' and 'if we need to
we will go to an Advisory Committee meeting' to get
them to review what our label should look like, a

**SCOLNICK_EDWARD_PLAINTIFF_AFFIRMATIVES**

scientific process to resolve the potential -- a
potential disagreement between the FDA and Merck.
Q: So, you rejected the label you got
from the FDA that had the CV warning; true?

279 **363:4 -363:18** Scolnick, Edward 2005-04-29 00:00:26 02:10:28 02:20:13

THE WITNESS: We rejected this label
in its totality. It had a CV warning, and it
ignored the GI data that we had garnered in VIGOR.
BY MR. BUCHANAN:
Q: David responded to you, 'We knew it
would be UGLY and it is.' Right, he said that to
you?
A: Yes.
Q: He also said, 'We'll fight back and
see where we get.' Right?
A: Yes. That's what he said.
Q: And he again said, we'll 'ask for an
advisory committee' if we can't make headway with
the FDA; right?
A: That's what he said.

Overruled

TT Same

280 **364:5 -365:12** Scolnick, Edward 2005-04-29 00:01:03 02:10:54 02:19:47

602 - personal knowledge

Q: Did you tell your scientists who were
dealing with the FDA to threaten the FDA with an
Advisory Committee?
A: I don't recall what I said to them.
Q: Do you know they did that?
A: I don't know. I wasn't part of those
negotiations.

Sustained 602

Q: You then say here in the final one,
your final e-mail from October 16, 2001, 'It is ugly
cubed.' Right?
A: Yes.
Q: You say, 'thye,' that should be they;
right?
A: Yes.
Q: 'Thye are bastards.' True?
A: That's what the e-mail says.
Q: That's what you wrote?
A: That's what I wrote.
Q: You meant it when you wrote it?
A: I was very upset when I wrote the
e-mail.
Q: So, this particular group within the
FDA was devious and antagonistic; true?
A: That's what I wrote.

Overruled

Q: They were bastards?
A: That reflected my emotional unhappiness with their label.
Q: They had the ability of grade D high school students; true?
A: That's what I wrote.
Q: And if you wanted to get anything done with them, you couldn't treat them with respect; true?

281 **365:14 -366:9** Scolnick, Edward 2005-04-29 00:01:23 02:11:57 02:18:44

THE WITNESS: I wrote all of these things, and I felt that we were not getting a fair process from this division.
BY MR. BUCHANAN:
Q: The FDA was pretty insistent this drug needed a cardiac warning, weren't they?
A: They presented this label to us, so, they must have felt that way. This division felt that way.

602

Q: Well, that's the impression you got, isn't it, sir?
A: That was -- that's what this label had. I don't -- I don't remember anything except the label.

Sustained

Q: You took from that that the FDA at least was concerned about the potential cardiovascular implications of your drug; true?
A: Yes.
Q: And they wanted to warn the American public about the potential cardiovascular implications of Vioxx; true?

282 **366:11 -366:19** Scolnick, Edward 2005-04-29 00:00:14 02:13:20 02:17:21

THE WITNESS: Yes, despite the Advisory Committee meeting, which had not felt that way.
BY MR. BUCHANAN:
Q: Did you interview the Advisory Committee members?
A: The Advisory Committee members voted and saw the cardiovascular safety. They did not suggest a warning for this drug.

283 **366:20 -367:4** Scolnick, Edward 2005-04-29 00:00:23 02:13:34 02:17:07

Q: Well, let me ask you this.
Did you show them the mortality data