UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

U. S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED  12-5-05

LORETTA G. WHYTE
CLERK

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| **This document relates to** | * | |
| **Case No. 05-4046*** | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| **EVELYN IRVIN PLUNKETT** | * | |
| as Personal Representative of the Estate of | * | |
| **RICHARD IRVIN, JR.,** | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| **MERCK & CO., INC.,** | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MOTION OF MERCK & CO., INC. ("MERCK") FOR JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S DESIGN DEFECT, FRAUD, AND BREACH OF WARRANTY CLAIMS

Merck, through undersigned counsel, and pursuant to Federal Rule of Civil Procedure 50(a), hereby moves the Court enter judgment in Merck's favor, as a matter of law, on plaintiff's claims for: (i) strict liability and negligent design defect; (ii) fraudulent misrepresentation and fraudulent concealment; and (iii) breach of express and implied warranty. The facts and law

Fee_____
Process_____
X_ Dktd_____
___CtRmDep._
Doc.No._____

supporting this motion are more fully set forth in the accompanying memorandum, declaration, and exhibit, which are incorporated as if fully set forth herein.

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
4041 Essen Lane
One United Plaza, Suite 501
Baton Rouge, Louisiana 70809
Phone:  225-490-8900
Fax:      225-490-8960

Defendants' Liaison Counsel

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:      312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone: 202-434-5000
Fax:      202-434-5029

And

John H. Beisner
Charles C. Lifland
Richard B. Goetz
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone: 213-430-6000
Fax:      213-430-6407

Attorneys for Merck & Co., Inc.

2

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Motion for Judgment as a Matter of Law on Plaintiff's Design Defect, Fraud, and Breach of Warranty Claims has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 5th day of December, 2005.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 05-4046* | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| EVELYN IRVIN PLUNKETT | * | |
| as Personal Representative of the Estate of | * | |
| RICHARD IRVIN, JR., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM IN SUPPORT OF MOTION OF MERCK & CO., INC. ("MERCK") FOR JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S DESIGN DEFECT, FRAUD, AND BREACH OF WARRANTY CLAIMS

After six days of testimony from over fifteen witnesses, plaintiff Evelyn Plunkett has been "fully heard" on all of her claims. FED. R. CIV. P. 50(a). At this point in the proceedings, the Court can, and should, take the opportunity to streamline and simplify the case by entering judgment as a matter of law on plaintiff's claims for: (i) strict liability and negligent design defect; (ii) fraudulent misrepresentation and fraudulent concealment; and (iii) breach of express and implied warranty. Merck reserves its right to move for judgment as a matter of law on plaintiff's core strict liability and negligent failure to warn claims after the close of all evidence. But there is no need to await the presentation of Merck's case to dispose of the design defect,

fraud, and warranty claims.  Plaintiff has not even attempted to produce legally sufficient evidence establishing these claims.  Dismissing these superfluous claims will both streamline Merck's case and simplify the issues on which the Court must ultimately instruct the jury (if the Court concludes, after the close of all evidence, that plaintiff has presented a submissible case on her warning claims).  Accordingly, as permitted by Rule 50(a), Merck now moves for judgment as a matter of law on plaintiff's design defect, fraud, and warranty claims.

## I.     THE LEGAL STANDARD

A motion for judgment as a matter of law should be granted if, "after a party has been fully heard by the jury on an issue, 'there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue.'" *Sur. Co. v. Pendleton Detectives of Miss., Inc.*, 182 F.3d 376, 377-78 (5th Cir. 1999) (quoting FED. R. CIV. P. 50).  "A party has been fully heard when he rests his case." *Echeverria v. Chevron USA Inc.*, 391 F.3d 607, 610 (5th Cir. 2004).  At that time, the court "may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated." FED. R. CIV. P. 50(a).   "A mere scintilla of evidence is insufficient to present a question for the jury." *Rutherford v. Harris County*, 197 F.3d 173, 179 (5th Cir. 1999). Instead, "[t]here must be a conflict in substantial evidence to create a jury question." *Id.*

## II.    MERCK IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S DESIGN DEFECT CLAIMS

Merck is entitled to judgment on the design defect claims for two reasons.  First, under comment k to Section 402A of the Restatement (Second) of Torts, as adopted and applied in Florida, plaintiff has no strict liability design defect claim distinct from her failure to warn claim. Second, plaintiff has presented no evidence of a safer alternative design – a failure of proof that defeats a design defect claim based on either strict liability or negligence.

A.   **Comment k Precludes Plaintiff's Strict Liability Design Defect Claim.**

On the issue of strict liability design defect, Florida has adopted Restatement (Second) of Torts § 402A, comment k, which eliminates design defect liability for unavoidably unsafe products as long as they carry an adequate warning. *Adams v. G.D. Searle & Co.*, 576 So. 2d 728, 732-33 (Fla. App. 1991) (applying RESTATEMENT (SECOND) OF TORTS § 402A cmt. k (1965)).[1]  As interpreted in *Adams*, comment k precludes strict design defect liability for a prescription drug where "the product's benefits . . . outweigh its known risks as of the date the product is distributed" and an adequate warning is provided.  576 So. 2d at 733.  But a pharmaceutical manufacturer need not be "clairvoyant."  *Id.*  The product need only be "apparently useful and desirable, considering its benefits and risks," and "the balance need only 'apparently' tip toward the benefit of a product at the time of distribution."  *Id.*

*Adams* initially placed the burden of demonstrating that the benefits outweighed the risks on the manufacturer, and rejected the argument that FDA approval presumptively establishes that fact for purposes of applying comment k.  *Id.*  Subsequent to *Adams*, however, as part of a 1999 tort reform measure, the Florida Legislature enacted Fla. Stat. § 768.1256, which reverses this allocation of the burden of proof by creating a statutory rebuttable presumption that a product provided in compliance with pertinent government regulations is *not* defective or unreasonably dangerous. FLA. STAT. ANN. § 768.1256(1).[2]

---

[1] Comment k also requires that the product in question be "properly prepared," *i.e.*, that it be free of manufacturing defects. *Adams*, 576 So. 2d at 731.  Plaintiff does not claim that the Vioxx taken by Mr. Irvin had a manufacturing defect.

[2] Denominated the "[g]overnment rules defense," section 768.1256(1) provides:

> In a product liability action brought against a manufacturer or seller for harm allegedly caused by a product, there is a rebuttable presumption that the product is not defective or unreasonably dangerous and the manufacturer or seller is not liable if, at the time the specific unit of the product was sold or delivered to the

*(footnote continued next page)*

3

In this case, it is undisputed that the FDA approved Vioxx® as "safe and effective" in 1999 and again in 2002 when it approved a new indication for rheumatoid arthritis. (Def. Ex. 73 (initial approval letter)); *see generally* 21 U.S.C. § 355(b)(1) (establishing requirements for FDA approval of prescription drugs).[3]  Thus, the FDA approved the distribution and sale of Vioxx before Mr. Irvin used it, and the FDA renewed its approval of Vioxx after Mr. Irvin used it and after a full review of the results of the VIGOR trial. (*See* Dec. 1, 2005 Tr. at 679:1-17, 680:7-681:1 (discussing 2001 FDA Advisory Committee meeting).)  Under Fla. Stat. § 768.1256(1), these approvals trigger a statutory presumption that Vioxx was *not* defective or unreasonably dangerous, and plaintiff has the burden of demonstrating otherwise, *i.e.*, that the apparent benefits of Vioxx did not outweigh its known risks at the relevant time. *Adams*, 576 So. 2d at 733.  Absent such proof, comment k applies, and plaintiff has no strict liability design defect claim.[4]

Plaintiff has presented no such proof.  Plaintiff's experts agree that gastrointestinal perforations, ulcers and bleeds from traditional NSAIDs have been a major cause of emergency room visits and death in this country. (Nov. 29, 2005 Tr. at 226:23-227:3 (Test. of Dr.

---

initial purchaser or user, the aspect of the product that allegedly caused the harm: (a) Complied with federal or state codes, statutes, rules, regulations, or standards relevant to the event causing the death or injury; (b) The codes, statutes, rules, regulations, or standards are designed to prevent the type of harm that allegedly occurred; and (c) Compliance with the codes, statutes, rules, regulations, or standards is required as a condition for selling or distributing the product.

[3] It is an undisputed matter of public record that the FDA approved Vioxx as safe and effective for treatment of osteoarthritis pain, primary dysmenorrheal, and acute pain on May 20, 1999, and that the FDA further approved Vioxx as safe and effective for treatment of adult rheumatoid arthritis pain in April 2002, after reviewing data from VIGOR.

[4] As noted above, comment k provides that an unavoidably unsafe product is still defective if it does not carry an adequate warning. At that point, however, the claim is indistinguishable from a straight strict liability warning claim, and a separate "design defect" claim is superfluous.

4

Lucchesi); Dec. 2, 2005 Tr. at 771:14-19 (Test. of Dr. Ray); *see also id.* at 764:16-771:13.) They also agree that Vioxx significantly reduces these potentially fatal side effects while providing equivalent pain relief. (Nov. 29, 2005 Tr. at 200:4-8 (Test. of Dr. Lucchesi); Dec. 2, 2005 Tr. at 803:25-804:6 (Test. of Dr. Ray); *see also* Dec. 1, 2005 Tr. at 646:25-647:20 (Test. of Dr. Nies).) And while all selective COX-2 inhibitors reduce the risk of ulcers, only Vioxx has been shown to reduce the risk of serious gastrointestinal bleeds. (Def. Ex. 338 at 2 (Apr. 6, 2005 FDA Decision Memo).) Finally, it is undisputed that for some patients – like Mr. Irvin – Vioxx was the *only* medication that provided effective pain relief.[5]

Plaintiff has offered no evidence that before May 2001 – the relevant time frame for this inquiry under *Adams* – the known risks of Vioxx outweighed these undisputed benefits. On the contrary, plaintiff's lead expert, Dr. Lucchesi, agreed that Vioxx was and is "perfectly safe" for the "vast majority of people" and has "a place in the market" even today:

> Q:  . . . I think I heard you say that for most people, Vioxx, notwithstanding your criticism, Vioxx is perfectly safe for most people; is that right?

