UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

U. S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED  *12 - 7 - 05*

LORETTA G. WHYTE
CLERK

| | |
|---|---|
| In re:  VIOXX * | MDL Docket No. 1657 |
| * | |
| PRODUCTS LIABILITY LITIGATION  * | SECTION L |
| * | |
| * | JUDGE FALLON |
| This document relates to * | |
| Case No. 05-4046* | |
| * | MAGISTRATE JUDGE KNOWLES |
| EVELYN IRVIN PLUNKETT * | |
| as Personal Representative of the Estate of  * | |
| RICHARD IRVIN, JR., * | |
| * | |
| Plaintiff, * | |
| * | |
| vs. * | |
| * | |
| MERCK & CO., INC., * | |
| * | |
| Defendant. * | |
| * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MOTION OF MERCK & CO., INC. ("MERCK") FOR
## JUDGMENT AS A MATTER OF LAW

Merck, through undersigned counsel, and pursuant to Federal Rule of Civil Procedure
50(a), hereby moves the Court to enter judgment in Merck's favor, as a matter of law, on
plaintiff's remaining causes of action, which include claims for: (i) strict liability and negligent
design defect; (ii) strict liability and negligent failure to warn; and (iii) failure to test Vioxx®.

____Fee_____
____Process_____
X__Dktd_____
____CtRmDep____
____Doc.No._____

The facts and law supporting this motion are more fully set forth in the accompanying memorandum, declaration, and exhibit, which are incorporated as if fully set forth herein.

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
4041 Essen Lane
One United Plaza, Suite 501
Baton Rouge, Louisiana 70809
Phone:  225-490-8900
Fax:      225-490-8960

Defendants' Liaison Counsel

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:      312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone: 202-434-5000
Fax:      202-434-5029

And

John H. Beisner
Charles C. Lifland
Richard B. Goetz
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone: 213-430-6000
Fax:      213-430-6407

Attorneys for Merck & Co., Inc.

## **CERTIFICATE OF SERVICE**

I hereby certify that the above and forgoing Motion for Judgment as a Matter of Law has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 7th day of December, 2005.

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| | * | **JUDGE FALLON** |
| **This document relates to** | * | |
| **Case No. 05-4046*** | * | |
| | * | **MAGISTRATE JUDGE KNOWLES** |
| **EVELYN IRVIN PLUNKETT** | * | |
| as Personal Representative of the Estate of | * | |
| **RICHARD IRVIN, JR.,** | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| **MERCK & CO., INC.,** | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## DECLARATION OF TAREK ISMAIL IN SUPPORT OF MOTION OF MERCK & CO., INC. ("MERCK") FOR JUDGMENT AS A MATTER OF LAW

I, TAREK ISMAIL, by way of declaration, say:

1.     I am an attorney in the law firm of Bartlit Beck Herman Palenchar & Scott LLP, attorneys for the defendant Merck & Co., Inc. ("Merck") in the above-captioned matter. I make this declaration in support of Merck's Motion for Judgment as a Matter of Law, filed concurrently herewith. I have personal knowledge to state that the following exhibit, which is attached to this declaration, is a true and correct copy of the document it purports to be.

2.      Attached hereto as Exhibit A is a true and correct copy of excerpts from the November 29, 2005; November 30, 2005; December 1, 2005; December 2, 2005; and December 3, 2005; December 5, 2005; and December 6, 2005 daily trial transcripts in this action.

Respectfully submitted,

Tarek Ismail, Esq.
Attorney for Merck & Co., Inc.

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Declaration of Phillip A. Wittmann in Support of Merck's Motion for Judgment as a Matter of Law has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 7th day of December, 2005.

**Declaration of Phillip A. Wittmann in Support of**
**Merck's Motion for Judgment as a Matter of Law**
*Exhibit A*

---

**Nov. 29, 2005 Transcript (Day One)**

[108:4] - [108:5]        Plaintiff's Opening Statement

```
page 108
   4                    MARCH OF 2000, DO THEY STOP SELLING THE DRUG?
   5         DO THEY TRY TO FIX THE FORMULA?  NO. ...  .
```

[200:4] - [200:8]        Testimony of Dr. Lucchesi

```
page 200
   4         Q.   WOULD VIOXX BE STRONGER OR MORE EFFECTIVE TO PAIN RELIEF
   5         THAN, SAY, IBUPROFEN THAT YOU COULD BUY OVER THE COUNTER FOR
   6         TEN CENT A PILL?
   7         A.   WELL, I WOULD SAY THEY'RE FAIRLY COMPARABLE IN THE ABILITY
   8         TO RELIEVE PAIN.
```

[226:23] - [227:3]        Testimony of Dr. Lucchesi

```
page 226
  23         Q.   NOW, SWITCHING FROM DOGS TO HUMANS AND FOLK, CAN YOU GO ON
  24         COX-2'S, COX-2 INHIBITORS, EXCUSE -- ME, DO YOU AGREE, SIR,
  25         THAT THE GASTROINTESTINAL COMPLICATIONS FROM TRADITIONAL NSAIDS
page 227
   1         WAS ONE OF THE MORE FREQUENT REASONS FOR EMERGENCY ROOM VISITS
   2         IN THE UNITED STATES?
   3         A.   THAT IS CORRECT.  THE LITERATURE SUPPORTS THAT.
```

[227:21] - [228:10]        Testimony of Dr. Lucchesi

```
page 227
  21         Q.   AND I THINK I HEARD YOU SAY THAT FOR MOST PEOPLE, VIOXX,
  22         NOTWITHSTANDING YOUR CRITICISM, VIOXX IS PERFECTLY SAFE FOR
  23         MOST PEOPLE; IS THAT RIGHT?
  24         A.   I THINK I SAID PEOPLE WITHOUT CARDIOVASCULAR DISEASE COULD
  25         PROBABLY TAKE VIOXX WITH SAFETY.
page 228
   1         Q.   WOULD YOU AGREE WITH THIS STATEMENT THAT FOR THE VAST
   2         MAJORITY OF PEOPLE, VIOXX IS PERFECTLY SAFE?
   3         A.   YES.
   4         Q.   AND WOULD YOU -- AND I THINK YOU'VE TESTIFIED BEFORE THAT,
   5         AS FAR AS YOU'RE CONCERNED, IT'S -- VIOXX HAS A PLACE ON THE
   6         MARKET; IS THAT RIGHT?
   7         A.   YES.
   8         Q.   AND I THINK YOU'VE TESTIFIED AT ONE POINT THAT YOU BELIEVE
   9         THAT VIOXX SHOULD STAY ON THE MARKET --
  10         A.   I BELIEVE I ANSWERED THAT, YES.
```

[253:1] - [253:10]        Testimony of Dr. Lucchesi

```
page 253
   1         Q.   AT PAGE 331, LINE 21, THROUGH PAGE 332, LINE ONE, WERE YOU
   2         ASKED THIS QUESTION AND DID YOU GIVE THIS ANSWER UNDER OATH:
   3         "QUESTION:  WOULD YOU AGREE, SIR, THAT THERE IS NOT A SINGLE
   4         PIECE OF PEER-REVIEWED MEDICAL LITERATURE THAT DEMONSTRATES
   5         EVEN IN AN ANIMAL MODEL THAT VIOXX CONTRIBUTES TO PLAQUE
   6         RUPTURE IN THE CORONARY ARTERY?
   7         "ANSWER:  THERE MAY NOT BE TODAY."
   8              IS THAT YOUR SWORN TESTIMONY?
   9         A.   IF YOU'RE REFERRING SPECIFICALLY TO VIOXX, THE ANSWER IS
  10         WHAT I GAVE LAST TIME.  THAT WOULD BE THE ANSWER TODAY.  BUT --
```

**Declaration of Phillip A. Wittmann in Support of**
**Merck's Motion for Judgment as a Matter of Law**
*Exhibit A*

Nov. 30, 2005 Transcript (Day Two)

[343:21] - [344:5]           Testimony of Dr. Bloor

```
page 343
21        Q.    AND AT PAGE 116, WERE YOU ASKED THIS QUESTION AND DID YOU
22        GIVE THIS ANSWER UNDER OATH:
23               "Q.   OKAY.   SO I GUESS WHAT I'M REALLY GETTING AT IS:
24        ARE YOU AWARE OF ANY STUDY THAT SHOWS THAT VIOXX MAKES
25        ATHEROSCLEROTIC PLAQUE MORE VULNERABLE OR MORE UNSTABLE?
page 344
1                "A.   I AM NOT AWARE OF ANY SUCH STUDY BEING DONE.
2                "Q.   OKAY.   SO THE ANSWER IS NO?
3                "A.   YES."
4                WAS THAT YOUR SWORN TESTIMONY IN YOUR DEPOSITION?
5         A.    YES, IT WAS.
```

[347:7] - [348:16]           Testimony of Dr. Bloor

```
page 347
7         Q.    AND THEN YOU CAME UP WITH THE NEW OPINION THAT WASN'T IN
8         YOUR REPORT THAT THERE WAS NO PLAQUE RUPTURE, MUST HAVE BEEN
9         SOME PROTHROMBOTIC AGENT AND, BY GOLLY, THAT MUST HAVE BEEN
10        VIOXX, RIGHT?
11        A.    WELL, AT THAT POINT YOU CONSIDER WHAT OTHER FACTORS MAY BE
12        PLAYING A ROLE; AND BEING AWARE THAT THE PATIENT WAS ON VIOXX
13        AT THE TIME, AND BASED ON THE DEPOSITION TESTIMONY AND REPORT
14        THAT I HAD SEEN FROM DR. LUCCHESI AT THAT POINT CONCERNING THE
15        PHARMACOLOGY MECHANISMS INVOLVED, AND ASSUMING THAT IT DID HAVE
16        PROTHROMBOTIC ACTIVITY, AND ALSO ON THE APPROVE STUDY
17        MENTIONING ABOUT IT CAUSING CARDIOVASCULAR THROMBOTIC EVENTS, I
18        CAME TO THAT CONCLUSION THAT IT IS A SUBSTANTIAL CONTRIBUTORY
19        FACTOR IN THE CAUSE OF DEATH IN THE FORMATION OF THAT THROMBUS.
20        Q.    WHEN YOU COME TO THAT CONCLUSION, YOU ARE ASSUMING, ARE
21        YOU NOT, THAT USING LOW-DOSE VIOXX, 25 MILLIGRAMS, SOMEHOW
22        INCREASES THE RISK OF BLOOD CLOTS EVEN IF THE DURATION OF USE
23        OR LENGTH OF TIME IS LESS THAN A MONTH.   THAT'S ONE OF YOUR
24        ASSUMPTIONS, RIGHT?
25        A.    YES.
page 348
1         Q.    BECAUSE YOU KNOW THAT FROM EVERYTHING WE UNDERSTAND FROM
2         MR. IRVIN'S FAMILY, THAT HE TOOK VIOXX FOR LESS THAN A MONTH,
3         RIGHT?
4         A.    THAT'S WHAT I'M AWARE OF, YES.
5         Q.    AND THE LOW DOSE, THE 25-MILLIGRAM VERSION, RIGHT?
6         A.    YES.
7         Q.    BUT THE TRUTH IS YOU DON'T REALLY KNOW ANYTHING YOURSELF
8         ABOUT VIOXX, DO YOU?
9         A.    I HAVE NOT STUDIED VIOXX, AND SO THE ASSUMPTIONS I MADE IN
10        ARRIVING AT THAT OPINION, AS I'VE ALREADY STATED, ARE BASED ON
11        DR. LUCCHESI'S EXPERTISE AND HIS TESTIMONY IN DEPOSITION AND IN
12        HIS REPORT AND ALSO ON WHAT STATEMENTS ARE MADE IN THE APPROVE
13        STUDY.
14        Q.    DID YOU HAVE A CHANCE -- SORRY.
15        A.    AND GOING BEYOND THAT, I WOULD DEFER TO AN EPIDEMIOLOGIST
16        ABOUT WHAT HE WOULD HAVE TO SAY ABOUT THE DURATION REQUIRED.
```

[364:1] - [364:23]           Testimony of Dr. Bloor

```
page 364
1         Q.    IS THE PHRASE "SUDDEN CARDIAC DEATH" ONE THAT ACCURATELY
2         DESCRIBES MR. IRVIN'S DEATH?
```

**Declaration of Phillip A. Wittmann in Support of**
**Merck's Motion for Judgment as a Matter of Law**
*Exhibit A*

```
3     A.   HIS WOULD PROBABLY BE CONSIDERED IN THAT CATEGORY.
4     Q.   NOW, IS SUDDEN CARDIAC DEATH OFTEN CAUSED BY BLOOD CLOTS
5     IN THE CORONARY ARTERY?
6     A.   THEY CAN OCCUR IN SUDDEN CARDIAC DEATH, YES.
7     Q.   AND IS SUDDEN CARDIAC DEATH OFTEN CAUSED BY PLAQUE
8     RUPTURES THAT RESULT IN BLOOD CLOTS IN THE CORONARY ARTERY?
9     A.   IT CAN BE.
10    Q.   AND SUDDEN CARDIAC DEATH IS A VERY COMMON CAUSE OF DEATH
11    IN THE UNITED STATES, IS IT NOT?
12    A.   WELL, I'M AWARE OF THE REPORTS HAD BEEN MADE ABOUT HOW
13    MANY SUDDEN CARDIAC DEATHS OCCUR PER YEAR.
14    Q.   AND YOU'RE AWARE OF REPORTS OF 300- TO 400,000 SUDDEN
15    CARDIAC DEATHS OCCURRING IN THE UNITED STATES ALONE, RIGHT?
16    A.   YES.
17    Q.   AND IN ABOUT 80 PERCENT OF THESE CASES OF SUDDEN CARDIAC
18    DEATH, PEOPLE HAVE SOME KIND OF PREEXISTING CORONARY ARTERY
19    DISEASE; ISN'T THAT RIGHT?
20    A.   I WOULD EXPECT IT TO BE -- IF WE'RE TALKING ABOUT
21    ATHEROSCLEROSIS, IT WOULD BE HIGHER THAN 80 PERCENT.
22    Q.   EVEN HIGHER THAN 80 PERCENT?
23    A.   YES.
```

