# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re:  VIOXX : | |
| : | MDL Docket NO. 1657 |
| PRODUCTS LIABILITY LITIGATION : | |
| : | SECTION L |
| : | |
| This document relates to All Personal Injury : | JUDGE FALLON |
| Class Action Complaints Pending or Subject: | |
| to Transfer to MDL 1657 : | MAG. JUDGE KNOWLES |

## PLAINTIFFS' STEERING COMMITTEE'S MOTION
## FOR CERTIFICATION OF A NATION-WIDE CLASS
## ACTION FOR PERSONAL INJURY AND WRONGFUL DEATH

Pursuant to Pretrial Order No. 16 (as amended), the Plaintiffs' Steering Committee

("PSC") moves pursuant to Fed.R.Civ.P. 23(a) and (b)(3) for certification of a national class

consisting of:

> All persons residing in the United States who took Vioxx in any
> dose at any time between May 20, 1999 when Vioxx was first
> approved by the United States Food & Drug Administration
> ("FDA"), and September 30, 2004, when Vioxx was first
> withdrawn from the market, and who claimed personal injuries or
> assert wrongful death claims arising from ingestion of Vioxx.

1

Fee_____
Process_____
__X__ Dktd_____
CtRmDep_____
Doc. No_____

WHEREFORE, for the reasons set forth in the accompanying memorandum in support of this motion for class certification, the PSC respectfully requests that this motion be granted and the class certified.

Respectfully submitted,

**PLAINTIFFS' STEERING COMMITTEE**

Date: December 7, 2005                        By:_____

**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
***Herman, Herman, Katz & Cotlar, L.L.P.***
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Telephone: (504) 581-4892
Facsimile: (504) 561-6024

Temporary address:
3411 Richmond Avenue, Suite 460
Houston, Texas 77046
Telephone: (713) 877-1843
Facsimile: (713) 871-9750

**PLAINTIFFS' LIAISON COUNSEL**

| | |
|---|---|
| Richard J. Arsenault, Esq.<br>P.O.Box 1190<br>2220 Bonaventure Court<br>Alexandria, LA  71309-1190<br>PH:  (318) 487-9874<br>FAX:  (318) 561-2591 | Gerald E. Meunier, Esq. **(on brief)**<br>Energy Centre<br>1100 Poydras Street, Suite 2800<br>New Orleans, LA  70163-2800<br>PH:  (504) 522-2304<br>FAX:  (504) 528-9973 |
| Andy D. Birchfield, Esq. **(Co-Lead Counsel)**<br>P.O. Box 4160<br>234 Commerce Street<br>Montgomery, AL  36103-4160<br>PH:  (800) 898-2034<br>FAX:  (334) 954-7555 | Troy Rafferty, Esq.<br>316 S. Baylen Street, Suite 400<br>Pensacola, FL  32502<br>PH:  (850) 435-7000<br>FAX:  (850) 497-7059 |
| Elizabeth Cabraser, Atty. **(on brief)**<br>Embarcadero Center West<br>275 Battery Street, 30th Floor<br>San Francisco, CA  94111-3339<br>PH:  (415) 956-1000<br>FAX:  (415-956-1008 | Drew Ranier, Esq.<br>1419 Ryan Street<br>Lake Charles, LA  70601<br>PH:  (337) 494-7171<br>FAX:  (337) 494-7218 |
| Thomas Kline, Esq.<br>1525 Locust St.<br>19th Floor<br>Philadelphia, PA  19102<br>PH:  (215) 772-1000<br>FAX:  (215) 772-1371 | Mark Robinson, Esq.<br>620 Newport Center Drive<br>7th Floor<br>Newport Beach, CA  92660<br>PH:  (949) 720-1288<br>FAX:  (949) 720-1292 |
| Arnold Levin, Esq. **(on brief)**<br>Fred S. Longer, Esq. **(on brief)**<br>510 Walnut Street<br>Suite 500<br>Philadelphia, PA  19106-3875<br>PH:  (215) 592-1500<br>FAX:  (215) 592-4663 | Christopher Seeger, Esq. **(Co-Lead Counsel)**<br>One William Street<br>New York, NY  10004<br>PH:  (212) 584-0700<br>FAX:  (212) 584-0799 |
| Carlene Rhodes Lewis, Atty.<br>2200 Texaco Heritage Plaza<br>1111 Bagby<br>Houston, TX  77002<br>PH:  (713) 650-0022<br>FAX:  (713-650-1669 | Christopher Vincent Tisi, Esq.<br>2000 L Street, NW<br>Suite 400<br>Washington, DC  20036-4914<br>PH:  (202) 783-6400<br>FAX:  (307) 733-0028 |
| | Dianne M. Nast, Esq. **(on brief)**<br>Jennifer S. Snyder, Esq. **(on brief)**<br>Roda & Nast, P.C.<br>801 Estelle Drive<br>Lancaster, PA  17601<br>PH:  (717) 892-3000<br>FAX:  (717) 892-1200<br>**Vice Chairperson of the Class Action,**<br>**Law and Briefing Committee** |

## PLAINTIFFS' STEERING COMMITTEE

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced in accordance with Pre-Trial Order No. #8, on this 5th day of December, 2005.

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  VIOXX | : | |
| | : | MDL Docket NO. 1657 |
| PRODUCTS LIABILITY LITIGATION | : | |
| | : | SECTION L |
| | : | |
| This document relates to All Personal Injury | : | JUDGE FALLON |
| Class Action Complaints Pending or Subject: | | |
| to Transfer to MDL 1657 | : | MAG. JUDGE KNOWLES |

## PLAINTIFFS' STEERING COMMITTEE'S MEMORANDUM IN SUPPORT OF MOTION FOR CERTIFICATION OF A NATION-WIDE CLASS ACTION FOR PERSONAL INJURY AND WRONGFUL DEATH

## I.    INTRODUCTION

The Plaintiffs' Steering Committee ("PSC"), pursuant to Pretrial Order No. 16 (as amended),

moves for certification of a national class consisting of

> All persons residing in the United States who took Vioxx in any dose at
> any time between May 20, 1999, when Vioxx was first approved by the
> United States Food and Drug Administration ("FDA"), and September
> 30, 2004, when Vioxx was withdrawn from the market, and who claim
> personal injuries or assert wrongful death claims arising from ingestion of
> Vioxx.

As set forth below, this Court may certify this class consistent with Rule 23 jurisprudence by unitary

application of the law of one state. As a corporate citizen of New Jersey, Merck can and should not only

be expected to be haled into court, but to be held accountable and required to defend itself against claims

from all persons in the United States under New Jersey law. In so doing, the superiority of the class device

1

would become manifest. Likewise, a trial of the litigation applying unitary law would be manageable so as to achieve the greater purpose of this MDL.

## II.   **FACTUAL BACKGROUND**

In the late 1980's and early 1990's, Merck was facing a business crisis because patents on several of its best-selling drugs, including Vasotec, Prinivil, Mevacor, Pepcid, and Prilosec were expiring. Never had a pharmaceutical company faced the loss of so-many million dollar patents at the same time. Merck management even feared that Merck might not survive as a company. Master Class Action Complaint (Personal Injury and Wrongful Death) [hereafter "Complaint" ¶66]. To preserve the company's future, Merck needed a new "Blockbuster" drug. *Id.* ¶68. By 1992, Merck had focused on a selective Cox-2 inhibitor to serve its need. That compound ultimately became known as Vioxx.[1] Without the drug, the company's history would have been very different. *Id.* ¶ *74.*

After intensive work in December 1994, Merck submitted its first investigational new drug (IND) application with the FDA to conduct clinical trials of Vioxx in humans. The intended use of the drug identified in the IND was the treatment of osteoarthritis and acute pain. *Id.* ¶70.

Following FDA approval of Vioxx in May of 1999, Merck marketed Vioxx as a selective Cox-2 inhibitor, which unlike traditional NSAIDs, did not inhibit the production of Cox-1. Merck claimed that since Vioxx was the most selective inhibitor of Cox-2 on the market, it conferred the anti-inflammatory and

---

[1]Vioxx belongs to a class of drugs known as non-steroidal anti-inflammatory drugs or "NSAIDs" which are used to reduce pain. NSAIDs generally reduce pain by blocking the production of an enzyme called prostaglandin G/H synthase, which consists of two similar forms Cyclooxygenase-1 ("Cox-1") and Cyclooxygenase-2 ("Cox-2"). Vioxx is a selective inhibitor of Cox-2. Vioxx reduces pain by selectively blocking the production of "Cox-2." *Id.* ¶ *64.*

analgesic benefits of traditional NSAIDs without the associated gastrointestinal toxicity.  Accordingly, Merck asserted that Vioxx was the safest NSAID on the market.  *Id.* ¶71.  In turn, sales of Vioxx led it to become the blockbuster Merck desired.

