1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3

4

5  IN RE: VIOXX PRODUCTS          *
   LIABILITY LITIGATION           *   MDL DOCKET NO. 1657
6                                 *
                                  *
7  THIS DOCUMENT RELATES TO       *   HOUSTON, TEXAS
   CASE NO. 05-4046:              *
8                                 *
   EVELYN IRVIN PLUNKETT, ET AL   *   DECEMBER 9, 2005
9                                 *
   VERSUS                         *
10                                *   8:30 A.M.
   MERCK & CO., INC.              *
11  * * * * * * * * * * * * * * * *

12

13                   VOLUME X
              JURY TRIAL BEFORE THE
14            HONORABLE ELDON E. FALLON
             UNITED STATES DISTRICT JUDGE

15

16

APPEARANCES:

17

18  FOR THE PLAINTIFF:         BEASLEY ALLEN CROW METHVIN
                                 PORTIS & MILES
19                             BY:  JERE LOCKE BEASLEY, ESQ.
                                    ANDY D. BIRCHFELD, JR., ESQ.
20                                  LEIGH O'DELL, ESQ.
                                    J. PAUL SIZEMORE, ESQ.
21                                  FRANK WOODSON, ESQ.
                               234 COMMERCE STREET
22                             POST OFFICE BOX 4160
                               MONTGOMERY, ALABAMA 36103

23

24  FOR THE PLAINTIFF:         ROBINSON, CALCAGNIE & ROBINSON
                               BY:  MARK P. ROBINSON, JR., ESQ.
25                             620 NEWPORT CENTER DRIVE
                               NEWPORT BEACH, CALIFORNIA 92660

1    <u>APPEARANCES, (CONTINUED)</u>:

2

3    FOR THE PLAINTIFF:              ABRAHAM, WATKINS, NICHOLS,
                                        SORRELS, MATTHEWS & FRIEND
                                     BY:  DAVID P. MATTHEWS, ESQ.
4                                    800 COMMERCE STREET
                                     HOUSTON, TEXAS 77002

5

6    FOR THE PLAINTIFF:              THE KAISER FIRM
                                     BY:  GRANT KAISER, ESQ.
7                                    8441 GULF FWY., SUITE 600
                                     HOUSTON, TEXAS 77017

8

9    FOR THE DEFENDANT:              BARTLIT BECK HERMAN
                                        PALENCHAR & SCOTT
10                                   BY:  PHILIP S. BECK,  ESQ.
                                           TAREK ISMAIL, ESQ.
11                                   54 W. HUBBARD STREET, SUITE 300
                                     CHICAGO, ILLINOIS 60601

12

13   OFFICIAL COURT REPORTERS:      CATHY PEPPER, CCR, RPR, CRR
                                     500 POYDRAS STREET, ROOM HB-406
14                                   NEW ORLEANS, LOUISIANA 70130
                                     (504) 589-7778

15

16

17
     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
18   PRODUCED BY COMPUTER.

