IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2005 DEC 19  PM 12: 07

LORETTA G. WHYTE
CLERK

| | |
|---|---|
| IN RE: VIOXX PRODUCTS LIABILITY<br>LITIGATION | : |
| | : |
| THIS DOCUMENT RELATES TO: | : |
| | : |
| KELLY A. CONNORS, Individually and<br>as Personal Representative of the Estate<br>of Barbara Ann Ballew, Deceased<br>2040 Harmon Avenue<br>Baltimore, Maryland 21230 | : |

                Plaintiff

And

To the Use of Robin M. Ballew
Surviving Daughter of Barbara Ballew
6350 Sittig Avenue
Hubbard, Ohio 44425

And

To the Use of Virgil G. Ballew
Surviving Spouse of Barbara Ballew
6350 Sittig Avenue
Hubbard, Ohio 44425

              Use Plaintiffs

        v.

MERCK & CO., INC.
One Merck Drive
Whitehouse Station, New Jersey 08889

            Defendant.

              Civil Action No: O5-3387  :

MDL DOCKET NUMBER 1657
SECTION L



Fee_____
X Process_____
— Dktd_____
— CtRmDep_____
— Doc. No _____

1

## FIRST AMENDED COMPLAINT

### JURISDICTION

1. This case is brought pursuant to 28 U.S.C. § 1332(a) as there exists complete diversity of citizenship and the amount in controversy exceeds $75,000.00, exclusive of interest or costs.

2. Plaintiff's and the Use Plaintiffs' claims accrued in whole or in part in Baltimore City, Maryland.  Plaintiff, Kelly A. Connors, is a resident citizen of Baltimore City, Maryland. The Use Plaintiffs, Robin M. Ballew and Virgil G. Ballew are residents of Ohio. Defendant is a domestic corporation, which is currently, and has been at all pertinent times, engaged in business, directly or by authorized agent, in Baltimore City, Maryland.  Consequently, jurisdiction and venue are proper in this Court.

### PARTIES

3. Decedent, Barbara Ann Ballew (hereafter "Plaintiff's Decedent"), was a resident citizen of Baltimore City, Maryland. Decedent's surviving daughter, Kelly A. Connors, is a resident of Baltimore City and is the designated Personal Representative of the Estate of Barbara Ann Ballew (Exhibit A). Plaintiff Kelly Connors brings this claim on her behalf individually and on behalf of the Estate of Barbara Ann Ballew.

4. The surviving spouse of Plaintiff's Decedent, Virgil G. Ballew, and another surviving daughter of Plaintiff's Decedent, Robin M. Ballew, are also joined in this action as Use Plaintiffs as beneficiaries who, together with Plaintiff Kelly A. Connors individually, are entitled to recover damages under Maryland's Wrongful Death Statute, Md.Code Ann., (Cts. & Jud.Proc.)§3-901 *et seq.* and Md. Rule 15-1001.

5. At all times relevant herein, Defendant Merck & Co., Inc. (hereinafter Merck), was and is, an American pharmaceutical company incorporated under the laws of the State of New Jersey with its principal place of business at One Merck Drive, P.O. Box 100, Whitehouse Station, New Jersey. Defendant was and is in the business of profiting from the design, manufacture, marketing, distribution and/or sales of the brand-name prescription drug VIOXX® (rofecoxib) (hereinafter "Vioxx").

6. Merck does business in and has substantial contacts with the State of Maryland. At all times material to this lawsuit, Merck was engaged in the business of developing, manufacturing, licensing, promoting, marketing, distributing, and/or selling in interstate commerce and the State of Maryland, either directly or indirectly, the pharmaceutical drug Vioxx.

## GENERAL ALLEGATIONS

Plaintiff and the Use Plaintiffs hereby incorporate by reference paragraphs 1 through 6 of this Complaint and further state as follows:

7. This action arises from damages sustained by Plaintiff's Decedent which were caused by Vioxx, an osteoarthritis and pain-relief drug containing rofecoxib, a member of a class of drugs known as non-steroidal anti-inflammatory drugs ("NSAIDS").

8. Defendant Merck obtained FDA approval for Vioxx, and began distribution and sale of Vioxx throughout the United States, in approximately May of 1999. Vioxx is a brand name used by Merck to market and distribute rofecoxib.

9. Plaintiff's Decedent was provided with a prescription for Vioxx by her physician and consumed Vioxx in accordance with her physician's instructions on, about, and between August 21, 2000 and June 1, 2002.

10. On or about June 1, 2002, Plaintiff's Decedent suffered a cardiovascular event resulting in her hospitalization and ultimate death later that same day.

11. Decedent is survived by her adult daughters Kelly A. Connors and Robin M. Ballew, and her surviving spouse Virgil G. Ballew.

12. Defendant Merck distributed and sold Vioxx to consumers such as Decedent. Vioxx was approved for marketing based on information submitted by Defendant to the United States Food & Drug Administration ("FDA") in its Application to Market a New Drug for Human Use ("NDA").

13. Despite knowledge of the relationship between Vioxx and cardiovascular-related adverse health effects gained in its clinical trials and post-marketing reports and studies, Merck promoted and marketed Vioxx as safe and effective for persons such as Plaintiff's Decedent.

14. Defendant Merck submitted an Application to Market a New Drug for Human Use ("NDA") for rofecoxib to the United States Food and Drug Administration ("FDA") on November 23, 1998, for tablets, at doses of 12.5 mg and 25 mg, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea.  This application was denoted NDA 21-042 by the FDA.

15. Defendant Merck also submitted an Application to Market a New Drug for Human Use ("NDA") for rofecoxib to the United States Food and Drug Administration ("FDA") on November 23, 1998, of oral suspension, at doses of 12.5 mg/mL and 25 mg/mL, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea.  This application was denoted NDA 21-052 by the FDA.

