prescription drugs."); *Heindel v. Pfizer Inc.*, 381 F. Supp. 2d 364, 384 (D.N.J. 2004) ("[T]he Court finds that Plaintiffs' claims [arising under the Pennsylvania Unfair Trade Practices and Consumer Protection Law] are indeed barred by the learned intermediary doctrine.").  Because Mr. Wright (like the other named plaintiffs) does not allege that his prescribing physician would not have prescribed Vioxx absent Merck's allegedly deceptive statements, the learned intermediary doctrine operates to defeat Mr. Wright's claim under ACFA and his claim fails for this reason as well.

### 2. Plaintiff Clara Fontanilles Fails To State A Claim Under Florida Law.

Plaintiffs argue that Ms. Fontanilles has stated a valid claim under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.204 ("FDUTPA") because: (1) she asserts "actual damages;" and (2) the learned intermediary doctrine does not bar her claims.  (Pls.' Resp. at 35, 46.)  Both arguments fail.

First, plaintiffs mistakenly argue that Fontanilles has alleged a valid injury under Florida law by claiming that she suffered economic loss in paying a higher price for Vioxx than she would have paid if she had purchased a traditional NSAID.  (Pls.' Resp. at 37.)  Contrary to plaintiffs' assertions, Florida law does not recognize speculative damages of the type plaintiff Fontanilles seeks.  *See Swindell v. Crowson*, 712 So. 2d 1162, 1164 (Fla. Dist. Ct. App. 1998) ("Damages cannot be based on speculation, conjecture or guesswork."); *Macias v. HBC of Fla.*, 694 So. 2d 88, 90 (Fla. Dist. Ct. App. 1997) (no recovery for speculative damages).  Plaintiffs' attempt to distinguish Merck's authorities on the ground that "they are cases in which the damages claimed were impossible to calculate" misses the point.  (Pls.' Resp. at 36.)   The question is not whether there is a way to calculate damages; rather, the question is whether plaintiff has alleged any injury entitling her to damages.  Plaintiffs fail to cite even one Florida

case to support their argument that Ms. Fontanilles suffered actual injury because she may have purchased less expensive NSAIDs absent Merck's alleged misstatements about Vioxx. Therefore, like the other plaintiffs in the master complaint, Ms. Fontanilles has not satisfied that requirement.

Second, plaintiffs' argument that Florida law does not apply the learned intermediary doctrine in consumer protection cases is incorrect. (Pls.' Resp. at 46.)  As set forth in Merck's opening brief, the learned intermediary doctrine applies in cases where a plaintiff alleges that a drug company provided inadequate information about the safety of its product. *See Felix v. Hoffman-La Roche, Inc.*, 540 So. 2d 102 (Fla. 1989).  Plaintiffs' attempt to distinguish *Felix* on the grounds that it is a "failure to warn" case rather than a FDUTPA action is unpersuasive because nowhere does the case limit the applicability of the doctrine to "failure to warn" actions. Moreover, courts that have specifically addressed the issue have held that the learned intermediary doctrine operates to defeat a consumer fraud claim where, as here, plaintiffs allege a failure to warn but do not allege that the defendant failed to warn their doctors of the drug's alleged risks and that such failure proximately caused them injury. *See* Section III.B.1, *supra*.

Plaintiffs' argument that the learned intermediary doctrine does not bar Fontanilles' claim because Merck did not provide adequate information to prescribing physicians generally is also unavailing. (Pls.' Resp. at 47.)  Not only do plaintiffs fail to cite any particular inadequacies in the actual warnings made by Merck but Ms. Fontanilles does not assert any allegations about *her* prescribing physician and whether he or she would have acted differently if Merck had issued different warnings about Vioxx.  Absent an allegation that her prescribing physician would not have prescribed her Vioxx without Merck's allegedly deceptive statements, plaintiff Fontanilles's claim must be dismissed.

3.    **The Claims Of Plaintiffs Marilyn Benoit, Coleen Lowery, Melvin Williams, and Sharon Murphy All Fail Under Illinois Law.**

Plaintiffs' arguments in support of their Illinois Consumer Fraud Act ("ICFA") claims similarly fail.  According to plaintiffs, the Illinois plaintiffs state a claim under the Illinois statute because:  (1) they allege cognizable injury under Illinois law; (2) ICFA does not require plaintiffs to plead reliance; (3) the learned intermediary doctrine does not apply to plaintiffs' claims; and (4) Illinois statutory exemptions do not apply in this case.  (Pls.' Resp. at 35, 40, 46, 49.)  Each of these arguments is undermined by established Illinois law.

First, as noted in Merck's opening brief, ICFA requires a plaintiff to allege injury before suing.  Specifically, a plaintiff seeking recovery under ICFA may bring an action to recover for any "*actual damage*" to the plaintiff that occurred "*as a result of*" that deceptive act.  815 Ill. Comp. Stat. 505/10a(a) (emphasis added).  Thus, mere allegations that a defendant acted improperly do not give a plaintiff standing to sue; rather, the plaintiff must allege that he or she suffered some concrete injury as a result of the alleged conduct.  *Kelly v. Sears Roebuck & Co.*, 720 N.E.2d 683, 692 (Ill. App. Ct. 1999) ("Plaintiffs are required to properly allege a present personal injury and/or damages in each count of their complaint."); *Verb v. Motorola, Inc.*, 672 N.E.2d 1287, 1296 (Ill. App. Ct. 1996) ("[P]laintiffs' complaint fails to state a cause of action because plaintiffs' claims are all based upon mere theoretical possibilities of injury and/or damages."); *Smith v. Prime Cable of Chi.*, 658 N.E.2d 1325, 1337 (Ill. App. Ct. 1995).

Plaintiffs' attempts to discredit Merck's cases are unpersuasive.  For example, plaintiffs claim that *Kelly* is not applicable because the claim at issue in that case was based on a product's potential to be defective rather than on a misrepresentation about the product.  (Pls. Resp. at 36 & n.29.)  To the contrary, the claim dismissed in *Kelly* was actually based on plaintiffs' allegation that they suffered injury as a result of defendant's failure to disclose that the product

plaintiffs purchased might be used (not new).  720 N.E.2d at 685-86.  As in the present case, the plaintiffs in *Kelly* did not properly plead injury because they did not allege the product was defective; they merely pled that it was not as valuable as they originally believed it to be. Plaintiffs also argue that *Verb* is not relevant because the damages claimed by plaintiffs in that case were impossible to calculate.  (Pls.' Resp. at 36 & n.30.)  In fact, however, *Verb* is directly on point because the named plaintiffs in that case, as here, admitted that their allegedly defective cellular phones had not caused them any personal injury.  Instead, they argued that they were damaged by an alleged "reduction in the value of the cellular phones."  *Verb*, 672 N.E.2d at 1289.  The *Verb* court affirmed the trial court's dismissal of all of the plaintiffs' claims, concluding that, absent an allegation that plaintiffs experienced a "present personal injury," their "claims constitute conjecture and speculation."  *Id.* at 1295.  Finally, plaintiffs' attempt to distinguish *Prime Cable of Chi.* on the basis that its holding "derive[s] from idiosyncratic facts" also fails.  (Pls.' Resp. at 37 & n.30.)  In *Prime Cable*, the court dismissed plaintiffs' ICFA suit for lack of injury after plaintiffs claimed that they paid too much for a pay-per-view television program because of defendants' misrepresentation about the length of the program.  658 N.E.2d at 1336.  As in the present case, the *Prime Cable* plaintiffs' allegation that the product they received was less valuable than they believed it to be at the time of sale was not sufficient to support a claim for relief under ICFA.

