FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 JAN 12   PM 12: 57

LORETTA G. WHYTE
CLERK

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| | * | **JUDGE FALLON** |
| **This document relates to All Personal** | * | |
| **Injury Class Action Complaints Pending** | * | **MAGISTRATE JUDGE** |
| **KNOWLES** | | |
| or Subject to Transfer to MDL 1657 | * | |
| | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## DEFENDANT MERCK & CO., INC.'S OPPOSITION TO PLAINTIFFS' STEERING COMMITTEE'S MOTION FOR CLASS CERTIFICATION OF A NATION-WIDE CLASS ACTION FOR PERSONAL INJURY AND WRONGFUL DEATH

___ Fee_____
___ Process_____
_X_ Dktd_____
___ CtRmDep_____
___ Doc. No _____

**TABLE OF CONTENTS**

Page

FACTUAL BACKGROUND............................................................................................2

ARGUMENT...................................................................................................................5

I.      PLAINTIFFS' PROPOSED CLASS FAILS TO SATISFY THE RULE 23
TYPICALITY, PREDOMINANCE AND SUPERIORITY REQUIREMENTS
BECAUSE THE PROPOSED CLASS MEMBERS' CLAIMS PRESENT
OVERWHELMING FACTUAL VARIATIONS................................................5

      A.    As A General Rule, Pharmaceutical Product Liability Actions Cannot Be
Afforded Class Treatment.............................................................................6

      B.    Plaintiffs' Bifurcation Proposal Does Not Resolve The Predominance And
Superiority Problems Posed By Their Proposal.........................................13

            1.    Plaintiffs Cannot Evade The Predominance Requirement By
Bifurcating Common And Individual Issues. ...........................16

            2.    Phase One Of Plaintiffs' Trial Plan Would Itself Involve Highly
Individualized Inquiries. ..........................................................18

                  a.    In Order To Determine Whether Merck Is Liable, A Jury
Would Have To Undertake Numerous Fact-Specific,
Individualized Inquiries Regarding The Circumstances Of
Each Plaintiff's Vioxx Prescription. ..............................19

                  b.    A Determination Of Whether Merck's Advertising Vitiated
The Learned Intermediary Doctrine (Even Accepting
Plaintiffs' Legal Premise) Would Also Be Highly
Individualized. ..............................................................33

            3.    Plaintiffs' Bifurcated Trial Plan Does Not Satisfy Rule 23(b)(3)'s
Superiority Requirement. ..........................................................35

      C.    Plaintiffs' Proposal Is Barred By The Seventh Amendment. ...................39

II.     PLAINTIFFS' PROPOSED NATIONWIDE CLASS FAILS FOR THE
ADDITIONAL REASON THAT INDIVIDUALIZED LEGAL ISSUES WILL
"SWAMP" ANY COMMON ISSUES OF LAW OR FACT...........................41

      A.    New Jersey's Governmental Interest Choice-Of-Law Approach Requires
Application Of The Laws Of Fifty States. ................................................42

      B.    Plaintiffs' Proposed Choice-of-Law Approach Also Raises Constitutional
Concerns. ...................................................................................................49

      C.    The Legal Variations Posed By Plaintiffs' Nationwide Class Preclude A
Finding Of Predominance Or Superiority..................................................51

III.    PLAINTIFFS' CLASS PROPOSAL IS NOT A SUPERIOR WAY OF
ADJUDICATING THEIR CLAIMS FOR THE ADDITIONAL REASON THAT
THE VIOXX LITIGATION IS NOT SUFFICIENTLY MATURE TO PROVIDE
A BASIS FOR CERTIFICATION. ...............................................................53

CONCLUSION.............................................................................................................55

**TABLE OF AUTHORITIES**

## CASES

*Abbent v. Eastman Kodak Co.*,
No. 90CV3436, 1992 WL 1472751 (D.N.J. Aug. 28, 1992) ...................................................... 9

*Alabama v. Blue Bird Body Co., Inc.*,
573 F.2d 309 (5th Cir. 1978) ............................................................................................... 36, 39

*Albertson v. Wyeth, Inc.*,
63 Pa. D. & C. 4th 514 (Phila. Ct. Com. Pl. 2003) ...................................................... 33

*Allison v. Citgo Petroleum Corp.*,
151 F.3d 402 (5th Cir. 1998) ............................................................................................... 16

*Amchem Prods. v. Windsor*,
521 U.S. 591 (1997) ........................................................................................................... 9, 13

*Appleby v. Glaxo Wellcome, Inc.*,
No. Civ. 04-0062 RBK, 2005 WL 3440440 (D.N.J. Dec. 13, 2005) ................................ 34, 35

*Arch v. Am. Tobacco Co., Inc.*,
175 F.R.D. 469 (E.D. Pa. 1997) ............................................................................................ 54

*Bacon v. Honda of Am. Mfg.*,
205 F.R.D. 466 (S.D. Ohio 2001) ...................................................................................... 16, 39

*Barela v. Showa Denko K.K.*,
No. CIV. 93-1469 LH/RLP, 1996 WL 316544, at *2 (D.N.M. Feb.
28, 1996) ............................................................................................................................. 9

*Barnes v. Am. Tobacco Co.*,
161 F.3d 127 (3d Cir. 1998) ............................................................................................... 9

*Barreras Ruiz v. Am. Tobacco Co., Inc.*,
180 F.R.D. 194 (D.P.R. 1998) .............................................................................................. 54

*Bethards v. Bard Access Sys., Inc.*,
No. 94 C 1522, 1995 WL 75356 (N.D. Ill. Feb. 22, 1995) ............................................... 9

*Bledsoe v. Combs*,
No. NA 99-153-C H/G, 2000 WL 681094 (S.D. Ind. Mar. 14, 2000) .............................. 16

*Block v. Abbott Labs.*, No.
99 C 7457, 2002 WL 485364 (N.D. Ill. Mar. 29, 2002) .................................................... 8

*BMW of N. Am., Inc. v. Gore*,
517 U.S. 559 (1996) ............................................................................................................ 49

*Bradshaw v. Pfizer, Inc.*,
No. 1:93 CV 1619, 1997 WL 33446663 (N.D. Ohio Oct. 31, 1997) .................................. 9

*Bresson v. Thomson McKinnon Secs. Inc.*,
118 F.R.D. 339 (S.D.N.Y. 1988) ......................................................................................... 52

*Broussard v. Meineke Disc. Muffler Shops, Inc.*,
155 F.3d 331 (4th Cir. 1998) ............................................................................................... 18

**TABLE OF AUTHORITIES**

*Bussell v. DeWalt Prods. Corp.*,
   614 A.2d 622 (N.J. Super. Ct. App. Div. 1992) ...................................................... 45

*Castano v. Am. Tobacco Co.*,
   84 F.3d 734 (5th Cir. 1996) ................................................................ *passim*

*Davenport v. Gerber Prods. Co.*,
   125 F.R.D. 116 (E.D. Pa. 1989)...................................................................... 9

*Dhamer v. Bristol-Myers Squibb Co.*,
   183 F.R.D. 520 (N.D. Ill. 1998)...................................................................... 8

*Erny v. Estate of Merola*,
   792 A.2d 1208 (N.J. 2002) ................................................................ 42, 43, 44

*Fink v. Ricoh Corp.*,
   839 A.2d 942 (N.J. Super. Ct. Law Div. 2003) .................................................. 43, 46

*Foister v. Purdue Pharma, LP*,
   No. Civ.A. 01-268-DCR, 2002 WL 1008608 (E.D. Ky. Feb. 26,
   2002) .................................................................................................. 8

*Fu v. Fu*,
   733 A.2d 1133 (N.J. 1999) ................................................................ 42, 43, 45

*Gasoline Prods. Co. v. Champlin Ref. Co.*,
   283 U.S. 494 (1931)................................................................................. 39

*Gevedon v. Purdue Pharma, Co.*,
   212 F.R.D. 333 (E.D. Ky. 2002)..................................................................... 8

*Hahn v. Richter*,
   673 A.2d 888 (Pa. 1996)........................................................................... 51

*Haley v. Medtronic, Inc.*,
   169 F.R.D. 643 (C.D. Cal. 1996)................................................................... 9

*Harding v. Tambrands, Inc.*,
   165 F.R.D. 623 (D. Kan. 1996) .................................................................... 9

*In re "Agent Orange" Prod. Liab. Litig.*,
   818 F.2d 145 (2d Cir. 1987) ...................................................................... 13

*In re Am. Med. Sys., Inc.*, 75
   F.3d 1069 (6th Cir. 1996) ................................................................. *passim*

*In re Baycol Prods. Liab. Litig.*,
   218 F.R.D. 197 (D. Minn. 2003) .............................................................. 8, 20

*In re Bendectin Prods. Liab. Litig.*,
   749 F.2d 300 (6th Cir. 1984) ...................................................................... 8

*In re Consol. Parlodel Litig.*,
   22 F. Supp. 2d 320 (D.N.J. 1998).............................................................. 46, 47

