others have indicated a more tempered skepticism, while still others have testified that they

considered the representatives a good source of information about prescription drugs and their

risks. *Compare* Deposition of Lawrence J. Leventhal ("Leventhal Dep.") at 70:8-24, *Heindel v.*

*Pfizer, Inc.*, No. 02-3348 (GEB) (E.D. Pa. May 22, 2003) (Q:  "[I]s it fair to say that you don't

rely on any promotional activity by drug manufacturers when deciding to prescribe . . . Vioxx?

A:  That's correct") (attached as Ex. 27) *and* Deposition of Dr. James Guadagni ("Guadagni

Dep.") at 25:5-11, *Cole v. Merck & Co., Inc.*, JCCP No. 4247 (Cal. Super. Ct. Apr. 25, 2005) ("I

throw [information from sales reps] in the garbage because I consider that a tainted source.")

(attached as Ex. 28) *with* (Deposition of Dr. Mark Bartiss ("Bartiss Dep.") at 68:4-7, Jan. 3, 2006

("They [pharmaceutical sales reps] would give me information.  Whether I would use the

information or believe what they say all the time would be questionable.") (attached as Ex. 29)),

Terrell Dep. at 35:8-10 ("Q:  Do you consider drug representatives a good source of information

regarding pharmaceuticals?   A:  Yes"), *and* Deposition of H. Kean Day ("Day Dep.") at

117:10-15, *Wascom v. Merck & Co., Inc.*, No. 02-CV-460 (M.D. La. Aug. 12, 2003) (physician

"depend[ed] on the reps to keep me posted") (attached as Ex. 30).

Plaintiffs in Vioxx cases have made it clear that they consider statements by sales

representatives to prescribing physicians to be central to their claims. (*See, e.g.*, Pls.' Purchase

Claims Master Class Action Compl. ¶ 74 ("Once the drug was approved, scores of sales

representatives fanned out across the country with samples, asserting that Vioxx had a better

safety profile than other NSAIDs"); *see also id.* at ¶ 97 ("Merck's internal documents also reveal

its massive effort to blitz doctors' offices with promotional material, while expertly training its

sales representatives to dodge any questions regarding the safety of Vioxx").)  However, if a

particular plaintiff's physician never spoke to a professional representative (like Drs. Schirmer

and DiGioia) or paid them no heed (like Drs. Leventhal and Guadagni), then statements by sales representatives should not be part of the mix of evidence considered by the jury as to that plaintiff's claims.

*What the physician knew from non-Merck sources.* Another individualized factor that could affect a jury's liability determination is what the prescribing physician knew about Vioxx's safety profile. This factor will vary from physician to physician, and even as to a particular physician, it will vary over time. *See In re Rezulin*, 210 F.R.D. at 67 ("class members would have to show that each doctor's decision to prescribe Rezulin would have been different had defendants issued what plaintiffs allege would have been proper warnings").

As noted in the declaration of Dr. Merlin Wilson, physicians do not merely rely on pharmaceutical manufacturers and their representatives for information related to a drug's risks. In addition, they also rely on a host of other potential sources of information that vary from physician to physician, including:

> (a) the physician's own clinical experience;
>
> (b) the clinical experience of the physician's colleagues;
>
> (c) the medical literature read by the physician;
>
> (d) the continuing medical education (CME) seminars or conferences that the physician attended; [and]
>
> (e) guidance provided by medical organizations.

(Declaration of Merlin R. Wilson, M.D. In Support Of Def. Merck & Co., Inc.'s Opp. To Pls.' Mot. For Class Cert. ("Wilson Decl.") ¶ 17, Jan. 4, 2006) (attached at Tab A).) For example, Dr. Wallace, Mr. Ernst's prescriber, testified that he does not "necessarily" read drug labels before prescribing a medication for the first time, but that he relied on a combination of information from lectures, colleagues, sales representatives, previous experience, medical school, and, if

necessary, his Physician's Desk Reference ("PDR"), Wallace Dep. at 32:17-25, and Dr. Lewer,

the prescribing physician in the *Humeston* case, stated that he primarily relies on a combination

of a product's package insert, the PDR, speaking with colleagues, and CME meetings.  Lewer

Dep. at 61:17-62:18.  Other doctors who prescribed Vioxx have testified that they relied more

heavily on journals such as the New England Journal of Medicine (NEJM), where the VIGOR

results were published, and the Journal of the American Medical Association (JAMA), which

also published Vioxx-related articles.  *See* Deposition of Eugene D. Pogorelic, D.O. at 46:2-21,

*Roush v. Merck & Co., Inc.*, ATL-L-2271-03-MT (N.J. Sup. Ct. Law Div. Aug. 23, 2005)

(attached as Ex. 31); *see also* Deposition of Chaiman D. Austin at 21:16-22:7, *Kimmelman v.*

*Merck & Co., Inc.*, ATL-L-462-03-MT (N.J. Sup. Ct. Law Div. Apr. 21, 2005) (attached as Ex.

32).  One Vioxx prescriber (deposed in his capacity as a plaintiff suing Merck) has testified that

he learned about drugs not from medical journals but from the Wall Street Journal.  Deposition

of Doy L. Freeland ("Freeland Dep.") at 38:1-19, *Calcaterra v. Merck & Co., Inc.*, ATL-L-462-

03-MT (S.D. Ill. Dec. 5, 2002) (attached as Ex. 33).

　　　　Prescribing physician knowledge of the alleged risks of Vioxx will also vary depending

on the date of prescription.  Just as Merck's knowledge about the safety profile of Vioxx evolved

during the more than five-year period that Vioxx was on the market, so too did the knowledge of

physicians and the general public.  Scores of Vioxx-related articles were published in medical

journals and the popular press between 1999 and 2004, resulting in a constantly changing mix of

information.  For example:

- On May 21, 2000, *Reuters* reported on the results of the VIGOR study, stating
  that "Merck has offered only a credible theory why fewer patients taking
  naproxen had heart attacks than those taking Vioxx . . . .  But it's only a theory.
  There's nothing in the trial to prove the supposedly beneficial effects of
  naproxen." Ransdell Pierson, *Vioxx, Celebrex aim to profit from improved
  safety labels*, Reuters, May 21, 2000 (quotation marks omitted) (attached as Ex.

34).

- The day after the February 8, 2001 public hearing held by the FDA Arthritis Advisory Committee on the safety of Vioxx, *USA Today* reported that "[arthritis patients] should know that the blockbuster drug [Vioxx] might increase their risk of suffering a heart attack." Rita Rubin, *Data: Vioxx might raise heart risk*, USA Today, Feb. 9, 2001, at 05B (attached as Ex. 35).

- An August 2001 article in JAMA published by researchers at the Cleveland Clinic provided a meta-analysis of three clinical trials involving Vioxx and one involving Celebrex, and concluded that there was a "potential increase in cardiovascular event rates for the presently available Cox-2 inhibitors." Deborah Mukherjee, et al., *Risk of Cardiovascular Events Associated With Selective COX-2 Inhibitors*, 286 J. Am. Med. Ass'n 954, 959 (2001) (attached as Ex. 36).

- An October 2002 article published in *The Lancet* published the results of an observational study that found "no evidence of increased risk of serious [coronary heart disease] for rofecoxib 25 mg or less." Wayne A. Ray, et al., *COX-2 selective non-steroidal anti-inflammatory drugs and risk of serious coronary heart disease*, 360 The Lancet 1071, 1072 (Oct. 5, 2002) (attached as Ex. 37).

