```
                              U.S. DISTRICT COURT
                           EASTERN DISTRICT OF LOUISIANA
                       FILED    JAN 1 3 2006
                           LORETTA G. WHYTE
                                 CLERK
```

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| In re:  VIOXX | MDL NO. 1657 |
| PRODUCTS LIABILITY LITIGATION | SECTION: L |
| THIS DOCUMENT RELATES TO: | JUDGE FALLON |
| ALL FOREIGN CLASS ACTION COMPLAINTS | JURY TRIAL DEMANDED |
| MDL Nos. 05-3383, 05-4185, 05-2914, 05-5083, 05-5331, 05-451, 05-2933, 05-5603 | |

### DEFENDANT MERCK & CO., INC.'S MOTION TO DISMISS THE FOREIGN CLASS ACTIONS OR, IN THE ALTERNATIVE, STRIKE THE FOREIGN CLASS ALLEGATIONS

Defendant Merck & Co., Inc., through undersigned counsel, hereby moves the Court for entry of an order dismissing the foreign class actions transferred into or filed directly in this MDL under the doctrine of *forum non conveniens*. Alternatively, Merck moves to strike the foreign class allegations.

The reasons supporting this motion are more fully set forth in the accompanying supporting memorandum and Appendix of Declarations and Exhibits, which are incorporated as if fully set forth herein.

```
___ Fee_____
___ Process_____
 X  Dktd_____
 V  CtRmDep_____
___ Doc. No _____
```

WHEREFORE, defendant Merck & Co. Inc. requests that this Court dismiss the putative class actions brought by foreign plaintiffs, or, in the alternative, strike or dismiss their class allegations.

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
Carmelite M. Bertaut, 3054
STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone: 504-581-3200
Fax:    504-581-3361

Defendant's Liaison Counsel

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Defendant Merck & Co., Inc.'s Motion to Dismiss the Foreign Class Actions or, in the Alternative, Strike the Foreign Class Allegations has been served on Liaison Counsel, Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8, on this 12th day of January, 2006.

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re:  VIOXX | MDL NO. 1657 |
| PRODUCTS LIABILITY LITIGATION | SECTION: L |
| THIS DOCUMENT RELATES TO: | JUDGE FALLON |
| ALL FOREIGN CLASS ACTION COMPLAINTS | JURY TRIAL DEMANDED |
| MDL Nos. 05-3383, 05-4185, 05-2914, 05-5083, 05-5331, 05-451, 05-2933, 05-5603 | |

**MEMORANDUM IN SUPPORT OF DEFENDANT MERCK & CO., INC.'S MOTION TO DISMISS THE FOREIGN CLASS ACTIONS OR, IN THE <u>ALTERNATIVE, STRIKE THE FOREIGN CLASS ALLEGATIONS</u>**

**TABLE OF CONTENTS**

Page

BACKGROUND ................................................................................................................. 2

ARGUMENT .................................................................................................................... 4

I.    THE FOREIGN PLAINTIFFS' CLAIMS SHOULD BE DISMISSED UNDER THE DOCTRINE OF *FORUM NON CONVENIENS*. ...................................................... 7

    A.    The Named Plaintiffs' Home Countries Provide Adequate Forums For Their Claims.................................................................................................... 9

    B.    The Public Interest Factors Strongly Favor Dismissal. ...................................... 11

        1.    Plaintiffs' Home Forums Have An Overwhelming Interest In Adjudicating Their Claims........................................................................ 12

            a.    Adjudicating Plaintiffs' Claims In This Forum Would Violate International Comity And Could Undermine Foreign Regulatory Judgments. ................................................... 12

            b.    Plaintiffs' Home Forums Have A Strong Interest In Seeing That Their Citizens Receive Appropriate Compensation For Any Valid Personal Injury Claims. ............................................. 16

        2.    Permitting Suit By Foreign Plaintiffs Would Require The Court To Analyze And Apply Unfamiliar Foreign Law And Regulations. ............ 17

        3.    Permitting Foreign Plaintiffs To Sue In This Forum Would Vastly Expand These Proceedings And Result In Even More Litigation Being Amassed In This Forum. ............................................................. 21

    C.    The Private Interest Factors Also Favor Dismissal of the Foreign Plaintiffs' Claims. ................................................................................. 22

II.    IN THE ALTERNATIVE, THE COURT SHOULD STRIKE OR DISMISS THE CLASS ALLEGATIONS. ................................................................................. 25

    A.    The Court Should Strike The Class Allegations Because Plaintiffs' Home Jurisdictions Would Likely Fail to Give United States Class Action Judgments *Res Judicata* Effect. .......................................................... 26

    B.    The Canadian and Australian Class Actions Should be Dismissed Because They Overlap With Class Actions Already Proceeding In Those Countries....... 29

CONCLUSION................................................................................................................. 31

**TABLE OF AUTHORITIES**

## CASES

*Adashunas v. Negley,*
626 F.2d 600 (7th Cir. 1980) ...................................................................................... 28

*Ansari v. New York Univ.,*
179 F.R.D. 112 (S.D.N.Y. 1998) ................................................................................. 27

*Bersch v. Drexel Firestone, Inc.,*
519 F.2d 974 (2d Cir. 1975).................................................................................. 26, 28

*Bhatangar v. Surrendra Overseas Ltd.,*
52 F.3d 1220 (3d Cir. 1995).......................................................................................... 8

*Blanco v. Banco Industrial de Venezuela,*
997 F.2d 974 (2d Cir. 1993)........................................................................................ 29

*Caspian Invs., Ltd. v. Vicom Holdings, Ltd.,*
770 F. Supp. 880 (S.D.N.Y. 1991) ............................................................................. 29

*Castano v. Am. Tobacco Co.,*
84 F.3d 734 (5th Cir. 1996) ..................................................................................... 6, 25

*CL-Alexanders Laing & Cruickshank v. Goldfeld,*
127 F.R.D. 454 (S.D.N.Y. 1989) ................................................................................ 27

*Contact Lumber Co. v. P.T. Moges Shipping Co.,*
918 F.2d 1446 (9th Cir. 1990) .................................................................................... 29

*Dafforn v. Rousseau Assocs., Inc.,*
Civil No. F 75-74, 1976 U.S. Dist. LEXIS 13910 (N.D. Ind. July 27, 1976)....................... 28

*Del Fierro v. Pepsico Int'l,*
897 F. Supp. 59 (E.D.N.Y. 1995) ............................................................................... 28

*Doe v. Hyland Therapeutics Div.,*
807 F. Supp. 1117 (S.D.N.Y. 1992).....................................................................*passim*

*Dowling v. Richardson-Merrell, Inc.,*
727 F.2d 608 (6th Cir. 1984) ...................................................................................... 14

*Empresa Lineas Maritimas Argentinas, S.A. v. Schichau-Unteweser, A.G.,*
955 F.2d 368 (5th Cir. 1992) ........................................................................................ 8

*Ensign-Bickford Co. v. ICI Explosives USA Inc.,*
817 F. Supp. 1018 (D. Conn. 1993)............................................................................ 30

*Gulf Oil Corp. v. Gilbert,*
330 U.S. 501 (1947)................................................................................................. 8, 24

*Harrison v. Wyeth Labs.,*
510 F. Supp. 1 (E.D. Pa. 1980) ...................................................................... 11, 13, 16

*In re Air Cras Disaster Near New Orleans, La. on July 9, 1982,*
821 F.2d 1147 (5th Cir. 1987) ...................................................................................... 7

*In re Air Disaster at Ramstein Air Base, Germany,*
81 F.3d 570 (5th Cir. 1996) ........................................................................................ 18

*In re Assicurazioni Generali S.P.A. Holocaust Ins. Litig.,*
228 F. Supp. 2d 348 (S.D.N.Y. 2002)................................................................... 27, 28

*In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.,*
288 F.3d 1012 (7th Cir. 2002) .................................................................................... 25

**TABLE OF AUTHORITIES**

*In re Dalkon Shield Prods. Liab. Litig.,*
   693 F.2d 847 (9th Cir. 1982) ................................................................ 6

*In re Fibreboard Corp.,*
   893 F.2d 706 (5th Cir. 1990) ................................................................ 6

*In re Rezulin Prods. Liab. Litig.,*
   210 F.R.D. 61 (S.D.N.Y. 2002) ............................................................ 6

*In re Rezulin Prods. Liab. Litig.,*
   214 F. Supp. 2d 396 (S.D.N.Y. 2002) ............................................. 9, 16

*In re Rhone-Poulenc Rorer, Inc.,*
   51 F.3d 1293 (7th Cir. 1995) .......................................................... 6, 25

*In re Richardson-Merrell, Inc.,*
   545 F. Supp. 1130 (S.D. Ohio 1982) ........................................... *passim*

*In re Silicone Gel Breast Implant Prods. Liab. Litig.,*
   887 F. Supp. 1469 (N.D. Ala. 1995) .................................................... 9

*In re Telectronics Pacing Sys., Inc.,*
   No. MDL-1057, 1996 U.S. Dist. LEXIS 11088 (S.D. Ohio Feb. 23, 1996) ................. 27, 30

*Iragorri v. United Techs. Corp.,*
   274 F.3d 65 (2d Cir. 2001) .................................................................. 9

*Kovzac Ltd. v. Westway Trading Corp.,*
   Civil Action No: 02-3702 Section: "R" (2), 2003 U.S. Dist. LEXIS 10767
   (E.D. La. June 19, 2003) ...................................................................... 7

*Ledingham v. Parke-Davis Div.,*
   628 F. Supp. 1447 (E.D.N.Y. 1986) .......................................... 9, 11, 12

*Magnin v. Teldyne Cont'l Motors,*
   91 F.3d 1424 (11th Cir. 1996) ............................................................ 9

