

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 JAN 22 P 3: 06

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: VIOXX | MDL Docket No. 1657 |
| PRODUCTS LIABILITY LITIGATION | SECTION L |
| | JUDGE FALLON |
| This document relates to Case No. 05-4046 | |
| EVELYN IRVIN PLUNKETT as Personal Representative of the Estate of RICHARD IRVIN, JR., | MAGISTRATE JUDGE KNOWLES |
| Plaintiff, | |
| vs. | |
| MERCK & CO., INC., | |
| Defendant. | |

## MOTION OF MERCK & CO., INC. ("MERCK") TO EXCLUDE TESTIMONY OF ROBERT H. FLETCHER, M.D., M.SC.

Merck, through undersigned counsel, and pursuant to Rule 702 of the Federal Rules of Evidence, hereby moves to exclude the testimony of plaintiff's expert Robert H. Fletcher, M.D.,

___ Fee _____
___ Process _____
_X_ Dktd _____
_✓_ CtRmDep _____
___ Doc. No. _____

796947v.1

M.Sc. The facts and law supporting this motion are more fully set forth in the accompanying memorandum, declarations, and exhibits, which are incorporated as if fully set forth herein.

Respectfully submitted,

*Dorothy H. Wimberly*

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone: 504-581-3200
Fax:    504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois 60610
Phone: 312-494-4400
Fax:    312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Phone: 202-434-5000
Fax:    202-434-5029

And

John H. Beisner
Charles C. Lifland
Richard B. Goetz
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone: 213-430-6000
Fax:    213-430-6407

Attorneys for Merck & Co., Inc.

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Motion to Exclude Testimony of Robert H. Fletcher, M.D., M.Sc. has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 23rd day of January, 2006.

*Dorothy H. Wimberly*

796947v.1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 05-4046* | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| EVELYN IRVIN PLUNKETT | * | |
| as Personal Representative of the Estate of | * | |
| RICHARD IRVIN, JR., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * | | |

**MEMORANDUM IN SUPPORT OF MOTION OF MERCK & CO., INC. ("MERCK")
TO EXCLUDE TESTIMONY OF ROBERT H. FLETCHER, M.D., M.Sc.**

In the wake of the recent controversy over the New England Journal of Medicine's ("NEJM") editorial accusing Merck of withholding and deleting data during the VIGOR editorial process, plaintiff has retained Robert H. Fletcher, M.D., M.Sc. to render expert opinions on "medical publishing." This is nothing more than a thinly-veiled, improper attempt to bring in inadmissible and irrelevant testimony related to the controversy – including the substance of the editorial itself and the deposition testimony of Dr. Curfman, one of the editorial's authors – by using Dr. Fletcher's status as an "expert" to lend it credibility. Dr. Fletcher's testimony, on

subjects far afield of his purported area of expertise, fails to meet the requirements of Rule 702 and should be excluded, for the reasons stated below.

## I.  THE LEGAL STANDARD.

The admission of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702.

Once the proponent of the evidence proves that the offered testimony is based on sufficient facts or data, he or she must then "demonstrate that the expert's findings and conclusions are based on the scientific method, and, therefore, are reliable." *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir.1998) (en banc). This process is governed by the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). In *Daubert*, the Supreme Court made clear that the district courts must act as gatekeepers to ensure that expert testimony is both relevant and reliable and identified the following non-exclusive factors a district court may consider in evaluating an expert's testimony: (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the theory or technique's degree of acceptance in the scientific community. *Daubert*, 509 U.S. 593-94; *Moore*, 151 F.3d at 275; *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d 603, 605-06 (E.D. La. 2003). *In Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) the Supreme Court

explained that the overarching goal of *Daubert*'s gatekeeping requirement is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."

As discussed below, Dr. Fletcher's proposed testimony fails to meet these legal standards and should be excluded.

## II. DR. FLETCHER'S OPINIONS ON VIGOR AND APPROVE ARE NEITHER RELEVANT NOR RELIABLE, AND MUST BE EXCLUDED UNDER RULE 702.

Dr. Fletcher devotes a significant portion of his expert report to analyzing the data in VIGOR and APPROVe. (Expert Report of Robert H. Fletcher, M.D., M.Sc. ("Fletcher Rpt.") at ¶¶ 16-38, attached to the Declaration of Phillip A. Wittmann in Support of Merck's *Daubert* Motions ("Wittmann Decl.") at Ex. 4.) This testimony is inadmissible for two reasons. First, Dr. Fletcher is not qualified to render expert opinions on clinical trials. Second, even if he were qualified, his opinions are either completely speculative or rest on unreliable evidence. They are thus neither relevant nor reliable, and should be excluded under Rule 702.

