

One
Financial
Center
Boston
Massachusetts
02111
*tel* 617.856.8200
*fax* 617.856.8201

PAUL W. SHAW
DIRECT DIAL: (617) 856-8363
E-MAIL:pshaw@brownrudnick.com

January 19, 2006

**BY FEDERAL EXPRESS**

Honorable Eldon E. Fallon
United States District Court
Eastern District of Louisiana
500 Poydras Street – Room C456
New Orleans, Louisiana 70130

> Re:  *In Re Vioxx Products Liability Litigation*
> MDL 1657 (E.D.La.)

Dear Judge Fallon:

Enclosed please find documents being submitted to the court for *in camera* review, as discussed in my letter of January 18, 2006.

Please note that the NEJM proposes to designate these documents as "Confidential" in accordance with Pre-Trial Order No. 13 and has designated them as such.

Very truly yours,
**BROWN RUDNICK BERLACK ISRAELS LLP**

By: _____
Paul W. Shaw

PWS/jag

cc:   Phillip A. Wittmann, Esq. (w/o encl.)
    Russ M. Herman, Esq.  (w/o encl.)

# 1409156 v3 - arnoldgt - 020908/0003



**Morrissey, Stephen**

From:     Morrissey, Stephen
Sent:     Sunday, December 11, 2005 1:06 PM
To:       Curfman, M.D., Gregory D.
Subject:  RE: NEJM Expression of Concern

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Tracking:  **Recipient**              **Read**
           Curfman, M.D., Gregory D. Read: 12/11/2005 1:10 PM

I added the unmentioned AEs I find in the memo (summary data on ischemic CVAs were given in the article).

---

**From:** Curfman, M.D., Gregory D.
**Sent:** Sunday, December 11, 2005 12:56 PM
**To:** Morrissey, Stephen; Curfman, M.D., Gregory D.
**Subject:** FW: NEJM Expression of Concern

---

**From:** Morrissey, Stephen
**Sent:** Sunday, December 11, 2005 10:30 AM
**To:** Curfman, M.D., Gregory D.
**Subject:** RE: NEJM Expression of Concern

How about a number 7 along the lines of the following? "We enclose copies of the presubmission manuscript, the completed Table 5, and the July 5, 2000, memo -- the documents from which points 1 through 6 arise. They represent the extent of our knowledge today. We expect, however, that you will also correct any other errors or omissions of which you or any of the authors have knowledge."

I take it we'll wait for Paul Shaw's reply before we act. Do you want me to get the memo (and the information to complete point 5 to you) so we can move on this today?

Steve

---

**From:** Curfman, M.D., Gregory D.
**Sent:** Sun 12/11/2005 9:35 AM
**To:** Morrissey, Stephen
**Cc:** Curfman, M.D., Gregory D.
**Subject:** RE: NEJM Expression of Concern

Dear Dr. Bombardier:

We are responding to your e-mail message of December 10 regarding the correction to the VIGOR article that we have requested from you. We will explain herein what we expect this correction to include.

1.  You should acknowledge that three myocardial infarctions were omitted from the summary data presented in the VIGOR article. Omission of these three infarctions resulted in an understatement of the cardiovascular risk of rofecoxib (the relative risk changed from 4.25 to 5.00); the higher relative risk had important public health implications because of the large number of patients taking rofecoxib.

2.  Inclusion of the three myocardial infarctions would have invalidated your claim in the article that there was a difference in the risk of myocardial infarction only in high-risk patients (i.e., those who were aspirin-

NEJM 005001

CONFIDENTIAL
PROTECTIVE ORDER

eligible). Since all three myocardial infarctions occurred in patients assigned to rofecoxib who were at low risk (i.e., aspirin-ineligible), inclusion of these patients would have produced a non-significant difference in risk between the aspirin-eligible and aspirin-ineligible groups.

3. Adjudicated data on the three additional myocardial infarctions were available to at least two of the authors on or before July 5, 2000, 4 ½ months before the VIGOR article was published. Thus, there would have been ample time for those data to have been included in the Journal article, as they should have been. You have claimed that there was an earlier cut-off date for tabulation of cardiovascular events in the trial (February 10, 2000, as compared with March 17, 2000, for the rest of the end points). However, the earlier cut-off date was never mentioned in the VIGOR article. Even if there had been an earlier cut-off date, the Journal's policy, shared by other journals, is that we expect to receive an update so that the data in the Journal article are complete and accurate. This is especially important for a potentially serious drug adverse event such as myocardial infarction.

4. Your explanation for the difference in risk of myocardial infarction between the rofecoxib and naproxen groups was unbalanced. You stated in the article that naproxen was protective against infarction but nowhere in the article did you acknowledge the alternative hypothesis -- i.e., that rofecoxib might be harmful. Your explanation lacked scientific objectivity. The relative risks were presented so as to favor naproxen and discount the possibility that rofecoxib might be harmful.

5. The summary data on myocardial infarction in the VIGOR article gave an incomplete presentation of the cardiovascular end points. Data on the actual numbers of myocardial infarctions were systematically deleted from the manuscript by a Merck editor two days before it was submitted, leaving only summary percentages. (INCLUDE PHOTOCOPIES OF TABLE 5 AND THE EDITED PAGES FROM PRESUBMSISION MANUSCRIPT). Furthermore, the memorandum of July 5, 2000, clearly indicates that at least two of the authors were aware of data on other cardiovascular end points (ischemic CVA's, hemorrhagic CVA's, TIA's, peripheral arterial events—WE NEED TO CHECK THESE END POINTS IN THE MEMO -- hemorrhagic stroke, TIAs, peripheral arterial thrombosis, peripheral venous thrombosis, unstable angina are what I find ) that would have given a more complete and accurate presentation of the cardiovascular risk, but these data were not included in the article.

6. These omissions and inaccuracies are regrettable, and this should be acknowledged in your statement.

7. We enclose copies of the presubmission manuscript, the completed Table 5, and the July 5, 2000, memorandum—the documents from which points 1 through 6 arise. They represent the extent of our knowledge today. We expect, however, that you will correct any other errors or omissions of which you or any of the authors have knowledge.

Yours truly,

Gregory Curfman, M.D., executive editor

Stephen Morrissey, Ph.D., managing editor

---

**From:** Morrissey, Stephen
**Sent:** Saturday, December 10, 2005 10:23 PM
**To:** pshaw@brownrudnick.com
**Cc:** Curfman, M.D., Gregory D.
**Subject:** FW: NEJM Expression of Concern

# REDACTED

Thanks.

CONFIDENTIAL –
SUBJECT TO
PROTECTIVE ORDER

Steve

---

**From:** Claire Bombardier MD [mailto:claire.bombardier@utoronto.ca]
**Sent:** Sat 12/10/2005 4:58 PM
**To:** NEJM Editorial; Morrissey, Stephen
**Cc:** llaine@hsc.usc.edu; claire.bombardier@utoronto.ca
**Subject:** NEJM Expression of Concern

Dear Drs. Curfman and Morrissey:

I am writing to follow-up on our conversation earlier this week regarding the VIGOR study published in
NEJM in November, 2000. You requested a submission from the authors of that study that addresses the
additional data and the issues set forth in the Expression of Concern that you published this week, and I
agreed to your request as lead author of that study.

We have already started on that task, and I seek your assistance for the project. In order for us to fully
and properly evaluate the data and the issues, we will need to have copies of all the materials that the
NEJM has that you referred to in your telephone call as well as those to which the Expression of
Concern referred. While you suggested earlier that we obtain these materials from Merck, in light of the
questions that you have raised about confidence in the provenance of data and information, we believe
that it is essential for us to obtain such materials directly from NEJM in order to ensure that the material
we are reviewing is in fact the same data that is referred to in your Expression of Concern.

Thank you.

## Claire Bombardier MD FRCPC
Professor of Medicine and Rheumatology Division Director, University of Toronto (website:
http://medicine.facmed.utoronto.ca )
Canada Research Chair in Knowledge Transfer for Musculoskeletal Care (website: www.chairs.gc.ca )
Senior Scientist, Institute for Work and Health and University Health Network


**Office:** (416)927-2027 ext 2132 (sec: **Charmaine Heath**)
**Pager:** (416)448-8247
email: claire.bombardier@utoronto.ca
Assistant email: cheath@iwh.on.ca

NEJM 005003

#2

CONFIDENTIAL –
SUBJECT TO
PROTECTIVE ORDER

**Morrissey, Stephen**

From:      Morrissey, Stephen
Sent:      Sunday, December 11, 2005 10:30 AM
To:        Curfman, M.D., Gregory D.
Subject:   RE: NEJM Expression of Concern

How about a number 7 along the lines of the following? "We enclose copies of the presubmission manuscript, the completed Table 5, and the July 5, 2000, memo -- the documents from which points 1 through 6 arise. They represent the extent of our knowledge today. We expect, however, that you will also correct any other errors or omissions of which you or any of the authors have knowledge."

I take it we'll wait for Paul Shaw's reply before we act. Do you want me to get the memo (and the information to complete point 5 to you) so we can move on this today?

Steve

**From:** Curfman, M.D., Gregory D.
**Sent:** Sun 12/11/2005 9:35 AM
**To:** Morrissey, Stephen
**Cc:** Curfman, M.D., Gregory D.
**Subject:** RE: NEJM Expression of Concern

Dear Dr. Bombardier:

We are responding to your e-mail message of December 10 regarding the correction to the VIGOR article that we have requested from you. We will explain herein what we expect this correction to include.

