sitting at his desk. An ambulance was called and EMS personnel arrived on the scene and initiated

cardiac protocol including defibrillation, intubation and the use of medications including Lidocaine and

Epinephrine. The EMS report notes no complaints of "any medical problems prior to arrest", however,

the Medical Examiner report notes that he had previously "complained of 'not been feeling well'" and

"being hot". The EMS assessment was cardiac arrest. Mr. Irvin was transported to the Flagler Hospital

Emergency Room where resuscitative efforts were unsuccessful. Mr. Irvin was non-responsive to all

medical therapy and was pronounced dead by the Emergency Room physician at approximately 9:02

am.

2. The family reports in their depositions that Mr. Irvin did not smoke, but occasionally chewed tobacco

and drank alcohol on special occasions. The blood alcohol and drug screens were performed and came

back negative, but showed caffein and Lidocaine, the latter most likely from the resuscitation. The

autopsy indicates Mr. Irvin was six feet tall and weighed over 230 pounds at the time of his death. The

family reported that Mr. Irvin had no significant medical history or known illnesses other than colds.

According to testimony, he may have undergone an echocardiogram and/or stress test in the mid-

nineties, which apparently was normal, but there are no medical records of this. Mr. Irvin had a sister

that apparently died of lupus-related complications. Mr. Irvin's mother reportedly had a triple by-pass

surgery in 2000, but is still alive.

3. According to the testimony, Mr. Irvin apparently had sporadic episodes of back pain which were

exacerbated by physical activity. According to Mrs. Irvin, Mr. Irvin had back pain beginning in

February after he lifted boxes at work. Mr. Irvin initially took Tylenol for his pain. He continued to

have back pain in early April, and according to the Walgreens' records on April 9 was prescribed an

approximate one week supply of Vicoprofen and Robaxin by Dr. Christopher Schirmer. He took this

medication only for a couple days because it made him sick to his stomach. Mr. Irvin then received

11

samples of Vioxx from a co-worker which he took. On April 15, 2001, Dr. Schirmer then prescribed

Vioxx 25 mg daily (30 tablets) for Mr. Irvin. The testimony indicates that Mr. Irvin was taking Vioxx

from that time through the time of his death.

4. An autopsy was performed on 5/16/2002. The more pertinent findings include generalized moderate

arteriosclerosis with "foci of 20-40% occlusion by atheromatous deposits with moderate calcification.

There is an area of 60% occlusion in the L.A.D branch at 2.2 cm's. Proximal to this, there is acute

thrombosis for 1.0 cm, non- attached."

B. Opinions

1. My opinions are made to a reasonable degree of 'medical certainty and are based on my review of the

listed materials, my experience and training. Prior to his sudden cardiac death, Mr. Irvin was a

generally healthy, 53-year-old, white male. His coronary artery disease was mild to, at most,

moderate and not flow limiting. The autopsy findings in all probability overestimated the extent of

stenosis compared to what angiographic findings would have been in this case. Regardless, most

patients would not have any exercise-induced symptoms from a cross-sectional stenosis from a fixed

stenotic lesion until it reached 70% on angiography. In my opinion, Mr. Irvin had limited single-

vessel disease which was certainly sub-critical in nature with no evidence of critical stenosis prior to

his thrombus. Mr. Irvin had no evidence of high cholesterol, high blood pressure or diabetes. In

retrospect, Mr Irvin was probably eligible for aspirin therapy. From a cardiovascular standpoint, Mr.

Irvin was symptom- free and overall doing well prior to his ingestion of Vioxx and his risk of sudden

cardiac death was very low.

2. I disagree with the characterization in the autopsy report that the cardiac weight of 420 grams

documented in the "Report of Autopsy" constituted cardiomegaly. The weight and size of an

12

individual's heart is proportionate to the overall body size.  This cardiac weight would likely not be unusual for a person of Mr. Irvin's body stature.  Further, cardiac size is not a predictor of acute coronary thrombosis.

3.  It is my opinion to a reasonable degree of medical certainty that Vioxx was the cause or a substantial contributing cause to Mr. Irvin's sudden cardiac death, meaning that but for the ingestion of Vioxx, Mr. Irvin would not have had his fatal cardiac event on 5/15/2001.  Mr. Irvin may have had an initial plaque fissure or rupture, a coronary vasospasm or platelet aggregation.  These events occur frequently and resolve without harm to the patient.  When the body's procoaguable and anticoaguable factors are in proper balance, what minimal thrombus that may form usually resolves itself.  However, in Mr. Irvin's case the thrombus continued to propagate, or grow, causing an occlusion or blockage of blood flow leading to sudden cardiac death.  In my opinion, Vioxx created an exaggerated thrombotic response in Mr. Irvin which led to the development and propagation of this acute thrombus.  This occlusive thrombosis in turn led to blockage of blood flow to the heart and sudden cardiac death with a concurrent evolving acute myocardial infarction.  There is a time-dependent continuum between onset of ischemia and visible evidence of infarction in the heart muscle.  The longer the ischemia persists, the more likely that pathologic changes of infarction can be identified.  In Mr. Irvin's situation, the time between onset of the acute occlusion and death was so short, that there were no pathologic changes in the myocardium.

4.  It is my opinion to a reasonable degree of medical certainty that Vioxx was the cause, or a substantial contributing cause, for Mr. Irvin's acute cardiac event and sudden death.  As more particularly explained in the literature and materials cited in this report, Vioxx is demonstrated to cause arterial thrombosis primarily by platelet aggregation and possible vasoconstriction through its selective Cox-2 inhibition and resulting imbalance between prostacyclin and thromboxane A2.  Thromboxane A2

13

production occurs most significantly in coronary arteries at sites under increased shear force or where there is inflammation, injury, irregularity or thickening. The body responds by upregulating Cox-2 in those areas to produce vasodilatation and reduced platelet aggregation. It is my opinion that this process was at work in Mr. Irvin – he had a Vioxx-induced prothrombotic state and as a result suffered an acute thrombosis in his LAD. Vioxx creates an increased risk of clotting and thrombus propagation, resulting in the exact type of acute cardiac event suffered by Mr. Irvin – a thrombosis resulting in an acute LAD occlusion, sudden ischemia, and resulting sudden cardiac death.

5. An early Vioxx study (Protocol 090) showed an increased risk of cardiovascular adverse events. In apparent response to this concern, Merck conducted Protocol 023 to evaluate the problem. This study, conducted by Catella-Lawson, was a Merck-sponsored, 14 day study in humans comparing the effects of Vioxx against indomethacin on thromboxane and prostacyclin metabolite excretion. This study showed that Vioxx caused an immediate reduction in systemic prostacyclin without a concomitant reduction in thromboxane. The Catella-Lawson study may underestimate the true disparity between prostacyclin and thromboxane at sites of arterial abnormality.

6. Subsequent studies confirmed the drug's potential cardiac risk. VIGOR and ADVANTAGE were begun in 1999 at about the same time. In those studies, Vioxx, 50 mg and 25 mg respectively, was compared against 1000 mg of Naproxen. The results of these studies showed an increased risk of cardiovascular events on Vioxx. VIGOR revealed a 2.8 fold increased risk of serious coronary heart disease and a 5 fold increased risk of acute MI. ADVANTAGE revealed a 3.32 fold increased risk of serious coronary heart disease (this was the result following the addition of three deaths which became known after the initial results were published). The FDA concluded that both studies revealed similar safety concerns with Vioxx. It is important to note that ADVANTAGE allowed concurrent aspirin use.

14

7. Juni performed a cumulative meta-analysis of 18 randomized controlled trials and 11 observational studies. The study showed an increased risk of myocardial infarction which was evident as early as 2000. Juni concluded that the increased relative risk was not dose or duration dependent.

8. The trial that finally led to the withdrawal of Vioxx from the market was APPROVE. This was a Merck-sponsored 25 mg Vioxx versus placebo trial to evaluate colonic polyp reduction. Merck contends that the trial showed a statistically significant increased risk of cardiovascular adverse events, but only after 18 months. In actuality, the study was not adequately powered to draw conclusions about duration of use. The relative risk was 2.80 for serious coronary heart disease and 2.08 for acute MI. This study was to be pooled with 2 other Merck studies (VICTOR and VIP) per Protocol 203 to examine the overall cardiovascular safety of Vioxx. VICTOR showed an increased relative risk of thrombotic events of 2.79 while VIP showed an increase in cardiac events of 1.25. All three studies, therefore, showed an increased risk of adverse cardiovascular events. In VICTOR, there was separation of the time-to-event curves within the first three months of use. This is further evidence of the cardiotoxic nature of Vioxx and its contributory role to Dick Irvin's death.

9. The VIGOR study was designed to exclude patients who were "aspirin indicated." However, a group of 321 patients (170 on Vioxx and 151 on Aleve) who in retrospect were "aspirin indicated" (although not on aspirin) made it into the study. This sub-group on Vioxx reflected a 4.89 increase in severe cardiovascular events. In other words, these patients were most at risk from the cardiotoxic affects of Vioxx. It is my opinion that Mr Irvin would have been "aspirin indicated" and been at similar increased risk from Vioxx's cardiotoxic affects as those in the Vigor study.

10. It is my opinion to a reasonable degree of medical certainty that Mr Irvin's use of Vioxx for less than thirty days created an increased risk of a sudden cardiac death. The initial support for this is found in biological plausibility. As previously stated, it is my opinion that the most likely cause of

15

Vioxx's cardiotoxicity is that it causes arterial occlusion primarily due to thrombosis from enhanced platelet aggregation and possible vasoconstriction through its selective Cox-2 inhibition and resulting imbalance between prostacyclin and thromboxane A2, especially at sites of arterial irregularity or injury. The decrease in prostacyclin which results in the drug's anti-inflammatory effect occurs within hours of taking the drug. This is one of the pharmacologic properties of the drug and its concomitant cardiotoxic risks would be expected to occur within hours as well. This would also be consistent with the mechanistic study Merck performed in protocol 023 by Catella-Lawson referenced in paragraph 5. The Advantage trial was a 12 week study. Once the numbers are adjusted for the number of adverse cardiac events found by the FDA, it showed a substantial increase in serious heart disease for patients taking Vioxx. This is consistent with Juni's findings that the increased risk is not dose or duration dependent. Dr. Ray's summary of the available scientific data also supports the concept that short-term use creates an increased risk. It is therefore my opinion that Vioxx results in a pro-thrombotic state likely within hours of the ingestion of the drug. The increased risk for thrombosis from Vioxx would have been present in Mr. Irvin on the date of his sudden cardiac death.

11.     Consequently, based upon the prevailing data and literature, I have come to the conclusion within a reasonable degree of medical certainty and applying the same rigors of evaluation and practice as customarily employed in my practice of cardiovascular medicine, that on May 15, 2001, Vioxx caused or substantially contributed to cause the development of an acute thrombosis which resulted in coronary occlusion, subsequent cardiac ischemia, a clinically evolving acute myocardial infarction, and the sudden death of Mr. Irvin.

**Past Testimony and Charges**

I have served as an expert witness on several occasions over the course of my career. I have testified three times in court, and have given approximately 20-30 depositions. I do not maintain records of my

testimonial history, and am unable to provide a list of the cases for which I have offered testimony by way of deposition over the last few years.  However, I do recall the names of the defendants in three medical negligence cases where I testified as an expert witness – James DiRenna, D.O., Paul Kramer, M.D., and William Ritter, M.D.  I believe all of these cases were in state court in Jackson County, Missouri.  I customarily charge the rate of $300 per hour for case review $600 per hour for deposition testimony, and $1000 per hour for trial testimony.

Executed this ___13___ day of January, 2006.


_____
Thomas Baldwin, M.D.

17

**EXHIBIT 3 - Trial Transcript Excerpts**

• **Motion to Exclude Baldwin**

[487:] - [487:25]     12/1/2005   Irvin Plunkett Trial - Baldwin, Nies, Ray

```
page 487
    0487
1                              UNITED STATES DISTRICT COURT
2                              EASTERN DISTRICT OF LOUISIANA
3
4
5
        IN RE: VIOXX PRODUCTS          *
6       LIABILITY LITIGATION           *  MDL DOCKET NO. 1657
                                        *
7                                       *
        THIS DOCUMENT RELATES TO        *  HOUSTON, TEXAS
8       CASE NO. 05-4046:               *
                                        *
9       EVELYN IRVIN PLUNKETT, ET AL    *  DECEMBER 1, 2005
                                        *
10      VERSUS                          *
                                        *  8:30 A.M.
11      MERCK & CO., INC.               *
        * * * * * * * * * * * * * * *   *
12
13
                                VOLUME III
14                       JURY TRIAL BEFORE THE
                         HONORABLE ELDON E. FALLON
15                    UNITED STATES DISTRICT JUDGE
16
17      APPEARANCES:
18
        FOR THE PLAINTIFF:          BEASLEY ALLEN CROW METHVIN
19                                    PORTIS & MILES
                                    BY:  JERE LOCKE BEASLEY, ESQ.
20                                       ANDY D. BIRCHFELD, JR., ESQ.
                                         J. PAUL SIZEMORE, ESQ.
21                                  234 COMMERCE STREET
                                    POST OFFICE BOX 4160
22                                  MONTGOMERY, ALABAMA 36103
23
        FOR THE PLAINTIFF:          ROBINSON, CALCAGNIE & ROBINSON
24                                  BY:  MARK P. ROBINSON, JR., ESQ.
                                    620 NEWPORT CENTER DRIVE
25                                  NEWPORT BEACH, CALIFORNIA 92660
```

[488:1] - [533:5]     12/1/2005   Irvin Plunkett Trial - Baldwin, Nies, Ray

```
page 488
1       APPEARANCES, (CONTINUED):
2
        FOR THE PLAINTIFF:          ABRAHAM, WATKINS, NICHOLS,
3                                    SORRELS, MATTHEWS & FRIEND
                                    BY:  DAVID P. MATTHEWS, ESQ.
4                                   800 COMMERCE STREET
                                    HOUSTON, TEXAS 77002
5
6       FOR THE DEFENDANT:          BARTLIT BECK HERMAN
                                     PALENCHAR & SCOTT
7                                   BY:  PHILIP S. BECK,  ESQ.
                                         TAREK ISMAIL, ESQ.
8                                   54 W. HUBBARD STREET, SUITE 300
                                    CHICAGO, ILLINOIS 60601
9
10      OFFICIAL COURT REPORTERS:   CATHY PEPPER, CCR, RPR, CRR
                                    TONI DOYLE TUSA, CCR
11                                  500 POYDRAS STREET, ROOM HB-406
                                    NEW ORLEANS, LOUISIANA 70130
```

