UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| | * | |
| Evelyn Irvin Plunkett v. Merck & Co, Inc.* | | CASE NO. 02:05CV4046 |

---

### PLAINTIFF'S RESPONSE TO DEFENDANT MERCK & CO., INC.'s MOTION TO EXCLUDE TESTIMONY OF ROBERT H. FLETCHER, M.S., M.Sc.

Defendant Merck & Co., Inc. ("Merck") has moved to exclude the expert testimony of Robert H. Fletcher, a medical doctor, former co-editor-in-chief of *Annals of Internal Medicine*, and co-author of a leading textbook on clinical epidemiology. Plaintiff Evelyn Irvin Plunkett has proffered Dr. Fletcher as an expert on the medical publication and peer review process, with a particular focus on two articles that appeared in the *New England Journal of Medicine*: a November 23, 2000 article by Bombardier et al on the VIGOR study,[1] and a March 17, 2005 article by Bresalier et al on the APPROVe study.[2]

Merck argues that Dr. Fletcher is not qualified to render opinions on clinical trials (especially Vioxx clinical trials), and that his specific opinions on VIGOR and APPROVe are speculative and rest on unreliable evidence. Since her initial proffer of Dr. Fletcher, Plaintiff has decided not to proffer his opinions on APPROVe. Merck's motion regarding those opinions is therefore moot. As to Dr. Fletcher's qualifications, it is hard to imagine a more

---

[1] Claire Bombardier, et al, *Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis*, 343 New Engl. J. Med. 1520 (2000).

[2] Robert S. Bresalier, et al, *Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial*, 352 New Engl. J. Med. 1092 (2005).

qualified expert on the publication of an article reporting on the results of an epidemiology or clinical study.  His opinions on VIGOR are based on a careful analysis of numerous documents, including but not limited to the text in the published article, manuscripts of the article, a memo containing statistical analyses conducted by a Merck employee, and the deposition of a *New England Journal of Medicine* editor.  Both his VIGOR opinions and his general opinions on the peer-review and publication process are well-supported, clearly reasoned, and eminently admissible.

## I.  DR. FLETCHER's QUALIFICATIONS

Dr. Fletcher's expert testimony will address the following types of questions:  Did Merck improperly withhold available information regarding VIGOR from the New England Journal of Medicine?  How did this withheld information affect the analysis of the VIGOR data, and how would it likely have affected the findings reported to the medical community?  Were the results as reported clear and understandable, and was the report logically consistent?  Were the findings in the VIGOR publication important to doctors who had to make decisions about whether or not to prescribe Vioxx to their patients?

As to what is expected of authors who submit articles to journals like the *New England Journal of Medicine*, Dr. Fletcher is clearly an expert.  From 1990 to 1993 he was co-editor-in-chief of "Annals of Internal Medicine, official journal of the American College of Physicians and the third most cited peer-reviewed clinical journal in the world."[3]  In that capacity he became familiar not only with the practices at his journal and its expectations of authors, but with practices and expectations typical of peer-reviewed medical journals in the United States and around the world.  He participated in the International Committee of

---

[3]         Expert Report of Robert H. Fletcher, M.D., M.Sc. (attached hereto as Exhibit 1) at Para. 5.

Medical Journal Editors,[4] and was a founding member of the World Association of Medical Editors.[5]

To the extent issues regarding the reporting and statistical interpretation of clinical trials are at issue regarding VIGOR, Dr. Fletcher's qualifications again could not be more stellar or relevant.  He is co-author of a book entitled Clinical Epidemiology: *The Essentials*, published by Lippincott Williams & Wilkins and now in its fourth edition.  Chapter 10 of this book addresses most of the major concepts relating to the interpretation of the VIGOR data: concepts like hypothesis testing, statistical significance, statistical power, point estimates, and inferential statistics.  A copy of this chapter is attached as Exhibit 2.

Until a few years ago, Dr. Fletcher was a practicing internist,[6] as well as a professor at the Harvard Medical School.  He is still actively teaching as an adjunct professor of epidemiology and social medicine at The University of North Carolina at Chapel Hill School of Medicine, where he teaches a class on clinical trials.[7]

Merck's motion to exclude suggests that without experience in Vioxx or COX-2 inhibitor research, Dr. Fletcher is not qualified to render opinions on how the results of such research were reported to the medical community.[8]  This argument is risible.  Concepts such as statistical significance don't change just because a specific drug is at issue.  Understanding the reasoning discussed in the VIGOR article with regard to the authors' supposed "finding

---

[4]      *Id.*

[5]      *Id.* at Para. 6.

[6]      He testified at his January 20, 2006 deposition ("Deposition") that he stopped seeing patients only about two years ago.  Transcript at 13:21-25.

