UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| Evelyn Irvin Plunkett v. Merck & Co, Inc. | * | CASE NO. 02:05CV4046 |

**PLAINTIFF'S RESPONSE TO DEFENDANTS MOTION TO EXCLUDE PROPOSED TESTIMONY OF WAYNE A. RAY, PH.D.**

COMES NOW Plaintiff Evelyn Irvin Plunkett, as Personal Representative of the Estate of Richard Irvin, Jr., by and through her attorneys, and responds to Merck's Motion to Exclude Proposed Testimony of Wayne A. Ray, Ph.D, as follows:

### INTRODUCTION

Merck's Motion to Exclude a portion of Wayne Ray, Ph.D's (hereinafter "Dr. Ray") opinions contains two separate arguments. First, Merck contends that Dr. Ray is a mere statistician and is unqualified to comment upon the mechanism of action by which Vioxx causes adverse events (i.e., the Fitzgerald Theory). Second, Merck contends that Dr. Ray should be barred from testifying about his assessment of the risk versus the benefits of Vioxx.

As will be further detailed below, both arguments must fail. Dr. Ray is eminently qualified to testify about both his pharmacoepidemiologic research of Vioxx as well as the risks and benefits of the drug. This is the very essence of his profession as a pharmacoepidemiologist. Dr. Ray is the Director of Pharmacoepidemiology at Vanderbilt University. He is a Professor of Preventative Medicine. Perhaps most importantly, the FDA

1

employs Dr. Ray to conduct the very type of analysis that Merck says he is unqualified to perform. The FDA then relies upon Dr. Ray's findings in determining what administrative actions to take in reference to the subject drug. Dr. Ray is qualified to give reliable testimony in the subject areas.

## ARGUMENT

### A. The Challenges Raised By Merck Were Previously Decided By This Court

Dr. Ray filed an initial report in this matter on or about September 21, 2005. A supplemental report was filed by Dr. Ray on January 11, 2006, after the mistrial of the initial proceedings. While several areas of revision/supplementation were included in Dr. Ray's January 2006 report, Merck has failed or declined to challenge these areas of the report and but instead re-asserts challenges raised, and already ruled upon by this Court, in the initial *Daubert* proceedings.

For example, the challenged opinions concerning biological plausibility are contained in Section 2 of both Dr. Ray's September 2005 report and his January 2006 report. The verbiage, opinions, and conclusions contained in both reports are identical. The introduction to section 2 (p. 10 Sept. report; p. 9-10 Jan. report) is verbatim. (September 21, 2005 Ray report (Ex. 1); January 11, 2006 Ray report (Ex. 2)). Section 2.1 (p. 10 Sept. report; p. 10 Jan. report) explaining the importance of Thromboxane is verbatim. Id. Section 2.2 (p. 10-11 Sept. report; p. 10-11 Jan. report) explaining the importance of Prostacyclin is verbatim. Id.

The similarity continues in the other sections of Dr. Ray's report, including the "Analysis and Conclusion Section" at pages 5 through 9. Id. More specifically, section 1 "NSAIDS" is verbatim in both reports; section 1.1 "History" is verbatim; section 1.2

"Mechanism of Action" is verbatim; section 1.3 "NSAID Gastropathy" is verbatim; section 1.4 "Coxibs" is verbatim and; section 1.5 "Rofecoxib" is verbatim.

Indeed, the only difference between the September and January reports is in the section that discusses biological plausibility where the second report contains a page break at page 9. The verbiage and conclusions concerning biological plausibility are the same.

This Court has previously addressed the reliability of this exact testimony in the initial *Daubert* proceedings. Merck challenged Dr. Ray's ability to opine on the issue of biological plausibility at the initial *Daubert* hearings. More specifically, according to the Court, Merck claimed, "As to biological plausibility, Merck claims that Professor Ray relied solely upon the Fitzgerald hypothesis to reach his conclusion that Vioxx causes a greater incidence of cardiovascular events. Merck claims that the Fitzgerald hypothesis is pure speculation. As such, Professor Ray's conclusion is based on unreliable information." (Order and Reasons, at 28 (Nov. 18, 2005)).

