FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA
2006 JAN 27 PM 4:59
LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 05-4046 | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| EVELYN IRVIN PLUNKETT | * | |
| as Personal Representative of the Estate of | * | |
| RICHARD IRVIN, JR., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

* * * * * * * * * * * * * * * * * *

### MOTION OF MERCK & CO., INC. ("MERCK") TO
### EXCLUDE TESTIMONY OF MICHAEL ALAN GRAHAM, M.D.

Merck, through undersigned counsel, and pursuant to Rule 702 of the Federal Rules of

Evidence, hereby moves to exclude the testimony of plaintiff's expert Michael Alan Graham,

Fee
Process
X  Dktd
✓  CtRmDep
Doc. No

797655v.1

M.D.   The facts and law supporting this motion are more fully set forth in the accompanying

memorandum, declarations, and exhibits, which are incorporated as if fully set forth herein.

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:      504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:      312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone: 202-434-5000
Fax:      202-434-5029

And

John H. Beisner
Charles C. Lifland
Richard B. Goetz
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone: 213-430-6000
Fax:      213-430-6407

Attorneys for Merck & Co., Inc.

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Motion to Exclude Testimony of Michael Alan Graham, M.D., has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 27th day of January, 2006.

_Dorothy H. Wimberg_

797655v.1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 05-4046 | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| EVELYN IRVIN PLUNKETT | * | |
| as Personal Representative of the Estate of | * | |
| RICHARD IRVIN, JR., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM IN SUPPORT OF MERCK & CO., INC.'S MOTION
TO EXCLUDE TESTIMONY OF MICHAEL ALAN GRAHAM, M.D.**

## I.      INTRODUCTION.

In the first trial of this case, plaintiff called Dr. Colin Bloor to offer opinions in the field

of pathology.  The Court likely recalls that the main thrust of Dr. Bloor's testimony was that Mr.

Irvin did not suffer a plaque rupture in his coronary arteries.  It was on that basis that Dr. Bloor

testified that Vioxx must have contributed to the clot that caused Mr. Irvin's death.

Plaintiff has now flipped 180 degrees in her view of Mr. Irvin's pathology. Plaintiff apparently has jettisoned her three former pathology experts (Drs. Bloor, Burton and Frist) in favor of a fourth pathologist, Dr. Michael Graham. Dr. Graham *agrees* with Merck's expert, Dr. Wheeler, *that Mr. Irvin in fact did have a plaque rupture*. Dr. Graham also agrees that Mr. Irvin's natural biological response to that plaque rupture was to form a thrombus at the site of the rupture. Dr. Graham further agrees that plaque rupture, without Vioxx, causes tens of thousands of deaths every year.

Faced with these undisputed facts, Dr. Graham has postulated a legally-insufficient opinion for specific causation. Dr. Graham does not point to any evidence in Mr. Irvin's medical records or pathology that Vioxx played a role in his death. Instead, Dr. Graham's entire specific causation opinion boils down to the assertion that "as a matter of mathematical probability," Mr. Irvin's heart attack was caused by Vioxx solely on the basis of population-based epidemiology data. Dr. Graham, however, is not qualified to opine on general causation. Nor is he qualified to opine on the pharmacology of Vioxx as he purports to do in his report. Finally, even if the Court allows Dr. Graham to discuss general causation and pharmacology, his opinions on specific causation are not scientifically reliable under applicable Fifth Circuit case law.

## II.   THE LEGAL STANDARD.

The admission of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702.  It is black-letter law that testimony beyond a witness's expertise should be excluded.  *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1050 (5th Cir. 1998) (trial court properly excluded property appraisal testimony since witness not a licensed appraiser or real estate broker and lacked training or formal schooling in appraisal methods).

Once the proponent of the evidence proves that the offered testimony is based on sufficient facts or data and within the expert's ken, he or she must then "demonstrate that the expert's findings and conclusions are based on the scientific method, and, therefore, are reliable."  *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir.1998) (en banc).  This process is governed by the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).  In *Daubert*, the Supreme Court held that district courts must act as gatekeepers to ensure that expert testimony is both relevant and reliable.  Toward that end, the Court identified the following non-exclusive factors a district court may consider in evaluating an expert's testimony: (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the theory or technique's degree of acceptance in the scientific community.  *Daubert*, 509 U.S. 593-94; Moore, 151 F.3d at 275; *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d 603, 605-06 (E.D. La. 2003).  In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999), the Court explained that the overarching goal of *Daubert*'s gatekeeping requirement is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."

