FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 JAN 27  PM 4: 57

LORETTA G. WHYTE
CLERK

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re:  VIOXX ) | **MDL NO. 1657** |
| ) | |
| **PRODUCTS LIABILITY LITIGATION** ) | **SECTION: L** |
| ) | |
| ) | **JUDGE FALLON** |
| **THIS DOCUMENT RELATES TO:** ) | |
| ) | |
| **ALL CASES** ) | |
| ) | **MAGISTRATE JUDGE KNOWLES** |
| ) | |
| ) | |

### SUPPLEMENTAL COMMENT OF MERCK & CO., INC. ON
### UNITED STATES' MOTION TO QUASH SUBPOENA

Defendant Merck & Co., Inc. ("Merck") respectfully submits this brief supplemental comment related to the U.S. motion to quash plaintiffs' subpoena of Dr. Graham.  As set forth in Merck's Comment (filed January 25, 2006), if the Court requires Dr. Graham to testify despite the FDA's consistent opposition to such depositions, Merck would require depositions of FDA officials as well.  Below, Merck identifies officials it may seek to depose if Dr. Graham is deposed by plaintiffs.

As the Court knows, Dr. Graham was the first-listed author in an article purporting to demonstrate adverse risks of Vioxx, an article that has been relied upon by plaintiffs in a number of Vioxx-related trials.[1]  Dr. Graham has also spoken widely about his views of the risks of

---

[1]    *See* David J. Graham, *et al.*, *Risk of acute myocardial infarction and sudden cardiac death in patients treated with cyclo-oxygenase 2 selective and non-selective non-steroidal anti-inflammatory drugs:  nested case-control*, 365 The Lancet 475 (2005).

___ Fee_____
___ Process_____
_X_ Dktd_____
_✓_ CtRmDep_____
___ Doc. No _____

Vioxx, both in government hearings and through various media.  (Pls.' Opp'n at 2-8.)

Notwithstanding this broad pool of resources embodying Dr. Graham's views already available

to plaintiffs, they now ask this Court to permit his deposition, ostensibly because neither Dr.

Graham's existing comments on the public record nor documents provided by the FDA in the

course of discovery "tell the entire story about the FDA's limited ability to curb the excesses of

large pharmaceutical companies."  (Pls.' Opp'n at 30.)  In essence, plaintiffs seek Dr. Graham's

testimony to decode the inner workings of the FDA for the benefit of the jury.

 Lest there be any doubt that Dr. Graham's views regarding Vioxx are shared by all his

colleagues at the FDA, both he and they have indicated that is not the case.  Dr. Graham

admitted as much in his testimony during Senate hearings, and it is clear from numerous

documents produced by the FDA in this litigation that many of Dr. Graham's colleagues

vigorously disagreed with his views on Vioxx.  Nonetheless, Dr. Graham's status as a current

FDA employee will lend undue credence to his testimony in the eyes of the jury as he "tell[s] the

entire story" of the inner workings of the FDA, unless Merck can present contrary testimony

from other officials.

 Below is a list of other employees at the FDA whose testimony Merck would potentially

seek if Dr. Graham were deposed.  (This list is illustrative – not exhaustive – since Merck could

not provide a final list of deponents until the Graham deposition were taken.)

1. Paul Seligman, M.D., M.P.H., Director, Office of Pharmacoepidemiology and Statistical Science.  Dr. Seligman, the director of the office in which Graham works, noted his disagreement with Dr. Graham's conclusions regarding high-dose use of Vioxx in an internal e-mail thread.[2]

2. Anne Trontell, M.D., M.P.H., Deputy Director of Office of Drug Safety.  Dr. Trontell, who was responsible for internal review of Graham's article, would provide important testimony regarding that review.  Notably, Dr Trontell has

---

[2] E-mail from Paul Seligman to Jonica Bull (Aug. 11, 2004) (attached as Ex. 1).

identified "several unexplained inconsistencies in the conduct of this study and the reporting of results."[3]  She also has noted numerous other concerns regarding Dr. Graham's study, including rapid reversals in findings based on identical data and reformulation of study goals that suggest manipulation of results.  Other officials at the FDA echoed Dr. Trontell's concerns.[4]  Ultimately, Dr. Graham submitted his manuscript to Lancet without waiting for final approval from Dr. Trontell.[5]

3.  Steven Galson, M.D., M.P.H., Acting Director, Center for Drug Evaluation and Research.  Dr. Galson expressed his disagreement with Dr. Graham's conclusion that Vioxx should never be used in high doses in an e-mail to Lestor Crawford, Commissioner of FDA.[6]

4.  Sandra Kweder, M.D., Deputy Director, Office of New Drugs.  Dr. Kweder would offer important testimony regarding Dr. Graham's role within the FDA during the course of his research of the cardiovascular effects of Cox-2 NSAIDs, and the FDA's role in funding and promoting that research.  Dr. Kweder represented the FDA in the same Senate hearings in which Dr. Graham testified.  She explained the FDA's role in ensuring drug safety and how it exercised that role during the Vioxx approval process.  She also briefly described the evolution of Dr. Graham's research and ultimate publication, suggesting intimate knowledge of FDA's approval-process and Dr. Graham's relationship to that process.[7]

---

[3]     *See* Ann Trontell, Memorandum to Paul Seligman, *Review of reports of FDA/Kaiser Vioxx study: Questions about Inconsistencies and Bias* at 2 (Oct. 29, 2004) (attached as Ex. 2).

