FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 JAN 27  PM 3:28

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: VIOXX | * | MDL NO. 1657 |
| PRODUCTS LIABILITY LITIGATION | * | |
| | * | SECTION: L (3) |
| | * | |
| | * | JUDGE FALLON |
| **THIS DOCUMENT RELATES TO** *Gary Dugas* | * | |
| *and his wife, Cathy Dugas, versus Merck & Co.,* | • | MAG. JUDGE KNOWLES |
| *Inc., and Dr. Florence Jones,* **Civil Action** | * | |
| **No. 05-4213, U.S.D.C., E.D. La.** | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MOTION TO REMAND
## FILED BY PLAINTIFFS GARY AND CATHY DUGAS

NOW INTO COURT, through undersigned counsel, come Plaintiffs Cary Dugas and his

wife, Cathy Dugas, who suggest to the Court that it lacks subject matter jurisdiction over Plaintiffs'

claims and that, accordingly, this action should be remanded to the Civil District Court for the Parish

of Orleans, State of Louisiana, for the reasons set forth in the attached Memorandum.

Respectfully submitted,

SILVESTRI & MASSICOT

BY: _____
       Frank A. Silvestri LSBA 12075
       John Paul Massicot (T.A.) LSBA 9033
       Damien Savoie LSBA 19144

**Temporary Office Address:**
909 East Cornerview Road #C
Gonzales, La 70737
Telephone: (504) 482-3400
Facsimile: (225) 647-3060

Page 1 of 2

\_\_\_ Fee_____
\_\_\_ Process_____
X  Dktd_____
\_\_\_ CtRmDep_____
\_\_\_ Doc. No _____

LAW OFFICE OF PETER D. DERBES

BY: _____
      Peter D. Derbes LSBA 4888

**Temporary Office Address:**
1017 Jefferson Avenue
New Orleans, LA 70115
Telephone: (504) 486-5006
Facsimile: (888) 568-8584

Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

     I hereby certify that the above and foregoing Motion to Remand Filed by Plaintiffs Gary and Cathy Dugas has been served on Liaision Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8, on this 27th day of January, 2006.

_____

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: VIOXX | * | MDL NO. 1657 |
| PRODUCTS LIABILITY LITIGATION | * | |
| | * | SECTION: L (3) |
| | * | |
| | * | JUDGE FALLON |
| **THIS DOCUMENT RELATES TO** *Gary Dugas* | * | |
| *and his wife, Cathy Dugas, versus Merck & Co.,* | • | MAG. JUDGE KNOWLES |
| *Inc., and Dr. Florence Jones,* Civil Action | * | |
| No. 05-4213, U.S.D.C., E.D. La. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## NOTICE OF MOTION
### (MOTION TO REMAND FILED BY PLAINTIFFS GARY AND CATHY DUGAS)

Please take notice that the Motion to Remand filed by Plaintiffs Gary and Cathy Dugas will

be brought on for hearing before the Honorable Eldon E. Fallon, United States District Judge, in

Room C456, United States Courthouse, 500 Poydras Street, New Orleans, Louisiana 70130, at 9:00

a.m. on the 15th day of March, 2006.

Respectfully submitted,

SILVESTRI & MASSICOT

BY: _____

Frank A. Silvestri LSBA 12075
John Paul Massicot (T.A.) LSBA 9033
Damien Savoie LSBA 19144

**Temporary Office Address:**
909 East Cornerview Road #C
Gonzales, La 70737
Telephone: (504) 482-3400
Facsimile: (225) 647-3060

Page 1 of 2

LAW OFFICE OF PETER D. DERBES

BY: _____

Peter D. Derbes LSBA 4888

**Temporary Office Address:**
1017 Jefferson Avenue
New Orleans, LA 70115
Telephone: (504) 486-5006
Facsimile: (888) 568-8584

Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Notice of Motion (Motion to Remand Filed by Plaintiffs Gary and Cathy Dugas) has been served on Liaision Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8, on this 27th day of January, 2006.

_____

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: VIOXX | * | MDL NO. 1657 |
| PRODUCTS LIABILITY LITIGATION | * | |
| | * | SECTION: L (3) |
| | * | |
| | * | JUDGE FALLON |
| **THIS DOCUMENT RELATES TO** *Gary Dugas* | * | |
| *and his wife, Cathy Dugas, versus Merck & Co.,* | • | MAG. JUDGE KNOWLES |
| *Inc., and Dr. Florence Jones,* **Civil Action** | * | |
| **No. 05-4213, U.S.D.C., E.D. La.** | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM IN SUPPORT OF MOTION TO REMAND
## FILED BY PLAINTIFFS GARY AND CATHY DUGAS

May it please the Court:

Plaintiffs' state court petition alleges that Mr. Dugas was prescribed 25 mg. of Vioxx per day by his physician, Defendant Florence Jones, M.D., beginning in May of 2003. The petition further alleges that, in August of 2003,  Dr. Jones increased the dosage to 50 mg. per day. Dr. Jones increased the dosage in the face of  Defendant Merck's "Dear Healthcare Professional" letter issued **over one year earlier**, in April of 2002, which cited the company's "VIGOR" study's finding that a Vioxx daily does of 50 mg appeared to result in a higher incidence of serious cardiovascular thrombotic events.  That letter, and the attendant revised labeling, advised Dr. Jones that "Chronic use of Vioxx 50 mg. daily is not recommended." In November 2003, three months after Dr. Jones had upped his Vioxx dose, Mr. Dugas suffered a heart attack.

It will be for the jury to decide whether Mr. Dugas's use of 25 mg of Vioxx for three months, his taking 50 mg. of Vioxx for three months, or a combination of these regimens over  half a year

caused or contributed to his heart attack. It can be expected that Merck will contend that Dr. Jones's

prescription of excessive doses of Vioxx, contrary to the "Dear Healthcare Professional" letter and

the revised Vioxx labeling, was the cause of Mr. Dugas's heart attack. See Merck's Fifteenth

Defense plead in its Answer.[1]

### Dr. Jones was not fraudulently or improperly joined.[2]

Like the Plaintiffs, Dr. Jones is a Louisiana citizen. Faced with two actors who either

individually or jointly brought about Mr. Dugas's injuries, Plaintiffs acted properly and prudently

in suing both Merck and Dr. Jones in the same action. Indeed, filing separate actions against each

Defendant would have invited the sole Defendant in each action to point the finger at an empty chair.

Merck's Answer telegraphs its intention to deflect blame for Plaintiffs's damages to a physician

seemingly ignorant of Merck's "Dear Healthcare Professional" and Vioxx's revised labeling

cautioning against use of a 50 mg. dose. See Exhibits 1 and 2, attached.[3] The same compelling facts

---

[1] "38.   If Plaintiffs have sustained injuries or losses as alleged in the Petition, upon information and belief, such injuries and losses were directly and proximately caused by the intervening or superseding act and conduct of persons not having real or apparent authority to take said actions on behalf of Merck and over whom Merck had no control and for whom Merck may not be held accountable."

[2] The Fifth Circuit has held that what was formerly known as "fraudulent joinder" should now be called "improper joinder." *Smallwood v. Illinois Central Railroad Company*, 385 F.2d 568 (5th Cir. 2004) (en banc), cert. denied 125 S.Ct. 1825 (2005).

[3] "In this circuit, a district court may `pierce the pleadings' and review all evidence placed before it in determining whether fraudulent joinder has occurred. Therefore, a plaintiff is not restricted to the facts in the state court pleadings, but may establish the facts of his claim against the in-state defendant by other evidence, including affidavits and deposition." *Shavers v. Beverly Enterprises-Mississippi, Inc.*, 977 F.Supp. 1259, 1261-62 (N.D. Miss., 1997)

which required Plaintiffs to sue Dr. Jones will undoubtedly thrust her into Merck's sights as well, as an inviting target onto whom Merck will attempt to place sole or joint responsibility for Plaintiffs' damages.

The removal papers which Merck has filed in this and other Vioxx actions have a knee-jerk, boilerplate quality to them: apparently *any* physician joined as a Defendant in a Vioxx suit is deemed improperly joined, regardless of the actual facts of any specific case.  Merck's papers fail to allege any facts which support its contention of improper joinder.  That failure dooms the removal and dictates remand to state court:

> The party alleging fraudulent joinder bears the burden of persuasion, and that burden is quite stringent. See *Hart v. Bayer Corp.*, 199 F.3d 239, 246 (5th Cir.2000) ("The burden of persuasion placed upon those who cry `fraudulent joinder' is indeed a heavy one."). In order to prove that a non-diverse party has been fraudulently joined by a plaintiff hoping to defeat diversity, the removing party must demonstrate either "outright fraud in the plaintiff's recitation of jurisdictional facts," or that there is "absolutely no possibility that the plaintiff will be able to establish a cause of action against the in-state defendant[s] in state court." *Hart*, 199 F.3d at 246. In connection with this inquiry, the Fifth Circuit has made clear that the removal statutes are to be construed "strictly against removal and for remand." *Eastus v. Blue Bell Creameries, L.P.*, 97 F.3d 100, 106 (5th Cir.1996); *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 108-109, 61 S.Ct. 868, 872, 85 L.Ed. 1214 (1941).

*Lauderdale v. Merck & Co., Inc.*, 219 F.Supp.2d 747, 749 (N.D. Miss., 2002).

> This Court "must evaluate all factual allegations and ambiguities in the controlling state law in favor of the plaintiff." See id. (citations omitted). Accordingly, "if there is any possibility that the plaintiff has stated a cause of action against any non-diverse defendant, the federal court must conclude that joinder is proper, thereby defeating complete diversity, and the case must be remanded." See id. (citations omitted).

*Murphy v. R.J. Reynolds Tobacco*, 171 F.Supp.2d 636, 638 (E.D. La., 2001) (Fallon, J.).

Given the absence of allegations of fraud in the recitation of jurisdictional facts, the sole ground for this removal is Merck's contention that there is ***no possibility*** that Plaintiffs have stated a cause of action for medical malpractice against Dr. Jones. But Merck does not deny that Dr. Jones was Mr. Dugas's physician.   Merck does not deny – indeed, one can be sure it will eventually strenuously argue – that Dr. Jones overdosed Mr. Dugas with Vioxx. It is too obvious a proposition under Louisiana law that a physician may be sued and found liable for overprescribing or misprescribing a drug contrary to the product labeling. See, e.g., *Hendricks v. Charity Hosp. of New Orleans*, 519 So.2d 163 (La. App. 4 Cir., 1987); *Wainwright v. Leary*, 623 So.2d 233 (La. App. 2 Cir., 1993); *Argus v. Scheppegrell*, 489 So.2d 392 (La.App. 5 Cir., 1986); *Carroll v. St. Paul Ins. Co.*, 550 So.2d 787 (La. App. 2 Cir., 1989); *Carroll v. St. Paul Ins. Co.*, 550 So.2d 787 (La. App. 2 Cir., 1989); *McCrory v. Jefferson Parish Hosp. Service Dist. No. 2*, 686 So.2d 1060 (La.App. 5 Cir., 1996); *Fournet v. Roule-Graham*, 783 So.2d 439 (La.App. 5th Cir. 2001). Indeed, in *Terrebonne v. Floyd*, 767 So.2d 758 (La.App. 1st Cir. 2000), the Louisiana First Circuit noted that "Although this case may present the first instance in Louisiana where a plaintiff seeks to rely solely on an admitted deviation from the manufacturer's specific warning to establish the standard of care owed, the Louisiana Supreme Court's holding in *Pfiffner* [*v. Correa*, 643 So.2d 1228 (La. 1994)] and the jurisprudence referenced by plaintiffs soundly points in favor of considering such evidence sufficient to make a prima facie showing of negligence."

