UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA
2006 JAN 30 AM 11:57
LORETTA G. WHYTE
CLERK

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| Evelyn Irvin Plunkett v. Merck & Co, Inc. | * | CASE NO. 02:05CV4046 |

### PLAINTIFF'S RESPONSE TO MERCK & CO.'S MOTION FOR ORDER TO EXCLUDE TESTIMONY OF THOMAS BALDWIN, M.D.

Plaintiff, for her Response to Merck and Company's Motion for Order to Exclude Testimony of Thomas Baldwin, M.D., states as follows:

### Introduction

The basis for defendant's motion and this Court's prior Order in this regard rely exclusively on Dr. Baldwin's own testimony, specifically Dr. Baldwin's purported inability to recite from memory specific details of randomly selected clinic studies and his statement that he was not an expert *per se* on Vioxx.

Dr. Baldwin's statement has been distorted to overshadow the real issues presented by his testimony. Dr. Baldwin has addressed this point in his recent Expert Witness Designation, stating:

> I am not an expert per se in Vioxx to the extent I was not involved in the drug's creation, am not knowledgeable about its chemical compounding, formulation, or molecular structure, and was not involved in designing or conducting Vioxx clinical trials. This would be true for virtually all of the drugs I come into contact with in my cardiology practice. However, consistent with what cardiologists routinely do, and what I do to educate myself about the drugs I come into contact with in my practice, I have extensively reviewed and studied the relevant medical and epidemiologic literature and studies on Vioxx. I do, therefore, consider myself to be an expert on the cardiotoxic

1

___ Fee_____
___ Process____
_X_ Dktd_____
_✓_ CtRmDep__
___ Doc. No___

>effects of Vioxx and the determination of whether Vioxx played
>a role in Mr. Irvin's sudden death.
>Dr. Baldwin's January 13, 2006 Expert Witness Report.

Dr. Baldwin's testimony is that of a clinically practicing cardiologist concerning his opinions about why Mr. Irvin suffered from sudden cardiac death. He has familiarized himself with the medical literature concerning the widely known and generally accepted cardiotoxic effects of Vioxx and, based thereon, arrived at his conclusions to a reasonable degree of medical certainty.

The only of Dr. Baldwin's opinions at issue is his belief that Vioxx was a cause or substantial contributing cause of Mr. Irvin's sudden cardiac death. In his Expert Witness Report, Dr. Baldwin sets forth his skill, training, education, and experience which qualifies him to testify concerning the role Vioxx played in Mr. Irvin's death. Dr. Baldwin's report also shows in greater detail the many facts of his skill, training, education and experience of which this Court was unaware when it made its previous rulings. As discussed herein, the law of the 5th Circuit dictates that his opinions should be accepted by this Court and that his alleged deficient knowledge concerning chapter and verse of the many studies on Vioxx goes to the weight of his testimony, not its admissibility.

**The Fifth Circuit has Approved Expert Methodology Similar to Dr. Baldwin's**

Pipitone v. Biometrix, Inc., 288 F.3d 239 (5th Cir. 2002) concerned the admissibility of expert testimony similar to that at issue here. In *Pipitone* the expert witness testimony at issue was that of Dr. Coco, a clinically practicing infectious disease specialist. In his lawsuit the plaintiff purported that he had been infected with salmonella by a contaminated injection of defendant's replacement synovial fluid, which was made from rooster combs. Dr. Coco conducted an extensive investigation into the cause of the infection and, by ruling out virtually all other explanations, determined that the infection was caused by the defendant's product. Nonetheless, the trial court precluded Dr. Coco's testimony and entered summary judgment in

2

favor of defendant. In overruling the trial court's decision to preclude Dr. Coco's testimony, the Court stated:

> "Specifically, Dr. Coco based his opinion on the timeliness of the infection (symptoms of which began to appear hours after the Synvisc injection), the source of the Synvisc, the type of organism (salmonella) that infected Pipitone, and the elimination of all other likely alternatives." Id. At 248.

This is essentially the approach that Dr. Baldwin took to forming his opinion that Mr. Irvin's death was caused or contributed to by his ingestion of Vioxx. Dr. Baldwin has taken the generally accepted scientific opinion that Vioxx tends to cause arterial thrombosis by platelet aggregation and possible vasoconstriction which results in an imbalance between prostacylin and thromboxane A2, combined that knowledge with his education, clinical experience and information that Mr. Irvin was a healthy, 53 year-old male who was symptom-free and doing well prior to his ingestion of Vioxx, and arrived at the medical opinion that Vioxx caused Mr. Irvin's death.

