FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 JAN 30  PM 5: 08

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: VIOXX | MDL Docket No. 1657 |
| PRODUCTS LIABILITY LITIGATION | SECTION L |
| | JUDGE FALLON |
| This document relates to Case No. 05-4046 | MAGISTRATE JUDGE KNOWLES |
| EVELYN IRVIN PLUNKETT as Personal Representative of the Estate of RICHARD IRVIN, JR., | |
| Plaintiff, | |
| vs. | |
| MERCK & CO., INC., | |
| Defendant. | |

## MERCK & CO., INC.'S OBJECTIONS TO PLAINTIFF'S DEPOSITION DESIGNATIONS FOR JAMES DUNN

In her proposed deposition designations for use at the upcoming *Plunkett II* trial, plaintiff has designated portions of the October 7, 2005 deposition of James Dunn. As set forth in (Merck & Co., Inc.'s ("Merck's") attached objections, plaintiff's designations are objectionable on numerous grounds. However, Merck would like to focus the Court's attention to several overarching concerns when ruling on the objections.

## Background

James Dunn is a Merck employee who was an educational program director. (*See* Oct. 7, 2005 Deposition of James Dunn at 9:10-18 ("Dunn Dep."), attached as Ex. 8 to the Declaration of Phillip A. Wittmann in support of Merck's Objections to Plaintiff's Deposition Designations ("Objections Wittmann Decl.").) In this role, he coordinated medical education programs for sales representatives. (*Id.* at 9-10.) The entirety of plaintiff's designations from Mr. Dunn's deposition consists of two exhibits, neither of which is relevant to this case and both of which are prejudicial under Rule 403.

## The "Be the Power" Video

Plaintiff uses Mr. Dunn as a vehicle for playing a short, fictional Star Trek-themed video that was shown to sales representatives during one district training session as a "mental break" in an eight or ten-hour training session. (Dunn Dep. at 304-05.) This video has no relevance to this case. Dr. Schirmer testified in his deposition that he had no contact with Vioxx sales representatives before prescribing Vioxx to Mr. Irvin. In addition, the video is prejudicial because plaintiff uses it to create the false impression that Merck sales representatives received no substantive scientific training. Therefore, the Court should exclude this video and all testimony related to it under Rules 401, 402 and 403.

## The Analyst Report

Mr. Dunn's remaining testimony concerns a third-party analyst's report dated February 8, 2002 that Mr. Dunn and others received via email. The report contains predictions about the value of Merck shares in the future. This document is hearsay and speculative, and plaintiff fails to establish that Mr. Dunn has any personal knowledge concerning its contents. In addition, the document post-dates Mr. Irvin's death and has no relevance to this case. Finally, profit and sales

data are not admissible during the liability phase of trial. The Court should therefore exclude this testimony and the accompanying exhibit.

\* \* \*

For the foregoing reasons, Merck respectfully requests that the Court strike Plaintiff's designations in their entirety.

Respectfully submitted,

*/s/ Dorothy H. Wimberly*

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone: 504-581-3200
Fax:    504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois 60610
Phone: 312-494-4400
Fax:    312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Phone: 202-434-5000
Fax:    202-434-5029

And

John H. Beisner
Charles C. Lifland
Richard B. Goetz
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone: 213-430-6000
Fax:    213-430-6407

Attorneys for Merck & Co., Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that the above and forgoing Merck & Co., Inc.'s Objections to Plaintiff's Deposition Designations for James Dunn has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon Plaintiffs' counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 30th day of January, 2006.

_Dorothy H. Wimberly_

— = Δ objections

dunn plaintiff affirmatives 1_21 (3).txt
Annotations Report [vioxx 2]

[9:2] 1/21/2006 James Dunn 10-7-05

Plaintiff's response

page 9
2  BY MR. PAPANTONIO:
3       Q.   Sir, state your name, please.
4       A.   James Dunn, D-U-N-N.

