

U.S. DISTRICT COURT
EASTERN DISTRICT OF LA
2006 JAN 30 PM 5:15
LORETTA G. WHYTE
CLERK

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **In re: VIOXX** | * | **MDL Docket No. 1657** |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | **JUDGE FALLON** |
| **This document relates to Case No. 05-4046** | * | |
| | * | **MAGISTRATE JUDGE KNOWLES** |
| **EVELYN IRVIN PLUNKETT** as Personal Representative of the Estate of **RICHARD IRVIN, JR.,** | * | |
| Plaintiff, | * | |
| vs. | * | |
| **MERCK & CO., INC.,** | * | |
| Defendant. | * | |

* * * * * * * * * * * * * * * * * * * *

**<u>MERCK & CO, INC.'S OBJECTIONS TO PLAINTIFF'S DEPOSITION DESIGNATIONS FOR DAVID ANSTICE</u>**

Merck hereby submits its objections to plaintiff's designations of the deposition of David Anstice.

Respectfully submitted,

[signature]

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone: 504-581-3200
Fax: 504-581-3361

Defendants' Liaison Counsel

___ Fee
___ Process
X Dktd
___ CtRmDep
___ Doc. No

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois 60610
Phone:  312-494-4400
Fax:     312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone: 202-434-5000
Fax:     202-434-5029

And

John H. Beisner
Charles C. Lifland
Richard B. Goetz
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone: 213-430-6000
Fax:     213-430-6407

Attorneys for Merck & Co., Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that the above and forgoing Merck & Co., Inc.'s Objections to Plaintiff's Designations for David Anstice has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon Plaintiffs' counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 30th day of January, 2006.

Dorothy H. Wimberly

Δ's objections to π's affirmative
1/28/06

anstice cuts irvin2.txt

Anstice (Multi-clip)
Anstice 57404 574:4-578:20

Δ objects to playing Mr. Lanier's examination (pp. 574-808) in its entirety

Q. Your name is David Anstice?
A. That's correct.
Q. Did I pronounce it right?
A. You did.
Q. All right. I understand you're the president of some part of Merck. What part are you the president of?
A. Human health for Canada, Latin American, Japan, Australia and New Zealand.
Q. At some point were you the president of Merck America or something like that?
A. Yes, I was.
Q. When was that?
A. From the period late '94 through to the end of 2002.
Q. Did you get promoted out of that or demoted from that?
A. I got a new assignment with Japan.
Q. Is that a promotion or a demotion?
A. That was an important, different responsibility.
Q. I understand.

575: page 575

But was it a promotion or demotion?
A. It was neither. It was --
Q. A lateral?
A. A lateral, correct.
Q. Merck made some tragic mistakes with Vioxx; didn't it?
A. I don't think so.
Q. Are you sure?
A. Yes.
Q. Well, sir, isn't rule number -- by the way, are you a medical doctor?

Δ: sarcastic, argumentative

A. No, I am not.
Q. You're the president of what part of Merck now? I'm sorry, let me write it down. You are the president of health and what?
A. Human health, which is our commercial operations.
Q. You're the president of human health, and you don't have a medical degree?
A. I do not.
Q. Well, did you go to any medical school at all?
A. No, I did not.
Q. As the president of human health, what kind of human health schooling do you have?

576: page 576

A. I'm responsible for sales and marketing activities, and I have the training and skills developed in 31 years at Merck.
Q. That wasn't my question, sir. What kind of schooling do you have in human health if you're going to be the president of the human health division?
A. I have schooling, I have tertiary education in economics, and I joined Merck, and typical with many people on the business side, I do

Δ: argumentative, asked & answered

not have a medical degree or a medical background.
Q. So, the president of human health is a salesman?
A. I'm responsible for sales and marketing, promoting the awareness and understanding of our products.
Q. So, the president of human health for Merck doesn't have any kind of health background at all, other than the fact he's been in sales for Merck for 30-some odd years; right?
A. Sales and marketing for Merck for 30 years. That's my experience and background.

Δ: asked & answered, argumentative

Q. Doesn't it strike you odd that a company that's supposed to be selling pharmaceuticals and a company supposed to be in charge of human health has a marketing and a salesman at the head instead of a doctor?
A. I'm at the head of our commercial operations. We have physicians and scientists in charge of our research laboratories, and there are other medical groups around the company.

Δ: sarcastic tone

Q. Yes. But they all report up to the president? The president is in charge; isn't he?
A. Of those divisions.
Q. Sir, who is in charge of the human health division?
A. I have responsibilities in the human health division.
Q. You're the one in charge; aren't you?
A. Of commercial operations, yes.
Q. Well, of all of the human health divisions that you were telling me about, you're the president; aren't you?
A. That's correct.
Q. And you don't have any health background other than the fact you've worked in sales and marketing for Merck for 30 years; right?
A. That's what I just said, yes.

