F I L E D
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 JAN 30  PM 4: 56

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: VIOXX | MDL Docket No. 1657 |
| PRODUCTS LIABILITY LITIGATION | SECTION L |
| This document relates to<br>Case No. 05-4046 | JUDGE FALLON |
| EVELYN IRVIN PLUNKETT<br>as Personal Representative of the Estate of<br>RICHARD IRVIN, JR., | MAGISTRATE JUDGE KNOWLES |
| Plaintiff, | |
| vs. | |
| MERCK & CO., INC., | |
| Defendant. | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MOTION OF MERCK & CO., INC. ("MERCK") TO EXCLUDE SCIENTIFICALLY UNRELIABLE AND IRRELEVANT MEDICAL AND SCIENTIFIC EVIDENCE

### (MOTION *IN LIMINE* NO. 6)

Defendant Merck & Co., Inc. ("Merck"), through undersigned counsel, and pursuant to Federal Rules of Evidence 401, 402, and 403, hereby moves to exclude evidence or argument regarding scientifically unreliable, irrelevant, and unfairly prejudicial medical and scientific evidence. The facts and law supporting this motion are more fully set forth in the accompanying memorandum, declarations, and exhibits, which are incorporated as if fully set forth herein.

Fee_____
Process_____
Dktd_____
CtRmDep_____
Doc. No_____

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone:  504-581-3200
Fax:     504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois 60610
Phone:  312-494-4400
Fax:     312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Phone:  202-434-5000
Fax:     202-434-5029

And

John H. Beisner
Charles C. Lifland
Richard B. Goetz
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone:  213-430-6000
Fax:     213-430-6407

Attorneys for Merck & Co., Inc.

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Motion of Merck & Co., Inc. to Exclude Scientifically Unreliable and Irrelevant Medical and Scientific Evidence has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 30th day of January, 2006.

*Dorothy H. Wimberly*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 05-4046* | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| EVELYN IRVIN PLUNKETT | * | |
| as Personal Representative of the Estate of | * | |
| RICHARD IRVIN, JR., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

* * * * * * * * * * * * * * * * * * *

MEMORANDUM IN SUPPORT OF MOTION OF MERCK & CO., INC.
("MERCK") TO EXCLUDE SCIENTIFICALLY UNRELIABLE AND
IRRELEVANT MEDICAL AND SCIENTIFIC EVIDENCE

(MOTION *IN LIMINE* NO. 6)

Plaintiff apparently plans to inundate the record with non-probative medical and scientific "evidence" that is unreliable, irrelevant, unduly prejudicial and almost certain to confuse and mislead the jury. Merck thus moves to exclude such evidence, including the following:

- Statistically Insignificant Data. Plaintiff's experts rely on scientific data that are not statistically significant to form their causation opinions. This approach

violates a basic tenet of scientific research: that if experimental results do not reach a level of statistical significance, the possibility that the results were attributable to chance cannot reliably be excluded.

- Investigator-Reported Data. Plaintiff's experts also rely on investigator-reported adverse-event data from clinical studies involving Vioxx® to contradict adjudicated data from the same studies. Where adjudicated data exist, however, investigator-reported data have no probative value, and their admission will cause undue delay, confusion and unfair prejudice to Merck. In clinical studies, field investigators report medical events that they believe may have occurred in their patients. Their observations are equivalent to raw, unverified data. In May 1998, Merck initiated a standard operating procedure for the independent adjudication of all cardiovascular investigator-reported adverse events. Through this adjudication process, independent, external boards of medical experts conducted blinded, detailed medical evaluations to determine the true nature of reported events. This process resulted in the identification of "confirmed" cardiovascular events. There is no dispute among experts for either side that adjudicated data are superior to investigator-reported data. Accordingly, plaintiff cannot properly present testimony or evidence of investigator-reported data where adjudicated data exist.

- "All-Cause Mortality" Figures From Alzheimer's Disease Clinical Trials. Plaintiff also intends to present to the jury the mortality data, from all causes, from two long-term clinical trials that were conducted to determine the efficacy of Vioxx in preventing or slowing the progression of Alzheimer's Disease. These figures include numerous deaths that had no possible association with cardiovascular events, including deaths from such causes as electrocution, trauma and cancer. The deaths have no bearing whatsoever on whether Vioxx taken at any dose and for any duration can cause a heart attack or sudden cardiac death, let alone whether taking Vioxx at the 25 mg dose for less than a month, as Mr. Irvin did, can cause such events. These "all-cause" mortality figures are inflammatory on their face, and they have no probative value to any issue the jury must decide. Admitting these numbers into evidence would unfairly prejudice Merck by creating the risk that the jury would base its determinations on emotion and prejudice rather than the relevant facts.

- Interim Data From VICTOR Trial. Plaintiff further intends to rely on interim data from the Vioxx in Colorectal Cancer Therapy ("VICTOR") trial. Specifically, plaintiff identified and apparently intends to rely on a February 1, 2005 internal Merck e-mail from Jennifer Ng, which contained interim data from VICTOR (the "February 2005 e-mail"), for the proposition that short-term Vioxx use can cause adverse cardiovascular events. (*See, e.g.*, Pl.'s Exs. 1.0014-1.0016.) The use of or reference to this e-mail, or the interim data contained in it, is irrelevant in light of additional available data from the same study and can serve only to confuse the jury and to prejudice Merck unfairly.

- **Cardiovascular Data From The Ingenix Study.** Plaintiff further intends to rely on cardiovascular data from a recently published observational epidemiologic study known as the "Ingenix" study.[1] Significantly, this study fails to show a statistically significant increased risk, let alone a doubling of the risk, associated with using Vioxx during the first 30 days. The study's data also are internally inconsistent and unreliable for other reasons. The cardiovascular data from the study are thus irrelevant to this case, and their admission would unfairly prejudice Merck.

- **Cardiovascular Data From the Hippisley-Cox Study.** Plaintiff further intends to rely on cardiovascular data from a recently published study by Dr. Hippisley-Cox.[2] Like the Ingenix study, the Hippisley-Cox study fails to show a statistically significant increased risk, let alone a doubling of the risk, associated with using Vioxx during the first 30 days. The study's data also are internally inconsistent and unreliable for other reasons. The cardiovascular data from the study are thus irrelevant to this case, and their admission would unfairly prejudice Merck.

- **Toxicological Data From Animal Studies.** Finally, plaintiff purports to rely on the results (some published and some not) of animal studies conducted using various NSAIDs. Plaintiff's experts rely on these studies to claim that Vioxx causes a host of adverse effects in humans – alleged results that are contrary to numerous and far superior human clinical trials. Animal studies do not provide a sufficient basis for establishing causation given the many differences between animals and human beings – especially when, as here, the animal studies contradict evidence from prospective clinical trials in humans. Further, the probative value of such studies, which are hypothesis-generating only, is far outweighed by the unfair prejudice and jury confusion that their admission likely will invoke.[3]

For the reasons discussed below, the Court should exclude the above data and reports

from the *Plunkett* retrial, as well as any lay or expert testimony predicated on this evidence.

---

[1] Velentgas, P. et al., *Cardiovascular risk of selective cyclooxygenase-2 inhibitors and other non-aspirin non-steroidal anti-inflammatory medications*, PHARMACOEPIDEMIOLOGY AND DRUG SAFETY 2005 (in press).

[2] Hippisley-Cox et al., *Risk of hospitalization for myocardial infarction in patients taking cyclo-oxygenase-2 inhibitors or conventional non-steroidal anti-inflammatory drugs: population based nested case-control analysis*, BRITISH. MED. J. 2005;330.

[3] Examples of documents reflecting inadmissible data in one or more of these categories include plaintiff's exhibits no. 1.0014, 1.0016, 1.0025, 1.0039, 1.0075, 1.0076, 1.0077, 1.0078, 1.0079, 1.0080, 1.0110, 1.0120, 1.0121, 1.0171, 1.0191, 1.0192, 1.0217, 1.0218, 1.0247, 1.0248, 1.0255, 1.0257, 1.0268, 1.0275, 1.0277, 1.0278, 1.0279, 1.0308, 1.0311, 1.0312, 1.0399, 1.0421, 1.0444, 1.0461, 1.0487, 1.0490., 1.0491, 1.0499, 1.0500, 1.0515, 1.0536, 1.0543, 1.0719, 1.0758, 1.0759, 1.0999, 1.1007, 1.1008, 1.1009, 1.1024, 1.1197, 1.1206, 1.1207, 1.1210, 1.1211, 1.1213, 1.1214, and 1.1235.

## I.   THE COURT SHOULD EXCLUDE ALL EVIDENCE OF STATISTICALLY INSIGNIFICANT DATA AND ALL TESTIMONY THAT IS BASED ON SUCH DATA.

