h.      Merck concealed the risk of serious GI toxicity such as bleeding, ulceration or perforation in patients taking Vioxx.

i.      Merck concealed certain precautions for use in patients with liver and kidney disease, as well as failure to disclose information about which patient populations should not use Vioxx, including women in late-term pregnancy.

91.     The FDA also warned Merck that its recent press releases: "confirming the favorable cardiovascular safety profile of Vioxx" were "simply incomprehensible" given the rate of heart attacks and "serious cardiovascular events compared to naproxen." Merck responded to this Warning Letter by pulling or revising the complained-of promotional materials, but persisted in refusing to include a cardiovascular warning in any of its direct-to-consumer advertisements. Merck's misleading statements had already infiltrated the market and influenced the ongoing demand for Vioxx.

92.     The FDA expressed increasing concern about Merck's marketing of the drug to physicians and medical professionals. In the September 17, 2001 Warning Letter, the FDA expressed concern over the representations made in a Merck-sponsored presentation by a doctor in June 2000. The doctor had said that the VIGOR trial showed that naproxen was "a wonderful drug" for reducing the risk of heart problems – not that there was anything wrong with Vioxx. Such statements, the FDA said, "minimized the potentially serious cardiovascular findings" of VIGOR.

93.     In April 2002, after fourteen months of negotiations with the FDA, the new Vioxx label, which went into effect in April 2002, listed the good news about fewer upset stomachs first. Then, the Product Insert listed in the Precautions section — not Warnings — two tables setting

forth certain data from the VIGOR study concerning increased incidence of cardiovascular events observed in the VIGOR study.

94.     With the introduction of the April 2002 label, Merck issued a press release that minimized the importance of the risks it had been required to disclose: "The significance of the cardiovascular findings from [the VIGOR study] is unknown . . . Merck is confident in the efficacy and safety profile of Vioxx." Merck was still engaged in a campaign designed to deceive the average consumer and the medical community by downplaying and suppressing any association between Vioxx and any serious cardiovascular risk.

### J.     Merck Attempts to Silence its Critics

95.     During its ongoing effort to conceal the negative cardiovascular effects of Vioxx, Merck officials repeatedly lashed out against and threatened dissenting voices within the medical community.

96.     In October 2000, a prominent COX-2 expert, Dr. Gurkipal Singh of Stanford University, who frequently gave lectures sponsored by Merck, repeatedly and publicly pressed Merck for more cardiovascular data on Vioxx.  Merck responded by canceling several of Dr. Singh's presentations that it had been scheduled to sponsor.  Still not satisfied, a senior Merck official, Louis Sherwood, called James Fries, MD, a Stanford University Medical School professor, to complain that Dr. Singh's lectures were "irresponsibly anti-Merck and specifically anti-Vioxx." According to Dr. Fries' letter to Mr. Gilmartin dated January 9, 2001, Sherwood threatened that, "if this continued, Dr. Singh would flame out and there would be consequences for [Dr. Fries] and for Stanford." Dr. Fries responded by writing a letter to Merck CEO, Raymond Gilmartin, in which he complained about Merck's consistent pattern of intimidation of Vioxx investigators.

97. In that same letter, Dr. Fries reported that he had learned of repeated other incidents where employees of Merck had attempted to intimidate critics of Vioxx, and reported what he had learned to Mr. Gilmartin.

98. Perhaps the most aggressive action taken by Merck to attack its critics was against Dr. Joan-Ramon Laporte of the Catalan Institute of Pharmacology in Barcelona, Spain. In the summer of 2002, a publication of the Catalan Institute edited by Dr. Laporte criticized Merck's handling of Vioxx's cardiovascular risks. Soon after, Merck officials sent Dr. Laporte a "rectification" to publish, but Dr. Laporte refused to print a correction. After repeated efforts to correct the study, Merck filed suit in a Spanish court against Dr. Laporte and the Institute under a Spanish law that allows Plaintiffs to demand a public correction of inaccurate published information. In January 2004, a judge ruled that Dr. Laporte's publication accurately reflected the medical debate about the cardiovascular safety of Vioxx, and ordered Merck to pay court costs. To punish Dr. Laporte, Merck withdrew funding for a pharmaceutical conference in Spain, which it had financed for the previous eight years, because the organizer would not remove Dr. Laporte from the list of speakers.

## K.    Merck Wrestles With Additional Studies Exposing Vioxx's Safety Concerns.

99. Following the VIGOR trial, Merck was confronted with study after study that demonstrated increasing evidence of Vioxx's serious and significant health risks.

### 1.    The JAMA Study

100. Despite Merck's efforts to prevent negative information about Vioxx from seeing the light of day, some continued to question Vioxx's safety profile. The concerns that Vioxx significantly increased cardiovascular risk in Vioxx users were described by Drs. Mukherjee, Nissen

and Topol in their August 2001 *Journal of the American Medical Association* ("JAMA") article. The authors specifically highlighted the dangerous cardiovascular adverse event profile of COX-2 inhibitors, particularly Vioxx.

