UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| Evelyn Irvin Plunkett v. Merck & Co, Inc. | * | CASE NO. 02:05CV4046 |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO EXCLUDE
PROPOSED TESTIMONY OF
MICHAEL ALAN GRAHAM, M.D.**

Plaintiff Evelyn Irvin Plunkett, as Personal Representative of the Estate of Richard Irvin, Jr., deceased, by and through her undersigned counsel, hereby responds in opposition to Merck's Motion to Exclude the Proposed Testimony of Michael Alan Graham, M.D. For the reasons set out below, Merck's motion is due to be denied.

I.   **LEGAL STANDARD**

Defendant has requested this Court conduct a hearing, pursuant to <u>Daubert v. Merrill Dow Pharmaceuticals</u>, 509 U.S. 579 (1993), and <u>Kumho Tire v. Carmichael</u>, 119 S. Ct. 1167 (1999), to establish the reliability of expert testimony the PSC intends to offer at trial in the areas of pathology and cardiac pathology. Rule 702 of the *Federal Rules of Evidence* permits the admission of expert testimony where scientific, technical, or other specialized knowledge will assist the trier of fact. Unlike an ordinary lay witness, an expert witness is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation. See Rules 702 and 703. <u>Daubert</u>, 509 U.S. at 592. In its role as "gatekeeper," the District Court has

___ Fee_____
___ Process_____
_X_ Dktd_____
_√_ CtRmDep_____
___ Doc. No._____

wide discretion to decide whether an expert's testimony is reliable enough to be admitted. Id. at 592. The Court must determine the reliability of expert testimony in light of the facts and circumstances of each particular case. Kumho Tire, 119 S. Ct. at 1179. The Daubert Court never held, however, that the required assessment had to be based in whole on scientific principles that are so well-established as to be considered scientific law. Daubert at 592, note 11. The requirements of Rule 702 should not be read to exclude the use of unconventional evidence, but rather, it merely requires that the evidence used be reliable in nature, and allows for, but does not even require, the inclusion of methods or assumptions that are "generally accepted" in the relevant scientific community. Daubert, 509 U.S. at 597. Furthermore, the Daubert analysis is a flexible one.

The Court of Appeals for the 5th Circuit held, in Pipitone v. Biomatrix, Inc., 288 F.3d 239 (5th Cir. 2002) that:

> Many factors bear on the inquiry into the reliability of scientific and other expert testimony.[1] In Daubert, the Supreme Court offered an illustrative, but not an exhaustive, list of factors that district courts may use in evaluating the reliability of expert testimony.[2] These factors include whether the expert's theory or technique: (1) can be or has been tested; (2) has been subjected to peer review and publication;(3) has a known or potential rate of error or standards controlling its operation; and (4) is generally accepted in the relevant scientific community.[3] In the later case of Kumho Tire Co. v. Carmichael,[4] the Supreme Court emphasized that the Daubert analysis is a "flexible"one and that"the factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony."[5] The district court's responsibility is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[6]

---

1 Daubert, 509 U.S. at 593; Skidmore v. Precision Printing and Packaging, Inc., 188 F.3d 606, 617 (5th Cir. 1999); Seatrax, 200 F.3d at 372.
2 Daubert, 509 U.S. at 593.
3 Id. at 593-94; see also Moore v. Ashland Chem., Inc., 151 F.3d 269, 275 (5th Cir. 1998) (en banc).
4 526 U.S. 137 (1999).
5 Id. at 150
6 Id. at 152.

II.     **ARGUMENT**

    A.    **Dr. Graham Is Qualified To Opine As To Whether Vioxx Caused Or Substantially Contributed To Cause Dicky Irvin's Death**

    Merck would have this Court believe that a pathologist must possess the expertise, not only of that of a physician, but also of a pharmacologist, an epidemiologist and a statistician and must further review each and every peer-reviewed published epidemiological study before he should be allowed to render an opinion about cause of death in a case that involves a pharmaceutical agent. Merck specifically attacks Dr. Graham, a board-certified pathologist, for not being a pharmacologist and epidemiologist and for relying, in part, on plaintiff's other experts to address Vioxx's pharmacological mechanisms.[7] He is further criticized for not doing "research of his own" into the prothrombotic properties of Vioxx.[8] This is a standard not required by the applicable rules of evidence or precedent, and which is both unreasonable and unrealistic. To expect and require a pathologist to render an analysis on matters of statistics, epidemiology, and pharmacokinetics as a precondition of accepting his opinion on a matter of pathology is to ask, indeed, to *invite* him to extend his opinions beyond his expertise and training and thus to offer unreliable evidence to the trier of fact.

