UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 FEB -1 P 12: 59

LORETTA G. WHYTE
CLERK

| | |
|---|---|
| In Re: VIOXX | : |
| | : |
| PRODUCTS LIABILITY LITIGATION | : |
| | : |
| This document relates to All Actions | : |
| | : |
| | : |

MDL Docket NO. 1657

SECTION L

JUDGE FALLON

MAG. JUDGE KNOWLES

THE PLAINTIFFS' STEERING COMMITTEE'S
OPPOSITION TO THE UNITED STATES GOVERNMENT'S MOTION TO QUASH
AND CROSS-MOTION TO COMPEL THE DEPOSITION OF DAVID GRAHAM, M.D.

## I.   INTRODUCTION

Plaintiffs' Steering Committee ("PSC") hereby opposes the United States

Government's (hereinafter the "Government") Motion to Quash and moves the Court for an Order

permitting the deposition of David Graham, M.D., a senior epidemiologist and Associate Director for

Science at the FDA, for deposition this multi-district litigation

As set forth more fully below, the FDA has tried to block this deposition

administratively by interfering with a valid subpoena served upon Dr. Graham. However, there is no

basis to block the deposition of Dr. Graham. Currently a "whistle-blower" with respect to Vioxx,

Dr. Graham has appeared in numerous public fora, to discuss Merck and the FDA's conduct with

respect to Vioxx. These include an appearance as a witness before the United States Senate, as well

as appearances and interviews with numerous news organizations. Despite Dr. Graham's voluntary

and very public appearances, and his central role in the Vioxx story, the FDA has taken the position

1



that his limited and one-time participation in this multi-district proceeding would be disruptive to him and the FDA.  It simply cannot be the case that Dr. Graham can testify and speak in every public forum, but that he cannot appear in this Courthouse where thousands of American citizens claim injury from Vioxx.  For the following reasons, the Court should permit the deposition of Dr. Graham to proceed and remove the impediments placed by the FDA, the agency that Dr. Graham so bravely blew the whistle on for the health and safety of the American people.

## II.    FACTUAL BACKGROUND

Dr. David Graham is a twenty (20) plus year veteran of the FDA.  Currently, he works as an epidemiologist within the Office of Post-Marketing Risk Assessment ("OPRA") at the FDA. (Exhibit "1").[1]  He is an extraordinarily well-qualified scientist, epidemiologist and expert in drug safety.  Prior to the withdrawal of Vioxx, Dr. Graham became what is commonly known as a "whistle-blower" was called to appear before the United States Senate Committee on Finance on November 18, 2004 where he was asked to testify about Vioxx and other issues including the FDA's ability to protect the American public by ensuring safe and effective drugs. *Id.*

---

[1] Dr. Graham introduced himself to the members of the United States Senate at the November 18, 2004 Finance Committee Hearing:

> Good morning. My name is David Graham, and I am pleased to come before you today to speak about Vioxx, heart attacks and the FDA. By way of introduction, I graduated from the Johns Hopkins University School of Medicine, and trained in Internal Medicine at Yale and in adult Neurology at the University of Pennsylvania. After this, I completed a three-year fellowship in pharmacoepidemiology and a Masters in Public Health at Johns Hopkins, with a concentration in epidemiology and biostatistics. Over my 20 year career in the field, all of it at FDA, I have served in a variety of capacities. I am currently the Associate Director for Science and Medicine in FDA's Office of Drug Safety.

A true and correct copy of Dr. Graham's testimony to the Senate is attached hereto as Exhibit "1."

At the Senate Hearings, Dr. Graham specifically clarified that he was <u>not</u> testifying in his capacity as an FDA employee and was not speaking for the FDA.  Rather, he was speaking as a private citizen who observed the interplay between Merck and the FDA with respect to Vioxx:

> **Senator Hatch:**    Dr. Psaty, I've been interested in all of this testimony.  Dr. Graham is an employee of the FDA and he does represent or at least is attempting to represent the views of the agency.
>
> **Dr. Graham:**    May I correct that?  I don't represent the views of the agency.  I think that's pretty clear.

(Exhibit "1," at 26).

During his Senate testimony, Dr. Graham touched upon many issues, most of which have been central to Merck's defense of these cases. *Id.*  Specifically, he testified that Vioxx was an unsafe drug from the moment that the VIGOR study results became known in 2001. *Id.* In addition, he testified that the FDA has institutional and regulatory limitations that permitted Merck to continue to market Vioxx in a manner that was unsafe, failing to include a warning on Vioxx about risk of heart attack. *Id.*  Indeed, he told the Senate that:

> In my opinion, the FDA has let the American people down, and sadly, betrayed a public trust.  I believe there are at least 3 broad categories of systematic problems that contributed to the Vioxx catastrophe and to a long line of other drug safety failures in the past 10 years.  Briefly, these categories are 1) organizational/structural, 2) cultural, and 3) scientific.

