*and Practice* § 8.20[2] at 460 (2d ed. 1997) (the APA states no formal pleading requirements), nor

suggested in any cases interpreting the APA.   Indeed, the Government's formalistic proposal

undermines rather than furthers the purposes of the APA's waiver provision, which was enacted in

1976 as "an important part of a major piece of legislation designed to remove 'technical' obstacles to

access to the federal courts." *Bowen v. Massachusetts*, 487 U.S. 879, 896 (1988); *see also* H. Rep.

No. 94-1656 at 20 (1976), reprinted in 1976 U.S.C.C.A.N 6121, 6140 (stating Congress's intent to

eliminate "artificial and outmoded barriers to judicial review of official action"); reprinted in 1976

U.S.C.C.A.N at 6142 (reprinting recommendation from the Administrative Conference of the United

States to limit sovereign immunity "where it blocks the right of citizens to challenge in courts the

legality of acts of governmental administrators.").

The Government's hyper-technical proposal similarly is inconsistent with the liberal

pleading practice embodied in the Federal Rules of Civil Procedure. "[T]he objective of the rules [is]

to avoid technicalities." 5 C. Wright, A. Miller, Federal Practice and Procedure § 1215 at 136-37 (2d

ed. 1990); *see also* Koch, Administrative Law and Practice § 8.22 at 476 ("pleadings are not of great

importance"). Under Fed. R. Civ. P. 8(a)(2), a litigant advancing a claim for relief need only assert

"a short and plain statement of the claim showing that [he] is entitled to relief." It is not necessary to

plead a specific legal theory. *See* 5 Wright & Miller, Federal Practice and Procedure § 1219. In light

of these principles, it is clear that the PSC acted entirely appropriately in bringing this matter to court

through a cross-motion to compel, rather than by means of a separate action. *See* Fed. R. Civ. P.

37(a)(1) (authorizing requests for orders compelling non-party discovery); *see also Exxon*, 34 F.3d at

780 n.11 (noting that "collateral APA proceedings can be costly, time-consuming, inconvenient to

litigants"). For these reasons, the Government's unsupported claim that this proceeding to enforce

the PSC's subpoena is not an "action" under the APA, to which the APA's waiver of sovereign immunity applies, should be rejected.

Finally, notwithstanding, and in addition to the preceding arguments, the Government invocation of the doctrine of Sovereign Immunity as a shield should be rejected for the following additional reasons.

First, in an action in federal court, unlike an action in state court, sovereign immunity does not bar a federal court from enforcing a federal subpoena against the federal government. *See Houston Business Journal, supra.* at 1211 (citing *Exxon Shipping, supra*; *Northrop Corp. v. McDonnell Douglas Corp.,* 751 F.2d 395, 398 n. 2 (D.C.Cir.1984)).

Second, the Court in *Exxon Shipping* rejected the same argument made by the Government. In doing so, the court asserted that interpreting sovereign immunity doctrine to allow "the executive branch to make conclusive determinations" as to whether federal employees must comply with a federal court subpoena " would raise serious separation of powers questions." *Id.* at 778. The court added further that such an interpretation would "violate the fundamental principle that 'the public ... has a right to every man's evidence.'" *Id.* at 779 (quoting *United States v. Bryan,* 339 U.S. 323, 331 (1950) (quoting JOHN H. WIGMORE, EVIDENCE § 2192 (3d ed. 1940))). The Government's sovereign immunity defense is thus inapplicable and should be rejected. The same analysis applies with regard to Dr. Graham's testimony. This Court should not be the *only* forum that Dr. Graham is not able to provide his very important testimony.

## B. THE MANY VIOXX VICTIMS' NEED FOR THE DR. GRAHAM TESTIMONY OUTWEIGHS THE FDA'S ASSERTED CONCERNS

Although the Government contends that providing testimony would divert important

24

agency time and resources away from the FDA's primary mission to protect the public health. On the contrary Dr. Graham's testimony will advance public health and the time away from the agency will be minimal.

### 1.    The Time Dr. Graham Would Spend Being Deposed Is Minimal Compared to the Importance of His Testimony

The Government objects that its employees, such as Dr. Graham, cannot be diverted from their normal duties to give deposition testimony. However, the PSC has offered to take Dr. Graham's deposition at any place and at any time convenient with his schedule within the next sixty (60) days, (including a weekend outside of normal FDA work hours). (Exhibit "28"). Moreover, the scope of the deposition will be limited to matters relevant to the litigation and consistent with the orders of this Court and stipulations of the parties. Dr. Graham has testified before Congress, appeared on television, been interviewed by numerous magazines and newspapers, and has spoken at professional meetings about the topics at issue in this case. Surely, his one-time appearance in these coordinated proceedings will not be a burden on the agency or Dr. Graham any more than those other public appearances have. When considering the minimal time that Dr. Graham would have to spend being deposed, it is important to remember that this is a coordinated proceeding involving thousands of plaintiffs, and that Dr. Graham's deposition will be cross-noticed in multiple state court actions.

