FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF L

2006 FEB -1 P 1: 0

LORETTA G. WHYTE
CLERK

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| | * | **JUDGE FALLON** |
| **This document relates to** | * | |
| **Case No. 05-4046\*** | * | |
| | * | **MAGISTRATE JUDGE KNOWLES** |
| **EVELYN IRVIN PLUNKETT** | * | |
| as Personal Representative of the Estate of | * | |
| **RICHARD IRVIN, JR.,** | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| **MERCK & CO., INC.,** | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## DECLARATION OF PHILLIP A. WITTMANN
## IN SUPPORT OF MERCK'S MOTIONS *IN LIMINE*

I, PHILLIP A. WITTMANN, by way of declaration, say:

      1.     I am an attorney in the law firm of Stone Pigman Walther Wittman L.L.C.,

attorneys for the defendant Merck & Co., Inc. ("Merck") in the above-captioned matter.  I make

this declaration in support of Merck's Motions *in Limine*, filed concurrently herewith.  I have

personal knowledge to state that the following exhibits, which are attached to this declaration,

are true and correct copies of the documents they purport to be.

Fee _____
Process _____
X  Dktd _____
CtRmDep _____
Doc. No _____

2.      Attached hereto as Exhibit 1 is a true and correct copy of excerpts from the trial transcript in *Plunkett v. Merck*, No. 05-4046, MDL No. 1657 (E.D. La. filed August 23, 2005).

3.      Attached hereto as Exhibit 2 is a true and correct copy of excerpts from the November 14, 2005 *Daubert* Hearing transcript in *Plunkett v. Merck*, No. 05-4046, MDL No. 1657 (E.D. La. filed August 23, 2005).

4.      Attached hereto as Exhibit 3 is a true and correct copy of excerpts from the January 25, 2006 deposition of Michael Alan Graham, M.D., taken in connection with this action.

5.      Attached hereto as Exhibit 4 is a true and correct copy of the expert report of Michael Alan Graham, M.D., submitted in connection with this action.

6.      Attached hereto as Exhibit 5 is a true and correct copy of excerpts from the November 22, 2005 deposition of Eric J. Topol, M.D., taken in connection with this action.

Respectfully submitted,

Phil Wittmann

Phillip A. Wittmann
Attorney for Merck & Co., Inc.

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Declaration of Phillip A. Wittmann in Support of Merck's Motions *in Limine* has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 30th day of January, 2006.



**EXHIBIT 1 - Plunkett I Trial Excerpts**

• **Plunkett II MILs**

[1:] - [1:25]      11/29/2005  Irvin Plunkett Trial - Jury Select, Openings, Lucch

```
page 1
   0001
1                           UNITED STATES DISTRICT COURT
2                           EASTERN DISTRICT OF LOUISIANA
3
4
5
        IN RE: VIOXX PRODUCTS             *
6       LIABILITY LITIGATION              *  MDL DOCKET NO. 1657
                                          *
7                                         *
        THIS DOCUMENT RELATES TO          *  HOUSTON, TEXAS
8       CASE NO. 05-4046:                 *
                                          *
9       EVELYN IRVIN PLUNKETT, ET AL      *  NOVEMBER 29, 2005
                                          *
10      VERSUS                            *
                                          *  8:30 A.M.
11      MERCK & CO., INC.                 *
        * * * * * * * * * * * * * * * *
12
13
                               VOLUME I
14                        JURY TRIAL BEFORE THE
                        HONORABLE ELDON E. FALLON
15                    UNITED STATES DISTRICT JUDGE
16
17      APPEARANCES:
18
        FOR THE PLAINTIFF:          BEASLEY ALLEN CROW METHVIN
19                                     PORTIS & MILES
                                    BY:  JERE LOCKE BEASLEY, ESQ.
20                                       ANDY D. BIRCHFELD, JR., ESQ.
                                         J. PAUL SIZEMORE, ESQ.
21                                  234 COMMERCE STREET
                                    POST OFFICE BOX 4160
22                                  MONTGOMERY, ALABAMA 36103
23
        FOR THE PLAINTIFF:          ROBINSON, CALCAGNIE & ROBINSON
24                                  BY:  MARK P. ROBINSON, JR., ESQ.
                                    620 NEWPORT CENTER DRIVE
25                                  NEWPORT BEACH, CALIFORNIA 92660
```

[10:13] - [10:23]      11/29/2005  Irvin Plunkett Trial - Jury Select, Openings, Lucch

```
page 10
13                     WITH REGARD TO 26(A)(2)(A), CLEARLY THEY MUST
14      DISCLOSE THE IDENTITY OF THE PARTY WHO MAY BE USED TO PRESENT
15      TESTIMONY AT THIS TRIAL, BUT WITH REGARD TO THIS PARTICULAR
16      EXPERT, IT SEEMS TO ME THAT THIS WITNESS, THE DISCLOSURE, HE
17      WAS A CARDIAC CONSULTANT FOR MERCK.  MERCK HAD TO BE AWARE OF
18      HIS OPINIONS SINCE APRIL OF 2001.  THIS IS NO SHRINKING VIOLET.
19      THIS PERSON HAS WRITTEN ARTICLE AFTER ARTICLE COMMENTING ON, IF
20      NOT CRITICIZING, THE VARIOUS TRIALS.  WHEN HE WAS LISTED BY THE
21      PLAINTIFFS, CLEARLY MERCK NEWLY WHAT THE PERSON WAS GOING TO
22      SAY BECAUSE THEY HAVE BEEN READING ABOUT WHAT HE WAS GOING TO
23      SAY FOR SEVERAL YEARS.
```

[11:22] - [12:24]      11/29/2005  Irvin Plunkett Trial - Jury Select, Openings, Lucch

```
page 11
22                     I'M GOING TO ALLOW HIM TO TESTIFY, BUT I DON'T
23      SEE HIM TESTIFYING BY WAY OF SIMPLY THE ENTIRE DEPOSITION.  I
24      THINK THE RELEVANCE OF HIS TESTIMONY IS WHAT MERCK KNEW, WHEN
```



EXHIBIT
/
Blumberg No. 5119

**EXHIBIT 1 - Plunkett I Trial Excerpts**

• **Plunkett II MILs**

```
                    25      MERCK KNOW IT, WHAT THEY DID, AND WHAT THEY DIDN'T DO.  I'M NOT
            page 12
                    1       INTERESTED IN WHAT HE THINKS THE STATE OF MIND OF MERCK IS.
                    2       I'M NOT INTERESTED IN WHAT HE SAID ON 60 MINUTES.  I'M NOT
                    3       INTERESTED IN WHAT HE SAID IN NEWSPAPER ARTICLES.  HE WROTE AN
                    4       ARTICLE.  I UNDERSTAND THAT HE TOLD MERCK ABOUT THE ARTICLE.
                    5       HE SENT IT TO THEM SOMETIMES FOR REVIEW, GOT RESPONSES BACK
                    6       FROM THEM.  HE SHOULD BE ABLE TO TESTIFY AS TO WHAT MERCK KNEW
                    7       AND WHEN THEY KNEW IT.
                    8               LET ME ALSO SAY THAT THIS CASE INVOLVES THE
                    9       DEATH OF A PERSON WHO WAS TAKING VIOXX IN APRIL OF 2001.  I
                    10      DON'T SEE ANY RELEVANCE IN THIS CASE AS TO WHAT HAPPENED IN
                    11      2004 UNLESS IT'S USED FOR IMPEACHMENT, BUT WHAT HAPPENED AFTER
                    12      THE DEATH IS OF NO SIGNIFICANCE IN THIS PARTICULAR CASE.  IT
                    13      MAY HAVE SIGNIFICANCE IN THE OVERALL PICTURE OF THE MDL, BUT
                    14      THAT'S A POTENTIAL, ALWAYS, PROBLEM WITH MDL WHEN YOU START
                    15      PEELING OFF CASES FOR TRIAL BECAUSE THE TRIAL OF THE CASE IS
                    16      WHAT'S AT ISSUE BEFORE THE JURY.  THE WHOLE MDL PROCEEDING IS
                    17      NOT AN ISSUE BEFORE THE JURY.  SO WHILE YOU CAN DISCOVER A LOT
                    18      IN THE MDL PROCEEDING, WHEN YOU GET DOWN TO THE TRIAL, IT HAS
                    19      TO BE SPECIFIC TO THE FACTS OF THAT PARTICULAR CASE.
                    20              I JUST DON'T SEE A LARGE PART OF THAT DEPOSITION
                    21      COMING INTO PLAY.  IT'S FILLED WITH COLLOQUY.  IT'S FILLED WITH
                    22      CONVERSATION BETWEEN COUNSEL.  IT'S FILLED WITH JABS BACK AND
                    23      FORTH.  THAT'S NOT REALLY APPROPRIATE FOR PRESENTATION INTO
                    24      EVIDENCE, SO THE DEPOSITION IS GOING TO HAVE TO BE STREAMLINED.
```

[12:6] - [12:7]       11/29/2005  Irvin Plunkett Trial - Jury Select, Openings, Lucch

```
            page 12
                    6       FROM THEM.  HE SHOULD BE ABLE TO TESTIFY AS TO WHAT MERCK KNEW
                    7       AND WHEN THEY KNEW IT.
```

[12:8] - [12:12]      11/29/2005  Irvin Plunkett Trial - Jury Select, Openings, Lucch

```
            page 12
                    8               LET ME ALSO SAY THAT THIS CASE INVOLVES THE
                    9       DEATH OF A PERSON WHO WAS TAKING VIOXX IN APRIL OF 2001.  I
                    10      DON'T SEE ANY RELEVANCE IN THIS CASE AS TO WHAT HAPPENED IN
                    11      2004 UNLESS IT'S USED FOR IMPEACHMENT, BUT WHAT HAPPENED AFTER
                    12      THE DEATH IS OF NO SIGNIFICANCE IN THIS PARTICULAR CASE.  IT
```

[114:23] - [114:24]   11/29/2005  Irvin Plunkett Trial - Jury Select, Openings, Lucch

```
            page 114
                    23      MARKETING.  WHEN MERCK LAUNCHED VIOXX BACK IN 1999, THEY SPENT
                    24      A MILLION DOLLARS ON THIS LAUNCH PARTY.  THEY BROUGHT IN ALL
```

[115:20] - [115:23]   11/29/2005  Irvin Plunkett Trial - Jury Select, Openings, Lucch

```
            page 115
                    20      3,800 SALES REPS IN THE MARKET."  THAT'S HOW THEY GET THE
                    21      SAMPLES IN THE DOCTORS' OFFICES SO FOLKS LIKE RICHARD AYCOCK,
                    22      WHO HAD SEEN THE COMMERCIALS ON TV, THE COMMERCIALS WITH
                    23      DOROTHY HAMILL SKATING AROUND -- AND, YOU KNOW, WE TALKED ABOUT
```

[116:7] - [116:10]    11/29/2005  Irvin Plunkett Trial - Jury Select, Openings, Lucch

```
            page 116
                    7       SO THEY WOULD BE DISTRIBUTED.  ANOTHER PART OF THAT WAS THROUGH
                    8       OF WHAT'S CALLED DIRECT-TO-CONSUMER ADVERTISING, TV ADS.  MERCK
                    9       SPENT $161 MILLION FOR DIRECT-TO-CONSUMER ADVERTISING.  THAT'S
                    10      MORE THAN ANHEUSER-BUSCH SPENT ON BUDWEISER AND PEPSI ON PEPSI.
```

EXHIBIT 1 - Plunkett I Trial Excerpts

• **Plunkett II MILs**

[117:9] - [117:22]    11/29/2005  Irvin Plunkett Trial - Jury Select, Openings, Lucch

```
page 117
9                     MERCK HAD TO DEAL WITH THAT.  THEY COME UP WITH
10       A SALES TRAINING PROGRAM FOR THEIR SALES REPS ABOUT HOW TO
11       HANDLE THOSE OBSTACLES, HOW TO HANDLE THOSE QUESTIONS FROM
12       DOCTORS.  THEY COME UP WITH SALES PROGRAM CALLED DODGE BALL,
13       DODGE BALL VIOXX.  WHAT ARE THE QUESTIONS THEY ARE TALKING
14       ABOUT HERE?  IT'S NOT SIMPLE MINOR QUESTIONS, "HOW CAN I GET A
15       FREE VIOXX?"  IT'S "WHAT ABOUT THE HEART ATTACK RISKS?"  THEY
16       ARE TRAINING THEIR SALES REPS THROUGH A PROGRAM CALLED DODGE
17       BALL VIOXX.  THEY HAVE AN OBVIOUS TACTICAL TRAINING GUIDE.
18       "DON'T LET THE HEART ATTACK RISK STAND IN THE WAY OF THE DOCTOR
19       WRITING PRESCRIPTIONS FOR VIOXX."  THEY HAVE A SLICK BROCHURE
20       THAT THEY PUT IN THEIR SALES REPS HANDS TO TAKE INTO DOCTORS'
21       OFFICES TO SHOW TO THE DOCTORS AND IT SAYS 11 TIMES FEWER
22       DEATHS WITH VIOXX.  THAT'S NOT GOOD SCIENCE.
```

