FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA
2006 FEB -1 PM 3:33
LORETTA G. WHYTE
CLERK

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **In re: VIOXX PRODUCTS LIABILITY LITIGATION** | **MDL Docket No. 1657** |
| | **SECTION L** |
| **This document relates to Case No. 05-4046*** | **JUDGE FALLON** |
| **EVELYN IRVIN PLUNKETT** as Personal Representative of the Estate of **RICHARD IRVIN, JR.**, Plaintiff, | **MAGISTRATE JUDGE KNOWLES** |
| vs. | |
| **MERCK & CO., INC.**, Defendant. | |

**REPLY MEMORANDUM IN SUPPORT OF MERCK & CO., INC.'S MOTION TO EXCLUDE TESTIMONY OF MICHAEL ALAN GRAHAM, M.D.**

In the first trial, plaintiff's former pathologist, Dr. Colin Bloor, testified that Mr. Irvin did not suffer a ruptured plaque. (*Plunkett I* Tr. at 331:4-12, attached as Ex. 1 to Declaration of Phillip A. Wittmann in Support of Merck's Reply Memorandum in Support of Motion to Exclude Testimony of Michael Alan Graham, M.D. ("Wittmann Decl.").) The testimony could not have been clearer:

Q: Okay. So that's your expert report. And then your testimony today, number 1, you say there was no plaque rupture. Right?

___ Fee
___ Process
X Dktd
✓ CtRmDep
___ Doc. No

A: I said, 'there is no sign of plaque rupture at the site of the nonattached thrombus.'

Q: Was there a plaque rupture somewhere else?

A: I have not seen that.

(*Id.* at 334:9-15.) And Dr. Lucchesi testified: "And when I hear that the pathologist was able to remove that clot – it was nonadhering – my conclusion would be that it was not a plaque rupture, because if it was, it would be firmly fixed to that blood vessel." (*Id.* 215:24-216:3.)

Had Mr. Irvin suffered a ruptured plaque, Dr. Bloor would have concluded that Vioxx did not contribute to his death.

Q: . . . Here is the question: if you saw plaque rupture and an associated thrombus such that you concluded that the plaque rupture caused the thrombus, it would be your opinion, to a reasonable medical probability, that the plaque rupture cased Mr. Irvin's death? Would you agree with that?

A: Yes.

Q: And would you agree that, in that case, it would not be Vioxx?

A: Again, if that lesion, with the qualification that I've already cited, yes, I would come to that conclusion.

Q: So if there was plaque rupture, that would be the probable cause of death rather than Vioxx, right?

A: As I said, yes, if it met those conditions.

(*Id.* at 345:9-23.)

Following the mistrial, plaintiff shifted her theory on Mr. Irvin's pathology 180 degrees. Her new pathology expert, Dr. Graham, now concedes that Mr. Irvin, in fact, *did* have a ruptured plaque. In her Opposition to Merck's motion to exclude Dr. Graham's testimony, plaintiff has come up with a brand new theory – one that none if her six prior expert ever has endorsed as being demonstrated to be scientifically reliable. Just five days before the retrial in this case, plaintiff now takes the position that Dr. Graham will testify that Vioxx is capable of causing plaque ruptures.

Plaintiff is playing games, and the Court should put an end to it. Dr. Graham – like plaintiff's other experts – has testified unequivocally that he has no reliable basis for offering an opinion that Vioxx is capable of causing plaque ruptures, nor does he have any basis for an opinion that Vioxx contributed in any way to Mr. Irvin's ruptured plaque. This Court cannot allow Dr. Graham to testify about a theory that he admits has no scientific support.

The other arguments raised in plaintiff's Opposition likewise have no merit. Notwithstanding Dr. Graham's cursory review of some literature selected by plaintiff's counsel, he is not qualified to offer an opinion that Vioxx caused or contributed in any way to Mr. Irvin's death. Nor does he have any scientifically reliable basis for offering such an opinion even if he were qualified to give it, which he is not.

