UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 FEB -2 P 12: 44

LORETTA G. WHYTE
CLERK

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket NO. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| LITIGATION | * | |
| | * | |
| | * | JUDGE FALLON |
| This document relates to: | * | |
| | * | MAG. JUDGE KNOWLES |
| Plunkett v. Merck & Co., Inc., | * | |
| | * | CASE NO. 2:05CV4046 |
| | * | |

## PLAINTIFF'S RESPONSES TO DEFENDANT'S OBJECTIONS TO PLAINTIFF'S EXHIBITS

Plaintiff hereby submits the following responses to Defendant's objections to Plaintiff's exhibits. Plaintiff's responses to Defendant's objections to the exhibits that will not be offered during deposition testimony is attached as Exhibit "A." This list does not include those exhibits that will be offered during deposition testimony. Plaintiff's responses to Defendant's objections to Plaintiff's exhibits that will be offered during deposition testimony is attached at Exhibit "B."

Plaintiff reserves the right to supplement these responses, as appropriate.

Respectfully submitted,

By: _P. Luigh O'Dell_

**Andy D. Birchfield, Jr.**
Paul J. Sizemore
P. Leigh O'Dell
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
(800) 898-2034 (telephone)
(334) 954-7555 (telecopier)

___ Fee_____
___ Process_____
_X_ Dktd_____
_✓_CtRmDep_____
___ Doc. No._____

**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
FAX: (504) 561-6024
**Temporary Office**
3411 Richmond Ave., Suite 460
Houston, TX 77046
PH: (713) 877-1843
FAX: (713) 871-9750

Christopher A. Seeger, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

**PLAINTIFFS' LIAISONCOUNSEL**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
MEUNIER&WARSHAUER, L.L.C.
P.O. Box 960
191 East Second Street
New Roads, LA 70760
(225) 638-6137
(225) 638-8836 (fax)

Carlene Rhodes Lewis, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Thomas R. Kline, Esquire
KLINE&SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced in accordance with Pre-Trial Order No. #8, on this the **2nd** day of February, 2006.

_P. Leigh O'Dell_

**Plaintiff's Deposition Testimony and Exhibits: Responses to Defendant's Objections**

**EXHIBIT A**

| Exhibit Number | Plaintiff's Responses |
|---|---|
| 1.0007 | The Dodge Ball documents are not singular instances which Merck claims that are irrelevant to the case, but rather are illustrative of an endemic business model which strives to maximize sales and profits at the expense of consumer safety. Merck was engaged in a continuing pattern and practice of widespread corporate behavior to avoid compliance with the regulations concerning the disclosure of risk information. Evidence of the defendant's misconduct in training its employees to minimize the increased risks compounding Vioxx are relevant for purposes of impeachment, motive, intent and state of mind. Merck takes the position and did so during the Irvin I trial that any and all risk information known to Merck was fully disclosed to the health care industry. Merck cannot take this position and then seek to exclude the Dodge Ball documents because no sales person who was trained in these evasive tactics had any contact with Schirmer or Irvin. |
| 1.0015 | Despite the significance of the issues upon which these clinical trial data bear, Merck focuses only on whether the evidence is probative of what it actually "knew" at the time of Mr. Irvin's injury. However, as Merck well knows, this is only half of the liability equation and only one of the many issues in this case. What dangers Merck knew or *should have known* is equally relevant. The clinical data that Merck seeks to exclude also bears upon general causation, a highly-contested issue in this case. Merck steadfastly maintains that the APPROVe trial must be considered without any reference to other causation evidence and that APPROVe demonstrates that there is absolutely no risk of cardiovascular injury associated with Vioxx until a person is exposed for more than 18 months. This clinical trial data refutes this assertion. In short, the clinical trial data is important to present the "whole Vioxx story" and will address numerous issues, not just what Merck knew at the time Mr. Irvin took Vioxx. |
| 1.0016 | Merck will defend this case by saying that Vioxx is not defective today, and was not defective when it was withdrawn from the market. Plaintiff has alleged, among other theories, that Vioxx was defective as designed. This Merck document, showing results of clinical studies, shows that the drug was defective. Admissible for these reasons. |
| 1.0074 | The Merck News Release is evidence of the defendant's continuing pattern and practice of widespread corporate behavior to maximize sales and profits while suppressing unfavorable safety data. Merck focuses only on whether the evidence is probative of what it actually "knew" at the time of Mr. Irvin's injury. However, as Merck well knows, this is only half of the liability equation and only one of the many issues in this case. What dangers Merck knew or *should have known* is equally relevant. The Merck Press Release is important in presenting the "whole Vioxx story" and not just what Merck knew at the time Mr. Irvin took Vioxx. Merck argued in the Irvin I trial and will likely argue again that it acted as a responsible corporate citizen at all times in disclosing adverse safety data. The Press Release is relevant in refuting this argument. |
| 1.0091 | Despite the significance of the issues upon the Draft Vioxx Label, Merck focuses only on whether the evidence is probative |

| Exhibit Number | Plaintiff's Responses |
|---|---|
| | of what it actually "knew" at the time of Mr. Irvin's injury. However, as Merck well knows, this is only half of the liability equation and only one of the many issues in this case. What dangers Merck knew or *should have known* is equally relevant. The Draft Label Merck seeks to exclude also bears upon general causation, a highly-contested issue in this case. |
| | The Draft label is also relevant to show the continued pattern of conduct in minimizing the increased risk of cardiovascular events. The FDA's Draft Response is also relevant to the issue of adequate warning. Plaintiffs intend to demonstrate that Merck knew the dangers of the increased risk of cardiovascular events long before Mr. Irvin's death and that this type of warning should have accompanied the product long before Mr. Irvin took Vioxx. |
| 1.0124 | The Fries incident is relevant to Merck's pattern of conduct in attempting to downplay the unfavorable side effect patterns of Vioxx while systematically attacking investigators or speakers who expressed what Merck staff felt were critical opinions of the safety of the drug. The sentence about the "Fries incident" is an admission by one senior management, Edward Skolnick, that Merck's systematic efforts to suppress the adverse safety results in the VIGOR study were worse than the actual results themselves. Finally, redacting the sentence causes confusion in the entire e-mail which the Defendant acknowledges is otherwise admissible. |
| 1.0138 | The e-mail is relevant to the conduct and state of mind of Merck. The document clearly expresses Merck's intent to aggressively and rapidly gain 51% of the market share. In doing so, Merck was willing to spend $1 million to promote the launch of Vioxx while suppressing the drug's dangerous side effects. This is another document that is relevant to telling the "whole Vioxx story". Merck's entire emphasis on the marketing of the drug and systematic suppression of the harmful side effects bears directly on plaintiff's burden of proving that Merck failed to use reasonable care in the marketing and promotion of Vioxx and that it intentionally distributed results and promotions pertaining to the dangers associated with Vioxx. Furthermore it bears directly on the plausibility of Merck's proper defenses. |
| 1.0149 | The amount of advertising Merck spent on Vioxx bears directly on elements of the plaintiff's claim and is critical to the jury's assessment of Merck's credibility. Merck argued in Irvin I and will argue again that the company had acted reasonably and promptly with patient's safety first and foremost amongst its concerns at all times. The Vioxx DTC Campaign e-mail tells a different story. Merck's entire motive was to catch and surpass the sales of Celebrex and attain a dominant share in the marketplace. In order to attain this goal in the marketplace, Merck outspent Celebrex 2 to 1 while systematically suppressing critical safety data. Merck's entire emphasis on the marketing of the drug and systematic suppression of the harmful side effects bears directly on plaintiff's burden of proving that Merck failed to use reasonable care in the marketing and promotion of Vioxx and that it intentionally distributed results and promotions pertaining to the dangers associated with Vioxx. Furthermore it bears directly on the plausibility of Merck's proper defenses. |
| 1.0184 | The evidence regarding the Fries incident is relevant to Merck's conduct in systematically suppressing the safety of Vioxx |

