FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 FEB -2  PM 5:02

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 05-4046* | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| EVELYN IRVIN PLUNKETT | * | |
| as Personal Representative of the Estate of | * | |
| RICHARD IRVIN, JR., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

* * * * * * * * * * * * * * * * * *

**OPPOSITION OF MERCK & CO., INC. ("MERCK") TO PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE THE FDA'S APRIL 6, 2005 MEMORANDUM AND EVIDENCE AND/OR ARGUMENT THAT THE FDA HAS CONCLUDED THERE IS A "CLASS EFFECT" FOR ALL NON-STEROIDAL ANTI-INFLAMMATORY DRUGS ("NSAIDS")**

**(MOTION *IN LIMINE* NO. 2)**

On April 6, 2005, the United States Food and Drug Administration ("FDA") issued a formal memorandum based on a careful review of all of the existing data concerning all non-steroidal anti-inflammatory drugs ("NSAIDs"), including COX-2 inhibitors such as Vioxx®.[1]

---

[1] (April 6, 2005 FDA Memorandum ("FDA Memorandum" or "Memorandum"), attached as Ex. 18 to the Declaration of Phillip A. Wittmann in Support of Merck's Oppositions to Plaintiff's Motions *in Limine* (Record Docket No. 1415) ("Wittmann Decl.").)

___ Fee_____
___ Process_____  798331v.1
_X_ Dktd_____
_✓_ CtRmDep_____
___ Doc. No _____

The FDA concluded, *inter alia*, that the data are best interpreted as being consistent with a "class effect" of a long-term increased risk of adverse cardiovascular events for *all* NSAIDs. In reaching this conclusion, the FDA evaluated a substantial amount of scientifically reliable data, as this Court noted in its *Plunkett I Daubert* ruling:

> In reaching the conclusions set forth in its April 6, 2005 Decision Memorandum, the FDA's advisory panel reviewed a large body of data. It reviewed an internal review by the FDA's Center for Drug Evaluation and Research of available data regarding the cardiovascular safety issues for COX-2 inhibitors and NSAIDs. In addition, it reviewed the regulatory histories, New Drug Application, and postmarketing databases of the various NSAIDs. It reviewed FDA and sponsor background documents prepared for the advisory committee meeting. It reviewed all of the data and materials submitted by and presentations made by interested parties. Lastly, the FDA Memorandum itself analyzes the results of the numerous clinical trials and epidemiological studies concerning NSAIDs that the advisory committee reviewed in reaching its conclusions. The Court finds that the FDA's conclusions were reached after a review of scientifically reliable data.

(Nov. 18, 2005 Order & Reasons at 52-53.)

The FDA's conclusion is scientifically reliable, and it is relevant to this case. In addition, the FDA Memorandum is a public record under Federal Rule of Evidence 803(8). In moving to exclude the Memorandum and any evidence of "class effect," plaintiff offers no new arguments to the contrary. Rather, she repeats arguments the Court has already considered and rejected. Thus, consistent with the Court's ruling in the first trial of this case, the Court should deny plaintiff's motion to exclude the memorandum and any evidence that the FDA has concluded that there a "class effect" for all NSAIDs.[2]

---

[2] By this motion, Merck incorporates by reference Merck & Co., Inc.'s Opposition to Plaintiff's Motion *in Limine* to Exclude Evidence and/or Argument That the FDA Has Concluded That There is a "Class Effect" For All Non-Steroidal Anti-Inflammatory Drugs ("NSAIDS") (Record Docket No. 1436).

798331v.1

I.  **THE APRIL 6, 2005 FDA MEMORANDUM, INCLUDING ITS CONCLUSION ABOUT A "CLASS EFFECT" OF ALL NSAIDs, IS RELEVANT, RELIABLE, AND ADMISSIBLE FOR ITS TRUTH.**

   A.  **Plaintiff Concedes that the FDA Memorandum is Admissible by Failing to Challenge a Majority of its Relevant Conclusions.**

The April 6, 2005 FDA Memorandum at issue contains relevant and reliable conclusions other than the *one* conclusion plaintiff challenges. It more broadly contains all of the FDA's conclusions based on a "thorough review of the available data . . . regarding currently approved COX-2 selective and non-selective non-steroidal anti-inflammatory drugs (NSAIDs) and the risk of adverse cardiovascular (CV) events." (FDA Memorandum at 1.) The Memorandum is the FDA's analysis of the best available science on NSAIDs, including selective COX-2 inhibitors. It was issued after the FDA convened a three-day Advisory Committee hearing in which outside experts in the fields of rheumatology, cardiology, epidemiology, pharmacology, ethics, risk-benefit analysis, drug safety and biostatistics, among others, heard and considered scientific presentations and clinical trial data on COX-2 inhibitors and nonselective NSAIDs.

