<u>**Plaintiff's Omnibus Response to Defendant's Objections**</u>
<u>**To Deposition Testimony Designation of**</u>
<u>**Merck Employee Mary Blake**</u>

**I.**   **Witness's Background**

1)   Mary Blake is currently employed by Merck and was hired in 1993 in the Public Affairs Department. She primarily worked for Jan Weiner. (Deposition testimony, pages 13, 16 and 18).

2)   She began working on Vioxx in the middle of 1999. On that project she worked with Merck Research Lab on epidemiological studies. (Deposition testimony, page 26).

3)   Her job responsibilities as manager of Public Affairs for Vioxx were for interactions with the new media related to Vioxx and also public affairs programs encouraging consumers to talk to their doctors about osteoarthritis. (Deposition testimony, page 27).

**II. Plaintiff's Omnibus Response to Defendant's Objections Generally**

1)   Merck's marketing efforts diffused the issue of whether Vioxx caused/increased risk of heart attacks.

2)   Merck's Marketing and Public Affairs Department shows Merck's efforts to diffuse the issue of MI/CD risk of Vioxx and goes to the failure to warn issue.

3)   Shows Merck's state of mind/knowledge at the relative time periods.

4)   Public Affairs Communications to the media shows how Merck would circumvent FDA and refute medical literature regarding MI risk of Vioxx by use of press releases, standby statements, websites and direct consumer advertising.

5)   Blake was expert of getting Merck's message out and could provide opinions on how/how effective it was. Jury may infer that the prescribing physician and/or friends and/or decedent was effected by the Merck message.

6)   The jury may infer that this massive marketing campaign reached the medical community (including Schirmer) and patients like Aycock and Irvin.

*Objection overruled Exhibits admitted*
*Exhibits 401 & 403  801 (d)(2)*

## III.    Exhibits Offered

| Exhibit Number | Argument in Support of Admission |
|---|---|
| P1.1471<br>(See Tab "A") | Witness identifies this as a Merck document.  (55:11-13)<br><br>Document entitled General Principles of Promotion.  FDA regulations impose five main principles of promotion on Bates page 44 of the document.  (Deposition testimony page 55:6-13).<br><br>Witness testifies at page 58:23 – 59:2 that she is familiar with these principles and they applied Merck's Vioxx promotions. |
| P1.1472<br>(See Tab "B") | This is the witness' performance review form from Merck and she testified she recognizes the document.  (Deposition Testimony page 69:3-7).<br><br>References section that states what the witness' accomplishments are for the year 2000 included that she "developed communication and handled media relations for the complex finding of the bigger study to "minimize attention to the heart attack issues… ."  See Bates page 0800006 in the paragraph entitled "Vigor". |

*BLAKE_~1.TXT: Page 11 Line 12 to Page 11 Line 13

12    Q.    Okay.  Good morning, Mrs. Blake.
13    A.    Good morning.  How are you?

Date: 01/27/2006
Issues:      cut

*BLAKE_~1.TXT: Page 13 Line 19 to Page 13 Line 21

19    Q.    All right.  You are currently working
20 for Merck, correct?
21    A.    Yes, I am.

Date: 01/27/2006

*BLAKE_~1.TXT: Page 16 Line 5 to Page 16 Line 8

5    Q.    Okay.  And when you were hired as a
6 full-time Merck employee, what were you hired as?
7    A.    I was hired as a public affairs
8 associate.

Date: 01/27/2006

*BLAKE_~1.TXT: Page 16 Line 14 to Page 16 Line 15

14    Q.    And that was specifically what date?
15    A.    December 1993.

Date: 01/27/2006

*BLAKE_~1.TXT: Page 18 Line 18 to Page 19 Line 2

what was your job
19 title from 1997 through 2001?
20    A.    It varied, but for most of that time,
21 I was a manager of public affairs.
22    Q.    Manager.  Okay.  And who did you work
23 for?
24    A.    There I worked for a number of

Blake Objections
11.29.05

Object in its entirety
on 401, 402, 403

π response - see
Omnibus response

Overruled
Relevant for
what D. knew
+ when it
was known
also relevant
to learned
inter defense

25 people.  Primarily Jan Weiner, who was the head of
00019
1 that group.  Sometimes I worked directly for her,
2 other times I worked for other people in between.

Date: 01/27/2006

*BLAKE_~1.TXT: Page 22 Line 14 to Page 23 Line 2

14          When is the first time you became
15 involved with the drug Vioxx or its predecessor,
16 while working for Merck?
17    A.    I started work on Vioxx, I did some
18 help when I wasn't directly responsible for it, in
19 the middle of 1999.
20    Q.    Okay.
21    A.    Sometime in the spring, early summer
22 of 1999.  And I was assigned Vioxx in the fall of
23 1999.
24    Q.    So in the fall of 1999, you say you
25 were "assigned Vioxx".  What does that mean?
00023
1     A.    Um-hmm.  I became the manager with
2 responsibility for Vioxx.

Date: 01/27/2006

*BLAKE_~1.TXT: Page 23 Line 18 to Page 23 Line 22

18          As it related to Vioxx, what was your
19 exact title?
20    A.    Manager.
21    Q.    Manager?
22    A.    U.S.H.H. Public Affairs.

