# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA
2006 FEB -7  AM 10: 04
LORETTA G. WHYTE
CLERK

|   |   |
|---|---|
| : | **MDL NO. 1657** |
| : | |
| : | **SECTION:  L** |
| : | |
| : | **JUDGE FALLON** |
| : | **MAG. JUDGE KNOWLES** |

IN RE: VIOXX

   PRODUCTS LIABILITY LITIGATION

.. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. :

**THIS DOCUMENT RELATES TO**
   *Plunkett v. Merck & Co., Inc.*, 05-4046

## ORDER

The Plaintiff sought to introduce at trial portions of a depositions taken of David Anstice. In response, the Defendant sought to offer counter-designations and affirmative designations of the same deposition testimony.  The Plaintiff, however, made several objections to the proffered deposition testimony.  The Court ruled on these objections.  The Court's rulings are noted on the attached deposition testimony, which has been entered into the record.

New Orleans, Louisiana, this ___6th___ day of ___February___, 2006.

UNITED STATES DISTRICT JUDGE

Fee_____
Process_____
X  /Dktd_____
CtRmDep_____
Doc. No _____

-1-

*// objections — None*

Anstice – Merck Counter-Designations


[1474:5] - [1475:11] 5/20/2005 Anstice, David  v.05 - (Ernst and NJ)

* Defendant Deposition Designations

page 1474
5                  And if they were asked questions
6   about VIGOR, they couldn't answer them, but they had
7   to refer -- they had to get in touch with the
8   company, that would send out a letter to doctors?
9         A.        What I testified to is that
10  immediately after the release of the VIGOR results,
11  they were equipped in the field with the physician
12  information request, which they could provide to the
13  physician at that time, which talked about the VIGOR
14  results.  And that was in response to a request.
15                  And then there's a routine procedure,
16  if the physician wanted more information about
17  VIGOR, it wanted the patient inclusion, exclusion
18  criteria, the dosage, all of those details, then the
19  representatives who understand this very well could
20  submit that question, an unsolicited question, but
21  could submit that question back to our medical
22  group, who would, in turn, respond to that
23  physician.
24        Q.        When you say, "the representatives
25  who understand this very well," what's the "this"?
page 1475
1         A.        The "this" is the fact that if a
2   physician asks a question which is outside the
3   domain or outside the scope of the label, then the
4   representative is not trained or equipped and is
5   asked not to discuss it, but, rather, to send the
6   question into the company so that a medical, the
7   appropriate medical person can respond to the
8   physician's request.
9         Q.        Do you do that with all your drugs?
10  Do you not train sales representatives to answer
11  questions about the risks of the drug?


[1475:13] - [1475:21] 5/20/2005 Anstice, David  v.05 - (Ernst and NJ)

* Defendant Deposition Designations

page 1475
13                  THE WITNESS:  That's not what I said.
14  Our representatives are trained extensively on the
15  benefits and risks of our drugs, and they do answer
16  questions responsively when they are asked.  If the
17  question, though, relates to data which is outside
18  the prescribing information approved at that time,
19  then our representatives are trained and understand
20  their obligation is to come back to the company and

21  ask for a physician information request.


[1475:23] - [1476:12] 5/20/2005 Anstice, David  v.05 - (Ernst and NJ)

* Defendant Deposition Designations

page 1475
23          Q.          And one of the other things you did
24  in addition to not allowing your sales reps to
25  initiate a discussion about VIGOR is they were
page 1476
1  trained that when they were asked questions about
2  the risks, that they were to redirect the doctor
3  back to the efficacy message?  Isn't that true?
4          A.          No, I don't believe that's true.  I
5  believe that they were trained, if they were asked
6  questions about VIGOR, to handle it in the way I
7  described.  If they were asked a broader question
8  about cardiovascular safety, they were at different
9  points in time provided with different materials.
10  And then after they had responded adequately
11  appropriately to the physician's question, then to
12  return to discussing the benefits of Vioxx.


[1478:17] - [1479:11] 5/20/2005 Anstice, David  v.05 - (Ernst and NJ)

* Defendant Deposition Designations

page 1478
17                    And the sales representatives were
18  trained when they are speaking to doctors and
19  doctors had questions about Vioxx to refer to that
20  cardiovascular card for the answers; correct?
21          A.          This is what I'm aware of.  I'm aware
22  that they were asked not to initiate discussions
23  around the VIGOR study.  If there were questions on
24  the VIGOR study, then they could provide a
25  professional information request.  If the doctor
page 1479
1  already had familiarity with the VIGOR results,
2  which many did because this was in their public
3  domain, and had specific concerns about
4  cardiovascular issues and asked broader questions
5  beyond VIGOR, then the so-called cardiovascular card
6  was provided to our representatives to provide the
7  other data beyond the VIGOR data at that time which
8  related to cardiovascular safety for Vioxx.
9          Q.          Mr. Anstice, let me stop you --
10          A.          They were asked to discuss that with
11  the doctor and be responsive.

*π objections to Merck's Affirmative*

*Δ responses to π's objections*

ANSTICE_DAVID_DEFENSE_AFFIRMATIVES

## ANSTICE_DAVID_DEFENSE_AFFIRMATIVES

*403*

*Cumulative*

← *willing to*
*remove lines 2-4*
← *rest is not*
*Cumulative*

| Scene | Designation | Source | Tx Duration | Elapsed | Remains |
|-------|-------------|--------|-------------|---------|---------|
| 1 | 1043:2 -1043:14 | Anstice, David 2005-04-12 | 00:00:29 | 00:00:00 | 00:23:43 |
| | | 1043: 2    Q: Good morning, Mr Anstice. Would you | | | |
| | | 1043: 3    please introduce yourself to the jury? | | | |
| | | 1043: 4    A: My name is David Westbrook Anstice. | | | |
| | | 1043: 5    Q: Mr. Anstice, how are you currently | | | |
| | | 1043: 6    employed? | | | |
| | | 1043: 7    A: I'm employed by Merck as president | | | |
| | | 1043: 8    for human health | | | |
| | | 1043: 9    Q: How long have you had that position? | | | |
| | | 1043: 10   A: Two years and three or four months | | | |
| | | 1043: 11   Q: Mr. Anstice, does the title | | | |
| | | 1043: 12   'president' mean that you're the head of the entire | | | |
| | | 1043: 13   company? | | | |
| | | 1043: 14   A: No. it does not | | | |
| 2 | 1043:22 -1044:3 | Anstice, David 2005-04-12 | 00:00:21 | 00:00:29 | 00:23:14 |
| | | 1043: 22   Q: What does the term 'human health' in | | | |
| | | 1043: 23   your title refer to? | | | |
| | | 1043: 24   A: This refers to -- my responsibility | | | |
| | | 1043: 25   today is for sales and marketing activities in a | | | |
| | | 1044: 1    number of countries around the world. Specifically | | | |
| | | 1044: 2    those countries are Canada, Latin America, Japan. | | | |
| | | 1044: 3    Australia and New Zealand. | | | |
| 3 | 1044:8 -1044:16 | Anstice, David 2005-04-12 | 00:00:25 | 00:00:50 | 00:22:53 |
| | | 1044: 8    Q: Can you tell us what the | | | |
| | | 1044: 9    significance. if any. is of the term 'human health'? | | | |
| | | 1044: 10   A: Human health is a term we use in our | | | |
| | | 1044: 11   company to cover the -- to describe the business of | | | |
| | | 1044: 12   our prescription medicine business as distinct from | | | |
| | | 1044: 13   vaccines or animal health products and, therefore. I | | | |
| | | 1044: 14   am responsible for all of the prescription medicines | | | |
| | | 1044: 15   sold by Merck. again, in the countries that I just | | | |
| | | 1044: 16   described | | | |
| 4 | 1045:17 -1045:19 | Anstice, David 2005-04-12 | 00:00:08 | 00:01:15 | 00:22:28 |
| | | 1045: 17   Q: Does the human health division at | | | |
| | | 1045: 18   Merck deal with anything other than the sales and | | | |
| | | 1045: 19   marketing side of Merck? | | | |
| 5 | 1045:22 -1047:6 | Anstice, David 2005-04-12 | 00:01:36 | 00:01:23 | 00:22:20 |
| | | 1045: 22   THE WITNESS: No  We are the | | | |
| | | 1045: 23   commercial arm for Merck | | | |
| | | 1045: 24   BY MR  RABER:  : | | | |
| | | 1045: 25   Q: Is there a division at Merck that's | | | |

