U. S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

Filed 2-7-06

LORETTA G. WHITE
CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | **MDL Docket No. 1657** |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| | * | **JUDGE FALLON** |
| | * | |
| This document relates to | * | **MAGISTRATE JUDGE KNOWLES** |
| | * | |
| Evelyn Irvin Plunkett v. Merck & Co, Inc.* | | **CASE NO. 02:05CV4046** |

---

### Notice of Filing Deposition Testimony
### of Susan Baumgartner, Pharm. D.

---

Plaintiff Evelyn Irvin Plunkett, as Personal Representative of the Estate of Mr. Richard Irvin, Jr., by and through her attorneys, hereby gives notice of filing the final transcript of the deposition testimony of Susan Baumgartner, Pharm. D. This testimony was played during the trial of this cause on February 6, 2006. A transcript is attached as Exhibit "A."

Respectfully submitted,

By: _P. Luigh oDell_

**Andy D. Birchfield, Jr.**
P. Leigh O'Dell
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
**Co-Lead Counsel**

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502

Fee_____
Process____
X Dktd
CtRmDep____
Doc.No._____

**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
***Herman, Herman, Katz & Cotlar, LLP***
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
FAX: (504) 561-6024

Christopher A. Seeger, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

**PLAINTIFFS' LIAISONCOUNSEL**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
MEUNIER&WARSHAUER, L.L.C.
P.O. Box 960
191 East Second Street
New Roads, LA 70760
(225) 638-6137
(225) 638-8836 (fax)

Carlene Rhodes Lewis, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Thomas R. Kline, Esquire
KLINE&SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced in accordance with Pre-Trial Order No. #8, on this the **7th** day of February, 2006.

durlist.txt

Page Range:      15:5-16:11

```
15: 5          Q.    Ma'am, state your name,
15: 6  please.
15: 7          A.    Susan Lynn Baumgartner.
15: 8          Q.    Ms. Baumgartner, are you
15: 9  presently employed with Merck?
15:10          A.    Yes.
15:11          Q.    Now, when did you start with
15:12  Merck?
15:13          A.    August of 1996.
15:14          Q.    How would you describe your
15:15  job title, and what did you do with Merck
15:16  in those first years that you worked
15:17  there?
15:18          A.    I started out as a
15:19  cardiovascular consultant working with
15:20  physicians in the greater Jacksonville
15:21  area.
15:22          Q.    Can I ask you something.
15:23                You are say you were working
15:24  with physicians.  What were you doing
16: Page 16
16: 1  with physicians in the greater
16: 2  Jacksonville area?
16: 3          A.    Interacting with them,
16: 4  presenting scientific information to them
16: 5  related to our cardiovascular products.
16: 6          Q.    So, you, I take it, then
16: 7  would get information in-house from
16: 8  Merck, and then you would take that
16: 9  information and you would present it to
16:10  those doctors; is that correct?
16:11          A.    Correct.
```

Page Range:      17:17-18:24

```
17:17                What did you do after that,
17:18  Ms. Baumgartner?
17:19          A.    I moved over to the market
17:20  integration team for Vioxx in mid-1998.
17:21          Q.    And in that market
17:22  integration role, what did you do?
17:23          A.    I was responsible for
17:24  primarily consultants meetings, the type
18: Page 18
18: 1  of meeting to gain market research from
18: 2  different physicians.
18: 3          Q.    Explain that.  To gain
18: 4  market research, what do you mean by
18: 5  that?
18: 6          A.    We wanted to understand what
18: 7  physicians thought about our product.  We
18: 8  had a new product, a new class of
18: 9  medicine.  We wanted to understand how
18:10  they treated pain, what types of patients
18:11  they saw.  It had been a long time since
18:12  we had been in the -- we had a product
18:13  related to pain and inflammation and
18:14  wanted to understand their current
```

Page 1

durlist.txt
```
18:15  thoughts about it.
18:16          Q.    And was part of that your
18:17  responsibility to provide those
18:18  individuals with accurate information
18:19  about the product Vioxx?
18:20          A.    It was providing information
18:21  about Vioxx, as well as other pain
18:22  medicine that was available, and getting
18:23  thoughts on all of those areas.  But I
18:24  did present scientific data for Vioxx.
```

Page Range:      19:1-19:6

```
19: 1          Q.    So, you had had experience,
19: 2  obviously, in trying to read scientific
19: 3  data, make sense of the scientific data,
19: 4  and then pass what you saw in that
19: 5  scientific data on to those doctors.  Is
19: 6  that a correct statement?
```

Page Range:      19:9-19:22

```
19: 9          THE WITNESS:  No.  I
19:10  coordinated the meetings and
19:11  facilitated those meetings, but we
19:12  had presenters who were experts,
19:13  either scientists at Merck or
19:14  physicians at Merck or thought
19:15  leading physicians outside of
19:16  Merck that actually presented
19:17  those scientific data and
19:18  interpreted those data.  And that
19:19  was what we used as a basis for
19:20  getting feedback from the
19:21  individuals who attended those
19:22  sessions.
```

Page Range:      19:24-20:16

```
19:24          Q.    But part of your
20: Page 20
20: 1  responsibility, I think you just told us,
20: 2  was to provide those doctors with
20: 3  accurate information, is that correct,
20: 4  about Vioxx?
20: 5          A.    My responsibility was in
20: 6  coordinating the meeting and assisting
20: 7  the presenters, to the extent that they
20: 8  wanted, in assembling the information and
20: 9  slides.  But the information that was
20:10  communicated was information not only
20:11  from Merck, and the information from
20:12  Merck was accurate information, the
20:13  information that was presented in the
20:14  meetings was accurate, it was also from
20:15  the literature from other companies, data
20:16  that other companies had presented.
```

Page Range:      21:19-22:9

Page 2

durlist.txt

```
21:19        Q.    And in order for them to
21:20  have any understanding of the scientific
21:21  data, it was important that that
21:22  information be accurate that you gave
21:23  them; is that correct?
21:24        A.    It was my hope that the
22: Page 22
22: 1  information that was communicated by the
22: 2  presenters there was accurate, yes.
22: 3        Q.    And in your mind, what you
22: 4  communicated, what Susan Baumgartner
22: 5  communicated in your mind was accurate?
22: 6        A.    What I personally
22: 7  communicated at the meetings?
22: 8        Q.    Yes.
22: 9        A.    Yes.
```

Page Range:    22:12-22:15

```
22:12              Why is it important,
22:13  Ms. Baumgartner, that you communicated
22:14  accurate information to these doctors?
22:15  Why was accuracy important?
```

Page Range:    22:19-22:22

```
22:19              THE WITNESS:  In the context
22:20  of my work, in all of my
22:21  interactions, I intend the things
22:22  I say to be accurate.
```

Page Range:    22:24-23:3

```
22:24        Q.    Tell me why that's important
23: Page 23
23: 1  that a doctor that might be prescribing
23: 2  Vioxx have accurate information.  Why is
23: 3  that important?
```

Page Range:    23:6-23:23

```
23: 6              THE WITNESS:  We want
23: 7              physicians to be fully informed
23: 8              about the products.
23: 9  BY MR. PAPANTONIO:
23:10        Q.    And why is it important that
23:11  they be fully informed about the
23:12  products?
23:13        A.    So they can use the products
23:14  appropriately.  The --
23:15        Q.    Is part -- excuse me.  I
23:16  don't mean to cut you off.  Were you
23:17  finished there?
23:18        A.    And make the right decisions
23:19  about use of the product.
23:20        Q.    So, in other words, it's
23:21  important that you give the doctor the
23:22  correct information so they can use it
```

