UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

Filed 2-7-06
LORETTA G. WHYTE
CLERK

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| Evelyn Irvin Plunkett v. Merck & Co, Inc. | * | CASE NO. 02:05CV4046 |

**Notice of Filing Deposition Testimony
of Jan Weiner**

Plaintiff Evelyn Irvin Plunkett, as Personal Representative of the Estate of Mr. Richard Irvin, Jr., by and through her attorneys, hereby gives notice of filing the final transcript of the deposition testimony of Jan Weiner. This testimony was played during the trial of this cause on February 7, 2006. A transcript is attached as Exhibit "A."

Respectfully submitted,

By: _____
**Andy D. Birchfield, Jr.**
P. Leigh O'Dell
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
**Co-Lead Counsel**

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS,
MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502

**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
FAX: (504) 561-6024

Christopher A. Seeger, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

**PLAINTIFFS' LIAISONCOUNSEL**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
MEUNIER&WARSHAUER, L.L.C.
P.O. Box 960
191 East Second Street
New Roads, LA 70760
(225) 638-6137
(225) 638-8836 (fax)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Thomas R. Kline, Esquire
KLINE&SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Carlene Rhodes Lewis, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced in accordance with Pre-Trial Order No. #8, on this the **7th** day of February, 2006.

_____

```
                              Final Weiner.txt

Jan Weiner (Multi-clip)
Weiner 1510     15:10-15:13

   15:10     Q.      You're currently employed by Merck?
   15:11     A.      Yes.
   15:12     Q.      Okay.  When did you start with Merck?
   15:13     A.      October of 1989.

Weiner 1812     18:12-20:24

   18:12                     Tell me, when you started with Merck
   18:13 in 1989, what was your first job?
   18:14        A.      My title was director of information
   18:15 services and I worked in the public affairs
   18:16 department for the US business.  And my job
   18:17 generally was to work on communications related to
   18:18 Merck's products.
   18:19        Q.      How long did you have that direct --
   18:20 what was your title?
   18:21        A.      My title was director of information
   18:22 services.
   18:23        Q.      Okay.  How long did you have that
   18:24 title?
   18:25        A.      A couple of years.
   19: Page 19
   19: 1        Q.      Until about '91 or so?
   19: 2        A.      '91, '92.
   19: 3        Q.      Okay.  And did your job change after
   19: 4 that?
   19: 5        A.      My title changed to senior director,
   19: 6 and some of the responsibilities -- the
   19: 7 responsibilities were generally the same.
   19: 8        Q.      Was it considered a promotion?
   19: 9        A.      Yes, it was.
   19:10        Q.      Okay.  And how long did you have that
   19:11 job?
   19:12        A.      I had that job for, I guess, about
   19:13 five years.
   19:14        Q.      Until like '97, '98, something like
   19:15 that?
   19:16        A.      Yeah.
   19:17        Q.      Okay.  And in 1998, what job did you
   19:18 take?
   19:19        A.      At that point the title was executive
   19:20 director, public affairs, for US -- for the US
   19:21 business, and it was the -- it was a higher title,
   19:22 more responsibility.  I had responsibility for all
   19:23 of the products and some of the issues that were
   19:24 current in the media at the time.
   19:25        Q.      Okay.  For just domestic
   20: Page 20
   20: 1 responsibilities?
   20: 2        A.      Yes, just -- just domestic.
   20: 3        Q.      Okay.  And how long did you hold that
   20: 4 title -- or that job?
   20: 5        A.      That job where it was focused
   20: 6 strictly on domestic was until somewhere 2000; 2000,
   20: 7 2001.  I'm having some trouble with the dates,
   20: 8 but --
   20: 9        Q.      Your best estimate.
   20:10        A.      Yes.  The job and how we organized
   20:11 that work changed for one year about that time.
                                   Page 1
```

```
                             Final Weiner.txt
20:12       Q.       So around 2000, 2001, did your job --
20:13 job title change?
20:14       A.       Executive director, global product
20:15 communications.
20:16       Q.       Okay. And how long did you hold that
20:17 job?
20:18       A.       Until April of 2003.
20:19       Q.       Then what job did you have?
20:20       A.       Executive director of public affairs
20:21 for Asia, Japan, Australia and New Zealand.
20:22       Q.       So you had no more domestic
20:23 responsibilities at that point?
20:24       A.       That is correct.

Weiner 2204     22:04-23:13

22: 4       Q.       Approximately when were your first
22: 5 responsibilities for Vioxx? When did you first take
22: 6 on those responsibilities?
22: 7       A.       '97, '98. That's -- that's the best
22: 8 I can do on timing.
22: 9       Q.       During the '97, 1998 time frame, what
22:10 were your responsibilities as it related to the drug
22:11 Vioxx?
