*Copy in Chambers*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| Evelyn Irvin Plunkett v. Merck & Co, Inc. | * | CASE NO. 02:05CV4046 |

**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR CLARIFICATION AND/OR RECONSIDERATION OF THE COURT'S ORDERS LIMITING THE TESTIMONY OF DOCTORS BALDWIN AND GRAHAM**

## I. INTRODUCTION

Plaintiff Evelyn Irvin Plunkett, as Personal Representative of the Estate of Mr. Richard Irvin, Jr., by and through her attorneys, seeks a clarification of this Court's determinations to exclude the testimony of Dr. Thomas F. Baldwin and Dr. Michael A. Graham regarding general and specific causation. In the alternative, Plaintiff seeks reconsideration of those determinations, which Plaintiff believes are contrary to Fed. R. Evid. 702 and the relevant precedents interpreting that rule.

Both Dr. Baldwin and Dr. Graham are well qualified to render helpful scientific opinions regarding the nature and the cause of Mr. Irvin's injury from Vioxx. After holding a *Daubert* hearing prior to the first trial of this case, the Court issued a November 18, 2005 Order & Reasons ("November Order") that explicitly would have allowed Dr. Baldwin "to rely on pharmacological and epidemiological experts."[1] Yet at trial he was not allowed to give

---

[1] November 18, 2005 Order & Reasons at 45.

1

testimony "about the part that Vioxx . . . played [in the case of Mr. Irvin]."[2] Despite a more detailed report from Dr. Baldwin, the Court has since adopted that ruling for the current trial,[3] and has in effect applied it to Dr. Graham as well.[4]

## II. CLARIFICATION SOUGHT BY PLAINTIFF

If the Court intended by the November Order only to preclude Dr. Baldwin from reaching *independent* conclusions about the mechanism through which Vioxx causes increased cardiovascular risk, and about the magnitude of that risk, Plaintiff has no disagreement with the Court. Plaintiff should then be able to ask Dr. Baldwin questions based on other evidence in the case relating to causation issues – evidence, per the November Order, from "pharmacological and epidemiological experts." For example, Plaintiff should be allowed to ask him a question such as the following: "Dr. Baldwin, the jury has heard testimony that Vioxx more than doubles the risk of myocardial infarction. Assuming that testimony is correct, how would that impact your analysis of how Mr. Irvin died?" The Plaintiff also should be allowed to pose another, similar, question: "Dr. Baldwin, the jury also has seen evidence of various possible mechanisms that would explain such a Vioxx-induced increase in risk, including an imbalance between thromboxane and prostacyclin that would enhance the formation of thrombi. If the imbalance mechanism is correct, how would that impact your analysis of how Mr. Irvin died?"

---

[2]  *Irvin v. Merck,* Trial Tr. at 509 (E.D.La. Dec. 1, 2005).

[3]  February 2, 2006 e-mail communication from the Court to the parties.

[4]  February 2, 2006 Order & Reasons at 10. (Finding that Dr. Graham "has no training in pharmacology, is not qualified to explain how Vioxx could lead to thrombosis, has never done any research on NSAIDs or COX-2 inhibitors prior to becoming an expert for the Plaintiff; is not qualified to analyze and interpret clinical and epidemiological data concerning Vioxx, has never prescribed Vioxx or any other COX-2 inhibitors to a patient, has never determined that Vioxx was a contributing cause of a death; and has never written an article on sudden cardiac death related to plaque rupture.").

If the Court allows the kind of questioning described above, Plaintiff has no disagreement with the Court's rulings with regard to Drs. Baldwin and Graham, and would seek no reconsideration of those rulings. If, however, the Court intended to preclude *any* testimony about the role Vioxx may have played in causing Mr. Irvin's death, then Plaintiff strongly urges the Court to reconsider its rulings, which Plaintiff believes go well beyond the qualification standard of Fed. R. Evid. 702.

