FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA
2006 FEB -9 AM 10: 48
LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| | : | MDL NO. 1657 |
| IN RE: VIOXX | : | |
| PRODUCTS LIABILITY LITIGATION | : | SECTION: L |
| | : | |
| | : | JUDGE FALLON |
| | : | MAG. JUDGE KNOWLES |
| .................................................. | : | |

THIS DOCUMENT RELATES TO
*Plunkett v. Merck & Co., Inc.*, 05-4046

**ORDER**

The Plaintiff sought to introduce at trial portions of a depositions taken of James Dunn. In response, the Defendant objected to certain portions of the deposition and sought to offer counter-designations and affirmative designations of the same deposition testimony. The Plaintiff, however, made several objections to the Defendant's proffered deposition testimony. The Court ruled on all these objections. The Court's rulings are noted on the attached deposition testimony, which has been entered into the record.

New Orleans, Louisiana, this 8th day of February, 2006.

UNITED STATES DISTRICT JUDGE

Fee
Process
X Dktd
✓ CtRmDep
Doc. No

— = Δ objections

dunn plaintiff affirmatives 1_21 (3).txt
Annotations Report [vioxx 2]

Plaintiff's response

[9:2] 1/21/2006 James Dunn 10-7-05

page 9
BY MR. PAPANTONIO:
Q. Sir, state your name, please.
A. James Dunn, D-U-N-N.

[9:3] - [10:4] 1/21/2006 James Dunn 10-7-05

page 9
Q. Sir, state your name, please.
A. James Dunn, D-U-N-N.
Q. And Mr. Dunn, you work for Merck?
A. Yes, sir.
Q. How many years have you worked for Merck?
A. Over 14 years.
Q. Tell us what you've done with Merck.
A. I've held a number of different positions at Merck. I've been a hospital representative. I've been an office space representative. I've been a marketing analyst. I've managed some of the data centers within Merck. I have been a business manager with Merck. I've been the FIT team leader for Vioxx at Merck. I was what we call educational program initiative senior director at Merck, and currently I'm a senior business director with Merck/Schering-Plough.
Q. In your role as educational program director for Merck was part of your job to train sales representatives about what they should tell doctors in the field selling products?
A. No, sir.
Q. What was it?
A. The job I had there was to coordinate the

page 10
scheduling activities for speakers so that we could schedule speakers to do medical education type of programs and help the field understand how we would want to execute those programs.

[12:2] - [12:5] 1/21/2006 James Dunn 10-7-05

page 12
Q. You had to have material given to you, scientific material, data that showed safety factors of Vioxx, and then you would take that material and then give it to the representatives; is that accurate?

[12:8] - [12:12] 1/21/2006 James Dunn 10-7-05

page 12
THE WITNESS: I would get data and materials from other folks and, you know, that process of medical legal approval. Then I would get that



Overruled Received in course of bus. Goes to credibility

dunn.txt

[198:24] 11/6/2005 Dunn - 10.7.2005

page 198

MR. PAPANTONIO: Give me 1274, please.

[200:23] - [200:25] 11/6/2005 Dunn - 10.7.2005

page 200

Q. Well, let's see. Let's read this document. Okay? It has your name at the top of it, doesn't it? Jim Dunn; do you see that?

[201:1] - [201:3] 11/6/2005 Dunn - 10.7.2005

page 201

A. Yes, I do.
Q. It says 2002; right?
A. Yes, I do.

[201:12] - [201:22] 11/6/2005 Dunn - 10.7.2005

page 201

Q. Okay. Now, let's read this document. You see the end of the -- the very end of the first paragraph it says, "Vioxx sales would fall dramatically if the drug's label were changed to indicate even a slight increase in the risk of heart attack." Do you see that? It says even a --
A. I'm sorry. Could you tell me where you're at?
Q. Vioxx -- I'm right here. Look up here. See that? You can read along right up there.
A. Okay. I'm with you. I wanted to make sure I was there.

[201:23] - [202:9] 11/6/2005 Dunn - 10.7.2005

page 201

Q. Vioxx -- let me read it again. Blow that up just so we can make sure that we're talking about the right thing, that last line, the last line.

page 202

"Vioxx sales would dramatically fall if the drug's label were changed to indicate a slight increase in the risk of heart attacks."
You were actually telling people in the field -- you, Jim Dunn, you were telling your representatives that if they had to warn by way of a label that Vioxx would increase the risk of heart attack that their sales were going to drop. You were telling them that.
A. No.

[202:12] - [203:4] 11/6/2005 Dunn - 10.7.2005

602

801-802

401-402

403

Witness received document in normal course of business.

803(6)

Relevant to Merck's motive to down-play CV risk.

cont. from previous page

page 202
Q. You weren't.
A. No.
Q. Have you ever seen this document before?
A. I mean, it was to me. I must have seen it at some point.
Q. This isn't talking about science. This is talking -- right up underneath it it says, "Merck shares poised to rebound." This is about money, isn't it? This isn't about science.
A. Sir, the subject title is Merck Shares Poised to Rebound in 2002.
Q. Right. This isn't about -- it has nothing to do with science. This is about money. Merck is going to lose money if Vioxx -- Vioxx sales would fall dramatically
page 203
if the drug's label were changed to indicate a slight increase. Do you see that, the word "slight"? What does that mean to you, slight increase? Small; right?
A. Uh-huh (affirmative).

