U. S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

Filed   2-10-06

LORETTA G. WHITE
CLERK

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re: VIOXX | * | **MDL Docket No. 1657** |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | **SECTION L** |
| | * | |
| | * | **JUDGE FALLON** |
| | * | |
| This document relates to | * | **MAGISTRATE JUDGE KNOWLES** |
| | * | |
| Evelyn Irvin Plunkett v. Merck & Co, Inc. | * | **CASE NO. 02:05CV4046** |

---

**Notice of Filing Deposition Testimony**
**of Edward Scolnick**

---

Plaintiff Evelyn Irvin Plunkett, as Personal Representative of the Estate of Mr. Richard Irvin, Jr., by and through her attorneys, hereby gives notice of filing Plaintiff's affirmative designations and Defendant's counter designations of the deposition testimony of Ed Scolnick. This testimony was played during the trial of this cause on February 8 and 9, 2006.  Defendant will file their affirmative designations of the deposition testimony of Ed Scolnick separately. A transcript is attached as Exhibit "A."

Respectfully submitted,

By: _O. Leigh O'Dell_ _____
**Andy D. Birchfield, Jr.**
P. Leigh O'Dell
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
**Co-Lead Counsel**


Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS,
MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502

Russ M. Herman (Bar No. 6819)
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
FAX: (504) 561-6024

Christopher A. Seeger, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

**PLAINTIFFS' LIAISONCOUNSEL**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
MEUNIER&WARSHAUER, L.L.C.
P.O. Box 960
191 East Second Street
New Roads, LA 70760
(225) 638-6137
(225) 638-8836 (fax)

Carlene Rhodes Lewis, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

Thomas R. Kline, Esquire
KLINE&SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced in accordance with Pre-Trial Order No. #8, on this the 10th day of February, 2006.

*P. Leigh O'Dell*

4

Scolnick Final Complete

Scolnick Part 1 (3-22-05) (Multi-clip)
Scolnick 1505     15:5-15:7

```
15: 5           Q.   Are you Dr. Ed Scolnick?
15: 6           A.   Yes, I'm Dr. Edward
15: 7     Scolnick.
```

Scolnick 2213     22:13-22:18

```
22:13           Q.   Are you the Edward M.
22:14     Scolnick, President of Merck Research
22:15     Labs and then the Executive Vice
22:16     President Science and Technology for
22:17     Merck & Company?
22:18           A.   Yes, I am.
```

Scolnick 47.2-48.2     47:2-48:2

```
47: 2           Q.   Well, let me suggest it to
47: 3     you if you'll look at Exhibit Number 4.
47: 4                I'll bet you've seen this
47: 5     e-mail lately getting ready for your
47: 6     deposition, haven't you?
47: 7           A.   I don't recall seeing this
47: 8     e-mail before right now.
47: 9           Q.   You don't recall seeing this
47:10     e-mail before?
47:11           A.   I do not recall seeing this
47:12     e-mail before.
47:13           Q.   All right. Well, if you'll
47:14     look down at your message dated December
47:15     5th, 2001, it's about an analyst who is
47:16     going to stand up in public and say
47:17     something negative about Vioxx.  And
47:18     you're the fellow who wrote, "David if he
47:19     says this I will boil him in oil at the
47:20     meeting." That's what you said, isn't
47:21     it?
47:22           A.   That is the e-mail you're
47:23     referring to, yes.
47:24           Q.   Does that mean, yes, you
47:ESQUIRE DEPOSITION SERVICES
48: 48
48: 1     said it?
48: 2           A.   That is my e-mail.
```

Scolnick 49.1-49.10     49:1-49:10

```
49: 1                So, you were saying you were
49: 2     going to boil this fellow in oil because
49: 3     this was an analyst who was going to
49: 4     stand up and suggest that maybe Vioxx
49: 5     causes CV events, heart attacks, strokes,
49: 6     things like that; right?
49: 7           A.   I don't recall the details
49: 8     of his report.  I have not seen this
49: 9     e-mail, and I don't recall the details of
49:10     this at all.
```

Scolnick 52.2-52.21     52:2-52:21

```
52: 2           Q.   Well, if you'll look behind
52: 3     you'll see what it is that upset you.
52: 4     It was this fellow named somebody, hang
52: 5     on, his name is at the end, Richard
52: 6     Stover, who prepared a reanalysis of
52: 7     Merck's meta-analysis.  Do you see where
52: 8     it says that?
52: 9           A.   That is the title for the
```
Page 1

                              Scolnick Final Complete
52:10   article that you're referring to.
52:11           Q.    Now, those are a lot of big
52:12   words for nonscientist people.  But just
52:13   between you and me, what this really is
52:14   is it's a stock analyst, someone who
52:15   advises the investment community on
52:16   whether to buy or sell stock, and he's
52:17   basically examining some of what you guys
52:18   had been telling people about the safety
52:19   of your drug, isn't he?
52:20           A.    He's talking about the VIGOR
52:21   study and Vioxx, yes.

Scolnick 58.17-58.24       58:17-58:24

58:17           Q.    Okay.  And that's why you
58:18   said "David if he says this I will boil
58:19   him in oil at the meeting."  You didn't
58:20   want that kind of talk out there, did
58:21   you?
58:22           A.    I didn't want -- having read
58:23   this memo, I didn't want an inaccurate
58:24   statistical analysis of our data.

Scolnick 6803      68:3-68:4

68: 3           Q.    I want to show you Scolnick
68: 4   Exhibit Number 7.  We're going to come

Scolnick 6811      68:11-68:18

68:11           Q.    Do you see your June 1, 1998
68:12   e-mail?
68:13           A.    Yes, I do.
68:14           Q.    You did threaten to quit,
68:15   didn't you?
68:16           A.    I was upset with a
68:17   particular marketing person.  I was --
68:18   and that is the thrust of this e-mail.

Scolnick 69.01-69.15       69:1-69:15

69: 1           Q.    Well, when you said "If you
69: 2   lose I will leave, because I will not be
69: 3   able to have any respect for this
69: 4   company," that's threatening to quit,
69: 5   isn't it?
69: 6           A.    The e-mail is accurate.
69: 7           Q.    No.  That wasn't my
69: 8   question.
69: 9                 I said, when you say in your
69:10   e-mail, "If you lose I will leave,
69:11   because I will not be able to have any
69:12   respect for this company," you're
69:13   threatening to quit, aren't you?
69:14           A.    I accept that
69:15   interpretation.

Scolnick 069.23-070.12       69:23-70:12

69:23           Q.    You're saying "Merck
69:24   marketing for once has to compete and
69:ESQUIRE DEPOSITION SERVICES
70: 70
70: 1   win.  If you do not beat Pfizer," which
70: 2   is who Searle was at the time; right?  If
70: 3   you don't beat Celebrex, that's what it
70: 4   means; right?
70: 5           A.    Yes, that's correct.
70: 6           Q.    "If you do not beat PFIZER
                                              Page 2

Scolnick Final Complete

```
70: 7   2/1 MERCK should throw in the towel and
70: 8   just give up and hand the company over to
70: 9   someone else.  If YOU," all capitals,
70:10   "lose I will leave, because I will not be
70:11   able to have any respect for this
70:12   company."
```

Scolnick 070.13-071.12      70:13-71:12

```
70:13   but you were pretty
70:14   upset with them, weren't you?
70:15          A.    It is a pointed e-mail.
70:16          Q.    Because you were upset;
70:17   weren't you?
70:18          A.    That is correct.
70:19          Q.    You were upset also because
70:20   of some study issues, research issues;
70:21   weren't you?
70:22          A.    I don't recall what you're
70:23   referring to.
70:24          Q.    Look at what it says at the
70:ESQUIRE DEPOSITION SERVICES
71: 71
71: 1   start.  You're saying that the reason
71: 2   y'all were three months behind Searle,
71: 3   the reason you were losing the race is
71: 4   because people in marketing "demanded a
71: 5   label that said we cause no ulcers."
71: 6   And then the budgets were so high that
71: 7   nobody could get the money that they
71: 8   needed for the study.  And that's why
71: 9   y'all were behind?  That's what you say;
71:10   isn't it?
71:11          A.    That is what the memo says,
71:12   yes.
```

Scolnick 7807      78:7-78:12

```
78: 7          Q.    Bottom line is, you were
78: 8   saying marketing needs to stop their
78: 9   demands and just get out there and
78:10   compete and win for once; right?
78:11          A.    That's what my memo
78:12   indicates.
```

Scolnick 7906-7911      79:6-79:11

```
79: 6          Q.    Sir, y'all weren't ready to
79: 7   go to market with your product, with
79: 8   Vioxx, when Celebrex hit the market?
79: 9   Y'all got beat; right?
79:10          A.    Celebrex got to the market
79:11   first.  That is correct.
```

Scolnick 9623      96:23-97:5

```
96:23          Q.    Well, we looked at an
96:24   exhibit a few minutes ago, the 1998 one
96:ESQUIRE DEPOSITION SERVICES
97: 97
97: 1   where you said that y'all were killing
97: 2   basic research again at Merck, once
97: 3   again.  That's because y'all needed more
97: 4   money.  You didn't have enough money in
97: 5   the budget; right?
```

Scolnick 9803      98:3-98:9

```
98: 3          Q.    All right.  So, now you'll
98: 4   agree with me in 1998 y'all didn't have
```

Page 3

Scolnick Final Complete

```
98: 5  enough money in your budget to do all the
98: 6  research you wanted to do.  True?
98: 7           A.    That is true.  That is
98: 8  always true of any really productive
98: 9  research laboratory.
```

Scolnick 10113      101:12-101:20

```
101:12  BY MR. LANIER:
101:13           Q.    Well, sir, you weren't in
101:14  marketing yourself, were you?
101:15           A.    No.
101:16           Q.    Well, why did you keep
101:17  dabbling in the marketing end?  Why were
101:18  you sending broadside e-mails to people,
101:19  because y'all were too slow on the
101:20  marketing?
```

Scolnick 10123      101:23-102:3

```
101:23           THE WITNESS:  I was
101:24  competitive, and we had a terrific
101:ESQUIRE DEPOSITION SERVICES
102: 102
102: 1           drug, and I wanted the company to
102: 2           present that drug well to
102: 3           physicians.
```

Scolnick 11503      115:3-115:10

```
115: 3           Q.    So, you had all the
115: 4  resources you needed to do the right
115: 5  studies, and if the studies weren't done,
115: 6  it was your fault for not doing them
115: 7  because you had the money.  Is that what
115: 8  you're telling me?
115: 9           A.    We had sufficient resources
115:10  to study Vioxx.
```

Scolnick 11805      118:5-118:11

```
118: 5           Q.    If you thought that there
118: 6  was an issue that needed debunking, you
118: 7  certainly knew how to order to get a
118: 8  study immediately to debunk the issue and
118: 9  destroy credibility, didn't you?
118:10           A.    And to find out if we were
118:11  wrong.
```

Scolnick 11818      118:18-119:3

```
118:18           Q.    That wasn't my question,
118:19  sir.  I said, you could have done a
118:20  study, and you could have ordered one to
118:21  be done with speed on the issue of
118:22  cardiovascular problems, heart attacks
118:23  and strokes, couldn't you?
118:24           A.    There was no reason to do
118:ESQUIRE DEPOSITION SERVICES
119: 119
119: 1  such a study before Vioxx went to market
119: 2  based on all of the data, huge NDA, over
119: 3  5,000 patients studied.
```

Scolnick 11910      119:10-119:23

```
119:10  question.  My question is simple.  You
119:11  certainly could have ordered a study for
119:12  risks of heart attacks and strokes before
119:13  you put the Vioxx drug on the market,
```

Page 4

Scolnick Final Complete

```
119:14   couldn't you?
119:15          A.    If there had been a reason
119:16   to do that, I could have done that.
119:17          Q.    By the same token, any day
119:18   that Vioxx had been on the market, the
119:19   second it occurred to you that there
119:20   might be a problem with heart attacks and
119:21   strokes, you could have ordered
119:22   immediately a speed study to be done;
119:23   couldn't you?
```

Scolnick 12002       120:2-120:5

```
120: 2                 THE WITNESS:  I could have
120: 3          asked or ordered a study to be
120: 4          done if I had thought there was a
120: 5          cardiovascular risk with Vioxx.
```

Scolnick 12023       120:23-121:23

```
120:23   to justify selling the drug.  I'm asking
120:24   you, did you ever order a specific study
120:ESQUIRE DEPOSITION SERVICES
121: 121
121: 1   about heart attacks and strokes?
121: 2          A.    I did not order a specific
121: 3   study.  I urged the group to come up with
121: 4   study designs after VIGOR to further
121: 5   examine the question that was raised by
121: 6   the VIGOR study.
121: 7          Q.    Well, sir, what about VALOR,
121: 8   did you have anything to do with talk
121: 9   about doing the VALOR study?
121:10          A.    VALOR?
121:11          Q.    Yes, sir.
121:12          A.    I don't recognize the term.
121:13   I'm sorry.
121:14          Q.    Did you know that your
121:15   company at one point contemplated and
121:16   actually went pretty far in designing the
121:17   idea of doing a study specifically to
121:18   look at heart attack, strokes, CV risks?
121:19          A.    Yes.  Several study designs
121:20   were considered.
121:21          Q.    And one of them had approval
121:22   and was about to be done when it was
121:23   cancelled.  Did you know that?
```

Scolnick 12201       122:1-122:3

```
122: 1                 THE WITNESS:  One of the
122: 2          studies that I'm aware of was not
122: 3          given final approval.
```

Scolnick 12205       122:5-122:9

```
122: 5          Q.    Why not?
122: 6          A.    Because when the study was
122: 7   reviewed, several people objected to the
122: 8   design of the study, that it was not a
122: 9   good scientific study to do.
```

Scolnick 12801       128:1-128:22

```
128: 1          Q.    Well, the truth is, the
128: 2   essential study that needed to be done
128: 3   for Vioxx was an outcomes study for heart
128: 4   attacks and strokes; right?
128: 5          A.    The study that would
128: 6   measure, as a predefined endpoint, heart
```

