Author: Rachael Raymon

page 168

In your review of the articles, you have noted, and you must have noted while you were working at Merck, that there were studies that found an increased relative risk of myocardial infarctions when using Vioxx or an increased relative risk of cardiovascular

page 169

events when using Vioxx. Correct?

A. So I -- it is -- it is true that I reviewed studies over time, some epidemiological studies. Some showed an elevated relative risk for some comparisons and some did not.

[169:13] - [170:14] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

page 169

Q. I'm not sure I heard your answer right, but did you indicate that there were studies that determined that there was no increased risk for myocardial infarctions or cardiovascular events?

A. So what -- what I said was that there are some -- were some studies that -- first of all, there are so many studies in the literature, I prefer to speak about specific studies if you have questions about specific

page 170

studies. But among the epidemiological studies, many different comparator groups were chosen, many different comparisons were done, and the same relative risk was certainly not calculated in every single one of the comparisons done across all studies. There were some that showed, you know, no association; some that showed increased risk, and some were statistically significant and some were not. So in a sense, I don't think it's very helpful to try to paint the epidemiological studies with one broad brush.

[170:15] - [171:18] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

page 170

Q. Can you recall any

epidemiologic studies that showed there was no association between Vioxx and cardiovascular events?

A. Well, I believe that in the Mamdani study there was a null association for some of the comparisons. And then beyond that, we could go through and characterize every relative risk in every study, but I do believe that to be

page 171

the case. And then, you know, it depends on dose comparisons and timing and so...

Q. You seem to have a study in mind when you say --

A. Oh no, no, no, no.

Q. -- there was one that found no association.

A. Well, a null association for some of the comparisons. And then, for instance, in the -- in the study by Dr. Solomon, for some of the comparisons in different populations, the association was not found to be elevated or statistically significant. So that's why I don't like to talk in such generalities, because many different comparisons were done in -- in all of these studies.

[172:15] - [174:15] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

page 172

Q. Were you involved in any analysis of the VIGOR results?

A. Any analysis meaning did I conduct the data analysis of the VIGOR results?

Q. Any analysis being, you know, any second look at the data of the VIGOR results, you know, any analysis at all at any point in time of the VIGOR results.

page 173

A. So in the epidemiology department, we don't manage the data from clinical trials in general. Some people may be more involved than I have been in clinical trial data, excuse me, and -- and the VIGOR study is a clinical trial.

I have been in discussions of the VIGOR data, and back then, four years ago, was, you know, told about the data and shown data and discussed data with colleagues but was not the point person for the analyses, so to speak.

Q. Right. But it seems to me no epidemiologist could come into Merck and work on Vioxx without getting a head full of VIGOR.

Sf Sustained

Side commentary/ Sidebar.

It was very important,
wasn't it?
A. So like I said, I -- I was involved in discussions of the VIGOR results, and -- I was involved in discussions of the VIGOR results.
Q. And you understood the timeframe of VIGOR was about six months
page 174
after -- after it was on the market. Right? After Vioxx was on the market?
MR. PATRYK: Object to the form. When you say the timing of VIGOR, Carlene, just for my -- the timing of the publication or the end of the study or --
MS. LEWIS: The timing of Merck receiving the results of the study.
THE WITNESS: I don't know the date on which the results were received, but I'm assuming it was before I joined the epidemiology department.

602
611
Sustained

[176:12] - [176:18] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

page 176
Q. And no decision should be made based on keeping the stock price up or keeping sales?
A. No decision whatsoever?
Q. No epidemiology decision.
A. Well, it's not -- it's not my job to make decisions.

401-402
403
Sustained 401-3

[177:7] - [177:10] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

page 177
Q. Within the epidemiology department, did you consider whether or not your messages were getting through with regard to Vioxx?

611
401-402

[177:14] - [178:4] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

page 177
THE WITNESS: Me personally? I -- I don't know -- you're talking about my messages with regard to what?

611 Sidebar; Not an appropriate question ← Overruled

-401-402

BY MS. LEWIS:
Q. Let's look at Exhibit 17. It looks like it's from Doug Watson to you. It's November 2001, which is post VIGOR, post different articles in journals. It's after the FDA warning letter.

page 178

A. What FDA warning letter are you referring to? I don't --
Q. The September 2001 one I found in your file.

[178:13] - [178:18] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

page 178

Q. From Doug Watson who was an epidemiologist. Right?
A. He is a -- he's in the epidemiology department. Right.
Q. And you are?
A. Right.

