**Plaintiff's Omnibus Response to Defendant's Objections to Deposition Testimony Designation of Dr. Gregory Curfman, MD**

**Introduction**

Plaintiff notes that she received Defendant Merck's objections to her designation of testimony from Dr. Gregory Curfman's deposition yesterday (January 29) at about 9:00 p.m. This is not to suggest that Defendant has been remiss in responding to Plaintiff's depositions designations, because this has not been the case. Indeed, both sides have worked long hours in the past week to complete the process of identifying and objecting to designations. Plaintiff raises this point about receipt of these objections only to reserve the opportunity to argue her objections orally, at the February 3, 2006 hearing, to the extent permitted by the Court.

**I.      Witness's Background**

Dr. Gregory Curfman, MD, has served as the executive editor of the New England Journal of Medicine for nearly six (6) years. (13:15) Prior to that, he served as deputy editor of the Journal for fourteen (14) years. (13:18-19) Dr. Curfman is board-certified in internal and cardiovascular medicine. (16:8-11) Dr. Curfman was the Executive Editor for the Journal during the time that the VIGOR article was reviewed and published. (21:14-17) Dr. Curfman attended all the editorial meetings at which the VIGOR article was discussed. (21:15-16) In addition, Dr. Curfman was the primary in-house editor for the APPROVe study. (22:4-6)

**II.     Defendant's Objections to Plaintiff's Designations**

Defendant's objections to Plaintiff's designations for Dr. Curfman deposition are confusing to say the least. Objections are layered one upon another, so that many passages are subject to a perplexing babushka doll of challenges. (See, e.g, p. 5 of Plaintiff's affirmative designation). This method of objecting makes it exceedingly difficult for Plaintiff to respond--

1

coherently--directly on the designation.  Simply put, there is not sufficient space to do so.

In the interest of clarity, Plaintiff will addresses the objections which are most frequently asserted.  Where appropriate, and where possible, Plaintiff will respond directly on the designation.

A.    **"Beyond the Scope"**

Defendant objects to wide swathes of Plaintiff's designation on the grounds that the testimony is beyond the scope of the deposition notice as set forth in "Schedule A."  (Attached hereto as Exhibit "A").  Schedule A identifies two (2) items of examination: 1) the publication of the VIGOR article; and 2) the publication of the APPROVe article.  Notwithstanding these broad categories of examination, Defendant repeatedly urges the nebulous objection "beyond the scope" to questions which plainly relate to the publication of these articles.  By way of example, Defendant identifies the following topics as beyond the scope of the "items of examination":

♦        Whether or not the Journal relies on the honesty and candor of authors with respect to the veracity of their findings in a manuscript submitted for review  (4);

♦        Whether Dr. Curfman recognizes the names of Dr. Alise Reicin and Dr. Deborah Shapiro as the two Merck authors on the VIGOR study (13);

♦        Whether information about a possible mechanism by which Vioxx causes higher cardiovascular event rates, as demonstrated in the VIGOR trial, would have been relevant to the readers of the Journal (20);

♦        Whether the authors of the VIGOR study disclosed to the editors that they were collecting data on the endpoint serious thromboembolic adverse events (22);

♦        Whether the increased risk for cardiovascular events seen in the VIGOR trail

2

would have been of interest to the readers of the Journal (24);

♦     Dr. Curfman's role in the review process of the VIGOR article following receipt
      of the manuscript by the Journal (25);

♦     Whether or not there was general agreement among the editors of the Journal that
      the 18-month hypothesis asserted in the APPROVe article was not credible (28);

♦     Whether or not Dr. Curfman insisted on a particular change to the APPROVe
      article (29).

As invoked by Defendant, the "beyond the scope" objection is essentially meaningless.
The scattershot use of this objection, to questions which are clearly within the scope of Schedule
A, is pointless at best and obstructionist at worst.

**B.     Leading**

Defendant peppered Plaintiff's designation with "leading" objections, based on F.R.E.
611, which prohibits the use of leading questions on direct examination of a witness. But this
rule also plainly allows the use of leading questions "as may be necessary to develop the
witness' testimony."

Dr. Curfman is not a hired Plaintiff's expert. His deposition was taken on short notice
and under strict time limits. Some permissible leading questions were necessary to develop Dr.
Curfman's testimony expeditiously.

**C.     Lack of Foundation and Improper Expert Opinion**

Defendant objects to a number of questions on the basis that the witness's answer lacks
foundation or that it contains an improper expert opinion. Often these objections are leveled at
that same question and/or answer. Defendant urges that, because Dr. Curfman's deposition was

taken as a fact witness, he ought not be permitted to offer expert opinions.  Defendant also
repeatedly invokes rule 602 with regard to questions, in response to which Dr. Curfman plainly
offers answers based on his direct, personal knowledge.

These objections ignore the fact that Dr. Curfman will--of necessity--offer testimony
based upon his expertise.  Dr. Curfman is a medical doctor, a researcher and has been the editor
of the most prestigious medical journal in the world for more than 20 years.  When he answers
questions about what readers of the Journal expect, he does so as the editor, as a physician and as
a researcher.  That this answer is based upon his expertise and experience does not mean it is not
fact testimony.

For example, Defendant objects to the following question and answer under F.R.E. 403,
602, 611 and 702:

Q:      "Do tracked changes show when deletions or insertions are made to a
manuscript?"

A:      "That's correct."  (5)

Plaintiff is at a loss as to how to respond to these multiple objections.  Does the witness lack the
requisite personal knowledge to answer the question?  (602)  It would seem not, based upon his
20 years experience as an editor of the Journal.  Is this an impermissible expert opinion?  (702)
Obviously not, as the witness is simply answering based upon his knowledge of how manuscripts
are reviewed at the Journal.

This begs the question why Defendant raised the objections in the first place.  It appears
the confusion is related to the fact Dr. Curfman is qualified to render expert opinions, based upon
his education, experience and skill.  But just because a witness possesses the qualifications to be

an expert does not mean, *ipso facto*, that all testimony he offers is expert opinion testimony.



## SCHEDULE A

The definitions set forth in Exhibit B to subpoena for production of documents to Massachuseetts Medical Society are incorporated as if fully set forth herein. In additon, plaintiff requests that the Massachuseetts Medical Society produce one or more officers, directors, managing agents, or other persons to testify to the following items of examination.

## ITEMS OF EXAMINATION

1. The publication of Bombardier, C., *et al,* Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis, New England Journal of Medicine, 2000; Vol. 343, No. 21, 1520-8 (November 23, 2000), ("VIGOR")including:

    a. Contents of a disk submitted by the authors with the draft manuscript on or about May 18, 2000;
    b. Whether the contents of the above-referenced disk were reviewed or known by any person employed by MMS on or before November 23, 2000;
    c. Circumstances under which any employee of MMS first learned of the contents of the above-referenced disk, including identity of such person(s) and date when such person(s) learned of the contents;
    d. Whether any employee(s) of MMS obtained information about rates and/or absolute numbers of cardiovascular adverse events in the VIGOR study from any source other than the author(s), on or before November 23, 2000, and if so, who obtained such information and what information was obtained;
    e. Telephone and in-person conversations between any employee(s) of MMS and any author(s) of the above referenced article;
    f. Written correspondence between any employee(s) of MMS and any author(s) of the above referenced article;
    g. Rules and guidelines for authors in submitting manuscripts for review; and
    h. Number of reprints of the article distributed by MMS in each year from 2000 to the present.

2. The publication of Bresalier, R.S., *et al,* Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial, New England Journal of Medicine, 2005; Vol. 352, 1092 (Feb 17, 2005) ("APPROVe") including:

    a. A reference to the suggestion to delete investigator-reported events froma table in the draft APPROVe manuscript submitted to MMS on or about February 6, 2005;
    b. Whether information was or was not conveyed by any author(s) to any employee(s) of MMS regarding investigator-reported events in APPROVe, on or before February 15, 2005, including but not limited to (1) stated reasons why investigator-reported data were deleted; (2) statistical significance of relative risk of investigator-reported events for Vioxx v. placebo during the 0-18 month and 19-36 month segments of APPROVe; (3) results of Cox proportional hazard testing of investigator-reported events; (4) Kaplan-Meier plot of incidence of investigator-reported events; and (5) similarities and/or differences between the

adverse events which comprised the "investigator-reported" and "confirmed thrombotic" endpoints in APPROVe;

c. Telephone and in-person conversations between any employee(s) of MMS and any author(s) of the above referenced article, including but not limited to conversations between the inclusive dates of February 9 and February 15, 2005;

d. Handwritten notes of any telephone and/or in-person conversations within the scope of paragraph 2c, above, which the deponent is directed to produce before, or at the time of the deposition;

e. Rules and guidelines for authors in submitting manuscripts for review; and

f. Written correspondence between any employee(s) of MMS and any author(s) of the above referenced article.

= Δ Objections.

curfman plaintiff affirmatives 1_20.txt
Annotations Report [Vioxx]

[12:13] - [12:14] 12/5/2005 Curfman - 11.21.2005

page 12
13      Q.  Good morning, Dr. Curfman.
14      A.  Good morning.

[13:11] - [13:19] 12/5/2005 Curfman - 11.21.2005

page 13
11      Q.  And what is your current employment, sir?
12      A.  I am the executive editor of The New
13  England Journal of Medicine.
14      Q.  How long have you held that position?
15      A.  Since July of 2000.
16      Q.  Did you have prior positions at New England
17  Journal?
18      A.  For the previous 14 years I was a deputy
19  editor at The New England Journal.

[13:20] - [14:5] 12/5/2005 Curfman - 11.21.2005

page 13
20      Q.  What is the role of a deputy editor?
21      A.  Deputy editor is an in-house editor who is
22  involved in editing manuscripts, reviewing
23  manuscripts, medical data, and moving those
24  manuscripts to publication in The New England
page 14
1   Journal.
2               Deputy editor also is involved in
3   soliciting editorial articles to comment on the
4   original scientific work and to -- is involved in
5   bringing articles into The Journal.

[14:19] - [15:2] 12/5/2005 Curfman - 11.21.2005

page 14
19      Q.  And what is the current circulation of The
20  New England Journal?
21      A.  196,000.
22      Q.  Has that been fairly steady over the past
23  several years?
24      A.  Yes, it has.
page 15
1       Q.  Is the circulation mostly doctors?
2       A.  Predominantly physicians.

[15:3] - [15:22] 12/5/2005 Curfman - 11.21.2005

page 15
3               we do have a website that is accessed
                            Page 1

Plaintiff's
response

Plaintiff reserves
right to supple-
ment responses
to objections,
orally, during
Feb. 3, 2006
hearing, to the
extent permitted
by the Court.

curfman plaintiff affirmatives 1_20.txt

4   by other members of the -- of the wider community,
5   including the general public.
6       Q.  What's the term "impact factor" mean?
7       A.  "Impact factor" is a measure of how
8   frequently articles published in The Journal are
9   cited in other journals.
10              So it is a measure of how important
11  other members of the medical research community
12  regard those articles.
13      Q.  Where does The New England Journal rank in
14  the hierarchy of impact factors of peer-reviewed
15  journals?
16      A.  Among clinical medical journals, The New
17  England Journal of Medicine is at the top of that
18  ranking.
19              The most current listing of The
20  Journal's impact factor is 38, approximately 38, 38
21  and change, which is the highest impact factor of
22  the clinical medical journals.


[15:23] - [16:2] 12/5/2005 Curfman - 11.21.2005


page 15
23      Q.  Has The Journal's impact been at the top of
24  the hierarchy consistently over the past several
page 16
1   years?
2       A.  Yes, it has.


[16:6] - [16:11] 12/5/2005 Curfman - 11.21.2005


page 16
6       Q.  Do you have a background in any particular
7   field of medicine?
8       A.  I am a board-certified internist.  I was
9   board-certified in 1974, and I am a board-certified
10  physician in cardiovascular medicine, cardiology,
11  board-certified in 1977.


[20:22] - [22:1] 12/5/2005 Curfman - 11.21.2005


page 20
22              Is it -- how would you characterize the
23  role you had in the review process concerning the
24  VIGOR study in the year 2000?
page 21
1       A.  Well, each manuscript that is submitted to
2   The Journal is assigned to an editor, an associate
3   editor, who's job it is to handle that article
4   through the review process.
5               In addition, that associate editor is
6   teamed with a deputy editor.  So there are two
7   editors who work in tandem to handle the article
8   through the review process.
9               I was not either the associate editor
10  nor the deputy editor on the VIGOR article.
11              During the time that the VIGOR

Page 2

[handwritten annotations:]
optional completeness:
16:12-18.

Not required per
32(a)(4) F.R.C.P.

BEYOND
SCOPE

overruled

Beyond the
Scope of What?
Witness is answering
an appropriate question

curfman plaintiff affirmatives 1_20.txt
12 manuscript was being handled in our office, between
13 May and July, I was still a deputy editor.
14            In July, I became the executive editor.
15 So it was during the time that the VIGOR article
16 was being reviewed that I had a change in my
17 position.
18            I did, however, attend all of the
19 editorial meetings where the VIGOR article was
20 discussed.  I was a part of those discussions.
21            I had the opportunity to express
22 opinions about the manuscript and the data, and so
23 I was a part of the process in that sense, but I
24 was not the primary editor who was responsible for
page 22
1  taking that article through the process.


[22:2] - [22:14] 12/5/2005 Curfman - 11.21.2005


page 22
2       Q.  Could you describe the role that you had in
3  the review process concerning the APPROVe study?
4       A.  For the APPROVe article, I was the primary
5  in-house editor responsible for taking that article
6  through the process.
7            So I selected the reviewers,
8  communicated with the reviewers, had the article
9  reviewed, communicated back with the corresponding
10 author, Dr. John Baron.  I had many discussions
11 with Dr. Baron about the article.
12            I carried it through the revision
13 process and carried it to the point of presenting
14 it to the editor-in-chief for final approval.


[23:2] - [24:12] 12/5/2005 Curfman - 11.21.2005


page 23
2       Q.  Dr. Curfman, marked as Exhibit 2 is a
3  document bearing the heading of "The New England
4  Journal of Medicine," entitled "Information For
5  Authors," dated January 6, 2000.
6            Are you familiar with this document?
7       A.  Yes, I am.
8       Q.  Does this document express the policy of
9  The New England Journal of Medicine as of the year
10 2000?
11      A.  Yes, that's correct, in terms of the
12 submission of manuscripts.
13      Q.  Directing your attention to the second full
14 paragraph on the left-hand side under the heading
15 "Manuscripts," there is a statement, "A covering
16 letter signed by all authors should identify the
17 person, with the address and telephone number,
18 responsible for negotiations concerning the
19 manuscript.  The letter should make it clear that
20 the final manuscript has been seen and approved by
21 all authors and that they have taken due care to
22 ensure the integrity of the work ."
23            Was that part of the policy of The New
24 England Journal of Medicine in the year 2000?
                                          Page 3



Obj: overruled
page 602, 401

curfman plaintiff affirmatives 1_20.txt

page 24
1    A.  Yes.
2    Q.  And with respect to that quoted language,
3  what does the phrase "ensure the integrity of the
4  work" mean?
5    A.  "The integrity of the work" refers to the
6  accuracy of the work, the completeness of the data,
7  and the conclusions flowing from the data being
8  appropriate and accurate.
9    Q.  Does the phrase "ensure the integrity of
10  the work" include ensuring that the actual data are
11  accurately presented in the manuscript?
12    A.  Yes.

[26:3] - [26:7] 12/5/2005 Curfman - 11.21.2005

page 26
3    Q.  Does The Journal, as any peer-review
4  journal, rely on the honesty and candor of authors
5  with respect to the veracity of their findings in a
6  manuscript submitted for review?
7    A.  Absolutely.

[26:8] - [26:10] 12/5/2005 Curfman - 11.21.2005

page 26
8    Q.  Can you please explain the statement in
9  this editorial concerning the best interests of
10  sick patients?

[26:17] - [27:4] 12/5/2005 Curfman - 11.21.2005

page 26
17    A.  The ultimate purpose of our journal, the
18  mission of our journal is to provide information to
19  the healthcare community so that they can take care
20  of people that are sick.
21          Very much in the back of our minds
22  every day that we do our work is that we are
23  dealing with people who are ill.  We are dealing
24  with illnesses.  We are dealing with human lives.
page 27
1  Human suffering.  That's all in the background of
2  our thinking, and our mission is to try to publish
3  information that is going to be helpful to people
4  who are sick.

