*overruled*

BEYOND SCOPE cont.

curfman plaintiff affirmatives 1 20.txt

page 152
1  after approximately 18 months of treatment."
2          Was that a change that you as editor
3  insisted on?
4      A.  Yes.
5      Q.  And was the addition of the phrase "in
6  post-hoc analyses" intended to convey to the reader
7  that the 18-month hypothesis was only a hypothesis?
8      A.  Yes, that's correct.
9          And, Attorney Arbitblit, since you are
10 at this paragraph, I would also point out the last
11 sentence in that paragraph, which I can read, "In
12 addition, there was an increased frequency of
13 investigator-reported events such as hypertension,
14 edema and congestive heart failure which occurred
15 much earlier in the study."
16         Now that's an important point, because
17 we can get into this more, perhaps, but there were
18 other endpoints where the separation of the curves
19 occurred almost immediately on initiation of the
20 study, and one of my tasks as editor was to ensure
21 that those data were presented in this article.
22     Q.  Well, let's follow up on that point.
23     A.  Because they establish that the 18-month
24 cutpoint is not a stable cutpoint.

- 611

Non-responsive

[153:3] - [153:7] 12/5/2005 Curfman - 11.21.2005

page 153
3      Q.  Going back to your February 9th letter,
4  which addresses some of these other endpoints, if
5  you could look at the comment of Reviewer E at Page
6  282, and let me know when you are there.
7      A.  I am there.

801/802

802

611-still leading

[153:8] - [153:22] 12/5/2005 Curfman - 11.21.2005

page 153
8      Q.  Reviewer E mentions, "It is also clear that
9  the safety committee was monitoring all major CV
10 events, not just thrombotic events, and that these
11 composite safety outcome -- that this composite
12 safety outcome showed a signal within four months.
13 Recommendation:  Add these additional serious
14 events to Table 3.  It would also be very useful to
15 see K-M curves for this broader composite.  I
16 suspect that this will show rapid separation, an
17 important finding."
18         Now referring to your letter of
19 February 9th, Paragraph 3, one of the directives
20 is:  Show the K-M curves for all serious CV events
21 to show the early separation.
22     A.  Yes.

[153:23] - [154:24] 12/5/2005 Curfman - 11.21.2005

page 153



curfman plaintiff affirmatives 1_20.txt
```
23      Q.  Was your Paragraph 3 intended to reflect,
24   in part, the concerns of Reviewer E that we just
page 154
1    read from Page 282?
2       A.  That's correct.
3       Q.  Also looking at the comments of Reviewer B
4    at Page 272.
5       A.  Right.
6       Q.  In the third full paragraph, Reviewer B
7    discusses the thrombotic cardiovascular serious
8    event endpoint.
9            Do you see that?
10      A.  The other outcome, thrombotic
11   cardiovascular endpoints, yes.
12      Q.  And goes on to say, "The two venous events
13   are outcomes that are not normally thought to be
14   preventable by aspirin except perhaps in the APTC
15   meta-analysis of aspirin use during surgery to
16   prevent venous thrombosis.  The use of the
17   composite endpoint that includes noise will reduce
18   power.  Based on known biologic mechanisms of COX-2
19   inhibitors, heart failure might have been a better
20   choice as an additional element of the primary
21   composite outcome than venous thrombosis."
22           Was your concern about getting a K-M
23   curve for all serious CV events also intended to
24   review Reviewer B's comment?

[163:1] - [164:24] 12/5/2005 Curfman - 11.21.2005

page 163
1       Q.  Dr. Curfman, Exhibit 34 is a series of
2    e-mails "RE: APPROVe - URGENT," bearing the date
3    2/9/05.
4            At pages MRK-AFV 399485 through 488 and
5    referring back to Exhibit 33, which we introduced
6    just before the break, which has Hui Quan composite
7    K-M plot for adjudicated confirmed thromboembolic,
8    APTC and congestive heart failure endpoints.
9            Then I direct your attention to the
10   second page -- the third page of the document which
11   is ending 487, in the middle, looking under the
12   e-mail from James Bressalier to Kevin Horgan,
13   Christopher Lines, Hui Quan and Ned Braunstein.
14           Do you see that?
15      A.  Yes, I do.
16      Q.  Do you see the reference to Dr. Bressalier
17   having spoken to John Baron and relating that the
18   NEJM wants the K-M plot, et cetera?
19      A.  Right.
20      Q.  "In speaking with John, he mentioned the
21   endpoint which was in the ESMB report last
22   September with CHF plus edema and other things."
23           He says, "I copied this from Hui's
24   report:  adjudicated/confirmed thromboembolic or
page 164
1    serious AEs or congestive heart failure, pulmonary
2    edema or cardiac failure," which is the same legend
3    as you see on Exhibit 33, the plot from September
4    13, correct?
5       A.  Correct.
```
                              Page 30

*Overruled*

*Beyond scope Court*

curfman plaintiff affirmatives 1_20.txt

```
 6      Q.  And then the request is made to Hui, "Can
 7  you make this K-M plot from the final frozen data?"
 8          Do you see that?
 9      A.  Yes.
10      Q.  Then if you go to the second page of the
11  document, do you see there is an e-mail from Alise
12  Reicin to a number of individuals -- Braunstein,
13  Gertz, Gregory, Lines, Horgan.  Where Dr. Reicin
14  states in the middle, "If they want a K-M of HTN"
15  -- or hypertension -- "a K-M of CHF, that is fine,
16  but mixing all together is inappropriate for this
17  paper."
18          Do you see that?
19      A.  Yes, I do.
20      Q.  Were you aware that your requests for
21  information to complete the review process of the
22  APPROVe study were being filtered through Merck
23  executives who were deciding what to provide and
24  what not to provide?
```

602

801/802

611 (also)

[165:3] 12/5/2005 Curfman - 11.21.2005

```
page 165
 3      A.  I was not aware of that, no.
```

[165:5] - [165:20] 12/5/2005 Curfman - 11.21.2005

```
page 165
 5      Q.  Exhibit 35 is an e-mail from Ned Braunstein
 6  to Janet Van Adelsberg at Merck, subject:  "DO NOT
 7  FORWARD.  NEJM letter on APPROVe study."
 8          "Janet, please do not forward.  We need
 9  to consider that all of the issues raised in this
10  letter will be questions that come up at the ACM.
11  We need K-M plots for hypertension, congestive
12  heart failure and all of the safety data from
13  APPROVe, but you should not mix with CV thrombotic
14  events."
15          Do you see that?
16      A.  Yes, I do.
17      Q.  You were now aware that Ned Braunstein was
18  calling the shots on what information you would or
19  wouldn't get in response to your requests to the
20  sponsor for data; is that right?
```

602

611

[165:23] - [166:1] 12/5/2005 Curfman - 11.21.2005

```
page 165
23      A.  NO.
24      Q.  "No," you were not aware of it?
page 166
 1      A.  I was not aware of it.
```

[166:2] - [166:14] 12/5/2005 Curfman - 11.21.2005



curfman plaintiff affirmatives 1_20.txt

page 166
2        Q.  Now, is it correct that you believe a
3   composite curve would have been something you
4   wanted to see?
5        A.  Beyond the one that we saw?
6        Q.  Yes.
7        A.  Yes.  If they had prepared one, yes.
8            Again, I'm not sure we would have
9   published it, but I would have wanted to see it.
10       Q.  As far as the comment by Reicin and
11  Braunstein that these are apples and oranges, do
12  you think these are more like apples and apples in
13  terms of they are being serious cardiovascular
14  endpoints?

[166:16] - [167:12] 12/5/2005 Curfman - 11.21.2005

page 166
16       A.  I was a little confused by what he meant
17  there.
18           If he means that congestive heart
19  failure shouldn't be displayed in the same graph or
20  pooled into a graph with, let's say, myocardial
21  infarction, I would disagree with that.  Those are
22  all apples, okay.
23           I mean, the most common cause of heart
24  failure is coronary heart disease.  So I think it's
page 167
1   legitimate to combine those to take a look at that.
2           The hypertension may be a bit different
3   in kind, and one might make an argument to separate
4   that out.
5        Q.  while you are on the subject of
6   hypertension, just briefly, did the authors of the
7   APPROVe study inform you at any time that they had
8   conducted a statistical analysis of the relative
9   risk of Vioxx versus placebo for confirmed
10  thrombotic events among patients who had suffered
11  elevated blood pressure above 160 systolic or 100
12  diastolic?

[167:14] - [168:9] 12/5/2005 Curfman - 11.21.2005

page 167
14       A.  They did not tell me that in those specific
15  terms.
16           What we did display in the APPROVe
17  article on hypertension is in Table 4, where their
18  hypertension events, at the top of the table, and
19  then as subcategory serious events, what they call
20  "serious events" where they are 11 in rofecoxib and
21  one in placebo, and I don't know if maybe that's
22  what they are referring to here.
23           I mean, we are talking about
24  hypertension, but that's as far as we went in the
page 168
1   APPROVe article.  We didn't get down to 160 or that
2   kind of thing.  We didn't get down to those
3   numbers.

