page 219

7       Q.  Doctor, I would ask you to take a look at
8  the Bombardier article as it was published, which
9  was marked as Exhibit 11 earlier today, and for now
10  I am just going to be looking at the first page of
11  the article.
12                  First of all, looking at the top of the
13  page, it appears that there are 12 authors listed
14  as authors of this article right under the title;
15  is that correct?
16      A.  Correct.
17      Q.  And, in fact, is -- The New England Journal
18  has a limit of 12 authors that can be listed in
19  that position on the page right below the title; is
20  that correct as well?
21      A.  At that time there was a limit.  There is
22  no longer a limit.
23      Q.  And if you look down at the bottom of this
24  page in the footnote, in the very last two lines,
page 220
1  there is note that Arthur Weaver, M.D. from the
2  Arthritis Center of Lincoln, Nebraska was another
3  author.
4                  Do you see that?
5      A.  Yes, I do.
6      Q.  He is listed down there rather than above
7  because of the rule at the time that you mentioned
8  that there could only be 12 listed at the top of
9  page; is that correct?
10      A.  That's correct.
11      Q.  And the footnote at the -- or not the
12  footnote, but the smaller text at the bottom of the
13  page describes where the authors -- the various
14  authors are from.
15                  Do you see that?
16      A.  Yes, I do.


[221:3] - [224:24] 11/21/05 Curfman, Gregory


page 221
3       Q.  And if you look at the bottom of the page,
4  these doctors come from a variety of institutions.
5                  For example, the lead author, Claire
6  Bombardier, is listed as coming from the Institute
7  For Work and Health as well as Mount Sinai Hospital
8  and the University Health Network of Toronto.
9                  Do you see that?
10      A.  Yes, I do.
11      Q.  The second author, Loren Laine, is from the
12  gastrointestinal Division, Department of Medicine
13  at the University of Southern California School of
14  Medicine in Los Angeles.
15                  Do you see that as well?
16      A.  Yes.

*Overruled*

```
17      Q.  And then there is the notation that two of
18  the authors, Dr. Alise Reicin and Dr. Deborah
19  Shapiro, are from Merck.
20              Do you see that?
21      A.  Yes.
22      Q.  Those are the only two of the 12 authors --
23  13 if you count Dr. Weaver -- that are actually
24  from Merck.  All of the other -- all of the other
page 222
1   authors are from outside institutions; is that
2   correct?
3       A.  That's correct.
4       Q.  And I won't go through all of them, in the
5   interest of time, but they are from a variety of
6   respected institutions, both within the United
7   States and around the world, including, just for
8   example, the University of Texas, Houston School of
9   Public Health; the Division of Rheumatology and
10  Clinical Immunology at the University of Maryland
11  in Baltimore; the Office of Clinical Research and
12  Training at Northwestern University School of
13  Medicine in Chicago, just as examples.
14              Do you see those?
15      A.  Yes.  Those are U.S. examples.
16      Q.  I named the U.S. examples, yes; and there
17  are also examples from Australia, Brazil, Mexico
18  and other countries around the world; is that
19  right?
20      A.  That's right.
21      Q.  Now, in order to be an author on the New
22  England -- on a paper within The New England
23  Journal of Medicine, there are certain requirements
24  that The New England Journal has; is that correct?
page 223
1       A.  That's correct.
2       Q.  One of those requirements is that each of
3   the authors must sign a statement that attests that
4   they have met certain requirements that The New
5   England Journal imposes in order to be an author on
6   the paper; is that right?
7       A.  Correct.
8           MR. FITZPATRICK:  I am going to mark
9   another document.
10              EXHIBIT NO. 45 MARKED
11      Q.  And, Doctor, do you recognize this as the
12  signed statements by the authors on the VIGOR
13  publication?
14      A.  Yes, I do.
15      Q.  And these came from your files.
16              They are all submitted as part of The
17  New England Journal's requirement that these
18  attestations be submitted before someone can appear
19  as an author on the article; is that correct?
20      A.  That's correct.
21      Q.  And just taking a look at the language of
22  the attestation, each of these doctors attest that
23  they have done several things in order to fulfill
```

*Compound*

*Compound*

*Merck response: None needed*

*602 lack of foundation*

*Overruled* (handwritten)

24  the authorship criteria of what are known as the
page 224
1   uniform requirements; is that correct?
2      A.  That's correct.
3      Q.  And those include stating that they have
4   made substantial contributions to (A) the
5   conception and design and/or analysis and
6   interpretation of the data.
7              That's one of the -- that's one the
8   substantial contributions, correct?
9      A.  Correct.
10     Q.  And, two, they have made substantial
11  contributions to drafting the article or revising
12  it critically for important intellectual content;
13  is that correct?
14     A.  That's correct.
15     Q.  And the third requirement that they have to
16  attest to is that they have made substantial
17  contributions to the final approval of the version
18  of the article to be published; is that correct?
19     A.  Correct.
20     Q.  And each of the -- each of the authors that
21  appeared as an author in The New England Journal
22  for the VIGOR manuscript signed these statements
23  attesting to each of those facts; is that correct?
24     A.  That's correct.


[225:11] - [225:22] 11/21/05 Curfman, Gregory


*Merck response:* (handwritten)
*None needed* (handwritten)

page 225
11     Q.  Do you have Exhibit 46, Doctor?
12     A.  Yes, I do.
13     Q.  And you recognize this as the letter that
14  you spoke about this morning, which was the May 18,
15  2000 letter which submitted the original VIGOR
16  manuscript to The New England Journal; is that
17  correct?
18     A.  That's correct.
19     Q.  And I think you mentioned the letter is
20  from Dr. Bombardier, who is a medical doctor and is
21  also at the University of Toronto?
22     A.  That's correct.

*Asked and answered* (handwritten)
*Cumulative* (handwritten)


[226:23] - [229:5] 11/21/05 Curfman, Gregory


page 226
23              If you turn to the -- just moving down
24   to the next sentence, it reads, "Given that NSAIDs
page 227
1   are among the most commonly used medications in the
2   world and the significant benefit for patients from
3   the reduction in gastrointestinal morbidity, we ask
4   that you please consider this manuscript for an

5  expedited review."
6              Do you see that sentence?
7      A.  I do.
8      Q.  You would agree in that sentence
9  Dr. Bombardier is asking that The Journal give this
10  manuscript an expedited review?
11     A.  That's correct.
12     Q.  Does The Journal have a specific procedure
13  whereby it can give a manuscript an expedited
14  review?
15     A.  Yes, we do.
16     Q.  And what is that procedure?
17     A.  Requests for expedited review are
18  considered by the editors based on the substance of
19  the research; and in particular, as I have alluded
20  to earlier, it's our estimation of the overall
21  impact on the health of the public and whether
22  people in our society and around the world will be
23  immediately impacted, immediately impacted in an
24  important way in terms of their health.
page 228
1              In addition, the other qualifying
2  factor is:  Can this research be reviewed
3  adequately in an expedited fashion, or are there
4  other complexities that will need to be dealt with
5  in the review process that will take more time?
6              So those are the two considerations
7  that go into a determination of whether we will do
8  an expedited review.
9      Q.  And is the effect of an expedited review,
10  if it is granted and the piece is in fact
11  published, that the manuscript would be published
12  faster than it would in the normal -- in the
13  ordinary course of peer review?
14     A.  Yes.

*Overruled*

15     Q.  And so what Dr. Bombardier was requesting
16  was an expert review that, if granted, would have
17  resulted in a faster publication of the VIGOR
18  results than had expedited review not been granted?
19     A.  Correct.

*asked and answered*

20     Q.  Was expedited review in fact granted for
21  the VIGOR manuscript?
22     A.  No, it was not.  And I guess I should
23  qualify my answers to your questions about
24  expedited review.
page 229

*Merck response:*
*None needed*

1              What we -- what we commit ourselves to,
2  if we agree to expedited review, is an expedited
3  review.  We do not commit to publication,
4  necessarily.  We commit to a review process that
5  will take less time.


[236:21] - [237:22] 11/21/05 Curfman, Gregory


page 236

```
21              EXHIBIT NO. 47 MARKED
22      Q.  And, Doctor, do you have Exhibit 47 in
23 front of you?
24      A.  I do, uh-huh.
page 237
1       Q.  Could you identify that, please.
2       A.  This is a letter written by the deputy
3 editor primarily responsible for the VIGOR
4 manuscript, Dr. Robert Steinbrook, to Dr. Claire
5 Bombardier, asking for some additional information,
6 pretty early on in the process, about the efficacy
7 of the two drugs in the treatment of rheumatoid
8 arthritis, and those data, in his mind, had not
9 been really very clearly displayed in the first
10 version of the manuscript, and he wanted to know
11 about that.
```

*Overruled (handwritten)*

```
12      Q.  Okay.  So Dr. Steinbrook basically wanted
13 to know some additional data about the efficacy of
14 rofecoxib or Vioxx in the treatment of rheumatoid
15 arthritis, and he requested that Dr. Bombardier
16 provide that data to him; is that fair?
17      A.  Right.  And then an additional question had
18 to do with prior history of gastrointestinal events
19 and proton-pump-inhibitor therapy or misoprostol
20 therapy, yes.
21              So these are issues he wanted more
22 information about as the editor.
```

