overruled

recall is that you asked, you know, did it have something to do with the trial. And it did have something to do with my testimony. But it turned out that my testimony was not part of the trial at all anyway. It never was played, and, therefore, was not

page 98

part of the trial.

[98:3] - [98:18] 1/24/2006 Curfman, Gregory (MDL)

page 98

Q. But you released the Expression of Concern early anyway --

A. Yes, we did.

Q. -- even though there was no need to in order to have the record straight concerning your deposition; right?

A. Yes. But we were prepared, and as I explained to you, according to the uniform requirements, and that's an important word, "requirements," of the International Committee of Medical Journal Editors, this is what was expected of us as editors. We had the information put together, and we released it.

assumes facts not in evidence leading, argumentative

D: Dr. Curfman has no problem with the question. Leading question is okay; question is not argumentative - it is merely stating facts. Not assuming facts not in evidence - Dr. Curfman volunteered that his dep wasn't played @ trial.

[99:16] - [100:15] 1/24/2006 Curfman, Gregory (MDL)

page 99

Q. Dr. Curfman, is it your testimony that the New England Journal of Medicine did not do anything out of the ordinary in terms of press relations with the Expression of Concern concerning the VIGOR article compared to what it did with those other two Expressions of Concern you mentioned?

A. Well, in fact, one of those

page 100

three Expressions of Concern was released last Friday, and there was some media attention given to that Expression of Concern as well. So, the first one that we released back in 2002, my recollection, did not generate as much media attention.

Q. Looking still at Exhibit 8, we were looking at the bottom of the three e-mails, which would have been the earliest. If you look up to the middle one, you see that that's from Dr. Drazen at 6:57 a.m. on December 8th to several people, including you?

A. Right.

leading

Leading is okay

hearsay 801, 802

• Business Records

• In any regard, not for truth of the matter, but instead shows NEJM frequent contact w/ the press on this issue + how NEJM went on the media offensive

Overruled

[100:20] - [101:5] 1/24/2006 Curfman, Gregory (MDL)

page 100

Q. And Dr. Drazen says "All," I guess that means to everybody whose name appears on the e-mail; right?

A. Right.

Q. And he says, "I think it

page 101

would make sense for me to contact" and then there's a name I can't pronounce. Can you pronounce that name?

A. Yes. Her name is Snigdha Prakash.

all questions re: e-mail + hearsay SAME Responses.

[101:14] - [101:20] 1/24/2006 Curfman, Gregory (MDL)

page 101

Q. Who is Snigdha Prakash, and how did you learn how to pronounce that name so well?

A. Snigdha Prakash is a reporter for National Public Radio.

Q. She follows the Vioxx litigation?

Compound harassing witness

Not true at all - sarcastic is apparent from the video. He is legitimately asking how to pronounce a difficult name.

[101:22] - [101:24] 1/24/2006 Curfman, Gregory (MDL)

page 101

THE WITNESS: I think she follows a lot of things. She probably follows that too, yes.

[102:2] - [102:4] 1/24/2006 Curfman, Gregory (MDL)

page 102

Q. Well, as you know, it's not just probably. You know that she follows it quite closely, don't you?

[102:9] - [102:11] 1/24/2006 Curfman, Gregory (MDL)

page 102

THE WITNESS: She's done stories on NPR about the litigation, yes.

asked and answered - leading argumentative

witness didn't give straight answer; okay to press. Nothing wrong with question.

[102:13] - [102:16] 1/24/2006 Curfman, Gregory (MDL)

page 102

Q. And she's quoted people from the New England Journal of Medicine about the litigation, hasn't she?

A. I believe she has.

leading - Leading Okay

[102:24] - [103:13] 1/24/2006 Curfman, Gregory (MDL)

overruled

What facts? Objection is vague. Witness agrees with description of the document.

page 102

Q. In any event, here is the

page 103

editor-in-chief asking whether it makes sense in connection with the probable early release of the Expression of Concern to contact this reporter from National Public Radio; right?

A. Uh-huh.

Q. And then if we look up to the next e-mail, you see that that's from you?

A. That's right.

Q. To Dr. Drazen and others; right?

A. Correct.

assumes facts not in evidence

hearsay 801, 802

Same hearsay response (same document; see bottom of page 21)

[103:15] - [104:1] 1/24/2006 Curfman, Gregory (MDL)

page 103

Read what you said in your e-mail back to Dr. Drazen about contacting the NPR reporter in connection with the early release of the Expression of Concern.

A. "I have some concerns about giving her an exclusive. Langreth has been following the situation closely. I think that maybe both of them could be called at the time the media e-mail is

page 104

sent out."

[104:10] - [104:16] 1/24/2006 Curfman, Gregory (MDL)

page 104

Q. Did the New England Journal of Medicine send out a media e-mail alerting members of the media to the Expression of Concern?

A. That's our routine for any kind of early web release, to inform people that it's there, yes.

[108:2] - [108:23] 1/24/2006 Curfman, Gregory (MDL)

page 108

Q. Certainly it's not part of the regular procedure with Expressions of Concern to call up individual members of the media and give them exclusive interviews, is it?

A. Well, we've only done three Expressions of Concern since 2002, so, we don't have a big track record with these.

Q. Your e-mail referred to Langreth. Who's Langreth?

A. Robert Langreth is a reporter with Forbes magazine.

Q. Is he also someone who

leading

hearsay

Leading is proper.

Not clear what π is objecting to in any event. Same hearsay response to the email (part of same document). But witness is just identifying a person.

Overruled

followed the Vioxx litigation closely?
A. Well, I learned that he did. Yes.
Q. In fact, that's what you meant when you said that "Langreth has been following the situation closely." Isn't that right?
A. That's right. I learned that he was.

leading - proper

[110:9] - [110:14] 1/24/2006 Curfman, Gregory (MDL)

page 110
Q. How about Ms. Prakash, did you give her an interview?
A. I believe so. You can probably show me -- I think I did. I think so. Yes, I think I did. I think that may have been on the second day.

