UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| | : | MDL NO. 1657 |
| IN RE: VIOXX | : | |
| PRODUCTS LIABILITY LITIGATION | : | SECTION: L |
| | : | |
| | : | JUDGE FALLON |
| | : | MAG. JUDGE KNOWLES |
| .......................................................... | : | |

THIS DOCUMENT RELATES TO
*Plunkett v. Merck & Co., Inc.*, 05-4046

**ORDER**

The Plaintiff sought to introduce at trial portions of a depositions taken of Dr. Eric Topol. In response, the Defendant objected to certain portions of the deposition. The Court ruled on all the objections. The Court's rulings are noted on the attached deposition testimony, which has been entered into the record.

New Orleans, Louisiana, this 9th day of February, 2006.

UNITED STATES DISTRICT JUDGE

___ Fee
___ Process
X Dktd
✓ CtRmDep
___ Doc. No

correct.
BY MR. KLINE:
Q. Now, you also formed opinions relating to the conduct of the pharmaceutical company, Merck, and its conduct of research and its marketing and its making available to the public the drug Vioxx; is that correct?

44:16-44:17

THE WITNESS: That's correct.

45:5-45:20

Q. Now, what I'd like to do is to show you a document which is from November 24, '04, marked as Exhibit Number 2.
- - -
(Whereupon, Deposition Exhibit Topol-2, E-mails, TOPOLE 0000450, was marked for identification.)
- - -
BY MR. KLINE:
Q. It's an e-mail from you to David Graham. Who is David Graham?
A. David Graham is a safety officer at the Food & Drug Administration.

46:23-47:6

Q. Does this e-mail reflect some of the opinions and conclusions that
Page 47
you reached relating to Merck's conduct of its scientific studies and its marketing of the drug Vioxx over the past four years since you have become involved in the matter?
A. Yes.

47:12-50:7

Off the record at 9:57.
MR. GOLDMAN: Can I have a standing objection to Exhibit 2 and any discussion about Exhibit 2 on the ground that it also is irrelevant, and it calls for opinion testimony?
MR. KLINE: Yes.
- - -
(Whereupon, an off-the-record discussion was held.)
- - -
Page 48
MR. KLINE: Before we go back on the record, let's ask, is

hearsay

This is an e-mail from witness to David Graham. 803(1)(2)(3)

Overruled
EF

Q. If anyone who listens to this or sees this some day feels that I'm rushing, it's because I have a lot to cover in a short time under a time frame. I want to try to get as much as I can out.

"Selective COX-2 Inhibitors Are Associated With an Increased Risk of Cardiovascular Events."

92:10-93:23

Q. Do you see it?

A. Yes.

Q. Okay.

Wait till you see this one.

Under "Results" --

MR. GOLDMAN: Object to the form, sidebar.

BY MR. KLINE:

Q. This is your paper; correct?

A. Yes. Well, I mean, this was the one that apparently was worked over.

Q. Correct.

A. This is not our paper.

Q. Were you aware of the fact that Merck was working over your paper?

Page 93

MR. GOLDMAN: Object to the form, lacks foundation.

THE WITNESS: I had no idea until this very moment.

BY MR. KLINE:

Q. Look under "Results" on Page 8. Do you see -- I'd like you to look at the -- don't look at the underlined sentence yet. Look at the last -- the sentence that begins, "The results of the event-free survival analysis on the 66 cases showed that the relative risk of developing a cardiovascular event in rofecoxib treatment arm was 2.37" percent.

That's something you eventually told people in your JAMA paper; correct?

A. Yes.

Q. Did you know or did they suggest it directly to you that according to Dr. Reicin, "we prefer to flip the data and say it was reduced on naproxen"?

94:2-94:5

THE WITNESS: It's amazing. Yes, I see it here, but it's amazing. It certainly didn't appear in our manuscript.

95:14-97:17

BY MR. KLINE:

Q. Sir, your JAMA article, I

Sidebar
Sustained
Sustained
Sidebar
Lack of foundation
speculation
overruled
801(d)(2)
overruled

Merck. Are you aware of that fact?
A. No.
MR. GOLDMAN: Objection to the characterization.
THE WITNESS: I had no knowledge of that.
BY MR. KLINE:
Q. And there's an e-mail from Dr. Demopoulos to a number of people, including Alise Reicin. And they took a crack at revising it, and if you look at the last sentence of the e-mail, "We recognize that the revised" transcript "does not completely neutralize the

Page 108

potential negative impact of the publication, but...it is substantially removed from the original. We" feel "that revising it further to more completely present a Merck perspective might alienate the authors and" thus "jeopardize our opportunity to contribute at all."
Did you know that's what was going on?
MR. GOLDMAN: Objection, and object --
THE WITNESS: This is remarkable. I didn't know --
MR. GOLDMAN: -- to the use of the document.
THE WITNESS: -- this was going on at all.

109:2-109:12

Q. Dr. Topol --
MR. GOLDMAN: Can I have that, Mr. Kline?
MR. KLINE: Yes.
BY MR. KLINE:
Q. You've now seen it. What do you think of that kind of conduct?
MR. GOLDMAN: Object to the form, opinion testimony.
THE WITNESS: I'm actually appalled by this.

