**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED 2-14-06

LORETTA G. WHYTE
CLERK

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| Evelyn Irvin Plunkett v. Merck & Co, Inc. | * | CASE NO. 02:05CV4046 |

---

### Notice of Filing Deposition Testimony
### of Gregory Curfman, M.D.

---

Plaintiff Evelyn Irvin Plunkett, as Personal Representative of the Estate of Mr. Richard Irvin, Jr., by and through her attorneys, hereby gives notice of filing the transcript of the testimony of Gregory Curfman played by Plaintiff. This testimony was played during the trial of this cause on February 10 and 13, 2006. Defendant will file the testimony designated by the parties in the cross examination of the deposition testimony of Gregory Curfman, M.D. Transcripts are attached as Exhibits "A" and "B."

___ Fee_____
___ Process_____
_X_ Dktd_____
___ CtRmDep_____
___ Doc. No._____

Respectfully submitted,

By: _____

**Andy D. Birchfield, Jr.**
P. Leigh O'Dell
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
**Co-Lead Counsel**


Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS,
MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
MEUNIER&WARSHAUER, L.L.C.
P.O. Box 960
191 East Second Street
New Roads, LA 70760
(225) 638-6137
(225) 638-8836 (fax)

**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
FAX: (504) 561-6024

Christopher A. Seeger, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

## PLAINTIFFS' LIAISONCOUNSEL

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
MEUNIER&WARSHAUER, L.L.C.
P.O. Box 960
191 East Second Street
New Roads, LA 70760
(225) 638-6137
(225) 638-8836 (fax)

Carlene Rhodes Lewis, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

Thomas R. Kline, Esquire
KLINE&SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

## PLAINTIFF'S STEERING COMMITTEE

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced in accordance with Pre-Trial Order No. #8, on this the 10th day of February, 2006.

Page Range:     12:13-12:14

12:13     Q.  Good morning, Dr. Curfman.
12:14     A.  Good morning.


Page Range:     13:11-13:15

13:11     Q.  And what is your current employment, sir?
13:12     A.  I am the executive editor of The New
13:13 England Journal of Medicine.
13:14     Q.  How long have you held that position?
13:15     A.  Since July of 2000.


Page Range:     16:6-16:11

16: 6     Q.  Do you have a background in any particular
16: 7 field of medicine?
16: 8     A.  I am a board-certified internist.  I was
16: 9 board-certified in 1974, and I am a board-certified
16:10 physician in cardiovascular medicine, cardiology,
16:11 board-certified in 1977.


Page Range:     20:22-22:14

20:22             Is it -- how would you characterize the
20:23 role you had in the review process concerning the
20:24 VIGOR study in the year 2000?
21: Page 21
21: 1     A.  Well, each manuscript that is submitted to
21: 2 The Journal is assigned to an editor, an associate
21: 3 editor, who's job it is to handle that article
21: 4 through the review process.
21: 5             In addition, that associate editor is
21: 6 teamed with a deputy editor.  So there are two
21: 7 editors who work in tandem to handle the article
21: 8 through the review process.
21: 9             I was not either the associate editor
21:10 nor the deputy editor on the VIGOR article.
21:11             During the time that the VIGOR
21:12 manuscript was being handled in our office, between
21:13 May and July, I was still a deputy editor.
21:14             In July, I became the executive editor.
21:15 So it was during the time that the VIGOR article
21:16 was being reviewed that I had a change in my
21:17 position.
21:18             I did, however, attend all of the
21:19 editorial meetings where the VIGOR article was
21:20 discussed.  I was a part of those discussions.
21:21             I had the opportunity to express
21:22 opinions about the manuscript and the data, and so
21:23 I was a part of the process in that sense, but I
21:24 was not the primary editor who was responsible for
22: Page 22
22: 1 taking that article through the process.
22: 2     Q.  Could you describe the role that you had in
22: 3 the review process concerning the APPROVe study?
22: 4     A.  For the APPROVe article, I was the primary

```
22: 5 in-house editor responsible for taking that article
22: 6 through the process.
22: 7          So I selected the reviewers,
22: 8 communicated with the reviewers, had the article
22: 9 reviewed, communicated back with the corresponding
22:10 author, Dr. John Baron.  I had many discussions
22:11 with Dr. Baron about the article.
22:12          I carried it through the revision
22:13 process and carried it to the point of presenting
22:14 it to the editor-in-chief for final approval.
```

Page Range:      23:2-24:12

```
23: 2    Q.  Dr. Curfman, marked as Exhibit 2 is a
23: 3 document bearing the heading of "The New England
23: 4 Journal of Medicine," entitled "Information For
23: 5 Authors," dated January 6, 2000.
23: 6          Are you familiar with this document?
23: 7    A.  Yes, I am.
23: 8    Q.  Does this document express the policy of
23: 9 The New England Journal of Medicine as of the year
23:10 2000?
23:11    A.  Yes, that's correct, in terms of the
23:12 submission of manuscripts.
23:13    Q.  Directing your attention to the second full
23:14 paragraph on the left-hand side under the heading
23:15 "Manuscripts," there is a statement, "A covering
23:16 letter signed by all authors should identify the
23:17 person, with the address and telephone number,
23:18 responsible for negotiations concerning the
23:19 manuscript.  The letter should make it clear that
23:20 the final manuscript has been seen and approved by
23:21 all authors and that they have taken due care to
23:22 ensure the integrity of the work ."
23:23          Was that part of the policy of The New
23:24 England Journal of Medicine in the year 2000?
24: Page 24
24: 1    A.  Yes.
24: 2    Q.  And with respect to that quoted language,
24: 3 what does the phrase "ensure the integrity of the
24: 4 work" mean?
24: 5    A.  "The integrity of the work" refers to the
24: 6 accuracy of the work, the completeness of the data,
24: 7 and the conclusions flowing from the data being
24: 8 appropriate and accurate.
24: 9    Q.  Does the phrase "ensure the integrity of
24:10 the work" include ensuring that the actual data are
24:11 accurately presented in the manuscript?
24:12    A.  Yes.
```

Page Range:      26:3-26:10

```
26: 3    Q.  Does The Journal, as any peer-review
26: 4 journal, rely on the honesty and candor of authors
26: 5 with respect to the veracity of their findings in a
26: 6 manuscript submitted for review?
26: 7    A.  Absolutely.
26: 8    Q.  Can you please explain the statement in
```

26: 9 this editorial concerning the best interests of
26:10 sick patients?

Page Range:      26:17-27:4

26:17     A.  The ultimate purpose of our journal, the
26:18 mission of our journal is to provide information to
26:19 the healthcare community so that they can take care
26:20 of people that are sick.
26:21               Very much in the back of our minds
26:22 every day that we do our work is that we are
26:23 dealing with people who are ill.  We are dealing
26:24 with illnesses.  We are dealing with human lives.
27: Page 27
27: 1 Human suffering.  That's all in the background of
27: 2 our thinking, and our mission is to try to publish
27: 3 information that is going to be helpful to people
27: 4 who are sick.

Page Range:      27:5-27:11

27: 5     Q.  Does that mission make it important for the
27: 6 information in The Journal to be accurate?
27: 7     A.  It is essential that it be accurate and
27: 8 complete and free of errors.
27: 9               Errors can be harmful to patients.  So
27:10 it's a very meticulous operation that we try to
27:11 run.

Page Range:      44:1-45:11

44: 1     Q.  Doctor, Exhibit 8 is from The New England
44: 2 Journal of Medicine, Volume 336.  It's got a
44: 3 copyright "1997" in the lower right.
44: 4     A.  Right.
44: 5     Q.  The page is entitled "Uniformed
44: 6 Requirements For Manuscripts Submitted to
44: 7 Biomedical Journals."
44: 8               Is this a document you are familiar
44: 9 with?
44:10     A.  Yes.  This is an earlier version of the
44:11 document that we were just -- that you were just
44:12 reading from.
44:13               So it has gone through a number of
44:14 iterations over the years.  This would, I believe,
44:15 have been the document in place at the time of the
44:16 consideration of the VIGOR trial.
44:17     Q.  And this again is a joint statement of The
44:18 International Committee of Medical Journal Editors
44:19 that The New England Journal has adopted for its
44:20 own policies; is that right?
44:21     A.  That's right.
44:22     Q.  Turning to Page 315, underneath the heading
44:23 "Sending the Manuscript to the Journal," there is a
44:24 statement that, "Manuscripts must be accompanied by
45: Page 45
45: 1 a covering letter, signed by all co-authors," and

```
45: 2 underneath that there is Subparagraph C that states
45: 3 the following:  "A statement that the manuscript
45: 4 has been read and approved by all the authors, that
45: 5 the requirements for authorship as stated earlier
45: 6 in this document have been met, and that each
45: 7 author believes that the manuscript represents
45: 8 honest work."
45: 9          Did that establish the policy of The
45:10 New England Journal from 1997 forward?
45:11    A.  Yes.
```

Page Range:     45:17-46:3

```
45:17    Q.  Dr. Curfman, Exhibit 9 is a copy of a
45:18 letter date May 18, 2000 from Claire Bombardier and
45:19 to Robert Utiger, Deputy Editor, New England
45:20 Journal of Medicine, dated May 18, 2000.
45:21          Have you seen this letter before?
45:22    A.  Yes, I have.
45:23    Q.  Is it correct that The New England Journal
45:24 received a draft manuscript of the VIGOR study from
46: Page 46
46: 1 Claire Bombardier, along with that letter dated May
46: 2 18, 2000?
46: 3    A.  That's correct.
```

Page Range:     46:8-46:24

```
46: 8    Q.  The letter itself, Dr. Curfman, is
46: 9 consecutively Bates numbered at Page 2000 NEMJ 1
46:10 and 2, is that correct, in the document that you
46:11 have?
46:12    A.  Yes, uh-huh.
46:13    Q.  And are the pages marked ending in the
46:14 numbers 5, 7 and 16 the author statements signed by
46:15 Drs. Bombardier, Alise Reicin -- that's R-E-I-C-I-N
46:16 -- and Deborah Shapiro that were submitted with the
46:17 manuscript?
46:18    A.  Correct.
46:19    Q.  In those letters, each of the signatories
46:20 attested that they had fulfilled the authorship
46:21 criteria of the uniform requirements that we read a
46:22 few moments ago from the 1997 standards; is that
46:23 right?
46:24    A.  That is right.
```

