229: Page 229
229: 1                What we -- what we commit ourselves to,
229: 2 if we agree to expedited review, is an expedited
229: 3 review.  We do not commit to publication,
229: 4 necessarily.  We commit to a review process that
229: 5 will take less time.


Page Range:      236:22-238:5

236:22    Q.  And, Doctor, do you have Exhibit 47 in
236:23 front of you?
236:24    A.  I do, uh-huh.
237: Page 237
237: 1    Q.  Could you identify that, please.
237: 2    A.  This is a letter written by the deputy
237: 3 editor primarily responsible for the VIGOR
237: 4 manuscript, Dr. Robert Steinbrook, to Dr. Claire
237: 5 Bombardier, asking for some additional information,
237: 6 pretty early on in the process, about the efficacy
237: 7 of the two drugs in the treatment of rheumatoid
237: 8 arthritis, and those data, in his mind, had not
237: 9 been really very clearly displayed in the first
237:10 version of the manuscript, and he wanted to know
237:11 about that.
237:12    Q.  Okay.  So Dr. Steinbrook basically wanted
237:13 to know some additional data about the efficacy of
237:14 rofecoxib or Vioxx in the treatment of rheumatoid
237:15 arthritis, and he requested that Dr. Bombardier
237:16 provide that data to him; is that fair?
237:17    A.  Right.  And then an additional question had
237:18 to do with prior history of gastrointestinal events
237:19 and proton-pump-inhibitor therapy or misoprostol
237:20 therapy, yes.
237:21          So these are issues he wanted more
237:22 information about as the editor.
237:23    Q.  And is that -- is that a fairly common
237:24 practice, if a deputy editor or an associated
238: Page 238
238: 1 editor wants additional information from the
238: 2 authors of a manuscript, that he or she can request
238: 3 that information from the authors?
238: 4    A.  Yes.  It is fairly common practice.  It is,
238: 5 yes.


Page Range:      238:7-239:4

238: 7    A.  I think what I would like to say in
238: 8 addition to that is that there is also an
238: 9 expectation on the part of the editors that there
238:10 is a sense of fairness in the scholarly community
238:11 that authors have a pretty good sense of what
238:12 information they have at their disposals.  Editors
238:13 don't.
238:14          If the expectation is that if an editor
238:15 doesn't ask for it, you as an author don't have to
238:16 provide it, that's not fair.
238:17    Q.  No, absolutely.
238:18    A.  That's not the way the scholarly community

238:19 has functioned for hundreds of years.
238:20            There has to be an expectation that the
238:21 researcher is going to provide the information that
238:22 they know they have there, not necessarily without
238:23 having to be asked by an editor.
238:24            Now these were issues that
239: Page 239
239: 1 Dr. Steinbrook wanted more information about,
239: 2 that's fair; but to carry that too far and to say
239: 3 if an editor didn't ask for it, then I don't have
239: 4 to give it, is not a level playing field.


Page Range:      240:2-241:5

240: 2            MR. FITZPATRICK:  I am going to mark
240: 3 the response to Dr. Steinbrook's request for data.
240: 4            EXHIBIT NO. 48 MARKED
240: 5    Q.  Doctor, do you have Exhibit 48 in front of
240: 6 you?
240: 7    A.  Yes, I do.
240: 8    Q.  And does this appear to be Dr. Bombardier
240: 9 response to Dr. Steinbrook's letter that we just
240:10 looked at?
240:11    A.  Yes, it does.
240:12    Q.  And just looking, just looking generally at
240:13 this response, does it appear to provide a fair bit
240:14 of detail on the efficacy data requested by
240:15 Dr. Steinbrook in his letter?
240:16    A.  Yes.
240:17    Q.  For example, Dr. Bombardier provides,
240:18 although they are not very clear in this copy, what
240:19 appear to be several -- several figures depicting
240:20 various measurements of efficacy in the treatment
240:21 of rheumatoid arthritis; is that correct?
240:22    A.  That's correct.
240:23    Q.  And so it is fair to say that when
240:24 Dr. Steinbrook did request this specific piece of
241: Page 241
241: 1 data, specifically the efficacy data in the
241: 2 treatment of rheumatoid arthritis, Dr. Bombardier
241: 3 was responsive and cooperative in providing that
241: 4 data; is that fair?
241: 5    A.  Yes.


Page Range:      241:6-245:12

241: 6    Q.  Doctor, if you could take a look at what
241: 7 was marked this morning as Exhibit 19.
241: 8            Do you have Exhibit 19, Doctor?
241: 9    A.  Yes, I do.
241:10    Q.  And I believe you already described this
241:11 document this morning.
241:12            Is it correct that this is a June 30
241:13 letter from Dr. Kaplan at The New England Journal
241:14 to Dr. Bombardier?
241:15    A.  Yes.
241:16    Q.  And this letter discusses the -- among
241:17 other things, it discusses some of the comments of

241:18 the reviewers to the VIGOR manuscript?
241:19     A.  Correct.
241:20     Q.  And I apologize, I think you told us
241:21 before, but who is Dr. Kaplan?
241:22     A.  He is the associate editor who was
241:23 responsible for handling this manuscript, and he is
241:24 a gastroenterologist by background.
242: Page 242
242: 1     Q.  Does this letter reflect the stage of the
242: 2 peer-review process where the associate editor
242: 3 contacts the authors and requires revisions -- that
242: 4 revisions be made in order for the piece to be
242: 5 considered for publication?
242: 6     A.  Yes.  Again, this is meant to be a summary,
242: 7 not necessarily an exhaustive repetition of all of
242: 8 the reviewers' comments, but some attempt at
242: 9 prioritizing them, focusing the authors on some of
242:10 the more important issues in Dr. Kaplan's mind.
242:11     Q.  And as Dr. Kaplan writes, "While the
242:12 editors are interested in your manuscript" -- and
242:13 then he gives the title of the manuscript -- "we
242:14 could not accept it for publication without
242:15 substantial revision"; is that correct?
242:16     A.  That's correct.
242:17     Q.  And so Dr. Kaplan is basically saying that
242:18 unless the comments of the reviewers and the
242:19 editors are addressed to the editors' satisfaction,
242:20 the manuscript will not be published in The New
242:21 England Journal of Medicine; is that correct?
242:22     A.  Correct.
242:23     Q.  Okay.  And the letter also goes through a
242:24 variety of requirements for a manuscript in order
243: Page 243
243: 1 to be published in The Journal, generally speaking,
243: 2 and in addition to the comments of the specific
243: 3 reviewers; is that correct?
243: 4     A.  Yes.
243: 5     Q.  I will just refer you as soon as I find it
243: 6 specifically to the second paragraph on Page 2 of
243: 7 the letter.
243: 8          One of the requirements is a firm limit
243: 9 that the manuscript should be no longer than 3,000
243:10 words of text; is that correct?
243:11     A.  Right.
243:12     Q.  And The Journal also requires a total of no
243:13 more than five figures and tables; is that correct?
243:14     A.  That's a target that we shoot for, but we
243:15 are flexible.  Typically, we are flexible on that.
243:16          It depends the data.  If there is
243:17 another piece of display data that is very, very
243:18 important, we will add additional figures and
243:19 tables; but we like to give the authors a target
243:20 because we don't want to end up with 30 tables that
243:21 we really can't published in print.
243:22     Q.  And it's fair to say that a great deal of
243:23 the information that sometimes appears in figures
243:24 can be adequately addressed in the text of the
244: Page 244
244: 1 article; is that correct?
244: 2     A.  Sometimes, yes.

244: 3      Q.  And specifically, in this letter Dr. Kaplan
244: 4 gave some specific instructions regarding figures
244: 5 in the next paragraph, figures and tables.
244: 6           He stated that Table 1 should be an
244: 7 appendix.  All of the figures should be deleted and
244: 8 summarized in the text as needed, and then
244: 9 Tables 2, 3, 4 and 5 should be maintained and an
244:10 additional table about efficacy should be added; is
244:11 that correct?
244:12      A.  Right.
244:13      Q.  And that would -- that would meet the
244:14 target of five figures and tables that The Journal
244:15 had set?
244:16      A.  That's correct.
244:17      Q.  And the information that had previously
244:18 been in other figures would not be removed from the
244:19 manuscript, but rather it would be summarized in
244:20 the text as needed according to Dr. Kaplan's
244:21 suggestions; is that correct?
244:22      A.  Right.
244:23      Q.  Going down a few paragraphs to the
244:24 paragraph that starts, "Please provide appropriate
245: Page 245
245: 1 references."
245: 2           Do you see that?
245: 3      A.  Yes, uh-huh.
245: 4      Q.  The last sentence of that paragraph reads,
245: 5 "All numerical data should be rounded to a
245: 6 reasonable number of significant figures in
245: 7 accordance with the precision of the data."
245: 8           Do you see that sentence?
245: 9      A.  Yes, I do.
245:10      Q.  Is that standard practice in The New
245:11 England Journal?
245:12      A.  Yes, it is.


Page Range:      250:19-251:1

250:19      Q.  Okay.  Okay.  I don't need to show you the
250:20 letter, Doctor, but this morning we did look at the
250:21 letter from Dr. Drazen to Dr. Bombardier in which
250:22 Dr. Drazen, as the editor-in-chief of The New
250:23 England Journal, accepted the VIGOR manuscript for
250:24 publication; is that correct?
251: Page 251
251: 1      A.  Yes, uh-huh.


Page Range:      255:9-255:19

255: 9      Q.  Okay.  Let's take a look again at the
255:10 published article, which is Exhibit 11.  If you
255:11 could get that, please, Doctor, and, Doctor, I
255:12 would likes to take a look at some of the data that
255:13 are presented in this article, and first I would
255:14 ask you to just take a look at the abstract on the
255:15 first page of the article.
255:16           Is it fair to say that, generally
255:17 speaking, the abstract is meant to be a summary of

255:18 the important information in the article?
255:19     A.  Yes.


Page Range:      259:4-259:19

259: 4     Q.  Then if you go a little further down in the
259: 5 "Results" section of the abstract on the first
259: 6 page, it reads, "The incidence of myocardial
259: 7 infarction was lower among patients in the naproxen
259: 8 group than among those in the rofecoxib group, 0.1
259: 9 percent versus 0.4 percent; relative risk, 0.2.  95
259:10 percent confidence interval, 0.1 to 0.7."
259:11         Do you see that?
259:12     A.  I do.
259:13     Q.  So based on that, if a person read -- if a
259:14 reader of this article read the first -- just the
259:15 first page of this article, they would see that
259:16 there was a -- there was a difference in lower
259:17 incidences of heart attacks in the patient taking
259:18 naproxen than in the patient taking Vioxx; is that
259:19 correct?


