FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 FEB 14  P 1: 54

LORETTA G. WHYTE
CLERK

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| | * | **JUDGE FALLON** |
| **This document relates to** | * | |
| **Case No. 05-4046**\* | * | |
| | * | **MAGISTRATE JUDGE KNOWLES** |
| **EVELYN IRVIN PLUNKETT** | * | |
| as Personal Representative of the Estate of | * | |
| **RICHARD IRVIN, JR.,** | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| **MERCK & CO., INC.,** | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MOTION OF MERCK & CO., INC. ("MERCK") FOR JUDGMENT AS A MATTER OF LAW

Merck, through undersigned counsel, and pursuant to Federal Rule of Civil Procedure 50(a), hereby moves the Court enter judgment in Merck's favor, as a matter of law, on all of plaintiff's claims.  The facts and law supporting this motion are more fully set forth in the accompanying memorandum and exhibit, which are incorporated as if fully set forth herein.

\_\_\_ Fee_____
\_\_\_ Process_____
X  Dktd_____
✓ CtRmDep\_799264v.1\_
\_\_\_ Doc. No._____

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:      504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:      312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone:  202-434-5000
Fax:      202-434-5029

And

Richard B. Goetz
Catalina J. Vergara
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone:  213-430-6000
Fax:      213-430-6407

Attorneys for Merck & Co., Inc.

2

799264v.1

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Motion for Judgment as a Matter of Law has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 13th day of February, 2006.

_Dorothy H. Wimberly_

799264v.1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 05-4046* | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| EVELYN IRVIN PLUNKETT | * | |
| as Personal Representative of the Estate of | * | |
| RICHARD IRVIN, JR., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM IN SUPPORT OF MOTION OF MERCK & CO., INC. ("MERCK") FOR JUDGMENT AS A MATTER OF LAW

The central question in this case is whether Vioxx, which Mr. Irvin allegedly took at a 25 mg dose for less than a month, caused his death.  Yet, after six days of testimony from over fifteen witnesses, plaintiff has presented absolutely no evidence to prove this critical element of her claims.  Nor has she introduced any testimony to show that Vioxx was in any way defectively designed.  Plaintiff has been "fully heard" on her claims against Merck, FED. R. CIV.

P. 50(a), and has failed to make any showing on specific causation or design defect.  Merck is thus entitled to judgment in its favor on all of plaintiff's claims.

## I.        THE LEGAL STANDARD.

A motion for judgment as a matter of law should be granted if, "after a party has been fully heard by the jury on an issue, 'there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue.'"  *Sur. Co. v. Pendleton Detectives of Miss., Inc.*, 182 F.3d 376, 377-78 (5th Cir. 1999) (quoting FED. R. CIV. P. 50).  "A party has been fully heard when he rests his case."  *Echeverria v. Chevron USA Inc.*, 391 F.3d 607, 610 (5th Cir. 2004).  At that time, the court "may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated."  FED. R. CIV. P. 50(a).   "A mere scintilla of evidence is insufficient to present a question for the jury."  *Rutherford v. Harris County*, 197 F.3d 173, 179 (5th Cir. 1999). Instead, "[t]here must be a conflict in substantial evidence to create a jury question."  *Id.*

## II.       MERCK IS ENTITLED TO JUDGMENT AS A MATTER OF LAW BECAUSE PLAINTIFF HAS NOT ESTABLISHED LEGAL CAUSATION.

Under Florida law, Mrs. Plunkett may prevail on her claims only if she proves, to a "reasonable degree of medical probability," that Mr. Irvin's use of Vioxx at the 25 mg dose for a period of less than a month was a "substantial factor" in bringing about his death.  *See Christopher v. Cutter Labs.*, 53 F.3d 1184, 1191 (11th Cir. 1995) (applying Florida law) (citing *Reaves v. Armstrong World Ins., Inc.*, 569 So. 2d 1307, 1309 (Fla. Dist. Ct. App. 1990) (per curiam)).  She has not only failed to meet this burden, but has offered *no* competent evidence at all on specific causation.  The closest she comes is Professor Ray's calculation that, for the small portion of Vioxx users who had a heart attack while on the drug, Vioxx was a cause just over

half the time.[1]  Even aside from the fundamental flaws of Professor Ray's calculations, they cannot prove specific causation.

What plaintiff needs – and what she failed to proffer in her case – is an expert to opine that, based upon a review of evidence specific to *Mr. Irvin*, one can both rule out other potential causes of his death, and rule in Vioxx as the cause.  To make Professor Ray's calculations even relevant, she also needs evidence that the studies upon which the Professor relies are representative of persons medically similar to Mr. Irvin.  But plaintiff has offered no testimony or other evidence that in any way links Professor Ray's conclusions to Mr. Irvin specifically. Nor has she demonstrated that Mr. Irvin's medical condition or usage of Vioxx "fit" those of the subjects of the studies upon which Professor Ray purports to rely.  None of plaintiff's expert witnesses testified that he can rule out, to a reasonable degree of medical certainty, the possibility that Mr. Irvin's heart attack resulted from his known risk factors – including age, gender, and family history of cardiovascular disease.

Professor Ray does nothing more than testify as to a matter of statistical probability, which is not the same as the Florida requirement of medical probability.  "Medical probability" considers the circumstances of an individual's medical condition in order to determine causation. "Statistical probability" is a markedly different question – one that addresses probabilities on a population-wide basis instead of focusing on the individual.  Professor Ray could not have been clearer in describing, in his own words, the limitations of his opinions:

> Q:      . . . As a pharmacoepidemiologist, you deal with these groups of people.

---

[1] Professor Ray opined, on the basis of his selective and incomplete review of epidemiological data and clinical trials, that there was a pooled relative risk of heart attack from taking Vioxx of 2.16, and that this translated into a 54% likelihood ("attributable risk") that a heart attack suffered by any patient taking Vioxx was caused by Vioxx. (*See* Feb. 7, 2006 Tr. at 376:3-378:6, attached hereto as Ex. 1.)

> You can say more likely than not, less likely than not, but you can't say "Well, the third yellow dot from the right, there was something about him that made him more likely where it was because of the medicine rather than not because of the medicine, right?"

A:   That's correct.

Q:   If anybody in the world can do it, it's not you, right?

A:   Yeah. *Well, what we can talk about is the proportion of a group, but not the individual.*

(Feb. 7, 2006 Tr. at 396:6-15 (emphasis added).)

Indeed, none of plaintiff's experts testified that Vioxx contributed in any way to Mr. Irvin's death. In the absence of such testimony, plaintiff cannot rely on Professor Ray's statistical calculations alone to prove specific causation. More than a "mere possibility" of causation is required for plaintiff to meet her burden of proof under Florida law; "pure speculation or conjecture" does not suffice. *Gooding v. University Hospital Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984) (citing Prosser, LAW OF TORTS § 41 (4th ed. 1971)). Yet such "speculation" is precisely what plaintiff has offered here. Given her failure to offer any reliable scientific evidence to distinguish Mr. Irvin's unfortunate death from the thousands of similar sudden cardiac deaths that occur every year, the Court should enter judgment for Merck as a matter of law on all of plaintiff's causes of action.

### A.   Plaintiff Cannot Meet Her Burden to Show Specific Causation Through Statistics Alone.

Merck has found no Florida case – ever – allowing proof of specific causation through mere statistical probabilities. On the contrary, in personal injury cases like this, Florida courts look to expert testimony that ties the general risks of a drug to the very specific circumstances of the individual allegedly harmed. *See Greene v. Flewelling*, 366 So. 2d 777, 780 (Fla. Dist. Ct. App. 1978) (affirming lower court's decision to set aside jury verdict based on insufficient evidence of causation, where plaintiff's loss of smell following an automobile accident was

4

connected only temporally and there was no "medical evidence" of legal causation); *see also Haggerty v. Upjohn Co.*, 950 F. Supp. 1160, 1160, 1168 (S.D. Fla. 1996) (applying Florida law) (excluding testimony of plaintiff's causation expert and granting summary judgment based on the lack of such testimony, which was "essential to all of Plaintiff's claims"), *aff'd*, 158 F.3d 588 (11th Cir. 1998).[2]  As is true in many jurisdictions, "it is necessary [in Florida] to demonstrate legal causation by expert testimony where this issue is beyond the common knowledge of laymen." *Greene*, 366 So. 2d at 780.  Professor Ray did not and could offer such expert testimony on specific causation in this case. (*See* Nov. 18, 2005 Order & Reasons at 32 (finding

---

[2] The court in *Haggerty* commented in *dictum* that "an expert need not be a medical doctor . . . to render opinions relevant to causation." *See Haggerty*, 950 F. Supp. at 1169, n.6 (citing *Byrnes v. Honda Motor Co., Ltd.*, 887 F. Supp. 279, 282 (S.D. Fla. 1994) (applying Florida law) (finding an expert on motorcycle safety unqualified to testify about motorcycle safety equipment)).  But here the issue is not whether plaintiff has offered relevant testimony, it is whether she has offered *sufficient* testimony.  Courts uniformly require expert medical testimony to show specific causation in personal injury cases involving pharmaceuticals, because such cases "involve complex questions of medical causation beyond the understanding of a lay person." *In re Baycol Prods. Litig.*, 321 F. Supp. 2d 1118, 1126 (D. Minn. 2004) (in MDL proceeding, reviewing law of numerous states and collecting cases)); *see also Lasley v. Georgetown Univ.*, 688 A.2d 1381, 1382, 1385 (D.C. Cir. 1997) (applying District of Columbia law) (explaining that "medical opinion testimony is normally required in medically complicated cases" and determining that whether an embolization procedure caused plaintiff harm was "so medically complicated" that medical testimony was required to assist the jury); *McClain v. Metabolife Int'l, Inc.*, 193 F. Supp. 2d 1252, 1258 (D. Ala. 2002) (applying Alabama law) (holding "an expert is required to prove causation in this case, as the interplay between ephedrine, caffeine, and the other ingredients in Metabolife 356, the varying states of pre-existing ill-health of Plaintiffs, and their various ultimate injuries is 'complex and technical in nature'" (citation omitted)); *Blinn v. Smith & Nephew Richards, Inc.*, 55 F. Supp. 2d 1353 (M.D. Fla. 1999) (applying Florida law) (granting summary judgment in medical device case where plaintiff presented no expert testimony on defect or causation, given that "Plaintiff would be required to provide expert testimony that the product was defective and evidence that the product caused the injury of which she complains"); *Goewey v. United States*, 886 F. Supp. 1268, 1279 (D.S.C. 1995) (applying South Carolina law) ("Where a medical causal relation issue is not one within the common knowledge of the layman, proximate cause cannot be determined without expert medical testimony.").  None of these cases – whether applying Florida law or the law of other states – has allowed proof of specific cause through statistics alone.

799285v.1

Professor Ray unqualified to testify "on the specific cause of Mr. Irvin's death").)  Plaintiff's claims thus fail as a matter of law.

It is unsurprising that Florida has not approved the use of mere statistics as a proxy for showing specific causation.  Plaintiffs typically adduce *actual evidence* that the defendant caused the plaintiff's injury.  In drug cases, plaintiffs provide expert testimony *about the individual* that rules out other potential causes and rules in the drug in question.  *See Haggerty*, 950 F. Supp. at 1166 (in a case arising from injuries allegedly sustained from ingesting a prescription sleep aid, finding the testimony of plaintiff's expert on medical causation unreliable and inadmissible under *Daubert* where the expert "failed to eliminate many possible causes . . . before arriving at her specific causation opinion").  Without such testimony, the jury has no basis to conclude the drug caused the injuries.  Here, for example, Professor Ray's calculation that 54% of the heart attacks among those on Vioxx are attributable to the drug gives no guidance to the jury on whether Mr. Irvin's heart attack was in that 54%.   The jury does not know how Vioxx would have affected Mr. Irvin or how Mr. Irvin's medical condition compares to the individuals in the Professor's calculations.  In short, the Professor's calculations provide the jury with no useful guidance at all.

