FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 FEB 21  AM 7: 37

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MICHAEL HEAVRIN,<br>KEVIN HENDERSON,<br>JANICE BAUM,<br>DARAI BRINER as Personal Representative<br>of the Estate of His Mother, Phyllis Briner,<br>RUBEN PORTILLO, Individually and as<br>Heir of Elvira M. Peña, | )<br>)<br>)<br>)<br>)<br>)<br>) | |
| | ) | CAUSE NO. |
| Plaintiffs, | )<br>) | |
| | ) | |
| vs. | ) | **CLASS ACTION COMPLAINT** |
| | ) | |
| MERCK & CO., INC., | ) | **DEMAND FOR JURY TRIAL** |
| | ) | |
| Defendant. | ) | |

## AMENDED COMPLAINT FOR DAMAGES
## AND CERTIFICATION OF CLASS ACTION

Plaintiffs, Michael Heavrin, Kevin Henderson, Darai Briner as personal representative of the

estate of his mother, Phyllis Briner, Ruben Portillo individually and as son and natural heir of Elvira

M. Peña, deceased, bring this action on behalf of themselves and all others similarly situated.

## PARTIES AND JURISDICTION

1.     Plaintiff Michael Heavrin ("Heavrin") is a citizen of the State of Indiana and a

resident of Marion County.

2.     Plaintiff Kevin Henderson ("Henderson") is a citizen of the State of Indiana and a

resident of Lake County.

3.     Plaintiff Janice Baum ("Baum") is a citizen of State of Indiana and a resident of Allen

County.

___ Fee_____
___ Process_____
_X_ Dktd_____
_√_ CtRmDep_____
___ Doc. No._____

4.     Plaintiff Darai Briner ("Briner") is a citizen of the State of Indiana and a resident of Lake County.  Decedent Phyllis Briner ("Mrs. Briner) was a resident of Lake County at the time of her death.

5.     Plaintiff Ruben Portillo ("Portillo") is a citizen of the State of Indiana and a resident of Orange County.  Decedent Elvira M. Peña (" Peña") was a resident of the State of Texas at the time of her death.

6.     Defendant Merck & Co., Inc. ("Merck") is incorporated under the laws of the State of New Jersey and maintains its principal place of business at One Merck Drive, Whitehouse Station, New Jersey.

7.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 because there is complete diversity of citizenship between the Plaintiffs and Merck and because the amount in controversy exceeds $75,000.00 each, exclusive of interest and costs.

8.     Venue is properly laid in this district because Heavrin is a resident of the Southern District of Indiana and Merck does business in this district.

## I.     GENERAL FACTS COMMON TO ALL CAUSES OF ACTION

9.     This is an action brought by Plaintiffs on behalf of themselves and all others similarly situated, who have ingested the non-steroidal, anti-inflammatory pain medication, Vioxx (chemical name "rofecoxib").

10.     This action seeks damages and the establishment of a medical monitoring program on behalf of the Plaintiffs and the class to ensure prompt diagnosis and treatment for Vioxx related adverse cardiovascular, cerebral and other adverse health effects for all Class Members.

## II.   FACTS COMMON TO ALL CAUSES OF ACTION

11.     At all times relevant, Merck itself or through the use of agents, researched, developed, manufactured, designed, tested, distributed, marketed, promoted, advertised and otherwise sold the pharmaceutical product, Vioxx.

12.     Vioxx is a brand name used by Merck to market and distribute rofecoxib. Merck began its distribution and sale of Vioxx in or about May of 1999 throughout the United States, including the states of Indiana and Texas. In order to insure successfully launching this product in competition with Celebrex (celecoxib) which was introduced to the market by Merck competitors Pharmacia and Pfizer, approximately three (3) months prior to the introduction of Vioxx, Merck failed to disclose the serious cardiovascular risks associated with Vioxx.

13.     Heavrin purchased ingested the drug Vioxx for four years. As a result of which he suffered a heart attack on September 29, 2002. Heavrin had no cardiac problems before ingesting Vioxx.

