UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | **MDL Docket No. 1657** |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| | * | **JUDGE FALLON** |
| **This document relates to** | * | |
| **Case No. 05-4046*** | * | |
| | * | **MAGISTRATE JUDGE KNOWLES** |
| **EVELYN IRVIN PLUNKETT** | * | |
| as Personal Representative of the Estate of | * | |
| **RICHARD IRVIN, JR.,** | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| **MERCK & CO., INC.,** | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM IN SUPPORT OF MOTION OF MERCK & CO., INC. ("MERCK") FOR JUDGMENT AS A MATTER OF LAW

Plaintiff has now had an opportunity to try this case twice, but one thing remains perfectly clear: there is no evidence to support her claim that Mr. Irvin's short-term use of a common, therapeutic dose of Vioxx played any role in his death. This issue is dispositive of all of plaintiff's claims, whether sounding in strict liability or negligence. Plaintiff has presented absolutely no evidence to prove that Vioxx, which Mr. Irvin allegedly took at a 25 mg dose for less than a month, caused his death. Nor has she introduced any testimony to show that Vioxx was in any way defectively designed or marketed. Plaintiff has been "fully heard" on her claims against Merck, FED. R. CIV. P. 50(a), and has failed to make the requisite showing on her causes

of action.  Accordingly, the Court should enter judgment in Merck's favor on all claims as a matter of law.

## I.        THE LEGAL STANDARD.

A motion for judgment as a matter of law should be granted if, "after a party has been fully heard by the jury on an issue, 'there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue.'"  *Sur. Co. v. Pendleton Detectives of Miss., Inc.*, 182 F.3d 376, 377-78 (5th Cir. 1999) (quoting FED. R. CIV. P. 50).  "A party has been fully heard when he rests his case."  *Echeverria v. Chevron USA Inc.*, 391 F.3d 607, 610 (5th Cir. 2004).  At that time, the court "may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated."  FED. R. CIV. P. 50(a).  "A mere scintilla of evidence is insufficient to present a question for the jury."  *Rutherford v. Harris County*, 197 F.3d 173, 179 (5th Cir. 1999).  Instead, "[t]here must be a conflict in substantial evidence to create a jury question."  *Id.*

## II.       MERCK IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON ALL CLAIMS BECAUSE PLAINTIFF HAS NOT ESTABLISHED LEGAL CAUSATION.

Under Florida law, Mrs. Plunkett may prevail on her claims only if she proves, to a "reasonable degree of medical probability," that Mr. Irvin's use of Vioxx at the 25 mg dose for a period of less than a month was a "substantial factor" in bringing about his death.  *See Christopher v. Cutter Labs.*, 53 F.3d 1184, 1191 (11th Cir. 1995) (applying Florida law) (citing *Reaves v. Armstrong World Ins., Inc.*, 569 So. 2d 1307, 1309 (Fla. Dist. Ct. App. 1990) (per curiam)).  She has not only failed to meet this burden, but has offered *no* competent evidence at all on specific causation.  The closest she comes is Professor Ray's calculation that, for the small portion of Vioxx users who had a heart attack while on the drug, Vioxx was a cause just over

half the time.[1]  Even aside from the fundamental flaws of Professor Ray's calculations, they cannot prove specific causation.

What plaintiff needs -- and what she failed to proffer in her case -- is an expert to opine that, based upon a review of evidence specific to *Mr. Irvin*, one can both rule out other potential causes of his death and rule in Vioxx as the cause.  To make Professor Ray's calculations even relevant, she also needs evidence that the studies upon which the Professor relies are representative of persons medically similar to Mr. Irvin.  But plaintiff has offered no testimony or other evidence that in any way links Professor Ray's conclusions to Mr. Irvin specifically.  Nor has she demonstrated that Mr. Irvin's medical condition or usage of Vioxx "fit" those of the subjects of the studies upon which Professor Ray purports to rely.  Those are fatal omissions, particularly since it is undisputed that Mr. Irvin had moderate to serious heart disease, which had developed over the course of many years,  and that thousands of people die every year from such heart disease without ever having taken Vioxx.[2]

Professor Ray does nothing more than testify as to a matter of statistical probability, which is not the same as the Florida requirement of medical probability.  "Medical probability" considers the circumstances of an individual's medical condition in order to determine causation.  "Statistical probability" is a markedly different question – one that addresses probabilities on a

---

[1] Professor Ray opined, on the basis of his selective and incomplete review of epidemiological data and clinical trials, that there was a pooled relative risk of heart attack from taking Vioxx of 2.16, and that this translated into a 54% likelihood ("attributable risk") that a heart attack suffered by any patient taking Vioxx was caused by Vioxx.  (*See* Feb. 7, 2006 Tr. at 376:3-378:6, attached hereto as Ex. 1.)

[2] It is undisputed that cardiovascular disease is the leading cause of death in the United States.  (*E.g.*, Feb. 9, 2006 Tr. at 845:5-19 (Testimony of Dr. Baldwin); Feb. 16, 2006 *Rough* Tr. at 242:14-23 (Testimony of Dr. Wheeler).)  This was true before Vioxx was ever sold in this country, and it has been true since Merck voluntarily withdrew the drug from the market.  (*See id.*)

population-wide basis instead of focusing on the individual.  Professor Ray could not have been

clearer in describing, in his own words, the limitations of his opinions:

> Q:    . . . As a pharmacoepidemiologist, you deal with these groups of people.
> You can say more likely than not, less likely than not, but you can't say
> "Well, the third yellow dot from the right, there was something about him
> that made him more likely where it was because of the medicine rather
> than not because of the medicine, right?"
>
> A:    That's correct.
>
> Q:    If anybody in the world can do it, it's not you, right?
>
> A:    Yeah.  *Well, what we can talk about is the proportion of a group, but not
> the individual.*

(Feb. 7, 2006 Tr. at 396:6-15 (emphasis added).)

Indeed, none of plaintiff's experts testified that Vioxx contributed in any way to Mr.

Irvin's death.[3]   In the absence of such testimony, plaintiff cannot rely on Professor Ray's

statistical calculations alone to prove specific causation.  More than a "mere possibility" of

causation is required for plaintiff to meet her burden of proof under Florida law; "pure

speculation or conjecture" does not suffice.  *Gooding v. University Hospital Bldg., Inc.*, 445 So.

