UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| Evelyn Irvin Plunkett v. Merck & Co, Inc. | * | CASE NO. 02:05CV4046 |

**Plaintiff's Memorandum in Opposition to Defendant's
Motion for Judgment As A Matter of Law**

MAY IT PLEASE THE COURT:

In this diversity trial a ruling on defendant's motion under Federal Rule of Civil Procedure 50 must be informed by both federal law and controlling state law, here the law of Florida.

The federal standard which governs the Court's "sufficiency of evidence" inquiry is embedded in the language of Rule 50 itself: Judgment as a matter of law in favor of a defendant following the presentation of plaintiff's case to a jury is only warranted if there is "no legally sufficient evidentiary basis for a reasonable jury" to render a verdict for plaintiff. *See* Fed. R. Civ. P. 50 (emphasis added). It is an appropriately strict standard, in order to ensure — as the Advisory Committee Notes to Rule 50 emphasize — that the trial judge not intrude upon or usurp the fact-finding responsibility conferred on a jury under the Seventh Amendment of the Constitution.

The Fifth Circuit recently reiterated in *Brennan's Inc. v. Dickie Brennan & Company, Inc.*, 376 F.3d 356 (5th Cir. 2004), that judgment as a matter of law under Rule 50 can only

occur:

> when the facts <u>and inferences</u> point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary verdict.

*Id.* at 362 (citations omitted) (emphasis added). Thus, in considering a Rule 50 motion, this Court must draw "all reasonable inferences in favor of the non-moving party...." *Id.*

In fact, this Circuit long has held that a party against whom a Rule 50 motion is brought is to be given the benefit of <u>all</u> legitimate inferences that can be drawn from the evidence. <u>See</u> *Boeing Co. v. Shipman*, 411 F.2d 365 (5th Cir. 1969). Hence, a "jury question" precluding judgment as a matter of law under Rule 50 is created so long as reasonable jurors could fairly draw conflicting inferences from the same evidence, giving rise to potentially conflicting verdicts. <u>See</u> *Texas Company v. Savoie*, 240 F.2d 674 (5th Cir. 1957).

Against the backdrop of this federal "sufficiency of evidence" standard, the Court must look to Florida law to determine the level of proof as to specific causation, to the extent this is the issue principally addressed by Defendant's motion. In so doing, it will be noted that the Florida jurisprudence on causation, specifically including product liability cases, fully upholds the fact-finder's prerogative to draw inferences from evidence and determine causation based on such inferences.

"In negligence actions Florida courts follow the more likely than not standard of causation and require proof that the negligence probably caused the plaintiff's injury." *Gooding v. University Hosp. Bldg., Inc.*, 445 So.2d 1015, 1018 (Fla. 1984). In order to meet this "more likely than not" standard of proof, the plaintiff *may* utilize expert testimony. 6 West's Florida Practice Series §3.10, Personal Injury and Wrongful Death Actions (2006) (citing *Zwinge v. Hettinger*, 530 So.2d 318 (Fla. 2d DCA 1988); *Lopez v. Florida Power & Light Co.*, 501 So.2d 1339 (Fla. 3d DCA 1987); *Gant v. Lucy Ho's Bamboo Garden, Inc.*, 460

products besides defendant's. Nevertheless, the Eleventh Circuit found sufficient evidence to support causation, based upon an infectious disease expert's testimony as to probabilities shown in epidemiological and clinical studies, and a treating doctor's testimony based on the temporal relationship between the use of the defendant's product and the symptoms of infection.

Obviously, therefore, the absence of a specific causation expert for plaintiff is not sufficient support for a Rule 50 judgment in Defendant's favor, based on the "controlling" law of Florida. Florida law, not unlike federal law, recognizes that proof of a causal relationship between an event and harm can be based on inferences the jury could reasonably draw from the evidence, and <u>without</u> the necessity of an expert to opine that such a relationship does exist.

A particularly apt illustration is the case of *Custodis Construction v. Register*, 435 So. 2d 947 (Fla. 1 DCA 1983), a case addressing the medical relationship between two separate incidents and injuries. The Court found that even though not a single medical expert testified to the existence of this relationship, the relationship could be predicated on a combination of testimony, lay and/or medical.

