UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

*U.S. FILED
EASTERN DISTRICT COURT
2006 MAR -8 PM 4: 58
LORETTA G. WHYTE
CLERK*

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| Evelyn Irvin Plunkett v. Merck & Co, Inc. | * | CASE NO. 02:05CV4046 |

---

## MOTION FOR NEW TRIAL

---

This Motion for New Trial is submitted by Plaintiff's Liaison Counsel on behalf of counsel for plaintiff, Evelyn Irvin Plunkett, and to accommodate such counsel.

Plaintiff Evelyn Irvin Plunkett, as Personal Representative of the Estate of Mr. Richard Irvin, Jr., by and through her attorneys, pursuant to *Federal Rule of Civil Procedure* 59, moves the Court to grant a new trial in this case. In support of her motion, Plaintiff states that the Court abused its discretion during the second trial of this case by: (1) by ruling that Dr. Thomas Baldwin, Plaintiff's cardiologist, and Dr. Michael Graham, Plaintiff's pathologist, could not testify that Vioxx was a contributing cause of Mr. Irvin's death; and (2) by denying Plaintiff's motion for a continuance following the Court's *Daubert* decisions involving Dr. Graham and Dr. Baldwin.

___ Fee_____
___ Process_____
_X_ Dktd_____
___ CtRmDep_____
___ Doc. No._____

For these reasons and those outlined in the brief in support of this motion, Plaintiff respectfully urges the Court to grant a new trial in this case.

Respectfully submitted,

**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA 70113
PH:    (504) 581-4892
FAX:  (504) 561-6024

Temporary Address:

Place St. Charles, 201 St. Charles Avenue
Suite 4310, New Orleans, LA 70170
**Plaintiffs' Liaison Counsel**

| | |
|---|---|
| Richard J. Arsenault, Esq.<br>P.O.Box 1190<br>2220 Bonaventure Court<br>Alexandria, LA 71309-1190<br>PH: (318) 487-9874<br>FAX: (318) 561-2591 | Gerald E. Meunier, Esq.<br>Energy Centre<br>1100 Poydras Street, Suite 2800<br>New Orleans, LA 70163-2800<br>PH: (504) 522-2304<br>FAX: (504) 528-9973 |
| Andy D. Birchfield, Esq. **(Co-Lead Counsel)**<br>P.O. Box 4160<br>234 Commerce Street<br>Montgomery, AL 36103-4160<br>PH: (800) 898-2034<br>FAX: (334) 954-7555 | Troy Rafferty, Esq.<br>316 S. Baylen Street, Suite 400<br>Pensacola, FL 32502<br>PH: (850) 435-7000<br>FAX: (850) 497-7059 |
| Elizabeth Cabraser, Atty.<br>Embarcadero Center West<br>275 Battery Street, 30th Floor<br>San Franciso, CA 94111-3339<br>PH: (415) 956-1000<br>FAX: (415-956-1008 | Drew Ranier, Esq.<br>1419 Ryan Street<br>Lake Charles, LA 70601<br>PH: (337) 494-7171<br>FAX: (337) 494-7218 |
| Thomas Kline, Esq.<br>1525 Locust St.<br>19th Floor<br>Philadelphia, PA 19102<br>PH: (215) 772-1000<br>FAX: (215) 772-1371 | Mark Robinson, Esq.<br>620 Newport Center Drive<br>7th Floor<br>Newport Beach, CA 92660<br>PH: (949) 720-1288<br>FAX: (949) 720-1292 |

| Arnold Levin, Esq. | Christopher Seeger, Esq. (**Co-Lead Counsel**) |
| 510 Walnut Street | One William Street |
| Suite 500 | New York, NY  10004 |
| Philadelphia, PA  19106-3875 | PH:  (212) 584-0700 |
| PH:  (215) 592-1500 | FAX:  (212) 584-0799 |
| FAX:  (215) 592-4663 | |
| | Christopher Vincent Tisi, Esq. |
| Carlene Rhodes Lewis, Atty. | 2000 L Street, NW |
| 2200 Texaco Heritage Plaza | Suite 400 |
| 1111 Bagby | Washington, DC  20036-4914 |
| Houston, TX  77002 | PH:  (202) 783-6400 |
| PH:  (713) 650-0022 | FAX:  (307) 733-0028 |
| FAX:  (713-650-1669 | |

## PLAINTIFFS' STEERING COMMITTEE

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleadings has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced in accordance with Pre-Trial Order No. #8, on this 8th day of March, 2006.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re: VIOXX | * | **MDL Docket No. 1657** |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| | * | **JUDGE FALLON** |
| | * | |
| **This document relates to** | * | **MAGISTRATE JUDGE KNOWLES** |
| | * | |
| Evelyn Irvin Plunkett v. Merck & Co, Inc. | * | **CASE NO. 02:05CV4046** |

## BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR NEW TRIAL

Plaintiff Evelyn Irvin Plunkett, as Personal Representative of the Estate of Mr. Richard Irvin, Jr., pursuant to *Federal Rule of Civil Procedure* 59, moves the Court to grant a new trial in this case. In support of her motion, Plaintiff states that the Court abused its discretion during the second trial of this case by: (1) by ruling that Dr. Thomas Baldwin, Plaintiff's cardiologist, and Dr. Michael Graham, Plaintiff's pathologist, could not testify that Vioxx was a contributing cause of Mr. Irvin's death; and (2) by denying Plaintiff's motion for a continuance following the Court's *Daubert* decisions involving Dr. Graham and Dr. Baldwin.

### STATEMENT OF THE FACTS

Mr. Richard Irvin, Jr. was a 53-year old male with lower back pain. On April 9, 2001, he asked Dr. Christopher Schirmer, an emergency room physician and his son-in-law, to prescribe for him pain medication. Dr. Schirmer prescribed vicoprofen and methocarbonol. The combination of vicoprofen and methocarbonol made Mr. Irvin experience severe nausea and provided no significant pain relief. Thereafter, Mr. Irvin received samples of Vioxx 25 mg from a friend. Vioxx did not cause nausea and assisted Mr. Irvin with his pain. On April

15, 2001, Mr. Irvin asked Dr. Schirmer to prescribe Vioxx for him until he could visit a physician near his home. Dr. Schirmer prescribed Mr. Irvin 30 tablets of Vioxx 25 mg to be taken once daily. The prescription was filled on April 22, 2001.

On May 15, 2001, Mr. Irvin suffered myocardial infarction. Despite extensive resuscitative efforts, Mr. Irvin was pronounced dead at 9:02 a.m. on May 15, 2001. An autopsy revealed an unattached thrombus, or clot, in his left anterior descending coronary artery.

## PROCEDURAL HISTORY

Mr. Irvin's surviving spouse, Evelyn Irvin Plunkett, brought this suit against Merck & Company on behalf of herself, Richie Irvin, III, Ashley Irvin and the Estate of Richard Irvin, Jr. In her Complaint, Plaintiff alleges that Vioxx is defective. In addition, Plaintiff alleges that Merck knew Vioxx is defective, and despite this knowledge, failed to adequately warn Mr. Irvin or Dr. Schirmer of Vioxx' defective nature. Plaintiff seeks to hold Merck responsible for Mr. Irvin's death. Originally filed in state court in West Palm Beach, Florida, Plaintiff agreed to have the case tried as a bellwether case in this multidistrict proceeding.

The case was first put to trial on November 29, 2005 in Houston, Texas. Prior to trial on November 18, 2005, the Court entered an order on numerous *Daubert* motions filed by both parties. In that Order, the Court ruled that Dr. Thomas Baldwin was "qualified to testify as an expert regarding Mr. Irvin's cardiac condition at his time of death. Moreover, Dr. Baldwin did review all the relevant materials and is entitled to rely on pharmacological and epidemiological experts. As such, his methodology was proper. Merck will be allowed to attack Dr. Baldwin's understanding during cross-examination, but will not be able to entirely

exclude him based on it."[1]   During the trial of the case – after Dr. Baldwin briefly stated his qualifications and following a brief voir dire examination by Defendant -- this Court ruled that Dr. Thomas Baldwin could testify that Mr. Irvin died of a myocardial infarction but ruled that Dr. Baldwin could not opine that the drug Vioxx was a contributing cause of the heart attack. Plaintiff moved the Court to reconsider this decision during the first trial, but the motion was denied.  The Court is well aware, the trial ended in a mistrial when the jury failed to reach a unanimous verdict.

The case was set for trial a second time in New Orleans on February 6, 2006.  On the evening of February 2, 2006, the parties received via email an order on *Daubert* motions filed by Defendant.  In the email, the Court indicated that it would follow its ruling in the first trial and would not allow Dr. Baldwin to testify to specific causation.  In its Order, the Court ruled that Dr. Michael Graham, Plaintiff's pathologist, would be allowed to testify that the cause of death was a myocardial infarction, but he too would not be allowed to testify that Vioxx was a contributing cause.

The following morning during a pretrial hearing, Plaintiff sought clarification of the Court's order and to learn what qualifications in the Court's judgment would pass through the *Daubert* gate in order for an expert cardiologist or pathologist to be allowed to give an opinion as to specific causation.  In addition, Plaintiff explained that the Court's order limiting the opinions of Dr. Baldwin and Dr. Graham eliminated Plaintiff's ability to present direct evidence of specific causation, though indirect evidence of specific causation would be presented during the trial through Dr. Wayne Ray, Plaintiff's epidemiologist.  Plaintiff moved the Court for a continuance of 30 or 60 days to locate an expert that would meet the Court's

---

[1] Order & Reasons of November 18, 2005, at 44-45.

criterion and be allowed to testify to specific causation. The Court denied Plaintiff's motion for a continuance.

