UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA



|  |  |  |
|---|---|---|
|  | : | MDL NO. 1657 |
| IN RE: VIOXX | : |  |
| PRODUCTS LIABILITY LITIGATION | : | SECTION: L |
|  | : |  |
|  | : | JUDGE FALLON |
|  | : |  |
|  | : | MAG. JUDGE KNOWLES |

.. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. :

THIS DOCUMENT RELATES TO ALL CASES

## ORDER & REASONS

Before the Court is a Motion to Quash the Deposition of David Graham, M.D. filed by

the United States of America by and on behalf of the United States Food and Drug

Administration and FDA Employee David Graham, M.D.'s (Rec. Doc. 2885) and the Plaintiffs'

Steering Committee's Opposition to the United States Government's Motion to Quash and

Cross-Motion to Compel the Deposition of David Graham, M.D. (Rec. Doc. 3075). For the

following reasons, the Court DENIES the United State's Motion to Quash and GRANTS the

Plaintiffs' Steering Committee's Cross-Motion to Compel.

## I. BACKGROUND

Vioxx (known generically as rofecoxib) belongs to a general class of pain relievers

known as non-steroidal anti-inflammatory drugs ("NSAIDs"). This class of drugs contains well-

known medications sold either over the counter—such as Advil (ibuprofen) and Aleve

(naproxen)—or by prescription—such as Daypro (oxaprozin) and Voltaren (diclofenac). NSAIDs work by inhibiting cyclooxygenase (COX), an enzyme that stimulates synthesis of prostaglandins, which are chemicals produced in the body that promote certain effects.

Traditional NSAIDs have been a longstanding treatment option for patients needing relief from chronic or acute inflammation and pain associated with osteoarthritis, rheumatoid arthritis, and other musculoskeletal conditions. This relief, however, comes with significant adverse side effects. Specifically, traditional NSAIDs greatly increase the risk of gastrointestinal perforations, ulcers, and bleeds ("PUBs"). This risk is increased when high doses are ingested, which is often necessary to remedy chronic or acute inflammation and pain. Scientists estimated that traditional NSAID-induced PUBs caused a significant number of deaths and hospitalizations each year in the United States.

In the early 1990s, scientists discovered that the COX enzyme had two forms—COX-1 and COX-2—each of which appeared to have several distinct functions. Scientists believed that COX-1 affected the synthesis or production of prostaglandins responsible for protection of the stomach lining, whereas COX-2 mediated the synthesis or production of prostaglandins responsible for pain and inflammation. This belief led scientists to hypothesize that "selective" NSAIDs designed to inhibit COX-2, but not COX-1, could offer the same pain relief as traditional NSAIDs with the reduced risk of fatal or debilitating PUBs. In addition, scientists believed that such drugs might be able to prove beneficial for the prevention or treatment of other conditions, such as Alzheimer's disease and certain cancers, where evidence suggested that inflammation may play a causative role.

In light of these scientific developments, Merck & Co., Inc. ("Merck") and several other

pharmaceutical companies began the development of such drugs, which became known as "COX-2 inhibitors" or "coxibs." Vioxx is a COX-2 inhibitor.

On May 20, 1999, the Food and Drug Administration ("FDA") approved Vioxx for sale in the United States. From its initial approval, Vioxx gained widespread acceptance among physicians treating patients with arthritis and other conditions causing chronic or acute pain.

Before and after its initial approval, Vioxx was subjected to a number of studies and tests, including, but not limited to, VIGOR, APPROVe, ViP, VICTOR, ADVANTAGE, the Alzheimer's studies, Professor Kronmal's reanalysis of Merck's clinical data, the Solomon study, the Juni study, the Ray study, the Graham study, the Kimmel study, the Levesque study, the Mamdani study, the Ingenix study, the Johnsen study, the Nussmeier study, and the Fitzgerald hypothesis. In addition, a large amount of scientific literature was written on the effects of Vioxx and other COX-2 inhibitors.

On September 30, 2004, Merck withdrew Vioxx from the market when interim unblinded data from a long-term, blinded, randomized placebo-controlled clinical trial, known as APPROVe, seeking to assess whether Vioxx could help prevent the recurrence of precancerous colon polyps, indicated that the use of Vioxx increased the risk of cardiovascular thrombotic events such as myocardial infarctions and ischemic stroke.

Thousands of lawsuits followed in both state and federal court. On February 16, 2005, as a result of the sheer mass of these lawsuits and the potential for many more, the Judicial Panel on Multidistrict Litigation ordered that the Vioxx litigation be centralized, designated as an MDL, and assigned to this Court.

As a part of this MDL, the Plaintiffs' Steering Committee has sought to obtain discovery

-3-

from the FDA. In a letter dated December 19, 2005, from Christopher V. Tisi, a member of the

PSC, to Carmelina Allis, an official in the FDA's Office of Chief Counsel ("the request letter"),

the PSC requested permission from the FDA to depose Dr. David Graham ("Dr. Graham"). Dr.

Graham is currently the Associate Director for Science and Medicine, Office of Drug Safety,

Center for Drug Evaluation and Research, U.S. Department of Health and Human Services, FDA

and has spent over twenty years in the field of drug safety.

