FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA
2006 MAR 22  PM 4: 34

LORETTA G. WHYTE
CLERK

## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

KATHERINE H. DAVIS
2746 Fenwick Avenue
Baltimore, Maryland 21218

                    Plaintiff,

      v.

MERCK & CO., INC.
One Merck Drive
Whitehouse Station, New Jersey 08889

                 Defendant.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

MDL Docket Number1657
Section ℒ

## FIRST AMENDED COMPLAINT

### JURISDICTION

1.  This case is brought pursuant to 28 U.S.C. § 1332(a) as there exists complete diversity of citizenship and the amount in controversy exceeds $75,000.00, exclusive of interest or costs.

2.  Plaintiff's claims accrued in whole or in part while Plaintiff was a resident of Baltimore City, Maryland.  Plaintiff is currently a resident citizen of Baltimore, Maryland. Defendant is a domestic corporation that is currently, and has been at all pertinent times, engaged in business, directly or by authorized agent, in Baltimore, Maryland.  Consequently, jurisdiction and venue are proper in this Court.

### PARTIES

3.  Plaintiff Katherine Davis is currently a resident citizen of Baltimore, Maryland.

4.  At all times relevant herein, Defendant Merck & Co., Inc. (hereinafter Merck), was and is, an American pharmaceutical company incorporated under the laws of the State of New

Fee
Process
Dktd
CtRmDep
Doc. No

Jersey with its principal place of business at One Merck Drive, P.O. Box 100, Whitehouse

Station, New Jersey. Defendant was and is in the business of profiting from the design,

manufacture, marketing, distribution and/or sales of the brand-name prescription drug VIOXX®

(rofecoxib) (hereinafter "Vioxx").

5. Merck does business in and has substantial contacts with the State of Maryland. At

all times material to this lawsuit, Merck was engaged in the business of developing,

manufacturing, licensing, promoting, marketing, distributing, and/or selling in interstate

commerce and the State of Maryland, either directly or indirectly, the pharmaceutical drug

Vioxx.

## GENERAL ALLEGATIONS

Plaintiff hereby incorporates by reference paragraphs 1 through 5 of this Complaint and

further states as follows:

6. This action arises from damages sustained by Plaintiff Katherine Davis which were

caused by Vioxx, an osteoarthritis and pain-relief drug containing rofecoxib, a member of a class

of drugs known as non-steroidal anti-inflammatory drugs ("NSAIDS").

7. Defendant Merck obtained FDA approval for Vioxx, and began distribution and sale

of Vioxx throughout the United States, in approximately May of 1999. Vioxx is a brand name

used by Merck to market and distribute rofecoxib.

8. Plaintiff Katherine Davis was provided with a prescription for Vioxx by her physician

and consumed Vioxx in accordance with her physician's instructions on, about, and between

June 2000 and January 2003.

9. On or about January 24, 2003, Plaintiff Katherine Davis suffered a cerebrovascular

event resulting in hospitalization and rehabilitation.

10. Defendant Merck distributed and sold Vioxx to consumers such as Plaintiff. Vioxx was approved for marketing based on information submitted by Defendant to the United States Food & Drug Administration ("FDA") in its Application to Market a New Drug for Human Use ("NDA").

11. Despite knowledge of the relationship between Vioxx and cardiovascular-related adverse health effects gained in its clinical trials and post-marketing reports and studies, Merck promoted and marketed Vioxx as safe and effective for persons such as Plaintiff.

12. In the late 1980's and early 1990's, Merck was facing a business crisis, because patents on several of its best-selling drugs, including Vasotec, Prinivil, Mevacor, Pepcid, and Prilosec were expiring. Never had a pharmaceutical company faced the loss of so many million dollar patents at the same time. Merck management even feared Merck may not survive as a company.

13. On or about December 20, 1994, Merck filed its first Investigational New Drug Application (IND) with the FDA to conduct clinical trials of Vioxx in humans. The IND identified the intended use of the drug as the treatment of osteoarthritis and acute pain.

14. Defendant Merck submitted an Application to Market a New Drug for Human Use ("NDA") for rofecoxib to the FDA on November 23, 1998, for tablets, at doses of 12.5 mg and 25 mg, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea. This application was denoted NDA 21-042 by the FDA.

15. Defendant Merck also submitted an Application to Market a New Drug for Human Use ("NDA") to the FDA on November 23, 1998, for rofecoxib of oral suspension, at doses of 12.5 mg/mL and 25 mg/mL, for relief of the signs and symptoms of osteoarthritis, the

management of acute pain, and the treatment of primary dysmenorrhea. This application was denoted NDA 21-052 by the FDA.

16. On or about May 20, 1999, the FDA approved NDA 21-042 and NDA 21-052 (hereinafter the "NDA") for rofecoxib, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea. Following FDA approval of Vioxx in May of 1999, Merck marketed Vioxx as a selective Cox-2 inhibitor, which unlike traditional NSAIDs, did not inhibit the production of Cox-1. Merck claimed that since Vioxx was the most selective inhibitor of Cox-2 on the market, it conferred the anti-inflammatory and analgesic benefits of traditional NSAIDs without the associated gastrointestinal toxicity. Accordingly, Merck asserted that Vioxx was the safest NSAID on the market.

17. As early as November 1996, years before FDA approval of Vioxx in May 1999, Merck recognized that unless taken in conjunction with aspirin, Vioxx posed a "substantial risk" of "significantly higher rates" of cardiovascular adverse events such as myocardial infarctions, strokes and transient ischemic attacks because, as a selective Cox-2 inhibitor, it lacked aspirin's "anti-platelet (i.e. anti-clotting) effect." In fact, early in the development program for Vioxx, to demonstrate that it selectively inhibited Cox-2, Merck used a platelet aggregation assay to assess the drug's effect on Cox-1. That research established that Vioxx did not affect thromboxane production or platelet aggregation because it did not inhibit Cox-1. In addition, a Merck-sponsored study found that Vioxx, unlike several other NSAIDs against which it was tested, had no appreciable anti-platelet effect (Protocol 061).

18. Two months later, in February 1997, Vioxx researcher Briggs Morrison conceded that "without Cox-1 inhibition you will get more thrombotic events and kill drug." Responding to this observation, Merck's Vice President of Clinical Research, Alise Reicin, complained:

4

> This is a no win situation. The relative risk of [adverse GI events with ] even low dose aspirin is 2-4 fold. Yet the possibility of increased CV [cardiovascular] events is of great concern (I just can't wait to be the one to present those results to senior management!). What about the idea of excluding high-risk CV patients- i.e. those that have already had an MI, CABG, PTCA.? This may decrease the CV event rate so that the difference between the two groups would not be evident. The only problem would be – would we be able to recruit any patients?

19. By early 1998, Merck's own clinical investigators, based on findings from a Merck-sponsored study (Protocol 023), advised the company that by inhibiting Cox-2, Vioxx, at the cellular level of blood vessel linings, may alter the homeostatic balance between prostacyclin – a Cox-2 platelet inhibitor that dilates blood vessels – and thromboxane – a Cox-1 platelet activator that constricts blood vessels – such that it could provoke the creation of blood clots.

20. In December 1997, Merck appointed a "Task Force" to investigate the incidence of cardiovascular serious adverse events in the ongoing Vioxx clinical trials. The reason for the investigation was the unexpected early results of a yearly clinical trial which showed a decline in the levels of PGI-2, the most potent of all inhibitors of platelet aggregation, but no inhibition of systemic thromboxane, in the urinalysis of patients taking Vioxx. This imbalance triggered a concern for the potential for thrombotic events.

21. The Task Force agreed to investigate the incidence of thrombotic events by analyzing the ongoing osteoarthritis (OA) trials. Because the trials were still blinded as to treatment groups, it could not be determined whether the adverse events in the database had occurred in the Vioxx, placebo, or "compared-to" drug populations. Therefore, the Task Force designed a study in which cardiovascular events from all arms of the OA trials would be added together, and the combined groups' incidence rate would be compared to placebo patients from trials of other Merck drugs. An expedited time frame was established for completion of the analysis, because of the rush to get Vioxx to market ahead of the competitors.

