FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 MAR 22 PM 4:02

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| | * | |

* * * * * * * * * * * * * * * * * *

## RESPONSE OF DEFENDANT MERCK & CO., INC. TO PLAINTIFFS' LETTER BRIEF REGARDING OGILVY, DDB AND MILLWARD THIRD-PARTY DISCOVERY

Defendant Merck & Co., Inc. ("Merck") respectfully submits this response to the PSC's March 14, 2006 letter to the Court related to third-party discovery of certain Merck contractors. (Letter from Russ M. Herman, Esq. to Honorable Eldon E. Fallon (Mar. 14, 2006) ("PSC Letter") (attached at Tab A).)

As set forth below, the gist of the PSC Letter – that Merck has waived the attorney-client privilege by sharing legal advice with DDB Communications Group, Inc. ("DDB"), Ogilvy Public Relations Worldwide, Inc. ("Ogilvy"), and Millward Brown, Inc. ("Millward") (or collectively, "the independent contractors") – is refuted by well established caselaw recognizing that a company does **not** waive the attorney-client privilege where, as here, it shares and/or engages in privileged communications with independent contractors who: (1) function in a similar manner to employees of the company; (2) require legal advice to carry out their

1

Fee
Process
X Dktd
CtRmDep
Doc. No.

802597v.1

contractual obligations; and (3) are expected to preserve the confidential nature of the privileged information.

Moreover, Merck's contracts with the independent contractors make clear that Merck has contractual rights in materials generated pursuant to the contractual relationship. Thus, even if there were no privileged documents at issue, Merck still would have the contractual right to review the documents before production by its contractors.

Finally, the review contemplated by Merck will not materially impede the prompt production of the documents sought by plaintiffs because Merck is reviewing the documents on an expedited, rolling basis in tandem with the contractors' own attorneys. Accordingly, the Court should reject plaintiffs' efforts to deprive Merck of the ability to review the documents at issue and protect those that are privileged from production.

## **BACKGROUND**

Beginning in 1998, Merck contracted with DDB and Ogilvy to provide advertising and public relations services, respectively, for the pharmaceutical company, in connection with Vioxx. (*See* Declaration of Molly Bucholz ("Bucholz Decl.") ¶ 5 (attached at Tab B); Declaration of Sherry Pudloski ("Pudloski Decl.") ¶ 5 (attached at Tab C).) DDB was retained by Merck "to create advertising and promotional programs for Vioxx" and was "tasked with creating a multi-pronged campaign which included, but was not limited to, newspaper, magazine and broadcast advertisements." (Bucholz Decl. ¶ 5.) Ogilvy was retained by the company to assist in developing and implementing public relations plans for Vioxx. (Pudloski Decl. ¶ 5.)[1]

---

[1] Because Millward Brown's counsel has not yet reached an agreement with plaintiffs as to the scope of the Millward Brown production, Merck cannot yet ascertain what, if any, review it will need to undertake. Accordingly, this brief focuses on Ogilvy and DDB only. Should Merck determine that the scope of the Millward review necessitates a Merck review of those documents as well, Merck will shortly supplement this memorandum with a declaration detailing the relationship between Millward and Merck.

In carrying out their contractual obligations related to Vioxx, both DDB and Ogilvy were in the same position, in all relevant respects, as Merck employees. The two companies' employees worked as members of Merck's advertising and public relations "teams" and interacted with Merck employees on a regular basis. (Bucholz Decl. ¶ 10 ("DDB employees worked alongside Merck employees as members of Merck's advertising team for the drug Vioxx."); Pudloski Decl. ¶ 9 ("In my experience, Ogilvy employees worked alongside and under the direction of Merck employees as a part of the Vioxx public affairs team.").) DDB and Ogilvy personnel attended Vioxx-related meetings at Merck offices. (*See* Bucholz Decl. ¶ 9 ("With respect to the day-to-day interactions between DDB and Merck, DDB employees participated in meetings at Merck's offices on a regular basis and communicated with members of Merck's Medical/Legal Board via senior Merck employees regarding Vioxx on a regular basis."); Pudloski Decl. ¶ 9.) Like company employees, the two independent contractors also worked under Merck's close supervision. For example, "DDB was not permitted to act with respect to any advertising plan without Merck's prior approval, and was always understood to be operating at Merck's direction and instruction." (*See* Bucholz Decl. ¶ 5.) Similarly, "[i]t was understood that Merck retained the right to, at any time and in its sole discretion, terminate its relationship with Ogilvy and direct Ogilvy to cease work on any communications, materials, projects, or initiatives." (Pudloski Decl. ¶ 6.)

