ORIGINAL

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 APR 10  PM 2: 26

LORETTA G. WHYTE
CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

:

CHARLES BAKER and PHYLLIS BAKER(h/w) :     CIVIL ACTION NUMBER

              Plaintiffs,    :     05-1564

   v.           :     L/3

                  :     COMPLAINT

MERCK & CO., Inc.       :

                  :     JURY TRIAL DEMANDED

         Defendant    :

---

## PLAINTIFF'S AMENDED COMPLAINT

Plaintiffs, for their Complaint, do hereby aver as follows:

### JURISDICTIONAL STATEMENT

1.    This action is brought pursuant to 42 U.S.C. sec. 1332.  Plaintiffs hereby aver that the amount in controversy in the above captioned matter exceeds the jurisdictional limits and that said controversy arises between citizens of different states as is required by the aforementioned statute in order to invoke the "Diversity of Citizenship" jurisdiction of this Court.  Plaintiffs also hereby invokes the pendant jurisdiction of this Court to hear and decide claims arising under state law.

### PARTIES

2.    Plaintiff, Charles Baker (hereinafter "plaintiff") and plaintiff Phyllis Baker (hereinafter "plaintiff" or "plaintiff-spouse") are an adult individuals and citizens of the Commonwealth of Pennsylvania residing at the address listed in the caption above.

3.    Defendant, Merck & Company, Inc. (hereinafter "Merck" or "defendant") is a business entity as listed in the caption and is a citizen of the United States, is a

_____ Fee_____
_____ Process_____
__X__ Dktd_____
_____ CtRmDep_____
_____ Doc. No_____

citizen of a state other than Pennsylvania, and maintains a principal places of business in a state other than Pennsylvania as listed in the caption.

## SUBSTANTIVE ALLEGATIONS

4.   At all times relevant and material hereto, defendant has conducted continuous and substantial business in the states of  New Jersey and Pennsylvania.

5.   At all times relevant and material hereto, the defendant acted and gained knowledge itself and by and through its various agents, servants, employees, and/or ostensible agents.

6.   As more particularly pleaded below, plaintiffs maintain that the pharmaceutical drug, Vioxx, is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings as to the dangers associated with its use.

7.   At all relevant times, defendant Merck was in the business of developing, researching, selling, distributing, designing, manufacturing, testing, evaluating, licensing, labeling, and/or marketing, either directly or indirectly through third parties or related entities, pharmaceutical drugs including Vioxx.

8.   At all relevant times, defendant Merck did in fact develop, research, sell, distribute, design, manufacture, test, evaluate, license, label, and/or market, either directly or indirectly through third parties or related entities, pharmaceutical drugs including Vioxx.

9.   During the time period from approximately 2000 until approximately 2003 plaintiff was prescribed, and took as directed, defendant's drug Vioxx for treatment arthritis symptoms.

10.   As a direct and proximate result of the liability-producing conduct of defendant and the defective and unreasonably dangerous condition of its product Vioxx, plaintiff has suffered physical injury and damage, including, but not limited to,

a heart attack resulting in a severely reduced cardiac ejection fraction which is permanent and life-threatening.

11. As a direct and proximate result of defendant's liability-producing conduct and defective product Vioxx, plaintiff has in the past and will in the future experience physical injuries, pain and suffering, loss of enjoyment of life, lost wages, lost earning capacity, medical expenses, medical monitoring expenses, embarrassment and humiliation, fright and apprehension, emotional distress, and other damages all of which are believed to be permanent.

12. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

13. Vioxx is the brand name of rofecoxib, one of a class of drugs called "prostaglandins," which work to reduce inflammation and pain by providing analgesic and anti-inflammatory benefits to persons with, among other conditions, arthritis and muscle pain.  Prostaglandins are COX (cyclooxygenase) inhibitors; COX enzymes metabolize arachidonic acid to produce prostaglandins.

14. Vioxx is a COX-2 inhibitor, which is designed to produce prostaglandins as inflammatory sites, and to produce prostacyclin, a vasodilator and an inhibitor of platelet aggregation.

