UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 APR 13  AM 7: 46

LORETTA G. WHYTE
CLERK

IN RE: VIOXX
      PRODUCTS LIABILITY LITIGATION

:    MDL NO. 1657
:
:    SECTION:    L
:
:    JUDGE FALLON
:    MAG. JUDGE KNOWLES
:
:

THIS DOCUMENT RELATES TO:    :
:

Sheet Metal Workers Local No. 20 Welfare and Benefit Fund;
Indiana Electrical Workers Benefit Trust;
Bricklayers of Indiana Welfare Fund;
Michiana Area Electrical Workers Health and Welfare Fund;
Indiana State Council of Roofers Health and Welfare Fund;
Indiana State District Council of Laborers and Hod Carriers Welfare Fund;
Painters Local No. 469 Health and Welfare Fund;
Plumbers and Steamfitters Local No. 166 Health and Welfare Plan;
Southern Ohio Painters Health and Welfare Fund;
Pipe Trades Industry Health and Welfare Plan;
IBEW 673 Fringe Benefit Funds;
IBEW Local 129 Fringe Benefit Funds;
Plumbers and Steamfitters Local 42 Health and Welfare Plan;
Painting Industry Insurance and Annuity Funds;
Service Employee International Union Local No. 3 Health and Welfare Fund;
Ohio State IBEW Health & Welfare Fund;
IBEW Local 32 Health and Welfare Fund;
IBEW Local 683 Fringe Benefit Funds;
Indiana State Council of Carpenters Health and Welfare Fund;
Plumbers Local No. 210 Health and Welfare Fund;
Indiana Carpenters Health and Welfare Fund;
Plumbers and Steamfitters Local 440 Health and Welfare Plan;
Indiana Bricklayers Local No. 6 Welfare Trust Fund;
Motion Picture Laboratory Technicians and Film Editors Local 780 Welfare Fund;
Dealers-Unions Insurance Fund; and,
United Food and Commercial Workers Union-Employer Health and Welfare Fund, On Behalf of
Themselves and All Others Similarly Situated, currently filed as 05-CV-0349-DFH-VSS; S.D.
Ind. and MDL No. 05-2269

**THIRD AMENDED CLASS ACTION COMPLAINT FOR DAMAGES AND JURY
DEMAND**

Fee
Process
X  Dktd
CtRmDep
Doc. No.

Plaintiffs, Sheet Metal Workers Local No. 20 Welfare and Benefit Fund, Indiana Electrical Workers Benefit Trust, Bricklayers of Indiana Welfare Fund, Michiana Area Electrical Workers Health and Welfare Fund, Indiana State Council of Roofers Health and Welfare Fund, Indiana State District Council of Laborers and Hod Carriers Welfare Fund, Painters Local No. 469 Health and Welfare Fund, Plumbers and Steamfitters Local No. 166 Health and Welfare Plan, Southern Ohio Painters Health and Welfare Fund, Pipe Trades Industry Health and Welfare Plan, IBEW 673 Fringe Benefit Funds, IBEW Local 129 Fringe Benefit Funds, Plumbers and Steamfitters Local 42 Health and Welfare Plan, Painting Industry Insurance and Annuity Funds, Service Employee International Union Local No. 3 Health and Welfare Fund, Ohio State IBEW Health & Welfare Fund, IBEW Local 32 Health and Welfare Fund, IBEW Local 683 Fringe Benefit Funds, Indiana State Council of Carpenters Health and Welfare Fund, Plumbers Local No. 210 Health and Welfare Fund and Indiana Carpenters Health and Welfare Fund, Plumbers and Steamfitters Local 440 Health and Welfare Plan, Indiana Bricklayers Local No. 6 Welfare Trust Fund, Motion Picture Laboratory Technicians and Film Editors Local 780 Welfare Fund, Dealers-Unions Insurance Fund, United Food and Commercial Workers Union-Employer Health and Welfare Fund (collectively, the "Funds" or the "Plaintiffs"), by counsel, for their third amended complaint against Defendant, Merck & Co., Inc. ("Merck"), allege and state the following:

## **INTRODUCTION**

This is an action to recover statutory damages related to the funds expended by the Plaintiffs for the purchase of Vioxx, a non-steroidal anti-inflammatory drug ("NSAID") developed, manufactured, marketed, distributed and sold throughout the United States by the

Defendant, Merck & Co., Inc., through its various divisions, employees, and agents.  Vioxx is a brand name used by Merck to market and distribute rofecoxib.

This action is brought pursuant to the civil provisions of Chapter 96 of Title 18, United States Code, codified at 18 U.S.C. §§ 1961 *et seq.*, entitled Racketeer Influenced and Corrupt Organizations Act ("RICO Act"), which authorizes any person injured in his business or property by reason of a violation of RICO's provisions to recover threefold his damages sustained, plus the cost of the suit, including reasonable attorneys' fees.

This action, as set forth more specifically herein, is based upon claims that Merck conducted an enterprise through a pattern of racketeering activity which included, but is not limited to, wire and mail fraud.  Through these racketeering activities, Merck misrepresented the safety and efficacy of Vioxx to the Food and Drug Administration (the "FDA") in order to achieve approval of Vioxx for widespread use.  Similarly through these racketeering activities, Merck fraudulently misrepresented the safety and efficacy of Vioxx to prescribing physicians, which resulted in the dispensing of the drug to health care consumers.  By its wrongful and unlawful conduct, Merck converted an otherwise legal association-in-fact used to approve and prescribe medication to patients into an illegal enterprise that operated to achieve Merck's goals of increasing its profits and making Vioxx the leader of this market.

