UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) ) ) ) ) | MDL Docket No. 1657<br>Section: L<br>JUDGE FALLON<br>MAG. JUDGE KNOWLES |
| *This document relates to Eugene Frontauria v. Merck & Co., Inc., 05-5679* | | JURY TRIAL DEMANDED |

## FIRST AMENDED COMPLAINT

Eugene Frontauria and Barbara Frontauria through their undersigned counsel bring this action for damages arising from Eugene Frontauria's ingestion of the pharmaceutical agent, VIOXX,™ and allege as follows:

### I.    PARTIES

1.    Plaintiff Eugene Frontauria and Barbara Frontauria, are, and all times relevant to this action were, citizens and residents of Davidson County, Tennessee.

2.    Defendant Merck and Co., Inc. (hereinafter "Merck") is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business located at One Merck Drive, Whitehouse Station, New Jersey 08889.

3.    Merck developed, manufactured, marketed and distributed the pharmaceutical agent rofecoxib under the trade name VIOXX.

### II.    JURISDICTION AND VENUE

4.    Mr. and Mrs. Frontauria allege an amount in controversy in excess of $75,000, exclusive of interest and costs.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between Mr. and Mrs. Frontauria and Merck.

5.      Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claim occurred in this District.  Mr. Frontauria was prescribed and ingested VIOXX within this District, resided within this District while taking VIOXX, and was injured while within this District.  As a result, many of the witnesses and records pertaining to these claims are located within this District.

6.      Venue is also proper within this District because Defendant Merck is subject to personal jurisdiction within this District.  Merck has substantial contacts with this District justifying exertion of both specific and general jurisdiction.  Merck regularly does business within this District, and derives substantial revenue from goods used and consumed within this District.  Furthermore, Merck's actions and inaction caused injury to Mr. Frontauria within this District.  Because it was reasonably foreseeable that Merck's tortious activity would have consequences in this District, Merck is subject to *in personam* jurisdiction within this District.  In addition, Merck's marketing, distribution, and sale of a dangerous and defective product within this District constituted tortious activity within this District also making venue proper.

## III.   FACTUAL BACKGROUND

7.      VIOXX belongs to a class of drugs called "COX-2 inhibitors."  COX-2 inhibitors and other non-steroidal anti-inflammatory drugs or "NSAIDS", such as ibuprofen and naproxen, are commonly prescribed to relieve pain and inflammation.  NSAIDs generally reduce pain by blocking the production of one or both of the cyclooxengenase enzymes.  COX-2 inhibitors, such as VIOXX, block the production of the enzyme known as cyclooxengenase-2 or COX-2.

8.      While it was on the market, VIOXX was Merck's leading drug for control of acute and chronic pain associated with osteoarthritis, rheumatoid arthritis, migraine headaches and dysmenorrheal pain.  In 2003 alone, worldwide sales of VIOXX reached $2.5 billion dollars, following the most impressive global sales growth for any drug.

525860.1

9.      From a marketing standpoint, VIOXX was an unqualified success.  From a public safety standpoint, it was an unmitigated disaster.  VIOXX's five year market history and the pre-marketing application process were plagued with safety concerns that went ignored, and/or were actively downplayed, or concealed by Merck.

10.      Despite the efforts of numerous healthcare professionals, Merck managed to hide the fact that VIOXX significantly increased the risk of thromboembolic adverse events, such as heart attacks and strokes until it recalled the drug in September 2004.

### A.      Merck's Pre-Market Knowledge of VIOXX's Cardiotoxicity and Prothrombotic Effects.

11.      The potential for cardiovascular risk of selective COX-2 inhibitors was known to Merck long before the U.S. Food and Drug Administration (the "FDA") granted market approval in May of 1999.  By 1997, and prior to the submission of the New Drug Application (the "NDA") for VIOXX, Merck was aware that, by inhibiting COX-2, VIOXX altered the homeostatic balance between prostacylcin synthesis and thromboxane and thereby increased the prothrombotic effects of the drugs, causing blood clots to form in those who ingested it.

12.      Although all COX-2 inhibitors have this mechanism of action, VIOXX was the most selective COX-2 inhibitor on the market in 1999.  Accordingly, it had the greatest potential to cause adverse cardiovascular and cerebrovascular events.

13.      Nevertheless, on November 23, 1998, Defendant Merck submitted a New Drug Application to the FDA for VIOXX, omitting information about the extent of the risks associated with VIOXX.  Without a complete picture of the potential hazards associated with the drug, the FDA approved VIOXX on or about May 20, 1999.

