# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  VIOXX | : | |
| | : | MDL Docket NO. 1657 |
| PRODUCTS LIABILITY LITIGATION | : | |
| | : | SECTION L |
| | : | |
| This document relates to All Actions | : | JUDGE FALLON |
| | : | MAG. JUDGE KNOWLES |
| | : | |

## MEMORANDUM OF LAW IN SUPPORT OF
## THE PLAINTIFFS' STEERING COMMITTEE'S
## <u>GENERIC MOTION *IN LIMINE*</u>

## I.    <u>INTRODUCTION</u>

The PSC submits this motion in limine to address recurring evidentiary matters that have presented themselves during the *Irvin* trials and that are expected to arise in the future trials that are to provide instructive and informative results.  As these trials are scheduled to begin in the near future, the PSC submits that this is an appropriate time for consideration of this motion.  Experience has taught the PSC that certain matters are outside the proper bounds of any Vioxx trial, that certain points of testimony or documents are irrelevant, inflammatory and/or prejudicial, and that an early in limine ruling by the Court will inform the PSC of the appropriate methods, means or preparations that must be embraced to conduct the future trials.

To this end, the PSC submits the following six motions that it considers imperative to have this Court rule upon promptly:

1)    Motion to preclude evidence and argument that Vioxx presents a potential cure for cancer;

2)      Motion to preclude evidence and argument that FDA regulations prohibited Merck

        from making label changes without prior agency approval;

3)      Motion to compel the attendance at trial of a Merck corporate representative;

4)      Motion to preclude the admission of the April 6, 2005 FDA Memo;

5)      Motion to compel the production of the confidential Memorandum of Invention; and,

6)      Motion to preclude testimony by Merck employee's regarding their personal use of

        Vioxx.

The prompt determination of these important motions will play a crucial role in the strategies

that plaintiffs will employ in future trials.  In addition, the Court's rulings  will shape, inform and

guide the conduct of the MDL trials conducted in this forum, which are intended to have meaningful

results for the entire MDL proceedings.

## II.     ARGUMENT

### A.      THIS COURT SHOULD PRECLUDE ANY TESTIMONY BY MERCK WITNESS DR. BRIGGS MORRISON THAT VIOXX IS A POTENTIAL CURE FOR CANCER AS IRRELEVANT, UNSUPPORTED BY EXPERT TESTIMONY, OUTSIDE THE SCOPE OF THIS LITIGATION, AND A WASTE OF TIME.

#### 1. Background

During the retrial of *Irvin v. Merck*, on February 14, 2006, Plaintiff sought a ruling that Dr.

Morrison be precluded from testifying that Vioxx was potentially a cure for cancer, on the grounds

that there is no scientific basis for such testimony.  This Court overruled Plaintiffs' objection, but

stated, however:

> It's a question of fact to some extent.  There has been testimony that
> cancer for some people associated with some of the information, that
> this drug may have some effect over the use of inflammation,

2

> therefore may have some effect on cancer, but it's early stage and I'll
> let you go on cross-examination.  It is somewhat irrelevant in this
> situation.  So let's not spend a lot of time on it.

(*Irvin 2 v. Merck & Co.,* Tr. At 1605 (Feb. 14, 2006).

This Court was correct with respect to the irrelevance of Vioxx' effect on cancer.  Neither

these MDL proceedings in general nor the cases queued up for trial specifically, involve claims that

Vioxx failed to cure Plaintiffs' cancer, that Vioxx caused Plaintiffs' cancer, or that Vioxx

exacerbated Plaintiffs' cancer.  To Plaintiffs' knowledge, physicians did not prescribe Vioxx as a

cancer therapy, nor tellingly, did Merck market, promote, or even seek FDA approval for Vioxx as

a cancer therapy.  Therefore, Vioxx's purported effect on cancer, for good or ill, is irrelevant to, and

outside the scope, of this litigation.  Any testimony to this effect would simply confuse and distract

the jury.  This Court has demonstrated an interest in streamlining trial proceedings, in order to retain

a focus on the real claims and defenses, to conserve the resources of the parties and the court, to

respect the jurors, and to minimize the potential for real or perceived error.  Simply put, this Court

need not, and should not, waste precious trial time on irrelevant matters outside its scope.

This Court's initial assessment of the Briggs Morrison cancer testimony as "somewhat

irrelevant in this situation"–an observation that preceded the testimony itself, has been borne out as

correct.  The testimony given was, in fact, utterly irrelevant to the Irvin trial and will be equally

irrelevant to the pending trials in this litigation.  It should be excluded in its entirety.

As this Court correctly observed, Dr. Briggs Morrison was not testifying–and will not be

testifying–for Merck as an expert witness on Vioxx and cancer.  There is no need for, or relevance

to, such testimony, because cancer claims are not at issue.  The Vioxx-cancer issue is, at best, a

potentially interesting sideshow–but not one with any bearing on trial issues here.  No time should be wasted on it as the Federal Rules of Evidence discourage such irrelevant testimony.

The "cancer" testimony of Dr. Briggs Morrison flunks the most basic test of the Federal Rules: F.R.E. Rule 401's definition of "Relevant Evidence."[1]  Vioxx's purported and tangential impact on cancer–which itself is unproven–is not a fact of any consequence to the determination of the trials in these proceedings.  Vioxx's supposed impact on cancer–even were it supported by competent expert testimony (as it is not here)–does nothing to make the determination of whether Vioxx was a substantial factor in Plaintiffs' claimed heart attacks or strokes more probable or less probable than it would be without such "evidence."[2]

Moreover, even if this evidence were marginally relevant, it would still be properly excluded under Rule 403, on grounds of prejudice, confusion, or waste of time.[3]  As this Court has already observed in *Irvin* 2, of the Briggs Morrison cancer testimony: "It is somewhat irrelevant in this situation.  So let's not spend a lot of time." Rule 403 backstops the Court in the decision to exclude this evidence, even if it were "somewhat relevant," rather than "somewhat irrelevant," on precisely the grounds this Court identified: "waste of time."

---

[1] F.R.E. 401 states: "Relevant Evidence" means "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

[2] Further, the standard is not "possible" causation.  There is no evidence that it is more probable than not that Vioxx causes cancer, and therefore, it is not only incompetent evidence, but also irrelevant evidence.

[3] F.R.E. 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

4

This Court has broad discretion in assessing admissibility under Rule 403.  *See U.S. v. Morris*, 79 F.3d 409, 412 (5th Cir. 1996).  In order to exclude the Morrison cancer testimony, this Court need not conclude that it would be unfairly prejudicial, nor need it engage its own time in attempting to craft a limiting jury instruction that might (or might not) enable an otherwise confused or distracted jury to focus on more relevant testimony, or to disregard it as tangential.  As the Fifth Circuit indicated in *U.S. v. Morris*, in a decision affirming a district court's determination to exclude testimony regarding other offenses or incidents, Rule 403 enables district courts to exercise their broad discretion to exclude "waste of time" testimony or evidence, without further compounding that "waste of time" through the crafting of limited jury instructions or other damage control.  *Id.,* 79 F.3d at 412.  Far better to exclude such extraneous testimony in the first instance, to guarantee a correctly focused trial.

Even the atmospheric suggestion that Vioxx could cure cancer is highly prejudicial.  The word "cancer" itself is uniquely charged with fear, misunderstanding, and foreboding.  Any jury may include–as the Irvin 2 jury did–persons in cancer remission, as well as those whose family members may be battling, or have lost the battle with, one of cancer's many forms.  The suggestion that plaintiffs have, somehow, foreclosed the promise of a new cancer therapy is unquestionably distracting and prejudicial–all the more so for being raised in passing.  Ironically, the more time is spent on cross-examination debunking the issue, the greater the potential for distraction; while minimizing the focus on it may nonetheless leave a subliminal impression that scars and distorts jury deliberations.  In this case, the best remedy is exclusion.

Other courts have noted the ability of otherwise tangential cancer-related testimony to overwhelm other directly relevant evidence in a case, out of all proportion to any purported probative

value, because of "the unfortunate ubiquity of genuine suffering from cancer, a dreaded and serious disease . . ." and the deep personal "anger felt toward the disease." *U.S. v. Brooke*, 4 F.3d 1480, 1487 (9th Cir. 1993).  In *Brooke*, the criminal defendant, charged with complicity in a pipe bomb assault, apparently also lied about having cancer to gain sympathy and money from acquaintances. The cancer issue so pervaded the case, and threatened to overwhelm the evidence relating to the actual crimes at issue, that the appellate court was compelled to reverse the convictions ("we must reverse") on the trial court's error in admitting any evidence that defendant falsely claimed to have cancer, because the probative value of the cancer evidence was substantially outweighed by its prejudicial effect. *Id.,* 4 F.3d at 1488-1489.[4]

Here, as in *U.S. v. Brooke*, regardless of the far different context in which the cancer issue arises, even this glancing cancer reference is equally "likely to have a visceral impact that far exceeds its probative value." *Id.* at 1487.

Merck should be precluded from introducing any evidence, testimony or argument that Vioxx is a potential cure for cancer.

### B.   MOTION IN LIMINE TO PRECLUDE MERCK FROM ARGUING THAT FDA REGULATIONS PROHIBITED THE COMPANY FROM MAKING LABEL CHANGES WITHOUT PRIOR AGENCY APPROVAL.

Plaintiffs anticipate that Merck & Co. will offer testimony and argue at trial that it could not have changed the Vioxx label to include warnings of cardiovascular risks or reports of cardiovascular and other adverse events without prior approval of the FDA.  Such testimony or argument is both

---

[4] "We hesitate to use the obvious, but nevertheless apt, metaphor.  Like an evidentiary cancer, the erroneously-admitted evidence infected the testimony of nearly every witness. Brooke is entitled to a trial cured of such a pervasive defect." *Id.* at 1488.

false and misleading and should therefore be precluded.  Though subject to FDA oversight, Merck

was responsible for ensuring that adequate warnings appeared in the Vioxx label at all times.

Therefore, Plaintiffs respectfully request entry of an order prohibiting Merck from eliciting such

testimony or argument.

### 1. Federal Regulations Required Merck to Warn of Known Hazards Associated With the Use of Vioxx.

Any suggestion that Merck could not have changed the Vioxx label without prior FDA

approval is false and misleading.  The Food, Drug and Cosmetic Act (the "Act") *expressly* requires

a drug manufacturer to immediately inform the public of newly discovered dangers rather than

waiting for the FDA to act.  *See McEwen v. Ortho Pharm. Corp.*, 528 P.2d 522, 534-535 (Or. 1974);

*see also Labeling and Prescription Drug Advertising; Content and Format for Labeling for Human*

*Prescription Drugs*, 44 Fed. Reg. 37434, 37447 (1979).  It is the legal obligation of a drug

manufacturer to promptly take steps to strengthen its warnings to physicians and consumers of newly

discovered dangers and risks of an approved product.  21 C.F.R. §201.57(e).

The intention of the Act is "to protect consumers from dangerous products."  *United States*

*v. Sullivan*, 332 U.S. 689, 696 (1948); *see FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S.

120 (2000).  Consistent with its purpose, the FDA and its regulations explicitly permit a

manufacturer to unilaterally strengthen a warning label at any time without regulatory approval, 21

C.F.R. § 314.70(c)(6)(iii)(attached as Exhibit "1"), to allow the drug manufacturer to quickly

strengthen warnings when evidence of side effects, risks, or dangers are discovered.  *See* 30 Fed.

