LAW OFFICES
**DECHERT LLP**
A PENNSYLVANIA LIMITED LIABILITY PARTNERSHIP
PRINCETON PIKE CORPORATE CENTER
(MAIL TO) P.O. BOX 5218, PRINCETON, NEW JERSEY 08543-5218
(DELIVER TO) 997 LENOX DRIVE, BUILDING THREE, SUITE 210
     LAWRENCEVILLE, NEW JERSEY 08648

(609) 620-3200

**HUGHES HUBBARD & REED LLP**
A NEW YORK LIMITED LIABILITY PARTNERSHIP
101 HUDSON STREET, SUITE 3601
JERSEY CITY, NEW JERSEY 07302-3918
(201) 536-9220

ATTORNEYS FOR MERCK & CO., INC.

|  |  |  |
|---|---|---|
| IN RE: VIOXX® LITIGATION | : | SUPERIOR COURT OF NEW JERSEY |
| | : | LAW DIVISION: ATLANTIC COUNTY |
| | : | DOCKET NO. ATL-L-1567-03-MT |
| | : | |
| | : | CASE NO.: 619 |
| | : | |
| | : | CIVIL ACTION |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION
FOR A PROTECTIVE ORDER PROHIBITING USE OR DISCLOSURE
OF INADVERTENTLY PRODUCED PRIVILEGED DOCUMENTS AND
COMPELLING PLAINTIFFS TO RETURN
ALL COPIES OF THE DOCUMENTS**



EXHIBIT
2

M001551640

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

BACKGROUND ............................................................................................................. 1

ARGUMENT ................................................................................................................. 4

I.  THE CONFIDENTIAL MEMORANDUM OF INVENTION CONSTITUTES
    AN ATTORNEY-CLIENT COMMUNICATION.................................................................. 4

      A.      Legal Standard ............................................................................................. 4

      B.      Invention Records Are Protected by the Attorney-Client Privilege .................... 6

II. MERCK HAS NOT WAIVED THE ATTORNEY-CLIENT PRIVILEGE............................. 9

CONCLUSION.............................................................................................................. 14

M00155164I

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*In re Gabapentin Patent Litigation,*
    214 F.R.D. 178 (D.N.J. 2003)................................................................................8

*In re Spalding Sports Worldwide, Inc.,*
    203 F.3d 800 (Fed. Cir. 2000)..............................................................................8

*Upjohn Co. v. United States,*
    449 U.S. 383 (1981)............................................................................................5

### STATE CASES

*Hannan v. St. Joseph's Hospital & Medical Ctr.,*
    318 N.J. Super. 22 (App. Div. 1999) .............................................................5, 7, 6

*Macey v. Rollins Environmental Services (N.J.), Inc.,*
    179 N.J. Super. 535 (App. Div. 1981) ...............................................................5, 7

*National Utility Serv., Inc. v. Sunshine Biscuits, Inc.,*
    301 N.J. Super. 610 (App. Div. 1997) ..................................................................9

*Schillaci v. First Fidelity Bank,*
    311 N.J. Super. 396 (App. Div. 1998) ................................................................10

*State v. Blacknall,*
    335 N.J. Super. 52 (Law Div. 2000) .....................................................................9

*State v. Krich,*
    123 N.J.L. 519 (1939) .......................................................................................11

*State v. Loponio,*
    85 N.J.L. 357 (1913) .........................................................................................11

*State v. Sugar,*
    84 N.J. 1 (1980) .................................................................................................5

*State v. Toscano,*
    13 N.J. 418 (1953) ............................................................................................11

M001551642

*Trilogy Communications, Inc. v. Excom Realty, Inc.,*
    279 N.J. Super. 442 (Law Div. 1994) .......................................................................10, 11, 12

## FEDERAL STATUTES

35 U.S.C. § 101 *et. seq.*....................................................................................................................7

## OTHER AUTHORITIES

*ABA Section of Litigation, Trial Evid. Comm. at 66 (2d ed. 1989)* ..............................................11

*ABA Formal Op. (Nov. 11, 1992)* ..................................................................................................12

M001551643

Defendant Merck & Co, Inc. ("Merck") submits the following Memorandum of Law in Support of its Motion for a Protective Order Prohibiting Use or Disclosure of Inadvertently Produced Privileged Documents and Compelling Plaintiffs to Return All Copies of the Documents pursuant to New Jersey Rules 4:10-3. Plaintiffs take the position that a Merck document inadvertently produced to plaintiffs in this litigation is not entitled to attorney-client protection, refuse to return such documents to Merck, and seek to use the documents in this litigation. Merck respectfully requests that this Court enter an Order compelling plaintiffs to return the documents to Merck.

## BACKGROUND

The first case in this coordinated litigation was filed on June 26, 2002. Since that time, over 1,650 cases have been filed. Merck has produced over 7 million pages of documents, 2,000 electronic files, and four databases (65 gigabytes) to plaintiffs. To meet the discovery demands in this action, Merck has collected documents from the files of scores of employees, located in a number of offices, under tight discovery deadlines.

Only by using hundreds of personnel to review, code and produce documents was Merck able to conduct a production of this scale. Each document is reviewed for privilege by attorneys in an effort to ensure that privileged communications are not produced. But in litigation of this scale, it is virtually inevitable that human error will result in the inadvertent production of privileged materials.

M001551844

This discovery dispute arises from the inadvertent production of privileged communications bates numbered MRK-AEG0020364-70 and MRK-AEE0000552-58.[1]  Prior to the production of these documents, Merck served written responses to plaintiffs' request for documents, making clear that inadvertent production of privileged material does not constitute a waiver of the privilege.  *See* Ex. A (Merck & Co., Inc.'s Responses and Objections to Plaintiffs' First Request for Production of Documents at ¶ 4) ("*Inadvertent production of any document shall not constitute a waiver of any privilege* or any other ground for objecting to discovery with respect to such document or any other document, or with respect to the subject matter thereof or the information contained therein, nor shall such inadvertent production waive Merck's right to object to the use of the document or the information contained therein during this or any other proceeding.") (Emphasis added).

The documents at issue are multi-page memoranda entitled "Confidential Memorandum of Invention" (CMI).  The CMI is a standard form developed by Merck's Patent Department and used by Merck scientists to provide information concerning an invention to lawyers in Merck's patent department.  *See* Affidavit of Joseph F. DiPrima ("DiPrima Aff.") at ¶ 5.  Upon receipt of the document, patent lawyers review the CMI to assess patentability of the invention, and initiate the patent process where appropriate.  *Id.*

Here, the CMI was completed by Dr. Kathleen Metters, Vice President and Site Head for Merck Frosst Canada & Company ("Merck Frosst"), a Canadian affiliate of Merck, and her colleagues.  *See* Affidavit of Dr. Kathleen Metters ("Metters Aff.") at ¶¶ 1, 3.  On or about April

---

[1]      These documents are identical copies and were produced to plaintiffs from the files of Dr. Kathleen Metters (MRK-AEE0000552-58) and Dr. Denis Riendeau (MRK-AEG0020364-70).  Copies of these documents will be provided to the Court for *in camera* review.

M001551845

14, 2000, Dr. Metters and others sent a signed copy of the CMI to Merck's Patent Department. *Id.* at ¶¶ 3-4.  On April 17, 2000, Merck's Patent Department received a signed copy of the CMI.[2]  *See* DiPrima Aff. at ¶ 6.  Upon review of the CMI, Merck's patent attorneys exercised their discretion and conducted legal analysis in determining the patentability of the invention and further used the document to prepare a patent application. *Id.* at ¶ 7.

In March 2005, plaintiffs deposed Mr. Raymond Gilmartin, President, Chairman and Chief Executive Officer of Merck.  During the course of the deposition, plaintiffs' counsel, Mr. Seeger, marked the CMI as Exhibit 21 and sought to question Mr. Gilmartin about his knowledge of the document.[3]  Upon being shown the document, Mr. Gilmartin's counsel, Mr. Butswinkas, promptly objected, and instructed the witness not to answer any questions concerning the document:

> Chris, I've consulted with in-house counsel at Merck. We believe this document may be privileged . . . . . What I'm going to ask is, if it was privileged, then it would have been inadvertently produced, and we would ask for its return.  What I would ask you to do is suspend your questioning on this document for now so I can investigate and find out the answer.  If it is not privileged, I will let you know, and you could on the second day of the deposition ask whatever you want about it.

Gilmartin dep. at 302-03 (attached hereto as Exhibit B).  After Mr. Seeger appeared not to accept the claim of privilege, Mr. Butswinkas again stated on the record that the document was privileged, and that he would not permit the witness to answer any questions about the document

---

[2]     A copy of the CMI as received by patent counsel will be provided to the Court for *in camera* review.

[3]     Specifically, document bates numbered MRK-AEE0000552-58 was marked for use at Mr. Gilmartin's deposition. *See* Gilmartin dep. at 300 (attached hereto as Exhibit B).

M001551646

itself. *Id.* at 306 ("So, I'm not going to allow any questions about it that would invoke privileged information.").

The very next day, Merck followed up with a formal letter requesting the return of the document. *See* Ex. C (Letter from S. Shamoto to D. Buchanan dated March 25, 2005). Two weeks later, and without explanation, counsel for plaintiffs flatly refused to return the document. *See* Ex. D (Letter from D. Buchanan to S. Shamoto dated April 8, 2005).

## ARGUMENT

### I.    THE CONFIDENTIAL MEMORANDUM OF INVENTION CONSTITUTES AN ATTORNEY-CLIENT COMMUNICATION

#### A.    Legal Standard

Because the CMI contains confidential communications between Merck scientists and in-house patent counsel provided for the express purpose of requesting legal advice and services, it is clearly a privileged attorney-client communication.

