FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2006 APR 21   PM 4: 24

LORETTA G. WHYTE
CLERK

IN RE: VIOXX
    PRODUCTS LIABILITY LITIGATION

:    MDL NO. 1657

:

:    SECTION: L

:

:    JUDGE FALLON

:    MAG. JUDGE KNOWLES

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . :

**THIS DOCUMENT RELATES TO:**
    *ALL CASES*

## ORDER

    For the reasons given at oral argument, the transcript of which is attached hereto, Merck

& Co., Inc.'s Motion and Incorporated Memorandum for Reconsideration of Court's Decision to

Overrule Merck's Asserted Attorney-Client Privilege As to Documents Listed on Merck's

Privilege Log is GRANTED IN PART AND DENIED IN PART.

    New Orleans, Louisiana, this __19th__ day of April, 2006.

UNITED STATES DISTRICT JUDGE

___ Fee_____
___ Process_____
_X_ Dktd _____
___ CtRmDep_____
___ Doc. No_____

```
 1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF LOUISIANA
 2

 3  *******************************************************

 4  IN RE:  VIOXX
                     DOCKET NO. MDL 05-1657 "L"
 5                   NEW ORLEANS, LOUISIANA
                     WEDNESDAY APRIL 19, 2006, 9:00 A.M.
 6
    *******************************************************
 7

 8                 TRANSCRIPT OF PROCEEDINGS
       HEARD BEFORE THE HONORABLE ELDON E. FALLON
 9               UNITED STATES DISTRICT JUDGE

10

11  APPEARANCES:

12  FOR THE PLAINTIFF:     HERMAN HERMAN KATZ & COTLAR
                           BY:  RUSS M. HERMAN, ESQUIRE
13                         201 ST. CHARLES AVENUE, SUITE 4310
                           NEW ORLEANS, LA 70170
14

15                         NEBLETT BEARD & ARSENAULT
                           BY:  JEAN PAUL P. OVERTON, ESQUIRE
16                         2220 BONAVENTURE COURT
                           PO BOX 1190
17                         ALEXANDRIA LA  71309-1190

18

19                         IRPINO LAW FIRM
                           BY:  ANTHONY IRPINO, ESQUIRE
                           ONE CANAL PLACE
20                         365 CANAL STREET, SUITE 2990
                           NEW ORLEANS LA  70130
21

22

    FOR THE DEFENDANT:     STONE PIGMAN WALTHER WITTMANN
23                         BY:  PHILLIP A. WITTMANN, ESQ.
                           546 CARONDELET STREET
24                         NEW ORLEANS, LA 70130-3588

25                                    AND
```

```
 1                             O'MELVENY & MYERS
                              BY:   JOHN BEISNER, ESQUIRE
 2                            1625 EYE STREET
                              WASHINGTON DC  20006
 3

 4    FOR THE LOUISIANA       DUGAN & BROWNE
      ATTORNEY GENERAL        BY:   JAMES R. DUGAN, ESQUIRE
 5    AND BLUE CROSS OF       650 POYDRAS STREET, SUITE 2150
      LOUISIANA:              NEW ORLEANS LA  70130
 6

 7
      OFFICIAL COURT REPORTER:      CATHY PEPPER, CCR, RPR, CRR
 8                                  500 POYDRAS STREET, ROOM B406
                                    NEW ORLEANS, LOUISIANA 70130
 9                                  (504) 589-7779

10

11
      PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT
12    PRODUCED BY COMPUTER.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1             P-R-O-C-E-E-D-I-N-G-S

2             WEDNESDAY, APRIL 19, 2006

3           M O R N I N G   S E S S I O N

4             (COURT CALLED TO ORDER)

5       THE DEPUTY CLERK:  Everyone rise.

6       THE COURT:  Be seated, please.  Good morning, ladies and

7 gentlemen.  I apologize it's so cold, but I assume that after we

8 finish the argument we'll be heated up.

9        Call the case, please.

10       THE DEPUTY CLERK:  Civil Action MDL 1657 In re:  Vioxx.

11       THE COURT:  Counsel make their appearance for the

12 record, please.

13       MR. HERMAN:  Good morning, Judge Fallon.  Russ Herman

14 for the Plaintiffs Steering Committee with regard to the

15 privilege issues, and with me at counsel table is Anthony Irpino.

16       MR. WITTMANN:  Good morning, Your Honor.  Phil Wittmann

17 for Merck, and with me is John Beisner, who will be arguing the

18 motion this morning.

19       THE COURT:  We have two motions, actually.  The first

20 motion has to do with consolidation, and the second motion has to

21 do with the privilege issues.  So let me deal with the first

22 motion first, the issue of consolidation.

23        This matter involves the plaintiffs seek to consolidate

24 two separate claims.  The Louisiana Attorney General, on behalf

25 of Medicare, has filed a claim seeking reimbursement for the cost

1   of Vioxx as well as the damages resulting from the use of Vioxx.

2   The plaintiffs, Blue Cross have about the same type claim.  Some

3   issues are different, but they also seek return of monies for the

4   purchase of Vioxx and also for the damages they allegedly claim,

5   the medical damages, the medical costs they allegedly claim

6   resulting from taking Vioxx.  At issue here today is the

7   consolidation of these two claims.

8        MR. DUGAN:  That's correct, Your Honor.  Good morning,

9   James Dugan on behalf of the Louisiana Attorney General and

10  Blue Cross of Louisiana, and Your Honor is absolutely correct.  I

11  know you know the gist of the claims and what these cases are

12  about.  And as you know, the Court enjoys broad discretion in

13  consolidation of the cases.

14       Brief procedural history as you know, the Louisiana

15  Attorney General case was filed in CDC and removed to Your Honor.

16  The Blue Cross case was originally filed as a class action,

17  original filing in the Eastern District of Louisiana.

18       We filed a motion to consolidate.  The defendant had

19  several arguments.  The first argument was that you couldn't

20  consolidate a class action and an individual case.  The second

21  argument was that even if you would consolidate it, that it would

22  be too confusing for a jury.  And then the last argument was

23  that, further again, even if you would consolidate it, that

24  somehow that you would have to try individual mini trials to be

25  able to determine what beneficiaries were injured by Vioxx.

1    THE COURT:  Wouldn't you also have to determine who said

2    what to whom and whom knew what and who should have known what?

3    Isn't that part of the whole process?

