

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 APR 24   PM 4: 38

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **In re: VIOXX** | * | **MDL Docket No. 1657** |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| | * | **JUDGE FALLON** |
| **This document relates to** | * | |
| **Case No. 05-4046*** | * | |
| | * | **MAGISTRATE JUDGE KNOWLES** |
| **EVELYN IRVIN PLUNKETT** | * | |
| as Personal Representative of the Estate of | * | |
| **RICHARD IRVIN, JR.,** | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| **MERCK & CO., INC.,** | * | |
| | * | |
| Defendant. | * | |
| | * | |

* * * * * * * * * * * * * * * * * * *

## OPPOSITION OF MERCK & CO., INC. ("MERCK") TO PLAINTIFF'S MOTION FOR NEW TRIAL

After two trials in this case – one that ended in a mistrial and one that resulted in a defense verdict – plaintiff Evelyn Plunkett now moves the Court to grant a *third* trial, citing Federal Rules of Civil Procedure 59 and 60. Plaintiff's motion is brought on three grounds. First, she argues the Court abused its discretion in ruling that two of her experts, Dr. Thomas Baldwin and Dr. Michael Graham, could not testify that Vioxx® caused Mr. Irvin's death. These experts' qualifications have been addressed five times by the Court, each time correctly.

___ Fee_____
___ Process_____
X  Dktd_____
___ CtRmDep_____
___ Doc. No._____

They warrant no reconsideration here.  Second, plaintiff asserts the Court abused its discretion in denying a motion for a continuance brought four days before trial and for no other reason than to buy plaintiff more time to find a specific cause expert.  But plaintiff had ample time to prepare not only one but two trials in this case – and proffered specific cause testimony in the first trial. Her failure do so in the second was due to her own tactical decisions, not the timing of the trial. Finally, in a desperate attempt to avoid the fact that there is *no evidence* to support the claim that Mr. Irvin's short-term use of a common, therapeutic dose of Vioxx caused his death, plaintiff argues Merck obtained its defense verdict through "fraud," and that a new trial is thus warranted under Rule 60.  The "fraud" alleged is Dr. Barry Rayburn's "intentional misrepresentation" of his credentials.  But the fabrication here is by plaintiff, not Dr. Rayburn, as explained further below.

None of these grounds supports plaintiff's request for a new trial.  Accordingly, her motion must be denied.

## I.   THE COURT'S RULINGS ON THE PERMISSIBLE SCOPE OF DR. BALDWIN'S AND DR. GRAHAM'S TESTIMONY WERE CORRECT AND DO NOT CONSTITUTE AN ABUSE OF DISCRETION.

For the first trial of this action, plaintiff designated Dr. Thomas Baldwin, a cardiologist, as an expert witness who would opine that taking Vioxx was a contributing cause of Mr. Irvin's death.  The Court twice ruled unequivocally – and correctly – that Dr. Baldwin is not qualified to give these opinions and that any such testimony was inadmissible under Federal Rule of Evidence 702.  For the second trial, plaintiff again designated Dr. Baldwin, and the Court stood by its prior ruling.  Plaintiff also designated Dr. Michael Graham, a pathologist, to show specific cause.  After a careful review of Dr. Graham's credentials, the Court ruled that he lacks the qualifications necessary to opine on whether Vioxx caused Mr. Irvin's death.  Plaintiff then brought *another* motion for reconsideration, and the Court again ruled unequivocally – and

2

correctly – that neither Dr. Baldwin nor Dr. Graham is qualified under Rule 702 to give specific cause testimony.

Notwithstanding the fact that these experts' qualifications have now been considered and reconsidered by the Court a total of five times, plaintiff continues to insist that both Dr. Baldwin and Dr. Graham "are well qualified to render helpful, scientific opinions regarding the nature and the cause of Mr. Irvin's death." (Pl.'s Mot. at 4.)  This may be so, but each of these purported experts lacks the qualifications necessary to opine about whether Vioxx played a role in Mr. Irvin's death.[1]  Plaintiff's assertions to the contrary lack foundation – as she seems to acknowledge, in conceding that "[n]either Dr. Baldwin nor Dr. Graham purports to be an expert on Vioxx *per se*." (*Id.* at 27.)  As the record makes clear, this Court acted in accord with Rule 702 – and well within its discretion – in limiting the scope of Dr. Baldwin's and Dr. Graham's testimony at trial.  The Court should reject plaintiff's argument that the Court abused its discretion in ruling that these experts could not proffer specific cause testimony.[2]

## A.    Dr. Baldwin Is Not Qualified To Testify About Specific Causation.

Plaintiff called Dr. Baldwin to testify in the first trial of this case. (*See* Dec. 1, 2005 Tr. at 487-533.)[3]  In response to Merck's objection, the Court ruled from the bench that Dr. Baldwin would not be permitted to testify "as to the part, if any, that Vioxx or COX-2 inhibitors played in

---

[1] Merck incorporates its prior briefing on both Dr. Baldwin and Dr. Graham as if fully set forth herein. (*See* Record Docket Nos. 1121, 1347, 2889, 2958, 3087, 2981, 3041, 3078, 3086, 3099, and 3113.)

[2] Given the Court's familiarity with these issues, little discussion need be devoted to what is essentially a renewed request for reconsideration.  It is sufficient to note that the Court has evaluated Dr. Baldwin's and Dr. Graham's qualifications on a number of occasions, and has each time determined that they fail to pass through the gates of 702.  However, in the interest of completeness, Merck addresses Dr. Baldwin's and Dr. Graham's lack of qualifications above.

[3] Cited testimony from *Plunkett I* is attached hereto as Exhibit A.  Exhibit B contains the cited portions of the *Plunkett II* transcript.

807272v.1

Mr. Irvin's death." (*Id.* at 507:6-8.)  The Court concluded that he is not qualified "by virtue of experience [or] training" to testify on that subject.  (*Id.* at 507:8-10.)  Following plaintiff's motion for reconsideration, the Court reiterated this ruling:

> [N]either Dr. Baldwin's knowledge, skill, experience, training, or education, even when considered in their totality, qualify him to testify as to the specific role that Vioxx played in Mr. Irvin's death.  Dr. Baldwin simply lacks the necessary qualifications to reach his proffered opinion on the subject.

(Dec. 3, 2005 Order & Reasons at 7, attached hereto as Ex. C.)

In determining that Dr. Baldwin is not qualified, the Court considered a host of factors that emerged from his deposition and trial testimony.  (*Id.* at 2.)  These included the fact that Dr. Baldwin has little to no experience with either Vioxx or any other COX-2 inhibitor.  (*Id.* at 4.)  Specifically, he has never conducted research regarding any such drugs nor prescribed any to his patients.  (*Id.*)  He has also never diagnosed a Vioxx-related cardiovascular adverse event in one of his patients.  (*Id.*)  Further, the Court noted that, during his deposition, he frequently displayed a "fundamental lack of understanding of the relevant scientific literature."  (*Id.* at 6.)  Indeed, Dr. Baldwin himself acknowledged that he was not an expert on COX-2 inhibitors.  (*Id.* at 6-7.)  For these reasons and more, the Court's conclusion that Dr. Baldwin is not qualified to address the effect of Vioxx on Mr. Irvin was certainly correct.

In preparation for the retrial of this action, plaintiff made no apparent effort to find a qualified substitute for Dr. Baldwin.[4]  She simply designated him a second time.  Although the doctor provided an "updated" expert report, his qualifications remained unchanged.[5]  Plaintiff

---

[4] She also decided not to call the experts who had provided specific cause testimony in *Plunkett I*, Dr. Lucchesi and Dr. Bloor.  (*See infra* at 12-13.)

[5] As explained in greater detail in the Supplemental Brief in Support of Merck's Motion for Order Excluding Testimony of Thomas Baldwin, M.D. (Record Docket No. 2889) ("Suppl. Baldwin Brief"), although Dr. Baldwin's revised report lists certain additional material he "had available" to him, he spent no more than 10 hours reviewing these materials – time that included

(*footnote continued next page*)

807272v.1

never argued at the retrial that Dr. Baldwin's slightly revised report cured the deficiencies this Court found in Dr. Baldwin's qualifications at the first trial. Rather, when the Court adopted its prior ruling regarding the permissible scope of Dr. Baldwin's testimony, plaintiff protested that the Court seemed to be placing too much value on certain criteria – and that the Court's rulings put plaintiff in a position of needing "a pharmacologist, epidemiologist, cardiologist, and in a death case a pathologist rolled into one" in order to proffer specific cause testimony. (Feb. 3, 2006 Tr. at 21:19-25.) The Court countered:

> . . . I'm not necessarily keyed in on the degrees that the individual has as much as his familiarity and experience with what he is talking about from the standpoint of the drugs. . . . I would expect an expert who has *some experience, some knowledge*, if he has done research, if he has prescribed it, if he has seen it, dealt with it, to be able to testify . . . .

(*Id.* at 22:16-20, 23:8-14 (emphasis added).) Dr. Baldwin plainly does not qualify to provide specific cause testimony under this standard. In the Court's words, he "doesn't know anything about the drug." (*Id.* at 26:17-27:5.) At trial, the Court affirmed this conclusion, in response to yet another motion for reconsideration brought by plaintiff. (Feb. 8, 2006 Tr. at 752:18-22.)

Given Dr. Baldwin's lack of qualifications, the Court's ruling was without a doubt correct. Under Rule 702, a person "qualified as an expert by knowledge, skill, experience, training, or education" may provide expert testimony. But, "[a]s a cardiologist with no . . . skill, training, education, or experience with Vioxx or any COX-2 inhibitor, . . . Dr. Baldwin is not qualified to testify regarding the specific role that Vioxx played in producing [Mr. Irvin's] clot." (Dec. 3, 2005 Order & Reasons at 6.) The deficiencies in his purported qualifications include the

---

two meetings and a conference call with plaintiff's counsel, meaning that the time he actually spent reviewing the new material could have amounted to no more than a couple of hours. (*Id.* at 4; Jan. 23, 2006 Baldwin Dep. at 179:14-180:1, attached hereto as Ex. D.) Further, all of the factors that led the Court to exclude his testimony in *Plunkett I* remained the same. (*See* Suppl. Baldwin Brief at 3-4.)

807272v.1

following:

- He does not consider himself an expert in COX-2 inhibitors.  (Dec. 1, 2005 Tr. at 494:18-20.)

- He has never done any research on NSAIDs generally, or on COX-2 inhibitors specifically, and does not consider himself a scientific researcher.  (Oct. 6, 2006 Baldwin Dep. at 16:23-17:3; Dec. 1, 2005 Tr. at 492:25-493:2, 494:5-17; Feb. 9, 2006 Tr. at 917:7-13.)

- He has never prescribed Vioxx.  (Dec. 1, 2005 Tr. at 492:19-21.)

- He has never treated a patient who he believes suffered an MI or sudden cardiac death because of Vioxx.  Nor can he recall having diagnosed any Vioxx patient who had taken Vioxx and subsequently experienced a clot.  (Oct. 6, 2006 Baldwin Dep. at 27:4-25; Dec. 1, 2005 Tr. at 493:3-23.)

- He cannot point to a single clinical study to support his opinion that use of Vioxx for less than one month increases one's CV risk.  (Oct. 6, 2006 Baldwin Dep. at 63:18-64:2, 105:13-20, 128:16-24.)

Plaintiff has never seriously addressed these deficiencies, and the present motion is no exception.  Indeed, plaintiff's only real argument in support of her contention that the Court should have allowed Dr. Baldwin's specific cause opinions is that, when Dr. Baldwin and Merck's specific cause expert Dr. Rayburn are compared to each other, "there seems to be little to no difference between them."  (Pl.'s Mot. at 10.)  Leaving aside for the moment whether this is sufficient to constitute reversible error – a point addressed *infra* at Part III – nothing could be further from the truth.  Notwithstanding plaintiff's selective and skewed comparison of the two doctors' qualifications, the fact is that Dr. Rayburn – a practicing physician, medical school professor, and clinical researcher (Feb. 14, 2006 Tr. at 1728:20-1729:7) – is far more qualified than Dr. Baldwin to render specific cause opinions in this case, as the following excerpts, *inter alia*, make plain:

Q:    How many hours, in total, have you spent working on the scientific issues that we have asked you to look at?

A:    In this matter, in general, well over 100 hours.

6

807272v.1

Q:     Why so many, sir?

A:     It's a very complicated literature.  I think the jury has probably gotten a perspective of it already with the various experts that have already been brought up here.

Q:     Going back to prior to the time that you were retained as an expert witness, did you have professional experience with Vioxx yourself?

A:     I did.

Q:     Did you ever prescribe the drug?

A:     I have.

Q:     Did you ever take care of patients who had the drug prescribed by other doctors but were under your care for cardiac issues?

A:     Yes, I have.

Q:     What about Celebrex?

A:     The same.

Q:     When you were prescribing the medicine and taking care of patients, did you get yourself up-to-speed on the cardiovascular issues with respect to COX-2 inhibitors?

A:     Yes.  When the issues surrounding the VIGOR article came out, shortly after the publication of that article I became aware that there was an issue with Vioxx that had been raised.  I read the VIGOR article, I read some of the editorials or comments about it. . . .  I sort of kept up with the discussion in the literature that was going on at the time.

. . .

Q:     Obviously, as it was part of your work on this case, you have spent a great deal of additional time investigating the scientific evidence?

A:     I have.

(Feb. 14, 2006 Tr. at 1727:7-1728:19.)

Dr. Baldwin does not possess a fraction of these qualifications.  By his own admission and plaintiff's concession, he is "not an expert *per se* in Vioxx."  (Jan. 13, 2006 Baldwin Rpt. at 2, attached to Pl.'s Mot. as Ex. D; *see also* Dec. 1, 2005 Tr. at 494:18-20; Pl.'s Mot. at 27.)  It is

7

thus disingenuous for plaintiff to suggest that, "[u]nless the dimensions of the gate vary based on subjective measurements, the Court's decision to allow Dr. Rayburn [to] testify to specific causation and not allow Dr. Baldwin to do so is an abuse of discretion." (Pl.'s Mot. at 19.)  As the Court has noted on a number of occasions, "not every cardiologist will be unable to testify as an expert witness with regard to the specific effect of Vioxx." (Dec. 3, 2005 Order & Reasons at 7.)  Whereas Dr. Baldwin lacks the requisite knowledge, skill, experience, training, or education -- even when these factors are "considered in their totality" (*id.*) – others, such as Dr. Rayburn, do pass through the gates of 702.  The Court's reasoned conclusion that Dr. Baldwin is not qualified to render specific cause opinions comports with Rule 702 and thus does not constitute an abuse of discretion.

### B.     Nor Is Dr. Graham Qualified To Testify About Specific Causation.

For similar reasons, the Court did not abuse its discretion in ruling – again correctly – that Dr. Graham is unqualified to testify about whether Vioxx played any role in Mr. Irvin's death.  As the Court summarized in its February 2, 2006 *Daubert* Order:

> By self-admission, Dr. Graham has no training in pharmacology; is not qualified to explain how Vioxx could lead to thrombosis; has never done any research on NSAIDs or COX-2 inhibitors prior to becoming an expert for the Plaintiff; is not qualified to analyze and interpret clinical and epidemiological data concerning Vioxx; has never prescribed Vioxx or any other COX-2 inhibitors to a patient; has never determined that Vioxx was a contributing cause of a death; and has never written an article on sudden cardiac death related to plaque rupture.   To compensate for his lack of education, experience, and training, Dr. Graham spent approximately eight hours reviewing sixty-seven medical articles, nine depositions, four expert reports, and three days' worth of trial transcripts – far less than this Court or any attorney has spent reviewing Vioxx related materials.

(Feb. 2, 2006 Order & Reasons at 10, attached hereto as Ex. E.)

In apparent denial of this overwhelming lack of qualifications, plaintiff brought a motion to reconsider the Court's exclusion of Dr. Graham's Vioxx-related testimony.  There, she reduced the above analysis to the simple – and inaccurate – statement that the Court's ruling was

8

based on the fact that Dr. Graham "lacked experience prescribing Vioxx, doing research on Vioxx, writing articles relating to Vioxx, or past experience diagnosing Vioxx-caused injury." (Pl.'s Motion for Clarification and/or Reconsideration at 6 (Record Docket No. 3213).)  In the present motion, plaintiff repeats these contentions.  She argues that the Court's "qualifications standard overemphasizes whether a physician has prescribed Vioxx ... [and] also overemphasized the importance of an expert's role in clinical research." (Pl.'s Mot. at 25.)

These arguments miss the mark.  As the Court clarified in response to plaintiff's motion for reconsideration, Dr. Graham's qualifications as an expert do not rise and fall on a single factor such as his whether he has experience prescribing Vioxx.  The analysis is not so myopic. (Feb. 8, 2006 Tr. at 752:9-13 ("I'm not saying. . . that you need to have diagnosed people or that you need to have prescribed or have some experience . . . .")  The qualifications question turns, instead, on whether an expert "has education *or* experience *or* knowledge to testify that Vioxx caused, in whole or in part, Mr. Irvin's demise." (*Id.* at 739:25-740:9 (emphasis added).)  As the Court concluded after a thorough examination of the relevant evidence, Dr. Graham does not possess the necessary qualifications.  Based on his own deposition testimony:

- "Dr. Graham is not an epidemiologist, he's not a cardiologist, he has no training as a pharmacologist, and he hasn't done a thorough investigation in the pathology of Vioxx." (*Id.* at 741:12-742:16.)

- Dr. Graham has neither researched nor published on atherosclerosis, sudden cardiac death, NSAIDs, or COX-2s. (*Id.* at 742:3-743:20.)

- In the over seven thousand autopsies Dr. Graham has performed, he has never once determined that Vioxx or any other COX-2 was a contributing cause of death. (*Id.* at 743:21-744:11.)

- Dr. Graham admitted that, prior to being retained as an expert in this case, Vioxx "wasn't on [his] radar screen" – it was "nothing that [he] was focused on." (*Id.* at 744:12-24.)

- Dr. Graham was no more than a "casual reader" of Vioxx-related medical literature prior to his involvement in this case.   (*Id.* at 744:25-745:6.)

Following his retention, "the articles that he reviewed were articles he was given by plaintiff's counsel" -- and it is unclear whether he even reviewed all of those, given his spotty recollection of the articles and the fact that he spent a mere eight or nine hours reviewing all of them. (*Id.* at 745:7-747:6; *see also id.* at 748:17-749:14 (Dr. Graham's review of other experts' reports cursory at best).)

- Dr. Graham lacks a meaningful understanding of issues basic to the case, such as the FitzGerald hypothesis and the relative risks allegedly associated with Vioxx use. (*Id.* at 747:7-748:16.)

In short, Dr. Graham does not have the knowledge, skill, experience, training, or education necessary to provide expert testimony on the role Vioxx allegedly played in Mr. Irvin's death.[6]   The Court properly excluded this testimony.  Again, the Court did not say by this ruling that no pathologist could satisfy the requisites of Rule 702.[7]   Rather, based on the "whole picture" of Dr. Graham's purported qualifications, the Court found – within its discretion and within the bounds of Rule 702 – that his specific cause testimony should be excluded.  Plaintiff has made no convincing argument to the contrary.  Accordingly, her motion should be denied to the extent it is based on the Court's exclusion of Dr. Graham's testimony.

C.      **Plaintiff's Cited Authority Does Not Change These Results.**

In her motion, plaintiff relies on the same legal authority she cited in her February 7, 2006 Motion for Clarification and/or Reconsideration.  (*Compare* Pls.' Mot. at 25-30 *with* Pl.'s Mot. for Clarification at 6-13.)  None of these authorities are new.  Indeed, the discussion is taken whole cloth, almost *verbatim*, from plaintiff's motion for reconsideration.  The cases are either inapposite or do not support plaintiff's position.[8]   In denying plaintiff's prior motions for

---

[6] The Court also expressed concern about Dr. Graham's methodology, a point that is not addressed in plaintiff's new trial brief.  (*See* Feb. 8, 2006 Tr. at 749:15-751:25.)

[7] To the contrary, the Court found the two pathologists designated by plaintiff in connection with the first *Plunkett* trial, Drs. Bloor and Burton, qualified to testify.  (*See* Feb. 8, 2006 Tr. at 752:1-5.)

[8] *See Pitipone v. Biomatrix, Inc.*, 288 F.3d 239 (5th Cir. 2002) (case involving a unique injury
(*footnote continued next page*)

807272v.1

reconsideration, this Court has already determined that these cases do not control whether Dr. Baldwin or Dr. Graham are qualified to testify about specific causation.  For the reasons previously set forth by the Court and in Merck's prior memoranda, the Court should affirm these prior rulings and deny plaintiff's motion for new trial.

## II.   THE COURT ACTED WITHIN ITS DISCRETION IN DENYING PLAINTIFF'S MOTION FOR A CONTINUANCE.

Perhaps realizing that her renewed request for reconsideration is baseless, plaintiff argues that the Court's denial of her February 3, 2006 request for a continuance also constitutes an abuse of discretion because it deprived of her of an opportunity to find a specific cause expert and therefore "seriously inhibited [her] ability to present a compelling case to the jury."  (Pl.'s Mot. at 33.)  In support of this argument, plaintiff goes to great lengths in her motion to characterize the circumstances that led up to the second trial as prejudicial to her interests: describing the "rapid preparation," at "break-neck speed," as one "almost unheard of in complex

---

that did not require proof of causation by clinical data); *United States v. 14.38 Acres of Land*, 80 F.3d 1074 (5th. Cir. 1996) (holding explicitly limited to the eminent domain context); *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777 (3d Cir. 1996) (addressing the exclusion of a treating physician, not retained experts such as Drs. Baldwin and Graham); *Benedi v. McNeil-P.P.C., Inc.*, 66 F.3d 1378 (4th Cir. 1995) (finding plaintiff's experts qualified to about specific causation based in part on the lack of evidence regarding any other cause of the injury); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994) (holding that an expert doctor must use "sufficient diagnostic techniques to have good grounds for his or her conclusion that the plaintiff's illness was caused by [defendant's product]"); *Kopf v. Skyrm*, 993 F.2d 374 (4th Cir. 1993) (finding police officers qualified to testify in an excessive force case where the expert testimony was grounded in "skill" and "experience" rather than the complicated medical issues present here); *Lavespere v. Niagara Mach. & Tool Works*, 910 F.2d 167 (5th Cir. 1990), *abrogated on other grounds*, 37 F.3d 1069 (5th Cir. 1996) (affirming the certification of an expert who proffered testimony on the subject of designing point-of-operation safeguards, where the expert had designed similar machines in the past and had also testified on the issue in other litigation); *Stewart v. Rowan Cos., Inc.*, 2002 WL 362847 (E.D. La. 2002) (addressing whether an expert proffered to quantify economic damages was unqualified to testify because he had a Masters in economics rather than Ph.D.); *Nugent v. Hercules Offshore Corp.*, 2000 WL 381925 (E.D. La 2000) (finding an expert in nylon qualified to analyze why a safety lanyard failed at the time of plaintiff's accident, where the issue was the tensile strength of nylon).

807272v.1

pharmaceutical litigation"; emphasizing the great "effort and expense" her counsel expended in preparing the case for trial; and suggesting that "[t]he abbreviated time period gave the parties and the Court precious little time to accomplish everything necessary to prepare for the second trial." (Pl.'s Mot. at 32-33.)  Plaintiff also characterizes the Court's February 2, 2006 rulings on her specific cause experts as a "surprise" and a "shock," and complains that she "had only three days – one business day – to seek to put forward the best case possible in light of the Court's ruling." (*Id.* at 33-34.)

What is missing from this tale of hardship is the fact that the holes in plaintiff's case going into the retrial of the case were entirely of her own making.  Plaintiff forgets that this case is one that *her lawyers chose* as one of five potential candidates – one of the PSC's "best cases" – to be tried first in this MDL proceeding.  It had been pending in state court since May of 2003 and was thoroughly vetted prior to being selected as the first MDL trial.  Plaintiff had more than adequate time to prepare the case, and more than adequate time to retain specific cause experts whose qualifications would pass muster under Rule 702.  Indeed, plaintiff proffered the testimony of not one *but two* specific cause experts in the first trial of the case.  On the eve of the second trial, however, she discarded her original theory of causation and adopted a diametrically opposed position on Mr. Irvin's pathology.  In so doing, she jettisoned her former specific cause experts in favor of Dr. Baldwin, whose specific cause testimony the Court had already excluded on two separate occasions, and Dr. Graham, whose credentials were both meager and untested.  By cobbling together a case based on the testimony of experts with such thin qualifications, plaintiff certainly should have anticipated the Court's rulings.[9]  Plaintiff is thus wrong to suggest

---

[9] It is thus puzzling that plaintiff apparently "relied on the fact that Dr. Graham would be able to testify that Vioxx was a contributing cause of Mr. Irvin's death based on the Court's previous
*(footnote continued next page)*

that "[n]ot having additional time to secure other expert testimony seriously prevented her from being able to present this case in the best light possible." (Pl.'s Mot. at 35.) It was not a lack of time that adversely impacted her case, it was her own tactical decisions.

Moreover, as plaintiff acknowledges, the Court has broad discretion in considering motions to continue. That discretion is "exceedingly wide." *Command-Aire Corp. v. Ontario Mechanical Sales and Service Inc.*, 963 F.2d 90, 96 (5th Cir. 1992) (citation omitted); *see also Amarin Plastics, Inc. v. Maryland Cup Corp.*, 946 F.2d 147, 151 (1st Cir. 1991) (only an "unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay" will abuse a district court's discretion to grant or deny continuances (citation omitted)).[10] A court's decision to deny such a request accordingly may not be reversed absent prejudice to "substantial rights" of a party. FED. R. CIV. PROC. 61. This standard is clearly not met in this case.

As the Court is well aware, plaintiff requested a continuance after months of trial preparation – including almost two months following the initial trial of the case – and four days before trial was scheduled to commence. Her request was prompted, simply, by plaintiff's realization that she "d[id] not have a particular expert that c[ould] deliver a specific cause opinion." (Feb. 3, 2006 Tr. at 20:23-21:12.) Plaintiff moved the Court to continue the trial date for no other reason than "to allow [plaintiff] to attempt to find an expert" with the qualifications

---

rulings." (Pl.'s Mot. at 33.) The Court's rulings on plaintiff's other experts, including Drs. Bloor and Burton, are and were irrelevant to the individualized assessment of Dr. Graham's qualifications. Even assuming Dr. Bloor and Dr. Burton are qualified to render expert testimony on specific causation – which Merck disputes – their qualifications are necessarily different from those of Dr. Graham. It thus does not follow that, simply because the Court found Drs. Bloor and Burton qualified under Rule 702, it would reach the same conclusion as to Dr. Graham. Plaintiff's motion ignores this fact.

[10] Plaintiff mistakenly cites and characterizes *Amarin* as a Fifth Circuit case in her motion. (Pl.'s Mot. at 32.) It is, in fact, a case out of the First Circuit.

807272v.1

sufficient to testify.  (*Id.*)  Based on the particular circumstances of the case, the Court rightly concluded that no continuance was warranted, noting:

> This is the second trial in this case.  I dealt with [*Daubert* challenges], made rulings [in] the first trial in advance of the trial, we went through the trial, and now it's the same issue.

(*Id.* at 24:17-21.)  Given these facts, the Court acted within its discretion in denying plaintiff's motion to continue.  Insofar as plaintiff's motion for new trial is based on the Court's ruling, the motion is has no basis.

Finally, even assuming the Court's rulings on specific cause were in error – which they were not – the Court should uphold the jury's verdict on any ground allowed for by the record. *Cf. Braun v. Flynt*, 731 F.2d 1205, 1206 (5th Cir. 1984) (per curiam) (upholding a general verdict even though it was based in part on a theory of recovery for which there was no evidence in the record).  The jury unanimously voted "no" on the following questions:

> 1.     Do you find that Merck & Co., Inc. failed to warn or inadequately warned Dr. Christopher Schirmer, the treating physician, of a known or knowable risk associated with Vioxx, and that such failure to warn or inadequate warning was a legal cause of Mr. Richard Irvin, Jr.'s death?
>
> 2.     Do you find that Vioxx was a defective product, that is, unreasonably dangerous due to defective design, and that defective design was a legal cause of Mr. Richard Irvin, Jr.'s death?
>
> 3.     Do you find that Merck & Co., Inc. was negligent in designing Vioxx, marketing Vioxx, or failing to warn Dr. Christopher Schirmer of a known or knowable risk associated with Vioxx, and that such negligence was a legal cause of Mr. Richard Irvin, Jr.'s death?

The jury's verdict therefore included the findings that Vioxx was not unreasonably dangerous and that Merck adequately warned Mr. Irvin's prescribing physician and was not negligent.  In other words, plaintiff did not simply lose her case on specific causation, she lost on liability as well – and plaintiff's counsel are not claiming that they were limited in any way in presenting their liability case.  Because the jury's findings are amply supported by the evidence in the

14

record, plaintiff's motion for a new trial must be denied.

## III.    PLAINTIFF'S ALLEGATIONS OF "FRAUD" ARE FALSE, IRRELEVANT, AND DO NOT SUPPORT PLAINTIFF'S REQUEST FOR A NEW TRIAL.

In a final, desperate attempt to override the jury's findings in this case, plaintiff urges the Court to order a new trial on the ground that Merck's expert cardiologist, Dr. Barry Rayburn, "lied under oath, intentionally misrepresenting his credentials to the Court and to the jury during the trial of this case." (Pl.'s Suppl. Mot. at 1.)  Plaintiff contends that Dr. Rayburn "represented to the Court and to the jury that he 'is' board certified, when he in fact is not." (*Id.*)

These allegations of "fraud" and "misrepresentation" are pure fantasy. Dr. Rayburn did not misrepresent his qualifications at all, and he certainly did not willfully perjure himself, as plaintiff suggests. (*Id.* at 11.)  To the contrary, he accurately represented his qualifications to the parties and to the Court.  Dr. Rayburn has passed boards in internal medicine and cardiovascular disease, and noted this fact in his expert report, CV, and testimony. (*See Plunkett I* Rayburn Rpt. at 1, attached to Pl.'s Mot. as Ex. A; *Plunkett II* Rayburn Rpt. at 1, attached to Pl.'s Mot. as Ex D; Rayburn CV at 2, attached to Pl.'s Mot. as Exs. B, E; Feb. 14, 2006 Tr. at 1724:21-23.)  He has *never* represented that he is currently certified, however.  And, notwithstanding plaintiff's insistence to the contrary, the "clear implication" of Dr. Rayburn's report, CV, and testimony is not that he is currently board certified.  Rather, his statement that he "has passed boards" must be taken at face value – as a representation that he was certified in internal medicine in 1990 and in cardiovascular disease in 1994, as his CV indicates.

