UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

Lori Wiltgen

and Stephen Wiltgen

    PLAINTIFFS,

vs.

Merck & Co., Inc.,

    DEFENDANT.

CASE NO. 06-2041

**AMENDED**

**COMPLAINT**

**Demand for Jury Trial**

## COMPLAINT

COMES NOW, Lori and Stephen Wiltgen, complaining against Merck & Co., Inc., and for their cause of action states as follows:

### I. PARTIES

1. Plaintiffs Lori and Stephen Wiltgen are, and at the times mentioned in this complaint were, husband and wife.

2. The plaintiffs are citizens of the State of Arizona.

3. The defendant (hereinafter "Merck") is a New Jersey corporation with its principal place of business at One Merck Drive, White House Station, New Jersey 08889.

4. Merck is in the business of designing, studying, manufacturing, and marketing prescription drugs.

### II. JURISDICTION AND VENUE

5. This is a civil action brought on behalf of Plaintiff, Lori Wiltgen, who was prescribed and used the prescription medication Vioxx, and suffered a blood clot.

6. The subject matter of this Complaint is also the subject matter of multi-district litigation commenced pursuant to 28 U.S.C. § 1407 in MDL No. 1657 in the Eastern District of Lousiana. U.S. District Judge Eldon E. Fallon is the Presiding Judge. Personal and subject matter jurisdiction are appropriate in this court as to Defendant pursuant to Pre-Trial Order

("PTO") No. 11, as Defendant has availed itself of this jurisdiction and venue.

7. The plaintiffs, as stated above, are citizens of Arizona, and Merck is incorporated, and has its principal place of business, in New Jersey.

8. Ms. Wiltgen's ingestion of Vioxx occurred in Minnesota, and the harm claimed to have resulted from her ingestion of it occurred in Minnesota.

9. Merck does, and at all times mentioned in this complaint did, business in Minnesota through the sale of prescription drugs in this state.

10. Merck did business in the state of Minnesota through the sale of the prescription drug Vioxx in this state until September 30, 2004.

11. The amount in controversy exceeds $75,000 exclusive of interest and costs.

12. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiffs and Defendant, and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

13. Defendant Merck has been and/or currently is engaged in business, directly or by authorized agent, in Minnesota, and at the times mentioned in this complaint did, business in Minnesota. Venue and jurisdiction are therefore proper, as to Plaintiffs, in the District of Minnesota pursuant to 28 U.S.C. § 1391., and in the Eastern District of Louisiana pursuant to PTO No. 11.

### III. MS. WILTGEN'S PERSONAL INJURY CLAIM

14. Ms. Wiltgen was prescribed Vioxx.

15. In 2004, Ms. Wiltgen, suffered a blood clot.

16. Ms. Wiltgen's ingestion of Vioxx was a substantial contributing cause, or the proximate legal cause, of this blood clot.

17. Merck's conduct, as identified in any one, all, or a combination of the five bases of liability identified in this complaint, was a substantial contributing cause, or the proximate legal cause, of this blood clot.

18. That as a direct and proximate result of defendant's negligence, plaintiff sustained injuries to her mind and body, some of which injuries are permanent and have caused, and will in the future cause, plaintiff to suffer mental and physical pain, suffering, mental distress,

embarrassment, and disability; that plaintiff has incurred, and will in the future incur, medical expenses, the exact amount of which cannot be fully ascertained at this time; that plaintiff has incurred a loss of earnings and a reduction of earning capacity; all to plaintiff's damage in a reasonable amount in excess of Seventy-Five Thousand and no/100 Dollars ($75,000.00).

## IV. VIOXX FACTS

19. Vioxx is the brand name of rofecoxib, a prescription drug in the class of nonsteroidal anti-inflammatory drugs ("NSAIDs")known as Cox-2 inhibitors.

20. Vioxx is a prescription drug designed to treat pain through reduced inflammation. Defendant did manufacture, design, package, market, sell, and distribute Vioxx. Defendant encouraged the use of Vioxx through aggressive marketing by its detail sales representatives and through direct to consumer advertising. Defendant misrepresented the safety and efficacy of Vioxx and concealed or understated its dangerous side effects.

