UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| Evelyn Irvin Plunkett v. Merck & Co, Inc. | * | CASE NO. 02:05CV4046 |

---

### PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR NEW TRIAL

---

Plaintiff Evelyn Irvin Plunkett replies to Merck & Co.'s opposition to her Motion for

New Trial and urges the Court once again to grant a new trial in this case.  Plaintiff's motion

rests on three grounds:  1) that the Court abused its discretion in refusing to allow Dr. Thomas

Baldwin and Dr. Michael Graham to testify to specific causation; 2) that the Court abused its

discretion in denying Plaintiff's motion to continue; and 3) that Dr. Barry Rayburn's

intentional misrepresentation of his qualifications prevented Plaintiff from fully and fairly

presenting her case to the jury.  Considered as whole, and individually, these grounds dictate

that the Court order a new trial in this case.

### I.    THE COURT ABUSED ITS DISCRETION BY LIMITING PLAINTIFF'S SPECIFIC-CAUSATION EXPERT TESTIMONY

It is no surprise that in its opposition Merck & Co. asserts the Court's decisions to

prevent Dr. Baldwin and Dr. Graham from testifying to specific causation were correct.  The

fact remains, however, that the Court misapplied Rule 702 and the *Daubert* standard to both of

these experts.  Each – in regard to their qualifications and methodology -- was qualified to

give expert testimony that Vioxx was a substantial contributing cause of Mr. Richard Irvin,

Jr.'s death.

Contrary to Merck's assertions, Dr. Baldwin is qualified to testify to specific causation. First, Merck argues that Dr. Baldwin has little to no experience with Vioxx or other Cox-2 inhibitors. Dr. Baldwin's experience with Cox-2 inhibitors is limited because he recognized with insight and prescience in March 2000 after reading the VIGOR study that if his patients were taking Vioxx or another Cox-2 inhibitor, they might be at greater risk for an adverse cardiovascular event. Due to the heightened risk (that he recognized despite Merck's proclamations to the contrary), Dr. Baldwin recommended that as many as 100 of his patients cease taking Vioxx. *See* Dr. Thomas Baldwin's Expert Report at p. 2 (Jan. 2006) (Ex. B, Mot. for New Trial). Second, Merck argues that Dr. Baldwin is not qualified because he did not prescribe Vioxx. Due to the nature of a cardiology practice, it is unlikely that many cardiologists would have prescribed Vioxx. Regardless, Dr. Baldwin did not prescribe or renew prescriptions for Vioxx and other Cox-2 inhibitors because he recognized the inherent cardiovascular dangers associated with their use. Dr. Baldwin's early recognition of the dangers of Vioxx and other Cox-2 inhibitors should only bolster his qualifications.

Third, Merck argues that Dr. Baldwin should not have been allowed to testify because he has not conducted any research involving Cox-2 inhibitors. It is true that Dr. Baldwin did not conduct clinical trials involving Cox-2 inhibitors. It is also true that Dr. Rayburn has not participated in any clinical research involving Cox-2 inhibitors.

Fourth, Merck has repeated numerous times Dr. Baldwin's forthright answer during *Irvin I* that he does not consider himself an expert per se "in Cox-2s," arguing that this statement somehow disqualifies him from giving specific causation testimony. Indeed, because Dr. Baldwin is not a pharmacologist or epidemiologist, he does not hold himself out as an expert in Cox-2 drugs. *See* Dr. Thomas Baldwin's Expert Report at p. 2 (Jan. 2006) (Ex.

2

B, Mot. for New Trial).  Dr. Baldwin rightly considers himself and so testified that he is an

expert as to the heart and as to agents in the body that might be considered prothrombotic,

causing adverse cardiovascular events in patients. *Id.*

Dr. Baldwin is a practicing cardiologist.  Dr. Baldwin is board certified in internal

medicine, cardiology, and interventional cardiology.  Dr. Baldwin reviewed the VIGOR article

when it was published.  Even though the authors of the VIGOR study "flipped the data" to

mask the fact that Vioxx users experienced five times more heart attacks than those taking

naproxen, Dr. Baldwin rightly recognized the cardiovascular dangers revealed by the study.

Dr. Baldwin requested that patients who had been prescribed Vioxx by other physicians to

stop taking the drug.  Dr. Baldwin reviewed the relevant literature.

Dr. Baldwin's well-supported explanation for his differential diagnosis and his

conclusion as to specific causation should have been admissible under *Daubert*.  In addition to

the authority cited in her initial memorandum in support of a new trial, Plaintiff urges the

Court to consider the Fifth Circuit's holding in *Pipitone v. Biometrix, Inc.*, 288 F.3d 239 (5th

Cir. 2002).  Dr. Baldwin was qualified to testify that Vioxx was a substantial contributing

cause of Mr. Irvin's death.  The Court erred when it prevented him from doing so.

