**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 MAY 10   PM 1: 36

LORETTA G. WHYTE
CLERK

| | | |
|---|---|---|
| In re: VIOXX | * | **MDL Docket No. 1657** |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| | * | **JUDGE FALLON** |
| **This document relates to all cases** | * | |
| | * | **MAGISTRATE** |
| | * | **JUDGE KNOWLES** |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MERCK & CO., INC.'S OPPOSITION TO PSC'S GENERIC MOTION *IN LIMINE*

The PSC's "generic" motion *in limine* consists of two parts. First, in the motion itself, the PSC requests a series of modifications to the conduct of upcoming trials that it evidently thinks will increase the odds of plaintiffs' verdicts. These departures from past practice would substantially and unnecessarily complicate the proceedings and should not be imposed without the agreement of all parties. Second, in its memorandum in support, the PSC makes a motion for reconsideration – without calling it that – that seeks to reverse a series of this Court's earlier rulings. The issues raised and the Court's rulings on them are summarized below in Figure 1. Most of those earlier rulings were made with the benefit of full briefing by the parties, as referenced in Figure 1, and neither the law nor the material facts have changed.

As courts in this district have recognized, "reconsideration of a previous order is an extraordinary remedy which should be used sparingly." *Fields v. Pool Offshore*, No. CIV. A. 97-3170, 1998 WL 43217, at *2 (E.D. La. Feb. 3, 1998) (citing *Rottmund v. Continental Assur. Co.*, 813 F. Supp. 1104, 1107 (E.D. Pa. 1992) (although federal district court has inherent power over interlocutory orders and may modify, vacate, or set aside these orders when the interests of

___ Fee_____
___ Process_____
_X_ Dktd _____
___ CtRmDep_____
___ Doc. No_____

809965v.1

justice require, "[b]ecause of the interest in finality . . . courts should grant motions for reconsideration sparingly"), *aff'd*, 182 F.3d 353 (5th Cir. 1999).  This rule is well justified: "For reasons of policy, courts and litigants cannot be repeatedly called upon to backtrack through the paths of litigation which are often laced with close questions." *Sussman v. Salem, Saxon & Nielsen*, 153 F.R.D. 689 (M.D. Fla. 1994); *accord Fields*, 1998 WL 43217, at *2.  Courts must accordingly "strike the proper balance" between the need for finality and "the need to render just decisions on the basis of all the facts." *Edward H. Bohlin Co. v. Banning Co.,* 6 F.3d 350, 355 (5th Cir.1993); *accord Goldman v. Hartford Life & Acc. Ins. Co.*, No. Civ.A. 03-0759, 2006 WL 861016, at *2 (E.D. La. Mar. 30, 2006).  This is especially true in the MDL context, where consistency and finality are critical to the fair and efficient resolution of sometimes hundreds – and, in this case, thousands – of claims.  *See, e.g., Ruth v. A.O. Smith Corp.*, No. 1:04-CV-18912, 2006 WL 530388, at *7 (N.D. Ohio Feb. 27, 2006) ("The Court intends to apply the same reasoning to other cases in this MDL, absent good reason to reconsider its position.").

Rather than re-brief the issues that have already been decided by this Court, Merck incorporates its prior briefing on the subjects -- all of which has been attached to this brief for the Court's convenience – and briefly summarizes its positions below.  For the reasons explained, Merck respectfully requests that the Court: (i) deny the PSC's motion to preclude evidence or argument pertaining to Dr. Briggs Morrison's relevant background and experience at Merck; (ii) deny the PSC's motion to preclude evidence or argument regarding whether Merck needed prior FDA approval to incorporate the VIGOR results into the Vioxx label; (iii) deny the PSC's repeated attempts to compel Mr. David Anstice to testify in future Vioxx-related cases in this Court; (iv) deny the PSC's motion to exclude the April 6, 2005 FDA Memorandum or its conclusions regarding the "class effect" of all NSAIDs; (v) deny the PSC's request to compel the

809965v.1

production of a privileged, inadvertently-produced Confidential Memorandum of Invention; (vi) deny the PSC's motion to preclude testimony by Merck employees about their personal use of Vioxx; and (vii) to the extent explained in Part VII below, deny the PSC's trial management requests that would unnecessarily lengthen and complicate future trials.

**Figure 1:**
**The Court's Prior Rulings on Issues Raised in the PSC's Generic Motion *In Limine***

| Present Motion | Prior Briefing | Prior Ruling |
|---|---|---|
| Motion to Preclude Evidence and Argument that Vioxx Presents a Potential Cure for Cancer | Oral motion to preclude testimony regarding clinical trials on the use of Vioxx to treat cancer | DENIED<br><br>In denying plaintiff's motion, the Court explained: "It's a question of fact to some extent. There has been some testimony . . . that this drug may have some effect over the use of inflammation, therefore may have some effect on cancer, but it's an early stage and I'll let you go on cross-examination. It is somewhat irrelevant in this situation. So let's not spend a lot of time." (Feb. 14, 2006 Tr. at 1605:2-8.)[1] |
| Motion to Preclude Evidence and Argument that FDA Regulations Prohibited Merck from Making Label Changes Without Prior Agency Approval | Motion to Exclude Opinion Testimony that Merck Could Not Provide Risk Information Through Labeling or Marketing Without Prior FDA Approval<br><br>Motion *In Limine* (No. 6) to Preclude Any Testimony by Defendant that It Could Not Have Amended the Vioxx Label or Issued Strengthened Warnings Without Prior FDA Approval | DENIED<br><br>The Court denied plaintiff's motions in both *Plunkett I* and *Plunkett II*, reasoning: "Merck is seeking to introduce evidence that the Vioxx label change was major and, as such, it could not make the label change without prior FDA approval. The Court finds that there is nothing false or legally unsupportable concerning Merck's position." (Nov. 18, 2005 Order re *Daubert* Motions, p. 55.) |

---

[1] Cited portions of the *Plunkett* trial transcripts are attached hereto as Ex. 1.

| Present Motion | Prior Briefing | Prior Ruling |
|---|---|---|
| Motion to Compel the Attendance at Trial of a Merck Corporate Representative | Opposition to Merck's Motion to Quash Subpoena of David Anstice | SUBPOENA QUASHED<br><br>After arguments on the motion, the Court agreed with Merck that plaintiff's subpoena exceeded the jurisdictional limitations on the Court's trial subpoena power under Rule 45 and that MDL statute did not expand that authority. *See In re Vioxx Prods. Liab. Litig. (Plunkett)*, MDL No. 1657, Minute Entry (E.D. La. Nov. 21, 2005). |
| Motion to Preclude the Admission of the April 6, 2005 FDA Memo | Motion *in Limine* (No. 5) to exclude Evidence that the FDA Has Concluded There Is a "Class Effect" for All NSAIDs | DENIED<br><br>The Court admitted the April 6, 2005 FDA Memorandum in both *Plunkett I* and *Plunkett II* under Federal Rule of Evidence 803(8). (*See* Dec. 2, 2005 Tr. at 818:16-19.) |
| Motion to Compel the Production of the Confidential Memorandum of Invention | Opposition to Merck's Motion *in Limine* (No. 14) to Exclude Evidence of a Privileged, Previously Excluded CMI | RESERVED<br><br>The Court reserved ruling on this issue, indicating that it would "deal with this at trial." (Nov. 20, 2005 Order re Merck's Motions *in Limine*, p. 6.) Plaintiff never offered the document at trial. |
| Motion to Preclude Testimony by Merck Employees Regarding Their Personal Use of Vioxx | Motion *in Limine* (No. 7) to exclude Evidence that Merck Employees or Family Members of Merck Employees Took Vioxx | DENIED IN PART (re Dr. Alice Reicin and Dr. Scolnick); GRANTED IN PART<br><br>The Court permitted testimony from Dr. Scolnick and Dr. Reicin regarding their use of Vioxx, calling it a "credibility issue." (Dec. 5, 2005 Tr. at 1182:18-1186:15; Feb. . 3, 2006 PTC Tr. at 9:12-24.)  As the Court explained, "when you attack [a] person and say that they're a liar, then [personal use] has some relevance to credibility." (Feb. 3, 2006 PTC Tr. at 9:22-24.) |

I.     **THE COURT SHOULD DENY THE PSC'S MOTION TO PRECLUDE EVIDENCE OR ARGUMENT PERTAINING TO DR. BRIGGS MORRISON'S RELEVANT BACKGROUND AND EXPERIENCE AT MERCK.**

The PSC first moves the Court to reconsider its *Plunkett II* ruling on the permissible scope of Dr. Briggs Morrison's testimony.  This motion should be denied.  In *Plunkett*, the Court permitted Dr. Morrison to testify about his relevant experience, including his background in

4

oncology and his role on the Vioxx team. (Feb. 14, 2006 Tr. at 1517:11-1520:9, 1604:2-1607:13.) Dr. Morrison testified, in part, that he came to Merck in order to work on clinical trials designed to test whether COX-2 inhibitors could prevent cancer. (*Id.*) The testimony helped explain Dr. Morrison's part in the development of Vioxx. It also helped explain to the jury the many phases of testing involved in the drug approval process, including the fact that Phase II through Phase V studies continue long after a drug receives initial approval. (*Id.* at 1601:24-1602:8, 1604:2-1607:13.) The Court was right to allow this testimony, which it called "a question of fact." (*Id.* at 1605:2-8.)

In an effort to keep this testimony from the jury, the PSC raises a straw man: "[t]he suggestion that plaintiffs have, somehow, foreclosed the promise of a new cancer therapy." (PSC's Mot. at 5.) Of course, Merck has never made any such suggestion – in *Plunkett* or any other trial – and does not intend to do so in the future.

In making this hyperbolic argument, the PSC cites *United States v. Brooke*, 4 F.3d 1480 (9th Cir. 1993), a case with no application here. There, the court reversed a defendant's conviction due to the trial court's error in admitting evidence that the defendant falsely claimed to have cancer, because the "unfairly prejudicial nature of the false-cancer evidence substantially outweighed its limited probative value." *Id.* at 1481. Here, in contrast, Dr. Morrison's truthful testimony is highly relevant – both as it pertains to his background and as it relates to the development and ongoing testing of Vioxx. Moreover, given plaintiffs' attacks on the motives and credibility of Merck employees such as Dr. Morrison, Merck is entitled to show that he is a dedicated doctor who has devoted his career to helping patients and searching for cures for serious diseases.

While no one is remotely suggesting that plaintiffs should be blamed for taking a potential cancer treatment off the market, it would be impossible to prohibit the use of the word "cancer" at trial.  As this Court is well aware, Merck voluntarily withdrew Vioxx from the market after interim, unblinded data from the APPROVe study showed a statistically significant increase in cardiovascular thrombotic events after 30 months of continuous daily use. APPROVe was a study to determine whether Vioxx might help prevent the recurrence of pre-cancerous colon polyps, and in so doing, reduce colon cancer.  VICTOR and ViP were also cancer studies.  In short, the Vioxx story simply cannot be told accurately by excising all references to cancer.

Further, Dr. Morrison's testimony is not unduly prejudicial, notwithstanding the PSC's arguments to the contrary.  He did not testify that plaintiffs should be blamed for taking a potential cancer cure off the market.  And the testimony is neither confusing nor a waste of time, as the PSC suggests.  In fact, plaintiff's counsel in *Plunkett* established with one question on cross-examination that Vioxx was never approved by the FDA for the treatment of cancer.  (*See* Feb. 14, 2006 Tr. at 1608:3-7.)  Therefore, that part of the PSC's motion that would have the Court limit Dr. Morrison's ability to explain his relevant background and experience at future Vioxx-related trials should be denied, consistent with the Court's prior ruling on the permissible scope of his testimony.

## II.   TESTIMONY THAT MERCK NEEDED PRIOR FDA APPROVAL TO CHANGE THE VIOXX LABEL IS HIGHLY RELEVANT AND WOULD NOT UNDULY PREJUDICE PLAINTIFFS.

Second, the PSC moves the Court to exclude evidence or argument that FDA regulations precluded Merck from adding the VIGOR results to the Vioxx labeling without prior agency

809965v.1

approval. This too is a matter that has already been resolved by this Court.[2]  In *Plunkett*, the Court allowed Merck to present evidence that it was not permitted by FDA regulations to change the Vioxx label to address the VIGOR results without prior FDA approval, and stated that there was "nothing false or legally unsupportable concerning Merck's position." (Nov. 18, 2005 Order re *Daubert* Motions at 55.)  At trial, regulatory experts testified on both sides of the issue. Plaintiff's expert, Dr. Kapit, suggested that Merck could have changed the label unilaterally (Feb. 10, 2006 Tr. at 1111:18-1117-12, 1120:14-1121:17), and Merck's expert, Dr. Arrowsmith-Lowe, countered that – given the regulations, the guidance provided by the agency, industry practice, and Merck's own prior experiences – Merck could not have made a major change without the agency's approval (Feb. 16, 2006 Tr. at 2199:22-2202:5, 2202:16-23, 2205:15-22, 2206:2-13, 2215:16-21).  It was then left to the jury to decide: (i) whether it believed that Merck's post-VIGOR proposed labeling change was a major change; (ii) the importance of multiple variables that Merck and the FDA needed to consider when analyzing any proposed label change; and (iii) whether it believed Merck acted reasonably and appropriately in the circumstances presented.

As was the case in *Plunkett*, Merck should be entitled to argue in future cases that it acted reasonably in submitting the VIGOR trial results to the FDA and seeking prior approval for its proposed label change.  In reaching a decision on this issue, it is necessary to explain all of the regulations governing Merck's conduct and why, under this regulatory scheme, it took the actions it did to ensure that the Vioxx label was changed in a timely and accurate manner.  To

---

[2] *See* Merck's Opposition to Plaintiff's Motion to Exclude Opinion Testimony That Merck Could Not Provide Risk Information Through Labeling or Marketing Without Prior Approval of the FDA and Merck's Opposition to Plaintiff's Motion *in Limine* to Preclude Any Testimony or Discussion by Defendant That It Could Not Have Amended the Vioxx Label or Issued Strengthened Warnings Without Prior FDA Approval, attached hereto as Ex. 2 and incorporated herein by reference.

that end, Merck must be permitted to offer testimony from experts and fact witnesses who will assist in assessing Merck's conduct in light of the complex FDA regulations.  *See McNeil Pharm. v. Hawkins*, 686 A.2d 567, 582-83 (D.C. Ct. App. 1996) (explaining importance of expert testimony for interpretation and application of the regulations in a drug labeling case). Such testimony is highly probative evidence that does not pose any risk to plaintiffs of undue prejudice, confusion of issues, misleading the jury, undue delay, or waste of time.  To the contrary, Merck will be prejudiced if it is not permitted to support its defense with such testimony.

The fact that Judge Higbee gave an erroneous instruction to the jury on this issue in the most recent Vioxx-related case tried in her court does not change – and should not affect – this Court's prior ruling. (*See* PSC's Mot. at 12-13.)  In *Cona/McDarby*, Judge Higbee's instruction incorrectly suggested to the jury that Merck could have utilized the "changes being effected" procedure to incorporate the data from the VIGOR study into the Vioxx label on its own, without seeking prior FDA approval.  This instructional error deprived Merck of the ability to explain why its conduct was reasonable and hobbled Merck's ability to defend its conduct.  And, as Dr. Arrowsmith-Lowe's testimony from *Plunkett* reveals, Judge Higbee's reading of the governing regulations is contrary to both the law and the facts.  To date, several cases have been tried in state courts, with differing results and with many inconsistent rulings.  Thousands more remained to be tried, and none has yet to move through the appellate courts.  This Court should not reverse its rulings – particularly on an issue of federal law such as this – every time a state court comes to a contrary conclusion.

The basic rule of labeling is that changes can be made only with the prior approval of the FDA.  21 C.F.R.  § 314.70(a)(1), (b)(2)(v)(A) (2005).  The CBE regulation, 21 C.F.R.

809965v.1

§ 314.70(c)(6)(iii)(A), on which the PSC relies, is a limited exception to the general rule.  In a Federal Register preamble last January, the FDA stated:

> While a sponsor is permitted to add risk information to the FPI [full prescribing information] without first obtaining FDA approval via a CBE supplement, FDA reviews all such submissions and may later deny approval of the supplement, and the labeling remains subject to enforcement action if the added information makes the labeling false or misleading under section 502(a) of the act (21 U.S.C. 352). Thus, in practice, manufacturers typically consult with FDA prior to adding risk information to labeling.

71 Fed. Reg. 3922, 3934 (2d col.) (Jan. 24, 2006).[3]   Plainly, the FDA – the regulatory agency with enforcement power over pharmaceutical manufacturers – views favorably the practice of manufacturers "typically" consulting with the Agency.  If manufacturers failed to do so, and simply changed or added risk information to their labeling unilaterally, the result would be frequent recalls of previously distributed labeling to correct what the FDA viewed as mistakes, confusion among physicians, decreased reliability of labeling, and decreased physician confidence in labeling.  A regulatory system in which potential inaccuracies are initially introduced into labeling and later changed under FDA supervision would be inadequate to protect the public health.  Yet, that is the regulatory system that the PSC contends exists.

As explained in the Declaration of Lisa D. Rarick, M.D. ("Rarick Decl.," filed Nov. 14, 2005) and the *Plunkett II* testimony of Dr. Arrowsmith-Lowe, that is not the system that exists. Section 314.70(c)(6)(iii)(A) applies, and is intended to apply, only where no analysis or interpretation of data is needed and, consequently, the wording of a risk disclosure is obvious. (Rarick Decl. at ¶ 6.)  An example is the addition of a new, spontaneously reported adverse reaction to the "Adverse Reactions" section of drug labeling; there, no analysis or interpretation

---

[3] Such a statement by the FDA in a Federal Register preamble constitutes an advisory opinion of the Agency.  21 C.F.R. § 10.85(d)(1) (2005).  "An advisory opinion represents the formal position of FDA on a matter . . . ."  *Id.* at § 10.85(e).  The FDA's formal interpretation of its regulations is entitled to *Chevron* deference. *NVE, Inc. v. Dep't of Health & Human Servs.*, 436 F.3d 182, 186 (3d Cir. 2006).

809965v.1

of data is needed, and the risk disclosure consists of the insertion into the labeling's "Adverse Reactions" section of a comma and the name of the adverse reaction. In contrast, where analysis and interpretation of complex data are involved, the FDA will not accept a CBE labeling change under section 314.70(c)(6)(iii)(A), but, rather, will insist on a prior approval supplement. (Rarick Decl. at ¶¶ 7-8.)

That the FDA does, in fact, so view and so apply the CBE regulation is shown by Merck's own experience with an attempted CBE labeling change in the fall of 1999 – just a few months before the unblinding of the VIGOR data. On October 6, 1999, Merck submitted a CBE labeling change under section 314.70(c)(6)(iii)(A) in order to add two discrete sentences to the Vioxx labeling: one sentence adding risk information about the interaction between Vioxx and another drug, warfarin, and the other calling attention to a pregnancy registry. On October 28, 1999, in a letter to Merck, the FDA rejected the proposed CBE labeling change and stated: "Changes of the kind you have proposed are not the kind of changes permitted by regulation to be put into effect prior to approval of a supplement." (Rarick Decl. at ¶ 9.) The labeling change Merck proposed in October 1999 was "significantly less substantial than any possible revisions based on the VIGOR data." (*Id.*)

Among the reasons why the FDA wants to be consulted about new disclosures of risk information is that the FDA is responsible not only for overseeing the labeling of individual products, but also for overseeing the labeling of classes of products (*i.e.*, drugs that are chemically related to one another) and the labeling of products that are therapeutic alternatives (*i.e.*, different products that may be used for the same therapeutic purpose). In assessing the benefits and risks of a particular product, a physician may take into account the benefits and risks of chemically related products; and in choosing a particular product to treat a particular patient, a

809965v.1

physician needs to know not only about the benefits and risks of that product but also how those benefits and risks compare to the benefits and risks of alternative products that might be used to treat that patient. Thus, adding new risk information to one product may affect not only whether and how physicians use that product, but also whether and how they use other products in the same class and other therapeutic alternatives. Moreover, in overseeing drug labeling, the FDA receives clinical trial data and adverse event reports from all companies, and therefore is in a better position than any one company to assess the risks and benefits of various therapeutic alternatives and to consider the impact of label revisions for any particular product on the public health generally. Creating incentives for manufacturers to bypass the FDA in adding risk information to the labeling of their individual products is very likely to upset the relationships that the FDA seeks to maintain among the labeled benefits and risks of the medical products it regulates. Instead, consultation with the FDA, rather than making unilateral label revisions, is a necessary and publicly beneficial element of the regulatory system – and Merck should be permitted to make this point.

