existing FDA regulations still bears on the reasonableness of its conduct." *See Feldman v. Lederle Labs.*, 132 N.J. 339, 347-48 (1993) ("*Feldman III*"). "The fact issue for the jury was whether a reasonable drug manufacturer with the same knowledge [the drug manufacturer] had [at the time] would have placed a [] warning on [the drug's] packaging in addition to corresponding with the FDA." *Id.* The court found error in the instruction that did not leave room for the jurors to find that defendant's decision not to warn above and beyond its compliance with FDA regulations was reasonable. *Id.* at 347.

Here, the jury will decide whether Merck acted reasonably in submitting the VIGOR trial results to the FDA and seeking prior approval for its proposed label change. To reach its decision, the jury is entitled to understand all of the regulations governing Merck's conduct, and Merck is entitled to explain to the jury why, under this regulatory scheme, it took the actions it did to ensure that the Vioxx label was changed in a timely and accurate manner. To that end, Merck is entitled to offer testimony from experts and fact witnesses that will assist the jury in assessing Merck's conduct in light of the complex FDA regulations. *See McNeil Pharm.*, 686 A.2d at 582-83 (explaining importance of expert testimony for interpretation and application of the regulations in a drug labeling case). The cases cited by plaintiff do not suggest otherwise.

## IV.   THE RELEVANCE OF MERCK'S TESTIMONY RELATED TO LABELING REGULATIONS IS NOT OUTWEIGHED BY ANY POSSIBLE CONFUSION OR PREJUDICE TO PLAINTIFF.

Plaintiff argues that Merck's testimony about why it sought the FDA's preapproval of its label change is misleading and would confuse and prejudice the jury by suggesting that the changes to the Vioxx label were not Merck's responsibility, but the FDA's. (Mot. at p. 1, 9 (citing FED. R. EVID. 402, 403).) It is undeniable that Merck is constrained to operate within federal regulations that govern its conduct. Merck simply seeks to defend its actions by explaining the limits placed upon it and why it acted reasonably within those limits. Testimony

12

or argument relating to the application of FDA regulations to Merck's situation is clearly relevant and probative of whether Merck acted reasonably when it sought FDA approval of its label instead of making such a change unilaterally. FED. R. EVID. 401 (relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"). Because testimony regarding the regulations governing label changes is relevant to Merck's defense, the only prejudice that would result is if Merck is deprived of its opportunity to present that aspect of its defense.

## III.   CONCLUSION.

For all of the foregoing reasons, Merck respectfully requests that the Court deny Plaintiff's Motion In Limine To Preclude Any Testimony Or Discussion By Defendant That It Could Not Have Amended The Vioxx Label Or Issued Strengthened Warnings Without Prior FDA Approval.

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone: 504-581-3200
Fax:    504-581-3361

Defendants' Liaison Counsel

790942v.1

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois 60610
Phone: 312-494-4400
Fax:    312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Phone: (202) 434-5000
Fax:    (202) 434-5029

And

John H. Beisner
Charles C. Lifland
Richard B. Goetz
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone: (213) 430-6000
Fax:    (213) 430-6407

Attorneys for Merck & Co., Inc.

790942v.1

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Opposition to Plaintiff's Motion *in Limine* to

Preclude Any Testimony or Discussion by Defendant That it Could Not Have Amended the

Vioxx Label or Issued Strengthened Warnings Without Prior FDA Approval (Motion *in Limine*

No. 6) has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand

delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by

electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-

Trial Order No. 8, on this 11th day of November, 2005.

790942v.1

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **In re: VIOXX** | **MDL Docket No. 1657** |
| **PRODUCTS LIABILITY LITIGATION** | **SECTION L** |
| **This document relates to**<br>**Case No. 05-4046** | **JUDGE FALLON** |
| **EVELYN IRVIN PLUNKETT**<br>as Personal Representative of the Estate of<br>**RICHARD IRVIN, JR.,** | **MAGISTRATE JUDGE KNOWLES** |
| Plaintiff, | |
| vs. | |
| **MERCK & CO., INC.,** | |
| Defendant. | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MOTION OF DAVID ANSTICE AND MERCK & CO., INC. ("MERCK") TO QUASH SUBPOENA

David Anstice and Merck move to quash plaintiff's trial subpoena of Mr. Anstice to testify at the *Plunkett* trial. Plaintiff's subpoena exceeds the jurisdictional limitations on the Court's trial subpoena power under Rule 45. The MDL statute does not expand this authority.

EXHIBIT

3

Blumberg No. 5119

## I.     BACKGROUND

Mr. Anstice resides in Montgomery County, Pennsylvania.  Anstice Dep. 894:19-895:10 (excerpt attached hereto as Exhibit 1).  Mr. Anstice is the President of Human Health for Japan, Australia, and New Zealand at Merck.  By virtue of his position, he spends a great deal of his time traveling overseas, particularly in Asia.

Plaintiffs deposed Mr. Anstice for a total of five days and on videotape.  Plaintiff lawyers asked questions, including lawyers from the PSC.  Plaintiff in this case has designated over 1500 pages of Mr. Anstice's deposition for use at trial.  Wittmann Decl. ¶ 4.

On November 17, 2005 plaintiff purported to serve a trial subpoena for Mr. Anstice to appear in Houston for the *Plunkett* trial.  *Id.* ¶3.  Plaintiff served the subpoena without prior agreement at the offices of Merck's counsel in New Orleans.  *Id.*

## II.     ARGUMENT

### A.     David Anstice Is Beyond The Reach Of This Court's Subpoena Power Under Rule 45(b)(2)

Federal Rule 45 governs the scope of this Court's subpoena power.  Rule 45(a)(2) states that a "subpoena commanding attendance at a trial or hearing shall issue from the court for the district in which the hearing or trial is to be held."  Fed R. Civ. P. 45(a)(2).  The subpoena to Mr. Anstice commands his appearance at the *Plunkett* trial.  The *Plunkett* trial will take place in Houston, which is in the Southern District of Texas.

Rule 45(b)(1) requires that plaintiff serve a subpoena on a witness "by delivering a copy [of the subpoena] to such person."  Fed. R. Civ. P. 45(b)(1).  Rule 45(b)(2) then sets out where a subpoena "may be served."  It states:

> Subject to the provisions of clause (ii) of subparagraph (c)(3)(A) of this rule, a subpoena <u>may be served</u> at any place within the district of the court by which it is

2

> issued, or at any place without the district that is within 100 miles of the place of
> the deposition, hearing, trial, production, or inspection specified in the subpoena
> or at any place within the state where a state statute or rule of court permits
> service of a subpoena issued by a state court of general jurisdiction sitting in the
> place of the deposition, hearing, trial, production, or inspection specified in the
> subpoena.

Fed. R. Civ. Proc. 45(b)(2) (emphasis added).  Rule 45(b)(2) defines the outermost boundaries of

a court's trial subpoena power to the borders of the state the court sits in *and* those places "within

100 miles of the place of the ... trial ...."

Mr. Anstice is not within the State of Texas, nor is he within 100 miles of the courthouse

in Houston where the *Plunkett* trial will take place.  Therefore, plaintiff cannot serve Mr. Anstice

with a trial subpoena under Rule 45(b)(2).

### B.  Rule 45(c)(3)(A) Does Not Extend The Geographic Limits Of The Court's Subpoena Power

Rule 45(c)(3)(A) details certain circumstances in which a court "shall quash or modify a

subpoena" and does not affect this analysis. Rule 45(c)(3)(A) states:

> On timely motion, the court by which a subpoena was issued <u>shall</u>
> <u>quash or modify</u> the subpoena if it
>
> (i) fails to allow reasonable time for compliance;
>
> (ii) requires a person who is not a party or an officer of a party to
> travel to a place more than 100 miles from the place where that
> person resides, is employed, or regularly transacts business in
> person, except that, subject to the provisions of clause (c)(3)(B)(iii)
> of this rule, such a person may in order to attend trial be
> commanded to travel from any such place within the state in which
> the trial is held, or
>
> (iii) requires disclosure of privileged or other protected matter and
> no exception or waiver applies, or
>
> (iv) subjects a person to undue burden.

