**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| In Re: VIOXX | MDL Docket NO. 1657 |
| PRODUCTS LIABILITY LITIGATION | SECTION L |
| This document relates to All Actions | JUDGE FALLON<br>MAG. JUDGE KNOWLES |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF**
**THE PLAINTIFFS' STEERING COMMITTEE'S**
**GENERIC MOTION *IN LIMINE***

## I.   INTRODUCTION

The Plaintiffs' Steering Committee, through its Generic Motion in Limine, seeks preliminary evidentiary and practical rulings from this Court that are essential to ensure that future test case trials are conducted fairly. Upon consideration, the expedited manner in which the Irvin/Plunkett trials were conducted demonstrated flaws in the procedures employed at those trials. These procedures resulted in an unjust environment that placed plaintiffs in a deficit prior to the trials even commencing, and which continued throughout the proceedings. In addition, the PSC submits that to prevent injustice several adverse evidentiary rulings should be refined in light of the experience gleaned from the earlier trials. The PSC does not believe that a one-size-fits-all approach to every trial is always correct, that some nuance applies to each case, and that the past process can be improved.

Thus, the PSC's motion presented specific proposals each directed to past practices found to be unbalanced and designed to restore symmetry between the adverse interests. These proposals

attempt to meet the Court's interest in expedited trials by incorporating procedures that appropriately streamline the introduction of evidence. For example, several proposals address pre-admission of documents, former testimony, demonstrative exhibits, etc., to eliminate wasteful time at trial authenticating documents or laying a foundation for their admission during trial. Similarly, several of the Court's earlier evidentiary rulings that were respectfully incorrect or worked unique prejudices against the plaintiffs should be inspected to consider whether their continued application is warranted in the evolution of the test trial process. Examples of these evidentiary rulings include the PSC's request to preclude irrelevant testimony suggesting that Vioxx was a potential cure for cancer, which testimony this Court found "somewhat irrelevant" yet was nevertheless highlighted by Merck's counsel during his opening argument to the prejudice of the plaintiffs; the PSC's request to exclude any evidence that FDA regulations precluded the company from making any label changes without prior agency approval, when FDA regulations plainly provide this authority and the judicial gloss concurs; and the PSC's request to exclude testimony that Merck employees took Vioxx, since it is not relevant and if admitted places the PSC on a slippery slope that would require inquiry on other tangential matters to establish lack of credibility and bias like stock options, bonuses, etc.

Against this background, Merck conjectures that several of the procedural aspects of the PSC's motion in limine are too complicated to implement and would delay future trials rather than speed them up, as intended. Certain of these issues have been separately addressed by the Plaintiffs Brief re: Use of Visuals in Opening Statements (filed May 12, 2006), while the remaining matters are addressed collectively herein. Merck also contends that plaintiffs' request to refine the existing evidentiary rulings that were made early in the Irvin/Plunkett trials are beyond reproach. Yet, as this Court recognized in its Order and Reasons of July 21, 2005 addressing ex parte communications

with physicians, there are instances when new evidence, clear error of law and the prevention of injustice, manifest themselves and demand modification of existing rulings because they are not "set in stone." *In re Vioxx Products Liability Litigation*, MDL No. 1657, Order and Reasons at 10 (E.D.La. July 21, 2005).

Here, the PSC has become responsible for shepparding a wave of test trial cases through to verdict. In that capacity, the PSC is obliged to attempt to level the playing field for those cases still to come to trial and correct matters that experience has proven to be incompatible with the tasks imposed upon the committee. As the Court's rulings are not set in stone, flexibility should be encouraged as to the practical aspects of trial to permit different styles and approaches to the craft of trying cases. Similarly, a willingness on the part of the Court to review past evidentiary rulings for error is likewise requested.

Thus resolved to meet our obligations, the PSC submits that the generic motion in limine should granted.

