**Catherine Kessedjian**
*Full Professor of the Faculties of Law*
*19 B Villa Seurat*
**75014 PARIS - FRANCE**
Tel +33 1 43 20 07 75
Fax +33 1 43 20 09 13
email: kessedjian@justice.com

# Legal Opinion
*Case: Vioxx*

Ralph De Toledo et al v. Merck & Co., Inc., a New Jersey Corporation

## 1) Introduction

1. I, the undersigned, Catherine Kessedjian, Full Professor of the Faculty of Law, have received a request for legal opinion from the Law Firm of Kenneth B. Moll & Associates, Ltd., attorney for the plaintiffs whose names appear in the caption of this Legal Opinion, in the lawsuit brought against the company Merck, Inc., based on a product liability claim. This lawsuit is pending before the Eastern District of Louisiana in the form of a *class action* as a result of certain undesirable side effects of the medications marketed under the name Vioxx.

2. I was asked to explain how the functioning of the French private international law concerning the obtaining of evidence could affect the claims of the plaintiffs against the defendant if the proceedings took place in France, and what could be the effects of a decision rendered by an American court at the close of a *"class action"* proceeding in France, if that decision were in favor of Merck.

### 1.1)   *General summary of professional experience*

3. I am a Full Professor at the University of Panthéon-Assas Paris II where I co-chair a Master 2 program in Research on European law and where I alternatively teach European Business Law, International Litigation and International Commercial Arbitration. I received my Doctorate in Law from the University of Panthéon-Sorbonne Paris I, with the highest honors in 1986, a Master's Degree from the University of Pennsylvania in 1981, a Diploma of Advanced Studies [DEA] in Private International Law and in International Trade Law, cum laude, and a Diploma of Advanced Studies [DEA] in Public International Law cum laude.

4. I acquired my experience in the field of international disputes during the 18 years of professional practice as attorney at the Paris Bar (1981-1998). Since 1999, I periodically advise companies or individuals who are parties to international proceedings before French Courts or arbitration courts. Since 1990, I have been regularly appointed as an arbitrator in ad hoc arbitration proceedings or in proceedings administered by institutions such as the Arbitration Court of the International Chamber of Commerce, the International Center for the Settlement of Investment Disputes

[ICSID], the *American Arbitration Association*, or the *London Court of International Arbitration*. I also act as mediator or facilitator in international commercial disputes.

5. I have been a member of the *American Law Institute* for several years. In 1998, I was appointed as an advisor for the Institute's project on transnational rules for civil procedure, which was finally adopted in 2004. In 2002, I was appointed as advisor for the project of principles on jurisdictional competence, the applicable law and judgments in matters concerning intellectual property. In 2005, I was accepted as a member of the *Advisory Group* for the *Aggregate Litigation* project.

6. I am also working on research and publication in the fields of private international law, international disputes, and I attend numerous international conferences on these subjects. I am a member of the European Group for private international law, and in that capacity, I participate in the drafting of the European private international law. I have taught at several foreign universities, notably at New York University and at The Hague Academy of International Law.

7. For the past two years, I was appointed President of an international work group, established under the auspices of the International Law Association, whose mission is to study international issues that arise in matters of class actions. As such, I follow the work done in France on the possible insertion of a "French type" of class action into the French law. This project is far from completion considering the extreme reluctance of companies against whom such actions would be brought, as will be explained below.

### 1.2) The facts on which the present opinion is based

8. In order to draft this opinion, I received the text of the "*class action Complaint before the United States District Court for the Northern District of Illinois, Eastern Division* and of the *Memorandum in support of Defendant Merck & Co., Inc.'s motion to dismiss the foreign class action or, in the alternative, to strike the foreign class allegations*". I have also received a copy of the statement of Professor Arnaud Raynouard dated December 13, 2005.

9. According to these documents, Merck maintains that the lawsuit of the French plaintiffs for product liability for the undesirable side effects which they experienced after taking the medication Vioxx (marketed under the name of COEXX outside the United States) would be better adjudicated in France because the French system of justice is most certainly in a position to protect the interests of the plaintiffs, whether from a procedural or a substantive point of view.

10. In this legal opinion, we will demonstrate that the French judicial system is not favorable for claims like those of the plaintiffs in this case, primarily because the means of proof which can be implemented in France are dramatically different from those used in the United States. Consequently, if the plaintiffs are sent back to sue before French courts, they would not have the means to demonstrate the source of their damages. In addition, we will show that if Merck were to prevail in the American proceedings, the judgment, which would be rendered in its favor, would be fully effective in France.

## 2) The general framework of the French judicial system

### 2.1.) France has a heritage of a non-litigious society

11. Traditionally, the French legal system is not a system that favors litigants, since the French society is a far less litigious society than the American society, for instance. Although it is undergoing changes, in France, the judges have always played a minor role. Napoleon always said that he wanted judges to be silent and obedient! Even if it is obviously ridiculous to think that the profession of judges has not evolved since then, one cannot help but think that the tradition still carries great weight and that if reforms are gradually modifying the essence of the entire system, this is happening very slowly.

12. In part, it is on account of these historical and cultural reasons that class actions have not developed in France the way they have in other European countries (in Sweden, for instance), or in the countries of North America (Canada and the United States). Article 31 of the New Code of Civil Procedure prohibits group actions, unless they have been specifically provided for by law. Besides, very few group actions have been instituted by the law to date. Essentially, there are three types of group actions. Firstly, trade unions may file group actions for a number of issues linked with labor law[1]. However, for a trade union to be able to act, it needs to be a "representative", i.e. it must be recognized by public authorities as having an adequately important role among social players. Moreover, article L.422.1 of the Consumer Code authorizes an accredited and nationally recognized association to initiate a group action, if it receives a mandate by at least two consumers who have suffered personal damages on account of an activity by a professional. However, the conditions under which such an action may be initiated are extremely severe. Indeed, not only must the association be accredited and recognized as being truly representative at the national level, which considerably restricts the number of associations that may act, but furthermore, the mandates may not be collected via public announcements either on TV, radio or by means of advertisements, flyers or even personal letters. In addition, each consumer must give the mandate in writing. Finally, similar provisions are given for the protection of those who invest in securities and financial products by articles L.454-1 and L.454-2 of the Monetary and Financial Code. It should also be noted that the judgment rendered at the end of such a group action does not completely bind persons, who have not participated in it. Those who participate may, at any point in time during the proceedings before the final judgment is rendered, step out of the group action in order to preserve their right to act.

13. Indeed, today there are discussions in order to establish a true class action (close to the American *class actions*) in French law, and a work group has been formed under the auspices of the Ministry of Justice and Ministry of Finance in order to study the feasibility of this project[2]. However, companies are exercising active lobbying against

---

[1] The labor Code provides a long list of matters, which may be the object of group actions initiated by trade unions.

[2] Group Action report submitted to the Minister of Economy, Finance and Industry and the Minister of Justice on December 16, 2005.

this project[3], and attorneys are equally concerned[4] about the consequences that such an action would have on the profession, primarily because of the inadequacies of existing rules and regulations concerning the compensation for attorneys' services. If our information is correct, given the present state of affairs, it seems like nothing will be decided until May 2007 and that, even after this date, this project will not be given any priority. Besides, I have also asked the European authorities (Commission of the internal Market of the European Parliament and the Directorate General of Freedom, *Justice and Security in the European Commission*) about a possible European project on the subject. The response has been abundantly clear: there is no political will at present to undertake such a project at the European level.

### 2.2.) *Prohibition against* contingency fees

14. We should consider the example of contingency fees, in other words, fees that are paid to attorneys only by virtue of the success that they can obtain for their clients and in proportion to that success. Fees of this type have always been formally prohibited in France. The origin of this lies in the distant past. We should not forget that the legal *profession in Rome was considered a service rendered by a friend* (Cicero was *not* paid for his services), and the individual for whom one pleads gave what he could give. When I studied to become an attorney, which was a little over 30 years ago, we were taught that a lawyer must not be influenced in his work by the amount of money he might earn. Therefore, he had to work in the same way regardless of the fact as to whether the client was rich and paid him very high fees or if the client was poor and could hardly pay anything at all. Clearly, all of this is purely theoretical, and one almost never sees people without means in our courts. The system was reformed in two ways: they have started to allow attorneys to receive part of their compensation in the form of contingency fees and they have instituted legal aid.

15. *This prohibition persists even today[5]. An attorney, therefore, is formally prohibited* from receiving his entire compensation in the form of contingency fees. However, it is possible that an attorney receives a contingency fee as a <u>supplementary payment.</u> The attorney must receive compensation for his work irrespective of the contingency fee, which would then be added to his basic compensation[6]. The proportion between his basic compensation and the contingency fee is not specified in the texts. The most authoritative doctrine is that this proportion must be reasonable[7]. It is not possible to

---

[3] Declaration of the International Chamber of Commerce [ICC] dated December 1, 2005.

[4] See, in particular, the article in the *Tribune* on February 27, 2006, entitled, "'Class Action': Heated Debate among Attorneys".

[5] *Article 10 of the Law of December 31, 1971, as modified by Law No. 91-647 of July 10, 1991. Civ.1, December 7, 1999.* §3 of Article 10 specifies: "The determination of attorney's fees solely by virtue of the legal *outcome, is hereby prohibited.*"

[6] §3 of Article 10 continues with the following provision: "An agreement is lawful which, in addition to the compensation paid for services rendered, allows a supplementary fee to be established by virtue of the outcome obtained or of the services rendered".

[7] André Damien and Henri Ader, *Règles de la profession d'avocat [Rules of the Legal Profession]*, Dalloz Action, 2004-2005, page 330.

Legal Opinion CK

05/09/2006

set the basic pay on a purely symbolic level in order to receive the main part of the compensation in the form of contingency fees. This system, therefore, does not provide as much incentive as do *contingency fees* in the United States.

16. Legal aid has also been established, which allows a person, whose income falls below *a certain threshold*, to benefit from free legal advice and representation. First of all, it should be noted that the income threshold which may not be exceeded is very low[8]. In addition, the attorney appointed by way of legal aid is likewise paid very little[9], with the result that, despite the ethical rules of the profession referred to above, an attorney does not have the means to do a good job nor does he have the means to devote the time required to prepare his case. Moreover, if the attorney appointed by way of legal aid succeeds in winning the case for his client, and if the legal aid is in full, the attorney may not solicit supplementary fees in addition to the sum allocated to him by the legal aid. In no way can this system thus be compared to that of *contingency fees*.