---

[5] As Mr. Irvin's prescribing physician, Dr. Schirmer, testified:

> Q:  Doctor, Mr. Beasley asked you some questions a moment ago about the comparative efficacy of Vioxx compared to traditional anti-inflammatory drugs. Do you recall those questions?
>
> A:  Yes.
>
> Q:  With respect to Mr. Irvin, we don't have to rely on any specific data regarding efficacy. You know through your own prescriptions and conversations regarding Mr. Irvin that the over-the-counter anti-inflammatories and even the Vicodin/ibuprofen combination in April 2001 was not providing him relief, correct?
>
> A:  Correct.
>
> Q:  Instead, through your own conversations, you learned that Vioxx was the only drug that provided him relief in that time frame, correct?
>
> A:  That was my understanding.

(Dec. 3, 2005 Tr. at 1024:18-1025:10.)

A:      I think I said people without cardiovascular disease could probably take Vioxx with safety.

Q:      Would you agree … that for the vast majority of people, Vioxx is perfectly safe?

A:      Yes.

Q:      And would you – and I think you've testified before that, as far as you're concerned, it's – Vioxx has a place on the market; is that right?

A:      Yes.

Q:      And I think you've testified at one point that you believe that Vioxx should stay on the market –

A:      I believe I answered that, yes.

(Nov. 29, 2005 Tr. at 227:21-228:10.)

Plaintiff's sole apparent attempt to make a contrary showing comes from Dr. Ray, who purported to testify in contradiction to Dr. Lucchesi that the overall risks of Vioxx outweighed its benefits. (Dec. 2, 2005 Tr. at 848:11-25.) But Dr. Ray's testimony does not rise to the level of legally sufficient evidence, for two reasons. First, as the Court noted in its *Daubert* order, Dr. Ray is neither a medical doctor nor an expert in FDA regulatory matters. (Nov. 18, 2005 Order and Reasons at 32-33.)   The Court ruled that Dr. Ray "is not qualified to testify as to the risk-benefit analysis performed by medical doctors" (*id.* at 32), and he "may not testify as to his disapproval of [regulatory] actions taken by the FDA" because "he does not have experience in this field." (*Id.* at 33.)  Dr. Ray thus lacks the requisite expertise to assess the overall benefits and risks of Vioxx from either a medical or a regulatory perspective, and his opinion is irrelevant.

Second, the stated basis for Dr. Ray's risk-benefit opinion is not a relevant comparison. As his testimony makes clear, Dr. Ray predicates his risk-benefit opinion solely on his observation that in VIGOR, the difference in serious adverse cardiovascular events favoring naproxen slightly exceeded the difference in serious adverse gastrointestinal events favoring

Vioxx. (Dec. 2, 2005 Tr. at 848:11-25.)[6]   VIGOR, however, compared a common therapeutic dose of naproxen (1000 mg per day) with *double* the maximum recommended chronic dose of Vioxx (50 mg per day). The maximum recommended chronic dose of Vioxx – and the dose used by Mr. Irvin – was 25 mg per day. As the FDA has noted, "[t]he higher dose of rofecoxib was used in the VIGOR trial to provide a 'worst case' estimate of the risk of serious GI bleeding for rofecoxib in comparison to naproxen." (Def. Ex. 338 at 9 n.5 (Apr. 5, 2005 FDA Decision Memo).)

A comparison based on a clinical trial designed to produce a "worst case" estimate of adverse gastrointestinal effects on Vioxx using a non-recommended dose does not and cannot constitute legally sufficient evidence that the risks of Vioxx outweighed its benefits. Such a comparison says nothing about the comparative risks and benefits of Vioxx when used, as Mr. Irvin used it, at the recommended dose of 25 mg. Tellingly, when Dr. Ray reviewed the VIGOR data in 2000, he urged caution on the 50 mg dose, but raised no questions about the safety of the 25 mg dose. (Dec. 2, 2005 Tr. at 800:4-14.) His own observational study, published in 2002, found no increased risk from 25 mg (*id.* at 779:11-15, 779:25-780:12), a conclusion consistent with all the placebo-controlled clinical trial data available up to that time, including the interim cardiovascular results of Merck's two large Alzheimer's studies. (*E.g.*, Dec. 1, 2005 Tr. at

---

[6] Specifically, Dr. Ray testified as follows:

> Q:    Do you have an opinion whether the risks of Vioxx in causing heart attacks and death outweighs the GI benefits?
>
> . . .
>
> [A.]   The findings of the VIGOR study clearly show that it was. There were 9.4 extra cases of serious cardiovascular disease per thousand patients, and 7.8 serious ulcer complications prevented. So it's more serious heart disease caused than ulcers prevented. And that's pretty clear-cut.

(Dec. 2, 2005 Tr. at 848:16-25.)

673:24-675:10.)  Many drugs pose greater risks when used at higher-than-recommended doses. That does not make them defective.[7]  The relevant inquiry under *Adams* is whether, based on what was known at the relevant time, the risks of using the drug at the recommended doses outweighed the apparent benefits.  Plaintiff has introduced *no* evidence on that point.

Absent legally competent and sufficient evidence that the known risks of Vioxx outweighed its potential benefits, the only issue remaining on the table under comment k is whether Vioxx was "accompanied by proper directions and warnings."  RESTATEMENT (SECOND) OF TORTS § 402A cmt. k (1965).  This issue is already tendered, however, in plaintiff's separate strict liability claim for failure to warn (*see supra* n.4), and in these circumstances an independent "design defect" claim is superfluous and should be dismissed.  *Cf. Hackett v. G.D. Searle & Co. (Hackett I)*, 246 F. Supp. 2d 591, 595 (W.D. Tex. 2002) (granting summary judgment on design defect claim in COX-2 prescription drug case (Celebrex) where application of comment k left only a duplicative warning claim).

**B.      Plaintiff Has Proffered No Evidence of a Safer Alternative Design.**

Plaintiff's design defect claim fails for an additional, independent reason: plaintiff has presented no evidence of a safer alternative design.  Under Florida law as elsewhere, a plaintiff in a defective design case must show that a safer alternative design was available.  *See Adams*, 576 So. 2d at 733 (design may be held defective if "new developments make possible a safer alternative design"); *see generally* BLACK'S LAW DICTIONARY 1329 (7th ed. 1999) (defining the risk-utility test as a "method of imposing product liability on a manufacturer if the evidence shows that a reasonable person would conclude that the benefits of a product's particular design

---

[7] For these same reasons, Dr. Topol's testimony about the risks of the 50 mg dose studied in VIGOR is irrelevant.

versus the feasibility of an alternative safer design did not outweigh the dangers inherent in the original design") (cited by Florida Supreme Court in *Std. Jury Instructions-Civil Cases (No. 02-2)*, 872 So. 2d 893, 894 (Fla. 2004)).[8]

Feasibility of a safer alternative design depends on "state of the art of scientific and technical knowledge and other circumstances that existed at the time of manufacture." FLA. STAT. ANN. § 768.1257. Here, plaintiff has not even attempted to offer evidence that Merck feasibly could have reformulated Vioxx to make it safer before May 2001 or indeed at any time. Plaintiff has simply offered no evidence on that subject. Without such proof, plaintiff's design defect claim fails whether grounded in strict liability or negligence. Under Rule 50(a), Merck is entitled to judgment the design defect claims, and the Court need not instruct the jury on those theories.

## III.   MERCK IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S CLAIM FOR BREACH OF IMPLIED WARRANTY

Plaintiff's claim for breach of implied warranty also fails as a matter of law. To prevail on such a claim, "the plaintiff must show that the product was transferred from the manufacturer's possession while in a *defective* state, and as a result of the *defect*, the plaintiff was injured." *E. R. Squibb & Sons, Inc. v. Jordan*, 254 So. 2d 17, 20 (Fla. App. 1971) (emphasis in original); *see also Husky Indus., Inc. v. Black*, 434 So. 2d 988, 991 (Fla. App. 1983) ("liability

---

[8] Florida courts acknowledge that the alternative "consumer expectations" test for design defects is not appropriate for products that are "too complex for a logical application" of that test. *Force v. Ford Motor Co.*, 879 So. 2d 103, 110 (Fla. App. 2004). Prescription drugs unquestionably meet that definition. *See Adams*, 576 So. 2d at 732-33 (applying risk-benefit analysis); *cf. Upjohn Co. v. MacMurdo*, 562 So. 2d 680, 683 (Fla. 1990) (expert testimony generally required to demonstrate inadequacy of prescription drug warnings); *Buckner v. Allergan Pharmaceuticals, Inc.*, 400 So. 2d 820, 822 (Fla. App. 1981) (duty to warn runs to prescribing physicians rather than patients because "prescription drugs are likely to be complex medicines, esoteric in formula and varied in effect").

for a breach of implied warranty of merchantability must be based on proof that the product was not merchantable at the time of sale, that is, the product was defective"); *Cassisi v. Maytag Co.*, 396 So. 2d 1140, 1143 (Fla. App. 1981) (plaintiffs in a products liability suit have the burden, "whether their case is founded in negligence, breach of an implied warranty, or strict liability, of establishing (1) that a defect was present in the product; (2) that it caused the injuries complained of; and (3) that it existed at the time the retailer or supplier parted possession with the product").