**Dec. 1, 2005 Transcript (Day Three)**

[646:25] - [647:20]          Testimony of Dr. Nies

```
page 646
25    Q.   DID VIOXX, IN THIS PHASE III TESTING, DELIVER ON ITS
page 647
1     PROMISE OF LOWER GI SIDE EFFECTS THAT WAS THE PURPOSE OF THE
2     DEVELOPMENT OF THE DRUG?
3     A.   YES, IT DID.  WE LOOKED AT THAT IN SEVERAL WAYS.  IN TERMS
4     OF SPECIFICALLY LOOKING AT THE STOMACH, WE DID SOME STUDIES IN
5     PATIENTS WITH OSTEOARTHRITIS WHERE A CAMERA IS PUT INTO THE
6     STOMACH AND THE LINING IS ACTUALLY PHOTOGRAPHED.  IT'S CALLED
7     ENDOSCOPY, AND THIS WAS DONE THREE TIMES OVER A PERIOD OF SIX
8     MONTHS -- THE VIOXX WAS GIVEN AT QUITE HIGH DOSES IN THIS STUDY
9     BECAUSE WE WANTED TO MAKE SURE IT WAS SAFE EVEN AT VERY HIGH
10    DOSES -- AND COMPARED THIS WITH IBUPROFEN OR MOTRIN.  THERE WAS
11    A VERY MUCH LESS EFFECT OF VIOXX ON THE STOMACH THAN THE
12    MOTRIN, AND IT'S DIRECTLY LOOKING AT IT WITH THE ENDOSCOPE.
13         WE ALSO TOOK ALL OF OUR PHASE III TRIALS, WHICH WERE
14    LARGE, AND COMBINED THEM SO THAT WE COULD LOOK AT HOW MANY OF
15    THE PEOPLE ON THE NSAIDS HAD ULCERS AND HOW MANY OF THE PEOPLE
16    ON VIOXX HAD ULCERS; AND WHEN YOU DO THAT THERE WAS A
17    DIFFERENCE AS WELL WITH VIOXX.  THERE WERE FEWER PEOPLE ON
18    VIOXX THAT HAD ULCERS AND COMPLICATIONS THAN THE PEOPLE ON THE
19    NSAIDS.  SO IT DID APPEAR THAT THE WHOLE HYPOTHESIS ON WHICH
20    THE DRUG DEVELOPMENT WAS BASED WAS TRUE.
```

[673:24] - [675:10]          Testimony of Dr. Nies

```
page 673
24    Q.   WHAT DID YOU TALK TO DR. SCOLNICK ABOUT?
25    A.   WHAT WE DID IS WE LOOKED AT ALL OF THE DATA THAT WE HAD AT
page 674
1     THAT TIME OF THE VIOXX VERSUS PLACEBO, WHICH IS ACTUALLY THE
2     BEST DATA TO BE ABLE TO TELL IF THERE'S ANYTHING GOING ON.  AND
3     VIOXX VERSUS OTHER NSAIDS.  BUT THE BEST DATA WAS THE VIOXX
4     VERSUS PLACEBO, AND WE HAD ONGOING AT THAT TIME A TRIAL IN
5     PATIENTS WHO HAD ALZHEIMER'S DISEASE.  AND THERE HAD BEEN
```

**Declaration of Phillip A. Wittmann in Support of**
**Merck's Motion for Judgment as a Matter of Law**
*Exhibit A*

```
  6     SOME -- THERE HAD BEEN A THEORY THAT THE COX-2 INHIBITORS COULD
  7     PROTECT AGAINST THE DEVELOPMENT OF ALZHEIMER'S DISEASE.
  8             SO WE WERE COMPARING VIOXX VERSUS A PLACEBO IN A
  9     GROUP OF PEOPLE WHO HAD ALZHEIMER'S DISEASE OR A
 10     PRE-ALZHEIMER'S TYPE OF DEMENTIA; AND WHEN WE LOOKED AT THOSE
 11     ELDERLY INDIVIDUALS WHO HAD TAKEN THE DRUG FOR OVER A YEAR,
 12     THEY HAVE NO EVIDENCE OF ANY INCREASE IN HEART ATTACKS WITH
 13     VIOXX.  SO, WHEREAS, WITH VIGOR YOU CAN'T TELL BECAUSE YOU HAVE
 14     TWO ACTIVE THERAPIES -- ONE COULD BE GOING UP OR ONE COULD BE
 15     GOING DOWN; WITH THE PLACEBO, YOU CAN TELL, AND THERE WASN'T
 16     ANY EVIDENCE THERE.
 17     Q.    WAS THAT ALZHEIMER'S DATA IN THOUSANDS OF PATIENTS?
 18     A.    YES.
 19     Q.    FOR A LONG PERIOD OF TIME?
 20     A.    YES.  IT WAS A PERIOD OF TIME ACTUALLY A BIT LONGER THAN
 21     THE VIGOR TRIAL.
 22     Q.    WHEN YOU COMBINED THE ALZHEIMER'S DATA, I DON'T MEAN
 23     PUTTING THEM ALL TOGETHER, BUT I MEAN IF YOU CONSIDER THE
 24     CONCLUSION OF ALZHEIMER'S AND WHAT THAT SHOWED WITH ALL THE
 25     PLACEBO DATA THAT YOU HAD WHEN YOU SOUGHT APPROVAL OF THE
page 675
  1     MEDICINE, WHAT DID THAT LEAD YOU TO CONCLUDE SHORTLY AFTER THE
  2     VIGOR RESULTS WERE UNBLINDED?
  3     A.    WHEN WE PUT ALL OF OUR DATA TOGETHER, WE COULD GET, I
  4     DON'T KNOW, MAYBE 25,000, 28,000 PATIENTS TOTAL WHO HAD GOTTEN
  5     OTHER NSAIDS OR PLACEBO, AND THERE WAS NO DIFFERENCE BETWEEN
  6     VIOXX AND THOSE OTHER GROUPS.  THE ONLY DIFFERENCE WAS IN
  7     STUDIES THAT HAD NAPROXEN IN IT.
  8     Q.    WHAT DID THAT TELL YOU WHETHER -- TO YOUR MIND, DID THAT
  9     SHOW WHETHER VIOXX WAS NEUTRAL OR HARMFUL?
 10     A.    IT LOOKED TO US THAT VIOXX WAS NEUTRAL.
```

[679:1] - [679:17]     Testimony of Dr. Nies

```
page 679
  1     Q.    WAS THERE AN FDA ADVISORY COMMITTEE IN FEBRUARY 2001?
  2     A.    YES.
  3     Q.    DID YOU ATTEND THAT MEETING?
  4     A.    YES.
  5     Q.    DID YOU PRESENT ON BEHALF OF MERCK, ALONG WITH OTHERS?
  6     A.    YES, I DID.
  7     Q.    WHAT WAS THE PURPOSE OF THE 2001 ADVISORY COMMITTEE
  8     MEETING?
  9     A.    THAT WAS TO DISCUSS VIGOR, WHICH WAS THE GI OUTCOMES
 10     TRIAL, BOTH IN TERMS OF ITS GASTROINTESTINAL BENEFIT AND IN
 11     TERMS OF THIS DIFFERENCE BETWEEN NAPROXEN AND VIOXX.  SO ALL OF
 12     THAT WAS DISCUSSED IN THIS PUBLIC MEETING.
 13     Q.    SIR, HOW WOULD YOU CHARACTERIZE THE DISCUSSION OR THE
 14     SCIENTIFIC DISCOURSE THAT HAPPENED AT THAT MEETING?
 15     A.    I THINK IT WAS A VERY, VERY OPEN THOUGHTFUL DISCUSSION.
 16     PEOPLE SAID THAT THEY FELT THAT WE HAD PROVED THE GI
 17     OUTCOMES --
```

[680:7] - [681:1]     Testimony of Dr. Nies

```
page 680
  7     Q.    DID YOU PRESENT DATA FROM THE VIGOR TRIAL TO THE ADVISORY
  8     COMMITTEE?
  9     A.    YES, I WAS ONE OF THE PEOPLE WHO PRESENTED.
 10     Q.    DID ANYONE AT THE FDA OR THE ADVISORY COMMITTEE AT THE
 11     FEBRUARY 2001 MEETING TELL MERCK THAT THE NAPROXEN HYPOTHESIS
 12     WAS ALL WET?
```

**Declaration of Phillip A. Wittmann in Support of**
**Merck's Motion for Judgment as a Matter of Law**
*Exhibit A*

```
13      A.    NO.
14      Q.    DID ANYONE AT THE FDA ADVISORY COMMITTEE IN FEBRUARY 2001
15      TELL MERCK THAT VIGOR HAD DEFINITIVELY PROVED A CARDIOVASCULAR
16      RISK WITH VIOXX?
17      A.    NO.
18      Q.    DOCTOR, DID YOU GO INTO THAT MEETING BELIEVING NAPROXEN
19      WAS THE BEST EXPLANATION FOR THE VIGOR DATA?
20      A.    YES.  YES.
21      Q.    CAN YOU CHARACTERIZE YOUR STATE OF MIND WHEN YOU LEFT THAT
22      MEETING IN FEBRUARY 2001?  WHAT DID YOU FEEL ABOUT THE DRUG OR
23      BELIEVE ABOUT THE DUG AFTER THIS OPEN DISCUSSION WITH OUTSIDE
24      EXPERTS AND THE FDA?
25      A.    I STILL BELIEVED THAT NAPROXEN WAS THE EXPLANATION FOR THE
page 681
 1      CARDIOVASCULAR DIFFERENCES IN THE TWO GROUPS.
```

[728:16] - [728:21]          Testimony of Dr. Ray

```
page 728
16      Q.    DOES VIOXX, IN YOUR OPINION, IN REVIEWING THE DATA,
17      DECREASE THE RISK OF STOMACH PROBLEMS?
18      A.    THERE'S BEEN ONE RANDOMIZED CLINICAL TRIAL, VIGOR, THAT
19      SHOWS THAT VIOXX DOES DECREASE THE RATE OF STOMACH ULCERS AND
20      COMPLICATIONS THAT ARE CLINICALLY IMPORTANT RELATIVE TO
21      NAPROXEN.  SO THAT ONE TRIAL SHOWS THAT, YES.
```

[730:18] - [730:25]          Testimony of Dr. Ray

```
page 730
18      Q.    I APOLOGIZE, DOCTOR.  THANK YOU FOR BEARING WITH ME.  IN
19      REVIEWING ALL THE DATA AND EPIDEMIOLOGICAL STUDIES WE HAVE
20      TALKED ABOUT, DO YOU HAVE AN OPINION WHETHER VIOXX CAUSES HEART
21      ATTACKS IN LESS THAN 30 DAYS?
22      A.    YES.  THE EVIDENCE THAT I HAVE REVIEWED FROM THE CLINICAL
23      TRIALS AND THE EPIDEMIOLOGIC STUDIES SHOWS THAT IT'S -- TO A
24      REASONABLE DEGREE OF CERTAINTY, LIKELY TO INCREASE HEART
25      ATTACKS AND SERIOUS CORONARY HEART DISEASE IN 1 TO 30 DAYS.
```

[731:1] - [732:23]          Testimony of Dr. Ray

```
page 731
 1      Q.    THANK YOU, DOCTOR.  DOCTOR, HOW LONG DID IT TAKE FOR HEART
 2      ATTACK RISKS TO BEGIN IN THE VIGOR STUDY?
 3      A.    ONE OF THE WAYS THAT WE ASSESS THAT IS BY LOOKING AT WHAT
 4      WE CALL THE CUMULATIVE INCIDENCE CURVES, AND THOSE ARE JUST THE
 5      CURVES THAT SHOW, FOR A GIVEN POINT IN TIME, HOW MANY PATIENTS
 6      HAVE DEVELOPED THE DISEASE.  WHEN THOSE CURVES BEGIN TO
 7      SEPARATE, THAT'S WHEN THE RISK FOR ONE DRUG IS -- IT'S AT LEAST
 8      STATISTICALLY -- WE ARE ABLE TO SHOW STATISTICALLY GREATER THAN
 9      THAT FOR THE OTHER DRUG.  IN VIGOR, THAT HAPPENED WITHIN TWO
10      MONTHS.
11      Q.    THESE CURVES, DID THEY SEPARATE BEFORE 18 MONTHS, THEN?
12      A.    THE VIGOR TRIAL ITSELF -- IT'S IMPORTANT TO UNDERSTAND THE
13      VIGOR TRIAL WAS A NINE-MONTH STUDY, SO THE AVERAGE LENGTH OF
14      FOLLOW-UP IN VIGOR WAS NINE MONTHS.  SO THIS 2.82 EXCESS RISK
15      OF SERIOUS CORONARY HEART DISEASE HAPPENED IN NINE MONTHS, AND
16      THE INCREASED RISK WAS STATISTICALLY APPARENT WITHIN TWO
17      MONTHS.
18      Q.    LET'S TALK ABOUT THE ADVANTAGE STUDY WE TALKED ABOUT A
19      LITTLE BIT EARLIER, DOCTOR.  WHAT DID THE ADVANTAGE STUDY
20      REVEAL IN PREFERENCE TO DURATION AND USE?
21      A.    THE ADVANTAGE STUDY HAD AN AVERAGE DURATION OF 69 DAYS, SO
```

**Declaration of Phillip A. Wittmann in Support of**
**Merck's Motion for Judgment as a Matter of Law**
*Exhibit A*

```
22      THAT'S A LITTLE BIT LESS THAN TEN WEEKS.  SO THE INCREASED RISK
23      FOR VIOXX USERS IN THAT STUDY, WHICH WAS THE 25-MILLIGRAM
24      STUDY, WAS APPARENT IN UNDER TEN WEEKS.
25      Q.   DOCTOR, DID THE APPROVE TRIAL ESTABLISH THAT IT TAKES
page 732
1       LONGER THAN 18 MONTHS FOR VIOXX TO CAUSE HEART ATTACKS?
2       A.   NO, IT DID NOT.
3       Q.   CAN YOU EXPLAIN THAT, PLEASE?
4       A.   YES.  THE DATA PUBLISHED REGARDING THE APPROVE STUDY
5       DID -- THE AUTHORS OF THE PUBLICATION SUGGESTED THE DATA SHOWED
6       IT TOOK AT LEAST 18 MONTHS.  BUT WHAT THEY ANALYZED WAS A
7       DISEASE THAT INCLUDED MANY OTHER CONDITIONS, SOME OF THEM NOT
8       RELATED TO HEART ATTACK.  FOR EXAMPLE, THEY INCLUDED DEEP VEIN
9       THROMBOSIS IN THAT 18 -- IN THAT 18-MONTH ANALYSIS, WHICH ARE
10      BLOOD CLOTS IN YOUR LEG.  THEY REALLY HAVE A DIFFERENT PATTERN
11      OF CAUSATION THAN HEART ATTACKS.
12              SO I ACTUALLY DID AN ANALYSIS OF THE APPROVE DATA,
13      LOOKING ONLY AT SERIOUS CORONARY HEART DISEASE, AND THAT
14      ANALYSIS SHOWS THE INCREASED RISK IS EVIDENT BY SIX MONTHS.
15      Q.   DOCTOR, THERE ARE ALSO EPIDEMIOLOGICAL STUDIES THAT
16      DISPUTE THIS 18-MONTH HYPOTHESIS?
17      A.   YES, THERE ARE.  THERE ARE TWO EPIDEMIOLOGIC STUDIES THAT
18      ACTUALLY LOOKED AT 1- TO 30-DAY DURATION, AND THESE TWO
19      EPIDEMIOLOGIC STUDIES REPORTED INCREASED RISK:  ONE, I BELIEVE,
20      AN INCREASED RISK OF ABOUT 2.4 -- 2.8; AND THE OTHER INCREASED
21      RISK OF 1.4 FOR THE PERIOD OF 1 TO 30 DAYS.  SO THE
22      EPIDEMIOLOGICAL STUDIES CONFIRM THE INFORMATION FROM THE
23      CLINICAL TRIALS THAT THE RISK APPEARS RELATIVELY SOON.
```