In 2003 alone, worldwide sales of Vioxx reached 2.5 billion dollars (U.S.), following the most impressive global sales growth of any drug in history.  *Id.* ¶73.  In public statements to the press, Merck has estimated that 105 million US prescriptions for Vioxx were written between May, 1999 and August, 2004.  Based on this, Merck has estimated that approximately 20 million patients have taken Vioxx in the US since the launch of the drug in May of 1999.  *Id.* ¶4.

Contrasted to this outward display of financial success, Vioxx was not the safe drug Merck touted it to be.  Vioxx significantly increased the risk of adverse thrombotic events, including devastating cardiovascular and cerebrovascular injuries such as myocardial infarctions (heart attacks) and strokes. Despite the efforts of numerous healthcare professionals, Merck successfully downplayed, and in some instances, actively concealed, these facts until the drug was finally recalled in late September 2004.  *Id.* ¶75.

## A.    Merck Knew of Vioxx's Cardiotoxic and Pro-thrombotic Effects Before it was Approved and Marketed.

Merck sought to market Vioxx as an alternative to earlier NSAIDs such as aspirin, which had frequently been associated with adverse gastrointestinal side effects.  However, as early as November, 1996, years before FDA approval of Vioxx, Merck recognized that unless taken in conjunction with aspirin, Vioxx posed a "substantial risk" of "significantly higher rates" of cardiovascular adverse events such as myocardial infarctions, strokes and transient ischemic attacks because, as a selective Cox-2 inhibitor,

3

it lacked aspirin's "anti-platelet [i.e. anti-clotting] effect." *Id.* ¶77.

Merck knew that, due to the mechanism by which the drug inhibited COX-2 but not COX-1, use of Vioxx could result in increased platelet aggregation (blood clotting) and thus increased rates of heart attacks and strokes. As one Merck researcher warned: "without COX-1 inhibition you will get more thrombotic events and kill drug." *Id.* ¶ 79. Moreover, it was clear to researchers that the desired superior gastrointestinal ("GI") safety profile would be impossible to demonstrate in Merck's target patient group for Vioxx—arthritis suffers. Because of their age and accepted medical practice, many potential Vioxx users would also be taking aspirin to reduce the risk of suffering cardiac events. Aspirin, however, is known to have GI side-effects. As Merck researcher Alise Reicin (who went on to supervise the Vigor trial) complained:

> This is a no win situation. The relative risk of [adverse GI events with] even low dose aspirin is 2-4 fold. Yet the possibility of increased CV [cardiovascular] events of great concern (I just can't wait to be the one to present those results to senior management!). What about the idea of excluding high risk CV patients – i.e. those that have already had an MI, CABG, PTCA.? This may decrease the CV event rate so that the difference between the two groups would not be evident. The only problem would be – would we be able to recruit any patients?

*Id.* ¶¶78, 79.

As a consequence of its research revealing platelet aggregation and the potential for thrombotic events, Merck appointed a Task Force to study these conditions in an ongoing osteoarthritis trial. *Id.* ¶¶81-83. The Task Force's analysis from the study showed a statistically significant increased relative risk of 2.16 for females in the Vioxx study versus the placebo group selected by Merck for comparison. These results constituted a clear signal of cardiovascular toxicity that should have triggered immediate investigation

and concern. However, Merck incorrectly dismissed the signal as of no concern and failed to disclose the results of this pre-marketing analysis. Instead it misrepresented to the FDA that it had no indication of cardiovascular risk before Vioxx was marketed. *Id.*¶84.

On or about May 20, 1999, the FDA approved Vioxx for the relief of signs and symptoms of acute pain, dysmenorrhea, and osteoarthritis, a chronic swelling and painful joint disease of one or more joints. *Id.* ¶88.

**B.     Continuing Post-Marketing Studies and Surveillance Confirmed the Cardiovascular Risks of Vioxx that Required it to be Withdrawn from the Market.**

Signs of Vioxx's risks of serious adverse events emerged soon after the FDA's approval of the drug. Beginning in January, 1999, a Merck-sponsored 8,000 patient clinical study known as the VIOXX Gastrointestinal Outcome Research Study (the "VIGOR study") was begun in rheumatoid arthritis patients comparing VIOXX with the over-the-counter NSAID Naproxen to obtain information regarding clinically meaningful gastrointestinal events, and purportedly, to develop a large controlled data-base for overall safety assessment. *Id.* ¶90.

When Merck released the results of the VIGOR study in March 2000, they revealed, among other things, that Vioxx users suffered five times as many heart attacks than their Naproxen counterparts. In addition, serious cardiovascular events (including heart attacks, ischemic strokes, unstable angina, and sudden unexplained deaths) were reported for more than twice as many Vioxx as Naproxen patients. *Id.* ¶93.[2] Despite the results of the VIGOR study Merck failed to include in its Vioxx label a cardiovascular

---

[2]Vioxx had exhibited significantly greater cardiovascular toxicity than Naproxen within the first
(continued...)

warning that VIOXX was contraindicated in high risk CV patients.

Merck ignored the causal relationship between Vioxx and this significantly increased rate of cardiovascular events in the VIGOR study. Instead, Merck seized upon and widely and continuously disseminated the *post hoc* rationalization that the VIGOR study showed that Naproxen reduced cardiovascular risk (i.e., it exerted a "cardioprotective effects"), not that Vioxx posed a serious cardiovascular hazard, an explanation with scant scientific support. Indeed, both the scientific literature and Merck consultants had concluded that Naproxen lacked any such cardioprotective effect. *Id.* ¶97. Merck continued to publish and describe that Naproxen had a cardioprotective effect, notwithstanding that Italian pharmacologist, Carlo Patrono, one of Merck's own consultants and an expert in the platelet effects of cyclooxygenase-inhibiting drugs (whom Merck regarded as "the world's most respected and knowledgeable" scientist in his field), advised Merck in March 2000, that the dramatic cardiovascular effects observed in the VIGOR study could not be attributed plausibly to Naproxen for several reasons. *Id.* ¶98.

Furthermore, on or about March 24, 2000, University of Pennsylvania pharmacologist Garrett Fitzgerald, then acting as a Merck consultant, advised Merck of a paper in press that included Naproxen among several NSAIDs which, in contrast to aspirin, had no significant effect on the incidence of first nonfatal myocardial infarctions in females in an epidemiological study. *Id.* ¶99.

After the VIGOR study, evidence of the dangers of cardiovascular and cerebrovascular adverse

---

[2](...continued)
six weeks of the VIGOR study, thus revealing that even minimal use of the drug posed a risk to Vioxx patients. Id. ¶95.

events associated with Vioxx use continued to surface. For example, in June of 2000, industry-sponsored studies presented at the European United League Against Rheumatism ("EULAR"), an organization in which Merck is a member and a corporate sponsor, showed that Vioxx use resulted in statistically significant increases in hypertension and myocardial infarctions. *Id.* ¶102.

Merck knowingly downplayed and, in certain instances, withheld from publication, the severity of cardiovascular and cerebrovascular risks associated with Vioxx. For example, Merck downplayed this information in connection with the New England Journal of Medicine's November 2000 article regarding the VIGOR study, authored by Merck sponsored authors. *Id.* ¶103.[3]

On or about May 22, 2001, Merck issued a press release through PR Newswire touting and "reconfirm[ing] the favorable cardiovascular safety profile of Vioxx". *Id.* ¶104. In a warning letter it issued four months later, the FDA, severely rebuking Merck, advised that:

> your claim in the [May 22, 2001] press release that Vioxx has a 'favorable cardiovascular safety profile,' is simply incomprehensible, given the rate of MI and serious cardiovascular events compared to Naproxen. The implication that Vioxx's cardiovascular profile is superior to other NSAIDS is misleading; in fact, serious cardiovascular events were twice as frequent in the VIOXX treatment group (101 events, 2.5%) as in the Naproxen treatment group (46 events, 1.1%) in the VIGOR study.

*Id.* ¶105.

Shortly thereafter, on August 22, 2001, the Journal of the American Medical Association ("JAMA") published an article authored by cardiologists from the Cleveland Clinic Foundation entitled

---

[3] Attached hereto as Exhibit "A".

7

"Risk of Cardiovascular Events Associated with Selective Cox 2 Inhibitors."[4] The JAMA article reported the Cleveland Clinic's evaluation of two randomized trials of more than 15,000 patients, comparing Pfizer's Celebrex in a study called CLASS and the VIGOR study involving Vioxx to placebo. The Cleveland Clinic reported that "the annualized myocardial infarction rates for COX 2 inhibitors in both VIGOR and CLASS were significantly higher than that in the placebo group." *Id.* ¶106.

One day before, and in anticipation of publication of, the JAMA article, Merck issued a statement claiming: "We have additional data beyond what they cite, and the findings are very, very reassuring. *Id.* VIOXX does not result in any increase in cardiovascular events compared to placebo." On the day after August 23, 2001, Merck stated in another press release: "The Company stands behind the overall and cardiovascular safety profile of VIOXX." *Id.* ¶¶106-107.