19

20

21

22

23

24

25

1          **PROCEEDINGS**

2          **(DECEMBER 9, 2005)**

3               (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN

4     CHAMBERS.)

5               **THE COURT:**  OKAY.  LET'S GO ON THE RECORD NOW.  I'M

6     IN CHAMBERS.  THE JURY IS NOT WITH US.  I'M WITH COUNSEL FOR

7     BOTH SIDES.

8               THE JURY WENT OUT ON THIS CASE ON DECEMBER 8,

9     AROUND NOON.  APPROXIMATELY AN HOUR OR SO AFTER THEY COMMENCED

10    THE DELIBERATION, THE *NEW ENGLAND JOURNAL OF MEDICINE* ISSUED AN

11    EDITORIAL QUESTIONING THE ACCURACY OF AN ARTICLE THAT WAS

12    SUBMITTED BY SEVERAL AUTHORS, ONE OF WHOM TESTIFIED IN THIS

13    TRIAL.  DR. REICIN, R-E-I-C-I-N, WAS THE INDIVIDUAL.

14              THE PERSON WHO TESTIFIED DURING THE TRIAL

15    INDICATED THAT THE VIGOR STUDY REVEALED TO HER CERTAIN

16    INFORMATION THAT GAVE HER COMFORT IN THE USE OF VIOXX AND

17    INDICATED ALSO THAT SHE DELIVERED AN ARTICLE OR WAS ONE OF THE

18    DRAFTERS OF AN ARTICLE WHICH WAS SUBMITTED TO THE *NEW ENGLAND*

19    *JOURNAL OF MEDICINE*.  THE ARTICLE WAS PEER-REVIEWED AND

20    ACCEPTED BY THE *NEW ENGLAND JOURNAL OF MEDICINE*.  THE EDITORIAL

21    POTENTIALLY QUESTIONS HER COMMENTS AND POTENTIALLY IS FODDER

22    FOR CROSS-EXAMINATION.  THE ISSUE WHICH IS PRESENTED TO THE

23    COURT IS WHAT TO DO AT THIS STAGE OF THE LITIGATION, AND I'VE

24    INVITED THE PARTIES TO GIVE ME THEIR COMMENTS.

25                   I'LL HEAR FIRST FROM THE PLAINTIFF AND THEN I'LL

1   HEAR FROM THE DEFENDANT.

2          **MR. BIRCHFIELD:**  YOUR HONOR, FIRST, WE HAVE

3   CONSIDERED THE OPTION OF REOPENING THE CASE, AND WE DO NOT

4   THINK THAT THAT IS A VIABLE OPTION.

5          **THE COURT:**  LET ME INTERRUPT YOU THERE.  GO OFF THE

6   RECORD FOR A MOMENT.

7                    **(OFF THE RECORD)**

8          **MR. BIRCHFIELD:**  YOUR HONOR, THE INFORMATION

9   REGARDING THE *NEW ENGLAND JOURNAL OF MEDICINE* AND MERCK'S

10  DEALINGS WITH THE *NEW ENGLAND JOURNAL OF MEDICINE* REGARDING THE

11  PUBLICATION OF THE VIGOR STUDY IS A MATTER THAT DIRECTLY

12  IMPACTS THE NATURE OF THIS CASE.  THE EDITORIAL WAS PUBLISHED

13  AFTER THE JURY BEGAN DELIBERATING IN THIS CASE, AND IT CAST

14  SERIOUS DOUBT ON THE TESTIMONY OF DR. ALISE REICIN.

15               IN THIS TRIAL, DR. TOPOL TESTIFIED IN DEPOSITION

16  THAT, AS HE WAS INVESTIGATING MERCK'S EXPLANATION OF THE VIGOR

17  RESULTS, BEING EXPLAINED BY THE NAPROXEN THEORY, AND AS HE WAS

18  LOOKING AT THE CARDIOVASCULAR RISKS OF VIOXX, HE FOUND A

19  DISCREPANCY BETWEEN THE PUBLICATION OF THE VIGOR RESULTS IN THE

20  *NEW ENGLAND JOURNAL OF MEDICINE* AND WHAT WAS REPORTED TO THE

21  FDA.  HE BROUGHT THAT TO LIGHT, AND HE TESTIFIED THAT THAT WAS

22  A MATTER OF SCIENTIFIC MISCONDUCT.

23               DR. REICIN TOOK THE STAND AND EXPLAINED AWAY

24  THAT SCIENTIFIC MISCONDUCT BY STATING THAT THERE WAS A CUTOFF

25  FOR THE SUBMISSION OF THESE EVENTS TO THE *NEW ENGLAND JOURNAL*

1    *OF MEDICINE* FOR PUBLICATION.  IT IS NOW REPORTED IN THE

2    EDITORIAL THAT THERE WAS A DISKETTE THAT WAS DELIVERED, ALONG

3    WITH A HARD COPY OF THE TRANSCRIPT, TO THE *NEW ENGLAND JOURNAL*

4    *OF MEDICINE*.  ON THAT DISKETTE, IT WAS DISCOVERED THAT MERCK

5    HAD DELETED THESE EVENTS.  THE EDITORIAL STATES THAT THERE WERE

6    THREE EVENTS, THESE THREE MYOCARDIAL INFARCTIONS WERE NOT

7    INCLUDED, MADE CERTAIN CALCULATIONS AND CONCLUSIONS IN THE

8    ARTICLE INCORRECT.

9             THIS IS THE *NEW ENGLAND JOURNAL OF MEDICINE*, IT

10   IS THE STUDY THAT WAS REPORTED ON VIOXX, AND DOCTORS RELY ON

11   THE INFORMATION IN THE MEDICAL JOURNALS, AND THEY ARE STATING

12   THAT "THE CONCLUSIONS IN THE ARTICLE ARE INCORRECT BASED ON THE

13   LACK OF INCLUSION OF THESE EVENTS.  THE LACK OF INCLUSIONS OF

14   THESE THREE EVENTS RESULTED IN AN UNDERSTATEMENT OF THE

15   DIFFERENCE IN RISKS OF MYOCARDIAL INFARCTION BETWEEN THE

16   ROFECOXIB AND NAPROXEN GROUPS."

17             THIS IS CERTAINLY A MAJOR ISSUE IN THIS CASE,

18   AND WHAT HAS COME TO LIGHT NOW BEARS A VERY HEAVY IMPACT ON US

19   BEING ABLE TO PRESENT OUR CASE IN A PROPER FASHION.

20             IT HAS BEEN SUGGESTED THAT WE KNEW ABOUT THIS

21   INFORMATION BEFORE THE TRIAL.  THE DEPOSITION OF THE *NEW*

22   *ENGLAND JOURNAL OF MEDICINE* WAS A 30(B)(6) DEPOSITION THAT WAS

23   TAKEN A WEEK BEFORE THIS TRIAL BEGAN.  WE ALSO HAD ANOTHER

24   DEPOSITION TAKEN THE WEEK BEFORE THIS TRIAL BEGAN, AND THAT WAS

25   THE DEPOSITION OF DR. ERIC TOPOL.  WE KNEW, THE PLAINTIFFS,

1    EVELYN PLUNKETT, KNEW ABOUT DR. TOPOL BEFORE THE DEADLINES FOR

2    DISCLOSING WITNESSES.  WE TIMELY DISCLOSED DR. ERIC TOPAL.  WE

3    TIMELY DESIGNATED HIS DEPOSITION EVEN BEFORE THE DEPOSITION WAS

4    TAKEN.  SO WE WERE ABLE, IN THE CASE OF DR. ERIC TOPAL, TO

5    TIMELY MEET THE DEADLINES AND MAKE THE DISCLOSURES.  STILL WE

6    HAD TO FIGHT VERY HARD TO BE ABLE TO PLAY THAT DEPOSITION IN

7    THE TRIAL OF THIS CASE.  SO IT'S UNFAIR FOR MERCK TO COME IN

8    AND SAY YOU HAD THIS DEPOSITION AVAILABLE WHEN THEY HAD SO

9    VEHEMENTLY HELD TO THE DEADLINES THAT WE WERE FACED ON THESE

10   OTHER DEPOSITIONS.

11            WE DID NOT HAVE INFORMATION ABOUT THE *NEW*

12   *ENGLAND JOURNAL OF MEDICINE* AND THE KNOWLEDGE THAT THEY HAD OF

13   MERCK'S SCIENTIFIC MISCONDUCT HERE.  SO IT WAS NOT SOMETHING

14   THAT WAS AVAILABLE.  WE DID OFFER, BECAUSE WE THINK THAT WE'RE

15   ENTITLED TO -- YOU KNOW, OFFER THAT TYPE OF TESTIMONY IN

16   REBUTTAL EVEN IF IT WASN'T DISCLOSED.  WE THINK THAT, BASED ON

17   THE TESTIMONY OF DR. REICIN, IT WAS A MATTER THAT COULD HAVE

18   BEEN PLAYED IN REBUTTAL.  WE DID WITHDRAW THAT AFTER THE COURT

19   INDICATED THAT IT WAS A MATTER THAT SHOULD HAVE BEEN BROUGHT UP

20   IN DIRECT.

21            BUT WHERE WE ARE NOW, YOUR HONOR, IS THAT WE

22   HAVE THIS VITAL ISSUE THAT HAS A DIRECT IMPACT AND WE THINK IS

23   GROUNDS FOR A MISTRIAL IN THE CASE.  BUT WE HAVE MOVED THIS

24   TRIAL FROM -- ORIGINALLY FROM FLORIDA STATE COURT TO

25   NEW ORLEANS, AND NOW WE HAVE MOVED IT TO HOUSTON.  WE HAVE GONE

1    THROUGH AN EXTREMELY EXPENSIVE TRIAL IN THIS CASE, AND IT HAS

2    BEEN A HEAVY BURDEN ON THE FAMILY TO COME HERE AND TO BE HERE

3    THROUGHOUT THIS TRIAL, SO FAR FROM HOME.  WE THINK THAT, YOU

4    KNOW, TO BE PUT IN A POSITION NOW -- BECAUSE OF MERCK'S

5    MISCONDUCT, FOR US TO BE PUT IN A POSITION OF HAVING TO CHOOSE

6    A MISTRIAL NOW AND BEAR THAT EXPENSE IS IMPROPER.  WE WOULD ASK

7    THE COURT TO HOLD A MOTION FOR MISTRIAL IN ABEYANCE UNTIL THE

8    VERDICT, FOR THE SAKE OF JUDICIAL ECONOMY.  ALL OF THIS, YOU

9    KNOW, CAN BE MOOTED IF A PLAINTIFF'S VERDICT IS RETURNED, AND

10   WE CAN ADDRESS THIS IN THE PUNITIVE PHASE OF THE TRIAL.

11            **THE COURT:**  WE'LL HEAR FROM THE DEFENDANT.

12            **MR. MEUNIER:**  YOUR HONOR, CAN I BRIEFLY BE HEARD --

13            **THE COURT:**  LET ME HEAR FROM THE DEFENDANT.