4

16. On or about May 20, 1999, the FDA approved NDA 21-042 and NDA 21-052 (hereinafter the "NDA") for rofecoxib, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea.

17. Merck knowingly chose to expose consumers to adverse health risks of Vioxx despite its knowledge at product launch, and in post-marketing data thereafter, that use of Vioxx carried significant risks. These adverse effects were realized in adverse event reports, in clinical trials where such events were adjudicated by primary investigators with Merck's assistance, and in one or more studies shortly after market launch which showed statistically significant increases in adverse cardiovascular events among Vioxx users.

18. Defendant concealed the serious cardiovascular risks associated with Vioxx because a successful launch of Vioxx was viewed as critical for Merck. Safety concerns over hypertension, thrombosis, edema and/or cardiovascular events would have drastically impacted Merck's positioning in the market as compared to a competitor's drug, Celebrex (celecoxib), which was placed on the market approximately three (3) months prior to the launch of Vioxx.

19. Defendant Merck submitted sNDA-007 with the goal of establishing a gastrointestinal ("GI") safety claim for rofecoxib. In conjunction with the sNDA, Defendant Merck performed the Vioxx Gastrointestinal Outcome Research (VIGOR) Protocol, No. 088-04, entitled "A Double-Blind, Randomized, Stratified, Parallel-Group Study to Assess the Incidence of PUBs During Chronic Treatment With MK-0966 or Naproxen in Patients With Rheumatoid Arthritis: U.S. Cohort." The VIGOR study was performed from January 6, 1999 through March 17, 2000.

20. The objectives of the VIGOR study were to (1) "determine the relative risk of confirmed PUB (Perforation, Ulcers, Bleeding) in patients taking MK-0966 50 mg daily

compared to patients in the group taking naproxen 1000 mg/day," and (2) "study the safety and tolerability of MK-0966 in patients with rheumatoid arthritis."

21. In industry sponsored studies presented in June of 2000 at the XV European United League Against Rheumatism Congress "EULAR", an organization in which Merck is a member and corporate sponsor, it was shown that Vioxx use resulted in a statistically significant increase in hypertension and edema in a study comparing rofecoxib and celecoxib among patients with osteoarthritis who used hypertensive medication. Merck did nothing to further accurately publish these findings, or warn consumers, and also denied the results with respect to hypertension in the official publication of the American Pharmaceutical Association, Pharmacy Today, in an article entitled, *Spin War Aside, Lessons Emerge From COX-2 Trials*, in August 2000, page 3.

22. Merck continued to deny the ill health effects associated with Vioxx while at the same time reaping profits obtained through its non-disclosure and concealment. Merck engaged in a massive advertising and sampling program and gained continued increases in the market share, which enhanced Merck's financial stability to the detriment of its consumers. As a result of Merck's scheme, it reaped more than $2 billion in profit in 2000 alone, and appropriated approximately 23 percent share of the market.

23. Merck continued to profit from its scheme by withholding information from Plaintiff's Decedent and the health care industry generally. For example, in November of 2000, Merck caused the publication of the VIGOR study results in the New England Journal of Medicine and knowingly downplayed and/or withheld the severity of cardiovascular risks associated with Vioxx consumption over naproxen consumption and the underlying data.

Bombardier, C., et al., *Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients With Rheumatoid Arthritis*. New Eng. J. Med. 2000; 343: 1520-1528.

24. On or about August 29, 2001, the Journal of the American Medical Association (JAMA) published a peer-reviewed human epidemiological study by the Cleveland Clinic Foundation, Cleveland, Ohio, Dr. D. Mukherjee, et al., showing what Merck had concealed— that the relative risk of developing a serious cardiovascular adverse event (defined in the article as "myocardial infarction, unstable angina, cardiac thrombus, resuscitated cardiac arrest, sudden or unexplained death, ischemic stroke, and transient ischemic attacks") among Vioxx users in Merck's VIGOR trial compared with patients using naproxen, at a 95% confidence interval ranged from: 1) 2.2 for event-free survival analysis when comparing all cardiovascular events termed "serious" in an FDA medical reviewer's opinion; 2) 2.38 among those adjudicated to have serious thrombotic cardiovascular adverse events; and 3) 4.89 for developing serious cardiovascular events among aspirin-indicated patients who used rofecoxib. See, Mukherjee, D., et al., *Risk of Cardiovascular Events Associated With Selective Cox-2 Inhibitors*. JAMA 286:8, 954-959, Aug. 22/29, 2001. In addition, the annualized myocardial infarction rates for Vioxx users compared to placebo revealed a statistically significant increase among Vioxx users. *Id*.

25. In the JAMA study, the authors set forth the theory that, "by decreasing PGI2 production [Vioxx] may tip the natural balance between prothrombotic thromboxane A2 and antithrombotic PGI2, potentially leading to an increase in thrombotic cardiovascular events." *Id*. at 957. In a follow-up peer-reviewed study reported in the Journal of the American College of Cardiology on or about February 6, 2002, Dr. Richard J. Bing conducted sciejuifiC testing and confirmed that the Cox-2 inhibitor, "tips the balance of prostacyclin/thromboxane in favor of thromboxane, leading to increased vascular and thrombotic events." Bing, R., Lomnicka, M.,

*Why Do Cyclo-Oxygenase-2 Inhibitors Cause Cardiovascular Events*? J.Am.Coll. Cardiol 39:3, Feb. 6, 2002. This biological plausibility is further supported by studies completed at the University of Pennsylvania. Cheng, Y., et al., *Role of Prostacyclin in the Cardiovascular Response to Thromboxane A 2*, Journal of Science, 296:539-541, Apr. 19, 2002.