Second, plaintiffs' ICFA claims must also be dismissed because they fail to properly allege causation.  Notably, plaintiffs do not dispute that causation is a required element to state a claim under ICFA.  (Pls.' Resp. at 40 ("a valid claim must show that the consumer fraud proximately caused plaintiff's injury" (citing *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 593 (Ill. 1996))).)  Rather, plaintiffs contend that they satisfy ICFA's causation element by  alleging

in the complaint that "[a]s a result of Merck's claims, Plaintiffs . . . purchased and/or paid for Vioxx even though . . . Vioxx was much more expensive than other NSAIDS." (Pls.' Resp. at 40 (emphasis removed).)   However, the learned intermediary doctrine, as adopted by Illinois, requires that a pharmaceutical manufacturer provide warnings regarding a drug's risks and side effects only to physicians, not to consumers.  *Kirk v. Michael Reese Hosp. & Med. Ctr.*, 513 N.E.2d 387, 392-93 (Ill. 1987).   As discussed *supra*, plaintiffs do not even identify their prescribing physicians, much less allege that those physicians were deceived by Merck and would not have prescribed Vioxx in the absence of Merck's allegedly deceptive statements. Without such allegations, plaintiffs cannot properly demonstrate causation under the learned intermediary doctrine.

Moreover, plaintiffs' argument that the learned intermediary doctrine "applies only to product liability and failure to warn claims," (Pls.' Resp. at 46 & n.39 (citing *Kirk*, 513 N.E.2d at 392-93), is without merit.  Nowhere does *Kirk* limit the applicability of the learned intermediary doctrine to certain tort claims and not others, and as discussed in Section III.B.1, *supra*, courts that have specifically addressed the issue have held that the learned intermediary doctrine operates to defeat a consumer fraud claim where, as here, plaintiffs do not allege that the defendant failed to warn their doctors proximately causing them injury.

In the alternative, plaintiffs incorrectly claim that they have adequately pled causation by alleging "indirect deception."  Plaintiffs' reliance on *Shannon v. Boise Cascade Corp.*, 805 N.E.2d 213, 218 (Ill. 2004) (Pls.' Resp. at 41) to support this argument is misplaced.  The *Shannon* court merely held that indirect deception might satisfy the causation requirement in a case where a homeowner was not actually deceived as to the quality of the materials used to build her home, but the contractor who selected and used the materials was  The case does not in

any way address the issue facing the Court here – whether plaintiffs adequately pled causation given the applicability of the learned intermediary doctrine.  The answer to that question, as set forth in Merck's opening brief, is no.

Finally, plaintiffs are incorrect in arguing that ICFA's exception for transactions approved by regulatory agencies does not apply in this case because FDA regulations do not permit "a pharmaceutical manufacturer to mislead its customers in the promotion of its product, and Merck cannot show that the FDA specifically endorsed its widespread, misleading, and deceptive VIOXX promotional campaign."  (Pls.' Resp. at 50.)  As stated in Merck's opening brief, ICFA does not apply to "[a]ctions or transactions specifically authorized by laws administered by any regulatory body or officer acting under statutory authority of this State or the United States."  815 Ill. Comp. Stat. § 505/10b(1); *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 942 (7th Cir. 2001) ("[R]ecognizing the primacy of federal law in [the pharmaceutical industry], the Illinois statute itself protects companies from liability if their actions are authorized by federal law.").  Plaintiffs' attempt to distinguish *Bober* is unsuccessful.  (Pls.' Resp. at 51.)  In *Bober*, the court held that a defendant drug company was protected from liability for any alleged consumer misrepresentation regarding proper use of its product under this provision because the FDA regulates how drug companies can recommend usage.   246 F.3d at 942.   "[T]he pharmaceutical industry is highly regulated"; therefore, "recognizing the primary of federal law in this field, the Illinois statute itself protects companies from liability if their actions are authorized by federal law." *Id.*  The same is true here:  Merck cannot be held liable under ICFA because the FDA specifically authorized the company to market and sell Vioxx to consumers by approving its prescription drug application.

25

Plaintiffs' cases are no more helpful to their argument. *Heastie v. Community Bank of Greater Peoria*, 690 F. Supp. 716 (N.D. Ill. 1988) (Pls.' Resp. at 51), merely held that misrepresentations made in a mortgage company's referral agreements were not exempted from ICFA liability because there was no federal law regulating referral agreements and/or specifically authorizing the company's conduct with respect to referrals. *Id.* at 721. The facts in *Heastie* vary greatly from those in the present case, since the FDA specifically approved Merck's drug application to allow the marketing and sale of Vioxx.[10] Thus, by its own terms, ICFA does not apply to allegations like plaintiffs' here.

>4.     **The Indiana Plaintiffs, Michelle Biondillo and Stephen Keisker, Fail To State A Cause Of Action Under The Indiana Deceptive Consumer Sales Act.**

Plaintiffs argue that named plaintiffs Biondillo and Keisker state claims under the Indiana Deceptive Consumer Sales Act (the "DCSA") because: (1) they allege a cognizable injury under Indiana law; (2) the DCSA does not include a reliance element; and (3) the learned intermediary does not apply to plaintiffs' claims. (Pls.' Resp. at 35, 41, 46.) All three arguments fail.

First, plaintiffs' argument that the Indiana plaintiffs allege a cognizable injury under the DCSA is without merit. As stated in Merck's opening brief, a plaintiff may bring a claim under the DCSA if he or she has alleges "damages actually suffered as a consumer as a result of the deceptive act." Ind. Code § 24-5-0.5-4(a). Plaintiffs claim that "the mere fact that Plaintiffs have not alleged physical injuries from the ingestion of Vioxx is irrelevant to the instant case, as Plaintiffs have pled that they suffered economic injuries resulting from their purchase of Vioxx." (Pls.' Resp. at 27). However, plaintiffs are unable to cite even one Indiana case to support their

---

[10]     Similarly, in *Sanders v. Lincoln Service Corp.*, No. 91 C 4542, 1993 U.S. Dist. LEXIS 4454 (N.D. Ill. April 5, 1993) (Pls.' Resp. at 51), the court found that the defendant mortgage company was subject to the ICFA because the relevant regulatory authorities did not in any way authorize the defendant to intentionally misstate the terms of its escrow contract with the plaintiff. *Id.* at *11-12. This scenario is quite different from the facts of the present case, since the FDA specifically approved the marketing and sale of Vioxx as a safe and effective drug.

argument.  To the contrary, this argument exposes the very insufficiency in the plaintiffs' allegations:  they do not allege that Vioxx was defective in any way and thus did not suffer an injury as a result of Merck's alleged representations regarding Vioxx's "safety and efficacy."

Second, plaintiffs' argument that the DCSA does not require reliance is contrary to the plain language of the statute.  As stated in Merck's opening brief, the DCSA explicitly states that "[a] person *relying* upon an uncured or incurable deceptive act may bring an action for the damages actually suffered as a consumer as a result of the deceptive act."  Ind. Code § 24-5-0.5-4(a).  Plaintiffs' cases do not contradict the plain language of the statute.  For example, the inquiry in *Perry v. Gulf Stream Coach, Inc.*, 814 N.E.2d 634 (Ind. Ct. App. 2004) (Pls.' Resp. at 42) focused on whether the defendant had engaged in a "deceptive act" under the statute by disseminating a brochure that misrepresented the features of defendant's product.  Contrary to plaintiffs' suggestion, the *Perry* court's failure to address the issue of reliance does not indicate that there is no reliance requirement under the Act, but rather that plaintiffs' reliance on defendant's representations was uncontested.  *See Perry*, 814 N.E.2d at 647-649.