*In re Copley Pharm., Inc.*,
   161 F.R.D. 456 (D. Wyo. 1995) .................................................................. 12

**TABLE OF AUTHORITIES**

*In re Diet Drugs*,
    MDL 1203, Civ. A 98-20594, 1999 WL 782560 (E.D. Pa. Sept. 27,
    1999) .................................................................................................................... 55

*In re Fibreboard Corp.*,
    893 F.2d 706 (5th Cir. 1990) ............................................................................ 9

*In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*,
    174 F.R.D. 332 (D.N.J. 1997).................................................................. 46, 47, 52

*In re L-Tryptophan*,
    MDL No. 865, slip op. (D.S.C. Jan. 7, 1993) ............................................... 9

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
    209 F.R.D. 323 (S.D.N.Y. 2002) ...................................................................... 37

*In re N. Dist. of Cal., Dalkon Shield IUD Prods. Liab. Litig.*,
    693 F.2d 847 (9th Cir. 1982) ............................................................................ 8

*In re Norplant Contraceptive Prods. Liab. Litig.*,
    168 F.R.D. 577 (E.D. Tex. 1996) ........................................................ 9, 29, 33, 47

*In re Orthopedic Bone Screw Prods. Liab. Litig.*,
    MDL No. 1014, CIV. A. 93-7074, 1995 WL 273597 (E.D. Pa. Feb.
    22, 1995) ............................................................................................................ 9

*In re Paxil Litig.*,
    212 F.R.D. 539 (C.D. Cal. 2003).............................................................. *passim*

*In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*,
    208 F.R.D. 625 (W.D. Wash. 2002) .......................................................... 7, 37

*In re Prempro Prods. Liab. Litig.*,
    230 F.R.D. 555 (E.D. Ark. 2005) ........................................................ 7, 21, 22, 23

*In re Propulsid Prods. Liab. Litig.*,
    208 F.R.D. 133 (E.D. La. 2002) ...................................................................... 7

*In re Rezulin Prods. Liab. Litig.*,
    210 F.R.D. 61 (S.D.N.Y. 2002) ................................................................ *passim*

*In re Rhone-Poulenc Rorer Inc.*,
    51 F.3d 1293 (7th Cir. 1995) .................................................................... *passim*

*In re Shell Oil Co.*,
    136 F.R.D. 588 (E.D. La. 1991) ................................................................ 10, 11

*Int'l Union of Operating Eng'rs Local #68 Welfare Fund v. Merck &
    Co., Inc.*,
    ATL-L-3015-03-MT, slip op. (N.J. Super. Law Div. June 29, 2005) ................ 42, 50

*Jenkins v. Raymark Indus., Inc.*,
    782 F.2d 468 (5th Cir. 1986) ...................................................................... 11, 41

*Kemp v. Metabolife Int'l, Inc.*,
    No. CIV. 00-3413, 2002 WL 113894 (E.D. La. Jan. 25, 2002)................................. 17

iv

**TABLE OF AUTHORITIES**

*Klein v. O'Neal, Inc.*,
  222 F.R.D. 564 (N.D. Tex. 2004) .................................................................................. 38, 39

*Kurczi v. Eli Lilly & Co.*,
  160 F.R.D. 667 (N.D. Ohio 1995) ........................................................................................ 9

*Laufer v. U.S. Life Ins. Co.*,
  No. BER-L-9082-04, 2005 WL 1869211 (N.J. Super. Ct. Law Div.
  Aug. 8, 2005) ..................................................................................................................... 46

*Lewis v. Bayer AG*,
  No. 002353, 2004 WL 1146692 (Pa. Ct. Com. Pl. Nov. 18, 2004) ......................................... 49

*Linkous v. Medtronic, Inc.*,
  Civil Action No. 84-1909, 1985 WL 2602 (E.D. Pa. Sept 4, 1985) ........................................ 9

*Margulies v. Chase Manhattan Mortgage Corp.*,
  2005 WL 2923580 (N.J. Super. Ct. App. Div. Nov. 7, 2005) ........................................... 45, 47

*Martin v. Am. Med. Sys., Inc.*,
  No. IP 94-2067-C-H/G, 1995 WL 680630 (S.D. Ind. Oct. 5, 1995) ........................................ 9

*Martin v. Dahlberg, Inc.*,
  156 F.R.D. 207 (N.D. Cal. 1994) .......................................................................................... 9

*Mehornay v. Pfizer Inc.*,
  No. CV 91-101-HLH, 1991 WL 540731 (C.D. Cal. June 3, 1991) ........................................... 9

*Mellk v. Sarahson*,
  229 A.2d 625 (N.J. 1967) .................................................................................................... 44

*Mertens v. Abbott Labs.*,
  99 F.R.D. 38 (D.N.H. 1983) ............................................................................................ 8, 38

*Miles v. Am. Med. Sys., Inc.*,
  No. C-94-1808 (N.D. Cal. Mar. 3, 1995) ............................................................................... 9

*Mullen v. Treasure Chest Casino, L.L.C.*,
  186 F.3d 620 (5th Cir. 1999) .................................................................................. 10, 14, 41

*N.Y. Life Ins. Co. v. Head*,
  234 U.S. 149 (1914) ............................................................................................................ 49

*Neely v. Ethicon Inc.*,
  No. 1:00-CV-00569, 1:01-CV-37, 1:01-CV-38, 2001 WL 1090204
  (E.D. Tex. Aug. 15, 2001) ............................................................................................. 17, 37

*O'Connor v. Boeing N. Am., Inc.*,
  197 F.R.D. 404 (C.D. Cal. 2000) ......................................................................................... 18

*Perez v. Metabolife Int'l, Inc.*,
  218 F.R.D. 262 (S.D. Fla. 2003) ...................................................................................... 8, 17

*Perez v. Wyeth Labs.*,
  734 A.2d 1245 (N.J. 1999) .......................................................................................... 33, 34, 44

**TABLE OF AUTHORITIES**

*Phillips Petroleum Co. v. Shutts*,
  472 U.S. 797 (1985)...................................................................................... 37, 49, 50

*Presto v. Sandoz Pharms. Corp.*,
  487 S.E.2d 70 (Ga. Ct. App. 1997)........................................................................ 33

*Raye v. Medtronic Corp.*,
  696 F. Supp. 1273 (D. Minn. 1988)......................................................................... 9

*Rink v. Cheminova, Inc.*,
  203 F.R.D. 648 (M.D. Fla. 2001) .......................................................................... 38

*Robertson v. Sikorsky Aircraft Corp.*,
  No. 397CV1216(GLG), 2000 WL 33381019 (D. Conn. July 5,
  2001)..................................................................................................................... 17

*Rosmer v. Pfizer, Inc.*,
  No. CIV.A. 9:99-2280-18RB, 2001 WL 34010613 (D.S.C. Mar. 30,
  2001)....................................................................................................................... 8

*Ryan v. Eli Lilly & Co.*,
  84 F.R.D. 230 (D.S.C. 1979) .................................................................................. 8

*Spence v. Glock GES.m.b.H.*,
  227 F.3d 308 (5th Cir. 2000) ................................................................................. 41

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
  538 U.S. 408 (2003)......................................................................................... 49, 50

*Sterling v. Velsicol Chem. Corp.*,
  855 F.2d 1188 (6th Cir. 1988) ......................................................................... 10, 11

*Strumpf v. Schering Corp.*,
  606 A.2d 1140 (N.J. Super. Ct. App. Div. 1992) .................................................. 29

*Strumpf v. Schering Corp.*,
  626 A.2d 1090 (N.J. 1993) .................................................................................... 29

*Sweet v. Pfizer*,
  No. EDCV05-0052 VAP,  2005 WL 3074602 (C.D. Cal. Nov. 15,
  2005).................................................................................................................. 12, 23

*Valentino v. Carter-Wallace, Inc.*,
  97 F.3d 1227 (9th Cir. 1996) .................................................................................. 8

*Veazey v. Doremus*,
  510 A.2d 1187 (N.J. 1986) ............................................................................... 42, 43

*Wethington v. Purdue Pharma, LP*,
  218 F.R.D. 577 (S.D. Ohio 2003)............................................................................ 8

*Windham v. Am. Brands, Inc.*,
  565 F.2d 59 (4th Cir. 1977) ............................................................................. 15, 38

**TABLE OF AUTHORITIES**

*Woodell v. Proctor & Gamble Mfg. Co.,*
   No. Civ. 3:96-CV02723-H, 1998 WL 686767 (N.D. Tex. Sept. 29,
   1998) ............................................................................................................................... 8

*Zehel-Miller v. AstraZenaca Pharms., LP,*
   223 F.R.D. 659 (M.D. Fla. 2004) ................................................................................. 8

*Zinser v. Accufix Research Inst., Inc.,*
   253 F.3d 1180 (9th Cir. 2001) ...................................................................................... 8

**STATUTES**

Fed. R. Civ. P. 23(b)(3)....................................................................................................... 36

La. Rev. Stat. § 9:2800.53................................................................................................... 48

Miss. Code Ann. § 11-1-63 (c)(ii) ...................................................................................... 48