In short, there is no uniform body of representations or other information to which all prescribers were exposed. To the contrary, physicians' prescribing decisions would have been influenced to varying degrees by statements about Vioxx from sources other than Merck, depending on which materials they were exposed to and when they prescribed the drug to a particular patient. These differences would have real ramifications at trial. For instance, a jury might evaluate differently the testimony of a prescribing physician who relied solely on Merck's representations and a physician who also read articles or studies suggesting the possibility of an association between Vioxx and heart attacks – even if the jury believed that Merck was not sufficiently forthcoming in its own representations, it still might find in favor of Merck in the latter instance because the physician was otherwise aware of the information Merck allegedly concealed. For this reason as well, there is simply no way to present the jury with classwide evidence of Merck's "liability."

***Whether the physician would have prescribed Vioxx to a particular patient regardless of the allegedly withheld information.***  A number of courts applying different state laws (including New Jersey's) have recognized that a drug manufacturer can only be liable if its alleged failure to warn caused the plaintiff's physician to prescribe the drug at issue; if the doctor knew of the alleged dangers or would have prescribed the drug regardless, the defendant cannot be held liable. *See, e.g., Strumpf v. Schering Corp.*, 626 A.2d 1090 (N.J. 1993), *adopting* 606 A.2d 1140, 1148 (N.J. Super. Ct. App. Div. 1992) (Skillman, J., dissenting) (in a prescription drug failure-to-warn case, a plaintiff "must show that adequate warnings would have altered her doctors' decision to prescribe"); *In re Norplant Contraceptive Prods. Liab. Litig.*, 955 F. Supp. 700, 711 (E.D. Tex. 1997) ("when the prescribing physician was aware of the possible side effects of a drug, yet, chose to use it regardless of the adequacy of the warning, then as a matter of law, the adequacy of the warning was not a producing cause of the plaintiff's injury").

The decision to prescribe a certain drug is highly patient-specific, depending on numerous "[f]actors such as the patient's age, sex, race, pregnancy status, occupation, social circumstances, family history, current medications, drug allergies, drug dependencies and genetic predisposition." (Wilson Decl. ¶ 9.) (*See also* Bartiss Dep. at 79:1-80:18 (selecting the dose of a particular medication prescribed to a particular patient is a highly individualized decision).)  All drugs have risks and benefits, and physicians balance those risks and benefits in making prescription decisions.  Importantly, in some cases, it may be appropriate for a patient to take a medication, even if it is known to be associated with serious risks.  In the case of Vioxx, Dr. Wilson explains:

> There were many important patient-specific considerations in the decision to prescribe COX-2 inhibitors like Vioxx versus traditional NSAIDs or other treatment options such as narcotics and corticosteroids.  Significant evidence suggests that while the efficacy of Vioxx and prescription doses of traditional

29

> NSAIDs is comparable, Vioxx was much safer on the gastrointestinal system. For some patients with a history of serious gastrointestinal problems after taking other NSAID pain medications, prescribing physicians frequently concluded that a COX-2 inhibitor like Vioxx was their only appropriate option. In addition, several scientific studies indicate that Vioxx did not interfere with the cardioprotective effect of aspirin, while some of the traditional NSAIDs like ibuprofen do. Therefore, some prominent scientists recommended COX-2 inhibitors like Vioxx as an appropriate choice for patients requiring concomitant treatment with low-dose aspirin. . . . Furthermore, Vioxx was the only available option for many patients because of patient-specific allergies, contraindications, and other idiosyncratic reactions.

(Wilson Decl. ¶ 11.)

Thus, while a jury might find that some doctors may have been less informed of the potential risks of Vioxx, others may have been keenly aware of the potential risks but still prescribed Vioxx to patients – like named plaintiff Hornik – who had a history of bleeding ulcers or other gastrointestinal conditions that precluded the use of other NSAIDs, *see* Leventhal Dep. at 9:6-9; (Bartiss Dep. at 90:22-91:8),[6] or plaintiffs who suffered from chronic, debilitating arthritis that was not alleviated by other NSAIDs, *see* Lewer Dep. at 92:7-11 (testimony by prescriber in *Humeston* that he would prescribe Cox-2 inhibitors for patients who were having "some problem" with his more typical prescription choices).

The fact that many doctors would continue to prescribe Vioxx with full knowledge of its alleged risks is confirmed by Dr. Wilson, who states that "Vioxx would be an appropriate treatment for many patients even considering the data from the APPROVe trial." (Wilson Decl. ¶ 16; *see also* Terrell Dep. at 38:9-12; 39:15-21 (named plaintiff M. Couch's prescribing physician testifying that he took Vioxx for several years and would still take Vioxx himself if it were available today but would "probably" not prescribe it to individuals with "a history of or a

---

[6]    Several of the named plaintiffs in this matter have a history of gastrointestinal conditions necessitating medication and/or hospitalization before their Vioxx usage, that would likely have affected their physician's prescription decisions. (*See, e.g.*, Lawrence's Resp. No. 19 (plaintiff indicated that she took medication daily for acid indigestion); *see also* Bell's Resp. No. 10 (plaintiff had gastric bypass surgery).)

strong family history of cardiovascular disease")); Freeland Dep. at 69:18-71:21 (physician continued to prescribe Vioxx despite misgivings about side effects, because the patients refused to give up the "excellent pain relief" that they got from the drug); Guadagni Dep. at 91:7-12 ("Right now I still think that probably the risks, if you have a person who [is] at risk for having bleeding ulcers, it's probably still safer, knowing that they have the higher cardiovascular risk, it's still probably safer than taking--taking one of the other drugs"); Deposition of Peter Schludermann, M.D. at 52:3-25, *Henderson v. Merck & Co., Inc.*, ATL-L-1654-03-MT (N.J. Super. Ct. Law Div. Nov. 4, 2004) (indicating that he had prescribed Vioxx to his daughter, that he would still use it, and that he still has it at home) (attached as Ex. 38). Indeed, even plaintiffs' expert Dr. Benedict Lucchesi has testified that Vioxx is "perfectly safe" for "the vast majority of people." *See, e.g.*, Trial Tr. at 227:21-228:10, *Plunkett v. Merck & Co., Inc.* (Nov. 29, 2005) (testimony by Dr. Lucchesi agreeing that "for the vast majority of people, Vioxx is perfectly safe") (attached as Ex. 39).

Others have agreed with this assessment. In April 2005, the FDA convened a three-day Advisory Committee meeting of outside experts to examine the best available science, including clinical trial data, on COX-2 inhibitors and nonselective NSAIDs. The FDA issued a Memorandum on April 6, 2005 ("FDA Memorandum" or "Memorandum") based on the evidence presented at that hearing, which stated that short-term ingestion of Vioxx does not increase a patient's risk of having a heart attack (*see* FDA Memorandum at 2 (attached as Ex. 40)), noting that "[s]hort-term use of NSAIDs to relieve acute pain, particularly at low doses, does not appear to confer an increased risk of serious adverse CV events" (*id.*), and going on to state that "with the exception of the parecoxib/valdecoxib CABG studies, the increased risk of serious adverse CV events in . . . clinical trials . . . only become [sic] apparent after months to

31

years of treatment" (*id.* at 13).  Additionally, the Memorandum stated that Vioxx, and Vioxx

alone, has been shown to have clinically significant GI benefits.  (*See id.* at 2 ("Only rofecoxib

has been shown to reduce the risk of serious GI bleeding compared to a non-selective NSAID

(naproxen) following chronic use.").)  Accordingly, the "[i]mproved GI tolerability of NSAIDs

is . . . a valid rationale for maintaining a range of options in the NSAID class from which

physicians and patients may choose." (*Id.* at 11-12.)