*Mamish v. Tidex Int'l, Inc.,*
   Civil Action No. 91-3791, Section "K" (5), 1992 U.S. Dist. LEXIS 9550 (E.D.
   La. June 25, 1992) ............................................................................. 8

*Matli ex rel. Matli v. Strategic Minerals Corp.,*
   No. 04 Civ. 5555(SAS), 2004 WL 2297373 (S.D.N.Y. Oct. 12, 2004) ................ 9

*McCracken v. Eli Lilly & Co.,*
   494 N.E.2d 1289 (Ind. Ct. App. 1986) ................................................. 9

*Mercier v. Sheraton Int'l, Inc.,*
   981 F.2d 1345 (1st Cir. 1992) ............................................................ 24

*Mertens v. Abbott Labs.,*
   99 F.R.D. 38 (D.N.H. 1983) ................................................................ 6

*MTS Secs., Inc. v. Creditanstalt-Bankverein,*
   96-CV-0567E(Sc), 1997 U.S. Dist. LEXIS 6683 (W.D.N.Y. May 1, 1997) ........ 10

*Pan E. Exploration Co. v. Hufo Oils,*
   798 F.2d 837 (5th Cir. 1986) ............................................................. 29

*Piper Aircraft Co. v. Reyno,*
   454 U.S. 235 (1981) ...................................................................... *passim*

*Tower Ventures, Inc. v. City of Westfield,*
   296 F.3d 43 (1st Cir. 2002) ................................................................ 7

**TABLE OF AUTHORITIES**

*Traver v. Officine Meccaniche Toschi Spa,*
    233 F. Supp. 2d 404 (N.D.N.Y. 2002) ................................................................... 9

*Van der Velde v. Philip Morris Inc.,*
    02 Civ. 783 (BSJ), 2004 U.S. Dist. LEXIS 246 (S.D.N.Y. Jan. 9, 2004) ..................... *passim*

*Vasquez v. Bridgestone/Firestone, Inc.,*
    325 F.3d 665 (5th Cir. 2003) ............................................................................. 7

*Veazey v. Doremus,*
    510 A.2d 1187 (N.J. 1986) ................................................................................ 18

*Vickrey v. Caterpillar Tractor Co.,*
    497 N.E.2d 814 (Ill. App. Ct. 1986) .................................................................... 17

*Zehel-Miller v. AstraZeneca Pharms., LP,*
    23 F.R.D. 659 (M.D. Fla. 2004) .......................................................................... 6

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re:  VIOXX | MDL NO. 1657 |
| PRODUCTS LIABILITY LITIGATION | SECTION: L |
| THIS DOCUMENT RELATES TO: | JUDGE FALLON |
| ALL FOREIGN CLASS ACTION COMPLAINTS | JURY TRIAL DEMANDED |
| MDL Nos. 05-3383, 05-4185, 05-2914, 05-5083, 05-5331, 05-451, 05-2933, 05-5603 | |

**MEMORANDUM IN SUPPORT OF DEFENDANT MERCK & CO., INC.'S MOTION TO DISMISS THE FOREIGN CLASS ACTIONS OR, IN THE ALTERNATIVE, STRIKE THE FOREIGN CLASS ALLEGATIONS**

Thirteen of the 188 class actions transferred into or filed directly in this MDL proceeding are brought on behalf of purported classes from countries as far afield as Australia, South Africa, Italy and Israel.  These suits, almost all of which were brought by one Chicago-based attorney, bear no relation to the United States and should be dismissed for at least two reasons.

*First*, this Court should decline to hear these suits under the doctrine of *forum non conveniens* because this is not an appropriate forum for their adjudication.  This Court should not get bogged down interpreting intricate issues of foreign law and regulation, or managing discovery of documents and witnesses located outside the United States, particularly when doing so would inevitably delay resolution of thousands of claims brought by United States citizens. *Second*, even if this Court were to slog through these issues of foreign law and international discovery, any class-wide judgments awarded in Merck's favor would lack preclusive effect in

most of the foreign countries at issue, because those countries do not recognize opt-out class actions (that is, actions brought on behalf of unnamed parties) like those sought here. Presumably for these reasons, the Plaintiffs' Steering Committee failed to include these foreign class claims in any of the master class action complaints they filed several months ago, making dismissal of the foreign class actions all the more appropriate.

## BACKGROUND

This proceeding includes thirteen lawsuits filed on behalf of purported classes of foreign citizens.  Many of these suits seek to certify class actions on behalf of citizens of particular foreign countries, such as England, Australia, Italy, France, South Africa, and Canada.[1]  Two of the suits are even more far-reaching: one is filed on behalf of citizens from all of "Europe," and another purports to assert claims on behalf of every Vioxx user in "the world."[2]

In each of these suits, plaintiffs make virtually the same allegations: that ingesting Vioxx causes an increased risk of "serious cardiovascular events," and that Merck failed to investigate this risk sufficiently and engaged in marketing campaigns that misrepresented it.[3]  In each suit,

---

[1]     Additional single-country suits have now been filed against Merck on behalf of citizens of Israel, Germany, New Zealand, the Netherlands, and Poland.  In order to avoid burdening the Court with additional affidavits of foreign law, Merck has not included those cases in this motion. However, the arguments set forth in this brief are likely to apply equally to those jurisdictions.   Accordingly, should this Court grant this motion, Merck expects to file a follow-on motion seeking similar relief in those additional jurisdictions as well.

[2]     The putative class actions filed on behalf of citizens of England, Australia, Italy, France, South Africa, Canada, and "the world" were all originally filed by counsel Kenneth Moll in the Northern District of Illinois.  The action on behalf of "all individuals[] residing in the nations of Europe" was filed by a different attorney in the District of New Jersey.

[3]     *See* Class Action Compl. ¶¶ 3, 19, 26, *Gough v. Merck & Co., Inc.* ("Canadian Compl.), No. 05C 5198 (N.D. Ill. Sept. 12, 2005); Class Action Compl. ¶¶ 3, 21, 28, *Bentley v. Merck & Co., Inc.* ("English Compl."), No. 05C 3220 (N.D. Ill. May 31, 2005); Class Action Compl. ¶¶ 3, 16, 23, *DeToledo v. Merck & Co. , Inc.* ("French Compl."), No. 05C 4966 (N.D. Ill. Aug. 29, 2005); Class Action Compl. ¶¶ 3, 18, 25, *Brunton v. Merck & Co., Inc.* ("Australian Compl."), No. 05C 5092 (N.D. Ill. Sept. 6, 2005); Class Action Compl. ¶¶ 3, 18, 25, *Donough v. Merck & Co., Inc.* ("South African Compl."), No. 05C 5531 (N.D. Ill. Sept. 26, 2005); Class Action Compl. ¶¶ 3, 24, 31, *Calandra v. Merck & Co., Inc.* ("Italian Compl."), No. 05C 2744 (N.D. Ill. May 9, 2005); Class Action Compl. ¶¶ 3, 17, 24, *Grant, et al. v. Merck & Co., Inc.* ("Worldwide Compl."), No. 04C 6407 (N.D. Ill. Oct. 5, 2004); Class Action Compl. ¶¶ 11-12, 14-16, 23, *Minbauer v. Merck & Co., Inc.* ("European Compl."), No. 05-1491(SRC) (D.N.J. Mar. 14, 2005).

plaintiffs assert claims for strict liability and negligence, violations of the Illinois and New Jersey

consumer protection statutes, unjust enrichment, medical monitoring, and breach of express and

implied warranty.[4]  Plaintiffs also seek to certify a class consisting of all citizens of the relevant

jurisdictions who were prescribed Vioxx, and propose to certify three subclasses consisting of

those putative class members who allegedly suffered personal injury as a result of ingesting

Vioxx, those who seek treatment and reimbursement under a medical monitoring program, and

those who seek reimbursement for the purchase price of Vioxx.[5]

These suits bear no relationship to the United States.  The foreign plaintiffs and putative

class members were prescribed Vioxx in their home countries, by doctors practicing in those

jurisdictions.  They purchased Vioxx in those countries, ingested it there, and sustained and were

treated for their alleged harms there.  The Vioxx these plaintiffs ingested was not sold and

marketed by U.S.-based Merck & Co., Inc., but rather by Merck Sharp & Dohme Limited, Merck

Frosst Canada Ltd., Merck Sharp & Dohme (Australia) Pty. Limited, MSD (Proprietary)

Limited, MSD (Proprietary) Limited, Merck Sharp & Dohme (Italia) S.p.A., and Laboratoires

Merck Sharp & Dohme-Chibret SNC.  These companies are incorporated and do business in

plaintiffs' home jurisdictions, not the United States.  In addition, Vioxx was subjected to

extensive, independent regulatory approval processes by the relevant government agencies in

each of the foreign plaintiffs' home countries.  Based on an assessment of risks and benefits

appropriate to that country, the relevant health agency decided that Vioxx was safe and effective

enough as labeled to merit prescription by its physicians to its citizens.  Each agency also

---

[4]      *See* Canadian Compl. ¶¶ 43-85, English Compl. ¶¶ 49-91; Italian Compl. ¶¶ 52-94; French Compl. ¶¶ 40-82; South African Compl. ¶¶ 42-84; Australian Compl. ¶¶ 42-84; *cf.* Worldwide Compl. ¶¶ 42-84 (asserting "violations of all states' consumer protection statutes" and otherwise identical claims).  The European Complaint, filed in New Jersey, asserts a different, but largely overlapping, set of claims.  *See* European Compl. ¶¶ 41-101.

[5]      *See* Canadian Compl. ¶¶ 28-29; English Compl. ¶¶ 33-34; Italian Compl. ¶¶ 36-37; French Compl. ¶¶ 25-26; South African Compl. ¶¶ 27-28; Australian Compl. ¶¶ 27-28; Worldwide Compl. ¶¶ 26-27; *cf.* European Compl. ¶ 33 (no subclasses proposed).

determined the appropriate content and wording of the Vioxx label in its country, based on the nature of medical practice, pharmaceutical marketing practices, and relevant linguistic and cultural norms in its country.  Because these cases overwhelmingly involve events that occurred outside the United States, they should not be adjudicated here.