### A. Dr. Fletcher's Professional Training and Experience Do Not Qualify Him to Interpret Clinical Data.

Dr. Fletcher is a general internist who specializes in clinical epidemiology. (Fletcher Rpt. at ¶ 3.) He has a background in medical journalism and has been retained by plaintiffs as an expert in that field. (*See* Fletcher Rpt. at ¶¶ 4-7; January 20, 2006 Rough Transcript of the Deposition of Robert H. Fletcher, M.D., M.Sc. ("Rough Fletcher Dep.") at 3:4-20, attached to the Wittmann Decl. as Ex. 2.) At his deposition, Dr. Fletcher stressed the limited scope of his expertise, explaining that "the only part of this that I would accept as an expert is the part having to do with medical journals and publication and . . . I confine my effort to that." (Rough Fletcher Dep. at 30:7-13.) Notwithstanding this representation, Dr. Fletcher purports to offer expert

3

opinions on a range of subjects that are well beyond the scope of his knowledge – including opinions on the validity and significance of the data presented in VIGOR and APPROVe. Dr. Fletcher's professional training and experience do not qualify him to opine on these subjects. Under Rule 702, this Court should exclude any testimony from Dr. Fletcher that strays beyond his self-proclaimed expertise in medical journalism.[1]

As Dr. Fletcher's own testimony reveals, he is not qualified to interpret clinical research on COX-2s, including data from Vioxx-related clinical trials. In fact, his understanding of the COX-2 class is rather limited. He has never done any research on COX-2s, and admits that COX-2s are not his "primary interest." (Rough Fletcher Dep. at 12:9-12:15, 12:25-13:6, 20:18-21.) Prior to being retained in this case, he had not studied the safety of NSAIDs "in depth." (*Id.* at 11:21-12:7.) Due to his lack of academic experience, one would assume that Dr. Fletcher would have studied COX-2s (or at least Vioxx) extensively in order to provide expert opinion in this case. Not so. Dr. Fletcher admits that his review of the safety data on Vioxx is incomplete. (*Id.* at 15-22-25.) He has spent only about forty hours on this case (*id.* at 38:19-39:20), and does not recall having reviewed such key pieces of information as the 2005 FDA Advisory Committee materials or the Vioxx label (*id.* at 16:18-18:1, 18:6-12). Nor does Dr. Fletcher make up in clinical experience what he lacks in academic expertise. By his own account, he has prescribed

---

[1] For example, the Court should prohibit Dr. Fletcher from testifying on the following subjects: (i) the plausibility of the naproxen hypothesis (*e.g.*, Rough Fletcher Dep. at 243:9-245:6 (admitting he's not an expert on the relevant data)); (ii) when the increased risk of Vioxx-related cardiovascular events became statistically significant (Fletcher Rpt. at ¶ 28); (iii) whether the updated, post-publication VIGOR results are so close to the cut-off for statistical significance as to be statistically significant (Fletcher Rpt. at ¶¶ 32-34); (iv) the weight and significance of investigator-reported events as compared to adjudicated events (Fletcher Rpt. at ¶ 25); and (v) whether Vioxx-related clinical studies were underpowered (Fletcher Rpt. at ¶26). He is plainly not qualified to testify on these and other matters involving the analysis of clinical trials in general or Vioxx-related clinical trials in particular.

COX-2s "less than ten" times and does not remember if he has ever prescribed Vioxx. (*Id.* at 10:9-11:2.)

Given these thin credentials, it is not surprising that Dr. Fletcher would state, "I am here as an expert on medical editing, not the drug [Vioxx]." (*Id.* at 14:21-15:2.) What *is* surprising, however, is that Dr. Fletcher would insist that he is an expert on VIGOR and APPROVe – which, in his words, "happen to be the best available evidence on the adverse effects of Vioxx" – when he concedes he is not an expert on the drug itself. (*Id.* at 15:4-11.) Again by Dr. Fletcher's own admission, he had little or no interest in either VIGOR or APPROVe prior to his involvement in this case. He had only read VIGOR "in a cursory way like I do all the stuff that comes out in those major journals" but "hadn't had occasion to really dig in and think about it critically." (*Id.* at 20:22-21:3.) He did not read the paper in detail when it was published (*id.* at 23:1-5), and similarly did not "have ... a reason" to read APPROVe "word-for-word" or "analyze" it upon its publication (*id.* at 24:7-19). Thus, his new-found "expertise" on these studies should be afforded little weight.