1. You should acknowledge that three myocardial infarctions were omitted from the summary data presented in the VIGOR article. Omission of these three infarctions resulted in an understatement of the cardiovascular risk of rofecoxib (the relative risk changed from 4.25 to 5.00); the higher relative risk had important public health implications because of the large number of patients taking rofecoxib.

2. Inclusion of the three myocardial infarctions would have invalidated your claim in the article that there was a difference in the risk of myocardial infarction only in high-risk patients (i.e., those who were aspirin-eligible). Since all three myocardial infarctions occurred in patients assigned to rofecoxib who were at low risk (i.e., aspirin-ineligible), inclusion of these patients would have produced a non-significant difference in risk between the aspirin-eligible and aspirin-ineligible groups.

3. Adjudicated data on the three additional myocardial infarctions were available to at least two of the authors on or before July 5, 2000, 4 ½ months before the VIGOR article was published. Thus, there would have been ample time for those data to have been included in the Journal article, as they should have been. You have claimed that there was an earlier cut-off date for tabulation of cardiovascular events in the trial (February 10, 2000, as compared with March 17, 2000, for the rest of the end points). However, the earlier cut-off date was never mentioned in the VIGOR article. Even if there had been an earlier cut-off date, the Journal's policy, shared by other journals, is that we expect to receive an update so that the data in the Journal article are complete and accurate. This is especially important for a potentially serious drug adverse event such as myocardial infarction.

4. Your explanation for the difference in risk of myocardial infarction between the rofecoxib and naproxen groups was unbalanced. You stated in the article that naproxen was protective against infarction but nowhere in the article did you acknowledge the alternative hypothesis, i.e. that rofecoxib might be harmful. Your explanation lacked scientific objectivity. The relative risks were presented so as to favor naproxen and discount the possibility that rofecoxib might be harmful.

5. The summary data on myocardial infarction in the VIGOR article gave an incomplete presentation of the cardiovascular end points. Data on the actual numbers of myocardial infarctions were systematically deleted from the manuscript by a Merck editor two days before it was submitted, leaving only summary

NEJM 005004

CONFIDENTIAL
SUBJECT TO
PROTECTIVE ORDER

percentages. (INCLUDE PHOTOCOPIES OF TABLE 5 AND THE EDITED PAGES FROM PRESUBMSISION MANUSCRIPT). Furthermore, the memorandum of July 5, 2000, clearly indicates that at least two of the authors were aware of data on other cardiovascular end points (ischemic CVA's, hemorrhagic CVA's, TIA's, peripheral arterial events—WE NEED TO CHECK THESE END POINTS IN THE MEMO) that would have given a more complete and accurate presentation of the cardiovascular risk, but these data were not included in the article.

6.  These omissions and inaccuracies are regrettable, which should be acknowledged in your statement.


Yours truly,

---

**From:** Morrissey, Stephen
**Sent:** Saturday, December 10, 2005 10:23 PM
**To:** pshaw@brownrudnick.com
**Cc:** Curfman, M.D., Gregory D.
**Subject:** FW: NEJM Expression of Concern



## REDACTED



Thanks.

Steve

---

**From:** Claire Bombardier MD [mailto:claire.bombardier@utoronto.ca]
**Sent:** Sat 12/10/2005 4:58 PM
**To:** NEJM Editorial; Morrissey, Stephen
**Cc:** llaine@hsc.usc.edu; claire.bombardier@utoronto.ca
**Subject:** NEJM Expression of Concern

Dear Drs. Curfman and Morrissey:

I am writing to follow-up on our conversation earlier this week regarding the VIGOR study published in NEJM in November, 2000. You requested a submission from the authors of that study that addresses the additional data and the issues set forth in the Expression of Concern that you published this week, and I agreed to your request as lead author of that study.

We have already started on that task, and I seek your assistance for the project. In order for us to fully and properly evaluate the data and the issues, we will need to have copies of all the materials that the NEJM has that you referred to in your telephone call as well as those to which the Expression of Concern referred. While you suggested earlier that we obtain these materials from Merck, in light of the questions that you have raised about confidence in the provenance of data and information, we believe that it is essential for us to obtain such materials directly from NEJM in order to ensure that the material we are reviewing is in fact the same data that is referred to in your Expression of Concern.

Thank you.

1/17/2006

NEJM 005005

CONFIDENTIAL –
SUBJECT TO
PROTECTIVE ORDER

**Claire Bombardier MD FRCPC**

Professor of Medicine and Rheumatology Division Director, University of Toronto (website: http://medicine.facmed.utoronto.ca )

Canada Research Chair in Knowledge Transfer for Musculoskeletal Care (website: www.chairs.gc.ca )

Senior Scientist, Institute for Work and Health and University Health Network

**Office:** (416)927-2027 ext 2132 (sec: **Charmaine Heath**)

**Pager:** (416)448-8247

email: claire.bombardier@utoronto.ca

Assistant email: cheath@iwh.on.ca

NEJM 005006

1/17/2006



**Curfman, M.D., Gregory D.**

CONFIDENTIAL –
SUBJECT TO
PROTECTIVE ORDER

**From:** Curfman, M.D., Gregory D.
**Sent:** Sunday, December 11, 2005 9:36 AM
**To:** Morrissey, Stephen
**Cc:** Curfman, M.D., Gregory D.
**Subject:** RE: NEJM Expression of Concern

Dear Dr. Bombardier:

We are responding to your e-mail message of December 10 regarding the correction to the VIGOR article that we have requested from you. We will explain herein what we expect this correction to include.

1. You should acknowledge that three myocardial infarctions were omitted from the summary data presented in the VIGOR article. Omission of these three infarctions resulted in an understatement of the cardiovascular risk of rofecoxib (the relative risk changed from 4.25 to 5.00); the higher relative risk had important public health implications because of the large number of patients taking rofecoxib.

2. Inclusion of the three myocardial infarctions would have invalidated your claim in the article that there was a difference in the risk of myocardial infarction only in high-risk patients (i.e., those who were aspirin-eligible). Since all three myocardial infarctions occurred in patients assigned to rofecoxib who were at low risk (i.e., aspirin-ineligible), inclusion of these patients would have produced a non-significant difference in risk between the aspirin-eligible and aspirin-ineligible groups.

3. Adjudicated data on the three additional myocardial infarctions were available to at least two of the authors on or before July 5, 2000, 4 ½ months before the VIGOR article was published. Thus, there would have been ample time for these data to have been included in the Journal article, as they should have been. You have claimed that there was an earlier cut-off date for tabulation of cardiovascular events in the trial (February 10, 2000, as compared with March 17, 2000, for the rest of the end points). However, the earlier cut-off date was never mentioned in the VIGOR article. Even if there had been an earlier cut-off date, the Journal's policy, shared by other journals, is that we expect to receive an update so that the data in the Journal article are complete and accurate. This is especially important for a potentially serious drug adverse event such as myocardial infarction.

4. Your explanation for the difference in risk of myocardial infarction between the rofecoxib and naproxen groups was unbalanced. You stated in the article that naproxen was protective against infarction but nowhere in the article did you acknowledge the alternative hypothesis, i.e. that rofecoxib might be harmful. Your explanation lacked scientific objectivity. The relative risks were presented so as to favor naproxen and discount the possibility that rofecoxib might be harmful.

5. The summary data on myocardial infarction in the VIGOR article gave an incomplete presentation of the cardiovascular end points. Data on the actual numbers of myocardial infarctions were systematically deleted from the manuscript by a Merck editor two days before it was submitted, leaving only summary percentages. (INCLUDE PHOTOCOPIES OF TABLE 5 AND THE EDITED PAGES FROM PRESUBMSISION MANUSCRIPT). Furthermore, the memorandum of July 5, 2000, clearly indicates that at least two of the authors were aware of data on other cardiovascular end points (ischemic CVA's, hemorrhagic CVA's, TIA's, peripheral arterial events—WE NEED TO CHECK THESE END POINTS IN THE MEMO) that would have given a more complete and accurate presentation of the cardiovascular risk, but these data were not included in the article.

6. These omissions and inaccuracies are regrettable, which should be acknowledged in your statement.

Yours truly,

---

**From:** Morrissey, Stephen
**Sent:** Saturday, December 10, 2005 10:23 PM
**To:** pshaw@brownrudnick.com
**Cc:** Curfman, M.D., Gregory D.

NEJM 005007

CONFIDENTIAL –
SUBJECT TO
PROTECTIVE ORDER

**Subject:** FW: NEJM Expression of Concern

# REDACTED

Thanks.

Steve

_____

**From:** Claire Bombardier MD [mailto:claire.bombardier@utoronto.ca]
**Sent:** Sat 12/10/2005 4:58 PM
**To:** NEJM Editorial; Morrissey, Stephen
**Cc:** llaine@hsc.usc.edu; claire.bombardier@utoronto.ca
**Subject:** NEJM Expression of Concern

Dear Drs. Curfman and Morrissey:

I am writing to follow-up on our conversation earlier this week regarding the VIGOR study published in NEJM in November, 2000. You requested a submission from the authors of that study that addresses the additional data and the issues set forth in the Expression of Concern that you published this week, and I agreed to your request as lead author of that study.