1/25/2006  10:32 AM



EXHIBIT
3

1

EXHIBIT 3 - Trial Transcript Excerpts

• Motion to Exclude Baldwin

```
12                                        (504) 589-7778
13
14
15          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
            PRODUCED BY COMPUTER.
16
17
18
19
20
21
22
23
24
25
page 489
1                              MORNING SESSION
2                            (DECEMBER 1, 2005)
3                  (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE
4          TRANSCRIBED BY CATHY PEPPER, OFFICIAL COURT REPORTER.)
5                  THE MARSHAL:  ALL RISE FOR THE JURY.  PLEASE BE
6          SEATED.
7                  THE COURT:  BE SEATED, PLEASE.  GOOD MORNING, LADIES
8          AND GENTLEMEN.  LET'S CALL YOUR NEXT WITNESS, PLEASE.  YOU
9          RECALL, MEMBERS OF THE JURY, WE'RE ON THE PLAINTIFF'S CASE NOW,
10         AND THEY ARE STILL CALLING WITNESSES.
11                 MR. BIRCHFIELD:  YOUR HONOR, WE CALL DR. TOM BALDWIN.
12                 THE DEPUTY CLERK:  PLEASE STEP INTO THE WITNESS BOX.
13         WOULD YOU RAISE YOUR RIGHT HAND.
14                 ( WHEREUPON, DR. TOM BALDWIN, HAVING BEEN DULY SWORN,
15         TESTIFIED AS FOLLOWS.)
16                 THE DEPUTY CLERK:  PLEASE BE SEATED, AND IF YOU WOULD
17         USE THE MICROPHONE THERE, WOULD YOU STATE YOUR FULL NAME FOR
18         THE RECORD.
19                 THE WITNESS:  THOMAS FREDERICK BALDWIN.
20                 THE COURT:  YOU MAY PROCEED, COUNSEL.
21                 MR. BIRCHFIELD:  YOUR HONOR.
22                                   VOIR DIRE
23         BY MR. BIRCHFIELD:
24         Q.   DR. BALDWIN, YOU HAVE IN FRONT OF YOU A SUMMARY OF YOUR
25         BACKGROUND, AND YOU ALSO -- ATTACHED TO THAT IS YOUR CURRICULUM
page 490
1          VITAE; IS THAT CORRECT?
2          A.   THAT'S CORRECT.
3          Q.   DOCTOR, WOULD YOU DESCRIBE FOR US BRIEFLY, JUST GIVE US A
4          BRIEF SUMMARY OF YOUR EDUCATION AND YOUR PROFESSIONAL
5          EXPERIENCE.
6          A.   SURE.  MY EDUCATION STARTED AT KANSAS STATE UNIVERSITY
7          WITH A BACHELOR OF SCIENCE DEGREE IN PREMED, MOVING ON TO THE
8          UNIVERSITY OF KANSAS FOR MEDICAL SCHOOL FOR INTERNAL MEDICINE
9          RESIDENCY, AND THEN SUBSEQUENTLY COMPLETING A CARDIOLOGY
10         FELLOWSHIP IN 1988.  I'M BOARD-CERTIFIED IN INTERNAL MEDICINE,
11         CARDIOVASCULAR MEDICINE, AND THEN SUBSPECIALTY BOARDED IN
12         INTERVENTIONAL CARDIOLOGY.
13                 FOLLOWING MY COMPLETION OF TRAINING AT KU MEDICAL
14         CENTER, I STARTED A CLINICAL PRACTICE IN 1988, AND I REMAIN IN
15         CLINICAL PRACTICE TODAY.  I'M CURRENTLY THE LEAD PHYSICIAN OF A
16         14-PHYSICIAN CARDIOLOGY GROUP THAT PRACTICES IN THE KANSAS CITY
17         AREA.
18         Q.   THANK YOU, DR. BALDWIN.
19                 MR. BIRCHFIELD:  AT THIS TIME, YOUR HONOR, WE OFFER
20         PLAINTIFF'S EXHIBIT D, WHICH IS HIS CURRICULUM VITAE AND
21         SUMMARY AND OFFER HIM AS AN EXPERT IN CARDIOLOGY.
22                 THE COURT:  THANK YOU, DOCTOR.  THE COURT WILL
23         RECEIVE HIM.
24                 MR. BECK:  YOUR HONOR, MAY WE APPROACH?
25                 (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT
page 491
```

**EXHIBIT 3 - Trial Transcript Excerpts**

• **Motion to Exclude Baldwin**

```
 1    THE BENCH.)
 2                    MR. BECK:  ARE YOU OFFERING HIM?
 3                    MR. BIRCHFIELD:  AS IT PERTAIN --
 4                    THE COURT:  MAKE YOUR TENDER.  WHAT IS THE TENDER?
 5                    MR. BIRCHFIELD:  WE'RE TENDERING HIM AS AN EXPERT IN
 6    CARDIOLOGY ON SPECIFIC CAUSATION, BUT IN ORDER TO GET TO
 7    SPECIFIC CAUSATION, HE HAS TO DO IT WITH THE MECHANISM.
 8                    MR. ISMAIL:  WE WERE AT THE DAUBERT HEARING.  WE
 9    ADDRESSED THE CARDIOLOGIST WITH DR. BALDWIN AND DR. GANDY, AND
10    WE HAD CHALLENGES TO THE METHODOLOGY OF -- AND SAID HE DID NOT
11    CONSIDER ALL OF THE EVIDENCE.  THAT WOULD BE A VIOLATION OF
12    DAUBERT.  I HAVE A COPY OF THE TRANSCRIPT, YOUR HONOR.
13                    MY REMARKS AS TO PLAINTIFFS YOU HAVE A GENERAL
14    CAUSATION EXPERT, RAY FARQUHAR, AND YOU DON'T NEED THESE GUYS
15    TO DO IT.  AND IN MY JUDGMENT, IT WAS CUMULATIVE.  MY OBJECTION
16    WAS THAT IN ADDITION TO BEING CUMULATIVE, HE DID NOT FOLLOW THE
17    PROPER METHODOLOGY.  AT THAT POINT I SAID WE RESERVE TO SEE
18    WHAT THEY DO TO OFFER HIM AT TRIAL, AND WE RESERVE THE DAUBERT
19    OBJECTION.
20                    MR. BIRCHFIELD:  YOUR HONOR, WE'RE NOT GOING TO SPEND
21    MUCH TIME ON THE CAUSE OF ACTION, BUT IN ORDER TO GET A
22    SPECIFIC CAUSATION HE HAS TO, IF IT'S NOT PROTHROMBOTIC, IF IT
23    DOES NOT WORK IN THAT WAY TO INCREASE THE RISK.  THAT'S THE
24    BASIS OF HIS OPINION, BASED ON HIS REVIEW OF THE MEDICAL
25    LITERATURE AND HIS UNDERSTANDING OF CLOT FORMATION, THE
page 492
 1    CLOTTING MECHANISM AND HOW IT PERTAINS TO CARDIAC EVENTS.
 2                    MR. ISMAIL:  YOU CAN SEE IN HIS REPORT, YOUR HONOR,
 3    HE HAD NO DISCUSSION -- IN HIS DEPOSITION HE WAS COMPLETELY
 4    UNPREPARED TO TALK ABOUT IT.  YOUR HONOR COMMENTED ON THAT IN
 5    YOUR DAUBERT RULING.
 6                    THE COURT:  LET'S PROCEED WITH IT AND MAKE YOUR
 7    OBJECTION, AND I'LL TAKE IT AT THAT TIME.
 8                    MR. ISMAIL:  IS IT PRESERVED NOW?
 9                    THE COURT:  NO. CALL MY ATTENTION TO IT.  I
10    UNDERSTAND YOU'RE MAKING THE OBJECTION, BUT IF WE GET INTO
11    SOMETHING THAT YOU FEEL IS OBJECTIONABLE, MAKE IT.
12                    MR. BIRCHFIELD:  OKAY.
13                    (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN
14    OPEN COURT.)
15                    THE COURT:  ANY QUESTIONS ON HIS QUALIFICATIONS?
16                    MR. ISMAIL:  YES, SIR.
17                            TRAVERSE
18    BY MR. ISMAIL:
19    Q.    NOW, SIR, AM I CORRECT THAT WHILE VIOXX WAS ON THE MARKET,
20    YOU NEVER PERSONALLY PRESCRIBED THE MEDICINE?
21    A.    NOT THAT I RECALL.
22    Q.    AND THAT WOULD BE TRUE FOR THE OTHER COX-2 INHIBITOR DRUGS
23    THAT WERE ON THE MARKET, BEXTRA AND CELEBREX; IS THAT CORRECT?
24    A.    TO MY RECOLLECTION, THAT IS CORRECT.
25    Q.    AND YOU HAVE NEVER DONE ANY RESEARCH IN COX-2 DRUGS,
page 493
 1    CORRECT?
 2    A.    THAT'S CORRECT.
 3    Q.    AND, SIR, I BELIEVE YOU SAID AT YOUR DEPOSITION THAT YOU
 4    DO NOT EVER RECALL DIAGNOSING ONE OF YOUR OWN PATIENTS AS
 5    HAVING A CARDIOVASCULAR THROMBOTIC EVENT FROM VIOXX; IS THAT
 6    CORRECT?
 7    A.    THAT'S CORRECT.  AT THE TIME OF MY DEPOSITION, I WAS NOT
 8    AWARE OF ANY OF MY PATIENTS THAT HAD AN EVENT WHILE ON VIOXX.
 9    I HAVE SUBSEQUENTLY BECOME AWARE OF ONE CASE.
10    Q.    SO YOUR DEPOSITION WAS TAKEN IN OCTOBER, CORRECT?
11    A.    THAT'S CORRECT.
12    Q.    THAT WAS ABOUT SIX WEEKS AGO?
13    A.    THAT'S CORRECT.
14    Q.    AND YOU SAID UNDER OATH AT THAT TIME YOU HAD NEVER
15    PERSONALLY TREATED A PATIENT WHOM YOU HAD DIAGNOSED AS HAVING A
16    VIOXX-RELATED BLOOD CLOT, CORRECT?
```

EXHIBIT 3 - Trial Transcript Excerpts

• **Motion to Exclude Baldwin**

```
17    A.    AND THAT HOLDS.  I HAVE TREATED A PATIENT THAT HAD A
18    CARDIAC EVENT WHILE ON VIOXX.  I HAVEN'T MADE A DIAGNOSIS THAT
19    IT WAS CAUSED BY VIOXX, THAT'S CORRECT.
20    Q.    THANK YOU FOR THAT CLARIFICATION.  WHEN YOU COME INTO THIS
21    COURTROOM TODAY, YOU PERSONALLY HAVE NOT DIAGNOSED ONE OF YOUR
22    PATIENTS AS HAVING A VIOXX-RELATED CLOT, CORRECT?
23    A.    THAT'S CORRECT.
24    Q.    NOW, IS THAT TRUE FOR CELEBREX AS WELL?
25    A.    THAT'S CORRECT.
page 494
1     Q.    SO YOUR QUALIFICATIONS ON DIAGNOSING CARDIAC EVENTS FROM
2     COX-2 INHIBITOR DRUGS, YOU HAVE NEVER DONE IT BEFORE OUTSIDE OF
3     THIS LITIGATION, CORRECT?
4     A.    THAT'S CORRECT.
5     Q.    NOW, SIR, YOU DON'T CONSIDER YOURSELF A CLINICAL
6     RESEARCHER, CORRECT?
7     A.    CORRECT.
8     Q.    AND I BELIEVE YOU HAVE NOT DONE ANY BASIC SCIENCE RESEARCH
9     YOURSELF SINCE COLLEGE?
10    A.    WITH THE PROVISO THAT DURING THE COURSE OF MEDICAL SCHOOL,
11    THERE MAY HAVE BEEN SOME INVOLVEMENT IN BASIC SCIENCE RESEARCH,
12    BUT...
13    Q.    SURE.  WHEN YOU'RE IN MEDICAL SCHOOL, YOU MAY HAVE HAD AN
14    OPPORTUNITY TO GO DOWN TO THE LAB AND MAYBE CONDUCT A FEW
15    EXPERIMENTS, BUT YOU WOULDN'T CONSIDER YOURSELF A SCIENTIFIC
16    RESEARCHER, WOULD YOU?
17    A.    THAT'S CORRECT.
18    Q.    AND YOU'RE REALLY NOT AN EXPERT TO COX-2 DRUGS, ARE YOU,
19    SIR?
20    A.    NOT AN EXPERT, PER SE, NO.
21    Q.    AND YOU HAVE NEVER BEEN RESPONSIBLE FOR ANALYZING DATA
22    FROM A CLINICAL TRIAL, CORRECT?
23    A.    WELL, RESPONSIBLE FOR IS KIND OF THE OPERATIVE PHRASE.  I
24    ANALYZE STUDIES IN THE LITERATURE AND APPLY THAT INFORMATION TO
25    MY PATIENTS ON A REGULAR BASIS.
page 495
1     Q.    SURE.  YOU MAY ACTUALLY SEE AN ARTICLE IN A JOURNAL AND
2     THERE IS CLINICAL RESULTS PRESENTED, AND THEN YOU READ THAT AS
3     A PRACTICING PHYSICIAN AND DRAW YOUR OWN CONCLUSIONS FROM IT,
4     CORRECT?
5     A.    THAT'S CORRECT.
6     Q.    BUT IN TERMS OF HAVING PRIMARY RESPONSIBILITY AS AN
7     INVESTIGATOR ON A TRIAL, YOU'VE NEVER DONE THAT AND ANALYZED
8     THE DATA FROM THE TRIAL, CORRECT?
9     A.    THAT IS CORRECT.
10    Q.    AND YOU'VE NEVER DONE ANY RESEARCH IN ANY NONSTEROIDAL
11    ANTI-INFLAMMATORY DRUG, CORRECT?
12    A.    CORRECT.
13    Q.    AND YOU DON'T CONSIDER YOURSELF AN EPIDEMIOLOGIST, DO YOU,
14    SIR?
15    A.    NO, I DO NOT.
16    Q.    CAN YOU TELL THE JURY WHAT AN EPIDEMIOLOGIST IS?
17    A.    AN EPIDEMIOLOGIST IS AN INDIVIDUAL THAT STUDIES EVENTS AND
18    TRIES TO APPLY STATISTICAL TOOLS TO EVALUATE CONNECTIONS
19    BETWEEN EVENTS.
20    Q.    AND, SIR, YOU'VE NEVER DONE CLINICAL RESEARCH ON THE
21    CAUSES OF SUDDEN CARDIAC DEATH, HAVE YOU?
22    A.    DURING THE COURSE OF MEDICAL SCHOOL, I MAY HAVE BEEN
23    INVOLVED WITH A RESEARCH PROJECT AND/OR DURING FELLOWSHIP BUT
24    NOT ONE THAT I WAS RESPONSIBLE FOR EVALUATING THE DATA.
25    Q.    AND WHEN DID YOU GRADUATE MEDICAL SCHOOL?
page 496
1     A.    1983.
2     Q.    SO, IN THE LAST 22 YEARS, WOULD IT BE FAIR TO SAY YOU'VE
3     NEVER BEEN INVOLVED IN CLINICAL RESEARCH INTO THE CAUSES OF
4     SUDDEN CARDIAC DEATH?
5     A.    MY CARDIOLOGY FELLOWSHIP TRAINING ENDED IN 1988, SO IT
6     WOULD HAVE BEEN SINCE '88.
```