[7]      Expert Report of Robert H. Fletcher, M.D., M.Sc. ("Report") at Para. 3.

[8]      Memorandum in Support of Motion of Merck & Co., Inc. ("Merck") to Exclude Testimony of Robert H. Fletcher, M.D., M.Sc. ("Merck Motion") at 4 ("he is not qualified to interpret clinical research on COX-2s, including data from Vioxx-related clinical trials").

that naproxen therapy was associated with a lower rate of myocardial infarction"[9] is in no way dependent on some special knowledge of Vioxx. He found a blatant inconsistency in the article as published, and he is exquisitely well-qualified to testify about how the information Merck withheld from the *New England Journal of Medicine* editors bore on the validity of the "naproxen cardioprotection" conclusion.

## II.   DR. FLETCHER's OPINIONS REGARDING VIGOR

Merck's motion to exclude Dr. Fletcher's testimony is devoid of any discussion of Dr. Fletcher's opinions regarding VIGOR. Those opinions are simply unassailable. He explained both in his report and at his deposition how and why the published article is misleading and why Merck's failure to tell the editors about the three additional heart attacks was such a serious breach of the peer review and publications process. In his report he made very clear that "the absence of a statistically significant difference in event rates (in this case in non-aspiring indicated patients) does not rule out the possibility that such a difference actually exists, especially, as in this case, if the estimate of risk is based on a small number of events."[10]

This statement is basic statistics. An epidemiologist who looked at three children and found that two had brown eyes would not conclude that two thirds of all children have brown eyes. The sample size would be too small. But based on this data the epidemiologist certainly would not leap to the conclusion that brown eyes are rare. The best estimate of the proportion of children with this eye color is two thirds, no matter how imprecise it might be.

In the VIGOR article, however, Merck suggested that the absence of a statistically significant difference between non-aspirin indicated people on Vioxx and non-aspirin

---

[9]     Claire Bombardier, et al, *Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis*, 343 New Engl. J. Med. 1520, 1527 (2000).

[10]    Report at Para. 32.

indicated people on naproxen meant there was no difference between the groups even though the relative risk for the data included in the publication was 2.25.  At Dr. Fletcher's deposition, counsel for Merck emphasized that the article did not explicitly make this false and illogical claim, but Dr. Fletcher responded that any reasonable reading of the article would lead one to understand that the heart attack rate was "decreased in the Naproxen group in patients who are aspirin indicated that should have gotten an aspirin like drug and that that rate wasn't increased in the people for whom aspirin was not indicated."[11]

With regard to the three unreported heart attacks, Dr. Fletcher agreed with *New England Journal of Medicine* editor Dr. Gregory Curfman that the data were very important.[12] He also reviewed and confirmed a statistical analysis by Dr. Harland Austin which shows that with the three additional heart attacks the relative risk in the non-aspirin indicated population rose from 2.25 to 3.0 and became at least borderline statistically significant.  The probability of seeing such a relative risk if the real relative risk were 1.0 (the implication of Merck's hypothesis that the VIGOR results were best explained by the cardioprotective effect of naproxen) would be on the order of only 4.7% to 7%.  In other words, the likelihood the higher risk was real and not due to chance varied from about 93% to about 95%.  As Dr. Fletcher explained in his report, for something as serious as heart attacks, one does not disregard such data if the significance level is one or two percent more than five percent.[13]

Moreover, as Dr. Fletcher noted in his report, Merck had data on adjudicated thrombotic cardiovascular serious adverse experiences that unequivocally *did* show a statistically significant difference between non-aspirin indicated people on Vioxx and non-

---

[11]        Deposition at 103:1-25.

[12]        Report at Para. 37.

[13]        Report at Para. 34.

aspirin indicated people on naproxen.[14]  Because there were more events, an analysis of "such

outcomes had a better chance of detecting differences in subgroups if they were present.  In

fact, this analysis did show that the risk was higher in the rofecoxib group even in patients

without aspirin indication."[15]

### III.     DR. FLETCHER'S OPINIONS REGARDING MERCK's OBLIGATIONS IN THE PEER REVIEW PROCESS

Merck attacks Dr. Fletcher's opinions on the peer review and publications process, and

Merck's failure to abide by accepted medical publication practices, only by mischaracterizing

and misrepresenting those opinions.  Dr. Fletcher's opinions relate not with how the *New*

*England Journal of Medicine* reviewed the VIGOR manuscript, but with what Merck did and

did not do.  Indeed, his opinion that information about the three additional heart attacks should

have been provided to the editors is not at all different from the testimony of Dr. Curfman.