The Court's prior ruling on this issue is applicable:

> "Professor Ray is currently a professor of preventative medicine at Vanderbilt University School of Medicine. He is the director of Pharmacoepidemiology and of the Master of Public Health Program. He received a B.S. from the University of Washington, a M.S. from Vanderbilt University, and Ph.D. from Vanderbilt University.
>
> Professor Ray has carried out pharacoepidemiologic research for thirty years and is actively involved in the design, execution, and analysis of numerous pharmacoepidemiologic studies. He is a fellow of the International Society for Pharmacoepidemiology. He is the principal investigator for the Vanderbilt Center for Education and Research on Therapeutics and for a Cooperative Agreement with Food and Drug Administration. In these duties, he is continually required to evaluate and design studies that determine whether or not there is evidence that a medication causes an adverse reaction.
>
> Professor Ray has published more than 150 manuscripts in the peer reviewed literature. He also reviews articles for numerous leading medical journals.
>
> As principal investigator for the Cooperative Agreement with the Food and Drug Administration, Professor Ray regularly meets with officials form the FDA and

> his work involves rapid identification and confirmation of adverse medication reactions and assessment of appropriateness of medication use.
>
> In particular, Professor Ray has conducted several studies of the gastrointestinal and cardiovascular safety of the NSAIDs and coxibs. These studies have been published in several peer reviewed scientific journals.
>
> First, the Court finds that Professor Ray is adequately qualified to testify as to whether short-term use of Vioxx increases the risk of adverse cardiovascular risks. His career has been based around pharmacoepidemiologic investigations that concern the adverse and beneficial effects of medications."

Id. at 30-31.

The same wisdom followed by this Court previously should be utilized again. As this Court correctly noted, Dr. Ray is adequately qualified to render the challenged testimony as "[h]is career has been based around pharmacoepidemiologic investigations that concern the adverse and beneficial effects of drugs." Id. at 31.[1]

### B. Merck's Biological Plausibility Challenge Merely Argues Differing Clinical Trial Results

Section I of Merck's challenge to Dr. Ray merely continues the "he said, she said" arguments revolving around the interpretation of available scientific literature that the parties began at the Daubert hearings in November 2005. For example, Merck parses two articles out of the eighty eight relied upon by Dr. Ray and seeks to challenge the validity of the findings of these studies. Merck apparently contends that since it interprets these two studies differently, then Dr. Ray should be excluded.

It appears that Merck challenges these studies based solely upon the fact that they are animal studies. Curiously, Merck (in the same paragraph) cites canine and rabbit studies for the conclusion that Cox-2 is unrelated to vascular prostacyclin production.

---

[1] It is noteworthy that not only has the FDA contracted with Dr. Ray to assist the FDA on issues of drug safety, Dr. Ray has actually co-authored a Vioxx safety study with Dr. David Graham of the FDA. See Graham. Risk of Acute Myocardial Infarction and Sudden Cardiac Death in Patients Treated with Cox-2 Selective and Non-Selective NSAIDS (Exhibit 3)

While it is of no benefit to revisit all the scientific studies/data outlined in the Plaintiff's Science Brief, there is one revealing study that should be noted. Protocol 023 was a Merck internal study that was ultimately published by Catella-Lawson and relied upon by Dr. Ray at endnote 85. (See Catella-Lawson, Effects of Specific Inhibition of Cyclooxygenase-2 on Sodium Balance, Hemodynamics and Vasoactive Eicosanoids Journal of Pharm Exp Therapy 289:735-41 (Ex.4))

This short term (2 week) study measured the reduction of prostacylcin and thromboxane levels within the human body by analysis of the excretion levels of their metabolites. This study found that Vioxx did not lower levels of thromboxane within the body, but did lower levels of "PGI-M, an index of total body biosynthesis of prostacyclin." Id. at 739 (emphasis added).

Merck's own study went on to note that "[a]n additional finding of this study was the suggestion that external biosynthesis of prostacyclin also was mediated by Cox-2." Id. Finally, Merck's study states, "In conclusion, our results suggest that Cox-2 plays a role in the biosynthesis of prostacylcin under physiological condition in humans...." Id. p. 740. These findings, by Merck scientists and consultants, stand in stark contrast to the bold assertions to the contrary outlined in Merck's challenge to Dr. Ray.[2]

### C. This Court Has Already Ruled That Dr. Ray Is Qualified To Testify About The Risks And Benefits Of Vioxx

Merck attempts to take a "second bite" at challenging Dr. Ray's ability to testify concerning the risks and benefits of Vioxx by expressing this argument in terms of "medical

---

[2] Briggs Morrison acknowledged as far back as 10/20/1997 that the assertions made by Merck in its challenge are invalid. Dr. Morrison noted that, "the second is PGI-M which is a metabolite of prostacyclin which is largely derived from endothelial cells... Although both Cox-1 and Cox-2 are known to be expressed in endothelial cells, this result suggests that most of the prostacyclin production comes from Cox-2." (10/20/1997 Memorandum of Briggs Morrison (Ex. 5)).

judgments" or "safer alternatives." The real issue is Dr. Ray's ability to testify about the risks and benefits of Vioxx.