As discussed below, Dr. Graham's proposed causation testimony concerning Vioxx fails to meet these legal standards. The Court, therefore, must exclude it.

### III.   DR. GRAHAM DOES NOT HAVE A RELIABLE SCIENTIFIC BASIS TO OPINE ON GENERAL CAUSATION.

Dr. Graham bases his causation opinions on a limited and insufficient foundation. As Dr. Graham admits, he has neither the background, nor has he undertaken the study required, to provide a reliable scientific basis for an opinion that the use of 25 mg Vioxx for less than 30 days can cause thrombotic cardiovascular ("CV") events. And even if Dr. Graham were qualified to offer such an opinion, there is no scientifically reliable evidence to support it.

#### A.   Dr. Graham Does Not Have The Necessary Skill, Training, Experience Or Education To Opine On General Causation.

Dr. Graham is a pathologist. That fact, however, does not qualify him to offer opinions on a host of issues relating to Vioxx, ranging from its pharmacology to an assessment of clinical and epidemiologic studies involving the medicine. The lack of Dr. Graham's expertise concerning Vioxx is stark. Indeed, Dr. Graham's expert report contains only about *one page* of Vioxx-related analysis, most of it relating to his review of Professor Wayne Ray's expert report.[1] (Expert Report of Dr. Michael Alan Graham, M.D. ("Graham Rpt.") at 3, attached as Ex. 5 to the Wimberly Decl.) Moreover, in his deposition, Dr. Graham made several critical admissions, including the following:

- He admitted he is not a pharmacologist and has no training in pharmacology. (Graham Dep. at 29:18-21.)

---

[1] Perhaps because of Dr. Graham's lack of familiarity with Vioxx, plaintiff's counsel provided him with a draft report containing his opinions, which he then reviewed, revised and submitted. (Rough Transcript of January 25, 2006 Deposition of Michael Alan Graham, M.D. ("Graham Dep.") at 32:22-33:21, attached as Ex. 3 to Declaration of Dorothy H. Wimberly in Support of Merck's Motion to Exclude Testimony of Michael Alan Graham, M.D. ("Wimberly Decl.").)

- He admitted he is not an expert on Vioxx or the pharmacology of Vioxx, and that he is not qualified to "explain how [Vioxx] . . . could lead to thrombosis." (*Id.* at 29:22-30:5, 92:20-93:13.)

- He admitted he has not done any research on any NSAIDs generally or COX-2s in particular, and that prior to becoming an expert for plaintiff, Vioxx was not on his "radar screen." (*Id.* at 28:15-20, 50:25-51:7.)

- He admitted he is not an epidemiologist. (*Id.* at 62:4-6, 187:6-11.)

- He admitted he is not a clinical researcher, has no expertise in clinical study design or statistics, and is not qualified to analyze and interpret clinical and epidemiological data concerning Vioxx – including the data concerning any relationship between Vioxx and cardiac events. (*Id.* at 64:5-21, 85:4-11, 103:13-104:1.)

- He admitted his expertise does not involve assessing drug safety. (*Id.* at 51:8-10.)

- He admitted he never has prescribed Vioxx or other COX-2 inhibitors to a patient. (*Id.* at 28:21-22.)

- He admitted he has performed seven thousand autopsies and never once determined that Vioxx or any other COX-2 inhibitor was a contributing cause of death. (*Id.* at 34:17-19, 35:17-36:6.)

- He admitted he has never written an article on the subject of sudden cardiac death related to plaque rupture -- *i.e.*, the exact mechanism that resulted in Mr. Irvin's death. (*Id.* at 27:22-28:8.)

Many of these admissions are among the very ones that led the Court to conclude that plaintiff's cardiologist, Dr. Thomas Baldwin, "lacks the skill, training, and education to testify as [an] expert regarding the role Vioxx played in Mr. Irvin's death." (Order (12/03/05) at 6.). As the Court explained with regard to Dr. Baldwin:

> As a cardiologist, Dr. Baldwin certainly has the skill, training, and education to testify that Mr. Irvin died of a myocardial infarction. In addition, he has the skill, training, and education to testify regarding the nature of the fatal clot or thrombus, its location, and explain its role in causing Mr. Irvin's death. As a cardiologist with no other skill, training, education, or experience with Vioxx or any Cox-2 inhibitor, however, Dr. Baldwin is not qualified to testify regarding the specific role that Vioxx played in producing the clot.

(*Id.*)

As with the testimony of Dr. Baldwin, the Court must exclude the testimony of Dr. Graham. While Dr. Graham may be qualified to testify on the existence of a thrombus and its role in Mr. Irvin's death, Dr. Graham lacks the skill, training, education and experience necessary to offer any opinion that Vioxx somehow contributed to Mr. Irvin's death.