[4]     *See, e.g.*, E-mail from Dr. Paul Seligman, Acting Director, Office of Drug Safety, Food & Drug Administration, to multiple recipients (Aug. 11, 2004) (attached as Ex. 1); E-mail from Dr. Janet Woodcock, Deputy Commissioner for OPE, Food & Drug Administration, to Dr. Ann Trontell (Oct. 29, 2004) (attached as Ex. 3).

[5]     *See* E-mail from Dr. David Graham to Dr. Ann Trontell (Oct. 26, 2004) (attached as Ex. 4).

[6]     E-mail from Dr. Steven Galson to Dr. Lestor Crawford (Aug. 25, 2004) (attached as Ex. 5).

[7]     *See* Testimony of Sandra Kweder, M.D., Deputy Director, Office of New Drugs, Food & Drug Administration, before Committee on Finance, U.S. Senate (Nov. 18, 2004), *available at* http://www.fda.gov/ola/2004/vioxx1118.html.

In short, if the Court permits the deposition of Dr. Graham, Merck would also seek to depose other FDA employees, in the interest of presenting a balanced picture of the FDA's role in matters relevant to the Vioxx litigation.

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
Carmelite M. Bertaut, 3054
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone: 504-581-3200
Fax:    504-581-3361

Defendants' Liaison Counsel

4

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Supplemental Comment of Merck & Co., Inc. on United States' Motion to Quash Subpoena has been served on Liaison Counsel, Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pretrial Order No. 8, on this 27th day of January, 2006.

_Dorothy H. Wimberly_

**Lackner, Michele**

| | |
|---|---|
| From: | Villalba, Lourdes |
| Sent: | Tuesday, October 05, 2004 11:11 AM |
| To: | Gould, Barbara |
| Subject: | FW: VIOXX email. cox-2 ispe poster |

-----Original Message-----

| | |
|---|---|
| From: | Bull, Jonca |
| Sent: | Wednesday, August 11, 2004 1:21 PM |
| To: | Hertz, Sharon H; Villalba, Lourdes; Harvey, Brian |
| Subject: | RE: cox-2 ispe poster |

Please respond from the division and consolidate your responses after discussion with Lourdes and Brian and any relevant others and send to Paul and cc me and John Jenkins.
Thanks for confirming my concerns here as to the leap between the methodology and conclusions reached.

It is of particular concern that the agency contributor is listed the first author. Look out for feedback from Merck in short order.
Jonca

-----Original Message-----

| | |
|---|---|
| From: | Hertz, Sharon H |
| Sent: | Wednesday, August 11, 2004 12:40 PM |
| To: | Bull, Jonca; Villalba, Lourdes; Harvey, Brian |
| Subject: | RE: cox-2 ispe poster |

Jonca,
Thanks for forwarding this for review. I do have concerns about the poster. In table 3 which appears to be the most damning for rofecoxib, it appears that David and Co. have not appropriately taken aspirin use into account.

The methods describe that in the survey of controls, "A <u>random</u> sample of controls exposed to celecoxib, ibuprofen, naproxen or rofecoxib, or remotely exposed to any NSAID were surveyed by telephone about their <u>use of low-dose aspirin</u> and OTC-NSAIDs, detailed smoking history and family history of AMI."

Table 2 which describes the characteristics of cases and controls does not identify aspirin by name among the "cardiovascular drug use in past year".

Given that the use of aspirin may substantially alter the risk of the events under evaluation, given that a only a random sample of controls were surveyed for aspirin use, and given that there were only a total of 18 ami or scd events that occurred among high dose rofecoxib users (see Table 3 below), an imbalance in the use of aspirin across cases and controls could have resulted in the difference in risk noted below. In a study such as this, it is critical to account for something as important as aspirin use. There were 32,796 controls used for this study. We don't know how many controls were contacted during the random sample. Presumably there was too little information about aspirin use to rely on aspirin use as a variable for the purpose of adjusting risk as it is not included in the factors used for adjusting risk identified in the foot note to Table 3.

I think it is inappropriate to draw any conclusion about the higher dose rofecoxib. It is disappointing that the authors are willing to draw such a strong conclusion from such flawed data.

Would you like me to forward these concerns to Paul Seligman or John?

<< OLE Object: Microsoft Word Document >>

1

FDACDER 021871



EXHIBIT
1

Blumberg No. 5119

Sharon
(301) 827-2017

-----Original Message-----
From: Bull, Jonca
Sent: Wednesday, August 11, 2004 11:14 AM
To: Villalba, Lourdes; Harvey, Brian; Hertz, Sharon H
Cc: Jenkins, John K
Subject: FW: cox-2 ispe poster

Please see the poster attached below for your comment. I regret the division was not consulted far earlier in
the process for this, particularly given that the lead is an FDA employee.
Jonca

-----Original Message-----
From:      Seligman, Paul
Sent:      Wednesday, August 11, 2004 10:19 AM
To:        Bull, Jonca
Subject:   FW: cox-2 ispe poster

Jonca,

Just wanted to make you aware of this poster presentation to displayed at ISPE in Bordeaux on August 25,
2004.

The analyses are based on clinical data from Kaiser Permanente in California.

My primary comment which I will express to David is the conclusion that "higher-dose rofecoxib should not
be prescribed or used" as I believe that the strength of this statement is not sustained by the limited number
of cases upon which the elevated odds ratio is based and for other reasons as well.