Plaintiffs have clearly stated a cause of action against Dr. Jones.

Merck's suggests that *if* Dr. Jones is a "qualified health care provider" under R. S. 40:§ 1299

then Plaintiffs' failure to convene the medical review panel renders her joinder herein premature and, perforce, fraudulent. Plaintiffs did in fact file a timely Request for Medical Review Panel against Dr. Jones (see Exhibit 3), but were subsequently informed by the Patient's Compensation Fund that Dr. Jones was not a qualified healthcare provider under the medical malpractice act. See Exhibit 4.

Merck offers no evidence to show Dr. Jones *is* a qualified health care provider under Louisiana law. But even if she were, and even if Plaintiffs had side-stepped the medical review panel procedure, her joinder in this action would not be fraudulent. In *Englande v. Smithkline*, 206 F.Supp.2d 815 (E.D. La., 2002), Judge Feldman surveyed the Louisiana Eastern District and Middle District jurisprudence and concluded that a premature action stating a valid claim against a qualified health care provider does not amount to fraudulent joinder:

> SB also contends that the medical defendants in this case were fraudulently joined. SB invokes several unpublished decisions from the Western District that suggest that the failure to complete the medical review process before filing suit eliminates the possibility that a plaintiff could state a viable cause of action against non-diverse medical defendants. If there is no possibility of recovery against them because of the procedural bar, then, these defendants are fraudulently joined. See, e.g., *Boxie v. Gate Pharmaceuticals*, No.98-2142 (W.D.La. Apr. 12, 1999); see also *Carter v. Warner-Lambert*, No. 01-0666 (W.D.La. June 29, 2001); *Gill v. Ethicon, Inc.*, No. 00-2042 (W.D.La. Jan. 22, 2001); *Comb v. American Medical Group*, No. 98-1250 (W.D.La. Sept. 30, 1998). But this reasoning elevates form over substance. The key inquiry to a claim of fraudulent joinder is whether the facts as alleged support the plaintiff's substantive claims against the non-diverse defendants. See *B., Inc. v. Miller Brewing Co.*, 663 F.2d 545 (5th Cir.1981); *Green v. Amerada Hess Corp.*, 707 F.Supp.2d 201 (5th Cir.1983). A number of cases in the Eastern and Middle Districts have remanded cases in the face of similar claims of fraudulent joinder. See *Cutter Biological*, 774 F.Supp. at 1004 ("Procedural prematurity is not a conceptually accurate measure of fraudulent joinder if the claim theory asserted can be said to have

Page 5 of 7

plausible substantive merit. Prematurity does not trump viability.");
*Perry v. McNulty*, 794 F.Supp. 606 (E.D.La.1992)(Arceneaux,
J.)(finding that the procedural bar to proceeding against the
non-diverse defendants did not undermine her substantive cause of
action, and fraudulent joinder claim had no merit); *Doe v. Armour
Pharmaceutical Co.*, 837 F.Supp. 178 (E.D.La.1993) (Mentz, J.)
("[W]hether a dilatory exception of prematurity has been filed or even
sustained in state court, plaintiffs have stated a cause of action against
the medical defendants sufficient to destroy diversity and thereby
preclude removal, despite their having commenced suit prior to a
medical review of their claims."); *Duffy v. Pendleton Memorial
Methodists Hospital*, 1998 WL 273114 (E.D.La.1998) (Vance, J.)
(remanding claim removed by manufacturer of venous access device
because nondiverse medical malpractice defendants were named,
even though the latter claims may have been premature); *Erdey v.
American Honda Co.,Inc.*, 96 F.R.D. 593, 595 (M.D.La.1983)(Parker,
J.)(reasoning that because the original petition would not have been
subject to an exception of no cause of action, but only an exception
of prematurity, petition stated a viable claim); *Johnson*, supra
(following the Eastern District line of cases and noting the interests
in judicial economy). These cases are consistent with the federal
courts' limited jurisdiction, strict construction of the removal statute,
and interests in judicial economy. Therefore, in this case, the medical
defendants were not fraudulently joined.

206 F.Supp.2d at 819-820.

In conclusion, since Plaintiffs have stated a well-recognized cause of action against Dr. Jones,

she was correctly joined as a Defendant herein. Since complete diversity of citizenship is therefore

lacking in this action, the court is without subject matter jurisdiction to hear it. *Strawbridge v. Curtis*,

7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806). Accordingly, Plaintiffs' motion to remand should be

granted.

Respectfully submitted,

SILVESTRI & MASSICOT

BY: _____
     Frank A. Silvestri LSBA 12075
     John Paul Massicot (T.A.) LSBA 9033
     Damien Savoie LSBA 19144

**Temporary Office Address:**
909 East Cornerview Road #C
Gonzales, La 70737
Telephone: (504) 482-3400
Facsimile: (225) 647-3060

LAW OFFICE OF PETER D. DERBES

BY: _____
     Peter D. Derbes LSBA 4888

**Temporary Office Address:**
1017 Jefferson Avenue
New Orleans, LA 70115
Telephone: (504) 486-5006
Facsimile: (888) 568-8584

Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Memorandum in Support of Motion to Remand Filed by Plaintiffs Gary and Cathy Dugas has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pretrial Order No. 8, on this 27th day of January, 2006.

_____

John Yates, M.D.
Vice President
Medical & Scientific Affairs
U.S. Human Health

Merck & Co., Inc.
P.O. Box 1000
North Wales, PA 19454



---

**IMPORTANT**
PRESCRIBING
INFORMATION

---

April 2002

Dear Healthcare Professional:

Merck & Co., Inc., would like to bring to your attention recent changes to the current Prescribing Information and Patient Product Information for VIOXX® (rofecoxib tablets and oral suspension). VIOXX is a nonsteroidal anti-inflammatory drug (NSAID) that was approved by the United States Food and Drug Administration (FDA) in May 1999 for relief of the signs and symptoms of osteoarthritis (OA), the management of acute pain in adults, and the treatment of primary dysmenorrhea.

The Prescribing Information has been revised to reflect the results of the VIOXX Gastrointestinal Outcomes Research (VIGOR) Study and the FDA approval of VIOXX for the relief of the signs and symptoms of rheumatoid arthritis in adults. Excerpts of the changes to the Prescribing Information are provided below.

\* \* \* \* \*

**CLINICAL STUDIES**
*Rheumatoid Arthritis (RA)*
VIOXX has demonstrated significant reduction of joint tenderness/pain and joint swelling compared to placebo. VIOXX was evaluated for the treatment of the signs and symptoms of RA in two 12-week placebo- and active-controlled clinical trials that enrolled a total of approximately 2,000 patients. VIOXX was shown to be superior to placebo on all primary endpoints (number of tender joints, number of swollen joints, patient and physician global assessments of disease activity). In addition, VIOXX was shown to be superior to placebo using the American College of Rheumatology 20% (ACR20) Responder Index, a composite of clinical, laboratory, and functional measures of RA. VIOXX 25 mg once daily and naproxen 500 mg twice daily showed generally similar effects in the treatment of RA. A 50-mg dose once daily of VIOXX was also studied; however, no additional efficacy was seen compared to the 25-mg dose.

*Special Studies*
The VIGOR study was designed to evaluate the comparative GI safety of VIOXX 50 mg once daily (twice the highest dose recommended for chronic use in OA and RA) versus naproxen 500 mg twice daily (common therapeutic dose). The general safety and tolerability of VIOXX 50 mg once daily versus naproxen 500 mg twice daily was also studied. VIGOR was a randomized, double-blind study (median duration of 9 months) in 8076 patients with rheumatoid arthritis (RA) requiring chronic NSAID therapy

Exhibit 1

(mean age 58 years). Patients were not permitted to use concomitant aspirin or other antiplatelet drugs. Patients with a recent history of myocardial infarction or stroke and patients deemed to require low-dose aspirin for cardiovascular prophylaxis were to be excluded from the study. Fifty-six percent of patients used concomitant oral corticosteroids. The GI safety endpoints (confirmed by a blinded adjudication committee) included:

PUBs—symptomatic ulcers, upper GI perforation, obstruction, major or minor upper GI bleeding.

Complicated PUBs (a subset of PUBs)—upper GI perforation, obstruction or major upper GI bleeding.

*Study Results*

*Gastrointestinal Safety in VIGOR*

The VIGOR study showed a significant reduction in the risk of development of PUBs, including complicated PUBs in patients taking VIOXX® (rofecoxib) compared to naproxen (see Table 1).

**Table 1**
**VIGOR—Summary of Patients with Gastrointestinal Safety Events[1]**
**COMPARISON TO NAPROXEN**

| GI Safety Endpoints | VIOXX 50 mg daily (N=4047)[2] n[3] (Cumulative Rate[4]) | Naproxen 1000 mg daily (N=4029)[2] n[3] (Cumulative Rate[4]) | Relative Risk of VIOXX compared to naproxen[5] | 95% CI[6] |
|---|---|---|---|---|
| PUBs | 56 (1.80) | 121 (3.87) | 0.46* | (0.33, 0.64) |
| Complicated PUBs | 16 (0.52) | 37 (1.22) | 0.43* | (0.24, 0.78) |

[1] As confirmed by an independent committee blinded to treatment, [2] N=Patients randomized, [3] n=Patients with events, [4] Kaplan-Meier cumulative rate at end of study when at least 500 patients remained (approx. 10½ months), [5] Based on Cox proportional hazard model
*p-value ≤0.005 for relative risk compared to naproxen

The risk reduction for PUBs and complicated PUBs for VIOXX compared to naproxen (approximately 50%) was maintained in patients with or without the following risk factors for developing a PUB (Kaplan-Meier cumulative rate at approximately 10½ months, VIOXX versus naproxen, respectively): with a prior PUB (5.12, 11.47); without a prior PUB (1.54, 3.27); age 65 or older (2.83, 6.49); or younger than 65 years of age (1.48, 3.01). A similar risk reduction for PUBs and complicated PUBs (approximately 50%) was also maintained in patients with or without *Helicobacter pylori* infection or concomitant corticosteroid use.

*Other Safety Findings: Cardiovascular Safety*

The VIGOR study showed a higher incidence of adjudicated serious cardiovascular thrombotic events in patients treated with VIOXX 50 mg once daily as compared to patients treated with naproxen 500 mg twice daily (see Table 2). This finding was largely due to a difference in the incidence of myocardial infarction between the groups. (See Table 3.) (See PRECAUTIONS, *Cardiovascular Effects*.)

Adjudicated serious cardiovascular events (confirmed by a blinded adjudication committee) included: sudden death, myocardial infarction, unstable angina, ischemic stroke, transient ischemic attack and peripheral venous and arterial thromboses.