The *Pipitone* court discussed *Daubert* at great length, taking particular note not only of the rigorous requirements of *Daubert*, but also that "'the trial court's role as gatekeeper is not intended to serve as replacement for the adversary system.' Rather, as Daubert makes clear, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" Id at 250, *citing* Daubert v. Merrell Dow Pharmaceuticals, Inc. 509 U.S. 579, 596 (1993). While plaintiff certainly disputes that Dr. Baldwin's opinions are "shaky", *Daubert's* message is clear – let the fact finder decide the facts.

The methodology used by Dr. Baldwin was also found acceptable by the Fifth Circuit in Curtis v. M&S Petroleum, Inc., 174 F.3d 661 (5th Cir. 1999). *Curtis* was a benzene exposure case in which Dr. Frank Stevens, an industrial hygienist, was proffered by plaintiff to establish

3

that the plaintiffs' injuries were caused by their exposure to Benzene. Dr. Stevens' medical causation testimony was excluded by the Court after an evidentiary hearing. Id at 668.

In reviewing the trial court's decision, the Fifth Circuit Court of Appeals first discussed Fed.R.Evid. 702 and its application of the *Daubert* opinion. In doing so, it stated:

> The Supreme Court set out four **non-exclusive** factors to aid in the determination of whether the methodology is reliable. They are: (1) whether the theory has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community. Id at 669. (Emphasis added).

Dr. Stevens' methodology was to review the manufacturers Material Data Safety Sheet and OSHA standards on benzene, both of which pointed out the effects of inhalation and dermal exposure to benzene were similar to the symptoms experienced by plaintiffs. Id. Dr. Stevens also referred a toxicological profile published by the federal government which contained information concerning epidemiological studies of the toxicity of benzene as well as the discussion by the United States Supreme Court of the harmful effects of benzene in Industrial Union v. American Petrol. Inst., 448 U.S. 607 (1980). Id at 670.

Dr. Stevens then pointed to the strong temporal connection between the exposure to the benzene and plaintiffs' symptoms. In finding that "both scientific literature and strong circumstantial evidence support the causal connection"[1], the Court observed that "a temporal connection is entitled to greater weight when there is an established scientific connection between exposure and illness or other circumstantial evidence supporting the causal link. Id, *citing* Cavallo v. Star Enter., 892 F.Supp. 756 (E.D.Va. 1995).

For the Fifth Circuit to uphold such medical causation testimony from such a witness is instructive in the instant case. In fact, *even the trial court found that Dr. Stevens had sufficient*

---

[1] Id.

4

*expertise and information upon which to base his opinions*, but precluded his testimony based on his lack of evidence concerning benzene levels.[2]

Dr. Stevens was not an epidemiologist. In fact, he was not even a medical doctor. He performed none of the primary research himself and did not appear to have any great understanding of the methodologies used in the underlying studies. Nonetheless Dr. Frank's opinions were deemed reliable under Fed.R.Evid 702 and *Daubert* because of his reliance on generally accepted scientific principle and his own observations of the instant case.

The Fifth Circuit has similarly dealt with arguments such as defendant's that only very specific medical specialists can testify as to medical causation and cause of death. Specifically Carroll v. Morgan, 17 F.3d 787 (5th Cir. 1994) states:

> *Daubert* does not support plaintiff's argument that the subject of Carroll's cause of death falls within the specific confines of pathology. The district court did not abuse its discretion in allowing Dr. Bennett, an expert cardiologist, to give an opinion on the relationship between Mr. Carroll's heart problems and his death. Id at 790 *citing* Karp v. Cooley, 493 F.2d 408, 418 (5th Cir. 1974).

### Dr. Baldwin's Knowledge, Skill, Experience, Training and Education Render Him Well-Suited to Assist the Jury in this Case

Dr. Baldwin is an interventional cardiologist. As such, he spends a significant portion of his professional time treating patients with myocardial infarction. He has treated hundreds, if not thousands, of patients with myocardial infarction. Given this professional experience, Dr. Baldwin is well-versed in the subject of risk factors for myocardial infarction. This knowledge also renders him qualified to offer his opinion on Mr. Irvin's specific risk for myocardial infarction based upon his review of Mr. Irvin's medical records and autopsy findings.

---

[2] The Fifth Circuit found that indeed Dr. Stevens did possess sufficient information about exposure levels based on his observations that the symptoms experienced by the workers were well-known symptoms of overexposure to benzene, a Dreager tube test, and the work practices and design of the refinery.