[9:3] - [10:4] 1/21/2006 James Dunn 10-7-05

page 9
3       Q.   Sir, state your name, please.
4       A.   James Dunn, D-U-N-N.
5       Q.   And Mr. Dunn, you work for Merck?
6       A.   Yes, sir.
7       Q.   How many years have you worked for Merck?
8       A.   Over 14 years.
9       Q.   Tell us what you've done with Merck.
10      A.   I've held a number of different positions at
11  Merck. I've been a hospital representative. I've been an
12  office space representative. I've been a marketing
13  analyst. I've managed some of the data centers within
14  Merck. I have been a business manager with Merck. I've
15  been the FIT team leader for Vioxx at Merck. I was what
16  we call educational program initiative senior director at
17  Merck, and currently I'm a senior business director with
18  Merck/Schering-Plough.
19      Q.   In your role as educational program director for
20  Merck was part of your job to train sales representatives
21  about what they should tell doctors in the field selling
22  products?
23      A.   No, sir.
24      Q.   What was it?
25      A.   The job I had there was to coordinate the
page 10
1  scheduling activities for speakers so that we could
2  schedule speakers to do medical education type of programs
3  and help the field understand how we would want to execute
4  those programs.

[12:2] - [12:5] 1/21/2006 James Dunn 10-7-05

page 12
2       Q.   You had to have material given to you,
3  scientific material, data that showed safety factors of
4  Vioxx, and then you would take that material and then give
5  it to the representatives; is that accurate?

[12:8] - [12:12] 1/21/2006 James Dunn 10-7-05

page 12
8            THE WITNESS: I would get data and materials
9       from other folks and, you know, that process of
10      medical legal approval. Then I would get that
                            Page 1

```
                              dunn.txt
[198:24] 11/6/2005 Dunn - 10.7.2005

page 198
24           MR. PAPANTONIO:  Give me 1274, please.

[200:23] - [200:25] 11/6/2005 Dunn - 10.7.2005

page 200
23     Q.   Well, let's see.  Let's read this document.
24  Okay?  It has your name at the top of it, doesn't it?  Jim
25  Dunn; do you see that?

[201:1] - [201:3] 11/6/2005 Dunn - 10.7.2005

page 201
1      A.   Yes, I do.
2      Q.   It says 2002; right?
3      A.   Yes, I do.

[201:12] - [201:22] 11/6/2005 Dunn - 10.7.2005

page 201
12     Q.   Okay.  Now, let's read this document.  You see
13  the end of the -- the very end of the first paragraph it
14  says, "Vioxx sales would fall dramatically if the drug's
15  label were changed to indicate even a slight increase in
16  the risk of heart attack."  Do you see that?  It says even
17  a --
18     A.   I'm sorry.  Could you tell me where you're at?
19     Q.   Vioxx -- I'm right here.  Look up here.  See
20  that?  You can read along right up there.
21     A.   Okay.  I'm with you.  I wanted to make sure I
22  was there.

[201:23] - [202:9] 11/6/2005 Dunn - 10.7.2005

page 201
23     Q.   Vioxx -- let me read it again.  Blow that up
24  just so we can make sure that we're talking about the
25  right thing, that last line, the last line.
page 202
1   "Vioxx sales would dramatically fall if the
2   drug's label were changed to indicate a slight increase in
3   the risk of heart attacks."
4           You were actually telling people in the field --
5   you, Jim Dunn, you were telling your representatives that
6   if they had to warn by way of a label that Vioxx would
7   increase the risk of heart attack that their sales were
8   going to drop.  You were telling them that.
9      A.   No.

[202:12] - [203:4] 11/6/2005 Dunn - 10.7.2005
                              Page 2
```

Handwritten annotations:
- 602
- 801-802
- 401-402
- 403
- Witness received document in normal course of business. → 803(6)
- Relevant to Merck's motive to downplay CV risk.