Δ: asked & answered; harassing

Q. So, when I say Merck messed up with Vioxx and you say, no, we didn't, I guess you're speaking from a sales and marketing perspective?
A. I'm speaking as a senior executive at Merck.
Q. Well, y'all put a drug on the market that you had to withdraw; didn't you?
A. We put a drug on the market. We have now withdrawn it.
Q. The drug shouldn't have been on the market to start with; should it?
A. I believe it should have been on the market.
Q. Were you part of the decision to take it off the market?
A. I was part of that decision, yes.
Q. Did you vote for taking it off or for leaving it on?
A. We did not have a vote. I supported the recommendation and the decision after the APPROVe study that in the interest of patient safety, Vioxx should be withdrawn from the market.

Anstice 58007 580:7-580:24

Q. Well, y'all should have had that data from APPROVe before you ever put the drug on the market; shouldn't you?
A. The data from APPROVe, APPROVe was a study in colon polyps, and that study was started some four-and-a-half years earlier.
Q. And my point is, y'all ought to study these things and decide if the drug is safe or not before you sell it, not after you've been selling it for years? Don't you agree?
A. Merck did study the product. Merck did provide safety analysis. And the basis of the approval for the product in 1999 was based on the safety data.
Q. But you didn't study the product adequate to decide whether or not you ought to keep it on the market, because that study didn't happen until the APPROVe study and you pulled it; right?

Anstice 58101 581:1-581:17

THE WITNESS: The data that we had at the time of the new drug application was consistent with studies done for all other -- very similar to all other nonsteroidals and was appropriate for the marketing of the product, efficacy and safety.
BY MR. LANIER:
Q. Truth be told, you couldn't wait to get all the studies done because you had to get to market quickly; right?
A. Merck completed all of the studies that were required for the new drug application.
Q. Oh, I'm not saying you didn't satisfy the law. I'm talking about taking care of the patients. My point is, you didn't do all of the studies you should have done before you went to market because you couldn't afford to time-wise; isn't that true?

Anstice 58119a 581:19-583:2

THE WITNESS: I do not accept that that's correct.
BY MR. LANIER:
Q. Well, let's look at a couple of things. Rule number one for a doctor, and I know you don't have medical training, but you probably heard it at least, that rule number one is, do no
582: page 582
harm; right?
A. That's correct.
Q. And you think for a drug company that ought to be pretty high up the chain of rules also; wouldn't you?
A. Patient safety is paramount in our company.
Q. It should be anyway, shouldn't it?
A. It is.
Q. Well, if it was, why didn't you do all of your studies before you marketed the drug?
A. We believed that we had the

602; sarcastic

argumentative tone

appropriate studies based on the knowledge at that time to support the benefits and risks of the product.
Q. If you had the appropriate studies, why were you still doing more?
A. Well, some of the studies were for new indications, and so we were continuing to do studies in different diseases.
Q. No. Y'all had trouble with cardiovascular events, CV events, from the very beginning with this drug, and you knew that; didn't you?
A. I did not know that.
583: page 583
Q. You didn't see --
A. Merck did not know that.

Anstice 58310 583:10-583:25

Q. You didn't see any of the VIGOR results that showed y'all had a five-fold increase of heart attacks over Naprosyn?
A. Yes, of course I saw the VIGOR results.
Q. Bells didn't go off in your head that said, holy smoke, we'd better make sure that either Naprosyn is cardioprotective or we'd better make sure that ours doesn't kill people?
A. Merck moved very quickly in response to the VIGOR study, and we unblinded the two Alzheimer's databases, we looked back at all of the other placebo and non-naproxen data and we saw no difference in CV events versus placebo or non-naproxen. So, the only outlier when the VIGOR data became available was the naproxen comparison.

Anstice 58404a 584:4-584:12

Q. Let's break it down this way. Certain things you and I agree on, I believe, and I would like to get those out of the way.
Number one, if we go to the mid-'90s, your company, Merck, was stuck in the middle in terms of drug companies in the rankings of it; fair to say?
A. Merck's been a large pharmaceutical company for many years.

Anstice 58525 585:25-586:14

Q. So, you're the David W. Anstice. And
586: page 586
if you will look on Page 2 of the talking points, it says in the second from the bottom, "When we established this goal in 1994, we were performing somewhere in the middle of the pack." Do you see that one?
A. Yes.
Q. So, when I use the language "middle of the pack," I'm using your language I got from your documents. I didn't make that up. Do you see that?
A. From a Merck document, yes.