Underscoring the weakness of plaintiff's claim, plaintiff's experts repeatedly rely on data that all parties agree are statistically insignificant.   For example, Professor Ray relies on a retrospective observational study by Dr. David Graham[4] (hereinafter the "Graham Study") for the proposition that 25 mg or less of "rofecoxib [Vioxx] increases the risk of serious coronary heart disease."   (March 31, 2005 Deposition of Wayne A. Ray ("Ray 3/31/05 Dep.") at 83:07-85:03, attached as Ex. 28 to Declaration of Phillip A. Wittmann in Support of Merck's Motions *in Limine*, filed November 4, 2005 ("*Plunkett I* Wittmann Decl.").)[5]   Professor Ray admitted, however, that Graham and his colleagues found *no* statistically significant association between Vioxx at the 25 mg dose and the risk of serious coronary heart disease.   Graham Study at 4 (showing adjusted odds ratio of 1.23, with a confidence interval of 0.89 – 1.71).   (*See also id.* at 87:18-21 (acknowledging that "[t]he value 1.23 with the confidence interval 0.89 to 1.71 is not statistically significant").)

This exemplifies the ubiquitous reliance by plaintiff's experts on data that are not statistically significant.   Merck moves to exclude all evidence of or reference to such statistically insignificant scientific data, including argument, testimony, and expert opinion relying on such data.

As a general matter, results that yield a probability value ("p-value") of less than .05 are

---

[4] *See* David J. Graham, et al., *Risk of acute myocardial infarction and sudden cardiac death in patients treated with cyclo-oxygenase 2 selective and non-selective non-steroidal anti-inflammatory drugs: nested case-control study*.

[5] Dr. Benedict R. Lucchesi, another of plaintiff's experts, also relies on the flawed Graham study for the proposition that Vioxx has been "linked . . . to more than 27,000 heart attacks or sudden cardiac deaths nationwide from the time it came on the market in 1999 through 2003." (Expert Report of Benedict R. Lucchesi ("Lucchesi Report") at 29-30, attached as Ex. 45 to *Plunkett I* Wittmann Decl.) Merck has moved separately to exclude evidence of and reference to this study because it is irrelevant and unduly prejudicial.

deemed statistically significant.[6] *See Cano v. Everest Minerals Corp.*, 362 F. Supp. 2d 814, 821 (W.D. Tex. 2005) ("[T]o support causation, an epidemiological study must be statistically significant at the 95% confidence level . . . ." (citing *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 723-24 (Tex. 1997)). That means that a statistical analysis, to be significant, must find that there is a 95% chance that the true result falls within the upper and lower confidence intervals demonstrated by a particular study and did not occur due to random error.[7] An additional method of expressing statistical significance is a confidence interval that does not include within its range the value of 1.0. For example, a 95% confidence interval that does not include 1.0 represents a statistically significant result. By contrast, were the confidence interval includes the value 1.0, the data is statistically *insignificant*.[8]

The Court should not permit plaintiff to use data that do not meet these criteria for statistical significance for at least two reasons. First, such evidence is irrelevant to any issue that the jury will decide in this case. Thus, the Court should exclude it under Rules 401 and 402.

---

[6] As the Reference Manual of Scientific Evidence states in the chapter on Epidemiology: "Thus, an outcome is statistically significant when the observed p-value for the study falls below the preselected significance level. The most common significance level, or alpha, used in science is .05. A .05 value means that the probability is 5% of observing an association at least as large as that found in the study when in truth there is no association." Saks et al., Federal Judicial Center, Annotated Reference Manual on Scientific Evidence (2d ed. 2004), at 498.

[7] Some analyses, such as retrospective data analysis or data mining, create a greater risk of falsely generating a correlation. Therefore, a more stringent p-value (*e.g.*, .01) may be appropriate in such cases. The Supreme Court indirectly referred to this practice in *Castaneda v. Partida*, 430 U.S. 482, 496, n.17 (1977) and *Hazelwood School District v. United States*, 433 U.S. 299, 311, n.17 (1977) (describing the null hypothesis as "suspect to a social scientist" when statistics from "large samples" fall more than "two or three standard deviations" from their expected value). Two or three standard deviations roughly translate to p-values of .05 and .01 in a normally distributed sample.

[8] *See, e.g., Brock v. Merrell Dow Pharms.*, 874 F.2d 307, 312 (5th Cir. 1989) (data is statistically insignificant where confidence interval includes 1.0); *Babin v. Ecolab, Inc.*, No. 2:04-CV-1595, 2005 WL 1629947, at * 3 (W.D. La. July 5, 2005) (same); *Cano*, 362 F. Supp. 2d at 821 (same); *Kelley v. Am. Heyer-Schulte Corp.*, 957 F. Supp 873, 878-79 (W.D. Tex. 1997) (same); *LeBlanc v. Merrell Dow Pharms., Inc.*, 932 F. Supp. 782, 784 n.3 (E.D. La. 1996) (same)."

Second, the Court should exclude such evidence under Rule 403 because of the danger of unfair prejudice to Merck.[9]

### A.     Statistically Insignificant Data Are Irrelevant and Should Be Excluded.

Statistically insignificant data are simply not relevant.  By their very nature, such data cannot tend to make any fact at issue in a case more or less probable.  Statistically insignificant evidence of difference is the same as no evidence of difference:  there is no reliable, scientific basis to assert that the study would detect any difference if conducted again.  Multiple courts have determined that statistically insignificant data is scientifically untrustworthy and insufficient to establish causation.[10]  *See, e.g., Brock*, 874 F.2d at 167 (finding plaintiffs' "failure to present statistically significant epidemiological proof that Bendectin causes limb reduction defects to be fatal to their case"); *In re Norplant Contraceptive Prods. Liab. Litig.*, 215 F. Supp. 2d 795, 831 (E.D. Tex. 2002) (finding "epidemiological data that is not 'statistically significant' cannot provide a scientific basis for an opinion on causation."); *Chambers v. Exxon Corp.*, 81 F. Supp. 2d 661, 665 (M.D. La. 2000) (excluding expert's testimony based on absence of "statistically significant . . . epidemiological proof"); *LeBlanc*, 932 F. Supp. at 784 (granting summary judgment in Bendectin litigation given absence of "statistically significant epidemiological studies").

The admission of statistically insignificant evidence would allow plaintiff to proffer almost any conceivable scientific theory, regardless of whether it is corroborated by reliable scientific evidence.  When tested scientifically, an incorrect hypothesis of association between

---

[9] For the purpose of this motion, statistically insignificant data include raw data, or data that have not yet been analyzed for significance, because there generally is no way to know whether such data are significant.

[10] Plaintiff's experts (Drs. Burton and Baldwin) all agree that, in the absence of statistical significance, one cannot rule out the possibility that a study's findings are attributable to chance. (*See* Merck's Memorandum In Support Of Motion To Exclude Evidence Of Plaintiff's Experts Regarding Causation ("Causation Brief") at 18 n. 8.)

any drug and any side effect may yield a statistically insignificant p-value.  The Court should not permit plaintiff's experts to rely on such flimsy results (which cannot be distinguished from chance) and then opine that an association exists.  According to sound science, such results do not afford a sufficiently reliable basis on which to opine about causation.  The Fifth Circuit has so held.  *See, e.g., Burleson v. Tex. Dep't of Crim. Justice*, 393 F.3d 577, 584-86 (5th Cir. 2004) (barring expert testimony because it did not rely on a scientific study demonstrating a statistically significant causal relationship); *see also Cano*, 362 F. Supp. 2d at 822 (expert testimony "that will not assist the trier of fact by advancing an element of the plaintiff's case should be excluded").  Statistically insignificant data are irrelevant, and the Court should exclude such evidence under Federal Rules of Evidence 401 and 402.[11]

**B.      The Court Should Exclude Statistically Insignificant Data Under Rule 403 Because Their Admission Would Cause Unfair Prejudice to Merck, Undue Delay and Confusion.**

The probative value of potentially confusing evidence must outweigh its tendency to confuse before such evidence is admissible.  *See* FED. R. EVID. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.").  The admission of statistically insignificant data, particularly where the data contradict the conclusions of a study's authors, easily can confuse and mislead the jury and cause it to disregard study results that are

---

[11] Merck recognizes that data that are statistically insignificant can be combined with additional data and that the combined result may rise to the level of statistical significance. (*See* Reference Manual on Scientific Evidence at 538-39; *see also* Declaration of J. Michael Gaziano, M.D., M.P.H. ("Gaziano Decl.") at ¶ 36, filed October 21, 2005.)  For example, several small studies may, under proper conditions, be combined into a single pooled analysis to determine whether a significant result arises.  This process, called a pooled- or meta-analysis, must be done in a statistically and scientifically rigorous manner, and it still only supports a hypothesis if in fact the end result of the combined study has a significant p-value.  Merck does not seek to exclude such statistically significant data here.

statistically meaningful. The jury would need to reconcile such discrepancies, which likely would distract it from resolving the core factual issues in this case. In cases such as this one, which require expert testimony on complicated scientific issues, courts have a special obligation to exclude misleading and scientifically unreliable evidence that will confuse the jury. *Daubert*, 509 U.S. at 595 (fact that "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it" makes it imperative that "the judge . . . exercises more control over experts than over lay witnesses"); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311-12 (11th Cir. 1999) (as a gate-keeper, trial court must exclude scientifically unreliable information "because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value").