101.    In August 2001, Merck again publicly denied the validity of the adverse cardiovascular results of the VIGOR study, while persistently touting the gastrointestinal safety profile demonstrated by VIGOR. In two press releases, Merck attempted to refute the Mukherjee study, and repeatedly stated: "Merck stands behind the cardiovascular safety profile of Vioxx." Merck indicated in its August 21, 2001 press release:

> . . . Merck believes that extensive cardiovascular data already exist on Vioxx and that these data — which were not incorporated into the Cleveland Clinic's analysis – suggest that there is no increase in the risk of cardiovascular events as a result of treatment with Vioxx.

102.    The day before the Mukherjee JAMA article was published, Merck stated in a Bloomberg News piece: "We have additional data beyond what [Topol and the Cleveland Clinic study] cite, and the findings are very, very reassuring. . . . Vioxx does not result in any increase in cardiovascular events compared to placebo."

103.    The August 2001 JAMA published a peer-reviewed human epidemiological study by the Cleveland Clinic Foundation, Cleveland, Ohio, Dr. D. Mukherjee, et al. (the "JAMA Study"). The JAMA Study demonstrated that Merck had concealed the relative risk of developing a "confirmed adjudicated thrombotic cardiovascular event" (defined in the article as "myocardial infarction, unstable angina, cardiac thrombus, resuscitated cardiac arrest, sudden or unexplained death, i schemic s troke, a nd t ransient i schemic a ttacks") a mong Vioxx users in Merck's trials, including VIGOR. The VIGOR trial, at 95% confidence interval, ranged from 2.2 for event-free

30

survival analysis, 2.35 compared to naproxen users, and a 4.89 for developing serious cardiovascular events among aspirin-indicated patients.  *See* Mukherjee, D., et al., *Risk of Cardiovascular Events Associated with Selective COX-2 Inhibitors*, JAMA, 286.8. 954-959, August 22/29, 2001.  The myocardial infarction rates for Vioxx users compared to placebo revealed a statistical increase among Vioxx users.

104.    In the JAMA Study, the authors stated that "by decreasing PGI 2 production [Vioxx] may tip the natural balance between prothrombotic thromboxane A2 and antithrombotic PGI 2, potentially leading to an increase in thrombotic cardiovascular events."  *Id.* at 957.

105.    On August 23, 2001, the day after the JAMA article was published, Merck stated in another press release:  "The Company stands behind the overall … cardiovascular safety profile of Vioxx."

106.    Merck asked the Cleveland Clinic to run a rebuttal to this article.  When it refused, Merck sent "Dear Doctor" letters to thousands of physicians nationwide that "strongly supported the cardiovascular safety profile" of Vioxx.  Merck also sent "Dear Patient" letters to thousands of consumers nationwide (identified from a prescription database) wherein it specifically minimized the risk of "heart attacks and strokes" and emphasized that Vioxx was "innovative, effective and safe."

2.    **The Advantage Study**

107.    In 1 999, M erck's m arketing department commissioned its own 12 week clinical t rial, a s a p romotional t ool, t o s how t hat V ioxx c aused f ewer s tomach problems than naproxen. This trial, called Advantage, also revealed a link between Vioxx and an increased risk of heart attacks and stroke.  Faced with yet another threat to Vioxx's commercial success, senior Merck

officials pressured their own researchers to change the trial results, so as to avoid concerns over the adverse cardiovascular effects of Vioxx.

108.    Merck intentionally distorted and omitted data from the Advantage study so that it could continue marketing and selling Vioxx without an FDA warning regarding its known cardiovascular risks.  Any such warning would have made Vioxx far less commercially attractive when compared to its closest competitor, Celebrex, which does not list heart risks on its label.

109.    In October 2003, more than three years after the study's completion, Merck reported the results of the flawed Advantage study in the *Annals of Internal Medicine*.  Although the report stated that five patients taking Vioxx had suffered heart attacks, the report failed to mention three additional heart-related deaths.

### 3.    The Kaiser Permanente Study

110.    In August of 2004, Dr. David Graham, Associate Director for Science, Office of Drug Safety, FDA Center for Drug Evaluation and Research, together with Dr. Wayne Ray and co-authors, presented an observational study at an international medical meeting, which evaluated the rate of cardiovascular events in patients taking Vioxx versus Celebrex versus non-selective NSAIDs.  This analysis was a retrospective study of the Kaiser Permanente database and was funded by the FDA.  The results of this study were published in February 2004 in *The Lancet*.

111.    On August 25, 2004, Dr. Graham reported that based on his study, Vioxx increased the chance of heart attacks in patients. This was the result of a retrospective study in which Dr. Graham and a team of researchers reviewed the medical records for approximately 1.4 million patients belonging to Kaiser-Permanente California HMO.  Of these patients, 27,000 were taking

Vioxx, and 40,000 were taking Celebrex.  Other patients were taking other NSAIDs such as aspirin, ibuprofen and naproxen.

112.    Dr. Graham studied the cardiovascular risks of Vioxx in his review. According to Dr. Graham's findings, which were reported at the international conference in Bordeaux, France:

   a. Patients taking over 25 mg of Vioxx daily had a three-fold risk of suffering a heart attack or sudden cardiac death;

   b. Patients taking lower doses of Vioxx were more likely to suffer serious cardiac problems compared to those taking Celebrex and other NSAIDs;

   c. Naproxen increased the risk of serious cardiac events by 18%; and

   d. Celebrex and ibuprofen had no effect on the risk of serious cardiac events.