    Dr. Graham is simply employing that methodology generally employed by pathologists in determining cause of death when a drug is involved; that is, he is relying upon peer-reviewed medical literature and his 'knowledge, skill, experiences, training, or education'[9] to testify in the form of an opinion to a matter "generally accepted in the relevant scientific community."[10] The sources on which he bases his opinions have inherent indicia of reliability and thus do not

---

7 Merck & Co., Inc.'s Motion to Exclude Testimony of Michael Alan Graham, M.D. at 4 - 5.
8 Merck & Co., Inc.'s Motion to Exclude Testimony of Michael Alan Graham, M.D. at 5.
9 Federal Rules of Evidence 702
10 Daubert at 593-94.; see also Moore v. Ashland Chem., Inc., 151 F.3d 269, 275 (5th Cir. 1998) (en banc).

undercut his opinions, but rather, strengthen them. Surely a peer-reviewed medical journal is more reliable than what Merck asks for, which is essentially the untrained, untested epidemiological "research" of a pathologist. Dr. Graham is entitled to rely on generally accepted principles and information from other sources for the basis of his opinions, so long as those other sources are reliable.

Foremost amongst 'other reliable sources' is the peer-reviewed medical literature. Dr. Graham has used and relied upon the work of numerous internal Merck experts as well as external experts in the area of Cox-2 inhibition in formulating his opinions. A sampling of these articles includes: 1) Bresalier et al. stated that, "[a]s compared with the placebo group, the rofecoxib (Vioxx) group had an increased risk of *confirmed thrombotic events* (relative risk, 1.92; 95 percent confidence interval, 1.19 to 3.11)"[11] (emphasis added); 2) Bombardier et al., published ***Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis*** ("VIGOR") in the New England Journal of Medicine in 2000[12] wherein *more* patients in the rofecoxib group suffered heart attacks than those in the naproxen group; 3) Solomon et al. published ***Cardiovascular Risk Associated with Celecoxib in a Clinical Trial for Colorectal Adenoma Prevention*** in the New England Journal of Medicine in 2005,[13] and reiterated that the VIGOR trial reported a higher risk of myocardial infarction among patients receiving rofecoxib[14] 4) Garret A. Fitzgerald M.D., and Carlo Patrono, M.D., published ***The Coxibs, Selective Inhibitors of Cyclooxygenase-2***, also in the New England Journal of Medicine and wrote "…thrombosis would be expected to occur in patients who are already at increased risk

---

11 Bresalier, R.S. Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial. N Eng J Med 2005; 352: 1092-1102, at 1096.
12 Bombardier C. Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis. N Eng J Med  2000;343:1520-8.
13 Soloman, SD.  Cardiovascular risk associated with celecoxib in a clinical trial for colorectal adenoma. prevention. N Eng J med. 2005 352:1071 – 1080.
14 Id at 1077.

because of other underlying conditions" (e.g., underlying cardiovascular atherosclerosis.)[15]

Dr. Graham's knowledge of this subject is not, however, limited to the above studies/articles. Merck admits that Dr. Graham has engaged in significant research into this matter including the "review[] [of] 67 scientific medical articles, nine depositions, four expert reports and three days' worth of trial transcripts from the first trial of this case."[16] Apparently, Merck would require as a precondition for testifying in this matter that a potential expert have reviewed every piece of medical and scientific literature even tangentially referencing Cox-2 inhibiting drugs. What Merck fails to mention is that none of their "experts" would meet such a fanciful burden either.

A Lexis Nexis search reveals that 125 articles in the general lay press have been published regarding Vioxx *in the last six months* alone. A pathologist would have to be practicing on another planet for the last 5 years to not be aware of the fact that Vioxx is considered by the relevant scientific community to be a 'prothrombotic' drug associated with sudden cardiac death, cardiac thromboses and myocardial infarction and was removed from the market for causing these very disorders. To somehow expect that the average, reasonable pathologist would disregard this evidence, published in the peer-reviewed medical literature, or to demand that he personally evaluate the raw data for each and every epidemiological study, or conduct his own research into the mechanism of action of Vioxx, is ludicrous. Dr. Graham is entitled to rely upon his education, training and experience as to how to perform an autopsy and *upon what* to rely in making a determination as to cause of death.