(Exhibit "1" at 2). Further, he testified to the FDA's close relationship with Merck and their unwillingness to permit the publication of unfavorable studies, including a multi-million dollar study funded by the FDA and conducted by Dr. Graham that found that Vioxx increases the risk of Heart

Attack. *Id.* (Exhibit "2").[2]

      In the first trial of the *Irvin* case, and in all state court trials that preceded it, Merck has repeatedly used the so-called "FDA defense" at trial.  Indeed, Merck has defended itself by arguing, "the FDA are the Police," "the FDA let us do it," "the FDA approved the warnings" and "we gave it all to the FDA." More specifically, Merck has defended its actions by specifically pointing to the FDA numerous approvals of New Drug Applications ("NDAs") and Supplemental New Drug Applications ("SNDAs") for Vioxx. In addition, Merck has sought to exonerate itself by pointing to the fact that, after almost two years of "negotiation," the FDA finally relented and approved a label without a heart attack warning and which presented the VIGOR results in a manner that "flipped the data," i.e. which suggested that the VIGOR results demonstrated that Naproxen was cardioprotective compared to Naproxen as opposed to cardiotoxic compared to Naproxen.  Merck uses the label as a shield notwithstanding the fact that discovery has revealed that it successfully manipulated the FDA into burying the VIGOR data (which was ultimately discovered to be inaccurate and misleading) in the "precautions" rather than the more-serious "warnings" section after months of bulling by Merck. (Exhibit "3").[3]  Dr. Graham's very public comments directly undermine

_____

[2]  That study was subsequently published in the Journal *Lancet*, and is attached hereto as Exhibit "2."

    3  The FDA sent Merck a proposed label with a cardiovascular warning in the "Warning" section of the label. (Exhibit "3""). Notwithstanding that Merck's top scientist, Dr. Edward Scolnick's "worry quotient" was "high," after seeing the VIGOR date and realizing that *"the cardiovascular events are clearly there"* and that ". . . *it is mechanism based as we all worried it was"* he later promised his colleagues that he would not agree to a FDA warning label about cardiovascular risks related to Vioxx. *"I assure you that I will not sign off on any label that had a cardiac warning,"* Dr. Scolnick wrote in a November, 2001 e-mail. (Exhibit "4"). Fearful the warning would hurt sales, Merck fought the FDA, according to internal e-mails in which Dr. Scolnick blasted regulators as *"bastards."* (Exhibit "5").  When David Anstice, President, Human Health, the Americas, called the proposed warning "ugly" in another e-mail, Dr. Scolnick responded: *"It is ugly cubed. They are bastards."* *Id.*  He proposed that Merck take a confrontational approach to the FDA. *"I have never seen being nice to the FDA, except on rare occasions, pay off,"* he wrote in another e-mail. (Exhibit "6"). In

4

Merck's FDA defense.

In addition to appearing before the United States Congress on issues directly related to this case, Dr. Graham has appeared before numerous print and other media outlets where he has consistently reiterated his Congressional testimony and insights into the relationship between Merck and the FDA. Specifically, he has appeared on the following television shows:

- ABC's *"Good Morning America"* with Diane Sawyer on November 19, 2004 (Exhibit "11");[4]

- ABC's *"World News Tonight"* with Peter Jennings on November 18, 2004; *Id.*

- ABC's *"Good Morning America"* on December 19, 2004; *Id.*

- ABC's *"Nightline"* with Ted Koppel on December 3, 2004 (Exhibit "12");[5]

- CNN's *"Newsnight with Aaron Brown"* on December 16, 2004 (Exhibit "13");[6]

---

another E-mail to his Vioxx team, alluding to the sportscasters' call when the U.S. Olympic hockey team defeated the Soviet Union in 1980, Dr. Scolnick writes: *"To all: If you get this label, it will be an Al Michaels quote: 'Do you believe in miracles?'"* (Exhibit "7"). "You were FANTASTIC," Dr. Scolnick wrote to his Vioxx development team in Pennsylvania and New Jersey in a February 8, 2001 E-mail, after a Merck presentation to an FDA Advisory Committee, *"You made them look like grade D high school students."* (Exhibit 8"). Ultimately, Merck was successful in bullying the FDA into burying the VIGOR data in the "precautions" rather than the more-serious "warnings" section. Likewise, there was no "black box" type warning and there is no actual language warning of the risk of heart attacks and strokes, only the reporting of data. *Id.*

4 Exhibit "9" intentionally omitted. *See* Exhibit "10" which is Washington Post article "White House Defends FDA as Drug Safety Debate Looms" which notes at page 2 Dr. Graham's appearance on "This Week." Furthermore, attached as Exhibit "11" is a list of all ABC TV Programs that Dr. Graham appeared on as well as all each program's transcripts.

5 A true and correct copy of the transcript of Dr. Graham's interview with Ted Koppel on "Nightline" is attached hereto as Exhibit "12."

6 A true and correct copy of the transcript of Aaron Brown's interview with Dr. Graham and Dr. Jerry Avorn is attached hereto as Exhibit "13".

- ABC's *"This Week"* with George Stephanopolous on December 19, 2004;

- MSNBC's *"Countdown with Keith Olbermann"* on December 22, 2004 (Exhibit "14");[7]

- CBS's *"Evening News"* on September 3, 2005 being interviewed about the verdict in Texas state court.[8]

- PBS's *"NOW"* with host David Brancasccio on January 7, 2005; Exhibit "15");[9] and,

- NBC's *"Today" Show with Katie Couric"* on December 21, 2005 where he appeared with the Dr. Lester Crawford, Acting FDA Commissioner (importantly Dr. Graham specifically prefaced his comments in this "debate" moderated by Katie Couric that although he was an FDA scientist, he was not appearing on behalf of the FDA or in his capacity as an FDA employee, pointing out that Dr. Lester was. He specifically clarified that he was speaking on his own behalf).[10]

Moreover, Dr. Graham gave numerous interviews which appeared in the printed and

---

7  A true and correct copy of the transcript of Dr. Graham's television interview on CNBC is attached hereto as Exhibit "14"".