The PSC's willingness to modify the subpoena in order to meet Dr. Graham's time and location concerns undermines the Government's argument. It should be noted that the FDA has never proposed, to the PSC any modification or limitations on the PSC's subpoena. Having failed to avail itself of available means for ameliorating the burdens it believes that the PSC's subpoena will impose, the agency should not be heard to complain about such burdens. Clearly, the Government is

improperly interfering with the PSC's valid subpoena to silence a Government whistle-blower.

As to any claim that allowing Dr. Graham's deposition to go forward would have an onerous cumulative impact on the agency, is also an insufficient reason to deny the PSC the right to depose Dr. Graham.[23] Therefore, there is no basis for the Government's asserted concern that allowing Dr. Graham to testify here would force the agency to provide testimony in all drug cases. The FDA cannot reasonably withhold relevant evidence merely to avoid creating "a troublesome legal precedent." *Davis*, 877 F.2d at 1190 (Weis, J., dissenting).

The Government cannot demonstrate that Dr. Graham's testimony is "duplicative" of the documents the FDA has produced.  Dr. Graham was invited by the United States Senate to testify about the FDA's handling of drug safety issues generally and more specifically his testimony was focused primarily on Vioxx. (Exhibit " ").  In his Senate testimony, Dr. Graham argued that the FDA is "incapable of protecting America against another Vioxx" and that the FDA's drug center "overvalues the benefits of the drugs it approves and seriously undervalues, disregards, and disrespects drug safety." *Id*.  Dr. Graham testified that "it is important that the American people understand that what happened with Vioxx is really a symptom of something far more dangerous to the safety of the American people" . . . "simply put, FDA and its Center for Drug Evaluation and Research is broken." *Id*.  Clearly none of the documents can speak to this testimony with such clarity and directness. The PSC bears the burden of proof in this case and would face significant difficulties

_____

23 Any reliance on *Davis supra*. and *Moore supra* would be misplaced in this case because in those cases it was assumed that the "arbitrary and capricious" standard of review properly applied. Here, as already shown, the proper standard is not as so strong and thus the question is not whether the FDA had a reasonable basis for fearing a "cumulative impact," but whether the there is a reasonable basis for finding that PSC's need for the testimony outweighed the FDA's speculative concerns. As discussed below, however, even under the "arbitrary and capricious" standard, the FDA's unfounded fear of a "cumulative impact" is not a legitimate basis for blocking Dr. Graham's deposition.

in meeting that burden before a jury, without direct testimony from the Dr. Graham , which goes well beyond the documents produced.

> ### 2. The Government is Correct - Dr. Graham's Testimony Before Congress and Other Public Forums Is Available – However It Is Not Admissible

The Government points to Dr. Graham's testimony before Congress and other public forums in support of its argument that the PSC does not need Dr. Graham's testimony. However, the Government fails to consider that, while Dr. Graham's Congressional testimony and his statements in other forum may be available, it is not admissible. Clearly, neither party had any opportunity to cross-examine Dr. Graham at the Congressional hearing of during any of his press interviews.

> ### 3. The PFS Has Not Asked the FDA to Take a Partisan Position

The Government does not wish to appear to be taking a partisan position in this private litigation. The PFS has not asked the FDA to take any position with respect to the merits of the pending litigation. Nevertheless, the recent state and federal trial have demonstrated that Merck has relied on the FDA's approval of Vioxx and the company's alleged compliance as an affirmative defense to exonerate itself. The FDA's refusal to permit Dr. Graham to testify is indeed a partisan act that goes directly to the merits of the case. Moreover, producing a fact witness for a single deposition, in and of itself, cannot be construed a partisan act. This is particularly true where Merck has, and continues, to enjoy almost unfettered access to the FDA on issues related to Vioxx.

**B. EVEN IF THE "ARBITRARY AND CAPRICIOUS" STANDARD APPLIES, THE FDA'S REFUSAL TO COMPLY WITH PSC'S REQUESTS FOR DR. GRAHAM'S SHOULD BE SET ASIDE**

Under 21 C.F.R. § 20.1(c), the FDA should authorize its employees to testify in response to subpoenas such as the PSC's when "such testimony will be in the public interest and will promote the objectives of the [Federal Food, Drug, and Cosmetic Act ('FDCA')], and the agency ...." The FDA clearly erred in determining that the PSC's request did not satisfy these criteria.

**1.      The PSC's Request Is In the Public Interest As Is Dr. Graham's Testimony**

The testimony the PSC seeks is in the public interest because it would help to protect all Americans from deadly and unsafe drugs, like Vioxx. This interest clearly predominates over the FDA's concern that Dr. Graham's depositions would divert important agency time and resources away from FDA's primary mission to protect the public health." *See In re Biosciences*, 150 F.R.D. at 82 (upholding subpoenas demanding testimony from FDA officials for use in private securities litigation, and noting that "the 'public interest' does not exist in a vacuum, isolated at the FDA's offices in Rockville, Maryland.").