[264:] - [264:25]    11/30/2005  Irvin Plunkett Trial - Bloor, Goldstein, Irvin, Ans

```
page 264
    0264
1                         UNITED STATES DISTRICT COURT
2                         EASTERN DISTRICT OF LOUISIANA
3
4
5
            IN RE: VIOXX PRODUCTS            *
6           LIABILITY LITIGATION            *   MDL DOCKET NO. 1657
                                            *
7                                           *
            THIS DOCUMENT RELATES TO        *   HOUSTON, TEXAS
8           CASE NO. 05-4046:               *
                                            *
9           EVELYN IRVIN PLUNKETT, ET AL    *   NOVEMBER 30, 2005
                                            *
10          VERSUS                          *
                                            *   8:30 A.M.
11          MERCK & CO., INC.               *
            * * * * * * * * * * * * * * * * *
12
13
                                 VOLUME II
14                         JURY TRIAL BEFORE THE
                           HONORABLE ELDON E. FALLON
15                         UNITED STATES DISTRICT JUDGE
16
17          APPEARANCES:
18
            FOR THE PLAINTIFF:            BEASLEY ALLEN CROW METHVIN
19                                          PORTIS & MILES
                                          BY:  JERE LOCKE BEASLEY, ESQ.
20                                             ANDY D. BIRCHFELD, JR., ESQ.
                                               J. PAUL SIZEMORE, ESQ.
21                                        234 COMMERCE STREET
                                          POST OFFICE BOX 4160
22                                        MONTGOMERY, ALABAMA 36103
23
            FOR THE PLAINTIFF:            ROBINSON, CALCAGNIE & ROBINSON
24                                        BY:  MARK P. ROBINSON, JR., ESQ.
                                          620 NEWPORT CENTER DRIVE
25                                        NEWPORT BEACH, CALIFORNIA 92660
```

[331:4] - [331:12]    11/30/2005  Irvin Plunkett Trial - Bloor, Goldstein, Irvin, Ans

```
page 331
4           Q.   AND THE OPINION THAT YOU'RE GIVING TODAY IS THAT, SINCE
5       THERE WAS NO PLAQUE RUPTURE, THE SOMETHING ELSE THAT CAUSED THE
```

## EXHIBIT 1 - Plunkett I Trial Excerpts

• **Plunkett II MILs**

```
6        PLAQUE MUST HAVE BEEN VIOXX.  RIGHT?
7        A.    WELL, SINCE THERE IS NO PLAQUE RUPTURE AT THE SITE WHERE
8        THIS NONATTACHED THROMBUS IS LOCATED, I CONSIDERED WHAT OTHER
9        FACTORS MAY BE.  AND KNOWING THAT THE PATIENT WAS ON VIOXX AND
10       ON THE ASSUMPTION, THE BASIS FOR WHICH I'VE STATED BEFORE, THAT
11       IT'S A PROTHROMBOTIC AGENT, THAT THIS IS WHY I'VE CONSIDERED IT
12       TO BE A SUBSTANTIAL CONTRIBUTORY FACTOR TO THE CAUSE OF DEATH.
```

[345:9] - [345:23]     11/30/2005  Irvin Plunkett Trial - Bloor, Goldstein, Irvin, Ans

```
page 345
9        Q.    LET ME ASK YOU THIS QUESTION AND TELL ME WHETHER YOU CAN
10       SAY IN GENERAL YES.  OKAY?  HERE IS THE QUESTION:  IF YOU SAW
11       PLAQUE RUPTURE AND AN ASSOCIATED THROMBUS SUCH THAT YOU
12       CONCLUDED THAT THE PLAQUE RUPTURE CAUSED THE THROMBUS, IT WOULD
13       BE YOUR OPINION, TO A REASONABLE MEDICAL PROBABILITY, THAT THE
14       PLAQUE RUPTURE CAUSED MR. IRVIN'S DEATH?  WOULD YOU AGREE WITH
15       THAT?
16       A.    YES.
17       Q.    AND WOULD YOU AGREE THAT, IN THAT CASE, IT WOULD NOT BE
18       VIOXX?
19       A.    AGAIN, IF THAT LESION, WITH THE QUALIFICATIONS THAT I'VE
20       ALREADY CITED, YES, I WOULD COME TO THAT CONCLUSION.
21       Q.    SO IF THERE WAS PLAQUE RUPTURE, THAT WOULD BE THE PROBABLE
22       CAUSE OF DEATH RATHER THAN VIOXX, RIGHT?
23       A.    AS I SAID, YES, IF IT MET THOSE CONDITIONS.
```

[740:] - [740:25]     12/2/2005   Irvin Plunkett Trial - Ray, Weeks, Irvin A, Raffa, S

```
page 740
    0740
1                        UNITED STATES DISTRICT COURT
2                        EASTERN DISTRICT OF LOUISIANA
3
4
5
         IN RE: VIOXX PRODUCTS                *
6        LIABILITY LITIGATION                 *  MDL DOCKET NO. 1657
                                              *
7                                             *
         THIS DOCUMENT RELATES TO             *  HOUSTON, TEXAS
8        CASE NO. 05-4046:                    *
                                              *
9        EVELYN IRVIN PLUNKETT, ET AL         *  DECEMBER 2, 2005
                                              *
10       VERSUS                               *
                                              *  8:30 A.M.
11       MERCK & CO., INC.                    *
         * * * * * * * * * * * * * * * * *
12
13
                            VOLUME IV
14                   JURY TRIAL BEFORE THE
                   HONORABLE ELDON E. FALLON
15               UNITED STATES DISTRICT JUDGE
16
17       APPEARANCES:
18
         FOR THE PLAINTIFF:            BEASLEY ALLEN CROW METHVIN
19                                       PORTIS & MILES
                                       BY:  JERE LOCKE BEASLEY, ESQ.
20                                          ANDY D. BIRCHFELD, JR., ESQ.
                                          J. PAUL SIZEMORE, ESQ.
21                                     234 COMMERCE STREET
                                       POST OFFICE BOX 4160
22                                     MONTGOMERY, ALABAMA 36103
23
         FOR THE PLAINTIFF:            ROBINSON, CALCAGNIE & ROBINSON
```

EXHIBIT 1 - Plunkett I Trial Excerpts

• **Plunkett II MILs**

```
                              24                                    BY:  MARK P. ROBINSON, JR., ESQ.
                                                                    620 NEWPORT CENTER DRIVE
                              25                                    NEWPORT BEACH, CALIFORNIA 92660
```

[740:] - [740:25]      12/2/2005   Irvin Plunkett Trial - Ray, Weeks, Irvin A, Raffa, S

```
                    page 740
                         0740
                    1                        UNITED STATES DISTRICT COURT
                    2                       EASTERN DISTRICT OF LOUISIANA
                    3
                    4
                    5
                          IN RE: VIOXX PRODUCTS              *
                    6     LIABILITY LITIGATION               *   MDL DOCKET NO. 1657
                                                             *
                    7                                        *
                          THIS DOCUMENT RELATES TO           *   HOUSTON, TEXAS
                    8     CASE NO. 05-4046:                   *
                                                             *
                    9     EVELYN IRVIN PLUNKETT, ET AL       *   DECEMBER 2, 2005
                                                             *
                    10    VERSUS                             *
                                                             *   8:30 A.M.
                    11    MERCK & CO., INC.                   *
                          * * * * * * * * * * * * * * * * *
                    12
                    13
                                                  VOLUME IV
                    14                      JURY TRIAL BEFORE THE
                                           HONORABLE ELDON E. FALLON
                    15                    UNITED STATES DISTRICT JUDGE
                    16
                    17    APPEARANCES:
                    18
                          FOR THE PLAINTIFF:          BEASLEY ALLEN CROW METHVIN
                    19                                  PORTIS & MILES
                                                      BY:  JERE LOCKE BEASLEY, ESQ.
                    20                                     ANDY D. BIRCHFELD, JR., ESQ.
                                                           J. PAUL SIZEMORE, ESQ.
                    21                                234 COMMERCE STREET
                                                      POST OFFICE BOX 4160
                    22                                MONTGOMERY, ALABAMA 36103
                    23
                          FOR THE PLAINTIFF:          ROBINSON, CALCAGNIE & ROBINSON
                    24                                BY:  MARK P. ROBINSON, JR., ESQ.
                                                      620 NEWPORT CENTER DRIVE
                    25                                NEWPORT BEACH, CALIFORNIA 92660
```

[957:17] - [957:18]      12/2/2005   Irvin Plunkett Trial - Ray, Weeks, Irvin A, Raffa, S

```
                    page 957
                    17    Q.   WHAT DID YOU DO WITH THE REMAINING VIOXX SAMPLES?
                    18    A.   I HAD GAVE ONE VIOXX SAMPLE TO DICKY IRVIN; AND THE OTHER
```

[959:2] - [959:4]      12/2/2005   Irvin Plunkett Trial - Ray, Weeks, Irvin A, Raffa, S

```
                    page 959
                    2     Q.   DID MR. IRVIN ASK YOU IF YOU COULD GIVE HIM A SAMPLE OF
                    3     VIOXX?
                    4     A.   NO.
```

[960:10] - [960:12]      12/2/2005   Irvin Plunkett Trial - Ray, Weeks, Irvin A, Raffa, S

```
                    page 960
                    10    A.   I THINK THE NEXT DAY HE TOLD ME THAT IT HELPED HIM, AND HE
                    11    KNEW THAT IT WAS ALL I HAD.  SO THAT WAS THE EXTENT OF THE
```

EXHIBIT 1 - Plunkett I Trial Excerpts

• Plunkett II MILs

12        CONVERSATION.  HE SAID HIS BACK WAS BETTER.

[975:5] - [976:15]        12/2/2005   Irvin Plunkett Trial - Ray, Weeks, Irvin A, Raffa, S

page 975
5        Q.    DO YOU KNOW WHETHER, PRIOR TO APRIL OF 2001, YOU ATTENDED
6        ANY MEDICAL CONFERENCE AT WHICH ANY COX-2 INHIBITOR DRUG WAS
7        DISCUSSED?
8        A.    THE ONLY CONFERENCE I CAN THINK OF THAT I MIGHT HAVE EVER
9        ATTENDED ON A COX-2 WAS I WENT TO A DINNER IN WHICH THEY SPOKE
10       ABOUT CELEBREX, BUT I DON'T REMEMBER THE EXACT DATES, TIMES.  I
11       KNOW IT WAS AT LEAST MORE THAN TWO, THREE YEARS.
12       Q.    DO YOU RECALL, SIR, WHETHER IT WAS BEFORE OR AFTER
13       MR. IRVIN PASSED AWAY?
14       A.    TO BE HONEST, I DON'T REMEMBER.
15       Q.    THAT DINNER THAT YOU RECALL ATTENDING, WAS THAT THE DINNER
16       SPONSORED BY PFIZER?
17       A.    I BELIEVE SO.
18       Q.    THEY DISCUSSED CELEBREX AT THAT DINNER?
19       A.    I BELIEVE SO.
20       Q.    DO YOU KNOW IF THEY DISCUSSED BEXTRA AT THAT DINNER?
21       A.    I DON'T REMEMBER.
22       Q.    WAS THE PURPOSE OF THAT PFIZER DINNER, THAT YOU RECALL, TO
23       DISCUSS CELEBREX, OR WAS IT A BROADER REVIEW OF THE OTHER DRUGS
24       OFFERED BY PFIZER?
25       A.    I BELIEVE IT WAS JUST TO DISCUSS CELEBREX.  IT WAS TO HAVE
page 976
1        DINNER AND DISCUSS THE PRODUCT.
2        Q.    HOW WAS IT THAT YOU CAME TO BE INVITED TO THAT
3        CONFERENCE -- OR THAT DINNER?  SORRY.
4        A.    I DON'T REMEMBER.
5        Q.    DO YOU RECALL HOW LONG THAT DINNER LASTED?
6        A.    NOT REALLY.
7        Q.    DID YOU OBTAIN ANY LITERATURE ABOUT CELEBREX AT THAT
8        DINNER?
9        A.    I REALLY DON'T REMEMBER.  IT WAS SEVERAL YEARS AGO.
10       Q.    DO YOU RECALL ANY OF THE SUBSTANCES DISCUSSED AT THAT
11       DINNER?
12       A.    I REMEMBER A NICE STEAK DINNER AND A POWERPOINT
13       PRESENTATION.
14       Q.    THAT'S IT?
15       A.    TWELVE-YEAR-OLD SCOTCH.  I DON'T REMEMBER.

[987:] - [987:25]        12/3/2005   Irvin Plunkett Trial - (Schirmer C, Topol)

page 987
    0987
1                                 UNITED STATES DISTRICT COURT
2                                 EASTERN DISTRICT OF LOUISIANA
3
4
         IN RE: VIOXX PRODUCTS              *
5        LIABILITY LITIGATION              *   MDL DOCKET NO. 1657
                                           *
6                                          *
         THIS DOCUMENT RELATES TO          *   HOUSTON, TEXAS
7        CASE NO. 05-4046:                 *
                                           *
8        EVELYN IRVIN PLUNKETT, ET AL      *   DECEMBER 3, 2005
                                           *
9        VERSUS                            *
                                           *   8:30 A.M.
10       MERCK & CO. INC.                  *
         * * * * * * * * * * * * * * * *   *
11
12
                                    VOLUME V
13                                  JURY TRIAL BEFORE THE

EXHIBIT 1 - Plunkett I Trial Excerpts

• Plunkett II MILs

<pre>
                                      HONORABLE ELDON E. FALLON
                14                   UNITED STATES DISTRICT JUDGE
                15
                16     APPEARANCES:
                17
                       FOR THE PLAINTIFF:          BEASLEY ALLEN CROW METHVIN
                18                                    PORTIS & MILES
                                                   BY:  JERE LOCKE BEASLEY, ESQ.
                19                                       ANDY D. BIRCHFELD, JR., ESQ.
                                                         LEIGH O'DELL, ESQ.
                20                                       J. PAUL SIZEMORE, ESQ.
                                                         FRANK WOODSON, ESQ.
                21                                   234 COMMERCE STREET
                                                   POST OFFICE BOX 4160
                22                                 MONTGOMERY, ALABAMA 36103
                23
                       FOR THE PLAINTIFF:          ROBINSON, CALCAGNIE & ROBINSON
                24                                 BY:  MARK P. ROBINSON, JR., ESQ.
                                                   620 NEWPORT CENTER DRIVE
                25                                 NEWPORT BEACH, CALIFORNIA 92660
</pre>

[997:9] - [997:21]      12/3/2005   Irvin Plunkett Trial - (Schirmer C, Topol)