## I. DR. GRAHAM HAS NO BASIS FOR OFFERING AN OPINION THAT VIOXX CAN CAUSE PLAQUE RUPTURES OR THAT IT CONTRIBUTED TO MR. IRVIN'S RUPTURED PLAQUE.

As Merck explained in its Opening Memorandum, Dr. Graham concedes that Mr. Irvin had a plaque rupture.[1] (Jan. 25, 2006 Deposition of Michael Alan Graham, M.D. ("Graham Dep.") at 11:23-25, 13:8-12, attached as Ex. 2 to the Wittmann Decl.) He further concedes that Mr. Irvin's natural biological response to that plaque rupture was to form a thrombus at the site of the rupture. (*Id.* at 133:18-134:12, 136:11-21, 162:20-24.) And he also concedes that plaque rupture causes tens of thousands of deaths every year in individuals who do not take Vioxx. (*Id.* at 145:1-147:25, 148:8-25, 156:10-19, 162:14-19.)

These concessions are devastating to plaintiff's case because they tend to show that Vioxx did not contribute to Mr. Irvin's death. Plaintiff understands the import of Dr. Graham's testimony. That is why she now intends to argue that Vioxx is capable of causing plaque

[1] Now, even plaintiff contends there is "consistent agreement" that Mr. Irvin had a ruptured plaque. (Opposition at 12.)

ruptures. As she states in her Opposition, "Vioxx, by its very nature, causes such ruptures," and there is a "valid scientific basis for Dr. Graham to opine that Vioxx" has such an effect. (Opposition at 10, 12.) Plaintiff's theory appears to be that if Vioxx caused Mr. Irvin's plaque to rupture, Vioxx must be responsible for the thrombus that Dr. Graham concedes developed in response to the ruptured plaque.

The problem with plaintiff's new theory, however, is that not even Dr. Graham can say that it is scientifically reliable. Indeed, Dr. Graham testified unequivocally that he has no basis, let alone a scientifically reliable basis, for opining that Vioxx is capable of causing plaque rupture.[2] To begin with, Dr. Graham conceded that the scientific community does not generally accept the proposition that the inhibition of COX-2 contributes to plaque ruptures. (Graham Dep. at 140:3-6.) Lest there be any doubt, here is Dr. Graham's testimony:

> Q: Certainly you would agree that it has not been generally accepted that COX-2 inhibition causes plaque instability in humans?
>
> A: ***Yeah, I would agree with that.***

(*Id.*) When asked if he will opine that Vioxx increases the risk of plaque ruptures, he admitted he does not know if Vioxx has such an effect: ***"I don't know if it does or not."*** (*Id.* at 138:6-9.) He further conceded that Vioxx has not been demonstrated to cause plaque ruptures: ***"I don't think it's been demonstrated that it does."*** (*Id.* at 138:10-15.) Finally, he admitted he cannot testify to a reasonable degree of medical certainty that Mr. Irvin's brief use of Vioxx somehow contributed to the rupture of his atherosclerotic plaque:

> Q: So we have a process that starts a clot forming in Mr. Irvin that you cannot say began because of Vioxx, correct?

---

[2] In fact, according to Dr. Graham, it is biologically plausible that Vioxx "could lead to plaque stabilization." (Graham Dep. at 181:14-18.)

A: ***Yeah. You can't say more likely than not that that caused the plaque to rupture. I would agree with that.***

Q: When you say it, you mean you cannot say that Vioxx more likely than not caused the plaque to rupture?

A: ***Correct.***

(*Id.* at 161:16-25.)