| Exhibit Number | Plaintiff's Responses |
|---|---|
| | and attacking anyone who dare negatively comment on the drug's adverse safety profiles. The e-mail does not contain hearsay much less double hearsay. It merely reveals the strategy among key Merck employees in an attempt to suppress negative comments being made about Vioxx. The e-mail is a business record of Merck, admissible under Fed. R. Evid. 803(6) that sets forth the present sense impression of the Merck employees, admissible under Fed. R. Evid. 803(1). |
| 1.0225 | Document is directly relevant to Merck's failure to warn. Merck will defend by saying it always warned adequately of the risks of Vioxx, yet this document shows that images of Dorothy Hamill skating were offered to the public to increase confidence in patients already using Vioxx, and were relied upon by the company to counter claims made in medical journals that the drug was dangerous. |
| 1.0231 | Merck will defend case by saying it did all studies necessary to determine the risks of the drug, but this document shows the company's plan to announce it was doing a study (when it fact it never did the study for fear it would prove Vioxx was dangerous) in order to deflate concerns about the drug from the medical and scientific community. |
| 1.0255 | This Alzheimer's disease clinical trial data will not confuse the jury under 403 and pursuant to 401 and 607 is relevant to issues of notice, a duty to investigate, a duty to warn, and the unreasonableness of Merck's conduct in marketing and selling the drug. |
| 1.0288 | The letter is an admission by a party opponent pursuant to 801(d)(2). It is relevant and has probative value as to Merck's conduct, reasonable care in marketing the drug, its failure to warn, as well as plausibility of the defenses under 401 and 607. The defendant has not shown unfair prejudice under 403. The rule does not exclude evidence because it is strongly persuasive or compellingly relevant. |
| 1.0383 | This e-mail is relevant to the Defendant's notice of cardiovascular risk of Vioxx under 401, and is essential to telling the complete Vioxx story about the Defendant's knowledge of the increased cardiovascular risk of Vioxx and its attempts to downplay or conceal that knowledge, while attempting to develop another coxib without the same adverse effects. |
| 1.0402 | This sales data is relevant as to motive, and profitability of Vioxx for the Defendant and is one basis for the Plaintiff's theory of liability. It may also be used to show bias and challenge the credibility of executives who testify at trial pursuant to 607. Defendant has failed to establish that evidence of financial pressure and the competitive nature of the COX-2 market is unfairly prejudicial under 403. |
| 1.0426 | This e-mail from a former Merck employee is relevant pursuant to 401 to show knowledge of cardiovascular adverse events risk and the motive for Merck's conduct in suppressing and concealing these concerns by not addressing them with a study to assess cardiovascular risk. It is necessary to tell the Vioxx story and is also relevant for purposes of impeachment under 607. Merck has taken the position that any and all risk information known to Merck was fully disclosed to the health care industry. Plaintiff would also seek to introduce this e-mail as relevant evidence of dangers Merck knew or *should have known*. This evidence is important in presenting the plausibility of Merck's defense that they had no evidence of an adverse |

3

| Exhibit Number | Plaintiff's Responses |
|---|---|
| | cardiovascular risk associated with Vioxx until the results of the APPROVe study were announced. The Defendant's knowledge and conduct is relevant the entire time Vioxx was on the market, not just Merck's knowledge at the time Mr. Irvin took Vioxx. |
| 1.0506 | Attached article is admissible as evidence of motive and intent of Merck as well as knowledge of the competitive market pressures facing the pharmaceutical company defendant. It is relevant under 401 to establish Defendant's conduct in keeping with Plaintiff's theory of the unreasonable care of Defendant in its aggressive marketing of Vioxx. |
| 1.0726 | This e-mail is an admission by a party opponent under 801(d)(2). It is relevant as to Plaintiff's contention that Defendant knew of the increased cardiovascular risks of Vioxx, additionally, the theory that the VIGOR study showed naproxen as cardio protective, not that VIOXX was cardio toxic, which the Defendant maintains as its defense and is contradicted in this e-mail, and is relevant to for impeachment pursuant to 607. |
| 1.0812 | The television ads are illustrative of a business practice and philosophy of the Defendant to maximize sales through aggressive marketing. These ads are relevant as evidence of motive, intent, state of mind and for impeachment. Although the Defendant has argued that each ad is irrelevant because they were not shown until after Mr. Irvin's death, such an exclusion would not allow the jury to put the Defendant's actions during the entire time Vioxx was on the market into perspective. As Defendant's seeks to show that it acted as a responsible and ethical pharmaceutical company at all times, surely its actions and conduct are admissible to establish the plausibility of its defense and the credibility of Plaintiff's claims of failure to warn and the negligence of the defendant. |
| 1.0815 | The television ads are illustrative of a business practice and philosophy of the Defendant to maximize sales through aggressive marketing. These ads are relevant as evidence of motive, intent, state of mind and for impeachment. Although the Defendant has argued that each ad is irrelevant because they were not shown until after Mr. Irvin's death, such an exclusion would not allow the jury to put the Defendant's actions during the entire time Vioxx was on the market into perspective. As Defendant's seeks to show that it acted as a responsible and ethical pharmaceutical company at all times, surely its actions and conduct are admissible to establish the plausibility of its defense and the credibility of Plaintiff's claims of failure to warn and the negligence of the defendant. |
| 1.0816 | The television ads are illustrative of a business practice and philosophy of the Defendant to maximize sales through aggressive marketing. These ads are relevant as evidence of motive, intent, state of mind and for impeachment. Although the Defendant has argued that each ad is irrelevant because they were not shown until after Mr. Irvin's death, such an exclusion would not allow the jury to put the Defendant's actions during the entire time Vioxx was on the market into perspective. As Defendant's seeks to show that it acted as a responsible and ethical pharmaceutical company at all times, surely its actions and conduct are admissible to establish the plausibility of its defense and the credibility of Plaintiff's claims of failure to warn and the negligence of the defendant. |