The FDA Memorandum contains many conclusions, only one of which plaintiff challenges in her motion. To take only some examples, the Memorandum concludes that:

- There is a "class effect" for all NSAIDs. (FDA Memorandum at 1 ("Data from large long-term controlled clinical trials that have included a comparison of COX-2 selective and non-selective NSAIDs do not clearly demonstrate that the COX-2 selective agents confer a greater risk of serious adverse CV events than non-selective NSAIDs"); *id.* at 2 ("the available data are *best interpreted* as being consistent with a class effect of an increased risk of serious adverse CV events for COX-2 selective and non-selective NSAIDs" (emphasis added)); *id.* at 10 (listing studies); *id.* ("We also believe that it is not possible to conclude at this point that the COX-2 selective drugs confer *an increased risk* over non-selective NSAIDs in chronic use").)

- *All* prescription NSAIDs should require black-box CV warnings. (FDA Memorandum at 2 ("The professional labeling for all prescription NSAIDs should be revised to include a boxed warning highlighting the potential increased risk of serious adverse CV events.").)

- There are "serious questions" about the FitzGerald hypothesis. (FDA Memorandum at 8 ("Taken together, these observations raise serious questions about the so-called 'COX-2 hypothesis,' which suggests that COX-2 selectivity contributes to increased CV risk.").)

- Short-term ingestion of Vioxx does not increase a patient's risk of having a heart attack. (FDA Memorandum at 2 ("Short-term use of NSAIDs to relieve acute pain, particularly at low doses, does not appear to confer an increased risk of serious adverse CV events (with the exception of valdecoxib in hospitalized patients immediately post-operative from coronary bypass (CABG) surgery)"); *id.* at 13 ("Further, with the exception of the parecoxib/valdecoxib CABG studies, the increased risk of serious adverse CV events in the controlled clinical trials described above have only become apparent after months to years of treatment.").)

- Vioxx, and Vioxx alone, has been shown to have clinically significant GI benefits. (FDA Memorandum at 2 ("The three approved COX-2 selective drugs reduce the incidence of GI ulcers visualized at endoscopy compared to certain non-selective NSAIDs. Only rofecoxib has been shown to reduce the risk of serious GI bleeding compared to a non-selective NSAID (naproxen) following chronic use."); *id.* at 11-12 ("Improved GI tolerability of NSAIDs is an important issue from an individual patient and public health perspective and is, at least in part, a valid rationale for maintaining a range of options in the NSAID class from which physicians and patients may choose.").)

Although plaintiff does not expressly challenge the admissibility of *any* of the FDA Memorandum's conclusions other than the first one, the other conclusions reached by the FDA are relevant to key issues in this litigation. For example, the FDA's conclusion that short-term ingestion of Vioxx does not increase a patient's risk of having a heart attack bears directly on plaintiff's allegation that Vioxx caused or contributed to Mr. Irvin's heart attack even though he ingested Vioxx for less than 30 days. These conclusions, in addition to the FDA's conclusion concerning the "class effect" of all NSAIDs, are admissible for the many reasons discussed below.

    **B.**    **The FDA Memorandum, Including Its "Class Effect" Conclusion, is Relevant.**

Plaintiff concedes that the FDA Memorandum, including its conclusion that there is a "class effect" associated with all NSAIDs, is relevant. (Plaintiff's Motion *in Limine* to Exclude

the FDA's April 6, 2005 Memorandum and Evidence that the FDA has Concluded that There Is a "Class Effect" for All Non-Steroidal Anti-Inflammatory Drugs ("Mot.") at 2 ("Although the testimony or argument at issue is relevant . . . ").) In any event, as set forth in Merck's Opposition to Plaintiff's Motion to Exclude Opinion Testimony that Vioxx® Is the Same As All NSAIDs Regarding Cardiotoxic Effects, filed November 2, 2005, the FDA Memorandum's conclusions concerning class effect are relevant for many reasons. (*Id.* at 8-10.)