Date: 01/27/2006

*BLAKE_~1.TXT: Page 26 Line 5 to Page 26 Line 19

5     Q.    All right.  Epidemiology.  Did you
6 manage epidemiologic issues related to Vioxx?
7     A.    I worked with Merck Research Labs as
8 well as others on epidemiological studies, as I —

9 in terms of drafting public affairs materials.  Yes,
10 I did that.
11      Q.      Okay.  And what people within Merck
12 Research Laboratories did you deal with concerning
13 those issues?
14      A.      It could range based on the
15 individual study.  If it was an epidemiological
16 study, it would gen -- I would generally speak with
17 Nancy Santanello and Alise Reicin, as well as
18 perhaps others in their department, but it depended
19 on the situation.

Date:  01/27/2006

*BLAKE_~1.TXT: Page 27 Line 9 to Page 27 Line 20


9      Q.      Before I get to that, describe for me
10 generally what your job responsibilities were as
11 manager, U.S.H.H., of public affairs for Vioxx.
12      A.      Essentially in that position I had
13 responsibility for interactions with the news media
14 related to Vioxx and also for public affairs
15 programs related to disease awareness.
16      Q.      What does that mean, the last part?
17      A.      The disease awareness part?  We
18 worked with third-party groups to implement programs
19 that encouraged consumers to talk to their doctor
20 about osteoarthritis, if they had it.

Date:  01/27/2006

*BLAKE_~1.TXT: Page 33 Line 2 to Page 33 Line 6


2      Q.      When you worked for public affairs,
3 there would be various tools that you would use to
4 get the word out when you needed to concerning
5 Vioxx, correct?
6      A.      Yes.

Date:  01/27/2006

*BLAKE_~1.TXT: Page 33 Line 11 to Page 33 Line 19

11    Q.    Who was in charge of press releases
12 for Vioxx?
13    A.    Well, ultimately the public affairs
14 department is responsible for developing and getting
15 the appropriate approvals and issuing news releases
16 in consultation with the various reviewers,
17 including medical/legal board.
18    Q.    But who was in charge?  Where did the
19 buck stop --

Date: 01/27/2006

*BLAKE_~1.TXT: Page 33 Line 25 to Page 34 Line 7


25        THE WITNESS:  In terms of where the
00034
1 buck stopped, ultimately Merck Research Labs and
2 legal have the final say in terms of whether or not
3 a news release is issued.
4 BY MR. PLACITELLA:
5    Q.    Who is responsible for drafting the
6 press releases and putting them in final form?
7    A.    Public affairs.

Date: 01/27/2006

*BLAKE_~1.TXT: Page 35 Line 14 to Page 36 Line 4


14    Q.    What is a standby statement?
15    A.    Standby statements are documents that
16 we create if we anticipate getting questions about
17 something that we would need to respond to within
18 public affairs.
19    Q.    And who was it intended that the
20 standby statements would be used by?
21    A.    Standby statements are intended to be
22 used by public affairs people in their interactions
23 with the news media as well as investor relations
24 for their interactions with analysts.
25    Q.    Were they ever given to people within
00036
1 Merck for responding to interviews?
2    A.    With the news media?
3    Q.    Correct.

4     A.    Yes.

Date: 01/27/2006

*BLAKE_~1.TXT: Page 36 Line 21 to Page 37 Line 21

21    Q.    What about video news releases, were
22 they a tool used for getting the word out?
23    A.    Yes, we used video news releases as
24 well.
25    Q.    And the video news releases, who was
00037
1 the person primarily responsible within public
2 affairs for the video news releases related to
3 Vioxx?
4     A.    Well, that too could vary based on
5 who had responsibility for a given project.  Often,
6 I had responsibility, and it would always go through
7 medical/legal board.  They had the final say.
8     Q.    In fact, you were involved with media
9 training for the video news releases and interviews
10 at various points in time related to Vioxx, true?
11    A.    Yes, I did media training.
12    Q.    And interviews with spokespersons for
13 Merck, was that a tool that was used for getting the
14 word out related to Vioxx?
15    A.    Merck people participated in
16 interviews about Vioxx, yes.
17    Q.    What about spokespersons versus --
18 did you have spokespersons that you hired that were
19 non-Merck employees to get the word out related to
20 Vioxx?
21    A.    Yes.

Date: 01/27/2006

*BLAKE_~1.TXT: Page 38 Line 8 to Page 38 Line 23

8     Q.    Okay.  Did you use websites as a
9 vehicle for getting the word out related to Vioxx?
10    A.    Within public affairs?
11    Q.    Um-hmm.
12    A.    Yes, we did.
13    Q.    And what websites did you use?

14     A.     Some -- if I'm remembering correctly,
15 and I apologize, it was a long time ago, we had a
16 disease awareness website in conjunction with the
17 Arthritis Foundation around the Speaking of Pain
18 program. And I can't remember the URL for that.
19 The content was also on the Arthritis Foundation's
20 website. It might even still be there.
21         And then, in addition to that, some
22 of the public affairs materials, I believe, were on
23 Vioxx.com.