ANSTICE_DAVID_DEFENSE_AFFIRMATIVES

| | |
|---|---|
| 1046: 1 | responsible for medical, scientific and research |
| 1046: 2 | part of Merck's business? |
| 1046: 3 | A: Yes. there is |
| 1046: 4 | Q: What's the name of that division? |
| 1046: 5 | A: That division is called Merck |
| 1046: 6 | Research Laboratories |
| 1046: 7 | Q: Are you a part of that division? |
| 1046: 8 | A: No, I am not |
| 1046: 9 | Q: Who's the president of that division? |
| 1046: 10 | A: Today the president of that division |
| 1046: 11 | is Dr Peter S. Kim |
| 1046: 12 | Q: Who was president of that division |
| 1046: 13 | during the development of Vioxx? |
| 1046: 14 | A: During the development of Vioxx, Dr |
| 1046: 15 | Edward Scolnick was president of that division |
| 1046: 16 | Q: What kind of training did Dr. Kim and |
| 1046: 17 | Dr. Scolnick have? |
| 1046: 18 | A: Dr. Kim is a Ph.D. in medical |
| 1046: 19 | science, and Dr. Scolnick is a medical physician, |
| 1046: 20 | but also with extensive scientific training |
| 1046: 21 | Q: In general terms, what kinds of |
| 1046: 22 | backgrounds did the people have that work in the |
| 1046: 23 | Merck Research Labs division? |
| 1046: 24 | A: Certainly at the senior levels, the |
| 1046: 25 | people. physicians, in some cases physicians also |
| 1047: 1 | with doctorates in medical sciences, in other cases |
| 1047: 2 | they have Ph D s or other senior degrees in medical |
| 1047: 3 | research fields quite broadly |
| 1047: 4 | Q: Do those people in the Merck Research |
| 1047: 5 | Labs division report to you? |
| 1047: 6 | A: No, they do not |

| 6 | 1058:1 -1059:23 | Anstice, David 2005-04-12 | 00:02:39 | 00:02:59 | 00:20:44 |
|---|---|---|---|---|---|

| | |
|---|---|
| 1058: 1 | Q: Are there rules and regulations that |
| 1058: 2 | control your marketing and sales of drugs in the |
| 1058: 3 | United States? |
| 1058: 4 | A: Yes. There are very important rules |
| 1058: 5 | and regulations |
| 1058: 6 | Q: Who oversees those rules and |
| 1058: 7 | regulations in the United States? |
| 1058: 8 | A: For prescription medicines, the Food |
| 1058: 9 | & Drug Administration oversees it, but specifically |
| 1058: 10 | through a group that's responsible for drug |
| 1058: 11 | advertising. |
| 1058: 12 | Q: Mr Anstice, can you please describe |
| 1058: 13 | for us in general terms what the marketing group |

ANSTICE_DAVID_DEFENSE_AFFIRMATIVES

1058: 14    does at Merck?
1058: 15    A:  In general terms, the marketing group
1058: 16    works with all of our products collaboratively with
1058: 17    the research group in the formative period of
1058: 18    development of the product, and as we approach
1058: 19    introduction of the product, then we begin to
1058: 20    formally develop the plans for our marketing efforts
1058: 21    for our salespeople  We're responsible for forming
1058: 22    a budget, directing activities related to all of the
1058: 23    activities that we deem appropriate to support the
1058: 24    marketing and selling  That is, the work, really,
1058: 25    of our people
1059: 1    We're actually charged with creating
1059: 2    awareness of the product that's insufficient. We
1059: 3    are then charged with creating understanding. that
1059: 4    is, physicians need to understand the benefits and
1059: 5    the risks
1059: 6    And, finally. we're charged with
1059: 7    encouraging physicians to trial and use the product
1059: 8    in appropriate patients.
1059: 9    Q:  Mr Anstice. what role, if any, does
1059: 10    the marketing group play in deciding what types of
1059: 11    studies should be done for a drug at Merck?
1059: 12    A:  I think the marketing group plays an
1059: 13    important role in providing ideas for studies  At
1059: 14    the end of the day, the research group has the final
1059: 15    say along with the regulators. but because the
1059: 16    marketing group is talking to physicians and to
1059: 17    payors, we're constantly aware. therefore. of gaps
1059: 18    or information that would be valuable to physicians
1059: 19    and payors  And, therefore, marketing constantly is
1059: 20    presenting ideas to our research colleagues, many of
1059: 21    which they may have already heard of and understood,
1059: 22    but the marketing people are constantly engaged in
1059: 23    that type of activity

| 7 | 1060:10-1061:2 | Anstice, David 2005-04-12 | 00:01:03 | 00:05:38 | 00:16:05 |

1060: 10    Q:  Let's talk, if we can. about the
1060: 11    different types of marketing materials that Merck
1060: 12    uses. and let's start at the beginning  What are
1060: 13    the very first marketing materials that Merck uses
1060: 14    with a new drug?
1060: 15    A:  The first materials are often called
1060: 16    launch materials, and perhaps the two most important
1060: 17    materials there are the detail aid or a promotional
1060: 18    brochure that we make available to our sales

1060: 19   representatives, which typically begins with the
1060: 20   label for the product, and then proceeds to a more
1060: 21   colorful brochure. The other primary vehicle is a
1060: 22   journal ad. what's called a journal ad. which is
1060: 23   then placed in appropriate relevant medical journals
1060: 24   for the particular disease that the product -- or
1060: 25   diseases that the product treats.
1061: 1   Q: Are these launch materials shared
1061: 2   with the FDA before they're made public?

| 8 | 1061:4 -1061:10 | Anstice, David 2005-04-12 | 00:00:22 | 00:06:41 | 00:17:02 |
|---|---|---|---|---|---|