Page 3

durlist.txt
```
23:23  properly; is that correct?


Page Range:     24:2-24:11

      24: 2             THE WITNESS:  It is
      24: 3         important that we give accurate
      24: 4         information.
      24: 5  BY MR. PAPANTONIO:
      24: 6             Q.   It would certainly not be a
      24: 7  good thing for Susan Baumgartner or
      24: 8  anybody with Merck, for that matter, to
      24: 9  mislead doctors about what they know
      24:10  about a product, Vioxx, for example?
      24:11             A.   I would agree with that.


Page Range:     24:22-25:12

      24:22             Q.   Well, just so we can be
      24:23  clear on what you -- what is your degree
      24:24  in?
      25: Page 25
      25: 1             A.   I have a doctor of pharmacy
      25: 2  and a master of business administration.
      25: 3             Q.   And where did you get your
      25: 4  doctor of pharmacy?
      25: 5             A.   University of Florida.
      25: 6             Q.   And tell the jury, if you
      25: 7  would, what it means to have a doctorate
      25: 8  in pharmacy.
      25: 9             A.   That is the highest degree
      25:10  in pharmacy, and it prepares you to serve
      25:11  as a pharmacist in various different
      25:12  roles.


Page Range:     30:17-30:19

      30:17             MR. PAPANTONIO:  Let's show
      30:18  Dr. Baumgartner 1259, please.  Not
      30:19  Dr. Baumgartner, Mrs. Baumgartner.


Page Range:     31:11-31:23

      31:11             Q.   Well, do you see where it
      31:12  says, Ms. Baumgartner, it says "From:
      31:13  Baumgartner, Susan L."  That's you, isn't
      31:14  it?
      31:15             A.   It is.
      31:16             Q.   And underneath it it says,
      31:17  "Subject:  JAMA Review."  Do you see
      31:18  that? "Subject:  JAMA Review."  Do you
      31:19  see that?
      31:20             A.   Yes.
      31:21             Q.   And then it has a date on
      31:22  it, "2001."  Do you see that?
      31:23             A.   Yes.


Page Range:     32:21-32:24
```

Page 4

durlist.txt
```
32:21          Q.    Now, Ms. Baumgartner, my
32:22 question to you, do you remember creating
32:23 that document?
32:24          A.    No, I don't.


Page Range:      33:9-35:18

33: 9          Q.    So, this document, obviously
33:10 that's what you did in this document, you
33:11 reviewed a piece of medical literature in
33:12 the JAMA.  Tell the jury what that is.
33:13          A.    The Journal of the American
33:14 Medical Association.
33:15          Q.    And you gave your
33:16 impressions; is that correct?
33:17          A.    Of this publication.
33:18          Q.    Yes.  Is this a document
33:19 that you kept in your normal course of
33:20 business?  Is this a record that you kept
33:21 in your normal course of business?
33:22          A.    I'm not sure.
33:23          Q.    Well, that is Susan L.
33:24 Baumgartner at the top; right?
34: Page 34
34: 1          A.    Right.
34: 2          Q.    And Tracy Mills, you sent
34: 3 this to Tracy Mills.  Tell the jury who
34: 4 Tracy Mills is, please.
34: 5          A.    Tracy was my boss at the
34: 6 time.
34: 7          Q.    Okay.
34: 8          So, did your boss ask you to
34: 9 review this medical literature and give
34:10 your impressions?
34:11          A.    I don't remember.
34:12          Q.    Well, do you see where it
34:13 says "Threats" there, Ms. Baumgartner?
34:14          A.    Yes.
34:15          Q.    Let's read.  It says,
34:16 "'Available data raise a cautionary flag
34:17 about the risk of cardiovascular events
34:18 with COX-2 inhibitors...Our findings
34:19 suggest a potential increase in CV event
34:20 rates for the presently available COX-2
34:21 inhibitors...We believe that it is
34:22 mandatory to conduct a trial specifically
34:23 assessing CV risk and benefit of these
34:24 agents.'"
35: Page 35
35: 1          Now, I want to ask you some
35: 2 questions since this is the beginning of
35: 3 this deposition.  What is a "CV risk"?
35: 4 What does that mean?
35: 5          A.    It typically refers to
35: 6 cardiovascular risk.
35: 7          Q.    And it says -- what is
35: 8 "events with COX-2"?  What is a COX-2?
35: 9          A.    That is a cyclooxygenase-2
35:10 inhibitor.  It's a class of products.
35:11          Q.    And that's what Vioxx was;
35:12 correct?
35:13          A.    Correct.
```
                          Page 5

durlist.txt

```
35:14            Q.    So, this says, "Available
35:15   data raise a cautionary flag about the
35:16   risk of cardiovascular events with COX-2
35:17   inhibitors."  Now, you read that
35:18   statement in 2001, didn't you?
```

Page Range:      35:24-37:14

```
35:24            A.    Yes.  It appears if I
36: Page 36
36: 1   transcribed it here, I probably read it.
36: 2            Q.    And so you read it, and then
36: 3   you reduced it to writing that,
36: 4   "Available data" in 2001 "raise a
36: 5   cautionary flag about the risk of
36: 6   cardiovascular events of COX-2
36: 7   inhibitors."  And then it goes on to say,
36: 8   "Our findings suggest a potential
36: 9   increase in CV event rates."  Now, what
36:10   are CV event rates?
36:11            A.    They're the rates of
36:12   cardiovascular events.
36:13            Q.    Now, do you see where it has
36:14   the next little point there.  It says,
36:15   "VIGOR."  Do you see that?
36:16            A.    Yes.
36:17            Q.    Now, at this point in the
36:18   trial, Ms. Baumgartner, it is very
36:19   possible, probable, in fact, that the
36:20   jury knows what VIGOR is, but why don't
36:21   you explain what VIGOR is, just in case
36:22   they haven't heard about it.
36:23            A.    VIGOR was a landmark
36:24   clinical trial in over 8,000 patients of
37: Page 37
37: 1   Vioxx and naproxen.
37: 2            Q.    And what was the purpose,
37: 3   what was the specific purpose of that
37: 4   trial?
37: 5            A.    Specific purpose was to
37: 6   study the effects of Vioxx compared to
37: 7   naproxen on the stomach.
37: 8            Q.    On the stomach for gastro --
37: 9   stomach problems; correct?
37:10            A.    Correct.  Gastrointestinal
37:11   problems.
37:12            Q.    Gastrointestinal problems
37:13   was really the purpose?
37:14            A.    Correct.
```

Page Range:      38:3-38:19

```
38: 3            Q.    In 2001, this is you
38: 4   continuing to write in this document
38: 5   where it says, "VIGOR."  It says,
38: 6   "Increased relative risk of developing a
38: 7   CV event, increased risk for
38: 8   aspirin-indicated and aspirin not
38: 9   indicated subgroups, time to event curve
38:10   showing separation of VIOXX and
38:11   naproxen."  Do you see that?
```

Page 6

durlist.txt
```
38:12          A.    Yes.
38:13          Q.    Now, you wrote that, this
38:14  first line where it says, "VIGOR -
38:15  Increased relative risk of developing a
38:16  CV event."  Do you see that?
38:17          A.    Yes.
38:18          Q.    You wrote that underneath
38:19  the heading that says "Threats."
```

Page Range:    38:24-39:16

```
38:24          Q.    Do you see this on your
39: Page 39
39: 1  screen, where it says "Threats"?  So, you
39: 2  wrote "Threats," and then underneath
39: 3  "Threats" you wrote, "VIGOR," which was a
39: 4  study that was conducted by Merck; is
39: 5  that correct?
39: 6          A.    Correct.
39: 7          Q.    And the purpose of the study
39: 8  was to figure out gastrointestinal, how
39: 9  gastrointestinal problems may affect
39:10  individuals taking Vioxx; correct?
39:11          A.    Correct.
39:12          Q.    And then in there you wrote,
39:13  next to VIGOR you said, "Increased
39:14  relative risk of developing a CV event."
39:15  Correct?
39:16          A.    Correct.
```

Page Range:    43:18-44:21

```
43:18          Q.    Just tell me what you meant
43:19  by that.  Why did you write that down?
43:20          A.    I don't remember.
43:21          Q.    You don't remember why you
43:22  wrote that down underneath the term
43:23  "Threats" in 2001?
43:24          A.    No.
44: Page 44
44: 1          Q.    What did you mean by
44: 2  "Threats"?  Who is being threatened by
44: 3  this information?
44: 4          A.    I don't know.
44: 5          Q.    Well, you wrote it down, Ms.
44: 6  Baumgartner, didn't you?
44: 7          A.    When I look at it today, I
44: 8  can give you my thoughts on it today, but
44: 9  I don't remember at the time why I would
44:10  have categorized things in different
44:11  sections or why I would have written
44:12  these thoughts down.
44:13          Q.    Well, does the term "threat"
44:14  mean the same thing to you that it did,
44:15  you think, when you wrote that down,
44:16  today?
44:17          A.    To me, threat looks like
44:18  something that was not consistent with
44:19  Merck's position.
44:20          Q.    Maybe bad to Merck's
44:21  position, threat?
```

durlist.txt

Page Range:      44:24-45:7

44:24              THE WITNESS:  I define it as
45: Page 45
45: 1      not consistent with Merck's
45: 2      position.
45: 3 BY MR. PAPANTONIO:
45: 4      Q.    So, in Baumgartner's -- in
45: 5 Susan Baumgartner's mind right now,
45: 6 "threat" does not mean bad; is that
45: 7 correct?