22:12       A.       The responsibilities were primarily
22:13 to develop communications plans for -- for the drug
22:14 and then also to develop news releases and other
22:15 materials related to scientific presentations and
22:16 publications about the drug.
22:17       Q.       Did those responsibilities change at
22:18 all over time as it relates to the drug Vioxx?
22:19       A.       Those remained the primary
22:20 responsibilities.
22:21       Q.       Regardless of job title?
22:22       A.       Yes.
22:23       Q.       And were your responsibilities as
22:24 related to the drug Vioxx always focused on the US
22:25 market?
23: Page 23
23: 1       A.       They were until I -- I held the title
23: 2 of global product communications.
23: 3       Q.       And that was like 2000, executive
23: 4 director of global product communications?
23: 5       A.       If you give me a minute, I can
23: 6 reconstruct in my head the timing on that.
23: 7       Q.       Go ahead. Take your time.
23: 8       A.       The global product communications job
23: 9 was during the calendar year of 2002.
23:10       Q.       So up to 2002, your responsibilities
23:11 as it related to the drug Vioxx were limited to the
23:12 United States?
23:13       A.       That is correct.

Weiner 3104     31:04-31:07

31: 4       Q.       Okay. And the press releases that
31: 5 were issued to the news media, who -- what audience
31: 6 was it that you -- you ultimately intended to reach
31: 7 out to?

Weiner 3109     31:09-32:05

31: 9                THE WITNESS: The news releases were
                                 Page 2
```

```
                                         Final Weiner.txt
31:10 designed to be reviewed by news reporters who would
31:11 make judgment as to whether the information was
31:12 worthy of news coverage.  And then it would be a
31:13 matter of who the audience is of any particular
31:14 media organization.
31:15 BY MR. PLACITELLA:
31:16        Q.      Okay.  You understood when those
31:17 press releases were issued that the information you
31:18 supplied could eventually be read or seen by people
31:19 taking Vioxx, correct?
31:20        A.      Yes, we understood that.
31:21        Q.      As well as doctors?
31:22        A.      Yes.
31:23        Q.      And as well as people who were not
31:24 currently taking Vioxx but who might be candidates
31:25 for taking Vioxx?
32: Page 32
32: 1        A.      You're really talking about the
32: 2 audience for the general media in the country?
32: 3        Q.      Correct.
32: 4        A.      And that's the general population who
32: 5 was consumers of news media.

Weiner 3209    32:09-32:17

32: 9        Q.      How did public affairs integrate with
32:10 marketing?
32:11        A.      We -- we worked with marketing as one
32:12 of the sources of information that -- that we had at
32:13 our disposal and we worked with them.  They had the
32:14 opportunity, like our scientists, like investor
32:15 relations, to review the news release and the Q and
32:16 A, and we worked with them side by side as -- as
32:17 departments do within a company.

Weiner 3703    37:03-37:11

37: 3        Q.      And what was Alise Reicin's primary
37: 4 function as it related to Vioxx and public
37: 5 relations?
37: 6        A.      She -- she often was the person that
37: 7 we would go to either to obtain information or data
37: 8 on which we based our news releases and materials,
37: 9 and then she would often be the point person within
37:10 MRL clinical to whom we would submit our materials
37:11 for review and clearance.

Weiner 4309    43:09-43:21

43: 9        Q.      Okay.  The material that you used
43:10 to -- as tools for public relations, they would
43:11 include press releases, correct?
43:12        A.      Yes.
43:13        Q.      Would they include standby
43:14 statements?
43:15        A.      Yes.
43:16        Q.      What is a standby statement?
43:17        A.      A standby statement is the company's
43:18 position on an issue that is used by people in
43:19 public affairs, typically, to respond to questions
43:20 in cases where we are not going to be issuing a news
43:21 release.

                                      Page 3
```

```
                                    Final Weiner.txt
Weiner 4507      45:07-45:14

    45: 7      Q.      Okay. What is the reason why some
    45: 8 press releases were submitted to the FDA and others
    45: 9 were not?
    45:10      A.      Merck's practice had been to send to
    45:11 the FDA news releases related to regulatory actions
    45:12 as part of a launch campaign. The FDA typically
    45:13 likes to see launch campaigns, and so a news release
    45:14 as part of a launch campaign was sent to the FDA.

Weiner 4523      45:23-46:11

    45:23      Q.      I don't want to get anybody in
    45:24 trouble here. So you can just tell me what your
    45:25 understanding was for the reason why some press
    46: Page 46
    46: 1 releases were sent to the FDA and others were not,
    46: 2 your understanding?
    46: 3      A.      That the FDA liked to see launch
    46: 4 materials. The news release was part of the launch.