### III.  ALTERNATIVE RECONSIDERATION SOUGHT BY PLAINTIFF

**A.  Factual and Procedural Background**

**1.  Dr. Thomas Baldwin**

At the first trial of this case the Court ruled that Dr. Baldwin, a board certified cardiologist, would be allowed to testify that Mr. Irvin died of a heart attack, but not that Vioxx caused the heart attack. Thus at the first trial, Dr. Baldwin testified that it would be important to a cardiologist to consider "things . . . that tip [a] patient to having a blood clot and causing a heart attack,"[5] but was not allowed to testify that Vioxx was such a "thing," or that Vioxx increased Mr. Irvin's cardiovascular risk.[6]

When Plaintiff provided a more complete tender of Dr. Baldwin's qualifications[7] and sought reconsideration of this oral trial ruling,[8] the Court found that Dr. Baldwin "has basically little to no experience with Vioxx or, for that matter, any other Cox-2 inhibitor. He testified that he never prescribed Vioxx or any other Cox-2 inhibitor. He never conducted any

---

[5] *Irvin v. Merck,* Trial Tr. at 529-530 (E.D. La. Dec. 1, 2005).

[6] *Irvin v. Merck,* Trial Tr. at 509 (E.D. La. Dec. 1, 2005).

[7] December 1, 2005 Plaintiff's Proffer of Evidence for Thomas Baldwin, M.D.

[8] December 2, 2005 Plaintiff's Motion to Reconsider Ruling In Regard To the Testimony of Dr. Thomas Baldwin.

3

research on Cox-2 inhibitors. He has never diagnosed Vioxx as the cause of a cardiac event."[9] Dr. Baldwin frankly stated he is not an expert on Cox-2 drugs, and for the Court that meant he lacked sufficient knowledge, skill, training or education to testify about "the proclivity of Vioxx to produce clot formations."[10]

Thus, the precise qualification issue relates to whether or not Vioxx has any proclivity to produce clots. If Dr. Baldwin is found qualified to give that testimony, he would also be allowed to testify that the clot forming potential of the drug caused Mr. Irvin's heart attack. Put otherwise, his qualification to testify about the effect of a thrombogenic substance on the circulatory system is not at issue, only whether Vioxx causes thromboses.

Since the first trial, Dr. Baldwin has submitted an expanded and revised expert report ("January Report") that (1) more clearly states his qualifications, (2) more fully articulates his reasoning and the opinions to which that reasoning leads, and (3) lists 27 additional references among the materials he reviewed. He was further deposed on January 23, 2006. It is this new evidence that led Plaintiff to re-urge the admissibility of Dr. Baldwin's causation opinions. The Court communicated via an Email on February 2, 2006 that it was not changing its initial (i.e. first trial) ruling on Dr. Baldwin.

Plaintiff now moves the Court to reconsider its most recent decision. The January Report clarifies that there "are many drugs that are primarily prescribed by physicians other than cardiologists, but whose cardiotoxic effects are well within the diagnostic expertise of a cardiologist."[11] It also explains that while Dr. Baldwin, as a cardiologist, "did not prescribe Vioxx . . . I do consider the cardiotoxic effects of the drug to be well within my area of

---

[9] December 6, 2005 Order & Reasons at 3-4.

[10] December 6, 2005 Order & Reasons at 6.

[11] January Report at 2.

expertise."[12] Consistent with his concerns about cardiotoxicity, and well before he ever became involved in Vioxx litigation, he "had patients on Vioxx whom I determined to be having adverse side effects, including congestive heart failure, from the drug. I recommended that between 20 and 100 patients stop taking the drug because of potential cardiovascular risks."[13] Thus the fact that Dr. Baldwin never prescribed Vioxx is not relevant to his qualifications to testify about the adverse effects of the drug.