[203:5] - [203:8] 11/6/2005 Dunn - 10.7.2005

page 203
Q. In the risk of heart attack. Do you see that?
A. Yes, sir, I do.
Q. All right. That's the first time you've seen that?

[203:10] - [203:13] 11/6/2005 Dunn - 10.7.2005

page 203
THE WITNESS: Sir, this e-mail obviously got sent to me so I can't -- you know, I did. It seems to be a report from an analyst, another financial analyst. Clearly it was sent to me.

[291:7] - [291:14] 11/6/2005 Dunn - 10.7.2005

page 291
Q. Okay. Good. All right. Now, let me ask you something. Do you know what the Be The Power is? I know you've seen this before. You helped create Be The Power, didn't you?
A. I'm aware of Be The Power, yes, sir.
Q. Well, you helped create Be The Power, didn't you?
A. My team was responsible for it, yes.

[292:12] - [292:20] 11/6/2005 Dunn - 10.7.2005

page 292
Q. Well, let's take a look at it. Why don't you --

403 objection

Obj this page
Overruled

dunn plaintiff affirmatives 1_21 (3).txt

final product. So it would be given to me in the final form and I would communicate that out.

[291:7] - [291:14] 1/21/2006 James Dunn 10-7-05

Plaintiff will remove.

SIDEBAR COMMENTARY

page 291

Q. Okay. Good. All right. Now, let me ask you something. Do you know what the Be The Power is? I know you've seen this before. You helped create Be The Power, didn't you?
A. I'm aware of Be The Power, yes, sir.
Q. Well, you helped create Be The Power, didn't you?
A. My team was responsible for it, yes.

[292:12] - [292:20] 1/21/2006 James Dunn 10-7-05

page 292

Q. Well, let's take a look at it. Why don't you -- section number 3, Be The Power, now, you worked on the team that put this together; is that right?
A. Yes, sir.
Q. Can we put that up there when you're ready to go? What is the V Squad?
A. Well, this is a fictitious rendition and the V Squad refers to the actors that are within this DVD.
Q. And you showed this to your sales team; right?

Asked + answered (611)

[292:23] - [295:7] 1/21/2006 James Dunn 10-7-05

page 292

THE WITNESS: This was part of the meeting packet that got sent down to them. It was optional so they could view it if they wanted to

page 293

or they didn't have to view it at all.
BY MR. PAPANTONIO:
Q. But you're trying to tell -- basically this is -- what you're -- you are providing information in this thing, aren't you?
A. No, sir.
Q. There's no information in here?
A. No, sir.
Q. Let's look at it. Go ahead.
(Whereupon the DVD was played as follows: "What's going on?" "It's an obstaclizer." "How do we get out of here?" "I don't know.")
BY MR. PAPANTONIO:
Q. What is an obstaclizer?
A. Once again, it's fictitious. This is based on futuristic, you know, like Star Trek theme stuff. You can see the way these people are dressed. Obstaclizer, it's a fictitious way to, you know -- computer system that they had in here. So it's all fake, phony stuff that's futuristic.
Q. So they're talking about an obstaclizer right

Relevant to rebut claim that video was a pointless exercise

611 (vague); 401-402

Asked + answered
Permissible cross examination

403 objection, cont.

here. Let's see what the obstaclizer does.
(Whereupon the DVD was continued as follows:
" -- while we're in here." "What happened?"
"We didn't get a chance to deal with the

Sidebar commentary; Not a question

page 294

obstacles.")
BY MR. PAPANTONIO:
Q. Hold it right there. What are obstacles?
A. Obstacles tend to be -- in the industry it tends to be questions that physicians would ask of us.
Q. A physician would ask you a question like will Vioxx cause cardiovascular events. That would be an obstacle; correct?
A. Any question a physician might ask would be.
Q. An obstacle would be a physician asking you Vioxx will cause strokes in human beings. That would be an obstacle; correct?
A. Any question.
Q. An obstacle would be could you explain to me, Mr. Sales Rep or Mrs. Sales Rep, what the chances are for a person taking Vioxx to have a myocardial infarction. That would be an obstacle; correct?
A. Sir, any question a physician would ask would be considered that, yes.
Q. Go ahead with this obstaclizer.
(Whereupon the DVD was continued as follows:
"Send you back in? You're lucky you made it out. That was a risk you took." "Risk is my middle name." "Really? It's mine too." "So send us back in again so we can finish the job."

overruled

611; asked + answered. Permissible cross examination

page 295

"Vince, the truth is I don't think you're ready. You moved slow in there. You've got to handle obstacles quickly, whether you're in the doctor's office or in an obstaclizer.")
BY MR. PAPANTONIO:
Q. Hold it. Why do you have to handle obstacles quickly?