Page 5

```
                              Scolnick Final Complete
128: 7    attacks and strokes was an important
128: 8    study for Vioxx.
128: 9            Q.    Not an important.  It was,
128:10    at least in the world of things back in
128:11    2001, the only essential study for Vioxx,
128:12    wasn't it?
128:13            A.    It was an essential study to
128:14    do for Vioxx.
128:15            Q.    That wasn't my question.
128:16            The only essential study;
128:17    true?
128:18            A.    It wasn't the only essential
128:19    study to do.  It was --
128:20            Q.    That's what you said.
128:21            A.    It was a very important
128:22    study.

Scolnick 13609    136:9-136:12

136: 9            Q.    Well, certainly by the year
136:10    2000 you knew that there was an issue
136:11    about heart attacks and strokes, weren't
136:12    you?

Scolnick 13615    136:15-136:17

136:15            THE WITNESS:  The VIGOR
136:16            study was available in the year
136:17            2000.

Scolnick 14109    141:9-142:7

141: 9            MR. LANIER:  We're marking
141:10            that as Exhibit Number 13.
141:11    BY MR. LANIER:
141:12            Q.    If you'll look down at the
141:13    third question, that's the one I want you
141:14    to look at.
141:15            A.    Uh-huh.
141:16            Q.    "Why did Merck undertake
141:17    the," APPROVe, "trial?"
141:18            A.    Uh-huh.
141:19            Q.    Merck prepared an answer to
141:20    that.  Nowhere in that answer does it say
141:21    to see if people are having heart attacks
141:22    and strokes, does it?
141:23            A.    The answer to the question
141:24    does not refer to the cardiovascular
141:ESQUIRE DEPOSITION SERVICES
142: 142
142: 1    outcome part of the study.
142: 2            Q.    I'm sorry.  That's a long
142: 3    answer.  Are you just saying, yes, you're
142: 4    right, it doesn't say heart attacks and
142: 5    strokes?
142: 6            A.    There's nothing about heart
142: 7    attacks and strokes in that answer.

Scolnick 14301    143:1-143:7

143: 1            Q.    Well, you keep wanting to
143: 2    tell this jury that this was your big
143: 3    test on cardiovascular events; right?
143: 4            A.    It was one of them, yes.
143: 5            Q.    If you look at Page 2,
143: 6    that's not what this memo says, is it?
143: 7    Do you see Page 2?

Scolnick 14313    143:13-144:19
```

                         Scolnick Final Complete
143:13          Q.    Well, why don't you look up
143:14   at question number 5.  "Why were you
143:15   looking at cardiovascular events?"  Do
143:16   you see that question?
143:17          A.    Yes, I do.
143:18          Q.    It says, "Cardiovascular
143:19   data is collected as part of the safety
143:20   data in all clinical programs."  Do you
143:21   see that?
143:22          A.    Yes, I do.
143:23          Q.    It doesn't say this was
143:24   specifically targeted to check for CV
143:ESQUIRE DEPOSITION SERVICES
144: 144
144: 1   events.  It says y'all do that, everybody
144: 2   does that in every study, that's just
144: 3   standard protocol; right?
144: 4          A.    The statement says,
144: 5   "Cardiovascular data is collected as part
144: 6   of the safety data in all clinical
144: 7   programs."  Then it says, "Merck began
144: 8   long-term randomized clinical trials to
144: 9   provide an even more comprehensive
144:10   picture of the cardiovascular safety
144:11   profile of Vioxx" as part of answer 5.
144:12          Q.    Sir, the point of this is,
144:13   it's saying, first of all, cardiovascular
144:14   data is collected in every program;
144:15   right?
144:16          A.    It says that, yes.
144:17          Q.    Because that's how important
144:18   cardiovascular data is; right?
144:19          A.    That's true.

Scolnick 14503      145:3-145:15

145: 3          Q.    Well, sir, this doesn't say
145: 4   that the APPROVe study was your targeted
145: 5   study for cardiovascular data.  It says
145: 6   that that's just something that happens
145: 7   in all of your studies, that the point of
145: 8   the APPROVe study was colorectal cancer;
145: 9   right?
145:10          A.    It says that.  I would like
145:11   to point out in answer 5 it does say,
145:12   "Merck began long-term randomized
145:13   clinical trials to provide an even more
145:14   comprehensive picture of the
145:15   cardiovascular safety profile of Vioxx."

Scolnick 14602      146:2-146:5

146: 2                You, Dr. Scolnick, knew
146: 3   Vioxx was causing heart attacks and
146: 4   strokes by the time of March 2000; true?
146: 5          A.    Not true.

Scolnick 14707      147:7-147:12

147: 7   jury, as of March 2000, you, Edward
147: 8   Scolnick, knew that the CV events, the
147: 9   heart attacks and strokes, were clearly
147:10   there, and you, Edward Scolnick, knew
147:11   that they were mechanism-based with
147:12   Vioxx?

Scolnick 14716      147:16-147:21

147:16          Q.    True?
147:17          A.    That was my very first
                                        Page 7

Scolnick Final Complete

```
147:18    reaction when I saw the data from the
147:19    VIGOR trial.
147:20         Q.    You knew it from the get-go.
147:21    It was your first reaction; right?
```

Scolnick 14724    147:24-148:2

```
147:24              THE WITNESS:  It was my
147:ESQUIRE DEPOSITION SERVICES
148: 148
148: 1             first reaction before other data
148: 2    was available.
```

Scolnick 14817    148:17-148:24

```
148:17         Q.    Sir, it is in March of 2000;
148:18    isn't it?
148:19         A.    Yes, it is.
148:20         Q.    And you said to everybody,
148:21    Alan Nies, Alise Reicin and Deborah
148:22    Shapiro certain things, didn't you?
148:23         A.    I did.  It says, "I just
148:24    received and went through the data."
```

Scolnick 14908    149:8-150:2

```
149: 8         Q.    And you don't step out and
149: 9    say something unless you know it's true
149:10    and right.  Do you remember that?
149:11         A.    I don't remember saying what
149:12    you've just quoted me as saying.
149:13         Q.    I think your exact words
149:14    were, you hold yourself to a very high
149:15    standard.  Do you remember that?
149:16         A.    Yes, I do remember that.
149:17         Q.    And so you sent this e-mail
149:18    to everybody, and you said that you
149:19    received and you went through the data;
149:20    right?
149:21         A.    Uh-huh.  That's what it
149:22    says.
149:23         Q.    And I'm sure you did that
149:24    thoroughly.  You didn't do a half slop
149:ESQUIRE DEPOSITION SERVICES
150: 150
150: 1    job; did you?
150: 2         A.    I don't think so.
```

Scolnick 15105    151:5-151:12

```
151: 5              THE WITNESS:  Excuse me.  If
151: 6    I can just look at the memo for
151: 7    one second.  "Pubs" in this
151: 8    context is talking about
151: 9    perforations, ulcers and bleeds
151:10    associated with the study.
151:11    BY MR. LANIER:
151:12         Q.    Okay.  Thank you.
```

Scolnick 15113    151:13-151:22

```
151:13              "There is no doubt about
151:14    the" perforations, ulcers and bleeds
151:15    "data."  Then look at your next sentence.
151:16    "The CV events are," what's that word?
151:17         A.    The sentence reads, "The
151:18    cardiovascular events are clearly there."
151:19         Q.    They're clearly there.  That
151:20    was your choice of words; wasn't it?
151:21         A.    This is my e-mail.  That is
```

Page 8

Scolnick Final Complete

151:22    correct.

Scolnick 15123       151:23-152:16

151:23         Q.    So, after you studied the
151:24    data, you went through it, you sent a
151:ESQUIRE DEPOSITION SERVICES
152: 152
152: 1    memo out to everybody, even though you
152: 2    hold yourself to a high standard, telling
152: 3    everybody that the CV events are clearly
152: 4    there, and that was March of 2000, wasn't
152: 5    it?
152: 6         A.    Yes, it is.
152: 7         Q.    And you never sent out an
152: 8    order at that point in time for a CV
152: 9    outcomes study, did you?
152:10         A.    We -- I did not send out an
152:11    order for a CV outcomes study.  We took
152:12    many immediate actions to try to
152:13    understand the cardiovascular events,
152:14    since we couldn't conclude what was going
152:15    on in the trial because there was no
152:16    placebo in the trial.

Scolnick 15607       156:7-156:10

156: 7              1999, I wrote, "Push Vioxx
156: 8    to market by May 22nd or" Merck will be
156: 9    "'a different company.'"  That's what you
156:10    said in 1999; right?

Scolnick 15613       156:13-156:19

156:13              THE WITNESS:  It accurately
156:14    reflects our earlier discussion.
156:15    BY MR. LANIER:
156:16         Q.    Then also in 1999 you sent
156:17    out the e-mail that said if we can't beat
156:18    Celebrex two to one, you're going to quit
156:19    or leave the company.  True?

Scolnick 156.21-156.23       156:21-156:23

156:21              THE WITNESS:  You reflected
156:22    my e-mail and some of my
156:23    sentiments in that e-mail.

Scolnick 157.10-157.14       157:10-157:14

157:10              The drug Vioxx did go to
157:11    market in 1999, and y'all marketed it
157:12    before the VIGOR study was finished;
157:13    true?
157:14         A.    Yes, that's correct.

Scolnick 16010       160:10-160:13

160:10         Q.    I said, very simple
160:11    question, sir.  It's a simple note.
160:12    2000, you never did a CV specific study;
160:13    true?

Scolnick 16016       160:16-160:23

160:16              THE WITNESS:  we did not do
160:17    a study where cardiovascular
160:18    outcomes were a primary endpoint.
160:19    we did do a study where
160:20    cardiovascular outcomes were a

Page 9

                              Scolnick Final Complete
160:21          predefined endpoint in our studies
160:22          to gather additional
160:23          cardiovascular outcomes data.

Scolnick 16120     161:20-161:23

161:20          Q.    Okay.  That's my point.  So,
161:21     you never did, never, one single study
161:22     where the primary outcome was, does it
161:23     cause heart attacks or strokes; right?

Scolnick 16202     162:2-162:3

162: 2               THE WITNESS:  You're
162: 3          correct.

Scolnick 16211     162:11-162:19

162:11               THE WITNESS:  The warning
162:12          label or a warning would be
162:13          warranted if there was an
162:14          unambiguous result which
162:15          implicated vioxx as causing heart
162:16          attacks.  And that was not the
162:17          case, based on all of the data
162:18          looked at after the VIGOR trial
162:19          became unblinded.

Scolnick 16223     162:23-163:8

162:23          Q.    Sir, simple question.  Did
162:24     you change your warning label and tell
162:ESQUIRE DEPOSITION SERVICES
163: 163
163: 1     people about the VIGOR results in the
163: 2     year 2000?  Yes or no?
163: 3          A.    We told people about the
163: 4     VIGOR results immediately after they
163: 5     became available to us.
163: 6          Q.    Okay.
163: 7          A.    And we submitted an NDA to
163: 8     the FDA to change our label.

Scolnick 22606     226:6-226:10

226: 6          Q.    Do you have Exhibit 18 in
226: 7     front of you?
226: 8          A.    Yes, I do.
226: 9          Q.    It's the day before your "to
226:10     do" list, isn't it, the 13th?

Scolnick 22615     226:15-226:17

226:15               THE WITNESS:  Yes.  It's the
226:16          day before this memo on the "to
226:17          do" list.

Scolnick 22707     227:7-227:9

227: 7          Q.    Four days away from your
227: 8     initial conclusion that Vioxx was causing
227: 9     heart attacks and strokes; right?

Scolnick 22711     227:11-228:14

227:11               THE WITNESS:  Four days from
227:12          my initial memo with my initial
227:13          conclusion, yes.
227:14     BY MR. LANIER:
227:15          Q.    All right.
                                        Page 10

Scolnick Final Complete
```
227:16              Now, already by four days
227:17 later, you have got Ms. Reicin scouring
227:18 the medical literature trying to find a
227:19 study somewhere that indicates that
227:20 NSAIDs helped your heart; right?
227:21      A.    That was one of the
227:22 questions that I asked the team when they
227:23 suggested that NSAIDs could be
227:24 cardioprotective.
227:ESQUIRE DEPOSITION SERVICES
228: 228
228: 1           Q.    And the only study she was
228: 2 able to find -- by the way, it is
228: 3 singular, there was only one study she
228: 4 could find; true?
228: 5      A.    That's what the e-mail says,
228: 6 yes.
228: 7      Q.    In fact, why don't you read
228: 8 that sentence where I've highlighted
228: 9 "only study."
228:10      A.    "Alan and Ed:  Below is
228:11 attached the abstract from the only study
228:12 I could find which assessed the potential
228:13 cardioprotective effects of an NSAID.
228:14 Alise."
```

Scolnick 22902     229:2-229:8
```
229: 2           Q.    Did it occur to you that
229: 3 people were taking the drug that could be
229: 4 having these heart attacks, or is that
229: 5 what you meant when you said it's sad or
229: 6 it's a shame, but it's a low incidence,
229: 7 you just didn't figure there would be
229: 8 that many of them?
```

Scolnick 22911     229:11-229:19
```
229:11           THE WITNESS:  As I've
229:12 stated, my initial conclusion was
229:13 that Vioxx was causing heart
229:14 attacks in patients.  After
229:15 discussions of this article and
229:16 extensive other data that we had
229:17 available to ourselves in our own
229:18 trials, I concluded that I was not
229:19 correct in my initial conclusion.
```

Scolnick 23021     230:21-230:23
```
230:21           Q.    I'm going to hand you a
230:22 document marked Exhibit 19.  Do you have
230:23 it in front of you?
```

Scolnick 23120     231:20-233:5
```
231:20           Q.    First of all, this
231:21 well-respected Carlo Patrono said that he
231:22 does not think that you can attribute the
231:23 increase in heart attacks and strokes to
231:24 the fact that the other people were
231:ESQUIRE DEPOSITION SERVICES
232: 232
232: 1 taking naproxen, and it must be good for
232: 2 your heart.  Fair to say?
232: 3      A.    That's what he writes, yes.
232: 4 That's what the person reflects on his
232: 5 comments.
232: 6      Q.    And then there are a number
232: 7 of reasons given why it can't be that
```
Page 11

Scolnick Final Complete

```
232: 8   naproxen is good; right?
232: 9          A.    What it says is, he
232:10   questions whether the magnitude of the
232:11   effects seen in VIGOR is consistent with
232:12   naproxen being cardioprotective.
232:13          Q.    Well, he said, first of all,
232:14   "There is a weak pharmacological basis."
232:15   Do you see where it said that?
232:16          A.    Yes, I do.
232:17          Q.    What that means to you and
232:18   me and folks who read this stuff more
232:19   than we probably should is that there's
232:20   really not a good medical science
232:21   pharmacy reason for saying it's naproxen.
232:22   That's what that means, doesn't it?
232:23          A.    It refers to the
232:24   pharmacology of the drug, and that's his
232:ESQUIRE DEPOSITION SERVICES
233: 233
233: 1   interpretation.
233: 2          Q.    And then it says, "No
233: 3   epidemiological evidence."  Do you see
233: 4   where it says that?
233: 5          A.    Yes, I do.
```

Scolnick 23314      233:14-234:3

```
233:14          Q.    Well, do you see the word
233:15   "no"?
233:16          A.    I do see that.
233:17          Q.    How many are there, if it
233:18   says there's no evidence?  How much
233:19   evidence is there?
233:20          A.    I see his comment.  I don't
233:21   know the details of his review that he
233:22   refers to here.
233:23          Q.    Well, when he says there's
233:24   no evidence, don't you think that means
233:ESQUIRE DEPOSITION SERVICES
234: 234
234: 1   zero?
234: 2          A.    I think that's a plausible
234: 3   explanation, yes.
```

Scolnick 23404      234:4-234:18

```
234: 4          Q.    Otherwise you think he'd use
234: 5   the word "some" or "a little" or "few" or
234: 6   "lots"?
234: 7          A.    He's talking about
234: 8   conventional nonsteroidals as part of his
234: 9   sentence.  And we actually agree with
234:10   that except for naproxen.
234:11          Q.    So, but you agree with the
234:12   statement even for naproxen, that there's
234:13   no epidemiological evidence that naproxen
234:14   is safe; right?  I mean, not safe, good
234:15   for the heart?
234:16          A.    There had been no prior data
234:17   to suggest that naproxen was
234:18   cardioprotective.
```

Scolnick 23420      234:20-235:5

```
234:20   next sentence.  He says, "Additionally"
234:21   which I guess means another reason, yet
234:22   another reason; right?
234:23          A.    Yes.
234:24          Q.    "Additionally the magnitude
234:ESQUIRE DEPOSITION SERVICES
```

Scolnick Final Complete

235: 235
235: 1    of the effect," in other words, how many
235: 2    more heart attacks you were causing,
235: 3    "would not be plausible even if" you'd
235: 4    been comparing it to aspirin.  He says
235: 5    that; doesn't he?