[179:13] - [180:13] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

SIDEBAR

page 179

Q. That is one. And here's my first question.
Dena Rosen Ramey is an epidemiologist. Right?
A. I don't know what her title is, but she's in the epidemiology --
Q. Richard H. Holmes, epidemiology?
A. He's in the epidemiology department.
Q. Yourself, epidemiology?
A. Uh-huh.

page 180

Q. Doug Watson, epidemiology?
A. Yes.
Q. And Nancy Santanello, epidemiology?
A. Yes.
Q. And the message conveyed is, "More news from ACR - from this story it seems that at least some of our messages are getting through, and that many physicians are not easily led by the competition and press..."
Did I read that correctly?
A. You read that correctly.

[181:10] - [181:14] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

page 181

Q. How many more e-mails did you receive about the effect of stock prices?

A. I am not in a -- I did not count -- I don't know --

401-402
403
Overruled

[181:22] - [182:9] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

page 181

Q. Do you remember anymore?

A. Not specifically. I don't -- I don't remember e-mails about

page 182

stock price.

Q. And the message that was given through, do you know what message that was?

A. No, no.

Q. The issue at that point in time was whether or not the VIGOR results showed Vioxx to be dangerous to people's hearts. Correct?

401-402
403
602
401-402
403
611
Sustained

[182:13] - [182:22] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

page 182

THE WITNESS: I don't remember the context for that e-mail. I don't remember getting the e-mail. So I don't know what the context was, and I -- and I don't -- I don't know what the message referred to. And I didn't author the e-mail, so I don't think, you know -- it's not my word, the message or --

[182:24] - [183:22] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

page 182

Q. Would you agree that during

page 183

that period of time post VIGOR into 2001 that Merck was minimizing the potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal

602
Overruled

Outcomes Research study and thus misrepresents the safety profile for Vioxx?
A. What I can tell you is that my job was devoted to studying the safety of Vioxx. So in my life, certainly -- and in my experience with what I was asked by my management at Merck to do was not that the issue was minimized. In fact, it was the entire focus of my job.
Q. Do you know whether Merck informed the public and doctors and insurance companies deciding whether to put -- keep this product on its formulary that the results of VIGOR were really an open question? Or did Merck tell all these people that the -- the results of VIGOR were attributable to naproxen?

Cont

Overruled

602

611

Answer does not accompany question.

Sustained

[184:9] - [185:5] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

page 184
Q. Let's back up this way.
Isn't it true that during that period of time, post VIGOR into late 2001, that Merck asserted that Vioxx did not increase the risk of MIs and that the VIGOR finding is consistent with naproxen's ability to block platelet aggregation like aspirin?
A. It sounds like you're quoting from something. Merck -- I -- I'm definitely aware that Merck held as one of the potential explanations that naproxen was -- for VIGOR that naproxen was cardioprotective.
Q. Is it also true that Merck failed to disclose that that explanation
page 185
was hypothetical, had not been demonstrated by substantial evidence, and that there's another reasonable explanation that Vioxx may have prothrombotic properties?

602

611

assumes fact not in evidence

Overruled

[185:9] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

page 185
Q. Is that true?

[185:12] - [186:4] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

page 185

THE WITNESS: It sounds like you're reading a quote from something. And it was acknowledged to me that there was another potential explanation. And the other potential explanation was that perhaps Vioxx was associated with increased cardiovascular risk and that that was the question that I was asked to continue to research. So that was my job. That -- and -- and my managers, Dr. Guess and

page 186

Dr. Santanello, certainly fostered an environment where I was given the resources to continue to study that question.

Cont.

[186:6] - [186:9] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

page 186

Q. So while that may have been a position of Merck as cited by the FDA, you're just saying it wasn't the position of its epidemiology department?

611
602
Sust. Overruled

[186:14] - [187:22] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

page 186

THE WITNESS: I can talk to you about my personal experience and what I was asked to do. And I have, you know, limited ability to comment for the entire company. But I can tell you in my experience, I was given the resources and the assignment of continuing to discuss the possibility that either it was the cardioprotective effect of

page 187

naproxen or an increased risk associated with Vioxx or both.

BY MS. LEWIS:

Q. You recognize Exhibit 19 as the warning letter from the FDA?

A. Where is the date that this was written, do you know?

Q. I know that it was sent September 16, 2001. September 16 -- September 17th it's faxed. Here's a fax.

A. So September 17, 2001, so

801-802
401-402
403
Overruled

three years ago. So I don't remember the details of this letter, but I remember that there was a letter, something like this. Or that I've heard people talk about the warning letter.
Q. Yeah.
A. I -- I believe it has to do with promotion, not research.
Q. In your time at Merck, did you get many of these FDA warning letters?

Cont.