[27:5] - [27:8] 12/5/2005 Curfman - 11.21.2005

page 27
5    Q.  Does that mission make it important for the
6  information in The Journal to be accurate?
7    A.  It is essential that it be accurate and
8  complete and free of errors.

Page 4

Relevant to
his fact
testimony.

OUTSIDE
SCOPE

A objection
•602
•701/ improper expert
702 testimony
Witness is the editor of
NEJM. Sufficient founda-
tion.

611
(Deletes leading
question that follows
26:11-15)

•611 -
leading question before
this answer.

Permissible
leading question
611 (c)

611

611(c)



*page Overruled*

curfman plaintiff affirmatives 1_20.txt

[27:9] - [27:11] 12/5/2005 Curfman - 11.21.2005

page 27
9           Errors can be harmful to patients.  So
10  it's a very meticulous operation that we try to
11  run.                                              611

[59:8] - [59:22] 12/5/2005 Curfman - 11.21.2005

page 59
8           Q.  Dr. Curfman, please take a look at what has
9   been marked as Exhibit 14, that has been Bates-
10  stamped 2000 NEJM 000235 through 282, and can you
11  tell me if this is an accurate copy of the May 2000
12  draft of the VIGOR study that you observed at the
13  time you reviewed the contents of the diskette in
14  October 2004, as you've testified earlier?
15          A.  Yes, it is.
16          Q.  You'll notice that we talked a little
17  before the break about the word "tracked changes."
18              Do tracked changes show when deletions
19  or insertions are made to a manuscript?
20          A.  That's correct.
21          Q.  Do they show, with manipulation of the
22  program, who made them and when?

Relevant exposition for his fact testimony.

OUTSIDE SCOPE

403, 602, 702, 611
Misleading

Sufficient foundation.
Not an expert opinion
Unclear how this testimony is misleading.

[59:24] 12/5/2005 Curfman - 11.21.2005

page 59
24          A.  Yes, it can do that.

[60:1] - [60:10] 12/5/2005 Curfman - 11.21.2005

page 60
1           Q.  And is that done by using the mouse to
2   hover over a specific insertion or deletion --
3           A.  Yes.
4           Q.  -- until some information appears on the
5   screen showing that a particular insertion or
6   deletion was made at a particular time by a
7   particular person?
8           A.  Right.  So it tracks the change and also
9   the individual and the time and date when the
10  change was made.

[60:11] - [61:2] 12/5/2005 Curfman - 11.21.2005

page 60
11          Q.  Now, when you observed this document on
12  screen in October 2004, did you observe that there
13  had been deletions with respect to the text that we
14  looked at earlier?
15              In particular, if you look at Page 251,
                    Page 5

611 - confusing, reading

curfman plaintiff affirmatives 1_20.txt
16  under the general "Safety Heading," do you see that
17  there is a reference to "Deleted:  8 and 0 patients
18  with myocardial infarction in the rofecoxib and
19  naproxen treatment groups respectively"?
20      A.  Yes.
21      Q.  And do you see that in the next sentence
22  the information that was deleted refers to the
23  absolute numbers of myocardial infarctions in the
24  nonaspirin indicated group, 9 for rofecoxib and 4
page 61
1  for naproxen?
2      A.  Yes, I do.

[61:10] - [61:11] 12/5/2005 Curfman - 11.21.2005

page 61
10     Q.  Okay.  Let's look at the Table 5 on the
11  last page, that's 282.

[61:18] - [62:4] 12/5/2005 Curfman - 11.21.2005

page 61
18     Q.  And does this Table 5 on the last page,
19  282, show "deleted" at the top?
20     A.  Yes, it does.
21     Q.  And does it show tracked change indicating
22  that the deletion was made by Merck?
23     A.  That's correct.
24     Q.  Does it show that the deletion was made by
page 62
1  Merck on May 16, 200 at 8:02 p.m.?
2      A.  Correct.
3      Q.  And what was the content of Table 5 that
4  was deleted?

[62:6] - [62:19] 12/5/2005 Curfman - 11.21.2005

page 62
6      A.  Well, as you can see, this was a table that
7  never -- well, what we have in front of us is -- I
8  interpret this as a table that had been proposed,
9  but the data themselves had not been entered into a
10  table.
11           In the highlighted area, the yellow
12  highlighting, in Footnote No. 1, I think that we
13  can conclude that these were the data categories
14  that would have been included in this table had the
15  data been introduced into the table, but what we
16  had in this May version was an incompleted table.
17      Q.  And in particular, Table 5 referred to
18  cardiovascular events; is that correct?
19      A.  That's the title of the events, yes.

[62:20] - [63:10] 12/5/2005 Curfman - 11.21.2005

*Overruled*

curfman plaintiff affirmatives 1_20.txt

page 62
20      Q.  The legend beneath what would have been
21 Table 5 states that it "Includes sudden death,
22 unknown cause of the death, fatal MI, fatal stroke
23 (hemorrhagic or ischemic), fatal subarachnoid
24 hemorrhage, fatal primary intracranial hemorrhage
page 63
1 and fatal GI bleeding episode," correct?
2      A.  That's right.
3      Q.  And underneath that, Footnote 2 states,
4 "Includes serious adjudicated fatal and nonfatal
5 MI," correct?
6      A.  Right.
7      Q.  And underneath that, "Includes serious
8 adjudicated fatal and nonfatal ischemic
9 cerebrovascular accidents."
10     A.  Correct.

*Cell-leading.*

*Permissible per 611 (c)*

[63:16] - [63:20] 12/5/2005 Curfman - 11.21.2005

page 63
16     Q.  Okay.  Do you see there is another
17 reference to the deletion of Table 5,
18 "Cardiovascular Events," from Page 266 at the
19 bottom?
20     A.  Yes, I do.

[64:22] - [65:5] 12/5/2005 Curfman - 11.21.2005

page 64
22     Q.  Just above the midpoint of the text, there
23 is a reference, "Deleted:  (Table 5)."
24            Do you see that?
page 65
1      A.  Right, yes, uh-huh.
2      Q.  And does that refer to the sentence -- you
3 can see where the tracked change comes from by
4 following the dotted line; is that right?
5      A.  That's right.

[65:6] - [65:10] 12/5/2005 Curfman - 11.21.2005

page 65
6      Q.  So the deletion of Table 5 as a reference
7 followed the statement about the percentages of
8 myocardial infarctions in the Vioxx and naproxen
9 groups, correct?
10     A.  That's right.

[65:11] - [65:18] 12/5/2005 Curfman - 11.21.2005

page 65
11     Q.  Now, turning to Page 252, the next page, do
12 you see that there is, in the first full paragraph
13 after the first sentence, a reference to Table 5
                                        Page 7

*Overruled* ✗

curfman plaintiff affirmatives 1_20.txt
14  which includes GI endpoints?
15      A.  (Nodding.)
16      Q.  And do you see that what was deleted there
17  is the number "6"?
18      A.  Correct.

[65:19] - [65:23] 12/5/2005 Curfman - 11.21.2005


page 65
19      Q.  Does that indicate to you that what was
20  changed is that the GI endpoints had been Table 6,
21  and that was changed to Table 5?
22      A.  Right.  When Table 5 was removed, Table 6
23  became Table 5.


[66:7] - [66:12] 12/5/2005 Curfman - 11.21.2005


page 66
7           Do you see, looking at Exhibit 15, the
8  deleted and inserted text that the, "8 and 0
9  patients with myocardial infarctions in the
10 rofecoxib and naproxen groups," states, "Merck, May
11 17, 2000, 11:20 a.m., deleted"?
12      A.  Yes, I do.

*611 - leading*
*Same response*

[66:13] - [66:17] 12/5/2005 Curfman - 11.21.2005


page 66
13      Q.  And is that something that you are able to
14  see by manipulating the mouse in a similar fashion
15  when the computer screen showed you this -- these
16  tracked changes?
17      A.  That's right.

*611 (leading) cont.*
*Same response*

[66:19] - [66:23] 12/5/2005 Curfman - 11.21.2005


page 66
19      Q.  And, Doctor, on Exhibit 16, do you see that
20  there's similar reference to the tracked change
21  deleting the absolute numbers 9 and 4 that states,
22  "Merck, May 17, 2000, 11:21 a.m., deleted"?
23      A.  Yes.

*Also - 463 - misleading - the authors submitted the manuscript in track changes; he does not need to "manipulate" text to see track changes. Simply describing the process.*

[66:24] - [67:3] 12/5/2005 Curfman - 11.21.2005


page 66
24      Q.  Doctor, I think you had previously
page 67
1  indicated that the letter submitting the VIGOR
2  manuscript from Dr. Bombardier was dated May 18,
3  2000; is that correct?

                                Page 8

*No answer provided; strike question & an answer*

*Answer follows at 67:8*

*Sustained* ✗



overruled

curfman plaintiff affirmatives 1_20.txt
[67:6] - [67:19] 12/5/2005 Curfman - 11.21.2005

page 67
6       Q.  Is Exhibit 9 the letter that initially sent
7   the VIGOR article --
8       A.  Yes, that's correct, May 18, 2000.
9       Q.  Does that indicate to you that the
10  deletions that we just looked at, referring to
11  Table 5, and the absolute numbers of data, were
12  made on May 16 and 17, one day or two days before
13  the manuscript was sent to you for review?
14      A.  That's correct.
15      Q.  If someone were to testify that any of
16  these deletions were made at the request of The New
17  England Journal, that would not be correct, would
18  it?
19      A.  That would not be correct.

[67:20] - [67:24] 12/5/2005 Curfman - 11.21.2005

page 67
20      Q.  Did Table 5 include a wider array of events
21  relating to the cardiovascular system and
22  cerebrovascular system than the reference to
23  myocardial infarctions in the version that was
24  submitted to The Journal and ultimately published?

[68:2] - [68:6] 12/5/2005 Curfman - 11.21.2005

page 68
2       A.  Yes.  It is a wider array of cardiovascular
3   endpoints that was included in the text.
4       Q.  Would the information about those endpoints
5   have been of interest to The New England Journal's
6   readers?

[68:9] - [68:11] 12/5/2005 Curfman - 11.21.2005

page 68
9       A.  Yes.  This would have been of interest to
10  The New England Journal readers.
11      Q.  Why is that?

[68:13] - [68:22] 12/5/2005 Curfman - 11.21.2005

page 68
13      A.  All of these endpoints relate in one way or
14  another to the cardiovascular system, and the data
15  in the text relate to a segment of the
16  cardiovascular system; namely, the coronary
17  arteries; but one that thinks about the vascular
18  system would also want to know about other parts of
19  the vascular system in relation to these endpoints.
20      Q.  Was that information referenced in Table 5

Page 9

Handwritten annotations:
→ permissible per 611(c)
- 611 - leading
- witness speculating
- mischaracterizes previous testimony re: when Table 5 was deleted 61:24-62:2
Dr. Curfman is the editor. He has a basis to know this and is answering the questions.
• 602, 611 (leading)
- witness speculating -- he testified that he thought Table 5 was an incomplete table (See 62:11-16)
602
OUTSIDE SCOPE
-opinion based; NOT factually based
- would need to rebut with evidence of bias.
This is fact testimony about the NEJM, from a reliable source, the editor.

curfman plaintiff affirmatives 1_20.txt

21  relevant to the consideration of the risks and
22  benefits of the drug?


[68:24] - [69:1] 12/5/2005 Curfman - 11.21.2005


page 68
24      A.  Yes.  My judgment would be that it would be
page 69
1  relevant.


[69:3] - [69:5] 12/5/2005 Curfman - 11.21.2005


page 69
3       Q.  Dr. Curfman, the exhibit marked No. 17 is a
4  draft of the VIGOR study with the Bates pages
5  MRK-AAB 0109378 through 411.


[69:22] - [70:1] 12/5/2005 Curfman - 11.21.2005


page 69
22      Q.  Do you see at Page 9402 that Table 5,
23  "Cardiovascular Events," was actually part of this
24  draft?
page 70
1       A.  Yes, I see that.


[70:2] - [70:7] 12/5/2005 Curfman - 11.21.2005


page 70
2       Q.  And do you see that Table 5 includes the
3  same legend beneath the table for the events that
4  were being included, such as sudden death, unknown
5  cause of the death, fatal MI, fatal stroke,
6  et cetera?
7       A.  Yes, I do.


[70:8] - [70:23] 12/5/2005 Curfman - 11.21.2005


page 70
8       Q.  Now, do you see that the cardiovascular --
9  first of all, do you see, for MI in the rofecoxib
10  versus naproxen group, the totals were 17 versus 4?
11      A.  Right.
12      Q.  And do those totals match up to the
13  absolute numbers that had been deleted; namely, 8
14  versus 0 in the aspirin-indicated and 9 versus 4 in
15  the nonaspirin-indicated?
16      A.  That's correct.
17      Q.  Do you see that the difference in 95
18  percent confidence interval are stated in an
19  inverted fashion rather than a relative risk of
20  Vioxx greater than naproxen?  It is stated
21  inversely, with the relative risk of naproxen less
                          Page 10

*Handwritten annotations in right margin:*
602 cont. OUTSIDE SCOPE cont. (opinion based)
Answering as a physician and editor.
611 - leading permissible per 611(c)
Same response
611 - leading
OUTSIDE SCOPE



curfman plaintiff affirmatives 1_20.txt

```
22  than Vioxx?
23       A.  That's correct.


[71:1] - [71:7] 12/5/2005 Curfman - 11.21.2005


page 71
1        Q.  And with that inverted format, is it
2   correct that according to the way scientists
3   interpret statistical significance, if the upper
4   bound of the confidence interval does not include
5   1.0, that would be interpreted as a significant
6   finding; is that correct?
7        A.  That's correct.


[71:9] - [71:18] 12/5/2005 Curfman - 11.21.2005


page 71
9        Q.  Is it correct then that the 17 versus 4
10  with the 0.3 and 0.07 to 0.57 would be considered a
11  significant -- statistically significant result?
12       A.  Correct.
13       Q.  Going one line above that, to the total of
14  cardiovascular deaths, nonfatal MI or CVA,
15  cerebrovascular accident, do you see that the
16  totals there 32 for rofecoxib or Vioxx versus 17
17  for naproxen?
18       A.  Yes.


[71:19] - [72:1] 12/5/2005 Curfman - 11.21.2005


page 71
19       Q.  And then in -- the difference in 95 percent
20  confidence interval, do you see that the result is
21  0.4 with the confidence interval of 0.01 to 0.73?
22       A.  Yes, I see that.
23       Q.  And, again, is that a statistically
24  significant result with the upper bounds lower than
page 72
1   1.0?


[72:3] - [72:7] 12/5/2005 Curfman - 11.21.2005


page 72
3        A.  Yes.
4        Q.  I take it you have never seen the data in
5   this Table 5 before today?
6        A.  No.
7        Q.  You have not?


[72:8] 12/5/2005 Curfman - 11.21.2005


page 72
8        A.  I have not, correct.
```

Page 11

Handwritten annotations: Overruled. 611 cont. leading. 611(c). Same response as previously stated. OUTSIDE SCOPE. OUTSIDE SCOPE. Also repetitive, asked + answered. Different question. Asking about data from Table 5.

*Overruled* (handwritten)

curfman plaintiff affirmatives 1_20.txt

[73:14] - [73:18] 12/5/2005 Curfman - 11.21.2005


page 73
14      Q.  Would it be consistent with your
15  understanding to state that the test applied here
16  shows a statistically significant result for the
17  difference between Vioxx and naproxen?
18      A.  Yes.


[73:24] - [74:4] 12/5/2005 Curfman - 11.21.2005


page 73
24      Q.  In particular, to make the record clear, is
page 74
1   it correct that Table 5 shows a statistically
2   significant result for the difference between Vioxx
3   and naproxen for myocardial infarction?
4       A.  Right.


[74:5] - [74:10] 12/5/2005 Curfman - 11.21.2005


page 74
5       Q.  Is it -- does the Table 5 show a
6   statistically significant result for the difference
7   between Vioxx and naproxen for the composite
8   endpoints of cardiovascular deaths, nonfatal MI or
9   CVA?
10      A.  Correct.


[74:11] - [74:24] 12/5/2005 Curfman - 11.21.2005


page 74
11      Q.  I believe I was about to direct your
12  attention to Page 12 of this draft, which has the
13  Bates Page 9389 at the end.
14      A.  Right.
15      Q.  And do you see that in the -- about six or
16  seven lines down, there is the same reference to
17  the text that we have seen previously about the
18  percentages of myocardial infarctions, but that
19  there is a reference to Table 5 following that
20  sentence?
21      A.  Yes.
22      Q.  And that was later deleted, correct, before
23  you saw it?
24      A.  Before we saw it, yes.