Page 32

*Overruled*

*Beyond SCOPE Compl.*

701-703

*Improper expert testimony*

curfman plaintiff affirmatives 1_20.txt

```
4      Q.  In the -- well, does the 160 level for
5  systolic or the 100 level for diastolic have any
6  particular -- in terms of the stages of
7  hypertension in your field?
8      A.  Yes.  That would be a more advanced stage
9  of hypertension.  You would want to deal with that.
```

[168:10] - [168:23] 12/5/2005 Curfman - 11.21.2005

```
page 168
10     Q.  And if you look at Page 1100 of the
11 published APPROVe study, there is a discussion of
12 mean arterial pressure in the middle of the last
13 paragraph on the left that says, "Mean arterial
14 pressure did not appear to have a significant
15 association with confirmed thrombotic events."
16         Do you see that?
17     A.  Yes, I do.
18     Q.  Would it be relevant to the editors to know
19 that another analysis was conducted of the
20 thrombotic events that did show a significant
21 association among patients who had elevated blood
22 pressure of the 160 or greater systolic or 100 or
23 greater diastolic level?
```

602

611

701-703

[169:1] - [169:9] 12/5/2005 Curfman - 11.21.2005

```
page 169
1      A.  Yes.  One of -- one, of course, of the
2  mechanisms of concern in terms of vascular disease
3  would be hypertension as a substrate leading to
4  vessel damage.
5          So that would be -- if such analysis
6  existed, it would be very appropriate to include
7  that.
8      Q.  And that would have been of interest, not
9  only to the editors, but also to readers?
```

[169:11] 12/5/2005 Curfman - 11.21.2005

602

```
page 169
11     A.  Yes.
```

[187:2] - [187:23] 12/5/2005 Curfman - 11.21.2005

```
page 187
2      Q.  Doctor, what is the total number of
3  reprints of the Bombardier VIGOR study that have
4  been distributed from 2000 to the present?
5      A.  The total is 929,400.
6      Q.  And how many were distributed in the year
7  2000?
8      A.  246,000.
9      Q.  And that was published on November 23,
10 2000?
```

curfman plaintiff affirmatives 1_20.txt

```
11      A.  Yes.
12      Q.  And in 2001, how many were there?
13      A.  125,900.
14      Q.  And how many in 2002?
15      A.  549,500.
16      Q.  How many in 2003?
17      A.  7,500.
18      Q.  And in 2004?
19      A.  500.
20      Q.  And in 2005?
21      A.  None in 2005.
22      Q.  Again, the total is 929,400?
23      A.  Correct.
```

*Asked & Answered*

[188:11] - [188:16] 12/5/2005 Curfman - 11.21.2005


```
page 188
11      Q.  Good afternoon, Dr. Curfman.
12      A.  Good afternoon.
13      Q.  I am Jim Fitzpatrick, and I am attorney
14  representing Merck, and first let me echo what
15  Mr. Arbitblit said this morning, and thank you for
16  being here.
```

[236:22] - [237:22] 12/5/2005 Curfman - 11.21.2005


```
page 236
22      Q.  And, Doctor, do you have Exhibit 47 in
23  front of you?
24      A.  I do, uh-huh.
page 237
1       Q.  Could you identify that, please.
2       A.  This is a letter written by the deputy
3   editor primarily responsible for the VIGOR
4   manuscript, Dr. Robert Steinbrook, to Dr. Claire
5   Bombardier, asking for some additional information,
6   pretty early on in the process, about the efficacy
7   of the two drugs in the treatment of rheumatoid
8   arthritis, and those data, in his mind, had not
9   been really very clearly displayed in the first
10  version of the manuscript, and he wanted to know
11  about that.
12      Q.  Okay.  So Dr. Steinbrook basically wanted
13  to know some additional data about the efficacy of
14  rofecoxib or Vioxx in the treatment of rheumatoid
15  arthritis, and he requested that Dr. Bombardier
16  provide that data to him; is that fair?
17      A.  Right.  And then an additional question had
18  to do with prior history of gastrointestinal events
19  and proton-pump-inhibitor therapy or misoprostol
20  therapy, yes.
21              So these are issues he wanted more
22  information about as the editor.
```

• 602
• Non-responsive

• 602
• non-responsive.

[237:23] - [238:3] 12/5/2005 Curfman - 11.21.2005


page 237

                    Page 34

```
                         curfman plaintiff affirmatives 1_20.txt
23      Q.  And is that -- is that a fairly common
24   practice, if a deputy editor or an associated
page 238
1   editor wants additional information from the
2   authors of a manuscript, that he or she can request
3   that information from the authors?


[238:4] - [238:5] 12/5/2005 Curfman - 11.21.2005


page 238
4      A.  Yes.  It is fairly common practice.  It is,
5   yes.


[238:7] - [238:13] 12/5/2005 Curfman - 11.21.2005


page 238
7      A.  I think what I would like to say in
8   addition to that is that there is also an
9   expectation on the part of the editors that there
10  is a sense of fairness in the scholarly community
11  that authors have a pretty good sense of what
12  information they have at their disposals.  Editors
13  don't.


[238:14] - [239:4] 12/5/2005 Curfman - 11.21.2005


page 238
14             If the expectation is that if an editor
15  doesn't ask for it, you as an author don't have to
16  provide it, that's not fair.
17      Q.  No, absolutely.
18      A.  That's not the way the scholarly community
19  has functioned for hundreds of years.
20             There has to be an expectation that the
21  researcher is going to provide the information that
22  they know they have there, not necessarily without
23  having to be asked by an editor.
24             Now these were issues that
page 239
1   Dr. Steinbrook wanted more information about,
2   that's fair; but to carry that too far and to say
3   if an editor didn't ask for it, then I don't have
4   to give it, is not a level playing field.


[239:5] - [239:9] 12/5/2005 Curfman - 11.21.2005


page 239
5      Q.  Right.  Absolutely.
6             Authors -- and I think you testified
7   before authors are expected to provide the
8   important results of the study to the editors for
9   their review; is that fair?


[239:11] - [240:1] 12/5/2005 Curfman - 11.21.2005
                         Page 35
```

Overruled

BEYOND SCOPE

Non-responsive
602
.401 - 403
.611

Not a question; 611
sidebar            403

Not a question; 611
sidebar            403

curfman plaintiff affirmatives 1_20.txt

*overrule*

page 239
11     A.  That's correct.
12     Q.  But I think -- and you also testified
13  before that there is not the expectation that you
14  are going to receive every piece of data concerning
15  a study as part of your manuscript review because
16  that wouldn't be feasible; is that fair as well?
17     A.  That wouldn't be feasible, but data can be
18  prioritized, and again, investigators are supposed
19  to know their data.  They are supposed to know the
20  field.  They are supposed to know what they have in
21  their hands there and prioritized it in such a way
22  that they are honestly providing in the manuscript
23  that they are submitting the data that are
24  relevant, the data that would impact on people's
page 240
1  health; that is a fair expectation.

*non-responsive*
*611*

[255:9] - [255:10] 12/5/2005 Curfman - 11.21.2005


page 255
9     Q.  Okay.  Let's take a look again at the
10  published article, which is Exhibit 11.  If you


[255:10] - [255:19] 12/5/2005 Curfman - 11.21.2005


page 255
10  published article, which is Exhibit 11.  If you
11  could get that, please, Doctor, and, Doctor, I
12  would likes to take a look at some of the data that
13  are presented in this article, and first I would
14  ask you to just take a look at the abstract on the
15  first page of the article.
16          Is it fair to say that, generally
17  speaking, the abstract is meant to be a summary of
18  the important information in the article?
19     A.  Yes.

*Beyond Scope*

[259:4] - [259:19] 12/5/2005 Curfman - 11.21.2005


page 259
4     Q.  Then if you go a little further down in the
5  "Results" section of the abstract on the first
6  page, it reads, "The incidence of myocardial
7  infarction was lower among patients in the naproxen
8  group than among those in the rofecoxib group, 0.1
9  percent versus 0.4 percent; relative risk, 0.2.  95
10  percent confidence interval, 0.1 to 0.7."
11          Do you see that?
12     A.  I do.
13     Q.  So based on that, if a person read -- if a
14  reader of this article read the first -- just the
15  first page of this article, they would see that
16  there was a -- there was a difference in lower
17  incidences of heart attacks in the patient taking
                                        Page 36

*Overrule — see — [Beyond scope cont]*

curfman plaintiff affirmatives 1_20.txt
18  naproxen than in the patient taking Vioxx; is that
19  correct?


[259:21] - [260:3] 12/5/2005 Curfman - 11.21.2005


page 259
21      A.  well, that's what it says, yes.
22      Q.  And I would like to ask you specifically a
23  few questions about the way the data are presented
24  there, and specifically the relative risk
page 260
1  presentation there of 0.2.
2              Could you describe what a relative risk
3  of 0.2 means?