*asked and answered (handwritten)*
*Cumulative (handwritten)*

```
[240:2] - [241:5] 11/21/05 Curfman, Gregory

page 240
2               MR. FITZPATRICK:  I am going to mark
3 the response to Dr. Steinbrook's request for data.
4               EXHIBIT NO. 48 MARKED
5       Q.  Doctor, do you have Exhibit 48 in front of
6 you?
7       A.  Yes, I do.
8       Q.  And does this appear to be Dr. Bombardier
9 response to Dr. Steinbrook's letter that we just
10 looked at?
11      A.  Yes, it does.
12      Q.  And just looking, just looking generally at
13 this response, does it appear to provide a fair bit
14 of detail on the efficacy data requested by
15 Dr. Steinbrook in his letter?
16      A.  Yes.
17      Q.  For example, Dr. Bombardier provides,
18 although they are not very clear in this copy, what
19 appear to be several -- several figures depicting
20 various measurements of efficacy in the treatment
21 of rheumatoid arthritis; is that correct?
22      A.  That's correct.
23      Q.  And so it is fair to say that when
24 Dr. Steinbrook did request this specific piece of
page 241
```

*Merck response: (handwritten)*
*None needed (handwritten)*

```
1  data, specifically the efficacy data in the
2  treatment of rheumatoid arthritis, Dr. Bombardier
3  was responsive and cooperative in providing that
4  data; is that fair?
5     A.  Yes.
```

[241:6] - [245:12] 11/21/05 Curfman, Gregory

```
page 241
6     Q.  Doctor, if you could take a look at what
7  was marked this morning as Exhibit 19.
8            Do you have Exhibit 19, Doctor?
9     A.  Yes, I do.
10     Q.  And I believe you already described this
11  document this morning.
12            Is it correct that this is a June 30
13  letter from Dr. Kaplan at The New England Journal
14  to Dr. Bombardier?
15     A.  Yes.
16     Q.  And this letter discusses the -- among
17  other things, it discusses some of the comments of
18  the reviewers to the VIGOR manuscript?
19     A.  Correct.
20     Q.  And I apologize, I think you told us
21  before, but who is Dr. Kaplan?
22     A.  He is the associate editor who was
23  responsible for handling this manuscript, and he is
24  a gastroenterologist by background.
page 242
1     Q.  Does this letter reflect the stage of the
2  peer-review process where the associate editor
3  contacts the authors and requires revisions -- that
4  revisions be made in order for the piece to be
5  considered for publication?
6     A.  Yes.  Again, this is meant to be a summary,
7  not necessarily an exhaustive repetition of all of
8  the reviewers' comments, but some attempt at
9  prioritizing them, focusing the authors on some of
10  the more important issues in Dr. Kaplan's mind.
11     Q.  And as Dr. Kaplan writes, "While the
12  editors are interested in your manuscript" -- and
13  then he gives the title of the manuscript -- "we
14  could not accept it for publication without
15  substantial revision"; is that correct?
16     A.  That's correct.
17     Q.  And so Dr. Kaplan is basically saying that
18  unless the comments of the reviewers and the
19  editors are addressed to the editors' satisfaction,
20  the manuscript will not be published in The New
21  England Journal of Medicine; is that correct?
22     A.  Correct.
23     Q.  Okay.  And the letter also goes through a
24  variety of requirements for a manuscript in order
page 243
1  to be published in The Journal, generally speaking,
```

*Overruled* [handwritten]

Merck response:
None needed [handwritten]

asked and
answered [handwritten]

2  and in addition to the comments of the specific
3  reviewers; is that correct?
4      A.  Yes.
5      Q.  I will just refer you as soon as I find it
6  specifically to the second paragraph on Page 2 of
7  the letter.
8              One of the requirements is a firm limit
9  that the manuscript should be no longer than 3,000
10 words of text; is that correct?
11     A.  Right.
12     Q.  And The Journal also requires a total of no
13 more than five figures and tables; is that correct?
14     A.  That's a target that we shoot for, but we
15 are flexible.  Typically, we are flexible on that.
16             It depends the data.  If there is
17 another piece of display data that is very, very
18 important, we will add additional figures and
19 tables; but we like to give the authors a target
20 because we don't want to end up with 30 tables that
21 we really can't published in print.
22     Q.  And it's fair to say that a great deal of
23 the information that sometimes appears in figures
24 can be adequately addressed in the text of the
page 244
1  article; is that correct?
2      A.  Sometimes, yes.
3      Q.  And specifically, in this letter Dr. Kaplan
4  gave some specific instructions regarding figures
5  in the next paragraph, figures and tables.
6              He stated that Table 1 should be an
7  appendix.  All of the figures should be deleted and
8  summarized in the text as needed, and then
9  Tables 2, 3, 4 and 5 should be maintained and an
10 additional table about efficacy should be added; is
11 that correct?
12     A.  Right.
13     Q.  And that would -- that would meet the
14 target of five figures and tables that The Journal
15 had set?
16     A.  That's correct.
17     Q.  And the information that had previously
18 been in other figures would not be removed from the
19 manuscript, but rather it would be summarized in
20 the text as needed according to Dr. Kaplan's
21 suggestions; is that correct?
22     A.  Right.
23     Q.  Going down a few paragraphs to the
24 paragraph that starts, "Please provide appropriate
page 245
1  references."
2              Do you see that?
3      A.  Yes, uh-huh.
4      Q.  The last sentence of that paragraph reads,
5  "All numerical data should be rounded to a
6  reasonable number of significant figures in
7  accordance with the precision of the data."
8              Do you see that sentence?

```
9     A.  Yes, I do.
10      Q.  Is that standard practice in The New
11  England Journal?
12      A.  Yes, it is.


[250:19] - [251:1] 11/21/05 Curfman, Gregory


page 250
19      Q.  Okay.  Okay.  I don't need to show you the
20  letter, Doctor, but this morning we did look at the
21  letter from Dr. Drazen to Dr. Bombardier in which
22  Dr. Drazen, as the editor-in-chief of The New
23  England Journal, accepted the VIGOR manuscript for
24  publication; is that correct?
page 251
1     A.  Yes, uh-huh.


[267:15] - [269:6] 11/21/05 Curfman, Gregory


page 267
15              Doctor if you could also take a look at
16  Exhibit 16, which -- I'm sorry -- 17, which is one
17  of the exhibits we looked at this morning, and I
18  would refer you specifically to Page 25 of that
19  exhibit, which is one -- which is the table that
20  you talked about this morning.
21              Are you there, Doctor?
22      A.  Yes, I am.
23      Q.  Okay.  Thanks.
24              Just taking a look at this table, this
page 268
1   was the table that you talked about this morning,
2   and this table did not ultimately appear in the
3   final published VIGOR article as a table, correct?
4       A.  That's correct.
5       Q.  I just want to go over some of the -- I
6   just want to go over the percentages that appear in
7   that table and confirm that those percentages do in
8   fact appear in the text of the final VIGOR article
9   with you.
10              Specifically, if you look at the first
11  row on Table 5 on Page 25, you have all deaths and
12  the percentages there are 0.5 percent and 0.4
13  percent.
14              Do you see those?
15      A.  Yes, I do.
16      Q.  And if you look at the second sentence
17  under "General Safety" it states that, "The
18  mortality rate was 0.5 percent in the rofecoxib
19  group and 0.4 percent in the naproxen group."
20              Do you see that?
21      A.  Yes.
22      Q.  So those percentage were disclosed in the
```

```
23  text of the article; is that correct?
24     A.  That's correct.
page 269
1      Q.  And then if you go to the -- back to Page
2  25 of Exhibit 17, if you look at cardiovascular
3  deaths, the percentages are 0.2 percent and 0.2
4  percent.
5              Do you see that?
6      A.  Yes, I do.


[269:7] - [270:6] 11/21/05 Curfman, Gregory


page 269
7      Q.  And in the next sentence, moving to the
8  next sentence of the published VIGOR article, it
9  states, "The rate of death from cardiovascular
10  causes was 0.2 percent in both groups"; is that
11  correct?
12     A.  Correct.
13     Q.  So, again, the percentage of cardiovascular
14  deaths from Table 5 do appear in the text of the
15  final published VIGOR article; is that correct?
16     A.  The percentages do, yes.
17     Q.  Yes.
18     A.  Uh-huh.
19     Q.  Then if you go to -- I am going to skip the
20  third row, which is composite endpoint, and go to
21  the next row, which is myocardial infarction, and
22  that has -- the percentages from the table are 0.4
23  percent and 0.1 percent; is that correct?
24     A.  Right.
page 270
1      Q.  The corresponding sentence in the published
2  paper states that, "Myocardial infarctions were
3  less common in the naproxen group than in the
4  rofecoxib group, 0.1 percent versus 0.4 percent,"
5  and then gives the 95 percent confidence interval
6  and relative risk; is that correct?


[270:8] - [271:23] 11/21/05 Curfman, Gregory


page 270
8      A.  Yes, uh-huh.
9      Q.  So, again, the percentages of the
10  myocardial infarction that occurred in both the
11  Vioxx arm and the naproxen arm of the study from
12  this Table 5 here do appear in the text of the
13  final published VIGOR article; is that correct?
14     A.  The percentages do, yes.
15              You breezed by the third entry on the
16  table.
17     Q.  Yes.  No.  I will come back to that.
18     A.  You will come back to that?
```

```
19       Q.  I will.  Yes.
20            And the final row of Table 5 is
21  ischemic cerebrovascular accidents, which are
22  essentially a type of stroke; is that correct,
23  Doctor?
24       A.  Correct.
page 271
1        Q.  And the percentages in that table are 0.2
2   percent on Vioxx and 0.2 percent in the naproxen.
3            Do you see that?
4        A.  Yes, I do.
5        Q.  And I think I skipped this sentence before.
6   It's above the prior one in the final published
7   article, but it states, "Ischemic cerebrovascular
8   events occurred in 0.2 percent of the patients in
9   each group"; is that correct?
10       A.  Yes.
11       Q.  So, again, the percentages of stroke in
12  both the Vioxx arm -- the percentage of patients
13  who suffered from a stroke in both the Vioxx arm
14  and the naproxen arm that were in this table also
15  appeared in the text of the final published
16  article; is that correct?
17       A.  The percentages did, yes.
18       Q.  And then the -- you mentioned the composite
19  endpoint, which was the -- which was the third row
20  on the table, and the specific percentages in that
21  table do not appear in the final published article;
22  is that correct?
23       A.  That's correct.


[287:11] - [287:14] 11/21/05 Curfman, Gregory


page 287
11       Q.  So, Doctor, my specific question now is the
12  data you are referring to, the myocardial
13  infarction data from VIGOR, was disclosed to the
14  FDA; is that correct?


[287:16] - [287:16] 11/21/05 Curfman, Gregory


page 287
16       A.  Yes.  They are on the FDA Website, yes.


[288:4] - [289:1] 11/21/05 Curfman, Gregory


page 288
4        Q.  Doctor, could you turn to the "Discussion"
5   section of the VIGOR manuscript, which begins on
6   Page 1525, and just as a general matter, is it fair
```