[110:19] - [110:22] 1/24/2006 Curfman, Gregory (MDL)

page 110
Q. When did you tell the authors of the VIGOR manuscript that you intended to release the Expression of Concern earlier than December 29th?

omits answer

No answer given Δ agrees to take out 110:19-22

[111:8] - [111:24] 1/24/2006 Curfman, Gregory (MDL)

page 111
Q. Did you personally tell Dr. Bombardier that you were going to have an early release of the Expression of Concern rather than wait until December 29th?
A. I don't recall personally talking with her about that. The conversations that we had, I think, were earlier and went over the fact that we would be releasing this and that we would be sending a series of questions to her that she could respond to at a later time at her leisure.
Q. Don't you remember that you told her when you first talked with her that you were scheduling the Expression of Concern for December 29th?

leading - proper

assumes facts not in evidence

[112:1] - [112:10] 1/24/2006 Curfman, Gregory (MDL)

page 112
A. Well, my colleague, Dr. Morrissey, does all the scheduling for the Journal, and so perhaps he said something, but I don't recall saying anything myself.
Q. Do you recall when it was that the New England Journal of Medicine

Witness can and does answer the question. Objection is vague - not clear what facts it is referring to. Witness testifies as to the Dec. 29th date.

overruled

notified Dr. Bombardier -- and what's the correct pronunciation of her name?

A. That would be Bombardier.

[112:13] - [113:11] 1/24/2006 Curfman, Gregory (MDL)

page 112

Q. Do you recall when it was that the New England Journal of Medicine notified Dr. Bombardier that the Expression of Concern was going to be subject to this early release on December 8, 2005?

A. I don't recall.

Q. Do you recall whether they gave her more than three hours' notice, "they" being the New England Journal of Medicine, that this thing was going to be released early?

page 113

A. I don't know.

Q. Do you remember that when Merck learned of your plans for an early release on December 8 that Merck asked you to consider some information to perhaps include in the Expression of Concern?

A. If you have a document that you can show me, that might jog my memory, but I am a little foggy about that.

hearsay 801, 802

Business Record, but also. Not for truth of what is contained in the email (e.g., addit'l MI's don't change conclusions) but instead to show what Merck told the NEJM before publication + that the NEJM ignored it. Goes to bias + credibility, notice.

[114:4] - [114:5] 1/24/2006 Curfman, Gregory (MDL)

page 114

MR. BECK: I'm now handing you what I've marked as Exhibit 9.

[114:14] - [114:16] 1/24/2006 Curfman, Gregory (MDL)

page 114

Q. This is another e-mail string; correct?

A. Right.

hearsay 801, 802

Same response

[114:22] - [114:24] 1/24/2006 Curfman, Gregory (MDL)

page 114

Q. And there's an e-mail to you and Dr. Morrissey; right?

A. Right.

[115:1] - [115:4] 1/24/2006 Curfman, Gregory (MDL)

page 115

Q. And he is basically attaching an e-mail that he got from a lawyer for Merck, right?

assumes facts not in evidence

hearsay 801, 802

No - email clearly shows it came from Merck att'y

same response

Ef Overruled 607, 801(c) / 801(d)

A. Mr. Fitzpatrick.

[115:8] - [115:21] 1/24/2006 Curfman, Gregory (MDL)

page 115

Q. And then there are some -- he says, "Paul," that's Mr. Shaw, "Please see the points below concerning the proposed editorial," and then there's three points made. And without going through each one in detail, do you now remember --

A. Yes, I now remember. Thank you.

Q. -- that, in fact, Merck did ask you to consider some points before you released -- made the early release of the Expression of Concern?

A. Yes.

hearsay - Same hearsay response

assumes facts not in evidence - ? No - it's just a regular question to which the witness answers "yes". No facts at issue in the question; objection is vague

[116:12] - [116:18] 1/24/2006 Curfman, Gregory (MDL)

page 116

Q. You say that you've considered these points?

A. Well, I read the points, yes.

Q. Do you see that you received this e-mail from Mr. Shaw at 2:59 p.m.?

A. Uh-huh.

[117:13] - [117:14] 1/24/2006 Curfman, Gregory (MDL)

page 117

Q. I'm handing you what we've marked as Exhibit 10.

[117:17] - [118:6] 1/24/2006 Curfman, Gregory (MDL)

page 117

Q. This is an e-mail -- let me state that your name is not on this one.

A. Right.

Q. -- from Karen Pedersen. That's the in-house, I think you had something other than PR person, right?

A. Media relations.

Q. Media relations?

page 118

A. Media relations specialist.

Q. So, the media relations specialist is sending it to the outside PR person's, "Subject: For talking points." Do you see that?

A. Right.

hearsay 801, 802
assumes facts not in evidence

• Business Record - Kept in the course of regularly conducted business activity
• Not for truth of the matter
• Objection is vague.
Not assuming facts not in evidence - merely reading subject line and recipient of email

[119:16] - [120:6] 1/24/2006 Curfman, Gregory (MDL)

page 119

Q. Then at the bottom, it says,
"Also, Paul Shaw called and said the
Merck attorney (Fitzpatrick) who
cross-examined Greg e-mailed him saying
he knows we're releasing a statement at 3
and he wants to send some information for
us to consider including in the
statement, which we're not going to do,
regardless of what it says, of course."

page 120

Did you talk with Karen
Pedersen about this subject and about
whether you would refuse to consider the
information regardless of what it said?
A. I don't recall talking with
Karen Pedersen about this

[121:6] - [122:8] 1/24/2006 Curfman, Gregory (MDL)

page 121

Q. You mentioned before the
standards for -- that you say you
followed, and I think you said they were
the standards of some organization?
A. The International Committee
of Medical Journal Editors. We sometimes
call it the ICMJE.
Q. They have standards that
you're supposed to follow in connection
with things like Expressions of Concern?
A. Well, the uniform
requirements is a fairly lengthy
document, the uniform requirements for
the preparation of manuscripts, and it's
a document that deals with guidelines
about a whole range of issues relating to
medical publication. So, I believe --
it's probably about a 25 or 30-page
document. It's contained on the website.

page 122

And among other things, it does deal with
retractions and Expressions of Concern.
That is one part of a much larger
document.
Q. So, the answer is yes, they
do have standards on Expressions of
Concern?
A. Yes, that's right.

[122:22] - [123:1] 1/24/2006 Curfman, Gregory (MDL)

page 122

Do you recognize this as a
printout of the ICMJE standards that you
were referring to?

page 123

A. Right.

[123:16] - [123:24] 1/24/2006 Curfman, Gregory (MDL)

Overruled EF

hearsay 801, 802

Δ: Same Hearsay responses: — Business Record — In any regard, not for truth of the matter — goes to the mindset of the NEJM about what info they would have considered from Merck, Inc.