Lack of foundation
Speculation
Improper opinion testimony

109:16-111:14

"ability to contribute." We didn't ask them to contribute. We asked them to reconcile the data inconsistencies.
BY MR. KLINE:
Q. Is part of the academic process -- you've worked --
You've done studies for large pharmaceutical companies, Merck?

Sustained
EF

Page 110

A. Yes.
Q. Is part of the process to get the scientific facts in the medical

significance in the clinical development of Vioxx. And the reason is is that this study had 978 patients. And within the 978 patients, they were randomly assigned, they had the typical arthritis, osteoarthritis so-called, they were randomly

Page 137

assigned to Vioxx, a medicine called nabumetone or known as Relafen, which isn't used very much, or placebo.

And so what they had were these three arms tested with only 12-and-a-half milligrams of Vioxx. So, it's a very low dose of Vioxx relative to these other trials that we've been discussing.

BY MR. KLINE:

Q. 090 being a 12.5 milligram, as opposed to VIGOR, which was 50?

A. That's right.

Q. Okay.

A. And what is so striking about this trial is that it has, at the end of six weeks of therapy, a statistically significant 760 percent excess of heart attacks. Now, it's not quite 1,000 patient trial, but certainly that can't be minimized. And the point being is that if you see that trial in replication with the problems with VIGOR,

Page 138

you have a very serious problem.

But moreover, what is the misleading statements that have been made, is that there have been no trials ever done with Vioxx, before APPROVe, comparing the drug except for naproxen, in which there was a risk. In fact, there was study 090, which compared to placebo or nabumetone, which showed a highly significant excess risk.

Overruled

138:21-145:21

Q. Was there, as you view this and as you viewed it back then in 2001, a real public health threat out there in the form of the drug Vioxx?

Page 139

MR. GOLDMAN: Objection, opinion testimony.

THE WITNESS: Yes. When we published our article in August 2001, there was an accompanying article in the Wall Street Journal, an A1 article, in which I stated just precisely that, that we're staring a public health -- I don't know if I used the word "disaster," but it was a

Hearsay
Lack of foundation

He is or was the top cardiologist at top hospital.

because of definitive risks, the Juni meta-analysis answers that, because once you have VIGOR and 090, statistically it's proven, without any question, from this analysis.

204:4-204:14

BY MR. KLINE:
Q. Now, this was published in the Lancet?
A. Yes, in November of 2004.
Q. So, not only could physicians see it, but Merck could see it as well; correct?
A. Yes.
Q. Okay.
Did they go about trashing Juni?

204:16-205:10

THE WITNESS: As I mentioned earlier, every time a study was published, there was a vehement response to that to try to provide an antidote or a negation of the results, whether it was our study or whether it was other reports.
This would have been -- in this case, they said that Dr. Juni
Page 205
and his colleagues didn't include the right trials, and they had all sorts of criticism that I believe was largely unfounded, and there was quite a bit of correspondence in the Lancet that followed this up subsequently.
BY MR. KLINE:
Q. I guess one thing that comes to mind, was Juni --

Leading
Argumentative
Lack of foundat'n
Overruled

205:14-205:17

Q. Was Juni independent of Merck, from what you knew?
A. Juni was, as best I know, fully independent of Merck.

214:7-219:8

One thing that Merck said from the APPROVe study was that there was an increased risk after 18 months. Do you recall that claim?
A. Yes.
Q. How did you see that in the context of the full picture of the articles?
MR. GOLDMAN: Objection.
THE WITNESS: This was

topol direct.txt

MR. GOLDMAN: Objection.

THE WITNESS: Okay.

So, what I cited here in this correspondence is how the article in the New England Journal -- this goes back to what we discussed earlier today, which is when the paper was published in November 2000 as compared to the FDA documents that we have a chance to review in February of 2001, there was -- there were gross discrepancies, which is why we had contacted Merck in the first place about this manuscript.

Then, finally, we had the ability to work with the New

Page 223

England Journal of Medicine editors, Dr. Curfman, Dr. Drazen, and to figure out what was going on.

Now, as it turns out, in the VIGOR manuscript, in the New England Journal in 2000, in three times in the paper, this is first authored by Bombardier, and three times it says that the mortality was the same between naproxen and Vioxx. And that was untrue.

In fact, there was a 46 percent difference. There were 22 deaths in the Vioxx arm versus 15 deaths in the naproxen arm. And so instead of presenting the deaths as they should, the authors only used percentages, rounded them off, but moreover, they asserted strongly in three different places that the mortality was the same. So, that's issue number one.

Page 224

Issue number two with that manuscript --

BY MR. KLINE:

Q. Before you get to issue number two, if you remember, how do you view that conduct? What word would you use to describe it?

MR. GOLDMAN: Objection.

THE WITNESS: We're talking about deaths, and we're talking about false assurances that the mortality was the same in three prominent places in the manuscript.

BY MR. KLINE:

Q. Outrageous?

MR. GOLDMAN: Objection.

THE WITNESS: I believe it's highly misleading.

BY MR. KLINE:

Lack of foundation

Overruled

Leading

Argumentative

Improper opinion testimony

Sustained

401 + 403