Page Range:     47:1-48:8

```
47: 1    Q.  Doctor, how long after The New England
47: 2 Journal received the draft with the May 18, 2000
47: 3 letter were you assigned in any capacity to the
47: 4 review process?
47: 5    A.  I was not assigned to handle this
47: 6 manuscript through the review process.
47: 7          So my colleagues Dr. Utiger, Dr. Kaplan
47: 8 and Dr. Steinbrook were the three editors who
47: 9 handled this manuscript through the review process.
```

47:10          Dr. Utiger and Dr. Steinbrook are
47:11 deputy editors, and Dr. Steinbrook was the primary
47:12 deputy editor.  When he was away, Dr. Utiger would
47:13 step in for him in that capacity; and Dr. Kaplan,
47:14 Marshall Kaplan, was the associate editor who was
47:15 primarily responsible for selecting the reviewers
47:16 and taking the manuscript through the review
47:17 procedures.
47:18     Q.  Was the VIGOR article sent for external
47:19 review?
47:20     A.  Oh, yes.
47:21     Q.  Was there a standard as to how many
47:22 reviewers you would send an article to?
47:23     A.  Well, in this particular case, the article
47:24 was sent to two outside reviewers.  It was also
48: Page 48
48: 1 reviewed by a statistical consultant who works in
48: 2 that capacity for The Journal.
48: 3          It would have also been read very
48: 4 carefully by Dr. Kaplan, by Dr. Steinbrook, by
48: 5 Dr. Utiger; and then toward the end of the process,
48: 6 I also read the manuscript before it was finally
48: 7 approved, and then accepted by Dr. Jeffrey Drazen,
48: 8 the editor-in-chief.


Page Range:     55:16-55:21

55:16     Q.  Dr. Curfman, the diskette was received
55:17 shortly after August 20, 2000; is that right?
55:18     A.  Yes.  The original diskette.
55:19          This would be a copy, but that original
55:20 diskette was received with this letter
55:21 (indicating).


Page Range:     59:8-59:22

59: 8     Q.  Dr. Curfman, please take a look at what has
59: 9 been marked as Exhibit 14, that has been Bates-
59:10 stamped 2000 NEJM 000235 through 282, and can you
59:11 tell me if this is an accurate copy of the May 2000
59:12 draft of the VIGOR study that you observed at the
59:13 time you reviewed the contents of the diskette in
59:14 October 2004, as you've testified earlier?
59:15     A.  Yes, it is.
59:16     Q.  You'll notice that we talked a little
59:17 before the break about the word "tracked changes."
59:18          Do tracked changes show when deletions
59:19 or insertions are made to a manuscript?
59:20     A.  That's correct.
59:21     Q.  Do they show, with manipulation of the
59:22 program, who made them and when?


Page Range:     59:24-59:24

59:24     A.  Yes, it can do that.

Page Range:        60:1-61:2

```
60: 1    Q.  And is that done by using the mouse to
60: 2 hover over a specific insertion or deletion --
60: 3    A.  Yes.
60: 4    Q.  -- until some information appears on the
60: 5 screen showing that a particular insertion or
60: 6 deletion was made at a particular time by a
60: 7 particular person?
60: 8    A.  Right.  So it tracks the change and also
60: 9 the individual and the time and date when the
60:10 change was made.
60:11    Q.  Now, when you observed this document on
60:12 screen in October 2004, did you observe that there
60:13 had been deletions with respect to the text that we
60:14 looked at earlier?
60:15         In particular, if you look at Page 251,
60:16 under the general "Safety Heading," do you see that
60:17 there is a reference to "Deleted:  8 and 0 patients
60:18 with myocardial infarction in the rofecoxib and
60:19 naproxen treatment groups respectively"?
60:20    A.  Yes.
60:21    Q.  And do you see that in the next sentence
60:22 the information that was deleted refers to the
60:23 absolute numbers of myocardial infarctions in the
60:24 nonaspirin indicated group, 9 for rofecoxib and 4
61: Page 61
61: 1 for naproxen?
61: 2    A.  Yes, I do.
```

Page Range:        61:10-61:11

```
61:10    Q.  Okay.  Let's look at the Table 5 on the
61:11 last page, that's 282.
```

Page Range:        61:18-62:2

```
61:18    Q.  And does this Table 5 on the last page,
61:19 282, show "deleted" at the top?
61:20    A.  Yes, it does.
61:21    Q.  And does it show tracked change indicating
61:22 that the deletion was made by Merck?
61:23    A.  That's correct.
61:24    Q.  Does it show that the deletion was made by
62: Page 62
62: 1 Merck on May 16, 200 at 8:02 p.m.?
62: 2    A.  Correct.
```

Page Range:        62:17-62:19

```
62:17    Q.  And in particular, Table 5 referred to
62:18 cardiovascular events; is that correct?
62:19    A.  That's the title of the events, yes.
```

Page Range:        62:20-63:10

```
62:20    Q.  The legend beneath what would have been
62:21 Table 5 states that it "Includes sudden death,
62:22 unknown cause of the death, fatal MI, fatal stroke
62:23 (hemorrhagic or ischemic), fatal subarachnoid
62:24 hemorrhage, fatal primary intracranial hemorrhage
63: Page 63
63: 1 and fatal GI bleeding episode," correct?
63: 2    A.  That's right.
63: 3    Q.  And underneath that, Footnote 2 states,
63: 4 "Includes serious adjudicated fatal and nonfatal
63: 5 MI," correct?
63: 6    A.  Right.
63: 7    Q.  And underneath that, "Includes serious
63: 8 adjudicated fatal and nonfatal ischemic
63: 9 cerebrovascular accidents."
63:10    A.  Correct.
```

Page Range:       66:7-66:17

```
66: 7              Do you see, looking at Exhibit 15, the
66: 8 deleted and inserted text that the, "8 and 0
66: 9 patients with myocardial infarctions in the
66:10 rofecoxib and naproxen groups," states, "Merck, May
66:11 17, 2000, 11:20 a.m., deleted"?
66:12    A.  Yes, I do.
66:13    Q.  And is that something that you are able to
66:14 see by manipulating the mouse in a similar fashion
66:15 when the computer screen showed you this -- these
66:16 tracked changes?
66:17    A.  That's right.
```

Page Range:       66:18-66:23

```
66:18              EXHIBIT NO. 16 MARKED
66:19    Q.  And, Doctor, on Exhibit 16, do you see that
66:20 there's similar reference to the tracked change
66:21 deleting the absolute numbers 9 and 4 that states,
66:22 "Merck, May 17, 2000, 11:21 a.m., deleted"?
66:23    A.  Yes.
```

Page Range:       67:6-67:19

```
67: 6    Q.  Is Exhibit 9 the letter that initially sent
67: 7 the VIGOR article --
67: 8    A.  Yes, that's correct, May 18, 2000.
67: 9    Q.  Does that indicate to you that the
67:10 deletions that we just looked at, referring to
67:11 Table 5, and the absolute numbers of data, were
67:12 made on May 16 and 17, one day or two days before
67:13 the manuscript was sent to you for review?
67:14    A.  That's correct.
67:15    Q.  If someone were to testify that any of
67:16 these deletions were made at the request of The New
67:17 England Journal, that would not be correct, would
67:18 it?
67:19    A.  That would not be correct.
```

Page Range:        67:20-67:24

    67:20     Q.  Did Table 5 include a wider array of events
    67:21 relating to the cardiovascular system and
    67:22 cerebrovascular system than the reference to
    67:23 myocardial infarctions in the version that was
    67:24 submitted to The Journal and ultimately published?


Page Range:        68:2-68:6

    68: 2     A.  Yes.  It is a wider array of cardiovascular
    68: 3 endpoints that was included in the text.
    68: 4     Q.  Would the information about those endpoints
    68: 5 have been of interest to The New England Journal's
    68: 6 readers?


Page Range:        68:9-68:11

    68: 9     A.  Yes.  This would have been of interest to
    68:10 The New England Journal readers.
    68:11     Q.  Why is that?


Page Range:        68:13-68:22

    68:13     A.  All of these endpoints relate in one way or
    68:14 another to the cardiovascular system, and the data
    68:15 in the text relate to a segment of the
    68:16 cardiovascular system; namely, the coronary
    68:17 arteries; but one that thinks about the vascular
    68:18 system would also want to know about other parts of
    68:19 the vascular system in relation to these endpoints.
    68:20     Q.  Was that information referenced in Table 5
    68:21 relevant to the consideration of the risks and
    68:22 benefits of the drug?


Page Range:        68:24-69:1

    68:24     A.  Yes.  My judgment would be that it would be
    69: Page 69
    69: 1 relevant.


Page Range:        69:3-69:5

    69: 3     Q.  Dr. Curfman, the exhibit marked No. 17 is a
    69: 4 draft of the VIGOR study with the Bates pages
    69: 5 MRK-AAB 0109378 through 411.