Page Range:      259:21-261:9

259:21     A.  Well, that's what it says, yes.
259:22     Q.  And I would like to ask you specifically a
259:23 few questions about the way the data are presented
259:24 there, and specifically the relative risk
260: Page 260
260: 1 presentation there of 0.2.
260: 2         Could you describe what a relative risk
260: 3 of 0.2 means?
260: 4     A.  The relative risk is a measure of the risk
260: 5 of one therapy versus another with respect to this
260: 6 particular endpoint.
260: 7         The confidence intervals reflect the
260: 8 variation on that point estimate of .2.  So the
260: 9 point estimate of .2 means that the risk of having
260:10 a myocardial infarction with naproxen was only 20
260:11 percent that of taking naproxen --
260:12     Q.  Than taking Vioxx; is that right?  I'm
260:13 sorry, Doctor, I think you may have misspoken.
260:14     A.  Oh, did I?
260:15     Q.  The relative risk of naproxen was 20
260:16 percent --
260:17     A.  Of rofecoxib.
260:18     Q.  Of rofecoxib?
260:19     A.  Yeah.
260:20     Q.  I'm sorry.  Go ahead.
260:21     A.  That's okay.  Go ahead.
260:22     Q.  So that's another way of saying, if someone
260:23 read this, that's another way of saying that the
260:24 rate of heart attacks on naproxen was one-fifth the
261: Page 261
261: 1 rate of heart attacks on Vioxx, roughly; is that
261: 2 correct?
261: 3     A.  Yes.
261: 4     Q.  And, conversely, and I think we discussed

```
261: 5 this this morning, that's another way of saying
261: 6 that the relative risk -- that the risk of
261: 7 myocardial infarctions on Vioxx was five times that
261: 8 of the relative risk -- sorry, the risk of heart
261: 9 attacks on naproxen; is that correct?
```

Page Range:     261:11-262:4

```
261:11    A.  Yeah, it doesn't say that here.  The
261:12 authors chose and the editors allowed to go through
261:13 the statement that naproxen was protective.
261:14          So that is the way it is stated here in
261:15 this summary, but it doesn't acknowledge the other
261:16 hypothesis here in the abstract.
261:17    Q.  Well --
261:18    A.  The other hypothesis being just what you
261:19 said:  That the risk of heart attack is five times
261:20 greater with naproxen -- with rofecoxib than with
261:21 naproxen.
261:22    Q.  Well, it's fair to say, isn't it, Doctor,
261:23 that neither hypothesis is really discussed in this
261:24 abstract?
262: Page 262
262: 1          What is discussed in the abstract is
262: 2 that the incidence on naproxen was lower than that
262: 3 on the Vioxx and that the magnitude of that
262: 4 difference was about fivefold; is that fair?
```

Page Range:     262:6-262:9

```
262: 6    A.  Yes.  But again, that's only one
262: 7 possibility.  The implication here is that naproxen
262: 8 is protective.  Now, of course, we know -- we know
262: 9 now that that is not true at all.
```

Page Range:     262:12-263:10

```
262:12    A.  It's not true at all, okay?
262:13    Q.  Yes.  But specifically, at least anyone
262:14 reading this first page of this article would know
262:15 that there was a fivefold difference between the
262:16 incidence of heart attacks on Vioxx and naproxen.
262:17 Whether that was a result of a protective effect of
262:18 naproxen or some effect of Vioxx, they would know
262:19 from reading this first page that there was a
262:20 fivefold difference in heart attacks?
262:21    A.  No.  I disagree with that.
262:22          They are being told that there are
262:23 fewer events with naproxen.  The clear implication
262:24 there is that naproxen is protective and not that
263: Page 263
263: 1 rofecoxib is deleterious.
263: 2    Q.  Right.  I understand -- and I understand
263: 3 that that is your view, Doctor, but my question is
263: 4 just, specifically, they wouldn't -- a person
263: 5 reading the first page of this article would know
263: 6 that there was a fivefold difference between the
```

263: 7 two -- that there were different rates of heart
263: 8 attacks on naproxen and rofecoxib?  They wouldn't
263: 9 have had to read past the abstract to understand
263:10 that particular fact?

Page Range:      263:12-263:17

263:12      A.  Yes.  They would know that particular fact,
263:13 but they would also take away the secondary fact
263:14 that the clear implication is that naproxen is
263:15 protective.
263:16      Q.  Okay.
263:17      A.  And we know now that that is not true.

Page Range:      263:21-264:16

263:21           The further -- the "Results" section
263:22 goes on further to state that, "The overall
263:23 mortality rate and the rate of death from
263:24 cardiovascular causes were similar in the two
264: Page 264
264: 1 groups."
264: 2           Do you see that?
264: 3      A.  Yes, I do.  With very low statistical
264: 4 power, that doesn't say that there, but I think we
264: 5 should bring into this that this study was not even
264: 6 close to be powered for cardiovascular mortality.
264: 7      Q.  Right.  The study -- this study was powered
264: 8 with respect to its primarily endpoint of
264: 9 gastrointestinal bleeding; is that correct?
264:10      A.  Yes.
264:11      Q.  And the same -- the same really holds true
264:12 with all of the cardiovascular events that are
264:13 being discussed here.  We are talking about low
264:14 number of events, and there is fairly low power to
264:15 make any determinations about the cardiovascular
264:16 events in this study; is that correct?

Page Range:      264:18-265:7

264:18      A.  No.  I wouldn't agree with that.
264:19           It's true that cardiovascular endpoints
264:20 were not the primary endpoints in the trial; but
264:21 the numerical data that we went through this
264:22 morning, I think that valid conclusions about
264:23 cardiac toxicity can be drawn from those data.
264:24           It's not that there are too few of them
265: Page 265
265: 1 that we can't say anything about it, that we can't
265: 2 validly assess cardiovascular toxicity from all of
265: 3 those tables of data that we reviewed this morning.
265: 4           There is very important information in
265: 5 those tables of data that indicate a very clear
265: 6 signal about the cardiac toxicity of rofecoxib, and
265: 7 we shouldn't sweep that under the rug.

Page Range:        267:15-269:6

267:15              Doctor if you could also take a look at
267:16 Exhibit 16, which -- I'm sorry -- 17, which is one
267:17 of the exhibits we looked at this morning, and I
267:18 would refer you specifically to Page 25 of that
267:19 exhibit, which is one -- which is the table that
267:20 you talked about this morning.
267:21              Are you there, Doctor?
267:22     A.  Yes, I am.
267:23     Q.  Okay.  Thanks.
267:24              Just taking a look at this table, this
268: Page 268
268: 1 was the table that you talked about this morning,
268: 2 and this table did not ultimately appear in the
268: 3 final published VIGOR article as a table, correct?
268: 4     A.  That's correct.
268: 5     Q.  I just want to go over some of the -- I
268: 6 just want to go over the percentages that appear in
268: 7 that table and confirm that those percentages do in
268: 8 fact appear in the text of the final VIGOR article
268: 9 with you.
268:10              Specifically, if you look at the first
268:11 row on Table 5 on Page 25, you have all deaths and
268:12 the percentages there are 0.5 percent and 0.4
268:13 percent.
268:14              Do you see those?
268:15     A.  Yes, I do.
268:16     Q.  And if you look at the second sentence
268:17 under "General Safety" it states that, "The
268:18 mortality rate was 0.5 percent in the rofecoxib
268:19 group and 0.4 percent in the naproxen group."
268:20              Do you see that?
268:21     A.  Yes.
268:22     Q.  So those percentage were disclosed in the
268:23 text of the article; is that correct?
268:24     A.  That's correct.
269: Page 269
269: 1     Q.  And then if you go to the -- back to Page
269: 2 25 of Exhibit 17, if you look at cardiovascular
269: 3 deaths, the percentages are 0.2 percent and 0.2
269: 4 percent.
269: 5              Do you see that?
269: 6     A.  Yes, I do.


Page Range:        269:7-269:16

269: 7     Q.  And in the next sentence, moving to the
269: 8 next sentence of the published VIGOR article, it
269: 9 states, "The rate of death from cardiovascular
269:10 causes was 0.2 percent in both groups"; is that
269:11 correct?
269:12     A.  Correct.
269:13     Q.  So, again, the percentage of cardiovascular
269:14 deaths from Table 5 do appear in the text of the
269:15 final published VIGOR article; is that correct?
269:16     A.  The percentages do, yes.

Page Range:      269:19-270:6

269:19      Q.  Then if you go to -- I am going to skip the
269:20 third row, which is composite endpoint, and go to
269:21 the next row, which is myocardial infarction, and
269:22 that has -- the percentages from the table are 0.4
269:23 percent and 0.1 percent; is that correct?
269:24      A.  Right.
270: Page 270
270: 1      Q.  The corresponding sentence in the published
270: 2 paper states that, "Myocardial infarctions were
270: 3 less common in the naproxen group than in the
270: 4 rofecoxib group, 0.1 percent versus 0.4 percent,"
270: 5 and then gives the 95 percent confidence interval
270: 6 and relative risk; is that correct?


Page Range:      270:8-274:1

270: 8      A.  Yes, uh-huh.
270: 9      Q.  So, again, the percentages of the
270:10 myocardial infarction that occurred in both the
270:11 Vioxx arm and the naproxen arm of the study from
270:12 this Table 5 here do appear in the text of the
270:13 final published VIGOR article; is that correct?
270:14      A.  The percentages do, yes.
270:15           You breezed by the third entry on the
270:16 table.
270:17      Q.  Yes.  No.  I will come back to that.
270:18      A.  You will come back to that?
270:19      Q.  I will.  Yes.
270:20           And the final row of Table 5 is
270:21 ischemic cerebrovascular accidents, which are
270:22 essentially a type of stroke; is that correct,
270:23 Doctor?
270:24      A.  Correct.
271: Page 271
271: 1      Q.  And the percentages in.that table are 0.2
271: 2 percent on Vioxx and 0.2 percent in the naproxen.
271: 3           Do you see that?
271: 4      A.  Yes, I do.
271: 5      Q.  And I think I skipped this sentence before.
271: 6 It's above the prior one in the final published
271: 7 article, but it states, "Ischemic cerebrovascular
271: 8 events occurred in 0.2 percent of the patients in
271: 9 each group"; is that correct?
271:10      A.  Yes.
271:11      Q.  So, again, the percentages of stroke in
271:12 both the Vioxx arm -- the percentage of patients
271:13 who suffered from a stroke in both the Vioxx arm
271:14 and the naproxen arm that were in this table also
271:15 appeared in the text of the final published
271:16 article; is that correct?
271:17      A.  The percentages did, yes.
271:18      Q.  And then the -- you mentioned the composite
271:19 endpoint, which was the -- which was the third row
271:20 on the table, and the specific percentages in that
271:21 table do not appear in the final published article;
271:22 is that correct?
271:23      A.  That's correct.