Tellingly, there appears to be no case in any jurisdiction that has allowed proof of complicated medical causation questions through statistics alone.  Instead, where statistics have been used as part of the proof of specific causation, courts have uniformly required evidence that ties those statistics to the allegedly injured individual and that takes the individual's unique medical conditions into account.  Where epidemiological studies are concerned, as in this case, courts have held them insufficient to prove specific causation unless numerous relevant factors are examined, including: (i) confounding bias, sampling error and author bias; (ii) the "Bradford

Hill" factors[3]; (iii) whether the relative risk is a "reasonably accurate measure of the extent of disease caused by the agent"; (iv) whether "the plaintiff in a given case is comparable to the subjects who made up the exposed cohort in the epidemiologic study"; and (v) whether there are interactions with other causal agents.   Saks, et al., Federal Judicial Center, ANNOTATED REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (2d ed. 2006) at 540; *see also Finestone*, 2006 WL 267330, at *9 (applying Florida law) (in an action arising from injuries sustained from alleged exposure to radioactive material, noting that, in order to assess the applicability of an epidemiological study, it is necessary to consider the "Bradford Hill" criteria, including the dose-response relationship).   This particularized assessment is well-justified.   As the Reference Manual on Scientific Evidence explains,

> A plaintiff may have been exposed to a dose of the agent in question that is greater or lower than that to which those in the study were exposed.  A plaintiff may have individual factors, such as higher age than those in the study, that make it less likely that exposure to the agent caused the plaintiff's disease . . . . Pathological-mechanism evidence may be available for the plaintiff that is relevant to the cause of the plaintiff's disease. *Before any causal relative risk from an epidemiologic study can be used to estimate the probability that the agent in question caused an individual plaintiff's disease, consideration of these (and similar) factors is required.*

Saks, et al., Federal Judicial Center, ANNOTATED REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (2d ed. 2006) at 540 (emphasis added).

Courts that have considered these factors have held, in case after case, that extrapolations from trial and study data that lack any connection to the injured party are legally insufficient proof of specific causation.  For example, in *Allison v. McGhan Medical Corp.*, 184 F.3d 1322

---

[3] These factors include (i) the strength of association; (ii) consistency of association; (iii) specificity of association; (iv) temporality; (v) biological gradient or dose-response relationship; (vi) plausibility; (vii) coherence; (viii) experimental evidence; and (ix) analogy. *See Finestone v. Florida Power & Light Co*, __ F. Supp. 2d __, 2006 WL 267330, at *9 (S.D. Fla. 2006) (applying Florida law).

799285v.1

(11th Cir. 1999), the Eleventh Circuit found no evidence of specific causation where: (i) the conclusions of plaintiff's causation expert were drawn years after the alleged injury and without the benefit of examining the plaintiff; and (ii) the expert could only testify to probability. *Id.* at 1320-22 (applying Georgia law) (affirming lower court's decision to exclude plaintiff's specific causation expert and grant defendant's summary judgment motion). Similarly, in *Cano v. Everest Minerals Corp.*, 362 F. Supp. 2d 814, 824 (W.D. Tex. 2005), a Texas district court held that plaintiffs' expert could not testify about specific causation because he failed to link the epidemiological studies at the root of his opinion to the plaintiffs' specific injury. *Id.* at 853 (applying Texas law). In so holding, the *Cano* court emphasized that the expert's failure to take into account whether the plaintiffs' alleged dose was comparable to that of the study subjects was a significant factor. *Id.* at 824 ("At a minimum . . . there must be evidence from which the factfinder can conclude that the plaintiff was exposed to levels of that agent that are known to cause the kind of harm that the plaintiff claims to have suffered." (internal quotations and citations omitted)).[4]

For similar reasons, plaintiff's failure to link Professor Ray's analysis to the specifics of Mr. Irvin's medical condition and usage of Vioxx is fatal to her claims. Plaintiff has not shown a

---

[4] *See also Hull v. Merrell Dow Pharms., Inc.*, 700 F. Supp. 28, 29-30 (S.D. Fla. 1988) (applying Florida law) (declining to consider epidemiological evidence as proof of specific causation where a temporal connection was lacking); *In re Fibreboard Corp.*, 893 F.2d 706, 711-12 (5th Cir. 1990) (applying Texas law) (disapproving trial of representative cases with results extrapolated to a class of 3,000 asbestos victims, without consideration of any evidence about the individual victims, and explaining that "the estimate of relative risk is a property of the studied population, not of an individual's case"); *Washington v. Armstrong World Indus., Inc.*, 839 F.2d 1121, 1123 (5th Cir. 1988) (applying Mississippi law) (summary judgment proper when plaintiff's sole causation expert could not offer proof that plaintiff's cancer was caused by asbestos exposure; expert's conclusion "that such a link is statistically probable and cannot be ruled out on the basis of the tests performed by the treating physician" was insufficient to carry plaintiff's burden of proving causation).

799285v.1

"fit" between Professor Ray's statistical extrapolation and Mr. Irvin.  *See Finestone*, 2006 WL 267330, at *9.  No witness that plaintiff called made any attempt to show that the subjects of the studies that Professor Ray used took Vioxx at the 25 mg dose for only one month – nor could they have done so even if asked, since no studies have shown any statistically significant elevated risk from taking Vioxx at that dosage for that short a period.  In fact, not only did Professor Ray ultimately acknowledge that the data are "still pending for the 25 mg dose" (Feb. 7, 2006 Tr. at 423:3-20), he also admitted that his own epidemiological study showed that 25 mg Vioxx did not pose a statistically significant increased risk (*id.* at 410:15-411:11).  Further, the Professor made no attempt to show any similarity between Mr. Irvin and the patients in the studies upon which he relies.

Professor Ray himself testified on cross-examination that, as a pharmacoepidemiologist, he can address "the proportion of a group, but not the individual."[5]  (Feb. 7, 2006 Tr. at 366:5-15.)  By his own admission, then, his calculations offer no basis for distinguishing Mr. Irvin from the thousands of non-Vioxx users with similar risk factors who also suffered fatal heart attacks.  In other words, they cannot, in and of themselves, satisfy plaintiff's burden to prove specific

---

[5] Professor Ray's methodology is the functional equivalent of Dr. Graham's *post hoc ergo propter hoc* analysis, which this Court has ruled does not "pass[] through the gates of 702." (Feb. 8, 2006 Tr. at 750:14-17.)  Dr. Graham's purported opinion on specific cause was based on nothing more than a temporal connection and probability:

> Q:      So just so we understand your methodology for giving a specific cause opinion, the methodology you applied here suggests that, on an individual basis, you would say anyone who temporally had a heart attack while on Vioxx, more likely than not, Vioxx was a contributing cause.  Correct?

> A:      Assuming that we're talking about individuals having heart attacks based on coronary artery disease, yeah.  If you pulled an individual patient and presented it to me, I think that would be the probability, yes.

(*Id.* at 750:2-11.)  The Court has explained repeatedly that such a tenuous connection between alleged cause and effect is insufficient to prove specific causation.  (*See id.* at 749:15-751:25.)

causation.

Nor can plaintiff fill this void through testimony from Drs. Graham or Baldwin. Both doctors acknowledged Mr. Irvin had risk factors for a heart attack, including 60% occlusion of his LAD and being a borderline obese, middle-aged male with a family history of heart disease. (Feb. 9, 2006 Tr. at 851:8-852:1, 857:19-858:2, 942:10-12; *see also* Autopsy Rpt., Def. Ex. 809.) Dr. Baldwin acknowledged that there was scant medical history for Mr. Irvin that would shed light on his other risk factors. (Feb. 9, 2006 Tr. at 952:12-25.) Dr. Graham admitted that most heart attacks occur in the morning, as did Mr. Irvin's. (*Id.* at 859:3-8.) Both acknowledged that people like Mr. Irvin die from heart attacks even if they have never taken Vioxx. (*Id.* at 840:15-22, 843:22-25, 845:5-19, 853:23-854:7, 854:21-855:1, 924:14-16, 948:16-24.) Neither compared the various studies that Professor Ray relied upon with Mr. Irvin's specific medical condition, and neither testified about the impacts Vioxx would have had on Mr. Irvin. While both suggested a catalyst would be necessary to cause Mr. Irvin's heart attack – something that would put him in a "prothrombotic state" – neither said Vioxx was the catalyst or even attempted to rule out other catalysts that have nothing to do with Vioxx. (*Id.* at 839:2-8, 936:6-16.) In sum, neither testified that they could rule out, to a reasonable degree of medical certainty, the possibility that Mr. Irvin's heart attack resulted from his numerous risk factors for sudden cardiac death. Nor did either doctor testify that Vioxx contributed in any way to Mr. Irvin's death.

No Florida court has allowed a plaintiff in a case such as this one to recover absent such testimony. To the contrary, "[i]t has long been held that a possibility of causation is not sufficient to allow a claimant to recover." *Greene*, 366 So. 2d 777, 781. Accordingly, Merck is entitled to judgment in its favor on all of plaintiff's claims. *Reaves*, 569 So. 2d at 1309 ("[W]hen

799285v.1

the matter [of causation] remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the Court to direct a verdict for the defendant.") (citing *Gooding*, 445 So. 2d at 1018); *cf. Allison*, 184 F.3d at 1322 (summary judgment warranted if there is no admissible evidence of specific causation); *Cano*, 362 F. Supp. 2d at 824 (same).

### B.   Professor Ray's Figure of 54% Is Based On A Flawed And Incomplete Analysis And Thus Is Scientifically Unreliable.

Professor Ray's calculations are also insufficient to show specific causation because they unreliable. For that reason alone, they cannot constitute sufficient evidence to go to the jury. The flaws in Professor Ray's methodology include the following:

- Professor Ray admitted his calculations were based on data at all Vioxx doses, and not just the 25 mg dose. (Feb. 7, 2006 Tr. at 438:1-444:2, 435:13-436:14, 448:25-449:5.) When asked whether he could calculate the risk for patients, like Mr. Irvin, who took only the 25 mg dose for a short period of time, he refused – calling it "inappropriate" and claiming that it would take "years" to conduct a more particularized analysis.[6] (*Id.*; Feb. 8, 2006 Tr. at 485:5-486:7, 501:20-502:14.) At the same time, Professor Ray admitted that there is no study or article showing a statistically significant increased risk for cardiovascular events between 25 mg placebo when used for less than a month. (Feb. 7, 2006 Tr. at 380:6-22.)

- Although insistent that his calculations were based on a "totality of the data," Professor Ray ignored relevant data from numerous placebo-controlled clinical trials involving Vioxx, and conceded that he did not take these studies into account in conducting his analysis. (Feb. 7, 2006 Tr. at 438:1-444:2.)

- Professor Ray improperly relied upon studies that either involved a completely different drug (*i.e.*, Bextra) or did not use placebo as a comparator (*i.e.*, VIGOR). (*See generally* Expert Report of Wayne A. Ray. Ph.D.; Feb. 7, 2006 Tr. at 357:14-358:1, 365:15-20.)

These and other methodological flaws in Professor Ray's analysis render his resulting calculation

---

[6] Professor Ray took the incredible position that, because Merck used a 50 mg dose to demonstrate the gastrointestinal benefits of Vioxx, it was appropriate for him to use the same dose to assess the cardiovascular risks of the drug. This is an illogical position – one that is not a matter of scientific principle, but of personal pique.

of relative risk and attributable risk unreliable.  Moreover, his obvious lack of objectivity belies his professed "transparency" and lack of bias.

In assessing the reliability of Professor Ray's relative risk and attributable risk numbers, it is important to keep in mind that his analysis flatly contradicts the FDA's conclusions about the relative safety of COX-2 inhibitors specifically and NSAIDs generally.  (*See* April 6, 2005 FDA Memorandum (FDA Mem.), Def. Ex. 338.)  After a comprehensive review of all of the available data, the FDA found no evidence of an increased cardiovascular risk associated with short-term use of COX-2 inhibitors and NSAIDs, "particularly at low doses."  (*Id.* at 2.)  The agency also determined that it was impossible "to reliably estimate the absolute magnitude of the increased risk of serious adverse CV events" associated with long-term use of the drugs – or to rank COX-2s in order of risk.  (*Id.* at 2, 10.)

The FDA's conclusions undermine Professor Ray's purported derivation of an objective number that reflects the "attributable risk" of Vioxx.  They also demonstrate that he has tried to quantify risks when there are insufficient data to do so with any reliability – undercutting his purported "expert opinion" that even short-term use of Vioxx presents an increased risk of adverse cardiovascular events.  Based on these and other flaws in Professor Ray's methodology, as well as plaintiff's general failure to proffer legally sufficient evidence of specific causation, the Court should enter judgment in Merck's favor on all of plaintiff's claims as a matter of law.

## III.   PLAINTIFF'S DESIGN DEFECT CLAIMS FAIL AS A MATTER OF LAW.

Merck is entitled to judgment in its favor on plaintiff's design defect claims for two additional and independent reasons.  First, plaintiff has not met her burden to show that Vioxx was defectively designed.  In fact, her own experts testified that there is no evidence that the risks of Vioxx at the 25 mg dose outweigh the drug's benefits.  Without such evidence, plaintiff's design defect claims fail as a matter of law.  Second, plaintiff has presented no

12

evidence of a safer alternative design – a failure of proof that defeats a design defect claim based on either strict liability or negligence.

### A. Plaintiff's Own Expert Testimony Precludes Her Strict Liability Design Defect Claim.

In order to make out a *prima facie* case of strict liability due to design defect, plaintiff must show that the risks of Vioxx at the 25 mg dose outweigh its benefits. She cannot and has not met this burden. No only has she failed to proffer evidence sufficient to show that the risks of Vioxx at the 25 mg dose outweigh its benefits, but her own expert testimony confirms that *there is no such evidence*. This testimony negates plaintiff's strict liability design defect claim and entitles Merck to judgment in its favor as a matter of law.