14.     Henderson purchased and ingested the drug Vioxx for approximately four (4) years. As a result of his ingestion of Vioxx, Henderson suffered Angina.

15.     Baum obtained and ingested the drug Vioxx for three (3) years. As a result of which she suffered major swelling of her extremities and severe blistering of her feet which required that she be treated at the Burn Unit in Ft. Wayne. She also went to the Mayo Clinic in an attempt to obtain a diagnosis of the causation of the narrowing of her arteries which resulted in this blistering and her feet turning purple. She missed a substantial amount of time from her work and incurred enormous medical bills as a result of these conditions caused by Vioxx.

3

16.     Briner is the son and personal representative of the estate of Mrs. Briner who died at age 56. She suffered a stroke and was in the hospital for approximately one (1) month prior to developing a blood clot which lodged in her lungs and was identified as the precipitating cause of death. Prior to that time, she had purchased and ingested Vioxx for a number of years.

17.     Peña purchased Vioxx and ingested the drug on a regular basis for many years. As a result of her taking Vioxx, she suffered a heart attack and died on December 21, 2003.

18.     Until Merck withdrew Vioxx from the market on or about September 30, 2004, none of the Plaintiffs or the Plaintiffs' decedents were aware of the connection between Vioxx and the substantially increased likelihood of suffering a cardiovascular or cerebrovascular incident as a result of taking Vioxx. At no time did any Plaintiff receive adequate warning that taking Vioxx could increase the chances of suffering cardiovascular incidents or cerebral events such as a stroke. Merck continued to market Vioxx from 1999 through September of 2004 through numerous television and print advertisements directed to the potential patient population and consuming public, as well as to the prescribing physicians, with no adequate warnings that Vioxx carried with it the cardiovascular risks which have now been disclosed.

19.     Merck knew or should have known of this increased risk as a result of prior studies of the performance of the drug as early as the year 2000, shortly after introduction of Vioxx to the market.

20.     In March of 2000, Merck released the results of the Vioxx Gastroinstestinal Outcomes Research Study (the "Vigor Study"), which had begun in approximately January 1999. The VIGOR Study revealed, among other things, "significantly fewer heart attacks were observed in patients taking Naproxen (0.1%) compared to the group taking Vioxx 50mg. (0.5%)."

4

21.     While the VIGOR Study did demonstrate that Vioxx reduced the incidence of serious gastrointestinal side effects as compared to Naproxen, it did not demonstrate an improved safety profile for Vioxx.  The VIGOR Study data revealed that:

      a.     Patients on Vioxx were five times more likely to suffer a heart attack as compared to patients on Naproxen;

      b.     Patients on Vioxx were 2.3 times more likely to suffer serious cardiovascular disease (including heart attacks, ischemic stroke, unstable angina, and sudden unexplained death) as compared to patients on Naproxen; and

      c.     Patients on Vioxx actually suffered *more* cases of serious disease (either gastrointestinal or cardiovascular) than did Naproxen users (61 and 57 cases respectively).

22.     In June of 2000, in an effort to obtain approval for new gastrointestinal safety claims for Vioxx, Merck submitted to the FDA this VIGOR Study that disclosed a substantial increased risk of serious cardiovascular events, including heart attacks and strokes in patients taking Vioxx, compared to patients taking Naproxen.  According to the FDA, "[e]valuation of safety by routine parameters showed no advantage of [Vioxx] refecoxib over Naproxen."

23.     Ignoring the evidence of a causal relationship between Vioxx and this significantly increased rate of cardiovascular events, Merck claimed that Naproxen had "cardio-protective effects" thus resulting in the lower incidents of heart attacks in the group taking Naproxen.

24.     After the VIGOR Study, evidence of the increased danger of cardiovascular problems continued to mount.  Industry sponsored studies presented at the European United League Against Rheumatism (EULAR), an organization in which Merck is a member and corporate sponsor, in June of 2000, showed that Vioxx use resulted in a statistically significant increase in hypertension and

myocardial infarction. Merck denied the results of these studies as to the hypertension problems in the official publication of the American Pharmaceutical Association, *Pharmacy Today*.