2d 1015, 1018 (Fla. 1984) (citing Prosser, LAW OF TORTS § 41 (4th ed. 1971)).  Yet such

"speculation" is precisely what plaintiff has offered here.  Given her failure to offer any reliable

scientific evidence to distinguish Mr. Irvin's unfortunate death from the thousands of similar

sudden cardiac deaths that occur every year, the Court should enter judgment for Merck as a

matter of law on all of plaintiff's causes of action.

---

[3] In contrast, Merck's expert Dr. Rayburn testified that, in his opinion, "Vioxx did not play a role
in Mr. Irvin's death; that Mr. Irvin had atherosclerosis, had the most common disease that causes
death in the United States; that his lesion was in a place of a severity that quite commonly
presents, the way Mr. Irvin did, as sudden cardiac death."  (Feb. 14, 2006 Tr. at 1765:13-21.)
Dr. Wheeler testified that there is nothing to distinguish Mr. Irvin's "textbook case" from the
thousands of deaths a year that can be attributed to cardiovascular disease.  (Feb. 16 *Rough* Tr. at
234:25-235:8.)  Drs. Rayburn and Wheeler were the *only* medical doctors to testify about the role
of Vioxx in Mr. Irvin's death, and each categorically rejected any causal link.

**A.**  **Plaintiff Cannot Meet Her Burden to Show Specific Causation Through Statistics Alone.**

Merck has found no Florida case – ever – allowing proof of specific causation through mere statistical probabilities.   On the contrary, in personal injury cases like this, Florida courts look to expert testimony that ties the general risks of a drug to the very specific circumstances of the individual allegedly harmed.  *See Greene v. Flewelling*, 366 So. 2d 777, 780 (Fla. Dist. Ct. App. 1978) (affirming lower court's decision to set aside jury verdict based on insufficient evidence of causation, where plaintiff's loss of smell following an automobile accident was connected only temporally and there was no "medical evidence" of legal causation); *see also Haggerty v. Upjohn Co.*, 950 F. Supp. 1160, 1160, 1168 (S.D. Fla. 1996) (applying Florida law) (excluding testimony of plaintiff's causation expert and granting summary judgment based on the lack of such testimony, which was "essential to all of Plaintiff's claims"), *aff'd*, 158 F.3d 588 (11th Cir. 1998).[4]  As is true in many jurisdictions, "it is necessary [in Florida] to demonstrate

_____

[4] The court in *Haggerty* commented in *dictum* that "an expert need not be a medical doctor . . . to render opinions relevant to causation."  *See Haggerty*, 950 F. Supp. at 1169, n.6 (citing *Byrnes v. Honda Motor Co., Ltd.*, 887 F. Supp. 279, 282 (S.D. Fla. 1994) (applying Florida law) (finding an expert on motorcycle safety unqualified to testify about motorcycle safety equipment)).  But here the issue is not whether plaintiff has offered relevant testimony, it is whether she has offered *sufficient* testimony.   Courts uniformly require expert medical testimony to show specific causation in personal injury cases involving pharmaceuticals, because such cases "involve complex questions of medical causation beyond the understanding of a lay person." *In re Baycol Prods. Litig.*, 321 F. Supp. 2d 1118, 1126 (D. Minn. 2004) (in MDL proceeding, reviewing law of numerous states and collecting cases)); *see also Lasley v. Georgetown Univ.*, 688 A.2d 1381, 1382, 1385 (D.C. Cir. 1997) (applying District of Columbia law) (explaining that "medical opinion testimony is normally required in medically complicated cases" and determining that whether an embolization procedure caused plaintiff harm was "so medically complicated" that medical testimony was required to assist the jury); *McClain v. Metabolife Int'l, Inc.*, 193 F. Supp. 2d 1252, 1258 (D. Ala. 2002) (applying Alabama law) (holding "an expert is required to prove causation in this case, as the interplay between ephedrine, caffeine, and the other ingredients in Metabolife 356, the varying states of pre-existing ill-health of Plaintiffs, and their various ultimate injuries is 'complex and technical in nature'" (citation omitted)); *Blinn v. Smith & Nephew Richards, Inc.*, 55 F. Supp. 2d 1353 (M.D. Fla. 1999) (applying Florida law) (granting summary judgment in medical device case where plaintiff presented no expert testimony on
*(footnote continued next page)*

legal causation by expert testimony where this issue is beyond the common knowledge of laymen." *Greene*, 366 So. 2d at 780. Professor Ray did not and could offer such expert testimony on specific causation in this case. (*See* Nov. 18, 2005 Order & Reasons at 32 (finding Professor Ray unqualified to testify "on the specific cause of Mr. Irvin's death").) Plaintiff's claims thus fail as a matter of law.

It is unsurprising that Florida has not approved the use of mere statistics as a proxy for showing specific causation. Plaintiffs typically adduce *actual evidence* that the defendant caused the plaintiff's injury. In drug cases, plaintiffs provide expert testimony *about the individual* that rules out other potential causes and rules in the drug in question. *See Haggerty*, 950 F. Supp. at 1166 (in a case arising from injuries allegedly sustained from ingesting a prescription sleep aid, finding the testimony of plaintiff's expert on medical causation unreliable and inadmissible under *Daubert* where the expert "failed to eliminate many possible causes . . . before arriving at her specific causation opinion"). Without such testimony, the jury has no basis to conclude the drug caused the injuries. Here, for example, Professor Ray's calculation that 54% of the heart attacks among those on Vioxx are attributable to the drug gives no guidance to the jury on whether Mr. Irvin's heart attack was in that 54%. Plaintiff has offered no testimony on how Vioxx would have affected Mr. Irvin or how Mr. Irvin's medical condition compares to the individuals in the Professor's calculations. In short, the Professor's calculations provide the jury with no useful guidance at all.

---

defect or causation, given that "Plaintiff would be required to provide expert testimony that the product was defective and evidence that the product caused the injury of which she complains"); *Goewey v. United States*, 886 F. Supp. 1268, 1279 (D.S.C. 1995) (applying South Carolina law) ("Where a medical causal relation issue is not one within the common knowledge of the layman, proximate cause cannot be determined without expert medical testimony."). None of these cases – whether applying Florida law or the law of other states – has allowed proof of specific cause through statistics alone.