This analysis is reminiscent of a landmark federal maritime decision based on the same proposition. In *Sentilles v. Inter-Carribean Shipping Corp.*, 361 U.S. 107, 80 S. Ct. 173, 4 L.Ed.2d 142 (1959), the issue was whether an incident had aggravated the maritime plaintiff's previously-latent condition. None of the expert witnesses called by plaintiff was able or willing to testify to this causal relationship. Nevertheless, upholding the verdict in plaintiff's favor, the Supreme Court observed as follows:

> The jury's power to draw the inference that the aggravation of petitioner's tubercular condition...was in fact caused by [the] accident, was not impaired by the failure of any medical witness

5

> to testify that it was in fact the cause....The matter does not turn on the use of a particular form of words by the physicians in giving their testimony. The members of the jury, not the medical witnesses, were sworn to make a legal determination of the question of causation. They were entitled to take all of the circumstances, including the medical testimony, into consideration.

*Id.*, 361 U.S. at 109-110 (citations omitted). The *Sentilles* decision has been cited by this Circuit in diversity case law. *See, e.g., Krister v. Beech Aircraft Corp.*, 479 F.2d 1089, 1095 (5th Cir. 1973). It also has been cited as precedent in Florida jurisprudence. *See Barahona v. Kloser Cruise Ltd.*, 851 So.2d 235 (Fla. 3 DCA 2003).

Defendant makes much of the fact that Plaintiff cannot meet her evidentiary burden through statistics alone. *See* Defendant's Memorandum in Support, pp. 4-11. Nonetheless, the Reference Manual on Scientific Evidence provides that:

> The threshold for concluding that an agent was more likely than not the cause of an individual's disease is a relative risk greater than 2.0. . . . When the relative risk reaches 2.0, the agent is responsible for an equal number of cases of disease as all other background causes. Thus, a relative risk of 2.0 (with certain qualifications noted below) implies a 50% likelihood that an exposed individual's disease was caused by the agent. *A relative risk greater than 2.0 would permit an inference that an individual plaintiff's disease was more likely than not caused by the implicated agent.* A substantial number of courts in a variety of toxic substances cases have accepted this reasoning.

Saks, et al., Federal Judicial Center, Annotated Reference Manual on Scientific Evidence (2d ed. 2006) at 384 [emphasis added].

In fact, many courts have found that if a plaintiff is able to prove a relative risk greater than 2.0, then that evidence is sufficient to prove specific causation. *See Davies v. Datapoint Corp.*, No. 94-56-P-DMC, 1995 U.S. Dist. LEXIS 21739, at 32-35 (D. Me. Oct. 31, 1995) (holding that epidemiologist could testify about specific causation, basing such testimony on the probabilities derived from epidemiologic evidence); *DeLuca v. Merrell Dow Pharms.*,

6

*Inc.*, 911 F.2d 941, 958-59 (3d Cir. 1990) (Bendectin allegedly caused limb reduction birth defects); *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1320 (9th Cir.) (requiring that plaintiff demonstrate a relative risk of 2.0), *cert. denied*, 516 U.S. 869 (1995); *Pick v. American Med. Sys., Inc.*, 958 F.Supp. 1151, 1160 (E.D. La. 1997) (recognizing that a relative risk of 2.0 implies a 50% probability of specific causation); *Sanderson v. International Flavors & Fragrances, Inc.*, 950 F.Supp. 981, 1000 (C.D. Cal. 1996) (acknowledging a relative risk of 2.0 as a threshold for plaintiff to prove specific causation); *Landrigan v. Celotex Corp.*, 605 A.2d 1079, 1087 (N.J. 1992) (relative risk greater than 2.0 "support[s] an inference that the exposure was the probable cause of the disease in a specific member of the exposed population"); *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 718 (Tex. 1997) ("The use of scientifically reliable epidemiological studies and the requirement of more than a doubling of the risk strikes a balance between the needs of our legal system and the limits of science.").

Turning to the specific causation proof herein, the record reflects the following:

1. **Dr. Eric Topol** testified that Vioxx, even in short term use, suppresses prostacyclin, and in his view without question increases the risk of clotting and thrombotic heart attacks — particularly in those at greater risk due to pre-existing arthrosclerosis. [pp. 972-973, 1020-1021].