The case was put to trial again on February 6, 2006. On February 7, 2006, Plaintiff moved the Court to reconsider its decisions regarding Dr. Baldwin and Dr. Graham. After a hearing on the same day, the Court denied Plaintiff's motion and the trial continued. The jury returned a verdict for Defendant on February 18, 2006. A final judgment was entered on February 23, 2006.

## ARGUMENT

## I. THE COURT ABUSED ITS DISCRETION BY REFUSING TO ALLOW DR. THOMAS BALDWIN AND DR. MICHAEL GRAHAM TO TESTIFY TO SPECIFIC CAUSATION

The Court abused its discretion by not allowing Dr. Thomas Baldwin and Dr. Michael Graham to testify that Vioxx was a substantial contributing cause of Mr. Irvin's death. Both Dr. Baldwin and Dr. Graham are well qualified to render helpful, scientific opinions regarding the nature and the cause of Mr. Irvin's death.

### A. The Court Abused Its Discretion By Refusing to Allow Dr. Baldwin from Testifying That Vioxx Was a Contributing Cause to Mr. Irvin's Death

#### a. The Court's Previous Rulings Regarding Dr. Baldwin

Plaintiff put forth Dr. Thomas Baldwin as an expert cardiologist. Dr. Baldwin sought to offer the following opinions:

- I am a certified cardiologist with sub-specialty in interventional cardiology.
- My clinical focus is identifying and treating factors that lead to blood clotting and sudden cardiac death.
- I am well-versed in the area of coronary thrombosis and its various causes including diseases and medications.
- In my practice, I typically review and rely upon the same type of materials I have reviewed in this case to form medical conclusions about factors which contribute to sudden cardiac death due to increased blood clotting. Those materials include:

4

- o Clinical circumstances and pre-event symptoms
- o Cardiac risk factors
- o Presence or absence of acute precipitating events
- o Introduction of new agents or drugs which could influence clotting
- o Autopsy materials
- o *Medical literature*

- I am an expert in analyzing what interrupts blood clotting balance and how that contributes to MI and sudden cardiac death (SCD).
- I am not a pharmacologist but I am an expert on the mechanism of action of Vioxx and how it influences clotting, MI and Sudden Cardiac Death.
- I am not an endocrinologist or an obstetrician but I have significant expertise on how diabetes or pregnancy/hormonal changes can affect clotting and cause thrombotic cardiovascular events.
- I have used the same methodology of the same type of materials I typically evaluate every day in reaching my opinion in this case.
- In this case, it is my opinion, to a reasonable degree of medical certainty that Vioxx directly caused or substantially contributed to cause the death of Mr. Irvin on May 15, 2001.  To a reasonable degree of medical certainty, *I hold the opinion that but for Mr. Richard Irvin, Jr. ingesting Vioxx that he would not have died of a fatal myocardial infarction on May 15, 2001.*
- It is my opinion that Vioxx does substantially increase the risk of heart attack and sudden cardiac death.
- I believe that my knowledge, skill, education, training, and experience, including my review of the extensive body of medical literature on the issue of Vioxx and CV complications, make me well-qualified to opine on the specific cause of Mr. Irvin's death.
- My opinion is based upon numerous clinical and autopsy factors in Mr. Irvin.

Plaintiff's Proffer of Testimony of Dr. Thomas Baldwin (December 1, 2005 & February 14, 2006).

In its Order of November 18, 2005, the Court stated the following:

> . . . ., the Court acknowledges that Dr. Baldwin is a cardiologist who is qualified to testify as an expert regarding Mr. Irvin's cardiac condition at his time of death.  Moreover, <u>Dr. Baldwin did review all the relevant materials and is entitled to rely on pharmacological and epidemiological experts.  As such, his methodology was proper.</u>  Merck will be allowed to attack Dr. Baldwin's understanding during cross-examination, but will not be able to entirely exclude him based on it.

Order & Reasons of November 18, 2005 at 44-45.

At the first trial, Plaintiff elicited the qualifications of Dr. Baldwin prior to offering him as an expert in cardiology.  The following testimony was presented:

BY MR. BIRCHFIELD:

Q. Dr. Baldwin, you have in front of you a summary of your background, and you also – attached to that is your curriculum vitae, is that correct?

A. That's correct.

Q. Doctor, would you describe for us briefly, just give us a brief summary of your education and your professional experience.

A. Sure.  My education started at Kansas State University with a Bachelor of Science degree in pre-med, moving on to the University of Kansas for medical school for internal medicine residency, and then subsequently completing a cardiology fellowship in 1988.  I'm board-certified in internal medicine, cardiovascular medicine, and then subspecialty boarded in interventional cardiology.

Following my completion of training at KU Medical Center, I started a clinical practice in 1988, and I remain in clinical practice today.  I'm currently the lead physician of a 14-physician cardiology group that practices in the Kansas City area.

Q. Thank you, Dr. Baldwin.

MR. BIRCHFIELD:   At this time, Your Honor, we offer Plaintiff's exhibit D, which is his curriculum vitae and summary and offer him as an expert in cardiology.

THE COURT:  Thank you, doctor.  The court will receive him.

MR. BIRCHFIELD:   We're tendering him as an expert in cardiology on specific causation, but in order to get to specific causation, he has to do it with the mechanism.

. . .

THE COURT:  Any questions on his qualifications?

MR. ISMAIL:  Yes sir.

BY MR. ISMAIL.

Q. Now, sir, am I correct that while Vioxx was on the market, you never personally prescribed the medicine?

A. Not that I recall.

Q. And that would be true for the other COX-2 inhibitor drugs that were on the market, Bextra and Celebrex; is that correct?

A. To my recollection, that is correct.

Q. And you have never done any research in COX-2 drugs, correct?

A. That's correct.

Q. And, sir, I believe you said at your deposition that you do not ever recall diagnosing one of your own patients as having a cardiovascular thrombotic event from Vioxx; is that correct?

A. That's correct. At the time of my deposition, I was not aware of any of my patients that had an event while on Vioxx. I have subsequently become aware of one case.

Q. So your deposition was taken in October, correct?

A. That's correct.

Q. That was about six weeks ago?

A. That's correct.

Q. And you said under oath at that time you had never personally treated a patient whom you had diagnosed as having a Vioxx-related blood clot, correct?

A. And that holds. I have treated a patient that had a cardiac event while on Vioxx. I haven't made a diagnosis that it was caused by Vioxx, that's correct.

Q. Thank you for that clarification. When you come into this courtroom today, you personally have not diagnosed one of your patients as having a Vioxx-related clot, correct?

A. That's correct.

Q. Now, is that true for Celebrex as well?

A. That's correct.

Q. So your qualifications on diagnosing cardiac events from COX-2 inhibitor drugs, you have never done it before outside of this litigation, correct?

A. That's correct.

Q. Now, sir, you don't consider yourself a clinical researcher, correct?

A. Correct.

Q. And I believe you have not done any basic science research yourself since college?

A. With the proviso that during the course of medical school, there may have been some involvement in basic science research, but...

Q. Sure. When you're in medical school, you may have had an opportunity to go down to the lab and maybe conduct a few experiments, but you wouldn't consider yourself a scientific researcher, would you?

A. That's correct.

Q. And you're really not an expert to COX-2, are you, sir?

A. Not an expert, per se, no.

Q. And you have never been responsible for analyzing data from a clinical trial, correct?

7

A. Well, responsible for is kind of the operative phrase. I analyze studies in the literature and apply that information to my patients on a regular basis.

Q. Sure. You may actually see an article in a journal and there is clinical results presented, and then you read that as a practicing physician and draw your own conclusions from it, correct?

A. That's correct.

Q. But in terms of having primary responsibility as an investigator on a trial, you've never done that and analyzed the data from the trial, correct?

A. That is correct.

Q. And you've never done any research in any nonsteroidal anti-inflammatory drug, correct?

A. Correct.

Q. And you don't consider yourself an epidemiologist, do you, sir?

A. No, I do not.

Q. Can you tell the jury what an epidemiologist is?

A. An epidemiologist is an individual that studies events and tries to apply statistical tools to evaluate connections between events.

Q. And, sir, you've never done clinical research on the causes of sudden cardiac death, have you?

A. During the course of medical school, I may have been involved with a research project and/or during fellowship but not one that I was responsible for evaluating the data.

Q. And when did you graduate medical school?

A. 1983.

Q. So, in the last 22 years, would it be fair to say you've never been involved in clinical research into the causes of sudden cardiac death?

A. My cardiology fellowship training ended in 1988, so it would have been since '88.

Q. So I amend my question by saying: In the last 17 years, you've never done any clinical research in the causes of sudden cardiac death?

A. That's correct.

*Irvin I v. Merck & Co.*, Transcript at 489-496 (December 1, 2005).

In response to Defendant's objection to Dr. Baldwin's qualifications to render an opinion as to specific causation, the following colloquy took place at the bench:

8

The Court:  . . . . Let me tell you the way I feel about this:  He's a cardiologist.  He seems to be well qualified as a cardiologist.  I think, as a cardiologist, he would be helpful to the Court and the jury in explaining things, like the anatomy of the heart, like cholesterol plaques, the formation of clots, how they form, the type of clots that are formed, even the type of clot that Mr. Irvin had, if he looked at the autopsy report and can diagnose that particular clot, the significance of clots, how clots affect the functioning of the heart, but I won't let him testify as to the part, if any, that Vioxx or Cox-2 inhibitors played in Mr. Irvin's death.  I don't feel he's qualified by virtue of experience, training, to testify as to the specific cause of Mr. Irvin's death.  A general cause of clots, the general formation of clots, how they are formed, whether they are formed, what type of clot Mr. Irvin had, where it was – all of those things he has knowledge and experience, and he can testify to but specifically with regard to Vioxx or any Cox-2 inhibitors. . .