On November 18, 2004, Dr. Graham testified at the United States Senate Finance

Committee's Hearing on the FDA, Merck, and Vioxx: Putting Patient Safety First?[1] At this

hearing, Dr. Graham criticized the FDA and its handling of Vioxx. As an example, Dr. Graham

stated his position as such: "The problem you are facing today is immense in scope. Vioxx is a

terrible tragedy and a profound regulatory failure. I would argue that the FDA, as currently

configured, is incapable of protecting America against another Vioxx. We are virtually

defenseless."[2]

After testifying before the Senate Finance Committee, Dr. Graham went on to appear on

the following television shows: (1) ABC's "World News Tonight" with Peter Jennings on

November 18, 2004; (2) ABC's "Good Morning America" with Diane Sawyer on November 19,

2004; (3)ABC's "Nightline" with Ted Koppel on December 3, 2004; (4) ABC's "Good Morning

America" on December 19, 2004; (5) CNN's "Newsnight with Aaron Brown" on December 16,

---

[1] *FDA, Merck, and Vioxx: Putting Patient Safety First?, Hearing Before the S. Finance Comm.*, (2004) 108th Cong. (statement of Dr. David Graham, MPH, Associate Director for Science and Medicine, Office of Drug Safety, Center for Drug Evaluation and Research, U.S. Department of Health and Human Services, Food and Drug Administration).

[2] *Id.*

2004; (6) ABC's "This Week" with George Stephanopoulous on December 19, 2004; (7)

MSNBC's "Countdown with Keith Olbermann" on December 22, 2004; (8) PBS's "NOW" with

David Brancasccio on January 7, 2005; (9) CBS's "Evening News" on September 3, 2005; (10)

NBC's "Today Show" with Katie Couric on December 21, 2005. In addition, he gave numerous

interviews that have appeared in the following print and on-line publications: (1) Forbes

Magazine; (2) MSNBC; (3) Multinational Monitor; (4) Newsweek Magazine; (5) Mother Jones

Magazine; (6) USA Today; (7) Crusader; (8) New Target.com; (9) the Wall Street Journal; (10)

the Washington Post; (11) the Detroit Free Press; and (12) the Atlanta Journal constitution.

Additionally, Dr. Graham has appeared on other television shows, has been quoted in other print

and on-line publications, and has spoken at professional meetings. In all these interviews and

appearances, Dr. Graham reiterated his position regarding the FDA and Vioxx.

On December 29, 2005, without hearing back from the FDA, Mr. Tisi requested in

another letter to Mrs. Allis that the FDA review the PSC's previous letter and respond as soon as

possible. Despite numerous other attempts to communicate with the FDA, the PSC failed to

receive a response.

With certain deadlines approaching, the PSC filed a Notice of Deposition on January 13,

2006, and mailed a courtesy copy of the notice to the FDA by overnight delivery. The PSC also

personally served Dr. Graham with a subpoena on January 14, 2006. The deposition was

scheduled for January 23, 2006.

On January 20, 2006, the FDA faxed two letters to Mr. Tisi regarding the PSC's request

that it produce Dr. Graham for a deposition. The first letter ("the refusal letter") was dated

January 18, 2006, and was signed by Lana L. Ogram, Director of the FDA's Office of

Enforcement, Division of Compliance Policy. The letter set forth the FDA's position that the testimony of Dr. Graham would not be in the interest of public health, would not promote the objectives of the Federal Food, Drug, and Cosmetics Act ("FDCA"), and would not advance the mission of the FDA and, as such, the FDA would not allow Dr. Graham to be deposed.

The second letter was dated January 19, 2006, and was signed by Michael M. Levy, Associate Chief Counsel, U.S. Food and Drug Administration. This letter set forth further legal grounds for the FDA's refusal to comply with the PSC's subpoena.

On January 20, 2006, in a reply letter to Mr. Levy, Mr. Tisi indicated that the PSC would temporarily postpone its deposition of Dr. Graham if the FDA would file a motion to quash with this Court by Monday, January 23, 2006. Pursuant to an agreement between the PSC and the United States Attorney's Office for the Eastern District of Louisiana, the United States filed a motion to quash on behalf of the FDA and Dr. Graham on Tuesday, January 24, 2006. On January 25, 2006, the PSC filed its opposition to the motion to quash and also filed a cross-motion to compel the deposition of Dr. Graham. The Court heard oral argument on these two motions on January 26, 2006, and took the motions under submission. The Court is now ready to rule.

## II. PRESENT MOTIONS

In its motion to quash, the United States contends that the Court must quash the PSC's subpoena because the United States is not a "person" within the meaning of Rule 45 of the Federal Rules of Civil Procedure. Second, the United States asserts that principles of sovereign immunity dictate that the PSC can only challenge the FDA's refusal to comply with PSC's deposition request in an independent civil action brought under the Administrative Procedures

Act ("APA"),[3] not through a non-party subpoena. Third, even if the United States is a "person" under Rule 45 and the United States has waived its sovereign immunity, the United States argues that the PSC cannot satisfy the APA's arbitrary and capricious standard for setting aside an agency action.

Conversely, in its opposition and cross-motion to compel, the PSC contends that the United States is a "person" under Rule 45. Second, in regards to the United States' waiver of sovereign immunity, the PSC argues that there is no functional difference between proceeding under a Rule 45 subpoena or filing a separate APA claim and, as such, sovereign immunity should not preclude this Court's determination of the pending motions. Lastly, the PSC asserts that the APA is not applicable in this instance because the FDA has not acted within its valid statutory authority and, as such, this Court must apply Rule 45's undue burden standard in determining the propriety of the PSC's subpoena.

Considering the issues at hand and the arguments made by the parties, the Court must first determine if the United States is a "person" for purposes of Rule 45. If the United States is a not a "person," the Court must end its inquiry and quash the PSC's subpoena.

On the other hand, if the United States is a "person" for purposes of Rule 45, the Court must determine if the United States has waived its sovereign immunity. If the United States has not waived its sovereign immunity, the Court must end its inquiry and quash the PSC's subpoena.