22. In January 1998, the analysis pursuant to the Task Force's plan showed a statistically significant increased relative risk of 2.16 for females in the Vioxx study versus the placebo group selected by Merck for comparison. These results constituted a clear signal of cardiovascular toxicity that should have triggered immediate investigation and concern. Instead, Merck made an after-the-fact claim that the placebo comparison group must have had an "atypically low" incidence of cardiovascular events, such that the higher rate in the Vioxx group was downplayed. Further, Merck changed the rules after the game had been played, by deciding to compare the rate in the Vioxx group to a so-called "background" rate, even though no such comparison was stated in the plan for the study. Merck intentionally chose an inappropriate "background" rate for comparison, from a published study of older patients at high risk for cardiovascular disease. Based upon the result of this comparison, Merck incorrectly dismissed the result as of no concern. Merck failed to disclose the results of this pre-marketing analysis, and instead has misrepresented that it had no indication of cardiovascular risk before Vioxx was marketed.

23. In or about 1998, six months before Merck filed its New Drug Application ("NDA") with the FDA, Merck's Scientific Advisory Board for the drug recommended that researchers "systematically collect data on cardiovascular (CV) events in all clinical trials" for Vioxx. In issuing this recommendation, the Board noted that some of its consultants were concerned that "[b]ased on data on PGI [prostaglandin] metabolism obtained for Vioxx, it is conceivable that Vioxx could disturb the [endothelium-platelet] interaction to favor platelet aggregation."

24. Merck chose to expose consumers to the significant adverse health risks of Vioxx despite its knowledge at product launch, and from post-marketing data thereafter, of these risks. These adverse effects were realized in Adverse Event Reports, in clinical trials where such events were adjudicated by primary investigators with Merck's assistance, and in one or more

studies shortly after market launch which showed statistically significant increases in adverse cardiovascular events among Vioxx users.

25. Merck concealed the serious cardiovascular risks associated with Vioxx because a successful launch of Vioxx was viewed as critical for Merck.  Safety concerns over hypertension, thrombosis, edema and/or cardiovascular events would have drastically impacted Merck's positioning in the market as compared to a competitor's drug, Celebrex (celecoxib), which was placed on the market approximately three (3) months prior to the launch of Vioxx.

26. Defendant Merck submitted a Supplemental New Drug Application (sNDA-007) with the goal of establishing a gastrointestinal ("GI") safety claim for rofecoxib.  In conjunction with the sNDA, Defendant Merck performed the Vioxx Gastrointestinal Outcome Research (VIGOR) Protocol, No. 088-04, entitled "A Double-Blind, Randomized, Stratified, Parallel-Group Study to Assess the Incidence of PUBs During Chronic Treatment With MK-0966 or Naproxen in Patients With Rheumatoid Arthritis: U.S. Cohort."  The VIGOR study was performed from January 6, 1999 through March 17, 2000.

27. The objectives of the VIGOR study were to (1) "determine the relative risk of confirmed PUB (Perforation, Ulcers, Bleeding) in patients taking MK-0966 50 mg daily compared to patients in the group taking Naproxen 1000 mg/day," and (2) "study the safety and tolerability of MK-0966 in patients with rheumatoid arthritis."

28. Merck excluded "high" cardiovascular risk patients from the VIGOR trial. On or about November 18, 1999, Merck's senior biostatistician, Deborah Shapiro, provided a tightly-controlled, highly confidential interim safety report to the VIGOR study's Data Safety and Monitoring Board ("DSMB"). The report showed that almost twice as many serious

cardiovascular events were occurring among patients taking Vioxx as among those taking Naproxen.

29. In or about March of 2000, Merck released the results of the VIGOR study. The study data revealed, among other things, that Vioxx users suffered five times as many heart attacks than their Naproxen counterparts. In addition, serious cardiovascular events (including heart attacks, ischemic strokes, unstable angina, and sudden unexplained deaths) were reported for more than twice as many Vioxx patients, compared with Naproxen patients. Vioxx had exhibited a significantly greater cardiovascular toxicity than Naproxen within the first six weeks of the VIGOR study. Despite the results of the VIGOR study Merck failed to include in its Vioxx label a cardiovascular warning that Vioxx was contraindicated in high risk CV patients.

30. On March 9, 2000, shortly after completion of the VIGOR study, Edward M. Scolnick, former president of Merck Research laboratories, concluded that "the CV [cardiovascular] events are clearly there" and stated that Merck should be prepared to "make clear to the world" that Vioxx's cardiovascular toxicity "is a class effect" (i.e. an effect of the class of selective Cox-2 inhibitors) that is "mechanism based as we worried it was," and as some of the company's consultants had maintained.

31. In industry sponsored studies presented in June of 2000 at the XV European United League Against Rheumatism Congress "EULAR," an organization in which Merck is a member and corporate sponsor, it was shown that Vioxx use resulted in a statistically significant increase in hypertension and edema. The study compared rofecoxib and celecoxib use among patients with osteoarthritis who used hypertensive medication.  Merck did nothing to further accurately publish these findings, or warn consumers. Further, it denied the results with respect to hypertension in an article entitled, *Spin War Aside, Lessons Emerge From COX-2 Trials*, in

August 2000, published in <u>Pharmacy Today</u>, the official publication of the American Pharmaceutical Association, in August, 2000, p. 3.

32. Merck continued to deny the ill health effects associated with Vioxx while at the same time reaping profits obtained through its non-disclosure and concealment. Merck engaged in a massive advertising and sampling program and gained continued increases in the market share, which enhanced Merck's financial stability to the detriment of its consumers. As a result of Merck's scheme, it reaped more than $2 billion in profit in 2000 alone, and appropriated approximately a 23 percent share of the market. By 2003, worldwide sales of Vioxx reached 2.5 billion dollars (U.S.), following the most impressive global sales growth of any drug in history.

33. Merck continued to profit from its scheme by withholding information from Plaintiff and the health care industry generally. For example, in November of 2000, Merck caused the publication of the VIGOR study results in the New England Journal of Medicine and knowingly downplayed and/or withheld the severity of cardiovascular risks associated with Vioxx consumption over Naproxen consumption and the underlying data. Bombardier, C., et al., *Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients With Rheumatoid Arthritis.* New Eng. J. Med. 2000; 343: 1520-1528.

34. Merck knowingly downplayed and, in certain instances, withheld from publication, the severity of cardiovascular and cerebrovascular risks associated with Vioxx. In June of 2000, industry-sponsored studies presented at the European United League Against Rheumatism ("EULAR"), an organization in which Merck is a member and a corporate sponsor, showed that Vioxx use resulted in statistically significant increases in hypertension and myocardial infarctions. On or about August 29, 2001, the Journal of the American Medical Association (JAMA) published a peer-reviewed human epidemiological study by the Cleveland Clinic

Foundation, Cleveland, Ohio, Dr. D. Mukherjee, et al. The study showed what Merck had

concealed—that the relative risk of developing a serious cardiovascular adverse event (defined in

the article as "myocardial infarction, unstable angina, cardiac thrombus, resuscitated cardiac

arrest, sudden or unexplained death, ischemic stroke, and transient ischemic attacks") among

Vioxx users in Merck's VIGOR trial compared with patients using Naproxen, at a 95%

confidence interval ranged from: 1) 2.2 for event-free survival analysis when comparing all

cardiovascular events termed "serious" in an FDA medical reviewer's opinion; 2) 2.38 among

those adjudicated to have serious thrombotic cardiovascular adverse events; and 3) 4.89 for

developing serious cardiovascular events among aspirin-indicated patients who used rofecoxib.

See, Mukherjee, D., et al., *Risk of Cardiovascular Events Associated With Selective Cox-2*

*Inhibitors*. JAMA 286:8, 954-959, Aug. 22/29, 2001.  In addition, the annualized myocardial

infarction rates for Vioxx users compared to placebo revealed a statistically significant increase

among Vioxx users.  *Id*.