The contractors' work product was subject to close supervision by Merck's legal department because of the dense regulatory framework governing the labeling and promotion of prescription drugs like Vioxx. In order to ensure that the media advertisements, releases and reports created and disseminated by DDB and Ogilvy complied with relevant federal regulations, these materials were often submitted to the Department of Health and Human Services Division

802597v.1

of Drug Marketing, Advertising and Communications ("DDMAC") for review and comment. 21 CFR 314.81(b)(3).   The independent contractors routinely sought legal advice from Merck's legal department ("Merck legal"), via their Merck corporate contacts, regarding these submissions to DDMAC, including how to implement DDMAC's suggested changes to proposed materials. (*See* Bucholz Decl. ¶ 6; Pudloski Decl. ¶ 6.)   As a result, "DDB employees needed the approval of the Merck team assigned to deal with Vioxx-related advertising issues that were completely intertwined with the highly technical regulatory and legal issues that accompany the marketing and advertising of prescription drugs." (*See* Bucholz Decl. ¶ 11.)   Similarly, "the [Merck] attorneys were ultimately responsible for making sure that the materials Ogilvy created were consistent with all relevant laws and regulations." (Pudloski Decl. ¶ 8.)   Both DDB and Ogilvy "received feedback from Merck legal and other confidential information from Merck so that they could accomplish their work on the Vioxx project and would understand the various legal and regulatory issues facing Merck." (Pudloski Decl. ¶ 10; *see also* Bucholz Decl. ¶ 11.) In addition, the independent contractors were sources of important advertising and marketing information ultimately provided to Merck legal.   (*See* Pudloski Decl. ¶ 10 ("Ogilvy was tasked with providing Merck employees with relevant information that was ultimately conveyed to Merck legal to inform them of the company's public affairs strategies for Vioxx."); *see also* Bucholz Decl. ¶ 11.)

Merck also maintained a strict relationship of confidentiality with both DDB and Ogilvy. (Bucholz Decl. ¶ 7; Pudloski Decl. ¶ 7.)   Merck's relationship with each of these entities was formalized by agreements explicitly providing that all Merck information was to be kept strictly confidential and to be used only in furtherance of their duties as Merck consultants. (*See* Ogilvy Public Relations Agency Agreement ("Ogilvy Agreement") ¶ 8 (attached at Tab D); DDB

4

Advertising Agency Agreement ("DDB Agreement") ¶ 15 (attached at Tab E).)   The two companies complied strictly with these confidentiality provisions.   (*See* Bucholz Decl. ¶ 7 ("DDB employees were explicitly instructed not to disclose confidential information to persons outside Merck without receiving prior, written permission from Merck."); (Pudloski Decl. ¶ 7 ("Ogilvy kept confidential all feedback from Merck legal, generally relayed to Ogilvy by other Merck employees.").)

The contracts at issue also make clear that Merck has contractual rights over all materials generated pursuant to the agreements.  Merck's contractual agreements with DDB specify that: (a) DDB may not disclose any Merck confidential information to a third party without Merck's written consent; (b) Merck has a right to examine all information in DDB's files that relate to Merck; (c) all advertising materials prepared by DDB are the exclusive property of Merck; and (d) all information regarding advertising materials is to be made available to Merck at the termination of the agreement.  (DDB Agreement ¶¶ 7(a), 11, 12(d), 15.)  Similarly, the Ogilvy Agreement provides that: (a) Ogilvy shall not disclose any Merck confidential information to any third party without Merck's prior written consent; (b) all documents made or received by Ogilvy are Merck's property and "shall be delivered to Merck by [Ogilvy] immediately upon demand"; and (c) Ogilvy is to deliver to Merck all work product and documents or other property of Merck at the termination of the agreement.  (Ogilvy Agreement ¶¶ 8, 9, 11.)