15. Defendant Merck submitted an Application to Market a new Drug for Human Use ("NDA") for rofecoxib to the United States Food and Drug Administration ("FDA") on November 23, 1998, for tablets, at doses of 12.5 mg and 25 mg, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea.  This application was denoted NDA 21-042 by the FDA.

16. Defendant Merck also submitted an Application to Market a New Drug for Human Use ("NDA") for rofecoxib to the United States Food and Drug

Administration ("FDA") on November 23, 1998, for oral suspension, at doses of
12.5 mg/mL and 25 mg/mL, for relief of the signs and symptoms of
osteoarthritis, the management of acute pain, and the treatment of primary
dysmenorrhea.  This application was denoted NDA 21-052 by the FDA.

17.     On or about May 20, 1999, the FDA approved NDA 21-042 and NDA 21-052
(hereinafter the "NDA") for rofecoxib, for relief of the signs and symptoms of
osteoarthritis, the management of acute pain, and the treatment of primary
dysmenorrhea.

18.     At the time the drug was approved by the FDA the labeling for rofecoxib stated,
in the section entitled "Special Studies - Upper Endoscopy in Patients with
Osteoarthritis," "Treatment with VIOXX 25 mg daily or 50 mg daily was
associated with a significantly lower percentage of patients with endoscopic
gastroduodenal ulcers than treatment with ibuprofen 2400 mg daily.  However,
the studies cannot rule out at least some increase in the rate of endoscopic
gastroduodenal ulcers when comparing VIOXX to placebo."

19.     The "Warnings" section of the labeling for rofecoxib, at the time the drug was
approved by the FDA, contains a section, "Gastrointestinal (GI) Effects - Risk of
GI Ulceration, Bleeding, and Perforation."

20.     Defendant Merck submitted sNDA-007 with the goal of establishing a
gastrointestinal ("GI") safety claim for rofecoxib.  In conjunction with the
sNDA, Defendant Merck performed the Vioxx GI Outcomes Research (VIGOR)
Protocol, No. 088-04, entitled "A Double-Blind, Randomized, Stratified,
Parallel-Group Study to Assess the Incidence of PUBs During Chronic
Treatment With MK-0966 or Naproxrn in Patients With Rheumatoid Arthritis:
U.S, Cohort."  The VIGOR study was performed from January 6, 1999 through
March 17, 2000.

21. The objectives of the VIGOR study were to (1) "determine the relative risk of confirmed PUB (Perforation, Ulcers, Bleeding) in patients taking MD-0966 50 mg daily compared to patients in the group taking naproxen 1000 mg/day," and (2) "study the safety and tolerability of MK-0966 in patients with rheumatoid arthritis."

22. In industry-sponsored studies presented at the European United League Against Rheumatism (EULAR), an organization in which Merck is a member and corporate sponsor, in June of 2000, it was shown that Vioxx use resulted in a statistically significant increase in hypertension and stroke. Not only did Merck do nothing to further accurately publish these studies, or warn consumers, but it denied the results with respect to hypertension in the official publication of the American Pharmaceutical Association, Pharmacy Today, *Spin War Aside, Lessons Emerge From COX-2 Trials, in August 2000, page 3.*

23. Merck continued to deny the ill health effects associates with Vioxx while at the same time reaping profits obtained through its non-disclosure and concealment. Merck engaged in a massive advertising and sampling program and gained continued increases in the market share, which enhanced Merck's financial stability to the detriment of its consumers. As a result of Merck's scheme, it reaped more than $2 billion in profit in the year 2000 alone, and appropriated approximately 23 percent share of the market.

24. Merck continued to profit from its scheme by withholding information from Plaintiff, the consuming public, and the health care industry. For example, in November of 2000, Merck caused the publication of a study in the New England Journal of Medicine in which it knowingly downplayed and/or withheld the severity of cardiovascular risks associated with Vioxx consumption over naproxen consumption.