As a result, Vioxx became Merck's leading selling drug, producing billions of dollars in sales and profits.  Merck used mail and wire fraud as an integral part of a massive consumer advertising scheme to accomplish the end of inducing physicians to prescribe Vioxx for its intended and off-label uses to dramatically increase its profits.  In order to avoid discovery of its wrongful conduct and the possibility that it might be called to account for such conduct, Merck engaged in a widespread fraudulent scheme to frustrate scrutiny by making false and deceptive

3

statements and by concealing documents and research that it knew would have exposed Vioxx's

risks and its campaign of deceit.  In addition, Merck undertook to re-direct attention from

problems with Vioxx through a campaign to discredit those researchers and others who

challenged Vioxx's safety.  Merck further hid details from and failed to fully warn the FDA,

physicians, health care consumers and Plaintiffs of the safety risks associated with using Vioxx

and that it was no more efficacious in relieving pain than many, if not most, much less expensive

NSAIDs.

In order to effectuate its fraudulent scheme, Merck took an otherwise legal association-

in-fact (namely itself, the FDA, the prescribing physicians, and the dispenser of the drugs) which

under normal circumstances would be associated for the purpose of providing a process by which

prescription pharmaceuticals are approved and reach appropriate consumers, and through its

above described racketeering activities, used that enterprise for its own unlawful purpose.  By

controlling the information received by the FDA, prescribing physicians, and health care

consumers, Merck deceived the FDA into approving Vioxx, the physicians into over-prescribing

it for intended and off-label uses, and health care consumers into demanding it by its false

advertising campaign, all to Merck's financial benefit.

In all relevant respects, Merck operated and managed the illegal enterprise, utilizing the

FDA, the physicians, and the dispensers of the drug to further Merck's fraudulent scheme.

Beginning even before Vioxx was introduced to the market in 1999, Merck through its various

agents and employees undertook efforts to convert the existing association-in-fact into an illegal

RICO enterprise for its benefit (the "Vioxx Enterprise").  The Vioxx Enterprise constitutes an

enterprise as that term is defined in 18 U.S.C. § 1961 (4).  Relying upon Merck's fraudulent

misrepresentations, the FDA, the physicians, and the dispensers of the drug have played their

expected roles in the continued operation and management of the Vioxx Enterprise and have committed numerous acts to maintain and expand the Vioxx Enterprise. Through its assertions of the safety and efficacy of Vioxx, and the demand it created by acts of mail and wire fraud, Merck was able to artificially inflate Vioxx's selling price paid by Plaintiffs and further increase its illegal profits. All of these actions and the roles of the various players have been wrongfully orchestrated by Merck through its racketeering activities.

Merck's wrongful and unlawful course of conduct has caused injury to Plaintiffs through excessive health care expenditures for the purchase of Vioxx. In the absence of Merck's wrongful and unlawful conduct, healthcare consumers and their physicians would have received sufficient information regarding the safety and efficacy of Vioxx. Instead of paying the artificially inflated price for Vioxx, healthcare consumers and their physicians would likely have chosen other, less expensive, pain treatment alternatives. Additionally, Vioxx, or the price of Vioxx, would not have been artificially inflated and Plaintiffs and the class would have paid millions of dollars less in costs to cover such health care treatment.

## JURISDICTION

1.      Jurisdiction in this action is predicated upon 18 U.S.C. § 1964(c).

## VENUE

2.      Venue for this action is predicated upon 18 U.S.C. § 1965(a) and 28 U.S.C. §§ 1391 (b) and (c).

## PARTIES

3.      Plaintiff Sheet Metal Workers Local No. 20 Welfare and Benefit Fund is an entity which maintains its principal place of business at 2828 East 45th Street, Indianapolis, Indiana 46220. Plaintiff is an "employee welfare benefit plan" and an "employee benefit plan" as

defined in the Employee Retirement Income Security Act ("ERISA").  Plaintiff is a non-profit trust, sponsored and administered by a Board of Trustees, established through collective bargaining by labor unions and employers.  Pursuant to the trust agreement under which it was created, it provides comprehensive healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees.

4.       Plaintiff Indiana Electrical Workers Benefit Trust is an entity, maintaining its principal place of business at 1828 North Meridian Street, Suite 103, Indianapolis, Indiana 46202.  Plaintiff is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act ("ERISA").  Plaintiff is a non-profit trust, sponsored and administered by a Board of Trustees, established through collective bargaining by labor unions and employers.  Pursuant to the trust agreement under which it was created, Plaintiff provides comprehensive healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees.

5.       Plaintiff Bricklayers of Indiana Welfare Fund is an entity, maintaining its principal place of business at 9045 East 59th Street, Indianapolis, Indiana 46219.  Plaintiff is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act ("ERISA").  Plaintiff is a non-profit trust, sponsored and administered by a Board of Trustees, established through collective bargaining by labor unions and employers.  Pursuant to the trust agreement under which it was created, it provides comprehensive healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees.

6.       Plaintiff Michiana Area Electrical Workers Health and Welfare Fund is an entity, maintaining its principal place of business at 1345 Northside Boulevard., South Bend, Indiana

46615. Plaintiff is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act ("ERISA").  Plaintiff is a non-profit trust, sponsored and administered by a Board of Trustees, established through collective bargaining by labor unions and employers.  Pursuant to the trust agreement under which it was created, it provides comprehensive healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees.

7.     Plaintiff Indiana State Council of Roofers Health and Welfare Fund is an entity, maintaining its principal place of business at 1345 Northside Boulevard., South Bend, Indiana 46615. Plaintiff is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act ("ERISA").  Plaintiff is a non-profit trust, sponsored and administered by a Board of Trustees, established through collective bargaining by labor unions and employers.  Pursuant to the trust agreement under which it was created, it provides comprehensive healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees.

8.     Plaintiff Indiana State District Council of Laborers and Hod Carriers Welfare Fund is an entity, maintaining its principal place of business at 413 Swan Street, Terre Haute, Indiana 47807. Plaintiff is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act ("ERISA").  Plaintiff is a non-profit trust, sponsored and administered by a Board of Trustees, established through collective bargaining by labor unions and employers.  Pursuant to the trust agreement under which it was created, it provides comprehensive healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees.