14.      In anticipation of approval, Merck put into place one of the most massive marketing campaigns in pharmaceutical history.  Once the drug was approved, scores of sales representatives fanned out across the country with samples, asserting that VIOXX had a better safety profile than other NSAIDs.  At the time the drug was approved, Merck's labeling

- 3 -

indicated that VIOXX, taken at the 12.5 mg., 25 mg. and 50 mg. daily dosage, "was associated with a significantly lower percentage of patients with endoscopic gastroduodenal ulcers than treatment with ibuprofen 2400 mg daily."

15.    Although Merck played up this advantage, this was not the label Merck wanted for VIOXX. Merck would have preferred that the VIOXX labeling did not warn at all about the possible serious gastrointestinal ("GI") side effects associated with NSAIDs. Without additional information proving VIOXX was free of this known risk, the FDA was unwilling to remove the GI warning.

### B.    The VIOXX Gastrointestinal Research ("VIGOR") Study

16.    While awaiting FDA approval, Merck initiated a clinical study that it hoped would convince the FDA to remove the GI warning from the labeling and provide Merck with a basis to market VIOXX as superior to its chief competitor, CELEBREX, and all of the existing, cheaper, over-the-counter NSAIDs already on the market. Because VIOXX was no more effective than the other NSAIDs, it was crucial that Merck be able to claim that it had a better safety profile. If the GI warning were removed, VIOXX would have a distinct advantage over the other NSAIDs.

17.    In early 1999, Merck initiated the VIOXX Gastrointestinal Outcomes Research ("VIGOR") study comparing VIOXX's efficacy and GI safety profile to a traditional NSAID, naproxen, in more than 8,000 rheumatoid arthritis patients.

18.    By early November 1999, there were indications in the VIGOR study that VIOXX carried serious cardiovascular risks. Merck knew that the VIGOR trial demonstrated a four-fold increase of acute myocardial infarction ("MI") with once-daily 50 mg doses of VIOXX compared with twice daily 500 mg doses of naproxen (0.4% compared with 0.1% with naproxen).

19.    Rather than acknowledge the increased risk associated with VIOXX demonstrated by the study, the Merck apologists hypothesized that the reason for the results was not that VIOXX increased the risk of heart attacks, but that naproxen reduced the risk of

cardiovascular events by having a cardioprotective benefit, similar to (but far more powerful than) aspirin. The final conclusion of the article emphasized the GI benefits of VIOXX over other NSAIDS, instead of acknowledging important information about the increased cardiovascular risks.

20.     In the months that followed the publication of the VIGOR results, Merck continued to maintain in many different forums and diverse ways that VIOXX had a satisfactory cardiovascular safety profile. Through direct-to-physician sales representative speeches to physicians, Merck spun the VIGOR results by claiming that they were either a result of chance or the result of the "cardioprotective effect of naproxen."

21.     Despite having information regarding the cardiotoxicity of VIOXX, Merck did not mention the VIGOR results in its label for over two years. Further, Merck strongly objected to the warning language proposed by the FDA, and instead, lobbied and battled with the FDA to obtain the least restrictive label. Direct-to-consumer advertising continued unabated, failing to adequately disclose the true risk-benefit profile of VIOXX.

22.     In June of 2000, at the pharmaceutical industry-sponsored studies presented to the European United League Against Rheumatism ("EULAR"), Merck scientist Dr. Claire Bombardier presented the VIGOR study. Her presentation highlighted the beneficial GI profile of VIOXX, and buried the critical evidence of VIOXX users' statistically significant increased hypertension and myocardial infarction rate compared to naproxen users.

23.     Merck continued to deny the ill health effects associated with VIOXX while at the same time reaping the financial rewards of its deception and concealment. Merck engaged in a massive advertising campaign designed to increase its market share. As a result of this scheme, Merck reaped more than $2 billion in profits in the year 2000 alone.

24.     Merck continued to profit from its failure to disclose crucial health information for years after the last VIGOR study participant had ceased taking the medication. In November 2000, Merck physicians published a study in the New England Journal of Medicine that again knowingly downplayed the severity of cardiovascular risks associated with VIOXX

consumption.  Then, on May 22, 2001, Merck issued a *PR Newswire* press release that selectively stated: "In response to news and analyst reports of data the Company released a year ago, Merck & Co., Inc., today reconfirmed the favorable cardiovascular safety profile of VIOXX."

25.     In response to information in 2001 demonstrating a significant increase in the risk of heart attack as a result of taking Vioxx, Merck spokeswoman Christine Fanelle continued to publicize the fiction that the statistic could be accounted for by the cardioprotective effect of comparator drugs.

26.     Despite Merck's efforts to prevent negative information about VIOXX from seeing the light of day, some continued to question VIOXX's safety profile.  The concerns that VIOXX significantly increased cardiovascular risk in VIOXX users were described by Drs. Mukherjee, Nissen and Topol in their August 2001 *JAMA* article.  The authors specifically highlighted the dangerous cardiovascular adverse event profile of COX-2 inhibitors, particularly VIOXX.