Reg. 993 (Jan. 30, 1965)(attached as Exhibit "2").

In the recent case of *McNellis v. Pfizer, Inc.*, No. 05-1286-JBS, 2005 WL 3752269 (D. N.J.

Dec. 29, 2005), the district court after outlining 21 C.F.R. § 314.70(c)(6) acknowledged a manufacturer's unilateral duty to warn:

> If the manufacturer desires to make changes to the labeling after a drug is approved, it must generally submit a Supplemental NDA to the FDA pursuant to 21 C.F.R. § 314.70(b)(2)(v)(A). Although most labeling changes require a Supplemental NDA, a number of exceptions have been enumerated in 21 C.F.R. § 314.70(c)(6)(iii), which provides in pertinent part:
>
> > (6) The agency may designate a category of changes for the purpose of providing that, in the case of a change in such category, the holder of an approved application may commence distribution of the drug product involved upon receipt by the agency of a supplement for the change. These changes include, but are not limited to:
> >
> >         *   *   *
> >
> > (I)    Changes in the labeling to accomplish any of the following:
> >
> > > (A) To add or strengthen a contraindication, warning, precaution or adverse reaction;
> > > (B) To add or strengthen a statement about drug abuse, dependence, psychological effect, or over dosage;
> > > (C) To add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product;
> > > (D) To delete false, misleading, or unsupported indications for use or claims for effectiveness; or
> > > (E) Any labeling change normally requiring a supplement
> > >
> > > submission and approval prior to distribution of the drug product that FDA specifically requests be submitted under this provision.

21 C.F.R. § 314.70(c)(6)(iii). Thus, it is apparent that prior FDA

> approval need not be obtained, nor will a product be deemed
> mislabeled, if the manufacturer voluntarily or even unilaterally
> strengthens the approved warnings, precautions or potential adverse
> reactions upon the label pursuant to 21 C.F.R. § 314.70(c)(6)(iii)(A).

*McNellis*, 2005 WL 3752269 at 4-5.

Moreover, "Section 201.57 delineates the 'specific requirements on content and format of labeling for human prescription drugs' and subsection (e) specifically governs 'warnings.'" *Motus v. Pfizer, Inc.*, 127 F.Supp.2d 1085, 1095 (C.D. Ca. 2000).  21 C.F.R. § 201.57(e) states: "labeling shall be revised to include a warning *as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved.* (emphasis added).

Also, 21 C.F.R. § 314.70(c) is explicit that labeling changes to "add or strengthen a contraindication, warning, precaution, or adverse reaction" do not require FDA's prior approval.

In fact, when promulgating these regulations the FDA Commissioner invited companies to strengthen the warnings contained in their drug labels.

> [D]rug labeling does not always contain the most current information and opinion
> available to physicians about a drug because advances in medical knowledge and
> practice inevitably precede formal submission of proposed new labeling by the
> manufacturer and approval by FDA. . . . [L]abeling regulations do not prohibit a
> manufacturer . . . from warning health care professionals wherever possibly harmful
> adverse effects associated with the use of a drug are discovered.  The addition to
> labeling and advertising of additional warnings . . . is not prohibited by these
> regulations. . . . [P]racticing physicians will welcome such information so they can
> make their best informed medical judgments in the care of their patients.

44 Fed. Reg. at 37,434 (emphasis added).

Without question, Merck was permitted to add a warning for cardiovascular risks to the Vioxx label *at any time after VIGOR* without advance approval by the FDA.  *Id.  See also* 30 Fed. Reg. 993 (Jan. 30, 1965) (encouraging drug manufacturers to strengthen its warnings "in the interest

of drug safety" at any time without FDA pre-approval to enable adoption of new warnings as soon as possible).  Any argument or testimony that Merck was required to obtain prior approval from the FDA before changing the Vioxx label to include warnings or information concerning serious cardiovascular adverse events is simply false.

Federal regulations dictate that Merck without prior approval by the FDA had a duty to add a warning to the Vioxx label and alert physicians and patients of the increased risk of cardiovascular events when taking Vioxx.

### 2.   Courts Recognize That Drug Manufacturers Have a Duty to Warn of Known Hazards Regardless of Prior FDA Approval.

Federal and state courts have concluded that current FDA regulations do not impose any restrictions on a drug manufacturer's ability to add warnings or precautions regarding newly-discovered risks and dangers but dictate that a warning of known risks be added to a label prior to FDA approval.

In *Witczak v. Pfizer, Inc.*, the district court found that FDA regulations explicitly permit pharmaceutical companies to unilaterally strengthen its warning label at any time without regulatory pre-approval. *Witczak v. Pfizer, Inc.* 377 F.Supp.2d 726 (D. Minn. 2005) (citing 21 C.F.R. § 314.70(c)(6)(iii)(A)).  The *Witczak* court noted that the "particular regulation was promulgated precisely to allow drug-makers to quickly strengthen label warnings when evidence of new side effects are discovered".  *Witczak*, 377 F.Supp.2d at 726 (citing 30 Fed.Reg. 993 (Jan. 30, 1965)).  FDA regulation "permits the addition to the drug's labeling or advertising of information about a hazard without advance approval" by the FDA.  *Id.*

Judge Steger of the United States District Court for the Eastern District of Texas recently

10

provided an in-depth analysis of the FDCA's applicability to state law claims against pharmaceutical companies, and the issue of preemption. *See Cartwright v. Pfizer, Inc.*, 369 F.Supp.2d 876 (E.D. Tex. 2005). In the *Cartwright* case, the defendant claimed that plaintiff's state law failure to warn claims were preempted because under the Food, Drug and Cosmetic Act, the manufacturer was required to obtain FDA approval before revising the product labeling. *Id.* The District Court specifically rejected this argument:

> Since 1965, the FDA's regulations permit a manufacturer "[t]o add or strengthen a contraindication, warning, precaution, or adverse reaction," without prior approval by the FDA...." *Id.* (*citing* 21 C.F.R. § 314.70(c)(6)(iii)(A) and finding that the Act sets minimum standards that "expressly do not prohibit a manufacturer from 'add[ing to] or strengthen[ing] a contraindication, warning, precaution or adverse reaction.'").... "Thus, FDA's position regarding stronger warnings by drug manufacturers, as expressed through *its own regulations*, is that a manufacturer <u>could, and should</u>, provide stronger warnings as soon as such a warning is warranted.

*Id.* (emphasis added). The *Cartwright* court further pointed out that under the regulations a manufacturer should issue a warning whenever there is "reasonable evidence of an association of a serious hazard with a drug; *a causal relationship need not have been proved*." *Id.* (*citing* 21 C.F.R. § 201.57(e)).[5] The *Cartwright* court concluded "it is clear to this Court that manufacturers must act quickly to warn regarding possibly deadly side effect associated with a drug because the FDA only sets forth minimum standards for labeling and safety of drugs." *Id.*

In *Madden v. Wyeth*, 2005 WL 2278081 (N.D. Tex. Sept 14, 2005), the defendant claimed its warning label was adequate in support of a summary judgment motion. The District Court

---

[5]As the *Cartwright* court noted, this same regulation requires that "black box" warnings be added to the label of drugs "that may lead to death or serious injury," *Id.*

rejected "defendant's argues that its warning label is adequate because it was approved by the FDA. Federal regulations do not prohibit a manufacturer from "add[ing to] or  strengthen[ing] a contraindication, warning, precaution, or adverse reaction." *Id.* (*citing* 21  C  .F.R.  § 314.70(c)(6)(iii)(A)).

In *Caraker v. Sandoz Pharmaceuticals Corp.*, 172 F.Supp.2d 1018 (S.D. Ill. 2001), the district court found that the manufacturer was explicitly authorized by the FDA's regulations to add or strengthen its warnings without prior FDA approval. *Id.* at 1033-34. The *Caraker* court cited to the FDA commissioner's statement that "labeling regulations do not prohibit a manufacturer, packer, relabeler, or distributor from warning health care professionals whenever possibly harmful adverse effects associated with the use of the drug are discovered." *Id.* at 1034 (*citing* 44 Fed.Reg. 37,434 & 37,447 (1979)); *see Jamison v. Purdue Pharma Company*, 251 F.Supp.2d 1315 (S.D. Miss. 2003) (listing situations where company may amend labeling without prior approval, including "adding or strengthening "(I) a contraindication, warning, precaution, or adverse reaction").

Lastly, the court in *Ohler v. Purdue Pharma, L.P.*, 2002 WL 88945 (E.D.La. 2002), addressed a similar issue in the context of a motion to remand, where removal was partially based on preemption grounds. In rejecting the defendants' arguments, this Court noted that the "applicable regulation states that changes in labeling that 'add or strengthen a contraindication, warning, precaution, or adverse reaction" fall within the category of adjustments that "may be made before FDA approval.'" *Id.  See also Kurer v. Parke, Davis & Co.*, 272 Wis.2d 390, 679 N.W.2d 867 (Wis.App. 2004).

Adhering to these same principles, Judge Higbee in the Cona/McDarby trial involving Vioxx

interrupted the testimony of a Merck employee, David Anstice, who had testified that the company could not have added a warning to the label without prior FDA approval, to give a curative instruction. The court informed the jury that the manufacturer was <u>not</u> limited by FDA regulations to add to the warning label at any point in time. The curative instruction was reported to be:

> "I just wanted to advise you that the law under FDA regulations does allow a company to change their warnings, to warn consumers and physicians about dangers they find out about after the label is approved," Higbee told the panel. "<u>They're allowed to make those changes through a special procedure, without prior FDA approval.</u>"

Brennan, *Judge Interrupts Vioxx Testimony to Instruct Jury on Label Warnings*, The Legal Intelligencer, March 20, 2006, at 3, col. 1 (emphasis added).

The overwhelming majority of federal and state courts have concluded and recognized that a manufacturer not only may, but should add or strengthen warnings related to a pharmaceutical drug, without waiting for FDA approval.    Federal regulations require that Merck should have strengthened the precautions and/or warnings contained in the Vioxx label as soon as it had actual or constructive knowledge of the increase risk of cardiovascular risks associated with the ingestion of the drug.

The Court is urged to enter an order precluding Merck from arguing or offering testimony that it could not amend the Vioxx label to include warnings or precautions concerning cardiovascular risks without prior FDA approval.  Such testimony or argument would be false, contrary to well-settled law, and misleading to a jury.

### C.    MOTION TO COMPEL APPEARANCE OF <u>MERCK CORPORATE REPRESENTATIVE.</u>

#### 1.    <u>Introduction</u>

13

Plaintiffs move pursuant to Fed.R.Civ.P. 45 to compel the appearance at trial of a corporate designee like David Anstice[6] who is an officer of Merck and who is familiar with Merck's marketing decisions and materials related to Vioxx. In lieu thereof, plaintiffs move for the admission of David Anstice's former testimony.[7]  In the alternative, plaintiffs move to compel the appearance of a corporate designee to present testimony in open court by contemporaneous transmission from a different location pursuant to Fed.R.Civ.P. 43.

### 2.   **Factual Background**

Merck is a New Jersey corporation with facilities and employees located in both New Jersey and Pennsylvania. Virtually all of Merck's employees and high ranking corporate officers reside and work in either New Jersey or Pennsylvania.