New Jersey recognizes the attorney-client privilege by statute and rule. *See* N.J.S.A. 2A:84A-20 ("communications between lawyer and his client in the course of that relationship and in professional confidence, are privileged, and a client has a privilege (a) to refuse to disclose any such communication, and (b) to prevent his lawyer from disclosing it, and (c) to prevent any other witness from disclosing such communication if it came to the knowledge of such witness . . . ."); N.J.R.E. 504 (same). The statute contains express exceptions, none of which apply here.[4]

---

[4] The statute provides, in relevant part:

- 4 -

M001551647

Deeply rooted in our jurisprudence, the attorney-client privilege is the "oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). Embodied in the principle that "sound legal advice or advocacy serves public ends," it is intended to "encourage full and frank communication between attorneys and their clients." *Hannan v. St. Joseph's Hosp. & Med. Ctr.*, 318 N.J. Super. 22, 27 (App. Div. 1999) (internal citations omitted). "To further this policy it is essential that a client be able to protect his discussions with his attorney from disclosure to his adversary." *Macey v. Rollins Envtl. Servs. (N.J.), Inc.*, 179 N.J. Super. 535, 539 (App. Div. 1981). Indeed, this state's Supreme Court has held that the "fundamental need for secrecy between attorney and client is clear [and] receives zealous enforcement." *State v. Sugar*, 84 N.J. 1, 13 (1980).

There is no question that the attorney-client privilege extends to corporations, including their officers and employees. *Upjohn*, 449 U.S. at 396-97. As stated in *Macey*, "[t]he necessity for full and open disclosure between corporate employees and in-house counsel . . . demands that all confidential communications be exempt from discovery." 179 N.J. Super. at 540. In applying this rule, courts look to whether the communication was made to the attorney in his professional capacity. *Upjohn*, 449 U.S. at 394. In such cases, the communication is deemed privileged. *Id.* at 395-97.

---

(2) **Exceptions.** Such privilege shall not extend (a) to a communication in the course of legal service or obtained in aid of the commission of a crime or fraud, or (b) to a communication relevant to an issue between parties all of whom claim through the client, regardless of whether the respective claims are by testate or intestate succession or by inter vivos transaction, or (c) to a communication relevant to an issue of breach of duty by the lawyer to his client, or by the client to his lawyer. Where 2 or more persons have employed a lawyer to act for them in common, none of them can assert such privilege as against the others as to communications with respect to that matter.

N.J.S.A. 2A:84-20. None of those exceptions is even conceivably relevant here.

M001551648

### B.   Invention Records Are Protected by the Attorney-Client Privilege

Under New Jersey statutory authority and case law, the CMI is a confidential communication between Merck scientists and in-house counsel and is therefore protected by the attorney-client privilege. Whether a document originates from the lawyer or, as here, the client, it is protected so long as the purpose of the confidential communication is to aid the attorney in rendering legal advice. *See Hannan*, 318 N.J. Super. at 27-28 (finding chronology of facts submitted to lawyer and prepared at his request carried a "presumption of confidentiality" and was protected by attorney-client privilege).

Here, there is no question but that the communication between Dr. Metters and Merck's patent counsel was intended to be kept confidential. On April 14, 2000, after completing certain portions of the CMI, Dr. Metters submitted the document directly to patent counsel. *See* Metters Aff. at ¶¶ 3-4. On April 17, 2000, Merck's patent lawyers received a copy of the CMI. *See* DiPrima Aff. at ¶ 6. Clearly marked on the front of the document is an instruction to forward the CMI to the Patent Department. Review of the document as received by Merck's Patent Department makes clear that the document was treated as a privileged communication. The face of the document bears a large stamp in the upper left corner with the word "RESTRICTED" in bold upper case letters. The front of the document also bears the names of patent counsel and the date the document was received by the Patent Department.

In addition to being confidential, the communication at issue here was also made for the express purpose of securing legal advice and services. *See* Metters Aff. at ¶ 4; DiPrima Aff. at ¶¶ 5, 7. As in this case, Merck scientists generally use the CMI to communicate certain

- 6 -

MDD155/649

information to patent counsel, in order to initiate counsel's patentability determinations and preparation and filing of patent applications. *See* DiPrima Aff. at ¶ 5. Each question in the document is tailored to elicit a response that informs patent counsel as to whether the particular invention satisfies the detailed requirements for a patent as set forth in 35 U.S.C. § 101 *et. seq.* For example, questions 5, 6 and 9 request discussion of historical efforts to solve the particular problem, publications in the field, and commercial use – all of which relate to the consideration of prior art, a factor in determining patentability. Question 8 requests a response concerning the proposed uses of the invention, so that counsel can address the usefulness requirement under the statute. Finally, as further evidence of the legal nature of the document, the CMI clearly states on its face that the Patent Department will determine inventorship. Once the CMI has been submitted to the Patent Department, it is the role of the patent lawyer to use his legal discretion and analysis in assessing patentability and drafting a patent application, if appropriate, thus creating and enforcing a legal right. *See* DiPrima Aff. at ¶ 5.

Thus, as the CMI was submitted to patent counsel for the exclusive purpose of soliciting legal advice on issues of patentability and initiating the patent process, the document is clearly protected by the attorney-client privilege under New Jersey's statue and case law. *See, e.g., Hannan*, 318 N.J. Super. at 27 ("If the purpose of the communication is to aid the attorney in giving legal advice to his client . . . then the privilege applies."); *see also Macey*, 179 N.J. Super. at 540 (holding that statements prepared by corporate agent at the direction of corporation's general counsel were protected by the attorney-client privilege); N.J.S.A. 2A:84A-20.

M001551650

This outcome is dictated not only by New Jersey precedent, but also by that of the Court of Appeals for the Federal Circuit, which has ruled that invention records like the CMI are privileged. In *In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800 (Fed. Cir. 2000), the court considered the applicability of the attorney-client privilege to "invention records," which the court defined as "standard forms generally used by corporations as a means for inventors to disclose to the corporation's patent attorneys that an invention has been made and to initiate patent actions," *id.* at 802 n.2 – precisely the type of document in question here. Like the CMI, such documents typically include information such as the "names of inventors, description and scope of invention, closest prior art, first date of conception, disclosure to others, [and] dates of publication" among other information.[5] *Id.* Such an invention record is privileged, the court found, if the communication "was made by a client to an attorney for the purpose of obtaining legal advice or services." *Id.* at 805. In *Spalding* – as in this case – that standard was met because the invention record was submitted by the inventors to the corporate legal department and the communication was made for the purpose of obtaining legal advice on patentability and legal services in connection with preparation of the patent application. *See* Metters Aff. at ¶ 4. Refusing to parse each section of the document, the court found that "[i]t is enough that the overall tenor of the document indicates that it is a request for legal advice or services." *Id.* at 806. Moreover, the fact that the invention record included technical information was irrelevant because "preparing a patent application necessarily require[s] the evaluation of technical information . . . " *Id. See also In re Gabapentin Patent Litig.*, 214 F.R.D. 178, 182 (D.N.J.

---

[5] See Questions 2 (names of inventors), 3 (scope of invention), 4 (first date of conception), 6 (closest prior art and dates of publication) and 10 (closest prior art) of the CMI.

M001551651

2003) (adopting *Spalding* as the standard for application of the attorney-client privilege in patent cases before the district courts in New Jersey).

The CMI was submitted by scientists at Merck to in-house counsel for the purpose of obtaining legal advice and services. In accordance with state law and federal patent law, this Court should find that the CMI is protected by the attorney-client privilege.

## II. MERCK HAS NOT WAIVED THE ATTORNEY-CLIENT PRIVILEGE

Merck's production of the documents in question were made pursuant to a written response specifying that any inadvertent production of privileged material would not constitute waiver of the privilege.[6] *See* Ex. A ¶ 4 ( "[i]nadvertent production of any document shall not constitute a waiver of any privilege"). That notice precisely tracks New Jersey law, which makes clear that inadvertent production of a privileged communication does not constitute waiver of the attorney-client privilege. *See State v. Blacknall*, 335 N.J. Super. 52, 59 (Law Div. 2000) (finding no waiver of the attorney-client privilege as a result of inadvertent disclosure of privileged communication); *National Util. Serv., Inc. v. Sunshine Biscuits, Inc.*, 301 N.J. Super. 610, 614 n.2 (App. Div. 1997) (acknowledging agreement among the parties that "inadvertent disclosure during discovery does not constitute a waiver by the client of its privilege.") (citing *Sugar*, 84 N.J. at 13).

---

[6] It should be noted that a protective order entered in *Ernst v. Merck & Co., Inc.*, pending in the District Court of Brazoria County, Texas contains a provision stating that "[i]nadvertent production of any privileged materials or other materials exempt from production by any party making production of materials in this proceeding shall not be deemed a waiver or impairment of any claim or privilege or exemption (including under the attorney-client privilege or Work Product Doctrine) containing any such materials or the subject matter thereof." Agreed Protective Order ¶ 19 (attached hereto as Exhibit E). At Mr. Gilmartin's deposition, Mr. Rick Meadow of The Lanier Law Firm noted his appearance on the record on behalf of his clients in the *Ernst* action. *See* Ex. B. at 13. The Lanier Law Firm is a signatory to the Agreed Protective Order, and is thus bound by its terms. *See* Ex. E at 13.

M001551652

First, in light of the strong public policy favoring protection of the privilege, a waiver will only be found where disclosure was "knowing and intentional rather than inadvertent." *Schillaci v. First Fidelity Bank*, 311 N.J. Super. 396, 407 (App. Div. 1998) (citing *Trilogy Communications, Inc. v. Excom Realty, Inc.*, 279 N.J. Super. 442, 445 (Law Div. 1994)). As aptly explained by the court in *Trilogy*, waiver by inadvertent production "would render nugatory this state's strong public policy favoring the confidentiality of lawyer-client communications embodied in statute, rules of evidence, rule of professional ethics, and case law." 279 N.J. Super. at 446-47. Instead, waiver will only be found where the party "knew their legal rights and deliberately intended to relinquish them." *Id.* at 447.