4    MR. DUGAN:  Yes, sir.  It is, Judge.  And that is very

5    easily -- that is very easily addressed.  I represent the

6    Attorney General in several pharmaceutical cases, and I

7    represented Blue Cross in several other pharmaceutical cases.

8    Discovery, first of all, on the first issue of who said

9    what to whom, the defendants can take the 30(b)(6)'s of

10   representatives from DHH at the Louisiana Attorney General's

11   office.  This data is readily available.

12   Basically the discovery is the same.  You take 30(b)(6)

13   from the Louisiana Attorney General, DHH, you take the 30(b)(6)

14   of the Blue Cross representative who handles these claims.

15   THE COURT:  But aren't you seeking individual damages,

16   and if you're seeking individual damages, doesn't each claimant

17   have some knowledge or some participation in that?

18   MR. DUGAN:  Yes, Judge, but it very easily resolved,

19   which is the sales representatives.  The Merck sales

20   representatives, I know there is only one that went to

21   Blue Cross, and I'm almost positive that there was only one or

22   two that actually went to the State.  So we can find out that

23   information from them.

24   They can take the 30(b)(6)'s of the plaintiffs to find

25   out what they knew and what information Merck was supposed to

1  give to them.  They can also ask questions about, you know, did

2  they rely upon these representations in including these drugs on

3  the formulary.  It's no more than a couple of depositions,

4  Your Honor.

5        THE COURT:  I've got the gist of it.  Let me hear from

6  the defendant.  I'll give you an opportunity to rebut.

7        MR. BEISNER:  Good morning, Your Honor.

8        THE COURT:  How do you see the problem in trying such a

9  case?

10       MR. BEISNER:  Well, Your Honor, I think the main point

11  here is that to the extent that counsel is talking about

12  consolidation for discovery purposes and so on, that's already

13  achieved.  We're all here before the same court.  We can do

14  discovery at the same time.

15       It's really the trial issue that Your Honor is focusing

16  on here.  And frankly, I think it's entirely premature to make

17  this determination now.  We need a record here to figure out how

18  complicated that trial is going to be.

19       Counsel is talking about how easy it will be to get the

20  discovery on this.  I think he's wrong about that.  I think it's

21  going to be far more complex to get the discovery on this, but

22  the real question is when you get that discovery, what is this

23  case going to look like in terms of presentation to the jury?

24       And you're going to have one fact pattern, a set of

25  fact patterns with respect to Blue Cross/Blue Shield, an entirely

1  different set of facts which would be very complex in and of

2  themselves with respect to the Attorney General.

3          I think as Your Honor pointed out, these claims are

4  really many individual product liability cases, because part of

5  the case on both sides involves prescription of the drug to

6  individual claimants, what went into that process, and whether or

7  not there is any causation with respect to those individual

8  cases.  I don't know how we go about doing that if you keep them

9  separate, but you put them together, and you greatly magnify the

10 problem.

11         And what the law says we need here is really to have a

12 record to determine whether or not that trial can be conducted

13 fairly from the defendant's standpoint, and we really just don't

14 have that record.  We have a couple of pages from plaintiffs

15 making the representations about this, but the bottom line is the

16 plaintiffs claims are highly individualized.

17         From everything we know right now, a consolidated trial

18 can result in substantial bias.  A joint trial would allow

19 plaintiffs to put before the jury evidence regarding one case

20 that would be irrelevant in the other case and, therefore, can

21 create bias, and there is a likelihood, as a result, of jury

22 confusion.

23         You add to that the idea that you're combining a

24 private and public trial.  You've got the AG present in one of

25 the cases, which is going to suggest to the jury that somehow the

1    AG, an elected figure in the state, is endorsing the claim of

2    Blue Cross/Blue Shield.

3          These claims are very complex trials in and of

4    themselves and mixing them, Your Honor, we think would create

5    substantial jury confusion and substantial bias to Merck, but we

6    need the full record to make that determination.

7          THE COURT:  Okay.  Thanks very much.  I really have read

8    this, and I do understands the issues, folks.  I agree with the

9    defendant.  I don't want to say that it's never going to be

10    consolidated, but I don't see the advantage of consolidating at

11    this time.  I do see an advantage of consolidating the discovery

12    but you've already got that.

13          For me at this point to say we're going to consolidate

14    all of these claims is a little, at best, premature, and it's

15    hard for me at this time, and maybe forever, to see how I can

16    have a large group, two large groups of claims that involve

17    individuals for whom you're seeking individual damages for each

18    one of those claimants to deal with this issue.

19          I can see, and some of the state courts have done it

20    successfully, combining a number of cases.  I don't know whether

21    the number is two or three or five or whatever.  I can see doing

22    that later on down the road, perhaps, but to combine hundreds of

23    them and thousands of them and say that's what we ought to do,

24    and have one jury sit on that, it just --

25          MR. DUGAN:  Judge, can I comment on that?

1          THE COURT:  Sure.

2          MR. DUGAN:  My comment on that is, you're right, there

3    are two components of the claims, as we sit here today.  The

4    prescription reimbursement claim, which is simple.  We ran the

5    numbers with the state.  They have about 15 million out

6    prescription costs.  Blue Cross of Louisiana has about 10 million

7    out of prescription costs.