If plaintiff thought this distinction was important, she certainly could have cross examined Dr. Rayburn about it.  The fact that board certification lapses after ten years and must be renewed is a knowable fact, and could have been discovered by plaintiff in the exercise of due

15

807272v.1

diligence.[11]   But plaintiff did not examine Dr. Rayburn about his board certifications, whether past or present.   In fact, the sum total of her counsel's questions at deposition regarding the qualifications listed on Dr. Rayburn's CV were as follows:

> Q:   Doctor, let me know who what I'm going to mark as Plaintiff's Exhibit Number 1 . . . .   This is a copy of your *curriculum vitae*. . . .   Doctor, is that a current CV for you?
>
> A:   Yes.

(Oct. 12, 2005 Rayburn Dep. at 11:17-24, attached hereto as Ex. F.)   Plaintiff's failure to ask questions, both at deposition and at trial, cannot be pinned on Dr. Rayburn.   It is true, as plaintiff points out, that "[t]he entire transcript of [*Plunkett II*] is devoid of any mention that Dr. Rayburn's board certifications have lapsed" – but this, again, is a problem of plaintiff's own making.

More importantly, plaintiff's newly-minted arguments about Dr. Rayburn utterly miss the point.   It was *plaintiff's* burden to prove specific causation through competent expert testimony, and she admits in her motion that she failed.[12]   Even if one assumes that the Court should not have permitted Dr. Rayburn to proffer specific cause opinions – either because he was no more qualified than Dr. Baldwin to testify, as plaintiff argues in her original motion, or because Dr. Rayburn committed a "fraud" on the Court, as plaintiff asserts in her supplemental brief – there is no reversible error here.   In order for an error in the admission of evidence to rise above harmless error, it must "affect the substantial rights of the parties."   FED. R. CIV. PROC. 61.   And, without question, plaintiff's "substantial rights" were not affected by the admission of Dr.

---

[11] This point is perfectly illustrated by the fact that plaintiffs' counsel in the most recent New Jersey trial *did* cross-examine Dr. Rayburn on the expiration of his board certifications.   (*See* Pl.'s Suppl. Mot. at 4-6.)

[12] See Merck's Motions for Judgment as a Matter of Law (Record Docket Nos. 2163, 2165, and 3324), which detail plaintiff's failure to make any showing on specific causation.

Rayburn's expert testimony.  With or without his testimony, plaintiff still would not have had *any evidence of specific causation*.  There was thus no impact – much less a significant impact – on plaintiff's ability to present her case.[13]

Nor does Dr. Rayburn's current board certification status impact the overall assessment of his qualifications as an expert.  He is qualified to testify regardless of whether he is currently certified or not, because of: (i) his clinical practice and ranking positions with in the University of Alabama at Birmingham, including his position as Head of the Section of Advanced Heart Failure, Transplant, and Pulmonary Vascular Disease and Co-Medical Director of the Heart Transplant Intensive Care Unit; (ii) his position as medical school professor, also at UAB; (iii) his extensive experience as a clinical researcher and peer reviewer, which includes serving as a reviewer for the journals *Circulation* and the *American Journal of Cardiology*; (iv) his membership on the editorial board of the *Journal of Heart and Lung Transplantation*; (v) his professional experience with Vioxx and other COX-2s, as explained in Part I.A above; and (vi) his knowledge of the relevant medical literature, also noted in Part I.A.  (*See also generally* Rayburn CV, attached to Pl.'s Mot. as Exs. B, E.)

Given these qualifications, and in light of the fact that plaintiff has presented no evidence to support her exaggerated claim that Dr. Rayburn "misrepresented" his credentials and perpetrated a "fraud" on the Court, plaintiff's supplemental request for a new trial must be denied.

---

[13] Plaintiff cannot seriously argue that Dr. Rayburn's alleged misrepresentation – even if true – prevented her from fully and fairly presenting her case.  Even if plaintiff had adduced testimony from him about his current certification status, this information would have gone to his credibility, at most.  (*See supra* n.11.)

807272v.1

## IV.    **CONCLUSION.**

For the reasons stated above, Merck respectfully request that the Court deny plaintiff's

motion for a new trial.

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:     312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone:  202-434-5000
Fax:     202-434-5029

Richard B. Goetz
Catalina J. Vergara
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone:  213-430-6000
Fax:     213-430-6407

Attorneys for Merck & Co., Inc.

807272v.1

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Opposition of Merck & Co., Inc. to Plaintiff's Motion for New Trial has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 24th day of April, 2006.

*Dorothy H Wimberly*

807272v.1

Issues Report [Merck_Trial_Transcripts (Ernst, Humeston, Irvin Plunkett)]

• **Opposition - Motion for New Trial**

[487:] - [488:1]        12/1/2005    Irvin Plunkett Trial - Baldwin, Nies, Ray

• Opposition - Motion for New Trial

page 487
    0487

```
1                                 UNITED STATES DISTRICT COURT
2                                 EASTERN DISTRICT OF LOUISIANA
3
4
5
        IN RE: VIOXX PRODUCTS            *
6       LIABILITY LITIGATION            *  MDL DOCKET NO. 1657
                                         *
7                                        *
        THIS DOCUMENT RELATES TO         *  HOUSTON, TEXAS
8       CASE NO. 05-4046:                *
                                         *
9       EVELYN IRVIN PLUNKETT, ET AL     *  DECEMBER 1, 2005
                                         *
10      VERSUS                           *
                                         *  8:30 A.M.
11      MERCK & CO., INC.                *
        * * * * * * * * * * * * * * * *
12
13
                             VOLUME III
14                      JURY TRIAL BEFORE THE
                      HONORABLE ELDON E. FALLON
15                   UNITED STATES DISTRICT JUDGE
16
17      APPEARANCES:
18
        FOR THE PLAINTIFF:          BEASLEY ALLEN CROW METEVIN
19                                      PORTIS & MILES
                                    BY:  JERE LOCKE BEASLEY, ESQ.
20                                       ANDY D. BIRCHFELD, JR., ESQ.
                                         J. PAUL SIZEMORE, ESQ.
21                                  234 COMMERCE STREET
                                    POST OFFICE BOX 4160
22                                  MONTGOMERY, ALABAMA 36103
23
        FOR THE PLAINTIFF:          ROBINSON, CALCAGNIE & ROBINSON
24                                  BY:  MARK P. ROBINSON, JR., ESQ.
                                    620 NEWPORT CENTER DRIVE
25                                  NEWPORT BEACH, CALIFORNIA 92660
```

page 488
```
1       APPEARANCES, (CONTINUED):
2
```

[487:] - [534:2]        12/1/2005    Irvin Plunkett Trial - Baldwin, Nies, Ray

• Opposition - Motion for New Trial

page 487
    0487

```
1                                 UNITED STATES DISTRICT COURT
2                                 EASTERN DISTRICT OF LOUISIANA
3
4
5
        IN RE: VIOXX PRODUCTS            *
6       LIABILITY LITIGATION            *  MDL DOCKET NO. 1657
                                         *
7                                        *
        THIS DOCUMENT RELATES TO         *  HOUSTON, TEXAS
8       CASE NO. 05-4046:                *
                                         *
9       EVELYN IRVIN PLUNKETT, ET AL     *  DECEMBER 1, 2005
                                         *
```

**EXHIBIT**

**A**

Issues Report [Merck_Trial_Transcripts (Ernst, Humeston, Irvin Plunkett)]

• **Opposition - Motion for New Trial**

```
10      VERSUS                                  *
                                                *  8:30 A.M.
11      MERCK & CO., INC.                       *
        * * * * * * * * * * * * * * * * *
12
13
                                VOLUME III
14                       JURY TRIAL BEFORE THE
                        HONORABLE ELDON E. FALLON
15                    UNITED STATES DISTRICT JUDGE
16
17      APPEARANCES:
18
        FOR THE PLAINTIFF:          BEASLEY ALLEN CROW METHVIN
19                                      PORTIS & MILES
                                    BY:  JERE LOCKE BEASLEY, ESQ.
20                                       ANDY D. BIRCHFELD, JR., ESQ.
                                    J. PAUL SIZEMORE, ESQ.
21                                  234 COMMERCE STREET
                                    POST OFFICE BOX 4160
22                                  MONTGOMERY, ALABAMA 36103
23
        FOR THE PLAINTIFF:          ROBINSON, CALCAGNIE & ROBINSON
24                                  BY:  MARK P. ROBINSON, JR., ESQ.
                                    620 NEWPORT CENTER DRIVE
25                                  NEWPORT BEACH, CALIFORNIA 92660
page 488
1       APPEARANCES, (CONTINUED):
2
        FOR THE PLAINTIFF:          ABRAHAM, WATKINS, NICHOLS,
3                                      SORRELS, MATTHEWS & FRIEND
                                    BY:  DAVID P. MATTHEWS, ESQ.
4                                   800 COMMERCE STREET
                                    HOUSTON, TEXAS 77002
5
6       FOR THE DEFENDANT:          BARTLIT BECK HERMAN
                                       PALENCHAR & SCOTT
7                                   BY:  PHILIP S. BECK,  ESQ.
                                         TAREK ISMAIL, ESQ.
8                                   54 W. HUBBARD STREET, SUITE 300
                                    CHICAGO, ILLINOIS 60601
9
10      OFFICIAL COURT REPORTERS:   CATHY PEPPER, CCR, RPR, CRR
                                    TONI DOYLE TUSA, CCR
11                                  500 POYDRAS STREET, ROOM HB-406
                                    NEW ORLEANS, LOUISIANA 70130
12                                  (504) 589-7778
13
14
15      PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
        PRODUCED BY COMPUTER.
16
17
18
19
20
21
22
23
24
25
page 489
1                                MORNING SESSION
2                               (DECEMBER 1, 2005)
3                 (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE
4       TRANSCRIBED BY CATHY PEPPER, OFFICIAL COURT REPORTER.)
5                 THE MARSHAL:  ALL RISE FOR THE JURY.  PLEASE BE
6       SEATED.
7                 THE COURT:  BE SEATED, PLEASE.  GOOD MORNING, LADIES
8       AND GENTLEMEN.  LET'S CALL YOUR NEXT WITNESS, PLEASE.  YOU
```

Issues Report [Merck_Trial_Transcripts (Ernst, Humeston, Irvin Plunkett)]

• Opposition - Motion for New Trial

```
 9        RECALL, MEMBERS OF THE JURY, WE'RE ON THE PLAINTIFF'S CASE NOW,
10        AND THEY ARE STILL CALLING WITNESSES.
11              MR. BIRCHFIELD:  YOUR HONOR, WE CALL DR. TOM BALDWIN.
12              THE DEPUTY CLERK:  PLEASE STEP INTO THE WITNESS BOX.
13        WOULD YOU RAISE YOUR RIGHT HAND.
14              ( WHEREUPON, DR. TOM BALDWIN, HAVING BEEN DULY SWORN,
15        TESTIFIED AS FOLLOWS.)
16              THE DEPUTY CLERK:  PLEASE BE SEATED, AND IF YOU WOULD
17        USE THE MICROPHONE THERE, WOULD YOU STATE YOUR FULL NAME FOR
18        THE RECORD.        \
19              THE WITNESS:  THOMAS FREDERICK BALDWIN.
20              THE COURT:  YOU MAY PROCEED, COUNSEL.
21              MR. BIRCHFIELD:  YOUR HONOR.
22                          VOIR DIRE
23        BY MR. BIRCHFIELD:
24        Q.   DR. BALDWIN, YOU HAVE IN FRONT OF YOU A SUMMARY OF YOUR
25        BACKGROUND, AND YOU ALSO -- ATTACHED TO THAT IS YOUR CURRICULUM
page 490
 1        VITAE; IS THAT CORRECT?
 2        A.   THAT'S CORRECT.
 3        Q.   DOCTOR, WOULD YOU DESCRIBE FOR US BRIEFLY, JUST GIVE US A
 4        BRIEF SUMMARY OF YOUR EDUCATION AND YOUR PROFESSIONAL
 5        EXPERIENCE.
 6        A.   SURE.  MY EDUCATION STARTED AT KANSAS STATE UNIVERSITY
 7        WITH A BACHELOR OF SCIENCE DEGREE IN PREMED, MOVING ON TO THE
 8        UNIVERSITY OF KANSAS FOR MEDICAL SCHOOL FOR INTERNAL MEDICINE
 9        RESIDENCY, AND THEN SUBSEQUENTLY COMPLETING A CARDIOLOGY
10        FELLOWSHIP IN 1988.  I'M BOARD-CERTIFIED IN INTERNAL MEDICINE,
11        CARDIOVASCULAR MEDICINE, AND THEN SUBSPECIALTY BOARDED IN
12        INTERVENTIONAL CARDIOLOGY.
13              FOLLOWING MY COMPLETION OF TRAINING AT KU MEDICAL
14        CENTER, I STARTED A CLINICAL PRACTICE IN 1988, AND I REMAIN IN
15        CLINICAL PRACTICE TODAY.  I'M CURRENTLY THE LEAD PHYSICIAN OF A
16        14-PHYSICIAN CARDIOLOGY GROUP THAT PRACTICES IN THE KANSAS CITY
17        AREA.
18        Q.   THANK YOU, DR. BALDWIN.
19              MR. BIRCHFIELD:  AT THIS TIME, YOUR HONOR, WE OFFER
20        PLAINTIFF'S EXHIBIT D, WHICH IS HIS CURRICULUM VITAE AND
21        SUMMARY AND OFFER HIM AS AN EXPERT IN CARDIOLOGY.
22              THE COURT:  THANK YOU, DOCTOR.  THE COURT WILL
23        RECEIVE HIM.
24              MR. BECK:  YOUR HONOR, MAY WE APPROACH?
25              (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT
page 491
 1        THE BENCH.)
 2              MR. BECK:  ARE YOU OFFERING HIM?
 3              MR. BIRCHFIELD:  AS IT PERTAIN --
 4              THE COURT:  MAKE YOUR TENDER.  WHAT IS THE TENDER?
 5              MR. BIRCHFIELD:  WE'RE TENDERING HIM AS AN EXPERT IN
 6        CARDIOLOGY ON SPECIFIC CAUSATION, BUT IN ORDER TO GET TO
 7        SPECIFIC CAUSATION, HE HAS TO DO IT WITH THE MECHANISM.
 8              MR. ISMAIL:  WE WERE AT THE DAUBERT HEARING.  WE
 9        ADDRESSED THE CARDIOLOGIST WITH DR. BALDWIN AND DR. GANDY, AND
10        WE HAD CHALLENGES TO THE METHODOLOGY OF -- AND SAID HE DID NOT
11        CONSIDER ALL OF THE EVIDENCE.  THAT WOULD BE A VIOLATION OF
12        DAUBERT.  I HAVE A COPY OF THE TRANSCRIPT, YOUR HONOR.
13              MY REMARKS AS TO PLAINTIFFS YOU HAVE A GENERAL
14        CAUSATION EXPERT, RAY FARQUHAR, AND YOU DON'T NEED THESE GUYS
15        TO DO IT.  AND IN MY JUDGMENT, IT WAS CUMULATIVE.  MY OBJECTION
16        WAS THAT IN ADDITION TO BEING CUMULATIVE, HE DID NOT FOLLOW THE
17        PROPER METHODOLOGY.  AT THAT POINT I SAID WE RESERVE TO SEE
18        WHAT THEY DO TO OFFER HIM AT TRIAL, AND WE RESERVE THE DAUBERT
19        OBJECTION.
20              MR. BIRCHFIELD:  YOUR HONOR, WE'RE NOT GOING TO SPEND
21        MUCH TIME ON THE CAUSE OF ACTION, BUT IN ORDER TO GET A
22        SPECIFIC CAUSATION HE HAS TO, IF IT'S NOT PROTHROMBOTIC, IF IT
23        DOES NOT WORK IN THAT WAY TO INCREASE THE RISK.  THAT'S THE
24        BASIS OF HIS OPINION, BASED ON HIS REVIEW OF THE MEDICAL
25        LITERATURE AND HIS UNDERSTANDING OF CLOT FORMATION, THE
page 492
```

Issues Report [Merck_Trial_Transcripts (Ernst, Humeston, Irvin Plunkett)]

• **Opposition - Motion for New Trial**

```
 1        CLOTTING MECHANISM AND HOW IT PERTAINS TO CARDIAC EVENTS.
 2                MR. ISMAIL:  YOU CAN SEE IN HIS REPORT, YOUR HONOR,
 3        HE HAD NO DISCUSSION -- IN HIS DEPOSITION HE WAS COMPLETELY
 4        UNPREPARED TO TALK ABOUT IT.  YOUR HONOR COMMENTED ON THAT IN
 5        YOUR DAUBERT RULING.
 6                THE COURT:  LET'S PROCEED WITH IT AND MAKE YOUR
 7        OBJECTION, AND I'LL TAKE IT AT THAT TIME.
 8                MR. ISMAIL:  IS IT PRESERVED NOW?
 9                THE COURT:  NO. CALL MY ATTENTION TO IT.  I
10        UNDERSTAND YOU'RE MAKING THE OBJECTION, BUT IF WE GET INTO
11        SOMETHING THAT YOU FEEL IS OBJECTIONABLE, MAKE IT.
12                MR. BIRCHFIELD:  OKAY.
13                (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN
14        OPEN COURT.)
15                THE COURT:  ANY QUESTIONS ON HIS QUALIFICATIONS?
16                MR. ISMAIL:  YES, SIR.
17                                TRAVERSE
18        BY MR. ISMAIL:
19        Q.   NOW, SIR, AM I CORRECT THAT WHILE VIOXX WAS ON THE MARKET,
20        YOU NEVER PERSONALLY PRESCRIBED THE MEDICINE?
21        A.   NOT THAT I RECALL.
22        Q.   AND THAT WOULD BE TRUE FOR THE OTHER COX-2 INHIBITOR DRUGS
23        THAT WERE ON THE MARKET, BEXTRA AND CELEBREX; IS THAT CORRECT?
24        A.   TO MY RECOLLECTION, THAT IS CORRECT.
25        Q.   AND YOU HAVE NEVER DONE ANY RESEARCH IN COX-2 DRUGS,
page 493
 1        CORRECT?
 2        A.   THAT'S CORRECT.
 3        Q.   AND, SIR, I BELIEVE YOU SAID AT YOUR DEPOSITION THAT YOU
 4        DO NOT EVER RECALL DIAGNOSING ONE OF YOUR OWN PATIENTS AS
 5        HAVING A CARDIOVASCULAR THROMBOTIC EVENT FROM VIOXX; IS THAT
 6        CORRECT?
 7        A.   THAT'S CORRECT.  AT THE TIME OF MY DEPOSITION, I WAS NOT
 8        AWARE OF ANY OF MY PATIENTS THAT HAD AN EVENT WHILE ON VIOXX.
 9        I HAVE SUBSEQUENTLY BECOME AWARE OF ONE CASE.
10        Q.   SO YOUR DEPOSITION WAS TAKEN IN OCTOBER, CORRECT?
11        A.   THAT'S CORRECT.
12        Q.   THAT WAS ABOUT SIX WEEKS AGO?
13        A.   THAT'S CORRECT.
14        Q.   AND YOU SAID UNDER OATH AT THAT TIME YOU HAD NEVER
15        PERSONALLY TREATED A PATIENT WHOM YOU HAD DIAGNOSED AS HAVING A
16        VIOXX-RELATED BLOOD CLOT, CORRECT?
17        A.   AND THAT HOLDS.  I HAVE TREATED A PATIENT THAT HAD A
18        CARDIAC EVENT WHILE ON VIOXX.  I HAVEN'T MADE A DIAGNOSIS THAT
19        IT WAS CAUSED BY VIOXX, THAT'S CORRECT.
20        Q.   THANK YOU FOR THAT CLARIFICATION.  WHEN YOU COME INTO THIS
21        COURTROOM TODAY, YOU PERSONALLY HAVE NOT DIAGNOSED ONE OF YOUR
22        PATIENTS AS HAVING A VIOXX-RELATED CLOT, CORRECT?
23        A.   THAT'S CORRECT.
24        Q.   NOW, IS THAT TRUE FOR CELEBREX AS WELL?
25        A.   THAT'S CORRECT.
page 494
 1        Q.   SO YOUR QUALIFICATIONS ON DIAGNOSING CARDIAC EVENTS FROM
 2        COX-2 INHIBITOR DRUGS, YOU HAVE NEVER DONE IT BEFORE OUTSIDE OF
 3        THIS LITIGATION, CORRECT?
 4        A.   THAT'S CORRECT.
 5        Q.   NOW, SIR, YOU DON'T CONSIDER YOURSELF A CLINICAL
 6        RESEARCHER, CORRECT?
 7        A.   CORRECT.
 8        Q.   AND I BELIEVE YOU HAVE NOT DONE ANY BASIC SCIENCE RESEARCH
 9        YOURSELF SINCE COLLEGE?
10        A.   WITH THE PROVISO THAT DURING THE COURSE OF MEDICAL SCHOOL,
11        THERE MAY HAVE BEEN SOME INVOLVEMENT IN BASIC SCIENCE RESEARCH,
12        BUT...
13        Q.   SURE.  WHEN YOU'RE IN MEDICAL SCHOOL, YOU MAY HAVE HAD AN
14        OPPORTUNITY TO GO DOWN TO THE LAB AND MAYBE CONDUCT A FEW
15        EXPERIMENTS, BUT YOU WOULDN'T CONSIDER YOURSELF A SCIENTIFIC
16        RESEARCHER, WOULD YOU?
17        A.   THAT'S CORRECT.
18        Q.   AND YOU'RE REALLY NOT AN EXPERT TO COX-2 DRUGS, ARE YOU,
```

Issues Report [Merck_Trial_Transcripts (Ernst, Humeston, Irvin Plunkett)]

• Opposition - Motion for New Trial

```
19     SIR?
20     A.    NOT AN EXPERT, PER SE, NO.
21     Q.    AND YOU HAVE NEVER BEEN RESPONSIBLE FOR ANALYZING DATA
22     FROM A CLINICAL TRIAL, CORRECT?
23     A.    WELL, RESPONSIBLE FOR IS KIND OF THE OPERATIVE PHRASE.  I
24     ANALYZE STUDIES IN THE LITERATURE AND APPLY THAT INFORMATION TO
25     MY PATIENTS ON A REGULAR BASIS.
page 495
1      Q.    SURE.  YOU MAY ACTUALLY SEE AN ARTICLE IN A JOURNAL AND
2      THERE IS CLINICAL RESULTS PRESENTED, AND THEN YOU READ THAT AS
3      A PRACTICING PHYSICIAN AND DRAW YOUR OWN CONCLUSIONS FROM IT,
4      CORRECT?
5      A.    THAT'S CORRECT.
6      Q.    BUT IN TERMS OF HAVING PRIMARY RESPONSIBILITY AS AN
7      INVESTIGATOR ON A TRIAL, YOU'VE NEVER DONE THAT AND ANALYZED
8      THE DATA FROM THE TRIAL, CORRECT?
9      A.    THAT IS CORRECT.
10     Q.    AND YOU'VE NEVER DONE ANY RESEARCH IN ANY NONSTEROIDAL
11     ANTI-INFLAMMATORY DRUG, CORRECT?
12     A.    CORRECT.
13     Q.    AND YOU DON'T CONSIDER YOURSELF AN EPIDEMIOLOGIST, DO YOU,
14     SIR?
15     A.    NO, I DO NOT.
16     Q.    CAN YOU TELL THE JURY WHAT AN EPIDEMIOLOGIST IS?
17     A.    AN EPIDEMIOLOGIST IS AN INDIVIDUAL THAT STUDIES EVENTS AND
18     TRIES TO APPLY STATISTICAL TOOLS TO EVALUATE CONNECTIONS
19     BETWEEN EVENTS.
20     Q.    AND, SIR, YOU'VE NEVER DONE CLINICAL RESEARCH ON THE
21     CAUSES OF SUDDEN CARDIAC DEATH, HAVE YOU?
22     A.    DURING THE COURSE OF MEDICAL SCHOOL, I MAY HAVE BEEN
23     INVOLVED WITH A RESEARCH PROJECT AND/OR DURING FELLOWSHIP BUT
24     NOT ONE THAT I WAS RESPONSIBLE FOR EVALUATING THE DATA.
25     Q.    AND WHEN DID YOU GRADUATE MEDICAL SCHOOL?
page 496
1      A.    1983.
2      Q.    SO, IN THE LAST 22 YEARS, WOULD IT BE FAIR TO SAY YOU'VE
3      NEVER BEEN INVOLVED IN CLINICAL RESEARCH INTO THE CAUSES OF
4      SUDDEN CARDIAC DEATH?
5      A.    MY CARDIOLOGY FELLOWSHIP TRAINING ENDED IN 1988, SO IT
6      WOULD HAVE BEEN SINCE '88.
7      Q.    SO I AMEND MY QUESTION BY SAYING:  IN THE LAST 17 YEARS,
8      YOU'VE NEVER DONE ANY CLINICAL RESEARCH IN THE CAUSES OF SUDDEN
9      CARDIAC DEATH?
10     A.    THAT'S CORRECT.
11     Q.    AND BASED ON ALL THAT EXPERTISE, SIR, CAN YOU TELL THE
12     JURY HOW MUCH YOU'RE CHARGING FOR YOUR TESTIMONY TODAY?
13     A.    SURE.  I CHARGE A THOUSAND AN HOUR IN THE COURTROOM, 300
14     AN HOUR TO REVIEW CASES, AND 600 AN HOUR IN DEPOSITION.
15     Q.    SO YOUR TIME HERE TODAY IS AT A THOUSAND DOLLARS AN HOUR?
16     A.    IN THE COURTROOM, YES.
17           MR. ISMAIL:  THAT'S ALL, YOUR HONOR.
18           THE COURT:  WHAT'S THE TENDER?
19           MR. BIRCHFIELD:  YOUR HONOR, WE OFFER HIM AS AN
20     EXPERT IN CARDIOLOGY.
21           THE COURT:  ALL RIGHT.  I'LL ALLOW HIM TO TESTIFY AS
22     AN EXPERT IN CARDIOLOGY.  BUT INSOFAR AS THE SPECIFICS, IF WE
23     GET INTO SPECIFICS, I'LL ENTERTAIN THE OBJECTION.
24           MR. ISMAIL:  THANK YOU, JUDGE.
25
page 497
1                      DIRECT EXAMINATION
2      BY MR. BIRCHFIELD:
3      Q.    DR. BALDWIN, WE JUST HAD A LOT OF DISCUSSION ABOUT
4      RESEARCH.  NOW, WHEN YOU SAY RESEARCH, ARE YOU TALKING ABOUT
5      ACTUALLY CONDUCTING CLINICAL TRIALS?  IS THAT WHAT YOU MEAN BY
6      RESEARCH?
7      A.    YES.
8      Q.    NOW, IF WE THINK OF RESEARCH IN TERMS OF REVIEWING MEDICAL
9      LITERATURE TO GAIN AN UNDERSTANDING OF HOW A DRUG WOULD AFFECT
10     A BODY, HOW IT FUNCTIONS, DO YOU DO THAT TYPE OF RESEARCH?
```

Issues Report [Merck_Trial_Transcripts (Ernst, Humeston, Irvin Plunkett)]