21. At all times relevant hereto, Defendant knew of the defective nature of Vioxx as herein set forth, yet continued to design, manufacture, market, distribute, and sell Vioxx so as to maximize sales and profits at the expense of the general public's health and safety, and in disregard of the foreseeable harm caused by Vioxx. Defendant's conduct exhibits such an entire want of care as to establish that its actions were a result of fraud, ill will, recklessness, gross negligence, or willful and intentional disregard to Plaintiffs individual rights. Punitive damages are therefore appropriate.

22. Merck submitted an Application to Market a New Drug for Human Use (NDA) for rofecoxib to the United States Food and Drug Administration (FDA) on November 23, 1998, for for treatment of osteoarthritic pain, acute pain, and menstrual pain. This application is designated as NDA 21-042 by the FDA.

23. Merck also submitted an NDA for rofecoxib to the FDA on November 23, 1998, for oral suspension for treatment of osteoarthritic pain, acute pain, and menstrual pain. This application is designated as NDA 21-052 by the FDA.

24. On May 20, 1999, the FDA approved both NDAs for treatment of osteoarthritic pain, of acute pain, and menstrual pain.

25. Merck launched an aggressive marketing campaign for Vioxx immediately after its approval in May 1999.

3

26. Merck submitted a Supplemental New Drug Application (sNDA), designated as sNDA-007, with the goal of establishing a gastrointestinal safety claim for rofecoxib. To support this sNDA, Merck conducted a study known as the Vioxx GI Outcomes Research study or "VIGOR".

27. The VIGOR study, a prospective, randomized, double-blind, one-year study, evaluated approximately 4000 patients on Vioxx 50 mg a day (twice the highest approved dose for chronic use) and approximately 4000 patients on the standard dose of naproxen (1000 mg a day), an NSAID. Patients who were under treatment with low dose aspirin for heart attack prevention were excluded from the study.

28. VIGOR showed a higher cumulative rate of serious cardiovascular thromboembolic adverse events in the Vioxx group (1.8%) compared to the naproxen group (0.6%).

29. On June 22, 1999, Merck contracted with Peter Holt, M.D., to conduct Vioxx promotional audio conferences, using content provided by Merck, which were to be presented to heath care professionals as educational programs.

30. The FDA sent a letter to Merck dated December 16, 1999, saying that certain Vioxx promotional pieces:

> "are false or misleading because they contain misrepresentations of Vioxx's safety profile, unsubstantiated comparative claims, and are lacking in fair balance."

31. By November 18, 1999, the Data and Safety Monitoring Board of the VIGOR study, a committee independent from Merck, the sponsor, had become concerned over the "excess deaths and cardiovascular events experiences in Group A [Vioxx] compared to Group B [naproxen]."

32. Dr. Peter Holt conducted six Vioxx promotional audio conferences, which were arranged by Merck, presented on behalf of Merck, and moderated by Merck employees: one on June 8, one on June 13, one on June 16, and three on June 21, 2000. Some of the content of these conferences was later found by the FDA to be:

> "false or misleading in that they minimized the MI results of the VIGOR study, minimized the Vioxx / Coumadin drug interaction, omitted important risk information, made unsubstantiated superiority claims, and promoted Vioxx for unapproved uses and an unapproved

dosing regimen."

33. The FDA sent a letter to Merck dated December 12, 2000, asking Merck to explain its involvement in, and influence on, the initiation, preparation, development, and publication of the Holt audio conferences conducted in June 2000. This letter also asks Merck to tell the FDA about the nature of its relationship with Dr. Holt.

34. Merck responded to the FDA's inquiry about Dr. Holt in a January 5, 2001, letter to the FDA, saying:

> "Dr. Holt entered into a speaker contract with Merck on June 22, 1999."
>
> "Merck has determined that we arranged for Dr. Holt to speak at ten audio conferences in 2000. Merck Business Managers provided him with the topic for the audio conferences and, for two of the audio conferences, asked him to address the safety profiles of Vioxx and other NSAIDs."