On the other hand, the Court allowed Dr. Rayburn to testify as to specific causation

even though he is less qualified than Dr. Baldwin.  Dr. Rayburn is a practicing physician and a

university professor.  Dr. Rayburn has not diagnosed a patient with a "Vioxx heart attack" –

same as Dr. Baldwin.  Dr, Rayburn has not participated in any clinical trials – same as Dr.

Baldwin.  Dr. Rayburn has not written any articles about Vioxx or other Cox-2 inhibitors –

same as Dr. Baldwin.  Unlike Dr. Baldwin, Dr. Rayburn is not board certified, though he

misrepresented this fact to the Court and to the jury.

Lastly, as Merck points out in its opposition, Dr. Rayburn testified at trial that he had

spent "well over 100 hours" working on this case. It appears that a majority of these hours were spent in preparation for trial. Dr. Rayburn testified in his first deposition, prior to *Irvin I* that he had spent between 23 or 24 hours, though it is unclear how many, if any, of these hours were devoted to the formulations of his opinions or in preparation to testify. During his deposition prior to *Irvin II*, Dr. Rayburn testified that he had spent an additional 10 to 12 hours on the case. From his trial testimony, it appears that Dr. Rayburn spent approximately 64 hours preparing to testify at trial. Time spent with lawyers being prepared to testify at trial in *Irvin II* and in other cases should not be considered by the Court in determining if Dr. Rayburn is qualified to testify to specific causation.

Plaintiff again submits that Dr. Baldwin and Dr. Rayburn should have passed through the *Daubert* gate and been allowed to give specific causation testimony. The Court's decision to allow Dr. Rayburn to do so and not to allow Dr. Baldwin to do so was an abuse of discretion. To preclude one but not the other under these circumstances was to invade the province of the jury.

## II.    THE COURT ABUSED ITS DISCRETION BY DENYING PLAINTIFF'S MOTION FOR CONTINUANCE

As noted in her initial motion, Plaintiff is well aware that this Court has great latitude in granting or denying a motion to continue. This broad discretion, however, is not without limits, and the Court abused its discretion in denying Plaintiff's motion to continue prior to the *Irvin II* trial.

Merck argues that there had been plenty of time for Plaintiff to prepare her case for trial in the MDL because the case had been pending in state court since May 2003. Actually,

this is not the case.  Merck removed the case from Florida state court to the United States

District for the Southern District of Florida not once, but twice, though federal jurisdiction at

was clearly not present.  On both occasions, Plaintiff's motion to remand was granted.  In

fact, in remanding the case for the second time, the district court on its own motion imposed

sanctions upon Merck & Co. for the improvident removals.  These baseless removals

prevented discovery on substantive issues in the case from moving forward.[1]

Plaintiff made every effort to comply with the Court's rigorous scheduling orders

prior to *Irvin I* and *Irvin II*.  Specifically, the abbreviated time period prior to *Irvin II* gave the

parties and the Court little time to accomplish everything necessary to prepare for the second

trial.  As a result of the compressed time period, the Court ruled on Defendant's *Daubert*

motions on the Thursday evening before the trial was to begin on Monday.  The Court's

decision seriously inhibited Plaintiff's ability to present a compelling case to the jury.  Though

Plaintiff's position remains that there was sufficient evidence to reach the jury, without

question, the absence of direct opinion testimony from an expert that Vioxx was a contributing

cause of Mr. Irvin's death seriously impaired Plaintiff's ability to persuade the jury.

Merck also argues that the Court should uphold the jury's verdict in this case because

the completed verdict form suggests that Plaintiff lost on liability as well as causation.

Merck's argument is not only irrelevant as the Court reviews its decision on Plaintiff's motion

for continuance, but also incorrect.  The special interrogatories submitted to the jury included

elements of both liability and causation.  It is undeterminable what the jury's finding was as to

---

[1] Similarly, Merck suggests that the PSC put the *Irvin* case up as its choice for the first MDL trial.  As the Court is aware, this is not the case.  *Irvin* was put forward as the second potential trial case because discovery had not yet been conducted in the case.  The PSC put forward the *Pikul* case to be tried first because discovery is already complete.

causation.  Regardless, this has no bearing on whether the Court abused its discretion in denying Plaintiff's motion to continue prior to the case beginning.

Plaintiff reiterates that the impact on the Court by delaying the trial 30 or 60 days would have been minimal when compared with the impact on Plaintiff.  As the surviving spouse of Mr. Irvin, the trial of this case was Mrs. Evelyn Irvin Plunkett's opportunity on behalf of her surviving children and the estate to present her claims to a jury of her peers.  Not having additional time to secure other expert testimony seriously prevented her from being able to present this case in the best light possible.  See *Smith-Weik Machinery Corp. v. Murdock Machine & Engineering*, 423 F.2d 842, 844 (5th Cir. 1970) ("on balance, the interests in favor of a fair trial heavily outweigh[] the interests in favor of an immediate trial").

The Court abused its discretion by refusing to grant a continuance in this case.