In sum, the PSC seeks a ruling that would prevent the jury from learning the FDA's intent and actual practice with respect to section 314.70(c)(6)(iii)(A), and that would create a powerful incentive for pharmaceutical manufacturers to bypass the FDA – to the great detriment of patients. Consistent with its prior rulings, this Court should deny the PSC's request and should permit Merck to present evidence that it acted appropriately in submitting its post-VIGOR labeling changes to the FDA for prior approval.

## III.   THE PSC'S REPEATED ATTEMPTS TO COMPEL DAVID ANSTICE TO TESTIFY SHOULD BE REJECTED.

In its third request, the PSC moves to compel David Anstice to appear at upcoming trials in this Court pursuant to Federal Rule of Civil Procedure 45, *or* to compel Mr. Anstice to testify

11

via contemporaneous transmission from another location, *or* to permit the use of Mr. Anstice's former deposition and trial testimony. (PSC's Mot. at 14-24.) These requests are grounded in the claim that "Merck . . . should be required to produce a corporate designee who is qualified to testify about the marketing of Vioxx" – meaning David Anstice, according to the PSC. (*Id.* at 15.) But the PSC cites no cases (and Merck has found none) in which an adverse party was permitted to hand-pick a corporate entity's representative at trial. This Court should accordingly reject the PSC's attempts to dictate who will represent Merck at future trials in this forum – whether through live testimony, simultaneous transmission from another location, or prior testimony.

## A.    Mr. Anstice Is Outside The Scope Of The Court's Subpoena Power, And Thus May Not Be Compelled To Appear At Trial.

The Court has already ruled that it has no authority to compel Mr. Anstice to testify live in these proceedings, following full briefing by the parties.[4] The matter thus requires little further comment. In November 2005, plaintiffs served a trial subpoena on Mr. Anstice in *Plunkett*, and Merck moved to quash. As the PSC notes, the Court agreed with Merck and quashed the subpoena, finding that it exceeded the jurisdictional limitations on the Court's trial subpoena power under Rule 45 and that the MDL statute did not expand that authority. *See In re Vioxx Prods. Liab. Litig. (Plunkett)*, MDL No. 1657, Minute Entry (E.D. La. Nov. 21, 2005). Given the Court's unambiguous ruling, there is no reason to revisit the issue.

## B.    Because Mr. Anstice Is Beyond The Court's Jurisdictional Reach, The Court May Not Compel Him To Testify From A Remote Location.

The PSC argues, in the alternative, that the Court may compel Mr. Anstice to testify in the upcoming trials via contemporaneous transmission from a different location, pursuant to

---

[4] Merck incorporates herein by reference its prior briefing on this issue. *See* Motion of David Anstice and Merck to Quash Subpoena, attached hereto as Ex. 3.

Federal Rule of Civil Procedure 43(a). The PSC is wrong. Rule 43 does not expand the Court's trial subpoena power. Moreover, even if Mr. Anstice were within the Court's reach, the requirements of Rule 43(a) have not been met.

The PSC's motion ignores the predicate to the application of Rule 43 – that is to say, proper jurisdiction over a person who is compelled to testify. Here, as the Court has already ruled, Mr. Anstice is beyond the scope of the Court's trial subpoena power. *See In re Vioxx Prods. Liab. Litig. (Plunkett)*, MDL No. 1657, Minute Entry (E.D. La. Nov. 21, 2005). The one case cited by the PSC in support of its request, *In re San Juan Dupont Plaza Hotel Fire Litigation*, 129 F.R.D. 424 (D.P.R. 1989), is thus inapposite.

In *Dupont Plaza*, the United States District Court for the District of Puerto Rico failed to consider the Rule 45 implications of compelling individuals beyond its trial subpoena power to testify via satellite transmission, brushing aside the defendant's concerns with the statement that, "[a]lthough [former] Rule 45(e)(1) does not explicitly permit this approach, neither does it expressly prohibit it."[5] *Id.* at 426. Perhaps not surprisingly, the case preceded the 1991 amendments to Rule 45, which substantially "enlarge[d] the protections afforded persons who are required to assist the court by giving information or evidence." FED. R. CIV. P. 43 advisory committee's note, 1991 amendments. That the *Dupont Plaza* court did not consider whether compelling witnesses outside of its jurisdictional territory to testify would violate Rule 45 renders the case inapplicable here. This Court has already determined, and rightly so, that Mr. Anstice may not be compelled to testify in this forum under Rule 45. The PSC's reliance on Rule 43(a), which does not expand that jurisdiction, therefore does not support its request that Mr. Anstice be compelled to testify from a remote location.

---

[5] In 1991, former section 45(e)(1) was replaced by 45(c)(3)(A). *See* FED. R. CIV. P. 43 advisory committee's note, 1991 amendments.

809965v.1

Moreover, even if this Court did have the power to compel Mr. Anstice's appearance, the requirements of Rule 43(a) have not been met in this case. Under the rule, a court may, *"for good cause shown in compelling circumstances* and upon appropriate safeguards, permit the presentation of testimony in open court by contemporaneous transmission from a different location." FED. R. CIV. P. 43(a) (emphasis added). Here, the PSC has failed to show good cause in compelling circumstances. As the advisory committee notes to the rule instruct:

> The most persuasive showings of good cause and compelling circumstances are likely to arise when a witness is unable to attend trial for unexpected reasons, such as accident or illness, but remains able to testify from a different place. . . . Other possible justifications for remote transmission must be approached cautiously. *Ordinarily depositions, including video depositions, provide a superior means of securing the testimony of a witness who is beyond the reach of a trial subpoena* . . . . An unforeseen need for the testimony of a remote witness that arises during trial, however, may establish good cause and compelling circumstances. . . . A party who could reasonably foresee the circumstances offered to justify transmission of testimony will have special difficulty in showing good cause and the compelling nature of the circumstances.

FED. R. CIV. P. 43 advisory committee's note, 1996 amendments (emphasis added).

All of these factors weigh against compelling Mr. Anstice to testify in this Court from a remote location. There is no "unexpected reason" Mr. Anstice will not be at the upcoming trials, no "unforeseen need" for his testimony.[6] *Id.* To the contrary, it has been Merck's position from the start of this litigation that Mr. Anstice is outside of this Court's trial subpoena jurisdiction. This case is thus akin to *Air Turbin Technology, Inc. v. Atlas Copco AB*, 217 F.R.D. 545 (S.D. Fla. 2003), where the United States District Court for the Southern District of Florida denied plaintiff's motion to compel defendants' foreign employees to testify via videoconference, reasoning:

---

[6] This case is thus further distinguishable from *Dupont Plaza*, where the court held that remote testimony was appropriate at least in part because the defendants in that case had unexpectedly decided, halfway through the trial, not to produce the employees in question voluntarily. 129 F.R.D. at 425.

809965v.1

> Plaintiff has known from the early stages of this case that witnesses from outside the United States would be testifying at trial. Depositions of the witnesses in question have been taken and this case is one month from the scheduled trial date. Additionally, there is no indication that Defendants have misled Plaintiff into believing that they would produce these witnesses for Plaintiff during its case in chief.

*Id.* at 546 (rejecting application of *Dupont Plaza*). So, too, in this case. The PSC nonetheless argues that denial of its request "would be prejudicial since it would preclude the plaintiffs from confronting the defendant on many pivotal issues." But this argument rings hollow, given the many opportunities plaintiffs have had to depose Mr. Anstice in preparation for this litigation. Plaintiffs have deposed Mr. Anstice numerous times, resulting in hours of videotaped deposition testimony, and have "confronted" Mr. Anstice at each of these depositions. If any prejudice will result from the denial of the PSC's motion, it is of the PSC's own making.

### C.   Mr. Anstice's Deposition Testimony May Be Used At Upcoming Trials, But His Trial Testimony May Not.

Finally, the PSC moves for the admission of Mr. Anstice's recent trial testimony and deposition testimony, in the event he is not compelled to testify at the upcoming trials in this Court. Merck does not dispute that Mr. Anstice's deposition testimony is admissible at trial, in accordance with the conditions that have been laid out by this Court.[7]   *See* FED. R. CIV. P. 32(a)(3)(B).

On the other hand, Merck opposes the PSC's request for permission to use Mr. Anstice's testimony from *Cona/McDarby*. Trials in this Court should not be reduced to a series of poor quality Court TV video clips from state court trials, where the mode and substance of the

---

[7] *See* Feb. 3, 2006 PTC Tr. at 4:1-8 (requiring plaintiff to read inappropriate portions of Mr. Anstice's deposition to the jury in lieu of playing them, and explaining: "Now, there are some problems with that deposition that Mr. Lanier took. I remember the tone of that one and it's just over the top. Andy, just read the deposition. I didn't do a lot of carving out of the objections. I did some of it, but some of it is okay; it's aggressive and it's asked okay. It's just the tone and the smirking and the laughter has no place in a federal court.").

809965v.1

testimony has been shaped by state court judges applying state court rules of evidence. Everything about this state court trial testimony – what objections are made or not made, what issues are explored or let go – is affected by the pre-trial rulings of the particular judge, the dynamics of the particular trial, and the facts of the particular case. Therefore, the testimony cannot fairly be used outside of its particular context. In this forum, Federal Rule of Evidence 611(a) invests this Court with authority to control the mode and order of the interrogation of witnesses, and that authority should be exercised in accordance with the Court's interpretation of the Federal Rules of Evidence, not ceded to a state court judge – however well qualified – who is applying state law.

Not only is the trial testimony inadmissible, it is also unnecessary. Plaintiffs have hours of taped testimony from depositions that were properly noticed in this MDL proceeding. They can play or read appropriate portions of this testimony, per the Court's prior rulings. See FED. R. CIV. P. 30, 32. Simply because Mr. Anstice has testified in other, factually-dissimilar, Vioxx-related cases does not mean that his prior testimony is admissible – or that it may fairly be admitted – in the upcoming trials in this forum. The PSC's request should be denied.

## IV.   THE APRIL 6, 2005 FDA MEMORANDUM, INCLUDING ITS CONCLUSIONS ABOUT A "CLASS EFFECT" OF ALL NSAIDS, IS RELEVANT, RELIABLE, AND ADMISSIBLE FOR ITS TRUTH.

Fourth, the PSC urges the Court to reconsider its ruling on the admissibility of the April 6, 2005 FDA Memorandum. In *Plunkett*, the Court correctly admitted the document under Federal Rule of Evidence 803(8). (*See* Dec. 2, 2005 Tr. at 818:16-19.) The PSC's arguments here simply repeat the unsuccessful arguments made by plaintiff in that case. For the reasons

809965v.1

stated in Merck's prior briefing on the issue,[8] the PSC's request for exclusion should again be denied.  The PSC's arguments about the conclusions of the FDA Memorandum go to the weight, not the admissibility, of the document.  Plaintiffs are of course free to argue at trial, as the PSC does in its generic motion *in limine*, that the conclusions of the memorandum are incorrect.[9]  But the PSC has offered no persuasive grounds for excluding the document itself.  A challenge to the conclusion of a public record is not, under any circumstances, a valid basis for excluding the record on the grounds that the record is not "trustworthy."  And, even if the PSC's disagreements with the Memorandum's conclusions were a valid basis for exclusion – which they are not – the PSC is wrong that the FDA "erred" in reaching its conclusions.  The Memorandum is based on a "thorough review of the available data . . . regarding currently approved COX-2 selective and non-selective non-steroidal anti-inflammatory drugs (NSAIDs) and the risk of adverse cardiovascular (CV) events."  (FDA Memorandum at 1.)  For all of these reasons, the Court should deny the PSC's renewed request for exclusion of the FDA Memorandum and its conclusions about the "class effect" of all NSAIDs.

## V.     THE COURT SHOULD EXCLUDE EVIDENCE OF THE INADVERTENTLY-PRODUCED CONFIDENTIAL MEMORANDUM OF INVENTION.

As its fifth point, the PSC moves the Court to compel the production of a "Confidential Memorandum of Invention" ("CMI") that was inadvertently produced without a waiver of

---

[8] *See* Merck's Opposition to Plaintiff's Motion *in Limine* to Exclude Evidence and/or Argument That the FDA Has Concluded There Is a "Class Effect" for All Non-Steroidal Anti-Inflammatory Drugs, attached hereto as Ex. 4 and incorporated herein by reference.

[9] However, the PSC is wrong to suggest about the "class effect" of all NSAIDs is based on insufficient data or an insufficiently rigorous review.  As the FDA Memorandum itself indicates, the "class effect" conclusion is based on a thorough evaluation of a number of long-term, randomized clinical trials comparing NSAIDs to other COX-2s.

809965v.1

privilege.[10]  As the Court knows, this is one of the documents that is the subject of the parties' ongoing dispute over privilege issues, which is now on appeal.  The potential release of documents withheld by Merck on privilege grounds is thus stayed pending the Fifth Circuit's review.  To the extent further determination on whether the CMI is privileged is required by this Court, Merck urges the Court to deny the PSC's motion to compel, on the grounds that: (i) the CMI is protected by the attorney-client privilege; (ii) the privilege has not been waived; and (iii) plaintiffs have not shown any compelling reason for disregarding the protections afforded by the privilege in this case.

### A.        The CMI Is Protected By the Attorney-Client Privilege.

As explained in Merck's prior briefing on the subject,[11] a CMI is a standard form developed by Merck's Patent Department and used by Merck scientists to communicate directly with company attorneys.  Merck's patent attorneys use information communicated in the CMI to provide legal advice on the patentability of the invention described in the document.  The CMI at issue here was completed and forwarded to Merck's patent attorneys by Dr. Kathleen Metters, Vice President and Site Head for Merck Frosst Canada & Company ("Merck Frosst"), a Canadian affiliate of Merck, and her colleagues.  Dr. Metters prepared the CMI for the express purpose of seeking legal advice from in-house Merck patent counsel.  In the course of producing more than seven million documents during pre-trial discovery, a copy of this CMI was inadvertently produced to plaintiffs in connection with the New Jersey Vioxx-related litigation.

---

[10] Because of the privileged nature of the CMI, Merck respectfully requests that the document be viewed only *in camera*.  If necessary, Merck will make the document available to the Court for review.

[11] *See* Merck's Motion *In Limine* to Exclude Evidence of a Privileged, Previously Excluded Confidential Memorandum of Invention, attached hereto as Ex. 5 and incorporated herein by reference.

Because the CMI is a communication on legal matters between corporate employees and their attorneys, prepared in order to seek legal advice, it is a privileged attorney-client communication under the laws of South Carolina, Kentucky, Tennessee, and Utah – the states whose laws govern the next cases to be tried in connection with this MDL proceeding.[12]  *See Ross v. Medical University of South Carolina*, 453 S.E.2d 880, 884 (S.C. 1994) ("Attorney-client privilege protects a client and any other person from disclosing confidential communications made to counsel relative to a legal matter."); *Leggett v. Sprint Comm. Co., L.P.*, __ S.W.3d __, 2005 WL 3244255, at *8 (Ky. App. Dec. 2, 2005) (applying KY. R. EVID. 503 ("lawyer-client privilege") and upholding attorney-client privilege claimed with respect to communications between client, in house counsel, and outside counsel, despite plaintiff's contention that the documents were "vital" to his claims); *Bryan v. State*, 848 S.W.2d 72, 79 (Tenn. Crim. App. 1992) ("the purpose of the privilege is to shelter the confidences a client shares with his or her attorney when seeking legal advice, in the interest of protecting a relationship that is a mainstay of our system of justice"); UTAH R. EVID. 504 ("A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client between the client and the client's representatives, lawyers, lawyer's representatives, and lawyers representing others in matters of common interest . . . .").

---

[12] The PSC makes the unsupported and illogical argument that "if any one State would not recognize that the CMI is subject to the attorney-client privilege, then for all intents and purposes the privilege is waived throughout these MDL proceedings." (PSC's Mot. at 33.) This cannot be true, as evidenced by the fact that the PSC cites no authority to bolster the point.  If it were the case, evidentiary and testimonial privileges would never be recognized in MDL proceedings such as this one.  A "race to the bottom" – to the lowest common denominator of state-law privileges – would eviscerate all protections, even one so important to the integrity of our judicial system as the attorney-client privilege.

809965v.1

This finding of privilege is supported not only by these states' precedents, but also by that of the Court of the Appeals for the Federal Circuit, which has ruled that invention records like the CMI are privileged. *See In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800 (Fed. Cir. 2000). In *Spalding*, the Court of Appeals considered the applicability of the attorney-client privilege to "invention records," which the court defined as "standard forms generally used by corporations as a means for inventors to disclose to the corporation's patent attorneys that an invention has been made and to initiate patent actions." *Id.* at 802 n.2. Such an invention record is privileged, the Federal Circuit in *Spalding* held, if the communication "was made by a client to an attorney for the purpose of obtaining legal advice or services." *Id.* at 805. That standard was met – as it is in this case – because the invention record was submitted by the inventors to the corporation's legal department and the communication was made to obtain legal advice on patentability and legal services in connection with the preparation of the patent application. The CMI is thus privileged.

**B.     Merck Has Not Waived the Privilege.**

Contrary to the PSC's arguments, the attorney-client privilege that attaches to the CMI has not been waived in this case. The PSC makes the facile argument that Merck waived the privilege by quoting portions of the CMI in a brief it filed in New Jersey, but it ignores the fact that Judge Higbee ruled the document was privileged under New Jersey law. The PSC also ignores that it was the *plaintiffs* in New Jersey, not Merck, who put the memorandum before the court, as an attachment to their letter brief opposing Merck's motion for a protective order. Merck cannot be held to have waived the privilege simply because it was responding to the New Jersey plaintiffs' brief and explaining why the document was privileged.

809965v.1

C.     **The PSC Has Made No Showing of Compelling Circumstances to Justify Disregarding the Privilege.**

Finally, the PSC's conclusory statement that it has a "substantial need" for the CMI does not justify piercing the privilege and ordering the document to be produced in this case.  Such a drastic step – compelling the production of a document that is otherwise privileged – is reserved for only the most extreme circumstances.  In Kentucky, for example, the only exceptions to the statutorily-codified attorney-client privilege are in cases where: (i) the services of the lawyer were sought or obtained in furtherance of crime or fraud; (ii) communications are relevant to an issue between parties who claim through the same deceased client; (iii) either the lawyer or her client breaches a duty; (iv) a lawyer is a witness, attesting to a document; or (v) the communication involves joint clients.  KY. R. EVID. 503(d).  There is no compelling need here – and, even if there were, the PSC has failed to show one.  The fact that the CMI might make plaintiffs' design defect claims easier to prove is not reason enough.  Accordingly, the PSC's request to compel production of the CMI must be denied.

VI.    **EVIDENCE THAT MERCK EMPLOYEES TOOK VIOXX OR ALLOWED THEIR FAMILY MEMBERS TO DO SO IS RELEVANT AND IS NOT UNDULY PREJUDICIAL.**

In the last of the substantive points raised in this motion *in limine,* the PSC moves for an order excluding any evidence or argument that Merck employees or their family members took Vioxx.  For the reasons explained in Merck's prior briefing on this subject, the Court should deny the motion.[13]  Contrary to the PSC's claims, evidence that Merck employees or their family members took Vioxx is neither irrelevant nor unfairly prejudicial.  It bears directly on plaintiffs' failure to warn claims because the very individuals who, plaintiffs contends, ignored the

---

[13] *See* Merck's Opposition to Plaintiff's Motion *in Limine* to Exclude Evidence That Merck Employees or Family Members Took Vioxx, attached hereto as Ex. 6 and incorporated herein by reference.

809965v.1

cardiovascular risks allegedly associated with Vioxx in order to increase Merck's revenue either personally took Vioxx or permitted their family members to take it. The jury may logically conclude that, had these witnesses – and through them Merck itself – believed Vioxx to be as dangerous as plaintiffs claim it is, they would not have taken it nor allowed their family members to do so. The evidence bears equally directly on the contention that, had plaintiffs known what these witnesses allegedly knew, they would not have taken Vioxx and their doctors would not have prescribed it. Finally, this evidence is "prejudicial" only to the extent that it is powerful evidence, as the PSC essentially concedes. Merck is entitled to defend itself by presenting this testimony to the jury.