Fed. R. Civ. P. 45(c)(3)(A) (emphasis added)  Under Rule 45(c)(3)(A)(ii) a court must quash or modify a subpoena that requires a non-party witness to travel more than 100 miles – even if service is proper under Rule 45(b)(2).[1]  This provision provides additional protections for witnesses that are not parties or officers as the following example illustrates:

If the plaintiff in a Houston trial wished to call a witness living in Dallas, Rule 45(b)(2) permits *service* on the witness because such service would be within the same state.  If the witness was not the defendant or an officer of the defendant, Rule 45(c)(3)(A)(ii) would require the court to "quash or modify" the trial subpoena.  Rule 45(c)(3)(A)(ii) would apply because the trial subpoena in this example would require the witness to *travel* more than 100 miles in order to testify in Houston.  However, if the witness was an officer of the defendant, Rule 45(c)(3)(A)(ii) would not apply and the plaintiff could compel the witness to travel from Dallas to Houston to give trial testimony.

Mr. Anstice is not in Texas, nor is he within 100 miles of the courthouse.  Therefore plaintiff cannot properly serve him under Rule 45(b)(2).  And because Mr. Anstice is an officer of Merck, Rule 45(c)(3)(A)(ii) does not apply.  Plaintiff may nevertheless argue that Rule 45(c)(3)(A)(ii) creates a system of nationwide service for officers of parties.  As discussed above, that argument misreads the rule.  *See Johnson v. Land O'Lakes, Inc.,* 181 F.R.D. 388, 396-397 (N.D. Iowa 1998) (officer of defendant was beyond the subpoena power of Rule 45(b)(2) because he lived and worked beyond a 100 mile radius of the location of the trial); *Jamsports and Entm't, LLC v. Paradama Prods., Inc.,* No. 02 C2298, 2005 WL 14917, at *1

---

[1] Under Rule 45(c)(3)(A)(iii) and Rule 45(c)(3)(B) a court may still command a non-party witness to travel over 100 miles *within* a state to testify at trial if in its discretion the court determines that the "party in whose behalf the subpoena is issued shows a substantial need for the testimony .. that cannot otherwise be met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonable compensated ...." Fed. R. Civ. P. 45(c)(3)(B).

(N.D. Ill. Jan. 3, 2005) ("Nothing in the history or adoption of Rule 45(c)(3)(A) suggests that it was intended to alter the longstanding geographic limitations on the reach of a district court's subpoena power."); *see also* 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2461 (2d ed. 2005) ("The 100-mile limit applies to a party as well as to an ordinary witness.") While other courts have held that Rule 45 allows such nationwide service of officers,[2] this Court should follow the *Land O'Lakes* and *Jamsports* decisions.

## C. The Expanded Discovery Powers Of An MDL Court Do Not Apply To Trial Subpoenas

This motion does not relate to the Court's role in this multi-district litigation. An MDL court has expanded discovery subpoena power under 28 U.S.C. § 1407. This expanded power applies only for pretrial proceedings. Specifically, § 1407 gives judges the "powers of a district judge in any district <u>for the purpose of conducting pretrial depositions in such coordinated or consolidated pretrial proceedings</u>." 28 U.S.C. § 1407(b) (emphasis added). These expanded powers do not apply to trial subpoenas. *See In re Air Crash Disaster at Detroit Metropolitan Airport on August 16, 1987*, 130 F.R.D. 647, 648 (E.D. Mich. 1989) (MDL court did not have the power to compel the trial testimony of a defendant's employees who were located outside of the jurisdiction at a trial).

MDL courts have special authority to conduct pre-trial proceedings in cases filed in transferor courts. In *Lexecon, Inc. et al. v. Milberg Weiss Bershad Hynes & Lerach et al.*, 523 U.S. 26, 39-41 (1998), the Supreme Court held that transferee courts do not have authority to try those cases. For this reason, the parties have cooperated in this case by dismissing and re-filing

---

[2] *See, e.g., Archer Daniels Midland Co. v. Aon Risk Servs., Inc.*, 187 F.R.D. 578, 587-88 (D. Minn. 1999); *Stone v. Morton Int'l, Inc.*, 170 F.R.D. 498, 500-501 (D. Utah 1997).

cases in the Eastern District of Louisiana. As a result of Hurricane Katrina and the relocation of the trial to Houston, this court has the power to conduct its business outside of the Eastern District of Louisiana. Federal Judiciary Emergency Special Sessions Act of 2005, Pub. L. No. 109-63 § 2(b) (Sept. 9, 2005). Therefore, Merck did not contest plaintiff's subpoena of Alan Nies, a former Merck employee residing within 100 miles of the Houston courthouse.

The MDL statute does not confer additional subpoena authority on this Court. The legislative history confirms that the MDL statute is directed to pre-trial proceedings only. "The proposed statute affects only the pretrial stages in multidistrict litigation." H.R. REP. NO. 1130, 90th Cong., 2d Sess., p. 3-4 (1968); *see also Lexecon Inc. et al., v. Milberg Weiss Bershad Hynes & Lerach et al.,* 523 U.S. 26, 39-40 (1998) (quoting H.R. REP. NO. 1130). Where Congress has decided that nationwide service is appropriate, Congress has provided for such service. *See, e.g.,* 15 U.S.C. § 23 (authorizing nationwide service of subpoenas in antitrust suits brought by the United States). No such statute provides additional trial subpoena powers for an MDL court trying a case filed in the transferee court.

## III.   CONCLUSION

For the foregoing reasons, Merck and Mr. Anstice respectfully request that the Court quash plaintiff's trial subpoena of Mr. Anstice.

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.

6

4041 Essen Lane
One United Plaza, Suite 501
Baton Rouge, Louisiana 70809
Phone:  225-490-8900
Fax:     225-490-8960

Defendants' Liaison Counsel

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:     312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone:  (202) 434-5000
Fax:     (202) 434-5029

And

John H. Beisner
Charles C. Lifland
Richard B. Goetz
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone:  (213) 430-6000
Fax:     (213) 430-6407

Attorneys for Merck & Co., Inc.

7

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Motion to Quash Plaintiff's Subpoena has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 19th day of November, 2005.

8

# Exhibit 1

```
1                SUPERIOR COURT OF NEW JERSEY
                 LAW DIVISION - ATLANTIC COUNTY
2                     - - -
        IN RE:  VIOXX LITIGATION      CASE NO. 619
3       ------------------------------------------------
                 CAUSE NO. 19961*BH02
4                     - - -
        CAROL ERNST, INDIVIDUALLY  : IN THE DISTRICT COURT OF
5       AND AS PERSONAL           :
        REPRESENTATIVE OF THE      :
6       ESTATE AND HEIRS OF ROBERT :
        CHARLES ERNST, DECEASED;   :
7       R. CHARLES ERNST;          :
        ANGELA F. ERNST,           : BRAZORIA COUNTY, TEXAS
8             v.                   :
        MERCK & CO., INC.,         :
9       HARVEY RESNICK, M.D. AND   :
        R/D CLINICAL RESEARCH,     :
10      INC., BRENT H. WALLACE     :
        M.D.                 : 23RD JUDICIAL DISTRICT
11      ------------------------------------------------
        PHILIP & CYNTHIA DiPIETRO  : COURT OF COMMON PLEAS
12         (h/w)           : DELAWARE COUNTY
              Plaintiffs,   :
13            v.            :
        MERCK & CO., INC.,         :
14            AND           :
        ROBERT F. CROWELL, D.O.,   :
15            AND           :
        BROOKHAVEN MEDICAL      : CIVIL ACTION
16      ASSOCIATES           : NO: 04-19198
        ------------------------------------------------
17            IN THE COURT OF COMMON PLEAS
              PHILADELPHIA COUNTY, PENNSYLVANIA
18                    - - -
        DAVID SCHRAMM and       : FEBRUARY TERM, 2005
19      CAROL SCHRAMM, h/w       :
              Plaintiffs,   :
20            v.            :
        MERCK & CO., INC.,         :
21         Defendant.    : NO. 2554
                      - - -
22                CONFIDENTIAL
              SUBJECT TO PROTECTIVE ORDER
23                    - - -
                 March 18, 2005
24                    - - -
        Continued videotape deposition of DAVID W. ANSTICE.
25
```