## II.   ARGUMENT

### A.   THIS COURT SHOULD EXCLUDE THE BRIGGS MORRISON "CURE FOR CANCER" TESTIMONY.

Plaintiffs have moved to preclude any testimony by Dr. Briggs Morrison that Vioxx is, may be, or was thought to be a potential cure for cancer. During Irvin 2, Dr. Morrison testified that, while at Merck, he focused his energies on determining whether COX-2s could "prevent or treat cancer[,]" *Irvin 2 v. Merck & Co.*, Tr. at 1605-1607 (Feb. 14, 2006); *see also Id.* at 1517-1520, and that he was ultimately not able to answer that question because "the VICTOR trial was stopped early when [VIOXX] was taken off the market." *Id.* at 1607:2-13.

3

To the extent that the question of fact Merck is presenting to the jury, either directly or by suggestion or implication, via Dr. Morrison is whether or not the drug might have been a cure for cancer, his testimony runs afoul of this Court's ruling in Plunkett I. There, pursuant to F.R.E. 401, this Court granted plaintiff's motion in limine to exclude any reference that a verdict for the Plaintiff will adversely affect the ability of any member of the jury to purchase or have available medications in the future . . . ." *Irvin 1 v. Merck*, Or. (Nov. 18, 2005). To the extent Dr. Morrison's testimony implies that the withdrawal of Vioxx prevented him and other scientists from preventing or finding a cure for cancer, it too should be excluded pursuant to F.R.E. 401.

Even if the testimony were relevant, however, it would not be admissible from Dr. Morrison. Dr. Morrison has not been offered as an expert witness, he has not passed Daubert muster – nor could he here – and Merck has not offered expert support for this proposition in any other form. Consequently, it must be excluded under F.R.E. 703.

Aware of this defect, Merck does not now argue that it has offered Dr. Morrison's testimony to support its contention that Vioxx is or might have been a cure for cancer. In response to the PSC's motion, Merck explains that the subject testimony was relevant in that it "helped explain Dr. Morrison's part in the development of Vioxx. It also helped explain to the jury the many phases of testing involved in the drug approval process, including the fact that Phase II through Phase V studies continue long after a drug receives initial approval." Merck & Co., Inc.'s Opposition to PSC's Generic Motion in Limine at 5 [hereinafter "Merck Brf."]. The question of fact for the jury which this testimony supports, as Merck now purports to recast it, is whether Dr. Morrison hoped Vioxx might cure cancer.

Dr. Morrison's background and experience in oncology and his efforts to find a cure for

4

cancer are not relevant, however, to whether Vioxx causes an increased cardiovascular risk, nor will that information shed any light on whether Vioxx caused or did not cause these plaintiffs' injuries in the instant cases. To the extent that Merck wishes to discuss Dr. Morrison's qualifications and dedication to his profession, it may do so without referring to his hope that Vioxx would provide a cure for cancer.

Even if Dr. Morrison's testimony regarding Vioxx and cancer were even marginally relevant, it must be excluded under F.R.E. 403. Merck fails to establish that the "cancer" testimony is any more pertinent to this case than this Court's assessment of it during Irvin 2: "It is somewhat irrelevant in this situation. So let's not spend a lot of time on it." In fact, the better course, under F.R.E. 403, is to spend no time whatsoever on it, for reasons that Merck's opposition brief makes all too clear. Merck persists in surrounding the cancer reference with the very innuendos that condemn the testimony as confusing, prejudicial and proper for exclusion from this case. The prejudicial power of cancer is the salient point of *United States v. Brooke*, 4 F.3d 1480 (9th Cir. 1993). Merck attempts to deny such power here, in order to invoke it at trial. Testimony implying that withdrawal of the drug stopped Merck from finding a cure for cancer is unavoidably inflammatory and prejudicial, while of no probative value on the issue of Vioxx' causation of cardiovascular injury, and therefore should be excluded.