### 2.3) Court order to pay the expenses of the winning party

17. Another rule specific to the French judicial system, which exerts a greater effect on the ability of individuals without large incomes to be able to seek justice, consists of requiring the losing party to pay the fees and expenses of the winning party. Before the *Tribunal de Grande Instance* (the first instance civil court competent in a lawsuit such as the one in question here), this particular rule is codified in Article 700 of the New Code of Civil Procedure, which provides that:

> "... *the judge shall order the party responsible to pay court expenses, or otherwise, the losing party to pay to the other party the sum which he determines for fees not included in court expenses. The judge shall take into account fairness or economic condition of the party against whom the order is given. He can even sua sponte, for reasons inferred from the same considerations, decide that an order of this kind is not appropriate."*

18. Indeed, it is clearly stated that the judge should take into account all of the circumstances of the case in point, in order to reach a decision as to whether to order the losing party to pay the fees and expenses of the winning party. Certainly, one would also think that a judge would show great hesitation before ordering an individual who has pitted himself against a big company to reimburse the latter, whether in whole or in part, for expenses incurred in its defense. But one cannot completely rule out the fact that, even in this case, if the judge believes that the individual should not have taken action, he would order that individual to pay a certain percentage of the costs incurred by the company. This feature of French law is thus

---

[8] Today, the maximum level of income is 859 euros per month for total legal aid, and 1288 euros for partial aid, which includes the joint income of a couple and of persons habitually living in the household and after a deduction of 155 euros for each of the first two dependents and 98 euros per person beginning with the third dependent.

[9] An attorney receives, towards complete legal aid, a total of 557.96 euros for a proceeding before the County Court, with the possibility of some increases: 193.14 euros in cases of expert advice with travel; 85.44 euros for expert advice without travel; [and] 64.38 euros for paperwork filed during an ongoing case.

generally taken into consideration by plaintiffs when they evaluate the chances of success of their lawsuit before taking the decision to go ahead and pursue legal action.

### 3) Obtaining evidence before a French Court

19. The law of evidence in international proceedings taking place before a French judge is subject to French law, including the Hague Convention of March 18, 1970, on the obtaining of evidence abroad in civil and commercial matters, a Convention to which both France and the United States are parties[10].

20. It is a well-known fact that the French law of evidence does not offer the same options as do the laws of evidence in the United States. The parties to a legal proceeding in France are not obliged to spontaneously reveal information in their possession, which might be of use in demonstrating the truth. The administration of evidence, therefore, essentially lies in the hands of the judge[11]. Article 10 of the Civil Code makes this conception of evidence perfectly clear. After having enunciated the principle according to which *"each one is responsible for contributing his aid towards the cause of justice, with a view towards manifesting the truth"*, the text specifies that only the judge may compel an unwilling person to meet that obligation under the sanction of compulsion, a civil fine, or damages. Experience has shown that, above all in civil matters, the judge rarely uses the powers vested in him by this text. In addition, even if he were to use these powers, the sanctions are generally of a small amount and are rarely used when individuals whose assistance is necessary are not under the control of the parties. For example, if the judge were to come up against a difficulty in administering evidence, he would tend to draw up a report about such a deficiency *without going any further in his investigation. At each stage in the proceedings, it is extremely difficult to exactly know the practice developed on this subject, for want of reliable statistics. On the other hand, it is appropriate to note that the extremely small amount of the civil fine (15 to 1500 €) could in no way act as a deterrent.*

21. What's more, civil proceedings in France continue to essentially be written proceedings[12]. with the result that, while it is not rare to submit sworn statements from third parties who agree to act as witnesses to the judge, this testimony is considered less probative than pre-existing written documents, in other words, documents that

---

[10] The text of the convention is available in French and English, the two official languages of the Conference, on the website of The Hague Conference on Private International Law, at the following URL: http://www.hcch.net/index_fr.php?act=conventions.text&cid=82.

[11] In this area, there barely exists any jurisprudence that deals with international cases. In support of this statement, it is sufficient to mention a report drawn up by France in 2003 for the needs of the practical application of the Hague Convention of 1970, which may be consulted at the website of the Hague Conference, at http://hcch.e-vision.nl/index_fr.php?act=conventions.publications&dtid=33&cid=82. While France reports only two decisions from the Court of Appeals, the United States reports more than a hundred.

[12] Article 1341 of the Civil Code clearly shows the hierarchy of evidence in French law by granting preference to written documents above all else. Testimony may never be used to contradict a written document. Certainly, this prohibition no longer applies between businessmen, and if we are dealing with a "hybrid" relationship (in other words, an act concluded between a businessman and a non-businessman) it only applies to the non-businessman. However, despite the great freedom, which exists in commercial matters, this mentality of the force of the written word is so anchored in everybody's mind that it remains extremely difficult to adduce evidence contrary to what has been stated in a written document.

existed prior to any proceeding. Moreover, it is extremely rare for witnesses to give oral testimony before a judge in civil proceedings. If they are heard nonetheless, it is not the equivalent to the common law system, examination and cross-examination. On the contrary, article 214 of the New Code of Civil Procedure is extremely rigid in its formulation[13]. It is the judge and only the judge who shall interrogate witnesses. After the interrogation, the parties may ask questions to the witness through the judge acting as an intermediary, if, and only if, the judge deems it necessary. It is not unusual for a judge to decide that the questions asked by one party or the other are redundant to those that have already been asked, or that they do not add clarity for him to reach a decision.

22. It is all the more paradoxical that, if the lawsuit unfolds in the U.S. and if, in order to comply with the requirements of the American procedure, a witness located in France must be heard, it shall be done within the forms and according to the rules of the American court that has assumed jurisdiction. This is the result of the application of the Hague Convention of March 18, 1970 in France. This is why Article 739 of the New Code of Civil Procedure provides that letters rogatory[14] are to be executed according to the French law "unless the foreign jurisdiction has requested that such letters be carried out according to a particular form." In addition, in order to allow witnesses to be heard in the form of American type of *cross-examination*, a new article 740 was added to the New Code of Civil Procedure, according to which: "The parties and their attorneys, even if they are foreigners, may, upon authorization by a judge, ask some questions ...". It is for this reason that, during my 18 years of practice, I have personally participated in a good number of hearings where witnesses have given testimony in Paris according to the American form of procedure before court reporters, who have traveled from the United States specially to record the depositions of witnesses according to the cross-examination procedure[15].

23. On the question of knowing the means by which French law provides for compelling witnesses to appear when they have not been found to be under the control of one of the parties to the lawsuit, we have already mentioned above (§19) that the only existing compulsions are those provided in article 10 of the Civil Code. If a witness was located in the territory of a foreign State, the method of summoning and/or hearing him will generally be that of letters rogatory provided by The Hague Convention of 1970 for countries which are party to that convention, such as the

---

[13] Article 214 of the New Code of Civil Procedure provides as follows: "The parties should not interrupt, nor question, nor seek to influence the witnesses who are to testify, nor should they be addressed directly, under penalty of exclusion. The judge may, if he deems it necessary, ask questions which the parties have submitted to him after interrogation of the witness".

[14] This is the form that is generally used to obtain evidence from abroad, by virtue of the The Hague Convention of March 18, 1970.

[15] The text of Article 740 of the New Code of Civil Procedure is supplemented by a provision according to which hearings shall be conducted in French or be translated. In reality, it is not uncommon for hearings to be held outside the presence of a judge, in a purely "amicable" manner, upon authorization by the central authority (in France, the Ministry of Justice) and in the language of the foreign court in which the testimony shall be used, unless one of the parties objects and provided that the witness knows the language and agrees to testify in that language. This practice, beyond the scope of the text, allows expenses arising from the proceedings to be reduced considerably.

*Legal Opinion CK*

05/09/2006

United States. Letters rogatory will be executed according to forms known in the law of the countries to which this request had been made, except if the requesting country has demanded that such letters be carried out according to special forms and provided that such forms are not incompatible with the law of the country to which the request had been made[16]. Being a treaty mainly aimed at cooperation, The Hague Convention of 1970 does not contain any constraining provisions. In addition, there do not exist any obligations, by virtue of this convention, for the State to which the request has been made to use any means of constraint to compel an unwilling witness to appear before court. Moreover, that is why it is generally the State to which the request has been made which dictates the rules by virtue of which an unwilling witness might be compelled to testify. We may note that is the reason why the French Ministry of Justice (civil department of international cooperation) that is the central authority in charge of applying that convention, only receives few requests to force an unwilling witness to participate in a legal proceeding.

24. In this case, we have been told that the essential part of the evidence concerning the medication Vioxx is found within the United States. As a result, if the French plaintiffs were to be excluded from the American proceedings and were obliged to institute proceedings before a French judge, the parties should obtain evidence by using procedures allowed under The Hague Convention of 1970. First and foremost, the documents that are to be requested must be listed in a limited manner in the rogatory letters, and they should have a direct and specific connection with the object of the dispute. This means that the plaintiffs must know the various elements of evidence held by the rival party in advance, at least with respect to their content, source, quantity, and the period during which these elements of proof were created[17]. Since French law does not have any method similar to the American *discovery*, or even to the British *disclosure*, it is often very difficult to obtain those elements of proof held by the defendant by virtue of French evidentiary laws, when their precise nature or other elements allowing their identification are not known. Moreover, implementing The Hague Convention would extend the time frame of the proceedings in France in a relatively significant manner, since it would be necessary to pass through the intervention of the central authorities, with the result that on an average, it *would require about ten months to carry a procedure used to obtain evidence* successfully through to the end.

25. Professor Raynouard insists on the fact that not all evidence may be communicated outside France and invokes various legislative French texts. But he fails to mention that, even to suppose that certain elements of proof were located in France, the texts that he relies on are generally never applied in civil matters, but essentially in sensitive areas, such as competition law or special economic areas.

26. Professor Raynouard also insists on the fact that in case of personal medical records, rules of confidentiality would prevent a foreign court from gaining knowledge of them. However, he fails to indicate that the confidentiality rule was enacted in French

---

[16] Articles 10 and 11 of the Convention of 1970.

[17] Court of Appeals Paris, September 18, 2003, cited in the French answers to questions addressed by the Permanent Bureau of the Hague Conference concerning the application of the Convention of March 18, 1970, on *obtaining evidence abroad in civil or commercial matters*, of October 9, 2003.

law only to protect the patient. As a result, patients are perfectly free to waive this right to confidentiality, as decided by the Court of Cassation[18]. We might, therefore, think that, in this case, patients, who are axiomatically the plaintiffs, would waive their right to confidentiality of their medical records.

### 4) The effects of American judgments in France

27. Since there aren't any multilateral or even bilateral conventions between France and the United States (except for informal agreements on the subject of alimony), it is the common French law of recognition and enforcement of foreign judgments which shall apply. From the onset, we ought to note that France has an extremely liberal policy on the subject of recognition and enforcement of foreign decisions and that there are numerous effects from which a foreign judgment might benefit on French territory.

28. The factual hypothesis that serves as a basis for developments in this case is as follows: the French plaintiffs are accepted in a class action in the United States and Merck wins these proceedings and seeks to protect itself against new proceedings, which would be instituted in France by the same plaintiffs. We can immediately say that all conditions are met so that Merck is not judged again in France in an identical or similar lawsuit. To that effect, it would be appropriate to recall the rules, which would be applied in France and to explain how a French judge would act if a new action were taken against Merck.

### 4.1. The effects which might be given to a foreign judgment

29. It is useful to recall that there are five types of effects that might be accorded to a foreign judgment in France. We will discuss them in decreasing order of importance. First and foremost, the foreign judgment might be "enforced" on French territory, in other words, it would be disguised with the "enforcement formula" which would permit, if necessary, appeal to be made to the public force, so that the party against whom the judgment is to be enforced would comply with the orders given by the foreign judge. This effect is given by a special procedure called "exequatur", which is a specific action that allows a foreign judgment to survive; contrary to what happens in the United States, there is no merger of the foreign judgment into a French judgment.