For the reasons already described, plaintiff has no support for a claim that Vioxx was defectively designed, and the implied warranty claim cannot go forward on that basis. To the extent plaintiff claims that Vioxx was defective because Merck failed to provide an adequate warning of potential side effects, her implied warranty claim duplicates her failure to warn claims. Because instructing on such a theory would be wholly redundant, the Court should dismiss it as surplusage. *Cf. Hackett v. G.D. Searle & Co. (Hackett II)*, No. A-01-CA-399-SS, 2002 U.S. Dist. LEXIS 16246, at *7 (W.D. Tex. June 25, 2002) (dismissing redundant implied warranty claim in Celebrex product liability suit).

## IV. MERCK IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S CLAIMS FOR FRAUD AND BREACH OF EXPRESS WARRANTY.

Finally, Merck is entitled to judgment as a matter of law on plaintiff's fraud and breach of express warranty claims. Each of these claims requires plaintiff to demonstrate that Merck made material misrepresentations about Vioxx on which Mr. Irvin or his prescribing physician, Dr. Schirmer, relied. *Pulte Home Corp. v. Ply Gem Indus., Inc.*, 804 F. Supp. 1471, 1483 (M.D. Fla. 1992) (fraud); *Thursby v. Reynolds Metals Co.*, 466 So. 2d 245, 249-50 (Fla. 1984) (express warranty); *see also Baker v. Danek Medical*, 35 F. Supp. 2d 875, 876 (N.D. Fla. 1998) (no fraud claim under Florida law absent showing that either plaintiff or her physician relied on alleged

misrepresentations by defendants).  Plaintiff has presented no such evidence.[9]

As to Mr. Irvin, the evidence shows that a friend gave him a Vioxx sample after Mr. Irvin

mentioned that he was experiencing back pain.  (Dec. 2, 2005 Tr. at 957:18-959:1.)  Vioxx had

not worked for the friend, but it worked for Mr. Irvin, who then obtained a prescription from his

son-in-law, Dr. Schirmer.  (*Id.* at 960:5-12; Dec. 3, 2005 Tr. at 1010:9-17; *see also* Dec. 2, 2005

Tr. at 932:1-14, 934:10-23.)  No evidence shows that Mr. Irvin saw or relied on any alleged

misrepresentations or warranties by Merck.[10]

Likewise, no evidence shows that Dr. Schirmer relied on any material misrepresentations

or express warranties in prescribing the drug to his father-in-law.  On the contrary, Dr. Schirmer

could not recall any conversations with Merck representatives, any exposure to any Merck

promotional activities, or even any awareness of the public scientific discussion of the VIGOR

study:

> Q:    You don't recall ever discussing with any Merck sales representative
>       Vioxx at any time, correct?
>
> A:    Correct.
>
> Q:    You don't recall ever reading and relying on any Merck promotional
>       activities, correct?

---

[9] To the extent these claims attempt to impose liability for "intentional suppression/failure to warn," they fail as a matter of law.  Florida law does not recognize such a claim.  *Jones v. GMC*, 24 F. Supp. 2d 1335, 1338 (M.D. Fla. 1998) ("Florida courts . . . have not recognized 'intentional suppression/failure to warn' as a separate and independent failure to warn claim in a products liability action.") (citing *Ferayorni v. Hyundai Motor Corp.*, 711 So. 2d 1167 (Fla. App. 1998)).

[10] Plaintiff proffered testimony from Mr. Irvin's friend, Mr. Aycock, that at an unspecified time Mr. Aycock had seen an unidentified Merck advertisement for Vioxx.  (Dec. 2, 2005 Tr. at 961:9-10.)  But Mr. Aycock did not testify that this advertisement had anything to do with his obtaining Vioxx for himself – a physician's assistant gave him a sample to try during a doctor's appointment following shoulder surgery (*id.* at 956:4-957:11) – and more importantly, he also testified that he had never discussed any such advertisement with Mr. Irvin.  (*Id.* at 961:11-12.) Thus, the testimony is irrelevant.

A:     That is correct.

Q:     Am I correct – and I think you told us this earlier – that in and around April of 2001, you hadn't seen any promotional material or any scientific articles about the VIGOR study; correct?

A:     Correct.

(Dec. 3, 2005 Tr. at 1025:16-1026:1.)  This uncontradicted testimony defeats any fraud or express warranty claim.  Once again, to the extent plaintiff has any claim at all, it sounds in failure to warn, not fraud or warranty.

Finally, plaintiff broadly asserts that Merck misrepresented the safety of Vioxx to the public in general.  But absent evidence of alleged misrepresentations or warranties with a demonstrated nexus to Mr. Irvin or Dr. Schirmer – *i.e.*, alleged misrepresentations upon which Mr. Irvin or Dr. Schirmer actually relied – plaintiff still has no fraud or express warranty claim. *See Morgan v. W.R. Grace & Co.*, 779 So. 2d 503, 506 (Fla. App. 2000) (plaintiff's allegation that defendants' actions created false impression among the public failed to state cause of action for fraud).  Plaintiff's complete failure of proof on the issue of reliance entitles Merck to judgment as a matter of law on the fraud and express warranty claims, and the Court need not instruct the jury on those claims.

## V.     CONCLUSION

For the reasons stated above, Merck respectfully request that the Court enter judgment in Merck's favor, as a matter of law, on plaintiff's claims for: (i) strict liability and negligent design defect; (ii) fraudulent misrepresentation and fraudulent concealment; and (iii) breach of express and implied warranty.

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
4041 Essen Lane
One United Plaza, Suite 501
Baton Rouge, Louisiana 70809
Phone:  225-490-8900
Fax:     225-490-8960

Defendants' Liaison Counsel

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:     312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone: 202-434-5000
Fax:     202-434-5029

And

John H. Beisner
Charles C. Lifland
Richard B. Goetz
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone: 213-430-6000
Fax:     213-430-6407

Attorneys for Merck & Co., Inc.

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Memorandum In Support of Motion of Merck & Co., Inc. for Judgment as a Matter of Law on Plaintiff's Design Defect, Fraud, and Breach of Warranty Claims has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 5th day of December, 2005.

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **In re:  VIOXX** | * | **MDL Docket No. 1657** |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| | * | **JUDGE FALLON** |
| **This document relates to** | * | |
| **Case No. 05-4046*** | * | |
| | * | **MAGISTRATE JUDGE KNOWLES** |
| **EVELYN IRVIN PLUNKETT** | * | |
| as Personal Representative of the Estate of | * | |
| **RICHARD IRVIN, JR.,** | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| **MERCK & CO., INC.,** | * | |
| | * | |
| Defendant. | * | |
| | * | |

* * * * * * * * * * * * * * * * * *

## DECLARATION OF PHILLIP A. WITTMANN IN SUPPORT OF MOTION OF MERCK & CO., INC. ("MERCK") FOR JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S DESIGN DEFECT, FRAUD, AND BREACH OF WARRANTY CLAIMS

I, PHILLIP A. WITTMANN, by way of declaration, say:

1.     I am an attorney in the law firm of Stone Pigman Walther Wittman L.L.C., attorneys for the defendant Merck & Co., Inc. ("Merck") in the above-captioned matter.  I make this declaration in support of Merck's Motion for Judgment as a Matter of Law on Plaintiff's Design Defect, Fraud, and Breach of Warranty Claims, filed concurrently herewith.  I have personal knowledge to state that the following exhibit, which is attached to this declaration, is a true and correct copy of the document it purports to be.

2.    Attached hereto as Exhibit A is a true and correct copy of excerpts from the November 29, 2005, December 1, 2005, December 2, 2005, and December 3, 2005 daily trial transcripts in this action.

Respectfully submitted,

_____
Phillip A. Wittmann
Attorney for Merck & Co., Inc.

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Declaration of Phillip A. Wittmann in Support of Merck's Motion for Judgment as a Matter of Law on Plaintiff's Design Defect, Fraud, and Breach of Warranty Claims has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 5th day of December, 2005.