[732:24] - [733:6]          Testimony of Dr. Ray

```
page 732
24      Q.   DOCTOR, DID THESE EPIDEMIOLOGICAL STUDIES INCLUDE THE
25      50-MILLIGRAM DOSAGE?
page 733
1       A.   THEY DID, BUT IT TURNS OUT -- THIS IS SOMETHING ANYBODY
2       CAN LEARN BY READING THE LABEL -- THAT THE 50-MILLIGRAM DOSE IS
3       ONLY SUPPOSED TO BE USED FOR FIVE DAYS OR LESS; AND SO
4       ACCORDING TO FDA DATA, 82 PERCENT OF USE IS FOR 25 MILLIGRAMS
5       OR LESS.  SO MOST OF THE DATA IN THOSE STUDIES REPRESENTED 25
6       MILLIGRAMS.
```

[733:15] - [733:19]          Testimony of Dr. Ray

```
page 733
15      Q.   I JUST WANTED TO SEE IF YOU COULD DO THAT OFF THE TOP OF
16      YOUR HEAD.  DOCTOR, DID EPIDEMIOLOGICAL STUDIES SHOW AN
17      INCREASED RISK WITHIN THE FIRST 30 DAYS OF USAGE OF VIOXX?
18      A.   AS WE'VE SAID, THE TWO EPIDEMIOLOGIC STUDIES DID SHOW
19      THAT.
```

**Dec. 2, 2005 Transcript (Day Four)**

[764:16] - [771:13]          Testimony of Dr. Ray

```
page 764
16      Q.   SIR, ON THIS TOPIC THAT YOU MENTIONED EARLY IN YOUR
17      EXAMINATION ABOUT THE -- YOUR CONCLUSION ABOUT RISKS AND
18      BENEFITS -- I DON'T WANT TO GET INTO ANY SORT OF CALCULATION OR
19      ANYTHING LIKE THAT, BUT JUST TO UNDERSTAND THE BENEFITS SIDE,
20      WHEN YOU SAID VIOXX'S -- VIOXX'S ULCER BENEFITS, I THINK WAS
21      THE WAY YOU PUT IT, HAVE YOU STUDIED THE GASTROINTESTINAL
```

**Declaration of Phillip A. Wittmann in Support of
Merck's Motion for Judgment as a Matter of Law**
*Exhibit A*

```
22      EFFECTS OF DIFFERENT PAIN RELIEVERS?
23      A.   YES, SIR, I HAVE.
24      Q.   AND YOU TALKED ABOUT THE ULCER EFFECTS.  I THINK YOU USED
25      THE PHRASE "STOMACH PROBLEMS" YESTERDAY.  BUT THESE -- THESE
page 765
1       STOMACH PROBLEMS THAT COME ALONG WITH CERTAIN TYPES OF PAIN
2       RELIEVERS CAN BE VERY SEVERE; ISN'T THAT TRUE?
3       A.   INFREQUENTLY, BUT YES, THEY CAN BE.  ABSOLUTELY.
4       Q.   I'M GOING TO PUT UP ON THE SCREEN AN ARTICLE THAT YOU
5       WROTE.  WHEN I SAY "YOU WROTE," I GUESS ALMOST ALL THE TIME
6       THERE IS MORE THAN ONE AUTHOR.
7       A.   IT'S A TEAM EFFORT, YES.
8       Q.   SO WAYNE RAY.  AND IS THIS AN ARTICLE UP ON THE SCREEN,
9       THE FIRST PAGE OF AN ARTICLE THAT WAS PUBLISHED IN 2001?
10      A.   YES, SIR, IT IS, SIR.
11              MR. BECK:  AND IF WE -- AND WE'LL MARK THIS FOR
12      IDENTIFICATION PURPOSES AND SUBMIT IT LATER, YOUR HONOR, AS
13      PLAINTIFF'S EXHIBIT 1044.  WE'RE NOT OFFERING IT IN EVIDENCE
14      BUT FOR IDENTIFICATION PURPOSES.
15              THE COURT:  OKAY.
16      BY MR. BECK:
17      Q.   AND THEN OVER ON PAGE 2, IN THE LEFT COLUMN, LET ME JUST
18      FIND WHERE I WANT TO BE HERE.  I'M SORRY.  COULD YOU READ THIS
19      PARAGRAPH FOR THE JURY; AND IF WE GET TO TECHNICAL WORDS, I'LL
20      ASK YOU TO STOP AND TO DEFINE THE TERM.
21      A.   CERTAINLY.  "NONSTEROIDAL ANTI-INFLAMMATORY DRUGS, NSAIDS,
22      ONE OF THE MOST FREQUENTLY PRESCRIBED CLASSES OF DRUGS IN THE
23      ELDERLY, ARE ALSO ONE OF THE MOST COMMON CAUSES OF DRUG-INDUCED
24      MORBIDITY AND MORTALITY IN THE ELDERLY."
25      Q.   LET ME JUST STOP THERE.  "MORBIDITY" MEANS GETTING SICK,
page 766
1       RIGHT?
2       A.   YES, SIR.
3       Q.   AND MORTALITY MEANS DYING, RIGHT?
4       A.   YES, SIR, IT DOES.
5       Q.   SO NSAIDS ARE ONE OF THE MOST FREQUENTLY PRESCRIBED
6       CLASSES OF DRUGS AND ALSO ONE OF THE MOST COMMON CAUSES OF
7       DEATH IN THE ELDERLY, RIGHT?
8       A.   DRUG-INDUCED DEATH.
9       Q.   DRUG-INDUCED DEATH.  OKAY.  GO AHEAD, PLEASE.
10      A.   AND WE HAVE TO MAKE A CAVEAT.  THOSE WERE OF THE DRUGS
11      THAT WERE AVAILABLE AT THE TIME.  THIS WAS FOUR TO FIVE YEARS
12      AGO, SO LIFE HAS CHANGED SINCE THEN.
13      Q.   SO THESE NSAIDS WERE BASICALLY TALKING ABOUT MOTRIN,
14      ADVIL, NOT VIOXX OR CELEBREX, RIGHT?
15      A.   YES, SIR.
16      Q.   OKAY.  THAT'S IMPORTANT.  SO THE OLD-STYLE NSAIDS, WE'VE
17      HEARD THEM REFERRED TO AS THE "NONSELECTIVE COX INHIBITORS,"
18      THOSE ARE THE ONES YOU'RE TALKING ABOUT; RIGHT?
19      A.   YES.
20      Q.   SO CONTINUE ON.
21      A.   "IN THE UNITED STATES, APPROXIMATELY 40 PERCENT OF PEOPLE
22      65 YEARS OR OLDER FILL AT LEAST ONE PRESCRIPTION FOR AN NSAID
23      EACH YEAR, AND ON A GIVEN DAY APPROXIMATELY 13 PERCENT ARE
24      TAKING A PRESCRIPTION NSAID.  THE MOST COMMON SERIOUS ADVERSE
25      EFFECTS OF NSAIDS -- PEPTIC ULCERATION, GASTROINTESTINAL
page 767
1       HEMORRHAGE, AND DEATH" --
2       Q.   LET'S STOP THERE.
3       A.   -- "OCCUR MORE FREQUENTLY IN THE ELDERLY."
4       Q.   I'M SORRY.  LET'S STOP THERE.  IT'S NOT A TECHNICAL TERM,
```

7

**Declaration of Phillip A. Wittmann in Support of**
**Merck's Motion for Judgment as a Matter of Law**
*Exhibit A*

```
 5       BUT ONE OF THE MOST COMMON SERIOUS ADVERSE EFFECTS OF THESE
 6       OLD-STYLE NSAIDS, BEFORE THE COX-2 INHIBITORS CAME ALONG, WAS
 7       DEATH; RIGHT?
 8       A.   I THINK THAT ARE -- THOSE ARE -- OF THE SERIOUS ADVERSE
 9       EFFECTS, THOSE ARE THE MOST COMMON ONES, YES.
10       Q.   AND THEY OCCUR MORE FREQUENTLY IN THE ELDERLY, RIGHT?
11       A.   YES, THEY DO.
12       Q.   OKAY.  CONTINUE AFTER THAT.
13       A.   "THE EXCESS FREQUENCY OF SERIOUS GASTROINTESTINAL
14       COMPLICATION REQUIRING HOSPITALIZATION IN PATIENTS YOUNGER THAN
15       65 YEARS OF AGE TAKING NSAIDS IS APPROXIMATELY THREE PER 1,000
16       PERSONS PER YEAR, COMPARED WITH 10 TO 20 PER 1,000 PERSONS PER
17       YEAR IN PATIENTS 65 YEARS OF AGE OR OLDER."
18       Q.   SO WHEN YOU WERE TALKING ABOUT HOW IT'S A RELATIVELY RARE
19       OCCURRENCE TO HAVE ONE OF THESE PROBLEMS, IN FACT, FOR ELDERLY
20       FOLKS, SERIOUS GASTROINTESTINAL COMPLICATION REQUIRING
21       HOSPITALIZATIONS WERE LIKE 10 TO 20 PEOPLE PER 1,000 PATIENT
22       YEARS; RIGHT?
23       A.   SURE, WITH ONE QUALIFICATION; AND THAT IS THAT THESE DATA
24       WERE ALL GATHERED BEFORE THE WIDE USE OF -- EXCUSE ME FOR THE
25       JARGON -- OF PROTON PUMP INHIBITORS.  BUT THOSE ARE DRUGS LIKE
page 768
 1       PRILOSEC, WHICH THERE IN SOME WAY THEY CAN PROTECT THE STOMACH
 2       TO ULCERS RELATED TO NSAIDS.  SO WE'RE ACTUALLY ENGAGED IN
 3       STUDIES NOW TO TRY TO UPDATE THOSE DATA BECAUSE SOME THINK THE
 4       NUMBERS MAY HAVE GONE DOWN.  BUT PRIOR TO THE INTRODUCTION OF
 5       THE PRILOSEC-TYPE DRUGS, THOSE NUMBERS WERE CORRECT.
 6       Q.   OKAY.  AND THEN I'M GOING TO SHOW YOU ANOTHER ARTICLE THAT
 7       YOU WROTE, WHICH, FOR IDENTIFICATION PURPOSES, WE'LL MARK AS
 8       DEFENDANTS EXHIBIT 1045.  IS THIS AN ARTICLE THAT YOU
 9       COAUTHORED -- I SEE YOU'RE LISTED AS THE FIRST AUTHOR HERE.
10       DOES THAT MEAN THAT YOU WERE THE MAIN AUTHOR?
11       A.   YES, IT DOES.
12       Q.   BUT IT'S STILL A TEAM EFFORT, BUT YOU'RE THE MAIN --
13       A.   ABSOLUTELY.
14       Q.   AND IS THIS AN ARTICLE THAT YOU WROTE IN 2000?
15       A.   YES.
16       Q.   AND IF WE GO TO THE SECOND PAGE OF THIS ARTICLE, I'M NOT
17       GOING TO ASK YOU TO READ THE WHOLE ARTICLE, BUT CAN YOU READ
18       THIS PORTION FOR THE JURY AND THEN, AGAIN, WE'LL STOP AND
19       EXPLAIN IF WE NEED TO.
20       A.   "HOWEVER, THE FREQUENT USE OF NSAIDS FOR ELDERLY PATIENTS
21       HAS BEEN QUESTIONED BECAUSE OF THE HIGH RISK FOR
22       GASTROINTESTINAL AND OTHER TOXICITY.
23       Q.   CAN WE JUST STOP HERE.  AGAIN WE'RE TALKING ABOUT ADVIL,
24       MOTRIN, NOT VIOXX OR CELEBREX, RIGHT?
25       A.   YES.
page 769
 1       Q.   AND WE'RE TALKING ABOUT THE DAYS BEFORE PRILOSEC.
 2       A.   "AND THEIR EFFICACY RELATIVE TO OTHER TREATMENTS FOR
 3       MUSCULOSKELETAL SYMPTOMS."
 4       Q.   INCIDENTALLY, LET ME JUST STOP YOU, MUSCULOSKELETAL,
 5       THAT'S THE SAME THING THAT VIOXX AND CELEBREX ARE USED FOR,
 6       RIGHT?
 7       A.   YES.  AND MAY I PUT THESE ARTICLES IN CONTEXT?
 8       Q.   WELL, READ THE REST OF IT, AND THEN I'M SURE THAT
 9       MR. SIZEMORE WILL ASK YOU TO PUT WHATEVER CONTEXT YOU WANT ON
10       IT.  SO KEEP READING.
11       A.   "FOR ELDERLY PATIENTS, USE OF NSAIDS CONFER SUBSTANTIAL
12       EXCESS RISK FOR GI TOXICITY, INCLUDING 10 TO 20 PER 1,000
13       ADDITIONAL HOSPITALIZATIONS PER YEAR FOR PEPTIC ULCERATION AND
```

**Declaration of Phillip A. Wittmann in Support of**
**Merck's Motion for Judgment as a Matter of Law**
*Exhibit A*

```
14        A FOUR-FOLD INCREASED RISK FOR DEATH FROM GI BLEEDING."
15        Q.   SO USING -- JUST LET ME STOP HERE.  USING AN NSAID
16        COMPARED TO NOT USING ANY PAIN MEDICINE AT ALL FOR THE ELDERLY
17        FOLKS QUADRUPLED THE RISK OF DEATHS FROM GI BLEEDING; RIGHT?
18        A.   YES.  ABSENT A PROTON PUMP INHIBITOR, YES.
19        Q.   AND THAT'S WHAT YOUR ARTICLE WAS ABOUT?
20        A.   BACK IN THE DAYS WHEN THEY WERE USED VERY COMMONLY.
21        Q.   WELL, KEEP READING.
22        A.   "THUS, AMONG ELDERLY PATIENTS, APPROXIMATELY 30 PERCENT OF
23        ULCER-RELATED HOSPITALIZATIONS AND DEATHS ARE ATTRIBUTABLE TO
24        NSAIDS."
25        Q.   OKAY.
page 770
1         A.   "OTHER ADVERSE EFFECTS INCLUDE RENAL TOXICITY."
2         Q.   AND IT GOES ON, BUT --
3         A.   YES.
4         Q.   THEN LET ME SHOW YOU AN ARTICLE WRITTEN BY SOMEBODY NAMED
5         WOLFE AND SOME OTHERS.  THE REVIEW ARTICLE FROM THE NEW ENGLAND
6         JOURNAL OF MEDICINE, WHICH, FOR IDENTIFICATION PURPOSES IS
7         PLAINTIFF'S EXHIBIT 1046, AND THIS IS FROM 1999, SO THAT --
8         THAT'S IN THE PRECOX-2 PORTION AS WELL, RIGHT?  PERIOD OF TIME?
9         A.   YES, IT IS.
10        Q.   AND I WANT TO LOOK AT A PARAGRAPH THAT ACTUALLY GOES FROM
11        PAGE 1 OVER TO PAGE 2.  SO I HAVE TO TRY THIS.  I THINK IT
12        WORKED.  ACTUALLY, I DID THIS WRONG.  I WANT TO START A LITTLE
13        HIGHER.  OKAY.  WE'RE STARTING -- ON THE BASIS OF THESE
14        CONSERVATIVE FIGURES AND ARAMIS DATA -- DO YOU KNOW WHAT ARAMIS
15        DATA IS?
16        A.   YES, SIR, I DO.
17        Q.   "THE ANNUAL NUMBER OF HOSPITALIZATIONS IN THE
18        UNITED STATES FOR SERIOUS GASTROINTESTINAL COMPLICATIONS IS
19        ESTIMATED TO BE AT LEAST 103,000.  AT AN ESTIMATED COST OF
20        15,000 TO 20,000 PER HOSPITALIZATION, THE ANNUAL DIRECT COST OF
21        SUCH COMPLICATIONS EXCEED TWO BILLION." CORRECT?
22        A.   THAT'S CERTAINLY WHAT THEY SAY, YES.
23        Q.   AND HE SAID THAT "IT'S BEEN ESTIMATED CONSERVATIVELY THAT
24        THERE WERE 16,500 NSAID-RELATED DEATHS OCCUR AMONG PATIENTS
25        WITH RHEUMATOID ARTHRITIS OR OSTEOARTHRITIS EVERY YEAR IN THE
page 771
1         UNITED STATES." AND THAT SQUARES WITH THE ANALYSIS THAT YOU'VE
2         DONE; RIGHT, SIR?
3         A.   THE NUMBERS ARE CERTAINLY COMPARABLE, YES.
4         Q.   AND THE FIGURE IS SIMILAR TO THE NUMBER OF DEATHS FOR THE
5         ACQUIRED IMMUNODEFICIENCY SYNDROME.  THAT WOULD BE AIDS, RIGHT?
6         A.   YES, SIR.
7         Q.   SO THIS PROBLEM THAT WE'RE TALKING ABOUT IS SIMILAR TO THE
8         NUMBER OF DEATHS FOR AIDS AND CONSIDERABLY GREATER THAN THE
9         NUMBER OF DEATHS FOR MULTIPLE MYELOMA, ASTHMA, CERVICAL CANCER,
10        HODGKIN'S DISEASE; RIGHT?
11        A.   THAT'S CERTAINLY WHAT THEY SAY.  I'M CERTAINLY NOT AN
12        EXPERT ON THOSE CAUSES OF DEATH, SO I CAN'T VERIFY
13        INDEPENDENTLY, BUT IT DOESN'T SOUND UNREASONABLE.
```