## C.   The Mounting Evidence Forced Merck to Withdraw Vioxx From The Market.

Merck continued to receive adverse event reports and to conduct numerous other studies, all of which called into question the safety profile of Vioxx. Finally, "on September 30, 2004, Merck withdrew Vioxx from the market when interim unblinded data from a long-term, blinded, randomized placebo-controlled clinical trial, known as APPROVe, seeking to assess whether Vioxx could help prevent the recurrence of precancerous colon polyps, indicated that the use of Vioxx increased the risk of cardiovascular thrombotic events such as myocardial infarctions and ischemic stroke." *In re Vioxx Products Liability Litigation (Plunkett)*, MDL No. 1657, Order and Reasons at 3 (E.D.La. Nov.18, 2005).

---

[4]Attached hereto as Exhibit "B".

Merck has claimed since the release of the APPROVe results in September 2004 that the risk of heart attack and stroke did not appear until after subjects had taken Vioxx for more than 18 months, based on so-called "adjudicated" events. However, Merck has concealed from the public its internal analysis of "investigator reported" cardiovascular events, which showed that the Vioxx rate exceeded placebo throughout the entire period of the study. *Id.* ¶143.

Even Merck's concealed internal analysis of such events showed a statistically significant increased risk for Vioxx versus placebo in the 0 to 18-month segment as well as the 19- to 36-month segment of the study. In a graph of the "Kaplan-Meier cumulative rate curves" for Vioxx versus placebo, the Vioxx curve begins to exceed the placebo curve at approximately 2 to 3 months, and separates from the placebo incidence curve by an increasing margin for the remainder of the 36-month study. *Id.* ¶144.

### D. Merck Pursued an Aggressive and Misleading Marketing Campaign That Calls Into Question Any Learned Intermediary Defense.

Merck persistently failed to advise the medical community and patients of serious cardiovascular and cerebrovascular adverse events occasioned by the use of Vioxx.

Merck's marketing strategy began in the 1990s. Merck began to aggressively market and sell Vioxx by falsely misleading potential users such as the members of the Class about the product and by failing to protect the consumers from serious dangers which the Defendant knew or should have known would result from the drug's use. *Id.* ¶111.

Defendant Merck wildly and successfully blitz-marketed Vioxx in the U.S. by undertaking an advertising campaign extolling the virtues of Vioxx in order to induce widespread use of Vioxx. This direct-to-consumer advertising campaign consisted of advertisements, promotional literature to be placed

in the offices of doctors and other health care providers and HMOs, and promotional materials provided directly to potential Vioxx users themselves. *Id.* ¶112.

The advertising campaign as a whole sought to create the image, impression and belief that the use of Vioxx was safe, had fewer side-effects and adverse reactions than other pain relief medications and would not interfere with daily life, even though Merck knew that these representations were false. Furthermore, Merck had no reasonable grounds to believe that any of these representations were true. *Id.* ¶113.

Merck engaged in a huge direct-to-consumer marketing scheme and failed to address these serious side effects with consumers until after Vioxx was withdrawn from the market. According to reports in the public press, Merck spent an estimated $45 million advertising Vioxx for a mere eight months in 2004. *Id.* ¶114.

In television advertising directed to consumers, Merck promoted Vioxx in widely-disseminated advertisements featuring a testimonial from former Olympic skater Dorothy Hammill. *Id.* ¶116. Notably absent from this advertisement was any reference to the serious cardiovascular side effects manifested in Merck's clinical trials of Vioxx. Similarly unbalanced print advertisements were widely used. *Id.* ¶117.

These direct-to-consumer advertisements made absolutely no mention of Vioxx's association with cardiovascular or cerebrovascular disease, notwithstanding that Merck had reason to know and, in fact, did know that Vioxx was causally related to serious cerebrovascular and cardiovascular adverse side

effects.[5]  *Id.*  ¶118.

At all times relevant, Vioxx had been promoted, marketed, and advertised by Merck directly to consumers and to medical care providers as a safe and effective pain reliever, similar to NSAIDs such as Advil (ibuprofen) and Aleve (Naproxen), but without any of the known side effects of other NSAIDs, most notably NSAID-induced GI toxicity.  *Id.*  ¶119.[6]

As a result of Merck's conduct each member of the national class has become injured as a result of his or her ingestion of Vioxx.

### E.    The Class Representative Plaintiffs.

Rosemary Lawrence is a 59 year old woman (DOB: 9/22/46) residing in New Jersey. She is an accountant by profession. Her physician, Dr. Bartiss, prescribed Vioxx to her to address pain from arthritis. After taking Vioxx [25 mg.] for at least 8 months, on July 30, 2002, Ms. Lawrence suffered a pulmonary embolism that required medical treatment.

Raymond Gibney is currently a 76 year old male (DOB: 12/11/28) and resides in New Jersey. Mr. Gibney is a retired builder. He began taking Vioxx [50 mg.] at the direction of his physician, Dr. Bauer on October 8, 2001. Approximately one year later, on December 29, 2002, Mr. Gibney suffered a heart attack for which he required medical treatment.

Both Ms. Lawrence and Mr. Gibney contend their injuries were caused by Vioxx.

─────────────────────────

[5]Not surprisingly, FDA issued two warning letters during this time period to reproach Merck for misleading promotional activity. *See* Complaint ¶¶126-131.

[6]In Response to Merck & Co., Inc.'s Motion to Dismiss Plaintiffs' Medical Monitoring Master Class Action Complaint, the PSC previously provided an evidentiary record to support its contention that Merck's efforts to develop and market Vioxx emanated primarily from New Jersey. The PSC adopts herein by reference that evidentiary record.

## III. ARGUMENT

**A.    Certification of the Nationwide Class Should be Guided by
New Jersey's Choice of Law Rules And Result in the
Application of the Substantive Law of New Jersey.**

Federal courts sitting in diversity must apply the choice of law provisions of the forum state. *See*

*Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 496 (1941).  The United States Supreme

Court has announced that the forum state is that of the transferor court for each individual action transferred

into the MDL.  *See VanDusen v. Barrack*, 376 U.S. 612 (1964); *Ferens v. John Deere Co.*, 494 U.S.

516 (1990); *In re Propulsid Products Liability Litigation*, 208 F.R.D. 133, 141 (E.D. La. 2002).

Plaintiffs Lawrence and Gibney are both residents of New Jersey.  They originally filed their

complaint in the District of New Jersey, along with Wanda Cole,  an Illinois resident, under 28 U.S.C. §

1332, as amended by the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C.  § 1771, *et seq.*

Plaintiffs alleged that claims in the aggregate exceeded $5,000,000.00 (five million dollars) and any one

member of a class has diverse citizenship from the defendant.  For both Mr. Gibney and Ms. Lawrence,

*Van Dusen* and *Ferens* dictate that New Jersey's choice of law doctrine applies.

In *Propulsid*, this Court employed the choice-of-law rules of the transferor jurisdiction, where the

case was initially filed, rather than the law of the MDL transferee forum, where the Master Complaint was

filed.  Applying the reasoning of *Propulsid* here, New Jersey's choice-of-law rules should apply.

As discussed below, employing New Jersey's choice of law analysis leads to the conclusion that

the substantive laws of New Jersey should apply to the national class because New Jersey has the greatest

interests in the outcome of this litigation.

1. **New Jersey's "Governmental Interest" Test.**

When a conflict of laws exists, New Jersey employs a flexible "governmental interests" test to determine which state has the greatest interest in governing that specific issue of the litigation. *Fu v. Fu*, 733 A.2d 1133, 1138 (N.J. 1999); *In re International Union of Operating Engineers Local #68 Welfare Fund v. Merck & Co. Inc.*, ATL-L-3015-03-MT (N.J.Super., Law Div. June 30, 2005)(applying New Jersey law and its governmental-interest analysis in certifying a nationwide class of third-party non-government payors who have paid any person for the purchase of Vioxx)[hereafter "Local #68"].[7] The governmental interests test must be performed "on an issue-by-issue basis, with each issue receiving separate analysis." *Erny v. Estate of Merola*, 792 A.2d 1208, 1213 (N.J. 2002).

The first step of the governmental interest analysis is to determine whether an actual conflict exists between the laws of New Jersey and any other states with an interest in the litigation. *See Fu,* 733 A.2d at 1138. The second prong of the test is to determine which state has "the most significant relationship to the occurrence and the parties with respect to the [issues.]" *Id.*

With respect to the first prong, the PSC acknowledges that conflicts are present. Not all states employ the precise criteria provided by the New Jersey Products Liability Act ("PLA"). N.J. Stat.Ann. §2a-58c-1, *et seq.* There are differences between the laws of New Jersey and other states. For example, Pennsylvania eschews strict liability claims in pharmaceutical cases but permits negligence claims to proceed under the same circumstances, *see Hahn v Richter,* 673 A.2d 888 (Pa. 1996), while Louisiana permits a claim to proceed by employing a failure to use reasonable care standard, La. R.S. 9:2800.57 (2005).

---

[7]Attached hereto as Exhibit "C".