14            **MR. BECK:**  YES, YOUR HONOR.  I JUST WANT TO WRITE

15   DOWN WHAT IT IS THAT THEY ARE MOVING FOR.

16            YOUR HONOR, THERE IS NO NEW INFORMATION IN THE

17   *NEW ENGLAND JOURNAL OF MEDICINE* EDITORIAL THAT HAS NOT BEEN

18   KNOWN TO PLAINTIFFS SINCE BEFORE THE TRIAL BEGAN.  THE FACTUAL

19   INFORMATION, TO THE EXTENT IT IS FACTUAL, THAT'S SET FORTH IN

20   THE *NEW ENGLAND JOURNAL OF MEDICINE* EDITORIAL HAS BEEN KNOWN

21   FOR A VERY LONG TIME TO THE PLAINTIFFS AND IT HAS BEEN THE

22   SUBJECT OF EXTENSIVE DISCOVERY AND DISCUSSION BEFORE THIS TRIAL

23   EVER BEGAN.

24            THE ONLY THING THAT IS RELATIVELY RECENT IN THE

25   EDITORIAL IS THE FACT THAT MEMBERS OF THE EDITORIAL BOARD OF

1    THE *NEW ENGLAND JOURNAL OF MEDICINE* HAVE STRONG OPINIONS.

2    THAT, TOO, WAS KNOWN TO THE PLAINTIFFS BEFORE THIS TRIAL BEGAN

3    BECAUSE THEY TOOK THE DEPOSITION OF THE EDITOR AND CHIEF OF THE

4    *NEW ENGLAND JOURNAL OF MEDICINE*, WHO EXPRESSED THOSE OPINIONS

5    IN EVEN MORE VEHEMENT LANGUAGE THAN APPEARS IN THE EDITORIAL.

6                    THE EDITORIAL ITSELF CONFIRMS THAT THE

7    INFORMATION THAT'S BEING TALKED ABOUT BY THE EDITORS WAS

8    INFORMATION THAT THEY LEARNED WHEN THE PLAINTIFF'S LAWYERS TOOK

9    THEIR DEPOSITION BEFORE THIS TRIAL BEGAN.  THE PLAINTIFF'S

10   LAWYERS WHO TOOK THE DEPOSITION ARE MEMBERS OF THE PLAINTIFFS

11   STEERING COMMITTEE.  SOME OF THE PLAINTIFF'S LAWYERS WHO

12   PARTICIPATED IN THE DEPOSITION HAVE APPEARED IN THE CASE, BOTH

13   DURING TRIAL AND PRETRIAL AND TODAY.

14                    IF YOU LOOKED AT MR. CURFMAN'S DEPOSITION AND

15   YOU LOOKED AT THE APPEARANCES, HE WAS THE -- YOU WILL SEE

16   MR. ARBITBLIT WAS A PLAINTIFFS STEERING COMMITTEE MEMBER WHO

17   APPEARED AT THE <u>DAUBERT</u> HEARING AFTER -- NO, THAT WOULD HAVE

18   BEEN BEFORE THE *NEW ENGLAND JOURNAL OF MEDICINE* DEPOSITION.

19   ALSO, BEFORE TRIAL, BERT BLACK, WHO IS WITH US THIS MORNING,

20   WAS AT THE DEPOSITION, AND HE HAS ATTENDED EVERY DAY AT TRIAL.

21   DAVE BUCHANON, PLAINTIFFS STEERING COMMITTEE MEMBER, WAS AT THE

22   DEPOSITION, AND HE HAS ATTENDED PARTS OF THE TRIAL.

23                    SO THE TRIAL COUNSEL WHO ARE REPRESENTING THE

24   PLUNKETTS HERE KNEW ABOUT THE DEPOSITION BEFORE THE TRIAL EVER

25   BEGAN.  THEY DID NOT RAISE THE USE OF THE DEPOSITION UNTIL THEY

1   ANNOUNCED THAT THEY WANTED TO PERHAPS USE IT IN REBUTTAL.  IT'S

2   TRUE THAT IT WASN'T ON THEIR LIST; ALTHOUGH, IF THEY FELT IT

3   WAS AN IMPORTANT DEPOSITION THAT HAD BEEN TAKEN AFTER THE LISTS

4   WERE DUE, THEY COULD HAVE BROUGHT THAT TO THE COURT'S ATTENTION

5   AND WE COULD HAVE BEEN HEARD ON IT.  BUT NOTHING PRECLUDED THEM

6   FROM BRINGING THAT TO THE COURT'S ATTENTION IF THE DEPOSITION

7   WAS TAKEN AFTER THE WITNESS LISTS WERE DUE.

8               WHEN THEY DID RAISE IT AS SOMETHING THAT THEY

9   WANTED TO PLAY IN REBUTTAL, WE OBJECTED THAT IT WAS IMPROPER

10  REBUTTAL -- WE DID NOT OBJECT ON THE GROUNDS THAT IT HADN'T

11  BEEN LISTED ON THE PRETRIAL; WE OBJECTED ON THE GROUNDS THAT

12  THEY KNEW ABOUT IT BEFORE TRIAL.  IT WAS NOT PROPER REBUTTAL

13  BECAUSE IT WAS IN FACT CONFIRMATORY OF EVIDENCE THEY PUT IN

14  DURING THEIR CASE IN CHIEF FROM DR. TOPOL AND OTHERS.  AND THE

15  COURT INDICATED A TENTATIVE AGREEMENT WITH US ON THAT, AT WHICH

16  POINT MR. BEASLEY AND MR. BIRCHFIELD SAID THAT THEY WOULD

17  WITHDRAW THE REQUEST AND WOULD NOT EVEN OFFER THE DEPOSITION

18  DURING THE REBUTTAL.

19              NOW THEY ARE CLAIMING THAT A DEPOSITION THAT

20  THEY KNEW ABOUT BEFORE THE TRIAL, THEY TALKED ABOUT USING

21  DURING THE TRIAL, AND THAT THEY WITHDREW THEIR REQUEST TO USE

22  AT TRIAL FROM A FORMAL RULING, CONTAINS INFORMATION SO

23  EARTHSHATTERING THEY SHOULD HAVE THE EXTRAORDINARY RELIEF, NOT

24  JUST OF A MISTRIAL, BUT AS SORT OF A "GET OUT OF JAIL FREE"

25  CARD WHERE THEY SAY, I DON'T WANT A MISTRIAL BECAUSE I MIGHT

1   WIN, BUT I'M GOING TO WANT ONE IF I LOSE.  THE EVIDENCE THAT

2   THEY HAD BEFORE THE TRIAL DOES NOT BECOME ANY MORE RELEVANT OR

3   IMPORTANT SIMPLY BECAUSE SOMEBODY HAS WRITTEN AN EDITORIAL

4   ABOUT IT AND THAT EDITORIAL HAS GOTTEN PICKED UP IN THE

5   MAINSTREAM PRESS.

6                    THE *NEW ENGLAND JOURNAL OF MEDICINE* EDITORIAL

7   DISCUSSES TWO PIECES OF INFORMATION FROM VIGOR, AND I THINK,

8   YOUR HONOR, THAT THOSE TWO PIECES HAVE BEEN CONFUSED HERE THIS

9   MORNING.  THAT'S NOT SURPRISING BECAUSE THE EDITORIAL ITSELF,

10  FOR WHATEVER REASON, BLURS THE DISTINCTION BETWEEN THE TWO

11  PIECES OF INFORMATION.  ONE PIECE IS THE BUSINESS ABOUT 17

12  MYOCARDIAL INFARCTIONS VERSUS 20 MYOCARDIAL INFARCTIONS.  I'M

13  USING 17 VERSUS 20; ALTHOUGH, THE WAY IT'S EXPRESSED IN THE

14  ARTICLE IS AS A PERCENTAGE OF PEOPLE IN THE CLINICAL TRIAL.  17

15  MYOCARDIAL INFARCTIONS EQUATES TO .4 PERCENT ON VIOXX.  THAT

16  WAS COMPARED IN THE ARTICLE TO .1 PERCENT ON NAPROXEN.  SO

17  THERE WAS A FOUR-FOLD DIFFERENCE.  20 MYOCARDIAL INFARCTIONS

18  EQUATES TO .5 PERCENT ON VIOXX VERSUS .1 PERCENT ON NAPROXEN.

19  THE REASON WE KNOW THAT THIS ISN'T NEW INFORMATION TO THE

20  PLAINTIFFS IS BECAUSE THAT'S ALL THEY TALKED ABOUT TRIAL WAS A

21  500 PERCENT INCREASE, A FIVE-FOLD INCREASE.  SO, ANYWAY, WE'RE

22  TALKING ABOUT .4 TO .1 VERSUS .5 TO .1.

23                    THE SECOND PIECE OF INFORMATION THAT THE

24  *NEW ENGLAND JOURNAL OF MEDICINE* ALLUDES TO BUT DOESN'T REALLY

25  EXPLAIN QUITE WELL IS SOMETHING CALLED "TABLE 5."  WHAT

1   HAPPENED IS THAT THERE WAS A DISC THAT WE GAVE TO THEM BACK IN

2   2000 THAT SHOWED, AS DISCS OFTEN DO, CHANGES THAT PEOPLE HAD

3   MADE:  THINGS THAT GOT PUT IN; THINGS THAT GOT TAKEN OUT.  WHAT

4   HAPPENED IS THAT THERE WAS A STATISTICAL TABLE THAT HAD BEEN IN

5   ONE OF THE EARLIER VERSIONS BEFORE THE DRAFT WAS FINALIZED THAT

6   WAS SENT TO THE *NEW ENGLAND JOURNAL* THAT HAD INFORMATION IN

7   TABULAR FORM.  THEN, IN THE REVISIONS THAT TOOK PLACE BEFORE IT

8   WAS PRESENTED TO THE *NEW ENGLAND JOURNAL OF MEDICINE*, THE

9   AUTHORS DECIDED TO PRESENT THAT INFORMATION IN SUMMARY FORM IN

10  THE TEXT RATHER THAN IN MORE DETAILED FORM IN A TABLE.

11              INCIDENTALLY, WHEN YOU READ THE DEPOSITION OF

12  THE *NEW ENGLAND JOURNAL OF MEDICINE* PERSON, HE SAYS THAT THEY

13  HAVE A LIMIT ON HOW MANY TABLES YOU USE AND THEY ENCOURAGE

14  PEOPLE TO PUT IN IT THE TEXT.

15              IN ANY EVENT, AN EDITORIAL JUDGMENT BY THE

16  AUTHORS, BEFORE THEY EVER SUBMITTED THE PAPER, WAS MADE TO

17  EXPRESS THEM IN A TEXT IN SUMMARY FASHION RATHER THAN TO HAVE A

18  DETAILED TABLE.

19              HERE IS THE KEY:  THE INFORMATION THAT WAS IN

20  THE TABLE THAT INSTEAD GOT TURNED INTO THE TEXT DID NOT CHANGE.

21  IT WAS THE 17 MYOCARDIAL INFARCTIONS.  IT WAS THE .4 PERCENT

22  VERSUS .1 PERCENT.  IT WAS NOT THE CASE THAT THERE WERE THESE

23  THREE ADDITIONAL MYOCARDIAL INFARCTIONS THAT WOULD HAVE CHANGED

24  THE DATA THAT WAS IN A TABLE THAT WAS DELETED.  THAT IS FALSE.

25              THE *NEW ENGLAND JOURNAL OF MEDICINE* EDITORIAL,

1    ON THEIR STATEMENT, TALKS ABOUT THE THREE ADDITIONAL MYOCARDIAL

2    INFARCTIONS, AND THEN LATER THEY TALK ABOUT A TABLE GETTING

3    DELETED.  A READER WHO DOESN'T KNOW ALL OF THE BACKGROUND MIGHT

4    CONFLICT THOSE TWO.  SO THERE WAS SOME CARELESS WRITING BY THE

5    EDITORIALIST THAT WOULD LEAD SOMEBODY TO THINK THAT MAYBE --

6    THAT DIFFERENT INFORMATION WAS ON A DISKETTE AND GOT DELETED.

7    THAT'S FALSE, AND WE KNOW IT'S FALSE, BECAUSE PEOPLE LOOKED AT

8    THAT DISKETTE DURING THE DEPOSITION OF THE PERSON FROM THE

9    *NEW ENGLAND JOURNAL OF MEDICINE*.