26. Merck continued its denial of these risks in order to continue reaping massive profits at the expense of patient's health and lives. In responsive Merck-authored and sponsored reviews, Merck claimed that naproxen had a cardioprotective effect which accounted for the cardiovascular risks among its Vioxx users. This was disputed by Merck's own employees, who published a pooled analysis in Circulation in October of 2001 and concluded that the data was insufficient to ascertain the cardiovascular benefits of naproxen. *Cardiovascular Thrombotic Events in Controlled, Clinical Trials of Rofecoxib*, Konstam, M.A., et al., Circulation, 104:2280-2288 (October 3, 2001). The article, authored by Dr. Marvin Konstam and various internal Merck employees, is a post-hoc retrospective pooled analysis of Vioxx data only available through access to Merck's files. The study shows that the data crosses dosing intervals and has as a primary basis interim placebo data from Alzheimer testing at the lowest possible dose of Vioxx (12.5 mg) as compared to 50 mg in VIGOR. However, Table 7 reveals that, at 50 mg., compared to other NSAIDs, Merck's additional data showed a greater than doubling of the risk of cardiovascular disease. Furthermore, in January of 2002, an epidemiologic study by Vanderbilt University School of Medicine was published in The Lancet concluding that, based upon information previously available, there is an absence of a protective effect of naproxen or other non-aspirin NSAIDs on risk of coronary heart disease. Ray, W., et al., *Non-Steroidal Anti-inflammatory Drugs and Risk of Serious Coronary Heart Disease: An Observational Cohort Study*, Lancet, 359:118-123, Jan. 12, 2002. A follow-up research letter by Ray, et al. appeared in

The Lancet on October 5, 2002 reiterating the cardiovascular risks of Vioxx and an inability to confirm any protective effect of naproxen.

27. On September 17, 2001, Thomas W. Abrams, R.Ph., MBA, Director of the FDA Division of Drug Marketing, Advertising, and Communications, issued a "Warning Letter" to Raymond V. Gilmartin, President and CEO of Defendant Merck, relating to "promotional activities and materials for the marketing of Vioxx (rofecoxib) tablets." A copy of this letter is attached as Exhibit "B" hereto.

28. The Warning Letter stated that Defendant Merck had "engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile for Vioxx." The letter further states:

> Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (naproxen).

29. The eight (8) page Warning Letter outlines, in detail, the conduct of Defendant Merck that supports the FDA's issuance of the Warning Letter, and states:

**"Conclusions and Requested Actions:"**

> The promotional activities and materials described above minimize the potentially serious cardiovascular findings that were observed in the VIGOR study, minimize the Vioxx/Coumadin drug interaction, omit crucial risk information associated with Vioxx therapy, contain unsubstantiated comparative claims, and promote unapproved uses. On December 16, 1999, we also objected to your dissemination of promotional materials for Vioxx that misrepresented Vioxx's safety profile, contained unsubstantiated comparative claims, and lacked fair balance.

> Due to the seriousness of these violations, and the fact that your violative promotion of Vioxx has continued despite our prior written notification regarding similar violations, we request that you provide a detailed response to the issues raised in this Warning Letter on or before October 1, 2001. This response should contain an action plan that includes a comprehensive plan to disseminate corrective messages about the issues discussed in this

letter to the audiences that received these misleading messages.  This corrective action plan should also include:

1.   Immediately ceasing all violative promotional activities, and the dissemination of violative promotional materials for Vioxx.

2.   Issuing a "Dear Healthcare provider" letter to correct false or misleading impressions and information.  This proposed letter should be submitted to us for review prior to its release.  After agreement is reached on the content and audience, the letter should be disseminated by direct mail to all healthcare providers who were, or may have been exposed to the violative promotion.

3.   A written statement of your intent to comply with "1" and "2" above.

30. On April 11, 2002, the FDA approved a supplemental application for the use of Vioxx (rofecoxib) for rheumatoid arthritis, adding this indication to the previously approved indications for osteoarthritis and pain.  The FDA also approved new labeling, a "Dear Doctor" letter, and a new patient package insert.  The labeling and the "Dear Doctor" letter contained information concerning the results of the VIGOR study.

31. The revised labeling further states, under "ADVERSE REACTIONS," that the administration of Vioxx 50 mg, was associated with a higher incidence of gastrointestinal symptoms.

> ***Clinical Studies in OA and RA with VIOXX 50 mg (Twice the highest dose recommended for chronic use)***
> In OA and RA clinical trials which contained VIOXX 12.5 or 25 mg as well as Vioxx 50 mg. Vioxx 50 mg QD was associated with a higher incidence of gastrointestinal symptoms (abdominal pain, epigastric pain, heartburn, nausea and vomiting), lower extremity edema, hypertension, serious* adverse experiences and discontinuation due to clinical adverse experiences compared to the recommended chronic doses of 12.5 and 25 mg (see DOSAGE AND ADMINISTRATION).

A copy of the revised labeling is attached as Exhibit "C" hereto.  (Highlighting provided in FDA website version).

32. The "Dear Doctor" letter, approved in April 2002, in conjunction with the revisions to the Vioxx labeling, outlines the changes to the Vioxx labeling. A copy of the "Dear Doctor" letter is attached as Exhibit "D" hereto.

33. However, the revised "Patient Information" sheet issued April 2002, does not add any information about the results of the VIGOR study." A copy of the revised "Patient Information Sheet" is attached as Exhibit "E" hereto.

34. The "Patient Information" sheet is the only written document that is provided to a patient for whom Vioxx is prescribed.

35. Both the initial labeling and the revised labeling are ineffective because they do not properly advise physicians and patients of the potential gastrointestinal side effects of Vioxx and of the significant increased risk of cardiovascular adverse events.