Third, plaintiffs' argument that the learned intermediary doctrine has no application to plaintiffs' claims is also wrong.  *See Ortho Pharm. Corp.  v. Chapman*, 388 N.E.2d 541, 549 (Ind. Ct. App. 1979) (Indiana recognizes the learned intermediary doctrine).  Plaintiffs' attempt to distinguish *Chapman* on the ground that it involved a "failure to warn" case rather than a claim under the DCSA is unavailing.  (Pls.' Resp. at 46 & n.39.)  In *Chapman*, the court held that "[when] drugs are available only by prescription, a manufacturer's duty to warn extends only to the medical profession and not the ultimate users."  388 N.E.2d at 549.  Nowhere in the decision is the doctrine limited to "failure to warn" cases brought under negligence theories.  To the contrary, the court noted that a manufacturer's duty extends only to prescribing physicians

because "[a]s a medical expert, the prescribing physician can take into account the propensities of the drug, as well as the susceptibilities of his patient[;] [h]is is the task of weighing the benefits of any medication against its potential dangers." *Id.* This rationale applies to all claims involving representations regarding the safety and efficacy of prescription drugs regardless of the legal theory under which they are brought. For that reason, other courts have recognized that the learned intermediary doctrine does apply in consumer fraud claims. *See* Section III.B.1, *supra.* Because the Indiana plaintiffs do not allege that Merck failed to adequately warn their doctors of the dangers of Vioxx and that their doctors would not have prescribed the drug if Merck had issued proper warnings, they cannot state a claim under Indiana law.

### 5. Plaintiff Christie Anderson Fails To State A Claim Under The Kentucky Consumer Protection Act.

Plaintiffs argue that Ms. Anderson states a valid claim under Kentucky law because: (1) she alleged an "ascertainable loss" under the Kentucky Consumer Protection Act (the "KCPA"); (2) the learned intermediary doctrine does not apply to her claims; and (3) the KCPA does permit consumer fraud class actions. (Pls.' Resp. at 35, 46, 53.) However, each of plaintiffs' claims is contrary to Kentucky precedent. As set forth in Merck's opening brief, Ms. Anderson's KCPA claims fail for all three independent reasons.

First, Ms. Anderson does not allege a valid injury under Kentucky law because she has not claimed that she was harmed by Vioxx. As explained in Merck's opening brief, the KCPA allows a cause of action for "[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers *any ascertainable loss* of money or property, real or personal, *as a result of* the use or employment by another person of a method, act or practice declared unlawful." Ky. Rev. Stat. Ann. § 367.220(1) (emphasis added). Plaintiffs' allegations that they "paid a high price for Vioxx instead of paying a low price for a

traditional NSAID" because of Merck's alleged conduct – even were this consistent with the allegations of the complaint, *see* Section II, *supra* – are simply not sufficient to claim an ascertainable loss. (Pls.' Resp. at 37-38.) Because Ms. Anderson does not allege that the Vioxx she took failed to reduce her pain or otherwise caused her injury, she has suffered no loss, economic or otherwise, as a result of her purchase and use of Vioxx.

Plaintiffs' attempt to distinguish *Nicholson v. Clark*, 802 S.W.2d 934 (Ky. Ct. App. 1990) (Pls.' Resp. at 36 n.30), is unavailing. In *Nicholson*, the Kentucky Court of Appeals dismissed a claim under the KCPA brought by an owner of real estate against an auctioneer hired to negotiate the sale of the property because there was no evidence that a willing bidder existed who was willing to pay more than the price secured by the defendant-auctioneer. 802 S.W.2d at 939. Plaintiffs argue that *Nicholson* is not applicable because the damages in that case were "impossible to calculate." (Pls.' Resp. at 36.) In fact, however, the case is directly analogous. Like the plaintiff in *Nicholson*, Ms. Anderson claims a loss between the product she expected (in this case, Vioxx) and the product she received (a drug allegedly indistinguishable from traditional NSAIDs). In both cases, plaintiffs received exactly what they bargained for: in Ms. Anderson's case, a drug that relieved her pain without causing physical harm. Thus, Ms. Anderson has not claimed a "cognizable injury" under Kentucky law.

Second, plaintiffs incorrectly argue that the learned intermediary doctrine does not apply to claims brought under the KCPA because the doctrine only applies to product liability and failure-to-warn claims. (Pls.' Resp. at 46.) As set forth in Merck's opening brief, however, Kentucky recognizes the learned intermediary doctrine in cases where a plaintiff alleges that a drug company provided inadequate information about the safety and efficacy of its product. *See Larkin v. Pfizer, Inc.*, 153 S.W.3d 758, 761-62 (Ky. 2004). Nowhere does *Larkin* suggest that

application of the doctrine is limited to failure-to-warn cases.  To the contrary, in noting that "manufacturers lack effective means to communicate directly with each patient" because "patients are unlikely to understand technical and medical information regarding the nature and propensities of prescription drugs," the case suggests that the doctrine applies to all claims based on the alleged inadequacy of communications by a drug manufacturer regarding a prescription drug.  *Id.* at 764 (quotations and citations omitted).  That is the precise allegation made here.  Accordingly, absent an allegation that her prescribing physician would not have prescribed Vioxx but for Merck's allegedly deceptive statements, Ms. Anderson's claim must fail.

Third, plaintiffs' argument that Ms. Anderson is entitled to bring a putative class action under the  KCPA is without merit.  There is an abundance of caselaw supporting Merck's arguments that class actions are unavailable under the KCPA.  *See Arnold v. Microsoft Corp.*, No. 00-CI-00123, 2001 WL 193765, at *6 (Ky. Cir. Ct. July 21, 2000); *In re Phenylopropanolamine Prods. Liab. Litig.*, MDL No. 1407, 2003 U.S. Dist. LEXIS 22530, at *10 n.1 (W.D. Wash. Nov. 5, 2003).  And none of the cases plaintiffs cite hold anything to the contrary.  For example, in both *Ratliff v. Merck SC Co., Inc.,* 359 F. Supp. 2d 571, 578-79 (E.D. Ky. 2005), and *Pope v. Independent Order of Foresters*, Civil Action No. 3:01CV0626-S, 2002 WL 1733606 (W.D. Ky. July 23, 2002) (Pls.' Resp. at 54), the federal courts did not address the propriety of class action claims under the KCPA; rather, those courts simply addressed jurisdictional issues.  For this reason too, plaintiff Anderson's claim should be dismissed.

### 6.     Plaintiffs Frank Saia and Emily Feinberg Fail To State A Claim Under Massachusetts Law.

Plaintiffs argue that Frank Saia and Emily Feinberg state valid claims under the Massachusetts Consumer Protection Act (the "MCPA") because: (1) the statutory exception for conduct authorized by a regulatory body does not apply in this case; and (2) plaintiffs' failure to

allege that they provided Merck thirty days written notice before filing a claim is not a jurisdictional defect. (Pls.' Resp. at 50, 55-56.) Plaintiffs are wrong on both counts.

First, plaintiffs are incorrect in their argument that the MCPA's regulatory exception does not apply to the FDA's approval of the sale of Vioxx.[11]  Massachusetts law explicitly states that the MCPA does not apply to transactions permitted by applicable administrative regulations. *See* Mass Gen. Laws ch. 93A, § 3; *Animal Legal Defense Fund Inc. v. Provimi Veal Corp. ("ALDF")*, 626 F. Supp. 278, 283 (D. Mass. 1986).  Plaintiffs' attempts to distinguish *ALDF* from the present case are not persuasive.  In *ALDF*, plaintiffs alleged that the defendant veal producer misled consumers by failing to disclose how its calves are raised. The court dismissed the claim because the defendant's practices were controlled by federal law and regulated by the Food and Drug Administration (the "FDA").  The court found that the *ALDF* plaintiffs, like the plaintiffs in the present action, did not properly allege in their pleadings that the defendant failed to comply with the FDA regulatory scheme in producing and marketing their products to consumers.  626 F. Supp. at 284.  Plaintiffs claim that *ALDF* is not applicable because, in that case, defendant's conduct "was specifically governed, regulated and authorized" by the FDA. (Pls.' Resp. at 51.)  However, that is precisely the case here, because Merck's conduct in marketing and selling prescription drugs is also specifically regulated by the FDA.