N.J. Stat. Ann. § 2A:58C-5 ................................................................................................. 48

N.J. Stat. Ann. § 2A:58C-4 ........................................................................................... 33, 48

Tenn. Code Ann. § 29-28-101 ............................................................................................. 48

**OTHER AUTHORITIES**

16 Am. Jur. 2d *Conflict of Laws* § 9 .................................................................................. 49

7B Charles Alan Wright et al., Federal Practice and Procedure § 1805
   (3d ed. 2005).................................................................................................................. 10

Martin L.C. Feldman,
   *Predominance and Products Liability Class Actions: An Idea Whose*
   *Time Has Passed?*, 74 TUL. L. REV. 1621, 1625 (2000) ............................................. 10

Deborah Mukherjee, et al.,
   *Risk of Cardiovascular Events Associated With Selective COX-2*
   *Inhibitors*, 286 J. Am. Med. Ass'n 954 (2001) ........................................................... 28

Ransdell Pierson,
   *Vioxx, Celebrex aim to profit from improved safety labels*, Reuters,
   May 21, 2000 ................................................................................................................. 27

Wayne A. Ray, et al.,
   *COX-2 selective non-steroidal anti-inflammatory drugs and risk of*
   *serious coronary heart disease*, 360 The Lancet 1071 (Oct. 5, 2002) ...................... 28

Restatement (Second) of Torts § 145............................................................................ 43, 44

Restatement (Second) of Torts § 146.................................................................................. 44

Restatement (Second) of Torts § 402a.................................................................................. 3

Rita Rubin,
   *Data: Vioxx might raise heart risk*, USA Today, Feb. 9, 2001 ................................... 28

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to All Personal | * | |
| Injury Class Action Complaints Pending | * | MAGISTRATE JUDGE KNOWLES |
| or Subject to Transfer to MDL 1657 | * | |
| | * | |
| | * | |

* * * * * * * * * * * * * * * * * *

### DEFENDANT MERCK & CO., INC.'S OPPOSITION TO PLAINTIFFS' STEERING COMMITTEE'S MOTION FOR CLASS CERTIFICATION OF A NATION-WIDE CLASS ACTION FOR PERSONAL INJURY AND WRONGFUL DEATH

Plaintiffs' motion asks this Court to spurn the wisdom of every federal Court of Appeals that has ever addressed the certifiability of a pharmaceutical product liability class action. As these appellate courts and numerous district courts have recognized, such claims simply cannot satisfy Rule 23's typicality, predominance, and superiority requirements because they require highly individualized inquiries into the particular facts governing each plaintiff's claims.

Well aware of the fate that has befallen similar class actions, plaintiffs try to salvage their class proposal in two ways. *First*, they seek to circumvent Rule 23's requirement that common *factual* questions predominate by proposing a so-called trial plan consisting of one supposedly common "class" phase, followed by a second, individualized phase. Under plaintiffs' proposal, the first "class" phase would provide what they characterize as a "preliminary finding of liability" – specifically, (1) whether Merck marketed Vioxx without proper warning; and (2) whether Merck marketed Vioxx "in such a manner as to vitiate the learned intermediary doctrine." (Pls.' Steering Committee's Preliminary Trial Plan For The Nationwide Personal

Injury & Wrongful Death Class Action ("Pls.' Trial Plan") at 2.)  In phase two, plaintiffs propose

separate trials for each of the thousands of purported class members to determine "causation and

damages."  As discussed below, this effort to paper over the clear predominance of

individualized factual issues in plaintiffs' proposed class action fails because:  (1) the law is clear

that bifurcation cannot be used as a vehicle to circumvent Rule 23(b)(3)'s predominance

requirement; (2) the first "common" phase of plaintiffs' proposal would itself require highly

individualized inquiries; (3) plaintiffs' bifurcated trial plan would violate the Seventh

Amendment; and (4) plaintiffs' proposal falls woefully short of Rule 23(b)(3)'s superiority

requirement.

**Second**, plaintiffs seek to circumvent the requirement that common ***legal*** issues

predominate by arguing that the New Jersey choice-of-law test requires application of New

Jersey substantive law to the claims of Vioxx users hailing from all fifty states.  As set forth

below, however, a proper application of New Jersey's governmental interests choice-of-law rule

points to the substantive laws of the fifty states where the proposed class members ingested, and

were allegedly injured by, Vioxx, rendering plaintiffs' proposed class all the more impossible.

## FACTUAL BACKGROUND

Plaintiffs in this action allege that Merck "negligently manufactured, marketed,

advertised, promoted and sold Vioxx as a safe prescription medication, when . . . Merck knew or

should have known that Vioxx was not safe for its intended purpose for the patients for whom it

was prescribed."  (First Am. Master Class Action Compl. (Personal Injury And Wrongful Death)

("Pls.' Compl.") ¶ 3.)  Plaintiffs' complaint further alleges that Merck "deceived Plaintiffs" (*id.* ¶

123) into taking Vioxx through "an advertising campaign . . . [designed] to induce widespread

use of Vioxx" (*id.* ¶ 112), and that sales of Vioxx "soared" due to the "biggest direct-to-

consumer marketing campaign ever undertaken by a pharmaceutical company" (*id.* ¶ 121).

Based on these allegations, plaintiffs seek to certify a nationwide class of all individuals who

ingested Vioxx "in any dose at any time between May 20, 1999 . . . and September 30, 2004"

and allege personal injury or wrongful death as a result. (*Id.* ¶ 5.) Plaintiffs allege three causes

of action: negligence; strict product liability (failure to warn); and strict product liability

(pursuant to RESTATEMENT (SECOND) OF TORTS § 402a (1965)) (*id.* ¶¶ 168-189) – and seek

compensatory damages, statutory damages, punitive damages, medical monitoring relief (for

plaintiffs from Alabama, Kentucky, Louisiana, Nevada and Virginia only), pre-judgment and

post-judgment interest, and costs and expenses (*id.*, Prayer For Relief ¶¶ B-G).

     In alleging that Merck failed to warn of the alleged dangers of Vioxx, plaintiffs identify a

number of Vioxx-related studies that were completed at various times before and after the drug

was placed on the market. For example, plaintiffs point to several Merck-sponsored preclinical

studies, including one called Protocol 023, that they claim demonstrated a cardiovascular risk

even prior to the approval of Vioxx by the FDA. (Pls.' Compl. ¶¶ 77-86.) Plaintiffs also

contend that post-approval studies, including the Merck-sponsored VIGOR study of rheumatoid

arthritis patients, the results of which were released in March 2000, should have led the

Company to further investigate and/or fully disclose the alleged dangers of the drug. (*Id.* ¶¶ 90-

98.) The complaint also references "industry-sponsored studies presented at the European

United League Against Rheumatism" in June of 2000 that allegedly showed that ingesting Vioxx

resulted in a "statistically significant" increase in certain CV injuries (*id.* ¶ 102), as well as the

results of the Velentgas and Solomon studies sponsored by Merck in 2003, which allegedly

found that there was a statistically significant difference in myocardial infractions ("MIs") and

unstable angina pectoris between patients treated with Vioxx and those treated with ibuprofen or

diclofenac; and that there was a 30% increase in MIs within the first 30 days of taking Vioxx compared to Celebrex. (*Id.* ¶¶ 133-34.)

Although the Master Complaint is brought on behalf of 23 named plaintiffs, the PSC has designated two individuals who originally filed suit in New Jersey as proposed nationwide class representatives (Pls.' Compl. ¶¶ 5, 8-9), presumably to support their attempt to apply New Jersey choice-of-law rules and New Jersey substantive law to the entire proposed class. The other named plaintiffs purport to be serving only as representatives of proposed single-state class actions. (*Id.* ¶¶ 10-60.)

The two prospective nationwide class representatives are Rosemary Lawrence and Raymond Gibney. Ms. Lawrence, who has testified that she had a history of heart "irregularit[ies]" and kidney damage prior to taking Vioxx (Deposition of Rosemary Lawrence ("Lawrence Dep") at 79:13-23; 81:2-14, Dec. 19, 2005 (attached as Ex. 1)), alleges that Dr. Mark James Bartiss prescribed Vioxx for her arthritis in 2000 (Rosemary Lawrence's Resp. To Def.'s First Set Of Interrogs. No. 5 (attached as Ex. 2)), and that after taking 25mg to 50mg dosages of the drug daily for over two years, she suffered a pulmonary embolism in July 2002. (*Id.* No. 17.) Ms. Lawrence is 5'4" and weighed 260 pounds when she began taking Vioxx. (Lawrence Dep. at 81:19-82:7.)