Similarly, in June 2005, an Expert Advisory Panel on selective COX-2 Inhibitors

convened by Health Canada reviewed the data on cardiovascular safety of COX-2 selective

inhibitors and voted 12 to 1 that Vioxx be allowed back on the market because: (a) the increased

risk of cardiovascular events caused by Vioxx appears similar to that of most NSAIDs; (b) the

risk of gastrointestinal harm caused by Vioxx appears less than most NSAIDs; and (c) patients

benefit from having a variety of drugs to choose from for pain management.  (Health Canada,

*Report of the Expert Advisory Panel on the Safety of Cox-2 Selective Non-steroidal Anti-*

*Inflammatory Drugs (NSAIDs)* 3-7 (July 6, 2005) (attached as Ex. 41).)  Despite these findings,

some doctors would not prescribe Vioxx even after regulators deemed it safe enough to put back

on the market. (*See* Bartiss Dep. at  99:22-100:1 (Q: If Vioxx was still on the market today,

would you be willing to prescribe it for some patients?  A:  No).)

\*     \*     \*

In short, it is simply not true, as plaintiffs contend, that "a preliminary finding of

liability" can be obtained through the application of classwide proof. (Pls.' Trial Plan at 2.)  To

the contrary, any determination as to Merck's liability with respect to the manufacturing and

marketing of Vioxx will require inquiry into a host of individualized issues, and this requirement

cannot be cured by plaintiffs' proposed bifurcation plan.

b.   **A Determination Of Whether Merck's Advertising Vitiated The Learned Intermediary Doctrine (Even Accepting Plaintiffs' Legal Premise) Would Also Be Highly Individualized.**

Plaintiffs' second proposed topic for Phase I of their trial plan – whether Merck marketed Vioxx in such a way as to vitiate the learned intermediary doctrine – would similarly require individualized inquiries. In urging a classwide trial on this issue, plaintiffs argue that "the learned intermediary doctrine is placed into serious doubt due to Merck's direct to consumer marketing practices and efforts to withhold material data and other findings regarding the dangers of Vioxx." (Pls.' Mot. at 25.) For this proposition, plaintiffs rely on *Perez v. Wyeth Laboratories*, 734 A.2d 1245 (N.J. 1999). However, even if plaintiffs' legal conclusions regarding *Perez* were correct, this analysis would still be individualized because it would require a determination about which proposed class members saw, and were influenced by, advertisements for Vioxx.

As a threshold matter, plaintiffs' desire for a common trial based on *Perez*, a case that applies New Jersey substantive law, fails for the reasons discussed in Section II, below – *i.e.*, that their claims are governed by the laws of all fifty states, not just New Jersey. Notably, courts applying other states' laws have reached decisions that are contrary to *Perez*. *See, e.g., In re Norplant Contraceptive Prods. Liab. Litig.*, 165 F.3d 374, 379 (5th Cir. 1999) (applying Texas law and rejecting plaintiff's argument "that because AHP engaged in 'aggressive' marketing, AHP should be liable for not providing adequate warnings in conjunction with that marketing"); *Albertson v. Wyeth, Inc.*, 63 Pa. D. & C. 4th 514, 539 (Phila. Ct. Com. Pl. 2003) (declining to recognize an exception to the learned intermediary doctrine based upon direct-to-consumer advertising); *Presto v. Sandoz Pharms. Corp.*, 487 S.E.2d 70, 73 (Ga. Ct. App. 1997) (refusing to invalidate the learned intermediary doctrine in a case where the manufacturer of an anti-

psychotic medicine provided a pamphlet with product information directly to consumers). In addition, the *Perez* decision relied in large part on the elective nature of the contraceptive prescription drug, Norplant, at issue in that litigation. *See* 734 A.2d at 1256 ("Concerns regarding patients' communication with and access to physicians are magnified in the context of medicines and medical devices furnished to women for reproductive decisions."). Indeed, the court specifically observed that "lifestyle drugs" and other treatments that are not "medically necessary," such as the Norplant contraceptive device, require greater consumer protection because these types of elective treatments may cause significant side effects without "any curative effect." *Id.* at 1257. In the instant case, plaintiffs do not dispute Vioxx's curative effect, and, in any event, Vioxx cannot be categorized as a "lifestyle" drug similar to those discussed in *Perez*. *Id.* at 1251-52. Accordingly, the rationale in *Perez* has no applicability to plaintiffs' claims here.[7]

Finally, even assuming *Perez* applied to non-lifestyle drugs like Vioxx and to non-New Jersey plaintiffs, its application would still require highly individualized inquiries to determine which plaintiffs actually viewed – and were influenced by – Merck's advertisements for Vioxx, since the learned intermediary doctrine would only be vitiated as to plaintiffs who saw Vioxx ads and were directly influenced by them. This is the conclusion recently reached by a New Jersey federal court. In *Appleby v. Glaxo Wellcome, Inc.*, No. Civ. 04-0062 RBK, 2005 WL 3440440 (D.N.J. Dec. 13, 2005), a plaintiff argued that the drug at issue fell within the direct marketing

---

[7]     Even if the *Perez* exception for direct-to-consumer advertising were applicable in this case, Merck has satisfied its duty to directly warn consumers. The New Jersey Products Liability Act provides a rebuttable presumption that warnings approved by the FDA are adequate. *See* N.J. Stat. Ann. § 2A:58C-4. In *Perez*, the court extended this presumption to direct-to-consumer advertising and concluded that a pharmaceutical manufacturer satisfies its obligation to warn consumers where, as here, the manufacturer's advertising "complies with FDA advertising, labeling and warning requirements." 734 A.2d at 1259. Indeed, "[f]or all practical purposes, absent deliberate concealment or nondisclosure of after-acquired knowledge of harmful effects, compliance with FDA standards should be virtually dispositive of such claims." *Id.* Thus, because Merck's advertising for Vioxx complied with FDA regulations, Merck has satisfied any duty to warn consumers under *Perez*.

exception to the learned intermediary doctrine recognized in *Perez. Id.* at *4. However, the plaintiff also testified that she had not been exposed to any of the manufacturers' advertising during the time she was ingesting the drug. *Id.* at *5. Because there was no evidence indicating the plaintiff was affected by any of the manufacturer's advertising or direct consumer marketing, the court concluded that "no reasonable jury could find that consumer advertising . . . was even a remote factor in bringing about Plaintiff's harm." *Id.*

The question whether a plaintiff was exposed to – or affected by – a drug manufacturer's advertisements is obviously highly individualized. Not only will plaintiffs' claims vary in terms of their exposure to advertisements – for example, six named plaintiffs indicate that they saw Vioxx ads and nine have indicated that they did not – but even those who saw the advertisements will have been influenced by them to different degrees. Both class representative Lawrence and class representative Gibney testified that they had viewed at least one commercial for Vioxx. (Lawrence Dep. 152:1-9; Gibney Dep. at 151:13-23.) However, they both also testified that they based their decision to ingest Vioxx solely on their doctor's decision to prescribe the drug for their conditions. (Lawrence Dep. at 138:10-22; Gibney Dep. at 105:22-107:10.) Accordingly, each plaintiff will be required to demonstrate that he or she was exposed to Merck's advertisements for Vioxx and that the advertisements had some effect on his or her decision to ingest the drug. Thus, even if *Perez* applied, any determination as to whether or not each plaintiff viewed – and was influenced by – Vioxx advertisements would require yet another highly individualized inquiry.

### 3. Plaintiffs' Bifurcated Trial Plan Does Not Satisfy Rule 23(b)(3)'s Superiority Requirement.

Plaintiffs' bifurcated trial plan also highlights the superiority problems posed by their class action. In determining whether a class action is "superior to other available methods for the

fair and efficient adjudication of the controversy," the court must consider: (1) the interests of individual class members in bringing their own private actions; (2) whether other litigation has been commenced by a member of the class; (3) the desirability of combining the actions in the particular forum; and (4) the manageability of the class. Fed. R. Civ. P. 23(b)(3); *Alabama v. Blue Bird Body Co., Inc.*, 573 F.2d 309, 315 (5th Cir. 1978). The fact that thousands of putative class members have filed individual suits against Merck demonstrates the putative class members' strong interests in bringing their own private actions. Moreover, plaintiffs' trial plan fails to provide a superior method of adjudicating their claims because: (1) there is a substantial risk that individual class members would be severely prejudiced by a bifurcated Phase I finding that Merck is not generally liable; and (2) Phase I would not advance the ball as to any individual's claim against Merck.