## ARGUMENT

Plaintiffs ask this Court to adjudicate the claims of thousands of potential foreign class members, most of whom have never set foot in the United States, let alone purchased Vioxx here.  These foreign claims should be dismissed for at least two reasons.

*First*, the foreign plaintiffs' claims should be dismissed under the doctrine of *forum non conveniens* because both the public and the private-interest factors relevant to a *forum non conveniens* determination overwhelmingly favor dismissal.  To begin with, because the foreign plaintiffs' claims squarely implicate the regulatory judgments of each plaintiff's home government (both about the safety of Vioxx and about its appropriate packaging and marketing), those jurisdictions have an overwhelming interest in adjudicating plaintiffs' claims.  As numerous courts have held, it would violate fundamental principles of international comity to permit a U.S. jury to second-guess foreign regulatory judgments.  This is especially so because medical systems, pharmaceutical marketing practices, linguistic usage, and general cultural norms are very different in each foreign country.  A U.S. jury would simply have no good means of evaluating whether a given foreign label or marketing scheme was adequate or appropriate, especially when the labeling and marketing was in a foreign language.

Equally important, litigating the foreign plaintiffs' claims in the United States would embroil this Court in a complex, time-consuming foreign law morass.  Although Australia, South Africa, Canada, and the countries in the European Union all permit litigation of pharmaceutical

4

products liability claims, they employ statutory or common-law causes of action that have no precise analog to the U.S.-law claims set forth in plaintiffs' complaints. These foreign laws are complex, unfamiliar, and in many instances unsettled. Accordingly, this Court would have to expend substantial resources developing an understanding of the laws of each of these foreign jurisdictions, applying those laws to plaintiffs' claims, and in some cases making *new* foreign law by determining how foreign courts would resolve the novel legal issues presented by these claims. In addition, any trial of the foreign plaintiffs' claims would involve the intricacies of foreign drug regulatory schemes, each of which differs in distinct, material ways from U.S. regulation. Funneling foreign claims from around the world into this forum would thus consume substantial judicial resources and delay adjudication of the U.S. plaintiffs' claims—the claims this proceeding was established to resolve.

In addition to these public interest considerations, the relevant private interest factors favor dismissal as well. Discovery in the foreign plaintiffs' cases will focus on documents and witnesses relevant to plaintiffs' own medical histories and experiences with Vioxx. The evidence relevant to these matters is all located in plaintiffs' home countries, outside the reach of this Court's compulsory process. In addition, because relevant witnesses are located abroad, adjudicating plaintiffs' claims in the United States would place potentially crucial trial witnesses outside the reach of the trial courts' compulsory process. And because plaintiffs' claims will involve the foreign corporate entities that marketed and sold the Vioxx plaintiffs actually ingested, trying plaintiffs' claims in the United States would also impose on those entities the burden of litigating in a foreign country, assuming the Court even has jurisdiction over these foreign corporations. Nor is there any reason for the Court to undertake this tremendous effort:

as numerous other courts have concluded, plaintiffs' home countries plainly provide adequate alternative forums in which they can bring their Vioxx-related claims.

**Second**, each of the foreign plaintiffs' class allegations should be stricken or dismissed for additional case-specific reasons as well. Even assuming that these personal injury cases could be certified for class treatment under Federal Rule of Civil Procedure 23 (a highly dubious proposition given the animosity of U.S. courts toward certifying personal injury classes[6]), the class allegations suffer from defects that should bar their consideration. The class claims on behalf of all the purported classes here—comprised of citizens of England, Australia, Italy, France, South Africa, Canada, Europe and the world—should be stricken because any class action decided in the U.S. would likely not have a *res judicata* effect in these jurisdictions, meaning that any class member could simply sue Merck again in their home country if they failed to obtain relief in the United States. And the Canadian and Australian class actions should be dismissed under the doctrine of international comity, because there are already class actions pending in those countries, and their courts are better suited to resolve those claims.[7]

---

[6]     *See, e.g., Castano v. Am. Tobacco Co.*, 84 F.3d 734, 746 (5th Cir. 1996) (noting that "certification of mass tort litigation classes has been disfavored"); *id.* at 746 n.23 (listing cases in which courts have refused to certify mass tort class actions); *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1304 (7th Cir. 1995) ("[m]ost federal courts . . . refuse to permit the use of the class-action device in mass-tort cases" and "[t]hose courts that have permitted it have been criticized"); *In re Fibreboard Corp.*, 893 F.2d 706, 712 (5th Cir. 1990) ("too many disparities among the various plaintiffs for their common concerns to predominate"); *In re Dalkon Shield Prods. Liab. Litig.*, 693 F.2d 847, 853 (9th Cir. 1982) ("In products liability actions . . . individual issues may outnumber common issues. No single happening or accident occurs to cause similar types of physical harm or property damage. No one set of operative facts establishes liability."); *Zehel-Miller v. AstraZeneca Pharms., LP*, 223 F.R.D. 659, 663 (M.D. Fla. 2004) (certification of personal injury damages claims "would be indisputably inappropriate, since individual issues would overwhelm any common questions"); *Mertens v. Abbott Labs.*, 99 F.R.D. 38, 41 (D.N.H. 1983) (resolving common issue of drug's capacity to cause injury would do "substantially nothing" to advance the litigation "[i]n light of the varied degrees of use, exposure and harm in each Plaintiff's case"); *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61, 65-66 (S.D.N.Y. 2002) (it is "not surprising that all relevant Court of Appeals and the bulk of relevant district court decisions have rejected class certification in products liability cases") (collecting cases) (footnotes omitted).

[7]     In addition, the PSC's failure to include any of the foreign class actions in its master class action complaints constitutes an independent reason to dismiss the foreign class action complaints. This Court's Pretrial Order 16 ("PTO-16") directed plaintiffs (1) to file a Master Complaint applicable to "all pending Class Action Cases and to those subsequently filed"; (2) to move for class certification "[w]ithin thirty (30) days after" defendants answered the master complaint; and (3) with respect to any class action for which plaintiffs determined not to file a

I.      **THE FOREIGN PLAINTIFFS' CLAIMS SHOULD BE DISMISSED UNDER THE DOCTRINE OF *FORUM NON CONVENIENS*.**

The doctrine of *forum non conveniens* permits courts to "decline to exercise jurisdiction over a controversy . . . where it appears that the convenience of the parties and the court and the interests of justice indicate that the action should be tried in another forum." *Kovzac Ltd. v. Westway Trading Corp.*, Civil Action No. 02-3702 Section "R" (2), 2003 U.S. Dist. LEXIS 10767, at *5 (E.D. La. June 19, 2003) (quoting *In re Air Crash Disaster Near New Orleans, La. on July 9, 1982*, 821 F.2d 1147, 1154 (5th Cir. 1987)).  To secure a *forum non conveniens* dismissal, "a party must demonstrate (1) the existence of an available and adequate alternative forum and (2) that the balance of relevant private and public interest factors favor[s] dismissal." *Vasquez v. Bridgestone/Firestone, Inc.*, 325 F.3d 665, 671 (5th Cir. 2003).

The first requirement is ordinarily satisfied if "the defendant is amenable to process in the other jurisdiction," *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 n.22 (1981), and if "the parties will not be deprived of all remedies or treated unfairly, even though they may not enjoy the same benefits as they might receive in an American court," *Vasquez*, 325 F.3d at 671.

---

motion for certification, to file "a notice and memorandum with an explanation for the reasons of reserving certain claims." (PTO-16 at 2, 4.)  As other courts have held, such "[s]cheduling orders are essential tools" in the case management process, with which "litigants have an unflagging duty to comply."  *Tower Ventures, Inc. v. City of Westfield*, 296 F.3d 43, 46 (1st Cir. 2002).

The PSC did not include these cases in their master complaints, and neither they nor plaintiffs' counsel in the foreign actions filed a motion for class certification or otherwise indicated an intent to prosecute these cases. (Pls.' Steering Comm.'s Ancillary Notice Concerning Master Compls. For Personal Injury & Medical Monitoring at 1, Aug. 2, 2005.)  In its Notice, the PSC asserted that it was "not the intention in eliminating these causes of action from the Master Complaints, to in any way, cause [their] dismissal," *id.* at 1-2, but it failed to provide any explanation whatsoever for why they excluded these claims from the master complaint or why they should not be dismissed.  Presumably, the reason these cases were excluded from the master complaints is that even the PSC recognized that they are too overreaching.  Whatever the reason, if neither the PSC nor the foreign plaintiffs' attorneys are actively pursuing these claims in the MDL proceeding, there is no reason for them to remain on the docket.

In conducting the second inquiry (*i.e.*, balancing the private and public interests), the Court looks to a series of factors related to the public and private interests implicated by adjudicating the case in a particular forum.  The private interest factors include "the relative ease of access to sources of proof," the "availability of compulsory process for attendance of unwilling" witnesses, the "cost of obtaining attendance of willing" witnesses, and "all other practical problems that make trial of a case easy, expeditious and inexpensive."  *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947).  The public interest factors include "the 'local interest in having localized controversies decided at home, '" the interest in trying a case "in a forum that is at home with the law that must govern the action," the "avoidance of unnecessary problems in conflict of laws, or in the application of foreign law," and the "unfairness of burdening citizens in an unrelated forum with jury duty."  *Piper Aircraft*, 454 U.S. at 241 n.6 (quoting *Gilbert*, 330 U.S. at 509).  Courts must "balance" these factors "to determine where trial will best serve the convenience of the parties and the ends of justice."  *Mamish v. Tidex Int'l, Inc.*, Civil Action No. 91-3791, Section "K"(5), 1992 U.S. Dist. LEXIS 9550, at *3 (E.D. La. June 25, 1992).