In sum, Dr. Fletcher is not "qualified as an expert by knowledge, skill, experience, training, or education" to testify about Vioxx-related clinical trials, including VIGOR and APPROVe. FED. R. EVID. 702. He clearly lacks the academic experience, credentials, and background to analyze the data in these studies in any way meaningful way. Any attempts by Dr. Fletcher to undertake such an analysis must be excluded under Rule 702.

### B. Dr. Fletcher's Opinions on VIGOR and APPROVe are Speculative and Unreliable.

Even if Dr. Fletcher were qualified to testify as an expert on clinical trials, the opinions on VIGOR and APPROVe that he offers in this case would still be inadmissible. Many of his conclusions are based on nothing more than speculation, unreliable evidence, or suspect

5

methodology. These opinions fail to meet the reliability standards set forth in *Daubert*, and – perhaps more importantly – would not "assist the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702. Under Rule 702, they should be excluded.

Dr. Fletcher's opinions on Protocol 203 serve as a prime example. Relying on a pooled analysis conducted by Dr. Nicholas Jewell, Dr. Fletcher concludes that, if such an analysis had been undertaken between the time of Vioxx's withdrawal and the publication of APPROVe, "it would have cast further doubt on the assertion that thrombotic events occurred only after 18 months of exposure to Vioxx."[2] (Fletcher Rpt. at ¶ 28; *see also id.* at Ex. C (Jewell Rpt.).) Dr. Fletcher's conclusion is based on information – Dr. Jewell's analysis – about which Dr. Fletcher knows absolutely nothing. He does not know Dr. Jewell or his work, and had never heard of him before this case. (Rough Fletcher Dep. at 205:7-206:12.[3]) This is problematic on a number of grounds. First, Jewell was not designated as an expert in this case. His materials and methods have not been disclosed to Merck. Thus, Dr. Fletcher's reliance on Dr. Jewell's report puts Merck at a serious disadvantage in preparing its defense – with no disclosure, no deposition, and no information from Dr. Fletcher to fill in the blanks.

Second, Dr. Fletcher appears simply to have accepted Dr. Jewell's report, which was provided to him by plaintiff's counsel, at face value – without scrutinizing or questioning the underlying methodology or data at all:

Q: Okay. Now, do you know what outcome Dr. [Jewel] used?

---

[2] Dr. Jewell's pooled analysis combines data from APPROVe and two other Vioxx-related studies, VICTOR and VIP. (Fletcher Rpt. at Ex. C.) As Dr. Fletcher notes, Merck planned and designed a similar study, entitled Protocol 203. (*Id.* at ¶ 26.)

[3] Note that the cited portion of Dr. Fletcher's deposition transcript mistakenly refers to Dr. Jewell as "Dr. July." Given the fact that the deposition was taken only last Friday, the court reporter has not yet had an opportunity to prepare a final transcript.

6

A: Dr [Jewel] was using the term cardiac events but since I don't have the methods part of his work I don't know precisely how he define[d] cardiac events.

Q: So you have no idea whether the end point used by Dr. [Jewell] is a reasonable or proper one for his analysis, correct?

A: I don't know that – those details of his methods, no.

Q: And do you know whether he was using adjudicated or investigated reported data?

A: I do not.

Q: Do you know where it is he got his data?

A: I was told he got it from Merck.

Q: Who told you that?

A: [Plaintiffs' counsel,] Mr. Black.

Q: So Mr. Black handed you this analysis from Dr. [Jewell] and said Dr. [Jewell] got his data from Merck? Do I have it right?

A: Well, something like that. . . .

. . .

Q: And so you have no idea whether he used the best, most up-to-date data, do you?

A: *I don't know what data he used.*

. . .

Q: And obviously you cannot independently confirm the accuracy of any of Dr. [Jewell's] numbers, correct?

A: No, I cannot.

. . .

Q: So you don't know through your own work, whether any of the data presented by Dr. [Jewell] . . . in fact are accurate, correct?

A: That's correct.

(Rough Fletcher Dep. at 208:7-209:4, 211:19-21 (emphasis added), 213:2-5, 213:14-17.)