We have already started on that task, and I seek your assistance for the project. In order for us to fully and properly evaluate the data and the issues, we will need to have copies of all the materials that the NEJM has that you referred to in your telephone call as well as those to which the Expression of Concern referred. While you suggested earlier that we obtain these materials from Merck, in light of the questions that you have raised about confidence in the provenance of data and information, we believe that it is essential for us to obtain such materials directly from NEJM in order to ensure that the material we are reviewing is in fact the same data that is referred to in your Expression of Concern.

Thank you.

**Claire Bombardier MD FRCPC**
Professor of Medicine and Rheumatology Division Director, University of Toronto (website: http://medicine.facmed.utoronto.ca )
Canada Research Chair in Knowledge Transfer for Musculoskeletal Care (website: www.chairs.gc.ca )
Senior Scientist, Institute for Work and Health and University Health Network

**Office:** (416)927-2027 ext 2132 (sec: **Charmaine Heath**)
**Pager:** (416)448-8247
email: claire.bombardier@utoronto.ca
Assistant email: cheath@iwh.on.ca

NEJM 005008

1/17/2006

Page 3 of 3

#4

CONFIDENTIAL –
SUBJECT TO
PROTECTIVE ORDER

**Curfman, M.D., Gregory D.**

**From:**     Curfman, M.D., Gregory D.
**Sent:**      Sunday, December 11, 2005 12:56 PM
**To:**         Morrissey, Stephen; Curfman, M.D., Gregory D.
**Subject:** FW: NEJM Expression of Concern

---

**From:** Morrissey, Stephen
**Sent:** Sunday, December 11, 2005 10:30 AM
**To:** Curfman, M.D., Gregory D.
**Subject:** RE: NEJM Expression of Concern

How about a number 7 along the lines of the following? "We enclose copies of the presubmission manuscript, the completed Table 5, and the July 5, 2000, memo -- the documents from which points 1 through 6 arise. They represent the extent of our knowledge today. We expect, however, that you will also correct any other errors or omissions of which you or any of the authors have knowledge."

I take it we'll wait for Paul Shaw's reply before we act. Do you want me to get the memo (and the information to complete point 5 to you) so we can move on this today?

Steve

---

**From:** Curfman, M.D., Gregory D.
**Sent:** Sun 12/11/2005 9:35 AM
**To:** Morrissey, Stephen
**Cc:** Curfman, M.D., Gregory D.
**Subject:** RE: NEJM Expression of Concern

Dear Dr. Bombardier:

We are responding to your e-mail message of December 10 regarding the correction to the VIGOR article that we have requested from you. We will explain herein what we expect this correction to include.

1. You should acknowledge that three myocardial infarctions were omitted from the summary data presented in the VIGOR article. Omission of these three infarctions resulted in an understatement of the cardiovascular risk of rofecoxib (the relative risk changed from 4.25 to 5.00); the higher relative risk had important public health implications because of the large number of patients taking rofecoxib.
2. Inclusion of the three myocardial infarctions would have invalidated your claim in the article that there was a difference in the risk of myocardial infarction only in high-risk patients (i.e., those who were aspirin-eligible). Since all three myocardial infarctions occurred in patients assigned to rofecoxib who were at low risk (i.e., aspirin-ineligible), inclusion of these patients would have produced a non-significant difference in risk between the aspirin-eligible and aspirin-ineligible groups.
3. Adjudicated data on the three additional myocardial infarctions were available to at least two of the authors on or before July 5, 2000, 4 ½ months before the VIGOR article was published. Thus, there would have been ample time for those data to have been included in the Journal article, as they should have been. You have claimed that there was an earlier cut-off date for tabulation of cardiovascular events in the trial (February 10, 2000, as compared with March 17, 2000, for the rest of the end points). However, the earlier cut-off date was never mentioned in the VIGOR article. Even if there had been an earlier cut-off date, the Journal's policy, shared by other journals, is that we expect to receive an update so that the data in the Journal article are complete and accurate. This is especially important for a potentially serious drug adverse event such as myocardial infarction.

NEJM 005009

CONFIDENTIAL —
SUBJECT TO
PROTECTIVE ORDER

4. Your explanation for the difference in risk of myocardial infarction between the rofecoxib and naproxen groups was unbalanced. You stated in the article that naproxen was protective against infarction but nowhere in the article did you acknowledge the alternative hypothesis, i.e. that rofecoxib might be harmful. Your explanation lacked scientific objectivity. The relative risks were presented so as to favor naproxen and discount the possibility that rofecoxib might be harmful.

5. The summary data on myocardial infarction in the VIGOR article gave an incomplete presentation of the cardiovascular end points. Data on the actual numbers of myocardial infarctions were systematically deleted from the manuscript by a Merck editor two days before it was submitted, leaving only summary percentages. (INCLUDE PHOTOCOPIES OF TABLE 5 AND THE EDITED PAGES FROM PRESUBMSISION MANUSCRIPT). Furthermore, the memorandum of July 5, 2000, clearly indicates that at least two of the authors were aware of data on other cardiovascular end points (ischemic CVA's, hemorrhagic CVA's, TIA's, peripheral arterial events—WE NEED TO CHECK THESE END POINTS IN THE MEMO) that would have given a more complete and accurate presentation of the cardiovascular risk, but these data were not included in the article.

6. These omissions and inaccuracies are regrettable, which should be acknowledged in your statement.

7. We enclose copies of the presubmission manuscript, the completed Table 5, and the July 5, 2000, memorandum—the documents from which points 1 through 6 arise. They represent the extent of our knowledge today. We expect, however, that you will correct any other errors or omissions of which you or any of the authors have knowledge.

Yours truly,

Gregory Curfman, M.D., executive editor

Stephen Morrissey, Ph.D., managing editor

---

**From:** Morrissey, Stephen
**Sent:** Saturday, December 10, 2005 10:23 PM
**To:** pshaw@brownrudnick.com
**Cc:** Curfman, M.D., Gregory D.
**Subject:** FW: NEJM Expression of Concern

# REDACTED

Thanks.

Steve

---

**From:** Claire Bombardier MD [mailto:claire.bombardier@utoronto.ca]
**Sent:** Sat 12/10/2005 4:58 PM
**To:** NEJM Editorial; Morrissey, Stephen
**Cc:** llaine@hsc.usc.edu; claire.bombardier@utoronto.ca
**Subject:** NEJM Expression of Concern

Dear Drs. Curfman and Morrissey:

NEJM 005010

1/17/2006

CONFIDENTIAL —
SUBJECT TO
PROTECTIVE ORDER

I am writing to follow-up on our conversation earlier this week regarding the VIGOR study published in NEJM in November, 2000. You requested a submission from the authors of that study that addresses the additional data and the issues set forth in the Expression of Concern that you published this week, and I agreed to your request as lead author of that study.

We have already started on that task, and I seek your assistance for the project. In order for us to fully and properly evaluate the data and the issues, we will need to have copies of all the materials that the NEJM has that you referred to in your telephone call as well as those to which the Expression of Concern referred. While you suggested earlier that we obtain these materials from Merck, in light of the questions that you have raised about confidence in the provenance of data and information, we believe that it is essential for us to obtain such materials directly from NEJM in order to ensure that the material we are reviewing is in fact the same data that is referred to in your Expression of Concern.

Thank you.

**Claire Bombardier MD FRCPC**
Professor of Medicine and Rheumatology Division Director, University of Toronto (website: http://medicine.facmed.utoronto.ca )
Canada Research Chair in Knowledge Transfer for Musculoskeletal Care (website: www.chairs.gc.ca )
Senior Scientist, Institute for Work and Health and University Health Network

**Office:** (416)927-2027 ext 2132 (sec: **Charmaine Heath**)
**Pager:** (416)448-8247
email: claire.bombardier@utoronto.ca
Assistant email: cheath@iwh.on.ca

1/17/2006

#5

CONFIDENTIAL –
SUBJECT TO
PROTECTIVE ORDER

**Morrissey, Stephen**

---

| | |
|---|---|
| **From:** | Morrissey, Stephen |
| **Sent:** | Sunday, December 11, 2005 1:18 PM |
| **To:** | Curfman, M.D., Gregory D. |
| **Subject:** | RE: NEJM Expression of Concern |
| **Attachments:** | 3677b2_06_cardio.pdf |

**Tracking:**      **Recipient**                    **Read**

Curfman, M.D., Gregory D. Read: 12/11/2005 1:18 PM

---

Alternatively...

---

**From:** Curfman, M.D., Gregory D.
**Sent:** Sunday, December 11, 2005 1:12 PM
**To:** Morrissey, Stephen
**Subject:** RE: NEJM Expression of Concern

OK, that's good. Can you send me the url for the FDA data on VIGOR?

---

**From:** Morrissey, Stephen
**Sent:** Sunday, December 11, 2005 1:06 PM
**To:** Curfman, M.D., Gregory D.
**Subject:** RE: NEJM Expression of Concern

I added the unmentioned AEs I find in the memo (summary data on ischemic CVAs were given in the article).