EXHIBIT 3 - Trial Transcript Excerpts

• Motion to Exclude Baldwin

```
7      Q.   SO I AMEND MY QUESTION BY SAYING:  IN THE LAST 17 YEARS,
8   YOU'VE NEVER DONE ANY CLINICAL RESEARCH IN THE CAUSES OF SUDDEN
9   CARDIAC DEATH?
10     A.   THAT'S CORRECT.
11     Q.   AND BASED ON ALL THAT EXPERTISE, SIR, CAN YOU TELL THE
12  JURY HOW MUCH YOU'RE CHARGING FOR YOUR TESTIMONY TODAY?
13     A.   SURE.  I CHARGE A THOUSAND AN HOUR IN THE COURTROOM, 300
14  AN HOUR TO REVIEW CASES, AND 600 AN HOUR IN DEPOSITION.
15     Q.   SO YOUR TIME HERE TODAY IS AT A THOUSAND DOLLARS AN HOUR?
16     A.   IN THE COURTROOM, YES.
17          MR. ISMAIL:  THAT'S ALL, YOUR HONOR.
18          THE COURT:  WHAT'S THE TENDER?
19          MR. BIRCHFIELD:  YOUR HONOR, WE OFFER HIM AS AN
20  EXPERT IN CARDIOLOGY.
21          THE COURT:  ALL RIGHT.  I'LL ALLOW HIM TO TESTIFY AS
22  AN EXPERT IN CARDIOLOGY.  BUT INSOFAR AS THE SPECIFICS, IF WE
23  GET INTO SPECIFICS, I'LL ENTERTAIN THE OBJECTION.
24          MR. ISMAIL:  THANK YOU, JUDGE.
25
page 497
1                    DIRECT EXAMINATION
2   BY MR. BIRCHFIELD:
3      Q.   DR. BALDWIN, WE JUST HAD A LOT OF DISCUSSION ABOUT
4   RESEARCH.  NOW, WHEN YOU SAY RESEARCH, ARE YOU TALKING ABOUT
5   ACTUALLY CONDUCTING CLINICAL TRIALS?  IS THAT WHAT YOU MEAN BY
6   RESEARCH?
7      A.   YES.
8      Q.   NOW, IF WE THINK OF RESEARCH IN TERMS OF REVIEWING MEDICAL
9   LITERATURE TO GAIN AN UNDERSTANDING OF HOW A DRUG WOULD AFFECT
10  A BODY, HOW IT FUNCTIONS, DO YOU DO THAT TYPE OF RESEARCH?
11     A.   YES.
12     Q.   IS THAT A NECESSARY PART OF YOUR PRACTICE?
13     A.   IT IS.
14     Q.   CAN YOU DESCRIBE FOR US, SIR, WHAT YOU DO DAY TO DAY?
15     A.   I TAKE CARE OF PATIENTS.  I'M A HANDS-ON CARDIOLOGIST.  I
16  TAKE CARE OF PATIENTS.  AND SPECIFICALLY, I PRACTICE
17  INTERVENTIONAL CARDIOLOGY.  AND THAT'S A SUBSET OF CARDIOLOGY
18  WHEREBY WE GO IN WITH MORE INVASIVE TYPE TOOLS -- BALLOONS,
19  GUIDE WIRES, CATHETERS -- AND PLACE THOSE INTO THE ARTERIES AND
20  VEINS AND DIAGNOSE CARDIAC PROBLEMS.  MOST OF THOSE HAVE TO DO
21  WITH ARTERY BLOCKAGES, AND THEN WE PROCEED TO FIX THOSE
22  BLOCKAGES AS BEST WE CAN, SHOULD THE NEED ARISE.
23          USUALLY, WITH BALLOON ANGIOPLASTY, YOU PROBABLY
24  HAVE -- WE'VE ALL HAD FAMILY MEMBERS AND FRIENDS THAT HAVE HAD
25  ARTERIES THAT HAVE BEEN OPENED UP WITH BALLOONS.  AND THEN WE
page 498
1   ALSO PUT IN STENTS, LITTLE SLOTTED METAL TUBES, THAT ARE
2   EXPANDED WITH A BALLOON TO ALLOW THE ARTERY TO REMAIN OPEN
3   WHILE IT'S HEALED.
4      Q.   DOCTOR, AS FAR AS YOUR PRACTICE GOES, YOUR EVERYDAY
5   PRACTICE, DO YOU REVIEW A CONSIDERABLE AMOUNT OF MEDICAL
6   LITERATURE?
7      A.   YES, WE CONSTANTLY REVIEW AND TALK ABOUT MEDICAL
8   LITERATURE.
9      Q.   AND SPECIFICALLY, DID YOU REVIEW MEDICAL LITERATURE THAT
10  PERTAINS TO COX-2 INHIBITORS AND HOW THEY AFFECT THE BODY?
11     A.   I DO.
12     Q.   WHY DID YOU DO THAT?
13     A.   WELL, I DO OBSERVE LITERATURE ALL ALONG TO THINGS THAT
14  PERTAIN TO CARDIOLOGY SPECIFICALLY.  AND COX-2 INHIBITORS CAME
15  TO THE FOREFRONT AS BEING RELATED TO CARDIAC EVENTS, AND SO I
16  HAD AN OPPORTUNITY TO BE ALERT TO THAT.  BUT SPECIFICALLY FOR
17  THIS INSTANCE, AND IN THE PROCESS OF RENDERING MY OPINION, I
18  HAVE EXPANDED THAT AND REVIEWED ADDITIONAL LITERATURE.
19     Q.   AND, DOCTOR, WE'LL GET INTO THAT IN JUST A MOMENT, BUT I
20  WOULD LIKE FOR YOU TO EXPLAIN TO US THE STRUCTURE AND THE
21  FUNCTION OF THE HEART BRIEFLY.  WILL YOU DO THAT FOR US?
22     A.   SURE.
```

EXHIBIT 3 - Trial Transcript Excerpts

• **Motion to Exclude Baldwin**

```
23     Q.   WE HAVE AN ILLUSTRATION HERE.  WOULD IT BE HELPFUL TO USE
24   THIS ILLUSTRATION AND DESCRIBE THAT TO THE JURY?
25     A.   YES, IT WOULD.
page 499
1              MR. BIRCHFIELD:  YOUR HONOR, MAY HE APPROACH THE
2    EASEL?
3              THE COURT:  YES.
4              THE WITNESS:  THIS DIAGRAM IS A PRETTY FAIR
5    REPRESENTATION OF THE HEART.  IT'S AS IF THE HEART WERE SLICED
6    IN TWO AND OPENED AND COLOR-CODED SO YOU CAN IDENTIFY THE
7    COMPONENTS.
8              AND, IN GENERAL, THE HEART IS A MUSCULAR SAC
9    THAT'S A PUMP, AND IT HAS FOUR CHAMBERS:  TWO ON THE RIGHT, TWO
10   ON THE LEFT.  THE TWO ON THE RIGHT WORK TO PUMP BLOOD UP
11   THROUGH THE LUNGS; THE TWO ON THE WORK LEFT WORK TO PUMP BLOOD
12   TO THE REST OF THE BODY.
13             YOU THINK OF THE HEART PUMPING TWO TO FOUR
14   LITERS, MAYBE UP TO TEN LITERS PER MINUTE.  YOU THINK IT WOULD
15   BE ABLE TO USE THAT BLOOD FOR ITS OWN NUTRITION.  TURNS OUT
16   THAT'S NOT THE WAY WE'RE BUILT.  THERE ARE SEVERAL ARTERIES
17   THAT COME OFF OF THE AORTA THAT COME AROUND AND FEED THE HEART
18   MUSCLE AND GIVE IT ITS OWN SEPARATE BLOOD SUPPLY, AND THOSE
19   ARTERIES ARE CALLED THE CORONARY ARTERIES.
20     Q.   AND DOCTOR, BEHIND THAT ILLUSTRATION IS ANOTHER
21   ILLUSTRATION.  DOES IT SHOW THOSE CORONARY ARTERIES THAT YOU
22   WERE TALKING ABOUT?
23     A.   IT DOES.  THIS IS MORE OF A THREE-DIMENSIONAL RENDERING
24   AND, LIKE MOST ARTISTS, TO MAKE IT EASIER TO FIGURE OUT, THEY
25   PUT THE ARTERIES IN RED AND VEINS IN BLUE.  IN THIS CASE THERE
page 500
1    IS TWO HEART ARTERIES:  A LEFT HEART ARTERY THAT SPLITS INTO
2    TWO DIVISIONS -- THE ANTERIOR DESCENDING ARTERY AND THE
3    CIRCUMFLEX CORONARY ARTERY THAT COMES DOWN THE BACK SIDE OF THE
4    HEART, AND THEN THE RIGHT CORONARY ARTERY THAT COMES DOWN THE
5    BOTTOM OR THE INFERIOR.
6      Q.   AND DOCTOR, YOU MENTIONED CORONARY ARTERY DISEASE.  WHAT
7    IS CORONARY ARTERY DISEASE?
8      A.   CORONARY ARTERY DISEASE REFERS TO ATHEROSCLEROSIS.
9    ATHEROSCLEROSIS IS A DISEASE OF ANY ARTERY, BUT IT'S PROMINENT
10   IN HEART ARTERIES.
11             AND ATHEROSCLEROSIS IS THE BODY'S RESPONSE TO INJURY,
12   AN ABNORMAL RESPONSE.  WHEN THE LINING OF THE ARTERY IS INJURED
13   THROUGH SOME PROCESS, ONE OF THE RESPONSES IS THE DEVELOPMENT
14   OF A THICKENED GROWTH OF THAT INNER LINING OF THE ARTERY.  A
15   LOT OF PEOPLE HAVE CONSTRUED THAT HEART ARTERY BLOCKAGE IS JUST
16   CHOLESTEROL THAT HAPPENS TO BUILD UP IN THE ARTERIES.  IN FACT,
17   CHOLESTEROL MAY HAVE AN IMPACT ON IT.  IT'S ACTUALLY A
18   THICKENED GROWTH WITHIN THE ARTERY WALL.  IT CAUSES THERE TO BE
19   A NARROWING IN THE ARTERY, AND IF IT BECOMES SEVERE, IT COULD
20   PREDISPOSE THE ARTERY TO BLOCKING IT COMPLETELY WITH THE BLOOD
21   CLOT WITHIN THAT DISEASED SEGMENT.
22     Q.   AND, DOCTOR, IS THAT WHAT WE TALK ABOUT WHEN WE SAY
23   "PLAQUE"?
24     A.   PLAQUE IS A DESCRIPTOR OF THAT THICKENED GROWTH BETWEEN
25   THE WALL.
page 501
1      Q.   HOW DOES PLAQUE DEVELOP?
2      A.   THE INSIDE LINING OF THE ARTERY, WHICH IS ONLY ONE OR TWO
3    CELLS THICK, THAT'S WHERE ALL THE ACTION IS.  THAT
4    INSIDE LINING OF THE ARTERY IS VERY BIOLOGICALLY ACTIVE.  IT
5    INTERACTS WITH BLOOD PRODUCTS.  IT SECRETES ENZYMES TO HELP
6    PREVENT BLOOD CLOTTING FROM OCCURRING.
7              IT HELPS -- IT INTERACTS WITH OTHER SUBSTANCES TO
8    ALLOW THE ARTERIES TO APPROPRIATELY DILATE WHEN THEY NEED TO,
9    AND SO THAT INNER LINING IS PRETTY CRUCIAL.  ONCE THAT INNER
10   LINING BECOMES DAMAGED IN SOME FASHION, THE ABNORMAL HEALING
11   PROCESS OCCURS, AND YOU CAN GET AN INFLAMMATION AND,
12   ESSENTIALLY, A THICKENED GROWTH OF THAT INSIDE LINING.  SO THE
```