Merck also argues that there can be no issue with its conduct because the VIGOR

manuscript was in fact accepted, as if getting past the peer review process means there could

not possibly be any errors or misstatements in an article.  Dr. Fletcher explained that the

process is not perfect,[16] that it's dependent on what the authors provide,[17] and that it's the

authors who ultimately are responsible for an article's content.[18]  These opinions are not

---

[14]      July 5, 2000, Merck internal memorandum, MRK-NJ0272446-458.

[15]      Report at Para. 36.

[16]      Report at Para. 13 ("there is no assurance that this process has made the published version perfect");
         Deposition at 83:17-20 ("articles are not perfect.  And that's a matter of research record.  So [editors] do
         their best to improve what the authors have given them, given whatever information the authors have
         provided.").

[17]      Report at Para. 14 ("For the peer review process to function effectively, the authors who submit
         manuscripts must provide complete and accurate information to the editors and peer reviewers.");
         Deposition at 136:21-22 ("The [responsibility] of authors is to provide all the information that they
         have.").

[18]      Deposition at 83:17-24 ("So [editors] do their best to improve what the authors have given them, given
         whatever information the authors have provided.  They try to, and push, the authors along to make it
         clearer, but in the end it is not their article.  They are just the publisher.  And it is the authors' article.").

speculative or unfounded.  They are based on his long and distinguished experience as a

medical journal editor.  In short, no one knows better than Dr. Fletcher how the process is

supposed to work.  No one is in a better position than he to explain how Merck abused the

process.

In the end, Merck's argument boils down to this:  "Even if we said the VIGOR results

support the finding that naproxen is protective when in fact they don't, we managed to

convince the editors of the *New England Journal of Medicine*, and that makes it so, even if it

makes no sense scientifically."  This false invocation of apparent authority over scientific

logic is the antithesis of what *Daubert* requires.  It is an argument no scientist would ever

accept.  Neither should this Court.

## IV.  CONCLUSION

For the foregoing reasons, Merck's Motion to Exclude Testimony of Robert H.

Fletcher, M.D., M.Sc. should be denied.

Respectfully submitted,

Andy Birchfield
**Beasley, Allen, Crow, Methvin,**
**Portis & Miles, P.C.**
234 Commerce Street
Montgomery, AL 36103
Phone:  (334) 269-2343
Fax:      (334) 954-7555


Bert Black
**Lockridge Grindal Nauen**
**P.L.L.P.**
100 Washington Avenue South,
        Suite 2200
Minneapolis, MN 55401
Phone:  612-339-6900
Fax:      612-339-0981

Christopher A. Seeger, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)

**Co-Lead Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
MEUNIER&WARSHAUER, L.L.C.
P.O. Box 960
191 East Second Street
New Roads, LA 70760
(225) 638-6137
(225) 638-8836 (fax)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS,
MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Thomas R. Kline, Esquire
KLINE&SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Carlene Rhodes Lewis, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced in accordance with Pre-Trial Order No. #8, on this 25th day of January, 2006.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In re: VIOXX PRODUCTS LIABILITY    *   MDL Docket No. 1657
LITIGATION                        *
                                     *   SECTION L
This document relates to       *
                                       *   JUDGE FALLON
ALL ACTIONS                   *
                                       *   MAGISTRATE JUDGE KNOWLES
                                       *
                                       *

**************************************** ****************************************

## EXPERT REPORT OF ROBERT H. FLETCHER, M.D., M.Sc.

**I.**     **Credentials and Qualifications.**

1.     A copy of my curriculum vitae is attached as Exhibit A. It includes a complete list of my publications. Over the last four years I have given no testimony, either at trial or at deposition. I am being compensated at the rate of $500 an hour for time spent working on this matter.

2.     A list of the materials I reviewed in the course of developing my conclusions and preparing this report is attached as Exhibit B.

3.     I am a general internist who is specialized in clinical epidemiology – the study of the research evidence base for patient care decisions. My current academic appointment is Professor Emeritus of Ambulatory Care and Prevention, Harvard Medical School, and Adjunct Professor of Epidemiology and Social Medicine, The University of North Carolina at Chapel Hill.

4.     I was founding Co-Editor of *Journal of General Internal Medicine*, the journal of the Society of General Internal Medicine, from 1984 to 1989.

5.     I was Co-Editor of *Annals of Internal Medicine*, official journal of the American College of Physicians and the third most cited peer-reviewed clinical journal in the world, from 1990 to 1993. In that capacity, I participated in the International Committee of Medical Journal Editors (ICMJE, "Vancouver Group"), an informal working group of Editors representing major journals throughout the world, such as the *New England Journal of Medicine*, the *Journal of the American Medical Association*, *Annals of Internal Medicine*, the *Lancet*, the *British Medical Journal*, the *Canadian Medical Association Journal*, and *The Medical Journal of*



*Australia*.  The ICMJE prepares policy statements on good editorial practices (www.icmje.org).