As this Court found in its previous order, Dr. Ray is uniquely qualified to provide such testimony. (Order and Reasons pp. 28-31.) Without revisiting his voluminous qualifications, he has decades of experience in pharmacoepidemiology, he has been hired by the FDA to study drug safety and he has been hired and paid by Merck to opine on the risks and benefits of the very drug at issue.[3]

Dr. Ray has been a member of two FDA Advisory Committees. He has been under contract with the FDA for 20 years to study the safety of medications. He is under contract with the FDA to study post-marketing drug safety. (Trial Transcript at 700.) Dr. Ray's sterling credentials persuaded this Court to conclude that Dr. Ray's "career has been based around pharmacoepidemiologic investigations that concern adverse and beneficial effects of medications." (Order and Reasons, at 31.)

As Dr. Ray's thirty plus year career has focused upon investigation the risks and benefits of medications, he should be allowed to testify in this case about his conclusions. Dr. Ray has actually been asked by the FDA to study the safety of NSAIDs, especially in reference to gastric complications. (Trial Testimony at 700.) This situation differs a little from the occasions when Dr. Ray is called before the FDA to give his opinions concerning the risk and benefits of a medication. It is of note that Dr. Ray's conclusions are in agreement with the FDA's findings that, "This analysis could lead one to conclude that naproxen, with 51% risk reduction compared to rofecoxib, would be the referred drug." (See February 1, 2001 FDA Memorandum at 12 (Ex. 6)).[4]

---

[3] Dr. Ray warned Merck, after being hired as a consultant by Merck in November 2000 that the Naproxen theory was "speculative and dangerous." (Trial Transcript at 700.)

[4] Dr. Ray warned Merck that Vioxx was an unsafe drug years before it was pulled off the market. (Trial Transcript at 696.) Merck chose to ignore Dr. Ray's accurate warnings back then and attempts, for a second time in this litigation, to quiet him.

6

Finally, Merck tangentially raises the issue of the safety of the co-administration of NSAIDs and proton pump inhibitors (i.e., "PPIs"). This issue arises from a recent paper published by Dr. Ray advocating the concomitant usage of NSAIDs and PPI's for gastric safety. Merck attempts to paint Dr. Ray as ignorant in the area of PPI's, despite his research, by selectively quoting his rough deposition and utilizing ellipses to redact relevant testimony. Indeed, Merck redacts, via ellipse, the very portion of Dr. Ray's deposition where it is noted "that the risk of ulcers in NSAID users is substantially reduced by concurrent use of misoprostol PPI's or adequate dose $H_2RAs$, all very safe medications...." (Ray dep. at 185.) Selective quotation by Merck should not constitute a basis for witness exclusion.

## CONCLUSION

The issues raised by Merck in the current challenge are mere revisitations of issues previously decided by this Court. The verbiage and conclusions challenged are identical to those in Dr. Ray's initial report. This initial report was evaluated under *Daubert* run through the judicial wringer of Daubert and the very challenges raised here were determined in favor of Plaintiff and Dr. Ray. This Court should not alter these prior rulings.

Respectfully submitted,

By: _____
**Andy D. Birchfield, Jr., Esquire**
J. Paul Sizemore
P. Leigh O'Dell
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
(800) 898-2034 (telephone)
(334) 954-7555 (telecopier)

**Co-Lead Counsel**

**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
FAX: (504) 561-6024

**Temporary Office**
3411 Richmond Ave., Suite 460
Houston, TX 77046
PH: (713) 877-1843
FAX: (713) 871-9750

**PLAINTIFFS' LIAISON COUNSEL**

Christopher A. Seeger, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)

**Co-Lead Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
MEUNIER&WARSHAUER, L.L.C.
P.O. Box 960
191 East Second Street
New Roads, LA 70760
(225) 638-6137
(225) 638-8836 (fax)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS,
MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Thomas R. Kline, Esquire
KLINE&SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Carlene Rhodes Lewis, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced in accordance with Pre-Trial Order No. #8, on this 25 day of January, 2006.

# SEE RECORD FOR

# EXHIBITS

# OR

# ATTACHMENTS

# NOT SCANNED