In addition, plaintiff cannot seriously argue that Dr. Graham has the necessary qualifications to offer such an opinion merely because he reviewed selected literature provided by plaintiff's counsel. (Graham Dep. at 37:15-38:16.) Dr. Graham's so-called "investigation" of the cardiovascular risks allegedly associated with Vioxx is woefully inadequate. He admitted that before being hired as an expert in this case, he had not reviewed the drug's cardiovascular safety and had only a "casual" familiarity with Vioxx literature. (*Id.* at 39:14-40:5.) To make up for his lack of education, training and experience in this field, Dr. Graham devoted a grand total of approximately eight (8) hours to reviewing 67 scientific medical articles, nine depositions, four expert reports and three days' worth of trial transcripts from the first trial of this case. (*Id.* at 42:14-44:2.) Dr. Graham spent much of the eight hours reviewing Dr. Ray's expert report and only a portion of his limited time reviewing the actual literature relating to Vioxx. (*Id.* at 49:10-14, 49:23-50:4.) Not surprisingly, Dr. Graham admitted he merely "skimmed" most of the Vioxx-related medical literature provided by plaintiff's counsel. (*Id.* at 44:10-45:13.)

In the first trial, the Court precluded Merck's expert pathologist, Dr. Wheeler, from offering opinions on general causation even though (a) Dr. Wheeler conducted a far more thorough investigation than did Dr. Graham and (b) plaintiff specifically opened the door to those opinions by asking questions on cross-examination. Dr. Graham is in no better position

than Dr. Wheeler to offer opinions on these subjects and, in fact, he is in a worse position due to his inadequate investigation.

Even if Dr. Graham had conducted an adequate review of the Vioxx literature -- and he plainly did not -- that would not qualify him to opine on the alleged role of Vioxx in Mr. Irvin's death. Federal Rule of Evidence 702 categorically forbids the admission of expert testimony unless the expert "has applied the principles and methods reliably to the facts of the case." This mandate means that an expert cannot satisfy the requirements of Rule 702 and *Daubert* merely by professing to have relied on available scientific literature. *See, e.g., United States v. Paul,* 175 F.3d 906, 912 (11th Cir. 1999) (upholding exclusion of handwriting expert "even though he had reviewed the literature in the field of questioned document examinations"); *Smith v. Rasmussen,* 57 F. Supp. 2d 736, 766-67 (N.D. Iowa 1999) (holding that expert's literature review "is an insufficient basis or methodology on which to render a reliable expert opinion" and confirming that "[c]ourts are suspicious of purported expertise premised solely or primarily on a literature review"); *Wade-Greaux v. Whitehall Labs., Inc.,* 874 F. Supp. 1441, 1476 (D.Vi. 1994) (witness educated as a pediatrician, pharmacologist, and toxicologist was not qualified to testify regarding the cause of birth defects merely because he reviewed selected literature on the subject for purposes of litigation). Instead, the expert, at a minimum, must *understand* and *explain* how the literature applies to the facts of the case and why it supports the expert's opinions. *Daubert,* 509 U.S. at 591-93 (scientific testimony is relevant only if expert's "reasoning" can be applied to facts at issue); *Moore,* 151 F.3d at 278 (upholding exclusion of expert who failed to explain why article involving level and duration of exposure greater than plaintiff's was helpful in forming causation opinion).

Dr. Graham has failed to offer that necessary explanation.  As explained above, his expert report contains only about *one page* of conclusory statements regarding the alleged cardiovascular risks associated with Vioxx.  And his deposition testimony confirms that he lacks a basic understanding of the Vioxx literature, much less the ability to explain how it is relevant to this case and his opinions.  For example, Dr. Graham relies heavily on a pooled analysis performed by Professor Ray of data from the Alzheimer's, APPROVe, VICTOR, VIP and Juni studies.  (Graham Rpt. at 3.)  Dr. Graham, however, admitted he did not review the data underlying Professor Ray's analysis and is unqualified to determine whether Professor Ray's calculations are accurate.  (*Id.* at 185:25-188:12.)  Similarly, Dr. Graham admitted he is "unqualified" to opine whether the APPROVe study showed an increased risk with the use of Vioxx for less than 18 months.  (*Id.* at 190:6-191:2.)  He did not review data from the VICTOR and VIP studies and does not know whether the results of those studies are statistically significant.  (*Id.* at 68:21-69:8, 189:21-190:5.)  He does not remember if he reviewed all the Alzheimer's studies and does not know what the data showed.  (*Id.* 69:23-70:1, 86:7-11.)  He did not review the literature relating to the cardioprotective effect of naproxen.  (*Id.* at 68:1-68:13.)  He does not know what NSAID comparators were involved in the Vioxx clinical trials at issue in the Juni study.  (*Id.* at 75:23-76:16.)  He does not know what the comparator drug was in the Solomon study.  (*Id.* at 80:17-21.)  He did not know that the Konstam study was a pooled analysis of Vioxx clinical trial data and testified initially that the study found no difference in cardiovascular risk between Vioxx and naproxen when in fact it found no difference between Vioxx and placebo or *non*-naproxen NSAIDs.[2]  (*Id.* at 82:4-83:14.)  And so on and so on.