I'll copy you on my comments to David.

Call me at 301-827-3207 if you wish to discuss further.

Thanks.

Paul

-----Original Message-----
From:      Graham, David J
Sent:      Wednesday, August 11, 2004 8:24 AM
To:        Seligman, Paul
Subject:   cox-2 ispe poster

<< File: ispe2004.ppt >>

FDACDER 021872



**MEMORANDUM**   **DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**PUBLIC HEALTH SERVICE**
**FOOD AND DRUG ADMINISTRATION**
**CENTER FOR DRUG EVALUATION AND RESEARCH**

Date:   October 29, 2004

To:   Paul Seligman, M.D. M.P.H.
      Acting Director, Office of Drug Safety

From:   Anne Trontell, M.D. M.P.H.
        Deputy Director, Office of Drug Safety

Subject:   Review of reports of FDA/Kaiser Vioxx study:
           Questions about Inconsistencies and Bias

### EXECUTIVE SUMMARY

I have reviewed the following materials related to the FDA/Kaiser study on selective and nonselective NSAIDs:

1. Two Memoranda of Need dated August 14, 2001 and August 13, 2002 that established the goals, requirements, and deliverables for the study
2. An abstract based on the study submitted to the American College of Rheumatology (ACR) on or before May 13, 2004
3. A poster presentation delivered by David Graham in Bordeaux, France on August 24, 2004 at the International Society for Pharmacoepidemiology (ISPE)
4. A memorandum addressed to you dated September 30, 2004 that contains the study report, and
5. A draft manuscript for publication delivered by David as a hard copy also dated September 30, 2004.

Coincident to the submission of the memo and manuscript on September 30th, Merck voluntarily withdrew rofecoxib from the worldwide market on the same day based on their own clinical trial data which showed an elevated risk of cardiovascular events in a randomized clinical trial (RCT) for the prevention of colonic polyps in patients using rofecoxib continuously for more than 18 months.

EXHIBIT
2
Blumberg No. 5119

As the FDA/Kaiser study may have safety implications for the use of the remaining COX2 inhibitors that remain on the market as well as the other non-steroidal anti-inflammatory agents (NSAIDs), it is important to review the methods, analyses and conclusions of the study.  In particular, it is essential to:

- Evaluate and assess the methodology for biases that may have contributed to the authors' findings on rofecoxib and other NSAID drug products that were examined in addition to rofecoxib
- Determine whether additional studies, scientific review, or regulatory action need to be taken on other selective and nonselective NSAIDs.

My review notes several unexplained inconsistencies in the conduct of this study and the reporting of results.  Before the findings and conclusions of the study report can be accepted, the authors must address all inconsistencies with adequate documentation that clearly explains how they occurred, in order to address the potential appearance of data manipulation and *post hoc* analyses.

### Reporting of Different Results

The ACR abstract, the ISPE poster and the documents submitted on September 30, 2004 appear to come from the same data set.  The data set is described similarly in all documents, and each document shares the same total number of patients (1,394,764), the same number of patients exposed to each drug, and the same total of acute cardiac events (8199), where acute cardiac events represent the combination of either acute myocardial infarction (AMI) or sudden cardiac death (SCD.)  Yet in the space of a few months, the same authors published two different sets of findings and results based on these apparently identical data.

First, the number of case and control patients on high-dose rofecoxib was reported in the ACR abstract as 12 (5 cases and 7 controls), whereas in the ISPE poster and September 30th documents, the number is reported as 18 (10 cases and 8 controls.)   None of the materials examined explains how the number of high-dose rofecoxib cases of acute cardiac events doubled from 5 in the ACR abstract to 10 in the ISPE and September 30th materials.  The September 30th manuscript describes a process of unanimous consensus by four Kaiser collaborators for adjudicating uncertain cases of high dose rofecoxib exposure.  It is not clear how the consensus process resulted in two different published numbers of high-dose rofecoxib cases and controls.

Second, the ACR abstract reports different risk estimates for current use of each NSAID when compared to the ISPE poster and the September 30th documents.  The ISPE poster and September 30th documents are the same except for a small difference in the risk estimate for high-dose rofecoxib.  The comparator for the ACR poster is not specified, whereas the comparator for the ISPE and September 30th documents is for remote use of any NSAID.  The ACR describes relative risks, whereas the ISPE poster describes odds ratios.

FDACDER 022463

The third area of difference among the four reports of the Kaiser data set is likely related to the previous two inconsistencies in case counting and analytical methodology: the statistical significance of the risk estimates for four of the NSAIDs changed between the ACR abstract and the ISPE poster. In the ACR abstract, the relative risk of celecoxib was statistically significant and less than one. The ACR abstract found neither risk estimate for the two dose regimes of rofecoxib to be statistically significant; low dose rofecoxib had an estimated risk of 1.02 and high dose rofecoxib had an estimated risk of 5.04. In the ISPE poster, ibuprofen, naproxen, and high dose rofecoxib had statistically significant risk estimates that were not present in the ACR abstract. Likewise, the ISPE poster differed from the ACR abstract in that the celecoxib risk estimate was no longer statistically significant.