**Table 2**
**VIGOR—Summary of Patients with Serious Cardiovascular**
**Thrombotic Adverse Events[1] Over Time**
**COMPARISON TO NAPROXEN**

| Treatment Group | Patients Randomized | | 4 Months[2] | 8 Months[3] | 10½ months[4] |
|---|---|---|---|---|---|
| VIOXX 50 mg | 4047 | Total number of events | 17 | 29 | 45 |
| | | Cumulative Rate[†] | 0.46% | 0.82% | 1.81%* |
| Naproxen 1000 mg | 4029 | Total number of events | 9 | 15 | 19 |
| | | Cumulative Rate[†] | 0.23% | 0.43% | 0.60% |

[1] Confirmed by blinded adjudication committee, [2] Number of patients remaining after 4 months were 3405 and 3395 for VIOXX and naproxen respectively, [3] Number of patients remaining after 8 months were 2806 and 2798 for VIOXX and naproxen respectively, [4] Number of patients remaining were 531 and 514 for VIOXX and naproxen respectively.
[†] Kaplan-Meier cumulative rate.
*p-value <0.002 for the overall relative risk compared to naproxen by Cox proportional hazard model

**Table 3**
**VIGOR—Serious Cardiovascular**
**Thrombotic Adverse Events[1]**

| | VIOXX 50 mg N[2]=4047 n[3] | Naproxen 1000 mg N[2]=4029 n[3] |
|---|---|---|
| Any CV thrombotic event | 45* | 19 |
| Cardiac events | 28** | 10 |
| Fatal MI/Sudden death | 5 | 4 |
| Non-fatal MI | 18** | 4 |
| Unstable angina | 5 | 2 |
| Cerebrovascular | 11 | 8 |
| Ischemic stroke | 9 | 8 |
| TIA | 2 | 0 |
| Peripheral | 6 | 1 |

[1] Confirmed by blinded adjudication committee, [2] N=Patients randomized, [3] n=Patients with events
*p-value <0.002 and **p-value ≤0.006 for relative risk compared to naproxen by Cox proportional hazard model

For cardiovascular data from 2 long-term placebo-controlled studies, see PRECAUTIONS, *Cardiovascular Effects*.

**WARNINGS**
*Gastrointestinal (GI) Effects—Risk of GI Ulceration, Bleeding, and Perforation*

[The standard NSAID warning of gastrointestinal effects is retained, with the following addition:]

Although the risk of GI toxicity is not completely eliminated with VIOXX® (rofecoxib), the results of the VIOXX GI outcomes research (VIGOR) study demonstrate that in patients treated with VIOXX, the risk of GI toxicity with VIOXX 50 mg once daily is significantly less than with naproxen 500 mg twice daily. (See CLINICAL STUDIES, *Special Studies, VIGOR*.)

## PRECAUTIONS
*Cardiovascular Effects*
The information below should be taken into consideration and caution should be exercised when VIOXX® (rofecoxib) is used in patients with a medical history of ischemic heart disease.

In VIGOR, a study in 8076 patients (mean age 58; VIOXX n=4047, naproxen n=4029) with a median duration of exposure of 9 months, the risk of developing a serious cardiovascular thrombotic event was significantly higher in patients treated with VIOXX 50 mg once daily (n=45) as compared to patients treated with naproxen 500 mg twice daily (n=19). In VIGOR, mortality due to cardiovascular thrombotic events (7 vs 6, VIOXX vs naproxen, respectively) was similar between the treatment groups. (See CLINICAL STUDIES, *Special Studies, VIGOR, Other Safety Findings: Cardiovascular Safety.*) In a placebo-controlled database derived from 2 studies with a total of 2142 elderly patients (mean age 75; VIOXX n=1067, placebo n=1075) with a median duration of exposure of approximate-ly 14 months, the number of patients with serious cardiovascular thrombotic events was 21 vs 35 for patients treated with VIOXX 25 mg once daily versus placebo, respectively. In these same 2 placebo-controlled studies, mortality due to cardiovascular thrombotic events was 8 vs 3 for VIOXX versus placebo, respectively. The significance of the cardiovascular findings from these 3 studies (VIGOR and 2 placebo-controlled studies) is unknown. Prospective studies specifically designed to compare the incidence of serious CV events in patients taking VIOXX versus NSAID comparators or placebo have not been performed.

**Because of its lack of platelet effects, VIOXX is not a substitute for aspirin for cardiovascular prophylaxis.** Therefore, in patients taking VIOXX, antiplatelet therapies should not be discontinued and should be considered in patients with an indication for cardiovascular prophylaxis. (See CLINICAL STUDIES, *Special Studies, Platelets*; PRECAUTIONS, *Drug Interactions, Aspirin.*) Prospective, long-term studies on concomitant administration of VIOXX and aspirin evaluating cardiovascular outcomes have not been conducted.

## ADVERSE REACTIONS
### Rheumatoid Arthritis
Approximately 1,100 patients were treated with VIOXX in the Phase III rheumatoid arthritis efficacy studies. These studies included extensions of up to 1 year. The adverse experience profile was generally similar to that reported in the osteoarthritis studies. In studies of at least three months, the incidence of hypertension in RA patients receiving the 25 mg once daily dose of VIOXX was 10.0% and the incidence of hypertension in patients receiving naproxen 500 mg twice daily was 4.7%.

## DOSAGE AND ADMINISTRATION
*Rheumatoid Arthritis*
The recommended dose is 25 mg once daily. The maximum recommended daily dose is 25 mg.

*Management of Acute Pain and Treatment of Primary Dysmenorrhea*

[The following statement has been added:]

Chronic use of VIOXX 50 mg daily is not recommended.

\* \* \* \* \*

4

These and other changes are highlighted in the enclosed Prescribing Information and in the Patient Product Information, both of which are enclosed.

At Merck, we constantly evaluate data concerning our products. You can assist us in this regard by reporting all adverse experiences involving patients on VIOXX to the Merck National Service Center at 1-800-672-6372 or the FDA MedWatch program by phone at 1-800-FDA-1088, by FAX at 1-800-FDA-1078, or by mail at MedWatch, HF-2, 5600 Fishers Lane, Rockville, MD 20857.

Please take the time to read the revised Prescribing Information and Patient Product Information for VIOXX, which are enclosed. Questions from healthcare professionals may be directed to the Merck National Service Center. Thank you very much for your time and attention.

Sincerely,

John Yates, MD
Vice President
Medical & Scientific Affairs
US Human Health

Enclosures: Prescribing Information for VIOXX® (rofecoxib)
Patient Product Information for VIOXX

VIOXX is a registered trademark of Merck & Co., Inc.

NDA 21-042/S-007, S-008, S-010, S-012, S-013, S-014
NDA 21-052/S-004, S-005, S-006, S-007, S-008, S-009
Page 4

# VIOXX®
## (rofecoxib tablets and oral suspension)

### DESCRIPTION

VIOXX* (rofecoxib) is described chemically as 4-[4-(methylsulfonyl)phenyl]-3-phenyl-2(5*H*)-furanone. It has the following chemical structure:



Rofecoxib is a white to off-white to light yellow powder. It is sparingly soluble in acetone, slightly soluble in methanol and isopropyl acetate, very slightly soluble in ethanol, practically insoluble in octanol, and insoluble in water. The empirical formula for rofecoxib is $C_{17}H_{14}O_4S$, and the molecular weight is 314.36.

Each tablet of VIOXX for oral administration contains either 12.5 mg, 25 mg, or 50 mg of rofecoxib and the following inactive ingredients: croscarmellose sodium, hydroxypropyl cellulose, lactose, magnesium stearate, microcrystalline cellulose, and yellow ferric oxide. The 50 mg tablets also contain red ferric oxide.

Each 5 mL of the oral suspension contains either 12.5 or 25 mg of rofecoxib and the following inactive ingredients: citric acid (monohydrate), sodium citrate (dihydrate), sorbitol solution, strawberry flavor, xanthan gum, and purified water. Added as preservatives are sodium methylparaben 0.13% and sodium propylparaben 0.02%.

### CLINICAL PHARMACOLOGY

*Mechanism of Action*

VIOXX is a nonsteroidal anti-inflammatory drug (NSAID) that exhibits anti-inflammatory, analgesic, and antipyretic activities in animal models. The mechanism of action of VIOXX is believed to be due to inhibition of prostaglandin synthesis, via inhibition of cyclooxygenase-2 (COX-2). At therapeutic concentrations in humans, VIOXX does *not* inhibit the cyclooxygenase-1 (COX-1) isoenzyme.

*Pharmacokinetics*

*Absorption*

The mean oral bioavailability of VIOXX at therapeutically recommended doses of 12.5, 25, and 50 mg is approximately 93%. The area under the curve (AUC) and peak plasma level ($C_{max}$) following a single 25-mg dose were 3286 (±843) ng•hr/mL and 207 (±111) ng/mL, respectively. Both $C_{max}$ and AUC are roughly dose proportional across the clinical dose range. At doses greater than 50 mg, there is a less than proportional increase in $C_{max}$ and AUC, which is thought to be due to the low solubility of the drug in aqueous media. The plasma concentration-time profile exhibited multiple peaks. The median time to maximal concentration ($T_{max}$), as assessed in nine pharmacokinetic studies, is 2 to 3 hours. Individual $T_{max}$ values in these studies ranged between 2 to 9 hours. This may not reflect rate of absorption as $T_{max}$ may occur as a secondary peak in some individuals. With multiple dosing, steady-state conditions are reached by Day 4. The $AUC_{0-24hr}$ and $C_{max}$ at steady state after multiple doses of 25 mg rofecoxib was 4018 (±1140) ng•hr/mL and 321 (±104) ng/mL, respectively. The accumulation factor based on geometric means was 1.67.

VIOXX Tablets 12.5 mg and 25 mg are bioequivalent to VIOXX Oral Suspension 12.5 mg/5 mL and 25 mg/5 mL, respectively.

*Food and Antacid Effects*

Food had no significant effect on either the peak plasma concentration ($C_{max}$) or extent of absorption (AUC) of rofecoxib when VIOXX Tablets were taken with a high fat meal. The time to peak plasma concentration ($T_{max}$),

*Registered trademark of MERCK & CO., Inc., Whitehouse Station, New Jersey, USA
COPYRIGHT © MERCK & CO., Inc., 1998
All rights reserved

Exhibit 2

NDA 21-042/S-007, S-008, S-010, S-012, S-013, S-014
NDA 21-052/S-004, S-005, S-006, S-007, S-008, S-009
Page 5

however, was delayed by 1 to 2 hours. The food effect on the suspension formulation has not been studied. VIOXX tablets can be administered without regard to timing of meals.

There was a 13% and 8% decrease in AUC when VIOXX was administered with calcium carbonate antacid and magnesium/aluminum antacid to elderly subjects, respectively. There was an approximate 20% decrease in $C_{max}$ of rofecoxib with either antacid.

*Distribution*

Rofecoxib is approximately 87% bound to human plasma protein over the range of concentrations of 0.05 to 25 mcg/mL. The apparent volume of distribution at steady state ($V_{dss}$) is approximately 91 L following a 12.5-mg dose and 86 L following a 25-mg dose.

Rofecoxib has been shown to cross the placenta in rats and rabbits, and the blood-brain barrier in rats.

*Metabolism*

Metabolism of rofecoxib is primarily mediated through reduction by cytosolic enzymes. The principal metabolic products are the *cis*-dihydro and *trans*-dihydro derivatives of rofecoxib, which account for nearly 56% of recovered radioactivity in the urine. An additional 8.8% of the dose was recovered as the glucuronide of the hydroxy derivative, a product of oxidative metabolism. The biotransformation of rofecoxib and this metabolite is reversible in humans to a limited extent (<5%). These metabolites are inactive as COX-1 or COX-2 inhibitors.

Cytochrome P450 plays a minor role in metabolism of rofecoxib. Inhibition of CYP 3A activity by administration of ketoconazole 400 mg daily does not affect rofecoxib disposition. However, induction of general hepatic metabolic activity by administration of the non-specific inducer rifampin 600 mg daily produces a 50% decrease in rofecoxib plasma concentrations. (Also see *Drug Interactions*.)

*Excretion*

Rofecoxib is eliminated predominantly by hepatic metabolism with little (<1%) unchanged drug recovered in the urine. Following a single radiolabeled dose of 125 mg, approximately 72% of the dose was excreted into the urine as metabolites and 14% in the feces as unchanged drug.