Dr. Baldwin has spent his career in cardiac medicine developing a considerable understanding of the role that age, gender, family history, hypertension, cholesterol and other factors play in the development of atherosclerosis and the future likelihood of myocardial infarction in a given patient. Dr. Baldwin's understanding and expertise in this area is a product of his clinical experience and ongoing review and analysis of the relevant medical literature. Admittedly, Dr. Baldwin has not been a researcher in hypertension, elevated cholesterol or the development of medications for those conditions. However, he is certainly qualified to testify regarding these well-accepted matters and assist the jury in understanding coronary artery disease and myocardial infarction. One need not work in a pharmaceutical company's laboratory or author textbooks to formulate such opinions. Similar principles should allow Dr. Baldwin to testify on the issue of specific causation. As set forth in his expert report and deposition testimony, Dr. Baldwin treated patients who were taking Vioxx. Some of these patients developed side effects from Vioxx, including congestive heart failure. Dr. Baldwin recommended that between 20 and 100 patients stop taking the drug due to potential cardiovascular risks. Since the removal of Vioxx from the market, Dr. Baldwin has reviewed the relevant body of medical and scientific literature regarding the increased risk of myocardial infarction associated with Vioxx usage.

Dr. Baldwin's work has included review of the published clinical trials regarding Vioxx as well as the review of numerous other papers and studies regarding Vioxx's mechanism of action and the resulting imbalance between prostacyclin and thromboxane A-2. In addition, Dr. Baldwin has reviewed the depositions reports of other experts in this litigation, including Dr. Ray, Dr. Lucchesi and Dr. Topol. As a result of Dr. Baldwin's experience as a cardiologist and his extensive review of the pertinent clinical trials, epidemiological data and other studies regarding Vioxx, he is of the opinion that Vioxx causes a significantly increased

risk of myocardial infarction. In that regard, Dr. Baldwin is in agreement with numerous authors and commentators on the subject.

Dr. Baldwin's opinions on specific causation expressed in his January 13, 2006 expert report are also within his area of "knowledge, skill, experience, training or education" as contemplated by Federal Rule of Evidence 702. The primary concerns identified to date by the Court are that Dr. Baldwin, "has little to no experience prescribing Vioxx, diagnosing Vioxx as the cause of a cardiac event, conducting clinical research related to Vioxx, and who failed to demonstrate a clear understanding of relevant scientific literature."

In reality, few practicing cardiologists prescribed Vioxx. Prescribing Vioxx was the realm of primary care physicians, rheumatologists and orthopedic surgeons. As to diagnosis of Vioxx-related cardiac events, few if any physicians in the country would have made such diagnosis prior to Vioxx's removal from the market. Similarly, very few practicing physicians were engaged in clinical research related to Vioxx. Those that did were either employed by Merck or had a financial relationship with Merck. Finally, Dr. Baldwin demonstrated a sufficient understanding of the relevant scientific literature to assist the jury in understanding the medical concepts surrounding Mr. Irvin's death. To the extent that Merck is concerned about Dr. Baldwin's lack of understanding, they will have opportunity for cross-examination.

## Conclusion

Dr. Baldwin made a detailed inquiry into the many studies concerning the cardiotoxic effects of Vioxx and is sufficiently familiar with Mr. Irvin's medical condition to conclude that Vioxx caused his death. This is what practicing physicians do. Very few physicians engage in primary research or clinical trials of pharmaceuticals, but that makes them no less an expert on their effects. *Daubert* does not require Dr. Baldwin to have an encyclopedic understanding of the clinic trial and epidemiological studies of Vioxx.

This is the reason that the U.S. Supreme Court went to such great lengths to specify that the *Daubert* factors are non-exclusive. To require otherwise would limit expert testimony only to those in the field of primary research and scientific testing. Dr. Baldwin, as a practicing cardiologist, possesses more than sufficient experience concerning the cardiotoxic effects of Vioxx to render his opinion and assist the jury on the issue of specific causation.

For the reasons set forth above, plaintiff respectfully requests that defendant's motion should be overruled.

Respectfully submitted,

By: *P. Leigh O'Dell*
Andy D. Birchfield, Jr., Esquire
J. Paul Sizemore
P. Leigh O'Dell
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
(800) 898-2034 (telephone)
(334) 954-7555 (telecopier)

**Co-Lead Counsel**

**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
FAX: (504) 561-6024

**Temporary Office**
3411 Richmond Ave., Suite 460
Houston, TX 77046
PH: (713) 877-1843
FAX: (713) 871-9750

**PLAINTIFFS' LIAISON COUNSEL**

Christopher A. Seeger, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)

**Co-Lead Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
MEUNIER&WARSHAUER, L.L.C.
P.O. Box 960
191 East Second Street
New Roads, LA 70760
(225) 638-6137
(225) 638-8836 (fax)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS,
MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Thomas R. Kline, Esquire
KLINE&SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Carlene Rhodes Lewis, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

9

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced in accordance with Pre-Trial Order No. #8, on this 27 day of January, 2006.

*P. Hugh O'Dell*