dunn.txt

```
page 202
12        Q.   You weren't.
13        A.   No.
14        Q.   Have you ever seen this document before?
15        A.   I mean, it was to me.  I must have seen it at
16   some point.
17        Q.   This isn't talking about science.  This is
18   talking -- right up underneath it it says, "Merck shares
19   poised to rebound."  This is about money, isn't it?  This
20   isn't about science.
21        A.   Sir, the subject title is Merck Shares Poised to
22   Rebound in 2002.
23        Q.   Right.  This isn't about -- it has nothing to do
24   with science.  This is about money.  Merck is going to
25   lose money if Vioxx -- Vioxx sales would fall dramatically
page 203
1    if the drug's label were changed to indicate a slight
2    increase.  Do you see that, the word "slight"?  What does
3    that mean to you, slight increase?  Small; right?
4         A.   Uh-huh (affirmative).
```

cont. from previous page

[203:5] - [203:8] 11/6/2005 Dunn - 10.7.2005

```
page 203
5         Q.   In the risk of heart attack.  Do you see that?
6         A.   Yes, sir, I do.
7         Q.   All right.  That's the first time you've seen
8    that?
```

[203:10] - [203:13] 11/6/2005 Dunn - 10.7.2005

```
page 203
10             THE WITNESS:  Sir, this e-mail obviously got
11        sent to me so I can't -- you know, I did.  It
12        seems to be a report from an analyst, another
13        financial analyst.  Clearly it was sent to me.
```

[291:7] - [291:14] 11/6/2005 Dunn - 10.7.2005

```
page 291
7         Q.   Okay.  Good.  All right.  Now, let me ask you
8    something.  Do you know what the Be The Power is?  I know
9    you've seen this before.  You helped create Be The Power,
10   didn't you?
11        A.   I'm aware of Be The Power, yes, sir.
12        Q.   Well, you helped create Be The Power, didn't
13   you?
14        A.   My team was responsible for it, yes.
```

[292:12] - [292:20] 11/6/2005 Dunn - 10.7.2005

```
page 292
12        Q.   Well, let's take a look at it.  Why don't you --
```

Page 3

*— 403 objection*

```
                    dunn plaintiff affirmatives 1_21 (3).txt
11       final product.  So it would be given to me in the
12       final form and I would communicate that out.


[291:7] - [291:14] 1/21/2006 James Dunn 10-7-05
                                        Plaintiff will remove.         SIDEBAR
page 291                                                               COMMENTARY
 7       Q.   Okay.  Good.  All right.  Now, let me ask you
 8   something.  Do you know what the Be The Power is?  I know
 9   you've seen this before.  You helped create Be The Power,
10   didn't you?
11       A.   I'm aware of Be The Power, yes, sir.
12       Q.   Well, you helped create Be The Power, didn't
13   you?
14       A.   My team was responsible for it, yes.


[292:12] - [292:20] 1/21/2006 James Dunn 10-7-05


page 292
12       Q.   Well, let's take a look at it.  Why don't you --   Asked +
13   section number 3, Be The Power, now, you worked on the     answered (611)
14   team that put this together; is that right?
15       A.   Yes, sir.
16       Q.   Can we put that up there when you're ready to
17   go?  What is the V Squad?
18       A.   Well, this is a fictitious rendition and the
19   V Squad refers to the actors that are within this DVD.
20       Q.   And you showed this to your sales team; right?


[292:23] - [295:7] 1/21/2006 James Dunn 10-7-05


page 292                                                        Relevant to rebut
23           THE WITNESS:  This was part of the meeting          claim that video was
24       packet that got sent down to them.  It was              a pointless exercise
25       optional so they could view it if they wanted to
page 293                                                        611 (vague); 401-402
 1   or they didn't have to view it at all.
 2   BY MR. PAPANTONIO:
 3       Q.   But you're trying to tell -- basically this
 4   is -- what you're -- you are providing information in this
 5   thing, aren't you?
 6       A.   No, sir.                                          Asked + answered
 7       Q.   There's no information in here?
 8       A.   No, sir.                                          ↳ Permissible
 9       Q.   Let's look at it.  Go ahead.                         cross examination
10           (Whereupon the DVD was played as follows:
11       "What's going on?"  "It's an obstaclizer."
12       "How do we get out of here?"  "I don't know.")
13   BY MR. PAPANTONIO:
14       Q.   What is an obstaclizer?
15       A.   Once again, it's fictitious.  This is based on
16   futuristic, you know, like Star Trek theme stuff.  You can
17   see the way these people are dressed.  Obstaclizer, it's a
18   fictitious way to, you know -- computer system that they
19   had in here.  So it's all fake, phony stuff that's
20   futuristic.
21       Q.   So they're talking about an obstaclizer right
                              Page 2
```