Q. A Merck document that went to you; right?
A. Yes.

Anstice 58716 587:16-587:23

Q. I'm going to ask you again. Sir, isn't it true in 1994 y'all were performing somewhere in the middle of the pack?
A. In terms of growth rate, yes.
Q. Y'all wanted to be the number one pharmaceutical company in the world; didn't you?
A. In terms of growth rates, yes. Not necessarily size.

Asked: answered; harassing

Anstice 58814 588:14-589:25

Q. Are you familiar with that?
A. I'm familiar with this product, yes.
Q. That's called Pepcid AC. Can you hold that up to the video so the jury can see it, please?
A. (Witness complies.)
Q. Thank you.
MR. LANIER: Can we get a close up where we can see what that is?
THE VIDEOTAPE TECHNICIAN: Sure.
MR. LANIER: That's good enough.
BY MR. LANIER:

401, 402 - Pepcid box not relevant

sidebar

page 589
Q. Thank you, sir.
Y'all held the patent on Pepcid; didn't you?
A. Yes.
Q. And that patent was very valuable to your company; wasn't it?
A. Yes, it was.
Q. Made a lot of money off Pepcid; didn't you?
A. Yes, we did.
Q. But you had a problem because your patent was about to run out and people were going to be able to go buy this stuff at the grocery store; true?
A. All of our research-discovered products, eventually the patent runs out and the answer is to find new drugs to replace them.
Q. I understand that, but that wasn't my question.
My question is specific, sir. The end of 1998, '99, early 2000, y'all knew your patent was running out on Pepcid, and a big moneymaker for you was about to be commercially available to everybody and it was going to hurt your bottom line; true?

sidebar

Anstice 59002 590:2-590:8

THE WITNESS: Well, we had known for many years that the Pepcid patent would expire. So, this was not an unknown event.
BY MR. LANIER:
Q. I know. That's one of the reasons

y'all had been working to try and get Vioxx up and going, you needed the money; true?

Anstice 59010 590:10-590:12

THE WITNESS: We were working in our research labs to find new products, and Vioxx was one of the important new products that we had.

Anstice 59016 590:16-590:25

Q. Sir, that wasn't my question.
I said you knew, your company knew you had major drugs going off the market in 2000 and 2001 that was a significant percentage of your sales; true?
A. It was an important percentage of our sales, correct.
Q. A significant percentage; true?
A. I can't define significant. It was --

Anstice 59410b 594:10-597:6

Object to Ex 101 in entirety – 602, 401, 402, 403. He did not write document

Q. Sir, if you'll look on the last page of that document right there.
A. I have it.
Q. It says four points up from the bottom, "The major drugs going off patent in 2000 and 2001," includes Pepcid, "together represent a significant percentage of our sales." That's what it says; doesn't it?
A. That's correct. Yes.
Q. So, I didn't use the word significant out of my own brain, it's in that document again that you got years ago; isn't it?
A. Yes, it is.
Q. Did you e-mail someone and say, I don't know what "significant" means?
A. No, I did not.
page 595
Q. So, that's just what you're telling the jury today when I'm asking questions. You knew what it meant when you got that memo; didn't you?

sarcastic tone; harassing witness

A. Yes, I did.
Q. So, now will you go back and agree with me that the major drugs going off patent represented a significant percentage of your sales?
A. Yes, I will agree with you.
Q. So, producing some replacement revenue, some money to take the place through a launch of products like Vioxx was very important for y'all; wasn't it?
A. Yes, it was important.
Q. Because by the end of 1997, Merck had put itself as the largest pharmaceutical company of the world; hadn't it?
A. I'm sorry. The question was?
Q. By the end of 1997, Merck had regained its position as the largest pharmaceutical company in the world; true?
A. I don't know if it was at that time. I don't remember.

602, 611

Q. Well, go back to the last page of that document again. Look at the second point from the top. "By the end of 1997, Merck had regained

page 596

its position as the largest pharmaceutical company in the world." Do you think he's lying when he said that?

A. No, I don't.

Q. All right. So, we can assume that that's true, too, can't we?

A. Yes, we can.

Asked & answered; argumentative

Q. So, y'all went from the middle of the pack in '94 to the largest pharmaceutical company in the world in '97, but you had major drugs like Pepcid going off patent in 2000/2001. I'm correct so far; right?