Additionally, if the Court were to allow plaintiff to rely on statistically insignificant data, Merck would be forced to introduce expert and third-party testimony to explain and interpret this irrelevant data. Merck, for example, would need to present testimony addressing such issues as how to form proper scientific hypotheses, how to develop proper statistical methodologies and how properly to interpret statistical tests in the context of various study designs. The net result would be a substantial lengthening of trial and an even greater risk of jury confusion. *See Lowry v. Seaboard Airline R. Co.*, 171 F.2d 625, 627 (5th Cir. 1949) (noting that if "evidence be admitted of a prior [incident] the company would have the right to show, if it could, that its servants were not to blame and three cases would have to be tried instead of one").

## II.   THE COURT SHOULD EXCLUDE ALL EVIDENCE OF AND TESTIMONY RELATED TO INVESTIGATOR-REPORTED DATA WHERE ADJUDICATED DATA EXIST.

Plaintiff's experts also rely on preliminary, investigator-reported adverse-event data from clinical studies involving Vioxx to contradict adjudicated, confirmed data from the same studies. This approach is scientifically unreliable.

In clinical studies, field investigators report medical events that they believe may have occurred in their patients. When doing so, they rely on their unique medical training, experience and judgment. Different investigators may report events using different diagnostic techniques. In addition, they may report events based only on second-hand information relayed by patients without conducting medical evaluations or even reviewing the patients' medical records. Field investigators sometimes can make mistakes by, for example, characterizing what is in fact an upper gastrointestinal event as a cardiovascular event. For these reasons, investigator-reported events are essentially raw and unverified data. (*See, e.g.*, June 22, 2004 Deposition of Alice Reicin ("Reicin 6/22/04 Dep.") at 120:12-125:8, taken in *Garza v. Heart Clinic, P.A.*, No. DC-03-84 (Dist. Ct. Starr County Tex. filed Mar. 10, 2003), attached as Ex. 31 to *Plunkett I* Wittmann Decl.; April 29, 2004 Deposition of Deborah Shapiro, Ph.D. ("Shapiro 4/29/04 Dep.") at 101:20-102:19, taken in *Garza v. Heart Clinic, P.A.*, No. DC-03-84 (Dist. Ct. Starr County Tex. filed Mar. 10, 2003), attached as Ex. 36 to *Plunkett I* Wittmann Decl.)

In May 1998, Merck initiated a standard operating procedure ("SOP") for the adjudication of all thrombotic cardiovascular events occurring in future clinical trials involving Vioxx. The purpose of the SOP was to standardize the evaluation of cardiovascular serious adverse experiences and to improve diagnostic accuracy among field investigators having different clinical specialties and practices. Through this adjudication process, independent boards of medical experts conducted detailed medical evaluations, on a blinded basis,[12] to determine by objective, scientific measures the true nature of reported events and whether an

---

[12] When "blinded," the adjudicators would not know which patients received Vioxx and which received placebo or a comparator drug. (Deposition of John W. Farquhar ("Farquhar Dep.") at 139:2-139:18, attached as Ex. 12 to *Plunkett I* Wittmann Decl.) Blinding helps eliminate the effect of bias during the adjudication process and thus maximizes the integrity of the resulting data. (Deposition of Barry K. Rayburn, M.D. ("Rayburn Dep.") at 55:9-56:5, attached as Ex. 29 to *Plunkett I* Wittmann Decl.)

event that had been reported in fact occurred.  This process results in the identification of "confirmed" cardiovascular adverse-events.  (*See, e.g.,* MRK-AAB0029224 *et seq.* (Standard Operating Procedure for the Surveillance, Monitoring and Adjudication of Acute Thromboembolic Vascular Events in Clinical Trials of COX-2 Specific Inhibitors); Farquhar Dep. at 138:23-140:9; Declaration of Ned Stephen Braunstein, M.D. ("Braunstein Decl.") at ¶ 34, filed October 21, 2005; April 21, 2005 Deposition of Peter S. Kim ("Kim 4/21/05 Dep.") at 116:8-117:16, taken in connection with *Ernst v. Merck*, No. 19961*BH02 (Dist. Ct. Brazoria County Tex. filed May 24, 2002), attached as Ex. 22 to *Plunkett I* Wittmann Decl.; Reicin 6/22/04 Dep. at 120:12-125:8; Shapiro 4/29/04 Dep. at 100:17-102:19; February 14, 2005 Deposition of Deborah S. Shapiro, Ph.D. ("Shapiro 2/14/05 Dep.") at 605:4-606:18, taken in connection with *Humeston v. Merck*, No. 619 (N.J. Super. Ct. Law Div. filed August 19, 2003), attached as Ex. 37 to *Plunkett I* Wittmann Decl.)

It is undisputed that adjudicated data are superior to investigator-reported data. Nevertheless, when adjudicated data exist, plaintiff's experts ignore them and rely, instead, on investigator-reported data to support their causation opinions.  Consider, for example, the reliance of plaintiff's experts on the APPROVe study, a long-term, randomized placebo-controlled clinical trial.  Adjudicated data from APPROVe showed an increased risk of adverse cardiovascular events that began only *after* 18 months of continuous 25 mg Vioxx use and that became statistically significant after approximately 30 months of continuous use.  (Merck's Memorandum Regarding Vioxx Science Issues ("Science Brief") at 16, filed October 21, 2005; Gaziano Decl. at ¶¶ 68-69.)  Plaintiff's experts, however, flatly ignore this confirmed, adjudicated data and, instead, relies on investigator-reported data from APPROVe that purportedly show an increased risk of serious cardiovascular events during the first 18 months of

25 mg Vioxx use. In other words, they use investigator-reported data expressly to contradict adjudicated data.

The reliance of plaintiff's experts on investigator-reported data when adjudicated data exists is scientifically inappropriate. In such circumstances, investigator-reported data has no probative value, and its admission will unduly confuse the jury and unduly prejudice Merck.

### A.    Where Adjudicated Data Exist, The Court Should Exclude Evidence Of Or Reference To Investigator-Reported Data.

Evidence is irrelevant and inadmissible when it does not tend to make any fact at issue in a case more or less probable. *See* FED. R. EVID. 401 & 402. That is the case here. In the case of Vioxx clinical trials, investigator-reported data, which include non-cardiovascular events, necessarily provide a less accurate estimate of cardiovascular risk when compared to adjudicated data, which includes only confirmed cardiovascular events. Accordingly, where, as here, the cardiovascular risk associated with a pharmaceutical product is at issue, investigator-reported data do not – and cannot – tend to make any material fact more or less probable when compared against adjudicated data.[13]

The APPROVe study is a prime example. According to plaintiff's experts, investigator-reported data from APPROVe shows a statistically significant increased risk during the first 18 months of Vioxx use. But that data encompasses events that, in fact, are false positives. Indeed, the Vascular Events Committee ("VEC")[14] for the APPROVe study reviewed all investigator-reported events to determine whether they were true cardiovascular events. (Barr 1/28/05 Dep. at 119:21-120:2.) The VEC determined that almost 50% of the 121 events could not be

---

[13] Of course, in circumstances where confirmed, adjudicated data are lacking, one cannot say that investigator-reported data are irrelevant. In that instance, investigator-reported data provide the only yardstick for measuring risk and thus have probative value.

[14] The VEC was a group of external, blinded cardiologists, neurologists and vascular specialists who were experts in the treatment of ischemic syndromes as well as the medical aspects of clinical trials. (*See* MRK-AAB0029228.)

confirmed as true cardiovascular events.[15]   By contrast, the confirmed, adjudicated data from APPROVe showed an increased risk of adverse cardiovascular events that began only *after* 18 months of continuous use and that became statistically significant after 30 months of such use. (Merck's Science Brief at 16; Gaziano Decl. at ¶¶ 68-69.)   Accordingly, when compared against the adjudicated data, the investigator-reported data do not provide an accurate estimate of the cardiovascular risk seen in APPROVe and thus have no probative value in this case.