113.    In fact, Dr. Graham and his collaborators linked Vioxx to more than 27,000 heart attacks or sudden cardiac deaths nationwide from the time it was introduced on the market in 1999 through 2003.

114.    Shortly after the Graham-Ray study was presented at the international medical meeting, Merck issued a press release that it: "strongly disagrees with the conclusions of the observational analysis presented at the international medical meeting:  Merck stands behind the efficacy, overall safety and cardiovascular safety of Vioxx."

115.    Despite Merck's strenuous objections to the findings published from the Kaiser Permanente study, asserting that it was not definitive because it was not a full-blown clinical

trial, one month later, Merck did an "about face" when its own clinical trial largely confirmed the results of Dr. Graham's study.

116.   In the interim, Merck had failed to conduct a planned study to directly investigate Vioxx's cardiovascular toxicity, but instead chose to collect cardiovascular event data from studies designed for other purposes.  In particular, Merck collected information about adverse events from trials to support applications to the FDA to expand the approved uses of Vioxx including the study that ultimately and belatedly caused the drug to be withdrawn.

### 4.   The APPROVe Study

117.   The Adenomatous Polyp Prevention on Vioxx ("APPROVe") Study was a multi-center, randomized, placebo-controlled study investigating the effects of Vioxx on the recurrence of neoplastic large bowel polyps in 2600 patients with a previous history of colorectal adenoma.  Commencing in 2000, the APPROVe trial studied these 2,600 patients to evaluate whether Vioxx 25 mg doses prevented the recurrence of colorectal polyps in patients with a history of colorectal adenomas. The primary purpose of the study was to add another indication for the use of Vioxx and thereby increase the market potential of Vioxx for previously unapproved uses. However, during the trial, Merck collected data concerning adverse events experienced by the subjects.  As in other clinical trials, high-risk patients were intentionally excluded, which weakened the ability to detect significant differences in cardiovascular event rates.

118.   In mid-September 2004, APPROVe was halted suddenly when the data showed that Vioxx caused a marked increase in the risk of heart attacks and strokes. In fact, patients taking Vioxx had double the risk of heart attacks as compared to patients taking placebo. APPROVe

revealed 15 cases of heart attack, stroke or blood clots over one year for Vioxx users as compared to 7.5 cases per year for those on placebo.

119.    Merck has claimed since the release of the APPROVe results in September, 2004, that the risk of heart attack and stroke did not appear until after subjects had taken Vioxx for more than 18 months, based on so-called "adjudicated" events.  However, Merck has concealed from the public its internal analysis of "investigator reported" cardiovascular events, which showed that the Vioxx rate exceeded placebo throughout the entire period of the study.  Furthermore, Merck has concealed its internal analysis of such events showing a statistically significant increased risk for Vioxx versus placebo in the 0 to 18 month segment as well as the 19 to 36 month segment of the study.  In a graph of the "Kaplan-Meier cumulative rate curves" for Vioxx versus placebo, the Vioxx curve begins to exceed the placebo curve at approximately 2 to 3 months, and separates from the placebo incidence curve by an increasing margin for the remainder of the 36 month study.  Merck's concealment of this data has been willful, intentional, deliberate, and designed to minimize its potential liability to Plaintiffs and the public.

L.    **Merck's Belated Withdrawal of Vioxx**

120.    On September 30, 2004, the Center for Drug Evaluation and Research of the FDA issued a Memorandum concluding that Vioxx has adverse cardiovascular effects, which were evident long before Merck's withdrawal of the drug:

> Rofecoxib [Vioxx] increases the risk of serious coronary heart disease defined as acute myocardial infarction and sudden cardiac death . . . The observation of an increased risk was first noted with the VIGOR trial, where a 5-fold difference in risk was found between high-dose rofecoxib and naproxen.  The manufacturer attributed this difference to a never before recognized protective effect of naproxen.  To explain a 5-fold difference, naproxen would have had to be one of the most potent and effective cardio-protectants known.  Three cohort

35

studies and the present nested case-control study found no evidence of cardio-protection with naproxen. The three case-control studies that reported a protective effect were misleading. When analyzed in a manner comparable to the present study, no protective effect is shown.2

121.    On that same day, September 30, 2004, Merck issued a press release announcing the withdrawal of Vioxx based on "new" data indicating an increased risk of cardiovascular events, such as heart attack and stroke for those taking the drug eighteen months or longer.3   The decision came after the Data Safety Monitoring Board for the APPROVe trial recommended that the study be stopped early for safety reasons based on the first three years of results.4

122.    However, the totality of information available to Merck suggests that Vioxx should have been taken off of the market years before Merck's recall.  In fact, an article in *The Lancet*, a respected British medical journal, pointed out that the "voluntary withdrawal of rofecoxib by its manufacturer, Merck, on the basis of a fairly small trial that was designed for a different purpose raises several questions."5 The critical question is why Merck waited so long to pull from the market a drug that it knew was associated with an unacceptably high risk of adverse cardiovascular and cerebrovascular events, such as heart attack and stroke.