It is informative then that the defense's own proposed pathology expert, Dr. Thomas M. Wheeler, testified that:

---

15 FitzGerald, GA and C. Patrono. The coxibs, selective inhibitors of cyclooxygenase-2. N Eng J Med. (2001) 345:433-442.
16 Merck & Co., Inc.'s Motion to Exclude Testimony of Michael Alan Graham, M.D. at 6.

> ...part of doing the autopsy is correlating the finding of the autopsy with the clinical, and **the clinical is, in large part, what the medication history is and how those might interact with what we find in autopsy.** So, if we were doing a sudden cardiac death and the patient were [sic] taking a non-steroidal, I'm sure it would come up during our discussion what role, if any, not only that particular class of drugs but any other class of drugs might have in the final terminal event.[17]

Dr. Wheeler was further questioned regarding a hypothetical patient suffering a cardiac event after ingesting cocaine, a drug whose overdosage can result in a fatal event.[18] Dr. Wheeler has personally never diagnosed a case of cocaine-induced death, but is "...generally familiar" with the medical literature on cocaine-induced death, opining that these persons "frequently die of a cardiac death."[19]

Dr. Wheeler's testimony about his ability to diagnose a cocaine related death is informative because it is analogous to the situation at hand. Dr. Graham is educated in the medical and clinical literature surrounding Vioxx. He is aware that Vioxx is a prothrombotic agent and that it was removed from the market for this very reason. He should therefore be allowed to include Vioxx as a potential contributing cause of this death. Just as Dr. Wheeler has never performed "hands on" research into cocaine, yet still felt qualified by his research, education, training and experience to diagnose a cocaine related death, Dr. Graham should be allowed to testify about the connection between Vioxx and death in this matter.

Dr. Graham is not required to possess all "background" information and data regarding Vioxx, nor must he be required to conduct research on non-steroidal anti-inflammatory medications, nor must he be required to have published on sudden cardiac death in order to render a reliable opinion as to the cause of death in this particular case. He need not be a pharmacologist but is entitled to rely upon the opinions of pharmacologists as to a drug's mechanism of action.

---

17 Dep. of Thomas M. Wheeler, MD at 16-17 (emphasis added).
18 Id. at 113.
19 Id. at 113.

He need not be an expert in clinical design or statistics to rely upon a published epidemiological study, nor must he possess the qualifications to analyze and interpret the raw clinical and epidemiological data – including the data concerning any relationship between Vioxx and cardiac events. As a pathologist he possesses every qualification required to render an opinion as to the cause of death in this case. The applicable standard does *not* require him to second guess the epidemiologists and biostatisticians or to reevaluate the raw data from the multitude of Vioxx studies which revealed an increased rate of cardiovascular events.

### B.  Short Term Usage

Merck next attacks Dr. Graham's opinion that the short-term use of Vioxx for approximately 30 days causes an imbalance between prostacyclin and thromboxane in the vasculature, and that this imbalance can result in an increased risk of cardiovascular events.[20] However, Merck's own experts do not support this farcical contention. Defense pathology expert Dr. Thomas M. Wheeler was asked at his deposition to name "any drug…recognized as…having the potential to cause a heart attack that requires 18 months of usage or longer prior to manifesting its effects" and Dr. Wheeler stated "I can't think of one as I sit here today."[21] Dr. Wheeler could think of no drug that hibernates within the body only to magically awake after 18 months to become cardiotoxic. It is of note that Dr. Wheeler failed to include drugs such as Vioxx, Celebrex and Bextra within this category of "delayed cardiotoxicty drugs."

The APPROVe study conclusively demonstrated the increased risk of sudden cardiac death conferred by Vioxx. Merck asserts that the risk was confined to persons who ingested Vioxx for more than 18 months, but this claim is based upon Merck's analysis of a subgroup of APPROVe

---

20 Merck & Co., Inc.'s Motion to Exclude Testimony of Michael Alan Graham, M.D. at 9-12.
21 Dep. of Thomas Wheeler, M.D. at 222.

patients that used Vioxx for no more than 18 months.[22] The study itself identifies that this is a "post hoc subgroup analysis."[23] Such an analysis is inherently weak and unreliable.[24] To require plaintiff's pathology expert to rely upon a form of epidemiological analysis that is universally frowned upon would take Dr. Graham into the realm of science disfavored by <u>Daubert</u> and its progeny.