8  The video of Dr. Graham's interview can be seen on the internet at http://video.msn.com/v/us/msnbc.htm?g=c8497a25-a43e-45d0-93fa-690c280ab96e&f=00. Dr. Graham is on the right in the still of the video below, next to Dr. Grasser.



9  A true and correct copy of the transcript of Dr. Graham interview on NOW is attached hereto as Exhibit "18"".

10  Dr. Graham's appearance on the "Today" show can be viewed on the internet at http://video.msn.com/v/us/msnbc.htm?g=c8497a25-a43e-45d0-93fa-90c280ab96e&f=00

on-line press including:

- *Forbes Magazine* , June 13, 2004, Dr Graham interviewed by Matthew Harper for Face of the Year: David Graham (Exhibit "16"");

- *MSNBC,* August 26, 2004, Arthritis drug linked to heart deaths: Vioxx may triple risk of cardiac arrest says FDA ("Graham, senior scientist for the FDA's Office of Drug Safety, said his own interpretations of the data *did not necessarily reflect the views of the FDA*")(Exhibit "17");

- *Multinational Monitor*, December, 2004, Blowing the Whistle on the FDA, An Interview with David Graham (Exhibit "18");

- *Newsweek Magazine*, January 8, 2005, Vioxx Woes May Reveal FDA's Flaws (Exhibit "19");

- *Newsweek Magazine*, January 28, 2005, Vioxx Woes May Reveal FDA's Flaws (Dr. Graham gives Newsweek's Jennifer Barrette Ozzolos an interview on about his research and views on FDA reform (Exhibit "20")

- *Mother Jones Magazine*, May/June 2005 Issue, The Side Effects of Truth: In exposing the deadly threat by Vioxx: FDA researcher David Graham was serving the public interest. His bosses had other interests in mind.(Graham gives two separate interviews at  coffee shop in Rockville, Maryland. "Shortly after Merck pulled Vioxx from the market last September, Graham began carrying an index card full of phone numbers in his breast pocket. The little scribbles of red and black ink were his lifelines, contacts to a dozen supportive congressional staffers and reporters who'd sought him out after he went public (Exhibit "21");

- *USA Today*, Scientist says FDA called Journal to Block Vioxx Article (Exhibit "22");

- *USA Today*, Quiet Scientist No More (Dr Graham gives a 3 hour interview at a coffee shop near his home stating: "FDA made me into a whistle-blower . . . it wasn't my intention to be a whistle-blower") (Exhibit "23");

- *Crusader*, Secrets of the FDA Revealed by a Top Insider (Exhibit "24");

- *New Target.com*, August 30, 2005, The FDA Exposed, An Interview

7

<u>with Dr. David Graham, the Vioxx Whistleblower</u> (Exhibit "25");

- *New Target.com*, October 7, 2005 , <u>The FDA Exposed, An Interview with Dr. David Graham, the Vioxx Whistleblower</u> (noting that he has worked for the FDA for 20 years "[b]ut when I'm here today *I'm speaking in my private capacity on my own time, and I do not represent the FDA*. We can be pretty certain that the FDA would not agree with most of what I have to say. So with those disclaimers you know everything is okay."(Exhibit "26").

Dr. Graham's comments, which have been consistent throughout this period, have been repeated throughout the media outlets above and in numerous stories in newspapers across the nation including the *Wall Street Journal*, *the Washington Post, USA Today, the Detroit Free Press, the Atlanta Journal Constitution* and others. (Exhibit "27").[11]

Despite his appearance at international scientific and medical meetings, and before the United States Congress, and in the numerous media outlets described above, the FDA has taken the position that the only place that Dr. Graham cannot appear is under oath in this litigation.

The PSC asserts that the importance of Dr. Graham's testimony to the thousands of plaintiffs claiming injury is far more important than Dr. Graham's appearance on television talk shows and his interviews with the numerous news and media outlets. The PSC further asserts that the Government's attempt to muzzle an important government whistle-blower is highly suspect and places upon the Government a high burden, one which it has failed to overcome. Consequently, the PSC respectfully requests that this Court grant this motion and permit this deposition to proceed.