Dr. Graham's testimony is not only essential to challenge Merck's FDA defense but it is important public health implications are demonstrated by Congress's invitation for him to testify about the role of the FDA. His testimony before Congress revealed that the FDA was, by design, or practice incapable of dealing with the emerging health issues related to Vioxx, despite the fact that Dr. Graham and other medical officers recognized that Merck's spin on the science was dubious. (Exhibit "35").[24]

---

[24] A true and correct copy of two memos written by FDA employee, Dr. Shari Targum, revealing that the medical officers at the FDA recognized the dangers of Vioxx notwithstanding Merck's spin are

Furthermore, Dr. Graham's testimony is relevant to the issue of whether scientific studies were suppressed including his own.  Dr. Graham will testify about how, the day before his Senate testimony, his superiors at the FDA threatened him with "severe consequences" if he published his findings from a study of 1.4 million patients in California who had either take pain relievers including Vioxx, Celebrex and other NSAIDS like Ibuprofen. This Study, initially suppressed by FDA management, revealed that patients taking Vioxx had a 34 percent higher chance of developing serious coronary heart disease compared to people who took other NSAIDs; with the disease being fatal in about 44 percent of patients. (Exhibit "1").  Even though the FDA suppressed the study, Dr. Graham presented his findings from the study to the Senate during his testimony. (Exhibit " ").  The Study was ultimately published a few months later, (after the Senate hearings) with no revision or comment after review by Dr. Graham's superiors at FDA.  (Exhibit "1"). Clearly there are serious and important public health concerns raised by such conduct by the agency that responsible to protect Americans from unsafe drugs.

In addition, Dr. Graham's testimony will highlight the unhealthy relationship between the pharmaceutical industry, including Merck, and the FDA, which further raises public health concerns.  During his Senate testimony, Dr. Graham relates directly to the power of the FDA to safeguard the American public by regulating drugs and how the system is failing the public.  For example Dr. Graham testified to Congress as follows:

> I worked with Kaiser Permanente in California to perform a large study, which was carefully done and took us nearly three years to complete.
>
> In early August of this year, we assembled a poster describing

---

attached hereto as Exhibit " 35."

some of our findings. We concluded that the high-dose Vioxx significantly increased the risk of heart attacks and sudden deaths that the high dose should not be prescribed or used by patients.

This is exactly the finding that VIGOR had, high dose increase the heart attack. We found the same thing.

This conclusion triggered an explosive response from the Office of New Drugs, which approved Vioxx in the first place and was responsible for regulating it post-marketing.

The response from senior management in my office, the Office of Drug Safety, was equally stressful. I was pressured to change my conclusions and recommendations. One drug safety manager recommended that I should be barred from presenting the poster at the meeting, and also noted that Merck needed to know our study results.

So I guess Merck needed to know the results, and the public didn't.

(Exhibit "1").

Finally, many of the documents produced in this litigation reveal that the resolution to the Vioxx issue was unusually difficult. Specifically, discovery has revealed that serious differences of opinion existed between the FDA and Merck with respect to the safety and effectiveness of Vioxx, the warnings which would be included on the labeling and when those warnings would be given, the manner in which Vioxx was tested and promoted and whether relevant safety data was omitted from Merck's submission to the agency. Also discovery has revealed that serious differences existed between Merck and the FDA about whether Merck was responsive to the FDA's concerns regarding post-marketing drug experience reports. It was in this context that Dr. Graham was asked to provide testimony to Congress. But the documents do not, and cannot tell the entire story about the FDA's limited ability to curb the excesses of large pharmaceutical companies like Merck. Dr. Graham's

testimony will allow a jury to consider this and will assist a jury who may have a misperception of what the FDA can and cannot do.

While the safety of Vioxx may itself no longer be a concern to the FDA, it is of great concern to the countless of Americans that have sustained life-threatening injuries, to the survivors of dead and injured, and to those who still do not know whether they have sustained permanent physical injury as a result of Vioxx. In addition, the recent Congressional investigations raise enormous health issues that should be of concern to the Government. This is particularly true because Merck continues to interact with the agency day-to-day with respect to Vioxx and many other prescription drug products.