<pre>
                page 997
                9         Q.   OKAY.  DID YOU, IN FACT, PRESCRIBE TO MR. IRVIN VICOPROFEN
                10    ON OR ABOUT APRIL 9, 2001?
                11        A.   YES.
                12        Q.   WHY DID YOU PRESCRIBE MR. IRVIN THAT DRUG ON THAT DATE?
                13        A.   I WAS ASKED BY HIS DAUGHTER, MY WIFE, TO GIVE HIM
                14    SOMETHING FOR PAIN BECAUSE HE WAS HAVING SOME BACK PAIN AND
                15    JOINT PAIN, WHICH HE'S HAD IN THE PAST, THAT PURPORTEDLY HAD --
                16    NORMALLY IS IMPROVED WITH JUST ADVIL OR ALEVE, BUT IT WAS NOT
                17    WORKING.  SO SHE ASKED ME TO GET HIM SOME MEDICATION THAT WOULD
                18    HELP HIM UNTIL HE COULD SEE HIS DOCTOR.  SO I PRESCRIBED THE
                19    VICOPROFEN AND THE ONE BELOW IT, THE METHOCARBAMOL, ALSO KNOWN
                20    AS ROBAXIN, WHICH IS A MUSCLE RELAXANT, AND I PRESCRIBED ABOUT
                21    A WEEK'S WORTH UNTIL HE COULD SEE HIS DOCTOR.
</pre>

[999:2] - [999:7]      12/3/2005   Irvin Plunkett Trial - (Schirmer C, Topol)

<pre>
                page 999
                2         Q.   IN AROUND APRIL OF 2001, HOW WELL DID YOU KNOW HIS MEDICAL
                3     CONDITION?
                4         A.   I HAD A GENERAL GESTALT OF IT.  WE TALKED ABOUT THIS OR
                5     THAT, COLDS, IF I HAD A COLD OR IF -- REALLY NOTHING TOO
                6     SPECIFIC OR TOO INVOLVED.  I'VE NEVER HAD A FORMAL ALLIANCE
                7     WITH HIM OR A PRACTICE WITH HIM.
</pre>

[999:8] - [999:22]      12/3/2005   Irvin Plunkett Trial - (Schirmer C, Topol)

<pre>
                page 999
                8         Q.   WOULD YOU SAY THAT YOU EVER TREATED MR. IRVIN PRIOR TO
                9     APRIL OF 2001?
                10        A.   INFORMALLY, YES.  YOU KNOW, I CAN RECALL -- I DON'T KNOW
                11    THE SPECIFICS, IF HE HAD A COLD, WHAT'S THE BEST THING FOR A
                12    COLD AND THAT KIND OF STUFF, BUT NOTHING -- CERTAINLY, I NEVER
                13    TREATED ANY ARE MAJOR ILLNESSES, IF YOU WILL, DIABETES,
                14    PNEUMONIA, THOSE KIND OF PROBLEMS.
                15        Q.   DID YOU EVER CONDUCT A MEDICAL EXAM ON MR. IRVIN --
                16        A.   NO.
                17        Q.   -- AT ANY TIME?  DID YOU EVER TAKE A MEDICAL HISTORY OF
                18    MR. IRVIN AT ANY TIME?
                19        A.   NOT A FORMAL ONE, NO.
                20        Q.   DID YOU EVER ORDER ANY LABORATORY TESTING FOR MR. IRVIN AT
                21    ANY TIME?
                22        A.   NOT TO MY KNOWLEDGE.
</pre>

EXHIBIT 1 - Plunkett I Trial Excerpts

• **Plunkett II MILs**

[1002:4] - [1002:5]        12/3/2005   Irvin Plunkett Trial - (Schirmer C, Topol)

```
page 1002
4          Q.   HAVE YOU EVER SEEN A MEDICAL RECORD REGARDING MR. IRVIN?
5          A.   I DON'T REMEMBER EVER SEEING A MEDICAL RECORD FOR HIM, NO.
```

[1008:25] - [1010:17]      12/3/2005   Irvin Plunkett Trial - (Schirmer C, Topol)

```
page 1008
25         Q.   GOING BACK TO THE WALGREEN'S FORM, EXHIBIT 4, THE FINAL
page 1009
1          PRESCRIPTION ON THIS PAGE IS FOR VIOXX.  DO YOU SEE THAT?
2          A.   YES.
3          Q.   THAT'S 25-MILLIGRAM PRESCRIPTION DOSE?
4          A.   UH-HUH.
5          Q.   YES?
6          A.   YES.
7          Q.   THE DATE OF THAT PRESCRIPTION'S APRIL 15, 2001, CORRECT?
8          A.   CORRECT.
9          Q.   IT LISTS YOU, AGAIN, AS THE PRESCRIBING PHYSICIAN,
10         CORRECT?
11         A.   YES.
12         Q.   DID YOU PHONE IN THIS PRESCRIPTION YOURSELF?
13         A.   YES.
14         Q.   DID YOU SPEAK TO MR. IRVIN AFTER APRIL 9 AND PRIOR TO
15         APRIL 15?
16         A.   YES.
17         Q.   ON HOW MANY OCCASIONS?
18         A.   I BELIEVE ONCE.
19         Q.   DID YOU SEE HIM IN PERSON OR WAS IT OVER THE PHONE?
20         A.   I BELIEVE IT WAS OVER THE PHONE.
21         Q.   DID HE INITIATE -- I'M SORRY.
22         A.   I'M GOING TO RETRACT THAT.  I AM PRETTY SURE I SPOKE TO
23         HIM DIRECTLY, EITHER THAT OR IT WAS AGAIN THROUGH MY WIFE.  I
24         DON'T REMEMBER THE SPECIFICS.
25         Q.   WHEN YOU SAY "DIRECTLY," DO YOU MEAN --
page 1010
1          A.    WHETHER HE WAS ON ONE END OF THE PHONE AND I WAS ON THE
2          OTHER END OF THE PHONE OR HE SPOKE TO MY WIFE ABOUT THE VIOXX
3          MEDICATION.
4          Q.    OKAY.  IN EITHER EVENT, YOU KNOW THE CONVERSATION WASN'T
5          IN PERSON, CORRECT?
6          A.    CORRECT.
7          Q.   DO YOU KNOW WHETHER HE CALLED YOU OR YOU CALLED HIM ON
8          THAT OCCASION?
9          A.   I DON'T KNOW WHO CALLED WHO, AND I BELIEVE IT WAS EITHER
10         HE HAD SPOKEN TO MY WIFE OR HAD SPOKEN TO ME AND SAID THAT
11         HE -- THE FIRST TWO MEDICATIONS I PRESCRIBED WERE NOT WORKING,
12         BUT A FRIEND OF HIS, SOMEBODY -- AN ACQUAINTANCE HE KNEW GAVE
13         HIM SOME SAMPLES OF VIOXX.  IT WAS MY UNDERSTANDING THAT HE
14         SAID IT HELPED AND THAT HE CANNOT GET IN TO SEE HIS DOCTOR
15         RIGHT AWAY, IF I COULD CALL HIM IN SOME UNTIL HE COULD GET TO
16         SEE HIS DOCTOR.  AT THAT POINT, THAT'S WHEN I CALLED IN THE
17         PRESCRIPTION OF 30.
```

[1009:14] - [1009:18]      12/3/2005   Irvin Plunkett Trial - (Schirmer C, Topol)

```
page 1009
14         Q.   DID YOU SPEAK TO MR. IRVIN AFTER APRIL 9 AND PRIOR TO
15         APRIL 15?
16         A.   YES.
17         Q.   ON HOW MANY OCCASIONS?
18         A.   I BELIEVE ONCE.
```

[1010:11] - [1010:17]      12/3/2005   Irvin Plunkett Trial - (Schirmer C, Topol)

```
page 1010
11         HE -- THE FIRST TWO MEDICATIONS I PRESCRIBED WERE NOT WORKING,
```

**EXHIBIT 1 - Plunkett I Trial Excerpts**

• **Plunkett II MILs**

```
12        BUT A FRIEND OF HIS, SOMEBODY -- AN ACQUAINTANCE HE KNEW GAVE
13        HIM SOME SAMPLES OF VIOXX.  IT WAS MY UNDERSTANDING THAT HE
14        SAID IT HELPED AND THAT HE CANNOT GET IN TO SEE HIS DOCTOR
15        RIGHT AWAY, IF I COULD CALL HIM IN SOME UNTIL HE COULD GET TO
16        SEE HIS DOCTOR.  AT THAT POINT, THAT'S WHEN I CALLED IN THE
17        PRESCRIPTION OF 30.
```

[1014:3] - [1014:11]      12/3/2005   Irvin Plunkett Trial - (Schirmer C, Topol)

```
page 1014
3         Q.   DID YOU TALK TO MR. IRVIN DIRECTLY OR INDIRECTLY ABOUT THE
4         RISKS ASSOCIATED WITH VIOXX IN ORDER TO --
5         A.   I HAVE NO RECOLLECTION OF THAT.
6         Q.   DO YOU KNOW WHETHER YOU ADVISED YOUR WIFE TO PASS ALONG
7         ANY INFORMATION TO HIM?
8         A.   I DON'T REMEMBER.
9         Q.   DID YOU, YOURSELF, PROVIDE ANYTHING IN WRITING TO
10        MR. IRVIN REGARDING THE RISKS AND BENEFITS OF VIOXX?
11        A.   I HAVE NO RECOLLECTION OF THAT.
```

[1017:3] - [1017:13]      12/3/2005   Irvin Plunkett Trial - (Schirmer C, Topol)

```
page 1017
3         Q.   ALL RIGHT.  NOW, YOU'VE NEVER MET ANY DETAIL PERSON OR
4         SALES REP FROM MERCK WHERE A DISCUSSION ABOUT VIOXX TOOK PLACE
5         PRIOR TO THE PRESCRIBING FOR MR. IRVIN; AM I CORRECT?
6         A.   I HAVE NO RECOLLECTION OF THAT.
7         Q.   I BELIEVE YOU HAD TOLD US ON A PRIOR DEPOSITION THAT YOU
8         HAD ONLY ONE PRIOR MEETING THAT YOU RECALLED WITH A MERCK
9         DETAIL PERSON AND THAT DID NOT HAVE ANYTHING TO DO WITH VIOXX,
10        WAS THAT --
11        A.   I'M SKETCHY EVEN ABOUT RECALLING THAT I EVER HAD A
12        MEETING, AND I CERTAINLY DON'T HAVE A RECOLLECTION OF EVER
13        BEING DETAILED ABOUT VIOXX.
```

[1025:19] - [1025:21]      12/3/2005   Irvin Plunkett Trial - (Schirmer C, Topol)

```
page 1025
19        Q.   YOU DON'T RECALL EVER READING AND RELYING ON ANY MERCK
20        PROMOTIONAL ACTIVITIES, CORRECT?
21        A.   THAT IS CORRECT.
```

[1077:23] - [1078:14]      12/3/2005   Irvin Plunkett Trial - (Schirmer C, Topol)

```
page 1077
23        Q.   AND YOU DID BELIEVE AT THAT TIME THAT THE DRUG NEEDED A
24        BLACK BOX WARNING, CORRECT?
25        A.   YES.  WE'RE NOW IN AUGUST OF 2004, PUBLISHING THIS.
page 1078
1         Q.   YES, SIR.
2         A.   AND THE EXTRAORDINARY OF EVIDENCE, NOT JUST FROM VIGOR BUT
3         FROM VARIOUS OTHER TRIALS AND STUDIES, WAS REALLY QUITE
4         EXCESSIVE IN MY OPINION, AND THAT'S WHY THE BLACK BOX WARNING
5         WAS LONG OVERDUE IN AUGUST 2004.
6         Q.   DO YOU HAVE A SENSE OF WHEN IT WAS DUE BY?
7         A.   IT COULD HAVE EASILY BEEN IMPOSED AS OF FEBRUARY 2001, OR
8         IF WE GO BACK TO THE JÜNI ANALYSIS IN THE LANCET, ALSO
9         PUBLISHED IN THE LANCET, IT COULD HAVE BEEN BACK IN THE YEAR
10        2000.  SO SOMEWHERE BETWEEN 2000 AND 2001, THERE WAS MORE THAN
11        ADEQUATE CONFIRMATION.  ESSENTIALLY ALL YOU NEED IS VIGOR AND
12        STUDY 090 TOGETHER.  AND I CAN TAKE YOU THROUGH THE JÜNI
13        ANALYSIS IN LANCET, BUT THAT BASICALLY CROSSES THE LINE FOR
14        PROVEN HAZARD OF HEART ATTACKS.
```

## EXHIBIT 1 - Plunkett I Trial Excerpts

• **Plunkett II MILs**

[1078:7]                12/3/2005   Irvin Plunkett Trial - (Schirmer C, Topol)

page 1078
7         A.    IT COULD HAVE EASILY BEEN IMPOSED AS OF FEBRUARY 2001, OR

[1080:18] - [1080:23]   12/3/2005   Irvin Plunkett Trial - (Schirmer C, Topol)

page 1080
18            SO NOW, IF ONE WERE TO ASK, WHEN SHOULD THE DRUG HAVE
19      NOT BEEN EITHER ON THE MARKET OR SHOULD HAVE BEEN A BLACK BOX
20      WARNING BECAUSE OF DEFINITIVE RISKS, THE JÜNI META-ANALYSIS
21      ANSWERS THAT, BECAUSE ONCE YOU HAVE VIGOR AND 090,
22      STATISTICALLY, IT'S PROVEN, WITHOUT ANY QUESTION, FROM THIS
23      ANALYSIS.