Significantly, Dr. Graham is not the only expert hired by plaintiff who admits that that there is no scientifically reliable evidence demonstrating that Vioxx is capable of causing plaque ruptures. At least ***five*** of plaintiff's experts – Drs. Benedict Lucchesi, Thomas Baldwin, Harold Gandy, Joseph Burton and Colin Bloor – have confirmed that there is no reliable scientific basis to establish that Vioxx has such an effect, even though all of these experts testified that they were aware of plaintiff's plaque instability theory. Here is Dr. Lucchesi's testimony on Vioxx and plaque ruptures:

Q: Would you agree, sir, that there's not a single piece of peer-reviewed medical literature that demonstrate even in an animal model that Vioxx contributes to plaque rupture in the coronary artery?

. . .

A: ***I'll agree to that because I don't know of any literature that relates to that specific point.***

(October 18, 2005 Deposition of Benedict Lucchesi, M.D. at 331:21-332:6, attached as Ex. 3 to the Wittmann Decl.) Here is Dr. Baldwin's testimony on Vioxx and plaque ruptures:

Q: . . . You're not aware of any study, literature, or clinical trial that has demonstrated an increased risk of plaque rupture associated with Vioxx, correct?

A: ***Correct.***

(October 6, 2005 Deposition of Thomas Baldwin. M.D. at 139:7-12, attached as Ex. 4 to the Wittmann Decl.) Here is Dr. Gandy's testimony on Vioxx and plaque ruptures:

Q: Are you aware of any scientific evidence that Vioxx increases the risk of plaque rupture?

A: ***I have not seen it.***

. . .

Q: Are you aware of any data to suggest that Vioxx contributes to plaque rupture?

A: I do not specifically recall.

(October 10, 2005 Deposition of Harold Gandy, M.D. at 183:16-18; 227:12-14, attached as Ex. 5 to the Wittmann Decl.) Here is Dr. Burton's testimony on Vioxx and plaque ruptures:

Q: Would you agree with me that Vioxx played no role in rendering [Mr. Irvin's] plaque any more vulnerable than it was?

A: I'll agree that ***I personally don't know how that would have happened***, but I can't say that I know enough about it, pharmacologically, to absolutely rule it out.

Q: You will not be opining at trial that Vioxx contributed to rendering Mr. Irvin's plaque more vulnerable, correct?

A: ***Yes. That's correct.***

. . .

Q: So you're not going to come to trial and opine that Vioxx contributes to the disrupture, or rupture of plaque, correct?

A: ***No, sir.*** It would be one of those things I'd have to depend on a hypothetical, or someone else's prior testimony.

(October 4, 2005 Deposition of Joseph Burton, M.D. at 271:11-21; 295:8-13, attached as Ex. 6 to the Wittmann Decl.) And here is Dr. Bloor's testimony on Vioxx and plaque ruptures:

Q: Are you aware of any study that shows that Vioxx makes atherosclerotic plaque more vulnerable or more unstable?

A: ***I am not aware of any such study being done.***

Q: Okay. So the answer is no?

A: ***Yes.***

(October 5, 2005 Deposition of Colin Bloor, M.D. at 116:2-9, attached as Ex. 7 to the Wittmann Decl.)

Notwithstanding that her own experts uniformly agree that there is no scientific evidence that Vioxx is capable of causing plaque ruptures in humans, plaintiff intends to argue that Vioxx has such an effect. Plaintiff bases her theory entirely on a comment in the APPROVe study to the effect that COX-2 inhibition might increase the risk of cardiovascular disease by "destabilizing plaque."[3] But plaintiff's reliance on this comment is misplaced for three reasons.

First, plaintiff's contention about what the APPROVe study purportedly shows is immaterial. What matters is whether *Dr. Graham* relies on the APPROVe study for the proposition that Vioxx is capable of causing plaque ruptures. While Dr. Graham relies on the study for his general opinion that Vioxx is pro-thrombotic, nowhere in his expert report or deposition does he purport to rely on it for the proposition that Vioxx is capable of causing plaque ruptures.