4

| Exhibit Number | Plaintiff's Responses |
|---|---|
| 1.0817 | The television ads are illustrative of a business practice and philosophy of the Defendant to maximize sales through aggressive marketing. These ads are relevant as evidence of motive, intent, state of mind and for impeachment. Although the Defendant has argued that each ad is irrelevant because they were not shown until after Mr. Irvin's death, such an exclusion would not allow the jury to put the Defendant's actions during the entire time Vioxx was on the market into perspective. As Defendant's seeks to show that it acted as a responsible and ethical pharmaceutical company at all times, surely its actions and conduct are admissible to establish the plausibility of its defense and the credibility of Plaintiff's claims of failure to warn and the negligence of the defendant. |
| 1.0818 | The television ads are illustrative of a business practice and philosophy of the Defendant to maximize sales through aggressive marketing. These ads are relevant as evidence of motive, intent, state of mind and for impeachment. Although the Defendant has argued that each ad is irrelevant because they were not shown until after Mr. Irvin's death, such an exclusion would not allow the jury to put the Defendant's actions during the entire time Vioxx was on the market into perspective. As Defendant's seeks to show that it acted as a responsible and ethical pharmaceutical company at all times, surely its actions and conduct are admissible to establish the plausibility of its defense and the credibility of Plaintiff's claims of failure to warn and the negligence of the defendant. |
| 1.0819 | The television ads are illustrative of a business practice and philosophy of the Defendant to maximize sales through aggressive marketing. These ads are relevant as evidence of motive, intent, state of mind and for impeachment. Although the Defendant has argued that each ad is irrelevant because they were not shown until after Mr. Irvin's death, such an exclusion would not allow the jury to put the Defendant's actions during the entire time Vioxx was on the market into perspective. As Defendant's seeks to show that it acted as a responsible and ethical pharmaceutical company at all times, surely its actions and conduct are admissible to establish the plausibility of its defense and the credibility of Plaintiff's claims of failure to warn and the negligence of the defendant. |
| 1.1013 | Relevant to failure to warn claim and the learned intermediary defense under 401. The evidence of the Vioxx Key Marketing Messages goes directly to the reasonable care the Defendant used in its promotion and marketing of Vioxx and the methods used are relevant not only to Plaintiff's claims but as to the credibility of Merck's defenses and the testimony of company executives. As to exclusion under 403 as irrelevant, Defendant has no explanation as to how Schirmer or Irvin's exposure to marketing documents is pertinent. The evidence is proposed to establish the *Defendant's* knowledge, motives, and reckless and negligent conduct. |
| 1.1087 | The court has previously denied MIL #12, (Irvin 1) this evidence is "relevant, not excluded by 403... and may also be admissible under 607.<br><br>The excerpts from the 16th and 17th editions of the Merck Manual are directly relevant under, as this goes to the very crux |

5

| Exhibit Number | Plaintiff's Responses |
|---|---|
| | of Plaintiff's claims that Vioxx causes adverse cardiovascular events, the Defendant's knowledge of this, the Defendant's failure to adequately warn physicians or patients regarding this risk, the Defendant's suppression or concealment of information about the cardiovascular risk of Vioxx, and that the Defendant's actions were knowing, deliberate and intentional. Defendant has no explanation as to how the evidence is potentially confusing to the jury. Of all the issues in this case, the excerpts from the Merck Manual are quite rudimentary. |
| | The 16th edition of the Merck Manual published in 1992, contains an explanation of the COX –2 Hypothesis, and the theory that inhibition of COX-2 enzymes could cause adverse cardiovascular events such as the myocardial infarction suffered by the plaintiff. |
| | Defendants continue to maintain no knowledge of the increased risk of cardiovascular events associated with COX-2 enzymes by VIOXX until the APPROVe trial results were revealed in August 2004. The elimination of the COX-2 discussion from the later edition of the Merck Manual is relevant and has probative value as to the Defendant's notice, conduct, and attempts to conceal the adverse cardiovascular events associated with Vioxx, which are all relevant to Plaintiff's claims. |
| 1.1135 | Document is relevant because it shows Merck's patterns and practices regarding the marketing of Vioxx. Relevant to show why Merck downplayed CV risks. Merck will defend case by saying it did everything it could to warn of risks. Document shows that Merck's obsession with Vioxx's success mitigated against warning patients fully of the risks of the drug. |
| 1.1254 | Document offered as notice that Merck's tactics with physicians who were critical of Vioxx were seen, by those physicians, as intimidating. Offered to rebut Merck's claims that it welcomed scientific debate about the risks of Vioxx, and that it did not intimidate physicians who were critical of Vioxx (as claimed by witness Susan Baumgartner). |
| 1.1256 | Comments of NEJM peer reviewers are offered to rebut claims that Vioxx is not defective and relevant and admissible to show extent to which Merck manipulated publication of scientific articles about Vioxx. Admissible per 803(6). Documents bears a Merck bates stamp and was received by the company in the normal course of business because of it participation, via employee James Bolognese, in the publication of the APPROVe study. |
| 1.1258 | Document is relevant because it shows Merck's patterns and practices regarding the marketing of Vioxx. Relevant to show why Merck downplayed CV risks. Merck will defend case by saying it did everything it could to warn of risks. Document shows that Merck's obsession with Vioxx's success mitigated against warning patients fully of the risks of the drug. |
| 1.1262 | Document relevant and admissible to show motive for downplaying risks of Vioxx. Shows that Merck persisted in improper safety claims after FDA remanded corrections. Admissible to show Merck's pattern and practice of downplaying CV risks and why it did so. |