### C. The "Class Effect" Conclusion is Evident and Reliable.

Plaintiff's two contentions are that the FDA Memorandum does not, in fact, conclude that there is a class effect, and that, even if it did, that conclusion would be unreliable and hence inadmissible under Rule 403 of the Federal Rules of Evidence. Plaintiff is incorrect.

Plaintiff's first contention is demonstrably false. Although the FDA Memorandum does indicate the need for further study – including the need for long-term clinical trials concerning NSAIDs other than Vioxx – it unambiguously concludes that:

> Data from large long-term controlled clinical trials that have included a comparison of COX-2 selective and non-selective NSAIDs do not clearly demonstrate that the COX-2 selective agents confer a greater risk of serious adverse CV events than non-selective NSAIDs.
>
> and
>
> Pending the availability of additional long-term controlled clinical trial data, *the available data are best interpreted as being consistent with a class effect of an increased risk of serious adverse CV events for COX-2 selective and non-selective NSAIDs.*

(FDA Memorandum at 1-2 (emphasis added).) That is without any serious question the conclusion of the FDA Memorandum.[3]

---

[3] In fact, plaintiff's expert, Dr. Wayne A. Ray, testified, "it's certainly in [the FDA Memorandum]" that "the FDA concluded . . . that all NSAIDs . . . have basically the same safety profile." (Dec. 2, 2005 Tr. at 818:21-819:3 (Testimony of Wayne A. Ray, Ph.D.), attached hereto as Exhibit 1.)

In any event, plaintiff's argument about what the actual "conclusions" of the FDA Memorandum are goes to the weight, not the admissibility, of the document. Plaintiff is free to argue at trial that language elsewhere in the FDA Memorandum somehow qualifies its conclusion about the "best interpret[ation]" of the "available data," but she offers no persuasive grounds for excluding the document itself on the basis of that purportedly qualifying language.

Plaintiff's more sustained argument is that, in any event, the FDA Memorandum's conclusions about a "class effect" are not sufficiently reliable. Plaintiff's view is that the Memorandum acknowledges that the "FDA lacks data" to draw that conclusion, and that the FDA was under "intense public and government scrutiny" at the time it created the document. (Mot. at 2.) Plaintiff argues that, for those reasons, the FDA Memorandum should be excluded under Rule 403 of the Federal Rules of Evidence. (*Id.* at 6.) Plaintiff is wrong. As this Court already noted in its *Plunkett I Daubert* ruling, "the FDA's conclusions[in the Memorandum] were reached after a review of scientifically reliable data." (Nov. 18, 2005 Order and Reasons at 53.)

Although plaintiff does not acknowledge it, the relevant rule of evidence governing the admissibility of the FDA Memorandum is Rule 803(8). That rule provides that "public records or reports" of a public agency are admissible for their truth if, *inter alia*, they set forth "(A) the activities of the office or agency, or . . . (C) in civil actions and proceedings . . ., factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." FED. R. EVID. 803(8).

By failing to address the pertinent rule, plaintiff appears to concede that the FDA Memorandum is a "public record" under Rule 803(8). In any event, it is just such a public record. It was written by Dr. John Jenkins, the Director of the FDA's Office of New Drugs, and Dr. Paul Seligman, the Director of the FDA's Office of Pharmacoepidemiology and Statistical

6

798331v.1

Science. It was released through the Acting Director of the FDA's Center for Drug Evaluation and Research ("CDER"), Dr. Steven Galson. CDER is charged with carrying out the FDA's mandate to decide the safety and efficacy of prescription drugs. *See* http://www.fda.gov/opacom/factsheets/justthefacts/3cder.html; *see generally* 21 U.S.C. § 393(b). "Participants in the CDER decision-making process included staff from the Office of New Drugs . . . , the Office of Drug Safety, Office of Pharmacoepidemiology and Statistical Science, the Office of Medical Policy, the Office of Regulatory Policy, and the Office of the Center Director." *See* http://www.fda.gov/cder/drug/infopage/cox2/COX2.qa.htm.

Moreover, the FDA has taken steps to make certain that the contents of the Memorandum are widely disseminated. The document is posted as a "Decision Memo" on the FDA's website, at http://www.fda.gov/cder/drug/infopage/COX2/NSAIDdecisionMemo.pdf. On April 7, 2005, the FDA issued a press release summarizing the recommendations made and actions taken in accordance with the Memorandum. *See* FDA News, dated April 7, 2005, *available at* http//www.fda.gov/bbs/topics/news/2005/NEW01171.html. The FDA also issued a Public Health Advisory, reiterating in abbreviated fashion the recommendations of the Memorandum. *See* http://www.fda.gov/cder/drug/advisory/COX2.htm. In accordance with the FDA Memorandum, the FDA has sent letters to sponsors of all NSAIDs, both prescription and non-prescription, requesting that they make labeling changes designed to provide more specific cardiovascular warnings and information about their products.