Date: 01/27/2006

*BLAKE_~1.TXT: Page 41 Line 7 to Page 41 Line 20


7     Q.     Did marketing have -- did marketing
8 also have to approve your press releases before they
9 were sent out?
10     A.     They were reviewed again.
11     Q.     And who was that? Who approved your
12 press releases in marketing?
13     A.     That would also vary by the news
14 release. My primary point of contact for many
15 things was Carrie Bourdow on the marketing team, but
16 some things would also be reviewed by her bosses as
17 well as the vice president of the marketing team.
18     Q.     Did that include Wendy Dixon?
19     A.     Yes, Wendy was the vice president at
20 the time, if I remember correctly.

Date: 01/27/2006

*BLAKE_~1.TXT: Page 41 Line 23 to Page 43 Line 2


23         Public affairs was really responsible
24 for communications concerning Vioxx to the general
25 public, correct?
00042
1     A.     No, to the news media.
2     Q.     Only to the news media?
3     A.     The news media is the primary
4 audience. The programs that we work on and the
5 materials we create are intended for use by the news
6 media. Now, we talked before about the disease

7 education program.  That involves working with
8 consumer groups and also had a media component to it
9 as well.
10    Q.    Well, you call it public affairs,
11 correct?
12    A.    That is the name of our department,
13 yes.
14    Q.    Meaning that you understood that the
15 messages that you were issuing would ultimately --
16 were ultimately intended to reach the public,
17 correct?
18         MR. PATRYK:  Object to form.  You may
19 respond.
20         THE WITNESS:  Our news releases go to
21 the news media who then communicate to the public.
22 BY MR. PLACITELLA:
23    Q.    The purpose of your reaching the news
24 media wasn't so they took the press releases and
25 video materials home and put them on -- in a shelf,
00043
1 right?
2    A.    That is correct.

Date: 01/27/2006

*BLAKE_~1.TXT: Page 44 Line 14 to Page 45 Line 6

14    Q.    But the purpose of the news tools
15 that we've discussed is to communicate Merck's
16 message to the public ultimately, true?
17         MR. PATRYK:  You may respond.
18         THE WITNESS:  Yes.
19 BY MR. PLACITELLA:
20    Q.    Okay.  And, in fact, you issued your
21 press releases online as well, didn't you?
22    A.    We distribute our news releases
23 through various news wire services.  We change them
24 during the course of time.  And they also appeared
25 on Merck.com.
00045
1    Q.    Right.
2    A.    So --
3    Q.    So if somebody was searching for
4 Vioxx, let's say, they could very well see your
5 press releases on Merck.com, correct?

6    A.    They could, yes.

Date: 01/27/2006

*BLAKE_~1.TXT: Page 45 Line 20 to Page 46 Line 21

20    Q.    Okay. And as somebody who worked in
21 the office of medical/legal, you recognized, did you
22 not, that all of the tools that we've discussed were
23 governed by the FDA labeling law, true?
24        MR. PATRYK: Objection to form. You
25 may respond.
00046
1        THE WITNESS: Yes, I'm familiar with
2 that.
3 BY MR. PLACITELLA:
4    Q.    Okay. In other words -- and labeling
5 includes not just a package insert, it includes your
6 press releases, your video news releases, anything
7 you'd give out to the public, right?
8    A.    Well, when I said labeling before, I
9 was referring specifically to the product
10 information.
11    Q.    You're aware that your press releases
12 and other tools were governed by the FDA labeling
13 law, true?
14    A.    Yes, I'm aware that public affairs
15 materials are governed by FDA regulations.
16    Q.    Okay. And that law required that all
17 of your materials be fairly balanced, correct?
18        MR. PATRYK: Just note my objection.
19 You may respond.
20        THE WITNESS: Within FDA regulations,
21 yes, there's an expectation for fair and balanced.

Date: 01/27/2006

*BLAKE_~1.TXT: Page 47 Line 7 to Page 47 Line 11

7    Q.    Well, you were part of the
8 medical/legal review, so you had some knowledge
9 about the regulations that pertain to what was
10 necessary to comply with the FDA's laws, correct?
11    A.    With -- yes. Within --

Date:  01/27/2006

*BLAKE_~1.TXT: Page 48 Line 5 to Page 48 Line 12

5      A.    -- what my job was within the office
6 of medical/legal.
7            I was the liaison to the FDA in terms
8 of sending them promotional materials for their
9 pre-review, for example, for the products that I
10 worked on.  I reviewed those materials as they came
11 through, but that was once they had already gone
12 through medical/legal board.

Date:  01/27/2006

*BLAKE_~1.TXT: Page 49 Line 6 to Page 49 Line 10

6      Q.    It was part of your job to know and
7 understand what the rules were concerning what you
8 could say and not say in public affairs materials,
9 true?
10     A.    To understand, yes.

Date:  01/27/2006

*BLAKE_~1.TXT: Page 52 Line 14 to Page 52 Line 24

14     Q.    Well, you understand as the director
15 or manager of public affairs that it's your
16 responsibility to make sure, from your perspective,
17 that the information that's contained in your
18 materials that's sent out into the public, that it
19 contains the truth and the whole truth, not half the
20 truth, correct?
21            MR. PATRYK:  Object to form.  You may
22 respond.
23            THE WITNESS:  Yes, our materials are
24 truthful.  I recognize that as our responsibility.