1061: 4   THE WITNESS: The FDA often requests
1061: 5   in its approval that materials. these launch
1061: 6   materials are presented to them. Even if they
1061: 7   don't, the Merck practice is that we submit for FDA
1061: 8   review all of the materials related to the launch of
1061: 9   our products. That's been a longstanding practice
1061: 10   at Merck.

| 9 | 1061:12 -1061:13 | Anstice, David 2005-04-12 | 00:00:07 | 00:07:03 | 00:16:40 |
|---|---|---|---|---|---|

1061: 12   Q: What is the particular division
1061: 13   within FDA to whom these materials are submitted?

| 10 | 1061:16 -1061:22 | Anstice, David 2005-04-12 | 00:00:22 | 00:07:10 | 00:16:33 |
|---|---|---|---|---|---|

1061: 16   THE WITNESS: The division that we
1061: 17   submit the materials to is known by the name DDMAC,
1061: 18   which is drug. marketing. advertising group
1061: 19   BY MR RABER: :
1061: 20   Q: Do the FDA rules and regulations
1061: 21   require that these launch materials be submitted to
1061: 22   the FDA before they're publicly used?

| 11 | 1061:24 -1062:6 | Anstice, David 2005-04-12 | 00:00:20 | 00:07:32 | 00:16:11 |
|---|---|---|---|---|---|

1061: 24   THE WITNESS: They don't require,
1061: 25   although sometimes the approval letters for our
1062: 1   products request that all launch materials be
1062: 2   provided to the FDA before being used in the
1062: 3   marketplace.
1062: 4   BY MR RABER: :
1062: 5   Q: Why does Merck make it a practice to
1062: 6   submit these materials to the FDA ahead of time?

| 12 | 1062:8 -1063:2 | Anstice, David 2005-04-12 | 00:01:10 | 00:07:52 | 00:15:51 |
|---|---|---|---|---|---|

1062: 8   THE WITNESS: 1 think a couple of
1062: 9   reasons that we do that. One is that the discussion
1062: 10   on the label occurs between the scientific drug
1062: 11   division and the company's regulatory people. which
1062: 12   describes the benefits and risks for the product,
1062: 13   but there needs to be an understanding with the drug

*Handwritten annotations:*

1) Lack of foundation 401
if for Vioxx 403
2) Merck redacts 404
everything not related
to Vioxx but asks
this all-encompassing question
for all drugs to infer "ethics" and
good character.

△ response: these questions are
responsive to questions regarding
submissions to the FDA

Printed: 11/29/2005  8:29:40PM

Page 4 of 11

ANSTICE_DAVID_DEFENSE_AFFIRMATIVES

1062: 14   advertising group as to how that language was
1062: 15   determined. because all language can be -- needs to
1062: 16   be interpreted  And at the launch of a product. we
1062: 17   think it's very important at Merck that we have not
1062: 18   only followed the letter of the label. but that we
1062: 19   are also fully in harmony with the FDA in terms of
1062: 20   the spirit of how they believe that the product
1062: 21   should be promoted  And the only way to really
1062: 22   validate or test that is by presubmitting the
1062: 23   materials to the FDA so that they can assess them as
1062: 24   being consistent with or in some cases they may
1062: 25   suggest modifications to how we've incorporated the
1063: 1   specifics out of the label into our promotional
1063: 2   materials.

---

13   1063:21 -1065:1   Anstice, David 2005-04-12         00:01:55   00:09:02   00:14:41

*Lack of Foundation*
*Hearsay*

*Merck redacts all*
*Non-Vioxx, but*
*wants to insert*
*404 evidence that*
*it submits "all"*
*material to FDA.*

*Δ: this is*
*response to*
*multiple questions*
*designated by*
*π regarding*
*submissions to*
*FDA*

1063: 21   Q:  Let's talk, if we can. about
1063: 22   marketing to physicians, if we can for a moment
1063: 23   Can you generally describe for us the review process
1063: 24   at Merck that occurs with materials that are sent to
1063: 25   physicians?
1064: 1   A:  Yes  We have a longstanding process
1064: 2   which we call medical/legal review  And that
1064: 3   process mandates within the company as a policy that
1064: 4   all materials written and broadcast that are going
1064: 5   to be reviewed with our customers, in this case,
1064: 6   physicians, that those materials go through a group
1064: 7   which has at least two physicians and one lawyer.
1064: 8   They review all of the materials for consistency and
1064: 9   balance with respect to our label. make any
1064: 10   appropriate adjustments, and they actually approve
1064: 11   the material for use  And only upon the approval of
1064: 12   that group, whatever the final form of material is,
1064: 13   can it be used with our customers
1064: 14   Q:  Does Merck share these physician
1064: 15   marketing materials with the FDA?
1064: 16   A:  The Merck practice is that upon our
1064: 17   internal approval and upon our sending the material
1064: 18   to whoever will be using it within the Merck system,
1064: 19   we then routinely automatically send a copy of that
1064: 20   material, whatever it is, to the FDA so that they
1064: 21   have a record of all of our promotional materials
1064: 22   Q:  Did Merck follow that particular
1064: 23   process that you've just described with respect to
1064: 24   Vioxx?
1064: 25   A:  Yes  Merck always follows that

ANSTICE_DAVID_DEFENSE_AFFIRMATIVES

1065: 1    process for all of our products

14    1067:9 -1069:10    Anstice, David 2005-04-12    00:03:13   00:10:57   00:12:46

1067: 9    Q:  Let's talk, if we can, about the
1067: 10   launch of Vioxx  Can you tell us when the FDA
1067: 11   approved Vioxx for marketing in the United States?
1067: 12   A:  Vioxx was approved for marketing in
1067: 13   the United States in May or June of 1999
1067: 14   Q:  What was your view about Vioxx as a
1067: 15   new drug at that time?
1067: 16   A:  I believed at that time, and I still
1067: 17   believe that Vioxx was a very exciting and important
1067: 18   new product that could provide benefit to millions
1067: 19   of patients suffering from pain in markets around
1067: 20   the world and certainly in the U.S
1067: 21   Q:  At the time of the launch, what had
1067: 22   Merck's studies showed about the potential for Vioxx
1067: 23   as a new drug?
1067: 24   A:  Merck's studies -- well, let me
1067: 25   describe that in two parts
1068: 1    Merck's studies that supported the
1068: 2    drug approval had shown across a large number of
1068: 3    patients that the product was extremely helpful in
1068: 4    relieving pain  Also, there were some studies,
1068: 5    they're called endoscopy studies, included in the
1068: 6    circular which helped physicians to understand that
1068: 7    the original promise, the reason, in fact, Vioxx was
1068: 8    developed and brought to the world in the first
1068: 9    place is, that it would be gentler on the stomach
1068: 10   Those studies versus Motrin, a commonly used agent,
1068: 11   showed that Vioxx was, in fact, gentler on the
1068: 12   stomach  So, the promise of Vioxx was that here was
1068: 13   another effective drug for relieving pain, but a
1068: 14   drug which may, in fact, offer benefits to patients
1068: 15   in terms of being more friendly to the stomach.
1068: 16   Q:  What were the nature of the stomach
1068: 17   problems that existed with traditional pain
1068: 18   relievers at that time?
1068: 19   A:  There was widespread knowledge that
1068: 20   all of the so-called traditional agents or all of
1068: 21   the pain relievers used at that time created in a
1068: 22   percentage of patients stomach problems, which went
1068: 23   from mild but through to more serious, which often
1068: 24   meant the patients could not take the medicine,
1068: 25   through to ulcers  There were -- at the serious end
1069: 1    of the spectrum, there were perforations, ulcers.