Page Range:      45:11-45:23

45:11      Q.    Yes or no?
45:12      A.    I don't want to put a
45:13 judgment on it, but I defined it as not
45:14 consistent with Merck's position.  We
45:15 felt we arrived at the right conclusion
45:16 based on the data available, and these
45:17 were things that were contrary to that.
45:18      Q.    Let's be clear about this.
45:19            Who paid for VIGOR?
45:20      A.    Merck.
45:21      Q.    Merck.  This is your study
45:22 you're talking about, correct, VIGOR?
45:23      A.    Correct.


Page Range:      46:23-47:21

46:23      Q.    And it used Merck employees,
46:24 people that were actually working for
47: Page 47
47: 1 Merck participated in VIGOR; is that
47: 2 correct?  Employees with Merck actually
47: 3 participated in VIGOR.  Yes or no?
47: 4      A.    I don't think I have enough
47: 5 information.  I'm not sure what you mean
47: 6 by that.
47: 7      Q.    You reviewed the JAMA
47: 8 article about VIGOR, didn't you?  That's
47: 9 what this is.  That's what we're looking
47:10 at.  That's what we've been talking about
47:11 here; right?
47:12      A.    Right.
47:13      Q.    And you're telling me you
47:14 don't know whether or not Merck employees
47:15 actually participated in VIGOR?  Is that
47:16 your testimony?
47:17      A.    It depends on how you define
47:18 "participated."
47:19      Q.    Well, let's talk about this
47:20 definition thing.  First of all, you
47:21 define "threat" as what?


Page Range:      48:2-48:21

48: 2      Q.    In terms of this document,
                              Page 8

durlist.txt

```
48: 3   we want to talk about definitions here.
48: 4   "Threat" means what to Susan Baumgartner?
48: 5            A.    When I look at this document
48: 6   today?
48: 7            Q.    Yes.
48: 8            A.    I defined it as inconsistent
48: 9   with Merck's position about the product
48:10   and other products.
48:11            Q.    You would say bad for
48:12   Merck's position; right?  Bad?
48:13            A.    Different.  Not consistent.
48:14            Q.    Yeah.  Well, is "threat" a
48:15   good thing or a bad thing in your mind?
48:16            A.    (Indicating.)
48:17            Q.    Don't know?  No opinion?
48:18            A.    It depends on its use.
48:19            Q.    Okay.
48:20                  How about "employ," what's
48:21   your definition of "employ"?
```

Page Range:     49:1-49:16

```
49: 1            Q.    Yeah, I asked you, did an
49: 2   employee work on the VIGOR study, and you
49: 3   said what?
49: 4            A.    You asked if they
49: 5   participated in the study.  When I think
49: 6   of participated, I think of the
49: 7   investigators.  It's just my experience
49: 8   with clinical trials.  I think of
49: 9   investigators.  So, they participated in
49:10   that they designed -- I don't even know.
49:11            Q.    You don't know what I mean
49:12   when I say did a Merck employee
49:13   participate in VIGOR study?  You don't
49:14   know what I'm talking about when I ask
49:15   you that question?  Is that what you're
49:16   telling me right now?
```

Page Range:     49:19-50:22

```
49:19                  THE WITNESS:  Yes.  The
49:20             other way I think about it is
49:21             participated as an actual patient
49:22             that was involved in the clinical
49:23             trial.
49:24   BY MR. PAPANTONIO:
50: Page 50
50: 1            Q.    Well, how about somebody who
50: 2   wrote the study, was that a participant
50: 3   in your mind?  Somebody whose name
50: 4   appears on the top of the VIGOR study, is
50: 5   that something that you would call -- if
50: 6   they're an employee of the company, would
50: 7   you consider them participating in that
50: 8   study?
50: 9            A.    Participating in the
50:10   publication of the results of the study,
50:11   yes.
50:12            Q.    Well, tell us who Alise
50:13   Reicin is.  You know who that is, don't
```

Page 9

durlist.txt

```
50:14  you?
50:15          A.    She worked in our MRL
50:16  department, our Merck Research
50:17  Laboratories as a scientist.
50:18          Q.    Right.
50:19                And you knew when I asked
50:20  you that question three minutes ago that
50:21  Alise Reicin participated in this study.
50:22  You knew that then, didn't you?
```

Page Range:      51:1-52:4

```
51: 1                THE WITNESS:  I wasn't sure
51: 2          what you meant by "participated."
51: 3          That's why I needed clarification.
51: 4  BY MR. PAPANTONIO:
51: 5          Q.    Well, you knew that Alise
51: 6  Reicin's name appears on the top of the
51: 7  VIGOR study that was paid for by Merck.
51: 8  You knew that when I asked you that
51: 9  question a minute ago about whether
51:10  employees participated.  You knew that
51:11  then, didn't you?
51:12          A.    I knew that fact, but I
51:13  didn't understand your question.
51:14          Q.    Well, you understand the
51:15  question now, don't you, Ms. Baumgartner?
51:16          A.    I do.
51:17          Q.    You understand that I'm
51:18  asking you, did a Merck employee
51:19  participate in the VIGOR study?  Do you
51:20  understand that?  Do you understand what
51:21  I'm asking you?
51:22          A.    I thought -- what I said yes
51:23  to was that a Merck employee participated
51:24  in publication of the study.
52: Page 52
52: 1          Q.    Okay.
52: 2                So we're clear on that, a
52: 3  Merck employee did participate, didn't
52: 4  they, in the VIGOR study; correct?
```

Page Range:      52:8-52:9

```
52: 8                THE WITNESS:  In the
52: 9          publication of that study.
```

Page Range:      56:8-57:8

```
56: 8          Q.    Well, tell us what the JAMA
56: 9  review is.  What is the JAMA?
56:10          A.    The Journal of the American
56:11  Medical Association.
56:12          Q.    Is that a pretty important
56:13  journal, Ms. Baumgartner?
56:14          A.    It is.
56:15          Q.    Why is it important?
56:16          A.    It's a peer-reviewed
56:17  publication that many physicians review
56:18  and depend on for updates.
```

durlist.txt
```
56:19          Q.    They depend on accurate
56:20  information, don't they?  Doctors depend
56:21  on accurate information in order to
56:22  safely prescribe medication.  Is that
56:23  true or false?
56:24          A.    I would agree, true.
57: Page 57
57: 1          Q.    And so we're talking about
57: 2  in this document that you created, we're
57: 3  talking about increased risk, relative
57: 4  risk of developing CV events, and you're
57: 5  also talking about MI rates; correct?
57: 6  "MI" is heart attack.  They were higher
57: 7  according to what you wrote down here
57: 8  also, weren't they?
```

Page Range:      57:11-57:21

```
57:11               THE WITNESS:  It's stated
57:12          here.  As I mentioned, I believe
57:13          this is a summary of what the
57:14          authors in that publication
57:15          concluded, because these were
57:16          contrary to Merck's beliefs and
57:17          conclusions about the product.
57:18  BY MR. PAPANTONIO:
57:19          Q.    And that's why you wrote
57:20  down "Threats"?
57:21          A.    Right.
```

Page Range:      81:9-81:11

```
81: 9          Q.    Now, why don't you take a
81:10  minute and look at that from Martino
81:11  Laurenzi.
```