    46: 5 And on the basis of that, it was submitted to the
    46: 6 FDA.
    46: 7      Q.      Okay. So other than that, generally
    46: 8 speaking, the news releases were not submitted to
    46: 9 the FDA?
    46:10      A.      Generally speaking. There were
    46:11 exceptions.

Weiner 4703      47:03-47:12

    47: 3      Q.      So every press release or video news
    47: 4 release was submitted to the FDA after it was
    47: 5 issued?
    47: 6      A.      Those releases related to products,
    47: 7 yes.
    47: 8      Q.      When you say "related to products,"
    47: 9 what do you mean by that?
    47:10      A.      Well, news releases that the company
    47:11 would issue about sales and earnings, for instance,
    47:12 would not be submitted to the FDA.

Weiner 4713      47:13-47:15

    47:13      Q.      Okay. Were you aware, as executive
    47:14 director of public affairs, that the press releases
    47:15 were governed by the FDA labeling requirements?

Weiner 4717      47:17-47:21

    47:17              THE WITNESS: Yes.
    47:18 BY MR. PLACITELLA:
    47:19      Q.      Were standby statements ever reviewed
    47:20 by the FDA?
    47:21      A.      I don't recall that.

Weiner 4916      49:16-50:10

    49:16      Q.      Okay. I think I left off with Q and
    49:17 As, questions and answers. Did public affairs
    49:18 prepare Q and As as they related to Vioxx?
    49:19      A.      Yes.
    49:20      Q.      Can you tell us what a Q and A is and
                                       Page 4
```

```
                                   Final Weiner.txt
49:21 what its function was related to Vioxx?
49:22      A.       A Q and A is prepared to answer
49:23 questions that we may receive from reporters that
49:24 would not be covered in a news release.  Sometimes
49:25 you can't put absolutely everything in a news
50: Page 50
50: 1 release and you know there are going to be
50: 2 additional questions, and so that's where you put
50: 3 the questions that you expect to receive and what
50: 4 the answers would be.
50: 5      Q.       Okay.  Were Q and As reviewed by the
50: 6 FDA at any point in time concerning Vioxx?
50: 7      A.       To the best of my knowledge, no.
50: 8      Q.       Okay.  Before you mentioned video
50: 9 news releases.  Can you tell us what a video news
50:10 release is?

Weiner 5014     50:14-50:25

50:14      A.       A video news release is prepared for
50:15 television stations, and it basically takes the
50:16 story in a print press release and puts it in a
50:17 format and form that television stations can choose
50:18 to use if they want to.  And there are several
50:19 different ways of preparing them.  And the way that
50:20 I thought about it was, you give a television
50:21 station the ingredients to do a story if they choose
50:22 to do it.  You give them additional background
50:23 footage.  You'll give them additional quotes so they
50:24 can tailor it, if they choose to do a story on that
50:25 particular subject.

Weiner 5508     55:08-55:10

55: 8                Did Merck distribute video news
55: 9 releases concerning Vioxx to the media without going
55:10 to the FDA first?

Weiner 5516     55:16-55:18

55:16                THE WITNESS:  I don't remember all of
55:17 the video news releases that we did on Vioxx, so I
55:18 really can't answer your question.

Weiner 6209     62:09-62:15

62: 9      Q.       Did you ever use the PR Newswire?
62:10      A.       We used PR Newswire and BusinessWire
62:11 for distribution of press releases.
62:12      Q.       And would you distribute those news
62:13 releases ever electronically over the PR Newswire on
62:14 the Internet?
62:15      A.       Oh, now I see.  Okay.  Yes.

Weiner 6307     63:07-63:11

63: 7      Q.       Okay.  Did you understand that when
63: 8 you distributed press releases on the PR Newswire or
63: 9 BusinessWire over the Internet that those press
63:10 releases were likely to appear on various web sites
63:11 throughout the Internet?

Weiner 6313     63:13-63:13
                                   Page 5
```

```
                              Final Weiner.txt
     63:13                 THE WITNESS:  Yes.

Weiner 7423      74:23-75:01

     74:23         Q.      Okay.  Can you tell me the physicians
     74:24 that you recall that were charged with
     74:25 responsibility of reviewing Vioxx press -- press
     75: Page 75
     75: 1 releases?

Weiner 7507      75:07-75:13

     75: 7                 THE WITNESS:  I can remember Dr.
     75: 8 Reicin reviewing releases.  I know that Ed Scolnick
     75: 9 in one case reviewed a news release.  I know that
     75:10 there were other people on Dr. Reicin's staff who
     75:11 reviewed news releases related to their
     75:12 presentations and publications, but those would be
     75:13 names I don't recall at this point.