The fact that Dr. Baldwin never diagnosed a Vioxx-caused myocardial infarction until Mr. Irvin's case is similarly irrelevant to the reliability and admissibility of his opinions. How could he be expected to do so when Merck maintained the whole time the drug was on the market, and even afterwards, that it was completely safe? Nor is the fact that he never conducted any research on Cox-2 drugs relevant. That does not mean he is incapable of understanding the literature about Vioxx, or from intelligently relying on reports prepared by other experts. From the literature he knows there is a widely held theory that Vioxx upsets the prostacyclin-thromboxane balance, thus making the drug thrombogenic.[14]

### 2. Dr. Michael A. Graham

Dr. Graham is a board certified pathologist who is both a professor at St. Louis University and the Chief Medical Examiner for the City of St. Louis.[15] He has performed approximately 7,000 autopsies.[16] He is more than qualified to testify about the medical examiner's report on Mr. Irvin, and on that point there is no issue. He also is qualified to

---

[12] January Report at 2.

[13] January Report at 2.

[14] January Report at 13-14.

[15] Expert Witness Report of Dr. Michael Alan Graham, MD ("Graham Report") at 1.

[16] January 25, 2006 Deposition of Dr. Graham at 34:17-19.

interpret medical and epidemiological literature, and to use the knowledge gleaned from such a review, or from reports of other experts, to conduct a post mortem differential diagnosis to determine the cause of death, as in Mr. Irvin's case.

The Court, however, has ruled Dr. Graham's causation testimony inadmissible because he, like Doctor Baldwin, lacks experience prescribing Vioxx, doing research on Vioxx, or past experience diagnosing Vioxx-caused injury. As with Dr. Baldwin, these points are not relevant to the admissibility of Dr. Graham's testimony.

### B.     Legal Standard

A motion to reconsider should be granted where the movant demonstrates any of the following criteria: (1) an intervening change in controlling law, (2) the availability of new evidence not previously available, or (3) the need to correct a clear error of law or to prevent injustice. *In re: Vioxx Products Liability Litigation*, 230 F.R.D. 473, 474-75 (E.D.La. 2005), *modified by*, 2005 WL 2036797 (E.D.La. Jul 22, 2005). "Reconsideration of an order is an extraordinary remedy which courts should use sparingly," *id.* at 475, but where one or more of the criteria are met, reconsideration should be granted.

### C.     Argument

Reconsideration should be granted in this case to correct a clear error of law and to prevent injustice. If left in place, this Court's rulings on Drs. Baldwin and Graham would establish a nearly impossible qualification standard for experts testifying on the role of Vioxx in causing death or serious injury. For instance, because most cardiologists never prescribed Vioxx, the Court's standard would make it difficult to establish the ability of almost any cardiologist to testify on the role of Vioxx in causing injuries. This is especially distressing since cardiologists will have extensive experience treating or diagnosing patients with cardiovascular injuries resulting from the drug.

6

As applied, the Court's qualification standard also overemphasizes the importance of an expert's role in clinical research. Many practicing doctors ordinarily rely upon published medical materials and the results of studies to formulate professional opinions.

If the super high qualification standard continues in this MDL, it will result in the exclusion of qualified physicians from testifying to Vioxx related injuries that resulted from Merck's failure to disclose important and material safety information that would have timely alerted the prescribing medical community of the risks associated with the drug. Because of Merck's delays and deceptions regarding this information, physicians are only now able to make the association between their patients' injuries and the use of Vioxx. The fact that their knowledge only emerged after the initiation of litigation, and they thus made no pre-litigation diagnoses of Vioxx-caused injury, should not preclude them from testifying about causation.

Plaintiff believes this Court abused its discretion by limiting the testimony of Dr. Baldwin and Dr. Graham. Although this Court has noted several potential weaknesses in the testimony of these experts, none is sufficient to limit the testimony of either expert. Instead, these points should be attacked on cross-examination, challenged through direct evidence and ultimately weighed by the jury.