[295:9] - [297:11] 1/21/2006 James Dunn 10-7-05

page 295

THE WITNESS: Well, once again, this is a fictitious piece here, but we would want our representatives to be able to give accurate information to questions physicians would have for a number of reasons.
Number one, we want them to have that data because they're asking for it. Number two, it builds the credibility of the rep. When the rep is viewed as a resource from the physician, one of the ways they do that is being able to answer questions to physicians accurately and quickly.
BY MR. PAPANTONIO:
Q. And honestly; right?
A. All the time; honesty all the time.
Q. And honesty always matters, doesn't it?
A. Yes, sir, it does.
Q. Let's go ahead.

page 296

(Whereupon the DVD was continued as follows:

403 Cont.

dunn plaintiff affirmatives 1_21 (3).txt

"Have to make every second count, two
efficacy messages, two GI risk messages,
appropriate balancing information and close."
"We know. We've been in workshops.")
BY MR. PAPANTONIO:
Q. Now, I heard GI information. I heard efficacy information. I didn't hear anything about CV information there, cardiovascular information. Did you tell salespeople not to talk about cardiovascular information until they were asked by the doctor?
A. No, sir. In fact, what the statement in there was was appropriate balanced information. Balanced information includes the entire product circular safety profile and we would discuss the cardiovascular profile as part of that balanced information.
Q. I thought this morning we saw an article that clearly -- a document that you saw -- I saw that said don't initiate the discussion about CV unless the doctor does. Didn't we see something?
A. I think you're inaccurate on that.
Q. I didn't show you a document this morning that says don't initiate any discussions about VIGOR and CV unless the doctor asks about it?
A. I think that was specific to VIGOR, and what I

page 297

had responded to you there was that we had other things that could answer questions for physicians and the fact that our representatives were walking into offices and proactively doctors were asking the question as well.
Q. Let's see what the obstaclizer does. Go ahead.
(Whereupon the DVD was continued as follows:
"We know the messages." "But you must do
more. You must be the power." "Be the power?"
"Be the power. It's the only way to reach the
full potential of the V Squad. Come on I'll show
you.")

Plaintiff will withdraw

tell
• mischaracterizes document
doesn't show document to witness
• [asked + answered]
EF Sustained

SIDEBAR COMMENTARY
unnecessary, no questions asked about this; video speaks for itself

403 cont

[298:24] - [299:2] 1/21/2006 James Dunn 10-7-05

page 298

Q. Move to strike. I want to ask the question again. You very specifically -- field reps were told to

page 299

make two efficacy presentations, two GI presentations; correct?

Sidebar; tell
Sustained EF

801/802;
602
Question relates to Video, a Merck document.

[299:4] - [299:13] 1/21/2006 James Dunn 10-7-05

page 299

THE WITNESS: I think that they were told to
provide the message flow -- that sounds familiar
to me -- but also and always to provide
appropriate balance. You wouldn't just say say
this without the appropriate balance. We always
provide appropriate balance.
BY MR. PAPANTONIO:
Q. So this isn't fictitious. This is what you'd actually tell people to do.
A. No, sir, this is fictitious.

801/802; → 801(d)(2)
602

Witness was in charge of team that developed Video.

Overruled EF

403 cont.

dunn plaintiff affirmatives 1_21 (3).txt

[304:5] - [305:22] 1/21/2006 James Dunn 10-7-05

Unnecessary, no questions asked

page 304
Q. Go ahead with this.
(Whereupon the DVD was continued as follows: "They're coming back." We're hitting them with facts. How about --" "Be the power.")
BY MR. PAPANTONIO:
Q. All right. That's enough. I don't need to see more. You don't know how much you spent on this, do you?
A. No, sir.
Q. But the truth was you used this as a training mechanism for salespeople; right?
A. That is not true.
Q. Well, why did you make it?
A. The reason we made this is the representatives -- there's a district meeting plan. We call it the DMAC, district meeting agenda and content, and that was multiple different training components, modules, and we were training representatives over multiple hours. I think this training day was eight to ten hours long.
Consistent with the adult learning model, part of that model is that adults don't learn just from lecture. They need breaks. These video clips were
page 305
designed not to be a training tool at all, nothing more than a mental break for the representatives so that they could kind of shut down for a little bit and then get reengaged and ready to go on the intense training that we had that are contained in those documents that I referred to.
Q. So none of what we just saw is instructional for your salespeople?
A. None of it.
Q. There's nothing in there that you hoped to pass on to your salespeople.
A. None of it.
Q. Including two efficacy presentations and two GI presentations.
A. The entire video was not meant to pass on anything to the reps. It was meant to give them a mental break.
Q. A mental break.
A. Yes, sir.
Q. And that was just a mental break for you? Was that a mental break, just watching that, for you?
A. Sir, yes, it was.

SIDEBAR; 611; 401-403

plaintiff will withdraw bracketed portion.

611; sidebar

611, 401-403; SARCASTIC TONE

all permissible cross examination countering witness's claims regarding video.