Scolnick 23507      235:7-235:17

235: 7              THE WITNESS:  He talks about
235: 8         the aspirin, yes, the comparator
235: 9         to aspirin.
235:10    BY MR. LANIER:
235:11         Q.    He says, "In fact,
235:12    in...three different trials, aspirin has
235:13    shown no effect on the primary prevention
235:14    of stroke, while we have seen a 50% lower
235:15    incidence of stroke in the naproxen arm
235:16    of VIGOR"; right?
235:17         A.    That's what he says.

Scolnick 23524      235:24-236:23

235:24              THE WITNESS:  I don't recall
235:ESQUIRE DEPOSITION SERVICES
236: 236
236: 1         what our thoughts were on naproxen
236: 2         reducing stroke because I don't
236: 3         recall the data.  I do recall that
236: 4         the team suggested and backed up
236: 5         with this study that a
236: 6         nonsteroidal that blocked the
236: 7         platelet the way aspirin did
236: 8         completely during 24 hours could
236: 9         be cardioprotective and there was
236:10         good evidence for that in this
236:11         article that they found.
236:12    BY MR. LANIER:
236:13         Q.    Well, you were hoping
236:14    naproxen helped the heart just like
236:15    aspirin did; right?
236:16         A.    We weren't hoping anything.
236:17    We were concluding based on this study
236:18    that you've referred to and all the other
236:19    analysis versus placebo and other NSAIDs,
236:20    that except for this naproxen study,
236:21    there was no evidence for an imbalance of
236:22    cardiovascular events attributable to
236:23    Vioxx.

Scolnick 23703      237:3-237:7

237: 3         Q.    Sir, what y'all were putting
237: 4    forth there as an idea was that naproxen
237: 5    helps the heart just like aspirin does;
237: 6    right?
237: 7         A.    Or -- yes, that's correct.

Scolnick 268.13-268.17      268:13-268:17

268:13         Q.    Just make sure we're on the
268:14    same page.  If we look at Exhibit 23, you
268:15    even sent a memo to this to the CEO and
268:16    to the president of Merck back in January
268:17    of 2001, didn't you?

Scolnick 26901      269:1-270:8

269: 1         A.    Yes.
269: 2         Q.    You said you "want to point
                                  Page 13

Scolnick Final Complete

```
269: 3   out to all of you at one time that, 1.
269: 4   there is no way to prove that in patients
269: 5   with rheumatoid arthritis that ALL of the
269: 6   difference between Vioxx and naproxen is
269: 7   due to the benefit of naproxen."  That's
269: 8   what you said, isn't it?
269: 9            A.    That's right.  And all is
269:10   capitalized.
269:11            Q.    And then you capitalize this
269:12   whole next phrase.  "IT IS IMPOSSIBLE TO
269:13   PROVE THIS."  Didn't you?
269:14            A.    That's what the e-mail says.
269:15            Q.    That's what you said, isn't
269:16   it?
269:17            A.    Yes, it is.  It is.
269:18            Q.    Then you capitalize for
269:19   emphasis this next sentence.  "IT IS
269:20   IMPOSSIBLE TO KNOW THIS WITH CERTAINTY."
269:21            A.    That's exactly what I said.
269:22            Q.    It's impossible to know it
269:23   with certainty based upon the evidence
269:24   y'all had.  You could do studies to find
269:ESQUIRE DEPOSITION SERVICES
270: 270
270: 1   it out, couldn't you?
270: 2            A.    We did do studies to find it
270: 3   out.
270: 4            Q.    To find it out or where that
270: 5   was a side effect?
270: 6            A.    We did studies to find out
270: 7   whether Vioxx had a negative
270: 8   cardiovascular effect.
```

Scolnick Part 2 (4-29-05) (Multi-clip)
Scolnick 1014     10:14-10:16

```
10:14            Q.    You retired from Merck Research Labs
10:15   in 2003; correct?
10:16            A.    That is correct.
```

Scolnick 2714a     27:14-27:17

```
27:14                  In the late '80s and early '90s, you
27:15   were also the president of Merck Research Labs;
27:16   right?
27:17            A.    Yes.
```

Scolnick 2824     28:24-29:2

```
28:24            Q.    At that point in time you did have
28:25   some concerns about what the prospects would be for
28:ESQUIRE DEPOSITION SERVICES
29: Confidential - Subject to Protective Order  29
29: 1   Merck in the late '90s and 2000 as several drugs
29: 2   were coming off patent; right?
```

Scolnick 2904     29:4-29:6

```
29: 4                  THE WITNESS:  I had concerns.  It was
29: 5   a way off, but, yes, I certainly remember vague
29: 6   thoughts about that.
```

Scolnick 2913     29:13-29:16

```
29:13            Q.    You have to anticipate that drugs
29:14   would be coming off patent maybe ten years down the
29:15   road and seek to have new drugs to fill the drugs
29:16   that were once proprietary of the company?
```

Scolnick Final Complete

Scolnick 2918        29:18-31:3

```
29:18                THE WITNESS:  That is correct.
29:19    BY MR. BUCHANAN:
29:20          Q.        Because once a drug becomes generic
29:21    or goes off patent, then other competitors can enter
29:22    the market and seek to take market share; correct?
29:23          A.        That's correct.
29:24          Q.        Okay.  So, in the early '90s you knew
29:25    that beginning in 2000 and 2001, Merck would have
29:ESQUIRE DEPOSITION SERVICES
30: Confidential - Subject to Protective Order  30
30: 1    several drugs going off patent; correct?
30: 2          A.        The one that comes to mind
30: 3    immediately is Mevacor, but I don't recall the other
30: 4    drugs at this point.
30: 5          Q.        Well, you also had Vasotec.
30: 6          A.        I don't remember exactly.  At this
30: 7    point I do not recall when Vasotec was scheduled to
30: 8    go off patent.
30: 9          Q.        It went off patent; correct?  It's
30:10    now off patent?
30:11          A.        It is off patent now, yes.
30:12          Q.        Okay.
30:13                    You don't quibble with whether it was
30:14    sometime after 2000, whether it went off patent, do
30:15    you?
30:16          A.        I believe it was after 2000.
30:17          Q.        Okay.
30:18                    So, you had Vasotec that went off
30:19    patent or was going off patent sometime after 2000;
30:20    right?
30:21          A.        I have to accept that, because I
30:22    don't remember the date.
30:23          Q.        Do you know a drug called Prinivil?
30:24          A.        Yes.
30:25          Q.        That was also going off patent?
30:ESQUIRE DEPOSITION SERVICES
31: Confidential - Subject to Protective Order  31
31: 1          A.        I think Prinivil was scheduled to go
31: 2    off patent after Vasotec and I don't recall the
31: 3    date.
```

Scolnick 3110        31:10-31:13

```
31:10                    Prilosec, is that off patent?
31:11          A.        I think the chemical is off patent.
31:12    I don't know if the drug per se in its formulation
31:13    is off patent.
```

Scolnick 3208        32:8-33:20

```
32: 8                    And Pepcid, Pepcid was also one of
32: 9    those drugs that was going off patent in 2000/2001;
32:10    right?
32:11          A.        Again, I don't remember the dates.
32:12          Q.        Okay.
32:13                    All these drugs were significant
32:14    drugs for Merck?
32:15          A.        Yes.
32:16          Q.        Several of these were blockbuster
32:17    drugs for Merck; right?
32:18          A.        They were large selling drugs, yes.
32:19          Q.        Well, "blockbuster" has a meaning or
32:20    a connotation in the industry, doesn't it?
32:21          A.        "Blockbuster" means usually a very
32:22    large drug, very large sales drug.
32:23          Q.        Traditionally it meant more than a
32:24    billion dollars in sales; true?
32:25          A.        That is one interpretation given to
```

Page 15

Scolnick Final Complete
32:ESQUIRE DEPOSITION SERVICES
33: Confidential - Subject to Protective Order   33
33: 1      it.
33: 2          Q.      So, several of these drugs were
33: 3      blockbuster drugs.  You'd agree with that?
33: 4          A.      Yes.
33: 5          Q.      Okay.
33: 6                  Several of these drugs, even if you
33: 7      can't remember all of them, were going off patent in
33: 8      2000, 2001, 2002; correct?
33: 9          A.      I'm not sure which ones, but some
33:10      drugs were going off patent at that point.
33:11          Q.      Well, you recall being concerned
33:12      about what the future will hold in 2000/2001 when
33:13      all these drugs were going off patent; correct?
33:14          A.      Yes.
33:15          Q.      You were concerned about that in the
33:16      early '90s?
33:17          A.      Yes.
33:18          Q.      And you were trying to design new
33:19      drugs to fill the void that would be left by these
33:20      drugs when they went off patent?

Scolnick 3324      33:24-33:25

33:24                  THE WITNESS:  We were trying to
33:25      develop and discover new drugs that would do that.

Scolnick 3408a     34:8-34:17

34: 8          Q.      One of the drugs that was going to be
34: 9      filling the void left by these other drugs when they
34:10      went off patent was Vioxx; true?
34:11          A.      Vioxx was going to fill the void, but
34:12      in the early '90s, Vioxx -- I believe Vioxx was not
34:13      even on the Merck radar screen.  I don't even think
34:14      we had thought of the project at that point.  I
34:15      don't -- I don't recall the date when the Vioxx
34:16      project started.
34:17                                     -- -- --

Scolnick 3613      36:13-37:24

36:13          Q.      There's a reference to Dr. Peppi
36:14      Prasit.  Do you see that?
36:15          A.      Dr. Peppi Prasit.
36:16          Q.      Prasit.  He was a scientist at your
36:17      labs in Montreal; correct?
36:18          A.      Yes, a chemist.
36:19          Q.      Okay.  That's Merck Frosst?
36:20          A.      Yes.
36:21          Q.      Merck Frosst was an affiliate of
36:22      Merck Research Labs?
36:23          A.      Merck Frosst was a division of Merck
36:24      & Company, and within Merck Frosst we had a research
36:25      group.
36:ESQUIRE DEPOSITION SERVICES
37: Confidential - Subject to Protective Order   37
37: 1          Q.      Dr. Prasit had attended a medical
37: 2      conference or a scientific conference where there
37: 3      had been some discussion about a selective COX-2
37: 4      inhibitor; true?
37: 5          A.      I believe he had attended a
37: 6      conference where the discovery of two forms of
37: 7      cyclooxygenase, COX, were -- was discussed, a COX-1
37: 8      and a COX-2.  I don't recall whether compounds were
37: 9      discussed that inhibited those enzymes at that
37:10      meeting.  I don't have any knowledge of that.
37:11          Q.      You see the date referenced here.
37:12      It's July 1992; correct?

Page 16

```
                         Scolnick Final Complete
37:13          A.      Yes, I do.
37:14          Q.      Does that refresh your recollection
37:15 as to when Merck started considering investigating
37:16 selective NSAIDS?
37:17          A.      Yes, it does.  I had not recalled we
37:18 started this project this early.
37:19          Q.      In fact, there was another scientist
37:20 at another company who was working on a similar
37:21 compound, Dr. Needleman; correct?
37:22          A.      There was another company that was --
37:23 that turned out to be working in the COX-2 area,
37:24 that is correct.
```

Scolnick 4206     42:6-42:9

```
42: 6                  So, you put a lot of resources within
42: 7 Merck Research Labs onto this particular project;
42: 8 correct?
42: 9          A.      Yes, that is correct.
```

Scolnick 43.11      43:11-43:19

```
43:11          Q.      And you encouraged Dr. Prasit and his
43:12 staff to pursue the Vioxx project with all resources
43:13 that were available at Merck Frosst; true?
43:14          A.      That is correct.
43:15          Q.      Okay.
43:16                  You knew how important this drug
43:17 could be for the company; right?
43:18          A.      I knew that this could be a very
43:19 important project, yes.
```

Scolnick 47.06      47:6-47:8

```
47: 6          Q.      You wanted to be the first to market
47: 7 with this selective COX-2 inhibitor; correct?
47: 8          A.      Yes.
```

Scolnick 8703      87:3-87:9

```
87: 3          Q.      All right, sir.  I want to get back
87: 4 to something.  I want to turn back to 1998.  I want
87: 5 to talk about the period prior to the time when
87: 6 Merck had Vioxx approved.  Okay?  Do you remember
87: 7 when Vioxx was approved?
87: 8          A.      I believe it was late 1999, middle of
87: 9 1999.
```

Scolnick 9806      98:6-98:10

```
98: 6                  For the record, it is an e-mail from
98: 7 you to a series of individuals, Alan Nies, Beth
98: 8 Seidenberg, Tom Simon, Robert Silverman.  Sir, are
98: 9 all of those people Merck employees?
98:10          A.      Yes, they were.
```

Scolnick 9811      98:11-98:23

```
98:11          Q.      Alan Nies was one of the supervisors
98:12 of the Vioxx project team?
98:13          A.      Yes.
98:14          Q.      Fine scientist?
98:15          A.      Fine clinical scientist.
98:16          Q.      He was, what, a vice president of
98:17 Merck?
98:18          A.      Yes, he was.
98:19          Q.      Beth Seidenberg is also on the list.
98:20 She was in charge of the Vioxx development program,
98:21 wasn't she?
98:22          A.      She had a major role.  I don't recall
```

Scolnick Final Complete
98:23    who was actually in charge of the program.