Overruled

[188:2] - [188:7] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

page 188
THE WITNESS: I never got one. I didn't get one and --
BY MS. LEWIS:
Q. That was in your file.
That was a significant event to you. Correct?

611-not a question

[188:10] - [188:21] 7/27/2005 Cannuscio - 10.8.2004

602
611
401-402
403
801-802

Author: Rachael Raymon

page 188
You may respond.
THE WITNESS: Would I call it a significant event in my life? I don't think it's a good thing. I -- I would say that.
BY MS. LEWIS:
Q. Okay. Let me show you Exhibit 20. That is a letter from Dr. Sherwood to healthcare providers and see if you remember this.
A. I don't remember this actually.

[190:6] - [191:5] 7/27/2005 Cannuscio - 10.8.2004

Overruled

Author: Rachael Raymon

page 190
Q. I highlighted two portions. And the first sentence said, regarding VIGOR that "Possible explanations include that Vioxx increased the MI rate."
A. And there is a second part of the quote as well.
Q. I'll read that, "Or naproxen decreased the MI rate."
I'm asking, do you agree with the first part?

A. I'd like to look at it again and read it, just so that -- it says, "Alternative interpretations have been proposed for the difference in the rates of myocardial infarctions in the Vioxx treatment group in comparison with the naproxen treatment group. Possible explanations include that Vioxx increased the MI rate." That was possible. Or
page 191
that naproxen decreased the MI rate. That was possible. "The underlying reason for the difference has not been established in prospectively designed clinical studies." I agree with that.

Cont.

Ef

Overruled

[191:6] - [192:15] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

page 191
Q. Do you also agree that Vioxx has not been proven to be safer or have fewer side effects than other NSAIDs when measured for overall safety?
A. This was -- this was further outside the realm of what I worked on, so this was a summary opinion of someone else. So I wasn't as familiar with the data about overall side effects and overall safety.
Q. You're not aware of any epidemiology studies that would contradict that statement of Dr. Louis Sherwood, the senior vice-president of Merck's US medical and scientific affairs, are you?
A. I'm not aware of any epidemiological studies that either support or refute that statement.
page 192
Q. Prior to the marketing of Vioxx, or even shortly thereafter, there were no studies done to actually evaluate that, were there, by Merck?
A. I -- I don't know. But you -- you're asking me a question about Vioxx has not been proven to be safer or have fewer side effects than other NSAIDs on measures of overall safety. I -- I have said already I don't know of studies that either support or refute that, and I don't know if there were -- I don't know about specific Merck studies that support or refute that or specific studies funded by other people.

602

401-402

701-702

Ef

Overruled

[192:16] - [192:21] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

page 192

Q. If Merck was representing that Vioxx was safer or had fewer side effects than other NSAIDs on measures of overall safety, you would expect they'd have epidemiological studies to support that, wouldn't you?

611
701-702
602
401-402

[193:9] - [193:13] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

page 193

MS. LEWIS: Based on what you know about -- what you know about Merck, that they would have had studies to have made that statement?

[194:9] - [195:4] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

page 194

THE WITNESS: I would imagine that there -- you -- you asked specifically about epidemiology studies. And -- and I told you I'm not familiar with any epidemiology studies to support or refute that specific statement.

I -- it's my belief that in order to approve a drug, there would have to be some studies that would be reviewed by the FDA to answer the question of the overall safety of the drug. So I'm assuming that because the FDA made the decision to approve Vioxx for

page 195

marketing, that the FDA was privy to data reflecting that overall, the relative safety of Vioxx warranted approval.

Overruled

[195:11] - [195:16] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

Sustained

page 195

Q. You know this letter from Dr. Sherwood is in response to the directive from the FDA in the warning letter to clear up the misrepresentations

611
602
801-802
401-402

by Merck with regard to the safety of Vioxx?

Cont.

[195:20] - [196:8] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

Sustained

Overruled

page 195

THE WITNESS: I actually didn't know that Dr. Sherwood was the one to write that letter. I see the letter. I -- I reviewed the letter, and I see that Dr.

page 196

Sherwood wrote a letter to the medical community to talk about the possible risks and benefits of Vioxx.

So I -- I agree that Dr. Sherwood wrote a letter to the healthcare community about the risks and benefits.

[196:17] - [197:6] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

Cont.

Also document speaks for itself

page 196

Q. You can see that it's -- that it has a label on the outside of the envelope, "Important correction of drug information."

You can see that?

A. Right, right.

Q. And Dr. Sherwood, in this letter that the FDA saw and that was in

page 197

response to the FDA warning letter, said that Vioxx had not been proven to be safer or have fewer side effects than other NSAIDs on measures of overall safety; isn't that correct that that's what he said?