[75:1] - [75:9] 12/5/2005 Curfman - 11.21.2005


page 75
1       Q.  And then just to close that loop, if you
2   look at the top of Page 13, do you see that the GI
                    Page 12

(handwritten annotations in right margin:)
611
611(c)
OUTSIDE SCOPE
going beyond the specific factual contents of what was on the disk
Same response

Repetitive asked + answered

Eliminate commentary. OUTSIDE SCOPE



curfman plaintiff affirmatives 1_20.txt
```
3  endpoints table that we looked at that had been
4  changed from Table 6 to Table 5 still appears as
5  Table 6 in this draft?
6     A.  That's correct.
7     Q.  To the best of your knowledge, has anyone
8  at The New England Journal seen the data in Table 5
9  before today?
```

[75:10] - [75:19] 12/5/2005 Curfman - 11.21.2005

page 75
```
10     A.  Not to my knowledge.
11     Q.  It would not be correct that anyone at the
12  New England Journal told the authors to take out
13  any such information from the article?
14     A.  No.  No one at New England Journal told
15  them to take this out.
16     Q.  Would it be fair to say just the opposite,
17  that this would have been the type of information
18  that the editors at The New England Journal would
19  have wanted to see in their review of the article?
```

[75:21] - [75:22] 12/5/2005 Curfman - 11.21.2005

page 75
```
21     A.  Yes.  I would have wanted to see these
22  data.
```

[75:24] - [76:5] 12/5/2005 Curfman - 11.21.2005

page 75
```
24     Q.  Now, Doctor, Exhibit 18 is a memo from
```
page 76
```
1  Deborah Shapiro to Alise Reicin and others dated
2  July 5, 2000.
3         Do you recognize the names of Shapiro
4  and Reicin as the two Merck authors on the VIGOR
5  study?
```

[76:6] 12/5/2005 Curfman - 11.21.2005

page 76
```
6     A.  Yes, I do.
```

[76:18] - [77:1] 12/5/2005 Curfman - 11.21.2005

page 76
```
18     Q.  Could you take a look at Table 7, which is
19  on Pages 9 and 10 of the document.  You have to use
20  the column headings from Page 9 to follow the
21  information onto Page 10.
22         But do you see that there is
23  information in this document dated July 5, 2000
```
Page 13

*Overruled* [handwritten]

curfman plaintiff affirmatives 1_20.txt
24  concerning the number of patients with different
page 77
1  adverse events?

OUT OF SCOPE [handwritten, boxed]

[77:4] - [77:8] 12/5/2005 Curfman - 11.21.2005

·611 — leading witness [handwritten]
·602 — testifying about internal Merck document he has not seen + does't have knowledge of —

page 77
4       A.  Yes, sorry.
5       Q.  And under the "Aspirin Indicated" row on
6  Page 9, do you see the MI listing of 8 versus 0 for
7  rofecoxib versus naproxen?
8       A.  Yes, I do.

[77:9] - [77:20] 12/5/2005 Curfman - 11.21.2005

—Object to all testimony re: July 5 memo. [handwritten]

page 77
9       Q.  And there, do you see that the -- on Page
10  10, the "Aspirin Not Indicated" group MI row shows
11  12 for Vioxx and 4 for naproxen?
12       A.  That's correct.
13       Q.  Now, the data that had been in the deleted
14  text from the May 2000 version showed 9 versus 4
15  for the nonaspirin-indicated; is that correct?
16       A.  That's correct.
17       Q.  And by July 5, 2000, the data of the Merck
18  authors showed that those numbers were 12 versus 4;
19  is that correct?
20       A.  That's correct.

[77:21] - [78:6] 12/5/2005 Curfman - 11.21.2005

page 77
21       Q.  Now, in the manuscript, it was stated that
22  the incidence difference was .2 versus .1 for the
23  nonaspirin-indicated for MI; do you recall that?
24       A.  Yes, I do.
page 78
1       Q.  Does the increase from 9 to 4 to 12 to 4
2  increase the relative risk to 3?
3       A.  Yes.  It is indicated here as .33 because,
4  again, it is being looked at in the reverse way
5  that you mentioned, but the relative risk estimate
6  is .33 as opposed to .2.

[78:7] - [78:17] 12/5/2005 Curfman - 11.21.2005

page 78
7       Q.  And you are looking for the relative risk
8  column on the right-hand side of Pages 9 and 10 of
9  the July 5th, 2000 memo where there is a relative
10  risk for each of the adverse events?
11       A.  Right.
12       Q.  And so the relative risk there is listed as
13  0.33, which would translate into 3 to 1 if the
14  number were inverted --

611 cont [handwritten]
602 cont [handwritten]

Page 14

*Overruled*

OUTSIDE SCOPE cont.

```
                    curfman plaintiff affirmatives 1_20.txt
15      A.  If they were inverted.
16      Q.  -- for Vioxx versus naproxen?
17      A.  That's right.


[80:20] - [81:3] 12/5/2005 Curfman - 11.21.2005


page 80
20      Q.  Considering the severity of the endpoint,
21  myocardial infarction, and the fact that there was
22  additional data showing a larger number than
23  initially represented in the manuscript submitted
24  to The Journal, would it have been of interest to
page 81
1   readers of The Journal to know that the results for
2   the nonaspirin-indicated group achieved a level
3   that was at least borderline significant?


[81:5] - [81:9] 12/5/2005 Curfman - 11.21.2005


page 81
5       A.  Oh, absolutely.
6               The difference between 9 MIs and 12 MIs
7   is absolutely of importance and quite relevant, and
8   I certainly would have wanted to have access to
9   these data, absolutely.


[84:14] - [84:16] 12/5/2005 Curfman - 11.21.2005


page 84
14      Q.  Exhibit 20 is a letter dated July 7th,
15  2000, with attachment, from Bombardier to
16  Dr. Kaplan.


[84:17] - [84:18] 12/5/2005 Curfman - 11.21.2005


page 84
17              Have you seen this before?
18      A.  Yes, I have.


[85:13] - [85:23] 12/5/2005 Curfman - 11.21.2005


page 85
13      Q.  Now, at the page ending with 037 under
14  heading 6, there's a reference -- does this appear
15  to be the alternating -- the reviewer's comments
16  and the author's responses?
17      A.  That's right.  The reviewer's comments are
18  in italics and the author's responses are in the
19  Roman type.
20      Q.  Does Paragraph 6 of the author -- of the
21  reviewer comment refer to Table 6 for GI symptoms,
22  and go on to state, "I do not see a Table 6"?
23      A.  That's correct.
                                    Page 15
```

602, 611, 403,
401-402.

leading,
unnecessary
commentary,
prejudicial

*Overruled*

801/802
803(6)



curfman plaintiff affirmatives 1_20.txt

[85:24] - [86:2] 12/5/2005 Curfman - 11.21.2005

page 85
24      Q.  And then the authors state, "We apologize
page 86
1  for the confusion created by the inadvertent
2  reference to Table 6, which never existed."

801
802

803(6)

[87:1] - [87:4] 12/5/2005 Curfman - 11.21.2005

page 87
1      Q.  Sir, do you see at Page 13 of Exhibit 17 in
2  the first full paragraph the GI endpoints are
3  referenced to a Table 6?
4      A.  Right.

OUTSIDE
SCOPE

[87:5] - [87:15] 12/5/2005 Curfman - 11.21.2005

page 87
5      Q.  And then if you look at Page 26 of document
6  which is Merck MRK-AAB 010940, does Table 6 and the
7  data appear on that page?
8      A.  Yes.
9      Q.  And then go back to 14, Exhibit 14.
10  Exhibit 14.
11      A.  14.
12      Q.  At Page 252, do you recall from earlier
13  this morning looking at the first full paragraph
14  where Table No. 6, the number "6" was deleted and
15  was replaced with Table 5?

401-403
611
801-802

repetitive

[87:16] - [87:18] 12/5/2005 Curfman - 11.21.2005

page 87
16      A.  Right.
17      Q.  So it would not be accurate to state on
18  July 17th that Table 6 never existed, would it?

witness
speculation

[87:20] - [87:21] 12/5/2005 Curfman - 11.21.2005

page 87
20      A.  It would not be accurate to make that
21  statement, yes.

[88:6] - [88:11] 12/5/2005 Curfman - 11.21.2005

page 88
6          In fact, Table 6 existed until it was
7  changed into Table 5, when Table 5 was deleted, is
8  that your understanding?

401, 402, 403
602
611
repetitive, leading,
prejudicial

Page 16



curfman plaintiff affirmatives 1_20.txt

9     A. That's right. And that's why the reviewer
10 here was confused, because there was still an
11 allusion to Table 6.

[88:12] - [88:16] 12/5/2005 Curfman - 11.21.2005

page 88
12     Q. Now, at Pages 37 and 38 of the document,
13 going over in response to Comment No. 7 from the
14 reviewer, the authors reiterated and slightly
15 modified the text concerning myocardial infarctions
16 in the ASA and non-ASA-indicated populations.

[88:17] - [88:19] 12/5/2005 Curfman - 11.21.2005

page 88
17              Do you see that? It's Page 9 and 10 of
18 the document ending in 3738 for the Bates range.
19     A. Right.

[88:20] - [89:1] 12/5/2005 Curfman - 11.21.2005

page 88
20     Q. And this document -- if you look at Exhibit
21 18 and compare Exhibit 18, is the July 5 document
22 showing the updated information with 12 events
23 versus 4 rather than the 9 versus 4 previously used
24 that were deleted from the May version, correct?
page 89
1     A. Correct.

[89:2] - [89:6] 12/5/2005 Curfman - 11.21.2005

page 89
2     Q. And the July 17th letter from the authors
3 12 days after this July 5 memo does not anywhere
4 inform The New England Journal of the 12 versus 4
5 figures, does it?
6     A. That's correct.

[89:7] - [89:15] 12/5/2005 Curfman - 11.21.2005

page 89
7     Q. Now, is it The Journal's policy to rely on
8 the manuscript authors to submit true and accurate
9 statements of the data?
10     A. Yes. That is imperative.
11     Q. Do The Journal's readers rely on the truth
12 and accuracy of the authors' statements of the data
13 in making decisions as to treatment of their
14 patients?
15     A. Yes, they do.

Page 17

curfman plaintiff affirmatives 1_20.txt

[89:17] - [90:15] 12/5/2005 Curfman - 11.21.2005

```
page 89
17      Q.  Is it The Journal's policy to require
18  authors to correct the statements in drafts of the
19  articles on the basis of information that becomes
20  known after an initial draft has been submitted?
21      A.  Our expectation is that if there is an
22  important relevant update to a piece of data during
23  the review process, that we would be informed about
24  that update, yes.
page 90
1       Q.  Is it correct that the authors did not
2   inform The New England Journal as to the change
3   from 9 versus 4 to 12 versus 4 in the nonaspirin-
4   indicated patients for Vioxx versus naproxen at any
5   time prior to the publication of the article?
6       A.  Well, not only did they not inform us that
7   the 9 was actually a 12, but you'll recall,
8   Attorney Arbitblit, that none of those data were in
9   the manuscript at all, none of the raw numbers of
10  heart attacks appeared in any version of the
11  manuscript, and therefore, are not in the published
12  article either.
13          So 9 versus 4 was not in there; 8
14  versus 0 was not there; 17 versus 4 was not in
15  there; and certainly 20 versus 4 was not in there.
```

[90:16] - [90:23] 12/5/2005 Curfman - 11.21.2005

```
page 90
16      Q.  Now, on the basis of the difference between
17  the data in the July 5 memo and the published
18  article, would you agree that physicians who read
19  The Journal for accurate information about efficacy
20  and toxicity did not receive accurate information
21  about the relative risk of MI and other
22  cardiovascular events in the Vioxx patients
23  compared to naproxen?
```

[91:1] - [91:2] 12/5/2005 Curfman - 11.21.2005

```
page 91
1       A.  Yes.  The risk would have appeared lower
2   than the real data would support.
```

[91:3] - [92:2] 12/5/2005 Curfman - 11.21.2005

```
page 91
3       Q.  Now, looking at Exhibit 18, the Shapiro
4   memo of July 5, at Page 3, Table 2, do you see that
5   the memo includes data in a category of confirmed
6   adjudicated serious thromboembolic AEs, or adverse
7   events, in VIGOR patients with rheumatoid
8   arthritis?
```

Page 18

BEYOND SCOPE

-611; Nonresponsive answer
-403
-Leading
-repetitive

testifying beyond specified factual bases; need to rebut with evidence of bias

611;
701-703
Improper expert opinion

611 (still leading the witness)
602

*Overruled*

BEYOND
SCOPE
cont

curfman plaintiff affirmatives 1_20.txt

9      A.  Yes.
10     Q.  Now, going to the published article --     } *Tell (response to*
11     A.  Got it.                                      *leading*
12     Q.  -- do you see the statement at the bottom    *question)*
13  left side of Page 1521, going on to the right-hand
14  column, "Because highly selective cyclooxygenase-2
15  inhibitors do not inhibit platelet aggregation,
16  which is mediated by cyclooxygenase-1, there was a
17  possibility that the incidence of thrombotic
18  cardiovascular events would be lower among patients
19  treated with nonselective cyclooxygenase inhibitors
20  than amongst those treated with cyclooxygenase-2
21  selected inhibitors.  Therefore, cardiovascular
22  events were also assessed for a future
23  meta-analysis by independent committees whose
24  members were unaware of the patients' treatment
page 92
1  assignments."
2              Are you familiar with that quote?


[92:3] - [92:9] 12/5/2005 Curfman - 11.21.2005


page 92
3      A.  Yes, I am, uh-huh.
4      Q.  Now, in plain English, does -- would it be       611
5  a fair characterization of that text to -- for a
6  reader to interpret that the rationale for the           602
7  review procedure of cardiovascular events was the
8  possibility of lower CV event rates with COX-1
9  inhibitors?


[92:11] - [92:17] 12/5/2005 Curfman - 11.21.2005


page 92
11     A.  That's correct, yes.
12     Q.  Is that the interpretation that you gave to       611
13  it at the time as an editor, consistent with what
14  you just said, that what was being said here was       602
15  that they started a review procedure because there
16  was a possibility that you would have a lower CV
17  event with a COX-1 inhibiter?


[92:19] - [93:2] 12/5/2005 Curfman - 11.21.2005


page 92
19     A.  Well, that was their stated rationale, yes.
20     Q.  Now, did the authors ever inform The            602
21  Journal, anywhere in the documents, that the reason
22  they began cardiovascular event review was that
23  Merck had found an imbalance of prostacyclin and       611
24  thromboxane in a premarketing study of Vioxx that
page 93
1  gave rise to a concern over possible increased
2  thrombotic events on Vioxx?


[93:4] - [93:20] 12/5/2005 Curfman - 11.21.2005
                    Page 19

*Overruled* (handwritten)

curfman plaintiff affirmatives 1_20.txt

BEYOND SCOPE Cont (handwritten)

Continues with opinion testimony + testimony beyond the limited factual topics specified in schedule A. (handwritten)

page 93
4       A. No.  They never made that point to The
5  Journal.                                          ]— 602 (handwritten)
6       Q. Would such information about a possible
7  mechanism for higher cardiovascular event rates
8  have been relevant to you as an editor of The     401-402 (handwritten)
9  Journal?
10      A. Yes.
11      Q. And why?
12      A. Prostacyclin is a powerful protector of the
13 inside of blood vessels, the vascular endothelium,
14 and a drug that basically knocks that substance out
15 could theoretically result in higher incidences of
16 thrombosis in a blood vessel.
17              So that would be the biologic rationale
18 for thinking about the possibility of an increase
19 in risk with a COX-2 inhibitor as opposed to a
20 reduction in risk with a nonselective NSAID.