[260:4] - [261:3] 12/5/2005 Curfman - 11.21.2005


page 260
4      A.  The relative risk is a measure of the risk
5  of one therapy versus another with respect to this
6  particular endpoint.
7              The confidence intervals reflect the
8  variation on that point estimate of .2.  So the
9  point estimate of .2 means that the risk of having
10  a myocardial infarction with naproxen was only 20
11  percent that of taking naproxen --
12      Q.  Than taking Vioxx; is that right?  I'm
13  sorry, Doctor, I think you may have misspoken.
14      A.  Oh, did I?
15      Q.  The relative risk of naproxen was 20
16  percent --
17      A.  Of rofecoxib.
18      Q.  Of rofecoxib?
19      A.  Yeah.
20      Q.  I'm sorry.  Go ahead.
21      A.  That's okay.  Go ahead.
22      Q.  So that's another way of saying, if someone
23  read this, that's another way of saying that the
24  rate of heart attacks on naproxen was one-fifth the
page 261
1  rate of heart attacks on Vioxx, roughly; is that
2  correct?
3      A.  Yes.


[261:4] - [261:9] 12/5/2005 Curfman - 11.21.2005


page 261
4      Q.  And, conversely, and I think we discussed
5  this this morning, that's another way of saying
6  that the relative risk -- that the risk of
7  myocardial infarctions on Vioxx was five times that
8  of the relative risk -- sorry, the risk of heart
9  attacks on naproxen; is that correct?


[261:11] - [262:4] 12/5/2005 Curfman - 11.21.2005

Page 37

*Overruled* BEYOND SCOPE cont

curfman plaintiff affirmatives 1_20.txt

page 261
11      A.  Yeah, it doesn't say that here.  The
12  authors chose and the editors allowed to go through
13  the statement that naproxen was protective.
14          So that is the way it is stated here in
15  this summary, but it doesn't acknowledge the other
16  hypothesis here in the abstract.
17      Q.  Well --
18      A.  The other hypothesis being just what you
19  said:  That the risk of heart attack is five times
20  greater with naproxen -- with rofecoxib than with
21  naproxen.
22      Q.  Well, it's fair to say, isn't it, Doctor,
23  that neither hypothesis is really discussed in this
24  abstract?
page 262
1          What is discussed in the abstract is
2  that the incidence on naproxen was lower than that
3  on the Vioxx and that the magnitude of that
4  difference was about fivefold; is that fair?

[262:6] - [262:9] 12/5/2005 Curfman - 11.21.2005

page 262
6      A.  Yes.  But again, that's only one
7  possibility.  The implication here is that naproxen
8  is protective.  Now, of course, we know -- we know
9  now that that is not true at all.

[262:12] - [263:10] 12/5/2005 Curfman - 11.21.2005

page 262
12      A.  It's not true at all, okay?
13      Q.  Yes.  But specifically, at least anyone
14  reading this first page of this article would know
15  that there was a fivefold difference between the
16  incidence of heart attacks on Vioxx and naproxen.
17  whether that was a result of a protective effect of
18  naproxen or some effect of Vioxx, they would know
19  from reading this first page that there was a
20  fivefold difference in heart attacks?
21      A.  No.  I disagree with that.
22          They are being told that there are
23  fewer events with naproxen.  The clear implication
24  there is that naproxen is protective and not that
page 263
1  rofecoxib is deleterious.
2      Q.  Right.  I understand -- and I understand
3  that that is your view, Doctor, but my question is
4  just, specifically, they wouldn't -- a person
5  reading the first page of this article would know
6  that there was a fivefold difference between the
7  two -- that there were different rates of heart
8  attacks on naproxen and rofecoxib?  They wouldn't
9  have had to read past the abstract to understand
10  that particular fact?

Page 38

Non-responsive 611

Improper expert testimony 74-702
• 611
• non-responsive

SAME 3 objections

sidebar; 611

611; sidebar

curfman plaintiff affirmatives 1_20.txt
[263:12] - [263:17] 12/5/2005 Curfman - 11.21.2005

page 263
12          A.  Yes.  They would know that particular fact,
13   but they would also take away the secondary fact
14   that the clear implication is that naproxen is
15   protective.
16          Q.  Okay.
17          A.  And we know now that that is not true.

*non-responsive*

*cell ; sidebar*

*• 701 - 703 - improper*
*expert testimony*
*• non-responsive*

[263:21] - [264:16] 12/5/2005 Curfman - 11.21.2005

page 263
21          The further -- the "Results" section
22   goes on further to state that, "The overall
23   mortality rate and the rate of death from
24   cardiovascular causes were similar in the two
page 264
1    groups."
2          Do you see that?
3          A.  Yes, I do.  With very low statistical
4    power, that doesn't say that there, but I think we
5    should bring into this that this study was not even
6    close to be powered for cardiovascular mortality.

*Non-responsive*
*sidebar.*

7          Q.  Right.  The study -- this study was powered
8    with respect to its primarily endpoint of
9    gastrointestinal bleeding; is that correct?
10          A.  Yes.
11          Q.  And the same -- the same really holds true
12   with all of the cardiovascular events that are
13   being discussed here.  We are talking about low
14   number of events, and there is fairly low power to
15   make any determinations about the cardiovascular
16   events in this study; is that correct?

[264:18] - [265:7] 12/5/2005 Curfman - 11.21.2005

page 264
18          A.  No.  I wouldn't agree with that.
19          It's true that cardiovascular endpoints
20   were not the primary endpoints in the trial; but
21   the numerical data that we went through this
22   morning, I think that valid conclusions about
23   cardiac toxicity can be drawn from those data.
24          It's not that there are too few of them

*Non-responsive,*
*403*

page 265
1    that we can't say anything about it, that we can't
2    validly assess cardiovascular toxicity from all of
3    those tables of data that we reviewed this morning.
4          There is very important information in
5    those tables of data that indicate a very clear
6    signal about the cardiac toxicity of rofecoxib, and
7    we shouldn't sweep that under the rug.

[267:15] - [268:4] 12/5/2005 Curfman - 11.21.2005

*BEYOND*
*SCOPE*



curfman plaintiff affirmatives 1_20.txt

page 267
15              Doctor if you could also take a look at
16  Exhibit 16, which -- I'm sorry -- 17, which is one
17  of the exhibits we looked at this morning, and I
18  would refer you specifically to Page 25 of that
19  exhibit, which is one -- which is the table that
20  you talked about this morning.
21              Are you there, Doctor?
22      A.  Yes, I am.
23      Q.  Okay.  Thanks.
24              Just taking a look at this table, this
page 268
1  was the table that you talked about this morning,
2  and this table did not ultimately appear in the
3  final published VIGOR article as a table, correct?
4      A.  That's correct.


[268:5] - [268:15] 12/5/2005 Curfman - 11.21.2005


page 268
5      Q.  I just want to go over some of the -- I
6  just want to go over the percentages that appear in
7  that table and confirm that those percentages do in
8  fact appear in the text of the final VIGOR article
9  with you.
10              Specifically, if you look at the first
11  row on Table 5 on Page 25, you have all deaths and
12  the percentages there are 0.5 percent and 0.4
13  percent.
14              Do you see those?
15      A.  Yes, I do.


[268:16] - [268:24] 12/5/2005 Curfman - 11.21.2005


page 268
16      Q.  And if you look at the second sentence
17  under "General Safety" it states that, "The
18  mortality rate was 0.5 percent in the rofecoxib
19  group and 0.4 percent in the naproxen group."
20              Do you see that?
21      A.  Yes.
22      Q.  So those percentage were disclosed in the
23  text of the article; is that correct?
24      A.  That's correct.


[269:1] - [269:16] 12/5/2005 Curfman - 11.21.2005


page 269
1      Q.  And then if you go to the -- back to Page
2  25 of Exhibit 17, if you look at cardiovascular
3  deaths, the percentages are 0.2 percent and 0.2
4  percent.
5              Do you see that?
6      A.  Yes, I do.
7      Q.  And in the next sentence, moving to the
8  next sentence of the published VIGOR article, it
9  states, "The rate of death from cardiovascular
                    Page 40

curfman plaintiff affirmatives 1_20.txt
10  causes was 0.2 percent in both groups"; is that
11  correct?
12       A.  Correct.
13       Q.  So, again, the percentage of cardiovascular
14  deaths from Table 5 do appear in the text of the
15  final published VIGOR article; is that correct?
16       A.  The percentages do, yes.


[269:19] - [270:6] 12/5/2005 Curfman - 11.21.2005


page 269
19       Q.  Then if you go to -- I am going to skip the
20  third row, which is composite endpoint, and go to
21  the next row, which is myocardial infarction, and
22  that has -- the percentages from the table are 0.4
23  percent and 0.1 percent; is that correct?
24       A.  Right.
page 270
1        Q.  The corresponding sentence in the published
2   paper states that, "Myocardial infarctions were
3   less common in the naproxen group than in the
4   rofecoxib group, 0.1 percent versus 0.4 percent,"
5   and then gives the 95 percent confidence interval
6   and relative risk; is that correct?