*Overruled*

Merck response:
None needed

```
 7  to say that the "Discussion" section is where the
 8  authors include their interpretation and analysis
 9  of the data that they have presented in the study?
10      A.  It's their interpretation of the data.  The
11  data analysis is presented in the "Results"
12  section.
13      Q.  Okay.  Thank you.
```

asked and
answered

```
14          So the authors' interpretation of the
15  data appears in the "Discussion" section; is that
16  correct?
17      A.  That's correct.
18      Q.  Okay.  And if you could, Doctor, please
19  turn to Page 1526 of the "Discussion" section, and
20  specifically looking at the right-hand column, and
21  the one, two, three, fourth paragraph down, the
22  paragraph that begins with, "The overall mortality
23  rate was similar in the two groups."
24          Do you see that?
page 289
 1      A.  Yes, I do.
```

611
counsel is simply
reading the
article to
witness.

beyond scope
of direct.

Merck response:
None needed

```
[289:9] - [289:24] 11/21/05 Curfman, Gregory

page 289
 9      Q.  Sure.  This paragraph here contains a
10  discussion of some data that we had been talking
11  about before, including another reference to the
12  significantly lower rate of myocardial infarctions
13  in the naproxen group, and again gives the
14  percentages as 0.1 percent versus 0.4 percent; is
15  that correct?
16      A.  That's correct.
17      Q.  Then if we move down to the next paragraph,
18  this paragraph discusses some of the basic science
19  surrounding naproxen, including the fact that it
20  inhibits the production of thromboxane by 95
21  percent and aggregation by 88 percent, and that
22  effect is maintained throughout the dosing
23  interval.
24          Do you see that?

[290:2] 11/21/05 Curfman, Gregory


page 290
 2      A.  I do see that.


[290:11] - [290:14] 11/21/05 Curfman, Gregory


page 290
11      Q.  All I am asking at this point is, does the
12  document in fact say, "Therefore, the events of the
```

13  regular use of naproxen may be similar to those of
14  aspirin"; is that correct?


[290:16] - [290:20] 11/21/05 Curfman, Gregory


page 290
16        A.  It's correct, what you have read.  That's
17  what it says there, yes.
18        Q.  And is it fair to say that this represented
19  the interpretation of the authors of this data at
20  that time; is that correct?


[290:22] 11/21/05 Curfman, Gregory


page 290
22        A.  Of the authors, yes.


[291:3] - [291:7] 11/21/05 Curfman, Gregory


page 291
3               Is it fair to say that none of the
4  outside reviewers who reviewed the manuscript took
5  issue with this particular section of the
6  discussion at this point?
7        A.  That's correct.


[292:24] - [293:5] 11/21/05 Curfman, Gregory


page 292
24              What I am asking specifically right now
page 293
1  is limited to at that time, and my question is just
2  specifically that at that time the editors believed
3  it was appropriate to allow the authors to include
4  this interpretation of the data in the "Discussion"
5  section; is that fair?


[293:8] - [293:9] 11/21/05 Curfman, Gregory


page 293
8        A.  There were no changes made by the editors
9  to this part of the "Discussion" section.

curfman ii counters.txt
Curfman Defendant Counter Designations Report [Irvin-Plunkett v. Merck]

Δ NOTE: Δ HAS
Objected to related
testimony designated by
TT. In the event the
Court sustains these
objections, Merck will
withdraw these counters

[256:23] - [258:3] 1/24/2006 Curfman, Gregory (Irvin-Plunkett)

page 256        Table 1 is entitled, "Data
23      on Myocardial Infarctions Omitting
24
page 257  the Three Events."  Data are
1       presented for the rofecoxib and
2       naproxen groups on person years of
3       exposure, number of myocardial
4       infarctions and relative risks in
5       the two groups, along with aspirin
6       indicated and aspirin
7       non-indicated groups, along with a
8       statistical analysis.
9               "The numbers of person years
10      of exposure as of February 10,
11      2000 have been estimated.
12      Relative risks were estimated by
13      Poisson regression; confidence
14      intervals were calculated by the
15      exact method."
16              Table 2 displays "Data on
17      Myocardial Infarctions Including
18      the Three Events" that had been
19      omitted, and identical data are
20      presented for the various study
21      groups, rofecoxib and naproxen,
22      aspirin indicated and aspirin not
23      indicated, that were presented in
24
page 258  Table 1.  And the same statistical
1       methods were used for the
2       calculations in this table.
3

[260:7] - [260:13] 1/24/2006 Curfman, Gregory (Irvin-Plunkett)

page 260        A.   "I recommend that you give
7       only the relative risk for rofecoxib
8       relative to naproxen.  Readers can
9       calculate the relative risk of N,"
10      naproxen, "relative to" rofecoxib "and
11      some readers will be confused if you give
12      both."
13

[285:20] - [285:24] 1/24/2006 Curfman, Gregory (Irvin-Plunkett)

page 285        Doctor, before you finish
20      reading this, have you ever seen
21      this before?
22              THE WITNESS:  Not to my
23      knowledge, no.
24                                      Page 1

Δ OBJections

## Ⓟ Curfman II Depo Cuts

**19:5 – 20:7**

Q.    And how long have you worked full time for the New England Journal of Medicine in that capacity?

THE WITNESS:  I've been an editor at the New England Journal of Medicine for over 20 years.  And for the first 15 years, I held the position of deputy editor, and for the last 5 years, I guess 6 now, I've been the executive editor of the journal.
BY MR. BECK:
Q.    Am I correct then, sir, that for the last 20 years, you've had a full-time job as a medical journalist in one capacity or another, rather than as a practicing doctor?
A.    Well, that's not quite right.  During that period of time, I did maintain some practice responsibilities and some teaching responsibilities, teaching medical students and residents.  At the present -- I've tended to dial that down over the years, and at the present time I'm essentially full time.

**43:15-21**

Q.    I will hand you what we've marked as Exhibit 3.  Is that a copy of the Expression of Concern?
A.    (Witness reviewing document.)  Yes, it is.

**45:21 – 46:11**

Q.    Whether it was its purpose or not, would you agree that the Expression of Concern was critical of the authors of the VIGOR study?
A.    The Expression of Concern was focused on an article that was published in the New England Journal of Medicine, a document, scientific document that we had obtained evidence that made us concerned about the procedures that led to the publication of that document.  And our Expression of Concern was focused on the scientific document in order to correct the scientific record.  It was not focused on individuals.

Sustained

**69:5 – 70:16**
Q.    And so on December 8th, when you released this Expression of Concern, there was no public health emergency --
A.    No.
Q.    Okay.
A.    No.  No.  The Expression of Concern, as I said earlier, was intended to set the scientific record straight.  In fact, just yesterday, even now, I received a new manuscript submission, and I was scanning through the references cited at the end of this new manuscript, and it contained a reference to the VIGOR article.  So, even now it is still being cited in articles.  And so even though rofecoxib had been removed from the market

Δ Objection:
Witness
interjects
without
a question
pending -
non-responsive

and you're right, there was no public health emergency, that wasn't the reason that we
issued an Expression of Concern.
Q.   What wasn't?  You say that wasn't the reason.  What wasn't the reason?
A.   There was no public health emergency to deal with.  We did it because that article
continued to exist in our journal archive, and as editors of the journal, we are responsible
for the integrity of that archive.  And our Expression of Concern was focused very
narrowly on trying to set -- trying to inform the medical community that we believe now
that there were some problems with that article and how it came out.  And it was our
responsibility to inform the medical community about that.

**122:20 – 123:9**

Q. . I'm handing you Exhibit 11.  Is this 11?  Yes.  Do you recognize this as a printout of
the ICMJE standards that you were referring to?
A.   Right.
Q.   If you'll turn, and the pages aren't numbered --
A.   No, they're not.
Q.   I'm looking for the page that has on its third line Roman Numeral III.B,
"Corrections, Retractions and 'Expressions of Concern'."
A.   Right.