Δ: Compound — witness had no problem understanding and answering the question

asked and answered — argumentative Δ: No. Witness would not give a straight answer on whether the ICMJE Guidelines contain standards dealing w/ an Expression of Concern. Counsel is trying to get clarity on this point.

hearsay 801, 802

→ ICMJE Standards not being used for the truth of the matter, rather to show whether NEJM acted in conformity with the standards

Overruled
EF

page 123

Q. And I just want to take a few minutes walking you through some of these.

The first sentence says, "Editors must assume initially that authors are reporting work based on honest observations." You agree that that's appropriate; right?

A. Yes, indeed.

Sidebar - Counsel is just setting context for the next line of questioning.

[125:15] - [125:24] 1/24/2006 Curfman, Gregory (MDL)

page 125

Continuing on then with that paragraph, it says, "If substantial doubts arise about the honesty or integrity of work, either submitted or published, it is the editor's responsibility to ensure that the question is appropriately pursued, usually by the authors' sponsoring institution." Right?

A. Yes.

[126:11] - [127:1] 1/24/2006 Curfman, Gregory (MDL)

page 126

Q. So, this procedure says then it's the editors, that would be the New England Journal's editors' --

A. Right.

Q. -- "responsibility to ensure that the question is appropriately pursued, usually by the authors' sponsoring institution." So, in the case of Dr. Bombardier, for example, who would the sponsoring institution be?

A. Her university in Toronto.

Q. But you did not follow the procedure of referring this matter to her university to pursue in the first

page 127

instance, did you?

[127:17] - [127:19] 1/24/2006 Curfman, Gregory (MDL)

page 127

THE WITNESS: We have been in touch with her superiors at the University of Toronto, yes.

[129:16] - [129:21] 1/24/2006 Curfman, Gregory (MDL)

page 129

Q. Before you published your conclusions in your Expression of Concern on December 8th, did you give the

Overruled

merck affirmative designations curfman jan 24, 06 conditional.txt

university a chance to conduct its own investigation?

A. No.

[131:10] - [131:14] 1/24/2006 Curfman, Gregory (MDL)

page 131

Q. Before you published your conclusions in the Expression of Concern, did you give any of the authors an opportunity to respond to what you were proposing to publish?

[131:19] - [132:1] 1/24/2006 Curfman, Gregory (MDL)

page 131

THE WITNESS: Yes, we did. But their response follows the publication of the Expression of Concern. But we did discuss with them before we published it that they would have an opportunity to

page 132

respond. Yes.

Δ: Dr. Curfman was on the call with Bombardier + Laine so he can speak to what they did or did not tell them; leading question is proper

[132:3] - [132:18] 1/24/2006 Curfman, Gregory (MDL)

page 132

Q. Actually, what you told them before when you first contacted them was that they would have an opportunity to comment before you published the Expression of Concern, isn't that true?

A. I don't -- I can't imagine that's true because that's not the protocol for an Expression of Concern.

Q. Didn't you tell Dr. Bombardier that you -- didn't you send her a copy of the draft Expression of Concern ask her for her comments to be received in a couple of weeks so that they could accompany any publication of the Expression of Concern?

A. No.

leading assumes facts not in evidence 6.2 - foundation

Δ vague objection - NOT true, counsel is asking a question

Compound leading assumes facts not in evidence

[133:2] - [133:15] 1/24/2006 Curfman, Gregory (MDL)

page 133

Did the New England Journal of Medicine, when it first communicated with Dr. Bombardier about this, tell her that you had a draft Expression of Concern that you were planning on publishing it on December 29, that you asked for her comments in response in advance of December 29th so that they could be considered in connection with the publication of the Expression of Concern?

Compound Same.

Δ: Witness did not have any problem understanding or answering the question; Nature of question is proper - asking witness whether they told the authors they would have a chance to respond before publication

A. No. Because the response from the authors is intended to follow the Expression of Concern.

[133:23] - [134:19] 1/24/2006 Curfman, Gregory (MDL)

page 133

Q. What is Exhibit 12?

MR. SHAW: If you know.

page 134

THE WITNESS: (Witness reviewing document.)

This is -- on the bottom of Page 1 and the top of Page 2 is an e-mailed letter that I and Dr. Morrissey and Dr. Drazen sent to Dr. Bombardier on December 5th informing her about the Expression of Concern, and I believe we attached to this a series of questions that we wanted her to address in her response.

And then above that, a couple of days later is a response saying that she and Dr. Loren Laine, who was her co -- corresponding author on the VIGOR trial, wanted to have a conference call. And we then set that up.

Overruled

[134:21] - [135:16] 1/24/2006 Curfman, Gregory (MDL)

page 134

Q. Focusing on the e-mail from you and your colleagues to Dr. Bombardier --

A. Yes.

page 135

Q. -- the first sentence says you're writing concerning the VIGOR study; correct? And then the second sentence says, "Recently we obtained new information that has led us to be concerned about the accuracy of certain data and conclusions in your article. The specific points at issue are" addressed "in the attached Expression of Concern, which we plan to publish in an upcoming issue of the Journal."

As of December 5th, 2005, the plan was to publish this in the December 29th edition of the Journal; correct?

A. Yes.

hearsay. 801 802. • Admission • Business record: email correspondence kept in the course of regular business activity • In any regard - not for truth of the statement (i.e. whether NEJM has recently obtained info re: accuracy ...) but instead what NEJM put authors on notice of at that point, etc.

[136:6] - [136:14] 1/24/2006 Curfman, Gregory (MDL)

page 136

Q. And then in the next sentence, you ask her to submit a

correction for publication in the Journal, and you ask her to do that by December 22nd; right?
A. That's right.
Q. So, a few weeks after this e-mail; right?
A. Correct.

[137:7] - [137:13] 1/24/2006 Curfman, Gregory (MDL)

page 137
Q. You talked before about two earlier or two other Expressions of Concern.
A. Yes.
Q. And let me ask you to take a look at Exhibit 12 -- or am I on 13 now?
Exhibit 13.

[138:5] - [139:5] 1/24/2006 Curfman, Gregory (MDL)

page 138
Q. Is that one of the Expressions of Concern that you were talking about?
A. Yes, it is.
Q. Would you agree with me that this one is different in kind from what you published concerning VIGOR?
A. Oh, I think it's very different in kind, yes.
Q. And in this one, you report in a single paragraph that concerns were raised concerning the data published in one of your articles, right?
A. Correct.
Q. And you say, "We have informed the director of Dr. Subdo's" --
A. Subdo.
Q. -- "Subdo's institution... and await the results of his investigation." Correct?
page 139
A. Correct.
Q. And you do not set forth any conclusions that you reached in advance of hearing from the author's institution; right?