Page Range:        69:22-70:1

    69:22     Q.  Do you see at Page 9402 that Table 5,
    69:23 "Cardiovascular Events," was actually part of this
    69:24 draft?
    70: Page 70

```
70: 1    A.  Yes, I see that.
```

Page Range:    70:2-70:23

```
70: 2    Q.  And do you see that Table 5 includes the
70: 3 same legend beneath the table for the events that
70: 4 were being included, such as sudden death, unknown
70: 5 cause of the death, fatal MI, fatal stroke,
70: 6 et cetera?
70: 7    A.  Yes, I do.
70: 8    Q.  Now, do you see that the cardiovascular --
70: 9 first of all, do you see, for MI in the rofecoxib
70:10 versus naproxen group, the totals were 17 versus 4?
70:11    A.  Right.
70:12    Q.  And do those totals match up to the
70:13 absolute numbers that had been deleted; namely, 8
70:14 versus 0 in the aspirin-indicated and 9 versus 4 in
70:15 the nonaspirin-indicated?
70:16    A.  That's correct.
70:17    Q.  Do you see that the difference in 95
70:18 percent confidence interval are stated in an
70:19 inverted fashion rather than a relative risk of
70:20 Vioxx greater than naproxen?  It is stated
70:21 inversely, with the relative risk of naproxen less
70:22 than Vioxx?
70:23    A.  That's correct.
```

Page Range:    71:1-71:7

```
71: 1    Q.  And with that inverted format, is it
71: 2 correct that according to the way scientists
71: 3 interpret statistical significance, if the upper
71: 4 bound of the confidence interval does not include
71: 5 1.0, that would be interpreted as a significant
71: 6 finding; is that correct?
71: 7    A.  That's correct.
```

Page Range:    71:9-71:18

```
71: 9    Q.  Is it correct then that the 17 versus 4
71:10 with the 0.3 and 0.07 to 0.57 would be considered a
71:11 significant -- statistically significant result?
71:12    A.  Correct.
71:13    Q.  Going one line above that, to the total of
71:14 cardiovascular deaths, nonfatal MI or CVA,
71:15 cerebrovascular accident, do you see that the
71:16 totals there 32 for rofecoxib or Vioxx versus 17
71:17 for naproxen?
71:18    A.  Yes.
```

Page Range:    71:19-72:1

```
71:19    Q.  And then in -- the difference in 95 percent
71:20 confidence interval, do you see that the result is
71:21 0.4 with the confidence interval of 0.01 to 0.73?
71:22    A.  Yes, I see that.
```

```
71:23     Q.  And, again, is that a statistically
71:24 significant result with the upper bounds lower than
72: Page 72
72: 1 1.0?
```

Page Range:     72:3-72:8

```
72: 3     A.  Yes.
72: 4     Q.  I take it you have never seen the data in
72: 5 this Table 5 before today?
72: 6     A.  No.
72: 7     Q.  You have not?
72: 8     A.  I have not, correct.
```

Page Range:     72:9-73:13

```
72: 9     Q.  Now, if you refer to Page 12 of this
72:10 draft --
72:11     A.  Could I make a comment, Attorney Arbitblit?
72:12           In looking at this table, I just would
72:13 like to point out the right-hand column designated
72:14 "Difference" with 95 percent confidence intervals.
72:15     Q.  Yes, sir.
72:16     A.  What is actually being displayed here is
72:17 the difference between -- if look at the
72:18 cardiovascular deaths, nonfatal MIs or CVAs, as an
72:19 example, it is the difference between the .8 and
72:20 the .4, and that's where the .4 comes for the
72:21 difference, and then the 95 percent confidence
72:22 interval is the bounds for the .4, for the
72:23 difference.
72:24           So this is not actually the relative
73: Page 73
73: 1 risk.  And when you asked me about statistical
73: 2 significance, I kind of answered, yes; but now that
73: 3 I look at this, I can't really determine
73: 4 statistical significance from the data in this
73: 5 particular table because we don't have a relative
73: 6 risk and the confidence limits around the relative
73: 7 risk.
73: 8           So I think that I really did misspeak
73: 9 when I commented about the statistical significance
73:10 here.  We would need, I think, a statistical test
73:11 to determine that.
73:12           It's a technical point, but I just
73:13 wanted to make that point.
```

Page Range:     73:14-73:18

```
73:14     Q.  Would it be consistent with your
73:15 understanding to state that the test applied here
73:16 shows a statistically significant result for the
73:17 difference between Vioxx and naproxen?
73:18     A.  Yes.
```

Page Range:     73:21-73:23

```
73:21    Q.  With respect to the two categories you
73:22 testified to previously?
73:23    A.  That's correct, yes.
```

Page Range:    73:24-74:24

```
73:24    Q.  In particular, to make the record clear, is
74: Page 74
74: 1 it correct that Table 5 shows a statistically
74: 2 significant result for the difference between Vioxx
74: 3 and naproxen for myocardial infarction?
74: 4    A.  Right.
74: 5    Q.  Is it -- does the Table 5 show a
74: 6 statistically significant result for the difference
74: 7 between Vioxx and naproxen for the composite
74: 8 endpoints of cardiovascular deaths, nonfatal MI or
74: 9 CVA?
74:10    A.  Correct.
74:11    Q.  I believe I was about to direct your
74:12 attention to Page 12 of this draft, which has the
74:13 Bates Page 9389 at the end.
74:14    A.  Right.
74:15    Q.  And do you see that in the -- about six or
74:16 seven lines down, there is the same reference to
74:17 the text that we have seen previously about the
74:18 percentages of myocardial infarctions, but that
74:19 there is a reference to Table 5 following that
74:20 sentence?
74:21    A.  Yes.
74:22    Q.  And that was later deleted, correct, before
74:23 you saw it?
74:24    A.  Before we saw it, yes.
```

Page Range:    75:21-75:22

```
75:21    A.  Yes.  I would have wanted to see these
75:22 data.
```

Page Range:    75:24-76:6

```
75:24    Q.  Now, Doctor, Exhibit 18 is a memo from
76: Page 76
76: 1 Deborah Shapiro to Alise Reicin and others dated
76: 2 July 5, 2000.
76: 3         Do you recognize the names of Shapiro
76: 4 and Reicin as the two Merck authors on the VIGOR
76: 5 study?
76: 6    A.  Yes, I do.
```

Page Range:    76:18-77:1

```
76:18    Q.  Could you take a look at Table 7, which is
76:19 on Pages 9 and 10 of the document.  You have to use
76:20 the column headings from Page 9 to follow the
76:21 information onto Page 10.
```

```
76:22                But do you see that there is
76:23 information in this document dated July 5, 2000
76:24 concerning the number of patients with different
77: Page 77
77: 1 adverse events?
```

```
Page Range:     77:4-78:17
```

```
77: 4     A.  Yes, sorry.
77: 5     Q.  And under the "Aspirin Indicated" row on
77: 6 Page 9, do you see the MI listing of 8 versus 0 for
77: 7 rofecoxib versus naproxen?
77: 8     A.  Yes, I do.
77: 9     Q.  And there, do you see that the -- on Page
77:10 10, the "Aspirin Not Indicated" group MI row shows
77:11 12 for Vioxx and 4 for naproxen?
77:12     A.  That's correct.
77:13     Q.  Now, the data that had been in the deleted
77:14 text from the May 2000 version showed 9 versus 4
77:15 for the nonaspirin-indicated; is that correct?
77:16     A.  That's correct.
77:17     Q.  And by July 5, 2000, the data of the Merck
77:18 authors showed that those numbers were 12 versus 4;
77:19 is that correct?
77:20     A.  That's correct.
77:21     Q.  Now, in the manuscript, it was stated that
77:22 the incidence difference was .2 versus .1 for the
77:23 nonaspirin-indicated for MI; do you recall that?
77:24     A.  Yes, I do.
78: Page 78
78: 1     Q.  Does the increase from 9 to 4 to 12 to 4
78: 2 increase the relative risk to 3?
78: 3     A.  Yes.  It is indicated here as .33 because,
78: 4 again, it is being looked at in the reverse way
78: 5 that you mentioned, but the relative risk estimate
78: 6 is .33 as opposed to .2.
78: 7     Q.  And you are looking for the relative risk
78: 8 column on the right-hand side of Pages 9 and 10 of
78: 9 the July 5th, 2000 memo where there is a relative
78:10 risk for each of the adverse events?
78:11     A.  Right.
78:12     Q.  And so the relative risk there is listed as
78:13 0.33, which would translate into 3 to 1 if the
78:14 number were inverted --
78:15     A.  If they were inverted.
78:16     Q.  -- for Vioxx versus naproxen?
78:17     A.  That's right.
```

```
Page Range:     80:20-81:3
```

```
80:20     Q.  Considering the severity of the endpoint,
80:21 myocardial infarction, and the fact that there was
80:22 additional data showing a larger number than
80:23 initially represented in the manuscript submitted
80:24 to The Journal, would it have been of interest to
81: Page 81
81: 1 readers of The Journal to know that the results for
81: 2 the nonaspirin-indicated group achieved a level
```

```
81: 3 that was at least borderline significant?
```

Page Range:     81:5-81:9

```
81: 5    A.  Oh, absolutely.
81: 6            The difference between 9 MIs and 12 MIs
81: 7 is absolutely of importance and quite relevant, and
81: 8 I certainly would have wanted to have access to
81: 9 these data, absolutely.
```

Page Range:     84:14-84:18

```
84:14    Q.  Exhibit 20 is a letter dated July 7th,
84:15 2000, with attachment, from Bombardier to
84:16 Dr. Kaplan.
84:17            Have you seen this before?
84:18    A.  Yes, I have.
```

Page Range:     85:13-86:2

```
85:13    Q.  Now, at the page ending with 037 under
85:14 heading 6, there's a reference -- does this appear
85:15 to be the alternating -- the reviewer's comments
85:16 and the author's responses?
85:17    A.  That's right.  The reviewer's comments are
85:18 in italics and the author's responses are in the
85:19 Roman type.
85:20    Q.  Does Paragraph 6 of the author -- of the
85:21 reviewer comment refer to Table 6 for GI symptoms,
85:22 and go on to state, "I do not see a Table 6"?
85:23    A.  That's correct.
85:24    Q.  And then the authors state, "We apologize
86: Page 86
86: 1 for the confusion created by the inadvertent
86: 2 reference to Table 6, which never existed."
```

Page Range:     87:1-87:18

```
87: 1    Q.  Sir, do you see at Page 13 of Exhibit 17 in
87: 2 the first full paragraph the GI endpoints are
87: 3 referenced to a Table 6?
87: 4    A.  Right.
87: 5    Q.  And then if you look at Page 26 of document
87: 6 which is Merck MRK-AAB 010940, does Table 6 and the
87: 7 data appear on that page?
87: 8    A.  Yes.
87: 9    Q.  And then go back to 14, Exhibit 14.
87:10 Exhibit 14.
87:11    A.  14.
87:12    Q.  At Page 252, do you recall from earlier
87:13 this morning looking at the first full paragraph
87:14 where Table No. 6, the number "6" was deleted and
87:15 was replaced with Table 5?
87:16    A.  Right.
87:17    Q.  So it would not be accurate to state on
87:18 July 17th that Table 6 never existed, would it?
```

Page Range:      87:20-87:21

    87:20      A.  It would not be accurate to make that
    87:21 statement, yes.