271:24      Q.  But what those -- what that composite
272: Page 272
272: 1 endpoint reflects is an addition of the percentages
272: 2 of cardiovascular deaths, nonfatal heart attacks
272: 3 and strokes; is that correct?
272: 4      A.  That's correct.
272: 5              And what you are asking the reader to
272: 6 do is do the addition for himself or herself rather
272: 7 than presenting it in a nice clear way, and of
272: 8 course, that's exactly what the percentages do,
272: 9 too.
272:10              In presenting percentages without raw
272:11 numbers, you are asking the reader then to do the
272:12 math, to go back to the total number of patients
272:13 and take .2 percent of that number and go through a
272:14 lot of calculations that almost no reader would do.
272:15              It's -- in other words, the data in the
272:16 text are summary percentages data, but they are
272:17 rather lacking in total clarity by not having the
272:18 actual patient numbers there.
272:19              In my opinion, the Table 5 that you're
272:20 asking us to look at is a much clearer presentation
272:21 of these data, much more helpful; and if I had to
272:22 do it over, I think that this is the way we would
272:23 have wanted to display these particular data.
272:24      Q.  But to be fair, in order to figure out
273: Page 273
273: 1 roughly the number of patients with each of these
273: 2 events, all you have to do is multiply the
273: 3 percentage times the number of patients in the
273: 4 study; is that correct?
273: 5      A.  And as an editor, if you are -- if that's
273: 6 the way you're going to run your journal, I'm not
273: 7 going to subscribe to your journal, because you are
273: 8 asking the reader to do too much.
273: 9              You are asking the reader to do the
273:10 math.  You should do the math, and it is your job
273:11 -- it is my job as editor to make sure that readers
273:12 don't have to do the math, that for important
273:13 endpoints that the data are very clearly presented
273:14 so that the reader doesn't have to go through and
273:15 do these calculations.
273:16              It's the job of those writing the
273:17 paper, and in fairness, I am taking some
273:18 responsibility myself, responsibility of the
273:19 editors is to ensure that such data are presented
273:20 in a way that that kind of additional step on the
273:21 part of a reader wouldn't be necessary.
273:22      Q.  And in this particular case, neither The
273:23 Journal nor the reviewer requested that authors
273:24 provide actual numbers as opposed to percentages;
274: Page 274
274: 1 is that correct?


Page Range:      274:3-275:17


274: 3      A.  I go back to the statement I made earlier,
274: 4 Attorney Fitzpatrick, that if, the expectation on
274: 5 the part of editors and journals is that if you

274: 6 don't ask for it, it's your tough luck.  That's not
274: 7 fair.
274: 8     Q.  I understand.
274: 9     A.  There aren't enough editors in the world to
274:10 ask all of the questions that would have to be
274:11 asked to pull together a whole article.
274:12     Q.  Right.
274:13     A.  There aren't enough editors in the world to
274:14 ask all those questions.  There is expectation in
274:15 the scholarly community that there will be an
274:16 honest and comprehensive providing of the data in a
274:17 submitted manuscript.  That's the expectation.
274:18     Q.  I understand.  And I am just saying,
274:19 assuming in this particular case that the authors,
274:20 the 12 authors from the various institutions around
274:21 the world, believed that this was an appropriate
274:22 way to present the data, no one at New England
274:23 Journal or none of the reviewers appeared to
274:24 disagree with this type of presentation and
275: Page 275
275: 1 required them to do another type of presentation
275: 2 and present the raw numbers; is that correct?
275: 3     A.  That is a correct statement, but it still
275: 4 doesn't make it right.  It still doesn't make it
275: 5 right.
275: 6         You can't conclude from what you just
275: 7 said that the presentation of the cardiovascular
275: 8 data in the VIGOR trial were an appropriate way of
275: 9 presenting the data.
275:10         Another perfectly valid conclusion is
275:11 that both the authors and the editors slipped up.
275:12     Q.  Okay.  But someone who is reading the
275:13 general safety section would be able to glean at
275:14 least the percentages of the patients in each group
275:15 that had the various types of events that are
275:16 described here, including heart attacks and
275:17 strokes; is that correct?


Page Range:      275:19-277:8


275:19     A.  The percentages, yes.
275:20     Q.  And if the reader wanted to do the --
275:21 wanted to figure out the rough number of patients
275:22 in each group that had these events, they could do
275:23 the multiplication problem and determine that
275:24 number of events.
276: Page 276
276: 1         If they -- if they believed it would be
276: 2 more helpful to them to know the numbers rather
276: 3 than the percentages, they could do that from the
276: 4 information that's provided in the paper; is that
276: 5 correct?
276: 6     A.  It's always more helpful to know the
276: 7 numbers.  Always.  And I go back to what I said
276: 8 earlier, that it would have been difficult to do
276: 9 this math.  You would have to figure out:  What am
276:10 I multiplying together?  It's not entirely clear
276:11 what you would multiply the .2 by to get the
276:12 answer.

```
276:13              Do you know?
276:14      Q.  Well --
276:15      A.  Can you tell me?
276:16      Q.  Yes.  You multiply it by the number of
276:17 patients --
276:18      A.  What is that number?  What is that number?
276:19      Q.  It's approximately 4,000.
276:20      A.  Well, approximate isn't going to be good
276:21 enough.
276:22              You have -- what I am saying is that
276:23 even you, you know, you have been studying this
276:24 stuff, you would have to go through and find those
277: Page 277
277: 1 total numbers of patients and then do the
277: 2 multiplication; and what I am saying is that that
277: 3 is making it hard for the reader to get the answer.
277: 4          The whole point of publishing journal
277: 5 articles is to make it easy for readers to get to
277: 6 the answer.  That's what we spend a lot of our time
277: 7 doing, and we need the help and cooperation of the
277: 8 authors to do that.


Page Range:      279:15-280:23

279:15      Q.  And, Doctor, just continuing with our
279:16 discussion of some of the data that were presented
279:17 in the "General Safety" section of the VIGOR study,
279:18 which is 1523 of Exhibit 11.
279:19              Are you there?
279:20      A.  Yes.
279:21      Q.  After the data we talked about, the article
279:22 describes that four percent of the study subjects
279:23 met the criteria of the FDA for the use of aspirin
279:24 for secondary cardiovascular prophylaxis -- and
280: Page 280
280: 1 then it describes that indication -- but were not
280: 2 taking low-dose aspirin therapy.
280: 3          Do you see that?
280: 4      A.  Yes.
280: 5      Q.  And the article states that these patients
280: 6 accounted for 38 percent of the patients in the
280: 7 study who had myocardial infarctions, or heart
280: 8 attacks; is that correct?
280: 9      A.  Yes.
280:10      Q.  And then the article goes on to describe
280:11 the difference that was seen in the patients who
280:12 were not indicated for low-dose aspirin, and states
280:13 that, "In the other patients, the difference in the
280:14 rate of myocardial infarction between groups was
280:15 not significant, 0.2 percent in the rofecoxib group
280:16 and 0.1 percent in the naproxen group."
280:17              Do you see that?
280:18      A.  Yes.
280:19      Q.  So you -- would you agree, at least, that
280:20 the fact that there was still a difference, albeit
280:21 not statistically significant, in the rate of heart
280:22 attacks among the nonaspirin-indicated patients is
280:23 disclosed in the article?
```

Page Range:       281:1-281:8

281: 1       A.  Well, your clients held back three of the
281: 2 heart attacks.
281: 3       Q.  Yes.
281: 4             But my question, Doctor, was
281: 5 specifically, is the fact that there is a
281: 6 difference in the rate of heart attacks in the
281: 7 patients who were not indicated for low-dose
281: 8 aspirin disclosed in the article; is that correct?

Page Range:       281:10-281:16

281:10       A.  Your client withheld three of the heart
281:11 attacks, and therefore, these numbers are not
281:12 really the final accurate numbers.
281:13       Q.  When you say -- when you say Merck withheld
281:14 heart attacks, you are -- you are not stating Merck
281:15 withheld any of the heart attacks from the FDA, are
281:16 you?

Page Range:       281:18-283:1

281:18       A.  No.
281:19       Q.  In fact, Merck disclosed those heart
281:20 attacks to the FDA, as far as you can tell; is that
281:21 correct?
281:22       A.  That's the way I learned about them.
281:23       Q.  Right.  And that's how you learned about
281:24 them --
282: Page 282
282: 1       A.  After this was published.
282: 2       Q.  Right.  I understand.  But so Merck did --
282: 3       A.  I am the responsible editor and I find out
282: 4 after --
282: 5       Q.  Right.
282: 6       A.  -- it was published.
282: 7       Q.  But we do -- we are in agreement that Merck
282: 8 did disclose the three heart attacks that you are
282: 9 referring to to the FDA; is that correct?
282:10       A.  To the FDA, but not to us.
282:11       Q.  Right.
282:12             And are you aware, Doctor, that this --
282:13 that the analysis that was presented of the data
282:14 that was given to The New England Journal of
282:15 Medicine was an analysis of the events that had
282:16 occurred as of a certain date?
282:17       A.  I am very well aware of that, and I also
282:18 think that, regardless of that arbitrary date, that
282:19 we are talking about peoples lives, and one trumps
282:20 the other.
282:21       Q.  No.  I understand.
282:22             Are you aware that the date cutoff that
282:23 I mentioned was pre-specified in the protocol as
282:24 the primary analysis of safety that would be done
283: Page 283
283: 1 in the study?

Page Range:        283:3-283:14

283: 3     A.  Yes.  And that I still contend is a minor
283: 4 technicality compared to the overriding importance
283: 5 of these sorts of data to the health of the public.
283: 6     Q.  Right.
283: 7          And you don't dispute that the data
283: 8 that's in this article is an accurate portrayal of
283: 9 the data, at least as of that cutoff point?
283:10          I understand that you disagree with the
283:11 use of that cutoff point, but as of that pre-
283:12 specified primary cutoff point, you agree that the
283:13 data presented in this article is accurate; is
283:14 that?