In Florida, a product that complies with pertinent government regulations is presumptively *not* defective or unreasonably dangerous. FLA. STAT. ANN. § 768.1256(1).[7] Here, it is undisputed that the FDA approved Vioxx as "safe and effective" in 1999 and again in 2002 when it approved a new indication for rheumatoid arthritis. Thus, the FDA approved the distribution and sale of Vioxx before Mr. Irvin used it, and the FDA renewed its approval of Vioxx after Mr. Irvin used it and after a full review of the results of the VIGOR trial. These approvals trigger Florida's statutory presumption that Vioxx was *not* defective or unreasonably

---

[7] Denominated the "[g]overnment rules defense," section 768.1256(1) provides:

In a product liability action brought against a manufacturer or seller for harm allegedly caused by a product, there is a rebuttable presumption that the product is not defective or unreasonably dangerous and the manufacturer or seller is not liable if, at the time the specific unit of the product was sold or delivered to the initial purchaser or user, the aspect of the product that allegedly caused the harm: (a) Complied with federal or state codes, statutes, rules, regulations, or standards relevant to the event causing the death or injury; (b) The codes, statutes, rules, regulations, or standards are designed to prevent the type of harm that allegedly occurred; and (c) Compliance with the codes, statutes, rules, regulations, or standards is required as a condition for selling or distributing the product.

799285v.1

dangerous, and plaintiff has the burden of demonstrating otherwise – *i.e.*, that the apparent benefits of Vioxx did not outweigh its known risks at the relevant time. *Adams v. G.D. Searle & Co.*, 576 So. 2d 728, 733 (Fla. Dist. Ct. App. 1991).

As indicated above, plaintiff has presented no such proof. She has offered no evidence that before May 2001 – the relevant time frame for this inquiry – the known risks of Vioxx outweighed its benefits.[8] To the contrary, she has proffered expert testimony that proves there is no such evidence. When Professor Ray was asked whether he could calculate the comparative risks and benefits of Vioxx at the 25 mg dose – the dose that Mr. Irvin was prescribed and purportedly ingested – he testified:

> *We don't really have data comparing head to head cardiovascular and GI for 25 milligrams*, but we need to be cautious. It's probably going to be true that the GI benefits will be there. I have no reason to think they're not. But it's quite possible that the cardiovascular risks will also be there. So in a sense the question is settled for 50 milligrams, don't take it, and *it's still pending for 25 milligrams.*

(Feb. 7, 2006 Tr. at 423:3-20 (emphasis added).)  By Professor Ray's own testimony, there is thus no evidence that the known risks of Vioxx at the 25 mg dose outweigh its benefits – even today. This critical admission negates plaintiff's strict liability design defect claim as a matter of law.

Plaintiff's sole apparent attempt to make a contrary showing also comes from Professor Ray, who testified that the overall risks of Vioxx at the 50 mg dose outweighs its benefits. (Feb. 7, 2006 Tr. at 341:15-343:6.)  This testimony does not rise to the level of legally sufficient evidence, because the stated basis for Professor Ray's risk/benefit opinion is not a relevant

---

[8] The benefits of Vioxx are undisputed. While all selective COX-2 inhibitors reduce the risk of ulcers, only Vioxx has been shown to reduce the risk of serious gastrointestinal bleeds. (*See* FDA Mem.)  Moreover, it is undisputed that for some patients – like Mr. Irvin – Vioxx was the *only* medication that provided effective pain relief. (Feb. 9, 2006 Tr. at 885:19-886:7.)

799285v.1

comparison.  As his testimony makes clear, Professor Ray predicates his risk/benefit opinion solely on his calculation that in VIGOR, the difference in serious adverse cardiovascular events favoring naproxen slightly exceeded the difference in serious adverse gastrointestinal events favoring Vioxx.  (*Id.*)  VIGOR, however, compared a common therapeutic dose of naproxen (1000 mg per day) with *double* the maximum recommended chronic dose of Vioxx (50 mg per day).  The maximum recommended chronic dose of Vioxx – and the dose used by Mr. Irvin – was 25 mg per day.[9]  As the FDA has noted, "[t]he higher dose of rofecoxib was used in the VIGOR trial to provide a 'worst case' estimate of the risk of serious GI bleeding for rofecoxib in comparison to naproxen."  (FDA Mem. at 9 n.5.)

A comparison based on a clinical trial designed to produce a "worst case" estimate of adverse gastrointestinal effects on Vioxx using a non-recommended dose does not and cannot constitute legally sufficient evidence that the risks of Vioxx outweighed its benefits.  Such a comparison says nothing about the comparative risks and benefits of Vioxx when used, as Mr. Irvin used it, at the recommended dose of 25 mg.  Tellingly, when Professor Ray reviewed the VIGOR data in 2000, he urged caution on the 50 mg dose, but raised no questions about the safety of the 25 mg dose.  (Feb. 7, 2006 Tr. at 412:20-415:5.)  His own observational study, published in 2002, found no increased risk from 25 mg, a conclusion consistent with all the placebo-controlled clinical trial data available up to that time, including the interim cardiovascular results of Merck's two large Alzheimer's studies.  (*Id.* at 410:15-411:11, 411:17-412:19; Pl.'s Ex. 2.0025.)

---

[9] The FDA-approved label for Vioxx at the time Mr. Irvin took the drug noted that the use of Vioxx at the 50 mg dose for more than 5 days "in management of pain ha[d] not been studied." (*See* July 2000 Vioxx Label, Def. Ex. 146.)

Many drugs pose greater risks when used at higher-than-recommended doses. That does not make them defective.[10]  The relevant inquiry is whether, based on what was known at the relevant time, the risks of using the drug at the recommended doses outweighed the apparent benefits.  *See* FLA. STAT. § 768.1257 (2005) (inquiry should focus on the "state of the art of scientific and technical knowledge and other circumstances that existed at the time of manufacture, not at the time of loss or injury"); *see also Adams*, 576 So. 2d at 732-33.  Plaintiff has introduced *no* evidence on that point.  Absent such proof, plaintiff has no strict liability design defect claim, entitling Merck to judgment in its favor.

**B.**     **Plaintiff Has Proffered No Evidence of a Safer Alternative Design.**

Finally, plaintiff's design defect claim fails because she has presented no evidence of a safer alternative design.  Under Florida law as elsewhere, a plaintiff in a defective design case must show that a safer alternative design was available.  *See Adams*, 576 So. 2d at 733 (design may be held defective if "new developments make possible a safer alternative design"); *see generally* BLACK'S LAW DICTIONARY 1329 (7th ed. 1999) (defining the risk-utility test as a "method of imposing product liability on a manufacturer if the evidence shows that a reasonable person would conclude that the benefits of a product's particular design versus the feasibility of an alternative safer design did not outweigh the dangers inherent in the original design") (cited by Florida Supreme Court in *Std. Jury Instructions-Civil Cases (No. 02-2)*, 872 So. 2d 893, 894 (Fla. 2004)).[11]

---

[10] For these same reasons, Dr. Topol's testimony about the risks of the 50 mg dose studied in VIGOR is irrelevant.

[11] Florida courts acknowledge that the alternative "consumer expectations" test for design defects is not appropriate for products that are "too complex for a logical application" of that test.  *Force v. Ford Motor Co.*, 879 So. 2d 103, 110 (Fla. Dist. Ct. App. 2004).  Prescription drugs unquestionably meet that definition.  *See Adams*, 576 So. 2d at 732-33 (applying risk/benefit
*(footnote continued next page)*

Feasibility of a safer alternative design depends on "state of the art of scientific and technical knowledge and other circumstances that existed at the time of manufacture." FLA. STAT. ANN. § 768.1257.   Here, plaintiff has not even attempted to offer evidence of an alternative formulation for Vioxx that not only would have conferred the gastrointestinal benefits of the drug but also would have worked for people, like Mr. Irvin, who either could not tolerate other NSAIDs or did not find them efficacious.   Plaintiff has simply offered no evidence that Merck feasibly could have reformulated Vioxx to make it safer before May 2001 – or at any time.   Without such proof, plaintiff's design defect claim fails, whether grounded in strict liability or negligence.

## IV.    CONCLUSION.

For the reasons stated above, Merck respectfully request that the Court enter judgment in Merck's favor as a matter of law.

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361

Defendants' Liaison Counsel

---

analysis); *cf. Upjohn Co. v. MacMurdo*, 562 So. 2d 680, 683 (Fla. 1990) (expert testimony generally required to demonstrate inadequacy of prescription drug warnings); *Buckner v. Allergan Pharmaceuticals, Inc.*, 400 So. 2d 820, 822 (Fla. Dist. Ct. App. 1981) (duty to warn runs to prescribing physicians rather than patients because "prescription drugs are likely to be complex medicines, esoteric in formula and varied in effect").

799285v.1

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:      312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone:  202-434-5000
Fax:      202-434-5029

And

Richard B. Goetz
Catalina J. Vergara
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone:  213-430-6000
Fax:      213-430-6407

Attorneys for Merck & Co., Inc.

18

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Memorandum In Support of Motion of

Merck & Co., Inc. for Judgment as a Matter of Law has been served on Liaison Counsel Russ

Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy

Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis

File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 14th day of February,

2006.

_Dorothy H Wimberg_

19

799285v.1

## Exhibit 1 - Excerpts of *Plunkett v. Merck* Trial Transcripts

[341:15] - [343:6]     2/7/2006     Day 2 - Baumgartner, Carroll, Weiner, Ray

page 341

15      Q.   WITH REGARDS TO THE SECOND OPINION HERE, YOU SAY "GI
16      BENEFITS OUTWEIGHED BY CARDIOVASCULAR RISKS"; IS THAT CORRECT?
17      A.   YES.
18      Q.   IS THAT ANOTHER WAY OF SAYING THAT THE RISKS OUTWEIGH THE
19      BENEFITS, DOCTOR?
20      A.   THAT'S IT EXACTLY.
21      Q.   AND, IF YOU WOULD, DESCRIBE FOR US HOW YOU COME TO THAT
22      OPINION.
23      A.   AND MAY I GRAPH THAT OUT ON THE BOARD?
24      Q.   YES.
25      A.   THANK YOU.  SO ONE OF THE STRENGTHS OF THE VIGOR TRIAL IS

page 342

1       THAT WE COULD DIRECTLY COMPARE THE SAFETY OF VIOXX WITH REGARD
2       TO, YOU KNOW, STOMACH PROBLEMS AND HEART ATTACKS, AND SO WHAT
3       I'VE DONE IS CALCULATED THE RATE OF SERIOUS STOMACH PROBLEMS OF
4       THE TYPE CAUSED BY DRUGS LIKE ALEVE AND THE RATE OF
5       CARDIOVASCULAR DISEASE, AND SO WE CAN JUST COMPARE THE TWO AND
6       SEE IF THE RISKS ARE OUTWEIGHED -- THE RISKS ARE GREATER THAN
7       THE BENEFITS.
8            SO IF WE DO AT THAT -- AND I'M GOING TO USE THE
9       STANDARD MEASURES.  SO IF YOU TAKE A THOUSAND PATIENTS AND YOU
10      GIVE THEM THE DRUG FOR A WEEK, HOW MANY SERIOUS STOMACH
11      PROBLEMS WILL YOU OBSERVE AND HOW MANY SERIOUS CASES OF
12      CARDIOVASCULAR DISEASE WILL YOU OBSERVE?  AND THE VIGOR TRIAL
13      DATA SHOW THAT THERE ARE 7.8 SERIOUS ULCERS PREVENTED.  SO THIS
14      IS THE BENEFIT OF GIVING SOMEBODY VIOXX, IS THAT THOSE THOUSAND
15      PEOPLE TAKING VIOXX HAVE 7.8 FEWER SERIOUS STOMACH PROBLEMS
16      THAN THE PEOPLE WHO TOOK NAPROXEN.  SO THAT'S GOOD.  THAT'S A
17      BENEFIT, NO DOUBT ABOUT IT.
18           BUT THEN WE LOOK -- LET'S LOOK AT THE RISKS, WHICH
19      ARE THE HEART ATTACKS AND STROKES, THE CARDIOVASCULAR DISEASE.
20      UNFORTUNATELY, FOR THOSE SAME THOUSAND PEOPLE, THERE WOULD BE
21      9.4 CASES OF SERIOUS CARDIOVASCULAR DISEASE CAUSED.  SO THE
22      RISKS, THE 9.4 IS GREATER THAN THE BENEFIT, THE 7.8.
23           AND EVEN THE FDA REVIEWER WHO LOOKED AT THESE DATA
24      SAID, FROM THE PATIENT'S PERSPECTIVE, THAT NAPROXEN LOOKS LIKE
25      THE BETTER DRUG BECAUSE THE RISKS OF VIOXX ARE GREATER THAN THE

page 343

1       BENEFITS.  AND THAT'S IT IN A NUTSHELL.
2       Q.   AND, DOCTOR, YOUR OPINION THAT THE RISKS OF CARDIOVASCULAR
3       EVENTS OUTWEIGHS THE BENEFIT OF ULCERS PREVENTED, IS THAT AN
4       OPINION THAT YOU HOLD TO A REASONABLE DEGREE OF SCIENTIFIC
5       CERTAINTY?
6       A.   YES, IT IS.