25.     Merck continued to deny the ill health effects associated with Vioxx while at the same time reaping the profits obtained through their false and misleading advertising to the patient public, including the Class Members, and to the physicians treating them. Merck engaged in a massive advertising and sampling program and gained continued increases in market share and sales, resulting in billions of dollars in sales for Merck in 2000 and thereafter and in Merck obtaining a significant market share.

26.     In November of 2000, Merck caused the publication of a study in the NEW ENGLAND JOURNAL OF MEDICINE, knowingly downplaying and/or withholding from publication the severity of cardiovascular risks associated with Vioxx consumption as compared to Naproxen consumption found in the VIGOR Study.

27.     Merck denied reports concerning the increased risk of cardiovascular problems as inaccurate and inconclusive. For example, on May 22, 2001, Merck issued a press release through the *PR Newswire* that stated, among other things: "In response to news and analyst reports of data the Company first released a year ago, Merck & Co., Inc. today reconfirmed the favorable cardiovascular safety profile of Vioxx."

28.     On August 22, 2001, the *Journal of the American Medical Association* ("JAMA") published an article authored by cardiologists Eric J. Topol, Debarata Mukherjee, and Steven E. Nessen of the Cleveland Clinic Foundation entitled "Risk of Cardiovascular Events Associated With Selective Cox-2 Inhibitors," which reported the results of a study of Vioxx and its competitor Celebrex. The JAMA article reported the Cleveland Clinic's evaluation of two randomized trials of

6

over 15,000 patients: "the annualized myocardial infarction rates for COX-2 inhibitors in both

VIGOR and CLASS were significantly higher than that in the placebo group . . ."

29.     The day before the JAMA article was published, *Bloomberg News* reported that

Merck attempted to discredit the article and further deceive the public and prescribing physicians by

claiming: "We have additional data beyond what they cite, and the findings are very, very reassuring.

Vioxx does not result in any increase in cardiovascular events compared to placebo." Further, on

August 23, 2001, the day after the article was published, Merck stated in a press release, "the

Company stands behind the overall and cardiovascular safety profile...of Vioxx."

30.     In July 2001, an article in Web MD quoted an FDA Study: "the study found that

Vioxx cut the occurrence of ulcers and other gastrointestinal problems by half compared with the

over-the-counter NSAID Aleve. But the study also showed that people taking Vioxx had four times

the risk of a heart attack." Merck's spokeswoman Christine Fanelle contended the "risk was

negligible" and that "it appeared to increase the risk of a heart attack because Aleve, like aspirin,

actually reduces heart attack risks."

31.     In September 2001, the FDA sent Merck a warning letter which warned Merck that its

marketing of Vioxx was "false, lacking in fair balance, or otherwise misleading..." The Warning

Letter went on to advise Merck that its marketing "minimize[s] the Vioxx/Coumadin drug

interaction, omit[s] crucial risk information associated with Vioxx therapy, contain[s]

unsubstantiated comparative claims, and promote[s] unapproved uses."

32.     The Warning Letter also reprimanded Merck for:

> assert[ing] that Vioxx does not increase the risk of [heart attacks] and
> that the VIGOR finding is consistent with naproxen's ability to block
> platelet aggregation like aspirin.  That is a possible explanation, but

7

you fail to disclose that your explanation is hypothetical, has not been demonstrated by substantial evidence, and that there is another reasonable explanation, that Vioxx may have pro-thrombotic properties.

33.     The theory asserted by Merck to explain the results of the Vigor Study, that naproxen had cardioprotective effect and therefore accounted for the higher cardiovascular risks among Vioxx users was refuted in approximately January of 2002 by a Vanderbilt University School of Medicine human epidemiologic peer-reviewed study. The study was published in *The Lancet*, and concluded that there is an absence of a protective effect of naproxen or other non-aspirin non-steroidal anti-inflammatory drugs on risk of coronary heart disease. Ray, W., et al., "Non-Steroidal Anti-Inflammatory Drugs and Risk of Serious Coronary Heart Disease: an Observational Cohort Study," *The Lancet*, 359: 118-123, Jan. 12, 2002.