Tellingly, there appears to be no case in any jurisdiction that has allowed proof of complicated medical causation questions through statistics alone. Instead, where statistics have been used as part of the proof of specific causation, courts have uniformly required evidence that ties those statistics to the allegedly injured individual and that takes the individual's unique medical conditions into account. Where epidemiological studies are concerned, as in this case, courts have held them insufficient to prove specific causation unless numerous relevant factors are examined, including: (i) confounding bias, sampling error and author bias; (ii) the "Bradford Hill" factors[5]; (iii) whether the relative risk is a "reasonably accurate measure of the extent of disease caused by the agent"; (iv) whether "the plaintiff in a given case is comparable to the subjects who made up the exposed cohort in the epidemiologic study"; and (v) whether there are interactions with other causal agents. Saks, et al., Federal Judicial Center, ANNOTATED REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (2d ed. 2006) at 540; *see also Finestone*, 2006 WL 267330, at *9 (applying Florida law) (in an action arising from injuries sustained from alleged exposure to radioactive material, noting that, in order to assess the applicability of an epidemiological study, it is necessary to consider the "Bradford Hill" criteria, including the dose-response relationship). This particularized assessment is well-justified. As the Reference Manual on Scientific Evidence explains,

> A plaintiff may have been exposed to a dose of the agent in question that is greater or lower than that to which those in the study were exposed. A plaintiff may have individual factors, such as higher age than those in the study, that make it less likely that exposure to the agent caused the plaintiff's disease .... Pathological-mechanism evidence may be available for the plaintiff that is

---

[5] These factors include (i) the strength of association; (ii) consistency of association; (iii) specificity of association; (iv) temporality; (v) biological gradient or dose-response relationship; (vi) plausibility; (vii) coherence; (viii) experimental evidence; and (ix) analogy. *See Finestone v. Florida Power & Light Co*, __ F. Supp. 2d __, 2006 WL 267330, at *9 (S.D. Fla. 2006) (applying Florida law).

relevant to the cause of the plaintiff's disease. *Before any causal relative risk from an epidemiologic study can be used to estimate the probability that the agent in question caused an individual plaintiff's disease, consideration of these (and similar) factors is required.*

Saks, et al., Federal Judicial Center, ANNOTATED REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (2d ed. 2006) at 540 (emphasis added).

Courts that have considered these factors have held, in case after case, that extrapolations from trial and study data that lack any connection to the injured party are legally insufficient proof of specific causation. For example, in *Allison v. McGhan Medical Corp.*, 184 F.3d 1322 (11th Cir. 1999), the Eleventh Circuit found no evidence of specific causation where: (i) the conclusions of plaintiff's causation expert were drawn years after the alleged injury and without the benefit of examining the plaintiff; and (ii) the expert could only testify to probability. *Id.* at 1320-22 (applying Georgia law) (affirming lower court's decision to exclude plaintiff's specific causation expert and grant defendant's summary judgment motion). Similarly, in *Cano v. Everest Minerals Corp.*, 362 F. Supp. 2d 814, 824 (W.D. Tex. 2005), a Texas district court held that plaintiffs' expert could not testify about specific causation because he failed to link the epidemiological studies at the root of his opinion to the plaintiffs' specific injury. *Id.* at 853 (applying Texas law). In so holding, the *Cano* court emphasized that the expert's failure to take into account whether the plaintiffs' alleged dose was comparable to that of the study subjects was a significant factor. *Id.* at 824 ("At a minimum . . . there must be evidence from which the factfinder can conclude that the plaintiff was exposed to levels of that agent that are known to cause the kind of harm that the plaintiff claims to have suffered." (internal quotations and citations omitted)).[6]

---

[6] *See also Hull v. Merrell Dow Pharms., Inc.*, 700 F. Supp. 28, 29-30 (S.D. Fla. 1988) (applying Florida law) (declining to consider epidemiological evidence as proof of specific causation
*(footnote continued next page)*

For similar reasons, plaintiff's failure to link Professor Ray's analysis to the specifics of Mr. Irvin's medical condition and usage of Vioxx is fatal to her claims. Plaintiff has not shown a "fit" between Professor Ray's statistical extrapolation and Mr. Irvin. *See Finestone*, 2006 WL 267330, at *9. No witness that plaintiff called made any attempt to show that the subjects of the studies that Professor Ray used took Vioxx at the 25 mg dose for only one month – nor could they have done so even if asked, since no studies have shown any statistically significant elevated risk from taking Vioxx at that dosage for that short a period. In fact, not only did Professor Ray ultimately acknowledge that the data are "still pending for the 25 mg dose" (Feb. 7, 2006 Tr. at 423:3-20), he also admitted that his own epidemiological study showed that 25 mg Vioxx did not pose a statistically significant increased risk (*id.* at 410:15-411:11). Further, the Professor made no attempt to show any similarity between Mr. Irvin and the patients in the studies upon which he relies.

Professor Ray himself testified on cross-examination that, as a pharmacoepidemiologist, he can address "the proportion of a group, but not the individual."[7] (Feb. 7, 2006 Tr. at 366:5-

---

where a temporal connection was lacking); *In re Fibreboard Corp.*, 893 F.2d 706, 711-12 (5th Cir. 1990) (applying Texas law) (disapproving trial of representative cases with results extrapolated to a class of 3,000 asbestos victims, without consideration of any evidence about the individual victims, and explaining that "the estimate of relative risk is a property of the studied population, not of an individual's case"); *Washington v. Armstrong World Indus., Inc.*, 839 F.2d 1121, 1123 (5th Cir. 1988) (applying Mississippi law) (summary judgment proper when plaintiff's sole causation expert could not offer proof that plaintiff's cancer was caused by asbestos exposure; expert's conclusion "that such a link is statistically probable and cannot be ruled out on the basis of the tests performed by the treating physician" was insufficient to carry plaintiff's burden of proving causation).