2. **Dr. Gregory Curfman** explained the biological mechanism by which Vioxx serves as a prothrombotic agent. He testified that "prostacyclin is a powerful protector of the inside of blood vessels, the vascular endothelium," and a drug [like Vioxx] which reduces prostacyclin could thereby "result in higher incidences of thrombosis in a blood vessel. (Tr. Transcr. at1252).

3. **Dr. Michael Graham** [plaintiff's expert in pathology] opined that Richard

7

Irvin suffered a plaque rupture, which led to the development of a thrombus, which in turn occluded his LAD artery and caused a heart attack [pp. 938-939, 948]. It was Dr. Graham's further opinion that Richard Irvin was probably in a prothrombotic state immediately prior to this event [pp. 839 & 861], and that without some catalyst or other factor, Mr. Irvin's atherosclerosis alone would not have led to his fatal heart attack on 5/15/01. [p. at 840].

4. **Dr. Tom Baldwin** [plaintiff's expert in cardiology] supported the view that it was a prothrombotic catalyst that more likely than not made the rupture of Mr. Irvin's plaque fatal. He testified that plaque rupture such as that which occurred in the case of Mr. Irvin is a "pretty common" event, which can and does repeatedly occur within an artery without leading to problems (Tr. Transc. at 926-927); most plaque ruptures, in other words, do not result in an occlusive clot, according to Dr. Baldwin. (Tr. Transc. at 927-928). Dr. Baldwin opined that the plaque rupture which Mr. Irvin experienced was not itself the cause of the myocardial infarction, and, in Mr. Irvin's clinical circumstance and given his profile and autopsy findings, should not have developed into a heart attack. (Tr. Transc. at 944). It therefore was Dr. Baldwin's opinion that Mr. Irvin was in a prothrombotic state which led to the development of an occlusive thrombus upon the rupture of his plaque. (Tr. Transc. at 945-96). He explained that this prothrombotic state means that Mr. Irvin's clotting system was out of balance. (Tr. Transc. at 945-946). According to Dr. Baldwin, Mr. Irvin would not have suffered sudden cardiac death had his clotting system been in balance, i.e., he would not have suffered a fatal myocardial infarction but for his prothrombotic state. (Tr. Transc. at 945-46).

8

5.  **Dr. Wayne Ray** [plaintiff's expert epidemiologist] testified from an analysis of all available epidemiological study and clinical trial data regarding Vioxx, that there is a heart attack "relative risk" of 2.16 in Vioxx users [p. 353]. This elevated risk applies to short term users as well as long term users [p. 356]. It converts into a 54% likelihood or probability that an individual Vioxx user's heart attack was caused by the drug [pp. 377-378]. Dr. Ray then was asked the following:

> Q. All right. Dr. Ray. How do you extrapolate that 54 percent and apply that to an individual in this population of Vioxx users?
> A. I think you say that, for any individual patient that has a heart attack, who was taking Vioxx, the likelihood is 54 percent that the heart attack was due to the Vioxx.
> Q. And do you hold that to a reasonable degree of scientific certainty, Dr. Ray?
> A. Yes, I do.

(Tr. Transc. at 378).

In conclusion, Defendant's motion fails to overcome the recognized prerogative of the jury to make causal relationship findings by inference from the evidence presented, including evidence of broader epidemiological conclusions, and/or general expert opinion testimony concerning science and medicine. It simply is not necessary that a specific causation expert step forward to state as an opinion that a relationship exist between the ingestion of Vioxx and Mr. Irvin's heart attack. Rather, the jury may infer that this relationship exists from the evidence which has been presented by Plaintiff in this trial.

It is respectfully submitted that, under the applicable federal and controlling state law, and considering the strict standard of proof required for a judgment as a matter of law under Federal Rule of Civil Procedure 50, Defendant's motion should be denied.

Respectfully submitted,

By: _____
**Andy D. Birchfield, Jr.**
P. Leigh O'Dell
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160

**Co-Lead Counsel**

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS,
MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
MEUNIER&WARSHAUER, L.L.C.
2800 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced in accordance with Pre-Trial Order No. #8, on this **16th** day of February, 2006.