Mr. Birchfield:  Your honor, Dr. Baldwin gives us the clearest, strongest, specific causation in the case, and it is based on his practice as a practicing cardiologist.  He works every day with patients that have heart attacks and have heart attacks as a result of clots.

He also, he knows the risk factors involved in each of these cases and determines what role risk factors play.  He has examined the medical records, he's examined the testimony of the witnesses in this case, and he is prepared.  He has said under oath that but for Vioxx Mr. Irvin would not have had a fatal heart attack on that day, but he does it through an differential diagnosis, your Honor.

The Court:  I understand that.  I don't see him qualified to testify as Vioxx.  I think he can testify risk factors.  I think that's within his expertise.  He can testify as to what risk factors, if any, Irvin had, what's the significance of the 60 percent blockage.  All of those things are within his prerogative.  This individual has never diagnosed anybody with a Vioxx problem.  He doesn't know anything about Vioxx.  He said that he has – that he's not an expert in various fields, both in his deposition and in his questioning.  So that's my ruling.  I understand your position, but that's my ruling on it and let's proceed.

*Irvin I v. Merck & Co.*, Transcript at 506-508 (December 1, 2005).

Plaintiff moved the Court to reconsider its ruling.  The Court issued the following

Order which is set out in pertinent part:

This testimony reveals that Dr. Baldwin has basically little to no experience with Vioxx or, for that matter, any other Cox-2 inhibitor.  He testified that he has never prescribed Vioxx or any other Cox-2 inhibitor.  He has never conducted any research on Cox-2 inhibitors.  He has never diagnosed Vioxx as the cause of a cardiac event.

. . . .

9

. . . Dr. Baldwin lacks skill, training, and education to testify as expert [sic] regarding the role of Vioxx played in Mr. Irvin's death. As a cardiologist, Dr. Baldwin certainly has the skill, training, and education to testify that Mr. Irvin died of a myocardial infarction. In addition, he has the skill, training, and education to testify regarding the nature of the fatal clot or thrombus, its location, and explain its role in causing Mr. Irvin's death. As a cardiologist with no other skill, training, education, or experience with Vioxx or Cox-2 inhibitor, however, Dr. Baldwin is not qualified to testify regarding the specific role that Vioxx played in producing the clot.

Court's Order on Plaintiff's Motion to Reconsider at 2-6 (Dec. 3, 2005).

Prior to the second trial, Plaintiff provided a more complete tender of Dr. Baldwin's qualifications and sought reconsideration of the Court's ruling in the first trial. Dr. Baldwin submitted an expanded and revised expert report that (1) more clearly stated his qualifications, (2) more fully articulated his reasoning,[2] and (3) listed 27 additional references among the materials he reviewed. Dr. Baldwin was further deposed on January 23, 2006. Plaintiff then re-urged the admissibility of Dr. Baldwin's causation opinions. For the second trial, the Court did not revisit his ruling on Dr. Baldwin or his qualifications. See Court's Email of February 2, 2006. Dr. Baldwin was not allowed to testify to specific causation.

During the second trial, Defendant offered Dr. Barry Rayburn as an expert in cardiology. Dr. Rayburn testified as to the following credentials:

BY MR. ISMAIL.

---

[2] In the January Report, Dr. Baldwin clarified his opinion by stating that there "are many drugs that are primarily prescribed by physicians other than cardiologists, but whose cardiotoxic effects are well within the diagnostic expertise of a cardiologist." See Dr. Thomas Baldwin Expert Rpt. (Ex. A) It also explains that while Dr. Baldwin, as a cardiologist, "did not prescribe Vioxx . . . I do consider the cardiotoxic effects of the drug to be well within my area of expertise." Id. Consistent with his concerns about cardiotoxicity, and well before he ever became involved in Vioxx litigation, he "had patients on Vioxx whom I determined to be having adverse side effects, including congestive heart failure, from the drug. I recommended that between 20 and 100 patients stop taking the drug because of potential cardiovascular risks." Id. Thus the fact that Dr. Baldwin never prescribed Vioxx is not relevant to his qualifications to testify about the adverse effects of the drug.

Dr. Baldwin had not diagnosed a Vioxx-caused myocardial infarction prior to doing so in Mr. Irvin's case. Though this fact is irrelevant to the reliability and admissibility of his opinions, Dr. Barry Rayburn, Defendant's cardiologist, also testified that he had not made a diagnosis regarding whether Vioxx contributed to the cause of a myocardial infarction prior to litigation.

Q. Good afternoon, Dr. Rayburn.  Sir, you're a medical doctor; is that correct?

A. That's correct.

Q. You're also a professor of medicine at the University of Alabama; is that also correct?

A. That's correct.

Q. Sir, have you been asked to investigate some of the medical and scientific issues as it relates to the drug Vioxx and also as it relates to the death of Mr. Irvin?

A. Yes, I have.

Q. Have you formed opinions with regard to that, to those questions, both as to the drug Vioxx and as to Mr. Irvin?

A. Yes I have.

Q. Are you prepared to give those opinions to the jury today?

A. Yes, I'll do that.

Q. Doctor, before we get to your opinions, let's review your background.  What is your field of specialty?

A. Cardiologist.

Q. Are you board-certified, sir?

A. Yes.  I passed boards in internal medicine and cardiovascular disease.

Q. Do you treat patients in your practice?

A. Yes, routinely.

Q. What kind of patient care do you specialize in?

A. I take care of all types of heart patients.  I have special expertise in the care of patients with heart failure and cardio-transplantation, take care of patients with coronary disease all the time.

Q. Do you take care of patients who either are experiencing or recently have experienced heart attacks?

A. Yes, routinely.

Q. Sir, if you could briefly review your medical training starting with college and medical school.

A. Sure.  I attended college at a small college in Illinois call McMurray, was accepted to Johns Hopkins School of Medicine in an early acceptance program, was there for five years and finished both my bachelor's degree and my medical degree.  I stayed on there, did my internal medicine residence, served as the Chief Resident in Internal Medicine, did a fellowship in cardiology, did a fellowship in cardiotransplantation.

Q. What did you do after your fellowships in cardiology and cardiac transplantation?

A. In 1993 I left Hopkins and joined the faculty at the Wake Forest University School of Medicine in North Carolina.

Q. Did you teach medicine there?

A. I did.

Q. Did you also care for patients?

11

A. I did.

Q. Did you then go the University of Alabama?

A. Yes.   In 1997 I was recruited and moved down to the University of Alabama at Birmingham.

Q. What are your positions there at the University?

A. Professor of Medicine in cardiovascular disease.  I served as the Medical Director of the heart transplant program and as the Section Head for the section of advanced heart failure transplant and pulmonary vascular disease and also as Medical Director of the heart transplant intensive care unit.

Q. In addition to taking care of patients and teaching med students and young doctors, do you participate in research?

A. I do.

Q. What kinds of research do you participate in?

A. Going back to my training days, I actually was involved in basic science research in basic science laboratories.   As I moved forward, I became more involved in clinical studies.  I participate in randomized clinical trials.   I participate in epidemiologic studies, a wide variety.

. . . .

Q. How many hours, in total, have you spent working on the scientific issues that we have asked you to look at?

A. In this matter, in general, well over 100 hours.

Q. Why so many, sir?

A. It's a very complicated literature.  I think the jury has probably gotten a perspective of it already with the various experts that have already been brought up here.

Q. Going back to prior to the time that you were retained as an expert witness, did you have professional experience with Vioxx yourself?

A. I did.

Q. Did you ever take care of patients who had the drug prescribed by other doctors but were under your care for cardiac issues?

A. Yes, I have.

Q. How about Celebrex?

A. The same.

Q. When you were prescribing the medicine and taking care of patients, did you get yourself up-to-speed on the cardiovascular issues with respect to COX-2 inhibitors?

A. Yes.   When the issues surrounding the VIGOR article came out, shortly after the publication of that article I became aware that there was an issue with Vioxx that had been raised.  I read the VIGOR article.  I read some of the editorials or comments about it.  I read Dr. Mukherjee's article when it was published.

12

I sort of kept up with the discussions in the literature that was going on at the time.

Q. Did you ever have any discussion at medical conferences or with other faculty at the medical school about the interesting question of cardiovascular literature on COX-2 inhibitors?

A. Yes. It was discussed. I don't remember any of the specifics, but we certainly talked about it at the time.

Q. Obviously, as it was part of your work on this case, you have spent a great deal of additional time investigating the scientific evidence?

A. I have.

Q. How do you allocate your time professionally in terms of your three duties as a doctor caring for patients, as a medical school professor, and as a clinical researcher?

A. Sure. The majority of my time is taking care of patients. Probably 80 percent of my time is either in the hospital or the clinic taking care of people, being their doctor. My roles as a researcher and teacher go along with that. Most of my teaching is done by having residents and medical students work with me when I'm caring for patients. Likewise, most of my research is also clinical research involving the patients I take care of and I'm working with. So those are sort of simultaneous. I do a little bit of classroom teaching, as well. The last 15 or 20 percent of my time is administrative.

Q. Have you ever heard of the term "evidence-based medicine?"

A. I have.

Q. Can you explain to the jury what that means?

A. Evidence-based medicine is the idea that as often as you possibly can you make decisions, you practice medicine, you take care of your patients using the best available evidence, using the data that you have available. We often talk about the art of medicine. There certainly still is room for art in medicine, but as much as possible you make decisions based on evidence.

Q. When you are taking care of patients, do you follow the concept of evidence-based medicine?

A. I try to very much.

Q. With respect to the questions that we have asked you to look at in this case, did you also endeavor to follow the same principles of evidence-based medicine?