Finally, if the United States has waived its sovereign immunity, the Court must determine if the pending motions should be reviewed under the APA's arbitrary and capricious standard or

---

[3] 5 U.S.C. §§ 701-06.

Rule 45's undue burden standard. Lastly, depending upon which standard the Court applies, the Court must conduct its analysis and determine whether to quash the PSC's subpoena or grant the PSC's cross-motion to compel.

## III. LAW AND ANALYSIS

### A. Is the United States a "person" as that term is used in Rule 45?

As a general rule, a litigant "may obtain discovery regarding any matter, not privileged, which is relevant to the claim or defense of any party . . . ." Fed. R. Civ. P. 26(b)(1). Pursuant to Rule 45 of the Federal Rules of Civil Procedure, which governs the Court's subpoena power over litigants, "every subpoena shall . . . command each person to whom it is directed to attend and give testimony." Fed. R. Civ. P. 45(a)(1)©). Subpoenas may be issued to non-parties pursuant to Rule 45, but that non-party can move to quash the subpoena for the reasons set forth in Rule 45(c)(3)(A), such as failure to allow a reasonable time for compliance, requiring a person to travel more than one hundred miles from his residence or employment, requiring disclosure of a privilege or protected matter, or undue burden. Fed. R. Civ. P. 45(c)(2)(B).

When the government is a party to litigation, it is subject to the rules of discovery. *United States v. Procter & Gamble Co.*, 356 U.S. 677, 681 (1958). Furthermore, in the past, it has always been assumed that the government is a "person" under Rule 45, even when the government is a non-party. *Linder v. Calero-Portocarrero*, 251 F.3d 178, 181 (D.C. Cir. 2001). This assumption, however, was questioned by the United States Court of Appeals for the District of Columbia in *Linder*.

The Court in *Linder* based its conclusions in large part on the circuit's ruling in *Al Fayed v. CIA*, 229 F.3d 272 (D.C. Cir. 2000). In *Al Fayed*, the D.C. Circuit held that "person" as used

in 28 U.S.C. § 1782 does not encompass the United States.[4]  The following year in *Linder*, based

on its holding in *Al Fayed*, the D.C. Circuit questioned whether "person" as used in Rule 45,

which it considered similar in function to section 1782, encompassed the United States. *Linder*,

251 U.S. at 181.  Although calling for a reexamination of the assumption that "person" as used in

Rule 45 comprehends the United States, the *Linder* court did not resolve the issue because the

government had not properly raised the issue in the district court.  *Id.*  Instead, the *Linder* court

affirmed the district court's ruling that the plaintiffs must pay half of the United States'

reasonable copying and labor costs in complying with the plaintiffs' subpoena. *Id.* at 183.

Since *Linder*, several district courts using the *Linder dicta* have found that "person" as

used in Rule 45 does not comprise the United States. *Truex v. Allstate Ins. Co.*, No. 05-0439,

2006 WL 241228, at *5 (D.D.C. Jan. 26, 2006); *SEC v. Biopure Corp.*, No. 05-506, slip. op. at 8

(D.D.C. Jan. 20, 2006);  *Robinson v. City of Phila.*, 233 F.R.D. 169, 172 (E.D. Pa. 2005); *Ho v.

Unites States*, 374 F. Supp. 2d 82, 84 n.4 (D.D.C. 2005); *AlohaCare, Inc. v. State of Hawaii ex

rel. Dep't of Human Servs.*, No. 04-498, slip. op. at 12 (D.D.C. June 28, 2005); *Taylor v. Gabelli*,

No. 04-534, 2005 WL 2375173, at *2 (D.D.C. May 3, 2005); *Yousuf v. Samantar*, No. 05-110,

2005 WL 1523385, at *4 (D.DC. May 3, 2005); *Lerner v. Dist. of Columbia*, No. 00-1590, 2005

WL 2375175, at *2 (D.D.C. Jan. 7, 2005).  All but one of these courts sit in the District Court for

the District of Columbia.

Not surprisingly, the FDA submits that this Court should follow the D.C. District Court's

approach.  Whereas, the PSC urges that the Court should forge its own divergent path.  The Fifth

---

[4] "Section 1782 provides a mechanism for international or foreign tribunals, or persons
interested in proceedings before such tribunals, to enlist the federal courts to acquire testimony,
documents, or other items." *Al Fayed*, 229 F.3d at 273.

Circuit has not yet spoken on this question and neither has any other circuit court with the possible exception of the D.C. Circuit in *Linder* and that court only addressed the issue in *dicta*.

The basis for the decisions out of the D.C. courts sheds some light on this issue. There is a recognized interpretative rebuttable presumption that with regard to the application of substantive laws, the sovereign may not be considered a "person." Numerous courts, including the D.C. Circuit in *Al Fayed* and *Linder*, have recognized and applied the longstanding interpretive presumption that the word "person" does not include the sovereign. *Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 780 (2000); *United States v. Mine Workers*, 330 U.S. 258, 275 (1947); *United States v. Cooper Corp.*, 312 U.S. 600, 604 (1941). The presumption is not a "'hard and fast rule of exclusion,'" but may be disregarded only upon some affirmative showing of statutory intent to the contrary. *Vermont Agency*, 529 U.S. at 781 (citing *Cooper Corp.*, 312 U.S. at 604-05). The purpose, the subject matter, the context, the legislative history, and the executive interpretation of the statute are all means in which an affirmative showing of statutory intent can be ascertained. *Cooper Corp.*, 312 U.S. at 605.

The relevant question in the present case is whether this substantive rule should extend to procedural vehicles such as Rule 45. Perhaps the answer lies in the history and justification for the presumptive rule. With this in mind, the Court turns to this history.