      35. In the JAMA study, the authors set forth the theory that, "by decreasing PGI2

production [Vioxx] may tip the natural balance between prothrombotic thromboxane A2 and

antithrombotic PGI2, potentially leading to an increase in thrombotic cardiovascular events." *Id*.

at 957.  In a follow-up peer-reviewed study reported in the Journal of the American College of

Cardiology on or about February 6, 2002, Dr. Richard J. Bing conducted scientific testing and

confirmed that the Cox-2 inhibitor, "tips the balance of prostacyclin/thromboxane in favor of

thromboxane, leading to increased vascular and thrombotic events." Bing, R., Lomnicka, M.,

*Why Do Cyclo-Oxygenase-2 Inhibitors Cause Cardiovascular Events?* J.Am.Coll. Cardiol 39:3,

Feb. 6, 2002.  This biological plausibility is further supported by studies completed at the

University of Pennsylvania.  Cheng, Y., et al., *Role of Prostacyclin in the Cardiovascular*

*Response to Thromboxane A 2*, Journal of Science, 296:539-541, Apr. 19, 2002. The conclusion

from these studies is that because Vioxx inhibited Cox-2 without substantially inhibiting Cox-1,

it, among other things, created a homeostatic imbalance that could result in increased

aggregation of blood platelets or blood clotting and thereby substantially increase the risk of

adverse cardiovascular and cerebrovascular events, including heart attacks – both clinically

recognized and unrecognized – ischemic strokes, and other serious injuries. Merck had reason to

know and did know of these serious adverse events in patients who ingested Vioxx.

      36.  Merck continued its denial of these risks in order to continue reaping massive profits

at the expense of patient's health and lives. On or about May 22, 2001, Merck issued a press

release through PR Newswire touting and "reconfirm[ing] the favorable cardiovascular safety

profile of Vioxx." On or about August 23, 2001, the day after the JAMA article was published,

Merck stated in another press release: "the Company stands behind the overall and

cardiovascular safety profile of Vioxx." In responsive Merck-authored and sponsored reviews,

Merck claimed that Naproxen had a cardioprotective effect which accounted for the

cardiovascular risks among its Vioxx users. This was disputed by Merck's own employees, who

published a pooled analysis in Circulation in October of 2001 and concluded that the data was

insufficient to ascertain the cardiovascular benefits of Naproxen. *Cardiovascular Thrombotic*

*Events in Controlled, Clinical Trials of Rofecoxib*, Konstam, M.A., et al., Circulation, 104:2280-

2288 (October 3, 2001).  The article, authored by Dr. Marvin Konstam and various internal

Merck employees, is a post-hoc retrospective pooled analysis of Vioxx data only available

through access to Merck's files.  The study shows that the data crosses dosing intervals and has,

as a primary basis, interim placebo data from Alzheimer testing at the lowest possible dose of

Vioxx (12.5 mg) as compared to 50 mg in VIGOR.  However, Table 7 reveals that, at 50 mg,

compared to other NSAIDs, Merck's additional data showed a greater than doubling of the risk of cardiovascular disease.  Furthermore, in January of 2002, an epidemiologic study by Vanderbilt University School of Medicine was published in The Lancet concluding that, based upon information previously available, there is an absence of a protective effect of Naproxen or other non-aspirin NSAIDs on risk of coronary heart disease.  Ray, W., et al., *Non-Steroidal Anti-inflammatory Drugs and Risk of Serious Coronary Heart Disease: An Observational Cohort Study*, Lancet, 359:118-123, Jan. 12, 2002.  A follow-up research letter by Ray, et al. appeared in The Lancet on October 5, 2002 reiterating the cardiovascular risks of Vioxx and an inability to confirm any protective effect of Naproxen. In addition, Italian pharmacologist Carlo Patrono, one of Merck's own consultants and an expert in the platelet effects of cyclooxygenase-inhibiting drugs (whom Merck regarded as "the world's most respected and knowledgeable" scientist in his field), advised Merck in March 2000, that the dramatic cardiovascular effects observed in the VIGOR study could not be attributed plausibly to Naproxen for several reasons. Furthermore, on or about March 24, 2000, University of Pennsylvania pharmacologist Garrett Fitzgerald, then acting as a Merck consultant, advised Merck of a paper in press that included Naproxen among several NSAIDs which, in contrast to aspirin, had no significant effect on the incidence of first nonfatal myocardial infarctions in females in an epidemiological study.

37. On September 17, 2001, Thomas W. Abrams, R.Ph., MBA, Director of the FDA Division of Drug Marketing, Advertising, and Communications, issued a "Warning Letter" to Raymond V. Gilmartin, President and CEO of Defendant Merck, relating to "promotional activities and materials for the marketing of Vioxx (rofecoxib) tablets."  A copy of this letter is attached as Exhibit "A" hereto.

38. The Warning Letter stated that Defendant Merck had "engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile for Vioxx." The letter further states:

> Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the competitor non-steroidal anti-inflammatory drug (NSAID), Naprosyn (Naproxen).

39. The FDA, in this Warning Letter, severely rebuked Merck's claims that Vioxx has a 'favorable safety profile':

> ...your claim in the [May 22, 2001] press release that Vioxx has a 'favorable cardiovascular safety profile,' is simply incomprehensible, given the rate of MI and serious cardiovascular events compared to Naproxen. The implication that Vioxx's cardiovascular profile is superior to other NSAIDS is misleading; in fact, serious cardiovascular events were twice as frequent in the VIOXX treatment group (101 events, 2.5%) as in the Naproxen treatment group (46 events, 1.1%) in the VIGOR study. (Emphasis added.)

40. The Warning Letter delineated the following misrepresentations made in six promotional audio conferences presented on behalf of Merck by Peter Holt, M.D., which were moderated by Merck employees; in Merck press releases; and in oral representations made by Merck sales representatives to promote Vioxx. According to this warning letter:

> a) Merck, its agents, employees and representatives minimized the rate of myocardial infarctions. For example, in a June 21, 2000 audioconference, Merck began the discussion of the myocardial infarction rates observed in the VIGOR study by stating, "when you looked at the MI rate, the rate was different for the two groups. The MI rate for Vioxx was .4 percent and if you looked at the Naproxen arm it was .1 percent, so there was a reduction in the

MI's in the Naproxen group." Merck offered what purported to be a scientific explanation, when, in fact, it was purely hypothetical. DDMAC wrote that, as Merck knew, it was misleading to assert: "that Vioxx does not increase the risk of [heart attacks] and that the VIGOR finding is consistent with Naproxen's ability to block platelet aggregation like aspirin. That is a possible explanation, but you [Merck] fail to disclose that your explanation is hypothetical, has not been demonstrated by substantial evidence, and there is another reasonable explanation, that Vioxx may have pro-thrombotic properties."

b)  Merck new that the promotional statement was false because the reason for the difference between the MI outcomes for the Vioxx users versus the Naproxen users had not yet been determined;

c)  Merck carefully excluded from the promotional literature materially relevant information that Vioxx may have pro-thrombotic properties;

d)  DDMAC reprimanded Merck for understating the role of myocardial infarctions. Merck had claimed that the MI rate was 0.2 percent for Naproxen and 0.1 percent for Vioxx, which was completely inaccurate. DDMAC wrote, "contrary to [Merck's] claim that there was a higher rate of MIs in the Naproxen group compared to the Vioxx group, the MI rate for Vioxx in this subpopulation was 12 MIs among 3877 patients (0.3%) as compared to 4 MIs among 3878 patients (0.1% for Naproxen).

e)  DDMAC reprimanded Merck for falsely claiming that the MI rate associated with the use of Vioxx was 'basically the same as" the crude MI rate in the

Celebrex study known as CLASS (Celebrex Long-Term Arthritis Safety Study);

f) DDMAC reprimanded Merck for misleading claims regarding the efficacy of Vioxx as compared to its competitor Celebrex. When publicly comparing the VIGOR study to the CLASS study, Merck failed to inform consumers that the patient populations in the two studies were extremely different. The VIGOR study excluded patients who had angina or congestive heart failure with symptoms that occurred at rest or with minimal activity as well as patients taking aspirin or other antiplatelet agents, all of which, if anything, should have made Vioxx appear to present less cardiovascular toxicity. The CLASS study did not exclude these patients, therefore, making it more likely that the CLASS trial included patients with a higher risk for myocardial infarctions prior to their ingestion of Celebrex. Nevertheless, Merck improperly compared the two studies to misrepresent that Vioxx was more effective and safer than Celebrex.