On February 7, 2006, the PSC issued subpoenas to Ogilvy, DDB and Millward for documents related to Vioxx.   (PSC Letter at 1.)   During subsequent meet-and-confer communications, counsel for the independent contractors informed the PSC that they believed Merck has the right to perform a review of all subpoenaed documents to determine whether or not, among other things, they contain privileged Merck attorney-client communications.  On

March 2, 2006, the PSC sent a letter to Merck counsel asking the company to provide a legal basis for its claim of privilege.  (*See* Letter from Leonard A. Davis, Esq. to Phillip Wittman, Esq., at 2 (Mar. 2, 2006) (attached at Tab F).)  Merck timely responded, explaining that Merck's attorney-client privilege extends to DDB and Ogilvy because the two independent contractors served as the "functional equivalent(s)" of Merck employees.  (Letter from Phillip Whittman, Esq. to Leonard A. Davis, Esq. (Mar. 3, 2006) (attached at Tab G).)  The PSC responded with its March 14, 2006 letter seeking the Court's "assistance with [the] discovery dispute."  (PSC Letter at 1.)

## ARGUMENT

Contrary to the PSC's suggestion, Merck's sharing of privileged communications with DDB and Ogilvy did not waive the attorney-client privilege.  Moreover, while the fact that Ogilvy and DDB possess documents that fall within the scope of Merck's attorney-client privilege makes Merck's review essential, Merck would be entitled to review the documents in any event based on its contractual rights over the documents.  Finally, Merck is performing an expedited evaluation of these documents on a rolling basis and its review will not materially delay the production of the requested documents.

## I.  MERCK DID NOT WAIVE THE ATTORNEY-CLIENT PRIVILEGE BY SHARING PRIVILEGED INFORMATION WITH THE CONTRACTORS.

As plaintiffs concede in their letter to the Court, the attorney-client privilege extends to privileged communications disclosed to third-party independent contractors where a "significant relationship" exists between the client and the contractor.  (PSC Letter at 3-4.)  *See In re Bieter Co.*, 16 F.3d 929, 938 (8th Cir. 1994) (protecting communications shared with outside contractors where the relationship between client and contractor is "of the sort that justifies application of the privilege").  While there is no specific test for determining when the privilege

6

should extend to an independent contractor, courts generally consider the following three factors: (1) whether the contractor's involvement with the corporate client is similar to that of an employee, see *Bieter*, 16 F.3d at 938; *Twentieth Century Fox Film v. Marvel Enter. Inc.*, No. 01 Civ. 3016 (AGS), 2002 WL 31556383, at *2 (S.D.N.Y. Nov. 15, 2002); (2) whether the independent contractor performs the types of duties that require legal advice from the corporation's attorneys, see *Bieter*, 16 F.3d at 937-38; *FTC v. GlaxoSmithKline ("GSK")*, 294 F.3d 141, 147 (D.C. Cir. 2002); *W. Res., Inc., v. Union Pac. R.R. Co.*, 2002 WL 181494, at *4 (D. Kan. Jan. 31, 2002); *In re Copper Mkt. Antitrust Litig.*, 200 F.R.D. 213, 218 (S.D.N.Y 2001); and (3) whether the communications between the two entities were intended to be confidential and were treated as such. *See Burlington Indus., Inc. v. Rossville Yarn, Inc.*, No. Civ. A. 495-CV-0401-H, 1997 WL 404319 at *4 (N.D. Ga. June 3, 1997); *GSK*, 294 F.3d at 148.