25.    On or about August 29, 2001, the Journal of the American Medical Association (JAMA) published a peer-reviewed human epidemiologic study by the Cleveland Clinic Foundation, Cleveland, Ohio, Dr. D. Mukhisjee, et al., showing what Merck had concealed that the relative risk of developing a "confirmed adjudicated thrombotic cardiovascular event" (defined in the article as "myocardial infarction, unstable angina, cardiac thrombus, resuscitated cardiac arrest, sudden or unexplained death, ischemic stroke, and transient ischemic attacks") among Vioxx users in Merck's trials, including VIGOR, at 95% confidence interval ranged from 2.2 for event-free survival analysis, 2.38 compared to naproxen users, and 4.89 for developing serious cardiovascular events among aspirin-indicated patients. *See* Mukhisjee, D., et al., *Risk of Cardiovascular Events Associated with Selective Cox-2 Inhibitors*, J.A.M.A. 286:8, 954-959, Aug. 22/29, 2001. In addition, the annualized myocardial infarction rates for Vioxx users compared to placebo revealed a statistically significant increase among Vioxx users.

26.    In the JAMA study, the authors stated that "by decreasing PG12 production [Vioxx] may tip the natural balance between prothrombotic thromboxane A2 and antithrombotic PG12, potentially leading to an increase in thrombotic cardiovascular events." *Id.* at 957. In a follow-up peer reviewed study reported in the Journal of the American College of Cardiology on or about February 6, 2002, Dr. Richard J. Bing conducted scientific testing and confirmed that the Cox-2 inhibitor "tips the balance of prostacyclin/thromboxane in favor of thromboxanne, leading to increased vascular and thrombotic events." Bing, R., & Lomnicka, M., *Why Do Cyclo-Oxygenase-2 Inhibitors Cause Cardiovascular Events?*, J.A.C.C., 39:3, Feb. 6, 2002. This is further supported by studies completed at the University of Pennsylvania. Cheng, Y., et al., *Role of*

*Prostacyclin in the Cardiovascular Response to Thromboxanne A2,* Journal of Science, V. 296:539-541, Apr. 19, 2002.

27.    On September 17, 2001, Thomas W, Abrams, R.Ph., MBA, Director of the FDA Division of Drug Marketing, Advertising, and Communications, issued a "Warning Letter" to Raymond V. Gilmartin, President and CEO of Defendant Merck, relating to "promotional activities and materials for the marketing of Vioxx (rofecoxib) tablets."

28.    The Warning Letter stated that Defendant Merck had "engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiosascular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile for Vioxx."  The letter further states:

> *Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (naproxen).*

29.    The eight (8) page Warning Letter outlines, in detail, the conduct of Defendant Merck that supports the FDA's issuance of the Warning Letter, and makes the following **"Conclusions and Requested Actions:"**

> *The promotional activities and materials described above minimized the potentially serious Cardiovascular findings that were observed in the VIGOR study, minimized the Vioxx / Coumadin  drug interaction, omit crucial risk information associated with Vioxx therapy, contain unsubstantiated comparative claims, and promote unapproved uses.  On December 16, 1999, we also objected to your dissemination*

*of promotional materials for Vioxx that misrepresented Vioxx's safety profile, contained unsubstantiated comparative claims, and lacked fair balance.*

*Due to the seriousness of these violations, and the fact that your violative promotion of Vioxx has continued despite our prior written notification regarding similar violations, we request that you provide a detailed response to the issues raised in this Warning Letter on or before October 1, 2001.*

*This response should contain an action plan that includes a comprehensive plan to disseminate corrective messages about the issues discussed in this letter to the audiences that received theses misleading messages. This corrective action plan should also include:*

*Immediately ceasing all violative promotional activities, and the dissemination of violative promotional materials for Vioxx.*

*Issuing a "Dear healthcare provider" letter to correct false or misleading impressions and information. This proposed letter should be submitted to us for review prior to its release. After agreement is reached on the content and audience, the letter should be disseminated by direct mail to all healthcare providers who were, or may have been exposed to the violative promotion.*

> *A written statement of your intent to comply with "1" and "2"*
> *above.*

30.    On April 11, 2002, the FDA approved a supplemental application for the use of Vioxx (rofecoxib) for rheumatoid arthritis, adding this indication to the previously approved indications for osteoarthritis and pain.  The FDA also approved new labeling, a "Dear Doctor" letter, and a new patient package insert.  The labeling and the "Dear Doctor" letter contained information concerning the results of the VIGOR study.