9.      Plaintiff Painters Local No. 469 Health and Welfare Fund is an entity, maintaining its principal place of business at 7730 North 500 East, Decatur, Indiana 46615. Plaintiff is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act ("ERISA"). Plaintiff is a non-profit trust, sponsored and administered by a Board of Trustees, established through collective bargaining by labor unions and employers. Pursuant to the trust agreement under which it was created, it provides comprehensive healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees.

10.     Plaintiff Plumbers and Steamfitters Local No. 166 Health and Welfare Plan is an entity, maintaining its principal place of business at 2930 West Ludwig Road, Fort Wayne, Indiana 46818. Plaintiff is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act ("ERISA"). Plaintiff is a non-profit trust, sponsored and administered by a Board of Trustees, established through collective bargaining by labor unions and employers. Pursuant to the trust agreement under which it was created, it provides comprehensive healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees.

11.     Plaintiff Southern Ohio Painters Health and Welfare Fund is an entity, maintaining its principal place of business at 2621 East Third Street, Dayton, Ohio 45403. Plaintiff is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act ("ERISA"). Plaintiff is a non-profit trust, sponsored and administered by a Board of Trustees, established through collective bargaining by labor unions and employers. Pursuant to the trust agreement under which it was created, it provides

comprehensive healthcare benefits to thousands of participants who are employed under various collective bargaining agreements, along with their dependents and retirees.

12.     Plaintiff Pipe Trades Industry Health and Welfare Plan is an entity, maintaining its principal place of business at 8838 East Milner, Terre Haute, Indiana 47803.  Plaintiff is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act ("ERISA").  Plaintiff is a non-profit trust, sponsored and administered by a Board of Trustees, established through collective bargaining by labor unions and employers.  Pursuant to the trust agreement under which it was created, it provides comprehensive healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees.

13.     Plaintiff IBEW 673 Fringe Benefit Funds Fund is an entity, maintaining its principal place of business at 8358 Munson Road, Mentor, Ohio 44060.  Plaintiff is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act ("ERISA").  Plaintiff is a non-profit trust, sponsored and administered by a Board of Trustees, established through collective bargaining by labor unions and employers.  Pursuant to the trust agreement under which it was created, it provides comprehensive healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees.

14.     Plaintiff IBEW Local 129 Fringe Benefit Funds is an entity, maintaining its principal place of business at 36964 Detroit Road, Avon, Ohio 44011.  Plaintiff is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act ("ERISA").  Plaintiff is a non-profit trust, sponsored and administered by a Board of Trustees, established through collective bargaining by labor unions and employers.

Pursuant to the trust agreement under which it was created, it provides comprehensive healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees.

15.    Plaintiff Plumbers and Steamfitters Local 42 Health & Welfare Plan is an entity, maintaining its principal place of business at 187 Woodlawn Avenue, Norwalk, Ohio 44857. Plaintiff is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act ("ERISA"). Plaintiff is a non-profit trust, sponsored and administered by a Board of Trustees, established through collective bargaining by labor unions and employers. Pursuant to the trust agreement under which it was created, it provides comprehensive healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees.

16.    Plaintiff Painting Industry Insurance and Annuity Funds is an entity, maintaining its principal place of business at 8257 Dow Circle, Cleveland, Ohio 44136. Plaintiff is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act ("ERISA"). Plaintiff is a non-profit trust, sponsored and administered by a Board of Trustees, established through collective bargaining by labor unions and employers. Pursuant to the trust agreement under which it was created, it provides comprehensive healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees.

17.    Plaintiff Service Employee International Union Local No. 3 Health and Welfare Fund is an entity, maintaining its principal place of business at 1735 East 23rd, Cleveland, Ohio 441144. Plaintiff is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act ("ERISA"). Plaintiff is a non-profit

trust, sponsored and administered by a Board of Trustees, established through collective bargaining by labor unions and employers. Pursuant to the trust agreement under which it was created, it provides comprehensive healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees.

18.     Plaintiff Ohio State IBEW Health & Welfare Fund is an entity, maintaining its principal place of business at 947 Goodale Boulevard, Columbus, Ohio 43216. Plaintiff is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act ("ERISA"). Plaintiff is a non-profit trust, sponsored and administered by a Board of Trustees, established through collective bargaining by labor unions and employers. Pursuant to the trust agreement under which it was created, it provides comprehensive healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees.

19.     Plaintiff IBEW Local 32 Health & Welfare Fund is an entity, maintaining its principal place of business at 1975 North West Street, Lima, Ohio 45801. Plaintiff is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act ("ERISA"). Plaintiff is a non-profit trust, sponsored and administered by a Board of Trustees, established through collective bargaining by labor unions and employers. Pursuant to the trust agreement under which it was created, it provides comprehensive healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees.

20.     Plaintiff IBEW Local 683 Fringe Benefit Funds is an entity, maintaining its principal place of business at 23 West Second Avenue, Columbus, Ohio 43201. Plaintiff is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee

Retirement Income Security Act ("ERISA"). Plaintiff is a non-profit trust, sponsored and administered by a Board of Trustees, established through collective bargaining by labor unions and employers. Pursuant to the trust agreement under which it was created, it provides comprehensive healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees.

21.     Plaintiff Indiana State Council of Carpenters Health and Welfare Fund is an entity, maintaining its principal place of business at 5420 West Southern Avenue, Suite 407, Indianapolis, Indiana 46241. Plaintiff is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act ("ERISA"). Plaintiff is a non-profit trust, sponsored and administered by a Board of Trustees, established through collective bargaining by labor unions and employers. Pursuant to the trust agreement under which it was created, it provides comprehensive healthcare benefits to thousands of participants who are employed under various collective bargaining agreements, along with their dependents and retirees.

22.     Plaintiff Plumbers Local No. 210 Health and Welfare Fund is an entity, maintaining its principal place of business at 2901 E. 83rd Place, Merrillville, Indiana 46410. Plaintiff is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act ("ERISA"). Plaintiff is a non-profit trust, sponsored and administered by a Board of Trustees, established through collective bargaining by labor unions and employers. Pursuant to the trust agreement under which it was created, it provides comprehensive healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees.