27.     In August 2001, Merck again publicly denied the validity of the adverse cardiovascular results of the VIGOR study, while persistently touting the gastrointestinal safety profile demonstrated by VIGOR.  In two press releases, Merck attempted to refute the Mukherjee study, and repeatedly stated: Merck stands behind the cardiovascular safety profile of VIOXX. Merck indicated in its August 21, 2001 press release:

> ". . . Merck believes that extensive cardiovascular data already
> exist on VIOXX and that these data  -- which were not
> incorporated into the Cleveland Clinic's analysis -- suggest that
> there is no increase in the risk of cardiovascular events as a result
> of treatment with VIOXX."

28.     The day before the Mukherjee *JAMA* article was published, Merck stated in a *Bloomberg News* piece: "We have additional data beyond what [Topol and the Cleveland Clinic study] cite, and the findings are very, very reassuring. . . . VIOXX does not result in any increase in cardiovascular events compared to placebo."  On August 23, 2001, the day after the

*JAMA* article was published, Merck stated in another press release: "The Company stands behind the overall ... cardiovascular safety profile ... of VIOXX."

29.   In response to Merck's representations about the safety of VIOXX, the FDA wrote a "Warning Letter" to Merck on September 17, 2001, demanding that Merck correct its false and misleading statements about VIOXX in its promotional activities and materials. The FDA's Division of Drug Marketing, Advertising, and Communications ("DDMAC") warned Merck that its marketing of VIOXX was "false, lacking in fair balance, or otherwise misleading in violation of the Federal Food, Drug, and Cosmetic Act (the Act) and applicable regulations." According to DDMAC, Merck:

> engaged in a promotional campaign for VIOXX that minimizes the
> potentially serious cardiovascular findings that were observed in
> the VIOXX Gastrointestinal Outcomes Research (VIGOR) study,
> and thus, misrepresents the safety profile of VIOXX. Specifically,
> your promotional campaign discounts the fact that in the VIGOR
> study, patients on VIOXX were observed to have a four to five
> fold increase in myocardial infarctions (MIs) compared to patients
> on the comparator non-steroidal anti-inflammatory drug (NSAID),
> Naprosyn (naproxen).

30.   As time marched on Merck sold more and more people its drug, while simultaneously accumulating, suppressing, and disputing increasing evidence of VIOXX's cardiotoxicity. In January 2002, an observational study by Dr. Wayne Ray and colleagues concerning VIOXX and other NSAID use was published in the *Lancet*. The 2002 Ray study concluded that VIOXX significantly increased the risk of cardiovascular events, specifically MIs, in the study population. Dr. Ray and her colleagues reported that more than 40% of the middle-aged and elderly VIOXX users studied had a history of cardiovascular disease, as compared to the healthy population tested in the VIGOR trial and other Merck-sponsored clinical trials. Further, Dr. Ray concluded that in the Tennessee population of middle aged and elderly, as compared to the trial populations, the risk of fatal or nonfatal MIs was 8 times higher (11.6 versus 1.45 in every 1000 patient years) than with other NSAIDs.

31.     In August of 2004, Dr. David Graham, Associate Director for Science, Office of Drug Safety, FDA Center for Drug Evaluation and Research, together with Dr. Ray and co-authors, presented an observational study at an international medical meeting, which evaluated the rate of cardiovascular events in patients taking VIOXX versus CELEBREX versus non-selective NSAIDs. This analysis was a retrospective study of the Kaiser Permanente database and was funded by the FDA. The results of this study were published in February 2004 in the *Lancet.*

32.     Dr. Graham, Dr. Ray and their colleagues demonstrated in their 2005 study that there is a significantly increased incidence of MIs with the use of VIOXX. Shortly after the Graham-Ray study was presented at the international medical meeting, Merck issued a press release that it: "strongly disagrees with the conclusions of the observational analysis presented at the international medical meeting: Merck stands behind the efficacy, overall safety and cardiovascular safety of VIOXX."

33.     In the interim, Merck had failed to conduct a planned study to directly investigate VIOXX's cardiovascular toxicity, but instead chose to collect cardiovascular event data from studies designed for other purposes. In particular, Merck collected information about adverse events from trials to support applications to the FDA to expand the approved uses of VIOXX, including the study that ultimately and belatedly caused the drug to be withdrawn.

34.     The Adenomatous Polyp Prevention on VIOXX ("APPROVe") Study was a multi-center, randomized, placebo controlled study investigating the effects of VIOXX on the recurrence of neoplastic large bowel polyps in 2600 patients with a previous history of colorectal adenoma. The primary purpose of the study was to increase the market potential of VIOXX for previously unapproved uses. However, during the trial, Merck collected data concerning adverse events experienced by the subjects. As in other clinical trials, high-risk patients were intentionally excluded, which weakened the ability to detect significant differences in cardiovascular event rates. Despite such weaknesses, in mid-September 2004, Merck abruptly halted its APPROVe clinical study because there was a statistically significant increase in the

risk of cardiovascular and cerebrovascular events in the VIOXX arm of the study.  As a result, Merck withdrew VIOXX from the market on September 30, 2004.