Much of Plaintiffs' products liability claims focuses on Merck's aggressive direct to consumer advertising campaign and its consistent failure to communicate risks associated with Vioxx to medical professionals and members of the public.  Plaintiffs require the testimony of a corporate designee such as Mr. Anstice to establish Merck's negligence in these areas, to move into evidence relevant Merck documents, and to have a corporate presence that can respond to plaintiffs' inquiries that arise at trial.

---

[6]David Anstice is Merck's President of Human Health.  (Dep. of David Anstice at 24). As President of Human Health, Mr. Anstice was responsible for Merck's operations in the United States during the time Vioxx was being developed and marketed. *Id.*  Mr. Anstice was responsible for the marketing of Vioxx within the United States. *Id.* at 25.  In fact, Mr. Anstice would be an excellent designee since he was a central figure in all of Merck's marketing decisions regarding Vioxx.

[7]David Anstice recently testified in a New Jersey state court proceeding *Cona, et al. v. Merck, Inc., Co.*, ATL-L-3553-05-MT (N.J.Super., Atlantic Cty.).  Mr. Anstice has also been deposed concerning the marketing of Vioxx.

To ensure the appearance of such a witness at trial, either this Court must exercise its subpoena power over a corporate officer or Merck must cooperate and voluntarily produce a witness. Historically, Merck has refused to cooperate. Thus, prior to the trial in the *Plunkett* case plaintiffs were required to issue a subpoena upon David Anstice to compel his testimony at trial. Although the subpoena appears to have been properly issued upon a corporate officer pursuant to Fed.R.Civ.P. 45, this Court granted Merck's motion to quash without opinion. *See In re Vioxx Products Liability Litigation (Plunkett)*, MDL No. 1657, Minute Entry (E.D.La. Nov. 21, 2005).

Without guidance from the court regarding its reasons for granting that motion, the PSC urges the court to require the presence of a corporate designee at future trials. Merck is a party to this litigation and should be required to produce a corporate designee who is qualified to testify about the marketing of Vioxx. Merck's previous arguments to the contrary should be rejected since the Federal Rules of Civil Procedure authorize federal courts to compel the appearance of a corporate officer, such as David Anstice, at trial, and it would be unfair to allow the fortuitous assignment of the MDL to this forum to block plaintiffs efforts to obtain the live testimony of a corporate designee.

## III.   REASONS FOR GRANTING THE MOTION

### A.   THIS COURT HAS AUTHORITY TO COMPEL THE APPEARANCE OF A CORPORATE DESIGNEE AT TRIAL.

This Court has authority to compel a party to appear before the tribunal for any purpose, including trial.[8] It is not disputed that this Court has both subject matter and in personam jurisdiction over Merck. For purposes of this trial, plaintiff seeks to obtain the testimony of an officer of Merck who is familiar with the marketing of Vioxx. Plaintiffs specifically request the presence of a

---

[8] *C.f. Chambers v. Nasco, Inc.*, 501 U.S. 32, 45-49 (1991)(discussing inherent powers of the federal courts to impose sanctions for bad-faith conduct).

corporate officer since the Federal Rules of Civil Procedure authorize the use of a subpoena to

compel the appearance of a corporate officer located beyond the 100-mile limit ordinarily in place

under Fed.R.Civ.P. 45.  When read *in pari materia* Rule 45 permits the issuance of a subpoena upon

a defendant corporation to compel the attendance of a corporate officer at trials beyond the 100-mile

limit of Rule 45.  Specifically, Rule 45 states:

> A subpoena commanding attendance at a trial or hearing shall issue from the court for the district in which the hearing or trial is to be held.

> * * *

> Subject to the provisions of clause (ii)(c)(3)(A) of this rule, a subpoena may be served at any place within the district of the court by which it is issued, or at any place without the district that is within 100 miles of the place of the deposition, hearing, trial, production, or inspection specified in the subpoena or at any place within the state where a state statute or rule of court permits service of a subpoena issued by a state court of general jurisdiction sitting in the place of a deposition, hearing, trial, production, or inspection specified in the subpoena.

> * * *

> On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it....(ii) requires a person <u>who is not a party or an officer of a party</u> to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to a provision of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend a trial be commanded to travel from any place within the state in which the trial is held.

Fed.R.Civ.P. 45(a)(2), (b)(2), (c)(3)(A)(ii) (emphasis added).

Courts that have construed the above language recognize that the "person who is not a party

or an officer of a party" phraseology permits the inverse inference that parties and officers of parties

are subject to compulsion to attend trials that occur outside of the 100-mile limit otherwise available

to non-parties.  The reasoning of these courts confirms the enforceability of a subpoena requiring the

attendance of a corporate designee such as David Anstice.  Most recently, in *American Federal of*

*Government Employees Local 922 v. Aschroft*, 354 F.Supp.2d 909, 915 (E.D.Ark. 2003), the court

held:

> This Court would have the authority to compel Mr. Thompson to
> appear and testify in the arbitration hearing, which is the equivalent
> of a trial, even though he resides outside this district and beyond the
> 100-mile limit of Rule 45.  <u>The majority of courts to consider the</u>
> <u>issue have held that a court may compel the trial testimony of parties</u>
> <u>and, where the party is a corporation or entity, the party's high-level</u>
> <u>employees or officers even when the person to be compelled resides</u>
> <u>beyond the 100-mile range for subpoenas.</u>  *See Archer Daniels*
> *Midland Co. v. Aon Risk Servs., Inc.*, 187 F.R.D. 578, 587 (D.Minn.
> 1999)(recognizing distinction between "ordinary employees,
> and...directors, officers, and other high-level representatives' for
> purposes of compelling appearance to testify); *Younis v. American*
> *Univ. in Cairo*, 30 F.Supp.2d 390, 395 n. 44 (S.D.N.Y.
> 1998)(recognizing that officers of an Egyptian university which was
> a defendant in the action could be compelled to appear and testify in
> New York); *Venzor v. Chaves Gonzalez*, 968 F.Supp. 1258, 1267
> (N.D.Ill. 1997)(the 100-mile "limitation on a trial subpoena applies
> only to a 'a person who is not a party.'" citing Fed.R.Civ.P.
> 45(c)(4)(A)(ii); *Nat'l Property Investors, VIII v. Shell Oil Co.*, 917
> F.Supp. 324, 329 (D.N.J. 1995)("[U]nlike party witnesses,
> Fed.R.Civ.P. 45(c)(3)(A)(ii), non-party witnesses [from North
> Carlina] cannot be compelled to testify before this Court...").

*Id.* at 915-16 (emphasis added).

        Other courts have recognized the exemption within the rule from the 100-mile limitation of

persons who are parties or officers of parties.  *See Ferrell v. IBP, Inc.*, 2000 WL34032907, *1,

(N.D.Iowa 2000) (high ranking officer of defendant who was served with subpoena outside of 100

miles of the district court compelled to travel to testify at trial despite two prior depositions,

including a videotaped deposition); *In re Ames Department Stores, Inc.*, 2004 WL1661983, *1

(Bankr.S.D.N.Y. 2004)(president of adversary preceding defendant, a resident of Florida, compelled to attend trial in New York);[9] *see also Mason v. Texaco, Inc.*, 741 F.Supp. 1472, 1504 (D.Kan. 1990)("Although Mr. Richards resides more than 100 miles from the district, he is Texaco for purposes of this lawsuit, and thus a party to the action. Thus, his compelled attendance at trial was appropriate"), *affirmed*, 948 F.2d 1546 (10th Cir. 1991), *cert. denied*, 501 U.S. 910 (1992).

Denying plaintiffs' motion to compel the appearance of a corporate representative would be prejudicial to plaintiffs since the testimony of a corporate designee such as Mr. Anstice is critical to the plaintiffs' case and since the jury should have the opportunity to observe this testimony first-hand. The testimony of a corporate designee will help to establish that Merck failed to warn the medical community and the public of risks associated with Vioxx, enable the PSC to authenticate and move into evidence critical Merck documents, and will help to establish that Merck is not entitled to the learned intermediary defense pursuant to *Perez v. Wyeth Laboratories Inc.*, 734 A.2d 1245, 1257 (N.J. 1999). The jury should have the opportunity to observe this testimony through a live witness so it can assess credibility based upon the demeanor of the witness and his or her responses to cross examination.[10] This assessment of credibility simply cannot be replicated through

---

[9]In *Ames Department Stores*, the court held: "Rule 45(c)(3)(A)(ii) grants the ability to quash, based on a travel obligation of more than 100 miles, where the subpoenaed person "is not a party or an officer of a party." Since that provision easily could have been drafted, if it had been the rule making intent, to simply omit the italicized language and make its provisions applicable to "a person" generally, the compelling interpretation is that its application is limited to those persons who are particularly described–*i.e.*, to non-parties or their officers." *Id.*

[10]The use of a live witness will also allow the plaintiffs to impeach the witness if his or her trial testimony is inconsistent with prior deposition testimony.

the dry reading of a deposition transcript.[11]  Additionally, any burden associated with providing a

corporate designee at trial has been overstated by Merck who is merely seeking a tactical advantage

created by the physical distance between this forum and its headquarters.[12]

Accordingly, ample authority exists that permits this Court to compel the attendance of a

corporate designee at trial.  In light of the importance of this testimony to the MDL proceedings,

plaintiffs respectfully request that the attendance of such a witness at trial be compelled.

**B.   THIS COURT SHOULD ADMIT DAVID ANSTICE'S
DEPOSITION TESTIMONY AND SHOULD ALSO
ADMIT HIS RECENT TRIAL TESTIMONY IF HE
DOES NOT TESTIFY AT TRIAL.**

Recently David Anstice was called as a witness by plaintiffs in the Cona/McDarby trial in

---

[11]*See Jamsports and Entertainment, LLC v. Paradama Productions, Inc.*, 2005 WL
14917, *4 Fn.2 (N.D.Ill. 2005)("The Court strongly urges JamSports to carefully think through
its strategy.  In the Court's experience, the use of a deposition, even a videotaped deposition,
tends to take a good deal of the "punch" out of the presentation of evidence, even with regard to
an adverse witness, and risks boring the jury."

[12]The assignment of this case to Louisiana by the JPML is fortuitous and should not be an
obstacle to plaintiffs.  Had the MDL been assigned to a court located in either New Jersey or
Pennsylvania Merck would be powerless to challenge a subpoena issued to any of its employees.
Moreover, since Rule 45 permits the use of a subpoena to compel the appearance of corporate
officer in excess of 100-miles from the courthouse, had the MDL been assigned to a court located
in a state such as Massachusetts, which is a short traveling distance from Pennsylvania and New
Jersey yet in excess of 100-miles, it is unlikely a court would find the burden significant enough
to quash a subpoena served upon a Merck officer.

If Merck is permitted to use the assignment of this case to Louisiana as a shield by
arguing that it would be burdensome to produce a designee, plaintiffs will be unable to examine
key witnesses employed by the defendant at trial.  Such a determination would effectively
preclude plaintiffs from calling the defendant as a witness at trial on important issues since, as a
corporation, Merck can only speak through its officers, directors and corporate designees.  So, in
order to examine the defendant at trial, the plaintiffs must either subpoena corporate designees or
use witnesses voluntarily produced by Merck.  If past is a prelude, Merck is unlikely to produce a
witness familiar with its marketing of Vioxx unless it is compelled to do so.

a New Jersey state court. This trial testimony is admissible in the MDL under the Federal Rules of

Evidence and plaintiffs request that a video tape of such testimony be pre-admitted unless Mr.