In keeping with this principle, "inadvertent disclosure through mere negligence should not be deemed to abrogate the attorney-client privilege which is deeply embodied in New Jersey law and public policy." *Id.* at 448. *See also Schillaci*, 311 N.J. Super. at 407. Given the New Jersey courts' affirmation of the public policy reasons favoring the attorney-client privilege and the stringent standard for knowing waiver of that privilege, inadvertent production of a privileged document cannot constitute a waiver.

Second, inadvertent production cannot result in waiver because the privilege can only be waived by the client. It is well-established that the attorney-client privilege is "personal to the client [and] can only be waived by him." *See Comment* on N.J.R.E. 504 [1C]. Thus, an attorney's act of inadvertently producing a privileged document does not waive the privilege. *Id.* at 2, 4 ("That the privilege belongs to the client is recognized in New Jersey. It is for his protection."); *see also Trilogy*, 279 N.J. Super. at 445 ("the privilege is that of the client and must therefore be waived by the client"); *The Attorney-Client Privilege and the Work Product*

- 10 -

MO01551653

*Doctrine*, ABA Section of Litigation, Trial Evid. Comm. at 66 (2d ed. 1989) ("Where the disclosure resulted because of the attorney's negligence and not that of the client, the client's privilege has not necessarily been relinquished."); *State v. Toscano*, 13 N.J. 418, 424 (1953) ("Since the protection of the privileged communication is not for the lawyer but for the client, waiver thereof rests with the client."); *State v. Krich*, 123 N.J.L. 519, 520-22 (1939) (same); *State v. Loponio*, 85 N.J.L. 357, 360 (1913) (same).

In this case, no waiver of the privilege could possibly be found. It is beyond question that the disclosures were unintentional and inadvertent errors by Merck's counsel – not a deliberate or intentional relinquishment of the privilege by Merck as required by statute and case law. The extent of the disclosure and the volume of production in this case provides strong evidence of Merck's inadvertence. In the New Jersey Coordinated VIOXX® Litigation alone, with nearly 2,000 cases filed, Merck has produced approximately 7 million pages of documents, 2,000 electronic files and four databases (65 gigabytes) to plaintiffs. To further appreciate the volume of discovery, 65 gigabytes of data would fill more than 11,000 boxes if the documents were downloaded and printed. By all accounts, this has been a massive undertaking. *See Trilogy*, 279 N.J. Super. at 448 (noting that the "inadvertent production of a privileged document through its attorney during the course of its production of over 5,500 pages of documents, is not a waiver of the attorney-client privilege").

In order to meet its discovery obligations in this case, Merck has produced millions of pages of documents. Each of those documents were reviewed for privilege by attorneys. *See* Affidavit of Thomas F. Munno at ¶ 5. Documents determined to be privileged were not produced and were recorded on a privilege log. *Id.* Despite counsel's best efforts, the CMI was

M001551654

inadvertently produced.  *Cf. Trilogy*, 279 N.J. Super. at 448 (recognizing the "realities of modern litigation," including "the need to resolve matters quickly and inexpensively; time requirements of the court rules for the production of documents and discovery strictly enforced by case management orders and other techniques; and the volume of documents often required to be produced in complex litigation").

Merck's inadvertence is further evidenced by its immediate action upon learning of the disclosure of the CMI.  When Merck first became aware that the CMI had been produced during Mr. Gilmartin's deposition, counsel promptly placed an objection on the record and instructed Mr. Gilmartin not to answer any questions about the document itself on the grounds of the attorney-client privilege.  *See* Gilmartin dep. at 302-03.  The very next day, Merck followed up with a formal letter requesting the return of the document.  *See* Ex. C.  Approximately two weeks later, counsel for plaintiffs refused to return the document.  *See* Ex. D.  When it became apparent that plaintiffs would not return the document and there would be no amicable resolution to the dispute, Merck immediately began preparing this motion for a protective order.

In light of the foregoing, plaintiffs' counsel should be required to return all copies of the inadvertently produced document.  The American Bar Association has concluded that attorneys who receive documents that appear privileged on their face are under an ethical duty (a) . . . not [to] examine the materials once the inadvertence is discovered, (b) . . . to notify the sending lawyer of their receipt, and (c) [to] abide by the sending lawyer's instructions as to their dispositions." ABA Formal Op. (Nov. 11, 1992).  Plaintiffs' counsel has been made aware of the privileged nature of the CMI and has not only refused to return it, but has persisted in their efforts to use the document in this litigation.  Consistent with New Jersey statutory law, case law

M001551655

and public policy, Merck is entitled to the return of the CMI as it contains privileged communication that was inadvertently produced.

To prevent similar discovery disputes like this in the future, Merck proposes that an Order be entered in this litigation in which inadvertent production of any privileged, work product, or other materials exempt from production, shall not be deemed a waiver of the privilege or work product protection as to the document disclosed. In addition, in the event that a party inadvertently fails to designate any privileged, work product, or other materials exempt from production, in this litigation, it may make such a designation subsequently by notifying all relevant parties in writing as soon as practicable upon discovery of the inadvertent failure to designate. Upon such notice, the party receiving the materials shall return all originals and copies of such materials to the producing party.

MOO1551656

## CONCLUSION

For the foregoing reasons, Merck's motion for a protective order should be granted.

Dated: April 26, 2005                    Respectfully submitted,

Diane P. Sullivan, Esq.
Dechert LLP
A Pennsylvania Limited Liability Partnership
Princeton Pike Corporate Center
P.O. Box 5218
Princeton, NJ 08543
(609) 620-3200

Attorneys for Defendant Merck & Co., Inc.

- 14 -

KLINE & SPECTER
Commerce Center
1800 Chapel Avenue, Suite 302
Cherry Hill, New Jersey 08002
(856) 662-1180
By:    Thomas R. Kline, Esquire
      Shanin Specter, Esquire
      Lee B. Balefsky, Esquire
      Michelle L. Tiger, Esquire
      David J. Caputo, Esquire        Attorneys for Plaintiffs

|  |  |
|---|---|
| In re: VIOXX LITIGATION | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION - ATLANTIC COUNTY<br><br>CASE CODE 619 |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
MOTION FOR A PROTECTIVE ORDER PROHIBITING USE OR DISCLOSURE OF
"INADVERTENTLY PRODUCED PRIVILEGED DOCUMENTS" AND COMPELLING
PLAINTIFFS TO RETURN ALL COPIES OF THE DOCUMENTS**

EXHIBIT
3

Blumberg No. 5119

M001 456718

# TABLE OF CONTENTS

Page

BACKGROUND  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    The VIGOR Study and Merck's Public Statements About It  . . . . . . . . . . . . 1

    B.    The "Confidential Memorandum of Invention" At Issue In This Motion  . . 3

    C.    Facts Relating to the Privilege Assertion  . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A.    The CMI Is Not An Attorney-Client Privileged Communication  . . . . . . . . 7

    B.    Even If The CMI Were Once Privileged,
             Merck Waived The Privilege By Twice
             Producing Two Redacted Copies  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    C.    The CMI Is Not Privileged Because It Falls
             Within the Crime-Fraud Exception to
             the Attorney-Client Privilege  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

i

M001456719

## TABLE OF CITATIONS

Cases                                                                          Page

*A. v. B.,*
    158 N.J. 51, 726 A.2d 924 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Carter v. Gibbs,*
    909 F.2d 1450 (Fed. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Ciba-Geigy Corp. v. Sandoz, Ltd.,*
    916 F. Supp. 404 (D.N.J. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*Fellerman v. Bradley,*
    99 N.J. 493, 493 A.2d 1239 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 14

*Hannan v. St. Joseph's Hospital and Medical Center,*
    318 N.J. Super. 22, 722 A.2d 971 (App. Div. 1999) . . . . . . . . . . . . . . . . . . . . . . . 8

*Horon Holding Corp. v. McKenzie,*
    341 N.J. Super. 117, 775 A.2d 111 (App. Div. 2001) . . . . . . . . . . . . . . . . . . . . . . 8

*In re: Gonnella,*
    238 N.J. Super. 509, 570 A.2d 53 (Law. Div. 1989) . . . . . . . . . . . . . . . . . . . . . . . 9

*In re: Spalding Sports Worldwide, Inc.,*
    203 F.3d 800 (Fed Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 12

*Kinsella v. NYT Television,*
    370 N.J. Super. 311, 851 A.2d 105 (App. Div. 2004) . . . . . . . . . . . . . . . . . . . . . 11

*Koch Materials Company v. Shore Slurry Seal, Inc.,*
    208 F.R.D. 109 (D.N.J. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*Matter of Kozlov,*
    79 N.J. 232, 398 A.2d 882 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 12

*National Utility Service, Inc. v. Sunshine Biscuits, Inc.,*
    301 N.J. Super. 610, 694 A.2d 319 (App. Div. 1997) . . . . . . . . . . . . . . . . . . . . . 11

*Ocean Spray Cranberries, Inc. v. Holt Cargo Systems, Inc.,*
    345 N.J. Super. 515, 785 A.2d 955 (Law. Div. 2000) . . . . . . . . . . . . . . . . . . . . . 14

M00146720

Page

*Ortho-McNeil Pharmaceuticals, Inc. v. Mylan Laboratories, Inc.,*
348 F. Supp.2d 713, (N.D.W.V. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Trilogy Communications, Inc. v. Excom Realty, Inc.,*
279 N.J. Super. 442, 652 A.2d 1273 (Law. Div. 1994) . . . . . . . . . . . . . . . . . . . . 11, 12

*United Jersey Bank v. Wolosoff,*
196 N.J. Super. 553, 483 A.2d 821 (App. Div. 1984) . . . . . . . . . . . . . . . . . . . . . . . 8

Statutes

N.J.S.A. 2A:84-20(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

N.J.S.A. 2A:84A-20(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

N.J.R.E. 504 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Evidence Rule 26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Rule of Professional Conduct 1.6(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

M001456721

Defendant Merck & Co.'s motion seeking to compel plaintiffs to return a "Confidential Memorandum of Invention" should be denied for three, independent reasons. First, Merck has failed to meet its threshold burden of proving that the document constitutes an attorney-client privileged communication. Second, even if the document were once privileged, Merck has waived the privilege by twice producing two identical copies redacted on grounds other than attorney-client privilege. Third, the document falls squarely within the crime-fraud exception to the attorney-client privilege. For all of these reasons, plaintiffs should be permitted to make full use of the document in this litigation.