8          It's taking us a long time to get in front of

9    Your Honor.  I have -- and I have consulted with my clients, and

10   we would be willing to waive, though, the medical reimbursement

11   claim in exchange for getting a trial date.  This is something

12   that's been a work in progress, and both of these clients are

13   substantial entities, which you have to go through the proper

14   channels of getting authority to do so.

15         So I'm trying to make this as simple as possible, so if

16   the Court has a real issue with that, and I understand that, I'm

17   prepared to amend or file a Motion to Dismiss those particular

18   claims to centralize it to just the prescription reimbursement

19   case.

20         THE COURT:  What's the situation with Blue Cross?  Do

21   they waive the same thing?

22         MR. DUGAN:  They would waive the same thing, Your Honor.

23         THE COURT:  That's potentially doable.  I can see

24   something like that better than I can see the individual

25   claimants.  I don't know how we deal with individual claimants

1    when you take the position that they have individual claims.

2    That's what this whole case is about.  And how would I just

3    consolidate your cases and not try all of the other cases at one

4    time?  For one hundred thousand of them.

5              MR. DUGAN:  I understand completely, and the direct

6    claims, the direct claims for the prescription reimbursement, I

7    would agree, would be a lot cleaner.

8              THE COURT:  Help me think this through.  What's this

9    situation with New Jersey now?  They have a nationwide class

10   action.  Does that play any part in your thinking?

11             MR. DUGAN:  Yes, sir.  They have a nationwide class

12   action, as you know.  The class certification was affirmed by the

13   Court of Appeals in New Jersey.

14             Two points on that:  Number 1, Blue Cross of

15   Louisiana's claim is so substantial, in the millions of dollars,

16   that it's going to be a separate case.  So I think the I think

17   the law has bolstered the claims tremendously, and the inquiries

18   that the Court has done on the factual side of it on the

19   certification phase, that it helps liability wise.

20             As far as Blue Cross is you concerned, they would opt

21   out of any national settlement over there.  In front of

22   Your Honor is the master purchase claims complaint which

23   Blue Cross decided, because its claim was so substantial, that

24   they are not a class representative in that case.

25             Secondly, that class definition in New Jersey excludes

1   governmental entities.  So the Attorney General would not be a

2   part of that.

3            Also the caveat, Judge, as you may or may not be aware,

4   the Texas Attorney General also filed suit.  They got removed in

5   federal court, but they got remanded back down to Travis County,

6   Texas.  They have a trial date set in January of '06 -- I'm

7   sorry, of '07.  January of '07, under the Texas Medicaid statute,

8   clearly allows the State of Texas to go after prescription

9   reimbursement claims.

10            So that case is going to be tried.  These cases can

11   absolutely be tried.  If you don't want -- I think consolidation

12   would be a lot cleaner, if we narrow it down to just the

13   prescription reimbursement.

14            Another difference between the AG case and the

15   Blue Cross case is that when the AG case got removed, Merck

16   answered it completely.  No motions to dismiss and they answered

17   the whole thing; whereas, the Blue Cross case, they answered part

18   of it, but they also filed Motion to Dismiss on part of it.

19            So I'm here on behalf of both clients.  My position is

20   that, Number 1, I will be filing a Motion to Amend or a Motion to

21   Dismiss the medical reimbursement claims, and also, I guess, I

22   don't know whether I need to reurge the Motion to Consolidate in

23   light of that.

24            THE COURT:  Yes, I think you should.  And I want you to

25   think about it, because I don't know what position I'm going to

1    take on it.  I hadn't focused and I want to give counsel an

2    opportunity to at least speak on that issue when you file your

3    motion, so I don't want you to feel that it's just going to be

4    routine.  I want to hear you, and I want to hear counsel.

5            I do say that it makes it easier to consider

6    consolidation than it does when you put everything else in the

7    picture.

8            MR. DUGAN:  And then, in addition, Your Honor, if the

9    term consolidation is inappropriate, the Louisiana Attorney

10   General case is ready to go, and we would be willing to try that

11   case in December or January or the first trial date that you

12   have.

13           THE COURT:  What about the situation with the

14   injunction?  How do you see that?  You're asking for an

15   injunction; Blue Cross is not.  How does that play with the jury?

16   Do I have a judge and jury case or a judge case, a jury case, or

17   just a jury case?

18           MR. DUGAN:  Well, also in the amendment, Judge, I took

19   out the claim for the jury claim, so my position is I would try

20   it to Your Honor.

21           THE COURT:  I will give that some thought too when we

22   visit next time.

23           I'll hear from you.

24           MR. BEISNER:  Just one clarification.  I don't want to

25   argue this now because I understand there will be a new motion on

1  this, but I just wanted to clarify my one thing just so it's

2  clear on the record here.

3          We're talking about two different sets of cases.  We've

4  got AG cases, and the one point I wanted to make is that the

5  Court has before it now AG cases from Louisiana, as represented

6  here, and Mississippi, which has been transferred here.

7          The Alaska Attorney General has filed an action as

8  well, which the federal district court in Alaska has stayed to

9  permit transfer here, so that case is headed here.

10          The Texas case has been removed again to federal court

11  after the discovery indicated the existence of a plethora of

12  federal issues.  And we're asking that that case be moved here as