• Opposition - Motion for New Trial

```
11    A.    YES.
12    Q.    IS THAT A NECESSARY PART OF YOUR PRACTICE?
13    A.    IT IS.
14    Q.    CAN YOU DESCRIBE FOR US, SIR, WHAT YOU DO DAY TO DAY?
15    A.    I TAKE CARE OF PATIENTS.  I'M A HANDS-ON CARDIOLOGIST.  I
16    TAKE CARE OF PATIENTS.  AND SPECIFICALLY, I PRACTICE
17    INTERVENTIONAL CARDIOLOGY.  AND THAT'S A SUBSET OF CARDIOLOGY
18    WHEREBY WE GO IN WITH MORE INVASIVE TYPE TOOLS -- BALLOONS,
19    GUIDE WIRES, CATHETERS -- AND PLACE THOSE INTO THE ARTERIES AND
20    VEINS AND DIAGNOSE CARDIAC PROBLEMS.  MOST OF THOSE HAVE TO DO
21    WITH ARTERY BLOCKAGES, AND THEN WE PROCEED TO FIX THOSE
22    BLOCKAGES AS BEST WE CAN, SHOULD THE NERD ARISE.
23              USUALLY, WITH BALLOON ANGIOPLASTY, YOU PROBABLY
24    HAVE -- WE'VE ALL HAD FAMILY MEMBERS AND FRIENDS THAT HAVE HAD
25    ARTERIES THAT HAVE BEEN OPENED UP WITH BALLOONS.  AND THEN WE
page 498
1     ALSO PUT IN STENTS, LITTLE SLOTTED METAL TUBES, THAT ARE
2     EXPANDED WITH A BALLOON TO ALLOW THE ARTERY TO REMAIN OPEN
3     WHILE IT'S HEALED.
4     Q.    DOCTOR, AS FAR AS YOUR PRACTICE GOES, YOUR EVERYDAY
5     PRACTICE, DO YOU REVIEW A CONSIDERABLE AMOUNT OF MEDICAL
6     LITERATURE?
7     A.    YES, WE CONSTANTLY REVIEW AND TALK ABOUT MEDICAL
8     LITERATURE.
9     Q.    AND SPECIFICALLY, DID YOU REVIEW MEDICAL LITERATURE THAT
10    PERTAINS TO COX-2 INHIBITORS AND HOW THEY AFFECT THE BODY?
11    A.    I DO.
12    Q.    WHY DID YOU DO THAT?
13    A.    WELL, I DO OBSERVE LITERATURE ALL ALONG TO THINGS THAT
14    PERTAIN TO CARDIOLOGY SPECIFICALLY.  AND COX-2 INHIBITORS CAME
15    TO THE FOREFRONT AS BEING RELATED TO CARDIAC EVENTS, AND SO I
16    HAD AN OPPORTUNITY TO BE ALERT TO THAT.  BUT SPECIFICALLY FOR
17    THIS INSTANCE, AND IN THE PROCESS OF RENDERING MY OPINION, I
18    HAVE EXPANDED THAT AND REVIEWED ADDITIONAL LITERATURE.
19    Q.    AND, DOCTOR, WE'LL GET INTO THAT IN JUST A MOMENT, BUT I
20    WOULD LIKE FOR YOU TO EXPLAIN TO US THE STRUCTURE AND THE
21    FUNCTION OF THE HEART BRIEFLY.  WILL YOU DO THAT FOR US?
22    A.    SURE.
23    Q.    WE HAVE AN ILLUSTRATION HERE.  WOULD IT BE HELPFUL TO USE
24    THIS ILLUSTRATION AND DESCRIBE THAT TO THE JURY?
25    A.    YES, IT WOULD.
page 499
1              MR. BIRCHFIELD:  YOUR HONOR, MAY HE APPROACH THE
2     EASEL?
3              THE COURT:  YES.
4              THE WITNESS:  THIS DIAGRAM IS A PRETTY FAIR
5     REPRESENTATION OF THE HEART.  IT'S AS IF THE HEART WERE SLICED
6     IN TWO AND OPENED AND COLOR-CODED SO YOU CAN IDENTIFY THE
7     COMPONENTS.
8              AND, IN GENERAL, THE HEART IS A MUSCULAR SAC
9     THAT'S A PUMP, AND IT HAS FOUR CHAMBERS:  TWO ON THE RIGHT, TWO
10    ON THE LEFT.  THE TWO ON THE RIGHT WORK TO PUMP BLOOD UP
11    THROUGH THE LUNGS; THE TWO ON THE WORK LEFT WORK TO PUMP BLOOD
12    TO THE REST OF THE BODY.
13              YOU THINK OF THE HEART PUMPING TWO TO FOUR
14    LITERS, MAYBE UP TO TEN LITERS PER MINUTE.  YOU THINK IT WOULD
15    BE ABLE TO USE THAT BLOOD FOR ITS OWN NUTRITION.  TURNS OUT
16    THAT'S NOT THE WAY WE'RE BUILT.  THERE ARE SEVERAL ARTERIES
17    THAT COME OFF OF THE AORTA THAT COME AROUND AND FEED THE HEART
18    MUSCLE AND GIVE IT ITS OWN SEPARATE BLOOD SUPPLY, AND THOSE
19    ARTERIES ARE CALLED THE CORONARY ARTERIES.
20    Q.    AND DOCTOR, BEHIND THAT ILLUSTRATION IS ANOTHER
21    ILLUSTRATION.  DOES IT SHOW THOSE CORONARY ARTERIES THAT YOU
22    WERE TALKING ABOUT?
23    A.    IT DOES.  THIS IS MORE OF A THREE-DIMENSIONAL RENDERING
24    AND, LIKE MOST ARTISTS, TO MAKE IT EASIER TO FIGURE OUT, THEY
25    PUT THE ARTERIES IN RED AND VEINS IN BLUE.  IN THIS CASE THERE
page 500
1     IS TWO HEART ARTERIES:  A LEFT HEART ARTERY THAT SPLITS INTO
2     TWO DIVISIONS -- THE ANTERIOR DESCENDING ARTERY AND THE
```

Issues Report [Merck_Trial_Transcripts (Ernst, Humeston, Irvin Plunkett)]

• Opposition - Motion for New Trial

```
 3      CIRCUMFLEX CORONARY ARTERY THAT COMES DOWN THE BACK SIDE OF THE
 4      HEART, AND THEN THE RIGHT CORONARY ARTERY THAT COMES DOWN THE
 5      BOTTOM OR THE INFERIOR.
 6      Q.   AND DOCTOR, YOU MENTIONED CORONARY ARTERY DISEASE.  WHAT
 7      IS CORONARY ARTERY DISEASE?
 8      A.   CORONARY ARTERY DISEASE REFERS TO ATHEROSCLEROSIS.
 9      ATHEROSCLEROSIS IS A DISEASE OF ANY ARTERY, BUT IT'S PROMINENT
10      IN HEART ARTERIES.
11             AND ATHEROSCLEROSIS IS THE BODY'S RESPONSE TO INJURY,
12      AN ABNORMAL RESPONSE.  WHEN THE LINING OF THE ARTERY IS INJURED
13      THROUGH SOME PROCESS, ONE OF THE RESPONSES IS THE DEVELOPMENT
14      OF A THICKENED GROWTH OF THAT INNER LINING OF THE ARTERY.  A
15      LOT OF PEOPLE HAVE CONSTRUED THAT HEART ARTERY BLOCKAGE IS JUST
16      CHOLESTEROL THAT HAPPENS TO BUILD UP IN THE ARTERIES.  IN FACT,
17      CHOLESTEROL MAY HAVE AN IMPACT ON IT.  IT'S ACTUALLY A
18      THICKENED GROWTH WITHIN THE ARTERY WALL.  IT CAUSES THERE TO BE
19      A NARROWING IN THE ARTERY, AND IF IT BECOMES SEVERE, IT COULD
20      PREDISPOSE THE ARTERY TO BLOCKING IT COMPLETELY WITH THE BLOOD
21      CLOT WITHIN THAT DISEASED SEGMENT.
22      Q.   AND, DOCTOR, IS THAT WHAT WE TALK ABOUT WHEN WE SAY
23      "PLAQUE"?
24      A.   PLAQUE IS A DESCRIPTOR OF THAT THICKENED GROWTH BETWEEN
25      THE WALL.
page 501
 1      Q.   HOW DOES PLAQUE DEVELOP?
 2      A.   THE INSIDE LINING OF THE ARTERY, WHICH IS ONLY ONE OR TWO
 3      CELLS THICK, THAT'S REALLY WHERE ALL THE ACTION IS.  THAT
 4      INSIDE LINING OF THE ARTERY IS VERY BIOLOGICALLY ACTIVE.  IT
 5      INTERACTS WITH BLOOD PRODUCTS.  IT SECRETES ENZYMES TO HELP
 6      PREVENT BLOOD CLOTTING FROM OCCURRING.
 7             IT HELPS -- IT INTERACTS WITH OTHER SUBSTANCES TO
 8      ALLOW THE ARTERIES TO APPROPRIATELY DILATE WHEN THEY NEED TO,
 9      AND SO THAT INNER LINING IS PRETTY CRUCIAL.  ONCE THAT INNER
10      LINING BECOMES DAMAGED IN SOME FASHION, THE ABNORMAL HEALING
11      PROCESS OCCURS, AND YOU CAN GET AN INFLAMMATION AND,
12      ESSENTIALLY, A THICKENED GROWTH OF THAT INSIDE LINING.  SO THE
13      WALL OF THE ARTERY IS REALLY WHAT BECOMES THICKENED AND
14      PROTRUDED.
15      Q.   AND, DOCTOR, WHAT PERCENTAGE OF THE POPULATION WOULD HAVE
16      ATHEROSCLEROSIS OR SOME PLAQUE BUILDUP?
17      A.   WELL, A LARGE PERCENTAGE OF THE POPULATION HAS SOME DEGREE
18      OF PLAQUE BUILDUP; AND IT'S DEPENDING UPON AGE, BUT WE KNOW
19      FROM AUTOPSY STUDIES OF SOLDIERS -- AND I DON'T THINK MEN 18,
20      19 YEARS OLD FROM PREVIOUS COMPLEX THAT THEY ALREADY HAD THE
21      DEVELOPMENT OF EARLY ATHEROSCLEROSIS WITHIN THEIR AORTA AND
22      SOME OF THEIR OTHER ARTERIES, SO WE KNOW THAT IT OCCURS FAIRLY
23      EARLY ON, AND WE KNOW THAT SOME DEGREE OF ATHEROSCLEROSIS IS
24      PRESENT IN PROBABLY A VAST MAJORITY OF FOLKS.
25      Q.   JUST A COUPLE OF OTHER DEFINITIONS.  IF YOU CAN, WOULD YOU
page 502
 1      TELL US WHAT A MYOCARDIAL INFARCTION IS.
 2      A.   YES.  A MYOCARDIAL INFARCTION IS A HEART ATTACK.  AND IT
 3      STARTS WHEN THERE IS COMPLETE OCCLUSION OF AN ARTERY, ALMOST
 4      ALWAYS DUE TO A BLOOD CLOT THAT CAUSES THAT ARTERY TO NO LONGER
 5      HAVE BLOOD FLOW.  AND THE HEART MUSCLE DOWNSTREAM FROM THAT
 6      ARTERY THAT ORDINARILY RECEIVES ITS OXYGEN AND BLOOD SUPPLY
 7      FROM THAT ARTERY STARTS TO BE INJURED AND STARTS AND CELL DEATH
 8      STARTS TO OCCUR.
 9             THE LONGER THE ARTERY IS BLOCKED, THE MORE DAMAGE
10      THAT OCCURS OVER TIME.  AND SO THAT'S HENCE OUR INTEREST IN THE
11      ONLY PREVENTING HEART ATTACKS BUT ALSO OUR INTEREST IN
12      INTERRUPTING HEART ATTACKS EARLY ON SO WE CAN SALVAGE AS MUCH
13      HEART MUSCLE AS WE CAN.
14      Q.   DOCTOR, IN THE COURSE OF THE TRIAL SO FAR, WE'VE HEARD THE
15      TERM "ISCHEMIA."  WHAT IS ISCHEMIA?
16      A.   ISCHEMIA IS MARCHING UP TO WHERE THE HEART HAS -- HEART
17      MUSCLE HAS LESS THAN ADEQUATE BLOOD SUPPLY.  NOT ENOUGH TO
18      CAUSE DAMAGE NECESSARILY, BUT LESS THAN IT'S HAPPY WITH.  AND
19      THE -- WE SEE ISCHEMIA IN PATIENTS THAT HAVE FLOW-LIMITING
20      BLOCKAGES IN THEIR ARTERIES WHEREBY THEY MAY BE FINE AT REST
```

Issues Report [Merck_Trial_Transcripts (Ernst, Humeston, Irvin Plunkett)]

• Opposition - Motion for New Trial

```
21      BUT, WITH EXERCISE, WHEN THEIR HEART NEEDS MORE BLOOD MOVING
22      THROUGH THOSE ARTERIES, IT CAN INCREASE FLOW THROUGH THAT
23      NARROWED AREA.  AND SO THEY CONSEQUENTLY HAVE CHEST DISCOMFORT
24      THAT WE DESCRIBE AS ANGINA, AND SO IT CAN AFFECT HEART MUSCLES
25      DURING -- USUALLY DURING PERIODS OF EXERCISE AND ACTIVITY.
page 503
1       Q.   DOCTOR, YOU TALKED ABOUT CLOTS IN THE HEART.  RIGHT?
2       A.   YES.
3       Q.   BLOOD CLOTS IN THE HEART.  IS THAT SOMETHING THAT YOU
4       ENCOUNTER AND YOU TREAT IN YOUR PRACTICE?
5       A.   ALMOST EVERY DAY.
6       Q.   I MEAN, IS THAT A BIG PART OF WHAT YOU DO EVERY DAY?
7       A.   IT IS.  AND SO MANY OF OUR TECHNIQUES AND MEDICATIONS THAT
8       WE USE NOW ARE TARGETED TO REDUCING THE FREQUENCY OF CLOTS AND
9       ALLOWING CLOTS TO -- THAT ARE PRESENT TO BREAK UP AND MOVE
10      ALONG.
11      Q.   AND, DOCTOR, DO YOU HAVE AN UNDERSTANDING OF HOW THE
12      CLOTTING MECHANISM WORKS AND HOW IT AFFECTS THE HEART?
13      A.   YES.
14      Q.   WOULD YOU DESCRIBE THAT FOR US, PLEASE?
15      A.   CLOTTING MECHANISM IN GENERAL, WE'RE BUILT WITH A CLOTTING
16      MECHANISM THAT KEEPS US FROM BLEEDING TO DEATH IF WE GET CUT,
17      ESSENTIALLY.  IT ALLOWS BLEEDING TO STOP LONG ENOUGH FOR THOSE
18      DAMAGED TISSUES TO BECOME REPAIRED.  THE CLOTTING MECHANISM,
19      LIKE A LOT OF BODY PHYSIOLOGY, IS A BALANCE BETWEEN FACTORS
20      THAT CAUSE THE BLOOD TO CLOT AND FACTORS THAT PREVENT THE BLOOD
21      FROM CLOTTING.  AND THE REASON BEING IS THAT YOU WANT A BLOOD
22      CLOT WHEN YOU WANT IT, BUT YOU DON'T WANT IT AT OTHER TIMES
23      WHEN IT OTHERWISE COULD BE DAMAGING TO THE BODY.
24           SO WE'RE INTERESTED IN EVALUATING PATIENTS SPECIFIC
25      TO THAT BALANCE.  AND THERE MAY BE FACTORS THAT EFFECT
page 504
1       PLATELETS, THE LITTLE PARTICLES OF THE BLOOD THAT INITIATE
2       BLOOD CLOTTING IN SO MANY LOCATIONS, AND FACTORS THAT AFFECT
3       OTHER CLOTTING, OTHER CLOTTING FACTORS, PROTEINS THAT ARE
4       SUBSEQUENTLY PRESENT WITHIN THE COURSE OF FORMING A BLOOD CLOT.
5       Q.   I WANT TO TALK ABOUT DICKY IRVIN FOR A MOMENT.  WHO FIRST
6       CONTACTED YOU ABOUT DICKY IRVIN'S CASE?
7       A.   MR. KIRK GOZA.
8       Q.   AND HE'S A LAWYER THAT WORKS WITH US IN THIS MATTER,
9       RIGHT?
10      A.   YES.
11      Q.   AND WHEN DID HE FIRST CONTACT YOU?
12      A.   PROBABLY SPRING OF THIS YEAR.
13      Q.   HAD YOU WORKED WITH HIM BEFORE?
14      A.   I HAD.
15      Q.   AND HOW MANY TIMES DID YOU WORK WITH HIM?
16      A.   I THINK ONCE, ABOUT PROBABLY A GOOD TEN PLUS YEARS AGO.
17      IT MAY HAVE BEEN A SECOND CASE THAT I CONSULTED THAT I -- JUST
18      ONCE.
19      Q.   HOW MANY MEDICOLEGAL CASES HAVE YOU WORKED ON?
20      A.   ON AVERAGE, PROBABLY LESS THAN TEN A YEAR.  THAT I'VE
21      REVIEWED.  I'VE BEEN TO -- TESTIFIED IN COURT.  I THINK THIS IS
22      MAYBE THE FOURTH TIME SINCE I STARTED TO PRACTICE.  SO PRETTY
23      INFREQUENTLY.
24           AND I DO WORK FOR BOTH SIDES, FOR DEFENSE AND FOR
25      PLAINTIFFS.  ALTHOUGH THE MAJORITY IS FOR DEFENSE WORK FOR
page 505
1       MEDICAL MALPRACTICE.
2       Q.   AND YOU DO CHARGE FOR YOUR TIME AWAY FROM THE OFFICE; IS
3       THAT RIGHT?
4       A.   YES.
5       Q.   YOU HAVE IN ALL THESE CASES?
6       A.   ACTUALLY, IT'S NOT TIME AWAY FROM THE OFFICE; IT'S TIME
7       AWAY FROM FAMILY.  SO IT'S REQUIRED.
8       Q.   AND, DOCTOR, WILL YOU TELL US WHAT YOU DID, WHAT YOU
9       REVIEWED IN PREPARING FOR YOUR OPINIONS IN THIS CASE?
10      A.   YES.
11      Q.   WHAT WAS IT?
12      A.   WELL, YOU HAVE A LONG LIST, BUT I HAD AN OPPORTUNITY TO
```

Issues Report [Merck_Trial_Transcripts (Ernst, Humeston, Irvin Plunkett)]

• Opposition - Motion for New Trial

```
13        REVIEW A CONSIDERABLE AMOUNT OF LITERATURE THAT DEALT WITH
14        VIOXX IN DIFFERENT REGISTRY DATA, CLINICAL TRIALS, BASIC
15        SCIENCE INFORMATION THAT APPLIES TO VIOXX AND COX-2 INHIBITORS
16        AND THEIR EFFECTS ON PATIENTS.
17        Q.    WHEN YOU SAY "MEDICAL LITERATURE," IS THAT STUDIES THAT'S
18        ACTUALLY REPORTED IN MEDICAL JOURNALS?
19        A.    MOST OF THOSE WERE STUDIES THAT WERE REPORTED IN MEDICAL
20        JOURNALS.  THERE WERE SOME STUDIES THAT WEREN'T PUBLISHED THAT
21        ALSO PERTAINED TO VIOXX.
22        Q.    AND YOU REVIEWED THOSE AS WELL?
23        A.    I HAD AN OPPORTUNITY TO SEE SOME OF THAT INFORMATION.
24        Q.    AND HAVE YOU REVIEWED ANY ADDITIONAL MATERIALS SINCE
25        PREPARING YOUR EXPERT REPORT?
page 506
1         A.    I HAD AN OPPORTUNITY TO LOOK AT DR. TOPAL'S DEPOSITION.
2         Q.    AND DID IT CHANGE YOUR OPINIONS IN ANY WAY?
3                 MR. ISMAIL:  OBJECTION.  YOUR HONOR, MAY WE APPROACH?
4                 THE COURT:  SURE.
5                 MR. ISMAIL:  THIS IS NOT A DISCLOSED BASIS FOR
6         DR. BALDWIN'S OPINION.  HE PROVIDED AN EXPERT REPORT IN WHICH
7         HE LISTED THE MATERIALS HE RELIED UPON.  DR. TOPAL'S DEPOSITION
8         WAS NOT IN IT.  OBVIOUSLY, IT WAS NOT EVEN TAKEN.  THERE WAS NO
9         SUPPLEMENT EXPERT REPORT.  THERE IS NO LETTER TELLING US THIS
10        IS WHAT HE WAS GOING TO BE RELYING ON.
11                MR. BIRCHFIELD:  HE'S NOT RELYING ON IT.  THAT'S THE
12        WHOLE POINT.  I JUST ASKED HIM IF HE REVIEWED ANY ADDITIONAL
13        MATERIALS, AND I WANT TO ASK HIM IF IT CHANGED HIS OPINIONS IN
14        ANY WAY.  HE'S GOING TO SAY NO.  THAT'S IT.
15                MR. ISMAIL:  WHY ARE YOU REFERENCING TOPAL
16        SPECIFICALLY?
17                MR. BIRCHFIELD:  I'M ASKING HIM WHAT HE REVIEWED
18        BECAUSE I WANT THE JURY TO KNOW THAT THIS IS A MATTER THAT HE
19        HAS REVIEWED AND THAT HE'S LOOKING AT IT, YOU KNOW, TO GET A
20        CLEAR ANSWER.
21                THE COURT:  ALL RIGHT.  OKAY.  I'VE HEARD THAT.  SO
22        LET'S NOT GET INTO TOPAL'S DEPOSITION.  LET ME TELL YOU THE WAY
23        I FEEL ABOUT THIS:  HE'S A CARDIOLOGIST.  HE SEEMS TO BE WELL
24        QUALIFIED AS A CARDIOLOGIST.  I THINK, AS A CARDIOLOGIST, HE
25        WOULD BE HELPFUL TO THE COURT AND THE JURY IN EXPLAINING
page 507
1         THINGS, LIKE THE ANATOMY OF THE HEART, LIKE CHOLESTEROL
2         PLAQUES, THE FORMATION OF CLOTS, HOW THEY FORM, THE TYPE OF
3         CLOTS THAT ARE FORMED, EVEN THE TYPE OF CLOT THAT MR. IRVIN
4         HAD, IF HE LOOKED AT THE AUTOPSY REPORT AND CAN DIAGNOSE THAT
5         PARTICULAR CLOT, THE SIGNIFICANCE OF CLOTS, HOW CLOTS AFFECT
6         THE FUNCTIONING OF THE HEART, BUT I WON'T LET HIM TESTIFY AS TO
7         THE PART, IF ANY, THAT VIOXX OR COX-2 INHIBITORS PLAYED IN MR.
8         IRVIN'S DEATH.  I DON'T FEEL THAT HE'S QUALIFIED BY VIRTUE OF
9         EXPERIENCE, TRAINING, TO TESTIFY AS TO THE SPECIFIC CAUSE OF
10        MR. IRVIN'S DEATH.  A GENERAL CAUSE OF CLOTS, THE GENERAL
11        FORMATION OF CLOTS, HOW THEY ARE FORMED, WHERE THEY ARE FORMED,
12        WHAT TYPE OF CLOT MR. IRVIN HAD, WHERE IT WAS -- ALL OF THOSE
13        THINGS HE HAS KNOWLEDGE AND EXPERIENCE, AND HE CAN TESTIFY TO.
14        BUT SPECIFICALLY WITH REGARD TO VIOXX OR ANY COX-2
15        INHIBITORS --
16                MR. BIRCHFIELD:  YOUR HONOR, DR. BALDWIN GIVES US THE
17        CLEAREST, STRONGEST, SPECIFIC CAUSATION IN THE CASE, AND IT IS
18        BASED ON HIS PRACTICE AS A PRACTICING CARDIOLOGIST.  HE WORKS
19        EVERY DAY WITH PATIENTS THAT HAVE HEART ATTACKS AND HAVE HEART
20        ATTACKS AS A RESULT OF CLOTS.
21                HE ALSO, HE KNOWS THE RISK FACTORS INVOLVED IN
22        EACH OF THESE CASES AND DETERMINES WHAT ROLE RISK FACTORS PLAY.
23        HE HAS EXAMINED THE MEDICAL RECORDS, HE'S EXAMINED THE
24        TESTIMONY OF THE WITNESSES IN THIS CASE, AND HE IS PREPARED.
25        HE HAS SAID UNDER OATH THAT BUT FOR VIOXX MR. IRVIN WOULD NOT
page 508
1         HAVE HAD A FATAL HEART ATTACK ON THAT DAY, BUT HE DOES IT
2         THOUGHT AN UNDIFFERENTIAL DIAGNOSIS, YOUR HONOR.
3                 THE COURT:  I UNDERSTAND THAT.  I DON'T SEE HIM
4         QUALIFIED TO TESTIFY AS VIOXX.  I THINK HE CAN TESTIFY RISK
```

Issues Report [Merck_Trial_Transcripts (Ernst, Humeston, Irvin Plunkett)]

• Opposition - Motion for New Trial

```
 5      FACTORS.  I THINK THAT'S WITHIN HIS EXPERTISE.  HE CAN TESTIFY
 6      AS TO WHAT RISK FACTORS, IF ANY, IRVIN HAD, WHAT'S THE
 7      SIGNIFICANCE OF THE 60 PERCENT BLOCKAGE.  ALL OF THOSE THINGS
 8      ARE WITHIN HIS PREROGATIVE.  THIS INDIVIDUAL HAS NEVER
 9      DIAGNOSED ANYBODY WITH A VIOXX PROBLEM.  HE DOESN'T KNOW
10      ANYTHING ABOUT VIOXX.  HE SAID THAT EE HAS -- THAT HE'S NOT A
11      EXPERT IN VARIOUS FIELDS, BOTH IN HIS DEPOSITION AND IN HIS
12      QUESTIONING.  SO THAT'S MY RULING.  I UNDERSTAND YOUR POSITION,
13      BUT THAT'S MY RULING ON IT AND LET'S PROCEED.  I'M TELLING YOU
14      AT THE BENCH SO THAT I DON'T EMBARRASS ANYBODY, INCLUDING THE
15      DOCTOR, IN FRONT OF THE JURY.
16                  MR. ISMAIL:  THANK YOU, JUDGE.  THANK YOU VERY MUCH.
17      I APPRECIATE IT.
18                  MR. BIRCHFIELD:  YOUR HONOR, MAY WE APPROACH FOR JUST
19      A SECOND.  I'VE GOT TO HAVE A BREAK IF -- BECAUSE HIS OPINIONS
20      IN THIS CASE ARE VERY CLEAR WHEN I ASKED HIM, "DOCTOR, DID YOU
21      FORM ANY OPINIONS IN THIS CASE?"  "YES."  "WHAT WERE THEY?"
22      AND HE IS GOING TO SAY THAT VIOXX --
23                  THE COURT:  I UNDERSTAND.  I'LL TAKE A 10-MINUTE
24      BREAK AT THIS TIME AND LET YOU GET SQUARED AWAY WITH HIM.  YOU
25      KNOW, I DON'T HAVE ANY PROBLEM WITH HIM TESTIFYING.  ALL THE
page 509
 1      STUFF THAT HE'S TESTIFIED SO FAR IS OKAY, INCLUDING, YOU KNOW,
 2      A LITTLE BIT MORE OF THE ANATOMY OF THE CLOTS, RISK FACTOR, THE
 3      SIGNIFICANCE OF RISK FACTORS, ELIMINATING RISK FACTORS, WHAT
 4      RISK FACTORS HE WOULD HAVE HAD, THE SPECIFICS ON THE CLOT IN
 5      MR. IRVIN.
 6                  I'M ASSUMING AT THE AUTOPSY, HE OUGHT TO BE ABLE
 7      TO LOOK AT THE AUTOPSY AND SAY WHERE IS THE CLOT OR WHERE THE
 8      AUTOPSY PROTOCOL INDICATES THE CLOT IS, EVEN THE TYPE OF CLOT.
 9      IF HE CAN DO THINGS FROM THERE, AND THE RISK FACTORS EE IS
10      AWARE OF FROM THE STANDPOINT OF REVIEWING THE MEDICAL DOCUMENTS
11      IN THE CASE.  BUT NOT THE PART THAT VIOXX HAS PLAYED.  I DON'T
12      THINK HE'S QUALIFIED TO DO THAT.  AND I THINK THERE ARE OTHER
13      PEOPLE WHO ARE QUALIFIED.  I'VE LOOKED AT THEM ALL, AND I TOLD
14      YOU-ALL PREVIOUSLY THIS.  OKAY?  WE'LL TAKE A BREAK HERE.
15                  (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN
16      OPEN COURT.)
17                  THE COURT:  MEMBERS OF THE JURY, IT'S NECESSARY FOR
18      US TO TAKE A 10-MINUTE BREAK AT THIS TIME.  IT WILL SPEED UP
19      THE TESTIMONY, SO WE'LL TAKE A 10-MINUTE BREAK AT THIS TIME.
20                  (WHEREUPON, THE COURT TOOK A BRIEF RECESS.)
21                  THE COURT:  WE'RE OUT OF THE PRESENCE OF THE JURY.
22      COUNSEL IS REURGING THE MOTION TO RECONSIDER THE QUESTION OF
23      WHETHER OR NOT THE COURT'S DAUBERT MOTION OR 702 MOTION
24      ALLOWING THIS WITNESS TO TESTIFY WITH RESTRICTING HIS TESTIMONY
25      IN GENERAL THE ANATOMY OF THE HEART, THE FUNCTIONING OF THE
page 510
 1      HEART, THE PHYSIOLOGY OF THE HEART, FUNCTIONING OF THE CLOTS,
 2      STRUCTURE OF THE CLOTS AND EVEN THE SIGNIFICANCE OF THE TYPE OF
 3      CLOT THAT MR. IRVIN HAD.  COUNSEL TAKES THE POSITION THAT HE
 4      USED PROPER METHODOLOGY AND BRINGS TO THE COURT'S ATTENTION THE
 5      FACT THAT HE DID REVIEW VARIOUS MATTERS.
 6                  PERHAPS I WASN'T OVERLY CLEAR IN THIS RULING.  I
 7      DON'T NECESSARILY HAVE A PROBLEM WITH METHODOLOGY WITH THIS
 8      WITNESS.  THIS WITNESS SEEMS TO ME TO HAVE READ SOME OF THE
 9      ARTICLES AND HAS READ SOME OF THE MATERIAL THAT IS INTRODUCED
10      OR EITHER IN EVIDENCE NOW OR WILL BE IN EVIDENCE.  HE'S
11      REVIEWED SOME DEPOSITIONS THAT ARE RELEVANT TO THE MATTER.
12                  THE PROBLEM THE COURT HAS WITH HIM ON 02 IS
13      QUALIFICATIONS, NOT METHODOLOGY.  IF I USE THE PROPER
14      METHODOLOGY, IF I LOOK AT ALL OF THE ARTICLES AND READ THE
15      ARTICLES AND COME TO THE CONCLUSION, I WILL HAVE USED THE
16      PROPER METHODOLOGY TO SATISFY DAUBERT, BUT I'M NOT A 702 EXPERT
17      BECAUSE MY QUALIFICATIONS BY VIRTUE OF EXPERIENCE, TRAINING IS
18      NOT THERE.
19                  THIS INDIVIDUAL IS A CARDIOLOGIST, BUT HE KNOWS
20      NOTHING ABOUT VIOXX.  HE KNOWS NOTHING ABOUT COX-2 INHIBITORS
21      OTHER THAN WHAT HE'S READ.  HE HAS NO PERSONAL EXPERIENCE WITH
22      IT, NO TRAINING IN IT.  HE'S NOT AN EPIDEMIOLOGIST.  HE'S NOT A
```

Issues Report [Merck_Trial_Transcripts (Ernst, Humeston, Irvin Plunkett)]