35. Results from the VIGOR study were submitted by Merck to the New England Journal of Medicine in the form of an article titled, *Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis VIGOR Study Group*, which was published in the Journal's November 23, 2000 edition. This article had several co-authors, including Alise Reicin, Merck's Vice President of Clinical Research. The lead author, Toronto rheumatologist Claire Bombardier, M.D., had then, and has had since, various relationships with Merck, including being the chief investigator for the VIGOR study.

36. The Bombardier/Reicin article addresses adverse cardiovascular event data by saying:

> "The incidence of myocardial infarction was lower among patients in the naproxen group than among those in the rofecoxib group (0.1 percent vs. 0.4 percent; relative risk, 0.2; 95 percent confidence interval, 0.1 to 0.7); the overall mortality rate and the rate of death from cardiovascular causes were similar in the two groups."

37. The conclusions reached in the Bombardier/Reicin article do not mention an increase in cardiovascular risks with Vioxx, saying only:

> "CONCLUSIONS: In patients with rheumatoid arthritis, treatment with rofecoxib, a selective inhibitor of cyclooxygenase-2, is associated with significantly fewer clinically important upper gastrointestinal events than

5

> treatment with naproxen, a nonselective inhibitor."

38. In response to growing public expressions of concern over the cardiovascular safety profile of Vioxx, Merck issued a press release titled "Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx," dated May 22, 2001. This press release says Vioxx has a "favorable cardiovascular safety profile." The FDA would later tell Merck:

> "your claim in the press release that Vioxx has a `favorable cardiovascular profile is simply incomprehensible, given the rate of MI and serious cardiovascular events compared to naproxen. The implication that Vioxx's cardiovascular profile is superior to other NSAIDs is misleading; in fact, serious cardiovascular events were twice as frequent in the VIOXX treatment group as in the naproxen treatment group in the VIGOR study."

39. An article titled *Risk of Cardiovascular Events Associated With Selective COX-2 Inhibitors,* written by Drs. Mukherjee, Nissen, and Topol at the Cleveland Clinic, was published in the August 29, 2001 edition of the Journal of the American Medical Association.

40. These Cleveland Clinic doctors found that the risk of serious cardiovascular adverse events in the studies they analyzed, including VIGOR, is 238% higher for Vioxx than naproxen, and in the subgroup of people for whom aspirin is indicated, the risk is 489% higher for Vioxx than naproxen.

41. Drs. Mukherjee, Nissen, and Topol conclude their article by saying:

> "The available data raise a cautionary flag about the risk of cardiovascular events with COX-2 inhibitors. Further prospective trial evaluation may characterize and determine the magnitude of the risk."

42. Thomas W. Abrams, Director of Drug Marketing, Advertising, and Communications at the FDA, issued a Warning Letter dated September 17, 2001, to Merck CEO Raymond V. Gilmartin, relating to "promotional activities and material for the marketing of Vioxx (rofecoxib) tablets."

43. This Warning Letter says:

> "[Merck] engaged in a promotional campaign for Vioxx that minimized the

potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile for Vioxx.

Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator nonsteroidal anti-inflammatory drug (NSAID), Naprosyn (naproxen).

The promotional activities and materials described above minimize the potentially serious Cardiovascular findings that were observed in the VIGOR study, minimized the VIOXX / Coumadin drug interaction, omit crucial risk information associated with Vioxx therapy, contain unsubstantiated comparative claims, and promote unapproved uses. On December 16, 1999, we also objected to your dissemination of promotional materials for Vioxx that misrepresented Vioxx's safety profile, contained unsubstantiated comparative claims, and lacked fair balance.

Due to the seriousness of these violations, and the fact that your violative promotion of Vioxx has continued despite our prior written notification regarding similar violations, we request that you provide a detailed response to the issues raised in this Warning Letter on or before October 1, 2001.

This response should contain an action plan that included a comprehensive plan to disseminate corrective messages about the issues discussed in this letter to the audiences that received these misleading messages. This corrective action plan should also include:

Immediately ceasing all violative promotional activities, and the dissemination of violative promotional materials for Vioxx.