**III.    Dr. Rayburn's Intentional Misrepresentation Requires a New Trial**

Plaintiff urges the Court to order a new trial because Dr. Barry Rayburn lied under oath, intentionally misrepresenting his credentials to the Court and to the jury during the trial of this case.  Rule 60(b)(3) provides that a Court may relieve a party from final judgment because of a misrepresentation. Fed. R. Civ. P. 60(b)(3).  According to *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1339 (5th Cir. 1978), the "conduct complained of must be such as prevented the losing party from fully and fairly presenting his case or defense."

First, in opposition to Plaintiff's supplemental motion, Merck argues that Plaintiff's allegations that Dr. Rayburn misrepresented his qualifications to the Court are "pure fantasy." (Def.'s Opp. at 15.)  Merck states that Dr. Rayburn "*never* represented that he is currently certified." (Id.)  The clear implications of Dr. Rayburn's curriculum vitae and expert reports

are that he "is" currently board certified.  On February 14, 2006, Dr. Rayburn, after being

sworn by the deputy clerk, gave the following testimony before this Court:

> Q.    Are you board-certified, sir?
> A.    Yes.  I passed boards in internal medicine and cardiovascular disease.
>
> . . . . .
>
> Q.    Doctor, I'm going to hand to you Exhibit 855 and ask if you can
>        identify that as your CV?
> A.    Yes, that's my CV.

*See* Transcript of *Irvin 2 v. Merck & Co.*, at 1723-1726 (Feb. 14, 2006) (emphasis added) (Ex.

F).  Of course, this testimony is false.  Furthermore, the entire transcript of *Irvin 2* is devoid of

any mention that Dr. Rayburn's board certifications have lapsed.  According to Merck's way

of thinking, Dr. Rayburn's misrepresentation may be a "fantasy."  But, in the real world, the

truth is quite clear:  Dr. Rayburn represented to this Court and to the jury that he "is" board

certified, when he in fact is not.

Second, Merck argues that Dr. Rayburn's misrepresentations are somehow Plaintiff's

fault.  According to Merck, Plaintiff should have exposed Dr. Rayburn's misrepresentation on

cross-examination.  This interesting argument suggests that Plaintiff should presume that

Merck's experts will not answer truthfully when asked a question under oath, even on straight-

forward matters of qualification.

Despite Merck's light treatment of the now-exposed misrepresentation, false testimony

given under oath in a United States District Court is a violation of 18 U.S.C.A. § 1621.

Section 1621 states:  "Whoever . . . having taken an oath before a competent tribunal, that he

will testify, . . . truly, . . . . willfully and contrary to such oath states . . . any material matter

which he does not believe to be true; . . . .is guilty of perjury and shall, . . . , be fined under this

title or imprisoned not more than five years, or both."  Dr. Rayburn was under oath when he

testified during *Irvin II*. Dr. Rayburn clearly testified that he **is** board certified when he is not. At the time of his testimony, Dr. Rayburn was clearly aware that he was not board certified.

Third, Merck argues that Dr. Rayburn's certification status would not have affected the Court's overall assessment of his qualifications. Though Plaintiff submits that Merck is incorrect in this assertion, this is not the point. Dr. Rayburn's misrepresentation to this Court and the jury prevented Plaintiff from fully and fairly presenting her case. If Dr. Rayburn had been truthful about his qualifications, Plaintiff would have had opportunity to cross-examine Dr. Rayburn's on his lack of board certification and on the importance of board certification in the medical community.

Dr. Rayburn's testimony was pivotal in the trial of this case. It is hard to overstate the difference truthful testimony from Dr. Rayburn about his credentials would have made in the trial and potentially, the outcome of the case. Dr. Rayburn's false testimony on the crucial point of medical qualification violated the law, impugned the integrity of the trial process, and intentionally compromised the jury's deliberations. There is clear and convincing evidence that Merck's expert's false testimony prevented Plaintiff from fully and fairly presenting her claims to the jury.

## CONCLUSION

For these reasons, and those previously outlined in her initial and supplemental motions for new trial, Plaintiff respectfully urges the Court to order a new trial in this case.

Respectfully submitted,

By: *P. Leigh O'Dell*
_____
**Andy D. Birchfield, Jr.**
P. Leigh O'Dell
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
(800) 898-2034 (telephone)
(334) 954-7555 (telecopier)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, ECHSNER &
PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
MEUNIER&WARSHAUER, L.L.C.
P.O. Box 960
191 East Second Street
New Roads, LA 70760
(225) 638-6137
(225) 638-8836 (fax)

**Counsel for Plaintiff**

**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
***Herman, Herman, Katz & Cotlar, LLP***
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
**PLAINTIFFS' LIAISON COUNSEL**

Christopher A. Seeger, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Carlene Rhodes Lewis, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Thomas R. Kline, Esquire
KLINE&SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced in accordance with Pre-Trial Order No. #8, on this the **5th** day of May, 2006.

P. Leigh O'Dell