Further, to the extent the Court is not inclined to allow this testimony without restriction, it should still abide by its prior rulings allowing such testimony where the credibility of Merck's witnesses is attacked. As the Court has explained, when plaintiffs "attack [a] person and say that they're a liar," as plaintiff did with Dr. Reicin in *Plunkett*, then evidence of personal use has "some relevance to credibility." (Feb. 3, 2006 PTC Tr. at 9:22-24; *see also id.* at 9:4-9 ("Phil, for example, brought up the issue about the person taking Vioxx [Dr. Reicin]. I can see where at this point that might have some relevance because of the attack on her credibility that's going to be launched with the article . . . . My thinking on that is that I would let her do that now because it does go to the credibility.").) The PSC's motion is thus premature at best – given the possibility that plaintiffs will continue to question the credibility of Merck's witnesses at the upcoming trials. It should be denied.

## VII.   THE PROCEDURAL POINTS RAISED IN THE PSC'S MOTION SHOULD, IN LARGE PART, BE REJECTED.

In addition to the substantive issues addressed above, the PSC raises a host of essentially procedural trial-management points in its filing. Most of these questions are not properly raised

in a motion *in limine*, as they do not pertain to the exclusion of evidence, but rather to the conduct of trial. And many of the requests would unnecessarily complicate and lengthen future trials in this Court -- by tripling the amount allotted each side for *voir dire*, more than doubling the length of opening statements, and permitting counsel to read from "core documents" for hours, among other things. For the reasons stated below, most of these requests should be denied.[14]

### A.  Changes in *Voir Dire*

- The PSC has requested that the Court triple each side's allotted time for *voir dire*. Merck opposes this request. The time allowed for *voir dire* in *Plunkett I* and *Plunkett II* – roughly one hour per side – was more than adequate, especially in light of the extensive jury questionnaires completed by prospective jurors.[15] The case should be decided on the evidence, not through "pre-trial" of the case in *voir dire*. The PSC's request for additional time is unjustified and should be denied.

- The PSC has also requested an opportunity to "reserve time to ask follow-up questions" on *voir dire*. There is no need to cross-examine prospective jurors, who sacrifice enough of their time without being subjected to an unnecessarily exhaustive interrogation by the parties. Merck opposes this request as well.

- Finally, the PSC has requested that the Court and counsel "spend time agreeing on specific statements" that will be made by the Court to prospective jurors "regarding the importance of the trial and jury duty" under what the PSC characterizes as "extreme" post-Katrina conditions. Merck opposes this request. The Court addressed post-Katrina issues appropriately and adequately in *Plunkett I* and *Plunkett II*. The parties' input on the matter is unnecessary.

### B.  Changes in Opening Statement

- The PSC has requested that opening statements be extended from one hour and fifteen minutes per side to two and a half hours per side. Merck opposes this request. Two and a half hours is excessive for a two-week case. The point is not to try one's case during openings, but rather to preview what the evidence will show. The time allotted for opening statements during *Plunkett I* and *Plunkett II* was sufficient and need not be increased.

---

[14] Merck's position on these issues was laid out in a letter brief to the Court dated April 26, 2006. The substance of that letter is repeated here for the Court's convenience.

[15] These questionnaires will likely be even more comprehensive in the upcoming MDL trials, further obviating the need for a longer *voir dire*. (*See infra* at Part VII.J.)

809965v.1

- The PSC has also requested the use of exhibits and deposition cuts during opening statements.  As the Court has previously recognized, neither party should be able to use such items absent mutual agreement.  Notwithstanding "preadmission" rulings, nothing is in evidence at the time of opening statements.  And, again, an opening statement is a brief overview of what each side expects the evidence will show – not a mini-trial.  Merck opposes this request.

- Third, the PSC has requested the use of demonstratives during opening statements. Consistent with its prior position on this issue, Merck would be happy to meet and confer with plaintiffs in an effort to reach agreement on the use of non-argumentative demonstratives – as was done in *Plunkett I*.  However, Merck opposes this request insofar as it contemplates the use of demonstratives on which the parties cannot reach agreement.

## C.    Easily Understood Presentation of Merck Core Documents

- The PSC has requested that Merck provide David Anstice to testify live at the upcoming MDL trials, or that Mr. Anstice's courtroom video testimony from the *Cona/McDarby* trial be played at upcoming MDL trials if Merck does not bring Mr. Anstice to testify live.  For the reasons stated *supra* at Part III, Merck opposes this request.

- The PSC has also requested that four hours be allotted to read excerpts from "core Merck documents."  Merck opposes this request.  The dramatic reading of documents – which amounts to pure lawyer argument through the selection of documents and the ordering of selections – is unnecessary and improper.  Witnesses should testify, not lawyers.

## D.    Conscious Disregard/Reckless Disregard/Concealment and/or Deceit

- The PSC has requested that the Court allow "evidence evincing the conscious disregard for safety, motive, concealment of safety issues or profits over safety, etc." in the first phase of upcoming MDL trials.  Merck opposes this request.  The Court addressed this issue in *Plunkett I* and *II* and correctly decided, as a matter of federal law, to bifurcate the issue of plaintiff's entitlement to punitive damages from the liability phase of trial.  The PSC's request is nothing more than an attempt to inject unfair prejudice into *Barnett* and other upcoming trials.  It should not be permitted.

## E.    Embedding Documents in the Merck Employee Video Depositions

- The PSC has requested that plaintiffs be permitted to embed and blow-up documents referenced in Merck employee video depositions.  Merck is not opposed, in principle, to this request.  However, in order to prevent undue prejudice, each party should get a

CD of what the other side actually intends to show the jury in time to provide comments and seek any necessary rulings from the Court.[16]

**F.      Approaching the Bench**

- The PSC has requested that Merck be prohibited from approaching the bench while plaintiffs' deposition cuts are playing.  This request should be denied.  Merck did not approach on frivolous matters during *Plunkett I* or *II*, and will not do so in future trials.  However, Merck is entitled to approach for a ruling on something it believes to be improper.

**G.      Early Briefing Schedule re Law of the Trial Case**

- The PSC has requested an early briefing schedule on a number of points, including substantive legal issues, jury instructions, *Daubert* challenges, and trial management issues.  This request is moot, given that the Court has established a Scheduling Order for the next MDL case, *Barnett*.  Moreover, the Court has requested state-law summaries of the laws that govern the next four MDL cases.

**H.      Outstanding Privilege Issues**

- The PSC has requested a determination by the Court of outstanding privilege issues.  This request has been overtaken by recent events.  As the Court and the PSC are aware, Merck has appealed this Court's privilege rulings to the Fifth Circuit.

**I.      Information Requested in Herman's Letters to Wittmann of February 16, 2006**

- By this request, the PSC presumably seeks all of the information listed in its February 15th and February 16th letters from Russ Herman to Phil Wittmann.  Merck has already responded to these requests, and has produced all relevant and available information to the extent permissible and appropriate.

**J.      Revised Jury Questionnaires**

- The PSC has requested a revised jury questionnaire.  Merck does not oppose this request.  There are redundancies and ambiguities in the form that have become apparent after two trials, and there are also additional items Merck would like to include in future questionnaires.

---

[16] In *Plunkett II*, plaintiff never provided Merck with these CDs.  Merck thus objected to plaintiff showing documents "on the fly" at trial, because the documents did not always depict what the witnesses were looking at or referring to.  The Court sustained Merck's objection.

**K.      Closing Arguments**

- The PSC has requested two hours per side for closing arguments.  Merck opposes this request, for much the same reasons that it opposes the PSC's request for longer opening statements.  (*See supra* Part VII.B.)  Two hours for closing arguments is excessive in a two-week case.  The evidence should come from the witnesses, not the lawyers.

**L.      Use of Admissions in Examinations of Witnesses**

- The PSC has requested the use of "admissions" in the examination of witnesses. Merck does not understand what is meant by this request, and is thus unable to respond.

**M.      Hearing on Attributable Risk**

- The PSC has requested a hearing on attributable risk.  Again, Merck does not understand what is meant by this request, and is thus unable to respond.

**N.      Preadmission of Documents**

- The PSC has requested a hearing on the preadmission of documents.  Merck believes evidentiary rulings on exhibits should be made in due course under a pre-trial schedule where each party has an opportunity to object to the exhibits on the opposing party's exhibit list.  The parties should meet and confer to try to reach agreement on exhibits.  To the extent exhibit objections remain unresolved, the exhibits should be submitted to the Court for a hearing and/or ruling.  The timing of objections to exhibits has been settled, per the scheduling order that was recently entered in *Barnett*.

- The PSC has also requested the Court allow the parties to use any preadmitted documents during opening statements, upon three-days advance notice to opposing counsel.  For the reasons stated *supra* at Part VII.B, Merck opposes this request.

**O.      Early Hearings on FDA Documents**

- The PSC has requested early hearings on FDA documents redacted by the FDA or Merck.  This request is moot.  The Court has addressed and ruled on the question of documents protected by the deliberative process privilege.  Additional hearings are unnecessary.

**P.      Briefing Deadlines on Legal Issues**

- The PSC has requested briefing deadlines on legal issues, which request is also moot in light of the Court's recently-adopted scheduling order in *Barnett*.

809965v.1

**Q.     APPROVe Data and Information**

- The PSC has requested APPROVe data and information no later than April 21, 2006. This request is moot, given the Court's recent order on the subject.

**R.     Permission to Cross-Examine/Examine**

- The PSC has requested permission to examine Merck employees on their financial status. Merck opposes this request. Much as it did in *Plunkett I* and *Plunkett II*, Merck will address this issue in the context of its *in limine* briefing. The PSC's attempts to circumvent this process are improper and should be denied.

**S.     Court to Set Specific Dates for Meet and Confers**

- The PSC has requested that the Court set specific dates for the parties to meet and confer about trial testimony excerpts, deposition cuts, and highlighted or embedded documents. This request is moot. All scheduling issues regarding *Barnett*, the next case to be tried in connection with this MDL, have been resolved.

**T.     Use of Excerpts from Other Trials**

- The PSC has requested the use of "excerpts from other trials where Merck was represented and available to object, examine or cross-examine." To the extent this is another request to use Court TV tapes from non-MDL cases at upcoming MDL trials, Merck is opposed for the reasons stated *supra* at Part III.

**VII.   CONCLUSION.**

For the reasons stated above, Merck respectfully requests that the Court: (i) deny the PSC's motion to preclude evidence or argument pertaining to Dr. Briggs Morrison's relevant background and experience at Merck; (ii) deny the PSC's motion to preclude evidence or argument regarding whether Merck needed prior FDA approval to incorporate the VIGOR results into the Vioxx label; (iii) deny the PSC's repeated attempts to compel Mr. David Anstice to testify in future Vioxx-related cases in this Court; (iv) deny the PSC's motion to exclude the April 6, 2005 FDA Memorandum or its conclusions regarding the "class effect" of all NSAIDs; (v) deny the PSC's request to compel the production of a privileged, inadvertently-produced CMI; (vi) deny the PSC's motion to preclude testimony by Merck employees about their

809965v.1

personal use of Vioxx; and (vii) to the extent explained in Part VII above, deny the PSC's requests regarding trial management that would unnecessarily lengthen and complicate future trials.

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
Carmelite M. Bertaut, 3054
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone:  504-581-3200
Fax:      504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Andrew Goldman
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:      312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone:  202-434-5000
Fax:      202-434-5029

And

Brian Currey
Catalina J. Vergara
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone:  213-430-6000
Fax:      213-430-6407

Attorneys for Merck & Co., Inc.

809965v.1

**CERTIFICATE OF SERVICE**

I hereby certify that the above and forgoing Opposition to the PSC's Generic Motion *in Limine* has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 10th day of May, 2006.

Phil Wittmann

Trial and Hearing Transcript Excerpts

• Opposition to Generic MIL

[740:] - [740:25]  12/2/2005  Irvin Plunkett Trial - Ray, Weeks, Irvin A, Raffa, S

page 740
    0740
```
1                             UNITED STATES DISTRICT COURT
2                             EASTERN DISTRICT OF LOUISIANA
3
4
5
          IN RE: VIOXX PRODUCTS             *
6         LIABILITY LITIGATION              *   MDL DOCKET NO. 1657
                                            *
7                                           *
          THIS DOCUMENT RELATES TO          *   HOUSTON, TEXAS
8         CASE NO. 05-4046:                 *
                                            *
9         EVELYN IRVIN PLUNKETT, ET AL      *   DECEMBER 2, 2005
                                            *
10        VERSUS                            *
                                            *   8:30 A.M.
11        MERCK & CO., INC.                 *
          * * * * * * * * * * * * * * * *   *
12
13
                              VOLUME IV
14                       JURY TRIAL BEFORE THE
                        HONORABLE ELDON E. FALLON
15                     UNITED STATES DISTRICT JUDGE
16
17        APPEARANCES:
18
          FOR THE PLAINTIFF:          BEASLEY ALLEN CROW METHVIN
19                                       PORTIS & MILES
                                      BY:  JERE LOCKE BEASLEY, ESQ.
20                                         ANDY D. BIRCHFELD, JR., ESQ.
                                           J. PAUL SIZEMORE, ESQ.
21                                    234 COMMERCE STREET
                                      POST OFFICE BOX 4160
22                                    MONTGOMERY, ALABAMA 36103
23
          FOR THE PLAINTIFF:          ROBINSON, CALCAGNIE & ROBINSON
24                                    BY:  MARK P. ROBINSON, JR., ESQ.
                                      620 NEWPORT CENTER DRIVE
25                                    NEWPORT BEACH, CALIFORNIA 92660
```

[818:16] - [818:19]  12/2/2005  Irvin Plunkett Trial - Ray, Weeks, Irvin A, Raffa, S

page 818
```
16              MR. BECK:  WE OFFER DEFENDANT'S EXHIBIT 338 INTO
17        EVIDENCE.
18              THE COURT:  I'LL ADMIT IT INTO EVIDENCE UNDER 8038 OF
19        THE RULES OF EVIDENCE.
```

[1156:] - [1156:25]  12/5/2005  Irvin Plunkett Trial - Scolnick, Plunkett-Irvin, Sil

page 1156
    1156
```
1                             UNITED STATES DISTRICT COURT
2                             EASTERN DISTRICT OF LOUISIANA
3
4
5         IN RE: VIOXX PRODUCTS             *
          LIABILITY LITIGATION             *   MDL DOCKET NO. 1657
6                                           *
                                            *
7         THIS DOCUMENT RELATES TO          *   HOUSTON, TEXAS
```

EXHIBIT
1

**Trial and Hearing Transcript Excerpts**

• Opposition to Generic MIL

```
          CASE NO. 05-4046:                *
   8                                        *
          EVELYN IRVIN PLUNKETT, ET AL      *  DECEMBER 5, 2005
   9                                        *
          VERSUS                            *
  10                                        *  8:30 A.M.
          MERCK & CO., INC.                 *
  11      * * * * * * * * * * * * * * * *
  12
  13                      VOLUME VI
                    JURY TRIAL BEFORE THE
  14               HONORABLE ELDON E. FALLON
                 UNITED STATES DISTRICT JUDGE
  15
  16
          APPEARANCES:
  17
  18      FOR THE PLAINTIFF:           BEASLEY ALLEN CROW METHVIN
                                          PORTIS & MILES
  19                                   BY:  JERE LOCKE BEASLEY, ESQ.
                                            ANDY D. BIRCHFELD, JR., ESQ.
  20                                        LEIGH O'DELL, ESQ.
                                            J. PAUL SIZEMORE, ESQ.
  21                                        FRANK WOODSON, ESQ.
                                       234 COMMERCE STREET
  22                                   POST OFFICE BOX 4160
                                       MONTGOMERY, ALABAMA 36103
  23
  24      FOR THE PLAINTIFF:           ROBINSON, CALCAGNIE & ROBINSON
                                       BY:  MARK P. ROBINSON, JR., ESQ.
  25                                   620 NEWPORT CENTER DRIVE
                                       NEWPORT BEACH, CALIFORNIA 92660
```

[1182:18] - [1186:15]    12/5/2005   Irvin Plunkett Trial - Scolnick, Plunkett-Irvin, Sil

```
          page 1182
  18                 MR. BECK:  YOUR HONOR, I HAD RAISED, BECAUSE WE'RE IN
  19      THE MIDDLE OF DR. SCOLNICK'S VIDEOTAPED DEPOSITION, THERE IS A
  20      CLIP LATER ON THAT WE WOULD WANT TO PLAY THAT HE TALKS ABOUT
  21      HOW HE USES VIOXX.  THERE WAS IN LIMINE RULING ON THIS THAT
  22      WE'RE NOT ALLOWED TO DO THAT WITHOUT APPROACHING THE COURT, AND
  23      I ASKED, AS I DID LAST WEEK, THAT WE BE ALLOWED TO PRESENT
  24      EVIDENCE THAT OUR WITNESSES USED VIOXX.
  25                 THE PLAINTIFFS, HAVING SECURED THE IN LIMINE
          page 1183
   1      RULING THEN INTRODUCED EVIDENCE FROM MR. AYCOCK THAT HE USED
   2      VIOXX, AND THEY INTRODUCED EVIDENCE THAT IT DIDN'T WORK.  THEN
   3      THEY HAD THEIR -- THE DAUGHTER ALLESHA, COME ON AND THEY
   4      ELICITED TESTIMONY FROM HER ON THE STAND THAT SHE USED VIOXX
   5      AND THAT IT DIDN'T WORK.
   6                 THEN OVER THE WEEKEND WHEN WE HEARD FROM
   7      DR. TOPOL, THERE WAS EVIDENCE -- SOME WAS DESIGNATED BY US,
   8      SOME BY THEM -- THAT HE USED VIOXX, BUT THEN THEY DESIGNATED
   9      EVIDENCE ABOUT HOW, YEAH, BUT HE HAD DETERMINED THAT HE WAS AT
  10      LOW RISK FOR HEART ATTACK AND SO IT WAS OKAY FOR HIM TO USE
  11      VIOXX.
  12                 SO WE'VE GOT A WHOLE BUNCH OF EVIDENCE FROM THE
  13      PLAINTIFF'S WITNESSES ON THEIR USE OF VIOXX, WHETHER IT WORKED
  14      OR NOT, AND WHETHER THEY WERE CONCERNED ABOUT HEART ATTACK
  15      RISKS WHEN THEY USED IT.  WE'RE ENTITLED TO PUT IN EVIDENCE
  16      FROM OUR WITNESSES ON THE SAME ISSUE.
  17                 I THINK IT'S MORE RELEVANT FROM OUR WITNESSES
  18      BECAUSE DR. SCOLNICK, FOR EXAMPLE, IS BEING CHARGED WITH --
  19      WITH BASICALLY SELLING VIOXX WHILE HE KNEW THAT IT CAUSED HEART
  20      ATTACKS EVEN WITH INTERMITTENT USE.  AND THE FACT THAT HE USED
  21      VIOXX AT THE TIME IS -- IS RELEVANT TO REFUTE THAT, THOSE
  22      ALLEGATIONS ABOUT HIS STATE OF MIND, SO WE WOULD ASK THAT YOU
  23      LIFT THAT RULING AND ALLOW US TO INTRODUCE THE EVIDENCE.
```