Page 664



```
1                    - - -
                  CONFIDENTIAL
2           SUBJECT TO PROTECTIVE ORDER
                    - - -
3
4        Continued videotape deposition of DAVID W.
5   ANSTICE, held in the offices of Morgan, Lewis &
6   Bockius, LLP, 1701 Market Street, Philadelphia,
7   Pennsylvania, commencing at 9:05 a.m., on the above
8   date, before Linda Rossi Rios, a Federally Approved
9   Registered Professional Reporter and Notary Public
10  of the Commonwealth of Pennsylvania.
11
12
13
14
15
16
17
18
19
20
21
22
23        ESQUIRE DEPOSITION SERVICES
                15th Floor
24      1880 John F. Kennedy Boulevard
         Philadelphia, Pennsylvania 19103
25          (215) 988-9191
```

1    2:51 p.m.)

2                - - -

3              VIDEOGRAPHER:  We're back on.  2:51.

4              - - -

5              EXAMINATION

6              - - -

7    BY MR. BALEFSKY:

8         Q.    Good afternoon, Mr. Anstice.

9         A.    Good afternoon.

10        Q.    My name is Lee Balefsky, and I

11   represent some plaintiffs who have filed claims in

12   Philadelphia County against Merck as a result of

13   taking Vioxx.

14              I know you've been here for a while,

15   and I'm going to try to keep my questions from being

16   repetitive.  I'm sure your counsel will remind me if

17   I do start asking repetitive questions.

18        A.    Thank you.

19        Q.    Could you — you've told us you're

20   from Pennsylvania.  Could you give us your home

21   address?

22        A.    Yes.

23              MR. RABER:  Excuse me.  You can

24   contact him through counsel.  He's not going to give

25   out his home address on a public record document

Page  894

1    like this.

2    BY MR. BALEFSKY:

3        Q.    Can you tell me what city you live

4    in?

5        A.    What township?

6        Q.    What township?

7        A.    Whitemarsh Township.

8        Q.    And that's in Montgomery County,

9    Pennsylvania?

10       A.    That is correct.

11       Q.    And you are 56 years old, you

12   testified to that already.  Correct?

13       A.    Yes.

14       Q.    Do you have any plans for retirement

15   from Merck at the present time?

16       A.    I have continually updated retirement

17   plans, but I have no specific retirement date.

18       Q.    Have your retirement plans been

19   changed at all by what's happened with Vioxx?

20       A.    No, my retirement plans have not been

21   altered because I don't have a set plan.  I've had a

22   broad plan in place for a number of years and

23   there's no change to that.

24       Q.    As far as the age that you're going

25   to work till, that hasn't changed as a result of the

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **In re: VIOXX** | * | **MDL Docket No. 1657** |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| | * | **JUDGE FALLON** |
| **This document relates to** | * | |
| **Case No. 05-4046*** | * | |
| | * | **MAGISTRATE JUDGE KNOWLES** |
| **EVELYN IRVIN PLUNKETT** | * | |
| as Personal Representative of the Estate of | * | |
| **RICHARD IRVIN, JR.,** | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| **MERCK & CO., INC.,** | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**OPPOSITION OF MERCK & CO., INC. ("MERCK") TO PLAINTIFF'S MOTION IN
LIMINE TO EXCLUDE EVIDENCE AND/OR ARGUMENT THAT
THE FDA HAS CONCLUDED THERE IS A "CLASS EFFECT" FOR
ALL NON-STEROIDAL ANTI-INFLAMMATORY DRUGS ("NSAIDS")**

**(MOTION IN LIMINE NO. 5)**

The United States Food and Drug Administration ("FDA") has concluded, based on a

careful review of all of the existing data concerning all non-steroidal anti-inflammatory drugs

("NSAIDs") – including COX-2 inhibitors such as Vioxx® – that those data are best interpreted

as being consistent with a "class effect" of a long-term increased risk of adverse cardiovascular

EXHIBIT 4

790931v.1

events for *all* NSAIDs. That conclusion is scientifically reliable, and it is relevant to this case. The Court should deny plaintiff's motion.

**I.     THE APRIL 6, 2005 FDA MEMORANDUM, INCLUDING ITS CONCLUSIONS ABOUT A "CLASS EFFECT" OF ALL NSAIDS, IS RELEVANT, RELIABLE, AND ADMISSIBLE FOR ITS TRUTH.**

    **A.     Plaintiff Concedes that the FDA Memorandum is Admissible by Failing to Challenge a Majority of its Relevant Conclusions.**

The April 6, 2005 FDA Memorandum at issue contains relevant and reliable conclusions other than the *one* conclusion plaintiff challenges. It more broadly contains all of the FDA's conclusions based on a "thorough review of the available data . . . regarding currently approved COX-2 selective and non-selective non-steroidal anti-inflammatory drugs (NSAIDs) and the risk of adverse cardiovascular (CV) events." (April 6, 2005 FDA Memorandum ("FDA Memorandum" or "Memorandum") at 1, attached as Ex. 18 to the Declaration of Phillip A. Wittmann in Support of Merck's Oppositions to Plaintiff's Motions *in Limine* ("Wittmann Decl.").) The Memorandum is the FDA's analysis of the best available science on NSAIDs, including selective COX-2 inhibitors. It was issued after the FDA convened a three-day Advisory Committee hearing in which outside experts in the fields of rheumatology, cardiology, epidemiology, pharmacology, ethics, risk-benefit analysis, drug safety and biostatistics, among others, heard and considered scientific presentations and clinical trial data on COX-2 inhibitors and nonselective NSAIDs.

The FDA Memorandum contains many conclusions, only one of which plaintiff challenges in her motion. To take only some examples, the Memorandum concludes that:

- There is a "class effect" for all NSAIDs. (FDA Memorandum at 1 ("Data from large long-term controlled clinical trials that have included a comparison of COX-2 selective and non-selective NSAIDs do not clearly demonstrate that the COX-2 selective agents confer a greater risk of serious adverse CV events than non-selective NSAIDs"); *id.* at 2 ("the available data are *best interpreted* as being consistent with a class effect of an increased risk of serious adverse CV events for COX-2 selective and non-selective NSAIDs") (emphasis

2

790931v.1

added)); *id.* at 10 (listing studies); *id.* ("We also believe that it is not possible to conclude at this point that the COX-2 selective drugs confer *an increased risk* over non-selective NSAIDs in chronic use").)

- *All* prescription NSAIDs should require black-box CV warnings. (FDA Memorandum at 2 ("The professional labeling for all prescription NSAIDs should be revised to include a boxed warning highlighting the potential increased risk of serious adverse CV events.").)

- There are "serious questions" about the FitzGerald hypothesis. (FDA Memorandum at 8 ("Taken together, these observations raise serious questions about the so-called 'COX-2 hypothesis,' which suggests that COX-2 selectivity contributes to increased CV risk.").)

- Short-term ingestion of Vioxx does not increase a patient's risk of having a heart attack. (FDA Memorandum at 2 ("Short-term use of NSAIDs to relieve acute pain, particularly at low doses, does not appear to confer an increased risk of serious adverse CV events (with the exception of valdecoxib in hospitalized patients immediately post-operative from coronary bypass (CABG) surgery)"); *id.* at 13 ("Further, with the exception of the parecoxib/valdecoxib CABG studies, the increased risk of serious adverse CV events in the controlled clinical trials described above have only become apparent after months to years of treatment.").)