Merck argues that, because several Vioxx studies had colon polyp endpoints, "the Vioxx story simply cannot be told accurately by excising all references to cancer." *Id.* at 6. This statement begs the question: "why not?" Merck has not articulated why the fact that these studies sought data on precancerous polyps is relevant to the question of cardiovascular risk or the efficacy of Vioxx to prevent pain. Consequently, the Court should exclude testimony regarding any COX-2s' impact,

5

potential or otherwise, on cancer. Merck has, however, articulated exactly the point it hopes the jury will absorb, while claiming that "no one is remotely suggesting" it: "That plaintiffs should be blamed for taking a potential cancer treatment off the market." Merck Brf. at 6. Such a prejudicial, albeit subliminal, suggestion is precisely what Merck intends, and what Rule 403 forbids.

### B.  MERCK SHOULD BE PRECLUDED FROM ARGUING THAT FDA REGULATIONS PROHIBITED THE COMPANY FROM MAKING LABEL CHANGES WITHOUT PRIOR AGENCY APPROVAL.

Any suggestion that Merck could not have changed the Vioxx label without prior FDA approval is false and misleading. Though subject to FDA oversight, Merck was responsible at all times for ensuring that adequate warnings appeared in the Vioxx label.

The law is quite clear. 21 C.F.R. § 201.57(e) states:

> Labeling shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved.

See also Motus v. Pfizer, Inc., 127 F.Supp.2d 1085, 1095 (C.D. Ca. 2000). Section 201.57(e) imposes an affirmative duty on a drug company to warn of a serious hazard associated with a drug as soon as possible. Furthermore, 21 C.F.R. § 314.70(c) provides a necessary mechanism for a manufacturer to add a warning: labeling changes to "add or strengthen a contraindication, warning, precaution, or adverse reaction" do not require FDA's prior approval. See 21 C.F.R. § 314.70(c)(6)(I)(A). Working in concert, these two regulations ensure that a drug company – as the party who knows the most about the safety profile of a drug – warn physicians and patients of any serious hazards caused by a drug as quickly as possible.

In its opposition, Merck first argues that "given the regulations, the guidance provided by the

6

agency, industry practice and Merck's own prior experiences" it could not have changed the label to include a cardiovascular warning. *See* Merck Brf. at 7. *But see The T.J. Hooper*, 60 F.2d 737 (2d Cir. 1932). Regardless of industry practice or its own experiences, the unambiguous language of § 201.57(e) and § 314.70(c) empowers a drug company to add a warning as soon as it becomes aware of a serious hazard associated with the use of its drug. In this circumstance, after receiving the results of VIGOR, Merck had reasonable evidence that using Vioxx caused a serious hazard – i.e., increased ones risk of having a heart attack by 5 times those using naproxen. Upon receiving this data, Merck had an affirmative duty to warn physicians and the millions of patients taking Vioxx on a daily basis (many of them already at risk for an adverse cardiovascular event).

In addition, Merck argues that recent FDA statements suggest that it could not have changed the label. Even the most liberal reading of the FDA's statements does not suggest that a drug manufacturer cannot change a drug label to warn of a serious hazard. Rather, the statement reads, "manufacturers typically consult with FDA prior to adding risk information to labeling." *See* Merck Brf. at 9 (quoting 71 Fed. Reg. 3922, 3934 (2d. col.) (Jan. 24, 2006)). To be sure, the FDA as the agency with over-sight authority over the drug industry has the final approval over a drug label. In the instance where a serious hazard is identified, however, the FDA requires that a manufacturer warn immediately – prior to approval. The agency through its own regulations creates an emphasis on patient safety first rather than FDA pre-approval of a warning. Furthermore, despite Merck's suggestion to the contrary, adding a warning would not have resulted in Vioxx being mis-labeled. As the Court in *McNellis v. Pfizer, Inc.*, No. 05-1286-JBS, 2005 WL 3752269 (D. N.J. Dec. 29, 2005), explained: "Thus, it is apparent that prior FDA approval need not be obtained, nor will a product be deemed mislabeled, if the manufacturer voluntarily or even unilaterally strengthens the