30. The "recognition" of a foreign judgment constitutes the second effect that can be attributed to it. It is often said that this simply involves giving effect to the authority of the object judged (res judicata) in the foreign judgment, in order to prevent a new case from being instituted in France against the same person. Generally, this recognition takes place in a new case on the merits brought before the French judge. It is on the occasion of this new case on the merits that the foreign judgment is raised as a means of defense and the French judge studies the reasons for which he ought not to recognize the foreign judgment. However, the beneficiary of the judgment may perfectly well not want to wait and run the risk that a legal action might be brought on

---

[18] Civ. 1, December 7, 2004, State-funded Public Hospitals of Paris v. La Mondiale et al.

the merits. He thus has the right to request an *exequatur* as a preventive measure in order to avoid any legal actions on the merits.

31. Let us now imagine that the foreign judgment cannot, as such, be recognized or enforced because there are reasons for denying such effects (these reasons are discussed below). In such a case, the beneficiary of the foreign judgment could again ask the French judge to grant three effects: 1) the effect of title; 2) the effect of proof; and 3) the effect of fact. Insofar as **the effect of title** is concerned, the foreign judgment might serve as title (for example, on the question of ownership of a property right), even if the remainder of the judgment would not be useful in France. In the scenario that now concerns us, this effect does not seem appropriate to us. On the other hand, insofar as the effect of proof and the effect of fact are concerned, this would be highly favorable to Merck. Let us imagine the impossible that the French judge refuses to grant the *exequatur* or recognition of a judgment obtained by Merck in the United States; Merck could, nonetheless, make use of that judgment and the elements of proof of which the foreign judge has taken note in the judgment as a matter of fact and as proof, so as to facilitate the defense of its interests before a French judge during new proceedings, which might possibly instituted against it in France[19]. As a result, even in the worst case scenario for Merck (which we believe would not be possible by virtue of the explanations given below), the American proceeding would not be a waste of time, and all arguments which would have taken place in that proceeding might well be used in France and would facilitate the work of Merck. However, as we have already indicated, we believe that a judgment rendered in the United States would satisfy the conditions for receiving an *exequatur* or formal recognition in France. This is what we will now examine.

### *4.2. Rules regarding the recognition and enforcement of judgments*

32. First of all, let us note that France, unlike certain states in the United States of America, does not require reciprocity. In other words, it is not because a judgment originating in France could not be recognized or enforced in Louisiana or in the territory of another Federal state, that France would refuse to recognize or enforce a judgment originating in the United States.

33. For monetary judgments, as it is in the case in point, and since the mid 1960's, any revision of the merits of a foreign decision has been prohibited[20]. The reasons for which a foreign decision may not be effective in France are listed in a restrictive manner by the jurisprudence of the Court of Cassation. Moreover, from the procedural point of view, these reasons are means of defense for the party opposing recognition or enforcement of the judgment. As a result, the beneficiary of the judgment, Merck in this case, only has to do one thing: prove the judgment by providing an enforceable copy with a certified translation. It would then be incumbent upon the individuals opposing recognition or enforcement to put forth the reasons for non-recognition and to prove that these reasons have been satisfied. The judge cannot act *sua sponte*. Therefore, if the defendant against an *exequatur* does not reveal the lack of

---

[19] The effect of a foreign judgment as a fact has once again been recognized by the Court of Cassation in a recent decision: Com. October 4, 2005 (unpublished).

[20] Munzer Decision, January 7, 1964.

jurisdiction of the foreign court, the judge may not, on his own initiative, study this question. This formula is highly advantageous for the beneficiary of the foreign judgment. Moreover, it considerably limits the arguments and thus the timeframes for obtaining an *exequatur*.

34. The first issue raised involves **the jurisdiction of the foreign judge**. Indeed, it is necessary that the foreign judge has jurisdiction to rule on the merits of the case. This is what is called "indirect jurisdiction". In 1985, the Court of Cassation created a rule extremely favorable to the beneficiary of a foreign judgment[21]. *It is sufficient that the nexus existing between the lawsuit and the foreign court does not violate any French rule of exclusive jurisdiction, that it is strong enough to be considered "significant", and that it is not fraudulent*[22]. In this case, French jurisdictional competence in matters of tort is not exclusive in nature, according to French law[23]. French nationals benefit from an *exclusive jurisdiction in France by virtue of article 14 of the Civil Code*, which is the jurisdictional privilege conferred upon plaintiffs who are French citizens, even if they are suing foreigners. However, the French plaintiff can always waive this privilege[24]. And as, according to the hypothesis, these are plaintiffs who have chosen to sue in the United States as they are plaintiffs in the case in the United States, they are automatically considered as having waived their privilege defined in article 14. Indeed, for a French citizen to sue abroad (and the voluntary participation in a *class action* suit is considered to be equivalent to suing) *is the same as waiving the privilege* of jurisdiction granted in article 14 of the Civil Code. There is no doubt that the courts of the United States have a significant nexus with the litigation, since the defendant company Merck is a company based in the United States. The fact that it is established in a state other than that in which the lawsuit is being pursued should not have any *bearing insofar as the French rules of indirect jurisdiction are concerned*. The defendant's domicile is the connecting factor par excellence, which allows a court to be declared competent within the framework of international relations.

35. It should be noted here that, contrary to what Professor Raynouard indicates, in order to verify the jurisdiction of a foreign court, the French judge should not at all see whether there is a legal nexus between the plaintiffs and Merck. This question arises only to decide on the merits of the case not for any issue of jurisdiction. *The plaintiff is free to summon whoever he wishes, at the risk of seeing himself rejected if the judge were to believe that there is no legal connection.*

36. Based on the above, there is no doubt that the courts of the United States would be considered as having jurisdiction in the sense of the French rules of indirect jurisdiction.

---

[21] Simitch Decision, February 6, 1985.

[22] The exact terms of the decision are as follows: "The foreign court should be recognized as being competent if the lawsuit is significantly associated with the country in which the judge has assumed jurisdiction and if the choice of that court is not fraudulent".

[23] It may be asked whether this solution has not been called into question by the decision of February 17, 2004. However, not only is the decision unclear, but it has been unanimously criticized in the doctrine.

[24] Mixed Chamber, June 28, 1974 (2 decisions), and more recently, Civ. 1, January 31, 2006 (unpublished).

37. The second question, which might be raised by the party losing on account of the foreign judgment in order to object to the recognition or enforcement thereof in France, arises from **fraud**. There can be two types of frauds that may be sanctioned when a foreign judgment becomes effective. First and foremost, it could involve a fraud vis-à-vis the law and, then, a fraud vis-à-vis the judgment. Insofar as a fraud vis-à-vis the law is concerned, this hypothesis is extremely rare. It would be necessary for the parties to seek to elude the application of the law normally applicable by virtue of the French conflict of the rule. We will examine this issue below with the verification of the law applied by the foreign court. Insofar as a fraud vis-à-vis the judgment is concerned, this hypothesis consists of one party intending to search abroad for a judgment, which it would not have been able to obtain in the jurisdiction of the country in which it wishes to use the foreign judgment. Now, in this case, what Merck fears is that it would not be able to use an American judgment which would be favorable to it while the French plaintiffs had wanted to proceed to the United States. Thus, in this matter, a fraud vis-à-vis the judgment could not be invoked by the French plaintiffs who would have lost in the United States, in order to prevent a French judge from effecting a judgment favorable to Merck. It is the principle of estoppel that applies here, a principle recognized by the French Court of Cassation, preventing one party from adopting a position different from that which it had previously adopted when its rival based itself on this position[25].

38. The third cause of non-recognition or non-enforcement of a foreign judgment consists in the verification of **legislative competence** undertaken by the foreign judge. The French judge then verifies the law that the foreign court applied to the merits of the lawsuit; since this law is not different from that which would have been applied by the French judge. In this statement alone, this verification appears quite anachronistic. It is quite possible, indeed, for the foreign court to have effectively applied a law other than that which would have been applied by the French judge. Moreover, this is why this exception has been highly criticized in the doctrine, it has been the subject of some adjustment in the jurisprudence and it is almost never applied in practice. Since a decision handed down by the *Chambre des Requêtes* on July 29, 1929, which was not called into question by the Munzer decision, the jurisprudence considers it to be sufficient if the law actually applied by the foreign judge and the law, which would have been applied by the French judge are **equivalent**. For the French judge to render the foreign decision effective, it is sufficient for these two laws to go in the same direction, that they have the same objectives, even if they are divergent in terms of their formulation or that the basic solution of the lawsuit would not have been the same. As mentioned above, the concrete hypotheses involving the application of this exception are very rare and they have only been generally raised in extra-monetary judgments (i.e. mainly family law). To our knowledge, there is no French decision on foreign money judgments where a French judge would have refused to recognize or enforce a judgment for that sole reason.

39. Finally, a French judge can use the exception of **public policy** in order to object to the recognition or enforcement of a foreign judgment on French territory. Since the Bachir

---

[25] Civ. 1, July 6, 2005.

decision[26], the exception of the public policy encompasses two branches: a **procedural branch** and a **substantive branch**.

40. A French judge makes sure that the **procedure followed abroad** meets French fundamental principles of the procedure, in other words, that it basically respects the defense rights. Considering the significance that the principle of *due process* is accorded in the United States, there is no doubt whatsoever that the pursuit of civil lawsuits in the United States complies with the fundamental principles of justice in France. The fact, that the proceedings are undertaken in accordance with the different modalities as compared to France, would have no bearing on the test used by French judges. The fact, for instance, that a civil process is carried out before a jury, while this modality is unknown in civil matters in France, can in no way influence the decision of the French judge, provided that the process is pursued equitably and fairly and that the parties thereto are granted the option of presenting their arguments within reasonable time frames and means. Similarly, the fact that proceedings are to be conducted in the form of a *class action*, while this form of procedure does not exist in France as such, is again not reason enough for a French judge to refuse to grant effect to a foreign judgment. The hypotheses existing in this jurisprudence where the fundamental principles are considered to have been violated are very rare. This would be the case if a foreign judge was not impartial, if it had been proven a posteriori by the fact that the foreign judge had been removed from the case, on grounds of legitimate suspicion[27]. This would have also been the case if the administration of evidence was such that the parties were not treated equitably[28] or if default by the defendant is taken as a confession[29]. There does not appear to be any reason, in this case, that a French judge can find fault with in the *class action* procedure in the United States, all the more so because the plaintiffs constituting a "class" and the defendant have benefited from the respect for its right to defend itself.

41. We have read the decision of the Constitutional Court of July 25, 1989, as cited by Professor Raynouard, in a different light. When the Constitutional Court says that the person concerned must be able to end a group action, it effectively means the *"opt out"* formula of *class actions* in the American sense. Moreover, even if Professor Raynouard were correct in his reading of the decision of the Constitutional Court, it is not because a certain form of court proceeding is unknown in France, that it would be automatically considered as contrary to French procedural public policy such that the foreign judgment rendered after such a procedure can not be effective in France.