# EXHIBIT A

**Declaration of Phillip A. Wittmann in Support of**
**Merck's Motion for Judgment as a Matter of Law**
*Exhibit A*

**Nov. 29, 2005 Transcript (Day One)**

[200:4] - [200:8]          Testimony of Dr. Lucchesi

```
page 200
4     Q.    WOULD VIOXX BE STRONGER OR MORE EFFECTIVE TO PAIN RELIEF
5     THAN, SAY, IBUPROFEN THAT YOU COULD BUY OVER THE COUNTER FOR
6     TEN CENT A PILL?
7     A.    WELL, I WOULD SAY THEY'RE FAIRLY COMPARABLE IN THE ABILITY
8     TO RELIEVE PAIN.
```

[226:23] - [227:3]          Testimony of Dr. Lucchesi

```
page 226
23    Q.    NOW, SWITCHING FROM DOGS TO HUMANS AND FOLK, CAN YOU GO ON
24    COX-2'S, COX-2 INHIBITORS, EXCUSE -- ME, DO YOU AGREE, SIR,
25    THAT THE GASTROINTESTINAL COMPLICATIONS FROM TRADITIONAL NSAIDS
page 227
1     WAS ONE OF THE MORE FREQUENT REASONS FOR EMERGENCY ROOM VISITS
2     IN THE UNITED STATES?
3     A.    THAT IS CORRECT.  THE LITERATURE SUPPORTS THAT.
```

[227:21] - [228:10]          Testimony of Dr. Lucchesi

```
page 227
21    Q.    AND I THINK I HEARD YOU SAY THAT FOR MOST PEOPLE, VIOXX,
22    NOTWITHSTANDING YOUR CRITICISM, VIOXX IS PERFECTLY SAFE FOR
23    MOST PEOPLE; IS THAT RIGHT?
24    A.    I THINK I SAID PEOPLE WITHOUT CARDIOVASCULAR DISEASE COULD
25    PROBABLY TAKE VIOXX WITH SAFETY.
page 228
1     Q.    WOULD YOU AGREE WITH THIS STATEMENT THAT FOR THE VAST
2     MAJORITY OF PEOPLE, VIOXX IS PERFECTLY SAFE?
3     A.    YES.
4     Q.    AND WOULD YOU -- AND I THINK YOU'VE TESTIFIED BEFORE THAT,
5     AS FAR AS YOU'RE CONCERNED, IT'S -- VIOXX HAS A PLACE ON THE
6     MARKET; IS THAT RIGHT?
7     A.    YES.
8     Q.    AND I THINK YOU'VE TESTIFIED AT ONE POINT THAT YOU BELIEVE
9     THAT VIOXX SHOULD STAY ON THE MARKET --
10    A.    I BELIEVE I ANSWERED THAT, YES.
```

**Dec. 1, 2005 Transcript (Day Three)**

[646:25] - [647:20]          Testimony of Dr. Nies

```
page 646
25    Q.    DID VIOXX, IN THIS PHASE III TESTING, DELIVER ON ITS
page 647
1     PROMISE OF LOWER GI SIDE EFFECTS THAT WAS THE PURPOSE OF THE
2     DEVELOPMENT OF THE DRUG?
3     A.    YES, IT DID.  WE LOOKED AT THAT IN SEVERAL WAYS.  IN TERMS
4     OF SPECIFICALLY LOOKING AT THE STOMACH, WE DID SOME STUDIES IN
5     PATIENTS WITH OSTEOARTHRITIS WHERE A CAMERA IS PUT INTO THE
6     STOMACH AND THE LINING IS ACTUALLY PHOTOGRAPHED.  IT'S CALLED
7     ENDOSCOPY, AND THIS WAS DONE THREE TIMES OVER A PERIOD OF SIX
8     MONTHS -- THE VIOXX WAS GIVEN AT QUITE HIGH DOSES IN THIS STUDY
9     BECAUSE WE WANTED TO MAKE SURE IT WAS SAFE EVEN AT VERY HIGH
```

**Declaration of Phillip A. Wittmann in Support of**
**Merck's Motion for Judgment as a Matter of Law**
*Exhibit A*

10   DOSES -- AND COMPARED THIS WITH IBUPROFEN OR MOTRIN.  THERE WAS
11   A VERY MUCH LESS EFFECT OF VIOXX ON THE STOMACH THAN THE
12   MOTRIN, AND IT'S DIRECTLY LOOKING AT IT WITH THE ENDOSCOPE.
13        WE ALSO TOOK ALL OF OUR PHASE III TRIALS, WHICH WERE
14   LARGE, AND COMBINED THEM SO THAT WE COULD LOOK AT HOW MANY OF
15   THE PEOPLE ON THE NSAIDS HAD ULCERS AND HOW MANY OF THE PEOPLE
16   ON VIOXX HAD ULCERS; AND WHEN YOU DO THAT THERE WAS A
17   DIFFERENCE AS WELL WITH VIOXX.  THERE WERE FEWER PEOPLE ON
18   VIOXX THAT HAD ULCERS AND COMPLICATIONS THAN THE PEOPLE ON THE
19   NSAIDS.  SO IT DID APPEAR THAT THE WHOLE HYPOTHESIS ON WHICH
20   THE DRUG DEVELOPMENT WAS BASED WAS TRUE.

[673:24] - [675:10]     Testimony of Dr. Nies

page 673
24   Q.   WHAT DID YOU TALK TO DR. SCOLNICK ABOUT?
25   A.   WHAT WE DID IS WE LOOKED AT ALL OF THE DATA THAT WE HAD AT
page 674
1    THAT TIME OF THE VIOXX VERSUS PLACEBO, WHICH IS ACTUALLY THE
2    BEST DATA TO BE ABLE TO TELL IF THERE'S ANYTHING GOING ON.  AND
3    VIOXX VERSUS OTHER NSAIDS.  BUT THE BEST DATA WAS THE VIOXX
4    VERSUS PLACEBO, AND WE HAD ONGOING AT THAT TIME A TRIAL IN
5    PATIENTS WHO HAD ALZHEIMER'S DISEASE.  AND THERE HAD BEEN
6    SOME -- THERE HAD BEEN A THEORY THAT THE COX-2 INHIBITORS COULD
7    PROTECT AGAINST THE DEVELOPMENT OF ALZHEIMER'S DISEASE.
8         SO WE WERE COMPARING VIOXX VERSUS A PLACEBO IN A
9    GROUP OF PEOPLE WHO HAD ALZHEIMER'S DISEASE OR A
10   PRE-ALZHEIMER'S TYPE OF DEMENTIA; AND WHEN WE LOOKED AT THOSE
11   ELDERLY INDIVIDUALS WHO HAD TAKEN THE DRUG FOR OVER A YEAR,
12   THEY HAVE NO EVIDENCE OF ANY INCREASE IN HEART ATTACKS WITH
13   VIOXX.  SO, WHEREAS, WITH VIGOR YOU CAN'T TELL BECAUSE YOU HAVE
14   TWO ACTIVE THERAPIES -- ONE COULD BE GOING UP OR ONE COULD BE
15   GOING DOWN; WITH THE PLACEBO, YOU CAN TELL, AND THERE WASN'T
16   ANY EVIDENCE THERE.
17   Q.   WAS THAT ALZHEIMER'S DATA IN THOUSANDS OF PATIENTS?
18   A.   YES.
19   Q.   FOR A LONG PERIOD OF TIME?
20   A.   YES.  IT WAS A PERIOD OF TIME ACTUALLY A BIT LONGER THAN
21   THE VIGOR TRIAL.
22   Q.   WHEN YOU COMBINED THE ALZHEIMER'S DATA, I DON'T MEAN
23   PUTTING THEM ALL TOGETHER, BUT I MEAN IF YOU CONSIDER THE
24   CONCLUSION OF ALZHEIMER'S AND WHAT THAT SHOWED WITH ALL THE
25   PLACEBO DATA THAT YOU HAD WHEN YOU SOUGHT APPROVAL OF THE
page 675
1    MEDICINE, WHAT DID THAT LEAD YOU TO CONCLUDE SHORTLY AFTER THE
2    VIGOR RESULTS WERE UNBLINDED?
3    A.   WHEN WE PUT ALL OF OUR DATA TOGETHER, WE COULD GET, I
4    DON'T KNOW, MAYBE 25,000, 28,000 PATIENTS TOTAL WHO HAD GOTTEN
5    OTHER NSAIDS OR PLACEBO, AND THERE WAS NO DIFFERENCE BETWEEN
6    VIOXX AND THOSE OTHER GROUPS.  THE ONLY DIFFERENCE WAS IN
7    STUDIES THAT HAD NAPROXEN IN IT.
8    Q.   WHAT DID THAT TELL YOU WHETHER -- TO YOUR MIND, DID THAT
9    SHOW WHETHER VIOXX WAS NEUTRAL OR HARMFUL?
10   A.   IT LOOKED TO US THAT VIOXX WAS NEUTRAL.

[679:1] - [679:17]     Testimony of Dr. Nies

page 679
1    Q.   WAS THERE AN FDA ADVISORY COMMITTEE IN FEBRUARY 2001?
2    A.   YES.
3    Q.   DID YOU ATTEND THAT MEETING?
4    A.   YES.

**Declaration of Phillip A. Wittmann in Support of**
**Merck's Motion for Judgment as a Matter of Law**
*Exhibit A*

```
5      Q.   DID YOU PRESENT ON BEHALF OF MERCK, ALONG WITH OTHERS?
6      A.   YES, I DID.
7      Q.   WHAT WAS THE PURPOSE OF THE 2001 ADVISORY COMMITTEE
8      MEETING?
9      A.   THAT WAS TO DISCUSS VIGOR, WHICH WAS THE GI OUTCOMES
10     TRIAL, BOTH IN TERMS OF ITS GASTROINTESTINAL BENEFIT AND IN
11     TERMS OF THIS DIFFERENCE BETWEEN NAPROXEN AND VIOXX.  SO ALL OF
12     THAT WAS DISCUSSED IN THIS PUBLIC MEETING.
13     Q.   SIR, HOW WOULD YOU CHARACTERIZE THE DISCUSSION OR THE
14     SCIENTIFIC DISCOURSE THAT HAPPENED AT THAT MEETING?
15     A.   I THINK IT WAS A VERY, VERY OPEN THOUGHTFUL DISCUSSION.
16     PEOPLE SAID THAT THEY FELT THAT WE HAD PROVED THE GI
17     OUTCOMES --
```