[771:14] - [771:19]        Testimony of Dr. Ray

```
page 771
14        Q.   AND WOULD YOU AGREE WITH THEM THAT IF DEATHS FROM
15        GASTROINTESTINAL TOXIC EFFECTS OF NSAIDS WERE TABULATED
16        SEPARATELY IN THE NATIONAL VITAL STATISTICS REPORTS, THOSE
17        EFFECTS WOULD CONSTITUTE THE 15TH MOST COMMON CAUSE OF DEATH IN
18        THE UNITED STATES.
19        A.   AT THAT TIME, THAT PROBABLY WAS A REASONABLE ESTIMATION.
```

**Declaration of Phillip A. Wittmann in Support of
Merck's Motion for Judgment as a Matter of Law**
*Exhibit A*

| [775:2] - [775:4] | Testimony of Dr. Ray |
|---|---|

page 775
2      Q.   BUT JUST BECAUSE SOMETHING IS STATISTICALLY APPARENT
3      DOESN'T MEAN THAT IT'S STATISTICALLY SIGNIFICANT, RIGHT?
4      A.   NO, IT DOESN'T.

| [779:11] - [779:15] | Testimony of Dr. Ray |
|---|---|

page 779
11     Q.   BUT, IN ANY EVENT, THE TAKE-AWAY CONCLUSION FROM THIS
12     STUDY IS THAT 25 MILLIGRAMS DOES NOT POSE AN INCREASED RISK OF
13     SERIOUS CARDIAC EFFECTS, BUT 50 MILLIGRAMS DOES; RIGHT?
14     A.   YES, WITH THE MINOR CAVEAT THAT 25 MILLIGRAMS OR LESS DOES
15     NOT SHOW INCREASED RISK VERSUS GREATER THAN 25 MILLIGRAMS.

| [779:25] - [780:12] | Testimony of Dr. Ray |
|---|---|

page 779
25     A.   "OUR RESULTS INDICATED THAT HIGH-DOSE ROFECOXIB COULD BE
page 780
1      ASSOCIATED WITH A RAISED RISK OF SERIOUS CORONARY HEART
2      DISEASE; WHEREAS, ROFECOXIB 25 MILLIGRAMS OR LESS, CELECOXIB,
3      NAPROXEN, AND IBUPROFEN ARE NOT.  RISK OF SERIOUS CORONARY
4      HEART DISEASE INCREASE 70 PERCENT RELATIVE TO NSAID NONUSERS,
5      AND NEW USERS HAVE NEARLY DOUBLED RISK."
6      Q.   THAT'S FOR THE HIGH-DOSE FOLKS, RIGHT?
7      A.   YES, IT IS.
8      Q.   THEN FOR THE LOW DOSE OR FOR -- EXCUSE ME, FOR 25
9      MILLIGRAMS, OKAY -- HERE WE GO, 25 MILLIGRAMS OR LESS, THERE
10     WAS -- THEY ARE NOT ASSOCIATED WITH A RAISED RISK OF SERIOUS
11     CORONARY HEART PROBLEMS, RIGHT?
12     A.   IN THIS STUDY, CORRECT.

| [780:18] - [782:14] | Testimony of Dr. Ray |
|---|---|

page 780
18     Q.   THIS PARAGRAPH THAT STARTS AT THE BOTTOM OF THE PAGE WE
19     WERE JUST ON AND CARRIES OVER TO THE NEXT PAGE, COULD YOU READ
20     THAT FOR THE JURY?
21     A.   AND IS THIS FROM THE SAME ARTICLE?
22     Q.   YES, THIS IS THE SAME ARTICLE.  AND I'M SORRY THAT I HAD
23     ALL OF THOSE COLORS AND THINGS.
24     A.   NO, I'M JUST DOUBLE-CHECKING.
25     Q.   IT'S THE SAME PAGE WE WERE ON WITH THE TABLE THERE ON THE
page 781
1      TOP.  AND NOW IT'S THE BOTTOM -- THE ONLY WAY I CAN DO IT HERE
2      IS TO SHOW THESE TWO PAGES AT ONCE, WHEN THE PARAGRAPH CARRIES
3      OVER FROM ONE TO --
4      A.   NO PROBLEM AT ALL.  DO YOU WANT ME TO READ?
5      Q.   YES, PLEASE.
6      A.   "OUR DATA, IN CONJUNCTION WITH PRE-MARKETING DATA THAT
7      SUGGEST THAT HIGH-DOSE ROFECOXIB INCREASES HYPERTENSION, LOWER
8      EXTREMITY EDEMA, AND CREATININE CONCENTRATIONS, RAISE SERIOUS
9      DOUBTS ABOUT THE CARDIOVASCULAR SAFETY OF THE DRUG AT DOSES OF
10     GREATER THAN 25 MILLIGRAMS.  RESULTS OF THE VIGOR STUDY AND AN
11     INABILITY TO CONFIRM A LARGE PROTECTIVE EFFECT OF 1,000
12     MILLIGRAMS OF NAPROXEN REINFORCE THIS CONCLUSION.  BECAUSE
13     THERE IS NO EVIDENCE OF GREATER LONGER TERM, GREATER THAN FIVE
14     DAYS, EFFICACY FOR THESE HIGH DOSES, WE RECOMMEND THAT AT
15     PRESENT, LONG-TERM USE OF HIGH-DOSE ROFECOXIB BE AVOIDED."
16     Q.   NOW, YOUR RECOMMENDATION FOCUSED EXCLUSIVELY ON HIGH-DOSE
17     50-MILLIGRAM, RIGHT?

**Declaration of Phillip A. Wittmann in Support of**
**Merck's Motion for Judgment as a Matter of Law**
*Exhibit A*

```
18      A.    THOSE WERE THE DATA WE HAD AT THE TIME.
19      Q.    AND YOUR RECOMMENDATION -- WELL, YOU HAD DATA -- THAT'S
20    NOT TRUE.  YOU HAD DATA ON 25 MILLIGRAMS AND LESS, RIGHT?
21      A.    YOU MIGHT HAVE MISUNDERSTOOD MY RESPONSE.  SO COULD YOU
22    START BACK WITH THE ORIGINAL QUESTION.
23      Q.    SURE.  YOU'RE SITTING THERE WITH DATA FOR 25-MILLIGRAM AND
24    50-MILLIGRAM, AND YOU LOOKED AT THE SAFETY, AND YOU SAW THAT
25    25-MILLIGRAM WAS JUST AS SAFE AS NO USE AT ALL, BUT
page 782
1     50-MILLIGRAM WAS A DIFFERENT STORY; RIGHT?
2       A.    CERTAINLY, WHAT I WAS TRYING TO SAY IS THAT OUR STUDY WAS
3     THE FIRST STUDY, EPIDEMIOLOGICAL STUDY, FOR ROFECOXIB; AND IN
4     THAT STUDY, THE DATA SHOWED AN INCREASE FOR 50 MILLIGRAMS AND
5     DIDN'T SHOW AN INCREASE FOR 25 OR LESS.  BUT IT WAS SIMPLY THE
6     FIRST OF THE STUDIES TO BE DONE, AND SO IT WAS THE DATA THAT
7     WAS AVAILABLE AT THE TIME.
8       Q.    AND IT WAS THE DATA AVAILABLE FOR ALL DOSES, RIGHT?
9       A.    FROM EPIDEMIOLOGICAL STUDIES, YES.
10      Q.    AND YOU NEVER MADE A REPRESENTATION IN 2002, THE YEAR
11    AFTER MR. IRVIN PASSED AWAY, WHEN YOU WERE ANALYZING THE
12    AVAILABLE DATA THEN, YOU NEVER MADE A RECOMMENDATION THAT
13    PEOPLE STOPPED USING 25 MILLIGRAMS, DID YOU?
14      A.    NO, I DIDN'T.
```

[787:11] - [787:18]          Testimony of Dr. Ray

```
page 787
11      Q.    WELL, DO YOU AGREE THAT, ON THE 25-MILLIGRAM, YOU TOLD THE
12    PEOPLE AT THE MEETING THAT THERE WAS NO INCREASED RISK OF THE
13    25-MILLIGRAM DOSE?
14      A.    THAT'S ESSENTIALLY CORRECT, YES, THAT OUR DATA SHOWED NO
15    INCREASED RISK WITH THE 25-MILLIGRAM DOSE.
16      Q.    ALL YOU CAN DO IS GO BY THE DATA?
17      A.    SOMETIMES PEOPLE GO BEYOND THE DATA, BUT OUR DATA SHOWED
18    NO INCREASED RISK WITH THE 25-MILLIGRAM DOSE.
```

[788:13] - [788:25]          Testimony of Dr. Ray

```
page 788
13      Q.    AND AGAIN, CONCERNING THE 50-MILLIGRAM DOSE AT THESE
14    MEETINGS, YOU SAID THAT THAT DOSE SHOULD BE USED CAUTIOUSLY
15    BECAUSE OF ITS CLEAR ASSOCIATION WITH CARDIOVASCULAR RISKS,
16    RIGHT?
17      A.    WHAT WE SAID WOULD BE ESSENTIALLY SIMILAR TO WHAT'S IN THE
18    ARTICLE.
19      Q.    AND AGAIN, AT THIS MEETING WHERE THE FDA WAS PRESENT, YOU
20    SAID THAT WITH 25 MILLIGRAMS, THERE WAS NO INCREASED RISK,
21    RIGHT?
22      A.    WE SAID THAT OUR DATA SHOWED NO INCREASED RISK WITH 25
23    MILLIGRAMS.
24      Q.    YOU TOLD THEM YOU SAW NO INCREASED RISK, DIDN'T YOU?
25      A.    YES.  THAT'S WHAT OUR DATA SHOWED.  EXACTLY.
```

[795:23] - [796:5]          Testimony of Dr. Ray

```
page 795
23      Q.    IN TERMS OF WHETHER THE 50-MILLIGRAM DOSE HELPED ON THE
24    PAIN AND THE GASTROINTESTINAL PROBLEMS, IT DID WORK WELL IN
25    THAT RESPECT, DIDN'T IT?
page 796
1       A.    YES.  THE DATA, AS I RECALL THEM, ARE THAT IT WAS EQUALLY
2     EFFICACIOUS TO NAPROXEN AND -- WITH REGARD TO PAIN.  SO IT WAS
```

## Declaration of Phillip A. Wittmann in Support of
## Merck's Motion for Judgment as a Matter of Law
### *Exhibit A*

|     |     |
| --- | --- |
| 3   | JUST AS GOOD, NO BETTER, BUT JUST AS GOOD AS NAPROXEN, AND IT |
| 4   | CUT THE RISK OF SERIOUS CONSEQUENCES OF STOMACH PROBLEMS ABOUT |
| 5   | IN HALF. |

[800:4] - [800:14]     Testimony of Dr. Ray

page 800

|     |     |
| --- | --- |
| 4   | Q.   WELL, IN FACT, WHEN THE VIGOR RESULTS FIRST CAME OUT, YOU |
| 5   | THOUGHT THAT THE MOST PROBABLE EXPLANATION WAS INCREASED RISK |
| 6   | FROM THE 50-MILLIGRAM VIOXX BUT THAT THE NAPROXEN HYPOTHESIS |
| 7   | WAS POSSIBLE, RIGHT? |
| 8   | A.   NO ONE WOULD ARGUE -- AT LEAST I WOULDN'T ARGUE -- THAT IT |
| 9   | WAS IMPOSSIBLE AT ALL, SIR, NO.   IT WAS SOMETHING THAT WAS |
| 10  | POSSIBLE, JUST NOT VERY LIKELY. |
| 11  | Q.   WELL, YOU THOUGHT THAT THE MOST PROBABLE EXPLANATION WAS |
| 12  | INCREASED RISK FROM 50-MILLIGRAM VIOXX BUT THAT THE NAPROXEN |
| 13  | HYPOTHESIS WAS POSSIBLE, DIDN'T YOU? |
| 14  | A.   IT CERTAINLY WAS POSSIBLE, YES, SIR. |

[803:25] - [804:6]     Testimony of Dr. Ray

page 803

|     |     |
| --- | --- |
| 25  | Q.   WELL, VIGOR SHOWED THAT NAPROXEN CAUSED MORE THAN TWICE AS |

page 804

|     |     |
| --- | --- |
| 1   | MANY SERIOUS GASTROINTESTINAL SIDE EFFECTS THAN THE |
| 2   | 50-MILLIGRAM DOSE OF VIOXX, WHICH WAS TWICE THE RECOMMENDED |
| 3   | DOSE. |
| 4   | A.   YES, THAT'S ABSOLUTELY CORRECT. |
| 5   | Q.   AND THAT FINDING WAS STATISTICALLY SIGNIFICANT? |
| 6   | A.   ABSOLUTELY.   NO ARGUMENT THERE. |