Simply because differences in state laws exist, however, should not cause this factor to weigh against the unitary application of New Jersey law. New Jersey law should apply unless it is demonstrated that the other states have a greater interest than New Jersey has in applying its laws. *See e.g., Gantes v. Kason Corp.*, 679 A.2d 106 (N.J. 1996)("determination that [a state] . . . has a cognizable and substantial interest does not end the inquiry into whether the choice of its statute . . . is appropriate to resolve the conflict . . . . [That state's] interest . . . must be compared and weighed against any governmental interest that [the other state] has in applying its statute"). Accordingly, these conflicts merely makes the analysis under the second prong necessary.

### a) New Jersey Has "The Most Significant Relationship to the Occurrence and the Parties with Respect to the Issues"

Under New Jersey's choice of law analysis, the state where the alleged tortious conduct took place and where the manufacturer had its fixed location – here primarily New Jersey -- is the state with the most significant relationship to the dispute. New Jersey has the most significant relationship to the occurrence and the parties with respect to the issues. The *lex loci delicti* standard (*i.e.*, the law of the place where wrong occurred) was abandoned by New Jersey courts almost four decades ago, in favor of the governmental interests analysis. *See Mellk v. Sarahson*, 229 A.2d 625, 626-29 (N.J. 1967). Indeed, the New Jersey Supreme Court has stated that "[t]raditional choice-of-law analysis in [the] tort context does *not* permit the examination to end upon review only of the law of the site of the conduct and injury . . . [T]he governmental-interest analysis requires the sister state's policies be reviewed before determining which state

has the dominant interest in having its . . . law apply." *Erny,* 792 A.2d at 1216 (emphasis added). While

Merck will claim that class members' injuries occurred where they took Vioxx, the focus on the location

of the injury does not necessarily mean that the law of that state should apply. The significant contacts

analysis is multi-factorial and takes into consideration several other matters that may ultimately prove to be

more important than *lex loci*, which doctrine New Jersey long ago abandoned. *See Fu,* 733 A.2d at

1138.

In tort cases, there are five main factors a court should use to guide its decision: (1) the interests

of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law; (4) the

interests of judicial administration; and (5) the competing interests of the states. *Fu,* 733 A.2d at 1140-41

(summarizing the factors set forth in the Restatement (Second) of Conflict of Laws § 6). The third and

fourth factors are less significant to the choice of law determination in a tort action. *Erny,* 792 A.2d at

1217; *Fu,* 733 A.2d at 1142. The fifth factor is the most important. *Erny,* 792 A.2d at 1217.

As to the first factor – the interest of interstate comity – it "require[s] courts to consider whether

application of competing state's laws would frustrate the policies of other interested states." *Fu,* 733 A.2d

at 1141. A state should only impose its laws on a particular issue if it has a strong policy that will be

fostered by the application of the law. *Id.* The next significant factor, *i.e.,* the second factor – the interests

underlying the field of tort law -- requires the court "to consider the degree to which deterrence and

compensation, the fundamental goals of tort law, would be furthered by the application of the state's local

laws." *Id.*

With respect to the fifth and most important factor, when evaluating the competing interests of the

states, the Court should consider qualitative contacts that the litigation has with the state's policies and not

15

the quantitative contacts. *Id.* at 1142. The contacts that are most significant to the analysis are: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and 4) the place where the relationship, if any, between the parties is centered. *Id.*

As set forth in the PSC's Response to Merck's pending motion to dismiss the Master Class Action Complaint for Medical Monitoring, Merck's wrongful acts and omissions all originated, occurred in, emanated from and/or were orchestrated from New Jersey and Pennsylvania. These acts include the manufacture of the Vioxx; the corporate decisions regarding the aggressive promotion of the drug; the collection of clinical study results and the manipulation of such results; the development and approval of direct to consumer sales and marketing materials and training materials provided to sales people or "detailers;" the development and approval of the drug's labels and so-called warnings; and the decision to maintain this drug on the market despite the rising rate of cardiovascular injury and death. Aggregating these contacts leads to the conclusion that application of New Jersey is neither arbitrary nor fundamentally unfair to Merck. As Judge Higbee in *Local #68* held, "The marketing of Vioxx was a national effort that was planned or executed through New Jersey offices * * * Thus, the court finds that no individual state has stronger factual connection to this litigation than New Jersey." *Local #68, supra*, slip op. at 34.[8]

---

[8]In some cases, like the one here, plaintiffs from a number of states can obtain adequate relief only where the laws of a single state will govern common issues of law and fact. *See Gruber v. Price Waterhouse*, 117 F.R.D. 74, 81-82 (E.D. Pa. 1987) (nationwide class certified and Pennsylvania choice of law rule utilized to find that Pennsylvania law applied as to all claims against defendant whose alleged wrongful conduct occurred in Pennsylvania); *see also In re Bendectin Litigation*, 857 F.2d 290, 302-306 (6th Cir. 1988) (Ohio's choice of law rule required application of law of the state of manufacture to claim of hundreds of out-of-state plaintiffs); *In re Martin*, 510 N.E. 2d 840 (Ill. 1987)
(continued...)

Merck may attempt to distance itself from its New Jersey connections, but such an argument would be flawed. Although not binding here, Judge Higbee in the New Jersey State Vioxx litigation, in the context of ruling upon a motion to dismiss based upon forum non conveniens, found that "New Jersey has substantial interest in policing the conduct and protecting the interests of its citizen corporations, such as Merck." *In re: Vioxx Litig, No.* 619, slip op. at 6 (N.J.Super. Sept. 13, 2004).[9] The court made plain that New Jersey has a significant interest in this litigation:

> NJ has more than a theoretical interest in its resident corporations, (1) because it is always interested in the conduct of its citizens, (2) because Merck employs a large number of NJ residents... In fact, NJ has an interest in both protecting and policing our own corporations.
>
> Merck relies on cases in which the important events occurred in the foreign jurisdictions, but here, the Plaintiffs allege, inter alia, that Merck intentionally failed to provide the required warnings on the VIOXX packaging and that it intentionally used misleading advertisements and promotional materials to induce consumers to purchase and use VIOXX. The Plaintiffs further allege that the decisions to do so were made in NJ, where Merck, a New Jersey corporation, is headquartered. *There is clearly a significant connection to NJ.*

*Id.* (emphasis added). The New Jersey court rejected Merck's emphasis on the location where the harm occurred, holding:

> [W]hile the several states in which these Plaintiffs ingested VIOXX have

---

[8](...continued)
(Illinois law applied to out of state class members suing defendant with principle place of business in Illinois for the same wrongful conduct); *Friends for All Children v. Lockheed Aircraft Corp.*, 746 F.2d 816 (D.C. Cir. 1984) (law of forum applied to multi-state claimants seeking medical monitoring of injuries resulting from air crash disaster).

[9]Attached hereto as Exhibit "D".

an interest in these cases, *NJ has a greater interest in allegedly fraudulent action that may have been committed by one of its citizens.* NJ courts have found that in products liability cases the focus should not be mechanically put on where the harm was suffered because NJ has an interest in deterring wrongful conduct by its residents.

*Id.* at 7 (emphasis added).

New Jersey's relationship with Plaintiffs' claim for personal injuries is also the "most significant" because, unlike other states, New Jersey has a direct interest in deterring misleading advertising by pharmaceutical businesses located in the state. This interest is especially magnified in the case of Merck, a New Jersey drug company that extensively conducted direct to consumer advertising that withheld information about the potential side effects of Vioxx from unsuspecting public. In situations such as this, the New Jersey Supreme Court in *Perez v. Wyeth Laboratories Inc.,* 734 A.2d 1245, 1257 (N.J. 1999), expressed an overriding interest of the State of New Jersey: "Prescription drug manufacturers that market their products directly to consumers should be subject to claims by consumers if their advertising fails to provide an adequate warning of the product's dangerous propensities."

In *Perez*, the plaintiffs were implanted with a contraceptive drug/device known as Norplant. Norplant was extensively advertised on television and other media in a manner that never warned of its inherent dangers.[10] The Supreme Court grappled with the issue of whether the learned intermediary doctrine applied where direct to consumer advertising was prevalent or whether a provision of the PLA controlled.[11] *Id.* at 1249-50. The court found that the statute provided a boundary, but not did not define

_____

[10]Similarly for Vioxx, Dorothy Hamill skated to the music of "It's a beautiful morning," but she never once mentioned Vioxx's risk of MI or stroke. Complaint ¶¶115-116.

[11]Section 2A:58C-4 of the PLA only refers to warnings in the context of a physician. It states:

(continued...)

18

the limit of the doctrine. It reasoned that medicine is no longer practiced in a Norman Rockwell world,

where that the paternalistic image of the doctor-patient relation clings to the "doctor knows best" approach.

Based upon the "normative situation" – where consumers have access to enormous amounts of information

and feel empowered to direct their own treatment – the court concluded "that the learned intermediary

doctrine does not apply to the direct marketing of drugs to consumers." *Id.* at 1258, 1264.