10            NOW, ON THE TWO SUBJECTS -- AND FORGIVE ME, BUT

11   IT'S IMPORTANT TO US TO GET THE TRUE FACTS OUT.  THERE IS 17

12   MYOCARDIAL INFARCTIONS VERSUS THE 20 MYOCARDIAL INFARCTIONS.

13   THE SHORT STORY IS THAT THERE IS SOMETHING CALLED A

14   "PRESPECIFIED CUTOFF DATE" FOR SCIENTIFIC PUBLICATIONS OR THE

15   PREPARATION OF THEM.  WHAT YOU DO IS YOU PRESPECIFY A DATE THAT

16   SAYS THAT, "WE'RE GOING TO COLLECT THE DATA AS OF THIS DATE,

17   AND THAT'S WHAT WE'RE GOING TO BE PRESENTING TO THE

18   PUBLICATION."  AND THE *NEW ENGLAND JOURNAL OF MEDICINE* EDITOR

19   SAID, "YES, THAT'S A COMMON PRACTICE."

20            ONE REASON THAT PEOPLE FOLLOW THAT PRACTICE IS

21   BECAUSE, IF YOU DON'T HAVE A PRESPECIFIED CUTOFF DATE, THEN YOU

22   CAN KIND OF WAIT AND SEE AS NEW DATA COMES IN AND THEN, WHEN IT

23   LOOKS GOOD FOR YOU, THEN YOU CAN SAY, "HERE IS WHAT WE'RE GOING

24   TO PRESENT."  SO YOU LIKE TO HAVE A PRESPECIFIED DATE SO THAT

25   KIND OF MANIPULATION CANNOT TAKE PLACE.

1    THE PRESPECIFIED DATE FOR THE CARDIAC --

2  CARDIOVASCULAR EVENTS IN THE VIGOR DATA WAS FEBRUARY 10, 2000.

3  THAT IS SHOWN IN THE P.S.U.R. LETTER THAT WE SENT TO THE FDA.

4  IT'S EXHIBIT 155, ON PAGE 2 IN THIS CASE.  THE PUBLICATION DATE

5  FOR THE *NEW ENGLAND JOURNAL OF MEDICINE* WAS NOVEMBER OF 2000.

6  SO INFORMATION HAD BEEN SUPPLIED TO THEM, GOING BACK IN MAY,

7  FROM THE FEBRUARY CUTOFF DATE.

8    AND WE SENT OUR P.S.U.R., WHICH IS A SUBMISSION

9  YOU MAKE TO THE FDA, PERIODIC SAFETY UPDATE REPORT, IN OCTOBER

10  OF 2000, BEFORE THE JOURNAL ARTICLE EVEN CAME OUT; AND WE SAID

11  TO THE FDA, WE HAVE ADDITIONAL INFORMATION THAT CAME IN AFTER

12  THE PRESPECIFIED CUTOFF DATE FOR THE UPCOMING VIGOR

13  PUBLICATION.  THE UPCOMING VIGOR PUBLICATION SAYS .4 TO .1.

14  WITH THE ADDITIONAL INFORMATION OF THREE MORE MYOCARDIAL

15  INFARCTIONS, THE UPDATED SAFETY DATA THAT YOU, THE FDA, SHOULD

16  KNOW ABOUT IS .5 TO .1.  SO THAT INFORMATION WAS SUPPLIED TO

17  THE FDA BEFORE THE VIGOR PUBLICATION EVEN CAME OUT, AND THAT

18  INFORMATION WAS PUBLICLY AVAILABLE FROM THE FDA.  DR. TOPOL

19  DOESN'T HAVE TO DO ANY EXTRAORDINARY DETECTIVE WORK TO FIND

20  THIS.

21    AS I SAID BEFORE, WE DID NOT DELETE ANY

22  MYOCARDIAL INFARCTION DATA ON THE DISKETTE THAT WAS SUPPLIED TO

23  THE *NEW ENGLAND JOURNAL OF MEDICINE*.  THAT IS A

24  MISUNDERSTANDING, AND I CAN UNDERSTAND A READER GETTING THAT

25  FROM THE EDITORIAL, BUT IT IS FACTUALLY UNTRUE.  THAT DISKETTE

1    ISSUE HAS TO DO WITH A TABLE THAT I'LL TALK ABOUT IN A MINUTE.

2                    THE .5 TO .1 RATIO REFLECTING THE ADDITIONAL

3    DATA OF ADDITIONAL MYOCARDIAL INFARCTIONS, AS I SAID, WAS

4    SHARED WITH THE FDA ON OCTOBER 13 IN THE PERIODIC SAFETY UPDATE

5    REPORT, BEFORE THE *NEW ENGLAND JOURNAL* EVEN CAME OUT.  THE

6    TRANSMITTAL LETTER THAT HAD ACCOMPANIES THAT EXPLAINED THAT THE

7    PRESPECIFIED CUTOFF DATE FOR THE VIGOR PUBLICATION IN THE

8    *NEW ENGLAND JOURNAL* WAS FEBRUARY 10, 2000.