36. Despite knowledge of the ineffectiveness of the warnings, and despite knowledge that Vioxx may cause serious gastrointestinal and cardiovascular side effects, Defendant Merck has concealed and/or downplayed the dangers associated with Vioxx, and continued to market the drug in the United States and abroad. In its 2001 Annual Report, for example, Defendant Merck states:

> The Company also noted that a number of federal and state lawsuits, involving individual claims as well as purported class actions, have been filed against the Company with respect to *Vioxx*…The lawsuits include allegations regarding gastrointestinal bleeding and cardiovascular events. The Company believes that these lawsuits are completely without merit and will vigorously defend them.

37. Further, in its January 23, 2001 8-K filing with the Securities and Exchange Commission, the Defendant fails to mention the cardiac and cardiothrombotic findings of the VIGOR study:

> "Our results reflect the strength of our growth strategy," Mr. Gilmartin said. "Our five key products, **VIOXX**, ZOCOR, COZAAR/HYZAAR*, FOSAMAX and

SINGULAIR, drove Merck's performance for the year and created a powerful platform for growth." These products accounted for 57% of Merck's worldwide human health sales for 2000 and 61% for the fourth quarter.

"Each of the five medicines offers unique competitive advantages," Mr. Gilmartin said. **Vioxx**, a once-a-day medicine, is the only COX-2 indicated in the United States both for osteoarthritis and acute pain. Since its extraordinarily successful 1999 launch, **Vioxx** has become the world's fastest growing branded prescription arthritis medicine, and it is already Merck's second largest-selling medicine. In the United States, **Vioxx** now accounts for approximately 50 percent of new prescriptions in the COX-2 class, despite being second to market in this class in the United States. **Vioxx** achieved $2.2 billion in sales for the full year 2000, with $700 million in the fourth quarter.

A Food and Drug Administration (FDA) Advisory Committee meeting is scheduled for Feb. 8 to review labeling changes Merck has requested based on the strong results of the VIGOR Study. This 8,000-patient gastrointestinal outcomes research study, in which **Vioxx** reduced the risk of serious gastrointestinal complications by half compared to the NSAID naproxen, was published in November in THE NEW ENGLAND JOURNAL OF MEDICINE. Another study, presented in November, showed that **Vioxx** significantly reduced moderate-to-severe acute pain after dental surgery to a greater degree compared to codeine combined with acetaminophen.

38. Despite the foregoing, Defendant Merck continued to represent to consumers that Vioxx is safe, and that any cardiovascular and/or cardiothrombotic side effects are not associated with the drug. Defendant has also downplayed any potential gastrointestinal side effects of the drug, promoting it as safer and more efficacious than other medications approved for treatment of similar conditions.

39. At all times relevant to this litigation, Defendant Merck had a significant market share based upon claims of Vioxx's efficacy, a very aggressive marketing program which included financial incentives to sales teams, infusion of some 700 new sales representatives, and a massive direct-to-consumer advertising and physician sampling program.

40. As a result of such marketing, Vioxx gained a significant market share in competition with Celebrex that Merck would not have gained if it had not suppressed information about Vioxx and/or made false representations of Vioxx's superiority and efficacy.

41. If Defendant had not engaged in this conduct, consumers, such as Plaintiff's Decedent, would have switched from Vioxx to safer products or refrained wholly from its use.

42. Defendant misrepresented to Plaintiff's Decedent and the health care industry the safety and effectiveness of Vioxx and/or concealed material information, including adverse information regarding the safety and effectiveness of Vioxx.

43. Defendant made misrepresentations and actively concealed adverse information at a time when Defendant knew, or should have known, that Vioxx had defects, dangers, and characteristics that were other than what Defendant had represented to Plaintiff's Decedent and the health care industry generally.  Specifically, Defendant misrepresented to and/or actively concealed from Plaintiff's Decedent, the health care industry and the consuming public that:

      a.      Vioxx had statistically significant increases in cardiovascular and cerebrovascular side effects, including without limitation thrombosis, myocardial infarction, stroke, and sudden onset death, which could result in serious injury or death;

      b.      There had been insufficient and/or company run studies regarding the safety and efficacy of Vioxx before and after its product launch;

      c.      Vioxx was not fully and adequately tested for the cardiovascular and cerebrovascular side effects at issue herein;

      d.      Other testing and studies showed the risk of or actual serious adverse risks; and/or that there was a greatly increased risk of such cardiovascular

and cerebrovascular events and death; there was a confirmed mechanism by which these thrombotic or cardiovascular events occurred as reported in the scientific literature.

44. These misrepresentations and/or active concealment were perpetuated directly and/or indirectly by Defendant.

45. Defendant knew or should have known that these representations were false and made the representations with the intent or purpose that Plaintiff's Decedent would rely on them, leading to the use of Vioxx.

46. Plaintiff alleges that the Defendant's marketing strategies, including, without limitation, the detail and sampling programs and direct-to-consumer advertising, targeted Decedent to induce her to use Vioxx. At the time the Defendant distributed, manufactured and marketed Vioxx, Defendant intended that Decedent would rely on the marketing, advertisements and product information propounded by it.

47. As a direct and proximate result of Defendant's misconduct as set forth herein, Plaintiff's Decedent suffered severe physical and mental pain and suffering, including damages for pain and suffering; medical expenses; fear of death and death for which Plaintiff is entitled to compensatory and/or punitive damages, and for which the Use Plaintiffs are entitled to compensatory damages.

## COUNT I

### (Negligence)

Plaintiff adopts and incorporates by reference each and every allegation of fact contained in paragraphs 1 through 47 of this Complaint as though the same were fully and completely set forth herein.