In addition, the cases relied on by the plaintiffs do not contradict Merck's argument that its conduct falls under the exception.  For example, in *Cablevision of Boston, Inc. v. Public Imp. Comm'n*, 38 F. Supp. 2d 46 (D. Mass. 1999) (Pls.' Resp. at 50), the court found that the

---

[11]     Notably, a court in Delaware recently dismissed claims brought against another drug manufacturer based on a similar provision in Delaware's consumer protection statute. *See Pennsylvania Employee Benefit Trust Fund v. Zeneca, Inc.*, No. 05-075-SLR, slip op. at 5 (D. Del. Nov. 8, 2005) (dismissing Delaware CFA claim on the ground that the Delaware statute explicitly excludes "any advertising or merchandising practice which is subject to and complies with the rules and regulations, of and the statutes administered by, the Federal Trade Commission," and that FTC and FDA jointly supervise pharmaceutical advertising (quoting Del. Code Ann. tit. 6, § 2513(b)(2))) (attached as Ex. 1).

defendant was exempted from liability under the Massachusetts Telecommunications Act because its actions were implicitly authorized by the governing regulatory agency. *Id.* at 61. Thus, *Cablevision* reaffirms Merck's argument that the MCA's statutory exception prohibits liability where a defendant's actions have been approved by the relevant regulatory body. And in *Rini v. United Van Lines*, 903 F. Supp. 224 (D. Mass. 1995) (Pls.' Resp. at 50-51), the court merely held that a defendant corporation is not exempted from liability when its actions are in violation of pertinent regulations. *Id.* at 232. Plaintiffs here do not allege that Merck failed to comply with FDA regulations. For this reason alone, the Massachusetts plaintiffs do not have valid claims.

Second, plaintiffs are also misguided in claiming that their failure to allege the submission of a thirty-day demand letter is not a jurisdictional prerequisite to filing an MCA claim. As set forth in Merck's opening brief, the plain language of the statute and the relevant case law both make clear that absent such a demand letter, their claims cannot proceed. *See* Mass. Gen. Laws ch. 93A, § 9(3); *McMahon v. Digital Equip. Corp.*, 944 F. Supp. 70, 77 (D. Mass. 1996) (dismissing plaintiff's 93A claim for failure to allege she sent a demand letter).

Plaintiffs misstate the law in citing *Fredericks v. Rosenblatt*, 667 N.E.2d 287, 289 (Mass. App. Ct. 1996), as "clarifying that 'references in case law to the demand requirement being jurisdictional in nature [are] misplaced.'" (Pls.' Resp. at 56.) In actuality, *Fredericks* recognized only that "the § 9 requirement . . . is not jurisdictional in the sense that a party cannot waive it, and we do not think it is open to the judge to raise the point on his own motion after trial and long after the thirty days have expired." 667 N.E.2d at 289. The case does not contradict Merck's contention that a plaintiff must allege that a demand letter was sent in order to survive a motion to dismiss. For this reason too, the Massachusetts plaintiffs' claims should be dismissed.

### 7.    Plaintiff   Christine   Seitz's   Michigan   Consumer Protection Act Claim Is Barred Under Michigan Law.

Plaintiffs' argument that Ms. Seitz states a claim under the Michigan Consumer Protection Act ("MCPA"), notwithstanding Michigan's bar on all product liability actions involving FDA-approved drugs, Mich. Comp. Laws Ann. § 600.2945, because the purchaser plaintiffs are not pursuing product liability claims (Pls.' Resp. at 52), was recently rejected by a Michigan trial court in a virtually identical case.  Moreover, their effort to refute Merck's argument that plaintiffs cannot state a claim under Michigan law absent an injury (Pls.' Resp. at 35) is contradicted by Michigan Supreme Court authority, and their argument that the learned intermediary doctrine does not apply to Ms. Seitz's claims is contrary to Michigan law and common sense.  Finally, plaintiffs do not even address Merck's argument that the MCPA does not apply to regulated activities like the sale and marketing of FDA-approved drugs.

First, contrary to plaintiffs' arguments, the Michigan bar on suits involving product liability applies to the full gambit of product liability suits, include those like plaintiffs' that are couched as fraud claims.  In fact, a circuit court judge in Michigan recently dismissed a class action on all fours with the claims asserted by Ms. Seitz here.  *See Duronio v. Merck & Co., Inc.*, Case No. 04-434718-CP, slip op. (Mich. Cir. Ct. Wayne County Nov. 22, 2005) (attached as Ex. 2).  In *Duronio*, as in the instant case, the plaintiff asserted that Merck had violated the MCPA based on alleged misrepresentations in the marketing, labeling, and promotion of Vioxx. *See id.*, slip op at 1.  In dismissing the plaintiff's claims, Judge Baxter reasoned that "economic damages arising from fraud and/or the MCPA are legal or equitable theories of liability defined as a product liability action under MCLA § 600.2945(h) and as such defendants are immune from liability under MCLA § 600.2946 (5)." *Id.* at 2. *See also, e.g., Henderson v. Merck & Co., Inc.*, 2005 WL 2600220, at *9 (E.D. Pa. Oct 11, 2005) (applying statute to Michigan plaintiff's

33

"fraud, fraudulent misrepresentation, and negligent misrepresentation claims emanat[ing] from the manner in which defendants sold, advertised, and marketed Bextra to the medical community and the public at large").[12]

Second, plaintiffs barely respond to Merck's arguments that Ms. Seitz has not alleged a cognizable injury.  (Merck Mem. at 39.)  Under the MCPA, only a plaintiff who suffers a "*loss as a result of a violation*" may bring suit.  Mich. Comp. Laws Ann. § 445.911(2) (emphasis added).  *See also Lozada v. Dale Baker Oldsmobile, Inc.*, 136 F. Supp. 2d 719, 728 (W.D. Mich. 2001) (a plaintiff may not recover under the MCPA absent a showing of actual damages); *Henry v. Dow Chem. Co.*, 701 N.W.2d 684, 688 (Mich. 2005) (confirming "the requirement of a present physical injury in the toxic tort context").  Plaintiffs' effort to distinguish Merck's cases on the ground that "the damages claimed were impossible to calculate, unlike the instant case in which damages are simply the difference between the price of Vioxx and the price of over-the-counter NSAIDs multiplied by the amount of Vioxx purchased" misses the point.  (Pls.' Resp. at 36.)  The question is not whether there is a way to calculate damages; rather, the question is whether plaintiff has alleged any injury entitling her to damages.  Like the other plaintiffs in the master complaint, Ms. Seitz has not satisfied that requirement.

Moreover, plaintiffs' argument that the learned intermediary doctrine does not bar Ms. Seitz's claim because the doctrine "applies only to product liability and failure to warn claims," (Pls.' Resp. at 46 & n.39 (citing *Mowery v. Crittenton Hosp.*, 400 N.W.2d 633 (Mich. Ct. App. 1986))), is without merit.  Nowhere does *Mowery* limit the applicability of the learned intermediary doctrine to product liability or failure to warn claims only.  Moreover, courts that

---

[12]     Nor does the fact that plaintiff Seitz complains of Merck's sales practices undermine that conclusion.  Rather, the statute applies broadly to suits involving the "manufacture, construction, design, formulation, development of standards, preparation, processing, assembly, inspection, testing, listing, certifying, warning, instructing, *marketing, selling, advertising,* packaging, or labeling."   Mich. Comp. Laws Ann. § 600.2945(i) (emphasis added).

have specifically addressed the issue have held that the learned intermediary doctrine does apply to consumer fraud claims.  *See* Section III.B.1, *supra*.  In short, absent an allegation that Ms. Seitz's prescribing physician would not have prescribed Vioxx but for Merck's allegedly deceptive statements, her claims must be dismissed for failure to allege causation.

Finally, plaintiffs do not even attempt to refute Merck's contentions that the MCPA does not apply to regulated industries (Merck. Mem. at 39) and thus apparently concede that Ms. Seitz's claims must be dismissed on this basis.