Mr. Gibney, a diabetic with high blood pressure (Deposition of Raymond Gibney ("Gibney Dep.") at 96:9-13, 82:1-3, Jan. 4, 2006 (attached as Ex. 3)) and a smoker for 50 years, (*id.* at 126:15-17) alleges that he suffered a heart attack (Raymond Gibney's Resp. To Def.'s First Set Of Interrogs. No. 3 (attached as Ex. 4)) after taking 50mg of Vioxx daily for at least fourteen months, beginning as early as October 2001. (Raymond Gibney's Pharmaceutical Records (attached to Gibney Dep. as Ex. 2) (attached as Ex. 5).) Dr. Basil Dibsie, Gibney's

close friend and physician, prescribed him Vioxx to treat his arthritis. (*Id.* No. 5.) Mr. Gibney is

5'10" tall and weighed 180 pounds when he began taking Vioxx. (*Id.* No. 8.) He also has a

family history of heart problems; his brother died of a massive heart attack at the age of 45 while

playing racquetball. (Gibney Dep. at 135:20-22, 137:2-5.)

## ARGUMENT

Plaintiffs' proposed class falls short of the threshold requirements for class certification

because individualized factual and legal questions predominate, the named plaintiffs are not

typical of the proposed class members, and their proposed class would suffer from numerous

manageability problems, making it an inferior – rather than superior – method for adjudicating

the proposed class members' claims.

## I.   PLAINTIFFS' PROPOSED CLASS FAILS TO SATISFY THE RULE 23 TYPICALITY, PREDOMINANCE AND SUPERIORITY REQUIREMENTS BECAUSE THE PROPOSED CLASS MEMBERS' CLAIMS PRESENT OVERWHELMING FACTUAL VARIATIONS.

Plaintiffs' proposed class fails to satisfy Rule 23's typicality, predominance, and

superiority requirements because each proposed class member's  personal injury claims involve

materially different facts – *e.g.,* when they were prescribed Vioxx, what dosage of Vioxx they

took, how long they were on Vioxx, why their physicians prescribed Vioxx, what their

physicians knew about its alleged risks, and what injury they allegedly suffered – and thus must

be adjudicated separately.

Faced with an overwhelming body of law rejecting product liability class actions because

of these types of factual variations, plaintiffs' motion makes no effort to assert that the totality of

their claims can properly be tried on a classwide basis.  Instead, they argue that they can

circumvent these deficiencies by bifurcation and propose a trial plan that would try "liability" on

a classwide basis, followed by separate trials on causation and injury.  However, plaintiffs'

proposed solution is incapable of remedying the massive flaws in their proposed class action

because: (1) bifurcation is only available if the threshold requirement of predominance is

satisfied without it; (2) the supposed "common" phase of plaintiffs' trial plan would itself

involve highly individualized factual inquiries; (3) plaintiffs' proposal would violate the Seventh

Amendment; and (4) a bifurcated trial is not the superior method for resolving plaintiffs' claims

because it would require thousands of individual follow-on trials.

### A.    As A General Rule, Pharmaceutical Product Liability Actions Cannot Be Afforded Class Treatment.

Plaintiffs' proposed personal injury class action is almost presumptively uncertifiable

because of the numerous, highly individualized factual inquiries that would be necessary to

resolve the proposed class members' claims. For this reason, "all relevant Court of Appeals and

the bulk of relevant district court decisions have rejected class certification in products liability

cases." *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61, 65-66 (S.D.N.Y. 2002) (footnotes

omitted). As these courts have noted, such class actions fail to satisfy the typicality,

predominance, and superiority requirements for certifying a damages class action under Rule

23(b)(3). *See, e.g., id.* at 66-67.

Judge Barbara Rothstein (now the director of the Federal Judicial Center) recently

catalogued some of the individualized issues that preclude certification of pharmaceutical class

actions in striking the class allegations in the PPA litigation:

> an individual's family and medical history; age; gender; diet; lifestyle, including
> the use of alcohol, tobacco, and other legal or illegal drugs; . . . the amount of
> PPA, if any, contained within th[e] product [used]; the timing of ingestion of the
> product; whether the individual followed the directions accompanying the
> product, exceeded the recommended dosage, or combined the product with other
> products and the effect of that combination; whether that individual suffered an
> injury, when the injury occurred, the type of injury suffered, and the number of
> occurrences of injury; the likelihood of injury; and/or the foundation as to whether
> a justifiable fear of injury exists.

*In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 208 F.R.D. 625, 631-32 (W.D. Wash. 2002) (emphasis added) (footnotes omitted).[1]  Other courts have reached similar conclusions. *See, e.g., In re Prempro Prods. Liab. Litig.*, 230 F.R.D. 555, 567 (E.D. Ark. 2005) (hormone replacement therapy) ("As in many cases before them, Plaintiffs have attempted to frame the 'predominant' issues broadly to compensate for variations in the class members' claims.  But they suffer the same fate.  Individual issues abound and are magnified by the necessity of applying diverse state laws, making certification under 23(b)(3) inappropriate." (internal quotation marks omitted)); *In re Propulsid Prods. Liab. Litig.*, 208 F.R.D. 133, 144-45 (E.D. La. 2002) (prescription drug) ("In the present case the monetary claims are dependent in a significant way on differences of each class member's circumstances.  They will require additional hearings

---

[1]      The named plaintiff interrogatory responses in this matter reveal precisely the same types of variations that existed in *PPA*. For example, the named plaintiffs have varying family histories of heart problems. (*Compare* Josephine Hornik's Resp. To Def.'s First Set Of Interrogs. ("Hornik's Resp.") No. 11 (no family history) (attached as Ex. 6) *with* Homer Couch's Resp. To Def.'s First Set Of Interrogs. ("H. Couch's Resp.") No. 11 (father and brother both died of heart problems) (attached as Ex. 7) *and* Jerry Key's Resp. To Def.'s First Set Of Interrogs. ("Key's Resp.") No. 11 (father and brother both died of strokes) (attached as Ex. 8).) They also have different risk factors, including size (*compare* Vivian Shinberg's Resp. To Def.'s First Set Of Interrogs. ("Shinberg's Resp.") No. 8 (plaintiff Shinberg is 5'3" and 115 pounds) (attached as Ex. 9) *with* Paul Kennedy's Resp. To Def.'s First Set Of Interrogs. ("Kennedy's Resp.") No. 8 (plaintiff Kennedy is 5'9" and 170 pounds) (attached as Ex. 10), Hornik's Resp. No. 8 (plaintiff Hornik is 5'5" and 200 pounds) *and* Connie Bell's Resp. To Def.'s First Set Of Interrogs. ("Bell's Resp.") No. 8 (plaintiff Bell is 5'8 ½" and 350 pounds) (attached as Ex. 11)), and history of alcohol and tobacco use (*compare* Key's Resp. No. 13 (doesn't smoke or drink) with Kevin Henderson's Resp. To Def.'s First Set Of Interrogs. ("Henderson's Resp.") No. 13 (smoked for 28 years) (attached as Ex. 12) *and* Darryl McMahon's Resp. To Def.'s First Set Of Interrogs. ("McMahon's Resp.") No. 13 (previously drank in "an amount which required intervention") (attached as Ex. 13)). The named plaintiffs also took Vioxx at several different dosage levels, (*compare* H. Couch's Resp. No. 17 (took 12.5 mg once a day) *with* McMahon's Resp. No. 17 (took 50 mg twice a day ) *and* Jon Brunkhorst's Resp. To Def.'s First Set Of Interrogs. ("Brunkhorst's Resp.") No. 17 (took 25 mg once a day) (attached as Ex. 14)), and for different amounts of time (*compare* Brunkhorst's Resp. No. 17 (took Vioxx for four months) with H. Couch's Resp. No. 17 (took Vioxx for approximately 16 months), and Henderson's Resp. No. 17 (took Vioxx for three years and eleven months)). The named plaintiffs were also prescribed Vioxx at different times over a period of several years, ranging from plaintiff Kennedy, who was prescribed Vioxx in 2000 (Kennedy's Resp. No. 17), to plaintiff Shinberg, who was prescribed Vioxx in 2001 (Shinberg's Resp. No. 17), plaintiff Donegan, who was prescribed Vioxx in July 2002 (Linda Kay Donegan's Resp. To Def.'s First Set Of Interrogs. ("Donegan's Resp.") No. 17 (attached as Ex. 15)), and plaintiff McMahon, who was prescribed Vioxx in 2004 (McMahon Resp. No. 17). And like the proposed class members in PPA, many of the plaintiffs here were taking more than one drug that could have caused the alleged injury. (*See, e.g.,* Bell's Resp. No. 19 (plaintiff took 1000 mg of Tylenol two to four times a day while taking Vioxx); Hornik's Resp. No. 18 (plaintiff took Bextra while taking Vioxx); Henderson's Resp. No. 18 (plaintiff took Celebrex prior to taking Vioxx); Deposition of Dr. Paul Terrell ("Terrell Dep.") at 16:23-17:10, Jan. 5, 2006 (attached as Ex. 16) (named plaintiff Mary Couch was also taking the hormone replacement drug Premarin).)