*First,* the use of a bifurcated trial in this case creates a serious danger that every Vioxx user in the country who fails to opt out of the class will be barred from asserting an individual claim for personal injury or wrongful death. Plaintiffs propose that Phase I of the bifurcated proceeding will "obtain a preliminary finding of liability" for personal injury and wrongful death claims. (Pls.' Trial Plan at 2.) Then, plaintiffs suggest that "[a]ssuming that the class receives a favorable finding regarding liability of Merck, the litigation will move into a second phase involving individual determination of causation and damages." (*Id.* at 3.) However, while plaintiffs assume a favorable finding (and, as the *Paxil* court noted, the format they propose dramatically and prejudicially increases the likelihood of that outcome), that positive result for plaintiffs is not predetermined. Should Merck prevail in phase one, every Vioxx plaintiff in the country who did not affirmatively opt out of the proposed class would be collaterally estopped from bringing an individual personal injury or wrongful death claim. This danger amplifies the

putative class members' strong interests in bringing their own individual suits.[8]

**Second**, plaintiffs' trial plan fails to satisfy the superiority requirement because the proposed classwide Phase I trial would not "materially advance" the litigation and the Phase II trials would be unmanageable. *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 209 F.R.D. 323, 352-53 (S.D.N.Y. 2002) (denying certification in product liability case because "countless individual trials . . . would follow the classwide trial" and the trial plan would thus fail to "materially advance this litigation"); *Neely v. Ethicon, Inc.*, No. 1:00-CV-00569, 1:01-CV-37, 1:01-CV-38, 2001 WL 1090204, at *4, 11 (E.D. Tex. Aug. 15, 2001) (rejecting trial plan that "would focus on Defendants' liability for a defective product and punitive damages" and concluding that "any negligence of any Defendant found in the proposed Phase I trial is immaterial if an individual plaintiff is unable to establish that negligence caused an actual injury").

As other courts have recognized, the most serious roadblock to superiority in product liability cases is typically specific causation: "[w]hether, and to what extent [a drug] causes . . . symptoms varies from patient to patient." *In re Paxil Litig.*, 212 F.R.D. 539, 551 (C.D. Cal. 2003). "Not only do individual physiologies affect the causation issues, but so too do the underlying illnesses and medical history of each individual plaintiff." *Id. See also In re Rezulin*, 210 F.R.D. at 66 (highlighting extremely individualized nature of specific causation inquiry); *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 208 F.R.D. 625, 632 (W.D. Wash. 2002)

---

[8]     As a class action defendant, Merck has a legitimate interest in ensuring that the legal rights of absent class members are protected in order to avoid nullification of class judgment on appeal. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 805 (1985) (holding that defendant vindicates its own interests in seeking to protect the legal rights of absent class members). In *Shutts*, the Supreme Court held that a defendant may argue against certification on behalf of absent class members because those members may one day seek to appeal any class verdict for the defendant as unfair. *Id.* The Court recognized that "[w]hether it wins or loses on the merits, [defendant] has a distinct and personal interest in seeing the entire plaintiff class bound by *res judicata* just as [defendant] is bound." *Id.*

("[a]n assessment of specific causation . . . necessarily dissolves into a myriad of individualized causation inquiries"). Where, as here, the issues of causation and damages would require "separate . . . trial(s) of an overwhelming large number of individual claimants," courts have found that the class device provides no benefits and instead leads to "staggering problems of logistics . . . render[ing] the case unmanageable as a class action." *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 68 (4th Cir. 1977) (internal quotation marks and footnotes omitted); *see id.* at 72 (refusing to certify bifurcated class claims of tobacco growers asserting antitrust claims against tobacco companies because "[w]hether dealt with in a unitary trial or in a severed trial, the problem of proof of the individual claims and of the essential elements of individual injury and damage will remain and severance could only postpone the difficulty of such proof"). *See also Rink v. Cheminova, Inc.*, 203 F.R.D. 648, 652 (M.D. Fla. 2001) (denying class certification partly due to concerns that resolution of any common issues on a class basis would not achieve any efficiency because "the juries in the hundreds or thousands or tens of thousands of 'mini-trials' on causation and damages would be required to reconsider the findings of the original jury in the liability case in order to compare and apportion fault." (quotation marks omitted)). Thus, even if general liability could be proven on a classwide basis – which it cannot for the reasons discussed above – that determination would do nothing to advance the litigation on the crucial, fact-specific question of specific causation, leaving the trial court to grapple with thousands of individual trials on causation. *See Mertens v. Abbott Labs.*, 99 F.R.D. 38, 42 (D.N.H. 1983) (denying class certification and motion to bifurcate because "judicial resources applied to each claim on an individual basis would doubtless be more effective than a general pronouncement applied to all cases without any real effect"). For this reason as well, class certification should be denied.[9]

---

[9]     In arguing that their trial plan satisfies the superiority requirement, plaintiffs rely on *Klein v. O'Neal, Inc.*,

**C.     Plaintiffs' Proposal Is Barred By The Seventh Amendment.**

Even if plaintiffs' bifurcation proposal could succeed in keeping individual issues out of

phase one, the plan would still fail because consideration of those individual issues in phase two

of the trial would inevitably lead juries to reconsider the "common" liability issues already

decided in phase one, in violation of the Re-examination Clause of the Seventh Amendment.

Under the Re-examination Clause of the Seventh Amendment, "no fact tried by a jury,

shall be otherwise re-examined in any Court of the United States, than according to the rules of

the common law." In *Gasoline Products Co. v. Champlin Refining Co.*, 283 U.S. 494 (1931), the

Supreme Court interpreted this Clause to prohibit a jury from passing on the same facts

necessarily determined by a prior jury. *Id.* at 500.  Subsequent courts have repeatedly relied on

*Gasoline Products* to reject bifurcation in cases where any facts decided by the first jury in the

first phase of the trial could possibly be reconsidered by the second jury in the second phase of

the trial. *See Blue Bird Body Co.*, 573 F.2d at 318 (observing that bifurcation of fact issues is

"not the usual course that should be followed") (citing *Gasoline Prods. Co.*); *Bacon v. Honda of

Am. Mfg.*, 205 F.R.D. 466, 489 (S.D. Ohio 2001) (rejecting plaintiffs' proposal to bifurcate

because the two stages "are not so distinct and separable from one another that they may be

considered separately by multiple fact-finders without violating the Seventh Amendment"

(quoting *Gasoline Prods. Co.*, 283 U.S. at 500)).  In *Rhone-Poulenc*, for example, the Seventh

Circuit reversed the district court's bifurcation order because the first jury would have merely

---

222 F.R.D. 564 (N.D. Tex. 2004) (Pls.' Mot. at 36), a case in which guardians suing on behalf of premature infants
injured by the drug E-Ferol within a specific six month period claimed that defendant manufacturers illegally placed
the intravenous drug in the stream of commerce despite the fact that it did not have FDA clearance, an act for which
defendants had already been criminally convicted. 222 F.R.D. at 567. The court found that superiority was met in
light of the fact that a generalized finding that the drug was released without regulatory authorization would apply to
all plaintiffs. *Id.* at 568. Conversely, in the present suit, as noted above, plaintiffs allege, *inter alia*, failure-to-warn
claims that require a showing of what Merck knew at the time that Vioxx was prescribed to each individual plaintiff
during a period of over five years. Because Merck's knowledge regarding the alleged risks associated with Vioxx
was constantly changing, a generalized finding on this issue would be of no use in advancing the litigation.

determined "whether one or more of the defendants was negligent under one of the two theories," leaving for a second phase "such issues as comparative negligence . . . and proximate causation," which would have inevitably required the second jury to revisit the findings of the first jury. 51 F.3d 1293, 1303 (7th Cir. 1995).