In striking this balance, "'a foreign plaintiff's choice of an American forum merits less deference'" than would a U.S. plaintiff's choice of his or her home forum.  *Mamish*, 1992 U.S. Dist. LEXIS 9550, at *4 (quoting *Empresa Lineas Maritinas Argentinas, S.A. v. Schichau-Unteweser, A.G.*, 955 F.2d 368, 373 (5th Cir. 1992)); *see also Piper Aircraft*, 454 U.S. at 255-56.  As the Supreme Court has stated, "[w]hen [a] plaintiff is foreign," the assumption that his or her choice of forum is convenient is "much less reasonable."  *Piper Aircraft*, 454 U.S. at 256.  Courts are thus "more skeptical of a foreigner's claim that a United States forum is in fact the most convenient forum available."  *Bhatnagar v. Surrendra Overseas Ltd.*, 52 F.3d 1220, 1226 (3d Cir. 1995).  Indeed, some courts have even warned that when a foreign citizen chooses a

United States forum, "a plausible likelihood exists that the selection was made for forum-shopping reasons, such as the perception that United States courts award higher damages than are common in other countries." *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71 (2d Cir. 2001).

In this case, the foreign plaintiffs' home jurisdictions plainly provide adequate forums for litigation of their claims, and both the public and private interests factors overwhelmingly favor dismissal.

### A.    The Named Plaintiffs' Home Countries Provide Adequate Forums For Their Claims.

There is no serious doubt that England, Australia, Italy, France, South Africa, Canada, and the countries of the European Union provide adequate alternative forums in which the foreign plaintiffs can litigate their disputes. United States courts have repeatedly found that these countries provide wholly adequate forums for litigation of products liability claims. *See, e.g., In re Richardson-Merrell*, 545 F. Supp. 1130, 1137 (S.D. Ohio 1982) (dismissing pharmaceutical products liability action in favor of British forum); *McCracken v. Eli Lilly & Co.*, 494 N.E.2d 1289, 1290 (Ind. Ct. App. 1986) (same); *In re Silicone Gel Breast Implant Prods. Liab. Litig.*, 887 F. Supp. 1469, 1478-79 (N.D. Ala. 1995) (dismissing products liability claims in favor of Australian forum); *Magnin v. Teldyne Cont'l Motors*, 91 F.3d 1424, 1429-31 (11th Cir. 1996) (affirming *forum non conveniens* dismissal of products liability claims in favor of French forum); *Traver v. Officine Meccaniche Toschi Spa*, 233 F. Supp. 2d 404, 415 (N.D.N.Y. 2002) (concluding that Italy is adequate alternative forum for *forum non conveniens* purposes in products liability, failure to warn, negligence, and breach of warranty case); *In re Rezulin Prods. Liab. Litig.*, 214 F. Supp. 2d 396, 401 (S.D.N.Y. 2002) (dismissing pharmaceutical tort claims in favor of Canadian forum); *Ledingham v. Parke-Davis Div. of Warner-Lambert Co.*, 628 F. Supp. 1447, 1452-53 (E.D.N.Y. 1986) (same); *Matli ex rel. Matli v. Strategic Minerals Corp.*, No. 04

9

Civ. 5555(SAS), 2004 WL 2297373, at *2 (S.D.N.Y. Oct. 12, 2004) (dismissing complaint

alleging work-related injuries caused by defendants' products in favor of South African forum);

*cf. MTS Secs., Inc. v. Creditanstalt-Bankverein*, 96-CV-0567E(Sc), 1997 U.S. Dist. LEXIS 6683,

at *15-30 (W.D.N.Y. May 1, 1997) (dismissing case in favor of Austrian forum, home forum of

the named plaintiff in the European Complaint).

     These courts have reached these conclusions for good reason.  In the first place, these

jurisdictions all "permit litigation of the subject matter" of plaintiffs' claims.  *Piper Aircraft*, 454

U.S. at 255 n.22.  All of these forums have long-standing systems of justice rooted in English

common law or Roman civil law, and provide causes of action for products liability and failure

to warn that would enable plaintiffs to obtain relief for the injuries asserted in their complaints.

(*See* Declaration of Sheila Block ("Block Decl.") ¶¶ 4-10 (attached as Ex. 1 to the Appendix of

Declarations and Exhibits in Support of Merck's Motion to Dismiss the Foreign Class Actions

("App. of Declarations and Exhibits.")); Declaration of Antonio Gambaro ("Gambaro Decl.") ¶¶

5-7 (attached as Ex. 2 to App. of Declarations and Exhibits); Declaration of John Roy Peter

("Peter Decl.") ¶¶ 7-11 (attached as Ex. 3 to App. of Declarations and Exhibits); Declaration de

Monsieur Le Professeur Arnaud Raynouard ("Raynouard Decl.") ¶¶ 1.1-1.2 (attached as Ex. 4 to

App. of Declarations and Exhibits); Declaration of Nicholas Underhill QC ("Underhill Decl.") ¶¶

6(a)-(d), 7-49, 62-70 (attached as Ex. 5 to App. of Declarations and Exhibits); Declaration of Ian

Gordon Harrison ("Harrison Decl.") ¶¶ 5-43 (attached as Ex. 6 to App. of Declarations and

Exhibits).)  This is more than sufficient.  As noted earlier, there is *no* requirement that the law of

the alternative forum be as favorable to the plaintiff as his or her chosen forum—"it is well

established that the adequacy of an alternate forum does not hinge on the possibility that it would

subject the plaintiffs to laws less favorable to them."  *Doe v. Hyland Therapeutics Div.*, 807 F.

Supp. 1117, 1124 (S.D.N.Y. 1992); *see also, e.g., Ledingham*, 628 F. Supp. at 1449-50 (Ontario,

Canada an adequate alternative forum despite lack of strict products liability, lack of contingency

fee representation, and upper limit on recovery of non-pecuniary general damages).

Moreover, there is no question that the companies that actually marketed and sold the

drugs plaintiffs ingested are amenable to service of process in England, Australia, Italy, France,

South Africa, and Canada: each is a citizen of the country in which it is located, and there are

already suits pending against these companies in some of these countries. *See Piper Aircraft*,

454 U.S. at 255 n.22.  In addition, Merck & Co., Inc., is amenable to service of process and suit

in each of these jurisdictions (as well as in any other relevant European Union country), as it will

consent to submit to jurisdiction in these forums in civil actions timely filed by the foreign

plaintiffs on their claims.  It is well-established that a defendant's voluntary consent to service of

process and jurisdiction is sufficient to establish amenability to suit for purposes of a *forum non*

*conveniens* analysis.  *See, e.g., In re Richardson-Merrell, Inc.*, 545 F. Supp. at 1134 ("courts

have frequently conditioned a [*forum non conveniens*] dismissal . . . upon defendant's consent to

jurisdiction in the alternative forum"); *Harrison v. Wyeth Labs.*, 510 F. Supp. 1, 9 (E.D. Pa.

1980) (granting *forum non conveniens* dismissal conditioned upon defendant's consenting to suit

and accepting process in plaintiffs' home jurisdiction).

**B.      The Public Interest Factors Strongly Favor Dismissal.**

The relevant public interest factors in this case overwhelmingly favor dismissal.  To

begin with, because plaintiffs' claims implicate involved regulatory judgments made by each of

plaintiffs' home jurisdictions, those jurisdictions have an especially strong interest in

adjudicating plaintiffs' claims, an interest reinforced by their general interest in seeing that their

own citizens are compensated for the injuries they suffer.  Moreover, litigating plaintiffs' claims

in the United States would require this court to apply unfamiliar, complex, and unsettled foreign

11

law from a variety of jurisdictions.  Permitting the foreign plaintiffs to maintain their suits here would also attract further foreign litigation to this forum, imposing an unjustifiable burden on this Court, and further diverting this Court's resources from the U.S. claims that are the focus of this proceeding.

**1.      Plaintiffs' Home Forums Have An Overwhelming Interest In Adjudicating Their Claims.**

Plaintiffs' home jurisdictions have an overwhelming interest in adjudicating plaintiffs' claims for at least two reasons.  *First*, litigating the foreign plaintiffs' claims in the United States would upset international comity by permitting U.S. juries to second-guess foreign regulatory judgments approving Vioxx for sale in these countries.  These comity concerns are heightened in this case because U.S. juries, unfamiliar with foreign languages, customs, and medical practice, would be ill-suited to adjudicating plaintiffs' claims.  *Second*, litigating plaintiffs' claims in the United States would deprive their home jurisdictions of their ability to ensure for themselves that their own citizens received appropriate compensation for their alleged injuries.

**a.      Adjudicating Plaintiffs' Claims In This Forum Would Violate International Comity And Could Undermine Foreign Regulatory Judgments.**

U.S. courts have long recognized that "when a regulated industry, such as the pharmaceutical industry, is involved in an action, the country where the injury occurs has a particularly strong interest in the litigation." *Ledingham*, 628 F. Supp. at 1451.  This is because every country has an interest in weighing for itself the benefits of permitting a particular drug's use against its potential risks, and in determining for itself whether a warning is necessary in light of prevailing community standards and practices.  If a U.S. court adjudicates a foreign plaintiff's challenge to the safety of a drug approved for sale in a foreign country, it risks disrupting these foreign regulatory judgments.  As one court aptly observed,

12

the courts of the United States are ill-equipped to set a standard of product safety for drugs sold in other countries. . . . Each government must weigh the merits of permitting the drug's use and the necessity of requiring a warning. Each makes its own determination as to the standards of degree of safety and duty of care. This balancing of the overall benefits to be derived from a product's use with the risk of harm associated with that use is peculiarly suited to a forum of the country in which the product is to be used. Each country has its own legitimate concerns and its own unique needs which must be factored into its process of weighing the drug's merits, and which will tip the balance for it one way or the other. The United States should not impose its own view of the safety, warning, and duty of care required of drugs sold in the United States upon a foreign country when those same drugs are sold in that country.