796951v.1

As evidenced by this testimony, Dr. Fletcher knows nothing about the accuracy of Dr. Jewell's report, yet he relied on the report without question. He spent a total of one hour reviewing the analysis. (*Id.* at 207:10-20.) Such casual confidence in potentially unreliable data casts serious doubt over any conclusions derived from the report. *See* FED. R. EVID. 702 (expert testimony must be based on "reliable principles and methods"). It also calls into question the academic rigor with which Dr. Fletcher compiled his report as a whole.

Moreover, Dr. Fletcher's reliance on the Jewell report provides troubling insight into Dr. Fletcher's own analytical abilities. Even assuming the underlying data were reliable, Dr. Fletcher interprets the report in ways that completely ignore well-established scientific principles and methodology. For example, he admits that Dr. Jewell's calculations do not show a statistically significant difference in cardiovascular risks between Vioxx and placebo after one year of use and that they do after eighteen months – in accord with the APPROVe findings – but concludes that an elevated risk is nonetheless "likely" after no more than fifteen day of use because "the actual numbers start to rise [of] Vioxx over the placebo at that point." (*Compare* Rough Fletcher Dep. at 218:14-219:11, 220:11-15 *with id.* at 229:17-230:3.) As he explained at his deposition,

> [Does] any of that prove that the risk exists early? No. Does any of it suggest it? Sure does. In my opinion. Does any of that mean as a physician taking care of a patient I would be worried about the cardiovascular events early on? Yes. In the absence of better data I would say I would be a little worried about this[.]

(*Id.* at 228:18-25.)

This analysis ignores the statistical concept of calculating relative risk and is based instead on the "suggestion" of risk. In direct contravention of established and recognized scientific principles, Dr. Fletcher somehow associates an elevated risk of cardiovascular events with Vioxx within the first thirty days of use, using inconclusive and insignificant data that even

8

Dr. Fletcher admits is fraught with uncertainty. (*See id.* at 225:5-226:3, 231:9-18.) His subjective methodology is insufficient to establish the link conclusively; it simply "suggest[s] that a risk is likely." (*Id.* at 227:4-16.) But suggestions are not enough to satisfy the "intellectual rigor" required under *Daubert*. What is needed is proof, which Dr. Fletcher lacks.[4]

In defense of his position, Dr. Fletcher proclaims, "I do not worship at the alt[a]r of statistical significance."[5] (*Id.* at 233:25-234:1.) This proclamation confirms that Dr. Fletcher is not qualified to opine on the risks of Vioxx. The subjective analysis Dr. Fletcher employs – by which he would have us believe that a risk is important when he says it is, without further support – cannot and does not meet the requirements of Rule 702. Accordingly, any unfounded opinions based on this kind of analysis are inadmissible and should be excluded, in the proper exercise of this Court's gatekeeping function. *See Black v. Food Lion, Inc.*, 171 F.3d 308, 314 (5th Cir. 1999) (admission of expert testimony was abuse of discretion when particular opinion had no apparent underlying support).

### III.   DR. FLETCHER'S TESTIMONY ON THE EDITING PROCESS CONCERNING VIGOR AND APPROVE IS UNRELIABLE AND IRRELEVANT.

In addition to providing unreliable opinion testimony on the significance of the VIGOR and APPROVe data, Dr. Fletcher makes a number of subjective and irrelevant judgments about the editing process that are also inadmissible. (See Fletcher Rpt. at ¶¶ 16-21, 27, 30, 31, 35, and 37.) He opines, for example, on the kind of information the authors of these papers should have

---

[4] Dr. Fletcher's testimony not only lacks reliability, but is also inadmissible under Rule 403. Because an expert often appears inherently credible to a jury, Dr. Fletcher's unsupported opinions present a threat of unfair prejudice and jury confusion. *See Askanse v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997); *United States v. Fosher*, 590 F.2d 381, 383 (1st Cir. 1979).

[5] As much is also apparent from his analysis of the VIGOR data, in which he concludes that "the absence of a statistically significant difference in event rates (in this case in non-aspirin indicated patients) does not rule our the possibility that such a difference actually exists . . . ." (Fletcher Rpt. at ¶¶ 32, 34.)

9

provided to the NEJM. (*E.g., id.* at ¶¶ 17-25.) He also defends the NEJM for having acted appropriately, in his view, in reviewing the papers and accepting them for publication. (*E.g.,* Rough Fletcher Dep. at 45:9-46:2, 101:23-102:4, 124:13-125:5.)