---

**From:** Curfman, M.D., Gregory D.
**Sent:** Sunday, December 11, 2005 12:56 PM
**To:** Morrissey, Stephen; Curfman, M.D., Gregory D.
**Subject:** FW: NEJM Expression of Concern

---

**From:** Morrissey, Stephen
**Sent:** Sunday, December 11, 2005 10:30 AM
**To:** Curfman, M.D., Gregory D.
**Subject:** RE: NEJM Expression of Concern

How about a number 7 along the lines of the following? "We enclose copies of the presubmission manuscript, the completed Table 5, and the July 5, 2000, memo -- the documents from which points 1 through 6 arise. They represent the extent of our knowledge today. We expect, however, that you will also correct any other errors or omissions of which you or any of the authors have knowledge."

I take it we'll wait for Paul Shaw's reply before we act. Do you want me to get the memo (and the information to complete point 5 to you) so we can move on this today?

Steve

---

NEJM 005012

CONFIDENTIAL –
SUBJECT TO
PROTECTIVE ORDER

**From:** Curfman, M.D., Gregory D.
**Sent:** Sun 12/11/2005 9:35 AM
**To:** Morrissey, Stephen
**Cc:** Curfman, M.D., Gregory D.
**Subject:** RE: NEJM Expression of Concern

Dear Dr. Bombardier:

We are responding to your e-mail message of December 10 regarding the correction to the VIGOR article that we have requested from you. We will explain herein what we expect this correction to include.

1.  You should acknowledge that three myocardial infarctions were omitted from the summary data presented in the VIGOR article. Omission of these three infarctions resulted in an understatement of the cardiovascular risk of rofecoxib (the relative risk changed from 4.25 to 5.00); the higher relative risk had important public health implications because of the large number of patients taking rofecoxib.

2.  Inclusion of the three myocardial infarctions would have invalidated your claim in the article that there was a difference in the risk of myocardial infarction only in high-risk patients (i.e., those who were aspirin-eligible). Since all three myocardial infarctions occurred in patients assigned to rofecoxib who were at low risk (i.e., aspirin-ineligible), inclusion of these patients would have produced  a non-significant difference in risk between the aspirin-eligible and aspirin-ineligible groups.

3.  Adjudicated data on the three additional myocardial infarctions were available to at least two of the authors on or before July 5, 2000, 4 ½ months before the VIGOR article was published. Thus, there would have been ample time for those data to have been included in the Journal article, as they should have been. You have claimed that there was an earlier cut-off date for tabulation of cardiovascular events in the trial (February 10, 2000, as compared with March 17, 2000, for the rest of the end points). However, the earlier cut-off date was never mentioned in the VIGOR article. Even if there had been an earlier cut-off date, the Journal's policy, shared by other journals, is that we expect to receive an update so that the data in the Journal article are complete and accurate. This is especially important for a potentially serious drug adverse event such as myocardial infarction.

4.  Your explanation for the difference in risk of myocardial infarction between the rofecoxib and naproxen groups was unbalanced. You stated in the article that naproxen was protective against infarction but nowhere in the article did you acknowledge the alternative hypothesis  --  i.e. ,  that rofecoxib might be harmful. Your explanation lacked scientific objectivity. The relative risks were presented so as to favor naproxen and discount the possibility that rofecoxib might be harmful.

5.  The summary data on myocardial infarction in the VIGOR article gave an incomplete presentation of the cardiovascular end points. Data on the actual numbers of myocardial infarctions were systematically deleted from the manuscript by a Merck editor two days before it was submitted, leaving only summary percentages. (INCLUDE PHOTOCOPIES OF TABLE 5 AND THE EDITED PAGES FROM PRESUBMSISION MANUSCRIPT). Furthermore, the memorandum of July 5, 2000, clearly indicates that at least two of the authors were aware of data on other cardiovascular end points (ischemic CVA's, hemorrhagic CVA's, TIA's, peripheral arterial events—WE NEED TO CHECK THESE END POINTS IN THE MEMO  -- hemorrhagic stroke, TIAs, peripheral arterial thrombosis, peripheral venous thrombosis, unstable angina are what I find ) that would have given a more complete and accurate presentation of the cardiovascular risk, but these data were not included in the article.

6.  These omissions and inaccuracies are regrettable,  and this  should be acknowledged in your statement.

7.  We enclose copies of the presubmission manuscript, the completed Table 5, and the July 5, 2000, memorandum—the documents from which points 1 through 6 arise. They represent the extent of our knowledge today. We expect, however, that you will correct any other errors or omissions of which you or any of the authors have knowledge.

Yours truly,

Gregory Curfman, M.D., executive editor

Stephen Morrissey, Ph.D., managing editor

NEJM 005013

CONFIDENTIAL —
SUBJECT TO
PROTECTIVE ORDER

**From:** Morrissey, Stephen
**Sent:** Saturday, December 10, 2005 10:23 PM
**To:** pshaw@brownrudnick.com
**Cc:** Curfman, M.D., Gregory D.
**Subject:** FW: NEJM Expression of Concern

# REDACTED

Thanks.

Steve

---

**From:** Claire Bombardier MD [mailto:claire.bombardier@utoronto.ca]
**Sent:** Sat 12/10/2005 4:58 PM
**To:** NEJM Editorial; Morrissey, Stephen
**Cc:** llaine@hsc.usc.edu; claire.bombardier@utoronto.ca
**Subject:** NEJM Expression of Concern

Dear Drs. Curfman and Morrissey:

I am writing to follow-up on our conversation earlier this week regarding the VIGOR study published in NEJM in November, 2000. You requested a submission from the authors of that study that addresses the additional data and the issues set forth in the Expression of Concern that you published this week, and I agreed to your request as lead author of that study.

We have already started on that task, and I seek your assistance for the project. In order for us to fully and properly evaluate the data and the issues, we will need to have copies of all the materials that the NEJM has that you referred to in your telephone call as well as those to which the Expression of Concern referred. While you suggested earlier that we obtain these materials from Merck, in light of the questions that you have raised about confidence in the provenance of data and information, we believe that it is essential for us to obtain such materials directly from NEJM in order to ensure that the material we are reviewing is in fact the same data that is referred to in your Expression of Concern.

Thank you.

**Claire Bombardier MD FRCPC**
Professor of Medicine and Rheumatology Division Director, University of Toronto (website:
http://medicine.facmed.utoronto.ca )
Canada Research Chair in Knowledge Transfer for Musculoskeletal Care (website: www.chairs.gc.ca )
Senior Scientist, Institute for Work and Health and University Health Network

**Office:** (416)927-2027 ext 2132 (sec: **Charmaine Heath**)

NEJM 005014

Pager: (416)448-8247
email: claire.bombardier@utoronto.ca
Assistant email: cheath@iwh.on.ca

CONFIDENTIAL –
SUBJECT TO
PROTECTIVE ORDER

NEJM 005015

# 6

**CONFIDENTIAL —
SUBJECT TO
PROTECTIVE ORDER**

## Curfman, M.D., Gregory D.

**From:** Morrissey, Stephen
**Sent:** Sunday, December 11, 2005 1:16 PM
**To:** Curfman, M.D., Gregory D.
**Subject:** RE: NEJM Expression of Concern

http://www.fda.gov/ohrms/dockets/ac/01/briefing/3677b2_06_cardio.pdf

**From:** Curfman, M.D., Gregory D.
**Sent:** Sunday, December 11, 2005 1:12 PM
**To:** Morrissey, Stephen
**Subject:** RE: NEJM Expression of Concern

OK, that's good. Can you send me the url for the FDA data on VIGOR?

**From:** Morrissey, Stephen
**Sent:** Sunday, December 11, 2005 1:06 PM
**To:** Curfman, M.D., Gregory D.
**Subject:** RE: NEJM Expression of Concern

I added the unmentioned AEs I find in the memo (summary data on ischemic CVAs were given in the article).

**From:** Curfman, M.D., Gregory D.
**Sent:** Sunday, December 11, 2005 12:56 PM
**To:** Morrissey, Stephen; Curfman, M.D., Gregory D.
**Subject:** FW: NEJM Expression of Concern

**From:** Morrissey, Stephen
**Sent:** Sunday, December 11, 2005 10:30 AM
**To:** Curfman, M.D., Gregory D.
**Subject:** RE: NEJM Expression of Concern

How about a number 7 along the lines of the following? "We enclose copies of the presubmission manuscript, the completed Table 5, and the July 5, 2000, memo -- the documents from which points 1 through 6 arise. They represent the extent of our knowledge today. We expect, however, that you will also correct any other errors or omissions of which you or any of the authors have knowledge."

I take it we'll wait for Paul Shaw's reply before we act. Do you want me to get the memo (and the information to complete point 5 to you) so we can move on this today?

Steve

**From:** Curfman, M.D., Gregory D.
**Sent:** Sun 12/11/2005 9:35 AM
**To:** Morrissey, Stephen
**Cc:** Curfman, M.D., Gregory D.
**Subject:** RE: NEJM Expression of Concern

NEJM 005016

1/17/2006

CONFIDENTIAL –
SUBJECT TO
PROTECTIVE ORDER

Dear Dr. Bombardier:

We are responding to your e-mail message of December 10 regarding the correction to the VIGOR article that we have requested from you. We will explain herein what we expect this correction to include.

1. You should acknowledge that three myocardial infarctions were omitted from the summary data presented in the VIGOR article. Omission of these three infarctions resulted in an understatement of the cardiovascular risk of rofecoxib (the relative risk changed from 4.25 to 5.00); the higher relative risk had important public health implications because of the large number of patients taking rofecoxib.