EXHIBIT 3 - Trial Transcript Excerpts

• **Motion to Exclude Baldwin**

```
13    WALL OF THE ARTERY IS REALLY WHAT BECOMES THICKENED AND
14    PROTRUDED.
15    Q.    AND, DOCTOR, WHAT PERCENTAGE OF THE POPULATION WOULD HAVE
16    ATHEROSCLEROSIS OR SOME PLAQUE BUILDUP?
17    A.    WELL, A LARGE PERCENTAGE OF THE POPULATION HAS SOME DEGREE
18    OF PLAQUE BUILDUP; AND IT'S DEPENDING UPON AGE, BUT WE KNOW
19    FROM AUTOPSY STUDIES OF SOLDIERS -- AND I DON'T THINK MEN 18,
20    19 YEARS OLD FROM PREVIOUS COMPLEX THAT THEY ALREADY HAD THE
21    DEVELOPMENT OF EARLY ATHEROSCLEROSIS WITHIN THEIR AORTA AND
22    SOME OF THEIR OTHER ARTERIES, SO WE KNOW THAT IT OCCURS FAIRLY
23    EARLY ON, AND WE KNOW THAT SOME DEGREE OF ATHEROSCLEROSIS IS
24    PRESENT IN PROBABLY A VAST MAJORITY OF FOLKS.
25    Q.    JUST A COUPLE OF OTHER DEFINITIONS.  IF YOU CAN, WOULD YOU
page 502
1     TELL US WHAT A MYOCARDIAL INFARCTION IS.
2     A.    YES.  A MYOCARDIAL INFARCTION IS A HEART ATTACK.  AND IT
3     STARTS WHEN THERE IS COMPLETE OCCLUSION OF AN ARTERY, ALMOST
4     ALWAYS DUE TO A BLOOD CLOT THAT CAUSES THAT ARTERY TO NO LONGER
5     HAVE BLOOD FLOW.  AND THE HEART MUSCLE DOWNSTREAM FROM THAT
6     ARTERY THAT ORDINARILY RECEIVES ITS OXYGEN AND BLOOD SUPPLY
7     FROM THAT ARTERY STARTS TO BE INJURED AND STARTS AND CELL DEATH
8     STARTS TO OCCUR.
9           THE LONGER THE ARTERY IS BLOCKED, THE MORE DAMAGE
10    THAT OCCURS OVER TIME.  AND SO THAT'S HENCE OUR INTEREST IN THE
11    ONLY PREVENTING HEART ATTACKS BUT ALSO OUR INTEREST IN
12    INTERRUPTING HEART ATTACKS EARLY ON SO WE CAN SALVAGE AS MUCH
13    HEART MUSCLE AS WE CAN.
14    Q.    DOCTOR, IN THE COURSE OF THE TRIAL SO FAR, WE'VE HEARD THE
15    TERM "ISCHEMIA."  WHAT IS ISCHEMIA?
16    A.    ISCHEMIA IS MARCHING UP TO WHERE THE HEART HAS -- HEART
17    MUSCLE HAS LESS THAN ADEQUATE BLOOD SUPPLY.  NOT ENOUGH TO
18    CAUSE DAMAGE NECESSARILY, BUT LESS THAN IT'S HAPPY WITH.  AND
19    THE -- WE SEE ISCHEMIA IN PATIENTS THAT HAVE FLOW-LIMITING
20    BLOCKAGES IN THEIR ARTERIES WHEREBY THEY MAY BE FINE AT REST
21    BUT, WITH EXERCISE, WHEN THEIR HEART NEEDS MORE BLOOD MOVING
22    THROUGH THOSE ARTERIES, IT CAN INCREASE FLOW THROUGH THAT
23    NARROWED AREA.  AND SO THEY CONSEQUENTLY HAVE CHEST DISCOMFORT
24    THAT WE DESCRIBE AS ANGINA, AND SO IT CAN AFFECT HEART MUSCLES
25    DURING -- USUALLY DURING PERIODS OF EXERCISE AND ACTIVITY.
page 503
1     Q.    DOCTOR, YOU TALKED ABOUT CLOTS IN THE HEART.  RIGHT?
2     A.    YES.
3     Q.    BLOOD CLOTS IN THE HEART.  IS THAT SOMETHING THAT YOU
4     ENCOUNTER AND YOU TREAT IN YOUR PRACTICE?
5     A.    ALMOST EVERY DAY.
6     Q.    I MEAN, IS THAT A BIG PART OF WHAT YOU DO EVERY DAY?
7     A.    IT IS.  AND SO MANY OF OUR TECHNIQUES AND MEDICATIONS THAT
8     WE USE NOW ARE TARGETED TO REDUCING THE FREQUENCY OF CLOTS AND
9     ALLOWING CLOTS TO -- THAT ARE PRESENT TO BREAK UP AND MOVE
10    ALONG.
11    Q.    AND, DOCTOR, DO YOU HAVE AN UNDERSTANDING OF HOW THE
12    CLOTTING MECHANISM WORKS AND HOW IT AFFECTS THE HEART?
13    A.    YES.
14    Q.    WOULD YOU DESCRIBE THAT FOR US, PLEASE?
15    A.    CLOTTING MECHANISM IN GENERAL, WE'RE BUILT WITH A CLOTTING
16    MECHANISM THAT KEEPS US FROM BLEEDING TO DEATH IF WE GET CUT,
17    ESSENTIALLY.  IT ALLOWS BLEEDING TO STOP LONG ENOUGH FOR THOSE
18    DAMAGED TISSUES TO BECOME REPAIRED.  THE CLOTTING MECHANISM,
19    LIKE A LOT OF BODY PHYSIOLOGY, IS A BALANCE BETWEEN FACTORS
20    THAT CAUSE THE BLOOD TO CLOT AND FACTORS THAT PREVENT THE BLOOD
21    FROM CLOTTING.  AND THE REASON BEING IS THAT YOU WANT A BLOOD
22    CLOT WHEN YOU WANT IT, BUT YOU DON'T WANT IT AT OTHER TIMES
23    WHEN IT OTHERWISE COULD BE DAMAGING TO THE BODY.
24          SO WE'RE INTERESTED IN EVALUATING PATIENTS SPECIFIC
25    TO THAT BALANCE.  AND THERE MAY BE FACTORS THAT AFFECT
page 504
1     PLATELETS, THE LITTLE PARTICLES OF THE BLOOD THAT INITIATE
2     BLOOD CLOTTING IN SO MANY LOCATIONS, AND FACTORS THAT AFFECT
```

EXHIBIT 3 - Trial Transcript Excerpts

• **Motion to Exclude Baldwin**

```
 3   OTHER CLOTTING, OTHER CLOTTING FACTORS, PROTEINS THAT ARE
 4   SUBSEQUENTLY PRESENT WITHIN THE COURSE OF FORMING A BLOOD CLOT.
 5   Q.   I WANT TO TALK ABOUT DICKY IRVIN FOR A MOMENT.  WHO FIRST
 6   CONTACTED YOU ABOUT DICKY IRVIN'S CASE?
 7   A.   MR. KIRK GOZA.
 8   Q.   AND HE'S A LAWYER THAT WORKS WITH US IN THIS MATTER,
 9   RIGHT?
10   A.   YES.
11   Q.   AND WHEN DID HE FIRST CONTACT YOU?
12   A.   PROBABLY SPRING OF THIS YEAR.
13   Q.   HAD YOU WORKED WITH HIM BEFORE?
14   A.   I HAD.
15   Q.   AND HOW MANY TIMES DID YOU WORK WITH HIM?
16   A.   I THINK ONCE, ABOUT PROBABLY A GOOD TEN PLUS YEARS AGO.
17   IT MAY HAVE BEEN A SECOND CASE THAT I CONSULTED THAT I -- JUST
18   ONCE.
19   Q.   HOW MANY MEDICOLEGAL CASES HAVE YOU WORKED ON?
20   A.   ON AVERAGE, PROBABLY LESS THAN TEN A YEAR.  THAT I'VE
21   REVIEWED.  I'VE BEEN TO -- TESTIFIED IN COURT.  I THINK THIS IS
22   MAYBE THE FOURTH TIME SINCE I STARTED TO PRACTICE.  SO PRETTY
23   INFREQUENTLY.
24        AND I DO WORK FOR BOTH SIDES, FOR DEFENSE AND FOR
25   PLAINTIFFS.  ALTHOUGH THE MAJORITY IS FOR DEFENSE WORK FOR
page 505
 1   MEDICAL MALPRACTICE.
 2   Q.   AND YOU DO CHARGE FOR YOUR TIME AWAY FROM THE OFFICE; IS
 3   THAT RIGHT?
 4   A.   YES.
 5   Q.   YOU HAVE IN ALL THESE CASES?
 6   A.   ACTUALLY, IT'S NOT TIME AWAY FROM THE OFFICE; IT'S TIME
 7   AWAY FROM FAMILY.  SO IT'S REQUIRED.
 8   Q.   AND, DOCTOR, WILL YOU TELL US WHAT YOU DID, WHAT YOU
 9   REVIEWED IN PREPARING FOR YOUR OPINIONS IN THIS CASE?
10   A.   YES.
11   Q.   WHAT WAS IT?
12   A.   WELL, YOU HAVE A LONG LIST, BUT I HAD AN OPPORTUNITY TO
13   REVIEW A CONSIDERABLE AMOUNT OF LITERATURE THAT DEALT WITH
14   VIOXX IN DIFFERENT REGISTRY DATA, CLINICAL TRIALS, BASIC
15   SCIENCE INFORMATION THAT APPLIES TO VIOXX AND COX-2 INHIBITORS
16   AND THEIR EFFECTS ON PATIENTS.
17   Q.   WHEN YOU SAY "MEDICAL LITERATURE," IS THAT STUDIES THAT'S
18   ACTUALLY REPORTED IN MEDICAL JOURNALS?
19   A.   MOST OF THOSE WERE STUDIES THAT WERE REPORTED IN MEDICAL
20   JOURNALS.  THERE WERE SOME STUDIES THAT WEREN'T PUBLISHED THAT
21   ALSO PERTAINED TO VIOXX.
22   Q.   AND YOU REVIEWED THOSE AS WELL?
23   A.   I HAD AN OPPORTUNITY TO SEE SOME OF THAT INFORMATION.
24   Q.   AND HAVE YOU REVIEWED ANY ADDITIONAL MATERIALS SINCE
25   PREPARING YOUR EXPERT REPORT?
page 506
 1   A.   I HAD AN OPPORTUNITY TO LOOK AT DR. TOPAL'S DEPOSITION.
 2   Q.   AND DID IT CHANGE YOUR OPINIONS IN ANY WAY?
 3        MR. ISMAIL:  OBJECTION.  YOUR HONOR, MAY WE APPROACH?
 4        THE COURT:  SURE.
 5        MR. ISMAIL:  THIS IS NOT A DISCLOSED BASIS FOR
 6   DR. BALDWIN'S OPINION.  HE PROVIDED AN EXPERT REPORT IN WHICH
 7   HE LISTED THE MATERIALS HE RELIED UPON.  DR. TOPAL'S DEPOSITION
 8   WAS NOT IN IT.  OBVIOUSLY, IT WAS NOT EVEN TAKEN.  THERE WAS NO
 9   SUPPLEMENT EXPERT REPORT.  THERE IS NO LETTER TELLING US THIS
10   IS WHAT HE WAS GOING TO BE RELYING ON.
11        MR. BIRCHFIELD:  HE'S NOT RELYING ON IT.  THAT'S THE
12   WHOLE POINT.  I JUST ASKED HIM IF HE REVIEWED ANY ADDITIONAL
13   MATERIALS, AND I WANT TO ASK HIM IF IT CHANGED HIS OPINIONS IN
14   ANY WAY.  HE'S GOING TO SAY NO.  THAT'S IT.
15        MR. ISMAIL:  WHY ARE YOU REFERENCING TOPAL
16   SPECIFICALLY?
17        MR. BIRCHFIELD:  I'M ASKING HIM WHAT HE REVIEWED
18   BECAUSE I WANT THE JURY TO KNOW THAT THIS IS A MATTER THAT HE
```