6.      I was a founding member of the World Association of Medical Editors (WAME), an association of editors who work together, through internet communications, to improve the level of medical journalism throughout the world.  I am currently Chair of WAME's Editorial Policy Committee, which is responsible for drafting statements of editorial policies for the Association.  A description of WAME and its policies can be found on the internet at www.wame.org.

7.      I currently serve on the International Advisory Committee of the *Lancet*, a leading medical journal published in England, and am an editor of UpToDate, an electronic textbook of medicine.

**II.      General Discussion of Medical Journals and the Review Process.**

8.      Peer reviewed medical journals are the main way in which the results of research are disseminated to the medical community, the popular media, and the public at large.  Submitted manuscripts are typically sent to two or more external ("peer") reviewers who advise authors on to how their manuscript could be improved and advise editors about whether the manuscript should be published in their journal. In the editorial review process, "manuscript" refers to the initially submitted version of an article and all subsequent versions except the final, published version.

9.      Peer reviewers' suggestions for improvement, along with summary comments from the editors, are transmitted to the authors.  Research manuscripts are rarely accepted outright, and in major medical journals most are rejected.  If authors are invited to resubmit the manuscript, they prepare a revised version of the manuscript and send it back to the journal with a covering letter to the editors that describes how they have dealt with each of the reviewers' and editors' comments.

10.     Authors are not required to change the manuscript in response to each comment, but they must give convincing reasons for recommendations they do not accept. There may be other rounds of this process before the manuscript is accepted for publication or rejected.  The goal is to make the description of scientific methods and results in the published article complete and accurate so that all stake-holders can judge the validity of the research for themselves.

11.     Typically, both authors and editors make value judgments throughout this process as to the most forthright and useful way to describe the research.  They must work together to fit a description of the research into the available space while maintaining information content and readability.

12.     The review process, from submission to acceptance, typically takes several months.  Sometimes this interval is shortened and the paper published

electronically before it appears in the print version of the journal. Such accelerated publication occurs when, in the opinion of the editors, it is in the public interest for the results to be available to all interested parties as soon as possible.

13.   It has been shown that peer review and editing improve articles. However, there is no assurance that this process has made the published version perfect.

14.   For the peer review process to function effectively, the authors who submit manuscripts must provide complete and accurate information to the editors and peer reviewers, and respond openly to requests for clarification or additional information. Editors' depend on the honesty and good faith of authors and have limited ability to recognize whether data have been withheld or falsified, so their failure to ask for information is not a justifiable reason for withholding it. Editors are not expected to discover information relevant to a submitted manuscript from sources other than the authors, such as the records of governmental organizations or the popular media.

15.   Medical journal editors attempt to prevent conflict of interest, bias, and misconduct in published articles. Editors are especially concerned about studies funded by pharmaceutical companies because they have a financial stake in the results. (See Tracy Hampton, *Biomedical Journals Probe Peer Review*, 294 JAMA 2287-8 (2005)) Editors are particularly concerned when the sponsor's role goes beyond funding the study to include data coding and analyses, and participation of company employees as investigators and authors.

**III.   The APPROVe Study.**

16.   The manuscript reporting results of the APPROVe trial that was first submitted to the *New England Journal of Medicine*, on February 6, 2005 (2005 NEJM 000286-318) included a table (Table 2) showing "rates and relative risks for confirmed thrombotic cardiovascular serious adverse events and APTC endpoint" (where "APTC" refers to Anti-Platelet Trialist Collaboration, a research groups that had defined criteria for cardiovascular endpoints that were used in the APPROVe study). (2005 NEJM at 000317) Table 2 did not include tabular data on investigator-reported cardiovascular ("CV") events. An earlier version of this manuscript, obtained by counsel from Merck, did include the tabulated data on investigator-reported CV events. (MRK-AFO0286560-583, at 0286583)

17.   An editor of the *New England Journal of Medicine*, in his covering letter to John Baron dated February 9, 2005 (2005 NEJM 000013-14, at 000013), asked that information about investigator-reported events be included in the table. Specifically, the editor's request was "Restore the investigator-reported events category to Table 2." He also asked that the authors remove "the assertion that increased risk was observed only after 18 months, because the event curves for other adverse events separate early." (2005 NEJM at 000014)

3

18. One of the reviewers (Reviewer E) also asked that investigator-reported events be included in Table 2: "You referenced the numbers of patients with a [sic] 'investigator-reported' events, but deleted this section of Table 2. Please restore." (2005 NEJM 000270-285 at 000283) This reviewer is referring to a note in Table 2, apparently left in the submitted manuscript inadvertently, "suggestion is to delete investigator-reported events." (2005 NEJM at 000317)