---

[2] Konstam MA et al., *Cardiovascular Thrombotic Events in Controlled, Clinical Trials of Rofecoxib*, CIRCULATION 2001 Nov;104:2280-88.

Based on Dr. Graham's demonstrated failure to understand the pertinent scientific literature, the Court should preclude him from opining that Vioxx could have caused Mr. Irvin's death.  Such a result would be fully consistent with the Court's previous decision to exclude similar testimony from Dr. Baldwin.  (Order (12/03/05) at 6 ("In his deposition, Dr. Baldwin displayed a fundamental lack of understanding of the relevant scientific literature. . . [H]is reliance on the relevant scientific literature was completely undermined by his inability to firmly understand the literature.").)

### B.    Dr. Graham's Speculative General Causation Opinions Are Not Supported By The Scientific Literature On Which He Relies.

Federal Rule of Evidence 702 forbids the admission of expert testimony that is not based on "sufficient facts or data."  In pharmaceutical cases, the dose and duration at which a plaintiff is exposed to a drug are among the most critical facts in any causal analysis.  *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1242 (11th Cir. 2005) (holding that dose-response relationship is "the hallmark of basic toxicology" and that "[d]ose is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect") (internal citations omitted).  Whether an expert's opinion is based on incomplete or inaccurate dosage or duration data is thus a factor to be considered in assessing the scientific reliability of expert testimony in such cases.  (Order (11/18/05) at 6-7 (citing *Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1114 (5th Cir. 1991).)  Dr. Graham himself admits that any alleged thrombotic effect of Vioxx is dose-dependent.  (Graham Dep. at 96:2-5; *see also id.* at 178:22-179:2.)

Even if Dr. Graham were qualified to opine about the alleged role of Vioxx in Mr. Irvin's death -- and he is not -- the simple fact is that Dr. Graham does not and cannot identify a single clinical study showing that use of 25 mg Vioxx for less than 30-days is capable of causing

thrombotic CV events. (Graham Dep. at 79:23-80:8.) He relies instead on a handful of studies that involved dosages and/or durations of Vioxx use not at issue here, to wit the VIGOR, ADVANTAGE, Juni and Solomon studies, Protocol 023, and Professor Ray's pooled analysis of data from the Alzheimer's, APPROVe, VICTOR, VIP and Juni studies. (*Compare* Graham Report at 3 *with* Updated Expert Report of Wayne A. Ray, Ph.D., filed on January 11, 2006 ("Ray Rpt.") at 22, 27, attached as Ex. 6 to Wimberly Decl.; Graham Dep. at 80:22-23.) But as explained in Merck's previous filings,[3] *none* of these studies shows that *Mr. Irvin's* short-term use of Vioxx is capable of causing thrombotic CV events, nor does any other study show that.[4] (Merck's Motion to Exclude Evidence of Plaintiff's Experts Regarding Causation at 26-35; Appendix of Studies Relied on By Plaintiff's Experts at 1-23; Reply Brief in Support of Merck's Motion to Exclude Evidence of Plaintiff's Experts Regarding Causation at 12-29.) The studies relied on by Dr. Graham thus cannot provide a scientifically reliable basis for a causation opinion in this case, which involves the use of 25 mg Vioxx only for less than 30 days. *See, e.g., Moore,*

---

[3] *See* Merck & Co., Inc.'s Motion and Memorandum in Support of Motion to Exclude Evidence of Plaintiff's Experts Regarding Causation (Record Docket No. 1515) and Reply Memorandum in Support of Motion of Merck & Co., Inc. to Exclude Evidence of Plaintiff's Experts Regarding Causation (Record Docket No. 1392). Merck hereby incorporates these pleadings by reference.