To my knowledge, no one in the FDA other than David Graham was informed about the existence or the contents of the ACR abstract (deadline for submission May 13, 2004) until after the ISPE poster was presented on August 24, 2004. Given the public health importance of getting accurate and reliable risk estimates for rofecoxib as well as the other NSAID drug products studied, and the importance of these data in informing regulatory decisions within the Agency, it is not clear why David failed to disclose a) that he had submitted results for public airing without FDA review and clearance; b) that those results differed from his subsequent ISPE results, and c) the rationale for why these results changed. The September 30th memo and manuscript do not address the ACR analysis or results.

**Ambiguities in Study Objectives**

The study objectives as stated in the September 30, 2004 memo vary from the documentation in our two Memoranda of Need for the Kaiser study. The original goal of the study was broadly stated to compare rates of myocardial infarction (MI) among patients treated with COX-2 inhibitors compared to conventional NSAIDs. There is no mention of a planned comparison of rofecoxib to celecoxib as is described in the September 30th documents.

Since it is only in comparison to celecoxib that low dose rofecoxib shows a statistically significant elevated risk (at the commonly accepted p-value of 0.05), it is important to clearly document if this was an *a priori* hypothesis or a *post hoc* analysis. Documentation of the *a priori* hypotheses and corresponding analytical and statistical plan should resolve this question. Ordinarily, any changes in study objectives and analytical plan should be limited and well documented to address potential charges of data manipulation or data dredging to arrive at a desired result. A *post hoc* analysis might require statistical correction or other considerations for proper interpretation.

**Technical Concerns for Confounding and Biases**

These comments and the ones in the main body of my review are highly technical, in keeping with the typical level of FDA critique of randomized clinical trial data submitted by drug sponsors for Agency review.

FDA/CDER 022464

In light of the greater prior cardiovascular risk (CVR) factors that Graham and collaborators describe for the celecoxib and rofecoxib exposed patients, my principal concern is for confounding of AMI and SCD by virtue of getting a COX2 prescription within Kaiser. In other words, do practice patterns or formulary constraints within Kaiser somehow lead patients at greater risk of AMI and SCD to preferentially receive a COX2 rather than a conventional NSAID? The data presented by the authors in the September 30th documents show that Kaiser patients use high dose rofecoxib less than half as frequently as the general US or Tennessee Medicaid population. If as a result of these prescribing differences the patients using COX2 agents in Kaiser are different in underlying cardiovascular risk than conventional NSAID users, to what extent can any statistical correction or modeling adequately account for and equalize their intercomparison?

My concern about the limitations of statistical correction for channeling of "sicker" patients to receive COX2 agents instead of nonselective NSAIDs arises from lessons learned from the estrogen replacement trial of the Women's Health Study. The Women's Health Study clinical trial showed that estrogen replacement therapy *increases* cardiovascular risk in women who take it, and contradicted multiple and statistically well-controlled epidemiologic studies which found estrogen use to *lower* the risk of cardiovascular disease in women. In retrospect, epidemiologists have hypothesized that the apparent yet incorrect protective effect of estrogen seen in multiple observational studies may have been due to "healthier" women seeking out or choosing estrogen replacement therapy.

Questions of confounding or residual bias in the statistical adjustment methods used by the authors will need to be addressed by statistical reviewers. These include whether risk set matching or propensity scores can fully account for evidence of risk channeling to COX2s versus nonselective NSAIDs. Presentation of the data on the different exposure groups would be helpful, since application of logistic regression with multiple variables to unseen primary data does not allow ready comparison of the different treatment groups.

**Recommendations**

The authors should document their methods in detail and respond to questions raised in this review, in particular the noted inconsistencies in the study objectives, results, and statistical findings of significance of their published ACR abstract and August 2004 ISPE poster. If possible, other analyses might be conducted to allow exploration of the time-dependency of NSAID exposure and acute cardiac events. Time dependency would be valuable to explore since the FDA/Kaiser study focused on *current* risks of COX2 and NSAID exposure, rather than the *long-term* or *cumulative* risks of COX2 exposure seen after 18 months of rofecoxib use in the Merck clinical trial of polyp prevention. Any considerations for regulatory actions for the class of selective and nonselective NSAIDs based upon this study or other epidemiologic studies will require further analysis and discussion.

FDACDER 022465

**MATERIALS REVIEWED:**

1. Memorandum dated September 30, 2004 from David Graham to Paul Seligman, "Risk of acute myocardial infarction and sudden cardiac death in patients treated with COX-2 selective and non-selective NSAIDs."

2. "Risk of Acute Myocardial Infarction and Sudden Cardiac Death in Patients Treated with COX-2 Selective and Non-Selective NSAIDS" by Graham, Campen, Cheetham, Hui, Spence, Levy, Shoor, Ray.  Apparent manuscript for publication. Hard copy left in Seligman's locked office on the evening of September 30, 2004.

3. "Risk of Acute Cardiac Events among Patients Treated with Cyclooxygenase-2 Selective and Non-Selective-Nonsteroidal Anti-Inflammatory Drugs" by Campen, Graham, Cheetham, Shoor, Levy, Hui, Spence, and Ray.  American College of Rheumatology Presentation Number 1756.  Obtained from the ACR website after September 22 meeting with ODE5.  Instructions for authors found on ACR website indicate that the deadline for submission was on or before May 13, 2004.

4. "Risk of Acute Myocardial Infarction and Sudden Cardiac Death with Use of COX-2 Selective and Non-Selective NSAIDS" by Graham, Campen, Cheetham, Hui, Spence, and Ray.  Presented at the International Society for Pharmacoepidemiology August 24, 2004 and followed by a press conference.