The plasma clearance after 12.5- and 25-mg doses was approximately 141 and 120 mL/min, respectively. Higher plasma clearance was observed at doses below the therapeutic range, suggesting the presence of a saturable route of metabolism (i.e., non-linear elimination). The effective half-life (based on steady-state levels) was approximately 17 hours.

*Special Populations*

*Gender*

The pharmacokinetics of rofecoxib are comparable in men and women.

*Geriatric*

After a single dose of 25 mg VIOXX in elderly subjects (over 65 years old) a 34% increase in AUC was observed as compared to the young subjects. Dosage adjustment in the elderly is not necessary; however, therapy with VIOXX should be initiated at the lowest recommended dose.

*Pediatric*

VIOXX has not been investigated in patients below 18 years of age.

*Race*

Meta-analysis of pharmacokinetic studies has suggested a slightly (10-15%) higher AUC of rofecoxib in Blacks and Hispanics as compared to Caucasians. No dosage adjustment is necessary on the basis of race.

*Hepatic Insufficiency*

A single-dose pharmacokinetic study in mild (Child-Pugh score ≤6) hepatic insufficiency patients indicated that rofecoxib AUC was similar between these patients and healthy subjects. A pharmacokinetic study in patients with moderate (Child-Pugh score 7-9) hepatic insufficiency indicated that mean rofecoxib plasma concentrations were higher (mean AUC: 55%; mean $C_{max}$: 53%) relative to healthy subjects. Patients with severe hepatic insufficiency have not been studied.

*Renal Insufficiency*

In a study (N=6) of patients with end stage renal disease undergoing dialysis, peak rofecoxib plasma levels and AUC declined 18% and 9%, respectively, when dialysis occurred four hours after dosing. When dialysis occurred 48 hours after dosing, the elimination profile of rofecoxib was unchanged. While renal insufficiency does not influence the pharmacokinetics of rofecoxib, use of VIOXX in advanced renal disease is not recommended. (See WARNINGS, *Advanced Renal Disease*.)

*Drug Interactions* (Also see PRECAUTIONS, *Drug Interactions*.)

*General*

In human studies the potential for rofecoxib to inhibit or induce CYP 3A4 activity was investigated in studies using the intravenous erythromycin breath test and the oral midazolam test. No significant difference in erythromycin

NDA 21-042/S-007, S-008, S-010, S-012, S-013, S-014
NDA 21-052/S-004, S-005, S-006, S-007, S-008, S-009
Page 6

demethylation was observed with rofecoxib (75 mg daily) compared to placebo, indicating no induction of hepatic CYP 3A4. A 30% reduction of the AUC of midazolam was observed with rofecoxib (25 mg daily). This reduction is most likely due to increased first pass metabolism through induction of intestinal CYP 3A4 by rofecoxib. *In vitro* studies in rat hepatocytes also suggest that rofecoxib might be a mild inducer for CYP 3A4.

Drug interaction studies with the recommended doses of rofecoxib have identified potentially significant interactions with rifampin, theophylline, and warfarin. Patients receiving these agents with VIOXX should be appropriately monitored. Drug interaction studies do not support the potential for clinically important interactions between antacids or cimetidine with rofecoxib. Similar to experience with other nonsteroidal anti-inflammatory drugs (NSAIDs), studies with rofecoxib suggest the potential for interaction with ACE inhibitors. The effects of rofecoxib on the pharmacokinetics and/or pharmacodynamics of ketoconazole, prednisone/prednisolone, oral contraceptives, and digoxin have been studied *in vivo* and clinically important interactions have not been found.

## CLINICAL STUDIES

*Osteoarthritis (OA)*

VIOXX has demonstrated significant reduction in joint pain compared to placebo. VIOXX was evaluated for the treatment of the signs and symptoms of OA of the knee and hip in placebo- and active-controlled clinical trials of 6 to 86 weeks duration that enrolled approximately 3900 patients. In patients with OA, treatment with VIOXX 12.5 mg and 25 mg once daily resulted in improvement in patient and physician global assessments and in the WOMAC (Western Ontario and McMaster Universities) osteoarthritis questionnaire, including pain, stiffness, and functional measures of OA. In six studies of pain accompanying OA flare, VIOXX provided a significant reduction in pain at the first determination (after one week in one study, after two weeks in the remaining five studies); this continued for the duration of the studies. In all OA clinical studies, once daily treatment in the morning with VIOXX 12.5 and 25 mg was associated with a significant reduction in joint stiffness upon first awakening in the morning. At doses of 12.5 and 25 mg, the effectiveness of VIOXX was shown to be comparable to ibuprofen 800 mg TID and diclofenac 50 mg TID for treatment of the signs and symptoms of OA. The ibuprofen studies were 6-week studies; the diclofenac studies were 12-month studies in which patients could receive additional arthritis medication during the last 6 months.

*Rheumatoid Arthritis (RA)*

VIOXX has demonstrated significant reduction of joint tenderness/pain and joint swelling compared to placebo. VIOXX was evaluated for the treatment of the signs and symptoms of RA in two 12-week placebo- and active-controlled clinical trials that enrolled a total of approximately 2,000 patients. VIOXX was shown to be superior to placebo on all primary endpoints (number of tender joints, number of swollen joints, patient and physician global assessments of disease activity). In addition, VIOXX was shown to be superior to placebo using the American College of Rheumatology 20% (ACR20) Responder Index, a composite of clinical, laboratory, and functional measures of RA. VIOXX 25 mg once daily and naproxen 500 mg twice daily showed generally similar effects in the treatment of RA. A 50-mg dose once daily of VIOXX was also studied; however, no additional efficacy was seen compared to the 25-mg dose.

*Analgesia, including Dysmenorrhea*

In acute analgesic models of post-operative dental pain, post-orthopedic surgical pain, and primary dysmenorrhea, VIOXX relieved pain that was rated by patients as moderate to severe. The analgesic effect (including onset of action) of a single 50-mg dose of VIOXX was generally similar to 550 mg of naproxen sodium or 400 mg of ibuprofen. In single-dose post-operative dental pain studies, the onset of analgesia with a single 50-mg dose of VIOXX occurred within 45 minutes. In a multiple-dose study of post-orthopedic surgical pain in which patients received VIOXX or placebo for up to 5 days, 50 mg of VIOXX once daily was effective in reducing pain. In this study, patients on VIOXX consumed a significantly smaller amount of additional analgesic medication than patients treated with placebo (1.5 versus 2.5 doses per day of additional analgesic medication for VIOXX and placebo, respectively).

*Special Studies*

The following special studies were conducted to evaluate the comparative safety of VIOXX.

*VIOXX GI Clinical Outcomes Research (VIGOR Study)*

*Study Design*

The VIGOR study was designed to evaluate the comparative GI safety of VIOXX 50 mg once daily (twice the highest dose recommended for chronic use in OA and RA) versus naproxen 500 mg twice daily (common therapeutic dose). The general safety and tolerability of VIOXX 50 mg once daily versus naproxen 500 mg twice daily was also studied. VIGOR was a randomized, double-blind study (median duration of 9 months) in 8076 patients with rheumatoid arthritis (RA) requiring chronic NSAID therapy (mean age 58 years). Patients were not permitted to use concomitant aspirin or other antiplatelet drugs. Patients with a recent history of myocardial infarction or stroke and

NDA 21-042/S-007, S-008, S-010, S-012, S-013, S-014
NDA 21-052/S-004, S-005, S-006, S-007, S-008, S-009
Page 7

patients deemed to require low-dose aspirin for cardiovascular prophylaxis were to be excluded from the study. Fifty-six percent of patients used concomitant oral corticosteroids. The GI safety endpoints (confirmed by a blinded adjudication committee) included:

   PUBs-symptomatic ulcers, upper GI perforation, obstruction, major or minor upper GI bleeding.

   Complicated PUBs (a subset of PUBs)-upper GI perforation, obstruction or major upper GI bleeding.

*Study Results*
*Gastrointestinal Safety in VIGOR*
   The VIGOR study showed a significant reduction in the risk of development of PUBs, including complicated PUBs in patients taking VIOXX compared to naproxen (see Table 1).

**Table 1**
**VIGOR-Summary of Patients with Gastrointestinal Safety Events[1]**
**COMPARISON TO NAPROXEN**

| GI Safety Endpoints | VIOXX 50 mg daily (N=4047)[2] n[3] (Cumulative Rate[4]) | Naproxen 1000 mg daily (N=4029)[2] n[3] (Cumulative Rate[4]) | Relative Risk of VIOXX compared to naproxen[5] | 95% CI[5] |
|---|---|---|---|---|
| PUBs | 56 (1.80) | 121 (3.87) | 0.46* | (0.33, 0.64) |
| Complicated PUBs | 16 (0.52) | 37 (1.22) | 0.43* | (0.24, 0.78) |

[1]As confirmed by an independent committee blinded to treatment, [2]N=Patients randomized, [3]n=Patients with events,
[4]Kaplan-Meier cumulative rate at end of study when at least 500 patients remained (approx. 10 1/2 months), [5]Based on Cox proportional hazard model

*p-value ≤0.005 for relative risk compared to naproxen

   The risk reduction for PUBs and complicated PUBs for VIOXX compared to naproxen (approximately 50%) was maintained in patients with or without the following risk factors for developing a PUB (Kaplan-Meier cumulative rate of PUBs at approximately 10 1/2 months, VIOXX versus naproxen, respectively): with a prior PUB (5.12, 11.47); without a prior PUB (1.54, 3.27); age 65 or older (2.83, 6.49); or younger than 65 years of age (1.48, 3.01). A similar risk reduction for PUBs and complicated PUBs (approximately 50%) was also maintained in patients with or without *Helicobacter pylori* infection or concomitant corticosteroid use.
*Other Safety Findings: Cardiovascular Safety*
   The VIGOR study showed a higher incidence of adjudicated serious cardiovascular thrombotic events in patients treated with VIOXX 50 mg once daily as compared to patients treated with naproxen 500 mg twice daily (see Table 2). This finding was largely due to a difference in the incidence of myocardial infarction between the groups. (See Table 3.) (See PRECAUTIONS, *Cardiovascular Effects*.) Adjudicated serious cardiovascular events (confirmed by a blinded adjudication committee) included: sudden death, myocardial infarction, unstable angina, ischemic stroke, transient ischemic attack and peripheral venous and arterial thromboses.

NDA 21-042/S-007, S-008, S-010, S-012, S-013, S-014
NDA 21-052/S-004, S-005, S-006, S-007, S-008, S-009
Page 8

### Table 2
### VIGOR-Summary of Patients with Serious Cardiovascular
### Thrombotic Adverse Events[1] Over Time
### COMPARISON TO NAPROXEN

| Treatment group | Patients Randomized | | 4 Months[2] | 8 Months[3] | 10 ½ months[4] |
|---|---|---|---|---|---|
| VIOXX 50 mg | 4047 | Total number of events | 17 | 29 | 45 |
| | | Cumulative Rate[†] | 0.46% | 0.82% | 1.81%* |
| Naproxen 1000 mg | 4029 | Total number of events | 9 | 15 | 19 |
| | | Cumulative Rate[†] | 0.23% | 0.43% | 0.60% |

[1]Confirmed by blinded adjudication committee, [2]Number of patients remaining after 4 months were 3405 and 3395 for VIOXX and naproxen respectively, [3]Number of patients remaining after 8 months were 2806 and 2798 for VIOXX and naproxen respectively, [4]Number of patients remaining were 531 and 514 for VIOXX and naproxen respectively.

[†]Kaplan-Meier cumulative rate.