*— 403 objection, cont.*

```
                        dunn plaintiff affirmatives 1_21 (3).txt
22   here.  Let's see what the obstaclizer does.
23              (Whereupon the DVD was continued as follows:
24              " -- while we're in here."  "what happened?
25         "we didn't get a chance to deal with the
page 294
1         obstacles.")
2    BY MR. PAPANTONIO:
3         Q.   Hold it right there.  What are obstacles?
4         A.   Obstacles tend to be -- in the industry it tends
5    to be questions that physicians would ask of us.
6         Q.   A physician would ask you a question like will
7    vioxx cause cardiovascular events.  That would be an
8    obstacle; correct?
9         A.   Any question a physician might ask would be.
10        Q.   An obstacle would be a physician asking you
11   vioxx will cause strokes in human beings.  That would be
12   an obstacle; correct?
13        A.   Any question.
14        Q.   An obstacle would be could you explain to me,
15   Mr. Sales Rep or Mrs. Sales Rep, what the chances are for
16   a person taking vioxx to have a myocardial infarction.
17   That would be an obstacle; correct?
18        A.   Sir, any question a physician would ask would be
19   considered that, yes.
20        Q.   Go ahead with this obstaclizer.
21             (Whereupon the DVD was continued as follows:
22             "Send you back in?  You're lucky you made it
23        out.  That was a risk you took."  "Risk is my
24        middle name."  "Really?  It's mine too."  "So
25        send us back in again so we can finish the job."
page 295
1        "Vince, the truth is I don't think you're ready.
2        You moved slow in there.  You've got to handle
3        obstacles quickly, whether you're in the doctor's
4        office or in an obstaclizer.")
5    BY MR. PAPANTONIO:
6         Q.   Hold it.  Why do you have to handle obstacles
7    quickly?


[295:9] - [297:11] 1/21/2006 James Dunn 10-7-05


page 295
9              THE WITNESS:  well, once again, this is a
10        fictitious piece here, but we would want our
11        representatives to be able to give accurate
12        information to questions physicians would have
13        for a number of reasons.
14             Number one, we want them to have that data
15        because they're asking for it.  Number two, it
16        builds the credibility of the rep.  when the rep
17        is viewed as a resource from the physician, one
18        of the ways they do that is being able to answer
19        questions to physicians accurately and quickly.
20   BY MR. PAPANTONIO:
21        Q.   And honestly; right?
22        A.   All the time; honesty all the time.
23        Q.   And honesty always matters, doesn't it?
24        A.   Yes, sir, it does.
25        Q.   Let's go ahead.
page 296
1              (whereupon the DVD was continued as follows:
                              Page 3
```

Annotations:
- *Sidebar commentary; Not a question* (referring to lines 22–25 of p. 294 / "here. Let's see what the obstaclizer does.")
- *Cell; asked + answered. Permissible cross examination* (referring to lines 9–19 of page 294)