A. Yes.

Q. And those drugs going off patent represented a significant percentage of your sales; true?

A. Correct.

Q. So, it was important y'all get some replacement products like Vioxx to make the money; right?

A. New products are always important in our business.

Q. Well, but those products like Vioxx, you saw it as something that replaced the revenue y'all were going to lose; right?

page 597

A. That's the normal course of our business, yes.

Q. So, the timing of this, and by "this" I mean selling the Vioxx, is very important to your company; wasn't it?

A. Yes, it was important.

Anstice 59721 597:21-599:8

Q. If you realize that in a few months you are not going to be having any money coming in, you need to figure out how to get some in money in the door if you are going to have to pay bills; true?

page 598

A. Or spend less money.

Q. Don't get the bills; right? But the point is, if Merck -- Merck has bills; doesn't it?

A. Yes, it does.

Q. Y'all got employees, y'all got to pay employees; don't you?

A. That's correct.

Q. You've got buildings and commitments to fund research and all these other things going on, too; don't you?

A. Yes.

Q. You've got to pay money to do all of that; don't you?

A. Yes.

Q. I'll bet y'all even have electric bills and stuff for your buildings; don't you?

A. Yes.

Q. So, Merck has got to make sure

they've got money coming in the door to pay all of these things; don't they?
A. Yes.
Q. Not the least of which they've got to pay you; don't they?
A. They have to pay all 60,000 of our people.
599: page 599

Anstice 59917 599:17-600:1

Q. So, it is important to keep the money coming into Merck so that Merck can keep paying you and everybody else; right?
A. It's important to keep finding products to bring them to market and to generate revenues, yes.
Q. Merck hit a point where it wasn't going to have any more money coming in on the Pepcid and some of these other drugs that had been keeping
600: page 600
the machine going; right?

Anstice 60003 600:3-602:3

THE WITNESS: Patent expirations were going to reduce revenues for those products, correct.
BY MR. LANIER:
Q. Reduce revenues for those products, you are an economics major. In every day talk, that means y'all aren't going to get as much money anymore; right?
A. Those products will have less sales, yes.
Q. So, Merck has really invested a lot of hopes and plans in Vioxx to pick up the slack for the year 2000/2001; right?
A. Merck invests a lot of hopes and plans in Vioxx because it was going to be a really important product for patients.
Q. Well, sir, if you'll look at the last page of that, it says Vioxx is very important to you, but it says, "Producing replacement revenue through the launch of new products like Vioxx is important." That's what it says; doesn't it?
A. I'm sorry, which?
Q. That's fourth point up from the
601: page 601
bottom.
A. Yes, it does.
Q. Now, there's already, before y'all get on the market with your drug, a race, there's another COX-2 inhibitor that wants to get on the market too; right?
A. That's correct.
Q. And that's Celebrex; right?
A. Correct.
Q. Do you remember which drug company makes Celebrex?
A. At the time, Searle.
Q. It is now Pfizer Searle; right?

Asked & answered; repetitive

602, 401, 402, 403
Witness did not create document

A. Now it's Pfizer, yes.
Q. Is it fair to say that y'all were racing each other to try and see who could get to the market first?
A. Yes. That's a fair characterization.
Q. They beat y'all; didn't they?
A. In the US they beat us, yes.
Q. It was significant enough to where y'all worked hard to overcome a late start; fair to say?
A. We were second. It was something of a disadvantage, but not overriding.
602: page 602
Q. Your company really pushed hard to make Vioxx a winner from a marketing perspective and an income perspective; true?

Anstice 60205 602:5-602:10

THE WITNESS: We believed in Vioxx as it came to market, we believed that it was a very important product for patients, we knew that there were a large number of patients that would benefit, and we believed that Vioxx would be a winner in this market, yes.

Anstice 60421a 604:21-605:3

THE WITNESS: We launched the product when it was approved by the FDA. ] incomplete
BY MR. LANIER:
Q. But y'all pushed for early FDA approval?
605: page 605
A. And we received that early approval from the FDA. We can request it, they have to accept it.

Anstice 60514a 605:14-606:25

THE WITNESS: We asked for and received six-month approval from the FDA based on the medical importance of the product. The reason for doing the VIGOR study, which had been started before the approval, was to get GI outcomes data from the VIGOR study. We had GI data in the label from the endoscopy studies. We were hoping that those studies would enable a change in the GI safety part of the label. We were disappointed in those efforts. Incomplete

The VIGOR study was started, and the VIGOR study was always going to -- the results were
606: page 606
always going to come after the product approval, even if it had been a regular 12-month approval.
BY MR. LANIER:
Q. Well, truth be told, there were two main reasons y'all pushed for early FDA approval; isn't that right?
A. The first reason was that this was an important new product for patients.
Q. Well, no. There was already a COX-2 inhibitor on the market. That was Celebrex. ] sidebar

First reason was y'all were trying to beat Celebrex, and they beat you to the market and you needed to hurry your product out there; right?
A. But at a certain point we knew we were behind them. And so that didn't change the patent behavior at that time.
Q. Well, one reason, though, was you needed to get to market as quickly as possible because you were losing the race. And the second reason is y'all didn't want the FDA to have forever to look at this drug; did you?
A. That's not a fair characterization. We submitted an application, we asked for a six-month review versus a 12-month review. The FDA accepted that.