**B.      Where Adjudicated Data Exist, Reliance On Investigator-Reported Data Will Result In Undue Delay and Confusion.**

Even assuming that investigator-reported data had some probative value when compared against adjudicated data – and they do not – any probative value of such evidence does not outweigh its tendency to confuse.   *See* FED. R. EVID. 403 ("[R]elevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.").   Admitting evidence of investigator-reported events in addition to adjudicated data from a single study undoubtedly will confuse and mislead the jury as to the study's actual results.   That is especially true where, as in the APPROVe study, the investigator-reported data contradict the adjudicated data.   In such circumstances, the jury will have to reconcile apparent discrepancies in the data.   That is an unreasonable and unfair demand to place on a jury that likely will have limited, if any, knowledge of how to interpret complicated scientific data.   In that event, there is an overwhelming danger that plaintiff will confuse and mislead the jury as to which set of data provides the most accurate estimation of the study's results:   the field investigators' initial

---

[15]  Bresalier RS et al., *Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial*, N. ENGL. J. MED. 2005;352 (11) 1092-1102, 1096.

impressions of observed medical events, or the careful evaluation of such events by a highly-qualified group of independent, blinded experts applying uniform, standardized and objective guidelines.

In addition, if plaintiff were allowed to introduce evidence regarding investigator-reported events when adjudicated data is available, Merck in turn would need to introduce testimony from expert and third-party witnesses to interpret and explain irrelevant and confusing data. Merck, for example, would need to present testimony on such tangential issues as clinical trial data collection and reporting procedures. Merck also would need to present detailed medical testimony to justify the decisions of the adjudication committees as to the appropriate classification of individual investigator-reported events. The net result will be a substantial lengthening of trial and an even greater risk of jury confusion. *See, e.g., Lowry*, 171 F.2d at 627 (noting that if "evidence be admitted of a prior [incident] the company would have the right to show, if it could, that its servants were not to blame and three cases would have to be tried instead of one").

C.    **Where Adjudicated Data Exist, Reliance On Investigator-Reported Data Will Result In Undue Prejudice to Merck.**

Finally, even relevant evidence is subject to exclusion where the danger of undue prejudice outweighs its probative value. *See* FED. R. EVID. 403. Again, that is the case here. If plaintiff were allowed to introduce evidence regarding investigator-reported events when adjudicated data is available, Merck would be unfairly prejudiced in at least two ways.

First, the jury likely would conclude that investigator-reported data is entitled to equal scientific weight as confirmed, adjudicated data. It is unreasonable to assume that a lay jury with no expertise in the interpretation of complicated, scientific data will be able to make a reasoned distinction between these two types of data. Accordingly, there is a very real likelihood that the

jury would ascribe to Vioxx a cardiovascular risk that, in fact, is not supported by the superior, adjudicated data.  Such an outcome would be extremely unfair and prejudicial to Merck.  In cases involving complicated scientific issues, courts have a special obligation to exclude misleading and unreliable evidence that will confuse the jury.  *Daubert*, 509 U.S. at 595; *Allison*, 184 F.3d at 1311-12.

Second, if the Court admits investigator-reported data where confirmed adjudicated data exist, the jury likely will be confused and misled.  Plaintiff likely will imply that Merck's decision to publish only adjudicated data was an intentional effort to "conceal" investigator reported event analysis.  Such an implication is misleading, given that adjudicated data is recognized as being superior.  It is also unfairly prejudicial and contrary to fact.  A jury, however, is unlikely to make such a fine a distinction, prejudicing Merck unfairly.

## III. MORTALITY DATA FROM THE MERCK ALZHEIMER'S DISEASE CLINICAL TRIALS ARE IRRELEVANT, INFLAMMATORY AND INADMISSIBLE.

Merck conducted two long-term, randomized clinical trials that were designed, respectively, to test whether Vioxx was effective in preventing and treating the symptoms of Alzheimer's Disease.[16]  Neither trial showed any statistically significant difference in the rates of adverse cardiovascular events experienced by participants in the Vioxx group and in the control (placebo) group.  *See, e.g.,* Gaziano Decl. at ¶ 65; Thal, L.J. *et al., A Randomized, Double-Blind Study of Rofecoxib in Patients with Mild Cognitive Impairment,* NEUROPSYCHOPHARMACOLOGY (2005) 30:1212. ("Elderly patients are at increased risk for serious vascular events. Rofecoxib did not appear to increase the risk in this study, since the number of confirmed serious thrombotic vascular events was similar in each treatment group.").  The figures on

---

[16] These trials, designated Protocol 078 and Protocol 091, respectively, are discussed in more detail in the Appendix of Studies Relied on by Plaintiff's Experts, filed concurrently with the Causation Brief, at 6-7.

cardiovascular events from those trials thus provided strong evidence that Vioxx does not cause heart attacks and other thrombotic cardiovascular events.

Undoubtedly recognizing that the cardiovascular events data undermine plaintiff's medical causation case, plaintiff's general causation experts, attempt to attach significance to the overall mortality figures from those trials, which encompass deaths from all causes, including causes that have no relation whatsoever to the cardiovascular system. The Court should exclude these "all-cause" mortality data, as well as any expert testimony predicated on such data. Those figures are completely irrelevant to any issue to be decided in this case. They could be linked to this case only by pure conjecture and speculation. Moreover, such data are highly inflammatory and, if admitted, would unfairly prejudice Merck and profoundly confuse the jury.

A.      **The Mortality Figures From The Alzheimer's Trials Are Irrelevant.**

The mortality data from the Alzheimer's trials attributable to all causes are irrelevant and thus inadmissible because they are not probative of any fact that must be determined in this case. *See* FED. R. EVID. 401 & 402. To prevail on her claims, plaintiff must prove that taking Vioxx at the 25mg dose for less than a month can, and in Mr. Irvin's case did, cause a sudden cardiac death. The mortality data have no bearing on that issue. While there were more deaths in the groups of trial participants who took Vioxx than in the placebo groups, there was no pattern to those deaths that supports an inference that they were caused by Vioxx. For example, included in the mortality figures were deaths attributable to such events as electrocution and trauma and to such diseases as cancer and pneumonia. *See* Thal et al., *supra,* at 1210. Moreover, a significant number of the deaths (for example, eleven of the deaths in the Vioxx group of Protocol 078) occurred more than *forty-eight weeks* after treatment had been discontinued – further confirmation that those deaths had nothing to do with Vioxx. *Id.* And, patients who had taken Vioxx, as opposed to placebo, were on average evaluated for a longer period after treatment

15

ended – an additional reason why the number of deaths reported in the Vioxx groups is not a reliable indication of causation. *Id.* at 1213. These deaths from disparate causes cannot be linked to the conclusion that plaintiff wants to reach – *i.e.,* that taking Vioxx increases the risk of adverse cardiovascular events – by any means other than speculation or *ipse dixit.* But "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to the existing data only by the *ipse dixit* of the expert." *Propulsid,* 261 F. Supp. 2d at 616 (*quoting Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997)).

Even if plaintiff's experts somehow could make a connection between the all-cause mortality figures and an increased cardiovascular risk associated with Vioxx, the all-cause mortality figures still would be irrelevant. Mr. Irvin died after taking Vioxx for less than a month. There is no statistically significant increase in risk for all-cause mortality when Vioxx is taken for such a short period of time. Figure 7 in Dr. Kronmal's report illustrates this uncontroverted fact, as there is no separation in the Kaplan-Meier curve for all-cause mortality until some time well *after* one month. (*See* Export Report of Richard A. Kronmal ("Kronmal Report") at 19, figure 7, attached as Exhibit 44 to *Plunkett I* Wittmann Decl.)

In short, plaintiff cannot escape the fact that the data from the Alzheimer's trials that are relevant here are those pertaining to cardiovascular events. The Court should not permit plaintiff to deflect attention from the relevant data by introducing irrelevant data that have no bearing on causation or any other issue.

**B.     The Mortality Figures From The Alzheimer's Trials Are Highly Inflammatory, And Admitting Such Data Would Unfairly Prejudice Merck.**

Even if these all-cause mortality figures had any probative value, their exclusion still would be warranted under Rule 403. Presenting to the jury evidence about these deaths would plainly entail the danger of "unfair prejudice, confusion of the issues, or misleading the jury. . . ."

FED. R. EVID. 403.

Evidence having an "undue tendency to suggest decision on an improper basis, commonly, although not necessarily, an emotional one," should be excluded as unfairly prejudicial. FED. R. EVID. 403 advisory committee's note. Thus, evidence is unfairly prejudicial where it "'appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish,' or otherwise 'may cause a jury to base its decision on something other than the established propositions in the case.'" *Carter v. Hewitt*, 617 F.2d 961, 972 (3d Cir. 1980) (quoting 1 J. Weinstein & M. Berger, WEINSTEIN'S EVIDENCE 403(03), at 403-15 to 403-17 (1978)).