---

2 David J. Graham, MD, MPII, Associate Director for Science, Office of Drug Safety, Center for Drug Evaluation and Research, FDA, *Risk of Acute Myocardial Infarction and Sudden Cardiac Death in Patients Treated with COX-2 Selective and Non-selective NSAIDs* 13 (Sept. 30, 2004).
3 Merck, Merck Announces Voluntary Withdrawal of Vioxx, available at http://www.Vioxx.con/Vioxx/documents/english/Vioxx_press_release.pdf (accessed Nov. 5, 2004).
4 FDA, *FDA Public Health Advisory: Safety of Vioxx*, available at http:/www.fda.gov/cder/drug/infopage/Vioxx/PHA_Vioxx.htm (accessed Nov. 5, 2004).
5 Peter Juni, et al., *The Lancet*, "Risk of Cardiovascular Events and Rofecoxib: Cumulative Meta-Analysis 4" (Nov. 5, 2004).

123.  *The Lancet* set out to find its own answers by conducting a meta-analysis of randomized controlled trials and observational studies.  It concluded that:

> Our cumulative meta-analysis of randomized controlled trials indicates that an increased risk of myocardial infarction was evident from 2000 onwards.  At the end of 2000, the effect was both substantial and unlikely to be a chance finding.  We found an increased risk of myocardial infarction in trials of both short and long duration, which is in contrast to the unpublished results from the APPROVe trial . . .
>
> [T]he reassuring statement by Merck, that there is no excess risk in the first 18 months, is not supported by our data. . . . [D]ata from these studies indicate that if a protective effect of naproxen exists, it is . . . not large enough to explain the findings of VIGOR.  By contrast to our findings, two earlier meta-analyses from Merck Research Laboratories showed no evidence of a rise in cardiovascular risk o r a n i ncrease i n r isk t hat w as r estricted t o t rials comparing rofecoxib with naproxen . . .
>
> To clarify the reasons behind the misleading results of Merck's meta-analysis of cardiovascular events in clinical trials of rofecoxib will be important . . . if Merck's statement in their recent press release that 'given the availability of alternate therapies, and the questions raised by the data, we concluded that a voluntary withdrawal is the responsible course to take' was appropriate in September, 2004, then **the same statement could and should have been made several years earlier, when the data summarized here first became available.  I nstead, M erck c ontinued t o m arket t he safety of rofecoxib.**6

124.  In early 2005, Dr. Levesque and her colleagues at McGill University published their study in the online edition of the *Annals of Internal Medicine*, to be followed by the print edition in April 2005.  The McGill University study examined pharmacy prescriptions and cardiovascular adverse events among users of Vioxx and other pain medications in a large population of more than 100,000 elderly persons (mean age of 75; 55 years at entry).

125.    Dr. Levesque reported that there were 5 times as many Vioxx-exposed case patients with MIs as reported by Dr. Juni in his study, and that Vioxx users had a significantly higher relative risk for MIs as compared to other NSAID users.  The large size of the Levesque study database increases the reliability of the analysis, and these results provide strong, confirmatory evidence that the use of Vioxx is associated with an increased risk for an acute MI.  The magnitude of the risk observed for users of Vioxx was even higher for individuals prescribed a dosage greater than 25 mg per day.  However, even the patients who took lower doses of Vioxx had an elevated risk of a cardiovascular event.  Further, Dr. Levesque wrote that, "[w]e have also shown that the cardio toxic effect of Rofecoxib previously observed in older and sicker populations extends to a healthier elderly population."

126.    According to Dr. Levesque, "the totality of the current evidence confirms the increased cardiovascular risk associated with Rofecoxib and the sagacity of its withdrawal."  These results were consistent with the results of the VIGOR study and the APPROVe results, as well as the studies of Ray (2002), and Graham and Ray (2005).

127.    In November 2004, the United States Senate Finance Committee held hearings on Vioxx and related drugs approved by the FDA and then withdrawn because of significant health risks.  Dr. David Graham testified about his experience with Vioxx:

> Graham: "Prior to approval of Vioxx a study that was performed by Merck, named 090, which found a nearly seven-fold increase in heart attack risks with low-dose Vioxx.  The labeling at approval said nothing about these heart attack risks. In November 2000, another Merck trial named VIGOR found a five-fold increase in heart attack risk with the high-dose form Vioxx.

---

[6] Peter Juni, et al., *The Lancet*, "Risk of Cardiovascular Events and Rofecoxib: Cumulative Meta-Analysis 5-7" (Nov. 5, 2004) (emphasis supplied).

About 18 months after the VIGOR results were published, FDA made a labeling change about heart attack risk. But it did not place this in the "Warnings" section of the labeling. Also, it did not ban the high dose formulation and its use.

I believe such ban should have been implemented.

* * *

In March 2004, another epidemiology study reported that those high- and low-dose Vioxx increased heart attack risks compared to CELEBREX, Vioxx's leading competitor. Our study found similar results.

A study report describing our work was put on the FDA website. This report estimated that nearly 28,000 excess cases of heart attack and sudden cardiac deaths have been caused by Vioxx.

I must emphasize to the committee that this is an extremely conservative estimate.

FDA always claims that randomized clinical trials provide the best data.

If you apply the risk level seen in the two Merck clinical trials, VIGOR and APPROVe, you obtain a more realistic and likely range estimates for the number of excess cases.

This estimate ranges from 88,000 to 139,000 Americans. Of these, 30 to 40% probably died; for the survivors, their lives were changed forever.