Merck also cites "the study by Konstam[25], which pooled Merck's data on Vioxx from 23 controlled clinical trials encompassing more than 28,000 patients" to attack Dr. Graham's opinion regarding duration of exposure. However, despite being aware of Dr. Konstam's true opinion regarding the risk of CV events with less than 18 months exposure, Merck does not share with this Court that on January 31, 2005, Dr. Konstam wrote an email stating that "[A]nalysis of shapes of curves are laden with hazards to begin with, and **we are already going out on a limb by emphasizing the 18 month issue**." (Emphasis added). If the lead author of the aforementioned meta-analysis believes they are "going out on a limb by emphasizing the 18 month issue," how dare the defense attack an expert for holding a reasonable belief that short-term exposure may plausibly be associated with cardiovascular events?

Finally, it is of note that this issue has been argued *ad nauseum* as far back as the initial <u>Daubert</u> challenges in this matter. This Court undertook a very thorough review of the issue and held:

> The Plaintiff asserts that the Defendant's position that Vioxx only causes prothrombotic effects if ingested for 18 months or longer is scientifically unreliable because this opinion is based upon a speculative post hoc sub group analysis by Merck from the APPROVe study, flies in the face of the results from

---

22 Rule 26(2)(B) report of Plaintiff's Expert Wayne Ray, ¶ 24.
23 Bresalier, R.S., Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial. N Eng J Med 2005; 352: 1092-1102.
24 The inherent weaknesses of post hoc subgroup analyses are addressed in both the Rule 26(2)(B) report of plaintiff's epidemiology expert, Dr. Wayne Ray and within the Plaintiff's submitted Science Brief.
25 Konstam, MA et al., Cardiovascular thrombotic events in controlled, Clinical trials of rofecoxib. Circulation. (2001) 104:2280-2288.

Merck's own clinical trials and other epidemiological studies, and is wholly without any biological plausibility. In opposition, Merck claims that the APPROVe study was reliable, its opinion is supported by its own clinical trials, and its opinion is supported by substantial literature and testing.

This motion concerns the results of the APPROVe study. The Plaintiff has interpreted the data collected by the APPROVe to mean that Vioxx can cause adverse thrombotic cardiovascular events after short-term use. Her position is based on adjudicated data from the study. Merck, however, takes the position that the APPROVe study shows that Vioxx only causes adverse thrombotic cardiovascular events after long-term use. Its position is based on confirmed data.

In essence, both parties are relying on the same test. Both parties agree that the test was conducted properly. The parties are disagreeing as to the conclusions reached by the other parties. As a gatekeeper, the Court must evaluate methodology, not conclusions. The proper forum for challenging conclusions is at cross-examination, not is a Daubert Motion. Accordingly, the Plaintiff's motion to exclude testimony is denied.

Accordingly, the plaintiff believes that, in accord with this Court's previous order, such duration challenges are best addressed through vigorous cross examination and should further be preserved until trial.

C.     **Causation/Mechanism Of Action**

It is generally accepted within the scientific community that Vioxx is prothrombotic. The drug was removed from the market, worldwide, because it is prothrombotic. There can be no dispute on this matter. In fact, Dr. Fitzgerald, the scientist whom even Merck acknowledges is the expert in this area, agrees with Dr. Graham on this issue. In his paper *Coxibs and Cardiovascular Disease*, Dr. Fitzgerald states that "...a single mechanism...might...predispose patients receiving coxibs to an exaggerated thrombotic response to the rupture of an atherosclerotic plaque."[26]

Merck's own studies prove that Vioxx is prothrombotic and diminishes prostacyclin levels systemically within the body. For example, Merck references Protocol 023, but fails to inform the Court that this short term (i.e., 14 days) study in humans revealed a near immediate reduction in

---

26 FitzGerald, G., *Coxibs and Cardiovascular Disease*. New Eng. J, Med (2004) 351; 1709-1711 at 1709.

systemic (i.e., total body) production of prostacyclin without a concomitant reduction of thromboxane. Thus, Merck's own study, upon which even Merck admits Dr. Graham relies, proves unequivocally that very short term use of Vioxx causes a hypercoaguable state.

Merck also contends that there is no valid scientific basis for Dr. Graham to opine that Vioxx can cause plaque instability or rupture. Again Merck's own APPROVe study, upon which Dr. Graham admittedly relies, is the best source of information. This study was conducted by Merck's own scientists and consultants. What did Merck's paid employee's say about Dr. Graham's theory that Vioxx causes plaque rupture and instability? Merck's own study shows that Cox-2 inhibition can have several deleterious effects, including "plaque instability."[27]

Once again the issue of Vioxx's causative role was thoroughly reviewed in the prior Daubert proceedings. Both the plaintiff and Merck filed Daubert causation related motions. The Court reviewed these motions and held, "In essence, both the Plaintiff and Merck rely on the same material. They simply interpret it differently and reach contrary conclusions. The Court's role as gate-keeper is to scrutinize the methodology, not the conclusions. Accordingly, Merck's motion is denied." The current motion is a mere recitation of Merck's prior causation related motion and, accordingly, should be denied once again.