## III.     PROCEDURAL BACKGROUND

Out of courtesy, on December 19, 2005, the PSC sent the FDA a letter requesting that

---

[11] Numerous articles in Newspapers and from on-line Internet sources are attached hereto as Exhibit "27."

they produce Dr. Graham for deposition. (Exhibit "28").[12] The PSC did not hear back from the FDA

at that time.  Subsequently, on December 29, 2005, the PSC sent a courtesy second request to the

FDA to produce Dr. Graham. (Exhibit "29").[13]  In that letter, the PSC explained the importance of

Dr. Graham's testimony to the underlying information. *Id.*  The PSC pointed out that Dr. Graham

had already given numerous interviews in connection with the issues related to the litigation, and had

testified before Congress. *Id.*  Nevertheless, the PSC noted that the only place that Dr. Graham has

not testified is in a forum that would permit his testimony to be used in the various trials relating to

Vioxx-induced injuries. *Id.*  Anticipating that the FDA may decline to agree to this deposition,

plaintiffs addressed the various objections that were anticipated at that time. *Id.*  Furthermore, in that

letter, the PSC indicated "while I appreciate you are in the midst of year-end holidays, the PSC

would like an answer as soon as possible as we have trials scheduled beginning in February." *Id.*

Thereafter, the PSC made numerous attempts to communicate with the FDA in order

to give it the courtesy to produce Dr. Graham for deposition, including numerous telephone calls to

the FDA, to no avail.  (Exhibits "31" to "34").

Finally, with the deadline for the *Irvin* trial fast approaching, and having failed to hear

anything from the agency, the PSC filed a Notice of Deposition on Friday, January 13, 2006 and sent

a courtesy copy of these by overnight delivery to the agency. (Exhibit "30").[14]  In addition, the PSC

personally served Dr. Graham with a Subpoena on Saturday, January 14, 2006. *Id.*  The deposition

_____

12 A true and correct copy of the letter is attached hereto as Exhibit "28."

13 A true and correct copy of the letter is attached hereto as Exhibit "29."

14 A true and correct copy of the Subpoena, Deposition Notice and Proof of Service is attached
hereto as Exhibit "30."

was noted for January 23, 2006. *Id.*[15]

On January 20, 2006, the FDA faxed two letters, refusing the PSC's request that it produce Dr. Graham. (Exhibit "32").[16]  The FDA objects on numerous technical grounds, but failing to consider the admissibility, further argues that the documents that relate to Dr. Graham as well as his Congressional and other public statements, should be sufficient for the PSC's purposes, and indicated that it would instruct Dr. Graham not to appear on the January 23, 2006. *Id.*

In its correspondence with the FDA, the PSC pointed out that by producing Dr. Graham, it would not be taking a partisan position in this private litigation.  *Id.*  The PSC pointed out that while Merck has unfettered access to the FDA even to this day, with respect to issues related to Vioxx, the PSC does not have such access. *Id.*  Further, the PSC pointed out that the mere act of producing a witness for a one-time deposition for all federal proceedings would be neither burdensome nor construed as a partisan act on behalf of the agency. *Id.*  The PSC anticipated that the FDA might suggest that the production of a witness in this multi-district litigation would result in similar multiple requests for the testimony of FDA officials. *Id.*  The PSC pointed out that producing a witness for one occasion for all cases would hardly be a burden on the agency, or Dr. Graham, who has shown a willingness to appear in numerous forum to express his views. *Id.*  Finally, the PSC pointed out that the agency has, in the past, produced witnesses in the MDL context for deposition, and the production of these witnesses has been extraordinarily helpful to both the Court and the

---

15   The government argues that the subpoena and Notice of Deposition are technically invalid. The subpoena is perfectly valid and was served on Dr. Graham.  The Notice of Deposition did contain an error by naming Dr. James Fries.  However, there is no question that all relevant parties; the Government; the FDA; Merck, and Dr. Graham are on notice.  The PSC will issue an amended Deposition Notice omitting any error if the Government's motion is denied.

16   A true and correct copy of the letter is attached hereto as Exhibit "32."

litigants. *Id.*  Specifically, the PSC notes that the FDA has produced a witness, Jeffrey Shuren, M.D.,

in *In re Diet Drugs Products Liability Litigation* [17] as well as Robert Misbin M.D., a medical officer

at the FDA in the case of *In re Rezulin Products Liability Litigation*.  (Exhibit "33").[18]

In this regard, the PSC agreed to give the FDA time to bring a Motion to Quash

before the Court, and agreed to postpone the deposition so long as a motion would be filed on or

before the January 24, 2006, which it was. (Exhibit "34").[19] The PSC indicated that it would file its

response immediately thereafter, and ask for an expedited hearing so that this issue can be resolved

in time that any deposition that the Court would order would be usable at the *Irvin* trial.  A hearing is

scheduled for February 26, 2006.

## IV.   LEGAL ARGUMENT

### A.    THE APPLICABLE LEGAL STANDARD

#### 1) The Federal Rules of Civil Procedure and Not the Administrative Procedures Act (APA) Govern this Dispute and Require the FDA to Produce Dr. Graham for Deposition

The PSC issued a valid subpoena upon Dr. Graham pursuant to Fed. R. Civ. P. 45.

The FDA has blocked the deposition of Dr. Graham clearly believing that as non-party governmental

agency, the Federal Rules of Civil Procedure do not apply to it, or to Dr. Graham.  The Government

contends that rather than reviewing the decision of the FDA not to produce Dr. Graham, this Court

---

17 *See In re: Diet Drug Litigation*, 2000 WL 1545028 (E.D. Pa.) noting that FDA official Jeffrey
E. Shuren, M.D. was deposed.