Serious questions have been raised about the FDA's ability to truly protect the public health. In addition to Dr. Graham's Congressional testimony, there have been numerous articles written about the public health crisis. For example, Dr. Eric Topol, a leading Cardiologist at the Cleveland Clinic, published an article on October 24, 2004 in the New England Journal entitled "Failing Public Health – Rofecoxib, Merck, and the FDA (Exhibit "37").[25] Dr. Topol states in his article:

> I believe there should be a full Congressional review of this case. The senior executives at Merck and the leadership of the FDA share responsibility for not having taken appropriate action and not recognizing that they are accountable for the public health. Sadly, it is clear to me that Merck's commercial interest in rofecoxib sales exceeded its concern about the drug's potential cardiovascular toxicity . . . Despite the best efforts of many investigators to conduct and publish meaningful independent research concerning the cardiovascular toxicity of rofecoxib, on the FDA is given authority to act. In my view, the FDA's passive position of waiting for data to accrue is not acceptable, given the strong signals that there was a problem and the vast number of

---

[25] A true and correct copy of Dr. Topol's article is attached hereto as Exhibit "36."

patients who were being exposed.
(Exhibit "36")

> Dr. Topol ended his article:

> > Certainly there are many facts that we are not privy to, such as the
> > direct communications between the FDA and Merck, but all facts
> > can and should be scrutinized closely in Congressional review in
> > order to avert such a catastrophe in the future.

*Id.* The PSC suggests that there is no greater public health objective that ensuring and discovering

whether or not there have indeed been irregularities in the approval and labelling of a drug, such as

Vioxx.

Although a "legitimate concern" for agency resources existed in *Davis, supra.*, 877

F.2d at 1187, that same concern does not exist here. In *Davis,* there were numerous lawsuits pending

which might seek the same testimony. *Id.* Moreover, the testimony requested, which concerned

routine investigative work by the EPA, was of a sort that litigants might request in numerous cases;

as the court noted, "private litigation follows each environmental issue." *Id.* Thus, if the testimony

were compelled, "the EPA could reasonably anticipate that its employees would be the subject of

frequent requests ...." *Id.* Here, by contrast, there is no meaningful possibility that a flood of

demands on the FDA's resources will result if the Dr. Graham's testify, which is needless to say

unique.  There are not hundreds of FDA Whistleblowers that are testifying before Congress and

appearing on CNN, NBC, CBS and ABC.  Dr. Graham will have to appear once for deposition in

this multi-district proceeding, not thousands of times.  Merck will undoubtedly cross-notice Dr.

Graham's deposition in various state court actions.  Moreover, there is no basis for supposing that

granting the PSC's request for testimony will result in the FDA receiving numerous similar requests.

### 2. The PSC's Request For Dr. Graham's Testimony Promotes the Objectives of the Food and Drug Act

The Government has erred in concluding that Dr. Graham's testimony would not promote important objectives of the Food and Drug Act.   In 1938, Congress enacted the Food, Drug and Cosmetic Act,  21 C F R Section 5.10 (1983)  *See, also Stanton by Brooks v Astra Zenica Pharmaceuticals, Inc.* 718 F.2d 553 (3d Cir 1983).  In that legislation, Congress created what would become the present day FDA.  *Id.*  As originally enacted, the FDC ACT required that animal toxicity studies be performed and that certain safety information be submitted to the agency.  In the face of Thalidomide disaster in Europe, Congress enacted the Kefauver-Harris amendments to the Act in 1962 . 76 Stat. 700 (1962),  *See, Stanton.*  These amendments, added the requirements that a sponsor demonstrate "substantial evidence" for efficacy and added additional requirements for toxicity testing, pre-approval.  The goal of these acts were to protect the public welfare by placing minimum requirements for the sale and marketing of safe and effective pharmaceutical products.  *See, Stanton* The Government's finding that Dr. Graham's deposition would not further the objectives of the Food and Drug Act thus should be rejected. "To withhold testimony that may be helpful to one side is to favor the other, but more importantly for society, is to prejudice proper resolution of the litigation." *Davis,* 877 F.2d at 1191 (Weis, J., dissenting).

### 3. The FDA Has Produced Medical Officers For Depositions in Other Pharmaceutical Cases – Those Officers Testimony While Important, Did Not Rise to The Level of Importance as Dr. Graham's Testimony

As stated above the FDA has produced medical officers in other MDL Pharmaceutical cases including *In Re. Diet Drugs* and *In Re. Rezulin.* (Exhibit "34"). It is quite telling that the FDA allowed these witnesses, who were not whistleblowers, to be deposed but will not allow Dr.

33

Graham's deposition.[26] The Government's argument should be viewed with high suspicion considering that it is trying silence a whistle-blower, who implicated the governmental agency he worked for, before Congress and the world.  Importantly the production of these witnesses was not considered a partisan act and did not impair their ability to engage in their normal duties.   Dr. Graham has testified before Congress, appeared extensively on television, has given numerous interviews, and has spoken at numerous professional meetings about the topics at issue in this litigation. Indeed, Forbes Magazine named Dr. Graham as its "Face of the Year" for his "steadfast advocacy for drug safety and his willingness to blow the whistle on his bosses." (Exhibit "16").  If the PSC is prohibited from deposing Dr. Graham, this court will be the only forum that he has not discussed his views. There is no more important forum for Dr. Graham to discuss these important public health issues than before this court – not NBC, CBS, ABC, CNN, PBS, MSNBC, Forbes, Newsweek, USA Today, any other media outlet or even Congress itself.