[1102:3] - [1102:10]    12/3/2005   Irvin Plunkett Trial - (Schirmer C, Topol)

page 1102
3       Q.    YOU SAID ON DIRECT EXAMINATION, DR. TOPOL, THAT A
4       BLACK-BOX WARNING COULD EASILY HAVE BEEN IMPOSED BY FEBRUARY OF
5       2001.  DO YOU REMEMBER TESTIFYING TO THAT?
6       A.    YES.
7       Q.    DID ANYBODY AT THE ADVISORY COMMITTEE MEETING SUGGEST THAT
8       A BLACK BOX WARNING BE PUT ON THE VIOXX LABEL?
9       A.    NO.  AND THAT'S BECAUSE THE CORRECT DATA FOR STUDY 090
10      WERE NOT PRESENTED.

[1102:7] - [1102:10]    12/3/2005   Irvin Plunkett Trial - (Schirmer C, Topol)

page 1102
7       Q.    DID ANYBODY AT THE ADVISORY COMMITTEE MEETING SUGGEST THAT
8       A BLACK BOX WARNING BE PUT ON THE VIOXX LABEL?
9       A.    NO.  AND THAT'S BECAUSE THE CORRECT DATA FOR STUDY 090
10      WERE NOT PRESENTED.

[1156:] - [1156:25]     12/5/2005   Irvin Plunkett Trial - Scolnick, Plunkett-Irvin, Sil

page 1156
          1156
1                            UNITED STATES DISTRICT COURT
2                            EASTERN DISTRICT OF LOUISIANA
3
4
5        IN RE: VIOXX PRODUCTS              *
         LIABILITY LITIGATION              *   MDL DOCKET NO. 1657
6                                          *
                                           *
7        THIS DOCUMENT RELATES TO           *   HOUSTON, TEXAS
         CASE NO. 05-4046:                 *
8                                          *
         EVELYN IRVIN PLUNKETT, ET AL      *   DECEMBER 5, 2005
9                                          *
         VERSUS                            *
10                                         *   8:30 A.M.
         MERCK & CO., INC.                 *
11       * * * * * * * * * * * * * * * * *
12
13                                  VOLUME VI
                              JURY TRIAL BEFORE THE
14                            HONORABLE ELDON E. FALLON
                             UNITED STATES DISTRICT JUDGE
15
16
         APPEARANCES:
17
18       FOR THE PLAINTIFF:           BEASLEY ALLEN CROW METHVIN
                                      PORTIS & MILES
19                                    BY:  JERE LOCKE BEASLEY, ESQ.

EXHIBIT 1 - Plunkett I Trial Excerpts

• Plunkett II MILs

```
                                              ANDY D. BIRCHFELD, JR., ESQ.
                      20                      LEIGH O'DELL, ESQ.
                                              J. PAUL SIZEMORE, ESQ.
                      21                      FRANK WOODSON, ESQ.
                                              234 COMMERCE STREET
                      22                      POST OFFICE BOX 4160
                                              MONTGOMERY, ALABAMA 36103
                      23
                      24      FOR THE PLAINTIFF:        ROBINSON, CALCAGNIE & ROBINSON
                                              BY:  MARK P. ROBINSON, JR., ESQ.
                      25                      620 NEWPORT CENTER DRIVE
                                              NEWPORT BEACH, CALIFORNIA 92660
```

[1379:15] - [1379:25]    12/5/2005   Irvin Plunkett Trial - Scolnick, Plunkett-Irvin, Sil

```
page 1379
15        WAY.  DID DR. SCHIRMER PRESCRIBE ANY MEDICATIONS FOR DICKY
16   PRIOR TO HIM PASSING AWAY?
17   A.    YES, HE DID.
18   Q.    DO YOU RECALL WHAT THEY WERE?
19   A.    THE FIRST TWO, I DO NOT REMEMBER THE NAME OF THEM.  I KIND
20   OF KNOW.  I KNOW VICOPROFEN, THAT WAS ONE OF THEM.  THE OTHER
21   ONE, I'M NOT SURE OF THE NAME OF IT.
22   Q.    DID DICKY TAKE EITHER OF THESE MEDICATIONS?
23   A.    HE TOOK THE VICOPROFEN AND THE OTHER ONE ONE DAY.  HE TOOK
24   IT.  IT MADE HIM SICK AND HE COULDN'T TAKE IT ANYMORE AND HE
25   QUIT TAKING IT.  ONE DAY.
```

[1380:13] - [1380:17]    12/5/2005   Irvin Plunkett Trial - Scolnick, Plunkett-Irvin, Sil

```
page 1380
13   Q.    DID IT UPSET HIS STOMACH?
14   A.    YES, IT DID.
15   Q.    DID HE TAKE ANY MORE OF THAT MEDICATION BESIDES THAT ONE
16   DAY?
17   A.    NO.
```

[1380:18] - [1380:24]    12/5/2005   Irvin Plunkett Trial - Scolnick, Plunkett-Irvin, Sil

```
page 1380
18   Q.    WHEN DID YOU LEARN THAT DICKY HAD TAKEN VIOXX?
19   A.    HE CALLED ME AND TOLD ME ONE DAY THAT HE WAS GOING TO THE
20   DRUGSTORE, STOP BY WALGREEN'S AND PICK UP A PRESCRIPTION OF
21   VIOXX ON HIS WAY HOME, AND HE SAID THOSE WERE THE -- AND I
22   QUESTIONED HIM ABOUT IT, AND HE SAID THAT THAT WAS THE DRUG OR
23   THE SAMPLES THAT HE HAD BEEN TAKING.  HE TOLD ME HE HAD BEEN
24   TAKING A FEW SAMPLES.  THAT'S HOW I FOUND OUT.
```

[1403:24] - [1404:6]    12/5/2005   Irvin Plunkett Trial - Scolnick, Plunkett-Irvin, Sil

```
page 1403
24   Q.    AS FAR AS YOU KNOW, AM I RIGHT, MA'AM, THAT MR. IRVIN, AS
25   FAR AS YOU KNOW, HAD NEVER EVEN HEARD OF VIOXX BEFORE YOUR
page 1404
1    SON-IN-LAW GAVE HIM THE PRESCRIPTION?
2    A.    NOT THAT I KNOW OF, HE HADN'T.
3    Q.    HE NEVER CERTAINLY MENTIONED TO YOU WHETHER HE HAD EVER
4    SEEN ANY TV ADVERTISEMENTS OR PRINT ADVERTISEMENTS, ANYTHING
5    LIKE THAT?
6    A.    NO.
```

[1449:2] - [1449:4]    12/5/2005   Irvin Plunkett Trial - Scolnick, Plunkett-Irvin, Sil

```
page 1449
2         THE COURT:  I DO UNDERSTAND THE ISSUE.  WITH REGARD
3    TO HEARSAY, I DON'T SEE ANY PROBLEM.  IT'S AN 803(8) QUESTION,
4    THAT IS AN EXCEPTION TO THE HEARSAY RULES.  COUNSEL MAKES A
```

**EXHIBIT 1 - Plunkett I Trial Excerpts**

• **Plunkett II MILs**

[1449:14] - [1449:18]      12/5/2005    Irvin Plunkett Trial - Scolnick, Plunkett-Irvin, Sil

```
page 1449
14                    IN THIS PARTICULAR CASE, PART OF THE PLAINTIFF'S
15          POSITION IS THAT VIOXX WAS RUSHED TO THE MARKET, THAT THERE WAS
16          AN INTEREST IN GETTING IT OUT THERE QUICKLY AND THAT THERE WAS
17          A LOT OF DISCUSSION AND, ACCORDING TO THEM, PRESSURE PUT ON THE
18          FDA AND OTHERS TO GET THIS DONE.  I THINK IT'S RELEVANT TO THAT
```

**EXHIBIT 2 - Daubert Hearing Excerpts**

• **Plunkett II MILs**

[1:] - [1:25]        11/14/2005  Irvin Plunkett Trial - Daubert transcripts  - (AM)

```
page 1
                                                                      1
 1                    UNITED STATES DISTRICT COURT
 2                    EASTERN DISTRICT OF LOUISIANA
 3
 4
     In Re: VIOXX PRODUCTS            *
 5   LIABILITY LITIGATION             *  MDL Docket No. 1657
                                      *
 6                                    *
     This document relates to         *  New Orleans, Louisiana
 7   Case No. 05-4046:                *
                                      *
 8   EVELYN IRVIN PLUNKETT, et al     *  November 14, 2005
                                      *
 9   versus                           *
                                      *  9:00 a.m.
10   MERCK & CO., INC.                *
     * * * * * * * * * * * * * * * * *
11
12
                        PROCEEDINGS BEFORE THE
13                      HONORABLE ELDON E. FALLON
                        UNITED STATES DISTRICT JUDGE
14
     APPEARANCES:
15
16   For the Plaintiff:         Gainsburgh, Benjamin, David,
                                  Meunier & Warshauer
17                              BY:  GERALD E. MEUNIER, ESQ.
                                1100 Poydras Street, Suite 2800
18                              New Orleans, Louisiana 70163
19
     For the Plaintiff:         Beasley Allen Crow Methvin
20                                Portis & Miles
                                BY:  J. PAUL SIZEMORE, ESQ.
21                              234 Commerce Street
                                Post Office Box 4160
22                              Montgomery, Alabama 36103
23
     For the Plaintiff:         Lopez, Hodes, Restaino, Milman
24                                & Skikos
                                BY:  JOHN M. RESTAINO, JR., ESQ.
25                              450 Newport Center Drive
                                Newport Beach, California 92660
```

[99:4] - [101:11]        11/14/2005  Irvin Plunkett Trial - Daubert transcripts  - (AM)

```
page 99
 4                That's because he is not a cardiovascular
 5   pathologist.  Remember, Your Honor, the round normal coronary
 6   artery, the round coronary artery with atherosclerotic plaque,
 7   the round plaque from Mr. Irvin, the clot, the fibrous cap.
 8   But, Your Honor, what Dr. Wheeler is completely missing is that
 9   the entire coronary artery was sectioned in such a way that we
10   have an entire section missing.  What that has led to is one of
11   two things had to occur.  Mr. Irvin suffered an aneurismal
12   blowout of his coronary artery, blowing an opening in that
13   artery, or the artery was misshapen when it was cut.
14                Well, we look at the autopsy report and we go to
15   the second page where they talk about the appearance of the
16   heart and the epicardium and the pericardium are gray-white and
17   glistening, the bowels are normal, no areas of softening,
18   coronary arteries are normally distributed, there's some
19   moderate atherosclerosis.  Your Honor, there is no mention of
```

EXHIBIT
2
Blumberg No. 5119

EXHIBIT 2 - Daubert Hearing Excerpts

• Plunkett II MILs

```
20  blood outside of the heart.  There is no mention of one of
21  these arteries -- the left anterior descending -- rupturing,
22  leading to either a thrombus on the outside of the heart or
23  perhaps bleeding into the pericardium.  That blood would be
24  there.  This internationally renowned expert in prostrate
25  cancer and pathology did not get this.  There's no mention of
page 100
 1  blood outside the heart.  It's misshapened.  It's artifactual.
 2  The whole section of it is missing.
 3                  I'm going to run through very quickly what I
 4  would have said.  Is the expert testifying about matters
 5  growing naturally out of the research independent of
 6  litigation?  No.  He has never conducted research in any aspect
 7  of cardiac pathology, never lectured, never published on it, no
 8  textbooks.  Has he engaged in improper extrapolation?  There
 9  has to be a rupture somewhere if there's thrombus and
10  atherosclerosis.  Has he taken into account all possible
11  alternative explanations?  He will not take into account the
12  potential role of the prothrombotic agent, Vioxx.  "In other
13  words, I don't see a way to see fibrous cap, the thrombus, and
14  the lipid-rich core without having this cap having ruptured."
15  Whether he has been as careful as he would be in his regular
16  professional work in paid litigation -- would he sign an
17  autopsy report "death due to a rupture of a fibrous cap that I
18  don't see, but it must be there somewhere because I don't have
19  any other way of explaining this death"?
20                  Whether the field of expertise claimed by --
21  again, because he is a specialist in prostatic pathology, in
22  his way of thinking there has to be a rupture somewhere because
23  they don't deal with atherosclerosis in the prostate gland.  We
24  don't die from acute prostatic death.  We die of cancer of the
25  prostate gland.  "I don't see a way to have the fibrous cap,
page 101
 1  the thrombus, and the lipid-rich core without having this cap
 2  having ruptured."
 3                  In conclusion, Dr. Wheeler would never be
 4  allowed by any medical board to write an autopsy report or a
 5  death certificate based upon, "There has to be a cancer here
 6  somewhere.  I don't see it, but by my way of thinking it has to
 7  be here somewhere."  "There has to be an infarct in the heart
 8  here.  I don't see it, but by my way of" -- he would never be
 9  allowed to do that in the regular course of his medical
10  practice.  He should not be allowed to do that in a court of
11  law.  Thank you.
```

[109:4] - [109:11]        11/14/2005  Irvin Plunkett Trial - Daubert transcripts  - (AM)

```
page 109
 4                  What is key is there is no rupture of the
 5  fibrous cap.  That is what Dr. Wheeler has missed.  Dr. Burton,
 6  Dr. Frist -- who works for Dr. Burton -- agrees, and Dr. Bloor
 7  so agrees the plaque is disrupted.  It is what is called in
 8  pathology a "vulnerable plaque."  At some point the plaque may
 9  disrupt even further.  No one knows.  However, the cap
10  protecting the prothrombotic material from within the plaque is
11  intact.  There is no rupture there and there is no disagreement
```

[151:1] - [151:12]        11/14/2005  Irvin Plunkett Trial - Daubert transcripts  - (AM)

```
page 151
 1                          CERTIFICATE
 2          I, Toni Doyle Tusa, CCR, Official Court Reporter,
 3  United States District Court, Eastern District of Louisiana, do
 4  hereby certify that the foregoing is a true and correct
 5  transcript, to the best of my ability and understanding, from
 6  the record of the proceedings in the above-entitled and
 7  numbered matter.
 8
```