Second, the purpose of the APPROVe study was to "report on the cardiovascular outcomes" allegedly associated with Vioxx.[4] The study did not examine, and the authors of the study did not purport to evaluate, whether COX-2 inhibition might increase the risk of plaque rupture. That being so, plaintiff cannot rely on the study as "proof" that Vioxx has such an effect.

---

[3] (Opposition at 10 (citing Bresalier et al, *Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Prevention Trial* [hereinafter "Bresalier"], N. ENG. J. MED. 2005; 352:1092-1102, at 1093).) According to plaintiff, multiple studies conducted by Merck supposedly "prove" that Vioxx causes plaque rupture. (Opposition at 12.) Plaintiff, however, has cited no study other than APPROVe for that proposition.

[4] Bresalier at 1092.

And third, the *only* article cited in the APPROVe study for the statement that COX-2 inhibition might result in plaque destabilization is a mouse study performed by Egan.[5] The Egan study involved genetically modified mice, who were not even given Vioxx, and who were given a thromboxane receptor antagonist. Such "proof" does not even come close to meeting Daubert standards, particularly given that six of plaintiff's own experts have stated under oath that there is no reliable scientific evidence that Vioxx caused plaque rupture. In fact, in the Egan study, administration of a COX-2 inhibitor alone *did not* lead to plaque destabilization in the mice. It was only when the COX-2 inhibitor was given with the thromboxane receptor antagonist (a drug Mr. Irvin did not take) that there were "changes" in the plaque of the genetically modified mice.

In addition, Dr. Graham conceded that he only "glanced" at the Egan mouse study and thus is not even familiar with the details of the authors' experiment, methodology or conclusions:

Q: And you recall that – do you recall the experiment that Egan ran?

A: No, off the top of my head, I don't. I saw that he did it. I kind of glanced over it and said fine. It's just another proposed mechanism. I'm not saying it is or is not what happened.

. . .

Q: Do you recall that Egan's experiment was on animals?

A: I think it was genetic defect. I don't know if it was hamsters or mice, I think.

Q: Right. Genetically-modified mice?

A: Okay, yeah.

Q: And he gave them a thromboxane receptor antagonist.

A: As I recall, that's correct.

---

[5] Bresalier at 1093, 1101.

> Q: And in fact, when he just inhibited COX-2 he saw no instability of the plaque. It was only in combination with thromboxane inhibitor antagonists and COX-2 inhibition?
>
> A: I'd have to go back and read it. I didn't go through the details of his methodology.

(Graham Dep. at 137:25-138:5, 138:22-139:11.) Merely "glancing" at an article that hypothesizes about a pharmaceutical's potential effect in mice when administered with an additional therapy does not provide a scientifically reliable basis for offering an opinion under oath in federal court that, to a reasonable degree of medical certainty, the pharmaceutical is capable of causing such effect in humans when administered alone. In any event, Dr. Graham concedes that the Egan mouse study does *not* establish that COX-2 inhibition increases the risk of plaque rupture in humans:

> Q: You would agree that Egan's experiment with genetically-modified mice does not mean this phenomenon of COX-2 inhibition leading to plaque instability actually happens in people, correct?
>
> A: I would agree with that.

(*Id.* at 139:23-140:2.) In fact, according to Dr. Graham, the article raises at most only "theoretical concerns," which he admits do not convince him to a reasonable degree of medical certainty that Vioxx is capable of causing plaque rupture in humans. (*Id.* at 138:6-21.)

In short, Dr. Graham has no basis for opining that Vioxx may have contributed to Mr. Irvin's death by causing his atherosclerotic plaque to rupture. As explained above, he expressly has disavowed that he is capable of giving any such opinion. Since Dr. Graham is not prepared to give such an opinion, the Court should preclude him from doing so. *See, e.g.*, *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 279 (5th Cir. 1998) (affirming exclusion of speculative and unsupported opinions); (Dec. 3, 2005 Order at 7 ("If Dr. Baldwin is not willing to consider himself an expert on the effect of Cox-2 inhibitors, it would seem quite peculiar for this Court to

qualify him as one.")). An order from the Court precluding Dr. Graham from giving such an opinion is especially important now that plaintiff has made clear that she will seek to offer such testimony.