6

| Exhibit Number | Plaintiff's Responses |
|---|---|
| 1.273 | Hearsay statements admissible to show Merck's collective state of mind regarding perceptions of Vioxx by the public. |
| 1.275 | Document is relevant because it shows Merck's patterns and practices regarding the marketing of Vioxx. Relevant to show why Merck downplayed CV risks. Merck will defend case by saying it did everything it could to warn of risks. Document shows that Merck's obsession with Vioxx's success mitigated against warning patients fully of the risks of the drug. |
| 1.309 | Public document, available from FDA, in manner in which FDA chose to make it available. No indication on the face of document that it is inauthentic. Conclusions based on document can be cross-examined based on final analysis. |
| 1.315 | Admissible to show defect in the product. Case reports are admissible. *See In re Phenylpropanolamine (PPA) Products Liability Litigation*, 289 F.Supp.2d 1230, 1246 (W.D.Wash. 2003). Merck's objection goes to the weight of the evidence. |
| 1.349 | |
| 1.402 | Document shown to witness to refresh recollection. Number of reprints of article which Plaintiff will show was false and misleading because of Merck's actions is directly relevant. Shows Merck widely disseminated a medical article which misstated the risks of Vioxx. The fact that Dr. Schirmer did not get a warning from this article shows Merck's plan was effective. Admissible to prove Plaintiff's failure to warn claim. |
| 1.689 | Raw footage is of Merck employees. If identified as such by any Merck witness, these clips are admissible as prior inconsistent statements and party admissions. Offered to impeach Merck and rebut claims that Vioxx was not defective and that the company adequately warned of the risks associated with the drug. |
| 2.0032 | To the extent called to the attention of an expert witness on cross examination or relied on by the expert witness in direct examination, statements from medical articles established by testimony as reliable authority are admissible and may be read into evidence. 803(18). |
| 2.0050 | To the extent called to the attention of an expert witness on cross examination or relied on by the expert witness in direct examination, statements from medical articles established by testimony as reliable authority are admissible and may be read into evidence. 803(18). |
| 2.0104 | To the extent called to the attention of an expert witness on cross examination or relied on by the expert witness in direct examination, statements from medical articles established by testimony as reliable authority are admissible and may be read into evidence. 803(18). |
| 2.0126 | To the extent called to the attention of an expert witness on cross examination or relied on by the expert witness in direct examination, statements from medical articles established by testimony as reliable authority are admissible and may be read into evidence. 803(18). |
| 2.0133 | To the extent called to the attention of an expert witness on cross examination or relied on by the expert witness in direct examination, statements from medical articles established by testimony as reliable authority are admissible and may be read into evidence. 803(18). |

**Plaintiff's Deposition Testimony and Exhibits: Responses to Defendant's Objections**

**EXHIBIT B**

| Exhibit Number | Plaintiff's Responses |
|---|---|
| 1.0001 | Highly relevant. Reflects Merck's attitudes toward FDA during critical labeling negotiations for VIOXX and at a time when the FDA was very concerned about cardiovascular risks. (See, e.g., contemporaneous Targum memo, where she recommends CV Warning for VIOXX). This attitude is collaborated by other evidence that Defendant is free to play their counter designations if they believe the statement is out of context. Scolnick later explains the comments (and expresses regret over his choice of words). |
| 1.0002 | Highly relevant. Reflects Merck's attitudes toward FDA during critical labeling negotiations for VIOXX and at a time when the FDA was very concerned about cardiovascular risks. (See, e.g., contemporaneous Targum memo, where she recommends CV Warning for VIOXX). Moreover, is consistent with Plaintiff's position that Merck could have chosen to warn patients and physicians prior to marketing the drug and certainly after the VIGOR trial, but instead opted to delay and stonewall the FDA's requests for information and recommendation for a CV warning. Also goes to causation and the adequacy of the original warning in place at the time of Mr. Irvin was prescribed the drug. |
| 1.0006 | Letter is an FDA warning concerning multiple statements made by a paid Merck lecturer, sales representatives, and contained in a public press release that minimized the cardiovascular risks of the drug and offered the naproxen theory as an explanation for the VIGOR trial results. Merck touted the naproxen theory as early as March 27, 2000 and still does so today. The FDA's rebuke of Merck for only offering this theory and for failing to tell doctors of the potential for VIOXX to be prothrombotic goes to the heart of plaintiff's claims. Second, it offers the FDA's position on the naproxen theory—mainly, that it is just a theory that is unsupported by clinical evidence. The fact that Jerman was unaware of the warning is precisely the point—Merck reps were never instructed to be forthright with physicians and to offer them alternative explanations for the VIGOR results. Also, I believe Anstice testified during Humeston that the statements were made and that Merck took corrective action with respect to Merck lecturers and sales representatives. |
| 1.0008 | Highly relevant. In conjunction with Exhibits 62 & 145, there is evidence that the CV card was distributed to all sales representatives, to provide information and talking points for doctors who had concerns about the cardiovascular safety of the drug. Other documents (which can be produced if needed) demonstrate that the CV card was in circulation until the April 2002 label change. Scolnick testified that the card should have been updated to include current information. Card contains misleading information related to CV safety and mortality and was never updated to include data from ADVANTAGE, Alzheimer's, or VIGOR trials. Also contains pooled analysis that the FDA would not allow Merck to put in the label. Doctor's may not have been shown the card itself, but reps were instructed to "use" to card and the information contained in it to reassure doctors of the drug's safety. |
| 1.0009 | Goes to motive and Merck's purported disclosure of "fair and balanced" information regarding the drug's safety. The fact that the Merck calculated a cost for, and expressed a need to, minimize and diffuse the CV safety issue is highly relevant. This is particularly responsive to Merck's defense that it was not spinning data but was fully disclosing safety data to physicians. Admission that one of Merck's goals was to minimize public safety issue. |
| 1.0010 | Plaintiffs contend that Merck rushed VIOXX to market without adequate testing because it was in a competitive race with Searle/Pfizer of COX-2 inhibitors. Plaintiff also contends that Merck was desperate for a blockbuster drug. Analysist's report is not being presented for the truth of the matter asserted, but for the effect it had on Merck and the perception that Merck needed to beat Celebrex to market. Further, the email is an admission that Merck would not fully fund requested research and that Merck chose to spend its money on marketing rather than research. This is highly relevant to plaintiff's claims. |
| 1.0011 | See above. Note also that Scolnick admits in his testimony that this was his thinking at the time and that he was trying to convey a sense of urgency to his team. |