Courts have routinely admitted as "public records" FDA or other public agency documents with the attributes of the FDA Memorandum. In *Sabel v. Mead Johnson & Co.*, 737 F. Supp. 135 (D. Mass. 1990), for example, the court determined that a letter to a manufacturer from the Director of the FDA's Division of Neuropharmacological Drug Products that recommended inclusion of a boxed warning in a drug's labeling qualified as a public record

under Federal Rule of Evidence 803(8)(C). The district court noted that "it [made] no difference that the underlying data was collected and received from an outside party, as long as the information was reliable." *Id.* at 142. The court also relied on the fact that the recommendation was a final opinion of the FDA rather than a tentative conclusion of the letter's author alone. *Id.*[4] Similarly, in *Kehm v. Procter & Gamble Mfng Co.,* 724 F.2d 613 (8th Cir. 1983), the Eighth Circuit Court of Appeals held that a Center for Disease Control report concerning studies of toxic shock syndrome was properly admitted as a public record despite the fact that the findings of that report "tend[ed] towards the conclusory rather than the factual end." *Id.* at 618-20. *See also Coates v. AC & S, Inc.,* 844 F. Supp. 1126, 1133-34 (E.D. La. 1994) (admitting as public records OSHA and EPA reports setting forth findings on effects of asbestos exposure; finding agencies had no interest in the litigation and were charged by law with responsibility of monitoring toxic substances); *In re Orthopedic Bone Screw Prods. Liab. Litig.,* No. MDL 1014, 1998 WL 964495, at *3 (E.D. Pa. Nov. 3, 1998) (suggesting that FDA review of orthopedic Cohort Study would be public record).

Because the FDA Memorandum qualifies as a public record, it is presumptively admissible unless plaintiff can establish that it is untrustworthy. This is so even for reports, such as the Memorandum, which "evaluat[e]" facts to draw a conclusion. *See, e.g., Moss v. Ole S.*

---

[4] By contrast, informal, unofficial or preliminary statements by FDA employees that do not qualify as public records include FDA Warning Letters or Untitled Letters. The FDA's own procedures manual recognizes these letters as informal and advisory. *See* Regulatory Procedures Manual, Chapter 4, Advisory Actions, Section 4-1-1, *available at* http://www.fda.gov/ora/compliance_ref/rpm/pdf/ch4.pdf. Moreover, courts have acknowledged that they do not constitute final agency action. *See Summit Tech., Inc. v. High-Line Med. Instruments Co.,* 933 F. Supp. 918, 934 n.9 (C.D. Cal. 1996) ("FDA regulatory warning letters do not constitute final agency action" and therefore do not reflect a final conclusion of wrongdoing). Additionally, any internal communication between agency employees, initial reports by agency employees, or statements made by employees outside the scope of their employment do not rise to the level of an official communication of the agency. All these examples are in contrast to the official, formal FDA Memorandum.

*Real Estate, Inc.*, 933 F.2d 1300, 1305 (5th Cir. 1991) (because "[t]he Advisory Committee assumes admissibility of 803(8)(C) reports in the first instance . . . , evaluative reports are presumed not to be excluded under the hearsay rule").

Plaintiff cannot overcome that presumption. First, a challenge to the *conclusion* of a public record is *not*, under any circumstances, a valid basis for excluding that record on the grounds that the record is not "trustworthy." *See id.* at 1307-08 (reversing magistrate's exclusion of public record in case in which magistrate disagreed with conclusions of the report). To the contrary, the Fifth Circuit Court of Appeals has made clear that challenges to the conclusions of a public record go to the weight, not the admissibility of the evidence. *See id.* at 1307-08 (holding that, because "reliability is not a matter of [the] credibility" of a conclusion, "courts should not focus on questions regarding the *accuracy or completeness of the document's conclusions*" (emphasis added)). For that reason, plaintiff cannot even make the threshold showing required to invoke the "trustworthiness" language of Rule 803(8)(C).[5]