Date:  01/27/2006

*BLAKE_~1.TXT: Page 54 Line 17 to Page 55 Line 13

17          MR. PLACITELLA:  Let me have this
18 marked as P-1.  This is the only one I don't have
19 multiple copies of, so I apologize.
20          (Exhibit P-1 "Drug Regulations:  The
21 Essentials, Medical Background", MRK-NJ0092058 thru
22 MRK-NJ0092133, is marked for identification.)
23 BY MR. PLACITELLA:
24     Q.    I'm going to show you what's been
25 marked P-1 for identification and ask you if you
00055
1 have ever seen this before?
2     A.    Okay.  I believe that this is a field
3 communication document, but I may be wrong.
4     Q.    Have you ever seen it before?
5     A.    I believe so.
6     Q.    Okay.  Can you turn to Page 44.
7     A.    Um-hmm.  Yes.
8     Q.    See where it says, "General
9 Principles of Promotion"?
10     A.    Um-hmm.
11     Q.    This is a Merck document, by the way,
12 correct?
13     A.    Yes.

Date:  01/27/2006

*BLAKE_~1.TXT: Page 56 Line 1 to Page 56 Line 15


1     Q.    Okay.  And here it says, "General
2 Principles of Promotion.  FDA regulations impose
3 five main principles on promotion."
4          Do you see that?
5     A.    Yes, I do.
6     Q.    Okay.  Do you see in the second one,
7 it says, "Absence of misleading information.  A
8 promotional claim", that includes all of your public
9 affairs materials, correct, that were distributed to
10 the public or to the press, not stuff you just kept
11 in-house?
12          MR. PATRYK:  Object to form.
13 BY MR. PLACITELLA:
14     Q.    Anything that you sent out was a
15 promotional claim under the FDA regulation, correct?

*overruled*

Lack of
foundation

π response
1. Witness testifies at
58:23-59:2 that
she is familiar with
the document/principles
and they applied to
Vioxx promotions.

Date: 01/27/2006

*BLAKE_~1.TXT: Page 56 Line 21 to Page 56 Line 24

21      THE WITNESS:  Okay.  Recognizing that
22 I'm not an expert on the regulation, I don't know
23 that everything that public affairs would create
24 would be considered to be promotional.

Date: 01/27/2006

*BLAKE_~1.TXT: Page 57 Line 16 to Page 58 Line 10

16      Q.     It says, "A promotional claim may not
17 be interpreted in a false or misleading manner by a
18 significant minority of prescribers."
19          Did I read that correctly?
20      A.     Yes.
21      Q.     Okay.  It then says, "Inclusion of
22 proper balance.  There must be appropriate weight
23 given to all clinically relevant information, that
24 is, the risks and benefits, that can affect a
25 physician's prescribing practices."
00058
1          Did you understand that to be the
2 case?
3      A.     That's what it says, yes.
4      Q.     Okay.  Then it says, "Absence of
5 omissions of relevant information.  Promotional
6 material, when taken as a whole, is inadequate if it
7 does not tell the whole truth, i.e., unfavorable
8 information may not be omitted."
9          Correct?
10     A.     Yes.

Date: 01/27/2006

*BLAKE_~1.TXT: Page 58 Line 17 to Page 59 Line 2

17      Q.     "Support by adequate clinical
18 studies.  Promotion may not promote the product in a
19 light more favorable than shown by data obtained

20 from clinical experience."
21        Did I read that correctly?
22   A.   Yes.
23   Q.   Did you understand that these were
24 the general principles that guided you in
25 constructing promotional materials for the product
00059
1 Vioxx?
2   A.   Yes, I'm familiar with those.

Date: 01/27/2006

*BLAKE_~1.TXT: Page 60 Line 12 to Page 60 Line 22

12   Q.   So in terms of your understanding, if
13 a company indicates that a drug does not have side
14 effects, when there's credible scientific evidence
15 to the contrary, that would be false and misleading,
16 from your understanding?
17        MR. PATRYK: Object to form. You may
18 respond.
19        THE WITNESS: From my understanding?
20 BY MR. PLACITELLA:
21   Q.   Yes.
22   A.   Yes.

Date: 01/27/2006

*BLAKE_~1.TXT: Page 61 Line 8 to Page 61 Line 15

8   Q.   Okay. Now, for five years, you
9 worked as the great defender of the drug Vioxx in
10 public affairs, didn't you?
11        MR. PATRYK: Object to form. You may
12 respond.
13        THE WITNESS: I worked on Vioxx for a
14 number of years, yes. I don't know that it was
15 five.

Date: 01/27/2006

*BLAKE_~1.TXT: Page 61 Line 24 to Page 62 Line 5

Overruled

Speculation
π response
1. Witness testified principle
apply - see 58:23 - 59:2
2. Witness is Mgr. of Public
Affairs - can testify understand
of false + misleading promotion

Argumentative
π response
1. Attorney paraphrasing
from personnel file of
witness - see
70:8-19

Sustained
401 - 3

403

Assumes facts not
in evidence

π response
1. Allowed to ask
witness recollection of
information in her
personnel file.