Handwritten margin notes:

△:
goes to whether Merck
employees thought Vioxx
was dangerous when
it went on market
401

Lack of Foundation
Buisness witness,
not clinical study
expert.
601
701

⊗: witness is
testifying from
personal
knowledge

ANSTICE_DAVID_DEFENSE_AFFIRMATIVES

| | |
|---|---|
| 1069: 2 | bleeds which could occur with the use of these |
| 1069: 3 | agents, and those could occur in patients of any |
| 1069: 4 | age, they could occur in patients that took the |
| 1069: 5 | product for a long time or even for a relatively |
| 1069: 6 | short duration. And so the promise of Vioxx was |
| 1069: 7 | that it might lessen the incidence of all of these |
| 1069: 8 | GI problems and that it might also, therefore, admit |
| 1069: 9 | more patients to be able to take an effective pain |
| 1069: 10 | reliever because these problems did not occur. |

15      1073:3 -1073:18      Anstice, David 2005-04-12          00:00:55   00:14:10   00:09:33

| | |
|---|---|
| 1073: 3 | Q: Let's go back, if we can, to the |
| 1073: 4 | formal launch of Vioxx. How did Merck launch the |
| 1073: 5 | product and when? |
| 1073: 6 | A: In the United States, we launched it |
| 1073: 7 | at a sales – two large sales meetings. We did that |
| 1073: 8 | in June of 1999, and that was somewhat typical of |
| 1073: 9 | the way that we introduced many of our large and |
| 1073: 10 | important products. |
| 1073: 11 | Q: Where did this launch event occur? |
| 1073: 12 | A: This particular event occurred in San |
| 1073: 13 | Francisco. |
| 1073: 14 | Q: Who attended the launch event? |
| 1073: 15 | A: The launch event was attended by all |
| 1073: 16 | of the sales representatives and others in the |
| 1073: 17 | organization who had primary responsibility for |
| 1073: 18 | Vioxx at that time. |

16      1073:23 -1074:11      Anstice, David 2005-04-12          00:00:50   00:15:05   00:08:38

| | |
|---|---|
| 1073: 23 | Q: How long did this launch event go on? |
| 1073: 24 | A: Each of the meetings lasted |
| 1073: 25 | approximately two-and-a-half days. Therefore, the |
| 1074: 1 | meeting – the two meetings lasted for a week. |
| 1074: 2 | Q: What kinds of subjects were discussed |
| 1074: 3 | and addressed at the meetings? |
| 1074: 4 | A: The meetings were a mix of |
| 1074: 5 | motivational, excitement-creating activities. Also, |
| 1074: 6 | there was extensive review of the product |
| 1074: 7 | information of the diseases for which Vioxx was |
| 1074: 8 | indicated, and also training of the representatives |
| 1074: 9 | in terms of their knowledge of Vioxx and the label |
| 1074: 10 | in all aspects, the benefits and the risks and all |
| 1074: 11 | of the details included in the label. |

17      1074:22 -1075:17      Anstice, David 2005-04-12          00:01:12   00:15:55   00:07:46

| | |
|---|---|
| 1074: 22 | Q: Mr. Anstice, did the sales |
| 1074: 23 | representatives who attended this event get any |

1074: 24 training beyond what they learned at the launch
1074: 25 event?
1075: 1 A: Yes. It's usual practice for us to
1075: 2 commence training for new products several months
1075: 3 prior to the product being approved
1075: 4 Representatives received extensive training, again.
1075: 5 around the diseases for which the product was
1075: 6 indicated, around the competitive agents that
1075: 7 physicians could choose, as well as our own product
1075: 8 After a launch meeting. our representatives
1075: 9 continually trained as changes to the circular
1075: 10 occur, but even independently of that, we constantly
1075: 11 update and ensure -- update our training and ensure
1075: 12 that our representatives are very familiar with all
1075: 13 of the information related to our product, and
1075: 14 they're also getting updates on competitive products
1075: 15 and changes in medicine which they need to be aware
1075: 16 of in terms of the disease conditions for which the
1075: 17 product is indicated

---

18 **1075:22-1076:23** Anstice, David 2005-04-12 00:01:37 00:17:07 00:06:36

1075: 22 Mr. Anstice. has the word 'obstacle'
1075: 23 ever been used at Merck in training sales
1075: 24 representatives?
1075: 25 A: Yes. it has In fact, in my
1076: 1 experience, it's a term that has been used for
1076: 2 decades in the Merck organization
1076: 3 Q: What does the term 'obstacle' mean in
1076: 4 that context?
1076: 5 A: The word 'obstacle' means a question,
1076: 6 or more specifically. a concern which, in fact, is
1076: 7 something which -- where a physician or a customer,
1076: 8 in fact, has a genuine either lack of knowledge or
1076: 9 wants more knowledge about a particular area or may,
1076: 10 in fact. have a set of opinions. which means that
1076: 11 they're not inclined to use your product
1076: 12 Q: Why is the term 'obstacle' used to
1076: 13 refer to those kinds of questions or concerns that a
1076: 14 doctor may have?
1076: 15 A: I think the reason that we use the
1076: 16 word 'obstacle' as opposed to 'question' is that it,
1076: 17 in fact, denotes that the physician requires more
1076: 18 information in order to perhaps use the product at
1076: 19 all or more information to use it more broadly, or,
1076: 20 in fact, it's something which is fundamental to --
1076: 21 until there is an answer, a satisfactory answer

| | | | |
|---|---|---|---|
| | 1076: 22 | provided to a question, then a physician is not | |
| | 1076: 23 | comfortable with the particular medicine | |

| 19 | 1077:2 -1077:25 | Anstice, David 2005-04-12 | 00:01:14  00:18:44  00:04:59 |

1077: 2    Q:  Are doctors' questions important to
1077: 3    sales representatives at Merck?
1077: 4    A:  I think that doctors' questions are
1077: 5    fundamentally important
1077: 6    Q:  Why is that?
1077: 7    A:  For the simple reason that it's very
1077: 8    important that you know what the issues, concerns,
1077: 9    questions are that your customers have  And it's
1077: 10    very important that you endeavor to your best extent
1077: 11    to answer those questions and to respond to them In
1077: 12    a helpful way
1077: 13    Q:  Mr. Anstice, did Merck train its
1077: 14    sales representatives to dodge questions or avoid
1077: 15    answering them when meeting with doctors?
1077: 16    A:  No. In my experience, Merck
1077: 17    encouraged representatives to listen for questions,
1077: 18    in fact. even probe to ask the doctor what concerns
1077: 19    they may have, because unless they identified what
1077: 20    the particular concerns or questions were that the
1077: 21    doctor had, then they couldn't adequately address
1077: 22    the issues the doctor may have  So, in fact, for a
1077: 23    salesperson, it was very important that they not
1077: 24    only respond to the questions, but that they, in
1077: 25    fact, draw them out from their customers

| 20 | 1081:8 -1082:3 | Anstice, David 2005-04-12 | 00:01:16  00:19:58  00:03:45 |