Page Range:      81:14-82:20

```
81:14          Q.    Is it the first time you've
81:15  ever seen that document?
81:16          A.    Yes.
81:17          Q.    Tell us, please, do you see
81:18  the term -- what is naproxen?  Tell the
81:19  jury what naproxen is.
81:20          A.    Naproxen is a nonselective
81:21  NSAID used to treat pain and
81:22  inflammation.
81:23          Q.    Do you see there it says,
81:24  "The presentation of the VIGOR data must
82: Page 82
82: 1  not mislead the audience into thinking
82: 2  that the difference in CV events could be
82: 3  explained by an anti-thrombotic effect of
82: 4  naproxen, which is not demonstrated."  Do
82: 5  you see that?
82: 6          A.    Yes.
82: 7          Q.    Now, is that the first time
82: 8  you've seen that written, "The
82: 9  presentation of the VIGOR data," which
82:10  we've talked about, the VIGOR data;
```
                    Page 11

durlist.txt
```
82:11  right?  "Must not mislead the audience
82:12  into thinking that the difference in CV
82:13  events," which is heart events; correct?
82:14  "Could be explained by anti-thrombotic
82:15  effect of naproxen."  Do you see that?
82:16          A.   Yes.
82:17          Q.   "Which is not demonstrated."
82:18  Do you see that?
82:19          A.   Yes.
82:20          Q.   Do you see the date on that?


Page Range:     83:1-83:5

83: 1              MR. PAPANTONIO:
83: 2          "2000-06-20."
83: 3  BY MR. PAPANTONIO:
83: 4          Q.   Do you see that date?
83: 5          A.   Yes.


Page Range:     83:6-83:9

83: 6          Q.   Now, you've not seen this
83: 7  until I've just shown this to you.  Is
83: 8  that what you're telling us?
83: 9          A.   That's correct.


Page Range:     84:13-84:14

84:13              MR. PAPANTONIO:  Would you
84:14          please show her 401?


Page Range:     87:16-88:8

87:16          Q.   It says, "National Thought
87:17  Leader Summary."  Do you see that?
87:18  "VIGOR Study, January 31, 2001."  Do you
87:19  see that?
87:20          A.   Yes.
87:21          Q.   Now, what is a national
87:22  thought leader?  What does that mean?
87:23          A.   Let me take one minute to --
87:24          Q.   Well, yeah, we can do that.
88: Page 88
88: 1  But just tell us as you're doing that,
88: 2  what is a national thought leader?
88: 3          A.   A national thought leader is
88: 4  a physician who leads thought in their
88: 5  respective area, an expert in a specific
88: 6  area, and by "national," we mean
88: 7  recognized by other physicians throughout
88: 8  the nation.


Page Range:     89:19-89:22

89:19              The date on there, you see
89:20  January 31st, 2001.  Do you see that at
89:21  the top?
89:22          A.   Yes.
```

durlist.txt

Page Range:      90:6-91:21

```
90: 6   But it says, "Recommend that Merck not
90: 7   emphasize" -- "Recommend that Merck not
90: 8   emphasize the 'protective effect' of"
90: 9   naproxen "as an explanation for the
90:10   cardio/renal (MI/thromboembolic) data in
90:11   VIGOR."  Now, let me just take that first
90:12   sentence and ask you, what does
90:13   "cardiorenal" mean?
90:14           A.    That refers to
90:15   cardiovascular and renal.
90:16           Q.    Which is --
90:17           A.    Heart and kidneys.
90:18           Q.    Heart and kidneys.
90:19                 And it says, "MI
90:20   thromboembolic."  What does that mean?
90:21           A.    Heart attack and clot
90:22   producing.
90:23           Q.    Okay.
90:24                 So, "Recommend that Merck
91: Page 91
91: 1   not emphasize the protective effect of"
91: 2   naproxen, and you've told us, we've
91: 3   talked about what naproxen is already,
91: 4   "as an explanation for the cardio/renal
91: 5   (MI/thromboembolic) data in VIGOR.
91: 6   Because there is no supporting data to
91: 7   substantiate a protective effect for"
91: 8   naproxen, "advocating this position as an
91: 9   explanation for the VIGOR data only
91:10   serves to undermine Merck's credibility
91:11   with physicians."
91:12                 Now, my question to you is,
91:13   credibility between you and physicians
91:14   was very important, wasn't it?  You had
91:15   to be credible with physicians, didn't
91:16   you?
91:17           A.    That's correct.
91:18           Q.    If physicians perceived
91:19   Susan Baumgartner as not being credible,
91:20   that became a problem for Merck, didn't
91:21   it?
```

Page Range:      91:24-92:16

```
91:24                 THE WITNESS:  I was
92: Page 92
92: 1   referring to Merck's credibility
92: 2   with physicians being important.
92: 3   BY MR. PAPANTONIO:
92: 4           Q.    Yeah.
92: 5           A.    But --
92: 6           Q.    Yeah.
92: 7           A.    But you're asking about my
92: 8   own --
92: 9           Q.    But your credibility with
92:10   the physicians certainly is important;
92:11   true?
92:12           A.    It's important to me.
                      Page 13
```

durlist.txt

```
92:13          Q.    Yeah.  And same with the
92:14  FDA.  I mean, if you are dealing with the
92:15  FDA, your credibility with the FDA is
92:16  important, isn't it?
```

Page Range:      92:20-93:20

```
92:20          Q.    From your standpoint, your
92:21  job --
92:22          A.    Yes, you want to be
92:23  credible.
92:24          Q.    -- with Merck.  Right.
93: Page 93
93: 1                And why is that, that you
93: 2  want to be credible with the doctors in
93: 3  what you were doing?
93: 4          A.    Because you want them to
93: 5  look at your history, and Merck had a
93: 6  long history of delivering good science
93: 7  and good products.  So, anything that
93: 8  would undermine that would not be a good
93: 9  thing.
93:10          Q.    Both to doctors, and you
93:11  would agree the FDA as well; correct?
93:12          A.    I think to any audience that
93:13  Merck interacts with, we want to be
93:14  credible.
93:15          Q.    And according to this
93:16  paragraph, these national thought leaders
93:17  are saying that naproxen is not an
93:18  explanation for the -- for what the VIGOR
93:19  data showed.  Naproxen was not an
93:20  explanation for that; is that correct?
```

Page Range:      93:24-94:12

```
93:24          Q.    That's what that says.
94: Page 94
94: 1          A.    I don't know to whom this
94: 2  refers, what thought leaders were being
94: 3  summarized here.
94: 4          Q.    No, no.  That's not my
94: 5  question, though, Ms. Baumgartner.
94: 6                This is saying that Merck
94: 7  should not use naproxen as an explanation
94: 8  for why Vioxx in VIGOR, in the VIGOR
94: 9  study, showed an increased risk of
94:10  cardio/renal or MI thromboembolic data.
94:11  That's all this is saying.  That's my
94:12  point.
```

Page Range:      94:16-94:18

```
94:16          Q.    Is that what this says?
94:17          A.    The words say what they say.
94:18  I'm not sure I can interpret it.
```

Page Range:      94:19-95:2

Page 14

durlist.txt

```
94:19          Q.    Okay.
94:20                Do you agree or disagree
94:21  with what I just said?
94:22          A.    I disagree, based on my own
94:23  experience of interacting with national
94:24  thought leaders --
95: Page 95
95: 1          Q.    Well, this --
95: 2          A.    -- on these conclusions.
```

Page Range:     95:8-95:10

```
95: 8                MR. PAPANTONIO:  Now, would
95: 9  you please show Ms. Baumgartner
95:10  516.
```

Page Range:     96:12-97:16

```
96:12                Do you see the date on
96:13  there, date, 2000, 3/28/2000?  Do you see
96:14  that up there?
96:15          A.    Yes.
96:16          Q.    You see "Subject:  Carlo
96:17  Patrono."  Do you see that?  "On VIGOR."
96:18          A.    Yes.
96:19          Q.    Now, tell us who Carlo
96:20  Patrono is.
96:21          A.    He's a thought leader in the
96:22  area of platelet effects.
96:23          Q.    And so it says -- you know
96:24  that he was a national thought leader,
97: Page 97
97: 1  you knew that?
97: 2          A.    Worldwide.
97: 3          Q.    Worldwide.  This guy is
97: 4  certainly one of the best doctors talking
97: 5  about this platelet issue that you would
97: 6  want to rely on.  Is that pretty
97: 7  accurate?  It says --
97: 8          A.    Extremely knowledgeable,
97: 9  very well respected.
97:10          Q.    It says, "Guys, I met with
97:11  Carlo Patrono last Saturday in Rome.  He
97:12  had already been informed by other
97:13  sources about the results of VIGOR,"
97:14  we've talked about VIGOR, "and we had an
97:15  interesting chat about it."  Do you see
97:16  the first line says --
```