Weiner 7918      79:18-79:21

     79:18         Q.      Sure.  When is the first time you
     79:19 learned that there were respected scientists that
     79:20 were concerned that Vioxx might have a role in
     79:21 causing heart attacks?

Weiner 7923      79:23-80:11

     79:23                 THE WITNESS:  I remember that there
     79:24 was a publication from Garret FitzGerald that raised
     79:25 questions about COX-2 inhibitors.  That's what I
     80: Page 80
     80: 1 remember.
     80: 2 BY MR. PLACITELLA:
     80: 3         Q.      And when was that -- when was that
     80: 4 publication, before or after VIGOR?
     80: 5         A.      I believe it was before.
     80: 6         Q.      Before.  Okay.  And what were the
     80: 7 circumstances that -- well, strike that.
     80: 8                 Garret FitzGerald was an occasional
     80: 9 paid advisor to -- medical advisor, to Merck.  Were
     80:10 you aware of that?
     80:11         A.      No, I was not.

Weiner 8016      80:16-80:18

     80:16         Q.      Okay.  What were the circumstances
     80:17 under which you learned about the Garret FitzGerald
     80:18 publication related to heart attacks and COX-2s?

Weiner 8020      80:20-81:04

     80:20                 THE WITNESS:  We received a question
     80:21 from a reporter based upon that publication, and
     80:22 through the question we learned about the
     80:23 publication and prepared a standby statement and a Q
     80:24 and A.
     80:25 BY MR. PLACITELLA:
     81: Page 81
     81: 1         Q.      Okay.  So the question that was asked
     81: 2 by the reporter concerning the publication of Garret
                                  Page 6
```

```
                              Final Weiner.txt
   81: 3 FitzGerald was what?
   81: 4       A.      I don't remember.
Weiner 8109      81:09-81:11

   81: 9       Q.      Who decided that a stand boy -- a
   81:10 standby statement and Q and A was necessary in
   81:11 relation to the Garret FitzGerald publication?

Weiner 8113      81:13-81:17

   81:13                 THE WITNESS:  I don't know who
   81:14 specifically made that decision, but if you have a
   81:15 question from a reporter and you need to develop an
   81:16 answer, the usual mechanism is to develop a quick
   81:17 standby statement and Q and A.

Weiner 8222      82:22-83:05

   82:22       Q.      Okay.  And, for the record, you were
   82:23 concerned about the question as it related to COX-2
   82:24 because Vioxx was a COX-2, correct?
   82:25       A.      That is correct.
   83: Page 83
   83: 1       Q.      Now, do you recall what Merck was
   83: 2 prepared to tell the press in response to the
   83: 3 FitzGerald article that was incorporated into the
   83: 4 standby statement and Q and A at that point in time?
   83: 5       A.      I don't recall.

Weiner 10215     102:15-103:15

   102:15                I think you had it marked.  Her
   102:16 personnel file, December 31, 1997, is the cover
   102:17 page.
   102:18                I'm going to show you what has been
   102:19 marked Weiner Exhibit 2, and I'll make sure that
   102:20 we're on the same page, so I'm going to give you the
   102:21 page 3.  Take a look, see where it says under Vioxx,
   102:22 and the third or fourth sentence down, it says,
   102:23 "Strong media outreach contributed to the most
   102:24 successful launch in Merck history."  Do you see
   102:25 that?
   103: Page 103
   103: 1       A.      Yes, I see that.
   103: 2       Q.      Okay.  "Vioxx was highlighted in
   103: 3 articles reaching a total of more than two
   103: 4 billion-almost ten times per person."  Did I read
   103: 5 that correctly?
   103: 6       A.      Yes, you did.
   103: 7       Q.      Okay.  Does that refresh your
   103: 8 recollection as to what the reach was of your media
   103: 9 campaign in the year 1999?
   103:10       A.      Somewhat.
   103:11       Q.      Okay.  "Of this total, there were 1.4
   103:12 billion impressions for Vioxx alone and an
   103:13 additional 700 million highlighting both agents."
   103:14 That meaning -- that is Celebrex, correct?
   103:15       A.      Yes.

Weiner 10404     104:04-104:08

   104: 4       Q.      Would you agree with me, generating
                                Page 7
```

```
                                    Final Weiner.txt
  104: 5 enough stories to reach ten times per person all the
  104: 6 people in the United States is an extraordinary
  104: 7 media outreach?
  104: 8          A.      I would say it was very successful.

Weiner 10617      106:17-106:20

  106:17                  So the two billion impressions means
  106:18 that, based on Merck's calculations, their message
  106:19 would have reached people in the United States two
  106:20 billion times?