As a general rule, "questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *United States v. 14.38 Acres of Land, More or Less Sit. in Lefore County, Miss.*, 80 F.3d 1074, 1077 (5th Cir.1996) (quoting, *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir.1987)). The threshold of reliability must indeed be low so that the courts do not impermissibly delve into the merits of the expert's opinion or exclude appropriate testimony. *See In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 744 (3d Cir. 1994) ("as we explained in *Paoli I*, the "reliability requirement must not be used as a tool by which

the court excludes all questionably reliable evidence."), *cert. denied*, 115 S. Ct. 1253 (1995). "Thus, while exercising its role as a gate-keeper, a trial court must take care not to transform a *Daubert* hearing into a trial on the merits." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002). Indeed, in *Daubert* itself, the Supreme Court cautioned that, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (*citing Rock v. Arkansas*, 483 U.S. 44, 61 (1987).[17]

"[T]he heart of *Daubert* is relevance and reliability. As long as some reasonable indication of qualification is adduced, the court may admit the evidence without abdicating its gatekeeping function. After that, qualification becomes an issue for the trier of fact, rather than for the court in its gate-keeping capacity." *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 507 (5th Cir. 1999), *cert. denied*, 528 U.S. 1160 (2000), *superseded by rule on other grounds*, 302 F.3d 448 (5th Cir. 2002). The court in *Rushing* further explained that "the 'emphasis on qualification over reliability reflect[s] a pre-Daubert sensibility." *Rushing*, 185 F.3d at 507.

Here, Plaintiff's experts – Drs. Baldwin and Graham – base their opinions upon the foundation of their general knowledge, training, and education, and their experience in their respective disciplines. Neither Dr. Baldwin nor Dr. Graham purports to be an expert on Vioxx *per se*, but that cannot keep them from giving testimony about what the drug caused. In fact,

---

[17] *In re TMI Litigation*, 193 F.3d 613, 692 690-93 (3d Cir. 1999) ("Rather, the proponent of the challenged testimony need only demonstrate that their opinions are reliable. So long as the expert's testimony rests upon "good grounds", it should be tested by the adversary process-competing expert testimony and active cross-examination-rather than excluded from juror's scrutiny for fear that they will not grasp its complexities or satisfactory weigh its inadequacies.")

Defendant's pathology expert, Dr. Wheeler, made the same admission about his qualifications but was permitted to testify about causation.

> Q. You're not an expert in Cox-2 Inhibiting drugs, right?
>
> . . . .
>
> A. I'm not an expert in pharmacology or the prescribing of Cox-2, but in terms of the duty of a pathologist in determining the cause of death, we take many things, both what we find at the autopsy, also toxicologic studies, drug studies, family history, and so forth and synthesize the diagnosis.[18]

Dr. Silver was similarly allowed to give testimony far afield from his primary area of expertise in rheumatology to testify to causation. Thus the Court has clearly imposed a higher qualification standard on Drs. Baldwin and Graham than it has on experts than for the Defendant. Like Merck's experts, Plaintiff's experts should be granted latitude to testify based on their knowledge, experience and review of the relevant materials.

In fact, the Court did allow causation testimony. Plaintiff's previous expert pathologist at the first trial, Dr. Colin Bloor, was correctly qualified by this Court to testify regarding general and specific causation. As the Court noted in its Order of November 18, 2005, Dr. Bloor is distinguished in the field of pathology and has received numerous awards and published numerous articles. He has never prescribed Vioxx. Dr. Bloor also has not ever stated that Vioxx was a substantial contributing cause to an individual's death outside of litigation. Dr. Bloor has not participated in any clinical research related to Vioxx or written any articles related to Vioxx. The Court wrote the following about Dr. Bloor:

> Dr. Bloor . . . . [has not] done any research on NSAIDs, published anything on NSAIDs, or have any pharmacological experience. They have, however, read the relevant materials and have a basic understanding of Vioxx and its hypothesized prothrombotic effect. They are entitled to rely on these materials, which are relevant and reliable. In reaching their own conclusions, just as an orthopaedic surgeon, who is not an expert X-Ray technician and has no knowledge of the mechanics of an X-Ray

---

[18] *Irvin v. Merck,* Trial Tr. at 1833-1834 (E.D.La. Dec., 7 2005); see also November 18, 2005 Order & Reasons, at. 9-13 (allowing defendant's pathologist to testify to Vioxx induced cardiovascular injury although he was a pathologist specializing in the prostate and despite the quoted testimony).