Overruled

Merck Responses to Pltf Objections to Dunn

Dunn Defendant Counter-Designations

[10:19] - [11:15] 10/7/2005 Dunn, James - (LA and Irvin)

* Defendant Deposition Designations

page 10

Q. So the material that you gave to the representatives is material that you reviewed; is that correct?
A. Yes, I would have reviewed it but I didn't have final approval.
Q. So you would take material that would -- who would give you this material that you would then give to

page 11

the representatives in the company at Merck?
A. The process is fairly thorough. Basically the marketing team would be responsible for marketing materials so these promotional materials, the marketing team would work with various different parts of the organization to generate these materials, go through all the various processes that they would go through, consulting with training, maybe hospital group, the managed care team, economic affairs, and they would pull together all these materials.
At that point those materials would go to the medical legal board. Medical legal would review the material and give final approval on it. Once those approvals were done then I would get the materials and put together communication out to the field.

overruled

[299:14] - [299:25] 10/7/2005 Dunn, James - (LA and Irvin)

* Defendant Deposition Designations

page 299

Q. Two efficacy presentations and two GI presentations is what we heard.
A. Also, you look at the training documents. They'll always provide us per policy that they have to provide the messaging, marketing messaging that we have along with balanced information, so we could give the information that might be the beneficial side of the equation but they would always give the safety information as well. That's part of our policy and it's within the detail pieces. All those detail pieces are already balanced. You have the benefits and the limitations right there in the same page.

602 assumes facts not in evidence

hearsay 801, 802

Merck response: the testimony itself provides the facts in evidence

[300:5] - [301:9] 10/7/2005 Dunn, James - (LA and Irvin)

* Defendant Deposition Designations

page 300

MR. PAPANTONIO: Show the rest of this, please.
(Whereupon the DVD was continued as follows:
"Are you sure you want to go back in there? It's risky." "It's okay. We have a job to do." "We're the V Squad." "Yes, you are." "Good luck." "Let's see what our favorite obstacles are up to."
"Like the - says, I heart generics." "I gotta tell you, the whole Vioxx edema thing, it worries me." "Like the lady said, Vioxx, bad. Celebrex, good."
"Ready with the data?" "Let's clean up this place." "Yes." "Hey, generic man, maybe that old prescribing habit could benefit from some new data." "Data."
"The risk of hypertension and edema in older OA patients can be reduced by starting with the minimum dose, 12.5 milligrams." "Okay. Okay. So I kind of fudged some of the facts to make Celebrex look better. We can still be friends,

page 301

can't we?"
"Well, that was easier than I thought." "Think again." "I thought we got rid of these guys." "We're back." "That's the thing about obstacles, Vicki. You never run out." "Is ibuprofen a great drug or what?"
"Watch out. The obstacles are getting tougher." "You know what to do." "Be the power.")

[306:6] - [306:9] 10/7/2005 Dunn, James - (LA and Irvin)

* Defendant Deposition Designations

page 306

Q. Sir, so one thing you would do as a way to -- at these sales meetings is you would show them this film called Be The Power.
A. It was just for this one meeting.

[322:15] - [330:8] 10/7/2005 Dunn, James - (LA and Irvin)

* Defendant Deposition Designations

page 322

Q. Now, based on your experience in the pharmaceutical industry for 14 or 15 years, have you developed an understanding of how Merck communicates information about its products?
A. Yes, sir. I've had a number of different positions directly involved in that.
Q. Can you name some of the different ways you're aware of that Merck communicates information about its



products? I'm going to try to write them down as you mention them so bear with me.
A. Sure. First we would communicate to the Federal

page 323

Food and Drug Administration so the FDA would be one of the folks that we would communicate data around.

602 no experience communicating with FDA

Q. Okay. The FDA. How's that look? Did I get that? Look at that. I spelled it right.
A. Yeah, it looks good.
Q. Okay.
A. Another place we would communicate through would be public affairs so out to the media, you know, television, newspaper and Internetwise, so the media would be a second place that we would communicate out information.

602 no experience communicating with FDA

Q. Okay. Media. What other ways are there that Merck communicates information about its products?
A. Scientific conventions or forums that -- and this is throughout the world, so scientific conventions.

602 no experience communicating with FDA

Q. All right. (Let's say scientific conventions.) — Sidebar
All right. Are there any other ways that Merck communicates information about its products?
A. Yes, sir; through medical journals. We would publish studies in medical journals.

602 no experience communicating with FDA

Q. All right. Any other ways you're familiar with?
A. We would do it through some other channels as well, the FDA, scientific, media, the representatives. We could do it through representatives.