Scolnick 9922        99:22-100:21

99:22              Q.      So, what you did here was you sent
99:23    these folks on your Vioxx development team and some
99:24    regulatory personnel an analyst report; correct?
99:25              A.      That appears to be correct.
99:ESQUIRE DEPOSITION SERVICES
100: Confidential - Subject to Protective Order 100
100: 1            Q.      Okay.
100: 2                     You sent it with high importance?
100: 3            A.      That's what it's marked.
100: 4            Q.      It was real important they saw this
100: 5    analyst report?
100: 6            A.      It's marked high importance.
100: 7            Q.      Do you make it a practice, sir, to
100: 8    send Wall Street analyst reports to employees who
100: 9    are on projects within Merck?
100:10            A.      I sent a variety of information to
100:11    them, sometimes analyst reports which had relevant
100:12    information, sometimes scientific articles.  I send
100:13    a variety of things to my employees.
100:14            Q.      Right.
100:15                     We're looking here at an October 20,
100:16    1998 e-mail from you forwarding an analyst report;
100:17    correct?
100:18            A.      Yes, I think so.
100:19            Q.      And the analyst report is dated the
100:20    same day, October 20th; right?
100:21            A.      Yes, it is.

Scolnick 11222       112:22-112:24

112:22                     So, it is, in fact, accurate to state
112:23    that in 1998 Merck had declining sales in several of
112:24    its key franchises; correct?

Scolnick 11301       113:1-113:13

113: 1                     THE WITNESS:  I've answered your
113: 2    question.
113: 3    BY MR. BUCHANAN:
113: 4            Q.      I would like you to answer that
113: 5    question, please.
113: 6            A.      Some of its franchises had declining
113: 7    sales.
113: 8            Q.      And they were key franchises?
113: 9            A.      And some of them were key.
113:10            Q.      Okay.
113:11                     You also had several drugs going off
113:12    patent in the near future; right?
113:13            A.      Correct.

Scolnick 11517a      115:17-116:11

115:17            Q.      You thought it was important to tell
115:18    your employees that Merck's base business was
115:19    eroding?
115:20            A.      Yes.
115:21            Q.      You thought it was important to tell
115:22    them that Merck had several products going off
115:23    patent?
115:24            A.      They knew that.  This was to
115:25    reemphasize that.
115:ESQUIRE DEPOSITION SERVICES
116: Confidential - Subject to Protective Order 116
116: 1            Q.      You thought it was important to tell
116: 2    them that several of the recently launched products
116: 3    had not been as successful as anticipated?
Page 18

```
                        Scolnick Final Complete
116: 4          A.     I wanted to provide them the
116: 5  information in this document, yes, that's correct.
116: 6          Q.     You thought it was important to tell
116: 7  them that several of the recently launched products
116: 8  weren't as successful as you anticipated they'd be;
116: 9  right?
116:10          A.     That's what's in here, and I wanted
116:11  to provide them that information.
```

Scolnick 11621     116:21-117:15

```
116:21                  At this point in time in October of
116:22  1998, where was Vioxx in the development process?
116:23          A.     I don't recall.  I'm sorry.
116:24          Q.     Had the NDA been filed yet?
116:25          A.     I have to think very hard.  I don't
116:ESQUIRE DEPOSITION SERVICES
117:Confidential - Subject to Protective Order 117
117: 1  think so, but I don't recall.  I'm sorry.  It's been
117: 2  a long time.
117: 3          Q.     Well, you had a bunch of regulatory
117: 4  people copied on this particular e-mail; right?
117: 5          A.     Yes, I did.
117: 6          Q.     They are the people who deal with the
117: 7  FDA?
117: 8          A.     Yes.
117: 9          Q.     They are the people who would liaise
117:10  or communicate with the FDA concerning an NDA?
117:11          A.     Yes.
117:12          Q.     They're the people who would make
117:13  sure that an NDA moves through the regulatory
117:14  process smoothly?
117:15          A.     That is part of their responsibility.
```

Scolnick 11718     117:18-118:3

```
117:18          Q.     They are the people who you would
117:19  hope would be able to facilitate a speedy approval
117:20  of your drug; correct?
117:21          A.     That is part of their responsibility.
117:22  Part of their jobs, yes.
117:23          Q.     And that's part of why you provided
117:24  this e-mail to them; right?
117:25          A.     Yes.
117:ESQUIRE DEPOSITION SERVICES
118:Confidential - Subject to Protective Order 118
118: 1          Q.     You wanted them to know how important
118: 2  it was that this drug proceed quickly through the
118: 3  regulatory approval process; right?
```

Scolnick 11806     118:6-118:9

```
118: 6                 THE WITNESS:  Yes.
118: 7  BY MR. BUCHANAN:
118: 8          Q.     It was essential to the financial
118: 9  success of the firm; right?
```

Scolnick 11811     118:11-118:18

```
118:11                 THE WITNESS:  It was essential to
118:12  Merck.  It was important to Merck, yes.
118:13  BY MR. BUCHANAN:
118:14          Q.     Okay.
118:15                 And, in fact, it was not only
118:16  essential, but Vioxx's success was necessary to
118:17  preserve Merck and Merck Research Labs period;
118:18  correct?
```

Scolnick 11821     118:21-118:22

Page 19

Scolnick Final Complete

```
118:21                   THE WITNESS:  That is what I said in
118:22      my e-mail.
```

Scolnick 11824      118:24-119:1

```
118:24          Q.      That's true; right?
118:25          A.      I believe it is an exaggeration, but
118:ESQUIRE DEPOSITION SERVICES
119: Confidential - Subject to Protective Order 119
119: 1    it has some truth.
```

Scolnick 12024a      120:24-121:3

```
120:24          Q.      Merck got Vioxx approved?
120:25          A.      Yes, it did.
120:ESQUIRE DEPOSITION SERVICES
121: Confidential - Subject to Protective Order 121
121: 1          Q.      These folks on this e-mail were
121: 2    involved in the approval of Vioxx?
121: 3          A.      Yes.
```

Scolnick 12116      121:16-121:24

```
121:16                  So, these scientists were involved in
121:17    the development process for Vioxx?
121:18          A.      Yes.
121:19          Q.      Had access to the good things about
121:20    Vioxx that came out of that development process?
121:21          A.      They had access to all the data that
121:22    came out of the Vioxx development process.
121:23          Q.      The good and the bad?
121:24          A.      Yes.
```

Scolnick 12201a      122:1-122:5

```
122: 1                  And they knew, though, that
122: 2    notwithstanding that bad information, nothing could
122: 3    stand in the way of this drug or Merck or Merck
122: 4    Research Labs would not flourish as it had
122: 5    traditionally flourished; true?
```

Scolnick 12208      122:8-123:7

```
122: 8                  THE WITNESS:  They would not have
122: 9    agreed with that statement.  They knew based on the
122:10    basic values of the laboratory if there was
122:11    something bad about the drug, that their
122:12    responsibility was to make that information
122:13    available to the agency, to anyone else and to me,
122:14    so that the drug could be developed properly.
122:15    BY MR. BUCHANAN:
122:16          Q.      Okay.
122:17                  Well, at this point in time, October
122:18    1998, what did you know about Vioxx's potential to
122:19    cause cardiovascular risks or cardiovascular
122:20    problems?
122:21          A.      I don't recall exactly what we knew
122:22    at this point.  There was no evidence at all in the
122:23    Vioxx development program at this point that Vioxx
122:24    caused cardiovascular risks.
122:25          Q.      What do you mean by that, "caused
122:ESQUIRE DEPOSITION SERVICES
123: Confidential - Subject to Protective Order 123
123: 1    cardiovascular risks"?
123: 2          A.      There was no evidence to say that
123: 3    Vioxx caused a cardiovascular risk.
123: 4          Q.      Well, you're not saying that in
123: 5    individual trials preapproval that you didn't see
123: 6    imbalances between cardiovascular risks in Vioxx and
123: 7    the comparator drugs, are you?
```
                                                    Page 20

Scolnick Final Complete

Scolnick 12309a      123:9-123:14

```
123: 9               THE WITNESS:  Before the drug was
123:10    approved?
123:11    BY MR. BUCHANAN:
123:12         Q.    Yes.
123:13         A.    I don't recall any such data.  So, if
123:14    it was there, I certainly don't recall it.
```

Scolnick 13005      130:5-130:11

```
130: 5         Q.    But you did conduct a clinical trial
130: 6    in 1997 with an individual named Garret FitzGerald;
130: 7    correct?
130: 8         A.    Yes.
130: 9         Q.    And he ran a clinical trial that
130:10    showed that Vioxx suppressed the urinary metabolites
130:11    of prostacyclin; correct?
```

Scolnick 13013      130:13-130:17

```
130:13               THE WITNESS:  Yes.
130:14    BY MR. BUCHANAN:
130:15         Q.    One of the conclusions that was drawn
130:16    by your consultants was that Vioxx was suppressing
130:17    systemic prostacyclin; correct?
```

Scolnick 13020a      130:20-130:22

```
130:20               THE WITNESS:  I don't believe they
130:21    drew that conclusion.  I think they raised that
130:22    question.
```

Scolnick 13109      131:9-131:11

```
131: 9               And if that was happening, there was
131:10    a risk that Vioxx could cause thrombotic events in
131:11    humans; true?
```

Scolnick 13113a      131:13-131:20

```
131:13               THE WITNESS:  There was a theory that
131:14    that could occur with no evidence ever garnered to
131:15    substantiate or refute that theory.
131:16    BY MR. BUCHANAN:
131:17         Q.    Now, that theory was put forth after
131:18    the drug was marketed or before the drug was
131:19    marketed?
131:20         A.    Long before Vioxx ever existed.
```

Scolnick 134.06-134.07      134:6-134:7

```
134: 6         Q.    If you wanted a cardiovascular study
134: 7    done, you could have ordered that; right?
```

Scolnick 13409      134:9-134:10

```
134: 9               THE WITNESS:  I would ask people to
134:10    design a protocol to do it, yes.
```

Scolnick 13412      134:12-134:17

```
134:12         Q.    And you could have ordered that it be
134:13    done; right?
134:14         A.    I could order it to be done.  I
134:15    couldn't design the protocols.  My people would then
134:16    have to, which they frequently did, say we have to
134:17    find a way to do this.
```

Page 21

Scolnick Final Complete

Scolnick 14123        141:23-142:1

    141:23          Q.       You weren't allowed to go out and
    141:24    tell doctors through your sales representatives that
    141:25    Vioxx reduced the serious clinical side effects
    141:ESQUIRE DEPOSITION SERVICES
    142: Confidential - Subject to Protective Order 142
    142: 1    associated with traditional NSAIDs; right?

Scolnick 14205        142:5-142:9

    142: 5                   THE WITNESS:  Serious
    142: 6    gastrointestinal side effects?
    142: 7    BY MR. BUCHANAN:
    142: 8          Q.       Yes.
    142: 9          A.       That is correct.

Scolnick 14315a       143:15-143:18

    143:15          Q.       So, the VIGOR trial was designed to
    143:16    test the safety of Vioxx 50 milligrams and
    143:17    rheumatoid arthritics over long-term use; correct?
    143:18          A.       Yes.

Scolnick 14323a       143:23-144:10

    143:23          Q.       And when -- let's see.
    143:24          Q.       Did you have access to the data from
    143:25    the VIGOR trial prior to March of 2000?
    143:ESQUIRE DEPOSITION SERVICES
    144: Confidential - Subject to Protective Order 144
    144: 1          A.       I did not.
    144: 2          Q.       You had no access to any data?
    144: 3          A.       None.
    144: 4          Q.       But you sought access to it, didn't
    144: 5    you?
    144: 6          A.       I wanted to see the data the minute
    144: 7    the trial was over and everything was calculated.
    144: 8          Q.       And, actually, you were reprimanded
    144: 9    for violating Merck's policies with respect to
    144:10    access to that data.  Isn't that true?

Scolnick 14414a       144:14-144:16

    144:14                   THE WITNESS:  I was not reprimanded.
    144:15    I was told that I couldn't see the data -- I
    144:16    couldn't be the first person to see the final data.

Scolnick 14424        144:24-145:8

    144:24          Q.       So, you first received the data,
    144:25    what, March 9, 2000 when you got the data?
    144:ESQUIRE DEPOSITION SERVICES
    145: Confidential - Subject to Protective Order 145
    145: 1          A.       I believe that date is correct.  I
    145: 2    don't recall the date at this point that I saw the
    145: 3    data.
    145: 4          Q.       When you saw that data, there were
    145: 5    dramatically more cardiovascular events in the Vioxx
    145: 6    arm of that trial as compared to the naproxen arm;
    145: 7    true?
    145: 8          A.       True.