[197:13] - [199:7] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

page 197

THE WITNESS: It says, "Vioxx has not been proven to be safer or have fewer side effects than other NSAIDs on measures of overall safety."

I told you, I don't -- I'm not -- it's beyond my realm as -- of experience which was

Sustained

specifically to design epidemiological studies regarding the cardiovascular question.
BY MS. LEWIS:

page 198

Q. As an epidemiologist, when you set out to design an epidemiology study around a cardiovascular question, is it important to have as much information about the cardiovascular experience in Vioxx users as possible?
A. What do you mean by as much information about the experience?
Q. If Merck has information that when people take Vioxx, they have increased blood pressure; or when people take Vioxx, they have a stroke; or when people take Vioxx, they have a heart attack, that would be information you'd want to know in order to design an appropriate study to evaluate that risk. Correct?
A. We design studies to evaluate the cardiovascular safety and/or any risks associated with Vioxx.
Is that your question?
Q. I'm asking, is it important to have complete information that your company has regarding the cardiovascular

page 199

experience of Vioxx users when you set out to design an appropriate study?
A. I think it's important to continue to collect over time ongoing safety data or monitoring data about the -- the profile of a drug. And that's what I understood us to be doing.

[200:4] - [203:1] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

page 200

Q. Once you joined the epidemiology departments, your focus was Vioxx.
At that time was that information shared with you regarding the adverse cardiovascular experiences of people on Vioxx in the VIGOR study?
A. So in various ways, information about the VIGOR study was shared with me. What I'm saying is, I don't remember this specific document.
Q. Okay. In any way, did anyone share with you that the risk of death or serious cardiovascular adverse events or cardiovascular adverse events leading to discontinuation was more than double in VIGOR for anyone with a history of cardiovascular disease?

Overruled

611 assumes fact not in evidence

Overruled

611

602

Assumes facts not in evidence

Cut out

A. I remember the discussions in general terms about the results of the VIGOR data. And it sounds like you're

page 201

asking me about a specific -- one specific element of the analysis. And I don't remember the -- you know, the specific odds ratios or confidence intervals or specific ways in which that particular element of the analysis was conducted. I remember the overall message that there was a higher risk of cardiovascular adverse events in the rofecoxib-treated group versus the naproxen-treated group.

Q. Did you get the overall message that that risk was the same whether or not a person had a history of any cardiovascular disease?

A. I remember discussions that -- that analyses were conducted in people with some prior reason for having elevated cardiovascular risk, but I don't remember how the results panned out in the stratified analysis.

Q. Do you remember that this doubling of cardiovascular adverse events was the same whether or not people had a

page 202

history of hypertension?

A. I don't remember that.

MR. PATRYK: Object to the form.

You may respond.

THE WITNESS: Yeah. I don't remember the specific stratified analysis that you're asking about.

BY MS. LEWIS:

Q. Do you remember whether or not it was the same whether or not the people were over 70 years old?

A. I don't remember.

MR. PATRYK: It's okay.

BY MS. LEWIS:

Q. Just so we're clear, this Exhibit 27 is something you don't recall ever getting as a senior epidemiologist on Vioxx at Merck?

A. Like I said, I received different information about the VIGOR study in many conversations and documents. And I don't remember that specific document from -- now you're

page 203

showing me a different document.

[203:2] - [203:3] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

page 203

Q. It's the same document.
This was a page from the same document.

[205:3] - [205:11] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

page 205
Q. Isn't it true that the only differences in the heart attack data that Merck had roughly six months after Vioxx went on the market and the heart attack data that resulted in Vioxx being recalled by Merck from the market was that the first study involved 50 milligrams and the second involved 25 milligrams and was four years later?

-611- Question w/o an answer
-602
-401-402
Sustained

[205:21] - [206:4] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

page 205
Q. Isn't that the only difference between them that's significant?
A. Oh, no.
page 206
Q. They both concluded with heart attacks. They had excess risks of heart attacks in people.
A. Okay. So --

Improper questioning; not a question. Sustained

[206:10] - [208:2] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

page 206
THE WITNESS: Okay. So, like I said, I did not design VIGOR, nor did I design APPROVe. But VIGOR was a study conducted in rheumatoid arthritis patients who have a baseline elevated risk of heart attack regardless of what drug they're taking.
BY MS. LEWIS:
Q. Both groups did. The VIGOR group and the naproxen group both had --
A. Right.
Q. -- rheumatoid arthritis --
A. Exactly. So all I'm --
you -- you're asking me to compare VIGOR
page 207
to APPROVe. You're not asking me to compare rofecoxib and naproxen treated groups?