[93:23] - [94:2] 12/5/2005 Curfman - 11.21.2005

page 93
23      Q. Would the information about a possible
24 mechanism for higher cardiovascular event rates     602 (handwritten)
page 94
1  have been relevant to the readers of The New        701-703 (handwritten)
2  England Journal of Medicine?
                                                        401-403 (handwritten)

[94:4] - [95:1] 12/5/2005 Curfman - 11.21.2005

page 94
4       A. Yes.  I think, in general, that the
5  published article would have been a better
6  statement if it had acknowledged both
7  possibilities.
8              Again, I get back to the point that I
9  made earlier that, without a placebo arm in this
10 trial, scientifically you really can't know the
11 reason for the difference between the naproxen
12 group and the rofecoxib group in MI rate.  You know
13 there is a difference, but you can't really know --
14 you can't dissect out the reason.
15              So the discussion section would have
16 been a better discussion section in the published
17 article if, instead of making the baldface
18 statement that naproxen was protective, that --
19 that could be mentioned as one possibility, but an
20 equally plausible possibility is that rofecoxib
21 increased the risk of heart attack; and as I said
22 earlier, both things theoretically could have been
23 going on simultaneously.  So the discussion section
24 would have been best framed, I think, if it had
page 95
1  said that.

[95:14] - [95:15] 12/5/2005 Curfman - 11.21.2005
                        Page 20

*Overruled*

curfman plaintiff affirmatives 1_20.txt

**page 95**
14       Q.  Now, looking back to the table in the
15  Shapiro memo.  Is that 18?

[95:18] - [96:5] 12/5/2005 Curfman - 11.21.2005

**page 95**
18  Sorry, let's look at Table 4 on Page 6 of the
19  document, which is MRK-NJ 0272451.
20              Do you see that there is a "Summary of
21  Adjudicated Thromboembolic Serious Adverse Events
22  in Selected Subgroups of Patients With Rheumatoid
23  Arthritis in VIGOR, Safety Update Report," and this
24  is part of the July 5, 2000 data set, correct?
**page 96**
1       A.  Correct.
2       Q.  Do you see for all patients there were 45
3  events in that category for Vioxx versus 19 for
4  naproxen?
5       A.  That's correct.

[96:6] - [97:5] 12/5/2005 Curfman - 11.21.2005

**page 96**
6       Q.  The relative risk and 95 percent confidence
7  interval are stated, and those numbers are
8  statistically significant, correct?
9       A.  That's correct.
10       Q.  You now the aspirin-indicated row that
11  follows shows 15 events in the Vioxx group versus 3
12  in the naproxen group.
13              Do you see that?
14       A.  Yes, I do.
15       Q.  With again a relative risk of .20, or 5 to
16  1, if it were stated inversely?
17       A.  Right.
18       Q.  And the relative risk is again
19  statistically significance, correct?
20       A.  Correct.
21       Q.  Then in the aspirin-not-indicated group,
22  the patients with events are 30 for Vioxx versus 16
23  for naproxen.
24              Do you see that?
**page 97**
1       A.  Yes, I do.
2       Q.  And again the relative risk is stated and
3  the 95 percent confidence interval is statistically
4  significance, correct?
5       A.  Yes, it is.

[97:6] - [97:11] 12/5/2005 Curfman - 11.21.2005

**page 97**
6       Q.  Is the finding of significant increased
7  risk in both the aspirin-indicated and not-aspirin-

BEYOND SCOPE cont.

602 — cont. discussion of July 5 memo — internal March document — lacks foundation + personal knowledge, + beyond scope

611 (leading) ..

No answer provided.



*Overruled* ✓

BEYOND SCOPE Cont

curfman plaintiff affirmatives 1_20.txt
8  indicated patients in VIGOR materially different
9  from the assertion in the published article that
10  there was a significant difference only in the
11  high-risk unprotected group?

(NO answer provided)

[98:8] - [98:19] 12/5/2005 Curfman - 11.21.2005

page 98
8       Q.  But do you see that the -- Page 1523 refers
9   to the difference in the rate of myocardial
10  infarction between the aspirin-indicated and the
11  nonaspirin-indicated subgroups?
12      A.  Right.
13      Q.  And as to the nonaspirin-indicated
14  subgroups, the information is provided that the
15  difference was not significant, is that right?
16      A.  I am trying to find that here.
17      Q.  It's under "General Safety" about --
18      A.  Right.
19      Q.  -- two-thirds of the way down.

611

[98:23] - [99:23] 12/5/2005 Curfman - 11.21.2005

page 98
23      A.  Yes.  In other words, the difference in the
24  rate of myocardial infarction between groups was
page 99
1   not significant, yep.
2       Q.  Is it correct to say that the authors never
3   even told The New England Journal that they were
4   collecting data on an endpoint that they described
5   as set forth in the July 5 memo as confirmed
6   adjudicated serious thromboembolic adverse events?
7       A.  Yes.  To my knowledge, we were never
8   informed about that, and we never saw this Table 4
9   in the memo.
10      Q.  Is that information you would have wanted
11  to see in your role as an editor at The New England
12  Journal in the year 2000?
13      A.  Yes.
14      Q.  Why?
15      A.  It provides more complete information about
16  the issue of cardiovascular toxicity; and although
17  the VIGOR trial was designed as a gastrointestinal
18  trial -- that was the primary focus of the study --
19  the heart is a very important organ; and if there
20  is potential toxicity here that was emerging from
21  the data, it would be highly relevant to present
22  that and to tell that part of the story in this
23  article.

611

[100:9] - [101:8] 12/5/2005 Curfman - 11.21.2005

page 100
9       Q.  Did the letter of August 20, 2000 take the
10  opportunity to inform The Journal of the July 5,
11  2000 data regarding cardiovascular events?

611 (question repeated below)

Page 22

*Overruled (handwritten)*

curfman plaintiff affirmatives 1_20.txt

12      A.  Can you repeat that?
13      Q.  Yes.  Do you see any indication in the
14  August 20, 2000 letter that the authors took
15  advantage of the opportunity of corresponding with
16  the editors to advise them of the new data and the
17  increase from 9 events to 12 events versus 4 in the
18  nonaspirin-indicated group?
19      A.  No.  I think the only reference in the
20  letter to cardiovascular events is on the top of
21  Page 2 where they again refer to the analysis
22  showing a reduced rate of cardiovascular events in
23  the naproxen group compared with the rofecoxib
24  group.

*repeated (handwritten)*

page 101
1       Q.  Did the authors take the opportunity on
2   August 20, 2000 in corresponding to The Journal to
3   inform The Journal that they had compiled the
4   events for naproxen and Vioxx in the serious
5   thromboembolic category as shown in the July 5 memo
6   on Table 6 showing a statistically significant
7   increased risk for Vioxx?
8       A.  No.

*• Asked + answered (handwritten)*
*• 602 (handwritten)*

[111:23] - [112:3] 12/5/2005 Curfman - 11.21.2005

page 111
23      Q.  Let's look at -- Exhibit 27 is a
24  Kaplan-Meyer figure showing the shape of the curve
page 112
1   for cardiovascular events dated June 20, 2000.
2                   Do you see that?
3       A.  Yes, I do.

*• 701-703 (handwritten)*
*Improper expert testimony. (handwritten)*

*BEYOND SCOPE (handwritten, boxed)*

[112:4] - [112:7] 12/5/2005 Curfman - 11.21.2005

page 112
4       Q.  Is the shape of the cardiovascular risk
5   curve similar to the gastrointestinal benefit
6   curve, only inverted so that the risk with Vioxx is
7   higher?

*611 (handwritten)*

[112:9] - [112:12] 12/5/2005 Curfman - 11.21.2005

page 112
9       A.  The display, the shapes of the curve, rough
10  curves look similar; but the axis, the vertical
11  axis is different.  The cumulative incidences would
12  be different, but, yes, the shapes are similar.

[112:23] - [113:5] 12/5/2005 Curfman - 11.21.2005

page 112
23      Q.  Did the authors provide The New England
24  Journal with both the GI-benefit curve and the
page 113

*602 (handwritten)*

Page 23

*Overruled*

curfman plaintiff affirmatives 1_20.txt
1  cardiovascular-increased-risk curve, or only the
2  GI-benefit curve?
3      A.  Only the GI-benefit curve.
4      Q.  And would the Vioxx-increased-risk curve
5  have been of interest to your readers?

BEYOND SCOPE

602 (cont.)

[113:7] - [113:17] 12/5/2005 Curfman - 11.21.2005

page 113
7      A.  Yes.
8      Q.  Why is that?
9      A.  Well, of course, these are data that we
10  would -- if we had received them, we would have had
11  to review them for validity and accuracy; but in
12  assessing a drug, one needs to look not only at its
13  benefits but also the adverse events, especially
14  such important ones as cardiovascular adverse
15  events; and so that a doctor prescribing a drug
16  needs to know both sides of the story, not just one
17  side of the story.

[119:4] - [119:12] 12/5/2005 Curfman - 11.21.2005

page 119
4      Q.  Doctor, Exhibit 28 is a document consisting
5  of an e-mail from John Baron to Jeff Drazen, dated
6  February 6, 2005, with an attached draft
7  manuscript, and the text of the e-mail states,
8  "Here is a version for review," with the subject
9  line of "APPROVe Cardiovascular."
10            Is this the first manuscript that was
11  submitted to The New England Journal concerning the
12  APPROVe study?

[119:13] - [119:14] 12/5/2005 Curfman - 11.21.2005

page 119
13     A.  Yes.  This appears that this is the first
14  version.

[119:15] - [120:13] 12/5/2005 Curfman - 11.21.2005

page 119
15     Q.  And you testified earlier that you were
16  aware that Vioxx was withdrawn from the market on
17  September 30, 2004, correct?
18     A.  That's correct.
19     Q.  Shortly after that, did you learn anything
20  about the manufacturer's intention to submit an
21  article of some kind about APPROVe to The New
22  England Journal?
23     A.  Dr. Drazen had communications with
24  Dr. Baron, that I was not personally involved with,
page 120
1  but that he told me about, that they were trying to

*Overruled*

801 | 802

Page 24

curfman plaintiff affirmatives 1_20.txt
2  work out a mechanism whereby the cardiovascular
3  events in the APPROVe trial with be submitted to
4  The New England Journal.
5          So Dr. Drazen took it upon himself to
6  enter into those discussions with Dr. Baron.  I
7  don't know exactly when they began, but it was
8  certainly several months before the actual date of
9  submission of the manuscript.
10      Q.  When did you first enter into the process
11 in any capacity?
12      A.  Dr. Drazen asked me to handle this
13 manuscript as the editor.

[121:16] - [121:22] 12/5/2005 Curfman - 11.21.2005

page 121
16          When did you actually first see the
17 manuscript?
18      A.  I would have seen it February 7th.  It
19 would have to be logged into our computer system
20 and given a manuscript number; and since I knew
21 that it was coming, we had a review process set up
22 and ready to activate.

[121:23] - [122:6] 12/5/2005 Curfman - 11.21.2005

page 121
23      Q.  Had you selected reviewers -- of course not
24 naming any names -- but you had gone through the
page 122
1  process of identifying who should review the
2  manuscript because you were expecting it?
3      A.  That's right.  We had gone through a
4  process of trying to determine who would be good
5  reviewers for this work.  So we had them lined up
6  in advance.

[125:2] - [126:1] 12/5/2005 Curfman - 11.21.2005

page 125
2      Q.  Now, following receipt of the manuscript,
3  what was your role in the review process?
4      A.  Well, I supervised the review process, and
5  the first thing I did was to read the manuscript
6  myself and to do that as quickly as possible, and
7  then sent it out for review to four outside
8  experts.  Four experts outside of our office.
9          You'll recall that with the VIGOR
10 manuscript, that was reviewed by two outside
11 experts.  I felt that we needed more opinions here,
12 given the high stakes; and I had selected four
13 outside experts who I already communicated with,
14 and who had agreed to review this within about a
15 48-hour time frame.  In fact, some of them did it a
16 little faster than that.
17          We also -- I also at the same time sent
18 the manuscript to one of our statistical
                    Page 25

*Overruled* (handwritten)

BEYOND SCOPE Cont (handwritten on sign)

```
                    curfman plaintiff affirmatives 1_20.txt
19  consultants who reviewed it during that same time
20  interval.
21
22          So within, roughly, I am estimating,
23  36, 48 hours, we had four outside reviews and the
24  statistical consultant review, their written
page 126
    comments, that were e-mailed in to our office, and
1   we had all that information.
```

[126:3] - [126:15] 12/5/2005 Curfman - 11.21.2005

```
page 126
3       Q.  Doctor, Exhibit 29 appears to be a letter
4   dated February 9, 2005 at 2005 NEJM 13 and 14, to
5   which a set of suggestions for transmittal to
6   authors are attached at Pages 270 to 285, and
7   finally, a financial disclosure and authorship form
8   at 2005 NEJM 8, at the last page.
9       A.  Right.
10      Q.  With respect to the letter, is that your
11  signature on the second page?
12      A.  Yes, it is.
13      Q.  Did you write this letter and send it to
14  John Baron on February 9th?
15      A.  Yes, I did.
```

[127:2] - [127:22] 12/5/2005 Curfman - 11.21.2005

```
page 127
2           How do the specific comments of the
3   reviewers and the overall letter that you wrote
4   yourself relate to each other in terms of what The
5   Journal's expectations are?
6       A.  Right.  The covering letter is really a
7   short summary of some of the really essential
8   points that need to be transmitted to the authors.
9           But the comments of the reviewers, in
10  this case, I felt were just spectacular, very
11  comprehensive; and there was duplication among the
12  reviews.
13          The only purpose of my letter was to
14  bring together some of the essential points; but in
15  making revisions to the manuscript, the authors
16  also need to go through the comments of the
17  reviewers, and that's why they spend so much time
18  writing these up, so we can transmit them to the
19  authors.
20          To summarize, the letter is not a
21  stand-alone.  The letter goes in conjunction with
22  the comments to the reviewers.
```

BEYOND SCOPE - opinion testimony (handwritten on sign)

801/802 -
401-402
403
(handwritten)

[128:6] - [128:13] 12/5/2005 Curfman - 11.21.2005

```
page 128
6       Q.  Doctor, we are going to mark this as
7   Exhibit 30.
8           Looking at the Exhibit 29, the letter
                        Page 26
```

curfman plaintiff affirmatives 1_20.txt
9  of February 9, 2005, on Page 2, underneath the
10 Paragraph No. 8 there is a statement, "You will
11 also find editorial comments in tracking changes in
12 the version of the manuscript being returned to
13 you."


[128:15] - [128:21] 12/5/2005 Curfman - 11.21.2005


page 128
15      A.  Right, yes, uh-huh.
16      Q.  My question is, with respect to Exhibit 30
17 that has been handed to you, is this document the
18 tracked-changes version that was returned to the
19 authors?
20      A.  Yes.  This is the version that was returned
21 to them.


[141:20] - [143:17] 12/5/2005 Curfman - 11.21.2005


page 141
20      Q.  Now, going on to some of the specific
21 comments in your letter of February 9, there is a
22 No. 7 on Page 2, which states, "Remove assertion
23 that increased risk was observed only after 18
24 months, because event curves for other adverse
page 142
1  events separate early.  Also the focus on the first
2  18 months was not pre-specified and is a post-hoc
3  analysis."
4        Do you see that reference?
5      A.  Yes, I do.
6      Q.  Now, going on to the comments of Reviewer C
7  at Page 276 of the attachment, there is a parallel
8  reference to the 18-month hypothesis that I want to
9  ask you about.
10       Are you at Page 276?
11     A.  Yes, I am, uh-huh.
12     Q.  Under the subheading "Specific Comments,"
13 do you see, No. 1, "The 18-month hypothesis.  The
14 MS" -- does that stand for "manuscript"?
15     A.  Yes.
16     Q.  "The MS aggressively promotes the safety of
17 up to 18 months of use of rofecoxib.  This goes
18 beyond the data of the study.  The analysis by
19 duration of use is an example of a post-hoc
20 subgroup analysis, because the variation of the
21 effect by duration was not an a priori hypothesis
22 and the 18-month cutpoint was chosen by inspection
23 of the data.  Yusuf and colleagues (JAMA, 1991,
24 266:93) warn about the danger of over-interpreting
page 143
1  such subgroup analyses in clinical trials, noting
2  that low power is of particular concern," and then
3  a quote from the Yusuf article is provided:
4  "Generally, trials adequate for detecting an
5  overall treatment effect cannot be expected to
6  detect effects within even relatively large
7  subgroups," and that's the end of the quote.
8        Did you mean for your comment in the
                        Page 27

Overruled

• 801/802
Based on hearsay;
    hearsay.
• 611

BEYOND
SCOPE

*[handwritten notations in margins: "Overrule X", "611; 801/802", "602 X", "BEYOND SCOPE cont.", "repetitive - asked above", "improper expert testimony (701-703)", "602", "801/802 X", "BEYOND SCOPE"]*

curfman plaintiff affirmatives 1_20.txt
9  letter of February 9 to, in a summary fashion,
10 address the concerns of Reviewer C that were just
11 read?
12    A.  Yes.
13    Q.  Do you agree with those concerns?
14    A.  Absolutely.
15    Q.  Was there general agreement at The New
16 England Journal among the editors that the 18-month
17 hypothesis was not credible?