[270:8] - [270:19] 12/5/2005 Curfman - 11.21.2005


page 270
8        A.  Yes, uh-huh.
9        Q.  So, again, the percentages of the
10  myocardial infarction that occurred in both the
11  Vioxx arm and the naproxen arm of the study from
12  this Table 5 here do appear in the text of the
13  final published VIGOR article; is that correct?
14       A.  The percentages do, yes.
15                You breezed by the third entry on the
16  table.
17       Q.  Yes.  No.  I will come back to that.
18       A.  You will come back to that?
19       Q.  I will.  Yes.

· Non - responsive
· hell
· repetitive
· witness is being
  argumentative

[270:20] - [271:4] 12/5/2005 Curfman - 11.21.2005


page 270
20                And the final row of Table 5 is
21  ischemic cerebrovascular accidents, which are
22  essentially a type of stroke; is that correct,
23  Doctor?
24       A.  Correct.
page 271
1        Q.  And the percentages in that table are 0.2
2   percent on Vioxx and 0.2 percent in the naproxen.
3                Do you see that?
4        A.  Yes, I do.


[271:5] - [271:17] 12/5/2005 Curfman - 11.21.2005
                              Page 41

curfman plaintiff affirmatives 1_20.txt

page 271
5      Q.  And I think I skipped this sentence before.
6   It's above the prior one in the final published
7   article, but it states, "Ischemic cerebrovascular
8   events occurred in 0.2 percent of the patients in
9   each group"; is that correct?
10      A.  Yes.
11      Q.  So, again, the percentages of stroke in
12   both the Vioxx arm -- the percentage of patients
13   who suffered from a stroke in both the Vioxx arm
14   and the naproxen arm that were in this table also
15   appeared in the text of the final published
16   article; is that correct?
17      A.  The percentages did, yes.


[271:18] - [273:21] 12/5/2005 Curfman - 11.21.2005


page 271
18      Q.  And then the -- you mentioned the composite
19   endpoint, which was the -- which was the third row
20   on the table, and the specific percentages in that
21   table do not appear in the final published article;
22   is that correct?
23      A.  That's correct.
24      Q.  But what those -- what that composite
page 272
1   endpoint reflects is an addition of the percentages
2   of cardiovascular deaths, nonfatal heart attacks
3   and strokes; is that correct?
4      A.  That's correct.
5          And what you are asking the reader to
6   do is do the addition for himself or herself rather
7   than presenting it in a nice clear way, and of
8   course, that's exactly what the percentages do,
9   too.
10          In presenting percentages without raw
11   numbers, you are asking the reader then to do the
12   math, to go back to the total number of patients
13   and take .2 percent of that number and go through a
14   lot of calculations that almost no reader would do.
15          It's -- in other words, the data in the
16   text are summary percentages data, but they are
17   rather lacking in total clarity by not having the
18   actual patient numbers there.
19          In my opinion, the Table 5 that you're
20   asking us to look at is a much clearer presentation
21   of these data, much more helpful; and if I had to
22   do it over, I think that this is the way we would
23   have wanted to display these particular data.
24      Q.  But to be fair, in order to figure out
page 273
1   roughly the number of patients with each of these
2   events, all you have to do is multiply the
3   percentage times the number of patients in the
4   study; is that correct?
5      A.  And as an editor, if you are -- if that's
6   the way you're going to run your journal, I'm not
7   going to subscribe to your journal, because you are
8   asking the reader to do too much.           Page 42

*(handwritten margin notes: "Overrule", "Non-responsive 611 602 BEYOND SCOPE", "Non-responsive 611")*



curfman plaintiff affirmatives 1_20.txt
```
 9              You are asking the reader to do the
10  math.  You should do the math, and it is your job
11  -- it is my job as editor to make sure that readers
12  don't have to do the math, that for important
13  endpoints that the data are very clearly presented
14  so that the reader doesn't have to go through and
15  do these calculations.
16              It's the job of those writing the
17  paper, and in fairness, I am taking some
18  responsibility myself, responsibility of the
19  editors is to ensure that such data are presented
20  in a way that that kind of additional step on the
21  part of a reader wouldn't be necessary.
```

[273:22] - [274:1] 12/5/2005 Curfman - 11.21.2005

```
page 273
22       Q.  And in this particular case, neither The
23  Journal nor the reviewer requested that authors
24  provide actual numbers as opposed to percentages;
page 274
 1  is that correct?
```

[274:3] - [274:7] 12/5/2005 Curfman - 11.21.2005

```
page 274
 3       A.  I go back to the statement I made earlier,
 4  Attorney Fitzpatrick, that if, the expectation on
 5  the part of editors and journals is that if you
 6  don't ask for it, it's your tough luck.  That's not
 7  fair.
```

[274:8] - [274:17] 12/5/2005 Curfman - 11.21.2005

```
page 274
 8       Q.  I understand.
 9       A.  There aren't enough editors in the world to
10  ask all of the questions that would have to be
11  asked to pull together a whole article.
12       Q.  Right.
13       A.  There aren't enough editors in the world to
14  ask all those questions.  There is expectation in
15  the scholarly community that there will be an
16  honest and comprehensive providing of the data in a
17  submitted manuscript.  That's the expectation.
```

[274:18] - [275:11] 12/5/2005 Curfman - 11.21.2005

```
page 274
18       Q.  I understand.  And I am just saying
19  assuming in this particular case that the authors,
20  the 12 authors from the various institutions around
21  the world, believed that this was an appropriate
22  way to present the data, no one at New England
23  Journal or none of the reviewers appeared to
```
                        Page 43

*overruled* — *Beyond Scope*

curfman plaintiff affirmatives 1_20.txt
24 disagree with this type of presentation and
page 275
1 required them to do another type of presentation
2 and present the raw numbers; is that correct?
3      A.  That is a correct statement, but it still
4 doesn't make it right.  It still doesn't make it
5 right.
6           You can't conclude from what you just
7 said that the presentation of the cardiovascular
8 data in the VIGOR trial were an appropriate way of
9 presenting the data.
10           Another perfectly valid conclusion is
11 that both the authors and the editors slipped up.

· Non-responsive
· 611

[275:12] - [275:17] 12/5/2005 Curfman - 11.21.2005

*sidebar*

page 275
12      Q.  Okay.  But someone who is reading the
13 general safety section would be able to glean at
14 least the percentages of the patients in each group
15 that had the various types of events that are
16 described here, including heart attacks and
17 strokes; is that correct?

[275:19] - [276:12] 12/5/2005 Curfman - 11.21.2005

page 275
19      A.  The percentages, yes.
20      Q.  And if the reader wanted to do the --
21 wanted to figure out the rough number of patients
22 in each group that had these events, they could do
23 the multiplication problem and determine that
24 number of events.
page 276
1           If they -- if they believed it would be
2 more helpful to them to know the numbers rather
3 than the percentages, they could do that from the
4 information that's provided in the paper; is that
5 correct?
6      A.  It's always more helpful to know the
7 numbers.  Always.  And I go back to what I said
8 earlier, that it would have been difficult to do
9 this math.  You would have to figure out:  What am
10 I multiplying together?  It's not entirely clear
11 what you would multiply the .2 by to get the
12 answer.

· Non-responsive
· 611

[276:13] - [276:21] 12/5/2005 Curfman - 11.21.2005

page 276
13           Do you know?
14      Q.  Well --
15      A.  Can you tell me?
16      Q.  Yes.  You multiply it by the number of
17 patients --
18      A.  What is that number?  What is that number?
19      Q.  It's approximately 4,000.

· 611
Non-responsive

Page 44

Crenuff

611; nonresponsive

curfman plaintiff affirmatives 1_20.txt
20    A.  Well, approximate isn't going to be good
21 enough.


[276:22] - [277:8] 12/5/2005 Curfman - 11.21.2005


page 276
22           You have -- what I am saying is that
23 even you, you know, you have been studying this
24 stuff, you would have to go through and find those
page 277
1 total numbers of patients and then do the
2 multiplication; and what I am saying is that that
3 is making it hard for the reader to get the answer.
4           The whole point of publishing journal
5 articles is to make it easy for readers to get to
6 the answer.  That's what we spend a lot of our time
7 doing, and we need the help and cooperation of the
8 authors to do that.


[279:15] - [280:23] 12/5/2005 Curfman - 11.21.2005


page 279
15    Q.  And, Doctor, just continuing with our
16 discussion of some of the data that were presented
17 in the "General Safety" section of the VIGOR study,
18 which is 1523 of Exhibit 11.
19           Are you there?
20    A.  Yes.
21    Q.  After the data we talked about, the article
22 describes that four percent of the study subjects
23 met the criteria of the FDA for the use of aspirin
24 for secondary cardiovascular prophylaxis -- and
page 280
1 then it describes that indication -- but were not
2 taking low-dose aspirin therapy.
3           Do you see that?
4    A.  Yes.
5    Q.  And the article states that these patients
6 accounted for 38 percent of the patients in the
7 study who had myocardial infarctions, or heart
8 attacks; is that correct?
9    A.  Yes.
10    Q.  And then the article goes on to describe
11 the difference that was seen in the patients who
12 were not indicated for low-dose aspirin, and states
13 that, "In the other patients, the difference in the
14 rate of myocardial infarction between groups was
15 not significant, 0.2 percent in the rofecoxib group
16 and 0.1 percent in the naproxen group."
17           Do you see that?
18    A.  Yes.
19    Q.  So you -- would you agree, at least, that
20 the fact that there was still a difference, albeit
21 not statistically significant, in the rate of heart
22 attacks among the nonaspirin-indicated patients is
23 disclosed in the article?