**123:16 – 125:7**

Q.   And I just want to take a few minutes walking you through some of these.
The first sentence says, "Editors must assume initially that authors are reporting work
based on honest observations."  You agree that that's appropriate; right?
A.   Yes, indeed.
Q.   Then it talks about  "Nevertheless, two types of difficulty may arise."  And the first
has to do with errors that "may be noted in published articles."  Correct?
A.   Correct.
Q.   And the second has – it says, "The second type of difficulty is scientific fraud."  And
in your judgment, when you were dealing with the Expression of Concern, which of these
two were you dealing with?
A.   Well, we were dealing with a situation that involved incomplete reporting of crucial
data.  And in trying to decide about what kind of editorial intervention to undertake,
should this paper be retracted, should there be a correction or should there be an
Expression of Concern, we had lengthy discussions about the distinction between these
three possible types of interventions.  And we -- it was our editorial judgment that this
best fit with an Expression of Concern.
Q.   And the Expression of Concern procedure is at least discussed in connection with
the second of those two events that's mentioned in this – in these standards; right?
A.   Right.

**131:10 – 132:1**

Q.   Before you published your conclusions in the Expression of Concern, did you give any of the authors an opportunity to respond to what you were proposing to publish?
THE WITNESS:  Yes, we did.  But their response follows the publication of the Expression of Concern.  But we did discuss with them before we published it that they would have an opportunity to respond.  Yes.

**176:16 – 179:3**

Q.   Dr. Curfman, you were quoted in the Forbes article as saying you were somewhere between surprised and stunned that some cardiovascular data that was in a presubmission draft, a draft that was prepared before it was submitted to the New England Journal of Medicine, had been deleted before the draft was submitted.  Do you remember that and were you accurately quoted?
MR. ARBITBLIT:  Do you want to show him a document and show it to the rest of us?
MR. BECK:  Well, I can do it if I have to, but I don't want to consume time unnecessarily.  If it's a question in your mind, I'll show you the Forbes --
THE WITNESS:  Well, I can  tell you what I was somewhere  between surprised and stunned about, and that was the document that was presented to me for the first time on November 21st, 2005, Exhibit 18, among the exhibits on that day, which was an internal memorandum dated July 5th, 2000, which contained an extensive body of data on the cardiovascular adverse events in VIGOR that I had never seen before.  And that put me somewhere between surprised and stunned.
BY MR. BECK:
Q.   So, this was that there was cardiovascular data that Merck had in its possession in July that you had not seen in connection with the editorial process involving VIGOR; is that right?
A.   Yes.  There were two of the VIGOR authors.  One of the authors was the author of the memo.  The other VIGOR author was --
Q.   Well, why don't you give their names.  Go ahead.
A.   Well, the author of the memo was Dr. Deborah Shapiro, and one of the several recipients of the memo was Dr. Alise Reicin, both of whom were authors of the VIGOR article, who clearly had this extensive body of information on a variety of cardiovascular adverse events involving four different vascular systems in the body that I had never seen before during the editorial process, and yet we knew from the date on the memo that those data were available to those two authors early in the summer, 4 months and 19 days before we published the VIGOR article, and that was the cause of the surprise.

**187:17 – 191:7**

Q.   Well, one of the things that your Expression of Concern talks about are three additional MIs -- or can I just call them heart attacks for short?
A.   Sure.
Q.   Okay. -- three additional heart attacks that were reported to the FDA and by the FDA but were not included in the VIGOR publication.  That was one of the subjects of your Expression of Concern, correct?
A.   Correct.

*Overruled*

*Non responsive answer / speech. Duplicative of next question.*

Q.   Okay.  So, just focusing on these three additional heart attacks, do you now know that the three additional heart attacks were adjudicated and reported after a prespecified cutoff date used in the VIGOR study?
THE WITNESS:  We don't accept a separate cutoff point for the cardiovascular events that was weeks earlier than the cutoff point for the GI events.  It's not only unorthodox, but unacceptable to set an earlier cutoff point for one set of endpoints and a later cutoff point for a separate set of endpoints.  What that means is, that you're not counting the two sets of endpoints equally.  They're out of phase by several weeks' time, and that is, as I said, not only unorthodox in clinical trials, but unacceptable in clinical trials.  The authors didn't tell us that they had done this, and we were unaware of it.  There's no statement about that in the VIGOR article.  The only statement about the analysis of the cardiovascular events in the VIGOR article is that there was no prespecified analysis plan for cardiovascular events in VIGOR.  That's the last sentence in the methods section of the VIGOR article published in the New England Journal.  But that's the only information that we had, the editors, about any kind of cutoff point.  So, this was unorthodox.  If we had known about it, we would not have accepted that different cutoff time.  I've consulted with people who are experts in clinical trials, and no one has ever heard about this kind of arrangement in a clinical trial.
BY MR. BECK:
Q.   My question, sir, is, are you now aware that the study employed a prespecified cutoff date for cardiovascular events and that these three MIs came in after that date?
A.   No.  Prespecified means in a clinical trial that that item is specified before the trial begins in the written protocol for the trial, before the trial begins.  "Pre" means before the trial begins.  This was in no way prespecified.  That's a misuse of the term "prespecified," and if the authors had told us about this, we would not have accepted it.  We would have required that all of the events that occurred within the same time frame as the GI events be included, and those included those three MIs.

**248:11 – 249:13**

BY MR. ARBITBLIT:
Q.   Doctor, you had your deposition taken on November 21st, 2005?
A.   Yes.
Q.   Did you have any intention of writing an Expression of Concern about the VIGOR study before that date?
A.   No, we did not.
Q.   Did you formulate an intention to write an Expression of Concern on or after November 21st, 2005?
A.   At 8:30 in the morning on November 22nd, Dr. Morrissey and I initiated discussions about some kind of editorial intervention, and then we continued those discussions in the subsequent days, leading eventually to an Expression of Concern.
Q.   Now, the Expression of Concern itself has previously been marked as Exhibit 3, and do you have that in front of you?
A.   I can get that.  Yes, I have it.
Q.   Could you read the entire Expression of Concern into the record, please?    *Duplicative of next question*

*[handwritten: Sustained]*

*[handwritten marginalia: △ Objection: Π Hearsay; attempts to get backdoor admission of Editorial by having Dr. Curfman read the entire thing]*

**251:22 - 252:1**

Q.   Doctor, could you please read the Expression of Concern into the record, and you can include the tables as appropriate.

**252 :9 - 23**

THE WITNESS:  "Bombardier, et al., 'Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis,' New England Journal of Medicine 2000," Volume 343, Pages 1520 to 28, authored by Gregory D. Curfman, Steven Morrissey and Jeffrey M. Drazen.  "We have recently obtained information regarding inaccuracies in data in the report of the VIGOR (Vioxx Gastrointestinal Outcomes Research) study by Bombardier" –

**253:7 – 256:22**

THE WITNESS-- "by Bombardier, et al. that raise concern about certain conclusions in the article.  "The VIGOR study was designed primarily to compare gastrointestinal events in patients with rheumatoid arthritis randomly assigned to treatment with rofecoxib (Vioxx) or naproxen (Naprosyn), but data on cardiovascular events were also monitored.  Three myocardial infarctions, all in the rofecoxib group, were not included in the data submitted to the Journal.  The editors first became aware of the additional myocardial infarctions in 2001 when updated data were made public by the Food & Drug Administration.  "Until the end of November 2005, we believed that these were late events that were not known to the authors in time to be included in the article published in the Journal on November 23rd, 2000.  It now appears, however, from a memorandum dated July 5, 2000, that was obtained by subpoena in the Vioxx litigation and made available to the Journal, that at least two of the authors knew about the three additional myocardial infarctions at least two weeks before the authors submitted the first two of revisions and 4 1/4 months before publication of the article.  Given this memorandum, it appears that there was ample time to include the data on these three additional infarctions in the article.  "The fact that these three myocardial infarctions were not included made certain calculations and conclusions in the article incorrect.  Although only summary percentages, not actual numbers of myocardial infarctions, were included in the Journal article, the following tables display the numerical data without (Table 1) and with (Table 2) the three myocardial infarctions.  "Lack of inclusion of the three events resulted in an understatement of the difference in risk of myocardial infarction between the rofecoxib and naproxen groups (presented in the article as a reduction in the risk with naproxen but shown here as an increase in the risk with rofecoxib).  It also resulted in the misleading conclusion that there was a difference in the risk of myocardial infarction between  the aspirin indicated and aspirin not indicated groups.  "In addition, memorandum of July 5, 2000 contained other data on cardiovascular adverse events that we believe would have been relevant to the article.  We determined from a computer diskette that some of these data were deleted from the VIGOR manuscript two days before it was initially submitted to the Journal on May 18, 2000.  "Taken together, these inaccuracies and deletions call

*Sustained* (handwritten)

into question the integrity of the data on adverse cardiovascular events in this article. We have asked the authors to submit a correction to the Journal."\

**259:7 - 23**

Q.   And does the comment at the bottom of Exhibit 5 with a redacted name of the author sent to you reflect a comment of a person to whom you sent the Expression of Concern for peer review?
A.   That's correct.
Q.   Did the peer reviewer check all of your calculations as indicated in
15 this document?
A.   Yes.  He actually checked them a number of times.
Q.   What -- if you could just read the first sentence of the reviewer's comments.
A.   "I read your EofC," Expression of Concern, "and thought that it was temperate and accurate."