[139:8] - [139:11] 1/24/2006 Curfman, Gregory (MDL)

page 139
THE WITNESS: Oh, there are preliminary conclusions in this paragraph, yes, that we had reached, yes.

[139:13] - [140:10] 1/24/2006 Curfman, Gregory (MDL)

page 139

Q. Well, the paragraph says, "In the issue of April 26, 2001, we published a study by John Sudbo. Figure 3B and Figure 3C of that article, which purport to represent two different patients and stages of oral" -- what's the next word?

A. -- "epithelial dysplasia."

Q. -- "are in fact different magnifications of the same photomicrogram."

A. That's right.

page 140

Q. "Because the results of another study of Dr. Sudbo, published in the issue of April 1, 2004 were derived from the same subjects followed through the same database, we have similar concerns." Then you say, "We have informed the director...and [we] await the results of his investigation." Right?

A. Uh-huh.

[141:6] - [142:15] 1/24/2006 Curfman, Gregory (MDL)

page 141

Q. Do you have in front of you the document that I've marked as Exhibit 14?

A. Yes.

Q. Was this the other Expression of Concern that you testified about earlier?

A. This is one of the three, yes.

Q. Okay.
And we talked about the one concerning VIGOR, we just talked about the one concerning Dr. Sudbo, and this is the third; right?

A. That's right.

Q. This concerns an article by Dr. Schiff; is that right?

A. Schiffl.

Q. Schiffl. I'm sorry. What

page 142

it says is that it has come to your attention that there was an "ongoing investigation into potential scientific misconduct" concerning this article that you published?

A. (Witness nods.)

Q. And you said you will inform your readers of the outcome of the investigation when it's complete. Right?

A. That's right.

Q. And that investigation that you referred to was the investigation by Dr. Schiffl's sponsoring institution; correct?

A. Correct.

[142:16] - [142:21] 1/24/2006 Curfman, Gregory (MDL)

page 142

Q. And then later on they told you that they had not found sufficient evidence of misconduct, and you, therefore, retracted the Expression of Concern, right?
A. Right.

Overruled EF

[143:6] 1/24/2006 Curfman, Gregory (MDL)

page 143

Q. Do you recognize Exhibit 15?

[143:11] - [143:21] 1/24/2006 Curfman, Gregory (MDL)

page 143

THE WITNESS: Yes, I do.
BY MR. BECK:
Q. Is this a message from you and Dr. Morrissey to Dr. Bombardier informing her of the early release of the Expression of Concern?
A. It's an e-mail from me and Dr. Morrissey to Dr. Bombardier regarding the release, yes.
Q. What's the date and time of your e-mail to Dr. Bombardier?

hearsay 801, 802
D: Same hearsay response – business record; not for truth of the matter but to show how much notice NEJM gave authors.

[144:8] - [144:16] 1/24/2006 Curfman, Gregory (MDL)

page 144

A. December 8 at 11:59 a.m.
Q. When do you tell her that the Expression of Concern is going to be released?
A. At 3:00.
Q. So, you gave her three hours and one minute notice?
A. Of the exact release time, yes.

[146:4] - [146:12] 1/24/2006 Curfman, Gregory (MDL)

page 146

Q. I guess in between 11:59 a.m. when you first told her you were going to do it and 3:00 when you did it, did she tell you that that didn't give her time to respond?
A. Well, I don't recall. I don't think I spoke with her. I don't recall anything about that. But --
Q. Please look at Exhibit 16.

hearsay
Same response

Overruled EF

merck affirmative designations curfman jan 24, 06 conditional.txt

[147:7] - [147:24] 1/24/2006 Curfman, Gregory (MDL)

page 147

Q. This is an e-mail from Dr. Bombardier to Mr. Morrissey.
A. Dr. Morrissey.
Q. Dr. Morrissey, excuse me.
It says, "Dr. Morrissey, Thank you for sending this in advance, given the nature of your expression of concern, we want the opportunity to respond but as you can well imagine it will not be possible to respond by the deadline of 3:00 p.m. this afternoon."
Did Dr. Morrissey communicate to you this message from Dr. Bombardier?
A. Yes, he did.
Q. But you went ahead with the publication anyway at 3 p.m., didn't you?
A. Yes, we did.

hearsay 801, 802
Δ: Same responses

leading argumentative

No - Counsel is establishing that they actually posted the Editorial at 3pm and that they went forward knowing authors could not respond. Leading question is proper.

[149:12] - [149:16] 1/24/2006 Curfman, Gregory (MDL)

page 149

Q. Did you personally decide to go ahead with the publication, even though she had told you, the New England Journal of Medicine, that she wanted an opportunity to respond in advance?

Compound assumes facts not in evidence

[149:19] - [150:1] 1/24/2006 Curfman, Gregory (MDL)

Δ: Witness has no problem understanding and answering question. Relates to the email the parties just discussed.

page 149

THE WITNESS: The final decision -- the final decision, as is always the case at the New England Journal about any decisions, comes from the editor-in-chief. And I'm not the

page 150

editor-in-chief.

[150:20] - [150:24] 1/24/2006 Curfman, Gregory (MDL)

page 150

Q. Later on, were you involved in sending Dr. Bombardier a seven-point letter telling her what points the New England Journal of Medicine wanted her to make when she responded?

assumes facts not in evidence.

Objection doesn't make sense - i.e. Exhibit 17 is on this exact topic and subsequent testimony

[151:1] - [151:16] 1/24/2006 Curfman, Gregory (MDL)

page 151

A. Yes. She had -- my recollection is that she had asked for additional clarification from us about

Overruled

what specifically we wanted her to respond to. Up until that time, we had only given her a copy of the Expression of Concern itself. And she wanted more guidance from us about our points of concern. And in response to that request, I believe Dr. Morrissey and I were the authors of that seven-point document that you mentioned. And we tried to bring out in that document some additional explanation of our reasons for concern about the article so that that could focus her response more directly.

D: Same hearsay response - • Business record; • Not for truth of the matter

[151:24] - [152:1] 1/24/2006 Curfman, Gregory (MDL)

page 151
Q. Please look at Exhibit 17.
page 152
Do you recognize that?