Page Range:      88:6-89:15

    88: 6                  In fact, Table 6 existed until it was
    88: 7 changed into Table 5, when Table 5 was deleted, is
    88: 8 that your understanding?
    88: 9      A.  That's right.  And that's why the reviewer
    88:10 here was confused, because there was still an
    88:11 allusion to Table 6.
    88:12      Q.  Now, at Pages 37 and 38 of the document,
    88:13 going over in response to Comment No. 7 from the
    88:14 reviewer, the authors reiterated and slightly
    88:15 modified the text concerning myocardial infarctions
    88:16 in the ASA and non-ASA-indicated populations.
    88:17                  Do you see that?  It's Page 9 and 10 of
    88:18 the document ending in 3738 for the Bates range.
    88:19      A.  Right.
    88:20      Q.  And this document -- if you look at Exhibit
    88:21 18 and compare Exhibit 18, is the July 5 document
    88:22 showing the updated information with 12 events
    88:23 versus 4 rather than the 9 versus 4 previously used
    88:24 that were deleted from the May version, correct?
    89: Page 89
    89: 1      A.  Correct.
    89: 2      Q.  And the July 17th letter from the authors
    89: 3 12 days after this July 5 memo does not anywhere
    89: 4 inform The New England Journal of the 12 versus 4
    89: 5 figures, does it?
    89: 6      A.  That's correct.
    89: 7      Q.  Now, is it The Journal's policy to rely on
    89: 8 the manuscript authors to submit true and accurate
    89: 9 statements of the data?
    89:10      A.  Yes.  That is imperative.
    89:11      Q.  Do The Journal's readers rely on the truth
    89:12 and accuracy of the authors' statements of the data
    89:13 in making decisions as to treatment of their
    89:14 patients?
    89:15      A.  Yes, they do.


Page Range:      89:17-90:23

    89:17      Q.  Is it The Journal's policy to require
    89:18 authors to correct the statements in drafts of the
    89:19 articles on the basis of information that becomes
    89:20 known after an initial draft has been submitted?
    89:21      A.  Our expectation is that if there is an
    89:22 important relevant update to a piece of data during
    89:23 the review process, that we would be informed about
    89:24 that update, yes.
    90: Page 90
    90: 1      Q.  Is it correct that the authors did not
    90: 2 inform The New England Journal as to the change

90: 3 from 9 versus 4 to 12 versus 4 in the nonaspirin-
90: 4 indicated patients for Vioxx versus naproxen at any
90: 5 time prior to the publication of the article?
90: 6      A.  Well, not only did they not inform us that
90: 7 the 9 was actually a 12, but you'll recall,
90: 8 Attorney Arbitblit, that none of those data were in
90: 9 the manuscript at all, none of the raw numbers of
90:10 heart attacks appeared in any version of the
90:11 manuscript, and therefore, are not in the published
90:12 article either.
90:13           So 9 versus 4 was not in there; 8
90:14 versus 0 was not there; 17 versus 4 was not in
90:15 there; and certainly 20 versus 4 was not in there.
90:16      Q.  Now, on the basis of the difference between
90:17 the data in the July 5 memo and the published
90:18 article, would you agree that physicians who read
90:19 The Journal for accurate information about efficacy
90:20 and toxicity did not receive accurate information
90:21 about the relative risk of MI and other
90:22 cardiovascular events in the Vioxx patients
90:23 compared to naproxen?


Page Range:     91:1-92:9

91: 1      A.  Yes.  The risk would have appeared lower
91: 2 than the real data would support.
91: 3      Q.  Now, looking at Exhibit 18, the Shapiro
91: 4 memo of July 5, at Page 3, Table 2, do you see that
91: 5 the memo includes data in a category of confirmed
91: 6 adjudicated serious thromboembolic AEs, or adverse
91: 7 events, in VIGOR patients with rheumatoid
91: 8 arthritis?
91: 9      A.  Yes.
91:10      Q.  Now, going to the published article --
91:11      A.  Got it.
91:12      Q.  -- do you see the statement at the bottom
91:13 left side of Page 1521, going on to the right-hand
91:14 column, "Because highly selective cyclooxygenase-2
91:15 inhibitors do not inhibit platelet aggregation,
91:16 which is mediated by cyclooxygenase-1, there was a
91:17 possibility that the incidence of thrombotic
91:18 cardiovascular events would be lower among patients
91:19 treated with nonselective cyclooxygenase inhibitors
91:20 than amongst those treated with cyclooxygenase-2
91:21 selected inhibitors.  Therefore, cardiovascular
91:22 events were also assessed for a future
91:23 meta-analysis by independent committees whose
91:24 members were unaware of the patients' treatment
92: Page 92
92: 1 assignments."
92: 2           Are you familiar with that quote?
92: 3      A.  Yes, I am, uh-huh.
92: 4      Q.  Now, in plain English, does -- would it be
92: 5 a fair characterization of that text to -- for a
92: 6 reader to interpret that the rationale for the
92: 7 review procedure of cardiovascular events was the
92: 8 possibility of lower CV event rates with COX-1
92: 9 inhibitors?

Page Range:        92:11-92:17

92:11    A.  That's correct, yes.
92:12    Q.  Is that the interpretation that you gave to
92:13 it at the time as an editor, consistent with what
92:14 you just said, that what was being said here was
92:15 that they started a review procedure because there
92:16 was a possibility that you would have a lower CV
92:17 event with a COX-1 inhibiter?


Page Range:        92:19-93:2

92:19    A.  Well, that was their stated rationale, yes.
92:20    Q.  Now, did the authors ever inform The
92:21 Journal, anywhere in the documents, that the reason
92:22 they began cardiovascular event review was that
92:23 Merck had found an imbalance of prostacyclin and
92:24 thromboxane in a premarketing study of Vioxx that
93: Page 93
93: 1 gave rise to a concern over possible increased
93: 2 thrombotic events on Vioxx?


Page Range:        93:23-94:2

93:23    Q.  Would the information about a possible
93:24 mechanism for higher cardiovascular event rates
94: Page 94
94: 1 have been relevant to the readers of The New
94: 2 England Journal of Medicine?


Page Range:        94:4-95:1

94: 4    A.  Yes.  I think, in general, that the
94: 5 published article would have been a better
94: 6 statement if it had acknowledged both
94: 7 possibilities.
94: 8          Again, I get back to the point that I
94: 9 made earlier that, without a placebo arm in this
94:10 trial, scientifically you really can't know the
94:11 reason for the difference between the naproxen
94:12 group and the rofecoxib group in MI rate.  You know
94:13 there is a difference, but you can't really know --
94:14 you can't dissect out the reason.
94:15          So the discussion section would have
94:16 been a better discussion section in the published
94:17 article if, instead of making the baldface
94:18 statement that naproxen was protective, that --
94:19 that could be mentioned as one possibility, but an
94:20 equally plausible possibility is that rofecoxib
94:21 increased the risk of heart attack; and as I said
94:22 earlier, both things theoretically could have been
94:23 going on simultaneously.  So the discussion section
94:24 would have been best framed, I think, if it had
95: Page 95
95: 1 said that.

Page Range:      93:4-93:20

93: 4      A.  No.  They never made that point to The
93: 5 Journal.
93: 6      Q.  Would such information about a possible
93: 7 mechanism for higher cardiovascular event rates
93: 8 have been relevant to you as an editor of The
93: 9 Journal?
93:10      A.  Yes.
93:11      Q.  And why?
93:12      A.  Prostacyclin is a powerful protector of the
93:13 inside of blood vessels, the vascular endothelium,
93:14 and a drug that basically knocks that substance out
93:15 could theoretically result in higher incidences of
93:16 thrombosis in a blood vessel.
93:17           So that would be the biologic rationale
93:18 for thinking about the possibility of an increase
93:19 in risk with a COX-2 inhibitor as opposed to a
93:20 reduction in risk with a nonselective NSAID.


Page Range:      95:14-95:15

95:14      Q.  Now, looking back to the table in the
95:15 Shapiro memo.  Is that 18?


Page Range:      95:18-97:11

95:18 Sorry, let's look at Table 4 on Page 6 of the
95:19 document, which is MRK-NJ 0272451.
95:20           Do you see that there is a "Summary of
95:21 Adjudicated Thromboembolic Serious Adverse Events
95:22 in Selected Subgroups of Patients With Rheumatoid
95:23 Arthritis in VIGOR, Safety Update Report," and this
95:24 is part of the July 5, 2000 data set, correct?
96: Page 96
96: 1      A.  Correct.
96: 2      Q.  Do you see for all patients there were 45
96: 3 events in that category for Vioxx versus 19 for
96: 4 naproxen?
96: 5      A.  That's correct.
96: 6      Q.  The relative risk and 95 percent confidence
96: 7 interval are stated, and those numbers are
96: 8 statistically significant, correct?
96: 9      A.  That's correct.
96:10      Q.  You now the aspirin-indicated row that
96:11 follows shows 15 events in the Vioxx group versus 3
96:12 in the naproxen group.
96:13           Do you see that?
96:14      A.  Yes, I do.
96:15      Q.  With again a relative risk of .20, or 5 to
96:16 1, if it were stated inversely?
96:17      A.  Right.
96:18      Q.  And the relative risk is again
96:19 statistically significance, correct?
96:20      A.  Correct.
96:21      Q.  Then in the aspirin-not-indicated group,
96:22 the patients with events are 30 for Vioxx versus 16

```
96:23 for naproxen.
96:24              Do you see that?
97: Page 97
97: 1    A.  Yes, I do.
97: 2    Q.  And again the relative risk is stated and
97: 3 the 95 percent confidence interval is statistically
97: 4 significance, correct?
97: 5    A.  Yes, it is.
97: 6    Q.  Is the finding of significant increased
97: 7 risk in both the aspirin-indicated and not-aspirin-
97: 8 indicated patients in VIGOR materially different
97: 9 from the assertion in the published article that
97:10 there was a significant difference only in the
97:11 high-risk unprotected group?
```

Page Range:       97:13-97:14

```
97:13    A.  Maybe we should turn to that statement in
97:14 the article.
```