Page Range:        283:16-284:16

283:16     A.  The article didn't even include the numbers
283:17 of patients.  So the percentages were accurate as
283:18 of that time but didn't even include the numbers of
283:19 patients.
283:20     Q.  Right.  But we agree --
283:21     A.  And --
283:22     Q.  I'm sorry.
283:23     A.  And the question that you are posing is
283:24 really off point.
284: Page 284
284: 1          I don't care what the situation was as
284: 2 of that date, wherever it was -- I can't remember
284: 3 -- the cutoff date that was supposedly
284: 4 pre-specified.
284: 5          That really doesn't matter when further
284: 6 data of extreme importance to the interpretation of
284: 7 this very important health matter was at stake.
284: 8 The data should have been provided The Journal, and
284: 9 they weren't provided to The Journal, and that's
284:10 where the story ends --
284:11     Q.  Right.  I understand.
284:12     A.  -- for me.
284:13     Q.  I understand.
284:14     A.  As the responsible editor, not to have been
284:15 provided with those data just is not right.  There
284:16 is something not right about that.


Page Range:        284:19-285:1

284:19     Q.  And just to state my question again, I
284:20 understand that you might not feel this is the
284:21 appropriate question, but you do agree, at least as
284:22 of the pre-specified cutoff date, the percentages
284:23 of events that occurred in each arm of the study is
284:24 presented accurately in this article; is that
285: Page 285
285: 1 correct?

Page Range:        285:4-285:14

```
285: 4      A.  The data that came after that were not, and
285: 5 those data are critical, critical to the
285: 6 interpretation of --
285: 7      Q.  Yes.
285: 8      A.  -- this study.
285: 9      Q.  I understand.
285:10              But can you -- can you answer my
285:11 question with respect to the data that existed
285:12 prior to the pre-specified cutoff point, and were
285:13 in fact the percentages presented accurately with
285:14 respect to that?
```

Page Range:        285:17-285:24

```
285:17      A.  They were, but I don't think that's the
285:18 relevant question.
285:19      Q.  Fair enough.
285:20      A.  You are talking to a doctor and a
285:21 cardiologist who cares and who has cared for many
285:22 patients with heart attacks, and to withhold three
285:23 of them like that is wrong.
285:24      Q.  I understand.
```

Page Range:        286:3-286:14

```
286: 3              When you're referring to withholding,
286: 4 you are referring to what was submitted to editors
286: 5 of The New England Journal, but these heart attacks
286: 6 were in fact disclosed to the FDA.
286: 7      A.  Are we not important?
286: 8      Q.  Of course not.  No, of course not, Doctor.
286: 9      A.  Is The New England Journal not important?
286:10      Q.  Of course not.  We are in agreement.
286:11      A.  Then why weren't we given the data?
286:12      Q.  We are in agreement about the importance
286:13 of --
286:14      A.  Why weren't we given the data?
```

Page Range:        287:11-287:14

```
287:11      Q.  So, Doctor, my specific question now is the
287:12 data you are referring to, the myocardial
287:13 infarction data from VIGOR, was disclosed to the
287:14 FDA; is that correct?
```

Page Range:        287:16-287:16

```
287:16      A.  Yes.  They are on the FDA Website, yes.
```

Page Range:        288:4-289:1

```
288: 4      Q.  Doctor, could you turn to the "Discussion"
288: 5 section of the VIGOR manuscript, which begins on
```

```
288: 6 Page 1525, and just as a general matter, is it fair
288: 7 to say that the "Discussion" section is where the
288: 8 authors include their interpretation and analysis
288: 9 of the data that they have presented in the study?
288:10     A.  It's their interpretation of the data.  The
288:11 data analysis is presented in the "Results"
288:12 section.
288:13     Q.  Okay.  Thank you.
288:14         So the authors' interpretation of the
288:15 data appears in the "Discussion" section; is that
288:16 correct?
288:17     A.  That's correct.
288:18     Q.  Okay.  And if you could, Doctor, please
288:19 turn to Page 1526 of the "Discussion" section, and
288:20 specifically looking at the right-hand column, and
288:21 the one, two, three, fourth paragraph down, the
288:22 paragraph that begins with, "The overall mortality
288:23 rate was similar in the two groups."
288:24             Do you see that?
289: Page 289
289: 1     A.  Yes, I do.
```

Page Range:        289:9-289:24

```
289: 9     Q.  Sure.  This paragraph here contains a
289:10 discussion of some data that we had been talking
289:11 about before, including another reference to the
289:12 significantly lower rate of myocardial infarctions
289:13 in the naproxen group, and again gives the
289:14 percentages as 0.1 percent versus 0.4 percent; is
289:15 that correct?
289:16     A.  That's correct.
289:17     Q.  Then if we move down to the next paragraph,
289:18 this paragraph discusses some of the basic science
289:19 surrounding naproxen, including the fact that it
289:20 inhibits the production of thromboxane by 95
289:21 percent and aggregation by 88 percent, and that
289:22 effect is maintained throughout the dosing
289:23 interval.
289:24             Do you see that?
```

Page Range:        290:2-290:2

```
290: 2     A.  I do see that.
```

Page Range:        290:11-290:14

```
290:11     Q.  All I am asking at this point is, does the
290:12 document in fact say, "Therefore, the events of the
290:13 regular use of naproxen may be similar to those of
290:14 aspirin"; is that correct?
```

Page Range:        290:16-290:20

```
290:16     A.  It's correct, what you have read.  That's
290:17 what it says there, yes.
```

290:18    Q.  And is it fair to say that this represented
290:19 the interpretation of the authors of this data at
290:20 that time; is that correct?


Page Range:    290:22-290:22

    290:22    A.  Of the authors, yes.


Page Range:    291:3-291:7

    291: 3            Is it fair to say that none of the
    291: 4 outside reviewers who reviewed the manuscript took
    291: 5 issue with this particular section of the
    291: 6 discussion at this point?
    291: 7    A.  That's correct.


Page Range:    291:8-291:13

    291: 8    Q.  And it's also true that the editors of The
    291: 9 New England Journal at least felt it was
    291:10 appropriate to allow the authors to include this
    291:11 interpretation of the data in the discussion
    291:12 section and to be published in The New England
    291:13 Journal?


Page Range:    291:15-291:17

    291:15    A.  Yeah, we signed off on this, and I have
    291:16 many times had second thoughts about having done
    291:17 that.


Page Range:    292:24-293:5

    292:24            What I am asking specifically right now
    293: Page 293
    293: 1 is limited to at that time, and my question is just
    293: 2 specifically that at that time the editors believed
    293: 3 it was appropriate to allow the authors to include
    293: 4 this interpretation of the data in the "Discussion"
    293: 5 section; is that fair?


Page Range:    293:8-294:6

    293: 8    A.  There were no changes made by the editors
    293: 9 to this part of the "Discussion" section.
    293:10    Q.  Okay.  And similarly, at that time in 2000
    293:11 when the editors, with the review of one of The
    293:12 Journal statistical consultants, believed that it
    293:13 was appropriate to allow the authors to include
    293:14 percentage data with respect to the cardiovascular
    293:15 events, as opposed to exact numerical data; is that
    293:16 correct?  And again at that time.
    293:17    A.  Today we saw what display data were really
    293:18 available at that time for the first time for me;

```
293:19 and having seen those data, which the authors of
293:20 the article had at that time, I would have wanted
293:21 to have been informed about those data, which were
293:22 available at that time, but I saw for the first
293:23 time today.  I would have been -- I would have
293:24 wanted to have seen those data.
294: Page 294
294: 1     Q.  To be fair, Doctor, when you are talking
294: 2 about the actual number of events as opposed to the
294: 3 percentages, it's not surprising that the authors
294: 4 had the actual number of events as opposed to the
294: 5 percentages?  You would need that number in order
294: 6 to calculate the percentages; is that fair?
```

Page Range:      294:8-294:13

```
294: 8     A.  Yes.  And I would have wanted to see that
294: 9 Table 5 where the actual numbers were.
294:10             I would have also wanted to have been
294:11 informed about the three additional heart attacks
294:12 that were totally omitted from any consideration,
294:13 including the calculations of the percentages.
```

Page Range:      305:3-306:2

```
305: 3     Q.  Okay.  Doctor, if you could take a look at
305: 4 Exhibit 29, which I think is the last exhibit we
305: 5 are looking at.
305: 6     A.  Right.
305: 7     Q.  And, specifically, if you look at Point
305: 8 No. 3.  This is one of the suggestions you made to
305: 9 Dr. Baron, and you were, I believe you testified,
305:10 consolidating some of the comments that the
305:11 reviewers had made in review of the APPROVe
305:12 manuscript; is that correct?
305:13     A.  That's correct.
305:14     Q.  And as your letter reads, the suggestion is
305:15 to "show the Kaplan-Meyer curves for all serious CV
305:16 events to demonstrate the early separation.  These
305:17 curves should become Figure 2A, while the current
305:18 Kaplan-Meyer curve should become Figure 2B"; is
305:19 that correct?
305:20     A.  That's correct.
305:21     Q.  Your point here, and the reviewer's point
305:22 here was to include other cardiovascular events
305:23 besides the adjudicated thrombotic events that had
305:24 appeared in the original manuscript, events such as
306: Page 306
306: 1 congestive heart failure; is that correct?
306: 2     A.  Right.
```

Page Range:      306:10-308:5

```
306:10             And the authors followed your
306:11 suggestion and included what became Figure 3 in the
306:12 final published paper which included investigator-
306:13 reported congestive heart failure, pulmonary edema
```

306:14 and cardiac failure events, correct?
306:15      A.  That's correct.
306:16      Q.  And as you said, when you look at those
306:17 events, the lines separate almost immediately,
306:18 certainly near the beginning of the study; is that
306:19 correct?
306:20      A.  Yeah, I would say immediately.  Yes,
306:21 uh-huh.
306:22      Q.  Okay.  And these data were presented to
306:23 your satisfaction and the editors of The Journal's
306:24 satisfaction in the final published article; is
307: Page 307
307: 1 that correct?
307: 2      A.  Based on what we were given at that time,
307: 3 we thought that we had the story we needed to have.
307: 4           Now, of course, today, we know there is
307: 5 more to the story, that I just found out today,
307: 6 that I didn't know then.
307: 7      Q.  Well, isn't what - isn't what you saw today
307: 8 essentially just what would have been Figure 2
307: 9 combined with Figure 3?  It would have been the
307:10 adjudicated events plus the investigator-reported
307:11 congestive heart failure, PE and cardiac failure
307:12 events?
307:13      A.  I don't have that curve in front of me
307:14 anymore, but I thought that it included even more
307:15 data than that.  I would have to see that curve --
307:16      Q.  Okay.  Well, if --
307:17      A.  -- but I don't have it here.
307:18      Q.  No.  That's fine.  We don't need to go into
307:19 that level of detail, but --
307:20      A.  It's a curve that I would have wanted to
307:21 have had the opportunity to see during the course
307:22 of the review process.
307:23           It would have been helpful to have seen
307:24 that during the course of the review process, based
308: Page 308
308: 1 on my recollection of what I saw earlier today.
308: 2      Q.  But if in fact that curve was basically
308: 3 just combining the data from these two curves, then
308: 4 you would agree that you believe that data were --
308: 5 those data were presented satisfactorily --

Page Range:      308:7-308:8

308: 7      Q.  -- in these two figures, and that's making
308: 8 the assumption that that is what that curve was?