[357:14] - [358:1]     2/7/2006     Day 2 - Baumgartner, Carroll, Weiner, Ray

page 357

14           AND THE THIRD BASIS OF MY OPINION IS THAT THERE IS A
15      SISTER DRUG OF VIOXX, A DRUG CALLED BEXTRA, THAT'S VERY SIMILAR
16      TO IT, THAT WORKS BY THE SAME PHARMACOLOGIC MECHANISMS.  THIS
17      DRUG WAS USED IN A 10- STUDY, AND IT INCREASES RISK OF HEART
18      ATTACKS IN TEN DAYS.  SO ALL THREE OF THOSE TAKEN TOGETHER
19      INDICATE THAT VIOXX INCREASES RISK IN 1 TO 30 DAYS.
20      Q.   AND YOU SAID -- YOU MENTIONED BEXTRA.  WHAT IS BEXTRA?
21      A.   BEXTRA IS A DRUG CALLED VALDECOXIB, AND IT'S -- JUST AS
22      VIOXX IS ROFECOXIB.  I CAN TELL YOU IT'S LIKE A SISTER DRUG TO
23      VIOXX.  IT WORKS THROUGH THE SAME PHARMACOLOGIC MECHANISMS.
24      IT'S USED FOR RELEASING PAIN OF MUSCLES AND JOINTS.  IT'S
25      THOUGHT NOT TO CAUSE AS MANY ULCERS AS THE TRADITIONAL DRUGS

page 358

1       LIKE ALEVE AND ADVIL.

1

## Exhibit 1 - Excerpts of *Plunkett v. Merck* Trial Transcripts

[365:15] - [365:20]     2/7/2006     Day 2 - Baumgartner, Carroll, Weiner, Ray

page 365

```
15     Q.    DOCTOR, YOU MENTIONED BEXTRA EARLIER.  CAN WE LOOK AT --
16     IS IT APPROPRIATE TO LOOK AT OTHER DRUGS IN THE CLASS AND GLEAN
17     INFORMATION FROM STUDIES PERTAINING TO THOSE DRUGS?
18     A.    ABSOLUTELY.  WE DO IT ALL THE TIME.
19     Q.    AND HAVE YOU DONE THAT IN THIS CASE?
20     A.    YES, I HAVE.
```

[376:3] - [378:6]     2/7/2006     Day 2 - Baumgartner, Carroll, Weiner, Ray

page 376

```
 3     Q.    DR. RAY, WOULD YOU DESCRIBE FOR US HOW YOU CALCULATE THE
 4     PROPORTIONAL RISK.
 5     A.    YES.
 6     Q.    DO YOU NEED TO USE THE BOARD?
 7     A.    MAY I USE THE BOARD?
 8     Q.    YES.
 9     A.    SO THE QUESTION THAT WE HAVE IS PHARMACOEPIDEMIOLOGISTS,
10     IF YOU HAVE A THOUSAND PATIENTS WHO WERE TAKING VIOXX AND HAD A
11     HEART ATTACK, WHAT -- HOW MANY OF THOSE THOUSAND PATIENTS WOULD
12     HAVE HAD THEIR HEART ATTACK CAUSED BY THE VIOXX?  AND THERE IS
13     A WAY CALLED "THE ATTRIBUTABLE RISK," OR "THE ATTRIBUTABLE RISK
14     PROPORTION," THAT WE CALCULATE THAT.  AND IT'S ACTUALLY NOT
15     THAT COMPLICATED.
16           SO WE CAN DO THE RATE OF HEART ATTACKS PER 1,000 PER
17     YEAR.  AND THAT'S WHAT I'VE BEEN SHOWING ON ALL OF THE REST OF
18     THE GRAPHS IS HOW MANY HEART ATTACKS A THOUSAND PEOPLE WOULD
19     HAVE IF YOU FOLLOWED THEM UP FOR A YEAR.  AND WE CAN TAKE A
20     POPULATION OF PATIENTS WHERE, IN THE ABSENCE OF VIOXX, THAT
21     RATE IS 4.  SO THAT'S WHAT THE PATIENTS' RISKS WOULD HAVE BEEN
22     IF THEY HADN'T TAKEN VIOXX.  OKAY?
23           AND THEN WE SAY, WELL, WHAT HAPPENS IF YOU ADD THE
24     VIOXX?  WELL, THAT'S ACTUALLY PRETTY EASY TO CALCULATE.  WE CAN
25     SAY WE KNOW THE RELATIVE RISK IS 2.16 FROM THE ANALYSIS THAT I
```

page 377

```
 1     DID.  SO VIOXX INCREASES YOUR RISK OF HEART ATTACK 2.16-FOLD.
 2     BASELINE RISK IS 4.
 3     Q.    DR. RAY, LET ME JUST MAKE SURE THAT WE'RE CLEAR.  THE
 4     2.16, THAT'S THE RELATIVE RISK THAT YOU CALCULATED BASED ON THE
 5     TOTALITY OF THE DATA?
 6     A.    YES, ON THE TOTALITY OF THE DATA.
 7     Q.    OKAY.
 8     A.    ON ALL OF THE ANALYSES THAT I SHOWED YOU.
 9     Q.    RIGHT.  OKAY.
10     A.    AND SO WE'LL MULTIPLY THAT 2.16 RISK THAT THE VIOXX GIVES
11     YOU TIMES YOUR 4-PER-1,000 BASELINE RISK, AND THAT GETS US
12     8.64.
13           WE CAN DRAW IT.  WELL, WE CAN BREAK THAT 8.64 DOWN IN
14     A PATIENT TAKING VIOXX TO THE RISK OF 4 THAT THEY HAD AS THEIR
15     BASELINE AND THEN THE EXTRA RISK FROM VIOXX.  SO THEN WE CAN
16     CALCULATE THE PROPORTION OF PATIENTS THAT WOULD HAVE HAD THEIR
17     HEART ATTACKS CAUSED BY VIOXX, OR WHAT PEOPLE CALL THE
18     ATTRIBUTABLE PROPORTION OR THE ATTRIBUTABLE RISK, AND THAT'S
19     EQUAL TO 4.64 DIVIDED BY 8.64.  SO 8.64 IS YOUR TOTAL RISK,
20     4.64 IS THE RISK THAT YOU GET ADDED ON TO YOUR BASELINE BECAUSE
21     YOU TAKE VIOXX.  SO THEN WE DIVIDE 4.64 BY 8.64, AND WE GET
22     54 PERCENT.
23           SO THEREFORE, OF OUR GROUP OF A THOUSAND PATIENTS,
24     540 WOULD HAVE THEIR HEART ATTACKS CAUSED BY VIOXX AND 460
25     WOULD HAVE IT DUE TO THE BACKGROUND FACTORS.
```

page 378

```
 1     Q.    ALL RIGHT.  DR. RAY, HOW DO YOU EXTRAPOLATE THAT
 2     54 PERCENT AND APPLY THAT TO AN INDIVIDUAL IN THIS POPULATION
 3     OF VIOXX USERS?
 4     A.    I THINK YOU SAY THAT, FOR ANY INDIVIDUAL PATIENT THAT HAS
 5     A HEART ATTACK, WHO WAS TAKING VIOXX, THE LIKELIHOOD IS
 6     54 PERCENT THAT THE HEART ATTACK WAS DUE TO THE VIOXX.
```

## Exhibit 1 - Excerpts of *Plunkett v. Merck* Trial Transcripts

[380:6] - [380:22]      2/7/2006      Day 2 - Baumgartner, Carroll, Weiner, Ray

page 380
```
 6      Q.    PROFESSOR, I WOULD LIKE TO ASK YOU A SOMEWHAT MORE PRECISE
 7      QUESTION THAN THE ONE THAT MR. BIRCHFIELD ENDED WITH, AND SO IF
 8      YOU WOULD LISTEN CAREFULLY TO THIS, LOOKING AT EVERY SINGLE
 9      ARTICLE AND STUDY THAT YOU DISCLOSED IN YOUR REPORT, IS THERE A
10      SINGLE ONE THAT SHOWS A STATISTICALLY SIGNIFICANT DIFFERENCE IN
11      HEART ATTACK RISKS BETWEEN 25-MILLIGRAM VIOXX AND A PLACEBO
12      WHEN USED FOR LESS THAN ONE MONTH?
13      A.    COULD YOU REPEAT THAT AGAIN, PLEASE.
14      Q.    YES.  LOOKING AT EVERY ARTICLE THAT YOU DISCLOSED IN YOUR
15      REPORT, IS THERE A SINGLE ONE THAT SHOWS A STATISTICALLY
16      SIGNIFICANT DIFFERENCE IN HEART ATTACK RISKS BETWEEN 25
17      MILLIGRAM VIOXX AND PLACEBO WHEN USED FOR LESS THAN ONE MONTH?
18      A.    THERE IS A POSSIBILITY THAT THE ALZHEIMER STUDIES DO, I
19      HAVEN'T CONDUCTED THAT ANALYSIS.
20      Q.    SO AS FAR AS YOU KNOW, THE ANSWER IS NO?
21      A.    WITH THAT EXCEPTION, THERE ARE NO STUDIES THAT HAVE TESTED
22      THE 1- TO 30-DAY, 25-MILLIGRAM ONLY, VERSUS PLACEBO.
```

[396:5] - [396:15]      2/7/2006      Day 2 - Baumgartner, Carroll, Weiner, Ray

page 396
```
 5      Q.    NOW, AS A STATISTICIAN -- EXCUSE ME.  I DID NOT MEAN TO
 6      SAY THAT.  AS A PHARMACOEPIDEMIOLOGIST, YOU DEAL WITH THESE
 7      GROUPS OF PEOPLE.  YOU CAN SAY MORE LIKELY THAN NOT, LESS
 8      LIKELY THAN NOT, BUT YOU CAN'T SAY, "WELL, THE THIRD YELLOW DOT
 9      OVER FROM THE RIGHT, THERE WAS SOMETHING ABOUT HIM THAT MADE
10      HIM MORE LIKELY WHERE IT WAS BECAUSE OF THE MEDICINE RATHER
11      THAN NOT BECAUSE OF THE MEDICINE," RIGHT?
12      A.    THAT'S CORRECT.
13      Q.    IF ANYBODY IN THE WORLD CAN DO IT, IT'S NOT YOU, RIGHT?
14      A.    YEAH.  WELL, WHAT WE CAN TALK ABOUT IS THE PROPORTION OF A
15      GROUP, BUT NOT THE INDIVIDUAL.
```

[410:15] - [411:11]      2/7/2006      Day 2 - Baumgartner, Carroll, Weiner, Ray

page 410
```
15      Q.    UNDER THE EPIDEMIOLOGICAL STUDY THAT YOU PERFORMED AFTER
16      VIGOR CAME OUT, WHAT YOU FOUND WAS -- WHETHER YOU'RE LOOKING AT
17      CURRENT USERS OF 25 MILLIGRAMS OR LESS OF VIOXX OR NEW USERS OF
18      25 MILLIGRAMS OR LESS OF VIOXX -- BOTH GROUPS WERE BASICALLY
19      INDISTINGUISHABLE FROM PEOPLE WHO WEREN'T USING ANY MEDICINE AT
20      ALL; ISN'T THAT TRUE?
21      A.    THE RELATIVE RISKS WERE 1.03 AND 1.02 AND THEY WEREN'T
22      STATISTICALLY SIGNIFICANT, ABSOLUTELY CORRECT.
23      Q.    SO FOR YOUR OWN STUDY, FOR THE PEOPLE WHO USED 25
24      MILLIGRAMS OR LESS OF VIOXX, IF SOMEBODY USING 25 MILLIGRAMS OR
25      LESS OF VIOXX HAD A HEART ATTACK, THE CHANCE THAT THAT HEART
page 411
 1      ATTACK WAS DUE TO VIOXX WAS BASICALLY ZERO, RIGHT?
 2      A.    CLOSE TO IT, YES.
 3      Q.    BECAUSE ACCORDING TO THE ANALYSIS THAT YOU DID, PEOPLE
 4      USING 25 MILLIGRAMS OF VIOXX OR LESS HAD NO INCREASED RISK OF
 5      HEART ATTACK; ISN'T THAT RIGHT?
 6      A.    THE RELATIVE RISK WAS 1.03 OR 1.02, SO A VERY SMALL
 7      INCREASED RISK.
 8      Q.    FROM A STATISTICAL POINT OF VIEW, THERE IS NO DIFFERENCE
 9      AT ALL, RIGHT?
10      A.    THERE IS CERTAINLY NO SIGNIFICANT DIFFERENCE, THAT'S
11      CORRECT.
```