34.     In a follow-up study reported in the *Journal of the American College of Cardiology* on or about February 6, 2002, Dr. Richard J. Bing reported on having conducted scientific testing and confirmed that the Cox-2 inhibitor tips the balance of prostacyclin/thromboxane in favor of thromboxane, leading to increased vascular and thrombotic events.

35.     During the time the results of these studies were being published, consumers and healthcare professionals were complaining about Vioxx to the FDA. The FDA's Adverse Events Reporting System ("AERS") database is a computerized system for collecting and maintaining information about adverse events reported by drug manufacturers, health professionals, and others. The system contains adverse events detected and reported after marketing of the drug.

8

36.     According to AERS, through October of 2003, almost 2,000 adverse cardiovascular events were experienced by persons taking Vioxx, including myocardial infarctions, cardiac arrests, and cardiac failures.  These cardiac events reported to the FDA, resulted in such outcomes as hospitalization, life threatening conditions, and even death.  Moreover, this system under-reported the actual frequency of such events in the Vioxx-taking population.

37.     On October 30, 2003, in an article entitled "Vioxx Study Sees Heart-Attack Risk," *The Wall Street Journal* reported that another study, sponsored by Merck, presented at the annual meeting of the American College of Rheumatology, confirmed an increased "risk of heart attacks in patients taking the pill [Vioxx]."  According to *The Wall Street Journal* article, within the first 30 days of taking Vioxx, the risk of a heart attack was increased 39% as compared to Vioxx's competitor, Celebrex.  However, Merck continued to insist that it stood behind the overall and cardiovascular safety profile of Vioxx.

38.     In August 2004, *Health Day News* quoted the FDA as finding "this and other studies cast serious doubt on the safety" of Vioxx and that Celebrex "may be safer."  Again Merck sprang to the defense of Vioxx, even at this late date.  Peter S. Kim, President of Merck Research Laboratories was quoted as saying Merck "strongly disagrees" with the findings of this new study.  On August 26, 2004, The Street.com commented "Merck Thursday released a detailed critique questioning the studies significance."

39.     Belatedly, on September 30, 2004, Merck finally revealed that this double blind FDA sponsored study had shown that Vioxx doubled the risk of heart attack and stroke for consumers who had taken the drug for a period of time in excess of 18 months, as compared to subjects taking a

placebo for the same period of time. Because of the results of this study, Merck was finally forced to withdraw Vioxx from the market worldwide.

40.     However, the withdrawal from the market came after the Plaintiffs and Plaintiffs' decedents and other similarly situated Class Members ingested the drug without adequate notice of the inherent risks to their health. As a result, Plaintiffs and Plaintiffs' decedents and untold other members of the class suffered heart attacks, strokes and other cardiovascular events, including death. This number has been estimated at over 17,000 in one study. Additional Class Members not yet having suffered any such adverse event have had their risk of suffering such an event in the future at least doubled. As a result, these Class Members have been damaged in that their health has been adversely affected and their risk of being disabled or dying from a future cardiovascular event has been substantially increased. A medical monitoring program provided by Merck is necessary to minimize this increased risk and the damages resulting therefrom.

41.     If Merck had not engaged in this misleading conduct, consumers, including Plaintiffs, and their treating physicians, would have known the true risks of ingesting Vioxx and could have switched from Vioxx to safer products or refrained wholly from its use.

42.     The marketing strategies of Merck through massive advertising in the consumer media targeted Plaintiffs and the other Class Members to induce them to purchase Vioxx and to physicians and to encourage them to prescribe Vioxx. At the time Merck distributed, manufactured and marketed Vioxx, Merck intended that Plaintiffs would rely on the advertisements which misleadingly omitted or minimized references to the cardiovascular risks known to Merck.

43.     Thus, despite knowledge from its clinical trials, post-marketing reports, studies and information relating to cardiovascular-related adverse health effects, Merck promoted and marketed

10

Vioxx as safe and effective for persons such as Plaintiffs, Plaintiffs' decedents and members of the class.