[7] Professor Ray's methodology is the functional equivalent of Dr. Graham's *post hoc ergo propter hoc* analysis, which this Court has ruled does not "pass[] through the gates of 702." (Feb. 8, 2006 Tr. at 750:14-17.) Dr. Graham's purported opinion on specific cause was based on nothing more than a temporal connection and probability:

> Q:    So just so we understand your methodology for giving a specific cause opinion, the methodology you applied here suggests that, on an individual
>
> *(footnote continued next page)*

15.)  By his own admission, then, his calculations offer no basis for distinguishing Mr. Irvin from

the thousands of non-Vioxx users with similar risk factors who also suffered fatal heart attacks.

In other words, they cannot, in and of themselves, satisfy plaintiff's burden to prove specific

causation.

Nor can plaintiff fill this void through testimony from Drs. Graham or Baldwin.  Both

doctors acknowledged Mr. Irvin had heart disease – with 60% occlusion of his LAD – and was a

borderline obese, middle-aged male with a family history of heart disease.  (Feb. 9, 2006 Tr. at

851:8-852:1, 857:19-858:2, 942:10-12; *see also* Autopsy Rpt., Def. Ex. 809.)  Dr. Baldwin

acknowledged that there was scant medical history for Mr. Irvin that would shed light on his

other risk factors.  (Feb. 9, 2006 Tr. at 952:12-25.)  Dr. Graham admitted that most heart attacks

occur in the morning, as did Mr. Irvin's.  (*Id.* at 859:3-8.)  Both acknowledged that people like

Mr. Irvin die from heart attacks even if they have never taken Vioxx.  (*Id.* at 840:15-22, 843:22-

25,  845:5-19,  853:23-854:7,  854:21-855:1,  924:14-16,  948:16-24.)    Neither  compared  the

various studies that Professor Ray relied upon with Mr. Irvin's specific medical condition, and

neither testified about the impacts Vioxx would have had on Mr. Irvin.  While both suggested a

catalyst would be necessary to cause Mr. Irvin's heart attack – something that would put him in a

"prothrombotic state" – neither said Vioxx was the catalyst or even attempted to rule out other

catalysts that have nothing to do with Vioxx.  (*Id.* at 839:2-8, 936:6-16.)  In sum, neither testified

---

> basis, you would say anyone who temporally had a heart attack while on
> Vioxx, more likely than not, Vioxx was a contributing cause.  Correct?
>
> A:  Assuming that we're talking about individuals having heart attacks based
> on coronary artery disease, yeah.  If you pulled an individual patient and
> presented it to me, I think that would be the probability, yes.

(*Id.* at 750:2-11.)  The Court has explained repeatedly that such a tenuous connection here
between alleged cause and effect is insufficient to prove specific causation.  (*See id.* at 749:15-
751:25.)

that he could rule out, to a reasonable degree of medical certainty, the possibility that Mr. Irvin's heart attack resulted from his numerous risk factors for sudden cardiac death. Nor did either doctor testify that Vioxx contributed in any way to Mr. Irvin's death.[8]

No Florida court has allowed a plaintiff in a case such as this one to recover absent such testimony. To the contrary, "[i]t has long been held that a possibility of causation is not sufficient to allow a claimant to recover." *Greene*, 366 So. 2d 777, 781. Accordingly, Merck is entitled to judgment in its favor on all of plaintiff's claims. *Reaves*, 569 So. 2d at 1309 ("[W]hen the matter [of causation] remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the Court to direct a verdict for the defendant.") (citing *Gooding*, 445 So. 2d at 1018); *cf. Allison*, 184 F.3d at 1322 (summary judgment warranted if there is no admissible evidence of specific causation); *Cano*, 362 F. Supp. 2d at 824 (same).

> **B.      Professor Ray's Figure of 54% Is Based On A Flawed And Incomplete Analysis And Thus Is Scientifically Unreliable.**

Professor Ray's calculations are also insufficient to show specific causation because they unreliable. For that reason alone, they cannot constitute sufficient evidence to go to the jury.

---

[8] Per the Court's *Daubert* rulings, neither doctor could have provided such testimony. (See Nov. 18, 2005 Order & Reasons (*Plunkett I Daubert* motions); Dec. 6, 2005 Order & Reasons (Plaintiff's Motion to Reconsider a Ruling in Regard to the Testimony of Dr. Thomas Baldwin); Feb. 2, 2006 Order & Reasons (*Plunkett II Daubert* motions).) Dr. Graham himself testified he is unqualified to render specific cause opinions:

> Q.    And is it true, sir, that there is no way for a doctor like you to predict in an individual patient whether his plaque rupture is going to result in a thrombus that will cause sudden cardiac death?

> A.    Yeah. You can't take an individual patient, say this is what's going to happen. You can obviously look at the probabilities, but you can't be definitive and say this is exactly what's going to happen.

(Feb. 9, 2006 Tr. at 856:10-17.)

The flaws in Professor Ray's methodology include the following:

- Professor Ray admitted his calculations were based on data at all Vioxx doses, and not just the 25 mg dose. (Feb. 7, 2006 Tr. at 438:1-444:2, 435:13-436:14, 448:25-449:5.) When asked whether he could calculate the risk for patients, like Mr. Irvin, who took only the 25 mg dose for a short period of time, he refused – calling it "inappropriate" and claiming that it would take "years" to conduct a more particularized analysis.[9] (*Id.*; Feb. 8, 2006 Tr. at 485:5-486:7, 501:20-502:14.) At the same time, Professor Ray admitted that there is no study or article showing a statistically significant increased risk for cardiovascular events between 25 mg placebo when used for less than a month. (Feb. 7, 2006 Tr. at 380:6-22.) Further, his September 2005 expert report indicates that increasing the dose of Vioxx increases the potential risks associated with the drug. (*E.g.*, Sept. 21, 2005 Expert Rpt. of W. Ray, Ph.D. at 24, 25.)

- Although insistent that his calculations were based on a "totality of the data," Professor Ray ignored relevant data from numerous placebo-controlled clinical trials involving Vioxx, and conceded that he did not take these studies into account in conducting his analysis. (Feb. 7, 2006 Tr. at 438:1-444:2.)