A. Yes. The approach I took was to try and parallel what I do when I take care of patients. I looked at the data that were available and tried to critically analyze them the way I would with any other subject.

MR. ISMAIL: At this time we proffer Dr. Rayburn as an expert in the area of cardiology.

13

THE COURT:  Any questions?

MR. BIRCHFIELD:  Yes, your Honor.

TRAVERSE

BY MR. BIRCHFIELD:

Q.  Good afternoon, Dr. Rayburn.

A.  Good afternoon.

Q.  You said that you had done some basic research; is that right?  You've done clinical studies?

A.  That's correct.

Q.  Have you ever done any clinical studies involving Vioxx?

A.  No, sir, I have not.

Q.  Have you done any clinical studies involving Celebrex?

A.  No sir.

Q.  Or any other COX-2 inhibitor?

A.  No sir.

Q.  Have you ever published any articles relating to Vioxx?

A.  No sir.

Q.  What about COX-2 inhibitors?

A.  No sir.

Q.  Outside of your handling of legal cases where Merck has hired you, have you ever investigated any death or heart attack to see whether or not Vioxx was a contributing factor in that heart attack or death?

A.  I'm not quite sure what you mean by "investigate," but certainly when I am confronted with a patient who is having a heart attack or has died from a heart attack I consider all of the possibilities, and specifically back at the time the discussion was being held publicly and in the literature about the results of the VIGOR trial certainly those discussions and thoughts came up.

Q.  So while Vioxx was on the market you had people that were taking Vioxx experience a heart attack or death and you evaluated whether or not Vioxx played a role; is that what you're telling me?

A.  No.  Actually, in the case of the patients that I care for, most of the time it was patients who had coronary disease in the background or had experienced a heart attack that were in need of pain relief and other choices had not worked for them and Vioxx or Celebrex or the other COX-2 agents were reasonable choices.

Q.  Let me make sure I've got a clear answer to my question.  Prior to the time Vioxx was pulled off the market, except for the

cases when you were hired by Merck, you never evaluated a case where a patient had a heart attack or death for the purposes of determining whether or not Vioxx played a role in that heart attack or death?

A. My evaluation was more on a general basis. I looked at the issues in general related to the COX-2 inhibitors, and as a general rule or in my mind, as a generalization, decided that that was not something that played an active role. So inasmuch as I was aware of the issue and I consider all of my medical knowledge when I approach an individual case, yes, I did consider it, but in a specific patient did I say, "did Vioxx cause this death," no, I didn't.

Q. Did you specifically analyze any case, except where Merck has hired you, where a person had a heart attack or sudden cardiac death for the purposes of determining whether or not Vioxx played a contributing role?

A. As I said, Mr. Birchfield, when I reviewed all of this contemporaneously at the time it was going on, my conclusion was that Vioxx didn't contribute. So in as far as that statement holds, no, I didn't specifically look at it with regard to other cases. I had already decided it wasn't something that was an issue.

Q. You're familiar with the PDR?

A. Yes, sir.

Q. Physicians' Desk Reference?

A. Yes, sir.

Q. That contains the product labels for the prescription drugs, is that right?

A. Yes, sir.

Q. Prior to you prescribing Vioxx and Celebrex, you didn't read the PDR or the product label for Vioxx, did you?

A. I doubt if I reviewed it in detail or read it specifically, no.

Q. You told me in your deposition you did not.

A. That's correct.

Q. In fact, you don't recall even reading the PDR or the product label for Vioxx up until the time you were hired by Merck as an expert, is that correct?

A. No, I think that's probably accurate. The product label, as we have talked about or as I'm sure people will see, contains a lot of information that is not necessarily what's always relevant to clinical practice. I tend to get most of my information from the literature.

Q. Dr. Rayburn, I just want to make sure that we have a proper scope on what you're offering expert opinions on. You are not an epidemiologist?

A. No, sir, although I have participated in epidemiologic studies and I certainly use epidemiologic research routinely in my work.

Q. You have never had any epidemiological training, have you?

A. I've taken a single class in epidemiologic study design sometime ago but, no, not formal training in epidemiology.

Q. Dr. Rayburn, do you remember at your deposition you were asked whether you could calculate a relative risk and you said no?  Do you recall that?

A. I think at the time I said I couldn't do it in the setting of the deposition right then, right there, but I certainly have working knowledge of statistics programs that I use on my computer all the time concerning relative risk.

Q. A relative risk calculation, that's a pretty simple calculation for an epidemiologist, isn't it?

A. That depends on the circumstances of the study.  You have to look at the study to know whether it's simple or not.

Q. Pretty simple formula, isn't it?

A. It depends.  Again, there are different formulas that you can use.

Q. Are you a biostatistician?

A. No.  Again, I use biostatistics all the time in my work and I generate statistics for my own studies sometimes, but I'm not a biostatistician.

*Irvin 2 v. Merck & Co.*, Transcript at 1724-1734 (February 14, 2006).

Based on Dr. Rayburn's qualifications, Plaintiff objected to Dr. Barry Rayburn giving

an opinion as to specific causation.  The following colloquy took place at that time:

MR. BIRCHFIELD:   Your Honor, I invoke the "goose gander rule."   He testified he has done no clinical research on Vioxx or any of the COX-2 inhibitors. He has not published any articles pertaining to Vioxx or the COX-2 inhibitors. He has made no diagnosis or determination, prior to Vioxx being pulled off the market, about the role in any heart attack or sudden cardiac death. I think, applying the same standard that has been applied to Dr. Baldwin, he should be restricted to general cardiovascular medicine and not to Vioxx.

THE COURT:   I see this guy differently than I saw Dr. Baldwin.  I see this guy somewhat like Bloor that I held was able to testify orally, even Lucchesi.  Both of those guys, as well as this person, has done a considerable amount of research, if you will, or study or review of the medical literature, the depositions.  He says he put in 100 hours reviewing the medical literature.  He is familiar

with Vioxx.  During his practice, he looked at the VIGOR article when it came out, discussed it with people.  He considered it when he is in his practice.  I just see that type of person as knowing something about Vioxx and being able to testify to issues of the case.

The last witness I saw that you put up, the pathologist, was a person who the only thing he read is what the plaintiff lawyers gave him.  Vioxx wasn't even on his radar screen until somebody from the plaintiff's team asked him to be a witness.  He spent a total of eight hours reading 15 depositions and all of the medical literature pertaining to Vioxx.  That, to me, doesn't make the person an expert in the field of determining whether Vioxx participated in the cause of the death.  It's a drug that apparently doesn't leave any footprint.

When you get a stroke or a thrombus, there's no such thing, apparently, as a Vioxx thrombus.  It's a thrombus.  So he could testify and I allowed him to testify, your pathologist, as to what the cause of death was, the type of thrombus.  But when you made that leap from what caused the thrombus – namely, did Vioxx cause the thrombus – he has no training, no experience, no research, no anything to testify.

I see this person as different.  I see this person on the stand now different.  He has done what he is supposed to do.  I don't think that an expert – I said this before, but I don't think he has to have a great deal of education in Vioxx.  I don't think he has to have years and years of experience with Vioxx.  Even that he diagnosed Vioxx is not a condition. [sic]  He just had to know something about Vioxx.  If you are going to ask him did Vioxx cause the death, he can't in effect say, "Vioxx?  How do you spell it?"  I don't say that he says that, but that's the problem I have with the people that you have submitted.  I don't have it with this person.

MR. BIRCHFIELD:   Your Honor, I understand your ruling.  I think we have made that record.  I think that the qualifications and the background and the amount of literature, the amount of literature and the appropriate literature, is very close on all of these, but I understand your ruling.  One thing that I do want to state, with all due respect, Your Honor, in regards to Lucchesi, your Daubert ruling was that he could not give a specific causation opinion.  That was in the first trial.  He did give a specific causation opinion without objection.

THE COURT: Lucchesi?

MR. BIRCHFIELD:   Yes, sir.   It was done without objection, but your ruling at the Daubert hearing – that's the reason I did not bring him here, because I knew that it wasn't going to go without objection this time.

THE COURT: Forensically, there's reasons; not only that, but he is a hard witness to handle forensically, Lucchesi.  I don't fault you for that.  I understand that.  The same way Bloor is a problem from your standpoint.  I don't say that you should have brought either one of them.  I understand both situations.  What I was just using those two folks for, particularly a guy like Bloor – frankly, I didn't even have any problem with Baldwin when I looked at his papers.  It's just when he took the stand and said, "Well, I don't know much about Vioxx and I'm not an expert in Vioxx," then just it is a problem when a doctor volunteers all that information.

*Irvin 2 v. Merck & Co.*, transcript at 1737-1740 (February 14, 2006) (emphasis added).

### b.  Comparison of Dr. Baldwin and Dr. Rayburn

Plaintiff has taken every opportunity to urge the Court to reconsider its decision in regard to Dr. Baldwin.  With all due respect, Plaintiff once again asks the Court to step back and reevaluate its decision regarding Dr. Baldwin.