In *United States v. Knight*, 39 U.S. 301, 315 (1840), the Supreme Court analyzed the application of general laws to the sovereign. Citing to Sir Francis Bacon, the Court found that:

> the general rule is, that where an act of Parliament is made for the public good, the advancement of religion and justice, and to prevent injury and wrong, the king shall be bound by such act, though not particularly named therein. But where a statute is general, and thereby any prerogative, right, title, or interest, is divested, or taken from the king, in such case he shall not be bound; unless the statute is made by express

words, to extend to him.

*Id.* With this language, the Court essentially created two presumptions regarding the applicability of general statutes to the sovereign. If the statute is designed for the benefit of the public or the advancement of justice, it is presumed that the statute applies to the sovereign. On the other hand, if the statute would divest the sovereign of its rights, privileges or titles, it is presumed that the statute does not apply to the sovereign.

Thirty-three years later, in *Dollar Savings Bank v. United States*, 86 U.S. 227 (1873) and *United States v. Herron*, 87 U.S. 251, 255-56 (1873), the Supreme Court reiterated and confirmed its holding in *Knight*. Sixty-four years after *Herron*, in *Nardone v. United States*, 302 U.S. 379, 383-84 (1937), the Supreme Court built upon its holdings in *Knight*, *Dollar Savings Bank*, and *Herron*.

In *Nardone*, the Court acknowledged a limitation to the application of the latter presumption or "canon that the general words of a statute do not include the government or affect its rights unless the construction be clear and indisputable." *Id.* at 383. The Court acknowledged that the presumption or canon only applies to two classes of cases. *Id.* "The first is where an act, if not so limited, would deprive the sovereign of a recognized or established prerogative title or interest." *Id.* Moreover, the "exclusion of the sovereign is less stringently applied where the operation of the law is upon the agents or servants of the government rather than on the sovereign itself." *Id.* "The second class—that where public officers are impliedly excluded from language embracing all persons—is where a reading which would include such officers would work obvious absurdity as, for example, the application of a speed law to a policeman pursuing a criminal or the driver of a fire engine responding to an alarm." *Id.* at 384.

Therefore, according to *Knight, Herron*, and *Nardone*, before a court can determine whether a general statute applies to the sovereign, a court must first determine the purpose of the statute. If the statute is designed for the public good, to advance justice, or to prevent injury, there is a presumption that the statute applies to the sovereign. If the statute divests the sovereign of its titles or rights, it is presumed that the statute does not apply to the sovereign; however, this exclusion is not stringently applied where the statute affects an agent of the government, rather than the sovereign itself. Lastly, it is presumed that the statute does not apply to the sovereign or agents thereof if such an application would result in an absurd result.

All the district courts that have previously ruled that the government is a "person" under Rule 45 have relied on Supreme Court precedent for applying the presumption that the government is not a person. The cases relied on by these district courts, however, have all been cases dealing with the application *vel non* of substantive statutes to the United States.

For example, in *Vermont Agency*, the Supreme Court applied the presumption and found that a State was not a "person" subject to *qui tam* liability under 31 U.S.C. § 3729(a). 529 U.S. at 778-88, *cited in Linder*, 251 F.3d at 181; *Al Fayed*, 229 F.3d at 274; *Truex*, 2006 WL 241228, at *4; *Robinson*, 233 F.R.D. at 172 n.10; *Biopure Corp.*, No. 05-506, slip. op. at 4; *Alohacare*, No. 04-498, slip. op. at 9; *Gabelli*, 2005 WL 2375173, at *1; *Lerner*, 2005 WL 2375175, at *3-4. In *Will v. Michigan Dep't of State Police*, the Supreme Court applied the presumption and found that a State was not a "person" under 42 U.S.C. § 1983. 491 U.S. 58, 72-87 (1989), *cited in Vermont Agency*, 529 U.S. at 781; *Int'l Primate Protection League v. Administrators of Tulane Educational Fund*, 500 U.S. 72, 83 (1991); *Al Fayed*, 229 F.3d at 274; *Biopure Corp.*, No. 05-506, slip. op. at 3; *Alohacare*, No. 04-498, slip. op. at 9; *Lerner*, 2005 WL 2375175, at *4. In

*Wilson v. Omaha Indian Tribe*, the Supreme Court applied the presumption and found that a

State was not a "white person" under 25 U.S.C. § 194.   442 U.S. 653, 666-69 (1979), *cited in*

*Vermont Agency*, 529 U.S. at 781; *Will*, 491 U.S. at 64; *Lerner*, 2005 WL 2375175, at *4.   In

*Vermont Agency*, *Will*, and *Wilson*, the presumption was properly applied because each of the

States at issue was facing potential liability, which they had not been subject to before, due to the

act of another sovereign—the federal government.   Considering that the federal government was

divesting these States of their sovereign immunity, the presumption was properly applied.

In *International Primate*, the Supreme Court applied the presumption and found that a

federal agency was not a "person" under 28 U.S.C. § 1442(a)(1).   500 U.S. at 79-87, *cited in*

*Vermont Agency*, 529 U.S. at 781; *Al Fayed*, 229 F.3d at 274; *Robinson*, 233 F.R.D. at 172 n.10;

*Alohacare*, No. 04-498, slip. op. at 10; *Gabelli*, 2005 WL 2375173, at *1; *Lerner*, 2005 WL

2375175, at *4.   At the time *International Primate* was decided, section 1442(a)(1) allowed the

removal of a civil action to federal district court if the defendant was "[a]ny officer of the United

States or any agency thereof, or person acting under him."   *Int'l Primate*, 500 U.S. at 79.   Had the

Court determined that "person" referred to the federal government, particularly a federal agency,

the statute would have "[a]ny officer of the United States or any agency thereof, or agency acting

under him."   *Id*. at 83.   Under such a reading, a federal agency would be acting under an officer

of the same agency.   *Id*.   Accordingly, the presumption was properly applied because if "person"

as used in section 1442(a)(1) encompassed a federal agency, section 1442(a)(1) would be

"decidedly awkward" and produce "absurd results."   *Id*. at 83-84.