g) Merck failed to point out that the more affordable alternative, Naproxen, had been statistically proven to produce half as many myocardial infarctions as Vioxx. These misrepresentations and omissions were made not only at the promotional audio conferences in June of 2000, but also at the annual meeting of the American Society of Health-Systems Pharmacists ("ASHP") in Los Angeles, California, on June 3 through June 6, 2001;

h) DDMAC reprimanded Merck for making false statements about the risks of Vioxx therapy in patients who were taking warfarin. For example, at an audio

conference on June 16, 2000, Merck stated: "…if you look at the thromboembolic agents, it's very clear that these selective COX-2 inhibitors [of which Vioxx is a member] have the benefit of not having platelet aggregation and bleeding time, and therefore, can be used safely in terms of post-op and with Coumadin." This statement is directly contradicted by the precaution in the Product Insert, reprinted in the Physicians Desk Reference ("PDR"), which states: "…in post-marketing experience, bleeding events have been reported, predominantly in the elderly, in association with increases in prothormbin time in patients receiving Vioxx concurrently with warfarin."

i) DDMAC rebuked Merck for its false and misleading marketing: "Merck's promotional audio conferences and sales representative presentations failed to present the serious and significant risks associated with Vioxx use. They failed to state that Vioxx is contraindicated in patients who have experienced asthma, urticaria, or allergic type reactions after taking aspirin or other NSAIDS.

41.    In those marketing promotional presentations, Merck omitted the warning about the possibility of serious gastrointestinal toxicity occurring with the use of Vioxx, such as gastric bleeding, ulceration or perforation; Merck failed to state that Vioxx's Product Insert clearly defines precautions for use in patients with liver and kidney disease; failed to include information about patient populations in which Vioxx is not recommended such as women in late pregnancy; and failed to include information about Vioxx's most common adverse effects:

serious cardiovascular and cerebrovascular events such as myocardial infarctions and ischemic strokes.

42.     The eight (8) page Warning Letter concludes:

**"Conclusions and Requested Actions:"**

The promotional activities and materials described above minimize the potentially serious cardiovascular findings that were observed in the VIGOR study, minimize the Vioxx/Coumadin drug interaction, omit crucial risk information associated with Vioxx therapy, contain unsubstantiated comparative claims, and promote unapproved uses. On December 16, 1999, we also objected to your dissemination of promotional materials for Vioxx that misrepresented Vioxx's safety profile, contained unsubstantiated comparative claims, and lacked fair balance.

Due to the seriousness of these violations, and the fact that your violative promotion of Vioxx has continued despite our prior written notification regarding similar violations, we request that you provide a detailed response to the issues raised in this Warning Letter on or before October 1, 2001. This response should contain an action plan that includes a comprehensive plan to disseminate corrective messages about the issues discussed in this letter to the audiences that received these misleading messages. This corrective action plan should also include:

1.      Immediately ceasing all violative promotional activities, and the dissemination of violative promotional materials for Vioxx.

2.      Issuing a "Dear Healthcare provider" letter to correct false or misleading impressions and information. This proposed letter should be submitted to us for review prior to its release. After agreement is reached on the content and audience, the letter should be disseminated by direct mail to all healthcare providers who were, or may have been exposed to the violative promotion.

3.      A written statement of your intent to comply with "1" and "2" above.

43.     In October 2001, Merck learned of the publication of an article stating that there was a higher reporting rate for Vioxx compared to Celebrex, for adverse events relating to renal events and cardiovascular effects. Merck responded by conducting an internal analysis of reported adverse events for Vioxx and Celebrex. Merck's analysis showed a greater reporting rate of myocardial infarction, as well as congestive heart failure and related illnesses, for Vioxx

in comparison to Celebrex. Merck disregarded this signal of cardiovascular toxicity and failed to disclose it to the public. Instead, Merck blamed the result on an alleged discrepancy in the number of events entered into the regulatory database for the two drugs. As in the case of the Task Force Analysis of 1997 and the VIGOR study of 2000, Merck once again searched for and found a reason to exonerate Vioxx and keep it on the market.

44.     On April 11, 2002, the FDA approved a supplemental application for the use of Vioxx for rheumatoid arthritis, adding this indication to the previously approved indications for osteoarthritis and pain.  The FDA also approved new labeling, a "Dear Doctor" letter, and a new patient package insert.  The labeling and the "Dear Doctor" letter contained information concerning the results of the VIGOR study.

45.     The revised labeling further states, under "ADVERSE REACTIONS," that the administration of Vioxx 50 mg, was associated with a higher incidence of gastrointestinal symptoms.

> ***Clinical Studies in OA and RA with VIOXX 50 mg (Twice the highest dose recommended for chronic use)***
> In OA and RA clinical trials which contained VIOXX 12.5 or 25 mg as well as Vioxx 50 mg. Vioxx 50 mg QD was associated with a higher incidence of gastrointestinal symptoms (abdominal pain, epigastric pain, heartburn, nausea and vomiting), lower extremity edema, hypertension, serious* adverse experiences and discontinuation due to clinical adverse experiences compared to the recommended chronic doses of 12.5 and 25 mg (see DOSAGE AND ADMINISTRATION).

A copy of the revised labeling is attached as Exhibit "B" hereto.  (Highlighting provided in FDA website version).

46.     The "Dear Doctor" letter, approved in April 2002, in conjunction with the revisions to the Vioxx labeling, outlines the changes to the Vioxx labeling.  A copy of the "Dear Doctor" letter is attached as Exhibit "C" hereto.

47.     However, the revised "Patient Information" sheet issued April 2002, does not add

any information about the results of the VIGOR study."  A copy of the revised "Patient

Information Sheet" is attached as Exhibit "D" hereto.

48.     The "Patient Information" sheet is the only written document that is provided to a

patient for whom Vioxx is prescribed.

49.     Both the initial labeling and the revised labeling are ineffective because they do

not properly advise physicians and patients of the potential gastrointestinal side effects of Vioxx

and of the significant increased risk of cardiovascular adverse events.

50.     Despite knowledge of the ineffectiveness of the warnings, and despite knowledge

that Vioxx may cause serious gastrointestinal and cardiovascular side effects, Defendant Merck

concealed and/or downplayed the dangers associated with Vioxx, and continued to market the

drug in the United States and abroad.  In its 2001 Annual Report, for example, Defendant Merck

states:

> The Company also noted that a number of federal and state lawsuits, involving
> individual claims as well as purported class actions, have been filed against the
> Company with respect to *Vioxx*…The lawsuits include allegations regarding
> gastrointestinal bleeding and cardiovascular events.  The Company believes that
> these lawsuits are completely without merit and will vigorously defend them.

51.     Further, in its January 23, 2001 8-K filing with the Securities and Exchange

Commission, the Defendant fails to mention the cardiac and cardiothrombotic findings of the

VIGOR study:

> "Our results reflect the strength of our growth strategy," Mr. Gilmartin said.  "Our
> five key products, **VIOXX**, ZOCOR, COZAAR/HYZAAR*, FOSAMAX and
> SINGULAIR, drove Merck's performance for the year and created a powerful
> platform for growth."  These products accounted for 57% of Merck's worldwide
> human health sales for 2000 and 61% for the fourth quarter.

> "Each of the five medicines offers unique competitive advantages," Mr. Gilmartin
> said.  **Vioxx**, a once-a-day medicine, is the only COX-2 indicated in the United

States both for osteoarthritis and acute pain.  Since its extraordinarily successful 1999 launch, **Vioxx** has become the world's fastest growing branded prescription arthritis medicine, and it is already Merck's second largest-selling medicine.  In the United States, **Vioxx** now accounts for approximately 50 percent of new prescriptions in the COX-2 class, despite being second to market in this class in the United States.  **Vioxx** achieved $2.2 billion in sales for the full year 2000, with $700 million in the fourth quarter.