Contrary to the PSC's suggestion, all three of those factors are present here. First, Merck's independent contractors were subject to Merck's supervision and functioned in the same manner as Merck employees. Second, the independent contractors were tasked with publicly disseminating information about Vioxx, a prescription drug, and are thus precisely the sort of independent contractor that must obtain advice from corporate counsel in order to fulfill its contractual obligations. And third, communications between Merck and the independent contractors were expected to remain – and did remain – strictly confidential.

### A.   The Independent Contractors Served As The Functional Equivalent Of Merck Employees And Thus Fell Within The Scope Of The Attorney-Client Privilege.

Courts have consistently held that where – as here – an independent contractor is subject to a company's supervision in a similar manner to an employee, communications with the contractor related to legal matters are protected by the attorney-client privilege. *See, e.g., Bieter*, 16 F.3d at 937 ("when applying the attorney-client privilege to a corporation or partnership, it is

7

inappropriate to distinguish between those on the client's payroll and those who are instead, and for whatever reason, employed as independent contractors." (internal quotation omitted)); *see also GSK*, 294 F.3d at 148 (concluding, with respect to public relations independent contractors, that "there is no reason to distinguish between a person on the corporation's payroll and a consultant hired by the corporation if each acts for the corporation and possesses the information needed by attorneys in rendering legal advice") (internal citation and punctuation omitted); *Ross v. UKI Ltd.*, No. 02 Civ. 9297 (WHP)JCF, 2004 WL 67221, at *5 (S.D.N.Y. Jan. 15, 2004) (concluding that real estate management services company "acted as the functional equivalent" of employees of a holding company with respect to certain real estate transactions for purposes of the attorney client privilege); *Neighborhood Dev. Collaborative v. Murphy*, No. CIV.A.-AW-03-1283, 2005 WL 3272711, at *4 (D. Md. Dec. 2, 2005) (similar).

The seminal case addressing this issue is *Bieter*, 16 F.3d at 936-38, a case also cited by the PSC. (*See* PSC Letter at 4.) In *Bieter*, the Eighth Circuit held that the attorney-client privilege extended to an independent contractor retained to provide advice and guidance regarding a commercial and retail development, finding that there was no principled basis to differentiate corporate employees from third-party contractors who are the "functional equivalent" of employees. *Id.* at 940.[2] In reaching this conclusion, the *Bieter* court focused on the fact that the independent contractor at issue in that case functioned as part of the corporate development team, working with corporate employees on a day-to-day basis, often attending meetings with corporate counsel, receiving communications from counsel, and taking direction from corporate leadership as to his duties and responsibilities. *Id.* at 934-939.

---

[2] Although *Bieter* involved the application of the privilege in the partnership context, the court noted that the analysis would be the same in the corporate context: "we. . . believe that when applying the attorney-client privilege to a corporation or partnership, it is inappropriate to distinguish between those on the client's payroll and those who are instead, and for whatever reason, employed as independent contractors." 16 F.3d at 937.

8

Other courts have reached the same conclusion based on similar factors.  *See, e.g., Twentieth Century Fox Film Corp.*, 2002 WL 31556383, at \*2; *In re Copper Mkt. Antitrust Litigation*, 200 F.R.D. at 219.  In *Twentieth Century Fox*, for example, the court extended the attorney-client privilege to individuals under contract to provide Fox with production-related services because the independent contractors worked on the same team as Fox employees and had similar access to the same privileged information.  2002 WL 31556383, at \*2.  In finding that privilege had not been waived, the court reasoned that merely because Fox chose to conduct its business through the use of independent contractors – rather than company employees – was no reason to limit the applicability of the attorney client privilege.  *Id.*  Similarly, in *In re Copper Market Antitrust Litigation*, the court held that communications with a "crisis management" public relations firm hired by a corporation to deal with "issues relating to publicity arising from high profile litigation" did not vitiate the attorney-client privilege.  200 F.R.D. at 215.  There, the court based its decision to uphold the privilege on a number of factors, including, *inter alia*, the following:  (1) the public relations firm "was, essentially, incorporated into [the corporation's] staff to perform a corporate function that was necessary in the context of" various litigations; (2) the public relations firm "possessed authority to make decisions on behalf of [the corporation] concerning its public relations strategy"; and (3) the public relations firm often consulted the corporation's attorneys in formulating this strategy.  *Id.* at 219.