31.    The revised labeling further states that the administration of Vioxx 50 mg, was associated with a higher incidence of gastrointestinal symptoms as follows:

> ***Clinical Studies in OA and RA with Vioxx 50 mg (Twice***
> ***the highest dose recommended for chronic use)***
> *In OA and RA clinical trials which contained VIOXX 12.5 or*
> *25 mg as well as VIOXX 50 mg, VIOXX 50 mg OD was*
> *associated with a higher incidence of gastrointestinal*
> *symptoms (abdominal pain, epigastric pain, heartburn,*
> *nausea and vomiting), lower extremity edema, hypertension,*
> *serious\* adverse experiences and discontinuation due to*
> *clinical adverse experiences compared to the recommended*
> *chronic doses of 12.5 and 25 mg [See DOSAGE AND*
> *ADMINISTRATION].*

32.    Further, the "Dear Doctor" letter approved in conjunction with the revisions to the Vioxx labeling, outlines the changes to the Vioxx labeling.

33.    The revised "Patient Information" sheet does not add any information about the results of the VIGOR study."

34.    The "Patient Information" sheet is the only written document that is provided to a patient for  whom Vioxx is prescribed.

35.   Both the initial labeling and the revised labeling are ineffective because they do not properly advise physicians and patients of the potential gastrointestinal and prothrombotic side effects of Vioxx.

36.   Despite knowledge of the ineffectiveness of the warnings, and despite knowledge that Vioxx may cause serious side effects, Defendant Merck has concealed and/or downplayed the dangers associated with Vioxx, and continues to market the drug in the United Stats and abroad.  In its 2001 Annual Report, for example, Defendant Merck states:

> The Company also notes that a number of the federal and state lawsuits, involving individual claims as well as purported class actions, have been filed against the Company with respect to Vioxx . . . The lawsuits include allegations regarding gastrointestinal bleeding and cardiovascular events.  The Company believes that these lawsuits are completely without merit and will vigorously defend them.

37.   Further, in its January 23, 2001 8-K filing with the Securities and Exchange Commission, a copy of which is attached as Exhibit "G" hereto, the Defendant fails to mention the cardiac and cardiothrombotic findings of the VIGOR study:

> "Our results reflect the strength of our growth strategy," Mr. Gilmartin said.  "Our five key products, **VIOXX**, ZOCOR, COZAAR/HYZAAR*, FOSAMAX and SINGULAR, drove Merck's performance for the year created a powerful platform for growth."  These products accounted for 57% of Merck's worldwide human health sales for 2000 and 61% for the fourth quarter.

*"Each of the five medicines offers unique competitive advantages, "Mr. Gilmartin said.  **VIOXX**, a once-a-day medicine, is the only COX-2 indicated in the United States both for osteoarthritis and acute pain.  Since its extraordinarily successful 1999 launch, **VIOXX** has become the world's fastest growing branded prescription arthritis medicine, and it is already Merck;s second largest-selling medicine.  In the United States, **VIOXX** now accounts for approximately 50 percent of new prescriptions in the COX-2 class, despite being second to market in this class in the United States.  **VIOXX** achieved $2.2 billion in sales for the full year 2000, with $700 million in the fourth quarter.*

*A Food and Drug Administration (FDA) Advisory Committee meeting is scheduled for Feb. 8 to review labeling changes Merck has requested based on the strong results of the VIGOR Study.  This 8,000-patient gastrointestinal outcomes research study, in which **VIOXX** reduced the risk of serious gastrointestinal complications by half compared to the NSAID naproxen, was published in November in THE NEW ENGLAND JOURNAL OF MEDICINE.  Another study, presented in November, showed that **VIOXX** significantly reduced moderate-to-severe acute pain after dental surgery to a greater degree compared to codeine combined with acetaminophen.*

38.    Despite the foregoing, Defendant Merck has continued to represent to consumers that Vioxx is safe, and that any cardiovascular and/or

cardiothrombotic side effects are not associated with the drug. The Defendant has also downplayed any potential gastrointestinal side effects of the drug, promoting it is safer and more efficacious than other medications approved for treatment of similar conditions.