23.    Plaintiff Indiana Carpenters Health and Welfare Fund is an entity, maintaining its principal place of business at 2635 Madison Avenue, Indianapolis, Indiana 46225.  Plaintiff is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act ("ERISA").  Plaintiff is a non-profit trust, sponsored and administered by a Board of Trustees, established through collective bargaining by labor unions and employers.  Pursuant to the trust agreement under which it was created, it provides comprehensive healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees.

24.    **Plumbers and Steamfitters Local 440 Health and Welfare Plan** is an entity, maintaining its principal place of business at 3747 S. Highschool Road, Indianapolis, Indiana 46241.  Plaintiff is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act ("ERISA").  Plaintiff is a non-profit trust, sponsored and administered by a Board of Trustees, established through collective bargaining by labor unions and employers.  Pursuant to the trust agreement under which it was created, it provides comprehensive healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees.

25.    **Indiana Bricklayers Local No. 6 Welfare Trust Fund** is an entity, maintaining its principal place of business at 7985 Marshall Street, Merrillville, Indiana 46410.  Plaintiff is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act ("ERISA").  Plaintiff is a non-profit trust, sponsored and administered by a Board of Trustees, established through collective bargaining by labor unions and employers.  Pursuant to the trust agreement under which it was created, it provides

comprehensive healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees.

26.    **Motion Picture Laboratory Technicians and Film Editors Local 780 Welfare Fund** is an entity, maintaining its principal place of business at 6301 N. Northwest Highway, Chicago, Illinois 60631.  Plaintiff is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act ("ERISA").  Plaintiff is a non-profit trust, sponsored and administered by a Board of Trustees, established through collective bargaining by labor unions and employers.  Pursuant to the trust agreement under which it was created, it provides comprehensive healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees.

27.    **Dealers-Unions Insurance Fund** is an entity, maintaining its principal place of business at 2902 Euclid Avenue, Cleveland, Ohio  44115.  Plaintiff is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act ("ERISA").  Plaintiff is a non-profit trust, sponsored and administered by a Board of Trustees, established through collective bargaining by labor unions and employers.  Pursuant to the trust agreement under which it was created, it provides comprehensive healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees.

28.    **United Food and Commercial Workers Union-Employer Health and Welfare Fund** is an entity, maintaining its principal place of business at 2828 Euclid Avenue Cleveland, Ohio 44115.  Plaintiff is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act ("ERISA").  Plaintiff

is a non-profit trust, sponsored and administered by a Board of Trustees, established through collective bargaining by labor unions and employers.  Pursuant to the trust agreement under which it was created, it provides comprehensive healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees.

29.     Defendant Merck & Co., Inc. ("Merck") is incorporated under the laws of the State of New Jersey and maintains its principal place of business at One Merck Drive, Whitehouse Station, New Jersey.

## CLASS ACTION ALLEGATIONS

30.     This action is brought by the Plaintiffs as a Class Action, on their own behalves and on behalf of all others similarly situated, under the provisions of Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure.

31.     The Plaintiffs represent an appropriate Class consisting of third-party payers throughout the United States who, beginning in 1999 and continuing until after September 30, 2004, have paid any entity for the purchase of the prescription drug Vioxx, whether by direct payment, reimbursement or otherwise, for or on behalf of their participants.  Excluded from the Class are Merck, including any parent, subsidiary, affiliate or controlled person or entity of Merck, and its officers, directors, agents, employees and members of their immediate families, and any Federal or state governmental entity.

32.     The Plaintiffs may bring this action as representatives of the Class because:

(a)     They are third party payers who have paid claims for the purchase of Vioxx;

(b)     They have been injured by Merck's actions, in that they have paid for Vioxx, at elevated prices based upon Merck's misrepresentations of the benefits of Vioxx;

(c)     Their claims are typical of the claims of other Class Members;

(d)     The predominant questions of fact and law are common to the Class;

(e)     The Plaintiffs are represented by seasoned counsel, experienced in class actions, products liability and injury litigation and will fairly and adequately protect the interests of the Class;

(f)     There are not less than several thousand members of the Class; thus, the Class is so numerous that joinder of individual members in this action is impracticable;

(g)     The prosecution of separate actions by individual members of the Plaintiff Class would create risk of (1) inconsistent or varying adjudications with respect to individual members of the Class; or (2) adjudications with respect to individual members of the Plaintiff Class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or which would substantially impair or impede their ability to protect their interests; and,

(h)     A class action is a superior method of adjudicating the rights of the parties.

33.     Common questions of fact and law predominate over questions of fact and law affecting only individual Class Members.  Such questions include:

(a)     Whether Merck converted an otherwise legitimate association-in-fact into a RICO enterprise for its unlawful purpose of achieving approval and increasing sales of Vioxx by using mail and wire fraud to provide the FDA, physicians, and dispensers of the drug with false and misleading information about Vioxx;

(b)     Whether Merck instituted a global strategy which was intended to and did create a means to control information and avoid disclosure of the risks associated with Vioxx, so that Merck might achieve its goal of increasing the market for and use of Vioxx and thereby unlawfully increase its profits;

(c)     Whether Merck unlawfully, knowingly and intentionally created, conducted, managed and/or operated the affairs of the Vioxx Enterprise;

(d)     Whether Merck engaged in a pattern of racketeering activity consisting of numerous acts of racketeering across several states, including acts indictable under 18 U.S.C. §§ 1341, 1343 and 1344;

(e)     Whether Merck orchestrated, managed and/or conducted the Vioxx Enterprise as a continuing unit to achieve its goals of preserving and expanding Vioxx's market, thereby unlawfully maximizing Merck's profits;

(f)     Whether Merck targeted Plaintiffs and the class through advertising to induce Vioxx prescriptions and usage and to induce Plaintiffs and the class to purchase and/or authorize the purchase of Vioxx;