###### C.   Post-Withdrawal Confirmation of VIOXX's Cardiotoxicity

35.   After the withdrawal of VIOXX from the worldwide market, additional critical medical studies were published.  Dr. Juni and her colleagues published a meta-analysis examining the risks of cardiovascular events in patients who took VIOXX in the *Lancet* in December 2004.  Dr. Juni demonstrated that VIOXX increases the risk of MIs, fatal and nonfatal, in VIOXX users at every dose.

36.   Dr. Juni and her colleagues concluded that an increased risk of MI was evident to Merck from at least the year 2000:

> Our cumulative meta-analysis of randomized controlled trials indicates that an increased risk of myocardial infarction was evident from 2000 onwards.  At the end of 2000, the effect was both substantial and unlikely to be a chance finding.
>
> We found an increased risk of myocardial infarction in trials of both short and long duration, which is in contrast to the unpublished results from the APPROVe trial.  Our findings thus indicate that patients are at risk even if [VIOXX] is taken for a few months only.  Therefore, the reassuring statement by Merck, that there is no excess risk in the first eighteen months, is not supported by our data.  Similarly, we recorded no evidence to support the notion that [VIOXX's] cardiovascular toxicity is dose dependent.  The reported increase in risk was greater in trials with an external endpoints committee (relative risk 3·9), suggesting that misclassification of coronary events could have biased results in trials that did not include external appraisal of safety outcomes.  The inclusion of an independent endpoints committee should be the rule, and exceptions to this rule should be justified.

37.   As Dr. Juni pointed out, because of restrictive inclusion criteria, most clinical trials and studies include only a few individuals, if any, with a history of cardiovascular disease.  For example, in both the VIGOR and APPROVe trials, patients with histories of cardiovascular events and patients who were taking aspirin were excluded specifically from the study population.  This contrasts with the situation encountered in routine clinical settings, in

which large numbers of high-risk patients were exposed to VIOXX and suffered high numbers of cardiovascular event rates as a result.

38.     Dr. Levesque and her colleagues at McGill University recently published their study in the online edition of the *Annals of Internal Medicine*, to be followed by the print edition in April 2005. The McGill University study examined pharmacy prescriptions and cardiovascular adverse events among users of VIOXX and other pain medications in a large population of more than 100,000 elderly persons (mean age of $75 \pm 55$ years at entry).

39.     Dr. Levesque reported that there were 5 times as many VIOXX-exposed case patients with MIs as reported by Dr. Juni in her study, and that VIOXX users had a significantly higher relative risk for MIs as compared to other NSAID users. The large size of the Levesque study database increases the reliability of the analysis, and these results provide strong, confirmatory evidence that the use of VIOXX is associated with an increased risk for an acute MI. The magnitude of the risk observed for users of VIOXX was even higher for individuals prescribed a dosage greater than 25 mg per day. However, even the patients who took lower doses of VIOXX had an elevated risk of a cardiovascular event. Further, Dr. Levesque wrote that "[w]e have also shown that the cardio toxic effect of Rofecoxib previously observed in older and sicker populations extends to a healthier elderly population."

40.     According to Dr. Levesque, "the totality of the current evidence confirms the increased cardiovascular risk associated with Rofecoxib and the sagacity of its withdrawal." These results were consistent with the results of the VIGOR study and the APPROVe results, as well as the studies of Ray (2002), and Graham and Ray (2005).

41.     In November 2004, the United States Senate Finance Committee held hearings on VIOXX and related drugs approved by the FDA and then withdrawn because of significant health risks. Dr. David Graham testified about his experience with VIOXX:

> Graham:     Prior to approval of VIOXX, a study was
>                    performed by Merck, named 090, which found a
>                    nearly seven-fold increase in heart attack risks
>                    with low-dose VIOXX. The labeling at approval

- 10 -

said nothing about these heart attack risks.

In November 2000, another Merck trial named VIGOR found a five-fold increase in heart attack risk with the high-dose form VIOXX.

About 18 months after the VIGOR results were published, FDA made a labeling change about heart attack risk.  But it did not place this in the "Warnings" section of the labeling.  Also, it did not ban the high dose formulation and its use.

I believe such ban should have been implemented.

* * *

In March 2004, another epidemiology study reported that both high- and low-dose VIOXX increased heart attack risks compared to CELEBREX, VIOXX's leading competitor.

Our study found similar results.