Anstice appears and testifies at trial.

Mr. Anstice's trial testimony is admissible as a hearsay exception pursuant to Fed.R.Evid.

804(b)(1).  A prerequisite to the introduction of this former testimony is that the witness be

unavailable.  Mr. Anstice will be "unavailable" unless he is compelled to appear at trial.  *See*

Fed.R.Evid. 804(a)(5)(which deems an individual to be unavailable where the declarant "is absent

from the hearing and the proponent of a statement has been unable to procure the declarant's

attendance ...").  If David Anstice is not compelled to appear at trial and is otherwise unavailable to

the plaintiffs, Federal Rule Evidence 804(b)(1) permits the use of his testimony from the trial

proceedings in New Jersey. Rule 804(b)(1) states:

> **(1) Former Testimony.** Testimony given as a witness at another hearing of the same
> or a different proceeding, or in a deposition taken in compliance with law in the
> course of the same or another proceeding, if the party against whom the testimony is
> now offered, or, in a civil action or proceeding, a predecessor in interest, had an
> opportunity and similar motive to develop the testimony by direct, cross, or redirect
> examination.

Fed.R.Evid. 804(b)(1). The testimony of Mr. Anstice from the trial pending in New Jersey concerns

the same subject matter, same documents and same marketing efforts that plaintiffs wish to explore

through live testimony in the MDL. Additionally, Merck is a party to both proceedings and had an

opportunity and a similar motive to develop Mr. Anstice's testimony in the New Jersey litigation.

*See Battle v. Memorial Hospital at GulfPort*, 228 F.3d 544, 552-3 (5th Cir. 2000), *rehearing and*

*suggestion for rehearing en banc denied*, 237 F. 3d 633 (5th Cir. 2000)(finding a party who was

present and represented during deposition of expert witness "had the same interests in asserting and

prevailing on those issues."). In the New Jersey proceeding as in the MDL, Merck is defending against allegations concerning its aggressive marketing campaign, is defending against allegations concerning its alleged failure to warn the medical profession and the public concerning risks associated with Vioxx, and is defending against allegations that its direct to consumer advertising campaign negated the learned intermediary doctrine pursuant to *Perez, supra*. Since Merck had a full opportunity and a similar motive to develop the testimony of David Anstice in the New Jersey proceedings, plaintiffs request that this Court permit Mr. Anstice's trial testimony be used in these proceedings.

Additionally, Mr. Anstice's deposition testimony is also admissible in the MDL for any purpose pursuant to Fed.R.Civ.P. 32, which permits the use of a deposition against a party who was present or represented at the taking of the deposition. Fed.R.Civ.P. 32(a)(2) provides as follows:

> (2) The deposition of a party or of anyone that at the time of taking the deposition was an officer, director, or managing agent, or a person designated under Rule 30(b)(6) or 31 (a) to testify on behalf ore a public or private corporation, partnership or association or governmental agency which is a party may be used by an adverse party <u>for any purpose</u>.

Fed.R.Civ.P. 32(a)(2); *see also Jamsports*, 2005 WL 14917, *4 (videotaped depositions of board members of corporate defendant are admissible in plaintiff's case in chief regardless of witness availability at trial and Rule 32(a)(2) does "not require [a party] to call the witnesses "live" in its case and use the depositions merely for impeachment purposes.").

Merck was represented by counsel present during all depositions of David Anstice that are pertinent to the MDL. Since Mr. Anstice is an officer of Merck his deposition is admissible for any purpose in this litigation under Fed.R.Civ.P. 32(a)(2). This deposition testimony is actually

21

admissible even if Mr. Anstice appears and testifies at trial.

Accordingly, plaintiffs respectfully request that David Anstice's prior testimony also be pre-admitted into evidence.

**C.     IN THE ALTERNATIVE, THIS COURT HAS AUTHORITY TO COMPEL THE APPEARANCE OF A CORPORATE DESIGNEE TO PRESENT TESTIMONY IN OPEN COURT FOR CONTEMPORANEOUS TRANSMISSION FROM A DIFFERENT LOCATION.**

Fed.R.Civ.P. 43 permits a court to present the testimony of a witness by contemporaneous transmission from a different location for good cause and under compelling circumstances.[13]  Good cause and compelling circumstances exist since Merck is a party to this litigation and virtually all if its officers, directors and employees are located in New Jersey and Pennsylvania.  Although officers of Merck are still subject to this Court's subpoena power pursuant to Rule 45, Merck has successfully argued in the past that it would be burdensome to produce officers or other witnesses at trial.  Thus, Merck could attempt to use this same argument as a basis for the denial of a motion to compel the appearance of such officers.  The denial of a motion to compel the appearance of a corporate designee at trial would be prejudicial since it would preclude the plaintiffs from confronting the defendant on many pivotal issues.  Given this obvious prejudice, there exists good cause and compelling circumstances for presenting the testimony of a corporate designee via contemporaneous transmission pursuant to Rule 43.

In *In re San Juan Dupont Plaza Hotel Fire Litigation*, 129 F.R.D. 424 (D.Pueto Rico 1990),

---

[13]Fed.R.Civ.P. 43 was amended in 1996 to allow for testimony in open court by contemporaneous transmission from another location.  *See* Fed.R.Civ.P. 43 advisory committee's notes for the 1996 amendments to Civil Rule 43(a).

the court granted a motion requesting leave to telecast live testimony of witnesses from various states via satellite hookup.[14]  As in this case, the witnesses were under the control of the defendant who refused to make them available for trial. *Id.* at 425.  In addition, unlike the officers involved in this case, the witnesses in *Dupont Plaza* were not subject to the court's subpoena power since they were mere employees located in excess of 100 miles from the courthouse. *Id.*  Nevertheless, the court held the testimony of such witnesses could be offered by satellite transmission since it found the main purpose of providing such testimony via satellite is to "provide the jury and this Court with live testimony rather than with the droning recitation of countless transcript pages of deposition testimony read by stand-in readers in a boring monotone." *Id.* (also noting that "reading of deposition gives rise to ludicrous objections concerning whether the reader may interpret the tone and mood of the questions and answers and whether the reader may or may not give inflection to certain words or passages.").  The court explained that:

> The Court has little doubt that the presentation of live testimony by satellite is a viable, and even refreshing, alternative to the deadening recitation of numerous depositions.  It would also be most helpful to the jury in the fulfilment of their sworn duties.  After all, the purpose of a trial is precisely to ensure the truth-seeking process which, to a great extent, is based on the demeanor of witnesses.

*Id.* at 425.

Although *Dupont Plaza* actually precedes the amendment to Rule 43(a), its analysis of factors supporting the use of satellite transmission of testimony in complicated multi-district litigation is directly on point.  In finding the satellite testimony to be warranted the court pointed to the following

---

[14]*See also Harrell v. State*, 689 So.2d 400, 405 (Fla.App. 3 Dist. 1997), *approved*, 709 So.2d 1364 (Fla. 1998), *cert. denied*, 525 U.S. 903 (1998)(citing the *Dupont Plaza* case with approval and implementing a similar technique to present the testimony of a tourist in a criminal case).

five-factors supporting its decision:

> (1) [T]he control defendants had over the witnesses in question; (2) the complex, multi-party, mult-state nature of the litigation; (3) the apparent tactical advantage, as opposed to any real inconvenience to the witnesses, that the defendants were seeking by not producing the witnesses voluntarily; (4) the lack of any true prejudice to the defendants; and (5) the flexibility needed to manage a complex multi-district litigation.

*Id.* at 426. These same factors are implicated in this case since: (1) Merck has control of its officers who are also subject to this Court's subpoena power; (2) this MDL involves complex, multi-party, multi-state litigation; (3) Merck is seeking a tactical advantage by forcing the plaintiffs to rely on deposition transcripts and there is little or no inconvenience in requiring witnesses to appear and testify via satellite since this can be accomplished from a location that is mutually convenient for all parties;[15] (4) permitting satellite testimony would not result in any prejudice to the defendants since similar evidence could be presented through deposition transcripts; and (5) flexibility is required in this litigation due to its complexity of the MDL and the fact that Merck is located a considerable distance from the MDL forum.

For these reasons, if this Court denies the plaintiffs' motion to compel the appearance of a corporate designee at trial and/or refuses to allow the use of David Anstice's prior testimony, plaintiffs respectfully request that a corporate designee be required to provide live testimony to the jury via contemporaneous transmission from another location.

---

[15]As was noted above, the assignment of the MDL to Louisiana was fortuitous and Merck should not be permitted to use this as a shield from testifying at trial. Moreover, plaintiffs should not be limited to the use of deposition transcripts as the sole basis of offering Merck's testimony on critical points and should be permitted an opportunity to confront the defendant in the presence of the jury. By witnessing such live testimony the jury will be better able to accomplish the truth-seeking process by observing the demeanor of the witness and by listening to his or her responses on cross-examination.

**D.     MOTION IN LIMINE TO PRECLUDE THE ADMISSION
OF THE APRIL 6, 2005 FDA MEMORANDUM.**

Plaintiffs move the Court for an ordering excluding the admission into evidence of a Food

and Drug Administration (FDA) April 6, 2005 Memorandum and all evidence and/or argument that

the FDA has concluded there is a "class effect" for all non-steroidal anti-inflammatory drugs

(NSAIDs).

Plaintiffs believe that in future trials, as it has in previous trials, Merck may attempt to

introduce evidence and/or argument that the FDA has concluded that the class of medications known

as non-steroidal anti-inflammatory drugs ("NSAIDs")—of which, COX-2 inhibitors such as Vioxx

are a subset—all carry an increased risk of cardiovascular injury.  To support its claims in previous

trials, Merck has referenced a memorandum published on the FDA website on April 6, 2005.  A copy

of the FDA memo is attached hereto as Exhibit "A".

This memorandum does not state that the FDA has concluded there is a class effect of

increased cardiovascular risk for all NSAIDs.  Instead, it contains preliminary and conditional

opinions and recommendations, offered during a time period when the FDA was (and continues to

be) under intense public and government scrutiny and was being widely criticized for failing to be

diligent in its evaluations of the safety of Vioxx and the accuracy of its label and promotional

materials.  Further, the memorandum explicitly acknowledges that the FDA lacks data to draw final

conclusions regarding the cardiovascular risks of NSAIDs.  Rather than wait, however, until more

conclusive data is available, the FDA chose to err on the side of caution and offer preliminary

opinions that might be beneficial to public safety.  As a result, the "conclusions" in the memorandum

lack the scientific certainty and reliability which might be presumed by the jury to attach to

information coming from the FDA.

The Court has previously admitted this document into evidence and has allowed testimony about the document. Plaintiffs urge the Court to reconsider its position. Testimony or argument regarding the April 6th FDA memorandum should be excluded because it is irrelevant. If permitted during future trials, it would also be unfairly prejudicial to Plaintiffs and confusing to juries.