## BACKGROUND

### A.    The VIGOR Study and Merck's Public Statements About It

Starting in early 1999, defendant Merck & Co., Inc. ("Merck") conducted a large study called VIOXX Gastrointestinal Outcomes Research, commonly known as "VIGOR." The purpose of VIGOR was to determine whether Vioxx, a selective cyclooxygenase-2 ("COX-2") inhibitor, reduced the rate of gastrointestinal complications, such as perforations, ulcers or bleeds, when compared to therapy with a conventional non-steroidal anti-inflammatory drug called naproxen.

On March 9, 2000, the results of the VIGOR study were unblinded to Merck officers and scientists. The results of this study demonstrated a statistically significant increase in serious cardiovascular adverse events in the group receiving Vioxx as compared with the group treated with naproxen. Following the release of these results, Merck officials privately considered whether the discrepancy in the number of serious cardiovascular events resulted from a prothrombotic effect of Vioxx caused by an imbalance in the physiologic activities of prostacyclin inhibition of COX-2, with a now proportionately greater effect of thromboxane. For

M001456722

example, on the day that the VIGOR results were unblinded, Edward M. Scolnick, M.D., the head of Merck Research Labs and the lead scientist in the company, sent an e-mail to VIGOR's unblinded biostatistician and two Merck senior scientists, stating: "the CV events are clearly there ... It is a shame but it is a low incidence and it is mechanism based as we worried it was." *See* 3/9/00 e-mail from Edward M. Scolnick, M.D. to Deborah R. Shapiro, Alise S. Reicin and Alan S. Nies (attached as Exhibit "A"). Dr. Scolnick testified at his deposition that, by "mechanism based," he meant "the thromboxane/prostacyclin theory." *See* Deposition of Edward M. Scolnick, M.D. at 140-42 (attached as Exhibit "B").

Over the ensuing weeks, Merck scientists formulated a hypothesis to favorably explain the VIGOR results from the perspective of Vioxx, namely, that the difference in the rates of adverse cardiovascular events observed between those administered Vioxx versus naproxen in the VIGOR study was attributable to a heretofore previously unobserved, and completely hypothetical, cardioprotective effect of naproxen, rather than an adverse response to Vioxx. During this time period, Merck's statements to both the Food and Drug Administration ("FDA") and the general public gave this explanation for the discrepancy in the VIGOR results, which had no empiric foundation. For example, on or about March 23, 2000, Merck reported the preliminary results of the VIGOR trial to the FDA, and attributed the difference in serious cardiovascular events to the hypothesized, but unproven, cardioprotective effect of naproxen. Four days later, Merck issued a press release stating:

> [S]ignificantly fewer thromboembolic events were observed in patients taking naproxen in this GI outcomes study, which is consistent with naproxen's ability to block platelet aggregation. The effect on these events had not been observed previously in any clinical studies for naproxen.

2

M001456723

*See* Merck News Release Dated March 27, 2000 (attached as Exhibit "C").

While Merck was telling the world that the heart attack rate in VIGOR was driven by naproxen's cardioprotection, Merck actually did not believe it. For example, just two weeks after the press release, Dr. Scolnick confessed in an e-mail to being in "minor agony" over the VIGOR results and said "WE WILL NOT KNOW FOR SURE WHAT IS GOING ON" without further study. *See* 4/12/00 e-mail from Edward M. Scolnick, M.D. to Alise S. Reicin (attached as Exhibit "D").

Despite the concerns expressed privately, Merck issued another press release under the headline "Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx." This press release stated:

> In preliminary findings from Merck's large gastrointestinal (GI) outcomes study that compared Vioxx with naproxen in patients with rheumatoid arthritis, significantly fewer heart attacks were observed in patients taking naproxen (0.1 percent) compared to patients taking Vioxx (0.5 percent). This result is consistent with naproxen's ability to block platelet aggregation. This is the first time this effect of naproxen to reduce these events has been demonstrated in a clinical study. Vioxx, like all COX-2 selective medicines, does not block platelet aggregation and therefore would not be expected to have these effects in reducing these events.

*See* Merck News Release dated April 28, 2000 (attached hereto as Exhibit "E"). Merck subsequently repeated this claim more than a year later in a press release headlined "Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx." *See* Merck News Release dated May 17, 2001 (attached hereto as Exhibit "F").

### B.     The "Confidential Memorandum of Invention" At Issue In This Motion

Merck seeks to retrieve a Confidential Memorandum of Invention ("CMI") under a claim of privilege. Substantively, this document demonstrates that Merck's scientists harbored strong

M001-456724

suspicions that the company's contemporaneous public statements concerning the explanation of

the VIGOR serious cardiovascular events results were patently untrue.  The CMI is dated April

14, 2000 in the electronic database produced by Merck, although the document, on its face, is not

dated.  According to Merck's affidavits in support of its motion, Merck Frosst[1] scientists

prepared the CMI and forwarded a signed copy to "Merck's Patent Department" on or about

April 14, 2000.  The Patent Department received the document three days later.  *See* Affidavit of

Kathleen Metters, Ph.D. ("Metters Aff.") ¶ 3; see also Affidavit of Joseph F. DiPrima, Esq.

("DiPrima Aff.") ¶ 6.

   Notably, Merck produced two copies of the exact same document twice during this

litigation.  On October 1, 2004, Merck produced copies of the document from the files of Merck

Frosst scientists Kathleen Metters (MRK-AEE0000552-558) and Denis Riedneau (MRK-

AEG0020364-370).[2]  Both copies contained unexplained redactions.  After the Court ordered

that Merck explain the basis of its redactions, Merck produced these two same documents a

second time on February 7, 2005.  Merck explained the redactions as "Other Product."

   In the CMI, Merck's scientists state that Vioxx "may cause increased risk of cardiac and

cerebral adverse events," contradicting Merck's comments to both the FDA and general public.

The invention described in the CMI is a combination of Vioxx with another compound, either a

thromboxane receptor antagonist or a thromboxane synthase inhibitor, intended to counteract the

prothrombotic effects of Vioxx.  The prothrombotic effect of Vioxx is precisely the physiologic

---

[1]    Merck does business as Merck Frosst in Canada.

[2]    Because Merck is submitting the documents for *in camera* review, plaintiffs will
not attach a copy of the documents to this response.

4

M001456725

consequence which Merck had previously concealed from both the FDA and the public. The CMI describes the rationale behind the invention, explaining:

> COX-2 inhibitors reduce prostacyclin urinary metabolites. This may reflect reduced prostacyclin in vivo. This may result in an altered ratio of prostacyclin to thromboxane. The increase in thromboxane relative to prostacyclin may cause increased risk of cardiac and cerebral adverse events. Treatment with a thromboxane receptor antagonist or a thromboxane synthase inhibitor or a dual blocker (receptor antagonist/enzyme inhibitor) would reduce this risk by inhibiting thromboxane synthesis or thromboxane action.

The domestic and worldwide patent applications for these inventions are matters of public record, and have been marked as exhibits at a deposition of Dr. Scolnick. *See* patent applications attached hereto as Exhibits "G" and "H." Both applications describe the need for the invention very differently from that presented in the CMI. The CMI clearly concedes the possible prothrombotic effect of Vioxx and attributes this effect to Vioxx's inhibition of COX-2, which creates a prostacyclin/thromboxane imbalance favoring thrombotic events. The patent applications, on the other hand, are silent as to any prothrombotic effect of Vioxx, and posit that the new combination is necessary for a totally different reason, namely, to correct the lack of a COX-2 effect on platelet function and inhibition. *See* Exhibit "G" at 4; Exhibit "H" at 2, 20.

## C.   Facts Relating to the Privilege Assertion

Merck claims that it discovered the inadvertent production of the CMI during the deposition of Raymond Gilmartin on March 24, 2005. More than a month later, Merck filed its motion in support of the privilege assertion. The evidence submitted which stands in support of this claim of privilege is sparse and unavailing. The CMI does not rise to the level of a privileged document, and it is clear that Merck is simply offering the pretext of privilege to "claw back" a highly damaging document.

5

M001456726

Merck offers the four paragraph affidavit of Dr. Metters, one of the authors of the CMI, as well as the seven paragraph affidavit from Mr. DiPrima, the head of the department that received the CMI, in support of their motion. Neither affidavit states that Dr. Metters, or any other scientist at Merck, authored the CMI for the exclusive, or even primary purpose, of seeking legal advice from Merck's attorneys. Rather, Dr. Metters states that she created the CMI and then "directed that the CMI be sent to Merck's Patent Department" to provide Merck's patent attorneys with information to evaluate the patentability of the invention and, if appropriate, to initiate the patent application process. Metters Aff. ¶ 4. Mr. DiPrima states that the Patent Department designed the CMI form for the "express purpose of providing the format by which scientists can provide information to Merck's patent attorneys needed to enable the attorneys to provide legal advice as to the patentability of the invention described in the CMI and, where appropriate, to enable Merck's patent attorneys to prepare and prosecute a patent application," and that this CMI was so received, reviewed and used for that purpose. DiPrima Aff. ¶¶ 5-7.

Merck fundamentally claims that a CMI is, by its very nature, communication entitled to attorney-client privilege status. This claim is incredulous under the facts of its production, as it would have been a simple matter for Merck's attorneys to have included the term "Confidential Memorandum of Invention" during the privilege searches described in the Affidavit of Thomas Munno, Esq. This leaves totally unexplained why Merck has not sought to "claw back" the other CMI it has produced in this case, MRK-AEF0003580-3587 (attached hereto as Exhibit "I"). Merck has made no such attempt.