13  well, and there is also a case pending in Montana, so there will

14  be a cluster of state AG cases here.

15          Then we also have a collection of other third-party

16  payor cases here.  So there is a little bit of an issue of

17  prematurity there because what you're doing is taking one from

18  each, putting them together, sort of without respect to the fact

19  that you've got other cases in those categories, so that's

20  another issue on prematurity, Your Honor.

21          THE COURT:  What do you think about judge rather than

22  jury?  Have you-all given that some thought?

23          MR. BEISNER:  Your Honor, we have not looked at that.

24          THE COURT:  What about the situation if there is a claim

25  for, and I understand the injunction claim, I'm not quite sure I

1   understand whether that's the extent or not, but if there is an

2   injunction for the request from the Attorney General, which is

3   generally a judge matter, as opposed to the Blue Cross, which is

4   generally a jury matter, how do you mix that?

5   MR. BEISNER:  I'm not sure we've thought that through

6   fully, Your Honor.  We want to address that in the briefing.  We

7   think that could actually add to some of the confusion because I

8   think that some of the claims may still be jury claims, but I

9   guess it's how they replead there as well.

10   And the facts are actually quite different, Your Honor,

11   on the representational issues as well because on the AG side you

12   get into the federal Medicare regulations as to the process the

13   state had to go through and the deference it had to pay to the

14   FDA approval of the drug in deciding to include it as part of his

15   formulary program, which isn't true in the private case side, so

16   those cases probably will try quite differently, but again, we

17   need further factual element to make that determination.

18   THE COURT:  Just for the record then I'll deny the

19   Motion to Consolidate presently because I see the two aspects of

20   the claims, both the recoupment of costs of medicine as well as

21   the recoupment of costs of medical care made necessary allegedly

22   by the use of Vioxx, particularly the latter aspect of the claim

23   is so specific -- who knew what, when they knew it, what they

24   should have known, or what they did about it -- causation issues

25   are so diverse, so different that it would seem to me not to be

1    helpful to consolidate those matters.

2            But we'll talk a little bit more about the issue.  I'm

3    going to deny the motion now but allow the parties to amend and

4    bring it back to me in a different state.  Thank you very much.

5            Now we have a motion with regard to privileged

6    documents.  The plaintiffs in this matter some time ago have

7    sought documents from the defendant.  The defendants have given a

8    substantial number of documents but also have claimed the

9    attorney-client privilege on a vast number of documents, some

10   81 boxes.  And we're here today to talk about reconsideration of

11   the Court's position on these documents.

12           I should say that when I originally got those boxes --

13   let me back up and say that there was a controversy as to whether

14   the documents should be forthcoming.  The parties tried to

15   negotiate it.  The parties tried to get a privileged log that was

16   drawn with more specificity than it had been.  The defendants

17   resisted.  Eventually another privileged log was drafted, but

18   even that, the plaintiffs said, was not specific enough.

19           And I looked at the situation and required that the

20   documents been given to the Court in camera, put in the registry

21   of the court.  Some 81 boxes of documents were delivered to the

22   Court.  Five thousand, six thousand documents per box, nearly

23   500,000 documents.

24           What I first thought was doable was for the documents

25   to be categorized into various categories and a representative

1   portion of each category be selected and looked at by the Court

2   and then a decision made on that particular category.

3          I instructed the defendants to give me a privileged log

4   with the categories fleshed out.  I got a privileged log, but the

5   privileged log was over a thousand pages.  Frankly, it wasn't

6   helpful to me, and I realized that it was not doable to

7   categorize them because they were strewn throughout the boxes, so

8   the categories, even if I were able to isolate the documents, it

9   would be a Herculean task to simply find those various documents,

10  extract them, put them in different boxes, and then proceed with

11  my review.

12         So what I decided to do was to review each of the

13  documents.  So for the last two weeks, coming early and working

14  late, I've looked through 500,000 pages and made my decision on

15  the documents.  I excluded certain documents from the boxes and

16  declared that those were excluded documents.  They were still

17  privileged.  The other documents, I felt, were not privileged.

18         When I finished the first 20 or 30 boxes, I put out a

19  minute entry advising the parties that I had reviewed those

20  documents.  I then made the documents that I maintained the

21  privilege on available to the defendant.

22         The defendant looked at these documents and took issue

23  with my rulings, saying that I should have made, should have

24  declared other documents privileged in addition to those that I

25  had declared privileged.  And therefore, now they reurge their

1   motion and ask the Court to reconsider its position, so we're

2   here today to talk about that.

3          Let me hear from the parties, either one of them.

4          MR. BEISNER:  Since it's our motion, Your Honor, I guess

5   I will start.

6          THE COURT:  That's fine.

7          MR. BEISNER:  Let me start, Your Honor, by saying that

8   we are quite grateful for the enormous amount of time that I know

9   you've dedicated, personally dedicated to reviewing the documents

10  in dealing with this issue and regret the amount of time.

11         THE COURT:  I'm probably the only one in this room who