• Opposition - Motion for New Trial

```
23      RESEARCH SCIENTIST.  HE DOESN'T CONSIDER HIMSELF AN EXPERT IN
24      VIOXX.  HE DOESN'T CONSIDER HIMSELF AN EXPERT IN COX-2
25      INHIBITORS.  HE SAID THAT.  HIS QUALIFICATIONS ARE LACKING, NOT
page 511
1       A METHODOLOGY.
2                     THE FACT THAT HE'S A CARDIOLOGIST DOESN'T MEAN
3       THAT HE OUGHT TO BE ABLE TO TESTIFY AS TO THE EXQUISITE
4       CAUSATION OF COX-2 INHIBITORS IN VIOXX.  THAT'S THE BASIS OF MY
5       RULING, NOT METHODOLOGY.
6                     MR. BIRCHFIELD:  YOUR HONOR, IN REGARDS TO HIS
7       EXPERIENCE WITH VIOXX, I THINK THERE IS A MISPERCEPTION THERE.
8       HE WAS ASKED --
9                     THE COURT:  HE TESTIFIED TO.
10                    MR. BIRCHFIELD:  HE WAS ASKED IF HE EVER PRESCRIBED
11      VIOXX, BUT HE DID NOT, BUT HE TREATED A LARGE NUMBER OF
12      PATIENTS THAT WERE ON VIOXX BECAUSE PATIENTS WOULD COME TO HIM
13      FOR CARDIAC PROBLEMS.
14                    HE HAS REVIEWED, IN THE COURSE OF HIS PRACTICE
15      AS HE DOES AS A CARDIOLOGIST, WHETHER A PARTICULAR DRUG HAS AN
16      IMPACT ON THE CARDIAC CONDITION OF PATIENTS.  HE HAS DONE THAT
17      WITH VIOXX.  HE MAKES THOSE RISKS AND BENEFIT ANALYSES.  HE HAS
18      DONE THAT IN REGARDS TO VIOXX AND OTHER COX-2 INHIBITORS, AND
19      HE CAME TO THE CONCLUSION THAT THEY ARE PROTHROMBOTIC AND DID
20      NOT PRESCRIBE IT FOR THAT REASON.  SO HE HAS -- HE HAS
21      CONSIDERABLE EXPERIENCE, YOU KNOW, WITH VIOXX.
22                    THE FACT THAT HE DID NOT PRESCRIBE IT DOES NOT
23      EQUATE TO HIM NOT HAVING EXPERIENCE THERE.  HE REVIEWED THE
24      LITERATURE NOT ONLY IN PREPARATION FOR THIS CASE, BUT HE ALSO
25      REVIEWED THE MEDICAL LITERATURE THAT PERTAINS TO VIOXX IN THE
page 512
1       COURSE OF TREATING HIS PATIENTS.
2                     SO HE DOES HAVE EXTENSIVE EXPERIENCE, YOUR
3       HONOR, YOU KNOW, WITH VIOXX, AND ON THE CROSS-EXAMINATION, WHEN
4       HE WAS ASKED ABOUT THAT, THAT WAS A LIMITED VIEW.  IT DOES NOT
5       FULLY DESCRIBE WHAT HIS EXPERIENCE WAS, AND THAT GOES DIRECTLY
6       TO HIS QUALIFICATION.
7                     MR. SIZEMORE:  YOUR HONOR, MAY I?  DURING THE DAUBERT
8       HEARINGS WE MOVED VERY QUICKLY AND I DID PUT UP AND INTRODUCE
9       SEVERAL DEPOSITION EXCERPTS FROM DR. BALDWIN, AND WE HAVE NOT
10      GONE OVER THOSE YET.  HE ACTUALLY TESTIFIED THAT HE HAD SEEN
11      VIOXX AND CELEBREX ADVERSE EVENTS ESPECIALLY IN PATIENTS WHO
12      HAD DEVELOPED CONGESTIVE HEART FAILURE AND/OR HAD EXACERBATION
13      OF HYPERTENSION AND RENAL INSUFFICIENCY.
14                    HE SAID THAT HE HAD TREATED PATIENTS FOR THOSE
15      CONDITIONS.  HE HAD ACTUALLY SAID -- THE QUESTION WAS, "ON HOW
16      MANY OCCASIONS DID YOU ADVISE PATIENTS TO DISCONTINUE VIOXX DUE
17      TO A SUGGESTED INCREASED RISK OF MI," THE EXACT ISSUE WE'RE
18      HERE TODAY ABOUT, JUDGE, AND HE SAID IT WOULD BE GREATER THAN
19      20 AND LESS THAN A HUNDRED TIMES.
20                    THE COURT:  ALL RIGHT.  LET ME HEAR --
21                    MR. ISMAIL:  YOUR HONOR, THE WITNESS TESTIFIED TODAY
22      AS HE DID IN HIS DEPOSITION THAT DICKY IRVIN IS THE FIRST MAN
23      HE'S EVER DIAGNOSED WITH A VIOXX-RELATED THROMBOTIC EVENT.
24      MR. SIZEMORE IS READING THE WITNESS' COMMENTS THAT IN REGARDS
25      TO HYPERTENSION AND EDEMA, A CLASS EFFECT WITH ALL NSAIDS,
page 513
1       WHICH IS NOT AT ISSUE IN THIS CASE.
2                     AND SO THE FACT THAT ANY DOCTOR HAS SEEN EDEMA
3       WITH AN NSAID DOES NOT RENDER THEM QUALIFIED TO COME TO THIS
4       COURTROOM AND SAY THAT DICKY IRVIN DIED OF A BLOOD CLOT IN HIS
5       HEART.  HE'S NEVER DONE IT BEFORE HE WALKED INTO THIS COURTROOM
6       FOR THE FIRST TIME.
7                     WITH RESPECT TO HIS QUALIFICATIONS, YOUR HONOR,
8       THAT HE'S NOT ONLY NOT PRESCRIBED COX-2'S NEVER DIAGNOSED A
9       THROMBOTIC EVENT FROM A COX-2, AND WE BELIEVE THAT HIS REVIEW
10      OF THE LITERATURE, I KNOW YOU'VE SEEN COMMENTS THAT HE'S READ
11      SOME OF THE LITERATURE, HIS OPINION IN THIS CASE IS, IT IS
12      PROTHROMBOTIC BECAUSE HE'S READ DR. RAY'S REPORT, HE'S READ
13      DR. LUCCHESI REPORT.  BOTH OF THOSE WITNESSES ARE GOING TO
14      TESTIFY IN THIS CASE.  YOU DON'T NEED HIM TO PARROT BACK WHAT
```

Issues Report [Merck_Trial_Transcripts (Ernst, Humeston, Irvin Plunkett)]

• Opposition - Motion for New Trial

```
15      THOSE TWO WITNESSES HAVE SAID.  HE'S NOT INDEPENDENTLY
16      QUALIFIED TO OPINE.
17              THE COURT:   I DO UNDERSTAND THE ISSUE.  I'VE THOUGHT
18      ABOUT IT.  I'VE READ THE DEPOSITION, AND THE BEST I CAN DO IS
19      JUST LOOK IT OVER AND MAKE MY RULING, SO THAT'S MY RULING.
20      NOW, IT WAS BASED ON THE FACT THAT I'M NOT QUESTIONING THE
21      METHODOLOGY, BECAUSE HE'S USED SOME PROPER METHODOLOGY.  HE'S
22      READ THE MATERIAL, HE'S STUDIED THE DOCUMENTS, BUT MY PROBLEM
23      WITH THIS WITNESS IN THIS PARTICULAR CASE IS THAT HIS
24      EXPERIENCE LEVEL DOESN'T GIVE HIM EXPERTISE TO SATISFY EVEN THE
25      FIRST HURDLE.
page 514
1               AS I SAID, IF I USE THE PROPER METHODOLOGY, I'LL
2       PASS DAUBERT, BUT I'VE GOT TO FIRST BE ABLE TO GET PAST THE
3       EXPERIENCE LEVEL.  AND I AGREE, I HEARD HIM SAY THIS IS THE
4       FIRST TIME.  I'VE NEVER SEEN ANYBODY WITH -- THEN HE SAID,
5       WELL, SINCE MY DEPOSITION, I REALIZED THAT I SAW ONE PERSON
6       THAT I TREATED WITH VIOXX.  I MEAN, I HEARD HIM TESTIFY TO
7       THAT.  THAT'S WHAT HE SAID ON THE STAND.
8               MR. MEUNIER:  BUT, YOUR HONOR, UNDER 702 YOU CAN BE
9       QUALIFIED NOT JUST BY EXPERIENCE BUT BY KNOWLEDGE.
10              THE COURT:  I'M SATISFIED HE DOESN'T HAVE THE
11      KNOWLEDGE.  THAT'S MY RULING.
12              MR. BIRCHFIELD:  TWO POINTS, YOUR HONOR.  ONE, WE
13      PREPARED OUR CASE BASED ON THE DAUBERT RULINGS AND HIM BEING
14      ABLE TO GIVE SPECIFIC CAUSATION IN THIS CASE.  AND HE IS -- HE
15      IS QUALIFIED, YOUR HONOR, HE DOES -- TO MAKE A DIFFERENTIAL
16      DIAGNOSIS AS TO CARDIAC EVENTS.  HE DOES IT EVERY DAY AS PART
17      OF HIS PRACTICE.
18              THE COURT:  I UNDERSTAND.  I TALK TO YOU-ALL AT THE
19      BENCH AS NOT TO EMBARRASS THE DOCTOR.  I'M ALWAYS CONCERNED
20      ABOUT TELLING SOMEBODY IN OPEN COURT WHERE WE'VE GOT PRESS AND
21      EVERYTHING, YOU'RE NOT QUALIFIED TO TESTIFY.  HE'S AN
22      EXPERIENCED DOCTOR.  HE'S A HARD-WORKING DOCTOR.
23              SO I TELL YOU THIS AT THE BENCH SO YOU KNOW MY
24      RULING, AND I RESERVED RULING ON THIS SPECIFIC POINT DURING
25      DAUBERT, AND SO I'M NOW TAKING THAT POSITION.  BUT THANK YOU
page 515
1       VERY MUCH.
2               MR. SIZEMORE:  YOUR HONOR, FOR THE RECORD CAN I JUST
3       READ --
4               THE COURT:  SURE.  EITHER NOW OR AFTER.  YOU CAN MAKE
5       A PROFFER ON IT.
6               THE MARSHAL:  ALL RISE.
7               THE COURT:  OKAY.
8       BY MR. BIRCHFIELD:
9       Q.   DR. BALDWIN, YOU TOLD US THAT YOU REVIEWED A SUBSTANTIAL
10      AMOUNT OF MATERIALS IN REGARD TO DICKY IRVIN; IS THAT CORRECT?
11      A.   I DID.
12      Q.   DID YOU REVIEW THE AUTOPSY REPORT?
13      A.   YES.
14      Q.   DID YOU FIND ANYTHING SIGNIFICANT IN THAT AUTOPSY REPORT?
15      A.   I DID.
16      Q.   TELL US WHAT YOU FOUND AND WHAT THE SIGNIFICANCE WAS.
17      A.   WELL, FIRST AND FOREMOST, THERE WAS AN INCLUSIVE BLOOD
18      CLOT IN THE ANTERIOR DESCENDING ARTERY.  THAT'S THE MAIN ARTERY
19      THAT COMES DOWN THE FRONT SIDE OF THE HEART.  AND THAT WAS IN
20      THE FACE OF ATHEROSCLEROSIS, BUT NOT THE SEVERE TYPE OF
21      ATHEROSCLEROSIS WITH CRITICAL NARROWING THAT WE TYPICALLY SEE
22      IN CONJUNCTION WITH A HEART ATTACK.
23      Q.   AND, DOCTOR, I THINK THE AUTOPSY REPORT SAID 60 PERCENT
24      OCCLUSION, IS THAT CORRECT?  IS THAT WHAT YOU RECALL?
25      A.   THAT'S WHAT IT SAID.
page 516
1       Q.   DO YOU CONSIDER THAT A SEVERE ATHEROSCLEROSIS?
2       A.   NO.  AND IT HAS A LITTLE BIT TO DO WITH THE WAY THE
3       PATHOLOGISTS HAVE AN OPPORTUNITY TO LOOK AT THE HEART.  IT'S IN
4       PATIENTS THAT ARE EXPIRED, THE HEART IS NOT BEATING, THERE IS
5       NOT BLOOD PRESSURE IN THE ARTERIES, SO THE ARTERIES AREN'T
6       APPROPRIATELY DISTENDED AS THEY ARE IN A LIVE PATIENT.
```

Issues Report [Merck_Trial_Transcripts (Ernst, Humeston, Irvin Plunkett)]

• Opposition - Motion for New Trial

```
 7                  PATHOLOGISTS DESCRIBE THE DEGREE OF BLOCKAGE BY THE
 8     AREA THAT'S TAKEN UP OF THE ARTERY BY THE PLAQUE; AND WHEREAS
 9     CARDIOLOGISTS, WE TYPICALLY DON'T GET AN OPPORTUNITY TO SEE
10     THAT.  WE SEE THE ARTERIES AS A PIPE.  WE SEE THE INSIDE LINING
11     OF THE ARTERY AS IT COMES DOWN.  AND SO THERE MAY BE AREAS THAT
12     ARE ONLY MINIMALLY NARROW, FIVE, TEN, PERCENT NARROWED, BUT
13     STILL HAVE SIGNIFICANT PLAQUE BECAUSE THE ARTERY WALL HAS
14     EXPANDED TO ALLOW FOR THAT WITHOUT CAUSING A NARROWING OF THE
15     ARTERY ITSELF.
16                  AND SO 60 PERCENT OCCLUSION DUE TO PLAQUE AT AUTOPSY
17     GENERALLY DOES NOT CORRELATE WITH A NARROWING THAT IS
18     OBSTRUCTIVE.  AND SO I WOULD CONSIDER THIS A NONFLOW-LIMITING
19     BLOCKAGE.  ONE THAT, IF WE SAW ON CARDIAC CATHETERIZATION,
20     WOULD NOT CAUSE US GREAT CONCERN.
21     Q.   LET ME MAKE SURE WE UNDERSTAND THAT.  YOU'RE SAYING THAT
22     THERE IS A DIFFERENCE IN HOW A PATHOLOGIST WOULD CHARACTERIZE A
23     PERCENTAGE OF BLOCKAGE THAN A CARDIOLOGIST WOULD IN A LIVE
24     PATIENT?
25     A.   RIGHT.
page 517
 1     Q.   AND SO WOULD YOU SAY THAT WHAT YOU SEE ON AUTOPSY WOULD BE
 2     A GREATER PERCENTAGE BLOCKAGE THAN YOU WOULD SEE IN A LIVE
 3     PATIENT?
 4     A.   THAT'S CORRECT.
 5     Q.   SO WHEN THE WHEN YOU READ THE PATHOLOGIST'S REPORT THAT
 6     SAID 60 PERCENT OCCLUSION, YOU WOULD CONSIDER IT TO BE WHEN HE
 7     WAS ALIVE, IT WOULD HAVE BEEN LESS THAN THAT?
 8     A.   CORRECT.  AT THE TIME OF THE CARDIAC CATHETERIZATION, WE
 9     WOULD LIKELY CONSIDER THAT TO BE A CONSIDERABLY LESS DEGREE OF
10     NARROWING.
11     Q.   DOCTOR, LET'S SAY THAT YOU HAVE A PATIENT THAT COMES IN,
12     DO YOU DO TESTS TO SEE WHAT THEIR PERCENTAGE OF BLOCKAGE IS IN
13     A -- IN THE ARTERIES OF THE HEART?
14     A.   WELL, A CARDIAC CATHETERIZATION STUDY WILL DEMONSTRATE
15     WHETHER OR NOT THERE IS APPRECIABLE NARROWING OF THOSE
16     ARTERIES.  IT DOESN'T SHOW THE SIZE OF THE PLAQUE PER SE.  WE
17     DO STRESS TESTS, EXERCISE STRESS TESTS, SOME EXERCISE
18     ULTRASOUND EXAMINATIONS OF THE HEART, OR OTHER TYPES OF STRESS
19     STUDIES, WHERE WE GIVE MEDICATIONS IN PLACE OF EXERCISE, TO TRY
20     TO ASSESS THE RELATIVE BLOOD FLOW TO THE DIFFERENT AREAS OF
21     HEART MUSCLE TO DETERMINE WHETHER OR NOT A BLOCKAGE IS REALLY
22     FLOW-LIMITING.
23     Q.   CAN YOU DESCRIBE FOR US HOW YOU DO INTERVENTIONAL
24     CARDIOLOGY; IS THAT RIGHT?
25     A.   RIGHT.
page 518
 1     Q.   SO WHEN SOMEBODY HAS A PROCEDURE, YOU TREAT IT?
 2     A.   THAT'S CORRECT.
 3     Q.   YOU GO INTO THE BODY WITH AN ANGIOPLASTY OR BALLOONS, THAT
 4     TYPE OF STUFF?
 5     A.   YES.
 6     Q.   DOCTOR, IF YOU HAVE A TEST THAT SHOWS A PATIENT HAS
 7     60 PERCENT OCCLUSION IN ONE OF HIS HEART ARTERIES, WHAT DO YOU
 8     DO FOR THAT PATIENT?
 9     A.   60 PERCENT OCCLUSION BASED ON THE PATHOLOGY DEFINITION?
10     Q.   YES.
11     A.   WE WOULD PUT THEM ON ASPIRIN.
12     Q.   YOU WOULDN'T DO ANY INTERVENTIONAL?
13     A.   NO.  THERE IS NO EVIDENCE TO SHOW THAT FIXING A BLOCKAGE
14     THAT'S NOT FLOW-LIMITING DOES ANYTHING GOOD FOR THE PATIENT
15     OTHER THAN TO SUBJECT THEM TO THE RISK OF THE PROCEDURE.
16     Q.   THEN, WHEN YOU SAY "FLOW-LIMITED," IS THAT A TERM
17     CARDIOLOGISTS TALK ABOUT?
18     A.   YES.
19     Q.   WHAT IS FLOW-LIMITING?  WHAT DO YOU MEAN BY THAT?
20     A.   ESSENTIALLY, THE SIZE OF THE ARTERY IS SUFFICIENT NOT ONLY
21     FOR THE HEART'S DEMANDS FOR BLOOD FLOW AT REST BUT, ALSO, THE
22     DEMANDS UNDER STRESS.  SO THE FLOW THROUGH THAT PIPE NEEDS TO
23     INCREASE PROPORTIONATELY TO THE INCREASED DEMANDS.
24                  YOU CAN HAVE CONSIDERABLE NARROWING, UP TO 50 PERCENT
```

Issues Report [Merck_Trial_Transcripts (Ernst, Humeston, Irvin Plunkett)]

• **Opposition - Motion for New Trial**

25     OR GREATER, DIAMETER NARROWING WHICH WOULD CORRELATE TO A

page 519
1     HIGHER DEGREE AT PATHOLOGY, BEFORE THERE IS ENOUGH CONSTRICTION
2     THERE THAT IT PREVENTS THE HEART DOWNSTREAM FROM GETTING THE
3     BLOOD SUPPLY THAT IT NEEDS.
4     Q.    ALL RIGHT.  AND, DOCTOR, WHEN YOU TALK IN TERMS OF A
5     BLOCKAGE BEING CLINICALLY SIGNIFICANT, WHAT DOES THAT MEAN?
6     A.    IT REFERS TO WHETHER OR NOT IT'S HEMODYNAMICALLY
7     SIGNIFICANT TYPICALLY.  ENOUGH TO CAUSE PEOPLE TO HAVE EVIDENCE
8     OF ISCHEMIA, WHICH WE TALKED ABOUT BEFORE, A HEART MUSCLE
9     THAT'S NOT HAPPY WITH ITS BLOOD SUPPLY COULD CAUSE CHEST
10    DISCOMFORT, ET CETERA.
11    Q.    OKAY.  NOW, YOU SAID -- WELL, HEMODYNAMIC, WHAT IS THAT?
12    A.    HEMODYNAMIC REFERS TO BLOOD MOVING.  IF IT IS OBSTRUCTIVE
13    ENOUGH THAT IT ACTUALLY CHANGES THE FLOW THROUGH THE ARTERY.
14    Q.    SO THAT'S WHAT YOU'RE TALKING ABOUT IN FLOW-LIMITING?
15    A.    CORRECT.
16    Q.    AND SO BASED ON WHAT YOU SAW IN THE AUTOPSY REPORT, WOULD
17    YOU CONSIDER DICKY IRVIN TO HAVE A FLOW-LIMITING CONDITION?
18    A.    NO.
19    Q.    AND WHY?  IS THERE ANYTHING ELSE THAT WOULD SUGGEST THAT
20    HE DID NOT HAVE A FLOW-LIMITING CONDITION THAT YOU'RE AWARE OF?
21    A.    NOT NECESSARILY FROM THE AUTOPSY, BUT I UNDERSTAND FROM
22    THE REST OF THE CLINICAL INFORMATION IS THAT HE COMPLAINED OF
23    NO SYMPTOMS, JUST EXERTIONAL CHEST DISCOMFORT PRIOR TO STARTING
24    MEDICATIONS OR PRIOR TO HIS AUTOPSY.
25    Q.    OKAY.  AND YOU SAY "OTHER CLINICAL SYMPTOMS."  DID YOU

page 520
1     REVIEW SOME DEPOSITIONS AND GET AN IDEA OF WHAT HIS CLINICAL
2     PICTURE WAS LIKE?
3     A.    YES.
4     Q.    AND YOU SAY THERE WAS NOTHING THERE THAT WOULD SUGGEST
5     THAT HE HAD A FLOW-LIMITING CONDITION?
6     A.    THAT'S CORRECT.
7     Q.    WHAT WOULD YOU EXPECT TO SEE IN SOMEONE WHO HAD A
8     FLOW-LIMITING CONDITION?
9     A.    A MORE TIGHTLY NARROWED ARTERY.  USUALLY DESCRIBED AT THE
10    TIME OF AUTOPSY NOT ONLY BY VIRTUE OF THE DESCRIPTION OF
11    PERCENT BLOCKAGE BUT A DESCRIPTION OF A VERY SMALL LUMEN,
12    MEANING THE OPENING OF THE ARTERY, THE OPENING OF THE ARTERY IS VERY
13    PINCHED IN AND SMALL.
14    Q.    IF SOMEONE HAD A FLOW-LIMITING CONDITION, WOULD YOU EXPECT
15    TO SEE SYMPTOMS?  WOULD THERE BE -- WOULD THERE BE CHEST PAINS
16    OR ANYTHING LIKE THAT?
17    A.    YES.
18    Q.    WHAT WOULD YOU EXPECT TO SEE?  ANYTHING BESIDES CHEST
19    PAINS?
20    A.    COULD BE SHORTNESS OF BREATH, COULD BE EXERCISE-INDUCED;
21    SHOULDER, NECK, OR JAW DISCOMFORT.
22    Q.    WAIT, DOES THAT COME HAND-IN-HAND:  IF YOU HAVE A
23    FLOW-LIMITING EXPERIENCE, DO YOU EXPERIENCE CHEST PAIN --
24    A.    YES.
25    Q.    -- OR SHORTNESS OF BREATH?  DOCTOR, WE'VE HAD SOME

page 521
1     DISCUSSION IN THE TRIAL ABOUT PLAQUE RUPTURE.  IS THAT
2     SOMETHING THAT YOU ENCOUNTER IN YOUR PRACTICE?
3     A.    YES.
4     Q.    WILL YOU DESCRIBE FOR US WHAT A PLAQUE RUPTURE IS.
5     A.    SURE.  WE TALKED A LITTLE BIT ABOUT ATHEROSCLEROTIC PLAQUE
6     BEING THAT THICKENED GROWTH IN THE ARTERY WALL.  AND SOME
7     PLAQUES HAVE VERY THIN CAPS, A THIN FIBROUS CAP OVER THE
8     SURFACE THAT SEPARATES THAT GROWTH FROM THE ARTERY BLOOD FLOW.
9     AND IF THAT CAP BECOMES SPLIT, FISSURED, OR CRACKED, THEN THEY
10    CAN EXPOSE THIS MATERIAL BENEATH THAT CAP, WHICH IS POOLED
11    CHOLESTEROL AND FRAGMENTS OF INFLAMMATORY CELLS THAT MAY HAVE
12    ALREADY DIED AND ARE BEING REABSORBED, COLLAGEN, OTHER
13    COMPONENTS OF THE ARTERY WALL, TO THE BLOODSTREAM, AND THAT MAY
14    ACT AS A STIMULUS FOR BLOOD CLOTTING TO OCCUR.
15    Q.    DOES A PLAQUE RUPTURE, DOES THAT ALWAYS END IN DEATH?
16    A.    NO. PROBABLY A VERY, VERY SMALL MINORITY OF THE PLAQUE

Issues Report [Merck_Trial_Transcripts (Ernst, Humeston, Irvin Plunkett)]

• Opposition - Motion for New Trial

```
17        RUPTURES END UP IN CLINICAL EVENTS, HEART ATTACKS AND DEATH.
18        Q.   SO A PLAQUE RUPTURE WOULDN'T AUTOMATICALLY END UP IN EVEN
19        A HEART ATTACK?
20        A.   CORRECT.
21        Q.   HOW OFTEN DO PLAQUE RUPTURES OCCUR?
22        A.   WE PROBABLY ALL HAVE PLAQUE RUPTURES, MAYBE EVEN EVERY
23        DAY.  SO THEY ARE VERY FREQUENT.  THEY DON'T PROCEED TO
24        OCCLUSIVE THROMBUS THAT CAUSES A CLINICAL EVENT, EXCEPT IN
25        CIRCUMSTANCES WHERE THE NARROWING IS SEVERE ENOUGH THAT YOU
```
page 522
```
1         DON'T HAVE TO FORM MUCH BLOOD CLOT FOR THE CLOT TO BE OCCLUDED
2         OR IN CIRCUMSTANCES WHERE THERE IS AN IMBALANCE IN THE CLOTTING
3         MECHANISM THAT FORMS THE DEVELOPMENT OF THE CLOT OTHERWISE.
4         Q.   WELL, DESCRIBE FOR US, DOCTOR, HOW IT WOULD WORK, HOW YOU
5         WOULD HAVE A PLAQUE RUPTURE THAT DIDN'T LEAD TO A CLOT
6         FORMATION IN NORMAL CIRCUMSTANCES.
7         A.   AS WE TALKED A LITTLE BIT ABOUT BEFORE, THERE IS A BALANCE
8         IN THE BODY'S CLOTTING MECHANISM THAT, AS A CLOT STARTS TO
9         FORM, THERE IS FACTORS THAT ARE ALREADY COMING INTO PLAY TO
10        HELP INTERACT OR INTERFERE WITH THAT OR CAUSE THE CLOT TO
11        DISSOLVE AND GO AWAY.  SO IT'S A BALANCE BETWEEN THOSE TWO.
12              MOST PLAQUE RUPTURES HAVE PLATELET DEPOSITION AND
13        FIBRIN DEPOSITION, ONE OF THE INITIAL COMPONENTS TO A CLOT, TO
14        ALLOW THAT -- ALLOW THAT RENT IN THE ARTERY WALL TO BE COVERED
15        OVER TO THEN ALLOW IT TO HEAL UNDERNEATH THAT COVER.  BUT THAT
16        COVERING DOESN'T PROLIFERATE ENOUGH TO CAUSE IT TO BE OCCLUDED.
17        Q.   THANK YOU.  YOU SAID "DEPOSITIONS."  WE'VE HAD SOME
18        DEPOSITIONS IN THE TRIAL, BUT WHAT ARE YOU TALKING ABOUT IN
19        TERMS OF THE INNER WALL OF THE VESSEL?  WHAT ARE YOU TALKING
20        ABOUT, A DEPOSITION?
21        A.   WE'RE TALKING ABOUT PROTEINS THAT, IN RESPONSE TO
22        PLATELETS STICKING TOGETHER AND OTHER PROTEINS COME INTO THAT
23        AREA, POLYMERIZE AND FORM A GELATINOUS TYPE SUBSTANCE THAT
24        OVERLIES THAT AREA OF INJURY.
25        Q.   SO IF THE CLOTTING MECHANISM IS NORMAL, AND YOU HAVE A
```
page 523
```
1         PLAQUE RUPTURE, YOU WOULDN'T EXPECT A CLOT FORMATION; IS THAT
2         RIGHT?
3                   MR. ISMAIL:  OBJECTION, LEADING.
4                   MR. BIRCHFIELD:  IS THAT RIGHT OR NOT?
5                   THE COURT:  I'LL LET THAT GO.  WE'VE GOT TO GET TO
6         IT, SO I OVERRULE THE OBJECTION.  CAN YOU ANSWER?
7         BY MR. BIRCHFIELD:
8         Q.   IF YOU HAVE A PLAQUE RUPTURE AND THE CLOTTING MECHANISM IS
9         NOT DISRUPTED, YOU WOULD NOT EXPECT TO SEE A CLOT?
10        A.   IN AN ARTERY THAT WASN'T TIGHTLY NARROWED, I WOULDN'T
11        EXPECT TO SEE A CLOT.
12        Q.   NOW, BASED ON THE CLINICAL FACTORS THAT YOU'RE AWARE OF IN
13        DICKY IRVIN'S CASE, AND BASED ON WHAT YOU SAW ON THE AUTOPSY,
14        WHAT TREATMENT WOULD YOU RECOMMEND -- IF HE WAS ALIVE AND HE
15        CAME TO SEE YOU, WHAT COURSE OF TREATMENT WOULD YOU HAVE
16        RECOMMENDED?
17        A.   ASPIRIN.
18        Q.   ASPIRIN ONLY?
19        A.   RIGHT.
20        Q.   NO OTHER PROCEDURES THAT YOU DO FOR INTERVENTIONAL
21        CARDIOLOGY?
22        A.   WELL, NO.  I WOULD NOT HAVE RECOMMENDED A PROCEDURE BASED
23        ON THAT INFORMATION.
24        Q.   AND, DOCTOR, DO YOU TREAT PATIENTS THAT ARE SEEING OTHER
25        DOCTORS AS THEIR GENERAL PHYSICIAN?
```
page 524
```
1         A.   ABSOLUTELY.
2         Q.   SO IF SOMEONE HAS JUST ORDINARY AILMENTS, THEY WOULD SEE
3         ANOTHER DOCTOR; IS THAT RIGHT?
4         A.   THEY MAY HAVE TWO OR THREE.
5         Q.   THEY ONLY COME TO YOU FOR CARDIOLOGY ISSUES?
6         A.   CORRECT.
7         Q.   AND, DOCTOR, DO YOU TREAT PATIENTS THAT ARE ALREADY ON
8         MEDICATIONS BEFORE THEY COME TO YOU?
```

Issues Report [Merck_Trial_Transcripts (Ernst, Humeston, Irvin Plunkett)]