Issuing a `Dear Healthcare provider' letter to correct false or misleading impressions and information. This proposed letter should be submitted to us for review prior to its release. After agreement is reached on the content and audience, the letter should be disseminated by direct mail to all healthcare providers who were, or may have been exposed to the violative promotion.

A written statement of your intent to comply with `1 and `2 above.

7

44. On September 27, 2004, Merck informed the FDA that the Data Safety Monitoring Board for an ongoing long-term study of Vioxx, known as the APPROVe study, had recommended that the study be stopped early for safety reasons.

45. The APPROVe study was not intended to be a cardiovascular risk assessment study. It was commissioned by Merck to look at the effect of Vioxx in people at risk for developing recurrent colon polyps.

46. The APPROVe study demonstrates an increased risk of cardiovascular adverse events, including heart attacks and strokes, for the Vioxx population relative to the placebo population in the study.

47. Merck representatives informed the FDA in a September 28, 2004, meeting that Merck would withdraw Vioxx from the United States market.

48. Merck and the FDA each announced the withdrawal of Vioxx from the United States market on September 30, 2004. Merck also announced worldwide withdrawal the same day.

## V. FIRST BASIS FOR IMPOSING LIABILITY: STRICT LIABILITY

49. Plaintiffs reallege all prior paragraphs of this Complaint as if fully set out herein.

50. Merck developed, patented, studied, manufactured, and marketed Vioxx.

51. The Vioxx taken by Lori Wiltgen was not materially altered between the time it was placed into the stream of commerce by Merck and the time it was taken by Lori Wiltgen.

52. Vioxx is a defective product in the sense that it is not reasonably safe for its intended use, based on an objective analysis weighing its risks and benefits against those of alternative pain relief drugs, which were available throughout the time Vioxx was on the market.

53. The design of the chemical formula for Vioxx is defective.

54. Vioxx is also defective because it was not accompanied by adequate warnings to health care professionals or to those who took the drug of its cardiovascular adverse event risks. Moreover, the warnings that were given were diluted and substantially rendered ineffective by Merck's misleading promotional efforts directed both at health care professionals and the public.

55. Vioxx's risk of cardiovascular adverse events made it more dangerous than its consumers would expect or anticipate.

56. Lori Wiltgen did not know, and a reasonable person under the same or similar

circumstances would not have had reason to know, of the Vioxx's defects.

57. Lori Wiltgen took Vioxx under circumstances that were within the range of intended uses that were anticipated by Merck.

58. The defective nature of Vioxx was a contributing cause of Plaintiffs' injuries and damages.

## VI. SECOND BASIS FOR IMPOSING LIABILITY: NEGLIGENCE

59. Plaintiffs reallege all prior paragraphs of this Complaint as if fully set out herein.

60. Merck did not use reasonable care in designing Vioxx.

61. Merck did an unreasonably poor job of studying the cardiovascular risks of Vioxx before seeking approval to market it.

62. Merck acted unreasonably each year Vioxx was on the market by not initiating a study to assess its cardiovascular risks in light of mounting evidence that Vioxx could be contributing to avoidable heart attacks, strokes, and other cardiovascular adverse events.

63. Merck unreasonably failed to advise health care professionals and the public to restrict the use of Vioxx to short term therapy for those at high risk for gastrointestinal adverse events.

64. Merck unreasonably failed to adequately warn of Vioxx's risk of cardiovascular adverse events.

65. Merck unreasonably presented unsubstantiated, false, and/or misleading information as to the risks and benefits of Vioxx to health care professionals and to the public.

66. It was unreasonable for Merck to eviscerate the cardiovascular risk information in Vioxx's prescribing information by minimizing these risks, making unsubstantiated comparison claims, and exaggerating the benefits and approved uses of the drug in Merck's promotional campaigns for it.

67. Merck acted unreasonably in making a series of marketing decisions to defend Vioxx, despite growing evidence that it contributes to serious and sometimes fatal cardiovascular events, in an effort to maintain the share of the cox-2 inhibitor market represented by Vioxx, until Merck could get its new Cox-2 inhibitor, Arcoxia, on the market to replace Vioxx.