Trial and Hearing Transcript Excerpts

• Opposition to Generic MIL

```
24                    MR. BIRCHFIELD:  YOUR HONOR, FIRST OF ALL, WHETHER
25          VIOXX IS EFFECTIVE IN TREATING PAIN IS NOT AT ISSUE IN THIS
page 1184
1           CASE.  I MEAN, WE'LL STIPULATE THAT IT'S EFFECTIVE; IT'S
2           EFFECTIVE IN TREATING PAIN.  THE FACT THAT DR. TOPAL, IN FACT,
3           HE SAID, I TOOK IT, BUT I HAD A FULL HEART CHECKUP.  I HAD A
4           STRESS CHEST AND I TOOK IT INTERMITTENTLY.  THAT IS TESTIMONY
5           THAT MERCK INTRODUCED, NOT US.
6                    THERE IS A BIG DISTINCTION BETWEEN, YOU KNOW,
7           WHEN MERCK IS OFFERING IT FOR, AND THEY ARE OFFERING IT TO SHOW
8           THAT THERE WAS -- THERE WAS A LACK OF KNOWLEDGE.  THAT'S NOT --
9           THAT DIDN'T HAVE ANYTHING TO DO WITH THE TESTIMONY THAT HAS
10          BEEN ELICITED, YOU KNOW, SO FAR.
11                   A KEY DISTINCTION IS THAT WE TO NOT HAVE, YOU
12          KNOW, THE MEDICAL RECORDS OF THE MERCK EMPLOYEES IN ORDER TO
13          CROSS-EXAMINE HIM.  IF THEY HAD A FULL HEART, YOU KNOW, HEART
14          CHECKUP AND KNEW THAT THEY WERE CLEAN AND THEY TOOK IT
15          INTERMITTENTLY, THAT'S A COMPLETELY DIFFERENT STORY.  BUT WE
16          DON'T HAVE, WE DON'T HAVE ANY OF THAT INFORMATION TO -- TO
17          CROSS-EXAMINE THEM ON.  WE HAVEN'T GOTTEN INTO ANY AREAS THAT
18          WE OPENED THE DOOR FOR.
19                   MR. BECK:  YOUR HONOR, JUST TO REPLY BRIEFLY.  THE
20          REASON THAT THEY ELICITED FROM THEIR WITNESSES THAT VIOXX
21          DIDN'T WORK IS BECAUSE THERE IS A QUESTION OF COST/BENEFIT
22          ANALYSIS HERE, AND SO THEY ARE THE ONES WHO CALL A WITNESS TO
23          THE STAND, ALLESHA, AND SAY THAT VIOXX DOES NOT WORK.
24                   MOREOVER, YOUR HONOR, WHAT MR. BEASLEY DID,
25          WHICH THEY PLAYED, THEY DESIGNATED WITH DR. SCHIRMER, IS TO
page 1185
1           SAY, DO YOU KNOW THAT MERCK IS NOW SAYING THAT VIOXX ISN'T ANY
2           BETTER THAN ALEVE OR ADVIL?  IF YOU HAD KNOWN THAT VIOXX WAS
3           SAYING OR MERCK WAS SAYING THAT VIOXX WASN'T ANY BETTER THAN
4           ALEVE OR ADVIL, SO THEY PUT THE ISSUE WHETHER VIOXX IS A GOOD
5           PAIN RELIEVER IN, AND IT'S IRRELEVANT TO THE COST/BENEFIT
6           ANALYSIS.
7                    THE COURT:  I UNDERSTAND THE ISSUE.  AT FIRST WHEN I
8           SAW THIS SITUATION, I FELT THAT IT WAS ADMISSIBLE FROM THE
9           STANDPOINT OF CROSS-EXAMINATION.  IF SOMEONE SAYS THAT VIOXX IS
10          A TERRIBLE DRUG AND A DANGEROUS DRUG, THEN I THOUGHT IT WAS
11          APPROPRIATE TO INTRODUCE EVIDENCE TO THE FACT THAT THAT
12          INDIVIDUAL TOOK THE DRUG.  IT GOES TO CREDIBILITY AND CAN BE
13          INTRODUCED IN THAT REGARD.
14                   BUT THE DEFENSE IS CORRECT IN THE SENSE THAT
15          SOME TESTIMONY OF PEOPLE WHO DON'T LIKE VIOXX HAVE ALSO
16          INDICATED THAT THEY TOOK IT, BUT THEY DIDN'T EXPLAIN THE WAY
17          THEIR REASON FOR TAKING IT.  AND THAT ASPECT OF IT INTRODUCES A
18          QUESTION THAT BEARS, TO SOME EXTENT, ON PLAINTIFF'S CLAIM OF
19          WARRANTY WHETHER OR NOT THE DEFENDANT WARRANTED THE DRUG FOR
20          ITS INTENDED PURPOSE OR WHETHER THE DRUG WAS APPROPRIATE FOR
21          ITS INTENDED PURPOSE, WHICH THEY NOW HAVE AN OPPORTUNITY TO
22          REBUT.
23                   I'M GOING TO ALLOW SCOLNICK TO TESTIFY AS TO
24          WHETHER OR NOT HE TOOK THE DRUG, BUT I'M NOT GOING TO MAKE A
25          BLANKET RULING AT THIS TIME.  AND I DON'T THINK THAT IT'S
page 1186
1           APPROPRIATE TO GO INTO SPECIFICS OF TAKING THE DRUG.  I THINK
2           IT'S -- HE TOOK IT BECAUSE IT WAS HELPFUL.  HE TOOK IT BECAUSE
3           HE FELT IT WAS SAFE.  I CAN SEE THAT.  BUT THE PLAINTIFFS HAVE
4           A POINT THAT WE DON'T KNOW AT THIS POINT THE BACKGROUND OR THE
5           MEDICAL BACKGROUND OF THOSE INDIVIDUALS.  AND I DON'T WANT TO
6           TRY ANOTHER CASE OTHER THAN THIS PARTICULAR CASE.
7                    SO I'LL GRANT THE DEFENDANT'S MOTION, AT LEAST
8           WITH REGARD TO SCOLNICK, AND I'LL HAVE TO TAKE A LOOK AT IT
9           OTHERWISE.
10                   MR. BIRCHFIELD:  YOUR HONOR, WILL YOU ORDER THE
11          PRODUCTION OF HIS MEDICAL RECORDS TO US?
12                   THE COURT:  NO, I'M NOT GOING TO DO THAT.  I'LL DENY
13          THAT.
```

Trial and Hearing Transcript Excerpts

• Opposition to Generic MIL

```
                     14              MR. BECK:  THANK YOU.
                     15              THE COURT:  THANK YOU VERY MUCH.
```

[1:] - [1:25]       2/3/2006    Plunkett II Trial - Hearing - Pre-Trial Motions

```
page 1
     0001
 1                               UNITED STATES DISTRICT COURT
 2                               EASTERN DISTRICT OF LOUISIANA
 3
 4
 5
          In Re: VIOXX PRODUCTS          *
 6        LIABILITY LITIGATION           *  MDL Docket No. 1657
                                         *
 7                                       *
                                         *
          This document relates to       *  New Orleans, Louisiana
 8        Case No. 05-4046:              *
                                         *
 9        EVELYN IRVIN PLUNKETT, et al    *  February 3, 2006
                                         *
10        versus                         *
                                         *  10:00 a.m.
11        MERCK & CO., INC.              *
          * * * * * * * * * * * * * * * *
12
13
14                          PROCEEDINGS BEFORE THE
                            HONORABLE ELDON E. FALLON
15                        UNITED STATES DISTRICT JUDGE
16
17        APPEARANCES:
18
          For the Plaintiff:           Beasley Allen Crow Methvin
19                                        Portis & Miles
                                       BY:  ANDY D. BIRCHFELD, JR., ESQ.
20                                          LEIGH O'DELL, ESQ.
                                       234 Commerce Street
21                                     Post Office Box 4160
                                       Montgomery, Alabama 36103
22
23        For the Plaintiff:           Levin, Papantonio, Thomas,
                                         Mitchell, Echsner & Proctor
24                                     BY:  TROY RAFFERTY, ESQ.
                                       316 South Baylen Street, Suite 600
25                                     Pensacola, Florida 32502
```

[4:1] - [4:8]       2/3/2006    Plunkett II Trial - Hearing - Pre-Trial Motions

```
page 4
 1              Now, there are some problems with that
 2    deposition that Mr. Lanier took.  I remember the tone of that
 3    one and it's just over the top.  Andy, just read the
 4    deposition.  I didn't do a lot of carving out of the
 5    objections.  I did some of it, but some of it is okay; it's
 6    aggressive and it's asked okay.  It's just the tone and the
 7    smirking and the laughter has no place in a federal court.
 8    That's going to be my ruling on that.
```

[9:4] - [9:9]       2/3/2006    Plunkett II Trial - Hearing - Pre-Trial Motions

```
page 9
 4    Phil, for example, brought up the issue about the person taking
 5    Vioxx.  I can see where at this point that might have some
 6    relevance because of the attack on her credibility that's going
 7    to be launched with the article and whatever it is.  My
 8    thinking on that is that I would let her do that now because it
```

**Trial and Hearing Transcript Excerpts**

• Opposition to Generic MIL
```
 9   does go to the credibility.  I don't know whether you use it in
```

[9:12] - [9:24]   2/3/2006   Plunkett II Trial - Hearing - Pre-Trial Motions
```
page 9
12              MR. BIRCHFIELD:  Your Honor, is your ruling that it's
13   limited to just Alise Reicin?
14              THE COURT:  Yes.  I'm going to do that now, but there
15   may be something that comes up with credibility.  You see, it's
16   a credibility issue.  It doesn't have any relevance, as I see
17   it, unless the person says Vioxx is terrible and then they took
18   Vioxx and but for the fact it was taken off the market they
19   would still be taking Vioxx.  I see that as attacking the
20   credibility of somebody.  If somebody says Vioxx is just
21   wonderful, I don't see that as being essential, that they are
22   saying, "It's wonderful and I took it," but when you attack
23   that person and say that they're a liar, then it has some
24   relevance to credibility.
```

[1008:] - [1008:25]   2/10/2006   Plunkett II Trial - Vol. 05 - Topol Kapit Raffa Cannusco Curfmn
```
page 1008
      1008
 1                       UNITED STATES DISTRICT COURT
 2                       EASTERN DISTRICT OF LOUISIANA
 3
 4
 5
         IN RE: VIOXX PRODUCTS          *
 6       LIABILITY LITIGATION           *     MDL DOCKET NO. 1657
                                        *
 7                                      *
         THIS DOCUMENT RELATES TO       *     NEW ORLEANS, LOUISIANA
 8       CASE NO. 05-4046:              *
                                        *
 9       EVELYN IRVIN PLUNKETT, ET AL   *     FEBRUARY 10, 2006
                                        *
10       VERSUS                         *
                                        *     8:30 A.M.
11       MERCK & CO., INC.              *
         * * * * * * * * * * * * * * *
12
13
                         VOLUME V - DAILY COPY
14                       JURY TRIAL BEFORE THE
                         HONORABLE ELDON E. FALLON
15                    UNITED STATES DISTRICT JUDGE
16
17       APPEARANCES:
18
         FOR THE PLAINTIFF:          BEASLEY ALLEN CROW METHVIN
19                                     PORTIS & MILES
                                     BY:  ANDY D. BIRCHFELD, JR., ESQ.
20                                        LEIGH O'DELL, ESQ.
                                     234 COMMERCE STREET
21                                   POST OFFICE BOX 4160
                                     MONTGOMERY, ALABAMA 36103
22
23       FOR THE PLAINTIFF:          LEVIN, PAPANTONIO, THOMAS,
                                       MITCHELL, ECHSNER & PROCTOR
24                                   BY:  TROY RAFFERTY, ESQ.
                                     316 SOUTH BAYLEN STREET, SUITE 600
25                                   PENSACOLA, FLORIDA 32502
```

[1111:18] - [1117:12]   2/10/2006   Plunkett II Trial - Vol. 05 - Topol Kapit Raffa Cannusco Curfmn
```
page 1111
```

**Trial and Hearing Transcript Excerpts**

• Opposition to Generic MIL

18    A.   YES.  AND THIS IS A VERY IMPORTANT PART OF THIS REGULATION
19    BECAUSE, IF YOU DO HAVE A SERIOUS ADVERSE REACTION, SOMETHING
20    THAT CAN AFFECT PATIENTS WHO ARE TAKING THE DRUG, YOU WANT THAT
21    INFORMATION PUT IN THE LABELING AS SOON AS POSSIBLE SO DOCTORS
22    CAN BE AWARE OF IT AS SOON AS POSSIBLE.
23           I MEAN, WE'RE TALKING ABOUT ADVERSE REACTIONS THAT
24    CAN CAUSE SERIOUS ILLNESS, ADVERSE REACTIONS THAT MIGHT EVEN BE
25    FATAL.  AND SO THE POINT, WHEN IT SAYS PUT IT IN AS SOON AS YOU

page 1112
1    HAVE THIS ASSOCIATION, IS THAT YOU WANT TO GET IT IN THERE AS
2    QUICKLY AS POSSIBLE.
3    Q.   AND WHEN WE TALK ABOUT PUTTING IT IN THERE AS QUICKLY AS
4    POSSIBLE, WHOSE RESPONSIBILITY IS THAT TO PUT THAT IN THE
5    WARNING?
6    A.   IT'S THE COMPANY'S RESPONSIBILITY.  IT'S THE COMPANY'S
7    LABEL.  THE COMPANY WRITES THE LABEL.  IT'S THE COMPANY'S
8    PRODUCT.  THE COMPANY IS SELLING THIS PRODUCT, AND IT'S THE
9    COMPANY'S RESPONSIBILITY, WHEN THEY KNOW OF A SERIOUS SAFETY
10    HAZARD ASSOCIATED WITH THEIR DRUG, TO GET THIS INFORMATION IN
11    LABELING AS SOON AS POSSIBLE.
12    Q.   NOW, I ALSO WANT TO TALK FOR JUST A MOMENT BECAUSE I WANT
13    TO SKIP -- OR GO BACK, ACTUALLY, TO THE TIME LINE FOR JUST A
14    SECOND.  THE JURY HAS HEARD A LOT ABOUT SOMETHING REFERRED TO
15    AS THE VIGOR STUDY.  ARE YOU FAMILIAR WITH THE VIGOR STUDY?
16    A.   YES.
17    Q.   AND WHEN DID THE RESULTS OF THE VIGOR STUDY BECOME KNOWN
18    TO MERCK?
19    A.   WELL, MERCK BECAME AWARE OF THE RESULTS OF THE VIGOR STUDY
20    IN THE FIRST QUARTER OF 2000, AND THEY NOTIFIED THE FDA ABOUT
21    THE RESULTS IN MARCH OF 2000.
22    Q.   SO MARCH 2000, IT'S SAFE TO SAY, VIGOR KNOWN TO MERCK.
23    A.   IT WAS CERTAINLY KNOWN BY THAT TIME BECAUSE, CLEARLY, THEY
24    HAD TO KNOW ABOUT IT BEFORE THEY TOLD THE FDA.  SO THEY KNEW
25    ABOUT THE RESULTS FOR A WHILE.

page 1113
1    Q.   NOW, DOCTOR, I WANT TO ASK YOU A VERY SPECIFIC QUESTION.
2    I WANT TO ASK YOU IF YOU AGREE WITH THIS STATEMENT:  "WE GOT
3    THE VIGOR RESULTS IN MARCH OF 2000.  IN JUNE OF 2000, WE ASKED
4    THE FDA IF WE COULD PUT A NEW LABEL ON.  YOU HAVE TO GET THE
5    FDA APPROVAL.  YOU CAN'T JUST CHANGE THE LABEL.  YOU HAVE TO
6    GET THE FDA'S APPROVAL FOR A NEWER LABEL."  DO YOU AGREE OR
7    DISAGREE WITH THAT STATEMENT?
8    A.   NO.  THAT STATEMENT IS FALSE.  IT'S INCORRECT.  IF WE ARE
9    TALKING ABOUT A WARNING OR A PRECAUTION OR ANY SERIOUS SAFETY
10    HAZARD, THE REGULATIONS PERMIT AND OBLIGATE THE COMPANY TO PUT
11    THAT WARNING IN LABELING -- OR THAT SERIOUS SAFETY HAZARD IN
12    LABELING AS SOON AS POSSIBLE.  THEY CAN DO IT WITHOUT FDA
13    APPROVAL.
14    Q.   AND ARE THERE ACTUAL RULES AND REGULATIONS THAT HAVE BEEN
15    PROMULGATED BY THE FDA THAT PERTAIN TO THE COMPANY'S
16    RESPONSIBILITY TO CHANGE THE LABEL?
17    A.   YES, THERE ARE.
18    Q.   AND ARE YOU FAMILIAR WITH THAT RULE AND REGULATION?
19    A.   YES.
20    Q.   IS THAT A RULE AND REGULATION THAT YOU WERE AWARE OF AND
21    THAT YOU UTILIZED IN YOUR WORK AT THE FDA'S AND MEDICAL REVIEW
22    OFFICE?
23    A.   I WAS THOROUGHLY FAMILIAR WITH IT.  I REVIEWED MANY
24    APPLICATIONS MADE BY PHARMACY COMPANIES TO PUT ADVERSE
25    REACTIONS AND WARNINGS IN LABELING AS SOON AS POSSIBLE.  IT WAS

page 1114
1    PART AND PARCEL OF MY WORK DURING THE ENTIRE PERIOD THAT I WAS
2    WITH THE FDA.
3    Q.   AT THIS TIME, DOCTOR, I WOULD LIKE TO REFER YOU IN YOUR
4    NOTEBOOK TO THE SECTION ENTITLED 21 CFR SECTION 314.70.
5    A.   YES.
6    Q.   IS THIS A COPY OF THAT RULE THAT YOU WERE REFERRING TO?
7    A.   YES, IT IS.

Trial and Hearing Transcript Excerpts

• Opposition to Generic MIL

8     Q.    AND ON PAGE -- I BELIEVE IT'S PAGE 3 OF MY COPY,
9     SUBSECTION 6, ON THE RIGHT-HAND SIDE.
10    A.    YES.
11    Q.    IT INDICATES THAT "THE AGENCY MAY DESIGNATE A CATEGORY OF
12    CHANGES FOR THE PURPOSE OF PROVIDING THAT THE -- IN THE CASE OF
13    A CHANGE IN SUCH CATEGORY, THE HOLDER OF AN APPROVE
14    APPLICATION," IS THAT REFERRING TO A NEW DRUG APPLICATION,
15    DOCTOR?
16    A.    THAT'S RIGHT.  THE HOLDER OF AN APPROVED NEW DRUG
17    APPLICATION.
18    Q.    "MAY COMMENCE DISTRIBUTION OF THE DRUG PRODUCT," AND WHEN
19    WE TALK ABOUT THAT, WE ARE TALKING ABOUT THE LABEL?
20    A.    YEAH.  WE ARE TALKING ABOUT ACTUALLY THE DRUG PRODUCT WITH
21    A NEW LABEL.
22    Q.    OKAY.  "INVOLVED UPON RECEIPT BY THE AGENCY OF A
23    SUPPLEMENT FOR THE CHANGE."
24    A.    THAT'S CORRECT.
25    Q.    "THESE CHANGES INCLUDE BUT ARE NOT LIMITED TO" -- AND THEN
page 1115
1     IF YOU GO DOWN TO SUBSECTION 3 --
2     A.    I'M THERE.
3     Q.    -- "CHANGES IN THE LABELING TO ACCOMPLISH ANY OF THE
4     FOLLOWING:  TO ADD OR STRENGTHEN A CONTRAINDICATION, WARNING,
5     PRECAUTION, OR ADVERSE REACTION?
6     A.    YES.
7     Q.    NOW, WHAT, IN TERMS OF YOUR WORK AS A MEDICAL OFFICER AT
8     THE FDA, IS THIS SOMETHING THAT DRUG MANUFACTURERS LIKE MERCK
9     ARE AWARE OF?
10    A.    THEY CERTAINLY ARE.
11    Q.    WHILE YOU WERE AN FDA MEDICAL OFFICER, DID DRUG
12    MANUFACTURERS SUCH AS MERCK TAKE IT AND USE THIS?
13    A.    I SAW THIS REGULATION BEING USED HUNDREDS OF TIMES DURING
14    THE TIME THAT I WAS AT THE FDA.
15    Q.    AND WHAT IS THE PURPOSE, IN YOUR EXPERIENCE, IN YOUR
16    OPINION AS AN FDA MEDICAL OFFICER, OF THIS REGULATION?
17    A.    WELL, THE PURPOSE -- WHAT IT SAYS IS THAT YOU CAN GET THE
18    LABELING CHANGE OUT THERE, AND THEN THE FDA CAN LOOK AT IT AND
19    DECIDE WHETHER TO APPROVE IT AFTERWARD.  THE POINT IS IF YOU'VE
20    GOT A SERIOUS SAFETY HAZARD, IF YOU'VE GOT A SERIOUS ADVERSE
21    REACTION, YOU WANT THE INFORMATION OUT THERE AS SOON AS
22    POSSIBLE SO THAT DOCTORS CAN BE AWARE OF IT AS SOON AS
23    POSSIBLE.  AND THE -- THE REGULATION PERMITS THE COMPANY TO PUT
24    IT OUT THERE AS SOON AS POSSIBLE, AND SO IT'S TO GET THIS
25    INFORMATION OUT QUICKLY WHEN THERE IS A SERIOUS SAFETY HAZARD,
page 1116
1     YOU WANT TO GET THE INFORMATION OUT THERE GO QUICKLY.
2           AND, YOU KNOW, THE FDA, IS A BUREAUCRACY.  IT TAKES
3     TIME TO DO THINGS.  IT'S NOT A GOOD THING TO WAIT FOR THE FDA
4     TO LOOK THROUGH ALL THE DATA IF IT'S A SERIOUS SAFETY HAZARD
5     AND PEOPLE REALLY NEED TO KNOW ABOUT IT RIGHT AWAY.
6           SO THAT'S THE WHOLE PURPOSE OF THIS REGULATION IS TO
7     GET THE INFORMATION OUT THERE AS QUICKLY AS POSSIBLE, LET THE
8     FDA LOOK AT IT AFTER IT'S OUT THERE.  IF THEY WANT TO MAKE ANY
9     CHANGES, THEY DO IT AT THAT POINT.
10    Q.    SO IF A COMPANY WANTS TO STRENGTHEN A WARNING OR ADD TO A
11    WARNING, THEY CAN DO IT; CORRECT?
12    A.    THAT'S WHAT THIS -- I MEAN, THE REGULATION THAT YOU READ,
13    THAT THIS PARTICULAR RULE IS SPECIFICALLY FOR THE PURPOSE OF
14    ADDING OR STRENGTHENING A CONTRAINDICATION, WARNING,
15    PRECAUTION, OR ADVERSE REACTION.
16    Q.    IF THEY WANT TO SUBTRACT OR TAKE AWAY A WARNING, THAT'S A
17    DIFFERENT SITUATION?
18    A.    TAKING AWAY A WARNING, IF THEY WANT TO TAKE IT OUT, WELL,
19    THE FDA WANTS TO LOOK AT THAT FIRST, SO THAT REQUIRES A PRIOR
20    APPROVAL.  YOU CAN'T DECIDE YOU'RE GOING TO TAKE OUT A WARNING,
21    YOU'RE GOING TO TAKE OUT INFORMATION ABOUT A SERIOUS ADVERSE
22    REACTION ON YOUR OWN AND JUST START DISTRIBUTING THE LABEL.
23    FDA WANTS TO MAKE SURE THEY KNOW WHAT YOU'RE DOING, AND SO