- Vioxx, and Vioxx alone, has been shown to have clinically significant GI benefits. (FDA Memorandum at 2 ("The three approved COX-2 selective drugs reduce the incidence of GI ulcers visualized at endoscopy compared to certain non-selective NSAIDs. Only rofecoxib has been shown to reduce the risk of serious GI bleeding compared to a non-selective NSAID (naproxen) following chronic use."); *id.* at 11-12 ("Improved GI tolerability of NSAIDs is an important issue from an individual patient and public health perspective and is, at least in part, a valid rationale for maintaining a range of options in the NSAID class from which physicians and patients may choose.").)

Plaintiff does not expressly challenge the admissibility of *any* of the FDA Memorandum's conclusions other than the first one. For obvious reasons, the Memorandum's other conclusions are relevant at trial. There is thus no question whether the document is itself admissible. Rather, the only question is whether the FDA's conclusion concerning the "class effect" of all NSAIDs is admissible. For many reasons, it is.

3

790931v.1

**B.      The "Class Effect" Conclusion is Relevant.**

Plaintiff concedes that the FDA Memorandum's conclusion that there is a "class effect" associated with all NSAIDs is relevant.  (Plaintiff's Motion in Limine to Exclude Evidence that the FDA has Concluded that There is a "Class Effect" for All Non-Steroidal Anti-Inflammatory Drugs ("Mot.") at 2 ("Although the testimony or argument at issue is relevant....").)  In any event, as set forth in Merck's Opposition to Plaintiff's Motion to Exclude Opinion Testimony That Vioxx® Is the Same As All NSAIDs Regarding Cardiotoxic Effects, filed November 2, 2005, the FDA Memorandum's conclusions concerning class effect are relevant for many reasons.  (*Id.* at 8-10.)

**C.      The "Class Effect" Conclusion is Evident and Reliable.**

Plaintiff's two contentions are that the FDA Memorandum does not, in fact, conclude that there is a class effect, and that, even if it did, that conclusion would be unreliable and hence inadmissible under Rule 403 of the Federal Rules of Evidence.  Plaintiff is incorrect.

Plaintiff's first contention is demonstrably false.  Although the FDA Memorandum does indicate the need for further study – including the need for long-term clinical trials concerning NSAIDs other than Vioxx – it unambiguously concludes that:

> Data from large long-term controlled clinical trials that have included a comparison of COX-2 selective and non-selective NSAIDs do not clearly demonstrate that the COX-2 selective agents confer a greater risk of serious adverse CV events than non-selective NSAIDs.

and

> Pending the availability of additional long-term controlled clinical trial data, *the available data are best interpreted as being consistent with a class effect of an increased risk of serious adverse CV events for COX-2 selective and non-selective NSAIDs.*

(FDA Memorandum at 1-2 (emphasis added).)   That is without any serious question the conclusion of the FDA Memorandum.

4

790931v.1

In any event, plaintiff's argument about what the actual "conclusions" of the FDA Memorandum are goes to the weight, not the admissibility, of the document. Plaintiff is free to argue at trial that language elsewhere in the FDA Memorandum somehow qualifies its conclusion about the "best interpret[ation]" of the "available data," but she offers no persuasive grounds for excluding the document itself on the basis of that purportedly qualifying language.

Plaintiff's more sustained argument is that, in any event, the FDA Memorandum's conclusions about a "class effect" are not sufficiently reliable. Plaintiff's view is that the Memorandum acknowledges that the "FDA lacks data" to draw that conclusion, and that the FDA was under "intense public and government scrutiny" at the time it created the document. (Mot. at 2.) Plaintiff argues that, for those reasons, the FDA Memorandum should be excluded under Rule 403 of the Federal Rules of Evidence. (*Id.* at 6.) Plaintiff is wrong.

Although plaintiff does not acknowledge it, the relevant rule of evidence governing the admissibility of the FDA Memorandum is Rule 803(8). That rule provides that "public records or reports" of a public agency are admissible for their truth if, *inter alia*, they set forth "(A) the activities of the office or agency, or . . . (C) in civil actions and proceedings . . ., factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." FED. R. EVID. 803(8).

By failing to address the pertinent rule, plaintiff appears to concede that the FDA Memorandum is a "public record" under Rule 803(8). In any event, it is just such a public record. It was written by Dr. John Jenkins, the Director of the FDA's Office of New Drugs, and Dr. Paul Seligman, the Director of the FDA's Office of Pharmacoepidemiology and Statistical Science. It was released through the Acting Director of the FDA's Center for Drug Evaluation and Research ("CDER"), Dr. Steven Galson. CDER is charged with carrying out the FDA's mandate to decide the safety and efficacy of prescription drugs. *See*

5

http://www.fda.gov/opacom/factsheets/justthefacts/3cder.html; *see generally* 21 U.S.C. § 393(b). "Participants in the CDER decision-making process included staff from the Office of New Drugs ..., the Office of Drug Safety, Office of Pharmacoepidemiology and Statistical Science, the Office of Medical Policy, the Office of Regulatory Policy, and the Office of the Center Director." *See* http://www.fda.gov/cder/drug/infopage/cox2/COX2.qa.htm.

Moreover, the FDA has taken steps to make certain that the contents of the Memorandum are widely disseminated. The document is posted as a "Decision Memo" on the FDA's website, at http://www.fda.gov/cder/drug/infopage/COX2/NSAIDdecisionMemo.pdf. On April 7, 2005, the FDA issued a press release summarizing the recommendations made and actions taken in accordance with the Memorandum. *See* FDA News, dated April 7, 2005, *available at* http//www.fda.gov/bbs/topics/news/2005/NEW01171.html. The FDA also issued a Public Health Advisory, reiterating in abbreviated fashion the recommendations of the Memorandum. *See* http://www.fda.gov/cder/drug/advisory/COX2.htm. In accordance with the FDA Memorandum, the FDA has sent letters to sponsors of all NSAIDs, both prescription and non-prescription, requesting that they make labeling changes designed to provide more specific cardiovascular warnings and information about their products.

Courts have routinely admitted as "public records" FDA or other public agency documents with the attributes of the FDA Memorandum. In *Sabel v. Mead Johnson & Co.*, 737 F. Supp. 135 (D.C. Mass. 1990), for example, the court determined that a letter to a manufacturer from the Director of the FDA's Division of Neuropharmacological Drug Products that recommended inclusion of a boxed warning in a drug's labeling qualified as a public record under Federal Rule of Evidence 803(c)(8). The district court noted that "it [made] no difference that the underlying data was collected and received from an outside party, as long as the information was reliable." *Sabel*, 737 F. Supp. at 142. The court also relied on the fact that the

recommendation was a final opinion of the FDA rather than a tentative conclusion of the letter's author alone. *Id.*[1]   Similarly, in *Kehm v. Procter & Gamble Manufacturing Co.*, 724 F.2d 613 (8th Cir. 1983), the Eighth Circuit Court of Appeals held that a Center for Disease Control report concerning studies of toxic shock syndrome was properly admitted as a public record despite the fact that the findings of that report "tend[ed] towards the conclusory rather than the factual end." *Id.* at 618-20.  *See also Coates v. AC & S, Inc.*, 844 F. Supp. 1126, 1133-34 (E.D. La. 1994) (admitting as public records OSHA and EPA reports setting forth findings on effects of asbestos exposure; finding agencies had no interest in the litigation and were charged by law with responsibility of monitoring toxic substances); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, No. MDL 1014, 1998 WL 964495, at *3 (E.D. Pa. Nov. 3, 1998) (suggesting that FDA review of orthopedic Cohort Study would be public record).