7

approved warnings, precautions or potential adverse reactions upon the label pursuant to 21 C.F.R. § 314.70(c)(6)(iii)(A)." *McNellis*, 2005 WL 3752269, at 4-5. Plainly, the regulations in question specifically impose a duty on a drug manufacturer to warn of serious hazards prior to approval. The principle is warn first – put patient safety first – rather than to continue exposing millions of patients to a serious hazard while the FDA is reviewing the proposed warning.[1]

Merck further argues that in this instance "the analysis and interpretation of complex data was involved" and that "the wording of a risk disclosure was not obvious" – both of which prevented it from adding a warning to the Vioxx label. Section 201.57(e) requires that a drug manufacturer warn when "as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved." The regulation does not require a final analysis of all data before the duty to warn is imposed, only "reasonable evidence of an association of a serious hazard." After the VIGOR results were received, Merck clearly had reasonable evidence that Vioxx caused a serious hazard – an increased risk of adverse CV events. A duty arose at that time. Though arguably there was additional clinical data to analyze from VIGOR and other studies, this in no way changed Merck's obligation as of March 2000. Merck violated the duty imposed by § 201.57(e) by failing to warn physicians or patients of increased CV risks. In regard to the language that should have been used, it would seem that some warning would have been better than no warning at all.

And, lastly as to this issue, Merck argues that it could not have added a warning because "the

---

[1] Indeed, the FDA is so concerned about post-marketing surveillance and advanced warnings that it recently proposed a website to advise of drugs under investigation. *See* "Draft Guidance for Industry on the Food and Drug Administration's 'Drug Watch' for Emerging Drug Safety Information," 70 Fed. Reg. 24606 (May 10, 2005).

8

FDA is responsible for not only for overseeing the labeling of individual products, but also for overseeing the labeling of classes of products . . . Creating incentives for manufacturers to bypass the FDA in adding risk information to the labeling of their individual products is likely to upset the relationships that the FDA seeks to maintain among the labeled benefits and risks of the medical products it regulates." *See* Merck Brf. at 10-11.

It is hard to imagine drug manufacturers competing on how much risk information they can add to their drug labels. This is particularly true in light of Dr. Ed Scolnick's views on adding a CV warning to the Vioxx label. As he writes in a November 8, 2001 email to Merck executives, Douglas A. Greene and Bonnie J. Goldmann, "[I] assure you that I will NOT sign off on any lable (sic) that had a cardiac warning." *See* Plaintiff's Ex. 1.1098 (Ex. "A"). Despite all of the data evidencing serious CV risks associated with the use of Vioxx, Merck had no intention of adding a CV warning to the Vioxx label unless forced to do so by the FDA. The reason for this, and the reason that manufacturers would never "compete" to add risk information to drug labels, is obvious. Adding risk information or a warning to a label reduces sales. In support, Plaintiffs would direct the Court's attention to Merck's own "Long Range Operating Plan" of July 2001 which indicates that adding a warning to the Vioxx label at that time would have decreased Vioxx sales by approximately **$1 billion**. *See* Plaintiff's Ex. 1.1135, at 17 (Ex. "B").

Lastly, it is also hard to imagine how Merck was "helping" the FDA comport with some preconceived notion of how NSAIDs should be labeled by failing to add a warning to the Vioxx label. From March 2000 until the time Vioxx was removed from the market – in other words, throughout the time Merck failed to add a warning to the Vioxx label – millions of patients were being exposed to a substantially increased risk of a heart attack and/or stroke. Merck's argument that its refusal to

9

seeking the to compel the attendance of Mr. Anstice in the Eastern District of Louisiana. The present motion is far broader as it relates to the compulsion of any corporate representative of Merck at a trial in this district, while earmarking Mr. Anstice as the representative likely to be most knowledgeable about the emails and other documents he generated or received. Because the Irvin motion addressed different issues, the PSC submits that reconsideration is not being requested. Even if construed in such a manner, there are new grounds that support granting the motion including respectfully clear error of law and the prevention of injustice.