42. When it is the **substantial public policy**, which is invoked before a French judge, the latter will have to consider the basic solution to which the foreign court has arrived and verify if the effect of that solution in France, within the French legal order, is contrary to French international public policy. Firstly, this task clearly involves

---

[26] *Civ. 1, October 4, 1967.*

[27] *Civ.1, December 3, 1996.*

[28] For evidence brought by a unilateral statement made by one of the parties, Civ., May 18, 1976, in a case of extra-monetary judgment (filiations outside marriage).

[29] Civ., March 10, 1982.

verifying whether the foreign judgment contradicts international public policy and not domestic public policy. Now the international public policy is narrower, more restrained than the domestic public policy. The parties might undertake activities within the international sphere even though they might not do so in a purely domestic context. *This first analysis thus limits, already in an appreciable way, those specific cases in which a foreign judgment may be considered as contrary to public policy. But a second element further reduces the scope of intervention of the substantive public policy considerably.* In fact, the public policy applied to a foreign judgment is said to be "attenuated" as compared to the public policy applied to a situation where there is a conflict of laws. Indeed, when dealing with a foreign judgment, one has to take into due consideration the fact that the right underlying the judgment originated, crystallized, and was acquired abroad. The French legal order is thus not very interested in this situation and if it were to become interested, it is solely because the judgment would produce certain effects in France. It is therefore at the very end of the process that the French legal order might intervene in order to eliminate the most shocking effects of the foreign judgment.

43. To illustrate what was explained in § 40 above, we will give an example taken from *corporate law*. The law governing corporations in France covers a certain number of provisions considered as public policy. This is the case with the mandates of votes cast by the shareholders, which should be limited in time and done in an ad-hoc manner for a general shareholders' meeting or a meeting replacing it. When these mandates are exercised in France, public policy is very strong and is applied even if the shareholder is a foreigner. However, if the mandate were carried out abroad (for example, for the operation of a foreign subsidiary of a French company), in a form that is in accordance with foreign law, which, as such, would clash with French public policy, a judgment rendered abroad forcing the French shareholder to respect a mandate of this type would not be considered as contrary to the international public policy.

44. Another clarification should be made at this stage. The French judge appreciates the public policy on the day on which he/she hands down his/her decision and not on the date on which the foreign judge renders his/her decision. Now, it is a known fact that *the public policy has a tendency to become less and less strong for civil or commercial activities*. It is not uncommon, in fact, that an activity is impossible to perform during a period of time (for example, by reason of the existence of a monopoly) while, some years later, it would be authorized, the monopoly having disappeared. Moreover, on the subject of product liability, the rules have essentially been fixed at the European level, and it doesn't seem like they would become stricter. As much as one might make projections about the future, it does not seem like Merck would have any fears about a potential contradiction to the public policy of a judgment handed down in its favor by a court located in the United States.

## 5) Procedural time-limits in France

45. French law of civil procedure is subject to the rules of the European Convention on Human Rights of 1950, which is interpreted by the European Court located in Strasbourg. Article 6§1 of the Convention requires procedures to be conducted within a *"reasonable time frame"*. It is incumbent on the Court to interpret this provision and to say, in concrete cases, whether the time period is reasonable or not. It is to be first

noted that the Court has decided that: *"the reasonable nature of the length of the proceedings must be evaluated taking into consideration all the circumstances of the case and having considered the established criteria of the Court, in particular, the complexity of the lawsuit, the behavior of the claimant and that of the competent authorities"*[30]. It is for this reason that France has been condemned on several occasions, for proceedings that are too lengthy, notably when it turns out that the magistrate hearing the case has failed to make use of the powers vested in him, specifically by failing to give the parties an order to file briefs[31].

46. In a lawsuit such as the one in question, it becomes extremely difficult, if not impossible, to speculate about the length of time which the proceeding might take before the Tribunal de Grande Instance (first instance civil court), and then, afterwards, for appeal. However, it might be thought, in the first instance, that a length of about three years would not be impossible, above all if the judge were to seek to *implement The Hague Convention of 1970.*[32]. It should not be forgotten that if one were to sue Merck, a corporation established in the United States, before French courts, it would be necessary to notify Merck in the United States, which would require supplementary deadlines by virtue of another Hague Convention, that of November 15, 1965 pertaining to the service and notification of judicial and extra-judicial documents in civil or commercial matters abroad, to which France and the United Sates are both parties[33]. Insofar as the procedure for appeal is concerned, this should last about two more years.

47. On the strength of which, I have drafted this legal opinion, carefully prepared by me and which represents, to the best of my knowledge, a concrete interpretation of the current French law, based on the facts that were presented to me.

Executed in Paris,
May 9, 2006

Catherine Kessedjian
Associate Professor
University of Panthéon-Assas Paris II

---

[30] See, for example, European Court of Human Rights [CEDH], X c. France, March 31, 1992; Ferrari v. France, July 28, 1999.

[31] European Court of Human Rights [CEDH], Cozalo v. France, November 9, 1999.

[32] France stated that it had no statistics regarding the time frames for applying the Convention, but the experience *of the central authority shows that execution of rogatory commissions is rarely less than six months.* See French responses to the questions sent by the Permanent Bureau of the Hague Conference concerning the application of the Convention of March 18, 1970, *on obtaining evidence abroad in civil or commercial matters,* of October 9, 2003.

[33] This Convention is available in the English and French, on the website of The Hague Conference of International Private Law, www.hcch.net



**TRANSPERFECT**
T R A N S L A T I O N S

City of New York, State of New York, County of New York

ATLANTA
BOSTON
BRUSSELS
CHICAGO
DALLAS
DENVER
FRANKFURT
GENEVA
HONG KONG
HOUSTON
LONDON
LOS ANGELES
MIAMI
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SEATTLE
STOCKHOLM
TOKYO
WASHINGTON, DC

I, Jessica Majestic, hereby certify that the following is, to the best of my knowledge
and belief, a true and accurate translation of the legal opinion from French into
English.

_____
Signature

Sworn to before me this
18th day of May, 2006

_____
Signature, Notary Public

PAUL D. RALSTON
..otary Public, State of New York
No. 01RA6023867
Qualified in Queens County
~mmission Expires May 3, 2007

_____
Stamp, Notary Public

**Catherine Kessedjian**
*Professeur agrégé des Facultés de droit*
19 B Villa Seurat
75014 PARIS - FRANCE
Tel +33 1 43 20 07 75
Fax +33 1 43 20 09 13
Courriel : kessedjian@justice.com

## Avis juridique

Affaire : Vioxx
Ralph de Toledo et al c. Merck & Co., Inc., une société enregistrée dans le New Jersey

### 1) Introduction

1. Je soussignée, Catherine Kessedjian, Professeur agrégé des Facultés de droit, ait reçu une demande d'avis juridique du Cabinet Kenneth B Moll & Associates Ltd, avocat des demandeurs dont les noms sont indiqués en tête du présent avis, dans l'affaire qui les oppose à la société Merck, Inc, en responsabilité du fait des produits défectueux. Cette affaire est pendante devant le tribunal du district est de Louisiane, sous forme d'action collective (*class action*) en raison des effets secondaires indésirables du médicament commercialisé sous le nom de Vioxx.

2. Il m'a été demandé d'expliquer comment le fonctionnement du droit international privé français en matière d'obtention des preuves pourrait affecter les demandes des demandeurs contre le défendeur si la procédure se déroulait en France, et quels pourraient être les effets en France d'une décision rendue par un tribunal américain, à l'issue d'une procédure de « *class action* », si cette décision était favorable à Merck.

#### *1.1)    Présentation générale de l'expérience professionnelle*

3. Je suis Professeur agrégé à l'Université Panthéon-Assas Paris II où je co-dirige un Master 2 Recherches de droit européen et où j'enseigne alternativement le droit européen des affaires, le droit du *contentieux international* et l'arbitrage du commerce international. Je suis titulaire d'un Doctorat en droit décerné par l'Université Panthéon-Sorbonne Paris I avec les plus hautes distinctions en 1986, d'un Master de l'Université de Pennsylvanie obtenu en 1981, d'un DEA de droit international privé et de droit du commerce international obtenu avec mention assez-bien et d'un DEA de droit international public également obtenu avec mention assez-bien.

4. J'ai acquis mon expérience en matière de contentieux international durant les 18 ans de pratique professionnelle en qualité d'avocat au Barreau de Paris (1981-1998). Depuis 1999, je continue à conseiller périodiquement des entreprises ou des individus qui sont parties à des procès internationaux devant les tribunaux français ou devant des tribunaux arbitraux. Depuis 1990, je suis périodiquement nommée en qualité d'arbitre dans des procédures ad hoc ou administrées par des institutions telles que la Cour

d'arbitrage de la Chambre de Commerce Internationale, le Centre international pour le Règlement des Différends relatifs aux Investissements (CIRDI), *l'American Arbitration Association* ou la *London Court of International Arbitration*. J'agis également en qualité de médiateur ou conciliateur dans le cadre de litiges commerciaux internationaux.

5. *Depuis de nombreuses années, je suis membre de l'American Law Institute*. En 1998, j'ai été nommée en qualité de conseil pour le projet de l'Institut sur les règles transnationales de procédure qui a été finalement adopté en 2004. En 2002, j'ai été *nommée en qualité de conseil pour le projet de principe sur la compétence juridictionnelle, le droit applicable et les jugements en matière de propriété intellectuelle*. En 2005, j'ai été acceptée en qualité de membre du « *Advisory Group* » pour le projet « *Aggregate Litigation* ».

6. J'ai une activité de recherche et de publication dans le domaine du droit international privé, du droit du contentieux international et je *participe à de nombreuses conférences internationales sur ces thèmes*. Je suis membre du Groupe européen de droit international privé et, à ce titre, participe à l'élaboration du droit international privé européen. J'enseigne dans de nombreuses *universités étrangères, notamment* à New York University et à l'Académie de droit international à La Haye.

7. Depuis deux ans, j'ai été nommée Présidente d'un *groupe de travail international*, constitué au sein de l'International Law Association, dont la mission est d'étudier les questions internationales qui se posent en matière d'actions collectives (class actions). A ce titre, j'ai suivi les travaux qui ont été menés en France sur l'éventuelle insertion en droit français d'une sorte d'action collective « à la française ». Ce projet est loin de pouvoir aboutir compte tenu des réticences extrêmement grandes des entreprises à l'encontre de telles actions ainsi qu'il sera expliqué ci-dessous.

### *1.2)   Les faits sur lesquels est fondé le présent avis*

8. Pour rédiger la présente consultation, j'ai reçu le texte de la "*class action Complaint before the United States District Court for the Northern District of Illinois, Eastern Division*" et du « *Memorandum in support of Defendant Merck & Co., Inc's motion to dismiss the foreign class action or, in the alternative, strike the foreign class allegations* ». J'ai également reçu copie de la déclaration du Professeur Arnaud Raynouard en date du 13 décembre 2005.

9. Il ressort de ces documents que Merck soutient que l'action des demandeurs français en responsabilité du fait des produits pour *les effets indésirables qu'ils ont ressentis après avoir pris le médicament Vioxx* (commercialisé sous le nom de Coexx en dehors des Etats-Unis) serait mieux jugée en France car le système de justice français est tout à fait à même de protéger les intérêts des demandeurs tant *du point de vue procédural qu'au fond*.