[680:7] - [681:1]      Testimony of Dr. Nies

```
page 680
7      Q.   DID YOU PRESENT DATA FROM THE VIGOR TRIAL TO THE ADVISORY
8      COMMITTEE?
9      A.   YES, I WAS ONE OF THE PEOPLE WHO PRESENTED.
10     Q.   DID ANYONE AT THE FDA OR THE ADVISORY COMMITTEE AT THE
11     FEBRUARY 2001 MEETING TELL MERCK THAT THE NAPROXEN HYPOTHESIS
12     WAS ALL WET?
13     A.   NO.
14     Q.   DID ANYONE AT THE FDA ADVISORY COMMITTEE IN FEBRUARY 2001
15     TELL MERCK THAT VIGOR HAD DEFINITIVELY PROVED A CARDIOVASCULAR
16     RISK WITH VIOXX?
17     A.   NO.
18     Q.   DOCTOR, DID YOU GO INTO THAT MEETING BELIEVING NAPROXEN
19     WAS THE BEST EXPLANATION FOR THE VIGOR DATA?
20     A.   YES.  YES.
21     Q.   CAN YOU CHARACTERIZE YOUR STATE OF MIND WHEN YOU LEFT THAT
22     MEETING IN FEBRUARY 2001?  WHAT DID YOU FEEL ABOUT THE DRUG OR
23     BELIEVE ABOUT THE DUG AFTER THIS OPEN DISCUSSION WITH OUTSIDE
24     EXPERTS AND THE FDA?
25     A.   I STILL BELIEVED THAT NAPROXEN WAS THE EXPLANATION FOR THE
page 681
1      CARDIOVASCULAR DIFFERENCES IN THE TWO GROUPS.
```

**Dec. 2, 2005 Transcript (Day Four)**

[764:16] - [771:13]      Testimony of Dr. Ray

```
page 764
16     Q.   SIR, ON THIS TOPIC THAT YOU MENTIONED EARLY IN YOUR
17     EXAMINATION ABOUT THE -- YOUR CONCLUSION ABOUT RISKS AND
18     BENEFITS -- I DON'T WANT TO GET INTO ANY SORT OF CALCULATION OR
19     ANYTHING LIKE THAT, BUT JUST TO UNDERSTAND THE BENEFITS SIDE,
20     WHEN YOU SAID VIOXX'S -- VIOXX'S ULCER BENEFITS, I THINK WAS
21     THE WAY YOU PUT IT, HAVE YOU STUDIED THE GASTROINTESTINAL
22     EFFECTS OF DIFFERENT PAIN RELIEVERS?
23     A.   YES, SIR, I HAVE.
24     Q.   AND YOU TALKED ABOUT THE ULCER EFFECTS.  I THINK YOU USED
25     THE PHRASE "STOMACH PROBLEMS" YESTERDAY.  BUT THESE -- THESE
page 765
1      STOMACH PROBLEMS THAT COME ALONG WITH CERTAIN TYPES OF PAIN
2      RELIEVERS CAN BE VERY SEVERE; ISN'T THAT TRUE?
3      A.   INFREQUENTLY, BUT YES, THEY CAN BE.  ABSOLUTELY.
4      Q.   I'M GOING TO PUT UP ON THE SCREEN AN ARTICLE THAT YOU
```

**Declaration of Phillip A. Wittmann in Support of
Merck's Motion for Judgment as a Matter of Law**
*Exhibit A*

```
 5   WROTE.  WHEN I SAY "YOU WROTE," I GUESS ALMOST ALL THE TIME
 6   THERE IS MORE THAN ONE AUTHOR.
 7   A.   IT'S A TEAM EFFORT, YES.
 8   Q.   SO WAYNE RAY.  AND IS THIS AN ARTICLE UP ON THE SCREEN,
 9   THE FIRST PAGE OF AN ARTICLE THAT WAS PUBLISHED IN 2001?
10   A.   YES, SIR, IT IS, SIR.
11           MR. BECK:  AND IF WE -- AND WE'LL MARK THIS FOR
12   IDENTIFICATION PURPOSES AND SUBMIT IT LATER, YOUR HONOR, AS
13   PLAINTIFF'S EXHIBIT 1044.  WE'RE NOT OFFERING IT IN EVIDENCE
14   BUT FOR IDENTIFICATION PURPOSES.
15           THE COURT:  OKAY.
16   BY MR. BECK:
17   Q.   AND THEN OVER ON PAGE 2, IN THE LEFT COLUMN, LET ME JUST
18   FIND WHERE I WANT TO BE HERE.  I'M SORRY.  COULD YOU READ THIS
19   PARAGRAPH FOR THE JURY; AND IF WE GET TO TECHNICAL WORDS, I'LL
20   ASK YOU TO STOP AND TO DEFINE THE TERM.
21   A.   CERTAINLY.  "NONSTEROIDAL ANTI-INFLAMMATORY DRUGS, NSAIDS,
22   ONE OF THE MOST FREQUENTLY PRESCRIBED CLASSES OF DRUGS IN THE
23   ELDERLY, ARE ALSO ONE OF THE MOST COMMON CAUSES OF DRUG-INDUCED
24   MORBIDITY AND MORTALITY IN THE ELDERLY."
25   Q.   LET ME JUST STOP THERE.  "MORBIDITY" MEANS GETTING SICK,
page 766
 1   RIGHT?
 2   A.   YES, SIR.
 3   Q.   AND MORTALITY MEANS DYING, RIGHT?
 4   A.   YES, SIR, IT DOES.
 5   Q.   SO NSAIDS ARE ONE OF THE MOST FREQUENTLY PRESCRIBED
 6   CLASSES OF DRUGS AND ALSO ONE OF THE MOST COMMON CAUSES OF
 7   DEATH IN THE ELDERLY, RIGHT?
 8   A.   DRUG-INDUCED DEATH.
 9   Q.   DRUG-INDUCED DEATH.  OKAY.  GO AHEAD, PLEASE.
10   A.   AND WE HAVE TO MAKE A CAVEAT.  THOSE WERE OF THE DRUGS
11   THAT WERE AVAILABLE AT THE TIME.  THIS WAS FOUR TO FIVE YEARS
12   AGO, SO LIFE HAS CHANGED SINCE THEN.
13   Q.   SO THESE NSAIDS WERE BASICALLY TALKING ABOUT MOTRIN,
14   ADVIL, NOT VIOXX OR CELEBREX, RIGHT?
15   A.   YES, SIR.
16   Q.   OKAY.  THAT'S IMPORTANT.  SO THE OLD-STYLE NSAIDS, WE'VE
17   HEARD THEM REFERRED TO AS THE "NONSELECTIVE COX INHIBITORS,"
18   THOSE ARE THE ONES YOU'RE TALKING ABOUT; RIGHT?
19   A.   YES.
20   Q.   SO CONTINUE ON.
21   A.   "IN THE UNITED STATES, APPROXIMATELY 40 PERCENT OF PEOPLE
22   65 YEARS OR OLDER FILL AT LEAST ONE PRESCRIPTION FOR AN NSAID
23   EACH YEAR, AND ON A GIVEN DAY APPROXIMATELY 13 PERCENT ARE
24   TAKING A PRESCRIPTION NSAID.  THE MOST COMMON SERIOUS ADVERSE
25   EFFECTS OF NSAIDS -- PEPTIC ULCERATION, GASTROINTESTINAL
page 767
 1   HEMORRHAGE, AND DEATH" --
 2   Q.   LET'S STOP THERE.
 3   A.   -- "OCCUR MORE FREQUENTLY IN THE ELDERLY."
 4   Q.   I'M SORRY.  LET'S STOP THERE.  IT'S NOT A TECHNICAL TERM,
 5   BUT ONE OF THE MOST COMMON SERIOUS ADVERSE EFFECTS OF THESE
 6   OLD-STYLE NSAIDS, BEFORE THE COX-2 INHIBITORS CAME ALONG, WAS
 7   DEATH; RIGHT?
 8   A.   I THINK THAT ARE -- THOSE ARE -- OF THE SERIOUS ADVERSE
 9   EFFECTS, THOSE ARE THE MOST COMMON ONES, YES.
10   Q.   AND THEY OCCUR MORE FREQUENTLY IN THE ELDERLY, RIGHT?
11   A.   YES, THEY DO.
12   Q.   OKAY.  CONTINUE AFTER THAT.
13   A.   "THE EXCESS FREQUENCY OF SERIOUS GASTROINTESTINAL
```