[825:20] - [826:8]     Testimony of Dr. Ray

page 825

|     |     |
| --- | --- |
| 20  | Q.   LET'S MOVE OFF ADVANTAGE AND GO TO VIGOR AGAIN. |
| 21  | YESTERDAY, WHEN TALKING ABOUT THE VIGOR TRIAL, YOU SAID THAT -- |
| 22  | AND YOU WERE ASKED SOME QUESTIONS ABOUT SHORT-TERM INCREASE OF |
| 23  | RISKS IN VIGOR.   I WROTE THIS DOWN.   YOU SAID THAT VIGOR SHOWED |
| 24  | A STATISTICALLY APPARENT RISK OF MI AND SUDDEN CARDIAC DEATHS |
| 25  | OF TWO MONTHS.   DO YOU REMEMBER THAT? |

page 826

|     |     |
| --- | --- |
| 1   | A.   YES, I DO. |
| 2   | Q.   "STATISTICALLY APPARENT."   YOU USED THAT PHRASE ON |
| 3   | PURPOSE, DIDN'T YOU? |
| 4   | A.   YES, I DID. |
| 5   | Q.   BUT AS WE KNOW FROM YOUR EARLIER TESTIMONY TODAY, SAYING |
| 6   | THAT SOMETHING IS STATISTICALLY APPARENT IS NOT AT ALL THE SAME |
| 7   | THING AS SAYING THAT IT IS STATISTICALLY SIGNIFICANT; RIGHT? |
| 8   | A.   THAT'S CORRECT.   ABSOLUTELY. |

[827:7] - [827:13]     Testimony of Dr. Ray

page 827

|     |     |
| --- | --- |
| 7   | Q.   AND YOU SAID THAT THE LINES SEPARATED AFTER TWO MONTHS. |
| 8   | DO YOU REMEMBER THAT? |
| 9   | A.   YES, I DO. |
| 10  | Q.   BUT THE LINES DID NOT SEPARATE TO THE POINT WHERE THERE |
| 11  | WOULD BE A STATISTICALLY SIGNIFICANT DIFFERENCE BETWEEN THOSE |
| 12  | LINES OF TWO MONTHS, DID THEY? |
| 13  | A.   NO. THE STUDY DIDN'T HAVE POWER TO SHOW THAT. |

[827:14] - [827:20]     Testimony of Dr. Ray

**Declaration of Phillip A. Wittmann in Support of**
**Merck's Motion for Judgment as a Matter of Law**
*Exhibit A*

---

```
page 827
14      Q.   AND, OF COURSE, THE VIGOR DOSE, AS WE'VE SAID SEVERAL
15      TIMES, WAS 50 MILLIGRAMS; TWICE WHAT MR. IRVIN TOOK, RIGHT?
16      A.   YES, SIR.
17      Q.   AND THE AVERAGE USE WAS HOW LONG?
18      A.   NINE MONTHS.
19      Q.   VERSUS LESS THAN ONE MONTH, RIGHT?
20      A.   THAT'S CORRECT.
```

[848:11] - [848:25]          Testimony of Dr. Ray

```
page 848
11      Q.   DOCTOR, MR. BECK TALKED TO YOU ABOUT THE RISK AND BENEFITS
12      OF VIOXX.  HAVE YOU EXAMINED THIS ISSUE?
13      A.   YES.  THERE IS ONE CLINICAL TRIAL, THE VIGOR STUDY, WHERE
14      YOU CAN COMPARE THE CLINICAL BENEFITS TO THE CLINICAL RISKS,
15      AND I'VE EXAMINED THOSE FINDINGS.
16      Q.   DO YOU HAVE AN OPINION WHETHER THE RISKS OF VIOXX IN
17      CAUSING HEART ATTACKS AND DEATH OUTWEIGHS THE GI BENEFITS?
18              MR. BECK:  I OBJECT, YOUR HONOR.
19              THE COURT:  I OVERRULE THE OBJECTION.
20              THE WITNESS:  THE FINDINGS OF THE VIGOR STUDY CLEARLY
21      SHOW THAT IT WAS.  THERE WERE 9.4 EXTRA CASES OF SERIOUS
22      CARDIOVASCULAR DISEASE PER THOUSAND PATIENTS, AND 7.8 SERIOUS
23      ULCER COMPLICATIONS PREVENTED.  SO IT'S MORE SERIOUS HEART
24      DISEASE CAUSED THAN ULCERS PREVENTED.  AND THAT'S PRETTY
25      CLEAR-CUT.
```

## Dec. 3, 2005 Transcript (Day Five)

[999:2] - [999:7]          Testimony of Dr. Schirmer

```
page 999
2       Q.   IN AROUND APRIL OF 2001, HOW WELL DID YOU KNOW HIS MEDICAL
3       CONDITION?
4       A.   I HAD A GENERAL GESTALT OF IT.  WE TALKED ABOUT THIS OR
5       THAT, COLDS, IF I HAD A COLD OR IF -- REALLY NOTHING TOO
6       SPECIFIC OR TOO INVOLVED.  I'VE NEVER HAD A FORMAL ALLIANCE
7       WITH HIM OR A PRACTICE WITH HIM.
```

[999:8] - [999:22]          Testimony of Dr. Schirmer

```
page 999
8       Q.   WOULD YOU SAY THAT YOU EVER TREATED MR. IRVIN PRIOR TO
9       APRIL OF 2001?
10      A.   INFORMALLY, YES.  YOU KNOW, I CAN RECALL -- I DON'T KNOW
11      THE SPECIFICS, IF HE HAD A COLD, WHAT'S THE BEST THING FOR A
12      COLD AND THAT KIND OF STUFF, BUT NOTHING -- CERTAINLY, I NEVER
13      TREATED ANY ARE MAJOR ILLNESSES, IF YOU WILL, DIABETES,
14      PNEUMONIA, THOSE KIND OF PROBLEMS.
15      Q.   DID YOU EVER CONDUCT A MEDICAL EXAM ON MR. IRVIN --
16      A.   NO.
17      Q.   -- AT ANY TIME?  DID YOU EVER TAKE A MEDICAL HISTORY OF
18      MR. IRVIN AT ANY TIME?
19      A.   NOT A FORMAL ONE, NO.
20      Q.   DID YOU EVER ORDER ANY LABORATORY TESTING FOR MR. IRVIN AT
21      ANY TIME?
22      A.   NOT TO MY KNOWLEDGE.
```

[1000:2] - [1000:6]          Testimony of Dr. Schirmer

```
page 1000
```

**Declaration of Phillip A. Wittmann in Support of**
**Merck's Motion for Judgment as a Matter of Law**
*Exhibit A*

```
                      2     Q.   IN OR AROUND 2001, SIR, DID YOU KNOW WHAT MR. IRVIN'S
                      3     BLOOD PRESSURE WAS?
                      4     A.   I THINK WE TALKED ABOUT IT BEFORE AND, YOU KNOW, WE'VE
                      5     ALWAYS -- WE DISCUSSED IT BACK AND FORTH AND I THINK THE -- THE
                      6     GENERAL GESTALT WAS IT WAS ALWAYS NORMAL OR IT WAS OKAY.
```

[1000:15] - [1001:1]     Testimony of Dr. Schirmer

```
                   page 1000
                     15     Q.   ON THOSE OCCASIONS THAT YOU DISCUSSED MR. IRVIN'S BLOOD
                     16     PRESSURE, WHAT WAS YOUR UNDERSTANDING AS TO WHO TOOK HIS BLOOD
                     17     PRESSURE READING?
                     18     A.   OH, I DON'T KNOW WHO TOOK IT.  I THINK WE'VE DISCUSSED
                     19     WHAT KIND OF PROBLEMS HE HAD WHEN -- I THINK IT WAS IN
                     20     PARTICULAR WHEN HE HAD THE COLD, A CERTAIN DECONGESTANT SHOULD
                     21     NOT BE TAKEN IF YOU HAVE HIGH BLOOD PRESSURE, AND TO THE BEST
                     22     OF MY RECOLLECTION IT WAS AROUND THAT TIME.  DON'T TAKE CERTAIN
                     23     MEDICATIONS IF YOU HAVE HIGH BLOOD PRESSURE.  IF I REMEMBER
                     24     CORRECTLY, HE WASN'T TAKING ANY MEDICATION FOR BLOOD PRESSURE,
                     25     DIABETES, BECAUSE IT WAS MY UNDERSTANDING HE DID NOT HAVE THOSE
                   page 1001
                      1     PROBLEMS.
```

[1001:5] - [1001:13]     Testimony of Dr. Schirmer

```
                   page 1001
                      5     Q.   JUST SO I'M CLEAR, YOU GOT THE SENSE, SIR, FROM THE
                      6     CONVERSATIONS WITH MR. IRVIN THAT HE HAD HAD HIS BLOOD PRESSURE
                      7     TAKEN SOMETIME IN THE LATE '90S SOMETIME, CORRECT?
                      8     A.    I INFERRED THAT HIS BLOOD PRESSURE WAS UNDER CONTROL OR
                      9     NORMAL.
                     10     Q.   YOU INFERRED THAT FROM HIS COMMENT TO YOU THAT HE WAS NOT
                     11     TAKING ANY MEDICATION TO CONTROL HIS BLOOD PRESSURE?
                     12     A.    I THINK IT WAS MORE FROM "I DON'T HAVE BLOOD PRESSURE
                     13     PROBLEMS."
```

[1001:14] - [1001:19]     Testimony of Dr. Schirmer

```
                   page 1001
                     14     Q.   OKAY.  IN OR AROUND 2000, DID YOU HAVE A SENSE OF WHAT
                     15     MR. IRVIN'S CHOLESTEROL READINGS WERE?
                     16     A.   NO.
                     17     Q.   DO YOU KNOW WHETHER HE HAD EVER HAD HIS CHOLESTEROL
                     18     CHECKED?
                     19     A.    I HAVE NO KNOWLEDGE OF HIS PRIOR MEDICAL VISITS.
```

[1002:4] - [1002:5]     Testimony of Dr. Schirmer

```
                   page 1002
                      4     Q.   HAVE YOU EVER SEEN A MEDICAL RECORD REGARDING MR. IRVIN?
                      5     A.    I DON'T REMEMBER EVER SEEING A MEDICAL RECORD FOR HIM, NO.
```

[1024:18] - [1025:10]     Testimony of Dr. Schirmer

```
                   page 1024
                     18     Q.   DOCTOR, MR. BEASLEY ASKED YOU SOME QUESTIONS A MOMENT AGO
                     19     ABOUT THE COMPARATIVE EFFICACY OF VIOXX COMPARED TO TRADITIONAL
                     20     ANTI-INFLAMMATORY DRUGS.  DO YOU RECALL THOSE QUESTIONS?
                     21     A.   YES.
                     22     Q.   WITH RESPECT TO MR. IRVIN, WE DON'T HAVE TO RELY ON ANY
                     23     SPECIFIC DATA REGARDING EFFICACY.  YOU KNOW THROUGH YOUR OWN
                     24     PRESCRIPTIONS AND CONVERSATIONS REGARDING MR. IRVIN THAT THE
```

**Declaration of Phillip A. Wittmann in Support of
Merck's Motion for Judgment as a Matter of Law**
*Exhibit A*

```
25      OVER-THE-COUNTER ANTI-INFLAMMATORIES AND EVEN THE
page 1025
1       VICODIN/IBUPROFEN COMBINATION IN APRIL 2001 WAS NOT PROVIDING
2       HIM RELIEF, CORRECT?
3       A.   CORRECT.
4       Q.   INSTEAD, THROUGH YOUR OWN CONVERSATIONS, YOU LEARNED THAT
5       VIOXX WAS THE ONLY DRUG THAT PROVIDED HIM RELIEF IN THAT TIME
6       FRAME; CORRECT?
7       A.   THAT WAS MY UNDERSTANDING.
8       Q.   AM I CORRECT THAT, TO YOUR OWN UNDERSTANDING, MR. IRVIN
9       TOOK VIOXX FOR LESS THAN 30 DAYS?
10      A.   THAT'S MY UNDERSTANDING.
```

## Dec. 5, 2005 Transcript (Day Six)

[1372:17] - [1373:4]      Testimony of Mrs. Plunkett

```
page 1372
17      Q.   IS IT FAIR TO SAY THAT DICKY WASN'T THE TYPE OF PERSON
18      THAT WOULD COMMONLY GO TO THE DOCTOR?
19      A.   NO, HE DID NOT LIKE TO GO TO THE DOCTOR.  IT WASN'T THAT
20      HE DIDN'T LIKE TO GO TO THE DOCTOR; HE DIDN'T FEEL LIKE HE
21      NEEDED TO GO TO THE DOCTOR.  HE WAS NEVER SICK.  HE NEVER FELT
22      BAD.  HE WAS A BIG, STRONG, HEALTHY GUY.  I THINK I WOULD HAVE
23      KNOWN IT.  I DIDN'T EVER SEE HIM OTHER THAN WHEN HE WOULD BE
24      OUT PICKING UP BOXES, HIS BACK WOULD HURT HIM OR HE WOULD DO
25      SOMETHING LIKE THAT, BUT HE NEVER WAS SICK.  HE MIGHT HAVE A
page 1373
1       COLD ONCE IN A WHILE, BUT HE JUST WAS NEVER SICK.
2       Q.   DID DICKY HAVE ANY TYPE OF HEALTH PROBLEMS THAT YOU WERE
3       AWARE OF EVELYN?
4       A.   NONE WHATSOEVER.  NO.  LIKE I SAID, HE WAS VERY HEALTHY.
```

[1436:13] - [1436:19]      Testimony of Dr. Silver

```
page 1436
13      THE STOMACH PROBLEMS, IS IT CAN CAUSE A VERY BAD RINGING IN
14      YOUR EAR CALLED TINNITUS.
15      Q.   YOU MENTIONED THE STOMACH PROBLEMS, AND LET'S FOCUS FOR A
16      BIT ON THESE NONSELECTIVE COX INHIBITORS, THE IBUPROFEN,
17      NAPROXEN, ET CETERA.  DO THEY HAVE SIDE EFFECTS?
18      A.   YES.  THE MOST CONCERNING SIDE EFFECT WE HAVE WITH THESE
19      NONSELECTIVE DRUGS IS SERIOUS STOMACH ULCERS.
```

[1437:8] - [1439:4]       Testimony of Dr. Silver

```
page 1437
8       Q.   DESCRIBE, PLEASE, THE KIND OF PROBLEMS THAT SOMEBODY COULD
9       HAVE USING A NONSELECTIVE NSAID, THE KIND OF STOMACH PROBLEMS
10      THEY COULD HAVE.
11      A.   WELL, THERE ARE REALLY TWO MAJOR PROBLEMS, TWO MOST
12      CONCERNING PROBLEMS THEY CAN HAVE.  ONE IS THAT THEY CAN
13      DEVELOP AN ULCER THAT ERODES INTO A BLOOD VESSEL.  IF THE ULCER
14      GOES DEEP ENOUGH AND GOES TO THE LINING WHERE THE LARGE BLOOD
15      VESSELS ARE, YOU CAN HAVE WHAT WE CALL A MAJOR BLEEDING ULCER
16      WHERE THIS --
17      Q.   NOW, WHERE ARE THESE THAT BLOOD VESSELS?  ARE THEY IN THE
18      STOMACH WALL?
19      A.   THEY ARE IN THE WALL OF THE STOMACH, YES.  I APOLOGIZE.
20      Q.   SO EXPLAIN, THEN, WHAT HAPPENS.
21      A.   WHAT HAPPENS IS THIS ULCER ERODES INTO THIS BLOOD VESSEL,
22      GOES DOWN, AND THE BLOOD VESSEL STARTS BLEEDING.  THIS IS
```