By leading the other jurisdictions in the manner by which direct to consumer advertising may be

prosecuted, New Jersey sets itself apart as having a clear and compelling state interest in the oversight of

its corporate citizens. Merck chose to operate in New Jersey with the imputed knowledge that it would

have to abide by New Jersey's directives. Notwithstanding the holding of *Perez*, Merck conducted

extensive direct to consumer advertising that clearly implicating New Jersey's interest in overseeing the

truthfulness of that advertising. It follows then that New Jersey has the most significant interests in

overseeing Merck's conduct.

### 2.   Application of the Substantive Law of New Jersey is Constitutionally Permitted.

Twenty years ago, in *Phillips Petroleum v. Shutts*, 472 U.S. 97 (1985), the Supreme Court

---

[11](...continued)
"In any product liability action the manufacturer or seller shall not be liable for harm caused by a failure to warn if the product contains an adequate warning or instruction or, in the case of dangers a manufacturer or seller discovers or reasonably should discover after the product leaves its control, if the manufacturer or seller provides an adequate warning or instruction. An adequate product warning or instruction is one that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger and that communicates adequate information on the dangers and safe use of the product, taking into account the characteristics of, and the ordinary knowledge common to, the persons by whom the product is intended to be used, or in the case of prescription drugs, taking into account the characteristics of, and the ordinary knowledge common to, the prescribing physician."

19

confirmed the power of state courts to certify and exercise jurisdiction over nationwide classes, provided

the due process touchstones of class notice, the right to opt out, and a constitutionally permissible choice-

of-law decisions were present.

The Supreme Court recently reaffirmed the vitality of the *Shutts* choice-of-law standard as the

hallmark of constitutional due process and explicitly applied the *Shutts* rule to choice-of-law decisions by

all courts, in *Franchise Tax Board v. Hyatt*, 538 U.S. 488 (2003):

> "For a State's substantive law to be selected in a constitutionally
> permissible manner, that State must have a significant contact or significant
> aggregation of contacts, creating state interests, such that choice of its law
> is neither arbitrary nor fundamentally unfair."

538 U.S. at 495, *citing Shutts*, 472 U.S. at 818.

Because New Jersey's contacts, and resulting interests, are "manifest" in this case, and it is

indisputable that "at least some of the conduct alleged to be tortious occurred in" New Jersey, this Court's

selection of New Jersey law to govern the claims of the class fully comports with due process, just as the

trial court's selection of Nevada law to govern the plaintiff's claims in *Franchise Tax Board* was affirmed.

538 U.S. at 495. So long as this court's choice-of-law analysis proceeds in fidelity to the *Shutts*

contacts/interests criteria, the Supreme Court has recognized that it is constitutionally permissible "that a

court can lawfully apply either the law of one State or the contrary law of another." 538 U.S. at 496. As

Justice O'Connor, writing for a unanimous Court, concluded:

> "In light of this experience, we abandon the balancing-of-interests
> approach to conflicts of law . . . [and] thus have held that a State need not
> substitute the statutes of other states for its own statutes dealing with a
> subject matter concerning which it is competent to legislate."

*Franchise Tax Board*, 538 U.S. at 496, *citing Allstate Ins. Co. v. Hague*, 499 U.S. 302, 308 n.10

(1981); *Sun Oil Co. v. Wortman*, 486 U.S. 717, 727 (1988); *Pacific Employers Ins. Co. v. Industrial Accident Commission*, 306 U.S. 493, 501 (1939); *Phillips Petroleum Co. v. Shutts*, 472 U.S. at 818-819.

Trial courts may properly choose a state's law over its competitors notwithstanding, and indeed because, true conflicts exist. *Shutts* and *Franchise Tax Board* empower this Court to choose New Jersey law to govern the adjudication of the pivotal questions that are common to the claims of all members of the proposed injury class.

For these reasons, New Jersey substantive law can and should be applied to these claims.

**B.   Class Certification of These Claims Will Advance the Purposes Behind Rule 23.**

Class Actions are governed by Rule 23 of the Federal Rules of Civil Procedure.  Class actions are designed to streamline litigation by avoiding duplicative proofs and creating efficient use of court and legal resources where common issues amongst class members exist.  See *Jenkins v. Raymark Industries*, 782 F.2d 468, 471 (5th Cir. 1986); *Cope v. Duggins*, 2000 WL 381928, *2 (E.D.La. 2000)(Fallon, J.).  Use of the class action mechanism has been increasingly acknowledged as necessary and proper in a variety of circumstances.  *See, e.g., In re Amchem Products Inc. v. Windsor*, 521 U.S. 591, 625 (1997). Specifically, the Supreme Court recognized that "even mass tort cases arising from a common cause or disaster may, depending upon the circumstances, satisfy the predominance requirement." *Id. See also Smith v. Texaco, Inc.*, 263 F.3d 394, 405 (5th Cir. 2001)(Class actions exist to dispose of "large-scale, complex litigation for money damages") *Sterling v. Velsicol Chemical Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988) (Where one defendant engaged in a single course of conduct involving chemical exposure to

a multitude of persons class certification is appropriate).

One of the early and successful class actions affirmed by the Fifth Circuit involved numerous victims of asbestos exposure. *Jenkins, supra.* In *Jenkins*, the court found that despite the fact that individual matters involving causation are always present in mass tort cases, that the exposure to asbestos by thousands of recipients, provided a preferable and superior device for adjudicating such controversies. Another successful mass tort exposure case involved the use of agent orange in Vietnam and was another class action that was upheld by federal appellate courts as being appropriate for nationwide class treatment. *In Re "Agent Orange" Products Liability Litigation*, 818 F.2d 145 (2nd Cir. 1986), *cert. denied sub nom., Pinkney v. Dow Chemical Co.*, 484 U.S. 1004 (1988). More recently, product liability suits have been brought because of defective pharmaceutical drugs or medical devices. *In re Copley Pharmaceutical, Inc.*, 1 F.Supp.2d 1407 (D. Wyo. 1998) (Albuterol); *In Re Diet Drugs (Phentermine Fenfluramine Dexfenfluramine) Products Liability Litigation*, 2000 WL 1222042 (E.D. Pa. 2000); *Klein v. O'Neal, Inc.*, 222 F.R.D. 564, 567 (N.D.Tex. 2004) .

This action presents an appropriate case for class treatment. Thousands of complaints seeking relief for personal injury claims have been filed in federal courts across the country and transferred to this Court. Certification of the proposed class will allow the federal and state judicial systems to conserve precious resources and avoid hearing many of these cases -- all of which are based on substantially the same nexus of operative facts and legal claims -- over and over again.

**C.     The Prerequisites of Rule 23 Are Met and the**
**Class Should be Certified.**

The class must first satisfy the four threshold requirements of Rule 23(a). Those requirements are:

(1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. If these prerequisites are met, together with one of the three provisions of Rule 23(b), a court must certify the suit as a class action, without examining the underlying merits of the claims. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974). The party seeking class certification bears the burden of showing that all of the criteria are met. *See Castano v. American Tobacco Co.*, 84 F.3d 734 (5th Cir.1996). However, the threshold for meeting these criteria, *e.g.,* commonality, is not particularly stringent. In all instances, the "district court maintains substantial discretion in determining whether to certify a class." *Smith*, 263 F.3d at 403.

As explained below, the proposed Class satisfies the criteria of the applicable provisions of Rule 23(a).

### 1. Membership of the Class Is So Numerous and Geographically Diverse That Joinder Of All Members Is Impracticable.

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." There is "no magic minimum number that breathes life into a class," and a plaintiff's "lack of knowledge of the exact number of persons" in the class is not a bar to certification. *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 509 (S.D.N.Y. 1996)(quotations omitted). "Plaintiffs may rely on reasonable inferences drawn from the available facts in order to estimate the size of the class." *Id.* "To meet this requirement, the class representatives need show only that it is difficult or inconvenient to join all members of the class." *Smith*, 263 F.3d at 405.

The numerosity requirement is plainly met in this case. There are approximately 20 million users of Vioxx spread across this country. Complaint ¶4. More than 105 million prescriptions were issued to

people who ingested this drug while it was on the market. *Id.*  Noted authors have remarked that the substantial risk posed by Vioxx likely caused an excess of heart attacks and sudden cardiac death numbering in the tens of thousands. *See* Graham, *Risk of Acute Myocardial Infarction and Sudden Cardiac Death in Patients Treated with COX-2 Selective and Non-selective NSAIDs*, Dept. of Health and Human Services (Sept. 30, 2004)[12]; Topol, *Failing the Public Health – Rofecoxib, Merck, and the FDA*, 351 N Engl J Med 20041707-1709 (Oct 21, 2004).[13]  Not surprisingly, the MDL docket is replete with approximately 3,600 personal injury complaints and in excess of 3,000 claims filed in the state court of New Jersey alone.  Under these circumstances, the numerosity condition has readily been satisfied.