9                    THEN THE COVER LETTER TRANSMITTING THE UPDATED

10   REPORT SAYS, "THIS UPDATE TO THE ORIGINAL REPORT INCLUDES DATA

11   ON 11 ADDITIONAL PATIENTS WHO EXPERIENCED CARDIOVASCULAR

12   SERIOUS ADVERSE EXPERIENCES ELIGIBLE FOR ADJUDICATION.  THESE

13   ADDITIONAL EVENTS WERE REPORTED AFTER THE PRESPECIFIED CUTOFF

14   DATE; HOWEVER, IN AN EFFORT TO ENSURE COMPLETENESS IN REPORTING

15   AND ANALYZING SAFETY DATA, THESE EVENTS WERE REFERRED FOR AN

16   ADJUDICATION."

17                    THEN IN THE PERIODIC SAFETY UPDATE REPORT,

18   TABLE 8, IN THE REPORT, IT SHOWS THE ORIGINAL THROMBOTIC DATA

19   FOR VIGOR, AND IT SHOWS THE DATA THAT WAS SUBMITTED TO THE

20   *NEW ENGLAND JOURNAL OF MEDICINE* 17 FOR MYOCARDIAL INFARCTIONS

21   FOR VIOXX FOR NAPROXEN.  JUST LIKE WHAT IS SHOWN IN THE FIRST

22   TABLE OF THE *NEW ENGLAND JOURNAL* EDITORIAL, THAT THEY SHOW

23   THOSE TWO THINGS.

24                    BUT THEN, TABLE 7, IN THE OCTOBER SUBMISSION TO

25   THE FDA, SHOWS THE UPDATED THROMBOTIC DATA FOR VIGOR, INCLUDING

1   THE THREE MYOCARDIAL INFARCTIONS THAT CAME IN AFTER THE

2   PRESPECIFIED CUTOFF DATE.  SO THAT SHOWS 20 MYOCARDIAL

3   INFARCTIONS FOR VIOXX, 4 FOR NAPROXEN.

4                    THE UPDATED INFORMATION WAS GIVEN TO THE

5   ADVISORY COMMITTEE THAT WE HEARD SO MUCH ABOUT, THAT LOOKED AT

6   THE VIGOR DATA AS WELL AS CELEBREX ISSUES.  THE UPDATED ISSUE

7   WAS IN THE TARGUM MEMORANDUM, WHICH IS PLAINTIFF'S

8   EXHIBIT 1-235 THAT THEY RELIED ON HEAVILY AND THEY PUT ON THEIR

9   TIME LINES.  THAT HAS THE UPDATED INFORMATION OF .5 TO .1.  IT

10  WAS IN OUR EXHIBIT 353, MERCK BACKGROUND PACKAGE, THAT WAS SENT

11  TO THE ADVISORY COMMITTEE.  SO ALL OF THAT WAS IN EVIDENCE IN

12  THE CASE.

13                   THE UPDATED SAFETY DATA WAS ALSO -- THE PRECISE

14  DATA THAT APPEARED IN THE LABEL THAT WAS EVENTUALLY APPROVED BY

15  THE FDA AND HAD THE .5, OR 20 -- I DON'T REMEMBER RIGHT NOW

16  WHETHER IT WAS EXPRESSED AS 20 MYOCARDIAL INFARCTIONS OR .5 TO

17  .1 OR WHETHER IT WAS EXPRESSED AS BOTH, BUT THE UPDATED

18  INFORMATION WAS WHAT WAS LOOKED AT BY THE FDA AND APPEARS IN

19  THE FDA'S LABEL.

20                   THE CHANGE FROM 17 MYOCARDIAL INFARCTIONS TO 20

21  MYOCARDIAL INFARCTIONS DID NOT CHANGE ANYONE'S ANALYSIS OF THE

22  SAFETY PROFILE OF VIOXX.  SEVENTEEN MYOCARDIAL INFARCTIONS', SO

23  THERE IS .4 TO .1, WAS STATISTICALLY SIGNIFICANT AND WAS

24  RECOGNIZED AS STATISTICALLY SIGNIFICANT BY EVERYBODY IN THE

25  CASE.  WHEN THREE ADDITIONAL MYOCARDIAL INFARCTIONS ARE ADDED,

1    THEN IT BECOMES .5 TO .1, THAT'S ALSO STATISTICALLY SIGNIFICANT

2    AND WAS RECOGNIZED AS SUCH BY EVERYBODY IN THE CASE.

3                    THE ADDITIONAL DATA DID NOT MOVE SOMETHING FROM

4    THE REALM OF STATISTICAL NONSIGNIFICANCE TO STATISTICAL

5    SIGNIFICANCE.  IT DIDN'T EVEN MOVE IT FROM THE REALM OF

6    MARGINALLY SIGNIFICANT TO TRULY SIGNIFICANT.  THESE WERE VERY

7    SIGNIFICANT DIFFERENCES, AND THE DIFFERENCE BETWEEN .4 AND .5

8    IS SIMPLY ONE OF A DEGREE BUT NOT ONE THAT AFFECTED THE

9    ANALYSIS, AND NO ONE HAS REALLY CONTENDED OTHERWISE.

10                   THE DIFFERENCE BETWEEN .4 TO .1, AS REPORTED IN

11   THE *NEW ENGLAND JOURNAL OF MEDICINE*, AND .5 TO .1, AS REPORTED

12   EVEN PRIOR TO PUBLICATION TO THE FDA AND AS WIDELY REPORTED

13   ELSEWHERE IN THE MEDICAL LITERATURE, HAS BEEN THE SUBJECT OF

14   EXTENSIVE DISCOVERY IN THIS CASE, WELL BEFORE TRIAL, AND ALSO

15   HAS BEEN THE SUBJECT OF DISCUSSION DURING TRIAL.

16                   THERE IS A JULY 2000 MEMORANDUM THAT IS

17   REFERENCED IN THE *NEW ENGLAND JOURNAL OF MEDICINE* WHERE THEY

18   SAY THIS SHOWS THAT AT LEAST TWO OF THE AUTHORS KNEW ABOUT

19   THESE EVENTS PRIOR TO PUBLICATION.  THAT MEMORANDUM IS NOT A

20   SECRET TO THE PLAINTIFFS.  IT WAS MARKED AS PLAINTIFF'S

21   EXHIBIT 1-1231 IN THIS CASE.  IT WAS USED IN THE DEPOSITION OF

22   THE *NEW ENGLAND JOURNAL OF MEDICINE* EDITOR BY MEMBERS OF THE

23   PLAINTIFFS STEERING COMMITTEE, AND THE DOCUMENT APPEARS ON THE

24   PLAINTIFF'S EXHIBIT LIST IN THIS CASE THAT WAS SERVED ON

25   OCTOBER 24, BEFORE THE DEPOSITION EVER TOOK PLACE.  IT -- YEAH,

1   IT'S -- PX1-1231 WAS THE DOCUMENT THAT'S REFERENCED IN THE

2   EDITORIAL.  THEY SAID THAT THEY NEED EXPERT REPORTS, EXPERTS,

3   TO EXAMINE THE SIGNIFICANCE OF THE CHANGE FROM .4 TO .1.

4                   THEY'VE HAD TWO EXPERTS WHO HAVE DONE THAT

5   ALREADY.  DR. FARQUHAR, IN PARAGRAPH 106 OF HIS REPORT,

6   DISCUSSES HOW THE DATA THAT WAS SUBMITTED TO THE *NEW ENGLAND*

7   *JOURNAL OF MEDICINE* WAS .4 COMPARED TO .1, WHEREAS THE DATA

8   WITH THE FDA IS .5 TO .1.  THEN HE GOES ON TO GIVE AN OPINION

9   CONCERNING THE SIGNIFICANCE OF THAT.

10                  DR. BRAUNWALD, ALSO, AT THE 13TH PAGE OF HIS

11  REPORT -- I'M NOT SURE WHETHER IT'S PAGE NUMBER 12 OR PAGE

12  NUMBER 13, BUT INCLUDING THE COVER PAGE, DR. BRAUNWALD, IN HIS

13  REPORT, ALSO TALKS ABOUT HOW THE *NEW ENGLAND JOURNAL* HAD .4,

14  THE FDA HAD .5, AND WHAT'S THE SIGNIFICANCE OF THAT, AND I

15  THINK THEY GO ON AND THEY OPINE ABOUT HOW WE'RE BAD PEOPLE

16  BECAUSE WE GAVE DIFFERENT INFORMATION AT AN EARLIER DATE TO THE

17  *NEW ENGLAND JOURNAL OF MEDICINE*.