48. Defendant, Merck, owed all individuals purchasing Vioxx in the ordinary stream of commerce, including Plaintiff's Decedent, the duty of reasonable care and safety. Defendant's duties included but were not limited to taking all reasonable and necessary care to 1) properly design, test and manufacture Vioxx; 2) safeguard individuals from hazards of Vioxx it knew or should have known about; 3) discover latent defects or hazards of the product; 4) ensure the drug was safe and effective; 4) inform the public and those prescribing Vioxx of the potential hazards of the drug, including the risk of cardiovascular damage.

49. Defendant Merck breached said duties in that Vioxx was defective, unreasonably dangerous and hazardous in one or more of the following ways:

(a)     The drug failed to include adequate warnings that would alert consumers and physicians to the potential risks and serious side effects of the drug;

(b)     Defendant failed to adequately and properly test the drug before placing the drug on the market;

(c)     Defendant failed to conduct sufficient testing on the drug, which, if properly performed, would have showed that the drug had serious side effects including, but not limited to, adverse cardiac and cardiovascular events;

(d)     Defendant failed to adequately warn that the testing that was done revealed an increased risk of adverse cardiac and cardiovascular events related to the drug;

(e)     Defendant failed to adequately warn Plaintiff's Decedent that the use of the drug carried a risk of temporary or permanent disability due to cardiovascular events and other serious side effects;

(f)     Defendant failed to warn Plaintiff's Decedent that the use of the drug carried a
        risk that adverse cardiovascular events resulting in death or disability might be
        caused by the drug;

(g)     Defendant failed to provide adequate post-marketing warnings or instructions
        after the defendant knew or should have known of the significant risks associated
        with the use of the drug;

(h)     Defendant encouraged misuse and overuse of the drug while downplaying the
        side effects to doctors and the public and by overstating the benefits of Vioxx in
        order to make a profit from their sales.

50. Defendant knew or should have known that the drug caused unreasonably dangerous
risks and serious side effects of which the Plaintiff's Decedent would not have been aware.
Defendant nevertheless advertised, marketed, sold and distributed the drug knowing that there
were safer methods for the treatment.

51. In addition, Merck had a legal duty to comply with the U.S. Food, Drug and
Cosmetics Act, U.S. Code 21 USC §301 et seq., and regulations promulgated thereunder.

52. Merck negligently and carelessly violated the laws and regulations of the United
States including, but not limited to the following: 21 CFR §330.10(a)(4)(v) (Labeling); 21 CFR
§369.10 (Labeling); 21 CFR §§201.56 and 201.57(d), (c) and (f) (Labeling); 21 CFR §1.21 (a)
(Labeling); 21 CFR §600.80 (Postmarketing Reporting of Adverse Experiences); 21 CFR §§314
and 50 (Post Marketing Reports of Adverse Drug Experiences).  The violations of those and
other statutes and regulations constitute negligence per se.

53. Merck knew or should have known that consumers, like Plaintiff's Decedent, would
suffer injury as a result of its failure to exercise ordinary care as described above.

54. As a direct and proximate result of the negligence of Defendant, Plaintiff's Decedent, with no contributory negligence on her part, suffered serious injuries including, but not limited to, heart failure, and other physical injuries and disability, resulting in hospitalization and her ultimate death.

55. As a further direct and proximate result of defendant's negligence, Plaintiff's Decedent, with no contributory negligence on her part, was caused to suffer severe physical and emotional pain and suffering, mental anguish, loss of capacity for the enjoyment of life, fear of death, death and was caused to incur significant costs for medical care, as well as costs to her Estate, including funeral expenses and numerous other costs.

56. At all times relevant hereto, Defendant Merck actually knew of the defective nature of the product as herein set forth and continued to design, manufacture, market and sell the product so as to maximize sales and profits at the expense of public health and safety. Defendant's conduct exhibits a wanton or reckless disregard for human life and such an entire want of care as to establish that its actions were a result of fraud, evil motive, actual malice, and the conscious and deliberate disregard of foreseeable harm to Plaintiff's Decedent.  Therefore, Plaintiff is entitled to punitive damages.

**WHEREFORE**, Plaintiff prays for relief as follows:

      A.     For $10,000,000 in compensatory damages;

      B.     For $20,000,000 in punitive damages;

      C.     For compensation for medical, incidental and hospital expenses;

      D.     For compensation for funeral and other Estate expenses;

      E.     For interest and costs;

F.     For such other extraordinary, declaratory and/or injunctive relief as permitted by law as necessary to assure that Plaintiff has an effective remedy; and

G.     For such further relief as this Court deems necessary, just and proper.

## COUNT II

### (Strict Products Liability – Failure To Warn)

Plaintiff adopts and incorporates by reference each and every allegation of fact contained in paragraphs 1 through 56 of this Complaint as though the same were fully and completely set forth herein.

63. Defendant sold Vioxx (rofecoxib) in the course of Defendant's business.

64. Vioxx (rofecoxib) was defective and unreasonably dangerous when it left the possession of Defendant in that it contained warnings insufficient to alert consumers, including Plaintiff's Decedent, to the dangerous risks and reactions associated with the drug including, but not limited to, adverse cardiac events, cerebrovascular accidents and other serious and life-threatening side effects.

65. Plaintiff's Decedent used the drug for its intended purposes in a manner reasonably anticipated without knowledge of itc defective and dangerous characteristics.

66. Decedent was an ordinary consumer and user of the Vioxx (rofecoxib) product sold, distributed, supplied, manufactured, designed, developed, marketed and/or promoted by Defendant and, therefore, it was foreseeable that Plaintiff's Decedent would purchase and use the product as indicated herein.