### 8.    Plaintiff Sara Cheeseman Does Not State A Claim For Consumer Fraud Under Vermont Law.

Plaintiffs argue that Ms. Cheeseman states a claim for consumer fraud under Vermont law because: (1) reliance is not an element of a claim under the Vermont Consumer Fraud Act ("VCFA"); and (2) they have adequately pled causation because Vermont would not adopt the learned intermediary doctrine if presented with the issue.  (Pls.' Resp. at 44, 47 n.40.)  Plaintiffs are wrong on both counts.

It is clear from the plain language of the statute that plaintiffs must plead reliance to bring a valid claim under the VCFA *unless* they allege an injury or damages – which they have not – in which case only causation must be alleged..  *See* Vt. Stat. Ann. tit. 9, § 2461(b) (consumer may bring a claim under the VCFA if he "contracts for goods or services *in reliance upon* false or fraudulent representations or practices . . . *or [] sustains damages or injury as a result of* any false or fraudulent representations or practices") (emphasis added).  *See also Carter v. Gugliuzzi*, 716 A.2d 17, 21 (Vt. 1998) (the VCFA "provides a remedy for any consumer who contracts for goods or services and, in reliance upon false or fraudulent representations or promises, sustains damages or injury").  Plaintiffs have pled neither.  Indeed, plaintiff Cheeseman has not identified any Merck representation or practice upon which she relied, or which otherwise caused her to

purchase Vioxx. Moreover, plaintiffs concede that they have not alleged reliance in their complaint. (*See* Pls' Resp. at 44 ("reliance is not an element of a claim under the VCFA.").) Plaintiffs' cases are not to the contrary. *Goldman v. Town of Plainfield*, 762 A.2d 854, 857 (Vt. 2000), did not address reliance or causation at all, but merely described the required proof to establish that a statement was deceptive and therefore actionable. It did not hold that reliance or causation can be measured objectively. Similarly, *Peabody v. P.J.'s Auto Village*, 569 A.2d 460 (Vt. 1989), did not purport to write reliance and causation out of the statute, but addressed only the measure of whether a statement is deceptive.

Alternatively, Ms. Cheeseman has not pled causation under the statute because the learned intermediary doctrine prohibits her claim. While plaintiffs argue that Vermont would not adopt the learned intermediary doctrine (Pls.' Resp. at 47 n.40), all evidence is to the contrary. As Merck asserted in its opening brief, Vermont is likely to adopt the doctrine because Vermont has adopted the principles from which the learned intermediary doctrine has evolved, found in section 402A of the Restatement (Second) of Torts, and has relied on several comments from that section. *See Paquette v. Deere & Co.*, 719 A.2d 410, 412 (Vt. 1998). *Cf. Ehlis v. Shire Richwood, Inc.*, 367 F.3d 1013, 1017 (8th Cir. 2004). Moreover, courts that have specifically addressed whether the doctrine applies to consumer fraud claims have held that the learned intermediary doctrine operates to defeat such a claim where, as here, plaintiffs allege a failure to warn. *See* Section III.B.1, *supra*. Because plaintiffs do not allege that their prescribing physicians would not have prescribed Vioxx but for Merck's allegedly deceptive statements, Ms. Cheeseman's claims would be barred by the learned intermediary doctrine, and her claim must be dismissed for this reason too.

9.     **Plaintiff Brenda Aguero Does Not State A Claim Under Washington Law.**

Plaintiffs argue that Ms. Aguero states a claim for consumer fraud under Washington law because: (1) Ms. Aguero has alleged a "cognizable injury" under the Washington Consumer Protection Act ("WCPA"), and (2) Ms. Aguero has properly alleged causation under the WCPA. (Pls.' Resp. at 35, 46.) Once again, plaintiffs have misinterpreted the applicable law.

First, without analysis or citation to a single Washington case, plaintiffs assert that "the mere fact that Plaintiffs have not alleged physical injuries from the ingestion of Vioxx is irrelevant to the instant case, as Plaintiffs have pled that they suffered economic injuries resulting from their purchase of Vioxx." (Pls.' Resp. at 27.) In support of this argument, plaintiffs assert – as they do with regard to other states – that this case "is not based on a defect in [Vioxx] but rather a misrepresentation by Merck about the drug safety and efficacy." (*Id.* at 36.) However, this assertion exposes the very insufficiency in Ms. Aguero's allegations: she is not alleging that Vioxx was defective in any way and thus did not suffer an injury as a result of Merck's representations regarding Vioxx's "safety and efficacy."

Plaintiffs' reliance on the class certification decision in *Microsoft Corp. v. Manning*, 914 S.W.2d 602 (Tex. App. 1995) (Pls.' Resp. at 46) is misplaced. In that case, a Texas appellate court, interpreting the WCPA, held that plaintiffs had alleged a sufficient injury under the WCPA because the "mere purchase of a defective product constitutes the purported injury." *Id.* at 610. Specifically at issue in *Manning* was a faulty disk compression software program that did not "perform as promised." *Id.* Critically, though, the court found that it was not necessary for plaintiffs to prove a loss of data as a result of the defect "if [they] could prove that an individual defect exists in *all* original . . . software." *Id.* at 609. In other words, plaintiffs could recover only if they proved that damage due to a defect was a certainty; the court saw no need to put

plaintiffs through a pointless exercise when the result was inevitable.  Here, however, plaintiffs concede that the Vioxx purchased was not defective in any way.  (*See* Pls.' Resp. at 36 (stating that this case "is not based on a defect in [Vioxx]").)  Even if they did allege a defect, they could not allege that it would manifest itself in every single person who ingests it – the threshold announced by the *Manning* court.  Accordingly, *Manning* is inapposite.

Plaintiffs' attempt to distinguish *Cooper's Mobile Homes, Inc. v. Simmons*, 617 P.2d 415 (Wash. 1980) (Pls.' Resp. at 36 & n.29) is also unavailing.  Plaintiffs contend that *Cooper's Mobile Homes* is inapposite because that case involved "an alleged defect [that] never manifested itself in a vehicle and plaintiff's claim was based on the vehicle's potential to be defective" whereas in the instant case "Plaintiff's claims are not based on a defect" in Vioxx. (Pls.' Resp. at 36.)  In fact, however, *Cooper's Mobile Homes* merely confirms that Ms. Aguero has failed to state a claim under the WCPA.

In *Cooper's Mobile Homes*, the Washington Supreme Court held that the plaintiffs could not present their WCPA claims to a jury because they failed to show that the defendant's allegedly deceptive acts "caused them any injury."  617 P.2d at 420.  As in the present case, the plaintiffs in *Cooper's Mobile Homes* made numerous allegations under the WCPA that they had been deceived and injured with respect to the purchase of a mobile home.  *Id.* at 420-21.  The court concluded, however, that the plaintiffs had essentially received the mobile home they had bargained for and any differences between the mobile home on the seller's lot and the mobile home actually delivered were "minor."  *Id.* at 420.  The same is true here.  Plaintiffs received precisely what they bargained for:  a drug that relieved their pain without causing any physical injury.  Accordingly, Ms. Aguero has failed to allege a "cognizable injury" under the WCPA.

Plaintiffs' second argument – that Ms. Aguero has "properly alleged that Defendant's misrepresentations and material omissions caused Plaintiffs to purchase Vioxx, which subsequently damaged Plaintiffs" (Pls.' Resp. at 46) – is also contrary to law.  Plaintiffs rely on *Mayer v. Sto Indus.*, 98 P.3d 116 (Wash. Ct. App. 2004) to support their assertion that causation under the WCPA can be established where a defendant induces a plaintiff to act.  (Pls.' Resp. at 45-46.)  However, the facts of *Mayer* demonstrate the precise opposite – that Ms. Aguero has failed to establish causation under the WCPA.  In concluding that the plaintiff had stated a claim under the WCPA, the court in *Mayer* specifically observed that the plaintiff "relied on the written material [the defendant] supplied.  Thus, the [plaintiff] proved that [defendant's] deceptive marketing techniques led to their injury."  *Mayer*, 98 P.3d at 122.  Here, Ms. Aguero does not allege that Merck failed to provide her physician with information about Vioxx that proximately caused her physician to prescribe her this drug as opposed to another.