to resolve the disparate merits of each individual's case." (internal quotation marks omitted)); *In re N. Dist. of Cal., Dalkon Shield IUD Prods. Liab. Litig.*, 693 F.2d 847, 853 (9th Cir. 1982) (contraceptive device) ("In products liability actions . . . individual issues may outnumber common issues.  No single happening or accident occurs to cause similar types of physical harm or property damage.  No one set of operative facts establishes liability."); *Zehel-Miller v. AstraZenaca Pharmas., LP*, 223 F.R.D. 659, 663 (M.D. Fla. 2004) (antipsychotic drug) (certification of personal injury damages claims "would be indisputably inappropriate, since individual issues would overwhelm any common questions"); *In re Baycol Prods. Liab. Litig.*, 218 F.R.D. 197, 204 (D. Minn. 2003) (cholesterol drug) ("[N]o [federal] Court of Appeals decision has approved class certification of an action involving prescription drugs."); *In re Paxil Litig.*, 212 F.R.D. 539, 551 (C.D. Cal. 2003) (antidepressant) ("[I]ndividual questions of fact regarding causation . . . subvert any benefits to be gained through a class action proceeding."); *Mertens v. Abbott Labs.*, 99 F.R.D. 38, 41 (D.N.H. 1983) (prescription drug DES) (resolving common issue of a drug's capacity to cause injury would do "substantially nothing" to advance the litigation "[i]n light of the varied degrees of use, exposure and harm in each Plaintiff's case"); *Ryan v. Eli Lilly & Co.*, 84 F.R.D. 230, 233 (D.S.C. 1979) (synthetic estrogen) ("A class situation is simply not efficient when so much in the way of individual proof by each of the class members will obviously be required.").[2]

---

[2]      *See Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180 (9th Cir. 2001) (pacemaker); *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996) (epilepsy drug); *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1085 (6th Cir. 1996) (penile implant) ("a number of other courts have denied class certifications in drug or medical product liability actions" because of lack of predominance and superiority); *In re Bendectin Prods. Liab. Litig.*, 749 F.2d 300 (6th Cir. 1984) (morning sickness drug); *Wethington v. Purdue Pharma, LP*, 218 F.R.D. 577 (S.D. Ohio 2003) (pain-relief drug); *Perez v. Metabolife Int'l, Inc.*, 218 F.R.D. 262 (S.D. Fla. 2003) (diet drug containing ephedrine); *Gevedon v. Purdue Pharma, Co.*, 212 F.R.D. 333 (E.D. Ky. 2002); *Foister v. Purdue Pharma, LP*, No. Civ.A. 01-268-DCR, 2002 WL 1008608 (E.D. Ky. Feb. 26, 2002); *Block v. Abbott Labs.*, No. 99 C 7457, 2002 WL 485364 (N.D. Ill. Mar. 29, 2002) (specimen test kit); *Rosmer v. Pfizer, Inc.*, No. CIV.A. 9:99-2280-18RB, 2001 WL 34010613 (D.S.C. Mar. 30, 2001) (antibiotic); *Dhamer v. Bristol-Myers Squibb Co.*, 183 F.R.D. 520 (N.D. Ill. 1998) (prescription drug); *Woodell v. Proctor & Gamble Mfg. Co.*, No. Civ. 3:96-CV02723-H, 1998 WL 686767 (N.D.

Nor are these decisions limited to drug/medical device cases. The same results have obtained in cases involving many other products (*e.g.,* asbestos, cigarettes and automobiles). *See, e.g., Amchem Prods. v. Windsor*, 521 U.S. 591, 609-10 (1997) (rejecting certification where class members had different exposures, different histories and different risk factors; "'[t]he number of uncommon issues in this humongous class action[]' . . . barred a determination, under existing tort law, that common questions predominated"); *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 146 (3d Cir. 1998) (numerous individual issues precluded certification of smoker class); *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 746 (5th Cir. 1996) ("historically, certification of mass tort litigation classes has been disfavored"; collecting cases); *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1304 (7th Cir. 1995) ("[m]ost federal courts . . . refuse to permit the use of the class-action device in mass-tort cases" and "[t]hose courts that have permitted it have been criticized"); *In re Fibreboard Corp.*, 893 F.2d 706, 712 (5th Cir. 1990) (the court found "too many disparities among the various plaintiffs for their common concerns to predominate"). As one commentator put it, "the United States Supreme Court, the federal courts of appeals . . ., and several federal district courts have evinced solidarity in declining to certify class actions in

---

Tex. Sept. 29, 1998) (pain-relief drug); *Bradshaw v. Pfizer, Inc.*, No. 1:93 CV 1619, 1997 WL 33446663 (N.D. Ohio Oct. 31, 1997) (artificial hip); *Harding v. Tambrands, Inc.*, 165 F.R.D. 623 (D. Kan. 1996) (tampons); *In re Norplant Contraceptive Prods. Liab. Litig.*, 168 F.R.D. 577 (E.D. Tex. 1996) (prescription contraceptive); *Barela v. Showa Denko K.K.*, No. CIV. 93-1469 LH/RLP, 1996 WL 316544, at *2 (D.N.M. Feb. 28, 1996) (citing *In re L-Tryptophan*, MDL No. 865, slip op. (D.S.C. Jan. 7, 1993) (food supplement)); *Haley v. Medtronic, Inc.*, 169 F.R.D. 643 (C.D. Cal. 1996) (cardiac pacemaker leads); *Bethards v. Bard Access Sys., Inc.*, No. 94 C 1522, 1995 WL 75356 (N.D. Ill. Feb. 22, 1995) (catheters); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, MDL No. 1014, CIV. A. 93-7074, 1995 WL 273597 (E.D. Pa. Feb. 22, 1995) (spinal fixation devices); *Martin v. Am. Med. Sys., Inc.*, No. IP 94-2067-C-H/G, 1995 WL 680630 (S.D. Ind. Oct. 5, 1995) (penile prostheses); *In re Am. Med. Sys.*, 75 F.3d at 1075 n.3 (citing *Miles v. Am. Med. Sys., Inc.*, No. C-94-1808, slip op. (N.D. Cal. Mar. 3, 1995) (same)); *Kurczi v. Eli Lilly & Co.*, 160 F.R.D. 667 (N.D. Ohio 1995) (pregnancy drug); *Martin v. Dahlberg, Inc.*, 156 F.R.D. 207 (N.D. Cal. 1994) (hearing aids); *Abbent v. Eastman Kodak Co.*, No. 90CV3436, 1992 WL 1472751 (D.N.J. Aug. 28, 1992) (pantopaque myelograms); *Mehornay v. Pfizer Inc.*, No. CV 91-101-HLH, 1991 WL 540731 (C.D. Cal. June 3, 1991) (heart valves); *Davenport v. Gerber Prods. Co.*, 125 F.R.D. 116 (E.D. Pa. 1989) (baby bottles); *Raye v. Medtronic Corp.*, 696 F. Supp. 1273 (D. Minn. 1988) (pacemakers); *Linkous v. Medtronic, Inc.*, Civil Action No. 84-1909, 1985 WL 2602 (E.D. Pa. Sept 4, 1985) (cardiac pacemakers).

products liability cases because the predominance requirement, made even more confined by the qualities of superiority, was not satisfied." Martin L.C. Feldman, *Predominance and Products Liability Class Actions: An Idea Whose Time Has Passed?*, 74 TUL. L. REV. 1621, 1625 (2000). *See also* 7B Charles Alan Wright *et al.*, FEDERAL PRACTICE AND PROCEDURE § 1805 (3d ed. 2005) ("[A]ttempts to invoke Rule 23 for mass products-liability claims have met with major difficulties. . . . [T]hese difficulties may indicate that the class action . . . may not provide the optimal device to handle these cases . . . .").

Against this overwhelming weight of authority, plaintiffs rely on a handful cases for the proposition that there is a "movement toward certification of mass torts." (Pls.' Steering Committee's Mem. In Support Of Mot. For Certification Of A Nationwide Class Action For Personal Injury & Wrongful Death ("Pls.' Mot.") at 32.) However, these facially distinguishable cases evince no trend toward certification of mass tort cases in which individual issues predominate. Furthermore, all but one of plaintiffs' cases are at least a decade old,[3] suggesting that any trend is decidedly in the opposite direction, disfavoring certification.

The first two cases plaintiffs cite – *In re Shell Oil Co.*, 136 F.R.D. 588 (E.D. La. 1991), and *Sterling v. Velsicol Chemical Corp.*, 855 F.2d 1188 (6th Cir. 1988) (Pls.' Mot. at 32) – are "single event" cases and thus involve far fewer factual variations than a product liability case. In *Shell Oil*, the court certified class action litigation arising from an "explosion in the catalytic cracking unit at the Shell Oil Refinery in Norco, Louisiana" that affected "persons or entities who were physically present or owned property within the Parishes of St. Charles, St. John the Baptist, St. James, Orleans or Jefferson on May 5, 1988." 136 F.R.D. at 589-90. The court found it significant that

---

[3]     The one case that is more recent – *Mullen v. Treasure Chest Casino, L.L.C.*, 186 F.3d 620 (5th Cir. 1999) – is highly inapposite for the reasons discussed in Section I.B.

> [u]nlike the asbestos cases and other cases affecting plaintiffs nationwide, and involving a course of conduct occurring over a long period of time as well as the likelihood of future claims, the present case involves a single event affecting, at one time, certain people in a five-parish area within the Eastern District of Louisiana.