The case at bar is on all fours with *Rhone-Poulenc*. Plaintiffs would limit phase one of the trial to "liability" and presumably exile to phase two individualized defenses and other fact-specific issues (though their trial plan simply ignores these complications, presumably in the hopes that the Court will forget them too). The problem with this approach, as recognized by the Fifth Circuit, is that "[a]t a bare minimum, a second jury will rehear evidence of the defendant's conduct," and "the second jury could reevaluate the defendant's fault, determine that the defendant was not at fault, and apportion 100% of the fault to the plaintiff." *Castano v. Am. Tobacco*, 84 F.3d 734, 751 (5th Cir. 1996). That risk arises because "[p]roximate causation is found by determining whether the harm to the plaintiff followed in some sense naturally, uninterruptedly, and with reasonable probability from the negligent act of the defendant." *Rhone-Poulenc*, 51 F.3d at 1303. In this case, to take one example, the first jury would have to decide what the side-effects are of Vioxx to determine whether Merck adequately warned of them. But a second jury would almost certainly revisit that issue in deciding whether a particular plaintiff was injured by Vioxx. As such, it is a virtual certainty, particularly given the overlap of evidence and issues in both stages, that a jury in the second stage would be called upon to re-examine the evidence introduced at the first stage and the findings reached by the first jury. *See Castano*, 84 F.3d at 751 (noting that "risk of such reevaluation is so great that class treatment can hardly be said to be superior to individual adjudication").[10]

---

[10]  Plaintiffs' cases are not to the contrary. Their headliner case, *Copley*, should not guide this Court for the reasons explained above. *Jenkins* involved bifurcation of punitive damages only and thus does not address the kind

In short, plaintiffs have not met their burden to show that their plan "carve[s] at the joint," *Rhone-Poulenc*, 51 F.3d at 1302, and that this case is suited for the "unusual course" of bifurcation. On the contrary, there is every reason to believe that the evidence presented to the first jury as to Merck's promotion of Vioxx will be reconsidered by the second jury, and there is certainly nothing at all in plaintiffs' bifurcation proposal that would guard against or prevent such a result. Accordingly, plaintiffs' bifurcation plan violates the Re-examination Clause of the Seventh Amendment and should be rejected for this reason as well.

## II. PLAINTIFFS' PROPOSED NATIONWIDE CLASS FAILS FOR THE ADDITIONAL REASON THAT INDIVIDUALIZED LEGAL ISSUES WILL "SWAMP" ANY COMMON ISSUES OF LAW OR FACT.

Even if plaintiffs' proposed class were not doomed by the overwhelming factual variations, it would still fail to meet the requirements of Rule 23 because of variations in the legal regimes governing each purported class member's claims. In the Fifth Circuit and elsewhere, it is well established that the need to apply numerous states' laws defeats certification because "variations in state law may swamp any common issues and defeat predominance." *See, e.g., Castano v. Am. Tobacco*, 84 F.3d 734, 741 (5th Cir. 1996); *Spence v. Glock GES.m.b.H.*, 227 F.3d 308 (5th Cir. 2000); *In re Am Med. Sys. Inc.*, 75 F.3d 1069 (6th Cir. 1996); *In re Rhone-Poulenc Rohrer Inc.*, 51 F.3d 1293, 1300 (7th Cir. 1995). Rather than attempt to refute this controlling body of law, plaintiffs assert that: (1) New Jersey's choice-of-law rule applies to the entire proposed class; and (2) application of that rule – known as the governmental interest test – requires the Court to apply the substantive law of New Jersey to all proposed class members, regardless of where they live and/or were allegedly injured.

---

of bifurcation proposed here. *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 474 (5th Cir. 1986). In plaintiffs' final case, *Mullen*, the defendants did not even raise a Seventh Amendment argument at the trial level. *Mullen v. Treasure Chest Casino LLC*, 186 F.3d 620, 628 (5th Cir. 1999). The issue was thus not preserved for review. The Fifth Circuit's musings on the Seventh Amendment in that case were therefore dicta and in any event of limited applicability in this case because *Mullins* involved much narrower factual and legal issues.

Plaintiffs' analysis relies almost entirely on Judge Higbee's ruling in the *Engineers* third-party payor class action in New Jersey, applying that state's consumer fraud laws to the claims of proposed class members throughout the country. *See Int'l Union of Operating Eng'rs Local #68 Welfare Fund v. Merck & Co., Inc.*, ATL-L-3015-03-MT, slip op. (N.J. Super. Law Div. June 29, 2005) ("*Engineers*") (attached as Ex. 42). In making this argument, however, plaintiffs fail to note: (1) that the New Jersey trial court's approach in *Engineers* is contrary to numerous other rulings on this issue, including, most recently, an appellate division ruling in New Jersey, and (2) that the New Jersey Appellate Division recently granted interlocutory appeal to review the *Engineers* ruling. In fact, as explained below, proper application of New Jersey's test almost always requires applying the law of the state in which the plaintiff's injury occurred – and certainly does so here. Thus, under New Jersey choice-of-law rules, each proposed class member's claims must be adjudicated under his or her home state's law, and for this reason alone, plaintiffs' proposed class must be rejected.

### A.   New Jersey's Governmental Interest Choice-Of-Law Approach Requires Application Of The Laws Of Fifty States.

New Jersey applies the "governmental interest" choice-of-law test, which "seeks to apply the law of the state with the greatest interest in governing the specific issue in the underlying litigation." *Fu v. Fu*, 733 A.2d 1133, 1138 (N.J. 1999). This test entails a two-step inquiry. "The first step in the analysis is to determine whether a conflict exists between the law[s] of the interested states." *Veazey v. Doremus*, 510 A.2d 1187, 1189 (N.J. 1986). If such a conflict exists, the next step is "to determine which state has the most significant relationship to the occurrence and the parties with respect to the issue [being litigated]." *Fu*, 733 A.2d at 1138; *see also Erny v. Estate of Merola*, 792 A.2d 1208, 1213 (N.J. 2002). "In doing so, [the court] must 'identify the governmental policies underlying the law of each state and how those policies are

affected by the state's contacts to the litigation and to the parties.'" *Fu*, 733 A.2d at 1138-39 (quoting *Veazey*, 510 A.2d at 1189). In short, New Jersey's "policies are tested in a choice-of-law analysis by comparison to the other interested state's policy preferences." *Erny*, 792 A.2d at 1215.

Plaintiffs concede that the state tort laws implicated by the class claims in this case conflict, requiring the Court to engage in the second step of the analysis. (Pls.' Mot. at 13-14.) It is with regard to the second step, however, that they veer off-course. Plaintiffs contend that the second half of the test creates a mechanical rule: the presence of a New-Jersey corporate defendant in the litigation requires application of New Jersey law. As plaintiffs argue, quoting Judge Higbee: "New Jersey has substantial interest in policing the conduct and protecting the interests of its citizen corporations, such as Merck." (*Id.* at 17 (quotation omitted).) In fact, applying the second prong of the governmental interest test here makes it plain that each class member's home state has the greatest interest in applying its laws to the claims alleged by that class member.