*Harrison*, 510 F. Supp. at 4.

For these reasons, U.S. courts have repeatedly dismissed foreign pharmaceutical products liability claims under the doctrine of *forum non conveniens*, emphasizing the foreign jurisdiction's strong interest in hearing claims that challenge or implicate its own regulatory judgments. In *Harrison*, for example, a group of United Kingdom residents sued a pharmaceutical manufacturer, alleging that they were injured after taking oral contraceptives that were marketed and sold by the manufacturer's foreign subsidiary, and prescribed and ingested in the United Kingdom. *Id.* at 2. Despite the fact that the center of gravity of those claims was clearly in the United Kingdom, the plaintiffs sued in Pennsylvania, the manufacturer's principal place of business. *Id.* The court determined that the claims should be dismissed under the doctrine of *forum non conveniens*, explaining that "[q]uestions as to the safety of drugs marketed in a foreign country are properly the concern of that country." *Id.* at 4. Numerous courts have since followed suit. *See, e.g.*, *Doe v. Hyland Therapeutics Div.*, 807 F. Supp. 1117, 1129 (S.D.N.Y. 1992) ("The forum whose market consumes the product must make its own determination as to the levels of safety and care required. That forum has a distinctive interest in explicating the controlling standards of behavior, and in enforcing its regulatory scheme."); *In re Richardson-Merrell*, 545 F. Supp. at 1135 ("This action involves the safety of drugs

manufactured in the United Kingdom and sold to its citizens pursuant to licenses issued by that government. The interest of the United Kingdom is overwhelmingly apparent. [The U.S. forums where the case was pending] have a minimal interest in the safety of products which are manufactured, regulated and sold abroad by foreign entities, even though development or testing occurred in this country."), *aff'd*, *Dowling v. Richardson-Merrell, Inc.*, 727 F.2d 608, 616 (6th Cir. 1984) ("When a regulated industry . . . is involved, the country where the injury occurs has a particularly strong interest in product liability litigation."); *cf. Van der Velde v. Philip Morris Inc.*, 02 Civ. 783 (BSJ), 2004 U.S. Dist. LEXIS 246, at *21-22 (S.D.N.Y. Jan. 9, 2004) (quoting *Doe*, 807 F. Supp. at 1129-1130).

This reasoning is directly applicable here. As the accompanying declarations attest, England, Australia, Italy, France, South Africa, Canada, and the European Union all have extensive regulatory processes through which they conduct independent evaluations of pharmaceuticals before approving them for public use. (*See* Block Decl. ¶¶ 31-36; Gambaro Decl. ¶ 16.3; Peter Decl. ¶¶ 57-72; Declaration de Madame Le Professeur Anne Laude ("Laude Decl.") ¶¶ 5-32 (attached as Ex. 7 to App. of Declarations and Exhibits); Underhill Decl. ¶ 36; Declaration of David Anderson QC ("Anderson Decl.") ¶¶ 48-54 (attached as Ex. 8 to App. of Declarations and Exhibits); Harrison Decl. ¶¶ 82-87.) Each jurisdiction also has a regulatory regime—different from the one in the United States—that governs pharmaceutical marketing. (*See* Block Decl. ¶¶ 37-41; Gambaro Decl. ¶¶ 16.1-16.2; Peter Decl. ¶¶ 73-81; Laude Decl. ¶¶ 33-48; Anderson Decl. ¶¶ 55-56; Harrison Decl. ¶¶ 88-90.) In each of these jurisdictions, Vioxx was subjected to these distinct and extensive regulatory approval procedures.

In Canada, for example, pharmaceuticals are regulated by the Therapeutic Products Directorate, a division of Health Canada, the national health regulatory agency. (*See* Block Decl.

¶¶ 31-32.)  Before it could sell or market Vioxx, Merck Frosst—the Merck subsidiary that sold and marketed Vioxx in Canada—was required to prepare and submit a voluminous New Drug Submission that included substantive scientific evidence demonstrating that Vioxx met the standards of safety, efficacy, and quality set forth in the Canadian Food and Drugs Act and corresponding Regulations.  (*See id.* ¶¶ 31-33.)  After reviewing and evaluating this submission, Health Canada issued a Notice of Compliance, indicating that Vioxx complied with the Regulations, and was authorized for sale.  (*See id.* ¶¶ 34-35.)  Unlike the United States, however, Canada prohibits most direct-to-consumer advertising.  (*See id.* ¶ 37.)  Accordingly, virtually all Vioxx advertising was directed at health care professionals.  (*See id.* ¶ 38.)  These marketing efforts were regulated by Canada's Pharmaceutical Advertising Advisory Board, an industry group that reviews and clears advertising material, and were also subject to the regulatory authority of the Therapeutic Products Directorate.  (*See id.* ¶¶ 40-41.)  The regulatory approval processes in England, Australia, Italy, France, South Africa, and the European Union involved similarly extensive submissions of data and other information to a national regulatory authority, independent testing or review of data by that authority, and a certification by the authority that Vioxx met the standards for safety and efficacy required in that jurisdiction.  (*See* Gambaro Decl. ¶ 16.3; Peter Decl. ¶¶ 57-72; Laude Decl. ¶¶ 5-32; Anderson Decl. ¶¶ 48-54; Harrison Decl. ¶¶ 82-87.)  Like Canada, these jurisdictions either prohibit or heavily restrict direct-to-consumer advertising, and closely regulate the advertising that may be disseminated to health care professionals.  (*See* Gambaro Decl. ¶¶ 16.1-16.2; Peter Decl. ¶¶ 74-77; Laude Decl. ¶¶ 39, 42-48; Anderson Decl. ¶¶ 55-56; Underhill Decl. ¶ 37; Harrison Decl. ¶¶ 88-90.)

Adjudicating plaintiffs' claims in the United States would in effect permit a U.S. jury to second-guess these foreign regulatory judgments.  As discussed above, this kind of interference

with foreign regulatory judgments should be avoided. *See Harrison*, 510 F. Supp. at 4; *Doe*, 807 F. Supp. at 1129-30; *In re Richardson-Merrell, Inc.*, 545 F. Supp. at 1135; *Van der Velde*, 2004 U.S. Dist. LEXIS 246, at *21-22.

In addition, it would be nearly impossible for a U.S. jury to make accurate determinations about the appropriateness of pharmaceutical warnings and the acceptable level of risk in foreign countries. The relevant warnings in several of the countries—including Italy, France, and most of the countries in the European Union—were not even written in English. Moreover, medical practices in even the English-speaking foreign jurisdictions differ from those in the United States. "[S]tress, diet, custom usage, and other factors may well differ greatly from country to country." Minute Entry at 4, *In re Propulsid Prods. Liab. Litig.*, MDL No. 1355 (E.D. La. May 11, 2001) (Fallon, J.) (attached as Ex. 9 to App. of Declarations and Exhibits). Pharmaceutical marketing practices in these countries are also very different. Not being familiar with medical practice, marketing practices, or linguistic or cultural norms in the countries where the foreign plaintiffs purchased and ingested Vioxx—and not being able even to read the labels and literature not written in English—a U.S. jury would be poorly equipped at best to evaluate the appropriateness of marketing, warnings, or the underlying decision to take Vioxx to market. The courts and juries of plaintiffs' home countries, needless to say, would be far better positioned to evaluate these questions.

    **b.**  **Plaintiffs' Home Forums Have A Strong Interest In Seeing That Their Citizens Receive Appropriate Compensation For Any Valid Personal Injury Claims.**

Plaintiffs' home forums also have a straightforward and "strong interest in seeing to it that [their] residents [are] fairly compensated for any injury inflicted upon [them]." *In re Rezulin Products Liability Litig.*, 214 F. Supp. 2d 396, 399 (S.D.N.Y. 2002). This interest outweighs any

general interest that U.S. courts might have in adjudicating claims that domestic companies had

marketed defective products.

This is particularly true because there can be no concern that if the foreign plaintiffs are

not permitted to sue, Merck will face too little potential deterrence regarding its future behavior

in the U.S.  Merck is facing thousands of lawsuits across the United States.  As one court

recently observed in a large-scale products liability case,

> [a]lthough the Defendant manufacturer is headquartered in New York, any
> interest of New York or the United States in ensuring that American
> manufacturers are deterred from producing defective products is likely to be
> insignificant.  [The manufacturer] has already litigated and continues to litigate a
> large number of . . . lawsuits in the United States.

*Van der Velde*, 2004 U.S. Dist. LEXIS 246, at *19 (internal quotation marks omitted) (citations

omitted).

### 2.    Permitting Suit By Foreign Plaintiffs Would Require The Court To Analyze And Apply Unfamiliar Foreign Law And Regulations.

Adjudicating the foreign plaintiffs' cases in the United States would also create massive,

"unnecessary problems in . . . the application of foreign law," and result in trial or disposition of

plaintiffs' claims in a forum that is less "at home with the law that must govern the action[s]."

*Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981).  As the Supreme Court has held, "the

public interest factors point towards dismissal where the court would be required to untangle

problems in . . . law foreign to itself." *Id.* at 251 (internal quotation marks omitted).