None of these subjective judgments meets the requirement of Rule 702. *See, e.g., In re Rezulin*, 309 F. Supp. 2d 531, 542-45 (S.D.N.Y. 2004) (excluding expert testimony on subjective ethical standards because it was purely speculative, unhelpful to the fact-finder, and likely to prejudice the fact-finder). Nor do they qualify as lay witness testimony, since they are not based on Dr. Fletcher's personal knowledge.[6] FED. R. EVID. 701. They are thus inadmissible and should be excluded.

Dr. Fletcher's testimony on these subjects is also irrelevant, and thus inadmissible under Rules 401 and 402. Whether the NEJM editors who handled VIGOR and APPROVe did an adequate job in the eyes of Dr. Fletcher is of no consequence to any issue to be determined in this case. In addition, whether these editors would have liked to have received additional information from the authors is based on nothing more than Dr. Fletcher's own conjecture. Dr. Fletcher admits as much:

> Q: . . . [Y]ou're just speculating an[d] guessing what the various new England Journal editors may – may wish had been different in the article.
>
> A: *I am speculating* – I am saying what I would have thought and I'm hoping they would have thought that too.

(Rough Fletcher Dep. at 125:6-12 (emphasis added).) Dr. Fletcher admits that there is no evidence the editors were concerned with any of the many topics he thinks could have been better presented by the authors. (*E.g., id.* at 119:7-10, 125:13-25 (naproxen hypothesis); 102:5-12 (way in which aspirin-indicated and non-indicated were addressed in VIGOR); 171:5-11

---

[6] To the extent the opinions are based on NEJM correspondence that Dr. Fletcher reviewed in preparing his report, it is inadmissible hearsay and should be excluded under Rules 801-04.

(absence of confidence intervals for aspirin-non-indicated group in VIGOR).) He also concedes that he is "not in a position to say what [the editors] would have done with the information." (*Id.* at 203:24-204:7.) In other words, he has no personal knowledge of how VIGOR and APPROVe were published, and should not be permitted to speculate on the topic.

Indeed, Dr. Fletcher's opinions on these supposed information gaps are obviated by the fact that the NEJM ultimately published both VIGOR and APPROVe. As Dr. Fletcher explained at his deposition, "[j]ournals have the right to not publish anything they want for any reason . . . ." (Rough Fletcher Dep. at 41:19-42:8; *see also id.* at 45:7-8 ("They always have the right to publish or not, absolutely.") The NEJM, in particular, has many articles to choose from and rejects almost every article submitted. (*Id.* at 46:12-15, 80:10-16.) If any of Dr. Fletcher's *post hoc* critiques had been so critical to the approval of VIGOR or APPROVe, the journal could have exercised its right to refuse to publish one or both of the papers:

> Q: Ultimately the journal . . . can refuse to publish any article, correct?
>
> A: Of course.
>
> Q: And if the journal believes that an article does not fairly present the results of the clinical trial the journal is well within its rights to refuse publication?
>
> A: Yes, it is their right and if they feel strongly enough they can do it.

(*Id.* at 43:21-44:4.) But they did not. Dr. Fletcher's musings on what could have gone better in the editing process are thus irrelevant and should be excluded.

In light of the fact that Dr. Fletcher's testimony on the publication of VIGOR and APPROVe is inadmissible, it appears that plaintiff has proffered Dr. Fletcher merely to provide argumentative "color commentary" on the controversy with the NEJM – including the recent

11

editorial, which is both misleading and independently inadmissible.[7] This commentary has no place at trial. The jury will hear about VIGOR, the subject of the NEJM editorial. It may, to the extent relevant, also hear about information that was not submitted to the NEJM for publication. But any personal observations Dr. Fletcher might have on the controversy are inadmissible for much the same reasons as the editorial, and should be excluded.

### IV. CONCLUSION.

For the foregoing reasons, Merck's Motion to Exclude Testimony of Robert H. Fletcher, M.D., M.Sc. should be granted.

Respectfully submitted,

*[signature: Dorothy H. Wimberly]*

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone: 504-581-3200
Fax:   504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois 60610
Phone: 312-494-4400
Fax:   312-494-4440

---

[7] Merck will move separately to exclude improper evidence and testimony from the NEJM, including the recent editorial.

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Phone: 202-434-5000
Fax:    202-434-5029

And

John H. Beisner
Charles C. Lifland
Richard B. Goetz
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone: 213-430-6000
Fax:    213-430-6407

Attorneys for Merck & Co., Inc.

796951v.1

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Motion to Exclude Testimony of Robert H. Fletcher, M.D., M.Sc. has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 23rd day of January, 2006.

*/s/ Dorothy H. Wimberly*