2. Inclusion of the three myocardial infarctions would have invalidated your claim in the article that there was a difference in the risk of myocardial infarction only in high-risk patients (i.e., those who were aspirin-eligible). Since all three myocardial infarctions occurred in patients assigned to rofecoxib who were at low risk (i.e., aspirin-ineligible), inclusion of these patients would have produced a non-significant difference in risk between the aspirin-eligible and aspirin-ineligible groups.

3. Adjudicated data on the three additional myocardial infarctions were available to at least two of the authors on or before July 5, 2000, 4 ½ months before the VIGOR article was published. Thus, there would have been ample time for those data to have been included in the Journal article, as they should have been. You have claimed that there was an earlier cut-off date for tabulation of cardiovascular events in the trial (February 10, 2000, as compared with March 17, 2000, for the rest of the end points). However, the earlier cut-off date was never mentioned in the VIGOR article. Even if there had been an earlier cut-off date, the Journal's policy, shared by other journals, is that we expect to receive an update so that the data in the Journal article are complete and accurate. This is especially important for a potentially serious drug adverse event such as myocardial infarction.

4. Your explanation for the difference in risk of myocardial infarction between the rofecoxib and naproxen groups was unbalanced. You stated in the article that naproxen was protective against infarction but nowhere in the article did you acknowledge the alternative hypothesis -- i.e. , that rofecoxib might be harmful. Your explanation lacked scientific objectivity. The relative risks were presented so as to favor naproxen and discount the possibility that rofecoxib might be harmful.

5. The summary data on myocardial infarction in the VIGOR article gave an incomplete presentation of the cardiovascular end points. Data on the actual numbers of myocardial infarctions were systematically deleted from the manuscript by a Merck editor two days before it was submitted, leaving only summary percentages. (INCLUDE PHOTOCOPIES OF TABLE 5 AND THE EDITED PAGES FROM PRESUBMSISION MANUSCRIPT). Furthermore, the memorandum of July 5, 2000, clearly indicates that at least two of the authors were aware of data on other cardiovascular end points (ischemic CVA's, hemorrhagic CVA's, TIA's, peripheral arterial events—WE NEED TO CHECK THESE END POINTS IN THE MEMO -- hemorrhagic stroke, TIAs, peripheral arterial thrombosis, peripheral venous thrombosis, unstable angina are what I find ) that would have given a more complete and accurate presentation of the cardiovascular risk, but these data were not included in the article.

6. These omissions and inaccuracies are regrettable, and this should be acknowledged in your statement.

7. We enclose copies of the presubmission manuscript, the completed Table 5, and the July 5, 2000, memorandum—the documents from which points 1 through 6 arise. They represent the extent of our knowledge today. We expect, however, that you will correct any other errors or omissions of which you or any of the authors have knowledge.

Yours truly,

Gregory Curfman, M.D., executive editor

Stephen Morrissey, Ph.D., managing editor

---

**From:** Morrissey, Stephen
**Sent:** Saturday, December 10, 2005 10:23 PM
**To:** pshaw@brownrudnick.com
**Cc:** Curfman, M.D., Gregory D.
**Subject:** FW: NEJM Expression of Concern

CONFIDENTIAL –
SUBJECT TO
PROTECTIVE ORDER



Thanks.

Steve

---

**From:** Claire Bombardier MD [mailto:claire.bombardier@utoronto.ca]
**Sent:** Sat 12/10/2005 4:58 PM
**To:** NEJM Editorial; Morrissey, Stephen
**Cc:** llaine@hsc.usc.edu; claire.bombardier@utoronto.ca
**Subject:** NEJM Expression of Concern

Dear Drs. Curfman and Morrissey:

I am writing to follow-up on our conversation earlier this week regarding the VIGOR study published in NEJM in November, 2000. You requested a submission from the authors of that study that addresses the additional data and the issues set forth in the Expression of Concern that you published this week, and I agreed to your request as lead author of that study.

We have already started on that task, and I seek your assistance for the project. In order for us to fully and properly evaluate the data and the issues, we will need to have copies of all the materials that the NEJM has that you referred to in your telephone call as well as those to which the Expression of Concern referred. While you suggested earlier that we obtain these materials from Merck, in light of the questions that you have raised about confidence in the provenance of data and information, we believe that it is essential for us to obtain such materials directly from NEJM in order to ensure that the material we are reviewing is in fact the same data that is referred to in your Expression of Concern.

Thank you.

**Claire Bombardier MD FRCPC**
Professor of Medicine and Rheumatology Division Director, University of Toronto (website:
http://medicine.facmed.utoronto.ca )
Canada Research Chair in Knowledge Transfer for Musculoskeletal Care (website: www.chairs.gc.ca )
Senior Scientist, Institute for Work and Health and University Health Network

**Office:** (416)927-2027 ext 2132 (sec: **Charmaine Heath**)
**Pager:** (416)448-8247
email: claire.bombardier@utoronto.ca
Assistant email: cheath@iwh.on.ca

NEJM 005018



CONFIDENTIAL –
SUBJECT TO
PROTECTIVE ORDER

**Curfman, M.D., Gregory D.**

---

**From:**  Morrissey, Stephen
**Sent:**  Sunday, December 11, 2005 1:18 PM
**To:**  Curfman, M.D., Gregory D.
**Subject:** RE: NEJM Expression of Concern

Alternatively...

---

**From:** Curfman, M.D., Gregory D.
**Sent:** Sunday, December 11, 2005 1:12 PM
**To:** Morrissey, Stephen
**Subject:** RE: NEJM Expression of Concern

OK, that's good. Can you send me the url for the FDA data on VIGOR?

---

**From:** Morrissey, Stephen
**Sent:** Sunday, December 11, 2005 1:06 PM
**To:** Curfman, M.D., Gregory D.
**Subject:** RE: NEJM Expression of Concern

I added the unmentioned AEs I find in the memo (summary data on ischemic CVAs were given in the article).

---

**From:** Curfman, M.D., Gregory D.
**Sent:** Sunday, December 11, 2005 12:56 PM
**To:** Morrissey, Stephen; Curfman, M.D., Gregory D.
**Subject:** FW: NEJM Expression of Concern

---

**From:** Morrissey, Stephen
**Sent:** Sunday, December 11, 2005 10:30 AM
**To:** Curfman, M.D., Gregory D.
**Subject:** RE: NEJM Expression of Concern

How about a number 7 along the lines of the following? "We enclose copies of the presubmission manuscript, the completed Table 5, and the July 5, 2000, memo -- the documents from which points 1 through 6 arise. They represent the extent of our knowledge today. We expect, however, that you will also correct any other errors or omissions of which you or any of the authors have knowledge."

I take it we'll wait for Paul Shaw's reply before we act. Do you want me to get the memo (and the information to complete point 5 to you) so we can move on this today?

Steve

---

**From:** Curfman, M.D., Gregory D.
**Sent:** Sun 12/11/2005 9:35 AM
**To:** Morrissey, Stephen
**Cc:** Curfman, M.D., Gregory D.
**Subject:** RE: NEJM Expression of Concern

NEJM 005019

CONFIDENTIAL –
SUBJECT TO
PROTECTIVE ORDER

Dear Dr. Bombardier:

We are responding to your e-mail message of December 10 regarding the correction to the VIGOR article that we have requested from you. We will explain herein what we expect this correction to include.

1. You should acknowledge that three myocardial infarctions were omitted from the summary data presented in the VIGOR article. Omission of these three infarctions resulted in an understatement of the cardiovascular risk of rofecoxib (the relative risk changed from 4.25 to 5.00); the higher relative risk had important public health implications because of the large number of patients taking rofecoxib.

2. Inclusion of the three myocardial infarctions would have invalidated your claim in the article that there was a difference in the risk of myocardial infarction only in high-risk patients (i.e., those who were aspirin-eligible). Since all three myocardial infarctions occurred in patients assigned to rofecoxib who were at low risk (i.e., aspirin-ineligible), inclusion of these patients would have produced  a non-significant difference in risk between the aspirin-eligible and aspirin-ineligible groups.

3. Adjudicated data on the three additional myocardial infarctions were available to at least two of the authors on or before July 5, 2000, 4 ½ months before the VIGOR article was published. Thus, there would have been ample time for those data to have been included in the Journal article, as they should have been. You have claimed that there was an earlier cut-off date for tabulation of cardiovascular events in the trial (February 10, 2000, as compared with March 17, 2000, for the rest of the end points). However, the earlier cut-off date was never mentioned in the VIGOR article. Even if there had been an earlier cut-off date, the Journal's policy, shared by other journals, is that we expect to receive an update so that the data in the Journal article are complete and accurate. This is especially important for a potentially serious drug adverse event such as myocardial infarction.

4. Your explanation for the difference in risk of myocardial infarction between the rofecoxib and naproxen groups was unbalanced. You stated in the article that naproxen was protective against infarction but nowhere in the article did you acknowledge the alternative hypothesis -- i.e. , that rofecoxib might be harmful. Your explanation lacked scientific objectivity. The relative risks were presented so as to favor naproxen and discount the possibility that rofecoxib might be harmful.