**EXHIBIT 3 - Trial Transcript Excerpts**

• **Motion to Exclude Baldwin**

```
19   HAS REVIEWED AND THAT HE'S LOOKING AT IT, YOU KNOW, TO GET A
20   CLEAR ANSWER.
21           THE COURT:  ALL RIGHT.  OKAY.  I'VE HEARD THAT.  SO
22   LET'S NOT GET INTO TOPAL'S DEPOSITION.  LET ME TELL YOU THE WAY
23   I FEEL ABOUT THIS:  HE'S A CARDIOLOGIST.  HE SEEMS TO BE WELL
24   QUALIFIED AS A CARDIOLOGIST.  I THINK, AS A CARDIOLOGIST, HE
25   WOULD BE HELPFUL TO THE COURT AND THE JURY IN EXPLAINING
page 507
1    THINGS, LIKE THE ANATOMY OF THE HEART, LIKE CHOLESTEROL
2    PLAQUES, THE FORMATION OF CLOTS, HOW THEY FORM, THE TYPE OF
3    CLOTS THAT ARE FORMED, EVEN THE TYPE OF CLOT THAT MR. IRVIN
4    HAD, IF HE LOOKED AT THE AUTOPSY REPORT AND CAN DIAGNOSE THAT
5    PARTICULAR CLOT, THE SIGNIFICANCE OF CLOTS, HOW CLOTS AFFECT
6    THE FUNCTIONING OF THE HEART, BUT I WON'T LET HIM TESTIFY AS TO
7    THE PART, IF ANY, THAT VIOXX OR COX-2 INHIBITORS PLAYED IN MR.
8    IRVIN'S DEATH.  I DON'T FEEL THAT HE'S QUALIFIED BY VIRTUE OF
9    EXPERIENCE, TRAINING, TO TESTIFY AS TO THE SPECIFIC CAUSE OF
10   MR. IRVIN'S DEATH.  A GENERAL CAUSE OF CLOTS, THE GENERAL
11   FORMATION OF CLOTS, HOW THEY ARE FORMED, WHERE THEY ARE FORMED,
12   WHAT TYPE OF CLOT MR. IRVIN HAD, WHERE IT WAS -- ALL OF THOSE
13   THINGS HE HAS KNOWLEDGE AND EXPERIENCE, AND HE CAN TESTIFY TO.
14   BUT SPECIFICALLY WITH REGARD TO VIOXX OR ANY COX-2
15   INHIBITORS --
16           MR. BIRCHFIELD:  YOUR HONOR, DR. BALDWIN GIVES US THE
17   CLEAREST, STRONGEST, SPECIFIC CAUSATION IN THE CASE, AND IT IS
18   BASED ON HIS PRACTICE AS A PRACTICING CARDIOLOGIST.  HE WORKS
19   EVERY DAY WITH PATIENTS THAT HAVE HEART ATTACKS AND HAVE HEART
20   ATTACKS AS A RESULT OF CLOTS.
21           HE ALSO, HE KNOWS THE RISK FACTORS INVOLVED IN
22   EACH OF THESE CASES AND DETERMINES WHAT ROLE RISK FACTORS PLAY.
23   HE HAS EXAMINED THE MEDICAL RECORDS, HE'S EXAMINED THE
24   TESTIMONY OF THE WITNESSES IN THIS CASE, AND HE IS PREPARED.
25   HE HAS SAID UNDER OATH THAT BUT FOR VIOXX MR. IRVIN WOULD NOT
page 508
1    HAVE HAD A FATAL HEART ATTACK ON THAT DAY, BUT HE DOES IT
2    THOUGHT AN UNDIFFERENTIAL DIAGNOSIS, YOUR HONOR.
3            THE COURT:  I UNDERSTAND THAT.  I DON'T SEE HIM
4    QUALIFIED TO TESTIFY AS VIOXX.  I THINK HE CAN TESTIFY RISK
5    FACTORS.  I THINK THAT'S WITHIN HIS EXPERTISE.  HE CAN TESTIFY
6    AS TO WHAT RISK FACTORS, IF ANY, IRVIN HAD, WHAT'S THE
7    SIGNIFICANCE OF THE 60 PERCENT BLOCKAGE.  ALL OF THOSE THINGS
8    ARE WITHIN HIS PREROGATIVE.  THIS INDIVIDUAL HAS NEVER
9    DIAGNOSED ANYBODY WITH A VIOXX PROBLEM.  HE DOESN'T KNOW
10   ANYTHING ABOUT VIOXX.  HE SAID THAT HE HAS -- THAT HE'S NOT A
11   EXPERT IN VARIOUS FIELDS, BOTH IN HIS DEPOSITION AND IN HIS
12   QUESTIONING.  SO THAT'S MY RULING.  I UNDERSTAND YOUR POSITION,
13   BUT THAT'S MY RULING ON IT AND LET'S PROCEED.  I'M TELLING YOU
14   AT THE BENCH SO THAT I DON'T EMBARRASS ANYBODY, INCLUDING THE
15   DOCTOR, IN FRONT OF THE JURY.
16           MR. ISMAIL:  THANK YOU, JUDGE.  THANK YOU VERY MUCH.
17   I APPRECIATE IT.
18           MR. BIRCHFIELD:  YOUR HONOR, MAY WE APPROACH FOR JUST
19   A SECOND.  I'VE GOT TO HAVE A BREAK IF -- BECAUSE HIS OPINIONS
20   IN THIS CASE ARE VERY CLEAR WHEN I ASKED HIM, "DOCTOR, DID YOU
21   FORM ANY OPINIONS IN THIS CASE?"  "YES."  "WHAT WERE THEY?"
22   AND HE IS GOING TO SAY THAT VIOXX --
23           THE COURT:  I UNDERSTAND.  I'LL TAKE A 10-MINUTE
24   BREAK AT THIS TIME AND LET YOU GET SQUARED AWAY WITH HIM.  YOU
25   KNOW, I DON'T HAVE ANY PROBLEM WITH HIM TESTIFYING.  ALL THE
page 509
1    STUFF THAT HE'S TESTIFIED SO FAR IS OKAY, INCLUDING, YOU KNOW,
2    A LITTLE BIT MORE OF THE ANATOMY OF THE CLOTS, RISK FACTOR, THE
3    SIGNIFICANCE OF RISK FACTORS, ELIMINATING RISK FACTORS, WHAT
4    RISK FACTORS HE WOULD HAVE HAD, THE SPECIFICS ON THE CLOT IN
5    MR. IRVIN.
6            I'M ASSUMING AT THE AUTOPSY, HE OUGHT TO BE ABLE
7    TO LOOK AT THE AUTOPSY AND SAY WHERE IS THE CLOT OR WHERE THE
8    AUTOPSY PROTOCOL INDICATES THE CLOT IS, EVEN THE TYPE OF CLOT.
```

EXHIBIT 3 - Trial Transcript Excerpts

• **Motion to Exclude Baldwin**

```
 9     IF HE CAN DO THINGS FROM THERE, AND THE RISK FACTORS HE IS
10     AWARE OF FROM THE STANDPOINT OF REVIEWING THE MEDICAL DOCUMENTS
11     IN THE CASE.  BUT NOT THE PART THAT VIOXX HAS PLAYED.  I DON'T
12     THINK HE'S QUALIFIED TO DO THAT.  AND I THINK THERE ARE OTHER
13     PEOPLE WHO ARE QUALIFIED.  I'VE LOOKED AT THEM ALL, AND I TOLD
14     YOU-ALL PREVIOUSLY THIS.  OKAY?  WE'LL TAKE A BREAK HERE.
15             (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN
16     OPEN COURT.)
17             THE COURT:  MEMBERS OF THE JURY, IT'S NECESSARY FOR
18     US TO TAKE A 10-MINUTE BREAK AT THIS TIME.  IT WILL SPEED UP
19     THE TESTIMONY, SO WE'LL TAKE A 10-MINUTE BREAK AT THIS TIME.
20             (WHEREUPON, THE COURT TOOK A BRIEF RECESS.)
21             THE COURT:  WE'RE OUT OF THE PRESENCE OF THE JURY.
22     COUNSEL IS REURGING THE MOTION TO RECONSIDER THE QUESTION OF
23     WHETHER OR NOT THE COURT'S DAUBERT MOTION OR 702 MOTION
24     ALLOWING THIS WITNESS TO TESTIFY WITH RESTRICTING HIS TESTIMONY
25     IN GENERAL THE ANATOMY OF THE HEART, THE FUNCTIONING OF THE
page 510
 1     HEART, THE PHYSIOLOGY OF THE HEART, FUNCTIONING OF THE CLOTS,
 2     STRUCTURE OF THE CLOTS AND EVEN THE SIGNIFICANCE OF THE TYPE OF
 3     CLOT THAT MR. IRVIN HAD.  COUNSEL TAKES THE POSITION THAT HE
 4     USED PROPER METHODOLOGY AND BRINGS TO THE COURT'S ATTENTION THE
 5     FACT THAT HE DID REVIEW VARIOUS MATTERS.
 6             PERHAPS I WASN'T OVERLY CLEAR IN THIS RULING.  I
 7     DON'T NECESSARILY HAVE A PROBLEM WITH METHODOLOGY WITH THIS
 8     WITNESS.  THIS WITNESS SEEMS TO ME TO HAVE READ SOME OF THE
 9     ARTICLES AND HAS READ SOME OF THE MATERIAL THAT IS INTRODUCED
10     OR EITHER IN EVIDENCE NOW OR WILL BE IN EVIDENCE.  HE'S
11     REVIEWED SOME DEPOSITIONS THAT ARE RELEVANT TO THE MATTER.
12             THE PROBLEM THE COURT HAS WITH HIM ON 02 IS
13     QUALIFICATIONS, NOT METHODOLOGY.  IF I USE THE PROPER
14     METHODOLOGY, IF I LOOK AT ALL OF THE ARTICLES AND READ THE
15     ARTICLES AND COME TO THE CONCLUSION, I WILL HAVE USED THE
16     PROPER METHODOLOGY TO SATISFY DAUBERT, BUT I'M NOT A 702 EXPERT
17     BECAUSE MY QUALIFICATIONS BY VIRTUE OF EXPERIENCE, TRAINING IS
18     NOT THERE.
19             THIS INDIVIDUAL IS A CARDIOLOGIST, BUT HE KNOWS
20     NOTHING ABOUT VIOXX.  HE KNOWS NOTHING ABOUT COX-2 INHIBITORS
21     OTHER THAN WHAT HE'S READ.  HE HAS NO PERSONAL EXPERIENCE WITH
22     IT, NO TRAINING IN IT.  HE'S NOT AN EPIDEMIOLOGIST.  HE'S NOT A
23     RESEARCH SCIENTIST.  HE DOESN'T CONSIDER HIMSELF AN EXPERT IN
24     VIOXX.  HE DOESN'T CONSIDER HIMSELF AN EXPERT IN COX-2
25     INHIBITORS.  HE SAID THAT.  HIS QUALIFICATIONS ARE LACKING, NOT
page 511
 1     A METHODOLOGY.
 2             THE FACT THAT HE'S A CARDIOLOGIST DOESN'T MEAN
 3     THAT HE OUGHT TO BE ABLE TO TESTIFY AS TO THE EXQUISITE
 4     CAUSATION OF COX-2 INHIBITORS IN VIOXX.  THAT'S THE BASIS OF MY
 5     RULING, NOT METHODOLOGY.
 6             MR. BIRCHFIELD:  YOUR HONOR, IN REGARDS TO HIS
 7     EXPERIENCE WITH VIOXX, I THINK THERE IS A MISPERCEPTION THERE.
 8     HE WAS ASKED --
 9             THE COURT:  HE TESTIFIED TO.
10             MR. BIRCHFIELD:  HE WAS ASKED IF HE EVER PRESCRIBED
11     VIOXX, BUT HE DID NOT, BUT HE TREATED A LARGE NUMBER OF
12     PATIENTS THAT WERE ON VIOXX BECAUSE PATIENTS WOULD COME TO HIM
13     FOR CARDIAC PROBLEMS.
14             HE HAS REVIEWED, IN THE COURSE OF HIS PRACTICE
15     AS HE DOES AS A CARDIOLOGIST, WHETHER A PARTICULAR DRUG HAS AN
16     IMPACT ON THE CARDIAC CONDITION OF PATIENTS.  HE HAS DONE THAT
17     WITH VIOXX.  HE MAKES THOSE RISKS AND BENEFIT ANALYSES.  HE HAS
18     DONE THAT IN REGARDS TO VIOXX AND OTHER COX-2 INHIBITORS, AND
19     HE CAME TO THE CONCLUSION THAT THEY ARE PROTHROMBOTIC AND DID
20     NOT PRESCRIBE IT FOR THAT REASON.  SO HE HAS -- HE HAS
21     CONSIDERABLE EXPERIENCE, YOU KNOW, WITH VIOXX.
22             THE FACT THAT HE DID NOT PRESCRIBE IT DOES NOT
23     EQUATE TO HIM NOT HAVING EXPERIENCE THERE.  HE REVIEWED THE
24     LITERATURE NOT ONLY IN PREPARATION FOR THIS CASE, BUT HE ALSO
```

**EXHIBIT 3 - Trial Transcript Excerpts**

• **Motion to Exclude Baldwin**

25      REVIEWED THE MEDICAL LITERATURE THAT PERTAINS TO VIOXX IN THE
page 512
1       COURSE OF TREATING HIS PATIENTS.
2               SO HE DOES HAVE EXTENSIVE EXPERIENCE, YOUR
3       HONOR, YOU KNOW, WITH VIOXX, AND ON THE CROSS-EXAMINATION, WHEN
4       HE WAS ASKED ABOUT THAT, THAT WAS A LIMITED VIEW.  IT DOES NOT
5       FULLY DESCRIBE WHAT HIS EXPERIENCE WAS, AND THAT GOES DIRECTLY
6       TO HIS QUALIFICATION.
7               MR. SIZEMORE:  YOUR HONOR, MAY I?  DURING THE DAUBERT
8       HEARINGS WE MOVED VERY QUICKLY AND I DID PUT UP AND INTRODUCE
9       SEVERAL DEPOSITION EXCERPTS FROM DR. BALDWIN, AND WE NOT HAVE
10      GONE OVER THOSE YET.  HE ACTUALLY TESTIFIED THAT HE HAD SEEN
11      VIOXX AND CELEBREX ADVERSE EVENTS ESPECIALLY IN PATIENTS WHO
12      HAD DEVELOPED CONGESTIVE HEART FAILURE AND/OR HAD EXACERBATION
13      OF HYPERTENSION AND RENAL INSUFFICIENCY.
14              HE SAID THAT HE HAD TREATED PATIENTS FOR THOSE
15      CONDITIONS.  HE HAD ACTUALLY SAID -- THE QUESTION WAS, "ON HOW
16      MANY OCCASIONS DID YOU ADVISE PATIENTS TO DISCONTINUE VIOXX DUE
17      TO A SUGGESTED INCREASED RISK OF MI," THE EXACT ISSUE WE'RE
18      HERE TODAY ABOUT, JUDGE, AND HE SAID IT WOULD BE GREATER THAN
19      20 AND LESS THAN A HUNDRED TIMES.
20              THE COURT:  ALL RIGHT.  LET ME HEAR --
21              MR. ISMAIL:  YOUR HONOR, THE WITNESS TESTIFIED TODAY
22      AS HE DID IN HIS DEPOSITION THAT DICKY IRVIN IS THE FIRST MAN
23      HE'S EVER DIAGNOSED WITH A VIOXX-RELATED THROMBOTIC EVENT.
24      MR. SIZEMORE IS READING THE WITNESS' COMMENTS THAT IN REGARDS
25      TO HYPERTENSION AND EDEMA, A CLASS EFFECT WITH ALL NSAIDS,
page 513
1       WHICH IS NOT AT ISSUE IN THIS CASE.
2               AND SO THE FACT THAT ANY DOCTOR HAS SEEN EDEMA
3       WITH AN NSAID DOES NOT RENDER THEM QUALIFIED TO COME TO THIS
4       COURTROOM AND SAY THAT DICKY IRVIN DIED OF A BLOOD CLOT IN HIS
5       HEART.  HE'S NEVER DONE IT BEFORE HE WALKED INTO THIS COURTROOM
6       FOR THE FIRST TIME.
7               WITH RESPECT TO HIS QUALIFICATIONS, YOUR HONOR,
8       THAT HE'S NOT ONLY NOT PRESCRIBED COX-2'S NEVER DIAGNOSED A
9       THROMBOTIC EVENT FROM A COX-2, AND WE BELIEVE THAT HIS REVIEW
10      OF THE LITERATURE, I KNOW YOU'VE SEEN COMMENTS THAT HE'S READ
11      SOME OF THE LITERATURE, HIS OPINION IN THIS CASE IS, IT IS
12      PROTHROMBOTIC BECAUSE HE'S READ DR. RAY'S REPORT, HE'S READ
13      DR. LUCCHESI REPORT.  BOTH OF THOSE WITNESSES ARE GOING TO
14      TESTIFY IN THIS CASE.  YOU DON'T NEED HIM TO PARROT BACK WHAT
15      THOSE TWO WITNESSES HAVE SAID.  HE'S NOT INDEPENDENTLY
16      QUALIFIED TO OPINE.
17              THE COURT:  I DO UNDERSTAND THE ISSUE.  I'VE THOUGHT
18      ABOUT IT.  I'VE READ THE DEPOSITION, AND THE BEST I CAN DO IS
19      JUST LOOK IT OVER AND MAKE MY RULING, SO THAT'S MY RULING.
20      NOW, IT WAS BASED ON THE FACT THAT I'M NOT QUESTIONING THE
21      METHODOLOGY, BECAUSE HE'S USED SOME PROPER METHODOLOGY.  HE'S
22      READ THE MATERIAL, HE'S STUDIED THE DOCUMENTS, BUT MY PROBLEM
23      WITH THIS WITNESS IN THIS PARTICULAR CASE IS THAT HIS
24      EXPERIENCE LEVEL DOESN'T GIVE HIM EXPERTISE TO SATISFY EVEN THE
25      FIRST HURDLE.
page 514
1               AS I SAID, IF I USE THE PROPER METHODOLOGY, I'LL
2       PASS DAUBERT, BUT I'VE GOT TO FIRST BE ABLE TO GET PAST THE
3       EXPERIENCE LEVEL.  AND I AGREE, I HEARD HIM SAY THIS IS THE
4       FIRST TIME.  I'VE NEVER SEEN ANYBODY WITH -- THEN HE SAID,
5       WELL, SINCE MY DEPOSITION, I REALIZED THAT I SAW ONE PERSON
6       THAT I TREATED WITH VIOXX.  I MEAN, I HEARD HIM TESTIFY TO
7       THAT.  THAT'S WHAT HE SAID ON THE STAND.
8               MR. MEUNIER:  BUT, YOUR HONOR, UNDER 702 YOU CAN BE
9       QUALIFIED NOT JUST BY EXPERIENCE BUT BY KNOWLEDGE.
10              THE COURT:  I'M SATISFIED HE DOESN'T HAVE THE
11      KNOWLEDGE.  THAT'S MY RULING.
12              MR. BIRCHFIELD:  TWO POINTS, YOUR HONOR.  ONE, WE
13      PREPARED OUR CASE BASED ON THE DAUBERT RULINGS AND HIM BEING
14      ABLE TO GIVE SPECIFIC CAUSATION IN THIS CASE.  AND HE IS -- HE