19. Investigator-reported events contain information that would have been useful to editors in deciding how the manuscript should be revised, whether or not they were included in the published manuscript. Adjudicated events differed from investigator reported events in two general ways. First, adjudicated events are a limited subset of all reported cardiovascular events. Some investigator-reported events were excluded by the adjudication process simply because they were not the kind of event for which the adjudicators were looking.[1] Second, adjudicated events had to meet rigorous research criteria and were not accepted if, for example, the clinical data needed to meet criteria were not complete. In any case, the investigators themselves seem to have thought that investigator-reported events were credible when they developed the study protocol. They had pre-specified investigator-reported events in their research protocol, calling them "secondary endpoints." (MRK-AHD0075757-75824 at 75766-67)

20. In the published article, the authors made brief reference to the numbers of investigator-reported serious thrombotic events (77 in the rofecoxib group and 44 in the placebo group), but did not include statistical analyses or time-to-event representations of these investigator-reported events in the revised manuscript. The published article did describe investigator-reported information on hypertension-related events and edema-related events (congestive heart failure, pulmonary edema, and cardiac failure) and summarized these results in Figure 3. Thus, the authors took an inconsistent position on the credibility of investigator-reported events within the article itself, not including them for thrombotic adverse events and including them for edema-related events.

21. The results that had been requested, on investigator-reported CV events in the rofecoxib and placebo groups, had been included in the earlier (January 10, 2005) version of the manuscript referenced above, which apparently was not provided to the editors. Table 2 in the January 10 version included investigator-reported serious cardiovascular thrombotic adverse events for rofecoxib and placebo groups for two time periods, 0-18 months and 19-36 months.

22. More complete presentation of investigator-reported thrombotic events over time was relevant to the interpretation of the apparent difference in risk of adjudicated events in the early (0-18 months) and later (18-36 months) time periods of the

---

[1] Compare Table 5 in a Cardiovascular Safety Report for APPROVe ("CSR") prepared after Vioxx was removed from the market (MRK-AHD0075757-75824 at 0775778) with Table 11 in the same document   (MRK-AHD075757-75824 at 0075790-91).

4

APPROVe study. While the overall relative risks for investigator-reported and confirmed events were similar in the January 10 version of Table 2 (1.84 and 1.96 respectively), the results in the two time periods were not, in my opinion. For months 0-18, the relative risk was 1.67 for investigator-reported events, with a 95% confidence interval of 1.01 to 2.76, indicating a difference between the placebo group and the rofecoxib group that was statistically significant at the conventional level. For months 19-36, the relative risk was 2.28, and the 95% confidence interval was 1.32 to 3.98, also statistically significant. Thus, for investigator-reported events, statistically significant elevations in CV risk were found in the rofecoxib group in both early and late time periods.

23. On the other hand, for confirmed events (the only information on CV events included in the manuscript submitted to the *New England Journal of Medicine*, and the only CV information included in the published version of the article), the relative risks for the two time periods were substantially different. In the earlier time period the relative risk was 1.12 (not statistically significant), and for the later time period the relative risk was 4.45 (which was statistically significant). The absence of statistical significance in the earlier period does not mean a difference could be ruled out. Rather, it means the investigators did not observe a difference beyond what could be have been expected by chance alone. The difference between the investigator-reported and confirmed data is accounted for by different rates at which investigator-reported events were confirmed in the rofecoxib and placebo groups.

24. In my opinion, reasonable scientists would conclude that the results for the investigator-reported events were different enough from results for the confirmed events, and represented useful enough information, that the editors should have seen them. Editors needed to see these results so that they could reach an adequately informed decision about whether to include them in the published paper. This is especially so in view of the concern expressed by the editor in the February 9, 2005 letter about the fact that "the event curves for other adverse events separate early." (2005 NEJM at 000014)

25. I agree that adjudicated events, if fairly done, are a sounder basis for final results of a trial than investigator-reported events. But both kinds of data contain important information. I agree with Dr. Curfman's comment, in his deposition, that "to draw the conclusion that somehow the adjudicated data are gold standard and the nonadjudicated data are, let's say, lead standard or bronze standard would not be a valid conclusion." (November 21, 2005 Deposition of Dr. Gregory Curfman at 316:15-19) As an editor I would have wanted to see the actual results based on both adjudicated and nonadjudicated data so that I, along with my colleagues in the editorial office, perhaps with the assistance of peer reviewers, could have participated in deciding whether it was in readers' best interests to include investigator-reported events in the published report.