[4] Dr. Graham's reliance on Protocol 023 is particularly misplaced. Protocol 023 is the clinical trial conducted by Dr. FitzGerald and Merck researchers wherein it was observed that the urine of patients treated with Vioxx contained lower levels of a metabolite of prostacyclin than urine of patients on placebo. Contrary to Dr. Graham's assertion (*see* Graham Rpt. at 3), Protocol 023 did *not* establish that Vioxx reduced prostacyclin levels in the human vasculature as opposed to elsewhere in the body, and plaintiff's former pathology expert has admitted as much. (Declaration of J. Michael Gaziano, M.D., M.P.H. in Support of Merck's Motions to Exclude Evidence and for Summary Judgment (Record Docket No. 1145) ("Gaziano Decl.") at ¶ 42, 44-45; Deposition of Joseph L. Burton, M.D., at 81:18-82:3, 84:10-14, attached as Exhibit 2 to Wimberly Decl.) Moreover, Dr. FitzGerald did *not* purport to detect a thrombus in any clinical trial patient. (Catella-Lawson et al., "Effects of Specific Inhibition of Cyclooxygenase-2 on Sodium Balance, Hemodynamics, and Vasoactive Eicosanoids," J. PHARM. AND EXP. THERP. 1999; 289:735–741). Thus, Protocol 023 plainly does *not* support Dr. Graham's assertion that Vioxx "increased the relative risk of a cardiovascular event among Vioxx users." (Graham Rpt. at 3.)

151 F.3d at 278 (excluding opinion of expert who "had no support for the theory that the level of chemicals to which Moore was exposed caused RADS").

### C.   Dr. Graham Has No Reliable Scientific Evidence Supporting The Hypothesized Mechanism By Which Vioxx Supposedly Could Cause Sudden Cardiac Death.

To establish causation in a pharmaceutical case, an expert must offer a "reliable explanation" of the physiological process by which the agent causes the alleged harm. *McClain*, 401 F.3d at 1253; *Black v. Food Lion, Inc.*, 171 F.3d 308, 314 (5th Cir. 1999). When assessing the scientific reliability of expert testimony, therefore, courts should consider whether the expert has identified "the specific mechanism by which the drug supposedly causes the alleged disease." (Order (11/18/06)); *see also In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d at 617.

In his expert report, Dr. Graham opines that Vioxx is capable of causing cardiac injury by promoting "platelet aggregation with resultant thrombosis" (*i.e.*, this is the FitzGerald hypothesis, which assumes that Vioxx reduces prostacyclin in the vasculature relative to thromboxane). (Graham Rpt. at 4.) Dr. Graham concedes, however, that he has no scientifically reliable evidence supporting this hypothesized mechanism.

Although Dr. Graham claimed to be aware of an article suggesting that COX-2 inhibitors may reduce prostacyclin in the human vasculature, he could not identify that article. (Graham Dep. at 88:18-90:18.) Nor could he identify a single scientific article establishing that Vioxx has such an effect.[5] (*Id.* at 91:2-21.) Understandably, Dr. Graham is not prepared to opine that Vioxx in fact reduces vascular prostacyclin. (*Id.* at 90:19-91:1, 91:14-21.) If Dr. Graham is not

---

[5] As explained more fully in Merck's prior filings, there is no reliable science establishing that Vioxx inhibits production of prostacyclin in the vasculature as opposed to elsewhere. (Merck's Motion to Exclude Evidence of Plaintiff's Experts Regarding Causation at 40-44.)

prepared to offer such opinion, the Court should not allow him to give it.  *See, e.g., Moore*, 151 F.3d at 279 (affirming exclusion of speculative and unsupported opinions); (Order (12/03/05) at 7 ("If Dr. Baldwin is not willing to consider himself an expert on the effect of Cox-2 inhibitors, it would seem quite peculiar for this Court to qualify him as one.")).

***

In sum, Dr. Graham is not qualified by his skill, training, experience or education to opine that Vioxx is capable of causing thrombotic CV events.  He has no scientifically reliable evidence showing that the use of 25 mg Vioxx for less than 30 days -- *i.e.*, the *only* dose and duration at issue in this case -- is capable of causing such events.  And he has no scientifically reliable evidence of the mechanism by which Vioxx supposedly causes such events. Accordingly, the Court should exclude his unreliable and unsupported testimony concerning general causation under Federal Rule of Evidence 702 and *Daubert*.