5. Memorandum of Need August 14, 2001  Requisition F09289 with program research goals, description of work, and reporting requirements and deliverable items for project "Comparison of Rates of Myocardial Infarction (MI) between Patients treated with cyclooxygenase -2 inhibitors (COX-2 ) and Traditional Non-Steroidal Anti-Inflammatory Drugs (NSAIDS)

6. Memorandum of Need August 13, 2002  Requisition A 175443 with program research goals, description of work, and reporting requirements and deliverable items for project "Design of Survey Questionnaire to be used in the Study of Comparison of Rates of Myocardial Infarction (MI) between Patients treated with cyclooxygenase -2 inhibitors (COX-2 ) and Traditional Non-Steroidal Anti-Inflammatory Drugs (NSAIDS)"



**INCONSISTENCIES AMONG DOCUMENTS THAT NEED TO ADDRESSED AND RESOLVED**

**In Primary Hypotheses/Objectives Of The Study**

1. The stated program research goals per the August 2001 MON were to compare the rates of MI among patients treated with COX-2 inhibitors compared to conventional NSAIDS using the Kaiser Permanente database for 1999-2001. There is no mention in this document or in the August 2002 MON of what the September 30th memo states as the primary study questions (to make comparisons to celecoxib or to determine if naproxen decreases the risk of AMI and SCD) or the draft manuscript statement that "an *a priori* purpose of the study ...to compare current exposure to either standard- or high-dose rofecoxib against current exposure to celecoxib." Changes in study objectives have implications for the analytical plan used, and ordinarily should be very limited and well documented during the course of a study to counter potential charges of data manipulation and data dredging.

2. Outcome definition and validation: Neither MON mentions a plan to include sudden cardiac death in the outcome definition. The description of work in the 2001 MON indicates that outcome validation "may require medical validation of all or a random sample of outcome events." No such validation is reported in any of the reports or published findings of this study.   See comment #2 in the following section entitled, "Documentation Questions and Possible Biases."

**In Results and Their Statistical Significance**

1. The results and statistical findings of the ACR abstract and ISPE poster differ as described below::

- Although the total numbers of patients and acute cardiac events are the same in both studies, the number of cases and controls in the high-dose rofecoxib group varies. In the ACR abstract, there were 5 cases and 7 controls, resulting in high dose rofecoxib having a non-significant relative risk (RR) of 5.06 and the authors noting that the statistical power was limited by these low levels of usage. In the ISPE poster, the high dose group is reported as having 10 cases and 8 controls, resulting in a new and statistically significant RR of 3.13.

- The inconsistent numbers of high dose rofecoxib patients who had either AMI or SCD are difficult to reconcile with the stated methods in the draft manuscript. The manuscript states "For rofecoxib-treated patients with inconsistencies between the instructions for use, days-supply and frequency of refills, computerized print-outs of all NSAID prescriptions covering the entire study period were reviewed by a panel blinded to case or control status." This panel is stated to have made assignment to high-dose rofecoxib only upon "unanimous consensus." If unanimity was required, how could the number of high-dose rofecoxib cases *increase* from 5 in the ACR abstract to 10 in the ISPE abstract? How did the number of controls *increase* from 7 to 8? The requirement for unanimity to assign a case might ordinarily be expected to *decrease* the total

6

number of agreed-upon high dose rofecoxib cases. Why were the cases and controls attributed to high dose rofecoxib changed and when? Who did this and how was it decided?

- The conclusion of the ACR abstract was "Rofecoxib use at doses above 25 mg/d was associated with a 5 fold increased risk of AMI and sudden cardiac death. Naproxen use did not reduce risk while celecoxib use did reduce risk. The latter finding was *unanticipated* [emphasis added] and may be due to chance. Additional study is needed." The statement that the celecoxib finding was incidental, possibly due to chance, and requires additional study appears inconsistent with the ISPE poster making a conclusion that "From a cardiovascular perspective, celecoxib may be preferable to lower-dose rofecoxib."

## TECHNICAL CONCERNS/QUESTIONS ON DOCUMENTATION, CONFOUNDING, AND POSSIBLE BIASES

1. Outcome measures: I would like to see greater documentation about how SCD came to be included as an outcome measure since it was not in the original MON with Kaiser. The classification of outpatient deaths as SCD was based on a broad list of cardiac conditions as reported on the death certificate, and was not validated by medical records. The authors assert that coronary artery disease frequently is manifest as sudden death outside of the hospital but they provide no references for this assertion.

2. Validity of outcome measures: The predictive value of classifying a case as an AMI based on diagnosis codes stands in contrast to the original study intention to validate AMI based on medical records. The authors note that laboratory evidence generally acknowledged as confirmatory of an AMI was missing in 13% of the Kaiser AMI cases. Can the authors show if this percentage is consistent for each set of drug-attributed cases, particularly among the very small group of high dose rofecoxib users (reported as 12 in the ACR abstract and as 18 in the ISPE abstract and September 30th documents?) Consistency across the different drug-attributed cases would provide reassurance that there are no important differences in the percentage of validated cases across drugs. One might postulate that lab confirmation might not occur as frequently or quickly for younger patients or patients who die of SCD or quickly after presenting. If these were differentially distributed across the exposed groups it would be an important finding that could raise or lower concerns for the different agents.