* p-value <0.002 for the overall  relative risk compared to naproxen by Cox proportional hazard model

### Table 3
### VIGOR- Serious Cardiovascular
### Thrombotic Adverse Events[1]

| | VIOXX 50 mg N[2]=4047 n[3] | Naproxen 1000 mg N[2]=4029 n[3] |
|---|---|---|
| Any CV thrombotic event | 45 * | 19 |
| Cardiac events | 28** | 10 |
| Fatal MI/Sudden death | 5 | 4 |
| Non-fatal MI | 18** | 4 |
| Unstable angina | 5 | 2 |
| Cerebrovascular | 11 | 8 |
| Ischemic stroke | 9 | 8 |
| TIA | 2 | 0 |
| Peripheral | 6 | 1 |

[1]Confirmed by blinded adjudication committee, [2]N=Patients randomized, [3]n=Patients with events

* p-value <0.002 and ** p-value ≤0.006 for relative risk compared to naproxen by Cox proportional hazard model

For cardiovascular data from 2 long-term placebo-controlled studies, see PRECAUTIONS, *Cardiovascular Effects.*
*Upper Endoscopy in Patients with Osteoarthritis and Rheumatoid Arthritis*
     The VIGOR study described above compared clinically relevant outcomes. Several studies summarized below have utilized scheduled endoscopic evaluations to assess the occurrence of asymptomatic ulcers in individual patients taking VIOXX or a comparative agent. The results of outcomes studies, such as VIGOR, are more clinically relevant than the results of endoscopy studies (see CLINICAL STUDIES, *Special Studies, VIGOR*).
     Two identical (U.S. and Multinational) endoscopy studies in a total of 1516 patients were conducted to compare the percentage of patients who developed endoscopically detectable gastroduodenal ulcers with VIOXX 25 mg daily or 50 mg daily, ibuprofen 2400 mg daily, or placebo. Entry criteria for these studies permitted enrollment of patients with active *Helicobacter pylori* infection, baseline gastroduodenal erosions, prior history of an upper gastrointestinal

NDA 21-042/S-007, S-008, S-010, S-012, S-013, S-014
NDA 21-052/S-004, S-005, S-006, S-007, S-008, S-009
Page 9

perforation, ulcer, or bleed (PUB), and/or age ≥65 years. However, patients receiving aspirin (including low-dose aspirin for cardiovascular prophylaxis) were not enrolled in these studies. Patients who were 50 years of age and older with osteoarthritis and who had no ulcers at baseline were evaluated by endoscopy after weeks 6, 12, and 24 of treatment. The placebo-treatment group was discontinued at week 16 by design.

Treatment with VIOXX 25 mg daily or 50 mg daily was associated with a significantly lower percentage of patients with endoscopic gastroduodenal ulcers than treatment with ibuprofen 2400 mg daily. See Figures 1 and 2 for the results of these studies.

**Figure 1**

**COMPARISON TO IBUPROFEN**

**Life-Table Cumulative Incidence Rate of Gastroduodenal
Ulcers ≥ 3mm** (Intention-to-Treat)**



| ▨ | Placebo | (N=158) |
| ▤ | Rofecoxib 25mg | (N=186) |
| ▥ | Rofecoxib 50mg | (N=178) |
| ■ | Ibuprofen 2400 mg | (N=167) |

† p < 0.001 versus ibuprofen 2400 mg
** Results of analyses using a ≥ 5mm gastroduodenal ulcer endpoint were consistent.
*** The primary endpoint was the cumulative incidence of gastroduodenal ulcer at 12 weeks.

NDA 21-042/S-007, S-008, S-010, S-012, S-013, S-014
NDA 21-052/S-004, S-005, S-006, S-007, S-008, S-009
Page 10

**Figure 2**

**COMPARISON TO IBUPROFEN**

**Life-Table Cumulative Incidence Rate of Gastroduodenal
Ulcers ≥ 3mm\*\* (Intention-to-Treat)**





| | Placebo | (N=182) |
| | Rofecoxib 25mg | (N=187) |
| | Rofecoxib 50mg | (N=182) |
| | Ibuprofen 2400 mg | (N=187) |

†    $p < 0.001$ versus ibuprofen 2400 mg
\*\*    Results of analyses using a ≥ 5mm gastroduodenal ulcer endpoint were consistent.
\*\*\*    The primary endpoint was the cumulative incidence of gastroduodenal ulcer at 12 weeks.

In a similarly designed 12-week endoscopy study in RA patients treated with VIOXX 50 mg once daily (twice the highest dose recommended for chronic use in OA and RA) or naproxen 1000 mg daily (common therapeutic dose), treatment with VIOXX was associated with a significantly lower percentage of patients with endoscopic gastroduodenal ulcers than treatment with naproxen.

Serious clinically significant upper GI bleeding has been observed in patients receiving VIOXX in controlled trials, albeit infrequently (see WARNINGS, *Gastrointestinal (GI) Effects - Risk of GI Ulceration, Bleeding, and Perforation*).

*Assessment of Fecal Occult Blood Loss in Healthy Subjects*

Occult fecal blood loss associated with VIOXX 25 mg daily, VIOXX 50 mg daily, ibuprofen 2400 mg per day, and placebo was evaluated in a study utilizing $^{51}$Cr-tagged red blood cells in 67 healthy males. After 4 weeks of treatment with VIOXX 25 mg daily or VIOXX 50 mg daily, the increase in the amount of fecal blood loss was not statistically significant compared with placebo-treated subjects. In contrast, ibuprofen 2400 mg per day produced a statistically significant increase in fecal blood loss as compared with placebo-treated subjects and VIOXX-treated subjects. The clinical relevance of this finding is unknown.

*Platelets*

Multiple doses of VIOXX 12.5, 25, and up to 375 mg administered daily up to 12 days had no effect on bleeding time relative to placebo.  There was no inhibition of *ex vivo* arachidonic acid- or collagen-induced platelet aggregation with 12.5, 25, and 50 mg of VIOXX.

**Because of its lack of platelet effects, VIOXX is not a substitute for aspirin for cardiovascular prophylaxis.** (See PRECAUTIONS, *Cardiovascular Effects.*)

**INDICATIONS AND USAGE**

VIOXX is indicated:

NDA 21-042/S-007, S-008, S-010, S-012, S-013, S-014
NDA 21-052/S-004, S-005, S-006, S-007, S-008, S-009
Page 11

For relief of the signs and symptoms of osteoarthritis.
For relief of the signs and symptoms of rheumatoid arthritis in adults.
For the management of acute pain in adults.
For the treatment of primary dysmenorrhea.

## CONTRAINDICATIONS

VIOXX is contraindicated in patients with known hypersensitivity to rofecoxib or any other component of VIOXX.

VIOXX should not be given to patients who have experienced asthma, urticaria, or allergic-type reactions after taking aspirin or other NSAIDs. Severe, rarely fatal, anaphylactic-like reactions to NSAIDs have been reported in such patients (see WARNINGS, *Anaphylactoid Reactions* and PRECAUTIONS, *Preexisting Asthma*).

## WARNINGS

*Gastrointestinal (GI) Effects - Risk of GI Ulceration, Bleeding, and Perforation*

Serious gastrointestinal toxicity such as bleeding, ulceration, and perforation of the stomach, small intestine or large intestine, can occur at any time, with or without warning symptoms, in patients treated with nonsteroidal anti-inflammatory drugs (NSAIDs). Minor upper gastrointestinal problems, such as dyspepsia, are common and may also occur at any time during NSAID therapy. Therefore, physicians and patients should remain alert for ulceration and bleeding, even in the absence of previous GI tract symptoms. Patients should be informed about the signs and/or symptoms of serious GI toxicity and the steps to take if they occur. The utility of periodic laboratory monitoring has not been demonstrated, nor has it been adequately assessed. Only one in five patients who develop a serious upper GI adverse event on NSAID therapy is symptomatic. It has been demonstrated that upper GI ulcers, gross bleeding or perforation, caused by NSAIDs, appear to occur in approximately 1% of patients treated for 3-6 months, and in about 2-4% of patients treated for one year. These trends continue thus, increasing the likelihood of developing a serious GI event at some time during the course of therapy. However, even short-term therapy is not without risk.

Although the risk of GI toxicity is not completely eliminated with VIOXX, the results of the VIOXX GI outcomes research (VIGOR) study demonstrate that in patients treated with VIOXX, the risk of GI toxicity with VIOXX 50 mg once daily is significantly less than with naproxen 500 mg twice daily. (See CLINICAL STUDIES, *Special Studies, VIGOR.*)

NSAIDs should be prescribed with extreme caution in patients with a prior history of ulcer disease or gastrointestinal bleeding. Most spontaneous reports of fatal GI events are in elderly or debilitated patients and therefore special care should be taken in treating this population. **To minimize the potential risk for an adverse GI event, the lowest effective dose should be used for the shortest possible duration.** For high risk patients, alternate therapies that do not involve NSAIDs should be considered.

Previous studies have shown that patients with a *prior history of peptic ulcer disease and/or gastrointestinal bleeding* and who use NSAIDs, have a greater than 10-fold higher risk for developing a GI bleed than patients with neither of these risk factors. In addition to a past history of ulcer disease, pharmacoepidemiological studies have identified several other co-therapies or co-morbid conditions that may increase the risk for GI bleeding such as: treatment with oral corticosteroids, treatment with anticoagulants, longer duration of NSAID therapy, smoking, alcoholism, older age, and poor general health status.

*Anaphylactoid Reactions*

As with NSAIDs in general, anaphylactoid reactions have occurred in patients without known prior exposure to VIOXX. In post-marketing experience, rare cases of anaphylactic/anaphylactoid reactions and angioedema have been reported in patients receiving VIOXX. VIOXX should not be given to patients with the aspirin triad. This symptom complex typically occurs in asthmatic patients who experience rhinitis with or without nasal polyps, or who exhibit severe, potentially fatal bronchospasm after taking aspirin or other NSAIDs (see CONTRAINDICATIONS and PRECAUTIONS, *Preexisting Asthma*). Emergency help should be sought in cases where an anaphylactoid reaction occurs.

*Advanced Renal Disease*

Treatment with VIOXX is not recommended in patients with advanced renal disease. If VIOXX therapy must be initiated, close monitoring of the patient's kidney function is advisable (see PRECAUTIONS, *Renal Effects*).

*Pregnancy*

In late pregnancy VIOXX should be avoided because it may cause premature closure of the ductus arteriosus.

NDA 21-042/S-007, S-008, S-010, S-012, S-013, S-014
NDA 21-052/S-004, S-005, S-006, S-007, S-008, S-009
Page 12

## PRECAUTIONS

*General*

VIOXX cannot be expected to substitute for corticosteroids or to treat corticosteroid insufficiency. Abrupt discontinuation of corticosteroids may lead to exacerbation of corticosteroid-responsive illness. Patients on prolonged corticosteroid therapy should have their therapy tapered slowly if a decision is made to discontinue corticosteroids.

The pharmacological activity of VIOXX in reducing inflammation, and possibly fever, may diminish the utility of these diagnostic signs in detecting infectious complications of presumed noninfectious, painful conditions.

*Cardiovascular Effects*

The information below should be taken into consideration and caution should be exercised when VIOXX is used in patients with a medical history of ischemic heart disease.