·403 Cont·

```
                        dunn plaintiff affirmatives 1_21 (3).txt
 2           "Have to make every second count, two
 3       efficacy messages, two GI risk messages,
 4       appropriate balancing information and close."
 5           "we know.  we've been in workshops.")
 6   BY MR. PAPANTONIO:
 7       Q.   Now, I heard GI information.  I heard efficacy
 8   information.  I didn't hear anything about CV information
 9   there, cardiovascular information.  Did you tell
10   salespeople not to talk about cardiovascular information
11   until they were asked by the doctor?
12       A.   No, sir.  In fact, what the statement in there
13   was was appropriate balanced information.  Balanced
14   information includes the entire product circular safety
15   profile and we would discuss the cardiovascular profile as
16   part of that balanced information.
17       Q.   I thought this morning we saw an article that
18   clearly -- a document that you saw -- I saw that said
19   don't initiate the discussion about CV unless the doctor
20   does.  Didn't we see something?
21       A.   I think you're inaccurate on that.
22       Q.   I didn't show you a document this morning that
23   says don't initiate any discussions about VIGOR and CV
24   unless the doctor asks about it?
25       A.   I think that was specific to VIGOR, and what I
page 297
 1   had responded to you there was that we had other things
 2   that could answer questions for physicians and the fact
 3   that our representatives were walking into offices and
 4   proactively doctors were asking the question as well.
 5       Q.   Let's see what the obstaclizer does.  Go ahead.
 6           (whereupon the DVD was continued as follows:
 7       "we know the messages."  "But you must do
 8       more.  You must be the power."  "Be the power?"
 9       "Be the power.  It's the only way to reach the
10       full potential of the V Squad.  Come on I'll show
11       you.")

[298:24] - [299:2] 1/21/2006 James Dunn 10-7-05

page 298
24       Q.   Move to strike, I want to ask the question
25   again.  You very specifically -- field reps were told to
page 299
 1   make two efficacy presentations, two GI presentations;
 2   correct?

[299:4] - [299:13] 1/21/2006 James Dunn 10-7-05

page 299
 4           THE WITNESS:  I think that they were told to
 5       provide the message flow -- that sounds familiar
 6       to me -- but also and always to provide
 7       appropriate balance.  You wouldn't just say say
 8       this without the appropriate balance.  we always
 9       provide appropriate balance.
10   BY MR. PAPANTONIO:
11       Q.   So this isn't fictitious.  This is what you'd
12   actually tell people to do.
13       A.   No, sir, this is fictitious.
                                Page 4
```

Handwritten annotations:
- 403 cont
- Plaintiff will withdraw
- 611
- mischaracterizes document; doesn't show document to witness
- Asked + answered
- SIDEBAR commentary unnecessary; no questions asked about this; video speaks for itself
- sidebar; 611
- 801/802; 602
- Question relates to video, a Merck document.
- 801/802; → 801(d)(?) 602
- Witness was in charge of team that developed video.

*403 cont.*

dunn plaintiff affirmatives 1_21 (3).txt

[304:5] - [305:22] 1/21/2006 James Dunn 10-7-05

*Unnecessary, no questions asked*

```
page 304
5       Q.   Go ahead with this.
6            (Whereupon the DVD was continued as follows:
7       "They're coming back." "We're hitting them
8       with facts. How about --" "Be the power.")
9  BY MR. PAPANTONIO:
10      Q.   [All right. That's enough. I don't need to see
11  more.] You don't know how much you spent on this, do you?
12      A.   No, sir.
13      Q.   But the truth was you used this as a training
14  mechanism for salespeople; right?
15      A.   That is not true.
16      Q.   Well, why did you make it?
17      A.   The reason we made this is the
18  representatives -- there's a district meeting plan. We
19  call it the DMAC, district meeting agenda and content, and
20  that was multiple different training components, modules,
21  and we were training representatives over multiple hours.
22  I think this training day was eight to ten hours long.
23           Consistent with the adult learning model, part
24  of that model is that adults don't learn just from
25  lecture. They need breaks. These video clips were
page 305
1   designed not to be a training tool at all, nothing more
2   than a mental break for the representatives so that they
3   could kind of shut down for a little bit and then get
4   reengaged and ready to go on the intense training that we
5   had that are contained in those documents that I referred
6   to.
7       Q.   So none of what we just saw is instructional for
8   your salespeople?
9       A.   None of it.
10      Q.   There's nothing in there that you hoped to pass
11  on to your salespeople.
12      A.   None of it.
13      Q.   Including two efficacy presentations and two GI
14  presentations.
15      A.   The entire video was not meant to pass on
16  anything to the reps. It was meant to give them a mental
17  break.
18      Q.   A mental break.
19      A.   Yes, sir.
20      Q.   And that was just a mental break for you? Was
21  that a mental break, just watching that, for you?
22      A.   Sir, yes, it was.
```

*Sidebar; 611; 401-903*

↳ *plaintiff will withdraw bracketed portion.*

*611; sidebar* *401-903; SARCASTIC TONE*

*all permissible cross examination countering witness's claims regarding video.*