Anstice 61105 611:5-612:12

401, 402, 403 – speech at launch party irrelevant. # of sales reps and speakers irrelevant.

Q. Sir, when you gave this speech in 1999 and y'all were launching this, how many months before you got your study results from VIGOR, you told everybody proudly you were going to, quote, own the market, close quote; right?
A. Right.
Q. And y'all told everybody about your extravagant incentive program; true?
A. For the representatives?
Q. Yes.
A. Yes.
Q. And y'all had an extravagant incentive program, you were going to own the market, and you had surpassed your goal of more than 560 advocates. Is that right?
A. That's -- if that's the right number, yes.
Q. Why don't you tell this jury what y'all were doing when you are trying to surpass your goal of 560 advocates?
A. What we were trying to do is have
page 612
people who would speak in support of Vioxx when the product came to the marketplace. And based on the size of the US and the number of speaking events that we wanted to conduct around the US, we believed we needed a large number of speakers and advocates for the product.

602 - personal knowledge

Q. How many in staff people did you have researching the safety of Vioxx at this point in time or in the last year before your launch?
A. I don't know.
Q. Not 560; is it?
A. I don't know.

Anstice 61317 613:17-613:22

401, 402, 403 - sales force not relevant to liability in this case.

Q. Not only advocates, sir, y'all put together the largest sales force in the history of medical industry; didn't you?
A. Certainly it was very large within Merck, and I think amongst the largest, competitive with Celebrex, yes. Very large.

Anstice 61512a 615:12-616:21

401, 402, 403 - samples not relevant to Mr. Irvin's Vioxx prescription from Dr. Schirmer

Q. So, you're going to own the market with an extravagant incentive program, you've got more than 560 advocates, you've assembled the largest sales force in history, you also decided that you were going to give out more free samples of this drug than you had ever given out of anything before. True?
A. I think that was correct, yes.
Q. Because your thought was, I'd rather lose a few prescriptions and get people for the long haul than just sell the drug outright; right?
A. The purpose of samples is for physicians for trial usage.

401, 402, 403 — launch speech not relevant and used only to inflame jury

Q. But, though, your language was
616: page 616
specific, that you'd rather give away a few prescriptions. I believe if you'll look at the top of 6, you said, "Some might call this extravagant. Not me." You put that in italics. "I am more than willing to sacrifice a few scripts." Isn't that prescriptions?
A. That's prescriptions.
Q. "A few prescriptions to samples in the short run to help assure we win share in the long run." That was your strategy; wasn't it?
A. Samples played that role, yes.
Q. What's HEL stand for?
A. Health education liaison.

401, 402, 403
602 - witness does not know what FMC is (see 617:7-8)

Q. Well, your commitment of health education liaison dollars, HEL dollars, was the largest of anything y'all had ever done with Vioxx; wasn't it?
A. Yes, it was.
Q. Not only that, y'all had extra FMC money; didn't you?
A. Yes.

Anstice 61704 617:4-617:24

401, 402, 403 - Dr. Schirmer not involved in any of these

Q. Sales representatives for programs?
A. Right.
Q. You mean like giveaways and stuff?
A. I can't be more precise than that. For programs that they conducted in the field.
Q. Is this like the dine and dollars thing?
A. That could be included in that, yes.
Q. So, this is where they go out to doctors and they've got millions and millions of dollars to try and give extras to doctors so that doctors will start writing your Vioxx prescriptions? Is that what that boils down to?
A. This is to conduct speaking events and get doctors interested in our product. Yes, to understand our product.
Q. Not just to conduct speaking events, this is like courting doctors' money. This is money to go out there and try to woo the doctors with wining and dining and things like that. That's included; isn't it?

Anstice 61802 618:2-618:13

401, 402, 403

THE WITNESS: The money that we provided our representatives was for programs which were set out in our documents and the conduct of appropriate programs. And yes, they were asked to conduct a lot of these programs, but programs that were consistent with our policies. And some of them certainly included events with dinners and so forth.

BY MR. LANIER:

Q. Doesn't that kind of seem dirty to you, that y'all are going to go out and take doctors to dinner and give doctors presents just to get them to write your prescription?

argumentative; assumes facts not in evidence

Anstice 61815a 618:15-619:16

THE WITNESS: We were not giving doctors presents. If we invited a doctor to an event, we did not give them money. They might get dinner or some food at that event, but there was medical education involved.