The all-cause mortality figures are inherently inflammatory and precisely the type of evidence that is calculated to appeal to jurors' sympathies and to cause them to base their decision on "something other than the established propositions in the case." *Id.* The danger that the jury would decide issues based on emotion and prejudice is exacerbated by the fact that these death figures would be presented through an expert witness. *Daubert*, 509 U.S. at 595 (fact that "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it" makes it imperative that "the judge . . . exercises more control over experts than over lay witnesses"). The likelihood of juror confusion is equally great. The jurors would be hard-pressed to understand why they were being asked to decide whether Vioxx can cause a sudden cardiac death on the basis of information about deaths from such causes as electrocution, trauma and cancer. Excluding the all-cause mortality data is plainly warranted under Rule 403.

## IV.   THE COURT SHOULD EXCLUDE ALL EVIDENCE OF AND TESTIMONY RELATED TO INTERIM DATA FROM THE VICTOR TRIAL AS IRRELEVANT AND UNDULY PREJUDICIAL.

Plaintiff also intends to rely on interim data from the VICTOR trial contained in a February 1, 2005 internal Merck e-mail from Jennifer Ng (the "February 2005 e-mail"), for the

proposition that short-term Vioxx use can cause adverse cardiovascular events. (*See, e.g.*, Plaintiff's Exhibits 1.0014-1.0016.)   This e-mail, and the interim data contained in it, is irrelevant in light of additional available data from the same study and can serve only to confuse the jury and to prejudice Merck unfairly.

VICTOR was a blinded clinical trial designed to assess the benefits of Vioxx in colorectal cancer. (*See* Declaration of Dr. Janet van Adelsberg ("Adelsberg Decl.") at ¶ 5.)   Although Merck provided funding, lead investigators at the University of Oxford ("Oxford") and the University of Birmingham, both in the United Kingdom, supervised and controlled the study. (*Id.* at ¶ 6.)   Oxford retained control over all of the study data, and contracted to provide Merck with a complete study dataset following completion or early termination of the study. (*Id.* at ¶¶ 6, 21.)   In addition, Merck planned to combine and analyze the adjudicated cardiovascular events from VICTOR with two other ongoing Vioxx trials.[17]   (*Id.* at ¶ 9.)   Because of the voluntary withdrawal of Vioxx from the market, Oxford informed all VICTOR investigators by October 1, 2004 to terminate dosing, and the data were unblinded to allow investigators to ascertain whether a patient had been given Vioxx or placebo. (*Id.* at ¶ 12.)   As of that date, 2,434 patients had been randomized, including 1,217 on placebo and 1,217 on a 25 mg dose of Vioxx. (*Id.*)

Merck provided preliminary cardiovascular safety data from VICTOR to the FDA on February 11, 2005.[18]   These results were based on preliminary data received from Oxford as of January 28, 2005, including the cardiovascular events adjudicated by that date. (*Id.* at ¶ 13.)   As reflected in the February 2005 e-mail, the preliminary data included twelve confirmed thrombotic cardiovascular serious adverse events ("CV SAEs") among patients on a 25 mg dose

---

[17] The two other studies were APPROVe and ViP.   (Adelsberg Decl. at ¶ 9.)

[18] The Kaplan-Meier plot included in the February 2005 e-mail was not submitted to the FDA, although the underlying statistical data was provided.

of Vioxx, versus four among patients on placebo. (*Id.*) Since that time, however, more data have become available. On August 22, 2005, Merck submitted an updated report on cardiovascular safety data in VICTOR to the FDA with data reported from Oxford to Merck as of May 31, 2005. (*Id.* at ¶ 16.) At the time of the August submission, there was one additional thrombotic CV SAE reported by Oxford which was undergoing adjudication. That event has subsequently been confirmed as having occurred in a patient on placebo, increasing the current total of serious CV SAEs in the placebo group to five. (*Id.* at ¶ 19.)

The VICTOR study data are still incomplete and it is likely, given that there are two additional unconfirmed thrombotic CV adverse experiences,[19] that more CV data from either the Vioxx or the placebo group will arrive prior to the estimated 2006 completion date for the analysis.[20] (*Id.* at ¶¶ 18, 20.)

A.   **The Court Should Exclude All Evidence of and Reference to the Interim VICTOR Data Under Rules 401 and 402.**

The plaintiff's reliance on the February 2005 e-mail containing preliminary data and Kaplan-Meier plot is scientifically inappropriate. Because the study was stopped early, with only a small fraction of the planned number of patients enrolled, and the data concerning those patients was itself preliminary, the evidence at issue is not scientifically reliable. Moreover, even though more recent interim data show an additional confirmed event on placebo, Merck believes that neither the older data from the February 2005 e-mail, nor the more recent interim data should be introduced into evidence.

---

[19] These events are adjudicated by an external committee with no knowledge as to whether the patient was on placebo or Vioxx, in order to eliminate any potential bias.

[20] The actual timing is under the control of Oxford.

The data from VICTOR represent a fraction of what was contemplated in the original study, because of VICTOR's early termination.   Generally, it is not possible to draw scientifically meaningful conclusions based on small amounts of data from a prematurely terminated study.  (*Id.* at ¶ 17.)  As plaintiff's own expert, Dr. Lucchesi, admits, "You don't publish partial data.  You publish complete data."  (Nov. 29, 2005 Tr. at 210:9-10) (explaining that he has not yet published his premature conclusions on an animal study involving Vioxx because "[t]he study is still ongoing").

In VICTOR, only 2,434 of the projected 7,000 patients were enrolled when the study was terminated, and even those participants were studied for a far shorter time than originally planned.  (Adelsberg Decl. at ¶¶ 7, 8.)  As a result, the Kaplan-Meier curve contained in the February 2005 e-mail was based on very few events.  The entire plot was generated from only 16 events, a small fraction of which appear to have occurred at a duration relevant to this case (*i.e.*, less than a month).[21]  Moreover, at the time the Kaplan-Meier plot was created, Oxford did not have the treatment start and stop dates for all patients, which is necessary for an accurate analysis.  (*Id.* at 14.)  Given the premature termination of the study, the preliminary nature of the data, the very small number of cardiovascular adverse events, and the absence of stop/start information, it is not possible to draw any scientifically meaningful conclusion from the preliminary Kaplan-Meier plots.  (*Id.* at ¶ 15.)

Because the interim data from VICTOR – including the Kaplan-Meier plot based on the January 2005 preliminary results contained in the February 2005 e-mail – cannot tend to make any fact at issue in this case more or less probable, it should be excluded under Rules 401 and 402.

---

[21] The updated interim data reflects only 19 events total between Vioxx and placebo (21 if the two events currently undergoing adjudication are included).

**B.      The Court Should Exclude All Evidence of and Reference to the Interim VICTOR Data Under Rule 403.**

Even if the obsolete and incomplete interim VICTOR event data in the February 2005 e-mail had some probative value, the confusion such data would likely engender should preclude the February 2005 e-mail's admission. *See* FED. R. EVID. 403. Admitting multiple "results" of incomplete, interim data from different points in time of a single study will confuse and mislead the jury as to the study's actual results. That is especially true where, as in this case, additional events may create different conclusions. In such circumstances, the jury will have to reconcile apparent discrepancies in the data. That is an unreasonable and unfair demand to place on a jury that has limited or no knowledge of how to interpret complicated scientific data and statistics.

In addition, if plaintiff is allowed to introduce the e-mail containing VICTOR interim data, Merck in turn will need to introduce testimony from expert and third-party witnesses to demonstrate the unreliability of this data. Merck, for example, will need to present testimony on such tangential issues as the agreement between Merck and Oxford, the policies and procedures Universities of Oxford and Birmingham used in performing the collection, reporting procedures, and analysis of the trial data. Merck also will need to present medical testimony to justify the decisions of adjudication committees as to the classification of individual events. The net result will be an inappropriate lengthening of the trial and an even greater risk of jury confusion. *See, e.g., Lowry v. Seaboard Airline R. Co.*, 171 F.2d 625, 627 (5th Cir. 1949) (noting that if "evidence be admitted of a prior [incident] the company would have the right to show, if it could, that its servants were not to blame and three cases would have to be tried instead of one").

**V.      THE COURT SHOULD EXCLUDE ALL EVIDENCE OF AND TESTIMONY RELATED TO CARDIOVASCULAR DATA FROM THE INGENIX STUDY.**

Plaintiff further intends to rely on cardiovascular risk data from of a recently published observational epidemiologic study involving Vioxx and other NSAIDs, known as the Ingenix

study.[22]  The Ingenix study was sponsored by Merck and co-authored by a current and a former

Merck employee, Drs. Douglas Watson and Carolyn Cannuscio, respectively.[23]   Merck's

involvement in the Ingenix study is further proof that Merck has not sought to conceal an alleged

cardiovascular risk associated with Vioxx, as plaintiff claims.  That said, Merck's involvement in

the study does not make the study's data admissible in this case.  Indeed, as explained below, the

Ingenix study data are irrelevant here and their admission would be unduly prejudicial to Merck.