This range does not depend at all on the data from our Kaiser-FDA study. Indeed, Dr. Eric Topol at the Cleveland Clinic recently estimated 160,000 cases in the article that was published in the New England Journal of Medicine."

128.    In February 2005, a 32-member FDA Advisory Panel conducted hearings to determine whether or not COX-2 inhibitors should be made available to the public and, if so, on what terms. The Panel criticized the label changes made by Merck in 2002, which the Panel deemed insufficient to warn the public about the cardiovascular risks of Vioxx use.

39

129.     During the Panel hearings, the senior director of Merck Research Laboratories, Dr. Ned Braunstein, tried to portray Vioxx's dangerous effects as a class effect of all COX-2 inhibitors.  This attempt to characterize the dangers of Vioxx as a class effect represents a critical admission of the risk of Vioxx use that directly contradicts Merck's prior statements and omissions about the safety and the unique characteristics of its product.

130.     At the conclusion of the hearings, the members of the Advisory Panel, a third of whom had worked for Merck in the past, voted by the narrowest of margins (17-15) to recommend that Vioxx be allowed to return to the market, with severe limitations on use.  If the panelists who had not previously worked for a pharmaceutical company had not voted, Vioxx would have been prevented from returning to the market by a margin of 14-8.  To date, the FDA has not accepted the Panel's recommendations.

131.     Merck publicly acknowledged on its website that it is responsible to reimburse patients for their unused portions of Vioxx.  To this end, Merck has instituted a reimbursement program that is fundamentally flawed, does not fully and effectively reimburse End-Payors, and does not make them whole.

**M.     Merck's Continued Fraudulent Marketing Campaign Caused Active Concealment of Vioxx' Deficiencies and Inflated Payments by End-Payors for Vioxx.**

132.     As a result of Merck's claims, Plaintiff purchased and/or paid for Vioxx even though, at $72 for a monthly supply (in 1999), Vioxx was much more expensive than other NSAIDs, which sold for $9 or less for the same month's supply.

133.     To justify the disparity of Vioxx's pricing as compared to other NSAIDs and to ensure that physicians would prescribe and that End-Payors would purchase and pay for the drug,

Merck misrepresented the safety and efficacy of Vioxx and omitted, concealed, and suppressed the risks, dangers, and disadvantages of the drug. Consequently, Vioxx captured a large market share of anti-inflammatory drugs prescribed for and used by patients. In 2000 alone, sales of Vioxx exceeded $2 billion, which represented 23% of the total NSAIDs market, despite the significantly higher cost of Vioxx as compared to other pain relievers in the same family of drugs.

134.     Merck's deceptive and misleading marketing campaign concealed, omitted, and suppressed material and important information, and resulted in inflated payments by consumers and third party payors, such as Plaintiff, for, in whole or in part, the costs of Vioxx. Millions of End-Payors, including consumers and third party payors, have already paid for, and/or purchased and consumed Vioxx at prices based on the proposed wholesale price, which was about one hundred times the cost of a generic aspirin. These End-Payors paid more than they would have or should have because Vioxx was promoted and advertised as a premium drug with reduced side effects for the purpose of deceiving consumers and end-payors about Vioxx's adverse cardiovascular and cerebrovascular effects.

135.     In fact, the economic effects of being required by the FDA to disclose the side effects and cardiovascular risks of Vioxx were known to Merck. In its internal documents, Merck calculated and included the expected losses in Vioxx sales and market share that could be anticipated to result when Merck would be required to include the risks in the Vioxx label. The projections estimated, at least, a $229 million loss in sales in 2002 and a loss in market share of, at least, 10 to 20 percent. Merck continued its game of deception well into 2004, finally withdrawing Vioxx from the market on September 30, 2004, years after it knew of, but omitted, suppressed, and concealed the increased serious health risks associated with Vioxx use.

41

## **FRAUDULENT CONCEALMENT**

136.    At all times pertinent hereto, Merck affirmatively and fraudulently concealed its unlawful conduct from Plaintiff.

137.    Plaintiff did not discover, and could not discover through the exercise of reasonable diligence, that Merck had unlawfully concealed, omitted, and suppressed the serious adverse effects of Vioxx until September 30, 2004, when Merck withdrew Vioxx from the market. Merck conducted its unlawful activities in secret, concealed the nature of its unlawful conduct, and attempted to confine information concerning the adverse effects of Vioxx.  Merck attempted to withhold such information from Plaintiff, the medical community, regulators and the public.  Merck fraudulently concealed its activities through various means and methods designed to avoid detection.

138.    Plaintiff could not have discovered Merck's unlawful conduct at an earlier date through the exercise of reasonable diligence because Merck actively and purposefully concealed its unlawful activities.