### D. Plaque Rupture

Merck claims that Dr. Graham's testimony is contrary to prior expert testimony presented in the first trial. Although Merck does not appear to base its motion upon this assertion, plaintiff feels that a short response is in order.

---

[27] Bresalier, *Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Prevention Trial*, 352: 1092-1102 at 1093 (2005)

A review of the actual expert testimony and not Merck's spin upon it is helpful. First, Dr. Graham testified in this deposition as follows:

> A.  Well, now let me go back. I don't think the slides actually show the rupture, but I think there has been a rupture.
>
> Q.  All right. So your opinion is that Mr. Irvin suffered a plaque rupture, correct?
>
> A.  Yes.
>
> * * *
>
> Q.  And Dr. Bloor testified that there was no plaque rupture?
>
> A.  I mean, I think he said there wasn't a plaque rupture in the slides. I don't recall whether he said that there wasn't one at all, but he said he couldn't see one in the slides, and I agree with him. I couldn't either.
>
> Q.  All right. Notwithstanding the fact you don't see – to your eyes see a plaque rupture in the slides, you certainly agree that Mr. Irvin had a plaque rupture? That's your opinion?
>
> A.  That's my opinion, yes.[28]

This Court may well remember from the initial <u>Daubert</u> proceedings that Merck tried to raise a similar issue by stating that Dr. Joseph Burton and Dr. Colin Bloor were propounding testimony at odds with one another. Dr. Burton, relying on slides reviewed by Dr. Frist, found there to be a plaque disruption. Dr. Bloor, as Dr. Graham correctly points out, opined at trial that there likely was a plaque rupture, but that he could not visualize the rupture at the site of the slides.

All of this testimony is consistent with what the defense expert, Dr. Wheeler, said in his deposition. Dr. Wheeler stated that two of the sections of coronary artery show "a portion of the fibrous cap is infiltrated by macrophages, acute hemorrhage into the lipid rich core, and

---

28 Deposition of Dr. Graham pp. 10 –12.

focal rupture of the thin fibrous cap."[29] Dr. Wheeler did not observe the rupture he states was present at the time he wrote his report. Dr. Wheeler was specifically asked the following question:

> Q   I'm reading from your report. It states, "A portion of the thin fibrous cap is infiltrated by macrophages. There is acute hemorrhage into the lipid-rich core and focal rupture of the thin fibrous cap." Can you mark for us on the – that which you saw on or before September 28th which is the focal rupture of what you spoke?[30]
>
> A   Okay. Do you want me to mark the other things that I mentioned or just the focal rupture....Okay. The focal rupture is the fact that in order to get the thrombus, which is right here, in between the fibrous cap and the cholesterol core, there had to be a rupture of the cap in this area here. **I don't actually see a site of rupture**, but it's -- in my way of thinking and analyzing this case, the way the clot got in there is that there had to be rupture somewhere so that the blood was exposed to the fibrous -- I'm sorry -- to the lipid-rich core and formed a thrombus. **In other words, I don't see a way to have the fibrous cap, the thrombus, and the lipid-rich core without having this cap having ruptured**[31] (Emphasis added).

Frankly, this entire issue is a red herring created by Merck in an attempt to confuse the jury. It is undisputed that Merck's own studies prove not only that Vioxx causes a hypercoaguable state, but that Vioxx causes plaque instability and rupture. The issue of whether there was or was not a plaque rupture is simply irrelevant. In this case we have, via pathological examination, a blood clot. Merck's studies prove that Vioxx causes such clots. We have consistent agreement that there is likely a plaque rupture as well. However, whether there was or was not a rupture is irrelevant because Vioxx, by its very nature, causes such ruptures. Merck cannot point to such a rupture as an ostensible affirmative defense when the drug at issue causes such injuries.