18  A true and correct copy of  the FDA's letter dated February 1, 2001 in *Rezulin* is attached
hereto as Exhibit "33."

19  A true and correct copy of a letter dated January 20, 2006 from the PSC to the FDA is attached
hereto as Exhibit "34."

should conduct a *de novo* review of the FDA's action under the APA's deferential "arbitrary and capricious" standard.  5 U.S.C. § 706 (2)(A).  Contrary to the FDA's argument, however, the "arbitrary and capricious" standard of review does not apply in this case because the FDA lacked legal authority to interfere with the PSC subpoena of Dr. Graham, a government whistle-blower.

"It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).  Before assessing agency action under the "arbitrary and capricious" standard, therefore, "[t]he court is first required to decide whether the [agency] acted within the scope of [its] authority." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971).  The APA explicitly provides for this initial inquiry by authorizing courts to set aside agency action that is "not in accordance with law," 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C).  Judicial review under these standards does not focus on whether the agency acted arbitrarily or capriciously, but instead "entails a firsthand judicial comparison of the claimed excessive action with the pertinent statutory authority." *Western Union Tel. Co. v. FCC*, 541 F.2d 346, 354 (3d Cir. 1976); *see also Killip v. Office of Personnel Management*, 991 F.2d 1564, 1569 (Fed. Cir. 1993) (in assessing whether an agency has exceeded its delegated authority, courts are not required to defer to the agency's decisions, but "are free to review the interpretation of the federal statute authorizing an agency to act"); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 46 USPQ2d 1385 (D.C. Cir. 1998) (setting aside action the FDA took pursuant to a regulation which the court held to be invalid).

The "arbitrary and capricious" standard is inapplicable here because, as explained below, the FDA exceeded its statutory authority and acted contrary to law by interfering with the

12

PSC's subpoena. Although the FDA based its interference on one of its regulations, 21 C.F.R. § 20.1,

that regulation does not give the FDA discretion to interfere with a federal court subpoena. Thus, the

FDA's reasons for interfering with the PSC's subpoena are not entitled to deferential "arbitrary and

capricious" review, but should be evaluated under the general rules of discovery. As set forth in

detail below case law supports the PSC's position and undercuts the Government's.

>   **2)    The FDA Has No Legal Authority to Interfere with Federal
>           Court Subpoenas of Private Citizens**

The regulation the FDA acted under when it refused the PSC's requests for Dr.

Graham's testimony, 21 C.F.R. § 20.1, was issued by the agency under the authority of the Federal

Housekeeping Statute, 5 U.S.C. § 301. *See In re Biosciences Sec. Litig.*, 150 F.R.D. 80, 81 (E.D. Pa.

1993). Although in section 20.1 the FDA reserved to itself discretion to deny a request for discovery,

the Housekeeping Statute does not authorize that reservation. The Housekeeping Statute expressly

states that "[t]his section does not authorize withholding information from the public or limiting the

availability of records to the public." 5 U.S.C. § 301. In light of this language, courts consistently

have held that the Housekeeping Statute does not authorize federal agencies to refuse to provide

testimony or documents demanded in federal court subpoenas.[20]

---

20 *See Houston Bus. Journal, Inc. v. Office of the Comptroller of the Currency*, 86 F.3d 1208,
1212 (D.C. Cir. 1996) ("neither the Federal Housekeeping Statute nor the *Touhy* decision [*United States ex
rel. Touhy v. Ragen*, 340 U.S. 462 (1951)] authorizes a federal agency to withhold documents from a
federal court."); *In re Bankers Trust Co.*, 61 F.3d 465, 470 (6th Cir. 1995) ("nothing in the text of the
statute empowers a federal agency to withhold documents or testimony from federal courts"); *Exxon
Shipping Co. v. U.S. Department of Interior*, 34 F.3d 774 (9th Cir. 1994) "[N]either the statute's text, its
legislative history, nor Supreme Court case law supports the government's argument that § 301 authorizes
agency heads to withhold documents or testimony from federal courts."); *see also United States ex rel.
O'Keefe v. McDonnell Douglas Corp.*, 132 F.3d 1252, 1255 (8th Cir. 1998) (the Housekeeping Statute
"expresses a clear congressional mandate that agencies cannot promulgate regulations exempting
themselves from their duty to make information available to the public"); *Linder v. NSA*, 94 F.3d 693
(D.C. Cir. 1996) (Rule 45 subpoena to the NSA not enforced on privilege grounds); *Friedman v. Bache
Halsey Stuart Shields, Inc.*, 738 F.2d 1336 (D.C. Cir. 1984) (reversing order refusing on privilege grounds

Insofar as the FDA asserts the authority to withhold information sought in discovery, Section 20.1 is also inconsistent with the Federal Rules of Civil Procedure. By purporting to give the FDA the power to refuse to comply with a federal court subpoena, section 20.1 "conflict[s] with the Federal Rules of Civil Procedure with respect to a district court's authority, under the Federal Rules, to control discovery." *Bankers Trust Co.*, 61 F.3d at 469; *see also Houston Bus. Journal*, 86 F.3d at 1212 (regulation which authorizes agency to refuse to comply with federal court subpoena "conflicts with Federal Rule of Civil Procedure 45"). As one court has stated:

> 21 C.F.R. § 20.1 is a regulation promulgated by FDA for its own benefit. It does not supersede the Federal Rules of Civil Procedure. When discovery of FDA personnel is relevant in civil litigation, it can be ordered despite this regulation.

*Metrex Research Corp. v. United States*, 151 F.R.D. 122, 124 (D. Colo. 1993).