4.      **The Government Privilege Argument Should be Rejected**

a)      **Privilege Generally**

The Government objects that it may be required to disclose information that would be subject to a privilege.  The Government is invited, and will surely attend Dr. Graham's deposition, to protect any privilege that it deems appropriate.  However, it is important to note that any privilege invoked will likely not apply to the issues that the PSC seek to depose Dr. Graham about because Dr. Graham has already spoken extensively in public and before Congress on those same issues.   Thus, the privilege was waived.

---

26  It is important to note that none of the agency employee whose depositions the government tried to block in *Exxon Shipping* were whistle-blowers, like Dr. Graham, whose testimony would strongly implicate the agency's ability to protect the health and safety of the American people.

34

**b)**        **The Deliberative Process Privilege**

The Government invokes the deliberative process privilege. The deliberative process privilege encompasses "confidential deliberations of law or policy-making, reflecting opinions, recommendations, or advice." *In Re: Diet Drugs Litigation, supra.* at 2000 WL at *2 (citing *Redland Soccer Club, Inc. v. Dep't of the Army,* 55 F.3d 827, 853 (3d Cir.1995) (citations omitted). Its purpose is to "prevent injury to the quality of agency decisions." *In Re: Diet Drugs Litigation, supra.* at 2000 WL at *2 (citing *N.L.R.B. v. Sears Roebuck and Co.,* 421 U.S. 132, 151, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975); *Redland Soccer,* 55 F.3d at 854.). The privilege does not protect factual information that is severable from an otherwise protectable document, nor does it protect "[c]ommunications made subsequent to an agency decision." *In Re: Diet Drugs Litigation, supra.* at 2000 WL at *2 (citing *In re Grand Jury,* 821 F.2d 946, 959 (3d Cir.1987), and quoting *United States v. Farley,* 11 F.3d 1385, 1389 (7th Cir.1993)).

The Government must demonstrate the applicability of the privilege. *In Re: Diet Drugs Litigation, supra.* at 2000 WL at *2. Two critical factors in determining the applicability of the privilege are whether the document is "predecisional" (i.e. created before adoption of the agency policy) and whether it is "deliberative" (i.e. reflects the give and take of the consultive process). *Id.* If the court determines that the privilege applies, it must balance the relative interests of the parties, with the party seeking discovery bearing the burden of showing that its need outweighs the government's interest. *Id.* When balancing interests, the court should consider, at a minimum, the:

1)  relevance of the information sought to be protected;

2)  availability of other evidence;

3)  seriousness of the litigation and the issue involved;

4) role of the government in the litigation; and,

5) possibility of future timidity by government employees who will be forced to recognize that their secrets are violable.

*Id.*

The Government has not sustained its burden. The deliberative process privilege does not preclude Dr. Graham's testimony since the communications he will be testifying about were, for the most part, made subsequent to an agency decision and since they have repeatedly been made public through his Congressional testimony and the media. Dr. Graham's testimony cannot be considered "deliberative," something the Government must prove. His testimony will largely be about factual information relating to Vioxx and the relationship between drug companies and the FDA. Thus, the deliberative process privilege is inapplicable.

Additionally, even if the privilege was to apply, in balancing the interests of the thousands of Vioxx victims that the PSC represents against the Government's, it is clear that Dr. Graham's testimony is relevant and important; is unavailable elsewhere; that this litigation is extremely serious and important from a public health perspective; that the Government's role will be minimal; and there is no chance that in the future a government employee will be timid because they will be forced to disclose since Dr. Graham himself choose to become a whistleblower outside of the context of this litigation, on his own. Based on the arguments and facts set forth above, the deliberative process privilege does not preclude Dr. Graham's testimony.

**C.    THE GOVERNMENT'S ARGUMENT THAT THE UNITED STATES IS NOT A "PERSON" WITHIN THE MEANINGS OF RULE 45 AND IS NOT OBLIGATED AS A NON-PARTY TO RESPOND TO THE PSC'S SUBPONEA IS MERITLESS**

In general, parties "may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action . . . [or which] appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).

Rule 45 provides, in relevant part, that "[e]very subpoena shall . . . command each person to whom it is directed to attend and give testimony or to produce and permit inspection and copying" of documents. Fed. R. Civ. P. 45(a)(1)(C).