**EXHIBIT 2 - Daubert Hearing Excerpts**

**• Plunkett II MILs**
9
10

11                                          _____
                                            Toni Doyle Tusa, CCR
                                            Official Court Reporter
12

**EXHIBIT 3 - Graham Deposition Excerpts**

• Plunkett II MILs

[1:1] - [1:16]        1/25/2006   Graham, Michael

```
page 1
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
2
3
     In Re:  VIOXX                  )
4                                   ) MDL Docket No. 1657
     PRODUCTS LIABILITY LITIGATION  )
5                                   ) SECTION L
     EVELYN IRVIN PLUNKETT, as      )
6    Personal Representative of the ) JUDGE FALLON
     Estate of RICHARD IRVIN, JR.,  )
7                                   ) MAGISTRATE JUDGE
              Plaintiff,            ) KNOWLES
8                                   )
              vs.                   ) CASE NO. 2:05CV4046
9                                   )
     MERCK & CO., INC.,             )
10                                  )
              Defendant.            )
11
12
13
14          DEPOSITION OF MICHAEL A. GRAHAM, M.D.
15            TAKEN ON BEHALF OF THE DEFENDANT
16                  JANUARY 25, 2006
```

[6:12] - [7:1]        1/25/2006   Graham, Michael

```
page 6
12        Q.   When were you first contacted by any lawyer
13   connected with the Vioxx cases?
14        A.   Oh, man, it's been several months ago.  I
15   think it was before the first trial.  They asked me if
16   I would review some material.  Then I didn't hear from
17   them for quite a while.  Then they called me again.
18   But I don't remember exactly when it was.
19        Q.   When you say the first trial, you mean the
20   first go-round with -- on the Plunkett case?
21        A.   Yes.
22        Q.   Okay.  And that would have been sometime in
23   August or September of last year that you were first
24   contacted?
25        A.   Yeah, I don't remember.  It was quite a
page 7
1    while ago.
```

[7:2] - [7:4]         1/25/2006   Graham, Michael

```
page 7
2         Q.   Do you have any materials in your file
3    which date when you were first contacted?
4         A.   No.  I don't keep phone call records.
```

[8:20] - [8:25]       1/25/2006   Graham, Michael

```
page 8
20        Q.   Did your -- did you understand you were
21   being considered to be an expert witness on behalf of
22   the plaintiffs as opposed to just consulting with
23   them?
24        A.   I didn't know one way or the other.  I
25   always take the approach that I'm willing to testify.
```



EXHIBIT
3

**EXHIBIT 3 - Graham Deposition Excerpts**

• **Plunkett II MILs**

[9:1] - [9:14]            1/25/2006   Graham, Michael

```
page 9
 1           Q.    And then you indicated Mr. Goza's firm sent
 2    you the tissue samples from Mr. Irvin's autopsy; is
 3    that correct?
 4           A.    Sent me I think some slides, and I think I
 5    asked for additional slides as I recall.
 6           Q.    And did you review those slides?
 7           A.    Yes.
 8           Q.    And did you do so before the first trial?
 9           A.    Yes.
10           Q.    Other than these slides themselves, did you
11    obtain any materials from any of the plaintiff lawyers
12    before the first trial?
13           A.    I think I may have had medical records.  I
14    don't know that I had anything else.
```

[9:21] - [10:23]          1/25/2006   Graham, Michael

```
page 9
21           Q.    Did you make any notes or report about what
22    you saw in the tissue sample slides that you reviewed?
23           A.    I think we may have made a report.  I think
24    I may have back then.
25           Q.    I have not been provided a copy of that
page 10
 1    report.  Do you know where it might exist?
 2           A.    No.  I'm not sure I even kept a copy.  I
 3    was -- as I recall, the time frame was -- and with my
 4    schedule we couldn't get a deposition in under the
 5    limit, and I at that point considered myself I was
 6    probably out of it.  So I don't think I kept a copy.
 7           Q.    And when you say you may have made a
 8    report, and when you use the word report, are you
 9    describing, you now, your typical expert witness
10    report?
11           A.    No.  It wasn't on my letterhead like I
12    usually do.  It was more like this type of thing.
13           Q.    When you say this type of thing --
14           A.    From this -- for the present trial.
15           Q.    Okay.  And so you prepared originally back
16    sometime last fall a litigation expert report with a
17    case caption on it describing your opinions?
18           A.    I don't know if it was a case caption, but
19    it was more of -- you know, of a kind of a one, two,
20    three type, which is not my usual style.
21           Q.    And you provided that report to plaintiff's
22    counsel?
23           A.    Yes.
```

[9:25] - [10:6]           1/25/2006   Graham, Michael

```
page 9
25           Q.    I have not been provided a copy of that
page 10
 1    report.  Do you know where it might exist?
 2           A.    No.  I'm not sure I even kept a copy.  I
 3    was -- as I recall, the time frame was -- and with my
 4    schedule we couldn't get a deposition in under the
 5    limit, and I at that point considered myself I was
 6    probably out of it.  So I don't think I kept a copy.
```

[10:15] - [10:23]         1/25/2006   Graham, Michael

```
page 10
15           Q.    Okay.  And so you prepared originally back
16    sometime last fall a litigation expert report with a
```

EXHIBIT 3 - Graham Deposition Excerpts

• Plunkett II MILs

```
17   case caption on it describing your opinions?
18        A.   I don't know if it was a case caption, but
19   it was more of -- you know, of a kind of a one, two,
20   three type, which is not my usual style.
21        Q.   And you provided that report to plaintiff's
22   counsel?
23        A.   Yes.
```

[13:8] - [13:12]        1/25/2006   Graham, Michael

```
page 13
8         Q.   All right.  Notwithstanding the fact you
9    don't see -- to your eyes see a plaque rupture in the
10   slides, you certainly agree that Mr. Irvin had a
11   plaque rupture?  That's your opinion?
12        A.   That's my opinion, yes.
```

[15:4] - [15:7]         1/25/2006   Graham, Michael

```
page 15
4         Q.   Can you estimate how much time you worked
5    on the Plunkett matter prior to the first trial?
6         A.   Probably no more than a couple hours, few
7    hours maybe.
```

[16:12] - [16:16]       1/25/2006   Graham, Michael

```
page 16
12        Q.   Okay.  So not only did you send a written
13   report before the first trial opining that Mr. Irvin
14   had a plaque rupture, you sat down with the plaintiff
15   lawyers and explained that to them, right?
16        A.   Yes.
```

[19:1] - [19:6]         1/25/2006   Graham, Michael

```
page 19
1         Q.   And are you saying you don't have any of
2    that material that was in your possession that dates
3    back to when you were first contacted, August,
4    September?
5         A.   I mean, I have the microscopic slides
6    again, but nothing else.
```

[20:2] - [20:5]         1/25/2006   Graham, Michael

```
page 20
2         Q.   How much time would you estimate you've
3    spent since you were contacted the second time to
4    serve as an expert witness for plaintiffs?
5         A.   Probably about 20, 25 hours.
```

[32:22] - [33:1]        1/25/2006   Graham, Michael

```
page 32
22        Q.   Okay.  And did anyone assist you in the
23   drafting of your report?
24        A.   Yeah.  The law firm sent me kind of a draft
25   in a format, and a lot of it I didn't particularly
page 33
1    like.  So I rewrote the whole thing basically.
```

[33:16] - [34:1]        1/25/2006   Graham, Michael

```
page 33
16        Q.   Did you send a draft back of your own to
17   plaintiff's counsel for them to review?
```

**EXHIBIT 3 - Graham Deposition Excerpts**

• **Plunkett II MILs**

```
18        A.    You know, I don't know that I did.  I
19 basically changed it, signed it, and sent it.  I think
20 I changed it and sent it, and then they needed it
21 signed.  So I signed it.
22        Q.    So you don't recall any changes after the
23 time you first started working -- after you started
24 first drafting it?
25        A.    No.  I think the draft I sent back, I think
page 34
1 that's the one we -- the one that we did.
```

[49:10] - [49:14]        1/25/2006   Graham, Michael

```
page 49
10        Q.    How much time did you spend reviewing
11 Dr. Ray's report, best estimate?
12        A.    I don't know.  Quite a while.
13        Q.    Quite a while of the eight or nine hours?
14        A.    Yeah.
```

[70:17] - [70:23]        1/25/2006   Graham, Michael

```
page 70
17        Q.    When did you get Dr. Ray's report?
18        A.    I had one back probably in December or
19 January -- well -- and then I think he wrote a
20 subsequent report in January and I got that more
21 recently.
22        Q.    Did you read both of them?
23        A.    I did.
```

[120:19] - [120:21]        1/25/2006   Graham, Michael

```
page 120
19 thrombus, yeah.  I saw that in the slides.  I mean, I
20 don't think there's any argument for me at least that
21 this is not -- that this is not plaque rupture.  What
```

[124:21] - [125:2]        1/25/2006   Graham, Michael

```
page 124
21        Also, as I looked at some of the thrombotic
22 material that looks like it was actually -- is
23 actually in the lumen, it looks to me like there may
24 be some plaque components in there.  Not very much.
25 But it looks to me like there may be some.  The only
page 125
1 way they can get in there is if you had some
2 disruption of a plaque.
```

[156:3] - [156:9]        1/25/2006   Graham, Michael

```
page 156
3        Q.    The actual mechanism of a subclinical
4 preexisting plaque that ruptures and that clots
5 fatally when the blood is exposed to a thrombogenic
6 plaque, right?
7        A.    The mechanism into what I think is his
8 already vulnerable thrombogenic state would be the
9 same, the plaque rupture part, yeah.
```

[164:13] - [165:1]        1/25/2006   Graham, Michael

```
page 164
13        Q.    (By Mr. Ismail)  So then you -- in
14 Mr. Irvin's case, so he's now exactly like the
15 individual whom you look at where you say there's
```

EXHIBIT 3 - Graham Deposition Excerpts

• Plunkett II MILs

```
                16  nothing unusual going on here, and he's taking Vioxx
                17  at the same time of his death?
                18       A.   He is different than most other people
                19  because he is in fact taking Vioxx.  Because when you
                20  look at let's say vulnerability to a sudden death, you
                21  have to consider obviously the plaque, but you also
                22  got to consider what's going on in the rest of the
                23  patient, including the likelihood that thrombus
                24  formation kind of gets out of control and goes on to
                25  complete occlusion, and is there something that would
              page 165
                1   promote that.
```

[185:25] - [188:12]     1/25/2006   Graham, Michael

```
              page 185
                25       Q.   All right.  And then -- so you pulled from
              page 186
                1   Dr. Ray's and plugged into your report relative risks
                2   for VICTOR, VIP, Alzheimer's, musculoskeletal, and
                3   possibly ADVANTAGE, right?
                4        A.   Yes.
                5        Q.   And do you know -- did you pull yourself
                6   the APPROVE and VIGOR relative risks?
                7        A.   They're in both places.  Six one, half
                8   dozen of another.
                9        Q.   You don't know whether you just sat down
                10  and typed in Dr. Ray's relative risks for VIGOR and
                11  APPROVE like you did for the other ones, or did you
                12  actually go to the actual articles?
                13       A.   Yeah, I don't recall which one.  As far as
                14  I remember, they're the same number.  So I think it's
                15  irrelevant.
                16       Q.   Do you know what endpoint Dr. Ray used?
                17       A.   No.
                18       Q.   Do you know whether Dr. Ray used
                19  adjudicated or investigated reported data?
                20       A.   I think he used both.  I think he
                21  considered both.
                22       Q.   Do you know what you reproduce in your
                23  report is relative risks?
                24       A.   I'd have to go back and look.  I don't
                25  recall.
              page 187
                1        Q.   Do you know how Dr. Ray computed the
                2   relative risks?
                3        A.   What formulas he used?
                4        Q.   Yeah.
                5        A.   No.
                6        Q.   You cannot say through your own work
                7   whether Dr. Ray has correctly reported the relative
                8   risks of many of these trials, right?
                9        A.   Yeah, I am not an epidemiologist.  He is.
                10  That's his area of expertise.  I would defer to him on
                11  that.
                12       Q.   You can't tell whether he's right, right?
                13       A.   I don't know if his calculations are
                14  correct or not.  As I read them, I saw no glaring
                15  defect that would come up to me.  It made sense to me.
                16  So I didn't have any particular reason not to think
                17  that he's correct.
                18       Q.   All right.  Well, you -- we're not going to
                19  hear at trial that you, Dr. Graham, have reviewed
                20  Dr. Ray's analyses and concur that the relative risk
                21  of cardiac events from Vioxx is 2.79 in the VICTOR
                22  trial?
                23       A.   Yeah, I'm not going to do an independent
                24  analysis of the data.  That's I guess --
```

**EXHIBIT 3 - Graham Deposition Excerpts**

• **Plunkett II MILs**

```
25        Q.   And you don't know -- I'm sorry.  And you
page 188
1    don't know whether the relative risk for Vioxx of
2    cardiac events in the VIP trial is 1.25, right?
3         A.   The number is there.  I'm not going to do
4    an independent analysis of the data.  That's not
5    something that I do.
6         Q.   And you don't know whether in fact Vioxx
7    has a relative risk of 1.95 in the Alzheimer's trials,
8    right?
9         A.   Again, as I read his material I don't see
10   any reason to disbelieve it, but I'm not going to
11   independently go back and try it recalculate it.
12   That's not something that's in my area of expertise.
```

[195:1] - [195:25]          1/25/2006   Graham, Michael

```
page 195
1                    CERTIFICATE OF REPORTER
2    STATE OF MISSOURI  )
                        ) ss.
3    CITY OF ST. LOUIS  )
4         I, William L. DeVries, a Certified Court
5    Reporter (MO), Certified Shorthand Reporter (IL),
6    Registered Diplomate Reporter, Certified Realtime
7    Reporter, and a Notary Public within and for the State
8    of Missouri, do hereby certify that the witness whose
9    testimony appears in the foregoing deposition was duly
10   sworn by me; that the testimony of said witness was
11   taken by me to the best of my ability and thereafter
12   reduced to typewriting under my direction; that I am
13   neither counsel for, related to, nor employed by any
14   of the parties to the action in which this deposition
15   was taken, and further that I am not a relative or
16   employee of any attorney or counsel employed by the
17   parties thereto, nor financially or otherwise
18   interested in the outcome of the action.
19
20   _____
21                    Notary Public within and for
22                    The State of Missouri
23
24
25   My commission expires May 30, 2006.
```

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to: | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| Evelyn Irvin Plunkett v. Merck & Co., | * | CASE NO. 2:05CV4046 |
| Inc., | * | |
| | * | |
| | * | |

### EXPERT WITNESS REPORT OF DR. MICHAEL ALAN GRAHAM, MD

### PLAINTIFF EVELYN IRVIN PLUNKETT

#### Professional Background and Qualifications

  I am a pathologist certified by the American Board of Pathology in anatomic and clinical pathology (1981) and in forensic pathology (1982).  Forensic pathology applies the principles of pathology to the resolution of applicable issues arising in public forums such as litigation.  I am a professor of pathology at St. Louis University where I co-direct the Division of Forensic and Environmental Pathology and have responsibility in diagnostic cardiac pathology, which has been a practice focus for me.