## II. PLAINTIFF'S OTHER ARGUMENTS HAVE NO MERIT.

None of the other arguments that plaintiff raises in her Opposition has any merit. Dr. Graham is not qualified to offer an opinion that Vioxx caused or contributed to Mr. Irvin's death. Nor does he have any scientific basis for opining that Mr. Irvin's short-term use of Vioxx could have caused or did cause his death.

### A. Dr. Graham Is Not Qualified To Opine That Vioxx Contributed to Mr. Irvin's Death.

First, although Dr. Graham may be qualified to opine that a thrombus formed in Mr. Irvin's artery and led to a sequence of events resulting in Mr. Irvin's death, he is not qualified to opine that Mr. Irvin's brief use of Vioxx caused or contributed to the development of that thrombus. Dr. Graham lacks the same skill, training and education regarding Vioxx as Dr. Baldwin, whose testimony this Court excluded. Plaintiff's only argument in response to this Motion is that Dr. Graham spent a few hours reviewing some literature and court documents that plaintiff supplied to him. Plaintiff misunderstands Merck's point. It is not that Dr. Graham only reviewed a portion of the cardiovascular literature involving Vioxx, but rather that the review he undertook was extremely limited. Dr. Graham spent a total of eight hours in his review – a review that supposedly included 67 medical articles, nine depositions, three days of trial testimony and four expert reports. (Graham Dep. at 42:14-17, 43:15-25.) That is the sum total of Dr. Graham's qualifications since he admits that he had no relevant expertise regarding the safety of Vioxx prior to serving as an expert here. (*Id.* at 39:14-40:5.) Plaintiff cites no authority to the contrary, nor does she cite any authority in support of her self-serving contention that Dr.

Graham's cursory review of a small fraction of the scientific and medical literature on a highly controversial topic constitutes a "methodology generally employed by pathologists." (Opposition at 3.) More importantly, as further demonstrated by Dr. Graham's testimony regarding the Egan mouse study (*see supra* at 7-8), Dr. Graham displayed a basic lack of understanding of the literature on which he relied – a fact that not even plaintiff disputes in her Opposition – and he failed to offer any explanation of how that literature applies to the facts of this case.[6]

**B. Dr. Graham Has No Scientific Basis for Opining That Mr. Irvin's Short- Term Use of Vioxx Is Capable of Causing Thrombotic Cardiovascular Events.**

Second, Dr. Graham has not identified any scientific evidence to support his opinion that the use of 25 mg Vioxx for less than 30 days is capable of causing thrombotic cardiovascular events. Plaintiff does not dispute Dr. Graham's lack of evidence in her Opposition. Instead, she criticizes the duration analysis in the APPROVe study and cites to an email written by Dr. Konstam.[7] (Opposition at 7-9.) But Dr. Graham does not purport to rely on Dr. Konstam's email, and he admits he is unqualified to opine on the APPROVe duration analysis. (Exhibit C to Dr. Graham's Expert Report; Graham Dep. at 190:7-191:3.) Plaintiff's arguments are thus

---

[6] Plaintiff argues that Dr. Graham should be allowed to testify at trial that Vioxx contributed to Mr. Irvin's death because Dr. Wheeler testified at his deposition that cocaine overexposure can result in death. Plaintiff's tit-for-tat argument makes no sense. In any event, Dr. Wheeler did not volunteer that testimony; instead, plaintiff's counsel actively elicited it during Dr. Wheeler's deposition.