1

| Exhibit Number | Plaintiff's Responses |
|---|---|
| 1.0013 | Highly relevant. Supports plaintiff's theory that Merck had a campaign to either punish doctors who were critical or questioned the drug's safety, while simultaneously rewarding those that were high prescriber's of the drug and adopted Merck's spin. Further, some of the doctor's listed were Merck thought leaders who are on a national and regional level, influence the general thinking about VIOXX. Doctor's do not receive their information from a drug solely from the label. They are influenced by their peers and by general perceptions. Moreover, this reflect continuing campaign by Merck sales representatives to minimize the safety issue—goes straight to failure to warn. |
| 1.017 | Scolnick acknowledged that Shapiro was the VIGOR statistician, that it is the type of report he would have routinely seen or should have seen, and that he didn't remember seeing. More importantly, he conceded that the analysis contained in the document should have been given to the FDA. Important claim of plaintiff that Merck failed to fully disclose risks and data to the FDA and the medical community. |
| 1.0020 | See above. Scolnick admitted that he reviewed Vioxx Project Team minutes on occasion, but did not remember seeing these specific minutes. This document was produced, as is, by Defendant from the custodial file of Briggs Morrison. With respect to the handwriting, it is an admission. Further, not being offered for the truth of the matter but for a matter of notice. |
| 1.0021 | Government record exception. These are official FDA minutes. These were routinely produced by the FDA after every meeting and many are available on the agency's website. Alternatively, with respect to Plaintiff's claim that Merck failed to promptly disclose Alzheimer's mortality data, the minutes are offered not for the truth of their contents but for a showing that Merck failed to raise the issue at this meeting. |
| 1.0060 | This was a training video shown to Merck Sales Reps (Dunn admits this in deposition, 04/30/2004 at 27-28) and reflects Merck's attitude toward dealing with physician's concerns about cardiovascular safety. Further, it further supports the use of the CV Card. |
| 1.0061 | Highly relevant to plaintiff's claims that from the time Merck submitted its NDA for Vioxx until the time the drug was withdrawn, Defendant engaged in a campaign to minimize and obscure adverse safety data and physician's concerns about cardiovascular safety. This is an internal Merck bulletin to its sales representatives. The document speaks for itself. Note also that it instructs sales reps to use the CV card with doctors in response to CV safety concerns and instructs them not to discuss the VIGOR study with physicians. |
| 1.0062 | See above. |
| 1.0079 | Goes directly to Plaintiff's claims concerning the safety of the drug and Merck's pattern of minimizing, failing to disclose, or delaying disclosure of critical safety data to the FDA, physicians, and the public. Had Merck fully and promptly disclosed this safety issue to the FDA, (it knew as early as January 31, 2001 and certainly by the date of the memo), Mr. Irvin would have stopped using VIOXX. With respect to the witness' knowledge of the document—it's addressed to him. |
| 1.0095 | Document bears Merck bates stamp showing that it was received and kept in the normal course of business. Not offered for the truth (that naproxen is not cardioprotective) but to show that Merck had notice of the defective nature of the drug. Relevant and admissible to show defect in the product. |
| 1.0122 | Witness was the President of Merck Research Laboratories and is being shown a Merck document which shows that the company had concerns about the safety of Vioxx nearly two years before it was marketed. Witness's lack of knowledge about the document is relevant and admissible evidence on Plaintiff's negligence claim. Document is a business record and party admission and is independently admissible. |
| 1.0125 | Document is offered to show pattern and practice of Merck resisting label change. The data that ultimately led to the April 2002 CV precaution was available more than a year before Mr. Irvin's death. Shows Merck fought, and later downplayed, label changes about CV risk. |

| Exhibit Number | Plaintiff's Responses |
|---|---|
| 1.0132 | Merck's only substantive objection to this document is that the author, Edward Scolnick, later changed his mind. This has no effect on admissibility, but rather is fodder for cross examination. Document's relevance is not outweighed by its prejudicial value. Shows that Merck's fears about the defective nature of this drug, expressed years before Mr. Irvin's death, were confirmed. Shows company knew the drug was defective more than a year before Mr. Irvin's death. |
| 1.0140 | Clearly relevant to show Merck's motive to downplay and hid any and all information about the risks of Vioxx. Party admission sent to deponent in the normal course of business. |
| 1.0145 | Clearly relevant to Merck's failure to warn. Shows that competitive pressure forced Merck to downplay the risks evident after the VIGOR trial. Explicitly shows Merck's plan to mislead prescribing physicians about CV risk. Comments attributed to Pfizer are admissible as present sense impressions about the COX-2 marketplace. |
| 1.0152 | Merck & Co., Inc. press release dated May 22, 2001. Witness testified that she would have been one of the Merck employees whose job it was to approve the press release. (147:21; 148:2) Witness testified that the information in the press release was accurate. (153:24) The press release addresses the February 8, 2001 FDA Advisory Committee meeting. It is based upon information known to Merck months, in some cases years, prior to May 2001 (VIGOR, clinical trials). In fact, the claims made in the press release date back at least to April 2000. (See P1.0583). |
| 1.0154 | Document is relevant to failure to warn. Shows that Merck promotions were false and misleading. Demonstrates how Merck overplayed the benefits of Vioxx well before Mr. Irvin ingested the drug. Shows that Merck would make efficacy claims without any mention of risk. Merck's representations about Vioxx are obviously relevant to the facts of this case and whether Merck adequately warned of the risks of Vioxx or misrepresented the overall risk:benefit ratio of the drug. |
| 1.0155 | Document shows Merck's marketing plan and demonstrates the enormous pressures of the COX-2 marketplace. Shows Merck's motive to downplay and misrepresent safety data when the company received it. Absolutely critical and relevant to Plaintiff's case to show why Merck would fail to warn of the risks of Vioxx. |
| 1.0158 | Document is based on data available long before Mr. Irvin's death. Shortly after VIGOR, Merck made claims that Vioxx was safe, despite the results of that trial. The FDA later told Merck that claim was "incomprehensible." These are the same claims Merck was making when Mr. Irvin took Vioxx, so it is small wonder he received the drug without a warning. Shows Merck response when faced with publication of data showing CV risk. Merck does not make efforts to disseminate the information, so patients like Mr. Irvin can receive, but takes extreme steps to cover up the information. |
| 1.0166 | Document is relevant because it shows Merck's patterns and practices regarding the marketing of Vioxx. Relevant to show why Merck downplayed CV risks. Merck will defend case by saying it did everything it could to warn of risks. Document shows that Merck's obsession with Vioxx's success mitigated against warning patients fully of the risks of the drug. |
| 1.0176 | Document is offered as notice to Merck that physicians perceived certain of the company's activities as threatening and |