Second, even if plaintiff's disagreement with the FDA Memorandum's conclusion were a valid basis for invoking Rule 803(8)(C) – which it is not – plaintiff is wrong that the FDA "erred" in reaching its conclusion.[6] The Memorandum is based on a *"thorough review of the available data . . .* regarding currently approved COX-2 selective and non-selective non-steroidal anti-inflammatory drugs (NSAIDs) and the risk of adverse cardiovascular (CV) events." (FDA

---

[5] Indeed, plaintiff is simply wrong to argue that, because the data are in some ways inconclusive, the FDA's conclusion must be incorrect. The jury is entitled to hear the FDA's conclusion and make its own judgments. Without question, the Memorandum notes the need for additional clinical trials assessing the risks posed by NSAIDs. But that simply does not mean that the conclusion it reaches – "following a thorough review of the available data" (FDA Memorandum at 1) – lack sufficient reliability to be admissible.

[6] Plaintiff's own expert, Dr. Lucchesi, has testified that all NSAIDs increase the risk of adverse events, including myocardial infarction. (*See* Testimony of Benedict R. Lucchesi, M.D., Ph.D., M.S., F.A.H.A., *Humeston v. Merck*, No. 619 (N.J. Super. Ct. Law Div. filed Aug. 19, 2003) of

Memorandum at 1 (emphasis added).) It describes the large body of data the expert advisory panel reviewed in reaching its conclusions. This Court, in fact, specifically noted in its *Plunkett I Daubert* ruling that, "[i]n reaching the conclusions set forth in its April 6, 2005 Decision Memorandum, the FDA's advisory panel reviewed a large body of data." (Nov. 18, 2005 Order & Reasons at 52-53.) For example, the FDA Memorandum states that "new data prompted the agency to conduct a comprehensive review of the available data," and that "CDER [the FDA's Center for Drug Evaluation and Research] conducted a thorough internal review of the available data regarding cardiovascular (CV) safety issues for COX-2 selective and non-selective non-steroidal anti-inflammatory drugs (NSAIDs)." (*Id.* at 3.) The participants in the CDER review included staff from the Division of Anti-Inflammatory Analgesic and Ophthalmologic Drug Products, the Division of Over-the Counter Drug Products, the Offices of Drug Evaluation II and V, the Office of New Drugs, the Office of Drug Safety, the Office of Biostatistics, the Office of Pharmacoepidemiology and Statistical Science, the Office of Medical Policy, the Office of Regulatory Policy, and the Office of the Center Director. (*Id.*) This group's comprehensive review drew on materials from a wide range of sources:

> [T]he regulatory histories and the NDA [New Drug Application] and postmarketing databases of the various NSAIDs, FDA and sponsor background documents prepared for the Advisory Committee meeting, all materials and data submitted by other stakeholders to the Advisory Committee meeting, presentations made at the Advisory Committee meeting, the discussions held by the Committee members during the meeting, and the specific votes and recommendations made by the joint Committee.

(*Id.* at 3-4.) The Memorandum itself analyzes the results of numerous clinical trials and epidemiological studies concerning various NSAIDs that the Advisory Committee reviewed in reaching its conclusion regarding a "class effect." For example, the Advisory Committee

---

September 20, 2005 ("Lucchesi *Humeston* Test.") at 953:14-955:17, attached as Ex. 13 to Wittmann Decl.)

798331v.1

reviewed data from a placebo-controlled clinical trial designed to determine whether Celebrex® (celecoxib), another COX-2 inhibitor, could prevent colorectal adenoma. The study, which also examined cardiovascular endpoints in over 2,000 patients, found that persons on a long-term regimen twice daily of 400 mg Celebrex had a statistically significant increased risk of death from cardiovascular causes compared to placebo.[7] Notably, however, the Kaplan-Meier curve for composite cardiovascular deaths did not separate from placebo, much less become statistically significant, until well after six months of use.[8]

In addition to the comprehensive review of the scientific data evident from the document itself, the facts surrounding the creation, purpose, and use of the FDA Memorandum provides additional assurance of its scientific reliability. Dr. Lisa Rarick, an expert in regulatory affairs who spent 15 years at the FDA before retiring in 2003,[9] testified in another Vioxx matter that the FDA Memorandum's findings were created, reviewed, and agreed to by the pertinent regulators at the Agency and that, based on those findings, the FDA took several regulatory actions. Dr. Rarick noted that the two authors of the FDA Memorandum, Dr. Jenkins (Director of the Office of New Drugs) and Dr. Seligman (Director of the Office of Pharmacoepidemiology and Statistical Science), are responsible for the approval of new drugs and post-marketing monitoring of safety concerns, respectively. (Testimony of Dr. Lisa Rarick, *Humeston v. Merck*, No. 619 (N.J. Super. Ct. Law Div. filed Aug. 19, 2003) ("Rarick *Humeston* Test.") of October 21, 2005 at 5026:15-5027:5, attached as Ex. 13 to Wittmann Decl.) Additionally, the Memorandum was