24    Q.    Well, did you, when you went out on
25 maternity leave, when Vioxx was recalled from the
00062
1 market, actually write to executives and say, for
2 the last five years, I was a defender of Vioxx and
3 now I'm upset that it's being recalled?
4          Did you ever do that?
5    A.    I don't know.

Date: 01/27/2006

*BLAKE_~1.TXT: Page 63 Line 12 to Page 64 Line 2

12    Q.    Your mission, yes or no, that you
13 were to accomplish was to minimize the attention
14 given to heart attack issues as it related to Vioxx?
15          MR. PATRYK:  Note my objection to the
16 form.  You may respond.
17          THE WITNESS:  I apologize, I wouldn't
18 characterize that as my mission.
19 BY MR. PLACITELLA:
20    Q.    One of your jobs was to convince the
21 world that there was no reason to believe that Vioxx
22 caused heart attacks, true?
23    A.    Based on Merck Research Labs'
24 assessment, because, you know, they're the ones who
25 know the data and understand the data.  That was my
00064
1 job to communicate that to the news media, my
2 interactions, but it was based on their assessment.

Date:  01/27/2006

*BLAKE_~1.TXT: Page 64 Line 24 to Page 65 Line 2

it was your job to
25 tell the news media that there was no reason to
00065
1 believe that Vioxx caused heart attacks, can we
2 agree on that?

Date:  01/27/2006

*BLAKE_~1.TXT: Page 65 Line 24 to Page 66 Line 3

24    Q.    Can you answer that question?
25          MR. PATRYK:  Note my objection.  You
00066
1 may respond again.
2           THE WITNESS:  Yes.  With Merck
3 Research Labs.

Date: 01/27/2006

*BLAKE_~1.TXT: Page 67 Line 2 to Page 67 Line 6


2           MR. PLACITELLA:  Can we have this
3 marked P-2 or P-Blake-2, however you want it.
4           (Exhibit P-2, Merck Performance
5 Review Form, Mary Elizabeth Basaman, MRK-ACW0800000
6 thru MRK-ACW0800030, is marked for identification.)

Date: 01/27/2006

*BLAKE_~1.TXT: Page 67 Line 19 to Page 69 Line 7


19    Q.    If it was a drug company's
20 responsibility, Merck, to tell the public what they
21 knew about Vioxx causing heart attacks, your
22 responsibility was the exact opposite, to convince
23 the public that Vioxx does not cause heart attacks,
24 right?
25          MR. PATRYK:  Same objection.  You may
00068
1 respond.
2           THE WITNESS:  My responsibility was
3 to interact with the news media, which throughout
4 most of 2000 was a lot of discussion about the
5 cardiovascular findings in the VIGOR trial.
6 BY MR. PLACITELLA:
7     Q.    You keep saying the news media, but
8 your whole point was to get the information that you
9 wanted out to the public, you didn't do it just so
10 the news media was going to take it home and put it
11 on a shelf, right?
12          MR. PATRYK:  Objection.  You may
13 respond.

14          THE WITNESS:  As a public affairs
15 person, I mean, the news media is who I interact
16 with.  I don't interact with the general public.
17 So, I mean, that's -- that's where interactions
18 were.  Yes, they communicate to the broader public,
19 but they are the ones who have complete control over
20 what it is that they report.  It's my job to convey
21 to them Merck's perspective.
22 BY MR. PLACITELLA:
23          Q.    Right.  And that's my point.  But
24 your hope was that in communicating to the news
25 media, they would communicate your message, in turn,
00069
1 to the public, true?
2          A.    Yes.
3          Q.    Okay.  Now, I want to show you P-2.
4 This is your performance review form?
5          A.    Um-hmm.
6          Q.    Do you recognize this?
7          A.    Yes.

Date:  01/27/2006

*BLAKE_~1.TXT: Page 69 Line 19 to Page 69 Line 22

19          Q.    Here it says that for the year 2000,
20 your accomplishments concerning the VIGOR study were
21 -- included minimizing the attention to heart attack
22 issues, correct?

Date:  01/27/2006

*BLAKE_~1.TXT: Page 70 Line 8 to Page 70 Line 19

8          Q.    See where it says, "Accomplishments
9 include" and then underneath it, it says "VIGOR"?
10 Do you see where it says "VIGOR"?
11          A.    Yes.  I'm sorry, that was the
12 paragraph I was reading.
13          Q.    Okay.  And part of your
14 accomplishment, which meant your mission, right, was
15 to minimize the attention to heart attack issues,
16 correct?
17          A.    Well, it does include that language,

18 yes, but this is done at the end of the year, not at
19 the beginning of the year.

Date: 01/27/2006

*BLAKE_~1.TXT: Page 72 Line 1 to Page 73 Line 9

1      Q.     Okay.  And every time they asked you
2 a question, your job was to tell them no, Vioxx does
3 not cause heart attacks, and we have the proof,
4 right?
5      A.     Based on Merck Research Labs'
6 assessment.
7      Q.     Correct?
8      A.     That was Merck Research Labs'
9 assessment, yes.
10     Q.     So -- and do you track, by the way,
11 for the first year the number of media impressions
12 where the Merck message got out?
13          MR. PATRYK:  Object to form.  You may
14 respond.
15          THE WITNESS:  It's hard to track.  We
16 do sometimes try and track that type.  Certainly for
17 the year 2000, for Vioxx, that would have been very
18 hard because there was so much coverage of the VIGOR
19 study.
20 BY MR. PLACITELLA:
21     Q.     You had never heard that there were
22 at least a million -- a billion media impressions
23 related to Vioxx with Merck's message in the year
24 2000?
25          MR. PATRYK:  Object to form.
00073
1          THE WITNESS:  Well, actually, it
2 wouldn't -- most of the media coverage in 2000 was
3 around cardiovascular findings from VIGOR, if I
4 remember correctly.  That's certainly what it felt
5 like.
6 BY MR. PLACITELLA:
7      Q.     A billion impressions, had you ever
8 heard that?
9      A.     I've heard that before, yes.