1081: 8    Q:  Mr Anstice, when Vioxx was launched,
1081: 9    there was another one of these COX-2 pain relievers
1081: 10    on the market called Celebrex; is that right?
1081: 11    A:  That's correct, yes
1081: 12    Q:  If Celebrex was already on the
1081: 13    market, why was Vioxx necessary?
1081: 14    A:  The development for Vioxx was started
1081: 15    many years ago, and we believed that there was
1081: 16    certainly room for more than one COX-2 agent. At
1081: 17    the time we were developing Vioxx, we could not be
1081: 18    certain what the final ultimate profile for Celebrex
1081: 19    would be. but we believed that Vioxx, for a variety
1081: 20    of reasons associated with our development. would be
1081: 21    an extremely effective pain reliever  We also
1081: 22    believed because of the COX-2 selectivity, its
1081: 23    preference for COX-2 inhibition, that it could also
1081: 24    provide substantial benefit in terms of GI safety

ANSTICE_DAVID_DEFENSE_AFFIRMATIVES

|  |  |  |
|---|---|---|
| 1081: 25 | And I think our belief has always been that patient |
| 1082: 1 | needs are best served if there's as broad a range of |
| 1082: 2 | choices as possible available to them for treatment |
| 1082: 3 | of important diseases |

| 21 | 1123:19 -1124:4 | Anstice, David 2005-04-12     00:00:38  00:21:14  00:02:29 |
|---|---|---|
| | 1123: 19 | Q:  Did Merck have a policy of |
| | 1123: 20 | intimidating doctors or scientists who were critical |
| | 1123: 21 | of Merck? |
| | 1123: 22 | A:  No  Merck has never had a policy to |
| | 1123: 23 | intimidate doctors |
| | 1123: 24 | Q:  If you were to learn of allegations |
| | 1123: 25 | that doctors and scientists were being intimidated |
| | 1124: 1 | by people at Merck, how would you respond to that? |
| | 1124: 2 | A:  Very promptly  And I think very |
| | 1124: 3 | strongly to if -- to find out if it was happening |
| | 1124: 4 | and to stop it |

| 22 | 1171:9 -1171:19 | Anstice, David 2005-04-12     00:00:31  00:21:52  00:01:51 |
|---|---|---|
| | 1171: 9 | Did the FDA require Merck to take |
| | 1171: 10 | Vioxx off the market? |
| | 1171: 11 | A:  No  That was -- Merck took the |
| | 1171: 12 | decision that we should voluntarily withdraw Vioxx |
| | 1171: 13 | after we became aware of the APPROVe results from |
| | 1171: 14 | their data set from the data monitoring group |
| | 1171: 15 | responsible for that study, and we advised the FDA |
| | 1171: 16 | and other regulators that we were taking that action |
| | 1171: 17 | voluntarily |
| | 1171: 18 | Q:  Why did Merck decide to withdraw |
| | 1171: 19 | Vioxx from the market? |

| 23 | 1171:21 -1172:22 | Anstice, David 2005-04-12     00:01:19  00:22:23  00:01:20 |
|---|---|---|
| | 1171: 21 | THE WITNESS:  We decided to do that |
| | 1171: 22 | for two reasons. One, there was, as seen in |
| | 1171: 23 | APPROVe, there was a relatively greater risk after |
| | 1171: 24 | 18 months in patients taking Vioxx versus the |
| | 1171: 25 | placebo arm  And based on that relatively greater |
| | 1172: 1 | risk and the fact that other agents were available |
| | 1172: 2 | in this category. which seemed certainly at that |
| | 1172: 3 | time had not shown this risk, we thought that it was |
| | 1172: 4 | in the best interest of patient safety, given the |
| | 1172: 5 | availability of alternatives, that we withdraw Vioxx |
| | 1172: 6 | from the market |
| | 1172: 7 | BY MR. RABER:   : |
| | 1172: 8 | Q:  Mr Anstice. I have just a few more |
| | 1172: 9 | questions before we break. |
| | 1172: 10 | The attorneys for the plaintiff have |

*Improper Question -*
*" The attorneys."*
*say. ∆: no response needed*

Printed:  11/29/2005   8:29:40PM

**ANSTICE_DAVID_DEFENSE_AFFIRMATIVES**

1172: 11   said, in effect, that Merck put profits ahead of
1172: 12   patient safety  What do you have to say about that?
1172: 13   A:  I absolutely do not believe that that
1172: 14   is true  Merck puts patient safety first  I've
1172: 15   worked at Merck for 30 more and more years, and I
1172: 16   have seen Merck consistently put patient safety
1172: 17   first  I've seen Merck bring to market wonderful
1172: 18   products, but always be very concerned, not only
1172: 19   about the benefits, but about really understanding
1172: 20   the risks associated with that and being very clear
1172: 21   to identify them and to communicate them to the
1172: 22   physicians who prescribe our products

Play Time for this Script:   **00:23:43**

Total time for all Scripts in this report:   **00:23:43**

No. COX 00-028
Apr 28, 2000

*admitted*
*+01 - 3*

---

**Bulletin for VIOXX®:**
**NEW RESOURCE: Cardiovascular Card**

---

**TO:**

All Field Personnel with Responsibility for VIOXX®             ACTION REQUIRED

**Background**

The presentation of information regarding the VIGOR and CLASS trials has led to some misunderstanding in the field, as well as with physicians, regarding the cardiovascular effects of VIOXX.

To ensure that you are well prepared to respond to questions about the cardiovascular effects of VIOXX, Team VIOXX has developed a new resource, the Cardiovascular Card. The Cardiovascular Card will allow you to set the record straight with your physicians regarding the cardiovascular profile of VIOXX and how this profile compared to other NSAIDs in OA clinical trials with VIOXX. **The Cardiovascular Card is an obstacle handling piece and should only be used with physicians in response to their questions regarding the cardiovascular effects of VIOXX.** This bulletin contains a draft version of the Cardiovascular Card and a roadmap to explain the content of the Cardiovascular Card and how to use it to address obstacles from your physicians. **This is for your background only. You may not use the Cardiovascular Card or the roadmap with your physicians. You will receive the final printed version of this resource to use with your physicians by Federal Express on Monday.**

**Draft of Cardiovascular Card** (Note: The Cardiovascular Card is a tri-fold similar to the Renal Profile Card)



001390(5)_spreads.pdf

The Cardiovascular Card is a resource which will allow you to address your HI COXIB or HI NSAID physician's concerns regarding the cardiovascular effects of VIOXX. The Cardiovascular Card contains the following information:

- Page 2 shows that patients who were at risk for cardiovascular disease were not excluded from the OA studies with VIOXX. In fact, many patients who were included in the study had risk factors for cardiovascular disease.
- Page 3 shows that the number of cardiovascular thromboembolic events that occurred in OA clinical trials with VIOXX was low and similar to ibuprofen, diclofenac, and nabumetone. Page 3 breaks the information down even further, specifically for MI, stroke, and angina, and shows that VIOXX was similar to comparator NSAIDs and placebo for all these CV events.
- Page 4 shows that the overall and CV mortality rates from the OA clinical trials with VIOXX were low.
- Page 6 shows that in OA clinical trial with VIOXX, the discontinuation rates for patients with hypertension was low, <0.1%. It also shows that the incidence of hypertension in these patients was 3.5% for VIOXX, which was similar to the comparator NSAIDs, diclofenac and ibuprofen.