Page Range:     97:22-98:2

```
97:22          Q.    "He said that he does not
97:23  think that the CV effect that we observed
97:24  can be attributed to naproxen."  Do you
98: Page 98
98: 1  see that?
98: 2          A.    Yes.
```

Page Range:     99:2-99:8

durlist.txt

```
99: 2          Q.     And in 2000, 3/28/2000,
99: 3    Carlo Patrono said that he did not
99: 4    believe, he didn't think that there was a
99: 5    CV effect that could be observed that's
99: 6    attributable to naproxen.  Do you see
99: 7    that?
99: 8          A.     Yes.
```

Page Range:      99:9-99:16

```
99: 9          Q.     Now --
99:10          A.     However, this was before he
99:11    had a chance to walk through the data
99:12    with Merck or discuss it with Merck.  I
99:13    guess he had heard it from other sources,
99:14    but didn't have a chance to discuss it
99:15    with the company or be exposed to the
99:16    information.
```

Page Range:      99:17-99:21

```
99:17          Q.     Oh, so, you participated in
99:18    all of this?  In other words, you
99:19    interacted with Carlo Patrono?
99:20          A.     I did not.  I'm reading this
99:21    document that you gave me.
```

Page Range:      100:10-100:12

```
100:10               MR. PAPANTONIO:  Now, could
100:11    you please show Ms. Baumgartner
100:12    177.
```

Page Range:      100:22-101:11

```
100:22         Q.     Now, this is from you, so,
100:23    we know you've seen this before.  It is
100:24    from Tracy Mills and Susan Baumgartner,
101: Page 101
101: 1    PharmD.  Do you see where it says that?
101: 2          A.     Yes.
101: 3          Q.     Do you see where it says,
101: 4    "Scientific Communications Plan for
101: 5    VIOXX"?
101: 6          A.     Yes.
101: 7          Q.     "Scientific Communication
101: 8    Plan."  What does scientific
101: 9    communications mean?
101:10          A.     Those are communications
101:11    about the scientific data.
```

Page Range:      101:20-101:22

```
101:20         Q.     And you wrote it, didn't
101:21    you?
101:22          A.     I did, in 2001.
```

Page 16

durlist.txt

Page Range:       102:4-102:21

```
102: 4              Q.    And do you see where it
102: 5   says, the first paragraph is, "To
102: 6   maintain the vigorous growth of VIOXX in
102: 7   2001 and to ensure competitive victories
102: 8   over Coxib competitors."  Who were coxib
102: 9   competitors?  Celebrex, were they one of
102:10   them?
102:11              A.    At the time.
102:12              Q.    So, "To ensure competitive
102:13   victories over Coxib competitors and
102:14   non-selective NSAIDs, our team has
102:15   developed the attached scientific
102:16   communication plan for VIOXX."  Do you
102:17   see that?
102:18              A.    Yes.
102:19              Q.    And you wrote those words,
102:20   didn't you?  Those are your words?
102:21              A.    Yes.
```

Page Range:       102:22-104:11

```
102:22              Q.    And then do you see down
102:23   where it has the box there, you created
102:24   that box as well, didn't you?
103: Page 103
103: 1              A.    I think so.
103: 2              Q.    Well, do you see where it
103: 3   says "STAGE 1 MESSAGES"?  Where it says,
103: 4   "Cardiovascular (MI)" down there at the
103: 5   bottom?
103: 6              A.    Yes.
103: 7              Q.    What is a cardiovascular MI
103: 8   again?  That's a heart attack, isn't it?
103: 9              A.    Yes.
103:10              Q.    And then "STAGE 1 MESSAGES,"
103:11   what does the "STAGE 1 MESSAGES," mean?
103:12              A.    It looks like the messages
103:13   in that time frame that's specified
103:14   underneath it.
103:15              Q.    And the time frame that's
103:16   specified there is 2000, February of
103:17   2001, that's stage one message is what
103:18   you have.  And then next to
103:19   cardiovascular MI, you say, "CV effects
103:20   similar to placebo and NSAIDs; difference
103:21   in MIs in VIGOR due to cardioprotection
103:22   with naproxen (based on limited data)."
103:23   Do you see that?
103:24              A.    Yes.
104: Page 104
104: 1              Q.    Now, you're telling -- in
104: 2   other words, this scientific
104: 3   communication that's been created by you,
104: 4   Ms. Baumgartner, is designed to tell
104: 5   people that the CV effects, which is the
104: 6   cardiovascular effects similar to
104: 7   placebo, were a result of naproxen.
104: 8   That's what that says, doesn't it?
104: 9   You're trying to tell the scientific
```

durlist.txt

104:10  community that naproxen is causing these
104:11  CV effects?

Page Range:      104:14-105:16

104:14  BY MR. PAPANTONIO:
104:15          Q.    Isn't that what it says?
104:16          A.    This was a statement of
104:17  Merck's understanding and interpretation
104:18  of the data that was available.
104:19          Q.    Well, now, wait just a
104:20  second.  Look at the date on here again.
104:21  3/27/2001, do you see that?
104:22          A.    Yes.
104:23          Q.    So far I've show you a
104:24  document that came from national thought
105: Page 105
105: 1  leaders that was January 2001.  Do you
105: 2  remember me showing you the document from
105: 3  national thought leaders?
105: 4          A.    Yes.
105: 5          Q.    I showed you a document from
105: 6  Martino Laurenzi, which was June of 2000.
105: 7  Do you remember me showing you that
105: 8  document or do you want to look at it
105: 9  again?
105:10          A.    I remember it.
105:11          Q.    And you saw me showing you a
105:12  document which was from Carlo Patrono
105:13  that was March 2000, and he says that
105:14  naproxen does not explain the VIGOR CVs.
105:15  Do you see that?  Do you remember me
105:16  asking you that question?

Page Range:      105:19-105:24

105:19                  THE WITNESS:  (Witness
105:20          nods.)
105:21  BY MR. PAPANTONIO:
105:22          Q.    Do you remember all three
105:23  documents I just showed you?
105:24          A.    Yes.

Page Range:      106:19-107:7

106:19          Q.    So, after the national
106:20  thought leaders said that naproxen cannot
106:21  explain the CV rates, after Martino
106:22  Laurenzi says naproxen, use of naproxen
106:23  is an explanation for the VIGOR CV rates
106:24  is misleading, after Carlo Patrono, who
107: Page 107
107: 1  you described as a world class thought
107: 2  leader says that naproxen does not
107: 3  explain the VIGOR CV rates, Susan
107: 4  Baumgartner creates a document in 2001
107: 5  that says naproxen does explain the CV
107: 6  rates.  That's what happened here, isn't
107: 7  it?

Page 18

durlist.txt

Page Range:        107:10-107:14

```
107:10              THE WITNESS:  Not the first
107:11        three things that you mentioned,
107:12        because I don't know the beliefs
107:13        of those two thought leaders that
107:14        you specified.
```

Page Range:        109:13-109:19

```
109:13              Q.    Well, did Carlo Patrono,
109:14        after he said March of 2000 that you
109:15        cannot use naproxen as an explanation for
109:16        CV rates in the VIGOR study, did he give
109:17        to you, Susan Baumgartner, another
109:18        document that showed that he changed his
109:19        mind?
```

Page Range:        109:23-111:3

```
109:23              Q.    Did he do that?
109:24              A.    I didn't receive any
110: Page 110
110: 1  documents.
110: 2              Q.    Okay.
110: 3              But nevertheless, on March
110: 4  27, 2001, after Martino Laurenzi said
110: 5  it's misleading to use naproxen as an
110: 6  explanation for CV rates, after the
110: 7  national thought leaders said it's
110: 8  inaccurate to do that, after Carlo
110: 9  Patrono said naproxen does not explain
110:10  the CV rates, Susan Baumgartner creates a
110:11  document, and what does it say?
110:12              A.    This document was designed
110:13  to create a summary of the conclusions
110:14  that the Merck researchers had arrived at
110:15  after reviewing the available data on the
110:16  product.
110:17              Q.    Really?  Where is Carlo
110:18  Patrono in here?  I didn't see his name
110:19  in here.  Is it in there?  Take a minute.
110:20  Please point out Carlo Patrono in this
110:21  document, where Carlo Patrono said you
110:22  may not use naproxen as an explanation
110:23  for the difference in CV rates and in the
110:24  VIGOR study.  Please point that out in
111: Page 111
111: 1  this document if that's there.
111: 2              A.    That is not in this
111: 3  document.
```