Weiner 10623      106:23-107:07

  106:23                  THE WITNESS:  It would have meant
  106:24 that two -- two billion people over the course of
  106:25 the year potentially would have seen the message.
  107: Page 107
  107: 1 BY MR. PLACITELLA:
  107: 2          Q.      Okay.  But we don't have two billion
  107: 3 people in the United States?
  107: 4          A.      That is correct.
  107: 5          Q.      So to break down the math, it would
  107: 6 mean that every person in the United States would
  107: 7 have seen your message at least ten times?

Weiner 10710      107:10-107:16

  107:10           Q.     Correct?
  107:11           A.     That is the way the math would work.
  107:12           Q.     So if every person in the United
  107:13 States would have seen your message ten times in a
  107:14 given year, it would be extremely important to be
  107:15 sure that the information contained in the message
  107:16 was accurate and truthful in every respect?

Weiner 10721      107:21-107:21

  107:21           A.     I would agree with that.

Weiner 14816      148:16-148:23

  148:16           Q.     And this press release says, in its
  148:17 headline, "Merck confirms favorable cardiovascular
  148:18 safety profile of Vioxx."  Did I read that
  148:19 correctly?
  148:20           A.     Yes, you did.
  148:21           Q.     Would the reader reading that
  148:22 headline believe that Vioxx had the potential to
  148:23 hurt your heart?

Weiner 14825      148:25 - 149:02

  148:25                  THE WITNESS:  I don't know what the
  149: Page 149
  149: 1 average person reading that would necessarily take
  149: 2 away from the headline.

Weiner 14912      149:12-149:21

  149:12           Q.     Okay.  It says in the first sentence,
  149:13 "In response to speculative news reports, Merck &
  149:14 Company, Inc., today confirmed the favorable
                                  Page 8
```

```
                                 Final Weiner.txt
 149:15 cardiovascular safety profile of Vioxx, its medicine
 149:16 that selectively inhibits COX-2."  Did I read that
 149:17 correctly?
 149:18         A.      Yes, you did.
 149:19         Q.      What did Merck do on April 28, 2000,
 149:20 to confirm that Vioxx was safe from a cardiovascular
 149:21 standpoint?

Weiner 14923     149:23-150:8

 149:23                 THE WITNESS:  The word "confirm"
 149:24 there is used in a news release context.  You could
 149:25 have said today commented on, today announced, today
 150: Page 150
 150: 1 said.  It's -- it's used in terms of -- it's a news
 150: 2 release type term as opposed to some other type
 150: 3 meaning.
 150: 4 BY MR. PLACITELLA:
 150: 5         Q.      Well, doesn't the average person,
 150: 6 when they hear "confirm," think that that means that
 150: 7 somebody checked something and now stands behind it?
 150: 8 Isn't that what "confirms" means?

Weiner 15010     150:10-150:13

 150:10                 THE WITNESS:  That is another way in
 150:11 which the -- the word is used.  But, again, you look
 150:12 at the total of the news release, not just the one
 150:13 sentence.

Weiner 15509     155:09-155:21

 155: 9         Q.      Okay.  Is there any mention in this
 155:10 press release concerning an alternate explanation
 155:11 for the heart attack findings in VIGOR, i.e., that
 155:12 Vioxx could be the cause of the heart attack
 155:13 imbalance in the VIGOR study?
 155:14         A.      The specific language that you
 155:15 suggested is not in this particular news release.
 155:16         Q.      Is there any indication whatsoever
 155:17 anywhere in this press release by Merck that one of
 155:18 the explanations for the VIGOR results is that Vioxx
 155:19 was causing the heart attacks?
 155:20         A.      That specific language is not in the
 155:21 news release.

Weiner 29119     291:19-292:04

 291:19         Q.      Now, on -- in the next month,
 291:20 November 2000, the VIGOR study was published in the
 291:21 Journal of the American Medical Association.  Do you
 291:22 recall that?
 291:23         A.      I believe it was published in the New
 291:24 England Journal of Medicine.
 291:25         Q.      You're right.  You're correct.
 292: Page 292
 292: 1                 And did you have press activities
 292: 2 around that publication?
 292: 3         A.      We issued a news release around that
 292: 4 publication.

Weiner 29216     292:16-292:19
```

```
                                 Final Weiner.txt
   292:16        Q.       Okay. And you also issued a video
   292:17 news release, correct?
   292:18        A.       I don't -- I don't recall whether we
   292:19 did or not.

Weiner 29223      292:23-293:01

   292:23        Q.       I'm going to show you a video news
   292:24 release and then we'll talk about it.
   292:25        A.       Okay.
   293: Page 293
   293: 1                 (Video clip shown.)