> machine, can rely on an X-Ray to diagnose a broken arm. Essentially, Merck is not attacking their methodology. Instead, Merck is attacking their level of understanding. This is fodder for cross-examination, not exclusion under *Daubert*.

Order of November 18, 2006, at 40-41. The Court rightly decided to allow the testimony of Dr. Bloor. The Court should follow its reasoning in allowing the causation testimony of Dr. Baldwin and Dr. Graham as well.

As the Fourth Circuit has explained in *Benedi v. McNeil, PPC, Inc.*, 66 F.3d 1378, 1384 (4th Cir. 1995), an expert witness may rely on inferences drawn from data normally relied upon by scientists to support his conclusions. *Id.*; see also *Poly-America, Inc., v. Serrot International, Inc.*, 2002 WL 1996561 (N.D. Tex. 2002) (expert testimony should not be excluded if facts or data reasonably relied upon in the particular field are made known to him, and these facts or data would permit him, to opine on matter within expertise). That is precisely what Plaintiff's experts have done in this case and they should not be precluded for having done so.

Moreover, it is well established that an expert's knowledge and expertise do not have to be perfectly tailored to the unique fact pattern of a particular case. Indeed, "one knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an opinion." *Kopf v Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993) (citing *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir.1989)), *cert denied*, 493 U.S. 1073 (1990); see also *Stewart v. Rowan Companies, Inc.*, 2002 WL 362847, *2 (E.D.La. 2002) (citing *Wright v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir. 1991) (expert witness qualified to testify on economic damages even though witness did not have a Ph.D. since ". . . a witness qualified as an expert in a products liability action is not strictly confined to his area of practice, but may testify concerning related applications; a lack of specialization

does not affect the admissibility of the opinion, but only its weight."). Thus, it is well recognized that Rule 702's "specialized knowledge" requirement does not compel the employment of only a particular witness with a specific expertise. *Id.; see also Holbrook v. Lykes Bros. S.S. Co., Inc.*, 80 F.3d 777, 781 (3d Cir. 1996) (court "eschewed imposing overly rigorous requirements of expertise."); *In re Paoli RR Yard PCB Litigation*, 916 F.2d at 855 ("The district court's insistence on a certain kind of degree or background is inconsistent with our jurisprudence in this area."); *Lillis v. Lehigh Valley Hospital, Inc.*, 1999 WL 718231, *6 (E.D.Pa. 1999), *aff'd*, 251 F.3d 154 (3d Cir. 2000) ("It is not for us to require that proponents of expert testimony provide witnesses with the qualifications that match a perfect fit to the issues presented. In fact, it would have been an abuse of discretion to do so.").

In focusing its analysis on the experiences of Plaintiff's experts, this Court has in a sense returned to a pre-*Daubert* analysis frowned upon by the *Rushing* case. In so doing, the Court has set forth an overly rigorous qualification standard for experts to testify on the role of Vioxx in causing the plaintiff's death. This Court's requirement that experts have preexisting research experience and/or first hand professional experience prescribing Vioxx or diagnosing Vioxx related injuries is not in accordance with the Rule 702 standard. Again, this Court disregards the fact that pathologists generally do not prescribe drugs at all, and cardiologists do not generally prescribe pain medications such as Vioxx. The Court also places far too much emphasis on research experience, since doctors routinely rely upon not only the opinions and reports of other experts but also upon medical publications and studies.

The Fifth Circuit has rejected similar logic to that being followed by this Court to avoid the scenario where the only experts qualified to speak about a product would be those employed by the manufacturer or those professional witnesses willing to exaggerate their credentials or their history dealing with the product. See, e.g., *Lavespere v. Niagara Machine*

11

& *Tool Works, Inc.*, 910 F.2d 167, 177 (5th Cir. 1990), *abrogated on other grounds,* 37 F.3d 1069 (5th Cir. 1996) (such an approach would often mean that the only experts who could testify regarding a machine are those who have an interest in defending its design).  Simply put, to accept this Court's qualification standards would limit Plaintiff to doctors employed or funded by Merck or one of its competitors, an unlikely possibility.  In *Lavespere*, the Fifth Circuit added that:

> Rule 702 provides that a witness may be qualified as an expert "by knowledge, skill, expertise, training, or education."  The disjunctive conjunction, which we must assume the drafters of the rule chose deliberately, suggests that an expert may be qualified on any of the five bases listed.  A witness therefore can qualify as an expert even though he lacks practical experience, provided that he has received suitable training or education or has otherwise gained the requisite knowledge or education.  Thus, although the absence of hands-on experience is certainly relevant to the determination of whether to accept a witness as an expert, it is not determinative.