602 no experience communicating with FDA

Q. Okay.

Merck response: None needed

page 324

A. We also have a resource at Merck, professional information request, that representatives could at least mail the information to physicians.
Q. Now, is there an acronym for professional information request? Because there's a lot of letters there.
A. PIR.
Q. PIR. We've heard a little bit about PIR in your examination by Mr. Papantonio. Can you tell us what a PIR is?
A. Yes. A PIR is a professional information request. A physician might request information that a representative could not answer directly but the representative has a mechanism to still get this information to them, not verbally but through the mail or fax, and the representative would take the question from the physician and submit it into the company to have that information sent to the physician.
There's a department back there called MEDSA that is manned by scientists and physicians and health care professionals that would have access to information that our reps would not and that would put this information together to get it out to physicians.
Q. Okay. So the PIR is another way by which Merck communicates information to physicians.

page 325

A. Yes.

Q. Are there any other ways that you're familiar with?
A. We have something called the National Service Center, NSC. Physicians have a 1-800 number that they can call at any time. They can call into the National Service Center with input into the company as well as ask it a question, and they can actually get live on the phone one of the folks I mentioned, the MEDSA folks, scientists and other health care professionals. They can have live conversation within the company around that.
Q. Any other methods you're aware of at the moment?
A. I think that summarizes it.
Q. Let's talk a little bit about the representatives, Mr. Dunn. Can you explain to the jury what a Merck professional representative does?
A. Yes. Our professional representatives are trained up extensively to go out and represent Merck and the product in therapeutic areas that they have responsibility for so they would get training in a particular area.

They're governed by our policy and by the FDA regulations and they basically would go out to physicians. They might have anywhere from a hundred to two hundred physicians in a geographic area that they have

page 326

responsibility for.

And their job is to provide information that is within the product label or the piece of paper that gets put in the sample box. When you get a sample from a physician's office there's a label, a product insert, a product circular. That product insert governs what the representative can say.

And when they're providing that information they would do it in what we call a balanced fashion. What a balanced fashion means is they're going to go in and talk about the benefits, how well the product works and a particular product type and that it would work well here to a physician.

At the same time they're balancing that by discussing the contraindications, warnings, precautions, adverse events. Basically all the safety information, they would be providing that in a balanced fashion.

So they're not just going in and talking about hey, the drug works well here. They would talk and say here's the efficacy data, how it works, and they would at the same time provide the safety information on every single call.
Q. When you say call, just so the jury understands what these representatives are doing, what does a call mean? What is that?

page 327

A. Representatives have responsibility for these hundred to two hundred people and they're all in what we call a routing. Typically it's a three to four week routing and they try to get around to each of the physicians in their territory, and a call would be going to their office typically and trying to get some time with

overruled

narrative response

602
assumes facts not in evidence
hearsay
801, 802

Merck response:
none needed

the physician to sit down and discuss the product. Sometimes they get time with the physician. Sometimes they get a lot of time with the physician. Sometimes they are asked to come back later.
Q. In addition to calling on physicians, did the representatives have any other responsibilities?
A. Yes. They have sampling responsibilities. Typically a representative might have samples for the products they have responsibility for and upon request from the physician they certainly would provide samples to the physicians so that they could use that in trial with patients so a patient could free of charge, you know, use that product to see if it's going to work for them or not.
They also provide medical education to the medical community through various different mechanisms.
Q. Okay. And do the -- is there any training that is done for the professional representatives by Merck?
A. Oh, a lot of training.
Q. Can you just tell us a little bit about what

page 328

training a professional representative undergoes at Merck.
A. Sure. The training at Merck really is divided up into two buckets. I'll call it the initial training when they're first hired by the company, and that's an eight to ten-week long course, and then the other bucket of training, I would say, is ongoing while they're employed at Merck and it just never ends. That's why I'm saying it's so extensive. Once you're trained up you're not trained up. You continually get trained up.
In this first bucket, this eight to ten week when a representative joins the company the standards are quite high. They take many, many examinations during this time period. Some of the examinations would be on pharmacology, meaning how do drugs work, anatomy, the organs within the body, physiology, how does the body work.
They would take product exams, which would be on the particular product they're going to have responsibility for, and they would take exams on the actual FDA-approved label. They're getting tested to make sure they understand that label.
They get policy examinations so that they're clearly making sure they understand how they're conducting themselves. All these exams -- also the standard at Merck is you either get an A or it's a failure. So you get 90

page 329

percent or greater. Anything below a 90 is considered failed and you either have to redo the test or ultimately you don't pass that.
They get a lot of training. They get car driver training to make sure they can drive safely. They get ethics training based on how the company wants them to conduct themselves, and that's contained within our policies and something called values and standards as well. (So this training, you can see it's very comprehensive.)
At that point when they've gone through all

Overruled EF

611 narrative response

Merck response: None needed

improper opinion

that, the next thing they have to do is sit down with their business manager. The person that basically hired them into the company will sit down with them and they'll take an oral examination, and the manager is going to test them on any of the topics that I just covered and make sure through an oral type of examination that the representative knows what they're doing.

At that point the manager can say okay, I think you're ready to go out and start representing Merck and the products that you have out to the physicians that you'll have responsibility for, and that's when you come into the second bucket of training.

And what I mean by that is the training is nonstop. As an example, the manager will ride with the

page 330

representative once or twice a month, and the manager's there to make sure that they understand the information, that they're complying with policy, that they can answer a physician's questions directly, honestly, truthfully and as quick as they can so that the physician's satisfied with the information. So that occurs every single month.