Scolnick 14511        145:11-145:18

    145:11                   THE WITNESS:  That's correct.
    145:12    BY MR. BUCHANAN:
    145:13          Q.       And your conclusion was that the CV
    145:14    events are clearly there; right?
    145:15          A.       I stated that.
                                          Page 22

Scolnick Final Complete

```
145:16          Q.      Okay.
145:17                  You also conclude that the effect was
145:18    mechanism based; true?
```

Scolnick 14520     145:20-145:24

```
145:20                  THE WITNESS:  I made that statement.
145:21    BY MR. BUCHANAN:
145:22          Q.      And you, in fact, acknowledged that
145:23    you'd previously worried about that particular
145:24    mechanism-related problem with Vioxx; right?
```

Scolnick 14601a     146:1-146:9

```
146: 1                  THE WITNESS:  I wrote an e-mail note
146: 2    containing all of the information that you're
146: 3    talking about.
146: 4    BY MR. BUCHANAN:
146: 5          Q.      Well, you were truthful in your
146: 6    e-mail; right?
146: 7          A.      That is an accurate rendition of that
146: 8    e-mail.  Those were my initial thoughts when I saw
146: 9    the VIGOR data.
```

Scolnick 14708     147:8-147:11

```
147: 8          Q.      When were you first worried about the
147: 9    potential that Vioxx could cause cardiovascular
147:10    events?
147:11          A.      I was first --
```

Scolnick 14713     147:13-148:8

```
147:13                  THE WITNESS: -- made aware of the
147:14    theory when the prostacyclin metabolite data came
147:15    up.  We looked carefully at all of the data
147:16    preclinically and clinically, could not find any
147:17    evidence to support there was a risk, and until the
147:18    VIGOR study, I didn't worry about it again.
147:19                         -   -   -
147:20                  (whereupon, Deposition Exhibit
147:21    Scolnick-3, E-mail, 3-9-00,
147:22    MRK-ABH0016219, was marked for
147:23    identification.)
147:24                         -   -   -
147:25    BY MR. BUCHANAN:
147:ESQUIRE DEPOSITION SERVICES
148: Confidential - Subject to Protective Order 148
148: 1          Q.      Let me pass over to you what we
148: 2    marked as exhibit, I think, Exhibit 3 to your
148: 3    deposition, sir.  It is the March 9th, 2000 e-mail
148: 4    from yourself to Deborah Shapiro, Alise Reicin and
148: 5    Alan Nies, Bates stamped MRK-ABH0016219.  The
148: 6    subject is VIGOR.  You copied yourself on this.  Do
148: 7    you see that?
148: 8          A.      I do.
```

Scolnick 14903     149:3-149:8

```
149: 3                  Looking through this, and I guess
149: 4    it's about two-thirds down, you say, "It is a shame
149: 5    but it is a low incidence and it is mechanism based
149: 6    as we worried it was."  "It is a shame," you're
149: 7    referring to the cardiovascular events?
149: 8          A.      Yes, I am.
```

Scolnick 15110a     151:10-152:4

```
151:10          Q.      well, an issue was identified in 1997
151:11    by Garret FitzGerald, a consultant to your company;
```

Scolnick Final Complete

151:12    correct?
151:13         A.       Yes.
151:14         Q.       It was an issue that raised potential
151:15    cardiovascular concerns with Vioxx; correct?
151:16         A.       Theoretical concerns.
151:17         Q.       If you had conducted a CV outcomes
151:18    trial in 1998, started it in 1998, that would have
151:19    slowed down the approval process for the drug; true?
151:20         A.       That is true.
151:21         Q.       If you had told the FDA, we're
151:22    concerned, we may have a potential cardiovascular
151:23    issue with the drug, we'd want to do a CV safety
151:24    study, that would have slowed down the approval
151:25    process?
151:ESQUIRE DEPOSITION SERVICES
152: Confidential - Subject to Protective Order 152
152: 1         A.       That would have.  We gave the FDA all
152: 2    of the data, including Garret FitzGerald's data, in
152: 3    the NDA and all the other analyses we did
152: 4    preapproval.

Scolnick 15212      152:12-152:13

152:12         Q.       You didn't give them the results from
152:13    a CV outcomes trial preapproval, did you?

Scolnick 15215      152:15-153:12

152:15              THE WITNESS:  There was no -- we did
152:16    not do a separate CV outcomes trial preapproval.
152:17    BY MR. BUCHANAN:
152:18         Q.       So, you couldn't give them the data
152:19    from such a trial?
152:20         A.       I've answered your question.
152:21         Q.       You couldn't give them the data from
152:22    such a trial? Could you answer that?
152:23         A.       Yes.
152:24         Q.       Thank you.
152:25              You state in that sentence that I
152:ESQUIRE DEPOSITION SERVICES
153: Confidential - Subject to Protective Order 153
153: 1    read a few minutes ago where you say, "it is a low
153: 2    incidence and it is mechanism based as we worried it
153: 3    was," you use the phrase, "mechanism based."  What
153: 4    does that mean?
153: 5         A.       What it generally means is that it
153: 6    has something to do with the mechanism of action of
153: 7    the drug.
153: 8         Q.       Okay.
153: 9              And what was the mechanism of action
153:10    of this drug that you believed on March 9th was
153:11    causing the cardiovascular events that you saw in
153:12    the data from the VIGOR trial?

Scolnick 15314a      153:14-153:22

153:14              THE WITNESS:  I was alluding to the
153:15    thromboxane/prostacyclin data that had been
153:16    published earlier.
153:17    BY MR. BUCHANAN:
153:18         Q.       That's the thromboxane/prostacyclin
153:19    theory that had been raised long before you had even
153:20    identified a molecule to test in people?
153:21         A.       Long before even COX-2 was ever
153:22    discovered.

Scolnick 15602a      156:2-157:24

156: 2         Q.       You said, sir, this was your initial
156: 3    conclusion on March 9th after looking at the data;

Page 24

Scolnick Final Complete

```
156: 4    right?
156: 5              A.       That is correct.
156: 6              Q.       And after this point in time, you
156: 7    looked at some other data?
156: 8              A.       Looked at other data and literature
156: 9    information.
156:10              Q.       Okay.
156:11                       What did you look at?
156:12              A.       We looked, again, at all of the
156:13    updated clinical trial data from our arthritis
156:14    trials and pain trials with Vioxx, comparing Vioxx
156:15    in aggregate in those studies to comparative agents
156:16    and placebo.  We saw no difference in the
156:17    cardiovascular event rates for the events seen in
156:18    VIGOR in the comparator trials to our other
156:19    non-steroidals when all of the data was aggregated,
156:20    a large amount of data, and we looked -- we did a
156:21    very unusual look because it was so important to us.
156:22    We looked at a study in patients with Alzheimer's
156:23    disease which had a large number of patients in
156:24    which 25 milligrams of Vioxx was compared to
156:25    placebo, and we looked at all of the safety data
156:ESQUIRE DEPOSITION SERVICES
157: Confidential - Subject to Protective Order 157
157: 1    that had been reported in that trial up to that
157: 2    period in time to see if there was an imbalance in
157: 3    those two arms for cardiovascular events and found
157: 4    there was none and, therefore, except for the
157: 5    comparative to naproxen, we had no evidence that
157: 6    Vioxx raised the risk of cardiovascular events.
157: 7              Q.       How big was that Alzheimer's trial
157: 8    you looked at?
157: 9              A.       I think it had about 12 or 1,300
157:10    patients in each arm, so, 25, 2,600 patients as I
157:11    recall.
157:12              Q.       How big was the VIGOR trial?
157:13              A.       The VIGOR trial had 4,000 in each
157:14    arm.
157:15              Q.       8,000 people?
157:16              A.       That's right.  Correct.
157:17              Q.       Was the Alzheimer's trial -- you've
157:18    heard the term "power" as it relates to a study;
157:19    right?
157:20              A.       Correct.
157:21              Q.       And when you refer to "power," it
157:22    refers to the ability of a study to detect a
157:23    particular endpoint; correct?
157:24              A.       That's correct.
```

Scolnick 15924a       159:24-160:8

```
159:24              Q.       You looked at the data, you said,
159:25    early; right?  The data wasn't final from the
159:ESQUIRE DEPOSITION SERVICES
160: Confidential - Subject to Protective Order 160
160: 1    Alzheimer's trial at the point in time when you
160: 2    looked at it?
160: 3              A.       That is correct.
160: 4              Q.       Okay.
160: 5                       Which is a very unusual step; true?
160: 6              A.       That's right.  We immediately wanted
160: 7    to try to access all available data that we had to
160: 8    try to interpret the VIGOR trial.
```

Scolnick 17405       174:5-174:17

```
174: 5    what's the Data Safety Monitoring Board, sir, in
174: 6    general terms?
174: 7              A.       In general terms, it's an external
174: 8    group that monitors the safety of the Merck trials,
```

```
                         Scolnick Final Complete
174: 9      for all trials or many trials.
174:10             Q.      And you have a different group for
174:11      each trial or the same group for all trials?
174:12             A.      I think it's a different group for
174:13      each trial because the clinical expertise is --
174:14      different clinical trials, different clinical
174:15      expertise.
174:16             Q.      Did the VIGOR trial have a DSMB?
174:17             A.      Yes, it did.
```

Scolnick 17421       174:21-175:9

```
174:21             Q.      To be clear in the DSMB's function,
174:22      the DSMB has access to unblinded data during the
174:23      conduct of clinical trials if they want it; correct?
174:24             A.      Yes, I believe that's true.
174:25             Q.      Because their function is to ensure
174:ESQUIRE DEPOSITION SERVICES
175: Confidential - Subject to Protective Order 175
175: 1      the safety of patients in those clinical trials, at
175: 2      least one of their functions; true?
175: 3             A.      Yes.
175: 4             Q.      Okay.
175: 5             Q.      Do you recall that the DSMB in the
175: 6      VIGOR trial sent a letter to Merck stating that they
175: 7      wanted the cardiovascular events in the VIGOR trial
175: 8      separately analyzed as compared to other safety
175: 9      analyses the company was doing?
```

Scolnick 17516       175:16-176:5

```
175:16                     THE WITNESS:  I became aware of that
175:17      memo long after it was sent to people at MRL.
175:18      BY MR. BUCHANAN:
175:19             Q.      Was that sent before or after you
175:20      were unblinded to all of the data on March 9, 2000?
175:21             A.      Was a letter from the DSMB sent to
175:22      some persons at MRL before I was unblinded?
175:23             Q.      Yes.
175:24             A.      Yes.  The memo -- I think I have come
175:25      to learn that that memo was sent before I was
175:ESQUIRE DEPOSITION SERVICES
176: Confidential - Subject to Protective Order 176
176: 1      unblinded.
176: 2             Q.      When did you first become aware of
176: 3      that letter being sent from the DSMB to MRL?
176: 4             A.      Some period of time shortly after the
176: 5      VIGOR results were shown to me.
```

Scolnick 17704a      177:4-177:11

```
177: 4             Q.      Sir, you have seen that letter as of
177: 5      today; correct?
177: 6             A.      I have seen that letter subsequent to
177: 7      the unblinding of the VIGOR trial, yes.
177: 8             Q.      That letter was actually sent to
177: 9      Alise Reicin at Merck; true?
177:10             A.      I don't recall who it went to.  It is
177:11      possible it was sent to Alise Reicin.
```

Scolnick 17804       178:4-178:7

```
178: 4             Q.      When you saw that letter from Dr.
178: 5      Weinblatt to Dr. Reicin, did that letter suggest to
178: 6      you that Merck may have a cardiovascular issue with
178: 7      Vioxx?
```

Scolnick 17809a      178:9-178:13

```
178: 9                     THE WITNESS:  When I saw that letter,
```
                              Page 26

```
                              Scolnick Final Complete
178:10   I wondered what had been in Dr. Weinblatt's mind
178:11   when he sent the letter, and that's what I wondered.
178:12   I hadn't seen the letter.  I don't know what was in
178:13   his mind.

Scolnick 17902      179:2-179:12

179: 2          Q.     You've never spoken to him?
179: 3          A.     I don't recall speaking to Dr.
179: 4   Weinblatt.
179: 5          Q.     Never called him up after you got the
179: 6   results of the VIGOR trial and asked what concerned
179: 7   you and the data you were looking at during the
179: 8   conduct of the trial?
179: 9          A.     No, I never called Dr. Weinblatt.
179:10          Q.     Never asked Dr. Weinblatt why you
179:11   allowed the trial to continue in the face of the
179:12   cardiovascular events in the trial?

Scolnick 17914      179:14-179:16

179:14                 THE WITNESS:  No.  I didn't.  I
179:15   didn't know what data he had.  I never dealt
179:16   directly with DSMBs.

Scolnick 20322      203:22-204:20

203:22          Q.     Before our break, we were talking
203:23   about -- at least a few moments before our break we
203:24   were talking about your March 9, 2000 e-mail.  Do
203:25   you recall that testimony?
203:ESQUIRE DEPOSITION SERVICES
204: Confidential - Subject to Protective Order 204
204: 1          A.     Yes, I do.
204: 2          Q.     That was the e-mail where you
204: 3   identified that the CV events were "clearly there."
204: 4   Right?
204: 5          A.     Yes.
204: 6          Q.     That it appeared to be "mechanism
204: 7   based" as you "worried it was."  Right?
204: 8          A.     That's what the e-mail says, yes.
204: 9          Q.     And you said it was also "real."
204:10   Right?
204:11          A.     Yes.
204:12          Q.     Then we talked about what Merck and
204:13   you did in response to your initial concerns about
204:14   the CV issues with Vioxx; right?
204:15          A.     Yes.
204:16          Q.     Now, over a period of weeks, you
204:17   reached the conclusion, contrary to your March 9th
204:18   e-mail, that it wasn't Vioxx that was causing the
204:19   problems, it was naproxen that was protecting
204:20   against the problems; is that right?

Scolnick 20422      204:22-205:10

204:22                 THE WITNESS:  That's correct.
204:23   BY MR. BUCHANAN:
204:24          Q.     You reached that conclusion in, what,
204:25   18 days?
204:ESQUIRE DEPOSITION SERVICES
205: Confidential - Subject to Protective Order 205
205: 1          A.     Within that period of time.
205: 2          Q.     Well, Merck issued a press release to
205: 3   the public on March 27, 2000 letting them know about
205: 4   the CV events in the trial as well as the GI events
205: 5   in the trial; correct?
205: 6          A.     Yes.
205: 7          Q.     And you stated at that point in time
205: 8   that you believed that the explanation for the
                              Page 27
```

Scolnick Final Complete

205: 9     difference between the two arms was the
205:10     cardioprotective effect of naproxen; correct?

Scolnick 20517      205:17-205:18

205:17             THE WITNESS:  Yes, that's basically
205:18     what the press release said.

Scolnick 20706      207:6-207:8

207: 6             Q.     So, within 18 days, you had made a
207: 7     complete 180 in your view as to the cause of the CV
207: 8     events in the VIGOR trial; right?

Scolnick 207.12-207.15      207:12-207:15

207:12             A.     Yes.  I thought the explanation which
207:13     best explained the results was naproxen's
207:14     cardioprotective activity based on data analysis,
207:15     literature analysis, as I've stated.

Scolnick 20908      209:8-209:11

209: 8             Q.     Did you bring in anybody who wasn't
209: 9     on the Merck payroll to look at the data from the
209:10     VIGOR trial before you reached the decision that
209:11     naproxen was cardioprotective?