-611
-602
-401-402
Overruled
Improper questioning; not a question
"

Q. Right.
A. Okay. So what I'm saying is that was a very particular patient population in the VIGOR study. And the dynamics of cardiovascular disease in rheumatoid arthritis patients are not completely understood. And a major difference -- another major difference between the VIGOR study and the APPROVe study, in addition to the difference you mentioned about 50 milligrams being used in -- in VIGOR and 25 being used in APPROVe, is -- is that so, first one included a -- an active comparator, we call it. So VIGOR included rofecoxib compared to naproxen. And APPROVe, as I understood it, included rofecoxib compared to placebo. So those are two major -- those are major differences between the trials. I wouldn't say that those trials are identical, by any means,
page 208
on all criteria except for the fact that a different dose was used, no.

Df Overruled

[208:3] - [209:7] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

page 208
Q. Did you ever provide any information to marketing people to allow them to address questions raised by doctors or consumers regarding health issues of Vioxx?
A. I shared data from the Dr. Solomon -- from Dr. Solomon's study when it was available with colleagues who may have included people in marketing. But the first people I would always share data with were my colleagues in MRL.
Q. Did you ever share data with marketing people or sales reps to help them dodge obstacle one, which was: I'm concerned with the potential edema that occurs with Vioxx?
A. I don't remember having been asked to address issues related to edema.
Q. Do you recall providing information to marketing or salespeople to help them dodge or address obstacle two, which is, "I am concerned with
page 209
dose-related increases in hypertension with Vioxx"?
A. As an epidemiologist in MRL, I wasn't, you know, creating these documents that you're showing me that have to do with questions about dose-related increase in hypertension.

Df Overruled

401-402
403
602

Ef

Sustained

[209:8] - [209:14] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

page 209

Q. That's why I didn't ask you if you created the document. I asked if you provided anybody in marketing or sales with information to help them address or dodge the obstacle regarding hypertension increases with Vioxx.

A. Oh, okay.

Improper questioning; not a question

[209:18] - [210:5] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

page 209

THE WITNESS: No, I don't think I had any hypertension -- I -- I don't remember being involved. Certainly if something I worked on was used for these purposes, that's possible. But I've never seen this document

page 210

before, ever. And I've -- I've never read those words on a paper before. I don't -- I don't -- I'm not familiar with this, in other words.

401-402
403
602

Ef

Sustained

[210:7] - [211:7] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

page 210

Q. Did you ever provide information to any marketing or salespeople within Merck to help them address or dodge obstacle three, which is, "Can Vioxx be used in patients using low dose aspirin"?

A. No, I never provided that kind of information.

Q. Did you ever provide marketing or sales personnel within Merck information to help them address or dodge with doctors or consumers obstacle four, which is, "I am concerned about the cardiovascular effects of Vioxx"?

A. I don't -- I may have been involved in providing data from some of my studies, but I don't specifically recall a marketing task of providing this

page 211

kind of information for this document

Ef

Overruled

which I've never seen before.

Q. You would provide data to marketing or sales that would help them deflect concerns about cardiovascular effects of Vioxx? Is that what you're saying?

401-403
611
602

[211:12] - [213:10] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

page 211

THE WITNESS: I agree that I'm -- I'm having difficulty with what you're -- the way that you're phrasing things. I feel more comfortable with my phrasing, which is that if I had data at my disposal that bore in any way on the issue of the cardiovascular effects of Vioxx, I would share it, first, with my colleagues in MRL. And there may have been times when the data were used to educate people in marketing or the

page 212

sales force. But that wasn't my primary job, and I don't recall specific instances in which my data were used for particular marketing purposes.

overruled

BY MS. LEWIS:

Q. You don't recall any time when you provided data demonstrating possible cardiovascular effects of Vioxx to marketing or salespeople, do you?

A. Like I said, when I had data at my disposal, I would make it available to people and --

Q. To marketing and sales people?

A. What I'm saying to you -- and I've said before -- is that the first way I would go is to share it with my line of command, you know, my managers. And there may have been times when the information was used to educate people in the field. And I don't recall specific examples to give to you of how that information was used by marketing, with

page 213

marketing, to educate marketing, to educate the field. I -- I don't -- I don't recall specific examples.

Q. Were you ever involved in taking the sort of complicated epidemiology information you would have and making it more simple, drafting something that would be a more simple response to any of the obstacles that I've mentioned so far?