[143:24] - [144:2] 12/5/2005 Curfman - 11.21.2005


page 143
24             Was there general agreement at The New
page 144
1  England Journal among the editors that the 18-month
2  hypothesis was not credible?


[144:4] - [144:20] 12/5/2005 Curfman - 11.21.2005


page 144
4    A.  Yes.  And again at the point that I wrote
5  my letter, you know, I was the editor sort of
6  driving this process.  So I never believed that the
7  separation of 18 months displayed in the figure
8  (indicating), that was displayed in the original
9  submission of the manuscript, I never believed that
10 that was a stable finding.
11         The reviewers -- and you just quoted
12 from one of the reviewers -- didn't believe it.  We
13 thought that if you had repeated the study in
14 exactly the same way, it would be very unlikely you
15 would see that kind of sharp separation at 18
16 months.
17         So we were very skeptical about it, and
18 I worked with Dr. Baron to try to get them to back
19 away from this contention, and a significant amount
20 of our communication was focused on that point.


[151:10] - [152:24] 12/5/2005 Curfman - 11.21.2005


page 151
10    Q.  Doctor, is Exhibit 32 the published APPROVe
11 study by Bressalier, et al., as it appeared in the
12 print version published in Volume 352 on March 17,
13 2005?
14    A.  That's correct.
15    Q.  Now, in comparing the tracked-changes
16 version at Page 14 under the discussion, which is
17 Page 332, with the first paragraph under the
18 discussion in the published article at 1098, the
19 sentence from the original manuscript reads, "The
20 increased relative risk was observed beginning
21 after approximately 18 months of treatment."
22         In the published version, it reads, "In
23 post-hoc analyses, the increased relative risk of
24 adjudicated thrombotic events was first observed
                        Page 28

Δ Response

*Leaving question is proper(see previous explanation) ; witness has No problem understanding the question and responding.*

merck affirmative designations curfman jan 24, 06.txt

```
20       A.     Right.
21       Q.     NOW, this is not the three
22 MIS, right?
23       A.     No.  This has nothing to do
24  with the three MIS.
page 193
1        Q.     Okay.
2               And this has to do with a
3  table that at least the shell or the form
4  of the table was in an electronic version
5  of the manuscript that you could see that
6  it had been in the draft before it had
7  been submitted to the New England Journal
8  of Medicine, but that had been taken out
9  before the submission was actually made;
10  is that right?
11       A.     Well, that's part of the
12  story.
```

*611*

*leading*

*Compound*

*Counsel testifying*

[194:3] - [194:7] 1/24/2006 Curfman, Gregory (MDL)

```
page 194
3               Am I correct that the New
4  England Journal of Medicine requested the
5  authors of the VIGOR manuscript to
6  provide an electronic version to the New
7  England Journal?
```

[194:10] - [194:20] 1/24/2006 Curfman, Gregory (MDL)

```
page 194
10              THE WITNESS:  I don't know
11  whether we requested it or not.
12  They did send it.  I'd have to --
13  you know, you can show me a
14  document with a sentence in there,
15  but they provided the disk.
16 BY MR. BECK:
17       Q.     Okay.
18              And they provided the disk
19  in August of 2000, right?
20       A.     Yes.
```

[194:23] - [195:4] 1/24/2006 Curfman, Gregory (MDL)

```
page 194
23       Q.     And when they provided you
24  with this disk, the electronic version,
page 195
1  they gave it to you with a feature called
2  track changes that was turned on when
3  they gave it to you, right?
4        A.     Yes.
```

[195:6] - [195:18] 1/24/2006 Curfman, Gregory (MDL)

*SAME response - witness has No problem understanding question. Question is very straightforward. If it is leading at all, the leading is proper b/c of hostile witness status.*

*Compound leading*

*Overruled*

*Δ SAME Response*

merck affirmative designations curfman jan 24, 06.txt

page 195
6              And this disk, little
7  computer disk, had three versions of the      *leading*
8  VIGOR manuscript on it; is that right?
9       A.    That's correct.
10      Q.    So that you could compare,
11 if you wanted to, you know, how the
12 versions evolved over time?
13      A.    Yes, you could.
14      Q.    And even within a single          *6 (1*
15 version with the track changes feature
16 turned on, or it's sometimes called a red
17 lining feature, are you familiar with
18 that term?

*leading*

[195:19] - [195:23] 1/24/2006 Curfman, Gregory (MDL)

page 195
19      A.    Sure.
20      Q.    And you can see, because the
21 computer keeps track of any language or
22 tables or data that was taken out during
23 the drafting process; correct?

[196:22] - [197:3] 1/24/2006 Curfman, Gregory (MDL)

page 196
22              with the track changes
23 feature turned on, within a single
24 version of the manuscript you can see,
page 197
1  because the computer keeps track of what
2  language or data is added and what
3  language or data is taken out, right?

[197:6] 1/24/2006 Curfman, Gregory (MDL)

*Overruled*

page 197
6              THE WITNESS:  Right.

[204:9] - [205:4] 1/24/2006 Curfman, Gregory (MDL)

*Δ SAME response*

*Compound leading*

page 204
9       Q.    Now, even though the authors
10 gave you the electronic version with the
11 track changes turned on back in August of
12 2000, am I correct from your Expression
13 of Concern that it looked like you never
14 looked at the electronic version until
15 sometime in the fall of 2004; is that
16 right?
17      A.    That's right.
18      Q.    Now, did you ever tell,
19 "you" being Dr. Curfman, covering you,
                                    Page 7



all of
page Overruled

Δ
SAME
response

Compound
leading

```
                    merck affirmative designations curfman jan 24, 06.txt
20  personally, first, back during the
21  editorial process in 2000, when the
22  authors gave you the electronic version
23  with the track changes turned on, did you
24  communicate in any way to them that you
page 205
1  and your colleagues were not going to
2  look at the electronic version, "you,"
3  personally, now?
4          A.    Yeah, no.
```

[205:15] - [206:4] 1/24/2006 Curfman, Gregory (MDL)

```
page 205
15        Q.      In terms of tables in
16  articles published in the New England
17  Journal of Medicine, is there some kind
18  of guideline or limit on the number of
19  tables that are supposed to be included?
20        A.      There's a guideline.
21  There's not a limit.
22        Q.      what does the guideline say
23  as to the number of tables?
24        A.      we generally go for five or
page 206
1  six tables in the print version.  We can
2  publish additional information on our
3  website, or sometimes we will publish
4  additional tables in print as well.
```

[206:9] - [206:17] 1/24/2006 Curfman, Gregory (MDL)

SAME
RESPONSE

```
page 206
9         Q.      You say there's a guideline
10  of five or six.  You know that that's not
11  true, don't you?  You know the guideline
12  is five, right?
13        A.      Well, the guideline in that
14  information of authors at that time
15  probably said five.
16        Q.      well, you know it said five,
17  don't you?
```

leading
6 11

NO - DIFFERENT
QUESTION:
establishing what
he knew for sure
rather than just
"probably" knew

Asked &
Answered

[207:3] - [207:10] 1/24/2006 Curfman, Gregory (MDL)

```
page 207
3             THE WITNESS:  The letter
4     that I send out to the authors at
5     the moment says five or six.
6  BY MR. BECK:
7         Q.      How about back in 2000 when
8  VIGOR was written, what was the guideline
9  then?
10        A.      It was probably five then.
```

Asked & Answered

[209:2] - [209:3] 1/24/2006 Curfman, Gregory (MDL)
                              Page 8

Different Question:
Guidelines at time
of Vigor publication;
also trying to establish
more concretely that witness
knew it was 5 (not "probably"
knew)

*Overruled ef* (handwritten)

merck affirmative designations curfman jan 24, 06.txt

page 209
2          Q.          The next exhibit is Exhibit
3  Number 19.


[211:19] - [212:6] 1/24/2006 Curfman, Gregory (MDL)


page 211
19                    And do you see here in the
20  very middle of the page that the VIGOR
21  authors -- up at the top it says,
22  "Suggestion for Transmittal to Authors."
23  Right?
24          A.     Yes.
page 212
1          Q.     Assuming that the suggestion
2  was followed, right there in the middle
3  of the page, it says, "The total number
4  of figures plus tables should not total
5  more than five."  Do you see that?
6          A.     Yes.

*Compound* (handwritten)

*B - NOT "compound," in any regard, witness had no problem understanding and answering the question.* (handwritten)

[214:1] - [214:3] 1/24/2006 Curfman, Gregory (MDL)


page 214
1                    So, look through Exhibit 1
2  and tell the jury how many tables there
3  were in the VIGOR article.


[214:6] - [214:8] 1/24/2006 Curfman, Gregory (MDL)


page 214
6                    There were five tables and
7  one figure for a total of six pieces of
8  documentation.

*Routine identification of document: NOT leading* (handwritten)

[217:5] - [218:11] 1/24/2006 Curfman, Gregory (MDL)


page 217
5          Q.     Look at Exhibit 20.  Is
6  Exhibit 20 some comments by a reviewer,
7  or is this a direct communication from an
8  editor of the New England Journal of
9  Medicine to the lead author of the VIGOR
10  publication?
11          A.     It is a letter from
12  associate editor Marshall Kaplan to the
13  corresponding author of the VIGOR
14  article, correct.
15          Q.     And Marshall Kaplan, in
16  terms of this time frame in June of
17  2000 --
18          A.     Right.
19          Q.     -- in terms of

*leading - Compound* (handwritten)

*611 much to leading questions are okay anyway here witness is merely identifying a document and has no problem answering questions.* (handwritten)

*leading* (handwritten)

Page 9

*Overruled* (handwritten)

merck affirmative designations curfman jan 24, 06.txt

```
20    communications with Dr. Bombardier,
21    Marshall Kaplan was really the voice of
22    the New England Journal of Medicine,
23    right?
24        A.    He was the associate editor,
page 218
1    yes.
2        Q.    But he was the one who was
3    in charge of communicating the views and
4    instructions --
5        A.    In this particular letter.
6        Q.    -- of the New England
7    Journal of Medicine to the author, Dr.
8    Bombardier --
9        A.    He wrote this letter, yes.
10       Q.    -- Dr. Bombardier; right?
11       A.    Yes. Uh-huh.
```

*leading* (handwritten) ×2

Handwritten right margin: *Same - i.e., Response - leading questions are okay + Questions are Routine.*

[219:18] - [219:24] 1/24/2006 Curfman, Gregory (MDL)

```
page 219
18       Q.    And why don't you read the
19    rest of that sentence that talks about
20    how it should be no longer than 3,000
21    words. What does it say right after
22    that?
23       A.    "With a total of no more
24    than five figures and tables."
```

*Compound* (handwritten)

Handwritten right margin: *Witness is reading a sentence of the document and has no problem doing it; Not compound.*

[236:14] - [236:19] 1/24/2006 Curfman, Gregory (MDL)

```
page 236
14       Q.    Let me hand you the next
15    document, Exhibit 26. Now, again, this
16    is a series of e-mails, and you see that
17    you're on these first two at least on
18    Page 1.
19       A.    Right.
```

*hearsay* (handwritten)

Handwritten right margin: *801, 802 - Business Records; Frequent emails btw. NEJM + particular members of the press re: VIGOR article. kept in normal course of business. • Also an Admission by the Editor in Chief of the NEJM. • In any regard, goes to mindset of editors, not for truth of the matter.*

[237:4] - [237:7] 1/24/2006 Curfman, Gregory (MDL)

```
page 237
4        So, let's go to Page 3 of
5    this exhibit, and this is an e-mail that
6    you got a copy of from Caryn Sandrew on
7    behalf of Dr. Drazen. Do you see that?
```

[237:8] - [237:10] 1/24/2006 Curfman, Gregory (MDL)

```
page 237
8        A.    Yes, I do.
9        Q.    And it's, again, to Ms.
10    Prakash of NPR; right?
```

Page 10

*Overruled*

merck affirmative designations curfman jan 24, 06.txt
[237:11] 1/24/2006 Curfman, Gregory (MDL)

page 237
11      A.    Right.


[239:15] - [239:21] 1/24/2006 Curfman, Gregory (MDL)

page 239
15      Q.    Let's go down to the very
16   bottom where he says, "It is generally
17   inappropriate to mine a data set for
18   endpoints that were not pre- specified in
19   the research protocol."
20      A.    Yes.  The problem is that in
21   a safety study, that does not apply.


• In series of
questions, asking
questions about the bottom
portion of the
document. Witness
understands + responds

no question


[240:14] - [240:21] 1/24/2006 Curfman, Gregory (MDL)

page 240
14      Q.    My focus is, he's making a
15   general observation about whether it is
16   appropriate or not to mine a data set for
17   endpoints that were not prespecified in
18   the research protocol.
19      A.    Except for safety endpoints.
20      Q.    But he doesn't say that,
21   does he?


No question   • SAME - It was
asked as a question.
Witness understands that
and responds.


[241:10] - [242:13] 1/24/2006 Curfman, Gregory (MDL)

page 241
10      Q.    Does he go on to say to the
11   NPR author, "Such a fishing expedition
12   can lead to misleading conclusions, both
13   positive and negative"?
14      A.    They could, but he had never
15   seen this document.  And this is a
16   critical document that no editor or
17   physician would ever overlook, the
18   importance of this document.  These are
19   critical safety endpoints, safety
20   endpoints.  And safety endpoints are
21   often not prespecified in a protocol.
22      Q.    But, in fact, when he made
23   that observation about how that's
24   inappropriate and it's a fishing
page 242
1   expedition, he was talking about the
2   safety endpoints of the VIGOR article,
3   was he not, sir?
4      A.    He was not -- he was not
5   privy to this document.
6      Q.    Was he talking about the
7   safety endpoints of the VIGOR article
8   when he said that "It is generally
9   inappropriate to mine a data set for

hearsay
document

speaker for itself

801, 802 • Business
record, admission
(see prior page)

602, 611, 801, 802
assumes facts not in
evidence

• Not disputed
that vigor had
safety endpoints.

Same objection Witness
understands +
has no problem
with the question.
SAME hearsay
response (see
above + prior page)

Page 11


• Document does not speak for itself,
which is precisely Dr. Curfman's
point (ie, Dr. Curfman adds a clause
when explaining it)

```
                merck affirmative designations curfman jan 24, 06.txt
10  endpoints that were not pre-specified to
11  the research protocol.  Such a fishing
12  expedition can lead to misleading
13  conclusions, both positive and negative"?

[242:17] - [242:23] 1/24/2006 Curfman, Gregory (MDL)

page 242
17          A.    It's not clear from this.
18  It's a new paragraph.
19          Q.    The entire subject of the
20  NPR article was the safety endpoints --
21          A.    The words don't say that.
22          MR. BECK:  No more
23      questions.
```

*overrule*

hear say 801, 802
SAME DOCUMENT
+ same hearsay responses
(Business Record, Admissions,
just proving what document
says
+ mindset
of editors)

*Overruled*

merck affirmative designations curfman jan 24, 06 conditional.txt
Issues Report [Curfman 1/24/06]

* Merck's Affirmative Designations - Conditional

[32:23] - [33:3] 1/24/2006 Curfman, Gregory (MDL)

page 32
23          Q.    Did there come a time when
24  people in the medical community began
page 33
1  criticizing the New England Journal of
2  Medicine for the way that it handled the
3  VIGOR publication?

*hearsay*
*Vague*

[33:10] - [35:1] 1/24/2006 Curfman, Gregory (MDL)

page 33
10  I can't recall exactly criticism.  I do
11  recall discussions.  There wasn't a lot
12  of discussion, but I'm not sure that I
13  would have recognized it as criticism.
14          Q.    By the middle of 2005, was
15  the senior editorial group at the New
16  England Journal of Medicine meeting on a
17  regular basis with a public relations
18  firm?
19          A.    Excuse me? Could you repeat
20  that?
21          Q.    Sure.
22          By the middle of 2005, was
23  the New England Journal of Medicine
24  editorial folks, you and the other senior
page 34
1  editors, were you meeting on a regular
2  basis with a public relations firm?
3          A.    I personally did attend some
4  meetings with a public relations firm,
5  yes.
6          Q.    Was one of the subjects that
7  you discussed in late 2005 continuing
8  into early 2006, one of the subjects that
9  you discussed with the public relations
10  firm was how to deal with criticism of
11  the New England Journal of Medicine for
12  the way it handled the VIGOR publication?
13          A.    Well, I don't recall that as
14  being the focus of discussion myself.  I
15  think the topic of COX-2 inhibitors, that
16  topic probably did come up, but I don't
17  recall that we were talking about -- I
18  don't think so.
19          Q.    So, you don't remember that
20  in November and December, in fact, you
21  were communicating almost on a daily
22  basis with this PR firm on subjects
23  including the criticisms of the New
24  England Journal of Medicine concerning
page 35
1  how they handled the VIGOR publication?