[281:1] - [281:8] 12/5/2005 Curfman - 11.21.2005
                    Page 45

BEYOND SCOPE



curfman plaintiff affirmatives 1_20.txt

page 281
1      A.  Well, your clients held back three of the
2  heart attacks.
3      Q.  Yes.
4              But my question, Doctor, was
5  specifically, is the fact that there is a
6  difference in the rate of heart attacks in the
7  patients who were not indicated for low-dose
8  aspirin disclosed in the article; is that correct?


[281:10] - [281:16] 12/5/2005 Curfman - 11.21.2005


page 281
10     A.  Your client withheld three of the heart
11  attacks, and therefore, these numbers are not
12  really the final accurate numbers.
13     Q.  When you say -- when you say Merck withheld
14  heart attacks, you are -- you are not stating Merck
15  withheld any of the heart attacks from the FDA, are
16  you?


[281:18] - [283:1] 12/5/2005 Curfman - 11.21.2005


page 281
18     A.  NO.
19     Q.  In fact, Merck disclosed those heart
20  attacks to the FDA, as far as you can tell; is that
21  correct?
22     A.  That's the way I learned about them.
23     Q.  Right.  And that's how you learned about
24  them --
page 282
1      A.  After this was published.
2      Q.  Right.  I understand.  But so Merck did --
3      A.  I am the responsible editor and I find out
4  after --
5      Q.  Right.
6      A.  -- it was published.
7      Q.  But we do -- we are in agreement that Merck
8  did disclose the three heart attacks that you are
9  referring to to the FDA; is that correct?
10     A.  To the FDA, but not to us.
11     Q.  Right.
12             And are you aware, Doctor, that this --
13  that the analysis that was presented of the data
14  that was given to The New England Journal of
15  Medicine was an analysis of the events that had
16  occurred as of a certain date?
17     A.  I am very well aware of that, and I also
18  think that, regardless of that arbitrary date, that
19  we are talking about peoples lives, and one trumps
20  the other.
21     Q.  NO.  I understand.
22             Are you aware that the date cutoff that
23  I mentioned was pre-specified in the protocol as
24  the primary analysis of safety that would be done
page 283

*[handwritten: Overruled]*

*[handwritten box: BEYOND SCOPE cont]*

curfman plaintiff affirmatives 1_20.txt

1  in the study?

[283:3] - [283:5] 12/5/2005 Curfman - 11.21.2005

page 283
3      A.  Yes.  And that I still contend is a minor
4  technicality compared to the overriding importance
5  of these sorts of data to the health of the public.

*[handwritten: Non-responsive 611 403]*

[283:6] - [283:14] 12/5/2005 Curfman - 11.21.2005

page 283
6      Q.  Right. —————————————————————————
7              And you don't dispute that the data
8  that's in this article is an accurate portrayal of
9  the data, at least as of that cutoff point?
10             I understand that you disagree with the
11  use of that cutoff point, but as of that pre-
12  specified primary cutoff point, you agree that the
13  data presented in this article is accurate; is
14  that?

*[handwritten: sidebar]*

[283:16] - [284:16] 12/5/2005 Curfman - 11.21.2005

page 283
16     A.  The article didn't even include the numbers
17  of patients.  So the percentages were accurate as
18  of that time but didn't even include the numbers of
19  patients.
20     Q.  Right.  But we agree --
21     A.  And --
22     Q.  I'm sorry.
23     A.  And the question that you are posing is
24  really off point.
page 284
1              I don't care what the situation was as
2  of that date, wherever it was -- I can't remember
3  -- the cutoff date that was supposedly
4  pre-specified.
5              That really doesn't matter when further
6  data of extreme importance to the interpretation of
7  this very important health matter was at stake.
8  The data should have been provided The Journal, and
9  they weren't provided to The Journal, and that's
10  where the story ends --
11     Q.  Right.  I understand.
12     A.  -- for me.
13     Q.  I understand.
14     A.  As the responsible editor, not to have been
15  provided with those data just is not right.  There
16  is something not right about that.

*[handwritten: Non-responsive 611 403 sidebars 602]*

[284:19] - [285:1] 12/5/2005 Curfman - 11.21.2005

page 284

curfman plaintiff affirmatives 1_20.txt

19    Q.  And just to state my question again, I
20  understand that you might not feel this is the
21  appropriate question, but you do agree, at least as
22  of the pre-specified cutoff date, the percentages
23  of events that occurred in each arm of the study is
24  presented accurately in this article; is that
page 285
1  correct?


[285:4] - [285:14] 12/5/2005 Curfman - 11.21.2005


page 285
4    A.  The data that came after that were not, and
5  those data are critical, critical to the
6  interpretation of --
7    Q.  Yes.
8    A.  -- this study.
9    Q.  I understand.
10        But can you -- can you answer my
11  question with respect to the data that existed
12  prior to the pre-specified cutoff point, and were
13  in fact the percentages presented accurately with
14  respect to that?


[285:17] - [285:24] 12/5/2005 Curfman - 11.21.2005


page 285
17    A.  They were, but I don't think that's the
18  relevant question.
19    Q.  Fair enough.
20    A.  You are talking to a doctor and a
21  cardiologist who cares and who has cared for many
22  patients with heart attacks, and to withhold three
23  of them like that is wrong.
24    Q.  I understand.


[286:3] - [286:14] 12/5/2005 Curfman - 11.21.2005


page 286
3            When you're referring to withholding,
4  you are referring to what was submitted to editors
5  of The New England Journal, but these heart attacks
6  were in fact disclosed to the FDA.
7    A.  Are we not important?
8    Q.  Of course not.  No, of course not, Doctor.
9    A.  Is The New England Journal not important?
10    Q.  Of course not.  We are in agreement.
11    A.  Then why weren't we given the data?
12    Q.  We are in agreement about the importance
13  of --
14    A.  Why weren't we given the data?


[291:8] - [291:13] 12/5/2005 Curfman - 11.21.2005


page 291

*(handwritten: Overrule / Red)*

curfman plaintiff affirmatives 1_20.txt
```
8      Q.  And it's also true that the editors of The
9   New England Journal at least felt it was
10   appropriate to allow the authors to include this
11   interpretation of the data in the discussion
12   section and to be published in The New England
13   Journal?
```

[291:15] - [291:17] 12/5/2005 Curfman - 11.21.2005

```
page 291
15      A.  Yeah, we signed off on this, and I have
16   many times had second thoughts about having done
17   that.
```

*(handwritten: Non-responsive)*

[292:24] - [293:5] 12/5/2005 Curfman - 11.21.2005

```
page 292
24              What I am asking specifically right now
page 293
1   is limited to at that time, and my question is just
2   specifically that at that time the editors believed
3   it was appropriate to allow the authors to include
4   this interpretation of the data in the "Discussion"
5   section; is that fair?
```

[293:8] - [293:24] 12/5/2005 Curfman - 11.21.2005

```
page 293
8      A.  There were no changes made by the editors
9   to this part of the "Discussion" section.
10      Q.  Okay.  And similarly, at that time in 2000,
11   when the editors, with the review of one of The
12   Journal statistical consultants, believed that it
13   was appropriate to allow the authors to include
14   percentage data with respect to the cardiovascular
15   events, as opposed to exact numerical data; is that
16   correct?  And again at that time.
17      A.  Today we saw what display data were really
18   available at that time for the first time for me;
19   and having seen those data, which the authors of
20   the article had at that time, I would have wanted
21   to have been informed about those data, which were
22   available at that time, but I saw for the first
23   time today.  I would have been -- I would have
24   wanted to have seen those data.
```

*(handwritten: BEYOND SCOPE)*
*(handwritten: · Non-responsive)*
*(handwritten: · 401 -402)*
*(handwritten: · 611)*

[294:1] - [294:6] 12/5/2005 Curfman - 11.21.2005

```
page 294
1      Q.  To be fair, Doctor, when you are talking
2   about the actual number of events as opposed to the
3   percentages, it's not surprising that the authors
4   had the actual number of events as opposed to the
5   percentages?  You would need that number in order
6   to calculate the percentages; is that fair?
```
                              Page 49

*Overruled*

curfman plaintiff affirmatives 1_20.txt

*Answer Beyond Scope*

[294:8] - [294:13] 12/5/2005 Curfman - 11.21.2005

*403*
*611*
*non-responsive*

page 294
8      A.  Yes.  And I would have wanted to see that
9   Table 5 where the actual numbers were.
10              I would have also wanted to have been
11   informed about the three additional heart attacks
12   that were totally omitted from any consideration,
13   including the calculations of the percentages.