*Overruled* (handwritten)

*711 - leading (not hostile witness)* (handwritten)

**260:14 – 261:13**

Q.   Doctor, in the Expression of Concern, did you state the relative risks in terms of an increase in risk with rofecoxib or Vioxx, rather than a decrease in risk with naproxen?
A.   Yes, that's correct.
Q.   Why did you do that?
A.   Well, the original VIGOR article presented the relative risks in the opposite direction, the implication being from that presentation that naproxen was protective against cardiovascular disease, not that rofecoxib increased the risk of heart disease. We now know that that is not the case, and in order to set the record straight, we made the decision in this Expression of Concern to express the relative risks as if rofecoxib increased the risk of cardiovascular disease. And, again, it was our interest here to correct the scientific record on this important point.

*Object on hearsay grounds - and comments are more problematic than traditional hearsay. We have the identity of speaker is kept secret, and yet we have their opinions w/o any meaningful way to challenge them.* (handwritten)

**263:21 - 270:3**

Q.   Now, compared to the way that you have presented the relative risk of 5 in Table 2 of the Expression of Concern versus the .4 versus the .1 presented in the published VIGOR article, is it correct that there's a 20 percent higher relative risk of the way you've presented the data with all the MIs counted?
A.   Yes.  Approximately 20 percent, 19, 20 percent.
Q.   Can you please look at the document marked as Exhibit 17 earlier today which consists of the NEJM 000011 through 14, and the last two pages.
THE WITNESS:  Almost there.
THE WITNESS:  Right.
BY MR. ARBITBLIT:
Q.   The last two pages being the letter to Dr. Bombardier.
A.   Right.  I've got it.
MR. SHAW: Take your time.
BY MR. ARBITBLIT:

*711 - leading.* (handwritten)

*— Delete attorney comments.* (handwritten)

*Sustained* (handwritten)

*overruled*

Q.   Now, could you look at Paragraph 1 of your letter to Dr. Bombardier at page NEJM 13. Does that paragraph reflect your expectation that the authors would correct the understatement of the cardiovascular risk of rofecoxib as set forth in the Expression of Concern?

A.   Yes. That was our request, based on our judgment.

Q.   And does your statement to Dr. Bombardier, "the higher relative risk had important public health implications because of the large number of patients taking rofecoxib," comport with your testimony a moment ago as to why that difference was important?

THE WITNESS: Yes. That's exactly what I meant. I don't know if it was a close quote of what I said.

*711 — leading a non-hostile witness*

BY MR. ARBITBLIT:

Q.   Now, going on to Paragraph 2 of your letter to Dr. Bombardier, could you please read the first sentence of Paragraph 2?

A.   "Inclusion of the three myocardial infarctions would have invalidated your claim in the article that there was a difference in the risk of myocardial infarction only in high-risk patients (i.e., those in the aspirin indicated group)."

Q.   Can you explain what you mean by that?

A.   The authors in the VIGOR article concluded that the difference in rate of myocardial infarction between the two treatment groups was present only in high-risk patients, high risk for heart disease, but not in low-risk patients, low risk for heart disease. If you add in the three additional heart attacks that were not reflected in the data and do the appropriate statistical analysis for interaction, this conclusion in the article is no longer sustained, and that's what this point is about.

Q.   Can you explain what a test for interaction means?

A.   There are two variables, the drug variables, rofecoxib versus naproxen; and second variable, aspirin indicated high-risk group, aspirin not indicated low-risk group. And an interaction means that these two terms will interact statistically, and the appropriate test involves a determination of whether there's an interaction.

Q.   And was such a test performed by a statistician at your request in connection with the Expression of Concern?

A.   Yes, it was.

Q.   Can you summarize the result of that test?

A.   The test indicated that the risk -- the increased risk of cardiovascular disease associated with the use of rofecoxib or Vioxx was found in both the high risk and the low-risk groups, and it was not restricted to the high-risk group.

*overruled*

Q.   Now, could you read the sentence in Paragraph 2 beginning with the word "Furthermore."

A.   "Furthermore, data listed in Table 4 of the July 5, 2000 memorandum (Exhibit 18 in Dr. Curfman's deposition) on 'Adjudicated Thromboembolic Serious Adverse Events,' directly contradict your assertion that there was a difference in risk only in patients for whom aspirin was indicated."

Q.   Could you please take a look at the July 5th memorandum, July 5, 2000 memorandum, I believe it's been marked today as Exhibit 24 --

A.   Right.

Q.   -- but it also has the exhibit sticker 18 from the previous deposition.

*602 — Testifying about internal Merck document*

A. Right.

Q. Is this the table you're referring to in Paragraph 2 of the letter to Dr. Bombardier?

A. Yes. It's Table 4. This is what I was referring to.

Q. Does this table indicate a statistically significant increased risk of Vioxx in both aspirin indicated and aspirin not indicated patients?

A. Yes, it does. Again, in this particular table, the relative risks are indicated in the reverse direction. But the fact is that this table clearly indicates that the increase in risk associated with the use of rofecoxib was present and statistically significant in both the aspirin indicated, the high-risk patients, high risk for heart disease, and the lower risk group for heart disease in whom aspirin was not indicated. So, the risk is present in both groups. When you look at the totality of the adjudicated thromboembolic serious adverse events, the conclusion in the article is not sustained by this table.

**272:19 – 274:16**

Q. Was Figure 2 at Page 13 one of the documents that you considered as part of the data of which the authors were aware as of July 5, 2000 that was not submitted to the New England Journal?

A. Yes, that is correct.

Q. Is it correct also that the cumulative incidence of 2.5 percent as indicated in Figure 2 is greater than the incidence of cardiovascular events reported in the VIGOR article?

MR. ARBITBLIT: I'll state for the record that question was not asked.

THE WITNESS: Yes. These data were not reported at all in the VIGOR article. The only data on the cardiovascular events on VIGOR article were summary percentage data for myocardial infarctions, excluding the three heart attacks that we've discussed. These data here include a variety of serious thromboembolic adverse events involving four different vascular systems in the body. So, it's a much more comprehensive expression of the adverse event experiences in the VIGOR trial and include not just the coronary artery bed in the heart, but also the cerebrovascular bed perfusing the brain, the peripheral arterial bed perfusing the legs and the arms, and the peripheral venous bed, the venous system in the legs. So, there are four vascular systems that would be reflected in this graph, and these data were not submitted to the New England Journal of Medicine.

**276:9 – 283:17**

Q. Now, in the letter to Dr. Bombardier, you reference in Paragraph 3 the issue of a cutoff date; is that correct?

A. Yes.

Q. Did you ever see any document during the review process that indicated a cutoff date for the cardiovascular events?

A. No. There was no document or no mention of this fact at all. The editors knew nothing about this. The reviewers knew nothing about this.

Q. I want to focus your attention on some testimony that you gave earlier today about the meaning of prespecified, and I'd like you to take a look at the actual data analysis plan for the VIGOR study which has been marked as Exhibit 28.

*For much of rest of witness's testimony on cross:*

*Δ Objections to Dr. Curfman's testimony on Fundmtl Grounds. No Fundmtl THAT WITNESS EVER SAW DOCUMENT THEREFORE WAS CARRIED ON IT HAS, ANYTHING TO DO W/ IT OR ANY knowledge OF it (See voir dire by merch by counsel at deposition)*

(Whereupon, Deposition Exhibit Curfman-28, "Vioxx Gastrointestinal Outcomes Research (VIGOR) Data Analysis Plan (Protocols 088 and 089)" MRK-NJ0243297 - MRK-NJ0243377, was marked for identification.)

- - -

BY MR. ARBITBLIT:

Q.   It's a lengthy document.  You can take as much time as you'd like to look at it, but I will direct your attention, when you're ready, to a particular portion of the document. And this bears a date of August 24, 1999 in the lower right-hand corner.  It starts at Bates Number MRK-NJ0243297 and continues to 377.  It's entitled the "Vioxx Gastrointestinal Outcomes Research (VIGOR) Data Analysis Plan (Protocols 088 and 089)."  Do you see that?

A.   Yes, I do.

MR. WEINBERG:  I'm sorry, is that 28?

MR. ARBITBLIT:  Exhibit 28.

(Witness reviewing document.)

BY MR. ARBITBLIT:

Q.   Now, Doctor, do you see that there is an executive summary on the first three pages of text?

A.   Right.

Q.   If you look at the bottom of the second page bearing the last three Bates pages 302, there is a paragraph that starts, "According to the prespecified plan, a total of two formal analyses (one interim and one final) will be performed for this study."  Do you see that?

A.   Yes, I do.

Q.   And do you see going over on to the next page that, the "interim analysis is scheduled when 60 patients experience confirmed PUB events, and the final analysis is planned when 120 patients experience confirmed PUB events, 40 patients experience confirmed complicated PUB events, or 6 months after the last patient was randomized, whichever comes last."  Do you see that?

A.   Yes, I do.

Q.   Now, if you'd look back to the second page at the top, the meaning of PUB is given.

A.   Right.

Q.   Do you see that?

A.   Yes.

Q.   Is that a gastrointestinal endpoint?

A.   That is a gastrointestinal endpoint.

Q.   Was that the primary aim of the VIGOR study, to evaluate gastrointestinal endpoints?

A.   Yes.

Q.   And do you see any reference in the statement of when the final analysis would be done to a prespecified cutoff date?

A.   No.  This is based on the number of cumulative events.  And when a certain number of cumulative events would be tabulated, that would be the stopping point rather than a particular date.  So, they wanted to be sure they had enough observations, and that is the gist of this.