[152:4] - [152:16] 1/24/2006 Curfman, Gregory (MDL)

page 152
Well, this, I think, begins with an e-mail from Dr. Bombardier to me and Dr. Morrissey along the lines of what I just said, requesting some additional -- I mean, we can read this.
Q. We could, but what you had said was she asked you for guidance about how she should respond. In fact, if you read this, what she asks you for is a copy of the information that you referred to in your Expression of Concern so that she could write her own response. Isn't that true?

hearsay 801, 802

compound leading argumentative assumes facts not in evidence

[153:2] - [154:17] 1/24/2006 Curfman, Gregory (MDL)

page 153
THE WITNESS: Okay. Well, what she says is that "You requested a submission from the authors of that study that addresses the additional data and the issues set forth in the Expression of Concern that you published this week, and I agreed to your request as lead author of that study.
"We have already started on that task, and I seek your assistance for the project. In order for us to fully and properly evaluate the data and the issues, we will need to have copies of all the materials that the New England Journal of Medicine has that you referred to in your telephone call

D: Question is proper + witness agrees that Bombardier is asking for is a copy of the information. Not argumentative - trying to establish the point of the email. Witness does not have any problem understanding to + responding question

Overruled
EEF

as well as those to which the Expression of Concern referred. While you suggested earlier that we obtain these materials from

page 154

Merck, in light of the questions that you have raised about confidence in the provenance of data and information, we believe that it is essential for us to obtain such materials directly from the New England Journal of Medicine in order to ensure that the material we are reviewing is in fact the same data that is referred to in your Expression of Concern."

BY MR. BECK:

Q. You agree, sir, that all she asked you for here was a copy of the data and the materials that you referenced in your Expression of Concern?

leading

D: Leading is proper. Trying to establish this basic point.

[154:22] 1/24/2006 Curfman, Gregory (MDL)

page 154

A. Yes.

[156:2] - [156:4] 1/24/2006 Curfman, Gregory (MDL)

page 156

Q. So, point number 7 of your seven-point letter to her basically said get these from the Merck lawyer; right?

[156:5] - [158:20] 1/24/2006 Curfman, Gregory (MDL)

page 156

A. Yes. And I think that it's fairly explicit.

Q. Yes, I agree.

But now what you also did is you and Dr. Morrissey attempted to dictate to Dr. Bombardier the content of her response?

A. We did not attempt to dictate. We attempted to articulate or provide additional explanation of points of our concern. We are the editors. We had concerns. It's not a matter of dictating. It's a matter of expressing what the concerns were so that she could respond to those concerns. That's what an Expression of Concern is. That's why it's called an Expression of Concern. It's an expression of our concern that then we ask her to address. We thought this would be helpful to her in framing a

page 157

response.

argumentative
leading
assumes facts not in evidence

D: Trying to establish point that NEJM basically mandated what the authors should write - this is very clear from the document (Ex. 17) Important point that goes to bias + credibility, not improper

Overruled

Q. Didn't you tell her "We will explain herein what we expect this correction to include"?
A. Uh-huh.
Q. The very first point you say, "You should acknowledge." Then you go on to tell her what she's supposed to acknowledge in her response, right? Is that right?
A. That's the way the sentence reads, yes.

hearsay – Same hearsay responses to ethics emails; (business records; not for truth of the matter etc)

Q. And then basically you tell her that she's supposed to say she's sorry, don't you?
~~MR. SHAW: Objection to Form.~~
BY MR. BECK:
Q. Point number 6. You're telling the author of this study that, number 6, "These omissions and inaccuracies are regrettable, and this should be acknowledged in your statement." You're telling her to

Argumentative – No – the content of the email specifically asks her to acknowledge that the actions were "regrettable"; Counsel is asking about this statement.

hearsay

asked and answered; argumentative

page 158

apologize for her article, aren't you?
A. We asked her for a response, and --
Q. And you told her what you wanted --
A. She --
Q. -- it to include?
A. She can respond in any way that she wishes. We were laying out our concerns. And one of our concerns was that there were omissions and inaccuracies that were regrettable. And she had evidence to back it up. And she can respond to that statement in any way that she wants.
Q. And she did, in fact, respond to that statement, did she not?
A. She did, yes.
Q. And she told you that you were wrong, right?

Same obj.

Tone was Not argumentative; witness was avoiding answering the question directly. Counsel is trying to establish bias in the NEJM's statement to the authors.

hearsay 801, 802 – Same response – not for truth of the matter, but to show that authors did respond.

[159:2] - [159:3] 1/24/2006 Curfman, Gregory (MDL)

page 159

THE WITNESS: I don't recall.

[159:5] - [159:16] 1/24/2006 Curfman, Gregory (MDL)

page 159

Q. You don't recall --
A. No, I don't.
Q. -- what she said in her response?
A. No.

merck affirmative designations curfman jan 24, 06 conditional.txt

Q. Have you looked at her response?
A. Only very cursorily at this point. We just received the response, and, in fact --
Q. Well, you received it more than a week ago, didn't you?

Overruled
EF

[159:19] - [159:24] 1/24/2006 Curfman, Gregory (MDL)

page 159

THE WITNESS: We didn't receive one response, and part of the complexity now of the issue is that we received two separate responses from two different groups of authors, and --

[160:18] - [160:19] 1/24/2006 Curfman, Gregory (MDL)

page 160

Q. My question is, you received it more than a week ago, didn't you?

asked and answered — No - witness did not answer the question about timing.

[161:10] - [161:12] 1/24/2006 Curfman, Gregory (MDL)

page 161

A. We received two responses, and I don't remember the exact dates of receipt.

[161:23] 1/24/2006 Curfman, Gregory (MDL)

page 161

Q. What is Exhibit 18?

[162:7] - [162:9] 1/24/2006 Curfman, Gregory (MDL)

page 162

Q. Is this some transmittal e-mail and then the response from Dr. Bombardier?

[162:13] - [162:20] 1/24/2006 Curfman, Gregory (MDL)

page 162

Q. Dr. Bombardier responded on behalf of herself and the other nine authors who were not Merck employees; right?
A. Yes.
Q. And in this response, these ten non-Merck authors told you that you were wrong; right?

hearsay 801, 802
Same hearsay response — not for truth of the matter but to show authors did respond and to impeach Dr. Curfman's credibility.
— Also, business record of the University of Toronto.