Page Range:       98:8-98:19

```
98: 8    Q.  But do you see that the -- Page 1523 refers
98: 9 to the difference in the rate of myocardial
98:10 infarction between the aspirin-indicated and the
98:11 nonaspirin-indicated subgroups?
98:12    A.  Right.
98:13    Q.  And as to the nonaspirin-indicated
98:14 subgroups, the information is provided that the
98:15 difference was not significant; is that right?
98:16    A.  I am trying to find that here.
98:17    Q.  It's under "General Safety" about --
98:18    A.  Right.
98:19    Q.  -- two-thirds of the way down.
```

Page Range:       98:23-99:23

```
98:23    A.  Yes.  In other words, the difference in the
98:24 rate of myocardial infarction between groups was
99: Page 99
99: 1 not significant, yep.
99: 2    Q.  Is it correct to say that the authors never
99: 3 even told The New England Journal that they were
99: 4 collecting data on an endpoint that they described
99: 5 as set forth in the July 5 memo as confirmed
99: 6 adjudicated serious thromboembolic adverse events?
99: 7    A.  Yes.  To my knowledge, we were never
99: 8 informed about that, and we never saw this Table 4
99: 9 in the memo.
99:10    Q.  Is that information you would have wanted
99:11 to see in your role as an editor at The New England
99:12 Journal in the year 2000?
99:13    A.  Yes.
99:14    Q.  Why?
99:15    A.  It provides more complete information about
99:16 the issue of cardiovascular toxicity; and although
99:17 the VIGOR trial was designed as a gastrointestinal
```

99:18 trial -- that was the primary focus of the study --
99:19 the heart is a very important organ; and if there
99:20 is potential toxicity here that was emerging from
99:21 the data, it would be highly relevant to present
99:22 that and to tell that part of the story in this
99:23 article.


Page Range:      100:13-101:8

100:13    Q.  Yes.  Do you see any indication in the
100:14 August 20, 2000 letter that the authors took
100:15 advantage of the opportunity of corresponding with
100:16 the editors to advise them of the new data and the
100:17 increase from 9 events to 12 events versus 4 in the
100:18 nonaspirin-indicated group?
100:19    A.  No.  I think the only reference in the
100:20 letter to cardiovascular events is on the top of
100:21 Page 2 where they again refer to the analysis
100:22 showing a reduced rate of cardiovascular events in
100:23 the naproxen group compared with the rofecoxib
100:24 group.
101: Page 101
101: 1    Q.  Did the authors take the opportunity on
101: 2 August 20, 2000 in corresponding to The Journal to
101: 3 inform The Journal that they had compiled the
101: 4 events for naproxen and Vioxx in the serious
101: 5 thromboembolic category as shown in the July 5 memo
101: 6 on Table 6 showing a statistically significant
101: 7 increased risk for Vioxx?
101: 8    A.  No.


Page Range:      111:23-112:7

111:23    Q.  Let's look at -- Exhibit 27 is a
111:24 Kaplan-Meyer figure showing the shape of the curve
112: Page 112
112: 1 for cardiovascular events dated June 20, 2000.
112: 2              Do you see that?
112: 3    A.  Yes, I do.
112: 4    Q.  Is the shape of the cardiovascular risk
112: 5 curve similar to the gastrointestinal benefit
112: 6 curve, only inverted so that the risk with Vioxx is
112: 7 higher?


Page Range:      112:9-112:12

112: 9    A.  The display, the shapes of the curve, rough
112:10 curves look similar; but the axis, the vertical
112:11 axis is different.  The cumulative incidences would
112:12 be different, but, yes, the shapes are similar.


Page Range:      112:23-113:5

112:23    Q.  Did the authors provide The New England
112:24 Journal with both the GI-benefit curve and the
113: Page 113

113: 1 cardiovascular-increased-risk curve, or only the
113: 2 GI-benefit curve?
113: 3     A.  Only the GI-benefit curve.
113: 4     Q.  And would the Vioxx-increased-risk curve
113: 5 have been of interest to your readers?


Page Range:     113:7-113:17

113: 7     A.  Yes.
113: 8     Q.  Why is that?
113: 9     A.  Well, of course, these are data that we
113:10 would -- if we had received them, we would have had
113:11 to review them for validity and accuracy; but in
113:12 assessing a drug, one needs to look not only at its
113:13 benefits but also the adverse events, especially
113:14 such important ones as cardiovascular adverse
113:15 events; and so that a doctor prescribing a drug
113:16 needs to know both sides of the story, not just one
113:17 side of the story.


Page Range:     119:4-120:13

119: 4     Q.  Doctor, Exhibit 28 is a document consisting
119: 5 of an e-mail from John Baron to Jeff Drazen, dated
119: 6 February 6, 2005, with an attached draft
119: 7 manuscript, and the text of the e-mail states,
119: 8 "Here is a version for review," with the subject
119: 9 line of "APPROVe Cardiovascular."
119:10         Is this the first manuscript that was
119:11 submitted to The New England Journal concerning the
119:12 APPROVe study?
119:13     A.  Yes.  This appears that this is the first
119:14 version.
119:15     Q.  And you testified earlier that you were
119:16 aware that Vioxx was withdrawn from the market on
119:17 September 30, 2004, correct?
119:18     A.  That's correct.
119:19     Q.  Shortly after that, did you learn anything
119:20 about the manufacturer's intention to submit an
119:21 article of some kind about APPROVe to The New
119:22 England Journal?
119:23     A.  Dr. Drazen had communications with
119:24 Dr. Baron, that I was not personally involved with,
120: Page 120
120: 1 but that he told me about, that they were trying to
120: 2 work out a mechanism whereby the cardiovascular
120: 3 events in the APPROVe trial with be submitted to
120: 4 The New England Journal.
120: 5         So Dr. Drazen took it upon himself to
120: 6 enter into those discussions with Dr. Baron.  I
120: 7 don't know exactly when they began, but it was
120: 8 certainly several months before the actual date of
120: 9 submission of the manuscript.
120:10     Q.  When did you first enter into the process
120:11 in any capacity?
120:12     A.  Dr. Drazen asked me to handle this
120:13 manuscript as the editor.

Page Range:      121:16-122:6

121:16              When did you actually first see the
121:17 manuscript?
121:18      A.  I would have seen it February 7th.  It
121:19 would have to be logged into our computer system
121:20 and given a manuscript number; and since I knew
121:21 that it was coming, we had a review process set up
121:22 and ready to activate.
121:23      Q.  Had you selected reviewers -- of course not
121:24 naming any names -- but you had gone through the
122: Page 122
122: 1 process of identifying who should review the
122: 2 manuscript because you were expecting it?
122: 3      A.  That's right.  We had gone through a
122: 4 process of trying to determine who would be good
122: 5 reviewers for this work.  So we had them lined up
122: 6 in advance.


Page Range:      125:2-126:1

125: 2      Q.  Now, following receipt of the manuscript,
125: 3 what was your role in the review process?
125: 4      A.  Well, I supervised the review process, and
125: 5 the first thing I did was to read the manuscript
125: 6 myself and to do that as quickly as possible, and
125: 7 then sent it out for review to four outside
125: 8 experts.  Four experts outside of our office.
125: 9              You'll recall that with the VIGOR
125:10 manuscript, that was reviewed by two outside
125:11 experts.  I felt that we needed more opinions here,
125:12 given the high stakes; and I had selected four
125:13 outside experts who I already communicated with,
125:14 and who had agreed to review this within about a
125:15 48-hour time frame.  In fact, some of them did it a
125:16 little faster than that.
125:17              We also -- I also at the same time sent
125:18 the manuscript to one of our statistical
125:19 consultants who reviewed it during that same time
125:20 interval.
125:21              So within, roughly, I am estimating,
125:22 36, 48 hours, we had four outside reviews and the
125:23 statistical consultant review, their written
125:24 comments, that were e-mailed in to our office, and
126: Page 126
126: 1 we had all that information.


Page Range:      126:3-126:15

126: 3      Q.  Doctor, Exhibit 29 appears to be a letter
126: 4 dated February 9, 2005 at 2005 NEJM 13 and 14, to
126: 5 which a set of suggestions for transmittal to
126: 6 authors are attached at Pages 270 to 285, and
126: 7 finally, a financial disclosure and authorship form
126: 8 at 2005 NEJM 8, at the last page.
126: 9      A.  Right.
126:10      Q.  With respect to the letter, is that your

126:11 signature on the second page?
126:12    A.  Yes, it is.
126:13    Q.  Did you write this letter and send it to
126:14 John Baron on February 9th?
126:15    A.  Yes, I did.


Page Range:      127:2-127:22

127: 2             How do the specific comments of the
127: 3 reviewers and the overall letter that you wrote
127: 4 yourself relate to each other in terms of what The
127: 5 Journal's expectations are?
127: 6    A.  Right.  The covering letter is really a
127: 7 short summary of some of the really essential
127: 8 points that need to be transmitted to the authors.
127: 9             But the comments of the reviewers, in
127:10 this case, I felt were just spectacular, very
127:11 comprehensive; and there was duplication among the
127:12 reviews.
127:13             The only purpose of my letter was to
127:14 bring together some of the essential points; but in
127:15 making revisions to the manuscript, the authors
127:16 also need to go through the comments of the
127:17 reviewers, and that's why they spend so much time
127:18 writing these up, so we can transmit them to the
127:19 authors.
127:20             To summarize, the letter is not a
127:21 stand-alone.  The letter goes in conjunction with
127:22 the comments to the reviewers.


Page Range:      128:6-128:13

128: 6    Q.  Doctor, we are going to mark this as
128: 7 Exhibit 30.
128: 8             Looking at the Exhibit 29, the letter
128: 9 of February 9, 2005, on Page 2, underneath the
128:10 Paragraph No. 8 there is a statement, "You will
128:11 also find editorial comments in tracking changes in
128:12 the version of the manuscript being returned to
128:13 you."


Page Range:      128:15-128:21

128:15    A.  Right, yes, uh-huh.
128:16    Q.  My question is, with respect to Exhibit 30
128:17 that has been handed to you, is this document the
128:18 tracked-changes version that was returned to the
128:19 authors?
128:20    A.  Yes.  This is the version that was returned
128:21 to them.