Page Range:      308:10-309:2

308:10      A.  I am not sure your assumption is correct.
308:11           I think there were other events in
308:12 there; but in any event, a reader shouldn't have to
308:13 somehow in their mind combine the two curves.  That
308:14 is asking too much of a reader and certainly too
308:15 much of an editor.
308:16           Again, I'm not saying that we would
308:17 have necessarily published that additional Kaplan-

308:18 Meyer curve that we saw earlier today, but we
308:19 certainly would have liked to have seen it, so that
308:20 we could have considered it along with the two
308:21 other figures that we did publish and try to make a
308:22 judgment, our best judgment, as to whether or not
308:23 it would have added additional information in a way
308:24 that would have made it important to publish.
309: Page 309
309: 1          But we never saw it.  I never saw it
309: 2 until today.


Page Range:     309:19-310:9

309:19          The third paragraph from the bottom
309:20 states, "The editors recognize that we are asking
309:21 for extensive changes, but we hope you will be able
309:22 to complete the revisions very soon, given the
309:23 timely nature and the public health importance of
309:24 the topic."
310: Page 310
310: 1          Do you see that?
310: 2     A.  I do.
310: 3     Q.  And the authors did in fact complete the
310: 4 revision very quickly, did they not?
310: 5     A.  They did.
310: 6     Q.  And the paper ultimately was published by
310: 7 the target date that The Journal had hoped to have
310: 8 in The Journal?
310: 9     A.  That's correct.


Page Range:     320:2-322:21

320: 2     Q.  Okay.  If you could just take a look at
320: 3 Exhibit 8.  It's one of the exhibits from this
320: 4 morning, Doctor.
320: 5          Do you have Exhibit 8, Doctor?
320: 6     A.  I do.
320: 7     Q.  And I think you testified this morning that
320: 8 this was an earlier version of the requirements
320: 9 that we had looked at previously; is that correct?
320:10     A.  This is the uniform requirements from The
320:11 International Committee of Medical Journal Editors.
320:12 This is not our information for authors.
320:13     Q.  Okay.  And this -- was this the version of
320:14 this document that existed at the time of the VIGOR
320:15 study?
320:16     A.  As far as I know, this is the fifth
320:17 edition, the 1997 edition.
320:18     Q.  And does this -- this particular document
320:19 does not state that there is a requirement that
320:20 absolute numbers be given instead of percentage
320:21 numbers; is that correct?
320:22     A.  Well, I have to read through it.
320:23          I don't know.  Do you want to take the
320:24 time to read it?
321: Page 321
321: 1     Q.  No.  I don't want to take --
321: 2     A.  It's a number of pages.

```
321: 3    Q.  -- the time to do that.  That's fair,
321: 4 but --
321: 5    A.  Requirement or not, it's something that we
321: 6 expect from authors for a fair and accurate
321: 7 presentation of data sets.
321: 8         I would say most data sets require a
321: 9 great majority of data sets, in order to be
321:10 accurately and fairly presented, do require the
321:11 actual numbers of patients to be there and not just
321:12 percentages.
321:13         From time to time, we will allow
321:14 percentages data to be presented, but not very
321:15 often.
321:16    Q.  And did you allow it in the instance of the
321:17 VIGOR manuscript, correct?
321:18         And to be fair, you allowed the authors
321:19 of the paper to present the percentage data, is
321:20 that correct, in the VIGOR manuscript?
321:21    A.  The authors decided on their own not to
321:22 give us the raw numbers.  They deleted them from
321:23 the pre-submission version of the manuscript.  They
321:24 were deleted from the manuscript --
322: Page 322
322: 1    Q.  Doctor --
322: 2    A.  -- and for the first time we saw that --
322: 3 those numbers.
322: 4    Q.  Right.  The authors -- the authors
322: 5 presented in the manuscript the percentages, and
322: 6 after the peer-reviewed process, the editors
322: 7 allowed the authors to present the data in that
322: 8 form; is that correct?
322: 9    A.  And, again, I come back to the fact that
322:10 the --
322:11    Q.  Would you just tell me whether that part is
322:12 correct.  I understand if you have additional --
322:13    A.  No, that's not correct.  "Allow" is not the
322:14 right word here.
322:15         We did accept the paper, but we expect
322:16 authors to provide us with the information.  As I
322:17 said earlier, we can't be in a position where we
322:18 have to ask for every little thing and drag every
322:19 little thing out of the authors.  We can't do that.
322:20 That is an expectation that's unreasonable in the
322:21 scholarly community.


Total Length - 02:20:07
```

```
Curfman 2 (Multi-clip)
Curfman  2  24812      248:12-249:10

   248:12        Q.    Doctor, you had your
   248:13 deposition taken on November 21st, 2005?
   248:14        A.    Yes.
   248:15        Q.    Did you have any intention
   248:16 of writing an Expression of Concern about
   248:17 the VIGOR study before that date?
   248:18        A.    No, we did not.
   248:19        Q.    Did you formulate an
   248:20 intention to write an Expression of
   248:21 Concern on or after November 21st, 2005?
   248:22        A.    At 8:30 in the morning on
   248:23 November 22nd, Dr. Morrissey and I
   248:24 initiated discussions about some kind of
   249: Page 249
   249: 1 editorial intervention, and then we
   249: 2 continued those discussions in the
   249: 3 subsequent days, leading eventually to an
   249: 4 Expression of Concern.
   249: 5        Q.    Now, the Expression of
   249: 6 Concern itself has previously been marked
   249: 7 as Exhibit 3, and do you have that in
   249: 8 front of you?
   249: 9        A.    I can get that.  Yes, I have
   249:10 it.

Curfman  2  26014      260:14-261:13

   260:14        Q.    Doctor, in the Expression of
   260:15 Concern, did you state the relative risks
   260:16 in terms of an increase in risk with
   260:17 rofecoxib or Vioxx, rather than a
   260:18 decrease in risk with naproxen?
   260:19        A.    Yes, that's correct.
   260:20        Q.    Why did you do that?
   260:21        A.    Well, the original VIGOR
   260:22 article presented the relative risks in
   260:23 the opposite direction, the implication
   260:24 being from that presentation that
   261: Page 261
   261: 1 naproxen was protective against
   261: 2 cardiovascular disease, not that
   261: 3 rofecoxib increased the risk of heart
   261: 4 disease.
   261: 5            We now know that that is not
   261: 6 the case, and in order to set the record
   261: 7 straight, we made the decision in this
   261: 8 Expression of Concern to express the
   261: 9 relative risks as if rofecoxib increased
   261:10 the risk of cardiovascular disease.
   261:11            And, again, it was our
   261:12 interest here to correct the scientific
   261:13 record on this important point.

Curfman  2  26321      263:21-264:11

   263:21        Q.    Now, compared to the way
   263:22 that you have presented the relative risk
```

263:23 of 5 in Table 2 of the Expression of
263:24 Concern versus the .4 versus the .1
264: Page 264
264: 1 presented in the published VIGOR article,
264: 2 is it correct that there's a 20 percent
264: 3 higher relative risk of the way you've
264: 4 presented the data with all the MIs
264: 5 counted?
264: 6        A.    Yes.  Approximately 20
264: 7 percent, 19, 20 percent.
264: 8        Q.    Can you please look at the
264: 9 document marked as Exhibit 17 earlier
264:10 today which consists of the NEJM 000011
264:11 through 14, and the last two pages.

Curfman  2  26419     264:19-264:23

264:19        THE WITNESS:  Right.
264:20 BY MR. ARBITBLIT:
264:21        Q.    The last two pages being the
264:22 letter to Dr. Bombardier.
264:23        A.    Right.  I've got it.

Curfman 2 26502     265:2-265:18

265: 2        Q.    Now, could you look at
265: 3 Paragraph 1 of your letter to Dr.
265: 4 Bombardier at page NEJM 13.
265: 5              Does that paragraph reflect
265: 6 your expectation that the authors would
265: 7 correct the understatement of the
265: 8 cardiovascular risk of rofecoxib as set
265: 9 forth in the Expression of Concern?
265:10        A.    Yes.  That was our request,
265:11 based on our judgment.
265:12        Q.    And does your statement to
265:13 Dr. Bombardier, "the higher relative risk
265:14 had important public health implications
265:15 because of the large number of patients
265:16 taking rofecoxib," comport with your
265:17 testimony a moment ago as to why that
265:18 difference was important?

Curfman 2 26520     265:20-270:3

265:20        THE WITNESS:  Yes.  That's
265:21        exactly what I meant.  I don't
265:22        know if it was a close quote of
265:23        what I said.
265:24 BY MR. ARBITBLIT:
266: Page 266
266: 1        Q.    Now, going on to Paragraph 2
266: 2 of your letter to Dr. Bombardier, could
266: 3 you please read the first sentence of
266: 4 Paragraph 2?
266: 5        A.    "Inclusion of the three
266: 6 myocardial infarctions would have
266: 7 invalidated your claim in the article
266: 8 that there was a difference in the risk
266: 9 of myocardial infarction only in