[411:17] - [412:19]      2/7/2006      Day 2 - Baumgartner, Carroll, Weiner, Ray

page 411
```
17      Q.    LET ME JUST GET YOUR EXPLANATION OF THE STUDY HERE.  HERE
18      WE GO.  THIS IS ONE OF THE PARAGRAPHS IN YOUR STUDY WHERE YOU
19      DESCRIBE THE SIGNIFICANCE OF THE STATISTICAL ANALYSIS, CORRECT?
20      A.    THAT'S A SUMMARY OF THE FINDINGS, YES.
21      Q.    SO A SUMMARY OF YOUR FINDINGS.  IN THE SUMMARY OF YOUR
```

3

**Exhibit 1 - Excerpts of *Plunkett v. Merck* Trial Transcripts**

```
22        FINDINGS, WHAT YOU SAY IS, "OUR RESULTS INDICATE THAT HIGH-DOSE
23        ROFECOXIB" -- AND THAT MEANS 50 MILLIGRAMS, RIGHT?
24        A.    GREATER THAN 25 MILLIGRAMS.
25        Q.    GREATER THAN 25 MILLIGRAMS.  "COULD BE ASSOCIATED WITH A
page 412
 1        RAISED RISK OF SERIOUS CHD."  THAT'S CORONARY --
 2        A.    -- HEART DISEASE.
 3        Q.    CORONARY HEART DISEASE.  "WHEREAS ROFECOXIB 25 MILLIGRAMS
 4        OR LESS, AS WELL AS THESE OTHER THINGS, ARE NOT," RIGHT?
 5        A.    THAT'S CORRECT.
 6        Q.    AND WHEN YOU SAY THAT ROFECOXIB AT 25 MILLIGRAMS OR LESS
 7        ARE NOT, WHAT THAT MEANS IS THAT THEY ARE NOT ASSOCIATED WITH A
 8        RAISED RISK OF SERIOUS CORONARY HEART DISEASE, RIGHT?
 9        A.    THAT'S CORRECT.
10        Q.    IN THIS ARTICLE, DID YOU RECOMMEND THAT THE USE OF 50
11        MILLIGRAMS OF VIOXX SHOULD BE AVOIDED, A HIGH DOSE?
12        A.    YES, WE DID.
13        Q.    BUT YOU DID NOT RECOMMEND THAT USE OF 25 MILLIGRAMS OF
14        VIOXX SHOULD BE AVOIDED, DID YOU, SIR?
15        A.    NO, WE DIDN'T.
16        Q.    THERE WAS NO REASON FOR YOU TO RECOMMEND THAT BECAUSE YOUR
17        STUDY SHOWED THAT THERE WAS NO INCREASE IN RISK, CORRECT?
18        A.    FOR THE LESS THAN OR EQUAL TO 25 MILLIGRAMS, THAT'S
19        CORRECT.


[412:20] - [415:5]     2/7/2006     Day 2 - Baumgartner, Carroll, Weiner, Ray
page 412
20        Q.    NOW, AFTER YOU WROTE THIS ARTICLE -- WELL, MAYBE IT WAS
21        EVEN BEFOREHAND.  IN 2000, DID YOU ALSO GIVE SOME SPEECHES TO
22        SCIENTIFIC AND MEDICAL GROUPS ABOUT THE QUESTION OF WHETHER
23        VIOXX INCREASED THE RISKS OF CARDIOVASCULAR DISEASE?
24        A.    YES.
25        Q.    DID YOU GIVE THOSE SPEECHES BEFORE YOU PUBLISHED THE
page 413
 1        ARTICLES OR AFTER?
 2        A.    THERE'S A COUPLE OF FORUMS.  ONE WOULD HAVE BEEN A SMALL
 3        FORUM AND THE OTHER A FAIRLY LARGE ONE.  IN BOTH CASES, I
 4        BELIEVE IT WAS BEFORE THE FINDINGS WERE PUBLISHED.
 5        Q.    WAS ONE OF THOSE SPEECHES AT THE INTERNATIONAL CONFERENCE
 6        ON PHARMACOEPIDEMIOLOGY?
 7        A.    YES, IT WAS.
 8        Q.    IN THAT TALK THAT YOU GAVE TO YOUR FELLOW
 9        PHARMACOEPIDEMIOLOGISTS, DID YOU TALK ABOUT THE 50-MILLIGRAM OR
10        HIGH DOSE OF VIOXX?
11        A.    WELL, THE TALK ESSENTIALLY PRESENTED THE FINDINGS OF THE
12        PAPER THAT YOU PUT UP THERE, SO I SPOKE ABOUT EVERYTHING THAT
13        YOU'VE SHOWN IN THAT TABLE, IN FACT.
14        Q.    JUST FOCUSING ON VIOXX NOW, ONE OF THE THINGS YOU SAID TO
15        YOUR FELLOW PHARMACOEPIDEMIOLOGISTS WAS THAT THE LONG-TERM USE,
16        AT LEAST, OF 50 MILLIGRAMS OF VIOXX SHOULD BE AVOIDED, RIGHT?
17        A.    YES.
18        Q.    AT THE SAME TIME YOU TOLD THE AUDIENCE, YOUR FELLOW
19        PHARMACOEPIDEMIOLOGISTS, THAT BASED ON YOUR ANALYSIS THERE WAS
20        NO INCREASED RISK WITH THE 25-MILLIGRAM DOSE; ISN'T THAT RIGHT,
21        SIR?
22        A.    WITH THE LESS THAN OR EQUAL TO THE 25-MILLIGRAM DOSE, AND
23        THAT'S WHAT OUR DATA SHOWED.
24        Q.    THE DATA SHOWED WAS YOU SAID THAT THERE WAS NO INCREASED
25        RISK WITH THE LESS THAN OR EQUAL TO 25-MILLIGRAM DOSE, RIGHT?
page 414
 1        A.    THAT'S CORRECT.
 2        Q.    DID YOU ALSO SPEAK AT SOMETHING CALLED THE CENTER ON
 3        EDUCATION AND RESEARCH ON THERAPEUTICS?
 4        A.    YES, I DID.
 5        Q.    IS THAT THING CALLED CERT FOR SHORT?
 6        A.    YES, IT IS.
 7        Q.    WHAT SORT OF PEOPLE COME TO THE CERT MEETING?
 8        A.    WELL, THERE'S THREE GROUPS.  THERE ARE THE INVESTIGATORS,
 9        WHO ARE PERSONS LIKE MYSELF.  I'M THE PRINCIPAL INVESTIGATOR OF
10        THE RESEARCH PROJECT AT VANDERBILT.  THERE ARE MEMBERS OF THE
```

4

## Exhibit 1 - Excerpts of *Plunkett v. Merck* Trial Transcripts

```
11        FEDERAL GOVERNMENT INCLUDING THE FDA, AGENCY FOR HEALTHCARE
12        RESEARCH AND QUALITY (AHRQ) OR NIH, AND THEN THERE IS A PUBLIC
13        STEERING COMMITTEE THAT INCLUDES PHARMACEUTICAL INDUSTRY PUBLIC
14        REPRESENTATIVES.
15        Q.   WAS THIS CONFERENCE THAT YOU SPOKE AT ALSO DURING THE YEAR
16        2000?
17        A.   YES.  IT WAS A STEERING COMMITTEE MEETING, SO CONFERENCE
18        FOR A MEETING THAT HAS 20 TO 30 PEOPLE MIGHT BE A BIT MUCH.
19        Q.   WELL, THERE WERE 20 OR 30 PEOPLE WHO WERE EITHER
20        INVESTIGATORS OR WORKING FOR THE FEDERAL GOVERNMENT OR WERE ON
21        THE PUBLIC STEERING COMMITTEE, CORRECT?
22        A.   YES, THAT'S CORRECT.
23        Q.   AT THIS GROUP DID YOU ONCE AGAIN EXPLAIN YOUR VIEW THAT 50
24        MILLIGRAMS SHOULD BE USED CAUTIOUSLY BECAUSE OF THE RISK THAT
25        YOU SAW WITH INCREASED CARDIOVASCULAR PROBLEMS?
page 415
1         A.   YES, I DID.
2         Q.   DID YOU ALSO TELL THIS GROUP THAT THERE WAS NO INCREASED
3         RISK WITH 25 MILLIGRAMS OR LESS?
4         A.   I TOLD THEM THAT'S WHAT THE FINDINGS WERE OF OUR STUDY.
5         I'M ALWAYS CAREFUL NOT TO GO BEYOND THE RESULTS OF OUR STUDY.


[423:3] - [423:20]     2/7/2006     Day 2 - Baumgartner, Carroll, Weiner, Ray
page 423
3         Q.   SO, THEN, GETTING BACK TO MY QUESTION:  IF MR. BIRCHFIELD
4         HAD ASKED YOU NOT ABOUT RISK-BENEFIT OF VIOXX GENERALLY, WHICH
5         ENDS UP BEING ALL DATA ON 50 MILLIGRAMS, BUT INSTEAD ASKED YOU
6         ABOUT RISK-BENEFIT OF 25 MILLIGRAMS, YOU WOULD HAVE TO SAY,
7         "WELL, MR. BIRCHFIELD, THE PROBLEM IS I DON'T HAVE THE BENEFIT
8         SIDE OF THAT'S EQUATION AND I CAN'T DO THE COMPARISON," RIGHT?
9         A.   YOU KNOW, IF YOU WOULD ASK ME WHAT I WOULD REALLY TELL
10        HIM, WHAT I WOULD SAY IS THIS.  I WOULD SAY, "THE VIGOR TRIAL
11        HAS SHOWED AT 50 MILLIGRAMS THAT THE CARDIOVASCULAR RISKS
12        OUTWEIGH THE GI BENEFITS.  WE DON'T REALLY HAVE DATA COMPARING
13        HEAD TO HEAD CARDIOVASCULAR AND GI FOR 25 MILLIGRAMS, BUT WE
14        NEED TO BE CAUTIOUS."  IT'S PROBABLY GOING TO BE TRUE THAT THE
15        GI BENEFITS WILL BE THERE.  I HAVE NO REASON TO THINK THEY'RE
16        NOT.  BUT IT'S QUITE POSSIBLE THAT THE CARDIOVASCULAR RISKS
17        WILL ALSO BE THERE.  SO IN A SENSE THE QUESTION IS SETTLED FOR
18        50 MILLIGRAMS, DON'T TAKE IT, AND IT'S STILL PENDING FOR 25
19        MILLIGRAMS.  YOU MIGHT GET MORE GI BENEFIT, YOU MIGHT NOT, BUT
20        THERE IS REAL REASON TO WORRY.


[435:13] - [436:14]     2/7/2006     Day 2 - Baumgartner, Carroll, Weiner, Ray
page 435
13        Q.   SO IN JANUARY, NOW, WHEN YOU COME UP WITH 2.16, WHERE YOU
14        SAY THAT TURNS INTO A 54 PERCENT CHANCE THAT IT'S DUE TO VIOXX,
15        THAT'S MELDING ALL THE 25 AND 50-MILLIGRAM DATA TOGETHER,
16        RIGHT?
17        A.   YES.  IT'S ALSO PUTTING TOGETHER THE ALZHEIMER'S DATA, THE
18        APPROVE DATA, THE VIGOR DATA, THE TOTALITY OF THE DATA TO THE
19        BEST OF MY ABILITY.
20        Q.   ALL DOSES, RIGHT?
21        A.   YES.
22        Q.   YOU DON'T BREAK IT OUT THE WAY YOU USED TO, 25 VERSUS 50,
23        RIGHT?
24        A.   THE PREVIOUS REPORT SHOWED ONLY TWO STUDIES, SO IT DID NOT
25        ASSESS THE REST OF THE OSTEOARTHRITIS STUDIES, FOR EXAMPLE.  IT
page 436
1         ONLY LOOKED AT TWO STUDIES, VIGOR AND APPROVE.  THERE ARE SOME
2         WHO WILL ARGUE THAT THAT APPROACH MIGHT BE REASONABLE, BUT IN
3         MY MIND IT DID NOT INCLUDE THE TOTALITY OF THE DATA AND,
4         THEREFORE, MY PRESENT APPROACH IS MORE ACCURATE.
5              MR. BECK:  YOUR HONOR, I GOT A LONG EXPLANATION, BUT
6         I DON'T THINK I GOT --
7              THE COURT:  WELL, ASK THE QUESTION AGAIN, AND DO THE
8         BEST YOU CAN TO ANSWER IT.
9         BY MR. BECK:
```