### III.    CLASS ACTION ALLEGATIONS

44.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2) and/or (b)(3), on behalf of a class consisting of all persons who acquired and ingested Vioxx from May 21, 1999 to September 30, 2004, inclusive. Excluded from the class are the affiliates and subsidiaries of Merck, the officers and directors of Merck, members of the immediate family of any excluded person, the legal representatives, heirs, successors and assigns of any excluded person, and any entity in which any excluded person has or had a controlling interest.

45.    The members of the proposed class are geographically disbursed throughout the United States and are so numerous that joinder of all of them is impracticable.

46.    Plaintiffs' class claims are typical of class members' claims because each Class Member was subject to a common course of conduct and pattern of practice perpetrated by Merck and Plaintiffs have suffered cardiovascular events, the substantially increased risk of which was known to Merck during the relevant time period.

47.    No conflict exists between Plaintiffs and Class Members because: (a) the claims of the named Plaintiffs are typical of the absent Class Members' claims, (b) virtually all of the questions of law or fact at the liability stage are common to the class and predominate over any individual issues, such that by prevailing on their own claims, Plaintiffs necessarily will establish Merck's liability as to all Class Members, and (c) without the representation provided by Plaintiffs herein, many Class Members will not receive legal representation or redress for their injuries.

48.    Plaintiffs can and will fairly and adequately represent and protect the interests of the

class and have no interests that conflict with or are antagonistic to the interests of the class. Plaintiffs

have retained attorneys competent and experienced in class action litigation, consumer law and

product liability.

49.    There are issues of law common to the class which predominate over any individual

issues in the claims, including, but not limited to:

a.    Whether Merck designed, manufactured and/or marketed Vioxx with knowledge that it was a dangerously defective product;

b.    Whether Merck acted negligently in marketing and selling Vioxx and failing to timely remove it from the market;

c.    Whether Merck conducted, either directly or indirectly, adequate testing of Vioxx for cardiovascular events after becoming aware of the increased incidence of such effects in those taking Vioxx;

d.    Whether Merck failed to adequately warn consumers and their treating physicians of the adverse health hazards caused by using Vioxx;

e.    Whether Merck falsely and fraudulently misrepresented in its advertising, promotional materials and other materials, among other things, the safety of using Vioxx;

f.    Whether Merck knowingly omitted, suppressed or concealed material facts about the unsafe and defective nature of Vioxx from the medical community and/or the consuming public;

g.    Whether Merck's conduct constituted the knowing or intentional concealment, suppression or omission of material information intended to be relied upon by others in connection with the sale of Vioxx;

h.    Whether Merck's actions support a cause of action for medical monitoring;

i.    Whether medical monitoring of Henderson, Van Jelgerhuis, Baum and the class who used Vioxx is reasonably necessary;

j.    Whether Merck's actions justify an award of punitive damages;

  k.  Whether Merck's actions constituted the production and sale of a defective and unreasonably dangerous product, a violation of Section 402A of the Restatement (Second) of Torts; and

  l.  Whether Merck's actions constitute negligence in the design and/or testing of Vioxx, including negligent failure to warn.

50.  Virtually all of the issues of fact in the class claims are common to the class and predominate over any individual issues in the class claims.

51.  A class action is superior to any other available method for the fair and efficient adjudication of this claim, given that:

  a.  common questions of law and fact overwhelmingly predominate over any individual questions that may arise, such that there would be enormous economies to the courts and to the parties in litigating the common issues on a class-wide basis as opposed to a repetitive, individual basis, which could result in conflicting judgments and obligations for the parties; and

  b.  no unusual difficulties are likely to be encountered in the management of this action as a class action.

52.  Class certification is also appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because Merck has acted on grounds generally applicable to the class, making appropriate equitable injunctive relief with respect to Plaintiffs and the Class Members. Specifically, Plaintiffs seek injunctive relief in the form of court-ordered medical monitoring and treatment of medical conditions which may befall those who used Vioxx.

WHEREFORE, Plaintiffs pray that the Court certify a nationwide class of all those individuals who have taken the drug Vioxx from 1999 to October 2004.