- Professor Ray improperly relied upon studies that either involved a completely different drug (*i.e.*, Bextra) or did not use placebo as a comparator (*i.e.*, VIGOR). (*See generally* Expert Report of Wayne A. Ray. Ph.D.; Feb. 7, 2006 Tr. at 357:14-358:1, 365:15-20.) As to Bextra, he nonetheless recognized that there are "different mechanisms for different COX-2 inhibitors at work" and that the drug was fundamentally different from Vioxx. (Feb. 8, 2006 Tr. at 489:2-5.)

These and other methodological flaws in Professor Ray's analysis render his resulting calculation of relative risk and attributable risk unreliable. Moreover, his obvious lack of objectivity belies his professed "transparency" and lack of bias.

In assessing the reliability of Professor Ray's relative risk and attributable risk numbers, it is important to keep in mind that his analysis flatly contradicts the FDA's conclusions about the relative safety of COX-2 inhibitors specifically and NSAIDs generally. (*See* April 6, 2005

---

[9] Professor Ray took the incredible position that, because Merck used a 50 mg dose to demonstrate the gastrointestinal benefits of Vioxx, it was appropriate for him to use the same dose to assess the cardiovascular risks of the drug. This is an illogical position – one that is not a matter of scientific principle, but of personal pique.

FDA Memorandum (FDA Mem.), Def. Ex. 338.)   After a comprehensive review of all of the available data, the FDA found no evidence of an increased cardiovascular risk associated with short-term use of COX-2 inhibitors and NSAIDs, particularly at lower doses.  (*Id.* at 2.)  The agency also determined that it was impossible "to reliably estimate the absolute magnitude of the increased risk of serious adverse CV events" associated with long-term use of the drugs – or to rank COX-2s in order of risk.  (*Id.* at 2, 10.)

The FDA's conclusions undermine Professor Ray's purported derivation of an objective number that reflects the "attributable risk" of Vioxx.  They also demonstrate that he has tried to quantify risks when there are insufficient data to do so with any reliability – undercutting his purported "expert opinion" that even short-term use of Vioxx presents an increased risk of adverse cardiovascular events.  Based on these and other flaws in Professor Ray's methodology, as well as plaintiff's general failure to proffer legally sufficient evidence of specific causation, the Court should enter judgment in Merck's favor on all of plaintiff's claims as a matter of law.

### III.   PLAINTIFF'S DESIGN DEFECT CLAIMS FAIL AS A MATTER OF LAW.

Merck is entitled to judgment in its favor on plaintiff's design defect claims for three additional and independent reasons.  First, plaintiff has not met her burden to show that Vioxx was defectively designed.  In fact, her own experts testified that there is no evidence that the risks of Vioxx at the 25 mg dose outweigh the drug's benefits.  Without such evidence, plaintiff's design defect claims fail as a matter of law.  Second, plaintiff has presented no evidence of a safer alternative design – a failure of proof that defeats a design defect claim based on either strict liability or negligence.  Third, given the comprehensive regulatory framework that governs the development, approval, sale, and marketing of prescription drugs in the United States, plaintiff's strict liability and negligent design defect claims are preempted as a matter of law.

13

A.      **Plaintiff's Own Expert Testimony Precludes Her Strict Liability Design Defect Claim.**

In order to make out a *prima facie* case of strict liability due to design defect, plaintiff must show that the risks of Vioxx at the 25 mg dose outweigh its benefits. She cannot and has not met this burden. Not only has she failed to proffer evidence sufficient to show that the risks of Vioxx at the 25 mg dose outweigh its benefits, but her own expert testimony confirms that *there is no such evidence*. This testimony negates plaintiff's strict liability design defect claim and entitles Merck to judgment in its favor as a matter of law.

In Florida, a product that complies with pertinent government regulations is presumptively *not* defective or unreasonably dangerous. FLA. STAT. ANN. § 768.1256(1).[10] Here, it is undisputed that the FDA approved Vioxx as "safe and effective" in 1999 and again in 2002 when it approved a new indication for rheumatoid arthritis. (*See* May 1999 Approval Ltr., Def. Ex. 83; April 2002 Approval Ltr., Def. Ex. 274.) Thus, the FDA approved the distribution and sale of Vioxx before Mr. Irvin used it, and the FDA renewed its approval of Vioxx after Mr. Irvin used it and after a full review of the results of the VIGOR trial. These approvals trigger Florida's statutory presumption that Vioxx was *not* defective or unreasonably dangerous, and plaintiff has the burden of demonstrating otherwise – *i.e.*, that the apparent benefits of Vioxx did

---

[10] Denominated the "[g]overnment rules defense," section 768.1256(1) provides:

In a product liability action brought against a manufacturer or seller for harm allegedly caused by a product, there is a rebuttable presumption that the product is not defective or unreasonably dangerous and the manufacturer or seller is not liable if, at the time the specific unit of the product was sold or delivered to the initial purchaser or user, the aspect of the product that allegedly caused the harm: (a) Complied with federal or state codes, statutes, rules, regulations, or standards relevant to the event causing the death or injury; (b) The codes, statutes, rules, regulations, or standards are designed to prevent the type of harm that allegedly occurred; and (c) Compliance with the codes, statutes, rules, regulations, or standards is required as a condition for selling or distributing the product.

not outweigh its known risks at the relevant time. *Adams v. G.D. Searle & Co.*, 576 So. 2d 728, 733 (Fla. Dist. Ct. App. 1991).

Even without this presumption, plaintiff must show the known risks of Vioxx outweighed its benefits. As indicated above, plaintiff has presented no such proof. She has offered no evidence that before May 2001 – the relevant time frame for this inquiry – the known risks of Vioxx outweighed its benefits.[11] To the contrary, she has proffered expert testimony that proves there is no such evidence. When Professor Ray was asked whether he could calculate the comparative risks and benefits of Vioxx at the 25 mg dose – the dose that Mr. Irvin was prescribed and purportedly ingested – he testified:

> *We don't really have data comparing head to head cardiovascular and GI for 25 milligrams*, but we need to be cautious. It's probably going to be true that the GI benefits will be there. I have no reason to think they're not. But it's quite possible that the cardiovascular risks will also be there. So in a sense the question is settled for 50 milligrams, don't take it, and *it's still pending for 25 milligrams.*

(Feb. 7, 2006 Tr. at 423:3-20 (emphasis added).) By Professor Ray's own testimony, there is thus no evidence that the known risks of Vioxx at the 25 mg dose outweigh its benefits – even today. This critical admission negates plaintiff's strict liability design defect claim as a matter of law.