When Dr. Baldwin and Dr. Rayburn are viewed side-by-side, there seems to be little to no difference between them.  The testimony outlined above plus deposition testimony supports the conclusion that their credentials, training, experience, knowledge and time expended are essentially identical.

| Criterion | Dr. Thomas Baldwin | Dr. Barry Rayburn |
|---|---|---|
| Board Certifications | Board certified in internal medicine & cardiology | Board certified in internal medicine & cardiology |
| Prescribed Vioxx | No[3] | Yes – Vioxx and Celebrex[4] |
| Took Patients off Vioxx due to safety concerns | Yes[5] | No |
| Diagnosed patient with Vioxx related cardiac event | No | No |
| Participated in Clinical Research Regarding Vioxx or other Cox-2 inhibitors | No | No |
| Published Articles Relating to Vioxx or other Cox-2 inhibitors | No | No |
| Not an epidemiologist | No | No |
| Not a pharmacologist | No | No |
| Reviewed Relevant Medical Literature | Yes | Yes |
| Reviewed VIGOR when published | Yes[6] | Yes |
| Hours spent before *Irvin 1* (according to deposition testimony) | 20-30 hours[7] | 23 or 24 hours[8] |
| Hours spent before *Irvin 2* (according to deposition testimony) | 10 to 12 more hours[9] | 10 to 12 hours[10] |

Plaintiff would submit that both Dr. Baldwin and Dr. Rayburn should pass through the

*Daubert* gate and be allowed to testify as to specific causation. Unless the dimensions of the

gate vary based on subjective measurements, the Court's decision to allow Dr. Rayburn testify

to specific causation and not allow Dr. Baldwin to do so is an abuse of discretion. Objectively

both experts possess virtually the same qualifications. To preclude one but not the other under

---

[3] Dr. Baldwin recognized the cardiovascular risks associated with taking Vioxx after reading the VIGOR study shortly after it was published and took patients off of the drug. Dep. of Dr. Thomas Baldwin 29-30 (Oct. 6, 2005) (Ex. B). In addition, Dr. Baldwin reviewed the PDR at that time. *Id.* at 20.
[4] Dr. Rayburn testified that he failed to review the label on either of these drugs prior to prescribing them. *Irvin 2 v. Merck & Co.,* Transcript at 1733 (Feb. 14, 2006).
[5] Dep. of Dr. Thomas Baldwin 27-30 (Oct. 6, 2005).
[6] Dep. of Dr. Thomas Baldwin at 31-36 (Oct. 6, 2005).
[7] Dep. of Dr. Thomas Baldwin at 9 Oct. 6, 2005).
[8] Dep. of Dr. Barry Rayburn at 98 (Oct. 12, 2005) (Exs. C & D).
[9] Dep. of Dr. Thomas Baldwin at 179 (Jan. 23, 2006) (Ex. E).
[10] Dep. of Dr. Barry Rayburn at 10 (Feb. 1, 2006) (Ex. F).

these circumstances is to invade the province of the jury by making what appears to be credibility determinations, not qualitative determinations.

**B.** **The Court Abused Its Discretion By Precluding Dr. Graham from Testifying That Vioxx Was a Contributing Cause of Mr. Irvin's Death**

Plaintiff asserts that Dr. Michael Graham is qualified by his experience, training, knowledge, and skill to give expert testimony that Vioxx was a contributing cause of Mr. Irvin's death. Plaintiff asserts that the Court abused its discretion by preventing Dr. Graham from offering specific causation testimony.

**a.** **The Court's Ruling Regarding Dr. Graham**

In its Daubert Order of February 2, 2006, prior to the second Irvin trial, the Court made the following ruling:

> Dr. Graham is not qualified to opine on either general causation or specific causation. Furthermore, his methodology is not scientifically reliable. Throughout his deposition testimony, Dr. Graham makes a litany of critical admissions. By self-admission, Dr. Graham has no training in pharmacology; is not qualified to explain how Vioxx could lead to thrombosis; has never done any research on NSAIDs or COX-2 inhibitors prior to becoming an expert for the Plaintiff; is not qualified to analyze and interpret clinical and epidemiological data concerning Vioxx; has never prescribed Vioxx or any other COX-2 inhibitors to a patient; has never determined that Vioxx was a contributing cause of a death; and has never written an article on sudden cardiac death related to plaque rupture. To compensate for his lack of education, experience, and training, Dr. Graham spent approximately eight hours reviewing sixty-seven scientific medical articles, nine depositions, four expert reports, and three day's worth of trial transcripts – far less than this Court or any attorney in this case has spent reviewing Vioxx related materials. In fact, most of these eight hours were spent reviewing Dr. Wayne Ray's expert report. While the Court could further explain Dr. Graham's lack of qualifications or his lack of a reliable scientific basis, it is enough to say that he is not qualified to render an opinion as to whether Vioxx can cause a thrombotic cardiovascular event or whether Vioxx did cause Mr. Irvin's death.

Court's Order of Feb. 2, 2006, at 10-11.

In a pre-trial conference on February 3, 2006, following the Court's own *Daubert* motions, Plaintiff sought clarification. The Court responded as follows:

> THE COURT:   . . . . Some comments about the requirements of the person, I'm not necessarily keyed in on the degrees that the individual has as much as his familiarity and experience with what he is talking about from the standpoint of the drugs.  The last witness that I viewed conducted some 700 autopsies.[11]  In his practice, he never in his history found one instance where he attributed the death to Vioxx.  He never thought about Vioxx.  He says it wasn't even on his radar screen until he was contacted by the plaintiff.  He spent eight hours learning all he could about Vioxx, which is less than anybody in this room has spent learning what they needed to learn about Vioxx.  Most of his time was spent in reading one report and understanding, to the extent that he understood anything, about Vioxx.
>
> He is familiar with autopsies, obviously.  He is familiar with clots, obviously.  He is familiar with the type of clots, obviously.  He is just not familiar with Vioxx, and Vioxx is something that is being attacked.  I would expect an expert who has some experience, some knowledge, if he has done research, if he has prescribed it, if he has seen it, dealt with it, to be able to testify, but someone who admits that – one of the experts admits, "I'm not an expert in Vioxx.  I've never prescribed it.  I've never found a cardiac problem with Vioxx.  I don't do it in my normal day."
>
> It seems to me that one of the things that the court even before Daubert – at least the Fifth Circuit wanted experts who in their day-to-day activity had some knowledge, some familiarity, some experience, some education to what they were talking about, and not just come to court and all of the sudden learn about something – either during the trial or immediately before the trial – that they had never seen before and opine as an expert.  So that's really the reason for it.
>
> I listened to the first trial and, frankly, I thought you made a prima facie case and I feel this way.  There were people that testified who were qualified to testify that in their opinion Vioxx was the cause of the demise of the party.  There's a lot on the opposite side, too, but it's not as if you did not have and do not

---

[11] Dr. Graham has actually performed or supervised over 7,000 autopsies. Dep. of Dr. Graham at 34 (Feb. 1, 2006). (Ex. H).

have an expert. I understand your motion and appreciate you bringing it and it's for the record. I will deny it.

. . . .

THE COURT: . . . . This is the second trial in this case. I dealt with that, made rulings the first trial in advance of the trial, we went through the trial, and now it's the same issue. The next trial that comes up, bring them to me earlier and I will deal with them earlier.

MR. BIRCHFIELD: I would like to address one key point here, Your Honor, in the Court's reasoning, and that is the fact that – well, first of all, Michael Graham, the pathologist here, did not testify that he had no familiarity with Vioxx prior to this litigation. He testified that he receives the New England Journal of Medicine at home. He had reviewed literature in that regard. It was not a primary focus on his part.

THE COURT: He said it wasn't even on his radar screen. I remember what he said in that situation. They asked him about Vioxx, about the fact that he had never prescribed it, never diagnosed anybody with it that died, and then the question was, "Did you focus on Vioxx," and he said, "Frankly, it wasn't on my radar screen prior to being contacted." It's the way I remember it.

MR. BECK: That's what he said.

MR. BIRCHFIELD: A major difficulty we will have in this litigation is finding someone who – a pathologist is doing autopsies at the time of the death or shortly thereafter, so it would be someone who is doing an autopsy and at that time concluding that it was Vioxx related when Merck was telling the scientific world and the world that Vioxx did not cause heart attack risks. So it's not something that pathologist would be looking at. In fact, the studies that Merck was publishing and the things they were telling is that Vioxx doesn't contribute to that.

. . . .

MR. BIRCHFIELD: . . . He certainly can testify about the fact that Vioxx causes heart attacks, causes thrombotic events, and causes it at 25 milligrams within the first 30 days. But what a pathologist does, Your Honor, every day in his practice is he relies on epidemiologists. He relies on pharmacologists and what's reviewed in the literature. What he does, if it's a cocaine-related death, he relies on the fact that it's in the literature, epidemiologists

22

have looked at or pharmacologists have looked at it and have come to the conclusion that cocaine can act in a certain way to cause a heart attack. He relies on that in making his determination as to the cause of death. That's our position here, your Honor, is that we should not have to have a pathologist that is an epidemiologist and a pharmacologist in —

THE COURT: I agree with that, Andy. I don't think you need that. I think if you have a pathologist who says, "I'm familiar with this because I have seen it on several occasions and it's consistent with what I have seen on other occasions," "I do this all the time and this is what I have been seeing for this period of time" — he can say that he saw clots, and then if in his normal day he has attributed those clots or even knows something about Vioxx or has looked into Vioxx or has thought about Vioxx or has written something on it or has some knowledge of Vioxx, but the one or two that I have excluded, they don't know anything about the drug. They know less than you folks know about the drug, less than I know about the drug — and I probably know less than you do — and they admit it.

. . .

THE COURT: I'm not taking the position that people have to be two and three and four diplomas deep. I just need somebody who knows something about what they are talking about.

MR. BIRCHFIELD: Your Honor, in that regard, I think that what you have in front of you in the deposition — certainly that's what you do in a deposition of an expert is you gain material that's fodder for cross-examination. I don't know if Dr. Michael Graham is an extremely fast reader. I don't know if he is a very poor estimator of time when he says eight hours, but he goes through a litany of articles/medical literature that he had reviewed and he says about eight hours. Now, that's when he is going through his bill or the time in this case. He had read articles relating to Vioxx prior to that. Your Honor, if the Court would be open to, you know, when we put Dr. Michael Graham on, if we establish that he is knowledgeable about Vioxx, then perhaps we could revisit the issue of him giving a specific causation opinion.