In *United Mine Workers*, the Supreme Court applied the presumption and found that the

federal government was not an "employer" under 29 U.S.C. § 52.   330 U.S. at 269-89, *cited in*

*Vermont Agency*, 529 U.S. at 780; *Will*, 491 U.S. at 64; *Wilson*, 442 U.S. at 667; *Robinson*, 233

F.R.D. at 172 n.12; *Alohacare*, No. 04-498, slip. op. at 9; *Gabelli*; 2005 WL 2375173, at *1;

*Lerner*, 2005 WL 2375175, at *4.  The presumption was properly applied because had the federal

government been considered an "employer," it would have been divested of its sovereign power

to seize and operate coal mines in the United States.  330 U.S. at 272-73, 289.

　　　In *Cooper Corp.*, the Supreme Court applied the presumption and found that the federal

government was not a "person" under 15 U.S.C. § 15.  312 U.S. at 604-14, *cited in Vermont*

*Agency*, 529 U.S. at 780; *Int'l Primate*, 500 U.S. at 83; *Will*, 491 U.S. at 64; *Wilson*, 442 U.S. at

667; *Al Fayed*, 229 F.3d at 274; *Alohacare*, No. 04-498, slip. op. at 9; *Lerner*, 2005 WL

2375175, at *4.  The presumption was properly applied because the recognition of the federal

government as a "person" would have potentially subjected the federal government to treble

damages under the Sherman Anti-Trust Act.  312 U.S. at 606.  Considering that such an

interpretation would have served as a waiver of sovereign immunity, the presumption was

properly applied.

　　　In *United States v. Fox*, without applying any presumption, the Supreme Court found that

the federal government was not a "person" under the New York statute of wills.  94 U.S. 315,

321 (1876), *cited in Cooper*, 312 U.S. at 604 n.5, *aff'g* In re *Fox's Will*, 52 N.Y. 530 (N.Y.

1873), *cited in Cooper*, 312 U.S. at 604 n.5.  The Court found that the federal government could

not be a "person" under the New York statute of wills because if it were so included, New York

would have divested sovereign control of lands within its own boundaries.

　　　In all of these cases, the Supreme Court was faced with one of the two classes of cases in

which the presumption should apply.  *Nardone*, 302 U.S. at 383-84.  In *Vermont Agency*, *Will*,

-14-

*Wilson*, *United Mine Workers*, *Cooper Corp.*, and *Fox*, the situation involved the possible divestiture of the sovereign's rights, privileges, and titles. In *International Primate*, the situation involved the possibility of an absurd result. Moreover, all of the cases involved the application *vel non* of substantive statutes to the United States or its agencies.

The district courts, which have held that "person" as used in Rule 45 does not include the federal government, have predominantly relied upon these seven cases in finding that there is an across-the board presumption that "person" does not include the federal government. This reliance is erroneous because, in the first place, there is no across-the aboard presumption and, secondly, the relied upon cases dealt with the application of substantive laws, not procedural or discovery vehicles.

Rule 45 is a procedural rule designed to regulate the form of, issuance of, service of, protection from, duties responding to, and contempt orders for failing to respond to a subpoena. It does not create any substantive rights or duties designed for the public good, to advance religion and justice, or to prevent injury, nor does it divest the federal government of any rights, titles, or privileges. Therefore, "person" as used in Rule 45 is not entitled to any presumption.

Since "person" as used in Rule 45 is not entitled to any presumption, it must be construed according to normal rules of statutory interpretation. In interpreting the federal rules of civil procedure, the rules must be considered in relation to one another. *Hickman v. Taylor*, 329 U.S. 495, 505 (1947); *Tiedman v. American Pigment Co.*, 253 F.2d 803, 808 (4th Cir. 1958); *Canister Co. v. Leahy*, 182 F.2d 510, 514 (3d Cir. 1950); *Rosseau v. Langley*, 7 F.R.D. 170, 172 (S.D.N.Y. 1945). Moreover, the rules of civil procedure and those governing the enforcement of subpoenas should be read in *pari materia*. *Boeing Airplane Co. v. Coggeshall*, 280 F.2d 654,

658 (D.C. Cir. 1960).

First, as the Supreme Court has recognized, "person" as used in the Federal Rules of Civil Procedure encompasses the federal government when it is a party. *Procter & Gamble Co.*, 356 U.S. at 681. With that in mind, there is no language in Rule 45 which would lead this Court to determine that "person" includes the government when it is a party, but not when it is a non-party. Therefore, if the government is a "person" when it is a party and there is no language in Rule 45 differentiating parties from non-parties, principles of consistent interpretation require "person" as used in Rule 45 to encompass the government when it is both a party and a non-party.

Second, Rule 30(a)(1) states that "[a] party may take the testimony of any person, including a party, by deposition upon oral examination . . . . The attendance of witnesses may be compelled by subpoena as provided in Rule 45." Rule 30(b)(6) states that "[a] party may in the party's notice and in a subpoena name as the deponent a . . . governmental agency." Reading Rules 30(a)(1) and 30(b)(6) in conjunction, a party may take the deposition of a governmental agency, whether a party or not, and compel the attendance of witnesses through the use of a Rule 45 subpoena. Accordingly, interpreting "person" in Rule 45 to exclude governmental agencies would contradict Rule 30.