A Food and Drug Administration (FDA) Advisory Committee meeting is scheduled for Feb. 8 to review labeling changes Merck has requested based on the strong results of the VIGOR Study.  This 8,000-patient gastrointestinal outcomes research study, in which **Vioxx** reduced the risk of serious gastrointestinal complications by half compared to the NSAID Naproxen, was published in November in THE NEW ENGLAND JOURNAL OF MEDICINE.  Another study, presented in November, showed that **Vioxx** significantly reduced moderate-to-severe acute pain after dental surgery to a greater degree compared to codeine combined with acetaminophen.

52.     Despite the foregoing, Defendant Merck continued to represent to consumers that Vioxx was safe, and that any cardiovascular and/or cardiothrombotic side effects were not associated with the drug.  Defendant has also downplayed any potential gastrointestinal side effects of the drug, promoting it as safer and more efficacious than other medications approved for treatment of similar conditions.

53.     At all times relevant to this litigation, Defendant Merck had a significant market share based upon claims of Vioxx's efficacy, a very aggressive marketing program which included financial incentives to sales teams, infusion of some 700 new sales representatives, and a massive direct-to-consumer advertising and physician sampling program. Defendant Merck wildly and successfully blitz-marketed Vioxx in the U.S. by undertaking an advertising campaign extolling the virtues of Vioxx in order to induce its widespread use. This direct-to-consumer marketing campaign consisted of advertisements, promotional literature to be placed in the offices of doctors and other health care providers and HMO's, and promotional materials provided directly to potential Vioxx users themselves. The advertising campaign as a whole

sought to create the image, impression and belief that the use of Vioxx was safe, had fewer side-effects and adverse reactions than other pain relief medications and would not interfere with daily life, even though Merck knew these representations were false. According to reports in the public press, Merck spent an estimated $45 million advertising Vioxx for a mere eight months in 2004. For the more than five years that Merck marketed Vioxx in the United States, it remained Merck's leading drug for control of acute pain and chronic pain associated with osteoarthritis, rheumatoid arthritis, migraine headaches and dysmenorrheal pain.

54.     In the television advertising directed to consumers, Merck promoted Vioxx in the following widely-disseminated television advertisement featuring testimony from former Olympic skater Dorothy Hamill:

> It seems like only yesterday. When I started skating at 8 years old – I never thought I'd experience the thrill of winning a medal. With all the great memories has come another thing I thought I'd never experience – the pain of osteoarthritis.
>
> Vioxx is here, a prescription medicine for osteoarthritis pain. With one little pill a day, Vioxx can provide powerful super 25 hour….relief. Vioxx specifically targets only the Cox-2 enzyme. A key source of arthrtitis pain. [Superimpose "See our ad in <u>Prevention</u>"].
>
> People with allergic reactions such as asthma to aspirin – see our ad in <u>Prevention</u> – or other arthritis medicines should not take Vioxx. In rare cases, serious stomach problems such as bleeding can occur without warning. Tell your doctor, if you have liver or kidney problems. For more information [superimpose] 1-888-36VIOXX] talk to your doctor about once daily Vioxx for the relief of osteoarthritis pain.
>
> Perhaps my biggest victory is to be able to plan my day around my life – and not my pain.
>
> [Superimpose: Your results may vary. Ask your doctor if Vioxx is right for you. Vioxx for every day victories].

55.     Notably absent from this advertisement was any reference to the serious cardiovascular side-effects manifested in Merck's clinical trials of Vioxx.

56.     In print advertisements, Merck advertised Vioxx by picturing Dorothy Hamill

accompanying the statements:

> Along with the all the great memories has come something I thought I'd never
> experience – the pain of osteoarthritis.

The advertisements continued:

> Vioxx is here. 24-hour relief of the most common type of arthritis pain,
> osteoarthritis.

> It isn't about going for a medal. Or feeling like a kid again. It's about controlling
> the pain that can keep you from doing everyday things. And Vioxx may help.
> Vioxx is a prescription medicine for osteoarthritis, the most common type of
> arthritis.

> ONE PILL – ALL DAY AND ALL NIGHT RELIEF.

> You take Vioxx only once a day. Just one little pill can relieve your pain all day
> and all night for a full 24 hours…

> VIOXX EFFECTIVELY REDUCED PAIN AND STIFFNESS

> In clinical studies, one daily Vioxx effectively reduced pain and stiffness. So
> Vioxx can help make it easier for you to do the things you want to do. By going
> for a morning glide on the ice.

> TAKE WITH OR WITHOUT FOOD

> Vioxx doesn't need to be taken with food. So you don't have to worry about
> scheduling Vioxx around meals.

> IMPORTANT INFORMATION ABOUT VIOXX

> People with allergic reactions, such as asthma, to aspirin or other arthritis
> medicines should not take Vioxx. In rare cases, serious stomach problems, such as
> bleeding can occur without warning. Tell your doctor if you have liver or kidney
> problems, or are pregnant. Also, Vioxx should not be used by women in late
> pregnancy. Vioxx has been extensively studied in large clinical trials. Commonly
> reported side-effects include upper respiratory infection, diarrhea, nausea and
> high blood pressure. ASK YOUR DOCTOR OR HEALTHCARE
> PROFESSIONAL ABOUT VIOXX. CALL 1-800 9MERCK8 FOR MORE
> INFORMATION, OR VISIT VIOXX.COM. PLEASE SEE IMPORTANT
> ADDITIONAL INFORMATION BELOW.

57.     These direct-to-consumer advertisements make absolutely no mention of Vioxx's association with cardiovascular or cerebrovascular disease, notwithstanding that Merck had reason to know and, in fact, did know that Vioxx was causally related to serious cerebrovascular and cardiovascular side-effects.

58.     As a result of such marketing, Vioxx gained a significant market share in competition with Celebrex that Merck would not have gained if it had not suppressed information about Vioxx and/or made false representations of Vioxx's superiority and efficacy. In public statements to the press, Merck has estimated that 105 million U.S. prescriptions for Vioxx were written between May 1999 and August 2004. Based on this estimate, Merck has estimated that approximately 20 million patients have taken Vioxx in the U.S. since the launch of the drug in May of 1999. Sales of Vioxx soared to 2.5 billion dollars in 2003 alone on the strength of the biggest direct-to-consumer marketing campaign ever undertaken by a pharmaceutical company for a prescription medication.

59.     Adverse events continued to occur because of Vioxx use, and Merck continued to deny Vioxx's dangers. According to the FDA Adverse Event Reporting System (ERS), through October 2003, almost 2,000 adverse cardiovascular events were experienced by Vioxx users, including myocardial infarctions, cardiac arrest and cardiac failures.

60.     On October 30, 2002, the Wall Street Journal reported that another study, sponsored by Merck, presented at the annual meeting of the American College of Rheumatology, confirmed an increased "risk of heart attacks in patients taking the pill [Vioxx]." According to the Wall Street Journal article, within the first 30 days of taking Vioxx, the risk of heart attack was increased 30% as compared to patients taking Celebrex.

61.     In or about November 2003, Merck received preliminary results of a study it had commissioned, performed by Merck personnel and Alex Walker, an executive at the Ingenix unit of United Health Group. This study revealed a statistically significant, greater incidence of myocardial infarction or unstable angina pectoris associated with the use of Vioxx compared to the NSAIDs ibuproen or diclofenac. The risk did not vary significantly by duration, use or dose. Merck never revealed the existence, much less the results of the study, prior to its withdrawal of Vioxx from the market in late September 2004.

62.     In August 2004, Health Day News quoted the FDA as finding "this and other studies cast serious doubt on the safety" of Vioxx and that Celebrex "may be safer."

63.     However, shortly after the August 24, 2004 FDA statement, Peter S. Kim, President of Merck Research Laboratories was quoted as saying that Merck "strongly disagrees" with the findings of this new study. On August 26, 2004, The Street.com reported: "Merck Thursday released a detailed critique questioning the study's significance."

64.     On or about November 8, 1999, Merck submitted an IND application to the FDA to conduct clinical trials of Vioxx to pursue a claim that Vioxx was effective in preventing colon polyps and ultimately colon cancer. Merck undertook another clinical study called the Adenomatous Polyp Prevention on Vioxx ("APPROVe") trial of Vioxx, 25mg/day, to try and demonstrate the drug's effectiveness in preventing colon polyps. At its first meeting in or about January 2002, the External Safety Monitoring Board ("ESMB") for the APPROVe trial voiced concerns regarding "trends noted in serious adverse clinical events and in thrombotic events."