The facts and holdings of *Bieter, Twentieth Century Fox* and *Copper Market Antitrust Litig.* clearly confirm the applicability of the attorney-client privilege here.  As noted above (*see* p. 2-4, *supra*), DDB and Ogilvy employees worked directly with Merck personnel as part of Merck's advertising, public relations and marketing "teams" for Vioxx.  (Bucholz Decl. ¶ 10; Pudloski Decl. ¶ 9.)  DDB employees "worked alongside Merck employees as members of

9

Merck's advertising team for the drug Vioxx" (Bucholz Decl. ¶ 10), while Ogilvy employees "worked alongside and under the direction of Merck employees as part of the Vioxx public affairs team." (Pudloski Decl. ¶ 9). Each of the consultants attended Vioxx-related meetings with Merck personnel (*see* Bucholz Decl. ¶ 9; Pudloski Decl. ¶ 9), and were often in communication with Merck employees (Bucholz Decl ¶¶ 9, 10; Pudloski Decl. ¶ 9). And perhaps most tellingly, just as in *Bieter*, the independent contractors were entirely dependent upon Merck to define the scope of their employment and direct their actions – just like regular employees of the company. (*See* Bucholz Decl. ¶ 5; Pudloski Decl. ¶ 6.)

In addition, the independent contractors received frequent feedback and advice from Merck legal to ensure compliance with the dense federal regulatory regime governing the labeling and promotion of prescription drugs. DDB communicated with the Merck Medical/Legal Board, via senior Merck employees, to ensure the company's advertising complied with FDA regulations. (Bucholz Decl. ¶ 9.) Similarly, the Merck attorneys were "ultimately responsible for making sure that the materials Ogilvy created were consistent with all relevant laws and regulations." (Pudloski Decl. ¶ 8.) Ogilvy employees even "[o]ccasionally attended meetings with Merck lawyers and received Vioxx-related communications by and between Merck's in-house lawyers and other Merck employees." (*See* Pudloski Decl. ¶ 9.)

Plaintiffs' cases do not undermine the obvious conclusion:  that the independent contractors were fully integrated into Merck's advertising and public relations departments and thus fall within the scope of the attorney-client privilege. Notably, the courts in *Energy Capital Corp. v. United States*, 45 Fed. Cl. 481, 492 (Ct. Cl. 2000) and *Horton v. United States*, 204 F.R.D. 670, 671 (D. Colo. 2002) (PSC Letter at 4-5) found no privilege because the parties seeking to avail themselves of the privilege had failed to provide any factual evidence to support

802597v.1

their claim that the nonparties were covered by the privilege, such as, the *Energy Capital* court suggested, an affidavit describing the relationship at issue. 45 Fed. Cl. at 492. Obviously, that is not the case here. In contrast to the parties in *Horton* and *Energy Capital*, the contractors in this case have submitted detailed declarations, specifically attesting to the close, confidential nature of their relationship with Merck.

The other cases cited by plaintiffs, *Labatt Limited v. Molson Breweries*, 1995 WL 23603 (S.D.N.Y. January 20, 1995) and *Dorf & Stanton Communications, Inc. v. Olson Breweries*, 100 F.3d 919 (Fed. Cir. 1996) (PSC Letter at 5), do not even address the question whether the attorney-client privilege extends to independent contractors. Rather, *Labatt* denied application of the attorney-client privilege after the court determined that the documents at issue did "not indicate either the seeking of legal advice or the confidentiality of their contents." 1995 WL 23603, at *1. And *Dorf* turned on the failure of the party seeking protection "to meet the requirements of a valid local rule [requiring production of privilege log] . . . to treat related documents consistently, and . . . use its best efforts to cure the problems created by its first two failures until it was too late." *Dorf & Stanton*, 100 F.3d at 923.