### Count I:
### Negligence

39. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

40. With regard to the averments above, defendant was negligent in knowing same, having reason to know same, should having known same, and/or otherwise being in possession of facts which would have caused a reasonable person or company to inquire and, with due diligence, discover same, but

    a. failed to use reasonable care to design an arthritis drug (Vioxx) that was safe for its intended and foreseeable uses, not defective, and not unreasonably dangerous;

    b. failed to use reasonable care in designing and manufacturing an Vioxx so as to make it safe for its intended uses, not defective, and not unreasonably dangerous;

    c. failed to use reasonable care to adequately warn foreseeable users such as plaintiff of the dangers of using Vioxx, including, but not limited to adverse cardiac events;

    d. failed to use reasonable care to make reasonable tests, inspections, drug trials, and/or evaluations necessary to discover such defects and unreasonably dangerous conditions associated with defendant's Vioxx;

e.      failed to comply with and/or to use reasonable care to comply with standards of care including accepted industry standards, FDA recommendations, government regulations, statutes, in the design, manufacture, affixing of warnings, and otherwise production and distribution of defendants' Vioxx;

f.      failed to use reasonable care to timely remove and/or recall from the market, retrofit, and/or otherwise prevent the continued contact of plaintiff and persons like plaintiff with such defects and unreasonably dangerous conditions of Vioxx;

g.      failed to use reasonable care to investigate and/or use known and/or knowable reasonable alternative designs, manufacturing processes, and/or materials for Vioxx;

h.      failed to use reasonable care to warn plaintiff of dangers known and/or reasonably suspected to defendant to be associated with Vioxx;

i.      failed to use reasonable care to make Vioxx safe;

j.      failed to timely use reasonable care to discover the dangerous conditions or character of defendant's Vioxx;

41.   As a direct and proximate result of defendants' negligence, plaintiff was harmed as aforesaid.


**Count II:**
**Strict Products Liability**

42.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

43.　At all relevant times, defendant was the researcher, developer, manufacturer, distributor, marketer, promoter, supplier and seller of Vioxx, which, at all relevant times, was defective and unreasonably dangerous to consumers.

44.　At all relevant times, defendant's Vioxx was defective in its design and/or formulation in that it was not reasonably fit, suitable or safe for its intended purpose and/or its foreseeable risks exceed the benefits associated with its design and formulation.　Vioxx was defective in design and/oror formulation in that it lacked efficacy and/or it posed a greater likelihood of injury than other nonsteroidal anti-inflammatory medicines and similar drugs on the market and was more dangerous than ordinary consumers can reasonably foresee.

45.　At all relevant times, the defective condition of Vioxx rendered it unreasonably dangerous, and Vioxx was in this defective condition at the time it left the hands of the defendant.　Vioxx was expected to and did reach consumers, including plaintiff, without substantial change in the condition in which it was designed, manufactured, labeled, sold, distributed, marketed, promoted, supplied and otherwise released into the stream of commerce.

46.　At all relevant times, plaintiff was unaware of the significant hazards and defects in Vioxx.　Vioxx was unreasonably dangerous than would be reasonably contemplated by the ordinary user.　During the period that plaintiff was taking Vioxx, the medication was being utilized in a manner that was intended by Defendant.　At the time plaintiff received and consumed Vioxx, it was represented to be safe and free from latent defects.

47.　At all relevant times, defendant Merck knew or should have known of the danger associated with the use of Vioxx, as well as the defective nature of Vioxx, but has continued to design, manufacture, sell, distribute, market, promote and/or supply Vioxx so as to maximize sales and profits at the expense

of the public health and safety, in conscious disregard of the foreseeable harm caused by Vioxx.

48. At all relevant times, defendant's Vioxx was in a defective and unreasonably dangerous condition which would not recognized or contemplated by a reasonable person among the expected users and consumers at the time it left the control of the defendant.

49. At all relevant times, defendant's Vioxx was defective and unreasonably dangerous when used in reasonably expectable ways of handling and/or consumption.

50. At all relevant times, the aforesaid Vioxx was expected to reach, and did reach, the ultimate user or consumer without substantial change in the condition in which it was sold and/or distributed by defendant.

51. At all relevant times, defendant's Vioxx was defective and unreasonably dangerous under section 402(A) Restatement (Second) of Torts 402, the New Jersey Products Liability Act ,and/or the Indiana Product Liability Act.