(g)     Whether the Vioxx Enterprise existed separate and apart from Merck's racketeering acts;

(h)     Whether Merck used mail and wire fraud to provide the other members of the Vioxx Enterprise with false and misleading information so that they would take action that furthered Merck's goals;

(i)     Whether, based upon Merck's false and misleading representations about Vioxx, the other members of the Vioxx Enterprise unknowingly engaged in activities that furthered Merck's goals;

(j)     Whether Merck acted repeatedly through the use of the mail and other media, including television and radio, as part of its efforts to control the conduct of the Vioxx Enterprise and to fraudulently build confidence of the members of the enterprise and healthcare consumers as to the safety and efficacy of Vioxx;

(k)     Whether Merck's false and misleading advertising caused Vioxx to be misbranded under 21 U.S.C. § 331(a) and 21 C.F.R. § 202.1;

(l)     Whether Merck engaged in activities of encouraging physicians to prescribe Vioxx for off-label uses; and,

(m)     Whether Merck engaged in various activities that amounted to illegal kick-backs to physicians to induce them to prescribe Vioxx for intended and off-label uses.

## GENERAL FACTS COMMON TO ALL CAUSES OF ACTION
### The Injured Parties

34.     This action is brought by the Plaintiffs on behalf of themselves and all others similarly situated for injuries to the business and property of each caused by the unlawful course of conduct of Merck.

35.     From 1999 to the present, Plaintiffs have expended hundreds of thousands of dollars, and the Plaintiff class has expended millions of dollars for the purchase of Vioxx for their participants.

36.     The vast majority of all prescription purchases in the United States are authorized and paid, in whole or in part, by third-party payers on behalf of the participants in their plans.

37.     Third-party payers often use a list of approved drugs referred to as a "formulary" for determination as to which drugs are "preferred" for treatment.  A preferred drug may be available at a lower co-payment than a non-preferred drug of the same therapeutic class.  Drugs that are not included on a formulary may not be approved for purchase by the third-party payer at all.

38.     In order to increase the market for and use of Vioxx so as to increase its profits, it was extremely important to Merck that Vioxx be approved by the FDA and/or be a formulary drug so that third-party payers would authorize payment for its purchase.

39.     In order to assure that Vioxx would be approved for purchase, Merck utilized the Vioxx Enterprise to disseminate, by mail and wire fraud, false and misleading information concerning the safety and benefits of Vioxx as compared to other drugs of the same class.

40.     Based on the actions of the Vioxx Enterprise, Plaintiffs approved Vioxx for payment on behalf of their participants under their respective plans.

41.     In comparison to the other appropriate, equally effective and safe, prescription and non-prescription NSAIDs that might have been used to treat the Plaintiffs' participants, Vioxx was as much as ten times more expensive.

### The Vioxx Enterprise

42.     Merck, the FDA, prescribing physicians, and dispensers of the drug are all persons as defined by the RICO Act.

43.     At all times relevant, Merck through its agents and employees researched, developed, manufactured, designed, tested, distributed, marketed, promoted, advertised and sold the pharmaceutical product Vioxx.

44.     On May 20, 1999, the FDA approved Vioxx for sale.  Shortly thereafter, Merck began its distribution and sale of Vioxx throughout the United States, including in the state of Indiana.

45.     Vioxx received a six-month priority review from the FDA based on its potential for therapeutic advantage due to presumably having fewer gastrointestinal side effects, including stomach ulcers and bleeding, and thus being safer for those individuals at risk for suffering these problems, and was approved for use in treatment of osteoarthritis and primary dysmenorrhea and for management of acute pain.

46.     In order to insure successfully launching this product in competition with Celebrex (celecoxib), which was introduced into the market by Merck competitors approximately three (3) months prior to the introduction of Vioxx, Merck intentionally failed to disclose to the FDA the serious cardiovascular risks it knew were associated with Vioxx.

47.     Both before and after launching Vioxx, Merck undertook aggressive action to avoid and prevent disclosure of serious cardiovascular risks it knew were associated with Vioxx so that it could position itself competitively and increase its profits.

48.     Toward this end, Merck decided to transform the otherwise lawful drug approval process (association-in-fact) in a fraudulent manner to convince the healthcare consumers and third party payers that Vioxx was safe for widespread use in chronic as opposed to acute pain management, not limited to patients suffering from bleeding stomach ulcers or other gastrointestinal conditions who would be at risk in using the much less expensive NSAIDs.

49.     From at least 1999 to the present, Merck engaged in activities that allowed it to manipulate the approval process through the Vioxx Enterprise.

50.     The Vioxx Enterprise is an enterprise, as that term is defined in 18 U.S.C. § 1961(4), that is, a group of entities and individuals associated in fact, which was engaged in, and the activities of which affected, interstate commerce and foreign commerce.

51.     Each of the identified individuals and entities participated in the operation and management of the Vioxx Enterprise, albeit induced by the wire and mail fraud misrepresentations from Merck.

52.     The fundamental goals of the Vioxx Enterprise were to preserve and unlawfully expand the market for Vioxx and, thereby, to unlawfully maximize Merck's profits.