A study report describing our work was put on the FDA website.  This report estimated that nearly 28,000 excess cases of heart attack and sudden cardiac deaths have been caused by VIOXX.

I must emphasize to the committee that this is an extremely conservative estimate.

FDA always claims that randomized clinical trials provide the best data.

If you apply the risk level seen in the two Merck clinical trials, VIGOR and APPROVe, you obtain a more realistic and likely range estimates for the number of excess cases.

This estimate ranges from 88,000 to 139,000 Americans.  Of these, 30 to 40% probably died; for the survivors, their lives were changed forever.

This range does not depend at all on the data from our Kaiser-FDA study.  Indeed, Dr. Eric Topol at the Cleveland Clinic recently estimated 160,000 cases in the article that was published in the New England Journal of Medicine.

42.     In February 2005, a 32-member FDA advisory panel conducted hearings to determine whether or not COX-2 inhibiters should be made available to the public and, if so, on what terms.  The panel criticized the label changes made by Merck in 2002, which it deemed insufficient to warn the public about the cardiovascular risks of VIOXX use.

43.     During the panel hearings, the senior director of Merck Research Laboratories, Dr. Ned Braunstein, tried to portray VIOXX's dangerous effects as a class effect of all COX-2 inhibitors.  This attempt to characterize the dangers of VIOXX as a class effect represents a critical admission of the risk of VIOXX use that contradicts Merck's prior statements about the safety and the unique characteristics of its product.

44.     At the conclusion of the hearing the members of the advisory panel, a third of whom had worked for Merck in the past, voted by the narrowest of margins (17-15) to recommend VIOXX be allowed to return to market.  If the panelists who had not previously worked for a pharmaceutical company had not voted, VIOXX would have been prevented from returning to market by a margin of 14-8.  To date, the FDA has not accepted the Panel's recommendations.

## IV.     EUGENE FRONTAURIA

45.     Eugene Frontauria is a 70 year-old resident of Nashville, Tennessee.

46.     Mr. Frontauria was prescribed VIOXX in 2001 and in September, 2003 for chronic back pain.  He took VIOXX 25 mg. once per day and continued using it from September, 2003 until April, 2004.

47.     Mr. Frontauria took VIOXX without any knowledge of the significantly increased risk of the serious thromboembolic events to which he was being exposed by taking it.

48.     On or about November 6, 2003 Mr. Frontauria underwent cardiac catheterization and stent placement after suffering from Acute Coronary Syndrome as a result of using VIOXX.  Mr. Frontauria was also suffering from unstable angina.

49.     Due to her husband's VIOXX induced injuries Barbara Frontauria has suffered from the loss of Mr. Frontauria's services, society, companionship, love and affection.

525860.1

50.     Had Mr. Frontauria been aware of any of the now apparent risks and dangers of VIOXX, he would not have taken the drug.

51.     Merck, however, not only concealed but affirmatively misrepresented the safety of VIOXX to Eugene Frontauria, physicians and the public.  As a result, it was not until Merck recalled VIOXX on September 30, 2004, that Mr. Frontauria had any reason to question the association between VIOXX and his illnesses.

## V. CAUSES OF ACTION

### COUNT ONE
### (Negligence)

52.     Mr. and Mrs. Frontauria incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

53.     At all relevant times to this action, Merck had a duty to exercise reasonable care to properly prepare, design, research, test, develop, manufacture, inspect, label, market, promote, advertise and sell its pharmaceutical product known as VIOXX.  That duty included the duty not to introduce a pharmaceutical drug, such as VIOXX, into the stream of commerce that caused users to suffer from unreasonable, dangerous or untoward adverse side effects.

54.     At all relevant times to this action, Merck owed a duty to properly warn Mr. Frontauria and the public of the risks, dangers and adverse side effects of its pharmaceutical drug VIOXX.

55.     Merck breached its duty by failing to exercise ordinary care in the preparation, design, research, testing, development, manufacturing, inspection, labeling, marketing, promotion, advertising and selling of VIOXX.

56.     Defendant Merck knew, or in the exercise of reasonable care should have known, that if VIOXX was not properly prepared, designed, researched, tested, developed, manufactured, inspected, labeled, marketed, promoted, advertised and sold, VIOXX was likely to be unreasonably dangerous and would cause injury to those who took it.