The FDA has not scientifically "concluded" anything about a "class affect" associated with NSAIDs. Merck, however, would seek to take the FDA's precautionary statements and use them to bolster the opinions of its own representatives and experts to transform this ongoing litigation from a controversy about Merck's conduct with respect to Vioxx, into a controversy about all NSAIDs. For these reasons -- the lack of relevancy, the substantial danger of unfair prejudice, the likelihood of confusion to a jury, and the lack of scientific reliability related to the "conclusions" in the FDA's memorandum, the Honorable Judge Higbee in the *Humeston v. Merck & Co.* case ruled that evidence and/or testimony related to the FDA's memorandum is inadmissible. Judge Higbee followed her previous ruling during the *McDarby/Cona* trial. This Court is urged to do the same.

### 1.   The FDA Memorandum Does Not Conclude That There is a Demonstrated Class Effect for All NSAIDS.

On April 6, 2005, the U.S. Food and Drug Administration ("FDA") published, on its website, a memorandum entitled, "Analysis and recommendations for Agency action regarding nonsteroidal anti-inflammatory drugs and cardiovascular risk." *See* Exhibit "A". The document contains select discussion and opinions derived from a review of "available clinical trial data," and "published and unpublished" observational studies. *Id.* at 1, 7.

The memorandum concludes that there is an "increased risk of serious adverse CV events

26

compared to placebo" for the selective COX-2 inhibitors Vioxx, Celebrex, and Bextra—a subset of

the broader class on non-selective NSAIDs. *Id.* at 1. With respect to a "class effect of NSAIDs,"

the FDA memorandum states that:

> Long-term placebo-controlled clinical trial data are not available to adequately assess the potential for the non-selective NSAIDs to increase the risk of serious adverse events. . . <u>Pending the availability of additional long-term controlled clinical trial data, the available data are best interpreted as being consistent with a class effect of an increased risk of serious adverse CV events for COX-2 selective and non-selective NSAIDs.</u>

*Id.* at 2 (emphasis added).

This equivocal and qualified observation cannot reasonably be interpreted as meaning that

the "FDA has concluded that there is a class effect of increased cardiovascular risks for <u>all</u> NSAIDs."

In the section of the memorandum entitled, "Analysis and Conclusions," the reviewers retreat from

their earlier summary opinion:

> <u>The absence of long-term controlled clinical trial data for the non-selective NSAIDs significantly limits our ability to assess whether these drugs may also increase the risk of serious adverse CV events.</u> . . . The adverse CV risk for the COX-2 selective drugs became apparent only from large, long-term controlled clinical trials and large retrospective cohort studies. Similar clinical trials are needed to assess the potential risks of the non-selective NSAIDs.

*Id.* at 11 (emphasis added).

Oddly, the reviewers then offer a <u>qualified</u> statement "that it is reasonable to conclude that

there is a 'class effect' for increased CV risk for all NSAIDs *pending the availability of data from*

*long-term controlled clinical trials that more clearly delineate the true relationships.*" *Id.* (emphasis

added). This qualification appears to be founded in the authors' acknowledgment that "[f]or the vast

majority of non-selective NSAIDs we do not have <u>any data</u> that allow comparisons with COX-2 selective agents for CV risk." *Id.* at 10 (emphasis added).  Moreover, with respect to the authors' hypothesis of a class effect, it was noted that "Naproxen may be an exception." *Id.*

The FDA memorandum demonstrates that as far as the FDA is concerned, more data is needed before reaching an unqualified conclusion that there is a "class effect" of increased risk of adverse cardiovascular events.  The authors observe significant differences in cardiovascular events among several NSAIDs, including Celebrex, Vioxx, and Naproxen. *Id.* at 4-5, 10.  In short, as far as the authors are concerned, they are not concluding that there is a class effect since additional data is needed.  Further, there is evidence that the agency felt pressured to provide guidance on the COX-2 controversy, even in the absence of long-term clinical trials addressing the cardiovascular risks of non-selective NSAIDs.  As the reviewers noted:

> The inability to reliably estimate the absolute magnitude of the increased risk of serious adverse CV events for individual COX-2 agents, combined with <u>the inability to reliably draw conclusions about the risk of COX-2 agents compared to one another or to other NSAIDs</u>, highlights the conundrum the Agency faces in making decision on appropriate regulatory actions.  <u>There is an urgent health need to make appropriate regulatory decisions because the adverse events at issue are serious and a very large number of patients use selective and non-selective NSAIDs . . .</u> Although the currently available data are not definitive, <u>the Agency cannot await more definitive data</u>, which may take years to accumulate from studies that have not even begun, before taking action.

*Id.* at 10 (emphasis added).

Irrespective of the merits of the FDA's opinions,[16] it is apparent that the FDA was under

---

[16] Plaintiffs note that the FDA analysis does not seem to account for several published studies that "ranked" the relative risk for serious adverse cardiovascular events among COX-2 inhibitors and non-selective NSAIDs, including Ray, *Non-steroidal Anti-inflammatory Drugs and Risk of Serious Coronary Heart Disease: an Observational Cohort Study*, The Lancet, Vol.

enormous pressure to weigh in on the COX-2 controversy.   Indeed, at the time the FDA memorandum was published on its website, the FDA's oversight of the development and marketing of Vioxx was being widely criticized by the medical community and in the media, and was the subject of both committee hearings in both the United States House of Representatives and Senate. As demonstrated above, any allegation that the FDA has definitely concluded that there is a class effect of increased cardiovascular risks for all NSAIDs is false.  Further, the circumstances under which the FDA rendered such opinions are suspect.

> ### 2.  Any Evidence of Argument That the FDA Has Concluded That There is a Class Effect of Increased Cardiovascular Risk For All NSAIDS is Unreliable and Highly Prejudical.

All evidence, including expert opinion, is subject to the requirements of Rules 401, 402 and 403 which address relevancy and reliability. Rule 403 provides, "relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

Any suggestion that the FDA has concluded that all NSAIDs—as a class—increase the risk of severe cardiovascular events is not supported by the Memorandum and is misleading and confusing to the jury.  As noted above, the FDA has not reached any such conclusion.  The "conclusions" reflected in the memorandum are, by the author's own acknowledgment, based on incomplete data and precautionary speculation.

---

359, Pg.118-123 (2002) and Juni, *Risk of Cardiovascular Events and Rofecoxib: Cumulative Meta-analysis,* The Lancet,  Pg. 1-9 (Nov. 5, 2004).

The FDA is widely perceived by the public to be an authority on such issues and, thus, the danger of unfair prejudice is magnified. Allowing such evidence or argument will distract future juries from the central questions regarding Vioxx to each case in this multidistrict litigation — did Merck fail to adequately warn physicians and patients about known cardiovascular risks associated with Vioxx? Is Vioxx defective or unreasonably dangerous?

If the FDA's April 6, 2005 Memorandum is admitted into evidence and testimony regarding its contents is allowed, there is a substantial danger that the jury will attach disproportionate significance to this evidence -- even with its dubious reliability or marginal relevance -- and give less weight to the scientific evidence presented by Plaintiff that has qualified for admission into evidence by passing through *Daubert's* gates.

Further, the prejudice to Plaintiffs is heightened by the fact that the authors of the FDA memorandum will likely not be testifying at trial. Plaintiffs have not had opportunity to verify or ascertain the basis of the authors' conclusions. Moreover, Plaintiffs will likely not have opportunity to cross-examine the authors of the FDA memorandum concerning their opinions prior to the upcoming trials. If Defendant is permitted to introduce evidence or argument that the FDA has concluded that there is a class effect for all NSAIDs at trial, Merck, in essence, will have the unfair advantage of bolstering the opinions of its representatives and experts without Plaintiffs having the opportunity to cross-examine the authors of the memorandum. Such an outcome is particularly troubling when one further considers the equivocal and confusing nature of the document, and the suspect circumstances under which it was published by the FDA.

Without question, the probative value of this memorandum is substantially outweighed by its prejudicial effect. Its admission in future trials would only serve to confuse and mislead the jury

30

and therefore, the memorandum should be excluded under Rule 403.

Plaintiff urges the Court to reverse its position and find that the FDA's April 6, 2005 Memorandum is not admissible in future trials as well as exclude all evidence and/or argument that the FDA has concluded that there is a "class effect" of increased cardiovascular risks for all NSAIDs.

### E.   MOTION TO COMPEL THE PRODUCTION OF CONFIDENTIAL MEMORANDUM OF INVENTION.

The personal injury cases pending in the MDL reflect the broad spectrum of cases from around the country.  These actions filed in either state court and removed to this court or filed directly in federal court based upon diversity jurisdiction comprise the bulk of litigants seeking damages for personal injury.  Some of the jurisdictions in which plaintiffs seek to recover from Merck for product defect claims must present evidence of an alternative design of the product at issue.  Thus, for example, Louisiana plaintiffs will have to present evidence that Rofecoxib or Vioxx had alternative designs that were available that made the product less dangerous and not defective.

In the course of litigations against Merck, the PSC has become aware of a April 2000 Confidential Memorandum of Invention ("CMI") that was produced by a Merck employee.  Through prior briefing in this litigation, the PSC is aware that the CMI at issue describes Merck's interests in patenting a new drug, invented by Merck scientist Edward Scolnick, which would combine COX-2 inhibitors with compounds designed to inhibit the body's production of thromboxane.  As set forth at page 5 of Merck's brief filed in the New Jersey litigation entitled, "Brief in Further Support of Merck & Co., Inc.'s Motion for a Protective Order Prohibiting Use or Disclosure of Inadvertently Produced Privileged Documents and Compelling Plaintiffs to Return all Copies of the Documents", the authors of the CMI explain that such a combination of drugs might achieve the, "therapeutic

benefit of COX-2 inhibitors with the additional benefit of reducing the risk of cardiac and cerebral adverse effects....".

This type of direct evidence, and admission by Merck that an alternative design for Vioxx was available, may be the only source of information available to address Merck's notice of the availability of an alternative design.  Plaintiffs that must establish an alternative design therefore have a substantial need for this evidence which justifies the piercing of any purported attorney/client privilege associated with this document.

Under the circumstances presented by these MDL proceedings, the PSC is obliged to move to compel the CMI document to further advance the discovery necessary for certain claimants within the MDL who must establish an alternative design theory.

1.    **Merck Must Establish that the CMI is Privileged
      In Every State Throughout the Country In Order
      to Maintain Any Notion that the CMI is Privileged.**

During the *Irvin* trial, Merck moved to exclude this document on privilege grounds.  This Court twice found that Merck's motion was "too broad."  *See In re Vioxx Products Liability Litigation (Irvin)*, MDL No. 1657, Order at ¶14 (E.D.La. Nov. 21, 2005); *In re Vioxx Products Liability Litigation (Plunkett)*, MDL No. 1657, Order and Reasons at 2 (E.D.La. Feb. 6, 2006).

Here, there is no reason to believe that the CMI is privileged.  In diversity cases such as these, privilege is controlled by state law.  Fed.R.Evid. 501, states in relevant part:

> "[I]n civil actions and proceedings, with respect to an element of a
> claim or defense as to which State law supplies the rule of decision,
> the privilege of a witness, person, government, State, or political
> subdivision thereof shall be determined in accordance with State
> law."

Because the PSC's discovery is to apply for any federal litigant, if any one State would not recognize that the CMI is subject to the attorney-client privilege, then for all intents and purposes the privilege is waived throughout these MDL proceedings. Stated differently, should a document become available to the PSC because one state finds there to be no privilege, then once in the public domain the PSC could make the document available to all participants in the MDL.