In addition, other documents produced in the litigation cast doubt on Merck's claim that a CMI is an attorney-client privileged communication. Merck has produced two documents

6

M001486727

entitled "MRL Information Asset Inventory," one with the subheading "Basic Research – US"

and the other with the subheading "Basic Research – Wide."   Both documents describe a

"confidential memorandum of invention (CMI)" as follows:

> This form initiates the patent application process.  Completed by the inventing
> scientist, it documents the conception and first experiment toward achieving that
> conception by date, location of records, to whom revealed.  Notebook page
> numbers, experimental schematics, history of prior art are included.  The
> departmental director's signature is required before submission.

*See* "MRL Information Asset Inventory, Basic Research – US" (MRK-ADR0000081-083)

(attached hereto as Exhibit "J") and "MRL Information Asset Inventory, Basic Research – Wide"

(MRK-ADR0000084-086) (attached hereto as Exhibit "K").  Merck also produced an e-mail

exchange in which a Merck employee described a CMI as "a document that protects a patent

position if necessary.  The details of when this was first discussed as well as by whom and when

it was first documented will be very helpful to the patent department if you are able to provide

that data." *See* E-mail from Riad H. El-Dada to Judith A. Boice dated September 8, 2002

(attached hereto as Exhibit "L").

## ARGUMENT

**A.**   **The CMI Is Not an Attorney-Client Privileged Communication**

Merck has failed to meet its threshold burden of proving that the document constitutes an

attorney-client privileged communication.  The motion should therefore be denied.

N.J.S.A. 2A:84A-20(a) provides that "communications between a lawyer and his client in

the course of that relationship and in professional confidence, are privileged." *See also* N.J.R.E.

504. As the Supreme Court of New Jersey has explained, "[f]or a communication to be

privileged it must initially be expressed by an individual in his capacity as a client in conjunction

M001456728

with seeking or receiving legal advice from the attorney in his capacity as such, with the expectation that its content remain confidential." *Fellerman v. Bradley*, 99 N.J. 493, 499, 493 A.2d 1239 (1985). *See also United Jersey Bank v. Wolosoff*, 196 N.J. Super. 553, 483 A.2d 821 (App. Div. 1984) ("the privilege accords the shield of secrecy only with respect to confidential communications made within the context of the strict relation of attorney and client.") (emphasis added). The attorney-client privilege interferes with the search for truth and therefore should be strictly construed. *Matter of Kozlov*, 79 N.J. 232, 248, 398 A.2d 882 (1979); *Horon Holding Corp. v. McKenzie*, 341 N.J. Super. 117, 124-25, 775 A.2d 111 (App. Div. 2001). The party asserting the privilege bears the burden of proving that it applies to a specific communication. *Id.* at 125, 775 A.2d 111.

Merck's evidence in support of its privilege assertion is not sufficient to sustain its burden. The Metters affidavit states that Merck scientists created the CMI and then forwarded it to the Patent Department for several reasons. The DiPrima affidavit states that the Patent Department used the CMI to assess the patentability of the invention and prepare patent applications. Neither affidavit expressly states that Merck scientists authored the CMI for the exclusive or even primary purpose of seeking legal advice from Merck's attorneys. *See Hannan v. St. Joseph's Hospital and Medical Center*, 318 N.J. Super. 22, 27, 722 A.2d 971 (App. Div. 1999) ("If the purpose of the communication is to aid the attorney in giving legal advice to his client or to prepare for litigation, then the privilege applies."). The fact that the CMI was sent to the Patent Department, which in turn used the document to provide legal advice, does not prove

M001456729

that it is privileged, if the purpose in creating the document originally is some reason other than to seek legal advice.[3]

Further, other Merck documents describing the CMI's purpose do not define its role as that of seeking legal advice. Rather, its purpose is a business record used to provide the factual background for the circumstances of an invention in order to protect the company's patent position. See Exhibits J, K and L. Given this purpose, Merck's scientists would not have an expectation that the CMI, despite its title, would be kept confidential. If there is a dispute concerning the patent, the CMI may be used as evidence in support of the patent claim. See, e.g., Ortho-McNeil Pharmaceuticals, Inc. v. Mylan Laboratories, Inc., 348 F. Supp.2d 713, 736 (N.D.W.V. 2004) (attaching CMI to affidavit produced in patent dispute). In addition, whether a dispute ensues or not, the process initiated by the CMI is a patent application, which is a public document. A scientist should expect the contents of the CMI to be reflected in the eventual public document that results from the invention. "The privilege has never been held to attach to communications which the client intends to be divulged to third persons." In re: Gonnella, 238 N.J. Super. 509, 514, 570 A.2d 53 (Law. Div. 1989).

At a minimum – if the court is inclined to find the CMI privileged and that there is no waiver of, or exception to, the privilege for the reasons stated below – plaintiffs should be

---

[3]     Merck relies heavily on In re: Spalding Sports Worldwide, Inc., 203 F.3d 800 (Fed Cir. 2000), in support of its privilege assertion. As a decision of an intermediate federal appellate court on an issue of circuit law, the case, of course, is not binding on this court. The scope of the New Jersey attorney-client privilege is uniquely a matter of state law. Moreover, Spalding is distinguishable on its facts. Unlike here, the record in that case established what the thin affidavits submitted in this case do not, i.e., that "the invention record was prepared and submitted primarily for the purpose of obtaining legal advice on patentability and legal services in preparing a patent application." Id. at 806.

9

M001456730

permitted to take discovery on these issues.  More than a month after claiming privilege, Merck

has submitted two short and conclusory affidavits from Merck employees who have not been

deposed.[4]  Plaintiffs had six days to respond without the benefit of taking discovery on the issues

raised in the motion.  Accordingly, plaintiffs respectfully request that, if necessary, they be

permitted to take discovery on the circumstances surrounding the creation and dissemination of

the CMI.

**B.     Even If the CMI Were Once Privileged, Merck Waived the
        Privilege by Twice Producing Two Redacted Copies**

Even if the Court holds on the current record that the document is a privileged attorney-

client communication, Merck has waived the privilege by disclosing the document under the

circumstances presented here.  Plaintiffs should not be compelled to return it.

Merck contends that inadvertent production of privileged documents is inevitable in a

litigation involving millions of pages of documents.  This contention is irrelevant, because that is

not what occurred with the CMI.  Merck twice produced two copies of the CMI from the

custodial files of two Merck employees after carefully redacting the document on grounds other

than privilege.  Merck and/or its counsel clearly reviewed the document on at least two occasions

and determined that portions of the document should be partially redacted but otherwise

produced.  They deemed the information contained in the unredacted portion of the CMI

responsive and discoverable.  In addition, Merck and/or its counsel also examined some version

of the document – or obtained information about the document – sufficient to determine that it

---

[4]     Plaintiffs do not know some very basic information about the document, for
example, who else received a copy of the CMI, for what purpose it was shared with others
outside the Patent Department, what roles each of the CMI's various authors of the CMI played
in its creation, and at whose request the CMI was created.

M001456731

was created on April 14, 2000. This information is not on the document itself, at least not in the form it was produced to plaintiffs.

Thus, contrary to Merck's assertions, the document was not "inadvertently" produced. Merck's counsel appropriately and deliberately produced an unprivileged document on two occasions. Now, recognizing that it is so damaging, Merck seeks to get it back. Merck should not be permitted to do so. Merck relies on *Trilogy Communications, Inc. v. Excom Realty, Inc.*, 279 N.J. Super. 442, 652 A.2d 1273 (Law. Div. 1994), which holds that inadvertent disclosure of a privileged communication does not constitute a waiver, as setting forth New Jersey law on the subject. *Trilogy* is distinguishable on the facts. In that case, the disclosure was truly inadvertent, not deliberate, as it was here. In any event, *Trilogy Communications* is a Monmouth County Law Division decision, which this Court is free to reject. No appellate decision defines the standard for determining when an "inadvertent" disclosure of an attorney-client privileged document constitutes waiver of the privilege. *See Kinsella v. NYT Television*, 370 N.J. Super. 311, 317-18, 851 A.2d 105 (App. Div. 2004).[5]

This Court should adopt either of the two alternative approaches that the *Trilogy Communications* court discussed but declined to adopt, namely, (1) "the privilege is destroyed by any involuntary disclosure, including a mistaken one," or (2) "documents may lose their privileged status if the disclosing party did not take reasonable steps to insure and maintain their confidentiality." *Trilogy Communications*, 279 N.J. Super. at 445, 652 A.2d 1273. The former approach is most consistent with the Supreme Court's guidance that, because the attorney-client

---

[5]    Merck cites the agreement of the parties noted in *National Utility Service, Inc. v. Sunshine Biscuits, Inc.*, 301 N.J. Super. 610, 614 n.2, 694 A.2d 319 (App. Div. 1997). The court did not decide the issue.

11

M001456732

privilege interferes with the search for truth, it should be strictly construed. *See Matter of Kozlov*, 79 N.J. at 248, 398 A.2d 882. It is also the law of the Federal Circuit, *see Carter v. Gibbs*, 909 F.2d 1450, 1451 (Fed. Cir. 1990) (inadvertent disclosure of attorney work product was waiver), which Merck relies on so heavily in citing *Spalding*, 203 F.3d 800.

The second approach discussed in *Trilogy Communications* is the approach followed in New Jersey's federal courts. This approach "focuses upon the reasonableness of the steps taken to preserve the confidentiality of privileged documents" and "considers inadvertent disclosure to be a form of waiver." *Ciba-Geigy Corp. v. Sandoz, Ltd.*, 916 F. Supp. 404, 410 (D.N.J. 1995); *see also Koch Materials Company v. Shore Slurry Seal, Inc.*, 208 F.R.D. 109, 117-18 (D.N.J. 2002). The factors to be considered under this approach are:

> 1) the reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of the document production; 2) the number of inadvertent disclosures; 3) the extent of the disclosure; 4) any delay and measures taken to rectify the disclosure; and 5) whether the overriding interests of justice would or would not be served by relieving the party of its error.