12  has looked over every one of those 500,000 pages.

13         MR. BEISNER:  I will confirm, as far as I'm concerned,

14  that you are absolutely correct, Your Honor.  All I can say,

15  Your Honor, is that the volume of those documents is at least in

16  part a product of the number of documents that we have been asked

17  to produce to date.

18         Just for the record, I note that Merck has produced

19  close to 2.4 million documents in a litigation that's about 18

20  million pages of materials.  And of those, and I'm talking here

21  about documents as opposed to pages, which I know is

22  substantially larger, I think we've claimed privilege for about

23  24,200 that have been withheld in their entirety.  There are some

24  others as to which we have redaction, so that's about one percent

25  of the total production.

1          I guess the issue here is more were they properly
2  withheld from a privileged standpoint, but I think just in terms
3  of percentages, that one percent is fairly consistent with what
4  you see in most proceedings, but again numbers aren't the issue
5  here.  The question is whether the documents themselves are
6  privileged.
7          Your Honor, I guess just one observation that I make at
8  the outset here, and I suspect that the Court is quite familiar
9  with this, but you do have a problem, a thorny issue of privilege
10  reviews in cases because of concern about consistency.  I am sure
11  that when Your Honor went through the documents, there were a
12  fair number as to which you said, I don't know why we're arguing
13  about this.  This is a completely neutral document or is actually
14  favorable to the defendant.
15          The problem, though, is one of consistency because if
16  some documents are released, our very worthy adversaries will say
17  that's a precedence for releasing other categories of documents.
18          THE COURT:  Frankly the other problem in this situation
19  is always the logistics, too.  From anybody's standpoint when
20  they are looking through documents, it's generally done with a
21  team, numbers of people, and it generally extends over a period
22  of time, and consistency is lax at best.  It's often in the eye
23  of the beholder, and it depends upon the person's view of the
24  litigation, and knowledge of the litigation, and overview of the
25  litigation.  They tend to err on the side of the person that's

1    declaring the privilege, and so if it looks like an interesting

2    document, they declare it privileged.  They don't go any further

3    than that, and that's the problem as a practical matter that the

4    Court always confronts.

5         MR. BEISNER:  Your Honor, given those consistency issues

6    that you're pointing to and the fact that privileged designations

7    can often be close calls, it's not surprising that court's

8    designations will come out differently with respect to a number

9    of cases.

10        Out concern here is not wanting to throw out the baby

11   with the bath water here.  There are a number of documents as to

12   which the company believes its cause would be considered more

13   meritorious if we were able to give the Court more specific

14   information on those individual documents.

15        We acknowledge this may have been a problem as far as

16   we were concerned that the Court didn't find the privileged log

17   useful.  Of course, there is other information that probably

18   needs to be conveyed in camera because that further explanation,

19   of course, breaches the privilege, and that's sort of the gap

20   that we're concerned about here is that -- and again, Your Honor,

21   we take the responsibility on this ourselves, but we feel that

22   some of these documents, there is probably a need to convey to

23   the Court in camera some additional background information that

24   might be informative with respect to those calls.

25        In our Motion for Reconsideration, we identified 25

1    sample documents that we thought warranted the Court's further

2    consideration with some additional information that we provided.

3    Your Honor, I'm not sure it would be helpful to go through those

4    here.  You have that information.

5         THE COURT:  No, I have it.  And frankly, I got that

6    material as I was going into the 31st box.  So I took that into

7    consideration and took your observations into consideration, and

8    then when I finished the 81st box, I went back, frankly, and

9    looked a second time at the first 30 boxes.  It's like reading

10   *War and Peace* over 81 times, Tolstoy's tome, so I understand this

11   situation fairly well.

12        MR. BEISNER:  Well, Your Honor, I won't belabor that.  I

13   guess really what we were asking was for some opportunity, and

14   again, Your Honor, we do not want to ask the Court to go through

15   this process again.  That is not at all what we're here for.  We

16   not seen the totality of the Court's calls on this, either the

17   re-review of the first 30 boxes or the latter, but we were simply

18   looking for some opportunity with respect to --

19        THE COURT:  You see, the problem is that you had some

20   opportunity, and that's the part that a privileged log plays,

21   frankly.  I know that in a privileged log, you don't want to tell

22   the entire scope of the document because then it defeats the

23   purpose, but it would be helpful if your privileged log would

24   say, Document 1006 is a letter from an attorney to a client

25   regarding a patent.  It doesn't have to say what the patent is.

1    It doesn't have to say what the situation is, so you reserve

2    that, but it's meaningful to me.

3         But just to say, An e-mail, I don't know who is the

4    lawyer.  I don't know whether there is a lawyer in that e-mail.

5    I know that there are some lawyers because I've gotten their

6    names, but I deduced that.  You didn't help me with that.  The

7    only one that was obvious to me was Joanne Lahner, because you

8    asked her everything and often copied her.  But there are some

9    other lawyers that are in there that I didn't know were lawyers

10   until I got into it and then started making lists that these are

11   lawyers.  But that's what I did.  You didn't do it.  If you had