• Opposition - Motion for New Trial

```
 9    A.    YES.
10    Q.    AND AS PART OF YOUR -- AS PART OF YOUR PRACTICE, DO YOU
11    MAKE YOURSELF FAMILIAR WITH HOW THOSE DRUGS THAT THEY MAY BE
12    TAKING WOULD AFFECT THEIR CARDIAC CONDITION?
13    A.    YES.
14    Q.    AND HOW DO YOU DO THAT?  WHAT DO YOU DO TO DETERMINE IF
15    THOSE DRUGS WOULD AFFECT THE CARDIAC CONDITION?
16    A.    WELL, WE TRY TO READ WHAT'S AVAILABLE TO US.  IT COULD BE
17    THE PDR OR THE PACKAGE INSERT IN REGARDS TO PARTICULAR
18    MEDICINES, JOURNAL ARTICLES, TO THE MEDICAL LETTERS, THE
19    JOURNAL THAT TALKS ABOUT NEW DRUGS AS THEY COME OUT.  SO WE
20    REVIEW THOSE INFORMATION AND TALK ABOUT -- AT MEETINGS TALK
21    ABOUT HOW NONCARDIAC DRUGS AFFECT CARDIAC PATIENTS.
22    Q.    IS THAT AN IMPORTANT PART OF YOUR PRACTICE AS A
23    CARDIOLOGIST?
24    A.    IT IS.
25    Q.    AND, DOCTOR, WE'VE HAD SOME MENTION OF THE RISK BENEFIT
page 525
 1    ANALYSIS OF DRUGS.  WHAT DOES THAT MEAN?
 2    A.    THE ENTIRE PRACTICE OF MEDICINE IS ESSENTIALLY AN
 3    EVALUATION OF RELATIVE RISKS VERSUS RELATIVE BENEFITS.  AND
 4    THAT APPLIES TO MEDICATIONS, IT APPLIES TO DIAGNOSTIC
 5    PROCEDURES, IT APPLIES TO THERAPEUTIC OR PROCEDURES THAT FIX
 6    THINGS.  AND SO WE'RE CONSTANTLY TRYING TO EVALUATE, FOR GIVEN
 7    PATIENTS, WHAT THE RELATIVE RISKS VERSUS THE BENEFITS OF
 8    PARTICULAR TREATMENT OR MEDICINE.
 9    Q.    AND, DOCTOR, YOU WERE ASKED EARLIER BY MR. ISMAIL IF YOU
10    EVER PRESCRIBED VIOXX.
11    A.    NOT THAT I RECALL.
12    Q.    BUT, DOCTOR, DID YOU TREAT PATIENTS THAT WERE TAKING VIOXX
13    FROM OTHER DOCTORS WHEN THEY CAME TO SEE YOU?
14    A.    YES.
15    Q.    AND APPROXIMATELY HOW MANY?
16    A.    LESS THAN A HUNDRED.
17    Q.    NOW, DID YOU GO THROUGH THAT RISK BENEFIT ANALYSIS IN
18    REGARDS TO -- IN REGARDS TO VIOXX FOR YOUR CARDIAC PATIENTS?
19    A.    ON AN ONGOING BASIS, THAT RISK BENEFIT ANALYSIS CHANGED AS
20    WE KNEW MORE ABOUT THAT PARTICULAR MEDICATION.
21    Q.    AND WHAT DID YOU DO TO EVALUATE THE RISK AND THE BENEFITS
22    OF VIOXX?
23              MR. ISMAIL:  I OBJECT, YOUR HONOR.
24              THE COURT:  WELL, I'LL LET HIM TESTIFY AS TO WHAT HE
25    DID IN HIS OWN PRACTICE.  I'LL OVERRULE THAT OBJECTION.
page 526
 1              THE WITNESS:  I WAS AWARE OF LITERATURE AND
 2    SUBSEQUENT EXPERTS THAT HAD STUDIED THOSE LITERATURES THAT HAD
 3    OPINIONS.  WE HAD COMMUNICATIONS BETWEEN US WITHIN OUR PRACTICE
 4    AND WITH OTHER PHYSICIANS AT MEETINGS.  AND WE ARE -- I'LL STOP
 5    THERE.  BUT WE TRY TO GATHER INFORMATION ON AN ONGOING BASIS
 6    AND THEN MAKE ADJUSTMENTS IN OUR THERAPIES BASED UPON OUR
 7    PERCEIVED RELATIVE RISKS.
 8    BY MR. BIRCHFIELD:
 9    Q.    AND YOU DID THAT SPECIFICALLY WITH VIOXX, RIGHT?
10    A.    I DID.
11    Q.    AND WHAT DETERMINATION DID YOU REACH IN REGARD TO THE RISK
12    BENEFIT ANALYSIS FOR VIOXX ON THE PATIENTS THAT YOU WERE
13    TREATING FOR CARDIAC CONDITIONS?
14    A.    I CAME TO THE CONCLUSION THAT BASED ON MY OBSERVATIONS OF
15    THOSE PATIENTS AND SOME OF THE ADVERSE EFFECTS THAT THEY HAD
16    ASSOCIATED WITH THE MEDICATIONS, IN ADDITION TO SOME OF THE
17    LITERATURE THAT WAS BECOMING AVAILABLE THAT THERE WAS
18    SIGNIFICANT POTENTIAL RISK FOR PATIENTS DUE TO THAT MEDICATION
19    SUCH THAT I ADVISED PATIENTS TO TRY TO FIND A DIFFERENT
20    MEDICATION.
21    Q.    AND DID YOU HAVE ANY DISCUSSIONS OR ANY COMMUNICATION WITH
22    THEIR DOCTORS THAT HAD ACTUALLY PRESCRIBED IT?
23    A.    YES.
24    Q.    AND WHAT DID YOU SAY?
25    A.    MY CORRESPONDENCE TO THEM TYPICALLY WAS:  I'VE SEEN JOHN
page 527
```

Issues Report [Merck_Trial_Transcripts (Ernst, Humeston, Irvin Plunkett)]

• Opposition - Motion for New Trial

```
 1      SMITH FOR HIS CORONARY ARTERY DISEASE, THAT HE'S DOING WELL,
 2      AND THEN REVIEWED AT THE END, I'VE ASKED MR. SMITH TO SEEK YOUR
 3      GUIDANCE IN REGARDS TO AN ALTERNATIVE TO -- AND I DIDN'T LIMIT
 4      IT TO VIOXX.  I INCLUDED THE OTHER COX-2 INHIBITORS, IN LIGHT
 5      OF SOME OF THE RECENT LITERATURE AND MY CONCERNS OVER MY
 6      EXPERIENCE WITH THOSE PATIENTS.
 7      Q.   DOCTOR, YOU TREAT PATIENTS THAT HAVE HAD HEART ATTACKS; IS
 8      THAT RIGHT?
 9      A.   EVERY DAY.
10      Q.   AND HOW MANY HEART ATTACKS HAVE YOU TREATED IN YOUR
11      CAREER?
12      A.   CERTAINLY HUNDREDS, PROBABLY THOUSANDS.
13      Q.   NOW, ISN'T HEART DISEASE THE NUMBER ONE KILLER IN OUR
14      COUNTRY?
15      A.   YES.
16      Q.   AND WHAT END ROADS HAVE BEEN MADE INTO TREATING OR CURBING
17      THE PREVALENCE OF HEART DISEASE?
18      A.   IT'S ACROSS THE BOARD.  IT'S RISK FACTOR MODIFICATION.  IT
19      IS TECHNIQUES TO EARLIER DIAGNOSE CARDIAC DISEASE, LIFESTYLE
20      MODIFICATIONS, AND MEDICATIONS.
21      Q.   AND, DOCTOR, DO PATIENTS DIE EVERY DAY WITHOUT HEART
22      ATTACKS OR SUDDEN CARDIAC DEATH, WITHOUT ANY WARNING SIGNS?
23      A.   YES.
24      Q.   AND HOW DOES THAT HAPPEN?
25      A.   WELL, PATIENTS CAN HAVE A -- FIRST OF ALL, A MAJORITY OF
page 528
 1      SUDDEN CARDIAC DEATH OCCURS IN CONJUNCTION WITH A HEART ATTACK.
 2      BECAUSE IN THE EARLY MINUTES OF A HEART ATTACK IS THE TIME WHEN
 3      THE HEART IS AT GREATEST RISK FOR AND ANY LIFE- THREATENING OR
 4      LIFE-ENDING HEARTBEAT.  THE HEARTBEAT JUST DOESN'T RESPOND TO
 5      THAT LACK OF OXYGEN AND BECOMES ELECTRICALLY UNSTABLE.  SO IN
 6      LIGHT OF THE PREVALENCE OF CORONARY ARTERY DISEASE AND HEART
 7      ATTACKS, THEN SUDDEN CARDIAC DEATH IS ALSO -- IS ALSO
 8      INCREASED.
 9      Q.   DR. BALDWIN, IN REVIEWING THE CLINICAL PICTURE OF DICKY
10      IRVIN AT THE TIME OF HIS DEATH AND REVIEWING THE INFORMATION
11      FROM THE AUTOPSY, IS HIS CONDITION SUCH THAT YOU WOULD EXPECT
12      TO SEE A SUDDEN CARDIAC DEATH OR HEART ATTACK?
13      A.   NO.
14      Q.   AND WHY NOT?
15      A.   WELL, ON SEVERAL POINTS.  IF WE LOOKED AT HIS RISK FACTOR
16      PROFILE, THIS GENTLEMAN LACKED MOST OF THE RISK FACTORS THAT WE
17      CONSIDERED THAT PUT PATIENTS AT HIGHER RISK FOR HEART ATTACKS
18      AND SUDDEN CARDIAC DEATH.  HE WAS NOT A DIABETIC; HE DIDN'T
19      SMOKE; HE DIDN'T HAVE EVIDENCE OF HIGH BLOOD PRESSURE, HIGH
20      CHOLESTEROL.  HE DIDN'T HAVE A FAMILY HISTORY OF PREMATURE
21      CORONARY ARTERY DISEASE.
22           HE WAS MALE AND HE WAS A BIG-FRAMED GENTLEMAN, MAYBE
23      MILDLY OBESE.  THAT WOULD BE AN ARGUMENT.  HE WAS SNEAKING INTO
24      AN AGE GROUP WHERE MEN START TO HAVE AN INCREASED RISK OF HEART
25      DISEASE, BUT I WOULD CONSIDER HIS RISK FOR CARDIAC EVENTS AND
page 529
 1      DEATH TO BE QUITE LOW.
 2      Q.   AND, DOCTOR, DO YOU TREAT PATIENTS THAT MEET THAT PROFILE?
 3      A.   YES.
 4      Q.   ON A DAILY BASIS?
 5      A.   I DON'T SEE THEM WITH HEART ATTACKS AND SUDDEN CARDIAC
 6      DEATH ON A DAILY BASIS.
 7      Q.   WOULD THAT BE RARE?  UNUSUAL?
 8      A.   IT WOULD BE VERY RARE.
 9      Q.   DOCTOR, WHEN YOU TREAT A PATIENT THAT HAS EXPERIENCED A
10      HEART ATTACK, DO YOU -- AS PART OF YOUR PRACTICE, DO YOU LOOK
11      FOR THE CATALYST OR THE TRIGGER FOR THAT HEART ATTACK?
12      A.   YES.
13      Q.   IS THAT AN IMPORTANT PART OF YOUR PRACTICE IN TREATING
14      CARDIAC PATIENTS?
15           MR. ISMAIL:  YOUR HONOR.
16           THE WITNESS:  IT IS.
17           THE COURT:  WE'RE GETTING INTO AN AREA NOW THAT I'M
18      SENSITIVE TO, SO --
```

Issues Report [Merck_Trial_Transcripts (Ernst, Humeston, Irvin Plunkett)]

• Opposition - Motion for New Trial

```
19              MR. BIRCHFIELD:  YES, SIR, I UNDERSTAND, YOUR HONOR.
20      BY MR. BIRCHFIELD:
21      Q.    IS THAT SOMETHING THAT YOU DO IN TREATING PATIENTS?  DO
22      YOU LOOK FOR A CATALYST OR A TRIGGER FOR THAT HEART ATTACK?
23      A.    YES.  WHEN WE SEE PATIENTS THAT HAVE EVENTS THAT ARE
24      UNEXPECTED, BASED ON THEIR ANATOMY OR THEIR RISK FACTORS, THEN
25      WE START TO SCRATCH OUR HEAD AND TRY TO FIGURE OUT ARE THERE
page 530
1       OTHER THINGS GOING ON THERE THAT TIP THIS PATIENT TO HAVING A
2       BLOOD CLOT AND CAUSING A HEART ATTACK.
3       Q.    THAT'S IMPORTANT TO KNOW, ISN'T IT, DOCTOR?
4       A.    IT IS.
5       Q.    I MEAN, IF YOU'VE GOT A CARDIAC PATIENT THAT HAS
6       EXPERIENCED A HEART ATTACK, AND YOU CAN IDENTIFY THE TRIGGER,
7       THEN YOU CAN TREAT BASED ON THAT TRIGGER; IS THAT RIGHT?
8       A.    CORRECT.
9               MR. ISMAIL:  YOUR HONOR --
10              THE COURT:  ALL RIGHT, COUNSEL, LET'S MOVE IT.  LET'S
11      MOVE ON.  I'LL SUSTAIN THE OBJECTION.
12              MR. BIRCHFIELD:  EXCUSE ME?
13              THE COURT:  HE HAD AN OBJECTION.  I SUSTAINED IT, AND
14      I ASKED YOU TO MOVE ON TO ANOTHER AREA.
15      BY MR. BIRCHFIELD:
16      Q.    WILL YOU DESCRIBE FOR US WHAT THE RISK FACTORS ARE FOR A
17      HEART ATTACK?
18      A.    YES.  BEING MALE OR BEING POSTMENOPAUSAL IN A FEMALE.
19      INCREASING AGE, HIGH CHOLESTEROL, SMOKING, HIGH BLOOD PRESSURE,
20      DIABETES, FAMILY HISTORY, AND OBESITY IS A WEAK ONE.  IF YOU
21      TAKE OUT THE INCREASED RISK OF DIABETES, HIGH CHOLESTEROL, AND
22      HIGH BLOOD PRESSURE OUT OF FOLKS THAT ARE OBESE, THEN THAT RISK
23      FACTOR REALLY DROPS OFF.
24      Q.    AND IN REGARDS TO THE RISK FACTORS AS THEY APPLY TO DICKY
25      IRVIN, WHAT DID YOU FIND?
page 531
1       A.    I FOUND THAT HE HAD A VERY LOW-RISK PROFILE.
2       Q.    AND WHAT WERE THOSE RISK FACTORS THAT YOU SAW WITH DICKY
3       IRVIN?
4       A.    WELL --
5               MR. ISMAIL:  YOUR HONOR.  THAT'S THE SECOND TIME
6       THROUGH THE SAME SET OF QUESTIONS.
7               THE COURT:  YES.  ASKED AND ANSWERED.
8       BY MR. BIRCHFIELD:
9       Q.    BASED ON YOUR UNDERSTANDING OF HIS CLINICAL PICTURE, YOU
10      WOULD NOT HAVE EXPECTED DICKY IRVIN TO HAVE A HEART ATTACK
11      OUTSIDE OF A TRIGGER?
12              MR. ISMAIL:  YOUR HONOR.
13              THE COURT:  THAT'S BEEN ASKED AND ANSWERED.  ANYTHING
14      FURTHER?
15              MR. BIRCHFIELD:  JUST ONE SECOND, YOUR HONOR.
16              THE COURT:  DO YOU HAVE ANY CROSS?
17      BY MR. BIRCHFIELD:
18      Q.    BASED ON THE AUTOPSY REPORT THAT YOU REVIEWED, YOU SAID
19      THAT YOU TOLD US THAT ONE SIGNIFICANT FACTOR WAS THE CLOT THAT
20      YOU SAW IN THE LEFT ANTERIOR DESCENDING ARTERY?
21      A.    YES.
22      Q.    WERE THERE ANY OTHER SIGNIFICANT FINDINGS IN THE AUTOPSY?
23      A.    NO.
24      Q.    AND DID YOU FIND ANYTHING IN THE AUTOPSY THAT WOULD GIVE
25      ANY INDICATION ABOUT HIGH BLOOD PRESSURE?
page 532
1       A.    YES.
2       Q.    WHAT WAS THAT?
3       A.    THERE WAS NO EVIDENCE OF THICKENING OF THE WALL OF THE
4       LEFT VENTRICLE.  WHEN THE HEART WORKS UNDER CHRONIC HIGH BLOOD
5       PRESSURE, IT BECOMES THICKENED, LIKE ANY OTHER MUSCLE THAT YOU
6       WOULD USE REPETITIVELY OR UNDER HARD STRESS.  THERE WAS NO
7       EVIDENCE OF THAT.
8               AND THEN LIKEWISE, THERE WAS NO EVIDENCE OF DAMAGE TO
9       THE KIDNEYS THAT YOU CAN SEE WITH SCARRING OR SHRINKAGE OF THE
10      KIDNEY IN RESPONSE TO HIGH BLOOD PRESSURE.
```

Issues Report [Merck_Trial_Transcripts (Ernst, Humeston, Irvin Plunkett)]

• **Opposition - Motion for New Trial**

```
11    Q.   SO BASED ON THE AUTOPSY REPORT, DID YOU CONCLUDE WHETHER
12    OR NOT DICKY HAD HYPERTENSION?
13    A.   I DID NOT.
14              MR. ISMAIL:  YOUR HONOR --
15    BY MR. BIRCHFIELD:
16    Q.   WHAT ABOUT IN REGARDS TO THE HEART WEIGHT OR CARDIOMEGALY,
17    WHAT DID YOU FIND THERE?
18    A.   I DID NOT CONSIDER THAT TO BE CONSISTENT WITH
19    CARDIOMEGALY.  HEART SIZE IS PROPORTIONAL TO BODY SIZE, ROUGHLY
20    THE SIZE OF YOUR FIST; AND SO CONSEQUENTLY, THE SIZE OF THE
21    HEART AS DESCRIBED AT AUTOPSY FOR THE SIZE GENTLEMAN THIS WAS,
22    THIS DID NOT CORRELATE WITH CARDIAC ENLARGEMENT.
23    Q.   DOCTOR, IN REGARDS TO THE CORONARY ARTERY DISEASE, HOW
24    WOULD YOU CATEGORIZE DICKY'S ATHEROSCLEROSIS?
25              MR. ISMAIL:  YOUR HONOR, SEVERAL TIMES.
page 533
1               THE COURT:  YES, WE HAVE BEEN THROUGH THAT.  ASKED
2     AND ANSWERED.  I'LL SUSTAIN THAT OBJECTION.
3               MR. BIRCHFIELD:  THAT'S ALL I HAVE, YOUR HONOR.
4               THE COURT:  THANK YOU VERY MUCH.  ANY CROSS?
5               MR. ISMAIL:  NO QUESTIONS, YOUR HONOR.
6               THE COURT:  CALL YOUR NEXT WITNESS.
7               MR. BEASLEY:  WE CALL DR. ALAN NIES.
8               THE COURT:  THIS IS HIS DEPOSITION?
9               MR. ISMAIL:  NO, SIR, LIVE.
10              THE COURT:  WOULD YOU COME FORWARD, SIR.
11              THE DEPUTY CLERK:  PLEASE STEP INTO THE WITNESS BOX.
12    WOULD YOU RAISE YOUR RIGHT HAND.
13              (WHEREUPON, ALAN NIES, HAVING BEEN DULY SWORN,
14    TESTIFIED AS FOLLOWS.)
15              THE DEPUTY CLERK:  PLEASE BE SEATED AND IF YOU WOULD
16    USE THE MICROPHONE THERE, WOULD YOU STATE YOUR FULL NAME FOR
17    THE RECORD.
18              THE WITNESS:  IT'S ALAN NIES, A-L-A-N.  NIES IS
19    N-I-E-S.
20              DEPUTY CLERK:  THANK YOU.
21                     DIRECT EXAMINATION
22    BY MR. BEASLEY:
23    Q.   GOOD MORNING, DR. NIES.  I DON'T BELIEVE WE'VE HAD THE
24    OPPORTUNITY TO MEET.  I'M JERRY BEASLEY.  I REPRESENT THE
25    FAMILY.  AM I CORRECT THAT YOU WORKED FOR MERCK FOR
page 534
1     APPROXIMATELY TEN YEARS?
2     A.   THAT'S RIGHT.  YES.
3     Q.   I BELIEVE YOU ARE RETIRED NOW FROM MERCK.  AM I CORRECT?
```

[492:19] - [492:21]     12/1/2005   Irvin Plunkett Trial - Baldwin, Nies, Ray

• **Opposition - Motion for New Trial**

```
page 492
18    BY MR. ISMAIL:
19    Q.   NOW, SIR, AM I CORRECT THAT WHILE VIOXX WAS ON THE MARKET,
20    YOU NEVER PERSONALLY PRESCRIBED THE MEDICINE?
21    A.   NOT THAT I RECALL.
22    Q.   AND THAT WOULD BE TRUE FOR THE OTHER COX-2 INHIBITOR DRUGS
```

[492:25] - [493:2]     12/1/2005   Irvin Plunkett Trial - Baldwin, Nies, Ray

• **Opposition - Motion for New Trial**

```
page 492
24    A.   TO MY RECOLLECTION, THAT IS CORRECT.
25    Q.   AND YOU HAVE NEVER DONE ANY RESEARCH IN COX-2 DRUGS,
page 493
1     CORRECT?
2     A.   THAT'S CORRECT.
3     Q.   AND, SIR, I BELIEVE YOU SAID AT YOUR DEPOSITION THAT YOU
```

Issues Report [Merck_Trial_Transcripts (Ernst, Humeston, Irvin Plunkett)]

• **Opposition - Motion for New Trial**
[493:3] - [493:23]          12/1/2005   Irvin Plunkett Trial - Baldwin, Nies, Ray

• Opposition - Motion for New Trial

```
page 493
2        A.    THAT'S CORRECT.
3        Q.    AND, SIR, I BELIEVE YOU SAID AT YOUR DEPOSITION THAT YOU
4    DO NOT EVER RECALL DIAGNOSING ONE OF YOUR OWN PATIENTS AS
5    HAVING A CARDIOVASCULAR THROMBOTIC EVENT FROM VIOXX; IS THAT
6    CORRECT?
7        A.    THAT'S CORRECT.  AT THE TIME OF MY DEPOSITION, I WAS NOT
8    AWARE OF ANY OF MY PATIENTS THAT HAD AN EVENT WHILE ON VIOXX.
9    I HAVE SUBSEQUENTLY BECOME AWARE OF ONE CASE.
10       Q.    SO YOUR DEPOSITION WAS TAKEN IN OCTOBER, CORRECT?
11       A.    THAT'S CORRECT.
12       Q.    THAT WAS ABOUT SIX WEEKS AGO?
13       A.    THAT'S CORRECT.
14       Q.    AND YOU SAID UNDER OATH AT THAT TIME YOU HAD NEVER
15   PERSONALLY TREATED A PATIENT WHOM YOU HAD DIAGNOSED AS HAVING A
16   VIOXX-RELATED BLOOD CLOT, CORRECT?
17       A.    AND THAT HOLDS.  I HAVE TREATED A PATIENT THAT HAD A
18   CARDIAC EVENT WHILE ON VIOXX.  I HAVEN'T MADE A DIAGNOSIS THAT
19   IT WAS CAUSED BY VIOXX, THAT'S CORRECT.
20       Q.    THANK YOU FOR THAT CLARIFICATION.  WHEN YOU COME INTO THIS
21   COURTROOM TODAY, YOU PERSONALLY HAVE NOT DIAGNOSED ONE OF YOUR
22   PATIENTS AS HAVING A VIOXX-RELATED CLOT, CORRECT?
23       A.    THAT'S CORRECT.
24       Q.    NOW, IS THAT TRUE FOR CELEBREX AS WELL?
```

[494:5] - [494:17]          12/1/2005   Irvin Plunkett Trial - Baldwin, Nies, Ray

• Opposition - Motion for New Trial

```
page 494
4        A.    THAT'S CORRECT.
5        Q.    NOW, SIR, YOU DON'T CONSIDER YOURSELF A CLINICAL
6    RESEARCHER, CORRECT?
7        A.    CORRECT.
8        Q.    AND I BELIEVE YOU HAVE NOT DONE ANY BASIC SCIENCE RESEARCH
9    YOURSELF SINCE COLLEGE?
10       A.    WITH THE PROVISO THAT DURING THE COURSE OF MEDICAL SCHOOL,
11   THERE MAY HAVE BEEN SOME INVOLVEMENT IN BASIC SCIENCE RESEARCH,
12   BUT...
13       Q.    SURE.  WHEN YOU'RE IN MEDICAL SCHOOL, YOU MAY HAVE HAD AN
14   OPPORTUNITY TO GO DOWN TO THE LAB AND MAYBE CONDUCT A FEW
15   EXPERIMENTS, BUT YOU WOULDN'T CONSIDER YOURSELF A SCIENTIFIC
16   RESEARCHER, WOULD YOU?
17       A.    THAT'S CORRECT.
18       Q.    AND YOU'RE REALLY NOT AN EXPERT TO COX-2 DRUGS, ARE YOU,
```

[494:18] - [494:20]          12/1/2005   Irvin Plunkett Trial - Baldwin, Nies, Ray

• Opposition - Motion for New Trial

```
page 494
17       A.    THAT'S CORRECT.
18       Q.    AND YOU'RE REALLY NOT AN EXPERT TO COX-2 DRUGS, ARE YOU,
19   SIR?
20       A.    NOT AN EXPERT, PER SE, NO.
21       Q.    AND YOU HAVE NEVER BEEN RESPONSIBLE FOR ANALYZING DATA
```

[494:18] - [494:20]          12/1/2005   Irvin Plunkett Trial - Baldwin, Nies, Ray

• Opposition - Motion for New Trial

```
page 494
17       A.    THAT'S CORRECT.
18       Q.    AND YOU'RE REALLY NOT AN EXPERT TO COX-2 DRUGS, ARE YOU,
19   SIR?
20       A.    NOT AN EXPERT, PER SE, NO.
21       Q.    AND YOU HAVE NEVER BEEN RESPONSIBLE FOR ANALYZING DATA
```

Issues Report [Merck_Trial_Transcripts (Ernst, Humeston, Irvin Plunkett)]

**• Opposition - Motion for New Trial**

[507:6] - [507:8]          12/1/2005    Irvin Plunkett Trial - Baldwin, Nies, Ray

                          • Opposition - Motion for New Trial

```
page 507
5          PARTICULAR CLOT, THE SIGNIFICANCE OF CLOTS, HOW CLOTS AFFECT
6          THE FUNCTIONING OF THE HEART, BUT I WON'T LET HIM TESTIFY AS TO
7          THE PART, IF ANY, THAT VIOXX OR COX-2 INHIBITORS PLAYED IN MR.
8          IRVIN'S DEATH.  I DON'T FEEL THAT HE'S QUALIFIED BY VIRTUE OF
9          EXPERIENCE, TRAINING, TO TESTIFY AS TO THE SPECIFIC CAUSE OF
```

[507:8] - [507:10]        12/1/2005    Irvin Plunkett Trial - Baldwin, Nies, Ray

                          • Opposition - Motion for New Trial

```
page 507
7          THE PART, IF ANY, THAT VIOXX OR COX-2 INHIBITORS PLAYED IN MR.
8          IRVIN'S DEATH.  I DON'T FEEL THAT HE'S QUALIFIED BY VIRTUE OF
9          EXPERIENCE, TRAINING, TO TESTIFY AS TO THE SPECIFIC CAUSE OF
10         MR. IRVIN'S DEATH.  A GENERAL CAUSE OF CLOTS, THE GENERAL
11         FORMATION OF CLOTS, HOW THEY ARE FORMED, WHERE THEY ARE FORMED,
```

Issues Report [Merck_Trial_Transcripts (Ernst, Humeston, Irvin Plunkett)]

• Opposition - Motion for New Trial

[1:] - [1:25]          2/3/2006     Plunkett II Trial - Hearing - Pre-Trial Motions
                       • Opposition - Motion for New Trial
                       page 1
                           0001
                       1                          UNITED STATES DISTRICT COURT
                       2                          EASTERN DISTRICT OF LOUISIANA
                       3
                       4
                       5
                               In Re: VIOXX PRODUCTS                *
                       6       LIABILITY LITIGATION                 *  MDL Docket No. 1657
                                                                   *
                       7                                           *
                               This document relates to            *  New Orleans, Louisiana
                       8       Case No. 05-4046:                    *
                                                                   *
                       9       EVELYN IRVIN PLUNKETT, et al         *  February 3, 2006
                                                                   *
                       10      versus                              *
                                                                   *  10:00 a.m.
                       11      MERCK & CO., INC.                    *
                               * * * * * * * * * * * * * * * * *
                       12
                       13
                       14                         PROCEEDINGS BEFORE THE
                                                  HONORABLE ELDON E. FALLON
                       15                         UNITED STATES DISTRICT JUDGE
                       16
                       17      APPEARANCES:
                       18
                               For the Plaintiff:            Beasley Allen Crow Methvin
                       19                                      Portis & Miles
                                                             BY:  ANDY D. BIRCHFELD, JR., ESQ.
                       20                                         LEIGH O'DELL, ESQ.
                                                             234 Commerce Street
                       21                                    Post Office Box 4160
                                                             Montgomery, Alabama 36103
                       22
                       23      For the Plaintiff:            Levin, Papantonio, Thomas,
                                                               Mitchell, Echsner & Proctor
                       24                                    BY:  TROY RAFFERTY, ESQ.
                                                             316 South Baylen Street, Suite 600
                       25                                    Pensacola, Florida 32502
                       page 2
                       1       Appearances, (Continued):

[20:23] - [21:12]      2/3/2006     Plunkett II Trial - Hearing - Pre-Trial Motions
                       • Opposition - Motion for New Trial
                       page 20
                       22  I'm going to deny it.  I'll explain my position on it.
                       23          MR. BIRCHFIELD:  Your Honor, if I may, I would like
                       24  to move for a continuance based on the Court's ruling last
                       25  night on the Daubert motion in regards to Dr. Baldwin and
                       page 21
                       1   Dr. Graham.  Certainly we believe that we have sufficient
                       2   evidence, with the expert testimony that we can proffer, that
                       3   will support getting this matter to a jury.  It will be by
                       4   inference.  Now, we do not have a particular expert that can
                       5   deliver a specific causation opinion.
                       6          Given the fact that this is a bellwether case in
                       7   the MDL, we ask the Court to continue this matter 30 to 60 days
                       8   to allow us to attempt to find an expert that will meet the
                       9   standard that we see the Court setting in its Daubert opinions.
                       10  If I can, Your Honor, I'm just going to ask the Court for some
                       11  guidance here.  I'll tell you how we view the Court's standard
                       12  that is set in the Daubert motion.