68. The negligence of Merck was a contributing cause of Plaintiffs' injuries and damages.

## VII. THIRD BASIS FOR IMPOSING LIABILITY: BREACH OF EXPRESS WARRANTY

69. Plaintiffs reallege all prior paragraphs of this Complaint as if fully set out herein.

70. Merck created an express warranty that Vioxx is reasonably safe for its intended purpose through the representations, described earlier in this complaint, made to health care professionals and to the public.

71. Merck breached this express warranty, because Vioxx is not reasonably safe for its intended purpose.

72. Lori Wiltgen reasonably relied on Merck's express warranty in making the decision to take the drug and Defendant's conduct was a contributing cause of Plaintiffs' injuries and damages.

## VIII. FOURTH BASIS FOR IMPOSING LIABILITY: BREACH OF IMPLIED WARRANTY

73. Plaintiffs reallege all prior paragraphs of this Complaint as if fully set out herein.

74. At the time Defendant marketed, sold, and distributed Vioxx for use by consumers, including Lori Wiltgen Defendant knew of the use for which Vioxx was intended and impliedly warranted the product to be of merchantable quality, safe, and fit for such use.

75. Lori Wiltgen reasonably relied upon the skill and judgment of Defendant as to whether Vioxx was of merchantable quality, safe, and fit for its intended use.

76. Contrary to said warranty, Vioxx was not of merchantable quality, and was not safe or fit for its intended use because Vioxx was, and is, unreasonably dangerous and unfit for the ordinary purpose for which it was intended.

77. Defendant's conduct in this regard was a contributing cause of Plaintiffs' injuries and damages.

## IX. FIFTH BASIS FOR IMPOSING LIABILITY: FRAUD AND MISREPRESENTATION

78. Plaintiffs reallege all prior paragraphs of this Complaint as fully set out herein.

79. Defendant negligently, recklessly, intentionally, and fraudulently made material misrepresentations that Vioxx was safe and effective. Defendant represented Vioxx as safe so that general public, including Lori Wiltgen, would rely upon those misrepresentations when purchasing

and using Vioxx.

80. Defendant aggressively marketed Vioxx. Defendant's representations that Vioxx was safe and effective were made so that Lori Wiltgen would rely on those representations and take Vioxx. In fact, Lori Wiltgen did rely on Defendant's representations in this regard.

81. At the time Defendant made those representations, it was aware they were false and made with reckless disregard to their truth and falsity.

82. As a result of Defendant's fraud and misrepresentation, Plaintiffs suffered injuries and damages.

## X. STEPHEN WILTGEN'S LOSS OF CONSORTIUM CLAIMS

83. As results of the blood clot his wife suffered, Stephen Wiltgen:

    a. has lost a substantial measure of his wife's consortium to date,

    b. will lose a substantial measure of his wife's consortium in the future,

    c. has lost a substantial measure of the value of his wife's household services, and

    d. will lose a substantial measure of the value of his wife's household services in the future.

## XI. RELIEF REQUESTED

- The plaintiffs ask for a judgment against Merck for economic and noneconomic compensatory damages in an amount which will, to the extent money can do it, put them where they would have been if Ms. Wiltgen had not suffered from a blood clot.
- The plaintiffs also ask for refund and reimbursement of all monies for purchase of rofecoxib (Vioxx).
- The plaintiffs also ask for prejudgment and post judgment interest on any verdict in their favor to the extent allowed by applicable state law.
- The plaintiffs also ask for reimbursement of attorney's fees, expenses, and costs of this action.
- The amount sought in compensatory damages exceeds $75,000 exclusive of interest and costs.
- A jury trial is requested.

- Such further relief as this court deems necessary, just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues presented herein.

Dated: 5/3 , 2006.   By /s/ *[signature]*

Meshbesher and Spence, Ltd
Anthony J. Nemo, MN #221351
Paul R. Dahlberg, MN #228217
Andrew L. Davick, MN #332719
Attorneys for Plaintiff
416 S Broadway
Rochester, MN 55904
507-280-8090