Trial and Hearing Transcript Excerpts

• Opposition to Generic MIL

```
24      TAKING IT OUT REQUIRES PRIOR APPROVAL.
25      Q.    AND THEY DO THIS SO THEY CAN START SUBMITTING -- THEY CAN
page 1117
1       START DISTRIBUTING THE LABEL AND WARNING DOCTORS AS LONG AS
2       THEY SUBMIT AN APPLICATION AT THE TIME THAT THEY DO THAT,
3       CORRECT?
4       A.    IF THEY HAVE NEW INFORMATION ABOUT A SERIOUS SAFETY
5       HAZARD, THEY SUBMIT -- THEY PUT IT IN LABELING, THEY GET IT OUT
6       THERE, AND THEY SUBMIT AN APPLICATION TO THE FDA AT THE SAME
7       TIME.
8       Q.    AT ANY POINT BETWEEN MAY OF 1999 AND APRIL OF 2002, DID
9       MERCK EVER UTILIZE -- IS THIS SOMETHING -- LET ME BACK UP.  IS
10      THIS WHAT'S CALLED A CHANGE BEING EFFECTED?
11      A.     THAT'S THE NAME OF THE REGULATION, A CHANGES BEING
12      EFFECTED.  CHANGES OF LABELING, CHANGES BEING EFFECTED.
```

[1120:14] - [1121:17]   2/10/2006   Plunkett II Trial - Vol. 05 - Topol Kapit Raffa Cannusco Curfmn

```
page 1120
14      Q.    IN FACT, IF YOU WOULD TURN TO PAGE 12, THE ONLY PLACE
15      MERCK -- WELL, WE'RE GOING TO TALK ABOUT A COUPLE OF OTHER
16      THINGS, BUT IN THIS SECTION, WHICH IS THE -- I BELIEVE IT'S THE
17      CLINICAL STUDIES SECTION; IS THAT CORRECT?
18      A.    THAT'S CORRECT.  YES.
19      Q.    TELL THE JURY WHAT THE SIGNIFICANCE IS OF THE CLINICAL
20      STUDY SECTION OF A LABEL.
21      A.    WELL, THE CLINICAL STUDY, WE'VE TALKED ABOUT THE SECTIONS
22      OF LABELING THAT CONCERN ADVERSE DRUG REACTIONS AND SAFETY
23      HAZARDS.  THOSE ARE THE SAFETY CONTRAINDICATIONS, WARNINGS AND
24      ADVERSE REACTIONS.  THERE IS ALSO A SECTION OF THE LABELING
25      THAT DESCRIBES THE RESULTS OF CLINICAL STUDIES, AND SO THIS IS
page 1121
1       THE CLINICAL STUDY SECTION WHERE THE RESULTS OF STUDIES ARE
2       DISCUSSED.
3       Q.    AND IN YOUR EXPERIENCE AS A MEDICAL OFFICER AT THE FDA --
4       STRIKE THAT.  LET ME BACK UP.  THE JURY HEARD FROM DR. SCHIRMER
5       YESTERDAY THAT HIS PRACTICE WAS TO REVIEW THE WARNINGS,
6       PRECAUTIONS, CONTRAINDICATIONS SECTIONS ON THE LABEL.
7       A.    THAT'S CORRECT.
8       Q.    IS THAT CONSISTENT WITH YOUR UNDERSTANDING OF YOUR
9       EXPERIENCE AT THE FDA, THAT THAT'S WHAT PHYSICIANS ARE
10      CONCERNED WITH?
11      A.    WHEN THEY ARE CONCERNED WITH ADVERSE REACTIONS, THEY LOOK
12      AT WARNINGS, CONTRAINDICATIONS, PRECAUTIONS; THAT'S CORRECT.
13      Q.    NOW, I WOULD LIKE TO ASK YOU:  IF MERCK HAD CHOSEN TO
14      CHANGE OR PUT THE CARDIOVASCULAR RISKS ASSOCIATED WITH VIOXX
15      INTO THE WARNING LABEL IN JUNE OF 2000, COULD THEY HAVE DONE
16      THAT WITHOUT GETTING PRIOR FDA APPROVAL?
17      A.    THEY CERTAINLY COULD HAVE.
```

[1492:] - [1492:25]   2/14/2006   Plunkett II Trial - Vol. 07 - Morrison, Weeks, Pacetti, Rayburn

```
page 1492
     1492
1                         UNITED STATES DISTRICT COURT
2                         EASTERN DISTRICT OF LOUISIANA
3
4
5
        IN RE: VIOXX PRODUCTS           *
6       LIABILITY LITIGATION            *    MDL DOCKET NO. 1657
                                        *
7                                       *
        THIS DOCUMENT RELATES TO        *    NEW ORLEANS, LOUISIANA
8       CASE NO. 05-4046:               *
                                        *
9       EVELYN IRVIN PLUNKETT, ET AL    *    FEBRUARY 14, 2006
                                        *
```

Trial and Hearing Transcript Excerpts

• Opposition to Generic MIL

```
10     VERSUS                              *
                                           *      8:30 A.M.
11     MERCK & CO., INC.                   *
       * * * * * * * * * * * * * *

12
13
                        VOLUME VII - DAILY COPY
14                      JURY TRIAL BEFORE THE
                        HONORABLE ELDON E. FALLON
15                    UNITED STATES DISTRICT JUDGE
16
17     APPEARANCES:
18
19     FOR THE PLAINTIFF:        BEASLEY ALLEN CROW METHVIN
                                    PORTIS & MILES
                                 BY:  ANDY D. BIRCHFELD, JR., ESQ.
20                                    LEIGH O'DELL, ESQ.
                                 234 COMMERCE STREET
21                               POST OFFICE BOX 4160
                                 MONTGOMERY, ALABAMA 36103
22
23     FOR THE PLAINTIFF:        LEVIN, PAPANTONIO, THOMAS,
                                    MITCHELL, ECHSNER & PROCTOR
24                               BY:  TROY RAFFERTY, ESQ.
                                 316 SOUTH BAYLEN STREET, SUITE 600
25                               PENSACOLA, FLORIDA 32502
```

[1517:11] - [1520:9]    2/14/2006   Plunkett II Trial - Vol. 07 - Morrison, Weeks, Pacetti, Rayburn

```
page 1517
11          Q.    IF YOU COULD, JUST BRIEFLY DESCRIBE YOUR DUTIES AS
12     VICE-PRESIDENT WITH MERCK.
13          A.    WELL, RIGHT NOW, I RUN A GROUP THAT DOES CLINICAL TRIALS
14     FOR THE DISCOVERY OF NEW CANCER MEDICINE.  SO I OVERSEE A LARGE
15     GROUP OF PEOPLE WHO ARE LOOKING FOR AND DOING CLINICAL STUDIES
16     ON POTENTIAL NEW MEDICINES FOR CANCER.
17          Q.    WHERE DO YOU LIVE AND WORK, SIR?
18          A.    I LIVE IN NEW JERSEY, AND I HAVE AN OFFICE BOTH IN NEW
19     JERSEY AND IN PENNSYLVANIA.
20          Q.    ARE YOU MARRIED?
21          A.    I AM.
22          Q.    WITH CHILDREN?
23          A.    I HAVE THREE BOYS.
24          Q.    DOCTOR, I'D LIKE TO BRIEFLY REVIEW YOUR BACKGROUND FOR A
25     MINUTE.  CAN YOU, JUST STARTING FROM COLLEGE, DESCRIBE YOUR
page 1518
1      EDUCATIONAL AND MEDICAL TRAINING.
2           A.    SURE.  I WENT TO GEORGETOWN UNIVERSITY FOR COLLEGE IN
3      WASHINGTON, DC.  AFTER THAT, I WENT TO THE UNIVERSITY OF
4      CONNECTICUT MEDICAL SCHOOL.  AFTER MEDICAL SCHOOL, I DID A
5      RESIDENCY -- INTERNSHIP AND RESIDENCY IN INTERNAL MEDICINE,
6      WHICH IS GENERAL ADULT MEDICINE, AND DID THAT IN BOSTON, AT THE
7      MASSACHUSETTS GENERAL HOSPITAL.  AND AFTER THAT, I DID A
8      FELLOWSHIP IN ONCOLOGY IN CANCER AT THE DANA FARBER CANCER
9      INSTITUTE THAT WAS ALSO IN BOSTON.  AFTER THAT I SPENT ABOUT
10     FOUR OR FIVE YEARS IN A BASIC RESEARCH LABORATORY STUDYING
11     BREAST CANCER.
12          Q.    AND HOW MANY YEARS IN TOTAL DID YOU HAVE IN PRACTICE
13     TREATING PATIENTS?
14          A.    ABOUT TEN.
15          Q.    AND WERE YOU EVER BOARD-CERTIFIED?
16          A.    BOARD-CERTIFIED IN INTERNAL MEDICINE, GENERAL ADULT
17     MEDICINE, AND IN CANCER.
18          Q.    AND WHEN DID YOU JOIN MERCK, SIR?
19          A.    NOVEMBER 1995.
20          Q.    AND WHY DID YOU LEAVE THE PRACTICE OF MEDICINE TO JOIN
21     MERCK?
22          A.    WELL, WHEN I CAME TO MERCK, I WAS DOING A NUMBER OF
```

**Trial and Hearing Transcript Excerpts**

• **Opposition to Generic MIL**

```
23        DIFFERENT THINGS.  I WAS RUNNING A BASIC RESEARCH LABORATORY,
24        STUDYING WAYS THAT WE CAN USE THE IMMUNE SYSTEM TO ATTACK
25        CANCER.  I WAS SEEING PATIENTS.  I WAS WHAT WE CALL
page 1519
1         "MOONLIGHTING," WHICH IS I USED TO WORK IN EMERGENCY ROOMS ALL
2         AROUND THE BOSTON AREA, TAKING CARE OF PATIENTS IN EMERGENCY
3         ROOMS, AND I WAS TRYING TO DECIDE WHAT IT WAS I WANTED TO DO
4         WITH ALL OF THIS TRAINING.
5              I HAD A CHOICE OF BEING A PRACTICING ONCOLOGIST, OF
6         BEING JUST A BASIC RESEARCH SCIENTIST, AND I DECIDED THAT I
7         WANTED TO COME TO MERCK BECAUSE I THOUGHT THAT, IN MY FIELD OF
8         CANCER, MOST OF THE MEDICINES THAT WE HAD THAT WE USE TO TREAT
9         CANCER PATIENTS ARE NOT PARTICULARLY EFFECTIVE AND THEY ARE NOT
10        PARTICULARLY SAFE, AND I THOUGHT IT WOULD BE AN EXCITING CAREER
11        TO WORK ON DEVELOPING NEW MEDICINES THAT ARE BOTH MORE
12        EFFECTIVE AND SAFER FOR PATIENTS.
13        Q.   AND WHEN YOU ARRIVED AT MERCK IN NOVEMBER OF 1995, JUST
14        FOCUSING IMMEDIATELY IN THAT PERIOD THEREAFTER, WHAT DID YOU
15        BEGIN TO WORK ON?
16        A.   WHEN I CAME TO MERCK IN 1995, I HAD -- MY PRIMARY
17        RESPONSIBILITY WAS WORKING ON VIOXX, AND ABOUT 20 PERCENT OF MY
18        EFFORT WAS WORKING WITH THE BASIC RESEARCH SCIENTISTS AT MERCK
19        WHO WERE TRYING TO DEVELOP CANCER DRUGS.
20        Q.   CAN YOU JUST BRIEFLY DESCRIBE YOUR -- JUST GIVE AN
21        OVERVIEW OF THE PROJECTS THAT YOU WORKED ON WITH RESPECT TO
22        VIOXX AND WHAT PERIOD OF TIME YOU WORKED ON THOSE.
23        A.   RIGHT.  SO WHEN I FIRST CAME IN 1995 -- AND I THINK WE'LL
24        TALK ABOUT THIS MORE -- VIOXX WAS IN WHAT WE CALL "PHASE II."
25        SO IT WAS ALREADY IN PATIENTS.  WE WERE TRYING TO TEST WHETHER
page 1520
1         THIS IDEA THAT IT WOULD BE SAFER ON THE STOMACH AND STILL TREAT
2         PAIN WAS TRUE.  SO THAT WAS GOING ON.
3              MY PRIMARY ROLE WAS IN DESIGNING AND CONDUCTING
4         STUDIES HAVING TO DO WITH THE PAIN INDICATION FOR VIOXX, AS
5         WELL AS ONE OF THE OSTEOARTHRITIS TRIALS.  AND THERE IS ONE
6         WHICH WE CALL "CLINICAL PHARMACOLOGY" WHICH STUDIES HOW THE
7         DRUGS WORKS THAT I WORKED ON.  THEN, LATER IN THE PROGRAM, I
8         WORKED ON A NUMBER OF STUDIES LOOKING TO SEE IF VIOXX WOULD
9         ACTUALLY WORK IN THE PREVENTION OR TREATMENT OF CANCER.
```

[1601:24] - [1602:8]    2/14/2006   Plunkett II Trial - Vol. 07 - Morrison, Weeks, Pacetti, Rayburn

```
page 1601
24        Q.   HOW ABOUT PHASE II STUDIES, DID THOSE CONTINUE EVEN AFTER
25        THE DRUG WAS APPROVED?
page 1602
1         A.   REMEMBER, PHASE II STUDIES IS WHERE YOU ARE ESSENTIALLY
2         ASKING THE QUESTION DOES THE DRUG WORK?  THE INITIAL PHASE II
3         STUDIES FOR VIOXX ARE, DOES IT WORK TO TREAT OSTEOARTHRITIS,
4         AND DOES IT NOT DAMAGE YOUR STOMACH?  BUT THERE WERE MANY OTHER
5         QUESTIONS DOES IT WORK IN RHEUMATOID ARTHRITIS?  DOES IT WORK
6         TO PREVENT OR TREAT CANCER, DOES IT WORK IN MIGRAINES, DOES IT
7         WORK IN OTHER DISEASES?  AND SO THERE ARE ESSENTIALLY PHASE II
8         STUDIES GOING ON FOR OTHER INDICATIONS AFTER DRUG APPROVAL.
```

[1604:2] - [1607:13]    2/14/2006   Plunkett II Trial - Vol. 07 - Morrison, Weeks, Pacetti, Rayburn

```
page 1604
2         Q.   AND HOW ABOUT PHASE IV AND V STUDIES.  I DON'T THINK WE'VE
3         TALKED ABOUT THOSE, BUT CAN YOU DESCRIBE THOSE AND WHETHER OR
4         NOT THEY WERE DONE HERE ON VIOXX?
5         A.   PHASE IV STUDIES ARE ESSENTIALLY STUDIES THE FDA ASKS YOU
6         TO DO AT THE TIME THAT YOUR DRUG IS APPROVED, AND PHASE V ARE
7         SORT OF THESE NEW INDICATIONS.  SO YES, WE WERE DOING PHASE IV
8         AND V STUDIES AS WELL.
9         Q.   NOW, DOCTOR, YOU SAID -- YOU DESCRIBED THE BACKGROUND IN
10        ONCOLOGY AND YOUR WORK ON DEVELOPING CANCER DRUGS.
11             MR. RAFFERTY:  YOUR HONOR, I WOULD LIKE TO APPROACH.
```