Because the FDA Memorandum qualifies as a public record, it is presumptively admissible unless plaintiff can establish that it is untrustworthy.  This is so even for reports, such as the Memorandum, which "evaluat[e]" facts to draw a conclusion.  *See, e.g., Moss v. Ole S. Real Estate, Inc.*, 933 F.2d 1300, 1305 (5th Cir. 1991) (because "[t]he Advisory Committee assumes admissibility of 803(8)(C) reports in the first instance . . ., evaluative reports are presumed not to be excluded under the hearsay rule").

---

[1] By contrast,  informal, unofficial or preliminary statements by FDA employees that do not qualify as public records include FDA Warning Letters or Untitled Letters.  The FDA's own procedures manual recognizes these letters as informal and advisory.  *See* Regulatory Procedures Manual, Chapter 4, Advisory Actions, Section 4-1-1, *available at* http://www.fda.gov/ora/compliance_ref/rpm/pdf/ch4.pdf.  Moreover, courts have acknowledged that they do not constitute final agency action.  *See Summit Tech., Inc. v. High-Line Med. Instruments Co.*, 933 F. Supp. 918, 934 n.9 (C.D. Cal. 1996) ("FDA regulatory warning letters do not constitute final agency action" and therefore do not reflect a final conclusion of wrongdoing).  Additionally, any internal communication between agency employees, initial reports by agency employees, or statements made by employees outside the scope of their employment do not rise to the level of an official communication of the agency.  All these examples are in contrast to the official, formal FDA Memorandum.

7

790931v.1

Plaintiff cannot overcome that presumption. First, a challenge to the *conclusion* of a public record is *not*, under any circumstances, a valid basis for excluding that record on the grounds that the record is not "trustworthy." *See id.* at 1307-08 (reversing magistrate's exclusion of public record in case in which magistrate disagreed with conclusions of the report). To the contrary, the Fifth Circuit Court of Appeals has made clear that challenges to the conclusions of a public record go to the weight, not the admissibility of the evidence. *See id.* at 1307-08 (holding that, because "reliability is not a matter of [the] credibility" of a conclusion, "courts should not focus on questions regarding the *accuracy or completeness of the document's conclusions*" (emphasis added)). For that reason, plaintiff cannot even make the threshold showing required to invoke the "trustworthiness" language of Rule 803(8)(C).[2]

Second, even if plaintiff's disagreement with the FDA Memorandum's conclusions were a valid basis for invoking Rule 803(8)(C) – which it is not – plaintiff is wrong that the FDA "erred" in reaching its conclusions.[3] The Memorandum is based on a *"thorough review of the available data* . . . regarding currently approved COX-2 selective and non-selective non-steroidal anti-inflammatory drugs (NSAIDs) and the risk of adverse cardiovascular (CV) events." (FDA Memorandum at 1 (emphasis added).) It describes the large body of data the expert advisory panel reviewed in reaching its conclusions. For example, the FDA Memorandum states that "new data prompted the agency to conduct a comprehensive review of the available data," and

---

[2] Indeed, plaintiff is simply wrong to argue that, because the data are in some ways inconclusive, the FDA's conclusions must be incorrect. The jury is entitled to hear the FDA's conclusions and make its own judgments about them. Without question, the Memorandum notes the need for additional clinical trials assessing the risks posed by NSAIDs. But that simply does not mean that the conclusions it reaches – "following a thorough review of the available data" (FDA Memorandum at 1) – lack sufficient reliability to be admissible.

[3] Plaintiff's own expert, Dr. Lucchesi, has testified that all NSAIDs increase the risk of adverse events, including myocardial infarction. (*See* Testimony of Benedict R. Lucchesi, M.D., Ph.D., M.S., F.A.H.A., *Humeston v. Merck*, No. 619 (N.J. Super. Ct. Law Div. filed Aug. 19, 2003) of

8

that "CDER [the FDA's Center for Drug Evaluation and Research] conducted a thorough internal review of the available data regarding cardiovascular (CV) safety issues for COX-2 selective and non-selective non-steroidal anti-inflammatory drugs (NSAIDs)." (FDA Memorandum at 3.) The participants in the CDER review included staff from the Division of Anti-Inflammatory Analgesic and Ophthalmologic Drug Products, the Division of Over-the-Counter Drug Products, the Offices of Drug Evaluation II and V, the Office of New Drugs, the Office of Drug Safety, the Office of Biostatistics, the Office of Pharmacoepidemiology and Statistical Science, the Office of Medical Policy, the Office of Regulatory Policy, and the Office of the Center Director. (FDA Memorandum at 3.) This group's comprehensive review drew on materials from a wide range of sources:

> [T]he regulatory histories and the NDA [New Drug Application] and postmarketing databases of the various NSAIDs, FDA and sponsor background documents prepared for the Advisory Committee meeting, all materials and data submitted by other stakeholders to the Advisory Committee meeting, presentations made at the Advisory Committee meeting, the discussions held by the Committee members during the meeting, and the specific votes and recommendations made by the joint Committee.

(FDA Memorandum at 3-4.) The Memorandum itself analyzes the results of numerous clinical trials and epidemiological studies concerning various NSAIDs that the Advisory Committee reviewed in reaching its conclusion regarding a "class effect." For example, the Advisory Committee reviewed data from a placebo-controlled clinical trial designed to determine whether Celebrex® (celecoxib), another COX-2 inhibitor, could prevent colorectal adenoma. The study, which also examined cardiovascular endpoints in over 2,000 patients, found that persons on a long-term regimen twice daily of 400 mg Celebrex had a statistically significant increased risk of

---

September 20, 2005 ("Lucchesi *Humeston* Test.") at 953:14-955:17, attached as Ex. 13 to Wittmann Decl.)

790931v.1

death from cardiovascular causes compared to placebo.[4]  Notably, however, the Kaplan-Meier curve for composite cardiovascular deaths did not separate from placebo, much less become statistically significant, until well after six months of use.[5]

In addition to the comprehensive review of the scientific data evident from the document itself, the facts surrounding the creation, purpose, and use of the FDA Memorandum provides additional assurance of its scientific reliability.  Dr. Lisa Rarick, an expert in regulatory affairs who spent 15 years at the FDA before retiring in 2003,[6] testified in another Vioxx matter that the FDA Memorandum's findings were created, reviewed, and agreed to by the pertinent regulators at the Agency and that, based on those findings, the FDA took several regulatory actions.  Dr. Rarick noted that the two authors of the FDA Memorandum, Dr. Jenkins (Director of the Office of New Drugs) and Dr. Seligman (Director of the Office of Pharmacoepidemiology and Statistical Science), are responsible for the approval of new drugs and post-marketing monitoring of safety concerns, respectively.  (Testimony of Dr. Lisa Rarick, *Humeston v. Merck*, No. 619 (N.J. Super. Ct. Law Div. filed Aug. 19, 2003) ("Rarick *Humeston* Test.") of October 21, 2005 at 5026:15-5027:5, attached as Ex. 13 to Wittmann Decl.)  Additionally, the Memorandum was published through their supervisor, Dr. Steven Galson, the Acting Director of the Center for Drug Evaluation and Research, who had to review and endorse its findings.  (FDA Memorandum at 1; Rarick *Humeston* Test. at 5028:3-13.)  Nor is there any doubt that the Memorandum represented a final decision setting forth the FDA's official position on these issues.  (Rarick

---

[4] *See* Solomon et al., *Cardiovascular Risk Associated With Celecoxib in a Clinical Trial for Colorectal Adenoma Prevention*, N. ENGL. J. MED. 2005:352:1-10; (FDA Memorandum at 4).

[5] Solomon *et al.*, at 7.

[6] Dr. Rarick's FDA experience included years as a medical officer responsible for reviewing the safety profile of various drugs. (*See Curriculum Vitae* of Lisa Dale Rarick, M.D., attached as Ex. 29 to the Declaration of Phillip A. Wittmann in Support of Merck's Opposition Briefs, filed November 2, 2005.)