### 1). AS A PARTY, MERCK CAN BE COMPELLED TO PRESENT A REPRESENTATIVE AT TRIAL

There is no dispute that Merck is a party defendant to this litigation. As a corporation, Merck must appear through its attorneys and officers and directors. If these officials of the corporation are directed by this court to appear at trial, Merck has little recourse. "The court has all the leverage it needs to compel the party's appearance. If the court directs the attendance of the party, disobedience can be compelled with something the seeking party would enjoy even more than the invoking of a contempt penalty: a default judgment against the recalcitrant party." Siegel, Practice Commentaries to Fed.R.Civ.P. 45 at C45-16. It is the other employees of Merck that are at issue.

### 2). MR. ANSTICE MAY BE SUBPOENAED TO APPEAR FOR TRIAL IN NEW ORLEANS OR, ALTERNATIVELY, NEW JERSEY FOR SIMULTANEOUS TRANSMISSION OF HIS TESTIMONY.

Merck takes false comfort believing that Mr. Anstice and its other employees are beyond the subpoena power of this Court based upon this Court's Minute Entry of November 21, 2005. *See In re Vioxx Products Liability Litigation*, MDL No. 1657, Minute Entry at 2 (E.D.La. Nov. 21, 2005). In that order, this Court denied a motion to compel the attendance of Mr. Anstice filed in close

proximately to trial in the *Plunkett* case. The Court's order provided no reasoning for its decision and may simply have been determined on the discretionary basis of timing, and not a lack of authority or jurisdiction over the witness as Merck contends. Without such reasoning the PSC seeks to clarify the order to insure that it was based on well founded legal grounds.

Rule 45 provides all the authority this Court needs to compel this testimony. The rule provides that non-party witnesses can be subpoenaed anywhere within the district or 100 miles of the district where the testimony is to be obtained (the "issuing district"). *See* Fed.R.Civ.P. 45(b)(2). Since the 1991 amendments to Rule 45, attorneys in federal practice are able to issue subpoenas for any district "in which a deposition . . . is compelled by the subpoena." Fed.R.Civ.P. 45(a)(3)(B). The Rule further provides that the issuing district court may compel the witness to travel to a distant district court to testify at trial or deposition.[2] *See* Fed.R.Civ.P. 45(c)(3)(A)(ii) and (B)(iii). *See also* Siegel, Practice Commentaries C45-16 ("Clause (iii) of subdivision (c)(3)(B) interplays with clause (ii) of subdivision (c)(3)(A). The latter assumes that a subpoena can direct a witness to attend a trial held beyond the stated limits measured from the witness's own base. So assuming, it then requires the court to quash or modify a subpoena that contains such a direction, but "subject to the provisions of clause (c)(2)(B)(iii)". In that "subject to" reference is the link that apparently permits the court to order a distant appearance."). Thus, the issuing court on good cause shown could compel Mr. Anstice to appear provided that he is reasonably compensated for his appearance.

---

[2] There is authority to suggest that 28 U.S.C. §1407(b) requires this Court to make the compulsion determination because "'pretrial proceedings in MDL cases <u>shall</u> be conducted by a judge or judges to whom such actions are assigned.' That judge, moreover, 'may exercise the powers of a district judge in <u>any</u> district for the purpose of conducting pretrial depositions in such coordinated or consolidated pretrial proceedings.'" *In re Subpoenas Served on Wilmer, Cutler & Pickering and Goodwin Proctor LLP*, 255 F.Supp. 2d 1, 2 (D.D.C. 2003).