10. Dans le présent avis juridique, nous démontrerons que le *système judiciaire français est peu favorable à des réclamations comme celles des demandeurs dans la présente instance, notamment en raison des moyens de preuve* qui peuvent être mis en œuvre en France et qui n'ont aucune commune mesure avec ceux qui peuvent être utilisés aux

Etats-Unis. Dès lors, les demandeurs, s'ils sont renvoyés à se pourvoir devant les juridictions françaises n'auront pas les moyens de démontrer l'origine de leur préjudice. Par ailleurs, nous démontrerons que si Merck devait prévaloir dans la procédure américaine, le jugement qui serait rendu en sa faveur aura plein effet en France.

## 2) L'environnement général du système judiciaire français

### 2.1.) La France a un héritage de société non contentieuse

11. Traditionnellement, le système juridique français n'est pas un système favorisant les contentieux, la société française étant une société beaucoup moins contentieuse que ne peut l'être la société américaine par exemple. Le rôle du juge, en France, même s'il est en train de changer, a toujours été un rôle mineur. Napoléon disait toujours qu'il voulait des juges silencieux et obéissants ! Même s'il est évidemment stupide de penser que la profession de magistrats n'a pas évolué depuis ce temps, on ne peut s'empêcher de penser que la tradition a encore un grand poids et que si les réformes modifient petit à petit l'état d'esprit de l'ensemble du système, cela se fait tout doucement.

12. C'est en partie pour ces raisons historiques et culturelles, que les actions collectives ne se sont pas développées en France comme elles ont pu le faire dans d'autres pays européens (la Suède, notamment) ou dans les pays du Nord de l'Amérique (Canada et Etats-Unis). L'article 31 du Nouveau Code de Procédure civile prohibe les actions de groupe sauf dans les cas spécifiquement énumérés par la loi. Or, jusqu'à aujourd'hui, très peu de cas ont été ouverts par la loi. Essentiellement, il existe trois sortes d'actions de groupe. Tout d'abord, les actions de groupe commencées par les syndicats pour des questions liées au droit du travail[1]. Mais pour que le syndicat puisse agir, encore faut-il qu'il soit « représentatif », c'est-à-dire qu'il soit reconnu par les autorités publiques comme ayant une place suffisamment importante parmi les acteurs sociaux. Par ailleurs, l'article L.422-1 du Code de la consommation autorise une association, agréée et reconnue représentative sur le plan national, à intenter une action de groupe si elle est mandatée par deux consommateurs au moins qui auraient subi un préjudice personnel causé par une activité d'un professionnel. Toutefois, les conditions dans lesquelles une telle action peut être intentée sont extrêmement strictes. En effet, non seulement l'association doit être agréée et reconnue comme représentative au niveau national, ce qui restreint considérablement le nombre d'associations qui peuvent agir, mais encore le mandat ne peut être sollicité par voie d'appel public télévisé ou radiophonique ni par voie d'affichage, de tract ou de lettre personnalisée. En plus, le mandat doit être donné par écrit par chaque consommateur. Enfin, des dispositions similaires sont prévues pour la défense des investisseurs en valeurs mobilières et produits financiers par les articles L.454-1 et L.452-2 du Code monétaire et financier. On doit noter également que le jugement rendu à l'issue d'une action de groupe de cette nature ne lie absolument pas les personnes qui n'y ont pas participé. Les

---

[1] Le code du travail énumère une longue liste de questions spécifiques du droit du travail qui peuvent donner lieu à des actions par les syndicats.

personnes qui y participent peuvent, à tout moment avant le jugement sur le fond sortir de la procédure de groupe afin de pouvoir conserver intact leur droit d'agir.

13. *Certes, il y a des discussions aujourd'hui pour instaurer en droit français une véritable action collective (proche des* class actions *à l'américaine) et un groupe de travail a été institué sous l'égide du Ministère de la Justice et du Ministère des Finances pour étudier la faisabilité de ce projet[2]. Toutefois, les entreprises exercent un lobbying actif contre ce projet[3] et les Avocats sont également très inquiets[4] des conséquences qu'une telle action entraînera sur la profession, notamment en raison de l'inadéquation des règles existantes concernant la rémunération des prestations d'avocat. Si nos informations sont correctes, il semble, en tout état de cause, que rien ne sera décidé d'ici à mai 2007 et que, même après cette date, ce projet ne sera pas prioritaire. Par ailleurs, j'ai également posé la question aux autorités européennes (commission du marché intérieur au Parlement européen, et Direction générale Liberté, Justice, Sécurité à la Commission européenne) d'un éventuel projet européen en la matière. La réponse a été très nette : il n'existe aucune volonté politique pour le moment pour lancer un tel projet au niveau européen.*

### 2.2.) L'interdiction des contingency fees

14. Nous prendrons l'exemple des honoraires de résultat, c'est-à-dire des honoraires qui ne sont versés à l'avocat qu'en fonction du succès qu'il obtient pour son client et en proportion de ce succès. De tous temps, ce type d'honoraires a été formellement interdit en France. *L'origine est là encore très lointaine.* Il ne faut pas oublier que l'avocature à Rome était considérée comme un service d'ami (Cicéron n'était pas payé pour ses services), la personne pour qui l'on plaidait donnant ce qu'il pouvait donner. Quand j'ai fait mes études pour devenir avocat, il y a un petit plus de *30 ans, on nous enseignait que l'avocat ne devait pas être influencé dans son travail par le montant d'argent qu'il pouvait gagner.* Il devait donc travailler de la même manière si le client était riche et versait beaucoup d'honoraires ou s'il était pauvre et ne pouvait guère payer. Evidemment, tout cela est théorique et on ne voyait quasiment *jamais les pauvres dans les prétoires. Le système a été* réformé de deux manières : on a commencé à admettre que l'avocat reçoive une partie de sa rémunération en honoraires de résultat ; on a institué l'aide judiciaire.

15. *Cette interdiction persiste encore aujourd'hui[5].* Il est donc formellement interdit pour un avocat de recevoir l'intégralité sous forme d'honoraires de résultat. Toutefois, il est possible que l'Avocat reçoive à titre complémentaire, un honoraire de résultat. L'avocat doit recevoir une rémunération de son travail indépendamment de

---

[2] *Rapport sur l'action de groupe remis au Ministre de l'Economie, des Finances et de l'Industrie et au Ministre de la Justice, en date du 16 décembre 2005.*

[3] Déclaration de la Chambre de Commerce internationale (CCI) en date du 1er décembre 2005.

[4] Voir, notamment, l'article dans la Tribune du 27 février 2006, intitulé : « 'Class action' : débat houleux des avocats ».

[5] *Article 10 de la loi du 31 décembre 1971 telle que modifiée par la loi n°91-647 du 10 juillet 1991. Civ.1, 7 déc. 1999. Le §3 de l'article 10 précise : « Toute fixation d'honoraires, qui ne le serait qu'en fonction du résultat judiciaire, est interdite. ».*

l'honoraire de résultat, celui-ci ne venant qu'ajouter à cette rémunération de base[6]. La proportion entre la rémunération de base et l'honoraire de résultat n'est pas précisée dans les textes. La doctrine la plus autorisée s'accorde à dire que cette proportion doit être raisonnable[7]. Il n'est pas possible de fixer la rémunération de base à un niveau purement symbolique pour recevoir l'essentiel de la rémunération en honoraires de résultat. Ce système n'est donc pas aussi incitatif que celui des *contingency fees* tel qu'il existe aux Etats-Unis.

16. On a également établi l'aide judiciaire qui permet à une personne, dont le revenu est situé en dessous d'un certain seuil, de bénéficier d'un avocat gratuitement. On doit noter tout d'abord que le seuil de revenu à ne pas dépasser est extrêmement faible[8]. De surcroît, l'avocat nommé au titre de l'aide judiciaire est également très peu rémunéré[9]. si bien que, malgré la règle déontologique que nous avons rappelée ci-dessus, l'avocat n'a pas les moyens ne faire du bon travail et de consacrer le temps nécessaire à la préparation des dossiers. Par ailleurs, si l'avocat commis au titre de l'aide judiciaire venait à gagner le dossier pour son client, et si l'aide judiciaire est totale, l'avocat ne pourra pas demander un complément d'honoraires par rapport à la somme qui lui est allouée par l'aide judiciaire. En aucune manière ce système ne peut donc être comparable avec celui des *contingency fees*.

### 2.3) La condamnation au paiement des frais de la partie gagnante

17. Une autre règle spécifique au système judiciaire français et qui emporte une conséquence majeure sur la capacité que des individus sans grands revenus peuvent avoir d'aller en justice, consiste à condamner la partie perdante à payer les frais et honoraires de la partie qui a gagné. Devant le Tribunal de Grande instance (juridiction compétente dans un litige tel que celui en cause en l'espèce), la règle est codifiée à l'article 700 du *Nouveau Code de Procédure civile* qui dispose :

> « ... le juge condamne la partie tenue aux dépens ou, à défaut, la partie perdante à payer à l'autre partie la somme qu'il détermine, au titre des frais exposés et non compris dans les dépens. Le juge tient compte de l'équité ou de la situation économique de la partie condamnée. Il peut même d'office, pour des raisons tirées des mêmes considérations, dire qu'il n'y a pas lieu à cette condamnation. »

---

[6] Le §3 de l'article 10 continue par la disposition suivante : « Est licite la convention qui, outre la rémunération des *prestations effectuées*, prévoit la fixation d'un honoraire complémentaire en fonction du résultat obtenu ou du service rendu. ».

[7] André Damien et Henri Ader, *Règles de la profession d'avocat*, Dalloz Action, 2004-2005,p.330.

[8] Aujourd'hui le niveau maximal de revenus est de 859 euros par mois, pour une aide totale et 1288 euros pour une aide partielle, en ce compris les revenus du conjoint et des personnes vivant habituellement au foyer et après déduction de 155 euros pour chacune des deux premières personnes à charge et 98 euros par personne à compter de la troisième personne à charge.

[9] L'Avocat reçoit, pour une aide judiciaire totale, 557,96 euros pour une procédure devant le Tribunal de Grande Instance avec des majorations possibles : 193,14 euros en cas d'expertise avec déplacement ; 85,44 euros pour une expertise sans déplacement ; 64,38 euros pour un incident de mise en état.

18. Certes, il est clairement dit que le juge tient compte de toutes les circonstances de l'espèce pour prendre la décision de condamner la partie perdante à payer les frais et honoraires de la partie gagnante. Certes, on peut penser aussi qu'un juge hésitera *beaucoup avant de condamner un particulier qui se bat contre une grande entreprise à* rembourser à cette dernière tout ou partie des frais exposés pour se défendre. Mais on ne peut complètement exclure que, même dans ce cas, s'il estime que le particulier n'aurait pas dû entreprendre l'action, il le condamne à payer un certain *montant des honoraires exposés par l'entreprise. Cet élément est donc* généralement pris en considération par les plaideurs lorsqu'ils évaluent les chances de succès de leur procès avant de prendre la décision de poursuivre.

### 3) L'obtention des preuves devant un tribunal français

19. Le droit de la preuve dans les procès internationaux se déroulant *devant un juge français est soumis au droit français y compris la* Convention de la Haye du 18 mars 1970 sur l'obtention des preuves à l'étranger en matière civile et commerciale, Convention à laquelle la France et les Etats-Unis sont parties[10].