4

Declaration of Phillip A. Wittmann in Support of
Merck's Motion for Judgment as a Matter of Law
*Exhibit A*

```
14        COMPLICATION REQUIRING HOSPITALIZATION IN PATIENTS YOUNGER THAN
15        65 YEARS OF AGE TAKING NSAIDS IS APPROXIMATELY THREE PER 1,000
16        PERSONS PER YEAR, COMPARED WITH 10 TO 20 PER 1,000 PERSONS PER
17        YEAR IN PATIENTS 65 YEARS OF AGE OR OLDER."
18        Q.   SO WHEN YOU WERE TALKING ABOUT HOW IT'S A RELATIVELY RARE
19        OCCURRENCE TO HAVE ONE OF THESE PROBLEMS, IN FACT, FOR ELDERLY
20        FOLKS, SERIOUS GASTROINTESTINAL COMPLICATION REQUIRING
21        HOSPITALIZATIONS WERE LIKE 10 TO 20 PEOPLE PER 1,000 PATIENT
22        YEARS; RIGHT?
23        A.   SURE, WITH ONE QUALIFICATION; AND THAT IS THAT THESE DATA
24        WERE ALL GATHERED BEFORE THE WIDE USE OF -- EXCUSE ME FOR THE
25        JARGON -- OF PROTON PUMP INHIBITORS.  BUT THOSE ARE DRUGS LIKE
page 768
1         PRILOSEC, WHICH THERE IN SOME WAY THEY CAN PROTECT THE STOMACH
2         TO ULCERS RELATED TO NSAIDS.  SO WE'RE ACTUALLY ENGAGED IN
3         STUDIES NOW TO TRY TO UPDATE THOSE DATA BECAUSE SOME THINK THE
4         NUMBERS MAY HAVE GONE DOWN.  BUT PRIOR TO THE INTRODUCTION OF
5         THE PRILOSEC-TYPE DRUGS, THOSE NUMBERS WERE CORRECT.
6         Q.   OKAY.  AND THEN I'M GOING TO SHOW YOU ANOTHER ARTICLE THAT
7         YOU WROTE, WHICH, FOR IDENTIFICATION PURPOSES, WE'LL MARK AS
8         DEFENDANTS EXHIBIT 1045.  IS THIS AN ARTICLE THAT YOU
9         COAUTHORED -- I SEE YOU'RE LISTED AS THE FIRST AUTHOR HERE.
10        DOES THAT MEAN THAT YOU WERE THE MAIN AUTHOR?
11        A.   YES, IT DOES.
12        Q.   BUT IT'S STILL A TEAM EFFORT, BUT YOU'RE THE MAIN --
13        A.   ABSOLUTELY.
14        Q.   AND IS THIS AN ARTICLE THAT YOU WROTE IN 2000?
15        A.   YES.
16        Q.   AND IF WE GO TO THE SECOND PAGE OF THIS ARTICLE, I'M NOT
17        GOING TO ASK YOU TO READ THE WHOLE ARTICLE, BUT CAN YOU READ
18        THIS PORTION FOR THE JURY AND THEN, AGAIN, WE'LL STOP AND
19        EXPLAIN IF WE NEED TO.
20        A.   "HOWEVER, THE FREQUENT USE OF NSAIDS FOR ELDERLY PATIENTS
21        HAS BEEN QUESTIONED BECAUSE OF THE HIGH RISK FOR
22        GASTROINTESTINAL AND OTHER TOXICITY.
23        Q.   CAN WE JUST STOP HERE.  AGAIN WE'RE TALKING ABOUT ADVIL,
24        MOTRIN, NOT VIOXX OR CELEBREX, RIGHT?
25        A.   YES.
page 769
1         Q.   AND WE'RE TALKING ABOUT THE DAYS BEFORE PRILOSEC.
2         A.   "AND THEIR EFFICACY RELATIVE TO OTHER TREATMENTS FOR
3         MUSCULOSKELETAL SYMPTOMS."
4         Q.   INCIDENTALLY, LET ME JUST STOP YOU, MUSCULOSKELETAL,
5         THAT'S THE SAME THING THAT VIOXX AND CELEBREX ARE USED FOR,
6         RIGHT?
7         A.   YES.  AND MAY I PUT THESE ARTICLES IN CONTEXT?
8         Q.   WELL, READ THE REST OF IT, AND THEN I'M SURE THAT
9         MR. SIZEMORE WILL ASK YOU TO PUT WHATEVER CONTEXT YOU WANT ON
10        IT.  SO KEEP READING.
11        A.   "FOR ELDERLY PATIENTS, USE OF NSAIDS CONFER SUBSTANTIAL
12        EXCESS RISK FOR GI TOXICITY, INCLUDING 10 TO 20 PER 1,000
13        ADDITIONAL HOSPITALIZATIONS PER YEAR FOR PEPTIC ULCERATION AND
14        A FOUR-FOLD INCREASED RISK FOR DEATH FROM GI BLEEDING."
15        Q.   SO USING -- JUST LET ME STOP HERE.  USING AN NSAID
16        COMPARED TO NOT USING ANY PAIN MEDICINE AT ALL FOR THE ELDERLY
17        FOLKS QUADRUPLED THE RISK OF DEATHS FROM GI BLEEDING; RIGHT?
18        A.   YES.  ABSENT A PROTON PUMP INHIBITOR, YES.
19        Q.   AND THAT'S WHAT YOUR ARTICLE WAS ABOUT?
20        A.   BACK IN THE DAYS WHEN THEY WERE USED VERY COMMONLY.
21        Q.   WELL, KEEP READING.
22        A.   "THUS, AMONG ELDERLY PATIENTS, APPROXIMATELY 30 PERCENT OF
```

**Declaration of Phillip A. Wittmann in Support of**
**Merck's Motion for Judgment as a Matter of Law**
*Exhibit A*

```
23   ULCER-RELATED HOSPITALIZATIONS AND DEATHS ARE ATTRIBUTABLE TO
24   NSAIDS."
25   Q.   OKAY.
page 770
1    A.   "OTHER ADVERSE EFFECTS INCLUDE RENAL TOXICITY."
2    Q.   AND IT GOES ON, BUT --
3    A.   YES.
4    Q.   THEN LET ME SHOW YOU AN ARTICLE WRITTEN BY SOMEBODY NAMED
5    WOLFE AND SOME OTHERS.  THE REVIEW ARTICLE FROM THE NEW ENGLAND
6    JOURNAL OF MEDICINE, WHICH, FOR IDENTIFICATION PURPOSES IS
7    PLAINTIFF'S EXHIBIT 1046, AND THIS IS FROM 1999, SO THAT --
8    THAT'S IN THE PRECOX-2 PORTION AS WELL, RIGHT?  PERIOD OF TIME?
9    A.   YES, IT IS.
10   Q.   AND I WANT TO LOOK AT A PARAGRAPH THAT ACTUALLY GOES FROM
11   PAGE 1 OVER TO PAGE 2.  SO I HAVE TO TRY THIS.  I THINK IT
12   WORKED.  ACTUALLY, I DID THIS WRONG.  I WANT TO START A LITTLE
13   HIGHER.  OKAY.  WE'RE STARTING -- ON THE BASIS OF THESE
14   CONSERVATIVE FIGURES AND ARAMIS DATA -- DO YOU KNOW WHAT ARAMIS
15   DATA IS?
16   A.   YES, SIR, I DO.
17   Q.   "THE ANNUAL NUMBER OF HOSPITALIZATIONS IN THE
18   UNITED STATES FOR SERIOUS GASTROINTESTINAL COMPLICATIONS IS
19   ESTIMATED TO BE AT LEAST 103,000.  AT AN ESTIMATED COST OF
20   15,000 TO 20,000 PER HOSPITALIZATION, THE ANNUAL DIRECT COST OF
21   SUCH COMPLICATIONS EXCEED TWO BILLION."  CORRECT?
22   A.   THAT'S CERTAINLY WHAT THEY SAY, YES.
23   Q.   AND HE SAID THAT "IT'S BEEN ESTIMATED CONSERVATIVELY THAT
24   THERE WERE 16,500 NSAID-RELATED DEATHS OCCUR AMONG PATIENTS
25   WITH RHEUMATOID ARTHRITIS OR OSTEOARTHRITIS EVERY YEAR IN THE
page 771
1    UNITED STATES."  AND THAT SQUARES WITH THE ANALYSIS THAT YOU'VE
2    DONE; RIGHT, SIR?
3    A.   THE NUMBERS ARE CERTAINLY COMPARABLE, YES.
4    Q.   AND THE FIGURE IS SIMILAR TO THE NUMBER OF DEATHS FOR THE
5    ACQUIRED IMMUNODEFICIENCY SYNDROME.  THAT WOULD BE AIDS, RIGHT?
6    A.   YES, SIR.
7    Q.   SO THIS PROBLEM THAT WE'RE TALKING ABOUT IS SIMILAR TO THE
8    NUMBER OF DEATHS FOR AIDS AND CONSIDERABLY GREATER THAN THE
9    NUMBER OF DEATHS FOR MULTIPLE MYELOMA, ASTHMA, CERVICAL CANCER,
10   HODGKIN'S DISEASE; RIGHT?
11   A.   THAT'S CERTAINLY WHAT THEY SAY.  I'M CERTAINLY NOT AN
12   EXPERT ON THOSE CAUSES OF DEATH, SO I CAN'T VERIFY
13   INDEPENDENTLY, BUT IT DOESN'T SOUND UNREASONABLE.
```

**[771:14] - [771:19]**     Testimony of Dr. Ray

```
page 771
14   Q.   AND WOULD YOU AGREE WITH THEM THAT IF DEATHS FROM
15   GASTROINTESTINAL TOXIC EFFECTS OF NSAIDS WERE TABULATED
16   SEPARATELY IN THE NATIONAL VITAL STATISTICS REPORTS, THOSE
17   EFFECTS WOULD CONSTITUTE THE 15TH MOST COMMON CAUSE OF DEATH IN
18   THE UNITED STATES.
19   A.   AT THAT TIME, THAT PROBABLY WAS A REASONABLE ESTIMATION.
```

**[779:11] - [779:15]**     Testimony of Dr. Ray

```
page 779
11   Q.   BUT, IN ANY EVENT, THE TAKE-AWAY CONCLUSION FROM THIS
12   STUDY IS THAT 25 MILLIGRAMS DOES NOT POSE AN INCREASED RISK OF
13   SERIOUS CARDIAC EFFECTS, BUT 50 MILLIGRAMS DOES; RIGHT?
14   A.   YES, WITH THE MINOR CAVEAT THAT 25 MILLIGRAMS OR LESS DOES
15   NOT SHOW INCREASED RISK VERSUS GREATER THAN 25 MILLIGRAMS.
```