**Declaration of Phillip A. Wittmann in Support of**
**Merck's Motion for Judgment as a Matter of Law**
*Exhibit A*

```
23        USUALLY AN ARTERY WHICH IS UNDER HIGH PRESSURE, AND BLOOD JUST
24        STARTS SPILLING OUT. UNFORTUNATELY, USUALLY PATIENTS DON'T HAVE
25        A WARNING SIGN.  IN THE MAJORITY OF CASES, THERE'S NOTHING TO
page 1438
 1        TELL THEM THAT THIS ULCER IS GOING TO OCCUR UNTIL THEY JUST
 2        START VOMITING BLOOD OR HAVING BLOOD COMING OUT THEIR OTHER
 3        END, AND THIS CAN HAPPEN VERY QUICKLY AND THEY CAN HEMORRHAGE
 4        AND BLEED ENORMOUSLY.
 5        Q.   HAVE YOU SEEN THIS, YOURSELF, WITH YOUR OWN EYES?
 6        A.   UNFORTUNATELY, I HAVE.  EVEN BACK IN TIMES WHEN I WAS A
 7        MEDICAL STUDENT AND A RESIDENT, I RECALL SEEING PATIENTS IN THE
 8        INTENSIVE CARE UNIT WHO WOULD BE JUST BASICALLY BLEEDING OUT,
 9        BLEEDING TO DEATH, FROM THESE HORRIBLE ULCERS.  I'VE ACTUALLY
10        SEEN, UNFORTUNATELY, PATIENTS DIE FROM THIS.
11             I'VE LOOKED AT THEM WITH THE GASTROENTEROLOGIST,
12        LOOKED THROUGH ONE OF THESE SCOPES.  YOU CAN PUT A SCOPE DOWN
13        THROUGH THE MOUTH AND THE STOMACH CALLED AN ENDOSCOPE AND YOU
14        CAN SEE THESE ULCERS THAT ARE BLEEDING.  YOU CAN JUST SEE THE
15        BLOOD SORT OF SHOOTING OUT.  IT'S ALMOST LIKE A FAUCET.  IT'S
16        COMING OUT AND IT'S A HORRIBLE SIGHT, IT REALLY IS.
17        Q.   YOU SAID THERE WERE TWO MAIN PROBLEMS.  ONE OF THEM IS IF
18        THE ACID STARTS TO EAT THROUGH THE WALL AND HITS ONE OF THESE
19        ARTERIES.  WHAT'S THE OTHER MOST SIGNIFICANT PROBLEM THAT CAN
20        COME WITH THESE NONSELECTIVE NSAIDS?
21        A.   THE OTHER SERIOUS PROBLEM IS SOMETHING CALLED A
22        PERFORATION.  BASICALLY, THE ULCER GOES COMPLETELY THROUGH THE
23        ENTIRE WALL OF THE STOMACH AND THE STOMACH PERFORATES.  WHAT
24        HAPPENS IS ALL THE CONTENTS OF THE STOMACH GO INTO YOUR
25        ABDOMINAL CAVITY -- THAT'S YOUR ABDOMINAL AREA -- AND CAUSE A
page 1439
 1        CONDITION CALL PERITONITIS, WHICH IS A HORRIBLE
 2        LIFE-THREATENING INFECTION.
 3        Q.   YOU SAY THAT'S LIFE-THREATENING, AS WELL?
 4        A.   YES.
```

[1440:17] - [1440:25]        Testimony of Dr. Silver

```
page 1440
17        Q.   HOW SERIOUS A PUBLIC HEALTH PROBLEM ARE THESE BLEEDS AND
18        PERFORATIONS THAT COME FROM THESE NONSELECTIVE NSAIDS?
19        A.   IT'S AN ENORMOUS PUBLIC HEALTH PROBLEM.  THERE WAS AN
20        ARTICLE IN THE NEW ENGLAND JOURNAL OF MEDICINE BACK IN 1999
21        WHICH LOOKS SPECIFICALLY AT THIS ISSUE.  WHAT THEY STATE IS
22        THAT THEY CONSERVATIVELY ESTIMATED THAT OVER 100,000 PEOPLE
23        EACH YEAR IN THE UNITED STATES WERE BEING HOSPITALIZED AS A
24        RESULT OF THESE COMPLICATIONS AND THAT 16,500 PEOPLE EACH YEAR
25        WERE DYING FROM THESE BLEEDS AND PERFORATIONS.
```

[1444:22] - [1444:23]        Testimony of Dr. Silver

```
page 1444
22             MR. BIRCHFIELD: YES, YOUR HONOR.  WE ARE WITHDRAWING
23        OUR CLAIMS ON THE BREACH OF WARRANTY AND THE FRAUD CLAIM.
```

**Dec. 6, 2005 *Rough* Transcript (Day Seven)**

[47:22] - [49:3]        Testimony of Dr. Reicin

```
page 47
22        Q.   HERE IT SAYS THERE'S MERCK'S REQUEST FOR RECLASSIFICATION
23        AS A PRIORITY REVIEW?
24        A.   THAT'S CORRECT.
```

**Declaration of Phillip A. Wittmann in Support of
Merck's Motion for Judgment as a Matter of Law**
*Exhibit A*

25    Q.   CAN YOU EXPLAIN THAT AGAIN?
page 481

A.   AGAIN, WE WERE ASKING THEM TO SHORTEN THE TIME LINES FOR
2    REVIEW OF THIS AND OUR ABILITY TO CHANGE OUR LABEL FROM A
3    STANDARD TEN-MONTH REVIEW DOWN TO A SIX-MONTH REVIEW.
4    Q.   THERE'S A REFERENCE HERE TO A TELECONFERENCE THAT OCCURRED
5    ON AUGUST 8TH.   THAT WOULD BE THE FOLLOWING DAY?
6    A.   THAT'S CORRECT.
7    Q.   AND THE PARTICIPANTS IN THIS CONFERENCE, DID THAT INCLUDE
8    YOURSELF HERE?
9    A.   YES.
10    Q.   WHAT WAS THE FDA'S RESPONSE TO MERCK WHEN MERCK SOUGHT TO
11    SPEED UP THE INCLUSION OF THE VIGOR CARDIOVASCULAR INFORMATION
12    INTO THE LABEL?
13    A.   THEY TURNED DOWN OUR REQUEST AND SAID THAT IT WOULD BE A
14    STANDARD REVIEW.
15    Q.   DID THAT MEAN THAT MERCK COULD NOT GO AHEAD AND ADD THAT
16    DATA TO THE LABEL?
17    A.   WE WOULD HAVE TO-- WE NEEDED TO HEAR FROM THEM AS TO WHAT
18    THEY THOUGHT NEEDED TO BE IN THE LABEL, AND THAT WOULD OCCUR
19    UNDER THEIR NORMAL TIME LINES.
20    Q.   DID THE FDA TELL YOU AT MERCK WHAT THEY WANTED TO DO
21    INSTEAD WITH REGARD TO THE QUESTION OF THE LABELING FOR VIOXX?
22    A.   I CAN'T REMEMBER IF IT WAS AT THAT MEETING OR AT A LATER
23    MEETING, BUT THEY DID TELL US THAT THEY WERE GOING TO HAVE AN
24    FDA ADVISORY COMMITTEE, WHERE THEY COULD INVITE A GROUP OF
25    INTERNAL EXPERTS TO REVIEW BOTH THE GI AND THE CARDIOVASCULAR
page 49
1    DATA FROM BOTH THE VIGOR STUDY AND A SIMILAR GI OUTCOMES STUDY
2    THAT WAS -- THAT HAD JUST BEEN CONDUCTED ON ANOTHER COX-2
3    INHIBITOR CALLED CELEBREX.

[70:2] - [70:16]    Testimony of Dr. Reicin

page 70
2    Q.   I WANT TO MAKE SURE I'M CLEAR ON ONE POINT BASED ON YOUR
3    TESTIMONY JUST NOW.   IS IT YOUR TESTIMONY TO THIS JURY THAT
4    FOLLOWING THE VIGOR RESULTS, THAT MERCK APPROACHED THE FDA AND
5    ASKED FOR AN EXPEDITED LABEL CHANGE?   IS THAT RIGHT?
6    A.   WE ASKED FOR A PRIORITY REVIEW OF THE NDA SUPPLEMENT,
7    WHICH WOULD HAVE RESULTED IN A LABEL CHANGE IN A PRIORITY
8    REVIEW, MEANS YOU ASKED FOR THAT REVIEW TO TAKE PLACE OVER SIX
9    MONTHS RATHER THAN TEN MONTHS.
10    Q.   ARE YOU SUGGESTING OR TELLING THE JURY THAT THE PURPOSE
11    FOR MERCK ASKING FOR AN EXPEDITED REVIEW IS BECAUSE MERCK
12    WANTED TO ADD A CV OR HEART ATTACK RISK TO THE LABEL AS QUICKLY
13    AS POSSIBLE?
14    A.   WE WANTED BOTH THE GI AND THE CARDIOVASCULAR DATA IN THE
15    LABEL.   I THINK WHAT YOU HAVE TO REMEMBER IS WE DID NOT THINK
16    THAT VIOXX CAUSED HEART ATTACKS.

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **In re: VIOXX** | * | **MDL Docket No. 1657** |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| | * | **JUDGE FALLON** |
| **This document relates to** | * | |
| **Case No. 05-4046*** | * | |
| | * | **MAGISTRATE JUDGE KNOWLES** |
| **EVELYN IRVIN PLUNKETT** | * | |
| as Personal Representative of the Estate of | * | |
| **RICHARD IRVIN, JR.,** | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| **MERCK & CO., INC.,** | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### MEMORANDUM IN SUPPORT OF MOTION OF MERCK & CO., INC. ("MERCK") FOR JUDGMENT AS A MATTER OF LAW

All of the evidence having been presented in this case, Merck now moves for judgment as a matter of law on plaintiff's claims for: (i) strict liability and negligent design defect; (ii) strict liability and negligent failure to warn; and (iii) failure to test Vioxx®.[1] The evidentiary record establishes without question that plaintiff has failed to produce legally sufficient evidence to support these claims. Merck is thus entitled to judgment on all of plaintiff's remaining claims as a matter of law. FED. R. CIV. P. 50(a).

---

[1] On December 5, 2005, plaintiff voluntarily withdrew her claims for fraudulent misrepresentation, fraudulent concealment, breach of express warranty, and breach of implied warranty. (Dec. 5, 2005 Tr. at 1444:22-23.)

## I.     THE LEGAL STANDARD

A motion for judgment as a matter of law disposes of "a claim . . . that cannot under the controlling law be maintained" if, "after a party has been fully heard by the jury on an issue, 'there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue.'" *Sur. Co. v. Pendleton Detectives of Miss., Inc.*, 182 F.3d 376, 377-78 (5th Cir. 1999) (quoting FED. R. CIV. P. 50). Such a motion is appropriately granted when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (internal citations and quotations omitted); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (U.S. 2000) (noting that the standard for granting a Rule 50 motion "mirrors" the summary judgment standard). "A mere scintilla of evidence is insufficient to present a question for the jury." *Rutherford v. Harris County*, 197 F.3d 173, 179 (5th Cir. 1999). Rather, "[t]here must be a conflict in substantial evidence to create a jury question." *Id.*

## IV.    MERCK IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON ALL CLAIMS BECAUSE PLAINTIFF HAS NO ADMISSIBLE, SCIENTIFICALLY RELIABLE EVIDENCE OF MEDICAL CAUSATION

First and most fundamentally, Merck's motion should be granted as to all of plaintiff's remaining causes of action because there is no "legally sufficient evidentiary basis" to support plaintiff's claim that Mr. Irvin's use of Vioxx at the 25 mg dose for a period of less than a month could have or did cause his death. FED. R. CIV. P. 50(a). To prevail on any of her claims, plaintiff must prove to a "reasonable degree of medical certainty" that Vioxx was a "substantial factor" in bringing about Mr. Irvin's death. *Donohue v. State of Florida*, 801 So. 2d 124 (Fla. 2001); *Christopher v. Cutter Labs.*, 53 F.3d 1184, 1191 (11th Cir. 1995) (citing *Reaves v.*

*Armstrong World Ins., Inc.*, 569 So. 2d 1307, 1309 (Fla. App. 1990)). "A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the Court to direct a verdict for the defendant." *Reaves*, 569 So. 2d at 1309 (citing *Gooding v. University Hosp.*, 445 So. 2d 1015, 1018 (Fla. 1984)).

Here, plaintiff cannot meet her burden to show either general or specific causation, for the reasons stated in Merck's previously-filed *Daubert* motions.[2] First, there is no evidence that use of Vioxx at Mr. Irvin's dose and duration (25 mg dose for a period of less than one month) is associated with an increased risk of thrombotic cardiovascular events.[3] (*See* Merck's Background Science Brief, filed Oct. 21, 2005; *see also* Nov. 30, 2005 Tr. at 347:7-348:16 (Test. of Dr. Bloor).) As such, there is no evidence on the essential element of general causation.

Second, plaintiff lacks the expert testimony necessary to show that Mr. Irvin's use of Vioxx actually caused his death. As explained in detail in Merck's Motion to Exclude

---

[2] Merck hereby incorporates the arguments made in its *Daubert* briefs by reference. (*See* Merck's Motion to Exclude Evidence of Plaintiff's Experts Regarding Causation, Merck's Motion to Exclude Testimony of Thomas Baldwin, M.D., Merck's Motion to Exclude Testimony of Colin M. Bloor, M.D. and Joseph L. Burton, M.D., and Merck's Motion to Exclude Testimony of Wayne A. Ray, Ph.D., filed Oct. 21, 2005; and Merck's Motion to Exclude Testimony of Benedict R. Lucchesi, M.D., filed Oct. 28, 2005.)

[3] While one of plaintiff's experts, Dr. Ray, testified that Vioxx is "likely to increase heart attacks and serious coronary heart disease in 1 to 30 days" (Dec. 1, 2005 Tr. at 730:18-25; *see also id.* at 733:15-19), this testimony is scientifically unreliable and should be given no weight. First, it was based on "statistically apparent" risks from clinical trials rather than "statistically significant" risks. (*Id.* at 731:1-732:23; *cf.* Dec. 2, 2005 Tr. at 775:2-4 (agreeing that "just because something is statistically apparent doesn't mean it's statistically significant"), *id.* at 825:20-826:8, 827:7-13 (conceding that VIGOR did not show a statistically significant increase of cardiovascular risks at two months). In addition, it relied in part on studies that tested Vioxx at a higher dose and a longer duration than the dose and duration at issue in this case. (*Id.* at 732:24-733:6, 827:14-20.) Dr. Ray's opinion in no way supports the proposition that use of Vioxx at the 25 mg dose for a period of less than one month is associated with an increased risk of thrombotic cardiovascular events.

Testimony of Plaintiff's Experts Regarding Causation, filed October 21, 2005, the causation testimony of plaintiff's experts – namely, Drs. Thomas Baldwin, Colin Bloor, Benedict Lucchesi, and Wayne Ray – is scientifically unreliable and therefore inadmissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993).   Moreover, plaintiff concedes that Mr. Irvin's death may have resulted from plaque rupture, and that Vioxx has not been shown to cause plaque rupture. (Nov. 29, 2005 Tr. at 253:1-10 (Test. of Dr. Lucchesi); Nov. 30, 2005 Tr. at 343:21-344:5 (Test. of Dr. Bloor).)