### 2.    There Are Numerous Questions Of Law And Fact Common To The Class.

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." The threshold for satisfying the commonality prerequisite is "not high." *Jenkins v. Raymark Industries*, 782 F.2d 468, 472 (5th Cir. 1986). The rule does not require that all questions of law and fact be common to the class, but only that some questions of law or fact be present, and that such questions of law or fact are shared by the members of the prospective class. *Id.* In general, the element is satisfied whenever "there is at least one issue, the resolution of which will affect all or a significant number of the putative class members." *Mullen v. Treasure Chest Casino*, 186 F.3d 620, 625 (5th Cir.1999); *Lightbourn v. County of El Paso,* 118 F.3d 421, 426 (5th Cir. 1997); *Smith*, 263 F.3d at 405.

The Complaint identifies numerous common questions of law or fact that focus on Defendants'

---

[12]Attached hereto as Exhibit "E".

[13]Attached hereto as Exhibit "F".

conduct and knowledge -- which affected every class member -- and Defendants' liability to the class members under certain statutes and common law. Compl. ¶155. One significant common question is that of Merck's asserted defenses. For example, the learned intermediary doctrine is placed into serious doubt due to Merck's direct to consumer marketing practices and efforts to withhold material data and other findings regarding the dangers of Vioxx that prevented physicians from discovering the actual problems associated with the drug prior to their prescribing it to their patients, the absent class members. As New Jersey law should apply to this litigation, the applicability of *Perez v. Wyeth Laboratories,* 734 A.2d 1245 (N.J. 1999), stands out.

As discussed above, the *Perez* case will present a predominating common class issue focused upon the learned intermediary doctrine. Whether the learned intermediary defense is applicable or not where Merck extensively conducted direct to consumer advertising will affect each class members' ultimate right to recover. In addition, the Complaint supplies numerous other common questions addressing Merck's knowledge, conduct and duty in its formulation, research and development, manufacturing, testing, promotion, marketing, advertising and sales of Vioxx. Complaint ¶ 155. This list of common questions of law and fact unquestionably satisfies Rule 23(a)(2), as the answers to these fundamental questions require a central examination of Merck's actions and Vioxx's properties and will resolve most, if not all, of the issues asserted on a class basis.

Numerous courts have found commonality where, as here, all class members seek to resolve the issue of whether the product at issue was defective and caused the plaintiffs' harm. For example, in *Klein, supra,* the court recently certified a national class of users of the drug, E-Ferol, for product liability claims involving their personal injuries. The court found that:

25

> Common questions of fact exist regarding the development,
> manufacturing, distribution, testing, and sale of the drug. Common fact
> questions also exist regarding the drug and its effects, and Defendants' role
> in curing the harms or warning infants who received E-Ferol.

*Id.*, 222 F.R.D. at 567. *See also In re A.H. Robins*, 880 F.2d 709, 740-41 (4th Cir. 1989)(Product

liability action where the predominating questions addressed the ability of the class to vitiate a settlement

agreement between the manufacturer and it's insurer to obtain funding for damages and whether the insurer

could be held as a joint tortfeasor); *In re Telectronics Pacing Systems, Inc.*, 172 F.R.D. 271, 280 (S.D.

Ohio 1997)("Thus, whether Telectronics' conduct caused this fatigue failure or whether the "J" Leads are

defective are a questions [sic] common to all class members."); *Copley Pharm., Inc. Albuterol Products*

*Liability Litig. ("Copley II")*, 161 F.R.D. 459, 462 (D. Wyo. 1995)(denying motion for decertification

and holding that "there are common issues concerning the extent, nature and dangerousness of the

contamination in Copley's Albuterol"); *Agent Orange*, 818 F.2d at 166-67 ("class certification was justified

under Rule 23(b)(3) due to the centrality of the military contractor defense.  First, this defense is common

to all of the plaintiffs' cases, and thus satisfies the commonality requirement of Rule 23(a)(2).").

The common underlying legal theory of this case is the violation of the New Jersey PLA.  To

establish a claim under the PLA, Plaintiffs must allege and prove the following elements, which are common

to each putative class member: 1) that Merck was a manufacturer or seller of a product; 2) that the product

causing the harm was not reasonably fit, suitable or safe for its intended purpose because it: a) deviated

from the design specifications, formulae, or performance standards of the manufacturer or from otherwise

identical units manufactured to the same manufacturing specifications or formulae, or b) failed to contain

adequate warnings or instructions, or c) was designed in a defective manner.  PLA, §2a-58c-2.  If Plaintiffs

prove these allegations, Merck is liable to each class member for damages, including punitive damages.[14]

Here, the liability issues are ideally suited for class-wide determination. Under the PLA, strict liability applies. Plaintiffs only need to prove that Merck failed to adequately warn of the significantly increased risk of the cardiotoxic and prothrombotic effects of Vioxx, matters that were known to Merck even before the drug was marketed, to recover. That Merck extensively marketed Vioxx without disclosing these material warnings presents common questions.

Thus, Merck's marketing practices present common proofs of fact that clearly predominate, making them ideal for resolution on a class-wide basis.

Plainly, the requirements of commonality are satisfied.

### 3.     The Claims Of The Representative Plaintiffs Are Typical Of The Claims Of The Class.

Rule 23(a)(3) requires that the representative plaintiff's claim be "typical" of those of other class members. The test for typicality, like the test for commonality, is "not demanding." *Mullen*, 186 F.3d at 625; *Forbush v. J.C. Penny,* 994 F.2d 1101, 1106 (5th Cir. 1993); *Shipes v. Trinity Industries*, 987 F.2d 311, 316 (5th Cir. 1993). The typicality requirement seeks to assure that the interests of the individuals are aligned with the common questions affecting the class as a whole, and is satisfied when the representative's claims for relief arise from the same course of conduct that gives rise to the claims of the other class members and are based upon the same legal or remedial theories. *See In re American Medical*

---

[14]Notwithstanding the general prohibition of punitive damages under 2A: 58C-5(c), the statute permits recovery of punitive damages, "where the product manufacturer knowingly withheld or misrepresented information required to be submitted under the agency's regulations, which information was material and relevant to the harm in question, punitive damages may be awarded." Thus, Merck's behavior regarding dissemination of its knowledge regarding the dangers posed by Vioxx is a common question significant not only to the imposition of liability but punitive damages, as well.

*Systems*, 75 F.3d 1069, 1075 (6th Cir. 1996) ("Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct.")

With respect to the claims and issues sought to be certified, the claims of the representative Plaintiffs for the class is typical of the claims of other members of the class. Each class members' claim arises from the same course of events, as described in the Complaint. The PSC anticipates that Defendant will attack factually the typicality of each Plaintiff claiming his or her own health issues, histories and idiosyncrasies defeat certification. However, as aptly stated in *Boggs v. Divested Atomic Corp.*, 141 F.R.D. 58, 65 (S.D.Ohio 1991), these arguments are unavailing:

> Clearly, people and parcels of real property, like snowflakes, necessarily have different and unique characteristics. The important question is to what extent those differences, when compared to the nature and extent of the shared characteristics of the named Plaintiffs' and the class members' claims, will defeat the Court's ability to achieve a considerable efficiency through collective adjudication of those claims.

*See also Klein*, 222 F.R.D. at 567 ("Individual variations among class members' claims with respect to individual causation, medical history, general health, extent of injury, or damages, do not defeat typicality, provided that the claims arise from the same events or course of conduct and are based on the same legal theories").

Further, in order to prosecute their own claims, each class member will be obliged to make similar legal arguments under New Jersey law to establish Defendants' liability. The proposed class representatives have the same incentive to prove the Defendant's wrongful conduct underlying their PLA claims. Moreover, it is beyond dispute that the relief sought by the class representatives, *i.e.*, monetary

damages, while they may differ from person to person is an insufficient ground to defeat class certification. *See Gunnells v. Healthplan Services, Inc.*, 348 F.3d 417, 429 (4th Cir. 2003)(The court spurned "the same argument made by almost all defendants in mass tort cases: determining damages will require individualized inquiry. Courts have routinely rejected this argument, concluding, as we have in previous cases, that the need for individualized proof of damages alone will not defeat class certification.")(emphasis in original); *Klein,* 222 F.R.D. at 567.

The typicality requirement of Rule 23(a)(3) is therefore satisfied.

### 4. The Representative Plaintiffs And Counsel Will Fairly And Adequately Protect The Class.

Rule 23(a)(4) requires that the class representatives "fairly and adequately protect the interests of the class." " The "adequacy" requirement looks at both the class representatives and their counsel." *Jenkins*, 782 F.2d at 472. Where the named plaintiffs' interests are identical to the interests of the absent class members and experienced counsel represent the class, courts routinely find that the adequacy requirement is fulfilled. *Mullen*, 186 F.3d at 625-26. Both prerequisites of adequacy of representation are met in this case.

The Class Plaintiffs have retained counsel who are experienced and qualified to prosecute this action. These counsel, appointed to the PSC by this Court in PTO No. 6 and then later approved as interim class counsel by Order dated June 7, 2005, have conscientiously and vigorously represented Plaintiffs and the interests of the proposed Class, and will continue to do so. These counsel have successfully prosecuted numerous complex class and mass tort actions throughout the United States, and have extensive experience in the successful prosecution of pharmaceutical litigation.