18                  THE PLAINTIFFS, AT TRIAL, PRESENTED TESTIMONY ON

19  THIS SUBJECT.  THEY ELECTED NOT TO CALL EITHER ONE OF THOSE

20  EXPERTS TO TALK ABOUT THAT SUBJECT, BUT THEY DID ELICIT

21  TESTIMONY FROM DR. TOPOL.  DR. TOPOL TESTIFIED -- AND I COULD

22  SUPPLY THE TRANSCRIPT PAGES LATER, BUT DR. TOPOL TESTIFIED THAT

23  THERE WAS A DISCREPANCY IN THE DATA, LIKE MR. BIRCHFIELD SAID.

24  I THINK DR. TOPOL CLAIMED TO HAVE DISCOVERED IT.

25                  BUT, IN ANY EVENT, DR. TOPOL SAID THAT THE *NEW*

1   *ENGLAND JOURNAL* AND THE .4 INFORMATION, THE FDA HAD THE .5

2   INFORMATION, HE CLAIMED THIS WAS A BIG DEAL AND SHOWED THAT

3   MERCK WAS A DISHONEST COMPANY AND THAT THE SCIENTISTS WERE

4   ACTING IMPROPERLY.  SO THEY INTRODUCED THAT TESTIMONY,

5   INCLUDING HEARSAY TESTIMONY THAT YOUR HONOR ADMITTED OVER OUR

6   OBJECTION CONCERNING HIS DISCUSSIONS ABOUT THIS WITH THE

7   EDITORS FROM THE *NEW ENGLAND JOURNAL OF MEDICINE*.

8            WE THEN PRESENTED TESTIMONY FROM DR. REICIN,

9   WHICH WAS ALSO NOT NEWS BECAUSE IT PARALLELED THE TESTIMONY

10  THAT SHE GAVE IN THE ERNST CASE IN STATE COURT IN TEXAS.

11  DR. REICIN EXPLAINED THAT THERE WAS A PRESELECTED CUTOFF DATE;

12  THAT THE INFORMATION THAT WAS SUPPLIED TO THE *NEW ENGLAND*

13  *JOURNAL OF MEDICINE* WAS THE INFORMATION THAT WE HAD AS OF THAT

14  CUTOFF DATE, AND THAT INFORMATION THAT CAME IN AFTER THAT

15  CUTOFF DATE BUT BEFORE PUBLICATION WAS SUBMITTED TO THE FDA

16  EVEN BEFORE THE *NEW ENGLAND JOURNAL OF MEDICINE* ARTICLE WAS

17  WRITTEN.

18            THE UPDATED DATA WAS WIDELY DISCUSSED BY

19  DR. RAY, THE VERY SAME DR. RAY WHO WAS AN EXPERT IN THIS CASE,

20  IN THE *LANCET* ARTICLE THAT WE HEARD ABOUT.  THAT'S BEEN MARKED

21  IN THIS CASE FOR IDENTIFICATION AS DEFENSE EXHIBIT 628.  IF ONE

22  WERE TO LOOK AT THE RIGHT COLUMN, THE FIRST SENTENCE OF THAT

23  ARTICLE, ONE WOULD SEE:  "THE RESULTS OF VIGOR, LARGE CLINICAL

24  TRIAL, INDICATED THAT INDIVIDUALS TOOK ROFECOXIB 50-MILLIGRAM

25  WERE FIVE TIMES MORE LIKELY TO HAVE A MYOCARDIAL INFARCTION

1  THAN THOSE WHO TOOK NAPROXEN."  SO DR. RAY, THEIR EXPERT, HAD

2  THE DATA THAT WE HAD GIVEN TO THE FDA.  SIMILARLY, THE WEIR

3  ARTICLE THAT WAS IN THE *AMERICAN HEART JOURNAL* TALKED ABOUT THE

4  .5 VERSUS .1, SO THAT INFORMATION MADE ITS WAY INTO TWO OF THE

5  KEY SCIENTIFIC PUBLICATIONS THAT HAD BEEN TALKED ABOUT IN THIS

6  CASE.

7                    THAT'S THE STORY ON THE 17TH VERSUS 20

8  MYOCARDIAL INFARCTIONS.  NOW MOVING TO TABLE 5.  THE SHORT

9  STORY ON TABLE 5 IS THAT, IN MAY 2000, THE LEAD AUTHOR OF THE

10 *NEW ENGLAND JOURNAL OF MEDICINE* ARTICLE GAVE A DISC TO THE

11 *NEW ENGLAND JOURNAL OF MEDICINE* THAT HAD HER -- HAD THE ARTICLE

12 ON IT, AND LIKE A LOT OF DISCS, YOU CAN GO IN, TRACK CHANGES,

13 OR WHATEVER THE FEATURE IS, AND YOU CAN PUT YOUR MOUSE OVER

14 AREAS, AND YOU CAN SEE WHERE PEOPLE PUT IN LANGUAGE OR PEOPLE

15 TOOK OUT LANGUAGE.  THE *NEW ENGLAND JOURNAL OF MEDICINE*, THE

16 EDITORIAL AND ALSO THE TESTIMONY, SAYS THAT THEY DID NOT EVEN

17 LOOK AT THE DISC UNTIL OCTOBER 2004, BUT STILL OVER A YEAR AGO.

18 THEY LOOKED AT THE HARD COPY.  THEY WERE GIVEN A DISC.  THEY

19 NEVER LOOKED AT THE DISC UNTIL OCTOBER 2004.  THAT'S OVER A

20 YEAR AGO.

21                    THERE IS NOTHING NEW ABOUT THIS HALF OF THE

22 STORY EITHER.  MERCK PRODUCED AN EARLY DRAFT OF -- HARD-COPY

23 DRAFT OF THE MANUSCRIPT THAT HAD TABLE 5 ATTACHED, THE TABLE

24 THAT DIDN'T MAKE ITS WAY INTO THE VERSION THAT WAS SUBMITTED TO

25 THE *NEW ENGLAND JOURNAL*.  BUT WE SUBMITTED, WE PRODUCED TO

1    PLAINTIFFS, A COPY OF THAT, AND WE PRODUCED IT SPECIFICALLY TO

2    THE BEASLEY ALLEN FIRM.  WE HAVE A LETTER THAT HAS "HERE ARE

3    THE BATES RANGES OF THE VARIOUS DOCUMENTS."  THEN THE DRAFT

4    DOCUMENT THAT HAD TABLE 5 IN IT, THAT DIDN'T MAKE ITS WAY INTO

5    THE *NEW ENGLAND JOURNAL OF MEDICINE* ARTICLE, IS ONE OF THOSE

6    DOCUMENTS THAT WE PRODUCED TO THE BEASLEY ALLEN FIRM.  WE HAVE

7    THE BATES NUMBER ON THE BOTTOM.

8              THEN A COPY OF THAT PAGE, WITHOUT THE SAME

9    PRODUCTION NUMBER, WAS USED IN THE DEPOSITION OF THE *NEW*

10   *ENGLAND JOURNAL OF MEDICINE* EDITOR, AND THE EDITOR WAS SHOWN A

11   COPY OF THAT EARLIER VERSION THAT WE PRODUCED LONG AGO IN THIS

12   LITIGATION.  IF ANYBODY THOUGHT THAT WAS A BIG DEAL, THAT THERE

13   WAS INFORMATION IN TABULAR FORM THAT, INSTEAD, WAS EXPRESSED IN

14   TEXTUAL FORM, THEY COULD HAVE MADE A BIG ABOUT IT IF THEY

15   WANTED.

16             AS I SAID, THE KEY THING ABOUT THIS TABLE THAT

17   PEOPLE HAVE MISUNDERSTOOD BECAUSE OF THE WAY THIS EDITORIAL HAS

18   BEEN WRITTEN IS THAT THE TABLE DID NOT INCLUDE DIFFERENT

19   NUMBERS OF MYOCARDIAL INFARCTIONS.  IN FACT, THE TABLE, WHICH

20   WAS PRODUCED TO BEASLEY ALLEN LONG AGO, HAD THE NUMBER OF 17

21   MYOCARDIAL INFARCTIONS, THE NUMBER OF MYOCARDIAL INFARCTIONS

22   THAT EXISTED AS OF THE PRESPECIFIED CUTOFF DATE, AND THAT WERE

23   MADE THE -- FORMED THE BASIS OF A .4 TO .1 COMPARISON THAT'S IN

24   THE TEXT OF THE ARTICLE.

25             BUT, IN ANY EVENT, EVERYTHING ABOUT THIS WAS

1    KNOWN EITHER BEFORE OR AT LEAST AT THE CURFMAN DEPOSITION, THE

2    DEPOSITION OF THE *NEW ENGLAND JOURNAL OF MEDICINE* PERSON.  THE

3    *NEW ENGLAND JOURNAL OF MEDICINE* PRODUCED THIS DISC SOMETIME

4    PRIOR TO THE DEPOSITION BECAUSE, IF YOU READ THE DEPOSITION,

5    THE FELLOW FROM THE PLAINTIFFS STEERING COMMITTEE WHO IS TAKING

6    THE DEPOSITION, WHO IS NOW SEEING THIS DISC FOR THE FIRST TIME,

7    HE'S GOING THROUGH THAT THING CHAPTER AND VERSE.  SO THE

8    PLAINTIFFS HAD THIS CERTAINLY AT THE DEPOSITION, SO THEY MUST

9    HAVE HAD IT BEFORE.

10                   THEY EXPLORED DURING THE CURFMAN DEPOSITION ALL

11   OF THESE ISSUES ABOUT WHETHER THE TABLE APPEARED.  BASICALLY,

12   CURFMAN'S TESTIMONY WAS, "WELL, I THINK THAT IT MIGHT HAVE BEEN

13   BETTER IF WE HAD THE TABLE RATHER THAN THE INFORMATION

14   EXPRESSED IN THE TEXT BECAUSE THE TABLE HAD SOME DETAILS THAT

15   WASN'T IN THE TEXT."  AND SO THAT WAS WHAT HIS TESTIMONY WAS

16   ABOUT.

17                   YOUR HONOR, IN CONCLUSION, WE BELIEVE THAT THE

18   PLAINTIFFS HERE HAVE TAKEN EVENTS WHICH ARE BOTH WELL KNOWN

19   HISTORICALLY IN THIS LITIGATION AND, IN OUR VIEW, INNOCUOUS AND

20   TRIED TO MAKE THEM SEEM NEFARIOUS.  WE DON'T LIKE THAT, BUT WE

21   CAN'T HELP IT WHEN PEOPLE CHARACTERIZE THE INFORMATION THAT

22   WAY.

23                   THE KEY POINTS HERE ARE THAT THERE IS NO NEW

24   INFORMATION FROM THE *NEW ENGLAND JOURNAL OF MEDICINE* EDITORIAL.

25   IT IS SIMPLY THE EDITORS REPORTING WHAT THEY LEARNED AND, FROM

1   A FACTUAL POINT OF VIEW, THE EDITORS REPORTING WHAT THEY KNEW

2   FROM THE PLAINTIFF'S LAWYERS, WHO ALREADY KNEW THIS

3   INFORMATION.

4            TO THE EXTENT THAT THE FEELINGS OR CONCLUSIONS

5   OF THE *NEW ENGLAND JOURNAL OF MEDICINE* EDITORS COULD

6   CONCEIVABLY BE RELEVANT IN THIS CASE, THOSE WERE ALSO KNOWN

7   BEFORE THE TRIAL BEGAN, BECAUSE THE DEPOSITION TOOK PLACE

8   BEFORE THE TRIAL BEGAN AND ALL OF THAT WAS SPELLED OUT IN EVEN

9   MORE DETAIL, FOR HUNDREDS OF PAGES, IN A DEPOSITION THAT WAS

10  AVAILABLE BEFORE THIS CASE TOOK PLACE.  IF MR. BIRCHFIELD FELT