67. The warnings that were given by Defendant were not accurate or clear, but were inadequate as to the frequency, character, severity, and spectrum of injuries caused by Vioxx (rofecoxib).

68. Defendant had a continuing duty to warn Plaintiff's Decedent of the dangers associated with the drug.

69. As a direct and proximate result of the Defendant's failure to warn, Plaintiff's Decedent sustained serious and permanent injuries including, but not limited to heart failure and other physical injuries; mental anguish, severe pain and suffering, fear of death; loss of capacity for the enjoyment of life; expenses of medication, physicians, hospitals, medical and nursing care and treatment; and permanent disability.

70. At all times relevant hereto, Defendant Merck actually knew of the defective nature of the product as herein set forth and continued to design, manufacture, market and sell the product so as to maximize sales and profits at the expense of public health and safety. Defendant's conduct exhibits a wanton or reckless disregard for human life and such an entire want of care as to establish that their actions were a result of fraud, evil motive, actual malice, and the conscious and deliberate disregard of foreseeable harm to Plaintiff's Decedent. Therefore, Plaintiff is entitled to punitive damages.

**WHEREFORE**, Plaintiff prays for relief as follows:

A.    For $10,000,000 in compensatory damages;

B.    For $20,000,000 in punitive damages;

C.    For compensation for medical, incidental and hospital expenses;

D.    For compensation for funeral and other Estate expenses;

E.    For interest and costs;

19

F.    For such other extraordinary, declaratory and/or injunctive relief as permitted by law as necessary to assure that Plaintiff has an effective remedy; and

G.    For such further relief as this Court deems necessary, just and proper.

## COUNT III

### (Strict Product Liability Design Defect)

Plaintiff adopts and incorporates by reference each and every allegation and fact contained in paragraphs 1 through 70 of this Complaint as though the same were fully and completely set forth herein.

71. At all times material hereto, Defendant engaged in the business of selling, distributing, supplying, marketing, manufacturing, developing, designing and promoting the drug Vioxx (rofecoxib) in the course of Defendant's business.

72. Merck sold the product Vioxx (rofecoxib) which was ingested by Plaintiff's Decedent, as described in this Complaint.

73. Vioxx (rofecoxib), as manufactured by Defendant Merck, was defective at the time it was sold by the defendant and/or left Defendant's control.

74. The Vioxx (rofecoxib) ingested by Plaintiff's Decedent, was expected to reach the user without substantial change from how it was sold.

75. The Vioxx (rofecoxib) ingested by Decedent, Barbara Ann Ballew, reached her without substantial change from how it was sold.

76. Plaintiff's Decedent was a person who would be reasonably expected to consume the product.

77. Vioxx (rofecoxib) was used by Plaintiff's Decedent in a manner reasonably anticipated by Defendant.

78. Vioxx (rofecoxib) when sold, distributed, supplied, manufactured, designed, developed, marketed and promoted by Defendant was unreasonably dangerous when put to a reasonably anticipated use as said product causes or contributes to serious adverse cardiac and cerebrovascular events including, but not limited to cerebrovascular accident and hypertension.

79. Vioxx (rofecoxib) when sold, distributed, supplied, manufactured, designed, developed, marketed and promoted by Defendant was defective when it left the hands of the Defendant in that said product was more dangerous than the ordinary user or consumer would expect of said drug product.

80. At all times material hereto, Vioxx (rofecoxib) was sold, distributed, supplied, manufactured, designed, developed, marketed and/or promoted by Defendant in a defective and unreasonably dangerous condition in ways which include, but are not limited to, one or more of the following particulars:

        (a)    When placed in the stream of commerce, the drug contained unreasonably dangerous design defects and was not reasonably safe as intended to be used, subjecting Decedent to risks which exceeded the benefits of the drug;

        (b)    When placed in the stream of commerce, the drug was defective in design and formulation, making its use more dangerous than an ordinary consumer would expect and more dangerous than other risks associated with other treatments for pain relief that were available;

21

     (c)     The drug was insufficiently tested;

     (d)     The drug caused harmful side effects which outweighed any potential utility;

     (e)     The drug was not accompanied by adequate instructions and/or warnings to fully apprise the consumers, including Decedent, of the full nature or extent of the risks and side effects associated with its use.

81. As a direct and proximate result of the defective design of Defendant's product Vioxx (rofecoxib), Plaintiff's Decedent sustained serious injuries, including, but not limited to, heart failure and other physical injuries; mental anguish, severe pain and suffering; loss of capacity for the enjoyment of life; expenses, physicians, hospitals, medical and nursing care and treatment; and death.

82. At all times relevant hereto, Defendant Merck actually knew of the defective nature of the product as herein set forth and continued to design, manufacture, market and sell the product so as to maximize sales and profits at the expense of public health and safety. Defendant's conduct exhibits a wanton or reckless disregard for human life and such an entire want of care as to establish that its actions were a result of fraud, evil motive, actual malice, and the conscious and deliberate disregard of foreseeable harm to the Plaintiff's Decedent. Therefore, Plaintiff is entitled to punitive damages.

**WHEREFORE**, Plaintiff prays for relief as follows:

     A.  For $10,000,000 in compensatory damages;

     B.  For $20,000,000 in punitive damages;

     C.  For compensation for medical, incidental and hospital expenses;

D.  For compensation for funeral and other Estate expenses;

E.  For interest and costs;

F.  For such other extraordinary, declaratory and/or injunctive relief as permitted

by law as necessary to assure that Plaintiff has an effective remedy; and

G.  For such further relief as this Court deems necessary, just and proper.

## COUNT IV

### (Fraud)

Plaintiff adopts and incorporates by reference each and every allegation of fact contained in paragraphs 1 through 82 of the Complaint as though the same were fully and completely set forth herein.