Moreover, plaintiffs' argument that the learned intermediary doctrine does not apply to Ms. Aguero's claims is without merit.  (Pls.' Resp. at 46.)  As set forth in Merck's opening brief, Washington has recognized the learned intermediary doctrine.  *Terhune v. A. H. Robins Co.*, 577 P.2d 975, 978 (Wash. 1978).  Because Ms. Aguero does not allege that Merck failed to provide her physician with information about Vioxx that proximately caused the physician to prescribe her this drug as opposed to another, her claim must be dismissed.  Plaintiffs' attempt to distinguish *Terhune* on the grounds that it is a failure to warn or product liability case – as opposed to a WCPA action (Pls.' Resp. at 46 & n.39) – is unpersuasive.  Nowhere does *Terhune* limit the applicability of the doctrine to failure to warn or product liability actions, and as discussed above, such an approach would be contrary to the policies underlying the learned intermediary doctrine.  *See* Section III.B.1, *supra*.

39

> **10.    If New Jersey Law Governed Plaintiffs' Claims, None Of Them Would State A Cause Of Action.**

Although there are no New Jersey named plaintiffs, plaintiffs argue for the universal application of New Jersey law to this action.  As explained *supra*, plaintiffs' choice-of-law approach is contrary to the overwhelming weight of authority.  However, even if New Jersey law did have such universal application, plaintiffs have still failed to state a claim under that state's law.

Plaintiffs contend they have properly stated a claim under the New Jersey Consumer Fraud Act ("NJCFA") because:  (1) plaintiffs have adequately alleged an "ascertainable loss," and (2) plaintiffs have properly pled causation.  (Pls.' Resp. at 22.)  Both of these arguments are wrong.

First, contrary to plaintiffs' contention, the fact that they have suffered no physical injury from their ingestion of Vioxx and do not contend that Vioxx failed to relieve their pain dooms their claim under the NJCFA.  As noted in Merck's opening brief, a claimant may not recover damages under the NJCFA unless the defendant caused the plaintiff an "ascertainable loss."  *See Cannon v. Cherry Hill Toyota, Inc.*, 161 F. Supp. 2d 362, 373 (D.N.J. 2001) ("[S]imply showing a violation of NJCFA is not enough to entitle a plaintiff to damages under that Act.").  In *Heindel v. Pfizer, Inc.*, 381 F. Supp. 2d 364 (D.N.J. 2004), a federal district court in New Jersey considered and rejected claims similar to those plaintiffs make here on this very ground.  The plaintiffs in *Heindel* brought suit on the basis of various studies that allegedly showed that Vioxx and Celebrex were less safe than the plaintiffs had previously believed.  *See id.* at 366.  Like plaintiffs here, the *Heindel* plaintiffs did not allege they suffered any injuries and did not argue that the drugs were ineffective.  The district court rejected the plaintiffs' claims, finding that the

plaintiffs had not suffered any "ascertainable loss" because they did not allege that they suffered any injuries or that the drugs did not effectively relieve their pain.[13]  *Id.* at 380.

Plaintiffs' cases are not to the contrary.  For example, in *Desiano v. Warner-Lambert Co.*, 326 F.3d 339 (2d Cir. 2003), certain insurance companies argued their injuries were not "derivative" of the injuries of end users of the diabetes medication Rezulin and, therefore, such companies had standing to sue the drug manufacturer.  *Id.* at 349.  As in this case, plaintiffs in *Desiano* alleged that a drug (Rezulin) had undisclosed negative side-effects.  *Id.* at 344.  But the plaintiffs in that case *also* alleged that Rezulin was no more effective than competing diabetes drugs, contrary to defendant's advertising claims.  *Id.* at 341-42.  In other words, the *Desiano* plaintiffs alleged that the entire basis of Rezulin's higher cost was illusory, irrespective of side-effects.  Plaintiffs here make no analogous allegation, and *Desiano* does not control.[14]

Moreover, the bare assertion that a product is simply "worth less" due to an alleged defect that never manifested itself to the plaintiff is insufficient to show that Merck caused a compensable injury under the NJCFA.  Again, the cases cited by plaintiff are not to the contrary. In *Thiedemann v. Mercedes-Benz USA, LLC*, 872 A.2d 783, (N.J. 2005) (Pls.' Resp. at 29), plaintiffs brought an action under the NJCFA seeking out-of-pocket costs based on allegations that their vehicles "contained a serious and hazardous latent design defect."  *Id.* at 786. However, in reversing the appellate court's decision and entering judgment for the defendant, the

---

[13]     The *Heindel* court considered whether the plaintiffs suffered an "ascertainable loss" under the Pennsylvania Unfair Trade Practices and Consumer Protection law.  381 F. Supp. 2d at 379.  *Heindel*'s discussion of what constitutes an ascertainable loss under Pennsylvania law is useful in interpreting New Jersey law because both states' consumer fraud statutes require an "ascertainable loss."  *See id.* at *373.  Indeed, the *Heindel* court specifically noted that the plaintiffs' claims would be precluded under both Pennsylvania and New Jersey law.  *See id.* at 381 n.7.

[14]     The distinction is an important one because tort remedies are available to compensate anyone who actually suffered a physical injury from ingesting Vioxx.  Once injuries from alleged side-effects are remedied, plaintiffs experience no loss provided they have otherwise received the promised benefits of the product, as all plaintiffs here have.  *Cf. Thiedemann v. Mercedes Benz USA, LLC*, 872 A.2d 783, 795 (N.J. 2005) (refusing to find loss when fuel-gauge problems were covered under warranty because plaintiffs "had no out-of-pocket loss attributable to that alleged defect").

New Jersey Supreme Court rejected plaintiffs' theory on ascertainable loss when it observed that "plaintiff must proffer evidence of loss that is not hypothetical or illusory." *Id.* at 792.

Plaintiffs' reliance on *Furst v. Einstein Moomjy, Inc.*, 860 A.2d 435 (N.J. 2004) (Pls.' Resp. at 29), is also misplaced. *Furst* involved an NJCFA claim where plaintiff alleged he had been sold a defective carpet. Specifically, the plaintiff in *Furst* "noticed that the carpet was damaged and smaller than the size indicated on the sales invoice." 860 A.2d at 439. Accordingly, the court determined that "when a merchant violates the Consumer Fraud Act by delivering defective goods and then refusing to provide conforming goods, a customer's ascertainable loss is the replacement value of those goods." *Id.* at 440. Unlike the plaintiff in *Furst*, however, plaintiffs in this litigation make no allegation that Vioxx is defective or caused them harm in any way. (Pls.' Resp. at 36 (this case "is not based on a defect in [Vioxx]").) Accordingly, none of plaintiffs' cases refute Merck's argument that they have not suffered an ascertainable loss.