*Id.* at 591. The instant nationwide action thus bears no resemblance to *Shell Oil*.

Similarly, *Sterling* affirmed certification of a class of plaintiffs exposed to ground water contaminated by a single landfill because "identical evidence would be required to establish the level and duration of chemical contamination." 855 F.2d at 1197. As *Sterling* itself recognized, toxic tort cases arising from a single identifiable incident are uniquely suited to class certification in a way that larger "mass" torts are not:

> In complex, mass, toxic tort accidents, where no one set of operative facts establishes liability, no single proximate cause equally applies to each potential class member and each defendant, and individual issues outnumber common issues, the district court should properly question the appropriateness of a class action for resolving the controversy. However, where the defendant's liability can be determined on a class-wide basis because the cause of the disaster is a single course of conduct which is identical for each of the plaintiffs, a class action may be the best suited vehicle to resolve such a controversy.

*Id.* Thus, in upholding class certification in *Sterling*, the Sixth Circuit virtually stated that it would have ruled differently in a pharmaceutical case, a statement borne out eight years later when it issued a writ of mandamus striking certification of a class in *In re American Medical Systems,* 75 F.3d 1069, 1084 (6th Cir. 1996) ("Although *Sterling* was a toxic tort case in which the court held that certification was proper, we think the court's remarks are instructive here. Unlike a mass tort action arising out of a single accident or single course of conduct, in medical device products liability litigation of the sort involved here the factual and legal issues often do differ dramatically from individual to individual because there is no common cause of injury.").

Plaintiffs' citation to *Jenkins v. Raymark Industries Inc.*, 782 F.2d 468 (5th Cir. 1986) (Pls.' Mot. at 32) is equally unpersuasive. *Jenkins* was an asbestos case brought on behalf of less

11

than a thousand class members. The Fifth Circuit affirmed class certification with little

explanation, confining its predominance analysis to three sentences. *See* 782 F.2d at 472-73.

But as the same court recognized a decade later in *Castano, Jenkins* is highly distinguishable

from the class proposal here: "*Jenkins* involved only 893 personal injury asbestos cases, the law

of only one state, and the prospect of trial occurring in only one district. Accordingly, for

purposes of the instant case, *Jenkins* is largely inapposite." *Castano*, 84 F.3d at 744.

Plaintiffs next cite *In re Copley Pharmaceutical, Inc.*, 161 F.R.D. 456 (D. Wyo. 1995)

(Pls.' Mot. at 32-33), as an example in which a court certified a personal injury product liability

action. However, the court in that case admitted that it was deviating from the great weight of

authority, and that decision clearly has no precedential value in this Circuit. *See* 161 F.R.D. at

466 (rejecting *Rhone-Poulenc* and the Advisory Committee note because without class

certification, "the courthouse door could be slammed on a great many plaintiffs"). Moreover,

*Copley* was decided before the availability of interlocutory review for class certification under

Rule 23(f) and thus does not reflect increased appellate guidance on class certification issues

after 1998. In any event, the factual variations at issue in *Copley* pale in comparison to the ones

at issue here. *Copley* did not involve alleged failure-to-warn of a drug's potential side-effects;

rather, *Copley* involved claims based on contaminated batches of Albuterol and many individual

issues were eliminated because the defendant admitted that "some of its product was

contaminated and that it is liable for any resulting injuries." *Id.* at 461. Furthermore, as one

court has noted, the ***decisive*** factor for certification in *Copley* was the small amount of recovery

sought by each plaintiff. *See Sweet v. Pfizer*, No. EDCV05-0052 VAP, 2005 WL 3074602, at

*12-13 (C.D. Cal. Nov. 15, 2005) (noting also that the Supreme Court has emphasized that "'the

Advisory Committee had dominantly in mind vindication of the rights of groups of people who

12

individually would be without effective strength to bring their opponents into court at all'"

(quoting *Amchem*, 521 U.S. at 617)).  These circumstances plainly are not present here.

Finally, plaintiffs' reliance on the class certification ruling in *In re "Agent Orange"*

*Prod. Liab. Litig.*, 818 F.2d 145 (2d Cir. 1987) (Pls.' Mot. at 32) is also misplaced, as that case

involved a pre-*Amchem* settlement class.  Moreover, as the MDL court in the *Rezulin* litigation

noted in rejecting application of the *Agent Orange* decision in that proceeding, the Second

Circuit was strongly influenced by the commonality of the government contractor defense in the

*Agent Orange* cases, a factor that is not present here:

> The presence of individual defenses in this case cuts in exactly the opposite way
> as it did for the plaintiffs in *In re Agent Orange Prod. Liab. Lit.*, 818 F.2d 145 (2d
> Cir. 1987).  There the Second Circuit expressed its doubt as to the presence of
> commonality, typicality and predominance of class-wide injury issues, but
> approved the certification of the class nonetheless.  It held that the presence of the
> military contractor defense as a defense to the claims of every single plaintiff
> provided the requisite commonality, typicality, adequacy, predominance and
> superiority.  There is no such common defense here.

*In re Rezulin*, 210 F.R.D. at 67.

In sum, the inarguable "trend" regarding personal injury classes in mass tort cases is – as

the mountain of case law cited above makes clear – to deny class certification because such cases

fail to satisfy the predominance, typicality and superiority requirements of Rule 23(b)(3).

**B.**     **Plaintiffs' Bifurcation Proposal Does Not Resolve The Predominance And
Superiority Problems Posed By Their Proposal.**

In an effort to resolve the predominance problems posed by their class action, plaintiffs

propose a trial plan under which the Court would hold a first-phase liability trial "designed to

obtain a preliminary finding of liability" (Pls.' Trial Plan at 2), followed by "a second phase

involving individual determination of causation and damages" (*id.* at 3; *see also id.* ("[S]eparate

mini-trials [in phase two] . . . will only be required to focus on specific causation and damages . .

. .")).

In making this proposal, plaintiffs rely on *Mullen v. Treasure Chest Casino, L.L.C.*, 186 F.3d 620 (5th Cir. 1999), a case in which the Fifth Circuit upheld certification of a class using a superficially similar bifurcated approach. In *Mullen*, the court certified a class of casino boat workers suing under federal law after they were allegedly injured by a defective air ventilation system on a single boat, at a single location in Louisiana, and during the same general time frame. *Id.* at 627. The *Mullen* court found that it could bifurcate the class action because "liability issues common to all class members" existed under federal law, including "whether the employees . . . are seamen within the meaning of the Jones Act, whether [the ship] is a vessel within the meaning of the Jones Act, whether the [ship] was rendered unseaworthy by the air quality aboard, and whether [the owner] was negligent in relation to [the ship's] ventilation system." *Id.* at 623. Notably, the *Mullen* court itself distinguished that case from the standard personal injury class action, noting that, unlike *Castano* and *Amchem*, "this case does not involve the type of individuated issues that have in the past led courts to find predominance lacking," because members of the putative class were exposed to toxic substances from different sources over different time periods. *Id.* at 626. The *Mullen* court therefore predicated certification and bifurcation in that rare case on the grounds that "the putative class members are all symptomatic by definition and claim injury from the same defective ventilation system over the same general period of time." *Id.* at 627.

In contrast, courts that have faced proposals more analogous to the one the PSC offers here have soundly rejected them. The plaintiffs in the Paxil litigation, for example, proposed a two-phase trial that would answer "common" questions framed as broad abstractions in the first phase – such as whether the defendant's "statements [are] misleading to American consumers," whether the defendant "owe[d] plaintiffs a duty of care," and whether the defendant was

"negligent by making certain active misrepresentations and failing to disclose certain material facts" – and everything else in the second phase. *In re Paxil*, 212 F.R.D. at 546. The district court rejected the proposal on numerous grounds. As a threshold matter, the court found fault with the trial plan, "which sketches the proposed plan of action in only the broadest strokes" and whose "description does not even begin to lay out the specific elements required to prove certain causes of action." *Id.* The court also had serious predominance concerns, even though "[a]ccording to Plaintiffs' proposed trial plan, Stage 1 would not require the examination of any individual plaintiff." *Id.* The court did not buy it: "the Court sees the individual issues in this case as an overarching barrier to class action treatment. The putative plaintiffs are many and their circumstances, varied." *Id.* at 548 (going on to list variations, including that "putative plaintiffs . . . took Paxil at various times, with different dosages, and for different underlying ailments," that "the symptoms and injuries allegedly suffered by the plaintiffs vary from individual to individual," and that "because the putative plaintiffs all took Paxil at different times, some of those patients may have ingested Paxil . . . before the advertisements at issue were aired or may have never seen the advertisements"). The court also worried that the "proposed bifurcation would present the case in a manner prejudicial" to the defendant because a

> class trial on liability without any reference to [defendant's defenses] runs the real risk . . . of a composite case being much stronger than any plaintiff's individual action would be . . . [and] permit[ting] plaintiffs to strike [Defendants] with selective allegations, which may or may not have been available to individual named plaintiffs.