The five factors that "guide courts in applying the governmental-interest test in tort cases" are: "(1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law; (4) the interests of judicial administration; and (5) the competing interests of the states." *Erny*, 792 A.2d at 1217 (quoting *Fu*, 733 A.2d at 1140-41) (citing RESTATEMENT (SECOND) OF TORTS § 145). The most important of these is the "competing interests" factor, which considers "the contacts which are most germane to the governmental-interest test." *Fink v. Ricoh Corp.*, 839 A.2d 942, 984 (N.J. Super. Ct. Law Div. 2003) (quoting *Fu*, 733 A.2d at 1142). New Jersey courts consider four elements under this heading: "(1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3)

43

the domicile, residence, nationality, place of incorporation, and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered." *Erny*, 792 A.2d at 1217. "In personal injury cases, *the place of the injury is important*." *Id.* (emphasis added).

All five factors weigh heavily in favor of the law of the putative class members' home states.[11] First, with regard to the states' competing interests, a substantial majority of the proposed nationwide class allegedly suffered injuries while taking Vioxx in places outside New Jersey. Those states' interests in protecting their citizens through compensation and deterrence – the twin purposes of tort law – are stronger than New Jersey's. Those interests are further enhanced by the fact that most putative class members likely were exposed to advertisements for Vioxx in the same state in which they ultimately ingested it:

> In personal injury cases, the place of the injury is important, and when both the conduct and the injury occur in the same place, that jurisdiction's law generally will apply except in those *rare* instances where another jurisdiction has a demonstrably dominant interest and no policy of the situs state is frustrated by application of the sister state's policy.

*Erny*, 792 A.2d at 1217-18 (citing RESTATEMENT (SECOND) OF TORTS §§ 145 cmt. e, 146 cmts. c & d) (emphasis added).[12]

The remaining factors of the governmental interest test confirm that the application of New Jersey law to all purported class claims is inappropriate. First, the interests of interstate comity are best served by enforcing the laws of each interested state, thereby avoiding the

---

[11]     Plaintiffs' argument that New Jersey has abandoned the *lex loci delicti* test (Pls.' Mot. at 14-15) is irrelevant because the place of injury remains a critical factor in the governmental interest test as applied to tort cases. Indeed, the New Jersey Supreme Court recognized in abandoning its old approach that the governmental-interest test will often reach the same conclusion as *lex loci*. *Mellk v. Sarahson*, 229 A.2d 625, 626-27 (N.J. 1967).

[12]     Plaintiffs' citation to *Perez v. Wyeth Laboratories, Inc.*, 734 A.2d 1245 (N.J. 1999), does not alter the analysis. The age of direct marketing may have changed the way medicine is prescribed by empowering patients, but that does not change the fact that the advertisements would have been received by class members in their home states. (And, in any event, plaintiff Lawrence testified in her deposition that she relied substantially on the advice of her physician in taking Vioxx. (*See* Lawrence Dep. at 138:10-22.)) Furthermore, *Perez* was not a choice-of-law case, nor did it involve a nationwide class. The "overriding interest" of New Jersey in regulating corporations headquartered there thus was not discussed in those terms, and that interest must yield to the superior interests of class members' home states.

possibility of "frustrat[ing] the policies of other interested states." *Fu*, 733 A.2d at 1141.

Second, New Jersey courts have recognized that compensation is the overriding purpose of the

New Jersey Product Liability Act and takes precedence over a state's interest in policing "a tort

defendant's corporate affairs." *Bussell v. DeWalt Prods. Corp.*, 614 A.2d 622, 628 (N.J. Super.

Ct. App. Div. 1992). "When the tort rule is designed primarily to compensate a victim for his or

her injuries, the state where the injury occurred, which is often where the plaintiff resides, may

have the greater interest in the matter." *Fu*, 733 A.2d at 1141. Third, the interests-of-the-parties

factor refers to the justified expectations of the parties as to which laws apply. Plaintiffs argue

that Merck "chose to operate in New Jersey with the imputed knowledge that it would have to

abide by New Jersey's directives." (Pls.' Mot. at 19.) But it is ludicrous to suggest that a

consumer in Illinois or Washington or Michigan reasonably expects that a personal injury claim

arising out of his or her ingestion of a prescription drug in those states will result in application

of the law of New Jersey. *See Margulies v. Chase Manhattan Mortgage Corp.*, 2005 WL

2923580, at *8 (N.J. Super. Ct. App. Div. Nov. 7, 2005) ("Parties entering into a transaction in

Maryland affecting Maryland real estate would naturally expect Maryland law to apply. This is

particularly so where one party is a Maryland resident and the other is licensed to transact that

kind of business in Maryland (although incorporated and headquartered in a different state).").

Finally, the interests of judicial administration do not favor any particular state, as the relevant

doctrines of most states are sufficiently developed as to permit "relative ease in determination

and application of the choice of law regarding" their product liability laws. *Fu*, 733 A.2d at

1142. In any event, this factor is "of lesser importance and must yield to a strong state interest

implicated by the remaining factors." *Id.*

Plaintiffs' choice-of-law analysis virtually ignores all of these factors, focusing instead on two related arguments as supposed counterweights to the significant interests of the states where the allegedly injured individuals reside: (1) Merck is headquartered in New Jersey and thus "orchestrated" its alleged torts there, and (2) New Jersey has a unique interest in "deterring misleading advertising by pharmaceutical businesses located in the state." (Pls.' Mot. at 16, 18.) Neither of these facts, however, supports plaintiffs' conclusion. First, while New Jersey certainly has an interest in regulating the conduct of businesses headquartered in that state, that fact alone is not sufficient to trump the interests of other states in enforcing their own tort laws. *See Bussell*, 614 A.2d at 628 (noting that New Jersey product liability law favors compensation over corporate policing for governmental-interest purposes); *Fink*, 839 A.2d at 985-86 (rejecting New Jersey corporate headquarters as a more significant contact than the place where a consumer fraud plaintiff received allegedly false advertising); *see also Laufer v. U.S. Life Ins. Co.*, No. BER-L-9082-04, 2005 WL 1869211, at *9 (N.J. Super. Ct. Law Div. Aug. 8, 2005); *In re Consol. Parlodel Litig.*, 22 F. Supp. 2d 320, 326-27 (D.N.J. 1998); *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 348 (D.N.J. 1997); *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61, 70-71 (S.D.N.Y. 2002). Second, New Jersey's supposed interest in serving as a nationwide marketing cop is of plaintiffs' own creation. As one court recently put it in rejecting a similar argument: "New Jersey has not elected to be the litigation capital for all consumer disputes with New Jersey-located companies throughout the United States." *Laufer*, 2005 WL 1869211, at *7.

Notably, the New Jersey Appellate Division (which is currently reviewing the *Engineers* decision) recently rejected an effort like plaintiffs' to apply New Jersey law extraterritorially simply because the defendant was based in the state. In *Margulies*, the court refused to apply

New Jersey law in a case where the plaintiff resided in Maryland and the transaction occurred

there, even though the defendant was headquartered in New Jersey. *Margulies*, 2005 WL

2923580, at \*8. States enact consumer fraud laws, the court reasoned, to "protect the rights of

consumers within [those] state[s]. Thus, application of Maryland law, which would advance the

primary purpose of that law to protect its residents, would be in furtherance of Maryland's policy

and would not frustrate the policy underlying New Jersey's law." *Id.* In so holding, the court

rejected the notion that New Jersey has the greater interest if the allegedly wrongful conduct

emanated from the defendant's headquarters in the state. *Id.*

Other courts have agreed. For example, in *In re Norplant Contraceptive Prods. Liab.*

*Litig*, 215 F. Supp. 2d 795 (E.D. Tex. 2002), the court rejected application of New Jersey law to

non-resident plaintiffs under New Jersey's choice-of-law rule, despite the fact that the defendant

drug manufacturer was headquartered there:

> Plaintiffs chose to file in New Jersey and [defendant]'s principal place of business
> is in New Jersey, but, aside from those two facts, none of the Plaintiffs in this
> category have any actual connection to New Jersey. New Jersey is neither the
> place where the conduct causing the injuries occurred nor where the injuries
> occurred, none of the Plaintiffs reside in New Jersey, and the parties' relationships
> are not centered in New Jersey. In short, New Jersey has only a slight factual
> nexus to [this case].