Under the relevant choice-of-law principles, this Court would be required to apply the

law of each plaintiff's home jurisdiction to his or her claims.[8]  Obviously, that would be a

---

[8]       In MDL proceedings, the court applies the choice-of-law rules of the state in which a transferred action was originally filed. *In re Air Disaster at Ramstein Air Base, Germany*, 81 F.3d 570, 577 (5th Cir. 1996).  All but one of these actions was filed in the Northern District of Illinois.  That jurisdiction applies "the local law of the place of the injury unless Illinois has a more significant relationship with the occurrence and with the parties." *Vickrey v. Caterpillar Tractor Co.*, 497 N.E.2d 814, 816 (Ill. App. Ct. 1986).  Given that the foreign plaintiffs suffered their

massive, complex, difficult, and extraordinarily time-consuming undertaking.  While each of

plaintiffs' home jurisdictions provides causes of actions for injuries caused by defective products

and inadequate warnings, none of these foreign causes of action is precisely analogous to the

U.S. causes of action alleged in plaintiffs' complaints.  (*See* Block Decl. ¶¶ 42-59; Gambaro

Decl. ¶¶ 8-13; Peter Decl. ¶¶12-37; Raynouard Decl. ¶¶ 2.1-2.5; Underhill Decl. ¶¶ 7-61;

Harrison Decl. ¶¶ 11-43.)  As the accompanying declarations attest, the law governing plaintiffs'

claims is complicated, and sometimes varies from province to province within a given country.

(*See* Block Decl. ¶¶ 4, 53, & Exs. B, C, E-H; Gambaro Decl. ¶¶ 9.2(e), 11, 8-13; Peter Decl. ¶¶

12-22; Raynouard Decl. ¶¶ 2.1-2.5; Underhill Decl. ¶¶ 6-49; Anderson Decl. ¶¶ 11, 19-34, 42-47,

58-65; Harrison Decl. ¶¶ 37, 40, 43.)

Moreover, in many instances, the substantive foreign law likely to be involved is highly

unsettled.  In England, for example, the principal cause of action for a plaintiff seeking

compensation for alleged injuries suffered from ingesting Vioxx would be an action under the

UK Consumer Protection Act of 1987 (the "CPA"), which implements the European Union

"Product Liability Directive" of July 25, 1985 (the "Directive").  (*See* Underhill Decl. ¶¶ 6(a)-

(c), 7-8; Anderson Decl. ¶¶ 11(b), 45, 60, 62.)  To determine the content of relevant English law,

this Court would therefore have to interpret European Union ("EU") legislation, and to make

legal determinations—such as the circumstances in which a drug is defective and the scope of

defenses available to a manufacturer—in accordance with the history and policy of the Directive,

and the application of the Directive in various European and United Kingdom courts.  (*See*

Underhill Decl. ¶¶ 6(a)-(c), 9-49; Anderson Decl. ¶¶ 11-14, 19-26, 42-47, 58-65.)  Determining

---

alleged injuries abroad, foreign law would apply to their claims.  The remaining action was filed in the District of
New Jersey.  That jurisdiction applies a "governmental-interest analysis."  *Veazey v. Doremus*, 510 A.2d 1187, 1189
(N.J. 1986).  Given the foreign governments' overwhelming interest in the foreign plaintiffs' claims, this analysis
too would mandate application of foreign law.

the content of United Kingdom law would also require evaluating the jurisprudence of the European Court of Justice (the "ECJ") on the interpretation of EU law generally, and in the particular ECJ cases involving the Directive. (*See* Underhill Decl. ¶¶ 6(c), 9-17, 22-27; Anderson Decl. ¶¶ 11(c)-(f), 14(c), 20-21, 27-41, 66-68.)

To say the least, this would be a difficult exercise. It would require this Court to interpret laws that are the product of years of negotiation and compromise between the governments of the European member states. (*See* Underhill Decl. ¶¶ 18-20; Anderson Decl. ¶¶ 11(f), 43-46.) The relevant materials are written in a variety of different languages, and the Court would have to consider these materials using an unfamiliar "teleological" interpretive methodology that places an unusually high degree of emphasis on ascertaining the purposes behind particular statutory provisions. (*See* Underhill Decl. ¶¶ 15, 17; Anderson Decl. ¶¶ 11(d)-(f), 24(a)-(c).) The difficulty would be exacerbated by the fact that there is little case-law interpreting the Directive: very few relevant cases have been decided by the ECJ or courts in the member states under the Directive (*see* Underhill Decl. ¶¶ 22-28; Anderson Decl. ¶ 47), and there are "almost n[o]" reported English decisions "giving guidance" about how the Directive applies in pharmaceutical cases, (Underhill Decl. ¶ 30). Determining the content of Australian, Italian, French, South African, and Canadian law—not to mention the law of all the remaining European countries or "the world"—would require a similarly daunting excursion into detailed statutory and common-law schemes, including the Roman-Dutch common law applicable in South Africa, and the civil law applicable in Italy, France, and most other European countries. (*See* Block Decl. ¶¶ 4, 42-59, & Exs. B, C, E-H; Gambaro Decl. ¶¶ 5-6, 9-12; Peter Decl. ¶¶ 7-9, 12-22; Raynouard Decl. ¶¶ 1.1, 2.1-2.5; Harrison Decl. ¶¶ 5-43.) This "need to apply foreign law point[s] towards dismissal." *Piper Aircraft Co.*, 454 U.S. at 260.

19

Applying foreign law in these cases could also create further problems of international comity.  For example, as noted above, there is scant authority applying the Directive to pharmaceutical cases.  Thus, if this Court were to adjudicate claims under English law, it would essentially be creating new European Union law.  But it would be doing so in a forum where neither the plaintiffs nor the defendants nor this Court itself would have the right to request that the interpretation of EU law be referred to the ECJ.  (*See* Anderson Decl. ¶ 28.)  A court in England, in contrast, would have the right to make such a referral.  And given the unsettled state of the law in this area, it is extremely likely that if the English plaintiffs' claims were heard in England, judicial interpretation of the Directive would be referred to the ECJ.  (*See id.* ¶¶ 11(c) & (e), 41, 58; *cf.* Raynouard Decl. ¶ 2.1 (noting possibility of referral to the ECJ, referred to as the "CJCE," or "Cour de justice des Communautés européennes").)  That court is specially equipped to adjudicate questions of EU law: it has a multinational membership, with judges and officials from all 25 European member states; it accepts input on pending cases from all member governments; and it has a staff of hundreds of translators and interpreters who can perform the comparative linguistic analysis necessary to analyze and harmonize EU law in all 20 of the EU's languages.  (*See* Anderson Decl. ¶¶ 11(e), 24(a), 33.)  It is also the only court that can provide an authoritative interpretation of EU law binding in all EU member states.  (*See id.* ¶¶ 11(c), 20, 33(e).)  Referring questions of EU law to the ECJ thus furthers the fundamentally important goal of achieving consistency in the interpretation of EU directives across Europe.  (*See id.* ¶¶ 26-34; Underhill Decl. ¶¶ 6(c), 16.)  Adjudicating the English plaintiffs' claims in a U.S. court would bypass this system and undermine this goal.

In addition, adjudicating the foreign plaintiffs' claims would require this Court (or the eventual trial court) to immerse itself in the extensive foreign regulatory regimes governing the

sale and marketing of Vioxx in plaintiffs' home countries.  *See, e.g., Van der Velde v. Philip Morris Inc.*, 2004 U.S. Dist. LEXIS 246, at *20-21 (S.D.N.Y. Jan. 9, 2004).  This would entangle the Court in an additional morass of foreign law determinations.

> ### 3.   Permitting Foreign Plaintiffs To Sue In This Forum Would Vastly Expand These Proceedings And Result In Even More Litigation Being Amassed In This Forum.

Permitting foreign plaintiffs to bring their claims in this forum would needlessly enlarge and complicate this already massive proceeding, diverting resources from and delaying resolution of the U.S. plaintiffs' claims.  In addition, permitting these foreign plaintiffs to bring their claims in this forum would encourage other foreign plaintiffs to bring their claims here, further increasing the burden on this court.[9]  Other courts faced with foreign plaintiffs seeking to join a large group of U.S. plaintiffs already bringing claims against a pharmaceutical manufacturer have found that "to allow . . . foreign plaintiffs access to American courts on the bare nexus that a [drug] was developed and tested in this country, when it was manufactured and sold abroad by a foreign corporation, would flood this country with cases in which its own interest is minimal and the [foreign forum's] great." *In re Richardson-Merrell*, 545 F. Supp. at 1135; *see also Van der Velde*, 2004 U.S. Dist. LEXIS 246, at *17 (permitting foreign plaintiffs to sue in the United States creates "an additional danger of congestion," because it "creates precedent for other foreign plaintiffs to bring . . . suits in United States courts").  These additional foreign suits "would undoubtedly place a heavy burden on" this Court and the eventual trial courts, "a burden that would not be justified in light of the de minimis connection between . . . injuries occurring outside of the United States and this [forum]." *Van der Velde*, 2004 U.S. Dist. LEXIS 246, at *17; *see also In re Richardson-Merrell*, 545 F. Supp. at 1136

---

[9]     As noted above, in recent months, plaintiffs from five additional countries—Israel, Germany, New Zealand, the Netherlands, and Poland—have filed purported class actions directly in this Court to be heard in connection with these proceedings.

("We . . . cannot ignore the likelihood that countless additional actions against the defendant by foreign plaintiffs will be filed in this district or transferred to it, absent the Court's dismissal of these actions.  The minimal nexus this jurisdiction has with such cases simply does not justify the potential burden on this Court and the citizens of this district.").