5. The summary data on myocardial infarction in the VIGOR article gave an incomplete presentation of the cardiovascular end points. Data on the actual numbers of myocardial infarctions were systematically deleted from the manuscript by a Merck editor two days before it was submitted, leaving only summary percentages. (INCLUDE PHOTOCOPIES OF TABLE 5 AND THE EDITED PAGES FROM PRESUBMSISION MANUSCRIPT). Furthermore, the memorandum of July 5, 2000, clearly indicates that at least two of the authors were aware of data on other cardiovascular end points (ischemic CVA's, hemorrhagic CVA's, TIA's, peripheral arterial events—WE NEED TO CHECK THESE END POINTS IN THE MEMO  -- hemorrhagic stroke, TIAs, peripheral arterial thrombosis, peripheral venous thrombosis, unstable angina are what I find ) that would have given a more complete and accurate presentation of the cardiovascular risk, but these data were not included in the article.

6. These omissions and inaccuracies are regrettable,  and this  should be acknowledged in your statement.

7. We enclose copies of the presubmission manuscript, the completed Table 5, and the July 5, 2000, memorandum—the documents from which points 1 through 6 arise. They represent the extent of our knowledge today. We expect, however, that you will correct any other errors or omissions of which you or any of the authors have knowledge.

Yours truly,

Gregory Curfman, M.D., executive editor

Stephen Morrissey, Ph.D., managing editor

---

**From:** Morrissey, Stephen
**Sent:** Saturday, December 10, 2005 10:23 PM
**To:** pshaw@brownrudnick.com
**Cc:** Curfman, M.D., Gregory D.
**Subject:** FW: NEJM Expression of Concern

CONFIDENTIAL
SUBJECT TO
PROTECTIVE ORDER

Thanks.

Steve

---

**From:** Claire Bombardier MD [mailto:claire.bombardier@utoronto.ca]
**Sent:** Sat 12/10/2005 4:58 PM
**To:** NEJM Editorial; Morrissey, Stephen
**Cc:** llaine@hsc.usc.edu; claire.bombardier@utoronto.ca
**Subject:** NEJM Expression of Concern

Dear Drs. Curfman and Morrissey:

I am writing to follow-up on our conversation earlier this week regarding the VIGOR study published in NEJM in November, 2000. You requested a submission from the authors of that study that addresses the additional data and the issues set forth in the Expression of Concern that you published this week, and I agreed to your request as lead author of that study.

We have already started on that task, and I seek your assistance for the project. In order for us to fully and properly evaluate the data and the issues, we will need to have copies of all the materials that the NEJM has that you referred to in your telephone call as well as those to which the Expression of Concern referred. While you suggested earlier that we obtain these materials from Merck, in light of the questions that you have raised about confidence in the provenance of data and information, we believe that it is essential for us to obtain such materials directly from NEJM in order to ensure that the material we are reviewing is in fact the same data that is referred to in your Expression of Concern.

Thank you.

**Claire Bombardier MD FRCPC**
Professor of Medicine and Rheumatology Division Director, University of Toronto (website:
http://medicine.facmed.utoronto.ca )
Canada Research Chair in Knowledge Transfer for Musculoskeletal Care (website: www.chairs.gc.ca )
Senior Scientist, Institute for Work and Health and University Health Network

**Office:** (416)927-2027 ext 2132 (sec: **Charmaine Heath**)
**Pager:** (416)448-8247
email: claire.bombardier@utoronto.ca
Assistant email: cheath@iwh.on.ca

NEJM 005021

**CONFIDENTIAL –
SUBJECT TO
PROTECTIVE ORDER**

#8



Shari L. Targum, M.D.
Division of Cardio-Renal Drug Products, HFD-110

Food and Drug Administration
5600 Fishers Lane
Rockville, MD 20816
Tel (301) 594-5384, FAX (301) 594-5494

**Memorandum**

**DATE:** February 1, 2001

**FROM:** Shari L. Targum, M.D., Medical Officer
Division of Cardio-Renal Drug Products, HFD-110
**THROUGH:** Norman Stockbridge, M.D., Ph.D., Team Leader
Division of Cardio-Renal Drug Products, HFD-110
Raymond J. Lipicky, M.D., Director
Division of Cardio-Renal Drug Products, HFD-110
**TO:** Sandra Cook, Project Manager, Division of Anti-Inflammatory Drug Products, HFD-550
Maria L. Villalba, MD, Medical Officer, Division of Anti-Inflammatory Drug Products, HFD-550

**SUBJECT:** Consultation NDA 21-042, S-007
Review of cardiovascular safety database

**NAME OF DRUG:** Rofecoxib (MK-0966)
**TRADE NAME:** VIOXX™
**FORMULATION:** tablets

**RELATED APPLICATIONS:** A submission for efficacy in rheumatoid arthritis is planned for the end of 2000.
**APPROVED INDICATIONS:** Acute pain (50 mg/day for up to 5 days) and osteoarthritis (12.5 and 25 mg/day)
**SPONSOR:** MERCK Research Laboratories

**DOCUMENTS AVAILABLE FOR REVIEW:**
1.  NDA 21-042, S-007 (electronic document room); 2. Prior Consultation from HFD-110 (Dr. Pelayo), 4/30/99;
3.  Primary Medical Review (Dr. Villalba), NDA 21-042; 4. Rodriguez LA et. al: Differential Effects of Aspirin and Non-Aspirin Nonsteroidal Antiinflammatory Drugs in the Primary Prevention of Myocardial Infarction in Postmenopausal Women. *Epidemiology* 2000; 11 (4):382-387.
**DATE CONSULT RECEIVED:** August 16, 2000
**DATE CONSULT COMPLETED:** December 8, 2000

The purpose of this consultation is to address a concern regarding risk of cardiovascular events with the use of rofecoxib, a selective COX-2 inhibitor. The Medical Reviewer, HFD-550, had five specific questions (see Attached Consultation) for the Cardio-Renal Division; these questions will be addressed under Issues and Comments, page 30.

NEJM 005022

**CONFIDENTIAL –
SUBJECT TO
PROTECTIVE ORDER**

BACKGROUND: .................................................................................................................................3

Methology: ......................................................................................................................................3

   Protocol 088-04  VIGOR (VIOXX GI Outcomes Research) ...........................................................4

    Primary Objectives: .....................................................................................................................4

    Study Design: ...............................................................................................................................6

    Results: .........................................................................................................................................6

      Patient Disposition: ...................................................................................................................6

      Drug Exposure: .........................................................................................................................6

      Baseline characteristics: ...........................................................................................................7

      Adjudication: ...........................................................................................................................11

      Safety: .....................................................................................................................................12

        Analyses of Cardiovascular Events in the VIGOR Study Using Endpoint Definitions Standard in Large

        Antiplatelet Trials ................................................................................................................13

        Serious Cardiovascular Adverse Experiences .........................................................................14

        On the next page, the time-to-event for Confirmed Cardiovascular Thrombotic Events is shown.  (Source:

        Safety Update Figure 1: pdf. Page 15) ....................................................................................16

        Adjudicated Thrombotic Serious Cardiovascular Adverse Experiences--Specific Events ............................17

        Deaths: ................................................................................................................................18

        Subgroup analyses of cardiovascular serious adverse experiences: .............................................20

      Comments: ...............................................................................................................................24

   Study 085: .....................................................................................................................................24

    Results: .......................................................................................................................................24

    Safety: ........................................................................................................................................25

    Comments: ..................................................................................................................................28

   Study 090: .....................................................................................................................................29

    Results: .......................................................................................................................................30

    Safety: ........................................................................................................................................34

    Comments: ..................................................................................................................................34

ISSUES & COMMENTS: ................................................................................................................37

RECOMMENDATIONS: ...............................................................................................................37

CONFIDENTIAL –
SUBJECT TO
PROTECTIVE ORDER

**BACKGROUND:**

   Prostaglandins have a role in a wide variety of processes, including inflammation and pain; inhibition of prostaglandin production by cyclooxygenase (COX) inhibitors such as aspirin and nonsteroidal anti-inflammatory has been an important means of providing analgesic and anti-inflammatory benefits.
   Cyclooxygenases, enzymes that metabolize arachidonic acid to produce prostaglandins, are subdivided into two isoforms:
   1. COX-1, constitutively expressed in most cells, which results in the production of homeostatic prostaglandins that maintain GI mucosal integrity as well as renal blood flow ; in addition, COX-1, found in platelets, mediates production of thromboxane A2, a prostaglandin that promotes vasoconstriction and well as platelet activation and aggregation.
   2. COX-2, purportedly inducible[1] in selected tissues, which results in the production of prostaglandins at inflammatory sites as well as prostacyclin ($PGI_2$), a vasodilator and inhibitor of platelet aggregation. Platelets do not express COX-2; COX-2 inhibition, therefore, would not be expected to directly affect platelet function. However, COX-2 inhibition might, by suppressing prostacyclin production, "inhibit the inhibitor" of platelet aggregation.
   Selective COX-2 inhibition would thus have the theoretical benefit of analgesia and decreased inflammation with fewer GI-related side effects (decreased bleeding, ulcers); however, there would also exist a theoretical concern about PGI inhibition and unopposed thromboxane production, leading to an increase in cardiovascular thrombotic events.
   Evidence for inhibition of prostacyclin but not thromboxane can be found in this sNDA (CV Events Analysis, pages 79-84; see also Appendix A), where the lack of COX-2 effects on bleeding time and ex vivo platelet aggregation are noted.
   It should be noted that there may be aspirin effects, other than thromboxane A2 and/or prostacyclin effects, that might alter the atherosclerotic process. While prostaglandin (thromboxane A2) inhibition has been the major mechanism of aspirin's cardiovascular benefit, it has been proposed that aspirin may also act as an antioxidant, protecting LDL from oxidative modification and improving endothelial dysfunction in atherosclerotic vessels[2]. There are currently two marketed COX-2 inhibitors: celecoxib and rofecoxib. As mentioned above, rofecoxib is approved for osteoarthritis (12.5-25 mg per day) and acute pain (50 mg/day for up to 5 days). Doses of rofecoxib up to 500 mg have been studied in man[3]. However, most of the exposure for ≥ 6 months has been to 12.5 and 25 mg daily; according to a prior NDA review, 272 patients have received rofecoxib 50 mg daily for ≥ 6 months[3]; at doses of 25-50 mg per day, hypertension, edema, and increased serum creatinine have been noted[4] in a dose-dependent manner.