EXHIBIT 3 - Trial Transcript Excerpts

• Motion to Exclude Baldwin

15    IS QUALIFIED, YOUR HONOR, HE DOES -- TO MAKE A DIFFERENTIAL
16    DIAGNOSIS AS TO CARDIAC EVENTS.  HE DOES IT EVERY DAY AS PART
17    OF HIS PRACTICE.
18         THE COURT:  I UNDERSTAND.  I TALK TO YOU-ALL AT THE
19    BENCH AS NOT TO EMBARRASS THE DOCTOR.  I'M ALWAYS CONCERNED
20    ABOUT TELLING SOMEBODY IN OPEN COURT WHERE WE'VE GOT PRESS AND
21    EVERYTHING, YOU'RE NOT QUALIFIED TO TESTIFY.  HE'S AN
22    EXPERIENCED DOCTOR.  HE'S A HARD-WORKING DOCTOR.
23         SO I TELL YOU THIS AT THE BENCH SO YOU KNOW MY
24    RULING, AND I RESERVED RULING ON THIS SPECIFIC POINT DURING
25    DAUBERT, AND SO I'M NOW TAKING THAT POSITION.  BUT THANK YOU
page 515
1     VERY MUCH.
2          MR. SIZEMORE:  YOUR HONOR, FOR THE RECORD CAN I JUST
3     READ --
4          THE COURT:  SURE.  EITHER NOW OR AFTER.  YOU CAN MAKE
5     A PROFFER ON IT.
6          THE MARSHAL:  ALL RISE.
7          THE COURT:  OKAY.
8     BY MR. BIRCHFIELD:
9     Q.   DR. BALDWIN, YOU TOLD US THAT YOU REVIEWED A SUBSTANTIAL
10    AMOUNT OF MATERIALS IN REGARD TO DICKY IRVIN; IS THAT CORRECT?
11    A.   I DID.
12    Q.   DID YOU REVIEW THE AUTOPSY REPORT?
13    A.   YES.
14    Q.   DID YOU FIND ANYTHING SIGNIFICANT IN THAT AUTOPSY REPORT?
15    A.   I DID.
16    Q.   TELL US WHAT YOU FOUND AND WHAT THE SIGNIFICANCE WAS.
17    A.   WELL, FIRST AND FOREMOST, THERE WAS AN INCLUSIVE BLOOD
18    CLOT IN THE ANTERIOR DESCENDING ARTERY.  THAT'S THE MAIN ARTERY
19    THAT COMES DOWN THE FRONT SIDE OF THE HEART.  AND THAT WAS IN
20    THE FACE OF ATHEROSCLEROSIS, BUT NOT THE SEVERE TYPE OF
21    ATHEROSCLEROSIS WITH CRITICAL NARROWING THAT WE TYPICALLY SEE
22    IN CONJUNCTION WITH A HEART ATTACK.
23    Q.   AND, DOCTOR, I THINK THE AUTOPSY REPORT SAID 60 PERCENT
24    OCCLUSION, IS THAT CORRECT?  IS THAT WHAT YOU RECALL?
25    A.   THAT'S WHAT IT SAID.
page 516
1     Q.   DO YOU CONSIDER THAT A SEVERE ATHEROSCLEROSIS?
2     A.   NO. AND IT HAS A LITTLE BIT TO DO WITH THE WAY THE
3     PATHOLOGISTS HAVE AN OPPORTUNITY TO LOOK AT THE HEART.  IT'S IN
4     PATIENTS THAT ARE EXPIRED, THE HEART IS NOT BEATING, THERE IS
5     NOT BLOOD PRESSURE IN THE ARTERIES, SO THE ARTERIES AREN'T
6     APPROPRIATELY DISTENDED AS THEY ARE IN A LIVE PATIENT.
7          PATHOLOGISTS DESCRIBE THE DEGREE OF BLOCKAGE BY THE
8     AREA THAT'S TAKEN UP OF THE ARTERY BY THE PLAQUE; AND WHEREAS
9     CARDIOLOGISTS, WE TYPICALLY DON'T GET AN OPPORTUNITY TO SEE
10    THAT.  WE SEE THE ARTERIES AS A PIPE.  WE SEE THE INSIDE LINING
11    OF THE ARTERY AS IT COMES DOWN.  AND SO THERE MAY BE AREAS THAT
12    ARE ONLY MINIMALLY NARROW, FIVE, TEN, PERCENT NARROWED, BUT
13    STILL HAVE SIGNIFICANT PLAQUE BECAUSE THE ARTERY WALL HAS
14    EXPANDED TO ALLOW FOR THAT WITHOUT CAUSING A NARROWING OF THE
15    ARTERY ITSELF.
16         AND SO 60 PERCENT OCCLUSION DUE TO PLAQUE AT AUTOPSY
17    GENERALLY DOES NOT CORRELATE WITH A NARROWING THAT IS
18    OBSTRUCTIVE.  AND SO I WOULD CONSIDER THIS A NONFLOW-LIMITING
19    BLOCKAGE.  ONE THAT, IF WE SAW ON CARDIAC CATHETERIZATION,
20    WOULD NOT CAUSE US GREAT CONCERN.
21    Q.   LET ME MAKE SURE WE UNDERSTAND THAT.  YOU'RE SAYING THAT
22    THERE IS A DIFFERENCE IN HOW A PATHOLOGIST WOULD CHARACTERIZE A
23    PERCENTAGE OF BLOCKAGE THAN A CARDIOLOGIST WOULD IN A LIVE
24    PATIENT?
25    A.   RIGHT.
page 517
1     Q.   AND SO WOULD YOU SAY THAT WHAT YOU SEE ON AUTOPSY WOULD BE
2     A GREATER PERCENTAGE BLOCKAGE THAN YOU WOULD SEE IN A LIVE
3     PATIENT?
4     A.   THAT'S CORRECT.

EXHIBIT 3 - Trial Transcript Excerpts

• **Motion to Exclude Baldwin**

```
 5     Q.   SO WHEN THE WHEN YOU READ THE PATHOLOGIST'S REPORT THAT
 6     SAID 60 PERCENT OCCLUSION, YOU WOULD CONSIDER IT TO BE WHEN HE
 7     WAS ALIVE, IT WOULD HAVE BEEN LESS THAN THAT?
 8     A.   CORRECT.  AT THE TIME OF THE CARDIAC CATHETERIZATION, WE
 9     WOULD LIKELY CONSIDER THAT TO BE A CONSIDERABLY LESS DEGREE OF
10     NARROWING.
11     Q.   DOCTOR, LET'S SAY THAT YOU HAVE A PATIENT THAT COMES IN,
12     DO YOU DO TESTS TO SEE WHAT THEIR PERCENTAGE OF BLOCKAGE IS IN
13     A -- IN THE ARTERIES OF THE HEART?
14     A.   WELL, A CARDIAC CATHETERIZATION STUDY WILL DEMONSTRATE
15     WHETHER OR NOT THERE IS APPRECIABLE NARROWING OF THOSE
16     ARTERIES.  IT DOESN'T SHOW THE SIZE OF THE PLAQUE PER SE.  WE
17     DO STRESS TESTS, EXERCISE STRESS TESTS, SOME EXERCISE
18     ULTRASOUND EXAMINATIONS OF THE HEART, OR OTHER TYPES OF STRESS
19     STUDIES, WHERE WE GIVE MEDICATIONS IN PLACE OF EXERCISE, TO TRY
20     TO ASSESS THE RELATIVE BLOOD FLOW TO THE DIFFERENT AREAS OF
21     HEART MUSCLE TO DETERMINE WHETHER OR NOT A BLOCKAGE IS REALLY
22     FLOW-LIMITING.
23     Q.   CAN YOU DESCRIBE FOR US HOW YOU DO INTERVENTIONAL
24     CARDIOLOGY; IS THAT RIGHT?
25     A.   RIGHT.
page 518
 1     Q.   SO WHEN SOMEBODY HAS A PROCEDURE, YOU TREAT IT?
 2     A.   THAT'S CORRECT.
 3     Q.   YOU GO INTO THE BODY WITH AN ANGIOPLASTY OR BALLOONS, THAT
 4     TYPE OF STUFF?
 5     A.   YES.
 6     Q.   DOCTOR, IF YOU HAVE A TEST THAT SHOWS A PATIENT HAS
 7     60 PERCENT OCCLUSION IN ONE OF HIS HEART ARTERIES, WHAT DO YOU
 8     DO FOR THAT PATIENT?
 9     A.   60 PERCENT OCCLUSION BASED ON THE PATHOLOGY DEFINITION?
10     Q.   YES.
11     A.   WE WOULD PUT THEM ON ASPIRIN.
12     Q.   YOU WOULDN'T DO ANY INTERVENTIONAL?
13     A.   NO.  THERE IS NO EVIDENCE TO SHOW THAT FIXING A BLOCKAGE
14     THAT'S NOT FLOW-LIMITING DOES ANYTHING GOOD FOR THE PATIENT
15     OTHER THAN TO SUBJECT THEM TO THE RISK OF THE PROCEDURE.
16     Q.   THEN, WHEN YOU SAY "FLOW-LIMITED," IS THAT A TERM
17     CARDIOLOGISTS TALK ABOUT?
18     A.   YES.
19     Q.   WHAT IS FLOW-LIMITING?  WHAT DO YOU MEAN BY THAT?
20     A.   ESSENTIALLY, THE SIZE OF THE ARTERY IS SUFFICIENT NOT ONLY
21     FOR THE HEART'S DEMANDS FOR BLOOD FLOW AT REST BUT, ALSO, THE
22     DEMANDS UNDER STRESS.  SO THE FLOW THROUGH THAT PIPE NEEDS TO
23     INCREASE PROPORTIONATELY TO THE INCREASED DEMANDS.
24          YOU CAN HAVE CONSIDERABLE NARROWING, UP TO 50 PERCENT
25     OR GREATER, DIAMETER NARROWING WHICH WOULD CORRELATE TO A
page 519
 1     HIGHER DEGREE AT PATHOLOGY, BEFORE THERE IS ENOUGH CONSTRICTION
 2     THERE THAT IT PREVENTS THE HEART DOWNSTREAM FROM GETTING THE
 3     BLOOD SUPPLY THAT IT NEEDS.
 4     Q.   ALL RIGHT.  AND, DOCTOR, WHEN YOU TALK IN TERMS OF A
 5     BLOCKAGE BEING CLINICALLY SIGNIFICANT, WHAT DOES THAT MEAN?
 6     A.   IT REFERS TO WHETHER OR NOT IT'S HEMODYNAMICALLY
 7     SIGNIFICANT TYPICALLY.  ENOUGH TO CAUSE PEOPLE TO HAVE EVIDENCE
 8     OF ISCHEMIA, WHICH WE TALKED ABOUT BEFORE, A HEART MUSCLE
 9     THAT'S NOT HAPPY WITH ITS BLOOD SUPPLY COULD CAUSE CHEST
10     DISCOMFORT, ET CETERA.
11     Q.   OKAY.  NOW, YOU SAID -- WELL, HEMODYNAMIC, WHAT IS THAT?
12     A.   HEMODYNAMIC REFERS TO BLOOD MOVING.  IF IT IS OBSTRUCTIVE
13     ENOUGH THAT IT ACTUALLY CHANGES THE FLOW THROUGH THE ARTERY.
14     Q.   SO THAT'S WHAT YOU'RE TALKING ABOUT IN FLOW-LIMITING?
15     A.   CORRECT.
16     Q.   AND SO BASED ON WHAT YOU SAW IN THE AUTOPSY REPORT, WOULD
17     YOU CONSIDER DICKY IRVIN TO HAVE A FLOW-LIMITING CONDITION?
18     A.   NO.
19     Q.   AND WHY?  IS THERE ANYTHING ELSE THAT WOULD SUGGEST THAT
20     HE DID NOT HAVE A FLOW-LIMITING CONDITION THAT YOU'RE AWARE OF?
```