26.    The strength of the evidence of adverse thrombotic events in the APPROVe study was limited by the small number of events. This is commonly the case for reports of adverse events based on randomized controlled trials of effectiveness. One way of overcoming this limitation is to combine data from similar studies so that, taken together, there are a sufficient number of adverse events to rule out chance as an explanation for the results. In fact, Merck had planned such a study, an analysis of pooled data on adverse events from the APPROVe study and two other trials (the VICTOR and ViP studies). The approved protocol for this analysis, Protocol 203, version 9.0, was dated 11 June 2003. (MRK-AFK0146567 - MRK-AFK0146727)

27.    I found no record that the authors had mentioned the existence of Protocol 203 to editors of the *New England Journal of Medicine*, even though the protocol had been written 20 months before the manuscript was submitted. Authors are expected to point out, in a covering letter to editors accompanying their manuscript, all of their other studies that are closely enough related to the manuscript under consideration to bear on its review and publication.

28.    I have reviewed a pooled analysis done by Dr. Nicholas Jewell, Professor of Biostatistics at the University of California, Berkeley. (Attached hereto as Exhibit C). In that analysis, the estimated relative risk for cardiac events in the Vioxx group, relative to the placebo group, was increased after 10 days of exposure to Vioxx and remained increased throughout the remainder of follow-up, 1095 days. If Protocol 203 data had been analyzed in the 5 months between stopping the three component trials (on September 30, 2004 when Vioxx was withdrawn from the market) and peer review of the APPROVe manuscript, it would have cast further doubt on the assertion that thrombotic events occurred only after 18 months of exposure to Vioxx.

## IV. The VIGOR Study.

29.    The VIGOR Study was primarily intended to describe differences in gastrointestinal complications in patients with rheumatoid arthritis randomized to rofecoxib or naproxen. Cardiovascular events were recorded as part of routine surveillance for safety.

30.    The VIGOR manuscript was submitted to the *New England Journal of Medicine* on May 18, 2000 (see faxed copy of printout from disk provided to the journal with the original submission), and published on November 23, 2000 (343 New Engl. J. Med. 1520-28 (2000)). VIGOR reported a statistically significant difference in the rates of adjudicated myocardial infarctions (MIs) in the naproxen and rofecoxib groups (0.1 % and 0.4%, respectively). The authors interpreted this difference as resulting from a protective effect of naproxen.

31.    In the May 18 manuscript, the authors noted that "Four percent of the study population met FDA criteria for aspirin use for secondary cardiovascular

6

prophylaxis (history of myocardial infarction, unstable or stable angina, cerebrovascular accident, transient ischemic attack, angioplasty, coronary bypass), but were not on low dose aspirin therapy.  These patients accounted for 38% of the myocardial infarctions in the study.  The difference in myocardial infarction rate between treatments in the other 96% of patients was much less apparent: rofecoxib (0.2%) vs. naproxen (0.1%).  (95% CI of difference, -0.1 to 0.3%)."  (See faxed copy of manuscript at fax page number 17).  In the final published version the authors similarly stated that: "The rate of myocardial infarction was significantly lower in the naproxen group than in the rofecoxib group (0.1 percent vs. 0.4 percent).  This difference was primarily accounted for by the high rate of myocardial infarction among the 4 percent of the study population with the highest risk of a myocardial infarction, for whom low-dose aspirin is indicated.  The difference in the rates of myocardial infarction between the rofecoxib and naproxen groups was not significant among the patients without indications for aspirin therapy as secondary prophylaxis."  (343 New Engl. J. Med. at 1526). The authors did not include in the manuscript or resulting article the actual number of events on which these summary statistics were based.

32.  Results showing no statistically significant risk of MI in patients without indication for aspirin use, and higher risk in those with indication for aspirin use, were interpreted as supporting the hypothesis that the aspirin-like effect of naproxen was protective and that the higher rates on rofecoxib were the result of these patients not taking aspirin, or a drug with similar effects (naproxen) for prevention of myocardial infarction.  However, the absence of a statistically significant difference in event rates (in this case in non-aspirin indicated patients) does not rule out the possibility that such a difference actually exists, especially, as in this case, if the estimate of risk is based on a small number of events.

33.  In any case, MIs are a subset of all clinically-important cardiovascular events, and by July 5, 2000, investigators at Merck noted, in an internal report, that 5 additional cardiovascular events had occurred since the February 10 cut-off date (presumably the one used for the results reported in the submitted manuscript). (MRK-NJ0272446-458).  In Table 4 (page 6) of that report, the relative risk for adjudicated thromboembolic serious adverse events was 0.53 (favoring naproxen) in patients in whom aspirin was not indicated.  The relative risk was 0.20 in the group for which aspirin was indicated.  Results for both groups were statistically significant.  Thus, cardiovascular risk was elevated in patients taking rofecoxib both in those who did not have indications for taking aspirin, as well as those who did have indications for taking aspirin.  These results were subsequently included in a February 1, 2001 memorandum from FDA medical officer Shari L. Targum to Sandra Cook and others regarding a review of the cardiovascular safety database on Vioxx.