## IV.   DR. GRAHAM DOES NOT HAVE A RELIABLE SCIENTIFIC BASIS TO OPINE ON SPECIFIC CAUSATION.

As with his general causation opinions, Dr. Graham's specific causation opinions do not pass muster under Federal Rule of Evidence 702 and *Daubert*.  As a pathologist, Dr. Graham may be qualified to opine that a thrombus formed in Mr. Irvin's artery and led to a sequence of events resulting in Mr. Irvin's death.  But such opinions are categorically different from an opinion that Mr. Irvin's short-term use of Vioxx *contributed* to the development of the thrombus through a specified mechanism.  As to the latter subject, Dr. Graham's own deposition testimony makes clear that he is no expert on the subject and that he does not and cannot hold any such opinion to a reasonable degree of medical certainty.

**A.      Dr. Graham's Methodology For Determining Specific Causation Necessarily Leads to False Positive Diagnoses.**

Dr. Graham's methodology for determining specific causation is scientifically unreliable. It wrongly assumes that every thrombotic CV event experienced by every Vioxx user is attributable to Vioxx, and it thus results as a matter of course in false positive diagnoses. According to Dr. Graham, because the selected literature on which he relies purportedly shows that Vioxx more than doubles the risk of cardiovascular injury,[6] he is willing to opine that *any* individual who died after taking Vioxx -- including Mr. Irvin -- more likely than not died because of the drug. Here is how Dr. Graham explained his methodology:

Q:      You're saying it is probably the case that Vioxx contributed to Mr. Irvin's death simply because the relative risk is greater than two?

A:      And he fits into that group who is at increased risk, yes.

. . .

Q:      . . . Just so we understand your methodology for giving a specific cause opinion, the methodology you applied here suggests that on an individual basis you would say anyone who temporally had a heart attack while on Vioxx, more likely than not Vioxx was a contributory cause, correct?

. . .

A:      Assuming that we're talking about individuals having heart attacks based on coronary artery disease, yeah, if you pulled an individual patient and presented it to me, I think that would be the probability, yes.

Q:      And that's the method you applied here?

A:      Yes.

(Graham Dep. at 56:1-6, 61:5-21.)   Significantly, Dr. Graham has adopted this methodology

_____

[6] As explained above, the available scientific literature does *not* show an increased risk, let alone a doubling of the risk, associated with the use of 25 mg Vioxx during the first 30 days. (*See supra* at 9-10.)

even though he concedes that many individuals who die after taking Vioxx die from causes *unrelated* to the drug.

> Q:     All right.  But then you know or certainly expect that there are lots of people who would fit in this high risk group where Vioxx did not play a contributory role?

> A:     Yes.  There are people in that group that Vioxx would not have played a role, but again, when you look at the individual and you put him in relation, the probability is he is in the high risk side.

> Q:     Right.  But that -- so if we take your sentence seriously, you would be opining that individually anyone who is taking Vioxx who had a heart attack, more likely than not Vioxx contributed to the heart attack?

> A:     If you take them one at a time, that would be correct, yes.

(*Id.* at 56:7-22.)

Dr. Graham's methodology for conducting a specific causation analysis is patently unscientific.  As the Texas Supreme Court explained in *Havner*, "epidemiologic studies cannot establish the actual cause of an individual's injury or condition."  953 S.W.2d at 715; *see also id.* at 718 ("[E]pidemiological studies show only an association.  There may in fact be no causal relationship even if the relative risk is high.").  Even when epidemiologic studies show more than a doubling of the risk, the "strong consensus" among scientists is that a "sound methodology" requires consideration of many additional factors before conclusions about causation can be drawn.  *Id.* at 718-19.  Additional factors to be considered include, but are not limited to, the "Bradford Hill" criteria (*see id.* at 719 & n.2);[7] the execution and design of the epidemiologic studies (*see id.* at 719); and the extent to which the plaintiff "is similar to those in the studies," which "would include proof that the injured person was exposed to the same

---

[7] The Bradford Hill criteria include strength of association, consistency, specificity, temporality, biologic gradient, plausibility, coherence, experiment and analogy.  *Havner*, 953 S.W.2d at 719 n.2.

substance, [and] that the exposure or dose levels were comparable to or greater than those in the studies." *Id.* at 720.

Dr. Graham's methodology, however, does not require consideration of any additional factors other than the relative risk observed in an epidemiologic study.  Armed with this methodology, Dr. Graham would opine under oath in every case that Vioxx more likely than not caused the plaintiff's heart attack even though he knows that cannot be true.  That is not how the scientific method works.  Accordingly, the Court should exclude Dr. Graham's speculative opinion that Vioxx somehow contributed to Mr. Irvin's death.