3. Method of control group selection and use: Allowing a single patient to serve as multiple controls or to become a case is not new to epidemiology. But I would like to see how duration and number of NSAIDs used varied across the case and control groups, since I and others might reasonably postulate that people continuously using NSAIDS might be a) more likely to be using a COX2 selective agent and b) to have a generally poorer health status (since OA occurs more in the elderly and RA is a systemic illness) than those using NSAIDs

intermittently for injury-related pain or dysmenorrhea. Especially since the RCT data from Merck suggest that the risk of AMI appears after continuous long-term use, is there any evidence of a difference in duration of COX2 or NSAID use between cases and controls? What statistical correction might be applied in this instance?

4. Risk Factors for AMI and SCD possibly correlated with likelihood of COX2 use: The list of cardiovascular risk factor drugs includes anticoagulants and platelet inhibitors. Since anticoagulants and platelet inhibitors raise the risk of GI bleeding, can the authors show that the higher percentage of cases who were taking these drugs because of high CV risk are not also systematically more likely to be using COX2 agents instead of nonselective NSAIDs, particularly rofecoxib which carried the strongest claim of GI protection? See my other comments later in this review about channeling and confounding by MI risk or generally more ill health to rofecoxib within Kaiser.

5. The statistical methods used to adjust for differences in underlying cardiovascular risk need further explanation and description. These methods have been developed by Wayne Ray who works with a Medicaid population of medically fragile elderly and underserved individuals who are likely to be quite different from those covered by an employment-based HMO like Kaiser. I cannot tell determine whether application of the CVR score to Kaiser patients is valid without further information, including looking at the references by Ray.

6. In follow-on to comment 5 above, the CVR scores are derived from patients who were not exposed to NSAIDS within the past 30 days. This means that people on continuous or near-continuous use of NSAIDs would have been systematically excluded from the risk score development and characterization. I would like to see data on the demographic and other health characteristics of the recent and remotely exposed patients compared to the currently exposed to make sure that my concern for bias stated in item 3 above did not occur. Namely, that the CVR score might well systematically misrepresent the potentially sicker patients using NSAIDs on a continuous daily basis. It is important to make sure currently exposed patients taking continuous NSAIDs are not more likely to be getting COX2s because of a higher risk of a CV event due to advanced age, medical frailty, and/or presence of a vasculitic disease like RA that can be associated with prothrombotic events.

7. Why was a score of 0-9 used to cover a 12.5 fold difference? Could 2 variables have been used or would that have resulted in a model with too many degrees of freedom for the small number of observations?

8. I defer to other reviewers about whether the Wald test is appropriate to compare rofecoxib to celecoxib. Other comments under inconsistencies ask for documentation that this was not a *post-hoc* analysis in support of a significant risk finding for low dose rofecoxib. Does the fact that the comparison was done solely among the COX2 drugs imply that the authors felt the COX2 users were more similar to each other than they were to nonselective NSAID users?

9. Telephone survey: This was administered to controls only, not cases. Why weren't cases surveyed? We see from the data shown in tables 1 and 2 that compared to controls, the cases generally had more cardiovascular

hospitalizations in the preceding year, greater cardiovascular drug use, appeared to smoke more, and used systemic corticosteroids more commonly. Can the authors defend why cases were not surveyed, since we might expect that case use of OTC ASA for CV protection might well be systematically different from controls and thus a source of unmeasured bias?

10. Questionable representativeness of Kaiser use to the overall U.S.: The data show that only 18 patients were currently taking high dose rofecoxib among the overall total of 266 current rofecoxib users. This represents about 7% of current users, in contrast to the 18% figure reported for the US in the draft manuscript. The rofecoxib patients were older, more likely to be women, to use an anticoagulant and steroids, and to be seeing a rheumatology specialist. Since people within the Kaiser HMO appear from the data to use high dose rofecoxib less than half as much as the US, can Kaiser elaborate on how its co-payment or prior authorization policies might have influenced the use of rofecoxib? In particular, can Kaiser indicate whether any medical illness criteria had to be met to allow and/or reimburse rofecoxib for their plan members? Such criteria might lead to sicker patients being channeled to rofecoxib, or confounding of drug exposure by disease severity. This information should also be presented for other COX2s and NSAIDs.

11. In the telephone survey, how did the 20% who didn't respond compare to responders in drug use, demographics, CVR score etc? How well did the surveyed patients compare to nonsurveyed patients in factors other than their case status? Sicker people are often underrepresented in surveys. The authors should supply additional data showing that there was not selective participation of healthier people in the survey and that their results can be applied to other people.

12. Reference 4 to a nationwide survey of COX2 and nonselective NSAID use indicates no differences with body mass index, smoking behavior, ASA use or education. But item 11 above raises the question of whether this generalization can be applied to the studied Kaiser system, since its use profile is different from the US population. Can the authors supply more information?