In VIGOR, a study in 8076 patients (mean age 58; VIOXX n=4047, naproxen n=4029) with a median duration of exposure of 9 months, the risk of developing a serious cardiovascular thrombotic event was significantly higher in patients treated with VIOXX 50 mg once daily (n=45) as compared to patients treated with naproxen 500 mg twice daily (n=19). In VIGOR, mortality due to cardiovascular thrombotic events (7 vs 6, VIOXX vs naproxen, respectively) was similar between the treatment groups. (See CLINICAL STUDIES, *Special Studies, VIGOR, Other Safety Findings: Cardiovascular Safety.*) In a placebo-controlled database derived from 2 studies with a total of 2142 elderly patients (mean age 75; VIOXX n=1067, placebo n=1075) with a median duration of exposure of approximately 14 months, the number of patients with serious cardiovascular thrombotic events was 21 vs 35 for patients treated with VIOXX 25 mg once daily versus placebo, respectively. In these same 2 placebo-controlled studies, mortality due to cardiovascular thrombotic events was 8 vs 3 for VIOXX versus placebo, respectively. The significance of the cardiovascular findings from these 3 studies (VIGOR and 2 placebo-controlled studies) is unknown. Prospective studies specifically designed to compare the incidence of serious CV events in patients taking VIOXX versus NSAID comparators or placebo have not been performed.

**Because of its lack of platelet effects, VIOXX is not a substitute for aspirin for cardiovascular prophylaxis.** Therefore, in patients taking VIOXX, antiplatelet therapies should not be discontinued and should be considered in patients with an indication for cardiovascular prophylaxis. (See CLINICAL STUDIES, *Special Studies, Platelets*; PRECAUTIONS, *Drug Interactions, Aspirin.*) Prospective, long-term studies on concomitant administration of VIOXX and aspirin evaluating cardiovascular outcomes have not been conducted.

*Fluid Retention, Edema, and Hypertension*

Fluid retention, edema, and hypertension have been reported in some patients taking VIOXX. In clinical trials of VIOXX at daily doses of 25 mg in patients with rheumatoid arthritis the incidence of hypertension was twice as high in patients treated with VIOXX as compared to patients treated with naproxen 1000 mg daily. Clinical trials with VIOXX at daily doses of 12.5 and 25 mg in patients with osteoarthritis have shown effects on hypertension and edema similar to those observed with comparator NSAIDs; these occurred with an increased frequency with chronic use of VIOXX at daily doses of 50 mg. (See ADVERSE REACTIONS.) VIOXX should be used with caution, and should be introduced at the lowest recommended dose in patients with fluid retention, hypertension, or heart failure.

*Renal Effects*

Long-term administration of NSAIDs has resulted in renal papillary necrosis and other renal injury. Renal toxicity has also been seen in patients in whom renal prostaglandins have a compensatory role in the maintenance of renal perfusion. In these patients, administration of a nonsteroidal anti-inflammatory drug may cause a dose-dependent reduction in prostaglandin formation and, secondarily, in renal blood flow, which may precipitate overt renal decompensation. Patients at greatest risk of this reaction are those with impaired renal function, heart failure, liver dysfunction, those taking diuretics and ACE inhibitors, and the elderly. Discontinuation of NSAID therapy is usually followed by recovery to the pretreatment state.

Caution should be used when initiating treatment with VIOXX in patients with considerable dehydration. It is advisable to rehydrate patients first and then start therapy with VIOXX. Caution is also recommended in patients with pre-existing kidney disease (see WARNINGS, *Advanced Renal Disease*).

*Hepatic Effects*

Borderline elevations of one or more liver tests may occur in up to 15% of patients taking NSAIDs, and notable elevations of ALT or AST (approximately three or more times the upper limit of normal) have been reported in approximately 1% of patients in clinical trials with NSAIDs. These laboratory abnormalities may progress, may remain unchanged, or may be transient with continuing therapy. Rare cases of severe hepatic reactions, including jaundice and fatal fulminant hepatitis, liver necrosis and hepatic failure (some with fatal outcome) have been reported with NSAIDs, including VIOXX. In controlled clinical trials of VIOXX, the incidence of borderline elevations of liver tests at doses of 12.5 and 25 mg daily was comparable to the incidence observed with ibuprofen and lower than that observed

NDA 21-042/S-007, S-008, S-010, S-012, S-013, S-014
NDA 21-052/S-004, S-005, S-006, S-007, S-008, S-009
Page 13

with diclofenac. In placebo-controlled trials, approximately 0.5% of patients taking rofecoxib (12.5 or 25 mg QD) and 0.1% of patients taking placebo had notable elevations of ALT or AST.

A patient with symptoms and/or signs suggesting liver dysfunction, or in whom an abnormal liver test has occurred, should be monitored carefully for evidence of the development of a more severe hepatic reaction while on therapy with VIOXX. Use of VIOXX is not recommended in patients with severe hepatic insufficiency (see *Pharmacokinetics, Special Populations*). If clinical signs and symptoms consistent with liver disease develop, or if systemic manifestations occur (e.g., eosinophilia, rash, etc.), VIOXX should be discontinued.

*Hematological Effects*

Anemia is sometimes seen in patients receiving VIOXX. In placebo-controlled trials, there were no significant differences observed between VIOXX and placebo in clinical reports of anemia. Patients on long-term treatment with VIOXX should have their hemoglobin or hematocrit checked if they exhibit any signs or symptoms of anemia or blood loss. VIOXX does not generally affect platelet counts, prothrombin time (PT), or partial thromboplastin time (PTT), and does not inhibit platelet aggregation at indicated dosages (see CLINICAL STUDIES, *Special Studies, Platelets*).

*Preexisting Asthma*

Patients with asthma may have aspirin-sensitive asthma. The use of aspirin in patients with aspirin-sensitive asthma has been associated with severe bronchospasm which can be fatal. Since cross reactivity, including bronchospasm, between aspirin and other nonsteroidal anti-inflammatory drugs has been reported in such aspirin-sensitive patients, VIOXX should not be administered to patients with this form of aspirin sensitivity and should be used with caution in patients with preexisting asthma.

**Information for Patients**

Physicians should instruct their patients to read the patient package insert before starting therapy with VIOXX and to reread it each time the prescription is renewed in case any information has changed.

VIOXX can cause discomfort and, rarely, more serious side effects, such as gastrointestinal bleeding, which may result in hospitalization and even fatal outcomes. Although serious GI tract ulcerations and bleeding can occur without warning symptoms, patients should be alert for the signs and symptoms of ulcerations and bleeding, and should ask for medical advice when observing any indicative signs or symptoms. Patients should be apprised of the importance of this follow-up. For additional gastrointestinal safety information see CLINICAL STUDIES, *Special Studies, VIGOR* and WARNINGS, *Gastrointestinal (GI) Effects - Risk of GI Ulceration, Bleeding and Perforation*. Patients should be informed that VIOXX is not a substitute for aspirin for cardiovascular prophylaxis because of its lack of effect on platelets. For additional cardiovascular safety information see CLINICAL STUDIES, *Special Studies, VIGOR* and PRECAUTIONS, *Cardiovascular Effects*.

Patients should promptly report signs or symptoms of gastrointestinal ulceration or bleeding, skin rash, unexplained weight gain, edema or chest pain to their physicians.

Patients should be informed of the warning signs and symptoms of hepatotoxicity (e.g., nausea, fatigue, lethargy, pruritus, jaundice, right upper quadrant tenderness, and "flu-like" symptoms). If these occur, patients should be instructed to stop therapy and seek immediate medical therapy.

Patients should also be instructed to seek immediate emergency help in the case of an anaphylactoid reaction (see WARNINGS).

In late pregnancy VIOXX should be avoided because it may cause premature closure of the ductus arteriosus.

*Laboratory Tests*

Because serious GI tract ulcerations and bleeding can occur without warning symptoms, physicians should monitor for signs or symptoms of GI bleeding.

*Drug Interactions*

*ACE inhibitors:* Reports suggest that NSAIDs may diminish the antihypertensive effect of Angiotensin Converting Enzyme (ACE) inhibitors. In patients with mild to moderate hypertension, administration of 25 mg daily of VIOXX with the ACE inhibitor benazepril, 10 to 40 mg for 4 weeks, was associated with an average increase in mean arterial pressure of about 3 mm Hg compared to ACE inhibitor alone. This interaction should be given consideration in patients taking VIOXX concomitantly with ACE inhibitors.

*Aspirin:* Concomitant administration of low-dose aspirin with VIOXX may result in an increased rate of GI ulceration or other complications, compared to use of VIOXX alone. At steady state, VIOXX 50 mg once daily had no effect on the anti-platelet activity of low-dose (81 mg once daily) aspirin, as assessed by *ex vivo* platelet aggregation and serum $TXB_2$ generation in clotting blood. Because of its lack of platelet effects, VIOXX is not a substitute for aspirin for cardiovascular prophylaxis. Therefore, in patients taking VIOXX, antiplatelet therapies should not be discontinued and should be considered in patients with an indication for cardiovascular prophylaxis. (See CLINICAL STUDIES, *Special*

NDA 21-042/S-007, S-008, S-010, S-012, S-013, S-014
NDA 21-052/S-004, S-005, S-006, S-007, S-008, S-009
Page 14

*Studies, Platelets* and PRECAUTIONS, *Cardiovascular Effects*.) Prospective, long-term studies on concomitant administration of VIOXX and aspirin have not been conducted.

*Cimetidine:* Co-administration with high doses of cimetidine [800 mg twice daily] increased the $C_{max}$ of rofecoxib by 21%, the $AUC_{0-120hr}$ by 23% and the $t_{1/2}$ by 15%. These small changes are not clinically significant and no dose adjustment is necessary.

*Digoxin:* Rofecoxib 75 mg once daily for 11 days does not alter the plasma concentration profile or renal elimination of digoxin after a single 0.5 mg oral dose.

*Furosemide:* Clinical studies, as well as post-marketing observations, have shown that NSAIDs can reduce the natriuretic effect of furosemide and thiazides in some patients. This response has been attributed to inhibition of renal prostaglandin synthesis.

*Ketoconazole:* Ketoconazole 400 mg daily did not have any clinically important effect on the pharmacokinetics of rofecoxib.

*Lithium:* NSAIDs have produced an elevation of plasma lithium levels and a reduction in renal lithium clearance. In post-marketing experience there have been reports of increases in plasma lithium levels. Thus, when VIOXX and lithium are administered concurrently, subjects should be observed carefully for signs of lithium toxicity.

*Methotrexate:* VIOXX 12.5, 25, and 50 mg, each dose administered once daily for 7 days, had no effect on the plasma concentration of methotrexate as measured by $AUC_{0-24h}$ in patients receiving single weekly methotrexate doses of 7.5 to 20 mg for rheumatoid arthritis. At higher than recommended doses, VIOXX 75 mg administered once daily for 10 days increased plasma concentrations by 23% as measured by $AUC_{0-24hr}$ in patients receiving methotrexate 7.5 to 15 mg/week for rheumatoid arthritis. At 24 hours postdose, a similar proportion of patients treated with methotrexate alone (94%) and subsequently treated with methotrexate co-administered with 75 mg of rofecoxib (88%) had methotrexate plasma concentrations below the measurable limit (5 ng/mL). Standard monitoring of methotrexate-related toxicity should be continued if VIOXX and methotrexate are administered concomitantly.

*Oral Contraceptives:* Rofecoxib did not have any clinically important effect on the pharmacokinetics of ethinyl estradiol and norethindrone.

*Prednisone/prednisolone:* Rofecoxib did not have any clinically important effect on the pharmacokinetics of prednisolone or prednisone.

*Rifampin:* Co-administration of VIOXX with rifampin 600 mg daily, a potent inducer of hepatic metabolism, produced an approximate 50% decrease in rofecoxib plasma concentrations. Therefore, a starting daily dose of 25 mg of VIOXX should be considered for the treatment of osteoarthritis when VIOXX is co-administered with potent inducers of hepatic metabolism.

*Theophylline:* VIOXX 12.5, 25, and 50 mg administered once daily for 7 days increased plasma theophylline concentrations ($AUC_{(0-\infty)}$) by 38 to 60% in healthy subjects administered a single 300-mg dose of theophylline. Adequate monitoring of theophylline plasma concentrations should be considered when therapy with VIOXX is initiated or changed in patients receiving theophylline.