BY MR. LANIER:

Q. Is a sales speech involved?

A. Not -- well, but by a physician who would be speaking to the physicians attending the meeting.

Q. Yes. Those are the speaking

619: page 619

contracts that you've also got on there. You're paying doctors to stand up and give these speeches; aren't you?

A. Yes. Yes, we do that.

Q. These are advocates. You've marshaled over 560 of these people, you are going to pay them money, and they are going to stand up and say, look how wonderful this product is, here, have a free dinner and go write prescriptions?

A. We have given money to speakers for speaking as a contract service to Merck to present their information about our product and other products because they are talking as people that have expertise in the area, that have knowledge about this disease, and they are passing on their experience as an opinion leader to other physicians.

Anstice 62025 620:25-621:14

Q. You didn't design the product to be

621: page 621

safe, you didn't develop the product to be safe, you didn't drive the product to be safe, you designed, developed and drove that product to win the market; didn't you?

A. The development of Vioxx was based on all of our standards of efficacy and safety. We designed the product with all of that in mind.

From the marketing side, yes, we believed we had a winner, we believed we had a very effective product, and we believed that with the right promotion support, we're responsible for promoting the product to physicians with the right level of support, we could make this the leading product in the category.

anstice cuts irvin2.txt

Anstice 62224 622:24-623:5

Q. But you never did a CV study. You never did a study to see if it caused heart attacks; did you?
A. We did not do that because we believed that the alternatives which we put in place would provide answers to the questions being posed by the VIGOR data.

Anstice 62404 624:4-624:6

You never studied Vioxx to see if it caused heart attacks or stroke or cardiovascular problems; true?

Anstice 62408a 624:8-624:21

THE WITNESS: We did not study Vioxx specifically with CV outcomes.
BY MR. LANIER:
Q. Do you want to tell us why?
A. Yes. I would like to add that because we considered it, as you know, on several occasions, and ultimately we concluded that the best way to get answers to the question was there a difference in risk was through the various other studies that we had underway.
Q. The best way to get the answer does it cause heart attacks is not by studying it?
A. The best -- we were -- no. That is not what I said.

sarcastic, argumentative

Anstice 62514 625:14-625:18

Q. The main problem is, it probably would have shown your drug was causing heart attacks, and y'all would have been in hot water because you were still selling it at this point when y'all were looking at that study, weren't you?

sarcastic, argumentative

Anstice 62520a 625:20-626:8

THE WITNESS: No. That was not the reason that we didn't do that study.
BY MR. LANIER:
Q. Sir, before you ever sold the drug, you could have studied it to see if it caused heart attacks; couldn't you?
A. Before we launched the drug, there was no basis on which we thought it was necessary to study the drug in the way you just described.
Q. You don't know that. You're not a doctor, you're a marketing guy. How would you know that?
A. The basis of the NDA was consistent with how you study agents in this category.

Argumentative, harassing

Anstice 62803 628:3-628:6

Q. So, your company could have tested to see if the concerns about heart attacks and strokes was true? Your company could have tested for that before you ever went to market; couldn't you?

Anstice 62808b 628:8-628:20

THE WITNESS: The company could have tested for that, but the scientists in considering the discussions I just referenced concluded that that was not necessary.
BY MR. LANIER:
Q. Well, what was the downside to doing a test like that?
A. It was deemed to be not necessary.
Q. That wasn't my question.
I said, what was the downside to it?
A. Well, that would take -- I mean, to do studies that are not scientifically necessary or relevant would divert resources.

Anstice 62919 629:19-630:10

Q. Oh, what it would do is it would mean that you might not get to market as early as you wanted to, and you were in a race with Celebrex to get to market first. That's what it really boils down to; doesn't it?
A. I don't accept that at all.
Q. Well, you were in a race with
page 630
Celebrex to get to market first; weren't you? You admitted that before.
A. There was a competitive development program between two companies.
Q. And if you take the time out for a year to do a study to see if this drug is going to kill people with heart attacks, that's going to delay you another year getting to market; isn't it?
A. That is not the reason that Merck did not proceed with those studies.

repetitive; asked & answered; Speculative

Anstice 63302a 633:2-633:4

Q. You understand before you sell a drug you ought to check to see if it's safe; true?
A. Yes.

Anstice 63320 633:20-633:22

Q. And if you delay the introduction, that delays making money on it; doesn't it?
A. Yes.

Anstice 64002 640:2-640:17

Q. Sir, what I would like to do is I would like to compare -- now, you see, I've messed up my exhibit. We're going to label this as Exhibit 127.
What I want to do in this exhibit, I'm going to compare what work y'all did on cardiovascular. And if I abbreviate that CV, will

you understand it?
A. Yes.
Q. I'm going to compare what work y'all did on cardiovascular versus the money and the work you did on marketing. Do you understand what I'm talking about? There you go.
A. (Witness reviewing document.)
Q. Do you understand what I'm doing here on this chart?