Accordingly, the Court should exclude any evidence of or testimony relating to such data.

A.     **The Court Should Exclude All Evidence of and Testimony Related to the Ingenix Study Data Under Rules 401 and 402.**

Rule 702 forbids the admission of expert testimony that is not based on "sufficient facts

or data."  In pharmaceutical cases, the dose and duration at which a plaintiff is exposed to a drug

are among the most critical facts in any causal analysis.  *See, e.g., McClain v. Metabolife Int'l,*

*Inc.,* 401 F.3d 1233, 1242 (11th Cir. 2005) (holding that dose-response relationship is "the

hallmark of basic toxicology" and that "[d]ose is the single most important factor to consider in

evaluating whether an alleged exposure caused a specific adverse effect") (internal citations

omitted); *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 720 (Tex. 1997) (inappropriate

to rely on epidemiologic studies absent "proof that the injured person was exposed to the same

substance, [and] that the exposure or dose levels were comparable to or greater than those in the

studies"); *see also* Merck's Motion to Exclude Evidence of Plaintiff's Experts Regarding

Causation at 24-26.[24]  Whether an expert's opinion is based on incomplete or inaccurate dosage

---

[22] Velentgas, P. et al., *Cardiovascular risk of selective cyclooxygenase-2 inhibitors and other non-aspirin non-steroidal anti-inflammatory medications,* PHARMACOEPIDEMIOLOGY AND DRUG SAFETY 2005 (in press). Dr. Velentgas, the lead author of the study, works for Ingenix i3 Drug Safety in Auburndale, Massachusetts.

[23] *See supra* n.23.

[24] Merck incorporates its prior filing herein by reference.

or duration data is thus a factor to be considered in assessing the scientific reliability of expert testimony in such cases.  (Order (11/18/05) at 6-7 (citing *Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1114 (5th Cir. 1991).)  Even plaintiff's own pathology expert, Dr. Graham, admits that any alleged thrombotic effect of Vioxx is dose-dependent.  (January 25, 2006 Deposition of Michael Graham, M.D. ("Graham Dep.") at 96:2-5, 178:22-179:2, attached as Exhibit 3 to the Declaration of Phillip Wittmann in Support of Merck's Plunkett II Motions in Limine, filed January 30, 2006 ("*Plunkett II* Wittmann Decl.")

The Ingenix study compared Vioxx users to a combined reference group of ibuprofen and diclofenac users.  The study's primary endpoint included MI, acute coronary syndrome and sudden cardiac death.  On the central issue in this case, the Ingenix study *failed* to show a statistically significant increased risk, let alone a doubling of the risk, associated with the use of Vioxx for less than 30 days (CI = 0.98 to 2.34).[25]  Based on its failure to report a statistically significant finding for the duration of Vioxx use at issue here, the Ingenix study does not tend to make any fact at issue in this case more or less probable.   *See, e.g., Brock v. Merrell Dow Pharms.*, 874 F.2d at 167 (finding plaintiffs' "failure to present statistically significant epidemiological proof that Bendectin causes limb reduction defects to be fatal to their case"); *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 278 (5th Cir.1998) (en banc) (excluding opinion of expert who "had no support for the theory that the level of chemicals to which Moore was exposed caused RADS"); *see also* Order (11/18/05) at 55 ("The issue, at least in this case, is temporal.").

Moreover, even if it were appropriate to consider the alleged cardiovascular risks associated with *different* doses and/or durations of Vioxx use – and it is not – the results of the

---

[25] *See supra* n.23 at 8 & Table 4.

Ingenix study still would be irrelevant. After all, the study *failed* to demonstrate a statistically significant doubling of the risk at *any* dose or duration of Vioxx use.[26]   This fact is significant, because an observational epidemiologic study cannot support an inference of causation unless it is statistically significant and shows more than a doubling of the risk.   (Merck's Motion to Exclude Evidence of Plaintiff's Experts Regarding Causation at 18-20, 32-33.)   Even plaintiff concedes this fact.   (Plaintiff's Opposition to Motion to Exclude Evidence of Plaintiff's Experts Regarding Causation at 7 ("A relative risk *greater* than 2.0 would permit an inference that an individual plaintiff's disease was more likely than not caused by the implicated agent." (emphases added))).   And the FDA likewise has concluded that the available observational data, which fails to show a relative risk in excess of 2.0, is insufficient to establish an increased cardiovascular risk associated with Vioxx at the 25 mg dose.   (FDA Memo. (04/06/05) at 7-8.)

Finally, the Ingenix study data are irrelevant to this case for other reasons.   First, the data are internally inconsistent and thus unreliable.   Indeed, the study found no consistent pattern of increasing or decreasing risk associated with the duration of Vioxx use, and it purported to show an increased risk associated with the 25 mg dose (although not a doubling and not during the first 30 days) but no increased risk associated with the 50 mg dose.[27]   These anomalous finding are at odds with the testimony of plaintiff's own experts, who concede that risk increases with

---

[26] For example, the new, continuous use of Vioxx at all doses was not associated with a statistically significant increased risk, let alone a doubling of the risk, for *any* duration of use. (*See supra* n.23 at 8 & Table 4.).   The new, continuous use of Vioxx at the 25 mg dose was associated with a relative risk of only 1.54 when all durations of Vioxx use were combined (the average duration of Vioxx use during the study was 5.1 months).   (*See supra* n.23 at 5, 9 & Table 5.)   The current use of Vioxx at all doses was associated with a relative risk of only 1.35.   (*See supra* n.23 at 7 & Table 3.).   The current use of Vioxx at all doses was associated with a relative risk of only 1.49 when compared to ibuprofen only.   (*See supra* n.23 at 7.)   Finally, the current use of Vioxx at all doses was not associated with a statistically significant increased risk, let alone a doubling of the risk, for the study's secondary endpoint, which included MI or death from congestive heart failure.   (*See supra* n.23 at 7.)

[27] *See supra* n.23 at Tables 4 & 5.

increased dosage and duration of use.  (Graham Dep. at 96:2-5, 178:22-179:2 ("Q:  Is your opinion, sir, about the alleged increased cardiovascular risk with Vioxx dependent on how long the patient uses the drug?  A:  Yeah, sure."); Expert Report of Wayne Ray ("Ray Rpt.") at 24-25, attached as Exhibit 46 to the *Plunkett I* Wittmann Decl.")

(conceding there is some evidence that the risk associated with Vioxx "increases with increasing dose" and noting that epidemiological studies show "a strong suggestion of a dose response relationship"); Trial Testimony of Dr. Benedict Lucchesi in *Ernst* ("Lucchesi Tr.") 8/2/05 at 118:2-5 ("Q:  So the dose of a drug can make a difference with respect to its health effect.  Is that what you're telling us?  A:  Yes.").).  The irrelevance and inconsistency of these findings are compounded by the fact that the study did not involve use of a placebo comparator, making it impossible to determine in the first instance if the observed findings are attributable to Vioxx.  (Gaziano Decl. ¶¶ 34-35)

Second, according to the authors, the study has multiple "limitations."[28]  For example, the authors relied on pharmacy and insurance records from a healthcare database to establish NSAID exposure and patient outcomes.  As the authors acknowledge, however, reliance on such records to determine exposure is only "a proxy for actual use" and cannot eliminate "confounding" from use of over-the-counter NSAIDs like aspirin, which could not be measured.[29]  Further, because selective COX-2 inhibitors are preferentially prescribed over non-selective NSAIDs to older patients and to those with a higher baseline risk of MI, the authors' reliance on such records cannot eliminate the effect of "channeling" bias.  (Gaziano Decl. at  57.)  Another "major problem" of reliance on such records is the potential for misclassification of patient outcomes, since it is impossible to verify medical endpoints through a detailed chart review.  (*Id.*)  Finally,

---

[28] *See supra* n.23 at 11.

[29] *See supra* n.23 at 11.

the authors concede that reliance on records from a healthcare database can lead to "[r]esidual confounding by other unmeasured factors such as smoking, body mass index, diet and exercise."[30]  Combined with the study's lack statistical significance, these "limitations" make the Ingenix study irrelevant to any issue in this case.