139.    Merck engaged in a successful, illegal fraud on consumers, third party payors and the general public, by which it deliberately and affirmatively concealed material information on the risks, dangers, defects, and disadvantages of Vioxx, in at least the following respects:

> a.    By failing to disclose adverse effects of Vioxx to Plaintiff, the medical community, regulators, and the public;
>
> b.    By failing to warn Plaintiff, the medical community, regulators, and the public of those adverse effects;
>
> c.    By agreements among senior Merck officials in meetings and in communications not to discuss publicly, or otherwise reveal, the totality of

the adverse effects caused by Vioxx, Merck's concealment of those adverse effects, and the nature and substance of other acts and communications in furtherance of Merck's illegal scheme; and

d.      By giving false and pretextual reasons for the existence of apparent adverse effects in studies of Vioxx, including, for example, by claiming that naproxen's cardioprotective effect was responsible for a noted increase in cardiovascular events in the VIGOR study in Vioxx versus naproxen patients, when, in fact, Vioxx was the cause of the reported increased incidence of cardiovascular effects.

140.    As a result of Merck's fraudulent concealment, Plaintiff purchased and/or paid for Vioxx and could not reasonably have discovered Merck's misconduct regarding Vioxx prior to September 30, 2004. Plaintiff therefore assert the tolling of any applicable statute of limitations affecting the rights of action of Plaintiff.

141.    Had the Defendant disclosed the risks and dangers associated with Vioxx, Plaintiffs' plan members and/or insureds would not have taken Vioxx or been subject to its catastrophic side effects. Moreover, Plaintiff would not have paid substantial sums for its plan members/insureds' Vioxx prescriptions or still more substantial sums for the medical expenses incurred due to those plan members/insureds' Vioxx-related injuries.

142.    On information and belief, as a result of the manufacturing, marketing, selling and distributing of Vioxx, the Defendant has reaped billions of dollars in profits at the expense of the health of individuals, including Plaintiffs' plan members/insureds.

## PLAINTIFF WAS DAMAGED BY THE DEFENDANT'S WRONGFUL CONDUCT

143.    The Defendant falsely and deceptively misrepresented or omitted a number of material facts concerning Vioxx, including, but not limited to, adverse health effects caused by Vioxx including the frequency, severity and rapid development of these adverse events.

144.    Furthermore, through, among other things, its advertising campaigns, misleading communications with a nd c oncealment o f i nformation f rom t he F DA, t he m edical community and the public, and despite its knowledge that Vioxx was dangerous, the Defendant continued to vigorously promote and advertise Vioxx.

145.    While Vioxx was on the U.S. Market, Plaintiff paid a substantial amount of money for the cost of filling Vioxx prescriptions for its plan members/insureds; additionally, Plaintiff incurred medical expenses resulting from injuries sustained by its plan members/insureds due to Vioxx use.

146.    The Defendant knew or should have known that Vioxx created significant risks of serious injuries, including damage to the heart, cardiovascular system, and other organs.  The Defendant failed to make proper, reasonable, timely or adequate warnings about the risks associated with the use of Vioxx.

147.    By way of its wrongful misconduct, the Defendant intended to supply and did supply Vioxx to consumers, including Plaintiffs' plan members/insureds, that was unreasonably dangerous and in certain instances, deadly.

148.    As a result of the Defendant's fraudulent concealment, the applicable statutes of limitations have been tolled as to all of Plaintiffs' claims.

44

149.    As a result of the manufacture, distribution, delivery and sale of the Defendant's p roducts t o P laintiffs' p lan m embers/insureds, d irectly or through its subsidiaries, affiliates or agents, the Defendant obtained the benefits of the laws of the State of Louisiana for its products.

## CAUSES OF ACTION

## COUNT I:  SUBROGATION

150.    Plaintiff re-alleges and incorporates all preceding paragraphs of this Complaint as if fully set forth here, and further alleges as follows:

151.    Plaintiff brings the following cause of action under theories of contractual and/or equitable subrogation.

152.    Throughout the relevant period, the Plaintiff provided a full spectrum of health benefit products, including but not limited to managed care products, third-party administration services, and indemnity products, to both groups and individuals, on both an insured and an employer funded basis.  Each of these products was provided to members who have been injured by the Defendant's drug, Vioxx.

153.    The damages sustained by the Plaintiff include, but are not limited to, damages for all benefits paid or provided to plan members or insureds, said damages being incurred as a result of the plan member or insured being injured by or seeking treatment, including diagnostic care,  as a proximate result of the use of the drug, Vioxx.

154.    The Plaintiff provided these and other benefits to its insureds and plan members n ot a s a v olunteer, b ut, p ursuant t o i ts o bligations u nder t he contractual agreements

specifying the respective rights and obligations of the Plaintiff and its plan members and/or insureds.

These agreements specifically grant Plaintiff broad subrogation and reimbursement rights.

## COUNT II: REDHIBITION

155.    Plaintiff re-alleges and incorporates all preceding paragraphs of this Complaint as if fully set forth here, and further alleges as follows:

156.    At all times pertinent herein, the Defendant marketed, sold, and distributed Vioxx for use by consumers, including Plaintiff and its plan members/insureds.

157.    The Defendant is liable to Plaintiff under the Louisiana law of Redhibition because, at the time it manufactured Vioxx and sold Vioxx to Plaintiff and its plan members/insureds, Vioxx contained redhibitory defects, and the Defendant knew or, alternatively, should have known, of such redhibitory defects and failed to disclose and/or concealed such defects.

158.    Had Plaintiff and/or its plan members/insureds known of such redhibitory defects, they would not have purchased Vioxx, nor would Plaintiff have approved and paid for such purchases.

159.    Had Plaintiff known of such redhibitory defects, Plaintiff would not have paid for Vioxx use by its plan members/insureds.