---

29 Report of Thomas M. Wheeler at 2.
30 Dep. of Thomas M. Wheeler, M.D. at 219.
31 Id. at 219-220.

### E. Relative Risk

Finally, Merck represents to this Court that Dr. Graham's findings in this matter are based solely upon epidemiological findings indicating a relative risk with Vioxx usage that exceeds two. Specifically, Merck states that "he is willing to opine that any individual who died after taking Vioxx – including Mr. Irvin – more likely than not died because of the drug."[32] Merck makes this bold assertion without any citation to Dr. Graham's deposition. Indeed, Merck does not point to any testimony wherein Dr. Graham makes this assertion.

When one reviews Dr. Graham's testimony, without parsing via ellipses, you see that Dr. Graham indicated he looks at the "individual patient" and "all the information that's available," not just the increased relative risk in making a causative determination. More specifically, Dr. Graham said:

> Q   What do you mean when you relate a relative risk greater than two with demonstrating a probable contributory role in Mr. Irvin's death?
>
> A   I think what it indicates is that obviously they're – once you're greater than two you have over a hundred percent increase in the incidence of whatever you happen to be studying . Without further subdividing and identifying that there are any subgroups that are at risk and subgroups that aren't at risk in the overall at-risk group, an individual statistically would fall into the higher risk group, and so if you have an over – if your risk is greater than two, then any individual person unless there's some reason that you can exclude him from the at-risk group would more likely than not be in the at-risk group.
>
> Q   Where did you get that concept of a relative risk greater than two means it is more likely than not that a person died as a result of the drug?
>
> A   Because your incidence then is increased at least a hundred percent.
>
> Q   You're saying just as a matter of math?
>
> A   Just a matter of math it's over a hundred percent. So statistically it's more likely than not that he would fall into that group.
>
> Q   You're not saying, sir, that just because someone had a heart attack while taking Vioxx, that Vioxx is a contributory role in each such heart attack, right?

---

[32] Merck & Co., Inc.'s Motion to Exclude Testimony of Michael Alan Graham, M.D. at 13.

A    No. I think you have to look at all the information that's available.

Q    Temporal association is not enough for cause and effect, right?

A    In determining cause and effect?

Q    Right.

A    That is correct.

Q    So if you take your last sentence seriously, what you're saying is that everyone who had a Vioxx—who was taking Vioxx at the time they had a heart attack, more likely than not Vioxx contributed to the heart attack?

A    Statistically as you take them by individual patient will be more likely than not in the at-risk group. It doesn't mean that every one of them was, but the probability on any given person is that they're in the at-risk group.

Dr. Graham not only took into consideration the increased relative risk of Vioxx usage, but he looked at Dicky Irvin as an individual. Dr. Graham examined the available medical records, emergency room records, EMS records, the autopsy report, tissue slides, medical literature, expert reports and depositions and came to an individualized conclusion as to Vioxx's contributory role in this case. Certainly he considered the increased danger from Vioxx in reaching his conclusion, but it was not the sole basis for his opinion as Merck pretends.

Nevertheless, Dr. Graham's statistical and mathematical assertions are correct. A review of <u>Reference Manuel on Scientific Evidence Second Edition</u> at p. 384, reveals that, "the threshold for concluding that an agent was more likely than not the cause of an individual's disease is a relative risk greater than 2.0." Here where Merck's own studies, as well as Dr. Wayne Ray's analysis, all prove a greater than 2.0 relative risk, Dr. Graham is entirely justified in relying upon this information in his causation analysis.

## III. <u>CONCLUSION</u>

For the above stated reasons, it is hereby respectfully requested that this Honorable court deny the Motion of Merck and Co., Inc. to Exclude Testimony of Michael Alan Graham, M.D.

Respectfully submitted,

By:_____
**Andy D. Birchfield, Jr., Esquire**
Paul J. Sizemore
P. Leigh O'Dell
BEASLEY, ALLEN, CROW,
METHVIN,
PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
(800) 898-2034 (telephone)
(334) 954-7555 (telecopier)

**Co-Lead Counsel**

**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
FAX: (504) 561-6024

**PLAINTIFFS' LIAISONCOUNSEL**

Christopher A. Seeger, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)

**Co-Lead Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
MEUNIER&WARSHAUER, L.L.C.
P.O. Box 960
191 East Second Street
New Roads, LA 70760
(225) 638-6137
(225) 638-8836 (fax)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Thomas R. Kline, Esquire
KLINE&SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Carlene Rhodes Lewis, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced in accordance with Pre-Trial Order No. #8, on this 30 day of January, 2006.

# SEE RECORD FOR

# EXHIBITS

# OR

# ATTACHMENTS

# NOT SCANNED