Contrary to the FDA's position, the Federal Rules of Civil Procedure apply to all non-parties, including government agencies, with respect to non-party discovery requests, such as those of the PSC in this case. *Exxon Shipping, supra.* at 774; *In re: Diet Drugs*, 2000 WL 1545028 (E.D. Pa. 2000)(refusing to apply the ADA to the FDA's decision not to comply subpoenas and pursuant to FOIA to produce documents and finding inapplicable the "deliberative process privilege); *In re: Orthopedic Bone Screws*, 1995 WL 925670 (E.D. Pa. 1995); *Metrex Research Corporation v. United States*, 151 F.R.D. 122 (D.Colo. 1993)(rejecting the Government's claim that a plaintiff may not depose an employee of the FDA without first obtaining approval of the FDA Commissioner, holding that "[w]hen discovery of FDA Personnel is relevant to civil litigation, it can be ordered despite

---

to enforce subpoena addressed to the CFTC); *Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395 (D.C. Cir. 1984) (reversing order quashing Rule 45 subpoena directed to the State Department); *Westinghouse Elec. Corp. v. City of Burlington*, 351 F.2d 762 (D.C. Cir. 1965) (reversing order quashing Rule 45 subpoena served on the Attorney General).

regulation).[21]

In *Exxon Shipping*, the plaintiffs made discovery requests of five federal administrative agencies and their employees. *Id.* at 776. Exxon believed that the agencies' employees had obtained information central to the underlying litigation. *Id.* As the FDA has refused to produce Dr. Graham, the Government in *Exxon Shipping* instructed eight federal employees not to submit to depositions and restricted the testimony of two others. *Id.* The District Court agreed with the government but the Appellate Court reversed.  Exxon then filed a complaint alleging that the government's refusal violated the federal rules.

In *Exxon Shipping*, the Court declared that the Federal Housekeeping Statute does not authorize federal agencies to withhold evidence sought under a valid federal court subpoena. *Exxon Shipping, supra.* at 780. The court pointed out that the statute was not intended to frustrate discovery from government agencies. *Id.* at 779. The court further stated that the U.S. Supreme Court had said that "judicial control over the evidence in a case cannot be abdicated to the caprice of executive officers." *Id.* (citing *U.S. v. Reynolds*, 345 U.S. 1, 9-10 (1953)).  The Court believed that it would not be appropriate to permit the executive branch to override a valid federal court subpoena. *Exxon Shipping, supra.* at 780. The Court held that district courts should apply the federal rules when ruling on discovery requests made against government agencies, whether or not the United States is a party

---

21 *See also, Connaught Laboratories, Inc. v. Smithkline Beecham,* 7 F.Supp.2d 477 (U.D.Del. 1998)(although FDA was not party in patent infringement suit, waiver of its sovereign immunity was not needed for federal court to exercise its subpoena power to compel FDA's response to alleged infringer's discovery requests); Committee *for Nuclear Responsibility, Inc. v. Seaborg,* 463 F.2d 788 (D.C. Cir. 1971); *NLRB v. Capitol Fish Co.,* 294 F.2d 868 (5th Cir. 1961); *cf .U.S. Enviromental Protection Agency v. General Electric Co.,* 197 F.3d 592 (2d Cir. 1999); *Comsat Corp. v. National Science Foundation,* 190 F.3d 269 (4th Cir. 1999)(distinguishable from this case in that it involved the Federal Arbitration Act's preclusion of authorizing arbitrators to subpoena third parties during pre-hearing discovery); *Phoenix*

to the underlying action. *Id.*

As set forth in detail below, there are more compelling reasons, substantially more, to compel the FDA to produce Dr. Graham for deposition than were before the court in *Exxon Shipping*.

> ### 3)    The Validity of PSC's Subpoena Should Be Determined Under the General Rules of Discovery As Set Forth In the Federal Rules of Civil Procedure

Because the FDA has no authority to decide for itself whether to comply with the PSC's subpoena, the "arbitrary and capricious" standard of the APA does not apply in this case. Rather, the FDA's refusal to comply with the PSC's subpoena must be set aside because it was "not in accordance with law," 5 U.S.C. § 706(2)(A), and was "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C). Thus, like any other non-party that is served with a discovery subpoena, if the FDA wishes to avoid compliance with the subpoena it must demonstrate that the subpoena creates an undue burden. *See Exxon*, 34 F.3d at 779 (District Court reviewing a federal agency's refusal to comply with a federal court subpoena must "balance the government's concerns under the general rules of discovery"); *Houston Bus. Journal*, 86 F.3d at 1212 (stating that the reasons federal agencies assert for refusing to comply with federal court subpoenas are entitled to "no deference.")

The PSC is not saying that the government's "unique interests" should be ignored. As the court explained in *Exxon Shipping*, "[u]nder the balancing test authorized by the rules, courts can ensure that the unique interests of the government are adequately considered." *Exxon*, 34 F.3d at 780. The court elaborated that:

> Rule 26(c) and Rule 45(c)(3) give ample discretion to district courts to

*Insurance Co. v. Phillips*, 2000 WL 680334 (E.D. La. 2000).

> quash or modify subpoenas causing "undue burden." ... For example, a
> court may ... limit discovery of agency documents or testimony of agency
> officials if the desired discovery is relatively unimportant when
> compared to the government interests in conserving scarce government
> resources.