**1)    Dr. Graham, A Whistleblower, is Not a Sovereign**

The Government argues that the FDA may interfere with a subpoena properly issued pursuant to Rule 45 because it claims the agency is not considered a "person" as this term is used in Rule 45.  However, the Government's argument must fail because the PSC is not seeking to take the deposition of the sovereign; "the United States" or even the FDA. On the contrary, the PSC issued a subpoena for Dr. Graham, who has been served personally, in his capacity as a private citizen who observed the interplay between Merck and the FDA. None of the cases that the Government cites involves a whistleblower, like Dr. Graham who repeatedly, and so publicly, made statements including before the United States Congress, and in the numerous media outlets described above. Furthermore, Dr. Graham repeatedly made clear in these public fora that he was not speaking on behalf of the FDA or as an FDA employee, which is consistent with his description as a whistleblower. [27]

---

27 A few examples include, during his Congressional hearing he stated "[m]ay I correct that?  I don't represent the views of the agency.  I think that's pretty clear" and on NBC's *"Today" Show with*

Alternatively, even if Dr. Graham is somehow considered a "soverign," the Government's argument should be rejected because the PSC can easily overcome the presumption that "person" does not include the sovereign.

The Supreme Court has directed that the presumption that "person" does not include the soverign may be disregarded when "[t]he purpose, the subject matter, the context, the legislative history, [or] the executive interpretation of the statute . . . indicate an intent, by the use of the term, to bring state or nation within the scope of the law." *United States v. Cooper Corp.*, 312 U.S. 600, 604-05 (1941).

The presumption is rebutted in this case. First, Courts, including the D.C. Circuit, which the Government relies so heavily on, have consistently enforced Rule 45 subpoenas against federal agencies, as set forth in detail below.[28] Second, interpreting "person" to include federal agencies is consistent with the use of "person" in other federal rules. Third, federal agencies historically have understood themselves to be subject to the subpoena power of the federal District Courts, as demonstrated by agency regulations and the failure to raise the argument until recently. Finally, to hold otherwise would seriously undermine a private party's ability to pursue its claims when the federal government holds relevant documents and information.

---

*Katie Couric*" on December 21, 2005 where he appeared with the Dr. Lester Crawford, Acting FDA Commissioner (he specifically prefaced his comments in this "debate," moderated by Katie Couric, that although he was an FDA scientist, he was <u>not</u> appearing on behalf of the FDA or in his capacity as an FDA employee, pointing out that Dr. Lester was. He specifically clarified that he was speaking on his own behalf)(Exhibit "1").

28  The PSC incorporates the argument above, which specifically addresses this point, ad

**2)**     **The Text and Structure of the Federal Rules of Civil Procedure Demonstrate That "Person" Encompasses Federal Agencies**

**a)**     **The Text of Rules 4, 30, and 45 Clearly Indicates the Intent to Include Federal Agencies in the Meaning of "Person"**

The text and structure of the federal rules plainly demonstrate that the federal government is a person subject to a subpoena and that the Government's argument should be rejected.

Rule 30(b)(6) states that a party may "in a subpoena name as the deponent a public or private corporation or partnership or association or governmental agency . . . ." Fed. R. Civ. P. 30(b)(6) (emphasis added). The Government's argument that the FDA's status as a governmental agency renders it beyond the reach of federal subpoenas, cannot be reconciled with the command of Federal Rule of Civil Procedure 30(b)(6), which states on its face that "governmental agencies" are subject to federal subpoenas. *Id.* Rule 30 expressly cross-references Rule 45 as the means by which the attendance of a witness may be compelled. Because Rule 45's commands apply only to "persons," and Rule 30 expressly includes "government agencies" within the scope of the District Court's subpoena power, there can be no question that "person" encompasses a federal agency like the FDA. Any suggestion from the Government that Rule 30's express reference to governmental agencies should be read to mean that Rule 45 does not include agencies because Rule 45 does not specifically identify agencies as persons is fundamentally flawed because the Rules themselves link Rule 30 and Rule 45.

Likewise, Rule 4 contains textual evidence that the term "person" in the Federal Rules of Civil Procedure includes federal agencies. That Rule refers to Service of Process to cure a failure

nauseum.

39

to serve "all persons required to be served in an action governed by Rule 4(i)(2)(A)." Fed. R. Civ. P. 4(i)(3)(A).  Rule 4(i)(2)(A) in turn expressly refers to "[s]ervice on an agency or corporation of the United States," among others. Fed. R. Civ. P. 4(i)(2)(A).  This cross-reference makes it clear that the term "person" includes a federal agency under Rule 4.

> **b)** **"Person" as Used in Other Federal Rules Includes Federal Agencies.**

The Government's conclusion that the term "person" in Rule 45 does not include federal agencies is also inconsistent with the manner in which the courts have interpreted the term "person" as used in other parts of the Federal Rules of Civil Procedure.  "Person" as used in Rule 45 should be interpreted consistently throughout the rules.  *See Mortgage Info. Serv., Inc. v. Kitchens*, 210 F.R.D. 562, 566 (W.D.N.C. 2002) (federal courts must adhere to "traditional canons of interpretation regarding the interaction between the various Federal Rules of Civil Procedure, which require that the rules be construed in a manner that is internally consistent") (citing *Hickman v. Taylor*, 329 U.S. 495 (1947)).