  My academic responsibilities include teaching cardiovascular pathology to medical students and teaching forensic pathology to medical students, physicians and other professionals. My service responsibilities include functioning as the Chief Medical Examiner for the City of St. Louis and providing medical examiner services to surrounding counties.  I am responsible for determining and legally certifying the causes



EXHIBIT
4

and manners of deaths of individuals who die suddenly and unexpectedly or when violence may have been involved. I provide medical/legal consultations to both sides in criminal and civil litigation.

I have published several articles on sudden death. I belong to the National Association of Medical Examiners where I have recently completed terms as President and Chairman of the Board of Directors. I belong to a number of other professional organizations including the College of American Pathologists, American Academy of Forensic Sciences, the Society for Cardiovascular Pathology and the Pulmonary Pathology Society. I have been a member of the committee responsible for writing forensic questions for the American Board of Pathology board certification examinations. I have personally performed or directly supervised approximately 7,000 autopsies.

**Review of Plaintiff**

My opinion with reasonable medical certainty is that the ingestion of Vioxx by Dicky Irvin was a substantial cause for his 5-15-01 sudden cardiac death (SCD). Phrased differently, I believe that but for taking Vioxx, Dicky Irvin would not likely have experienced SCD at that time. I base this on the pathologic findings set out below, as well as Vioxx epidemiology that shows an increased relative risk of occlusive thrombus (OT) with its use. A relative risk of greater than 1 but less than 2 demonstrates an increased risk of a given adverse event in a given patient population. I have reviewed epidemiology materials which, overall, lead me to conclude that Vioxx ingestion creates a relative risk of greater than 2, therefore, demonstrating a probable contributory role in Dicky Irvin's death.

I have reviewed a variety of medical and epidemiologic information, including the reports of experts involved in this matter, as is more fully set out in exhibit A. I found the information set out in Dr. Wayne Rays' report to be a convincing analysis of the data from multiple studies. Both VIGOR (50 mg) and ADVANTAGE (25 mg) showed a relative risk of serious ischemic heart disease on Vioxx greater than 2.0 when compared to 1000 mg of naproxen (i.e., relative risk 2.8 in VIGOR and RR 3.32 in ADVANTAGE). A pooled analysis of multiple trials (e.g., musculoskeletal 2.24; Alzheimer's 1.95; APPROVE 2.8; VICTOR 2.79 and VIP 1.25) reveals an overall increased RR greater than 2.0 (i.e., 2.16). The Juni meta-analysis article concluded the elevated relative cardiovascular risk of Vioxx was evident in mid-2000. Protocol 023 was a 14-day human study that showed an immediate reduction of systemic prostacyclin without a concomitant reduction in thromboxane. The literature provides a biologically plausible and epidemiologically demonstrable increased relative risk for a cardiovascular event among Vioxx users, like Dicky Irvin. Ingestion of Vioxx created a prothrombotic environment that substantially contributed to Dicky Irvin's death.

Specifically in reference to Mr. Irvin, there were no clinical records that established cardiac symptoms until shortly before 8:00 a.m. on May 15, 2001. At approximately 8:00 a.m. on May 15, 2001, Mr. Irvin complained that he was not feeling well and was feeling hot. This is consistent with the effects of myocardial ischemia stemming from the thrombotic coronary occlusion that ultimately led to his death.

None of Mr. Irvin's pre-existing coronary artery anatomically "fixed" atherosclerotic lesions would have been considered clinically or pathophysiologically "critical". A cross-sectional narrowing of 75% or more is considered the threshold for "critical" (flow-limiting)

fixed stenotic lesions.  The extent of Mr. Irvin's coronary artery disease was generally 20-40% with a focus of 60% narrowing in the left anterior descending artery.  This 60% plaque would have been considered "subcritical".  There is no documentation that Richard Irvin suffered either from stable or unstable ischemic heart disease before taking Vioxx in April and May of 2001.  I do not note evidence establishing arteriosclerotic heart disease risk factors such as current smoking, diabetes, an abnormal lipid profile or hypertension.

One of the plausible pathophysiological mechanisms explaining Vioxx-related cardiac injury is an increase in platelet aggregation with resultant thrombosis that can lead to a variety of cardiac events such as arrhythmia and/or myocardial infarction.  Another reported effect of Vioxx is vasospasm.  These mechanisms appear to result from selective inhibition of the Cox 2 enzyme with a relative sparing of the Cox 1 enzyme.

A review of the pathologic autopsy materials demonstrates a number of important findings including:

1.      I have reviewed the gross autopsy description and the microscopic slides of the tissues sampled from Dicky Irvin's body.  The clinical circumstances as set out in the medical record demonstrate sudden, unexpected death.  A review of the non-heart organs and tissues revealed no evidence of significant disease that in any way contributed to his death.  The heart is of normal size, shape and condition (except for the coronary artery atherosclerosis and thrombosis) for a patient of Dicky Irvin's size without any indication of pathologic hypertrophy, previous myocardial ischemia or the effects of chronic hypertension.

2.      Some degree of arteriosclerosis can be seen in patients as young as 12 years and is almost universal in adult men in Western society.  Dicky Irvin predominately had mild atherosclerosis of his coronary arteries with a solitary, fixed subcritical area of moderate narrowing in the left anterior descending artery.  This was not limiting to blood flow meaning that up to the time of the lethal thrombotic event Dicky Irvin's heart received normal blood flow through his coronary arteries.  A flow-limiting "critical" lesion typically involves a narrowing of at least 75% cross sectional area of the artery.

3.      Although the microscopic slides do not show the actual site, there is evidence of atherosclerotic plaque disruption.  Medical literature cited in my attachment demonstrates that plaque fissures/ruptures commonly do not lead to the generation and propagation of a thrombus that completely occludes the lumen of the blood vessel.  To the contrary, non-fatal non-occlusive thrombi appear to be more commonly associated with plaque disruption than a fatal occlusive thrombus as occurred in Dicky Irvin. This has been studied and reported by Farb and Burke.  Plaque rupture-related non-fatal/non-occlusive thrombus formation is likely a relatively common phenomenon that often goes unrecognized and is underreported. This is so because the body's normally functioning and balanced coagulation system ordinarily would work to limit the thrombus generated during the healing of plaque disruptions to the area of plaque damage while preventing progression to an occlusive thrombus.  In Dicky Irvin's case, exposure of the plaque components to blood resulted in initiation and

continued propagation of the thrombus to a size that completely occluded the left anterior descending coronary artery. This in turn led to inadequate perfusion of the myocardium leading to electrical instability and the consequent lethal dysrhythmia. The likelihood of plaque rupture leading to occlusive thrombosis is influenced by multiple factors including the state of blood coagulability that in this case was increased by Vioxx.

Michael Alan Graham, MD          1-13-06

**EXHIBIT 5 - Topol Deposition Excerpts**

• **Plunkett II MILs**

[1:1] - [1:24]  11/22/2005  Topol, Eric (MDL)

```
page 1
1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF LOUISIANA
2
   IN RE: VIOXX LITIGATION: MDL DOCKET
3                          NO. 1657
     ─────────────────────────────────
4
   SUPERIOR COURT OF THE STATE OF CALIFORNIA
5          COUNTY OF LOS ANGELES
                  -  -  -
6
   Coordination Proceeding: CASE NO.  JCCP
7  Special Title         : JCCP NO. 4247
   (Rule 1550(b))        :
8                         :
   This Document Applies  :
9  To All                 :
   VIOXX CASES
10
                  -  -  -
11
                CONFIDENTIAL
12
         SUBJECT TO PROTECTIVE ORDER
13
                  -  -  -
14
              November 22, 2005
15
                  -  -  -
16
17         Videotape deposition of ERIC J.
   TOPOL, M.D., held in the InterContinental
18 Hotel, 9801 Carnegie Place, Cleveland,
   Ohio 44106, commencing at 9:41 a.m., on
19 the above date, before Linda L. Golkow, a
   Federally-Approved Registered Diplomate
20 Reporter and Certified Shorthand Reporter.
21                 -  -  -
22      GOLKOW LITIGATION TECHNOLOGIES
           Four Penn Center - Suite 1210
23       1600 John F. Kennedy Boulevard
         Philadelphia, Pennsylvania 19103
24            1.877.DEPS.USA
```

[26:13] - [38:2]  11/22/2005  Topol, Eric (MDL)

```
page 26
13           (Whereupon, Deposition
14      Exhibit Topol-1, Curriculum Vitae
15      Eric Jeffrey Topol, M.D., TOPOLE
16      0000001 - TOPOLE 0000127, was
17      marked for
18      identification.)
19               -  -  -
20 BY MR. KLINE:
21      Q.    The version that I have is
22 what I understand to be an abridged
23 version of 127 pages.  Suffice it to say,
24 you have a very substantial curriculum
page 27
1  vitae outlining your background and
2  experience; correct?
3       A.    Yes.
```



EXHIBIT
5

EXHIBIT 5 - Topol Deposition Excerpts

• Plunkett II MILs

```
4          Q.     You are -- what is your
5    current position, sir?
6          A.     I'm Provost of the Cleveland
7    Clinic Lerner College of Medicine, Chief
8    Academic Officer of the Cleveland Clinic,
9    and also the chairman of the Department
10   of Cardiovascular Medicine of the
11   Cleveland Clinic.
12         Q.     Take them one at a time.
13   Identify each one of those positions, and
14   tell me very briefly what they entail.
15         A.     The Provost of the medical
16   college is providing the oversight of
17   this college of medicine, which had its
18   beginning just three years ago, and it's
19   part of Case Western Reserve University.
20                The chief academic officer
21   responsibility is responsible for all
22   research and education here at this
23   academic medical center, and I've been
24   chairman of the department of
page 28
1    cardiovascular medicine since 1991, and
2    this is a large department, one of the
3    largest departments in cardiovascular
4    medicine in the country.
5          Q.     My understanding, sir, that
6    this -- and you are a cardiologist; is
7    that correct?
8          A.     That's right.
9          Q.     Trained as a cardiologist;
10   correct?
11         A.     That's exactly right.
12         Q.     You did your undergraduate
13   degree at the University of Virginia,
14   your medical school at the University of
15   Rochester, a residency at the University
16   of California, San Francisco, a
17   fellowship at Johns Hopkins in
18   cardiology, and then you became Board
19   Certified in internal medicine and in
20   cardiology.  All correct?
21         A.     That's all correct.
22         Q.     And then you practiced
23   medicine and eventually worked yourself
24   up to become the top person in the
page 29
1    department of cardiovascular medicine at
2    the Cleveland Clinic; correct?
3                 MR. GOLDMAN:  Object to
4          form.
5                 THE WITNESS:  That's
6          correct, yes.  As of 1991, I came
7          to Cleveland Clinic.
8    BY MR. KLINE:
9          Q.     And when did you become
10   chairman of the department of
11   cardiovascular medicine?
12         A.     On my arrival.
13         Q.     Oh, right on your arrival?
14         A.     Yes.  That was why I was
15   recruited here.
16         Q.     Where were you previously?
17         A.     University of Michigan,
18   where I directed the cardiocatherization
19   laboratory, and I was a professor of
20   medicine there.
21         Q.     And you've spent your entire
```

**EXHIBIT 5 - Topol Deposition Excerpts**

• Plunkett II MILs

```
22   career as a practicing cardiologist, sir?
23        A.    Yes.  I continue to practice
24   cardiology with patients.
page 30
 1        Q.    And how many years have you
 2   been a cardiologist?
 3        A.    20 years.
 4        Q.    You also -- it mentioned
 5   that you're the Provost of the Cleveland
 6   Clinic, and that involves overseeing the
 7   entire medical college?
 8        A.    The medical college, which I
 9   founded with Case Western Reserve
10   University back in 2001.
11        Q.    In addition -- oh, and I
12   might add, the Cleveland Clinic, sir,
13   give us a sentence or two on what is the
14   Cleveland Clinic, especially in heart
15   medicine.
16        A.    Well, in the field of heart
17   medicine, it's been ranked by the U.S.
18   News & World Report as the number one
19   center for the last 11 years
20   consecutively.
21        Q.    You have been a clinical
22   investigator on many clinical studies; is
23   that correct?
24        A.    That's right.
page 31
 1        Q.    Tell us about it briefly, a
 2   few sentences.
 3        A.    Well, I've chaired a number
 4   of clinical trials over the past 20
 5   years.  The most widely known are the
 6   so-called GUSTO trials of heart attack.
 7   All these trials had something to do with
 8   heart attack prevention or better
 9   treatment.
10        The cumulative 200,000
11   patients were enrolled, the largest heart
12   attack trials ever performed in the
13   United States, coordinated.  I've been
14   the chair of all of those trials.
15   They've been multinational trials,
16   involving 40 different countries around
17   the world, and these trials have had, I
18   think, a substantial impact on clinical
19   practice in the field of cardiology and
20   for patients.
21        MR. GOLDMAN:  Move to strike
22        as nonresponsive.
23   BY MR. KLINE:
24        Q.    You hold two patents; is
page 32
 1   that correct, sir?
 2        A.    I think the patents have
 3   been applied for.  I'm not -- yes, yes.
 4        Q.    Now, in addition, you are on
 5   the editorial board of a number of
 6   peer-review journals; is that correct?
 7        A.    Yes.
 8        Q.    Would you explain them?
 9   Well, let me tick them off.  I think it
10   could be done more quickly.
11        Circulation, JACC, American
12   College -- American Journal of
13   Cardiology, American Journal of Medicine,
14   among others; is that correct?
```