[7] Merck has responded to plaintiff's criticisms in prior filings. (Reply Memorandum in Support of Merck's Motion to Exclude Evidence of Plaintiff's Experts Regarding Causation (Record Docket No. 1392) at 13-14 & n.5; Merck's Opposition to Plaintiff's Motion to Exclude Opinion Testimony That Vioxx Cannot Cause Adverse Thrombotic Events Unless Ingested Eighteen (18) Months or Longer (Record Docket No. 1206) at 10-13.) For the Court's convenience, Merck will not repeat its responses here.

irrelevant to the issue of whether *Dr. Graham* has a scientifically reliable basis for his causation opinions. He plainly does not.

**C. Dr. Graham Has No Scientific Basis For Opining on the Specific Mechanism By Which Vioxx Supposedly Caused Mr. Irvin's Death.**

Third, Dr. Graham has no scientific basis for opining on the specific mechanism by which Vioxx supposedly caused Mr. Irvin's death. As explained above, Dr. Graham expressly has disavowed any opinion that Vioxx is capable of causing plaque ruptures or that Vioxx somehow contributed to Mr. Irvin's ruptured plaque. Nor, as explained in Merck's Opening Memorandum, does Dr. Graham have any basis for opining that Vioxx is capable of causing an imbalance in vascular prostacyclin levels or that it caused a clinically significant imbalance in Mr. Irvin's vasculature. Again, plaintiff does not deny these facts. Instead, she seeks to re-cast the debate as a disagreement over the appropriate conclusion to be drawn from the scientific literature. While Merck certainly disagrees with Dr. Graham's conclusion, its real disagreement is with the *methodology* that he employed to reach that conclusion. At his deposition, Dr. Graham could not identify any scientific study showing that Vioxx reduces vascular prostacyclin levels, and he admitted he was not prepared to offer an opinion that Vioxx has such an effect. (Graham Dep. at 88:17-91:21.) Dr. Graham also admits that he has no idea whether Mr. Irvin suffered an imbalance in *his* vascular prostacyclin levels as a result of his short-term use of Vioxx. (*Id.* at 107:12-108:1, 156:20-157:9, 157:16-24.) Dr. Graham's methodology is thus purely speculative and inadmissible. It makes no difference if the Court determined that some *other* expert may have a scientific basis for offering an opinion on the alleged mechanism of action by which Vioxx supposedly can and did cause Mr. Irvin's death. The point here is that *Dr. Graham* has no basis for offering such an opinion.

156:10-19, 162:14-19.) Dr. Graham also concedes that had Mr. Irvin not been taking Vioxx, "his plaque rupture still could have resulted in death." (*Id.* at 165:23-166:1.) Based on these facts, Dr. Graham cannot reliably rule out Mr. Irvin's naturally-occurring thrombus as a plausible cause of his death. Plaintiff does not take issue with these facts in her Opposition. Instead, she simply concludes, *without offering any supporting evidence*, that Dr. Graham "looked at Dicky Irvin as an individual . . . and came to an individualized conclusion as to Vioxx's contributory role in this case." (Opposition at 14.) Plaintiff's self-serving conclusion, however, does not and cannot transform Dr. Graham's methodology into one that is scientifically reliable. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987) (expert cannot, in the face of multiple "potential" causes, "simply pick[] the cause that is most advantageous to [plaintiff's] claim[s]").

## III. CONCLUSION.

For the foregoing reasons, the Court should grant Merck's Motion to Exclude Testimony of Michael Alan Graham, M.D.

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone: 504-581-3200
Fax: 504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois 60610
Phone: 312-494-4400
Fax: 312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Phone: (202) 434-5000
Fax: (202) 434-5029

And

John H. Beisner
Charles C. Lifland
Richard B. Goetz
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone: (213) 430-6000
Fax: (213) 430-6407

Attorneys for Merck & Co., Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that the above and forgoing Reply Memorandum in Support of Merck & Co., Inc.'s Motion to Exclude Testimony of Michael Alan Graham, M.D. has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 1st day of February, 2006.

Dorothy H. Wimberly