| Exhibit Number | Plaintiff's Responses |
|---|---|
| 1.0177 | intimidating, whether these claims were true or not. Witness worked for Dr. Louis Sherwood, and prepared Merck documents which mention the physicians listed in the exhibit. The exhibit is used, with nine (9) additional exhibits which were all either authored or received by witness, to impeach her claims that neutralizing physicians meant that Merck was helping physicians, and that Merck did not intimidate physicians who voiced concerns about the risks of Vioxx. |
| 1.0192 | Document prepared by the witness in the normal course of business. (Baumgartner deposition, 101:22). Shows that, in order to boost sales of Vioxx, the company was going to push the naproxen theory, notwithstanding all the evidence in its possession showing the theory was incorrect. Shows an intentional disregard for patient safety and clear failure to warn. |
| 1.0226 | Witness was President of Merck Research Laboratories. His lack of knowledge about trials on Vioxx is itself relevant. Party admission and business record so independently admissible. |
| 1.0229 | E-mail authored by witness. Witness testified that the e-mail accurately reflects her thinking at the time it was written. (181:15) Offered to counter Defendant's claims, at trial, that the company thought Vioxx was safe until receipt of the APPROVe data in September 2004. |
| 1.0234 | First, the document discusses information known prior to Irvin's death. Second, the press release itself does not need to have been seen by anyone in the case in order for the document to be relevant. This is because the document, at least in part, is being offered to show the pattern of corporate conduct of Merck and how it "spun" information and mislead both the public and medical sectors. Rule 405 overcomes 401, 402 and 403 inasmuch as Merck's corporate character is a relevant. Additionally, Rule 406 overcomes 401, 402 and 403 inasmuch as Rule 406 allows plaintiffs to use this exhibit in furtherance of showing habit and/or "routine practice of an organization" (Merck). |
| 1.0235 | No objection - no response. |
| 1.0298 | Part of the point of the document is that the witness lacks knowledge on this subject when he should have knowledge, and this fact alone shows a pertinent issue. |
| 1.0304 | Rule 405 overcomes 401, 402 and 403 inasmuch as Merck's corporate character is a relevant. Additionally, Rule 406 overcomes 401, 402 and 403 inasmuch as Rule 406 allows plaintiffs to use this exhibit in furtherance of showing habit and/or "routine practice of an organization" (Merck). |
| 1.0305 | Rule 405 overcomes 401, 402 and 403 inasmuch as Merck's corporate character is a relevant. Additionally, Rule 406 overcomes 401, 402 and 403 inasmuch as Merck's corporate character is a relevant. Additionally, Rule 406 allows plaintiffs to use this exhibit in furtherance of showing habit and/or "routine practice of an organization" (Merck). |

| Exhibit Number | Plaintiff's Responses |
|---|---|
| 1.0309 | overcomes 401, 402 and 403 inasmuch as Rule 406 allows plaintiffs to use this exhibit in furtherance of showing habit and/or "routine practice of an organization" (Merck). |
| 1.0329 | Cause mortality data from Alzheimer's trials is relevant to this case. Moreover, the correspondence from Scolnick to Green shows Scolnick's knowledge and Merck's knowledge regarding the safety issues associated with the drug. |
| 1.0362 | Rule 405 overcomes 401, 402 and 403 inasmuch as Merck's corporate character is a relevant. Additionally, Rule 406 overcomes 401, 402 and 403 inasmuch as Rule 406 allows plaintiffs to use this exhibit in furtherance of showing habit and/or "routine practice of an organization" (Merck). Finally, the allegedly "hearsay statements by non-Merck persons" are not being offered to prove the truth of the matter asserted. |
| 1.0364 | The practice of misrepresenting and "spinning" the VIGOR results is a primary and relevant issue in this case. Rule 405 overcomes 401, 402 and 403 inasmuch as Merck's corporate character is a relevant. Additionally, Rule 406 overcomes 401, 402 and 403 inasmuch as Rule 406 allows plaintiffs to use this exhibit in furtherance of showing habit and/or "routine practice of an organization" (Merck). Patrono statements are not hearsay - 801(d)(2). |
| 1.0400 | Rule 405 overcomes 401, 402 and 403 inasmuch as Merck's corporate character is a relevant. Additionally, Rule 406 allows plaintiffs to use this exhibit in furtherance of showing habit and/or "routine practice of an organization" (Merck). |
| 1.0401 | Diary contains information that relates back to before Irvin's death. Rule 405 overcomes 401, 402 and 403 inasmuch as Merck's corporate character is a relevant. Additionally, Rule 406 overcomes 401, 402 and 403 inasmuch as Rule 406 allows plaintiffs to use this exhibit in furtherance of showing habit and/or "routine practice of an organization" (Merck). Not hearsay - 801(d)(2). Even if determined to be hearsay, falls under 803(5). |
| 1.0408 | Part of the point of the document is that the witness lacks knowledge on this subject when she should have knowledge, and this fact alone shows a pertinent issue. Not hearsay because it is not being offered to prove the truth of the matters asserted.

Rule 405 overcomes 401, 402 and 403 inasmuch as Merck's corporate character is a relevant. Additionally, Rule 406 overcomes 401, 402 and 403 inasmuch as Rule 406 allows plaintiffs to use this exhibit in furtherance of showing habit and/or "routine practice of an organization" (Merck). |

| Exhibit Number | Plaintiff's Responses |
| --- | --- |
| 1.0413 | The document may concern CV card, however the focus of the document is Merck's conduct in connection with the CV card and not whether or not Dr. Schirmer saw it. |
| 1.0415 | Rule 405 overcomes 401, 402 and 403 inasmuch as Merck's Rule 406 overcomes 401, 402 and 403 inasmuch as Rule 406 allows plaintiffs to use this exhibit in furtherance of showing habit and/or "routine practice of an organization" (Merck). |
| 1.0516 | Patrono statements are not hearsay - 801(d)(2). The focus of the document is that the witness lacks knowledge on this subject when she should have knowledge and/or the veracity of the witness (inasmuch as she claims to have a lack of knowledge). |
| 1.0531 | No objection - no response. |
| 1.0541 | Rule 405 overcomes 401, 402 and 403 inasmuch as Merck's corporate character is a relevant. Additionally, Rule 406 overcomes 401, 402 and 403 inasmuch as Rule 406 allows plaintiffs to use this exhibit in furtherance of showing habit and/or "routine practice of an organization" (Merck). The focus of the document is that the witness lacks knowledge on this subject when she should have knowledge and/or the veracity of the witness (inasmuch as she claims to have a lack of knowledge). Analyst's Reports are not hearsay - 801(d)(2). |
| 1.0542 | Cause mortality data from Alzheimer's trials is is relevant to this case. Moreover, the correspondence shows Scolnick's knowledge and Merck's knowledge regarding the safety issues associated with the drug. |
| 1.0581 | No objection - no response. |
| 1.0583 | The practice of misrepresenting and "spinning" the study results is a primary and relevant issue in this case. Rule 405 overcomes 401, 402 and 403 inasmuch as Merck's corporate character is a relevant. Additionally, Rule 406 overcomes 401, 402 and 403 inasmuch as Rule 406 allows plaintiffs to use this exhibit in furtherance of showing habit and/or "routine practice of an organization" (Merck). The focus of the document is that the witness lacks knowledge on this subject when she should have knowledge on this subject when she should have knowledge and/or the veracity of the witness (inasmuch as she claims to have a lack of knowledge). |
| 1.0667 | The substance of the article lays the predicate for motive and mind-set of Merck. One focus of the document is that the witness lacks knowledge on this subject when he should have knowledge and/or the veracity of the witness (inasmuch as she claims to have a lack of knowledge). The article is not being offered to prove the truth of the matters asserted in the article, rather, it is being offered to lay the foundation for Merck's state of mind and actions taken relevant to the article. |