---

[7] See Solomon et al., *Cardiovascular Risk Associated With Celecoxib in a Clinical Trial for Colorectal Adenoma Prevention,* N. ENGL. J. MED. 2005:352:1-10; (FDA Memorandum at 4).

[8] Solomon *et al.*, at 7.

[9] Dr. Rarick's FDA experience included years as a medical officer responsible for reviewing the safety profile of various drugs. (*See Curriculum Vitae* of Lisa Dale Rarick, M.D., attached as Ex. 29 to the Declaration of Phillip A. Wittmann in Support of Merck's Opposition Briefs, filed November 2, 2005.)

published through their supervisor, Dr. Steven Galson, the Acting Director of the Center for Drug Evaluation and Research, who had to review and endorse its findings. (FDA Memorandum at 1; Rarick *Humeston* Test. at 5028:3-13.) Nor is there any doubt that the Memorandum represented a final decision setting forth the FDA's official position on these issues. (Rarick *Humeston* Test. at 5040:22-5041:8, 5054:4-7.) As noted above, the FDA's own website, where the FDA published the Memorandum shortly after issuing it, refers to it as a "Decision Memo." *See* http://www.fda.gov/cder/drug/infopage/cox2/.

It also bears noting that the FDA believed the findings and conclusions described in its FDA Memorandum were sufficiently reliable to warrant significant regulatory action. As the FDA website describes, in the wake of the Advisory Committee meeting and the Memorandum:

> The Food and Drug Administration (FDA) has issued supplemental request letters to sponsors of all non-steroidal anti-inflammatory drugs (NSAID) requesting that they make labeling changes to their products. These letters include recommended proposed labeling for both the prescription and over-the-counter (OTC) NSAIDs and a medication guide for the entire class of prescription products.
> . . . .
> Manufacturers of **non-prescription** (over-the-counter) NSAIDs are being asked to revise their labeling to provide more specific information about the potential CV and GI risks of their individual products and remind patients of the limited dose and duration of treatment of these products in accordance with the package instructions.

*See* http://www.fda.gov/cder/drug/infopage/cox2/; (*see also* Rarick *Humeston* Test. at 5038:21-5039:20). The FDA would not have taken these actions on *all NSAIDs* if it did not believe that its analysis, findings, and conclusions were based on reliable scientific evidence. Indeed, the Medication Guide that the FDA created to accompany prescription NSAIDs, which was based on the Advisory Committee's work, is required by law to be "scientifically accurate." *See* 21 C.F.R. § 208.20(a)(2); (Rarick *Humeston* Test. at 5057:13-16, 5099:16-5100:2).

Plaintiff cites no precedent holding that a finding or conclusion by a government agency charged by Congress with making that assessment is inadmissible or unreliable because it is not

absolute or is based only on "available" data. (*See* Mot. at 3-4.) Indeed, any such argument would defy common sense, as all properly-derived scientific conclusions are based on currently-known facts. Here, the FDA has published its conclusion that the best available interpretation of the scientific data is that a "class effect" exists both among COX-2 inhibitors and between COX-2 inhibitors and NSAIDs generally, and that this conclusion is sufficiently reliable to institute significant regulatory change.

Finally, plaintiff's assertion that the document is inadmissible because the FDA was under "enormous pressure" at the time is equally misplaced. (Mot. at 5.) Public agencies are often under "enormous pressure" when they create public records. But that does not mean that a "public record" within the meaning of Rule 803(8) becomes something else whenever a private party in litigation asserts that the pertinent agency was under political pressure to create it. Indeed, plaintiff's argument to that effect is literally unprecedented – there is no case cited in plaintiff's papers (nor is Merck aware of any such case) holding that the mere allegation of "pressure" calls into question the "public record" status of a document otherwise falling within the scope of the exception. *See* FED. R. EVID. 803(8). Nor is plaintiff's argument even logical – public "pressure" and scrutiny would lead FDA to do a more careful review in order to get it right. In any event, as noted above, the FDA Memorandum is the result of rigorous review of all the relevant data by scores of scientists, and its conclusions cannot be ignored simply because plaintiff believes the FDA was under political pressure to reach them.