Date: 01/27/2006

\*BLAKE_~1.TXT: Page 74 Line 2 to Page 74 Line 5

2    Q.    In fact, it was the Merck message for
3 the billion media impressions, whenever asked, that
4 Vioxx does not cause heart attacks, correct?
5    A.    That was Merck Research Labs, yes.

Date: 01/27/2006

π objections to Merck Counters

**Defendant's Counter Deposition Designations**

[43:23] - [44:13]        11/29/2005  Blake, Mary (MDL)

page 43
23          Q.        The -- you understood that the
24    messages that you were delivering were ultimately
25    intended for the public to see, correct?
page 44
1           A.        Well -- I apologize, it's hard to
2     answer the question that way just because, I mean,
3     the materials that we create go to the news media,
4     who then are responsible for the stories that they
5     write, and they have other sources besides Merck.
6              So it would be exceedingly rare for a
7     news release just to go -- to be seen by the general
8     public.  It goes to the news media, who then writes
9     their stories.  So, but, yes, ultimately they go to
10    the public --
11          Q.        All right.  I'll --
12          A.        The story is seen by the public, but
13    the news release is not necessarily.

[46:23] - [47:2]        11/29/2005  Blake, Mary (MDL)

page 46
23          Q.        Okay.
24          A.        But, ultimately -- I just do want to
25    clarify that -- you know, as part of the
page 47
1     medical/legal board review process, I mean, that's
2     where those decisions get made.

[48:13] - [48:15]        11/29/2005  Blake, Mary (MDL)

page 48
13          Q.        Okay.
14          A.        I was not a sign-off on any
15    materials.

[48:18] - [49:2]        11/29/2005  Blake, Mary (MDL)

page 48
18              You were generally aware of what the
19    FDA rules were concerning labeling and public
20    affairs materials, correct?
21          A.        Generally.  But, again, I'm not a
22    lawyer or doctor.
23          Q.        But that was part of your job to
24    know, correct?
25          A.        It was part of my job to be familiar
page 49
1     with, but I would not call myself an expert in any
2     way.

[56:14] - [56:15]        11/29/2005  Blake, Mary (MDL)

page 56
14          Q.        Anything that you sent out was a
15    promotional claim under the FDA regulation, correct?

[56:21] - [56:24]        11/29/2005  Blake, Mary (MDL)

page 56
21              THE WITNESS:  Okay.  Recognizing that
22    I'm not an expert on the regulation, I don't know
23    that everything that public affairs would create
24    would be considered to be promotional.

[62:17] - [62:19]        11/29/2005  Blake, Mary (MDL)

page 62
17              One of your missions as it related to

Defendant's Counter Deposition Designations

18   the drug Vioxx was to minimize the attention given
19   to heart attack issues, correct?

[62:22] - [63:7]        11/29/2005  Blake, Mary (MDL)

page 62
22                    THE WITNESS:  One of my
23   responsibilities as the -- one of the public affairs
24   people responsible for Vioxx was once the VIGOR
25   results came out and the media reported again and
page 63
1    again on the cardiovascular findings of VIGOR was to
2    -- there was so much coverage on the cardiovascular
3    findings, to bring that essentially back into
4    balance, because that's what they reported on all
5    the time, and MRL, based on their analysis, didn't
6    believe that to be the case.  It was my job to talk
7    about that to the news media.

[65:5] - [65:12]        11/29/2005  Blake, Mary (MDL)

*NON-responsive*
*Witness answered*
*question seen*
*at 64:25 -*

page 65
5                    THE WITNESS:  It was -- well, I mean,
6    it's important to keep in mind that the news media
7    are a highly independent body, and it was my job to
8    convey to them Merck's perspective.  Sometimes I did
9    that directly, sometimes we had people from Merck
10   Research Labs who did that, and ultimately reporters
11   put together a complete story based on our
12   perspective as well as others.  And that included --

[70:21] - [71:6]        11/29/2005  Blake, Mary (MDL)

*65:12 when*
*re-read to*
*her at 65:19*
*Transcript*
*attached for*
*Court, Witness*
*answers without*
*speech at 65: 5-12.*

page 70
21        A.       So when -- well, when you talk about
22   mission, that implies that it started at the
23   beginning of the year.  And this was written at the
24   end of 2000, after almost all of the media coverage
25   was around the cardiovascular findings from the
page 71
1    VIGOR trial.
2                    So it was my job to include Merck's
3    perspective in those stories based on what Merck
4    Research Labs said, bringing it from the point of
5    overemphasis.  So I think where it talks about
6    balanced coverage, I mean, that was really the goal.