P1.0062

MRK-AAR0007383

**Please read the attached roadmap for this card.** It will help you understand how to use this card to address physician's questions regarding the CV effects of VIOXX.



"CV Roadmap.doc"

**If you have any questions regarding this bulletin, please contact the Merck National Service Center at 1-800-NSC MERCK.**

MRK-AAR0007384

*advilled*

 **DEPARTMENT OF HEALTH & HUMAN SERVICES**          Public Health Service

Food and Drug Administration
Rockville MD 20857

DEC 1 6 1999

TRANSMITTED VIA FACSIMILE

Ellen R. Westrick
Executive Director
Office of Medical/Legal
Merck & Co., Inc.
P.O. Box, WP37C-116
West Point, PA 19486

RE:   NDA 21-042
      Vioxx (rofecoxib) tablets
      MACMIS ID #8410, 8506

Dear Ms. Westrick:

Reference is made to Merck & Co., Inc.'s (Merck) letters, dated November 30, 1999, and
December 15, 1999, in response to letters from the Division of Drug Marketing, Advertising, and
Communications (DDMAC) dated, November 12, 1999, and December 1, 1999. Our letters
concerned the alleged dissemination of two "homemade" promotional pieces, entitled "TEN
REASONS WHY VIOXX IS BETTER THAN CELEBREX," and "Vioxx vs. Celebrex Poem"
distributed by or on behalf of Merck, that promoted Vioxx (rofecoxib) capsules in violation of
the Federal Food, Drug and Cosmetic Act (Act) and its regulations. DDMAC requested that
Merck investigate the extent to which these "homemade" pieces were used to promote Vioxx,
and the number of health care professionals who received these pieces.

In your letter, you described that in both cases one sales representative distributed these
"homemade" pieces in their respective geographic regions. Your letter also described Merck's
policy for prohibiting dissemination of homemade materials by your sales force, and specified
the corrective actions taken to ensure that this activity will not continue.

We have reviewed these promotional pieces and have determined that they are false or
misleading because they contain misrepresentations of Vioxx's safety profile, unsubstantiated
comparative claims, and are lacking in fair balance.

Misrepresentation of Safety Information

- You present claims that misrepresent the safety profile for Vioxx, including but not limited
  to, "VIOXX HAS ENDOSCOPY STUDIES SHOWING A SAFER THAN PLACEBO
  INCIDENCE RATE OF GASTRODUODENAL ULCERS." However, this claim is in direct
  contrast with the approved product labeling (PI) that states, "...the studies cannot rule out at

P1.0154

MRK-ABI0003291

Ellen R. Westrick                                                    page 2
Merck & Co., Inc.
NDA #21-042

least some increase in the rate of endoscopic gastroduodenal ulcers when comparing Vioxx
to placebo." Furthermore, this claim suggests that Vioxx is safer than placebo in regards to
clinically significant gastroduodenal events. However, the PI states, "The correlation
between findings of endoscopic studies, and the relative incidence of clinically serious upper
GI events that may be observed with different products, has not been fully established."
Moreover, this claim minimizes the warning in the PI that states, "Serious gastrointestinal
toxicity such as bleeding, ulceration, and perforation of the stomach, small intestine or large
intestine, can occur at any time, with or without warning symptoms...," and omits material
fact in the PI which states, "Serious clinically significant upper GI bleeding has been
observed in patients receiving VIOXX in controlled trials...."  Therefore, we object to this
claim because it minimizes the GI warning associated with Vioxx and is inconsistent with the
data in the PI.

Unsubstantiated Comparative Claims

Promotional materials are false or misleading if they contain representations or suggestions that a
drug's safety or effectiveness is comparable or superior to another drug when such has not been
demonstrated by substantial evidence.  Some examples of misleading comparative claims in your
"homemade" promotional pieces include:

- In the Vioxx vs. Celebrex Poem you claim, "Your patients in pain – they give you their
  grief; A Cox-II is the answer for their pain relief."  This claim makes a broad superiority
  claim comparing Vioxx to not only the class of NSAIDs, of which it is a member, but to all
  analgesic and anti-inflammatory therapies available for the management of pain.  However,
  this global superiority claim has not been demonstrated by substantial evidence, and
  therefore, is false or misleading.  Moreover, PI states that Vioxx is indicated, "For the
  management of <u>acute pain in adults</u>." (emphasis added).  Therefore, this claim lacks
  important contextual information concerning Vioxx's approved indication, and
  consequently, is misleading.

- You also presents several unsubstantiated comparative claims to Celebrex (celecoxib),
  including but not limited to, "Vioxx of course – the answer again, It's stronger, lasts longer,
  is faster, and then its safer...."  This claim suggests Vioxx is more efficacious and has a
  superior safety profile compared to Celebrex, when such has not been demonstrated by
  substantial evidence.  Therefore, this unsubstantiated comparative claim is misleading.

Fair Balance

Overall, Merck's "homemade" promotional pieces are lacking in fair balance with respect to the
content and presentation of risk information related to the use of Vioxx.  In general, promotional
materials must present information about the risks associated with the use of a drug with a
prominence and readability reasonably comparable to that of claims for the drug.

- Although these pieces contain numerous claims for the efficacy and safety of Vioxx, you
  have not presented <u>any</u> risk information concerning the contraindications, warnings,

MRK-ABI0003292

Ellen R. Westrick                                                    page 3
Merck & Co., Inc.
NDA #21-042

precautions, or adverse events associated with Vioxx's use. (emphasis added).  Therefore, we
consider these promotional pieces to be lacking in fair balance.  Furthermore, these
promotional pieces are in violation of the Act because the approved product labeling for
Vioxx did not accompany them.

In addition, promotional materials must be submitted to the FDA, under Form FDA 2253, at the
time of initial dissemination.  However, our records indicate these promotional materials were
not submitted at the time of initial use.  This failure to submit promotional materials at the time
of initial dissemination is in violation of the Act.

We have reviewed your response and actions taken in response to the dissemination of this
violative promotional piece.  We do not wish to comment your internal processes, however we
do acknowledge your investigation and the corrective actions taken to prevent reoccurrence of
this type of violative promotional activity.  At this time, we have no further questions and
consider this matter closed.

If you have any further questions or comments, please contact the undersigned by facsimile at
(301) 594-6771, or by written communication at the Food and Drug Administration, Division of
Drug Marketing, Advertising and Communications, HFD-42, Rm. 17B-20, 5600 Fishers Lane,
Rockville, MD  20857.  We remind you that only written communications are considered
official.