Page Range:        111:7-111:13

```
111: 7              Q.    It's not, is it?
111: 8              But Carlo Patrono had a
111: 9  document that he gave to Merck as early
111:10  as 2000 where he said you may not use
111:11  that as an explanation.  You knew Carlo
```

Page 19

durlist.txt

```
111:12  Patrono said naproxen is not an
111:13  explanation?
```

Page Range:      111:16-112:23

```
111:16                  THE WITNESS:  I did not know
111:17          that.
111:18  BY MR. PAPANTONIO:
111:19          Q.   Well, could you please point
111:20  out where you have anything in this
111:21  document about what the national thought
111:22  leaders said about VIGOR and the
111:23  relationship between naproxen and CVs?
111:24  Please point it out in this document.
112: Page 112
112: 1  Where is it?
112: 2          A.   This document was not
112: 3  designed to summarize that information.
112: 4          Q.   No, ma'am.  You just said
112: 5  that this document was a scientific
112: 6  communication plan for Vioxx.  Isn't that
112: 7  what you just said?  Is that what this
112: 8  document is?  This is part of a
112: 9  scientific communication plan?
112:10          A.   This is an internal document
112:11  that was used to summarize some of the
112:12  information and some of the programs that
112:13  were being conducted to discuss this
112:14  important topic.
112:15          Q.   And it is an important
112:16  topic, isn't it?  Naproxen was an
112:17  extremely important topic, wasn't it?
112:18          A.   One of many associated with
112:19  the product.
112:20          Q.   Because Carlo Patrono had
112:21  said you may not use naproxen as a reason
112:22  for explaining why more people were dying
112:23  from the use of Vioxx in the VIGOR study?
```

Page Range:      113:6-113:9

```
113: 6          Q.   You may not use naproxen,
113: 7  Ms. Baumgartner, that's what Patrono told
113: 8  you a year before you created this
113: 9  document?
```

Page Range:      113:12-113:13

```
113:12                  THE WITNESS:  That is not
113:13          true.
```

Page Range:      113:15-113:24

```
113:15          Q.   Well, how about the national
113:16  thought leaders, is there anything in
113:17  here in this document where you talk
113:18  about the national thought leaders that
113:19  had told you two months before that,
113:20  there's no relationship between naproxen
```

Page 20

durlist.txt

```
113:21  and Vioxx, as far as the relationship
113:22  between CVs?  Please point that out to
113:23  the jury.  You can hold it right up to
113:24  this camera if you find it.
```

Page Range:        114:5-114:24

```
114: 5          Q.    Can you find it?
114: 6          A.    I don't, because it's not
114: 7  the feedback that the national thought
114: 8  leaders provided to us based on their
114: 9  review of the data that we share with
114:10  them.
114:11          Q.    So, you're telling me --
114:12  let's go to the next -- see the box right
114:13  next to that, it says, "CV effects
114:14  similar to placebo and NSAIDs without
114:15  potent, sustained anti-platelet effects;
114:16  difference in MIs in VIGOR due to
114:17  cardioprotection with naproxen."  Do you
114:18  see that?  You're saying that again.  You
114:19  are telling in this document that was
114:20  created in March of 2001, you're still
114:21  talking about how naproxen is the
114:22  difference in the VIGOR study where it
114:23  comes to Vioxx and CV rates.  That's what
114:24  that says, isn't it?
```

Page Range:        115:3-115:20

```
115: 3          THE WITNESS:  That is the
115: 4          conclusion that was reached by the
115: 5          Merck scientists.
115: 6  BY MR. PAPANTONIO:
115: 7          Q.    Yeah.  Are you telling me
115: 8  that you are the person who is supposed
115: 9  to communicate to doctors about the
115:10  safety of Vioxx, and you didn't know the
115:11  national thought leaders document that I
115:12  showed you you had never seen?  The
115:13  Martino Laurenzi document you had never
115:14  seen, and the Carlo Patrono document you
115:15  had never seen?  Is that what you're
115:16  telling this jury, that you had never
115:17  seen those three documents that said
115:18  clearly unequivocally, we may not relate
115:19  naproxen to the increased CVs that we
115:20  found in the VIGOR study?
```

Page Range:        115:24-116:17

```
115:24          THE WITNESS:  I had seen --
116: Page 116
116: 1  BY MR. PAPANTONIO:
116: 2          Q.    Is that what you're telling
116: 3  us?
116: 4          A.    I had seen two of those, one
116: 5  of those documents prior to this
116: 6  litigation process.
116: 7          Q.    Which one did you see?
```
Page 21

durlist.txt
```
116: 8        A.     The national thought leader
116: 9  summary.
116:10        Q.     Yeah.
116:11        A.     And that was inconsistent
116:12  with all of the market research that I
116:13  had conducted with national thought
116:14  leaders and other thought leaders
116:15  throughout the country.
116:16        Q.     Well, where do you mention
116:17  it in here?
```

Page Range:      116:22-117:3

```
116:22              THE WITNESS:  There were --
116:23        can I refer back to --
116:24  BY MR. PAPANTONIO:
117: Page 117
117: 1        Q.     Ma'am, you can point out
117: 2  anything you want to as far as, my
117: 3  question is this --
```

Page Range:      117:20-119:1

```
117:20              THE WITNESS:  We just wanted
117:21        to communicate that the majority
117:22        of thought leaders that I spoke
117:23        with in the context of advisory
117:24        board meetings or consultants
118: Page 118
118: 1        meetings felt that naproxen was
118: 2        the explanation for those VIGOR
118: 3        results, in light of the other
118: 4        cardiovascular data available for
118: 5        Vioxx.  There were some, a few who
118: 6        came to the conclusion that it
118: 7        could have been because of Vioxx.
118: 8        There were others who could not
118: 9        come to a conclusion because they
118:10        didn't feel they had enough data
118:11        to arrive at a conclusion.
118:12              So, there were dissenting
118:13        views, and Merck wanted to hear
118:14        about those, and that was part of
118:15        my responsibility, to understand
118:16        the thoughts that were out there,
118:17        not just the ones that agreed with
118:18        Merck, but others as well.
118:19  BY MR. PAPANTONIO:
118:20        Q.     Well, where is the part in
118:21  this document that says your scientific
118:22  communication that we have up here where
118:23  it says anything that naproxen should not
118:24  be considered?  Point it out.  I don't
119: Page 119
119: 1  see it in there.  Do you see it in there?
```

Page Range:      119:4-119:12

```
119: 4              THE WITNESS:  Merck did not
119: 5        believe that.  These were
```
                        Page 22

```
                        durlist.txt
119: 6          conclusions that were reached
119: 7          based on review of data --
119: 8  BY MR. PAPANTONIO:
119: 9          Q.   Merck --
119:10          A.   And that was -- naproxen was
119:11  the explanation of the VIGOR results --
119:12          Q.   I'm not talking about Merck.


Page Range:     119:15-119:16

119:15                  THE WITNESS:  This is the
119:16          internal document.


Page Range:     119:18-119:24

119:18          Q.   I'm talking about Susan
119:19  Baumgartner.  Susan Baumgartner knew
119:20  clearly that the national thought leaders
119:21  said the naproxen argument is not true,
119:22  it's misleading, it is a lie.  You knew
119:23  that when you created that document,
119:24  didn't you?


Page Range:     120:5-120:9

120: 5          Q.   You knew that?
120: 6          A.   That -- I'm not sure where
120: 7  the document came from that you gave me.
120: 8          Q.   Well, you said you'd seen
120: 9  it.


Page Range:     121:3-121:9

121: 3          Q.   You had seen the national
121: 4  thought leaders say that there's no
121: 5  relationship between naproxen and
121: 6  cardiovascular events that took place in
121: 7  VIGOR, you knew that, prior to the time
121: 8  you created this document that the jury
121: 9  is looking at right now?


Page Range:     121:13-121:13

121:13          Q.   Susan Baumgartner knew that?


Page Range:     121:16-121:17

121:16                  THE WITNESS:  I had received
121:17          this document back in 2001.


Page Range:     121:20-122:16

121:20          A.   And the -- in general, I
121:21  don't think it mentions what you say,
121:22  because there are statements in here not
121:23  concerned about cardio/renal data from
                        Page 23
```

durlist.txt
121:24  VIGOR, believe that those effects are
122: Page 122
122: 1  COX-2 class effect.  COX-2 class does not
122: 2  pose cardiovascular risk.  There are many
122: 3  statements in here that are consistent
122: 4  with what I heard in the context of my
122: 5  discussions and market research that was
122: 6  conducted with the thought leaders.
122: 7          That statement is around not
122: 8  emphasizing the protective effect of
122: 9  Naprosyn as an explanation.  Emphasizing
122:10  it, not that it wasn't true, which I
122:11  think was what you were saying, but just
122:12  in the context of that statement.
122:13          And the second statement, no
122:14  supporting data, is not consistent with
122:15  my knowledge of what was available around
122:16  Naprosyn at the time.