Weiner 29303      293:3-293:13

   293: 3        Q.       Now, I've stopped the video news
   293: 4 release in the beginning.  It says, "In a study of
   293: 5 Vioxx published in the New England Journal of
   293: 6 Medicine, Vioxx significantly reduced the risk of
   293: 7 serious gastrointestinal side effects by half
   293: 8 compared to naproxen.  TV news feed:  DWJ
   293: 9 Television."
   293:10                 Have you ever seen this video news
   293:11 release before?
   293:12        A.       I'm certain that I saw it at the
   293:13 time.

Weiner 29322      293:22-293:22

   293:22                 (Video clip shown as follows:

Weiner 29417      294:17-295:5

   294:17        Q.       Do you recognize the individual on
   294:18 this news release, the doctor?
   294:19        A.       I recognize the name.  I have never
   294:20 met the man, so seeing him, I assume that that's who
   294:21 it is.
   294:22        Q.       And who is that?
   294:23        A.       His name is Dr. Loren Laine.
   294:24        Q.       And what was his relationship with
   294:25 Merck?
   295: Page 295
   295: 1        A.       He was involved in the VIGOR study.
   295: 2 I do not know his specific role in that study.
   295: 3        Q.       Okay.  Was he paid by Merck?
   295: 4        A.       If he was an investigator in the
   295: 5 study, there would have been a contract.

Weiner 29623      296:23-296:25

   296:23        Q.       Okay.  Now, in that video news
   296:24 release, was there any mention of the heart attack
   296:25 findings of VIGOR?

Weiner 29703      297:03-297:21

   297: 3                 THE WITNESS:  In the cut piece that
   297: 4 we just saw, there was no mention of cardiovascular.
   297: 5 BY MR. PLACITELLA:
   297: 6        Q.       Now, when you say "cut piece," what
   297: 7 do you mean by that?
   297: 8        A.       The video package, as we typically
                                    Page 10
```

```
                                     Final Weiner.txt
297: 9 put them together, had several different elements.
297:10 At the beginning you had the full news release, then
297:11 you have what we call, and the term in television is
297:12 cut piece, and that is the part that's put together
297:13 that we just saw, then you have the additional
297:14 background footage and other choices that the
297:15 television editors can use in putting together their
297:16 own pieces, and then we had full labeling at the
297:17 end.
297:18           Q.      Okay.  And any of the video connected
297:19 to this video news release, including the B-roll
297:20 portions, was there ever any mention of the heart
297:21 attack findings in VIGOR?

Weiner 29724     297:24-298:05

297:24                   THE WITNESS:  We have not reviewed
297:25 the full package.  We haven't looked at the
298: Page 298
298: 1 background footage.
298: 2 BY MR. PLACITELLA:
298: 3      Q.      Okay.
298: 4      A.      So I don't -- I can't answer your
298: 5 question.

Weiner 29809     298:09-298:17

298: 9                   (Video clip shown.)
298:10 BY MR. PLACITELLA:
298:11      Q.      This is a section without ambient
298:12 sound, meaning it's just photos, correct?
298:13      A.      It's just visuals.
298:14      Q.      Okay.  And you use this in case
298:15 somebody wants to do a lead-in or a fade-out or
298:16 something like that when they're doing the story?
298:17                  (Video clip shown as follows:

Weiner 29904     299:4-299:7

299: 4      Q.      So far, have you seen anything from
299: 5 Dr. Laine to indicate that he was telling the
299: 6 viewers that one of the findings in VIGOR was that
299: 7 people on Vioxx had more heart attacks?

Weiner 29909     299:9-299:11

299: 9                   THE WITNESS:  There's no -- there's
299:10 no information that I have heard related to
299:11 cardiovascular.

Weiner 29922     299:22-299:25

299:22      Q.      Do you see any language on this part
299:23 of the video news release telling people that one of
299:24 the findings in VIGOR was that the people on Vioxx
299:25 had more heart attacks?

Weiner 30006     0:0-0:0

300: 6                   THE WITNESS:  I have not seen the
300: 7 information related to cardiovascular.
300: 8                   MR. PLACITELLA:  Okay.
                                    Page 11
```

```
                                    Final Weiner.txt
Weiner 30025       300:25-301:09

  300:25       Q.       Now, what we're watching now is a
  301: Page 301
  301: 1  B-roll and a B-roll is typically silent, correct?
  301: 2       A.       It can be either way, with ambient
  301: 3  sound or without.
  301: 4       Q.       But it's really there just as
  301: 5  background, filler material, for people running the
  301: 6  story, right?
  301: 7       A.       They have a visual to accompany
  301: 8  whatever sound they wish to add to it.
  301: 9       Q.       Okay.