910 F.2d at 176-77.

Thus, although Plaintiff's experts may lack clinical research experience with Vioxx they are nevertheless experts in their fields and are entitled to rely upon outside sources of information to formulate conclusions to the requisite degree of medical certainty.  In *Nugent v. Hercules Offshore Corp.*, 2000 WL 381925, * 4 (E.D.La. 2000), the court rejected a similar challenge to an expert's qualifications:

> Dalloz premises this argument on the following facts: (1) Dr. Jacobus is admittedly not an expert in sewing; (2) he is not an engineer, (3) he has never worked nor consulted for a lanyard manufacturer; and (4) he has never been qualified as an expert in the manufacture of a safety lanyard.  The Court finds that none of these factors justifies precluding Dr. Jacobus's expert testimony in this case.  Dr. Jacobus's resume and experience reveal that he is qualified to testify regarding the failure of the nylon.  That Dr. Jacobus does not have specialized experience in the manufacture of a safety lanyard affects the weight of his opinion regarding the lanyard's failure, not its admissibility.  *Id.*

Plaintiff's experts may not have extensive clinical research experience with Vioxx, but they are still qualified to testify regarding the cause plaintiff's injuries given their expertise,

experience and their justified reliance upon recognized outside sources of data. Any supposed weaknesses in the bases for these expert opinions are subject to attack through cross-examination by Merck.

### IV.  CONCLUSION

If Plaintiff's understanding of the meaning and intent of this Court's November Order is correct, Plaintiff will proceed to elicit the kind of testimony proposed above. No reconsideration of the prior orders would then be necessary. If, however, the Court intended to preclude *any* causation testimony from Drs. Baldwin and Graham, Plaintiff respectfully asks the Court to reconsider for reasons stated herein.

Because Merck did not disclose material data, the entire medical community was misled regarding the safety profile of Vioxx and thus had an institutional lack of knowledge. This deficit was the result of Merck's marketing behavior and should not reflect upon the propriety of Dr. Baldwin's or Dr.'s Graham's qualifications. Each of these physicians, when presented with the knowledge of what was previously withheld by Merck, has now been able to formulate well-supported and well-reasoned opinions regarding causation. Doctors in the 50's and 60s were initially unaware of the mesothelioma and cancer risks of asbestos, but when withheld information was revealed they quickly saw the scientific truth of what this deadly substance could cause.

Here the pattern is very similar. When doctors like Dr. Baldwin and Dr. Graham were provided with the previously withheld information on Vioxx they could discern a causal relationship not previously apparent to them. Now that the truth has been revealed, these doctors can reasonably opine and are well qualified to do so. The effect of this Court's ruling will prevent dedicated and qualified clinicians from testifying about the causal effects of

Vioxx now that knowledge of the drug's effects have reached generalized acceptance in the medical community.

Under this Court's present rationale, only those physicians close enough to Merck to have the secret information, or those physicians willing to overstate their qualifications could testify. Having now supplemented their knowledge specifically related to Vioxx Dr. Baldwin and Dr. Graham should now be allowed to testify about how they conducted post mortem differential diagnoses to determine the cause of Mr. Irvin's death.

Because of the significance of the Court's ruling on this initial trial and subsequent MDL proceedings, Plaintiff respectfully requests that the Court reconsider its ruling regarding Drs. Baldwin and Graham and permit them to testify consistent with their reports.