The manager will also conduct about once a quarter --

Overruled

omits question

Merck response: no question omitted only the interrupting objection has been cut

[330:16] - [331:23] 10/7/2005 Dunn, James - (LA and Irvin)

* Defendant Deposition Designations

page 330

A. Also the manager conducts routinely about once a quarter -- once every three months they'll have a district meeting. And what I mean by that is pull the entire team of representatives this manager has responsibility for and they'll have a meeting, and that meeting is training in nature and they review lots of different things.

They're reviewing the products. They're doing games to understand that information. They're doing multiple different formats to understand the information. So that occurs three to four times a year, maybe sometimes

page 331

even five times a year depending on the product.

Q. And you had mentioned the product. Is there any training on the products themselves? For example, is there any training on Vioxx for the representatives who had responsibility for Vioxx?

A. Absolutely.

Q. Can you tell us about what topics the representatives were trained on Vioxx?

A. Sure. Prior to Vioxx coming to market, months ahead of time before Vioxx got approved the representatives were trained up on all the background information.

This was a new disease entity. We were talking about osteoarthritis and acute pain. We didn't have a product like that in the marketplace and we needed to train our representatives up on a totally new disease

area, new types of physicians.
We were not calling on orthopedic surgeons so they had to have training around what an orthopedic surgeon is, how they operate on a daily basis. So they have training there and also the physiology and some of the alternatives that physicians may consider for treatment of pain and osteoarthritis.

[347:2] - [350:11] 10/7/2005 Dunn, James - (LA and Irvin)

* Defendant Deposition Designations

page 347

Q. And can you tell the jury, did you train -- did you or Merck train its representatives to avoid or dodge questions from physicians?

A. Never. We never did that. That's not what we're in. We want to make sure physicians have answers to questions. That's what we want them to have. At the end it benefits us if they have the information so why would we dodge it? We want them to have the information.

Q. Even if the questions are -- the answers involve safety information?

A. Sir, part of our presentation to physicians, we're proactively talking about that safety information. Physicians routinely have safety questions. They ask safety questions my experience is very frequently and we want to make sure that they understand that information.

Q. Can you tell the jury what this dodge ball exercise is? While you do that let me provide to you another document and ask you to identify that document. That we'll mark as Dunn Defendant Exhibit 3.

(Dunn Defendant's Exhibit Number 3 was marked for identification.)

A. Well, the two documents I have in front of me, one is the actual game. The other is the basic training leader's guide, and this leader's guide basically points

page 348

out what the rules of the game are.

Once again, the game is designed with the adult learning model in mind and that states that adults like to learn in multiple different ways, that the old -- just someone up there writing on a chalkboard is not as effective as engaging people, especially when it comes to memorization. We have to engage them in different ways.

So this game right here, dodge ball, was designed to help our representatives memorize answers to questions. And the rules are contained right here in this document that is entitled Selling Clinics Basic Training Leaders Guide, are contained in this document.

Q. And can you just briefly summarize the rules of this dodge ball game for the jury?

A. You bet. The rules are stated right here on page 7. Basically the rules of the game are -- you know, the outcome is we want representatives to memorize. And there's a deck of cards.

611 leading

602 no knowledge about what happened in any particular sales call

Merck response: None needed

In this exhibit here, the one entitled dodge ball, these are cards. They're bigger than decks of cards that you're used to playing cards with. They're bigger than that but they're still a deck of cards.

And the rules of the game basically is a representative -- you're going to be in maybe a semicircle group of representatives and a representative will pull a

page 349

card, one of these cards from the deck and there's a question on it. They will read the question to the group and the trainer will ask them to answer the question for the group.

If they answer the question accurately, which is the objective of the game, they get a point and they get to sit down.

Where dodge comes into it, within this deck of cards there are very few cards that are called dodge. If one of the representatives that is in this group pulls the dodge card, they get to show it to everyone and they automatically get to sit down and the next person in line has to stand up and pull another one and answer the next question.

So basically it's a free pass. They don't have to answer that particular -- because there is no question on that card, but remember, this is a group training environment and most of the cards are questions that we're actually trying to get them to memorize so they can answer the questions to physicians.

Q. And are there any answers to the questions contained within the dodge ball cards?

A. No, sir. The trainer has memorized these and we're expecting the representative to have memorized it. That's the objective of the game. We're not going to ask

page 350

the question and put the answer on it because part of the game is you pull it and you're expected to know it. So that's why the answer is not on here.

Q. Can you tell us -- there's a reference to obstacles in the dodge ball exercise. What is an obstacle?

A. An obstacle -- it's kind of an industry term. Multiple pharmaceutical companies use the same term, and basically it's a question a physician may have for the representative about a particular product or disease, and they're simply asking a question.