Scolnick 20914a      209:14-210:3

209:14             THE WITNESS:  As I've stated, I
209:15     didn't bring in an outside consultant.  I do not
209:16     know who the team might have consulted as outside
209:17     investigators.
209:18     BY MR. BUCHANAN:
209:19             Q.     But you're pretty sure, though, if
209:20     you had told your team, I want to get this data
209:21     looked at by somebody independent of Merck, they
209:22     could have done that; right?
209:23             A.     They could have done it.  I don't
209:24     know whether -- I don't that they didn't do it.
209:25             Q.     But you do know you didn't tell them
209:ESQUIRE DEPOSITION SERVICES
210: Confidential - Subject to Protective Order 210
210: 1     to do it?
210: 2             A.     I did not.  I did not, that is
210: 3     correct.

Scolnick 231.17      231:17-232:4

231:17             Q.     Did you consider the implications to
231:18     the sales of the drug if your initial conclusion was
231:19     the final conclusion?
231:20             A.     Of course.  And that was not part of
231:21     my reason for reaching my conclusion.
231:22             Q.     What was the implication to sales of
231:23     the drug if your initial conclusion was, in fact,
231:24     the final conclusion?
231:25             A.     Sales of the drug would be
231:ESQUIRE DEPOSITION SERVICES
232: Confidential - Subject to Protective Order 232
232: 1     significantly curtailed.  The sales of the drug
232: 2     would be curtailed.  Even with the publicly
232: 3     available information, sales of the drug would be
232: 4     curtailed.

Scolnick 23208      232:8-232:11

232: 8             Q.     Did you ever tell the public your
232: 9     initial conclusion?

Page 28

Scolnick Final Complete

```
232:10            A.        I did not because I thought it was an
232:11   error.
```

Scolnick 23221a      232:21-233:9

```
232:21            Q.        Did you ever send an e-mail at the
232:22   end of March 2000 saying, boy, I was way off on
232:23   this --
232:24            A.        No, I did --
232:25            Q.        -- I feel very comfortable with the
232:ESQUIRE DEPOSITION SERVICES
233: Confidential - Subject to Protective Order 233
233: 1   data now?
233: 2            A.        I did not send that in an e-mail like
233: 3   that, no.
233: 4            Q.        In fact, at the end of March, you
233: 5   were still worried, weren't you?
233: 6            A.        Yes, I was, even though I had reached
233: 7   what I thought was the right conclusion.  I always
233: 8   worried about the safety of our drugs, and I
233: 9   continued to worry about it.
```

Scolnick 23323      233:23-234:2

```
233:23            Q.        Did you tell the FDA you were
233:24   worried?
233:25            A.        I didn't speak to the FDA, and I
233:ESQUIRE DEPOSITION SERVICES
234: Confidential - Subject to Protective Order 234
234: 1   don't know what the regulatory affairs people told
234: 2   the FDA.
```

Scolnick 23523      235:23-236:1

```
235:23            You don't think the FDA or the
235:24   medical community would have been interested in what
235:25   you, Ed Scolnick, were worried about with respect to
235:ESQUIRE DEPOSITION SERVICES
236: Confidential - Subject to Protective Order 236
236: 1   Vioxx?
```

Scolnick 23603      236:3-236:8

```
236: 3            THE WITNESS:  If the FDA had wanted
236: 4   to ask me, they would have asked me, and I
236: 5   communicated with members of the medical community
236: 6   in consultants' meetings.  I don't know what the
236: 7   medical community as a whole or the public as a
236: 8   whole would have liked to know.
```

Scolnick 23618      236:18-236:24

```
236:18            Q.        So, you're saying that if the FDA had
236:19   wanted to figure out what you were thinking in terms
236:20   of concerns about Vioxx, they could have asked you?
236:21   Is that it?
236:22            A.        The FDA could have asked me any time
236:23   if they wanted to.  They had all the data available
236:24   to them.
```

Scolnick 23720a      237:20-238:18

```
237:20            Q.        Well, ultimately there was an
237:21   Advisory Committee held in February 2001; right?
237:22            A.        I think that date is correct.
237:23            Q.        And it was to consider certain of the
237:24   clinical trial data from VIGOR; right?
237:25            A.        Yes.
237:ESQUIRE DEPOSITION SERVICES
238: Confidential - Subject to Protective Order 238
```

```
                          Scolnick Final Complete
238: 1              Q.       And in particular, GI safety; right?
238: 2              A.       Yes.
238: 3              Q.       As well as CV safety; true?
238: 4              A.       Correct.
238: 5              Q.       GI being gastrointestinal?
238: 6              A.       Yes.
238: 7              Q.       CV being cardiovascular?
238: 8              A.       Correct.
238: 9              Q.       Did you tell the FDA, you, Ed
238:10    Scolnick, in February 2001 that you were worried
238:11    about the safety of Vioxx from a cardiovascular
238:12    perspective?
238:13              A.       In February '01 I was not worried
238:14    about the cardiovascular safety of Vioxx.  Our team
238:15    presented the Merck Research Labs view of Vioxx and
238:16    all of the data to the FDA at that meeting, answered
238:17    all the questions, and they represented me.  I was
238:18    not directly involved in that meeting.
```

Scolnick 23822      238:22-238:23

```
238:22              Q.       It's a no?
238:23              A.       It's not a no.
```

Scolnick 24004      240:4-240:14

```
240: 4              Q.       You never told the FDA at any point
240: 5    in time to the best of your knowledge that your
240: 6    initial conclusion was that the CV events seen in
240: 7    the VIGOR trial were mechanism based and
240: 8    attributable to Vioxx?
240: 9              A.       I never told them that.
240:10              Q.       To the best of your knowledge, did
240:11    anybody at Merck ever tell FDA that Ed Scolnick,
240:12    president of Merck Research Labs' initial conclusion
240:13    was that the CV events seen in the VIGOR trial were
240:14    due to Vioxx?
```

Scolnick 24016a      240:16-240:19

```
240:16                       THE WITNESS:  I don't know whether
240:17    people did or didn't.  To the best of my knowledge,
240:18    it was not done.  It could have been done, I don't
240:19    know.
```

Scolnick 24106      241:6-241:10

```
241: 6              Q.       They didn't have any way to figure
241: 7    out, though, that the president of Merck Research
241: 8    Labs, when he first saw the data, concluded that
241: 9    Vioxx was the most likely cause of the CV events
241:10    seen in the VIGOR trial; right?
```

Scolnick 241.12-241.13      241:12-241:13

```
241:12                       THE WITNESS:  They would not have
241:13    known that single fact, that is correct.
```

Scolnick 241.15-242.07      241:15-242:7

```
241:15              Q.       Sir, do you respect the FDA?
241:16              A.       Yes, I do.  I have great respect for
241:17    the FDA.
241:18              Q.       You respect their ability?
241:19              A.       Yes, I do.  Many people at the FDA
241:20    are really excellent scientists.
241:21              Q.       Do you respect their power?
241:22              A.       Absolutely.
241:23              Q.       Do you respect their role in the
241:24    system for drug approval?
```
                                                    Page 30

Scolnick Final Complete

241:25          A.     I do indeed.
241:ESQUIRE DEPOSITION SERVICES
242: Confidential - Subject to Protective Order 242
242: 1          Q.     Do you respect their role in the
242: 2     labeling process?
242: 3          A.     I do.
242: 4          Q.     You respect the role they play in
242: 5     protecting the public?
242: 6          A.     I do.
242: 7          Q.     Then why did you fight them so hard?

Scolnick 242.09-242.21     242:9-242:21

242: 9               THE WITNESS:  We didn't fight them so
242:10     hard.  We wanted -- we submitted our data rapidly to
242:11     them.  We were interested in a rapid review and
242:12     rapid labeling discussions and wanted them to
242:13     consider all the data in the label, the GI data, the
242:14     Alzheimer's data, the VIGOR data.  And that's not
242:15     fighting them hard.  That's just asking them to
242:16     consider all the data and not just part of the data.
242:17     BY MR. BUCHANAN:
242:18          Q.     Merck submitted a proposed label to
242:19     FDA sometime in 2000; right?
242:20          A.     Yes.  I believe within three months
242:21     of having the VIGOR data.

Scolnick 24322     243:22-244:14

243:22               So, at the end of March of 2000,
243:23     Merck issues a press release and tells the world the
243:24     favorable properties of Vioxx found in the VIGOR
243:25     trial as it relates to GI effects; correct?
243:ESQUIRE DEPOSITION SERVICES
244: Confidential - Subject to Protective Order 244
244: 1          A.     That is correct.
244: 2          Q.     Also discloses that there's an
244: 3     increased number of -- excuse me -- a decreased
244: 4     number of cardiovascular effects in the naproxen arm
244: 5     of the VIGOR trial; right?
244: 6          A.     That's correct.
244: 7          Q.     You didn't tell the public that there
244: 8     was an increased number of cardiovascular events in
244: 9     the Vioxx arm; right?
244:10          A.     The press release was not worded that
244:11     way, that is correct.
244:12          Q.     Okay.  Because that would have
244:13     suggested that Vioxx had actually increased the
244:14     risk; right?

Scolnick 24416     244:16-244:17

244:16               THE WITNESS:  It might have suggested
244:17     that, and we didn't believe that.

Scolnick 24504     245:4-245:7

245: 4          Q.     You were trying to convey to people
245: 5     that it was, in fact, naproxen that was reducing the
245: 6     risk of cardiovascular events in the VIGOR trial;
245: 7     true?

Scolnick 24509     245:9-245:10

245: 9               THE WITNESS:  True.  That's the way
245:10     the press release was worded, as I stated before.

Scolnick 24517     245:17-245:25

245:17          Q.     Doctor, before we go on, even two

Scolnick Final Complete

```
245:18    weeks after you issued the press release, you,
245:19    Merck, issued the press release announcing the VIGOR
245:20    results, Dr. Ed Scolnick was still personally
245:21    worried about what the results from VIGOR really
245:22    meant; true?
245:23              A.      That's correct.
245:24              Q.      And you were worried that Vioxx was
245:25    actually causing cardiovascular events; true?
```

Scolnick 24602      246:2-247:19

```
246: 2              THE WITNESS:  I was worried that we
246: 3    couldn't exclude an effect of Vioxx, although the
246: 4    major effect, I was convinced, was due to naproxen.
246: 5    BY MR. BUCHANAN:
246: 6              Q.      And you actually told your staff that
246: 7    you personally were actually in minor agony over the
246: 8    issue; true?
246: 9              A.      True.
246:10              Q.      And you told your staff that we're
246:11    not going to know the answer until we do an outcomes
246:12    trial; right?
246:13              A.      That we were not going to know -- we
246:14    were not going to be able to exclude an effect of
246:15    Vioxx until we did an outcomes trial.
246:16              Q.      You told your staff, your project
246:17    team, we will not know for sure what is going on
246:18    until we do an outcomes trial; true?
246:19              A.      True.
246:20              Q.      And you wanted to do a big outcomes
246:21    trial; right?
246:22              A.      Yes.  That's correct.
246:23              Q.      Not some pooled analysis; right?
246:24              A.      That's correct.
246:25              Q.      You wanted to do a 10,000 patient
246:ESQUIRE DEPOSITION SERVICES
247:Confidential - Subject to Protective Order 247
247: 1    study on Vioxx, 10,000 people on a comparator agent;
247: 2    true?
247: 3              A.      True.  That's correct.
247: 4              Q.      You were advocating using Tylenol as
247: 5    the comparator agent; right?
247: 6              A.      That was my idea, yes.
247: 7              Q.      You wanted to do a 20,000 person
247: 8    study in April of 2000 to evaluate the
247: 9    cardiovascular safety of Vioxx; right?
247:10              A.      Correct.
247:11              Q.      It was going to be a head-to-head
247:12    trial, Tylenol on one arm, Vioxx on the other;
247:13    right?
247:14              A.      That's correct.
247:15              Q.      And when did you run that trial?
247:16              A.      The project team told me that was a
247:17    trial that could not be done because patients
247:18    couldn't be kept on Tylenol who had osteoarthritis
247:19    for that long a period of time.
```

Scolnick 24720      247:20-248:9

```
247:20              Q.      Is that right?
247:21              A.      That's what --
247:22              Q.      You can't --
247:23              A.      Tylenol is not sufficient as a
247:24    painkiller to patients with osteoarthritis, and,
247:25    therefore, the trial could not be done, and I had to
247:ESQUIRE DEPOSITION SERVICES
248:Confidential - Subject to Protective Order 248
248: 1    accept that because they felt that way unanimously,
248: 2    very strongly, that you couldn't do the trial, and
248: 3    if the alternative was to do it against another
```

Scolnick Final Complete

```
248: 4     comparator nonsteroidal, it might not give as clear
248: 5     an answer.  And so we were in a conundrum about what
248: 6     trial to do at that point.
248: 7          Q.     Well, you were the boss; right?
248: 8          A.     I never asked them to do a trial that
248: 9     they thought was undoable.
```

Scolnick 24810     248:10-248:15

```
248:10          Q.     You were the boss at that point in
248:11     time; right?
248:12          A.     Yes, I was.
248:13          Q.     On matters of science, the buck
248:14     stopped with you; right?
248:15          A.     I was the boss.
```

Scolnick 24816     248:16-248:18

```
248:16          Q.     You had ultimate authority to compel
248:17     a study to be done if you wanted an outcomes study
248:18     to be done; true?
```

Scolnick 24820     248:20-248:23

```
248:20          THE WITNESS:  I never had ultimate
248:21     authority to compel a study to be done that was an
248:22     undesignable study.  I respected my staff in that
248:23     respect -- in that regard enormously.
```

Scolnick 24906     249:6-249:7

```
249: 6          Q.     Doctor, I'm going to pass you over an
249: 7     e-mail.
```

Scolnick 24914a     249:14-249:25

```
249:14          Q.     Sir, I'm passing over what we're
249:15     marking as Exhibit 5 to your deposition.  It's an
249:16     e-mail thread; right?
249:17          A.     Do you mean by that a series of
249:18     e-mails?
249:19          Q.     I do.  I'm sorry.
249:20          A.     Yes.
249:21          Q.     You've written a few of these; right?
249:22     You're an author of a few of these e-mails, sir?
249:23          A.     Of this trail?
249:24          Q.     Yes.
249:25          A.     Yes.  Two of the -- two of them.
```

Scolnick 252.09-254.04     252:9-254:4

```
252: 9          Let's look at this e-mail, then, from
252:10     April 12, 2000 from you to Dr. Reicin.  You wrote
252:11     this late at night; right?
252:12          A.     Yes.  It's dated 10:42 p.m.
252:13          Q.     You sent it with high importance;
252:14     true?
252:15          A.     True.
252:16          Q.     And you wrote: "Hi Alise.  I have
252:17     been trading e-mails with Doug Greene in real time."
252:18     Who is Doug Greene?
252:19          A.     Doug Greene at the time was head of
252:20     the clinical, regulatory and statistics department
252:21     at Merck, which is usually referred to as
252:22     development.
252:23          Q.     "We all are online too late.  I will
252:24     tell you my worry quotient is high.  I actually am
252:25     in minor agony."  Do you see that?
```