401-402
403
611

overruled

[213:14] - [215:7] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

cont. Overruled

page 213

THE WITNESS: So when you ask that question, I -- I feel like at some point I was asked to try to distill all that was going on with the hormone replacement therapy debate, which was very complicated and had issue --
BY MS. LEWIS:
Q. Talking about Vioxx.
A. I'm trying to tell you, I'm trying to recall instances in which I was
page 214
asked to distill epidemiological information. And that -- and to do it in a way that somebody who didn't have a scientific background might be able to read it. And that's an example that comes to mind.
And I -- there were other times when I was asked to communicate what the results of, for instance, the Solomon study were, but I can't remember who the audiences were for those pieces of information.
Q. You can't remember any of the audiences when you explained the results of the Solomon study?
A. Like I said, I do recall quite clearly that I would always talk to my colleagues in MRL. And I do recall at one point talking to Adam Schecter (ph) about the results of the Solomon study, but you're asking me about creation of documents or creation of the distilled epidemiological information. And I -- and I don't remember who, you know -- for
page 215
whom those things were prepared or -- or, you know, what audiences they were given to or how they might have been used by the field. It was not a main part of my job by any means. If I was asked to do something, I would try to just synthesize the data in the best way I could.

[215:15] - [216:8] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

page 215
Did you distill or simplify, you know, pick your word, the results of the VIGOR study to be shared with MRL?

A. Since that was a clinical study, there were other people who took the lead in -- in describing the results of this -- of the VIGOR study.
Q. Other epidemiologists that provided it to sales?
A. Well, remember, the -- I

page 216

mean, the things that you just gave me from the analyses from VIGOR were from October 1999 when I wasn't even working on -- on Vioxx. So I don't know who handled it when the data first came out.
Q. The VIGOR -- the VIGOR issue was very much alive later than 1999. Right?

602 401-402 Overruled

[216:12] - [217:1] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

page 216

Q. Let me ask you this: Have you -- have you been asked to help distill or prepare a response with regard to any of the published studies we've discussed today, other than Solomon?
A. Have I ever been asked to distill -- there may have been times when I reviewed things that Dr. Watson prepared.
Q. Was he the one generally asked to prepare those --
A. Summaries.
Q. -- or distillations to be

page 217

shared with marketing?

. 602 . Question w/o an answer Sustained

[217:7] - [217:8] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

page 217

Q. Would you want any of your data to be used to dodge questions?

401-402 403

[217:12] - [217:17] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

page 217

THE WITNESS: I would want to try to be as fair to the data and -- and accurate about my portrayal of the data as possible. That would be my goal as a scientist.

Sustained

[217:19] - [218:10] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

page 217
Q. Have -- have there been any conclusions reached in the Merck Ingenix study or Ugenix study, whatever the name was, from earlier?
A. It's called the -- yeah, it's the Ingenix United HealthCare study.
page 218
When I went out on maternity leave, the data were still interim data. And I have not rereviewed the data or revisited the data since I went out on maternity leave.
Q. Do you know when that will be made public?
A. I think the intent is to try to submit it for publication soon. I don't know about a specific timeline.

401-402

Overruled

[218:11] - [219:8] 7/27/2005 Cannuscio - 10.8.2004

Author: Rachael Raymon

page 218
Q. What did the interim data show?
A. I don't remember the specifics, but I do remember that there was some elevation in relative risk, I believe, when Vioxx was compared to celecoxib, but I don't remember the specific comparisons.
Q. And relative risk with regard to what?
A. Like I said earlier, I think that the end points were, but I don't remember specifically because I haven't looked at the protocol in a long time. I
page 219
think the -- the end points included -- actually, I think they included hospitalization for myocardial infarction or for unstable angina and possibly also for sudden cardiac death, but I can't remember specifically if that was included. I think it was, but I can't remember for sure.

Merck Responses to Cannuscio objections

Cannuscio Defense Counter-Designations

[31:19] - [32:20] 10/8/2004 Cannuscio, Carolyn - (LA)

* Defendant Deposition Designations

page 31

Q. Who were the outside consultants that you generally referred Vioxx issues to while you were senior epidemiologist at Merck?

A. So who did I ask for help as an epidemiologist or who did Merck ask

page 32

for help?

Q. We'll take them one at a time.

Who did you ask for help?

A. So in these collaborations I've talked to you about, for instance, the Ingenix United HealthCare study, Dr. Alex Walker works for Ingenix and is -- is an epidemiologist who I would ask for help in methodological issues, for instance. And I mentioned to you Dr. Mary Chester Wasko and Dr. Mark Genovese who are rheumatologists.

So most of the people I -- in my role who I would recommend would -- would have been, you know, like Dr. Alex Walker, an epidemiologist, to bring methods or expertise or a clinician, because I'm not a clinician, to provide that kind of perspective.