Page 1

*Δ Response*
*— Goes to*
*801, 802 impact on*
*NEJM and*
*NEJM's motivations*
*for taking action; Not*
*for truth of the matter*
*— Witness has NO*
*problem answering*
*questions.*

*Curtlen emais*
*in NEJM production*
*shows this communication*
*cancel is pressing*
*witness on various*
*point that he is*
*not resisting +*
*where he*
*gradually*
*backs off*
*his*
*position*

*assumes facts*
*in evidence*
*asked & answered*

*omits answer*
*No - witness doesn't give*
*answer; but question is*
*important in that it leans*
*in to next question + answer*

Δ Response

Witness was very Non-responsive
– Avoided answering questions + then
would give lengthy speeches.

He would Not Answer this
very simple question + as shown
Argumentative       below,
                    he finally
                    reveals more
                    info on the topic
                    that he was
                    previously refusing
                    to mention.

merck affirmative designations curfman jan 24, 06 conditional.txt

[35:11] - [35:18] 1/24/2006 Curfman, Gregory (MDL)

page 35
11       Q.   Do you -- are you saying
12   that as you sit here today that you don't
13   know that the New England Journal of
14   Medicine in November and December was
15   communicating with this PR firm on almost
16   a daily basis about criticisms of the New
17   England Journal of Medicine on how it
18   handled the VIGOR publication?

[36:19] - [36:23] 1/24/2006 Curfman, Gregory (MDL)

page 36
19           THE WITNESS: Well, all I
20   can do is tell you that I was not
21   talking with people at a PR firm
22   about, what did you say, how to
23   handle the VIGOR article or --

[37:22] - [38:6] 1/24/2006 Curfman, Gregory (MDL)
page 37
22       Q.   My question to you, sir, is,
23   is it your testimony today that you don't
24   know that back in November and December,
page 38
1   the New England Journal of Medicine was
2   communicating on a regular basis with a
3   PR firm about how to handle criticism of
4   the manner in which the New England
5   Journal of Medicine handled the VIGOR
6   publication?

[38:12] - [39:5] 1/24/2006 Curfman, Gregory (MDL)

page 38
12       A.   Okay.  To the best of my
13   recollection, to the best of my memory,
14   there was a member of the, what you call
15   the PR firm, Morrissey & Company, that
16   would provide us with e-mail updates
17   about articles in the media that would be
18   of interest to the New England Journal of
19   Medicine, to the editors, other staff
20   members at the journal.  And I would be
21   copied on these e-mails.  I have to say
22   that I didn't open all of them, but I did
23   open some.  They would contain sometimes
24   copies of articles in the media that
page 39
1   relate to journal activities, and some of
2   those, I'm sure, related to rofecoxib,
3   other COX-2 inhibitors, and this general
4   topic which was being written about in
5   the media at that time.

[40:1] - [40:6] 1/24/2006 Curfman, Gregory (MDL)
                                  Page 2

argumentative
asked & answered
    No - it was Not Answered.
Dr. Curfman gave Non-
responsive answers + then
finally "remembers" about the
PR Firm.  Important b/c this
line of questioning goes
to bias + his credibility as
a witness.

*[handwritten, top right:]* Δ Response

*[handwritten:]* Leading questions are allowed. Not asked + answered —

merck affirmative designations curfman jan 24, 06 conditional.txt

*[handwritten, right of page 40 block:]* leading / argumentative / asked & answered — this question goes to whether the PR Firm coached him personally.

```
page 40
1         Q.    Don't you remember that they
2    coached you on what to say to the media
3    when the media asked any questions that
4    might be critical of the way that the New
5    England Journal of Medicine handled the
6    VIGOR publication?
```

[40:13] - [40:16] 1/24/2006 Curfman, Gregory (MDL)

*[handwritten, right:]* Previous question went to communications generally btw. NEJM + PR firm.

```
page 40
13             THE WITNESS:  Well, I don't
14    recall specifically receiving any
15    coaching about how to handle the
16    VIGOR publication.
```

*[handwritten, right:]* Ans Not argumentative — witness was being very difficult (+ had to be reprimanded numerous times by his own counsel)

[42:17] - [42:22] 1/24/2006 Curfman, Gregory (MDL)

```
page 42
17             Q.    And then moving on with our
18    chronology, did you and your colleagues,
19    Dr. Morrissey and Dr. Drazen, prepare and
20    post on your website a document called an
21    "Expression of Concern"?
22             A.    That's correct.
```

[43:17] - [44:3] 1/24/2006 Curfman, Gregory (MDL)

```
page 43
17             Is that a copy of the
18    Expression of Concern?
19             A.    (Witness reviewing
20    document.)
21             Yes, it is.
22             Q.    What date did you release
23    this and post it on your website?
24             A.    I believe it was December
page 44
1    8th or 9th, somewhere in that area.
2             Q.    I think we'll see as we go
3    forward that it was December 8.
```

*[handwritten, right:]* Sidebar; Counsel testifying Δ: Witness agrees to this. DATE NOT IN DISPUTE

[44:9] - [45:3] 1/24/2006 Curfman, Gregory (MDL)

*[handwritten, right:]* Improper mention of 1st trial / answer facts not in evidence / leading / argumentative

```
page 44
9             Q.    And do you remember that on
10    December 8th, Thursday, the day that you
11    decided to release this Expression of
12    Concern, that that was the day of closing
13    argument and submission to the jury of
14    the case called the Irvin case?
15             A.    Well, I certainly know that
16    a case was going on.  I'm not familiar
17    with the term "Irvin case," but I know
18    that a case is going on.  But I honestly
19    didn't know exactly what was going on in
20    the case on that particular day.
21             Q.    Did you know that there was
```

Page 3

*[handwritten, bottom:]* Δ: Meaning of release of EoC on last day of trial / jury deliberations goes directly to bias + credibility. Witness knew trial was going on. Leading question is fine; question was Not argumentative; merely asking witness about the timing of the release vis a vis the trial. DATES NOT in dispute.

*Overruled* (handwritten)

merck affirmative designations curfman jan 24, 06 conditional.txt
22  a case being tried in Federal Court in
23  Houston in early December?
24       A.    Yes.
page 45
1       Q.    And, in fact, you got daily
2  updates on that trial, didn't you, from
3  your PR team and the others?

[45:6] - [45:9] 1/24/2006 Curfman, Gregory (MDL)

page 45
6             THE WITNESS:  I don't -- I
7  don't know if they were daily
8  updates. I think that there were
9  updates from time to time.

[45:11] - [46:18] 1/24/2006 Curfman, Gregory (MDL)

page 45
11      Q.    And --
12      A.    Newspaper articles.
13      Q.    And when you released the
14 Expression of Concern --
15      A.    uh-huh.
16      Q.    -- which I think you'll
17 agree was critical of the authors of the
18 VIGOR study, is that a fair statement?
19      A.    That was not the purpose of
20 the Expression of Concern.
21      Q.    Whether it was its purpose
22 or not, would you agree that the
23 Expression of Concern was critical of the
24 authors of the VIGOR study?
page 46
1       A.    The Expression of Concern
2  was focused on an article that was
3  published in the New England Journal of
4  Medicine, a document, scientific document
5  that we had obtained evidence that made
6  us concerned about the procedures that
7  led to the publication of that document.
8  And our Expression of Concern was focused
9  on the scientific document in order to
10 correct the scientific record. It was
11 not focused on individuals.
12      Q.    Well, do you remember that
13 you went out and gave a bunch of
14 interviews after the Expression of
15 Concern was published where you were
16 critical of the authors of the VIGOR
17 study?
18      A.    I did not --

[46:21] - [47:6] 1/24/2006 Curfman, Gregory (MDL)

page 46
21            THE WITNESS:  I did not go
22            out and give a bunch of
23            interviews.
24 BY MR. BECK:

Page 4

Handwritten annotations (right margin):

A:
• Leading question okay b/c of hostile witness status argumentative (same rationale throughout)

• Question was not argumentative + witness was being quite difficult + Non responsive. Initially he testified that timing of release had Nothing to do with the trial. Question is a proper leading question.

leading 611

Not a pure leading question; IN any regard Leading questions are okay.

leading 611

Argumentative leading 611

SAME RESPONSES - Dr. Curfman's name is all over the press. It is clear he gave many interviews by conducting a simple media search. It is proper for counsel to press him on this point, especially where he denies it.

*[Handwritten annotations in margins:]*

*overruled*

*and — ok to press - goes to credibility.*
*evasive Dr. Curfman was he later admits - did*
*Give interviews. He was being quite*
*non-responsive to the question being asked.*

*asked and answered*
*interrupts witness — witness*
*argumentative WAS interrupting*
*counsel and*
*giving lengthy*
*speeches throughout*
*deposition. His own*
*counsel had to scold*
*him on numerous*
*occasions. Merck counsel*
*let him give speeches all*
*day, but this was a*
*question with a very*
*basic answer, and*
*Dr. Curfman would*
*not provide an answer.*
*Evasive — goes to*
*credibility*

*argumentative*
*leading*
*Same obj.*

*Not argumentative -*
*impeaching the*
*witness. Leading*
*Nature of question*
*is proper.*

---

merck affirmative designations curfman jan 24, 06 conditional.txt

```
page 47
1    Q.   You didn't?
2    A.   No, I did not.
3    Q.   How many did you give?
4    A.   The way the --
5    Q.   Can you just answer how many
6  you gave?
```

[47:11] - [481] 1/24/2006 Curfman, Gregory (MDL)

```
page 47
11            THE WITNESS:  The way the --
12   we were surprised that there were
13   so many press calls.  We did not
14   issue a press release about the
15   Expression of Concern.  We posted
16   it on our website, and after it
17   was posted, we began to receive
18   calls from the media.  I was
19   surprised that they were
20   interested in this.  For us --
21   this was standard editorial
22   procedure for us.  We have issued
23   a total of three Expressions of
24   Concern since 2002, and we were
page 48
1    following standard procedures.
```

[48:24] - [49:2] 1/24/2006 Curfman, Gregory (MDL)

```
page 48
24              how many interviews
page 49
1  did you give?  Can you answer that
2  question?
```

[49:7] - [49:11] 1/24/2006 Curfman, Gregory (MDL)

```
page 49
7            THE WITNESS:  I can't
8    really.  Probably more than four
9    and less than ten.  I don't know.
10   I didn't count the number of
11   telephone calls that came in.
```

[49:13] - [49:23] 1/24/2006 Curfman, Gregory (MDL)

```
page 49
13   Q.   When you said under oath a
14   minute ago that you did not issue a press
15   release, in fact, the New England Journal
16   of Medicine sent out an e-mail alert to
17   the media --
18   A.   Right.
19   Q.   -- informing the media that
20   this Expression of Concern that you say
21   was routine was going to be posted later
22   that day?
23   A.   Yes.
                              Page 5
```

*Overruled 611(a)(b)(c)*

merck affirmative designations curfman jan 24, 06 conditional.txt

Δ
*SAME response*

**[50:10] - [50:14] 1/24/2006 Curfman, Gregory (MDL)**

```
page 50
10        Q.     And are you claiming that
11   the New England Journal of Medicine
12   treated this Expression of Concern as a
13   routine matter, nothing out of the
14   ordinary?
```

*argumentative leading 611*

**[50:23] - [50:24] 1/24/2006 Curfman, Gregory (MDL)**

```
page 50
23             THE WITNESS:  I didn't say
24        that.
```

**[51:6] - [51:10] 1/24/2006 Curfman, Gregory (MDL)**

```
page 51
6         Q.     Are you claiming that the
7    New England Journal of Medicine treated
8    this Expression of Concern as a routine
9    matter that was nothing out of the
10   ordinary?
```

*asked and answered argumentative leading 611*

*Witness was Not answering question. It is abundantly clear that the NEJM treated this EoC very different from past Editorial EoCs. Okay to press on this point; Not argumentative, but instead was responding to previous statement by witness that the NEJM followed standard procedure for the Editorial like they always did.*

**[51:13] - [51:17] 1/24/2006 Curfman, Gregory (MDL)**

```
page 51
13             THE WITNESS:  This is part
14        of the responsibility of editors.
15        It's part of our job that when,
16        after an article has been
17        published in a journal,
```

**[51:20] - [52:9] 1/24/2006 Curfman, Gregory (MDL)**

```
page 51
20             published in a journal and at a
21        later time new evidence comes to
22        light that causes the editors to
23        be concerned about some aspect of
24        that article, the process by which
page 52
1         it was published, the data, the
2         content, issuing an Expression of
3         Concern is part of the standard
4         operating procedure.  It's set
5         down in the uniform requirements
6         of the International Committee of
7         Medical Journal Editors of which
8         the New England Journal is one of
9         the founding members.
```

**[53:8] 1/24/2006 Curfman, Gregory (MDL)**

```
page 53
8         Q.     What's Exhibit 4?
```

Page 6

*overrule*

merck affirmative designations curfman jan 24, 06 conditional.txt

[54:17] - [55:1] 1/24/2006 Curfman, Gregory (MDL)

```
page 54
17              To the best of my
18   recollection, when the Expression
19   of Concern was posted on the
20   website, I believe that this may
21   have been a statement was
22   placed below it or next to it,
23   below it, I guess, to provide
24   additional explanation for why it
page 55
1    was being released.
```

*Leading okay, witness has no problem understanding + answering the questions. Dates are not in dispute*

[55:3] - [55:13] 1/24/2006 Curfman, Gregory (MDL)

```
page 55
3         Q.    So, this was a statement
4    issued by the New England Journal of
5    Medicine on December 8th, the same day as
6    the Expression of Concern, and it
7    accompanied the Expression of Concern on
8    the New England Journal of Medicine's
9    website?  Isn't that true?
10        A.    Well, if you tell me -- to
11   the best of my recollection -- it doesn't
12   say that here, but that's the best of my
13   recollection.
```

*leading compound assume facts not in evidence*

[55:15] - [55:17] 1/24/2006 Curfman, Gregory (MDL)

```
page 55
15        Q.    And you'd never done that
16   before in connection with an Expression
17   of Concern, had you?
```

*leading — SAME response assume facts not in evidence — No counsel is asking a question.*

[55:20] - [55:21] 1/24/2006 Curfman, Gregory (MDL)

```
page 55
20             THE WITNESS: I don't
21      recall.  I don't recall.
```

[55:23] - [56:3] 1/24/2006 Curfman, Gregory (MDL)

```
page 55
23        Q.    Well, you don't recall one
24   way or another whether you issued a
page 56
1    one-page statement accompanying either
2    one of those other two Expressions of
3    Concern that you talked about?
```

*asked and answered*

[56:13] - [56:24] 1/24/2006 Curfman, Gregory (MDL)

```
page 56
13             I didn't write
                           Page 7
```

*This is key point — whether NEJM treated the Vigor EOC differently from prior EOC's. He was not giving straight answers and would backtrack. It is proper to press on key issues to make sure what he is saying is accurate.*

*overrule* [handwritten]

merck affirmative designations curfman jan 24, 06 conditional.txt

```
14        this statement, and I do remember
15        being informed that, would it be
16        advisable to provide some
17        explanation given the technical
18        nature of the Expression of
19        Concern, would it be advisable to
20        have such a statement?  And I
21        remember discussing that, and
22        so -- but I did not write the
23        statement.  I remember discussing
24        it.
```

[57:2] - [57:24] 1/24/2006 Curfman, Gregory (MDL)

page 57
```
 2        Q.    You said before that you
 3   handled this Expression of Concern the
 4   same way you handled the other two?
 5        A.    Yes.  In terms of --
 6        Q.    And my question for you,
 7   sir, is, in either one of the other two
 8   Expressions of Concern, did the New
 9   England Journal of Medicine release a
10   statement that accompanied the Expression
11   of Concern?
12        A.    Again, I don't recall the
13   answer to that, but what I was referring
14   to was the -- in terms of handling the
15   Expression of Concern, what I was talking
16   about is the steps that we took, how
17   the -- how we made the decision to write
18   an Expression of Concern, how that
19   Expression of Concern was written, who
20   read it and reviewed it, and when it was
21   released.  Those kinds of steps were the
22   same steps that we followed in each of
23   these three cases.  And that's what I was
24   referring to.
```

[58:1] - [58:14] 1/24/2006 Curfman, Gregory (MDL)

page 58
```
 1        Q.    Now, you say that you did
 2   not write this statement, Exhibit 4, that
 3   was posted on the website.  Did Dr.
 4   Morrissey write it?  He was one of the
 5   co-authors with you of the Expression of
 6   Concern, right?
 7        A.    Yes, he was.
 8        Q.    Did Dr. Morrissey write this
 9   statement that was posted on your
10   website?
11        A.    I don't know who wrote this
12   statement, to be honest with you.
13        Q.    Well, don't you know, in
14   fact, that it was written by your PR guy?
```

[58:17] - [59:9] 1/24/2006 Curfman, Gregory (MDL)

page 58

Page 8

[Handwritten annotations:]

Yes or No question. Merck counsel let Dr. Curfman make speech interrupts witness after speech throughout the 3.5 hrs. Time was limited and lengthy speeches and frequent objections by Plaintiffs' counsel + NEJM counsel ate up a lot of time where question was yes or No. Merck counsel is just trying to move things along here.