[305:3] - [307:6] 12/5/2005 Curfman - 11.21.2005

page 305
3      Q.  Okay.  Doctor, if you could take a look at
4   Exhibit 29, which I think is the last exhibit we
5   are looking at.
6      A.  Right.
7      Q.  And, specifically, if you look at Point
8   No. 3.  This is one of the suggestions you made to
9   Dr. Baron, and you were, I believe you testified,
10   consolidating some of the comments that the
11   reviewers had made in review of the APPROVe
12   manuscript; is that correct?
13      A.  That's correct.
14      Q.  And as your letter reads, the suggestion is
15   to "show the Kaplan-Meyer curves for all serious CV
16   events to demonstrate the early separation.  These
17   curves should become Figure 2A, while the current
18   Kaplan-Meyer curve should become Figure 2B"; is
19   that correct?
20      A.  That's correct.
21      Q.  Your point here, and the reviewer's point
22   here was to include other cardiovascular events
23   besides the adjudicated thrombotic events that had
24   appeared in the original manuscript, events such as
page 306
1   congestive heart failure; is that correct?
2      A.  Right.
3      Q.  And the authors followed the suggestion and
4   did include a Kaplan-Meyer curve that included the
5   serious CV events, including, and I will read the
6   -- I'm sorry, I will read it from the actual paper
7   so that I get it right, as soon as I find it.
8              Where did it go?  Hold on one second.
9   Sorry, I withdraw that and start again.
10              And the authors followed your
11   suggestion and included what became Figure 3 in the
12   final published paper which included investigator-
13   reported congestive heart failure, pulmonary edema
14   and cardiac failure events, correct?
15      A.  That's correct.
16      Q.  And as you said, when you look at those
17   events, the lines separate almost immediately; is that
18   certainly near the beginning of the study; is that
19   correct?
20      A.  Yeah, I would say immediately.  Yes,
21   uh-huh.
22      Q.  Okay.  And these data were presented to
                      Page 50

*Not necessary, tell*

*STO Debra*

curfman plaintiff affirmatives 1_20.txt
23  your satisfaction and the editors of The Journal's
24  satisfaction in the final published article; is
page 307
1   that correct?
2       A.  Based on what we were given at that time,
3   we thought that we had the story we needed to have.
4           Now, of course, today, we know there is
5   more to the story, that I just found out today,
6   that I didn't know then.


[307:7] - [308:8] 12/5/2005 Curfman - 11.21.2005


page 307
7       Q.  Well, isn't what - isn't what you saw today
8   essentially just what would have been Figure 2
9   combined with Figure 3?  It would have been the
10  adjudicated events plus the investigator-reported
11  congestive heart failure, PE and cardiac failure
12  events?
13      A.  I don't have that curve in front of me
14  anymore, but I thought that it included even more
15  data than that.  I would have to see that curve --
16      Q.  Okay.  Well, if --
17      A.  -- but I don't have it here.
18      Q.  No.  That's fine.  We don't need to go into
19  that level of detail, but --
20      A.  It's a curve that I would have wanted to
21  have had the opportunity to see during the course
22  of the review process.
23          It would have been helpful to have seen
24  that during the course of the review process, based
page 308
1   on my recollection of what I saw earlier today.
2       Q.  But if in fact that curve was basically
3   just combining the data from these two curves, then
4   you would agree that you believe that data were --
5   those data were presented satisfactorily --
6           MS. GROSS:  Objection.
7       Q.  -- in these two figures, and that's making
8   the assumption that that is what that curve was?


[308:10] - [309:2] 12/5/2005 Curfman - 11.21.2005


page 308
10      A.  I am not sure your assumption is correct.
11          I think there were other events in
12  there; but in any event, a reader shouldn't have to
13  somehow in their mind combine the two curves.  That
14  is asking too much of a reader and certainly too
15  much of an editor.
16          Again, I'm not saying that we would
17  have necessarily published that additional Kaplan-
18  Meyer curve that we saw earlier today, but we
19  certainly would have liked to have seen it, so that
20  we could have considered it along with the two
21  other figures that we did publish and try to make a
22  judgment, our best judgment, as to whether or not
23  it would have added additional information in a way
24  that would have made it important to publish.
                        Page 51

*Overruled*

*BEYOND SCOPE Cont*

page 309

1          But we never saw it.  I never saw it
2  until today.

*Non-responsive*

[309:19] - [310:15] 12/5/2005 Curfman - 11.21.2005


page 309
19          The third paragraph from the bottom
20  states, "The editors recognize that we are asking
21  for extensive changes, but we hope you will be able
22  to complete the revisions very soon, given the
23  timely nature and the public health importance of
24  the topic."
page 310
1          Do you see that?
2     A.  I do.
3     Q.  And the authors did in fact complete the
4  revision very quickly, did they not?
5     A.  They did.
6     Q.  And the paper ultimately was published by
7  the target date that The Journal had hoped to have
8  in The Journal?
9     A.  That's correct.
10          And we learned that they had that
11  additional Kaplan-Meyer curve in hand at that time
12  and could have very easily been provided to us
13  within the time constraints that I had set out in
14  the letter.  It would have been very easy to have
15  done that.

*Non-responsive BEYOND SCOPE*
*611*
*403*

[320:2] - [322:3] 12/5/2005 Curfman - 11.21.2005


page 320
2     Q.  Okay.  If you could just take a look at
3  Exhibit 8.  It's one of the exhibits from this
4  morning, Doctor.
5          Do you have Exhibit 8, Doctor?
6     A.  I do.
7     Q.  And I think you testified this morning that
8  this was an earlier version of the requirements
9  that we had looked at previously; is that correct?
10     A.  This is the uniform requirements from The
11  International Committee of Medical Journal Editors.
12  This is not our information for authors.
13     Q.  Okay.  And this -- was this the version of
14  this document that existed at the time of the VIGOR
15  study?
16     A.  As far as I know, this is the fifth
17  edition, the 1997 edition.
18     Q.  And does this -- this particular document
19  does not state that there is a requirement that
20  absolute numbers be given instead of percentage
21  numbers; is that correct?
22     A.  Well, I have to read through it.
23          I don't know.  Do you want to take the
24  time to read it?
page 321
1     Q.  No.  I don't want to take --
2     A.  It's a number of pages.

*611*

                    Page 52

*Overruled*

*Non responsive   BEYOND SCOPE*

```
                    curfman plaintiff affirmatives 1_20.txt
 3       Q.  -- the time to do that.  That's fair,
 4  but --
 5       A.  Requirement or not, it's something that we
 6  expect from authors for a fair and accurate
 7  presentation of data sets.
 8            I would say most data sets require a
 9  great majority of data sets, in order to be
10  accurately and fairly presented, do require the
11  actual numbers of patients to be there and not just
12  percentages.
13            From time to time, we will allow
14  percentages data to be presented, but not very
15  often.
16       Q.  And did you allow it in the instance of the
17  VIGOR manuscript, correct?
18            And to be fair, you allowed the authors
19  of the paper to present the percentage data, is
20  that correct, in the VIGOR manuscript?
21       A.  The authors decided on their own not to
22  give us the raw numbers.  They deleted them from
23  the pre-submission version of the manuscript.  They
24  were deleted from the manuscript --
page 322
 1       Q.  Doctor --
 2       A.  -- and for the first time we saw that --
 3  those numbers.
```

*602, 611, 403 Non-responsive*

[322:4] - [322:21] 12/5/2005 Curfman - 11.21.2005

*sidebar*

```
page 322
 4       Q.  Right.  The authors -- the authors
 5  presented in the manuscript the percentages, and
 6  after the peer-reviewed process, the editors
 7  allowed the authors to present the data in that
 8  form; is that correct?
 9       A.  And, again, I come back to the fact that
10  the --
11       Q.  Would you just tell me whether that part is
12  correct.  I understand if you have additional --
13       A.  No, that's not correct.  "Allow" is not the
14  right word here.
15            We did accept the paper, but we expect
16  authors to provide us with the information.  As I
17  said earlier, we can't be in a position where we
18  have to ask for every little thing and drag every
19  little thing out of the authors.  We can't do that.
20  That is an expectation that's unreasonable in the
21  scholarly community.
```

*• 602*
*• Non responsive*
*• 611*
*• 401-403*

Page 53

*Defendant Merck's Responses to Pltf Objections to Curfman Counters*

Curfman - Defendant Counter-Designations

[44:1] - [45:11] 11/21/05 Curfman, Gregory

page 44
1        Q.  Doctor, Exhibit 8 is from The New England
2   Journal of Medicine, Volume 336.  It's got a
3   copyright "1997" in the lower right.
4        A.  Right.
5        Q.  The page is entitled "Uniformed
6   Requirements For Manuscripts Submitted to
7   Biomedical Journals."
8                Is this a document you are familiar
9   with?
10       A.  Yes.  This is an earlier version of the
11  document that we were just -- that you were just
12  reading from.
13               So it has gone through a number of
14  iterations over the years.  This would, I believe,
15  have been the document in place at the time of the
16  consideration of the VIGOR trial.
17       Q.  And this again is a joint statement of The
18  International Committee of Medical Journal Editors
19  that The New England Journal has adopted for its
20  own policies; is that right?
21       A.  That's right.
22       Q.  Turning to Page 315, underneath the heading
23  "Sending the Manuscript to the Journal," there is a
24  statement that, "Manuscripts must be accompanied by
page 45
1   a covering letter, signed by all co-authors," and
2   underneath that there is Subparagraph C that states
3   the following:  "A statement that the manuscript
4   has been read and approved by all the authors, that
5   the requirements for authorship as stated earlier
6   in this document have been met, and that each
7   author believes that the manuscript represents
8   honest work."
9                Did that establish the policy of The
10  New England Journal from 1997 forward?
11       A.  Yes.