Q.   Now, that would be enough observations to evaluate the primary endpoint. Is that what you mean?

A.   Yes. For statistical analysis.

Q.   The next document is Exhibit 29, and I'll identify it for the record while you're looking at it.

- - -

(Whereupon, Deposition Exhibit Curfman-29, Letter 12-20-99, MRK-AAX0002759, was marked for identification.)

- - -

THE WITNESS: Uh-huh.

MR. ARBITBLIT: It is a letter from Michael Weinblatt, M.D., dated December 20, 1999 to Alise Reicin of Merck.

BY MR. ARBITBLIT:

Q.   And are you there with me now?

A.   Yes, uh-huh.

Q.   The document says, "Dear Dr. Reicin: We are aware that the VIGOR trial is in its final stages. We are also aware that there is an adjudication committee reviewing serious vascular adverse experiences in the entire Vioxx program. Due to the interest about COX-2 inhibitors and their potential role in vascular events, we recommend that an analysis plan be developed to analyze adjudicated serious vascular events in the VIGOR trial separately from any other planned analyses of these data. It will be important that these events [be] adjudicated blinded." Have I read that correctly?

A.   Yes.

Q.   Does this letter indicate any prespecified cutoff point for the cardiovascular events that the DSMB wanted evaluated?

BY MR. ARBITBLIT:

Q.   Do you see any reference to a prespecified cutoff point in this letter, Doctor?

A.   No. There's no reference to a prespecified cutoff point because there never was one, as far as we knew. The DSMB here is asking that an analysis plan be developed for the first time for the cardiovascular events. That had never been done up to this point, dated December 20, 1999 on the letter.

- - -

(Whereupon, Deposition Exhibit Curfman-30, "Changes to the VIGOR Data Analysis Plan 12/21/99," MRK-NJ0120246 - MRK-NJ0120247, was marked for identification.)

- - -

BY MR. ARBITBLIT:

Q.   Doctor, do you see Exhibit 30, which has a title "Changes to the VIGOR Data Analysis Plan," December 21st, 1999, with the Bates Number MRK-NJ0120246 and 247, that's marked as Exhibit 30?

A.   Yes, I have it.

**286:15 - 296:10**

Q: The question is, do you see any reference to any prespecified cutoff points in the "Changes to the VIGOR Analysis Plan" dated December 21st, 1999?

*overruled*

*cert.*

THE WITNESS: No. I don't see any prespecified cutoff dates.

BY MR. ARBITBLIT:

Q. Doctor, could you please take a look at Exhibit 31, which I'll identify for the record while you're looking at it.

- - -

(Whereupon, Deposition Exhibit Curfman-31, E-mail 12-10-05, NEJM001013, was marked for identification.)

- - -

MR. ARBITBLIT: It is an e-mail. The name of the sender is redacted, and you and Drs. Morrissey and Drazen are the recipients. And the Bates page at the bottom is NEJM 001013.

BY MR. ARBITBLIT:

Q. Do you see that?

A. Yes, I do.

Q. And is this an e-mail that you received on or about December 10, two days after the Expression of Concern was published?

A. Right.

Q. Now, I'll have some questions about other aspects of the document, but for the moment, I want to focus your attention on the last paragraph where the author refers to the cutoff date. Do you see that?

A. Yes.

Q. Do you see that the author says, "Finally, it would be important to get a clear understanding of what this 'cut off date' means"? Do you see that?

A. Yes, I do.

Q. Do you agree with that statement?

A. Yes.

Q. Is that something that you are evaluating as part of the process of Expression of Concern and correction?

THE WITNESS: Yes. I mean, we just --

THE WITNESS: As --

BY MR. ARBITBLIT:

Q. Doctor, is there --

A. Yes.

MR. BECK: That's as focused as I can make it.

MR. SHAW: There's no question before you, Dr. Curfman. Let him ask a question, because I don't know what the heck he's asking.

THE WITNESS: Okay.

BY MR. ARBITBLIT:

Q. Is there a process of Expression of Concern followed by response of the authors leading toward a potential correction in the publication?

A. Well, there'll be a further response from the editors at some future time, yes.

Q. And as part of that process, is it important to you to understand what this cutoff date means as set forth in the e-mail marked as Exhibit 31?

THE WITNESS: Yes. It's very important, because we've never been able to understand it. It, to us, seemed very unorthodox to have separate cutoff times for one set of adverse events, as compared with another set of adverse events. They should be counted for the

same duration of time so that the safety profile of the drug can be validly assessed. If you cut off one set of endpoints prematurely and give them less time to accumulate, then the playing field is not level in terms of assessing the overall safety profile of the drug. So, we are at a complete loss about this prespecified cutoff point and were never told about it in the first place. So, we're doubly confused, and we hope to get some kind of clarification from the authors as to why this was done, since we -- I've been at the New England Journal 20 years, handling many clinical trials, I've never seen it before, and so I don't understand it. I don't understand the rationale, and we've given the authors a chance to address that question.

*[handwritten: Cont.]*

BY MR. ARBITBLIT:

Q.  At the bottom of the same paragraph, could you read the last question in that paragraph?

A.  "That" -- you mean, "That was news to me and needs to be tied down - when and how was that date arrived at?"

Q.  And then following with the last question.

A.  "If true why were these three cases in the FDA analysis?"   *[handwritten: Take out.]*

Q.  Do you agree with the question that -- I'll withdraw that. What do you understand the author to have been saying to you about this issue?

*[handwritten: Overruled]*
*[handwritten: Duplicative Testimony]*

A.  Well, in the first question that I read, what he is saying is basically what I just said, that we need to try, if we can, to understand why there were separate cutoff times for the two sets of adverse events, which seems extremely unusual to us, and we don't understand it.  And the second question, "if true, why were these three cases in the FDA analysis," is also very puzzling to me.  The three events, the three heart attacks were included in the July 5 memo  that was prepared by the chief statistician for the VIGOR article, and yet despite the fact that she felt that it was appropriate to include them among the data in this memo that she generated, and despite the fact that this memo is dated July 5, 2000, early in the summer and early in the review process of the VIGOR article, they weren't included in the VIGOR article.  So why are they included here and not in the VIGOR article?  It's confusing to me what the rationale -- what could be the rationale for that disconnection.

Q.  Can you conceive of any scientific rationale for including those three events in the FDA analysis and omitting them from the analysis in the New England Journal?

*[handwritten: Calls for expert opinion testimony from non-expert.]*

A.  There is no scientific rationale that I can come up with, scientific rationale, why there should be separate cutoff points for the cardiovascular adverse events as compared with the gastrointestinal adverse events.  There is no scientific justification for doing that, and in my judgment, results in a misleading picture of the data.

- - -

(Whereupon, Deposition Exhibit Curfman-32, Memo, 1-24-00, "Merck Management Requests to VIGOR Data Safety and Monitoring Board," MRK-NJ0071309, was marked for identification.)

*[handwritten: Foundation]*

- - -

BY MR. ARBITBLIT:

Q.  Doctor, Exhibit 32 has been handed to you, and it is a memorandum from Deborah Shapiro to Drs. Bjorkman, Neaton, Silman and Sturrock, dated January 24th, 2000.  Do you see that?

*[handwritten: Sustained (?) Too broad]*

*[handwritten: See voir dire at dep 297:9-15- witness has never seen document before. No foundation and improper testimony]*

*overruled*

*Foundation Cont.*

A.  Yes.

**298:10 – 301:15**

Q.  Do you see that in this document Dr. Shapiro is conveying that the Merck management requested that "a separate analysis of the VIGOR data not be performed"? Do you see that statement?

THE WITNESS:  Yes, I do.

BY MR. ARBITBLIT:

Q.  And do you see that "In this case VIGOR would be pooled with all other rheumatoid arthritis trials for analysis at a later date"?

A.  Right.

Q.  Do you see that "They also requested that the adjudication take place after data base unblinding"?

THE WITNESS:  Yes, I do.

BY MR. ARBITBLIT:

Q.  Do you see any reference to a prespecified cutoff point in this document?

- - -

  (Whereupon, Deposition Exhibit Curfman-33, Letter 1-24-00, with attachments, MRK-AAX0002760; MRK-NJ0243719 - MRK-NJ0243720, was marked for identification.)

- - -

*Foundation - state grounds -*

BY MR. ARBITBLIT:

Q.  Exhibit 33 is a letter to Dr. Reicin from Dr. Weinblatt, and it is MRK-AAX0002760. Do you see that Dr. Weinblatt writes to Dr. Reicin that he spoke to Dr. Shapiro, the author of the memo you looked at just a moment ago?

A.  Right.

*using witness as a prop to show doc he's never seen before*

BY MR. ARBITBLIT:

Q.  Do you see that in the document, sir?

A.  Yes.

Q.  This is not a document you've seen before; right?

A.  No.

Q.  And Merck has not --

MR. SHAW:  What's the date of the letter you are referencing?

MR. ARBITBLIT:  January 24, 2000.

BY MR. ARBITBLIT:

Q.  And Merck has not provided you with this letter in connection with its claims of a prespecified cutoff date, has it?

A.  No.

**305:20 – 307:11**

Q.  Doctor, do you see any reference to a prespecified cutoff date in the exchange between Dr. Shapiro, Dr. Reicin and Dr. Weinblatt?

BY MR. ARBITBLIT:

Q.  You can answer.

*Same; also letter refers to conversations that obviously witness is not privy to, & cannot comment on whether there were representations made in those other communications that are referenced & incorporated in the document*

*overruled*

A.   There is no mention of a prespecified cutoff point in this second request for a data analysis plan for the VIGOR cardiovascular data.