[162:24] - [163:5] 1/24/2006 Curfman, Gregory (MDL)

Overruled
EF

merck affirmative designations curfman jan 24, 06 conditional.txt

page 162
A. No. I don't read it that
page 163
way. But, again, I want to make it clear that I have not had an opportunity to go through this, and I'm not prepared to discuss this document. I wasn't -- we have read these documents, and, again, I

[163:20] - [164:9] 1/24/2006 Curfman, Gregory (MDL)

page 163
Q. Now, are you telling me -- you've certainly known that your deposition was going to be taken in connection with the Expression of Concern. You've known that for certainly
page 164
over a week, right?
A. Right.
Q. And you've had the answer from the ten non-Merck authors --
A. Right.
Q. -- to your Expression of Concern, and you say you haven't read it carefully enough to be prepared to discuss it?

argumentative
leading

Leading nature of question is okay. KEY point that he hadn't taken the time to review the responses. Goes directly to bias & credibility. Δ were not available to cross on the responses.

[165:2] - [165:5] 1/24/2006 Curfman, Gregory (MDL)

page 165
A. My answer to your question -- yes. My answer to your question is, I have not had time to adequately digest this.

[166:16] - [166:24] 1/24/2006 Curfman, Gregory (MDL)

page 166
Q. Do you recognize Exhibit 21 to be a response on behalf of Drs. Reicin and Shapiro who are both affiliated with Merck?
A. Right. It's being communicated by a medical communications person.
Q. Right.
A. Right.

hearsay

801, 802

Same hearsay responses

[170:2] - [170:16] 1/24/2006 Curfman, Gregory (MDL)

page 170
Q. And you had not only Dr. Bombardier's response on behalf of the ten non-Merck authors for over a week before today, you also had Dr. Reicin's response on behalf of herself and Dr. Shapiro, the Merck authors, for over a

Compound
argumentative

SAME Response

Overruled
[initials]

week before today, right?
A. If you say so. I'll take your word for it. Sure.
Q. And here you are, you know this is the only chance that I get to ask you questions about the Expression of Concern, and you didn't take the time to read either one of these to comment on their substance?

argumentative
SARCASTIC
omits answer
Same response; NOT sarcastic but establishing important point.

[171:14] - [171:23] 1/24/2006 Curfman, Gregory (MDL)

page 171
Q. My question is simply that knowing that your deposition was going to be taken today and that the main subject was your Expression of Concern, and having the responses filed by both the non-Merck lawyer -- the non-Merck authors and the Merck authors for over a week, it's your testimony that you didn't take the time to read them so that you could talk about the substance of them?

OK to insert 170:17

[172:2] - [172:16] 1/24/2006 Curfman, Gregory (MDL)

page 172
THE WITNESS: Our response to these documents will require very careful deliberation. Editors of journals don't do things on a knee jerk. We can't afford to do that. I did not set the date for this deposition, and, in fact, we received these when we received them. And we will need time to very carefully digest the situation, and then we'll have an official response to it. I'm not prepared to do that now. We do things carefully in our office. That's how we do things.

[172:22] - [173:9] 1/24/2006 Curfman, Gregory (MDL)

page 172
Q. Have you looked at these two responses enough to know whether they're in basic agreement or whether there's any
page 173
points of disagreement?
A. No. I can't really comment about that.
Q. So, it's not just that you haven't had, you know, conferences with your colleagues to talk it all through, you just haven't read them carefully in advance of your deposition. Is that your testimony?

Compound
Same response to previous compound objection
Compound
Argumentative
Sarcastic
same response

overruled
EF

merck affirmative designations curfman jan 24, 06 conditional.txt

[173:12] - [174:1] 1/24/2006 Curfman, Gregory (MDL)

page 173

THE WITNESS: I'm saying that we -- documents of this kind will demand careful deliberation among the editors at the New England Journal of Medicine, and we have not gone through that process yet. And anything that I might say today might not be fully accurate because we've not gone through this process of deliberating together and interpreting these two documents. And that's all I can say about

page 174

this.

[174:3] - [174:7] 1/24/2006 Curfman, Gregory (MDL)

page 174

Q. Well, getting back to your Expression of Concern, you indicated it got a lot of media attention, and you and your outside PR people followed the media attention pretty closely, didn't you?

Compound

witness understands + answers just fine

Witness answered question (yes/no)

[174:12] - [174:13] 1/24/2006 Curfman, Gregory (MDL)

page 174

THE WITNESS: No. I certainly didn't. I mean -- ← interrupts witness

[175:1] - [175:6] 1/24/2006 Curfman, Gregory (MDL)

page 175

Q. Did the people at the New England Journal of Medicine monitor at least the major newspapers to see how they were reporting on the Expression of Concern and whether there were any errors that should be corrected?

SARCASTIC argumentative

This is a very legitimate question. The NEJM corrected other errors – e.g. whether Editorial was called a "retraction" or an EOC. Goes to bias + credibility as to whether they corrected the articles saying authors deleted the 3 MIs.

[175:9] - [175:22] 1/24/2006 Curfman, Gregory (MDL)

page 175

THE WITNESS: Our media relations specialist always monitors the news. That's what her job is. She does that every day about everything that we publish to see what the media is writing about it. That's what her job is. And part of it is to make sure that they're reporting accurately on articles that we publish, not just the Expression

Overruled

of Concern. This happens every day for every article. We get news updates every day.

[201:18] - [201:24] 1/24/2006 Curfman, Gregory (MDL)

page 201

Q. When you wrote that Expression of Concern focusing on the fact that the table was taken out, did you take into account the fact that the authors showed you that when they gave you the electronic version with the track changes feature turned on?

assumes facts not in evidence
leading
No Response necessary

[202:3] - [202:4] 1/24/2006 Curfman, Gregory (MDL)

page 202

THE WITNESS: Yes. We took that into consideration.

[221:10] - [221:15] 1/24/2006 Curfman, Gregory (MDL)

page 221

Q. Doctor, on the subject of the significance of the deletion of Table 5, did Dr. Drazen tell you that he thought that that whole subject did not even have enough significance to be mentioned in the Expression of Concern?

hearsay
Admission; Not for truth of the matter

[221:18] - [221:19] 1/24/2006 Curfman, Gregory (MDL)

page 221

THE WITNESS: Not to my knowledge.