Page Range:      141:20-143:14

141:20    Q.  Now, going on to some of the specific
141:21 comments in your letter of February 9, there is a
141:22 No. 7 on Page 2, which states, "Remove assertion

141:23 that increased risk was observed only after 18
141:24 months, because event curves for other adverse
142: Page 142
142: 1 events separate early.  Also the focus on the first
142: 2 18 months was not pre-specified and is a post-hoc
142: 3 analysis."
142: 4         Do you see that reference?
142: 5    A.  Yes, I do.
142: 6    Q.  Now, going on to the comments of Reviewer C
142: 7 at Page 276 of the attachment, there is a parallel
142: 8 reference to the 18-month hypothesis that I want to
142: 9 ask you about.
142:10         Are you at Page 276?
142:11    A.  Yes, I am, uh-huh.
142:12    Q.  Under the subheading "Specific Comments,"
142:13 do you see, No. 1, "The 18-month hypothesis.  The
142:14 MS" -- does that stand for "manuscript"?
142:15    A.  Yes.
142:16    Q.  "The MS aggressively promotes the safety of
142:17 up to 18 months of use of rofecoxib.  This goes
142:18 beyond the data of the study.  The analysis by
142:19 duration of use is an example of a post-hoc
142:20 subgroup analysis, because the variation of the
142:21 effect by duration was not an a priori hypothesis
142:22 and the 18-month cutpoint was chosen by inspection
142:23 of the data.  Yusuf and colleagues (JAMA, 1991,
142:24 266:93) warn about the danger of over-interpreting
143: Page 143
143: 1 such subgroup analyses in clinical trials, noting
143: 2 that low power is of particular concern," and then
143: 3 a quote from the Yusuf article is provided:
143: 4 "Generally, trials adequate for detecting an
143: 5 overall treatment effect cannot be expected to
143: 6 detect effects within even relatively large
143: 7 subgroups," and that's the end of the quote.
143: 8         Did you mean for your comment in the
143: 9 letter of February 9 to, in a summary fashion,
143:10 address the concerns of Reviewer C that were just
143:11 read?
143:12    A.  Yes.
143:13    Q.  Do you agree with those concerns?
143:14    A.  Absolutely.


Page Range:      143:24-144:2

143:24         Was there general agreement at The New
144: Page 144
144: 1 England Journal among the editors that the 18-month
144: 2 hypothesis was not credible?


Page Range:      144:4-144:20

144: 4    A.  Yes.  And again at the point that I wrote
144: 5 my letter, you know, I was the editor sort of
144: 6 driving this process.  So I never believed that the
144: 7 separation of 18 months displayed in the figure
144: 8 (indicating), that was displayed in the original
144: 9 submission of the manuscript, I never believed that

144:10 that was a stable finding.
144:11           The reviewers -- and you just quoted
144:12 from one of the reviewers -- didn't believe it.  We
144:13 thought that if you had repeated the study in
144:14 exactly the same way, it would be very unlikely you
144:15 would see that kind of sharp separation at 18
144:16 months.
144:17           So we were very skeptical about it, and
144:18 I worked with Dr. Baron to try to get them to back
144:19 away from this contention, and a significant amount
144:20 of our communication was focused on that point.


Page Range:      151:10-152:24

151:10     Q.  Doctor, is Exhibit 32 the published APPROVe
151:11 study by Bressalier, et al., as it appeared in the
151:12 print version published in Volume 352 on March 17,
151:13 2005?
151:14     A.  That's correct.
151:15     Q.  Now, in comparing the tracked-changes
151:16 version at Page 14 under the discussion, which is
151:17 Page 332, with the first paragraph under the
151:18 discussion in the published article at 1098, the
151:19 sentence from the original manuscript reads, "The
151:20 increased relative risk was observed beginning
151:21 after approximately 18 months of treatment."
151:22           In the published version, it reads, "In
151:23 post-hoc analyses, the increased relative risk of
151:24 adjudicated thrombotic events was first observed
152: Page 152
152: 1 after approximately 18 months of treatment."
152: 2           Was that a change that you as editor
152: 3 insisted on?
152: 4     A.  Yes.
152: 5     Q.  And was the addition of the phrase "in
152: 6 post-hoc analyses" intended to convey to the reader
152: 7 that the 18-month hypothesis was only a hypothesis?
152: 8     A.  Yes, that's correct.
152: 9           And, Attorney Arbitblit, since you are
152:10 at this paragraph, I would also point out the last
152:11 sentence in that paragraph, which I can read, "In
152:12 addition, there was an increased frequency of
152:13 investigator-reported events such as hypertension,
152:14 edema and congestive heart failure which occurred
152:15 much earlier in the study."
152:16           Now that's an important point, because
152:17 we can get into this more, perhaps, but there were
152:18 other endpoints where the separation of the curves
152:19 occurred almost immediately on initiation of the
152:20 study, and one of my tasks as editor was to ensure
152:21 that those data were presented in this article.
152:22     Q.  Well, let's follow up on that point.
152:23     A.  Because they establish that the 18-month
152:24 cutpoint is not a stable cutpoint.


Page Range:      164:20-164:24

164:20     Q.  Were you aware that your requests for

164:21 information to complete the review process of the
164:22 APPROVe study were being filtered through Merck
164:23 executives who were deciding what to provide and
164:24 what not to provide?

Page Range:      165:3-165:3

165: 3     A.  I was not aware of that, no.

Page Range:      165:5-165:20

165: 5     Q.  Exhibit 35 is an e-mail from Ned Braunstein
165: 6 to Janet Van Adelsberg at Merck, subject:  "DO NOT
165: 7 FORWARD.  NEJM letter on APPROVe study."
165: 8          "Janet, please do not forward.  We need
165: 9 to consider that all of the issues raised in this
165:10 letter will be questions that come up at the ACM.
165:11 We need K-M plots for hypertension, congestive
165:12 heart failure and all of the safety data from
165:13 APPROVe, but you should not mix with CV thrombotic
165:14 events."
165:15          Do you see that?
165:16     A.  Yes, I do.
165:17     Q.  You were now aware that Ned Braunstein was
165:18 calling the shots on what information you would or
165:19 wouldn't get in response to your requests to the
165:20 sponsor for data; is that right?

Page Range:      165:23-166:14

165:23     A.  No.
165:24     Q.  "No," you were not aware of it?
166: Page 166
166: 1     A.  I was not aware of it.
166: 2     Q.  Now, is it correct that you believe a
166: 3 composite curve would have been something you
166: 4 wanted to see?
166: 5     A.  Beyond the one that we saw?
166: 6     Q.  Yes.
166: 7     A.  Yes.  If they had prepared one, yes.
166: 8          Again, I'm not sure we would have
166: 9 published it, but I would have wanted to see it.
166:10     Q.  As far as the comment by Reicin and
166:11 Braunstein that these are apples and oranges, do
166:12 you think these are more like apples and apples in
166:13 terms of they are being serious cardiovascular
166:14 endpoints?

Page Range:      166:16-167:12

166:16     A.  I was a little confused by what he meant
166:17 there.
166:18          If he means that congestive heart
166:19 failure shouldn't be displayed in the same graph or
166:20 pooled into a graph with, let's say, myocardial
166:21 infarction, I would disagree with that.  Those are

166:22 all apples, okay.
166:23          I mean, the most common cause of heart
166:24 failure is coronary heart disease.  So I think it's
167: Page 167
167: 1 legitimate to combine those to take a look at that.
167: 2          The hypertension may be a bit different
167: 3 in kind, and one might make an argument to separate
167: 4 that out.
167: 5     Q.  While you are on the subject of
167: 6 hypertension, just briefly, did the authors of the
167: 7 APPROVe study inform you at any time that they had
167: 8 conducted a statistical analysis of the relative
167: 9 risk of Vioxx versus placebo for confirmed
167:10 thrombotic events among patients who had suffered
167:11 elevated blood pressure above 160 systolic or 100
167:12 diastolic?


Page Range:      167:14-168:23

167:14     A.  They did not tell me that in those specific
167:15 terms.
167:16          What we did display in the APPROVe
167:17 article on hypertension is in Table 4, where their
167:18 hypertension events, at the top of the table, and
167:19 then as subcategory serious events, what they call
167:20 "serious events" where they are 11 in rofecoxib and
167:21 one in placebo, and I don't know if maybe that's
167:22 what they are referring to here.
167:23          I mean, we are talking about serious
167:24 hypertension, but that's as far as we went in the
168: Page 168
168: 1 APPROVe article.  We didn't get down to 160 or that
168: 2 kind of thing.  We didn't get down to those
168: 3 numbers.
168: 4     Q.  In the -- well, does the 160 level for
168: 5 systolic or the 100 level for diastolic have any
168: 6 particular -- in terms of the stages of
168: 7 hypertension in your field?
168: 8     A.  Yes.  That would be a more advanced stage
168: 9 of hypertension.  You would want to deal with that.
168:10     Q.  And if you look at Page 1100 of the
168:11 published APPROVe study, there is a discussion of
168:12 mean arterial pressure in the middle of the last
168:13 paragraph on the left that says, "Mean arterial
168:14 pressure did not appear to have a significant
168:15 association with confirmed thrombotic events."
168:16          Do you see that?
168:17     A.  Yes, I do.
168:18     Q.  Would it be relevant to the editors to know
168:19 that another analysis was conducted of the
168:20 thrombotic events that did show a significant
168:21 association among patients who had elevated blood
168:22 pressure of the 160 or greater systolic or 100 or
168:23 greater diastolic level?


Page Range:      169:1-169:9

169: 1     A.  Yes.  One of -- one, of course, of the

169: 2 mechanisms of concern in terms of vascular disease
169: 3 would be hypertension as a substrate leading to
169: 4 vessel damage.
169: 5          So that would be -- if such analysis
169: 6 existed, it would be very appropriate to include
169: 7 that.
169: 8     Q.  And that would have been of interest, not
169: 9 only to the editors, but also to readers?


Page Range:      169:11-169:11

     169:11   A.  Yes.