266:10 high-risk patients (i.e., those in the
266:11 aspirin indicated group)."
266:12          Q.    Can you explain what you
266:13 mean by that?
266:14          A.    The authors in the VIGOR
266:15 article concluded that the difference in
266:16 rate of myocardial infarction between the
266:17 two treatment groups was present only in
266:18 high-risk patients, high risk for heart
266:19 disease, but not in low-risk patients,
266:20 low risk for heart disease.
266:21               If you add in the three
266:22 additional heart attacks that were not
266:23 reflected in the data and do the
266:24 appropriate statistical analysis for
267: Page 267
267: 1 interaction, this conclusion in the
267: 2 article is no longer sustained, and
267: 3 that's what this point is about.
267: 4          Q.    Can you explain what a test
267: 5 for interaction means?
267: 6          A.    There are two variables, the
267: 7 drug variables, rofecoxib versus
267: 8 naproxen; and second variable, aspirin
267: 9 indicated high-risk group, aspirin not
267:10 indicated low-risk group.  And an
267:11 interaction means that these two terms
267:12 will interact statistically, and the
267:13 appropriate test involves a determination
267:14 of whether there's an interaction.
267:15          Q.    And was such a test
267:16 performed by a statistician at your
267:17 request in connection with the Expression
267:18 of Concern?
267:19          A.    Yes, it was.
267:20          Q.    Can you summarize the result
267:21 of that test?
267:22          A.    The test indicated that the
267:23 risk -- the increased risk of
267:24 cardiovascular disease associated with
268: Page 268
268: 1 the use of rofecoxib or Vioxx was found
268: 2 in both the high risk and the low-risk
268: 3 groups, and it was not restricted to the
268: 4 high-risk group.
268: 5          Q.    Now, could you read the
268: 6 sentence in Paragraph 2 beginning with
268: 7 the word "Furthermore."
268: 8          A.    "Furthermore, data listed in
268: 9 Table 4 of the July 5, 2000 memorandum
268:10 (Exhibit 18 in Dr. Curfman's deposition)
268:11 on 'Adjudicated Thromboembolic Serious
268:12 Adverse Events,' directly contradict your
268:13 assertion that there was a difference in
268:14 risk only in patients for whom aspirin
268:15 was indicated."
268:16          Q.    Could you please take a look
268:17 at the July 5th memorandum, July 5, 2000
268:18 memorandum, I believe it's been marked
268:19 today as Exhibit 24 --

```
268:20        A.    Right.
268:21        Q.    -- but it also has the
268:22 exhibit sticker 18 from the previous
268:23 deposition.
268:24        A.    Right.
269: Page 269
269: 1        Q.    Is this the table you're
269: 2 referring to in Paragraph 2 of the letter
269: 3 to Dr. Bombardier?
269: 4        A.    Yes.  It's Table 4.  This is
269: 5 what I was referring to.
269: 6        Q.    Does this table indicate a
269: 7 statistically significant increased risk
269: 8 of Vioxx in both aspirin indicated and
269: 9 aspirin not indicated patients?
269:10        A.    Yes, it does.  Again, in
269:11 this particular table, the relative risks
269:12 are indicated in the reverse direction.
269:13 But the fact is that this table clearly
269:14 indicates that the increase in risk
269:15 associated with the use of rofecoxib was
269:16 present and statistically significant in
269:17 both the aspirin indicated, the high-risk
269:18 patients, high risk for heart disease,
269:19 and the lower risk group for heart
269:20 disease in whom aspirin was not
269:21 indicated.
269:22               So, the risk is present in
269:23 both groups.  When you look at the
269:24 totality of the adjudicated
270: Page 270
270: 1 thromboembolic serious adverse events,
270: 2 the conclusion in the article is not
270: 3 sustained by this table.
```

Curfman   2   27219       272:19-273:5

```
272:19        Q.    Was Figure 2 at Page 13 one
272:20 of the documents that you considered as
272:21 part of the data of which the authors
272:22 were aware as of July 5, 2000 that was
272:23 not submitted to the New England Journal?
272:24        A.    Yes, that is correct.
273: Page 273
273: 1        Q.    Is it correct also that the
273: 2 cumulative incidence of 2.5 percent as
273: 3 indicated in Figure 2 is greater than the
273: 4 incidence of cardiovascular events
273: 5 reported in the VIGOR article?
```

Curfman   2   27312       273:12-274:16

```
273:12               THE WITNESS:  Yes.  These
273:13        data were not reported at all in
273:14        the VIGOR article.  The only data
273:15        on the cardiovascular events on
273:16        VIGOR article were summary
273:17        percentage data for myocardial
273:18        infarctions, excluding the three
273:19        heart attacks that we've
```

```
273:20        discussed.
273:21             These data here include a
273:22        variety of serious thromboembolic
273:23        adverse events involving four
273:24        different vascular systems in the
274: Page 274
274: 1        body.  So, it's a much more
274: 2        comprehensive expression of the
274: 3        adverse event experiences in the
274: 4        VIGOR trial and include not just
274: 5        the coronary artery bed in the
274: 6        heart, but also the
274: 7        cerebrovascular bed perfusing the
274: 8        brain, the peripheral arterial bed
274: 9        perfusing the legs and the arms,
274:10        and the peripheral venous bed, the
274:11        venous system in the legs.
274:12             So, there are four vascular
274:13        systems that would be reflected in
274:14        this graph, and these data were
274:15        not submitted to the New England
274:16        Journal of Medicine.

Curfman  2  27609     276:9-282:8

276: 9        Q.    Now, in the letter to Dr.
276:10 Bombardier, you reference in Paragraph 3
276:11 the issue of a cutoff date; is that
276:12 correct?
276:13        A.    Yes.
276:14        Q.    Did you ever see any
276:15 document during the review process that
276:16 indicated a cutoff date for the
276:17 cardiovascular events?
276:18        A.    No.  There was no document
276:19 or no mention of this fact at all.  The
276:20 editors knew nothing about this.  The
276:21 reviewers knew nothing about this.
276:22        Q.    I want to focus your
276:23 attention on some testimony that you gave
276:24 earlier today about the meaning of
277: Page 277
277: 1 prespecified, and I'd like you to take a
277: 2 look at the actual data analysis plan for
277: 3 the VIGOR study which has been marked as
277: 4 Exhibit 28.
277: 5                   -  -  -
277: 6             (Whereupon, Deposition
277: 7        Exhibit Curfman-28, "Vioxx
277: 8        Gastrointestinal Outcomes
277: 9        Research (VIGOR) Data Analysis
277:10        Plan (Protocols 088 and 089)"
277:11        MRK-NJ0243297 - MRK-NJ0243377,
277:12        was marked for identification.)
277:13                   -  -  -
277:14 BY MR. ARBITBLIT:
277:15        Q.    It's a lengthy document.
277:16 You can take as much time as you'd like
277:17 to look at it, but I will direct your
277:18 attention, when you're ready, to a
```

277:19 particular portion of the document.
277:20          And this bears a date of
277:21 August 24, 1999 in the lower right-hand
277:22 corner.  It starts at Bates Number
277:23 MRK-NJ0243297 and continues to 377.  It's
277:24 entitled the "Vioxx Gastrointestinal
278: Page 278
278: 1 Outcomes Research (VIGOR) Data Analysis
278: 2 Plan (Protocols 088 and 089)."  Do you
278: 3 see that?
278: 4          A.    Yes, I do.
278: 5              MR. WEINBERG:  I'm sorry, is
278: 6      that 28?
278: 7              MR. ARBITBLIT:  Exhibit 28.
278: 8              (Witness reviewing
278: 9      document.)
278:10 BY MR. ARBITBLIT:
278:11          Q.    Now, Doctor, do you see that
278:12 there is an executive summary on the
278:13 first three pages of text?
278:14          A.    Right.
278:15          Q.    If you look at the bottom of
278:16 the second page bearing the last three
278:17 Bates pages 302, there is a paragraph
278:18 that starts, "According to the
278:19 prespecified plan, a total of two formal
278:20 analyses (one interim and one final) will
278:21 be performed for this study."  Do you see
278:22 that?
278:23          A.    Yes, I do.
278:24          Q.    And do you see going over on
279: Page 279
279: 1 to the next page that, the "interim
279: 2 analysis is scheduled when 60 patients
279: 3 experience confirmed PUB events, and the
279: 4 final analysis is planned when 120
279: 5 patients experience confirmed PUB events,
279: 6 40 patients experience confirmed
279: 7 complicated PUB events, or 6 months after
279: 8 the last patient was randomized,
279: 9 whichever comes last."  Do you see that?
279:10          A.    Yes, I do.
279:11          Q.    Now, if you'd look back to
279:12 the second page at the top, the meaning
279:13 of PUB is given.
279:14          A.    Right.
279:15          Q.    Do you see that?
279:16          A.    Yes.
279:17          Q.    Is that a gastrointestinal
279:18 endpoint?
279:19          A.    That is a gastrointestinal
279:20 endpoint.
279:21          Q.    Was that the primary aim of
279:22 the VIGOR study, to evaluate
279:23 gastrointestinal endpoints?
279:24          A.    Yes.
280: Page 280
280: 1          Q.    And do you see any reference
280: 2 in the statement of when the final
280: 3 analysis would be done to a prespecified

280: 4 cutoff date?
280: 5        A.    No.  This is based on the
280: 6 number of cumulative events.  And when a
280: 7 certain number of cumulative events would
280: 8 be tabulated, that would be the stopping
280: 9 point rather than a particular date.  So,
280:10 they wanted to be sure they had enough
280:11 observations, and that is the gist of
280:12 this.
280:13        Q.    Now, that would be enough
280:14 observations to evaluate the primary
280:15 endpoint.  Is that what you mean?
280:16        A.    Yes.  For statistical
280:17 analysis.
280:18        Q.    The next document is Exhibit
280:19 29, and I'll identify it for the record
280:20 while you're looking at it.
280:21                  -  -  -
280:22        (Whereupon, Deposition
280:23        Exhibit Curfman-29, Letter
280:24        12-20-99, MRK-AAX0002759, was
281: Page 281
281: 1        marked for identification.)
281: 2        -  -  -
281: 3        THE WITNESS:  Uh-huh.
281: 4        MR. ARBITBLIT:  It is a
281: 5 letter from Michael Weinblatt,
281: 6 M.D., dated December 20, 1999 to
281: 7 Alise Reicin of Merck.
281: 8 BY MR. ARBITBLIT:
281: 9        Q.    And are you there with me
281:10 now?
281:11        A.    Yes, uh-huh.
281:12        Q.    The document says, "Dear Dr.
281:13 Reicin:  We are aware that the VIGOR
281:14 trial is in its final stages.  We are
281:15 also aware that there is an adjudication
281:16 committee reviewing serious vascular
281:17 adverse experiences in the entire Vioxx
281:18 program.  Due to the interest about COX-2
281:19 inhibitors and their potential role in
281:20 vascular events, we recommend that an
281:21 analysis plan be developed to analyze
281:22 adjudicated serious vascular events in
281:23 the VIGOR trial separately from any other
281:24 planned analyses of these data.  It will
282: Page 282
282: 1 be important that these events [be]
282: 2 adjudicated blinded."  Have I read that
282: 3 correctly?
282: 4        A.    Yes.
282: 5        Q.    Does this letter indicate
282: 6 any prespecified cutoff point for the
282: 7 cardiovascular events that the DSMB
282: 8 wanted evaluated?