## Exhibit 1 - Excerpts of *Plunkett v. Merck* Trial Transcripts

```
10      Q.   THE QUESTION THAT I ASKED YOU, SIR, WAS:  TODAY THE 2.16
11      THAT YOU'RE USING, THAT'S AN AMALGAMATION OF ALL THE DATA ON
12      25-MILLIGRAM AS WELL AS 50-MILLIGRAM AND YOU DON'T BREAK IT OUT
13      SEPARATELY THE WAY YOU USED TO, RIGHT?
14      A.   I DON'T BREAK IT OUT SEPARATELY, THAT'S CORRECT.
```

[438:1] - [444:2]      2/7/2006      Day 2 - Baumgartner, Carroll, Weiner, Ray

page 438
```
 1      Q.   YOU SAID THAT YOU WANTED TO LOOK AT THE TOTALITY OF THE
 2      DATA FOR VIOXX IN THIS ANALYSIS WITHOUT EXCLUDING ANYTHING,
 3      RIGHT?
 4      A.   YES, THE TOTALITY OF THE CLINICAL TRIAL DATA.
 5      Q.   HAVE YOU EVER HEARD OF PROTOCOL 126?
 6      A.   YES, I HAVE.
 7      Q.   YOU DID NOT INCLUDE PROTOCOL 126 IN THIS CHART, DID YOU?
 8      A.   NO, AND THE REASON FOR THAT IS DESCRIBED IN THE REPORT.
 9      MERCK DIDN'T INCLUDE IT IN THEIR SUBMISSION TO THE FDA, FOR
10      EXAMPLE.
11      Q.   WELL, MERCK WASN'T DOING A POOLED ANALYSIS THAT INCLUDED
12      ALL THE STUFF THAT YOU HAVE ON HERE, WERE THEY?
13      A.   NO.  BUT THE GIST OF THE COMMUNICATION WAS THAT THE DATA
14      WERE TOO UNRELIABLE TO ANALYZE, AND THAT'S ACTUALLY FOOTNOTED
15      IN MY REPORT; THAT I CONSIDERED THE DATA, BUT FOLLOWED THE
16      OPINION OF BOTH MERCK AND THE FDA.  THIS WAS A VERY SMALL STUDY
17      THAT WAS TERMINATED ALMOST AS SOON AS IT STARTED.  BOTH MERCK
18      AND THE FDA SEEMED TO AGREE THAT THE DATA WERE UNRELIABLE AND
19      SO, AS FOOTNOTED IN MY REPORT, I DID NOT INCLUDE IT.
20      Q.   WELL, WHAT DID THE DATA SHOW THAT WAS AVAILABLE?
21      A.   I'VE NEVER BEEN ABLE TO FIND IT, SO I DON'T KNOW.
22      Q.   DID YOU EVER ASK THE PLAINTIFF'S LAWYERS TO GIVE YOU THE
23      DATA?
24      A.   YES, I DID.
25      Q.   THEY WERE NEVER ABLE TO DO THAT?
```
page 439
```
 1      A.   NO.
 2      Q.   I THINK YOUR FOOTNOTE IN YOUR REPORT SAYS THAT THE REASON
 3      THAT YOU DID NOT INCLUDE IT WAS BECAUSE IT WAS STOPPED EARLY
 4      BECAUSE EARLIER TRIALS INDICATED NO EFFICACY FOR VIOXX -- IN
 5      TERMS OF WHAT THEY ARE LOOKING AT HERE -- AND, THUS, THERE'S
 6      CONCERN THAT THE DATA ON THE CARDIAC OUTCOMES ARE UNRELIABLE.
 7      IS THAT WHAT YOU SAID IN YOUR REPORT?
 8      A.   I BELIEVE SO, YES.
 9      Q.   YOU DID INCLUDE OTHER STUDIES THAT WERE STOPPED EARLY,
10      DIDN'T YOU?
11      A.   ABSOLUTELY.
12      Q.   THE VICTOR STUDY, FOR EXAMPLE, IT WAS ALSO STOPPED EARLY,
13      BUT YOU INCLUDED THAT ANYWAY, DIDN'T YOU?
14      A.   YES, AND THE DATA WERE CONSIDERED RELIABLE.  IT HAD GONE
15      ON FOR SOME TIME BEFORE IT WAS STOPPED.  APPROVE WAS STOPPED
16      EARLY, PUBLISHED IN THE NEW ENGLAND JOURNAL.  THE POINT IS NOT
17      THAT IT WAS STOPPED EARLY.  IT WAS STOPPED VERY EARLY, WHEN
18      THERE WAS A SMALL AMOUNT OF DATA AVAILABLE.  THE OPINION OF
19      BOTH FDA AND MERCK SEEMED TO BE THAT THOSE DATA WERE
20      UNRELIABLE.
21      Q.   HAVE YOU LOOKED AT THE BOGATY (PH.) ARTICLE?
22      A.   I'M NOT FAMILIAR WITH THE NAME AS YOU MENTIONED IT.
23      PERHAPS IF I SAW IT, I WOULD BE.
24      Q.   I MAY BE MISPRONOUNCING IT.  I'M HANDING YOU WHAT I'VE
25      MARKED FOR DEMONSTRATIVE PURPOSES AS DEFENSE EXHIBIT 664.  THIS
```
page 440
```
 1      CERTAINLY IS NOT SECRET, CONFIDENTIAL INFORMATION, IS IT?
 2      A.   NO.
 3      Q.   THIS IS PUBLISHED INFORMATION IN A PEER-REVIEW JOURNAL,
 4      CORRECT?
 5      A.   YES.
 6      Q.   DID YOU TAKE INTO ACCOUNT THIS PUBLICATION WHEN YOU SAID
 7      YOU WANTED TO LOOK AT ALL OF THE DATA?
 8      A.   ONLY IF IT WAS INCLUDED IN JÜNI, AND I BELIEVE IT WAS NOT.
 9      THIS WAS A VERY SMALL STUDY AND I DID NOTE THAT, WITH THE
10      EXCEPTION OF VERY SMALL STUDIES, MY ANALYSIS INCLUDED ALL THE
```

6

**Exhibit 1 - Excerpts of *Plunkett v. Merck* Trial Transcripts**

```
11      DATA.
12      Q.   SO I'M JUST GOING TO WRITE "JÜNI."  WHEN YOU REFER TO
13      THAT, THAT'S WHAT YOU USED FOR THE MUSCULOSKELETAL, RIGHT?
14      A.   YES.
15      Q.   SO THIS IS A STUDY AND ARE YOU AWARE, SIR, THAT THIS STUDY
16      SHOWED NO DIFFERENCE AT ALL IN CARDIAC EVENTS BETWEEN VIOXX AND
17      A PLACEBO?
18      A.   I WOULD BE SURPRISED IF THERE WERE ANY IN 35 STABLE
19      SUBJECTS.  THIS IS A STUDY WITH 35 PEOPLE.
20      Q.   IT LASTED FOR SIX MONTHS, RIGHT?
21      A.   THIS ISN'T A TINY STUDY.
22      Q.   IT LASTED FOR SIX MONTHS?
23      A.   YES.
24      Q.   DID YOU KNOW ABOUT THIS STUDY?
25      A.   NO, I DID NOT.
page 441
1       Q.   HAVE YOU HEARD OF A STUDY BY A DOCTOR NAMED DR. TITLE
2       (PH.) ?
3       A.   NOT BY THAT NAME.  PERHAPS IF YOU SHOW IT TO ME I'LL
4       RECOGNIZE IT.
5       Q.   I'M HANDING YOU WHAT WE'VE MARKED AS DEFENDANT'S EXHIBIT
6       660.  THIS, TOO, IS A PUBLISHED STUDY, NOT SECRET DATA,
7       CORRECT?
8       A.   YES.
9       Q.   IT'S AN EIGHT-WEEK STUDY OF PEOPLE WHO TOOK 25 MILLIGRAMS
10      OF VIOXX VERSUS A PLACEBO, RIGHT?
11      A.   AGAIN, THIS IS A TINY STUDY, 30 PATIENTS IN EACH ARM.
12      Q.   IN THIS STUDY COMPARING EIGHT WEEKS, SHORT-TERM USE, 25
13      MILLIGRAMS OF VIOXX VERSUS A PLACEBO, THERE WAS NO DIFFERENCE
14      AT ALL IN THE CARDIOVASCULAR EVENTS, CORRECT?
15      A.   WELL, WE'LL LOOK AND SEE.
16      Q.   LOOK OVER ON THE FOURTH PAGE.  THERE WERE NO
17      CARDIOVASCULAR EVENTS IN EITHER GROUP?
18      A.   YEAH, WITH THE CAVEAT THAT WE WOULD HAVE TO VERIFY THESE
19      DATA.  IF THERE WAS MERCK FUNDING INVOLVED, WE WOULD HAVE TO
20      VERIFY THESE DATA WITH THE FDA.  BUT IT'S A TINY STUDY, SO I
21      WOULD BELIEVE THERE WERE FEW EVENTS IN EITHER ARM.
22      Q.   HOW ABOUT IF THERE WAS A PLAINTIFF'S LAWYERS FUNDING OF
23      THE AUTHORS OF STUDIES, WHAT WOULD YOU DO THEN?
24      A.   WELL, WHEN YOU CAN SHOW ME AN EXAMPLE WHERE STUDIES FUNDED
25      BY PLAINTIFF'S LAWYERS HAVE WITHHELD DATA FROM THE NEW ENGLAND
page 442
1       JOURNAL, THEN MY CONCERN WOULD BE RAISED, BUT MERCK HAS A
2       HISTORY OF WITHHOLDING DATA.
3             MR. BECK:  YOUR HONOR, I MOVE TO STRIKE THAT LAST
4       COMMENT.
5             THE COURT:  LET IT BE STRICKEN.  THE JURY IS TO
6       DISREGARD IT AT THIS POINT.
7       BY MR. BECK:
8       Q.   EXHIBIT 662, IS THIS PUBLIC INFORMATION THAT YOU CHOSE NOT
9       TO INCLUDE IN YOUR ANALYSIS OF ALL OF THE DATA?
10      A.   AGAIN, THESE ARE STUDIES THAT ARE PURE PHARMACOLOGIC
11      STUDIES USED TO INVESTIGATE MECHANISMS, AND THEY ARE CONSIDERED
12      DIFFERENT THAN CLINICAL STUDIES USED TO TEST WHETHER OR NOT A
13      DRUG HAS BENEFITS OR RISKS.  SO THERE'S PROBABLY DOZENS OF
14      THESE VERY SMALL STUDIES THAT LOOK LIKE AT 10, 15, 20 PATIENTS
15      AND LOOK AT MECHANISMS.
16      Q.   DID THIS ONE LOOK AT 34 PATIENTS, THREE MONTHS, VIOXX
17      25 MILLIGRAMS VERSUS PLACEBO?
18      A.   YES.  IF I COULD FINISH, I WAS GOING TO SAY THAT THE JÜNI
19      META-ANALYSIS DID NOT, NOR DID I, LOOK AT ANY OF THESE SMALL
20      MECHANISM STUDIES.
21      Q.   WAS THE RESULT HERE THAT THERE WERE ACTUALLY TWO HEART
22      ATTACKS ON THE PLACEBO AND ONE ON VIOXX?
23      A.   AGAIN, WITH THE PROVISO THAT THE DATA MAY NEED TO BE
24      CHECKED AND I HAVEN'T READ THE ARTICLE, I'M WILLING TO BELIEVE
25      THAT.
page 443
1       Q.   LET ME HAND YOU EXHIBIT 694.
2       A.   IT SAYS HERE THAT THREE PATIENTS HAD EVENTS,
3       REVASCULARIZATION IN THE ROFECOXIB GROUP AND ONE HAD AN MI.  SO
```

7

**Exhibit 1 - Excerpts of *Plunkett v. Merck* Trial Transcripts**

```
 4      WE COULD INCLUDE ALL OF THESE STUDIES, BUT THEY'RE --
 5      Q.   BUT YOU DIDN'T, RIGHT?
 6      A.   THEY ARE SMALL.
 7      Q.   EXHIBIT 694, AGAIN, THIS IS A PUBLISHED STUDY THAT ANYBODY
 8      WHO DID A LITERATURE SEARCH WOULD FIND, RIGHT, NOT SOME SECRET
 9      STUDY.
10      A.   I BELIEVE THIS ONE IS ACTUALLY INCLUDED IN JÜNI'S
11      META-ANALYSIS.
12      Q.   YOU THINK THIS ONE IS?
13      A.   I THINK IT IS, YES.
14      Q.   HOW WOULD YOU FIND THAT OUT?
15      A.   WELL, I COULD REFER TO THE JÜNI ARTICLE.
16      Q.   OKAY.  WHEN WE GET TO JÜNI, WE'LL DO THAT.  JUST STICKING
17      WITH THIS ARTICLE ITSELF, THIS IS A SIX-WEEK STUDY OF VIOXX AT
18      12.5 AND 25 MILLIGRAMS, AS WELL AS CELEBREX AND SOMETHING
19      CALLED ACETAMINOPHEN?
20      A.   THAT'S TYLENOL.
21      Q.   TYLENOL.  THERE WERE OVER 380 PATIENTS, RIGHT?
22      A.   YES.
23      Q.   THERE WERE NO HEART ATTACKS FOUND IN ANY OF THE GROUPS,
24      RIGHT?
25      A.   YES.  IN THE META-ANALYSIS, THOSE STUDIES WOULD ACTUALLY
page 444
 1      DROP OUT, SO INCLUDING THEM OR EXCLUDING THEM MAKES NO
 2      DIFFERENCE.
```