## COUNT I
## Negligent Design, Failure to Reasonably Test and Failure to Warn

53.     Plaintiffs reallege each and every allegation of paragraphs 1 through 52 of this Complaint, as if set forth fully herein.

54.     At least after the VIGOR Study in March 2000, Merck knew or in the exercise of reasonable care should have known that evidence existed associating Vioxx with substantially increased risk of causing cardiovascular events dangerous to the health of those consumers taking Vioxx.  This knowledge of Merck increased with each study between March 2000 and September 30, 2004.

55.     Despite what Merck knew, should have known or was reckless in not knowing, as described herein, Merck negligently and in violation of 21 CFR § 201.57(e) failed to issue timely or adequate warnings of the danger of increased cardiovascular problems to the physicians prescribing or supplying Vioxx for use by Plaintiffs and Plaintiffs' decedents herein.

56.     Despite Merck's knowledge described herein, Merck negligently failed to advise Plaintiffs, Plaintiffs' decedents and the medical community of these dangers which would have alerted them to available safer treatments for arthritis and the other conditions for which the patients were taking Vioxx.

57.     As a proximate result of Merck's failure to issue timely or adequate warnings as above alleged, Plaintiffs and Plaintiffs' decedents were damaged as previously alleged in paragraphs 13, 14, 15, 16 and 17 above.

WHEREFORE, Plaintiffs demand judgment against Merck for damages sufficient to fully and fairly compensate Plaintiffs for the injuries which they have suffered, for the wrongful death of

14

Mrs. Briner and Mrs. Peña, for survival damages for Mrs. Peña, for taxable costs, and for all other proper relief.

**COUNT II**
**Strict Liability**

58.     Plaintiffs reallege each and every allegation of paragraphs 1 through 57 of this Complaint, as if set forth fully herein.

59.     Merck was in the business of designing, manufacturing, supplying, marketing, selling and distributing Vioxx.

60.     Vioxx was sold by Merck in a defective condition, unreasonably dangerous to potential users thereof.

61.     Vioxx was expected to and did reach Plaintiffs and Plaintiffs' decedents without substantial change in the condition in which it was sold.

62.     Merck failed to adequately warn Plaintiffs and Plaintiffs' decedents of the dangers and adverse health risks associated with the use of Vioxx.

63.     Vioxx was acquired by Plaintiffs and Plaintiffs' decedents, it was used by them for the purpose intended, and it caused them physical harm, in the form of blood clots, heart attacks, other cardiovascular events, and death.

64.     Merck is strictly liable to Plaintiffs and Plaintiffs' decedents for the harm, damages, injuries and death complained of herein.

65.     As a proximate result of Merck's actions as above alleged, Plaintiffs have been damaged thereby as previously alleged in paragraphs 13, 14, 15, 16 and 17 above.

WHEREFORE, Plaintiffs demand judgment against Merck for damages sufficient to fully and fairly compensate Plaintiffs for the injuries which they have suffered, for the wrongful death of Mrs. Briner and Mrs. Peña, for survival damages for Mrs. Peña, for taxable costs, and for all other proper relief.

## COUNT III
## Fraud

66.     Plaintiffs reallege each and every allegation of paragraphs 1 through 65 of this Complaint, as if set forth fully herein.

67.     Merck misrepresented to the treating physicians, the population of Vioxx consumers, and to the public at large, and thus to Plaintiffs' doctors, Plaintiffs, and Plaintiffs' decedents themselves, that Vioxx was safe to prescribe and take by falsely minimizing the cardiovascular risks associated with Vioxx, which risks were known to Merck.

68.     At the time it made these misrepresentations, Merck knew or should have known that these statements were false.

69.     These statements were made with the intent that those to whom they were directed would rely on them to their detriment; and Plaintiffs, Plaintiffs' decedents, and their physicians did so.

70.     As a result of Merck's misrepresentations as above alleged, Plaintiffs and Plaintiffs' decedents suffered the damages alleged in paragraphs 13, 14, 15, 16, and 17 above.