Plaintiff's sole apparent attempt to make a contrary showing also comes from Professor Ray, who testified that the overall risks of Vioxx at the 50 mg dose outweigh its benefits. (Feb. 7, 2006 Tr. at 341:15-343:6.) This testimony does not rise to the level of legally sufficient

---

[11] The benefits of Vioxx are undisputed. An estimated 10,000 to 15,000 people die in this country a year from GI side-effects associated with traditional NSAIDs. (Feb. 14, 2006 Tr. at 1521:12-1531:21 (Test. of Dr. Morrison).) Countless others are hospitalized. (*Id.*) While all selective COX-2 inhibitors reduce the risk of ulcers, only Vioxx has been shown to reduce the risk of serious gastrointestinal bleeds. (*See* FDA Mem.) Moreover, it is undisputed that for some patients – like Mr. Irvin – Vioxx was the *only* medication that provided effective pain relief. (Feb. 9, 2006 Tr. at 885:19-886:7 (Test. of Dr. Schirmer).)

evidence, because the stated basis for Professor Ray's risk/benefit opinion is not a relevant comparison. As his testimony makes clear, Professor Ray predicates his risk/benefit opinion solely on his calculation that in VIGOR, the difference in serious adverse cardiovascular events favoring naproxen slightly exceeded the difference in serious adverse gastrointestinal events favoring Vioxx. (*Id.*) VIGOR, however, compared a common therapeutic dose of naproxen (1000 mg per day) with *double* the maximum recommended chronic dose of Vioxx (50 mg per day). The maximum recommended chronic dose of Vioxx – and the dose used by Mr. Irvin – was 25 mg per day.[12] As the FDA has noted, "[t]he higher dose of rofecoxib was used in the VIGOR trial to provide a 'worst case' estimate of the risk of serious GI bleeding for rofecoxib in comparison to naproxen." (FDA Mem. at 9 n.5.)

A comparison based on a clinical trial designed to produce a "worst case" estimate of adverse gastrointestinal effects on Vioxx using a non-recommended dose does not and cannot constitute legally sufficient evidence that the risks of Vioxx outweighed its benefits. Such a comparison says nothing about the comparative risks and benefits of Vioxx when used, as Mr. Irvin used it, at the recommended dose of 25 mg. Tellingly, when Professor Ray reviewed the VIGOR data in 2000, he urged caution on the 50 mg dose, but raised no questions about the safety of the 25 mg dose. (Feb. 7, 2006 Tr. at 412:20-415:5.) His own observational study, published in 2002, found no increased risk from 25 mg, a conclusion consistent with all the placebo-controlled clinical trial data available up to that time, including the interim cardiovascular results of Merck's two large Alzheimer's studies. (*Id.* at 410:15-411:11, 411:17-412:19; Pl.'s Ex. 2.0025.)

---

[12] The FDA-approved label for Vioxx at the time Mr. Irvin took the drug noted that the use of Vioxx at the 50 mg dose for more than 5 days "in management of pain ha[d] not been studied." (*See* July 2000 Vioxx Label, Def. Ex. 146.)

That Vioxx was associated with some adverse effects at higher doses is neither surprising nor determinative. Many drugs pose greater risks when used at higher-than-recommended doses. That does not make them defective. The relevant inquiry is whether, based on what was known at the relevant time, the risks of using the drug at the recommended doses outweighed the apparent benefits. *See* FLA. STAT. § 768.1257 (2005) (inquiry should focus on the "state of the art of scientific and technical knowledge and other circumstances that existed at the time of manufacture, not at the time of loss or injury"); *see also Adams*, 576 So. 2d at 732-33. Plaintiff has introduced *no* evidence on that point. Absent such proof, plaintiff has no strict liability design defect claim, entitling Merck to judgment in its favor.

Moreover, Professor Ray's statistical calculations are improper for another reason. The balancing of risks and benefits of a prescription drug is a medical judgment that Professor Ray is in no position to make. Professor Ray's statistics do not – and cannot – substitute for medical expertise on whether Vioxx was "defective" in the context of actual patients to whom it was prescribed. Professor Ray ignored the importance of a doctor's assessment of the medical condition and needs of his or her patient. *Cf. Reyes v. Wyeth Labs.*, 498 F.2d 1264, 1276 (5th Cir. 1974), *cert. denied*, 419 U.S. 1096 (1974) (noting that the learned intermediary doctrine recognizes that a medical professional is qualified by knowledge, experience, and preparation to exercise his "individual medical judgment bottomed on a knowledge of both patient and palliative."). Instead, he improperly treated prescription drugs as if they were simple over-the-counter drugs for which a generic "risk/benefit ratio" could be calculated. Such testimony provides no real guidance to the jury on whether Vioxx could be labeled "defective."

### B.      Plaintiff Has Proffered No Evidence of a Safer Alternative Design.

Finally, plaintiff's design defect claim fails because she has presented no evidence of a

safer alternative design. Under Florida law as elsewhere, a plaintiff in a defective design case must show that a safer alternative design was available. *See Adams*, 576 So. 2d at 733 (design may be held defective if "new developments make possible a safer alternative design"); *see generally* BLACK'S LAW DICTIONARY 1329 (7th ed. 1999) (defining the risk/utility test as a "method of imposing product liability on a manufacturer if the evidence shows that a reasonable person would conclude that the benefits of a product's particular design versus the feasibility of an alternative safer design did not outweigh the dangers inherent in the original design") (cited by Florida Supreme Court in *Std. Jury Instructions-Civil Cases (No. 02-2)*, 872 So. 2d 893, 894 (Fla. 2004)).[13]  Feasibility of a safer alternative design depends on "state of the art of scientific and technical knowledge and other circumstances that existed at the time of manufacture." FLA. STAT. ANN. § 768.1257.