. . .

THE COURT: Let's not go into that. I have already ruled on it. I'm not going back on it. Your objection is noted. I feel the record is complete with it. This will be made a part of the record and my rulings will be, also. Do we need anything else?

*Irvin 2 v. Merck & Co.,* Hearing before Honorable Eldon E. Fallon at 22-28 (Feb. 3, 2006).

On February 7, 2006, Plaintiff filed a motion to reconsider the Court's order regarding

Dr. Graham.  At a hearing on the motion the Court stated the following:

> I don't say that every pathologist has the same problems that this doctor does.  In fact, I didn't feel that way.  I looked at the two pathologists that were submitted or questioned or attacked, or objected to last time, and I felt that they were qualified to testify.
>
> Dr. Lucchesi, he wasn't a treating physician, but he had a lot of credentials and was a doctor, an M.D.  I felt he was qualified to testify.
>
> So I don't paint with a broad brush in this situation.  I'm not saying that you need to be a pathologist, that you need to have diagnosed people or that you need to have prescribed or have some experience, but a bit of some of those things are necessary.
>
> I don't feel that this doctor demonstrated to me that he had any of them, and I kept looking for more to see whether or not he could get through the gate.  And every time I looked a little further, it seemed more problematic.
>
> So I do take these things seriously, and I don't just willy-nilly shoot from the hip.  I felt that this doctor might be qualified to testify on other areas but not the specific causation, and I really have already dealt with the other doctor on several occasions and I won't change that.
>
> So I understand the motion.   I appreciate counsel's enthusiasm in bringing it, but I do deny the motion.

*Irvin 2 v. Merck & Co.,* Transcript at 736 (February 7, 2006).

### b.  Dr. Graham's Qualifications

Dr. Graham is a board certified pathologist who is both a professor at St. Louis

University and the Chief Medical Examiner for the City of St. Louis.[12]  He has performed

---

[12] Expert Witness Report of Dr. Michael Alan Graham (Ex. G).

approximately 7,000 autopsies.[13]   Dr. Graham was more than qualified to testify about the medical examiner's report on Mr. Irvin, and on that point there is no issue.  He also was qualified to interpret medical and epidemiological literature, and to use the knowledge gleaned from such a review, or from reports of other experts, to conduct a post mortem differential diagnosis to determine the cause of death, as in Mr. Irvin's case.  Dr. Graham does this everyday in his practice.

The Court, however, ruled Dr. Graham's causation testimony inadmissible because he, like Doctor Baldwin, lacked experience prescribing Vioxx, doing research on Vioxx, writing articles relating to Vioxx, or past experience diagnosing Vioxx-caused injury.  As with Dr. Baldwin, these points were not relevant to the admissibility of Dr. Graham's testimony.


**C.     Both Dr. Baldwin and Dr. Graham Meet the *Daubert* Standard**

The Court abused its discretion in ruling that neither Dr. Baldwin nor Dr. Graham could testify as to specific causation.  Respectfully, Plaintiff believes that the Court's *Daubert* rulings on these Plaintiff's experts are incorrect.  The rulings establish a nearly impossible standard for experts testifying on the role of Vioxx in causing death or serious injury.

As applied, the Court's qualification standard overemphasizes whether a physician has prescribed Vioxx.  The circumstances under which a cardiologist would have prescribed Vioxx would be rare; the circumstances under which a pathologist would have prescribed Vioxx would be rarer still – probably non-existent.  The standard also overemphasizes the importance of an expert's role in clinical research.  Practicing doctors primarily rely upon published medical materials and the results of studies to formulate professional opinions.

---

[13]   Dep. of Dr. Graham at 34 (Feb. 1, 2006). (Ex. H).

If the Court follows these decisions in other bellwether trials, it will result in the exclusion of qualified physicians from testifying to Vioxx-related injuries that resulted from Merck's failure to disclose important and material safety information that would have timely alerted the prescribing medical community of the risks associated with the drug. Because of Merck's delays and deceptions regarding this information, physicians are only now able to make the association between their patients' injuries and the use of Vioxx. Therefore, it is not surprising that Dr. Baldwin would not have diagnosed a "Vioxx heart attack" prior to litigation. The same is true of Dr. Graham not concluding that Vioxx was a contributing factor in a person's sudden cardiac death.[14]  The fact that a much of their knowledge emerged after the initiation of litigation should not have precluded them from testifying about causation.

Plaintiff believes this Court abused its discretion by limiting the testimony of Dr. Baldwin and Dr. Graham.  Although this Court noted several potential weaknesses in the testimony of these experts, none were sufficient to limit the testimony of either expert. Instead, these points should have been left open to attack on cross-examination, challenged through direct evidence and ultimately weighed by the jury.

As a general rule, "questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *United States v. 14.38 Acres of Land, More or Less Sit. in Lefore County, Miss.*, 80 F.3d 1074, 1077 (5th Cir.1996) (quoting, *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir.1987)).  The threshold of reliability must indeed be low so that the courts do not impermissibly delve into the merits of the expert's opinion or exclude appropriate testimony.  See *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 744 (3d Cir. 1994)

---

[14] It is even more unlikely that that a practicing pathologist would give an opinion outside of litigation that Vioxx was contributing cause of a sudden cardiac death when the duty of a pathologist is to determine the event that caused the death – i.e., sudden cardiac death or stroke, etc. – rather than to enumerate the factors that may have contributed to that event.

("[A]s we explained in *Paoli I*, the "reliability requirement must not be used as a tool by which the court excludes all questionably reliable evidence."), *cert. denied*, 115 S. Ct. 1253 (1995). "Thus, while exercising its role as a gate-keeper, a trial court must take care not to transform a *Daubert* hearing into a trial on the merits." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002). Indeed, in *Daubert* itself, the Supreme Court cautioned that, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (*citing Rock v. Arkansas*, 483 U.S. 44, 61 (1987)).[15]

"[T]he heart of *Daubert* is relevance and reliability. As long as some reasonable indication of qualification is adduced, the court may admit the evidence without abdicating its gatekeeping function. After that, qualification becomes an issue for the trier of fact, rather than for the court in its gate-keeping capacity." *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 507 (5th Cir. 1999), *cert. denied*, 528 U.S. 1160 (2000), *superseded by rule on other grounds*, 302 F.3d 448 (5th Cir. 2002). The court in *Rushing* further explained that "the 'emphasis on qualification over reliability reflect[s] a pre-Daubert sensibility." *Rushing*, 185 F.3d at 507.

Here, Plaintiff's experts – Drs. Baldwin and Graham – base their opinions upon the foundation of their general knowledge, training, and education, and their experience in their respective disciplines. Neither Dr. Baldwin nor Dr. Graham purports to be an expert on Vioxx *per se*, but that should not have kept them from giving testimony about what the drug caused.

---

[15] *In re TMI Litigation*, 193 F.3d 613, 692 690-93 (3d Cir. 1999) ("Rather, the proponent of the challenged testimony need only demonstrate that their opinions are reliable. So long as the expert's testimony rests upon "good grounds", it should be tested by the adversary process-competing expert testimony and active cross-examination-rather than excluded from juror's scrutiny for fear that they will not grasp its complexities or satisfactory weigh its inadequacies.")

In particular as to Dr. Baldwin, the Court clearly imposed a higher qualification standard on Dr. Baldwin than it did on Defendant's expert, Dr. Rayburn. Like Merck's experts, Plaintiff's experts should be granted latitude to testify based on their knowledge, experience and review of the relevant materials. The Court should correct its decision and order a new trial.

As the Fourth Circuit has explained in *Benedi v. McNeil, PPC, Inc.*, 66 F.3d 1378, 1384 (4th Cir. 1995), an expert witness may rely on inferences drawn from data normally relied upon by scientists to support his conclusions. *Id.*; see also *Poly-America, Inc., v. Serrot International, Inc.*, 2002 WL 1996561 (N.D. Tex. 2002) (expert testimony should not be excluded if facts or data reasonably relied upon in the particular field are made known to him, and these facts or data would permit him, to opine on matter within expertise). That is precisely what Plaintiff's experts did in this case and they should not have been precluded from giving specific causation testimony for having done so.

Moreover, it is well established that an expert's knowledge and expertise do not have to be perfectly tailored to the unique fact pattern of a particular case. Indeed, "one knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an opinion." *Kopf v Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993) (citing *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir.1989)), *cert denied*, 493 U.S. 1073 (1990); see also *Stewart v. Rowan Companies, Inc.*, 2002 WL 362847, *2 (E.D.La. 2002) (citing *Wright v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir. 1991) (expert witness qualified to testify on economic damages even though witness did not have a Ph.D. since ". . . a witness qualified as an expert in a products liability action is not strictly confined to his area of practice, but may testify concerning related applications; a lack of specialization does not affect the admissibility of the opinion, but only its weight."). Thus,

28

it is well recognized that Rule 702's "specialized knowledge" requirement does not compel the employment of only a particular witness with a specific expertise. *Id.; see also Holbrook v. Lykes Bros. S.S. Co., Inc.*, 80 F.3d 777, 781 (3d Cir. 1996) (court "eschewed imposing overly rigorous requirements of expertise."); *In re Paoli RR Yard PCB Litigation,* 916 F.2d at 855 ("The district court's insistence on a certain kind of degree or background is inconsistent with our jurisprudence in this area."); *Lillis v. Lehigh Valley Hospital, Inc.,* 1999 WL 718231, *6 (E.D.Pa. 1999), *aff'd,* 251 F.3d 154 (3d Cir. 2000) ("It is not for us to require that proponents of expert testimony provide witnesses with the qualifications that match a perfect fit to the issues presented. In fact, it would have been an abuse of discretion to do so.").