Third, Rule 4(i)(2)(A) states that "[s]ervice on an agency or corporation of the United States, or an officer or employee of the United States sued only in an official capacity, is effected by serving the United States in the manner prescribed by Rule 4(i)(1) and by also sending a copy of the summons and complaint by registered or certified mail to the officer, employee, agency, or corporation." Rule 4(i)(3)(A) then refers to agencies and corporations of the United States as

-16-

"persons required to be served in an action governed by Rule 4(i)(2)(A)." Therefore, in Rule 4(i), agencies of the United States are referenced as "persons." As such, if "person" as used in Rule 45 is to be construed in harmony with "persons" as used in Rule 4(i), it should encompass federal agencies.

Fourth, the United States has implicitly been considered a "person" under other rules of civil procedure. *See, e.g, United States v. Yellow Cab Co.*, 340 U.S. 543, 553 (1951) (Rule 14); *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232-33 (D.C. Cir. 2003) (Rule 24); *Carlson v. Tulalip Tribes of Washington*, 510 F.2d 1337, 1339 (9th Cir. 1975) (Rule 19). To hold that the United States and its agencies are not "a person" as used in Rule 45 solely when they are a non-party is inconsistent with the wording of the Rule as well as with other rules of civil procedure.

### B. Has the United States waived its sovereign immunity?

The United States next argues that it is immune from complying with the subpoena in the present case because the PSC has failed to follow the proper procedural steps for challenging the FDA's decision. As a sovereign, the United States may not be sued without its consent. *Voluntary Purchasing Groups, Inc. v. Reilly*, 889 F.2d 1380, 1385 (5th Cir. 1989). 5 U.S.C. § 702 serves as a waiver of the United States' sovereign immunity such that a person suffering legal wrong because of agency action can seek judicial review of such action.

In the present case, the PSC contends that it has suffered legal wrong by the FDA's refusal to produce Dr. Graham for a deposition. The United States, however, claims that it has not waived its sovereign immunity. Specifically, the United States contends that its waiver of sovereign immunity only extends to independent actions filed under the APA, not to subpoenas or motions to compel filed as part of a pre-existing suit between private litigants.

-17-

In *EPA v. General Electric Company*, the Second Circuit, faced with this exact issue, held

that the APA allows the enforcement of a non-party *subpoena duces tecum* for discovery against

the United States through a motion to compel.  197 F.3d 592, 599 (2d Cir. 1999); *see also*

*Barnett v. Illinois State Bd. of Illinois*, No. 02-2401, 2002 WL 1560013, at *1 (N.D. Ill. July 2,

2002).  *But see Landry v. FBI*, No. 97-197, 1997 WL 375881, at *1 (E.D. La. July 3, 1997).  In

*General Electric*, the Second Circuit specifically found that section 702 did not require a separate

APA action and that such a requirement would only create time-consuming additional litigation,

serve as an unnecessary delay, and place procedure ahead of substance.

Moreover, other courts have also explicitly and implicitly held that federal agencies

cannot claim sovereign immunity to avoid compliance with third-party subpoenas.  *See, e.g.,*

*Linder*, 251 F.3d at 180; *Comsat Corp. v. Nat'l Science Found.*, 190 F.3d 269, 274 (4th Cir.

1999); In re *Bankers Trust Co.*, 61 F.3d 465, 470 (6th Cir. 1995); *Exxon Shipping Co. v. Dep't of*

*the Interior*, 34 F.3d 774, 778 (9th Cir. 1994); *Moore v. Armour Pharmaceutical Co.*, 927 F.2d

1194, 1197 (11th Cir. 1991); *Davis Enterprises v. EPA*, 877 F.2d 1181, 1186 (3d Cir. 1989); In

re *PE Corp. Sec. Litig.*, No. 00-705, 2005 WL 806719, at **6-7 (D. Conn. Apr. 8, 2005); *Moran*

*v. Pfizer, Inc.*, No. 99-9969, 2000 WL 1099884, at *2 n.1 (S.D.N.Y. Aug. 4, 2000); *Phoenix Ins.*

*Co. v. Phillips*, No. 99-1945, 2000 WL 680334, at *1 (E.D. La. May 24, 2000); *Metrex Research*

*Corp. v. United States*, 151 F.R.D. 122, 124 (D. Colo. 1993); In re *Bioscience Sec. Litig.*, 150

F.R.D. 80, 81 (E.D. Pa. 1993).  Some of these courts have found section 702's waiver to be

limited by section 706's arbitrary and capricious standard of review; whereas, other courts have

found that nothing in the language of section 702 indicates that it only applies to actions brought

under section 706 and, as such, have reviewed motions to quash under Rule 45's undue burden

standard.[5] *See Linder*, 251 F.3d at 181.  While there is varied reasoning for each of these respective positions, this Court acknowledges that nearly every court faced with this issue has determined that sovereign immunity does not insulate a federal agency from complying with a Rule 45 subpoena.  This Court agrees.

### C. Should this Court review the motion to quash under Rule 45 or APA standards?

Even though this Court has found that sovereign immunity does not immunize federal agencies from complying with a Rule 45 subpoena, the government is not helpless.  It can still challenge the propriety of the subpoena.  There are two possible standards of review that this Court can implement in reviewing the challenged subpoena.  The first is the standard set forth in Rule 45, and the second is the standard set forth in the APA.  This Court must now determine which standard of review applies and then determine if the standard has been satisfied.

In *United States ex rel. Touhy v. Ragen*, 340 U.S. 462, 467-68 (1951), the United States Supreme Court held that federal regulations authorizing the head of a federal agency to determine if a subordinate may produce documents to a court are valid regulations.  As a result of this case, these federal regulations have become known as *Touhy* regulations.