65.     On or about September 17, 2004, the ESMB noted that "the trend for excess risk" for heart attacks and strokes "has continued to grow at each meeting over the last 1-2 years." Consequently, the ESMB recommended that patients participating in APPROVe be instructed to

discontinue the study treatment. Merck abruptly discontinued the APPROVe study in mid-September 2004.

66.     On or about September 27, 2004, Merck advised the FDA of the ESMB's recommendation. On or about September 28, 2004, Merck informed the FDA that it was withdrawing Vioxx from the market.

67.     Merck has claimed since the release of the APPROVe results in September 2004 that the risk of heart attack and stroke did not appear until after subjects had taken Vioxx for more than 18 months, based on so-called "adjudicated" events. However, Merck has concealed from the public its internal analysis of "investigator reported" cardiovascular events, which showed that the Vioxx rate exceeded placebo throughout the entire period of the study.

68.     Furthermore, Merck has concealed its internal analysis of such events showing a statistically significant increased risk for Vioxx versus placebo in the 0 to 18-month segment as well as the 19-36 month segment of the study. In a graph of the "Kaplan-Meier cumulative rate curves" for Vioxx versus placebo, the Vioxx curve begins to exceed the placebo curve after 2-3 months, and separates from the placebo incidence curve by an increasing margin for the remainder of the 36 month study. Merck's concealment of this data has been willful, intentional, and designed to minimize its potential liability to plaintiffs and the public.

69.     The APPROVe study demonstrated that Vioxx doubled the risk of heart attack and stroke for consumers who had taken the drug for a period in excess of 18 months, as compared to subjects taking a placebo for the same period of time.

70.     In APPROVe, the relative risk for cardiovascular events for Vioxx patients already at a heightened cardiovascular risk was particularly high. For example, Vioxx patients with a history of symptomatic atherosclerotic cardiovascular disease were approximately 9 ½

times more likely to suffer such events than their placebo counterparts, and those with a history

of diabetes were approximately six times more likely to experience such events than patients in

the placebo arm.

71.     In March 2005, an article by Thal reported on exposure to Vioxx among patients

in a trial related to Alzheimer's disease. The article reported that during a follow-up of patients

for a median duration of approximately 29 weeks in the Vioxx group and 20 weeks in the

placebo group, there were 17 deaths in the Vioxx group compared to only 5 in the placebo group.

Twelve of those deaths (11 in the Vioxx group and 1 in the placebo group) occurred more than

48 weeks after treatment discontinuation. There were five fatal myocardial infarctions and two

fatal cardiac arrests in the Vioxx group versus none in the placebo group for either of these

adverse events. The authors did not provide a statistical analysis of the data, but they are clearly

a cause for concern that the effects of Vioxx on the cardiovascular system may continue long

after discontinuation of drug exposure.

72.     Defendant misrepresented to Plaintiff and the health care industry the safety and

effectiveness of Vioxx and/or concealed material information, including adverse information

regarding the safety and effectiveness of Vioxx.

73.     Defendant made misrepresentations and actively concealed adverse information at

a time when Defendant knew, or should have known, that Vioxx had defects, dangers, and

characteristics that were other than what Defendant had represented to Plaintiff and the health

care industry generally.  Specifically, Defendant misrepresented to and/or actively concealed

from Plaintiff, the health care industry, and the consuming public that:

> a.     Vioxx had statistically significant increases in cardiovascular and
>
>        cerebrovascular side effects, including without limitation thrombosis,

myocardial infarction, stroke (and sudden onset death), which could result in serious injury or death;

b.    There had been insufficient and/or company run studies regarding the safety and efficacy of Vioxx before and after its product launch;

c.    Vioxx was not fully and adequately tested for the cardiovascular and cerebrovascular side effects at issue herein;

d.    Other testing and studies showed the risk of (or actual serious adverse risks; and/or that there was a greatly increased risk of) such cardiovascular and cerebrovascular events and death; and that there was a confirmed mechanism by which these thrombotic or cardiovascular events occurred as reported in the scientific literature.

74.    These misrepresentations and/or active concealment were perpetuated directly and/or indirectly by Defendant.

75.    Defendant knew or should have known that these representations were false and made the representations with the intent or purpose that Plaintiff would rely on them, leading to the use of Vioxx.

76.    If Defendant had not engaged in this conduct, consumers, such as the Plaintiff would have switched from Vioxx to safer products or refrained wholly from its use.

77.    Plaintiff alleges that the defendant's marketing strategies, including, without limitation, the detail and sampling programs and direct-to-consumer advertising, targeted Plaintiff to induce her to use Vioxx. At the time the Defendant distributed, manufactured and marketed Vioxx, Defendant intended that Plaintiff would rely on the marketing, advertisements and product information propounded by it.

78.     As a direct and proximate result of Defendant's misconduct as set forth herein, Plaintiff Katherine Davis has had physical and mental pain and suffering, has experienced physical and mental disabilities, and has incurred medical expenses and other damages for which she is entitled to compensatory and/or punitive damages, as set forth herein.

## COUNT I

### (Negligence)

Plaintiff Katherine Davis adopts and incorporates by reference each and every allegation of fact contained in paragraphs 1 through 78 of this Complaint as though the same were fully and completely set forth herein.

79.     Defendant, Merck, owed all individuals purchasing Vioxx in the ordinary stream of commerce, including Plaintiff Katherine Davis, the duty of reasonable care and safety. Defendant's duties included but were not limited to taking all reasonable and necessary care to 1) properly design, test and manufacture Vioxx; 2) safeguard individuals from hazards of Vioxx it knew or should have known about; 3) discover latent defects or hazards of the product; 4) ensure the drug was safe and effective; 4) inform the public and those prescribing Vioxx of the potential hazards of the drug, including the risk of cardiovascular accidents.

80.     Defendant Merck breached said duties in that Vioxx was defective, unreasonably dangerous and hazardous in one or more of the following ways:

(a)     The drug failed to include adequate warnings that would alert consumers and physicians to the potential risks and serious side effects of the drug;

(b)     Defendant failed to adequately and properly test the drug before placing the drug on the market;

(c)     Defendant failed to conduct sufficient testing on the drug, which, if properly performed, would have showed that the drug had serious side effects including, but not limited to, adverse cardiac and cardiovascular events;

(d)     Defendant failed to adequately warn Plaintiff Katherine Davis that the testing that was done revealed an increased risk of adverse cardiac and cardiovascular events related to the drug;

(e)     Defendant failed to adequately warn Plaintiff Katherine Davis that the use of the drug carried a risk of temporary or permanent disability or death due to adverse cardiovascular events and other serious side effects;

(f)     Defendant failed to provide adequate post-marketing warnings or instructions after the defendant knew or should have known of the significant risks associated with the use of the drug;

(g)     Defendant encouraged misuse and overuse of the drug while downplaying the side effects to doctors and the public and by overstating the benefits of Vioxx in order to make a profit from its sale.

81.     Defendant knew or should have known that the drug caused unreasonably dangerous risks and serious side effects of which the Plaintiff Katherine Davis would not be aware. Defendant nevertheless advertised, marketed, sold and distributed the drug knowing that there were safer methods for the treatment.

82.     In addition, Merck had a legal duty to comply with the U.S. Food, Drug and Cosmetics Act, U.S. Code 21 USC §301 et seq., and regulations promulgated thereunder.

83.     Merck negligently and carelessly violated the laws and regulations of the United States including, but not limited to the following: 21 CFR §330.10(a)(4)(v) (Labeling); 21 CFR

§369.10 (Labeling); 21 CFR §§201.56 and 201.57(d), (c) and (f) (Labeling); 21 CFR §1.21 (a) (Labeling); 21 CFR §600.80 (Postmarketing Reporting of Adverse Experiences); 21 CFR §§314 and 50 (Post Marketing Reports of Adverse Drug Experiences). The violations of those and other statutes and regulations constitute negligence per se.

84.     Merck knew or should have known that consumers, like Plaintiff Katherine Davis, would suffer injury as a result of its failure to exercise ordinary care as described above.