In sum, plaintiffs do not -- and cannot -- refute that: (1) DDB and Ogilvy worked under Merck's close supervision as the functional equivalents of Merck employees; and (2) such a relationship extends the scope of the attorney-client privilege to cover communications with an independent contractor. Accordingly, Merck's "economic decision to conduct its business through independent contractors as opposed to employees should not effect the scope of its privilege." *Twentieth Century Fox*, 2002 WL 31556383, at *1.

11

**B.     DDB And Ogilvy Required Advice From Merck's Legal Department In Order To Properly Do Their Jobs.**

The applicability of the attorney-client privilege to Merck's communications with the independent contractors is all the more apparent because the consultants required Merck's legal advice to complete their duties (and conversely, the consultants were often sources of information needed by Merck legal to provide the company with legal advice). *See GSK*, 294 F.3d at 147; *see also Bieter*, 16 F.3d at 938 (privilege extended where independent contractor's involvement in the area of the partnership's business at issue in the litigation made him "precisely the sort of person with whom a lawyer would wish to confer confidentially" because he provided "relevant information needed by corporate counsel [to] advise the client with respect to. . . actual or potential difficulties" (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 391 (1981)).

In *GSK*, for example, the D.C. Circuit reversed the district court's holding that a pharmaceutical company waived the attorney-client privilege by sharing confidential documents with its independent public relations and government affairs consultants in connection with the marketing, regulatory approval, and sale of a prescription drug.  The circuit court held that the privilege extended to the contractors because they "needed to provide input to the [corporate client's] legal department and/or receive the legal advice and strategies formulated by counsel." 294 F.3d at 147; *see also W. Res., Inc.*, 2002 WL 181494, at *7 (holding that the privilege applies to independent contractor hired to advise corporate client on technical, non-litigation issues in the coal industry and noting that "too narrow a definition of 'representative of the client' will lead to attorneys not being able to confer confidentially with nonemployees who, due to their relationship [with] the client, possess the very sort of information that the privilege envisions flowing most freely" (quoting *Bieter*, 16 F.3d at 932-38)).

As in *GSK*, the independent contractors here served as marketing and public relations consultants to a pharmaceutical drug company operating within the strict confines of FDA regulation. (*See* Bucholz Decl ¶ 6; Pudloski Decl. ¶ 6.) Just as the consultants in *GSK* needed advice from the corporate legal department to effectively perform their duties while complying with the dense regulatory framework of the pharmaceutical drug industry, Merck's independent contractors did too. As noted above, Merck's "Medical/Legal Board . . . was ultimately responsible for reviewing and approving the content of proposed advertising and promotional materials that DDB created for Vioxx." (*See* Bucholz Decl. ¶ 8.) Moreover, both DDB and Ogilvy routinely received, and were directed to follow, advice from Merck legal regarding the development of advertisements and other public statements for submission to DDMAC, the relevant regulatory body. (*See* Bucholz Decl. ¶¶ 6, 8; Pudloski Decl. ¶ 6.) In addition, both DDB and Ogilvy employees "received feedback from Merck legal and other confidential information from Merck so that they could accomplish their work on the Vioxx project and would understand the various legal and regulatory issues facing Merck." (Pudloski Decl. ¶ 10; *see also* Bucholz Decl. ¶ 11.) Finally, the independent contractors were often the source of important advertising and marketing information provided to Merck legal. (*See* Bucholz Decl. ¶ 11 ("DDB was the source of relevant information ultimately provided to Merck legal, which informed the company's marketing and advertising strategies for Vioxx."); *see also* Pudloski Decl. ¶ 10.)

In short, because the independent contractors were required to seek legal advice from Merck in order to comply with FDA regulations governing the labeling, promotion and marketing of prescription drugs, they were precisely the type of contractor that should fall within

13

the scope of the attorney-client privilege, and for this reason, too, should be entitled to the same privilege as corporate employees.