52. Defendant Merck is strictly liable to Plaintiff(s) for designing, manufacturing, and placing into the stream of commerce a product which was defective and unreasonably dangerous for its reasonably foreseeable uses at the time it left the control of defendant.

53. As a direct and proximate result of defendants' defective and unreasonably dangerous products, plaintiff was harmed as aforesaid.

### Count III:
### Failure to Warn

54. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

55. At all relevant times, defendant Merck researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce the pharmaceutical, Vioxx, and in the course of same, directly advertised or marketed the product of FDA, consumers or persons responsible for consumers, and therefore had a duty to warn of the risks associated with the use of Vioxx.

56. At all relevant times, Vioxx was under the exclusive control of the Defendant as aforesaid, and was unaccompanied by appropriate warnings regarding all possible adverse side effects and complications associated with the use of Vioxx, dangerous drug-drug interactions and food-drug interactions, and the comparative severity, duration and the extent of the risk of injury with such use.

57. At all relevant times, defendant Merck has failed to timely and reasonably warn of material facts regarding the safety and efficacy of Vioxx so that no medical care provider would have prescribed, or no consumer would have used, Vioxx had those facts been made known to such providers and consumers.

58. At all relevant times, defendant Merck has failed to perform or otherwise facilitate adequate testing in that such testing would have shown that Vioxx posed serious and potentially life-threatening side effects and complications with respect to which full and proper warning accurately and fully reflecting the symptoms, scope and severity should have been made to medical care providers, the FDA and the public, including the Plaintiff.

59. At all relevant times, Vioxx, which was researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold and otherwise released into the stream of commerce by Defendant, was defective due to inadequate post-marketing warning and/or instruction because, after Defendant knew or should have known of the risk of serious and

potentially life-threatening side effects and complications from the use of Vioxx, Defendant failed to provide adequate warnings to medical care providers, the FDA and the consuming public, including Plaintiff, and continued to promote Vioxx aggressively.

60.  As a direct and proximate result of defendants' defective and unreasonably dangerous product and its failure to warn plaintiff and other's like him of same, plaintiff was harmed as aforesaid.

## Count IV:
### Breach of the Implied Warranty of Merchantability

61.  Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

62.  Defendant's Vioxx was not of merchantable quality and not fit for the ordinary purposes for which such a product is used.

63.  As a direct and proximate result of defendant's defective and unreasonably dangerous Vioxx and its breach of the implied warranty of merchantability, plaintiff was harmed as aforesaid.

## Count V:
### Breach of the Implied Warranty of Fitness for a Particular Purpose

64.  Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

65.  Defendant's Vioxx was not fit for its particular purpose of safely treating arthritis pain.

66.  Defendant Merck actually and/or constructively knew of the purposes to which its Vioxx was to be used.

67.  Plaintiff relied upon defendant to furnish Vioxx in a condition suitable for its particular purpose.

68.   As a direct and proximate result of defendant's defective and unreasonably dangerous Vioxx and its breach of implied warranty of fitness for a particular purpose, plaintiff was harmed as aforesaid.

## Count VI:
## Breach of Express Warranty

69.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

70.   At all relevant times, defendant warranted that its Vioxx was safe and not defective and/or unreasonably dangerous as stated above.

71.   At all relevant times, defendant Merck placed Vioxx into the stream of commerce for sale and recommended its use to physicians, the FDA and consumers without adequately warning physicians, the FDA and consumers, including the Plaintiff(s), of the risks associated with the use of Vioxx.

72.   At all relevant times, defendant Meck had a duty to exercise reasonable care in the research, development, design, testing, manufacture, inspections, labeling, distribution, marketing, promotion, sale and release of Vioxx, including a duty to:

   a.   Ensure that the product did not cause the user unreasonably dangerous side effects;

   b.   Warn of dangerous and potentially fatal side effects; and

   c.   Disclose adverse material facts when making representations to physicians, the FDA and the public at large, including Plaintiff.

73.   When plaintiff's; physicians(s) prescribed Vioxx and plaintiff made the decision to use Vioxx, both Plaintiff and their physicians reasonably relied upon the defendant and its agents to disclose known defects, risks, dangers and side effects of  Vioxx.