53.     To achieve these goals, Merck, among other things:

(a)     used the mail to communicate to the FDA data which misrepresented the safety and efficacy of Vioxx;

(b)     used the mail to communicate to the physicians through "Dear Doctor" letters, information that misrepresented the safety and efficacy of Vioxx by

minimizing the level of risk of Vioxx while favorably comparing Vioxx's

effectiveness and safety to other NSAIDs;

(c)     used advertisements in various publications, transmitted through the mail,

to communicate with health care consumers information that misrepresented the

safety and efficacy of Vioxx while favorably comparing Vioxx's effectiveness

and safety to other NSAIDs;

(d)     hired and trained a physician, Dr. Peter Holt, to conduct promotional

conferences for physicians about the benefits of Vioxx while minimizing some

risks and failing to disclose others;

(e)     caused its employees and/or agents to publish articles that falsely attacked

scientific evidence that suggested Vioxx was unsafe while knowing such evidence

was scientifically reliable;

(f)     trained sales and marketing employees to engage in false and misleading

promotional activities with physicians and to avoid answering questions about CV

risks of Vioxx so that physicians would continue and increase prescribing Vioxx

for on-label and off-label uses;

(g)     used the mail, electronic broadcasts on television and/or radio, and print

publications on many occasions to distribute false or misleading information

about Vioxx's safety and efficacy to healthcare consumers to enhance demand for

Vioxx and create pressure on physicians to prescribe Vioxx;

(h)     threatened professionally and attempted to discredit scientists who

challenged Merck's misleading published statements;

22

(i)    attempted to discredit scientific reports or research challenging Vioxx's safety and efficacy, and,

(j)    pursued litigation in foreign courts over published research critical of Vioxx's safety.

54.    On information and belief, Merck developed a marketing program, using illegal kickbacks to physicians, to further induce them to prescribe Vioxx for on-label and off-label users rather than a competitive, less risky and equally effective NSAIDs.

## The Enterprise's Effect on Interstate Commerce

55.    Through its use of the Vioxx Enterprise and mail and wire fraud as above alleged, Merck was able to create a market for Vioxx that resulted in estimated annual sales reaching $2.5 billion.  According to Merck's 1999 Annual Report, 5 million prescriptions were written for Vioxx in its first seven months on the market.  In 2003, an estimated 19.9 million prescriptions were written.  By the time Vioxx was taken off the market in September, 2004, it was estimated that 105 million prescriptions had been written and that Vioxx had been ingested by 20 million patients in the United States alone.

56.    Plaintiffs' participants purchased Vioxx through various dispensers of the durg such as pharmacies and through prescription mail services that utilized the mail for delivery of prescription medications.

57    Merck communicated false and misleading information about Vioxx to the FDA, physicians, health care consumers, and third party payers through various media, including radio, television, and written materials sent through the mail.

58.    Each of these efforts affected interstate commerce.

### Merck's Acts to Conceal Its Knowledge of Vioxx's Cardiovascular Risks

59.    As early as 1997, internal Merck emails warned that studies of Vioxx indicated it could cause blood clots and resulting cardiovascular problems.

60.    Despite access to this and other negative information about Vioxx, Merck repeatedly used misleading information to the FDA to gain FDA approval of the sale of Vioxx in May of 1999.  However, the FDA would not approve a label statement that it had fewer side effects.

61.    In March of 2000, Merck released the results of the Vioxx Gastrointestinal Outcomes Research Study (the "VIGOR Study"), which had begun in approximately January 1999  While the VIGOR Study did demonstrate that Vioxx reduced the incidence of serious gastrointestinal side effects as compared to Naproxen, it did not demonstrate an improved safety profile for Vioxx.  In fact, it showed the opposite.  The VIGOR Study data revealed that:

(a)    Patients on Vioxx were five times more likely to suffer a heart attack as compared to patients on Naproxen;

(b)    Patients on Vioxx were 2.3 times more likely to suffer serious cardiovascular disease (including heart attacks, ischemic stroke, unstable angina, and sudden unexplained death) as compared to patients on Naproxen; and,

(c)    Patients on Vioxx actually suffered *more* cases of serious disease (either gastrointestinal or cardiovascular) than did Naproxen users (61 and 57 cases respectively).

62.    Nonetheless, Merck transmitted the VIGOR study by mail to the FDA.  In June of 2000, in an effort to obtain approval for new gastrointestinal safety claims for Vioxx,   In a desperate effort to explain the evidence of a causal relationship between Vioxx and this significantly increased rate of cardiovascular events, Merck, without any substantive basis whatsoever, claimed that Naproxen had "cardio-protective effects," and that this resulted in the

lower incidence of heart attacks in the group taking Naproxen.  Subsequent further research showed this claim not only was unfounded, but, in fact, it was false.

63.    After the VIGOR Study, evidence of the increased danger of cardiovascular problems attributable to Vioxx continued to mount. In June of 2000, industry sponsored studies presented at the European United League Against Rheumatism (EULAR), an organization in which Merck was a member and corporate sponsor, showed that Vioxx use resulted in a statistically significant increase in hypertension and myocardial infarction.  Merck denied the results of these studies as to the hypertension problems in the official publication of the American Pharmaceutical Association, *Pharmacy Today*..

64.    Merck continued to deny the significant cardiovascular risks associated with Vioxx while at the same time reaping the profits obtained through their false and misleading advertising to the healthcare consumers and to the physicians treating them, as well as to the third party payers to the extent they paid for the drug

65.    In November of 2000, Merck caused the publication of a study in the NEW ENGLAND JOURNAL OF MEDICINE, knowingly downplaying and/or withholding from publication the severity of cardiovascular risks associated with Vioxx consumption as compared to Naproxen consumption found in the VIGOR Study.

66.    Ignoring the evidence to the contrary, on May 22, 2001, Merck issued a press release through the *PR Newswire* that stated, among other things: "In response to news and analyst reports of data the Company first released a year ago, Merck & Co., Inc. today reconfirmed the favorable cardiovascular safety profile of Vioxx."

67.    In September 2001, the FDA mailed Merck a warning letter which warned Merck that its marketing of Vioxx was "false, lacking in fair balance, or otherwise misleading... ." The

Warning Letter went on to advise Merck that its marketing "minimize[s] the Vioxx/Coumadin drug interaction, omit[s] crucial risk information associated with Vioxx therapy, contain[s] unsubstantiated comparative claims, and promote[s] unapproved uses."

68.     The Warning Letter also reprimanded Merck for:

"assert[ing] that Vioxx does not increase the risk of [heart attacks] and that the VIGOR finding is consistent with naproxen's ability to block platelet aggregation like aspirin. That is a possible explanation, but you fail to disclose that your explanation is hypothetical, has not been demonstrated by substantial evidence, and that there is another reasonable explanation, that Vioxx may have pro-thrombotic properties."