- 13 -

525860.1

57.     Defendant Merck was negligent in the preparation, design, research, testing, development, manufacturing, inspection, labeling, marketing, advertising, promotion and selling of VIOXX in that it:

(a)     failed to use due care in the preparation and development of VIOXX to prevent the aforementioned risk of injuries to individuals when the drugs were ingested;

(b)     failed to use due care in the design of VIOXX to prevent the aforementioned risk of injuries to individuals when the drugs were ingested;

(c)     failed to conduct adequate pre-clinical testing and research to determine the safety of VIOXX;

(d)     failed to conduct adequate post-marketing surveillance to determine the safety of VIOXX;

(e)     failed to completely, accurately and in a timely fashion, disclose the results of the pre-marketing testing and post-marketing surveillance to Mr. Frontauria, the consumers, the medical community and the FDA;

(f)     failed to accompany VIOXX with proper warnings regarding all possible adverse side effects associated with the use of VIOXX;

(g)     failed to use due care in the manufacture, inspection and labeling of VIOXX to prevent the aforementioned risk of injuries to individuals who used VIOXX;

(h)     failed to use due care in the promotion of VIOXX to prevent the aforementioned risk of injuries to individuals when the drugs were ingested;

(i)     failed to use due care in the advertisements in connection with the sale and marketing of VIOXX to prevent the aforementioned risk of injuries to individuals when the drugs were ingested;

(j)     failed to use due care in the selling of VIOXX to prevent the aforementioned risk of injuries to individuals when the drugs were ingested;

(k)     failed to provide adequate and accurate training and information to the sales representatives who sold VIOXX;

(l)     failed to provide adequate and accurate training and information to healthcare providers for the appropriate use of VIOXX; and

(m)     was otherwise careless and negligent.

58.     Despite the fact that Merck knew or should have known that VIOXX caused unreasonable and dangerous side effects which many users would be unable to remedy by any means, Merck continued to promote and market VIOXX to consumers, including Mr. Frontauria, when safer and more effective methods of pain relief were available.

59.     Defendant Merck was or should have been in possession of evidence demonstrating that VIOXX caused serious side effects.  Nevertheless, Merck continued to market its products by providing false and misleading information with regard to the safety and efficacy of VIOXX.

60.     Defendant Merck knew or should have known that consumers such as Mr. Frontauria would foreseeably suffer injury as a result of Merck's failure to exercise ordinary care as described above.

61.     As a result of Merck's wrongful misconduct, Mr. Frontauria suffered the injuries and damages specified herein.

62.     Merck's actions as described above, were intentional, fraudulent, and undertaken in reckless disregard for the rights and safety of the Frontauria family and the public. Merck intentionally, fraudulently, and with reckless disregard for the rights and health of the patients, misled both the medical community and the public at large, including Mr. Frontauria, by making false representations about the safety of VIOXX.  Merck hid, downplayed, understated and disregarded its knowledge of the serious and permanent side effects associated with the long-term use of VIOXX despite available information demonstrating that VIOXX was likely to cause serious and sometimes fatal side effects to users

525860.1

## COUNT TWO
### (Products Liability)

63.     Mr. and Mrs. Frontauria incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

64.     At all times relevant to this action, Merck was a supplier of VIOXX, placing the drug into the stream of commerce in a defective and/or unreasonably dangerous condition such that the foreseeable risk of injuries from VIOXX exceeded the benefits associated with the design and/or formulation of the product.

65.     VIOXX was unsafe for normal or reasonably anticipated use.

66.     VIOXX was expected to and did reach Mr. Frontauria without substantial change in the condition in which it was manufactured and sold.

67.     Alternatively, the VIOXX manufactured and/or supplied by Merck was defective and/or unreasonably dangerous in design or formulation because when they left the hands of the manufacturer and/or supplier, it was unreasonably dangerous and more dangerous than an ordinary consumer would expect.

68.     The VIOXX manufactured and supplied by Merck was defective and/or unreasonably dangerous due to inadequate warnings, and/or inadequate clinical trials, testing and study, and inadequate reporting regarding the results of the clinical trials, testing and study.

69.     The VIOXX manufactured and supplied by Merck was defective and/or unreasonably dangerous due to inadequate post-marketing warnings or instructions because, after Merck knew or should have known of the risk of injuries from VIOXX, it failed to provide adequate warnings to the medical community and the consumers, to whom they were directly marketing and advertising VIOXX; and, further, it continued to affirmatively promote VIOXX as safe and effective.

70.     VIOXX was manufactured, distributed, tested, sold, marketed, advertised and promoted defectively by Merck.  As a direct and proximate cause of Merck's defective

525860.1

and/or unreasonably dangerous design of VIOXX, Mr. Frontauria used VIOXX and as a result suffered the personal injuries described above.

71.    Information given by Merck to the medical community and to the consumers concerning the safety and efficacy of VIOXX, especially the information contained in the advertising and promotional materials, did not accurately reflect the potential side effects of VIOXX.

72.    Merck failed to perform adequate testing before exposing Mr. Frontauria to the medication which would have shown that VIOXX had the potential to cause serious side effects.