The attorney-client privilege acts in derogation of open discovery and the search for truth, therefore, it is generally, if not universally, construed narrowly. *See generally Upjohn Co. v. United States*, 449 U.S. 384, 396 (1981)(privilege is decided on a case by case basis so as not to violate the spirit of Rule of Evidence 501); *Fisher v. United States*, 425 U.S. 391, 403, (1976)(because the privilege "has the effect of withholding relevant information from the fact-finder, it applies only where necessary to achieve its purpose"). Further, it is the burden of the person asserting the privilege to prove that he made confidential communications to his lawyer for the primary purpose of securing either a legal opinion, legal services or assistance in some legal proceeding. *See generally United States v. Robinson*, 121 F.3d 971, 974 (5th Cir. 1997), *cert. denied.*, 522 U.S. 1065 (1998). Thus, merely because the communication passes an attorney does not necessarily cloak that communication with a privilege. *See, e.g., PSE Consulting, Inc. v. Frank Mercede and Sons, Inc.*, 838 A.2d 135, 167 (Conn. 2004)(communication of matters of fact that are not inextricably linked to the giving of legal advice are not privileged); *U.S. Fidelity & Guaranty Co. v. Barron Industries, Inc.*, 809 F.Supp. 355, 364 (M.D.Pa. 1992)(Under Pennsylvania law, title of attorney is not dispositive; only communications in which attorney is acting as advisor presenting opinions and setting forth defense tactics are privileged, discussions of facts no matter how extensive are not privileged).

33

Merck can not support any claim of privilege.

### 2.    The CMI Is Not Protected by the Attorney-Client Privilege

A communication that pertains to mere instructions on what services the attorney is to perform is not protected by the attorney-client privilege.   *In re Pabst Licensing GmbH Patent Litigation*, 2001 U.S. Dist. Lexis 15667, at 6 (E.D.La. 2001).  In April 2000, the CMI was prepared by Dr. Kathleen Metters and describes Merck's interest in patenting a new drug, invented by Merck scientist Edward Scolnick, which would combine COX-2 inhibitors with compounds designed to inhibit the body's production of thromboxane.  The CMI was received by the patent department for purposes of beginning the process of drafting a patent application.  The CMI was essentially administrative in nature and conveyed instructions to the Patent Department's attorneys and staff.  As such, it should not be protected by the attorney-client privilege.

### 3.    If protected, Merck Waived Its Attorney-Client Privilege by Quoting Portions of the CMI in a Brief it Filed in New Jersey.

Under New Jersey law, a party waives the privilege if, "without coercion and with knowledge of his right or privilege, [he] made disclosure of any part of the privileged matter or consented to such a disclosure made by anyone." N.J. Stat. Ann. § 2A:84A-29, N.J.R. Evid. 530. "It is axiomatic that any voluntary disclosure by the holder of such a privilege waives the privilege." *Leonen v. Johns-Manville,* 135 F.R.D. 94, 99 (D.N.J. 1990) (drawing from federal common law in applying New Jersey law). The voluntary disclosure of any significant portion of confidential communication waives the privilege as to the whole. *Leonen v. Johns-Manville*, 135 F.R.D. 94, 99 (D.N.J. 1990); *In re Pabst Licensing GmbH Patent Litigation*, 2001 U.S. Dist. Lexis 15667 (E.D.La. 2001); *see Nguyen v. Excel Corp.*, 197 F. 3d 200, 207 (5th Cir. 1999).

34

In *In re Pabst*, the Court ruled that privilege had been waived because the party claiming the privilege revealed privileged communications when its associate general counsel included in a declaration, attached in a response to a motion for summary judgment, revealing communications that were directly related to the asserted privilege. The Court stated that the disclosure was not inadvertent, as "it was intentionally included in a sworn declaration," which was attached to a pleading. *In re Pabst*, 2001 U.S. Dist. Lexis 15667, at 7 – 10.

In the present case, in a pleading filed in the New Jersey proceeding, Merck specifically cites details of the CMI document at issue as follows:

> In April, 2000, Dr. Kathleen Metter, Vice President and Site Head for Merck Frosst Canada & Company ("Merck Frosst), and other Merck Frosst scientists prepared the CMI now at issue. The CMI described an idea for a new drug combining COX-2 inhibitors with compounds designed to inhibit production or action of thromboxane. The authors explained that such a combination drug might achieve "therapeutic benefit of COX-2 inhibitors with the additional benefit of reducing the risk of cardiac and cerebral adverse effects" for "at risk populations" CMI at 2. The authors also noted a theory that has come to be known as the Fitzgerald hypothesis – that because COX-2 inhibitors have been observed to reduce urinary metabolites of prostacyclin (an anti-platelet agent), "this may reflect reduced prostacyclin in vivo" which "may result in an altered ratio or prostacyclin to thromboxane (TX)A2" which in turn "may cause increased risk of cardiac and cerebral events.

(Brief in Further Support of Merck & Co., Inc.'s Motion for A Protective Order Prohibiting Use of Disclosure of Inadvertently Produced Privileged Documents and Compelling Plaintiffs to Return all Copies of the Documents), Superior Court New Jersey Law Division, Civil Action No. 619, at 5).

The disclosure of these "significant portions" of the CMI document constitutes a waiver of the attorney-client privilege. *See Leonen*, 135 F.R.D. at 99; *In re Pabst*, 2001 U.S. Dist. Lexis 15667, at 6.

35

Based upon the fact that Merck had already publicly revealed the "content" of the CMI document, there is no confidential aspect of the document, and thus, the confidentiality element of privilege is not satisfied.

### 4.     Plaintiffs Have a Substantial Need of this Document

The attorney-client shield may be pierced when confidential communications are made a material issue by virtue of the allegations in the pleadings and where such information cannot be secured from any less intrusive source. *United Jersey Bank v. Wolosoff*, 483 A.2d 824, 823 (N.J. App. Div. 1984). According to the *New Jersey Bank* Court:

> The factors of analysis involved with the piercing of the attorney-client shield were described by our Supreme Court in *In re Kozlov*, 79 N.J. 232 (1979). There, the Court adopted a tripartite test in determining whether the privilege must yield to other important societal concerns. First, "[t]here must be a legitimate need . . . to reach the evidence sought to be shielded." ... Second, "[t]here must be a showing of relevance and materiality of that evidence to the issue before the court." ... Lastly, the party seeking to bar assertion of the privilege must show "by a fair preponderance of the evidence including all reasonable inferences that the information [cannot] be secured from any less intrusive source.

*Id.* at 826.

"The typical setting in which the attorney-client privilege has not been sustained by the New Jersey Supreme Court in *In re Kozlov*, 79 N.J. 232 (N.J. 1979), is where the party claiming the privilege has implicitly waived it by putting the confidential communications 'in issue' in the litigation. Most jurisdictions recognize implicit waiver of the attorney-client privilege 'where the plaintiff has placed in issue a communication which goes to the heart of the claim in controversy.'" *Kinsella v. Kinsella*, 696 A.2d 556, 568 - 569 (N.J. 1997); Developments in the Law, Privileged Communications, supra, 98 Harv. L. Rev. at 1637-38; 81 Am. Jur. 2d Witnesses § 348, at 323

(1992).

Here, the necessity on certains plaintiffs to prove an alternative design is not avoidable. Under these circumstances, the fact that Merck has a document that admits of an alternative design emphasizes the need for this document. Merck cannot sustain its claim of privilege when the privilege operates to conceal such a prominent admission.

The motion to compel the CMI memo should be granted.

### F.   MOTION IN LIMINE TO PRECLUDE TESTIMONY BY MERCK EMPLOYEES REGARDING THEIR PERSONAL USE OF VIOXX.

Plaintiffs move the Court for an order excluding any evidence, discussion or argument that Merck employees, former employees, or family members of Merck employees took Vioxx prior to the drug's withdrawal from the market on September 30, 2004. Such evidence is irrelevant and unfairly prejudicial, and should not be allowed at trial.

In the first and second trials of *Evelyn Irvin Plunkett v. Merck & Co.*,[17] the Court allowed Dr. Alise Reicin and Dr. Edward Scolnick to testify that they took Vioxx and believed that the drug was safe and effective to treat their arthritis pain. Though not offered in the *Irvin* trials, other Merck employees and former employees have testified by deposition that they or a family member took Vioxx. Former Merck CEO Raymond Gilmartin; current president of Merck U.S. Human Health, David Anstice; and current president of Merck Research Laboratories, Peter Kim, have testified that they or a family member took Vioxx prior to the drug's withdrawal from market on September 30, 2004.

---

[17] The Court originally, and Plaintiffs believe correctly, ruled that evidence of employee use of Vioxx was irrelevant and inadmissible pursuant to Rule 401. The Court reversed the decision during *Irvin I.*

Plaintiffs expect Merck to offer similar testimony from some or all of these Merck employees or former employees during upcoming trials in the MDL. With this evidence, Merck intends to bolster its assertions that Vioxx is safe and that prior to receiving data from APPROVe, it had no knowledge of the increased cardiovascular risks associated with the use of Vioxx.

Such testimony is not relevant to Plaintiffs' claims that Vioxx is defective and that Merck failed to warn physicians and patients of the increased risk of cardiovascular events associated with the use of the drug. Moreover, the probative value of the evidence is substantially outweighed by its prejudicial effect. Plaintiffs respectfully move the Court for an order excluding such evidence during any upcoming trials in the MDL.

1.      **The Alleged Use of Vioxx by Merck Employees or
        Their Family Members if Irrelevant to Plaintiffs' Claims.**

Anecdotal evidence that Merck employees or their family members took Vioxx is irrelevant to Plaintiffs' claims of defective product and failure to warn.[18]

First, such evidence, testimony, or discussion is irrelevant to prove or disprove that Vioxx is unreasonably dangerous. Arguably, those who have testified they took Vioxx had substantial information about the safety profile of the drug. It can be argued that they were well aware of the

---

[18] All such testimony to date has not been supported by any evidence with the exception of Dr. Reicin. Medical records of Dr. Scolnick, Mr. Anstice, Dr. Kim, or Mrs. Gilmartin establishing that they were in fact prescribed and took Vioxx have not been produced by Merck. Merck witnesses should not be allowed to testify they or their family member took Vioxx without providing a sworn Profile Form on the issue which identified their pharmacy, prescribing doctor and medical exam records and provides HIPPA authorizations for the release of such records such that meaningful cross examination can be conducted.

cardiovascular risks associated with taking Vioxx. Unlike physicians who prescribing the drug to millions of patients, these executives and their family members would have been privy to data drawing into question the safety of Vioxx. These employees and their family members or their physicians would have had opportunity to perform a different risk benefit analysis prior to taking the drug then the rest of the public.

Plaintiffs have not been given medical records on the employees and family members in question (with the exception of the limited medical records of Alise Reicin provided during *Irvin II*). Plaintiffs have not had opportunity to depose their treating physicians. It is unknown what these persons medical conditions were or what other medications were being taken along with Vioxx.

It might be that Merck executives, having knowledge of the drugs prothombotic nature, would have also taken a blood thinning agent to minimize the risk of a thrombotic event. Or the individual had few risk factors for cardiovascular disease that would elevate the risk of an adverse event. Or possibly their arthritic pain was so extreme that the individual made a decision to take Vioxx regardless of the cardiovascular risk. Lastly, they may have simply taken the drug without any consideration or care, having total disregard for their safety or welfare.