*Id.* at 118 (quoting *Ciba-Geigy*, 916 F. Supp. at 411). Applying these factors, the court in *Ciba-Geigy* held that, where counsel produced a memorandum from in-house counsel twice without conducting a privilege review, counsel's neglect was "inexcusable"and the privilege was held to be waived. 916 F. Supp. at 412. Likewise, in *Koch Materials*, the court relied heavily upon the fact that counsel twice reviewed the privileged documents (handwritten notes of unclear origin), yet made no effort to identify the documents' author. 208 F.R.D. at 119. The court also noted that the documents went to heart of the asserted privilege. "Thus, although the number of privileged documents produced was small relative to the production, the documents are central to Koch's asserted privilege." *Id.*

12

M001456733

This approach makes sense precisely because of the situation that confronts the court here. Merck produced two copies of a document nearly six months before it decided to seek its return on the basis of error. Merck and its counsel should be held to a standard that encourages careful conduct. The burden of counsel's claimed mistake should not fall on plaintiffs, who would otherwise have to spend time and incur cost retrieving the document.[6]

Further, while the scope of the document production in this case exceeds that in both *Ciba-Geigy* and *Koch Materials*, the reasoning of both cases is instructive and persuasive. The CMI addresses issues at the heart of this litigation. It was prepared during a critical time period, was reviewed at least twice for privilege, and was redacted on other grounds. The CMI also is a standard form document, according to its own employees' affidavits, and it should have been very easily searchable using the same procedures identified in the affidavit of Merck's outside counsel. Even though the CMI is but one document among millions, reasonable precautions would have prevented its production because it contains Merck's virtual admission of the pro-thrombotic effects of Vioxx. Moreover, the fact that Merck has produced at least one other CMI (*see* Exhibit "I"), and has yet to seek to reclaim it, casts considerable doubt on whether CMI's are

---

[6]     Merck accuses plaintiffs' counsel of having "persisted in their efforts to use the document in this litigation" after the claim of privilege. *See* Merck's Mem. at 12. That is not so. Plaintiffs' counsel, David Buchanan, expressly agreed on behalf of plaintiffs not to make any use of the document, and instructed anyone with access to the document to do the same, until the Court ruled on this motion. Based on that agreement, Merck agreed to forego filing a motion seeking return of the document pending a resolution of its privileged status. Merck also gratuitously cites ABA Formal Op. 92-368, which is inapposite. By its terms, that ethical opinion – which no New Jersey court or bar association committee has adopted – applies when "[a] lawyer who receives materials that on their face appear to be subject to the attorney-client privilege or otherwise confidential, under circumstances where it is clear they were not intended for the receiving lawyer." (Emphasis added). Neither of these conditions was met here.

13

M001456734

privileged, as well as the reasonableness of the precautions taken to prevent their disclosure.

For these reasons, Merck has waived any privilege that once attached to the document.

**C.   The CMI Is Not Privileged Because It Falls Within the
       Crime-Fraud Exception to the Attorney-Client Privilege**

Finally, the CMI falls within the New Jersey crime-fraud exception to the attorney-client

privilege and, to the extent it may once have been privileged, that privilege has now evaporated.

For this additional reason, Merck's motion should be denied.

The crime-fraud exception is quite broad and embraces this situation. N.J.S.A. 2A:84-

20(2) provides that the attorney-client privilege "shall not extend (a) to a communication in the

course of legal service or obtained in aid of the commission of a crime or fraud." As the

Supreme Court of New Jersey explained in *Fellerman*, "[i]n this context our courts have

generally given the term 'fraud' an expansive reading." 99 N.J. at 503, 493 A.2d 1239.

> There is no reason to believe that the use of the word 'fraud' in that rule is to be
> limited to conventional notions of tortious frauds. Acts constituting fraud are as
> broad and as varied as the human mind can invent. Deception and deceit in any
> form universally connote fraud. Public policy demands that the 'fraud' exception
> to the attorney-client privilege as used in Evidence Rule 26 be given the broadest
> possible interpretation.

*Id.* (citation omitted). For example, a variety of types of "disrespect for the legal process may

constitute 'fraud on the court.'" 99 N.J. at 505, 493 A.2d 1239. Indeed, in *A. v. B.*, 158 N.J. 51,

58, 726 A.2d 924 (1999), the Supreme Court held that a "husband's deliberate omission of the

existence of an illegitimate child constitutes a fraud on his wife" in the analogous setting of Rule

of Professional Conduct 1.6(c).

Moreover, the document need only contain "evidence or suggestions of false information"

for the crime-fraud exception to apply. *Ocean Spray Cranberries, Inc. v. Holt Cargo Systems,*

14

M001456735

*Inc.*, 345 N.J. Super. 515, 522, 785 A.2d 955 (Law. Div. 2000) (citing *Sunshine Biscuits, Inc.*,

301 N.J. Super. at 618, 694 A.2d 319). There must simply be evidence of the fraud other than

the allegedly privileged communication itself. *Id.* (citing *Sunshine Biscuits*).

 The CMI demonstrates that Merck's statements to the FDA and to the public about the

VIGOR results were fraudulent. In March and April 2000, Merck told the FDA and the public

that the significantly higher rate of adverse cardiovascular events in VIGOR's Vioxx users was

due to a previously unobserved, and completely hypothetical, cardioprotective effect of naproxen.

In the April 2000 CMI, Merck's scientists not only admitted the possibility that this was not true,

but described the <u>specific mechanism</u> of the pro-thrombotic effect of Vioxx – the inhibition of

COX-2, thereby creating prostacyclin/ thromboxane imbalance. Yet, Merck did not mention this

prothrombotic mechanism, or the cardiovascular consequences, in the eventual patent

applications. *See* Exhibits "G" and "H." Merck's fraud on the government (both the FDA and

the patent office) and on the public fall squarely within the definition of "fraud" that New Jersey

courts apply in this context.

 There is evidence of the fraud independent of the CMI. Dr. Scolnick's March 9, 2000 e-

mail, for example, admits that "The CV events are clearly there ... It is a shame but it is a low

incidence and it is mechanism based as we worried it was." *See* Exhibit "A." A month later,

after Merck's benign press release, Dr. Scolnick confessed to being in "minor agony" over the

VIGOR results and said "WE WILL NOT KNOW FOR SURE WHAT IS GOING ON" without

further study. *See* Exhibit "D." Further evidence of Merck's fraud comes from the FDA itself,

which sent Mr. Gilmartin a strongly worded "WARNING LETTER" on September 17, 2001

accusing Merck of "misrepresent[ing] the safety profile of Vioxx" and misleading the public by

M001456736

failing to disclose that the naproxen explanation was "hypothetical." *See* Letter from Thomas W. Abrams to Raymond V. Gilmartin dated September 17, 2001 (attached hereto as Exhibit "M").

Because the CMI is evidence of Merck's fraud on the government and the public, it falls within the crime-fraud exception to the attorney-client privilege. Accordingly, the CMI is not entitled to protection from disclosure.

## CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that the Court deny Merck's motion seeking to compel plaintiffs to return the CMI and allow plaintiffs to make full use of the document in this litigation. Going forward, plaintiffs request that the same procedure that was followed in this case – whereby Merck notifies plaintiffs of a claim of inadvertent production and plaintiffs agree to make no further use of the document until the court rules on whether it is privileged – be followed in the future, with one exception. Merck took more than a month to file this motion, which has created problems in scheduling and completing depositions. Plaintiffs

16

M001456737

therefore request that the party claiming inadvertent production be required to file its motion for

protective order within ten (10) days of learning of the production.

RESPECTFULLY SUBMITTED

KLINE & SPECTER

By: _____

Thomas R. Kline, Esquire
Shanin Specter, Esquire
Lee B. Balefsky, Esquire
Michelle L. Tiger, Esquire
David J. Caputo, Esquire
1800 Chapel Avenue, Suite 302
Cherry Hill, New Jersey 08002
(856) 662-1180

SEEGER WEISS LLP
By:     David R. Buchanan
550 Broad Street, Suite 920
Newark, NJ 07102
(973) 639-9100

Date:   May 2, 2005                    Attorneys for Plaintiffs

17

LAW OFFICES
**DECHERT LLP**
A PENNSYLVANIA LIMITED LIABILITY PARTNERSHIP
PRINCETON PIKE CORPORATE CENTER
(MAIL TO)          P.O. BOX 5218, PRINCETON, NEW JERSEY 08543-5218
(DELIVER TO)       997 LENOX DRIVE, BUILDING THREE, SUITE 210
                   LAWRENCEVILLE,  NEW JERSEY 08648
                   (609) 620-3200

**HUGHES HUBBARD & REED LLP**
A NEW YORK LIMITED LIABILITY PARTNERSHIP
101 HUDSON STREET, SUITE 3601
JERSEY CITY, NEW JERSEY 07302-3918
(201) 536-9220

ATTORNEYS FOR DEFENDANT MERCK & CO., INC.

RECEIVED
JUL 13 2005
3:19PM

JUL 13 2005

CAROL E. HIGBEE, J.S.C.

|                              |     |                                      |
|------------------------------|-----|--------------------------------------|
|                              | :   | SUPERIOR COURT OF NEW JERSEY         |
|                              | :   | LAW DIVISION:  ATLANTIC COUNTY       |
|                              | :   |                                      |
| IN RE: VIOXX® LITIGATION     | :   | CIVIL ACTION                         |
|                              | :   |                                      |
|                              | :   | CASE CODE 619                        |
|                              | :   |                                      |
|                              | :   | **ORDER GRANTING DEFENDANT'S**       |
| APPLICABLE TO ALL CASES      | :   | **MOTION FOR A PROTECTIVE**          |
|                              | :   | **ORDER PROHIBITING USE OR**         |
|                              | :   | **DISCLOSURE OF INADVERTENTLY**      |
|                              | :   | **PRODUCED PRIVILEGED**              |
|                              | :   | **DOCUMENTS AND COMPELLING**         |
|                              | :   | **PLAINTIFFS TO RETURN ALL**         |
|                              | :   | **COPIES OF THE DOCUMENTS**          |

THIS MATTER having come before the Court on motion by Dechert, LLP and Hughes

Hubbard & Reed LLP, counsel for Defendant, Merck & Co., Inc., and the Court having

considered the papers submitted and the arguments of counsel, and for good cause shown, and

for the reasons set forth in the accompanying Memorandum of Decision,

　　　　IT IS ON THIS _12_ day of _____, 2005 hereby ORDERED that:

　　　1.　　　The motion of Defendant Merck & Co., Inc. for a protective order prohibiting the

use or disclosure of inadvertently produced privileged documents and compelling plaintiffs to

return all copies of the documents is GRANTED.