12   done it, it would have been easier.

13        I understand your position.  Folks, I really have read

14   your material, and I do understand it.  Let me hear from the

15   plaintiffs.

16        MR. HERMAN:  First of all, Your Honor, good morning.

17   I'm Russ Herman for the PSC, and I can assure you Mr. Irpino and

18   I have not read a single document, but we're anxious to do it,

19   and we're willing to have a team that's already assembled go

20   through the 81 boxes so that the four cases Your Honor has set

21   for trial will have the benefit of those documents.

22        This issue is pregnant with delay, nine months of

23   delay, and it's about time to deliver this child.  I think at one

24   point Merck must have gone to Broadway and 46th Street, studied

25   the guy that plays the Three-Card Monte and watch the

 1  Legerdemain, which is certainly faster and quicker than the eye

 2  in order to not only create 500,000 documents and label them

 3  privileged but to mix them up while they did it.  That's not easy

 4  to shuffle all that stuff together.

 5          The Court made a thorough review.  What context is

 6  needed?  Your Honor sat through two trials, a hundred motions, a

 7  number meet and confers, more than nine months of conferences on

 8  this matter.  Why now does the information come forward?  Because

 9  everything the defendants raise now could have been raised in the

10  privilege log.

11          I mean, they didn't list -- we asked on August 22nd, we

12  said this is not a privilege log.  This is not what the

13  Fifth Circuit requires.  On August 24th, we indicated in brief

14  and in letter, You violated Rule 26.  We need a privileged log.

15          On September 22nd, September 28th, September 29th,

16  October 26th, October 27th, November 3rd, twice on November 4th,

17  a third time on November 4th with cosmetic changes.  That were

18  the first changes.

19          January 30, '06; February 15, '06; February 17, '06;

20  February 22, '06, and we raised it in meet and confers, we raised

21  it in open court, we raised it with opposing counsel.  We raised

22  it in brief.  We raised it in argument.

23          Now, I don't know how many times you've got to raise

24  something to have two cases tried, excuse me, four cases tried in

25  state court without the benefit of these documents, one case in

1    federal court tried twice without the benefit of these documents,

2    four cases set in federal court.

3            The significance of an MDL from a plaintiff's point of

4    vantage is that if the MDL PSC does its job right, it will be

5    able to produce a work product that can be used in trials.  This

6    has been very frustrating.  It's been anguishing.  It's certainly

7    not as anguishing as it is for this court.

8            I can assure this, from a plaintiff's point of view,

9    it's quite remarkable that a federal judge would go through

10    500,000 documents, which, incidentally, constitute more than

11    five percent of what's been produced.

12            Merck has no authority for the procedure it now

13    suggests.  It covers no new ground.  There has been no be change

14    in the law.  There is no newly discovered evidence, and, in fact,

15    in two Eastern District cases in 2004, *Hodges* and *Feeham*, found

16    under the same circumstances the privilege were waived.

17            If Your Honor is required to meet in camera with

18    defense counsel, if they go through the 81 boxes and they start

19    pulling documents you want Your Honor to review, we will never

20    get through this process, and this court and counsel have other

21    work to do.

22            Your Honor, most respectfully, we believe that the case

23    cited, the *McMoRan Freeport* [sic] case is directly on point.  We

24    ask Your Honor to give it to a valued consideration under the

25    circumstances.

1          Justice Brandeis, the U.S. Supreme Court once said that

2    "Sunshine is the best disinfectant." You just can't sweep these

3    things under the rug. You can't hide the pea under the walnut.

4    You can't play Three-card Monte. You can't send paralegals and

5    lawyers out to go through documents willy-nilly and have them

6    justify what they are doing by just marking things

7    indiscriminately as privileged, and consciously failing to

8    produce a privileged log that's meaningful.

9          You don't need to be reminded, these are seasoned

10   lawyers, 15 times on 15 different occasions, we need a real

11   privileged log. Then, what off puts the entire argument made is

12   the fact that they said, Oh, we've made some harmless errors.

13   We'll go release 220,000 pages of documents.

14         Well, what were they thinking when they say they made a

15   review and there were harmless errors and they left 500,000

16   documents in 81 boxes? I know what they were thinking. They

17   were thinking delay. This will look like we're in good faith.

18   We'll never get to this issue.

19         So, Your Honor, most respectfully we ask that

20   Your Honor's orders as to the 81 boxes stand and that we get on

21   with the production of these documents. Thank you, Your Honor.

22         THE COURT: Thank you. I've told you that the cold

23   courtroom would be heated up. It seems to me it has.

24         I do understand both sides. Let me ruminate or think

25   out loud just a little bit with you about this whole concept of

1 the privilege and how it fits in with the rules of evidence.

2       I'm not unfamiliar with the rules of evidence.  As many

3 of you, I have lived with them in the pit, so to speak,

4 practicing law for over 30 years, doing nothing but litigation,

5 so I am familiar with them.  I've also taught courses in rules of

6 evidence at law schools, and I published a couple of books on the

7 area.

8       It's always been intriguing to me, frankly, the

9 dichotomy or least the tension between the other rules of

10 evidence that exist in the Code of Evidence or even the common

11 law and the rules of privilege.  With regard to the rules of

12 evidence, their job and their function is to seek the truth and

13 to elicit the truth and to allow the truth to be told in some