EXHIBIT

B

Issues Report [Merck_Trial_Transcripts (Ernst, Humeston, Irvin Plunkett)]

• Opposition - Motion for New Trial

```
13                    We have a pharmacologist who the Court has ruled
```

[21:19] - [21:25]     2/3/2006    Plunkett II Trial - Hearing - Pre-Trial Motions

• Opposition - Motion for New Trial

```
page 21
18   part because they are not a pharmacologist or an
19   epidemiologist.  So that leaves us, in order to have an expert
20   that can deliver a causation opinion -- that we think is not
21   necessary to get to the jury, but certainly it is very
22   important for the persuasive effect for the jury -- that we
23   would have to have one expert who was a pharmacologist,
24   epidemiologist, cardiologist, and in a death case a pathologist
25   rolled in one.
page 22
1                     It appears, Your Honor, that the Court puts
```

[22:16] - [22:20]     2/3/2006    Plunkett II Trial - Hearing - Pre-Trial Motions

• Opposition - Motion for New Trial

```
page 22
15           MR. BECK:  May I respond?
16           THE COURT:  You don't need to.  Some comments about
17   the requirements of the person, I'm not necessarily keyed in on
18   the degrees that the individual has as much as his familiarity
19   and experience with what he is talking about from the
20   standpoint of the drugs.  The last witness that I viewed
21   conducted some 700 autopsies.  In his practice, he never in his
```

[23:8] - [23:14]     2/3/2006    Plunkett II Trial - Hearing - Pre-Trial Motions

• Opposition - Motion for New Trial

```
page 23
7    of clots, obviously.  He is just not familiar with Vioxx, and
8    Vioxx is something that is being attacked.  I would expect an
9    expert who has some experience, some knowledge, if he has done
10   research, if he has prescribed it, if he has seen it, dealt
11   with it, to be able to testify, but someone who admits that --
12   one of the experts admitted, "I'm not an expert in Vioxx.  I've
13   never prescribed it.  I've never found a cardiac problem with
14   Vioxx.  I don't do it in my normal day."
15                   It seems to me that one of the things that the
```

[24:6] - [24:21]     2/3/2006    Plunkett II Trial - Hearing - Pre-Trial Motions

• Opposition - Motion for New Trial

```
page 24
5    record.  I will deny it.
6            MR. MEUNIER:  Judge, if you may allow me, for the
7    record, to just express a concern on behalf of the PSC and as
8    one of counsel that may be involved in later trials, if
9    case-specific causation experts are going to be struck on
10   Daubert four days before we start these trials, it's just going
11   to make it difficult in the downstream litigation of the MDL to
12   be able to serve up to a jury a specific causation opinion.  I
13   want to suggest that perhaps there's a way to get these rulings
14   done and the motion practice done with enough time to allow the
15   right kind of expert.
16           MR. BECK:  Well, Your Honor in that regard --
17           THE COURT:  I don't need anything.  This is the
18   second trial in this case.  I dealt with that, made rulings the
19   first trial in advance of the trial, we went through the trial,
20   and now it's the same issue.  The next trial that comes up,
21   bring them to me earlier and I will deal with them earlier.
22           MR. BIRCHFIELD:  I would like to address one key
```

Issues Report [Merck_Trial_Transcripts (Ernst, Humeston, Irvin Plunkett)]

• Opposition - Motion for New Trial

[26:17] - [27:5]        2/3/2006    Plunkett II Trial - Hearing - Pre-Trial Motions

• Opposition - Motion for New Trial

page 26
16   epidemiologist and a pharmacologist in --
17              THE COURT:  I agree with that, Andy.  I don't think
18   you need that.  I think if you have a pathologist who says,
19   "I'm familiar with this because I have seen it on several
20   occasions and it's consistent with what I have seen on other
21   occasions," "I do this all the time and this is what I have
22   been seeing for this period of time" -- he can say that he saw
23   clots, and then if in his normal day he has attributed those
24   clots or even knows something about Vioxx or has looked into
25   Vioxx or has thought about Vioxx or has written something on it
page 27
1    or has some knowledge of Vioxx, but the one or two that I have
2    excluded, they don't know anything about the drug.  They know
3    less than you folks know about the drug, less than I know about
4    the drug -- and I probably know less than you do -- and they
5    admit it.
6              MR. BECK:  Judge, we certainly don't take the

[33:5] - [33:16]        2/3/2006    Plunkett II Trial - Hearing - Pre-Trial Motions

• Opposition - Motion for New Trial

page 33
4                              * * *
5                            CERTIFICATE
6              I, Toni Doyle Tusa, CCR, Official Court Reporter,
7    United States District Court, Eastern District of Louisiana, do
8    hereby certify that the foregoing is a true and correct
9    transcript, to the best of my ability and understanding, from
10   the record of the proceedings in the above-entitled and
11   numbered matter.
12
13
14
                                    _____
                                    Toni Doyle Tusa, CCR
15                                  Official Court Reporter
16
17

[471:] - [471:25]       2/8/2006    Plunkett II Trial - Vol. 03 - Ray, Scolnick

• Opposition - Motion for New Trial

page 471
      0471
1                        UNITED STATES DISTRICT COURT
2                        EASTERN DISTRICT OF LOUISIANA
3
4
5

6        IN RE: VIOXX PRODUCTS         *
         LIABILITY LITIGATION          *     MDL DOCKET NO. 1657
                                       *
7                                      *
                                       *
8        THIS DOCUMENT RELATES TO      *     NEW ORLEANS, LOUISIANA
         CASE NO. 05-4046:             *
                                       *
9        EVELYN IRVIN PLUNKETT, ET AL  *     FEBRUARY 8, 2006
                                       *
10       VERSUS                        *
                                       *     8:30 A.M.
11       MERCK & CO., INC.             *
         * * * * * * * * * * * * * * * *
12
13
                         VOLUME III - DAILY COPY

Issues Report [Merck_Trial_Transcripts (Ernst, Humeston, Irvin Plunkett)]

• Opposition - Motion for New Trial

```
14                          JURY TRIAL BEFORE THE
                           HONORABLE ELDON E. FALLON
15                      UNITED STATES DISTRICT JUDGE
16
17      APPEARANCES:
18
        FOR THE PLAINTIFF:          BEASLEY ALLEN CROW METHVIN
19                                    PORTIS & MILES
                                    BY:  ANDY D. BIRCHFELD, JR., ESQ.
20                                      LEIGH O'DELL, ESQ.
                                    234 COMMERCE STREET
21                                  POST OFFICE BOX 4160
                                    MONTGOMERY, ALABAMA 36103
22
23      FOR THE PLAINTIFF:          LEVIN, PAPANTONIO, THOMAS,
                                      MITCHELL, ECHSNER & PROCTOR
24                                  BY:  TROY RAFFERTY, ESQ.
                                    316 SOUTH BAYLEN STREET, SUITE 600
25                                  PENSACOLA, FLORIDA 32502
page 472
1       APPEARANCES, (CONTINUED):
```

[739:25] - [740:9]      2/8/2006    Plunkett II Trial - Vol. 03 - Ray, Scolnick

• Opposition - Motion for New Trial

```
page 739
24      UNDERSTOOD IT.  I THOUGHT IT WOULD BE HELPFUL TO THE JURY.
25              THE ISSUES THAT I SEE IN DR. GRAHAM ARE REALLY
page 740
1       TWOFOLD:  ONE IS WHETHER HE'S QUALIFIED TO TESTIFY REGARDING
2       VIOXX, AND ALSO, HIS METHODOLOGY CONCERNED ME A BIT.  I DIDN'T
3       DISCUSS IT IN THE OPINION BECAUSE I DIDN'T GET THAT FAR, BUT
4       THE METHODOLOGY ALSO I SHARE WITH YOU GIVES ME SOME CONCERN.
5       THE ISSUE WITH REGARD TO QUALIFICATIONS, TO MY MIND, IS WHETHER
6       HE HAS EDUCATION OR EXPERIENCE OR KNOWLEDGE TO TESTIFY THAT
7       VIOXX CAUSED, IN WHOLE OR IN PART, MR. IRVIN'S DEMISE.  THIS IS
8       A ISSUE THAT I THINK IS A LOT DIFFERENT THAN OTHER FACTS, OTHER
9       SCENARIOS, IF YOU WILL.
10              I THINK IF THERE ARE TWO PATHOLOGISTS, ONE THAT
```

[741:12] - [742:16]      2/8/2006    Plunkett II Trial - Vol. 03 - Ray, Scolnick

• Opposition - Motion for New Trial

```
page 741
11      WITNESS TO TESTIFY ALONG THAT LINE.
12              I TURN TO THE EVIDENCE IN THE FORM OF THE
13      DEPOSITION THAT WAS TAKEN, AND I LOOK OVER FIRST THE EDUCATION
14      AND EXPERIENCE OF DR. GRAHAM.  ON PAGE 62, YOU KNOW THAT
15      DR. GRAHAM IS NOT AN EPIDEMIOLOGIST, HE'S NOT A CARDIOLOGIST,
16      HE HAS NO TRAINING AS A PHARMACOLOGIST, AND HE HASN'T DONE A
17      THOROUGH INVESTIGATION IN THE PATHOLOGY OF VIOXX.
18              "Q.  AND YOU REALLY HAVEN'T DONE A THOROUGH
19      INVESTIGATION INTO PHARMACOLOGY?"
20              ON PAGE 27, LINE 24:
21              "A.  I'VE LOOKED AT IT TO THE EXTENT THAT I NEED TO
22      ANSWER QUESTIONS IN THIS PARTICULAR CASE.  I'M NOT A
23      UNIVERSAL EXPERT IN VIOXX.
24              "Q.  NOR ARE YOU AN EXPERT IN PHARMACOLOGY OF VIOXX?
25              "A.  OTHER THAN WHAT I NEED IN THIS CASE, NO, I'M
page 742
1       NOT.  THAT'S CORRECT."
2               I ALSO LOOK AT HIS KNOWLEDGE OF CLINICAL TRIALS,
3       WHICH IS NOT ESSENTIAL, BUT IT'S HELPFUL IN A CASE OF THIS
4       SORT.  QUESTION ON PAGE 64:
5               "Q.  WOULD YOU AGREE THAT PLACEBO-CONTROLLED CLINICAL
6       TRIALS ARE THE GOLD STANDARD FOR DETERMINING THE RISKS OF
7       MEDICINE?
8               "A.  I WOULD DEFER TO EXPERTS WHO DESIGN STUDIES TO
9       LOOK AT SPECIFIC THINGS.  THAT'S NOT IN MY AREA OF
```

Issues Report [Merck_Trial_Transcripts (Ernst, Humeston, Irvin Plunkett)]

• **Opposition - Motion for New Trial**

```
10              EXPERTISE.
11                      QUESTION ON LINE 15:
12              "Q.  YOU'RE AGREEING YOU'RE NOT QUALIFIED TO
13      DETERMINE THE HIERARCHY OR RELIABILITY IS WITH RESPECT TO
14      THE CLINICAL TRIAL EVIDENCE THAT EXISTS ON VIOXX?
15              "A.  CORRECT.  YEAH, THAT'S NOT SOMETHING I DO.  I
16      WOULD DEFER TO EXPERTS ON A DAILY BASIS."
17                      I LOOK TO WRITINGS TO SEE WHETHER OR NOT HE'S
```

[742:2] - [743:20]     2/8/2006    Plunkett II Trial - Vol. 03 - Ray, Scolnick

• Opposition - Motion for New Trial

```
page 742
1               NOT.  THAT'S CORRECT."
2                       I ALSO LOOK AT HIS KNOWLEDGE OF CLINICAL TRIALS,
3       WHICH IS NOT ESSENTIAL, BUT IT'S HELPFUL IN A CASE OF THIS
4       SORT.  QUESTION ON PAGE 64:
5               "Q.  WOULD YOU AGREE THAT PLACEBO-CONTROLLED CLINICAL
6       TRIALS ARE THE GOLD STANDARD FOR DETERMINING THE RISKS OF
7       MEDICINE?
8               "A.  I WOULD DEFER TO EXPERTS WHO DESIGN STUDIES TO
9       LOOK AT SPECIFIC THINGS.  THAT'S NOT IN MY AREA OF
10      EXPERTISE.
11                      QUESTION ON LINE 15:
12              "Q.  YOU'RE AGREEING YOU'RE NOT QUALIFIED TO
13      DETERMINE THE HIERARCHY OR RELIABILITY IS WITH RESPECT TO
14      THE CLINICAL TRIAL EVIDENCE THAT EXISTS ON VIOXX?
15              "A.  CORRECT.  YEAH, THAT'S NOT SOMETHING I DO.  I
16      WOULD DEFER TO EXPERTS ON A DAILY BASIS."
17                      I LOOK TO WRITINGS TO SEE WHETHER OR NOT HE'S
18      DONE ANY WRITINGS OR HAS CONDUCTED ANY RESEARCH.  I SEE ON PAGE
19      28 OF HIS DEPOSITION, LINE 22:
20              "Q.  ALL RIGHT.  SO WOULD I BE CORRECT, SIR, THAT YOU
21      HAVE NEVER PUBLISHED ANY ARTICLE ON THE SPECIFICS OF
22      CARDIAC PATHOLOGY THAT DEALS WITH MR. IRWIN'S DEATH.
23      CORRECT?
24              "A.  NOT THE SPECIFICS, THAT'S CORRECT."
25              "Q.  AND INDEED, YOU'VE NEVER WRITTEN AN ARTICLE THAT
page 743
1       DEALS WITH THE MECHANISM OF SUDDEN CARDIAC DEATH FROM
2       PLAQUE RUPTURE, CORRECT?
3               "A.  NOT SPECIFICALLY, NO.
4               "Q.  HAVE YOU EVER WRITTEN AN ARTICLE THAT DEALT WITH
5       ATHEROSCLEROTIC OR SUDDEN CARDIAC DEATH?
6               "A.  NO."
7                       I LOOK TO WHETHER OR NOT HE'S CONDUCTED ANY
8       RESEARCH OF ANY OF THIS.
9               "Q.  NOW, YOU'VE NEVER DONE ANY RESEARCH ON THE CLASS
10      OF MEDICINES KNOWN AS NSAIDS, CORRECT?
11              "A.  I HAVE NOT.
12              "Q.  AND OBVIOUSLY, THAT INCLUDES NO RESEARCH EVER
13      DONE ON COX-2 INHIBITORS?
14              "A.  THAT'S CORRECT.
15              "Q.  HAVE YOU EVER PRESCRIBED VIOXX OR CELEBREX?"
16                      THIS FELLOW IS A PATHOLOGIST.  I DON'T THINK HE
17      CAN HELP THE PEOPLE THAT HE EXAMINES FROM THE STANDPOINT OF
18      FREEDOM OF PAIN.  GENERALLY, THEY'RE DEAD.  SO IT DOESN'T
19      SURPRISE ME.  BUT HE DOESN'T HAVE ANY EXPERIENCE.  I SIMPLY
20      NOTE THAT.
21                      EXPERIENCE BEFORE HE WAS RETAINED, AS I SAID,
```

[743:21] - [744:11]     2/8/2006    Plunkett II Trial - Vol. 03 - Ray, Scolnick

• Opposition - Motion for New Trial

```
page 743
20              NOTE THAT.
21                      EXPERIENCE BEFORE HE WAS RETAINED, AS I SAID,
22      WAS CONSIDERABLE.  OVER 7,000 AUTOPSIES HE'S BEEN ASSOCIATED
23      WITH.  HE'S NEVER OPINED THAT A COX-2 INHIBITOR DRUG WAS THE
```

Issues Report [Merck_Trial_Transcripts (Ernst, Humeston, Irvin Plunkett)]

• Opposition - Motion for New Trial

```
24        CAUSE OF DEATH.  I THINK COUNSEL MAKES A VALID POINT.  THIS IS
25        RATHER NEW.  IT'S ONLY, WHAT, TEN YEARS OLD NOW OR THEREABOUTS?
page 744
1         SO IT'S SOMEWHAT NEW.  IT'S NOT TODAY OR YESTERDAY, BUT IT'S
2         SOMEWHAT NEW.
3                    BUT NOTWITHSTANDING THAT, I NOTE THAT THAT'S SOMEWHAT
4         NEW.  BUT, IN ANY EVENT, HE HADN'T HAD ANY PERSONAL EXPERIENCE
5         WITH EVER DIAGNOSING OR MENTIONING THAT THAT WAS A CAUSE.
6         QUESTION ON PAGE 36:
7                    "Q.  HAVE YOU EVER, IN ANY OF THE 7,000 AUTOPSIES
8         YOU'VE PERFORMED, EVER COME TO THE CONCLUSION, WHETHER YOU
9         WERE ASKED OR NOT, THAT VIOXX OR ANY OTHER COX-2
10        CONTRIBUTED TO THE CAUSE OF DEATH?"
11                   "A.  I HAVE NOT."
12                   QUESTION ABOUT WHAT IS HIS EXPERIENCE IN HIS
```

[744:12] - [744:24]        2/8/2006        Plunkett II Trial - Vol. 03 - Ray, Scolnick

• Opposition - Motion for New Trial

```
page 744
11                   "A.  I HAVE NOT."
12                   QUESTION ABOUT WHAT IS HIS EXPERIENCE IN HIS
13        DAY-TO-DAY PRACTICE, QUESTION ON PAGE 39:
14                   "Q.  IS IT FAIR TO SAY THAT YOU NEVER CONSIDERED THE
15        CARDIAC SAFETY OF VIOXX UNTIL YOU WERE CONTACTED BY
16        PLAINTIFF'S COUNSEL?"
17                   "A.  ...IT WASN'T SOMETHING THAT I DEALT WITH ON A
18        DAILY BASIS."
19                   ON PAGE 51:
20                   "Q.  SO PRIOR TO BEING RETAINED AS PLAINTIFF'S
21        EXPERT, VIOXX, TO YOUR KNOWLEDGE, WAS NOT RELEVANT TO
22        ANYTHING YOU WERE DOING, RIGHT?"
23                   "A.  IT WAS NOTHING THAT I WAS FOCUSED ON.  IT WASN'T
24        ON MY RADAR SCREEN ON INDIVIDUAL CASE MANAGEMENT."
25                   I LOOK AT HIS READINGS BEFORE HE WAS RETAINED BY
```

[744:25] - [745:6]        2/8/2006        Plunkett II Trial - Vol. 03 - Ray, Scolnick

• Opposition - Motion for New Trial

```
page 744
24                   ON MY RADAR SCREEN ON INDIVIDUAL CASE MANAGEMENT."
25                   I LOOK AT HIS READINGS BEFORE HE WAS RETAINED BY
page 745
1         COUNSEL, READINGS ABOUT VIOXX, PAGE 50:
2                    "Q.  AND PRIOR TO BEING RETAINED IN THIS CASE, YOU
3         WERE JUST A CASUAL READER TO THE EXTENT VIOXX LITERATURE
4         APPEARED IN JOURNALS YOU HAPPENED TO BE READING AT THE
5         TIME, RIGHT?"
6                    "A.  YES."
7                    REVIEW OF THE MEDICAL LITERATURE AFTER HE WAS
```

[745:7] - [747:6]        2/8/2006        Plunkett II Trial - Vol. 03 - Ray, Scolnick

• Opposition - Motion for New Trial

```
page 745
6                    "A.  YES."
7                    REVIEW OF THE MEDICAL LITERATURE AFTER HE WAS
8         RETAINED -- AFTER HE WAS RETAINED, THAT HE REVIEWED ARTICLES.
9         BUT THE ARTICLES THAT HE REVIEWED WERE ARTICLES HE WAS GIVEN BY
10        PLAINTIFF COUNSEL, AND I'M NOT QUITE SURE HE REVIEWED ALL OF
11        THOSE.
12                   "Q.  I MEAN, SO DO YOU RECALL WHAT PART OF THIS LIST
13        YOU PUT TOGETHER AND WHAT PART WAS PUT TOGETHER BY
14        OTHERS?"
15                   IT'S ON PAGE 38.
16                   "A.  I MEAN, AS FAR AS THE LIST GOES, I THINK MOST OF
17        THE VIOXX ARTICLES ON THE LIST WERE LISTED BY THE LAW
18        FIRM" -- MEANING THE LAW FIRM THAT RETAINED HIM.  "SOME OF
```

Issues Report [Merck_Trial_Transcripts (Ernst, Humeston, Irvin Plunkett)]

• Opposition - Motion for New Trial

```
19        THAT OVERLAPPED WITH ARTICLES THAT I HAD ALREADY HAD, BUT
20        I -- YOU KNOW, I DIDN'T CHANGE THAT.  MOST OF THE CARDIAC
21        PATHOLOGY SUDDEN DEATH ARTICLES, I ADDED."
22                WHAT DID HE DO WITH THE ARTICLES?  HE SAID THAT
23   HE FLIPPED THROUGH THEM.  ON PAGE 35, HE SAYS:
24            "Q.  OTHER THAN PERHAPS FLIPPING THROUGH
25        VIOXX-RELATED ARTICLES IN THE NEW ENGLAND JOURNAL PRIOR TO
page 746
1         BEING CONTACTED BY THE PLAINTIFF COUNSEL, HAD YOU DONE ANY
2         REVIEW OF CARDIOVASCULAR SAFETY ON THE DRUG?"
3            "A.  NO."
4                THE TIME THAT HE SPENT ON THE ARTICLES THAT HE
5    WAS GIVEN, QUESTION ON PAGE 38:
6            "Q.  SO, REALLY, YOU'VE GOT EIGHT OR NINE HOURS IN
7         TOTAL THAT POSSIBLY COULD BE CONNECTED TO YOUR REVIEW OF
8         THE CARDIOVASCULAR SAFETY OF VIOXX?"
9            "A.  YES."
10               THE REVIEW OF HIS DISCUSSION ABOUT THE ARTICLES
11   CONCERNED ME A LITTLE BIT WHEN HE'S ASKED ON PAGE 66:
12           "Q.  OTHER THAN VIGOR, CAN YOU NAME ANY CLINICAL
13        TRIALS OF VIOXX?"
14           "A.  WELL, I MEAN, THERE WAS APPROVE, THERE WAS
15        VICTOR, THERE WAS VIM, THERE WAS ADVANTAGE."
16           "Q.  WHAT'S THE THIRD ONE YOU SAID?  VIM?"
17           "A.  VIM."
18           "Q.  NEVER HEARD OF VIM."
19           "A.  I THINK IT WAS CALLED VIM.  IT WAS A, I THINK,
20        PROSTATE CANCER PREVENTION STUDY."
21           "Q.  VIP?"
22           "A.  OH, VIP, I'M SORRY.  YOU'RE RIGHT.  YEAH."
23           "Q.  YOU SAID APPROVE, VICTOR, VIP, ADVANTAGE.  ANY
24        OTHERS?"
25           "A.  NOT SPECIFICALLY VIOXX, BUT IT WAS CLASS.  I
page 747
1    THINK THAT WAS CELEBREX."
2            "Q.  RIGHT.  ANYTHING ELSE?"
3            "A.  THERE WAS A BUNCH WITH NUMBERS.  I DON'T KNOW
4    THAT THEY WERE EVER PUBLISHED, BUT THERE WAS A NUMBER OF
5    STUDIES, APPARENTLY, THAT WERE DONE THAT WERE NUMBER
6    STUDIES.  I MEAN, THEY HAD, LIKE, A CODE NUMBER ON THEM."
7                I TRY TO DISCERN WHETHER HE HAS SOME KNOWLEDGE
```

[747:7] - [748:16]        2/8/2006   Plunkett II Trial - Vol. 03 - Ray, Scolnick

• Opposition - Motion for New Trial

```
page 747
6         STUDIES.  I MEAN, THEY HAD, LIKE, A CODE NUMBER ON THEM."
7                I TRY TO DISCERN WHETHER HE HAS SOME KNOWLEDGE
8    ABOUT THE ISSUES THAT ARE PRESENT.  ONE OF THE SIGNIFICANT
9    PARTIES OF PLAINTIFF'S CASE IS THAT VIOXX DECREASED OR
10   INHIBITED PROSTACYCLIN AND INCREASED THROMBOXANE; AND WHILE
11   THAT THEORY IS QUESTIONED, IT'S A RATHER VISIBLE THEORY AND A
12   SIGNIFICANT ONE AND EXPLAINED BY COUNSEL TO THE JURY ON
13   OCCASIONS.  QUESTION ON PAGE 108:
14           "Q.  DO YOU HAVE AN OPINION WHAT DEGREE OF
15        PROSTACYCLIN INHIBITION IN THE VASCULAR SYSTEM IS NEEDED
16        IN ORDER TO INCREASE THE RISK OF CARDIAC EVENTS?"
17           "A.  NO."
18           "Q.  DO YOU HAVE ANY OPINION TO WHAT DEGREE VIOXX
19        INHIBITS PROSTACYCLIN PRODUCTION IN THE VASCULAR SYSTEM?"
20           "A.  NO."
21               AND QUESTION ON PAGE 94:
22           "Q.  AND MORE SPECIFICALLY, YOUR OPINION REGARDING
23        THE FACT THAT -- YOUR OPINION THAT VIOXX REDUCES
24        PROSTACYCLIN IN PRODUCTION IN THE VASCULAR SYSTEM IS
25        SOMETHING YOU REACHED IN THE LAST TWO OR THREE WEEKS?"
page 748
1            "A.  YEAH.  LAST MONTH OR SO, SURE.  YEAH."
2                I'M CONCERNED ABOUT THE RISKS, THAT HE
```

Issues Report [Merck_Trial_Transcripts (Ernst, Humeston, Irvin Plunkett)]

• Opposition - Motion for New Trial

```
3          UNDERSTAND THE RISKS.  PAGE 97 QUESTION:
4               "Q.  DO YOU BELIEVE THE RISK CHANGES OVER DURATION OF
5          USE?"
6               "A.  THERE IS SOME DATA THAT THE LONGER YOU USE IT,
7          THE RISK DOES GO UP TO SOME PERIOD, AND THEN LONG-TERM
8          USE, IT SEEMS TO STABILIZE."
9               "Q.  DO YOU RECALL WHAT THAT DATA COMES FROM?"
10              "A.  NO, I DON'T OFF THE TOP OF MY HEAD.  I MEAN,
11         THERE WERE SOME STUDIES, AND PART OF IT MAY HAVE BEEN
12         SOLOMON THAT LOOKED AT, LIKE, LESS THAN 30 DAYS AND THEN
13         LONGER.  THERE WAS ONE THAT LOOKED AT LESS THAN 16 -- OR
14         SIX MONTHS OR LONGER.  THEN, AS I RECALL IT, THERE WAS
15         ANOTHER STUDY THAT SHOWED, BASICALLY, AFTER YOU GET TO A
16         CERTAIN POINT, YOU COULDN'T DEMONSTRATE THE RISK ANYMORE."
17              HE ALSO REVIEWED OTHER EXPERT REPORTS, WHICH IS
```

[748:17] - [749:14]    2/8/2006    Plunkett II Trial - Vol. 03 - Ray, Scolnick

• Opposition - Motion for New Trial

```
page 748
16              CERTAIN POINT, YOU COULDN'T DEMONSTRATE THE RISK ANYMORE."
17              HE ALSO REVIEWED OTHER EXPERT REPORTS, WHICH IS
18         SIGNIFICANT AND HELPFUL, BECAUSE 703 ALLOWS THAT AND INSTRUCTS
19         THE EXPERTS TO DO THAT.  QUESTION ON PAGE 73:
20              "Q.  I NOTICED THAT YOU DIDN'T REVIEW ANY OF MERCK'S
21         EXPERT REPORTS OTHER THAN DR. WHEELER; IS THAT CORRECT?"
22              "A.  I WASN'T GIVEN ANY.  NOBODY GAVE THEM TO ME TO
23         REVIEW."
24              "Q.  THEY ONLY GAVE YOU DR. RAY ON THE QUESTION OF
25         EPIDEMIOLOGY?"
page 749
1               "A.  THERE WAS ANOTHER ONE BY, I THINK, SOMEBODY FROM
2          UNIVERSITY OF MICHIGAN."
3               "Q.  DR. LUCCHESI?"
4               "A.  YES."
5               "Q.  YEAH, HE'S ANOTHER PLAINTIFF EXPERT."
6               "A.  OKAY.  I SAW THAT.  THAT'S THE ONLY ONES I SAW.
7          I DID NOT SEE DEFENSE REPORTS OTHER THAN DR. WHEELER'S OR
8          ANYTHING."
9               "Q.  SO THE ONLY REPORTS THAT YOU CONSIDERED ON THE
10         QUESTION OF THE RELATIVE RISK OF VIOXX FOR CARDIOVASCULAR
11         EVENTS ARE THE ONES PROVIDED BY PLAINTIFF EXPERTS, NOT
12         MERCK EXPERTS, RIGHT?"
13              "A.  THAT -- AS FAR AS EXPERT REPORTS, THAT'S
14         CORRECT.  THAT'S ALL THAT WAS GIVEN TO ME TO REVIEW."
15              I LOOK AT IT IN ITS TOTALITY, AND I AM CONCERNED
```

[749:15] - [751:25]    2/8/2006    Plunkett II Trial - Vol. 03 - Ray, Scolnick

• Opposition - Motion for New Trial

```
page 749
14              CORRECT.  THAT'S ALL THAT WAS GIVEN TO ME TO REVIEW."
15              I LOOK AT IT IN ITS TOTALITY, AND I AM CONCERNED
16         THAT HE HAS ENOUGH EXPERIENCE, ENOUGH EDUCATION, OR ENOUGH
17         HANDS-ON OR KNOWLEDGE OR EVEN WHETHER HE'S BEEN EXPOSED TO
18         ENOUGH OR EVEN UNDERSTANDS WHAT HE HAS BEEN GIVEN.  I ALSO AM
19         CONCERNED A BIT ABOUT HIS METHODOLOGY.  ON PAGE 51, HE'S ASKED:
20              "Q.  RIGHT.  BUT THAT -- SO IF WE TAKE YOUR SENTENCE
21         SERIOUSLY, YOU WOULD BE OPINING THAT, INDIVIDUALLY, ANYONE
22         WHO IS TAKING VIOXX, WHO HAD A HEART ATTACK, MORE LIKELY
23         THAN NOT VIOXX CONTRIBUTED TO THE HEART ATTACK?"
24              "A.  IF YOU TAKE THEM ONE AT A TIME, THAT WOULD BE
25         CORRECT."
page 750
1               AGAIN, ON PAGE 61, LINE 4, HE'S ASKED:
2               "Q.  SO JUST SO WE UNDERSTAND YOUR METHODOLOGY FOR
3          GIVING A SPECIFIC CAUSE OPINION, THE METHODOLOGY YOU
4          APPLIED HERE SUGGESTS THAT, ON AN INDIVIDUAL BASIS, YOU
5          WOULD SAY ANYONE WHO TEMPORALLY HAD A HEART ATTACK WHILE
```