**Trial and Hearing Transcript Excerpts**

• Opposition to Generic MIL

```
12                 (WHEREUPON, THERE WAS A DISCUSSION HELD AT THE
13      BENCH.)
14                 MR. RAFFERTY:  YOUR HONOR, IN HIS PREVIOUS TESTIMONY,
15      THIS IS WHEN THE DOCTOR LAUNCHES INTO A DIATRIBE -- VIOXX IS
16      POTENTIALLY THE CURE FOR CANCER.  AND THERE IS ABSOLUTELY NO
17      SCIENTIFIC BASIS FOR IT.  IT WOULD BE INAPPROPRIATE AND
18      PREJUDICIAL FOR HIM TO NOW TALK ABOUT THIS IS SOMEHOW A CANCER
19      AGENT, LEAVING THE JURY THE IMPRESSION THAT VIOXX HAS -- IT'S
20      EXTREMELY PREJUDICIAL.
21                 MR. ISMAIL:   DR. MORRISON HAS A PATENT FOR THE USE
22      OF VIOXX IN TREATING COLON CANCER.  HE DESIGNED THE VICTOR
23      TRIAL, WHICH WAS AN OUTCOME MORTALITY TRIAL ON CANCER.  HE WAS
24      KNOWN FOR THE APPROVE STUDY, AND VIOXX DOES HAVE STATISTICALLY
25      SIGNIFICANT EFFICACY IN THE REDUCTION OF PRECANCEROUS POLYPS SO
page 1605
1       ALL THAT AND HE'S FAMILIAR WITH IT AS AN ONCOLOGIST.
2                  THE COURT:  IT'S A QUESTION OF FACT TO SOME EXTENT.
3       THERE HAS BEEN SOME TESTIMONY THAT CANCER FOR SOME PEOPLE
4       ASSOCIATED WITH SOME OF THE INFORMATION, THAT THIS DRUG MAY
5       HAVE SOME EFFECT OVER THE USE OF INFLAMMATION, THEREFORE MAY
6       HAVE SOME EFFECT ON CANCER, BUT IT'S AN EARLY STAGE AND I'LL
7       LET YOU GO ON CROSS-EXAMINATION.  IT IS SOMEWHAT IRRELEVANT IN
8       THIS SITUATION.  SO LET'S NOT SPEND A LOT OF TIME.
9                  MR. RAFFERTY:  THANK YOU, YOUR HONOR.
10      BY MR. ISMAIL:
11      Q.   DOCTOR YOU DESCRIBED YOUR BACKGROUND AS AN ONCOLOGIST, HOW
12      DID YOU, WHEN YOU CAME TO MERCK, END UP ON THE VIOXX TEAM WITH
13      YOUR BACKGROUND?
14      A.   SO WE TALKED ABOUT WHEN I WENT TO MEDICAL SCHOOL, WE ONLY
15      THOUGHT THERE WAS ONE CYCLOOXYGENASE, AND EVENTUALLY WE FOUND
16      OUT THERE WERE TWO.  WELL, ONE OF THE SCIENTISTS WHO WAS ONE OF
17      THE FIRST ONES TO IDENTIFY THIS SECOND FORM WAS A CANCER
18      RESEARCHER.  AND WHAT THE CANCER RESEARCHER WAS TRYING TO
19      FIGURE OUT WAS ARE -- IS THERE ANYTHING AT ALL IN A CANCER CELL
20      THAT'S NOT IN A NORMAL CELL.  AND HIS LOGIC WAS, IF THERE IS A
21      SPECIFIC MACHINERY IN A CANCER CELL THAT'S NOT IN A NORMAL
22      CELL, MAYBE I CAN MAKE A DRUG AGAINST THAT, AND THAT WOULD
23      TREAT CANCER WITHOUT DAMAGING NORMAL CELLS.  AND WHEN HE WENT
24      LOOKING FOR THINGS THAT ARE IN CANCER CELLS BUT NOT NORMAL
25      CELLS HE FOUND COX-2.
page 1606
1                  SO AT THE VERY BEGINNING OF THE DISCOVERY OF COX-2,
2       THERE WERE PEOPLE WHO THOUGHT THAT COX-2 ACTUALLY HAD SOMETHING
3       TO DO WITH THE FORMATION OF CANCER, AND THERE WERE RESEARCH
4       SCIENTISTS AT MERCK WORKING ON THIS.  THERE WERE RESEARCH
5       SCIENTISTS ALL OVER THE WORLD WORKING ON THIS.  A COLLEAGUE OF
6       MINE AND I EVENTUALLY FILED A PATENT AND OBTAINED THE PATENT
7       FOR THE USE OF VIOXX TO PREVENT PROSTATE CANCER.
8                  AND WHEN I CAME TO MERCK, I REMEMBER MY INTERVIEW
9       WITH ALAN NIES, WHO SAID TO ME, THERE IS THIS WHOLE IDEA THAT
10      THESE THINGS MIGHT WORK IN CANCER.  AS PART OF YOUR ASSIGNMENT
11      HERE, WE WOULD LIKE YOU TO, YOU KNOW, LOOK INTO THAT AND HELP
12      US THINK ABOUT HOW WE MIGHT BE ABLE EITHER PROVE THAT'S TRUE OR
13      NOT TRUE.
14      Q.   AND DID YOU WORK DESIGNING CLINICAL TRIALS THAT WOULD
15      HOPEFULLY ADDRESS THAT QUESTION?
16      A.   YES.
17      Q.   AND WHAT TRIAL WAS THAT?
18      A.   THE BIGGEST ONE THAT I WORKED ON WAS A TRIAL CALLED
19      VICTOR.  AND VICTOR WAS A TRIAL THAT WE WORKED WITH A GROUP IN
20      ENGLAND TO SET UP.  AND THE TRIAL WAS, AGAIN, ONE OF THESE
21      OUTCOMES TRIALS.  WHAT IT WAS PEOPLE WHO HAD COLON CANCER, THEY
22      WOULD HAVE SURGERY, THEY WOULD RECEIVE CHEMOTHERAPY, WHATEVER
23      THE STANDARD OF CARE WAS IN ENGLAND AT THE TIME, AND THEN THEY
24      WOULD BE RANDOMIZED TO VIOXX VERSUS PLACEBO.  AND THE QUESTION
25      WAS, COULD VIOXX PREVENT THEM FROM HAVING THEIR CANCER COME
page 1607
1       BACK?
```

**Trial and Hearing Transcript Excerpts**

• Opposition to Generic MIL

```
2    Q.   IN YOUR WORK WITH THE RESEARCHERS IN ENGLAND, WHAT WAS THE
3    HOPED-FOR PROMISE WITH THAT THERAPY?
4    A.   PEOPLE WERE PRETTY EXCITED ABOUT COX-2'S, COX-2 INHIBITORS
5    AS A POTENTIAL EFFECTIVE CANCER THERAPY, AND CERTAINLY FROM A
6    SAFETY POINT OF VIEW, COMPARED TO THE TRADITIONAL CANCER
7    MEDICINES, THEY HAVE A LOT OF SIDE EFFECTS, IF THIS WERE TRUE
8    THAT THIS COULD PREVENT OR TREAT CANCER, PEOPLE WERE VERY
9    EXCITED IT.
10   Q.   AND ULTIMATELY WERE YOU ABLE TO GET AN ANSWER TO THAT
11   QUESTION IN THE VICTOR TRIAL?
12   A.   NO, THE VICTOR TRIAL WAS STOPPED EARLY WHEN THE DRUG WAS
13   TAKEN OFF THE MARKET.
```

[1605:2] - [1605:8]   2/14/2006   Plunkett II Trial - Vol. 07 - Morrison, Weeks, Pacetti, Rayburn

```
page 1605
2          THE COURT:   IT'S A QUESTION OF FACT TO SOME EXTENT.
3    THERE HAS BEEN SOME TESTIMONY THAT CANCER FOR SOME PEOPLE
4    ASSOCIATED WITH SOME OF THE INFORMATION, THAT THIS DRUG MAY
5    HAVE SOME EFFECT OVER THE USE OF INFLAMMATION, THEREFORE MAY
6    HAVE SOME EFFECT ON CANCER, BUT IT'S AN EARLY STAGE AND I'LL
7    LET YOU GO ON CROSS-EXAMINATION.   IT IS SOMEWHAT IRRELEVANT IN
8    THIS SITUATION.   SO LET'S NOT SPEND A LOT OF TIME.
```

[1608:3] - [1608:7]   2/14/2006   Plunkett II Trial - Vol. 07 - Morrison, Weeks, Pacetti, Rayburn

```
page 1608
3    A.   IT WAS STOPPED WHEN VIOXX WAS TAKEN OFF THE MARKET, YES.
4    Q.   AND THE FDA, THE DRUG VIOXX HAD NEVER BEEN APPROVED TO BE
5    MARKETED AS ANYTHING IN TERMS OF CURE FOR CANCER; IS THAT
6    CORRECT?
7    A.   THAT'S CORRECT.
```

[2056:] - [2056:25]   2/16/2006   Plunkett II Trial - v.09 - Reicin, A-Lowe, SchirmerA, Wheeler

```
page 2056
         2056
1                        UNITED STATES DISTRICT COURT
2                        EASTERN DISTRICT OF LOUISIANA
3
4
5
         IN RE: VIOXX PRODUCTS          *
6        LIABILITY LITIGATION           *     MDL DOCKET NO. 1657
                                         *
7                                        *
         THIS DOCUMENT RELATES TO        *     NEW ORLEANS, LOUISIANA
8        CASE NO. 05-4046:               *
                                         *
9        EVELYN IRVIN PLUNKETT, ET AL    *     FEBRUARY 16, 2006
                                         *
10       VERSUS                          *
                                         *     8:30 A.M.
11       MERCK & CO., INC.               *
         * * * * * * * * * * * * * * * * *
12
13
                         VOLUME IX - DAILY COPY
14                       JURY TRIAL BEFORE THE
                         HONORABLE ELDON E. FALLON
15                       UNITED STATES DISTRICT JUDGE
16
17       APPEARANCES:
18
         FOR THE PLAINTIFF:          BEASLEY ALLEN CROW METHVIN
19                                   PORTIS & MILES
                                     BY:  ANDY D. BIRCHFELD, JR., ESQ.
```

Trial and Hearing Transcript Excerpts

• Opposition to Generic MIL

```
20                                      LEIGH O'DELL, ESQ.
                                     234 COMMERCE STREET
21                                   POST OFFICE BOX 4160
                                     MONTGOMERY, ALABAMA 36103
22
23        FOR THE PLAINTIFF:         LEVIN, PAPANTONIO, THOMAS,
                                        MITCHELL, ECHSNER & PROCTOR
24                                   BY:  TROY RAFFERTY, ESQ.
                                     316 SOUTH BAYLEN STREET, SUITE 600
25                                   PENSACOLA, FLORIDA 32502
```

[2199:22] - [2202:5]    2/16/2006    Plunkett II Trial - v.09 - Reicin, A-Lowe, SchirmerA, Wheeler

```
page 2199
22        Q.   IS THERE AN EXCEPTION TO THE RULE OF GETTING APPROVAL OF
23        YOUR NEW LABEL BEFORE YOU CAN USE IT?
24        A.   WELL, THERE IS THIS PROCESS CALLED CHANGES BEING EFFECTED,
25        AND THERE ARE BASICALLY TWO PARTS TO THAT.  ONE IS YOU CAN --
page 2200
1         IF IT'S A VERY MINOR CHANGE, YOU CAN NOTIFY FDA AND CHANGE THE
2         LABEL.  THEN THERE'S ANOTHER CBE THAT REQUIRES A 30-DAY WAITING
3         PERIOD TO GIVE FDA TIME TO REVIEW AND SAY "YES" OR "NO" BEFORE
4         INSTITUTING A CHANGE.  BUT MOSTLY THE CHANGES ARE DONE AS WHAT
5         ARE CALLED PRIOR APPROVAL SUBMISSIONS, WHICH IS YOU SEND THE
6         INFORMATION TO FDA AND YOU WAIT UNTIL THEY SAY YES BEFORE
7         CHANGING THE LABEL.
8         Q.   DID YOU HANDLE THE CBE EXCEPTIONS TO THAT RULE WHEN YOU
9         WERE AT THE FDA?
10        A.   YES, I RECEIVED SOME OF THOSE.
11        Q.   NOW, DOES THE FDA HAVE SPECIFIC REGULATIONS DEALING WITH
12        THE CBE EXCEPTION?
13        A.   YES.  FDA HAS SPECIFIC REGULATIONS DEALING WITH ALL
14        ASPECTS OF ITS REGULATION OF MEDICAL PRODUCTS.
15        Q.   NOW, HAS THE FDA ALSO PUBLISHED, IN ADDITION TO THE
16        REGULATIONS, SOMETHING KNOWN AS A GUIDANCE FOR INDUSTRY THAT
17        LETS DRUG COMPANIES KNOW WHEN A CBE IS AND IS NOT APPROPRIATE?
18        A.   RIGHT.
19        Q.   WHAT DOES THE GUIDANCE FOR INDUSTRY SAY ABOUT WHEN A CBE
20        IS APPROPRIATE?
21        A.   IT SAYS FOR MINOR CHANGES LIKE CHANGES IN DATES -- I CAN'T
22        REMEMBER EXACTLY THE EXAMPLES -- AND THEN WHAT ARE CALLED
23        MODERATE CHANGES.  I KNOW IT HAS EXAMPLES.  I CAN'T REMEMBER
24        THEM RIGHT OFF THE TOP OF MY HEAD, BUT THEY BASICALLY
25        DIFFERENTIATE IT INTO MINOR, WHICH IS "YOU CAN JUST LET US KNOW
page 2201
1         AND DO IT," AND THE MODERATE, WHICH HAVE THIS 30-DAY WAITING
2         PERIOD.
3         Q.   SO IN BOTH MINOR AND MODERATE CHANGES A CBE IS
4         APPROPRIATE?
5         A.   YES.
6         Q.   WHEN IS A CBE NOT APPROPRIATE, ACCORDING TO THE FDA'S
7         GUIDANCE?
8         A.   WELL, WHEN YOU ARE MAKING MAJOR CHANGES TO THE LABEL.
9         Q.   NOW, WOULD INCLUDING EITHER ALL OF THE DATA FROM VIGOR OR
10        JUST THE CARDIOVASCULAR DATA IN THE LABEL HAVE BEEN A MINOR OR
11        MODERATE CHANGE OR WOULD IT HAVE BEEN A MAJOR CHANGE?
12        A.   WELL, IN MY OPINION, IT WOULD HAVE BEEN A MAJOR CHANGE.
13        IT WAS AN UNAPPROVED POPULATION.  IT WAS AN UNAPPROVED DOSE,
14        AND A DOSE THAT ACTUALLY WAS NEVER SOUGHT APPROVAL FOR CHRONIC
15        USE, AND IT WAS VERY COMPLEX DATA.  I DON'T BELIEVE THAT FDA
16        WOULD HAVE PERMITTED A CBE.  I CAN'T IMAGINE.  I CAN'T IMAGINE
17        A COMPANY WOULD SUGGEST A CBE AND I CAN'T IMAGINE THAT FDA
18        WOULD PERMIT IT.
19        Q.   WHEN YOU SAY IT'S AN UNAPPROVED DOSE IN AN UNAPPROVED
20        POPULATION, CAN YOU JUST EXPLAIN THAT BRIEFLY?
21        A.   WELL, THE VIGOR TRIAL WAS IN PEOPLE WITH RHEUMATOID
22        ARTHRITIS AT A CHRONIC DOSE OF 50 MILLIGRAMS A DAY.  THAT WAS
23        NOT A POPULATION INDICATION -- RHEUMATOID ARTHRITIS AT THAT
```

**Trial and Hearing Transcript Excerpts**

• Opposition to Generic MIL

```
24        TIME WAS NOT AN INDICATION THAT WAS APPROVED FOR VIOXX, AND A
25        50-MILLIGRAM DOSE WAS ONLY APPROVED FOR SHORT-TERM USE.  THE
page 2202
1         COMPANY ACTUALLY NEVER SOUGHT APPROVAL FOR CHRONIC USE AT THAT
2         DOSE.
3         Q.   SO RATHER THAN SUBMITTING A CBE, DID MERCK SUBMIT A LABEL
4         CHANGE THROUGH THE PRIOR APPROVAL PROCESS?
5         A.   YES.  THEY SUBMITTED A SUPPLEMENTAL NDA.
```

[2202:16] - [2202:23]    2/16/2006   Plunkett II Trial - v.09 - Reicin, A-Lowe, SchirmerA, Wheeler

```
page 2202
16        Q.   NOW, DOES THE FDA'S DENIAL OF A PRIORITY REVIEW INDICATE
17        ANYTHING TO YOU ABOUT WHETHER A CBE WOULD HAVE BEEN
18        APPROPRIATE?
19        A.   WELL, NOT ONLY THE FACT THAT THEY DENIED PRIORITY REVIEW,
20        WHICH MEANS IT'S JUST A COMPRESSED REVIEW TIME, BUT THEY
21        ACTUALLY DIDN'T RESPOND TO MERCK'S PROPOSED LABEL CHANGES FOR
22        ANOTHER YEAR AND A HALF.  SO I THINK THE IDEA THAT YOU COULD DO
23        THIS BY CBE IS NOT REASONABLE.
```

[2205:15] - [2205:22]    2/16/2006   Plunkett II Trial - v.09 - Reicin, A-Lowe, SchirmerA, Wheeler

```
page 2205
15        Q.   NOW, HOW DOES MERCK'S EXPERIENCE WITH THE 1999 WARFARIN
16        CBE IMPACT YOUR OPINION AS TO WHETHER A CBE WOULD HAVE BEEN
17        APPROPRIATE FOLLOWING THE VIGOR RESULTS?
18        A.   WELL, I THINK IF YOU LOOK AT THE CHANGES THAT WERE
19        EFFECTED EVENTUALLY IN THE LABEL HAVING TO DO WITH VIGOR AND
20        COMPARE IT TO THE CHANGES PROPOSED HERE IN 1999, TO ME IT
21        REINFORCES MY OPINION THAT THE VIGOR LABEL WOULD NOT HAVE BEEN
22        APPROPRIATE FOR A CBE.
```

[2206:2] - [2206:13]    2/16/2006   Plunkett II Trial - v.09 - Reicin, A-Lowe, SchirmerA, Wheeler

```
page 2206
2         Q.   DOES THE FACT THAT THE FDA CONVENED AN ADVISORY COMMITTEE
3         SIGNIFY ANYTHING TO YOU ABOUT WHETHER A CBE WOULD HAVE BEEN
4         APPROPRIATE?
5         A.   WELL, NOT ONLY THE FACT THAT AN ADVISORY COMMITTEE WAS
6         CONVENED, BUT ALSO THE DISCUSSIONS IN THE ADVISORY COMMITTEE
7         MADE IT VERY CLEAR THAT THE VIGOR DATA ARE QUITE COMPLICATED
8         AND NOT STRAIGHTFORWARD.  SO IT FURTHER REINFORCES THE FACT TO
9         ME THAT A CBE WOULD NOT HAVE BEEN APPROPRIATE.  I WANT TO SAY,
10        IF FDA THOUGHT THAT A CBE WAS APPROPRIATE, THEY CAN ASK A
11        COMPANY TO SUBMIT INFORMATION AS A CBE.  FDA IS NOT POWERLESS
12        IN THIS.  THEY CAN REQUEST LABELING CHANGES WHEN THEY FEEL IT'S
13        APPROPRIATE.
```

[2215:16] - [2215:21]    2/16/2006   Plunkett II Trial - v.09 - Reicin, A-Lowe, SchirmerA, Wheeler

```
page 2215
16        Q.   WELL, LET'S JUST SCROLL THROUGH THE LABEL SO WE CAN GET A
17        SENSE OF WHAT'S HIGHLIGHTED.  NOW, LOOKING AT THE HIGHLIGHTED
18        PORTIONS THAT WERE CHANGED, WHAT DOES THAT TELL YOU ABOUT
19        WHETHER A CBE WOULD HAVE BEEN APPROPRIATE IN THIS CASE?
20        A.   WELL, A LABEL CHANGE THAT EXTENSIVE WOULD NEVER BE
21        CONSIDERED APPROPRIATE FOR A CBE.
```



## UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 05-4046* | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| EVELYN IRVIN PLUNKETT | * | |
| as Personal Representative of the Estate of | * | |
| RICHARD IRVIN, JR., | * | |
| | * | |
|      Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
|      Defendant. | * | |
| | * | |

* * * * * * * * * * * * * * * * *

## OPPOSITION OF MERCK & CO., INC. ("MERCK") TO PLAINTIFF'S MOTION TO EXCLUDE OPINION TESTIMONY THAT MERCK COULD NOT PROVIDE RISK INFORMATION THROUGH LABELING OR MARKETING WITHOUT PRIOR APPROVAL OF THE FEDERAL FOOD AND DRUG ADMINISTRATION

Citing two district court preemption cases, both decided on case-specific factual analyses, plaintiff seeks to preclude Merck from offering expert testimony on whether Merck needed prior FDA approval to change its label and whether Merck acted appropriately in connection with the proposed label modification for Vioxx®. Setting aside whether those cases were correctly

EXHIBIT
2A
Blumberg No. 6119

M002A17989

decided, they do not govern the admissibility of the proposed expert testimony based on the facts of this case.

Here, the jury will decide, among other things, whether Merck acted reasonably in: (1) submitting the VIGOR trial results to the FDA and seeking prior approval for its proposed label change; and (2) disseminating information on the alleged risks of Vioxx while its application for a label change was pending before the FDA. The testimony offered by former FDA official Dr. Janet Arrowsmith-Lowe bears directly on those issues.[1]

## I.   WHETHER MERCK NEEDED PRIOR FDA APPROVAL TO CHANGE THE VIOXX LABEL IS PROPERLY DETERMINED BASED ON THE SPECIFIC FACTS OF THIS CASE.

The FDA regulations governing labeling that were in effect in 2000 (when Merck was first unblinded to the VIGOR results) provided, subject to certain exceptions, that for "[a]ny change in labeling" a pharmaceutical company was required to "submit a supplement, and obtain FDA approval of it, before making the changes." 21 C.F.R. § 314.70(b)(3). The regulations further provided, as an exception to the general rule, that among the changes that could be made without first obtaining FDA pre-approval were changes "[t]o add or strengthen a contra-indication, warning, precaution, or adverse reaction." 21 C.F.R. § 314.70(c)(2)(i). This regulation is commonly referred to as the "Changes Being Effected" or "CBE" regulation.

Citing *Witczak v. Pfizer, Inc.*, 377 F. Supp. 2d 726 (D. Minn. 2005), and *Cartwright v. Pfizer, Inc.*, 369 F. Supp. 2d 876 (E.D. Tex. 2005), plaintiff argues that the CBE regulation established a hard-and-fast rule that, no matter what the nature or complexity of the safety

---

[1]   Plaintiff's motion mentions Dr. David Silver's opinion on the adequacy of the warnings on the Vioxx label (Pl.'s Motion to Exclude Opinion Testimony That Merck Could Not Provide Risk Information Through Labeling or Marketing Without Prior Approval of the Federal Food and Drug Administration ("Mot.") at 3.) Since Dr. Silver does not opine on FDA requirements or what Merck could do, or on Merck's interaction with the FDA, there is nothing to exclude.