790931v.1

*Humeston* Test. at 5040:22-5041:8, 5054:4-7.)  As noted above, the FDA's own website, where the FDA published the Memorandum shortly after issuing it, refers to it as a "Decision Memo." *See* http://www.fda.gov/cder/drug/infopage/cox2/.

It also bears noting that the FDA believed the findings and conclusions described in its FDA Memorandum were sufficiently reliable to warrant significant regulatory action.  As the FDA website describes, in the wake of the Advisory Committee meeting and the Memorandum:

> The Food and Drug Administration (FDA) has issued supplemental request letters to sponsors of all non-steroidal anti-inflammatory drugs (NSAID) requesting that they make labeling changes to their products. These letters include recommended proposed labeling for both the prescription and over-the-counter (OTC) NSAIDs and a medication guide for the entire class of prescription products.
> . . . .
> Manufacturers of **non-prescription** (over-the-counter) NSAIDs are being asked to revise their labeling to provide more specific information about the potential CV and GI risks of their individual products and remind patients of the limited dose and duration of treatment of these products in accordance with the package instructions.

*See* http://www.fda.gov/cder/drug/infopage/cox2/; (*see also* Rarick *Humeston* Test. at 5038:21-5039:20).  The FDA would not have taken these actions on *all NSAIDs* if it did not believe that its analysis, findings, and conclusions were based on reliable scientific evidence.  Indeed, the Medication Guide that the FDA created to accompany prescription NSAIDs, which was based on the Advisory Committee's work, is required by law to be "scientifically accurate."  *See* 21 C.F.R. § 208.20(a)(2); (Rarick *Humeston* Test. at 5057:13-16, 5099:16-5100:2).

Plaintiff cites no precedent holding that a finding or conclusion by a government agency charged by Congress with making that assessment is inadmissible or unreliable because it is not absolute or is based only on "available" data.  (*See* Mot. at 3-4.)  Indeed, any such argument would defy common sense, as all properly-derived scientific conclusions are based on currently known facts. Here, the FDA has published its conclusion that the best available interpretation of the scientific data is that a "class effect" exists both among COX-2 inhibitors and between COX-

11

2 inhibitors and NSAIDs generally, and that this conclusion is sufficiently reliable to institute significant regulatory change.

Finally, plaintiff's assertion that the document is inadmissible because the FDA was under "enormous pressure" at the time is equally misplaced. (Mot. at 5.) Public agencies are often under "enormous pressure" when they create public records. But that does not mean that a "public record" within the meaning of Rule 803(8) becomes something else whenever a private party in litigation asserts that the pertinent agency was under political pressure to create it. Indeed, plaintiff's argument to that effect is literally unprecedented – there is no case cited in plaintiff's papers (nor is Merck aware of any such case) holding that there mere allegation of "pressure" calls into question the "public record" status of a document otherwise falling within the scope of the exception. *See* FED. R. EVID. 803(8). Nor is plaintiff's argument even logical – public "pressure" and scrutiny would lead FDA to do a more careful review in order to get it right. In any event, as noted above, the FDA Memorandum is the result of rigorous review of all the relevant data by scores of scientists, and its conclusions cannot be ignored simply because plaintiff believes the FDA was under political pressure to reach them.

790931v.1

## II.    CONCLUSION.

For these reasons, as well as those set forth in Merck's Opposition to Plaintiff's Motion to Exclude Opinion Testimony that Vioxx is the Same as All NSAIDs, the Court should deny plaintiff's motion.

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
4041 Essen Lane
One United Plaza, Suite 501
Baton Rouge, Louisiana 70809
Phone:  225-490-8900
Fax:     225-490-8960

Defendants' Liaison Counsel

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:     312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone: (202) 434-5000
Fax:     (202) 434-5029

And

13

790931v.1

John H. Beisner
Charles C. Lifland
Richard B. Goetz
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone: (213) 430-6000
Fax:    (213) 430-6407

Attorneys for Merck & Co., Inc.

14

790931 v.1

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Opposition to Plaintiff's Motion *in Limine* to Exclude Evidence and/or Argument That the FDA Has Concluded That There is a "Class Effect" For All Non-Steroidal Anti-Inflammatory Drugs ("NSAIDS") (Motion *in Limine* No. 5) has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 11th day of November, 2005.

_Dorothy H. Wimberly_

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 05-4046* | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| EVELYN IRVIN PLUNKETT | * | |
| as Personal Representative of the Estate of | * | |
| RICHARD IRVIN, JR., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

* * * * * * * * * * * * * * * * * *

### MOTION OF MERCK & CO., INC. ("MERCK") TO EXCLUDE EVIDENCE OF A PRIVILEGED, PREVIOUSLY EXCLUDED CONFIDENTIAL MEMORANDUM OF INVENTION

### (MOTION *IN LIMINE* NO. 14)

Defendant Merck & Co., Inc. ("Merck"), through undersigned counsel, hereby moves to exclude evidence of a privileged, previously excluded confidential memorandum of invention because it is a privileged attorney-client communication under Florida Rule of Evidence 90.502. The facts and law supporting this motion are more fully set forth in the accompanying memorandum, declarations, and exhibits, which are incorporated as if fully set forth herein.

EXHIBIT

5

Blumberg No. 5116

Respectfully submitted,

_Dorothy H. Wimberly_

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:     312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone:  202-434-5000
Fax:     202-434-5029

John H. Beisner
Charles C. Lifland
Richard B. Goetz
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone:  213-430-6000
Fax:     213-430-6407

Attorneys for Merck & Co., Inc.

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Motion of Merck & Co., Inc. to Exclude Evidence of a Privileged, Previously Excluded Confidential Memorandum of Invention has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 30th day of January, 2006.

*Dorothy H. Wimberly*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 05-4046* | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| EVELYN IRVIN PLUNKETT | * | |
| as Personal Representative of the Estate of | * | |
| RICHARD IRVIN, JR., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM IN SUPPORT OF MOTION OF MERCK & CO., INC. ("MERCK")
TO EXCLUDE EVIDENCE OF A PRIVILEGED, PREVIOUSLY EXCLUDED
<u>CONFIDENTIAL MEMORANDUM OF INVENTION</u>**

**(MOTION *IN LIMINE* NO. 14)**

Merck moves to exclude evidence of, and reference to, a document that the New Jersey superior court, in Vioxx®-related litigation, specifically ruled was protected by the attorney-client privilege.  The document is a "Confidential Memorandum of Invention" ("CMI") that the New Jersey court found was inadvertently produced without a waiver of the privilege.  The court

ordered all copies of the CMI returned to Merck or destroyed.  Plaintiff here may not introduce this privileged document into evidence, use it in cross-examination, or use it for impeachment. Florida law is clear that the CMI is inadmissible because it is a privileged attorney-client communication.

## I.    FACTUAL BACKGROUND.

A CMI is a standard form developed by Merck's Patent Department and used by Merck scientists to communicate directly with company attorneys.  Merck's patent attorneys use information communicated in the CMI to provide legal advice on the patentability of the invention described in the document.  (*See* Affidavit of Joseph F. DiPrima in Support of Motion For A Protective Order Prohibiting Use Or Disclosure Of Inadvertently Produced Privileged Documents And Compelling Plaintiffs To Return All Copies Of The Documents ("DiPrima Aff.") at ¶ 5, filed in *In Re: Vioxx Litigation*, Case No. 619 (N.J. Super. Ct. Law Div. filed August 19, 2003), attached as Exhibit 49 to the Declaration of Phillip A. Wittmann in Support of Merck's Motions *in Limine*, filed November 4, 2005 ("*Plunkett I* Wittmann Decl.").)