12

The PSC submits that good cause exists. Mr. Anstice is uniquely knowledgeable about the sales and marketing efforts of Merck given his position and central involvement in those efforts. David Anstice is President of Human Health of Merck As President of Human Health, Mr. Anstice was responsible for Merck's operations in the United States throughout the time that Vioxx was being developed and marketed. Given his overall knowledge and involvment, his testimony about events, key documents he authored or received, and company activities is crucial to any trial. Plaintiffs would be supremely prejudiced without his live testimony, which is available in the New Jersey Vioxx Litigation, thereby establishing good cause to compel his attendance at trial in these MDL proceedings.

Alternatively, Mr. Anstice can be compelled to give deposition testimony in the issuing district court, *i.e.*, the District of New Jersey. Both Rule 30 (b)(7) and Rule 43 permit the simultaneous broadcast of the testimony to meet the speedy, just and inexpensive goals of Fed.R.Civ.P 1. Merck's arguments that the 1991 Amendments only afforded protections to witnesses from subpoenas and limited the ruling of *In re San Juan Dupont Plaza Hotel Fire Litigation*, 129 F.R.D. 424 (D.P.R. 1989), are misplaced. As discussed above, the 1991 amendments to Rule 45 expanded the ability of attorneys to issue subpoenas from issuing district courts without need for leave to obtain the subpoena from the distant forum. Also, the added protections afforded to witnesses like Mr. Anstice that Merck adverts to is addressed by the assurance that he will be compensated for his inconvenience traveling to the distant forum, not that he is beyond the authority of the Court. Simultaneous broadcast of the testimony by "remote electronic means" is permitted by Rule 30(b)(7) and consistent with Rule 43(a). Both of these Rules reinforce the reasoning of *San Juan Dupont Plaza Hotel*, not diminish it.

13

For these reasons, the PSC respectfully requests that Mr. Anstice, or, alternatively some other corporate representative can be compelled to appear at trial in the MDL.

### D. THE APRIL 6, 2005 FDA MEMORANDUM SHOULD NOT BE ADMISSIBLE.

The Food and Drug Administration (FDA) April 6, 2005 Memorandum is a compilation of preliminary and conditional opinions. It should not be admissible because it is not reliable.

The memorandum explicitly acknowledges that the FDA lacks data to draw final conclusions regarding the cardiovascular risks of NSAIDs. As a result, the "conclusions" in the memorandum lack the scientific certainty and reliability which might be presumed by the jury. The FDA is widely perceived by the public to be an authority on such issues and, thus, the danger of unfair prejudice is magnified. If the FDA's April 6, 2005 Memorandum is admitted into evidence and testimony regarding its contents is allowed, there is a substantial danger that the jury will attach disproportionate significance to this evidence -- even with its dubious reliability or marginal relevance -- and give less weight to the scientific evidence presented by Plaintiffs that has qualified for admission into evidence by passing through *Daubert's* gates.

As Plaintiffs argued previously, the prejudice to Plaintiffs is heightened by the fact that the authors of the FDA memorandum will not testify at upcoming trials. Plaintiffs will not have opportunity to verify or ascertain the basis of the authors' conclusions through depositions or other means of discovery. Plaintiffs will not have opportunity to cross-examine the authors of the FDA memorandum concerning their opinions. If Defendant is permitted to introduce evidence or argument that the FDA has concluded that there is a class effect for all NSAIDs at trial, Merck, in essence, will have the unfair advantage of bolstering the opinions of its representatives and experts

without Plaintiffs having the opportunity to cross-examine the authors of the memorandum.

For these reasons – the lack of relevancy, the substantial danger of unfair prejudice, the likelihood of confusion to a jury, and the lack of scientific reliability related to the "conclusions" in the FDA's memorandum, the Honorable Judge Higbee in the *Humeston v. Merck & Co.* case ruled that evidence and/or testimony related to the FDA's memorandum is inadmissible. Judge Higbee followed her previous ruling during the *McDarby/Cona* trial. This Court should do the same.