20. Il est de notoriété publique *que le droit français de la preuve n'offre pas les mêmes* possibilités que le droit de la preuve aux Etats-Unis. Les parties à un procès en France n'ont aucune obligation de révéler spontanément les informations en leur possession qui seraient utiles à la manifestation de la vérité. *L'administration de la preuve est donc essentiellement entre les mains du juge*[11]. L'article 10 du Code civil révèle parfaitement cette conception de la preuve. Après avoir énoncé le principe selon lequel *"chacun est tenu d'apporter son concours à la justice en vue de la manifestation de la vérité"*, le texte précise que seul le juge peut contraindre une personne récalcitrante à satisfaire à cette obligation *sous la sanction d'une astreinte, d'une amende civile ou de* dommages et intérêts. L'expérience montre, surtout en matière civile, que le juge emploie rarement les pouvoirs qui lui sont donnés par ce texte. De surcroît, s'il utilise ces pouvoirs, les sanctions sont généralement d'un faible montant et sont rarement employées lorsque les personnes *dont le concours est nécessaire ne sont pas sous le* contrôle des parties. Par exemple, si le juge se heurte à une difficulté dans l'administration de la preuve, il aura tendance à établir un procès-verbal de carence, sans aller plus loin dans ses investigations. En tout état de cause, *il est extrêmement difficile de connaître exactement la pratique développée en la matière*, faute de statistiques fiables. En outre, il convient de noter le montant extrêmement faible de l'amende civile (15 à 1500€) qui n'est absolument pas incitatif.

---

[10] Le texte de la convention est disponible, en langue française et en langue anglaise, les deux langues officielles de la Conférence, sur le site de la Conférence de La Haye de droit international privé à l'URL suivante : http://www.hcch.net/index_fr.php?act=conventions.text&cid=82.

[11] Dans ce domaine, il n'existe quasiment aucune jurisprudence mettant en cause des procédures internationales. Pour s'en convaincre, il suffit de se reporter au rapport établi par la France en 2003 pour les besoins de *l'application pratique de la Convention de La Haye de 1970* que l'on peut consulter sur le site de la Conférence de La Haye http://hcch.e-vision.nl/index_fr.php?act=conventions.publications&dtid=33&cid=82. Quand la France rapporte deux décisions de Cour d'appel seulement, les Etats-Unis en rapportent plus d'une centaine.

Avis juridique CK

09/05/2006

21. De plus, la procédure civile en France demeure essentiellement une *procédure écrite*[12]. Si bien que, s'il n'est pas rare de soumettre au juge des *attestations* de tiers acceptant de témoigner, ces *témoignages sont considérés comme moins probants que des documents écrits pré-constitués*, c'est-à-dire existant avant tout procès. Par ailleurs, il est extrêmement rare qu'en procédure civile des témoins soient entendus oralement par le juge. S'ils le sont malgré tout, il n'existe pas d'équivalent au système de *common law*, d'*examination* et *cross-examination*. Bien au contraire, l'article 214 du Nouveau code de procédure civile est très ferme dans sa formulation[13]. *C'est le juge et lui seul qui interroge les témoins. Après l'interrogatoire, les parties peuvent poser des questions au témoin mais par l'intermédiaire du juge uniquement et seulement si le juge l'estime nécessaire. Il n'est pas rare que le juge estime que les questions posées par l'une ou l'autre des parties sont redondantes* par rapport à celles qu'il a déjà posées, ou ne l'éclairent pas particulièrement pour la décision à prendre.

22. Ceci est d'autant plus paradoxal que, si le procès se déroule aux Etats-Unis et que pour les besoins de la procédure américaine, un *témoin situé en France doit être entendu, il pourra l'être dans les formes et selon les règles du tribunal américain saisi*. C'est le *résultat de l'application en France de la Convention de La Haye du 18 mars 1970*. C'est ainsi que l'article 739 du Nouveau code de procédure civile dispose que les commissions rogatoires[14] sont exécutées conformément à la loi française "à moins que la juridiction étrangère n'ait demandé qu'il y soit procédé selon une forme particulière". De surcroît, pour permettre l'audition de témoins dans les formes de la *cross-examination* à l'américaine, le Nouveau code de procédure civile s'est enrichi d'un article 740 qui dispose : "Les parties et leurs défenseurs, même s'ils sont étrangers, peuvent, sur autorisation du juge, poser des questions …". C'est ainsi que durant mes dix-huit années de pratique, j'ai personnellement participé à plusieurs auditions de témoins faites à Paris, selon les formes américaines, devant des « *court reporters* » qui venaient spécialement des Etats-Unis pour enregistrer les dépositions de témoins selon la procédure de *cross-examination*[15].

---

[12] L'article 1341 du Code civil montre bien la hiérarchie des preuves en droit français en privilégiant avant toute chose l'écrit. *Le témoignage ne peut jamais venir contredire un écrit.* Certes, cette interdiction ne s'applique pas aux tiers à l'acte en cause. Elle ne s'applique pas non plus entre commerçants et si l'on est en présence d'une relation "mixte" (c'est-à-dire un acte conclu entre un commerçant et un non-commerçant), elle s'applique seulement à l'égard du non-commerçant. Toutefois, *malgré la plus grande liberté qui existe en matière commerciale, la mentalité de la force de l'écrit est tellement ancrée dans les esprits qu'il n'en demeure pas moins* extrêmement difficile d'apporter une preuve contraire à ce que dit un acte.

[13] L'article 214 du Nouveau code de procédure civile dispose : "Les parties ne doivent ni interrompre, ni interpeller ni chercher à influencer les témoins qui déposent, ni s'adresser directement à eux, à peine d'exclusion. Le juge pose, s'il l'estime nécessaire, les questions que les parties lui soumettent après l'interrogation du témoin".

[14] C'est la forme habituelle utilisée pour obtenir des preuves situées à l'étranger, en vertu de la Convention de La Haye du 18 mars 1970.

[15] Le texte de l'article 740 du Nouveau code de procédure civile est complété par une disposition selon laquelle les auditions doivent se faire en langue française ou être traduites. En réalité, il n'est pas rare que les auditions se fassent hors la présence d'un juge, de manière purement "amiable", avec l'*autorisation de l'autorité centrale* (en France, le Ministère de la Justice) et dans la langue du tribunal étranger devant lequel le témoignage sera utilisé, à moins que l'une des parties ne s'y oppose et à condition que le témoin connaisse cette langue et accepte de témoigner dans cette langue. Cette pratique, en marge du texte, permet d'alléger considérablement *les frais du procès.*

23. Sur la question de savoir quels sont les moyens dont le droit français dispose pour contraindre un témoin à comparaître alors qu'il ne se trouve pas sous le contrôle d'une des parties au procès, nous avons déjà évoqué ci-dessus (§19) que les seules contraintes existantes sont celles prévues à l'article 10 du Code civil. Si le témoin se trouve sur le territoire d'un Etat étranger, la méthode de convocation et/ou d'audition sera généralement celle de la commission rogatoire prévue par la Convention de La Haye de 1970 pour les pays qui sont Partie à cette convention, comme les Etats-Unis. *La commission rogatoire sera exécutée selon les formes connues par le droit du pays requis sauf si le pays requérant demande qu'elle soit exécutée selon des formes particulières et à condition que ces formes ne soient pas incompatibles avec le droit du pays requis*[16]. *S'agissant d'une convention de coopération*, la Convention de la Haye de 1970 ne contient pas de dispositions contraignantes. De surcroît, il n'existe aucune obligation, en vertu de cette convention, pour l'Etat requis d'utiliser des moyens de contrainte pour forcer un témoin récalcitrant à se présenter. C'est d'ailleurs pourquoi, généralement, ce sont les dispositions de l'Etat requis qui dictent les règles en vertu desquelles un témoin récalcitrant pourrait être contraint à témoigner. On peut noter que le Ministère de la Justice français (service civil d'entraide internationale), qui est l'autorité centrale chargée de l'application de cette convention, ne reçoit que très peu de demandes pour forcer un témoin récalcitrant à participer à une procédure.

24. Dans la présente affaire, il nous a été dit que l'essentiel des preuves concernant le médicament Vioxx se trouvent aux Etats-Unis. En conséquence, si les demandeurs français devaient être exclus de la procédure américaine et devaient procéder devant le juge français, les parties devraient obtenir ces preuves en utilisant les procédures prévues par la Convention de La Haye de 1970. Tout d'abord, les documents dont la production est sollicitée doivent être limitativement énumérés dans la commission rogatoire et doivent avoir un lien direct et précis avec l'objet du litige. Cela veut dire que les demandeurs doivent connaître par avance les éléments de preuve détenus par la partie adverse, au moins quant à leur nature, leur auteur, leur quantité et à la période durant laquelle ces éléments de preuve ont été créés[17]. Comme il n'existe en droit français aucune méthode similaire à la *discovery* à l'américaine, ou même à la *disclosure* à l'anglaise, il est souvent très difficile d'obtenir, en vertu du droit français de la preuve, des éléments de preuve détenus par le défendeur, alors que l'on n'en connaît pas précisément la nature ni les autres éléments permettant de les identifier. D'autre part, mettre en œuvre la Convention de La Haye, allongera les délais de la procédure en France de manière relativement importante puisqu'il est nécessaire de passer par le truchement des autorités centrales, si bien qu'il faut en moyenne dix mois environ pour mener à bien une procédure d'obtention de preuve.

25. Le Professeur Raynouard insiste sur le fait que toutes les preuves ne peuvent pas être communiquées hors de France et invoque divers textes législatifs français. Mais il omet de dire qu'à supposer même que certains éléments de preuve soient situés en France, les textes qu'il vise ne sont généralement pas appliqués en matière civile, *mais*

---

[16] Articles 10 et 11 de la Convention de 1970.

[17] *CA Paris, 18 septembre 2003, cité dans les réponses françaises aux questions adressées par le Bureau permanent de la Conférence de La Haye concernant l'application de la Convention du 18 mars 1970 sur l'obtention des preuves à l'étranger en matière civile ou commerciale, du 9 octobre 2003.*

essentiellement dans des domaines sensibles comme le droit de la concurrence ou des domaines économiques particuliers.

26. Le Professeur Raynouard insiste encore sur le fait que s'agissant de dossiers médicaux personnels, des règles de confidentialité empêcheraient un tribunal étranger d'en prendre connaissance. Il omet toutefois de signaler que la règle de la confidentialité n'est édictée par le droit français que pour protéger le malade. En conséquence, le malade peut parfaitement renoncer à la confidentialité ainsi que l'a jugé la Cour de cassation[18]. On peut donc penser dans la présente affaire que les malades, qui sont par hypothèse les demandeurs renonceront à leur droit de confidentialité sur leurs dossiers médicaux.

## 4) Les effets des jugements américains en France

27. Puisqu'il n'existe aucun accord multilatéral ou bilatéral entre la France et les Etats-Unis (sauf des accords informels en matière d'aliments) c'est le droit commun français de la reconnaissance et de l'exécution des jugements étrangers qui va devoir s'appliquer. Nous devons noter dès l'abord que la France a une politique extrêmement libérale en matière de reconnaissance et d'exécution des décisions étrangères et qu'il existe de nombreux effets dont un jugement étranger peut bénéficier sur le territoire français.