## Declaration of Phillip A. Wittmann in Support of
## Merck's Motion for Judgment as a Matter of Law
### Exhibit A

**[779:25] - [780:12]**   Testimony of Dr. Ray

```
page 779
25     A.   "OUR RESULTS INDICATED THAT HIGH-DOSE ROFECOXIB COULD BE
page 780
1      ASSOCIATED WITH A RAISED RISK OF SERIOUS CORONARY HEART
2      DISEASE; WHEREAS, ROFECOXIB 25 MILLIGRAMS OR LESS, CELECOXIB,
3      NAPROXEN, AND IBUPROFEN ARE NOT.  RISK OF SERIOUS CORONARY
4      HEART DISEASE INCREASE 70 PERCENT RELATIVE TO NSAID NONUSERS,
5      AND NEW USERS HAVE NEARLY DOUBLED RISK."
6      Q.   THAT'S FOR THE HIGH-DOSE FOLKS, RIGHT?
7      A.   YES, IT IS.
8      Q.   THEN FOR THE LOW DOSE OR FOR -- EXCUSE ME, FOR 25
9      MILLIGRAMS, OKAY -- HERE WE GO, 25 MILLIGRAMS OR LESS, THERE
10     WAS -- THEY ARE NOT ASSOCIATED WITH A RAISED RISK OF SERIOUS
11     CORONARY HEART PROBLEMS, RIGHT?
12     A.   IN THIS STUDY, CORRECT.
```

**[800:4] - [800:14]**   Testimony of Dr. Ray

```
page 800
4      Q.   WELL, IN FACT, WHEN THE VIGOR RESULTS FIRST CAME OUT, YOU
5      THOUGHT THAT THE MOST PROBABLE EXPLANATION WAS INCREASED RISK
6      FROM THE 50-MILLIGRAM VIOXX BUT THAT THE NAPROXEN HYPOTHESIS
7      WAS POSSIBLE, RIGHT?
8      A.   NO ONE WOULD ARGUE -- AT LEAST I WOULDN'T ARGUE -- THAT IT
9      WAS IMPOSSIBLE AT ALL, SIR, NO.  IT WAS SOMETHING THAT WAS
10     POSSIBLE, JUST NOT VERY LIKELY.
11     Q.   WELL, YOU THOUGHT THAT THE MOST PROBABLE EXPLANATION WAS
12     INCREASED RISK FROM 50-MILLIGRAM VIOXX BUT THAT THE NAPROXEN
13     HYPOTHESIS WAS POSSIBLE, DIDN'T YOU?
14     A.   IT CERTAINLY WAS POSSIBLE, YES, SIR.
```

**[803:25] - [804:6]**   Testimony of Dr. Ray

```
page 803
25     Q.   WELL, VIGOR SHOWED THAT NAPROXEN CAUSED MORE THAN TWICE AS
page 804
1      MANY SERIOUS GASTROINTESTINAL SIDE EFFECTS THAN THE
2      50-MILLIGRAM DOSE OF VIOXX, WHICH WAS TWICE THE RECOMMENDED
3      DOSE.
4      A.   YES, THAT'S ABSOLUTELY CORRECT.
5      Q.   AND THAT FINDING WAS STATISTICALLY SIGNIFICANT?
6      A.   ABSOLUTELY.  NO ARGUMENT THERE.
```

**[848:11] - [848:25]**   Testimony of Dr. Ray

```
page 848
11     Q.   DOCTOR, MR. BECK TALKED TO YOU ABOUT THE RISK AND BENEFITS
12     OF VIOXX.  HAVE YOU EXAMINED THIS ISSUE?
13     A.   YES.  THERE IS ONE CLINICAL TRIAL, THE VIGOR STUDY, WHERE
14     YOU CAN COMPARE THE CLINICAL BENEFITS TO THE CLINICAL RISKS,
15     AND I'VE EXAMINED THOSE FINDINGS.
16     Q.   DO YOU HAVE AN OPINION WHETHER THE RISKS OF VIOXX IN
17     CAUSING HEART ATTACKS AND DEATH OUTWEIGHS THE GI BENEFITS?
18          MR. BECK:  I OBJECT, YOUR HONOR.
19          THE COURT:  I OVERRULE THE OBJECTION.
20          THE WITNESS:  THE FINDINGS OF THE VIGOR STUDY CLEARLY
21     SHOW THAT IT WAS.  THERE WERE 9.4 EXTRA CASES OF SERIOUS
22     CARDIOVASCULAR DISEASE PER THOUSAND PATIENTS, AND 7.8 SERIOUS
23     ULCER COMPLICATIONS PREVENTED.  SO IT'S MORE SERIOUS HEART
24     DISEASE CAUSED THAN ULCERS PREVENTED.  AND THAT'S PRETTY
25     CLEAR-CUT.
```

**Declaration of Phillip A. Wittmann in Support of**
**Merck's Motion for Judgment as a Matter of Law**
*Exhibit A*

| | |
|---|---|
| [932:1] - [932:14] | Testimony of Allesha Schirmer |

```
page 932
 1        Q.   DID YOU SPEAK WITH MR. IRVIN ON THE PHONE BETWEEN THE
 2   9th AND 15th OF APRIL?
 3        A.   YES.
 4        Q.   WHAT DO YOU REMEMBER ABOUT THAT CONVERSATION?
 5        A.   I REMEMBER HIM CALLING AND SAYING THAT A FRIEND HAD GIVEN
 6   HIM SOME SAMPLES OF A MEDICATION THAT WAS THE FIRST THING THAT
 7   HAS HELPED HIS BACK, IT WAS VIOXX, AND WOULD CHRIS -- DO I
 8   THINK CHRIS WOULD MIND CALLING IN A PRESCRIPTION LONG ENOUGH
 9   UNTIL HE COULD GO SEE HIS DOCTOR.  I SAID, "LET ME LET YOU TALK
10   TO HIM," BECAUSE I THINK -- I HANDED THE PHONE OFF TO CHRIS AT
11   THAT POINT.  I MEAN, WE PROBABLY TALKED ABOUT A FEW OTHER
12   THINGS; BUT AS FAR AS THE MEDICATION GOES, ONCE HE ASKED ME
13   THAT AND HE SAID HE HAD BEEN TAKING SOME SAMPLES THAT HAD BEEN
14   GIVEN HIM, I HANDED THE PHONE TO CHRIS.
```

| | |
|---|---|
| [934:10] - [934:23] | Testimony of Allesha Schirmer |

```
page 934
10        Q.   DO YOU REMEMBER MR. IRVIN TELLING YOU THAT THE VIOXX
11   SAMPLES HE HAD TRIED WORKED FOR HIM?
12        A.   YES.
13        Q.   DO YOU REMEMBER YOUR FATHER TELLING YOU THAT THE VIOXX HE
14   HAD TRIED ALLEVIATED HIS BACK PAIN?
15        A.   YES.
16        Q.   DID MR. IRVIN TELL YOU IN THAT CONVERSATION THAT HE WOULD
17   LIKE A PRESCRIPTION FOR VIOXX?
18        A.   HE DID NOT TELL ME.  HE ASKED ME IF I THOUGHT MY HUSBAND
19   WOULD CALL IN A PRESCRIPTION UNTIL HE COULD GO SEE HIS DOCTOR
20   SINCE THIS -- AS A MEDICATION THAT FINALLY WORKED FOR HIM.
21        Q.   DO YOU REMEMBER MR. IRVIN SAYING THAT HE WANTED A
22   PRESCRIPTION UNTIL HE COULD GO SEE A DOCTOR?
23        A.   YES.
```

| | |
|---|---|
| [956:4] - [957:11] | Testimony of Richard Aycock |

```
page 956
 4        Q.   DID YOU SAY A PA GAVE YOU A SAMPLE?
 5        A.   YES.  IT WAS EITHER A PA OR ONE OF THE OTHER DOCTORS IN
 6   THE PARTICULAR GROUP.  I DON'T THINK IT WAS ROBERT POHL THAT
 7   OPERATED ON ME BECAUSE I DON'T THINK HE WAS IN THAT DAY WHEN I
 8   WENT IN TO -- I HAD HAD NOT AN MRI, BUT ANOTHER X-RAY.
 9        Q.   HAD YOU BEEN EXAMINED BY ONE OF THE DOCTORS IN THAT
10   ORTHOPEDIC GROUP?
11        A.   YES, I HAVE BEEN EXAMINED.  I WAS OPERATED ON BY
12   DR. ROBERT POHL AND ANOTHER DOCTOR IN THE GROUP, AND THEN I WAS
13   EXAMINED BY SEVERAL.  I HAD EXTENSIVE REBUILDING ON THE
14   SHOULDER AND I WENT BACK ON NUMEROUS OCCASIONS.  IN FACT, I SAW
15   A COUPLE OTHER ORTHOPEDICS, ALSO.
16        Q.   WERE YOU EVER EXAMINED BY A DOCTOR ON THE DAY YOU RECEIVED
17   THE VIOXX SAMPLE?
18        A.   I WANT TO SAY YES, I SAW THE DOCTOR, BUT IT WASN'T
19   ROBERT POHL.  IT WAS ONE OF THE OTHER DOCTORS IN THERE.  THEN
20   THE PA CAME AND THEY TOOK SEVERAL SETS OF X-RAYS AND PUT ME
21   THROUGH SOME RANGE-OF-MOTION STUFF.
22        Q.   DO YOU REMEMBER IF YOUR BLOOD PRESSURE WAS TAKEN ON THE
23   DAY YOU RECEIVED THE VIOXX SAMPLE?
24        A.   I'M SURE IT WAS.  THEY TOOK IT EVERY TIME I WENT IN THERE.
25        Q.   DO YOU REMEMBER WHAT DOSE THE SAMPLES WERE THAT YOU
page 957
```