These defects in plaintiff's proffered expert testimony go to both the admissibility and the sufficiency of the evidence.  Scientifically reliable expert testimony is required to prove general and specific causation. *See In re Norplant Contraceptive Prods. Liab. Litig.*, 215 F. Supp. 2d 795, 830 (E.D. Tex. 2002).  Without such testimony, plaintiff's claims necessarily fail. *See Haggerty v. Upjohn Co.*, 950 F. Supp. 1160, 1160, 1168 (S.D. Fla. 1996) (excluding the testimony of plaintiff's causation expert under *Daubert* and granting summary judgment in defendant's favor "based on a lack of admissible expert testimony on essential elements of [p]laintiff's claims"), *aff'd*, 158 F.3d 588 (11th Cir. 1998).  The speculative and unreliable causation testimony of plaintiff's experts can neither rule Vioxx in nor rule it out as a cause of Mr. Irvin's death.   In contrast, it is undisputed that Mr. Irvin had moderate to severe atherosclerosis. (*See* Nov. 30, 2005 Tr. at 364:1-23.)  Given the lack of reliable scientific evidence to distinguish Mr. Irvin's unfortunate death from the hundreds of thousands of similar sudden cardiac deaths that occur every year, the Court should enter judgment in Merck's favor as a matter of law on each of plaintiff's claims for strict liability and negligent design defect and failure to warn.

## II.   PLAINTIFF'S DESIGN DEFECT CLAIMS FAIL AS A MATTER OF LAW

Merck is entitled to judgment on plaintiff's strict liability and negligent design defect

claims on three additional, independent grounds.[4]  First, under comment k to Section 402A of the Restatement (Second) of Torts, as adopted and applied in Florida, plaintiff has no strict liability design defect claim distinct from her failure to warn claim.  Second, plaintiff has presented no evidence of a safer alternative design – a failure of proof that defeats a design defect claim based on either strict liability or negligence.  Third, given the comprehensive regulatory framework that governs the development, approval, sale, and marketing of prescription drugs in the United States, plaintiff's strict liability and negligent design defect claims are preempted as a matter of law.

### A.    Comment k Precludes Plaintiff's Strict Liability Design Defect Claim.

On the issue of strict liability design defect, Florida has adopted Restatement (Second) of Torts § 402A, comment k, which eliminates design defect liability for unavoidably unsafe products as long as they carry an adequate warning.  *Adams v. G.D. Searle & Co.*, 576 So. 2d 728, 732-33 (Fla. App. 1991) (applying RESTATEMENT (SECOND) OF TORTS § 402A cmt. k (1965)).[5]  As interpreted in *Adams*, comment k precludes strict design defect liability for a prescription drug where "the product's benefits . . . outweigh its known risks as of the date the product is distributed" and an adequate warning is provided.  576 So. 2d at 733.  But a pharmaceutical manufacturer need not be "clairvoyant."  *Id.*  The product need only be "apparently useful and desirable, considering its benefits and risks," and "the balance need only 'apparently' tip toward the benefit of a product at the time of distribution."  *Id.*

---

[4] Merck hereby renews the first two of these arguments, which were originally made in Merck's Motion for Judgment as a Matter of Law on Plaintiff's Design Defect, Fraud, and Breach of Warranty Claims, filed at the close of plaintiff's case on December 5, 2005.

[5] Comment k also requires that the product in question be "properly prepared," *i.e.*, that it be free of manufacturing defects.  *Adams*, 576 So. 2d at 731.  Plaintiff does not claim that the Vioxx taken by Mr. Irvin had a manufacturing defect.

*Adams* initially placed the burden of demonstrating that the benefits outweighed the risks on the manufacturer, and rejected the argument that FDA approval presumptively establishes that fact for purposes of applying comment k. *Id.* Subsequent to *Adams*, however, as part of a 1999 tort reform measure, the Florida Legislature enacted Fla. Stat. § 768.1256, which reverses this allocation of the burden of proof by creating a statutory rebuttable presumption that a product provided in compliance with pertinent government regulations is *not* defective or unreasonably dangerous. FLA. STAT. ANN. § 768.1256(1).[6]

In this case, it is undisputed that the FDA approved Vioxx as "safe and effective" in 1999 and again in 2002 when it approved a new indication for rheumatoid arthritis. (Def. Ex. 73 (initial approval letter)); *see generally* 21 U.S.C. § 355; 21 C.F.R. § 201.56-57.[7] Thus, the FDA approved the distribution and sale of Vioxx before Mr. Irvin used it, and the FDA renewed its approval of Vioxx after Mr. Irvin used it and after a full review of the results of the VIGOR trial. (*See* Dec. 1, 2005 Tr. at 679:1-17, 680:7-681:1 (discussing 2001 FDA Advisory Committee meeting).) Under Fla. Stat. § 768.1256(1), these approvals trigger a statutory presumption that

---

[6] Denominated the "[g]overnment rules defense," section 768.1256(1) provides:

> In a product liability action brought against a manufacturer or seller for harm allegedly caused by a product, there is a rebuttable presumption that the product is not defective or unreasonably dangerous and the manufacturer or seller is not liable if, at the time the specific unit of the product was sold or delivered to the initial purchaser or user, the aspect of the product that allegedly caused the harm: (a) Complied with federal or state codes, statutes, rules, regulations, or standards relevant to the event causing the death or injury; (b) The codes, statutes, rules, regulations, or standards are designed to prevent the type of harm that allegedly occurred; and (c) Compliance with the codes, statutes, rules, regulations, or standards is required as a condition for selling or distributing the product.

[7] It is an undisputed matter of public record that the FDA approved Vioxx as safe and effective for treatment of osteoarthritis pain, primary dysmenorrheal, and acute pain on May 20, 1999, and that the FDA further approved Vioxx as safe and effective for treatment of adult rheumatoid arthritis pain in April 2002, after reviewing data from VIGOR.

Vioxx was *not* defective or unreasonably dangerous, and plaintiff has the burden of demonstrating otherwise, *i.e.*, that the apparent benefits of Vioxx did not outweigh its known risks at the relevant time. *Adams*, 576 So. 2d at 733. Absent such proof, comment k applies, and plaintiff has no strict liability design defect claim.[8]

Plaintiff has presented no such proof. Plaintiff's experts agree that gastrointestinal perforations, ulcers and bleeds from traditional NSAIDs have been a major cause of emergency room visits and death in this country. (Nov. 29, 2005 Tr. at 226:23-227:3 (Test. of Dr. Lucchesi); Dec. 2, 2005 Tr. at 771:14-19 (Test. of Dr. Ray); *see also id.* at 764:16-771:13 (Test. of Dr. Ray); Dec. 5, 2005 Tr. at 1436:13-19, 1437:8-1439:4, 1440:17-25 (Test. of Dr. Silver).) They also agree that Vioxx significantly reduces these potentially fatal side effects while providing equivalent pain relief. (Nov. 29, 2005 Tr. at 200:4-8 (Test. of Dr. Lucchesi); Dec. 1, 2005 Tr. at 728:16-21 (Test. of Dr. Ray); Dec. 2, 2005 Tr. at 795:23-796:5, 803:25-804:6 (Test. of Dr. Ray); *see also* Dec. 1, 2005 Tr. at 646:25-647:20 (Test. of Dr. Nies).) And while all selective COX-2 inhibitors reduce the risk of ulcers, only Vioxx has been shown to reduce the risk of serious gastrointestinal bleeds. (Def. Ex. 338 at 2 (Apr. 6, 2005 FDA Decision Memo).) Finally, it is undisputed that for some patients – like Mr. Irvin – Vioxx was the *only* medication that provided effective pain relief.[9]

---

[8] As noted above, comment k provides that an unavoidably unsafe product is still defective if it does not carry an adequate warning. At that point, however, the claim is indistinguishable from a straight strict liability warning claim, and a separate "design defect" claim is superfluous.

[9] As Mr. Irvin's prescribing physician, Dr. Schirmer, testified:

> Q:  Doctor, Mr. Beasley asked you some questions a moment ago about the comparative efficacy of Vioxx compared to traditional anti-inflammatory drugs. Do you recall those questions?
>
> A:  Yes.
>
> Q:  With respect to Mr. Irvin, we don't have to rely on any specific data
> *(footnote continued next page)*

Plaintiff has offered no evidence that before May 2001 – the relevant time frame for this inquiry under *Adams* – the known risks of Vioxx outweighed these undisputed benefits. On the contrary, plaintiff's lead expert, Dr. Lucchesi, agreed that Vioxx was and is "perfectly safe" for the "vast majority of people" and has "a place in the market" even today:

> Q:   . . . I think I heard you say that for most people, Vioxx, notwithstanding your criticism, Vioxx is perfectly safe for most people; is that right?
>
> A:   I think I said people without cardiovascular disease could probably take Vioxx with safety.
>
> Q:   Would you agree . . . that for the vast majority of people, Vioxx is perfectly safe?
>
> A:   Yes.
>
> Q:   And would you – and I think you've testified before that, as far as you're concerned, it's – Vioxx has a place on the market; is that right?
>
> A:   Yes.
>
> Q:   And I think you've testified at one point that you believe that Vioxx should stay on the market –
>
> A:   I believe I answered that, yes.

(Nov. 29, 2005 Tr. at 227:21-228:10.)

Plaintiff's sole apparent attempt to make a contrary showing comes from Dr. Ray, who purported to testify in contradiction to Dr. Lucchesi that the overall risks of Vioxx outweighed its benefits. (Dec. 2, 2005 Tr. at 848:11-25.) But Dr. Ray's testimony does not rise to the level of

---

> regarding efficacy.   You know through your own prescriptions and conversations regarding Mr. Irvin that the over-the-counter anti-inflammatories and even the Vicodin/ibuprofen combination in April 2001 was not providing him relief, correct?
>
> A:   Correct.
>
> Q:   Instead, through your own conversations, you learned that Vioxx was the only drug that provided him relief in that time frame, correct?
>
> A:   That was my understanding.

(Dec. 3, 2005 Tr. at 1024:18-1025:10.)

legally sufficient evidence, for two reasons.  First, as the Court noted in its *Daubert* order, Dr.

Ray is neither a medical doctor nor an expert in FDA regulatory matters.  (Nov. 18, 2005 Order

and Reasons at 32-33.)   The Court ruled that Dr. Ray "is not qualified to testify as to the risk-

benefit analysis performed by medical doctors" (*id.* at 32), and he "may not testify as to his

disapproval of [regulatory] actions taken by the FDA" because "he does not have experience in

this field." (*Id.* at 33.)  Dr. Ray thus lacks the requisite expertise to assess the overall benefits

and risks of Vioxx from either a medical or a regulatory perspective, and his opinion is

irrelevant.

Second, the stated basis for Dr. Ray's risk-benefit opinion is not a relevant comparison.

As his testimony makes clear, Dr. Ray predicates his risk-benefit opinion solely on his

observation that in VIGOR, the difference in serious adverse cardiovascular events favoring

naproxen slightly exceeded the difference in serious adverse gastrointestinal events favoring

Vioxx.  (Dec. 2, 2005 Tr. at 848:11-25.)[10]  VIGOR, however, compared a common therapeutic

dose of naproxen (1000 mg per day) with *double* the maximum recommended chronic dose of

Vioxx (50 mg per day).  The maximum recommended chronic dose of Vioxx – and the dose used

by Mr. Irvin – was 25 mg per day.  As the FDA has noted, "[t]he higher dose of rofecoxib was

used in the VIGOR trial to provide a 'worst case' estimate of the risk of serious GI bleeding for

---

[10] Specifically, Dr. Ray testified as follows:

> Q:     Do you have an opinion whether the risks of Vioxx in causing heart
>        attacks and death outweighs the GI benefits?
>
> . . .
>
> [A.]   The findings of the VIGOR study clearly show that it was.  There were 9.4
>        extra cases of serious cardiovascular disease per thousand patients, and 7.8
>        serious ulcer complications prevented.  So it's more serious heart disease
>        caused than ulcers prevented.  And that's pretty clear-cut.

(Dec. 2, 2005 Tr. at 848:16-25.)

rofecoxib in comparison to naproxen." (Def. Ex. 338 at 9 n.5 (Apr. 5, 2005 FDA Decision Memo).)

A comparison based on a clinical trial designed to produce a "worst case" estimate of adverse gastrointestinal effects on Vioxx using a non-recommended dose does not and cannot constitute legally sufficient evidence that the risks of Vioxx outweighed its benefits.  Such a comparison says nothing about the comparative risks and benefits of Vioxx when used, as Mr. Irvin used it, at the recommended dose of 25 mg.  Tellingly, when Dr. Ray reviewed the VIGOR data in 2000, he urged caution on the 50 mg dose, but raised no questions about the safety of the 25 mg dose.  (Dec. 2, 2005 Tr. at 800:4-14.)  His own observational study, published in 2002, found no increased risk from 25 mg (*id.* at 779:11-15, 779:25-780:12, 780:18-782:14, 787:11-18, 788:13-25), a conclusion consistent with all the placebo-controlled clinical trial data available up to that time, including the interim cardiovascular results of Merck's two large Alzheimer's studies.  (*E.g.*, Dec. 1, 2005 Tr. at 673:24-675:10.)  Many drugs pose greater risks when used at higher-than-recommended doses.  That does not make them defective.[11]  The relevant inquiry under *Adams* is whether, based on what was known at the relevant time, the risks of using the drug at the recommended doses outweighed the apparent benefits.  Plaintiff has introduced *no* evidence on that point.

Absent legally competent and sufficient evidence that the known risks of Vioxx outweighed its potential benefits, the only issue remaining on the table under comment k is whether Vioxx was "accompanied by proper directions and warnings."  RESTATEMENT (SECOND) OF TORTS § 402A cmt. k (1965).  This issue is already tendered, however, in plaintiff's separate

---

[11] For these same reasons, Dr. Topol's testimony about the risks of the 50 mg dose studied in VIGOR is irrelevant.  Dr. Topol purported to do a risk-benefit analysis in his mind but a mistake be never knew GI solutions

strict liability claim for failure to warn (*see supra* n.8), and in these circumstances an independent "design defect" claim is superfluous and should be dismissed. *Cf. Hackett v. G.D. Searle & Co. (Hackett I)*, 246 F. Supp. 2d 591, 595 (W.D. Tex. 2002) (granting summary judgment on design defect claim in COX-2 prescription drug case (Celebrex) where application of comment k left only a duplicative warning claim).

### B.    Plaintiff Has Proffered No Evidence of a Safer Alternative Design.

Plaintiff's strict liability and negligent design defect claims also fail because plaintiff has presented no evidence of a safer alternative design. Under Florida law as elsewhere, a plaintiff in a defective design case must show that a safer alternative design was available. *See Adams*, 576 So. 2d at 733 (design may be held defective if "new developments make possible a safer alternative design"); *see generally* BLACK'S LAW DICTIONARY 1329 (7th ed. 1999) (defining the risk-utility test as a "method of imposing product liability on a manufacturer if the evidence shows that a reasonable person would conclude that the benefits of a product's particular design versus the feasibility of an alternative safer design did not outweigh the dangers inherent in the original design") (cited by Florida Supreme Court in *Std. Jury Instructions-Civil Cases (No. 02-2)*, 872 So. 2d 893, 894 (Fla. 2004)).[12]

Feasibility of a safer alternative design depends on "state of the art of scientific and technical knowledge and other circumstances that existed at the time of manufacture." FLA.