The proposed representative Plaintiffs are appropriate class representatives because there is no antagonism or conflict of interest between them and the members of the class they seek to represent. Ms. Lawrence and Mr. Gibney each took Vioxx and suffered significant injury caused by their ingestion of the drug. The interests of the representative Plaintiffs are coextensive with the interests of the members of the class they seek to represent in that they share the same objective -- proving Defendants' wrongful conduct and establishing Defendants' liability.

Accordingly, all the requirements of Rule 23(a) have been satisfied.

**D.     This Class Action Also Fulfills All of the Requirements of Rule 23(b)(3).**

Plaintiffs' claims should be certified pursuant to Rule 23(b)(3), because "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3).

Rule 23(b)(3) requires the presence of two factors: 1) whether common questions of law or fact predominate over questions affecting individuals only, and 2) whether a class action is the superior method of adjudicating the controversy. These questions are obviously related, and, therefore, courts finding that common questions predominate normally will find that a class action is also the superior method of resolving the case.

1.    **Common Questions of Law and Fact Predominate.**

As previously discussed, there exist a significant number of common issues of fact and law in this case.  In order to fulfill the requirement that common questions predominate, "common issues must constitute a significant part of the individual cases.  *Mullen*, 186 F.3d at 626, *quoting, Jenkins*, 782 F.2d at 472.

In the Fifth Circuit, provided sufficient consideration is given to the class trial plan,[15] mass torts can be certified, particularly for a determination on the predominating common issues of liability.  *See Mullen*, 186 F.3d at 626.  In *Mullen*, the Fifth Circuit affirmed the certification of a class of crew members with respiratory ailments caused by a defective ventilation system aboard their vessel, a floating casino.  The district court found only limited issues would be tried commonly, *i.e.*, seaman status, vessel status, negligence and seaworthiness.  *Id*.  The Fifth Circuit agreed that these issues predominated, especially noting that the last two issues "are not only significant but pivotal." *Id*.  It further accepted that the district court's 2-stage trial plan sufficiently addressed developments to permit the predominating common issues to be tried in a manner that effectively isolated them from the type of individuated issues that had posed obstacles to class certification in *Amchem* and *Castano*.[16]

---

[15]The PSC is simultaneously filing a separate trial plan to address how this litigation can be conducted on a class basis.

[16]The multi-phase class action trial plan that enabled certification of the *Mullen* injury class, and that the Fifth Circuit affirmed, acknowledged specific causation, damages, and comparative negligence as individual issues, incapable of class-wide adjudication in the Phase-I common issues trial.  The Fifth Circuit affirmed the Trial Plan that placed these individuated issues into a second phase trial with "waves of approximately five class members at one time." *Id.*, 186 F.3d at 623.  Plaintiffs acknowledge similar individual issues here, requiring second phase, individual trials, and adopt the *Mullen* reasoning that such issues do not defeat the significance or predominance criteria.  Here the

(continued...)

31

Other courts have similarly utilized the class procedure to effect significant results in concluding complex litigation. For example, the Honorable Henry A. Mentz Jr. utilized a class action in the mass tort litigation arising out of an explosion at Shell Oil's Norco refinery. The Court defined the class and class issues and set a trial plan to govern the class that called for a single trial on liability with trials on unique issues of damages and causation to follow in waves of five plaintiffs at a time. *See In re Shell Oil Co.*, 136 F.R.D. 588 (E.D.La.), *aff'd, Watson v. Shell Oil Co.*, 979 F.2d 1014 (5th Cir. 1992).

Citing the predominating common issues which could be resolved in a single trial, the Fifth Circuit affirmed certification for a mass tort over a decade ago in *Jenkins, supra*. A year later, the Second Circuit followed suit in *Agent Orange, supra*, and affirmed the certification of a class of service people exposed to the herbicide Agent Orange while in Vietnam based on the predominating government contractor defense. In a further indication of the movement toward certification of mass torts, the Sixth Circuit certified a class of individuals with personal injuries suffered as a result of waste buried by a chemical company. *Sterling, supra*. The *Sterling* court dispelled the myth that class action is inappropriate for mass torts, holding that where there is a common issue of liability which can be tried, a class is beneficial even if individual damages calculations are required. *Id.*

In recent years, the trend has continued toward certification in similar mass tort situations. For example, in *Copley Pharmaceutical, supra*, Judge Brimmer certified a class of users of a contaminated prescription drug, Albuterol. Judge Brimmer, a then current member of the Judicial Panel for Multi-District

---

[16](...continued)
pivotal questions are raised by Vioxx itself and Merck's conduct in promoting and selling it. A similar docket management plan has been adopted by Judge Higbee, who is employing an analog to the *Mullen* multiple plaintiff "waves" strategy in the New Jersey Vioxx litigation, by setting early 2006 trial dates for groups of plaintiffs with similar circumstances, *e.g.* long term Vioxx use."

Litigation, recognized that the purpose of multi-district litigation is to facilitate resolution of mass tort litigation. Building upon the established body of jurisprudence where courts have employed the class device to efficiently resolve the predominating common issues in restricted trial settings, the court pursued the class action. The court's certification and trial of common issues permitted the successful resolution of that MDL litigation, thus effecting the purpose of MDL litigation.

The instant case primarily raises a failure to warn claim under the PLA and it does not present the fundamental problems of manageability and lack of commonality that ultimately doomed certification efforts in the sprawling *Castano* class.[17] In *Castano v. American Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996),

---

[17] The plaintiffs in *Castano* attempted to certify a class of "all nicotine dependent persons in the United States, including current, former and deceased smokers since 1943." *Castano*, 84 F.3d at 738. In introducing the unique situation presented by this proposed class, the Court noted that it was "faced with managing a novel claim involving eight causes of action, multiple jurisdictions, millions of plaintiffs, eight defendants, and over fifty years of alleged wrongful conduct." *Id.* at 744. This Court has already determined that this established products liability claim does not fit in Castano's "immature tort" mold. *See In re Vioxx Products Liability Litigation*, MDL No. 1657, Hearing Transcript at 7-8 (E.D.La. Nov. 10, 2005)("The maturity of the tort is different in Castano, where you had some question as to whether there was a tort in the first place. In this type of situation, I don't see an immature tort."). A parallel can be drawn between *Castano* and this Court's November 10, 2005 statement and tobacco litigation in the Third Circuit contrasted against pharmaceutical litigation in that circuit. In Philadelphia, tobacco litigation had been addressed in *Barnes v. American Tobacco Co.*, 161 F.3d 127 (3d Cir. 1998), cert. denied, 526 U.S. 1114 (1999). There the Third Circuit affirmed the decertification of a medical monitoring tobacco case where questions regarding proof of individual addiction created a lack of cohesiveness. Nevertheless, following *Barnes*, Judge Bechtle, a jurist in the Third Circuit, determined that Rule 23(b)(3)'s predominance requirement could still be satisfied for diet drug users who took the drugs over varying time periods, etc. *See In re Diet Drugs Products Liability Litigation*, 2000 WL 1222042 at *42 ("Where *Barnes* involved the entire tobacco industry, which manufactured hundreds of different products containing different ingredients, the class here involves a single defendant with essentially a single diet drug product. In *Barnes*, plaintiffs claimed that defendants manipulated nicotine levels. Thus, nicotine levels in different products at different times became an individual issue destroying class cohesion. No such individual issues divide the instant class. Moreover, addiction, an inherently individual issue, worked to further splinter the tobacco class in *Barnes*. No such individual issue exists with respect to the instant class.").

(continued...)

the Fifth Circuit rejected class certification based upon perceived variations in state laws. *Id.* at 741. These variations in state law prevented the class from satisfying the certification requirements of predominance and superiority. *Id.* Further, the Court also disfavored certification because of the novel theory which the plaintiffs presented suggested that the tort was immature. The plaintiffs sought damages solely for the injury of nicotine addiction. *Id.* at 737. The court reasoned that addiction-as-injury was a claim with which courts are unfamiliar; therefore, it was impossible to know whether they would be better managed by a class or by individual actions. *Id.* at 745.

In *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), the Supreme Court of the United States refused certification of a settlement class of persons "exposed to different asbestos-containing products, in different ways, over different periods, and for different amounts of time; some suffered no physical injury, others suffered disabling or deadly diseases." *Id.* at 610. These factual differences, in the words of the Court, made it too much of a "sprawling class." *Id.* at 622. The Court was clearly disturbed by counsel carving out from the class their own inventory of clients who were to receive preferential treatment outside of the settlement. But most importantly, the Court was concerned about binding absent class members to a settlement where, due to the latency period of asbestos disease, the individuals may not even know that they were exposed, (*i.e.,* the "futures" class). *Id.* at 626-28.