11  THAT THAT WAS IMPORTANT INFORMATION THAT SHOULD BE PRESENTED TO

12  THIS JURY, ALL HE HAD TO DO WAS COME TO THIS COURT AND ASK FOR

13  RELIEF FROM THE WITNESS LIST AND SAY, "WE JUST TOOK THIS

14  DEPOSITION LAST WEEK."  WE MIGHT VERY WELL HAVE OBJECTED TO IT,

15  BUT THE COURT WOULD HAVE LOOKED AT IT AND DECIDED.

16            IT'S NO ANSWER TO SAY, "WE DIDN'T PUT IT ON OUR

17  WITNESS LIST.  WE HAD THE DEPOSITION BEFOREHAND.  IT WAS TAKEN

18  BY OUR COLLEAGUES, WHO HAVE APPEARED WITH US IN THIS CASE, BUT

19  WE DECIDED NOT TO TELL THE COURT ABOUT IT UNTIL THE REBUTTAL

20  CASE.  SO THEY HAD THE CHANCE TO PRESENT THIS DURING THEIR CASE

21  IN CHIEF.  IF THEY THOUGHT IT WAS SIGNIFICANT ENOUGH, THEY

22  COULD HAVE ASKED PERMISSION TO DO SO.

23            BUT THEY DID COME TO THE COURT AND SAY DURING

24  REBUTTAL THEY WANTED TO PRESENT IT.  WE DID NOT OBJECT ON THE

25  GROUND THAT IT WASN'T ON THEIR WITNESS LIST.  WE SAID THAT IT

1   SHOULD HAVE BEEN PRESENTED DURING THEIR CASE IN CHIEF.  THE

2   COURT DID NOT HAVE TO RULE; THE COURT SIMPLY SAID, "WELL, ANDY,

3   I THINK THEY HAVE A GOOD POINT HERE."  THEN MR. BEASLEY SAID

4   WHEN WE WERE UP AT THE BENCH, "WE'LL JUST WITHDRAW IT, YOUR

5   HONOR.  THAT'S A FAIR POINT.  WE'LL JUST WITHDRAW IT."  AND SO

6   THEY NEVER EVEN SOUGHT FORMALLY TO OFFER THIS DURING THEIR

7   REBUTTAL CASE.

8              THE TRIAL, YOUR HONOR, SHOULD NOT BE DERAILED OR

9   PUT IN SOME KIND OF SUSPENDED ANIMATION BECAUSE SOMEBODY AT THE

10  *NEW ENGLAND JOURNAL OF MEDICINE* HAS DECIDED OR SOMEHOW BEEN

11  PERSUADED TO WRITE THIS EDITORIAL ABOUT AN ISSUE THAT THE

12  PLAINTIFF'S LAWYERS HAVE KNOWN ABOUT FOR A LONG TIME.  WHAT

13  DISTURBS ME, YOUR HONOR, IS THE TIMING OF ALL OF THIS.

14             VIOXX WAS VOLUNTARILY WITHDRAWN FROM THE MARKET

15  OVER A YEAR AGO.  THERE IS NO PRESSING PUBLIC HEALTH ISSUE

16  WHERE THIS INFORMATION NEEDED TO BE AIRED IN THE *NEW ENGLAND*

17  *JOURNAL OF MEDICINE* ON THE DAY OF CLOSING ARGUMENT IN THE CASE

18  RATHER THAN NEXT WEEK, AFTER A VERDICT IS RETURNED.

19             HERE IS WHAT WE UNDERSTAND CONCERNING THE

20  TIMING.  WEDNESDAY AFTERNOON -- SO TWO DAYS AGO -- THE *NEW*

21  *ENGLAND JOURNAL OF MEDICINE* CALLED THE PRINCIPAL INVESTIGATORS

22  ON THE AUTHOR, BOMBARDIER AND LAINE.  THEY WERE LED TO BELIEVE

23  THAT THEY WOULD HAVE UNTIL DECEMBER 22 TO SUBMIT A RESPONSE TO

24  THESE ISSUES RAISED BY THE EDITORS IN THE *NEW ENGLAND JOURNAL*

25  *OF MEDICINE* AND THAT THIS WHOLE MATTER WOULD BE AIRED IN THE

1    DECEMBER ISSUE OF THE *NEW ENGLAND JOURNAL OF MEDICINE*, WHATEVER

2    CONCERNS THE EDITORS HAD, ALONG WITH THE RESPONSES FROM

3    BOMBARDIER AND LAINE.

4              BUT THEN ON THURSDAY, AT NOON, WHICH I THINK WAS

5    PROBABLY IN THE MIDDLE OF MY CLOSING ARGUMENT AND NOT TOO FAR

6    BEFORE THE JURY WAS CHARGED, THE *NEW ENGLAND JOURNAL OF*

7    *MEDICINE* INFORMED MERCK THAT THEY WOULD BE POSTING THIS

8    EDITORIAL ON THEIR WEB SITE AT 3:00 IN THE AFTERNOON.  MERCK

9    HAD ASKED IF THEY COULD SEE A COPY BEFORE IT WAS POSTED SO THAT

10   THEY COULD COMMENT.  THE *NEW ENGLAND JOURNAL OF MEDICINE* SAID

11   NO.

12             AS I SAID, THE ARTICLE ITSELF THAT DEALS WITH

13   ALL OF THIS IS NOT DUE TO BE PUBLISHED BY THE *NEW ENGLAND*

14   *JOURNAL OF MEDICINE* UNTIL THE DECEMBER -- I'M TOLD IT'S THE

15   DECEMBER 29TH EDITION.  WE DO NOT KNOW WHETHER ANYBODY

16   REPRESENTING OTHER VIOXX PLAINTIFFS HAS HAD ANY DISCUSSION WITH

17   THE *NEW ENGLAND JOURNAL OF MEDICINE* CONCERNING THE TIMING OF

18   THIS EDITORIAL.  I AM 100 PERCENT CONFIDENT THAT THE BEASLEY

19   ALLEN LAWYERS HAD NOTHING TO DO WITH THE TIMING OF THE

20   EDITORIAL OR HAD ANY ADVANCE NOTICE.  I WROTE THAT DOWN BEFORE

21   I CAME OVER TO COURT, AND I CONFIRMED IT WITH ANDY, AND I AM

22   100 PERCENT CONFIDENT.  I BELIEVE THEY WOULD HAVE TOLD ME AND

23   THEY WOULD HAVE TOLD THE COURT IF THEY KNEW THAT THIS WAS

24   COMING UP AND THEY HAD A JURY ABOUT TO GO OUT.

25             I'M NOT SO CONFIDENT, FRANKLY, ABOUT OTHER

1  PLAINTIFFS LAWYERS.  WE DO KNOW THAT OTHER PLAINTIFFS LAWYERS

2  ARE USING THE TIMING OF THE EDITORIAL TO ATTACK MERCK AND ITS

3  WITNESSES WHILE WE HAVE A JURY DELIBERATING IN THIS CASE, AND

4  ALL OF THOSE PLAINTIFFS LAWYERS HAVE A FINANCIAL INTEREST IN

5  SEEING US LOSE.

6          WE WOULD EXPECT NO LESS FROM MARK LANIER.  HE'S

7  BEEN QUOTED IN THE *NEW YORK TIMES*, WHICH WAS THE SAME

8  PUBLICATION THAT HAD A JOURNALIST EMBEDDED IN HIS TEAM DURING

9  THE ERNST TRIAL.  HE WAS QUOTED IN THE *NEW YORK TIMES* AS SAYING

10 THAT ALISE REICIN SHOULD BE INVESTIGATED FOR THE TESTIMONY THAT

11 SHE GAVE IN TEXAS.  IN FACT, HER TESTIMONY IN ERNST WAS EXACTLY

12 THE SAME AS HER TESTIMONY WAS IN THIS CASE ABOUT THE SPECIFIED

13 CUTOFF DATE.  HE SAYS THAT THE ISSUE CALLS INTO QUESTION

14 MERCK'S INTEGRITY IN THE COURTROOM, NOT JUST SCIENTIFIC

15 INTEGRITY BEFOREHAND.

16         NOW, BEFORE THIS TRIAL BEGAN, MR. LANIER

17 WITHDREW FROM THE PLAINTIFFS STEERING COMMITTEE, EVEN THOUGH

18 HE'S HAD A MEMBER OF HIS FIRM HERE DURING TRIAL REGULARLY

19 MONITORING AND TALKING TO THE PRESS.  HE MAY BE BEYOND THE

20 REACH OF THE COURT.

21         WE ALSO HAVE AT LEAST ONE PLAINTIFFS STEERING

22 COMMITTEE MEMBER, HOWEVER, WHO HAS APPEARED IN CHAMBERS AND HAS

23 INTRUDED INTO THE DISCUSSIONS AND SPOKE ON BEHALF OF THE IRVINS

24 IN THIS CASE.  THAT'S MR. SEEGER.  HE, TOO, IS QUOTED IN THE

25 *NEW YORK TIMES*.  HE SAYS THAT THIS ALTERS THE LANDSCAPE AND

1   SAYS THAT THEY ARE ACCUSING MERCK OF SCIENTIFIC MISCONDUCT.

2                  AND MR. SEEGER IS THE SAME INDIVIDUAL WHO WAS

3   INDIGNANT WHEN WE WERE IN CHAMBERS BEFORE AND I DECLINED HIS

4   INVITATION TO SAY THAT I WOULD NEVER SUSPECT ANY MEMBER OF THE

5   PLAINTIFFS STEERING COMMITTEE OF SPEAKING ABOUT THE SUBSTANCE

6   OF THIS CASE WHEN YOUR HONOR HAS ASKED US NOT TO.

7                  WE WANT THE CASE TO GO TO VERDICT.  WE BELIEVE

8   OUR CASE WENT IN WELL.  WE BELIEVE THAT OTHERS MAY DISAGREE

9   WITH THAT AND HOPE THAT THE JURY COULD BE INFLUENCED.  NOT ANDY

10  AND NOT JERRY; BUT OTHERS, BYSTANDERS, INTERESTED BYSTANDERS,

11  WE BELIEVE, WOULD LIKE TO SEE THIS CASE DERAILED OR THE JURY

12  INFLUENCED.

13                 WE DON'T BELIEVE THAT A MISTRIAL IS IN ORDER.

14  WE DON'T BELIEVE, ALSO, YOUR HONOR, THAT THE PLAINTIFFS HAVE

15  THE RIGHT TO SAY, "WE DON'T WANT A MISTRIAL BECAUSE WE'RE

16  HOPING WE MIGHT WIN, BUT WE WANT A MOTION ON FILE THAT YOUR

17  HONOR CAN RULE ON IN CASE WE'RE WRONG AND WE LOSE."  I THINK

18  THEY HAVE TO MAKE THEIR CHOICE:  ARE THEY GOING TO MOVE FOR

19  MISTRIAL OR NOT.  IF THEY ARE, I'LL MAKE A FULL PRESENTATION

20  WITH ALL OF THE EVIDENCE THAT I REFERRED TO, BUT WE DON'T THINK

21  THAT WE SHOULD DO ANYTHING OTHER THAN LET THIS JURY DECIDE THE

22  CASE BASED ON THE EVIDENCE THAT WAS PRESENTED AT TRIAL.

23                 **THE COURT:**  OKAY.  I'LL GIVE YOU AN OPPORTUNITY TO

24  RESPOND.  BUT WHY DON'T YOU TALK TO YOUR COLLEAGUES AND SO THAT

25  YOU CAN RESPOND FOR THEM, TOO, SO THAT WE'RE NOT JUST HERE ALL

1    DAY.  WE'LL TAKE A 10-MINUTE BREAK AND COME BACK.  THANK YOU.

2                (WHEREUPON, THE COURT TOOK A BRIEF RECESS.)

3                **THE COURT:**  ALL RIGHT.  WE'LL PROCEED.