83. Defendant concealed facts regarding Vioxx from the consuming public, including Plaintiff's Decedent, which it had a duty to disclose.

84. The facts concealed and not disclosed include, but are not limited to, those set forth in the general allegations of this Complaint.

85. Each of the facts concealed and not disclosed was material.

86. Defendant concealed material facts to the consuming public with the intent that the consuming public, like Plaintiff's Decedent, would take a course of action that it would otherwise not have taken if it had been informed of the actual facts known to Merck, including, but not limited to, the totality of the risks associated with the ingestion of Vioxx (rofecoxib).

87. Plaintiff's Decedent, Barbara Ballew, and her prescribing physician's reliance upon Defendant's misrepresentations was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position

to know the true facts concerning Vioxx (rofecoxib).  Defendant aggressively marketed the use of Vioxx (rofecoxib) and concomitantly downplayed the risks, inducing her physician to prescribe the drug and inducing Plaintiff's Decedent to use the drug.

88. Plaintiff's Decedent took such action relying on the assumption that the undisclosed facts did not exist and/or were different than they actually were.

89. As a direct and proximate result of Plaintiff's Decedent's reliance on the incomplete and inaccurate information communicated by Defendant, and her assumption that the non-disclosed facts aboud the risks associated with the use of Vioxx (rofecoxib) did not exist, Plaintiff's Decedent sustained serious and permanent injuries including, but not limited to heart failure and other physical injuries; disability, mental anguish, severe pain and suffering; fear of death, loss of capacity for the enjoyment of life; expenses of medication, physicians, hospitals, medical and nursing care and treatment; and death.

90. At all times relevant hereto, Defendant actually knew of the defective nature of the product as herein set forth and continued to design, manufacture, market and sell the product so as to maximize sales and profits at the expense of public health and safety.  Defendant's conduct exhibits a wanton or reckless disregard for human life and such an entire want of care as to establish that its actions were a result of fraud, evil motive, actual malice, and the conscious and deliberate disregard of foreseeable harm to Plaintiff's Decedent.  Therefore, Plaintiff is entitled to punitive damages.

WHEREFORE, Plaintiff prays for relief as follows:

A.      For $10,000,000 in compensatory damages;

B.      For $20,000,000 in punitive damages;

C.      For compensation for medical, incidental and hospital expenses;

D.      For compensation for funeral and other Estate expenses;

E.      For interest and costs;

F.      For such other extraordinary, declaratory and/or injunctive relief as

permitted by law as necessary to assure that Plaintiff has an effective

remedy; and

G.      For such further relief as this Court deems necessary, just and proper.

## COUNT V

### (Breach of Express Warranties)

Plaintiff adopts and incorporates by reference each and every allegation of fact contained in paragraphs 1 through 90 of this Complaint as though the same were fully and completely set forth herein.

91. Vioxx (rofecoxib), which was designed, tested, manufactured, distributed, promoted and sold by Defendant, was expected to, and did, reach Plaintiff's Decedent, without a substantial change in its condition.

92. Defendant, through, but not limited to, its labeling, package inserts, submissions to the FDA, advertising and promotional materials, expressly warranted that Vioxx (rofecoxib) was safe for the use for which it was intended, namely as a pain relief medication.

93. Defendant breached said express warranties in that Vioxx (rofecoxib) was unsafe in light of the risk of life-threatening side effects associated with its use, including, but not limited to, adverse cardiac events and cerebrovascular accidents.

94. Plaintiff's Decedent relied to her detriment on the express warranties of Defendant.

95. As a direct and proximate result of Defendant's breach of express warranties, Plaintiff's Decedent sustained serious injuries including, but not limited to, heart failure and

other physical injuries; disability, mental anguish, severe pain and suffering; loss of capacity for the enjoyment of life; expenses of medication, physicians, hospitals, medical and nursing care and treatment; and death.

**WHEREFORE**, Plaintiff prays for relief as follows:

A.   For $10,000,000 in compensatory damages;

B.   For compensation for medical, incidental and hospital expenses;

C.   For compensation for funeral and other Estate expenses;

D.   For interest and costs;

E.   For such other extraordinary, declaratory and/or injunctive relief as permitted by law as necessary to assure that Plaintiff has an effective remedy; and

F.   For such further relief as this Court deems necessary, just and proper.

## COUNT VI

### (Breach of Implied Warranties)

Plaintiff adopts and incorporates by reference each and every allegation of fact contained in paragraphs 1 through 95 of this Complaint as though the same were fully and completely set forth herein.

96. Vioxx (rofecoxib), which was designed, tested, manufactured, distributed, promoted and sold by Defendant, was expected to, and did, reach Plaintiff's Decedent, without a substantial change in its condition.

97. Defendant, through, but not limited to, its labeling, package inserts, submissions to the FDA, advertising and promotional materials, impliedly warranted that Vioxx (rofecoxib), was of merchantable quality and safe for the use for which it was intended, namely as a pain relief medication.

98. Defendant breached said implied warranties in that Vioxx (rofecoxib) was unsafe in light of the risk of life-threatening side effects associated with its use, including, but not limited to, adverse cardiac events and cerebrovascular accidents.

99. Plaintiff's Decedent reasonably relied, to her detriment, on the implied warranties of Merck.

100. As a direct and proximate result of Defendant's breach of implied warranties, Plaintiff's Decedent sustained serious injuries including, but not limited to, heart failure and other physical injuries; disability, mental anguish, severe pain and suffering; loss of capacity for the enjoyment of life; expenses of medication, physicians, hospitals, medical and nursing care and treatment; and death.