Plaintiffs also half-heartedly argue that they need not "prove that they were physically harmed or that Vioxx did not relieve their pain" because they have alleged that Merck engaged in "unconscionable commercial practices." (Pls.' Resp. at 30 (citing Master Complaint ¶ 204(d)).) Not surprisingly, the cases cited by plaintiff do not support their attempt to rewrite the plain language of the statute. *Fenwick v. Kay American Jeep, Inc.*, 371 A.2d 13 (N.J. 1977) (Pls.' Resp. at 30), involved allegations that a motor vehicle advertiser failed to disclose the bona fide odometer reading in an advertisement for the sale of a used automobile. *Id.* at 14. The court held that "a showing of intent" was not required to sustain the allegations of unconscionable commercial practices. *Id.* at 16. Nowhere does the *Fenwick* court suggest, as plaintiffs do here, that allegations of unconscionable commercial practices obviate the requirement that a claimant

must allege an ascertainable loss to state a claim under the NJCFA.  *See also Island Mortgages v. 3M*, 860 A.2d 1013, 1016 (N.J. Super. Ct. Law Div. 2004) (granting motion to dismiss NJCFA claim for failure to allege a violation of the Act; "[p]laintiffs have failed to set forth any factual allegation that would satisfy the requirement that a claim for unconscionable commercial practices demonstrate 'a capacity to mislead.'"); *Leon v. Rite Aid Corp.*, 774 A.2d 674, 680 (N.J. Super. Ct. App. Div. 2001) (analyzing whether or not defendant pharmacy's pricing system for prescription drugs was a violation of the NJCFA and separately concluding – without analysis – that there was "no basis for the trial court's concern that plaintiff has not shown a specific ascertainable loss").

Second, plaintiffs are incorrect in arguing that they have adequately alleged causation notwithstanding the learned intermediary doctrine.  As noted in Merck's opening brief, a prescription drug manufacturer's duty to warn runs to the prescribing physician, not the patient. N.J. Stat. Ann. § 2A:58C-4.  *See Niemiera v. Schneider*, 555 A.2d 1112, 1117 (N.J. 1989) ("In New Jersey, as elsewhere, we accept the proposition that a pharmaceutical manufacturer generally discharges its duty to warn the ultimate user of prescription drugs by supplying physicians with information about the drug's dangerous propensities.").[15]  Accordingly, claims such as those brought by plaintiffs here can only proceed if they allege that plaintiffs' physicians would not have prescribed Vioxx but for the alleged fraud.  Notwithstanding plaintiffs' assertions, *Perez v. Wyeth Laboratories*, 734 A.2d 1245 (N.J. 1999), does not require a different result.  *Perez* involved products liability claims regarding the reversible contraceptive Norplant.

---

[15]     Plaintiffs' attempt to distinguish *Niemiera* on grounds that the learned intermediary doctrine "applies only to product liability and failure to warn claims" (Pls.' Resp. at 46 & n.39), and not claims under the NJCFA, is without merit.  Nowhere does *Niemiera* limit the applicability of the learned intermediary doctrine to product liability or failure to warn claims.  As discussed above, such an approach is contrary to the policies underlying the learned intermediary doctrine and has been rejected by the few courts that have addressed this issue.  *See* Section III.B.1, *supra*.

Though the *Perez* court concluded that an exception to the learned intermediary doctrine is appropriate where pharmaceutical companies engage in direct-to-consumer advertising, the rationale in *Perez* is inapplicable here because there is no allegation that any of the plaintiffs viewed Merck's advertisements regarding Vioxx. Having rejected defendant's argument that the court "should refrain from deciding whether the learned intermediary doctrine applies because these plaintiffs did not say that they had been influenced by defective advertising of Norplant," *id.* at 1260, the *Perez* court essentially admitted its decision was made in the abstract.

Moreover, the reasoning in *Perez* relied upon the elective nature of the contraceptive prescription drug at issue in that litigation. *See* 734 A.2d at 1256 ("Concerns regarding patients' communication with and access to physicians are magnified in the context of medicines and medical devices furnished to women for reproductive decisions."). Indeed, the court specifically observed that "lifestyle drugs" and other treatments that are not "medically necessary," such as the Norplant contraceptive device, require greater consumer protection because these types of elective treatments may cause significant side effects without "any curative effect." *Id.* at 1257. In the instant case, plaintiffs do not dispute Vioxx's curative effect, and, in any event, Vioxx cannot be categorized as a "life style" drug similar to those discussed in *Perez*: contraceptives, allergy medicines, hair loss remedies, and treatments for male impotence. *Id.* at 1251-52. Accordingly, the rationale in *Perez* simply has no applicability in the instant case, where there is no allegation that plaintiffs actually viewed Merck's advertisements and where the prescription drug at issue cannot be described as a "lifestyle" drug.

Even if the Court were to conclude the rationale in *Perez* applied to the instant case – which it does not – plaintiffs have still failed to establish causation because the *Perez* court further concluded that compliance with FDA regulations with respect to consumer advertising

establishes a rebuttable presumption that any duty to warn consumers has been met. 734 A.2d at 1259. The court observed that "a rebuttable presumption that the duty to consumers is met by compliance with FDA regulations helps to ensure that manufacturers are not made guarantors against remotely possible, but not scientifically-verifiable, side-effects of prescription drugs." *Id.* According to *Perez*, compliance with FDA regulations is "compelling evidence" that a drug manufacturer has satisfied its duty to warn consumers. *Id.* Thus, even if the learned intermediary doctrine did not apply to plaintiffs' claims under the NJCFA, Merck has still discharged its duty to warn as a result of its compliance with FDA regulations regarding the marketing and labeling of Vioxx. For this reason too, plaintiffs' claims fail under New Jersey law.

### C.      The Third-Party Payor Plaintiffs' Consumer Protection Act Claims Fail.

The third-party payor plaintiffs similarly fail to rebut Merck's motion to dismiss arguments. As set forth below, their claims fail not only for most of the reasons set forth above, but also because many consumer fraud statutes bar claims by business entities.

### 1.      Cavalier Homes, Inc., Cannot State A Claim Under The Alabama Deceptive Trade Practices Act.

Plaintiffs argue that Cavalier Homes, Inc. ("CHI") has a valid class claim under the Alabama Deceptive Trade Practices Act (the "ADTPA") because: (1) the ADTPA's bar on class actions does not apply in this case; (2) CHI has standing to bring a claim under ADTPA; (3) CHI properly states a claim for "actual damages" under Alabama law; and (4) CHI validly alleges causation because the learned intermediary doctrine is not applicable in this case. (Pls.' Resp. at 35, 55, 58-59.) All of plaintiffs' arguments are without merit, and the Alabama plaintiff's claims fail for each of these four independent reasons.

First, plaintiffs' argument that a class action may be brought under the ADTPA is wholly unsubstantiated.  As Merck explained in its opening brief, the plain language of the Act clearly states that "[a] consumer or other person bringing an action under this chapter may not bring an action on behalf of a class."  Ala. Code § 8-19-10(f).  Plaintiffs do not cite a single case in support of their claim that the ADTPA's explicit prohibition on class actions is a mere "procedural rule," rather than a substantive bar to such suits.  (Pls.' Resp. at 55.)  Thus, plaintiffs do not refute Merck's argument that CHI's claim may not proceed on a classwide basis.

Second, plaintiffs incorrectly argue that CHI has standing as a "consumer" under the ADTPA.  Plaintiffs assert that, as a third-party payor, CHI has a valid claim for economic injuries because the corporation functioned as a purchaser in the market for Vioxx.  (Pls.' Resp. at 59.)  However, as Merck explained in its opening brief, it is clear from the plain language of the Act and relevant case law that application of the ADTPA is limited to "[a]ny *natural person who buys goods or services for personal, family, or household use*."  Ala. Code § 8-19-3(2) (emphasis added); *In re Vitamins Antitrust Litig.*, MDL No. 1285, 2001 U.S. Dist. LEXIS 25072, at *24 (D.D.C. Mar. 13, 2001); *EBSCO Indus., Inc.* v. *LMN Enters. Inc.*, 89 F. Supp. 2d 1248, 1266 (N.D. Ala. 2000).