*Id.* at 547-48 (citations and internal quotation marks omitted). Finally, the court concluded, the "completed picture will no doubt be too vast and too complicated for even the most diligent jury to grasp." *Id.* at 546.[4]

---

[4]     Other courts have reached similar conclusions. *See, e.g.*, *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 70-71 (4th Cir. 1977) (affirming district court decision refusing plaintiffs' proposal to bifurcate "the trial, trying first the

As set forth below, plaintiffs' proposed trial plan suffers from many of the flaws as the *Paxil* plan and should be rejected for similar reasons.

> 1.    **Plaintiffs Cannot Evade The Predominance Requirement By Bifurcating Common And Individual Issues.**

As a threshold matter, the law is clear that plaintiffs cannot evade the predominance requirement by putting a few purportedly common issues into one class trial and declaring it to satisfy the predominance requirement, while leaving other more individualized issues for resolution in subsequent claimant-specific trials. Rather, a class proposal must satisfy the predominance requirement in its entirety. As the Fifth Circuit put it in *Castano*, a "district court cannot manufacture predominance through the nimble use of [bifurcation]" because "a cause of action, as a whole, must satisfy the predominance requirement of (b)(3)." *Castano*, 84 F.3d at 745 n.21. In *Castano*, the court reversed class certification despite plaintiffs' proposal that common issues be severed from individual issues. In explaining its decision, the Fifth Circuit noted:

> Reading rule 23(c)(4) as allowing a court to sever issues until the remaining common issue predominates over the remaining individual issues would eviscerate the predominance requirement of [R]ule 23(b)(3); the result would be automatic certification in every case where there is a common issue, a result that could not have been intended.

*Id.*; *see also Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 421 (5th Cir. 1998) (upholding district court's denial of bifurcated class certification in racial discrimination suit because there is "no legal basis for the district court to certify a class action on the first stage of the plaintiffs'

---

common issue of 'liability' and then (if liability is found) trying the issue of damages"); *Bacon v. Honda of Am. Mfg.*, 205 F.R.D. 466, 488 (S.D. Ohio 2001) (rejecting plaintiffs' proposal "to bifurcat[e] the class action into two stages, whereby the issues of liability and the claim for punitive damages would be tried in the first proceeding, and the class claims for compensatory relief would be addressed in the second proceeding"); *Bledsoe v. Combs*, No. NA 99-153-C H/G, 2000 WL 681094, at *1 (S.D. Ind. Mar. 14, 2000) (rejecting plaintiffs' proposal to try the issue of liability "on a class-wide basis, with individual damages determinations left to bifurcated proceedings after the issue of liability is decided"); *In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1303 (7th Cir. 1995) ("The first jury will not determine liability. It will determine merely whether one or more of the defendants was negligent under one of the two theories.").

pattern or practice claim when there is no foreseeable likelihood that the claims for compensatory and punitive damages could be certified in the class action sought by the plaintiffs"); *Neely v. Ethicon Inc.*, No. 1:00-CV-00569, 1:01-CV-37, 1:01-CV-38, 2001 WL 1090204, at *5 (E.D. Tex. Aug. 15, 2001) (denying certification in part because "the Fifth Circuit prohibits courts from using 23(c)(4)(A) to circumvent the predominance requirement in Rule 23(b)(3)"); *Robertson v. Sikorsky Aircraft Corp.*, No. 397CV1216(GLG), 2000 WL 33381019, at *19 (D. Conn. July 5, 2001) ("[a]n action must be considered as a whole in order to determine whether or not the predominance requirement has been satisfied"); *Perez v. Metabolife Int'l, Inc.*, 218 F.R.D. 262, 273 (S.D. Fla. 2003) (the requirements of Rule 23(b)(3) "cannot be satisfied by seeking to repeatedly split the claims pursuant to Rule 23(c)(4)," when "liability as to Plaintiffs is, overall, a highly individuated issue" (quoting *Kemp v. Metabolife Int'l, Inc.*, No. CIV. 00-3413, 2002 WL 113894, at *4 (E.D. La. Jan. 25, 2002))).

The district court's decision in *Neely* is particularly instructive. In that case, plaintiffs claimed injuries resulting from defective medical sutures and proposed a bifurcated trial plan. The *Neely* court recognized that "Fifth Circuit case law clearly mandates that [bifurcation under] Rule 23(c)(4)(A) does not operate independently from the rule of predominance found in 23(b)(3)" and refused to limit its predominance inquiry to the "common issues" phase of the bifurcated trial alone. 2001 WL 1090204, at *5. Considering the class claims as a whole, the *Neely* court held that Rule 23(b)(3) was not satisfied because "individual issues of causation and comparative fault will predominate over Plaintiffs' proposed common issues." *Id.* at *11. The same is true here; as explained above, the highly individualized inquiry of whether Vioxx specifically caused the injury alleged by each individual plaintiff in light of his or her medical history, family history, and use of the drug, among other factors, clearly precludes a finding of

17

predominance.  Indeed, as noted above, plaintiffs do not contend otherwise.  Accordingly, that fact alone renders certification of plaintiffs' proposed class untenable – and, as in *Neely*, bifurcation cannot correct that deficiency.

 2. **Phase One Of Plaintiffs' Trial Plan Would Itself Involve Highly Individualized Inquiries.**

 Even if it were proper to bifurcate common and individualized issues where the individualized issues predominate, plaintiffs' proposal would still fail because their supposedly "common" phase would itself require highly individualized inquiries.  According to plaintiffs, they seek to establish Merck's general liability during Phase I of their proposed trial, specifically: (1) whether or not Merck marketed a defective product by failing to adequately warn patients and/or doctors of the alleged risks associated with Vioxx; and (2) whether or not Merck promoted Vioxx in such a way as to "vitiate" the learned intermediary doctrine.  (Trial Plan at 2.)  Even assuming that resolution of these two questions alone were, in fact, sufficient to find liability (a proposition that totally ignores the other critical elements of plaintiffs' negligence and strict liability claims that plaintiffs are obliged to prove), any real analysis of these two questions would require individualized inquiries.  Otherwise, plaintiffs would be able to advance their claims on behalf of a composite, "perfect plaintiff," and force Merck to "defend against a fictional composite without the benefit of deposing or cross-examining the disparate individuals behind the composite creation."  *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 345 (4th Cir. 1998).  Such an approach would jeopardize Merck's due process rights. *See In re Paxil*, 212 F.R.D. at 547 ("a class trial on liability without any reference to [defendant's defenses] runs the real risk . . . of a composite case being much stronger than any plaintiff's individual action would be" (internal quotation marks omitted) (alterations in original) (quoting *O'Connor v. Boeing N. Am., Inc.*, 197 F.R.D. 404, 415 (C.D. Cal. 2000))).

18

a.      **In Order To Determine Whether Merck Is Liable, A Jury Would Have To Undertake Numerous Fact-Specific, Individualized Inquiries Regarding The Circumstances Of Each Plaintiff's Vioxx Prescription.**

Plaintiffs' allegations that Merck is liable because it failed to adequately warn consumers and/or doctors regarding the alleged health risks associated with Vioxx – whether they sound in strict liability or negligence – necessarily turn on numerous individualized issues. These include: the alleged injury, what Merck knew about the risks of the alleged injury when the patient was prescribed Vioxx, what Merck told physicians and consumers about those risks in its package inserts, what their physicians knew from other sources, and whether their physician would have prescribed Vioxx regardless of what other warnings Merck might have provided. These distinctions will be critical both to determining what evidence is admissible in a certain trial (for example, although plaintiffs like to argue that evidence of conversations between sales representatives and physicians is important to their case, this evidence would have no relevance to a case where the specific physician was never visited by a sales representative) and to a jury's conclusions (a jury might conclude that Merck warned adequately of one alleged side-effect but did not warn adequately of another alleged side-effect). The Court has acknowledged as much in proposing "representative" trials for various categories of cases in this MDL proceeding, but even those categories do not account for the numerous individualized inquiries that will vary from case to case.

Among the individualized factors that will affect a jury's finding of "liability" are the following:

*The plaintiff's alleged injury.* As a threshold matter, whether or not Merck failed to warn of an alleged side-effect will depend in large part on what that side-effect is. Plaintiffs here seek to certify a class action consisting of anyone who claims any form of personal injury

19

attributable to Vioxx. The named plaintiffs allege that Vioxx has caused a range of injuries, including heart attacks (H. Couch's Resp. No. 3); blood clots (Bell's Resp. No. 3); kidney failure/liver damage (Turner Compl. ¶ 9); and strokes (Donegan's Resp. No. 4). Other putative class members will undoubtedly allege other injuries. Obviously, it would be impossible for a jury to make one liability determination about whether Merck failed to warn of every different injury that has allegedly been caused by Vioxx. What Merck knew with regard to alleged risks of heart attacks at a particular juncture, for example, is not probative of what it knew at that time about the risk of strokes or any other side effects, and evidence of the former could not be used to support some generalized finding of liability.