215 F. Supp. 2d at 817. Likewise, in *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*,

174 F.R.D. 332, 348 (D.N.J. 1997), the court explained:

> Each plaintiff's home state has an interest in protecting its consumers from in-
> state injuries caused by foreign corporations and in delineating the scope of
> recovery for its citizens under its own laws. These interests arise by virtue of
> each state being the place in which plaintiffs reside, or the place in which
> plaintiffs bought and used their allegedly defective [product] or the place where
> plaintiffs' alleged damages occurred.

174 F.R.D. at 348. *See also In re Consol. Parlodel Litig.*, 22 F. Supp. 2d at 326 (even though the

drug was designed and manufactured in New Jersey, the law of each plaintiff's home state,

where prescription drug was marketed and consumed, would apply to the out-of-state plaintiffs' claims).

Finally, even if *Engineers* were rightly decided, it would actually undermine plaintiffs' argument here. In reaching her decision to apply New Jersey's consumer fraud statute to all the claims in that case, Judge Higbee relied in large part on her analysis of the various consumer protection statutes and her conclusion that New Jersey has the "strongest" interest in applying its laws, because its laws are the strongest. This novel, bigger-is-better approach to New Jersey's governmental-interest test does no work for plaintiffs in ***this*** case, in which they would proceed under New Jersey's ***product liability*** laws, which certainly are not the "strongest" (*i.e.*, most pro-plaintiff) in the nation. For example, the NJPLA imposes limitations on punitive damages and specific evidentiary presumptions in pharmaceutical cases; other states do not have these limitations. *Compare* N.J. Stat. Ann. § 2A:58C-5 ("[p]unitive damages shall not be awarded if a drug or device or food or food additive which caused the claimant's harm was subject to premarket approval or licensure by the federal Food and Drug Administration) *with* Tenn. Code Ann. § 29-28-101 to -108 (making no punitive damage exception for pharmaceutical products); *compare* N.J. Stat. Ann. § 2A:58C-4 ("[i]f the warning or instruction given in connection with a drug or device or food or food additive has been approved or prescribed by the federal Food and Drug Administration . . . a rebuttable presumption shall arise that the warning or instruction is adequate") *with* Miss. Code Ann. § 11-1-63 (c)(ii) (no presumption that prescription drug warning is adequate if approved by the FDA; adequacy instead measured by "characteristics of, and the ordinary knowledge common to, a physician or other licensed professional who prescribes the drug") *and* La. Rev. Stat. § 9:2800.53 (FDA approval does not create to presumption that warning is adequate; warning is adequate if it "would lead an ordinary

reasonable user or handler of a product to contemplate the danger in using or handling the product and either to decline to use or handle the product or, if possible, to use or handle the product in such a manner as to avoid the damage for which the claim is made" ).

In short, the *Engineers* decision is vastly outnumbered by numerous well-reasoned federal, state appellate and state trial court decisions that have come out precisely the opposite way – and is, in any event, inapplicable to the claims here.  Because a proper analysis under the governmental interests test points to the substantive law of the states where the proposed class members were injured, the proposed class members' claims will be governed by the varying laws of all fifty states, and for this reason alone, class certification should be denied.

### B.      Plaintiffs' Proposed Choice-of-Law Approach Also Raises Constitutional Concerns.

Plaintiffs' proposed choice-of-law approach also raises constitutional concerns because the "constitutional limitations on choice of law" – embodied in the Due Process, Commerce, and Full Faith and Credit Clauses of the federal Constitution – restrict New Jersey's capacity to regulate the conduct of New Jersey companies beyond New Jersey's borders.  *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 816 (1985).  "It is a firmly established principle of American jurisprudence that the law, statutory or otherwise . . . of one state has no extraterritorial effect in another state."  16 Am. Jur. 2d *Conflict of Laws* § 9 (2005); *accord State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 572-73 (1996); *N.Y. Life Ins. Co. v. Head*, 234 U.S. 149, 161 (1914).  Endorsement of the approach urged by plaintiffs would "afford[] [New Jersey] law an extraterritorial scope neither contemplated by the [New Jersey] Legislature in enacting our choice of law rules nor contemplated by our founding fathers in creating our Federal form of national government."  *Lewis v. Bayer AG*, No. 002353, 2004 WL 1146692, at *13 (Pa. Ct. Com. Pl. Nov. 18, 2004).

49

Contrary to plaintiffs' suggestion (Pls.' Mot. at 17), Merck has not argued that as a matter of constitutional law, the law of the place of the injury must always be chosen. However, neither is it true that the mere fact of Merck's residence in New Jersey gives the state a broad license to regulate its conduct in all other states, even where the application of "strong" New Jersey law to such conduct would directly undermine another state's policy efforts "to encourage business and other commercial transactions to take place within that particular state's borders." *Engineers*, slip op. at 32. New Jersey cannot override another state's conflicting policy choice as to how conduct within that state's borders should be regulated – even conduct by a company headquartered in New Jersey – because it is a "basic principle of federalism" that "each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders." *State Farm*, 538 U.S. at 422.

In *Shutts*, the Supreme Court recognized this principle as a "constitutional limitation[] on choice of law," 472 U.S. at 816, which precluded a Kansas court from applying Kansas law to class members' claims against a Kansas defendant, where the conduct at issue occurred primarily outside the state. *Id.* at 819. The fact that the defendant "own[ed] property and conduct[ed] substantial business in the State" meant that "Kansas certainly ha[d] an interest in regulating [the defendant's] conduct *in Kansas*," the court acknowledged, *id.* (emphasis added), but it did *not* suffice to give the Kansas court authority to apply Kansas law to the defendant's out-of-state conduct, at least insofar as Kansas law reflected different policy choices from the state laws that would otherwise govern the conduct. *Id.* at 821-22. So it is here: the mere fact that Merck is located in New Jersey does not give New Jersey a legitimate interest in overriding the policy choices of all the states where Merck chooses to sell its products.

**C.    The Legal Variations Posed By Plaintiffs' Nationwide Class Preclude A Finding Of Predominance Or Superiority.**

Plaintiffs' failure to even suggest that this class action could be certified absent the application of New Jersey law to all class claims speaks for itself.  Fifth Circuit case law is clear that nationwide product liability class actions like this one, which require application of all fifty states' laws, are not viable because "variations in state law may swamp any common issues and defeat predominance" and superiority.  *Castano*, 84 F.3d at 741.[13]  In *Castano*, the court refused to certify a class of smokers alleging personal injury based, in part, on the difficulty of applying varying state products liability law to plaintiffs' claims:

> Products liability law . . . differs among the states.  Some states do not recognize strict liability.  Some have adopted RESTATEMENT (SECOND) OF TORTS § 402A.  Among the states that have adopted the Restatement, there are variations.  Differences in affirmative defenses also exist.  Assumption of risk is a complete defense to a products claim in some states.  *E.g.* S.C. CODE ANN. § 15-73-20 (Law Co-op 1976).  In others, it is a part of comparative fault analysis.  *E.g.*, COLO. REV. STAT. § 13-21-111.7 (1986).  Some states utilize "pure" comparative fault, *e.g.*, ARIZ. REV. STAT. ANN. § 12-2503-09 (1984); others follow a "greater fault bar," *e.g.*, CONN. GEN. STAT. ANN. § 52-572h (West 1988); and still others use an "equal fault bar," *e.g.*, ARK. CODE. ANN. § 16-64-122 (Michie 1991).