### C.      The Private Interest Factors Also Favor Dismissal of the Foreign Plaintiffs' Claims.

An evaluation of the private interest factors further demonstrates why the foreign plaintiffs' claims do not belong in this forum.  To start, most of the documents and witnesses relevant to their claims are located in their home jurisdictions.  As noted above, the key factual events involved in these cases occurred abroad: the foreign plaintiffs were prescribed Vioxx abroad, bought it there, and suffered their alleged injuries there.  Information and records regarding plaintiffs' prescription and purchase of the drug are likely to be located abroad, as are foreign regulatory and marketing documents kept by the foreign corporations that actually marketed and sold Vioxx in these countries.  Plaintiffs' medical histories will likely play a large role in the adjudication of their claims; yet the foreign plaintiffs' medical records and treating physicians are likely to be located abroad.  All of this renders plaintiffs' home jurisdictions a far more convenient choice of forum.  *See, e.g., Doe v. Hyland Therapeutics Div.*, 807 F. Supp. 1117, 1125 (S.D.N.Y. 1992) (U.S. forum not appropriate for Irish plaintiffs' claims in part because "[a]ll the evidence relating to the patients' medical history and treatment is located in Ireland," as well as prescribing, "treating[,] and consulting physicians, medical personnel, other health care providers such as hospitals and clinics, and experts who can testify as to local medical community practices").

The experience in *Aiello v. Merck & Co., Inc.*, No. ATL-L-2598-03 MT (N.J. Sup. Ct. Law Div.)—an individual case by a Canadian plaintiff against Merck that is currently pending in

New Jersey and that has proceeded to discovery—is instructive.  Mr. Aiello has indicated that he

has seen approximately twenty different healthcare providers in connection with various

workers' compensation injuries, general physical treatments, and his heart attack.  *See* List of

Medical Providers and Other Sources of Information at 5 (attached to Plaintiff's Fact Sheet for

Robert Aiello ("Aiello Fact Sheet"), *Aiello v. Merck & Co., Inc.*, No. ATL-L-2598-03 MT (N.J.

Super. Ct. Law. Div. Dec. 30, 2003)) (attached as Ex. 10 to App. of Declarations and Exhibits);

Deposition of Robert Aiello ("Aiello Dep.") at 97:13-98:20, 101:12-102:2, 107:9-108:4, 110:18-

24, 112:6-11, 121:8-12, 135:1-7, 136:9-17, 138:16-23, 141:14-24, 145:6-17, 164:19-165:6,

179:1-12, 189:5-25, *Aiello v. Merck & Co., Inc.*, No. ATL-L-2598-03 MT (N.J. Super. Ct. Law

Div. Aug. 1, 2005) (attached as Ex. 11 to App. of Declarations and Exhibits).  He confirmed in

his deposition that all of these physicians reside and practice in British Columbia.  *See* Aiello

Dep. at 30:19-31:4, 47:5-14, 100:1-5, 147:13-48:3.  Moreover, in his deposition, Mr. Aiello was

asked to identify witnesses who had known him both before and after his heart attack.  *See id.* at

34:17-21.  Every one of these witnesses resides in Canada.  *See id.* at 35:3-36:8, 47:5-11.

Further, Mr. Aiello repeatedly identified his common-law wife as the person who could best

testify about his condition and life before his heart attack, and who could provide the best

testimony of the events surrounding his heart attack.  Aiello Fact Sheet at 25; Aiello Dep. at

33:11-15.  Yet Mr. Aiello's lawyers have refused to produce his wife, who resides in Canada, for

deposition.  This is typical of the kind of experience likely to occur if the foreign plaintiffs'

claims undergo pretrial proceedings in this forum.

  In addition, if these cases proceed to trial, potentially critical third-party witnesses, such

as plaintiffs' physicians, spouses, and other family members, will be outside the reach of the trial

court's compulsory process.  As the accompanying declarations confirm, there is simply no way

a U.S. court can compel the attendance of foreign third-party witnesses at trial. (*See, e.g.*, Block Decl. ¶ 14; Peter Decl. ¶ 43; Raynouard Decl. ¶ 5; Underhill Decl. ¶ 71.) And to secure their testimony in recorded form would involve an extended process, requiring the discretionary intervention of foreign courts. (*See* Block Decl. ¶¶ 11-16; Gambaro Decl. ¶ 14; Peter Decl. ¶¶ 44-54; Raynouard Decl. ¶¶ 5-6; Underhill Decl. ¶¶ 71-74; Harrison Decl. ¶¶ 60-66.)[10] Trial in a U.S. forum would thus make it extremely difficult (if not impossible) for Merck to secure potentially crucial evidence for trial. As courts have repeatedly recognized, the unavailability of compulsory process counsels in favor of dismissal. *See, e.g.*, *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 511 (1947) ("to fix the place of trial at a point where litigants cannot compel personal attendance [of witnesses] and may be forced to try their cases on deposition, is to create a condition not satisfactory to court, jury or most litigants"); *Mercier v. Sheraton Int'l, Inc.*, 981 F.2d 1345, 1356 (1st Cir. 1992) (granting *forum non conveniens* motion in part because unavailability of a witness would result in "serious injustice"); *Van der Velde*, 2004 U.S. Dist. LEXIS 246, at *12 ("[A]lthough the Decedent's relatives are willing to travel to the United States to testify at trial, Plaintiff exercises no control over Decedent's health providers or non-family members who may have knowledge of Decedent's smoking history. Therefore, the ease of access to evidence weighs in favor of conducting this litigation in England.") (citation omitted); *Doe*, 807 F. Supp. at 1126 ("With respect to the availability of compulsory process for attendance of unwilling witnesses, it is of considerable importance that litigation in New York

---

[10]   With respect to the Canadian claims, for example, this Court would have to issue letters rogatory to a court in the relevant Canadian jurisdiction, requesting its assistance in obtaining evidence. (*See* Block Decl. ¶ 14.) The Canadian court would then have the discretion to grant or refuse the request. (*See id.*) That court would exercise this discretion based on its judgment of, among other things, whether the evidence was relevant, otherwise unavailable, and identified with reasonable specificity, and whether the request was contrary to public policy or unduly burdensome. (*See id.* ¶ 16.) In short, the discovery process for claims to be tried in a U.S. court would be controlled largely by the local court of a foreign country.

would deprive defendants of compulsory process for substantial evidence in Ireland in the control of third parties.").

*    *    *

In sum, a *forum non conveniens* analysis confirms what is obvious from the face of the foreign plaintiffs' complaints: these are foreign claims, squarely implicating foreign regulatory judgments, foreign law, and foreign regulations, and principally involving foreign documents and witnesses. They should be tried where plaintiffs reside—not in the United States.

## II.    IN THE ALTERNATIVE, THE COURT SHOULD STRIKE OR DISMISS THE CLASS ALLEGATIONS.

Even if dismissal of the foreign class actions were not appropriate under *forum non conveniens* principles, these claims should not proceed as class actions. First, even assuming that the foreign class actions could be certified—a highly dubious proposition, as noted above[11]—most of the proposed class actions involve citizens from countries that would not afford preclusive effect to a U.S. judgment against the putative members of an opt-out class. These class actions should be stricken on that basis. In addition, the Canadian and Australian class allegations should be dismissed on grounds of international comity because class actions are already pending in those countries.

---

[11]    *See supra* note 6 and accompanying text. Moreover, given the tremendous variation in applicable law in a European or worldwide class, these two classes are preposterous on their face. *See, e.g., In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 288 F.3d 1012, 1015 (7th Cir. 2002) ("No class action is proper unless all litigants are governed by the same legal rules."); *cf. Castano v. Am. Tobacco Co.*, 84 F.3d 734, 741 (5th Cir. 1996) ("In a multi-state class action, variations in state law may swamp any common issues and defeat predominance."); *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1300-02 (7th Cir. 1995) (issuing writ of mandamus ordering district court to decertify class partly because it would be impossible to condense all of the states' laws into one jury instruction on negligence).

25

A.     **The Court Should Strike The Class Allegations Because Plaintiffs'
Home Jurisdictions Would Likely Fail to Give United States Class
Action Judgments *Res Judicata* Effect.**

As the accompanying declarations attest, the courts of England, Australia, Italy, France,
South Africa, and Canada are unlikely to give preclusive effect to a U.S. class action judgment
rendered in favor of a defendant.  (*See* Block Decl. ¶¶ 19-22; Gambaro Decl. ¶ 15; Peter Decl. ¶
42.3; Raynouard Decl. ¶ 8; Underhill Decl. ¶¶ 80-90; Declaration of Andrew Scott Bell ("Bell
Decl.") ¶¶ 17-42 (attached as Ex. 12 to App. of Declarations and Exhibits).)  In Australia, for
example, courts will likely not afford *res judicata* effect to any purported class judgment unless
class members have taken actual affirmative steps to submit themselves to the jurisdiction of the
U.S. court.  (Bell Decl. ¶¶ 18-19, 37-38, 42.)  Mere receipt of notice and the opportunity to opt
out would not be sufficient.  (*Id.* ¶ 38.)  The remaining jurisdictions operate under similar rules.
(*See* Block Decl. ¶¶ 19-22; Gambaro Decl. ¶ 15; Peter Decl. ¶ 42.3; Raynouard Decl. ¶ 8.1(b),
8.2; Underhill Decl. ¶¶ 80-90.)  Thus, if a citizen of one of those countries were a member of a
certified class that lost in U.S. litigation, that class member could reassert his or her claim in a
foreign court, despite the fact that the claim had already been rejected on the merits by a U.S.
court.

Plaintiffs from these jurisdictions should therefore not be permitted to bring class actions
in the United States.  As courts have long observed, "if defendants prevail against a class they
are entitled to a victory no less broad than a defeat would have been."  *Bersch v. Drexel
Firestone, Inc.*, 519 F.2d 974, 996 (2d Cir. 1975).  This principle would be violated if this Court
permitted class actions from the above-named countries to proceed.  Merck, the named plaintiffs,
and this Court would invest massive amounts of time and resources briefing preliminary motions
and class certification, and conducting class and merits discovery.  If a class were certified, the
cases would then be the subject of a similarly massive effort to conduct a class action trial.

Then, at the end of that trial, if Merck prevailed, the putative class members could turn around and proceed against Merck in their home countries, forcing Merck to begin again from scratch, defending against essentially the same claims a *second* time.