   The Sponsor has submitted sNDA-007 with the apparent goal of establishing a GI safety claim, i.e., reduction in GI bleeding and ulcers, for rofecoxib. An sNDA for an efficacy claim in the treatment of rheumatoid arthritis is planned for the end of 2000.

**Methology:**

   The focus of this review was on the cardiovascular safety of rofecoxib (MK-0966) 50 mg daily in patients with rheumatoid arthritis. To accomplish this review, the Medical Reviewer used the electronic version of the sNDA submission as well as prior reviews (see footnotes) for a reference database. Unless otherwise indicated, all analyses utilized will be taken from the Sponsor's analyses and have not been corroborated by statisticians from HFD-110.
   On October 13, 2000, the sponsor submitted a safety update which included 11 additional patients referred for adjudication of cardiovascular serious adverse experiences after February 10, 2000, the prespecified cut-off date in the original safety report. Where possible, the Medical Reviewer will present data from the safety update rather than the original report.

---

[1] According to a prior consult from HFD-110 (Dr. Pelayo), there may be constitutive expression of COX-2 in the kidney.
[2] Awtry EH and Loscalzo J. Aspirin. *Circulation.* 2000; 101: 1206-1218.
[3] Prior Medical Officer (Dr. Villalba) review; NDA 21-042/21-052 (5/17/99): Safety Review: page 74.
[3] vide supra.
[4] Prior consult from HFD-110 (Dr. Pelayo) to HFD-550, completed April 30, 1999.

CONFIDENTIAL –
SUBJECT TO
PROTECTIVE ORDER

*Protocol 088-04  VIGOR (VIOXX GI Outcomes Research)*

**Title:** A Double-Blind, Randomized, Stratified, Parallel-Group Study to Assess the Incidence of PUBs[5] During Chronic Treatment With MK-0966 or Naproxen in Patients With Rheumatoid Arthritis: U.S. Cohort. (VIGOR)

Study dates: January 6, 1999 (first patient in) - March 17, 2000 (last patient out)
Number of sites: 301 (multinational)

Primary Objectives:
1. To determine the relative risk of confirmed PUB (Perforation, Ulcers, Bleeding) in patients taking MK-0966 50 mg daily compared to patients in the group taking naproxen 1000 mg/day.
2. To study the safety and tolerability of MK-0966 in patients with rheumatoid arthritis.

Study Design:

This was a Phase III parallel-group, double-blind study conducted under in-house blinding procedures.  There were 2 protocols, 088 (US) and 089 (multinational); however the study was conducted as a single study with a projected total of 7000 patients, with approximately 3500 from the U.S.  Treatment duration was partially event-driven, i.e. determined by the need to observe at least 120 confirmed PUBs and and at least 40 confirmed complicated PUBs, or for the minimum duration of treatment to be 6 months, whichever came last.

Patients were eligible if they were 50 years or older with rheumatoid arthritis and felt to require NSAID therapy for at least 1 year; patients 40 to 49 years on chronic oral steroids were also eligible. Patients were stratified by a history of a peptic ulcer, upper GI bleeding or perforation versus those without this history. **The use of low-dose aspirin was not allowed in this study; patients requiring aspirin for cardioprotection were excluded.** Other "cardiac-related" exclusions: angina or congestive heart failure with symptoms at rest or minimal activity, myocardial infarction or coronary bypass grafting within 1 year, stroke or transient ischemic attack within 2 years, uncontrolled hypertension.

Those eligible were randomized to MK-0966 50 mg per day or naproxen 500 mg 2 times a day in a blinded fashion (double-dummy technique); there was no placebo arm.  The primary endpoint was occurrence of PUBs.  Other endpoints were related to efficacy or GI safety and included: complicated PUBs, discontinuation due to lack of efficacy, Patient Global Assessment of Disease Activity, and Investigator Global Assessment of Disease Activity.

Prespecified subgroups (for analysis) included: prior history of PUB, age, gender, race, and study region.

---

[5] **PUB** refers to gastrointestinal (GI) perforation, gastric outlet obstructions, complicated ulcers, severe upper GI bleeding.

CONFIDENTIAL —
SUBJECT TO
PROTECTIVE ORDER



STUDY DESIGN

Besides all serious adverse experiences and those leading to study discontinuation, prespecified adverse experiences included those related to: digestive system, hypertension, edema, renal (clinical or laboratory adverse experiences), hepatic (clinical or laboratory adverse experiences), and congestive heart failure;

Patients who discontinued were to have a discontinuation visit within 48 hours of their dropping from the study. In addition, those who discontinued were contacted 14 days after the last day of treatment for a safety follow-up. They were also contacted 45 days after the last day of treatment and at the end of study to specifically check for a GI adverse experience.

A Protocol Amendment on 9/2/99 removed the requirement for a 14 day follow up phone call for those completing the study.

Committees:

Steering Committee provided overall direction of the trial and was responsible for the trial's conduct.  In the protocol, this committee was to be blinded to the results--though the DSMB (see below) had the option of "unblinding" some members of the Steering Committee to certain aspects of the data.

Executive Committee decided on practical issues during the trial and advised the Steering Committee.

Advisory Committee would meet with the DSMB,  discuss recommendations to terminate the study or amend the protocol, and discuss these recommendations with the Steering Committee.

End Point Classification Committee was to define and review all PUBs (per protocol).

Case Review Committee was to have final blinded adjudication for all potential endpoints.  This committee consisted of three voting clinicians, of whom at least two were gastroenterologists.

Data and Safety Monitoring Board (DSMB) monitored this trial for beneficial or adverse effects; except for a nonvoting Merck statistician, members of this committee were to be independent from the Sponsor, investigators, and patients.

A blinded, external Vascular Event Committee (VEC), containing three separate subspecialty committees (cardiac, cerebrovascular, and peripheral), existed for surveillance, monitoring, and adjudication of vascular events occurring in COX-2 inhibitor trials.

The Vascular Events Monitoring and Adjudication SOP can be found in the protocol: Category 3, Appendix 6 under 088c (sNDA, P088c: Appendix 3.2.1, pdf. Page 1681), dated August 30, 1999.  Your Division, HFD-550, has been asked to clarify whether the Vascular Event Committee was prespecified, or created in response to a safety concern). The DSMB minutes begin in October, 1999.

DSMB: Minutes of the VIGOR DSMB meetings on October 4, 1999, November 18, 1999, and December 22, 1999 can be found in sNDA S-007: P088C: Appendix 3.9.1 (pdf pages 2937-2952).

The October 3, 1999 meeting was convened to discuss the first interim analysis of the VIGOR trial; at this time there was no specific mention of cardiovascular adverse events.

During the November 18, 1999 meeting, discussion  focused on the "excess deaths and cardiovascular adverse experiences in Group A compared to Group B" (52 versus 29 serious cardiovascular events, respectively).  In this report, there were 40 and 17 patients that discontinued the study because of cardiovascular adverse events in Groups A and B, respectively.  In addition, a mean increase in systolic blood pressure ( 4 mm Hg) was noted in Group A and

CONFIDENTIAL –
SUBJECT TO
PROTECTIVE ORDER

a corresponding increase in hypertension adverse events, compared to little or no change in Group B.  It was noted that this trial was unable to distinguish between a potentially harmful effect of Treatment A  and a cardioprotective effect of Treatment B; in addition, the event rates were small.  DSMB members expressed concern but the trial was allowed to continue.  Additional analyses (Cox model, subdividing by those with underlying cardiac disease) were planned.  An additional non-endpoint safety analysis was planned with a December 1 cutoff.

In a December 20, 1999 letter to the sponsor, the DSMB recommended development of a separate analysis plan for adjudicated events in the VIGOR study.  This letter specifically stated that "it will be important that these events be adjudicated blinded."  One concludes from this statement that the DSMB received unadjudicated adverse event data.

In the December 22, 1999 meeting the additional analysis was presented; it was noted that (as expected) a higher rate of events occurred in the higher risk patients in both treatment groups.  No member felt that the trial should be stopped; members expressed belief  that the effect might be "due to cardioprotective effects of Treatment B."  At the time, no cardiovascular analysis plan was in place for VIGOR or VIOXX; it was again suggested that the analysis plan be developed prior to unblinding.