**EXHIBIT 3 - Trial Transcript Excerpts**

• **Motion to Exclude Baldwin**

```
21    A.    NOT NECESSARILY FROM THE AUTOPSY, BUT I UNDERSTAND FROM
22    THE REST OF THE CLINICAL INFORMATION IS THAT HE COMPLAINED OF
23    NO SYMPTOMS, JUST EXERTIONAL CHEST DISCOMFORT PRIOR TO STARTING
24    MEDICATIONS OR PRIOR TO HIS AUTOPSY.
25    Q.    OKAY.  AND YOU SAY "OTHER CLINICAL SYMPTOMS."  DID YOU
page 520
1     REVIEW SOME DEPOSITIONS AND GET AN IDEA OF WHAT HIS CLINICAL
2     PICTURE WAS LIKE?
3     A.    YES.
4     Q.    AND YOU SAY THERE WAS NOTHING THERE THAT WOULD SUGGEST
5     THAT HE HAD A FLOW-LIMITING CONDITION?
6     A.    THAT'S CORRECT.
7     Q.    WHAT WOULD YOU EXPECT TO SEE IN SOMEONE WHO HAD A
8     FLOW-LIMITING CONDITION?
9     A.    A MORE TIGHTLY NARROWED ARTERY.  USUALLY DESCRIBED AT THE
10    TIME OF AUTOPSY NOT ONLY BY VIRTUE OF THE DESCRIPTION OF
11    PERCENT BLOCKAGE BUT A DESCRIPTION OF A VERY SMALL LUMEN,
12    MEANING THE OPENING OF THE OPENING OF THE ARTERY IS VERY
13    PINCHED IN AND SMALL.
14    Q.    IF SOMEONE HAD A FLOW-LIMITING CONDITION, WOULD YOU EXPECT
15    TO SEE SYMPTOMS?  WOULD THERE BE -- WOULD THERE BE CHEST PAINS
16    OR ANYTHING LIKE THAT?
17    A.    YES.
18    Q.    WHAT WOULD YOU EXPECT TO SEE?  ANYTHING BESIDES CHEST
19    PAINS?
20    A.    COULD BE SHORTNESS OF BREATH, COULD BE EXERCISE-INDUCED;
21    SHOULDER, NECK, OR JAW DISCOMFORT.
22    Q.    WAIT, DOES THAT COME HAND-IN-HAND:  IF YOU HAVE A
23    FLOW-LIMITING EXPERIENCE, DO YOU EXPERIENCE CHEST PAIN --
24    A.    YES.
25    Q.    -- OR SHORTNESS OF BREATH?  DOCTOR, WE'VE HAD SOME
page 521
1     DISCUSSION IN THE TRIAL ABOUT PLAQUE RUPTURE.  IS THAT
2     SOMETHING THAT YOU ENCOUNTER IN YOUR PRACTICE?
3     A.    YES.
4     Q.    WILL YOU DESCRIBE FOR US WHAT A PLAQUE RUPTURE IS.
5     A.    SURE.  WE TALKED A LITTLE BIT ABOUT ATHEROSCLEROTIC PLAQUE
6     BEING THAT THICKENED GROWTH IN THE ARTERY WALL.  AND SOME
7     PLAQUES HAVE VERY THIN CAPS, A THIN FIBROUS CAP OVER THE
8     SURFACE THAT SEPARATES THAT GROWTH FROM THE ARTERY BLOOD FLOW.
9     AND IF THAT CAP BECOMES SPLIT, FISSURED, OR CRACKED, THEN THEY
10    CAN EXPOSE THIS MATERIAL BENEATH THAT CAP, WHICH IS POOLED
11    CHOLESTEROL AND FRAGMENTS OF INFLAMMATORY CELLS THAT MAY HAVE
12    ALREADY DIED AND ARE BEING REABSORBED, COLLAGEN, OTHER
13    COMPONENTS OF THE ARTERY WALL, TO THE BLOODSTREAM, AND THAT MAY
14    ACT AS A STIMULUS FOR BLOOD CLOTTING TO OCCUR.
15    Q.    DOES A PLAQUE RUPTURE, DOES THAT ALWAYS END IN DEATH?
16    A.    NO. PROBABLY A VERY, VERY SMALL MINORITY OF THE PLAQUE
17    RUPTURES END UP IN CLINICAL EVENTS, HEART ATTACKS AND DEATH.
18    Q.    SO A PLAQUE RUPTURE WOULDN'T AUTOMATICALLY END UP IN EVEN
19    A HEART ATTACK?
20    A.    CORRECT.
21    Q.    HOW OFTEN DO PLAQUE RUPTURES OCCUR?
22    A.    WE PROBABLY ALL HAVE PLAQUE RUPTURES, MAYBE EVEN EVERY
23    DAY.  SO THEY ARE VERY FREQUENT.  THEY DON'T PROCEED TO
24    OCCLUSIVE THROMBUS THAT CAUSES A CLINICAL EVENT, EXCEPT IN
25    CIRCUMSTANCES WHERE THE NARROWING IS SEVERE ENOUGH THAT YOU
page 522
1     DON'T HAVE TO FORM MUCH BLOOD CLOT FOR THE CLOT TO BE OCCLUDED
2     OR IN CIRCUMSTANCES WHERE THERE IS AN IMBALANCE IN THE CLOTTING
3     MECHANISM THAT FORMS THE DEVELOPMENT OF THE CLOT OTHERWISE.
4     Q.    WELL, DESCRIBE FOR US, DOCTOR, HOW IT WOULD WORK, HOW YOU
5     WOULD HAVE A PLAQUE RUPTURE THAT DIDN'T LEAD TO A CLOT
6     FORMATION IN NORMAL CIRCUMSTANCES.
7     A.    AS WE TALKED A LITTLE BIT ABOUT BEFORE, THERE IS A BALANCE
8     IN THE BODY'S CLOTTING MECHANISM THAT, AS A CLOT STARTS TO
9     FORM, THERE IS FACTORS THAT ARE ALREADY COMING INTO PLAY TO
10    HELP INTERACT OR INTERFERE WITH THAT OR CAUSE THE CLOT TO
```

EXHIBIT 3 - Trial Transcript Excerpts

• **Motion to Exclude Baldwin**

```
11      DISSOLVE AND GO AWAY.  SO IT'S A BALANCE BETWEEN THOSE TWO.
12              MOST PLAQUE RUPTURES HAVE PLATELET DEPOSITION AND
13      FIBRIN DEPOSITION, ONE OF THE INITIAL COMPONENTS TO A CLOT, TO
14      ALLOW THAT -- ALLOW THAT RENT IN THE ARTERY WALL TO BE COVERED
15      OVER TO THEN ALLOW IT TO HEAL UNDERNEATH THAT COVER.  BUT THAT
16      COVERING DOESN'T PROLIFERATE ENOUGH TO CAUSE IT TO BE OCCLUDED.
17      Q.    THANK YOU.  YOU SAID "DEPOSITIONS."  WE'VE HAD SOME
18      DEPOSITIONS IN THE TRIAL, BUT WHAT ARE YOU TALKING ABOUT IN
19      TERMS OF THE INNER WALL OF THE VESSEL?  WHAT ARE YOU TALKING
20      ABOUT, A DEPOSITION?
21      A.    WE'RE TALKING ABOUT PROTEINS THAT, IN RESPONSE TO
22      PLATELETS STICKING TOGETHER AND OTHER PROTEINS COME INTO THAT
23      AREA, POLYMERIZE AND FORM A GELATINOUS TYPE SUBSTANCE THAT
24      OVERLIES THAT AREA OF INJURY.
25      Q.    SO IF THE CLOTTING MECHANISM IS NORMAL, AND YOU HAVE A
page 523
1       PLAQUE RUPTURE, YOU WOULDN'T EXPECT A CLOT FORMATION; IS THAT
2       RIGHT?
3               MR. ISMAIL:  OBJECTION, LEADING.
4               MR. BIRCHFIELD:  IS THAT RIGHT OR NOT?
5               THE COURT:  I'LL LET THAT GO.  WE'VE GOT TO GET TO
6       IT, SO I OVERRULE THE OBJECTION.  CAN YOU ANSWER?
7       BY MR. BIRCHFIELD:
8       Q.    IF YOU HAVE A PLAQUE RUPTURE AND THE CLOTTING MECHANISM IS
9       NOT DISRUPTED, YOU WOULD NOT EXPECT TO SEE A CLOT?
10      A.    IN AN ARTERY THAT WASN'T TIGHTLY NARROWED, I WOULDN'T
11      EXPECT TO SEE A CLOT.
12      Q.    NOW, BASED ON THE CLINICAL FACTORS THAT YOU'RE AWARE OF IN
13      DICKY IRVIN'S CASE, AND BASED ON WHAT YOU SAW ON THE AUTOPSY,
14      WHAT TREATMENT WOULD YOU RECOMMEND -- IF HE WAS ALIVE AND HE
15      CAME TO SEE YOU, WHAT COURSE OF TREATMENT WOULD YOU HAVE
16      RECOMMENDED?
17      A.    ASPIRIN.
18      Q.    ASPIRIN ONLY?
19      A.    RIGHT.
20      Q.    NO OTHER PROCEDURES THAT YOU DO FOR INTERVENTIONAL
21      CARDIOLOGY?
22      A.    WELL, NO.  I WOULD NOT HAVE RECOMMENDED A PROCEDURE BASED
23      ON THAT INFORMATION.
24      Q.    AND, DOCTOR, DO YOU TREAT PATIENTS THAT ARE SEEING OTHER
25      DOCTORS AS THEIR GENERAL PHYSICIAN?
page 524
1       A.    ABSOLUTELY.
2       Q.    SO IF SOMEONE HAS JUST ORDINARY AILMENTS, THEY WOULD SEE
3       ANOTHER DOCTOR; IS THAT RIGHT?
4       A.    THEY MAY HAVE TWO OR THREE.
5       Q.    THEY ONLY COME TO YOU FOR CARDIOLOGY ISSUES?
6       A.    CORRECT.
7       Q.    AND, DOCTOR, DO YOU TREAT PATIENTS THAT ARE ALREADY ON
8       MEDICATIONS BEFORE THEY COME TO YOU?
9       A.    YES.
10      Q.    AND AS PART OF YOUR -- AS PART OF YOUR PRACTICE, DO YOU
11      MAKE YOURSELF FAMILIAR WITH HOW THOSE DRUGS THAT THEY MAY BE
12      TAKING WOULD AFFECT THEIR CARDIAC CONDITION?
13      A.    YES.
14      Q.    AND HOW DO YOU DO THAT?  WHAT DO YOU DO TO DETERMINE IF
15      THOSE DRUGS WOULD AFFECT THE CARDIAC CONDITION?
16      A.    WELL, WE TRY TO READ WHAT'S AVAILABLE TO US.  IT COULD BE
17      THE PDR OR THE PACKAGE INSERT IN REGARDS TO PARTICULAR
18      MEDICINES, JOURNAL ARTICLES, TO THE MEDICAL LETTERS, THE
19      JOURNAL THAT TALKS ABOUT NEW DRUGS AS THEY COME OUT.  SO WE
20      REVIEW THOSE INFORMATION AND TALK ABOUT -- AT MEETINGS TALK
21      ABOUT HOW NONCARDIAC DRUGS AFFECT CARDIAC PATIENTS.
22      Q.    IS THAT AN IMPORTANT PART OF YOUR PRACTICE AS A
23      CARDIOLOGIST?
24      A.    IT IS.
25      Q.    AND, DOCTOR, WE'VE HAD SOME MENTION OF THE RISK BENEFIT
page 525
```

EXHIBIT 3 - Trial Transcript Excerpts

• **Motion to Exclude Baldwin**

```
 1    ANALYSIS OF DRUGS.  WHAT DOES THAT MEAN?
 2    A.    THE ENTIRE PRACTICE OF MEDICINE IS ESSENTIALLY AN
 3    EVALUATION OF RELATIVE RISKS VERSUS RELATIVE BENEFITS.  AND
 4    THAT APPLIES TO MEDICATIONS, IT APPLIES TO DIAGNOSTIC
 5    PROCEDURES, IT APPLIES TO THERAPEUTIC OR PROCEDURES THAT FIX
 6    THINGS.  AND SO WE'RE CONSTANTLY TRYING TO EVALUATE, FOR GIVEN
 7    PATIENTS, WHAT THE RELATIVE RISKS VERSUS THE BENEFITS OF
 8    PARTICULAR TREATMENT OR MEDICINE.
 9    Q.    AND, DOCTOR, YOU WERE ASKED EARLIER BY MR. ISMAIL IF YOU
10    EVER PRESCRIBED VIOXX.
11    A.    NOT THAT I RECALL.
12    Q.    BUT, DOCTOR, DID YOU TREAT PATIENTS THAT WERE TAKING VIOXX
13    FROM OTHER DOCTORS WHEN THEY CAME TO SEE YOU?
14    A.    YES.
15    Q.    AND APPROXIMATELY HOW MANY?
16    A.    LESS THAN A HUNDRED.
17    Q.    NOW, DID YOU GO THROUGH THAT RISK BENEFIT ANALYSIS IN
18    REGARDS TO -- IN REGARDS TO VIOXX FOR YOUR CARDIAC PATIENTS?
19    A.    ON AN ONGOING BASIS, THAT RISK BENEFIT ANALYSIS CHANGED AS
20    WE KNEW MORE ABOUT THAT PARTICULAR MEDICATION.
21    Q.    AND WHAT DID YOU DO TO EVALUATE THE RISK AND THE BENEFITS
22    OF VIOXX?
23          MR. ISMAIL:  I OBJECT, YOUR HONOR.
24          THE COURT:  WELL, I'LL LET HIM TESTIFY AS TO WHAT HE
25    DID IN HIS OWN PRACTICE.  I'LL OVERRULE THAT OBJECTION.
page 526
 1          THE WITNESS:  I WAS AWARE OF LITERATURE AND
 2    SUBSEQUENT EXPERTS THAT HAD STUDIED THOSE LITERATURES THAT HAD
 3    OPINIONS.  WE HAD COMMUNICATIONS BETWEEN US WITHIN OUR PRACTICE
 4    AND WITH OTHER PHYSICIANS AT MEETINGS.  AND WE ARE -- I'LL STOP
 5    THERE.  BUT WE TRY TO GATHER INFORMATION ON AN ONGOING BASIS
 6    AND THEN MAKE ADJUSTMENTS IN OUR THERAPIES BASED UPON OUR
 7    PERCEIVED RELATIVE RISKS.
 8    BY MR. BIRCHFIELD:
 9    Q.    AND YOU DID THAT SPECIFICALLY WITH VIOXX, RIGHT?
10    A.    I DID.
11    Q.    AND WHAT DETERMINATION DID YOU REACH IN REGARD TO THE RISK
12    BENEFIT ANALYSIS FOR VIOXX ON THE PATIENTS THAT YOU WERE
13    TREATING FOR CARDIAC CONDITIONS?
14    A.    I CAME TO THE CONCLUSION THAT BASED ON MY OBSERVATIONS OF
15    THOSE PATIENTS AND SOME OF THE ADVERSE EFFECTS THAT THEY HAD
16    ASSOCIATED WITH THE MEDICATIONS, IN ADDITION TO SOME OF THE
17    LITERATURE THAT WAS BECOMING AVAILABLE THAT THERE WAS
18    SIGNIFICANT POTENTIAL RISK FOR PATIENTS DUE TO THAT MEDICATION
19    SUCH THAT I ADVISED PATIENTS TO TRY TO FIND A DIFFERENT
20    MEDICATION.
21    Q.    AND DID YOU HAVE ANY DISCUSSIONS OR ANY COMMUNICATION WITH
22    THEIR DOCTORS THAT HAD ACTUALLY PRESCRIBED IT?
23    A.    YES.
24    Q.    AND WHAT DID YOU SAY?
25    A.    MY CORRESPONDENCE TO THEM TYPICALLY WAS:  I'VE SEEN JOHN
page 527
 1    SMITH FOR HIS CORONARY ARTERY DISEASE, THAT HE'S DOING WELL,
 2    AND THEN REVIEWED AT THE END, I'VE ASKED MR. SMITH TO SEEK YOUR
 3    GUIDANCE IN REGARDS TO AN ALTERNATIVE TO -- AND I DIDN'T LIMIT
 4    IT TO VIOXX.  I INCLUDED THE OTHER COX-2 INHIBITORS, IN LIGHT
 5    OF SOME OF THE RECENT LITERATURE AND MY CONCERNS OVER MY
 6    EXPERIENCE WITH THOSE PATIENTS.
 7    Q.    DOCTOR, YOU TREAT PATIENTS THAT HAVE HAD HEART ATTACKS; IS
 8    THAT RIGHT?
 9    A.    EVERY DAY.
10    Q.    AND HOW MANY HEART ATTACKS HAVE YOU TREATED IN YOUR
11    CAREER?
12    A.    CERTAINLY HUNDREDS, PROBABLY THOUSANDS.
13    Q.    NOW, ISN'T HEART DISEASE THE NUMBER ONE KILLER IN OUR
14    COUNTRY?
15    A.    YES.
16    Q.    AND WHAT END ROADS HAVE BEEN MADE INTO TREATING OR CURBING
```