34.  As reported in both the July 5, 2000 Merck internal memo and the Targum memo, with regard to MIs, the data favored naproxen (or were against rofecoxib) in both the aspirin indicated group (8 versus 0 events) and in the aspirin not indicated

group (12 versus 4 events). The 8 versus 0 difference was statistically significant, but the 12 versus 4 difference was reported as not statistically significant. Actually, the latter difference is close to the traditional cut-off point for statistical significance (.05 or one chance in 20 of being wrong), with whether it is above or below that value depending on what particular test of significance is used. I would not attach much scientific importance to whether the difference happens to be just above or just below the cut-off point, which is in any case arbitrarily chosen, especially for a life-threatening event such as myocardial infarction. In any event, as discussed in the preceding paragraph, there was a statistically significant difference for adjudicated serious thromboembolic adverse events even in the group for which aspirin was not indicated. That analysis may not have been available as of May 18, but it certainly was available well before the article was published or even accepted for publication.

35.   The VIGOR manuscript was under revision until September 13, 2000, when it was accepted by the *New England Journal of Medicine*. (2000 NEJM 000054-56) The article was published on November 23, 2000. Although the additional events, and different results, had been known at Merck since at least July 5, 2000, 2 months before the manuscript was accepted and 5 months before it was published, there is no record that the editors were notified of the additional outcome events, nor were these events included in the published article. If they had been, they would have undermined the assertion in the article that the difference in rates arose because high-risk patients in the rofecoxib group were not taking aspirin for secondary prophylaxis, and so were not benefiting from the aspirin-like protective effect afforded by naproxen.

36.   The submitted manuscript and published article reported the relative risk of myocardial infarction, just one of the several cardiovascular events that comprise thromboembolic serious adverse events as a whole. The analysis for this one endpoint, further divided into subgroups defined by aspirin indication, reduced the chance of finding a statistically significant relationship. Composite cardiovascular outcomes, as summarized in the July 5 memorandum and later reported to the FDA, are also clinically important, and an analysis of such outcomes had a better chance of detecting differences in subgroups if they were present. In fact, this analysis did show that the risk was higher in the rofecoxib group even in patients without aspirin indication.

37.   I believe that these additional outcome events and analyses, which were known well before the manuscript was accepted by the Journal, are relevant to the interpretation of the cardiovascular risks of these two drugs and should have been called to the attention of the editors. I concur with Dr. Curfman, who agreed at his deposition that "it would have been of interest to readers of the Journal to know that the results for the nonaspirin-indicated group achieved a level that was at least borderline significant." (November 21, 2005 Deposition of Dr. Gregory Curfman at 80:20-81:9) If editors had known about these results, they might have asked that they be included in the published manuscript. This would have led to a

8

substantially different interpretation of the cardiovascular risk findings, making it less plausible that the difference could be accounted for by the absence of an aspirin-like protective effect in the rofecoxib group, and not to rofecoxib itself.

38.     Editors of New England Journal of Medicine published an "expression of concern" with the VIGOR article in the journal's December 29, 2005 issue.  (353 New Engl. J. Med. 2813 (2005)).  In this editorial, the editors showed how lack of inclusion of the three additional cases of myocardial infarction, which were not reported to the journal or included in the VIGOR article, "resulted in an understatement of the difference in risk of myocardial infarction between the rofecoxib and naproxen groups…" and how this resulted in "misleading conclusions."

All opinions in this report are expressed to a reasonable degree of scientific or medical certainty. This report accurately states my opinions based on the information currently available to me. Should additional information become available, I will revise or add to my opinions as appropriate.

Robert H. Fletcher, M.D., M.Sc.

FOURTH EDITION

# Clinical Epidemiology
## The Essentials

**Robert H. Fletcher, M.D., M.Sc.**

*Professor*
*Department of Ambulatory Care and Prevention*
*Harvard Medical School*
*Boston, Massachusetts*

*Adjunct Professor*
*Departments of Epidemiology and Social Medicine*
*The University of North Carolina at Chapel Hill*
*Chapel Hill, North Carolina*

**Suzanne W. Fletcher, M.D., M.Sc.**

*Professor*
*Department of Ambulatory Care and Prevention*
*Harvard Medical School*
*Boston, Massachusetts*

*Adjunct Professor*
*Departments of Epidemiology and Social Medicine*
*The University of North Carolina at Chapel Hill*
*Chapel Hill, North Carolina*



LIPPINCOTT WILLIAMS & WILKINS
A Wolters Kluwer Company
Philadelphia • Baltimore • New York • London
Buenos Aires • Hong Kong • Sydney • Tokyo

EXHIBIT
2
tabbies®

*Acquisitions Editor:* Betty Sun
*Developmental Editor:* Emilie Linkins
*Marketing Manager:* Joe Schott
*Associate Production Manager:* Kevin P. Johnson
*Designer:* Holly McLaughlin
*Services/Compositor:* Seven Worldwide Publishing Solutions
*Printer:* Quebecor/Versailles

Copyright © 2005 Lippincott Williams & Wilkins

351 West Camden Street
Baltimore, MD 21201

530 Walnut Street
Philadelphia, Pennsylvania 19106-3621 USA

All rights reserved. This book is protected by copyright. No part of
this book may be reproduced in any form or by any means, including
photocopying, or utilized by any information storage and retrieval
system without written permission from the copyright owner.