### B.   Dr. Graham Cannot Rule Out Mr. Irvin's Pre-Existing Atherosclerotic Disease As A Plausible Explanation of His Death.

In addition, Dr. Graham's methodology for determining specific causation is scientifically unreliable because he does not and cannot rule out Mr. Irvin's pre-existing atherosclerosis as a plausible explanation of his death.  Before an expert will be allowed to testify that an individual's exposure to an agent resulted in injury, the expert first must rule out alternative explanations of the injury.  *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987); *Propulsid*, 261 F. Supp. 2d at 618; (*see also* Order (11/18/05) at 6 (in assessing admissibility of expert testimony, trials courts should consider whether expert has adequately accounted for alternative explanations)).

According to Dr. Graham, Mr. Irvin's coronary artery disease pre-existed his brief use of Vioxx.  (Graham Dep. at 133:1-9.)  Mr. Irvin had a 60% narrowing in his left anterior descending coronary artery, where the coroner found the thrombus.  (Graham Rpt. at 4.)  In addition, his atherosclerotic plaque was "vulnerable," meaning that, before he began taking Vioxx, he already was at an increased risk for sudden cardiac death resulting from a ruptured plaque.  (Graham Dep. at 141:22-142:5, 143:19-144:1.)  Mr. Irvin's vulnerable plaque also

contained a substantial amount of lipid material, which placed him at an increased risk of developing a fatal thrombus in response to a plaque rupture. (*Id.* at 152:7-18, 154:1-21.)

In addition, Dr. Graham concedes that Mr. Irvin in fact suffered a ruptured atherosclerotic plaque.[8] (*Id.* at 11:23-25, 13:8-12 ("Q: . . . So your opinion is that Mr. Irvin suffered a plaque rupture, correct?  A:  Yes."); Graham Report at 5 ("there is evidence of atherosclerotic plaque disruption")).   This finding is significant because Dr. Graham concedes that plaque ruptures "commonly" result in the formation of coronary thrombi. (Graham Report at 5.).    In other words, according to Dr. Graham, the initial formation of Mr. Irvin's thrombus was a natural response to his ruptured plaque. (Graham Dep. at 133:18-134:12, 136:20-21.) As Dr. Graham conceded, he "can't say Vioxx more . . . likely than not started [Mr. Irvin] on the path" to developing a thrombus. (*Id.* at 162:20-24.)

Mr. Irvin's situation was not unique.  According to Dr. Graham, death from heart disease is "extraordinarily common," and atherosclerotic heart disease is the leading cause of death for men in their 50s, like Mr. Irvin.   (*Id.* at 36:14-20, 128:3-10, 130:11-22.)   In fact, tens of thousands of individuals without a prior history of heart attacks die every year from sudden cardiac death resulting from ruptured atherosclerotic plaques, and that had been true long before Vioxx was ever sold. (*Id.* at 145:2-147:25, 162:14-19.)  And in the majority of such cases, the individuals have only "subcriticial" narrowing of their coronary arteries, oftentimes less than 60%.   (*Id.* at 148:8-25.)   In short, according to Dr. Graham, the precise circumstances surrounding Mr. Irvin's death are regrettably "very common."  (*Id.* at 163:12-164:12.)  As Dr. Graham explained:

Q:      All right.  So let's make sure I understand specifically what you're

---

[8] Dr. Burton, plaintiff's former pathology expert, likewise found evidence of a plaque rupture. (Burton Dep. at 180:7-13.)

saying.  Mr. Irvin's sudden cardiac death on May 15th, 2001 was similar to literally hundreds of thousands of Americans before Vioxx was ever on the market in that he had a nonflow limiting amount of plaque in his coronary artery disease that ruptured that exposed his blood to a thrombogenic plaque core that resulted in a fatal thrombus?

A:      Yeah.  In that sense it was similar, yes.

(*Id.* at 156:10-19.)  Not surprisingly, Dr. Graham concedes that had Mr. Irvin not been taking Vioxx, "his plaque rupture still could have resulted in death."  (*Id.* at 165:23-166:1.)

Based on these facts, Dr. Graham cannot reliably rule out Mr. Irvin's naturally-occurring thrombus as a plausible cause of his death.  To be sure, Dr. Graham opines that plaque ruptures are "more commonly associated" with non-fatal, non-occlusive thrombi than with fatal, occlusive thrombi.  (Graham Rpt. at 5.)  But that opinion is besides the point.  As explained above, Dr. Graham concedes that plaque ruptures can and do result in fatal, occlusive thrombi, even in men like Mr. Irvin who purportedly have only a 60% narrowing of their coronary arteries.  Dr. Graham thus has no way of distinguishing Mr. Irvin's unfortunate death from those of tens of thousands of individuals who never took Vioxx.