APPEARS THIS WAY
ON ORIGINAL

**Mingioli, Fiona**

| | |
|---|---|
| **From:** | Woodcock, Janet |
| **Sent:** | Friday, October 29, 2004 6:58 PM |
| **To:** | Trontell, Anne E; Kweder, Sandra L; Woodcock, Janet |
| **Subject:** | RE: My review of FDA/Kaiser study of NSAIDs |

TX  Very nice. I also wondered why the comparison to celecoxib, also the pooling of high and low dose results to get an estimate of overall MI excess (in the intro) seemed very strange. jw

-----Original Message-----
**From:** Trontell, Anne E
**Sent:** Friday, October 29, 2004 5:21 PM
**To:** Kweder, Sandra L; Woodcock, Janet
**Subject:** FW: My review of FDA/Kaiser study of NSAIDs

Steven asked me to pass this along to both of you, thinking it might help in handling press.  Bob O'Neill and Bruce Stadel also did reviews that I can pass along if you're interested.
Anne << File: AETKaiserstudyreview.doc >>

-----Original Message-----
**From:** Galson, Steven
**Sent:** Friday, October 29, 2004 4:59 PM
**To:** Trontell, Anne E
**Cc:** Seligman, Paul
**Subject:** RE: My review of FDA/Kaiser study of NSAIDs

Anne,
Wow! Looks really excellent. Looking forward to reading in detail. Can you share with Sandy and Dr. Woodcock? They are doing press on this and it may be helpful.
S

-----Original Message-----
**From:** Trontell, Anne E
**Sent:** Friday, October 29, 2004 4:37 PM
**To:** Seligman, Paul
**Cc:** Galson, Steven; Trontell, Anne E
**Subject:** My review of FDA/Kaiser study of NSAIDs

Paul,
Thanks for your comments.  I am attaching my finalized review and copying Steven as you requested. I will also share my review directly with David.

Anne
 << File: AETKaiserstudyreview.doc >>
Anne Trontell, M.D., M.P.H.
Deputy Director
Office of Drug Safety
Center for Drug Evaluation and Research
15B-33 Parklawn
HFD-400
5600 Fishers Lane
Rockville MD 20857
301-827-3219
301-443-5161 (fax)
trontella@cder.fda.gov

1

**FDACDER 022482**


EXHIBIT
3

**Graham, David J**

| | |
|---|---|
| From: | Graham, David J |
| Sent: | Tuesday, October 26, 2004 12:09 PM |
| To: | Trontell, Anne E; Seligman, Paul |
| Cc: | 'David Campen (E-mail)'; 'Rita Hui (E-mail)'; 'Michele Spence (E-mail)'; 'Wayne Ray (E-mail)' |
| Subject: | RE: cox-2 manuscript |

Anne,

One other thing that I forgot to mention. Although your e-mail is silent on the point, I interpreted your response as confirmation that I am not breaking any FDA rules in submitting the manuscript to the Lancet today.

Dave

-----Original Message-----

| | |
|---|---|
| From: | Graham, David J |
| Sent: | Tuesday, October 26, 2004 8:14 AM |
| To: | Trontell, Anne E; Seligman, Paul |
| Cc: | David Campen (E-mail); Rita Hui (E-mail); Michele Spence (E-mail); Wayne Ray (E-mail) |
| Subject: | RE: cox-2 manuscript |

Anne,

We need to send the manuscript out today. I was contacted by the Lancet at the end of August regarding my considering submiting a manuscript of our study to it. The co-authors agreed and I communicated that back to the journal. Last Friday, I was telephoned by the Lancet because it has another article on rofecoxib under fast-track review and they want our submission ASAP.  We (the co-authors) held a teleconference on Friday and agreed that the paper was ready to go and should be submitted Tuesday. I communicated this to the Lancet.

I've read Bob's and Bruce's comments and these do not raise major red flags for us. Compared to what has been published on this subject, our study is better designed and more appropriately analyzed than most. It's time to see what a journal's peer reviewers have to say, reviewers who are not constrained by FDA expectations.

Regarding clearance, it's nearly 4 weeks since the manuscript was placed in clearance when 2 weeks is what is stated in FDA's manuscript clearance memorandum. If you recall, I expressed concern to both you and Paul about our manuscript getting held up, delayed or blocked by the clearance procedure. You assured me that this would not happen. In the current medical-scientific environment, I am aware of 2 other manuscripts on the subject of rofecoxib/celecoxib and AMI (in addition to the 1 mentioned above) that have found results very similar to what we found and that are under journal peer review. Our study also needs to be under journal peer review.

As for the FDA disclaimer, none of the authors expects FDA's endorsement of our study or conclusions. We don't pretend to speak for the Agency. I understand that you disagree with the conclusions we've reached and that you consider the study to be a "scientific rumor" but that is not what I or my co-authors believe. You're entitled to your conclusions and I'm fine with that. The paper has undergone extensive discussion among the authors and we have reached agreement. The conclusions are truly those of the study group. I have not forced anything down anyone's throat. Indeed, if you had sat in on some of our study meetings, you'd realize how scientifically independent each of the co-authors are.

For all that the Center claims in its operating principles that respect for others is a core value, my experience with rofecoxib was just the opposite from management, once the results from this study and their potential implications came to light in August. I'll be happy to read and consider your comments, but I must submit the manuscript today.

Dave

-----Original Message-----

| | |
|---|---|
| From: | Trontell, Anne E |
| Sent: | Monday, October 25, 2004 5:45 PM |
| To: | Graham, David J; Seligman, Paul |
| Cc: | 'David Campen (E-mail)'; 'Rita Hui (E-mail)'; 'Michele Spence (E-mail)'; 'Craig Cheetham (E-mail)'; 'Wayne Ray (E-mail)' |
| Subject: | RE: cox-2 manuscript |
| Importance: | High |

1

FDACDER 023041



EXHIBIT
4
Blumberg No. 5119

David,

Sorry for the delay In replying. I didn't see your email from Friday until a few minutes ago. Paul and I are behind in reading and replying to our emails.