These data suggest that rofecoxib may produce a modest inhibition of cytochrome P450 (CYP) 1A2. Therefore, there is a potential for an interaction with other drugs that are metabolized by CYP1A2 (e.g., *amitriptyline, tacrine, and zileuton*).

*Warfarin:* Anticoagulant activity should be monitored, particularly in the first few days after initiating or changing VIOXX therapy in patients receiving warfarin or similar agents, since these patients are at an increased risk of bleeding complications. In single and multiple dose studies in healthy subjects receiving both warfarin and rofecoxib, prothrombin time (measured as INR) was increased by approximately 8% to 11%. In post-marketing experience, bleeding events have been reported, predominantly in the elderly, in association with increases in prothrombin time in patients receiving VIOXX concurrently with warfarin.

Carcinogenesis, Mutagenesis, Impairment of Fertility

Rofecoxib was not carcinogenic in mice given oral doses up to 30 mg/kg (male) and 60 mg/kg (female) (approximately 5- and 2-fold the human exposure at 25 and 50 mg daily based on $AUC_{0-24}$) and in male and female rats given oral doses up to 8 mg/kg (approximately 6- and 2-fold the human exposure at 25 and 50 mg daily based on $AUC_{0-24}$) for two years.

Rofecoxib was not mutagenic in an Ames test or in a V-79 mammalian cell mutagenesis assay, nor clastogenic in a chromosome aberration assay in Chinese hamster ovary (CHO) cells, in an *in vitro* and an *in vivo* alkaline elution assay, or in an *in vivo* chromosomal aberration test in mouse bone marrow.

Rofecoxib did not impair male fertility in rats at oral doses up to 100 mg/kg (approximately 20- and 7-fold human exposure at 25 and 50 mg daily based on the $AUC_{0-24}$) and rofecoxib had no effect on fertility in female rats at doses up to 30 mg/kg (approximately 19- and 7-fold human exposure at 25 and 50 mg daily based on $AUC_{0-24}$).

NDA 21-042/S-007, S-008, S-010, S-012, S-013, S-014
NDA 21-052/S-004, S-005, S-006, S-007, S-008, S-009
Page 15

*Pregnancy*
*Teratogenic effects: Pregnancy Category C.*
   Rofecoxib was not teratogenic in rats at doses up to 50 mg/kg/day (approximately 28- and 10-fold human exposure at 25 and 50 mg daily based on $AUC_{0-24}$). There was a slight, non-statistically significant increase in the overall incidence of vertebral malformations only in the rabbit at doses of 50 mg/kg/day (approximately 1- or <1-fold human exposure at 25 and 50 mg daily based on $AUC_{0-24}$). There are no studies in pregnant women. VIOXX should be used during pregnancy only if the potential benefit justifies the potential risk to the fetus.
*Nonteratogenic effects*
   Rofecoxib produced peri-implantation and post-implantation losses and reduced embryo/fetal survival in rats and rabbits at oral doses ≥10 and ≥75 mg/kg/day, respectively (approximately 9- and 3-fold [rats] and 2- and <1-fold [rabbits] human exposure based on the $AUC_{0-24}$ at 25 and 50 mg daily). These changes are expected with inhibition of prostaglandin synthesis and are not the result of permanent alteration of female reproductive function. There was an increase in the incidence of postnatal pup mortality in rats at ≥5 mg/kg/day (approximately 5- and 2-fold human exposure at 25 and 50 mg daily based on $AUC_{0-24}$). In studies in pregnant rats administered single doses of rofecoxib, there was a treatment-related decrease in the diameter of the ductus arteriosus at all doses used (3-300 mg/kg: 3 mg/kg is approximately 2- and <1-fold human exposure at 25 or 50 mg daily based on $AUC_{0-24}$). As with other drugs known to inhibit prostaglandin synthesis, use of VIOXX during the third trimester of pregnancy should be avoided.
*Labor and delivery*
   Rofecoxib produced no evidence of significantly delayed labor or parturition in females at doses 15 mg/kg in rats (approximately 10- and 3-fold human exposure as measured by the $AUC_{0-24}$ at 25 and 50 mg). The effects of VIOXX on labor and delivery in pregnant women are unknown.
   Merck & Co., Inc. maintains a registry to monitor the pregnancy outcomes of women exposed to VIOXX while pregnant. Healthcare providers are encouraged to report any prenatal exposure to VIOXX by calling the **Pregnancy Registry at (800) 986-8999**.
*Nursing mothers*
   Rofecoxib is excreted in the milk of lactating rats at concentrations similar to those in plasma. There was an increase in pup mortality and a decrease in pup body weight following exposure of pups to milk from dams administered VIOXX during lactation. The dose tested represents an approximate 18- and 6-fold human exposure at 25 and 50 mg based on $AUC_{0-24}$. It is not known whether this drug is excreted in human milk. Because many drugs are excreted in human milk and because of the potential for serious adverse reactions in nursing infants from VIOXX, a decision should be made whether to discontinue nursing or to discontinue the drug, taking into account the importance of the drug to the mother.
*Pediatric Use*
   Safety and effectiveness in pediatric patients below the age of 18 years have not been evaluated.
*Geriatric Use*
   Of the patients who received VIOXX in osteoarthritis clinical trials, 1455 were 65 years of age or older. This included 460 patients who were 75 years or older, and in one of these studies, 174 patients who were 80 years or older. No substantial differences in safety and effectiveness were observed between these subjects and younger subjects. Greater sensitivity of some older individuals cannot be ruled out. As with other NSAIDs, including those that selectively inhibit COX-2, there have been more spontaneous post-marketing reports of fatal GI events and acute renal failure in the elderly than in younger patients. Dosage adjustment in the elderly is not necessary; however, therapy with VIOXX should be initiated at the lowest recommended dose.

## ADVERSE REACTIONS

*Osteoarthritis*
   Approximately 3600 patients with osteoarthritis were treated with VIOXX; approximately 1400 patients received VIOXX for 6 months or longer and approximately 800 patients for one year or longer. The following table of adverse experiences lists all adverse events, regardless of causality, occurring in at least 2% of patients receiving VIOXX in nine controlled studies of 6-week to 6-month duration conducted in patients with OA at the therapeutically recommended doses (12.5 and 25 mg), which included a placebo and/or positive control group.

NDA 21-042/S-007, S-008, S-010, S-012, S-013, S-014
NDA 21-052/S-004, S-005, S-006, S-007, S-008, S-009
Page 16

| | Placebo | VIOXX 12.5 or 25 mg daily | Ibuprofen 2400 mg daily | Diclofenac 150 mg daily |
|---|---|---|---|---|
| Clinical Adverse Experiences occurring in ≥ 2.0% of Patients Treated with VIOXX in OA Clinical Trials | | | | |
| | (N = 783) | (N = 2829) | (N = 847) | (N = 498) |
| *Body As A Whole/Site Unspecified* | | | | |
| Abdominal Pain | 4.1 | 3.4 | 4.6 | 5.8 |
| Asthenia/Fatigue | 1.0 | 2.2 | 2.0 | 2.6 |
| Dizziness | 2.2 | 3.0 | 2.7 | 3.4 |
| Influenza-Like Disease | 3.1 | 2.9 | 1.5 | 3.2 |
| Lower Extremity Edema | 1.1 | 3.7 | 3.8 | 3.4 |
| Upper Respiratory Infection | 7.8 | 8.5 | 5.8 | 8.2 |
| *Cardiovascular System* | | | | |
| Hypertension | 1.3 | 3.5 | 3.0 | 1.6 |
| *Digestive System* | | | | |
| Diarrhea | 6.8 | 6.5 | 7.1 | 10.6 |
| Dyspepsia | 2.7 | 3.5 | 4.7 | 4.0 |
| Epigastric Discomfort | 2.8 | 3.8 | 9.2 | 5.4 |
| Heartburn | 3.6 | 4.2 | 5.2 | 4.6 |
| Nausea | 2.9 | 5.2 | 7.1 | 7.4 |
| *Eyes, Ears, Nose, And Throat* | | | | |
| Sinusitis | 2.0 | 2.7 | 1.8 | 2.4 |
| *Musculoskeletal System* | | | | |
| Back Pain | 1.9 | 2.5 | 1.4 | 2.8 |
| *Nervous System* | | | | |
| Headache | 7.5 | 4.7 | 6.1 | 8.0 |
| *Respiratory System* | | | | |
| Bronchitis | 0.8 | 2.0 | 1.4 | 3.2 |
| *Urogenital System* | | | | |
| Urinary Tract Infection | 2.7 | 2.8 | 2.5 | 3.6 |

In the OA studies, the following spontaneous adverse events occurred in >0.1% to 1.9% of patients treated with VIOXX regardless of causality:

*Body as a Whole:* abdominal distension, abdominal tenderness, abscess, chest pain, chills, contusion, cyst, diaphragmatic hernia, fever, fluid retention, flushing, fungal infection, infection, laceration, pain, pelvic pain, peripheral edema, postoperative pain, syncope, trauma, upper extremity edema, viral syndrome.

*Cardiovascular System:* angina pectoris, atrial fibrillation, bradycardia, hematoma, irregular heartbeat, palpitation, premature ventricular contraction, tachycardia, venous insufficiency.

*Digestive System:* acid reflux, aphthous stomatitis, constipation, dental caries, dental pain, digestive gas symptoms, dry mouth, duodenal disorder, dysgeusia, esophagitis, flatulence, gastric disorder, gastritis, gastroenteritis, hematochezia, hemorrhoids, infectious gastroenteritis, oral infection, oral lesion, oral ulcer, vomiting.

*Eyes, Ears, Nose, and Throat:* allergic rhinitis, blurred vision, cerumen impaction, conjunctivitis, dry throat, epistaxis, laryngitis, nasal congestion, nasal secretion, ophthalmic injection, otic pain, otitis, otitis media, pharyngitis, tinnitus, tonsillitis.

*Immune System:* allergy, hypersensitivity, insect bite reaction.

*Metabolism and Nutrition:* appetite change, hypercholesterolemia, weight gain.

*Musculoskeletal System:* ankle sprain, arm pain, arthralgia, back strain, bursitis, cartilage trauma, joint swelling, muscular cramp, muscular disorder, muscular weakness, musculoskeletal pain, musculoskeletal stiffness, myalgia, osteoarthritis, tendinitis, traumatic arthropathy, wrist fracture.

*Nervous System:* hypesthesia, insomnia, median nerve neuropathy, migraine, muscular spasm, paresthesia, sciatica, somnolence, vertigo.

*Psychiatric:* anxiety, depression, mental acuity decreased.

*Respiratory System:* asthma, cough, dyspnea, pneumonia, pulmonary congestion, respiratory infection.

NDA 21-042/S-007, S-008, S-010, S-012, S-013, S-014
NDA 21-052/S-004, S-005, S-006, S-007, S-008, S-009
Page 17

*Skin and Skin Appendages:* abrasion, alopecia, atopic dermatitis, basal cell carcinoma, blister, cellulitis, contact dermatitis, herpes simplex, herpes zoster, nail unit disorder, perspiration, pruritus, rash, skin erythema, urticaria, xerosis.

*Urogenital System:* breast mass, cystitis, dysuria, menopausal symptoms, menstrual disorder, nocturia, urinary retention, vaginitis.

The following serious adverse events have been reported rarely (estimated <0.1%) in patients taking VIOXX, regardless of causality. Cases reported only in the post-marketing experience are indicated in italics.