Anstice 64019a 640:19-641:10

THE WITNESS: Can you just be clear what you are doing on the left-hand side?
BY MR. LANIER:
Q. Yes. I want to talk about the efforts and money y'all put into studying the cardiovascular effects. In other words, does Vioxx cause heart attacks. I want to compare on one side
641: page 641
what money and efforts y'all did on that to the other side, the efforts y'all did to market and sell the drugs. Let's see where you put your resources and effort. Fair to say?
A. Okay.
Q. All right. Cardiovascular effects, what money and resources did y'all put into studying that?
A. Every clinical study we've done has studied the cardiovascular effects of Vioxx.

Anstice 64306 643:6-644:8

Q. Sir, we're talking about it being the result of studies, but not the purpose of studies? Y'all didn't do a study just for cardiovascular purposes; did you?
A. We did not do a study where the primary endpoint was CV safety.
Q. Right. So, what other monies and efforts did y'all put into trying to figure out if cardiovascular problems were going to come from that drug?
A. But that's across a large number of clinical studies, not only the original studies in arthritis, rheumatoid arthritis, VIGOR, but also the Alzheimer's disease studies and also eventually finally three cancer studies.
Q. All right.
A. So, a large number of Phase III and subsequent studies.
Q. I'll list them. VIGOR, Alzheimer's, cancer. What others?
644: page 644
A. All the Phase III programs.
Q. Phase III. Any others?
A. Every study that we did with Vioxx.
Q. Can you think of any others?
A. I'm sure there were some other studies.
Q. I'm going to put "Maybe others." Did I write it right?

Anstice 64410 644:10-644:19

THE WITNESS: You wrote down the words that you said you were writing down, yes.
BY MR. LANIER:
Q. Okay. Now, let's just make sure we're clear on this. Y'all were not studying Vioxx to see if it caused Alzheimer's or to see if it caused cancer, to see if it was dangerous in that way, y'all were studying it to see if you could sell it as a cure or as a help for Alzheimer's and cancer; right?

Anstice 64421 644:21-646:17

THE WITNESS: We were studying it to see if there was a benefit to patients, and we're assessing the risks at the same time so that we could make a benefit/risk assessment.
BY MR. LANIER:
645: page 645
Q. In other words, you weren't studying it because you were worried it was going to cause cancer and you wanted to see, you were studying it to see if you could help cancer?
A. Yes, we were. And another benefit of those studies was that we could use Vioxx in those studies along with placebo, which we believed would give us the best data in terms of answering all questions that may be raised about safety.
Q. Now, if I wanted to know the number of researchers that were working on the cardiovascular issue, that's one where I would have to talk to Dr. Kim and get him to tell me who to talk to because you don't know that; right?
A. I don't know that.

602

Q. But to be fair, we ought to put number of researchers because there were a number of researchers over on this side of the column that were working on safety at least, even if it wasn't cardiovascular; right?
A. Correct.
Q. Can you think of anything else y'all were putting in other than researchers and studies? Any other efforts to determine whether or not Vioxx caused heart attacks?
646: page 646
A. Well, there are numerous scientific meetings, reviews at congresses, so, there was a lot of dialogue, and there's a lot of effort over and above the studies, because there's people discussing what all the options were, the alternatives were extensively, right through this period.
Q. So, that's kind of research, I guess, but more than that, it's just talking about research?
A. It's having --
Q. So, y'all had -- I'm sorry. Go ahead.
A. So, it's people discussing what all of the options are.
Q. So, I've put down a third thing, people talking about it. Y'all had that going in to

argumentative; misstates testimony; sarcastic

try and figure it out; true? Is that fair to say?

Anstice 64619 646:19-646:21

THE WITNESS: We had a lot of people doing more than talking about it. Working on this issue, reviewing databases and so forth.

Anstice 64725a 647:25-648:13

Q. Now, I would like to then move over
page 648
to the other side of our chart, the marketing side. First of all, your company brought a lot of expertise into marketing; true?
A. We hired some people, yes.
Q. And not only that, your company was world-renowned for marketing; right?
A. It is one of our reputations; yes.
Q. Well, you are world-famous for it. You are world renowned for marketing; aren't you?
A. We have a good reputation, yes.
Q. I mean, you're not fussing the world renowned language; are you?
A. No. No, I'm not.

401, 402, 403 – Marketing not relevant; Merck's reputation for marketing not relevant

Anstice 65511 655:11-655:22

Q. Another thing you did on marketing, we'll list it as number 5. You would study the effects of label changes. You actually spend money to see if changing the label language was going to hurt your sales; wouldn't you?
A. We would do market research constantly on our products, and that included testing different language and labels.
Q. And y'all would do that with outside companies; wouldn't you?
A. Market research was typically done with outside companies.