**B.    The Court Should Exclude All Evidence of and Testimony Related to the Ingenix Study Data Under Rule 403.**

The probative value of potentially confusing evidence must outweigh its tendency to confuse before such evidence is admissible.  *See* FED. R. EVID. 403.  As explained above, the cardiovascular data from the Ingenix study have no probative value here because they fail to show a statistically significant doubling of the risk associated with the use of Vioxx during the first 30 days (or, indeed, at any dose or duration).  By contrast, the admission of such data would likely confuse the jury.

For example, the authors found no statistically significant increased risk associated with Vioxx at all doses during the first 30 days but purported to find an increased risk associated with the 25 mg dose when all durations of use were combined.  Similarly, the authors found no statistically significant increased risk associated with the "new, continuous" use of Vioxx at any duration of use but purported to find a small and marginally significant increased risk associated with the "current" use of Vioxx when all durations of use were combined.  While all of these results are irrelevant for the reasons explained above, the jury would need to reconcile them, which would distract it from resolving the core factual issues in this case.  In cases such as this one, which require expert testimony on complicated scientific issues, courts have a special obligation to exclude misleading and scientifically unreliable evidence that will confuse the jury. *Daubert*, 509 U.S. at 595; *Allison*, 184 F.3d at 1311-12.  This is particularly true when, as here,

---

[30] *See supra* n.23 at 10; *see also* Gaziano Decl. at ¶ 57.

the testifying experts have failed to "appl[y] the [scientific] principles and methods reliably to the facts of the case." FED. R. EVID. 702.

Additionally, if the Court were to allow plaintiff to rely on cardiovascular data from the Ingenix study, Merck would be forced to introduce expert and third-party testimony to explain and interpret this irrelevant data.   Merck, for example, would need to present testimony addressing such issues as how to form proper scientific hypotheses, how to develop proper statistical methodologies and how properly to interpret statistical tests in the context of observational studies.   The net result would be a substantial lengthening of trial and an even greater risk of jury confusion. *See Lowry*, 171 F.2d at 627.

## VI.   THE COURT SHOULD EXCLUDE ALL EVIDENCE OF AND TESTIMONY RELATED TO THE HIPPISLEY-COX STUDY.

Plaintiff further intends to rely on cardiovascular risk data from of a recently published observational epidemiologic study by Dr. Hippisley-Cox.[31]   As with the Ingenix study, the cardiovascular data from the Hippisely-Cox study are irrelevant here and their admission would be unfairly prejudicial to Merck.   Accordingly, the Court should exclude any evidence of or testimony relating to such data.

### A.   The Court Should Exclude All Evidence of and Testimony Related to the Hippisley-Cox Study Data Under Rules 401 and 402.

As explained above, the dose and duration at which a plaintiff ingests a drug are among the most critical facts in any causal analysis. (*See supra* at 22-23.) The threshold issue in this case is whether Mr. Irvin's use of 25 mg Vioxx for less than 30 days is capable of causing thrombotic cardiovascular events.   As to that threshold issue, the Hippisley-Cox study is simply irrelevant because it does not purport to show an increased risk, let alone a statistically

---

[31] Hippisley-Cox et al., *Risk of hospitalization for myocardial infarction in patients taking cyclo-oxygenase-2 inhibitors or conventional non-steroidal anti-inflammatory drugs:   population based nested case-control analysis*, BRITISH. MED. J. 2005;330.

significant doubling of the risk, associated with the use of 25 mg Vioxx during the first 30 days. (*See supra* at 24.) In fact, her study does not purport to show a statistically significant doubling of the risk associated with Vioxx at *any* dose or duration.

While Dr. Hippisley-Cox does report a small and marginally significant increased risk associated with the use of Vioxx within three months (RR = 1.32, CI = 1.09-1.61), that purported finding is not relevant to this case for several reasons. First, it does not establish that Vioxx causes heart attacks. The FDA has reviewed the available observational data from studies similar to Dr. Hippisley-Cox's study and concluded that such data are insufficient to establish an increased risk associated with Vioxx at the 25 mg dose. (FDA Memo. (04/06/05) at 7-8.) The FDA also concluded that a small increased risk like that reported by Dr. Hippisley-Cox is "in a range where interpretation may be difficult and influenced by uncontrolled residual confounding or biases." (*Id.* at 8.) Even Dr. Hippisley-Cox concedes that her study merely "suggest[s] an increased risk."[32]

Second, whatever Dr. Hippisley-Cox's study shows about the risk associated with Vioxx after use for three months, it does *not* establish that there is an increased risk associated with Vioxx during the first 30 days, which is the core issue here.[33] Third, Dr. Hippisley-Cox did not distinguish between patients taking Vioxx at the 25 mg or 50 mg dose.[34] It is thus impossible to determine whether the results of her study are applicable to Mr. Irvin's case. *Daubert*, 509 U.S.

---

[32] *See supra* n. 32 at 1 & 5.

[33] Nor would it be appropriate to *assume* that an increased risk seen at three months applies during the first month of use. Such an assumption amounts merely to extrapolating from what is observed to what is unknown, and it is scientifically unreliable under *Daubert*. *Moore*, 151 F.3d at 279 (stating that it is improper to "leap[] from an accepted scientific premise to an unsupported one"); *Claar v. Burlington N.R.R.*, 29 F.3d 499, 502-03 (9th Cir. 1994) ("Coming to a firm conclusion first and then doing research to support it is the very antithesis of [the scientific] method.").

[34] *See supra* n. 32 at 6 ("[W]e did not analyze dose.")

at 591-92 (expert testimony inadmissible if lacking appropriate "fit" to specific facts of the case). Fourth, while Dr. Hippisley-Cox purported to find an increased risk within three months, she found *no* statistically significant increased risk associated with the use of Vioxx for more than three months (CI = 0.89-1.24).[35] This anomaly renders all of her Vioxx-related findings suspect. (*See supra* at 24-25.)  And finally, like the Ingenix study, the Hippisley-Cox study relied on records from a healthcare database to determine patient exposure and patient outcomes.  Her purported findings are thus subject to the same limitations as those of the Ingenix study.  Indeed, Dr. Hippisley-Cox concedes that pharmacy records are not a reliable indicator of actual exposure, as the "number of tablets taken by patients . . . can vary day to day according to levels of pain." [36]  She also concedes that her anomalous findings are "at risk of bias and confounding" by "unmeasured variables" that she "cannot correct for."[37]

### B.   The Court Should Exclude All Evidence of and Testimony Related to the Hippisley-Cox Study Data Under Rule 403.

The probative value of potentially confusing evidence must outweigh its tendency to confuse before such evidence is admissible. *See* FED. R. EVID. 403.  As explained above, the cardiovascular data from the Hippisley-Cox study have no probative value here because they fail to show a statistically significant doubling of the risk associated with the use of Vioxx during the first 30 days (or, indeed, at any dose or duration).  By contrast, the admission of such data would likely confuse the jury.

For example, Dr. Hippisley-Cox found no statistically significant increased risk associated with Vioxx at all doses when taken for longer than three months but purported to find a small increased risk associated with Vioxx at all doses during the first three months of use.

---

[35] *See supra* n.32 at 2-3 & Table 3.

[36] *See supra* n.32 at 5-6.

[37] *See supra* n.32 at 5-6.

While both findings are irrelevant for the reasons explained above, the jury would need to reconcile them, which would distract it from resolving the core factual issues in this case. Moreover, the jury may be misled into believing that the use of 25 mg Vioxx for less than 30 days is associated with an increased risk based on Dr. Hippisley-Cox's purported finding that Vioxx at all doses was associated with an increased risk in the first three months. Such a misapprehension would be at odds even with the reasoning of plaintiff's own experts. (*See supra* at 25.) In cases such as this one, which require expert testimony on complicated scientific issues, courts have a special obligation to exclude misleading and scientifically unreliable evidence that will confuse the jury. *Daubert*, 509 U.S. at 595; *Allison*, 184 F.3d at 1311-12.

Additionally, if the Court were to allow plaintiff to rely on cardiovascular data from the Hippisley-Cox study, Merck would be forced to introduce expert and third-party testimony to explain and interpret this irrelevant data. Merck, for example, would need to present testimony addressing such issues as how to form proper scientific hypotheses, how to develop proper statistical methodologies and how properly to interpret statistical tests in the context of observational studies. The net result would be a substantial lengthening of trial and an even greater risk of jury confusion. *See Lowry*, 171 F.2d at 627.

## VII.   **CONCLUSION.**

For the reasons stated above, Merck respectfully requests that the Court exclude all evidence of and reference to scientifically unreliable and irrelevant medical and scientific evidence.

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:     312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone: 202-434-5000
Fax:     202-434-5029

And

John H. Beisner
Charles C. Lifland
Richard B. Goetz
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone: 213-430-6000
Fax:    213-430-6407

Attorneys for Merck & Co., Inc.