160.    Under the Louisiana laws of Redhibition, the Defendant is liable to Plaintiff for a return of the purchase price, including interest, all expenses occasioned by the sale, all damages sustained by Plaintiff, as well as costs, penalties, and reasonable attorneys' fees.

## COUNT III:  STRICT LIABILITY AND FAILURE TO WARN

161.    Petitioners re-allege and incorporate all preceding paragraphs of this Petition as if fully set forth here, and further alleges as follows:

46

162.     The drug Vioxx is an unreasonably dangerous product as defined by Louisiana Revised Statute 9:2800.1 *et seq.* (the Louisiana Products Liability Act) and the defendant manufacturer is liable for all injuries proximately caused thereby.

163.     The drug Vioxx was defective at the time of its manufacture, development, production, testing, inspection, endorsement, prescription, sale and distribution, in that, and not by way of limitation, said product and its warnings, instructions and directions failed to warn of the dangerous propensities of Vioxx, which risks were known or reasonably scientifically knowable to the Defendant. The Defendant knew or should have known of the defective condition, characteristics and risks associated with Vioxx, as previously set forth herein.

164.     At all times herein mentioned, the aforementioned product was defective, and the Defendant knew that the product was to be ingested by the user without inspection for defects therein. Moreover, Plaintiffs and its plan members/insureds neither knew, nor had reason to know at the time of the use of the subject product, of the existence of the aforementioned defects.

165.     As a result of the defective condition of the aforementioned product, Petitioners are entitled to all the damages as alleged herein.

### COUNT IV: BREACH OF EXPRESS WARRANTY

166.     Plaintiff re-alleges and incorporates all preceding paragraphs of this Complaint as if fully set forth here, and further alleges as follows:

167.     The drug Vioxx is an unreasonably dangerous product as defined by Louisiana Revised Statute 9:2800.51 et seq. (the Louisiana Products Liability Act), and the defendant manufacturer is liable for all injuries proximately caused thereby.

168.    At all times herein mentioned, the Defendant expressly warranted to Plaintiff and its plan members/insureds, and their agents and physicians, by and through statements made by the Defendant or their authorized agents or sales representatives, orally and in publications, package inserts and other written materials intended for physicians, medical patients and the general public, that the aforementioned product was safe, effective, fit and proper for its intended use.

169.    In purchasing, paying for, and/or utilizing the aforementioned product, Plaintiff, its plan members/insureds, and their agents and physicians relied upon the skill, judgment, representations and foregoing express warranties of the Defendant.   Said warranties and representations were false in that the aforementioned product was not safe and was unfit for the use for which it was intended.

170.    As a result of the foregoing breach of express warranties by the Defendant, Plaintiff suffered damages as alleged herein.

### COUNT V:  BREACH OF IMPLIED WARRANTY

171.    Plaintiff re-alleges and incorporates all preceding paragraphs of this Complaint as if fully set forth here, and further alleges as follows:

172.    The drug Vioxx is an unreasonably dangerous product as defined by Louisiana Revised Statute 9:2800.51 et seq. (the Louisiana Products Liability Act) and the defendant manufacturer is liable for all injuries proximately caused thereby.

173.    At all times pertinent herein, the Defendant marketed, sold, and distributed Vioxx for use by consumers, such as Plaintiff's plan members/insureds, and the Defendant knew of the use for which Vioxx was intended and impliedly warranted Vioxx to be of merchantable quality and safe and fit for its intended use.

48

174.    Plaintiff and its plan members/insureds were and are unskilled in the research, design and manufacture of the aforementioned product and reasonably relied entirely on the skill, judgment and implied warranty of the Defendant in using, purchasing, and/or paying for the aforementioned product.

175.    Contrary to such implied warranty, Vioxx was not of merchantable quality or safe and fit for its intended use, because Vioxx was unreasonably dangerous and unfit for the ordinary purposes for which it was used as described herein.

176.    As the proximate result of the Defendant's breach of implied warranty, Plaintiff has sustained damages as described herein.

## COUNT VI:  VIOLATIONS OF THE LOUISIANA UNFAIR TRADE PRACTICES ACT

177.    Plaintiff re-alleges and incorporates all preceding paragraphs of this Complaint as if fully set forth herein, and further allege as follows:

178.    The acts committed by the Defendant as alleged herein violate the provisions of the Louisiana Unfair Trade Practices Act ("LUTPA"), La. Rev. Stat. Ann. § 51:1401, et seq. Each of the previously described acts by the Defendant were "unlawful" in that they were "unfair methods of competition and[/or] unfair or deceptive acts or practices in the conduct of [Defendant's] trade or commerce," as prohibited by La. Rev. Stat. Ann. § 51:1405.

179.    As a direct and proximate result of the Defendant's wrongful conduct in violation of LUTPA, Petitioners have sustained financial losses in amounts as will be established at the trial of this matter, which amounts Petitioners are entitled to recover from the Defendant. Plaintiff, which, due to the Defendant's unlawful conduct in violation of LUTPA, spent substantial sums to purchase Vioxx for persons covered under its plans and/or policies and to pay for medical

49

services for such persons injured by Vioxx, are entitled to all remedies afforded under La. Rev. Stat. Ann. §51:1409, including actual damages, reasonable attorney's fees, and costs. Finally, Plaintiff seeks any and all other and further remedies to which it is entitled under LUTPA.