*Id.* at 779-80.

Consistent with the decisions in *Exxon, Houston Business Journal,* and the other cases cited herein, this Court should properly considered this matter under the general rules of discovery and when it does, Dr. Graham should be produced.[22] Under the Rules of Civil Procedure, the deposition should plainly proceed. Dr. Graham has not limited his views to the corridors of the agency in which he works. Rather, he has become a whistle-blower and has freely given his views under oath to the United States Congress, and he has written and given interviews to medical and scientific publications and before national medical outlets. Clearly, he has spent far more time in those endeavors than he would spend in a one-time deposition in this multi-district proceeding. Not can the FDA claim that Dr. Graham's testimony is unimportant to the litigants and to public health in general. As the Chairman Senator Charles Grassley stated in his opening remarks, the hearing (including Dr. Graham's testimony), "can result in accountability and necessary reforms for the public good." (Exhibit "1"). The Government's attempt to interfere with the PSC's subpoena of a Government whistle-blower undermines Senator Grassley's goal and is highly improper. Finally, the PSC's request for this deposition is far from unprecedented. In fact, the FDA has produced

---

22 The PSC's position is that under *Exxon Shipping,* the APA's "arbitrary and capricious" standard does not apply. However, as set forth below, should the Court apply that standard, the Government should still be compelled to produce Dr. Graham because for the reasons herein, the Government's decision was "arbitrary and capricious," as evidence by the fact that the Government is trying silence a whistle-blower, who implicated a governmental agency, the FDA before Congress and the world.

witnesses in several MDLs, including *In re Diet Drugs Products Liability Litigation*, (producing FDA lawyer, Jeffrey Shuren, Esq.) and *In re Rezulin Products Liability Litigation*, (producing current medical officer and whistle-blower, Robert Misbin, MD.).  There is no suggestion that those depositions resulted in a disruption to the agency.  (Exhibit "33").

      **4)**     **The Government's Arguments That the "Arbitrary and Capricious" Standard Applies Should Be Rejected**

Despite the holdings in *Exxon Shipping* and *Houston Business Journal*, the Government insists that its regulation is valid and that its decision under the regulation is thus reviewable under the "arbitrary and capricious" standard of the APA.  The reasons the FDA advances to support this argument are meritless.

      **a.**     **The Supreme Court's *Touhy* Decision Does Not Require Review Under the "Arbitrary and Capricious" Standard**

The Government relies on *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951), to argue that this Court cannot compel federal employees to testify contrary to agency regulations since a federal agency has the power to restrict its employees from releasing information without authorization. When an agency exercises that power, the Government contends, its decision must be reviewed under the "arbitrary and capricious" standard. Although the Government is correct that *Touhy* authorizes federal agencies to supervise their employees' responses to subpoenas, the FDA is incorrect that *Touhy* prevents federal courts from enforcing such subpoenas, or that *Touhy* requires review of an agency's refusal to comply with a subpoena under the "arbitrary and capricious" standard.  At best, this is a wishful but not accurate reading of *Touhy*

In *Touhy*, the Supreme Court held only that a subordinate agency official (in *Touhy*, it was an FBI agent) could not be held in contempt for refusing to comply with a subpoena when his

refusal was premised on an agency regulation similar to section 20.1. In reaching that decision, the Court assumed, but did not decide, that the regulation was a valid exercise of agency authority. *See Touhy*, 340 U.S. at 467 ("We find it unnecessary, however, to consider the ultimate reach of the authority of the Attorney General to refuse to produce at a court's order the government papers in his possession, for the case as we understand it raises no question as to the power of the Attorney General himself to make such a refusal.") *Id.* at 469 ("The constitutionality of the Attorney General's exercise of a determinative power as to whether or on what conditions or subject to what disadvantages to the Government he may refuse to produce government papers under his charge must await a factual situation that requires a ruling."). Hence, *Touhy* is not controlling here because, by bringing the FDA itself into court, and not just its employees, the PSC has properly raised the issue of the FDA's authority to refuse to comply with a subpoena. *See Exxon,* 34 F.3d at 777 (when "the agencies themselves are named defendants ... the ultimate question of federal agencies' authority to withhold discovery, including deposition testimony, is squarely at issue").

Moreover, other cases in this area such as *In re Boeh*, 25 F.3d 761 (9th Cir. 1994), *Tholen Supply Co. v. Continental Cas*. Co., 859 F. Supp. 467 (D. Kan. 1994), and *Smith v. C.R.C. Builders Co.*, 626 F. Supp. 12 (D. Colo. 1983), do not support the Government's argument that it may refuse to comply with a federal court subpoena. Like *Touhy*, those cases decided only that a subordinate agency employee cannot be held in contempt for refusing to comply with a subpoena pursuant to his agency's instructions, but did not "reach the question of the [agency's] power to refuse to provide evidence ..." *Boeh*, 25 F.3d at 765; *see also id.* at 764 ("We do not decide here that *Boeh* may never be required to testify"). Indeed, *Tholen* and *Smith* actually undermine the Government's contention that it may block the PSC's deposition of Dr. Graham, because those cases acknowledge

19

that discovery can be obtained from an agency by serving a subpoena on the agency's head or another appropriate official under Fed. R. Civ. P. 30(b)(6). *See Tholen*, 859 F. Supp. at 470 (noting that discovery could be obtained by "service of the *subpoena duces tecum* upon the appropriate official"); *Smith*, 626 F. Supp. at 15 (same).