In *Carlson v. Tulalip Tribes of Washington*, the Ninth Circuit expressly held that "the United States is a person described in Rule 19(a)(1), (2)," the rule governing the joinder of indispensable parties.  510 F.2d 1337, 1339 (9th Cir. 1975).[29]  The Supreme Court and the District of Columbia District Court, which the Government relies so heavily on, have also reached the implicit conclusion on numerous occasions that the United States is a "person" within the meaning of other rules.  For example, in *United States v. Yellow Cab Co.*, 340 U.S. 543 (1951), held that the United States could be impled as a third-party under Rule 14, which authorizes a third-party

---

[29]  *See also, e.g., Spirit Lake Tribe v. North Dakota*, 262 F.3d 732, 746-48 (8th Cir. 2001) (holding that the government was an indispensable person under Fed. R. Civ. P. 19(b)); *Dunlop v.*

complaint against "a *person* not a party to the action." Fed. R. Civ. P. 14 (emphasis added). The Court's reliance on Rule 14 to support its holding that the United States could be impled necessarily reflects a conclusion that the United States is a "person" within the meaning of Rule 14(a).

Similarly, by permitting the United States to intervene as of right, the District Court, so relied on by the Government, in *Roeder v. Islamic Republic of Iran* implicitly concluded that the United States is a "person" for the purposes of Rule 24(c). 333 F.3d 228, 232-33 (D.C. Cir. 2003). Rule 24(c), which governs the procedure for intervention, states that "[a] *person* desiring to intervene" shall serve a motion on the parties. Fed. R. Civ. P. 24(c) (emphasis added).

Likewise, the United States frequently itself invokes Rule 22, which governs interpleader and allows "[p]ersons having claims against the plaintiff" to be joined as defendants, to enter a case to assert a tax lien against property, or to settle competing claims to property in the government's possession. *See* 7 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure, Civil 3d § 1721 (2001).

Because the federal government is treated as a "person" under other Federal Rules of Civil Procedure, "person" under Rule 45 also should be construed to include federal government agencies.

      c)      **Federal Agency Regulations Reflect the Executive Branch's Understanding that Federal Agencies Are Subject to District <u>Court Subpoenas</u>**

Federal agency regulations, including the State Department's own regulations, reflect the Executive Branch's understanding that its agencies are subject to the federal District Court's subpoena power. *See* 22 C.F.R. § 172.1 (revised as of April 1, 2003) (State Department regulations

---

*Minnesota*, 626 F. Supp. 1127, 1131-32 (D. Minn. 1986) (same).

governing "PRODUCTION OR DISCLOSURE OF OFFICIAL INFORMATION IN RESPONSE

TO . . . SUBPOENAS"); 12 C.F.R. § 309.6(b)(8)(i) (2002) (FDIC); 12 C.F.R. §§ 510.4; 510.5(c)(5)

(2002); *see also Boske v. Comingore*, 177 U.S. 459, 460-61 (1900) (quoting Internal Revenue

regulations from 1898 regarding subpoena responses).

Indeed, despite the fact that Rule 45 has long applied to "persons," federal agencies

have only recently begun to challenge subpoenas on the basis that they are not "persons."  At a

minimum, the Executive Branch's course of conduct refutes any presumption that "person" does not

include federal agencies. *See Cooper Corp.*, 312 U.S. at 604-05 (listing "executive interpretation" as

a factor rebutting a presumption that "person" as used in legislation does not include the sovereign).

> **d)** **Unless Rule 45 Applies to Federal Agencies, Private Litigants
> Will Be Seriously Prejudiced in Cases in Which the Government
> Holds Relevant Information**

The Government's position if accepted would result in substantial prejudice to private

litigants whose cases may depend on important information held by a federal agency.

Under the Government's theory, a private litigant's only recourse if the agency refuses

to produce any documents or a witness, would be to wait an indeterminate time to allow the

government adequately to consider the litigant's document requests, and then to file suit under the

Administrative Procedure Act ("APA"), which is addressed above.  The government would have 60

days to respond to that collateral suit. *See* Fed. R. Civ. P. 12(a)(3).  It is impossible to determine

when the court presiding over that collateral suit would consider the merits of that case, but there

would be no assurance that it would reach a decision within the time allowed for discovery in the

underlying lawsuit.  And, under the Government's theory, any decision to withhold documents or

witnesses would be subject only to the APA's deferential "arbitrary and capricious" standard of review, which was refuted by the PSC above. *See* 5 U.S.C. § 706.

For these reasons, a collateral proceeding under the APA is an extraordinarily cumbersome device that could in effect deprive a private litigant of the necessary discovery, within the timeframe needed for litigation. As the Ninth Circuit recognized in *Exxon Shipping*, "collateral APA proceedings can be costly, time-consuming, inconvenient to litigants, and may 'effectively eviscerate[]' any right to the requested testimony." 34 F.3d at 780 n.11 (citation omitted).