EXHIBIT 5 - Topol Deposition Excerpts

• Plunkett II MILs

```
15        A.    That's right.
16        Q.    And what does that involve,
17 sir, very briefly?
18        A.    Well, that means being a
19 peer reviewer for manuscripts, work,
20 research that's being conducted
21 elsewhere, and to provide reviews and
22 input and at times editorials, to help
23 advance the field insofar as biomedical
24 research and literature.
page 33
1         Q.    You have been an
2 investigator, according to your vitae, on
3 many NIH projects, National Institutes of
4 Health.  Briefly, a few sentences, tell
5 us about that.
6              MR. GOLDMAN:  Objection to
7         form.
8              THE WITNESS:  Well, the main
9         one is at a specialized center of
10        clinically-oriented research,
11        which is the flagship grant of the
12        NIH, which I was awarded a year
13        ago.  It's a five-year grant for
14        nearly $18 million to support our
15        work in genetics and genomics of
16        coronary artery disease and heart
17        attack, and that's been the main
18        research interest that I've had
19        over the past five years, has been
20        in the genetics and genomics of
21        heart attack.
22 BY MR. KLINE:
23        Q.    You've been a manuscript
24 reviewer for a number of journals, peer
page 34
1  review, including Nature, Science, the
2  New England Journal of Medicine, JAMA,
3  Lancet and many other prestigious
4  journals; correct?
5              MR. GOLDMAN:  Object to
6         form.
7              THE WITNESS:  Yes.
8  BY MR. KLINE:
9         Q.    I have by count, and I'm
10 doing all of this, I might say, just to
11 save time, to get through all of this,
12 you have by my count, 909 original
13 publications in the scientific
14 literature.  Does that sound about right?
15        A.    That's about right.
16        Q.    You have 36 collaborative
17 group-authored papers, meaning papers
18 where a group is mentioned, not you, but
19 you really were a major contributor.  Is
20 that also correct?
21             MR. GOLDMAN:  Object to
22        form.
23             THE WITNESS:  That's
24        correct.
page 35
1  BY MR. KLINE:
2         Q.    You are -- you have 39
3  articles submitted for publication at the
4  time that the curriculum vitae you handed
5  us was.  In other words, these are not
6  even yet published, they're in the mill;
7  is that correct?
```

EXHIBIT 5 - Topol Deposition Excerpts

• Plunkett II MILs

```
 8              MR. GOLDMAN:  Object to
 9      form.
10              THE WITNESS:  Yes.
11 BY MR. KLINE:
12      Q.    Again, by my count, an
13 author or co-author on 30 books?
14              MR. GOLDMAN:  Objection to
15      the form.
16              THE WITNESS:  That's
17      correct.
18 BY MR. KLINE:
19      Q.    164 book chapters?
20              MR. GOLDMAN:  Same
21      objection.
22              THE WITNESS:  That's
23      correct.
24 BY MR. KLINE:
page 36
 1      Q.    And these all deal in the
 2 field of cardiology, sir?
 3      A.    Virtually all are cardiology
 4 pieces of work, yes.
 5      Q.    And there was a recent
 6 article, and I'd like you to tell me if
 7 this is correct, it sort of pulls some
 8 things together, on November 11th in the
 9 Associated Press which says, "One medical
10 journal index service ranked Topol as the
11 eighth most cited medical researcher
12 among its index publications in the past
13 ten years with his 498 papers cited by
14 colleagues, 21,050 times."
15              Is that about correct?
16              MR. GOLDMAN:  Object to
17      form.
18              THE WITNESS:  That's
19      correct.  The ISI ranks medical
20      researchers, and in the last ten
21      years, I'm ranked number eight of
22      the most widely cited medical
23      researchers in the world.  So,
24      that's correct.
page 37
 1 BY MR. KLINE:
 2      Q.    Let me ask it in a different
 3 way just to be sure.
 4              How does the -- what is the
 5 ISI, and how does it rank you as someone
 6 who is cited by others in the medical
 7 field?
 8      A.    That means that if you
 9 publish a paper and that paper is cited
10 by others, that's the cumulative tally of
11 citations of your impact in the medical
12 literature, in the medical community, and
13 so that is the most highly regarded
14 authority for collating that data.  And
15 in the ten-year cumulative tally, as you
16 mentioned, somewhere around 500
17 manuscripts were published, and that was
18 the eighth leading, I believe, citation
19 tally in the rankings.
20      Q.    Are you, sir, with this
21 background, an expert in the field of
22 cardiovascular medicine?
23              MR. GOLDMAN:  Object to the
24      form.
page 38
```

**EXHIBIT 5 - Topol Deposition Excerpts**

• **Plunkett II MILs**

```
1              THE WITNESS:  I believe I
2       am, yes.
```

[50:17] - [51:1]    11/22/2005  Topol, Eric (MDL)

```
page 50
17      A.    "I am also upset that the
18  story of their scientific misconduct for
19  the VIGOR paper in" the New England
20  Journal of Medicine, that's "NEJM, with
21  errors of omission (deaths), erroneous
22  data (MIs)," or heart attacks, "and
23  incomplete data (more than 1/2 of the
24  thrombotic events) has not received any
page 51
1   attention whatsoever."
```

[60:2] - [60:7]    11/22/2005  Topol, Eric (MDL)

```
page 60
2              THE WITNESS:  Well, the
3              medicine's risk, Vioxx's risk, has
4              been evident since trials
5              conducted in 1999 and all the way
6              through the time of withdrawal in
7              September 30, 2004.
```

[60:9] - [60:18]    11/22/2005  Topol, Eric (MDL)

```
page 60
9       Q.    Have there been multiple
10  tests and multiple studies that have, in
11  your opinion, proven that fact?
12             MR. GOLDMAN:  Objection,
13             calls for opinion testimony.
14             THE WITNESS:  There's been
15             replication of untoward
16             significant excess of events of
17             heart attack, death and stroke in
18             multiple trials.  That's right.
```

[126:23] - [127:15]    11/22/2005  Topol, Eric (MDL)

```
page 126
23      Q.    That Figure 1, which is the
24  Kaplan-Meier curve showing the time to
page 127
1   cardiovascular adverse events, the line
2   separated how many days?
3       A.    Between four and six weeks
4   these curves diverge.
5             MR. GOLDMAN:  Move to strike
6             the opinion testimony.
7   BY MR. KLINE:
8       Q.    Is this, by the way,
9   something that has been replicated in
10  other studies?
11             MR. GOLDMAN:  Objection,
12             move to strike.
13             THE WITNESS:  It's been
14             replicated in four randomized
15             trials.
```

[127:24] - [128:17]    11/22/2005  Topol, Eric (MDL)

```
page 127
24      A.    Study 090, which was a
```

**EXHIBIT 5 - Topol Deposition Excerpts**

• **Plunkett II MILs**

```
page 128
1   six-week trial, which had a 760 percent
2   excess within the six weeks.
3         Q.    Yes.
4         A.    The VIGOR trial I just
5   mentioned.
6         Q.    Yes.
7         A.    The ADVANTAGE trial, which
8   was a 12-week trial that showed a
9   significant excess in the 12-week time
10  frame.
11        And the VICTOR trial, which
12  has not yet been published, which is a
13  colon cancer trial of 2,300 patients
14  coordinated out of Oxford, which has been
15  at least commented on by the
16  investigators having immediate excess in
17  heart attack risk.
```

[133:1] - [133:16]     11/22/2005  Topol, Eric (MDL)

```
page 133
1         Q.    So, what do you think of
2   this naproxen hypothesis that was put
3   forward by Merck to justify the results
4   in VIGOR?
5         MR. GOLDMAN:  Objection,
6   opinion testimony.
7         THE WITNESS:  It doesn't
8   justify -- I mean, as I mentioned
9   earlier, the problem is you have
10  an experimental drug which is not
11  fully defined, and you compare it
12  to a drug that's been known for 20
13  years.  To all of a sudden to
14  ascribe some type of magical
15  protective effect without any
16  basis is not acceptable.
```

[166:5] - [166:21]     11/22/2005  Topol, Eric (MDL)

```
page 166
5         The warnings on this drug,
6   were there adequate warnings on this
7   drug, sir, in the '99 and 2002 labels?
8         MR. GOLDMAN:  Objection.
9   BY MR. KLINE:
10        Q.    As to cardiovascular risks?
11        THE WITNESS:  In my opinion,
12  both the original label and then
13  the revision in April 2002 did not
14  show adequate safety concerns
15  about heart attacks, strokes and
16  death that could occur from the
17  medicine.  So, it wasn't present
18  at all in the first iteration in
19  1999, and it certainly was not
20  adequately flagged in the 2002
21  revision.
```

[197:19] - [198:12]     11/22/2005  Topol, Eric (MDL)

```
page 197
19        Q.    Do you have a sense of when
20  it was due by?
21        MR. GOLDMAN:  Objection.
22        THE WITNESS:  It could have
```

EXHIBIT 5 - Topol Deposition Excerpts

• Plunkett II MILs

```
                23        easily been imposed as of February
                24        2001, or if we go back to the Juni
        page 198
                1         analysis in the Lancet, also
                2         published in the Lancet, it could
                3         have been back in year 2000.  So,
                4         somewhere between 2000 and 2001
                5         there was more than adequate
                6         confirmation.
                7              Essentially all you need is
                8         VIGOR and study 090 together, and
                9         I could take you through the Juni
                10        analysis in the Lancet, but that
                11        basically crosses the line for
                12        proven hazard of heart attacks.
```

[214:16] - [216:5]      11/22/2005  Topol, Eric (MDL)

```
        page 214
                16             THE WITNESS:  This was
                17        another extremely concerning part
                18        of that dissemination on the day
                19        of withdrawal, that it took 18
                20        months for there to be any risk,
                21        because that's not true.
                22             In fact, as I reviewed
                23        earlier in this deposition, there
                24        were four trials that showed that
        page 215
                1         the timeline for that was
                2         considerably quicker.  In VIGOR,
                3         with four to six weeks, there was
                4         separation.  In ADVANTAGE, within
                5         12 weeks.  In VICTOR, this was
                6         immediate.  And in study 090,
                7         within six weeks.
                8              And in all of these trials,
                9         there were no heart disease
                10        patients.  So, it could have been
                11        much worse than -- in the days or
                12        weeks.  And beyond all that,
                13        there's the issue of a problem of
                14        statistical power, that is, you
                15        have to do a very large trial if
                16        you're not expecting adequate
                17        number of events, and so none of
                18        the trials were adequately powered
                19        from a time perspective.
                20             But, given all those things,
                21        that is, statistical power, lack
                22        of cardiovascular patients, and
                23        four randomized trials, in
                24        addition to the Juni analysis,
        page 216
                1         there's a pretty strong case that
                2         the risk of Vioxx for heart
                3         attacks can occur at any time
                4         after the initiation of the
                5         medicine.
```

[216:17] - [218:9]      11/22/2005  Topol, Eric (MDL)

```
        page 216
                17             Q.   By that time or by the
                18        time -- by today, by today there were
                19        studies done by -- let's see, there was a
                20        study done by Ray, correct, in Lancet, in
                21        '02, the Ray study?
```

EXHIBIT 5 - Topol Deposition Excerpts

• Plunkett II MILs

```
22        A.    Yes.
23        Q.    I'm talking epidemiology
24  studies.
page 217
1         A.    There were two Ray studies
2   in the Lancet.
3         Q.    Did that show an increased
4   risk of heart attacks?
5               MR. GOLDMAN:  Objection.
6               THE WITNESS:  Yes.
7   BY MR. KLINE:
8         Q.    There was a study by Solomon
9   in Circulation in 2004.  I'm talking just
10  the epidemiological studies.  Did that
11  show an increased risk of heart attacks?
12              MR. GOLDMAN:  Objection.
13              THE WITNESS:  Yes.
14  BY MR. KLINE:
15        Q.    There was a study by Graham
16  in Lancet in 2005, which we'll get to.
17  Did that show an increased risk of heart
18  attacks?
19              MR. GOLDMAN:  Objection.
20              THE WITNESS:  Yes.
21  BY MR. KLINE:
22        Q.    There was a study by Kimmel
23  in the Annals of Internal Medicine
24  published, I'm not sure when.  Did that
page 218
1   show an increased risk of heart attacks?
2               MR. GOLDMAN:  Objection.
3               THE WITNESS:  Yes.
4   BY MR. KLINE:
5         Q.    There was a study by
6   Levesque, L-E-V-E-S-Q-U-E.  Did that show
7   an increased risk of heart attacks?
8               MR. GOLDMAN:  Objection.
9               THE WITNESS:  Yes.
```

[224:4] - [224:19]        11/22/2005  Topol, Eric (MDL)

```
page 224
4         Q.    Before you get to issue
5   number two, if you remember, how do you
6   view that conduct?  What word would you
7   use to describe it?
8               MR. GOLDMAN:  Objection.
9               THE WITNESS:  We're talking
10              about deaths, and we're talking
11              about false assurances that the
12              mortality was the same in three
13              prominent places in the
14              manuscript.
15  BY MR. KLINE:
16        Q.    Outrageous?
17              MR. GOLDMAN:  Objection.
18              THE WITNESS:  I believe it's
19              highly misleading.
```