| Exhibit Number | Plaintiff's Responses |
|---|---|
| 1.0966 | Rule 405 overcomes 401, 402 and 403 inasmuch as Merck's corporate character is a relevant. Additionally, Rule 406 overcomes 401, 402 and 403 inasmuch as Rule 406 allows plaintiffs to use this exhibit in furtherance of showing habit and/or "routine practice of an organization" (Merck). One focus of the document is that the witness lacks knowledge on this subject when he should have knowledge and/or the veracity of the witness (inasmuch as she claims to have a lack of knowledge). |
| 1.004 | Merck document offered to impeach witness's claim that Merck's motivation was not profit. Merck wanted to eliminate pill-splitting to force consumers to pay for more expensive pills. Qualifies as business record created in the ordinary course of business. |
| 1.005 | Merck document offered to show that Merck put profits ahead of patient safety. Also shows that while Merck could have spent money investigating the safety of Vioxx, it instead studied ways to reformulate the drug. Qualifies as business record created in the ordinary course of business. |
| 1.1014 | Merck document offered to demonstrate Merck's unwillingness to investigate potential adverse effects of Vioxx. Demonstrates Merck's disregard for patient health. Qualifies as business record created in the ordinary course of business. |
| 1.1084 | Merck document offered to demonstrate Merck's unwillingness to investigate potential adverse effects of Vioxx. Demonstrates Merck's disregard for patient health. Qualifies as business record created in the ordinary course of business. |
| 1.097 | Merck document offered to show Merck's spin relating to Vioxx continued even after the drug was withdrawn, as well as Merck's ultimate conclusion that Vioxx does increase the risk of CV events. Qualifies as business record created in the ordinary course of business. |
| 1.098 | Merck e-mail offered to show how strongly Merck opposed a black box warning for Vioxx. Shows Merck's refusal to accept the safety recommendations of the FDA, and its disregard for that agency. Demonstrates lack of concern for the safety of Vioxx patients. |
| 1.1100 | Merck document offered to show that Merck considered conducting further studies of the safety of Vioxx, yet chose not to. Document shows a number of studies and variables that Merck considered running in order to determine whether Vioxx was safe for consumers. Merck ultimately chose not to risk obtaining more conclusive evidence of Vioxx's risks and failed to conduct any of the studies considered. Qualifies as business record created in the ordinary course of business. |
| 1.1101 | No objection by defendant |
| 1.1103 | Merck document offered to show how Vioxx was marketed and promoted by Merck. Shows Merck's downplaying of CV risks to physicians, in order to increase sales. Even if one specific doctor did not see this document, its use in the medical community increased awareness of Vioxx and increased the likelihood of Vioxx being prescribed to Plaintiff. Qualifies as business record created in the ordinary course of business. |

| Exhibit Number | Plaintiff's Responses |
|---|---|
| 1.1106 | Merck e-mail is not hearsay because not offered for the truth of the matter asserted. Offered to show notice by Merck of the opinion by at least one highly respected scientist that the VIGOR results were not due to the cardioprotective effects of naproxen, and that Merck was concerned about that opinion. |
| 1.1141 | Document shows Merck's knowledge that Vioxx was not safe as designed and marketed. Offered to show, and relevant and admissible to show, a defect in the product. This e-mail relates to Vioxx in the same formulation ingested by Mr. Irvin. Will be offered to rebut Merck's claims that the drug was not defective. |
| 1.1194 | Document is relevant to lay foundation for witness's testimony regarding video news releases. |
| 1.1231 | Merck document that was sent to at least seven different Merck employees. Document reports statistics from patients in the VIGOR trial. Qualifies as business record created in the ordinary course of business. |
| 1.1253 | Document authored by Merck employee, copied to witness, regarding Vioxx. Report sent specifically to witness, and received by her in the normal course of business. The e-mail itself discusses neutralizing a physician who had made negative comments about Vioxx. This shows Merck's attempt to quiet anyone who raised questions about the safety of Vioxx. |
| 1.1255 | Document authored by Merck employee, sent to witness, regarding Vioxx. Report of Merck activities made specifically to witness, received in the normal course of her activities. Specifically requests response from witness. The document is not hearsay because it is not offered for the truth of the matter asserted. It is offered to show Merck's response to people who do not share the same opinion as Merck concerning Vioxx. |
| 1.1257 | Document authored by Merck employee, offered to impeach witness's claims that Merck wanted prescribing physicians to be fully informed about the safety of Vioxx. Demonstrates Merck's practice of placing sales ahead of patient safety. Used to impeach witness's claims regarding pediatric studies. Shows Merck's motive in pushing for approval of a pediatric indication for Vioxx was to bolster the safety image of the drug. |
| 1.1259 | No objection by defendant |
| 1.1260 | E-mail authored by Merck employee, sent to witness. Offered to show Merck's practice of collecting information on those who spoke about the safety risks of Vioxx, and attempting to discredit them. Rather than investigate the safety concerns or engage in scientific debate, Merck chose to attack the credibility of Vioxx's critics. |
| 1.1265 | Merck document created in the ordinary course of business, distributed to all field and hospital representatives dealing with Vioxx, among others. Offered to impeach witness' testimony that Merck wanted physicians to have all relevant safety information regarding Vioxx. Demonstrates Merck's unwillingness to discuss complete safety data with physicians, and Merck's goal to focus physicians on pain relief, rather than the safety concerns of the drug. |
| 1.1267 | Merck e-mail offered to show Merck's practice of downplaying negative information about Vioxx. Used to impeach |