## II. CONCLUSION.

For these reasons, as well as those set forth in Merck's previously-filed Opposition to Plaintiff's Motion to Exclude Opinion Testimony that Vioxx is the Same as All NSAIDs, the Court should deny plaintiff's motion.

Respectfully submitted,

*/s/ Dorothy H. Wimberly*

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone: 504-581-3200
Fax:    504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois 60610
Phone: 312-494-4400
Fax:    312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Phone: 202-434-5000
Fax:    202-434-5029

And

798331v.1

        John H. Beisner
        Charles C. Lifland
        Richard B. Goetz
        O'MELVENY & MYERS LLP
        400 South Hope Street
        Los Angeles, CA 90071
        Phone:  213-430-6000
        Fax:    213-430-6407

        Attorneys for Merck & Co., Inc.

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Opposition to Plaintiff's Motion *in Limine* to Exclude the FDA's April 6, 2005 Memorandum and Evidence and/or Argument that the FDA Has Concluded that There Is a "Class Effect" For All Non-Steroidal Anti-Inflammatory Drugs ("NSAIDS") (Motion *in Limine* No. 2) has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 2nd day of February, 2006.

*Dorothy H. Wimberly*

798331v.1

**EXHIBIT 1 - Trial Excerpts**

• **Plunkett II MIL Oppositions**

[740:] - [740:25]     12/2/2005   Irvin Plunkett Trial - Ray, Weeks, Irvin A, Raffa, S

```
page 740
      0740
1                    UNITED STATES DISTRICT COURT
2                    EASTERN DISTRICT OF LOUISIANA
3
4
5
            IN RE: VIOXX PRODUCTS            *
6           LIABILITY LITIGATION             *   MDL DOCKET NO. 1657
                                             *
7                                            *
            THIS DOCUMENT RELATES TO         *   HOUSTON, TEXAS
8           CASE NO. 05-4046:                *
                                             *
9           EVELYN IRVIN PLUNKETT, ET AL     *   DECEMBER 2, 2005
                                             *
10          VERSUS                           *
                                             *   8:30 A.M.
11          MERCK & CO., INC.                *
            * * * * * * * * * * * * * * * * *
12
13
                              VOLUME IV
14                      JURY TRIAL BEFORE THE
                     HONORABLE ELDON E. FALLON
15                  UNITED STATES DISTRICT JUDGE
16
17          APPEARANCES:
18
            FOR THE PLAINTIFF:            BEASLEY ALLEN CROW METHVIN
19                                          PORTIS & MILES
                                          BY:  JERE LOCKE BEASLEY, ESQ.
20                                             ANDY D. BIRCHFELD, JR., ESQ.
                                               J. PAUL SIZEMORE, ESQ.
21                                        234 COMMERCE STREET
                                          POST OFFICE BOX 4160
22                                        MONTGOMERY, ALABAMA 36103
23
            FOR THE PLAINTIFF:            ROBINSON, CALCAGNIE & ROBINSON
24                                        BY:  MARK P. ROBINSON, JR., ESQ.
                                          620 NEWPORT CENTER DRIVE
25                                        NEWPORT BEACH, CALIFORNIA 92660
```

[818:21] - [819:3]     12/2/2005   Irvin Plunkett Trial - Ray, Weeks, Irvin A, Raffa, S

```
page 818
21     Q.   DO YOU KNOW, SIR, THAT THIS LETTER OR THE MEMORANDUM FROM
22     THE FDA, IN IT THE FDA CONCLUDED THAT, WITH POSSIBLE EXCEPTION
23     OF NAPROXEN, THAT ALL NSAIDS, INCLUDING VIOXX, CELEBREX,
24     IBUPROFEN, ALL HAVE BASICALLY THE SAME SAFETY PROFILE?  YOU'RE
25     AWARE THAT THE FDA CONCLUDED THAT, RIGHT?
page 819
1      A.   I'VE SEEN THAT CONCLUSION IN THIS MEMORANDUM.  AGAIN, THE
2      EXTENT TO WHICH IT REPRESENTS THE OFFICIAL POSITION OF THE FDA
3      IS UNCLEAR TO ME, BUT IT'S CERTAINLY IN THIS DOCUMENT.
```