△: witness is directly answering question.
Lawyer was attempting to intimidate
witness by asking question again when
he did not like her answer.

Confidential - Subject to Protective Order

Page 62

1 market, actually write to executives and say, for
2 the last five years, I was a defender of Vioxx and
3 now I'm upset that it's being recalled?
4         Did you ever do that?
5     A.    I don't know.
6     Q.    The mission that you were given to
7 accomplish as it related to Vioxx was to minimize
8 the attention given to heart attack issues, correct?
9         MR. PATRYK: Object to form.
10 BY MR. PLACITELLA:
11    Q.    That was one of your missions to
12 accomplish?
13         MR. PATRYK: Same objection. You may
14 answer.
15 BY MR. PLACITELLA:
16    Q.    Let me restate the question.
17        One of your missions as it related to
18 the drug Vioxx was to minimize the attention given
19 to heart attack issues, correct?
20        MR. PATRYK: Same objection. You may
21 respond.
22        THE WITNESS: One of my
23 responsibilities as the -- one of the public affairs
24 people responsible for Vioxx was once the VIGOR
25 results came out and the media reported again and

Page 63

1 again on the cardiovascular findings of VIGOR was to
2 -- there was so much coverage on the cardiovascular
3 findings, to bring that essentially back into
4 balance, because that's what they reported on all
5 the time, and MRL, based on their analysis, didn't
6 believe that to be the case. It was my job to talk
7 about that to the news media.
8         MR. PLACITELLA: All right. I'll
9 move to strike the answer.
10        THE WITNESS: Okay.
11 BY MR. PLACITELLA:
12    Q.    Your mission, yes or no, that you
13 were to accomplish was to minimize the attention
14 given to heart attack issues as it related to Vioxx?
15        MR. PATRYK: Note my objection to the
16 form. You may respond.
17        THE WITNESS: I apologize, I wouldn't
18 characterize that as my mission.
19 BY MR. PLACITELLA:
20    Q.    One of your jobs was to convince the
21 world that there was no reason to believe that Vioxx
22 caused heart attacks, true?
23    A.    Based on Merck Research Labs'
24 assessment, because, you know, they're the ones who
25 know the data and understand the data. That was my

Page 64

1 job to communicate that to the news media, my
2 interactions, but it was based on their assessment.
3     Q.    All right. So the answer to my
4 question is, then, one of your missions was to
5 convince the world there was no reason to believe
6 that Vioxx caused heart attacks, that was your job,
7 part of your job, right?
8         MR. PATRYK: Objection. You may
9 respond.
10        THE WITNESS: It was part of my job
11 to convey MRL's perspective on the data, yes, and
12 that was their perspective.
13 BY MR. PLACITELLA:
14    Q.    Okay. So, just so it's clear, it was
15 part of your job to convince the world there was no
16 reason to believe that Vioxx caused heart attacks?
17        MR. PATRYK: Objection. You may
18 respond.
19        THE WITNESS: It was my job to
20 interact with the news media.
21 BY MR. PLACITELLA:
22    Q.    And tell them --
23    A.    Not the world.
24    Q.    To convince -- it was your job to
25 tell the news media that there was no reason to

Page 65

1 believe that Vioxx caused heart attacks, can we
2 agree on that?
3         MR. PATRYK: Objection. You may
4 respond.
5         THE WITNESS: It was -- well, I mean,
6 it's important to keep in mind that the news media
7 are a highly independent body, and it was my job to
8 convey to them Merck's perspective. Sometimes I did
9 that directly, sometimes we had people from Merck
10 Research Labs who did that, and ultimately reporters
11 put together a complete story based on our
12 perspective as well as others. And that included --
13 BY MR. PLACITELLA:
14    Q.    Well --
15    A.    But one of the things that Merck
16 Research Labs did believe was that Vioxx did not
17 increase cardiovascular risks, so it's one of the
18 things we communicated.
19        MR. PLACITELLA: Could you read my
20 question back, please?
21        (Pertinent portion of the record is
22 read.)
23 BY MR. PLACITELLA:
24    Q.    Can you answer that question?
25        MR. PATRYK: Note my objection. You

17 (Pages 62 to 65)

GOLKOW LITIGATION TECHNOLOGIES

7ffe10cd-7a9d-486a-8ad6-eef3f42f3317

MEB 1

EXHIBIT
P-1
DENISE BACH // b9/05



# Drug Regulations: The Essentials

Medical Background

MERCK

Resource Document
Printed Material

NOT TO BE USED IN DETAILING.