In all future correspondence regarding this matter, please refer to the MACMIS # 8506 and 8410,
in addition to the NDA number.

Sincerely,

**/S/**

Spencer Salis, Pharm.D.
Regulatory Review Officer
Division of Drug Marketing,
   Advertising and Communications

MRK-ABI0003293

**VIOXX LAUNCH MEETING/Remarks of Mr. David Anstice**
**Draft date: April 28REVISED May 24, 1999/3:30 pm**                                  p. 1

## REMARKS TO REPRESENTATIVES

Thank you, Marty, and thank you everyone.

Here we are. It's the middle of June. Summertime, in all its splendor.
Heat. Humidity. Vacations. Why, within a week, we'll be at June 21,
the longest day of the year.

But you know what? Today doesn't feel like summertime. At least not to
me. Today, I feel like a kid on Christmas morning! Because I've been
presented with a gift that's at the top of every pharmaceutical executive's
wish list. That gift – is a *winning product.*

Now, having just said that, let me not be naïve about this. A winning
product isn't just at the top of <u>my</u> wish list. A winning product is what
every <u>sales</u> representative wishes for; what every sales <u>manager</u> wishes
for; heck, it's what we <u>all</u> wish for.

Well, ladies and gentlemen, I'm here to tell you -- our wish has come
true! In fact, we're getting not just what we've been wishing for – we're
getting even more. I'm talking about a product that's not just a "winner."
Vioxx is a champion. A blockbuster. A superstar. MRL has handed us
the opportunity of a lifetime, and it's been passed to us on the equivalent
of a silver platter.

I make that statement because, remember -- winners --champions --
aren't born. They're <u>made</u>. And this is precisely the case with Vioxx.

Vioxx was <u>designed</u>, intentionally and deliberately, to be a winner.

P1.0155

Confidential - Subject To Protective Order                                        MRK-ABI0004488

**VIOXX LAUNCH MEETING/Remarks of Mr. David Anstice**
~~Draft date:  April 28~~REVISED May 24, 1999/3:30 pm                    |      **p. 2**

Vioxx was <u>developed</u>, strategically and methodically, to be a champion.

Vioxx was been <u>driven</u> and propelled along the road to victory -- from day
one.

In particular, over the last year and a half, I assure you of this:  I have
had no higher priority than being absolutely <u>certain</u> Vioxx realizes its full
winning potential.  In fact, if there's only one thing you remember from
my remarks this morning, it's this.

When it comes to this market, David Anstice <u>has</u> been in it to win it.  I
<u>am</u> in it to win it.  And I shall <u>remain</u> in it to win it.  *You can bank on
that!*

*(wait for applause)*

Thank you for that – but frankly, words are cheap.  <u>Actions</u> aren't.
*Especially* in this business.  So let's spend a minute and look at some of
the actions that show, conclusively and beyond a doubt, that I – <u>we</u> – are
in it to win it.

There are <u>many</u> such actions.  But for the sake of brevity, let me borrow
a page from <u>another</u> "David" – David Letterman – and roll out my very
own version of a top ten list.  Here, then, are The Top Ten Reasons
Showing We're In It To Win It.

*(as DWA introduces each reason, roll Letterman-style drum roll and build
list of reasons on screen)*

Confidential - Subject To Protective Order                              MRK-ABI0004489

VIOXX LAUNCH MEETING/Remarks of Mr. David Anstice
~~Draft date: April 28~~REVISED May 24, 1999/3:30 pm                                    p. 3

Reason number ten – launch meeting activity has been <u>intensive</u>. You've already had your very intensive district meetings. And now, as Marty alluded to earlier, we've come together from multiple roads to join forces at this national gathering. This national gathering is a departure from the way we've launched products over the last couple of years. But the added training, and motivation, and emotion that develops at a national event is highly combustible. And I am convinced this will turbocharge our sales and marketing engine as we power down the road to victory.

Reason number nine – the incentive program behind Vioxx is an absolute corker! There's an in line incentive. Plus, an incredible non-monetary incentive program which you'll hear more about later today. But over and above all this, there is a special cluster-based incentive program.

Now -- some might call such a program extravagant. *Not me!* This is a program consistent with the philosophy that we're in it to win it! Wouldn't you agree?

*(wait for applause)*

Good – I was hoping you would!

Okay, reason number eight – Vioxx has been developed with the <u>largest</u> number of consultants programs <u>ever</u> held in support of a Merck product. Consistent with the Merck marketing principles – which, in fact, have been the backbone of all our prelaunch work -- we've taken a targeted, sequential approach.

Confidential - Subject To Protective Order                                    MRK-ABI0004490

We started our consultants meetings with the specialists. Then, we moved on to the primary care physicians. Holding as many meetings as we did with so many attendees has given us <u>incredible</u> insight into this market. We've gotten a <u>remarkable</u> understanding of Cox-2 inhibitors in practice. We've received a <u>priceless</u> education of how use of Celebrex has evolved since its approval. But best of all, we've gotten feedback from our consulting physicians on <u>our</u> approach and presentation of the Vioxx data. And I'm <u>not</u> exaggerating when I tell you that feedback on our scientific excellence and balanced approach has been very, very positive.

Reason number seven – Our specialty representatives have not only reached, they've <u>surpassed</u> their target of developing 560 potential advocates. Since this group was initially deployed in the fall of 1997, they have done an absolutely incredible job of re-introducing Merck to the rheumatologist community.

Notice, I say "re"-introduced because remember, we have a legacy in this market. Ten or fifteen years ago, we owned this market. Well, I'm here to tell you to get ready – because history is about to repeat itself!! We are going to own this market once again!

*(wait for applause)*

Okay – reasons number six and five. We've got the numbers. Of people. And of samples. Maybe you've heard or read about the fact that Pfizer and Searle have created what they <u>assumed</u> was the largest force ever assembled for a single product. Three thousand people.

Confidential - Subject To Protective Order

MRK-ABI0004491

Well, that just goes to show you -- never assume anything.  Especially
about how determined Merck is to win this race!  We're topping that
3,000 number by over 25 percent.  With the participation of Group A and
all three hospital groups, we're marshalling a force that will total thirty
eight hundred people.

And as far as I'm concerned, that's thirty-eight hundred of the most
professional, the most capable -- in short, the all-around best
representatives across this entire industry.

We could not, and would not, have achieved such a massive number of
people were it not for the commitment and support of all the Executive
Directors heading up the other TBG's.  Which only goes to show you that
all of Merck, to a person, is in this to win it!

Including MMD.  That organization has been unbelievably responsive in
meeting our sample needs.  They're producing samples on not one, not
two, but three separate lines in order to expedite shipments.  No other
product in Merck history has ever received this type of support.

Other people will explain the details of the sample program to you.  But
for now, suffice it to say that we're giving away stock bottles to twenty-
five thousand physicians for 375 thousand patients.

Let me state that another way -- between now and the end of the year --
that's just seven months -- we'll be distributing seventeen million units.
That's as many samples of Zocor as we give away in a year.