Page Range:      123:3-123:6

123: 3          MR. PAPANTONIO:  Please show
123: 4  her 400.  There's the entire 400.
123: 5  What page is this?
123: 6          MR. KAUFMAN:  28.


Page Range:      123:17-124:10

123:17          Q.    Page 28.  I'm showing you
123:18  something you've seen before because you
123:19  created it.  I think it's called daily
123:20  record of events.  Have you seen this
123:21  before?
123:22          A.    It looks like my planner,
123:23  and that is my handwriting.
123:24          Q.    It is your handwriting, it
124: Page 124
124: 1  is your planner.  Tell the jury what your
124: 2  planner is.
124: 3          A.    My planner includes my
124: 4  calendar, as well as notes that I take
124: 5  from messages, from meetings, from my
124: 6  to-do list.
124: 7          Q.    Would you look at Page --
124: 8          MR. PAPANTONIO:  Is it Page
124: 9          28?
124:10          MR. KAUFMAN:  28.


Page Range:      125:10-127:5

125:10          Q.    But at any rate, you've got
125:11  February, 2001, Friday, the 9th.  Do you
125:12  see that?
125:13          A.    Yes.
125:14          Q.    Now, it says, and as George
125:15  pointed out, I highlighted this, but it
125:16  says, "FDA bought that naproxen could be
125:17  cardioprotective."
125:18          A.    Yes.
125:19          Q.    Did you write that?
                        Page 24

                            durlist.txt
125:20          A.    It's my handwriting, yes.
125:21          Q.    It says, "FDA bought that
125:22 naproxen could be cardioprotective."  Who
125:23 was selling that to the FDA, that
125:24 naproxen could be cardioprotective, you
126: Page 126
126: 1 or Ms. Reicin?
126: 2          A.    Nobody was selling that to
126: 3 the FDA.
126: 4          Q.    Well, it says they bought
126: 5 it, "FDA bought that naproxen could be
126: 6 cardioprotective."  Do you see that?
126: 7          A.    Yes.
126: 8          Q.    That statement was made
126: 9 February 2001, and just to recap, that's
126:10 after the Patrono document, which was
126:11 March 2000, that's after the Laurenzi
126:12 Martino document, Martino Laurenzi, which
126:13 was June 2000, that's after the thought
126:14 leaders, which was January 2001.  You're
126:15 still talking about in your handwriting,
126:16 "The FDA bought that naproxen could be
126:17 cardioprotective."  Why did you write
126:18 that?
126:19          A.    I mentioned previously in
126:20 another deposition that it refers, in my
126:21 opinion, to the FDA agreeing that
126:22 naproxen could be cardioprotective.  Not
126:23 used in the bought/sell type of
126:24 discussion.
127: Page 127
127: 1          Q.    Well, you used the term
127: 2 "bought."
127: 3          A.    Right.
127: 4          Q.    If you have a buyer, you
127: 5 also have a seller, don't you?


Page Range:    127:8-127:18

127: 8              THE WITNESS:  Bought could
127: 9 be --
127:10 BY MR. PAPANTONIO:
127:11          Q.    Well, the national thought
127:12 leaders were saying the month before that
127:13 you cannot sell that fact, that naproxen
127:14 is related to CVs, increased risk in
127:15 VIGOR.  You saw that.  You talked about
127:16 that already.  Did you send that to the
127:17 FDA?  Did you send the national thought
127:18 leaders' statement to the FDA?


Page Range:    127:21-128:8

127:21              THE WITNESS:  No, I did not.
127:22 BY MR. PAPANTONIO:
127:23          Q.    Did you send Martino
127:24 Laurenzi's statement to the FDA?
128: Page 128
128: 1          A.    No.
128: 2          Q.    Did you send Carlo Patrono's
128: 3 statement to the FDA?
                        Page 25

durlist.txt
```
128: 4            A.    No.  I was not involved in
128: 5   interactions with the FDA.
128: 6            Q.    So, were you the one -- so,
128: 7   who talked to FDA where the FDA bought
128: 8   the naproxen argument?  Who was that?
```

Page Range:      128:11-128:14

```
128:11                THE WITNESS:  The Merck
128:12            scientists, I believe, were the
128:13            ones that presented the
128:14            information to the FDA.
```

Page Range:      205:2-206:21

```
205: 2            Q.    Did you know, Mrs.
205: 3   Baumgartner, that we've been talking
205: 4   about human beings, people that were
205: 5   dying in protocols where they were taking
205: 6   Vioxx, did you know that while that was
205: 7   going on that Merck, the company that you
205: 8   now still work for, that they were
205: 9   creating "kiddy data" to see if they
205:10   could sell Vioxx to children?  Did you
205:11   know that?  Have you ever see document
205:12   1257, sitting there in front of you?
205:13                MR. PAPANTONIO:  Blow that
205:14            up so we can read this.
205:15   BY MR. PAPANTONIO:
205:16            Q.    Do you see the data on that?
205:17   Let's be very clear.  In 2001, 8th month,
205:18   2001, you were working on the Vioxx
205:19   project, weren't you?
205:20            A.    I was on the marketing team.
205:21            Q.    Did you know Barry Gertz?
205:22            A.    I knew of him.
205:23            Q.    And who was Ken Truitt?
205:24            A.    He was a scientist in MRL.
206: Page 206
206: 1            Q.    And you see where it says
206: 2   "Ken" --
206: 3                MR. PAPANTONIO:  Blow this
206: 4            up, please.
206: 5   BY MR. PAPANTONIO:
206: 6            Q.    "Thinking through how we
206: 7   might bolster the safety image of vioxx,
206: 8   it comes to mind that the sooner we can
206: 9   get agreement on the peds written request
206:10   and get the kiddy data out to the public
206:11   and, hopefully, the sooner we can get an
206:12   indication for children the sooner we can
206:13   claim 'safe enough for children.'  That
206:14   might go some of the way to helping us in
206:15   the marketplace."
206:16                Did you realize that while
206:17   Merck was getting information that people
206:18   were dying 3 to 1, Vioxx to placebo, that
206:19   they're still talking about testing it on
206:20   children?  Did you know that prior to
206:21   coming here today?
```

durlist.txt

Page Range:        207:1-207:19

```
207: 1            Q.    Have you ever heard that?
207: 2            A.    I was aware of pediatric
207: 3    studies that were ongoing, and the
207: 4    company believed the product was safe.
207: 5    They believed in the product and looked
207: 6    at the totality of the information, not
207: 7    just individual studies that you've shown
207: 8    or individual results, but all available
207: 9    data, to come to the conclusions and
207:10    believed that we could help children in
207:11    treating their pain.
207:12            Q.    No, no.  This doesn't talk
207:13    about treating the pain of children.  You
207:14    know what it talks about?  You want to
207:15    read it -- let's read it again.
207:16                  "Thinking through how we
207:17    might bolster the safety image of vioxx."
207:18    What does that have to do with children's
207:19    pain?
```