Weiner 30112       301:12-301:15

  301:12       Q.       While we're watching this silent
  301:13  part, can you tell us whether this video news
  301:14  release was submitted to the FDA before it was
  301:15  issued?

Weiner 30119       301:19-302:1

  301:19       Q.       Do you know whether this was ever
  301:20  submitted to the FDA before November 23rd, 2000?
  301:21       A.       It would -- it is unlikely that it
  301:22  would have been submitted because our practice was
  301:23  to submit for pre-clearance those items generally
  301:24  that related to regulatory actions.  This is a
  301:25  study -- this is a study publication.  Again, I
  302: Page 302
  302: 1  don't -- I don't know if this was ever issued.

Weiner 30203       302:03-302:08

  302: 3                (Video clip shown.)
  302: 4  BY MR. PLACITELLA:
  302: 5       Q.       Anywhere on this video news release
  302: 6  did you hear mentioned that one of the findings in
  302: 7  VIGOR was that the people on Vioxx had more heart
  302: 8  attacks than the people on naproxen?

Weiner 30211       302:11-302:18

  302:11                THE WITNESS:  I did not hear that in
  302:12  the video news release.
  302:13  BY MR. PLACITELLA:
  302:14       Q.       Did the -- any of the spokespeople in
  302:15  this video news release tell the audience that one
  302:16  of the significant findings in VIGOR was that people
  302:17  on Vioxx had more heart attacks than people on
  302:18  naproxen?

Weiner 30220       302:20-303:10

  302:20                THE WITNESS:  There was no verbal
  302:21  statement given related to the cardiovascular
  302:22  findings in VIGOR.
  302:23  BY MR. PLACITELLA:
  302:24       Q.       Why not?
  302:25       A.       I don't know.
  303: Page 303
  303: 1       Q.       Did medical/legal clear these -- this
                                    Page 12
```

```
                                        Final Weiner.txt
303: 2 video news release?
303: 3         A.      If this video news release were
303: 4 issued, it would have gone through the Merck review
303: 5 process, and it would have been seen and reviewed by
303: 6 a number of people.
303: 7         Q.      When is it proper to issue press
303: 8 materials, including a video news release, that
303: 9 includes some significant findings of a study but
303:10 not others?

Weiner 30312    303:12-303:16

303:12                  THE WITNESS:  When a video news
303:13 release is prepared, there will be decisions about
303:14 what is included and not included.  I do not know
303:15 the discussions or the decisions that were made in
303:16 this case.  I don't recall.

Weiner 30407    304:07-304:09

304: 7         Q.      Do you recall you or any of your
304: 8 staff raising objection to this news release on not
304: 9 including all of the significant findings of VIGOR?

Weiner 30411    304:11-304:15

304:11                  THE WITNESS:  I don't recall.
304:12 BY MR. PLACITELLA:
304:13         Q.      Okay.  This video news release did
304:14 not include any information from the heart attack
304:15 meta-analysis done by Merck a month before, correct?

Weiner 30417    304:17-304:20

304:17                  THE WITNESS:  It -- it did not
304:18 include cardiovascular information.  It did not
304:19 include cardiovascular information in the spoken
304:20 part of the video news release.

Weiner 42703    427:03-427:09

427: 3         Q.      Now, in conjunction with the press
427: 4 release that you issued concerning the Topol
427: 5 article, you also constructed and issued a video
427: 6 news release, correct?
427: 7         A.      My recollection is that we put
427: 8 together a video package but not a video news
427: 9 release per se.

Weiner 42802    428:2-428:13

428: 2         Q.      Okay.  And they could cut and paste
428: 3 whatever they wanted and stick it in their news
428: 4 story, correct?
428: 5         A.      Essentially, yes.
428: 6         Q.      Was the video package presented to
428: 7 the FDA before it was aired?
428: 8         A.      I don't believe so.  That would not
428: 9 have been normal practice.
428:10         Q.      Okay.  Now I'm going to show you
428:11 what's been produced to us by Merck's counsel
428:12 concerning the Topol article in August 2001.
428:13         A.      Okay.
                                Page 13
```

```
                                           Final Weiner.txt
Weiner 42815      428:15-428:20

  428:15                    (Video clip shown.)
  428:16 BY MR. PLACITELLA:
  428:17        Q.      All right.  Before we move forward,
  428:18 did you see that was from August 21, 2001?
  428:19        A.      I glanced at it.
  428:20        Q.      All right.  Let me go back.

Weiner 42822      428:22-428:22

  428:22                    THE WITNESS:  I see August 21.

Weiner 42903      429:03-429:10

  429: 3         Q.      Okay.  And this material, according
  429: 4 to this, includes source disclosure, news release,
  429: 5 super information.  What's super information?
  429: 6         A.      It's the name and title of the people
  429: 7 who are on the screen.