Respectfully submitted,

By: /s/

**Andy D. Birchfield, Jr.**
P. Leigh O'Dell
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
(800) 898-2034 (telephone)
(334) 954-7555 (telecopier)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, ECHSNER &
PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
MEUNIER&WARSHAUER, L.L.C.
P.O. Box 960
191 East Second Street
New Roads, LA 70760
(225) 638-6137
(225) 638-8836 (fax)

**Counsel for Plaintiff**

Arnold Levin, Esquire
Fred Longer, Esquire
Matthew Gaughan, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500
(215) 592-4663 (fax)

Bert Black, Esquire
LOCKRIDGE GRINDAL NAUEN
100 Washington Ave. South, Suite 2200
Minneapolis, MN 55401
(612) 339-6900
(612) 339-0981 (fax)

**On the Brief**

15

| | |
|---|---|
| **Russ M. Herman (Bar No. 6819)**<br>Leonard A. Davis (Bar No. 14190)<br>Stephen J. Herman (Bar No. 23129)<br>***Herman, Herman, Katz & Cotlar, LLP***<br>820 O'Keefe Avenue<br>New Orleans, LA 70113<br>PH: (504) 581-4892<br><br>FAX: (504) 561-6024<br>**Temporary Office**<br>3411 Richmond Ave., Suite 460<br>Houston, TX 77046<br>PH: (713) 877-1843<br>FAX: (713) 871-9750 | Christopher A. Seeger, Esquire<br>SEEGER WEISS<br>One William Street<br>New York, NY 10004<br>(212) 584-0700 (telephone)<br>(212) 584-0799 (telecopier)<br>**Co-Lead Counsel for the MDL**<br>**Plaintiffs'Steering Committee** |

**PLAINTIFFS' LIAISON COUNSEL**

| | |
|---|---|
| Richard J. Arsenault, Esquire<br>NEBLETT, BEARD & ARSENAULT<br>2220 Bonaventure Court, P.O. Box 1190<br>Alexandria, LA 71301-1190<br>(318) 487-9874 (telephone)<br>(318) 561-2591 (telecopier) | Carlene Rhodes Lewis, Esquire<br>GOFORTH, LEWIS, SANFORD LLP<br>2200 Texaco Heritage Plaza<br>1111 Bagby<br>Houston, TX 77002<br>(713) 650-0022 (telephone)<br>(713) 650-1669 (telecopier) |
| Elizabeth J. Cabraser, Esquire<br>LIEFF, CABRASER, HEIMANN &<br>BERNSTEIN, LLP<br>Embarcadero Center West<br>275 Battery Street, 30th Floor<br>San Francisco, CA 94111<br>(415) 956-1000 (telephone)<br>(415) 956-1008 (telecopier) | Drew Ranier, Esquire<br>RANIER, GAYLE & ELLIOT, L.L.C.<br>1419 Ryan Street<br>Lake Charles, LA 70601<br>(337)494-7171 (telephone)<br>(337) 494-7218 (telecopier) |
| Thomas R. Kline, Esquire<br>KLINE&SPECTER, P.C.<br>1525 Locust Street, 19th Floor<br>Philadelphia, PA 19102<br>(215) 772-1000 (telephone)<br>(215) 772-1371 (telecopier) | Mark Robinson, Esquire<br>ROBINSON, CALCAGNIE & ROBINSON<br>620 Newport Center Drive<br>7th Floor<br>Newport Beach, CA 92660<br>(949) 720-1288 (telephone)<br>(949) 720-1292 (telecopier) |
| Arnold Levin, Esquire<br>LEVIN, FISHBEIN, SEDRAN & BERMAN<br>510 Walnut Street, Suite 500<br>Philadelphia, PA 19106<br>(215) 592-1500 (telephone)<br>(215) 592-4663 (telecopier) | Christopher V. Tisi, Esquire<br>ASHCRAFT & GEREL<br>2000 L Street, N.W.<br>Suite 400<br>Washington, DC 20036-4914<br>(202) 783-6400 (telephone)<br>(307) 733-0028 (telecopier) |

**PLAINTIFF'S STEERING COMMITTEE**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced in accordance with Pre-Trial Order No. #8, on this the 8th day of February, 2006.

_____
B. Hugh Odell