**Exhibit No. P1.0060**
MRK-AAR0073258

Video:
Be the Power 2S01

admitted

To: Miller, Reid T; Alberti, Peter M; Barker, Tyrus; Biegelsen, Lawrence H.; Biehn, Brant; Bourdow, Carrie L.; Brakewood, E.B. E; Campbell, M. Shane; Cannell, Thomas R.; Coppola, Linda G.; Dervishian, Marc A.; Dunn, Jim(FIT for VIOXX & ARCOXIA); El-Dada, Riad H.; Griffing, Robert J.; Guza, Korinne M; Hayward, Kathryn S.; Hisaw, Steve R; LaMond, Lisa; Laux, Jennifer I; Lee, James S.(BADS-VIOXX); McKeever, Jeffrey D; Nunno, Leigh; Payne, Susan M; Pendleton, Kathy; Posner, Christopher A; Pound, Margaret M.; Roberts, Rick M; Rode, Robert J.; Stanton, Michael A; Vignau, Steven R.; Wentworth, Marian W.
From: Miller, Reid T
Cc
Bcc:
Date: 2002-02-08 20:16:36
Subject: MERCK SHARES POISED TO REBOUND IN 2002

---

The main risk we see in Merck is the possibility that Vioxx sales continue to weaken, forcing us to further cut our growth expectations. On December 11, Merck marred its annual meeting with analysts by predicting that less-than-expected sales of Vioxx would keep the drugmaker from achieving any earnings growth in 2002.
The fact that Vioxx doesn't offer superior pain relief to other, cheaper medicines means regulators and physicians may be less tolerant of side effects such as increased blood pressure and incidence of heart attacks. Vioxx sales would fall dramatically if the drug's label were changed to indicate a slight increase in the risk of heart attack. Data emerged last year that showed the potential of heart attacks as a Vioxx side effect. Worse yet, the follow up to Vioxx, Arcoxia, may have similar side effect problems.

02/08/2002 15:01:13
MERCK SHARES POISED TO REBOUND IN 2002 - PT 1/2
03:01pm EST 8-Feb-02 Raymond James & Associates Inc (Mike Krensavage 212-856-

COMPANY REPORT

RAYMOND JAMES & ASSOCIATES
MEMBER NEW YORK STOCK EXCHANGE/SIPC

Pharmaceuticals
Update Report:
February 8, 2002

Michael Krensavage
Summary(212) 856-4364
mkrensavage@ecm.rjf.com
Michael Bailey
Research Associate

Merck & Co.
(MRK:NYSE) Strong Buy 1

---

Merck & Company (www.Merck.com) is a Whitehouse Station, New Jersey-based drug maker with 2001 sales of $48 billion. Its medicines include Vioxx for arthritis, Zocor for high cholesterol, and Singulair for asthma. Set to be spun off in 2002, Merck`s Medco unit administers prescription drug benefits.

---

Merck Shares Poised to Rebound in 2002

* We reiterate our Strong Buy rating on Merck and Co. based on easing competition from generic drugs, a planned divestment of its pharmacy-benefits manager, and an attractive valuation.

* For all of 2001, earnings increased 8%. While Merck's growth trails that of its peers, it compares with a decline of about 20% for companies in the S&P 500.

* Investors are penalizing Merck more than it deserves, pricing its shares at a 15% discount to the S&P 500 based on 2002 earnings.

* We believe the valuation of Merck shares will expand as new drugs such as Arcoxia for pain and Zetia for high cholesterol help Merck overcome a string of patent expirations set to conclude this year.

* Our research indicates drug stocks facing significant patent expirations typically bottom six to 18 months before generics hit the market, suggesting Merck shares are poised to rally.

* The planned divestment of Medco, the pharmacy-benefits manager, will expand Merck's margins, make the company easier to analyze, and eliminate a conflict of interest.

* Our price target of $75.00 assumes Merck trades at a 10% discount to a targeted drug group multiple of 24x estimated 2003 EPS.

---

| | |
|---|---|
| Current Price (2/7/02) | $58.33 |
| Projected 12-Month Price Range | $75.00-$55.00 |
| | |
| 52-Week Range | $85.55-$56.71 |
| Dividend/Yield | $1.40/2.4% |
| Book Value (9/01) | $6.64 |
| Suitability | Growth |
| | |
| Shares Out. (mil.) | 2,301.0 |
| Market Cap. (mil.) | $134,217.3 |
| Avg. Daily Vol. (10 day) | 5,735,480 |
| | |
| Proj. 3-Yr EPS Growth Rate | 13% |
| ROE (2000) | 48.6% |
| LT Debt (mil.)/% Cap. | $4235/22% |

P/E Ratios

| | |
|---|---|
| 2002E | 18.6x |
| 2003E | 16.8x |

Revenues (mil.)

| | Old | New |
|---|---|---|
| 2001A | $47716.0 | $47716.0 |
| 2002E | $51854.0 | $51854.0 |
| 2003E | $56277.0 | $56277.0 |

Operating Margins

| | |
|---|---|
| 2001A | 21.1% |
| 2002E | 19.0% |
| 2003E | 18.3% |

---

| EPS FY= Dec | Q1 Mar | Q2 Jun | Q3 Sep | Q4 Dec | Full Year |
|---|---|---|---|---|---|
| 2001A | $0.71 | $0.78 | $0.84 | $0.81 | $3.14 |
| Old 2002E | 0.70 | 0.75 | 0.81 | 0.89 | 3.14 |
| New 2002E | 0.70 | 0.75 | 0.81 | 0.89 | 3.14 |
| Old 2003E | UR | UR | UR | UR | 3.48 |
| New 2003E | UR | UR | UR | UR | 3.48 |

---

Notes: Rows may not add due to rounding. UR: Under Review.