252:ESQUIRE DEPOSITION SERVICES

253: Confidential - Subject to Protective Order 253

```
                        Scolnick Final Complete
253: 1          A.       I do.
253: 2          Q.       You wrote that?
253: 3          A.       I did.
253: 4          Q.       You meant it?
253: 5          A.       I did.
253: 6          Q.       "What I really want to do is a 10000
253: 7   versus 10000 patient study in mild - moderate OA
253: 8   Tylenol versus Vioxx with PRN" -- is that
253: 9   preventative?
253:10          A.       No.  It means use if you need.
253:11          Q.       "With PRN low dose ASA."  Is that
253:12   aspirin?
253:13          A.       Yes.
253:14          Q.       "For those judged to need it."
253:15   Sir, are you telling me that you
253:16   couldn't do a long-term study in patients with even
253:17   mild osteoarthritis, Tylenol versus Vioxx?
253:18          A.       That's what my team told me.
253:19          Q.       You believed that?
253:20          A.       Despite my request.  Yes.  I ended up
253:21   believing them, otherwise we would have done the
253:22   trial.  I wanted to do the trial.  If they had
253:23   thought it was doable, they would have done the
253:24   trial.
253:25          Q.       You continue.  "WE WILL NOT KNOW FOR
253:ESQUIRE DEPOSITION SERVICES
254: Confidential - Subject to Protective Order 254
254: 1   SURE WHAT IS GOING ON UNTIL WE DO THIS STUDY.
254: 2   PLEASE THINK HARD ABOUT THE DESIGN BEFORE THE PAC
254: 3   MEETING."  You wrote that in all caps; right?
254: 4          A.       I did.

Scolnick 26323     263:23-264:8

263:23          Q.       Sir, I'm passing you over what we
263:24   just marked as exhibit, I think it's 7, to your
263:25   deposition.  It's entitled, "VIOXX Outcomes Study
263:ESQUIRE DEPOSITION SERVICES
264: Confidential - Subject to Protective Order 264
264: 1   Potential Designs."  For the record, it is
264: 2   MRK-ABT0014818 to 827.  Do you recognize this as a
264: 3   slide set, sir?
264: 4          A.       That's what it looks like it is.
264: 5          Q.       Okay.  It's entitled, "VIOXX Outcomes
264: 6   Study Potential Designs."  It is a PowerPoint
264: 7   printout.  Is that what it looks like to you?
264: 8          A.       More or less.

Scolnick 26421     264:21-265:13

264:21          Q.       This document summarizes several
264:22   different outcomes studies concerning cardiovascular
264:23   issues that were being considered in or around April
264:24   of 2000; true?
264:25          A.       Yes.
264:ESQUIRE DEPOSITION SERVICES
265: Confidential - Subject to Protective Order 265
265: 1          Q.       One of the outcomes studies that was
265: 2   being considered was the Vioxx versus Tylenol study;
265: 3   true?
265: 4          A.       Yes.
265: 5          Q.       There's some pros and cons listed
265: 6   there; right?
265: 7          A.       Yes.
265: 8          Q.       One of the pros is, "This study
265: 9   directly addresses the question of the CV safety of
265:10   COX-2 inhibitors."  Do you see that?
265:11          A.       Yes.
265:12          Q.       I read that right; correct?
265:13          A.       Yes.
```

Page 34

Scolnick Final Complete

Scolnick 26625      266:25-267:17

266:25          Q.      Okay.  There's two cons that are
266:ESQUIRE DEPOSITION SERVICES
267: Confidential - Subject to Protective Order 267
267: 1    listed here; right?
267: 2          A.      Yes.
267: 3          Q.      One is, "Demonstration of a CV
267: 4    difference would likely be due to a COX-2 CLASS
267: 5    effect but would put VIOXX at extreme disadvantage
267: 6    to celebrex and negate existing OA and Alzheimers
267: 7    data."  Do you see that?
267: 8          A.      I do.
267: 9          Q.      The next point was there was a
267:10    possibility that you detect "small differences from
267:11    Tylenol in GI safety," and that would be of concern;
267:12    true?
267:13          A.      That's what it says.
267:14          Q.      Okay.  You were concerned that if you
267:15    went head-to-head Vioxx versus Tylenol, you might
267:16    highlight some favorable GI safety properties of
267:17    Tylenol.  Isn't that right?

Scolnick 26719      267:19-268:1

267:19          THE WITNESS:  That's what this says.
267:20    I wasn't concerned about that.  That's what this
267:21    says.
267:22    BY MR. BUCHANAN:
267:23          Q.      Okay.
267:24          There was also a possibility that you
267:25    might be wrong, and the cardiovascular effects seen
267:ESQUIRE DEPOSITION SERVICES
268: Confidential - Subject to Protective Order 268
268: 1    in VIGOR was really due to Vioxx; right?

Scolnick 26803a     268:3-268:10

268: 3          THE WITNESS:  That's what this says
268: 4    as a con for the study.
268: 5    BY MR. BUCHANAN:
268: 6          Q.      Okay.
268: 7          Again, this particular proposal was
268: 8    discussed at this meeting in April of 2000; correct?
268: 9          A.      I can only assume that.  I don't
268:10    remember the meeting.

Scolnick 26816      268:16-268:21

268:16          So, it wouldn't have been unethical
268:17    to do a trial of Vioxx versus Tylenol?
268:18          A.      What I said is it would be undoable
268:19    based on other input people gave me because Tylenol
268:20    would not relieve pain enough to be monotherapy in
268:21    such a trial.

Scolnick 27002a     270:2-270:17

270: 2          Now, apart from just asking your
270: 3    internal folks and thinking about yourself what type
270: 4    of CV study could be done, you actually consulted
270: 5    with some people from outside Merck; right?
270: 6          A.      Several.
270: 7          Q.      Okay.  You asked them whether a CV
270: 8    study could be designed to evaluate the
270: 9    cardiovascular safety of Vioxx, didn't you?
270:10          A.      I asked them what kind of study could
270:11    be designed, yes.
270:12          Q.      You actually spoke with a John Oates
                                Page 35

Scolnick Final Complete

```
270:13      about whether a trial could be done to test the CV
270:14      safety of Vioxx; right?
270:15           A.      I don't remember all the people that
270:16      our group talked to.  Dr. Oates was one of our
270:17      consultants on our board of advisors.
```

Scolnick 27110      271:10-271:24

```
271:10           Q.      Wasn't it Dr. Oates' view right after
271:11      the VIGOR data was released that you had to do
271:12      another trial comparing Vioxx with aspirin and
271:13      naproxen to see whether Vioxx was cardiotoxic?
271:14           A.      I don't remember.  I really don't
271:15      remember.
271:16           Q.      Do you remember that study design
271:17      being proposed?
271:18           A.      I remember that among several study
271:19      designs, yes.
271:20           Q.      Did you ever do that study?
271:21           A.      That study was not done.
271:22           Q.      You never did a study like that;
271:23      right?
271:24           A.      That study was not done.
```

Scolnick 27515      275:15-276:11

```
275:15           Q.      Do you know a Dr. Topol?
275:16           A.      I know his name.
275:17           Q.      Do you remember dealing with him in
275:18      connection with the planning for a CV outcome trial?
275:19           A.      I never dealt directly with Dr.
275:20      Topol.
275:21           Q.      Do you remember Merck dealing with
275:22      Dr. Topol in 2001 concerning the design of a CV
275:23      outcome trial?
275:24           A.      I believe Merck research scientists
275:25      dealt with Dr. Topol, yes.
275:ESQUIRE DEPOSITION SERVICES
276: Confidential - Subject to Protective Order 276
276: 1           Q.      He was consulting for Merck in 2001?
276: 2           A.      He was -- if he was consulted as part
276: 3      of a cardiovascular outcomes trial, he was
276: 4      consulted.  I do not know whether Dr. Topol was a
276: 5      consultant for Merck outside of that capacity.
276: 6           Q.      You'd agree he's a respected
276: 7      cardiologist?
276: 8           A.      He has a significant reputation in
276: 9      cardiology.
276:10           Q.      He's a respected cardiologist, sir?
276:11           A.      He has a significant reputation.
```

Scolnick 27620      276:20-276:22

```
276:20           Q.      Do you respect Dr. Topol?
276:21           A.      I think there are some things he's
276:22      done in science which have not held up to be true.
```

Scolnick 27804      278:4-278:6

```
278: 4                   So, one of the things that you based
278: 5      your mixed view of Dr. Topol on is the negative
278: 6      study he published concerning Vioxx; correct?
```

Scolnick 27808a      278:8-279:5

```
278: 8                   THE WITNESS:  Base it not on the
278: 9      negative study, base it on the methods which he used
278:10      to do the methods -- the negative study.
278:11      BY MR. BUCHANAN:
278:12           Q.      Let's be clear about what we're
```

Page 36

Scolnick Final Complete

278:13     talking about.
278:14              In August of 2001, Dr. Topol
278:15     published a study in the Journal of the American
278:16     Medical Association; true?
278:17         A.    True.
278:18         Q.    That study was raising caution about
278:19     the potential for COX-2 inhibitors like Vioxx and
278:20     Celebrex to cause cardiovascular events; true?
278:21         A.    That's what that study claimed to
278:22     have shown.
278:23         Q.    And you're saying that you have
278:24     spoken to statisticians that challenge the work of
278:25     Dr. Topol in terms of its statistical rigor.  Is
278:ESQUIRE DEPOSITION SERVICES
279: Confidential - Subject to Protective Order 279
279: 1     that what you're saying?
279: 2         A.    That's exactly what I'm saying.
279: 3         Q.    Did you tell Dr. Topol that?
279: 4         A.    I've never discussed anything
279: 5     directly with Dr. Topol.

Scolnick 27910     279:10-279:12

279:10         Q.    Well, did you know that some of your
279:11     scientists went out to talk to Dr. Topol about that
279:12     article even before it was published?

Scolnick 27914a     279:14-279:23

279:14              THE WITNESS:  I believe that Dr.
279:15     Reicin told me that she and Dr. Demopoulos, who was
279:16     a cardiologist by training, were going out to see
279:17     him to discuss the article.
279:18     BY MR. BUCHANAN:
279:19         Q.    And they went out to see him before
279:20     the article in the Journal of the American Medical
279:21     Association was published; right?
279:22         A.    I believe they did.  I believe that's
279:23     what Dr. Reicin told me.

Scolnick 28009     280:9-280:14

280: 9         Q.    And the objective was that Dr. Topol
280:10     would not publish the article in the form it
280:11     currently existed because that was negative to
280:12     Vioxx; true?
280:13         A.    Because it was inaccurately done
280:14     statistically.

Scolnick 28202     282:2-282:16

282: 2         Q.    Well, the Journal of the American
282: 3     Medical Association has editors; right?
282: 4         A.    Yes, it does.
282: 5         Q.    I mean, Dr. Topol just didn't just
282: 6     publish this article in JAMA by himself; right?
282: 7         A.    That is correct.
282: 8         Q.    There were editors at JAMA who
282: 9     reviewed the article; right?
282:10         A.    I don't know who reviewed the
282:11     article.
282:12         Q.    Well, in your experience, sir, in the
282:13     peer-reviewed medical literature, there are editors
282:14     at medical journals; true?
282:15         A.    There are, but I don't know how that
282:16     article was reviewed or who reviewed it.

Scolnick 28301     283:1-283:5

283: 1         Q.    You would agree, sir, that it would

```
                              Scolnick Final Complete
283: 2    be unusual for a journal like JAMA not to have an
283: 3    article like that peer reviewed?
283: 4             A.      It would be unusual, but I don't know
283: 5    what they did.
```

Scolnick 28311      283:11-283:13

```
283:11                    In fact, Merck actually issued a
283:12    press release preemptively to challenge the results
283:13    from that JAMA article, didn't they?
```

Scolnick 28316a      283:16-283:17

```
283:16                    THE WITNESS:  I don't recall at all
283:17    whether that was done.
```

Scolnick 28405      284:5-284:17

```
284: 5    if we can get that out.  The peer-reviewed medical
284: 6    literature is the vehicle through which -- is a
284: 7    vehicle through which scientific opinion is
284: 8    exchanged; true?
284: 9             A.      Correct.
284:10             Q.      And the standard way of responding to
284:11    scientific opinion expressed in scientific
284:12    literature is to respond in scientific literature to
284:13    that particular issue raised; true?
284:14             A.      True.
284:15             Q.      It is not standard practice to
284:16    respond to an opinion in a medical article with a
284:17    press release disparaging an article; true?
```

Scolnick 28420      284:20-285:15

```
284:20                    THE WITNESS:  That's not the usual
284:21    practice.  I don't recall what Merck did.
284:22    BY MR. BUCHANAN:
284:23             Q.      Is that a practice you endorse?
284:24             A.      Absolutely not.
284:25             Q.      The appropriate way to respond is in
284:ESQUIRE DEPOSITION SERVICES
285: Confidential - Subject to Protective Order 285
285: 1    the medical journal itself; true?
285: 2             A.      That is an appropriate way to
285: 3    respond.
285: 4             Q.      You could write a letter to the
285: 5    editor; right?
285: 6             A.      Yes, correct.
285: 7             Q.      You can submit your own article?
285: 8             A.      Correct.
285: 9             Q.      Or you can publish a competing
285:10    article in another journal; right?
285:11             A.      Correct.
285:12             Q.      But one of the things that you think
285:13    would be unusual is to issue a press release to
285:14    respond to an article in the medical literature;
285:15    true?
```

Scolnick 28517      285:17-285:20

```
285:17                    THE WITNESS:  It would be unusual.
285:18    BY MR. BUCHANAN:
285:19             Q.      And just not right?
285:20             A.      It would be --
```