[48:21] - [50:9] 10/8/2004 Cannuscio, Carolyn - (LA)

* Defendant Deposition Designations

page 48

Q. Following the Solomon study, did you recommend that Merck withdraw Vioxx from the market?

A. Following the publication of

page 49

the -- of the Solomon study in Circulation, no, I did not recommend that Merck withdraw Vioxx from the market.

Q. Following the completion of the study, but I guess that's about five months before its publication or six months, did you recommend that Merck withdraw Vioxx from the market?

A. As I've said, no, I did not recommend to the corporation that -- that

Vioxx be withdrawn from the market.
Q. Did Dr. Solomon?
A. To me?
Q. To Merck.
A. I -- well, in my conversations, Dr. Solomon did not recommend to me that -- that Merck remove Vioxx from the market, no.
Q. Did any other authors of the paper in Circulation recommend to Merck that it withdraw Vioxx from the market at that time?
A. I don't know about any communications the co-authors may have

page 50

had with other people at Merck. If there were any, I am not aware of them. But -- but Dr. Solomon, Dr. Avorn, they did not recommend to me as an individual that -- that Vioxx be removed from the market, nor did they ask me to tell Merck that Vioxx should be removed from the market.
Q. They concluded it was dangerous?

Overruled

[50:14] - [51:22] 10/8/2004 Cannuscio, Carolyn - (LA)

* Defendant Deposition Designations

page 50

Q. Correct?
A. I -- I think that -- well, you -- you're asking me for their interpretation of the data. They came to relative risks that we could speak about in detail if you -- if you wanted me to look at the paper with you.
But to make a -- I as an epidemiologist was trained that one epidemiological study does not prove anything, that it can add to a

page 51

discussion, that we can make observations, but that there's not proof as a result of an observational study. So that's -- I don't know what their conclusion was overall about -- about Vioxx, but they did -- they definitely did not say to me Merck should remove Vioxx from the market. They definitely did not.
Q. And in none of your discussions with them working on the -- working with them on the project and analyzing the data did they say this drug's dangerous, it's a safety problem?

Merck response: The question asked for a conclusion which is what the witness provides

611 non-responsive

cumulative

Overruled

Merck Response: conditional counter designation not offered for the truth

A. They may have said we have an elevated relative risk. And -- and they did not say to me, though, you know, definitively this solves it, this means that the drug is dangerous and should be removed from the market. No, they did not. They -- Dr. Solomon and Dr. Avorn did not say that to me.

801, 802 hearsay
602 lack of foundation
assumes facts not in evidence
Speculation

[56:6] - [56:9] 10/8/2004 Cannuscio, Carolyn - (LA)

* Defendant Deposition Designations

page 56

Q. As a senior epidemiologist at Merck, what does constitute sufficient data to stop selling a product that may be killing people?

[56:12] - [57:15] 10/8/2004 Cannuscio, Carolyn - (LA)

* Defendant Deposition Designations

page 56

THE WITNESS: Well, of course, with -- with every single drug, the risks and the benefits are always weighed. And I, as a very junior scientist, have never been in the position before of having to make that decision. I -- in -- in my role, you know, I'm trained as a social epidemiologist. I am not of -- I'm not in a leadership position where I've been called upon to ask -- to answer that question in

page 57

the past. I've never been in that position before.

So I would have to ask experts, colleagues who are far more senior than I am, what they would consider enough evidence and -- and trust their judgment and -- and understand the limitations of what I know as a junior -- a junior colleague. I know my title is senior epidemiologist, but it's actually one of the most junior scientists, Ph.D. scientist positions in the company.

611
non-responsive

Merck response:
Withdrawn

[64:7] - [64:11] 10/8/2004 Cannuscio, Carolyn - (LA)

* Defendant Deposition Designations

page 64

Q. What we can agree on here perhaps is that it surely wasn't known at Merck at that time that Vioxx wasn't what caused the heart attacks in the VIGOR study?

[64:16] - [65:2] 10/8/2004 Cannuscio, Carolyn - (LA)

* Defendant Deposition Designations

page 64

THE WITNESS: I think it was an open question whether it -- whether Vioxx was a cause of heart attacks in patients taking it. I think it was.

BY MS. LEWIS:

Q. And with that open question, do you believe it ethical as an epidemiologist, based on your training,

page 65

for a company to continue to sell the product?

Overruled

[65:10] - [66:18] 10/8/2004 Cannuscio, Carolyn - (LA)

* Defendant Deposition Designations

page 65

THE WITNESS: I personally listening to the scientific discussions that went on and -- and talking to people who were experts in the field, for instance, in pharmacoepidemiology, for instance, talking to Dr. Alex Walker who used to be the chair of epidemiology at Harvard and who's widely respected in the field, he engaged in a study with us to try to understand whether or not Vioxx was associated with increased cardiovascular risk.