Confound — Witness understands and answers question. Says Morrissey was a co-author, which is not in dispute. Says he doesn't know if Dr. Morrissey wrote the statement (can that question)

leading 611 assumes facts not in evidence argumentative

Leaving okay; document clearly establishes that PR guy-Ed- wrote the statement.

*(handwritten at top: "Overruled Ed")*

```
                merck affirmative designations curfman jan 24, 06 conditional.txt
17              THE WITNESS:  No, I don't
18      know who wrote the statement.
19 BY MR. BECK:
20      Q.      Did you have a chance to
21 spend some time reviewing this statement
22 before it was posted on behalf of the New
23 England Journal of Medicine on your
24 website?
page 59
1       A.      I believe I saw it briefly,
2 but I did not spend a lot of time with
3 it, no.
4       Q.      Do you remember that you
5 weren't even shown this statement that
6 was posted on your website until the day
7 it was posted?
8       A.      I think that's certainly
9 possible, yes.
```

*(handwritten right margin: "Leading (same response); Document establishes this fact; Dr. Curfman answers the question just fine")*

*(handwritten: "leading assumes facts not in evidence")*

[59:23] - [60:4] 1/24/2006 Curfman, Gregory (MDL)

```
page 59
23      Q.      Ed, do you remember Ed?
24      A.      Ed?
page 60
1       Q.      The PR guy named Ed?  Do you
2 remember a PR guy named Ed that you
3 talked with almost every day during this
4 period?
```

*(handwritten: "assumes facts not in evidence")*

*(handwritten right margin: "Dr. Curfman understand + answers; he knows who Ed is and that he had frequent communications with him.")*

[60:15] - [60:20] 1/24/2006 Curfman, Gregory (MDL)

```
page 60
15              THE WITNESS:  You mean Ed
16      Cafasso?  Is that who you mean, Ed
17      Cafasso?
18 BY MR. BECK:
19      Q.      Yes.  The PR guy, Ed.
20      A.      Yes.
```

*(handwritten: "Same")*

[61:20] - [62:2] 1/24/2006 Curfman, Gregory (MDL)

```
page 61
20      Q.      During early December, were
21 the senior editors of the New England
22 Journal of Medicine following the trial
23 down there in Houston so closely that
24 they were actually reading or being
page 62
1 informed of the contents of the testimony
2 that was coming in during that trial?
```

*(handwritten: "leading 611 argumentative assumes facts not in evidence")*

*(handwritten: "Leading nature of question is proper; Ernie to follow goes to this very point. The timing of the Editorial vis a vis the trial + whether editors followed the trial is KEY.")*

[62:5] - [62:7] 1/24/2006 Curfman, Gregory (MDL)

```
page 62
5               THE WITNESS:  I can really
6       only speak for myself, and the
7       answer is unequivocally no.
```

Page 9

*Overruled* [handwritten]

merck affirmative designations curfman jan 24, 06 conditional.txt

[62:15] - [62:16] 1/24/2006 Curfman, Gregory (MDL)

page 62
15        Q.    I'm handing you what we've
16   marked as Exhibit 5.


[62:19] - [64:10] 1/24/2006 Curfman, Gregory (MDL)

page 62
19        Q.    Do you see here, sir, that
20   this is an e-mail, internal e-mail from
21   or among the senior editors of the New
22   England Journal of Medicine?
23        A.    Yes.
24        Q.    And it's from Dr. Drazen;
page 63
1    right?
2         A.    Well, there are two e-mails
3    here. Are you talking --
4         Q.    The one on the top.
5         A.    The one on the top. Yes.
6    From Dr. Drazen, yes.
7         Q.    He's the editor-in-chief of
8    the New England Journal of Medicine,
9    right?
10        A.    Yes, he is.
11        Q.    It's dated Saturday,
12   December 3rd; correct?
13        A.    Right.
14        Q.    And it's to you, right?
15        A.    Uh-huh.
16        Q.    And to Dr. Morrissey,
17   correct?
18        A.    Right.
19        Q.    And you would be the three
20   top editors of the New England Journal of
21   Medicine, right?
22        A.    We're three of the top
23   editors, yes.
24        Q.    And do you see here where
page 64
1    the editor-in-chief of the New England
2    Journal of Medicine is reporting to you
3    concerning the contents of the deposition
4    testimony of Dr. Reicin?
5         A.    Uh-huh.
6         Q.    Why was the editor-in-chief
7    of the New England Journal of Medicine
8    giving you updates concerning the
9    contents of Dr. Reicin's testimony down
10   there in the Houston trial?


[65:9] - [65:10] 1/24/2006 Curfman, Gregory (MDL)

page 65
9         Q.    And I will read it into the
10   record.


[65:13] - [65:20] 1/24/2006 Curfman, Gregory (MDL)
                    Page 10

[Handwritten annotations in right margin:]
hearsay 801, 802 applies to all questions related to e-mail

Business Record - entri sent by 1 editor to 2 other editors in Normal course of business. In any regard, not for truth of the matter, but instead to show they were aware of the trial.

omits answer - No - Witness does not give answer, but Q is important & provides part of next question

801, 802

*overruled* (handwritten)

merck affirmative designations curfman jan 24, 06 conditional.txt

page 65
13          Q.     "Steve and Greg, in her
14  depositional testimony Reicin says that
15  there were also GI events that were not
16  recorded but came in late. We should
17  make this clear in the note of concern
18  and ask them to provide full reporting of
19  all data they had on or before October
20  13, 2000."

*not a question* (handwritten)
*ADD IN 65:21 - 66:1 (see next page)* (handwritten)

[66:20] - [67:18] 1/24/2006 Curfman, Gregory (MDL)

page 66
20          Q.     You know there are
21  depositions, then there are trials.
22  You're in a deposition now. The thing
23  that was going down in Houston with a
24  jury was a trial.
page 67
1                  Now, when you read this, did
2  you understand it to refer to trial
3  testimony by Dr. Reicin or deposition
4  testimony or which?
5          A.     Well, I'll have to be very
6  honest with you. I only vaguely remember
7  this e-mail message. I remember that it
8  was on a Saturday late in the morning. I
9  was working at my desk in my home.
10         Q.     Actually, it says 11:31 p.m.
11         A.     Oh, p.m., I'm sorry.
12         Q.     Almost midnight he's telling
13  you about this testimony, right?
14         A.     I don't think I was awake
15  then. I try to be in bed earlier than
16  that. So, I think that I got it perhaps
17  the next morning, maybe it was actually
18  Sunday morning, I was working at my desk.

*Counsel testifying — improper mention of previous trial* (handwritten)
*NO, just giving proper context for question.* (handwritten)
*See objection @ bottom of pg. 3. Necessary to establish bias & to judge credibility by showing EoC was voiced — of all days — during jury deliberations of trial.* (handwritten)

[68:14] - [69:8] 1/24/2006 Curfman, Gregory (MDL)

page 68
14         Q.     When you released the
15  editorial on December 8th, I think you
16  indicated before you didn't know, you
17  say, precisely what was going on in the
18  trial down in Houston. Is that right?
19         A.     Right.
20         Q.     You knew that the trial was
21  still going on down in Houston?
22         A.     Yes.
23         Q.     You also knew, obviously,
24  that Vioxx was not being prescribed and
page 69
1  sold on December 8th, 2005; right?
2          A.     Yes. That's right. We
3  generally -- we have referred to it as
4  rofecoxib, but, yes, that's right.
5          Q.     And so on December 8th, when
6  you released this Expression of Concern,
7  there was no public health emergency --
                              Page 11

*improper mention of previous trial* (handwritten)
*SAME response* (handwritten)

Merck affirmative desgnations curfman jan 24, 06 conditional (supp)

[65:21] - [66:1] 1/24/06 Curfman, Gregory (MDL)

page 65
21      A.   Okay.
22      Q.   Did -- now, do you
23  understand this to refer to something
24  other than Dr. Reicin's testimony down in
page 66
1  Houston?

*Overruled* (handwritten)

merck affirmative designations curfman jan 24, 06 conditional.txt
8      A.     No.

[71:11] - [72:17] 1/24/2006 Curfman, Gregory (MDL)

page 71
11        Q.     You've got what we've marked
12  as Defendant's Exhibit 6 in front of you,
13  right?
14        A.     Right.  Uh-huh.
15        Q.     And do you see that the
16  first page of Defendant's Exhibit 6 is an
17  e-mail string of e-mails from December
18  8th?
19        A.     Right.
20        Q.     And the first one is from
21  Karen Pedersen --
22        A.     Pedersen, yes.
23        Q.     Pederson to you?
24        A.     Right.
page 72
1         Q.     With a copy to Dr.
2  Morrissey?
3         A.     That's right.
4         Q.     And it says she's forwarding
5  something called talking points; right?
6         A.     Yes.  That's what I referred
7  to earlier.
8         Q.     And Karen Pedersen, is she
9  an internal PR person for the New England
10 Journal of Medicine?
11        A.     She's the manager of media
12 relations.  We don't call her a PR
13 person, but she is our interface with the
14 media.
15        Q.     And she's forwarding on
16 talking points that were sent to her by
17 Ed Cafasso; right?

[73:2] - [73:20] 1/24/2006 Curfman, Gregory (MDL)

page 73
2         Q.     But do you see right
3  underneath the first e-mail --
4         A.     Yeah.
5         Q.     -- that we looked at, which
6  would have been the most recent e-mail,
7  there's an e-mail -- she's forwarding the
8  thing that she got right below from Ed
9  Cafasso to her --
10        A.     Right.
11        Q.     -- "Subject:  Talking
12 points," "Importance:  High"?
13        A.     Uh-huh.  Yep.
14        Q.     And Ed Cafasso, he's the
15 outside PR guy; right?
16        A.     Yes.
17        Q.     So, he's attaching the
18 talking points and the Q&A, he says;
19 correct?
20        A.     Right.

Page 12

hearsay 801, 802
• Business Record
• Also, Not for truth
of the matter, but instead
to show what NEJM editors
were told to say to the
press

leading 611  Leading is.
okay

assumes facts not in evidence
omits answer  if any

ADD to
72: 20-22
see next
page

801, 802

• SAME
Hearsay responses
• Establishes ED
Sent the Talking
Points - Not assuming
Facts Not in
evidence

Merck affirmative desgnations curfman jan 24, 06 conditional (supp)

[72:20] - [72:22] 1/24/06 Curfman, Gregory (MDL)

page 72
20          THE WITNESS:  I don't see
21     the talking points.  Are they
22     here?

*Overruled*

merck affirmative designations curfman jan 24, 06 conditional.txt

[74:3] - [74:14] 1/24/2006 Curfman, Gregory (MDL)

```
page 74
3         Q.      Are you on the page that has
4    at the top the title "Expression of
5    Concern: key Points and Q&A."
6         A.      Right.
7         Q.      Are these the kind of
8    talking points that you referred to
9    earlier in your testimony that people
10   would give you to use?
11        A.      Sometimes they would, yes.
12        Q.      And they did this time;
13   right?
14        A.      They did.
```

*leading 611 — Leading okay.*

[74:17] - [75:9] 1/24/2006 Curfman, Gregory (MDL)

```
page 74
17        Q.      Well, let's take a look down
18   at the one that says "Why Did we Release
19   this Today?"
20        A.      Uh-huh.
21        Q.      And the talking point says,
22   "We felt it was important to release this
23   information as soon as we understood how
24   it impacted the conclusions of the paper
page 75
1    we had published.  We felt we should
2    announce this once we had completed our
3    investigation of the data, which included
4    a statistical analysis, and had raised
5    our concerns with the authors."
6         Q.      Did you follow that talking
7    point when members of the media asked you
8    why you released the Expression of
9    Concern when the jury was out in Houston?
```

*Sidebar — Directing Dr. Curfman to portion of document for next graphast. Dr. Curfman interposes an "uh-huh"*

*hearsay 801, 802 - Same hearsay response as previous page*

*improper mention of previous trial & same objection as bottom of page 3.*

[75:15] 1/24/2006 Curfman, Gregory (MDL)

```
page 75
15             THE WITNESS:  I don't --
```

*incomplete answers — No - that is Dr. Curfman's complete answer*

[76:1] - [76:11] 1/24/2006 Curfman, Gregory (MDL)

```
page 76
1         Q.      Is it still your testimony
2    that you didn't know on December 8th when
3    you released the Expression of Concern
4    that the jury was out in Houston?
5         A.      I don't know how I could
6    have known that.  I mean, you know, it's
7    not something that I would have known.
8         Q.      Did you use this talking
9    point when you answered questions from
10   the media about why you released that
11   Expression of Concern on that date?
```

Page 13

*asked and answered - Not answered - he didn't give a full answer. In any regards okay to press when the witness is being non-responsive throughout the deposition.*

*Overruled*

merck affirmative designations curfman jan 24, 06 conditional.txt
[76:16] - [76:21] 1/24/2006 Curfman, Gregory (MDL)

page 76
16        Q.   Well, you were asked about
17   why in the media, weren't you?
18        A.   I don't recall, but what I
19   can say is that I didn't use this talking
20   point because I didn't need to use this
21   talking point.

*leading — Leading Obuy.*

[77:1] - [77:17] 1/24/2006 Curfman, Gregory (MDL)

page 77
1               THE WITNESS:  The truth of
2    the matter is that we released the
3    Expression of Concern when we had
4    all of the data assembled, when we
5    had deliberated, we had the facts
6    in hand.  We very carefully
7    deliberated.  The editors had come
8    together, reviewed all the
9    information that we had, including
10   information that we obtained on
11   November 21st, 2005.  We made our
12   best judgment as editors of the
13   New England Journal of Medicine
14   with many years of experience
15   collectively, and we sat down and
16   wrote the document, the Expression
17   of Concern.

[78:1] - [78:6] 1/24/2006 Curfman, Gregory (MDL)

page 78
1                       And when we
2    finally reached what we considered
3    to be a final version after going
4    through many versions of the
5    Expression of Concern we released
6    it, which is our responsibility as

*incomplete answer*

*Rest of answer is Non-responsive to question + is a repetitive, lengthy Speech.*

[80:17] - [80:19] 1/24/2006 Curfman, Gregory (MDL)

page 80
17        Q.   We've been looking at the
18   December 8 talking points.  Let me show
19   you Exhibit 7.

*Sidebar*

[81:7] - [81:10] 1/24/2006 Curfman, Gregory (MDL)

page 81
7    BY MR. BECK:
8         Q.   Do you see that this
9    document is the December 5th version of
10   the talking points?

[81:15] - [81:16] 1/24/2006 Curfman, Gregory (MDL)

*Just introducing witness to Exhibit 7 - sets context for questions to follow.*

                        Page 14

*overruled*

merck affirmative designations curfman jan 24, 06 conditional.txt

page 81
15      Q.      Down at the bottom it says,
16   "why Did we Release This when we Did?"