[45:17] - [46:3] 11/21/05 Curfman, Gregory


page 45
17       Q.  Dr. Curfman, Exhibit 9 is a copy of a
18  letter date May 18, 2000 from Claire Bombardier and
19  to Robert Utiger, Deputy Editor, New England
20  Journal of Medicine, dated May 18, 2000.
21               Have you seen this letter before?
22       A.  Yes, I have.
23       Q.  Is it correct that The New England Journal
24  received a draft manuscript of the VIGOR study from

page 46
1  Claire Bombardier, along with that letter dated May
2  18, 2000?
3      A.  That's correct.


[46:8] - [46:24] 11/21/05 Curfman, Gregory


page 46
8      Q.  The letter itself, Dr. Curfman, is
9  consecutively Bates numbered at Page 2000 NEMJ 1
10  and 2, is that correct, in the document that you
11  have?
12      A.  Yes, uh-huh.
13      Q.  And are the pages marked ending in the
14  numbers 5, 7 and 16 the author statements signed by
15  Drs. Bombardier, Alise Reicin -- that's R-E-I-C-I-N
16  -- and Deborah Shapiro that were submitted with the
17  manuscript?
18      A.  Correct.
19      Q.  In those letters, each of the signatories
20  attested that they had fulfilled the authorship
21  criteria of the uniform requirements that we read a
22  few moments ago from the 1997 standards; is that
23  right?
24      A.  That is right.


[47:1] - [48:8] 11/21/05 Curfman, Gregory


page 47
1      Q.  Doctor, how long after The New England
2  Journal received the draft with the May 18, 2000
3  letter were you assigned in any capacity to the
4  review process?
5      A.  I was not assigned to handle this
6  manuscript through the review process.
7           So my colleagues Dr. Utiger, Dr. Kaplan
8  and Dr. Steinbrook were the three editors who
9  handled this manuscript through the review process.
10           Dr. Utiger and Dr. Steinbrook are
11  deputy editors, and Dr. Steinbrook was the primary
12  deputy editor.  When he was away, Dr. Utiger would
13  step in for him in that capacity; and Dr. Kaplan,
14  Marshall Kaplan, was the associate editor who was
15  primarily responsible for selecting the reviewers
16  and taking the manuscript through the review
17  procedures.
18      Q.  Was the VIGOR article sent for external
19  review?
20      A.  Oh, yes.
21      Q.  Was there a standard as to how many
22  reviewers you would send an article to?
23      A.  Well, in this particular case, the article
24  was sent to two outside reviewers.  It was also

page 48
1   reviewed by a statistical consultant who works in
2   that capacity for The Journal.
3                   It would have also been read very
4   carefully by Dr. Kaplan, by Dr. Steinbrook, by
5   Dr. Utiger; and then toward the end of the process,
6   I also read the manuscript before it was finally
7   approved, and then accepted by Dr. Jeffrey Drazen,
8   the editor-in-chief.


[55:16] - [55:21] 11/21/05 Curfman, Gregory


page 55
16        Q.  Dr. Curfman, the diskette was received
17  shortly after August 20, 2000; is that right?
18        A.  Yes.  The original diskette.
19                   This would be a copy, but that original
20  diskette was received with this letter
21  (indicating).


[72:9] - [73:13] 11/21/05 Curfman, Gregory


page 72
9         Q.  Now, if you refer to Page 12 of this
10  draft --
11        A.  Could I make a comment, Attorney Arbitblit?
12                   In looking at this table, I just would
13  like to point out the right-hand column designated
14  "Difference" with 95 percent confidence intervals.
15        Q.  Yes, sir.
16        A.  What is actually being displayed here is
17  the difference between -- if look at the
18  cardiovascular deaths, nonfatal MIs or CVAs, as an
19  example, it is the difference between the .8 and
20  the .4, and that's where the .4 comes for the
21  difference, and then the 95 percent confidence
22  interval is the bounds for the .4, for the
23  difference.
24                   So this is not actually the relative
page 73
1   risk.  And when you asked me about statistical
2   significance, I kind of answered, yes; but now that
3   I look at this, I can't really determine
4   statistical significance from the data in this
5   particular table because we don't have a relative
6   risk and the confidence limits around the relative
7   risk.
8                   So I think that I really did misspeak
9   when I commented about the statistical significance
10  here.  We would need, I think, a statistical test
11  to determine that.
12                   It's a technical point, but I just
13  wanted to make that point.

[73:21] - [73:23] 11/21/05 Curfman, Gregory


page 73
21        Q.  With respect to the two categories you
22   testified to previously?
23        A.  That's correct, yes.


[190:15] - [191:4] 11/21/05 Curfman, Gregory


page 190
15        Q.  Generally speaking, what's the purpose of
16   the peer-review process at The New England Journal?
17        A.  There are two general purposes:  The first
18   is for us to have a process for selecting that
19   research among a huge body of medical research that
20   we and our reviewers believe will have the highest
21   impact on the practice of medicine and healthcare;
22   and secondly, to try to present that information in
23   the clearest manner, the most accurate manner, to
24   our readers.
page 191
1              So there is a selection part of the
2   process, and there is an editing part of the
3   process; and in the broadest frame, those are the
4   two parts of our procedures.


[191:13] - [191:21] 11/21/05 Curfman, Gregory


page 191
13              And there are quite a few steps to the
14   peer-review process at The New England Journal; is
15   that fair?
16        A.  Yes.
17        Q.  One of the things that that means is that
18   there are a lot of different people, both at The
19   Journal and outside The Journal, who see drafts of
20   manuscripts before they are ever published in The
21   New England Journal?


[191:23] - [192:10] 11/21/05 Curfman, Gregory


page 191
23        A.  That's correct.
24        Q.  And I believe -- and you can feel free to
page 192
1   refer to this if it is helpful -- is the first step
2   in that process that the editor-in-chief, or the
3   executive editor if the editor-in-chief is not

4  available, reviews each manuscript as it comes in
5  briefly?
6      A.  Yes.
7      Q.  And do you know whether that occurred with
8  the VIGOR manuscript?
9      A.  I have to assume.  I wasn't in the room.
10 So I can't -- but it must have, yes.

602
Speculation

[192:18] - [193:2] 11/21/05 Curfman, Gregory


page 192
18      Q.  And what is the purpose of that initial
19 review conducted by the editor-in-chief?
20      A.  The editor-in-chief is trying to, first of
21 all, make a determination if it is an article that
22 we want to review at all.
23           Then, if it is, which editor is the
24 most appropriate editor to be the point person on
page 193
1  that manuscript, and then to assign that manuscript
2  to that editor.


[193:14] - [195:9] 11/21/05 Curfman, Gregory


page 193
14      Q.  And how is the -- I think you mentioned
15 that the editor-in-chief will try to select an
16 appropriate editor.
17           How is that selection made?
18      A.  Primarily based on the topic of the article
19 in question.
20      Q.  And do you know who the associate editor
21 was who was selected with respect to the VIGOR
22 manuscript?
23      A.  Yes, I do.
24      Q.  Who was that?
page 194
1      A.  Dr. Marshall Kaplan.
2      Q.  And do you know, Dr. Kaplan is a medical
3  doctor?
4      A.  He is a medical doctor, and his training is
5  in gastroenterology; and since the primary focus of
6  the VIGOR trial was a gastrointestinal endpoint,
7  the manuscript was assigned to Dr. Kaplan to
8  handle.
9      Q.  Okay.  And what -- I believe your article
10 states that the associate editor, at least
11 initially, is assessing the value and the validity
12 of the manuscript; is that right?
13      A.  Yes.  The associate editor would then take
14 another read.  It might be a fairly quick read.
15 Again, to determine in his or her mind if it was
16 something that would be appropriate for The New

17  England Journal; and if so, go on to identify the
18  outside reviewers for the manuscript.
19      Q.  Okay.  And if it -- if at that step the
20  associate editor determines that the piece is not
21  valid or the piece is not fairly written, does --
22  can the associate editor at that point reject the
23  piece?
24      A.  Yes.
page 195
1       Q.  And I think your article, I think your
2  article mentions that, should the associate editor
3  determine that the piece is not appropriate, it
4  could go to a deputy editor for a second opinion;
5  is that correct?
6       A.  Yes.  Our general procedure is that we
7  don't reject manuscripts with only one pair of eyes
8  having seen it.  We like two pairs of eyes to have
9  seen it.