- - -

(Whereupon, Deposition Exhibit Curfman-34, Letter 2-7-00, with attachments, MRK-NJ0243715 - MRK-NJ0243718, was marked for identification.)

- - -

BY MR. ARBITBLIT:

Q.   Now, Doctor, are you familiar with the claim by the authors that there was a cutoff date of February 10 for cardiovascular events, February 10, 2000?

A.   I am now, yes.

Q.   Please take a look at Exhibit 34, which is a letter from Alise Reicin to Michael Weinblatt.  I take it you haven't seen this one either; is that correct?

A.   That's correct.

**308:11 – 311:5**

Q.   Do you see that there's a reference to a cutoff date for reporting of these events to Merck will be February 10th?

A.   I do.

Q.   And do you consider that a prespecified cutoff date?

A.   Well, let's just say that the letter is dated February 7th, and the cutoff date is designated February 10th, and this is called prespecified?  Not according to any definition of prespecified that I've ever heard, which, as I said earlier in testimony, involves specifying the item in advance of them beginning of the trial.  So, I haven't ever heard of a definition of prespecified that would come that late in the trial.  That's three days shy of when they want to shut down tabulation of the endpoints.

Q.   Underneath the heading, "Timing & Logistics," do you see the statement, "Any events which are reported after February 10th will be adjudicated, however they will not be included in the initial analyses"?

MR. BECK:  At this point, pursuant to the judge's procedure, I would request that that entire paragraph be read.  I can do it or the witness can do it.

MR. ARBITBLIT:  That's fine.  I'll do it.

BY MR. ARBITBLIT:

Q.   "Timing & Logistics.  A cut-off date for reporting of these events to Merck will be February 10th (the Termination date for the study).  Our goal is to have final packages retrieved from the sites by the time that frozen file is achieved in late April.  It is likely that due to logistical purposes, the adjudication of some of these events will take place after unblinding of the database has occurred; however, all individuals involved in the adjudication process will remain blinded to individual patient treatment.  We will do our best to ensure that events are adjudicated and analyses are completed prior to submission of VIGOR data to regulatory agencies.  Any events which are reported after February 10th will be adjudicated, however, they will not be included in the initial analyses."  Did I read that correctly?

A.   Yes.

Q.   Do you see any reference to not including events reported after February 10th in final analyses?

*Favorian – same objection. Exhibit about document he's never seen.*

*(all objections were made at the depo itself as well)*

*Atty sidebar*

*Overrule* *[handwritten]* *SAME Foundation objection [handwritten]*

A.   No.
Q.   Now, do you see in the first paragraph that the "Merck management has  again met to discuss the plans for accelerating the adjudication and analysis procedures"? Do you see that?

**311:24 – 313:22**

Q.   "I want to share with you Merck's plan for analyzing serious thromboembolic & embolic cardiovascular adverse experiences from the VIGOR study.  Subsequent to your conversation with Dr. Shapiro on January 21, 2000, Merck management has again met to discuss the plans for accelerating the adjudication and analysis procedures.  The plan that was decided upon in these most recent meetings should I believe address the requests" that "you have made in your letter to me dated January 24, 2000."  Did I read that correctly?
A.   Yes.
Q.   As of February 7, 2000, there had been no submission to the New England Journal about the VIGOR study, had there?
A.   No.
Q.   And certainly the New England Journal had not asked Merck or its employees to accelerate adjudication   and analysis, had it?
A.   No.
Q.   Now, if you look at the attachment to the February 7th letter, MRK-NJ0243717, there's a timeline there.  Do you see that at the top of the page, "projected major VIGOR milestones are as follows"?
A.   Yes.

BY MR. ARBITBLIT:
Q.   Do you see what the June 30th, 2000 culmination of the VIGOR milestones is?
A.   "SNDA Filing."
Q.   Do you know what an sNDA is?
A.   It's a supplementary new drug application.

**316:1 – 317:19**

MR. BECK: Yes.  This is Bates Number ending 3717.  So, the first page of the attachment, the portion about midway down where it says, "The following dates are in effect: 2/10/00.  Cut-off date for eligible events to be included in the analysis.  Events for which the WAES (Worldwide Adverse Event Reporting System) Report has an 'initial report date' following this date will be adjudicated, but not included in the analysis.  Events reported by" February 10, 2000 "but for which the WAES Report initially contains an SAE term that is not eligible for adjudication, and which is subsequently revised after this date to a term that is eligible for adjudication, will be adjudicated but not included in   the analysis."
*Atty sidebar [handwritten]* MR. ARBITBLIT:  Are you done?
MR. BECK:  Yes.
BY MR. ARBITBLIT:

*[handwritten: Overruled]*

Q.   Now, do you see, Dr. Curfman, that the cutoff date from which counsel just read is part of a document bearing a date in the upper right-hand corner of February 10, 2000?
A.   Yes.
Q.   Is February 10, 2000 the same date that's created as a cutoff date?
A.   That's correct.
Q.   Now, is a cutoff date that's created on the termination date of the study a prespecified cutoff date?
A.   Not according to any definition of prespecified cutoff date that I have ever seen.

**318:17 – 320:2**

Q.   Doctor, in the Expression of Concern, one of the points that you made was that until November of 2005, you believed that the three MIs were late events that were not known to the authors in time to be included in the article published on November 23rd, 2000; correct?
A.   Yes.
Q.   Can you please take a look at the document marked as Exhibit 36, which is a memorandum to Alise Reicin from Linda Nelson dated May 26, 2000, "Subject: Adjudication results for 11 events after 2/10/2000." Do you see this document?
A.   Right.
Q.   If you could turn to the second page, do you see that there are three myocardial infarctions with the report dates of February 22nd, 2000, February 17, 2000 and February 16, 2000?
A.   Right.
Q.   At any time during the review process for the VIGOR manuscript, did Alise Reicin inform you that she knew the confirmed status of the three MIs reported after February 10, 2000 no later than May 26, 2000?

THE WITNESS:  None of the authors informed the Journal about the three myocardial infarctions.

*[handwritten right margin: same Famosas objection]*

**320:24 – 323:16**

Q.   Doctor, what is Exhibit 37?
A.   This is a series of three e-mail messages involving our media specialist Karen Pedersen, myself and Dr. Drazen and some of the other editors.  It has to do with an editorial that was published in the Washington Post in early January that Karen Pedersen brought to our attention because she thought that it might contain some factual inaccuracies and is asking us if we wanted to perhaps respond in some way.
Q.   And did Ms. Pedersen send you an e-mail suggesting four points that you might make in response to the editorial?
A.   Right.
Q.   Just to back up and identify it for the record, it's dated January 3rd, 2006, NEJM 000280.  Doctor, did you respond to Ms. Pedersen's e-mail concerning point number 2 which stated, "The 3 MIs are a trivial amount of the total data withheld"?

*[handwritten right margin: 801/802; goes beyond scope of direct examination]*

*[handwritten at bottom: (A) See Objection at 323:17-3:24:1 Can't bring in email through backdoor by having witness read it when email would not be admissible.]*

A.   Yes. I think that she wasn't correct about that, and I wanted to give her some feedback about that so we could correct that statement.

Q.   Could you read the first paragraph, the e-mail that you sent to Ms. Pedersen on January 3rd, 2006 into the record, please?

BY MR. ARBITBLIT:

Q.   Go ahead, Doctor.

A.   "The only comment I have is about # 2. I would not characterize the 3 MIs as trivial exactly. It is never appropriate to withhold data, under any circumstances, and we don't want to appear as if we are endorsing that practice. It's just that they were withheld" -- "that they withheld not only 3 MI's, but 9 tables and two figures of additional data, all of which, in total, painted a very ominous picture regarding cardiovascular toxicity of Vioxx. They never revealed these data to the editors, and therefore readers never saw them. They were disclosed to FDA, but not posted on the FDA website until 2001, months after the New England Journal of Medicine VIGOR article was published. In any case, the FDA Web site does not constitute publication in the usual sense; doctors don't read the FDA Web site - they read journals. The cardiac toxicity data from VIGOR have never been published in any medical journal. The company wanted to keep the Journal article pristine for purposes of marketing. And it worked - for a while."

Δ Response
to Objections

merck affirmative designations curfman jan 24, 06.txt
Issues Report [Vioxx - Plunkett case specific]

* Merck's Affirmative Designations

[18:21] - [19:4] 1/24/2006 Curfman, Gregory (MDL)


page 18
21          Q.    Dr. Curfman, are you
22  currently actively practicing medicine?
23          A.    A very small fraction of my
24  time is in medical practice in teaching,
page 19
1  but my main responsibility is I'm the
2  executive editor of the New England
3  Journal of Medicine, which is a full-time
4  job.


[20:8] - [21:7] 1/24/2006 Curfman, Gregory (MDL)


page 20
8          Q.    I'd like to take a few
9  minutes and just establish with you, sir,
10  a basic chronology of some of the key
11  events that we'll be talking about.
12          You recall that the VIGOR
13  manuscript was submitted to the New
14  England Journal of Medicine in May of
15  2000; is that right?
16          A.    Well, it was submitted -- it
17  was received into our system on May 23rd
18  of 2000.  For the record, I think it's
19  important that we note that the letter of
20  transmission from the corresponding
21  author was dated May 18th.
22          Q.    Do you remember that the
23  authors asked for expedited treatment of
24  the VIGOR manuscript?
page 21
1          A.    Yes, I do.
2          Q.    Do you remember that the New
3  England Journal of Medicine determined
4  not to grant the expedited treatment?
5          A.    Yes.  The editor who made
6  that decision decided that it was not
7  indicated in that case, yes.