[222:3] - [223:6] 1/24/2006 Curfman, Gregory (MDL)

801 802

page 222

Q. I've handed you Exhibit 22. Do you see that this is an e-mail from Dr. Drazen, the editor-in-chief, to you and Dr. Morrissey, "Subject: Expression of Concern"?
A. I do, yes.
Q. And it's dated December 4th. Was that pretty early in the drafting of the Expression of Concern?
A. That was still pretty early, yes.
Q. Okay. And do you see here on the e-mail he's attached a document. And when explaining his attachment, he says, "I attach another edited version of the expression. The biggest change is the deletion of the stuff about Table 5. I

Overruled

think it attributes more to this table than it deserves and the numbers speak for themselves. This piece is cleaner without it."

page 223

So, does that refresh your recollection that the editor-in-chief of the New England Journal told you that he didn't think that the stuff about Table 5 was even significant enough to be included in the Expression of Concern?

hearsay 801,802 Same response

[223:9] - [223:17] 1/24/2006 Curfman, Gregory (MDL)

page 223

THE WITNESS: He changed his mind.

BY MR. BECK:

Q. Well, my question is, does this refresh your recollection that, in fact, he told you, at least on December 4th, that this whole table 5 stuff was not even a big enough deal to be included in the Expression of Concern?

[224:19] - [224:22] 1/24/2006 Curfman, Gregory (MDL)

page 224

A. Yes. That's what he said. I, frankly, don't exactly remember this e-mail because he changed his mind, and we did include the material on Table 5.

[225:18] - [226:19] 1/24/2006 Curfman, Gregory (MDL)

page 225

Q. And I will show you Exhibit 23, which is the attachment to the e-mail that we just looked at.

A. Yes.

Q. And this is kind of a printed out version of that track changes feature that we talked about, isn't it?

page 226

This is a draft of the Expression of Concern, and you can see on the right things that have been deleted and things that have been added?

A. Right. Yep.

Q. Okay.

And do you see over here on this attachment to the editor-in-chief's e-mail to you that that last square over there that shows what was deleted, at least as of December 4, he wanted to take out the entire paragraph having to do with Table 5, right?

A. Yes, at that time. And then he changed his mind. That was an early version. And we went through many

Compound Witness understands question

hearsay 801,802 Not for truth of the matter

overruled

versions of this document and a lot of editing was done. The final version, of course, did include that material.

[325:6] - [325:7] 1/24/2006 Curfman, Gregory (MDL)

page 325

MR. BECK: I'm going to ask one question.

Sidebar

Helps explain witness's answer to the last question (i.e., his refusal to answer)

[325:19] - [326:17] 1/24/2006 Curfman, Gregory (MDL)

page 325

Q. My question, whether you choose to answer it or not, sir, is, you testified about various matters that you said you could not understand concerning the prespecified cutoff date and the rationale for it. Did you make any

page 326

effort to look at what the authors said and their response to the Expression of Concern to understand their reasoning for using the prespecified cutoff date?

A. Well, we will be looking very carefully at their responses to that question to see if we learn any new information. So far, as of today, we haven't learned any new information. But we will be looking very, very carefully at that crucial point to see what their response is.

argumentative
Compound
misstates testimony

not argumentative - very legitimate question given Dr. Curfman's testimony. Goes to credibility + bias.

Q. So, in terms of your testimony about what you cannot understand, you haven't tried to take into account yet the responses of the authors; is that right?

[326:22] - [326:23] 1/24/2006 Curfman, Gregory (MDL)

page 326

THE WITNESS: You said one question.

Asked and answered

He would not provide a direct answer.

Δ Objections

Π Curfman II Depo Cuts
Counter Desinatie - ONLY

Overruled

**44:9-20**

Q. And do you remember that on December 8th, Thursday, the day that you decided to release this Expression of Concern, that that was the day of closing argument and submission to the jury of the case called the Irvin case?
A. Well, I certainly know that a case was going on. I'm not familiar with the term "Irvin case," but I know that a case is going on. But I honestly didn't know exactly what was going on in the case on that particular day.

**51:6 – 52:23**

Q. Are you claiming that the New England Journal of Medicine treated this Expression of Concern as a routine matter that was nothing out of the ordinary?
THE WITNESS: This is part of the responsibility of editors. It's part of our job that when, after an article has been published in a journal, and it's not just our journal, it's any medical journal, if an article is published in a journal and at a later time new evidence comes to light that causes the editors to be concerned about some aspect of that article, the process by which it was published, the data, the content, issuing an Expression of Concern is part of the standard operating procedure. It's set down in the uniform requirements of the International Committee of Medical Journal Editors of which the New England Journal is one of the founding members. And so that, fortunately, we have not had to issue Expressions of Concern very often. We feel very fortunate about that. But since 2002, we have issued three of them. And when we have to do it, it's part of our job, and we do it. And we are accustomed -- we know the protocol, we follow the same procedure each time that we've done this, and as I've said, it's a part of the responsibilities. Editors sometimes have to do this.

602
402

Non responsive
repetitive

**61:20 – 62:7**

Q. During early December, were the senior editors of the New England Journal of Medicine following the trial down there in Houston so closely that they were actually reading or being informed of the contents of the testimony that was coming in during that trial?
THE WITNESS: I can really only speak for myself, and the answer is unequivocally no.

**93:16 – 96:2**

Q. Sure. Did you ever tell anybody that the reason you released the Expression of Concern in the middle of the trial in Houston was because you'd been told that they were planning on playing your testimony, and you wanted to coordinate the release of the Expression of Concern with the playing of your testimony down in Houston?
THE WITNESS: Well, I can't -- I can't imagine that I would have said that because Dr. Campion articulates very precisely in his e-mail what the issue was with respect to my testimony. And the issue with respect to my testimony was that my testimony consisted,

as it does today, with a series of questions and answers. And I did the best that I could in that deposition of November 21st to answer the questions. But it was not a written, an official written statement of the journal. It was testimony, it was oral testimony. We believed that in order to make sure that the Expression of Concern was clearly understood by those who would be interested in the public, that we needed to have our official statement out before the deposition was played. Now, to my way of thinking, this is not the trial. It's my deposition, it's things that I said in deposition which, as I said, was a free flowing conversation just like we're having here today, questions and answers, questions and answers, but deposition does not allow me to sit down and actually write out and think very carefully in written form, as you would in an official written statement, which the Expression of Concern was intended to be an official written statement. So, we felt that the official written statement, as Dr. Campion indicates in this e-mail, needed to be out in advance of the testimony, which might have been misinterpreted given the free flowing nature of testimony.