Page Range:      187:2-187:23

     187: 2     Q.  Doctor, what is the total number of
     187: 3 reprints of the Bombardier VIGOR study that have
     187: 4 been distributed from 2000 to the present?
     187: 5     A.  The total is 929,400.
     187: 6     Q.  And how many were distributed in the year
     187: 7 2000?
     187: 8     A.  246,000.
     187: 9     Q.  And that was published on November 23,
     187:10 2000?
     187:11   A.  Yes.
     187:12   Q.  And in 2001, how many were there?
     187:13   A.  125,900.
     187:14   Q.  And how many in 2002?
     187:15   A.  549,500.
     187:16   Q.  How many in 2003?
     187:17   A.  7,500.
     187:18   Q.  And in 2004?
     187:19   A.  500.
     187:20   Q.  And in 2005?
     187:21   A.  None in 2005.
     187:22   Q.  Again, the total is 929,400?
     187:23   A.  Correct.


Page Range:      190:15-191:4

     190:15     Q.  Generally speaking, what's the purpose of
     190:16 the peer-review process at The New England Journal?
     190:17     A.  There are two general purposes:  The first
     190:18 is for us to have a process for selecting that
     190:19 research among a huge body of medical research that
     190:20 we and our reviewers believe will have the highest
     190:21 impact on the practice of medicine and healthcare;
     190:22 and secondly, to try to present that information in
     190:23 the clearest manner, the most accurate manner, to
     190:24 our readers.
     191: Page 191
     191: 1          So there is a selection part of the
     191: 2 process, and there is an editing part of the
     191: 3 process; and in the broadest frame, those are the
     191: 4 two parts of our procedures.

Page Range:        191:13-191:21

191:13              And there are quite a few steps to the
191:14 peer-review process at The New England Journal; is
191:15 that fair?
191:16      A.  Yes.
191:17      Q.  One of the things that that means is that
191:18 there are a lot of different people, both at The
191:19 Journal and outside The Journal, who see drafts of
191:20 manuscripts before they are ever published in The
191:21 New England Journal?


Page Range:        191:23-192:10

191:23      A.  That's correct.
191:24      Q.  And I believe -- and you can feel free to
192: Page 192
192: 1 refer to this if it is helpful -- is the first step
192: 2 in that process that the editor-in-chief, or the
192: 3 executive editor if the editor-in-chief is not
192: 4 available, reviews each manuscript as it comes in
192: 5 briefly?
192: 6      A.  Yes.
192: 7      Q.  And do you know whether that occurred with
192: 8 the VIGOR manuscript?
192: 9      A.  I have to assume.  I wasn't in the room.
192:10 So I can't -- but it must have, yes.


Page Range:        192:18-193:2

192:18      Q.  And what is the purpose of that initial
192:19 review conducted by the editor-in-chief?
192:20      A.  The editor-in-chief is trying to, first of
192:21 all, make a determination if it is an article that
192:22 we want to review at all.
192:23              Then, if it is, which editor is the
192:24 most appropriate editor to be the point person on
193: Page 193
193: 1 that manuscript, and then to assign that manuscript
193: 2 to that editor.


Page Range:        193:14-195:9

193:14      Q.  And how is the -- I think you mentioned
193:15 that the editor-in-chief will try to select an
193:16 appropriate editor.
193:17              How is that selection made?
193:18      A.  Primarily based on the topic of the article
193:19 in question.
193:20      Q.  And do you know who the associate editor
193:21 was who was selected with respect to the VIGOR
193:22 manuscript?
193:23      A.  Yes, I do.
193:24      Q.  Who was that?
194: Page 194
194: 1      A.  Dr. Marshall Kaplan.
194: 2      Q.  And do you know, Dr. Kaplan is a medical

194: 3 doctor?
194: 4     A.  He is a medical doctor, and his training is
194: 5 in gastroenterology; and since the primary focus of
194: 6 the VIGOR trial was a gastrointestinal endpoint,
194: 7 the manuscript was assigned to Dr. Kaplan to
194: 8 handle.
194: 9     Q.  Okay.  And what -- I believe your article
194:10 states that the associate editor, at least
194:11 initially, is assessing the value and the validity
194:12 of the manuscript; is that right?
194:13     A.  Yes.  The associate editor would then take
194:14 another read.  It might be a fairly quick read.
194:15 Again, to determine in his or her mind if it was
194:16 something that would be appropriate for The New
194:17 England Journal; and if so, go on to identify the
194:18 outside reviewers for the manuscript.
194:19     Q.  Okay.  And if it -- if at that step the
194:20 associate editor determines that the piece is not
194:21 valid or the piece is not fairly written, does --
194:22 can the associate editor at that point reject the
194:23 piece?
194:24     A.  Yes.
195: Page 195
195: 1     Q.  And I think your article, I think your
195: 2 article mentions that, should the associate editor
195: 3 determine that the piece is not appropriate, it
195: 4 could go to a deputy editor for a second opinion;
195: 5 is that correct?
195: 6     A.  Yes.  Our general procedure is that we
195: 7 don't reject manuscripts with only one pair of eyes
195: 8 having seen it.  We like two pairs of eyes to have
195: 9 seen it.

Page Range:     195:12-196:10

195:12             Did Dr. Kaplan on his initial
195:13 assessment of the value and validity of the piece
195:14 determine that it should be further reviewed, or
195:15 did Kaplan reject the piece and therefore require a
195:16 second opinion from a deputy editor?
195:17     A.  No.  He determined that it was worthy of
195:18 review, and then went ahead and assigned the
195:19 reviewers.
195:20     Q.  And so that is -- that is the next step, as
195:21 your article mentioned -- mentioned, and as you
195:22 just testified, that Dr. Kaplan would assign the
195:23 manuscript to outside reviewers; is that correct?
195:24     A.  That's correct.
196: Page 196
196: 1     Q.  And there can be -- there can be two
196: 2 reviewers with certain manuscripts?
196: 3     A.  Oh, sure.
196: 4     Q.  And I believe -- I believe VIGOR actually
196: 5 received a review from three viewers; is that
196: 6 correct?
196: 7     A.  Yes.  Two of the reviewers were outside
196: 8 reviewers, and one of the reviewers was a
196: 9 statistical consultant who is a part-time member of
196:10 our staff.

Page Range:        196:17-197:17

196:17      Q.  And what is the -- what's the purpose of
196:18 the review conducted by the external reviewers as
196:19 well as the statistical consultant?
196:20      A.  The external reviewers are asked to
196:21 carefully read and evaluate the manuscript and give
196:22 us their opinion on its suitability for publication
196:23 in terms of the novelty of the research, the
196:24 accuracy and the validity of the research, the
197: Page 197
197: 1 composition of the manuscript -- how it is written,
197: 2 how the data are displayed -- and the overall
197: 3 interest to the readership of The New England
197: 4 Journal of Medicine.  So there are four categories
197: 5 of evaluation that they are asked to make.
197: 6           Reviewers serve as advisors to the
197: 7 editors.  We ask them for a judgment on the
197: 8 suitability for the publication of the manuscript
197: 9 in The New England Journal, but the final decision
197:10 is really made by the editors, collectively.
197:11           We meet together, discuss the
197:12 manuscript in quite a lot of detail.  All of the
197:13 editors are there.  The statistical consultants are
197:14 there, and we have an opportunity then to take the
197:15 reviewers' comments and put them into a larger
197:16 context, a larger discussion, with input from all
197:17 the editors.


Page Range:        198:4-198:7

198: 4      Q.  And does The New England Journal make an
198: 5 effort to assign manuscripts to reviewers who have
198: 6 expertise in the fields relevant to that particular
198: 7 manuscript?


Page Range:        198:9-200:6

198: 9      A.  We maintain a computerized database of many
198:10 thousands of medical experts around the world, and
198:11 we use that database to try to match up the content
198:12 of article with the expertise of the reviewers, and
198:13 we ask the reviewers to categorize their own
198:14 reviewing interest.
198:15           So we maintain that in the database,
198:16 and we are able to do a search of the database to
198:17 find those reviewers whose interests match up with
198:18 the content of the article, and so that's how we
198:19 select the reviewers.
198:20      Q.  Okay.  Let's just -- let's just break down
198:21 some of the -- some of the types of things that the
198:22 reviewers can do when they get -- when they review
198:23 a manuscript.
198:24           Can the reviewers, if they feel
199: Page 199
199: 1 additional data would appropriate, request that the

199: 2 authors provide additional data that was not
199: 3 provided in the manuscript?
199: 4     A.  Yes.
199: 5     Q.  And if the reviewers believe that data --
199: 6 data are presented inappropriately or in a
199: 7 misleading way in the manuscript, is that something
199: 8 the reviewers are permitted to comment on?
199: 9     A.  Yes.
199:10     Q.  And similarly, separate from the data, but
199:11 with the conclusions and the interpretations that
199:12 are drawn from that data, if the reviewers believe
199:13 those invalid or inappropriate, the reviewers have
199:14 the right to comment on that as well?
199:15     A.  That's right.
199:16     Q.  Now, I believe you mentioned that the next
199:17 step, once the reviewers return their reviews to
199:18 The New England Journal, is that the associated
199:19 editor, who has control of the manuscript or has
199:20 been assigned to the manuscript, has the
199:21 opportunity to discuss the reviews and the
199:22 manuscript with the entire editorial board; is that
199:23 correct?
199:24     A.  Yes.
200: Page 200
200: 1     Q.  And mentioned in the case of the VIGOR
200: 2 manuscript, I believe you said that that was the
200: 3 stage at which you first became involved, was
200: 4 during these discussions with the entire editorial
200: 5 board; is that right?
200: 6     A.  Yes.  That's correct.