Curfman  2  28216      282:16-283:17

282:16        Q.    Do you see any reference to
282:17 a prespecified cutoff point in this

```
282:18 letter, Doctor?
282:19        A.    No.  There's no reference to
282:20 a prespecified cutoff point because there
282:21 never was one, as far as we knew.  The
282:22 DSMB here is asking that an analysis plan
282:23 be developed for the first time for the
282:24 cardiovascular events.  That had never
283: Page 283
283: 1 been done up to this point, dated
283: 2 December 20, 1999 on the letter.
283: 3                -  -  -
283: 4               (Whereupon, Deposition
283: 5        Exhibit Curfman-30, "Changes to
283: 6        the VIGOR Data Analysis Plan
283: 7        12/21/99," MRK-NJ0120246 -
283: 8        MRK-NJ0120247, was marked for
283: 9        identification.)
283:10                -  -  -
283:11 BY MR. ARBITBLIT:
283:12        Q.    Doctor, do you see Exhibit
283:13 30, which has a title "Changes to the
283:14 VIGOR Data Analysis Plan," December 21st,
283:15 1999, with the Bates Number MRK-NJ0120246
283:16 and 247, that's marked as Exhibit 30?
283:17        A.    Yes, I have it.
```

Curfman 2 d 28520     285:20-285:24

```
285:20               Doctor, before you finish
285:21        reading this, have you ever seen
285:22        this before?
285:23               THE WITNESS:  Not to my
285:24        knowledge, no.
```

Curfman 2  28615     286:15-286:18

```
286:15        Q.    The question is, do you see
286:16 any reference to any prespecified cutoff
286:17 points in the "Changes to the VIGOR
286:18 Analysis Plan" dated December 21st, 1999?
```

Curfman 2  28621     286:21-288:17

```
286:21               THE WITNESS:  No.  I don't
286:22        see any prespecified cutoff dates.
286:23 BY MR. ARBITBLIT:
286:24        Q.    Doctor, could you please
287: Page 287
287: 1 take a look at Exhibit 31, which I'll
287: 2 identify for the record while you're
287: 3 looking at it.
287: 4                -  -  -
287: 5               (Whereupon, Deposition
287: 6        Exhibit Curfman-31, E-mail
287: 7        12-10-05, NEJM001013, was marked
287: 8        for identification.)
287: 9                -  -  -
287:10               MR. ARBITBLIT:  It is an
287:11        e-mail.  The name of the sender is
287:12        redacted, and you and Drs.
```

```
287:13        Morrissey and Drazen are the
287:14        recipients.  And the Bates page at
287:15        the bottom is NEJM 001013.
287:16 BY MR. ARBITBLIT:
287:17        Q.    Do you see that?
287:18        A.    Yes, I do.
287:19        Q.    And is this an e-mail that
287:20 you received on or about December 10, two
287:21 days after the Expression of Concern was
287:22 published?
287:23        A.    Right.
287:24        Q.    Now, I'll have some
288: Page 288
288: 1 questions about other aspects of the
288: 2 document, but for the moment, I want to
288: 3 focus your attention on the last
288: 4 paragraph where the author refers to the
288: 5 cutoff date.  Do you see that?
288: 6        A.    Yes.
288: 7        Q.    Do you see that the author
288: 8 says, "Finally, it would be important to
288: 9 get a clear understanding of what this
288:10 'cut off date' means"?  Do you see that?
288:11        A.    Yes, I do.
288:12        Q.    Do you agree with that
288:13 statement?
288:14        A.    Yes.
288:15        Q.    Is that something that you
288:16 are evaluating as part of the process of
288:17 Expression of Concern and correction?


Curfman  2  29007     290:7-290:17


290: 7        Q.    Is there a process of
290: 8 Expression of Concern followed by
290: 9 response of the authors leading toward a
290:10 potential correction in the publication?
290:11        A.    Well, there'll be a further
290:12 response from the editors at some future
290:13 time, yes.
290:14        Q.    And as part of that process,
290:15 is it important to you to understand what
290:16 this cutoff date means as set forth in
290:17 the e-mail marked as Exhibit 31?


Curfman  2  29020     290:20-293:24


290:20        THE WITNESS:  Yes.  It's
290:21 very important, because we've
290:22 never been able to understand it.
290:23 It, to us, seemed very unorthodox
290:24 to have separate cutoff times for
291: Page 291
291: 1        one set of adverse events, as
291: 2        compared with another set of
291: 3        adverse events.  They should be
291: 4        counted for the same duration of
291: 5        time so that the safety profile of
291: 6        the drug can be validly assessed.
291: 7              If you cut off one set of
```

```
291: 8        endpoints prematurely and give
291: 9        them less time to accumulate, then
291:10        the playing field is not level in
291:11        terms of assessing the overall
291:12        safety profile of the drug.  So,
291:13        we are at a complete loss about
291:14        this prespecified cutoff point and
291:15        were never told about it in the
291:16        first place.
291:17            So, we're doubly confused,
291:18        and we hope to get some kind of
291:19        clarification from the authors as
291:20        to why this was done, since we --
291:21        I've been at the New England
291:22        Journal 20 years, handling many
291:23        clinical trials, I've never seen
291:24        it before, and so I don't
292: Page 292
292: 1        understand it.  I don't understand
292: 2        the rationale, and we've given the
292: 3        authors a chance to address that
292: 4        question.
292: 5 BY MR. ARBITBLIT:
292: 6        Q.    At the bottom of the same
292: 7 paragraph, could you read the last
292: 8 question in that paragraph?
292: 9        A.    "That" -- you mean, "That
292:10 was news to me and needs to be tied
292:11 down - when and how was that date arrived
292:12 at?"
292:13        Q.    And then following with the
292:14 last question.
292:15        A.    "If true why were these
292:16 three cases in the FDA analysis?"
292:17        Q.    Do you agree with the
292:18 question that -- I'll withdraw that.
292:19            What do you understand the
292:20 author to have been saying to you about
292:21 this issue?
292:22        A.    Well, in the first question
292:23 that I read, what he is saying is
292:24 basically what I just said, that we need
293: Page 293
293: 1 to try, if we can, to understand why
293: 2 there were separate cutoff times for the
293: 3 two sets of adverse events, which seems
293: 4 extremely unusual to us, and we don't
293: 5 understand it.
293: 6            And the second question, "if
293: 7 true, why were these three cases in the
293: 8 FDA analysis," is also very puzzling to
293: 9 me.  The three events, the three heart
293:10 attacks were included in the July 5 memo
293:11 that was prepared by the chief
293:12 statistician for the VIGOR article, and
293:13 yet despite the fact that she felt that
293:14 it was appropriate to include them among
293:15 the data in this memo that she generated,
293:16 and despite the fact that this memo is
293:17 dated July 5, 2000, early in the summer
```

```
293:18 and early in the review process of the
293:19 VIGOR article, they weren't included in
293:20 the VIGOR article.  So why are they
293:21 included here and not in the VIGOR
293:22 article?  It's confusing to me what the
293:23 rationale -- what could be the rationale
293:24 for that disconnection.
```

Curfman  2  29605     296:5-296:10

```
296: 5        Q.   Doctor, Exhibit 32 has been
296: 6 handed to you, and it is a memorandum
296: 7 from Deborah Shapiro to Drs. Bjorkman,
296: 8 Neaton, Silman and Sturrock, dated
296: 9 January 24th, 2000.  Do you see that?
296:10        A.   Yes.
```

Curfman  2  d 29712     297:12-297:15

```
297:12             So, I would ask on voir
297:13        dire, sir, have you ever seen this
297:14        document before today, Exhibit 32?
297:15             THE WITNESS:  No.
```

Curfman  2  29810     298:10-298:15

```
298:10        Q.   Do you see that in this
298:11 document Dr. Shapiro is conveying that
298:12 the Merck management requested that "a
298:13 separate analysis of the VIGOR data not
298:14 be performed"?  Do you see that
298:15 statement?
```

Curfman  2  29817     298:17-299:2

```
298:17             THE WITNESS:  Yes, I do.
298:18 BY MR. ARBITBLIT:
298:19        Q.   And do you see that "In this
298:20 case VIGOR would be pooled with all other
298:21 rheumatoid arthritis trials for analysis
298:22 at a later date"?
298:23        A.   Right.
298:24        Q.   Do you see that "They also
299: Page 299
299: 1 requested that the adjudication take
299: 2 place after data base unblinding"?
```

Curfman  2  29904     299:4-299:8

```
299: 4             THE WITNESS:  Yes, I do.
299: 5 BY MR. ARBITBLIT:
299: 6        Q.   Do you see any reference to
299: 7 a prespecified cutoff point in this
299: 8 document?
```