[448:25] - [449:5]      2/7/2006      Day 2 - Baumgartner, Carroll, Weiner, Ray
```
page 448
25      Q.   HAVE YOU DONE A CALCULATION OF THE RELATIVE RISKS WHERE
page 449
 1      YOU SAY, "OKAY.  I'M GOING TO TAKE VIGOR OUT BECAUSE IT'S 50
 2      MILLIGRAMS, TWICE THE NORMAL DOSE, AND IT'S COMPARING TO
 3      NAPROXEN INSTEAD OF A PLACEBO, TO SEE WHETHER THIS RELATIVE
 4      RISK STAYS ABOVE 2.0 OR DROPS BELOW 2.0"?  HAVE YOU DONE THAT?
 5      A.   I DID NOT CONSIDER IT APPROPRIATE AND SO I DIDN'T DO IT.
```

[485:5] - [486:7]      2/8/2006      Day 3 - Ray, Scolnick
```
page 485
 5      Q.   YESTERDAY YOU ASKED ME IF WE COULD GO OVER THE JOHNSEN
 6      STUDY, WHICH WE HAVE DONE, AND REMEMBER I ASKED YOU IF YOU
 7      COULD TAKE VIGOR, WHICH HAD 50 MILLIGRAMS -- IF YOU COULD KIND
 8      OF BACK VIGOR OUT OF YOUR TABLE 9 AND FIGURE OUT WHAT THE
 9      RELATIVE RISK WOULD BE IF YOU TOOK VIGOR OUT, IF SOMEBODY
10      DECIDED THAT VIGOR IS JUST APPLES AND ORANGES.  OVER THE
11      EVENING, DID YOU HAVE A CHANCE TO DO THAT?
12      A.   WELL, I THINK THAT -- OVER THE EVENING, I REALIZED EVEN
13      MORE STRONGLY THAT THAT'S INAPPROPRIATE.  WE DO NOT BACK VIGOR
14      OUT OF THE EFFICACY CALCULATIONS.  SO WHEN MERCK MARKETS THE
15      DRUG TO PATIENTS FOR 25 MILLIGRAMS, THEY RELY ON VIGOR TO SHOW
16      THAT IT CAUSES FEWER GI PROBLEMS.  THAT'S FINE.  I ACCEPT THAT.
17      THAT'S THE WAY WE PRACTICE MEDICINE.  SIMILARLY, WE DON'T BACK
18      VIGOR OUT OF SAFETY CALCULATIONS.  THAT'S JUST THE WAY IT'S
19      DONE.  THAT'S THE GENERALLY ACCEPTED PRACTICE.
20      Q.   SO IS THE ANSWER THAT, NO, YOU DID NOT DO THAT OVER THE
21      EVENING?
22      A.   I THINK I ANSWERED THE QUESTION.
23      Q.   DID YOU DO IT OR NOT?
24      A.   NO, I DID NOT.
25      Q.   YOU TOLD ME WHAT YOU THOUGHT ABOUT WHETHER IT WOULD BE A
page 486
 1      GOOD IDEA OR A BAD IDEA, BUT MY QUESTION IS NOT WHETHER YOU
 2      THINK IT'S A GOOD IDEA.  MY QUESTION IS:  IF OTHER PEOPLE THINK
 3      IT'S A GOOD IDEA AND WANT TO KNOW THE ANSWER, HAVE YOU DONE THE
 4      MATH?
 5      A.    THANK YOU FOR CLARIFYING THAT.  MY RESPONSE IS THAT,
 6      ACCORDING TO GENERALLY ACCEPTED PRACTICE, IT'S INAPPROPRIATE,
 7      SO I DID NOT DO IT.
```

**Exhibit 1 - Excerpts of *Plunkett v. Merck* Trial Transcripts**

[501:20] - [502:14]    2/8/2006    Day 3 - Ray, Scolnick

page 501
20    Q.   NOW, DID YOU EVER JUST SAY, "OKAY.  SINCE I TESTIFIED
21    UNDER OATH THAT THE MORE ACCURATE NUMBER FOR VIGOR FOR RELATIVE
22    RISK WOULD BE 2.8 RATHER THAN 5.0," DID YOU EVER TAKE TABLE 9
23    AND SAY, "I'M GOING TO TAKE VIGOR OUT OF THE JÜNI ONE, JUST
24    FIGURE OUT THE RELATIVE RISK FROM THE OTHER STUDIES THAT JÜNI
25    HAS, AND I'M GOING TO TREAT VIGOR THE WAY I THINK IS RIGHT AND
page 502
1    GIVE IT 2.8," AND THEN FIND OUT THAT, LO AND BEHOLD, THIS
2    NUMBER WOULD DROP SIGNIFICANTLY BELOW 2.0?  DID YOU EVER DO
3    THAT CALCULATION?
4    A.   IT'S AN EXCELLENT POINT THAT THE JÜNI ANALYSIS FOCUSES ON
5    HEART ATTACKS, AND I DID CONSIDER TRYING TO TAKE ALL OF THE
6    20-SOMETHING STUDIES THAT JÜNI ANALYZED AND LOOKING AT SERIOUS
7    CORONARY HEART DISEASE FOR ALL OF THOSE STUDIES.  IN ADVANTAGE,
8    FOR EXAMPLE -- WHICH IS ANOTHER ONE OF THE STUDIES I PRESENT IN
9    MY REPORT -- THE NUMBER THAT JÜNI USES IS LOWER BECAUSE OF THE
10    INCLUSION OF -- THE FOCUS ON HEART ATTACKS ONLY.  I DECIDED
11    THAT TO REVIEW THOSE 20 STUDIES WOULD BE A WORK OF A COUPLE OF
12    YEARS AND THAT THE JÜNI ANALYSIS, WHICH FOCUSES ON HEART
13    ATTACKS, IS PERFECTLY APPROPRIATE FOR MY POOLED ANALYSIS.  I
14    TELL YOU WHAT I DO, AS WELL, SO IT'S ALL TRANSPARENT.


[749:15] - [751:25]    2/8/2006    Day 3 - Ray, Scolnick

page 749
15             I LOOK AT IT IN ITS TOTALITY, AND I AM CONCERNED
16    THAT HE HAS ENOUGH EXPERIENCE, ENOUGH EDUCATION, OR ENOUGH
17    HANDS-ON OR KNOWLEDGE OR EVEN WHETHER HE'S BEEN EXPOSED TO
18    ENOUGH OR EVEN UNDERSTANDS WHAT HE HAS BEEN GIVEN.  I ALSO AM
19    CONCERNED A BIT ABOUT HIS METHODOLOGY.  ON PAGE 51, HE'S ASKED:
20             "Q.   RIGHT.  BUT THAT -- SO IF WE TAKE YOUR SENTENCE
21    SERIOUSLY, YOU WOULD BE OPINING THAT, INDIVIDUALLY, ANYONE
22    WHO IS TAKING VIOXX, WHO HAD A HEART ATTACK, MORE LIKELY
23    THAN NOT VIOXX CONTRIBUTED TO THE HEART ATTACK?"
24             "A.   IF YOU TAKE THEM ONE AT A TIME, THAT WOULD BE
25    CORRECT."
page 750
1             AGAIN, ON PAGE 61, LINE 4, HE'S ASKED:
2             "Q.   SO JUST SO WE UNDERSTAND YOUR METHODOLOGY FOR
3    GIVING A SPECIFIC CAUSE OPINION, THE METHODOLOGY YOU
4    APPLIED HERE SUGGESTS THAT, ON AN INDIVIDUAL BASIS, YOU
5    WOULD SAY ANYONE WHO TEMPORALLY HAD A HEART ATTACK WHILE
6    ON VIOXX, MORE LIKELY THAN NOT, VIOXX WAS A CONTRIBUTING
7    CAUSE.  CORRECT?"
8             "A.   ASSUMING THAT WE'RE TALKING ABOUT INDIVIDUALS
9    HAVING HEART ATTACKS BASED ON CORONARY ARTERY DISEASE,
10    YEAH.  IF YOU PULLED AN INDIVIDUAL PATIENT AND PRESENTED
11    IT TO ME, I THINK THAT WOULD BE THE PROBABILITY, YES."
12             "Q.   AND THAT'S THE METHOD YOU APPLIED?"
13             "A.   YES."
14             THAT METHODOLOGY, IF YOU'RE TAKING THE DRUG AND
15    YOU HAVE A HEART DISEASE -- HEART PROBLEM, THE DRUG CAUSED IT.
16    THAT'S A METHODOLOGY THAT I DON'T THINK PASSES THROUGH THE
17    GATES OF 702.  HE WAS QUESTIONED ON THE METHODOLOGY ON PAGE
18    109:
19             "Q.   NOW, EARLIER YOU AGREED THAT IT WOULD BE YOUR
20    EXPECTATION THAT NOT EVERYONE WHO TEMPORALLY HAD A HEART
21    ATTACK WHILE ON VIOXX NECESSARILY HAD THEIR HEART ATTACK
22    CAUSED BY VIOXX.  DO YOU RECALL SAYING THAT?"
23             "A.   YES."
24             "Q.   HOW DO YOU DISTINGUISH BETWEEN THOSE PEOPLE WHO
25    HAD A CARDIAC EVENT THAT YOU BELIEVE WAS CAUSED BY VIOXX
page 751
1    AND THOSE WHOM DO NOT?"
2             "A.   AGAIN, IT'S PROBABILITY.  IT'S -- YOU'RE LOOKING
3    AT STATISTICALLY.  IF THERE IS A MORE OR -- MORE THAN TWO
4    TIMES INCIDENCE THAT ANY INDIVIDUAL PATIENT WOULD MOST
5    LIKELY BE IN THE GROUP, THAT IT WAS RELATED TO VIOXX.

9

**Exhibit 1 - Excerpts of *Plunkett v. Merck* Trial Transcripts**

```
 6          IT'S REALLY A STATISTICAL PROBABILITY.  THERE IS NOTHING
 7          IN THE PATHOLOGY THAT YOU CAN POINT TO AND SAY THIS IS A
 8          VIOXX THROMBUS."
 9              "Q.  ALL RIGHT.  LET'S TALK ABOUT THAT LAST ANSWER.
10          WHEN YOU SAY THERE IS NOTHING IN THE PATHOLOGY THAT YOU
11          CAN POINT TO AND SAY THIS IS A VIOXX THROMBUS, DOES THAT
12          MEAN THAT THERE IS NOTHING THAT IDENTIFIES A BLOOD CLOT IN
13          A CORONARY ARTERY AS BEING CAUSED BY VIOXX SPECIFICALLY ON
14          A PATHOLOGICAL REVIEW?"
15              "A.  THAT WOULD BE CORRECT."
16              THEN QUESTION ON 110:
17              "Q.  DOES THAT MEAN, SIR, THAT YOU CANNOT DISTINGUISH
18          IN THE GROUP OF FOLKS WHO HAD HEART ATTACKS WHILE TAKING
19          VIOXX THOSE WHO HAD HEART ATTACKS FROM VIOXX AND THOSE WHO
20          DID NOT?"
21              "A.  YOU CAN DO THEM IN BIG POPULATIONS
22          STATISTICALLY.  BUT IF YOU'RE ASKING ABOUT THIS INDIVIDUAL
23          PATIENT, AGAIN, YOU'RE DEALING WITH PROBABILITIES.  YOU
24          CAN'T POINT TO THE THROMBUS AND SAY THIS IS A VIOXX
25          THROMBUS VERSUS A NON-VIOXX THROMBUS."
```

[839:2] - [839:8]    2/9/2006    Day 4 - Scolnick, Graham, Schirmer, Baldwin, Topol

```
page 839
 2          Q.  AND, DOCTOR, CAN YOU TELL US WHETHER OR NOT DICKY IRVIN'S
 3          ATHEROSCLEROSIS, HIS ATHEROSCLEROTIC CONDITION ALONE WOULD HAVE
 4          LED TO HIS DEATH ON MAY 15, 2001?
 5          A.  IF --
 6          Q.  WITHOUT ANY CATALYST, WITH JUST HIS ATHEROSCLEROTIC
 7          CONDITION, HAVE LED TO HIS DEATH ON MAY 15, 2001?
 8          A.  PROBABLY NOT.
```