WHEREFORE, Plaintiffs demand judgment against Merck for damages sufficient to fully and fairly compensate Plaintiffs for the injuries which they have suffered, for the wrongful death of

75.     Merck's failure to so advise Plaintiffs and Plaintiffs' decedents as well as Merck's misrepresentations herein alleged constituted constructive fraud.

76.     As a proximate result of the actions and omissions of Merck, Plaintiffs and Plaintiffs' decedents have been damaged thereby as alleged in paragraphs 13, 14, 15, 16 and 17 above.

WHEREFORE, Plaintiffs demand judgment against Merck for damages sufficient to fully and fairly compensate them for the injuries which they have suffered, for the wrongful death of Mrs. Briner and Mrs. Peña, for survival damages for Mrs. Peña, for taxable costs, and all other proper relief.

## COUNT V
## Medical Monitoring

77.     Plaintiffs reallege each and every allegation of paragraphs 1 through 76 of this Complaint, as if set forth fully herein.

78.     Henderson, Baum, and other Class Members who have suffered a cardiovascular event but survived, and those Class Members who have taken Vioxx for a sufficient period of time without yet having suffered such an event, but who have increased risks of such an event  from hypertension, elevated cholesterol, or other cardiovascular conditions, require that Merck be ordered to institute and fund a Medical Monitoring Program sufficient to minimize the additional risks of such an event of adverse health effects Henderson, Baum and Class Members may suffer in the future as a result of taking Vioxx.

WHEREFORE, Plaintiffs pray that the Court enter a mandatory injunction requiring Merck to undertake such a program as requested.

18

## COUNT VI
## Punitive Damages

79.     Plaintiffs reallege each and every allegation of paragraphs 1 through 78 of this Complaint, as if set forth fully herein.

80.     Merck's actions were malicious, wanton, willful, grossly negligent, oppressive or in reckless disregard of the rights of Plaintiffs and Plaintiffs' decedents.

81.     An award of punitive damages against Merck is necessary and appropriate to deter Merck and others similarly situated from engaging in similar conduct in the future.

WHEREFORE, in addition to the compensatory damages prayed for in Counts I through V above, Plaintiffs pray that judgment be entered for punitive damages in an amount deemed by the jury to be sufficient to punish Merck for its conduct as alleged herein and to deter similar conduct in the future.

### DEMAND FOR JURY TRIAL

Come now the Plaintiffs, by counsel, Price Waicukauski Riley & DeBrota, LLC, and demand that this Court schedule this matter for trial by jury.

Respectfully submitted,

PRICE WAICUKAUSKI RILEY & DEBROTA, LLC

By _____
Henry J. Price, Bar No. 8522-49
William N. Riley, Bar No. 14941-49
Amy Ficklin DeBrota, Bar No. 17294-49
Jana K. Strain, Bar No. 20677-49
Jamie R. Sweeney, Bar No. 25124-49
Christopher A. Moeller, Bar No. 25710-49

19

The Hammond Block Building
301 Massachusetts Avenue
Indianapolis, IN 46204
Telephone: (317) 633-8787
Fax: (317) 633-8797

## CERTIFICATE OF SERVICE

I hereby certify that on January 17, 2006, a copy of the foregoing Amended Complaint for Damages and Certification of Class Action was sent via Federal Express to the Clerk of the Eastern District of Louisiana for filing. Notice of this filing will be sent to the following parties by uploading the same to Lexis Nexis File & Serve on January 17, 2006.

Russ M. Herman
HERMAN HERMAN KATZ & COTLAR
820 O'Keefe Avenue
New Orleans, LA 70013

Phillip Whittmann
STONE PIGMAN WALTHER WITTMANN LLC
546 Carondelet Street
New Orleans, LA 70130

George M. Plews, Esq.
Brett E. Nelson, Esq.
David L. Pippen, Esq.
PLEWS SHADLEY RACHER & BRAUN
1346 North Delaware Street
Indianapolis, Indiana 46202

Susan J. Giamportone, Esq.
Womble Carlyle Sandridge & Rice, PLLC
301 North Main Street, Suite 300
Winston-Salem, North Carolina 27101

Christopher A. Moeller