Here, plaintiff has not even attempted to offer evidence of an alternative formulation for Vioxx that not only would have conferred the gastrointestinal benefits of the drug but also would have worked for people, like Mr. Irvin, who either could not tolerate other NSAIDs or did not find them efficacious.  Instead, plaintiff makes the hollow claim that Merck could have withdrawn Vioxx or reformulated the drug entirely.  But withdrawal does not constitute an alternative design, and plaintiff has presented no evidence to show that Merck could have designed a drug with the same benefits as Vioxx. Plaintiff has simply offered no evidence that

---

[13] Florida courts acknowledge that the alternative "consumer expectations" test for design defects is not appropriate for products that are "too complex for a logical application" of that test. *Force v. Ford Motor Co.*, 879 So. 2d 103, 110 (Fla. Dist. Ct. App. 2004).  Prescription drugs unquestionably meet that definition. *See Adams*, 576 So. 2d at 732-33 (applying risk/benefit analysis); *cf. Upjohn Co. v. MacMurdo*, 562 So. 2d 680, 683 (Fla. 1990) (expert testimony generally required to demonstrate inadequacy of prescription drug warnings); *Buckner v. Allergan Pharmaceuticals, Inc.*, 400 So. 2d 820, 822 (Fla. Dist. Ct. App. 1981) (duty to warn runs to prescribing physicians rather than patients because "prescription drugs are likely to be complex medicines, esoteric in formula and varied in effect").

Merck feasibly could have reformulated Vioxx to make it safer before May 2001 – or at any time. Without such proof, plaintiff's design defect claim fails, whether grounded in strict liability or negligence.

### C.      Plaintiff's Claims for Design Defect Are Preempted By Federal Law.

Third and finally, plaintiff's design defect claims fail on federal preemption grounds. Federal law overrides state law under the Supremacy Clause when, among other things, "Congressional intent to preempt may be inferred from the existence of a pervasive federal regulatory scheme." *AT&T Corp. v. PUC*, 373 F.3d 641, 645 (5th Cir. 2004) (citation omitted). The regulation of pharmaceutical products in this country is without a doubt "pervasive." The federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq. (the "FDCA"), and its implementing regulations establish a comprehensive system under which the FDA sets and enforces standards governing prescription drugs. Plaintiff's design defect claims – which effectively ask the jury to engage in a risk/benefit analysis of an FDA-approved drug – impermissibly conflict with this scheme.

In particular, plaintiff's design defect claims run counter to the FDA's determination that Vioxx was safe and effective for use in accordance with its labeling. (*See* May 20, 1999 Approval Ltr., Def. Ex. 83); 21 U.S.C. § 355; 21 C.F.R. § 201.56-57. The necessary underpinning of these claims is that Vioxx should not have been permitted on the market as formulated. But, it is the "primary function of the [FDA] . . . and not of the courts or juries, to determine whether a prescription drug should be approved and marketed." *Sprague v. Upjohn Co.*, No. CIV. A-91 40035-NMG, 1995 WL 376934, at *2 (D. Mass. May 10, 1994) (dismissing claim that a prescription drug should have never been marketed). To "second-guess" the FDA's analysis is not only inappropriate, but also "set[s] up a direct collision with federal policy."

*Touchet v. Ace Med. Co.*, No. CIV. A. 96-3534, 1998 WL 531887, at *7 (E.D. La. Aug. 24, 1998) (FDA performed a comprehensive risk/utility analysis that a product could be sold; to reevaluate that analysis, as well the FDA's decision to approve the product based on state strict liability law would conflict with federal policy); *see also Jacobs v. Dista Products Co.*, 693 F. Supp. 1029, 1035 (D. Wyo. 1988) (court will not "second guess" FDA's determination that a legitimate public interest in drug's availability outweighs "any adversities which might arise in course of its usage"); *Grundberg v. Upjohn Co.*, 813 P.2d 89, 97 (Utah 1991) ("Allowing individual courts and/or juries to continually reevaluate a drug's risks and benefits ignores the processes of this expert regulatory body and the other avenues of recovery available to plaintiffs"). To the extent plaintiff would have the jury supplant the FDA's judgment on the approval and marketing of Vioxx, her claim conflicts with federal law and is preempted.

## IV.  MERCK IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S FAILURE TO WARN CLAIMS.

Plaintiff's strict liability and negligent failure to warn claims fail as a matter of law for two additional and independent reasons. First, plaintiff has not shown that a different Vioxx label would have changed Dr. Schirmer's prescribing decision. Second, to the extent the failure to warn claims are predicated on Merck's alleged failure to incorporate the VIGOR data into the Vioxx label without FDA approval, they conflict with federal law and are preempted.

### A.  Plaintiff's Failure to Warn Claims Fail for Want of Evidence of Causation.

Plaintiff cannot make a *prima facie* case of failure to warn. In a products liability case involving a prescription drug, "a plaintiff must not only show that a manufacturer's warning was inadequate, but that such inadequacy affected the prescribing physician's use of the product and thereby injured the plaintiff." *Baker v. Danek Med.*, 35 F. Supp. 2d 875, 881 (N.D. Fla. 1998); *see also Felix v. Hoffmann-LaRoche, Inc.*, 540 So.2d 102, 104 (Fla. 1989) (warning information

need only be directed to the learned intermediary).  Stated more directly, "the plaintiff must show that the physician would not have used the device [or drug] in question if he or she had been warned by the manufacturer of its risks."  *Edgar v. Danek Med., Inc.*, No. 96-2451-CIV-T-24A, 1999 WL 1054864, at *6 (M.D. Fla. Mar. 31, 1999).

The crux of plaintiff's failure to warn claim is that Merck should have provided information on the VIGOR results sooner than it did – *i.e.*, that it should have added information immediately to the Vioxx label in order to advise the medical community about the difference in cardiovascular events between the Naproxen arm and the 50 mg Vioxx arm of the study.  But plaintiff has offered no evidence that such warnings would have made a difference for Mr. Irvin.  Specifically, there is no indication that Dr. Schirmer, even if fully aware of the VIGOR data, would have changed his prescribing decision.  He was not prescribing a 50 mg dose of Vioxx to Mr. Irvin.  And by all accounts, Mr. Irvin had no outward symptoms of coronary artery disease.[14] That his autopsy would later reveal moderate to severe atherosclerosis could not have been

---

[14] As Dr. Schirmer testified:

> Q:  How would you describe Dicky Irvin's physical health in the time that you knew him?
>
> A:  I thought he was a fairly healthy fellow.
>
> Q:  In the times you knew him from 1989 forward, was there ever an indication to you that he had any kind of serious health condition?
>
> A:  I've never had any indication that – or red flag, as I would call it, of serious health issue, no.
>
> Q:  Would you describe Mr. Irvin as an active person, physically active?
>
> A:  Yes.
>
> Q:  Was there ever anything in your experience with Mr. Irvin that led you to believe that he was at risk for a heart attack?
>
> A:  No, sir.