In focusing its analysis on the experiences of Plaintiff's experts, the Court applied an overly rigorous qualification standard for experts to testify on the role of Vioxx in causing the Plaintiff's death. The Court's requirement that experts have preexisting research experience and/or first-hand professional experience prescribing Vioxx or diagnosing Vioxx-related injuries *was not in accordance with the Rule 702 standard.*

The Fifth Circuit has rejected similar logic. <u>See, e.g.</u>, *Lavespere v. Niagara Machine & Tool Works, Inc.,* 910 F.2d 167, 177 (5th Cir. 1990), *abrogated on other grounds,* 37 F.3d 1069 (5th Cir. 1996) (holding that such an approach would often mean that the only experts who could testify regarding a machine are those who have an interest in defending its design). In *Lavespere, the Fifth Circuit added that:*

> Rule 702 provides that a witness may be qualified as an expert "by knowledge, skill, expertise, training, or education." The disjunctive conjunction, which we must assume the drafters of the rule chose deliberately, suggests that an expert may be qualified on any of the five bases listed. A witness therefore can qualify as an expert even though he lacks practical experience, provided that he has received suitable training or education or has otherwise gained the requisite

> knowledge or education.  Thus, although the absence of hands-on experience is certainly relevant to the determination of whether to accept a witness as an expert, it is not determinative.

910 F.2d at 176-77.

Plaintiff's experts are experts in their field and should have been entitled to rely upon outside sources of information to formulate conclusions to the requisite degree of medical certainty.  In *Nugent v. Hercules Offshore Corp.*, 2000 WL 381925, * 4 (E.D. La. 2000), the court rejected a similar challenge to an expert's qualifications:

> Dalloz premises this argument on the following facts: (1) Dr. Jacobus is admittedly not an expert in sewing; (2) he is not an engineer, (3) he has never worked nor consulted for a lanyard manufacturer; and (4) he has never been qualified as an expert in the manufacture of a safety lanyard.  The Court finds that none of these factors justifies precluding Dr. Jacobus's expert testimony in this case.  Dr. Jacobus's resume and experience reveal that he is qualified to testify regarding the failure of the nylon.  That Dr. Jacobus does not have specialized experience in the manufacture of a safety lanyard affects the weight of his opinion regarding the lanyard's failure, not its admissibility.  *Id.*

Plaintiff's experts may not have extensive clinical research experience with Vioxx, but they were still qualified to testify regarding the cause Plaintiff's injuries given their expertise, experience and their justified reliance upon recognized outside sources of data.  Any supposed weaknesses in the bases for these expert opinions should not have precluded the admission into evidence of those opinions but should have been left open to cross-examination by Merck.

The Court abused its discretion in limiting the testimony of Drs. Baldwin and Graham. For this reason, a new trial should be granted.

## II.    THE COURT ABUSED ITS DISCRETION BY DENYING PLAINTIFF'S MOTION FOR CONTINUANCE

On the evening of February 2, 2006, the parties received via email the Court's Order relating to the *Daubert* motions on Dr. Baldwin, Dr. Ray, Dr. Graham, and Dr. Fletcher.  As

noted above, the Court ruled that neither Dr. Graham nor Dr. Baldwin could testify that Vioxx

was a contributing cause of Mr. Irvin's death.  On the morning of February 3, 2006, during a

pretrial hearing before trial was scheduled to begin on February 6, Counsel for Plaintiff urged

the Court to continue the case for 30 or 60 days to give Plaintiff opportunity to locate a

cardiologist and a pathologist that would comply with the Court's standard for qualifications

in order that they might testify to specific causation:

> Your Honor, if I may, I would like to move for a continuance
> based on the Court's ruling last night on the Daubert motion in
> regards to Dr. Baldwin and Dr. Graham.  Certainly we believe that
> we have sufficient evidence with the expert testimony that we can
> proffer, that will support getting this matter to a jury.  It will be by
> inference.  Now, we do not have a particular expert that can deliver
> a specific causation opinion.

> Given the fact that this is a bellwether case in the MDL, we ask the
> Court to continue this matter 30 to 60 days to allow us to attempt
> to find an expert that will meet the standard that we see the Court
> setting in its Daubert opinions.  If I can, Your Honor, I am going to
> ask the Court for some guidance here.  I'll tell you how we view
> the Court's standard that is set in the Daubert motion.  We have a
> pharmacologist who the Court has ruled can testify about
> pharmacology but cannot deliver a causation opinion because he is
> not a cardiologist or a pathologist.  We have a pathologist and a
> cardiologist that the Court has ruled cannot deliver a causation
> opinion at least in part because they are not pharmacologists or
> epidemiologists.  So that leaves us, in order to have an expert that
> can deliver a causation opinion – that we think is not necessary to
> go to the jury, but certainly is very helpful or is very important for
> the persuasive effect for the jury – that we would have to have one
> expert who was a pharmacologist, epidemiologist, cardiologist and
> in a death case a pathologist rolled into one.

> It appears, your Honor, that the Court puts substantial value in the
> fact that they prescribed Vioxx and that they had diagnosed, really
> before the withdrawal of the drug, a patient having either a heart
> attack or death related to a drug.  The Court puts value on the fact
> that they were involved in clinical research, actually conducting
> trials with regard to Vioxx.  That would put us in a position, really,
> of needing a whistle blower because Merck controls who does the
> clinical trials there.  We do believe that that's a higher standard
> than Daubert actually requires.  We intend to file a motion to

reconsider on these grounds, but I certainly understand where the
Court is.   Because this is a bellwether case in the MDL, we ask
that you give us time to see if we can find an expert that would
meet the Court's standard.

Hearing before Honorable Eldon E. Fallon at 20-22 (Feb. 3, 2006).   The Court denied

Plaintiff's motion. *Id.* at 22.

Without question, a court has great latitude in decisions regarding motions to continue.

"The court's discretion is not unlimited, however." *Liquid Drill, Inc. v. US Turnkey*

*Exploration, Inc.*, 48 F.3rd 927, 930 (5th Cir. 1995).   Decisions regarding motions to continue

are reviewed for an abuse of discretion. *Coughlin v. Lee*, 946 F.2d 1152, 1158 (5th Cir. 1991).

Plaintiff believes that the Court abused its discretion by refusing to grant a continuance in this

circumstance.

In *Amarin Plastics, Inc. v. Maryland Cup Corporation*, 946 F.2d 147 (5th Cir. 1991),

defendant moved the trial court to continue the case until a witness was well enough to testify.

The Fifth Circuit Court of Appeals wrote that when ruling on a motion for continuance, a trial

court may consider "prior delays, the reasons for the request, the hardship to the nonmovant,

and the good faith of the movant." *Amarin*, 946 F.2d at 151.

First, in this particular instance, there have been no prior delays.   When this case was

set for trial as a bellwether case, the Court set an ambitious, rigorous schedule.   This was in

keeping with the Court's desire to have trials in the MDL as soon as possible.

The case was ordered to trial at the end of August 2005.   No discovery had been done

on the case at that time.   Discovery was completed expeditiously.   The parties filed or

responded to 15 *Daubert* motions and twenty-seven motions *in limine.*   The case was then put

to trial on November 29, 2005.   Under any analysis, this case was prepared for the first trial at

break-neck speed.   Such rapid preparation and trial of a case is almost unheard of in complex

pharmaceutical litigation.   Plaintiff submitted to the Court's schedule without complaint. When the first trial ended in a hung jury, the Court set a second trial date for some 55 days later.  Plaintiff with much effort and expense prepared the case for a second trial.

The abbreviated time period gave the parties and the Court precious little time to accomplish everything necessary to prepare for the second trial.  As a result of the compressed time period, the Court ruled on Defendant's *Daubert* motions on the Thursday before the trial was to begin on Monday.  The Court's decision seriously inhibited Plaintiff's ability to present a compelling case to the jury.   Though Plaintiff's position was that there was sufficient evidence to reach the jury, without question, the absence of direct evidence – direct opinion testimony -- from an expert that Vioxx was a contributing cause of Mr. Irvin's death seriously impaired Plaintiff's ability to persuade the jury.

As to the Court's *Daubert* ruling, it might be said that Plaintiff should have not have surprised about the Court's decision regarding Dr. Baldwin.  Though Plaintiff maintains that the Court has been and is incorrect in its ruling, the Court's decision regarding Dr. Baldwin was not a surprise.  The Court's decision as to Dr. Graham was quite surprising, however, in light of the fact that the Court had ruled in *Irvin I* that Dr. Colin Bloor and Dr. Joseph Burton – Plaintiff's pathologist experts -- could both give opinions as to specific causation and in fact, allowed Dr. Bloor to give a specific causation opinion in *Irvin I*.  Plaintiff had relied on the fact that Dr. Graham would be able to testify that Vioxx was a contributing cause of Mr. Irvin's death based on the Court's previous rulings.  Therefore, when the Court's decision was received, it was with dismay as well as shock.

In light of these facts and the detrimental effect the *Daubert* order would have on Plaintiff's case, Plaintiff's request for a 30 to 60 day continuance was entirely reasonable, meeting the second requirement under *Amarin*.

In *McAllister v. FDIC*, 87 F.3d 762, 766 (5[th]Cir. 1996), the Fifth Circuit addressed a circumstance where a plaintiff had moved the district court for a continuance in order to conduct discovery when new issues were raised in a motion to dismiss. The trial court denied the motion for continuance and then granted the motion to dismiss without a hearing. In that case, the plaintiffs had only ten days to respond to the new argument. The Fifth Circuit held that the district court had abused its discretion in denying plaintiffs' motion for continuance and reversed and remanded the case for additional discovery and a hearing on the motion to dismiss. *McAllister,* 87 F.3d at 767.