Like many federal agencies, the FDA has promulgated its own *Touhy* regulations.  Specifically, section 20.1 of title 21 of the Code of Federal Regulations governs the testimony of FDA employees.  It prohibits any FDA employee from testifying before any tribunal as to information acquired in the discharge of his official duties except with the authorization of the Commissioner of the FDA or an employee designated to act on the Commissioner's behalf.

In its request letter, the PSC complied with the FDA's *Touhy* regulations by asking the

---

[5] This is the issue discussed in Part III.C.

-19-

FDA to permit Dr. Graham to testify.  In its refusal letter, the FDA denied the PSC's request because such testimony would not be in the public interest and would not further the interests of the FDA.

The instant issue for the Court to determine is whether it should review the pending motions under Rule 45 or APA standards.  Under Rule 45(3)(A), a court may quash or modify a subpoena if it subjects a person to undue burden.  If this standard would apply, the United States would have to prove that the PSC's subpoena subjects it to an undue burden.

Conversely, under section 706 of the APA, a court may set aside an agency action if it is arbitrary or capricious or if it is in excess of the agency's authority.  If this standard applies, the PSC would have to prove that the FDA's refusal to produce Dr. Graham for a deposition was arbitrary, capricious, or in excess of the FDA's authority.

As a basic proposition, federal regulations are entitled to deference and should, whenever possible, be given full force and effect of law. *Chevron, U.S.A, Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 844 (1984).  As long as the federal regulation is based upon a permissible interpretation of the enabling statute, the federal regulation should be enforced. *Id.*

In the present case, 21 C.F.R. § 20.1 is the federal regulation at issue.  It was enacted pursuant to 5 U.S.C. § 301—the federal housekeeping statute. *Chrysler Corp. v. Brown*, 441 U.S. 281, 309-10 (1979).  The first sentence of section 301 authorizes the heads of federal agencies to prescribe regulations for the governance of their agencies and the conduct of their agency's employees.  The second sentence of section 301, however, prevents agency heads from authorizing the "withholding [of] information from the public or limiting the availability of records to the public."

-20-

The second sentence of section 301, which was originally codified at 5 U.S.C. § 22, was enacted in 1958. *Exxon Shipping Co.*, 34 F.3d at 777. The legislative history surrounding this addition represents that Congress was concerned that the executive branch had turned this statute from a rule of agency organization and procedure into a substantive basis for withholding information from the public. *Chrysler Corp.*, 441 U.S. at 310. In light of the legislative history surrounding the second sentence of section 301, a split has developed over whether the APA's arbitrary and capricious standard or Rule 45's undue burden standard should control motions to quash subpoenas compelling discovery from federal agencies and agents. Several courts have held that Rule 45's undue burden standard should apply. *Bankers Trust Co.*, 61 F.3d at 470; *Exxon Shipping Co.*, 34 F.3d at 780; *PE Corp.*, 2005 WL 806719, at **6-7; *Metrex Research*, 151 F.R.D. at 124; *Bioscience Sec. Litig.*, 150 F.R.D. at 81. On the other hand, several courts have held that the APA's arbitrary and capricious standard should apply. *General Elec.*, 197 F.3d at 599; *Comsat Corp.*, 190 F.3d at 274; *Moore*, 927 F.2d at 1197; *Davis*, 877 F.2d at 1186; *Moran*, 2000 WL 1099884, at *2 n.1; *Phoenix Ins. Co.*, 2000 WL 680334, at *1. Lastly, the D.C. Circuit has held that a *subpoena duces tecum* should be reviewed under Rule 45, but a *subpoena ad testificandum* should be reviewed under the APA. *Houston Bus. Journal, Inc. v. Office of the Comptroller of the Currency*, 86 F.3d 1208, 1212 n.4 (D.C. Cir. 1996).

While acknowledging the dispute over the applicable standard, this Court need not resolve this issue. In the present case, the deposition of Dr. Graham must proceed because the FDA has acted arbitrarily and capriciously in failing to provide Dr. Graham for a deposition and has also failed to show that the deposition of Dr. Graham will subject it to an undue burden.

In support of its motion to quash, the United States contends that the deposition of Dr.

-21-

Graham would divert the FDA's time and resources and cripple its ability to fulfill its statutory mandate, that the PSC has no need for Dr. Graham's deposition, that the deposition will embroil the FDA in private litigation, that Dr. Graham's testimony is not in the public interest, and that Dr. Graham's testimony would not further the objectives of the FDA or FDCA. Accordingly, its decision to prevent Dr. Graham from testifying was not arbitrary and capricious. The United States' argument is unpersuasive.

First, Dr. Graham's deposition would not divert the FDA's time or resources or cripple its ability to fulfill its duties. The PSC is willing to depose Dr. Graham at any place and any time, such as in the evening or on the weekends, convenient with his schedule. This Court does not see how the deposition of one employee during non-working hours would cripple the FDA's ability to function.

Nonetheless, this Court is not blind to the possible ramifications of its decision. The FDA's real concern is not a one time deposition of a single employee, but the potential cumulative effect of this Court's ruling. If the Court allows the deposition of Dr. Graham to proceed, the FDA is worried that many other FDA employees may be subpoenaed by Merck to counterbalance the effect of Dr. Graham's testimony. In fact, Merck has already indicated its intent to subpoena several FDA employees if the deposition of Dr. Graham is allowed to proceed. Moreover, beyond the present litigation, the FDA is concerned about the aggregate effect that this ruling may have in future cases throughout the country.