85.     As a direct and proximate result of the negligence of Defendant, Plaintiff Katherine Davis, with no contributory negligence on her part, suffered serious and permanent injuries including, but not limited to, a cardiovascular event, and other physical injuries and disability, resulting in hospitalization, rehabilitation and ongoing medical treatment.

86.     As a further direct and proximate result of defendant's negligence, Plaintiff Katherine Davis, with no contributory negligence on her part, was caused to suffer severe physical and emotional pain and suffering, mental anguish, loss of capacity for the enjoyment of life, and to incur significant costs for medical care.

87.     At all times relevant hereto, Defendant Merck actually knew of the defective nature of the product as herein set forth and continued to design, manufacture, market and sell the product so as to maximize sales and profits at the expense of public health and safety. Defendant's conduct exhibits a wanton or reckless disregard for human life and such an entire want of care as to establish that its actions were a result of fraud, evil motive, actual malice, and the conscious and deliberate disregard of foreseeable harm to Plaintiff. Therefore, Plaintiff is entitled to punitive damages.

WHEREFORE, Plaintiff Katherine Davis prays for relief as follows:

A.     For $10,000,000 in compensatory damages;

B.  For $20,000,000 in punitive damages;

C.  For compensation for medical, incidental and hospital expenses;

D.  For interest and costs;

E.  For such other extraordinary, declaratory and/or injunctive relief as permitted by law as necessary to assure that Plaintiff Katherine Davis has an effective remedy; and

F.  For such further relief as this Court deems necessary, just and proper.

## COUNT II

### (Strict Product Liability Design Defect)

Plaintiff Katherine Davis adopts and incorporates by reference each and every allegation and fact contained in paragraphs 1 through 87 of this Complaint as though the same were fully and completely set forth herein.

88.  At all times material hereto, Defendant engaged in the business of selling, distributing, supplying, marketing, manufacturing, developing, designing and promoting the drug Vioxx in the course of Defendant's business.

89.  Merck sold the product Vioxx, which was ingested by Plaintiff Katherine Davis, as described in this Complaint.

90.  Vioxx, as manufactured by Defendant Merck, was defective at the time it was sold by the defendant and/or left Defendant's control.

91.  The Vioxx ingested by Plaintiff Katherine Davis, was expected to reach the user without substantial change from how it was sold.

92.  The Vioxx ingested by Plaintiff Katherine Davis reached her without substantial change from how it was sold.

93.     Plaintiff Katherine Davis was a person who would be reasonably expected to consume the product.

94.     Vioxx was used by Plaintiff Katherine Davis in a manner reasonably anticipated by Defendant.

95.     Vioxx when sold, distributed, supplied, manufactured, designed, developed, marketed and promoted by Defendant was unreasonably dangerous when put to a reasonably anticipated use as said product causes or contributes to serious adverse cardiac and cerebrovascular events including, but not limited to heart attack, stroke and hypertension.

96.     Vioxx when sold, distributed, supplied, manufactured, designed, developed, marketed and promoted by Defendant was defective when it left the hands of the Defendant in that said product was more dangerous than the ordinary user or consumer would expect of said drug product.

97.     At all times material hereto, Vioxx was sold, distributed, supplied, manufactured, designed, developed, marketed and/or promoted by Defendant in a defective and unreasonably dangerous condition in ways which include, but are not limited to, one or more of the following particulars:

(a)     When placed in the stream of commerce, the drug contained unreasonably dangerous design defects and was not reasonably safe as intended to be used, subjecting Plaintiff to risks which exceeded the benefits of the drug;

(b)     When placed in the stream of commerce, the drug was defective in design and formulation, making its use more dangerous than an ordinary consumer would expect and more dangerous than other

32

risks associated with other treatments for pain relief that were
available;

(c)     The drug was insufficiently tested;

(d)     The drug caused harmful side effects which outweighed any
potential utility;

(e)     The drug was not accompanied by adequate instructions and/or
warnings to fully apprise the consumers, including Plaintiff, of the
full nature or extent of the risks and side effects associated with its
use.

98.     As a direct and proximate result of the defective design of Defendant's product
Vioxx, Plaintiff Katherine Davis sustained serious and permanent injuries, including, but not
limited to, a cerebrovascular event, and other physical injuries; disability, mental anguish, severe
pain and suffering; loss of capacity for the enjoyment of life; expenses for medication,
physicians, hospitals, medical and nursing care and treatment; and permanent disability.

99.     At all times relevant hereto, Defendant Merck actually knew of the defective
nature of the product as herein set forth and continued to design, manufacture, market and sell
the product so as to maximize sales and profits at the expense of public health and safety.
Defendant's conduct exhibits a wanton or reckless disregard for human life and such an entire
want of care as to establish that its actions were a result of fraud, evil motive, actual malice, and
the conscious and deliberate disregard of foreseeable harm to the Plaintiff Katherine Davis.
Therefore, Plaintiff Katherine Davis is entitled to punitive damages.

WHEREFORE, Plaintiff Katherine Davis prays for relief as follows:

A.     For $10,000,000 in compensatory damages;

B.      For $20,000,000 in punitive damages;

C.      For compensation for medical, incidental and hospital expenses;

D.      For interest and costs;

E.      For such other extraordinary, declaratory and/or injunctive relief as permitted by law as necessary to assure that Plaintiff has an effective remedy; and

F.      For such further relief as this Court deems necessary, just and proper.

## COUNT III

### (Strict Products Liability – Failure To Warn)

Plaintiff Katherine Davis adopts and incorporates by reference each and every allegation of fact contained in paragraphs 1 through 99 of her Complaint as though the same were fully and completely set forth herein.

100.    Defendant sold Vioxx in the course of Defendant's business.

101.    Vioxx was defective and unreasonably dangerous when it left the possession of Defendant in that it contained warnings insufficient to alert consumers, including Plaintiff Katherine Davis, to the dangerous risks and reactions associated with the drug including, but not limited to, adverse cardiac events, cardiovascular accidents and other serious and life-threatening side effects.

102.    Plaintiff Katherine Davis used the drug for its intended purposes in a manner reasonably anticipated without knowledge of its defective and dangerous characteristics.

103.    Plaintiff Katherine Davis was an ordinary consumer and user of the Vioxx product sold, distributed, supplied, manufactured, designed, developed, marketed and/or

promoted by Defendant and, therefore, it was foreseeable that Plaintiff would purchase and use the product as indicated herein.

104.    The warnings that were given by Defendant were not accurate or clear, but were inadequate as to the frequency, character, severity, and spectrum of injuries caused by Vioxx.

105.    Defendant had a continuing duty to warn Plaintiff Katherine Davis of the dangers associated with the drug.

106.    As a direct and proximate result of the Defendant's failure to warn, Plaintiff Katherine Davis sustained serious and permanent injuries including, but not limited to, a cerebrovascular event, and other physical injuries; disability, mental anguish, severe pain and suffering; loss of capacity for the enjoyment of life; expenses of medication, physicians, hospitals, medical and nursing care and treatment; and permanent disability.

107.    At all times relevant hereto, Defendant Merck actually knew of the defective nature of the product as herein set forth and continued to design, manufacture, market and sell the product so as to maximize sales and profits at the expense of public health and safety. Defendant's conduct exhibits a wanton or reckless disregard for human life and such an entire want of care as to establish that their actions were a result of fraud, evil motive, actual malice, and the conscious and deliberate disregard of foreseeable harm to the Plaintiff Katherine Davis. Therefore, Plaintiff Katherine Davis is entitled to punitive damages.

**WHEREFORE**, Plaintiff Katherine Davis prays for relief as follows:

A.    For $10,000,000 in compensatory damages;

B.    For $20,000,000 in punitive damages;

C.    For compensation for medical, incidental and hospital expenses;

D.    For interest and costs;

35

E.     For such other extraordinary, declaratory and/or injunctive relief as permitted by law as necessary to assure that Plaintiff Katherine Davis has an effective remedy; and

F.     For such further relief as this Court deems necessary, just and proper.

## COUNT IV

### (Fraud)

Plaintiff Katherine Davis adopts and incorporates by reference each and every allegation of fact contained in paragraphs 1 through 107 of the Complaint as though the same were fully and completely set forth herein.