### C.   Communications Between Merck And The Independent Contractors Were Subject To Strict Confidentiality.

Finally, the applicability of the attorney-client privilege is confirmed by the fact that both Merck and the independent consultants intended the information shared between them to remain confidential. *See GSK*, 294 F.3d at 147. As the court found in *GSK*, discussed *supra*, a corporation's explicit demand for confidentiality from its independent contractor is a further indication that disseminating legal information to that contractor does not waive the attorney-client privilege. *Id.* at 147.

Here, just as in *GSK*, the contractual terms of Merck's agreements with each of the independent contractors explicitly noted that the contractors would not disclose Merck's confidential information "to anyone other than the [contractor's] employees who need to know the same in performance of [their duties]," and that the contractors shall use the Confidential Information only in connection with the performance [of their duties] and for no other purpose. (Ogilvy Agreement ¶ 8; *see also* DDB Agreement ¶ 15 ("[t]he Agency shall not, at any time, without [Merck's] prior written consent, disclose to any third-party any of [Merck's] Confidential Information.").) In compliance with these contractual provisions, "DDB employees were explicitly instructed not to disclose confidential information to persons outside Merck without receiving prior, written permission from Merck [and] there was a contractual duty of confidentiality between DDB and Merck." (*See* Bucholz Decl. ¶ 7.) Similarly, "Ogilvy kept confidential all feedback from Merck legal, generally relayed to Ogilvy by other Merck employees." (Pudloski Decl. ¶ 7.)

Accordingly, it is clear that the privileged communications Merck shared with its

802597v.1

independent contractors were intended to – and did – remain confidential, and for this reason too, those communications should be protected by the attorney-client privilege.

## II. MERCK HAS CONTRACTUAL RIGHTS OVER THE DOCUMENTS THAT GIVE MERCK THE RIGHT TO REVIEW THEM BEFORE PRODUCTION.

Not only does Merck have the right to review the documents at issue for privilege, but it also is entitled to review the documents because under its contracts with DDB and Ogilvy, Merck has contractual rights to access, review, and prevent dissemination of documents generated pursuant to the contracts. The PSC neither discusses these contractual rights nor offers any reason why they should be ignored. Not surprisingly, the PSC is able to offer no legal support for its unfounded contention that it can block Merck from exercising its contractual rights over these documents and reviewing them prior to production.

## III. MERCK'S REVIEW OF DOCUMENTS IN THE POSSESSION OF DDB AND OGILVY WILL NOT MATERIALLY DELAY PRODUCTION TO THE PSC.

Finally, the PSC's asserted concern that Merck's exercise of its right to review will create undue delay in this litigation is wholly unwarranted.

As a threshold matter, the fact that the contractors' attorneys are reviewing the documents does not vitiate the need for review by Merck. Since the privilege at issue here belongs to Merck, its attorneys are obviously better positioned to identify precisely which communications with the contractors reflect privileged legal advice and which do not.

Moreover, as Merck has already explained to the PSC, Merck intends to review the documents at issue on a rolling basis, in coordination with the reviews currently being conducted by the independent contractors' own outside counsel. Thus, Merck's review will not materially delay the timing of the production.

802597v.1

## CONCLUSION

For the foregoing reasons, Merck respectfully requests that this Court reject plaintiffs'

efforts to deprive Merck the ability to review materials subpoenaed from its independent

contractors prior to their production.

Respectfully submitted,


Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
Carmelite M. Bertaut, 3054
STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone: 504-581-3200
Fax:    504-581-3361

Defendant's Liaison Counsel

16

802597v.1

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Response of Defendant Merck & Co., Inc. to Plaintiffs' Letter Brief Regarding Ogilvy, DDB and Millward Third-Party Discovery has been served on Liaison Counsel, Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8, on this 22nd day of March, 2006.

*Dorothy H. Wimberly*

802597v.1

# SEE RECORD FOR

# EXHIBITS

# OR

# ATTACHMENTS

# NOT SCANNED