74. Plaintiff's physicians(s), the FDA and/or Plaintiff had no knowledge of the falsity or incompleteness of the defendant's statements and representations concerning Vioxx when Plaintiff; physician(s) prescribed and/or otherwise provided Vioxx and Plaintiff purchased and used Vioxx as researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold and otherwise released into the stream of commerce by the Defendant.   Plaintiff justifiably and detrimentally relied on the warranties and representations of Defendant in the purchase and use of Vioxx.

75. At all relevant times, defendant Merck was under a duty to disclose the defective and unsafe nature of Vioxx to physicians, the FDA, consumers and users, such as Plaintiff.  Defendant had sole access to material facts concerning the defects, and Defendant knew that physicians, the FDA and users, such as Plaintiff, could not have reasonably discovered such defects.

76. By the conduct alleged, Defendant Merck, its agents and employees expressly warranted to Plaintiff and Plaintiff's physicians(s) that the products were merchantable and fit for the purpose intended.

77. This warranty was breached because Vioxx was not safe and effective as a medication for arthritis and pain, as Defendant had represented, and Plaintiff was injured.

78. As a direct and proximate result of defendant's defective and unreasonably dangerous Vioxx and its breach express warranty, plaintiff was harmed as aforesaid.

**Count VII:**
**Misrepresentation**

79. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

80.  Defendant fraudulently, intentionally, wilfully and wantonly, purposefully, knowingly, recklessly, negligently and/or in fact materially misrepresented both affirmatively and by omission that its Vioxx was of good quality, non-defective, safe for its intended use, merchantable, and fit for its particular purposes.

81.  Defendant intended, knew, and/or should have known that plaintiff would be induced, by the aforesaid misrepresentations, to use defendants Vioxx.

82.  In using defendant's Vioxx, plaintiff justifiably relied on defendant's representations that its Vioxx was of good quality, non-defective, safe for its intended use, merchantable, and fit for its particular purposes.

83.  Defendant's Vioxx was, in fact, defective and unreasonably dangerous, as recited above.

84.  As a direct and proximate result of defendant's defective and unreasonably dangerous Vioxx as well as its affirmative misrepresentations and omissions, plaintiff was harmed as aforesaid.

## Count VIII:
## Violation of Unfair Trade Practice/Consumer Protection Laws

85.  Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

86.  At all relevant times, defendant Merck knew or should have known that the use of Vioxx causes serious and life threatening injuries bu failed to warn the public, including Plaintiff, of same.

87.  At all relevant times, defendant Merck made untrue, deceptive or misleading representations of material facts to and omitted and/or concealed material facts from Plaintiff in product packaging, labeling, medical advertising, direct-to-consumer advertising, promotional campaigns and materials, among other ways, regarding the safety and use of Vioxx.   Moreover, Defendant downplayed

and/or understated the serious nature of the risks associated with Vioxx in other to increase the sales of Vioxx and secure a greater share of the COX-2-market.

88.    At all relevant times, defendant's statements and omissions were undertaken with the intent that the FDA, physicians, and consumers, including the Plaintiff, would rely on the defendant's statements and/or omissions.

89.    At all relevant times, defendant knew of the growing public acceptance of the misinformationand misrepresentations regarding the safety and efficacy of Vioxx but remained silentbecause Merck's appetite for significant future profits far outweighed its concern for the health and safety of the Plaintiff and others like him.

90.    Plaintiff's physician(s) prescribed and/or otherwise provided Plaintiff with Vioxx, and Plaintiff consumed Vioxx, and suffered ascertainable losses of money as a result of the Defendant's use or employment of the methods, acts or practices alleged herein.

91.    The aforesaid promotion and release of Vioxx into the stream of  commerce constitutes an unconscionable commercial practice, deception, false pretense, misrepresentations, and/or the knowing concealment, suppression, or omission of material facts with the intent that others would rely upon such concealment, suppression or omission in connections with the sale or advertisement of such merchandise or services by Defendant.