69.     The hypothetical but unsubstantiated explanation asserted by Merck to explain the results of the VIGOR Study was refuted in approximately January of 2002 by a Vanderbilt University School of Medicine human epidemiologic peer-reviewed study.   The study was published in *The Lancet*, a noted Brittish medical journal, and concluded that there is an absence of a protective effect of naproxen or other non-aspirin NASAIDs on risk of coronary heart disease.  Ray, W., et al., "Non-Steroidal Anti-Inflammatory Drugs and Risk of Serious Coronary Heart Disease: an Observational Cohort Study," *The Lancet*, 359: 118-123, Jan. 12, 2002.

70.     In a follow-up study reported in the *Journal of the American College of Cardiology* on or about February 6, 2002, Dr. Richard J. Bing reported on having conducted scientific testing and confirmed that a Cox-2 inhibitor (Vioxx) tips the balance of prostacyclin/thromboxane in favor of thromboxane, leading to increased vascular and thrombotic events.

71.     During the time the results of these studies were being published, healthcare consumers and physicians were complaining about Vioxx to the FDA.  The FDA's Adverse

Events Reporting System ("AERS") database is a computerized system for collecting and maintaining information about adverse events reported by drug manufacturers, health professionals, and others.   The system contains adverse events detected and reported after marketing of the drug.

72.     According to AERS, through October of 2003, almost 2,000 adverse cardiovascular events were experienced by persons taking Vioxx, including myocardial infarctions, cardiac arrests, and cardiac failures.   These cardiac events reported to the FDA resulted in such outcomes as hospitalization, life threatening conditions, and death.   Moreover, it was recognized that this system under-reported the actual frequency of such events in the Vioxx-taking population.

73.     On October 30, 2003, in an article entitled "Vioxx Study Sees Heart-Attack Risk," *The Wall Street Journal* reported that another study, sponsored by Merck, presented at the annual meeting of the American College of Rheumatology, confirmed an increased "risk of heart attacks in patients taking the pill [Vioxx]."   According to *The Wall Street Journal* article, within the first 30 days of taking Vioxx, the risk of a heart attack was increased 39% as compared to Vioxx's competitor, Celebrex.

74.     Nonetheless, in response to these various studies, Merck continued to stand behind the overall and cardiovascular safety profile of Vioxx.

75.     In August 2004, *Health Day News* quoted the FDA as finding "this and other studies cast serious doubt on the safety" of Vioxx.   Even at this late date, Merck sprang to the defense of Vioxx.   Peter S. Kim, President of Merck Research Laboratories was quoted as saying Merck "strongly disagrees" with the findings of this new study.   On August 26, 2004, The

Street.com commented "Merck Thursday released a detailed critique questioning the study's significance."

76.    Pharmaceutical companies routinely communicate by mail and in person with physicians regarding prescribing information.  When a company communicates expanded positive information about a drug, the company uses a blue box on its correspondence.  When it communicates warning information, it uses a red box.

77.    In the "Dear Doctor" letter, Merck asserted that Vioxx's prescribing information had been revised to reflect the results of the VIGOR Study and the FDA approved Vioxx for the relief of the signs and symptoms of rheumatoid arthritis in adults.

78.    Rather than providing a warning of the serious cardiovascular risks associated with Vioxx, Merck instead falsely represented to physicians only a "precaution" related to cardiovascular effects, stating that "the significance of the cardiovascular findings" was "unknown."  In fact, Merck knew Vioxx was the cause of significantly increased cardiovascular risks, yet concealed this knowledge from physicians charged with prescribing safe medication for their patients.

79.    Merck continued using the Vioxx Enterprise to ensnare the FDA and, less than a month before Merck pulled Vioxx from the market on September 8, 2004, announced that the FDA had approved Vioxx's use for treatment of juvenile rheumatoid arthritis in children as young as two years.

80.    Throughout the time Vioxx was on the market, Merck used television advertisements targeted to healthcare consumers, print advertisements in magazines mailed to healthcare consumers, and other wire and mail communications to promote Vioxx's widespread use for chronic pain management without any cardiovascular warnings.  These advertisements

were intended to and did encourage healthcare consumers and potential healthcare consumers to ask their physicians to prescribe Vioxx for them.

81.     Merck used funds obtained from the sale of Vioxx to support other business activities of Merck.

## The Injury Caused By The Racketeering Activity

82.     At all times relevant, the Plaintiffs provided health care coverage for their participants.

83.     Among other expenses the Plaintiffs paid on behalf of their participants was the cost to purchase Vioxx, less any applicable co-payment paid directly by the participant.

84.     Due to Merck's use of mail and wire fraud to misrepresent Vioxx's safety and efficacy, Merck was able to artificially inflate the price for Vioxx much higher than other NSAIDs.

85.     As a result, the Plaintiffs paid substantially more to purchase Vioxx for their participants than they would have paid for other NSAIDs or for Vioxx if its price had accurately reflected its actual and uninflated value in the market place.

86.     The FDA, the treating physicians who prescribed Vioxx, the healthcare consumers who took Vioxx, and the Plaintiffs, were all victims of Merck's aggressive wire and mail fraud campaign, effected through the Vioxx Enterprise and intended to deceive the public as to the risks and benefits related to taking Vioxx.

87.     As a direct and proximate result of the racketeering activities in which Merck engaged, at no time did members of the public, including the Plaintiffs, receive adequate warning that taking Vioxx could cause cardiovascular injuries or increase the chances of suffering cardiovascular incidents or cerebral events such as a stroke.

88.     Until Merck withdrew Vioxx from the market on or about September 30, 2004, the Plaintiffs were not aware of the connection between Vioxx and the substantially increased likelihood of suffering a cardiovascular or cerebrovascular incident as a result of taking Vioxx.

89.     Until Merck withdrew Vioxx from the market due to Merck's unlawful conduct, the Plaintiffs were not aware that the price for Vioxx had been artificially inflated.