73.    VIOXX manufactured and supplied by Merck was defective due to inadequate post-marketing warnings and instructions because, even after Merck knew or should have known of the risk of injuries and death from VIOXX, Merck failed to provide adequate warnings to physicians or to consumers.  Nevertheless, Merck continued to aggressively advertise, market and promote VIOXX.

74.    Had adequate warnings and instructions been provided, Mr. Frontauria would not have taken VIOXX as he did, and would not have been at risk of the harmful side effects described herein.

75.    Due to Merck's actions described herein, Mr. and Mrs. Frontauria suffered the injuries and losses described herein.

76.    Merck's actions, as described above, were intentional, fraudulent, and undertaken in reckless disregard for the rights of the Frontauria family and the public.

## COUNT THREE
### (Fraud)

77.    Mr. and Mrs. Frontauria incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

525860.1

78.     Merck fraudulently, intentionally and/or negligently misrepresented the safety and effectiveness of VIOXX and fraudulently, intentionally and/or negligently concealed material adverse information regarding the safety and effectiveness of VIOXX.

79.     Merck made these misrepresentations and actively concealed adverse information at a time when Merck knew or had reason to know that VIOXX had defects and was unreasonably dangerous and was not what Merck represented to the medical community, the FDA and the consuming public, including Mr. Frontauria, or alternatively was reckless in not knowing of VIOXX's defects and danger.

80.     Merck omitted, suppressed and/or concealed material facts concerning the dangers and risk of injuries associated with the use of VIOXX including, but not limited to, the cardiovascular, cerebrovascular, and other serious health risks. Furthermore, Merck purposely was willfully blind to, ignored, downplayed, avoided, and/or otherwise understated the serious nature of the risks associated with the use of VIOXX in order to increase its sales.

81.     Merck falsely and deceptively misrepresented and knowingly omitted, suppressed or concealed facts of such materiality regarding the safety and efficacy of VIOXX from physicians, the FDA, the consuming public and Mr. Frontauria.

82.     Merck engaged in calculated silence and misrepresentation, despite its knowledge of the growing public acceptance of the misinformation and misrepresentations regarding both safety and efficacy it had perpetrated.

83.     Merck engaged in this fraudulent activity because its interest in profits outweighed its concerns with the health and safety of Mr. Frontauria and the public.

84.     Merck purposefully downplayed the side effects and provided misinformation and misrepresentations about the adverse effects of VIOXX and succeeded in persuading large segments of the medical community, the FDA and consumers including Mr. Frontauria, of the safety and efficacy of VIOXX.

85.     Merck misrepresented the safety of VIOXX in the labeling, advertising, promotion and marketing of VIOXX.

525860.1

86.     Merck intended that Mr. Frontauria rely upon its misrepresentations and act in reliance on it.

87.     Mr. Frontauria's physician and Mr. Frontauria relied on and were induced by Merck's misrepresentations, omissions, and/or active concealment of the dangers of VIOXX in selecting VIOXX treatment.

88.     Mr. Frontauria and the treating medical community did not know that the representation was false and were justified in relying upon Merck's representations.

89.     Had Mr. Frontauria been aware of the increased risk of side effects associated with VIOXX and the relative efficacy of VIOXX compared with other readily available medications, he would not have taken VIOXX as he did.

90.     As a direct and proximate result of one or more of those wrongful acts or omissions by Merck, Mr. Frontauria suffered the personal injuries, non-economic and economic damages described above, and Mrs. Frontauria suffered from the loss of her husband's services, society, companionship, love and affection.

91.     Merck's actions, as described above, were intentional, fraudulent, malicious and undertaken in reckless disregard for the rights of the Frontauria family and the public.

## COUNT FOUR
### (Breach of Warranties (Express and Implied))

92.     Mr. and Mrs. Frontauria incorporate by reference all of the paragraphs of this Complaint as if fully set forth herein.

93.     Merck, through descriptions, affirmations of fact, and promises relating to their VIOXX drugs to the FDA, prescribing physicians, and the general public, including Mr. Frontauria, expressly warranted that VIOXX was both safe and efficacious for its intended use.

94.     These warranties came in the form of:

(a)     Publicly made written and verbal assurances of the safety and efficacy of VIOXX by Merck;

(b)     Press releases, interviews and dissemination via the media of promotional information, the sole purpose of which was to create an increased demand for VIOXX, which failed to warn of the risk of injuries inherent to the ingestion of VIOXX, especially to the long-term ingestion of VIOXX;

(c)     Verbal assurances made by Merck regarding VIOXX, downplaying the risk of injuries associated with the drug;

(d)     False and misleading written information, supplied by Merck, and published in the Physician's Desk Reference on an annual basis, upon which physicians relied in prescribing VIOXX during the period of Mr. Frontauria's ingestion of VIOXX, including, but not limited to, information relating the recommended duration of the use of the drugs;

(e)     Promotional pamphlets and brochures published and distributed by Merck and marketed directly to consumers, which contradicted the information that was set forth in the package insert and the Physician's Desk Reference; and

(f)     advertisements.