This issue has been considered by Judge Carol E. Higbee in New Jersey. In *Humeston, et al v. Merck & Co., Inc.*, the court made the following finding directed at the inadmissibility of such evidence based on the fact that evidence regarding the ingesting of Vioxx by a non-party Merck employee or Merck family member was irrelevant as involving a factual analysis unrelated to the plaintiff:

> The individual decision made by a person in consultation with their doctor to take a drug is a personal decision which can be made for many reasons. People are willing to take different risks. Some

> people, depending on their medical condition, may have been willing
> to gamble on the cardiovascular risks even if they knew of the risk.
> The exploration at trial of each employee's personal decision would
> be prejudicial, confusing and time consuming.

*See* Memorandum of Decision on Motion, *Humeston v. Merck & Co.*, No. ATL-L-2272-03-MT, slip

op. at 3 (N.J. Super., Atlantic Cty. September 9, 2005) [attached hereto as Exhibit "B"].

These individual choices cannot be extrapolated across the entire population of those taking

Vioxx and judged as evidence that Vioxx is safe as labeled.  Such testimony does not prove that the

drug is not unreasonably dangerous.  It is irrelevant.

To allow the admission of this testimony would be much like allowing a cigarette company

executive to testify that he smoked, members of his family smoked, and that somehow that testimony

of those facts proved that cigarettes are not unreasonably dangerous or that they had no knowledge

of the danger.  Clearly, cigarettes are dangerous and cause untold harm.  Individual choices to smoke

have no bearing on that conclusion.  The Court's analysis in this case should be the same as the New

Jersey court.

Second, one of Plaintiffs' primary claims is that Merck knew of the cardiovascular dangers

associated with the use of Vioxx but failed to warn the physicians and their patients.  Testimony

regarding Merck executives and their family members using Vioxx is immaterial and irrelevant to

this claim.  Merck executives and their family members had the benefit of internal safety data

available for their use that was not available to the public.  Clearly, any decisions they made to take

Vioxx are irrelevant to Plaintiffs' claim that they and their treating physicians were not adequately

warned of the risks associated with the drug.  Rather, at best, such evidence is merely confusing.  As

Judge Higbee found in *Humeston*, "[s]uch evidence does not have any probative value in answering

the ultimate issues in the failure to warn aspect of this litigation." *Id.* Defendant should therefore

be precluded from introducing such evidence.

> **2.    The Probative Value of Claims that Merck Employees or**
> **Their Family Members Took Vioxx is Substantiality Outweighed**
> **By Their Prejudicial Effect.**

Plaintiffs contend that the Court correctly ruled prior to *Irvin I* that testimony and evidence

that Merck employees and their family members took Vioxx is not relevant. Plaintiffs urge the Court

to return to its previous decision and find that the testimony is inadmissible under Rule 401. In the

event the Court finds that the evidence is relevant, however, the evidence clearly should not be

admitted under Rule 403.  Federal Rule of Evidence Rule 403 provides: "Although relevant,

evidence may be excluded if its probative value is substantially outweighed by the danger of unfair

prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste

of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.  Though any probative

value is highly questionable, the same is clearly substantially outweighed by factors outlined in Rule

403 including the danger of unfair prejudice, confusion of issues and waste of time.

The probative value of the testimony at issue is minimal and pales in comparison to the

prejudicial effect of the testimony.  Testimony that a witness' relative took Vioxx could mislead a

jury into believing that Vioxx was safe and effective, since—as Merck will undoubtedly argue—no

witness would have allowed his or her relative to take a drug that was known to be dangerous.  This

implication, however, is not necessarily the case.  As demonstrated above, Merck employees may

have taken and allowed their relatives to take Vioxx knowing its dangerous condition for numerous

reasons – it was taken in addition to a blood thinning agent (something a physician without

knowledge of the drug's prothombotic effect would not have known to add to a patient's therapy),

the risk in the case of extreme pain was outweighed by the benefit, or the family member was just a risk taker.

In proposing this testimony, Merck essentially attempts to put forward a "trump" card – if we took it, the drug must be safe. This flies in the face of other scientific evidence. Allowing such testimony would only confuse the jury and encourage the jury to overlook the scientific evidence that has passed through *Daubert's* gates during the course of the trial.

Moreover, allowing the testimony is counter to the Court's expressed desire to streamline the trial process. If allowed, in future trials, Plaintiffs will be forced to seek the medical records of those offering such testimony and will have to spend considerable time exposing the underlying health condition and risk-benefit analysis undertaken for each witness. This will result in a mini-trial in the midst of a trial, a considerable investment of the Court's time, but essential in order that Plaintiffs be given opportunity to adequately answer this evidence.

Judge Higbee, after briefing and oral argument on the same issues presented herein, correctly ruled:

> The court finds that evidence that Merck employees or their family members took VIOXX is substantially more prejudicial than probative and must be excluded during trial. Such evidence does not have any probative value in answering the ultimate issues in the failure to warn aspect of this litigation. Allowing Merck employees to testify that they or their family members took VIOXX would be highly prejudicial to plaintiffs' claims and would not demonstrate with any reliability that VIOXX was more or less safer than was being represented by Merck to the public.

*Id.*, slip op. at 3. Judge Higbee has continued to follow this ruling in the *McDarby/Cona* trial. Plaintiffs submit this reasoning is persuasive and should be adopted.

42

For the foregoing reasons, Plaintiffs respectfully request that this Court enter an order excluding any evidence or discussion that Merck employees, former employees or their family members used Vioxx.

## IV.   CONCLUSION

For the reasons set forth at length above, the several motions should be granted.

Respectfully submitted,

PLAINTIFFS' STEERING COMMITTEE

Date: April 19, 2006          By: _____

Russ M. Herman (Bar No. 6819)
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, L.L.P.*
Place St. Charles
201 St. Charles Avenue, Suite 4310
New Orleans, Louisiana 70170
Telephone: (504) 581-4892
Facsimile: (504) 561-6024

**PLAINTIFFS' LIAISON COUNSEL**

Andy D. Birchfield, Jr., Esquire **(on brief)**
Leigh O'Dell, Esquire **(on brief)**
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
(800) 898-2034 (telephone)
(334) 954-7555 (telecopier)
**Co-Lead Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA  71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Christopher A. Seeger, Esquire

SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
  MEUNIER & WARSHAUER, L.L.C.
Energy Centre
1100 Poydras Street, Ste. 2800
New Orleans, LA 70163
(504) 522-2304 (telephone)
(504) 528-9973 (fax)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA

316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire **(on brief)**
LIEFF, CABRASER, HEIMANN &
  BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Thomas R. Kline, Esquire
KLINE & SPECTER, P.C.
1525 Locust Street
19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Arnold Levin, Esquire **(on brief)**
Fred S. Longer, Esquire **(on brief)**
Michael M. Weinkowitz, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Carlene Rhodes Lewis, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire **(on brief)**
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

## PLAINTIFFS' STEERING COMMITTEE

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing pleading has been served upon Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis/Nexis File and Serve Advanced, in accordance with Pre-Trial Order No. 8, on this the 19th day of April, 2006.

44

Westlaw.

21 C.F.R. § 314.70

**c**

**Effective: [See Text Amendments]**

Code of Federal Regulations Currentness
 Title 21. Food and Drugs
  Chapter I. Food and Drug Administration,
  Department of Health and Human Services (Refs &
  Annos)
   Subchapter D. Drugs for Human Use
     Part 314. Applications for FDA Approval
     to Market a New Drug (Refs & Annos)
       Subpart B. Applications

        ➡§ 314.70 Supplements and other
        changes to an approved application.

<For implementation date(s) of amendment(s) to
  section, see 71 FR 3922.>

(a) Changes to an approved application.

   (1) The applicant notify FDA about each change in
   each condition established in an approved
   application beyond the variations already provided
   for in the application. The notice is required to
   describe the change fully. Depending on the type
   of change, the applicant must notify FDA about it
   in a supplement under paragraph (b) or (c) of this
   section or by inclusion of the information in the
   annual report to the application under paragraph
   (d) of this section.

   (2) The holder of an approved application under
   section 505 of the act must assess the effects of the
   change before distributing a drug product made
   with a manufacturing change.

   (3) Notwithstanding the requirements of
   paragraphs (b) and (c) of this section, an applicant
   must make a change provided for in those
   paragraphs in accordance with a regulation or
   guidance that provides for a less burdensome
   notification of the change (for example, by

submission of a supplement that does not require
approval prior to distribution of the product or in
an annual report).

(4) The applicant must promptly revise all
promotional labeling and advertising to make it
consistent with any labeling change implemented
in accordance with paragraphs (b) and (c) of this
section.

(5) Except for a supplement providing for a change
in the labeling, the applicant must include in each
supplement and amendment to a supplement
providing for a change under paragraph (b) or (c)
of this section a statement certifying that a field
copy has been provided in accordance with §
314.440(a)(4).

(6) A supplement or annual report must include a
list of all changes contained in the supplement or
annual report. For supplements, this list must be
provided in the cover letter.

(b) Changes requiring supplement submission and
approval prior to distribution of the product made using
the change (major changes).

   (1) A supplement must be submitted for any
   change in the drug substance, drug product,
   production process, quality controls, equipment, or
   facilities that has a substantial potential to have an
   adverse effect on the identity, strength, quality,
   purity, or potency of the drug product as these
   factors may relate to the safety or effectiveness of
   the drug product.

   (2) These changes include, but are not limited to:

   (i) Except those described in paragraphs (c) and (d)
   of this section, changes in the qualitative or
   quantitative formulation of the drug product,
   including inactive ingredients, or in the
   specifications provided in the approved
   application;

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT "1"**

21 C.F.R. § 314.70

(ii) Changes requiring completion of studies in accordance with part 320 of this chapter to demonstrate the equivalence of the drug product to the drug product as manufactured without the change or to the reference listed drug;

(iii) Changes that may affect drug substance or drug product sterility assurance, such as changes in drug substance, drug product, or component sterilization method(s) or an addition, deletion, or substitution of steps in an aseptic processing operation;

(iv) Changes in the synthesis or manufacture of the drug substance that may affect the impurity profile and/or the physical, chemical, or biological properties of the drug substance;

(v) The following labeling changes:

(A) Changes in labeling, except those described in paragraphs (c)(6)(iii), (d)(2)(ix), or (d)(2)(x) of this section;

<Text of subsection (b)(2)(v)(B) effective until June 30, 2006.>

(B) If applicable, any change to a Medication Guide required under part 208 of this chapter, except for changes in the information specified in § 208.20(b)(8)(iii) and (b)(8)(iv) of this chapter.

<Text of subsection (b)(2)(v)(B) effective June 30, 2006.>

(B) If applicable, any change to a Medication Guide required under part 208 of this chapter, except for changes in the information specified in § 208.20(b)(8)(iii) and (b)(8)(iv) of this chapter; and

<Text of subsection (b)(2)(v)(C) effective June 30, 2006.>

(C) Any change to the information required by § 201.57(a) of this chapter, with the following

exceptions that may be reported in an annual report under paragraph (d)(2)(x) of this section:

(1) Removal of a listed section(s) specified in § 201.57(a)(5) of this chapter; and

(2) Changes to the most recent revision date of the labeling as specified in § 201.57(a)(15) of this chapter.