186677.1.PRI_07 7/6/2005 12:23 PM



EXHIBIT
4
Blumberg No. 5119
M000608559

2.      The document entitled "Confidential Memorandum of Invention," assigned bates numbers MRK-AEG0020364-70 and MRK-AEE0000552-58, is a privileged attorney-client communication that was inadvertently produced. The inadvertent production of this document does not constitute a waiver of the attorney-client privilege. Plaintiffs shall immediately return or destroy all originals and copies of this document, including any copies plaintiffs disclosed to any other person. This document cannot be used for any purpose in this litigation.

3.      Merck shall produce, to the extent it has not already, any and all non-privileged documents regarding the invention that is the subject of the above-referenced document, including all e-mails, correspondence, memos, reports, and other records or documents of any type that relate to the proposed invention, including all such information from Kathleen Metters and Mike Gresser. Merck shall produce such materials on a rolling basis and shall complete its production by July 21, 2005.

4.      Merck shall produce Kathleen Metters for deposition on or before July 28, 2005. The above-referenced Confidential Memorandum of Invention may not be used or discussed at her deposition.

_____
HON. CAROL E. HIGBEE, J.S.C.

M000608560



<u>**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE COMMITTEE ON OPINIONS**</u>

## SUPERIOR COURT OF NEW JERSEY
COUNTIES OF
ATLANTIC AND CAPE MAY

CAROL E. HIGBEE, J.S.C.                                      1201 Bacharach Boulevard
                                                            Atlantic City, NJ 08401-4527
                                                            (609) 343-2190

<u>MEMORANDUM OF DECISION ON MOTION</u>
<u>Pursuant to Rule 1:6-2(f)</u>

*CASE:*             **In re VIOXX® Litigation**

*DOCKET #:*         Case Code 619

*RETURN DATE:*      **May 27, 2005**

*MOTION:*           **Defendant's Motion for Protective Order**

*ATTORNEYS:*        **Dianne P. Sullivan – Defendant**
                    **Thomas R. Kline; Shanuin Specter; Lee B. Balefsky; Michelle**
                    **L. Tiger; David J. Caputo; David R. Buchanan – Plaintiffs**

Having carefully reviewed the papers submitted and any response filed, I have ruled on the above Motion as follows:

Defendant Merck & Co., Inc. ("Merck") brings this motion for a protective order seeking to prohibit use or disclosure of documents it claims were privileged and inadvertently produced during the course of discovery. Also, Merck seeks to compel Plaintiffs to return or destroy all copies of the documents that had been inadvertently produced. Plaintiffs oppose this motion.

<u>BACKGROUND</u>

Merck's proposed protective order specifically applies to a document that had been produced twice in discovery, and assigned bates numbers MRK-AEG0020364-70 and MRK-AEE0000552-58. The dispute over these documents arose during the deposition of Merck's

⑨   *"The Judiciary of New Jersey is an equal Opportunity/Affirmative Action Employer"* ₺

then chief executive officer Raymond Gilmartin. Plaintiffs sought to question Mr. Gilmartin regarding the contents of the document but counsel for Merck objected and instructed the witness not to answer. After consulting with Merck, counsel for the Defendant determined that the documents were privileged and that they would be seeking a protective order. The next day, March 25, 2005, Merck sent a written request to Plaintiffs' counsel requesting that all copies of the document be returned. On April 8, 2005, counsel for Plaintiffs responded without returning the subject documents but by sending a letter disputing the inadvertence of the production. On April 26, 2005, Merck filed this motion for a protective order and has submitted the document in question to the court for *in camera* review.

The document in question is a Confidential Memorandum of Invention ("CMI") that Merck claims was an attorney-client communication between Merck scientists and in-house patent counsel provided for the express purpose of requesting legal advice and services. Since the filing of this motion, the deposition of the former head of Merck's Research Laboratories, Dr. Edward Scolnick took place. During this deposition, counsel for Merck questioned Dr. Scolnick about an idea for an invention he conceived that ultimately resulted in the CMI in question being drafted that further resulted in a patent application being filed.

Merck asserts that the CMI was written so its scientists can communicate information to the patent counsel so the latter can make determinations of patentability and preparations for filing patent applications. Merck argues that the CMI is thus protected by the attorney-client privilege. Furthermore, Merck argues that the inadvertent production of the document did not constitute a waiver of the privilege. Merck notes that in providing responses and objections to Plaintiffs' first request for production of documents, it stated that inadvertent production of documents would not constitute a waiver of any privilege. Merck contends that the production

M000606562

of the document in question was a result of an unintentional and inadvertent error on the part of its defense counsel during the process of producing approximately seven million documents as a part of this mass tort litigation.

Plaintiffs argue that the documents are not privileged and that if there is a privilege, it has been waived. Plaintiffs claim that the fact that the CMI was sent to the Merck Patent Department, does not prove that the document is privileged. Further, Plaintiffs argue that they have not had an opportunity to discover important information about the document, such as who received a copy of the CMI, who ordered the creation of the CMI and how many authors were involved. In the alternative, Plaintiffs assert that if a privilege is found to exist, it was waived by Merck's production of the CMI on two different occasions. Plaintiffs claim that the production was not inadvertent because portions of the CMI were redacted, indicating that attorneys had reviewed the CMI prior to it being produced.

ANALYSIS AND FINDINGS

R. 4:10-3 provides in relevant part:

> Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the court may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including, but not limited to, one or more of the following:
> (a) That the discovery not be had;
> (d) That certain matters not be inquired into, or that the scope of the discovery be limited to certain matters;
> (g) That a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way;
> If the motion for a protective order is denied in whole or in part, the court may, on such terms and conditions as are just, order that any party or person provide or permit discovery. The provisions of R. 4:23-1(c) apply to the award of expenses incurred in relation to the motion.

M000608563

In determining whether a protective order should be issued in this matter, the court must decide first, whether the CMI constitutes a privileged document under the attorney-client privilege.  If the CMI is found to be privileged, then the court must determine whether that privilege has been waived.  If it is determined that the privilege hasn't been waived, the court must consider whether the CMI falls within the crime-fraud exception to the attorney-client privilege.

**The Attorney-Client Privilege**

N.J.R.E. 504 governs the lawyer-client privilege in New Jersey.  It provides:

(1) General rule. Subject to Rule 37 [Rule 530] and except as otherwise provided by paragraph 2 of this rule communications between lawyer and his client in the course of that relationship and in professional confidence, are privileged, and a client has a privilege (a) to refuse to disclose any such communication, and (b) to prevent his lawyer from disclosing it, and (c) to prevent any other witness from disclosing such communication if it came to the knowledge of such witness (i) in the course of its transmittal between the client and the lawyer, or (ii) in a manner not reasonably to be anticipated, or (iii) as a result of a breach of the lawyer-client relationship, or (iv) in the course of a recognized confidential or privileged communication between the client and such witness. The privilege shall be claimed by the lawyer unless otherwise instructed by the client or his representative; the privilege may be claimed by the client in person, or if incompetent or deceased, by his guardian or personal representative. Where a corporation or association is the client having the privilege and it has been dissolved, the privilege may be claimed by its successors, assigns or trustees in dissolution.
(2) Exceptions. Such privilege shall not extend (a) to a communication in the course of legal service sought or obtained in aid of the commission of a crime or a fraud, or (b) to a communication relevant to an issue between parties all of whom claim through the client, regardless of whether the respective claims are by testate or intestate succession or by inter vivos transaction, or (c) to a communication relevant to an issue of breach of duty by the lawyer to his client, or by the client to his lawyer. Where 2 or more persons have employed a lawyer to act for them in common, none of them can assert such privilege as against the others as to communications with respect to that matter.
(3) Definitions. As used in this rule (a) "client" means a person or corporation or other association that, directly or through an authorized representative, consults a lawyer or the lawyer's representative for the purpose of retaining the lawyer or securing legal service or advice from him in his professional capacity; and includes an incompetent whose guardian so consults the lawyer

4

M000606564

or the lawyer's representative in behalf of the incompetent, (b) "lawyer" means a person authorized, or reasonably believed by the client to be authorized to practice law in any State or nation the law of which recognizes a privilege against disclosure of confidential communications between client and lawyer. A communication made in the course of relationship between lawyer and client shall be presumed to have been made in professional confidence unless knowingly made within the hearing of some person whose presence nullified the privilege.

The attorney-client privilege extends to corporate entities. Payton v. New Jersey Turnpike Authority, 148 N.J. 524, 550 (1997).

New Jersey law does not directly address whether internal corporate documents submitted to in-house corporate patent attorneys for purposes of developing a patent application fall within the attorney-client privilege. This issue was most directly addressed in In re Spalding Sports Worldwide, Inc., 203 F.3d 800, 805 (Fed. Cir. 2000). In Spalding, the court, applying Federal Circuit law, found that internal corporate documents generated for submission to patent counsel were subject to the attorney-client privilege so long as it was submitted to obtain a legal opinion, legal services, or assistance with a legal proceeding. Id. at 805 citing Knogo Corp. v. United States, 213 U.S.P.Q. 936 (Ct.Cl. Trial Div. 1980). The court also noted that whether the attorney client privilege exists must be determined on a case-by-case basis and in order to determine if the privilege applies, "the central inquiry is whether the communication is one that was made by a client to an attorney for the purpose of obtaining legal advice or services." Id. Further, the court declined to dissect the invention record for parts that might not be confidential, holding that "[i]t is enough that the overall tenor of the document indicates that it is a request for legal advice or services. Moreover, it is not necessary to expressly request confidential legal assistance when that request is implied." Id. At 806. The Spalding holding regarding corporate documents pertaining to inventions sent to patent attorneys was recently followed in In re Gabapentin Patent Litigation, 214 F.R.D. 178 (D.N.J. 2003).