14 unblemished fashion.

15       Rules 801, 803 and 804, particularly 803 and 804 are

16 the exceptions to the hearsay rule, they prevent hearsay from

17 getting in, but there is a host of exceptions which allow certain

18 aspects of hearsay to come in.

19       612, 613 are the rules that deal with the use of

20 writings and allow the fleshing out of testimony and the

21 confrontations of witnesses with various previous testimony.

22       401, 403 ensures the use of material which is not

23 prejudicial but allows it to be used in evidence.

24       106 allows the full disclosure of writings by each

25 side, by the other side.

1        All of the rules of evidence seek to allow evidence; to

2   fashion the way that it is acceptable and can be received by the

3   fact finder.  The rule of privilege is a little different.  The

4   rule of privilege promotes relationships above disclosure.

5        The concept of privilege recognizes that there are some

6   relationships in society that are more significant, frankly, than

7   the disclosure of relevant material to the fact finder, but,

8   because it's such a deviant, such a difference from the rest of

9   the rules, there is a high burden placed on the party urging the

10  privilege.  It's strictly construed usually, privilege is, and

11  the party urging it has the duty, the burden of showing the

12  privilege.

13       The attorney-client privilege is really the oldest

14  privilege available.  I used to think that perhaps the medical

15  privilege, privilege between patient and doctor, was the oldest,

16  but clearly Hippocrates didn't have that privilege.  You see

17  nothing in Herodotus, nothing in Thucydides that discusses that.

18       The attorney-client privilege really goes back to Roman

19  law.  Not as far as the Greeks but to Roman law.  The interesting

20  thing to me about it is that it was originally based on the

21  concept of loyalty that a client owed the attorney and the

22  attorney owed the client.

23       We see it coming into English law in the Elizabethan

24  times, but it is, again, based on this concept of loyalty that

25  existed between the two parties.

1    In the 18th century, it's still with us, beginning to

2  take fashion and form, and it changes a bit there and begins to

3  be based on what we recognize today as the real reason for the

4  privilege.   It's replete in cases today.   Three concepts, three

5  propositions bolster that privilege.  Hold it up, support it, if

6  you will.

7    First, the law is complex, and for members of society

8  to comply with the privilege, they need to consult with lawyers;

9  the first leg of that triangle.   Second, lawyers can't discharge

10 their duty without full knowledge of the facts; the second aspect

11 of that concept.   And third, a client can't be expected to

12 confide in a lawyer without the assurance that the lawyer cannot

13 be forced, cannot be made to testify in court as to what the

14 client told them.   Again, it elevates relationship above

15 disclosure, but it's something that is different from the rest of

16 the rules of evidence.

17   In modern times it has been particularly difficult to

18 apply that privilege to corporations, originally, as I said,

19 comes out of this loyalty concept, concepts that really are

20 people relationships as opposed to attorney relationships to a

21 corporation.   And indeed, some of the first cases didn't allow it

22 to apply to corporations, but the Supreme Court weighed in in the

23 '70s and clearly stated that in the *Upjohn* case that it was

24 applied to corporations, 449 U.S. 382.

25   So it's clearly applicable to corporations, and it's a

1  significant privilege.

2        I take it very seriously, frankly, because as I say,

3  I've lived and walked in your shoes for three decades, and I know

4  the significance of attorney-client privilege.  I know the

5  significance of the relationship between lawyer and client.  So I

6  take it very seriously.  I take it extremely seriously and even

7  more so when the likes of Phil Wittmann, John Beisner urged the

8  privilege, professional lawyers, capable people, experienced

9  individuals, so it's significant to me that you stand up and say

10  that these are privileged documents.

11        As I said at the outset, I got the documents.  All

12  81 boxes.  They are housed in another courtroom, which I had been

13  visiting frequently, more so than my own courtroom, as I looked

14  at the documents.

15        I take it seriously, but I also expect that the people

16  who extract the documents and put that very, very significant

17  privilege claim on them to take it seriously.  And so I was

18  surprised to find in the documents that were claimed privileged

19  things such as promotional overviews, press releases, studies

20  which are already into evidence in various forms, sales meetings,

21  question and answers regarding various TV interviews, statistical

22  analysis protocol, discussion points for meetings.

23        I also saw a drawing of a bathrobe for a male and a

24  female with a Vioxx patch on the right sleeve.  Somehow or

25  another that was declared a privileged document.

1    I saw a script for a commercial regarding a man in a
2  dog park without pain, obviously, bending down, tying his shoes,
3  feeding his dog, and there was a remark -- and I assume it may
4  have been a remark by a lawyer, since it's the only reason it
5  would be eligible to be privileged -- the remark was, "I'm
6  concerned about the friskiness of the dog.  Should have a
7  peaceful dog."  And there are the other things.  There is an ad
8  for *Southern Living* magazine.

9    Some of the documents contain handwritten notes, but I
10  don't know who wrote them.  I don't know who penned the material.
11  There is nothing in there that helps me.  I could barely decipher
12  the handwritten notes.  I looked at them and did the best I could
13  to decipher them, but I couldn't make out everything, and what's
14  more, as I've said, I didn't know who wrote them.  I didn't know
15  whether it was the janitor, whether it was an employee, whether
16  it was a lawyer, whether it was a corporate executive.  I had no
17  road map.