Issues Report [Merck_Trial_Transcripts (Ernst, Humeston, Irvin Plunkett)]

• Opposition - Motion for New Trial

```
 6        ON VIOXX, MORE LIKELY THAN NOT, VIOXX WAS A CONTRIBUTING
 7   CAUSE.   CORRECT?"
 8        "A.   ASSUMING THAT WE'RE TALKING ABOUT INDIVIDUALS
 9   HAVING HEART ATTACKS BASED ON CORONARY ARTERY DISEASE,
10   YEAH.   IF YOU PULLED AN INDIVIDUAL PATIENT AND PRESENTED
11   IT TO ME, I THINK THAT WOULD BE THE PROBABILITY, YES."
12        "Q.   AND THAT'S THE METHOD YOU APPLIED?"
13        "A.   YES."
14             THAT METHODOLOGY, IF YOU'RE TAKING THE DRUG AND
15   YOU HAVE A HEART DISEASE -- HEART PROBLEM, THE DRUG CAUSED IT.
16   THAT'S A METHODOLOGY THAT NOT I DON'T THINK PASSES THROUGH THE
17   GATES OF 702.   HE WAS QUESTIONED ON THE METHODOLOGY ON PAGE
18   109:
19        "Q.   NOW, EARLIER YOU AGREED THAT IT WOULD BE YOUR
20   EXPECTATION THAT NOT EVERYONE WHO TEMPORALLY HAD A HEART
21   ATTACK WHILE ON VIOXX NECESSARILY HAD THEIR HEART ATTACK
22   CAUSED BY VIOXX.   DO YOU RECALL SAYING THAT?"
23        "A.   YES."
24        "Q.   HOW DO YOU DISTINGUISH BETWEEN THOSE PEOPLE WHO
25   HAD A CARDIAC EVENT THAT YOU BELIEVE WAS CAUSED BY VIOXX
page 751
 1   AND THOSE WHOM DO NOT?"
 2        "A.   AGAIN, IT'S PROBABILITY.   IT'S -- YOU'RE LOOKING
 3   AT STATISTICALLY.   IF THERE IS A MORE OR -- MORE THAN TWO
 4   TIMES INCIDENCE THAT ANY INDIVIDUAL PATIENT WOULD MOST
 5   LIKELY BE IN THE GROUP, THAT IT WAS RELATED TO VIOXX.
 6   IT'S REALLY A STATISTICAL PROBABILITY.   THERE IS NOTHING
 7   IN THE PATHOLOGY THAT YOU CAN POINT TO AND SAY THIS IS A
 8   VIOXX THROMBUS."
 9        "Q.   ALL RIGHT.   LET'S TALK ABOUT THAT LAST ANSWER.
10   WHEN YOU SAY THERE IS NOTHING IN THE PATHOLOGY THAT YOU
11   CAN POINT TO AND SAY THIS IS A VIOXX THROMBUS, DOES THAT
12   MEAN THAT THERE IS NOTHING THAT IDENTIFIES A BLOOD CLOT IN
13   A CORONARY ARTERY AS BEING CAUSED BY VIOXX SPECIFICALLY ON
14   A PATHOLOGICAL REVIEW?"
15        "A.   THAT WOULD BE CORRECT."
16             THEN QUESTION ON 110:
17        "Q.   DOES THAT MEAN, SIR, THAT YOU CANNOT DISTINGUISH
18   IN THE GROUP OF FOLKS WHO HAD HEART ATTACKS WHILE TAKING
19   VIOXX THOSE WHO HAD HEART ATTACKS FROM VIOXX AND THOSE WHO
20   DID NOT?"
21        "A.   YOU CAN DO THEM IN BIG POPULATIONS
22   STATISTICALLY.   BUT IF YOU'RE ASKING ABOUT THIS INDIVIDUAL
23   PATIENT, AGAIN, YOU'RE DEALING WITH PROBABILITIES.   YOU
24   CAN'T POINT TO THE THROMBUS AND SAY THIS IS A VIOXX
25   THROMBUS VERSUS A NON-VIOXX THROMBUS."
page 752
 1             I DON'T SAY THAT EVERY PATHOLOGIST HAS THE SAME
```

[752:9] - [752:13]     2/8/2006   Plunkett II Trial - Vol. 03 - Ray, Scolnick

• Opposition - Motion for New Trial

```
page 752
 8   FELT HE WAS QUALIFIED TO TESTIFY.
 9             SO I DON'T PAINT WITH A BROAD BRUSH IN THIS
10   SITUATION.   I'M NOT SAYING THAT YOU NEED TO BE A PATHOLOGIST,
11   THAT YOU NEED TO HAVE DIAGNOSED PEOPLE OR THAT YOU NEED TO HAVE
12   PRESCRIBED OR HAVE SOME EXPERIENCE, BUT A BIT OF SOME OF THOSE
13   THINGS.
14             I DON'T FEEL THAT THIS DOCTOR DEMONSTRATED TO ME
```

[752:18] - [752:22]    2/8/2006   Plunkett II Trial - Vol. 03 - Ray, Scolnick

• Opposition - Motion for New Trial

```
page 752
17   LOOKED A LITTLE FURTHER, IT SEEMED MORE PROBLEMATIC.
18             SO I DO TAKE THESE THINGS SERIOUSLY, AND I DON'T
19   JUST WILLY-NILLY SHOOT FROM THE HIP.   I FELT THAT THIS DOCTOR
20   MIGHT BE QUALIFIED TO TESTIFY ON OTHER AREAS BUT NOT THE
```

Issues Report [Merck_Trial_Transcripts (Ernst, Humeston, Irvin Plunkett)]

• Opposition - Motion for New Trial

```
        21      SPECIFIC CAUSATION, AND I REALLY HAVE ALREADY DEALT WITH THE
        22      OTHER DOCTOR ON SEVERAL OCCASIONS AND I WON'T CHANGE THAT.
        23              SO I UNDERSTAND THE MOTION.  I APPRECIATE
```

[757:] - [758:1]      2/9/2006      Plunkett II Trial - Vol. 04 - Scolnk, Graham, SchirmC, Baldwin, T

• Opposition - Motion for New Trial

page 757

```
   0757
  1                       UNITED STATES DISTRICT COURT
  2                       EASTERN DISTRICT OF LOUISIANA
  3
  4
  5
        IN RE: VIOXX PRODUCTS          *
  6     LIABILITY LITIGATION           *    MDL DOCKET NO. 1657
                                        *
  7                                     *
        THIS DOCUMENT RELATES TO        *    NEW ORLEANS, LOUISIANA
  8     CASE NO. 05-4046:               *
                                        *
  9     EVELYN IRVIN PLUNKETT, ET AL    *    FEBRUARY 9, 2006
                                        *
 10     VERSUS                          *
                                        *    8:30 A.M.
 11     MERCK & CO., INC.               *
        * * * * * * * * * * * * * * *   *
 12
 13
                        VOLUME IV - DAILY COPY
 14                     JURY TRIAL BEFORE THE
                        HONORABLE ELDON E. FALLON
 15                     UNITED STATES DISTRICT JUDGE
 16
 17     APPEARANCES:
 18
        FOR THE PLAINTIFF:            BEASLEY ALLEN CROW METHVIN
 19                                     PORTIS & MILES
                                      BY:  ANDY D. BIRCHFELD, JR., ESQ.
 20                                        LEIGH O'DELL, ESQ.
                                      234 COMMERCE STREET
 21                                   POST OFFICE BOX 4160
                                      MONTGOMERY, ALABAMA 36103
 22
 23     FOR THE PLAINTIFF:            LEVIN, PAPANTONIO, THOMAS,
                                        MITCHELL, ECHSNER & PROCTOR
 24                                   BY:  TROY RAFFERTY, ESQ.
                                      316 SOUTH BAYLEN STREET, SUITE 600
 25                                   PENSACOLA, FLORIDA 32502
page 758
  1     APPEARANCES, (CONTINUED):
  2
```

[917:7] - [917:13]      2/9/2006      Plunkett II Trial - Vol. 04 - Scolnk, Graham, SchirmC, Baldwin, T

• Opposition - Motion for New Trial

page 917

```
  6     INTENSIVE CARE UNIT AND FOLLOW UP IN THE OFFICE.
  7     Q.    DO YOU HOLD YOURSELF OUT AS AN ACADEMIC PHYSICIAN ENGAGED
  8     IN SCIENTIFIC RESEARCH?
  9     A.    NOT PER SE.  THERE ARE MEMBERS OF MY GROUP THAT ARE
 10     INVOLVED IN SOME CLINICAL RESEARCH, STUDY OF MEDICATIONS THAT
 11     HAVE ALREADY BEEN RELEASED ON DIFFERENT GROUPS OF CARDIAC
 12     PATIENTS, AND SO I'M JUST VERY PERIPHERALLY INVOLVED IN THOSE
 13     STUDIES.
 14     Q.    ARE YOU MORE OF A HANDS-ON PHYSICIAN?
```

Issues Report [Merck_Trial_Transcripts (Ernst, Humeston, Irvin Plunkett)]

**• Opposition - Motion for New Trial**
[1492:] - [1492:25]      2/14/2006    Plunkett II Trial - Vol. 07 - Morrison, Weeks, Pacetti, Rayburn

• Opposition - Motion for New Trial

page 1492
     1492

```
 1                          UNITED STATES DISTRICT COURT
 2                          EASTERN DISTRICT OF LOUISIANA
 3
 4
 5
       IN RE: VIOXX PRODUCTS             *
 6     LIABILITY LITIGATION              *    MDL DOCKET NO. 1657
                                         *
 7                                       *
       THIS DOCUMENT RELATES TO          *    NEW ORLEANS, LOUISIANA
 8     CASE NO. 05-4046:                 *
                                         *
 9     EVELYN IRVIN PLUNKETT, ET AL      *    FEBRUARY 14, 2006
                                         *
10     VERSUS                            *
                                         *    8:30 A.M.
11     MERCK & CO., INC.                 *
       * * * * * * * * * * * * * * *
12
13
                              VOLUME VII - DAILY COPY
14                            JURY TRIAL BEFORE THE
                              HONORABLE ELDON E. FALLON
15                            UNITED STATES DISTRICT JUDGE
16
17     APPEARANCES:
18
       FOR THE PLAINTIFF:              BEASLEY ALLEN CROW METHVIN
19                                        PORTIS & MILES
                                       BY: ANDY D. BIRCHFELD, JR., ESQ.
20                                         LEIGH O'DELL, ESQ.
                                       234 COMMERCE STREET
21                                     POST OFFICE BOX 4160
                                       MONTGOMERY, ALABAMA 36103
22
23     FOR THE PLAINTIFF:              LEVIN, PAPANTONIO, THOMAS,
                                         MITCHELL, ECHSNER & PROCTOR
24                                     BY: TROY RAFFERTY, ESQ.
                                       316 SOUTH BAYLEN STREET, SUITE 600
25                                     PENSACOLA, FLORIDA 32502
page 1493
 1     APPEARANCES, (CONTINUED):
```

[1724:21] - [1724:23]      2/14/2006    Plunkett II Trial - Vol. 07 - Morrison, Weeks, Pacetti, Rayburn

• Opposition - Motion for New Trial

```
page 1724
20     A.    CARDIOLOGIST.
21     Q.    ARE YOU BOARD-CERTIFIED, SIR?
22     A.    YES.  I PASSED BOARDS IN INTERNAL MEDICINE AND
23     CARDIOVASCULAR DISEASE.
24     Q.    DO YOU TREAT PATIENTS IN YOUR PRACTICE?
```

[1727:7] - [1728:19]      2/14/2006    Plunkett II Trial - Vol. 07 - Morrison, Weeks, Pacetti, Rayburn

• Opposition - Motion for New Trial

```
page 1727
 6     TRIAL TESTIMONY $600 AN HOUR.
 7     Q.    HOW MANY HOURS, IN TOTAL, HAVE YOU SPENT WORKING ON THE
 8     SCIENTIFIC ISSUES THAT WE HAVE ASKED YOU TO LOOK AT?
 9     A.    IN THIS MATTER, IN GENERAL, WELL OVER 100 HOURS.
10     Q.    WHY SO MANY, SIR?
11     A.    IT'S A VERY COMPLICATED LITERATURE.  I THINK THE JURY HAS
```

Issues Report [Merck_Trial_Transcripts (Ernst, Humeston, Irvin Plunkett)]

• **Opposition - Motion for New Trial**

```
12        PROBABLY GOTTEN A PERSPECTIVE OF IT ALREADY WITH THE VARIOUS
13        EXPERTS THAT HAVE ALREADY BEEN BROUGHT UP HERE.
14        Q.    GOING BACK TO PRIOR TO THE TIME THAT YOU WERE RETAINED AS
15        AN EXPERT WITNESS, DID YOU HAVE PROFESSIONAL EXPERIENCE WITH
16        VIOXX YOURSELF?
17        A.    I DID.
18        Q.    DID YOU EVER PRESCRIBED THE DRUG?
19        A.    I HAVE.
20        Q.    DID YOU EVER TAKE CARE OF PATIENTS WHO HAD THE DRUG
21        PRESCRIBED BY OTHER DOCTORS BUT WERE UNDER YOUR CARE FOR
22        CARDIAC ISSUES?
23        A.    YES, I HAVE.
24        Q.    HOW ABOUT CELEBREX?
25        A.    THE SAME.
page 1728
1         Q.    WHEN YOU WERE PRESCRIBING THE MEDICINE AND TAKING CARE OF
2         PATIENTS, DID YOU GET YOURSELF UP-TO-SPEED ON THE
3         CARDIOVASCULAR ISSUES WITH RESPECT TO COX-2 INHIBITORS?
4         A.    YES.  WHEN THE ISSUES SURROUNDING THE VIGOR ARTICLE CAME
5         OUT, SHORTLY AFTER THE PUBLICATION OF THAT ARTICLE I BECAME
6         AWARE THAT THERE WAS AN ISSUE WITH VIOXX THAT HAD BEEN RAISED.
7         I READ THE VIGOR ARTICLE, I READ SOME OF THE EDITORIALS OR
8         COMMENTS ABOUT IT.  I READ DR. MUKHERJEE'S ARTICLE WHEN IT WAS
9         PUBLISHED.  I SORT OF KEPT UP WITH THE DISCUSSIONS IN THE
10        LITERATURE THAT WAS GOING ON AT THE TIME.
11        Q.    DID YOU EVER HAVE ANY DISCUSSION AT MEDICAL CONFERENCES OR
12        WITH OTHER FACULTY AT THE MEDICAL SCHOOL ABOUT THE INTERESTING
13        QUESTION OF CARDIOVASCULAR LITERATURE ON COX-2 INHIBITORS?
14        A.    YES.  IT WAS DISCUSSED.  I DON'T REMEMBER ANY OF THE
15        SPECIFICS, BUT WE CERTAINLY TALKED ABOUT IT AT THE TIME.
16        Q.    OBVIOUSLY, AS IT WAS PART OF YOUR WORK ON THIS CASE, YOU
17        HAVE SPENT A GREAT DEAL OF ADDITIONAL TIME INVESTIGATING THE
18        SCIENTIFIC EVIDENCE?
19        A.    I HAVE.
20        Q.    HOW DO YOU ALLOCATE YOUR TIME PROFESSIONALLY IN TERMS OF
```

[1728:20] - [1729:7]        2/14/2006    Plunkett II Trial - Vol. 07 - Morrison, Weeks, Pacetti, Rayburn

• Opposition - Motion for New Trial

```
page 1728
19        A.    I HAVE.
20        Q.    HOW DO YOU ALLOCATE YOUR TIME PROFESSIONALLY IN TERMS OF
21        YOUR THREE DUTIES AS A DOCTOR CARING FOR PATIENTS, AS A MEDICAL
22        SCHOOL PROFESSOR, AND AS A CLINICAL RESEARCHER?
23        A.    SURE.  THE MAJORITY OF MY TIME IS TAKING CARE OF PATIENTS.
24        PROBABLY 80 PERCENT OF MY TIME IS EITHER IN THE HOSPITAL OR THE
25        CLINIC TAKING CARE OF PEOPLE, BEING THEIR DOCTOR.  MY ROLES AS
page 1729
1         A RESEARCHER AND TEACHER GO ALONG WITH THAT.  MOST OF MY
2         TEACHING IS DONE BY HAVING RESIDENTS AND MEDICAL STUDENTS WORK
3         WITH ME WHEN I'M CARING FOR PATIENTS.  LIKEWISE, MOST OF MY
4         RESEARCH IS ALSO CLINICAL RESEARCH INVOLVING THE PATIENTS I
5         TAKE CARE OF AND I'M WORKING WITH.  SO THOSE ARE SORT OF
6         SIMULTANEOUS.  I DO A LITTLE BIT OF CLASSROOM TEACHING, AS
7         WELL.  THE LAST 15 OR 20 PERCENT OF MY TIME IS ADMINISTRATIVE.
8         Q.    HAVE YOU EVER HEARD OF THE TERM "EVIDENCE-BASED MEDICINE"?
```



**COPY**

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: VIOXX | : | MDL NO. 1657 |
|     PRODUCTS LIABILITY LITIGATION | : | SECTION: L |
| | : | |
| | : | JUDGE FALLON |
| | : | MAG. JUDGE KNOWLES |

.. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. :

THIS DOCUMENT RELATES TO
*Plunkett v. Merck & Co., Inc.*, 05-4046

### ORDER & REASONS

Before the Court is the Plaintiff's Motion to Reconsider a Ruling in Regard to the

Testimony of Dr. Thomas Baldwin. For the following reasons, the motion is DENIED.

**I.      BACKGROUND**

On November 18, 2005, the Court entered its rulings on all the *Daubert* motions in this

case. Among the motions was the Defendant's motion to exclude the entire testimony of Dr.

Thomas Baldwin. In its rulings, the Court focused on the methodology that Dr. Baldwin used in

formulating his opinions and found that Dr. Baldwin was qualified to testify as an expert

regarding Mr. Irvin's cardiac condition at the time of his death. Specifically, the Court found

that the methodology used by Dr. Baldwin was proper. Absent from the Court's order was any

specific ruling as to whether Dr. Baldwin was qualified to render an opinion on whether Vioxx

was the specific cause of Mr. Irvin's death.

On December 1, 2005, at the trial of this matter, Plaintiff's counsel sought to elicit

testimony from Dr. Baldwin not only dealing with Mr. Irvin's general cardiac condition, but also

to the effect that Vioxx was the specific cause of Mr. Irvin's death. The Defendant objected to

this testimony arguing that Dr. Baldwin was not qualified to render an opinion as to the specific



EXHIBIT
C

effect of Vioxx on Mr. Irvin's death. The Court sustained the Defendant's objection finding that Dr. Baldwin was not qualified to render an opinion in this regard.

## II.   PRESENT MOTION

On December 2, 2005, the Plaintiff filed the present motion urging the Court to reconsider its ruling. The Plaintiff argues that Dr. Baldwin's review of the relevant literature combined with his knowledge of the cardiovascular system renders him qualified to testify that Vioxx caused Mr. Irvin's death.

The Plaintiffs' Steering Committee ("PSC") filed a Memorandum in Support of Plaintiff's Motion to Reconsider the Court's Ruling Limiting the Testimony of Dr. Thomas Baldwin. In its supporting memorandum, the PSC asserts that Dr. Baldwin's knowledge is sufficient to qualify him as an expert. In addition, the PSC contends that the Court's ruling sets an "unfortunate precedent in this MDL."

## III.   LAW AND ANALYSIS

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. This rule establishes standards regarding the qualifications of the proposed expert as well as the methodology used to arrive at the expert's opinion. With regard to the expert's qualifications, Rule 702 provides that a prospective expert must be qualified by knowledge, skill, experience, training, or education before being allowed to testify as an expert witness. In this case, Dr. Baldwin is not qualified by either knowledge, skill, training, education, or experience to render an opinion as to whether Vioxx caused Mr. Irvin's death. In reaching this conclusion, the Court predominantly relies on Dr. Baldwin's own trial and deposition testimony.

First, with regard to experience, Dr. Baldwin testified as follows:

2

Q.    Now, sir, am I correct that while Vioxx was on the market, you never personally prescribed the medicine?

A.    Not that I recall.

Q.    And that would be true for the other Cox-2 inhibitor drugs that were on the market, Bextra and Celebrex; is that correct?

A.    To my recollection, that is correct.

Q.    And you have never done any research in Cox-2 drugs, correct?

A.    That's correct.

Q.    And, sir, I believe you said at your deposition that you do not ever recall diagnosing one of your own patients as having a cardiovascular thrombotic event from Vioxx; is that correct?

A.    That's correct.  At the time of my deposition, I was not aware of any of my patients that had an event while on Vioxx.  I have subsequently become aware of one case.

. . .

Q.    Thank you for that clarification.  When you come into this courtroom today, you personally have not diagnosed one of your patients as having a Vioxx-related clot, correct?

A.    That's correct.

Q.    Now is that true for Celebrex as well?

A.    That's correct.

Q.    So your qualifications on diagnosing cardiac events from Cox-2 inhibitor drugs, you have never done it before outside of this litigation, correct?

A.    That's correct.[1]

This testimony reveals that Dr. Baldwin has basically little to no experience with Vioxx or,

---

[1] Transcript of Record at 492-94, *Plunkett v. Irvin* (No. 05-4046).

3

for that matter, any other Cox-2 inhibitor. He testified that he never prescribed Vioxx or any other Cox-2 inhibitor. He never conducted any research on Cox-2 inhibitors. He has never diagnosed Vioxx as the cause of a cardiac event.

Second, with regard to skill, training, and experience, Dr. Baldwin testified as follows:

Q.    Now, sir, you don't consider yourself a clinical researcher, correct?

A.    Correct.

Q.    And I believe you have not done any basic science research yourself since college?

A.    With the proviso that during the course of medical school, there may have been some involvement in basic science research, but . . .

Q.    Sure. When you're in medical school, you may have had an opportunity to go down to the lab and maybe conduct a few experiments, but you wouldn't consider yourself a scientific researcher, would you?

A.    That's correct.

. . .

Q.    And you have never been responsible for analyzing data from a clinical trial, correct?

A.    Well, responsible for is kind of the operative phrase. I analyze studies in the literature and apply that information to my patients on a regular basis.

Q.    Sure. You may actually see an article in a journal and there is clinical results presented, and then you read that as a practicing physician and draw your own conclusions from it, correct?

4

A.    That's correct.

Q.    But in terms of having primary responsibility as an investigator on a trial, you've never done that and analyzed the data from the trial, correct?

A.    Correct.

Q.    And you've never done any research in any nonsteroidal anti-inflammatory drug, correct?

A.    Correct.

Q.    And you've don't consider yourself an epidemiologist, do you, sir?

A.    No, I do not.

. . .

Q.    And, sir, you've never done clinical research on the causes of sudden cardiac death, have you?

A.    During the course of medical school, I may have been involved with a research project and/or during fellowship but not one that I was responsible for evaluating the data.

Q.    And when did you graduate medical school?

A.    1983.

Q.    So, in the last 22 years, would it be fair to say you've never been involved in clinical research into the causes of sudden cardiac death?

A.    My cardiology fellowship training ended in 1988, so it would have been since '88.

Q.    So I amend my question by saying: In the last 17 years, you've never done

5

any clinical research in the causes of sudden cardiac death?

A.    That's correct.[2]

This testimony reveals that Dr. Baldwin lacks the skill, training, and education to testify as expert regarding the role Vioxx played in Mr. Irvin's death.  As a cardiologist, Dr. Baldwin certainly has the skill, training, and education to testify that Mr. Irvin died of a myocardial infarction.  In addition, he has the skill, training, and education to testify regarding the nature of the fatal clot or thrombus, its location, and explain its role in causing Mr. Irvin's death.  As a cardiologist with no other skill, training, education, or experience with Vioxx or any Cox-2 inhibitor, however, Dr. Baldwin is not qualified to testify regarding the specific role that Vioxx played in producing the clot.

Both the Plaintiff and PSC contend that Dr. Baldwin's knowledge is sufficient to qualify him to testify as an expert regarding the proclivity of Vioxx to produce clot formations.  An examination of Dr. Baldwin's deposition testimony leads to the opposite conclusion.  In his deposition, Dr. Baldwin displayed a fundamental lack of understanding of the relevant scientific literature. Throughout his deposition, Dr. Baldwin was unable to explain  or recount the results and implications of the numerous tests and studies conducted with Vioxx and other Cox-2 inhibitors. Simply put, his reliance on the relevant scientific literature was completely underminded by his inability to firmly understand this literature.  Accordingly, whatever knowledge Dr. Baldwin professes to have of Vioxx and its pro-thrombotic effects, it is insufficient to qualify him as an expert on the effect of that drug or any of the Cox-2 inhibitors.  In fact, Dr. Baldwin had this to say about his qualifications on that subject:

Q.    And you're really not an expert to Cox-2 drugs, are you, sir?

---

[2] *Id.* at 494-96.

A.      Not an expert, per se, no.[3]

If Dr. Baldwin is not willing to consider himself an expert on the effect of Cox-2 inhibitors, it would seem quite peculiar for this Court to qualify him as one.

In short, neither Dr. Baldwin's knowledge, skill, experience, training, or education, even when considered in their totality, qualify him to testify as to the specific role that Vioxx played in Mr. Irvin's death.  Dr. Baldwin simply lacks the necessary qualifications to reach his proffered opinion on that subject.

To the extent that the PSC asserts that this ruling will set an "unfortunate precedent in this MDL," the PSC is simply mistaken.  The only precedent this ruling sets is that this Court is committed to following the dictates of Rule 702 and, as such, will require prospective experts to be qualified to render their respective opinions.

Moreover, the Court recognizes that not every cardiologist will be unable to testify as an expert witness with regard to the specific effect of Vioxx.  The Court's order is limited to Dr. Baldwin, a cardiologist who has little to no experience prescribing Vioxx, diagnosing Vioxx as the cause of a cardiac event, conducting clinical research related to Vioxx, and who failed to demonstrate a clear understanding of the relevant scientific literature.

IV.     CONCLUSION

For the foregoing reasons, the Plaintiff's Motion to Reconsider its Ruling in Regard to the Testimony of Dr. Thomas Baldwin is DENIED.

---

[3] *Id.* at 494.