M002A17990

information at issue, a pharmaceutical company as a matter of law always could proceed to change its label to add or strengthen a warning or precaution without awaiting the FDA's agreement, and that Merck therefore should be precluded from presenting contrary evidence here.

The CBE regulation and cases cited by plaintiff do not bear the weight plaintiff places on them.  Interpreting 21 C.F.R. § 314.70(c)(2)(1) to allow a pharmaceutical company to bypass the FDA approval process whenever it wanted to add or strengthen a warning or precaution would be contrary to the FDA's interpretation of the CBE regulation as reflected in its official guidance, the FDA's application of the CBE regulation in practice, and existing case law,.  In fact, whether a pharmaceutical company may avail itself of the CBE procedure to change its label without first consulting the FDA is a fact-driven determination based on the circumstances of each individual labeling change.

First, the FDA's official guidance document interpreting the CBE regulation is at odds with plaintiff's interpretation.  The FDA's official guidance addressing labeling changes for an existing drug, issued in November 1999, divides proposed labeling changes into three categories: "major," "moderate," and "minor."  (FDA, *Guidance for Industry; Changes to an Approved NDA or ANDA* ("Guidance") at 24-25, attached as Ex. 32 to Declaration of Phillip A. Wittmann in Support of Merck's Opposition Briefs ("Wittmann Decl.").)  "Major" changes to the label include, but are not limited to, changes based on post-marketing study results (including changes associated with new indications and usage) and changes to the clinical pharmacology or clinical studies section of the label.  Major changes may not be made using the CBE procedure, but instead *must* be submitted as a prior approval supplement and FDA approval obtained before the

3

M002A17991

label change is made. (*Id.* at 24; Declaration of J. Paul Waymack, M.D. ("Waymack Decl.") at ¶ 12.)

The Guidance provides that it is only the more "moderate" changes that may be made using the CBE procedure, including changes to add to the label safety information that does not fall within the scope of a "major" change. (Guidance at 24-25.). *See also* Brief for the FDA as *Amicus Curiae* Supporting Respondents at 5-6, *Dowhal v. SmithKline Beecham Consumer Healthcare*, 122 Cal. Rptr. 2d 246 (Ct. App. 2002) (No. A094460), ("Unless the proposed changes are minor, an applicant typically submits labeling changes in a pre-approval supplement. . . . [I]n actual practice, only minor product labeling changes, like an editorial change, deletion of an ingredient affecting only the color of a drug product, or changes in the container or closure system for the drug product are generally made without FDA's prior approval."), *rev'd*, 32 Cal. 4th 910 (2004); *id.* at 24 ("[A] drug manufacturer's use of the 'changes being effected' supplement is generally limited to circumstances involving noncontroversial labeling changes.").[2]   Thus, the FDA Guidance interpreting the CBE regulation flatly contradicts plaintiff's reading of the CBE regulation that a pharmaceutical company always is free to add or strengthen a warning or precaution using the CBE regulation; instead, whether a prior approval supplement or a CBE is appropriate depends on the type of change at issue.[3]

Second, plaintiff's argument that a pharmaceutical company always is free to use the CBE regulation to bypass FDA pre-approval to add or strengthen a warning or precaution is inconsistent with the FDA's application of the CBE procedure in practice. For example, Merck's

---

[2]   Minor changes – those that are trivial and in no way affect drug safety – can be made to the label without FDA pre-approval and reported on an annual basis. (Guidance at 25; Waymack Decl. at ¶ 10.)

[3]   The current FDA regulations governing labeling actually adopt the categories of "major," "moderate," and "minor" changes in the text of the labeling regulations themselves. *See* 21 C.F.R. §314.70.

4

M002A17992

own prior experience with the FDA on a separate Vioxx labeling issue demonstrates that a pharmaceutical company is *not* always permitted to use the CBE regulation to strengthen its label without prior FDA approval.  On October 6, 1999, five months before the VIGOR data was unblinded to Merck, Merck submitted to the FDA a CBE labeling change that would have strengthened the Precautions section of the Vioxx label to include information from its post-marketing experience with the concurrent administration of Vioxx and Warfarin, a blood-thinning drug.  (Declaration of Lisa D. Rarick, M.D. ("Rarick Decl.") at ¶ 9; *see* Oct. 6, 1999 NDA 21-042: Vioxx (rofecoxib tablets), Special Supplement – Changes Being Effected, from Eric A. Floyd, PhD., Merck Research Laboratories, to the Food and Drug Association, attached as Ex. 30 to Wittmann Decl.)  On October 28, 1999, the FDA rejected Merck's CBE submission stating: "Changes of the kind that you have proposed *are not the kind of changes permitted by regulation to be put into effect prior to approval of a supplement.*"  *See* Oct. 28, 1999 Letter from Anthony Zeccola, Food and Drug Administration, to Eric A. Floyd, PhD., Merck Research Laboratories (emphasis added), attached as Ex. 31 to Wittmann Decl.  Thus, the FDA's statement about Merck's proposed Warfarin CBE confirms what is reflected in the case law, in the FDA's interpretation of its own regulation in its official guidance, and in its application of the CBE regulation in practice – the regulation is not appropriate for any and all safety labeling changes, but instead, only for those that are minor and non-controversial.  (Rarick Decl. at ¶¶ 9, 12.)

Merck has submitted testimony from three former FDA medical officers, with a combined 30+ years of experience at the FDA in applying FDA's labeling regulations (in addition to many years working as consultants to pharmaceutical companies interacting directly with the FDA on labeling issues), that the CBE regulation is not appropriate for all labeling

M002A17993

changes that would add safety information to a label and, indeed, could not have been used on the facts of this case to incorporate the VIGOR results into the Vioxx label.   Dr. Janet Arrowsmith-Lowe was a medical epidemiologist and medical review officer at the FDA for approximately 11 years, and was acting Director of the Office of Surveillance and Biometrics, Center for Devices and Radiologic Health at FDA for another 3 years.  (Expert Report of Janet Arrowsmith-Lowe, M.D., F.A.C.P. ("Arrowsmith-Lowe Report") at 2, attached as Ex. 15 to Wittmann Decl.)  Dr. Lisa Rarick worked for 15 years at the FDA as, among other positions, a medical review officer, Division Director, Deputy Director, and Associate Director for Quality Assurance in the Office of the Center Director.   (Rarick Decl. at ¶ 2.)  Dr. Paul Waymack worked as a medical review officer at the FDA and has been employed for the last 10 years as a consultant to pharmaceutical companies, including work developing and submitting product labeling and labeling amendments.  (Waymack Decl. at ¶¶ 4-5.)

All of these former FDA officials agree that use of the CBE procedure is not appropriate in all circumstances where labeling needs to be changed to incorporate new safety information. (*See* Arrowsmith-Lowe Report at 8 ("There are narrow circumstances in which a manufacturer is permitted to change its labeling without FDA's prior approval but those circumstances were not present here.  The VIGOR trial presented a highly complex data set, involving thousands of patients, from multiple clinical sites in a patient population for which Vioxx did not yet have an approved indication and with a dose that had not yet been approved for chronic use."); Rarick Decl. at ¶¶ 5-6 ("Based on my experience, the CBE process is intended to implement relatively minor changes or changes that do not require the analysis or interpretation of data.  If a proposed label change requires an amendment that incorporates the interpretation or analysis of data, the FDA wants that type of change submitted as a prior approval supplement, not a CBE.");

6

M002A17994

Waymack Decl. at ¶14 ("In contrast to changes based upon spontaneous adverse event reports –
that is changes based upon limited data – changes based upon data from clinical trials require
more in depth analyses: both by the sponsor and the FDA. . . . As a result of the complexity of
such data, for changes to the labeling based upon results – results other than isolated adverse
events – from clinical trials, the FDA's accepted position on the proper method of changes being
made to capture such data is to submit proposed changes to the FDA as major changes.").)

Third, the case law does not support plaintiff's reading of the CBE regulation. The cases
plaintiff cites do not establish a sweeping rule that safety information always may be added to a
label without the permission of the FDA. To the contrary, a number of courts, on the facts of
their specific cases, have held that pharmaceutical companies could not unilaterally have
changed their labels. For example, in *Ehlis v. Shire Richwood, Inc.,* the court concluded that
"[t]he FDA dictates the contents of the label" and that "defendants were prohibited from
changing [the drug label] without prior approval from the FDA, except in limited circumstances
for a limited period of time." 233 F. Supp. 2d 1189, 1198 (D.N.D. 2002); *see also Brooks v.
Howmedica, Inc.,* 273 F. 3d 785, 796 (8th Cir. 2001) (considering analogous provision governing
label changes for medical devices and concluding that the drug company "may not unilaterally
make such changes [to add new safety information to its labeling] under federal law").
Similarly, the court in *Kanter v. Warner-Lambert Co.,* citing the same regulations as the *Witczak*
and *Cartwright* courts, recognized that "changes in the labeling generally require a
supplementary application and approval by the FDA" and "Warner-Lambert also was not free to
devise any label of its choosing." 99 Cal. App. 4th 780, 793-94 (2002); *See also Reiter v.
Zimmer Inc.,* 897 F. Supp. 154, 157 (S.D.N.Y. 1995) (finding the manufacturer "could make no
change in the design, manufacture or label affecting the safety of [the medical device] without

7

the prior review and approval of the FDA"); *Dusek v. Pfizer, Inc.*, No. Civ.A. H-02-3559, 2004 WL 2191804, at *9 (S.D. Tex. Feb. 20, 2004) (concluding that the label could not unilaterally have been changed to include a warning of a causal relationship between the drug and an adverse event).

Finally, the FDA regulations are clear – and plaintiff does not dispute – that even if a pharmaceutical company is permitted to make a labeling change without prior FDA approval using the CBE regulation, it simultaneously must submit the change to the FDA. *See* 21 C.F.R. § 314.70(c) ("An applicant shall submit a supplement at the time the applicant makes any kind of change listed below in the conditions in an approved application. . . ."). The FDA then has the ability to reject the CBE, and require that the pharmaceutical company submit the labeling change as a prior approval supplement, just as it did with Merck's Warfarin CBE. (*See* Rarick Decl. ¶8 ("During my 15 years at FDA, I never saw a company successfully submit new clinical trial data unilaterally through the CBE process. Indeed, the few times when companies attempted to make such changes unilaterally, the FDA rejected the new labels and required the submission of a prior approval supplement.").) Plaintiff advances no argument – because there is none – that expert testimony that the FDA would have rejected any attempt to include the VIGOR results in the Vioxx label through a CBE somehow is inconsistent with FDA law or regulation. To the contrary, the law is crystal clear that the FDA at all times remains the ultimate arbiter of the contents of the label.

## II.   MERCK'S EXPERT TESTIMONY WILL ASSIST THE JURY IN DETERMINING WHETHER MERCK ACTED APPROPRIATELY IN CONNECTION WITH THE PROPOSED LABEL MODIFICATION.

Court decisions such as the *Witczak* and *Cartwright* decisions cited by plaintiff, which analyze whether entire claims are preempted, do not purport to address what expert testimony should be admissible at trial. Generally, the FDA's labeling decisions and the pharmaceutical

8

M002A17996

company's disclosures to the FDA cannot be second-guessed by a plaintiff or the jury. *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350, 353 (2001) (claims of fraud on the FDA preempted by FDCA). To the extent plaintiff is going to be permitted to question the FDA's labeling decisions for Vioxx, Merck must be allowed to present expert evidence on the reasonableness of its actions. Dr. Arrowsmith-Lowe's testimony will be of assistance to the jury in assessing Merck's conduct in light of the FDA regulations.

Dr. Arrowsmith-Lowe will testify that the FDA regulates virtually every aspect of the research, development, marketing, and promotion of prescription drugs in the United States. Based on her nearly 15 years of work at the FDA, Dr. Arrowsmith-Lowe undisputedly has the expertise to assist the jury in understanding the process by which the FDA "extensively regulates the contents and wording" of a drug's label. *See Hurley v. Lederle Labs.*, 863 F.2d 1173, 1179 (5th Cir. 1989). Under a complex and detailed framework, most changes to a drug's label require prior approval from FDA. (Arrowsmith-Lowe Report at 3.) Dr. Arrowsmith-Lowe's testimony will assist the jury with the complex factual issues that it will need to analyze – for example, the jury will need to determine whether adding a description of the VIGOR trial to the Vioxx package insert was a "major" change requiring the FDA's advance approval or a "moderate" change that could be made without first consulting the FDA.

Dr. Arrowsmith-Lowe will testify that the proposed changes based on the VIGOR trial fall squarely within the category of major changes requiring FDA prior approval. (Arrowsmith-Lowe Report at 8-9; *see also* Waymack Decl. at ¶ 18; Rarick Decl. at ¶ 8.) As described by Dr. Arrowsmith-Lowe, "the VIGOR trial involved a highly complex data set, involving thousands of patients, from multiple clinical sites in a patient population for which VIOXX® did not yet have an approved indication and with a dose that had not yet been approved for chronic use." It

9

M002417997

would not have been appropriate for Merck to craft a label conveying this complex data without the FDA's input. (Arrowsmith-Lowe Report at 8; *see also* Rarick Decl. at ¶ 7.) Expert testimony will assist the jury in understanding this complicated process, including why the proposed labeling change was a major change, the multiple variables that Merck and the FDA needed to consider when analyzing any proposed label change, and why Merck acted reasonably and appropriately in the circumstances presented.

In addition, Dr. Arrowsmith-Lowe will explain that in order for the cardiovascular results of the VIGOR trial to be meaningful to physicians – *i.e.,* useful for making informed prescribing decisions – they required explanation in the label. It was, for example, necessary to describe the design of the VIGOR study, including the fact that VIGOR was a GI Outcomes trial that was primarily designed to compare the effects of Vioxx and naproxen on the gastrointestinal system. It was likewise important to explain that VIGOR compared twice the dose of Vioxx approved for chronic use with a common therapeutic dose of naproxen and that the study was conducted in a rheumatoid arthritis population. *Id.* Without including this information in the label, the cardiovascular findings would have been meaningless and, arguably, misleading to physicians. Brief for the United States as *Amicus Curiae* Supporting Defendant-Appellee and Cross-Appellant at 18-19, *Motus v. Pfizer,* 358 F.3d 659 (9th Cir. 2004) (Nos. 02-55372, 02-55498) ("The manufacturer's inclusion of a false or misleading warning misbrands the product *per se*."). Inclusion of this important contextual information in the package insert required prior FDA approval, providing an independent reason why use of the CBE procedure would have been

10

M002A17998

inappropriate here. *Id.* at 18; (*see* Arrowsmith-Lowe Report at 8-9; Waymack Decl. at ¶¶ 14-18.)[4]

Dr. Arrowsmith-Lowe also will opine that the precise significance of the VIGOR data was not easily discernable. (*See* Arrowsmith-Lowe Report at 8.) The FDA required time to analyze the data to ensure that its significance was portrayed correctly in the label. Merck promptly submitted the VIGOR results to FDA in March 2000, within two weeks of learning the results itself. The FDA did not request that Merck submit a CBE or take other regulatory action to disseminate the VIGOR results. Indeed, in May 2000, an FDA official stated that Vioxx was labeled appropriately, indicating that there was no need to change the label on an expedited basis. After Merck submitted a proposed revised label in June 2000, FDA, in fact, rejected Merck's request for a more rapid, priority review of the proposed revised label. (*Id.* at 9.) In February, 2001, the FDA convened an Advisory Committee of outside experts to assist it in evaluating the data from the VIGOR trial and a trial involving another drug in Vioxx's class,

---

[4]    Plaintiff also argues that the VIGOR test findings should have been included as a "warning." (*See* Mot. at 5.) A warning is required for "serious adverse reactions and potential safety hazards" with a drug. 21 C.F.R. § 201.57(e). The FDA, however, placed the new cardiovascular data in the "precautions" section of the Vioxx label when it approved the new package insert, and described their "significance" as "unknown." Plaintiff therefore should be precluded from arguing that the VIGOR results should have been reflected in the "warnings" section of the label. To the extent plaintiff is permitted to argue that Merck and the FDA were wrong and that the VIGOR results should have been included in the warnings section, the jury would benefit from expert testimony on this complicated issue. A package insert must be revised to include a warning as soon as there is "reasonable evidence of an association of a serious hazard with a drug." *Id.* The VIGOR trial did not provide such evidence. It involved two arms with active ingredient treatments, both arms consisted of patients in a population for which Vioxx was not approved for use, and the Vioxx arm was receiving twice the normal therapeutic dose. It was widely accepted that the circumstances of the trial made it impossible to determine whether the disparity in myocardial infarction rates resulted from a cardiovascular risk of one product or a cardioprotective benefit of the other. The findings therefore did not satisfy the legal standard for a "warning," and expert testimony can help clarify this point.

11

M002A17999

Celebrex.  (Rarick Decl. at ¶ 7), and thereafter requested emerging data from ongoing Vioxx trials.  The resulting label, approved in April 2002, reflected extensive revisions to several different sections of the label.

In sum, Dr. Arrowsmith-Lowe will testify that, although the FDA regulations do provide a procedure for making changes to a drug label in certain circumstances without prior FDA approval, that procedure was not appropriate here.  (Arrowsmith-Lowe Report at 8; *see also* Waymack Decl. at ¶ 18.)   Merck is entitled to offer such expert opinions regarding the appropriateness of its actions.  *See Feldman v. Lederle Labs.*, 625 A.2d 1066, 1070 (N.J. 1993) (Although FDA regulations did not prevent the defendant from placing a warning on the drug label while awaiting FDA approval, defendant's "attempt to comply with existing FDA regulations still bears on the reasonableness of its conduct.   The fact issue for the jury was whether a reasonable drug manufacturer with the same knowledge [the drug manufacturer] had [at the time] would have placed a . . . warning on [the drug's] packaging in addition to corresponding with the FDA."); *see also McNeil Pharm. v. Hawkins*, 686 A.2d 567, 582-83 (D.C. Ct. App. 1996) (explaining importance of expert testimony for interpretation and application of the regulations in a drug labeling case).

Finally, Dr. Arrowsmith-Lowe will testify that federal law also governed what Merck could say about Vioxx while its labeling application was pending with the FDA.  She will offer her opinion, base on her experience at the FDA and as a consultant to the pharmaceutical industry, that Merck disseminated the VIGOR results in appropriate ways.  Merck presented the data at scientific conferences, issued several press releases, and provided the data in response to unsolicited questions from healthcare professionals.  Significantly, a group of researchers published the study in the New England Journal of Medicine, a peer-reviewed medical journal

12

article that is widely read by physicians. (Arrowsmith-Lowe Report at 6-7; *see also* Expert Report of David S. Silver, M.D. at 12-13 (discussing ways that the VIGOR test results were disseminated throughout the medical community), attached as Ex. 21 to Wittmann Decl.) Merck is entitled to present expert testimony regarding whether these disclosures were appropriate in light of FDA regulations. Jurors cannot reasonably be expected to analyze these complex issues without the assistance of an expert in the field.

## III. CONCLUSION.

For all of the foregoing reasons, Merck respectfully requests that the Court deny Plaintiff's Motion to Exclude Opinion Testimony that Merck Could Not Provide Risk Information Through Labeling or Marketing Without Prior Approval of the Federal Food and Drug Administration.

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone: 504-581-3200
Fax:   504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois 60610
Phone: 312-494-4400
Fax:   312-494-4440

13

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Phone: (202) 434-5000
Fax:     (202) 434-5029

And

John H. Beisner
Charles C. Lifland
Richard B. Goetz
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone: (213) 430-6000
Fax:     (213) 430-6407

Attorneys for Merck & Co., Inc.

M002A18002

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Opposition of Merck & Co., Inc. to Plaintiff's Motion to Exclude Opinion Testimony That Merck Could Not Provide Risk Information Through Labeling or Marketing Without Prior Approval of the Federal Food and Drug Administration has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 2nd day of November, 2005.