The CMI was completed and forwarded to Merck's patent attorneys by Dr. Kathleen Metters, Vice President and Site Head for Merck Frosst Canada & Company ("Merck Frosst"), a Canadian affiliate of Merck, and her colleagues.  Dr. Metters prepared the CMI for the express purpose of seeking legal advice from in-house Merck patent counsel.  (*See* Affidavit of Dr. Kathleen Metters in Support of Motion For A Protective Order Prohibiting Use Or Disclosure Of Inadvertently Produced Privileged Documents And Compelling Plaintiffs To Return All Copies Of The Documents ("Metters Aff.") at ¶ 4, filed in *In Re: Vioxx Litigation*, Case No. 619 (N.J. Super. Ct. Law Div. filed August 19, 2003), attached as Exhibit 50 to the *Plunkett I* Wittmann Decl.)

In the course of producing more than seven million documents during pre-trial discovery,

2

a copy of this CMI was inadvertently produced to plaintiffs in *In re: Vioxx Litigation*. Plaintiffs in that case refused to return the document. Ruling that the CMI was privileged and could not be used at trial, New Jersey Superior Court Judge Carol E. Higbee ordered plaintiffs to destroy or return to Merck all copies of the privileged document, and, subsequently, denied plaintiffs' motion to reconsider that ruling.  *In re: Vioxx Litigation*, Superior Court of New Jersey Law Division, Memorandum of Decision on Motion, May 27, 2005 and Memorandum of Decision on Motion, September 30, 2005.[1]

## II.   THE COURT MUST EXCLUDE THE CMI BECAUSE, UNDER FLORIDA LAW, IT IS A PRIVILEGED DOCUMENT AND THEREFORE INADMISSIBLE.

Even without the New Jersey ruling, the CMI is inadmissible because it is clearly a privileged attorney-client communication.   The document contains privileged information communicated by Merck scientists to in-house patent counsel for the express purpose of requesting legal advice and services.

Florida[2] Evidence Code 90.502(2) provides:

> A client has a privilege to refuse to disclose, and to prevent any other person from disclosing, the contents of confidential communications when such other person learned of the communications because they were made in the rendition of legal services to the client.[3]

---

[1] Because of the privileged nature of the CMI, Merck respectfully requests that the document, and Judge Higbee's Order describing it in some detail, be viewed *in camera*.  Merck will make the documents available to the Court at the time of the hearing, or at any other time convenient for the Court, for such *in camera* review.

[2] Federal Rule of Evidence 501, the provision that governs privilege in federal courts, provides that "in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law." Accordingly, Florida attorney-client privilege law is applicable to this civil proceeding.

[3] Florida Evidence Code 90.502(4) contains express exceptions, none of which is remotely relevant here:   (1) services of lawyer obtained to enable or aid a crime or fraud; (2) communication relevant to claimants through same deceased client; (3) communication relevant to breach of duty by a lawyer or client; (4) communication relevant to document attested by a

3

The privilege extends to communications on legal matters between corporate employees and in-house attorneys. *Shell Oil Co. v. Par Four Partnership*, 638 So. 2d 1050 (Fla. Dist. Ct. App. Dist. 1994); FLA. EVID. CODE 90.502(1)(b). The statements and advice of both the attorney to the client and the client to the attorney are protected. *Cunningham v. Appel*, 831 So. 2d 214, 216 (Fla. Dist. Ct. App. 2002).

Under Florida statutory and case law, the CMI is a confidential communication between Merck scientists and in-house counsel protected by the attorney-client privilege. There is no question that the communication between Dr. Metters and Merck's patent counsel was intended to be kept confidential and that it was submitted to counsel for the express purpose of securing legal advice and services. (Metters Aff. at ¶ 4; DiPrima Aff. at ¶¶ 5, 7.) The attorney's advice and counsel are not subject to subsequent disclosure.

The finding of privilege is supported not only by Florida precedent, but also by that of the Court of the Appeals for the Federal Circuit, which has ruled that invention records like the CMI are privileged. Thus, in *In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800 (Fed. Cir. 2000), the Court of Appeals considered the applicability of the attorney-client privilege to "invention records," which the court defined as "standard forms generally used by corporations as a means for inventors to disclose to the corporation's patent attorneys that an invention has been made and to initiate patent actions." *Id.* at 802 n.2. Such an invention record is privileged, the Federal Circuit in *Spalding* held, if the communication "was made by a client to an attorney for the purpose of obtaining legal advice or services." *Id.* at 805. In *Spalding*, as here, that standard was met because the invention record was submitted by the inventors to the corporation's legal

---

lawyer; or (5) communication relevant to issue of common interest between two or more clients. FLA. EVID. CODE 90.502(4).

4

department and the communication was made to obtain legal advice on patentability and legal services in connection with the preparation of the patent application.

Nor has Merck waived its attorney-client privilege. Because the privilege belongs to the client, *Cone v. Culverhouse*, 687 So. 2d 888, 892 (Fla. Dist. Ct. App. 1997), an attorney's inadvertent production of a privileged document does not waive the privilege. As the New Jersey court specifically found, there is no question that the release of the CMI was a mistake. Under Florida law, the inadvertent disclosure by counsel of attorney-client information during discovery does not waive the attorney-client privilege. *Abamar Housing & Dev., Inc. v. Lisa Daly Lady Décor. Inc.*, 698 So. 2d 276, 278 (Fla. Dist. Ct. App. 1997) ("[O]ne cannot be deemed to have waived a privilege upon the inadvertent production of documents."); *see also Smith v. Armour Pharm. Co.*, 838 F. Supp. 1573, 1576 (S.D. Fla. 1993) (applying Florida law) ("[C]ounsel's inadvertent disclosure of privileged documents during discovery is insufficient by itself to constitute a waiver of the privilege.").

## III.   CONCLUSION.

For all the foregoing reasons, Merck respectfully requests that the Court issue an order excluding evidence of, or reference to, the CMI.

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361

Defendants' Liaison Counsel

5

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:     312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone:  202-434-5000
Fax:     202-434-5029

And

John H. Beisner
Charles C. Lifland
Richard B. Goetz
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone:  213-430-6000
Fax:     213-430-6407

Attorneys for Merck & Co., Inc.

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Memorandum in Support of Motion of Merck & Co., Inc. to Exclude Evidence of a Privileged Confidential Memorandum of Invention has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 30th day of January, 2006.

7



# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 05-4046* | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| EVELYN IRVIN PLUNKETT | * | |
| as Personal Representative of the Estate of | * | |
| RICHARD IRVIN, JR., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## OPPOSITION OF MERCK & CO., INC. ("MERCK") TO PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE EVIDENCE THAT MERCK EMPLOYEES OR FAMILY MEMBERS TOOK VIOXX®

### (MOTION *IN LIMINE* NO. 7)

The Court should deny this motion.  Contrary to plaintiff's claims, evidence that Merck employees or their family members took Vioxx® is neither irrelevant nor unfairly prejudicial.  It bears directly on plaintiff's failure to warn claim because the very individuals who, plaintiff contends, knew of the cardiovascular risks allegedly associated with Vioxx either personally took Vioxx or permitted their family members to take it.  The jury may logically conclude that,

EXHIBIT

6

Blumberg No. 5119

798334v.1

had these witnesses – and through them Merck itself – believed Vioxx to be as dangerous as plaintiff claims it is, they would not have taken it or allowed their family members to do so.  The evidence bears equally directly on plaintiff's contention that, had Mr. Irvin known what these witnesses allegedly knew, he would not have taken Vioxx and his son-in-law would not have prescribed it to him.  And it is "prejudicial" only to the extent that it is powerful evidence, as plaintiff essentially concedes.  Merck is entitled to defend itself by presenting this testimony to the jury.