Without question, the minimal probative value of this memorandum is substantially outweighed by its prejudicial effect. Its admission in future MDL trials would only serve to confuse and mislead these juries and result in skewed MDL verdicts. Because of this unfair prejudice, the impact on future MDL trials, and the need to level the playing field, the PSC urges the Court to revise its position and find that the FDA's April 6, 2005 Memorandum is not admissible in future trials.

### E.   MERCK'S CONFIDENTIAL MEMORANDUM OF INVENTION IS NOT PRIVILEGED.

Merck maintains the fiction that the confidential memorandum of invention ("CMI") is privileged. That fiction has already been dispelled by this Court's April 19, 2006 ruling in which it deprivileged documents subject to its in camera inspection. During that review, the CMI was considered by the Court for purposes of privilege and found wanting. The Court's ruling on the matter would ordinarily resolve the matter except that Merck has sought mandamus review and an appeal. Plaintiffs agree with Merck that the Court lacks jurisdiction to review this motion, as the matter is now the subject of appeal. *See Nicol v. Gulf Fleet Supply Vessesl, Inc.*, 743 F.2d 298, 299 (5th Cir. 1984).

Notwithstanding that the issue is stayed until resolution by the appellate court, Merck's other arguments should not be heard to stand without a reply. For example, Merck's argument that the privilege is controlled by resort to the jurisprudence of only those jurisdictions of the forthcoming test cases is bewildering. This MDL is replete with actions from across the nation and populated with civil actions from far more than four states. To limit the court's analysis privilege analysis to those four states where the test cases originated is incomplete. Merck has the burden to show that the privilege it contends to apply to the CMI would arise in every jurisdiction in which a transferor court exists because if the document becomes deprivileged in one jurisdiction, once made public it loses its privileged character not just in that jurisdiction but throughout the MDL. The document is not produced here on a state by state basis; it is produced in the MDL to the PSC to act for all counsel in the MDL, wherever their clients' cases originated. Merck denies the practical effect that this court's ruling would have in this MDL. Yet, when it sought a writ of mandamus to prevent this Court from deprivileging documents it argued to the Fifth Circuit that it would be severely prejudiced once the documents were released because the privilege would be forever lost if disclosed. Merck's contrary argument before this Court is disingenuous and without foundation.

As previously demonstrated, Merck has disclosed so much of the content of the document in its legal papers that it has waived the privilege. Merck's rejoinder that it was forced to do so in its legal papers to counter the strength of plaintiffs' papers in New Jersey is of no moment. Merck is on public record having "outed" the document. Once revealed to the public, the document's privilege genie can not be put forced back into the bottle. This waiver is permanent.

Finally, the fact that the CMI demonstrates that Merck had knowledge of and contemplated a patent based upon an alternate design of Vioxx that coadministered Vioxx with another agent to

counter Vioxx's prothrombotic qualities, highlights the significance of that document for plaintiffs that must demonstrate an alternative design. Since the CMI is a virtual admission by Merck that plaintiffs can use to establish an alternative design, compelling circumstances exist that warrant disregarding the privilege, assuming it is not already waived by Merck's actions.

### F. MOTION IN LIMINE TO PRECLUDE TESTIMONY BY MERCK EMPLOYEES REGARDING THEIR PERSONAL USE OF VIOXX.

Plaintiffs continue to urge the Court to alter its position and find that evidence that Merck employees, former employees, or family members of Merck employees took Vioxx is irrelevant, unfairly prejudicial, and inadmissible at trial.

Such evidence, testimony, or discussion is irrelevant to prove or disprove that Vioxx is unreasonably dangerous. Arguably, those who have testified they took Vioxx had substantial information about the safety profile of the drug. It can be argued that they were well aware of the cardiovascular risks associated with taking Vioxx. Unlike physicians who prescribed the drug to millions of patients, these executives and their family members would have been privy to data drawing into question the safety of Vioxx. These employees and their family members or their physicians would have had opportunity to perform a different risk benefit analysis prior to taking the drug then the rest of the public. Ordinary patients and their physicians would not have had the relevant safety information in order to properly and accurately evaluate the risks associated with the use of Vioxx. The individual choices of Merck executives and their family members, therefore, cannot be extrapolated across the entire population of those taking Vioxx and judged as evidence that Vioxx is safe as labeled.