28. L'hypothèse factuelle qui sert de base aux développements qui suivent est la suivante : Les demandeurs français sont acceptés dans la class action aux Etats-Unis et Merck gagne ce procès et cherche à se prémunir à l'encontre d'une nouvelle procédure qui serait intentée en France par les mêmes demandeurs. Nous pouvons dire, immédiatement, que toutes les conditions sont réunies pour que Merck ne puisse pas être à nouveau jugée en France pour une action identique ou similaire. Pour ce faire, il convient de rappeler les règles qui vont s'appliquer et d'expliquer comment le juge français agira s'il est saisi d'une nouvelle action à l'encontre de Merck.

### 4.1. Les effets qui peuvent être donnés à un jugement étranger

29. Il n'est pas inutile de rappeler que cinq types d'effets peuvent être donnés en France à un jugement étranger. Nous les exposerons par ordre décroissant d'importance. Tout d'abord, le jugement étranger peut être « exécuté » sur le territoire français, c'est-à-dire qu'il sera revêtu de la formule exécutoire permettant, si nécessaire, de faire appel à la force publique, pour que le débiteur du jugement exécute les condamnations ordonnées par le juge étranger. Cet effet est donné par une procédure particulière appelée « exequatur » qui est une action spécifique qui laisse perdurer le jugement étranger ; contrairement à ce qui se passe aux Etats-Unis, il n'y a pas de fusion (merger) du jugement étranger dans un jugement français.

30. La « reconnaissance » du jugement étranger constitue le deuxième effet qui peut lui être donné. On dit souvent qu'il s'agit simplement de donner effet à l'autorité de chose jugée (res judicata) du jugement étranger pour empêcher qu'une nouvelle action ne

---

[18] Civ. 1, 7 décembre 2004, Assistance publique-Hôpitaux de Paris c. La Mondiale et al.

soit intentée en France à l'encontre de la même personne. Généralement, cette reconnaissance a lieu à l'occasion d'une nouvelle instance sur le fond dont est saisi le juge français. C'est à l'occasion de cette instance sur le fond, que le jugement étranger est soulevé comme moyen de défense et que le juge français étudie les raisons pour lesquelles il ne devrait pas reconnaître le jugement étranger. Toutefois, le bénéficiaire du jugement peut parfaitement ne pas vouloir attendre et prendre le risque qu'une action sur le fond soit intentée. Il a donc le droit de demander un *exequatur* à titre préventif pour empêcher toute action sur le fond.

31. Imaginons, maintenant, que le jugement étranger ne puisse pas, en tant que tel, être reconnu ou exécuté, parce qu'il existerait des raisons pour lui refuser de tels effets (ces raisons étant exposées ci-dessous). Dans un tel cas, le bénéficiaire du jugement étranger peut encore demander au juge français d'accorder trois effets : 1) l'effet de titre ; 2) l'effet de preuve ; 3) l'effet de fait. En ce qui concerne **l'effet de titre**, le jugement étranger sert de titre (par exemple sur la question du titulaire d'un droit de propriété) même si le reste du jugement ne peut pas être utile en France. Dans l'hypothèse qui nous occupe, cet effet ne nous paraît pas approprié. En ce qui concerne **l'effet de preuve et l'effet de fait**, en revanche, cela est beaucoup plus favorable à Merck. Imaginons que, par impossible, le juge français refuse d'accorder l'exequatur ou la reconnaissance au jugement obtenu par Merck aux Etats-Unis, Merck pourra néanmoins se servir de ce jugement et des éléments constatés par le juge étranger dans ce jugement comme un fait et comme un *élément de preuve* pour faciliter la défense de ses intérêts devant le juge français lors d'un nouveau procès qui lui serait éventuellement intenté en France[19]. En conséquence, même dans la pire des situations pour Merck (ce que nous ne pensons pas possible en raison des explications qui seront données ci-dessous) la procédure américaine ne sera pas inutile et tous les débats qui auront lieu dans cette procédure pourront être utilisés en France et faciliteront le travail de Merck. Toutefois, comme nous l'avons déjà dit, nous pensons que le jugement rendu aux Etats-Unis remplira les conditions pour recevoir un exequatur ou une reconnaissance en France. C'est ce que nous allons étudier maintenant.

### 4.2. Les règles sur la reconnaissance et l'exécution des jugements

32. Notons, tout d'abord, que la France, contrairement à certains Etats des Etats-Unis d'Amérique, ne connaît pas l'exigence de réciprocité. En d'autres termes, ce n'est pas parce qu'un jugement en provenance de la France ne pourrait pas être reconnu ou exécuté en Louisiane ou sur le territoire d'un autre Etat fédéré, que la France refusera de reconnaître ou d'exécuter un jugement en provenance des Etats Unis.

33. Pour les jugements en matière patrimoniale, comme ce sera le cas en l'espèce, et depuis le milieu des années 1960, toute révision au fond de la décision étrangère est interdite[20]. Les raisons pour lesquelles une décision étrangère peut ne pas recevoir d'effet en France sont limitativement énumérées par la jurisprudence de la Cour de cassation. De surcroît, du point de vue de la procédure, ces raisons sont des moyens de

---

[19] L'effet de fait du jugement étranger a été reconnu à nouveau par la Cour de cassation dans un arrêt récent : Com. 4 octobre 2005 (inédit).

[20] Arrêt Munzer, 7 janvier 1964.

défense pour la partie qui s'oppose à la reconnaissance ou à l'exécution. En conséquence, le bénéficiaire du jugement, Merck en l'occurrence, n'a qu'une chose à faire : prouver le jugement en en fournissant une copie exécutoire avec sa traduction jurée. Ce sera ensuite aux personnes qui s'opposent à la reconnaissance ou à l'exécution de soulever les motifs de non reconnaissance et de prouver que ces motifs sont remplis. Le juge ne peut pas agir *sua sponte*. C'est ainsi que si le défendeur à l'*exequatur* ne soulèvent pas l'incompétence du tribunal étranger, le juge ne pourra pas, de sa propre initiative, étudier cette question. Cette formule est évidemment très avantageuse pour le bénéficiaire du jugement étranger. Par ailleurs, elle limite considérablement les débats et donc les délais pour obtenir l'exequatur.

34. La première question qui se pose concerne **la compétence du juge étranger**. Il faut, en effet, que le juge étranger ait été compétent pour statuer sur l'action au fond. On appelle cela, la compétence indirecte. En 1985, la Cour de cassation a créé une règle extrêmement favorable pour le bénéficiaire du jugement étranger[21]. Il suffit que le lien (*nexus*) qui existait entre le litige et le juge étranger ne heurte aucune règle de compétence exclusive française, qu'il soit suffisamment fort pour être « caractérisé » et qu'il ne soit pas frauduleux[22]. En l'espèce, les compétences juridictionnelles françaises en matière de délit ne sont pas de nature exclusive selon le droit français[23]. Les ressortissants français bénéficient d'une compétence exclusive en France en raison de l'article 14 du Code civil qui est le privilège de juridiction conféré aux citoyens français demandeurs dans un procès, même à l'encontre d'étrangers. *Cependant*, le demandeur français peut *toujours renoncer à ce privilège*[24]. Et comme, par hypothèse, ce sont les demandeurs qui ont assigné aux Etats-Unis puisqu'ils sont demandeurs dans l'action aux Etats-Unis, ils sont *ipso jure* considérés comme ayant renoncé au bénéfice de l'article 14. En effet, le fait pour un citoyen français d'assigner à l'étranger (et la participation volontaire à une *class action* est considérée comme l'équivalent d'une assignation), vaut renonciation au privilège de juridiction de l'article 14 du Code civil. *Il ne fait aucun doute non plus que les tribunaux des Etats-Unis possèdent un lien caractérisé avec le litige puisque la société Merck défenderesse est une société installée aux Etats-Unis*. Le fait qu'elle soit établie dans un Etat différent de celui dans lequel le procès se déroule n'a aucune incidence au regard des règles françaises de compétence indirecte. *Le domicile du défendeur est le lien par excellence qui permet à un tribunal de se déclarer compétent dans le cadre de relations internationales*.

35. On doit remarquer ici que, contrairement à ce qu'indique le Professeur Raynouard, pour vérifier la compétence du juge étranger, le juge français ne regardera absolument pas s'il existe un lien de droit entre les demandeurs et la société Merck. Cette question relève, en effet, du fond du litige et non de la compétence juridictionnelle. Le

---

[21] Arrêt *Simitch*, 6 février 1985.

[22] Les termes exacts de l'arrêt sont les suivants : « le tribunal étranger doit être reconnu compétent si *le litige se rattache de manière caractérisée au pays dont le juge a été saisi et si le choix de la juridiction n'a pas été frauduleux*. ».

[23] On a pu se poser la question de savoir si cette évolution n'était pas remise en cause par un arrêt du 17 février 2004. Mais outre que l'arrêt n'est pas clair, il a été unanimement critiqué en doctrine.

[24] Ch. Mixte 28 juin 1974 (2 arrêts). Et, plus récemment, Civ. 1, 31 janvier 2006 (*inédit*).

demandeur est libre d'assigner qui il veut au risque de se voir débouté au fond si le juge considère que le lien de droit n'existe pas.

36. En conséquence de ce qui précède, il ne fait aucun doute que les tribunaux des Etats-Unis seront considérés comme étant compétents au sens des règles françaises de compétence indirecte.

37. La deuxième question qui pourrait être soulevée par le débiteur du jugement étranger pour s'opposer à sa reconnaissance ou à sone exécution en France, relève de la **fraude.** Il peut y avoir deux types de fraudes qui sont sanctionnées au stade de l'effet du jugement étranger. Tout d'abord, ce peut être une *fraude à la loi* et, ensuite, une *fraude au jugement.* En ce qui concerne la fraude à loi, cette hypothèse est extrêmement rare. Il faudrait que les parties aient cherché à éluder l'application de la loi normalement applicable en vertu de la règle de conflit française. Nous étudierons cette question ci-après avec la vérification de la loi appliquée par le juge étranger. *Quant à la fraude au jugement, cela consiste pour une partie à aller chercher à l'étranger un jugement que l'on n'aurait jamais pu obtenir devant les juridictions du pays dans lequel on veut se servir du jugement étranger.* Or, en l'espèce, ce que Merck craint c'est de ne pas pouvoir se servir d'un jugement américain qui lui serait favorable alors que *ce sont les demandeurs français qui ont voulu procédé aux Etats-Unis. Donc, par hypothèse, la fraude au jugement ne pourra pas être invoquée par les demandeurs français qui auraient perdu aux Etats-Unis pour empêcher qu'un juge français donne effet au jugement qui aurait donné raison à Merck. C'est le principe de l'estoppel qui s'applique ici, principe reconnu par la Cour de cassation française,* empêchant une partie d'adopter une position différente de celle qu'elle a adoptée précédemment lorsque son adversaire s'est fondé sur cette position[25]

38. La troisième cause de non reconnaissance ou de non exécution d'un *jugement étranger est constituée par la vérification de la* **compétence législative** effectuée par le juge étranger. Le juge français va donc vérifier la loi que le juge étranger a appliquée au fond du litige ; cette loi ne devant pas être différente de celle qui aurait été appliquée par le juge français. Rien qu'à l'énoncer, cette hypothèse apparaît comme assez anachronique. Il y a *toutes les chances,* en effet, pour que le juge étranger ait effectivement appliqué une loi différente de celle qu'aurait appliquée le juge français. C'est d'ailleurs pourquoi cette exception est très critiquée en doctrine ; elle a fait l'objet d'un aménagement par la jurisprudence et elle n'est quasiment jamais appliquée en pratique. *Depuis un arrêt de la Chambre des Requêtes du 29 juillet 1929, qui n'a pas été remis en cause par l'arrêt Munzer, la jurisprudence se contente d'une* **équivalence** *entre la loi effectivement appliquée par le juge étranger et la loi qu'aurait appliqué le juge français. Pour que le juge français donne effet à la décision étrangère, il suffit que ces deux lois aillent dans le même sens, qu'elles aient les mêmes objectifs, même si elles sont divergentes dans leur formulation ou que la solution au fond du litige n'aurait pas été la même.* Comme nous l'avons dit précédemment, les hypothèses concrètes d'application de cette exception sont rarissimes et elles n'ont été soulevées généralement qu'en matière extra-patrimoniale. A notre connaissance, il n'existe *aucune décision française* en matière patrimoniale qui aurait refusé de reconnaître ou d'exécuter un jugement étranger pour ce seul motif.