**Declaration of Phillip A. Wittmann in Support of**
**Merck's Motion for Judgment as a Matter of Law**
*Exhibit A*

```
1    RECEIVED?
2    A.   I THINK THEY WERE 25 MILLIGRAMS.  I CAN'T BE SURE, BUT
3    THAT'S WHAT COMES TO MIND.
4    Q.   DID THE DOCTOR TELL YOU WHAT DOSE TO TAKE EVERY DAY?
5    A.   HE TOLD ME -- I THINK THEY ONLY -- THE REASON I ONLY GOT
6    THREE SAMPLES WAS BECAUSE IT WAS ALL THEY HAD.  HE SAID TRY
7    THIS, IT WORKS FOR SOME PEOPLE THAT HAVE HAD INJURIES SIMILAR
8    TO MINE.  HE SAID, "IF IT WORKS FOR YOU, COME BACK IN, AND
9    WE'LL REASSESS YOU AND WRITE A PRESCRIPTION FOR IT."  I WENT
10   THROUGH THIS WITH SEVERAL, THE RELAFEN AND SEVERAL OTHERS THAT
11   I DON'T REMEMBER.
```

**[957:18] - [959:1]**          Testimony of Richard Aycock

```
page 957
18   A.   I HAD GAVE ONE VIOXX SAMPLE TO DICKY IRVIN; AND THE OTHER
19   ONE, I DON'T KNOW WHAT HAPPENED TO IT.
20   Q.   DO YOU REMEMBER WHEN YOU GAVE DICKY IRVIN A VIOXX SAMPLE?
21   A.   NO, I DON'T REMEMBER THE DATE.  I DO REMEMBER GIVING IT TO
22   HIM, AND IT WAS AFTER WE WERE DISCUSSING -- HE HAD HAD A BAD
23   BACKACHE FOR A COUPLE OF DAYS, AND HE KNEW THAT I HAD GONE
24   THROUGH THE SURGERY AND WAS TAKING A LOT OF ANTI-INFLAMMATORIES
25   OR TRYING A LOT OF ANTI-INFLAMMATORIES.  HE SAID, "I'VE GOT A
page 958
1    BAD BACKACHE, AND IT'S BEEN BOTHERING ME FOR A COUPLE DAYS,"
2    AND IT CAME TO MIND THAT -- I SAID, "THIS DIDN'T WORK FOR ME.
3    IT MIGHT WORK FOR YOU," AND I GAVE HIM THE ONE BLISTER PACK.
4    LIKE I SAID, I DON'T KNOW IF IT WAS ONE OR TWO PILLS.
5    Q.   DO YOU REMEMBER HOW LONG BEFORE HE PASSED AWAY THAT YOU
6    GAVE MR. IRVIN THE VIOXX SAMPLE?
7    A.   NO, I DON'T.
8    Q.   WAS THAT ONE VIOXX SAMPLE THAT YOU GAVE MR. IRVIN THE ONLY
9    SAMPLE YOU EVER GAVE HIM?
10   A.   YES.
11   Q.   WHEN MR. IRVIN TOLD YOU THAT HE HAD HAD A BACKACHE, DID
12   YOU OFFER TO GIVE HIM A SAMPLE OF THE VIOXX?
13   A.   I THINK THAT'S HOW IT CAME UP IN THE CONVERSATION.  HE
14   ASKED ME IF I HAD ANYTHING, YOU KNOW, FOR MY SHOULDER THAT HAD
15   HELPED ME.  I SAID, "I'VE GOT SOMETHING THAT THEY GAVE ME THAT
16   DIDN'T WORK IF YOU WANT TO TRY IT."  THAT'S HOW IT CAME UP.  IN
17   FACT, I THINK IT WAS IN MY TRUCK BOX AT THE TIME.
18   Q.   DID YOU GIVE IT TO HIM DURING THAT CONVERSATION?
19   A.   I WENT BACK IN THE TRUCK AND BROUGHT IT BACK IN AND GAVE
20   IT TO HIM.  I DON'T REMEMBER WHEN HE TOOK IT.
21   Q.   DO YOU REMEMBER ANYTHING ELSE ABOUT THAT FIRST
22   CONVERSATION WHEN YOU GAVE MR. IRVIN THAT VIOXX SAMPLE?
23   A.   THAT WAS PRETTY MUCH JUST IN PASSING.  YOU KNOW, HE HAD A
24   BACKACHE, WHICH IT MAY HAVE BEEN SOMETHING TO DO WITH UNLOADING
25   A TRUCK.  I DON'T KNOW.  YOU KNOW, THERE WAS A LOT OF LIFTING
page 959
1    INVOLVED IN THAT JOB.
```

**[960:5] - [960:12]**          Testimony of Richard Aycock

```
page 960
5    Q.   AFTER THE CONVERSATION WHERE YOU GAVE MR. IRVIN THE VIOXX
6    SAMPLE, DID YOU EVER TALK TO HIM ABOUT VIOXX AGAIN?
7    A.   NO.
8    Q.   DID MR. IRVIN EVER TELL YOU WHETHER HE HAD TRIED THE
9    SAMPLE YOU HAD GAVE HIM?
10   A.   I THINK THE NEXT DAY HE TOLD ME THAT IT HELPED HIM, AND HE
11   KNEW THAT IT WAS ALL I HAD.  SO THAT WAS THE EXTENT OF THE
```

**Declaration of Phillip A. Wittmann in Support of**
**Merck's Motion for Judgment as a Matter of Law**
*Exhibit A*

```
              12        CONVERSATION.  HE SAID HIS BACK WAS BETTER.
```

[961:9] - [961:10]          Testimony of Richard Aycock
```
              page 961
                9     Q.    HAVE YOU EVER SEEN ANY VIOXX COMMERCIALS?
               10     A.    YES.
```

[961:11] - [961:12]         Testimony of Richard Aycock
```
              page 961
               11     Q.    DID YOU TALK TO MR. IRVIN ABOUT ANY VIOXX COMMERCIALS?
               12     A.    NO.
```

**Dec. 3, 2005 Transcript (Day Five)**

[1010:7] - [1010:17]        Testimony of Dr. Schirmer
```
              page 1010
                7     Q.    DO YOU KNOW WHETHER HE CALLED YOU OR YOU CALLED HIM ON
                8     THAT OCCASION?
                9     A.    I DON'T KNOW WHO CALLED WHO, AND I BELIEVE IT WAS EITHER
               10     HE HAD SPOKEN TO MY WIFE OR HAD SPOKEN TO ME AND SAID THAT
               11     HE -- THE FIRST TWO MEDICATIONS I PRESCRIBED WERE NOT WORKING,
               12     BUT A FRIEND OF HIS, SOMEBODY -- AN ACQUAINTANCE HE KNEW GAVE
               13     HIM SOME SAMPLES OF VIOXX.  IT WAS MY UNDERSTANDING THAT HE
               14     SAID IT HELPED AND THAT HE CANNOT GET IN TO SEE HIS DOCTOR
               15     RIGHT AWAY, IF I COULD CALL HIM IN SOME UNTIL HE COULD GET TO
               16     SEE HIS DOCTOR.  AT THAT POINT, THAT'S WHEN I CALLED IN THE
               17     PRESCRIPTION OF 30.
```

[1024:18] - [1025:10]       Testimony of Dr. Schirmer
```
              page 1024
               18     Q.    DOCTOR, MR. BEASLEY ASKED YOU SOME QUESTIONS A MOMENT AGO
               19     ABOUT THE COMPARATIVE EFFICACY OF VIOXX COMPARED TO TRADITIONAL
               20     ANTI-INFLAMMATORY DRUGS.  DO YOU RECALL THOSE QUESTIONS?
               21     A.    YES.
               22     Q.    WITH RESPECT TO MR. IRVIN, WE DON'T HAVE TO RELY ON ANY
               23     SPECIFIC DATA REGARDING EFFICACY.  YOU KNOW THROUGH YOUR OWN
               24     PRESCRIPTIONS AND CONVERSATIONS REGARDING MR. IRVIN THAT THE
               25     OVER-THE-COUNTER ANTI-INFLAMMATORIES AND EVEN THE
              page 1025
                1     VICODIN/IBUPROFEN COMBINATION IN APRIL 2001 WAS NOT PROVIDING
                2     HIM RELIEF, CORRECT?
                3     A.    CORRECT.
                4     Q.    INSTEAD, THROUGH YOUR OWN CONVERSATIONS, YOU LEARNED THAT
                5     VIOXX WAS THE ONLY DRUG THAT PROVIDED HIM RELIEF IN THAT TIME
                6     FRAME; CORRECT?
                7     A.    THAT WAS MY UNDERSTANDING.
                8     Q.    AM I CORRECT THAT, TO YOUR OWN UNDERSTANDING, MR. IRVIN
                9     TOOK VIOXX FOR LESS THAN 30 DAYS?
               10     A.    THAT'S MY UNDERSTANDING.
```

[1025:16] - [1026:1]        Testimony of Dr. Schirmer
```
              page 1025
               16     Q.    YOU DON'T RECALL EVER DISCUSSING WITH ANY MERCK SALES
               17     REPRESENTATIVE VIOXX AT ANY TIME, CORRECT?
               18     A.    CORRECT.
```

**Declaration of Phillip A. Wittmann in Support of
Merck's Motion for Judgment as a Matter of Law**
*Exhibit A*

```
19        Q.    YOU DON'T RECALL EVER READING AND RELYING ON ANY MERCK
20        PROMOTIONAL ACTIVITIES, CORRECT?
21        A.    THAT IS CORRECT.
22        Q.    AM I CORRECT -- AND I THINK YOU TOLD US THIS EARLIER --
23        THAT IN AND AROUND APRIL OF 2001, YOU HADN'T SEEN ANY
24        PROMOTIONAL MATERIAL OR ANY SCIENTIFIC ARTICLES ABOUT THE VIGOR
25        STUDY; CORRECT?
page 1026
 1        A.    CORRECT.
```