---

[12] Florida courts acknowledge that the alternative "consumer expectations" test for design defects is not appropriate for products that are "too complex for a logical application" of that test. *Force v. Ford Motor Co.*, 879 So. 2d 103, 110 (Fla. App. 2004). Prescription drugs unquestionably meet that definition. *See Adams*, 576 So. 2d at 732-33 (applying risk-benefit analysis); *cf. Upjohn Co. v. MacMurdo*, 562 So. 2d 680, 683 (Fla. 1990) (expert testimony generally required to demonstrate inadequacy of prescription drug warnings); *Buckner v. Allergan Pharmaceuticals, Inc.*, 400 So. 2d 820, 822 (Fla. App. 1981) (duty to warn runs to prescribing physicians rather than patients because "prescription drugs are likely to be complex medicines, esoteric in formula and varied in effect").

STAT. ANN. § 768.1257.  Here, plaintiff has not even attempted to offer evidence that Merck

feasibly could have reformulated Vioxx to make it safer before May 2001 or indeed at any time.

Plaintiff has simply offered no evidence on that subject.  Without such proof, plaintiff's design

defect claim fails whether grounded in strict liability or negligence.  Under Rule 50(a), Merck is

entitled to judgment as a matter of law on plaintiff's design defect claims.

> **C.      Plaintiff's Claims for Design Defect Are Preempted By Federal Law.**

Third and finally, plaintiff's design defect claims fail on federal preemption grounds.

Federal law overrides state law under the Supremacy Clause when, among other things,

"Congressional intent to preempt may be inferred from the existence of a pervasive federal

regulatory scheme." *AT&T Corp. v. PUC*, 373 F.3d 641, 645 (5th Cir. 2004) (citation omitted).

The regulation of pharmaceutical products in this country is without a doubt "pervasive."  The

federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* (the "FDCA"), and its

implementing regulations establish a comprehensive system under which the FDA sets and

enforces standards governing prescription drugs.  Plaintiff's design defect claims – which

effectively ask the jury to engage in a risk-benefit analysis of an FDA-approved drug –

impermissibly conflict with this scheme.

In particular, plaintiff's design defect claims run counter to the FDA's determination that

Vioxx was safe and effective for use in accordance with its labeling.  (Def. Ex. 73; *see also*

*supra* n.5); 21 U.S.C. § 355; 21 C.F.R. § 201.56-57.  The necessary underpinning of these claims

is that Vioxx should not have been permitted on the market as formulated.  (*E.g.*, Nov. 29, 2005

Tr. at 108:4-5 ("March of 2000, do they stop selling the drug?  Do they try to fix the formula?

No.")  But, it is the "primary function of the [FDA] . . . and not of the courts or juries, to

determine whether a prescription drug should be approved and marketed." *Sprague v. Upjohn*

*Co.*, No. CIV. A-91 40035-NMG, 1995 WL 376934, at *2 (D. Mass. May 10, 1994) (dismissing

claim that a prescription drug should have never been marketed).  To "second-guess" the FDA's analysis is not only inappropriate, but also "set[s] up a direct collision with federal policy." *Touchet v. Ace Med., Co.*, No. CIV. A. 96-3534, 1998 WL 531887, at *7 (E.D. La. Aug. 24, 1998) (FDA performed a comprehensive risk-utility analysis that a product could be sold; to reevaluate that analysis, as well the FDA's decision to approve the product based on state strict liability law would conflict with federal policy); *see also Jacobs v. Dista Products Co.*, 693 F. Supp. 1029, 1035 (D. Wyo. 1988) (court will not "second guess" FDA's determination that a legitimate public interest in drug's availability outweighs "any adversities which might arise in course of its usage"); *Grundberg v. Upjohn Co.*, 813 P.2d 89, 97 (Utah 1991) ("Allowing individual courts and/or juries to continually reevaluate a drug's risks and benefits ignores the processes of this expert regulatory body and the other avenues of recovery available to plaintiffs").  To the extent plaintiff would have the jury supplant the FDA's judgment on the approval and marketing of Vioxx, her claim conflicts with federal law and is preempted.

## III.   MERCK IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S FAILURE TO WARN CLAIMS

Plaintiff's strict liability and negligent failure to warn claims fail as a matter of law for two additional and independent reasons.  First, plaintiff has not shown that a different Vioxx label would have changed Dr. Schirmer's prescribing decision.  Second, to the extent the failure to warn claims are predicated on Merck's alleged failure to incorporate the VIGOR data into the Vioxx label without FDA approval, they conflict with federal law and are preempted.

### A.   Plaintiff's Failure to Warn Claims Fail for Want of Evidence of Causation.

Plaintiff cannot make a *prima facie* case of failure to warn.  In a products liability case involving a prescription drug, "a plaintiff must not only show that a manufacturer's warning was inadequate, but that such inadequacy affected the prescribing physician's use of the product and

13

thereby injured the plaintiff." *Baker v. Danek Med.*, 35 F. Supp. 2d 875, 881 (N.D. Fla. 1998); *see also Felix v. Hoffmann-LaRoche, Inc.*, 540 So.2d 102, 104 (Fla. 1989) (warning information need only be directed to the learned intermediary). Stated more directly, "the plaintiff must show that the physician would not have used the device [or drug] in question if he or she had been warned by the manufacturer of its risks." *Edgar v. Danek Med., Inc.*, No. 96-2451-CIV-T-24A, 1999 WL 1054864, at *6 (M.D. Fla. Mar. 31, 1999).

Plaintiff has no evidence on this critical element of her claim. Plaintiff contends that Merck should have provided information on the VIGOR results sooner than it did – *i.e.*, that it should have better warned about the difference in cardiovascular events between the Naproxen arm and the 50 mg Vioxx 50 arm of the study, and should have perhaps also added some warning of possible increased risk for high-risk heart patients of taking Vioxx. But plaintiff has offered no evidence that such warnings would have made a difference for Mr. Irvin. Specifically, there is no indication that Dr. Schirmer, even if fully aware of the VIGOR data, would have changed his prescribing decision. He was not prescribing a 50 mg dose of Vioxx to Mr. Irvin. And by all accounts, Mr. Irvin had no outward symptoms of coronary artery disease.[13] That his

---

[13] As Mrs. Plunkett herself testified:

Q:    Is it fair to say that Dicky wasn't the type of person that would commonly go to the doctor?

A:    No, he did not like to go to the doctor. It wasn't that he didn't like to go to the doctor; he didn't feel like he needed to go to the doctor. He was never sick. He never felt bad. He was a big, strong, healthy guy. I think I would have known it. I didn't ever see him other than when he would be out picking up boxes, his back would hurt him or he would do something like that, but he never was sick. He might have a cold once in a while, but he just was never sick.

Q:    Did Dicky have any type of health problems that you were aware of Evelyn?

A:    None whatsoever. No. Like I said, he was very healthy.

(Dec. 5, 2005 Tr. at 1372:17-1373:4.)

autopsy would later reveal moderate to severe atherosclerosis could not have been known to Dr. Schirmer, especially given Dr. Schirmer's limited understanding of his father-in-law's medical condition.[14]  In fact, Dr. Schirmer thought that Mr. Irvin's blood pressure was "normal" (Dec. 3, 2005 Tr. at 1000:2-6, 1000:15-1001:1, 1001:5-13), and he had no knowledge of Mr. Irvin's cholesterol level (*id.* at 1001:14-19).  He had treated Mr. Irvin "informally" prior to April 2001, and had never taken a medical history of Mr. Irvin, had never reviewed any of his medical records, and had never ordered any laboratory testing for Mr. Irvin.  (*Id.* at 999:8-22, 1002:4-5.) In short, plaintiff has offered no evidence that Dr. Schirmer would have considered Mr. Irvin to be anything other than the kind of patient "without cardiovascular disease" that even plaintiff's own experts admit "could probably take Vioxx with safety." (Nov. 29, 2005 Tr. at 227:21-25 (Test. of Dr. Lucchesi).)

Because plaintiff has not proffered any evidence to show that Dr. Schirmer would have considered Mr. Irvin a high-risk heart patient, there is no evidence from which the trier of fact could conclude that additional or different information from Merck about the purported risks of Vioxx would have affected Dr. Schirmer's prescribing decision.  Given this failure of proof, Merck is entitled to judgment as a matter of law on plaintiff's strict liability and negligent failure to warn claims.

**B.      Plaintiff's Failure to Warn Claim Is Preempted By Federal Law.**

To the extent plaintiff's failure to warn claims are based on the suggestion that Merck could or should have changed the Vioxx labeling sooner to incorporate the VIGOR results, the claims fail on conflict preemption grounds. *See AT&T Corp. v. Public Util. Comm'n of Tex.*, 373

---

[14] In Dr. Schirmer's words, he had only a "general Gestalt" of Mr. Irvin's medical condition in April 2001, when he prescribed Vioxx to his father-in-law.  (Dec. 3, 2005 Tr. at 999:2-7.)

F.3d 641, 645 (5th Cir. 2004) ("Federal law will override state law under the Supremacy Clause when . . . state law conflicts with federal law or its purposes." (citation omitted)).  State law is preempted if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" or "places irresistible pressure on the subject of the regulation to violate federal law." *Id.* (citations omitted).  Any failure to warn claim based on Merck's alleged failure to incorporate the VIGOR data into the Vioxx label without the FDA's prior approval implicates both of these bases for preemption.

More broadly, such an argument ignores the vast regulatory framework that governs the development, approval, sale, and marketing of prescription drugs in the United States.  (*See supra* p. 12.)  The FDA oversees every step in the approval and marketing of a prescription drug, and exercises "pervasive and complete" control over the product's labeling.  *American Home Products Corp. v. Johnson & Johnson*, 672 F. Supp. 135, 146 (S.D.N.Y. 1987); *see also* 21 U.S.C. §§ 352; 355(b)(1)(F) (requiring that proposed labeling be submitted with the NDA).  Because the final approved label is the official description of a medication, derived from and condensing the voluminous preclinical and clinical data submitted by the manufacturer in support of its new drug application, it has enormous "scientific, medical, legal, and administrative importance."  40 Fed. Reg. 15392, 15393 (Apr. 7, 1975).

Every holder of an approved New Drug Application ("NDA") must notify the FDA of any change in a condition established in the approved application, including a change to the approved labeling.  21 C.F.R. § 314.70(a)(1).  Prior approval is required for "changes based on postmarketing study results, including, but not limited to, labeling changes associated with new indications and usage."  FDA, GUIDANCE FOR INDUSTRY: CHANGES TO AN APPROVED NDA OR ANDA (Nov. 1999).  It is also required for changes to the "clinical studies" section of the

package insert for new data and for expansion or contraction of the intended patient population based on new data. *Id.*; *see also* 21 C.F.R. § 314.70(b)(2)(v) (default requirement of prior approval for labeling changes). Marketing a product using unapproved labeling "violate[s] the FDCA's prohibitions against marketing an unapproved new drug and against marketing a misbranded drug." *Amicus Curiae* Brief of the United States of America, *Dowhal v. SmithKline Beecham Consumer Health Care*, No. A094460 (Cal. Ct. App. Mar 25, 2002) at 6.

In this highly-regulated environment, Merck could not have changed the Vioxx label without prior FDA approval, especially given the nature of the VIGOR data. To take such an action would have violated FDA regulation and policy. Moreover, the record shows that when Merck submitted the VIGOR data – and asked for expedited review of a label change – the FDA denied expedited review, requested additional data (both before and after Mr. Irvin's death), and insisted that an Advisory Committee review the VIGOR data. (Dec. 6, 2005 *Rough* Tr. at 47:22-49:3, 70:2-16 (Test. of Dr. Reicin).) Ultimately, the FDA approved a label change that referred to the VIGOR cardiovascular data in the Precautions section of the label – not in the Warnings section, which plaintiff claims was the appropriate location. (*See* Pl.'s Ex. 1.0465 (July 2001 Vioxx label).) A finding of liability based upon Merck's alleged failure to change the Vioxx label unilaterally to include the VIGOR results is equivalent to an imposition of liability for failure to do what FDA regulations prohibited Merck from doing. To impose such liability under state law would conflict with the letter and the spirit of the applicable federal regulations. *See AT&T*, 373 F.3d at 645. Therefore, plaintiff's strict liability and negligent failure to warn claims are preempted and should be adjudicated in Merck's favor as a matter of law.[15]

---

[15] To the extent this argument turns on fact issues regarding whether and when Merck could have changed the Vioxx label without FDA approval, plaintiff has offered no evidence to rebut
(*footnote continued next page*)

## IV.   PLAINTIFF'S CLAIM FOR "FAILURE TO TEST" FAILS AS A MATTER OF LAW

Finally, Merck is entitled to judgment as a matter of law on plaintiff's "failure to test" claim.  In connection with her negligence cause of action, plaintiff alleges that Merck breached its duty to exercise due care by: (i) "failing to properly test Vioxx"; (ii) "failing to properly and thoroughly analyze the data" regarding Vioxx; (iii) "failing to conduct sufficient post-market testing and surveillance of Vioxx"; (iv) "designing, manufacturing, marketing, advertising, distributing, and selling Vioxx to consumers . . . without an adequate warning"; (v) "failing to exercise due care when advertising and promoting Vioxx"; and (vi) "negligently continuing to . . . distribute Vioxx" after Merck knew or should have known of its alleged risks.  (Compl. at 108.)  Under Florida law, the "duty to test . . . is a subpart of a manufacturer's duty to design a product with reasonable care, and thus is subsumed in the plaintiff's claims for defective design and failure to warn."  *Adams*, 576 So. 2d at 730-31.  Any claim based on a negligent failure to test – whether grounded in an alleged failure to conduct tests, conduct a sufficient number of tests, or properly analyze data – is thus invalid as a matter of law.

---

Merck's proffered evidence, including the testimony of Dr. Alice Reicin.  Moreover, under Florida law, a product such as Vioxx that complies with relevant government regulations is presumptively neither defective nor unreasonably dangerous.  FLA. STAT. ANN. § 768.1256.  It is plaintiff's burden to proffer competent evidence to counter this presumption.  FLA. STAT. ANN. § 90.302.  She has failed to do so.

## V.      CONCLUSION

For the reasons stated above, Merck respectfully request that the Court enter judgment in

Merck's favor, as a matter of law, on all of plaintiff's remaining causes of action.

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
4041 Essen Lane
One United Plaza, Suite 501
Baton Rouge, Louisiana 70809
Phone:  225-490-8900
Fax:     225-490-8960

Defendants' Liaison Counsel

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:     312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone: 202-434-5000
Fax:     202-434-5029

And

John H. Beisner
Charles C. Lifland
Richard B. Goetz

O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone: 213-430-6000
Fax:    213-430-6407

Attorneys for Merck & Co., Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and forgoing Memorandum In Support of Motion of Merck & Co., Inc. for Judgment as a Matter of Law has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 7th day of December, 2005.