Clearly, the disparities among class members that troubled the courts in *Castano* and *Amchem* do not exist in the instant case. Unlike, the sprawling class in *Amchem*, the instant case presents a cohesive group of persons injured by Vioxx that will pursue a single legal theory under the PLA. Unlike *Castano*,

---

[17](...continued)

rather than attempting to bring claims under the varying laws of several different states, the single pursuit

of the PLA claims avoids the variance in state laws that worked against the predominance and

manageability criteria. In addition, the present class does not have the problem of dealing with the liability

of several defendants and several different products with different methods of exposure. *See In re Diet*

*Drugs Products Liability Litigation*, 2000 WL 1222042 at *42. Nor is there a "futures" problem with

Vioxx. Persons can be presumed to have known they were taking the drug as prescription records exist.

Further, there is no issue of latency in the sense of development of cancer (the medical monitoring class

seeks relief for detection of undiagnosed myocardial infarctions).

Common questions of law and fact predominate in this case because the primary focus of this suit

is the behavior of Merck in manufacturing and direct to consumer marketing of Vioxx. In sum, because

the allegations of the Complaint and the potential proof at trial show the predominance of common issues,

and because considerations of efficiency, economy and fairness weigh in favor of class treatment, the

predominance test is satisfied for each of plaintiffs' claims.[18]

### 2.   The Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of this Controversy.

Rule 23(b)(3) also requires that a class action be "superior to other available methods for the fair

and efficient adjudication of the controversy."

As stated previously, under Rule 23(b)(3), the resolution of the predominance question normally

determines whether the class procedure will be superior to other methods of adjudication. *See, e.g., Roper*

*v. Consurve, Inc.*, 578 F.2d 1106, 1112-13 (5th Cir. 1978), *aff'd on other grounds sub. nom., Deposit*

---

[18]To the extent individual issues remain after trial on the common issues, these issues can be
addressed in subsequent proceedings. *See Jenkins, supra; Klein, supra.*

*Guaranty National Bank v. Roper*, 445 U.S. 326, *rehearing denied*, 446 U.S. 947 (1980).  The alternatives to certifying this case under Rule 23 are patently inferior to the class action mechanism.  These alternatives include:  the test case, joinder, intervention, consolidation and individual actions.  No other method of adjudication provides the efficiency and conservation of judicial and private resources better than a class action.

In *Klein*, the court concluded that the superiority of the class device weighed in favor of certification:

> Certification of this litigation as a voluntary ("opt-out") class action is superior to individual actions or other available methods for the fair and efficient adjudication of this controversy.  Joinder is impracticable due to the number of potential claimants, and individual cases would first require the resolution of issues that could be better resolved on a class basis. Resolution of the common issues of fact in this case will further the resolution of individual damages claims.  Alternative methods of adjudication fail to offer the efficient resolution of factual issues offered by class certification, and the interests of judicial economy and justice require that this Court certify a class of Plaintiffs as proposed.

*Id.*, 222 F.R.D. at 568.  Thus, efficiencies in determining Merck's overall responsibility to the class as a whole based upon its conduct of direct to consumer advertising, offering an inadequate label and other actions that failed to adequately warn of the defect in Vioxx make the class device more effective and efficient than individual trials or other procedural devices. *See also Local #68,* slip op. at 67 (Judge Higbee recognized the superiority of class device *inter alia* once determination of uniform application of New Jersey law applied).

The manageability of the class is further enhanced by the Court's ability to determine particular issues during the trial that focus only upon the common issue to preserve the res judicata effect of any

judgment.  *See* Fed.R.Civ.P. 23(c)(4).[19]  Where an overriding legal or factual determination so overwhelmingly predominates litigation that it is vital or pivotal, courts have willingly employed the class procedure even when the common predominating issue is quite limited.  For example, in *Agent Orange* the issue was the government contractor defense; in *A.H. Robins,* it was the insurance coverage and joint tortfeasor issues.  Such an issue-oriented trial avoids treading on the individual causation issues while still taking advantage of the a common trial on the predominating questions of Merck's liability.

This suit is manageable as a class action and no other superior method of adjudication of the class exists.

Therefore, this action meets the requirements of Rule 23(b)(3).

---

[19]The PSC does not mean to imply that only by limiting the claims to a particular issue does predominance or superiority exist.  *See Castano*, 84 F.3d at 745 n.21.  The PSC is mindful of the import of the teachings of *Castano* and *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 422 (5th Cir. 1998), on this subject.  Rather, the PSC suggests that these liability issues already predominate and that a class trial addressing these limited issues may actually benefit the class by avoiding the necessity for repeated proofs of the inadequacy of Vioxx's direct to consumer advertising, warnings, product defect and the learned intermediary doctrine.

## IV.    CONCLUSION

Like *Agent Orange, Copley, Jenkins* and *Shell Oil*, this case also presents vital, overriding predominating questions, particularly as they relate to Merck's liability and the application of the learned intermediary defense. For the reasons set forth above, class certification should be granted.

Respectfully submitted,

**PLAINTIFFS' STEERING COMMITTEE**

Date: December 7, 2005                    By:_____

**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
***Herman, Herman, Katz & Cotlar, L.L.P.***
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Telephone: (504) 581-4892
Facsimile: (504) 561-6024

Temporary address:

3411 Richmond Avenue, Suite 460
Houston, Texas 77046
Telephone: (713) 877-1843
Facsimile: (713) 871-9750

**PLAINTIFFS' LIAISON COUNSEL**

38

Richard J. Arsenault, Esq.
P.O.Box 1190
2220 Bonaventure Court
Alexandria, LA 71309-1190
PH: (318) 487-9874
FAX: (318) 561-2591

Andy D. Birchfield, Esq. **(Co-Lead Counsel)**
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
PH: (800) 898-2034
FAX: (334) 954-7555

Elizabeth Cabraser, Atty. **(on brief)**
Embarcadero Center West
275 Battery Street, 30th Floor
San Franciso, CA 94111-3339
PH: (415) 956-1000
FAX: (415-956-1008

Thomas Kline, Esq.
1525 Locust St.
19th Floor
Philadelphia, PA 19102
PH: (215) 772-1000
FAX: (215) 772-1371

Arnold Levin, Esq. **(on brief)**
Fred S. Longer, Esq. **(on brief)**
510 Walnut Street
Suite 500
Philadelphia, PA 19106-3875
PH: (215) 592-1500
FAX: (215) 592-4663

Carlene Rhodes Lewis, Atty.
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
PH: (713) 650-0022
FAX: (713-650-1669

Gerald E. Meunier, Esq. **(on brief)**
Energy Centre
1100 Poydras Street, Suite 2800
New Orleans, LA 70163-2800
PH: (504) 522-2304
FAX: (504) 528-9973

Troy Rafferty, Esq.
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
PH: (850) 435-7000
FAX: (850) 497-7059

Drew Ranier, Esq.
1419 Ryan Street
Lake Charles, LA 70601
PH: (337) 494-7171
FAX: (337) 494-7218

Mark Robinson, Esq.
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
PH: (949) 720-1288
FAX: (949) 720-1292

Christopher Seeger, Esq. **(Co-Lead Counsel)**
One William Street
New York, NY 10004
PH: (212) 584-0700
FAX: (212) 584-0799

Christopher Vincent Tisi, Esq.
2000 L Street, NW
Suite 400
Washington, DC 20036-4914
PH: (202) 783-6400
FAX: (307) 733-0028

Dianne M. Nast, Esq. **(on brief)**
Jennifer S. Snyder, Esq. **(on brief)**
Roda & Nast, P.C.
801 Estelle Drive
Lancaster, PA 17601
PH: (717) 892-3000
FAX: (717) 892-1200
**Vice Chairperson of the Class Action,**
**Law and Briefing Committee**

## PLAINTIFFS' STEERING COMMITTEE

39

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing pleading has been served upon Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis/Nexis File and Serve Advanced, in accordance with Pre-Trial Order No. 8, on this the 7th day of December, 2005.

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

In Re:  VIOXX                                          :
                                                       :        MDL Docket NO. 1657
PRODUCTS LIABILITY LITIGATION                          :
                                                       :        SECTION L
                                                       :
This document relates to All Personal Injury :         JUDGE FALLON
Class Action Complaints Pending or Subject:
to Transfer to MDL 1657                                :        MAG. JUDGE KNOWLES

## ORDER

AND NOW THIS            DAY OF                 ,              , upon consideration of the

Plaintiffs' Steering Committee's Motion for Class Certification of a Nation-wide Class Action

for Personal Injury and Wrongful Death, it is hereby ORDERED that the following class shall be

certified pursuant to Fed.R.Civ.P. 23(a) and (b)(3):

> All persons residing in the United States who took Vioxx in any
> dose at any time between May 20, 1999 when Vioxx was first
> approved by the United States Food & Drug Administration
> ("FDA"), and September 30, 2004, when Vioxx was first
> withdrawn from the market, and who claimed personal injuries or
> assert wrongful death claims arising from ingestion of Vioxx.

NEW ORLEANS, LOUISIANA, THIS _____ DAY OF _____, 2005.


_____
ELDON E. FALLON, JUDGE
UNITED STATES DISTRICT COURT JUDGE

1

# SEE RECORD FOR

# EXHIBITS

# OR

# ATTACHMENTS

# NOT SCANNED