4                **MR. BIRCHFIELD:**  YOUR HONOR, FIRST, IN REGARDS TO THE

5    NEW INFORMATION HERE, IT'S NOT THAT THE UNDERLYING DATA WAS

6    NEW.  WHAT WAS NEW IS THE FACT THAT MERCK'S PROVIDING

7    MISLEADING INFORMATION WAS INTENTIONAL VERSUS UNINTENTIONAL.

8                THE EDITORIAL SAYS, "UNTIL THE END OF

9    NOVEMBER 2005."  UNTIL THE END OF LAST MONTH, A COUPLE WEEKS

10   AGO.  WE BELIEVED THAT THERE WERE LATE EVENTS THAT WERE NOT

11   KNOWN TO THE AUTHORS IN TIME TO BE INCLUDED IN THE ARTICLE

12   PUBLISHED IN THE JOURNAL ON NOVEMBER 23, 2000.  THAT IS NEARLY

13   SIX MONTHS BEFORE DICKY'S DEATH, WHEN THEY ORIGINALLY PUBLISHED

14   THIS.  THEY THOUGHT AT THAT POINT THAT THOSE EVENTS WERE NOT

15   DISCOVERED.

16               LAST MONTH THEY LEARNED THAT MERCK HAD -- IT WAS

17   NOT UNINTENTIONAL, BUT IT WAS INTENTIONAL THAT THOSE EVENTS

18   WERE WITHHELD FROM THEM.  THAT'S WHAT'S NEW HERE.  IT'S NOT --

19   YOU KNOW, MISLEADING THE MEDICAL COMMUNITY THROUGH THIS

20   PUBLICATION -- AND THAT'S EXACTLY WHAT THESE EDITORS SAY, THAT

21   IT WAS MISLEADING; THE CONCLUSIONS WERE MISLEADING -- THAT'S

22   NOT EXCUSED.  THAT MISLEADING CONDUCT IS NOT EXCUSED BY

23   PROVIDING INFORMATION TO THE FDA.

24               THIS IS VERY CLEAR.  YOU KNOW, THIS IS A

25   "FAILURE TO WARN" CASE.  AND MERCK HAS DEFENDED THIS CASE BY

1   SAYING WE PUBLISHED THE VIGOR RESULTS IN THE *NEW ENGLAND*

2   *JOURNAL OF MEDICINE* IN NOVEMBER OF 2000.  WE NOW KNOW THAT WHAT

3   THEY PUBLISHED WAS MISLEADING INFORMATION AND IT WAS NOT

4   UNINTENTIONAL.  IT WAS AN INTENTIONALLY MISLEADING.  AND IT HAS

5   A DIRECT CONNECTION TO DICKY IRVIN'S CASE.  THEY MISLED THE

6   MEDICAL COMMUNITY.  NOW WE KNOW THAT IT WAS INTENTIONAL.

7            IN REGARDS TO, YOU KNOW, THE EXPERT TESTIMONY

8   THAT I WAS MENTIONED THAT WOULD BE NEEDED, IT'S NOT A MATTER OF

9   WHETHER IT'S .4 VERSUS .5 THAT IS SIGNIFICANT THAT WE WOULD

10  NEED THE EXPERT ANALYSIS AND EVALUATION ON; IT'S WHERE THESE

11  EVENTS WERE, ON THE ASPIRIN-INDICATED VERSUS THE

12  NONASPIRIN-INDICATED, BECAUSE THAT GOES TO THE HEART OF THE

13  NAPROXEN DEFENSE.

14           IT'S ALARMING TO ME THAT MERCK WILL BLAME THE

15  PLAINTIFF'S LAWYERS AND ACCUSE US OF HAVING MORE INFLUENCE WITH

16  THE *NEW ENGLAND JOURNAL OF MEDICINE* THAN MERCK DOES.  BUT BE

17  THAT AS IT MAY, IT'S ALSO WRONG FOR THEM TO SAY, LOOK, WE GAVE

18  PIECES OF THE INFORMATION TO THE *NEW ENGLAND JOURNAL OF*

19  *MEDICINE* AND OTHER PIECES OF INFORMATION TO THE FDA AND PIECES

20  OF THE INFORMATION TO, YOU KNOW, TO BEASLEY ALLEN AND OTHER

21  PLAINTIFFS LAWYERS, AND YOU'RE TO BLAME BECAUSE YOU COULDN'T

22  PUT ALL OF THOSE PIECES TOGETHER IN TIME FOR, YOU KNOW, THIS

23  TRIAL.  THAT'S THE ARGUMENT THAT THEY'RE MAKING HERE IN REGARDS

24  TO THE TIMING.

25           IT'S CLEAR FROM THE PRESENTATION THAT WAS MADE

1    HERE, IT'S CLEAR FROM THE TESTIMONY OF DR. ALISE REICIN, THAT

2    THEY KNEW ABOUT THIS.  THIS WAS NOT SOMETHING THAT CAME UP LATE

3    YESTERDAY AFTERNOON.  YOUR HONOR, THE -- I DO NOT WANT -- I

4    DON'T WANT A MISTRIAL FOR THE SAKE OF THIS FAMILY, I MEAN, AND

5    WHAT HAS GONE ON HERE AND WHAT THEY HAVE GONE THROUGH TO HAVE

6    THIS TRIAL IN HOUSTON, BUT WHAT WE HAVE WITH DR. ALISE REICIN'S

7    TESTIMONY, WHERE SHE CAME IN AND SHE EXPLAINED AWAY THE

8    MISCONDUCT THAT DR. TOPOL HAD LAID OUT, AND SHE EXPLAINED IT

9    AWAY BY SAYING THAT THERE WAS A DEADLINE.  WE NOW HAVE

10   INFORMATION THAT WOULD SAY THAT THAT SUGGESTS VERY STRONGLY

11   THAT THAT IS NOT TRUE, AND IT WOULD HAVE HAD A DIRECT IMPACT ON

12   THE MEDICAL COMMUNITY.

13                IF I'M PUT IN A POSITION, WHICH IT APPEARS THAT

14   I AM, OF EITHER HAVING TO MOVE FOR A MISTRIAL NOW OR NOT OR

15   WAIVE IT, THEN I THINK I HAVE MUST MOVE FOR A MISTRIAL, AND I

16   ASK THE COURT TO IMPOSE A COST ON MERCK FOR THIS TRIAL AND ASK

17   THAT THE CASE BE RESET AS SOON AS POSSIBLE IN WEST PALM BEACH

18   SO THAT WE DO NOT HAVE TO BRING THIS FAMILY FAR AWAY FROM HOME

19   FOR THE NEXT TRIAL.

20             **THE COURT:**  OKAY.

21             **MR. MEUNIER:**  MAY I PUT SOMETHING ON THE RECORD THAT

22   WAS JUST DIRECTLY MENTIONED BY MR. BECK?

23             **THE COURT:**  ALL RIGHT.

24             **MR. MEUNIER:**  FIRST OF ALL, ON BEHALF OF THE PLC, I'M

25   OFFENDED BY ANY SUGGESTION THAT ANY MEMBER OF THE PSC WOULD

 1   HAVE ANY TIMING ON THE JOURNAL.  BUT, YOUR HONOR, FROM THE PSC

 2   STANDPOINT, IT MUST BE POINTED OUT THAT IT IS CRITICAL AND THAT

 3   YOU YOURSELF HAVE SAID THAT THE VERDICTS BE INSTRUCTIVE, AND

 4   THE CONVERSE IS JUST AS IMPORTANT.  THE LAST THING THAT THE

 5   COURT AND COUNSEL SHOULD WANT IS TO INVEST TIME AND RESOURCES

 6   IN VERDICTS WHICH THEN CANNOT BE CONSIDERED AND REPORTED ON

 7   BOTH SIDES AS REFLECTIVE OF REALITY.  AND I'M AFRAID EVERY

 8   CASE, EVERY VERDICT, YOUR HONOR, WILL BE A SNAPSHOT; AND AS

 9   INFORMATION UNFOLDS, THAT WILL BE TRUE.  BUT I'M AFRAID THAT,

10   WHILE WE'VE BEEN IN THE DARKROOM DEVELOPING THIS PICTURE, THE

11   WEATHER OUTSIDE HAS NOT JUST CHANGED A LITTLE; IT'S SHIFTED SO

12   FUNDAMENTALLY THAT WHATEVER IS DEVELOPED WILL NOT BE A TRUE

13   LIGHT DEPICTION OF REALITY ABOUT MERCK AND ITS DEFENSES.  SO

14   FROM THE PSC'S STANDPOINT, IF THAT'S THE ONLY ALTERNATIVE IS TO

15   HAVE THIS CASE TRIED IN LIGHT OF THAT TRUTH, WE WOULD SUPPORT

16   MR. BIRCHFIELD'S REPRESENTATION.

17            **THE COURT:**  THANK YOU.  I DON'T NEED A RESPONSE ON

18   THAT.

19                 LET ME THINK ABOUT WHAT YOU-ALL HAVE SAID.  THE

20   OTHER OPTION, OF COURSE, IS TO REOPEN THE TRIAL.  THE PROBLEM

21   WITH REOPENING THE TRIAL AT THIS TIME IS THAT IT DOESN'T AFFORD

22   COUNSEL FOR EITHER SIDE AN OPPORTUNITY TO ADDRESS THIS ISSUE

23   AND IT CREATES MORE PROBLEMS THAN IT SOLVES, FRANKLY.  I GATHER

24   THAT COUNSEL FOR BOTH SIDES SEEM TO FEEL THAT THAT WOULD BE THE

25   CASE, BUT WHETHER OR NOT THEY DO, IT SEEMS TO ME, FROM THE

1   COURT'S STANDPOINT, IT PRESENTS MORE PROBLEMS AT THIS STAGE

2   THAN IT SOLVES.  SO THAT OPTION IS NOT AVAILABLE.

3                I ONLY FOCUS ON THE MISTRIAL AT THIS TIME.  I'M

4   NOT FOCUSING FOR EITHER SIDE ON THE NEW TRIAL.  THAT'S NOT

5   BEFORE ME, AND SO I DON'T CONSIDER ANYTHING THAT'S SAID TO BEAR

6   ON THAT PARTICULAR ISSUE UNTIL OR UNLESS IT'S MADE BY EITHER

7   THE DEFENDANT OR THE PLAINTIFF AT THE END OF THIS MATTER, IF WE

8   GO THAT FAR.

9                ALL RIGHT.  I'VE HEARD FROM YOU-ALL.  I'VE GIVEN

10  YOU AN OPPORTUNITY TO PUT YOUR THOUGHTS ON THE RECORD, AND

11  WE'LL A WAIT UNTIL -- THE JURY IS STILL DELIBERATING.  THANK

12  YOU VERY MUCH, ALL OF YOU.

13          **MR. BEASLEY:**  WILL THE ARTICLE BE A PART OF THE

14  RECORD?

15          **THE COURT:**  WHAT ARTICLE?

16          **MR. BEASLEY:**  THE EDITORIAL.

17          **THE COURT:**  YES, I'LL ATTACH IT.  DO YOU WANT TO

18  ATTACH ANYTHING?

19          **MR. BECK:**  YES.  WE'LL PUT TOGETHER A PACKAGE OF THE

20  THINGS THAT I REFERRED TO.

21          **THE COURT:**  THAT'S FINE.  AND YOU, TOO, ANDY, IF YOU

22  NEED TO.  I'LL ATTACH A COPY OF THE EDITORIAL TO THE RECORD,

23  AND I'LL ALLOW THE PARTIES TO SUBSTITUTE.

24          **MR. BIRCHFIELD:**  WE WANT TO ATTACH THE DIRECT EXAM OF

25  ALISE REICIN.

1          **THE COURT:**  YOU CAN DO THAT LATER.

2                              * * *

3                          <u>**CERTIFICATE**</u>

4          I, CATHY PEPPER, CCR, RPR, CRR, OFFICIAL COURT

5    REPORTER, UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF

6    LOUISIANA, DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND

7    CORRECT TRANSCRIPT, TO THE BEST OF MY ABILITY AND

8    UNDERSTANDING, FROM THE RECORD OF THE PROCEEDINGS IN THE

9    ABOVE-ENTITLED AND NUMBERED MATTER.

10

11

12                              _____

                                CATHY PEPPER, CCR, RPR, CRR
13                              OFFICIAL COURT REPORTER

14

15

16

17

18

19

20

21

22

23

24

25