**WHEREFORE**, Plaintiff prays for relief as follows:

    A.    For $10,000,000 in compensatory damages;

    B.    For compensation for medical, incidental and hospital expenses;

    C.    For compensation for funeral and other Estate expenses;

    D.    For interest and costs;

    E.    For such other extraordinary, declaratory and/or injunctive relief as permitted by law as necessary to assure that Plaintiff has an effective remedy; and

      F.      For such further relief as this Court deems necessary, just and proper.

## COUNT VII

### (Deceptive Trade Practices)

Plaintiff adopts and incorporates by reference each and every allegation of fact contained in paragraphs 1 through 100 of this Complaint as though the same were fully and completely set forth herein.

101. Defendant, by misrepresenting the safety of Vioxx (rofecoxib) and concealing its risks with the intent that consumers like Plaintiff's Decedent would rely upon such concealment, violated Md. Code Ann., (Com. Law) §§ 13-101 *et seq*. (1999).

102. In violation of the Maryland Consumer Protection Act, Defendant withheld the risk of adverse cerebrovascular and cardiac events associated with its product Vioxx, which was known to Defendant.

103. As a direct and proximate result of Defendant's violation of the Maryland Consumer Protection Act, Plaintiff's Decedent sustained serious injuries including, but not limited to, heart failure, and other physical injuries; disability, mental anguish, severe pain and suffering; loss of capacity for the enjoyment of life; expenses of medication, physicians, hospitals, medical and nursing care and treatment; and death.

**WHEREFORE**, Plaintiff prays for relief as follows:

      A.      For $10,000,000 in compensatory damages;

      B.      For compensation for medical, incidental and hospital expenses;

      C.      For compensation for funeral and other Estate expenses;

      D.      For interest and costs;

E.   For such other extraordinary, declaratory and/or injunctive relief as

permitted by law as necessary to assure that Plaintiff has an effective remedy; and

or such further relief as this Court deems necessary, just and proper.

## COUNT VIII

### (Wrongful Death)

Plaintiff and the Use Plaintiffs adopt and incorporate by reference each and every

allegation of fact contained in paragraphs 1 through 103 of this Complaint as though the same

were fully and completely set forth herein.

104. As a direct and proximate result of Defendant's Acts, omissions, failures, breaches

of warranty, duty and law as alleged above, Plaintiff's Decedent developed acute cardiovascular

problems and conditions which caused her death.

105. As a direct and proximate result of the wrongful death of Plaintiff's Decedent,

Plaintiff Kelly Connors has lost and has been deprived of the services, care, attention, society,

companionship, comfort, protection, marital care, advice, counsel and guidance which Plaintiff's

Decedent rendered to her while alive and which she would have continued to afford and render

to him had she continued to live. As a further and direct proximate result of the tortious conduct

complained of herein, Plaintiff Kelly Connors has suffered and will suffer extreme mental

anguish and emotional pain and suffering and, further, has been, is and will be unable to live her

normal life.

106. By reason of the aforementioned acts, omissions, failures, breaches of warranty,

duty and law by the Defendant Merck, a cause of action for wrongful death accrued for the use

of and on behalf of Plaintiff Kelly Connors for compensation to her for all pecuniary losses and

damages, past, present and future which she has sustained, is sustaining and will sustain, pursuant to the Maryland Wrongful Death Statute, Md.Code Ann., (Cts. & Jud.Proc.) §3-901 *et seq.*.

107. Plaintiff's Decedent's surviving spouse, Virgil G. Ballew, and her other adult daughter, Robin Ballew, join in this action as Use Plaintiffs.

108. As a direct and proximate result of the wrongful death of Plaintiff's Decedent, the Use Plaintiffs have lost and have been deprived of the services, care, attention, society, companionship, comfort, protection, guidance and education which Plaintiff's Decedent rendered to them while alive and which she would have continued to afford and render to them had she continued to live. As a further and direct proximate result of the tortious conduct complained of herein, the Use Plaintiffs have suffered and will suffer extreme mental anguish and emotional pain and suffering and further, have been, are and will be unable to live their normal life.

109. By reason of the aforementioned acts, omissions, failures, breaches of warranty, duty and law by the Defendant Merck, a cause of action has accrued for the use of and on behalf of the surviving spouse and surviving adult daughter of Plaintiff's Decedent as Use Plaintiffs for compensation to them for all pecuniary losses and damages, past, present and future which they have sustained, are sustaining and will sustain, pursuant to the Maryland Wrongful Death Statute, Md.Code Ann., (Cts. & Jud.Proc.) §3-901 *et seq.* and Md. Rule 15-1001.

**WHEREFORE,** Plaintiff and the Use Plaintiffs pray for relief as follows:

      A.    For $10,000,000 in compensatory damages;

      B.    For compensation for medical, incidental and hospital expenses;

      C.    For compensation for funeral and other Estate expenses;

      D.    For interest and costs;

E.      For such other extraordinary, declaratory and/or injunctive relief as

permitted by law as necessary to assure that Plaintiff and the Use Plaintiff

have an effective remedy; and

F.      For such further relief as this Court deems necessary, just and proper.

Peter G. Angelos (Fed Bar #01645)
M. Albert Figinski (Fed Bar #02291)
H. Russell Smouse (Fed Bar #01637)
Patricia J. Kasputys (Fed Bar #03775)
Mary V. McNamara-Koch (Fed. Bar #26591)
Attorneys for Plaintiff


**LAW OFFICES OF PETER G. ANGELOS, P.C.**
100 North Charles Street, 20th Floor
Baltimore, Maryland 21201
Telephone: 410-649-2000
Facsimile: 410-649-2101

## REQUEST FOR JURY TRIAL

Plaintiff, by undersigned counsel, hereby requests a jury trial on all counts in this action.

Mary V. McNamara-Koch