Plaintiffs' attempt to distinguish their claim from the facts in *In re Vitamins* is unsuccessful.  (Pls.' Resp. at 59.)  In that case, the court dismissed a claim under the ADTPA because the plaintiffs were not consumers, but rather indirect purchasers who were injured only "in their business" by paying more for the defendant's vitamin products than they would have absent alleged unfair trade practices.  *In re Vitamins*, 2001 U.S. Dist. LEXIS 25072, at *20-21. *In re Vitamins* is directly analogous to the circumstances in the present case because the only damage CHI alleges is economic injury equal to the difference between Vioxx's sale price and

46

the price of NSAIDs CHI claims it would have purchased, in its business capacity, absent Merck's alleged misrepresentations.  Contrary to plaintiffs' argument, there is also no distinction between CHI's claims and the ADTPA claims dismissed by the court in *EBSCO*.  (Pls.' Resp. at 59-60.)  In *EBSCO*, the court held that plaintiffs were not consumers under ADTPA because:  (a) they were corporate entities rather than natural persons, and (b) they did not buy defendant's product for personal or household use. 89 F. Supp. 2d at 1266.  The same is true here.

Moreover, none of plaintiffs' cases support the proposition that third-party payors are "consumers" for the purpose of establishing a claim under ADTPA.  For example, *Kartell M.D. v. Blue Shield of Mass., Inc.*, 749 F.2d 922 (1st Cir. 1984) (Pls.' Resp. at 59), is an antitrust case that addressed the issue of alleged Sherman Act violations resulting from insurance payment schemes.  There, the court merely held that the distinction between "insurance reimbursement" and "purchasing" was "irrelevant for antitrust purposes."  *Id.* at 926.  Similarly, *In re Synthroid Mktg. Litig.*, 264 F.3d 712 (7th Cir. 2001) (Pls.' Resp. at 59), merely addressed whether settlement was proper in a consumer fraud case.  It does not stand for the proposition that TPPs should be considered "consumers."  In fact, when placed in context, the quote plaintiffs selectively cite from *Synthroid* actually undermines plaintiffs' argument by emphasizing that "*[u]nlike* members of the consumer class, TPPs are sophisticated purchasers of pharmaceuticals." *In re Synthoid*, 264 F.3d at 717 (emphasis added).  (*Cf.* Pls.' Resp. at 59.)  As a result, plaintiffs are unable to rebut Merck's argument that third-party payors lack standing to bring claims under the ADTPA because they are not "consumers" as defined by the Act.

Third, CHI cannot sustain a claim under Alabama law because it fails to allege actual damages.  As explained in Merck's opening brief, it is evident from the statutory language and relevant case law that a plaintiff must plead actual economic damages to sustain a claim under

the ADTPA.  *See* Ala. Code § 8-19-10(a); *Ford Motor Co. v. Rice*, 726 So. 2d 626, 629 (Ala. 1998); *Billions v. White & Stafford Furniture Co.*, 528 So. 2d 878, 880 (Ala. Civ. App. 1988). Numerous courts around the nation have held that no actual damage exists where a product serves its purpose and is not defective.  *See Briehl v. Gen. Motors Corp.*, 172 F.3d 623, 627 (8th Cir. 1999).  Plaintiffs' attempts to distinguish these authorities are unavailing.  For example, plaintiffs question the applicability of *Rice*.  (Pls.' Resp. at 36 n.28.)  In *Rice*, the plaintiffs claimed economic injury in the form of lost value based on the allegation that their vehicles had a greater risk of roll-overs than plaintiffs had believed at the time of sale.  726 So. 2d at 631. The plaintiffs in *Rice* admitted that their vehicles had not actually rolled over and merely alleged that it carried a risk of doing so in the future.  In reaching its decision, the Alabama court held that "it is well established that purchasers of an allegedly defective product have no legally recognizable claim where the alleged defect has not manifested itself in the product they own." *Id*. at 629 (quotations and citations omitted).  That principle bars CHI's claims here.

Plaintiffs also attempt to distinguish *Billions* on the ground that its holding derives from "idiosyncratic facts." (Pls.' Resp. at 37.)  The plaintiff in *Billions*, like CHI, brought suit under the ADTPA claiming economic loss where defendants took a security interest in a different piece of his property than was agreed upon by the parties.  529 So. 2d at 880.  The crux of the court's holding, however, was its establishment of a "test for a private right of action under the [ADTPA]," stating that there is no valid claim under the Act where "[t]here has been no showing by [plaintiff] that he suffered any monetary damages as a result of . . . error on the part of [defendant]." *Id.*  Similarly, because CHI never alleges that the Vioxx it paid for failed to relieve pain or caused any injury, the Alabama corporation cannot show that it suffered any real monetary damages.

Finally, contrary to plaintiffs' contention, CHI does not adequately allege causation under the learned intermediary doctrine.  Because plaintiffs do not dispute Merck's argument that CHI cannot proceed under a "fraud on the market" theory of causation, CHI must allege that Merck's alleged misrepresentations directly caused the corporation injury.  (Pl. Mem at 38.)  As set forth in Merck's opening brief, Alabama case law establishes that the learned intermediary doctrine applies in cases where a plaintiff alleges that a drug company provided inadequate information about the safety and efficacy of their product.  *See Stone v. Smith Kline & French Labs.*, 447 So. 2d 1301, 1305 (Ala. 1984) (holding that "[p]harmaceutical companies . . . in selling prescription drugs are required to warn only the prescribing physician, who acts as a 'learned intermediary' between manufacturer and consumer.").  Thus, CHI must allege that Merck failed to adequately warn its plan participants of the alleged dangers of Vioxx and that their physicians would not have prescribed Vioxx had they been adequately warned.  Plaintiffs make no such allegations.

Plaintiffs' attempt to distinguish *Stone* on the basis that it is a "failure to warn" case instead of an action under the ADTPA (Pls.' Resp. at 46 & n.39) is unpersuasive.  In *Stone*, as in the present action, the inquiry focused on the alleged inadequacy of communications made by a drug manufacturer regarding a prescription drug.  In resolving the issue, the court specifically acknowledged that the doctrine applies in cases involving prescription drugs because they are "likely to be complex medicines, esoteric in formula and varied in effect[;] [a]s a medical expert, the prescribing physician can take into account the propensities of the drug as well as the susceptibilities of his patient."  *Stone*, 447 So. 2d at 1305.  Thus, the learned intermediary doctrine also bars CHI's claims under Alabama law.

**2.      AFSCME Fails To State A Claim Under District Of Columbia Law.**

Named plaintiff American Federation of State, County, and Municipal Employees ALCIO ("AFSCME") erroneously contends that the definition of "consumer" in D.C. Code § 28-3901 ("the Act") bars only resellers from bringing claims.  (Pl. Resp. at 60.)  The "consumer" definition, however, also bars claims by third-party payors, such as AFSCME.

The D.C. Act is intended to protect "consumers" – defined as those who purchase products for personal use – from unfair practices.  *See* § 28-3901(a)(2).  Courts in the District of Columbia have held that "[t]ransactions along the distribution chain that do not involve *the ultimate retail customer* are not 'consumer transactions' that the Act seeks to reach.  Rather, it is the ultimate retail transaction between the final distributor and the *individual member of the consuming public* that the Act covers." *Adam A. Weschler & Son, Inc. v. Klank*, 561 A.2d 1003, 1005 (D.C. 1989) (emphasis added).  Thus, the Act seeks to protect the individuals who buy and use the product, not third-party payors who subsidize the purchases.  Because AFSCME is a third-party payor (Purchase Claims Compl. ¶ 34), it is not a "consumer" within the meaning of the Act and is thus precluded from bringing a claim.

Plaintiff cites inapposite case law to support its assertion that third-party payors qualify as protected consumers within the meaning of the Act.  For example, although *Independent Communications Network, Inc. v. MCI Telecommc'ns Corp.*, 657 F. Supp. 785 (D.D.C. 1987), held that resellers were not "consumers" within the meaning of the Act (Pl. Resp. at 60),  it did not hold that resellers were the *only* group excluded by the "consumer" definition.  *Indep. Commc'ns*, 657 F. Supp. at 787-88.  Rather, the court merely indicated that resellers were *one* group that was excluded from the Act's aegis.  *See id.* at 787-88.  Thus, *Independent*