**What Merck knew at the time the particular plaintiff was prescribed Vioxx.** Plaintiffs propose a class of individuals who took Vioxx for a period spanning more than five years – from the time Vioxx was first approved for sale in the U.S. on May 20, 1999, until it was voluntarily withdrawn from the market on September 30, 2004. Throughout this period, Merck's knowledge regarding Vioxx's safety profile was constantly evolving, as additional clinical studies were completed, and as clinical data and other information accumulated.

As other courts have recognized, the changing nature of a defendant's knowledge over time precludes the use of common proof to establish that defendant's liability. In the *Baycol* cases, for example, the plaintiffs argued that common facts predominated because they needed only to show that "Defendants knew, but did not adequately disclose, the incidence of adverse side effects caused by Baycol and that Baycol was defective and unreasonably dangerous." *In re Baycol Prods. Liab. Litig.*, 218 F.R.D. 197, 208 (D. Minn 2003). But the court in that case was not persuaded and rejected the plaintiffs' attempt to elevate these generalized "common" facts above the actually predominating individual questions:

Plaintiffs' claims of failure to warn turn on what Defendants knew at the time Baycol was prescribed. As the class members were prescribed Baycol at different times, the issue of Defendants' knowledge will differ from case to case. The same is true for the claims based on negligence. For example, negligence claims depend on individual facts - whether there is a breach of duty or the foreseeability of harm will depend on what Defendants knew or should have known at the time Baycol was prescribed and whether Defendants acted reasonably based on the knowledge it had at that time.

*Id. See also Prempro*, 230 F.R.D. at 567 ("since scientific knowledge is constantly changing, a 1995 ad making certain claims might not be fraudulent, however if made in 1999, it might well be").

The same is true here. During the five and a half year period that Vioxx was on the market, Merck's knowledge about the drug changed repeatedly based on data from dozens of randomized clinical trials, including the VIGOR study and Alzheimer's studies cited by plaintiffs, several pooled analyses of the clinical trial data, many other analyses and observational studies, and various reports of clinical experiences. Thus, a jury could not be expected to reach a uniform conclusion as to Merck's obligation to warn consumers, much less whether its effort to so warn – which changed over time – was adequate. For this reason as well, certification is inappropriate.

*What the label/advertisements/product inserts said at the time the particular plaintiff was prescribed Vioxx.* Another individualized factor in the liability determination is what Merck was publicly saying about Vioxx at the time a plaintiff was prescribed the drug. This would include the mix of advertisements, labels and package inserts that Merck was using at the time of the prescription. Over the five-plus years that Vioxx was on the market, the package insert ("PI") changed 11 times, and the patient package insert ("PPI") changed 10 times. For example, in 2002, Merck added product packaging containing new language reflecting the results of the VIGOR study:

21

In VIGOR, a study in 8076 patients (mean age 58; VIOXX n=4047, naproxen n=4029) with a median duration of exposure of 9 months, the risk of developing a serious cardiovascular thrombotic event was significantly higher in patients treated with VIOXX 50 mg once daily (n=45) as compared to patients treated with naproxen 500 mg twice daily (n=19). In VIGOR, mortality due to cardiovascular thrombotic events (7 vs. 6, VIOXX vs naproxen, respectively) was similar between the treatment groups. . . . Prospective studies specifically designed to compare the incidence of serious CV events in patients taking VIOXX versus NSAID comparators or placebo have not been performed.

**Because of its lack of platelet effects, VIOXX is not a substitute for aspirin for cardiovascular prophylaxis.** Therefore, in patients taking VIOXX, antiplatelet therapies should not be discontinued and should be considered in patients with an indication for cardiovascular prophylaxis

PI 9183811 (2002) (emphasis in original) (attached as Ex. 17). Also in 2002, PPI 9183906

(2002) (attached as Ex. 18) was introduced to make patients aware of the results of VIGOR:

Tell your doctor if you have . . . history of angina, heart attack or a blocked artery in your heart . . . . VIOXX cannot take the place of aspirin for prevention of heart attack or stroke. If you are currently taking aspirin for this purpose, you should not discontinue taking aspirin without consulting your doctor. . . . Heart attacks and similar serious events have been reported in patients taking VIOXX.

Other changes included the addition of a statement that "the maximum recommended

chronic daily dose of VIOXX for patients with moderate hepatic insufficiency is 12.5 mg daily"

in PI 9556413 (2004) (attached as Ex. 19), the deletion of a statement that "[a]naphylactoid

reactions were not reported in patients receiving VIOXX" in clinical trials (*compare* PI 9183804

(2000) (attached as Ex. 20) *with* PI 9183802 (1999) (attached as Ex. 21)), and the addition of a

notice that "severe skin reactions have also been reported" in patients taking Vioxx in PPI

9183902 (2000) (attached as Ex. 22).

Such changes in the Company's public statements about Vioxx and its risks similarly

preclude a "common" finding of liability because the answer to the question whether warnings

were adequate could, by definition, vary over time and because different evidence (*i.e.*,

warnings) would be at issue with respect to various class members' claims. *See Prempro*, 230

22

F.R.D. at 567 ("Because Wyeth's promotional material, informational literature, and advertising changed over time, what and when a plaintiff saw the advertisement will differ from plaintiff to plaintiff, directly affecting whether Wyeth violated any consumer fraud laws."); *see also Sweet v. Pfizer*, No. EDCV 05-0052 VAP, 2005 WL 3074602, at *7 (C.D. Cal. Nov. 15, 2005) (a change in the label of a drug during the class period could create "legal differences between those who took the drug before the labeling change and those who took the drug after the addition"); *In re Rezulin*, 210 F.R.D. at 66-67 (the individualized nature of the causation inquiry "is compounded by the fact that there were several changes in the labeling of Rezulin during its brief period on the market, thus altering the total mix of information available during the various periods in which class members took the drug").

   *The plaintiffs' dosage.*  The various studies conducted about Vioxx involved different dosages of the drug.  For example, the VIGOR study involved 50 mg of Vioxx per day over an average of nine months, whereas the "Protocol 090" study involved 12.5 mg of Vioxx per day for a shorter period, and the "Protocol 078" study (one of the "Alzheimer's Studies") involved a dose of 25 mg per day for 48 months.  Thus, even if two plaintiffs were prescribed Vioxx at the same time by the same doctor, a jury could reach different conclusions regarding Merck's liability to a plaintiff who was prescribed 12.5 mg per day and a plaintiff who was prescribed 25 mg per day, or a plaintiff who was prescribed 50 mg per day.[5]

   *The duration of the prescription.*  A jury could also reach different conclusions about Merck's liability based on the duration of a plaintiff's prescription.  For example, a jury could reach different conclusions about Merck's liability if a plaintiff took 50 mg of Vioxx for an extended period – "not recommended," according to Merck's labeling – or if a plaintiff took 50

---

[5]    As discussed above, *see* n. 1, *supra*, the named plaintiffs themselves took different dosages of Vioxx.

mg of Vioxx for just a few days.

      ***What Merck's professional representatives told the prescribing physician (and whether he or she listened).***  Another individualized factor in the liability inquiry is what – if anything – Merck's sales representatives told each plaintiff's prescribing physician(s) about the drug's safety profile.  Discovery in individual Vioxx cases highlights these variations.  For example, Mr. Irvin's prescriber, Dr. Schirmer, testified that he had never received a visit from a Merck representative with regard to Vioxx.  (*See* Deposition of Christopher Schirmer, M.D. ("Schirmer Dep.") at 68:20-21, Sept. 6, 2005 ("I certainly don't have a recollection of ever being detailed about Vioxx.") (attached as Ex. 23)); *see also* Deposition of Anthony DiGioia, M.D. ("DiGioia Dep.") at 30:21-22, *Rodemoyer v. Merck & Co., Inc.*, ATL-L-703-03-MT (N.J. Sup. Ct. Law Div. Dec. 17, 2004) (DiGioia stated that he had "a policy of never meeting with [pharmaceutical company] representatives" about their products) (attached as Ex. 24).  In contrast, Mr. Humeston's prescriber, Dr. Lewer, testified that he is visited by pharmaceutical sales representatives a couple of times per week, and that he had met on "at least one" occasion with a Merck representative about Vioxx, Deposition of Gregory S. Lewer, M.D. ("Lewer Dep.") at 246:15-248:10, *Humeston v. Merck & Co., Inc.*, ATL-L-2272-03-MT (N.J. Sup. Ct. Law Div. June 2, 2005) (attached as Ex. 25) and Mr. Ernst's prescriber, Dr. Brent Wallace, testified that he was visited by Merck representatives to explain the company's view of the results of the VIGOR study, Deposition of Brent Wallace ("Wallace Dep.") at 42:7-16, *Ernst v. Merck & Co., Inc.*, No. 19961-BH02 (Tex. Dist. Ct. June 9, 2005) (attached as Ex. 26).

      Also relevant is how much stock each plaintiff's physician put into any information he or she received from sales representatives.  Some physicians deposed in Vioxx cases have indicated that they do not listen to sales representatives and even throw their materials in the garbage,

24