*Id.* at 743 (citations omitted).  As plaintiffs themselves admit in their Motion for Class Certification, these variations are heightened in cases involving pharmaceutical products. (Pls.' Mot. at 13 ("[f]or example, Pennsylvania eschews strict liability claims in pharmaceutical cases but permits negligence claims to proceed under the same circumstances, *see Hahn v. Richter*, 673 A.2d 888 (Pa. 1996), while Louisiana permits a claim to proceed by employing a failure to use reasonable care standard").)

---

[13]    This Court has already acknowledged as much, noting:  "I see [this case] as a real problematic issue of national class action in this type of situation because not only do you have the different law in each of the states from the standpoint of products liability and the significance of the defense of learned intermediary and what effect does advertisement in a state have on the learned intermediary defense, there's a difference in views." (Hearing Tr. at 9, Nov. 10, 2005 (attached as Ex. 43).)

51

A long line of other courts have reached similar conclusions, recognizing that "[n]egligence claims are unsuited for class treatment because the "state laws governing these claims do vary significantly, particularly with respect to the defenses of contributory negligence, comparative negligence and assumption of the risk." *Bresson v. Thomson McKinnon Secs. Inc.,* 118 F.R.D. 339, 344 (S.D.N.Y. 1988). *See also In re Am. Med. Sys.,* 75 F.3d at 1085 (granting mandamus in a multi-state product liability action, in part because "the district judge . . . failed to consider how the law of negligence differs from jurisdiction to jurisdiction; "[i]f more than a few of the laws of the fifty states differ, the district court would face an impossible task of instructing a jury on the relevant law"); *In re Rhone-Poulenc Rohrer Inc.,* 51 F.3d 1293, 1300 (7th Cir. 1995) (granting mandamus to vacate nationwide class certification because, *inter alia,* variations in negligence law from state to state preclude class certification; the "law of negligence, including subsidiary concepts such as duty of care, foreseeability, and proximate cause" differs among states). State law variations have similarly doomed multi-state strict liability classes. *See, e.g., In re Paxil Litigation,* 212 F.R.D. 539, 551 (C.D. Cal. 2003) (refusing to certify a multi-state strict liability class because, *inter alia,* "the differing standards of liability required by the laws of various states preclude a finding that common questions of law predominate"); *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.,* 174 F.R.D. at 351 (refusing to certify multi-state strict liability class due to state law variations in strict liability law, including different warning requirements and different affirmative defenses). Similarly, in the present case, this Court can neither apply a single theory of strict liability and negligence to the claims of every Vioxx user in the country nor validly conduct a class trial applying the strict liability and negligence laws of all 50 states.

Because the law is well-settled that the need to apply the varying laws of multiple states is itself sufficient to defeat class certification, plaintiffs' motion should be rejected on this ground as well.

### III.   PLAINTIFFS' CLASS PROPOSAL IS NOT A SUPERIOR WAY OF ADJUDICATING THEIR CLAIMS FOR THE ADDITIONAL REASON THAT THE VIOXX LITIGATION IS NOT SUFFICIENTLY MATURE TO PROVIDE A BASIS FOR CERTIFICATION.

Plaintiffs' proposal also fails to satisfy the superiority requirement of Rule 23(b)(3) for another reason that plaintiffs have themselves conceded: the Vioxx litigation is not sufficiently mature to allow class certification and would initially be better determined by "individual trials." (Pls.' Steering Committee's Mot. To Stay Class Briefing ("Pls.' Mot. to Stay") at 4-6.)  While this Court has recognized that the Vioxx litigation is not so immature as to preclude a finding that class certification is inappropriate (Hearing Tr. at 8:2-9, Nov. 10, 2005), the litigation does lack maturity insofar as there are many categories of cases that have not yet been subject to trial or, for that matter, any significant factual development.

Fifth Circuit caselaw is clear that the maturity of a claim "is a matter of importance to the class certification determination in aggregated personal injury claims."  (Pls.' Mot. to Stay at 4.) In *Castano*, the Fifth Circuit reversed the district court's certification of a class of nicotine-dependant cigarette smokers, noting that:

> Our specific concern is that a mass tort cannot be properly certified without a prior track record of trials from which the district court can draw the information necessary to make the predominance and superiority analysis required by rule 23. This is because certification of an immature tort results in a higher than normal risk that the class action may not be superior to individual adjudication.

*Id.* (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 747 (5th Cir. 1996)).  Similarly, in *Rhone-Poulenc*, the Seventh Circuit granted mandamus to vacate class certification of a products liability class alleging injury from receiving HIV-tainted blood, noting that "[m]ost federal

53

courts . . . refuse to permit the use of the class-action device in mass-tort cases . . . [and] [t]hose courts that have permitted it have been criticized, and alternatives have been suggested which recognize that a sample of trials makes more sense than entrusting the fate of an industry to a single jury." 51 F.3d at 1304 (citations omitted). *See also Barreras Ruiz v. Am. Tobacco Co., Inc.*, 180 F.R.D. 194, 198 (D.P.R. 1998) (denying class certification in action by nicotine dependant plaintiffs against tobacco companies in part because claims lacked maturity); *Arch v. Am. Tobacco Co., Inc.*, 175 F.R.D. 469, 495 (E.D. Pa. 1997) (denying class certification in action by smokers against tobacco companies because, inter alia, class action was not the superior method to adjudicate immature tort).

The same problems exist here. Only two Vioxx cases have gone to verdict in a jury trial, with one verdict for the plaintiff and one for the defense. *See Ernst v. Merck & Co.*, No. 19961 (Tex. Dist. Ct.); *Humeston v. Merck & Co., Inc.*, No. 619, No. ATL-L-2272-03MT (N.J. Super. Ct. Law Div.). Because of the disparate outcomes of these two cases, there is no "prior track record of trials from which [this Court] can draw the information necessary to make the ... superiority analysis required by rule 23." *Arch*, 175 F.R.D. at 494 (alterations in original); *id.* ("the immature tort theory has a much broader meaning than its mere name would suggest. [It] can refer to a new cause of action, or an old cause of action applied to a new situation"). Moreover, many of the categories of cases this Court envisions have not been set for nor subject to trial in any jurisdiction. For example, no trial court has considered a Vioxx case where gastrointestinal injury, renal failure or stroke is alleged. Nor has there been a trial involving a plaintiff who primarily consumed a 50mg dosage of the drug. In addition, courts have yet to try even one case involving extended Vioxx use of 18 months or more. Without the insight provided by such individual trials, this Court cannot determine that a class action is the superior

method for resolving the personal injury claims of every Vioxx user nationwide. *See In re Diet Drugs*, MDL 1203, Civ. A 98-20594, 1999 WL 782560, at *7 (E.D. Pa. Sept. 27, 1999) (denying certification of a proposed settlement class in the Fen-Phen litigation where only one trial had been completed). For this reason too, class certification should be denied.

## CONCLUSION

For all of the foregoing reasons, plaintiffs' motion for class certification should be denied.

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, LA 70130

Defendants' Liaison Counsel

And

John H. Beisner
Jessica Davidson Miller
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006

Attorneys for Merck & Co., Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Merck & Co., Inc.'s

Opposition to Plaintiffs' Steering Committee's Motion for Class Certification of a

Nation-Wide Class Action for Personal Injury and Wrongful Death has been served on

Liaison Counsel, Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail

and upon all parties by electronically uploading the same to LexisNexis File & Serve

Advanced in accordance with Pre-Trial Order No. 8, on this 9th day of January, 2006.

Dorothy H. Wimberly