For this reason, numerous courts have recognized that it is simply "unfair to certify a class" if the class members "would not be precluded from litigating abroad in their home countries should they lose in [the United States] forum." *In re Assicurazioni Generali S.p.A. Holocaust Ins. Litig.*, 228 F. Supp. 2d 348, 364 (S.D.N.Y. 2002). In *Ansari v. New York University*, 179 F.R.D. 112, 116-17 (S.D.N.Y. 1998), for example, the district court held that certifying a class action comprised of citizens from eleven foreign countries would be inappropriate in part because of the lack of preclusive effect that would be afforded by the courts of those countries, which "counsel[ed] against a finding that the class action is superior to other forms of litigation." *Id.* at 116. In an earlier proposed class action involving citizens of the United Kingdom, that same district court similarly concluded that the plaintiffs had failed to demonstrate superiority of the class action form because "a British court will not recognize a foreign judgment in a United States 'opt-out' class action." *CL-Alexanders Laing & Cruickshank v. Goldfeld*, 127 F.R.D. 454, 459 (S.D.N.Y. 1989) (citing affidavit by a British barrister). Similarly, in *In re Telectronics Pacing Systems, Inc.*, No. MDL-1057, 1996 U.S. Dist. LEXIS 11088 (S.D. Ohio Feb. 23, 1996), the district court decertified a worldwide class based on uncontradicted affidavits demonstrating that the court's judgment would have no preclusive effect in several foreign jurisdictions, including England, Japan, France, Germany, and Australia. *Id.* at *3-4

*Del Fierro v. Pepsico Int'l*, 897 F. Supp. 59 (E.D.N.Y. 1995), is also instructive. In that case, which arose out of events in the Philippines, the district court dismissed the action and

refused to allow the plaintiff to amend his complaint to include class action allegations.  As a basis for the dismissal and denial of leave to amend, the court explained that a judgment in the defendant corporation's favor "would not inevitably have *res judicata* effect in the Philippines[,]" and thus success in the United States defending the suit "would not bar foreign class members from relitigating the same issues in the Philippines by asserting . . . that [the] court did not have jurisdiction, that particular class members did not receive adequate notice, or that [the] court's judgment was based on a clear mistake of fact or law."  *Id.* at 64.  Notably, the court reached this conclusion despite the fact that the *res judicata* effect of a U.S. judgment was uncertain.  *See id.*; *see also Bersch*, 519 F.2d at 996-97; *Assicurazioni Generali*, 228 F. Supp. 2d at 364.  In line with these cases, this Court should thus strike the class allegations in the complaints filed on behalf of English, Australian, Italian, French, South African, and Canadian citizens.  Because the putative European and worldwide class allegations encompass these jurisdictions, those allegations should be stricken as well.[12]

---

[12]  Further support for dismissing these international class actions can be found in cases denying certification of "failsafe" classes, in which plaintiffs attempt to define a class made up of persons to whom the defendant is liable on a particular claim.  *See, e.g., Adashunas v. Negley*, 626 F.2d 600, 601, 604 (7th Cir. 1980) (refusing to certify class of "all children attending public schools within Indiana who have specific learning disabilities and are not receiving adequate special education"); *Dafforn v. Rousseau Assocs., Inc.*, Civil No. F 75-74, 1976 U.S. Dist. LEXIS 13910, at *2 (N.D. Ind. July 27, 1976) (refusing to certify class of persons charged "an artificially fixed and illegal brokerage fee").  Courts have held that such class definitions are impermissible, because if such classes proceeded to trial and lost, the class would by definition have no members, and the class members would be free to sue again on other grounds.  *See Adashunas*, 626 F.2d at 604 (the "class definition, if allowed, would result in a 'fail-safe' class, a class which would be bound only by a judgment favorable to plaintiffs but not by an adverse judgment"); *Dafforn*, 1976 U.S. Dist. LEXIS 13910 at *3-4 ("The new class definition, if allowed, would result in a 'fail-safe' class, a class which would be bound only by a judgment favorable to plaintiffs but not by an adverse judgment.  Since the proposed class would consist only of those homeowners who paid illegal fees, a jury determination that defendants have charged no such illegal fees would at the same time determine that there was no class.  Absent class members would thereupon be free to relitigate the legality of defendants' fee structures.  But Rule 23 was never meant to be an exception to the rules of res judicata or to provide a risk-free method of litigation.").  As in the cases described in the text, courts have recognized that it is fundamentally unfair to provide class members with multiple opportunities to litigate essentially the same claims.

**B.    The Canadian and Australian Class Actions Should be Dismissed Because They Overlap With Class Actions Already Proceeding In Those Countries.**

As the attached declarations attest, class action proceedings are under way in Canada and Australia asserting claims based on alleged injuries suffered from ingesting Vioxx. (*See* Block Decl. ¶¶ 60-63; Declaration of Julie Grasso ¶¶ 2, 7-19 (attached as Ex. 13 to App. of Declarations and Exhibits).)[13]  The pendency of these actions reinforces the *forum non conveniens* arguments set forth above, demonstrating the adequacy of these forums and providing additional public and private interest reasons to dismiss these claims. *See, e.g., Blanco v. Banco Industrial De Venezuela*, 997 F.2d 974, 983 (2d Cir. 1993) (in assessing public interest factors, "considerations of comity weigh heavily in favor of noninterference with ongoing foreign judicial proceedings"); *Contact Lumber Co. v. P.T. Moges Shipping Co.*, 918 F.2d 1446, 1452 (9th Cir. 1990) (dismissal would favor private interests by "spar[ing] the litigants the additional costs of duplicate lawsuits").

In addition, the pendency of these foreign class actions provides an independent basis for dismissing the Australian and Canadian class actions under the doctrine of international comity. "The doctrine of international comity denotes the deference that courts of the United States should give to the acts of foreign governments and their courts." *Pan E. Exploration Co. v. Hufo Oils*, 798 F.2d 837, 839 (5th Cir. 1986).  It involves a "discretionary decision that deference will best promote the mutual interests of the United States and the foreign sovereign." *Id.*  Relevant factors in this decision include "the similarity of the parties and issues involved, promotion of judicial efficiency, adequacy of relief available in the alternative forum, [and] considerations of fairness to all parties." *Caspian Invs., Ltd. v. Vicom Holdings, Ltd.*, 770 F. Supp. 880, 884

---

[13]    Class action proceedings have also been commenced in Israel.  The arguments in this section are therefore applicable to the Israeli complaint as well.

(S.D.N.Y. 1991).  Courts have also considered the relative interests of the domestic and foreign jurisdictions in the litigation.  *See Ensign-Bickford Co. v. ICI Explosives USA Inc.*, 817 F. Supp. 1018, 1032 (D. Conn. 1993).

Under these standards, comity considerations clearly favor dismissal of the Canadian and Australian class actions pending in this MDL proceeding.  For reasons discussed above, litigation of these claims in Canada and Australia will best promote the mutual interests of the United States and these foreign jurisdictions, leaving cases that implicate foreign regulatory judgments, foreign parties, and foreign injuries in their home jurisdictions, and reducing court congestion in the United States.  *See* Section I *supra*.  The parties involved in the foreign class actions are similar, if not identical—Merck & Co., Inc., for example, is already a party in Canadian and Australian class actions, and has submitted to jurisdiction in those cases.  The foreign forums are manifestly adequate and fair for the plaintiffs, who will be able to litigate at home.  And having one rather than two proceedings will plainly foster judicial efficiency.  *See id.*  Accordingly, as other courts have done in similar situations, this Court should "pay comity to [these] foreign court[s'] jurisdiction," and dismiss the Australian and Canadian class actions.  *In re Telectronics*, 1996 U.S. Dist. LEXIS 11088, at *4.

## CONCLUSION

For the reasons set forth above, this Court should dismiss the putative class actions brought by foreign plaintiffs, or, in the alternative, strike or dismiss their class allegations.

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
Carmelite M. Bertaut, 3054
STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone: 504-581-3200
Fax:    504-581-3361

Defendant's Liaison Counsel

31

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Memorandum in Support of Defendant Merck & Co., Inc.'s Motion to Dismiss the Foreign Class Actions or, in the Alternative, Strike the Foreign Class Allegations has been served on Liaison Counsel, Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8, on this 12th day of January, 2006.

*Dorothy H. Wimberly*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | ) | **MDL NO. 1657** |
| | ) | |
| **PRODUCTS LIABILITY LITIGATION** | ) | **SECTION: L** |
| | ) | |
| | ) | **JUDGE FALLON** |
| **THIS DOCUMENT RELATES TO:** | ) | |
| | ) | |
| **ALL FOREIGN CLASS** | ) | **JURY TRIAL DEMANDED** |
| **ACTION COMPLAINTS** | ) | |
| | ) | |
| **MDL Nos. 05-3383, 05-4185, 05-2914,** | ) | |
| **05-5083, 05-5331, 05-451, 05-2933,** | ) | |
| **05-5603** | ) | |

## NOTICE OF HEARING

PLEASE TAKE NOTICE that Defendant Merck & Co., Inc.'s Motion to Dismiss the Foreign Class Actions or, in the Alternative, Strike the Foreign Class Allegations will be brought on for hearing on the 2nd day of February, 2006, at 1:30 o'clock, before the Honorable Eldon E. Fallon, Judge, United States District Court, Eastern District of Louisiana, 500 Poydras Street, New Orleans, Louisiana.

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
Stone Pigman Walther Wittmann L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone:  504-581-3200
Fax:  504-581-3361

Defendants' Liaison Counsel

786273v.1

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Notice of Hearing on Defendant Merck & Co., Inc.'s Motion to Dismiss the Foreign Class Actions or, in the Alternative, Strike the Foreign Class Allegations has been served on Liaison Counsel, Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 12th day of January, 2006.

786273v.1

# SEE RECORD FOR

# EXHIBITS

# OR

# ATTACHMENTS

# NOT SCANNED