Results:


**Patient Disposition:**


The following table represents patient accounting, as noted by the sponsor.  No meaningful differences in patient disposition are noted between the two treatment groups.  Approximately 29% of patients did not complete this trial.  The most common reason for discontinuation was the occurrence of a clinical adverse experience.  There appear to be no meaningful differences between the two treatment groups in percentage discontinuing the trial and the overall reasons for discontinuation.  Slightly more patients in the rofecoxib group were discontinued due to laboratory adverse experience and protocol deviations.

| Patient Accounting | | | | | | |
|---|---|---|---|---|---|---|
| | Rofecoxib | | Naproxen | | Total | |
| | 50 mg | | 1000 mg | | | |
| | n (%) | | n (%) | | n (%) | |
| | | | | | | |
| TOTAL PATIENTS | 4047 (100.0) | | 4029 (100.0) | | 8076 (100.0) | |
| COMPLETED TRIAL | 2862 | (70.7) | 2880 | (71.5) | 5742 | (71.1) |
| | | | | | | |
| DISCONTINUED TRIAL | 1185 | (29.3) | 1149 | (28.5) | 2334 | (28.9) |
| Clinical adverse experience | 645 | (15.9) | 636 | (15.8) | 1281 | (15.9) |
| Laboratory adverse experience | 22 | (0.5) | 12 | (0.3) | 34 | (0.4) |
| Lack efficacy | 256 | (6.3) | 263 | (6.5) | 519 | (6.4) |
| Lost to follow-up | 6 | (0.1) | 4 | (0.1) | 10 | (0.1) |
| Patient discontinued for other | 27 | (0.7) | 30 | (0.7) | 57 | (0.7) |
| Patient moved | 17 | (0.4) | 16 | (0.4) | 33 | (0.4) |
| Patient withdrew consent | 138 | (3.4) | 130 | (3.2) | 268 | (3.3) |
| Protocol deviation | 74 | (1.8) | 58 | (1.4) | 132 | (1.6) |
| Data Source: [4.7] | | | | | | |

(Source: Study Report 088c: pdf. page 92.  Original submission: 6/29/00)


**Drug Exposure:**

NEJM 005027

CONFIDENTIAL –
SUBJECT TO
PROTECTIVE ORDER

As noted below, patients were followed for a mean of 8.0 months. There appear to be no meaningful differences in the two treatment groups in the duration of follow-up or the number of patients exposed to study drugs. (Source: 088c Clinical study report pdf. page 93. Original submission: 6/29/00)

| Time in Study† | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Treatment | | | Duration of Follow-Up (Months) | | | |
| Cohort | Group | N | Mean | SD | Median | Range | Inter-Quartile Range |
| Overall | Rofecoxib | 4047 | 8.0 | 3.1 | 9.0 | 0.5 to 13.0 | 7.5 to 10.1 |
| | Naproxen | 4029 | 8.0 | 3.1 | 9.0 | 0.5 to 12.7 | 7.6 to 10.1 |
| | Total | 8076 | 8.0 | 3.1 | 9.0 | 0.5 to 13.0 | 7.6 to 10.1 |
| U.S. | Rofecoxib | 1748 | 7.5 | 3.6 | 8.5 | 0.5 to 13.0 | 4.4 to 10.3 |
| | Naproxen | 1750 | 7.5 | 3.5 | 8.5 | 0.5 to 12.7 | 4.4 to 10.3 |
| | Total | 3498 | 7.5 | 3.6 | 8.5 | 0.5 to 13.0 | 4.4 to 10.3 |
| Multi-national | Rofecoxib | 2299 | 8.4 | 2.7 | 9.2 | 0.5 to 12.3 | 8.0 to 10.0 |
| | Naproxen | 2279 | 8.4 | 2.6 | 9.2 | 0.5 to 12.2 | 8.1 to 10.0 |
| | Total | 4578 | 8.4 | 2.7 | 9.2 | 0.5 to 12.3 | 8.0 to 10.0 |
| † | Up to 14 days past discontinuation. | | | | | | |

| Number of Patients in the Study at Different Time Points† | | | | |
|---|---|---|---|---|
| | | Rofecoxib | Naproxen | Total |
| | | (N=4047) | (N=4029) | (N=8076) |
| Month | | n (%) | n (%) | n (%) |
| | 2 | 3645 (90.1) | 3647 (90.5) | 7292 (90.3) |
| | 4 | 3407 (84.2) | 3395 (84.3) | 6802 (84.2) |
| | 6 | 3181 (78.6) | 3173 (78.8) | 6354 (78.7) |
| | 8 | 2806 (69.3) | 2800 (69.5) | 5606 (69.4) |
| | 9 | 2026 (50.1) | 2039 (50.6) | 4065 (50.3) |
| | 10 | 1072 (26.5) | 1074 (26.7) | 2146 (26.6) |
| | 11 | 440 (10.9) | 432 (10.7) | 872 (10.8) |
| | 12 | 57 (1.4) | 60 (1.5) | 117 (1.4) |
| †The number of patients at each time point indicated represents the number of patients completing the previous time point and at risk at the beginning of the indicated time period. | | | | |
| Duration of observation includes 14 days past date of discontinuation. | | | | |
| (Source: 088c Study Report pdf. page 94. 6/29/00) | | | | |

**Baseline characteristics:**

Baseline characteristics between the two treatment groups revealed no meaningful differences in age, weight, height, ethnic group, study region, alcohol use, duration of RA, ARA status, smoking history, or history of cardiac disease.

The study population was mostly female (approx. 80%), mainly (over 70%) under 65, and mainly (approx. 68%) Caucasian. About 43% of the total population came from the U.S. Almost half of the total population had a history of "cardiac disease"(it is unclear how this parameter was defined) and about half had a history of any cardiac risk factor; however, less than 6% had a history of atherosclerotic cardiovascular disease (see below, Table C-1, Baseline Cardiovascular Demographics). About 82% had a history of prior NSAID use (for RA or other reasons) with no difference between the two treatment groups.

| Baseline Patient Characteristics by Treatment Group | | | |
|---|---|---|---|
| | | | |

CONFIDENTIAL
SUBJECT TO
PROTECTIVE ORDER

| Treatment Group | N | Mean (SD) | |
|---|---|---|---|
| **Age (Years)** | | | |
| Rofecoxib | 4047 | 58.0 | (9.5) |
| Naproxen | 4029 | 58.2 | (9.6) |
| Total | 8076 | 58.1 | (9.5) |
| **Weight (kg)** | | | |
| Rofecoxib | 4045 | 72.2 | (17.7) |
| Naproxen | 4027 | 71.9 | (17.0) |
| Total | 8072 | 72.1 | (17.3) |
| **Height (cm)** | | | |
| Rofecoxib | 4026 | 161.8 | (10.2) |
| Naproxen | 4010 | 161.8 | (10.0) |
| Total | 8036 | 161.8 | (10.1) |

Source: Sponsor: 088c: pdf. page 98.  Original submission 6/29/00.

| | Rofecoxib | | Naproxen | | Total | |
|---|---|---|---|---|---|---|
| Baseline Demographics | (N=4047) | | (N=4029) | | (N=8076) | |
| | n | (%) | n | (%) | n | (%) |
| **Gender** | | | | | | |
| Female | 3223 | (79.6) | 3215 | (79.8) | 6438 | (79.7) |
| Male | 824 | (20.4) | 814 | (20.2) | 1638 | (20.3) |
| **Ethnic Group** | | | | | | |
| White | 2761 | (68.2) | 2750 | (68.3) | 5511 | (68.2) |
| Black | 207 | (5.1) | 202 | (5.0) | 409 | (5.1) |
| Asian | 101 | (2.5) | 85 | (2.1) | 186 | (2.3) |
| Hispanic | 501 | (12.4) | 516 | (12.8) | 1017 | (12.6) |
| Multi-racial | 464 | (11.5) | 466 | (11.6) | 930 | (11.5) |
| Other | 13 | (0.3) | 10 | (0.2) | 23 | (0.3) |
| **Study Region** | | | | | | |
| U.S. | 1748 | (43.2) | 1750 | (43.4) | 3498 | (43.3) |
| Multinational | 2299 | (56.8) | 2279 | (56.6) | 4578 | (56.7) |
| **Age Group** | | | | | | |
| <40 | 10 | (0.2) | 11 | (0.3) | 21 | (0.3) |
| **History of Cardiac Disease** | | | | | | |
| Yes | 1884 | (46.6) | 1838 | (45.6) | 3722 | (46.1) |
| No | 2163 | (53.4) | 2191 | (54.4) | 4354 | (53.9) |
| **Smoking Status** | | | | | | |
| Unknown | 1 | (0.0) | 0 | (0.0) | 1 | (0.0) |
| Never Smoked | 2128 | (52.6) | 2150 | (53.4) | 4278 | (53.0) |
| Ex-Smoker | 1128 | (27.9) | 1100 | (27.3) | 2228 | (27.6) |
| Current Smoker | 790 | (19.5) | 779 | (19.3) | 1569 | (19.4) |
| **Number Cigarettes/24 Hours** | | | | | | |
| <11/day | 404 | (51.1) | 409 | (52.5) | 813 | (51.8) |
| 11 to 20/day | 271 | (34.3) | 252 | (32.3) | 523 | (33.3) |
| >20/day | 115 | (14.6) | 118 | (15.1) | 233 | (14.9) |

Source: 088c: pdf. Pages 99- 100.  Original submission 6/29/00.

Baseline cardiac risk factors are presented ( next page):
There appear to be no meaningful differences between the two treatment groups in age, gender, past cardiovascular history, and cardiac risk factors.

| Baseline Cardiovascular Demographics in Rheumatoid Arthritis Patients | |
|---|---|
| | |

NEJM 005029