EXHIBIT 3 - Trial Transcript Excerpts

• **Motion to Exclude Baldwin**

```
17    THE PREVALENCE OF HEART DISEASE?
18    A.    IT'S ACROSS THE BOARD.  IT'S RISK FACTOR MODIFICATION.  IT
19    IS TECHNIQUES TO EARLIER DIAGNOSE CARDIAC DISEASE, LIFESTYLE
20    MODIFICATIONS, AND MEDICATIONS.
21    Q.    AND, DOCTOR, DO PATIENTS DIE EVERY DAY WITHOUT HEART
22    ATTACKS OR SUDDEN CARDIAC DEATH, WITHOUT ANY WARNING SIGNS?
23    A.    YES.
24    Q.    AND HOW DOES THAT HAPPEN?
25    A.    WELL, PATIENTS CAN HAVE A -- FIRST OF ALL, A MAJORITY OF
page 528
1     SUDDEN CARDIAC DEATH OCCURS IN CONJUNCTION WITH A HEART ATTACK.
2     BECAUSE IN THE EARLY MINUTES OF A HEART ATTACK IS THE TIME WHEN
3     THE HEART IS AT GREATEST RISK FOR AND ANY LIFE- THREATENING OR
4     LIFE-ENDING HEARTBEAT.  THE HEARTBEAT JUST DOESN'T RESPOND TO
5     THAT LACK OF OXYGEN AND BECOMES ELECTRICALLY UNSTABLE.  SO IN
6     LIGHT OF THE PREVALENCE OF CORONARY ARTERY DISEASE AND HEART
7     ATTACKS, THEN SUDDEN CARDIAC DEATH IS ALSO -- IS ALSO
8     INCREASED.
9     Q.    DR. BALDWIN, IN REVIEWING THE CLINICAL PICTURE OF DICKY
10    IRVIN AT THE TIME OF HIS DEATH AND REVIEWING THE INFORMATION
11    FROM THE AUTOPSY, IS HIS CONDITION SUCH THAT YOU WOULD EXPECT
12    TO SEE A SUDDEN CARDIAC DEATH OR HEART ATTACK?
13    A.    NO.
14    Q.    AND WHY NOT?
15    A.    WELL, ON SEVERAL POINTS.  IF WE LOOKED AT HIS RISK FACTOR
16    PROFILE, THIS GENTLEMAN LACKED MOST OF THE RISK FACTORS THAT WE
17    CONSIDERED THAT PUT PATIENTS AT HIGHER RISK FOR HEART ATTACKS
18    AND SUDDEN CARDIAC DEATH.  HE WAS NOT A DIABETIC; HE DIDN'T
19    SMOKE; HE DIDN'T HAVE EVIDENCE OF HIGH BLOOD PRESSURE, HIGH
20    CHOLESTEROL.  HE DIDN'T HAVE A FAMILY HISTORY OF PREMATURE
21    CORONARY ARTERY DISEASE.
22         HE WAS MALE AND HE WAS A BIG-FRAMED GENTLEMAN, MAYBE
23    MILDLY OBESE.  THAT WOULD BE AN ARGUMENT.  HE WAS SNEAKING INTO
24    AN AGE GROUP WHERE MEN START TO HAVE AN INCREASED RISK OF HEART
25    DISEASE, BUT I WOULD CONSIDER HIS RISK FOR CARDIAC EVENTS AND
page 529
1     DEATH TO BE QUITE LOW.
2     Q.    AND, DOCTOR, DO YOU TREAT PATIENTS THAT MEET THAT PROFILE?
3     A.    YES.
4     Q.    ON A DAILY BASIS?
5     A.    I DON'T SEE THEM WITH HEART ATTACKS AND SUDDEN CARDIAC
6     DEATH ON A DAILY BASIS.
7     Q.    WOULD THAT BE RARE?  UNUSUAL?
8     A.    IT WOULD BE VERY RARE.
9     Q.    DOCTOR, WHEN YOU TREAT A PATIENT THAT HAS EXPERIENCED A
10    HEART ATTACK, DO YOU -- AS PART OF YOUR PRACTICE, DO YOU LOOK
11    FOR THE CATALYST OR THE TRIGGER FOR THAT HEART ATTACK?
12    A.    YES.
13    Q.    IS THAT AN IMPORTANT PART OF YOUR PRACTICE IN TREATING
14    CARDIAC PATIENTS?
15         MR. ISMAIL:  YOUR HONOR.
16         THE WITNESS:  IT IS.
17         THE COURT:  WE'RE GETTING INTO AN AREA NOW THAT I'M
18    SENSITIVE TO, SO --
19         MR. BIRCHFIELD:  YES, SIR, I UNDERSTAND, YOUR HONOR.
20    BY MR. BIRCHFIELD:
21    Q.    IS THAT SOMETHING THAT YOU DO IN TREATING PATIENTS?  DO
22    YOU LOOK FOR A CATALYST OR A TRIGGER FOR THAT HEART ATTACK?
23    A.    YES.  WHEN WE SEE PATIENTS THAT HAVE EVENTS THAT ARE
24    UNEXPECTED, BASED ON THEIR ANATOMY OR THEIR RISK FACTORS, THEN
25    WE START TO SCRATCH OUR HEAD AND TRY TO FIGURE OUT ARE THERE
page 530
1     OTHER THINGS GOING ON THERE THAT TIP THIS PATIENT TO HAVING A
2     BLOOD CLOT AND CAUSING A HEART ATTACK.
3     Q.    THAT'S IMPORTANT TO KNOW, ISN'T IT, DOCTOR?
4     A.    IT IS.
5     Q.    I MEAN, IF YOU'VE GOT A CARDIAC PATIENT THAT HAS
6     EXPERIENCED A HEART ATTACK, AND YOU CAN IDENTIFY THE TRIGGER,
```

EXHIBIT 3 - Trial Transcript Excerpts

• **Motion to Exclude Baldwin**

```
 7    THEN YOU CAN TREAT BASED ON THAT TRIGGER; IS THAT RIGHT?
 8    A.    CORRECT.
 9            MR. ISMAIL:  YOUR HONOR --
10            THE COURT:  ALL RIGHT, COUNSEL, LET'S MOVE IT.  LET'S
11    MOVE ON.  I'LL SUSTAIN THE OBJECTION.
12            MR. BIRCHFIELD:  EXCUSE ME?
13            THE COURT:  HE HAD AN OBJECTION.  I SUSTAINED IT, AND
14    I ASKED YOU TO MOVE ON TO ANOTHER AREA.
15    BY MR. BIRCHFIELD:
16    Q.   WILL YOU DESCRIBE FOR US WHAT THE RISK FACTORS ARE FOR A
17    HEART ATTACK?
18    A.   YES.  BEING MALE OR BEING POSTMENOPAUSAL IN A FEMALE.
19    INCREASING AGE, HIGH CHOLESTEROL, SMOKING, HIGH BLOOD PRESSURE,
20    DIABETES, FAMILY HISTORY, AND OBESITY IS A WEAK ONE.  IF YOU
21    TAKE OUT THE INCREASED RISK OF DIABETES, HIGH CHOLESTEROL, AND
22    HIGH BLOOD PRESSURE OUT OF FOLKS THAT ARE OBESE, THEN THAT RISK
23    FACTOR REALLY DROPS OFF.
24    Q.   AND IN REGARDS TO THE RISK FACTORS AS THEY APPLY TO DICKY
25    IRVIN, WHAT DID YOU FIND?
page 531
 1    A.   I FOUND THAT HE HAD A VERY LOW-RISK PROFILE.
 2    Q.   AND WHAT WERE THOSE RISK FACTORS THAT YOU SAW WITH DICKY
 3    IRVIN?
 4    A.   WELL --
 5            MR. ISMAIL:  YOUR HONOR.  THAT'S THE SECOND TIME
 6    THROUGH THE SAME SET OF QUESTIONS.
 7            THE COURT:  YES.  ASKED AND ANSWERED.
 8    BY MR. BIRCHFIELD:
 9    Q.   BASED ON YOUR UNDERSTANDING OF HIS CLINICAL PICTURE, YOU
10    WOULD NOT HAVE EXPECTED DICKY IRVIN TO HAVE A HEART ATTACK
11    OUTSIDE OF A TRIGGER?
12            MR. ISMAIL:  YOUR HONOR.
13            THE COURT:  THAT'S BEEN ASKED AND ANSWERED.  ANYTHING
14    FURTHER?
15            MR. BIRCHFIELD:  JUST ONE SECOND, YOUR HONOR.
16            THE COURT:  DO YOU HAVE ANY CROSS?
17    BY MR. BIRCHFIELD:
18    Q.   BASED ON THE AUTOPSY REPORT THAT YOU REVIEWED, YOU SAID
19    THAT YOU TOLD US THAT ONE SIGNIFICANT FACTOR WAS THE CLOT THAT
20    YOU SAW IN THE LEFT ANTERIOR DESCENDING ARTERY?
21    A.   YES.
22    Q.   WERE THERE ANY OTHER SIGNIFICANT FINDINGS IN THE AUTOPSY?
23    A.   NO.
24    Q.   AND DID YOU FIND ANYTHING IN THE AUTOPSY THAT WOULD GIVE
25    ANY INDICATION ABOUT HIGH BLOOD PRESSURE?
page 532
 1    A.   YES.
 2    Q.   WHAT WAS THAT?
 3    A.   THERE WAS NO EVIDENCE OF THICKENING OF THE WALL OF THE
 4    LEFT VENTRICLE.  WHEN THE HEART WORKS UNDER CHRONIC HIGH BLOOD
 5    PRESSURE, IT BECOMES THICKENED, LIKE ANY OTHER MUSCLE THAT YOU
 6    WOULD USE REPETITIVELY OR UNDER HARD STRESS.  THERE WAS NO
 7    EVIDENCE OF THAT.
 8            AND THEN LIKEWISE, THERE WAS NO EVIDENCE OF DAMAGE TO
 9    THE KIDNEYS THAT YOU CAN SEE WITH SCARRING OR SHRINKAGE OF THE
10    KIDNEY IN RESPONSE TO HIGH BLOOD PRESSURE.
11    Q.   SO BASED ON THE AUTOPSY REPORT, DID YOU CONCLUDE WHETHER
12    OR NOT DICKY HAD HYPERTENSION?
13    A.   I DID NOT.
14            MR. ISMAIL:  YOUR HONOR --
15    BY MR. BIRCHFIELD:
16    Q.   WHAT ABOUT IN REGARDS TO THE HEART WEIGHT OR CARDIOMEGALY,
17    WHAT DID YOU FIND THERE?
18    A.   I DID NOT CONSIDER THAT TO BE CONSISTENT WITH
19    CARDIOMEGALY.  HEART SIZE IS PROPORTIONAL TO BODY SIZE, ROUGHLY
20    THE SIZE OF YOUR FIST; AND SO CONSEQUENTLY, THE SIZE OF THE
21    HEART AS DESCRIBED AT AUTOPSY FOR THE SIZE GENTLEMAN THIS WAS,
22    THIS DID NOT CORRELATE WITH CARDIAC ENLARGEMENT.
```

**EXHIBIT 3 - Trial Transcript Excerpts**

**• Motion to Exclude Baldwin**

```
23          Q.    DOCTOR, IN REGARDS TO THE CORONARY ARTERY DISEASE, HOW
24     WOULD YOU CATEGORIZE DICKY'S ATHEROSCLEROSIS?
25                MR. ISMAIL:  YOUR HONOR, SEVERAL TIMES.
page 533
1                 THE COURT:  YES, WE HAVE BEEN THROUGH THAT.  ASKED
2      AND ANSWERED.  I'LL SUSTAIN THAT OBJECTION.
3                 MR. BIRCHFIELD:  THAT'S ALL I HAVE, YOUR HONOR.
4                 THE COURT:  THANK YOU VERY MUCH.  ANY CROSS?
5                 MR. ISMAIL:  NO QUESTIONS, YOUR HONOR.
```