The publisher is not responsible (as a matter of product liability, negligence, or otherwise) for any
injury resulting from any material contained herein. This publication contains information relating
to general principles of medical care that should not be construed as specific instructions for individual
patients. Manufacturers' product information and package inserts should be reviewed for current
information, including contraindications, dosages, and precautions.

*Printed in the United States of America*

First Edition, 1982
Second Edition, 1988
Third Edition, 1996

**Library of Congress Cataloging-in-Publication Data**

Fletcher, Robert H.
  Clinical epidemiology: the essentials/Robert H. Fletcher, Suzanne W. Fletcher.—4th ed.
    p. ; cm.
  Includes bibliographical references and index.
  ISBN 0-7817-5215-9 (alk. paper)
  1. Clinical epidemiology.  I. Fletcher, Suzanne W.  II. Title.
    [DNLM: 1. Epidemiologic Methods.  WA 950 F614c 2005]
RA652.2.C55F57 2005
614.4—dc22
  2004029660

*The publishers have made every effort to trace the copyright holders for borrowed material.*
*If they have inadvertently overlooked any, they will be pleased to make the necessary arrangements*
*at the first opportunity.*

To purchase additional copies of this book, call our customer service department at **(800) 638-3030**
or fax orders to **(301) 824-7390.** International customers should call **(301) 714-2324.**

***Visit Lippincott Williams & Wilkins on the Internet: http://www.LWW.com.*** Lippincott Williams
& Wilkins customer service representatives are available from 8:30 am to 6:00 pm, EST.

04 05 06 07 08
1 2 3 4 5 6 7 8 9 10

# CONTENTS IN BRIEF

**1**   **Introduction** .......................................... 1

**2**   **Abnormality** ......................................... 17

**3**   **Diagnosis** ............................................ 35

**4**   **Frequency** ........................................... 59

**5**   **Risk: Looking Forward** ........................... 75

**6**   **Risk: Looking Backward** ......................... 91

**7**   **Prognosis** .......................................... 105

**8**   **Treatment** ......................................... 125

**9**   **Prevention** ........................................ 147

**10**  **Chance** ............................................ 169

**11**  **Cause** .............................................. 187

**12**  **Systematic Reviews** ............................. 205

**13**  **Knowledge Management** ........................ 221

   **Appendix A—Answers to Review Questions** .................................... 233

   **Appendix B—Additional Readings** ............ 241



CHAPTER **10**

# Chance

## KEY WORDS

Hypothesis testing
Estimation
Statistically significant
Type I error (or α error)
Type II error (or β error)
Inferential statistics

Statistical testing
*P* value
Statistical tests
Null hypothesis
Statistical power
Point estimate

Statistical precision
Confidence interval
Sample size
Multiple comparisons
Secondary analyses
Multivariable modeling

> *Though . . . human beings are not unique in their responses to some treatment, there is no doubt that they are likely to be variable, and sometimes extremely variable. Two or three observations may, therefore, give, merely through the customary play of chance, a favorable picture in the hands of one doctor, an unfavorable picture in the hands of another.*
>
> — Sir Austin Bradford Hill, 1971

Learning from clinical experience, whether during formal research or in the course of patient care, is impeded by two processes: bias and chance. As discussed in Chapter 1, bias is systematic error, the result of any process that causes observations to differ systematically from the true values. In clinical research, a great deal of effort is aimed at avoiding bias whenever possible and controlling for and estimating its effects when bias is unavoidable.

On the other hand, random error, resulting from the play of chance, is inherent in all observations. It can be minimized but never avoided altogether. This source of error is called "random," because on average it is as likely to result in observed values being on one side of the true value as on the other.

Many clinicians tend to underestimate the importance of chance relative to bias when interpreting data. One might say, in essence, "If the statistical conclusions are strong, a little bit of bias can't do much harm." However, when data are biased, no amount of statistical elegance can save the day. As one scholar put it, perhaps taking an extreme position, "A well designed, carefully executed study usually gives results that are obvious without a formal analysis and if there are substantial flaws in design or execution a formal analysis will not help." (1)

In this chapter, chance is discussed in the context of a controlled clinical trial because it is a simple way

**169**