Because Dr. Graham cannot rule out Mr. Irvin's naturally-occurring thrombus as a alternative explanation for his sudden cardiac death, Dr. Graham's opinion that Mr. Irvin would not have died but for his brief use of Vioxx is scientifically unreliable and thus inadmissible.

### C.      Dr. Graham Has No Scientifically Reliable Basis For Opining About The Mechanism By Which Vioxx Supposedly Caused Mr. Irvin's Death.

Finally, as explained above, before an expert can opine to a reasonable degree of medical certainty that exposure to an agent caused an individual's disease, the expert must identify the specific mechanism by which the agent allegedly had that effect.  (*See supra* at 10-11.)  Dr. Graham, however, cannot identify to a reasonable degree of medical certainty the specific mechanism by which Mr. Irvin's brief exposure to Vioxx supposedly resulted in his sudden

cardiac death.   Accordingly, Dr. Graham's specific causation opinion is not based on a scientifically reliable methodology and it is thus inadmissible.

Because Dr. Graham has no evidence that Vioxx causes plaque ruptures[9] and because he admits that plaque ruptures commonly result in the formation of coronary thrombi, Dr. Graham is forced to take the position that Vioxx somehow made Mr. Irvin's naturally-occurring thrombus worse.  (Graham Report at 5-6.)  Dr. Graham's opinion, however, is not based on a scientifically reliable methodology.

Indeed, his opinion depends entirely on the FitzGerald hypothesis, which *assumes* that Vioxx leads to an imbalance in prostacyclin and thromboxane in the vasculature.  Even if the Court were to credit this assumption as scientifically reliable -- and there is no basis on which to do so -- Dr. Graham still has no reliable basis for opining that Vioxx contributed to *Mr. Irvin's* naturally occurring thrombus.  For example, Dr. Graham concedes that a reduction in vascular prostacyclin levels will not necessarily result in a clinical effect.  (Graham Dep. at 107:13-17.) He does not know what level of vascular prostacyclin inhibition is needed to produce a clinical effect.[10]  (*Id.* at 107:19-23.)  He does not know the extent to which Vioxx supposedly reduces vascular prostacyclin.  (*Id.* at 107:24-108:2.)  He does not know if Vioxx produces a reduction in vascular prostacyclin in all patients who take the drug.  (*Id.* at 156:20-25.)  He admits that there is no way to know if Vioxx even caused an imbalance in Mr. Irvin's vascular prostacyclin levels.

---

[9] Dr. Graham admits that the scientific community does not generally accept the proposition that Vioxx contributes to plaque ruptures.  (Graham Dep. at 140:3-6.)  Further, he admits he does not know whether Vioxx has such an effect; he admits Vioxx has not been shown to have such an effect; and he admits he is not prepared to opine that Vioxx can or did have such an effect in this case.  (*Id.* at 138:6-21, 161:2-162:5 ("Q:  [Y]ou cannot say that Vioxx more likely than not caused the plaque to rupture?  A:  Correct.").)

[10] Plaintiff's other experts likewise acknowledge the absence of such data.  (October 3, 2002 Deposition of Benedict Lucchesi at 95:23-96:11, attached as Ex. 4 to the Wimberly Decl.; October 6, 2005 Deposition of Thomas Baldwin, M.D. at 51:14-52:14, 52:16-18, 54:3-10, attached as Ex. 1 to Wimberly Decl.)

(*Id.* at 158:16-24.)   And he admits that it is impossible to differentiate between a naturally-occurring thrombus and one supposedly caused by Vioxx.  (*Id.* at 108:22-24, 110:10-12, 157:13-15 ("There is nothing in the pathology that you can point to and say this is a Vioxx thrombus.")).  The absence of such threshold data precludes a finding of specific causation in this case.  *See, e.g., Moore*, 151 F.3d at 278.

**V.     CONCLUSION.**

For the foregoing reasons, the Court should grant Merck's Motion to Exclude Testimony of Michael Alan Graham, M.D.

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:     312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone: (202) 434-5000
Fax:     (202) 434-5029

And

John H. Beisner
Charles C. Lifland
Richard B. Goetz
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone: (213) 430-6000
Fax:     (213) 430-6407

Attorneys for Merck & Co., Inc.

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Memorandum in Support of Merck & Co., Inc.'s Motion to Exclude Testimony of Michael Alan Graham, M.D. has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 27th day of January, 2006.

*Dorothy H. Wimberly*