Would you please give me until Friday October 29th to send you my comments and questions on your manuscript? Paul will clear the document once you have considered them.

Thanks!

Anne

-----Original Message-----
**From:** Graham, David J
**Sent:** Friday, October 22, 2004 10:29 AM
**To:** Seligman, Paul; Trontell, Anne E
**Cc:** Graham, David J; David Campen (E-mail); Rita Hui (E-mail); Michele Spence (E-mail); Craig Cheetham (E-mail); Wayne Ray (E-mail)
**Subject:** cox-2 manuscript

Paul and Anne,

I reviewed the comments of Bob and Bruce and discussed them with the co-authors. We changed the paper to exclude our estimate of the actual number of excess cases of AMI/SCD, suggested by both Bob and Bruce.

My understanding of FDA's manuscript clearance procedure is that if the manuscript is not cleared by the office director after 2 weeks, the FDA author is permitted to submit it to a journal, provided it carries a disclaimer. Our manuscript has had a disclaimer on it since I submitted it for clearance on September 30.

It's now over 3 weeks later and we would like to submit the manuscript for consideration by a journal. Unless I am informed otherwise by close of business Monday, I will assume that I am correctly interpreting the FDA clearance procedure, which you shared with the Office earlier this year, and that I have your permission to submit the article. IMS has cleared the use of their data for this manuscript.

If there is a problem, please provide citations and documents for all controlling authority. In that way, I will then be able to work to ensure compliance with all relevant rules.

−Dave

**Appears This Way
On Original**

2

FDACDER 023042

**Throckmorton, Douglas C**

| | |
|---|---|
| **From:** | Galson, Steven |
| **Sent:** | Wednesday, August 25, 2004 8:23 PM |
| **To:** | Crawford, Lester, D.V.M. |
| **Cc:** | Woodcock, Janet; Bond, Susan; Throckmorton, Douglas C; Seligman, Paul; Henderson, Deborah J; Stone, Bradford |
| **Subject:** | Fw: Interesting article about ISPE presentation |

Dr Crawford
Another Dr Graham special. This article is based on a poster presented
at the int epi mtg in France this wk.
It contains the standard disclaimer statement that it does not represent
FDA policy. We gave Merck an advance copy. I do not believe he went
through FDA press office to set up Reuters interview.  We believe the
study findings are sound but the conclusion that the drug should not be
used in high doses is not.  In my absence Dr
Seligman can provide any further info. I apologize for not telling you
about this this AM when we met. We suspected this was going to happen.
S


-----Original Message-----
From: Seligman, Paul <SELIGMANP@cder.fda.gov>
To: Galson, Steven <GalsonS@cder.fda.gov>; Throckmorton, Douglas C
<THROCKMORTON@cder.fda.gov>
Sent: Wed Aug 25 18:27:15 2004
Subject: FW: Interesting article about ISPE presentation


FYI.

Paul

  -----Original Message-----
From:     DalPan, Gerald
Sent: Wednesday, August 25, 2004 5:54 PM
To:   Seligman, Paul; Trontell, Anne E
Subject:    Intersting article about ISPE presentation

FDA Study Finds Vioxx Increases Heart Attack Risk
By Ransdell Pierson, Reuters
NEW YORK (Aug. 25) - Patients taking Merck & Co. Inc.'s Vioxx arthritis
drug had a 50 percent greater chance of heart attacks and sudden cardiac
death than individuals using Pfizer Inc.'s rival Celebrex medicine,
according to a large study financed by the U.S. Food and Drug
Administration.
The study, presented at an epidemiologists conference on Wednesday, also
found patients taking the highest recommended daily dosage of Vioxx had
three times the risk of heart attack and sudden cardiac death as those
not taking standard painkillers.
Sudden cardiac death, a sudden electrical disturbance of the heart that
is not considered a heart attack, is the biggest cause of death in the
United States.
Researchers came up with the potentially damaging findings on Vioxx, a
$2.5-billion-a-year blockbuster medicine, after analyzing the medical
records of 1.4 million people insured by Kaiser Permanente, the Oakland,
California-based health maintenance organization.
Graham said another major finding was that patients taking the typical
starting dose of Vioxx had a 50 percent greater chance of heart attack
and sudden cardiac death than patients taking any dose of Celebrex.
"Based upon the evidence in this study, I don't think doctors should
prescribe high-dosage Vioxx, and patients shouldn't take it," Dr. David
Graham, lead investigator for the trial, said in an interview.

**FDACDER 021583**



EXHIBIT
5

Most patients take daily Vioxx doses of 12.5 milligrams and 25 milligrams for arthritis. But a higher dose of 50 milligrams is approved by the FDA for treatment of pain for no longer than five days.
"The problem is that some patients continue to take it for 30, 60, or 90 days," Graham said, putting themselves at elevated risk of heart attack and sudden cardiac death, Graham said.
Graham, senior scientist for the FDA's Office of Drug Safety, said his own interpretations of the data did not necessarily reflect the views of the FDA.
He presented results of the study on Wednesday at an international meeting of epidemiologists being held in Bordeaux, France.

APPEARED THIS WAY
ON ORIGINAL

231

FDACDER 021584