*Cardiovascular:* cerebrovascular accident, congestive heart failure, deep venous thrombosis, myocardial infarction, *pulmonary edema,* pulmonary embolism, transient ischemic attack, unstable angina.

*Gastrointestinal:* cholecystitis, colitis, colonic malignant neoplasm, *duodenal perforation,* duodenal ulcer, *esophageal ulcer, gastric perforation, gastric ulcer,* gastrointestinal bleeding, *hepatic failure, hepatitis,* intestinal obstruction, *jaundice,* pancreatitis.

*Hemic and lymphatic:* agranulocytosis, leukopenia, lymphoma, *thrombocytopenia.*

*Immune System:* anaphylactic/anaphylactoid reaction, angioedema, bronchospasm, hypersensitivity vasculitis.

*Metabolism and nutrition:* hyponatremia.

*Nervous System:* aseptic meningitis.

*Psychiatric:* confusion, hallucinations.

*Skin and Skin Appendages: severe skin reactions, including Stevens-Johnson syndrome and toxic epidermal necrolysis.*

*Urogenital System: acute renal failure,* breast malignant neoplasm, *hyperkalemia, interstitial nephritis,* prostatic malignant neoplasm, urolithiasis, *worsening chronic renal failure.*

In 1-year controlled clinical trials and in extension studies for up to 86 weeks (approximately 800 patients treated with VIOXX for one year or longer), the adverse experience profile was qualitatively similar to that observed in studies of shorter duration.

**Rheumatoid Arthritis**

Approximately 1,100 patients were treated with VIOXX in the Phase III rheumatoid arthritis efficacy studies. These studies included extensions of up to 1 year. The adverse experience profile was generally similar to that reported in the osteoarthritis studies. In studies of at least three months, the incidence of hypertension in RA patients receiving the 25 mg once daily dose of VIOXX was 10.0% and the incidence of hypertension in patients receiving naproxen 500 mg twice daily was 4.7%.

**Analgesia, including primary dysmenorrhea**

Approximately one thousand patients were treated with VIOXX in analgesia studies. All patients in post-dental surgery pain studies received only a single dose of study medication. Patients in primary dysmenorrhea studies may have taken up to 3 daily doses of VIOXX, and those in the post-orthopedic surgery pain study were prescribed 5 daily doses of VIOXX.

The adverse experience profile in the analgesia studies was generally similar to those reported in the osteoarthritis studies. The following additional adverse experience, which occurred at an incidence of at least 2% of patients treated with VIOXX, was observed in the post-dental pain surgery studies: post-dental extraction alveolitis (dry socket).

**Clinical Studies in OA and RA with VIOXX 50 mg (Twice the highest dose recommended for chronic use)**

In OA and RA clinical trials which contained VIOXX 12.5 or 25 mg as well as VIOXX 50 mg, VIOXX 50 mg QD was associated with a higher incidence of gastrointestinal symptoms (abdominal pain, epigastric pain, heartburn, nausea and vomiting), lower extremity edema, hypertension, serious* adverse experiences and discontinuation due to clinical adverse experiences compared to the recommended chronic doses of 12.5 and 25 mg (see DOSAGE AND ADMINISTRATION).

---

\* adverse experience that resulted in death, permanent or substantial disability, hospitalization, congenital anomaly, or cancer, was immediately life threatening, was due to an overdose, or was thought by the investigator to require intervention to prevent one of the above outcomes

NDA 21-042/S-007, S-008, S-010, S-012, S-013, S-014
NDA 21-052/S-004, S-005, S-006, S-007, S-008, S-009
Page 18

## OVERDOSAGE

No overdoses of VIOXX were reported during clinical trials. Administration of single doses of VIOXX 1000 mg to 6 healthy volunteers and multiple doses of 250 mg/day for 14 days to 75 healthy volunteers *did not result in serious toxicity.*

In the event of overdose, it is reasonable to employ the usual supportive measures, e.g., remove unabsorbed material from the gastrointestinal tract, employ clinical monitoring, and institute supportive therapy, if required.

Rofecoxib is not removed by hemodialysis; it is not known whether rofecoxib is removed by peritoneal dialysis.

## DOSAGE AND ADMINISTRATION

VIOXX is administered orally. The lowest dose of VIOXX should be sought for each patient.
*Osteoarthritis*

The recommended starting dose of VIOXX is 12.5 mg once daily. Some patients may receive additional benefit by increasing the dose to 25 mg once daily. The maximum recommended daily dose is 25 mg.
*Rheumatoid Arthritis*

The recommended dose is 25 mg once daily. The maximum recommended daily dose is 25 mg.
*Management of Acute Pain and Treatment of Primary Dysmenorrhea*

The recommended dose of VIOXX is 50 mg once daily. The maximum recommended daily dose is 50 mg. Use of VIOXX for more than 5 days in management of pain has not been studied. Chronic use of VIOXX 50 mg daily is not recommended. (See ADVERSE REACTIONS, *Clinical Studies in OA and RA with VIOXX 50 mg*).
*Hepatic Insufficiency*

Because of significant increases in both AUC and $C_{max}$, patients with moderate hepatic impairment (Child-Pugh score: 7-9) should be treated with the lowest possible dose (see CLINICAL PHARMACOLOGY, *Special Populations*).

VIOXX Tablets may be taken with or without food.
*Oral Suspension*

VIOXX Oral Suspension 12.5 mg/5 mL or 25 mg/5 mL may be substituted for VIOXX Tablets 12.5 or 25 mg, respectively, in any of the above indications. Shake before using.

## HOW SUPPLIED

No. 3810 — Tablets VIOXX, 12.5 mg, are cream/off-white, round, shallow cup tablets engraved MRK 74 on one side and VIOXX on the other. They are supplied as follows:
**NDC** 0006-0074-31 unit of use bottles of 30
**NDC** 0006-0074-28 unit dose packages of 100
**NDC** 0006-0074-68 bottles of 100
**NDC** 0006-0074-82 bottles of 1000
**NDC** 0006-0074-80 bottles of 8000.
No. 3834 — Tablets VIOXX, 25 mg, are yellow, round tablets engraved MRK 110 on one side and VIOXX on the other. They are supplied as follows:
**NDC** 0006-0110-31 unit of use bottles of 30
**NDC** 0006-0110-28 unit dose packages of 100
**NDC** 0006-0110-68 bottles of 100
**NDC** 0006-0110-82 bottles of 1000
**NDC** 0006-0110-80 bottles of 8000.
No. 3835 — Tablets VIOXX, 50 mg, are orange, round tablets engraved MRK 114 on one side and VIOXX on the other. They are supplied as follows:
**NDC** 0006-0114-31 unit of use bottles of 30
**NDC** 0006-0114-28 unit dose packages of 100
**NDC** 0006-0114-68 bottles of 100
**NDC** 0006-0114-74 bottles of 500
**NDC** 0006-0114-81 bottles of 4000.
No. 3784 — Oral Suspension VIOXX, 12.5 mg/5 mL, is an opaque, white to faint yellow suspension with a strawberry flavor that is easily resuspended upon shaking.
**NDC** 0006-3784-64 unit of use bottles containing 150 mL (12.5 mg/5 mL).

NDA 21-042/S-007, S-008, S-010, S-012, S-013, S-014
NDA 21-052/S-004, S-005, S-006, S-007, S-008, S-009
Page 19

   No. 3785 — Oral Suspension VIOXX, 25 mg/5 mL, is an opaque, white to faint yellow suspension with a strawberry flavor that is easily resuspended upon shaking.
   **NDC** 0006-3785-64 unit of use bottles containing 150 mL (25 mg/5 mL).

*Storage*
*VIOXX Tablets:*
   Store at 25°C (77°F), excursions permitted to 15-30°C (59-86°F). [See USP Controlled Room Temperature.]
*VIOXX Oral Suspension:*
   Store at 25°C (77°F), excursions permitted to 15-30°C (59-86°F). [See USP Controlled Room Temperature.]

Rx only

---

Issued April 2002
Printed in USA

------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

------------------------------------------------------------------------

```
 /s/
--------------------
Lawrence Goldkind
4/11/02 01:01:00 PM
```



**STATE OF LOUISIANA**
**OFFICE OF THE GOVERNOR**
**PATIENT'S COMPENSATION FUND**

NO. _____

**GARY DUGAS and his wife, Cathy Dugas**

**VERSUS**

**DR. FLORENCE JONES**

<u>**REQUEST FOR MEDICAL REVIEW PANEL**</u>



Claimants, GARY DUGAS and his wife Cathy Dugas, request a Medical Review Panel be convened to determine whether the standard of care was breached by the respondent relative to the care rendered to GARY DUGAS, as follows:

1.

Made respondent herein is

a)    Dr. Florence Jones, general surgeon/general practicioner

2.

At all pertinent times herein, Dr. Jones rendered treatment to Gary Dugas at her clinic in New Orleans.

Exhibit 3

3.

Dr. Florence Jones began prescribing Vioxx 25 mg to Gary Dugas in about May 2003. Mr. Dugas took Vioxx 25 mg on a daily basis through sometime in August 2003.

4.

In August 2003, Dr. Jones increased the strength of the prescription to Vioxx 50mg. Mr. Dugas took Vioxx 50 mg on a daily basis through November 11, 2003, as prescribed.

5.

As a result of taking Vioxx, Gary Dugas suffered a heart attack on November 11, 2003. Claimants did not discover Vioxx was the likely cause of his heart attack until after its withdrawal by Merck from the market in September 2004.

6.

Claimants maintain that Dr. Jones was negligent and breached the appropriate standard of care in the following, non-exclusive, regards:

a.   in failing to appropriately follow and monitor Gary Dugas while he was taking Vioxx;

b.   in failing to appropriately prescribe Vioxx to Gary Dugas;

c.   any other acts of negligence and/or breaches of the appropriate standard of care which the medical review panel may determine.

-2-

WHEREFORE, claimants respectfully requests a Medical Review Panel be convened pursuant to statute for the purpose of reviewing whether the conduct of the respondent deviated from the appropriate standard of care due Gary Dugas as alleged, as discovered in this proceeding or as may be evident from the record and evidence submitted.

Respectfully Submitted,

SILVESTRI & MASSICOT

BY: _____
FRANK A. SILVESTRI, #12075
DAMIEN SAVOIE, #19144
3914 Canal St.
New Orleans, LA 70119
(504) 482-3400

Law Office of Peter Derbes
3914 Canal St
New Orleans, La.   70119

-3-

OFFICE OF THE GOVERNOR
**Kathleen Babineaux Blanco**
GOVERNOR



State of Louisiana

**PATIENT'S COMPENSATION FUND**

P. O. BOX 3718
BATON ROUGE, LA 70821
(225) 342-8787
pcf@lapcf.louisiana.gov
(225) 342-5324

**CERTIFIED MAIL RETURN
RECEIPT REQUESTED**

July 22, 2005

Mr. Damien Savoie
Attorney at Law
3914 Canal St.
New Orleans, LA 70119

     RE:   **Gary Dugas, et al
               PCF File No.: 2005-1290**

Dear Mr. Savoie:

     This will acknowledge receipt of your letter dated July 12, 2005, submitting the above referenced complaint.

     None of the defendants named in the petition have coverage in the Patients' Compensation Fund under the provisions of Louisiana Revised Statutes 40:1299.41 et seq.  If you would provide this office with the address of the not qualified defendant we will be glad to send them a not qualified notice.

     This is to acknowledge receipt on July 14, 2005 of your check in the amount of $100.00, dated July 11, 2005.   A refund of $100.00 will be issued.

     The above PCF file number is for reference purposes only.

                    Very truly yours,

                    Cheryl Jackson
                    Medical Malpractice Compliance Director

CJ/smd

M D

# Exhibit 4