401, 402, 403 – market research on label change not relevant

Anstice 69302 693:2-693:7

Q. Well, you didn't, when you decided to put Vioxx on the market without running a test to see if it causes heart attacks, the way some of your scientists thought it might?
A. When Vioxx was brought to the market, it was a safe product.

argumentative, assumes facts not in evidence

Anstice 69410 694:10-694:21

Sir, that wasn't my question. My question is this. Did the drug change from the time y'all started selling it to everybody to the time you pulled it off the market?
A. Did it change in what regard?
Q. Was it the same drug, did it have the same chemical makeup?
A. Yes. It was the same product.
Q. So the product y'all finally agreed to admit was unsafe and caused you to pull it from

harassing – lawyer is yelling at witness

the market is the exact same drug that you were peddling years before, isn't it?

Anstice 69423 694:23-695:12

THE WITNESS: No. The product that we withdrew from the market is a safe product.

BY MR. LANIER:

ESQUIRE DEPOSITION SERVICES

Q. Sir, the product you pulled from the market, according to your own APPROVe study, causes an increased number of heart attacks and strokes, doesn't it?

A. The APPROVe study showed that there was a relative risk greater in the Vioxx group versus the placebo group for the first time in all of the placebo controlled studies, which have been extensive, and based on that relative risk difference and based on the availability of alternative therapies, Merck made a decision to withdraw the product.

Anstice 69602 696:2-696:16

Q. It showed if you take Vioxx, you got a higher chance, statistically significant higher chance of getting a heart attack and a stroke than if you didn't take it, that's what it showed, didn't it?

A. What APPROVe showed is that if you took Vioxx continuously for 18 months compared to a placebo group, then there was a relative risk difference which was adverse to Vioxx.

Q. That's a long way of saying, yes, Mr. Lanier, you are correct, it showed that if you take Vioxx under the APPROVe study, and you're going to get a statistically significant number more of heart attacks and strokes than if you don't take it. That's what it showed.

Asked & answered, harassing

Anstice 69619a 696:19-696:21

Q. Right?

A. No. I just said that that's not what it showed.

Anstice 70022 700:22-701:18

Q. All right. So this study is going, this semi-independent group is monitoring it, and this group says to Merck, time-out, you got to stop this study because the people who are taking Vioxx

ESQUIRE DEPOSITION SERVICES

have a higher rate of heart attacks and strokes than the people who are just taking a sugar pill. Is that right?

A. They -- that's right.

Q. All right.

A. They told Merck to stop the study. It was their recommendation.

Q. Now, this was not the first study

y'all did where one group taking Vioxx had a higher rate of heart attacks and strokes than a group that was taking a different kind of pill. True?
A. It was not the first time, but it was the first time in a placebo-controlled study that a difference had been shown.
Q. Because the first time was the VIGOR study, that was your very first study out of the box that y'all were doing while you were selling the drug on the fast track. Right?

misstate testimony, assumes facts not in evidence

Anstice 70120 701:20-702:7

THE WITNESS: VIGOR was not the first study that Merck did. Merck had extensive studies before VIGOR. VIGOR, which did not have a placebo arm, also showed a difference in CV events between Vioxx and in that case naproxen. Not a sugar pill, but naproxen.

701:ESQUIRE DEPOSITION SERVICES
702: 702

BY MR. LANIER:
Q. And so y'all's reaction to the VIGOR study that showed people taking Vioxx were getting more heart attacks and strokes than the people taking the other pill was just to say the other pill must be really helpful for your heart? That was your response then, wasn't it?

Anstice 70209 702:9-702:15

THE WITNESS: Our response at that time, after looking at whether or not Vioxx in the VIGOR study, that's what we're talking about, whether the Vioxx was prothrombotic, our conclusion, based on looking at the then accumulated data we had, was that Vioxx was not different from placebo and not different from non-naproxen NSAIDS.

Anstice 70217 702:17-702:24

THE WITNESS: We then looked at the naproxen arm to see if there could be explanations which explained why it would have the statistically significant rate. And our conclusion is that on the weight -- the balance of evidence, that the most likely, not the only explanation, but the most likely explanation was that naproxen was cardioprotective.

Anstice 70303 703:3-703:8

Q. Sir, in other words, in common everyday language, when your VIGOR study showed people taking Vioxx were more likely to have heart attacks and strokes than people taking the other pill, the explanation that your company offered was, well, that other pill must help your heart. True?

Anstice 70310a 703:10-703:25

THE WITNESS: After considering all of the data, we believed that that was the most