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Memorandum in Support of Motion of Merck

& Co., Inc. to Exclude Scientifically Unreliable and Irrelevant Medical and Scientific Evidence

has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery

and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by

electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-

Trial Order No. 8, on this 30th day of January, 2006.

*Dorothy H. Wimberly*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to Case No. 05-4046 | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| EVELYN IRVIN PLUNKETT, | * | |
| as Personal Representative of the Estate of | * | |
| RICHARD IRVIN, JR., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

* * * * * * * * * * * * * * * * * *

## DECLARATION OF JANET VAN EDELSBERG, M.D., IN SUPPORT OF MERCK's MOTION TO EXCLUDE EVIDENCE OF INTERIM DATA FROM THE VICTOR TRIAL OF VIOXX®

Janet van Adelsberg, M.D., under penalty of perjury, declares:

       1.     I have been asked by counsel for Merck to provide this declaration in support of Merck's Motion to Exclude Evidence of Interim Data from the VICTOR Trial of VIOXX®.

       2.     I am Director, Clinical Immunology & Analgesia, Merck Research Laboratories ("MRL"), a division of Merck & Co., Inc. ("Merck"), the company that discovered and developed the prescription medicine VIOXX® that I understand is at issue in this lawsuit.

3.      Merck is a leading global pharmaceutical company headquartered in New Jersey. Founded in 1891, Merck is well known in the industry for its commitment to rigorous scientific research. The company's research arm, Merck Research Laboratories, employs thousands of scientists. Over the years, Merck has developed numerous innovative medicines and vaccines addressing the needs of patients with AIDS, cancer, high cholesterol, high blood pressure, river blindness, arthritis, and many other diseases.

4.      I worked on several Vioxx clinical studies and co-authored Protocol 203, Merck's combined analysis of cardiovascular data from three cancer studies, which is described more fully below. With regard to the VICTOR (VIOXX™ in Colorectal Cancer Therapy: Definition of Optimal Regime) study I reviewed serious adverse experiences and functioned as liaison between Merck and Oxford University, and continue to do so.

5.      VICTOR was designed as an international, multi-center, Phase III, randomized, double-blind trial of Vioxx 25 mg vs. placebo. The study was designated as Protocol 145. VICTOR was designed to test whether long-term treatment with 25 mg Vioxx would improve the survival rate of patients with a history of colorectal cancer. (VICTOR study protocol, MRK-ABS0387094-0387122.)

6.      The VICTOR study was a collaboration between Merck and the Universities of Oxford and Birmingham in the United Kingdom. The University of Oxford ("Oxford") was responsible for data collection and study management, and the University of Birmingham provided statistical analysis. Merck sponsored the study. Oxford was to retain control over all the study data, and would provide a complete study dataset following completion or early termination of the study. (Collaborative Agreement for "VICTOR", MRK-AFK0175996-0176033.)

7.      In VICTOR, patients were randomized to 2-year treatment and 5-year treatment groups. The primary endpoint was overall survival, and the secondary endpoint was disease-free survival. The target enrollment for VICTOR was 7,000 patients. (VICTOR study protocol, MRK-ABS0387094-0387122.)

8.      The protocol for VICTOR called for all patients, whether on Vioxx or placebo, including those who withdrew from the study, to be followed up at specified intervals during the first year after entering the study, and once every year thereafter. Follow-up would continue until the last patient in the 5-year treatment group had undergone treatment for 5 years. (VICTOR study protocol, MRK-ABS0387094-0387122.)

9.      Independent of VICTOR, Merck designed a study protocol in consultation with the FDA for the systematic analysis of cardiovascular safety data from three large-scale, long-term, placebo-controlled trials. These were VICTOR, ViP (VIOXX[TM] in Prostate Cancer Prevention Study), and APPROVe (Adenomatous Polyp Prevention On VIOXX[TM] Study.) This combined analysis was designated Protocol 203. The primary endpoint for Protocol 203 was confirmed thrombotic cardiovascular serious adverse experiences (CV SAEs) defined according to the Merck standard operating procedure (SOP) for evaluation and adjudication of potentially thrombotic vascular serious adverse experiences. The secondary endpoints included investigator-reported cardiovascular events, and confirmed occurrences of the Anti-Platelet Trialists' Collaboration combined endpoint. All serious adverse experiences which began while a patient was on a study medication or within 14 days after the last dose of a study medication, and which corresponded to one of the study endpoints, were reviewed according to the SOP. (Protocol 203, MRK-I8940077723-0077883.)

10.     Oxford was to collect reports of serious adverse experiences in VICTOR and would enter data on each event in Merck's Worldwide Adverse Experience System (WAES) database as soon as it learned of the event. Upon learning of a serious adverse experience which qualified under the SOP for adjudication, Merck would request from Oxford an adjudication package, that is, all available clinical data necessary for adjudication of the event. Merck would then send that package to an external adjudication committee.

11.     To the extent that I am aware, all the procedures indicated above have been followed according to the applicable agreements and protocols.

12.     Because of the voluntary withdrawal of Vioxx from the market, Oxford informed all VICTOR investigators by October 1, 2004 to terminate dosing, and Oxford decided to unblind investigators to treatment assignment on that date. However, the external adjudication committee remained and continues to remain blinded to treatment assignment for all adverse experiences it receives for adjudication. As of that date, 2,434 patients had been randomized, including 1,217 on placebo and 1,217 on Vioxx 25 mg. (Protocol 145 (VICTOR) Memo, MRK-I8940096438-0096445.)

13.     On February 11, 2005, Merck submitted an analysis of interim cardiovascular safety results from ViP (Protocol 201) and VICTOR to the FDA. For VICTOR, the analysis was based on preliminary data from Oxford received as of January 28, 2005 and all cardiovascular cases adjudicated by that date. A Cox proportional hazards model with a covariate for treatment was used to calculate the relative risk estimates and the corresponding confidence intervals. This analysis reported 12 confirmed thrombotic cardiovascular serious adverse events (CV SAEs) on Vioxx 25 mg vs. 4 on placebo, and an estimated relative risk of

3.14 (95% CI 1.01 – 9.75).  (Letter from Huang to FDA dated February 11, 2005, MRK-I8940096025-0096044.)

        14.    This analysis was based on incomplete, interim data from Oxford.  For example, Oxford did not have treatment start and stop dates for all patients.  Also, as explained more fully below, Oxford did not yet have data on all adverse experiences from on-drug patients.

        15.    I understand that plaintiffs make reference to Kaplan-Meier plots of time to events in VICTOR which were generated in February 2005 based on the interim, incomplete data described above.  Given the small number of cardiovascular adverse events in VICTOR, it is not possible to draw any scientifically meaningful conclusion about those Kaplan-Meier plots.

        16.    On August 22, 2005, Merck submitted an updated report on cardiovascular safety data in VICTOR to the FDA with data reported from Oxford to Merck as of May 31, 2005.  This submission included two more confirmed thrombotic CV SAEs on Vioxx 25 mg, totalling 14 events on Vioxx vs. 4 on placebo.  (Protocol 145 (VICTOR) Memo, MRK-I8940096438-0096445.)

        17.    The analysis in the August submission was also an interim analysis based on incomplete data.  Oxford still did not have treatment start and stop dates for all patients, as well as other data, and reports of adverse experiences from on-drug patients were still arriving.  Also, after the unblinding on October 1, 2004, there was a potential for differential reporting of adverse experiences in VICTOR.  That is, adverse experiences may have been reported more or less rigorously according to treatment group.  Generally, it is not possible to draw scientifically meaningful conclusions based on small amounts of data from a prematurely terminated study, as is the case in VICTOR.

18.     As of today, the study data in VICTOR is still incomplete.  Because of the scheduling of patient follow-up and the parameters allowed for follow-up visits and reporting, as specified in Protocol 145, it is possible that more serious adverse experience data will arrive from patients in either the Vioxx or placebo group.  Also, it takes a certain amount of time for reported adverse experiences to be adjudicated.  I expect that final and complete study data from the active treatment phase of VICTOR will be available sometime in 2006, but the actual timing is under the control of Oxford.

19.     At the time of the August submission, I was aware of one additional thrombotic CV SAE reported by Oxford which was undergoing adjudication.  I am now aware that this event has been confirmed, and occurred in a patient on placebo.  This would result in an overall comparison of 14 thrombotic CV SAEs on Vioxx vs. 5 on placebo.

20.     I am further aware of two additional unconfirmed thrombotic CV SAEs. Merck has requested adjudication packages from Oxford for these adverse experiences.

21.     Apart from the results of adjudication, from the initiation of VICTOR onward Oxford, not Merck, controlled and will continue to control the study data.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Rahway, New Jersey on November 22, 2005.

JANET VAN ADELSBERG, M.D.