## COUNT VII:   OTHER STATE LAW THEORIES OF RECOVERY

180.    Plaintiff re-alleges and incorporates all preceding paragraphs of this Complaint as if fully set forth here, and further alleges as follows:

181.    At all times herein mentioned, the Defendant owed a duty to Plaintiff a duty to properly manufacture, design, formulate, compound, test, produce, process, assemble, inspect, research, distribute, market, label, package, prepare for use, sell, prescribe and adequately warn of the risks and dangers of the aforementioned product.

182.    At all times herein mentioned, the Defendant negligently and carelessly manufactured, designed, formulated, compounded, produced, processed, assembled, inspected, distributed, marketed, labeled, packaged, prepared for use and sold the aforementioned product and failed to adequately test and warn of the risk and dangers of the aforementioned product.

183.    The Defendant impliedly and/or expressly represented to Plaintiff that the drug Vioxx, which it manufactured, distributed and/or sold was safe for use and would not cause the adverse health effects described herein. Despite the Defendant's knowledge to the contrary, the Defendant misrepresented to Plaintiff that Vioxx was safe and/or concealed its unsafe propensities from Plaintiff. Plaintiff relied upon these misrepresentations to its detriment by placing Vioxx on its drug formulary and by paying for and/or reimbursing its plan members/insureds' Vioxx prescriptions.

184.    As a result of said negligence, carelessness, and misrepresentations of the Defendant, Plaintiff has suffered damages as alleged herein.

### COUNT VIII:  UNJUST ENRICHMENT

185.    Plaintiff re-alleges and incorporates all preceding paragraphs of this Petition as if fully set forth here, and further alleges as follows:

186.    The Defendant has been enriched from the selling and manufacturing of a defective product, and Plaintiff has been correspondingly impoverished by purchasing or paying for the defective product.  There is no justification or cause for Defendants' enrichment or Plaintiff's resulting impoverishment.

187.    Defendants' enrichment at the expense or impoverishment of Plaintiff is inequitable.  Although Plaintiff has alleged that it enjoys remedies at law against Defendant, to the extent that Plaintiff does not enjoy a remedy at law, Defendant should be made to return all sums unjustly obtained from Plaintiff.

188.    Plaintiff demands that Merck & Co., Inc. return all such monies acquired from Plaintiff through the selling of Vioxx.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays as follows:

1.    That the unlawful conduct alleged herein be adjudged and decreed to be unlawful and unfair methods of competition and/or unfair and  deceptive acts or practices committed by the Defendant as prohibited by La. Rev. Stat. Ann. §51:1405;

2.    That, pursuant to LUTPA, the Defendant be found liable to Plaintiff for all remedies available to Plaintiff under La. Rev. Stat. Ann. §51:1409, including

51

actual damages, reasonable attorney's fees, and costs;

3.  That Petitioners be granted all damages to which they are reasonably entitled, including, but not limited to, the return of the purchase price paid by Plaintiff for Vioxx prescriptions, reimbursement of all sums paid by Plaintiff for medical services for the treatment of persons injured by Vioxx, attorney's fees to the full extent recoverable, all costs, and legal interest from the date of judicial demand until paid, due to Vioxx's redhibitory defects, the Defendant's failure to warn, the Defendant's breach of express and/or implied warranties, the Defendant's deceptive and unfair trade practices, the Defendant's negligence, the Defendant's misrepresentations, and/or the Defendant's unjust enrichment.

4.  Petitioners further pray for any and all such other, further and, different relief as the nature of the case may require or as may be deemed just and proper by this Court, including, but not limited to, the recovery of all costs of this suit, judicial interest, and attorney's fees to the fullest extent recoverable by law.

5.  Petitioners pray that all deposition and travel expenses be taxed as costs.

Respectfully submitted, this 30ᵗʰ day of _January_, 2006,

**DUGAN & BROWNE, APLC**

_____

**James R. Dugan, II, T.A.** (LSBA No. 24785)
**David L. Browne** (LSBA No. 20729)
**Douglas R. Plymale** (LSBA No. 28409)
650 Poydras Street
Suite 2150
Telephone:      (504) 648-0180
Facsimile:      (504) 648-0181

**Charles A. O'Brian** (LSBA No. 10143)
BlueCross BlueShield of Louisiana
5525 Reitz Ave.
P.O. Box 98029
Baton Rouge, Louisiana 80809
Telephone:      (225) 295-2454
Facsimile:      (225) 297-2760

**Taylor Townsend** (LSBA No. 20021)
Kelly Townsend & Thomas
137 St. Denis Street
P.O. Box 756
Natchitoches, Louisiana. 71457
Telephone:  (318) 352-2353
Facsimile:  (318) 352-8918

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Plaintiff, Louisiana Health Indemnity Company d/b/a BlueCross/BlueShield of Louisiana's, First Supplemental and Amended Complaint has been served upon all parties by U.S. Mail and e-mail or by hand-delivery and e-mail, or by e-mail on all parties by electronically uploading same to Lexis/Nexis File & Serve Advance in accordance with Pre-Trial Order No. 8, this 30th day of _January_____, 2006

53