The Government is also mistaken that *Touhy* requires application of the "arbitrary and capricious" standard in this case. Because "the Court [in *Touhy*] specifically refused to reach the question of the agency head's power to withhold evidence from a court without a specific claim of privilege," *Exxon*, 34 F.3d at 776, the *Touhy* decision says nothing about what standard of review should be applied when an agency refuses to comply with a subpoena.

Furthermore, *Davis Enters. v. United States Environmental Protection Agency*, 877 F.2d 1181 (3d Cir. 1989), and *Moore v. Armour Pharm. Co.*, 927 F.2d 1194 (11th Cir. 1991), similarly do not support the Government's contention that "arbitrary and capricious" review should apply here, because, like *Touhy*, those cases assumed but did not decide the validity of the regulations under which the agency refused discovery. *See Davis*, 877 F.2d at 1184 ("Appellants have not challenged the validity of the EPA's power to promulgate regulations which grant the agency discretion to determine whether to comply with subpoenas or requests for employee testimony in private litigation.").

Indeed, the Government's *Touhy* argument is directly refuted by the decisions in *Exxon*, *Houston Business Journal* and the other cases cited herein.

In *Exxon Shipping*, the court rejected the Government's *Touhy* argument, holding that "agency heads" are not authorized "to withhold documents or testimony from federal courts." *Exxon supra*. at 778. Further, *Houston Business Journal* similarly held that *Touhy* does not "authorize[] a

federal agency to withhold documents from a federal court." *Houston Bus. Journal, supra.* at 1212. Moreover, as previously noted, both *Exxon* and *Houston Business Journal* hold that the "arbitrary and capricious" standard of review is inapplicable in cases such as this one. *See Exxon*, 34 F.3d at 779 (district court reviewing a federal agency's refusal to comply with a federal court subpoena must "balance the government's concerns under the general rules of discovery"); Houston Bus. Journal, 86 F.3d at 1212 (holding that the reasons federal agencies assert for refusing to comply with federal court subpoenas are entitled to "no deference").

In sum, contrary to the Government's argument, this case does not raise any issues concerning whether an employee should testify contrary to agency regulations or whether an agency can restrict its employees from releasing information without authorization. What is at issue here is whether the FDA may unilaterally decide to refuse to provide testimony sought by subpoena, subject to "arbitrary and capricious" review, or whether, like any non-party in litigation, its objections should be decided by the District Court under the general rules of discovery. As already argued, because the FDA lacks authority to interfere with a subpoena, the general rules of discovery rather than "arbitrary and capricious" review applies in this case.

      **b.**    **Sovereign Immunity Principles Do Not Require Application of "Arbitrary and Capricious" Review and The Government's Sovereign Immunity Defense Should be Rejected Because it <u>Violates the Separation of Powers</u>**

In its effort to avail itself of "arbitrary and capricious" review, the Government offers a confused set of arguments relating to sovereign immunity. It must acknowledges that the APA waives sovereign immunity in situations such as this one where a litigant seeks to compel an agency's compliance with discovery subpoenas. 5 U.S.C. § 702); *see also Exxon*, 34 F.3d at 779 n.9;

*Houston Bus. Journa*l, 86 F.3d at 1212; *Moore v. Armour Pharm. Co.,* 129 F.R.D. 551, 555 n.2 (N.D. Ga. 1990), aff'd, 927 F.2d 1194 (11th Cir. 1991). Yet it contends that the APA's waiver of sovereign immunity does not apply here because the PSC did not start this proceeding under the APA, and because the PSC allegedly disavowed the APA. Further, the Government argues that if the APA's waiver of sovereign immunity does apply here, the "arbitrary and capricious" test must be applied. There is no merit in any of these circular arguments.

First, the Government is incorrect that the APA's waiver of sovereign immunity applies only to actions brought "under the APA." The APA waiver applies to any "action in a court of the United States seeking relief other than money damages," 5 U.S.C. § 702, and thus "is not limited to suits brought under the APA." *Specter v. Garrett*, 995 F.2d 404, 410 (3d Cir. 1993), rev'd on other grounds sub nom; *Dalton v. Specter*, 511 U.S. 462 (1994); *accord Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("The APA's waiver of sovereign immunity applies to any suit whether under the APA or not."); *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 525 (9th Cir. 1989) ("§ 702 waives sovereign immunity in all actions seeking relief from official misconduct except for money damages"). The PSC's has filed its cross-motion to compel, because it seeks "relief other than money damages," clearly falls within the plain language of section 702. Thus, the APA's waiver of sovereign immunity applies here notwithstanding that the PSC did not institute this proceeding as an action under the APA. *See, e.g., Moore,* 129 F.R.D. at 555 n.2 (holding that APA's waiver applies in proceeding to quash subpoena).

Second, by insisting that the PSC must formally bring a separate action, under the APA in order to trigger the APA's waiver of sovereign immunity, the Government proposes a hyper technical pleading requirement that is neither stated in the APA, *see* C. Koch, *Administrative Law*