## V.    **CONCLUSION**

Dr. Graham has testified before Congress, appeared extensively on television, has given numerous interviews, and has spoken at numerous professional meetings about the topics at issue in this litigation. Indeed, Forbes Magazine named Dr. Graham as its "Face of the Year" for his "steadfast advocacy for drug safety and his willingness to blow the whistle on his bosses." (Exhibit "16"). If the PSC is prohibited from deposing Dr. Graham, this court will be the only forum that he has not discussed his views. There is no more important forum for Dr. Graham to discuss these important public health issues than before this court – not NBC, CBS, ABC, CNN, PBS, MSNBC, Forbes, Newsweek, USA Today, any other media outlet or even Congress itself.

For all the foregoing reasons, the PSC respectfully requests that this Honorable Court deny the Government's Motion to Quash, granting the PSC's Cross-motion to compel, and enter an Order compelling Dr. Graham to appear on a date convenient to Dr. Graham on or before February 4, 2006 (4 days before the start of the *Irvin* trial).

43

Respectfully submitted,

**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
***Herman, Herman, Katz & Cotlar, LLP***
820 O'Keefe Avenue
New Orleans, LA  70113
PH:     (504) 581-4892
FAX:   (504) 561-6024

Temporary Office:

Place St. Charles, 201 St. Charles Avenue
Suite 4310, New Orleans, Louisiana  70170

**Plaintiffs' Liaison Counsel**

| | |
|---|---|
| Richard J. Arsenault, Esq.<br>P.O.Box 1190<br>2220 Bonaventure Court<br>Alexandria, LA  71309-1190<br>PH: (318) 487-9874<br>FAX: (318) 561-2591 | Gerald E. Meunier, Esq.<br>Energy Centre<br>1100 Poydras Street, Suite 2800<br>New Orleans, LA  70163-2800<br>PH: (504) 522-2304<br>FAX: (504) 528-9973 |
| Andy D. Birchfield, Esq. **(Co-Lead Counsel)**<br>P.O. Box 4160<br>234 Commerce Street<br>Montgomery, AL  36103-4160<br>PH: (800) 898-2034<br>FAX: (334) 954-7555 | Troy Rafferty, Esq.<br>316 S. Baylen Street, Suite 400<br>Pensacola, FL  32502<br>PH: (850) 435-7000<br>FAX: (850) 497-7059 |
| Elizabeth Cabraser, Atty.<br>Embarcadero Center West<br>275 Battery Street, 30th Floor<br>San Franciso, CA  94111-3339<br>PH: (415) 956-1000<br>FAX: (415-956-1008 | Drew Ranier, Esq.<br>1419 Ryan Street<br>Lake Charles, LA  70601<br>PH: (337) 494-7171<br>FAX: (337) 494-7218 |
| Thomas Kline, Esq.<br>1525 Locust St.<br>19th Floor<br>Philadelphia, PA  19102<br>PH: (215) 772-1000<br>FAX: (215) 772-1371 | Mark Robinson, Esq.<br>620 Newport Center Drive<br>7th Floor<br>Newport Beach, CA  92660<br>PH: (949) 720-1288<br>FAX: (949) 720-1292 |
| | Christopher Seeger, Esq. **(Co-Lead Counsel)**<br>One William Street<br>New York, NY  10004<br>PH: (212) 584-0700<br>FAX: (212) 584-0799 |

| | |
|---|---|
| Arnold Levin, Esq. **(On Brief)**<br>Michael M. Weinkowitz, Esq.<br>**(primary author on the brief)**<br>510 Walnut Street<br>Suite 500<br>Philadelphia, PA 19106-3875<br>PH: (215) 592-1500<br>FAX: (215) 592-4663<br><br>Carlene Rhodes Lewis, Atty.<br>2200 Texaco Heritage Plaza<br>1111 Bagby<br>Houston, TX 77002<br>PH: (713) 650-0022<br>FAX: (713-650-1669 | Christopher Vincent Tisi, Esq. **(On Brief)**<br>2000 L Street, NW<br>Suite 400<br>Washington, DC 20036-4914<br>PH: (202) 783-6400<br>FAX: (307) 733-0028 |

## PLAINTIFFS' STEERING COMMITTEE

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing PSC's Opposition to the United States Government's Motion to Quash and Cross-Motion to Compel the Deposition of David Graham, M.D. has been served on Defense Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery, on the below listed parties via Federal Express, hand delivery and/or e-mail, and e-mail and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced in accordance with Pre-Trial Order No. #8, on this 25th day of January, 2006:

1.  Sharon D. Smith
    Assistant U.S. Atty.
    500 Poydras Street
    Second Floor
    Hale Boggs, Federal Bldg.
    New Orleans, LA 70130

2.  David Graham, M.D.
    24212 Hawkins Landing
    Gaithersberg, MD 20882

45

# SEE RECORD FOR

# EXHIBITS

# OR

# ATTACHMENTS

# NOT SCANNED