[226:22] - [227:13]        11/22/2005  Topol, Eric (MDL)

```
page 226
22        Q.    -- 16, thank you.
23              You state here, something we
24  talked about earlier, which is, "We
page 227
1   indeed" -- top of the second column,
2   2878.
```

**EXHIBIT 5 - Topol Deposition Excerpts**

• Plunkett II MILs

```
3              "We indeed acknowledged that
4     naproxen may have a cardioprotective
5     effect, but the magnitude of the effect
6     would be unlikely to exceed that of
7     aspirin, at a 25 percent reduction of
8     heart attacks.  Instead, in the VIGOR
9     trial, there was a 500 percent increase
10    in heart attacks.  This makes any
11    'naproxen hypothesis' of cardioprotection
12    mathematically indefensible."  Correct?
13    Your words?
```

[227:19] - [228:19]    11/22/2005  Topol, Eric (MDL)

```
page 227
19             THE WITNESS:  I wrote this.
20         These are my words, absolutely.
21    BY MR. KLINE:
22         Q.   And you said in this article
23    or this correspondence, putting out there
24    for the public, for the medical
page 228
1     community, a little further down, "There
2     were no differences in the rate of
3     perforation (0.1 percent in...rofecoxib
4     and naproxen groups)."
5              Your words, "It is hard to
6     imagine that the small protection from
7     gastric or duodenal ulcers in the VIGOR
8     trial is an acceptable trade-off as
9     compared with twice the incidence of
10    death, heart attacks, and strokes."
11             Did you write those words?
12             MR. GOLDMAN:  Objection.
13             THE WITNESS:  Yes, I
14         certainly did.
15    BY MR. KLINE:
16         Q.   And were you doing a
17    risk/benefit analysis there in your mind?
18             MR. GOLDMAN:  Objection.
19             THE WITNESS:  Yes.
```

[229:1] - [229:9]    11/22/2005  Topol, Eric (MDL)

```
page 229
1              Were you weighing the risk
2     of pain relief versus death?
3              MR. GOLDMAN:  Objection.
4              THE WITNESS:  We were
5         weighing -- I was weighing, when I
6         wrote that statement, the risk of
7         heart attacks principally versus
8         the small protection from
9         significant stomach complications.
```

[230:19] - [235:20]    11/22/2005  Topol, Eric (MDL)

```
page 230
19             (Whereupon, Deposition
20         Exhibit Topol-17, "Good Riddance
21         to a Bad Drug," (Topol) New York
22         Times Reprint, October 2, 2004,
23         (2 pages), was marked for
24         identification.)
page 231
1                       -  -  -
2     BY MR. KLINE:
```

## EXHIBIT 5 - Topol Deposition Excerpts

• **Plunkett II MILs**

```
 3          Q.     While you're testifying,
 4    we'll show this to the jury.  It's a
 5    document which is entitled, "Good
 6    Riddance to a Bad Drug."
 7               Let me start with this, sir,
 8    because I've seen this in your writings.
 9               Was Vioxx and is Vioxx a
10    dangerous drug?
11               MR. GOLDMAN:  Objection.
12               THE WITNESS:  Let me first
13          start off by saying I didn't title
14          this, New York Times op/ed.  I
15          learned, since this was the first
16          op/ed I had in the New York Times,
17          that you don't get a right to pick
18          your title.
19               My title was "Vioxx
20          Vanquished," but the editor of the
21          New York Times of the op/ed picked
22          this one, and I didn't know it
23          until it was actually published.
24    BY MR. KLINE:
page 232
 1    Q.     Did you approve it?
 2               MR. GOLDMAN:  Objection.
 3          I'm sorry.  Objection,
 4          nonresponsive.
 5               THE WITNESS:  It was
 6          probably different than what I was
 7          trying to convey, because what I'm
 8          trying to convey in this op/ed is
 9          that Vioxx had a risk that had
10          never been adequately defined,
11          that overall it was unacceptable,
12          that the whole class of COX-2
13          inhibitors was suspect, and that
14          we can't tolerate this sort of
15          situation where a medicine is
16          being mass marketed, and it could
17          induce tens of thousands of heart
18          attacks and without the
19          appropriate studies.  So, the FDA
20          is involved in this as well, in
21          this op/ed.
22               So, there are many things,
23          but alerting the public who read
24          the New York Times about that it
page 233
 1          is not safe necessarily for any
 2          COX-2 inhibitor, which is in here,
 3          about naproxen and Aleve, Motrin,
 4          all these other possible
 5          alternatives, and some of the
 6          lessons that we need to learn from
 7          this, and most importantly was the
 8          statement that our two most common
 9          deadly diseases should not be
10          caused by a drug.
11               MR. GOLDMAN:  Objection,
12          move to strike as nonresponsive.
13    BY MR. KLINE:
14    Q.     Is that what you were trying
15    to convey, what you just said?
16    A.     Yes.
17    Q.     And when you conveyed it, on
18    the second page you listed two points and
19    you say, "Second, and what may be more
20    alarming, is that despite studies showing
```

### EXHIBIT 5 - Topol Deposition Excerpts

• **Plunkett II MILs**

```
21   the magnitude of the public health
22   problem, for several years Merck did
23   nothing to investigate."
24           Is that the message you
page 234
1    wanted to convey as well?
2                MR. GOLDMAN:  Objection.
3                THE WITNESS:  That was a
4        critical message that probably was
5        conveyed innumerable times over
6        these last five years.
7    BY MR. KLINE:
8        Q.   You stated, "This surely
9    represents a conflict between the
10   interests of the public and the interests
11   of a company with a blockbuster drug that
12   had sales of 2.5 billion in 2003."
13           Did you write that in the --
14   for the New York Times?
15               MR. GOLDMAN:  Objection.
16               THE WITNESS:  Yes.
17   BY MR. KLINE:
18       Q.   You stated, "At the same
19   time, Merck spent at least $100 million a
20   year for direct-to-consumer Vioxx
21   advertising, while the company's
22   employees and their consultants published
23   several papers in medical journals
24   rebutting studies reporting Vioxx's heart
page 235
1    attack risk."
2                Did I read that correctly?
3                MR. GOLDMAN:  Objection.
4                THE WITNESS:  Yes, you did.
5    BY MR. KLINE:
6        Q.   And you describe this as
7    "the Vioxx debacle."  Were those your
8    words?
9                MR. GOLDMAN:  Objection.
10               THE WITNESS:  That is my
11       phrase, "As the Vioxx debacle
12       shows," yes.
13   BY MR. KLINE:
14       Q.   You, later in 2004 in that
15   Cleveland Clinic article, and I'm trying
16   to put it in front of me, described this
17   whole thing as the rofecoxib debacle,
18   same language; correct?
19               MR. GOLDMAN:  Objection.
20               THE WITNESS:  Yes.
```

[234:18] - [235:20]     11/22/2005 Topol, Eric (MDL)

```
page 234
18       Q.   You stated, "At the same
19   time, Merck spent at least $100 million a
20   year for direct-to-consumer Vioxx
21   advertising, while the company's
22   employees and their consultants published
23   several papers in medical journals
24   rebutting studies reporting Vioxx's heart
page 235
1    attack risk."
2                Did I read that correctly?
3                MR. GOLDMAN:  Objection.
4                THE WITNESS:  Yes, you did.
5    BY MR. KLINE:
6        Q.   And you describe this as
```

EXHIBIT 5 - Topol Deposition Excerpts

• Plunkett II MILs

```
        7    "the Vioxx debacle."  Were those your
        8    words?
        9              MR. GOLDMAN:  Objection.
        10             THE WITNESS:  That is my
        11      phrase, "As the Vioxx debacle
        12      shows," yes.
        13   BY MR. KLINE:
        14        Q.    You, later in 2004 in that
        15   Cleveland Clinic article, and I'm trying
        16   to put it in front of me, described this
        17   whole thing as the rofecoxib debacle,
        18   same language; correct?
        19             MR. GOLDMAN:  Objection.
        20             THE WITNESS:  Yes.
```

[251:6] - [251:20]    11/22/2005 Topol, Eric (MDL)

```
   page 251
        6              By the way, sir, if I can
        7      pause for a minute.  Has Merck made life
        8      absolute hell for people who criticize
        9      them?
        10             MR. GOLDMAN:  Objection, and
        11      can I have a standing objection to
        12      the use of this document?
        13             MR. KLINE:  Yes.
        14             THE WITNESS:  I believe that
        15      is the case, that is, there have
        16      been retaliation and actions taken
        17      to make life extremely difficult
        18      for people who have objected to
        19      their work, to their studies or to
        20      the lack of studies.
```

[270:11] - [270:22]    11/22/2005 Topol, Eric (MDL)

```
   page 270
        11        A.    Yes.  The only thing I
        12      hadn't mentioned was the symposia that
        13      would be done at each of the national
        14      meetings, where they would have these
        15      Merck consultants giving lectures, taking
        16      apart our data, like the JAMA paper, and
        17      assuring the medical community like
        18      cardiologists or internists, doctors,
        19      that there was nothing wrong with the
        20      safety of Vioxx, that it was an illusion
        21      of the Cleveland Clinic authors of the
        22      JAMA paper.
```

[292:21] - [296:9]    11/22/2005 Topol, Eric (MDL)

```
   page 292
        21        Q.    Did the Cleveland -- it
        22      raises the question that, has anyone from
        23      Merck, to your knowledge, either
        24      contacted anyone at the Cleveland Clinic
   page 293
        1      or your colleagues or anyone relating to
        2      your writings or your public statements
        3      relating to Vioxx in any way?  And if so,
        4      what is it, if anything?
        5              MR. GOLDMAN:  Objection.
        6              THE WITNESS:  I was told by
        7      a colleague here at the clinic on
        8      October 14th, the chairman of the
        9      board of trustees, Mr. Mal Mixon,
```

**EXHIBIT 5 - Topol Deposition Excerpts**

• Plunkett II MILs

```
10          was contacted.
11 BY MR. KLINE:
12          Q.    His name is?
13          A.    Mal, Malachi Mixon, chairman
14 of our board of trustees.
15          Q.    Current?
16          A.    Yes, of the Cleveland
17 Clinic.  That he was contacted directly
18 by Raymond Gilmartin in October of 2004,
19 and that Mr. Gilmartin said to Mr. Mixon,
20 what has Merck ever done to the Cleveland
21 Clinic to warrant this?  And this was
22 relayed by a colleague who spoke to Mr.
23 Mixon.
24          Q.    Who was that colleague, sir.
page 294
1              MR. GOLDMAN:  Objection,
2          move to strike as nonresponsive.
3              THE WITNESS:  His name is
4          Richard Rudick.
5 BY MR. KLINE:
6          Q.    Who is he?
7          A.    He is the director of
8 clinical research.
9          Q.    Rudick was told by Mixon
10 that Mixon was contacted by Gilmartin.
11 Is that what you're telling me?
12              MR. GOLDMAN:  Objection.
13              THE WITNESS:  Yes.  That he
14          was further told that Mr.
15          Gilmartin and Mr. Mixon were
16          colleagues together at Harvard
17          M.B.A. school, they were old
18          friends, and that Mr. Mixon
19          understood that Mr. Gilmartin was
20          very upset when he called in
21          October '04.
22              This was relayed on October
23          14th to Dr. Rudick.  I don't know
24          exactly what date.  I believe it
page 295
1          was the day prior, October 13th,
2          but I can't know for sure.
3              MR. GOLDMAN:  Objection,
4          lacks foundation.
5 BY MR. KLINE:
6          Q.    And where does October 14
7 fit on our chronology?  What event does
8 that relate to?
9          A.    That was eight days after
10 the New England Journal paper, of my
11 editorial, and about 13 or 12 days after
12 the New York Times op/ed.
13          Q.    And from your perspective,
14 assuming we pin all of that down that
15 that, indeed, happened -- first of all,
16 you believe that if called to testify,
17 that's what Dr. Rudick would tell us?  Is
18 that what you're saying?
19              MR. GOLDMAN:  Objection.
20              THE WITNESS:  Yes.  I've
21          confirmed this with Dr. Rudick,
22          yes.
23 BY MR. KLINE:
24          Q.    And what -- how do you view
page 296
1 all of this?
2              MR. GOLDMAN:  Objection.
```

EXHIBIT 5 - Topol Deposition Excerpts

• **Plunkett II MILs**

```
3    BY MR. KLINE:
4         Q.   How do you view this event
5    that you've just described for me?
6              MR. GOLDMAN:  Same
7         objection.
8              THE WITNESS:  I find it
9         entirely repulsive.
```

[643:1] - [643:22]   11/22/2005 Topol, Eric (MDL)

```
page 643
1              C E R T I F I C A T E
2
3
4              I, LINDA L. GOLKOW, a Notary
     Public and Certified Shorthand Reporter
5    of the State of New Jersey, do hereby
     certify that prior to the commencement of
6    the examination, ERIC J. TOPOL, M.D. was
     duly sworn by me to testify to the truth,
7    the whole truth and nothing but the
     truth.
8
9
               I DO FURTHER CERTIFY that the
10   foregoing is a verbatim transcript of the
     testimony as taken stenographically by
11   and before me at the time, place and on
     the date hereinbefore set forth, to the
12   best of my ability.
13
14             I DO FURTHER CERTIFY that I am
     neither a relative nor employee nor
15   attorney nor counsel of any of the
     parties to this action, and that I am
16   neither a relative nor employee of such
     attorney or counsel, and that I am not
17   financially interested in the action.
18
19
20
21             _____
               LINDA L. GOLKOW, CSR
               Notary Number:  1060147
22             Notary Expiration:  1-2-08
               CSR Number:  30XI176200
```