8

| Exhibit Number | Plaintiff's Responses |
|---|---|
| | witness' testimony that Merck wanted physicians to have all relevant safety information about Vioxx. |
| 1.1274 | Analyst report concerning Merck sent to company management involved in sales, including the witness. Witness acknowledges the document was sent to him. Relevant to show motive for downplaying risks of Vioxx |
| 1.1370 | Offered for notice and not for the truth. |
| 1.1373 | |
| 1.1379 | |
| 1.1380 | Witness recognizes document and testifies about it in his capacity as a 30(b)(6) witness.  He is the person from the New England Journal of Medicine best able to tell what the document is.  No showing from the deposition that the document as presented is inauthentic.  Relevant and admissible to show the facts surrounding the publication of the VIGOR study in the NEJM. |
| 1.1381 | Witness recognizes document and testifies about it in his capacity as a 30(b)(6) witness.  He is the person from the New England Journal of Medicine best able to tell what the document is.  No showing from the deposition that the document as presented is inauthentic.  Relevant and admissible to show the facts surrounding the publication of the VIGOR study in the NEJM. Non-depo exhibits |
| 1.1382 | |
| 1.1390 | Figure C-2 is a part of a Merck funded study, authored by agents of Merck and is therefore an admission.  The witness has personal knowledge of the matter related to the VIGOR study having been involved in the review process for the publication of this article, and having had the chance to review documents which were omitted in the submission of the article to NEJM.  The witness is therefore competent to testify as to this document as something that he should have seen within the scope of his duties as the editor of the journal. |
| 1.1391 | Author of email is an agent of Merck and email is admissible as an admission.  The fact that Dr. Curfman's name is not on the document is irrelevant.  The email is transmitted to Dr. Drazen, an agent of the NEJM and a colleague of Dr. Curfman.  Dr. Curfman can testify as to this document on behalf of the NEJM.  Further, Dr. Curfman is competent to testify as to the contents of this document as he supervised the review of this manuscript. |
| 1.1392 | The remarks of the anonymous reviewers is irrelevant - this document is being offered to show Merck had notice and knowledge of increased CV risk that were not being fully communicated to the journal, as a part of Merck's ongoing campaign to perpetrate a fraud on the medical community.  Further, it is relevant to show that the APPROVe results are not applicable only to 18 month or longer usage, but to people who used Vioxx for less than 18 months, such as the |

| Exhibit Number | Plaintiff's Responses |
| --- | --- |
| | Plaintiff. |
| 1.1393 | The manuscript is of a Merck funded study, authored by agents of Merck and is therefore an admission. It is further admissible under the Learned Treatise exception to the hearsay rule. The document is relevant to show that Vioxx could have caused plaintiff's death even after short duration. Witness is competent to testify is competent to testify as to the contents of this document as he supervised the review of this manuscript and these were documents that would be central to his review. Further, the document goes to Merck's notice and knowledge of an increased CV risk which is directly relevant to plaintiff's failure to warn cause of action. |
| 1.1395 | Document is relevant to show fraud in that Merck selectively provided data to journal reviewers and did not adequately communicate the dangers of the drug to the medical community. Though this is a 2005 document, it is relevant to show an ongoing pattern of conduct of deception with both the APPROVe and VIGOR studies. Witness is competent to testify is as to the contents of this document as he supervised the review of this manuscript and these were documents that would be central to his review. The witness is therefore competent to testify as to this document as something that he should have seen within the scope of his duties as the editor of the journal. Further, the plaintiff died of a myocardial infarction, a medical condition that is subject of the APPROVe study, and is therefore relevant and admissible to show that the drug caused the death. |
| 1.1396 | Document is relevant to show fraud in that Merck selectively provided data to journal reviewers and did not adequately communicate the dangers of the drug to the medical community. Though this is a 2005 document, it is relevant to show an ongoing pattern of conduct of deception with both the APPROVe and VIGOR studies. The witness is therefore competent to testify as to this document as something that he should have seen within the scope of his duties as the editor of the journal. Further, the plaintiff died of a myocardial infarction, a medical condition that is subject of the APPROVe study, and is therefore relevant and admissible to show that the drug caused the death. |
| 1.1402 | The number of reprints of the VIGOR article is a data compilation kept in the course of a regularly conducted business activity and therefore falls under the Business Records exception to the hearsay rule. Further, the document is relevant because the use of the study is part of Merck's overall marketing campaign. Though Schirmer was not a direct recipient of the reprint, he is susceptible to Merck's marketing campaign through word of mouth in the medical community. |
| 1.1412 | This manuscript is not a medical article, but is a review of a manuscript with notations made by an agent of Merck and is therefore an admission. In addition, the Learned Treatise exception to the hearsay rule applies. Further, the witness is |

| Exhibit Number | Plaintiff's Responses |
|---|---|
| 1.413 | competent to testify as to the document, as he has personal knowledge of the contents of the original manuscript and can comment on the changes that have been made to it. The document also goes to Merck's notice and knowledge of an increased CV risk which is directly relevant to plaintiff's failure to warn cause of action. |
| 1.471 | This manuscript is not a medical article, but is a review of a manuscript with notations and revisions made by an agent of Merck and is therefore an admission. In addition, the Learned Treatise exception to the hearsay rule applies. Further, the witness is competent to testify as to the document, as he has personal knowledge of the contents of the original manuscript and can comment on the changes that have been made to it. The document also goes to Merck's notice and knowledge of an increased CV risk which is directly relevant to plaintiff's failure to warn cause of action. |
| 1.466 | This document is admissible under the Learned Treatise exception to the hearsay rule. It further goes to Merck's notice and knowledge of an increased CV risk which is directly relevant to plaintiff's failure to warn cause of action. |
| 1.467 | This document is relevant to show Merck's ongoing notice and knowledge of the dangers of the drug in that Merck continued to study the drug for CV risk. |
| 1.472 | The document is relevant because the use of the promotional materials is part of Merck's overall marketing campaign. As a doctor, Schirmer is susceptible to Merck's marketing campaign through word of mouth in the medical community. Further, the plaintiff received samples of Vioxx from a friend who in turn received them from people in the pharmaceutical business. The plaintiff then asked De. Schirmer for a prescription, so the plaintiff was exposed to Merck's overall marketing campaign. |
| 1.504 | This document is relevant as it goes to the credibility of the witness. Further, it is relevant to show that Merck is manipulating the media to maximize usage of the product by consumers such as the plaintiff. |
| 1.565 | This is an email from Hinkley to Carroll dated 6/20/01 and is exhibit P1.1504 of Carroll's 10/27/05 deposition. |
| 2.0017 | Probative to show Merck's corporate strategy of misrepresenting safety which is directly relevant to Plaintiff's failure to warn cause of action. |
| 2.0209 | This document is admissible under the Learned Treatise exception to the hearsay rule. It further goes to Merck's notice and knowledge of an increased CV risk which is directly relevant to plaintiff's failure to warn cause of action. |
| 2.0232 | This document is admissible under the Learned Treatise exception to the hearsay rule. It further goes to Merck's notice and knowledge of an increased CV risk which is directly relevant to plaintiff's failure to warn cause of action. |
| 2.0232 | The article is relevant as it reflects the policy of the NEJM in relying upon the honesty of the authors when accepting articles for publication. Goes to Merck's failure to adhere to this policy and its perpetration of fraud on the medical community. Further, this admissible under the Learned Treatise exception to the hearsay rule. |
| 2.0233 | This document is admissible under the Learned Treatise exception to the hearsay rule. |

| Exhibit Number | | | Plaintiff's Responses |
|---|---|---|---|
| Curfman Ex. 32 | | | The published APPROVe study is a Merck-funded study, authored by agents of Merck and is therefore an admission. |