PI.1471

Confidential - Subject To Protective Order

MRK-NJ0092058

# Table of Contents

Foreword . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3
   Purpose. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3
   Federal Agencies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4
      Department of Health and Human Services (DHHS)  . . . . . . . . . .   4
         *Food and Drug Administration (FDA)* . . . . . . . . . . . . . . . . . .   5
         *Other DHHS Agencies* . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8
   Key Points. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10
   Self-Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

The Process of Developing Regulations  . . . . . . . . . . . . . . . . . . . . . .   13
   Due Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13
   Legislation and Regulation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13
   Code of Federal Regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14
   Freedom of Information Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15
   Key Points. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16
   Self-Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

FDA Regulation of Drug Product Development . . . . . . . . . . . . . . . . . .   19
   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19
   Preclinical Evaluation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19
   Manufacturing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20
   Clinical Use of an Investigational New Drug (IND) . . . . . . . . . . . . .   21
      Purpose of an IND Application . . . . . . . . . . . . . . . . . . . . . . . .   21
      Process of Obtaining an IND  . . . . . . . . . . . . . . . . . . . . . . . . .   21
   Protocol Development . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22
   Phases of Clinical Development. . . . . . . . . . . . . . . . . . . . . . . . . . . .   23
   Informed Consent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25
      Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25
      Elements of Informed Consent . . . . . . . . . . . . . . . . . . . . . . . .   26
   Institutional Review Board. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26
   New Drug Application (NDA) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27
   Key Points. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29
   Self-Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32

i

Confidential - Subject To Protective Order

MRK-NJ0092059

*Table of Contents*

**FDA Regulation of Labeling and Advertising** . . . . . . . . . . . . . . . . . . . . . . . **35**

    Labeling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

        Terminology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

        Definition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

        Information Required in Labeling . . . . . . . . . . . . . . . . . . . . . . . . 36

    Other Labeling Formats . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

        Brief Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

        Patient Prescribing Information . . . . . . . . . . . . . . . . . . . . . . . . 42

        Patient Brief Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

    Advertising and Promotion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

        General Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

        Labeling as the Basis for Advertising and Promotion . . . . . . . . . . 43

        General Principles of Promotion . . . . . . . . . . . . . . . . . . . . . . . . 44

    Key Points . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

    Self-Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

**Post-Approval Responsibilities** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **49**

    General Reporting Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

        Field Alert Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

        Annual Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

        Advertising and Promotional Labeling . . . . . . . . . . . . . . . . . . . 51

    Adverse Experience Reporting Requirements . . . . . . . . . . . . . . . . . . . 51

        Rationale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

        Definition of Adverse Events . . . . . . . . . . . . . . . . . . . . . . . . . . 51

        Reporting System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

        Reporting Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

        MED WATCH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

        Responsibilities of the Professional Representative . . . . . . . . . . . . 54

    Current Good Manufacturing Practice Reporting Requirements . . . . . . . 54

    Key Points . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

    Self-Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

**Summary** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **59**

**Self-Assessment Answers** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **65**

ii

MRK-NJ0092060

# List of Appendices, Figures, and Tables

## Appendices

Appendix I.     Titles of the US Code of Federal Regulations . . . . . . . . . . 61

Appendix II.    Abbreviations of Institutions and Organizations,
                and Available Web Site Addresses . . . . . . . . . . . . . . . . . . 62

## Figures

Figure 1.     Department of Health and Human Services
              (selected agencies) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

Figure 2.     Food and Drug Administration
              (selected activities) . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

Figure 3.     Center for Drug Evaluation and Research
              (selected activities) . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

## Tables

Table 1.     Title 21 Sections of the Code of Federal Regulations
             Applicable to Drugs . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Table 2.     Reviewing Divisions in CDER . . . . . . . . . . . . . . . . . . . . 22

Table 3.     Characteristics of Clinical Phases of Drug Product
             Development . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

iii

iv

Confidential - Subject To Protective Order

MRK-NJ0092062



# Foreword

This medical background has incorporated important features intended to enhance its usefulness as a learning guide. These features include:

- **Key Points** located at the end of each section that highlight essential points
- **Self-Assessment** questions at the end of each section
- **Appendices** listing Titles of the the US Code of Federal Regulations, and abbreviations/acronyms of institutions, organizations, and other pertinent information used throughout the medical background
- **Web Site Addresses** should the reader wish to explore other areas associated with a particular topic

It is hoped that the reader will find these features useful when reading through the material for the first time as well as for future reference.

In addition to this print publication, an **Electronic Version** is available from the Medical Services Home Page* educational materials library for internal users and from FSNet for field sales. This version also features the following:

- links to pertinent Web sites (not available in the FSNet version)
- links that guide the user from section to section as well as accessing cross-references
- a screen friendly format in which each page is readable without scrolling

* Medical Services Home Page  http://medserv.merck.com

Confidential - Subject To Protective Order

MRK-NJ0092063

2

Confidential - Subject To Protective Order

MRK-NJ0092064



## Purpose

This module introduces the reader to the federal agencies that affect virtually every aspect of drug development, marketing, promotion, and use. It is important for everyone concerned with the business of pharmaceutical drug products to understand that federal statutes and regulations play key roles in forming the regulatory environment:

- they provide direction and guidance to the pharmaceutical industry and clinical investigators in the step-wise clinical development of drug candidates
- they describe the content of the consent form for human subjects and the role of the Institutional Review Board in supervising clinical studies
- they specify in detail the content of the product insert that serves as the primary basis for promotion and advertising
- they direct the means for continued routine and special reporting of all activities related to marketing, including reports on adverse experiences
- they establish committees that advise the federal government on the approvability of new drugs
- they describe the rules for developing new regulations and policies

The federal organizations discussed in this chapter are the Department of Health and Human Services and its key agencies including the Food and Drug Administration (FDA).

3

Confidential - Subject To Protective Order

MRK-NJ0092065