Confidential - Subject To Protective Order                                          MRK-ABI0004492

**VIOXX LAUNCH MEETING/Remarks of Mr. David Anstice**
~~Draft date:  April 28~~REVISED May 24, 1999/3:30 pm                    | **p. 6**

Here again, some might call this extravagant.  *Not me!*  I am more than
willing to sacrifice a few scripts to samples in the short run to help
assure we win share in the long run.

What do you think – doesn't that make sense?

*(applause)*

Next is reason number four;  and that has to do with our pharmacy
stocking.

[DETAILS TO BE INSERTED WHEN AVAILABLE]

Okay – what number are we up to here? – Right, reason number three.
Our commitment of HEL dollars has never been larger.  And another four
million dollars was just made available.  This includes extra FMC money
in the fourth quarter, an RSP program, and speaker contracts.

Let me put it another way.  We are spending over three million dollars for
HEL in every month of 1999.

Let me ask you one last time -- is that the type of commitment that
shows we're in it to win it?

*(applause)*

Thank you, I'm glad you think so.

Confidential - Subject To Protective Order                    MRK-ABI0004493

VIOXX LAUNCH MEETING/Remarks of Mr. David Anstice
~~Draft date: April 28~~REVISED May 24, 1999/3:30 pm                          p. 7

Next – reason number two. The Advantage Trial. And that word "advantage" is sure an appropriate name for this clinical study. This study will not only dramatically underscore the advantages of Vioxx versus NSAIDs. Better still, this study was initiated prior to launch. Already, we're well on our way to reaching our target of *eight hundred* clinical investigators. And those eight hundred investigators *aren't* specialists. They're primary care physicians – all of whom are already in the process of getting a first hand look and becoming familiar with the tremendous advantages of Vioxx.

Which, ultimately, brings me to the number one and truthfully, most important, reason why we're in this to win it.

Vioxx is the best product for patients. And let us not ever forget that that's what it's all about.

The strength of Vioxx is unsurpassed. It is the first and only Cox II approved for relief of acute post-ortho and post-dental pain, and chronic pain of osteoarthritis.

The safety of Vioxx is also unsurpassed. Vioxx is the first and only Cox II with demonstrated ulcer rates comparable to placebo. I hope you heard me say "only" – because Celebrex can't make this claim.

~~The strength of Vioxx is also unsurpassed. It is the first and only Cox II approved for relief of acute post-ortho and post-dental pain, and chronic pain of osteoarthritis.~~

Confidential - Subject To Protective Order                          MRK-ABI0004494

VIOXX LAUNCH MEETING/Remarks of Mr. David Anstice
~~Draft date:  April 28~~REVISED May 24, 1999/3:30 pm                    |   **p. 8**

Finally, the <u>simplicity</u> of Vioxx is, again, unsurpassed.  It is the first and
<u>only</u> Cox II that provides fast, long-lasting relief with the convenience of
once a day dosing.

Clearly, these are the attributes of a product we <u>all</u> wish for:  a winning
product.  A champion product.  A blockbuster product.  As I said earlier,
your marketing team was presented with this landmark opportunity on
the equivalent of a silver platter.  Which is precisely the style in which I'd
like to present Vioxx to all of you.

Marty, if you'll join me on stage for a moment.

[MARTY JOINS DAVID ON STAGE.  A STAGE HAND PRESENTS DAVID
WITH A PACKAGE OF VIOXX ON A GLEAMING, ORNATE SILVER
PLATTER.  DAVID THEN CONTINUES --]

Marty, this opportunity of a lifetime is being presented to you, as our
meeting host, and leader of the best field sales organization in the
industry, bar none.  Hundreds, even thousands of people, across MRL,
MMD, the TBG, and the MIT, present it to you and your team on a silver
platter.  This sterling silver platter symbolizes the work and preparedness
that's been expended in support of Vioxx leading up to this great
moment.  More importantly, though, this symbolizes the <u>attitude</u> and
<u>philosophy</u> of those hundreds and thousands of people.

Namely -- they are in it to win it.

Just as I am.

Confidential - Subject To Protective Order

**VIOXX LAUNCH MEETING/Remarks of Mr. David Anstice**
**Draft date: April 28REVISED May 24, 1999/3:30 pm**              |     **p. 9**

And just as I know that you and all of your team are, as well.

Best wishes for a sensational ride down the road to victory!

Thank you all very much.

[DAVID PRESENTS THE PLATTER TO MARTY AND EXITS.]

Confidential - Subject To Protective Order                                      MRK-ABI0004496

VIOXX LAUNCH MEETING/Remarks of Mr. David Anstice
Draft date:  April 28REVISED May 24, 1999/3:30 pm                    | **p. 10**

## SEQUENCE OF TOPICS TO ADDRESS FOR PHYSICIANS

*Welcome--*
- To San Francisco
- To Vioxx Launch Meeting

*Express Appreciation For --*
- Their taking time for this important event
- Their interest in Merck

*Recognize The Distinction Of Participation --*
- Reps invited those physicians they believed would add greatest value

*Confirm Benefits Of Participation—*
- Learn more about very exciting, important, beneficial new product
- Understand more about Merck
- Help us assure our representatives continue to add maximum value when visiting physicians

*Stress How Important This Latter Objective Is To Merck—*
- We place highest priority upon value our representatives can bring –
  - Provide physicians with helpful, insightful information
  - Data presented with integrity and balance
- Make best use of physicians' limited time
  - Appreciate that access is an issue
  - Understand that patients are the physician's top priority

Confidential - Subject To Protective Order

**VIOXX LAUNCH MEETING/Remarks of Mr. David Anstice**
~~Draft date: April 28~~REVISED May 24, 1999/3:30 pm                    |    **p. 11**

### *Patients Are, Similarly, Merck's Top Priority—*
- George Merck quote: "We try never to forget that medicine is for the people. It is not for the profits. The profits follow, and if we have remembered that, they have never failed to appear. The better we have remembered that, the larger they have been."
- This quote puts Vioxx in perspective
  - Truly breakthrough product, best in class
- Latest in line of new medicines from Merck: 14 introduced in past four years
  - A productivity record for Merck research, manufacturing, marketing
- 1998 research budget: $1.8 billion
- Research and development continuing in variety of areas, most notably therapies for depression and oncology


### *Restate Commitment To Deliver Medicines To As Many Patients As Possible, Advance The Cause Of Health Care—*
- Mectizan Donation Program
  - 1998 was 12th year
  - Reached an estimated 25 million people last year
- $2.4 million in grants last year to University of Capte Town in South Africa and Philadelphia College of Pharmacy
- Lead sponsor of nationally progressive Philadelphia Dept. of Health Men's Health Conference & Expo


### *Summarize By Reinforcing Concept That Our Priorities Are Aligned—*
- Ultimate goal is to help patients
- Continue to advance the quality of health care

Confidential - Subject To Protective Order                                            MRK-ABI0004498

**VIOXX LAUNCH MEETING/Remarks of Mr. David Anstice**
~~Draft date:  April 28~~REVISED May 24, 1999/3:30 pm                    |    p. 12

- Listen and learn from what each can teach the other
- Your being here is a great learning opportunity for us
- We trust it will also be a great learning opportunity for you, as well

Confidential – Subject To Protective Order

MRK-ABI0004499