Page Range:        208:4-208:21

```
208: 4            Q.    It is talking about
208: 5    bolstering the safety image of Vioxx.
208: 6    "It comes to mind that the sooner we can
208: 7    get an agreement on the peds."  What's
208: 8    peds?
208: 9            A.    Pediatrics, I think it
208:10    refers to.
208:11            Q.    "Written request and get the
208:12    kiddy data...to the public and,
208:13    hopefully, the sooner we can get an
208:14    indication for children the sooner we can
208:15    claim 'safe enough for children.'  That
208:16    might go some of the way to helping us in
208:17    the marketplace."  This isn't about
208:18    children's pain, Mrs. Baumgartner, is it?
208:19    Where do you get that about children's
208:20    pain?
208:21            A.    That the --
```

Page Range:        208:24-209:19

```
208:24                  You can answer.
209: Page 209
209: 1                  THE WITNESS:  My thought is
209: 2             that the written request that went
209: 3             in for a pediatric study was a
209: 4             study that was designed to look at
209: 5             an important therapeutic option
209: 6             for children and an important
209: 7             treatment study in a population
209: 8             that had maybe not been looked at
209: 9             previously.
209:10    BY MR. PAPANTONIO:
209:11            Q.    Where does it say that?
209:12    Please tell me.  Point that out in this
209:13    document, where it talks about pain,
```

Page 27

durlist.txt
```
209:14  where it talks about improving the life
209:15  of children.  This is about marketing
209:16  Vioxx, improving the market for Vioxx.
209:17  Merck is willing to test this stuff on
209:18  children after they know that people are
209:19  dying in protocols; is that correct?


Page Range:     210:1-210:23

210: 1                THE WITNESS:  I'm not
210: 2          involved in decisions to do
210: 3          studies or not.  But in hearing
210: 4          multiple researchers talk about
210: 5          the reasons that we would support
210: 6          a study, that is my -- it's my
210: 7          hope and expectation that Merck is
210: 8          consistent with its mission,
210: 9          consistent with the way we
210:10          approach helping patients.
210:11               MR. PAPANTONIO:  Blow this
210:12          up so we all can see it, so the
210:13          jury can see it.  Now, blow this
210:14          whole document up.
210:15  BY MR. PAPANTONIO:
210:16          Q.   Please point out to the jury
210:17  where this is a discussion about trying
210:18  to solve the pain of children.  Point it
210:19  out on that document, if you would.
210:20          A.   I'm giving you my
210:21  perceptions of the reasons that we give
210:22  clinical studies.  I can't comment on
210:23  what was meant by this communication.


Page Range:     234:18-234:19

234:18               MR. PAPANTONIO:  Can you
234:19          please show her 176?


Page Range:     235:3-235:22

235: 3          Q.   Now, 176 is a document
235: 4  you've seen before; is that right?
235: 5          A.   (Witness reviewing
235: 6  document.)
235: 7               I saw this during one of my
235: 8  depositions.
235: 9          Q.   Okay.
235:10               This document -- let's read
235:11  it.  It's 2001, January 9, 2001.  Tell us
235:12  who Dr. Fries is, please.
235:13          A.   Dr. Fries was a physician
235:14  from Stanford.
235:15          Q.   Who is Raymond Gilmartin?
235:16          A.   Mr. Gilmartin was the CEO of
235:17  Merck.
235:18          Q.   So, Dr. Fries from Stanford
235:19  is writing to Dr. Gilmartin, is that
235:20  correct, on January 9, 2001?  Do you see
235:21  that?
235:22          A.   It's shown here.
```
                        Page 28

durlist.txt

Page Range:      238:13-240:22

```
238:13          Q.    It says at the top,
238:14  "Stanford University Medical Center."
238:15          Did you work directly with
238:16  any doctors at Stanford University
238:17  Medical Center?
238:18          A.    Interacted with a few of
238:19  them, but --
238:20          Q.    Who did you interact with at
238:21  Stanford University Medical Center?
238:22          A.    Dr. Singh was one that I
238:23  remember.
238:24          Q.    So, you know Dr. Singh then,
239: Page 239
239: 1  don't you?
239: 2          A.    I have met him on a few
239: 3  occasions.
239: 4          Q.    Well, the truth is you --
239: 5  well, let me go through -- I want to ask
239: 6  you some specific questions and ask you
239: 7  what involvement you had with these
239: 8  issues.  The next page, if you go to the
239: 9  next page, do you see the second
239:10  paragraph?  It says, "The much broader
239:11  issues, which surfaced at the American
239:12  College of Rheumatology meetings, were
239:13  most disturbing and involve" suspicion of
239:14  data by Merck --
239:15          MR. TSOUGARAKIS:  You said
239:16  "suspicion."
239:17  BY MR. PAPANTONIO:
239:18          Q.    Excuse me.  "...suppression
239:19  of data by Merck and a consistent pattern
239:20  of intimidation of investigators by Merck
239:21  staff, principally Dr. Sherwood but also
239:22  others on his staff.
239:23          "A number of physicians have
239:24  concerns that Vioxx may have some serious
240: Page 240
240: 1  and underemphasized drug toxicity
240: 2  problems, particularly at the 50
240: 3  milligram dose approved for pain
240: 4  control - these concerns are shared by
240: 5  the FDA renal reviewer.  Vioxx has been
240: 6  reported to have more frequent peripheral
240: 7  edema problems, more aggravated
240: 8  hypertension, more congestive heart
240: 9  failure, and more heart attacks than
240:10  other NSAIDs, especially Celebrex."  Do
240:11  you see that?
240:12          A.    (Witness nods.)
240:13          Q.    Now, you were asked, weren't
240:14  you, Doctor -- I mean Ms. Baumgartner, to
240:15  put together a program where actually it
240:16  was really a program of intimidation of
240:17  doctors that were saying these things
240:18  that Fries is saying here?  Well, you can
240:19  say yes or no to it.  But you were asked
240:20  to put together a program to intimidate
240:21  doctors that disagreed with what Merck
```
Page 29

durlist.txt
240:22  wanted to put forward.  Is that true?


Page Range:      241:1-243:4

241: 1              THE WITNESS:  That is
241: 2         absolutely not correct.
241: 3  BY MR. PAPANTONIO:
241: 4         Q.    Absolutely not true.  That's
241: 5  your testimony?
241: 6         A.    That's not true.
241: 7         Q.    Well, let's read something
241: 8  then.  Look at the last paragraph.  It
241: 9  says, "Even worse were the allegations of
241:10  Merck damage control by intimidation,
241:11  often with a" growing "pattern of" the
241:12  "Dean or Department Head with complaints
241:13  of anti-Merck bias and always alleging
241:14  unbalanced anti-Vioxx presentations.
241:15  This has happened to at least eight
241:16  investigators:  Dr. Singh" you know who
241:17  that is; right?
241:18         A.    Yes.
241:19         Q.    Dr. Lipsky, you know who
241:20  "Dr. Peter Lipsky" is, don't you?
241:21         A.    Yes.  I know of him.
241:22         Q.    He's now research chief at
241:23  the Arthritis Institute.
241:24              "Dr. Andrew Whelton," you
242: Page 242
242: 1  know who that is at Hopkins; correct?
242: 2         A.    Yes, I do.
242: 3         Q.    "Dr. Michelle Petri"; true?
242: 4  You know who that is, Michelle Petri?
242: 5         A.    I know of her.
242: 6         Q.    Hopkins?
242: 7         A.    I don't know her.
242: 8         Q.    Dr. Yocum, you know "Dr.
242: 9  David Yocum" of Tucson?
242:10         A.    I do not know him.
242:11         Q.    Do you know "Dr. Lee Simon"
242:12  of Harvard?
242:13         A.    I know of him.
242:14         Q.    "Dr. James McMillen," you
242:15  know Dr. James McMillen?
242:16         A.    I know of him as well.
242:17         Q.    You know Dr. Stillman, don't
242:18  you?
242:19         A.    I know of him.
242:20         Q.    Now, let's look at the front
242:21  page of this document again.  Okay?  This
242:22  document was written 2001, January 9,
242:23  2001.  Do you see that?
242:24         A.    Yes.
243: Page 243
243: 1         Q.    It's directed to Dr. Raymond
243: 2  Gilmartin, Chief Executive Officer;
243: 3  correct?
243: 4         A.    Correct.


Page Range:      243:8-244:18

Page 30