  429: 8         Q.      Okay.  Soundbites, B-roll and
  429: 9 prescribing information, correct?
  429:10         A.      That is correct.

Weiner 43024      430:24-431:06

  430:24                    THE TAPE:  ...the kind of extensive
  430:25 data that...suggests that patients receiving Vioxx
  431: Page 431
  431: 1 are not at an increased risk for heart attack or
  431: 2 other cardiovascular event.)
  431: 3 BY MR. PLACITELLA:
  431: 4         Q.      What is it that Laura Demopoulos just
  431: 5 told the world about Vioxx and cardiovascular
  431: 6 events?

Weiner 43114      431:14-431:17

  431:14                    THE WITNESS:  That there is -- that
  431:15 there is an extensive body of evidence that would
  431:16 tend to suggest that patients receiving.  Vioxx are
  431:17 not at an increased risk of cardiovascular events.

Weiner 43411      434:11-434:15

  434:11         Q.      Okay.  To be fair, in the fullest
  434:12 sense, what I'm going to do is play the entire thing
  434:13 through, and then we'll go back and take pieces,
  434:14 rather than have you guess what's coming.  Okay?
  434:15 Because that may not be a fair way to approach this.

Weiner 43617      436:17-436:21

  436:17         Q.      Does Dr. Demopoulos tell people who
  436:18 are watching this video that Merck ran a study
  436:19 called VIGOR, that one of the theories was that
  436:20 there was at least four times as many heart attacks
  436:21 for people on Vioxx versus naproxen?

Weiner 43623      436:23-437:02

  436:23                    THE WITNESS:  That particular sound
                                           Page 14
```

```
                                   Final Weiner.txt
 436:24 bite does not make reference to that statement.
 436:25 BY MR. PLACITELLA:
 437: Page 437
 437: 1        Q.      In fact, her statement is that Vioxx
 437: 2 does not cause heart attacks, correct?

Weiner 43705       437:05-437:06

 437: 5                THE WITNESS:  I think -- I think her
 437: 6 statement -- her statement is quite clear.

Weiner 44414       444:14-444:15

 444:14        Q.      But Merck knew there was a lot of
 444:15 data to the contrary, true?

Weiner 44417       444:17-444:18

 444:17                THE WITNESS:  Again, her statements
 444:18 went through the Merck review process.

Weiner 44422       444:22-444:23

 444:22                One, Merck had the information from
 444:23 the VIGOR study at this point, true?

Weiner 44503       445:03-445:10

 445: 3        A.      Yes, Merck had the VIGOR results at
 445: 4 that time.
 445: 5        Q.      Merck had the results of the
 445: 6 ADVANTAGE trial as of this point, true?
 445: 7        A.      I believe that's the case.
 445: 8        Q.      Merck had the results of the low back
 445: 9 pain study, true?
 445:10         A.      I don't know that to be a fact.

Weiner 44601       446:1-446:4

 446: 1        Q.      Okay. And Merck had in its
 446: 2 possession the study -- the analysis that Dr.
 446: 3 Shapiro did in October of 2000 concerning heart
 446: 4 attacks and Vioxx, true?

Weiner 44606       446:06-446:11

 446: 6                THE WITNESS:  We certainly had Dr.
 446: 7 Shapiro's analysis.
 446: 8 BY MR. PLACITELLA:
 446: 9        Q.      And Laura Demopoulos mentioned none
 446:10 of that on national television in response to Dr.
 446:11 Topol's article, true?

Weiner 44613       446:13-446:14

 446:13                THE WITNESS:  Her comments do not
 446:14 include specific references to those things.

Weiner 54825       548:25-549:19

 548:25        Q.      Do you recall that Mr. Placitella
 549: Page 549
 549: 1 asked you about a video package that was prepared
                                  Page 15
```

```
                             Final Weiner.txt
549: 2 with regard to the publication of the New England
549: 3 Journal of Medicine article on the VIGOR results?
549: 4           A.      I remember that.
549: 5           Q.      Was that package sent to the FDA?
549: 6           A.      It was sent to the FDA on a 2253
549: 7 form.
549: 8           Q.      Was the difference in heart attack
549: 9 rates between naproxen and Vioxx in the VIGOR study
549:10 mentioned in that news release, in that video
549:11 package?
549:12           A.      Yes.  The video packages that Merck
549:13 provides to reporters starts with the full Merck
549:14 news release and then the video materials.  And
549:15 within the news release that was provided in that
549:16 video package, the data related to cardiovascular
549:17 was included.  In addition to that, television
549:18 reporters would have received the Merck news release
549:19 in their normal course of business.


Total Length - 00:38:12
```