---

(C) Bridge Information Systems, Inc. 2002

Insider Trading BOT/SL (thou.)
last 6 month 3.3/39.9
Float (mil.) 2,273.4
Common Equity (mil.)/
% of Cap $15,356.7/78%

Company Description

Merck & Company discovers, develops, manufactures, and markets drugs for humans and animals. The company also provides pharmaceutical benefit services through Merck-Medco, which will be spun-off this year. Merck's 2001 sales were $47.7 billion, versus $40.4 billion in 2000.

Merck's pharmaceuticals are primarily sold by prescription, and the company also sells vaccines. Its drugs target a wide range of disorders. One of the company's most well known drugs is Vioxx, an anti-inflammatory pain pill. Another is Propecia, for male-pattern hair loss. One of Merck's best-known over-the-counter medications is Pepcid, for heartburn. Merck also manufactures and markets products for the following disorders: atherosclerosis, including the drug Zocor for high cholesterol; hypertension/heart failure; respiratory ailments; opthamalogical ailments; migraines; prostate enlargement; and HIV. Finally, Merck manufactures vaccines for measles/mumps/rubella, chickenpox, and hepatitis B, among others.

Merck-Medco manages prescription-drug benefits for employers and insurance companies and operates the largest mail-order pharmacy. Merck-Medco generated 2001 revenues of $26.4 billion, up 30.9% from 2000. Merck announced January 29 that it would divest the pharmacy-benefits manager unit to shareholders as part of a tax-free dividend this year.

Investment Thesis

We are reiterating our Strong Buy rating on Merck & Co., a Whitehouse Station, New Jersey-based drug maker. We believe the company's 17% discount to other drug stocks makes it compelling. We expect new drugs such as Arcoxia for pain and Zetia for high cholesterol to help Merck overcome a string of patent expirations set to conclude this year.

By the end of last year, drugs that accounted for more than 15% of Merck's 2000 pharmaceutical sales lost their patents, clearing the way for generic drug companies to introduce discounted clones that can steal 80% of a branded drug's market share within a year.

The last drug to lose exclusivity is Prinivil, a hypertension medicine that would face generics in June. Our research indicates that drug stocks facing significant patent expirations typically bottom six to 18 months before generics hit the market, suggesting Merck shares are poised to rally.

We believe two new drugs for pain and high cholesterol will help Merck surmount its patent expiration woes. Arcoxia, with better efficacy and fewer side effects than other pain medicines, is likely to reach the market late this year as a follow-up to the pain and arthritis drug Vioxx. Although Arcoxia will probably cannibalize some Vioxx revenues, we estimate that the drug could generate about $500 million in annual sales.

A second new drug, Zetia, should launch in 2003. Although Zetia could generate $2 billion per year, about half of the cholesterol drug's sales would be split with partner Schering-Plough (SGP/$31.40/Strong Buy). A more effective cholesterol-fighting drug that combines Zetia and Merck's Zocor could reach the market in 2004.

At a 17% discount to the group, Merck's shares are being overly penalized for slow growth in 2002 and a string of patent expirations set to conclude this year. We believe that new drugs such as Arcoxia and Zetia will help Merck overcome its of patent woes and lift MRK shares toward our $75 price target. This 12-month price target assumes Merck trades at a 10% discount to a targeted drug group multiple of 24x estimated 2003 EPS.

Investment Risks

The main risk we see in Merck is the possibility that Vioxx sales continue to weaken, forcing us to further cut our growth expectations. On December 11, Merck marred its annual meeting with analysts by predicting that less-than-expected sales of Vioxx would keep the drugmaker from achieving any earnings growth in 2002.

The fact that Vioxx doesn't offer superior pain relief to other, cheaper medicines means regulators and physicians may be less tolerant of side effects such as increased blood pressure and incidence of heart attacks. Vioxx sales would fall dramatically if the drug's label were changed to indicate a slight increase in the risk of heart attack. Data emerged last year that showed the potential of heart attacks as a Vioxx side effect. Worse yet, the follow up to Vioxx, Arcoxia, may have similar side effect problems.

In addition, the company faces risks typical of all drug makers. Few medicines formulated in laboratories reach human testing. If they reach the clinic, they often fail to prove effective. Or they may produce unacceptable side effects. If a drug passes all three phases of human trials, regulators can refuse to approve it.

CONTINUED...

FCviaNewsEDGE

BROKER: Raymond James & Associates Inc

Reid Miller
Marketing Analyst
Merck & Co., Inc.
Forecasting & Decision Research (F&DR)
BADS - USHH
Mail Stop: UG2B-50

Telephone: (267) 305-2038
Facsimile: (267) 305-9757
E-mail: reid_miller@merck.com

This e-mail and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to which they are addressed. If you are not the intended recipient or the person responsible for delivering the e-mail to the intended recipient, be advised that you have received this e-mail in error, and that any use, dissemination, forwarding, printing, or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please immediately notify Barbara Reimers at 267-305-3351 or Debbie Breen at 267-305-5416.

---