Scolnick 28522      285:22-286:1

```
285:22                    THE WITNESS:  It is not a standard
285:23    way of doing it.
285:24    BY MR. BUCHANAN:
```

```
                                  Scolnick Final Complete
285:25            Q.      And certainly nothing you'd endorse?
285:ESQUIRE DEPOSITION SERVICES
286: Confidential - Subject to Protective Order 286
286: 1            A.      That is correct.

Scolnick 29311      293:11-293:20

293:11            Q.      But May of 2001, you were still
293:12    interested in a trial to evaluate the CV safety of
293:13    Vioxx; true?
293:14            A.      That is true.  I constantly wanted to
293:15    garner additional data to what we already had to
293:16    further prove what we had concluded.
293:17            Q.      And nobody had come up with an idea
293:18    by 2001 of a CV study that could be done to evaluate
293:19    the cardiovascular safety of Vioxx?  That's your
293:20    testimony?

Scolnick 29323      293:23-294:2

293:23            THE WITNESS:  As the discussions
293:24    evolved, what everybody focused on was a study
293:25    versus placebo, and no placebo-controlled trial had
293:ESQUIRE DEPOSITION SERVICES
294: Confidential - Subject to Protective Order 294
294: 1    yet been brought forth that people were satisfied
294: 2    with the design on.

Scolnick 29608      296:8-296:9

296: 8            Q.      Do you remember the VALOR trial, sir?
296: 9            A.      I don't remember that name, no.

Scolnick 29625      296:25-297:19

296:25            Q.      Dr. Scolnick, I just passed you over
296:ESQUIRE DEPOSITION SERVICES
297: Confidential - Subject to Protective Order 297
297: 1    what we marked as Exhibit 10 to your deposition.  It
297: 2    is Bates stamped MRK-ABA0003490 to 3491.  It is a
297: 3    letter from a Carlo Patrono; correct?
297: 4            A.      Yes.  It's from Dr. Patrono.
297: 5            Q.      Ever seen this before?
297: 6            A.      I don't recall.
297: 7            Q.      Who is Dr. Braunwald?
297: 8            A.      Braunwald is a well-known
297: 9    cardiologist at Peter Bent Brigham Hospital.
297:10            Q.      Here in Massachusetts?
297:11            A.      Yes.
297:12            Q.      That's affiliated with Harvard; is
297:13    that right?
297:14            A.      Yes, it is.
297:15            Q.      Merck was actually speaking to
297:16    Dr. Braunwald about running a VALOR trial; right?
297:17            A.      That's what this letter suggests.  I
297:18    remember Dr. Braunwald making suggestions, but I
297:19    don't remember the details involved.

Scolnick 29824      298:24-299:11

298:24            Q.      Well, do you recall at the end of
298:25    2001 there was increased urgency to do a
298:ESQUIRE DEPOSITION SERVICES
299: Confidential - Subject to Protective Order 299
299: 1    cardiovascular study; true?
299: 2            A.      There was, because a number of
299: 3    people, scientists and others, still were
299: 4    questioning whether Vioxx had been a contributor in
299: 5    the VIGOR trial as opposed to naproxen being
299: 6    beneficial.
```

Scolnick Final Complete

```
299: 7          Q.      People were still worried about
299: 8   whether Vioxx was causing cardiovascular events;
299: 9   true?
299:10          A.      There were some people who still were
299:11   raising that question.
```

Scolnick 30012      300:12-301:10

```
300:12                  I may have asked you this, but did
300:13   you run the VALOR trial?
300:14          A.      No, I don't think the VALOR trial was
300:15   run.
300:16          Q.      Why not?
300:17          A.      I don't remember why the VALOR trial
300:18   wasn't run.  This sounds like a pretty complicated
300:19   trial to me, and I don't remember why it wasn't run.
300:20          Q.      Was money an issue?
300:21          A.      I don't remember why the VALOR trial
300:22   wasn't run.  As I said, this seems like a fairly
300:23   complicated paragraph here from Dr. Patrono to Dr.
300:24   Braunwald, so, I'm not able to figure this out
300:25   quickly.
300:ESQUIRE DEPOSITION SERVICES
301: Confidential – Subject to Protective Order 301
301: 1          Q.      Do you see the third paragraph?  It
301: 2   reads, "I have serious reservations about the role
301: 3   of the Sponsor."  The sponsor would be Merck?
301: 4          A.      Presumably.
301: 5          Q.      "I have serious reservations about
301: 6   the role of the Sponsor in monitoring and
301: 7   termination of the study, as well as in the
301: 8   statistical analysis of the results."  Do you see
301: 9   that?
301:10          A.      I do.
```

Scolnick 30515      305:15-305:25

```
305:15                  Following the Advisory Committee in
305:16   2001, a series of negotiations took place with FDA
305:17   concerning the label for Vioxx; right?
305:18          A.      Yes, a very long time before we
305:19   actually got a label from them.
305:20          Q.      Well, the way the labeling process
305:21   works with FDA, it is not that the FDA gets to
305:22   dictate the label, do they?
305:23          A.      They have the power to dictate the
305:24   label.  They can -- they can tell you what they
305:25   absolutely want or not.
```

Scolnick 30611      306:11-306:12

```
306:11          Q.      You could have accepted the label the
306:12   FDA gave you in October 2001, couldn't you?
```

Scolnick 30614      306:14-306:19

```
306:14                  THE WITNESS:  We could have.  We
306:15   thought it was -- and I thought it was a completely
306:16   inaccurate and inadequate label.  It totally ignored
306:17   all of the gastrointestinal data that had been in
306:18   the VIGOR trial, and to the best of my recollection,
306:19   it totally ignored all the Alzheimer's data.
```

Scolnick 30811a      308:11-308:22

```
308:11                  So, in March 2000 you have the
308:12   results from VIGOR.  Shortly thereafter, Merck filed
308:13   a supplemental NDA application; true?
308:14          A.      Very shortly.  8,000 patients in
308:15   three months.
```

Page 40

```
                              Scolnick Final Complete
308:16        Q.        Filed it in June of 2000?
308:17        A.        That's right.
308:18        Q.        So, Merck was able to digest all the
308:19   data from that VIGOR trial, crunch it, put it in a
308:20   supplemental new drug application and file it with
308:21   the FDA by June of 2000; is that right?
308:22        A.        That's correct.
```

Scolnick 30917    309:17-310:2

```
309:17                  Thereafter, the FDA started to
309:18   evaluate the data you gave them; right?
309:19        A.        They received the package, they
309:20   started to review it.
309:21        Q.        They convened an Advisory Committee;
309:22   right?
309:23        A.        They did.  That was for February '01.
309:24        Q.        Okay.
309:25                  Merck participated in the Advisory
309:ESQUIRE DEPOSITION SERVICES
310: Confidential - Subject to Protective Order 310
310: 1   Committee?
310: 2        A.        Of course.
```

Scolnick 31121    311:21-313:3

```
311:21        Q.        I want to pass you over what we just
311:22   marked as Exhibit 11 to your deposition.  It's an
311:23   e-mail dated January 31st, 2001 from you to Mr.
311:24   Gilmartin and Mr. Anstice.  The subject is "Monday
311:25   MC."  Do you see that?
311:ESQUIRE DEPOSITION SERVICES
312: Confidential - Subject to Protective Order 312
312: 1        A.        Yes.
312: 2        Q.        "MC" refers to management committee?
312: 3        A.        Yes.
312: 4        Q.        It is Bates stamped MRK-ACR0008985.
312: 5                  You write, I guess it's the second
312: 6   sentence or so:  "The vigor meeting is next
312: 7   thursday.  On Monday I will show you the essence, an
312: 8   update, of the data that supports Vioxx is safe in
312: 9   the CV sense.  But I want to point out to all of you
312:10   at one time that 1. there is no way to prove that in
312:11   patients with rheumatoid arthritis that," and you
312:12   put this in all caps, "ALL of the difference between
312:13   Vioxx and naproxen is due to the benefit of
312:14   naproxen."  Do you see that.
312:15        A.        I do.
312:16        Q.        Then you continue.  "IT IS IMPOSSIBLE
312:17   TO PROVE THIS."  That's all caps; right?
312:18        A.        Yes.
312:19        Q.        And you continue further.  "IT IS
312:20   IMPOSSIBLE TO KNOW THIS WITH CERTAINTY."  That's
312:21   what you wrote; right?
312:22        A.        I did.
312:23        Q.        And that was -- that was your feeling
312:24   as of January 31st, 2001?
312:25        A.        Yes.  That's just what I've just told
312:ESQUIRE DEPOSITION SERVICES
313: Confidential - Subject to Protective Order 313
313: 1   you again.
313: 2        Q.        A week before the Advisory Committee?
313: 3        A.        Yes.
```

Scolnick 31325    313:25-314:18

```
313:25        Q.        You continue, "Knowing what is about
313:ESQUIRE DEPOSITION SERVICES
314: Confidential - Subject to Protective Order 314
314: 1   to happen, managing the short term fall out, and
```

Scolnick Final Complete

```
314: 2    facing and managing any longer term consequences."
314: 3    "Short term fall out," what are you thinking about
314: 4    there?
314: 5         A.        When all the data is presented again,
314: 6    people will raise questions whether we can prove the
314: 7    negative completely and, therefore, will question
314: 8    whether they should use Vioxx or not.
314: 9         Q.        "Short term fall out" also refers to
314:10    potential impact on Merck stock; right?
314:11         A.        I don't know.  I think I had in mind
314:12    just the effects on Vioxx.
314:13         Q.        Well, the effects of Vioxx would
314:14    include decreased sales of Vioxx; true?
314:15         A.        Yes.
314:16         Q.        I mean, that's why you were making
314:17    this presentation to the management committee;
314:18    right?
```

Scolnick 31420      314:20-315:24

```
314:20                   THE WITNESS:  I wanted them to
314:21    understand all the Vioxx data and what potential
314:22    labeling would be about that so that they could plan
314:23    their communications to physicians about Vioxx.
314:24    BY MR. BUCHANAN:
314:25         Q.        And you wanted to communicate the
314:ESQUIRE DEPOSITION SERVICES
315: Confidential - Subject to Protective Order 315
315: 1    potential financial implications of what might
315: 2    happen at the Advisory Committee to the management
315: 3    committee; right?
315: 4         A.        That is not what my memo says.
315: 5         Q.        That's not what it says, but that's
315: 6    what you were doing; right?
315: 7         A.        No, that's not what I was doing.  I
315: 8    was trying to tell them what to expect so that they
315: 9    could plan their communications based on what I've
315:10    said that the labeling would include.
315:11         Q.        Well, did you think that negative
315:12    labeling for Vioxx would have an adverse effect on
315:13    Vioxx sales?
315:14         A.        Certainly.
315:15         Q.        Did you think that if there was a CV
315:16    warning for Vioxx, that that would have a negative
315:17    effect on Vioxx sales?
315:18         A.        Certainly, but I didn't expect a CV
315:19    warning based on the data.
315:20         Q.        Did you think that if there was a CV
315:21    warning on Vioxx, that would also have an effect on
315:22    Merck stock?
315:23         A.        Certainly.  But as I've said, I did
315:24    not expect a CV warning.
```

Scolnick 32206      322:6-325:17

```
322: 6         Q.        And you really thought it was a
322: 7    challenge in your team to convince the FDA and the
322: 8    Advisory Committee that Vioxx didn't have a
322: 9    cardiovascular problem; true?
322:10         A.        We had all the data which said that
322:11    we didn't have a problem, and we wanted to make sure
322:12    we could present all that data, sure.
322:13         Q.        But it wasn't just a challenge, it
322:14    was almost impossible; right?
322:15         A.        It was impossible to prove the
322:16    negative, which I pointed out in my e-mail note.  It
322:17    was possible to present all the data which supported
322:18    our position.
322:19         Q.        Well, the Advisory Committee went
322:20    well from your perspective; true?
```

Page 42

Scolnick Final Complete

322:21          A.      Yes.  Quite well.
322:22          Q.      Your team did a fantastic job; true?
322:23          A.      Yes.
322:24          Q.      And they made the FDA look like
322:25     "grade d high school students."  Isn't that what you
322:ESQUIRE DEPOSITION SERVICES
323: Confidential - Subject to Protective Order 323
323: 1     said?
323: 2          A.      I did in an e-mail note, yes.  I
323: 3     regret those words, but we did a good job.
323: 4          Q.      You meant them when you wrote it?
323: 5          A.      It was -- I meant them.  It was an
323: 6     allusion to something that had happened a few years
323: 7     ago, but I did write those words.
323: 8          Q.      This is the same FDA that you
323: 9     respect?
323:10          A.      Yes.
323:11          Q.      This is the same FDA that's
323:12     responsible for the public safety?
323:13          A.      That's correct.
323:14          Q.      This is the same FDA that's
323:15     responsible for evaluating the cardiovascular data
323:16     concerning your drug?
323:17          A.      Yes.
323:18          Q.      And you were proud that your team
323:19     made the FDA look like grade D high school students;
323:20     true?
323:21          A.      I wrote those words.  I regret the
323:22     choice of words.  I wrote those words.
323:23                  MR. BUCHANAN:  Let's mark as Exhibit
323:24     12, I think, the e-mail you were referring to, sir.
323:25                       - -
323:ESQUIRE DEPOSITION SERVICES
324: Confidential - Subject to Protective Order 324
324: 1                  (Whereupon, Deposition Exhibit
324: 2                  Scolnick-12, E-mails, MRK-ACT0018064,
324: 3                  was marked for identification.)
324: 4                       - - -
324: 5                  THE WITNESS:  Yes.
324: 6     BY MR. BUCHANAN:
324: 7          Q.      Dr. Scolnick, I just passed you over
324: 8     Exhibit 12 to your deposition.  It is an e-mail, two
324: 9     e-mails, the earliest of which is an e-mail from you
324:10     to several folks, subject, "Today."  It's Bates
324:11     stamped MKR-ACT0018064.  It's dated Thursday,
324:12     February 8, 2001, 9:10 p.m. is the time.  Do you see
324:13     that?
324:14          A.      Yes, I do.
324:15          Q.      You wrote this the day of the
324:16     February 2001 Advisory Committee?
324:17          A.      I don't remember the date of the
324:18     meeting.
324:19          Q.      You wrote "TO ALL" --
324:20          A.      It looks like it is the same day.
324:21          Q.      "To ALL:  I bit my nails all day."
324:22     You're referring to you listening to the Advisory
324:23     Committee?
324:24          A.      Either listening or being there.  I
324:25     don't remember whether I was there or I viewed it.
324:ESQUIRE DEPOSITION SERVICES
325: Confidential - Subject to Protective Order 325
325: 1          Q.      If you didn't go, you did listen?
325: 2          A.      Yes.
325: 3          Q.      You said, "You all were FANTASTIC."
325: 4     You wrote that in all caps; right?
325: 5          A.      Yes.
325: 6          Q.      You then wrote that "You made them
325: 7     look like grade d high school students."  Right?
325: 8          A.      That's what the memo says.
325: 9          Q.      You say, "and you won big huge and
Page 43