And I -- and I trust him so

page 66

completely, I trusted Dr. Guess and still trust Dr. Guess and Dr. Santanello so completely to do the right thing and -- and had full confidence that these people

801, 802 hearsay
611 non-responsive
602 lack of foundation
assumes facts not in evidence

Merck response: Plaintiffs designated a great deal of testimony on the witness' consideration of risk and this conditional designation goes to her state of mind

who -- with whom I was working also believed it truly to be an open question. And -- and also, you know, institutional review boards, reviewing clinical trials and the FDA, I -- I had to trust that -- that all of these systems and all of these people who were looking at all the available evidence also shared my view that it was an open question and that it was, in fact, appropriate to continue studies of the matter.

---

[66:20] - [66:21] 10/8/2004 Cannuscio, Carolyn - (LA)

* Defendant Deposition Designations

page 66

Q. And in your view, it was most definitely an open question?

[67:1] - [67:2] 10/8/2004 Cannuscio, Carolyn - (LA)

* Defendant Deposition Designations

page 67

THE WITNESS: I saw it as an open question.

[77:3] - [77:15] 10/8/2004 Cannuscio, Carolyn - (LA)

* Defendant Deposition Designations

page 77

Q. Yes.
A. But I don't -- I don't know about it in detail. Again, I was still on maternity leave when that study was -- was presented. And I didn't attend the scientific meeting where it was presented.
Q. Generally speaking, you know it to be a large nested, case control study?
A. I don't know any of the details about the study. I just know that it received press attention.

[82:13] - [82:15] 10/8/2004 Cannuscio, Carolyn - (LA)

* Defendant Deposition Designations

page 82

Q. You were never a part of any discussion about deaths that could be avoided if Vioxx were not prescribed?

overruled
EF

[82:20] - [83:18] 10/8/2004 Cannuscio, Carolyn - (LA)

* Defendant Deposition Designations

page 82

THE WITNESS: The -- the supposition you're making is that at some other point it was determined that Vioxx was causally related to heart attacks, and then

page 83

a step was taken then to project, then, based on that causal interpretation. And as I've said before, until this recent removal of Vioxx from the market, it was my understanding that nobody in the scientific community at Merck had come to that conclusion, while taking into account the advice from -- from experts as well and from the FDA as well.

So -- and I've said -- no, I was not part of any conversation about projections based on available data, projections in -- in excess cardiovascular events, no. Not that I can remember, anyway.

611
non-responsive

Merck response: This designation is necessary because plaintiffs designated the following answer out of context.

[84:23] - [85:3] 10/8/2004 Cannuscio, Carolyn - (LA)

* Defendant Deposition Designations

page 84

Q. Maybe we can get at it this way.

page 85

The risks that Vioxx will cause a heart attack didn't just begin on September 30, 2004. Correct?

[85:7] - [85:24] 10/8/2004 Cannuscio, Carolyn - (LA)

* Defendant Deposition Designations

page 85

THE WITNESS: I'm trying -- I'm trying to -- your question is,

did the risk with exposure begin
on -- on September whatever, the end of September. And now retrospect -- retroactively going back and looking at all the available data today, we can make that interpretation, that -- that yes, there -- there was an elevation in risk to people who had taken it before. But we didn't have that kind of data available prior to now. And the available data prior to that was understood to leave the question as an open one about whether or not there was increased risk.

Overruled

[105:18] - [105:23] 10/8/2004 Cannuscio, Carolyn - (LA)

* Defendant Deposition Designations

page 105

Q. Were you involved in the discussions?

A. Initially I was. And then I asked Dr. Santanello to take charge of it for me because I needed to focus on Caleb and getting him to eat.

401, 402, 403 The issue of her sons health shortly after birth is wholly irrelevant and its mention highly prejudicial.

Merck response: withdrawn

[119:13] - [120:1] 10/8/2004 Cannuscio, Carolyn - (LA)

* Defendant Deposition Designations

page 119

Q. I didn't see another version. You -- you had 10 boxes. I'm not saying that it wasn't there.

A. Okay. I mean, I had no intention of having you not see it. I would like for you to be able to have the final version. That's absolutely for sure. I wouldn't want, you know, anything to be withheld in that regard. I don't want there to be any intimation that I would not want that there. I want you to be able to see exactly what the

page 120

contract said. So...

401, 402, 403 irrelevant and confusing

Merck response: withdrawn