*No answer*)   *Okay to delete 81:15-16*

[82:15] - [83:7] 1/24/2006 Curfman, Gregory (MDL)

page 82
15      Q.      I apologize.  I've got the
16   date wrong.  So, now we're talking about
17   after it's been released and out there in
18   the public for a while; right?
19      A.      Right.  Uh-huh.
20      Q.      And so this was a later
21   version of the talking points.  And down
22   at the bottom it says "why Did we Release
23   This when we Did?"  Could you read for me
24   the first sentence --

*leading → Just correcting the date; in any regards, "leading" questions are ok.*

page 83
1       A.      Sure.
2       Q.      -- of the talking points?
3       A.      Sure.  "We made this
4    information public as soon as we could,
5    without regard to the trial."
6       Q.      Now, that statement in the
7    talking points was false, wasn't it?

*leading omits answer*

*No answer. (plaintiffs' counsel interrupts in the middle ② of the question sequence)*

*Compound*

[83:11] - [83:15] 1/24/2006 Curfman, Gregory (MDL)

page 83
11      Q.      In fact, when you were
12   planning the release of the Expression of
13   Concern, you were planning it to coincide
14   with specific events of the trial down in
15   Houston.  Isn't that true?

*assumes facts not in evidence*

*Compound*

[83:22] - [84:2] 1/24/2006 Curfman, Gregory (MDL)

page 83
22              You were planning to release
23   the Expression of Concern based on
24   specific events that you had been told
page 84
1    would take place down in the trial in
2    Houston, isn't that true, sir?

*Witness understand question and answers. Just bc facts are clearly established in docs (eg, NEJM 000001) and discussed in the deposition). This is important point because Dr. Curfman later backtracks off this answer. Goes directly to bias + credibility.*

[84:6] 1/24/2006 Curfman, Gregory (MDL)

page 84
6               THE WITNESS:  No.

[84:14] 1/24/2006 Curfman, Gregory (MDL)

page 84
14      Q.      What is Exhibit 8?

[84:18] - [84:22] 1/24/2006 Curfman, Gregory (MDL)

Page 15

*Overruled* (handwritten)

merck affirmative designations curfman jan 24, 06 conditional.txt

page 84
18            THE WITNESS:  Right.  This
19   is some e-mail from December 8th
20   among the various editors of the
21   Journal about the Expression of
22   Concern.

*hearsay 801.802* (handwritten)

*• Business Records* (handwritten)
*• In Any regard, not* (handwritten)
*for truth of the* (handwritten)
*matter, but instead* (handwritten)
*to show what NEJM* (handwritten)
*editors thought and* (handwritten)
*how that may have* (handwritten)
*influenced their* (handwritten)
*actions.* (handwritten)

[84:24] - [85:18] 1/24/2006 Curfman, Gregory (MDL)

page 84
24        Q.    And on the bottom, which
page 85
1   would be the earliest of the three
2   e-mails printed on this page; is that
3   correct?
4        A.    Yes.  December 7th, right.
5        Q.    And it's December 7th, 6:00
6   p.m. from Tad Campion.  Who is Tad
7   Campion?
8        A.    He's the senior deputy
9   editor at the journal.
10        Q.    Then it says to -- and it
11   has Lisa Scott, Karen Pedersen, Sandra
12   Jacobs, Andrea Graham and Julie Mooza.
13   Are they all employees of the New England
14   Journal of Medicine?
15        A.    This is the web team, yes.
16        Q.    And then cc, that means
17   copies; right?
18        A.    That's right.

[87:6] - [88:2] 1/24/2006 Curfman, Gregory (MDL)

page 87
6        Q.    And then you're copied on
7   this December 7th 6:00 p.m. e-mail;
8   right?
9        A.    Yes.
10        Q.    Dr. Drazen, the
11   editor-in-chief is also copied; correct?
12        A.    Correct.
13        Q.    Then the subject, what does
14   the subject line read?
15        A.    "Probable Early Release
16   Tomorrow P.M.," is that what you're
17   referring to?
18        Q.    Yes.  Underneath where it
19   says "Probable Early Release Tomorrow
20   P.M.," there's a line that says
21   "Importance," and what did Mr. Campion
22   say was the importance of this e-mail?
23        A.    It says "High."
24        Q.    Then the e-mail says,
page 88
1   "Steve." Who would that be?  Is that
2   Steve Morrissey?

*leading* (handwritten)

*Leading is* (handwritten)
*okay.* (handwritten)

[88:4] - [88:5] 1/24/2006 Curfman, Gregory (MDL)

page 88

Page 16



*overruled*
*607*

merck affirmative designations curfman jan 24, 06 conditional.txt
4          THE WITNESS:  That would
5       probably be Dr. Morrissey, yes.

[88:7] - [89:3] 1/24/2006 Curfman, Gregory (MDL)

page 88
7          Q.    "Steve wants us to know
8   that we need to get ready to post as an
9   early release the Expression of Concern
10  that is scheduled for the editorial pages
11  of the December 29th issue."
12               Let me ask you first, as of
13  December 7 at 6 p.m., in fact, the
14  Expression of Concern had been scheduled
15  to be printed on December 29th with the
16  regular edition of the journal, right?
17         A.    Yes.
18         Q.    And then it says, "The
19  reason," that's the reason for this early
20  release; right?
21         A.    Right.
22         Q.    "The reason is that
23  tomorrow's testimony in the Vioxx trial
24  may involve part of a deposition that
page 89
1   Greg gave about the NEJM and the VIGOR
2   trial." "Greg" is you; right?
3          A.    That's right.


[89:4] - [89:16] 1/24/2006 Curfman, Gregory (MDL)

page 89
4          Q.    And then it says, "If so,
5   there will be press attention, and we
6   want the press to know about the official
7   NEJM statement.  That is being laid out
8   and needs to be ready to go" on the
9   website "as an early release."  Right?
10         A.    Correct.
11         Q.    "Steve or Greg or I will
12  let you know when it's time to go.
13  Things in a trial can always get pushed
14  back a day or two, so we cannot yet be
15  positive."  Right?
16         A.    Uh-huh.


[89:20] - [90:15] 1/24/2006 Curfman, Gregory (MDL)

page 89
20         Q.    And that's what you were
21  told on December 7, 6:00 p.m.; correct?
22         A.    Right.
23         Q.    Then earlier you said that
24  you were surprised at the press reaction
page 90
1   to the --
2          A.    Yes.
3          Q.    -- Expression of Concern?
4          A.    Yes, I was.
5          Q.    Do you see the last line, it
                                Page 17

*— See previous page*

*F01,802*

*hearsay*

*leading*

*hearsay*

*hearsay*

*improper mention of trial —*

*See bottom of page 3 -*

*(Goes directly to bias + credibility - necessary to rebut Dr Curfman's testimony)*

*hearsay*

*hearsay*

*hearsay*

*overruled* [handwritten]

*same response* [handwritten]

merck affirmative designations curfman jan 24, 06/conditional.txt

```
 6   says, "It will be essential to notify the
 7   press and make it prominent on the press
 8   site"?  Do you see that?
 9      A.    Yes, I do.
10      Q.    Now, how is it that you and
11   your colleagues at the New England
12   Journal of Medicine knew that the
13   plaintiffs' lawyers were hoping to play
14   your deposition on the next day, December
15   8, as is reflected in this e-mail?
```

*hearsay* [handwritten]

*assumes facts not in evidence* [handwritten]

*leading* [handwritten]

*argumentative* [handwritten]

[90:19] - [90:22] 1/24/2006 Curfman, Gregory (MDL)

```
page 90
19           THE WITNESS:  I don't -- you
20      know, Dr. Campion didn't tell me
21      where he got the information, so,
22      I can't answer that.
```

*A Response: This is also Not argumentative. This info was an important point. This info was Not public and the any possible source is some plaintiff's attorney. Okay to ask this question as it goes to bias & credibility* [handwritten]

[90:24] - [92:5] 1/24/2006 Curfman, Gregory (MDL)

```
page 90
24      Q.    Well, do you know who it was
page 91
 1   from the New England Journal of Medicine
 2   who was gathering information about what
 3   was expected to be done down there in the
 4   Houston trial and when it was expected to
 5   happen?
 6      A.    I don't know who was
 7   collecting that, no.
 8      Q.    Do you know whether somebody
 9   at the New England Journal of Medicine
10   was in communication with the plaintiffs'
11   lawyers to find out what they were
12   planning to do each day?
13      A.    I certainly am not aware of
14   that, no.
15      Q.    Well, did you ever ask Tad
16   Campion how he came to know that the
17   plaintiffs' lawyers were hoping to play
18   your deposition on December 8th?
19      A.    I didn't ask him, no.  I
20   received the e-mail, and that was really
21   the extent of the communication.
22      Q.    Did you ever tell any of the
23   newspaper or broadcast media folks that
24   you gave interviews to that, in fact, the
page 92
 1   reason that you released the Expression
 2   of Concern on December 8th instead of
 3   waiting until December 9th was because of
 4   what you expected was going to happen
 5   down in the Vioxx trial?
```

*assumes facts not in evidence - No - they found out somehow - that's asked and answered (No goes to frequency of communication with plaintiffs' lawyer* [handwritten]

*asks this question as it goes to bias & credibility* [handwritten]

*assumes facts not in evidence - NOT TRUE. NEJM 00002 (Ex. 8) establishes this; it was just discussed.* [handwritten]

*Compound* [handwritten]

*argumentative* [handwritten]

*assumes facts not in evidence* [handwritten]

*Facts are in evidence - re times etc see bias re compound* [handwritten]

[92:8] - [92:11] 1/24/2006 Curfman, Gregory (MDL)

```
page 92
 8           THE WITNESS:  I don't recall
 9      getting that question or giving
```

*Not argumentative - goes to what he told the press on a critical point (that WAS the subject of the "talking points"). Goes to bias & credibility. Not compound in traditional sense - but regardless, witness understands & answers the question just fine* [handwritten]

Page 18

*Overruled* [handwritten signature]

[handwritten right margin:] Not argumentative — Witness recants below in response + admits that the Editorial did have something to do with his deposition being played at trial. Witness changes answer throughout goes to bias & credibility

Compound answer facts not in evidence argumentative — Form of question is proper.
— Docs + testimony below discuss this effect issue.

```
                    merck affirmative designations curfman jan 24,'06 conditional.txt
10                 that kind of answer.  I don't
11         recall.

[92:13] - [92:21] 1/24/2006 Curfman, Gregory (MDL)

page 92
13         Q.    Did you ever tell anybody
14    that the reason that you released the
15    Expression of Concern in the middle of
16    the trial in Houston was because you'd
17    been told that they were planning on
18    playing your testimony, and you wanted to
19    coordinate the release of the Expression
20    of Concern with the playing of your
21    testimony in Houston?

[93:13] - [93:14] 1/24/2006 Curfman, Gregory (MDL)

page 93
13              THE WITNESS:  Could you
14         repeat the question?

[93:16] - [94:1] 1/24/2006 Curfman, Gregory (MDL)

page 93
16    Q.    Sure.  —— [handwritten: Sidebar]
17              Did you ever tell anybody
18    that the reason you released the
19    Expression of Concern in the middle of
20    the trial in Houston was because you'd
21    been told that they were planning on
22    playing your testimony, and you wanted to
23    coordinate the release of the Expression
24    of Concern with the playing of your
page 94
1  testimony down in Houston?
```

[handwritten: Same obj. Same. Response.]

```
[94:5] - [95:4] 1/24/2006 Curfman, Gregory (MDL)

page 94
5              THE WITNESS:  Well, I
6    can't -- I can't imagine that I
7    would have said that because Dr.
8    Campion articulates very precisely
9    in his e-mail what the issue was
10   with respect to my testimony.  And
11   the issue with respect to my
12   testimony was that my testimony
13   consisted, as it does today, with
14   a series of questions and answers.
15   And I did the best that I could in
16   that deposition of November 21st
17   to answer the questions.  But it
18   was not a written, an official
19   written statement of the journal.
20   It was testimony, it was oral
21   testimony.
```

                              Page 19

*Overruled* [handwritten]

merck affirmative designations curfman jan 24, 06 conditional.txt

```
22                we believed that in order to
23            make sure that the Expression of
24            Concern was clearly understood by
page 95
1             those who would be interested in
2             the public, that we needed to have
3             our official statement out before
4             the deposition was played.
```

[96:4] - [96:8] 1/24/2006 Curfman, Gregory (MDL)

```
page 96
4        Q.   Well, do you now admit that
5    the timing of the release of the
6    Expression of Concern was, in fact,
7    dictated by what was happening down in
8    the Houston trial?
```

*leading argumentative* [handwritten]

*Leading okay, not argumentative — showing how Dr. Curfman's testimony is inconsistent with what he testified to previously in the deposition namely that the release of the Editorial has nothing to do w/ what was going on @ the trial.* [handwritten]

[96:11] - [96:19] 1/24/2006 Curfman, Gregory (MDL)

```
page 96
11           THE WITNESS:  Well, that's
12   not what -- as I just said, as far
13   as the trial is concerned, I was
14   not following the trial closely.
15   The issue was my personal
16   testimony and when that would be
17   played and how that might be
18   interpreted or misinterpreted by
19   members of the media.
```

[96:24] - [97:8] 1/24/2006 Curfman, Gregory (MDL)

```
page 96
24           THE WITNESS:  So, yeah, it's
page 97
1    not a matter of admitting to
2    anything.  It's what I have just
3    said and said a moment ago.  I
4    think the explanation is quite
5    clear and coherent, and that's my
6    answer to your question.  I can't
7    really say any more about it than
8    that.
```

[97:10] - [97:14] 1/24/2006 Curfman, Gregory (MDL)

```
page 97
10       Q.   Well, do you remember
11   earlier this morning saying that the
12   Expression of Concern, the timing of its
13   release had nothing to do with what was
14   going on in the trial in Houston?
```

*mistake testimony* [handwritten]

*No- See 76:16- 78:6; 83:11-84:4* [handwritten]

[97:16] - [98:1] 1/24/2006 Curfman, Gregory (MDL)

```
page 97
16           THE WITNESS:  Well, what I
```

*In any regard, Dr. Curfman tries to explain the apparent inconsistency. Goes to credibility + bias.* [handwritten]

Page 20

*overruled* (handwritten)

merck affirmative designations curfman jan 24, 06 conditional.txt

17          recall is that you asked, you
18          know, did it have something to do
19          with the trial.  And it did have
20          something to do with my testimony.
21          But it turned out that my
22          testimony was not part of the
23          trial at all anyway.  It never was
24          played, and, therefore, was not
page 98
1           part of the trial.

[98:3] - [98:18] 1/24/2006 Curfman, Gregory (MDL)

page 98
3          Q.    But you released the
4    Expression of Concern early anyway --
5          A.    Yes, we did.
6          Q.    -- even though there was no
7    need to in order to have the record
8    straight concerning your deposition;
9    right?
10         A.    Yes.  But we were prepared,
11   and as I explained to you, according to
12   the uniform requirements, and that's an
13   important word, "requirements," of the
14   International Committee of Medical
15   Journal Editors, this is what was
16   expected of us as editors.  We had the
17   information put together, and we released
18   it.

[99:16] - [100:15] 1/24/2006 Curfman, Gregory (MDL)

page 99
16         Q.    Dr. Curfman, is it your
17   testimony that the New England Journal of
18   Medicine did not do anything out of the
19   ordinary in terms of press relations with
20   the Expression of Concern concerning the
21   VIGOR article compared to what it did
22   with those other two Expressions of
23   Concern you mentioned?
24         A.    Well, in fact, one of those
page 100
1    three Expressions of Concern was released
2    last Friday, and there was some media
3    attention given to that Expression of
4    Concern as well.  So, the first one that
5    we released back in 2002, my
6    recollection, did not generate as much
7    media attention.
8          Q.    Looking still at Exhibit 8,
9    we were looking at the bottom of the
10   three e-mails, which would have been the
11   earliest.  If you look up to the middle
12   one, you see that that's from Dr. Drazen
13   at 6:57 a.m. on December 8th to several
14   people, including you?
15         A.    Right.

Page 21

Handwritten margin notes:
- assumes facts not in evidence
- leading; argumentative
- A: Dr. Curfman has no problem with the question. Leading question is okay; question is not argumentative, it is merely stating facts. Not testimony of facts not in evidence – Dr. Curfman volunteered that his dep wasn't played @ trial.
- leading
- leading is okay
- hearsay 801, 802
  - Business Records
  - In any regard, not for truth of the matter but instead shows NEJM frequent contact w/ the press on this issue + how NEJM went on the media offensive