[195:12] - [196:10] 11/21/05 Curfman, Gregory


page 195
12              Did Dr. Kaplan on his initial
13  assessment of the value and validity of the piece
14  determine that it should be further reviewed, or
15  did Kaplan reject the piece and therefore require a
16  second opinion from a deputy editor?
17      A.  No.  He determined that it was worthy of
18  review, and then went ahead and assigned the
19  reviewers.
20      Q.  And so that is -- that is the next step, as
21  your article mentioned -- mentioned, and as you
22  just testified, that Dr. Kaplan would assign the
23  manuscript to outside reviewers; is that correct?
24      A.  That's correct.
page 196
1       Q.  And there can be -- there can be two
2  reviewers with certain manuscripts?
3       A.  Oh, sure.
4       Q.  And I believe -- I believe VIGOR actually
5  received a review from three viewers; is that
6  correct?
7       A.  Yes.  Two of the reviewers were outside
8  reviewers, and one of the reviewers was a
9  statistical consultant who is a part-time member of
10  our staff.


[196:17] - [197:17] 11/21/05 Curfman, Gregory


page 196
17      Q.  And what is the -- what's the purpose of
18  the review conducted by the external reviewers as
19  well as the statistical consultant?

```
20      A.  The external reviewers are asked to
21  carefully read and evaluate the manuscript and give
22  us their opinion on its suitability for publication
23  in terms of the novelty of the research, the
24  accuracy and the validity of the research, the
page 197
 1  composition of the manuscript -- how it is written,
 2  how the data are displayed -- and the overall
 3  interest to the readership of The New England
 4  Journal of Medicine.  So there are four categories
 5  of evaluation that they are asked to make.
 6            Reviewers serve as advisors to the
 7  editors.  We ask them for a judgment on the
 8  suitability for the publication of the manuscript
 9  in The New England Journal, but the final decision
10  is really made by the editors, collectively.
11            We meet together, discuss the
12  manuscript in quite a lot of detail.  All of the
13  editors are there.  The statistical consultants are
14  there, and we have an opportunity then to take the
15  reviewers' comments and put them into a larger
16  context, a larger discussion, with input from all
17  the editors.
```

[198:4] - [198:7] 11/21/05 Curfman, Gregory

```
page 198
 4      Q.  And does The New England Journal make an
 5  effort to assign manuscripts to reviewers who have
 6  expertise in the fields relevant to that particular
 7  manuscript?
```

[198:9] - [200:6] 11/21/05 Curfman, Gregory

```
page 198
 9      A.  We maintain a computerized database of many
10  thousands of medical experts around the world, and
11  we use that database to try to match up the content
12  of article with the expertise of the reviewers, and
13  we ask the reviewers to categorize their own
14  reviewing interest.
15            So we maintain that in the database,
16  and we are able to do a search of the database to
17  find those reviewers whose interests match up with
18  the content of the article, and so that's how we
19  select the reviewers.
20      Q.  Okay.  Let's just -- let's just break down
21  some of the -- some of the types of things that the
22  reviewers can do when they get -- when they review
23  a manuscript.
24            Can the reviewers, if they feel
page 199
 1  additional data would appropriate, request that the
```

2  authors provide additional data that was not
3  provided in the manuscript?
4      A.  Yes.
5      Q.  And if the reviewers believe that data --
6  data are presented inappropriately or in a
7  misleading way in the manuscript, is that something
8  the reviewers are permitted to comment on?
9      A.  Yes.
10     Q.  And similarly, separate from the data, but
11 with the conclusions and the interpretations that
12 are drawn from that data, if the reviewers believe
13 those invalid or inappropriate, the reviewers have
14 the right to comment on that as well?
15     A.  That's right.
16     Q.  Now, I believe you mentioned that the next
17 step, once the reviewers return their reviews to
18 The New England Journal, is that the associated
19 editor, who has control of the manuscript or has
20 been assigned to the manuscript, has the
21 opportunity to discuss the reviews and the
22 manuscript with the entire editorial board; is that
23 correct?
24     A.  Yes.
page 200
1      Q.  And mentioned in the case of the VIGOR
2  manuscript, I believe you said that that was the
3  stage at which you first became involved, was
4  during these discussions with the entire editorial
5  board; is that right?
6      A.  Yes.  That's correct.


[204:7] - [206:10] 11/21/05 Curfman, Gregory


page 204
7      Q.  So you had -- is it fair to say that you,
8  therefore, received the input of medical doctors
9  and at least one statistical consultant that had
10 expertise in a variety of different fields?
11     A.  Correct.
12     Q.  I think you mentioned before, Doctor, that
13 you're board-certified in internal medicine and
14 cardiology; is that correct?
15     A.  That's right.
16     Q.  Are there other cardiologists, to your
17 knowledge, that participated in the review of the
18 VIGOR manuscript, with the exception, of course, of
19 the anonymous reviewers?
20     A.  Yes.  Dr. Lagakos is a board-certified
21 cardiologist, and he would have had an opportunity
22 to weigh in as well.
23     Q.  And ultimately -- ultimately, after this
24 group deliberates, the editors have to determine
page 205
1  ultimately that a piece is appropriate for
2  publication before it is published in The New

```
3   England Journal; is that correct?
4       A.  That's correct.
5       Q.  But usually there is an intervening step,
6   which there was here, which is that the paper is
7   sent back to the authors for some revision based on
8   the comments of reviewers and perhaps the editors
9   as well; is that right?
10      A.  That's right.
11      Q.  And I think I said this, but that actually
12  did happen with the VIGOR paper?
13      A.  Correct.
14      Q.  And, in fact, there can be multiple
15  requests for revisions where the paper is sent to
16  the authors for revision, and the authors make
17  certain revisions, and the editors determine that
18  more revisions are appropriate; is that correct?
19      A.  That's correct.
20      Q.  And, again, that did -- that did in fact
21  happen with the VIGOR manuscript?
22      A.  Yes.
23      Q.  And so what -- what that means is that on
24  more than one occasion editors at The Journal sent
page 206
1   the paper back to the authors of the manuscript and
2   told them that changes would be required before it
3   could be published in The New England Journal, and
4   the authors then made changes and sent it back to
5   the editors for review; is that right?
6       A.  That's right.
7       Q.  Is it fair to say that The New England
8   Journal has one of the most rigorous peer-review
9   processes of any peer-review journal?
10      A.  It's rigorous.

[206:13] - [206:24] 11/21/05 Curfman, Gregory


page 206
13              In the peer-review process that we have
14  been talking about -- we were referring
15  specifically to an article that you wrote in
16  2000 -- has the peer-review process remained,
17  generally speaking, the same today up at The New
18  England Journal?
19      A.  It has.  Additional staff have been added.
20  There are more associate editors.  There are more
21  deputy editors.
22              The process, the steps in the process
23  remain essentially the same, but there are more
24  people involved now.


[207:21] - [208:1] 11/21/05 Curfman, Gregory


page 207
```

*Overruled* (handwritten)

*asked and answered* (handwritten)

*Musck response: more needed* (handwritten)

```
21              I mean, is it -- is it fair to say that
22  the editors of The New England Journal worked very
23  hard with the authors of the paper to ensure that
24  the data was presented in what The New England
page 208
1  Journal believed to be a fair and accurate manner?
```

[208:3] - [208:19] 11/21/05 Curfman, Gregory

```
page 208
3       A.  The VIGOR manuscript was received in our
4  office in May of 2000.  The VIGOR article was
5  published in The Journal on November 23, 2000.
6  That's six months.
7              The manuscript was not sitting around
8  on someone's desk for six months.  There was a lot
9  of work that went into that manuscript during those
10 six months.  That's a long period of time.
11             A lot of things were happening.  So
12 there was a very diligent process that the editors
13 went through.
14             When you say the editors worked in
15 conjunction with the authors, I wouldn't say that's
16 exactly the right phraseology.  There was a lot of
17 back and forth.  There were a lot of requests that
18 the editors made to the authors.  Some of those
19 requests were honored.  Others were not.
```

[210:7] - [210:11] 11/21/05 Curfman, Gregory

```
page 210
7       Q.  But would it still be fair to say it is --
8  a substantial amount of editorial time was spent
9  reviewing the cardiovascular data and analysis that
10 was ultimately published in The New England
11 Journal?
```

*Overruled*

[210:13] - [210:19] 11/21/05 Curfman, Gregory

```
page 210
13      A.  Yes.  The data that were provided to us
14 were reviewed.  The data that were provided to us
15 were reviewed.
16      Q.  Right.  And a substantial amount of time
17 was spent reviewing that data, the data that were
18 provided?
19      A.  Time was spent reviewing those data, yes.
```

*asked and answered*

[219:7] - [220:16] 11/21/05 Curfman, Gregory

*Merck response:*

*None needed*