[21:20] - [21:24] 1/24/2006 Curfman, Gregory (MDL)


page 21
20          Q.    Again, because we'll be
21  referring to it during the deposition, do
22  you recognize Exhibit 1 as a copy of the
23  VIGOR manuscript as it eventually was
24  published in November of 2000?

                        Page 1

merck affirmative designations curfman jan 24, 06.txt
[22:21] 1/24/2006 Curfman, Gregory (MDL)

page 22
21      A.      Okay.

[23:23] - [24:19] 1/24/2006 Curfman, Gregory (MDL)

page 23
23          Q.      Continuing with the
24  chronology, do you recall that in
page 24
1   February 2001 the FDA convened an
2   Advisory Committee?
3          A.      Yes.  I did not have that
4   information in February, but I did learn
5   about that at a later time, later in
6   2001, yes.
7          Q.      Do you remember when you
8   learned in 2001 that the FDA had convened
9   an Advisory Committee?
10          A.      To the best of my
11  recollection, it was in August or perhaps
12  September of 2001 that I first learned
13  about that.
14          Q.      And did you learn that the
15  FDA had information that they had posted
16  on their website concerning VIGOR?
17          A.      Yes.  I learned about that
18  from a colleague, again, it was perhaps
19  late August or September of 2001

[26:23] - [27:3] 1/24/2006 Curfman, Gregory (MDL)

page 26
23          Q.      Eventually, did you read a
24  memorandum that was part of the FDA's
page 27
1   file on this that was posted on line
2   called the Targum memorandum?
3          A.      That's right.

[27:14] - [27:24] 1/24/2006 Curfman, Gregory (MDL)

page 27
14          Q.      Is Exhibit 2, does that
15  appear to you to be a copy of the Targum
16  memorandum?
17          A.      (Witness reviewing
18  document.)
19          Yes, it does.
20          Q.      When did you first read the
21  Targum memorandum?
22          A.      I first became aware of the
23  data on the FDA website in late August or
24  perhaps September of 2001.

                              Page 2

merck affirmative designations curfman jan 24, 06.txt

[28:23] - [30:1] 1/24/2006 Curfman, Gregory (MDL)

page 28
23          Q.      Continuing in the
24  chronology, in 2004, did you learn that
page 29
1   Merck had voluntarily withdrawn Vioxx
2   from the marketplace?
3          A.      That's correct.
4          Q.      And when in 2004 did you
5   learn that?
6          A.      I believe that the date was
7   september 30th, 2004, plus or minus a day
8   or two.
9          Q.      Did you learn around that
10  time or soon after the withdrawal that
11  the FDA was convening another Advisory
12  Committee?
13         A.      Right.
14         Q.      And you understood that this
15  Advisory Committee would be looking at
16  all COX-2 inhibitors; is that right?
17         A.      Right.
18         Q.      As well as other NSAIDs.
19  Did you understand that?
20         A.      Yes.
21         Q.      Did the New England Journal
22  of Medicine ask the people who were
23  writing up the APPROVe study to submit it
24  to the New England Journal of Medicine
page 30
1   for possible publication?


[30:23] - [31:23] 1/24/2006 Curfman, Gregory (MDL)


page 30
23         A.      There were discussions
24  between our editor-in-chief and one of
page 31
1   the authors about that possibility, yes,
2   but I honestly don't know who made the
3   first phone call.  I was not involved in
4   those conversations.
5          Q.      Was it the case that even
6   though Vioxx had been voluntarily
7   withdrawn from the market, the New
8   England Journal of Medicine was
9   interested in publishing the APPROVe
10  study so that it would be available to
11  the public before the Advisory Committee
12  met?
13         A.      I don't recall that.  I
14  think that we were interested in
15  publishing the data, because it seemed to
16  us to be an important data set, very
17  informative data set, that would inform
18  physicians and the rest of the medical
19  community about this drug and this class
20  of drugs, but I don't recall anything
                              Page 3

Δ Response

Dr. Curfman is a
hostile witness + leading
questions are proper. His
prior deposition, Motion
to Quash (with accompanying
Curfman affidavit) accusing
Merck of "retaliation" and
acting in "bad faith", and
Editorial (Expression of Concern)
all establish Dr. Curfman
is a hostile witness.

611
leading

*overruled* [handwritten]

merck affirmative designations curfman jan 24 06.txt
21  about trying to publish it before an
22  Advisory Committee.  I don't recall that
23  at all.

[176:16] - [177:1] 1/24/2006 Curfman, Gregory (MDL)

page 176
16          Q.    Dr. Curfman, you were quoted
17  in the Forbes article as saying you were
18  somewhere between surprised and stunned
19  that some cardiovascular data that was in
20  a presubmission draft, a draft that was
21  prepared before it was submitted to the
22  New England Journal of Medicine, had been
23  deleted before the draft was submitted.
24  Do you remember that and were you
page 177
1  accurately quoted?

*Compound*
*leading 611*
*Counsel testifying* [handwritten]

[177:10] - [177:24] 1/24/2006 Curfman, Gregory (MDL)

page 177
10          THE WITNESS:  Well, I can
11  tell you what I was somewhere
12  between surprised and stunned
13  about, and that was the document
14  that was presented to me for the
15  first time on November 21st, 2005,
16  Exhibit 18, among the exhibits on
17  that day, which was an internal
18  memorandum dated July 5th, 2000,
19  which contained an extensive body
20  of data on the cardiovascular
21  adverse events in VIGOR that I had
22  never seen before.  And that put
23  me somewhere between surprised and
24  stunned.

*Δ Response:*
*Question is proper — witness*
*had no problem understanding*
*the question + leading nature*
*of question is fine given Dr.*
*Curfman's status as hostile*
*witness.* [handwritten]

[179:22] - [180:4] 1/24/2006 Curfman, Gregory (MDL)

page 179
22          My question is, from your
23  review of the materials, are you aware
24  that all of the data that was collected
page 180
1  in the July 2000 memorandum and including
2  the tables and the statistical analyses,
3  that all of that was communicated to the
4  FDA in the fall of 2000?

*Δ Response* [handwritten]
*602* [handwritten]
*Foundation was adequately*
*established in the deposition*
*on this point (See 26:23-*
*27:3 for example). This is*
*foundation confirmed by the*
*witness's answer.*

[180:8] - [180:10] 1/24/2006 Curfman, Gregory (MDL)

page 180
8          THE WITNESS:  Yes.  I'm
9  aware that it was communicated to

*Internal NEJM does*
*confirm that Dr. Curfman*
*was aware that the data*
*was given to the FDA. He*
*testifies that he saw the FDA*
*material w/ updated data (Targum*
*Memo) which clearly states when data*
*was given to FDA (Fall 2000).* [handwritten]

*overruled* (handwritten)

```
                     merck affirmative designations curfman jan 24, 06.txt
10        the FDA.
```

[183:2] - [183:18] 1/24/2006 Curfman, Gregory (MDL)

```
page 183
 2         Q.     How about in the materials
 3  communicating the information to the FDA,
 4  was there a mention there of a
 5  prespecified cutoff date?
 6         A.     I don't recall.  It's a big
 7  document, and I'd have to go back through
 8  it.
 9         Q.     How about in the FDA
10  materials prepared by people within the
11  FDA, is there an indication in the FDA
12  materials that this additional
13  information that was transmitted to them
14  in October had come in after a
15  prespecified cutoff date that was used in
16  the VIGOR study?
17         A.     Well, I don't know.  I don't
18  know about that.
```

Δ Response (handwritten)
602 What exactly Dr. Curfman did or did Not Know in 2000/2001 time frame is directly at issue in establishing his bias + basis for publishing the Editorial when he did. Indeed, his lack of knowledge during that time frame is the alleged reason for waiting 5 yrs to publish the EOC.

*overruled* (handwritten)

[185:5] - [185:12] 1/24/2006 Curfman, Gregory (MDL)

```
page 185
 5         Q.     Did you ever look at the
 6  Targum memo that we talked about earlier,
 7  that internal FDA memo that analyzes
 8  data?  Did you ever look at the Targum
 9  memo to see whether it explains that that
10  information that was provided in the fall
11  of 2000 had come in after a prespecified
12  cutoff date for the VIGOR study?
```

Compound (handwritten)
Δ Response
Dr. Curfman has NO trouble understanding the question, and was able to answer

[185:17] - [185:19] 1/24/2006 Curfman, Gregory (MDL)

```
page 185
17         Q.     Did you ever look at the
18  Targum memo to see that?
19         A.     Yes, I did.
```

[192:10] - [193:12] 1/24/2006 Curfman, Gregory (MDL)

```
page 192
10         Q.     Let me turn to another
11  subject that is addressed in your
12  Expression of Concern, and that is
13  information that was in a draft before
14  the draft was submitted to the New
15  England Journal of Medicine, but then was
16  taken out in the draft that was submitted
17  to the New England Journal of Medicine.
18                Do you understand what topic
19  I'm talking about?
                                        Page 5
```

Side bar counsel testifying
Δ Response
Counsel is Not testifying; Counsel is asking about the key topic at issue in the Expression of Concern and is establishing that is the topic for the next line of questioning. Question is entirely proper.

*overruled* (handwritten)