**119:16 – 120:15**

Q.   Then at the bottom, it says, "Also, Paul Shaw called and said the Merck attorney (Fitzpatrick) who cross-examined Greg e-mailed him saying he knows we're releasing a statement at 3 and he wants to send some information for us to consider including in the statement, which we're not going to do, regardless of what it says, of course." Did you talk with Karen Pedersen about this subject and about whether you would refuse to consider the information regardless of what it said?
A.   I don't recall talking with Karen Pedersen about this, but as I indicated previously, Expressions of Concern are statements from the editors, and they're not subject to negotiation. They're simply not that kind of document. It's an explicit document written by the editors expressing the concern of the editors, and it's really not a document that can be the subject of negotiation with outside parties.

**127:21 – 128:21**

Q.   Then it says, "It is not ordinarily the task of editors to conduct a full investigation or to make a determination; that responsibility lies with the institution where the work was done or with the funding agency." Here you made your own determination; right?
A.   Well, there are two things that happened simultaneously. The sponsoring institution, by virtue of the fact that one of their faculty members may have been involved in some sort of misconduct or some sort of issue with relation to research that's done there, has an obligation to undertake an investigation of the situation with respect to the research performed at their institution. With respect to the Journal, in parallel with that, the Journal editors are going to be making judgments about what needs to be done with respect to the best interest of their Journal and the scientific record. And those two processes go on in parallel.

**135:23 – 137:5**

So, you planned on publishing it, I'm sorry, on December 29th, and you told that to Dr. Bombardier in this conference call you had with her; right?
A. I don't recall. We may have. I don't recall.
Q. And then in the next sentence, you ask her to submit a correction for publication in the Journal, and you ask her to do that by December 22nd; right?
A. That's right.
Q. So, a few weeks after this e-mail; right?
A. Correct.
Q. And the reason for that is because you planned and you told her that you would print what she wrote or consider it for publication along with the Expression of Concern on December 29th?
A. No. That's incorrect.
Q. You don't remember telling her that in your conference call?
THE WITNESS: We did not tell her that in the conference call. That was not part of the plan.

Overruled

**144:21 – 145:18**

Q. Did Dr. Bombardier respond that it was impossible for her to respond in advance of your early release of the Expression of Concern?
A. She, in fact, told us that she asked for an extension beyond the December 22nd deadline that we had given her. She asked for an extension, and we ranted that extension. We gave her the time that she asked for.
Q. I'm talking about in the time period before you told her about the --
A. Well, I don't know --
Q. -- early release of the Expression of Concern.
A. I'm talking about the December 22nd time when she communicated back with us and said that she couldn't have her response prepared within that time frame and asked for a several week extension, which we granted.

Δ: Entirely non-responsive to question. Line of questioning related to a response before the early release - i.e., Dec 8. Response is confusing + Q/A pair should be excluded

**148:14 – 149:10**

Q. Well, you personally went ahead with it, didn't you? I mean, you personally were involved with the decision to go ahead with it, even though the author had not had an opportunity to respond; right?
THE WITNESS: The author's response to an Expression of Concern is always intended to follow the original Expression of Concern. The Expression of Concern is not a matter of negotiation between the editors and the authors. It is a statement from the editors about concerns about the article, and the author has the opportunity to respond at a followup time, a later time.

Δ: Answer is non-responsive. Witness answers in a theoretical fashion but does not answer the question asked

**201:18 – 202:18**

– unnecessary

Q. [And my question is] when you wrote that Expression of Concern focusing on the fact that the table was taken out, did you take into account the fact that the authors

showed you that when they gave you the electronic version with the track changes feature turned on?

MR. ARBITBLIT: Object to form. Mischaracterizes.

THE WITNESS: Yes. We took that into consideration. The table was not the only data that were removed from the manuscript.

BY MR. BECK:

Q. Okay. I'm just focusing on the table now.

A. Yes. But the entire data set on the numbers of myocardial infarctions, or heart attacks, the entire -- every number, every number relating to a heart attack, the numbers of patients who had heart attacks were systematically removed from the text and the table, and we can show you this if you'd like.

**227:18 – 228:1**

Q. Exhibit 24 is the July 5th, 2000 memo that you were talking about, correct?

A. That's correct.

Q. And my only question, sir, is do you see that the very first phrase in the memo says, "After the February 10, 2000 cutoff"?

**237:23 – 239:3**

Q. Towards the bottom, did the editor-in-chief tell Ms. Prakash, "As I pointed out in our previous discussion and e-mail, the VIGOR article was a seminal article that provided the first report of potentially dangerous cardiovascular side effects of Vioxx. We stand behind the message of that article, which for the first time brought the attention of the medical community to this serious problem"? Now, did you know that in July, the editor-in-chief was saying that the New England Journal of Medicine stands behind the VIGOR article?

A. At the time that this exchange took place, Dr. Drazen was not aware of this information in the July 5 memo, which he learned about it on November 21st, 2005. And that changes everything. This exchange of e-mail is completely out of date and null and void based on the information that he obtained on this -- in this memo on November 21st 24 of 2005, several months later.

Q. The --

A. This is the crucial document here.

**244:6 - 21**

Q. The exhibit in front of you has been marked as Exhibit 27.

BY MR. ARBITBLIT:

Q. If you'll notice, if you go through the document to the seventh page, I believe you will find the previously introduced suggestion for transmittal to authors, which mentioned that the total number of figures plus tables should not total more than five. That's on the page number ending 136 at the bottom right. Do you see that, sir?

A. Yes, I do.

**245:8 - 20**

MR. ARBITBLIT: For the record, this document begins at Bates Number 2000 NEMJ 000025, and the Bates Numbers for the letter go through 027, and then the comments of the reviewers are at 134 through 138.
BY MR. ARBITBLIT:
Q. Do you see that?
A. Yes.
Q. Now, the date on this letter is June 30, 2000; is that correct?
A. Yes.

**246:13 – 17**

Q. Now, when did you receive the manuscript for the first time?
A. We received it, the receipt date was May 23rd, 2000. The letter of transmission was dated May 18, 2000.

**247:13 – 248:10**

Q. Doctor, this letter is dated June 30 with the suggestion that there should be five tables; right?
A. Right.
Q. And the table that you are concerned about in the Expression of Concern was deleted before the manuscript was even submitted to you; wasn't it?
~~A. That's correct.~~
Q. So, the authors didn't suddenly decide that they should only have five tables and should delete the cardiovascular event table because of some letter written on June 30, 2000 when, in fact, it had been removed before that; correct?
THE WITNESS: That would be correct.

LEADING

Sustained