Page Range:      204:7-206:10

204: 7     Q.  So you had -- is it fair to say that you,
204: 8 therefore, received the input of medical doctors
204: 9 and at least one statistical consultant that had
204:10 expertise in a variety of different fields?
204:11     A.  Correct.
204:12     Q.  I think you mentioned before, Doctor, that
204:13 you're board-certified in internal medicine and
204:14 cardiology; is that correct?
204:15     A.  That's right.
204:16     Q.  Are there other cardiologists, to your
204:17 knowledge, that participated in the review of the
204:18 VIGOR manuscript, with the exception, of course, of
204:19 the anonymous reviewers?
204:20     A.  Yes.  Dr. Lagakos is a board-certified
204:21 cardiologist, and he would have had an opportunity
204:22 to weigh in as well.
204:23     Q.  And ultimately -- ultimately, after this
204:24 group deliberates, the editors have to determine
205: Page 205
205: 1 ultimately that a piece is appropriate for
205: 2 publication before it is published in The New
205: 3 England Journal; is that correct?
205: 4     A.  That's correct.
205: 5     Q.  But usually there is an intervening step,
205: 6 which there was here, which is that the paper is
205: 7 sent back to the authors for some revision based on

205: 8 the comments of reviewers and perhaps the editors
205: 9 as well; is that right?
205:10    A.  That's right.
205:11    Q.  And I think I said this, but that actually
205:12 did happen with the VIGOR paper?
205:13    A.  Correct.
205:14    Q.  And, in fact, there can be multiple
205:15 requests for revisions where the paper is sent to
205:16 the authors for revision, and the authors make
205:17 certain revisions, and the editors determine that
205:18 more revisions are appropriate; is that correct?
205:19    A.  That's correct.
205:20    Q.  And, again, that did -- that did in fact
205:21 happen with the VIGOR manuscript?
205:22    A.  Yes.
205:23    Q.  And so what -- what that means is that on
205:24 more than one occasion editors at The Journal sent
206: Page 206
206: 1 the paper back to the authors of the manuscript and
206: 2 told them that changes would be required before it
206: 3 could be published in The New England Journal, and
206: 4 the authors then made changes and sent it back to
206: 5 the editors for review; is that right?
206: 6    A.  That's right.
206: 7    Q.  Is it fair to say that The New England
206: 8 Journal has one of the most rigorous peer-review
206: 9 processes of any peer-review journal?
206:10    A.  It's rigorous.


Page Range:     219:7-220:16

219: 7    Q.  Doctor, I would ask you to take a look at
219: 8 the Bombardier article as it was published, which
219: 9 was marked as Exhibit 11 earlier today, and for now
219:10 I am just going to be looking at the first page of
219:11 the article.
219:12            First of all, looking at the top of the
219:13 page, it appears that there are 12 authors listed
219:14 as authors of this article right under the title;
219:15 is that correct?
219:16    A.  Correct.
219:17    Q.  And, in fact, is -- The New England Journal
219:18 has a limit of 12 authors that can be listed in
219:19 that position on the page right below the title; is
219:20 that correct as well?
219:21    A.  At that time there was a limit.  There is
219:22 no longer a limit.
219:23    Q.  And if you look down at the bottom of this
219:24 page in the footnote, in the very last two lines,
220: Page 220
220: 1 there is note that Arthur Weaver, M.D. from the
220: 2 Arthritis Center of Lincoln, Nebraska was another
220: 3 author.
220: 4            Do you see that?
220: 5    A.  Yes, I do.
220: 6    Q.  He is listed down there rather than above
220: 7 because of the rule at the time that you mentioned
220: 8 that there could only be 12 listed at the top of
220: 9 page; is that correct?

220:10    A.  That's correct.
220:11    Q.  And the footnote at the -- or not the
220:12 footnote, but the smaller text at the bottom of the
220:13 page describes where the authors -- the various
220:14 authors are from.
220:15         Do you see that?
220:16    A.  Yes, I do.

Page Range:    221:3-224:24

221: 3    Q.  And if you look at the bottom of the page,
221: 4 these doctors come from a variety of institutions.
221: 5         For example, the lead author, Claire
221: 6 Bombardier, is listed as coming from the Institute
221: 7 For Work and Health as well as Mount Sinai Hospital
221: 8 and the University Health Network of Toronto.
221: 9         Do you see that?
221:10    A.  Yes, I do.
221:11    Q.  The second author, Loren Laine, is from the
221:12 gastrointestinal Division, Department of Medicine
221:13 at the University of Southern California School of
221:14 Medicine in Los Angeles.
221:15         Do you see that as well?
221:16    A.  Yes.
221:17    Q.  And then there is the notation that two of
221:18 the authors, Dr. Alise Reicin and Dr. Deborah
221:19 Shapiro, are from Merck.
221:20         Do you see that?
221:21    A.  Yes.
221:22    Q.  Those are the only two of the 12 authors --
221:23 13 if you count Dr. Weaver -- that are actually
221:24 from Merck.  All of the other -- all of the other
222: Page 222
222: 1 authors are from outside institutions; is that
222: 2 correct?
222: 3    A.  That's correct.
222: 4    Q.  And I won't go through all of them, in the
222: 5 interest of time, but they are from a variety of
222: 6 respected institutions, both within the United
222: 7 States and around the world, including, just for
222: 8 example, the University of Texas, Houston School of
222: 9 Public Health; the Division of Rheumatology and
222:10 Clinical Immunology at the University of Maryland
222:11 in Baltimore; the Office of Clinical Research and
222:12 Training at Northwestern University School of
222:13 Medicine in Chicago, just as examples.
222:14         Do you see those?
222:15    A.  Yes.  Those are U.S. examples.
222:16    Q.  I named the U.S. examples, yes; and there
222:17 are also examples from Australia, Brazil, Mexico
222:18 and other countries around the world; is that
222:19 right?
222:20    A.  That's right.
222:21    Q.  Now, in order to be an author on the New
222:22 England -- on a paper within The New England
222:23 Journal of Medicine, there are certain requirements
222:24 that The New England Journal has; is that correct?
223: Page 223
223: 1    A.  That's correct.

223: 2    Q.  One of those requirements is that each of
223: 3 the authors must sign a statement that attests that
223: 4 they have met certain requirements that The New
223: 5 England Journal imposes in order to be an author on
223: 6 the paper; is that right?
223: 7    A.  Correct.
223: 8            MR. FITZPATRICK:  I am going to mark
223: 9 another document.
223:10            EXHIBIT NO. 45 MARKED
223:11    Q.  And, Doctor, do you recognize this as the
223:12 signed statements by the authors on the VIGOR
223:13 publication?
223:14    A.  Yes, I do.
223:15    Q.  And these came from your files.
223:16            They are all submitted as part of The
223:17 New England Journal's requirement that these
223:18 attestations be submitted before someone can appear
223:19 as an author on the article; is that correct?
223:20    A.  That's correct.
223:21    Q.  And just taking a look at the language of
223:22 the attestation, each of these doctors attest that
223:23 they have done several things in order to fulfill
223:24 the authorship criteria of what are known as the
224: Page 224
224: 1 uniform requirements; is that correct?
224: 2    A.  That's correct.
224: 3    Q.  And those include stating that they have
224: 4 made substantial contributions to (A) the
224: 5 conception and design and/or analysis and
224: 6 interpretation of the data.
224: 7            That's one of the -- that's one the
224: 8 substantial contributions, correct?
224: 9    A.  Correct.
224:10    Q.  And, two, they have made substantial
224:11 contributions to drafting the article or revising
224:12 it critically for important intellectual content;
224:13 is that correct?
224:14    A.  That's correct.
224:15    Q.  And the third requirement that they have to
224:16 attest to is that they have made substantial
224:17 contributions to the final approval of the version
224:18 of the article to be published; is that correct?
224:19    A.  Correct.
224:20    Q.  And each of the -- each of the authors that
224:21 appeared as an author in The New England Journal
224:22 for the VIGOR manuscript signed these statements
224:23 attesting to each of those facts; is that correct?
224:24    A.  That's correct.


Page Range:        225:11-225:22

225:11    Q.  Do you have Exhibit 46, Doctor?
225:12    A.  Yes, I do.
225:13    Q.  And you recognize this as the letter that
225:14 you spoke about this morning, which was the May 18,
225:15 2000 letter which submitted the original VIGOR
225:16 manuscript to The New England Journal; is that
225:17 correct?
225:18    A.  That's correct.

```
225:19     Q.  And I think you mentioned the letter is
225:20 from Dr. Bombardier, who is a medical doctor and is
225:21 also at the University of Toronto?
225:22     A.  That's correct.
```

Page Range:      226:23-229:5

```
226:23              If you turn to the -- just moving down
226:24 to the next sentence, it reads, "Given that NSAIDs
227: Page 227
227: 1 are among the most commonly used medications in the
227: 2 world and the significant benefit for patients from
227: 3 the reduction in gastrointestinal morbidity, we ask
227: 4 that you please consider this manuscript for an
227: 5 expedited review."
227: 6              Do you see that sentence?
227: 7     A.  I do.
227: 8     Q.  You would agree in that sentence
227: 9 Dr. Bombardier is asking that The Journal give this
227:10 manuscript an expedited review?
227:11     A.  That's correct.
227:12     Q.  Does The Journal have a specific procedure
227:13 whereby it can give a manuscript an expedited
227:14 review?
227:15     A.  Yes, we do.
227:16     Q.  And what is that procedure?
227:17     A.  Requests for expedited review are
227:18 considered by the editors based on the substance of
227:19 the research; and in particular, as I have alluded
227:20 to earlier, it's our estimation of the overall
227:21 impact on the health of the public and whether
227:22 people in our society and around the world will be
227:23 immediately impacted, immediately impacted in an
227:24 important way in terms of their health.
228: Page 228
228: 1              In addition, the other qualifying
228: 2 factor is:  Can this research be reviewed
228: 3 adequately in an expedited fashion, or are there
228: 4 other complexities that will need to be dealt with
228: 5 in the review process that will take more time?
228: 6              So those are the two considerations
228: 7 that go into a determination of whether we will do
228: 8 an expedited review.
228: 9     Q.  And is the effect of an expedited review,
228:10 if it is granted and the piece is in fact
228:11 published, that the manuscript would be published
228:12 faster than it would in the normal -- in the
228:13 ordinary course of peer review?
228:14     A.  Yes.
228:15     Q.  And so what Dr. Bombardier was requesting
228:16 was an expert review that, if granted, would have
228:17 resulted in a faster publication of the VIGOR
228:18 results than had expedited review not been granted?
228:19     A.  Correct.
228:20     Q.  Was expedited review in fact granted for
228:21 the VIGOR manuscript?
228:22     A.  No, it was not.  And I guess I should
228:23 qualify my answers to your questions about
228:24 expedited review.
```