Curfman  2  29916     299:16-299:18

```
299:16             THE WITNESS:  This document
299:17        does not reference a prespecified
299:18        cutoff point.
```

```
Curfman  2   30010       300:10-300:16

  300:10        Q.    Exhibit 33 is a letter to
  300:11 Dr. Reicin from Dr. Weinblatt, and it is
  300:12 MRK-AAX0002760.  Do you see that Dr.
  300:13 Weinblatt writes to Dr. Reicin that he
  300:14 spoke to Dr. Shapiro, the author of the
  300:15 memo you looked at just a moment ago?
  300:16        A.    Right.

Curfman  2   30023       300:23-301:15

  300:23        Q.    Do you see that in the
  300:24 document, sir?
  301: Page 301
  301: 1        A.    Yes.
  301: 2        Q.    This is not a document
  301: 3 you've seen before; right?
  301: 4        A.    No.
  301: 5        Q.    And Merck has not --
  301: 6             MR. SHAW:  What's the date
  301: 7        of the letter you are referencing?
  301: 8             MR. ARBITBLIT:  January 24,
  301: 9        2000.
  301:10 BY MR. ARBITBLIT:
  301:11        Q.    And Merck has not provided
  301:12 you with this letter in connection with
  301:13 its claims of a prespecified cutoff date,
  301:14 has it?
  301:15        A.    No.

Curfman  2   30520       305:20-305:23

  305:20        Q.    Doctor, do you see any
  305:21 reference to a prespecified cutoff date
  305:22 in the exchange between Dr. Shapiro, Dr.
  305:23 Reicin and Dr. Weinblatt?

Curfman  2   30612       306:12-307:11

  306:12        A.    There is no mention of a
  306:13 prespecified cutoff point in this second
  306:14 request for a data analysis plan for the
  306:15 VIGOR cardiovascular data.
  306:16             - - -
  306:17             (Whereupon, Deposition
  306:18        Exhibit Curfman-34, Letter
  306:19        2-7-00, with attachments,
  306:20        MRK-NJ0243715 - MRK-NJ0243718,
  306:21        was marked for identification.)
  306:22             - - -
  306:23 BY MR. ARBITBLIT:
  306:24        Q.    Now, Doctor, are you
  307: Page 307
  307: 1 familiar with the claim by the authors
  307: 2 that there was a cutoff date of February
  307: 3 10 for cardiovascular events, February
  307: 4 10, 2000?
  307: 5        A.    I am now, yes.
```

```
307: 6        Q.      Please take a look at
307: 7 Exhibit 34, which is a letter from Alise
307: 8 Reicin to Michael Weinblatt.  I take it
307: 9 you haven't seen this one either; is that
307:10 correct?
307:11        A.      That's correct.
```

```
Curfman  2  30811      308:11-309:13
```

```
308:11        Q.      Do you see that there's a
308:12 reference to a cutoff date for reporting
308:13 of these events to Merck will be February
308:14 10th?
308:15        A.      I do.
308:16        Q.      And do you consider that a
308:17 prespecified cutoff date?
308:18        A.      Well, let's just say that
308:19 the letter is dated February 7th, and the
308:20 cutoff date is designated February 10th,
308:21 and this is called prespecified?  Not
308:22 according to any definition of
308:23 prespecified that I've ever heard, which,
308:24 as I said earlier in testimony, involves
309: Page 309
309: 1 specifying the item in advance of the
309: 2 beginning of the trial.
309: 3              So, I haven't ever heard of
309: 4 a definition of prespecified that would
309: 5 come that late in the trial.  That's
309: 6 three days shy of when they want to shut
309: 7 down tabulation of the endpoints.
309: 8        Q.      Underneath the heading,
309: 9 "Timing & Logistics," do you see the
309:10 statement, "Any events which are reported
309:11 after February 10th will be adjudicated,
309:12 however they will not be included in the
309:13 initial analyses"?
```

```
Curfman  2  30922      309:22-311:5
```

```
309:22        Q.      "Timing & Logistics.  A
309:23 cut-off date for reporting of these
309:24 events to Merck will be February 10th
310: Page 310
310: 1 (the Termination date for the study).
310: 2 Our goal is to have final packages
310: 3 retrieved from the sites by the time that
310: 4 frozen file is achieved in late April.
310: 5 It is likely that due to logistical
310: 6 purposes, the adjudication of some of
310: 7 these events will take place after
310: 8 unblinding of the database has occurred;
310: 9 however, all individuals involved in the
310:10 adjudication process will remain blinded
310:11 to individual patient treatment.  We will
310:12 do our best to ensure that events are
310:13 adjudicated and analyses are completed
310:14 prior to submission of VIGOR data to
310:15 regulatory agencies.  Any events which
310:16 are reported after February 10th will be
```

```
310:17  adjudicated, however, they will not be
310:18  included in the initial analyses."
310:19          Did I read that correctly?
310:20      A.   Yes.
310:21      Q.   Do you see any reference to
310:22  not including events reported after
310:23  February 10th in final analyses?
310:24      A.   No.
311: Page 311
311: 1      Q.   Now, do you see in the first
311: 2 paragraph that the "Merck management has
311: 3 again met to discuss the plans for
311: 4 accelerating the adjudication and
311: 5 analysis procedures"?  Do you see that?
```

Curfman   2   31124        311:24-313:7

```
311:24      Q.   "I want to share with you
312: Page 312
312: 1 Merck's plan for analyzing serious
312: 2 thromboembolic & embolic cardiovascular
312: 3 adverse experiences from the VIGOR study.
312: 4 Subsequent to your conversation with Dr.
312: 5 Shapiro on January 21, 2000, Merck
312: 6 management has again met to discuss the
312: 7 plans for accelerating the adjudication
312: 8 and analysis procedures.  The plan that
312: 9 was decided upon in these most recent
312:10 meetings should I believe address the
312:11 requests" that "you have made in your
312:12 letter to me dated January 24, 2000."
312:13          Did I read that correctly?
312:14      A.   Yes.
312:15      Q.   As of February 7, 2000,
312:16 there had been no submission to the New
312:17 England Journal about the VIGOR study,
312:18 had there?
312:19      A.   No.
312:20      Q.   And certainly the New
312:21 England Journal had not asked Merck or
312:22 its employees to accelerate adjudication
312:23 and analysis, had it?
312:24      A.   No.
313: Page 313
313: 1      Q.   Now, if you look at the
313: 2 attachment to the February 7th letter,
313: 3 MRK-NJ0243717, there's a timeline there.
313: 4 Do you see that at the top of the page,
313: 5 "projected major VIGOR milestones are as
313: 6 follows"?
313: 7      A.   Yes.
```

Curfman   2   31316        313:16-313:22

```
313:16      Q.   Do you see what the June
313:17 30th, 2000 culmination of the VIGOR
313:18 milestones is?
313:19      A.   "SNDA Filing."
313:20      Q.   Do you know what an sNDA is?
313:21      A.   It's a supplementary new
```

313:22 drug application.

Curfman   2   31601       316:1-317:19

316: 1          MR. BECK:  Yes.  This is
316: 2      Bates Number ending 3717.  So, the
316: 3      first page of the attachment, the
316: 4      portion about midway down where it
316: 5      says, "The following dates are in
316: 6      effect:  2/10/00.  Cut-off date
316: 7      for eligible events to be included
316: 8      in the analysis.  Events for which
316: 9      the WAES (Worldwide Adverse Event
316:10      Reporting System) Report has an
316:11      'initial report date' following
316:12      this date will be adjudicated, but
316:13      not included in the analysis.
316:14      Events reported by" February 10,
316:15      2000 "but for which the WAES
316:16      Report initially contains an SAE
316:17      term that is not eligible for
316:18      adjudication, and which is
316:19      subsequently revised after this
316:20      date to a term that is eligible
316:21      for adjudication, will be
316:22      adjudicated but not included in
316:23      the analysis."
316:24          MR. ARBITBLIT:  Are you
317: Page 317
317: 1      done?
317: 2          MR. BECK:  Yes.
317: 3 BY MR. ARBITBLIT:
317: 4      Q.    Now, do you see, Dr.
317: 5 Curfman, that the cutoff date from which
317: 6 counsel just read is part of a document
317: 7 bearing a date in the upper right-hand
317: 8 corner of February 10, 2000?
317: 9      A.    Yes.
317:10      Q.    Is February 10, 2000 the
317:11 same date that's created as a cutoff
317:12 date?
317:13      A.    That's correct.
317:14      Q.    Now, is a cutoff date that's
317:15 created on the termination date of the
317:16 study a prespecified cutoff date?
317:17      A.    Not according to any
317:18 definition of prespecified cutoff date
317:19 that I have ever seen.

Curfman   2   31817       318:17-319:21

318:17      Q.    Doctor, in the Expression of
318:18 Concern, one of the points that you made
318:19 was that until November of 2005, you
318:20 believed that the three MIs were late
318:21 events that were not known to the authors
318:22 in time to be included in the article
318:23 published on November 23rd, 2000;
318:24 correct?
319: Page 319

```
319: 1        A.    Yes.
319: 2        Q.    Can you please take a look
319: 3 at the document marked as Exhibit 36,
319: 4 which is a memorandum to Alise Reicin
319: 5 from Linda Nelson dated May 26, 2000,
319: 6 "Subject:  Adjudication results for 11
319: 7 events after 2/10/2000."  Do you see this
319: 8 document?
319: 9        A.    Right.
319:10        Q.    If you could turn to the
319:11 second page, do you see that there are
319:12 three myocardial infarctions with the
319:13 report dates of February 22nd, 2000,
319:14 February 17, 2000 and February 16, 2000?
319:15        A.    Right.
319:16        Q.    At any time during the
319:17 review process for the VIGOR manuscript,
319:18 did Alise Reicin inform you that she knew
319:19 the confirmed status of the three MIs
319:20 reported after February 10, 2000 no later
319:21 than May 26, 2000?
```

Curfman  2  31924      319:24-320:2

```
319:24              THE WITNESS:  None of the
320: Page 320
320: 1        authors informed the Journal about
320: 2        the three myocardial infarctions.
```

Curfman  2  32024      320:24-322:8

```
320:24        Q.    Doctor, what is Exhibit 37?
321: Page 321
321: 1        A.    This is a series of three
321: 2 e-mail messages involving our media
321: 3 specialist Karen Pedersen, myself and Dr.
321: 4 Drazen and some of the other editors.  It
321: 5 has to do with an editorial that was
321: 6 published in the Washington Post in early
321: 7 January that Karen Pedersen brought to
321: 8 our attention because she thought that it
321: 9 might contain some factual inaccuracies
321:10 and is asking us if we wanted to perhaps
321:11 respond in some way.
321:12        Q.    And did Ms. Pedersen send
321:13 you an e-mail suggesting four points that
321:14 you might make in response to the
321:15 editorial?
321:16        A.    Right.
321:17        Q.    Just to back up and identify
321:18 it for the record, it's dated January
321:19 3rd, 2006, NEJM 000280.
321:20              Doctor, did you respond to
321:21 Ms. Pedersen's e-mail concerning point
321:22 number 2 which stated, "The 3 MIs are a
321:23 trivial amount of the total data
321:24 withheld"?
322: Page 322
322: 1        A.    Yes.  I think that she
322: 2 wasn't correct about that, and I wanted
```

```
322: 3 to give her some feedback about that so
322: 4 we could correct that statement.
322: 5          Q.     Could you read the first
322: 6 paragraph, the e-mail that you sent to
322: 7 Ms. Pedersen on January 3rd, 2006 into
322: 8 the record, please?
```

Curfman   2   32214       322:14-323:16

```
322:14          A.     "The only comment I have is
322:15 about # 2.  I would not characterize the
322:16 3 MIs as trivial exactly.  It is never
322:17 appropriate to withhold data, under any
322:18 circumstances, and we don't want to
322:19 appear as if we are endorsing that
322:20 practice.  It's just that they were
322:21 withheld" -- "that they withheld not only
322:22 3 MI's, but 9 tables and two figures of
322:23 additional data, all of which, in total,
322:24 painted a very ominous picture regarding
323: Page 323
323: 1 cardiovascular toxicity of Vioxx.  They
323: 2 never revealed these data to the editors,
323: 3 and therefore readers never saw them.
323: 4 They were disclosed to FDA, but not
323: 5 posted on the FDA website until 2001,
323: 6 months after the New England Journal of
323: 7 Medicine VIGOR article was published.  In
323: 8 any case, the FDA Web site does not
323: 9 constitute publication in the usual
323:10 sense; doctors don't read the FDA Web
323:11 site - they read journals.  The cardiac
323:12 toxicity data from VIGOR have never been
323:13 published in any medical journal.  The
323:14 company wanted to keep the Journal
323:15 article pristine for purposes of
323:16 marketing.  And it worked - for a while."
```

Total Length - 00:41:02