[840:15] - [840:22]    2/9/2006    Day 4 - Scolnick, Graham, Schirmer, Baldwin, Topol

```
page 840
15          Q.  AND AM I RIGHT THAT HEART DISEASE IN GENERAL, AS A CAUSE
16          OF DEATH, WAS EXTRAORDINARILY COMMON IN THOSE 7,000 AUTOPSIES
17          THAT YOU'VE PERFORMED OR SUPERVISED?
18          A.  AMONG THE NATURAL DEATHS, YES.
19          Q.  SO EXCLUDING THE PEOPLE WHO WERE SHOT TO DEATH OR STABBED,
20          THE PEOPLE WHO DIED NATURAL DEATHS, HEART DISEASE IS AN
21          EXTRAORDINARILY COMMON CAUSE OF DEATH; IS THAT RIGHT?
22          A.  YES, IT IS.
```

[843:22] - [843:25]    2/9/2006    Day 4 - Scolnick, Graham, Schirmer, Baldwin, Topol

```
page 843
22          Q.  IN THE 7,000 AUTOPSIES THAT YOU YOURSELF HAVE DONE OR
23          SUPERVISED, HAVE YOU EVER MADE A CONCLUSION THAT VIOXX OR ANY
24          OTHER COX-2 INHIBITOR CONTRIBUTED TO A PATIENT'S DEATH?
25          A.  NO.
```

[845:5] - [845:19]    2/9/2006    Day 4 - Scolnick, Graham, Schirmer, Baldwin, Topol

```
page 845
 5          Q.  OKAY.  SO "CAUSE OF DEATH:  VENTRICULAR FIBRILLATION DUE
 6          TO ARTERIOSCLEROTIC CORONARY HEART DISEASE," AND YOU DESCRIBED
 7          WHAT VENTRICULAR FIBRILLATION IS.  JUST BRIEFLY, WHAT IS
 8          ARTERIOSCLEROTIC CORONARY HEART DISEASE?
 9          A.  IT'S HARDENING OF THE ARTERIES, AFFECTING THE ARTERIES
10          THAT SUPPLY BLOOD TO THE HEART.
11          Q.  AND IS THIS CAUSE OF DEATH THAT'S DESCRIBED HERE THE
12          LEADING CAUSE OF DEATH FOR AMERICAN MEN IN THEIR 50S?
13          A.  YES.
14          Q.  WAS THAT TRUE BEFORE, SAY, 1998?
15          A.  YES.
16          Q.  IS IT TRUE TODAY IN THE YEAR, WHAT ARE WE IN NOW, 2006?
17          A.  I THINK SO, YES.
18          Q.  AND LAST YEAR TOO, RIGHT?
19          A.  AND LAST YEAR TOO.
```

## Exhibit 1 - Excerpts of *Plunkett v. Merck* Trial Transcripts

[851:8] - [852:1]     2/9/2006     Day 4 - Scolnick, Graham, Schirmer, Baldwin, Topol

```
page 851
 8        Q.   THANKS.   THE KIND OF PLAQUE THAT YOU WERE DESCRIBING WITH
 9        MR. BIRCHFIELD THAT YOU SAW ON THE SLIDES FROM MR. IRVIN, HOW
10        LONG DOES IT TAKE FOR THAT KIND OF PLAQUE TO BUILD UP?
11        A.   THE PLAQUE ITSELF?   YEARS.
12        Q.   IN FACT, I THINK YOU'VE INDICATED BEFORE THAT THAT PLAQUE
13        BUILDUP COULD HAVE BEEN GOING ON FOR 30 YEARS OR SO?
14        A.   SURE.
15        Q.   AND IN TERMS OF WHY PLAQUE BUILDS UP LIKE IT DID ON THE
16        SLIDES WE SAW, CAN THAT BE DUE TO AGE?
17        A.   YES.
18        Q.   AND WHETHER YOU'RE A MAN OR A WOMAN?   IT'S MORE LIKELY IN
19        MEN, RIGHT?
20        A.   YES.
21        Q.   FAMILY HISTORY COULD PLAY A ROLE IN THAT?
22        A.   IT COULD PLAY SOME ROLE, SURE.
23        Q.   HOW ABOUT DIET?
24        A.   DIET IS IMPORTANT.
25        Q.   WEIGHT?
page 852
 1        A.   A LITTLE BIT.   NOT VERY MUCH.
```

[853:23] - [854:7]     2/9/2006     Day 4 - Scolnick, Graham, Schirmer, Baldwin, Topol

```
page 853
23        Q.   SO FOR MEN IN THEIR 50S, THE MOST COMMON CAUSE OF A HEART
24        ATTACK IS WHEN SUBCRITICAL, LESS THAN 75 PERCENT, PLAQUE
25        RUPTURES AND THROMBUS FORMS.   RIGHT?
page 854
 1        A.   YES.
 2        Q.   AND WAS THAT TRUE BEFORE 1998?
 3        A.   YES.
 4        Q.   IS IT TRUE IN WHATEVER THIS YEAR IS, 2006?
 5        A.   IT'S STILL TRUE.
 6        Q.   AND WAS IT TRUE IN 2005?
 7        A.   YES.
```

[854:21] - [855:1]     2/9/2006     Day 4 - Scolnick, Graham, Schirmer, Baldwin, Topol

```
page 854
21        Q.   AND THIS PROCESS THAT WE HAVE BEEN TALKING ABOUT OF A
22        PLAQUE RUPTURE, LIPID CORE IN CONTACT WITH THE BLOOD FORMING A
23        THROMBUS, YOU SAID BEFORE IT'S THE MOST COMMON CAUSE OF HEART
24        ATTACKS OF MEN IN THEIR 50'S.   AND IN FACT, THIS IS THE SORT OF
25        THING THAT HAPPENS TENS OF THOUSANDS OF TIMES EVERY YEAR?
page 855
 1        A.   YES.
```

[857:19] - [858:2]     2/9/2006     Day 4 - Scolnick, Graham, Schirmer, Baldwin, Topol

```
page 857
19        Q.   AND MR. IRVIN HAD VULNERABLE PLAQUE, DIDN'T HE?
20        A.   THAT'S THE WAY I WOULD CHARACTERIZE IT.
21        Q.   AND FROM YOUR KNOWLEDGE OF HOW THIS DEVELOPS, HE HAD
22        VULNERABLE PLAQUE BEFORE THE YEAR 19 -- BEFORE THE YEAR 2000,
23        WOULDN'T YOU SAY?
24        A.   PROBABLY.
25        Q.   AND BEFORE THE YEAR 2000, HE WAS AT RISK FOR A RUPTURE OF
page 858
 1        THE VULNERABLE PLAQUE AND THROMBUS FORMING, WOULDN'T YOU SAY?
 2        A.   PROBABLY WAS, YEAH.
```

[859:3] - [859:8]     2/9/2006     Day 4 - Scolnick, Graham, Schirmer, Baldwin, Topol

```
page 859
 3        Q.   IS THERE A TIME OF DAY WHEN HEART ATTACKS ARE MORE LIKELY
 4        TO OCCUR?
 5        A.   MOST STUDIES WILL SHOW THEY ARE MORE COMMON IN THE
 6        MORNING.
```

## Exhibit 1 - Excerpts of *Plunkett v. Merck* Trial Transcripts

```
7       Q.    WHEN DID MR. IRVIN'S OCCUR?
8       A.    MORNING.
```

[885:19] - [886:7]      2/9/2006      Day 4 - Scolnick, Graham, Schirmer, Baldwin, Topol

```
page 885
19      Q.    AND DID HE EXPLAIN THAT THE MEDICATIONS THAT YOU HAD
20      PRESCRIBED FOR HIM BEFORE WERE NOT WORKING?
21      A.    THAT WAS MY RECOLLECTION, YES, SIR.
22      Q.    AND THAT IT DIDN'T WORK FOR HIS PAIN RELIEF AND, ALSO,
23      THAT IT GAVE HIM STOMACH PROBLEMS, RIGHT?
24      A.    TO BE HONEST, ALL I REMEMBER, IT WASN'T WORKING, SO AND IT
25      WASN'T WORKING AND I HAVE A MEDICINE THAT WAS WORKING, COULD I,
page 886
1       YOU KNOW, HELP HIM OUT.
2       Q.    AND DID HE EXPLAIN TO YOU THAT SOME FRIEND OF HIS HAD GAVE
3       HIM A COUPLE OF VIOXX SAMPLES?
4       A.    YES, SIR.
5       Q.    AND DID HE EXPLAIN TO YOU THAT THE VIOXX SAMPLES SEEMED TO
6       WORK WELL AND ALLEVIATE HIS PAIN WITH NO ADVERSE REACTIONS?
7       A.    YES.
```

[924:14] - [924:16]      2/9/2006      Day 4 - Scolnick, Graham, Schirmer, Baldwin, Topol

```
page 924
14      Q.    DO SOME PEOPLE DIE OF HEART ATTACKS WITHOUT ANY WARNING
15      SIGNALS?
16      A.    YES, SOME CAN.
```

[936:6] - [936:16]      2/9/2006      Day 4 - Scolnick, Graham, Schirmer, Baldwin, Topol

```
page 936
6       Q.    YOU MENTIONED EARLIER CATALYSTS.  ARE THERE CATALYSTS THAT
7       CAN AFFECT THAT BALANCE IN THE BODY OR THAT PROTHROMBOTIC
8       STATE?
9       A.    I BELIEVE SO.  I THINK YOU CAN PROBABLY GO BACK AND SAY
10      THAT RISK FACTORS THEMSELVES COULD BE INTERPRETED AS CATALYSTS
11      BECAUSE NOT ONLY DO THEY INCREASE THE RISK OF ATHEROSCLEROSIS
12      DEVELOPING IN THE FIRST PLACE, BUT THERE'S GENERAL OPINION THAT
13      ALSO THOSE DISEASE PROCESSES FOR RISK FACTORS AFFECT HOW THE
14      ARTERY WALL AND PLATELETS INTERACT.  SO THE RISK FACTOR ITSELF
15      COULD BE CONSIDERED A CATALYST, OTHER MEDICATIONS COULD BE
16      CONSIDERED AS CATALYSTS.
```

[942:10] - [942:12]      2/9/2006      Day 4 - Scolnick, Graham, Schirmer, Baldwin, Topol

```
page 942
10      Q.    ON AUTOPSY IT WAS DESCRIBED AS 60 PERCENT OCCLUSION?
11      A.    RIGHT.  AT THE TIME OF THE HEART CATHETERIZATION TEST, I
12      THINK THAT LIKELY WOULD HAVE BEEN MUCH LESS.
```

[948:16] - [948:24]      2/9/2006      Day 4 - Scolnick, Graham, Schirmer, Baldwin, Topol

```
page 948
16      Q.    RIGHT.  SO MR. IRVIN HAD A HEART ATTACK FROM A BLOOD CLOT,
17      CORRECT, IN HIS CORONARY ARTERY?
18      A.    CORRECT.
19      Q.    THE GREAT MAJORITY OF HEART ATTACKS IN THIS COUNTRY ARE
20      CAUSED BY BLOOD CLOTS, CORRECT?
21      A.    THEY ARE USUALLY IN THE FACE OF MORE CRITICAL NARROWINGS.
22      Q.    THE ANSWER IS, "YES, THE GREAT MAJORITY OF HEART ATTACKS
23      ARE CAUSED BY BLOOD CLOTS"?
24      A.    YES, USUALLY IN THE FACE OF MORE CRITICAL NARROWINGS.
```

[952:12] - [952:25]      2/9/2006      Day 4 - Scolnick, Graham, Schirmer, Baldwin, Topol

```
page 952
12      Q.    NOW, WITH RESPECT TO THE OTHER RISK FACTORS THAT YOU
13      DESCRIBED -- DIABETES, SMOKING -- MR. IRVIN DIDN'T HAVE VERY
14      MANY MEDICAL RECORDS FOR YOU TO REVIEW, DID HE?
```

**Exhibit 1 - Excerpts of *Plunkett v. Merck* Trial Transcripts**

```
15      A.    THAT'S CORRECT.
16      Q.    WHEN YOU SAID THAT HE DID NOT HAVE HIGH CHOLESTEROL, YOU
17      DIDN'T REALLY KNOW WHAT HIS CHOLESTEROL WAS AT ANY POINT IN HIS
18      LIFE, DO YOU, DOCTOR?
19      A.    I DON'T RECALL THAT I'VE EVER SEEN A CHOLESTEROL LEVEL IN
20      THIS PATIENT'S MEDICAL RECORD.
21      Q.    WHEN YOU SAID THAT MR. IRVIN DID NOT HAVE HIGH BLOOD
22      PRESSURE, YOU CERTAINLY DIDN'T SEE ANY BLOOD PRESSURE READINGS
23      FOR HIM IN THE PRECEDING THREE OR FOUR YEARS BEFORE HIS DEATH,
24      CORRECT?
25      A.    THAT'S CORRECT.
```