(Feb. 9, 2006 Tr. at 868:1-14.)

known to Dr. Schirmer, especially given Dr. Schirmer's limited understanding of his father-in-law's medical condition.  In fact, Dr. Schirmer had never done a physical examination of Mr. Irvin, had never taken his medical history, had never ordered lab tests. [15]  (Feb. 9, 2006 Tr. at 878:13-19.)  He had no knowledge of Mr. Irvin's cholesterol level or whether Mr. Irvin had had a physical exam (beyond a stress test) in twenty years.  (*Id.* at 880:9-23.)  He had never seen any medical records for Mr. Irvin, and hadn't given his cardiovascular health "much thought."  (*Id.*; *id.* at 880:24-882:6.)  In short, plaintiff has offered no evidence that Dr. Schirmer would have gathered sufficient information about Mr. Irvin to make an informed prescribing decision, much less a different one.

Moreover, Dr. Schirmer testified that he continued to prescribe Vioxx for two years after the VIGOR label came out.  (*Id.* at 909:9-20, 910:47.)  And although plaintiff criticizes the manner in which the VIGOR data was disclosed and made public to the  medical community, such criticism is irrelevant, because Dr. Schirmer testified that he never read the VIGOR publication – or any other medical literature, for that matter.  (*Id.* at 892:12-25.)  The information in the article would only have been sufficient to change Dr. Schirmer's prescribing decision had he read it.

---

[15] In prescribing a pain medication to Mr. Irvin without the benefit of this information, Dr. Schirmer violated rule 64B8-9.013(3)(a) of the Florida Administrative Code, which provides:

> (3) Standards. The Board has adopted the following standards for the use of controlled substances for pain control:

> (a) Evaluation of the Patient. A complete medical history and physical examination must be conducted and documented in the medical record. The medical record should document the nature and intensity of the pain, current and past treatments for pain, underlying or coexisting diseases or conditions, the effect of the pain on physical and psychological function, and history of substance abuse. The medical record also should document the presence of one or more recognized medical indications for the use of a controlled substance.

Because plaintiff has not proffered any evidence to show that Dr. Schirmer would have considered Mr. Irvin a high-risk heart patient, there is no evidence from which the trier of fact could conclude that additional or different information from Merck about the purported risks of Vioxx would have affected Dr. Schirmer's prescribing decision.  Given this failure of proof, Merck is entitled to judgment as a matter of law on plaintiff's strict liability and negligent failure to warn claims.

### B.       Plaintiff's Failure to Warn Claim Is Preempted By Federal Law.

To the extent plaintiff's failure to warn claims are based on the suggestion that Merck could or should have changed the Vioxx labeling sooner to incorporate the VIGOR results, the claims also fail on conflict preemption grounds.[16]  *See AT&T Corp. v. Public Util. Comm'n of Tex.*, 373 F.3d 641, 645 (5th Cir. 2004) ("Federal law will override state law under the Supremacy Clause when . . . state law conflicts with federal law or its purposes." (citation omitted)).  State law is preempted if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" or "places irresistible pressure on the subject of the regulation to violate federal law." *Id.* (citations omitted).  Any failure to warn claim based on Merck's alleged failure to incorporate the VIGOR data into the Vioxx label without the FDA's prior approval implicates both of these bases for preemption.

More broadly, such a claim  ignores the vast regulatory framework that governs the development, approval, sale, and marketing of prescription drugs in the United States.  (*See supra* pp. 19-20.)  The FDA oversees every step in the approval and marketing of a prescription

---

[16] Moreover, under Florida law, a product such as Vioxx that complies with relevant government regulations is presumptively neither defective nor unreasonably dangerous.  FLA. STAT. ANN. § 768.1256.  It is plaintiff's burden to proffer competent evidence to counter this presumption. FLA. STAT. ANN. § 90.302.  She has failed to do so.

drug, and exercises "pervasive and complete" control over the product's labeling. *American Home Products Corp. v. Johnson & Johnson*, 672 F. Supp. 135, 146 (S.D.N.Y. 1987); *see also* 21 U.S.C. §§ 352; 355(b)(1)(F) (requiring that proposed labeling be submitted with the NDA). It "extensively regulates the contents and wording" of a drug's label. *Hurley v. Lederle Labs.*, 863 F.2d 1173, 1179 (5th Cir. 1989). Because the final approved label is the official description of a medication, derived from and condensing the voluminous preclinical and clinical data submitted by the manufacturer in support of its new drug application, it has enormous "scientific, medical, legal, and administrative importance." 40 Fed. Reg. 15392, 15393 (Apr. 7, 1975).

Given this oversight, "manufacturers generally may not deviate from FDA-approved product labeling without submitting an NDA supplement that provides a full explanation for the basis of the change." *Amicus Curiae* Brief for the United States, *Motus v. Pfizer*, No 02-55372 (9th Cir. Sept. 19, 2002) at 6. Every holder of an approved New Drug Application ("NDA") must notify the FDA of any change in a condition established in the approved application, including a change to the approved labeling. 21 C.F.R. § 314.70(a)(1). Prior approval is required for "changes based on postmarketing study results, including, but not limited to, labeling changes associated with new indications and usage." FDA, GUIDANCE FOR INDUSTRY: CHANGES TO AN APPROVED NDA OR ANDA (Nov. 1999). It is also required for changes to the "clinical studies" section of the package insert for new data and for expansion or contraction of the intended patient population based on new data. *Id.*; *see also* 21 C.F.R. § 314.70(b)(2)(v) (default requirement of prior approval for labeling changes). Marketing a product using unapproved labeling "violate[s] the FDCA's prohibitions against marketing an unapproved new drug and against marketing a misbranded drug." *Amicus Curiae* Brief of the United States of America, *Dowhal v. SmithKline Beecham Consumer Health Care*, No. A094460 (Cal. Ct. App.