Though procedurally distinct, the circuit court's reasoning in *McAllister* supports the reasonableness of Plaintiff's request in this case and Plaintiff's argument that the Court abused its discretion in denying her motion. In this instance, Plaintiff had only three days – one business day -- to seek to put forward the best case possible in light of the Court's ruling. There was not sufficient time to obtain a new expert or adjust trial strategy. Plaintiff was forced to move forward though her case was materially impaired.

Third, a continuance would have had a minimal impact on Merck & Co. and would not have been a hardship. Additional time before trial would have given Defendant, like Plaintiff, additional time to prepare its case in light of the Court's order.

Fourth, Plaintiff moved the Court for a continuance in good faith. Throughout the proceedings before the Court, Plaintiff met each deadline set by the Court. She has done nothing to delay the trial but in fact, has done all that the Court has asked to try the case as quickly as possible, including voluntarily dismissing her state court case and refilling her case in the Eastern District of Louisiana after successfully fighting removal on three occasions to finally secure a state court venue, agreeing to expedite necessary discovery, agreeing to trial in

34

Houston following Hurricane Katrina, and taking the necessary steps for re-trail in New Orleans within 55 days of the first trial.

Analysis under *Amarin* reveals that a continuance should have been granted. The impact on the Court by delaying the trial 30 or 60 days would have been minimal when compared with the impact on Plaintiff. As the surviving spouse of Mr. Irvin, the trial of this case was Mrs. Evelyn Irvin Plunkett's opportunity on behalf of her surviving children and the estate to present her claims to a jury of her peers. Not having additional time to secure other expert testimony seriously prevented her from being able to present this case in the best light possible. See *Smith-Weik Machinery Corp. v. Murdock Machine & Engineering*, 423 F.2d 842, 844 (5th Cir. 1970) ("on balance, the interests in favor of a fair trial heavily outweigh[] the interests in favor of an immediate trial").

As counsel for Plaintiff appreciates the situation, the primary reason that the Court was unwilling to delay the trial was because of its desire to have trials proceed in the MDL as quickly as possible – to seize every opportunity to gain ground on concurrent state Vioxx trials. While this may be a worthy goal for the ongoing MDL proceedings, with all due respect to the Court, it should not trump the rights of an individual plaintiff. The individual rights of Mrs. Plunkett should not be overridden by an overzealous case management strategy applicable to the entire MDL.

With great respect for the Court, its hard work and its professionalism in presiding over the MDL proceedings, Plaintiff believes that in this instance the Court abused its discretion by refusing to grant a continuance in this case. Plaintiff, therefore, urges the Court to grant a new trial in this case.

## CONCLUSION

For the reasons outlined above, Plaintiff urges the Court to grant a new trial in this case.

Respectfully submitted,

**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA 70113
PH:    (504) 581-4892
FAX:  (504) 561-6024

Temporary Address:

Place St. Charles, 201 St. Charles Avenue
Suite 4310, New Orleans, LA 70170
**Plaintiffs' Liaison Counsel**

| | |
|---|---|
| Richard J. Arsenault, Esq.<br>P.O.Box 1190<br>2220 Bonaventure Court<br>Alexandria, LA 71309-1190<br>PH: (318) 487-9874<br>FAX: (318) 561-2591 | Gerald E. Meunier, Esq.<br>Energy Centre<br>1100 Poydras Street, Suite 2800<br>New Orleans, LA 70163-2800<br>PH: (504) 522-2304<br>FAX: (504) 528-9973 |
| Andy D. Birchfield, Esq. **(Co-Lead Counsel)**<br>P.O. Box 4160<br>234 Commerce Street<br>Montgomery, AL 36103-4160<br>PH: (800) 898-2034<br>FAX: (334) 954-7555 | Troy Rafferty, Esq.<br>316 S. Baylen Street, Suite 400<br>Pensacola, FL 32502<br>PH: (850) 435-7000<br>FAX: (850) 497-7059 |
| Elizabeth Cabraser, Atty.<br>Embarcadero Center West<br>275 Battery Street, 30th Floor<br>San Francisco, CA 94111-3339<br>PH: (415) 956-1000<br>FAX: (415-956-1008 | Drew Ranier, Esq.<br>1419 Ryan Street<br>Lake Charles, LA 70601<br>PH: (337) 494-7171<br>FAX: (337) 494-7218 |
| Thomas Kline, Esq.<br>1525 Locust St.<br>19th Floor<br>Philadelphia, PA 19102<br>PH: (215) 772-1000<br>FAX: (215) 772-1371 | Mark Robinson, Esq.<br>620 Newport Center Drive<br>7th Floor<br>Newport Beach, CA 92660<br>PH: (949) 720-1288<br>FAX: (949) 720-1292 |

| | |
|---|---|
| Arnold Levin, Esq.<br>510 Walnut Street<br>Suite 500<br>Philadelphia, PA 19106-3875<br>PH: (215) 592-1500<br>FAX: (215) 592-4663<br><br>Carlene Rhodes Lewis, Atty.<br>2200 Texaco Heritage Plaza<br>1111 Bagby<br>Houston, TX 77002<br>PH: (713) 650-0022<br>FAX: (713-650-1669 | Christopher Seeger, Esq. (**Co-Lead Counsel**)<br>One William Street<br>New York, NY 10004<br>PH: (212) 584-0700<br>FAX: (212) 584-0799<br><br>Christopher Vincent Tisi, Esq.<br>2000 L Street, NW<br>Suite 400<br>Washington, DC 20036-4914<br>PH: (202) 783-6400<br>FAX: (307) 733-0028 |

## PLAINTIFFS' STEERING COMMITTEE

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleadings has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced in accordance with Pre-Trial Order No. #8, on this 8th day of March, 2006.

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| Evelyn Irvin Plunkett v. Merck & Co, Inc. | * | CASE NO. 02:05CV4046 |

---

## NOTICE OF HEARING

---

Please take notice that, upon the pleadings, the depositions, and other matters of record, the undersigned will move the Court before the Honorable Judge Eldon E. Fallon, United States District Court for the Eastern District of Louisiana, Room C456, United States Courthouse, 500 Poydras Street, New Orleans, Louisiana, 70130, at 10:00 o'clock a.m., at the monthly status conference to be held in May, 2006, or as soon thereafter as counsel can be heard, for an order on Plaintiff's Motion for New Trial, and for such other and further relief as the Court may deem just and appropriate.

Respectfully submitted,

**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA 70113
PH:     (504) 581-4892
FAX:  (504) 561-6024

Temporary Address:

Place St. Charles, 201 St. Charles Avenue
Suite 4310, New Orleans, LA 70170
**Plaintiffs' Liaison Counsel**

| | |
|---|---|
| Richard J. Arsenault, Esq.<br>P.O.Box 1190<br>2220 Bonaventure Court<br>Alexandria, LA 71309-1190<br>PH: (318) 487-9874<br>FAX: (318) 561-2591 | Gerald E. Meunier, Esq.<br>Energy Centre<br>1100 Poydras Street, Suite 2800<br>New Orleans, LA 70163-2800<br>PH: (504) 522-2304<br>FAX: (504) 528-9973 |
| Andy D. Birchfield, Esq. **(Co-Lead Counsel)**<br>P.O. Box 4160<br>234 Commerce Street<br>Montgomery, AL 36103-4160<br>PH: (800) 898-2034<br>FAX: (334) 954-7555 | Troy Rafferty, Esq.<br>316 S. Baylen Street, Suite 400<br>Pensacola, FL 32502<br>PH: (850) 435-7000<br>FAX: (850) 497-7059 |
| Elizabeth Cabraser, Atty.<br>Embarcadero Center West<br>275 Battery Street, 30th Floor<br>San Franciso, CA 94111-3339<br>PH: (415) 956-1000<br>FAX: (415-956-1008 | Drew Ranier, Esq.<br>1419 Ryan Street<br>Lake Charles, LA 70601<br>PH: (337) 494-7171<br>FAX: (337) 494-7218 |
| Thomas Kline, Esq.<br>1525 Locust St.<br>19th Floor<br>Philadelphia, PA 19102<br>PH: (215) 772-1000<br>FAX: (215) 772-1371 | Mark Robinson, Esq.<br>620 Newport Center Drive<br>7th Floor<br>Newport Beach, CA 92660<br>PH: (949) 720-1288<br>FAX: (949) 720-1292 |
| Arnold Levin, Esq.<br>510 Walnut Street<br>Suite 500<br>Philadelphia, PA 19106-3875<br>PH: (215) 592-1500<br>FAX: (215) 592-4663 | Christopher Seeger, Esq. **(Co-Lead Counsel)**<br>One William Street<br>New York, NY 10004<br>PH: (212) 584-0700<br>FAX: (212) 584-0799 |
| Carlene Rhodes Lewis, Atty.<br>2200 Texaco Heritage Plaza<br>1111 Bagby<br>Houston, TX 77002<br>PH: (713) 650-0022<br>FAX: (713-650-1669 | Christopher Vincent Tisi, Esq.<br>2000 L Street, NW<br>Suite 400<br>Washington, DC 20036-4914<br>PH: (202) 783-6400<br>FAX: (307) 733-0028 |

**PLAINTIFFS' STEERING COMMITTEE**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleadings has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced in accordance with Pre-Trial Order No. #8, on this 8th day of March, 2006.

# SEE RECORD FOR

# EXHIBITS

# OR

# ATTACHMENTS

# NOT SCANNED