The FDA need not go sleepless fearing endless depositions. This ruling is not a blank check written to the PSC, Merck, or any other litigant. To the extent that Merck may seek its own depositions and to the extent that future litigants may seek depositions in different cases, the

FDA is not powerless. It will be able to file a motion to quash. At that time, this Court, or whichever court the motion is filed in, must make its own determination as to the merits of each individual case.

It is proper that motions, such as those pending before the Court, should be decided on a case-by-case basis. Discovery motions are heavily based on the individual facts in an individual case. It would be particularly unwise to quash Dr. Graham's deposition simply because the FDA may at some unknown time in the future become inundated with deposition requests. Likewise, if this Court were to make such an unsound ruling, it would in effect allow the FDA to implement a practice of denying all deposition requests under the guise of possible, although presently nonexistent consequences. Much as this Court will not write litigants a blank check, it will not deal the FDA a trump card.

Moreover, Dr. Graham has already testified before Congress, appeared on television shows, been interviewed by numerous magazines and newspapers, and has spoken at professional meetings about the FDA's interplay with Vioxx. How can it be that the FDA and Dr. Graham had enough resources and time for him to appear in all these varied venues yet neither can afford to have him appear for a federal court subpoenaed deposition at the time and place of their choosing? The FDA has not offered any reasons. The Court suspects that there are none, except for arbitrariness and caprice.

Furthermore, the FDA has voluntarily produced medical officers in connection with other pharmaceutical MDLs. If the FDA has voluntarily produced medical officers in the past, why can it not produce one in this litigation? This Court can only speculate because the FDA's refusal letter does not address the specifics surrounding the PSC's particular request for Dr.

Graham's deposition. Instead, despite the fact that the PSC specifically pointed out that the FDA has voluntarily produced medical officers in other MDLs, the FDA only offered a two page standardized refusal letter. Apparently, based solely on a reading of the FDA's letter, the FDA only briefly, if it all, considered any of the specifics raised in the PSC's request letter. More is required from federal agencies. They "must examine the relevant data and articulate a satisfactory explanation for [their] action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicles Mfrs. Assoc. of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citing *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

Second, the United States contends that the PSC has no need for Dr. Graham's testimony because its substance is contained in documents already produced by the FDA and in Dr. Graham's congressional testimony. None of the documents provided by the FDA can express the Dr. Graham's opinion with the clarity and tone as he personally can in his deposition. Furthermore, considering that Dr. Graham's congressional testimony was not subject to cross-examination by any party in this litigation, it is doubtful such testimony would be admissible at trial.

Third, the deposition of Dr. Graham and the FDA's participation in this MDL will not force the FDA to become embroiled in private litigation. The production of a fact witness for a single deposition does not make the FDA a part of this litigation. Furthermore, at his deposition, Dr. Graham need not take any position on the merits of the pending litigation. Additionally, like he has done before, Dr. Graham can specify that he is testifying in his individual capacity. Lastly, to the extent that this deposition may embroil the FDA in this litigation, the FDA has

already embroiled itself by allowing Dr. Graham to give his testimony before Congress, on television, in print, and at professional meetings. Considering that Dr. Graham's deposition testimony will be limited to the scope of his prior testimony, the FDA will not become any more embroiled than it already is.

Fourth, this Court fails to see how disclosure of this information is not in the public interest. Vioxx is a drug that was used by millions of patients and is currently the subject of thousands of lawsuits.

Although it has many purposes and goals, litigation is a fact-finding device designed as a search for the truth. With this in mind, it is vitally important to every plaintiff in this litigation to know the truth surrounding Vioxx, including what the FDA knew, when the FDA knew it, what if anything was kept, intentionally or unintentionally, away from the FDA, and what, if anything, the FDA kept from the public. Similarly, this information is important to those people who used Vioxx, were injured, and may have a claim against Merck, but are still contemplating the filing of a formal suit. This information is also important to Merck, who is now spending countless dollars trying to vindicate itself and its product and who, after voluntarily removing Vioxx from the market, most likely desires to place Vioxx, which it believes is safe and effective, back on the market. This information is also important to those people who took Vioxx, suffered no injury, and who still wish they could take Vioxx, but cannot because it has been voluntarily removed from the market.

Fifth, Dr. Graham's deposition would further the objectives of the FDA and the FDCA. The objective of the FDA and FDCA is the protection of the public. The FDA protects the public by enacting regulations governing the sale and marketing of pharmaceutical products and,

based upon those regulations, approving and monitoring pharmaceutical products for sale and marketing. Any improvements deriving from such a reevaluation would promote the protection of the public—the FDA's ultimate goal.

In reaching its decision, the FDA failed to consider important aspects of this particular problem, offered an explanation that runs counter to the evidence before the agency, and is so implausible that it cannot be ascribed to a difference in view or the product of agency action. *Motor Vehicle Mfrs.*, 463 U.S. at 43. Therefore, the Court finds that the FDA's refusal to produce Dr. Graham for a deposition was arbitrary and capricious and also finds that the deposition of Dr. Graham would not subject the FDA to an undue burden.

## IV.    CONCLUSION

For the foregoing reasons, the United States of America by and on behalf of the United States Food and Drug Administration and FDA Employee David Graham, M.D.'s Motion to Quash the Deposition of David Graham, M.D. is DENIED and the Plaintiffs' Steering Committee's Cross-Motion to Compel the Deposition of David Graham, M.D. is GRANTED.

IT IS FURTHER ORDERED that the deposition of Dr. Graham shall proceed expeditiously, and at a time outside of normal working hours, unless all parties agree otherwise. IT IS FURTHER ORDERED that the scope of the deposition shall be limited to matters relevant to this litigation and to which Dr. Graham has previously addressed.

New Orleans, Louisiana, this __13th__ day of __March__, 2006.

UNITED STATES DISTRICT JUDGE

-26-