108.    Defendant concealed facts regarding Vioxx from the consuming public, including Plaintiff Katherine Davis, to which it had a duty to disclose such facts.

109.    The facts concealed and not disclosed include, but are not limited to, those set forth in the general allegations of this Complaint.

110.    Each of the facts concealed and not disclosed was material.

111.    Defendant concealed material facts to the consuming public, including Plaintiff, with the intent that the consuming public, like Plaintiff Katherine Davis, would take a course of action that it would otherwise not have taken if it had been informed of the actual facts known to Merck, including, but not limited to, the totality of the risks associated with the ingestion of Vioxx.

112.    Plaintiff Katherine Davis, and her prescribing physician's reliance upon Defendant's misrepresentations was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Vioxx. Defendant aggressively marketed the use of Vioxx and

concomitantly downplayed the risks, inducing her physician to prescribe the drug and inducing Plaintiff Katherine Davis to use the drug.

113.    Plaintiff Katherine Davis took such action relying on the assumption that the undisclosed facts did not exist and/or were different than they actually were.

114.    As a direct and proximate result of her reliance on the incomplete and inaccurate information communicated by Defendant, and her assumption that the non-disclosed facts about the risks associated with the use of Vioxx did not exist, Plaintiff Katherine Davis sustained serious and permanent injuries including, but not limited to, a cerebrovascular event, and other physical injuries; disability, mental anguish, severe pain and suffering; loss of capacity for the enjoyment of life; expenses of medication, physicians, hospitals, medical and nursing care and treatment; and permanent disability.

115.    At all times relevant hereto, Defendant actually knew of the defective nature of the product as herein set forth and continued to design, manufacture, market and sell the product so as to maximize sales and profits at the expense of public health and safety.  Defendant's conduct exhibits a wanton or reckless disregard for human life and such an entire want of care as to establish that its actions were a result of fraud, evil motive, actual malice, and the conscious and deliberate disregard of foreseeable harm to Plaintiff.  Therefore, Plaintiff Katherine Davis is entitled to punitive damages.

**WHEREFORE**, Plaintiff Katherine Davis prays for relief as follows:

      A.     For $10,000,000 in compensatory damages;

      B.     For $20,000,000 in punitive damages;

      C.     For compensation for medical, incidental and hospital expenses;

      D.     For interest and costs;

E.  For such other extraordinary, declaratory and/or injunctive relief as permitted by law as necessary to assure that Plaintiff has an effective remedy; and

**F.**  For such further relief as this Court deems necessary, just and proper.

## COUNT V

### (Breach of Express Warranties)

Plaintiff Katherine Davis adopts and incorporates by reference each and every allegation of fact contained in paragraphs 1 through 115 of this Complaint as though the same were fully and completely set forth herein.

116.  Vioxx, which was designed, tested, manufactured, distributed, promoted and sold by Defendant, was expected to, and did, reach Plaintiff Katherine Davis without a substantial change in its condition.

117.  Defendant, through, but not limited to, its labeling, package inserts, submissions to the FDA, advertising and promotional materials, expressly warranted that Vioxx was safe for the use for which it was intended, namely as a pain relief medication.

118.  Defendant breached said express warranties in that Vioxx was unsafe in light of the risk of life-threatening side effects associated with its use, including, but not limited to, adverse cardiac events and cardiovascular events.

119.  Plaintiff Katherine Davis relied to her detriment on the express warranties of Defendant.

120.  As a direct and proximate result of Defendant's breach of express warranties, Plaintiff Katherine Davis sustained serious and permanent injuries including, but not limited to, a cerebrovascular event, and other physical injuries; disability, mental anguish, severe pain and

suffering; loss of capacity for the enjoyment of life; expenses of medication, physicians, hospitals, medical and nursing care and treatment; and permanent disability.

      **WHEREFORE**, Plaintiff Katherine Davis prays for relief as follows:

      A.    For $10,000,000 in compensatory damages;

      B.    For compensation for medical, incidental and hospital expenses;

      C.    For interest and costs;

      D.    For such other extraordinary, declaratory and/or injunctive relief as permitted by law as necessary to assure that Plaintiff has an effective remedy; and

      F.    For such further relief as this Court deems necessary, just and proper

## COUNT VI

### (Breach of Implied Warranties)

      Plaintiff Katherine Davis adopts and incorporates by reference each and every allegation of fact contained in paragraphs 1 through 120 of this Complaint as though the same were fully and completely set forth herein.

      121.    Vioxx, which was designed, tested, manufactured, distributed, promoted and sold by Defendant, was expected to, and did, reach Plaintiff Katherine Davis, without a substantial change in its condition.

      122.    Defendant, through, but not limited to, its labeling, package inserts, submissions to the FDA, advertising and promotional materials, impliedly warranted that Vioxx, was of merchantable quality and safe for the use for which it was intended, namely as a pain relief medication.

123.     Defendant breached said implied warranties in that Vioxx was unsafe in light of the risk of life-threatening side effects associated with its use, including, but not limited to, adverse cardiac events and cardiovascular accidents.

124.     Plaintiff Katherine Davis reasonably relied, to her detriment, on the implied warranties of Merck.

125.     As a direct and proximate result of Defendant's breach of implied warranties, Plaintiff Katherine Davis sustained serious and permanent injuries including, but not limited to, a cerebrovascular event, and other physical injuries; disability, mental anguish, severe pain and suffering; loss of capacity for the enjoyment of life; expenses of medication, physicians, hospitals, medical and nursing care and treatment; and permanent disability.

**WHEREFORE**, Plaintiff Katherine Davis prays for relief as follows:

      A.     For $10,000,000 in compensatory damages;

      B.     For compensation for medical, incidental and hospital expenses;

      C.     For interest and costs;

      D.     For such other extraordinary, declaratory and/or injunctive relief as permitted by law as necessary to assure that Plaintiff has an effective remedy; and

      **E.**  For such further relief as this Court deems necessary, just and proper.

## COUNT VII

### (Deceptive Trade Practices)

Plaintiff Katherine Davis adopts and incorporates by reference each and every allegation of fact contained in paragraphs 1 through 125 of this Complaint as though the same were fully and completely set forth herein.

126.    Defendant, by misrepresenting the safety of Vioxx and concealing its risks with the intent that consumers like Plaintiff would rely upon such concealment, violated MD. Code Ann., Com.Law §§ 13-101 et seq. (1999).

127.    In violation of the Maryland Consumer Protection Act, Defendant withheld the risk of adverse cardiovascular and cardiac events associated with its product Vioxx, which was known to Defendant.

128.    As a direct and proximate result of Defendant's violation of the Maryland Consumer Protection Act, Plaintiff sustained serious and permanent injuries including, but not limited to, a cerebrovascular event, and other physical injuries; disability, mental anguish, severe pain and suffering; loss of capacity for the enjoyment of life; expenses of medication, physicians, hospitals, medical and nursing care and treatment; and permanent disability.

**WHEREFORE**, Plaintiff Katherine Davis prays for relief as follows:

A.    For $10,000,000 in compensatory damages;

B.    For reasonable attorney's fees;

C.    For compensation for medical, incidental and hospital expenses;

D.    For interest and costs;

E.    For such other extraordinary, declaratory and/or injunctive relief as permitted by law as necessary to assure that Plaintiff has an effective remedy; and

F.    For such further relief as this Court deems necessary, just and proper.

*Patricia Kasputys*

Peter G. Angelos (Fed Bar #01645)
M. Albert Figinski (Fed Bar #02291)
H. Russell Smouse (Fed Bar #01637)
Patricia J. Kasputys (Fed Bar #03775)
Mary V. McNamara-Koch (Fed. Bar #26591)
Attorneys for Plaintiffs

**LAW OFFICES OF PETER G. ANGELOS, P.C.**
100 North Charles Street, 20th Floor
Baltimore, Maryland 21201
Telephone: 410-649-2000
Facsimile: 410-649-2101

## REQUEST FOR JURY TRIAL

Plaintiffs, by their undersigned counsel, hereby request a jury trial on all counts in this action.

*Patricia Kasputys*

Patricia J. Kasputys