92.    At all relevant times, defendant Merck concealed, omitted, or minimized the side effects of Vioxx or provided misinformation about adverse reactions, risks and potential harms from Vioxx and succeeded in persuading consumers, including plaintiff, to purchase and ingest Vioxx despite the lack of safety and the risk of adverse medical reactions, including cardiovascular events and gastrointestinal effects.

93. At all relevant times, defendant Merck's practice of promoting and marketing Vioxx created and reinforced a false impression as to the safety of Vioxx, thereby placing consumers, including plaintiff, at risk of serious and potential lethal effects.

94. At all relevant times, Vioxx lacked appropriate warnings, and the packaging and labels used by defendant were misleading, inaccurate, incomplete and/or untimely.

95. Defendant Merck violated its post-manufacture duty to warn which arose when Merck knew, or with reasonable care should have know, that Vioxx was injurious and sometimes fatal.

96. At the time when consumers purchased and ingested Vioxx, defendant Merck intended that others would rely upon the concealment, suppression or omission of the risks of ingesting Vioxx.

97. Defendant's actions in connection with manufacturing, distributing, and marketing of Vioxx as set forth herein evidence a lack of good faith, honesty in fact and observant of fair dealing so as to constitute unconscionable commercial practices.

98. Defendant Merck acted willfully, knowingly, intentionally, unconscionably and with reckless indifference when committing these acts of consumer fraud.

99. As a proximate result of the acts of consumer fraud set forth above, Plaintiff purchased an unsafe product and incurred monetary expense and the risk to himself and members of his household that they would consume Vioxx and thereby suffer an increased risk of harm as previously set forth herein.

100. The conduct of the defendant, as set forth above, constitutes unfair, deceptive, unlawful, and/or unconscionable acts and/or practices prohibited under The Commonwealth of Pennsylvania's Consumer Protection Law, 73 Pa. Stat. Ann. § 201-2 et seq..

101.   The conduct of the defendant, as set forth above, constitutes unfair, deceptive, unlawful, and/or unconscionable acts and/or practices prohibited under The State of New Jersey's Consumer Protection Law, N.J.S.A. 56:8-2, et seq..

102.   As a direct and proximate result of defendant's unfair, deceptive, unlawful, and/or unconscionable acts or practices in violation of the aforesaid Consumer Protection Laws of Pennsylvania, New Jersey and/or other states, injuries and damages were sustained by plaintiff.

**Count IX:**
**Punitive Damages**

103.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

104.   Based upon the above, a jury could conclude that the defendant knew of facts that created a high degree of risk of physical harm to the plaintiff and that the defendants deliberately proceeded to act in conscious disregard or indifference to that risk, and therefore that an award of punitive damages is warranted.

## Count X:
## Loss of Consortium

105.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

106.   At all times relevant and material hereto plaintiff-spouse, Phyllis Baker, was the lawful wife of plaintiff Charles Baker.

107.   As a direct an proximate result of the acts, omissions, negligence, and/or carelessness of the defendant, as set forth herein above, plaintiff-spouse, Phyllis Baker, has been deprived of the love, services, society, advice, companionship, and/or consortium of her husband, Charles Baker, and will continue to be deprived of the same to his great detriment and loss in the future.

   **WHEREFORE**, plaintiff demands the following:

   1.   judgment in his favor and against defendant;

   2.   compensatory damages in an amount in excess of the jurisdictional limit, trebled on applicable Counts;

   3.   exemplary and punitive damages in an amount in excess of the jurisdictional limit, trebled on applicable Counts;

   4.   all elements of interest, including but not limited to pre- and post-judgment interest;

   5.   all Bill of Costs elements, including attorney fees and expert witness fees; and

   6.   such other and further relief as the Court may deem just and proper.

7.    a trial by a jury on all issues of the case.


**JURY TRIAL DEMANDED**

Dated: 4 7 06


LEONARD V. FODERA, ESQUIRE
**LOUIS T. SILVERMAN, ESQUIRE**
**ALLISON LONG, ESQUIRE**
Silverman & Fodera
1835 Market Street, Suite 2600
Philadelphia, PA 19103

**ARNOLD LEVIN, ESQUIRE**
**FRED S. LONGER, ESQUIRE**
**MICHAEL M. WEINKOWITZ, ESQUIRE**
**DANIEL C. LEVIN, ESQUIRE**
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106