## Violations of the Racketeer Influenced and Corrupt Organizations Statute ("RICO") under § 1962(c)

90.     Plaintiffs incorporate by reference the foregoing paragraphs as though fully set forth herein.

91.     At all relevant times, the Vioxx Enterprise was engaged in and undertook activities that affected interstate and foreign commerce.

92.     During the relevant times, Merck engaged in a pattern of racketeering activity consisting of numerous acts of racketeering across several states, indictable under 18 U.S.C. §§ 1341 (mail fraud), and 1343 (wire fraud), including but not limited to the specific acts of racketeering alleged *supra*, which are incorporated by reference as if fully set forth herein.

93.     During the relevant times, Merck orchestrated and conducted the Vioxx Enterprise as a continuing unit to achieve its goals of preserving and expanding the market for Vioxx, thereby maximizing Merck's profits.

94.     In order to achieve its goals, Merck provided the other members of the Vioxx Enterprise – the FDA, prescribing physicians, and dispensers of the drug – with information it knew to be false and misleading so that each would take action that furthered Merck's goal of increasing sales of Vioxx.

95.     In reliance upon Merck's false and misleading information, healthcare consumers engaged in activities that furthered the goals of the Vioxx Enterprise by increasing the sales of Vioxx, by requesting Vioxx be prescribed for their conditions, on and off-label.

96.     The fraudulent, misleading and unlawful efforts orchestrated by Merck and carried out through the Vioxx Enterprise continued from its inception through the withdrawal of Vioxx in September 2004.

97.     Throughout the relevant time period, Merck has repeatedly used advertisements, promotions, and public statements sent through the mail, issued through broadcasts on radio and television or through other media as part of a concerted effort to influence the conduct of the Vioxx Enterprise and to build the confidence of the members of the Vioxx Enterprise and the healthcare consumers as to the safety of Vioxx.

98.     Through its false and misleading advertising, Merck caused Vioxx to be misbranded pursuant to 21 U.S.C. § 331 and 21 C.F.R. § 202.1(j)(3).

99.     The formation, existence and maintenance of the Vioxx Enterprise were essential to Merck's strategy.  Merck was aware at all times that, if it failed to manage and control the FDA's, prescribing physicians' , and healthcare consumers' responses to public information, it risked substantially diminished sales or market withdrawal of Vioxx and substantially reduced income levels.

100.    At all times relevant, the Vioxx Enterprise has existed separate and apart from Merck's racketeering acts.

101.    The Vioxx Enterprise has an ascertainable structure and purpose beyond the scope and commission of Merck's predicate acts.  In the absence of those predicate acts, the Vioxx Enterprise would have functioned in its lawful course to produce for consideration a

pharmaceutical product, the appropriateness of approval of a pharmaceutical product, to evaluate the necessity of specific safety warnings, to evaluate the appropriateness of the pharmaceutical product for a particular patient to prescribe appropriate medical treatment for particular patients, and for the drug to be dispensed.  In the absence of the racketeering activities of this Vioxx Enterprise, the healthcare consumer would have been aware of all the risks of the product before he or she requests her doctor to prescribe it.

102.    By its racketeering activities, Merck took an otherwise innocent association-in-fact and corrupted it, operating it for its own unlawful purposes in order to increase its profits and hide from disclosure information about the safety risks of Vioxx.

103.    Plaintiffs and Plaintiffs' class paid, for a price-inflated, over-prescribed product, and ultimately these funds reached Merck as payment for Vioxx.

104.    On information and belief, in addition to using the profits from Vioxx to continue the unlawful purposes of the Vioxx enterprise, Merck used the profits to support its lawful business.  As a direct and proximate result of Merck's racketeering activities and the actions of the Vioxx Enterprise, until the withdrawal of Vioxx from the market, Plaintiffs and the class have suffered injury to their businesses as alleged herein.

WHEREFORE, Plaintiffs on behalf of themselves and all others similarly situated, pray this Court:

1.    enter an order determining that this action is a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2.     appoint Plaintiffs as Class Representatives;

3.    appoint Plaintiffs' counsel as Class Counsel;

4.    enter judgment in favor of Plaintiffs and the Class and against Merck;

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing has been served on Liaison Counsel, Russ Herman and Phillip Whittmann, by U.S. Mail and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre Trial Order No. 8 on this 10ᵗʰ day of April, 2006.  Copies have also been sent via U.S. Mail and e-mail to:

George M. Plews, Esq.
Brett E. Nelson, Esq.
David L. Pippen, Esq.
PLEWS SHADLEY RACHER & BRAUN
1346 North Delaware Street
Indianapolis, Indiana 46202

E-Mail:         gplews@psrb.com
                bnelson@psrb.com
                dpippen@psrb.com

Ellen M. Gregg, Esq.
Womble Carlyle Sandridge & Rice, PLLC
301 North Main Street, Suite 300
Winston-Salem, North Carolina 27101

E-Mail:         MDL@wcsr.com

Jamie R. Sweeney

5.     award Plaintiffs and the Class compensatory damages sufficient to compensate

them for their injuries;

6.     award Plaintiffs and the Class pre-judgment and post-judgment interest as

provided by law;

7.     award Plaintiffs and the Class treble damages as provided by statute;

8.     award Plaintiffs and the Class the costs of this action, including reasonable

attorneys' fees; and,

9.     grant all other appropriate relief.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues so triable.

Respectfully submitted,

**PRICE WAICUKAUSKI RILEY & DeBROTA, LLC**

By_____

Henry J. Price, Bar No. 8522-49
William N. Riley, Bar No. 14941-49
Amy Ficklin DeBrota, Bar No. 17294-49
Jana K. Strain, Bar No. 20677-49
Jamie R. Sweeney, Bar No. 25124-49
Christopher A. Moeller, Bar No. 25710-49

The Hammond Block Building
301 Massachusetts Avenue
Indianapolis, IN  46204
Telephone: (317) 633-8787
Fax: (317) 633-8797