95.     The documents referred to above were created by and at the direction of Defendant Merck.

96.     At the time of these express warranties, Merck had knowledge of the purpose for which VIOXX was to be used and warranted it to be in all aspects safe, effective and proper for such purpose, when indeed it was not.

97.     Merck knew or had reason to know that VIOXX did not conform to these express representations in that VIOXX is neither as safe nor as effective as represented, and that VIOXX produces serious adverse side effects.

98.     As such, Merck's product was neither in conformity with the promises, descriptions or affirmations of fact made about VIOXX nor adequately contained, packaged, labeled or fit for the ordinary purpose for which these goods were sold and used.

99.     Merck breached these express warranties to Mr. Frontauria in violation of the applicable provisions of the Uniform Commercial Code by:

525860.1

(a)      manufacturing, marketing, packaging, labeling and selling VIOXX to Mr. Frontauria in such a way that misstated the risk of injury, without warning or disclosure thereof by package or label of such risks to him or the prescribing physicians or pharmacists, and without modifying or excluding such express warranties;

(b)      manufacturing, marketing, packaging, labeling, advertising and selling VIOXX to Mr. Frontauria, in a manner which failed to counteract the negative health effects and increased the risks incurred by Mr. Frontauria; and

(c)      manufacturing, marketing, packaging, labeling, advertising, promoting and selling VIOXX to Mr. Frontauria, thereby causing him increased risk of serious physical injury and harm, pain and suffering.

100.     Merck was or should have been in possession of evidence demonstrating that VIOXX caused serious side effects.  Nevertheless, Merck continued to market VIOXX by providing false and misleading information without regard to the safety and efficacy of VIOXX.

101.     As a result of Merck's conduct, Mr. Frontauria suffered the losses, injuries and damages specified herein, and Mrs. Frontauria suffered from the loss of her husband's services, society, companionship, love and affection.

102.     Merck's actions, as described above, were intentional, fraudulent, malicious and undertaken in reckless disregard for the rights of the Frontauria family and the public.

## COUNT FIVE
### (Unjust Enrichment)

103.     Mr. and Mrs. Frontauria incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein.

104.     At all times relevant to this action, Merck was the manufacturer, seller, and/or supplier of the drug VIOXX.

105.     Eugene Frontauria paid for VIOXX for the purpose of treating his pain safely and effectively.

525860.1

106.    Defendant Merck has accepted payment from Mr. Frontauria for the purchase of VIOXX.

107.    Mr. Frontauria has not received the safe and effective pharmaceutical product for which he paid.

108.    It is inequitable for Merck to retain this money because Eugene Frontauria did not in fact receive the product Defendant represented VIOXX to be.

109.    WHEREFORE, Eugene and Barbara Frontauria demand judgment against Merck and seek equitable relief, the costs of suit and attorneys' fees and such other and further relief as this Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Eugene and Barbara Frontauria request the following relief:

110.    That this matter be set for trial before a jury;

111.    Compensatory damages in an amount to be determined by a jury;

112.    Disgorgement of profits;

113.    Punitive and exemplary damages;

114.    Pre-judgment and post-judgment interest as provided by law;

115.    Recovery of Mr. and Mrs. Frontaurias' costs including, but not limited to, discretionary Court costs of these causes, and those costs available under the law, as well as expert fees and attorneys' fees and expenses, and costs of this action; and

116.    Such other and further relief as the Court deems just and proper.

- 22 -

## JURY TRIAL DEMAND

Eugene and Barbara Frontauria hereby demand a jury trial for all claims so triable.

Dated: April 12th, 2006

Mark P.  Chalos BPR #19328
Kathryn E. Barnett BPR #15361
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
150 Fourth Avenue North, Suite 1650
Nashville, TN 37219
Tel. (615) 313-9000
Fax. (615) 313-9965

Counsel for Eugene and Barbara Frontauria

- 23 -

525860.1

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing First Amended Complaint has been sent by Federal Express to be filed with the Clerk of Court for the United states District Court for the Eastern District of Louisiana on this _12th_ day of April, 2006.

I hereby certify that the above and foregoing First Amended Complaint has been served on Liaison Counsel by U.S. Mail and e-mail and upon all parties by electronically uploading the same to Lexis Nexis File & Serve Advanced in accordance with Pretrial Order No. 8, on this _12th_ day of April, 2006:

Phillip Wittmann
546 Carondelet St.
New Orleans, LA  70130

Russ Herman
Herman, Herman, Katz & Cotlar
3411 Richmond Ave., Suite 460
Houston, TX  77057

Mark P. Chalos

525860.1