(vi) Changes in a drug product container closure system that controls the drug product delivered to a patient or changes in the type (e.g., glass to high density polyethylene (HDPE), HDPE to polyvinyl chloride, vial to syringe) or composition (e.g., one HDPE resin to another HDPE resin) of a packaging component that may affect the impurity profile of the drug product.

(vii) Changes solely affecting a natural product, a recombinant DNA-derived protein/polypeptide, or a complex or conjugate of a drug substance with a monoclonal antibody for the following:

(A) Changes in the virus or adventitious agent removal or inactivation method(s);

(B) Changes in the source material or cell line; and

(C) Establishment of a new master cell bank or seed.

(viii) Changes to a drug product under an application that is subject to a validity assessment because of significant questions regarding the integrity of the data supporting that application.

(3) The applicant must obtain approval of a supplement from FDA prior to distribution of a drug product made using a change under paragraph (b) of this section. Except for submissions under paragraph (e) of this section, the following information must be contained in the supplement:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 C.F.R. § 314.70

(i) A detailed description of the proposed change;

(ii) The drug product(s) involved;

(iii) The manufacturing site(s) or area(s) affected;

(iv) A description of the methods used and studies performed to assess the effects of the change;

(v) The data derived from such studies;

(vi) For a natural product, a recombinant DNA-derived protein/polypeptide, or a complex or conjugate of a drug substance with a monoclonal antibody, relevant validation protocols and a list of relevant standard operating procedures must be provided in addition to the requirements in paragraphs (b)(3)(iv) and (b)(3)(v) of this section; and

(vii) For sterilization process and test methodologies related to sterilization process validation, relevant validation protocols and a list of relevant standard operating procedures must be provided in addition to the requirements in paragraphs (b)(3)(iv) and (b)(3)(v) of this section.

(4) An applicant may ask FDA to expedite its review of a supplement for public health reasons or if a delay in making the change described in it would impose an extraordinary hardship on the applicant. Such a supplement and its mailing cover should be plainly marked:    "Prior Approval Supplement-Expedited Review Requested."

(c) Changes requiring supplement submission at least 30 days prior to distribution of the drug product made using the change (moderate changes).

(1) A supplement must be submitted for any change in the drug substance, drug product, production process, quality controls, equipment, or facilities that has a moderate potential to have an adverse effect on the identity, strength, quality, purity, or potency of the drug product as these factors may relate to the safety or effectiveness of the drug product. If the supplement provides for a labeling change under paragraph (c)(6)(iii) of this section, 12 copies of the final printed labeling must be included.

(2) These changes include, but are not limited to:

(i) A change in the container closure system that does not affect the quality of the drug product, except those described in paragraphs (b) and (d) of this section;  and

(ii) Changes solely affecting a natural protein, a recombinant DNA-derived protein/polypeptide or a complex or conjugate of a drug substance with a monoclonal antibody, including:

(A) An increase or decrease in production scale during finishing steps that involves different equipment;  and

(B) Replacement of equipment with that of a different design that does not affect the process methodology or process operating parameters.

(iii) Relaxation of an acceptance criterion or deletion of a test to comply with an official compendium that is consistent with FDA statutory and regulatory requirements.

(3) A supplement submitted under paragraph (c)(1) of this section is required to give a full explanation of the basis for the change and identify the date on which the change is to be made.  The supplement must be labeled "Supplement-- Changes Being Effected in 30 Days" or, if applicable under paragraph  (c)(6)  of  this  section, "Supplement--Changes Being Effected."

(4) Pending approval of the supplement by FDA, except as provided in paragraph  (c)(6) of this section, distribution of the drug product made using the change may begin not less than 30 days after receipt of the supplement by FDA.   The information listed in paragraphs (b)(3)(i) through (b)(3)(vii) of this section must be contained in the supplement.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 C.F.R. § 314.70

(5) The applicant must not distribute the drug product made using the change if within 30 days following FDA's receipt of the supplement, FDA informs the applicant that either:

(i) The change requires approval prior to distribution of the drug product in accordance with paragraph (b) of this section; or

(ii) Any of the information required under paragraph (c)(4) of this section is missing; the applicant must not distribute the drug product made using the change until the supplement has been amended to provide the missing information.

(6) The agency may designate a category of changes for the purpose of providing that, in the case of a change in such category, the holder of an approved application may commence distribution of the drug product involved upon receipt by the agency of a supplement for the change. These changes include, but are not limited to:

(i) Addition to a specification or changes in the methods or controls to provide increased assurance that the drug substance or drug product will have the characteristics of identity, strength, quality, purity, or potency that it purports or is represented to possess;

(ii) A change in the size and/or shape of a container for a nonsterile drug product, except for solid dosage forms, without a change in the labeled amount of drug product or from one container closure system to another;

<Text of subsection (c)(6)(iii) intro. par. effective until June 30, 2006.>

(iii) Changes in the labeling to accomplish any of the following:

<Text of subsection (c)(6)(iii) intro. par. effective June 30, 2006.>

(iii) Changes in the labeling, except for changes to the information required in § 201.57(a) of this

chapter (which must be made pursuant to paragraph (b)(2)(v)(C) of this section), to accomplish any of the following:

(A) To add or strengthen a contraindication, warning, precaution, or adverse reaction;

(B) To add or strengthen a statement about drug abuse, dependence, psychological effect, or overdosage;

(C) To add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product;

(D) To delete false, misleading, or unsupported indications for use or claims for effectiveness; or

(E) Any labeling change normally requiring a supplement submission and approval prior to distribution of the drug product that FDA specifically requests be submitted under this provision.

(7) If the agency disapproves the supplemental application, it may order the manufacturer to cease distribution of the drug product(s) made with the manufacturing change.

(d) Changes to be described in an annual report (minor changes).

(1) Changes in the drug substance, drug product, production process, quality controls, equipment, or facilities that have a minimal potential to have an adverse effect on the identity, strength, quality, purity, or potency of the drug product as these factors may relate to the safety or effectiveness of the drug product must be documented by the applicant in the next annual report in accordance with § 314.81(b)(2).

(2) These changes include, but are not limited to:

(i) Any change made to comply with a change to an official compendium, except a change described in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 C.F.R. § 314.70

paragraph (c)(2)(iii) of this section, that is consistent with FDA statutory and regulatory requirements.

(ii) The deletion or reduction of an ingredient intended to affect only the color of the drug product;

(iii) Replacement of equipment with that of the same design and operating principles except those equipment changes described in paragraph (c) of this section;

(iv) A change in the size and/or shape of a container containing the same number of dosage units for a nonsterile solid dosage form drug product, without a change from one container closure system to another;

(v) A change within the container closure system for a nonsterile drug product, based upon a showing of equivalency to the approved system under a protocol approved in the application or published in an official compendium;

(vi) An extension of an expiration dating period based upon full shelf life data on production batches obtained from a protocol approved in the application;

(vii) The addition or revision of an alternative analytical procedure that provides the same or increased assurance of the identity, strength, quality, purity, or potency of the material being tested as the analytical procedure described in the approved application, or deletion of an alternative analytical procedure;

(viii) The addition by embossing, debossing, or engraving of a code imprint to a solid oral dosage form drug product other than a modified release dosage form, or a minor change in an existing code imprint;

(ix) A change in the labeling concerning the description of the drug product or in the information about how the drug product is supplied, that does not involve a change in the dosage strength or dosage form; and

<Text of subsection (d)(2)(x) effective until June 30, 2006.>

(x) An editorial or similar minor change in labeling.

<Text of subsection (d)(2)(x) effective June 30, 2006.>

(x) An editorial or similar minor change in labeling, including a change to the information allowed by paragraphs (b)(2)(v)(C)(1) and (2) of this section.

(3) For changes under this category, the applicant is required to submit in the annual report:

(i) A statement by the holder of the approved application that the effects of the change have been assessed;

(ii) A full description of the manufacturing and controls changes, including the manufacturing site(s) or area(s) involved;

(iii) The date each change was implemented;

(iv) Data from studies and tests performed to assess the effects of the change; and,

(v) For a natural product, recombinant DNA-derived protein/polypeptide, complex or conjugate of a drug substance with a monoclonal antibody, sterilization process or test methodology related to sterilization process validation, a cross-reference to relevant validation protocols and/or standard operating procedures.

(e) Protocols. An applicant may submit one or more protocols describing the specific tests and studies and acceptance criteria to be achieved to demonstrate the lack of adverse effect for specified types of manufacturing changes on the identity, strength, quality, purity, and potency of the drug product as these factors

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 6

21 C.F.R. § 314.70

may relate to the safety or effectiveness of the drug product. Any such protocols, if not included in the approved application, or changes to an approved protocol, must be submitted as a supplement requiring approval from FDA prior to distribution of a drug product produced with the manufacturing change. The supplement, if approved, may subsequently justify a reduced reporting category for the particular change because the use of the protocol for that type of change reduces the potential risk of an adverse effect.

(f) Patent information. The applicant must comply with the patent information requirements under section 505(c)(2) of the act.

(g) Claimed exclusivity. If an applicant claims exclusivity under § 314.108 upon approval of a supplement for change to its previously approved drug product, the applicant must include with its supplement the information required under § 314.50(j).

[50 FR 14212, April 11, 1985; 50 FR 21238 May 23, 1985; 57 FR 17983, April 28, 1992; 58 FR 47352, Sept. 8, 1993; 58 FR 47959, Sept. 13, 1993; 59 FR 50364, Oct. 3, 1994; 62 FR 39900, July 24, 1997; 63 FR 66399, Dec. 1, 1998; 65 FR 56479, Sept. 19, 2000; 67 FR 9586, March 4, 2002; 69 FR 18764, April 8, 2004; 71 FR 3997, Jan. 24, 2006]

SOURCE: 39 FR 11718, March 29, 1974; 50 FR 7493, Feb. 22, 1985; 50 FR 21238, May 23, 1985; 54 FR 39636, Sept. 27, 1989; 55 FR 37322, Sept. 11, 1990; 58 FR 47351, Sept. 8, 1993; 59 FR 13200, March 21, 1994; 62 FR 51516, Oct. 1, 1997; 63 FR 26698, May 13, 1998; 63 FR 59712, Nov. 5, 1998; 64 FR 401, Jan. 5, 1999; 65 FR 64617, Oct. 30, 2000, unless otherwise noted.

AUTHORITY: 21 U.S.C. 321, 331, 351, 352, 353, 355, 355a, 356, 356a, 356b, 356c, 371, 374, 379e.

21 C. F. R. § 314.70, **21 CFR § 314.70**

Current through March 30, 2006; 71 FR 16060

Copr. © 2006 Thomson/West

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw.**

30 FR 992-02                                                                 Page 1

30 Fed. Reg. 992 (January 30, 1965)

RULES AND REGULATIONS

FOOD AND DRUG ADMINISTRATION, DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE

21 CFR Part 121

NATURAL FLAVORING SUBSTANCES AND NATURAL SUBSTANCES USED IN CONJUNCTION WITH FLAVORS

January 30, 1965

ACTION: Final Rule

In the matter of promulgating a food additive regulation prescribing the safe use of
natural flavoring substances and adjuvants:

30 FR 992-993

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT "2"**