5

M000606565

As noted above, New Jersey law does not specify whether the attorney-client privilege applies to corporate documents generated for purposes of developing a patent application. However, New Jersey courts have found that a report generated by a corporate attorney for purposes of determining whether the corporation should retain an employee. Sicpa North America v. Donaldson Enterprises, Inc., 179 N.J. Super. 56 (Law Div. 1981) is privileged.

The Court finds that the CMI in question is a privileged document. Regardless of whether the contents of the document only contain technical information about the proposed invention, the document is clearly marked confidential and was sent to Merck's patent attorneys for the purpose of obtaining legal services. New Jersey case law has rarely addressed the issue of attorney-client privilege as it pertains to patent-related services because federal law typically governs such issues. It would be inappropriate for a New Jersey court to impinge upon the findings of courts that handle such matters regularly as a matter of practice.

**Waiver of the Attorney-Client Privilege**

Merck has provided the certification of Thomas F. Munno, a member of the law firm of Dechert, LLP, who, since March 2005 has been responsible for the management of attorneys that are engaged in the reviewing and producing documents in association with the VIOXX® litigation. The certification sets forth the process which attorneys for Merck review and identifies documents in order to avoid the production of privileged documents. The certification also states that both inadvertent productions of the CMI occurred on October 1, 2004. Merck notes that it has produced over seven million documents in association with this mass tort litigation as a part of the ongoing discovery. It argues that given the massive scale of this litigation, it is inevitable that human error would result in the inadvertent production of otherwise privileged materials.

M000608568

Plaintiffs argue that the fact that Merck produced the CMI not once, but twice in discovery and each time having redacted certain portions of the document on grounds other than privilege. Plaintiffs claim that the fact that the document was reviewed by attorneys, as demonstrated by the redactions, indicates that the production was not inadvertent as Merck asserts. Plaintiffs contend that the precautions that Merck had in place to protect privileged documents were inadequate and that reasonable precautions would have prevented its production.

The attorney-client privilege is held by the client and cannot be waived without the client's consent. Siepa, supra, 179 N.J. Super. at 60 (holding that contractually limited disclosure of portions of a privileged report to a party's adversary for settlement purposes constituted a waiver of the privilege as to the whole report). "Waiver, under New Jersey law, involves the intentional relinquishment of a known right, and thus it must be shown that the party charged with the waiver knew of his or her legal rights and deliberately intended to relinquish them." Shebar v. Sanyo Business Sys. Corp., 111 N.J. 276, 291 (1988). There is no binding precedent in New Jersey case law to dictate a standard for if and when the inadvertent production of a privileged document should amount to a waiver of the attorney-client privilege. See Trilogy Communications, Inc. v. Excom Realty, Inc., 279 N.J. Super. 442, 443 (Law Div. 1994). However, New Jersey courts have found that inadvertent disclosure of privileged materials does not waive the victim-counselor privilege. State v. J.G., 261 N.J. Super. 409 (App.Div. 1993) (questioning whether inadvertent production waives the attorney client privilege).

The only New Jersey case that directly discusses the effect of inadvertent production on the attorney-client privilege is Trilogy Communications, Inc., supra. Trilogy held that

7

M000608567

inadvertent production of a privileged document does not constitute a waiver of the attorney-client privilege. Id. at 448. In so holding, the court stated:

> Inadvertent disclosure through mere negligence should not be deemed to abrogate the attorney-client privilege which is deeply embodied in New Jersey law and public policy. To hold otherwise would ignore the realities of modern litigation; the need to resolve matters quickly and inexpensively; time requirements of the court rules for the production of documents and discovery strictly enforced by case management orders and other techniques; and the volume of documents often required to be produced in complex litigation.
> Id.

In Trilogy, over 5,500 pages of documents were produced in discovery and the defendants claimed that one of the documents had been privileged. There had been no evidence that the defendant's general counsel reviewed the document or that it had been authorized to be disclosed to the plaintiff. The court found that the document was indeed inadvertently produced and did not constitute a waiver of the attorney-client privilege.

In the matter at hand, the Court adopts the reasoning set forth in Trilogy and concludes that inadvertent production of a privileged document does not waive the attorney-client privilege. The VIOXX® mass tort is a complicated litigation that involves a massive amount of discovery that dwarfs the discovery taken in Trilogy. While it is true that Merck has attorneys review the documents being produced prior to their release, it would be unreasonable to expect them to have such specific requirements for screening to prevent the disclosure of all privileged documents. Merck has demonstrated a legitimate, good-faith screening process to avoid the disclosure of privileged documents. They should not be penalized for meeting stringent discovery deadlines when certain privileged information slips through established filters undetected until it is in the hands of their adversaries.

Plaintiffs also argue that the privilege was waived as a result of Merck's counsel questioning Dr. Scolnick during a June 1, 2005 deposition about the invention that is described I

8

M000606568

the CMI. The questioning at the deposition never mentioned the CMI directly, but only discussed the proposed invention.

The Court finds that merely discussing the invention during the deposition does not constitute a waiver of the attorney-client privilege. What is at issue in this motion is a communication made to Merck's patent attorneys for the purpose of obtaining legal services. Communications between Merck scientists in developing the invention that would ultimately be submitted to the patent attorneys are not privileged and are discoverable. Communications submitted by the patent attorneys to the FDA as part of the patent application are clearly not privileged and are discoverable. However, to the extent that Merck scientists submitted information to its patent attorneys for the purposes of obtaining legal services, those communications are privileged. Merely discussing the invention during a deposition, when a patent application had been made regarding the invention, does not put the CMI at issue in the litigation and does not waive the attorney-client privilege.

**The Crime-Fraud Exception**

Plaintiffs argue that the CMI should be produced even if it is a privileged document because if falls under the crime-fraud exception to the attorney-client privilege. Plaintiffs contend that the contents of the CMI demonstrate that Merck was aware that VIOXX® had a high rate of adverse cardiovascular events and that consequently Merck's statements to the FDA and the public regarding the results of the VIGOR trial were fraudulent. Plaintiffs also refer to e-mails written by Dr. Scolnick that indicate his concerns over the results of the VIGOR study.

In addition to these arguments, Plaintiffs assert that the recent efforts of Merck's counsel to solicit information from Dr. Scolnick about the invention that is contemplated in the CMI during the June 1, 2005 deposition, provides further evidence of Merck's intention to perpetuate

M000608569

a fraud on the public. It is Plaintiffs' contention that the invention discussed in the CMI was developed to act as a supplement to VIOXX® to counter the alleged prothrombotic effects of the drug making its users more susceptible to adverse health results such as heart attacks and strokes. Plaintiffs' argument is that Merck, despite knowing of these adverse health results, did not disclose and indeed misrepresented the benefits and adverse effects of VIOXX®. During the June 1, 2005 deposition, Dr. Scolnick testified that the proposed invention was not intended to address the theory that all COX-2 inhibitors such as VIOXX® have prothrombotic effects, but rather to provide a supplement for VIOXX® users who were already at a high cardiovascular risk. Plaintiffs argue that this testimony is contrary to information contained in the CMI about the description of the proposed invention.

Merck argues that Dr. Scolnick's testimony is consistent with the information contained in the CMI, that it did not attempt to deceive either the public or the FDA, and that the crime-fraud exception does not apply to this matter.

The New Jersey Supreme Court has stated that in determining if the crime-fraud exception to the attorney-client privilege applies:

> the relevant factor to consider is whether the client consulted with the attorney in order (1) to aid the client "in the commission of any crime"; (2) to enable the client "to avoid any criminal investigation or proceeding pending at the time the advice was given"; or (3) to assist the client to "avoid lawful process in any proceeding pending at the time the advice was given."
> In re Nackson, 114 N.J. 527, 535 (1989) (internal citations omitted).

Additionally, the crime-fraud exception should be applied if the type of communication at issue is "alien to the fundamental reasons that underlie the privilege." National Utility Service, Inc. v. Sunshine Biscuits, Inc., 301 N.J. Super. 610, 616 (App.Div. 1997) quoting Fellerman v. Bradley, 99 N.J. 493, 503 (1983). Acts constituting frauds or crimes are to be interpreted broadly. Id. at 616.

M000608570

In the matter at hand, the Court finds that the CMI itself was not made to aid Merck in the commission of any crime. Nor were the communications between Merck scientists and Merck patent attorneys done to avoid criminal investigations or proceedings or to assist in avoiding lawful process in any proceeding. The communications were made merely for the purposes of obtaining a patent on a proposed invention.

The court recognizes this is a serious and important point of contention. The plaintiffs allege Merck perpetrated a fraud on the public and are continuing to do so now through false testimony as to what was known and when about VIOXX®. Merck denies these allegations.

If indeed Merck intended the invention to counteract prothrombotic effects of VIOXX® that Merck knew to exist but withheld from the public the plaintiff is entitled to discover other non-privileged information about the invention. Merck is ordered to produce any and all information regarding the invention that is not otherwise privileged that it hasn't already produced within 30 days including all e-mails, correspondence, notes, memos, reports and other record or documents of any type that relate to the original proposed invention including all such information from Kathleen Metters and Mike Gresser. In addition, Ms. Metters must be produced for deposition within 30 days. Although she may be questioned about the development of the idea for the patent etc. the privileged document may not be used or discussed at the deposition.

Motion Granted. All plaintiffs' copies of the privileged document must be returned to Merck or destroyed immediately.

Defense counsel shall submit the appropriate Order.

CAROL E. HIGBEE, J.S.C.

11

M000060571