18    But I trucked on and looked at the documents.  I
19  examined the documents, and I excluded those documents that I
20  felt were privileged, allowing the other documents to remain in
21  the box, putting them back in the boxes from whence they came.

22    I felt it appropriate, rather than waiting until the
23  end, I wanted to get some feedback from the parties, so at the
24  end of, as I said, about 30 boxes, I did a minute entry telling
25  the parties that I had done that and giving the documents that I

1 still maintained were privileged to the defendants so they could

2 extrapolate from that what documents were nonprivileged and give

3 me some input, and they did.

4   And they gave me the names of some attorneys, some of

5 whom I hadn't known to be attorneys before.  I hadn't known they

6 were attorneys.  I had seen their names in the e-mail, but I saw

7 a lot of other people's names in the e-mail.

8   In any event, with that information, I continued on

9 with the 81 boxes of documents with that new information, and

10 then I went back and looked again a second time at the first 30

11 boxes of documents with that additional information.

12   I felt that the documents that were not privileged,

13 were not privileged because either the privilege was waived, had

14 no adequate privilege log, or that the documents had already been

15 disclosed either during TV presentations or the letters were out

16 in public.  I had seen them during the course of the trial, and

17 they were in some form or fashion no longer privileged, if ever

18 they were privileged.  In short, I felt the party urging the

19 privilege failed to carry the burden.

20   So I am going to deny the Motion to Reconsider with the

21 view that I have taken into consideration the material,

22 information and some of the points that the defendants have

23 presented or raised.

24   What I'm going to do is, by tomorrow, I will have all

25 of the privileged documents back in boxes, in a box or boxes, and

1    I'll make them available to the defendants.  By Monday, noon, I

2    will have the plaintiffs pick up all of the documents unless the

3    defendants takes some action to get them back, but I want to give

4    them an opportunity at least to look at what I've done.  And the

5    only way I know is a fair way of doing this is to give the

6    defendant access to it and give you some days to look at it and

7    think about it, but by Monday, at noon, I would appreciate

8    somebody taking all of those boxes and getting that other

9    courtroom unburdened by that material.

10            MR. HERMAN:  Your Honor, we won't have any problem

11   removing those boxes.  I do have one housekeeping matter.

12            THE COURT:  Okay.

13            MR. HERMAN:  Mr. Wittmann has advised me that the

14   Approve material, he needs the names of the individuals to

15   receive it.  I have those.  Tom Klein, Chris Tisi, the four lead

16   counsel in the cases that are set for trial in the MDL, myself,

17   Mr. Buchanan, Mr. Don Arbitblit of the Lieff Cabraser firm,

18   Mr. Burt Black, and Mr. John Restaino.

19            Also, Mr. Wittmann has something, a motion.  I need to

20   review it, relating to the Victor study at Oxford.  We should be

21   able to get something to you by the end of the week, and we

22   appreciate the opportunity to appear before you.

23            THE COURT:  All right.  One other thing I want to

24   logistically run past you two.  I received a motion pro se from a

25   person saying that they do not have access to LexisNexis, and

1   they called LexisNexis, and LexisNexis said if they got an order

2   from me they would permit access.  I'm not quite sure I

3   understand the full scope of that, but my question to you-all is

4   if you have a problem with that?

5         MR. WITTMANN:  Is it somebody who is a party to the case

6   Judge, or just an outsider?

7         THE COURT:  No, a plaintiff.  Pro se plaintiff.  I'm

8   sorry --

9         MR. HERMAN.  Is this a plaintiff that's

10  institutionalized?  No?

11        THE LAW CLERK:  I don't think he institutionalized.  I

12  think he's pro se, doesn't have an attorney, might not want an

13  attorney, contacted LexisNexis wanting to get access.

14        MR. HERMAN:  I don't think I got a copy of that.

15        THE COURT:  If you want to communicate with him and find

16  out the full scope of it.

17        MR. HERMAN:  Yes.

18        THE COURT:  And I'll report to Mr. Wittmann and we'll

19  get back to you and you can give me your input.

20        MR. WITTMANN:  I encourage those people to communicate

21  with Mr. Herman.

22        THE COURT:  Whether or not they are institutionalized.

23        MR. HERMAN:  Phil, you've always been of great help to

24  me.  I appreciate it.

25        MR. WITTMANN:  Judge, just so I clear on the order with

1   respect to the privileged documents, we'll pick up the privileged

2   documents tomorrow.  We'll have until Monday to decide what to do

3   after we have been able to extrapolate backwards and see what the

4   ruling actually are.

5            THE COURT:  Right.  And not hearing from you, I'm going

6   to release them Monday.

7            MR. WITTMANN:  Fair enough.  Thank you, Judge.

8            THE COURT:  Thank you.  The court will stand in recess.

9            THE DEPUTY CLERK:  Everyone rise.

10            MR. HERMAN:  Judge, may I approach with Mr. Wittmann.  I

11   have one other thing that's come up.

12            THE COURT:  Yes.

13                      (END OF COURT)

14                   *      *      *

15

16                   REPORTER'S CERTIFICATE

17       I, Cathy Pepper, Certified Realtime Reporter, Registered
     Professional Reporter, Certified Court Reporter, Official Court
18   Reporter, United States District Court, Eastern District of
     Louisiana, do hereby certify that the foregoing is a true and
19   correct transcript, to the best of my ability and understanding,
     from the record of the proceedings in the above-entitled and
20   numbered matter.

21

22                              _____
                             Cathy Pepper, CCR, RPR, CRR
                             Official Court Reporter
23                             United States District Court

24

25