Issues Report [Merck_(Depos)]

• **Opposition - Motion for New Trial**

[1:1] - [1:25]      10/6/2005    Baldwin, Thomas (Irvin Plunkett Pltf. Expert)

• Opposition - Motion for New Trial

```
page 1
1                   IN THE UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF LOUISIANA
2
3
4    In re:  VIOXX                 )  MDL Docket No. 1657
                                   )
5    PRODUCTS LIABILITY LITIGATION )  SECTION L
                                   )
6                                  )  JUDGE FALLON
                                   )
7                                  )  MAGISTRATE JUDGE KNOWLES
                                   )
8    This document relates to:     )
                                   )
9    Evelyn Irvin Plunkett         )
                                   )
10   vs.                           )  CASE NO. 2:05CV4046
                                   )
11   Merck & Co., Inc.,            )
12
13
14
15
16
17            VIDEOTAPED DEPOSITION OF THOMAS BALDWIN, M.D.
18                  TAKEN ON BEHALF OF THE DEFENDANT
19                          OCTOBER 6, 2005
20
21
22
23
24
25
page 2
1                   IN THE UNITED STATES DISTRICT COURT
```

[16:23] - [17:3]      10/6/2005    Baldwin, Thomas (Irvin Plunkett Pltf. Expert)

• Opposition - Motion for New Trial

```
page 16
22   medical school or residency.
23           Q.     I take it, then, you've never done any
24   research into the class of drugs known as NSAIDs?
25           A.     Correct.
page 17
1            Q.     And that would include no research on COX-2's,
2    correct?
3            A.     Correct.
4            Q.     Have you ever done any research on the causes
```

[27:4] - [27:25]      10/6/2005    Baldwin, Thomas (Irvin Plunkett Pltf. Expert)

• Opposition - Motion for New Trial

```
page 27
3            A.     They were in these circumstances.
4            Q.     Have you ever treated a patient who has taken
5    Vioxx who had a heart attack?
6            A.     Not that I can recall.
7            Q.     Did you ever treat a patient who was taking
8    Vioxx who died of sudden cardiac death?
9            A.     Again, not that I know of.
10           Q.     Did you ever treat a patient who was taking
11   Vioxx who had any sort of thrombotic event?
```

EXHIBIT

Blumberg No. 6119

D

Issues Report [Merck_(Depos)]

**• Opposition - Motion for New Trial**

```
12          A.      Not that I directly recall.
13          Q.      Do you indirectly recall one?
14          A.      When you say "thrombotic event", that includes
15   deep venous thrombosis, it may include TIA's, and we have
16   patients that have had those events.  I just can't recall
17   specifically if those patients were also on Vioxx.
18          Q.      So am I correct, sir, that in the 20 -- more
19   than 20 and less than 100 patients whom you have personally
20   treated who you understood were taking Vioxx, in no instance
21   did any of those patients develop a cardiac thrombotic event?
22          A.      I just don't know that they didn't develop the
23   event because I may not have been the physician caring for
24   them if and when they had an event, but in my recall of the
25   care of those patients, I don't recall a specific event.
page 28
1           Q.      Okay.  Have you ever advised a patient, prior
```

**[63:18] - [64:2]**      10/6/2005   Baldwin, Thomas (Irvin Plunkett Pltf. Expert)

**• Opposition - Motion for New Trial**

```
page 63
17   the specifics of the trial, if you'd like me to.
18          Q.      Can you cite me a single clinical trial that
19   has demonstrated an increased risk associated with Vioxx for
20   MI or sudden cardiac death in less than 30 days of use?
21          A.      Well, the clinical trials -- short answer is
22   no, and let me explain.  The reason being is the clinical
23   trials were not powered to show those changes in 30 days.  So
24   once again, any null result doesn't mean that there wasn't a
25   significant change associated with those groups at that time
page 64
1    period.  There is meta-analysis that suggests that timing of
2    therapy has little to do with associated risks.
3           Q.      And when you say "meta-analysis", you're
```

**[105:13] - [105:20]**      10/6/2005   Baldwin, Thomas (Irvin Plunkett Pltf. Expert)

**• Opposition - Motion for New Trial**

```
page 105
12   BY MR. ISMAIL:
13          Q.      And are you aware of any clinical trial data
14   whatsoever that demonstrates an increased risk associated
15   with Vioxx in less than 30 days of use?
16          A.      Not clinical trial data, and the reason being
17   is those clinical trials were, by and large, produced by
18   Merck with different outcomes, with different end points, and
19   so consequently, the -- the power of the data show
20   differences of 30 days is -- is not present.
21          Q.      You're not trying to suggest that the fact
```

**[128:16] - [128:24]**      10/6/2005   Baldwin, Thomas (Irvin Plunkett Pltf. Expert)

**• Opposition - Motion for New Trial**

```
page 128
15          A.      Correct.
16          Q.      And you can -- you can testify to that under
17   oath, even though you cannot show me a single piece of
18   clinical trial data that has been demonstrated, an increased
19   risk of heart attack due to Vioxx in less than 30 days of
20   use, correct?
21          A.      When you say "clinical trial data", I will
22   agree to that, but I think that, as previously stated, that
23   there's strong evidence in totality that -- that I can make
24   that connection.
25          Q.      For individuals that do not have a
```

Issues Report [Merck_(Depos)]

• **Opposition - Motion for New Trial**

[167:1] - [167:25]    1/23/2006    Baldwin, Thomas v. 2 (Irvin-Plunkett)

• Opposition - Motion for New Trial

```
page 167
1            IN THE UNITED STATES DISTRICT COURT
2               EASTERN DISTRICT OF LOUISIANA
3
4    In Re:   VIOXX,              ) MDL DOCKET NO. 1657
5    PRODUCTS LIABILITY LITIGATION) SECTION L
6    This Document relates to:    ) JUDGE FALLON
7    Evelyn Irvin Plunkett,       ) MAGISTRATE JUDGE
8    v.                           ) KNOWLES
9    Merck & Co., Inc.            )
10   _____) CASE NO. 2:05CV4046
11
12
13
14       CONTINUED VIDEOTAPED DEPOSITION OF THOMAS F.
15   BALDWIN, MD, a witness, taken on behalf of the
16   Defendant, pursuant to Agreement, on the 23rd day
17   of January, 2006, at the offices of Thomas F.
18   Baldwin, MD, 20805 West 151st Street, Suite 400,
19   Olathe, Kansas, before
20
21       ANGIE SHERWOOD, CRR, CSR, CCR #814,
22
23   a Registered Professional Reporter, Certified
24   in Kansas and Missouri.
25
page 168
1    APPEARANCES OF COUNSEL:
```

[174:15] - [180:1]    1/23/2006    Baldwin, Thomas v. 2 (Irvin-Plunkett)

• Opposition - Motion for New Trial

```
page 174
14        A.    Correct.
15        Q.    And between the first week of
16   December 2005 and January 13, 2006 you obviously
17   spoke to plaintiff's counsel?
18        A.    Yes.
19        Q.    At some point in that time frame they
20   asked you to prepare a revised expert report?
21        A.    Yes.
22        Q.    And your best estimate today is that
23   you began drafting the revised report in January
24   '06?
25        A.    I believe that's as close as I can
page 175
1    come.
2        Q.    And it's dated January 13.  Is that the
3    date upon which the report was completed?
4        A.    Yes.
5        Q.    Do you recall when it was that you had
6    an initial draft of your expert report?
7        A.    I don't.
8        Q.    Did you provide your draft expert
9    report to anyone?
10       A.    No.
11       Q.    So prior to its submission in -- on
12   January 13, 2006, nobody else saw the revised
13   expert report other than you?
14       A.    No.  Counsel and I worked over the
15   report for wording, and so I worked with counsel
16   on the report but I didn't send a report to
17   anybody.
18       Q.    Did counsel come to you and together
19   you looked at a draft of the report?
20       A.    We looked at the old report and then we
```

Issues Report [Merck_(Depos)]

• Opposition - Motion for New Trial

```
21   went forward from there.
22        Q.    I'm trying to understand the context
23   when you say counsel and yourself worked on the
24   language of the new report.
25        A.    Correct.
page 176
1         Q.    And what were you -- to get physically
2    together?
3         A.    Yes.  Well, yes, and then I think
4    probably had some discussions over the phone as
5    well.
6         Q.    And had you prepared an -- an initial
7    draft of your revised report when you met with
8    counsel?
9         A.    No.
10        Q.    So it's fair to say that the initial
11   draft that you prepared of your report, of your
12   revised report, was created with counsel working
13   side-by-side with you?
14        A.    Correct.
15        Q.    And then after that initial draft of
16   your revised report you had subsequent
17   conversations with counsel?
18        A.    I believe so, yes.
19        Q.    About the format and language of your
20   report?
21        A.    Correct.
22        Q.    Is that correct?
23        A.    Correct.
24        Q.    Do you have records, sir, that you keep
25   in terms of on which dates and for how long you do
page 177
1    work for attorneys?
2         A.    I try to.  I'm a little in arrears in
3    regards to this -- this case over the last couple
4    of weeks but, yes.
5         Q.    Do you have a calendar that would show
6    on what date you first met with counsel to sit
7    down together and draft your revised report?
8         A.    I don't know that -- I know that I
9    don't have any specific calendar that -- that
10   would be specific as to report generation.  It
11   would be discussions with counsel regarding this
12   case.
13        Q.    And which counsel did you meet with?
14        A.    Both Mr. Honnold and Mr. Goza.
15        Q.    Did you meet with both Mr. Honnold and
16   Mr. Goza when you sat down to initially create a
17   revised expert report?
18        A.    I think I met with both of them in the
19   course of that report.  I don't recall if they
20   were together at that initial sit-down or not.
21        Q.    How many meetings did you have with
22   counsel at which you drafted your revised expert
23   report?
24        A.    I'd say two would be my best estimate.
25        Q.    In addition to the two meetings you had
page 178
1    with counsel, you had discussions over the phone?
2         A.    Yes.
3         Q.    And am I correct that counsel either
4    Mr. Honnold or Mr. Goza -- withdrawn.
5              Did either Mr. Honnold or Mr. Goza
6    take a draft of your revised report when they left
7    their meeting with you?
8         A.    I don't know if it's a draft per se.  I
9    think they had notes that we had talked about in
10   regards to changes in the report which were
11   relatively minor but -- and then they produced,
12   word processing produced a document and we
```

Issues Report [Merck_{Depos}]

• **Opposition - Motion for New Trial**

```
13   eventually got that settled.
14        Q.    Okay.  Was the actual word processing
15   of your revised report done by counsel?
16        A.    It was.
17        Q.    Okay.  I see.  So you met with counsel
18   to sort of amend your initial report, and then
19   plaintiff's counsel took those notes and
20   physically typed up the revisions?
21        A.    Yes.
22        Q.    Okay.  And then provided you back with
23   the word-processed document?
24        A.    Correct.
25        Q.    And then you met again to go over with
page 179
1    plaintiff's counsel your revised report?
2         A.    I believe we met a second time.
3         Q.    And so obviously you don't know what
4    other plaintiff lawyers reviewed your draft
5    revised report after Mr. Honnold or Mr. Goza left
6    with the notes?
7         A.    I do not.
8         Q.    Fair to say that plaintiff's counsel
9    suggested certain language that you should use in
10   your revised report?
11        A.    Yes.
12        Q.    Now, can you estimate for me how much
13   time -- let me withdraw that question.
14             Starting from the first week of
15   December when you left Houston up until you
16   submitted your revised expert report on
17   January 13, can you estimate how much time you
18   spent in that period?
19        A.    Probably at least ten hours.
20        Q.    Ten hours.  And does that ten hours
21   include meeting with counsel and the phone calls
22   going over your revised expert report?
23        A.    Yes, and literature review so it's at
24   least ten hours.
25        Q.    That's your best estimate?
page 180
1         A.    That's my best estimate.
2         Q.    Now, sir, am I correct that --
```

[277:1] - [277:25]        1/23/2006   Baldwin, Thomas v. 2 (Irvin-Plunkett)

• Opposition - Motion for New Trial

```
page 276
25   AS
page 277
1                  C E R T I F I C A T E
2
3              I, Angie Sherwood, a Certified
4    Shorthand Reporter of the State of Kansas, do
5    hereby certify:
6              That prior to being examined, the
7    witness was first duly sworn;
8              That said testimony was taken down by
9    me in shorthand at the time and place hereinbefore
10   stated and was thereafter reduced to typewriting
11   under my direction;
12             That the foregoing transcript is a true
13   record of the testimony given by said witness;
14             That I am not a relative or employee or
15   attorney or counsel of any of the parties or a
16   relative or employee of such attorney or counsel
17   or financially interested in the action.
18             Witness my hand and seal this 24th day
19   of January, 2006.
20
```

Issues Report [Merck_(Depos)]

• Opposition - Motion for New Trial

        21
        22

        23                          Angie Sherwood
        24                          Certified Shorthand Reporter
        25                          State of Kansas

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
|  | : | **MDL NO. 1657** |
| **IN RE: VIOXX** | : |  |
| **PRODUCTS LIABILITY LITIGATION** | : | **SECTION: L** |
|  | : |  |
|  | : | **JUDGE FALLON** |
|  | : | **MAG. JUDGE KNOWLES** |

.. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. :

**THIS DOCUMENT RELATES TO**
   *Plunkett v. Merck & Co., Inc.*, 05-4046

### ORDER & REASONS

Pending before the Court is the Motion of Merck & Co., Inc. to Exclude Testimony of Robert H. Fletcher, M.D., M.Sc. (Rec. Doc. 2858); the Motion of Merck & Co., Inc. to Exclude the Testimony of Michael Alan Graham, M.D. (Rec. Doc. 2981); and the Motion of Merck & Co., Inc. to Exclude the Testimony of Wayne A. Ray, Ph.D. (Rec. Doc. 1117) including its Supplemental Brief in Support of its Motion (Rec. Doc. 2857) . For the following reasons, Merck's motion to exclude the testimony of Dr. Fletcher is GRANTED; Merck's motion to exclude the testimony of Dr. Graham is GRANTED IN PART AND DENIED IN PART; and Merck's motion to exclude the testimony of Dr. Ray is DENIED.

**I.     Background**

Vioxx (known generically as rofecoxib) belongs to a general class of pain relievers

-1-

EXHIBIT
E
Bumberg No. 5119

known as non-steroidal anti-inflammatory drugs ("NSAIDs").  This class of drugs contains well-known medications sold either over the counter—such as Advil (ibuprofen) and Aleve (naproxen)—or by prescription—such as Daypro (oxaprozin) and Voltaren (diclofenac). NSAIDs work by inhibiting cyclooxygenase (COX), an enzyme that stimulates synthesis of prostaglandins, which are chemicals produced in the body that promote certain effects.

Traditional NSAIDs have been a longstanding treatment option for patients needing relief from chronic or acute inflammation and pain associated with osteoarthritis. rheumatoid arthritis, and other musculoskeletal conditions.  This relief, however, comes with significant adverse side effects.  Specifically, traditional NSAIDs greatly increase the risk of gastrointestinal perforations, ulcers, and bleeds ("PUBs").  This risk is increased when high doses are ingested, which is often necessary to remedy chronic or acute inflammation and pain.  Scientists estimated that traditional NSAID-induced PUBs caused a significant number of deaths and hospitalizations each year in the United States.

In the early 1990s, scientists discovered that the COX enzyme had two forms—COX-1 and COX-2—each of which appeared to have several distinct functions.  Scientists believed that COX-1 affected the synthesis or production of prostaglandins responsible for protection of the stomach lining, whereas COX-2 mediated the synthesis or production of prostaglandins responsible for pain and inflammation.  This belief led scientists to hypothesize that "selective" NSAIDs designed to inhibit COX-2, but not COX-1, could offer the same pain relief as traditional NSAIDs with the reduced risk of fatal or debilitating PUBs.  In addition, scientists believed that such drugs might be able to prove beneficial for the prevention or treatment of other conditions, such as Alzheimer's disease and certain cancers, where evidence suggested that inflammation may play a causative role.

-2-

In light of these scientific developments, Merck & Co., Inc. ("Merck") and several other pharmaceutical companies began the development of such drugs, which became known as "COX-2 inhibitors" or "coxibs." Vioxx is a COX-2 inhibitor.

On May 20, 1999, the Food and Drug Administration ("FDA") approved Vioxx for sale in the United States. From its initial approval, Vioxx gained widespread acceptance among physicians treating patients with arthritis and other conditions causing chronic or acute pain.

Before and after its initial approval, Vioxx was subjected to a number of studies and tests, including, but not limited to, VIGOR, APPROVe, ViP, VICTOR, ADVANTAGE, the Alzheimer's studies, Professor Kronmal's reanalysis of Merck's clinical data, the Solomon study, the Juni study, the Ray study, the Graham study, the Kimmel study, the Levesque study, the Mamdani study, the Ingenix study, the Johnsen study, the Nussmeier study, and the Fitzgerald hypothesis. In addition, a large amount of scientific literature was written on the effects of Vioxx and other COX-2 inhibitors.

On September 30, 2004, Merck withdrew Vioxx from the market when interim unblinded data from a long-term, blinded, randomized placebo-controlled clinical trial, known as APPROVe, seeking to assess whether Vioxx could help prevent the recurrence of precancerous colon polyps, indicated that the use of Vioxx increased the risk of cardiovascular thrombotic events such as myocardial infarctions and ischemic stroke.

Thousands of lawsuits followed in both state and federal court. On February 16, 2005, as a result of the sheer mass of these lawsuits and the potential for many more, the Judicial Panel on Multidistrict Litigation ordered that the Vioxx litigation be centralized, designated as an MDL, and assigned to this Court.

One of this Court's first tasks was to set cases for early federal court trial. With the

-3-

consent of both the Plaintiff and Merck, this case was set for trial in late November in New Orleans, Louisiana. Due to Hurricane Katrina, the location of the trial was moved with the consent of the parties to Houston, Texas, but the timing of the trial remained the same. The trial commenced as scheduled, but resulted in a mistrial due to the jury's inability to reach a unanimous verdict. As such, this trial has been rescheduled for February 6, 2006, in New Orleans.

This case involves the death of Richard Irvin, Jr. Mr. Irvin was a 53-year-old man with severe lower back and hip pain. He weighed approximately 230 lbs. and stood 6' tall. On April 9, 2001, he asked his son-in-law, Dr. Christopher Schirmer, an emergency room physician, to give him something for pain. Dr. Schirmer gave Mr. Irvin a prescription for Vicoprofen 7.5/200 mg and Methocarbrnol 750 mg each to be taken once every six hours. Mr. Irvin was unable to tolerate this medication because it produced severe nausea and vomiting. In addition, it provided no significant pain relief.

Subsequently, Mr. Irvin received some samples of Vioxx 25 mg from a friend. He was able to tolerate the Vioxx, and it also reduced his pain. On April 15, 2001, he again contacted Dr. Schirmer and, this time, requested a prescription for Vioxx. Dr. Schirmer sent Mr. Irvin a prescription for 30 tablets of Vioxx 25 mg to be taken once daily. This prescription was filled on April 22, 2001.

On May 15, 2001, while at work, Mr. Irvin suffered a heart attack. Extensive resuscitative efforts were then carried out by the Fire Department Emergency Medical Technicians and later by emergency room personnel at Flagler Hospital in St. Augustine, Florida, where Mr. Irvin had been taken. These efforts were unsuccessful, and Mr. Irvin was pronounced dead at 9:02 a.m. on May 15, 2001. An autopsy revealed an unattached coronary

thrombus, or clot, in the left anterior descending coronary artery.

Mr. Irvin's surviving spouse, Evelyn Irvin Plunkett, has brought this suit against Merck on behalf of herself, Mr. Irvin's two minor children, and the Estate of Richard Irvin, Jr. She alleges that Vioxx was a defective product, Merck knew Vioxx was defective, and Merck failed to adequately warn Mr. Irvin of Vioxx's defective nature. As such, she asserts that Merck is liable for Mr. Irvin's death.

In particular, the Plaintiff asserts that the scientific tests conducted on and the scientific literature written on Vioxx revealed that Vioxx increases the risk of cardiovascular thrombotic events. To put it simply, the Plaintiff contends that Vioxx creates an imbalance between thromboxane and prostacyclin. Thromboxane promotes platelet aggregation, vessel constriction, and proliferation of smooth muscle cells. Prostacyclin, however, opposes the action of thromboxane inhibiting platelet aggregation, facilitating vasodilation, and preventing proliferation of smooth muscle cells. COX-2 is the dominant source of prostacyclin; therefore, the Plaintiff claims that the inhibition of COX-2 favors thrombogenesis, hypertension, and the promotion of atherosclerosis. Specifically, the Plaintiff claims that this mechanism ultimately led to the formation of the thrombus in Mr. Irvin's left anterior descending coronary artery and caused his death.

Merck asserts that none of the tests specifically revealed that Vioxx 25 mg ingested for less than a month can increase the risk of adverse cardiovascular events or create a prothrombotic state.

A central issue in this litigation is the use of expert testimony. On November 18, 2005, prior to the first trial of this matter, the Court ruled on sixteen *Daubert* motions. The parties have re-urged all of their prior *Daubert* motions. In addition, Merck has filed two new *Daubert*

motions pertaining to the testimony of Dr. Robert H. Fletcher and Dr. Michael Alan Graham. Furthermore, Merck has filed supplemental briefing pertaining to its previous motion to exclude the testimony of Dr. Wayne A. Ray.

## II.    Law and Analysis

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Rule 702 is in effect a codification of the United States Supreme Court's opinion in *Daubert v. Merrel Dow Pharmaceuticals*, 509 U.S. 579 (1993). In *Daubert*, the Supreme Court held that trial courts should serve as the gatekeeeper for expert testimony and should not admit such testimony without first determining that the testimony is both "reliable" and "relevant." *Id.* at 589.

Scientific testimony is reliable only if "the reasoning or methodology underlying the testimony is scientifically valid," meaning that such testimony is based on recognized methodology and supported by appropriate validation based on what is known. *Id.* at 592-93. In *Daubert*, the Supreme Court set forth a non-exclusive list of factors to consider in determining the scientific reliability of expert testimony. *Id.* at 593-95. These factors are: (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error; (4) whether standards and controls exist and have been maintained with respect to the technique; and (5) the general acceptance of the methodology in the scientific community. *Id.* Whether some or all these factors apply in a particular case depends on the facts, the expert's particular expertise, and the subject of his testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 138 (1999).

In addition to the five factors laid out in *Daubert*, a trial court may consider additional factors in assessing the scientific reliability of expert testimony. *Black v. Food Lion, Inc.*, 171

F.3d 308, 312 (5th Cir. 1999). Some of these factors may include: (1) whether the expert's

opinion is based on incomplete or inaccurate dosage or duration data; (2) whether the expert has

identified the specific mechanism by which the drug supposedly causes the alleged disease; (3)

whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded

conclusion; (4) whether the expert has adequately accounted for alternative explanations; and (5)

whether the expert proposes to testify about matters growing directly out of research he or she

has conducted independent of the litigation. *See, e.g., id.* at 313; *Moore v. Ashland Chem., Inc.,*

151 F.3d 269, 278-79 (5th Cir. 1998); *Christophersen v. Allied-Signal Corp.,* 939 F.2d 1106,

1114 (5th Cir. 1991); *Newton v. Roche Labs., Inc.,* 243 F. Supp. 2d 672, 678 (W.D. Tex. 2002).

Scientific testimony is relevant only if the expert's reasoning or methodology can be

properly applied to the facts in issue, meaning that there is an appropriate fit between the

scientific testimony and the specific facts of the case. *Daubert,* 509 U.S. at 593. Scientific

evidence is irrelevant, however, when there is too great an analytical gap between the data and

the opinion proffered. *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997).

The party seeking to introduce the expert testimony bears the burden of demonstrating

that the testimony is both relevant and reliable. *Moore,* 151 F.3d at 275-76. The focus is not on

the result or conclusion, but on the methodology. *Id.* The proponent need not prove that the

expert's testimony is correct, but must prove by a preponderance of the evidence that the

methodology used by the expert was proper. *Id.*

The trial court is the gatekeeper of scientific evidence. *Daubert,* 509 U.S. at 596. It has

a special obligation to ensure that any and all expert testimony meets these standards. *Id.*

Accordingly, it must make a preliminary assessment of whether the reasoning or methodology

underlying the testimony is scientifically valid and whether the reasoning or methodology can be

-7-

properly applied to the facts in issue. *Id.* at 592-93. In making this assessment, the trial court need not take the expert's word for it. *Joiner*, 522 U.S. at 147. Instead, when expert testimony is demonstrated to be speculative and lacking in scientific validity, trial courts are encouraged to exclude it. *Moore*, 151 F.3d at 279.

In reaching its decision, the Court throughly reviewed the expert reports and deposition testimony of both experts.

## III.    Present Motions

### A.    Dr. Robert H. Fletcher

The Plaintiff has offered Dr. Fletcher as an expert in the field of medical publications and the peer review process, with a particular focus on two articles that appeared in the New England Journal of Medicine: a November 23, 2000 article by Bombardier et al on the VIGOR study,[1] and a March 17, 2005 article by Bresalier et al. on the APPROVe study.[2]

In opposition, Merck contends that Dr. Flecther is not qualified to render his opinions and that his opinions are based on unreliable methodology. In response to Merck's opposition, the Plaintiff withdrew Dr. Fletcher's testimony as to APPROVe. Thus, Dr. Flecther's testimony as to VIGOR is the only issue remaining.

Before the Court can embark on analysis of an expert's qualifications and the methodology used, the Court must first make a threshold determination under Rule 702 that the proffered expert testimony "will assist the trier of fact to understand the evidence or to determine

---

[1] Claire Bombardier, et al, *Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis*, 343 New Engl. J. Med. 1520 (2000).

[2] Robert S. Bresalier, et al, *Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial*, 352 New Engl. J. Med. 1092 (2005).

a fact in issue." Fed. R. Evid. 702. Under Rule 702, an expert must "bring to the jury more than the lawyers can offer in argument." *Eymard v. Pan American World Airways*, 795 F.2d 1230, 1233 (5th Cir. 1986).

In regards to the VIGOR article, Dr. Fletcher will testify that Merck failed to report certain additional adverse events to the New England Journal of Medicine. Furthermore, based on these facts, Dr. Fletcher will opine that the editors of the New England Journal of Medicine would have wanted to see the additional adverse events and that this information might have made a difference in whether the article would have been published as is or at all.

As an important side issue, on November 21, 2005, Dr. Gregory Curfman testified by deposition in this matter. Dr. Curfman is the Executive Editor of the New England Journal of Medicine. In his deposition, as is frequently quoted by Dr. Fletcher in his expert report, Dr. Curfman testified to the same effect as Dr. Fletcher intends to testify. In addition, the New England Journal of Medicine published an "Expression of Concern" in regards to the VIGOR article where it also stated the substance of Dr. Fletcher's testimony. In this case, Dr. Fletcher's testimony will not assist the jury to understand the evidence or to determine a fact in issue.

Furthermore, Dr. Fletcher's testimony reiterates the deposition testimony of Dr. Curfman and the exact message of the New England Journal of Medicine's "Expression of Concern." In addition to not assisting the trier of fact, Dr. Fletcher is merely validating Dr. Curfman's testimony and the "Expression of Concern." Validating or adding credibility to another witness' testimony is not the proper realm for an expert. Cheerleading the testimony of another editor or a medical publication does not constitute expert testimony. The Plaintiff's attorneys can argue for Dr. Curfman and the New England Journal of Medicine just as well as Dr. Fletcher.

**B.      Dr. Michael Alan Graham**

-9-

The Plaintiff has offered Dr. Graham as an expert to opine that Vioxx 25 mg taken for less than 30 days can cause thrombotic cardiovascular events. Dr. Graham is prepared to testify that Vioxx can cause the formation of a thrombus and that Vioxx did cause a Mr. Irvin's thrombus, which led to his death. Essentially, Dr. Graham will testify that Vioxx caused Mr. Irvin's death.

In its opposition, Merck asserts that Dr. Graham is not qualified to opine as to whether Vioxx can generally cause thrombotic cardiovascular events or specifically caused Mr. Irvin's myocardial infarction.

Dr. Graham is not qualified to opine on either general causation or specific causation. Furthermore, his methodology is not scientifically reliable   Throughout his deposition testimony, Dr. Graham makes a litany of critical admissions. By self-admission, Dr. Graham has no training in pharmacology; is not qualified to explain how Vioxx could lead to thrombosis; has never done any research on NSAIDs or COX-2 inhibitors prior to becoming an expert for the Plaintiff; is not qualified to analyze and interpret clinical and epidemiological data concerning Vioxx; has never prescribed Vioxx or any other COX-2 inhibitors to a patient; has never determined that Vioxx was a contributing cause of a death; and has never written an article on sudden cardiac death related to plaque rupture. To compensate for his lack of education, experience, and training, Dr. Graham spent approximately eight hours reviewing sixty-seven scientific medical articles, nine depositions, four expert reports, and three days' worth of trial transcripts—far less than this Court or any attorney in this case has spent reviewing Vioxx related materials. In fact, most of these eight hours were spent reviewing Dr. Wayne Ray's expert report. While the Court could further explain Dr. Graham's lack of qualifications or his lack of a reliable scientific basis, it is enough to say that he is not qualified to render an opinion

as to whether Vioxx can cause a thrombotic cardiovascular event or whether Vioxx did cause Mr. Irvin's death.

Notwithstanding Dr. Graham's lack of qualifications as to causation, Dr. Graham is qualified to testify as to the existence of a thrombus and its role in Mr. Irvin's death. He just is not qualified to testify that Vioxx can cause a thrombus and did cause Mr. Irvin's thrombus.

### C.    Dr. Wayne A. Ray

Despite the arguments asserted in Merck's supplemental brief, the Court finds that Dr. Ray is still qualified to testify as an expert and did rely on proper methodology in forming his opinions.

## IV.    CONCLUSION

For the foregoing reasons, Merck's motion to exclude the testimony of Dr. Fletcher is GRANTED. Additionally, Merck's motion to exclude the testimony of Dr. Graham is GRANTED IN PART AND DENIED IN PART. Lastly, Merck's motion to exclude the testimony of Dr. Ray is DENIED.

New Orleans, Louisiana, this ___2nd___ of ___February___, 2006.

_____
UNITED STATES DISTRICT JUDGE

Issues Report [Merck_(Depos)]

• Opposition - Motion for New Trial

[1:1] - [1:25]          10/12/2005  Rayburn, Barry - (Irvin-Plunkett Vol. 1)

                        • Opposition - Motion for New Trial

                        page 1
                                                                              1
                        1            IN THE UNITED STATES DISTRICT COURT
                        2               EASTERN DISTRICT OF LOUISIANA
                        3
                        4   MDL DOCKET NO:  1657      CASE NO:  2:05CV4046
                        5   SECTION L  JUDGE FALLON    MAGISTRATE JUDGE KNOWLES
                        6   IN RE:
                            VIOXX LITIGATION
                        7   PRODUCTS LIABILITY LITIGATION

                        8   _____

                            EVELYN IRVIN PLUNKETT,
                        9      Plaintiff
                        10  v.
                        11
                            MERCK & CO, INC.
                        12     Defendants
                        13               DEPOSITION OF:
                        14             BARRY RAYBURN, M.D.
                        15                VOLUME I
                        16        S T I P U L A T I O N S
                        17      IT IS STIPULATED AND AGREED, by and between
                        18  the parties through their respective counsel, that
                        19  the deposition of:
                        20               BARRY RAYBURN, M.D.
                        21  may be taken before Lisa Bailey, CSR, Notary
                        22  Public, State at Large, at Johnston, Barton, Proctor
                        23  & Powell, 1901 Sixth Avenue North, Birmingham,
                        24  Alabama, on October 12, 2005 commencing at
                        25  approximately 8:20 a.m.
                        page 2
                        1            IT IS FURTHER STIPULATED AND AGREED that

[11:17] - [11:24]       10/12/2005  Rayburn, Barry - (Irvin-Plunkett Vol. 1)

                        • Opposition - Motion for New Trial

                        page 11
                        16      A.    That's probably an accurate statement.
                        17      Q.    Doctor, let me show you what I'm going to
                        18  mark as Plaintiff's Exhibit Number 1, or Rayburn
                        19  Exhibit Number 1.  This is a copy of your curriculum
                        20  vitae.
                        21             (Plaintiff's Exhibit
                                        Number 1 was marked
                        22              for identification.)
                        23      Q.    Doctor, is that a current CV for you?
                        24      A.    Yes.
                        25      Q.    Okay.  Did you review that in preparation

[131:1] - [131:21]      10/12/2005  Rayburn, Barry - (Irvin-Plunkett Vol. 1)

                        • Opposition - Motion for New Trial

                        page 130
                        25
                        page 131
                        1             C E R T I F I C A T E
                        2
                        3   STATE OF ALABAMA  )
                        4   JEFFERSON COUNTY  )
                        5
                        6             I hereby certify that the above and
                        7   foregoing deposition was taken down by me in
                        8   stenotype, and the questions and answers thereto

EXHIBIT

F

Issues Report [Merck_(Depos)]

• Opposition - Motion for New Trial

```
 9   were reduced to computer print under my supervision,
10   and that the foregoing represents a true and correct
11   transcript of the deposition given by said witness
12   upon said hearing.
13          I further certify that I am neither of
14   counsel nor of kin to the parties to the action, nor
15   am I in anywise interested in the result of said
16   cause.
17
18
19          _____
20          Lisa Bailey, Commissioner
21
22
```