Phil Wittmann

M002A16003

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 05-4046* | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| EVELYN IRVIN PLUNKETT | * | |
| as Personal Representative of the Estate of | * | |
| RICHARD IRVIN, JR., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

* * * * * * * * * * * * * * * * * *

OPPOSITION OF MERCK & CO., INC. ("MERCK") TO PLAINTIFF'S
MOTION IN LIMINE TO PRECLUDE ANY TESTIMONY
OR DISCUSSION BY DEFENDANT THAT IT COULD NOT HAVE
AMENDED THE VIOXX® LABEL OR ISSUED STRENGTHENED
WARNINGS WITHOUT PRIOR FDA APPROVAL

(MOTION IN LIMINE NO. 6)

The jury will decide, among other things, whether Merck acted reasonably in submitting

the VIGOR trial results to the FDA and seeking prior approval for its proposed label change.

Testimony from former FDA officials and Merck employees related to the application of FDA

EXHIBIT
2B

Blumberg No. 5119

790942v.1

regulations to Merck's conduct bears directly on this issue. Such testimony is highly probative evidence that does not pose any risk to plaintiff of undue prejudice, confusion of issues, misleading the jury, undue delay, or waste of time. To the contrary, Merck will be prejudiced if it is *not* permitted to support its defense with such testimony.

I.   **WHETHER MERCK NEEDED PRIOR FDA APPROVAL TO CHANGE THE VIOXX LABEL IS PROPERLY DETERMINED BASED ON THE FACTS OF THIS CASE.**

The FDA regulations governing labeling that were in effect in 2000 (when Merck was first unblinded to the VIGOR results) provided that for "[a]ny change in labeling" a pharmaceutical company was required to submit a supplement, and obtain FDA approval . . . before distribution of the product with the labeling change." 63 FR 66375, 66394 (referring to 21 C.F.R. 314.70(b)(3)(i) (in effect in 2000) – Supplements and other changes to an approved application). The regulations further provided, as an exception to the general rule, that a company could make a change without FDA pre-approval "[t]o add or strengthen a contra-indication, warning, precaution, or adverse reaction." 21 C.F.R. § 314.70(c)(6)(iii)(A). This regulation is commonly referred to as the "Changes Being Effected" or "CBE" regulation.

Plaintiff argues that the CBE regulation established a hard-and-fast rule that, no matter what the nature or complexity of the safety information at issue, a pharmaceutical company can, as a matter of law, change its label to add or strengthen a warning or precaution without FDA preapproval, and that the Court should preclude Merck from presenting contrary evidence here. The CBE regulation and cases cited by plaintiff do not bear the weight plaintiff places on them. Interpreting 21 C.F.R. § 314.70(c)(2)(1) to allow a pharmaceutical company to bypass the FDA approval process whenever it wanted to add or strengthen a warning or precaution would be contrary to the FDA's interpretation of the CBE regulation as reflected in its official guidance, the FDA's application of the CBE regulation in practice, and existing case law. In fact, whether

2

a pharmaceutical company may avail itself of the CBE procedure to change its label without first consulting the FDA is a fact-driven determination based on the circumstances of each individual labeling change.

First, the FDA's official guidance document interpreting the CBE regulation is at odds with plaintiff's interpretation. The FDA's official guidance addressing labeling changes for an existing drug, issued in November 1999, divides proposed labeling changes into three categories: "major," "moderate," and "minor." (FDA, *Guidance for Industry; Changes to an Approved NDA or ANDA* ("Guidance") at 24-25, attached as Ex. 32 to Declaration of Phillip A. Wittmann in Support of Merck's Opposition Briefs, filed November 2, 2005 ("Wittmann 11/2/05 Decl.").) "Major" changes to the label include, but are not limited to, changes based on post-marketing study results (including changes associated with new indications and usage) and changes to the clinical pharmacology or clinical studies section of the label. The CBE procedure cannot be used to make major changes, they instead *must* be submitted as a prior approval supplement and FDA approval obtained before the label change is made. (*Id.* at 24; Declaration of J. Paul Waymack, M.D., Sc.D. ("Waymack Decl.") at ¶ 12, filed November 2, 2005.)

The Guidance provides that it is only the more "moderate" changes that may be made using the CBE procedure, including changes to add to the label safety information that does not fall within the scope of a "major" change. (Guidance at 24-25.). *See also* Amicus Curiae Brief for the United States in Support of Defendants/Respondents Smithkline, 2003 WL 23527781, at *10-11, filed in *Dowhal v. SmithKline Beecham Consumer Healthcare*, 100 Cal. App. 4th 8 (Ct. App. 2002) (Unless the proposed changes are minor, "[a]n applicant typically submits substantive labeling changes in a pre-approval supplement. . . . [I]n actual practice, only minor product labeling changes, like an editorial change, deletion of an ingredient affecting only the

3

color of a drug product, or changes in the container or closure system for the drug product are generally made without FDA's prior approval."), *rev'd*, 32 Cal. 4th 910 (2004); *id.*, at *31 ("[A] drug manufacturer's use of the 'changes being effected' supplement is generally limited to circumstances involving noncontroversial labeling changes.").[1]   Thus, the FDA Guidance interpreting the CBE regulation flatly contradicts plaintiff's reading of the CBE regulation that a pharmaceutical company always is free to add or strengthen a warning or precaution using the CBE regulation; instead, whether a prior approval supplement or a CBE is appropriate depends on the type of change at issue.[2]

Second, plaintiff's argument that a pharmaceutical company always is free to use the CBE regulation to bypass FDA pre-approval to add or strengthen a warning or precaution is inconsistent with the FDA's application of the CBE procedure in practice.  For example, Merck's own prior experience with the FDA on a separate Vioxx labeling issue demonstrates that a pharmaceutical company is *not* always permitted to use the CBE regulation to strengthen its label without prior FDA approval.  On October 6, 1999, five months before the VIGOR data was unblinded to Merck, Merck submitted to the FDA a CBE labeling change that would have strengthened the Precautions section of the Vioxx label to include information from its post-marketing experience with the concurrent administration of Vioxx and Warfarin, a blood-thinning drug.  (Declaration of Lisa D. Rarick, M.D. ("Rarick Decl.") at ¶ 9, filed November 2, 2005; *see* Oct. 6, 1999 NDA 21-042: Vioxx (rofecoxib tablets), Special Supplement – Changes Being Effected, from Eric A. Floyd, PhD., Merck Research Laboratories, to the Food and Drug

---

[1] Minor changes – those that are trivial and in no way affect drug safety – can be made to the label without FDA pre-approval and reported on an annual basis. (Guidance at 25; Waymack Decl. at ¶ 10.)

[2] The current FDA regulations governing labeling actually adopt the categories of "major," "moderate," and "minor" changes in the text of the labeling regulations themselves.  *See* 21 C.F.R. § 314.70.

4

790942v.1

Association, attached as Ex. 30 to Wittmann 11/2/05 Decl.)  On October 28, 1999, the FDA

rejected Merck's CBE submission stating:  "Changes of the kind that you have proposed *are not*

*the kind of changes permitted by regulation to be put into effect prior to approval of a*

*supplement.*"  (*See* Oct. 28, 1999 Letter from Anthony Zeccola, Food and Drug Administration,

to Eric A. Floyd, Ph.D., Merck Research Laboratories (emphasis added), attached as Ex. 31 to

Wittmann 11/2/05 Decl.)  Thus, the FDA's statement about Merck's proposed Warfarin CBE

confirms what is reflected in the case law, in the FDA's interpretation of its own regulation in its

official guidance, and in its application of the CBE regulation in practice – the regulation is not

appropriate for any and all safety labeling changes, but instead, only for those that are minor and

non-controversial. (Rarick Decl. at ¶¶ 9, 11.)

Merck plans to submit testimony from a former FDA medical officer, with many years of

experience at the FDA in applying FDA's labeling regulations, that the CBE regulation is not

appropriate for all labeling changes that would add safety information to a label and, indeed,

could not have been used on the facts of this case to incorporate the VIGOR results into the

Vioxx label.  This testimony will support Merck's defense that the CBE procedure is not

appropriate in all circumstances where labeling is changed to incorporate new safety

information. (*See* Expert Report of Janet Arrowsmith-Lowe, M.D. ("Arrowsmith-Lowe Report")

at 8, attached as Ex. 15 to Wittmann 11/2/05 Decl. ("There are narrow circumstances in which a

manufacturer is permitted to change its labeling without FDA's prior approval but those

circumstances were not present here.  The VIGOR trial presented a highly complex data set,

involving thousands of patients, from multiple clinical sites in a patient population for which

Vioxx did not yet have an approved indication and with a dose that had not yet been approved

for chronic use."); *see also* Waymack Decl. at ¶ 14 ("In contrast to changes based upon

5

spontaneous adverse event reports – that is changes based upon limited data – changes based upon data from clinical trials require more in depth analyses: both by the sponsor and the FDA. . . . As a result of the complexity of such data, for changes to the labeling based upon results – results other than isolated adverse events – from clinical trials, the FDA's accepted position on the proper method of changes being made to capture such data is to submit proposed changes to the FDA as major changes."); (Rarick Decl. at ¶¶ 5-8 (plaintiff's "contention is based on a fundamental misunderstanding of FDA policy, procedure, and practice.").)

Finally, the FDA regulations are clear – and plaintiff does not dispute – that even if a pharmaceutical company is permitted to make a labeling change without prior FDA approval using the CBE regulation, it simultaneously must submit the change to the FDA. *See* 21 C.F.R. § 314.70(c) (stating supplement must be filed even for changes implemented under (c)(6)(iii)); *see also* 21 C.F.R. § 314.70(7). The FDA then has the ability to reject the CBE, and require that the pharmaceutical company submit the labeling change as a prior approval supplement, just as it did with Merck's Warfarin CBE. (*See* Rarick Decl. ¶ 8 ("During my 15 years at FDA, I never saw a company successfully submit new clinical trial data unilaterally through the CBE process. Indeed, the few times when companies attempted to make such changes unilaterally, the FDA rejected the new labels and required the submission of a prior approval supplement.").) Plaintiff advances no argument – because there is none – that testimony or other evidence that the FDA would have rejected any attempt to include the VIGOR results in the Vioxx label through a CBE somehow is inconsistent with FDA law or regulation. To the contrary, the law is clear that the FDA at all times remains the ultimate arbiter of the contents of the label.

## II. MERCK'S TESTIMONY IS HIGHLY RELEVANT TO THE JURY'S DETERMINATION OF WHETHER MERCK ACTED APPROPRIATELY IN CONNECTION WITH THE PROPOSED LABEL MODIFICATION.

The court decisions cited by plaintiff, which analyze either whether entire claims are preempted or whether, in the specific facts of that case, a party could have changed the label without FDA approval, do not purport to address what testimony or evidence should be admissible at trial. Generally, the FDA's labeling decisions and the pharmaceutical company's disclosures to the FDA cannot be second-guessed by a plaintiff or the jury. *Buckman Co. v. Pls' Legal Comm.*, 531 U.S. 341, 350, 353 (2001) (claims of fraud on the FDA preempted by FDCA). To the extent plaintiff is going to be permitted to question the FDA's labeling decisions for Vioxx, Merck must be allowed to present evidence on the reasonableness of its actions.

Specifically, Merck will present testimony that the FDA regulates virtually every aspect of the research, development, marketing, and promotion of prescription drugs in the United States and that most changes to a drug's label require prior approval from FDA. (Arrowsmith-Lowe Report at 3.) This testimony is relevant to the complex factual issues the jury will need to analyze – for example, the jury will need to determine whether adding a description of the VIGOR trial to the Vioxx package insert was a "major" change requiring the FDA's advance approval or a "moderate" change that could be made without first consulting the FDA.

Merck's testimony, presented through former FDA officials, will be that the proposed changes based on the VIGOR trial fall squarely within the category of major changes requiring FDA prior approval. (Arrowsmith-Lowe Report at 8-9; *see also* Waymack Decl. at ¶ 18.) As described by Dr. Arrowsmith-Lowe, "the VIGOR trial presented a highly complex data set, involving thousands of patients, from multiple clinical sites in a patient population for which VIOXX® did not yet have an approved indication and with a dose that had not yet been approved for chronic use." It would not have been appropriate for Merck to craft a label

7

790942v.1

conveying this complex data without the FDA's input.  (Arrowsmith-Lowe Report at 8.)  The jury can then assess: (1) whether it believes that the proposed labeling change was a major change; (2) the importance of multiple variables that Merck and the FDA needed to consider when analyzing any proposed label change; and (3) whether it believed Merck acted reasonably and appropriately in the circumstances presented.

In addition,  Merck will present testimony that for the cardiovascular results of the VIGOR trial to be meaningful to physicians – *i.e.*, useful for making informed prescribing decisions – they required an explanation in the label.  It was, for example, necessary to describe the design of the VIGOR study, including the fact that VIGOR was a GI Outcomes trial that was primarily designed to compare the effects of Vioxx and naproxen on the gastrointestinal system. It was likewise important to explain that VIGOR compared twice the dose of Vioxx approved for chronic use with a common therapeutic dose of naproxen and that the study was conducted in a rheumatoid arthritis population.  *Id.*  Without including this information in the label, the cardiovascular findings would have been meaningless and, arguably, misleading to physicians. Brief for the United States as *Amicus Curiae* Supporting Defendant-Appellee and Cross-Appellant, 2002 WL 32303084, at *18-19, (filed in *Motus v. Pfizer*, 358 F.3d 659 (9th Cir. 2004) (Nos. 02-55372, 02-55498)) ("The manufacturer's inclusion of a false or misleading warning misbrands the product *per se*.").  Inclusion of this important contextual information in the package insert required prior FDA approval, providing an independent reason why use of the CBE procedure would have been inappropriate here.  *Id.* at 18; (*see* Arrowsmith-Lowe Report at 8-9; Waymack Decl. at ¶¶ 14-18.)[3]

---

[3] Plaintiff also argues that the VIGOR test findings should have been included as a "warning." (*See* Plaintiff's Motion in Limine to Preclude any Testimony or Discussion by Defendant That it Could Not Have Amended the Vioxx Label or Issued Strengthened Warnings Without Prior

790942v.1

Part of Merck's defense will be that FDA approval was required because the VIGOR data was not easily discernable. (*See* Arrowsmith-Lowe Report at 8.)  The FDA required time to analyze the data to ensure that its significance was portrayed correctly in the label.  Merck promptly submitted the VIGOR results to FDA in March 2000, within two weeks of learning the results itself.  The FDA did not request that Merck submit a CBE or take other regulatory action to disseminate the VIGOR results.  Indeed, in May 2000, an FDA official stated that Vioxx was labeled appropriately, indicating that there was no need to change the label on an expedited basis.  After Merck submitted a proposed revised label in June 2000, FDA, in fact, rejected Merck's request for a more rapid, priority review of the proposed revised label.  (*Id.* at 9.)  In February 2001, the FDA convened an Advisory Committee of outside experts to assist it in evaluating the data from the VIGOR trial and a trial involving another drug in Vioxx's class, Celebrex.  (Rarick Decl. at ¶ 7), and thereafter requested emerging data from ongoing Vioxx trials.  The resulting label, approved in April 2002, reflected extensive revisions to several different sections of the label.

Merck is entitled to present evidence to support its defense that, although the FDA regulations do provide a procedure for making changes to a drug label in certain circumstances without prior FDA approval, that procedure was not appropriate here.  (Arrowsmith-Lowe

---

FDA Approval ("Mot.") at 7-8.)  A warning is required for "serious adverse reactions and potential safety hazards" with a drug. 21 C.F.R. § 201.57(e).  The FDA, however, placed the new cardiovascular data in the "precautions" section of the Vioxx label when it approved the new package insert, and described their "significance" as "unknown."  Merck is entitled to present testimony that the VIGOR trial did not provide evidence sufficient to mandate a warning. It involved two arms with active ingredient treatments, both arms consisted of patients in a population for which Vioxx was not approved for use, and the Vioxx arm was receiving twice the normal therapeutic dose.  It was widely accepted that the circumstances of the trial made it impossible to determine whether the disparity in myocardial infarction rates resulted from a cardiovascular risk of one product or a cardioprotective benefit of the other.  The findings therefore did not satisfy the legal standard for a "warning", and testimony related to this issue is relevant.

9

790942v.1

Report at 8; *see also* Waymack Decl. at ¶ 18.)  *See Feldman v. Lederle Labs.*, 625 A.2d 1066, 1070 (N.J. 1993) (*Feldman I*) (Although FDA regulations did not prevent the defendant from placing a warning on the drug label while awaiting FDA approval, defendant's "attempt to comply with existing FDA regulations still bears on the reasonableness of its conduct.  The fact issue for the jury was whether a reasonable drug manufacturer with the same knowledge [the drug manufacturer] had [at the time] would have placed a . . . warning on [the drug's] packaging in addition to corresponding with the FDA."); *see also McNeil Pharm. v. Hawkins*, 686 A.2d 567, 582-83 (D.C. Ct. App. 1996) (explaining importance of expert testimony for interpretation and application of the regulations in a drug labeling case).

## III.    PLAINTIFF'S CASE LAW DOES NOT SUPPORT HER INTERPRETATION OF THE CBE REGULATION.

The cases plaintiff cites do not establish a sweeping rule that safety information always may be added to a label without the permission of the FDA.  To the contrary, a number of courts, on the facts of their specific cases, have held that pharmaceutical companies could not unilaterally change their labels.  For example, in *Ehlis v. Shire Richwood, Inc.*, the court concluded that "[t]he FDA dictates the contents of the label" and that "defendants were prohibited from changing [the drug label] without prior approval from the FDA, except in limited circumstances for a limited period of time."  233 F. Supp. 2d 1189, 1198 (D.N.D. 2002), *aff'd*, 367 F.3d 1013 (8th Cir. 2004); *see also Brooks v. Howmedica, Inc.*, 273 F. 3d 785, 796 (8th Cir. 2001) (considering analogous provision governing label changes for medical devices and concluding that the drug company "may not unilaterally make such changes [to add new safety information to its labeling] under federal law").  Similarly, the court in *Kanter v. Warner-Lambert Co.* recognized that "changes in the labeling generally require a supplementary application and approval by the FDA" and "Warner-Lambert also was not free to devise any

10

label of its choosing." 99 Cal. App. 4th 780, 794, 796 (2002); *See also Reiter v. Zimmer Inc.*, 897 F. Supp. 154, 157 (S.D.N.Y. 1995) (finding the manufacturer "could make no change in the design, manufacture or label affecting the safety of [the medical device] without the prior review and approval of the FDA"); *Dusek v. Pfizer, Inc.*, No. Civ.A. H-02-3559, 2004 WL 2191804, at *9 (S.D. Tex. Feb. 20, 2004) (concluding that the label could not unilaterally have been changed to include a warning of a causal relationship between the drug and an adverse event).

More importantly, the cases cited by plaintiff do not govern the *admissibility* of the proposed testimony based in this case. Most were cases addressing whether the plaintiffs' claims should be preempted or otherwise decided as a matter of law. *See Witczak v. Pfizer, Inc.* 377 F. Supp. 2d 726 (D. Minn. 2005) (deciding preemption issue); *Cartwright v. Pfizer, Inc.*, 369 F. Supp. 2d 876 (E.D. Tex. 2005) (same); *Madden v. Wyeth*, No. 3-03-CV-0167-BD, 2005 WL 2278081 (N.D. Tex. Sept. 14, 2005) (denying defendant's motion for summary judgment). In none of the cases was the court asked to consider whether the drug company could defend its actions to a jury by offering testimony as to why it believed its conduct conformed to FDA regulations or was otherwise reasonable. Nor did any of the cases involve a situation where, like here, the proposed change would require an extensive explanation to make it accurate. *See id.*; *Ohler v. Purdue Pharma, L.P.*, No. CIV. A 01-3061, 2002 WL 88945 (E.D. La. Jan. 22, 2002).

Two companion cases from the New Jersey Supreme Court illustrate why this procedural difference is important. In *Feldman v. Lederle Labs.*, 125 N.J. 134 (1991) (*Feldman II*) the court held that plaintiff's strict liability claims against a drug manufacturer were not preempted by FDA regulations. On a subsequent appeal, the New Jersey Supreme Court held that although the FDA regulations did not prevent the defendant in that case from placing a warning on the drug label while awaiting FDA approval, as a matter of law, defendant's "attempt to comply with

11

790942v.1