## I.  EVIDENCE THAT MERCK WITNESSES TOOK VIOXX OR ALLOWED THEIR FAMILY MEMBERS TO DO SO IS RELEVANT.

Plaintiff's first claim is that testimony that Merck witnesses or their family members took Vioxx is "irrelevant to the issues of this case" and specifically that it is *"irrelevant to defendant's knowledge of the drug's cardiovascular risks."*[1]  (Plaintiff's Motion *In Limine* to Exclude Evidence that Merck Employees or Family Members of Merck Employees Took Vioxx (Motion *In Limine* No. 7) ("Mot.") at 2-3 (emphasis added).)  That is just not so.  Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to a determination of the action more probable or less probable than it would be without the evidence."  FED. R. EVID. 401.   Testimony that Merck scientists and executives who were intimately aware of Vioxx's safety profile themselves took Vioxx, or allowed their family members to do so, unquestionably bears on the issue of what those witnesses knew about the risks associated with taking Vioxx; it therefore satisfies the requirements of Rule 401.  As a matter of basic fairness, Merck must be permitted to offer this evidence in order to defend itself

---

[1] Plaintiff also contends that evidence of personal ingestion of Vioxx is not relevant to other issues in the trial, but of course evidence need not be relevant to every issue in a case to be admissible.  Here, the evidence is relevant to at least two major issues – Merck's knowledge of the safety of Vioxx and the credibility of plaintiff's allegation that Dr. Schirmer would not have prescribed Vioxx, and Mr. Irvin would not have taken Vioxx, if they had known what she contends Merck knew about the alleged cardiovascular risks.

against plaintiff's contention that Merck knew of cardiovascular risks but failed to provide an adequate warning of those risks.

Plaintiff asserts that testimony from a particular witness that he or she took Vioxx, or permitted a loved one to do so, "does not impact and is not relevant on the issue of whether the Merck corporate entity, through its officers, directors and/or medical personnel had knowledge of the drug's cardiovascular risks when it placed its product in the stream of commerce for individuals, like Mr. Irvin, to consume." (Mot. at 3.) Plaintiff simply announces that conclusion, rather than explaining it. And that conclusion – plaintiff's *only* argument as to relevance – is no answer at all. The key players involved in developing, testing, and marketing Vioxx are the very witnesses who will testify that they or their family members took Vioxx. They include Raymond Gilmartin, the former CEO; Edward Scolnick, the former chief scientist at Merck and head of its research laboratories; Peter Kim, the present head of the Merck research laboratories; David Anstice, the head of marketing and United States sales at Merck; Alise Reicin, a senior Merck scientist and physician extensively involved in the development and testing of Vioxx; Alan Nies, a former senior scientist at Merck who was the head of the Vioxx development program.[2]

Plaintiff is no stranger to these individuals – they are the same people who have been accused of wrongdoing during their depositions and in prior trials. It is entirely disingenuous to suggest, on one hand, that the fact that these witnesses allegedly knew of the cardiovascular risks of Vioxx shows that "Merck" was aware of those risks, while at the same time contending that the fact that those witnesses either personally used or permitted their family members to use Vioxx is irrelevant because their knowledge cannot be imputed to Merck. Plaintiff cannot have it both ways. Unless she is willing to stipulate that she will not accuse these witnesses at trial of

___

[2] If it becomes necessary to do so at trial, Merck will make offers of proof concerning the personal use of Vioxx by these individuals.

3

798334v.1

having knowledge of Vioxx's cardiovascular risks, plaintiff cannot persuasively argue that evidence of these witnesses' personal or family use of Vioxx is irrelevant to the issue of Merck's knowledge.

And even if plaintiff were willing to stipulate to that effect, this evidence would still be admissible as it is also highly relevant to the issue of warning causation – and specifically to assessment of the credibility of plaintiff's contention that Mr. Irvin would not have taken Vioxx but for Merck's failure to warn adequately of cardiovascular risks that it knew about. (Compl. ¶ 104); *see Felix v. Hoffman-LaRoche, Inc.*, 540 So. 2d 102, 104 (Fla. 1989). It is undisputed that Mr. Irvin suffered from severe back pain, and, before taking Vioxx, had tried other medications that were ineffective in alleviating the pain or that caused gastric distress. (*See* Deposition of Evelyn Irvin Plunkett at 54:12-24, 59:2-8, 62:11-65:1, 76:9-77:9, attached as Ex. 9 to Declaration of Phillip A. Wittmann in Support of Merck's Oppositions to Plaintiff's Motions *in Limine* ("Wittmann Decl.); Deposition of Allesha Schirmer at 44:14-45:2, 46:14-47:1, attached as Ex. 10 to Wittmann Decl.; Sept. 6, 2005 Deposition of Dr. Christopher Schirmer at 87:21-88:8, attached as Ex. 11 to Wittmann Decl.) The jury should not be kept in the dark about the fact that Merck employees who were extremely knowledgeable about Vioxx were taking the drug. If they hear this evidence, the jury might well question the contention that Mr. Irvin would have never taken Vioxx had he or his physician son-in-law only known what these witnesses allegedly knew.

## II. EVIDENCE THAT MERCK EMPLOYEES AND THEIR FAMILY MEMBERS TOOK VIOXX IS NOT UNFAIRLY PREJUDICIAL AND SHOULD NOT BE EXCLUDED UNDER FEDERAL RULE OF EVIDENCE 403.

Plaintiff's fallback position is that this evidence is unfairly prejudicial and thus should be excluded Federal Rule of Evidence 403. As plaintiff's papers put it, this evidence "could

798334v.1

mislead a jury into believing that Vioxx was safe and effective, since – as Merck will undoubtedly argue – *no witness would have allowed his or her relative to take a drug that was known to be dangerous.*" (Mot. at 5 (emphasis added).) Far from demonstrating any unfairly prejudicial aspect of this evidence, this statement simply confirms the common-sense notion that this evidence *is* probative in assessing the witnesses' knowledge. Indeed, to the extent that plaintiff means the jury might fully credit the testimony, and therefore conclude that a particular witness *believed* that Vioxx was safe and effective, that is precisely why the evidence is relevant, and thus admissible. That is not unfair prejudice; it is just good evidence.[3]

## III.   CONCLUSION

For the reasons stated above, Merck respectfully requests that the Court deny plaintiff's motion to exclude evidence that Merck employees or family members took Vioxx.

Respectfully submitted,

*Dorothy H. Wimberly*

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone:   504-581-3200
Fax:      504-581-3361

Defendants' Liaison Counsel

---

[3] Plaintiff notes that Judge Higbee excluded this evidence during the *Humeston* trial.  With respect, Merck believes that Judge Higbee's ruling was in error.  It also bears noting that: (1) evidence that Merck employees took Vioxx  was introduced during the *Ernst* trial (Aug. 5, 2005 Tr., *Ernst v. Merck*, No. 19961*BH02 (Dist. Ct. Brazoria County Tex. filed May 24, 2002), at 83:24-84:3, attached as Ex. 12 to the Wittmann Decl.); and (2) Judge Higbee held that, if plaintiffs opened the door to the testimony by arguing that Merck placed profits above safety, she would reconsider her ruling (Aug. 25, 2005 Tr., *Humeston v. Merck*, No. 619 (N.J. Super. Ct. Law Div. filed August 19, 2003), at 102:5-138:23, attached as Ex. 19 to the Wittmann Decl.)  In any event, the rulings by the two state courts have no authoritative force in the action before this Court.

5

Philip S. Beck
Adam L. Hoeflich
Tarek Ismail
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois 60610
Phone: 312-494-4400
Fax:    312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Phone:  202-434-5000
Fax:     202-434-5029

And

John H. Beisner
Charles C. Lifland
Richard B. Goetz
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone: 213-430-6000
Fax:     213-430-6407

Attorneys for Merck & Co., Inc.

6

798334v.1

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Opposition to Plaintiff's Motion *In Limine* to

Exclude Evidence That Merck Employees or Family Members Took Vioxx (Motion *In Limine*

No. 7) has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand

delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by

electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-

Trial Order No. 8, on this 2nd day of February, 2006.

*Dorothy H. Wimberly*