Moreover, if allowed, the Court must give Plaintiffs opportunity to answer this evidence by

allowing Plaintiffs to discover the medical records of those offering such testimony and to discover the underlying health condition and risk-benefit analysis undertaken for each witness. This will result in a "mini-trial" on this issue for each witness offering such testimony that can only delay any trial and needlessly confuse a jury over clearly extraneous matters.

Plaintiffs respectfully request that this Court enter an order excluding any evidence or discussion that Merck employees, former employees or their family members used Vioxx.

### G. THE PROCEDURAL REQUESTS OF THE PSC REQUIRE FURTHER CONSIDERATION BY THE COURT.

The PSC's motion set forth numerous practical procedural considerations towards advancing the MDL test trials expeditiously and fairly. Certain matters regarding the use of visuals and opening statements, preadmission of exhibits and the length of opening statements have already been briefed for the court separately. As to the remaining matters, the parties are in accord as to some and at diametrically opposite positions as to others. To reconcile these matters, repeating our disagreements on paper is counter-productive. Therefore, the PSC submits that this Court should conduct a pretrial conference to discuss the several proposals outlined in the PSC's motion in limine. The PSC submits that this would be the best approach towards resolving the disagreements between the parties and finding out where common ground can be reached.

### III. CONCLUSION

The determination to proceed with test trials in the MDL requires that the trial proceedings be fair to both parties. The PSC's generic motion in limine sets out those matters that are critical to leveling the playing field. As discussed above, each of the components of the PSC's motion are

well founded and have substantial merit. Accordingly, the PSC respectfully submits that the generic motion in limine should be granted.

Respectfully submitted,

**PLAINTIFFS' STEERING COMMITTEE**

Date:   May 16, 2006         By: _____
**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
***Herman, Herman, Katz & Cotlar, L.L.P.***
Place St. Charles
201 St. Charles Avenue, Suite 4310
New Orleans, Louisiana 70170
Telephone: (504) 581-4892
Facsimile: (504) 561-6024

**PLAINTIFFS' LIAISON COUNSEL**

19

Andy D. Birchfield, Jr., Esquire
Leigh O'Dell, Esquire **(on brief)**
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
(800) 898-2034 (telephone)
(334) 954-7555 (telecopier)
**Co-Lead Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Christopher A. Seeger, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
 MEUNIER & WARSHAUER, L.L.C.
Energy Centre
1100 Poydras Street, Ste. 2800
New Orleans, LA 70163
(504) 522-2304 (telephone)
(504) 528-9973 (fax)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire **(on brief)**
LIEFF, CABRASER, HEIMANN &
 BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Thomas R. Kline, Esquire
KLINE & SPECTER, P.C.
1525 Locust Street
19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Arnold Levin, Esquire **(on brief)**
Fred S. Longer, Esquire **(on brief)**
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Carlene Rhodes Lewis, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire  
ROBINSON, CALCAGNIE & ROBINSON  
620 Newport Center Drive  
7th Floor  
Newport Beach, CA 92660  
(949) 720-1288 (telephone)  
(949) 720-1292 (telecopier)

Christopher V. Tisi, Esquire  
ASHCRAFT & GEREL  
2000 L Street, N.W.  
Suite 400  
Washington, DC 20036-4914  
(202) 783-6400 (telephone)  
(307) 733-0028 (telecopier)

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing pleading has been served upon Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis/Nexis File and Serve Advanced, in accordance with Pre-Trial Order No. 8, on this the 16th day of May, 2006.

*[signature]*