---

[25] Civ. 1 6 juillet 2005.

39. Enfin, le juge français peut utiliser l'exception **d'ordre public** pour s'opposer à la reconnaissance ou à l'exécution d'un jugement étranger sur le *territoire français*. Depuis l'arrêt Bachir[26], *l'exception d'ordre public* comprend deux branches : une **branche procédurale** et une **branche substantielle**.

40. Le juge français va s'assurer que la **procédure suivie à l'étranger** correspond aux principes fondamentaux de la procédure en France, c'est-à-dire, essentiellement, le respect des droits de la défense. Compte tenu de *l'importance très grande* que revêt le principe de *due process* aux Etats-Unis, il ne fait aucun doute que le déroulement des procès civils aux Etats-Unis est conforme aux principes fondamentaux de la justice en France. Le fait que la procédure se déroule selon des modalités différentes par rapport à la France n'a pas d'incidence sur le test utilisé par les juges français. Le fait, par exemple, qu'un procès civil soit conduit en présence d'un jury, alors que cette *modalité est inconnue en France au civil, ne peut en aucun cas influencer la décision du juge français*, à condition que le procès ait été équitable et juste et que les parties aient eu la possibilité de présenter leurs arguments selon des délais et des modalités raisonnables. De la même manière, le fait que le procès se soit déroulé sous forme de *class action*, alors que cette forme de procédure n'existe pas en tant que telle en France, *n'est pas non plus une raison suffisante pour le juge français de refuser de donner effet au jugement étranger*. Très rares sont les hypothèses qui existent en jurisprudence où les principes fondamentaux ont été considérés comme violés. Ce fut le cas lorsque le juge étranger n'était pas impartial, ce qui avait été prouvé a posteriori par le fait que le juge étranger avait été dessaisi, après le procès, pour cause de suspicion légitime[27]. Ce fut le cas aussi lorsque l'administration de la preuve est telle que les parties *ne sont pas traitées à égalité*[28] ou que le défaut du défendeur est assimilé à un aveu[29]. On ne voit aucune raison, en l'espèce, que le juge français puisse trouver à redire dans la procédure de *class action* aux Etats-Unis, d'autant plus que ce sont les demandeurs qui sont constitués en « *class* » et que le défendeur aura bénéficié du respect de ses droits à se défendre.

41. Nous faisons une lecture différente de la décision du Conseil constitutionnel du 25 juillet 1989 citée par le Professeur Raynouard.  Quand le Conseil constitutionnel dit que l'intéressé doit pouvoir mettre un terme à l'action collective en ce qui le concerne, il vise effectivement la formule du « *opt out* » des *class actions* à l'américaine. De surcroît, même si le Professeur Raynouard avait raison dans sa lecture de la décision du Conseil constitutionnel, ce n'est pas parce qu'une forme de procès ne peut pas avoir lieu en France qu'elle serait automatiquement considérée comme contraire à l'ordre public international français de telle manière que le jugement étranger rendu à la suite d'une telle procédure ne puisse recevoir effet en France.

---

[26] Civ. 1, 4 octobre 1967.

[27] Civ. 1, 3 décembre 1996.

[28] Pour la preuve par la seule déclaration de l'une des parties, Civ. 18 mai 1976 dans une matière extra-patrimoniale (filiation naturelle).

[29] Civ. 10 mars 1982.

42. Lorsque c'est **l'ordre public substantiel** qui est invoqué devant le juge français, ce dernier devra regarder la solution au fond à laquelle est parvenu le juge étranger et vérifier si l'effet en France, dans l'ordre juridique français, de cette solution est contraire à l'ordre public international français. Tout d'abord, il s'agit bien de vérifier la contrariété à l'ordre public international et non pas l'ordre public interne. Or, l'ordre public international est plus étroit, plus restreint, que l'ordre public interne. Les parties peuvent entreprendre des activités dans la sphère internationale alors même qu'elles ne pourraient pas le faire dans une sphère purement interne. Ce premier élément limite donc déjà sensiblement les cas concrets dans lesquels un jugement étranger pourra être considéré comme contraire à l'ordre public. Mais un deuxième élément vient encore réduire considérablement le champ d'intervention de l'ordre public. En effet, l'ordre public appliqué en matière de jugements étrangers est dit « atténué » par rapport à l'ordre public appliqué en matière de conflit de lois. En effet, on part de la constatation que le droit dont une partie veut se prévaloir en France est né à l'étranger, s'est cristallisé à l'étranger et a été acquis à l'étranger. L'ordre juridique français n'est donc pas très intéressé par cette situation et s'il le devient, c'est uniquement parce que le jugement devra produire certains effets en France. C'est donc en toute fin de parcours que l'ordre juridique français peut intervenir pour refuser les effets les plus choquants.

43. Pour illustrer ce qui vient d'être dit, on peut donner un exemple en matière de droit des sociétés. Le droit des sociétés en France revêt un certain nombre de dispositions considérées comme d'ordre public. C'est le cas pour les mandats de vote que peuvent consentir les actionnaires qui doivent être limités dans le temps et fait de manière ad hoc pour une assemblée générale ou celle qui la remplace. Lorsque ces mandats sont exercés en France, l'ordre public est très fort et s'applique même si l'actionnaire est étranger. Toutefois, si le mandat est fait à l'étranger (par exemple pour le fonctionnement d'une filiale étrangère d'une société française), sous une forme connue du droit étranger et qui, en tant que telle, heurte l'ordre public français, un jugement rendu à l'étranger qui forcerait l'actionnaire français à respecter ce type de mandat ne serait pas considéré comme contraire à l'ordre public international atténué de la France.

44. Une autre précision doit être donnée à ce stade. Le juge français apprécie l'ordre public au jour où il statue et non pas au jour où le juge étranger a statué. Or, il est un fait que l'ordre public a tendance à s'amenuiser dans le cadre de situations civiles ou commerciales. Il n'est pas rare, en effet, qu'une activité soit impossible durant une certaine période de temps (par exemple en raison de l'existence d'un monopole) alors que quelques années plus tard, elle sera autorisée, le monopole ayant disparu. Par ailleurs, en matière de responsabilité du fait des produits, les règles sont désormais fixées essentiellement au niveau européen et il ne semble pas qu'un durcissement des principes applicables en cette matière soit à envisager. Autant que l'on puisse faire de projection dans l'avenir, il ne semble pas que Merck ait une quelconque crainte à avoir sur l'éventuel contrariété à l'ordre public d'un jugement qui serait rendu en sa faveur par un tribunal situé aux Etats-Unis.

## 5) Les délais de la procédure en France

45. Le droit français de la procédure civile est soumis aux règles de la Convention européenne des Droits de l'Homme de 1950 qui est interprétée par la Cour européenne siégeant à Strasbourg. L'article 6§1 de la Convention exige que les procédures doivent être conduites dans une « *délai raisonnable* ». Il est revenu à la Cour d'interpréter cette disposition et de dire, dans des cas concrets, si le délai était raisonnable ou non. Notons d'abord qu'elle a décidé que : « *le caractère raisonnable de la durée de la procédure s'apprécie suivant les circonstances de la cause et eu égard aux critères consacrés par la jurisprudence de la Cour, en particulier la complexité de l'affaire, le comportement du requérant et celui des autorités compétentes* »[30]. C'est ainsi que la France a été condamnée à plusieurs reprises pour des procédures trop longues, notamment lorsqu'il était avéré que le magistrat de la mise en état n'avait pas fait usage des pouvoirs que lui donne le code de procédure civile, notamment en donnant aux parties injonction de conclure[31].

46. Dans une affaire comme celle en cause ici, il est extrêmement difficile, voire impossible, de spéculer sur la durée que pourrait prendre une procédure devant le Tribunal de grande instance puis, ensuite, en appel. On peut penser, cependant, en première instance, qu'une durée de 3 ans environ ne serait pas impossible, surtout si le juge devait mettre en œuvre la Convention de La Haye de 1970[32]. Il ne faut pas oublier non plus que si l'on devait attraire Merck, société de droit américain, devant les juridictions françaises, il faudrait lui notifier l'acte introductif d'instance aux Etats-Unis, ce qui nécessiterait des délais supplémentaires en vertu d'une autre Convention de La Haye, celle du 15 novembre 1965 relative à la signification et la notification à l'étranger des actes judiciaires et extrajudiciaires en matière civile ou commerciale à laquelle la France et les Etats-Unis sont également partie[33]. Quant à la procédure d'appel, elle devrait durer environ deux années supplémentaires.

---

[30] Voir par exemple, CEDH, X c. France, 31 mars 1992 ; Ferrari c. France, 28 juillet 1999.

[31] CEDH, Cozalo c. France, 9 novembre 1999.

[32] La France a déclaré qu'elle n'avait pas de statistique sur les délais d'application de la Convention mais l'expérience de l'autorité centrale montre que l'exécution des commissions rogatoires est rarement inférieure à *six mois*. Voir les réponses françaises aux questions adressées par le Bureau permanent de la Conférence de La Haye concernant l'application de la Convention du 18 mars 1970 sur l'obtention des preuves à l'étranger en matière civile ou commerciale, du 9 octobre 2003.

[33] Cette Convention est disponible, en langue anglais et en langue française, sur le site de la Conférence de La Haye de Droit international privé, www.hcch.net

Avis juridique CK

09/05/2006

47. En foi de quoi, j'ai établi le présent avis juridique, préparé par mes propres soins, et qui représente, au mieux de mes connaissances, une interprétation correcte du droit français actuel, en fonction des faits qui m'ont été présentés.

Fait à Paris,
le 9 mai 2006

Catherine Kessedjian
Professeur agrégé
Université Panthéon-Assas Paris II