Prof. CLAUDIO CONSOLO, Esq.
37121 VERONA – Via Leoncino, 16
Telephone and Fax:  045/8011532 - 8031480

# CLASS ACTION AND THE RESPONSIBILITIES FOR DAMAGES DUE TO MEDICATION

## The Various Protection Perspectives
## in Italian and American Regulations

### I. INTRODUCTION

1.  This opinion is written as a supplement and, in many aspects, as a proper reply and amendment of the document dated December 13, 2005, written by Prof. Gambaro, in connection with the proceedings initiated in the *United States District Court for the Northern District of Illinois* by a group of plaintiffs that reside in Italy, in order to obtain compensation for damages suffered as a result of taking the medicine Vioxx, manufactured  by *Merck & Co.*, which is headquartered in the State of *New Jersey* (USA) and is the company that has been summoned.

    Faced with the *forum non conveniens* [unsuitable tribunal] objection advanced by the defendant company, Prof. Gambaro was charged with the task of explaining to the Court in which the legal action was brought, what basic body of *legislation* and what *protective trial devices* could be of help to the Italian plaintiffs if they developed their legal action in Italy and what the effects of a possible American sentence could be in Italy.

    I had the opportunity to examine the *Italian Class Action Complaint*, dated May 9, 2005, by means of which the plaintiffs petition the Court to certify a class made up of "*All Italian persons...who were prescribed, purchased, used and /or ingested the drug Vioxx, manufactured, distributed and / or sold by [the] Defendant*".

2.  Within such class, the plaintiffs characterize **three different** *subclasses*:

    - *Personal Injury Subclass,* composed of persons who have already suffered clear health damage as a result of taking the medicine;

    - *Medical Monitoring Subclass,* composed of persons that because up until now have not suffered real health damage as a result of taking the medicine request compensation for the continuous treatments and medical care that they have to undergo, in accordance with a monitoring program determined in advance, for the purpose of preventing the onset of the ailment;

    - *Reimbursement Subclass,* composed of persons that request reimbursement for purchase price of the medicine.

1

3. I believe that the clear distinction between the different requests related to each subclass must be constantly kept in mind in order to arrive at a clear explanation of the quite different protection capacities offered by the Italian and American [legal] systems.

4. With the present opinion, in fact, it will be attempted to demonstrate to the Court that in Italy only one of the above protection requests, that is the petition activated by the persons in a position to show clear out and out health damage with resulting personal damages, economic and non – economic damages, by chance connected with the taking of Vioxx and only through this could obtain a suitable kind of recognition, although after huge expenses of consultation and legal, *useless formalities and a waiting of around 5-10 years*, for the likely duration of such a complex trial.

Besides this, the claims that we could term of a minor nature, that is the claim for the compensation of damages due to the need for continuous medical check ups or to claim reimbursement for the cost of the medicine, in Italy could not take advantage of a suitable lawsuit that in Italy would be impracticable above all because entrusted to a so called expert witness, *appointed by the Judge who, in cases where the liability has to be established on a scientific basis,* bases the decision on matters of fact almost entirely on the expert witness.

Therefore, these claims as well would most likely be devoid of real protection even after long and expensive waiting.

5. Such lack of protection is due at least [in part] to a double kind of reasoning that will be explained:  first of all to the unanimously recognized inadequacy[1] of the trial devices available in

---

[1]About the limitations of our trial system concerning the protection of widespread interests, see CONSOLO, *Class action fuori dagli USA?* [Class action outside the USA?], in *Rivista di Diritto Civile* [Civil Law Review], 1993, I, 609, GIUSSANI, *La mass tort class action negli Stati Uniti* [Mass tort class action in the United States], in *Rivista Critica di Diritto Privato* [Private Law Critical Review], 1988, 331, Idem, *La prova statistica nelle class actions* [The statistic proof in class actions], in *Rivista di Diritto Precedurale* [Procedural Law Review], 1989, 1029, Idem, *Studi sulle "class action"* [Studies on "class action"], Padua, 1986.  Concerning the difficulties of introducing a trial institution that could absorb the class action in Italy, see RESCIGNO, *Sulla compatibilità tra il modello processuale delle class action ed i principi fondamentali dell'ordinamento giuridico Italiano* [On the compatibility between the trial model of the class action and the basic principles of the Italian legal system], in *Giurisprudenza Italiana* [Italian Jurisprudence], 2000, 2224.  About the by now reached awareness on the part of the Italian legislator concerning the inadequacy of our trial system as far as the protection of super individual rights is

2

Italy in pursuit of the protection of multi-individual juridical situations; secondly for motives of a basic nature, namely due to the opposition displayed by the Italian jurisprudence in abandoning a vision of civil liability strictly related to private law and "*one on one*" disputes and to come up with types of compensation not only of the damages suffered by a single plaintiff present in the proceedings, but also of the overall damage caused by the defendant to the whole group of persons injured by a given behavior.

## II. LIMITATIONS OF SUBSTANTIVE NATURE:

a) **Liability for Multi-Individual Damage in Italy:   The Necessary Confrontation with the Jurisprudence**

1. In his explanation of the substantive Italian law, with respect to the liability for defective products and regarding damages due to medication, Prof. Gambaro, gives a full description of the regulations upon which in Italy could be based the petition for compensation of the damages, as well as of the single damage items that could obtain compensation in Italy[2].

---

concerned, see the recent parliamentary initiatives directed to fill the protection gaps present in our system and rendered more serious and obvious following the recent development of the economic and social relationships:  *it has to do with* [see] Parliamentary Bills No. 3838 and 3839, about which, see the remarks of FAVA, *Class action all'italiana:  paese che vai, usanza che trovi* [Class action Italian-style: when in Rome do as the Romans do], in *Corriere Giuridico*, 3/2004, 1, and CONSOLO, *Fra nuovi riti civili e riscoperta delle class action, alla ricerca di una "giusta" efficienza* [In the middle of new civil procedures and the rediscovery of class action, in search of a "fair" efficiency], in *Corriere Giuridico*, 5/2004, 565.

[2]Compare with pages 7 and 8 of Prof. Gambaro's statement *in which is explained that in Italy the petition for compensation of damages could be based on the general clause of Article 2043 of the Civil Code, regarding the rules of the Decree of the President for the Republic 224/88, now incorporated in decree-law 206/2005, or in Article 2050 of the Civil Code and that on the basis of such petitions, the plaintiffs could obtain compensation for the property damage in the narrow sense (in his double meaning of actual damage that consists of the cost of the medical expenses, and of the loss of profit, which consists of the decreased ability to produce income) for health damage and for moral damage (or in light of the recent sentence of the Court of Cassation, dated May 31, 2003, No. 8828, compare with Note 3, generally non-property),*

---

The above **ITALIAN** into **ENGLISH** translation was completed May 18, 2006, by 1ST **METROPOLITAN TRANSLATION SERVICES, INC.**, located at 30 S. Wacker Dr., 22nd Floor, Chicago, IL 60606, (312) 621-1500.

Nevertheless, it appears that in that opinion not enough emphasis is given on the tangible applications that the jurisprudence has made of such regulations.

Instead, any such analysis appears to be absolutely necessary in order to arrive at a complete evaluation concerning concrete prospects for protection that would loom ahead for the plaintiffs in the event that they would have in mind to put forward legal action in Italy.

2. In particular, in light of a brief but careful examination of the jurisprudence that relates to health damage, it is possible to notice that in Italy the persons that, because cannot yet complain of real health damages due to the taking of the defective medication, would take action for the more limited purposes of obtaining compensation for having been exposed to the risk of future damage (that is individuals that form part of the *medical monitoring subclass*) could hardly obtain an effective protection.

The Italian jurisprudence that has pronounced sentences in similar cases recognizes that such persons have suffered non-property damage[3] that consists of the limitation of their liberty of action and life owing to the need to undergo medical check ups and for being constantly subjected to stress and the fear of being struck by severe health problems in the future, but nevertheless, has indicated strong opposition in granting a considerable, or even minimal, type of relief for such damages.

3. An illustrative example of how the Italian justice tends to judge cases involving liability for non-property "multi-person" damage of the same type as that of the complaints outlined in the *medical monitoring subclass*, can be obtained from the well known Seveso case that, although has to do with compensation for health damages due to an environmental disaster that happened in Lombardy (north of Milan) 30 years ago, has some aspects that could be considered part of the present case.

---

[3] This generic expression is preferred to that of the more specific moral damage, in light of the jurisprudential development that has brought back to Article 2059 of the Civil Code all the assumptions of non-property damage meant as an ample category that includes all the assumptions in which takes place an unfair injury of an inherent value to the person, guaranteed by the constitution, from which ensues detriments not susceptible to economic evaluation and not subject to the limit derived from the legal reservation of Article 185 of the Penal Code (Civil Cassation, May 31, 2003, No. 8828, in *Corriere Giuridico*, 8/2003, 1024).

The above ITALIAN into ENGLISH translation was completed May 18, 2006, by 1ST METROPOLITAN TRANSLATION SERVICES, INC., located at 30 S. Wacker Dr., 22nd Floor, Chicago, IL 60606, (312) 621-1500.

4.  The Seveso environmental accident took place thirty years ago, but nevertheless is considered useful to briefly go over the event that was judicially concluded only a short time ago, to note the close analogy with the present case and to sadly note of how in that occurrence, although much more famous and followed by the mass media, despite having used all their efforts to make the best of the blunt trial devices at the disposal of our system, the citizens did not in any way receive from the Italian justice the hoped for and proper satisfaction of their legitimate expectations.

Italian justice has taken 25 years to express itself and has shown to be deaf with respect to the statistical damage and to every kind of liability and/or damages for risk.

**b) An Illustrative Case:  Seveso – The Facts**

5.  On the evening of July 10, <u>1976,</u> there was an explosion in the Icmesa Plant of Seveso in the department where trichlorophenol was produced, a basic chemical compound utilized in the production of cosmetics and antiseptic for hospitals.  Subsequent to the explosion, the trichlorophenol was transformed into dioxin, a highly toxic mixture that began to escape and read into the air.  The first symptoms perceived by the population were a strong acrid odor and stinging sensations on the skin.

Only nine days later the Provincial Hygiene and Preventive Treatment Laboratory began to study the extent and intensity of the pollution.  The territory surrounding the zone of the accident was divided into three zones based upon the average concentration of dioxin found.

With the proclamation of July 24, 1976, 14 days after the accident, the City of Seveso issued an order that mandated the evacuation of Zone A, as well as the evacuation of children and pregnant women from Zone B and from the strip in which the construction of buildings is limited (Zone R).  In a likely manner, special measures were issued that recommended the temporary control of births and the suspension of breast nursing but, among the most severe measures there was one that, while in Italy abortion was still considered a crime in any form, authorized the interruption of the pregnancies in progress for the women involved in the accident.[4]

---

[4]The state of deep tension and despair that had its origin following the Seveso accident reached its height with the assassination by a group of terrorists of one of the executives that were considered to be responsible for the disaster.  Although this represented an isolated action, it is believed useful to remember it in this writing as a warning and reminder of how delicate is the task of the State when it is called to do justice concerning behaviors that have so harshly struck the goods most important for the person, such as the right to be healthy, and the right to not be sentenced to a life constantly subjected to the fear of death.

The above **ITALIAN** into **ENGLISH** translation was completed May 18, 2006, by 1ST METROPOLITAN TRANSLATION SERVICES, INC., located at 30 S. Wacker Dr., 22nd Floor, Chicago, IL 60606, (312) 621-1500.

A technical-scientific Committee headed by the then President of the Superior Board of Health was established and for the following 10 years (until 1986) every inhabitant of the polluted zone was subjected to clinical surveillance.

Special research projects were conducted in order to see if these persons would show chromosomal alterations or develop pathologies related to the exposure of dioxin. Nevertheless, the conclusions of the Committee seemed to dispel any fear with the statement that the only case histories directly attributable to the dioxin were those of the skin disease denominated chloracne.

Nevertheless, as a precautionary measure, the Committee directed that the studies and inspection of mortality due to the pathologies of tumors should continue at least until the year 1997.

Meanwhile, in Europe several types of studies were developed regarding the effects of dioxin, in parallel with the development in the United States of the studies related to "Agent Orange"[5] that were affecting the Vietnam veterans.

Only in 1997, after a series of worldwide studies and research, the International Agency for Cancer Research along with the World Health Organization entered doxin into the list of carcinogenic substances. However, it concluded that up until now it is not possible to connect with any certainty some tumor pathologies concretely developed in *some persons exposure to* dioxin: it is certain that the exposure increases the risk of cancer, but when tumoral disease develops, up to now it is not possible to know if it has been caused by the dioxin or by other causes (genetic, or family predisposition, extraneous environmental or alimentary factors...).

c) **Seseo - *The Rights of the Victims: Two Million Liras to Every Plaintiff, After 15-20 Years.***

6. Although the facts are deeply sad and dramatic, it is even more dramatic to note the total lack of protection offered to the citizens that are stricken in their health and free exercise of their personal freedom by such a severe catastrophe.

*On the basis of the uncertain scientific conclusions described above for the inhabitants of Seseo and the neighboring zones, there was no opportunity for legal action tending to obtain compensation:* in fact, because the obstacle represented by the required rigorous individual proof

---

[5]"Agent Orange" was a defoliating gel, strongly contaminated by dioxin and whose toxic and cancer producing properties have been confirmed, which was issued to American military personnel in the Vietnam War.

The above **ITALIAN** into **ENGLISH** translation was completed May 18, 2006, by 1ST **METROPOLITAN TRANSLATION SERVICES, INC.,** located at 30 S. Wacker Dr., 22nd Floor, Chicago, IL 60606, (312) 621-1500.

of the causal connection, every attempt to connect a pathology to the exposure to dioxin would not be considered believable.

The only recognizable damage was that of the strong emotional stress related to the initial lack of information about what happened and of the risks connected with the exposure to the dioxin, to the subsequent and progressive surfacing of fears always more definite and clear cut, to limitations in the way of living that consisted of the need to undergo continuous medical check ups and of the restrictions in the fundamental choices of life, as those of either not procreate or move elsewhere.

Yet even such damages were *also* recognized only after an interval of years.

Only in 1991 and 1994, well after 15-20 years of this occurrence, the Milan Court of Appeals recognized a moral damage due to stress to the inhabitants of Seveso.

7. Nevertheless, from the substance of such sentences it cannot be affirmed that the citizens of Seveso obtained justice.

In the sentencing of July 11, 1991, the Milan Court of Appeals, while premising that, *"in the Seveso event the regulations and limitations to the freedom of action and living, the basically mandatory coercive medical check ups and the fear for the future surely constitute reasons for trouble and moral damage"*, it nevertheless concluded by considering fair and appreciable, *"the compensation of two million liras, including interest, in real money for each plaintiff"*.

The Milan Court of Appeals decreed in the same way in the sentencing of April 15, 1994, in which it was decided that the *"minimum moral damage that is not possible to do less than acknowledge for all the residents of the location of an environmental disaster that are directly involved in the results of the same, who are forced to undergo medical check ups for the purpose of diagnosing the unknown results of the suffered contact with harmful substances, and for this reason are subject to restrictions, can settle with an amount of two million liras"*[6].

---

[6]For the text of the sentences, see *Responsibilità civile e previdenza* [Civil liability and social security], 1995, 136 and following pages. Also see the note by FEOLA, *Il caso Seveso e la risarcibilità dei danni non patrimoniali alla collettività vittima di un disastro ambientale* [The Seveso case and the compensability of non-property damage to the community that is the victim of an environmental disaster], where it is pointed out that the population had formed an association to implement a strategy that reduced the cost of the judgment, sending out in the open a "leading group" consisting of approximately thirty persons, inhabitants of the municipalities involved in the contamination. The group had the task of fostering the civil action, in hopes that when obtaining a favorable sentence, it would be of help in

7

### d) Seveso - The Trial:  The Damages Must be Proven Beyond Any Reasonable Doubt

8. The Court of Appeals did not limit itself to granting a derisory compensation, but did much more: in the reasoning of the sentencing it specified that, in the absence of a detailed proof of unusual moral distress suffered by a person as a result of the unlawful event, the fair minimum amount of the damage due to each person merely for having to submit to medical check ups and consequently being restricted, is of only two million liras.

   As if the Court, immediately after having opened the way for the recognition of a joint compensation and (at least in cases of this kind) equal for everybody, had wanted to emphasize that in any event such compensation would be of the second class kind (even with respect to the amount of the settlement) because it was granted even in the absence of individual allegations and of a detailed indication of the title upon which the particular compensation claim of each person is based.

   By reading between the lines it is seen the assertion of how in Italy the conception of civil liability is completely individualistic and based upon private law, continues to be something not to be ignored.

9. This orientation of our jurisprudence has not been contradicted by subsequent sentences, as a matter of fact, in the present situation the above noted sentencing of the Milan Court of Appeals can be considered to represent one of the most significant times in which the jurisprudence was disposed to recognize that non-property multi-person damage due to stress deserved compensation.

   In fact, subsequently to these sentences and intervening on the same subject, the [Court of] Cassation, in twin decisions, has even believed that non-property damage would deserve

---

convincing the company to reach a settlement, thus avoiding the expenses associated with possible judgments for both the responsible and damaged parties.

In fact, differing from the American *class action* in which the amount obtained as compensation for the entire class is "shared" by the individual members of the *class*, in Italy the possible favorable sentence would apply only to the persons who participated in the trial, while the other persons in the same situation to the participate in the court action would have to obtain an independent sentence, taking advantage of the previous favorable sentence, which, among other things, in Italy would not have a binding role.

---

The above ITALIAN into ENGLISH translation was completed May 18, 2006, by 1ST METROPOLITAN TRANSLATION SERVICES, INC., located at 30 S. Wacker Dr., 22nd Floor, Chicago, IL 60606, (312) 621-1500.

compensation only if it was the result of a physical-psychological impairment or of another event that produced property damage[7].

10. Only recently, in the year 2002, the Court of Cassation-United Sections again gave an opinion on the Seveso case, recognizing that personal moral damage deserves compensation by itself even in the absence of a physical-psychological injury or of other events resulting in property damage, but clearly stating that such compensation is due only to persons, *"that prove to have in actual fact suffered a psychological disturbance (suffering and mental anguish) of a temporary nature due to the exposure of polluting substances and the resulting limitations to the normal carrying out of their lives"*[8].

11. With this sentence, the United Sections, although recognizing that a compensation is due to those persons who have suffered damage because of the worries and of the severe limitations to their way of living resulting from the need to undergo continuous medical check ups, have nevertheless required the allegation and proof of the particular physical-psychological damage suffered by each person.

Essentially, the United Sections have not continued in the direction of recognition of non-property damage joint and equal for everybody.

As it has been noted, in such sentence, "we are in the presence of a <u>summation of different and independent positions of individual damage</u>; with such standard, who declares to be a victim can not limit himself to alleging to reside or work in the polluted localities, but, if he wants his

---

[7]*Deals with* [see] Cassation, May 24, 1997, No. 4631 and Cassation, June 20, 1997, No. 5530, both published in *Responsabilità Civile e Previdenza* [Civil Liability and Social Security], 1997, 1059.

[8]Sezione Un Civile [Unified Civil Division], February 21, 2002, No. 2515 in *Responsabilità Civile e Previdenza* [Civil Liability and Social Security], 2002, 726, with note by D. FEOLA, *Il prezzo dell'inquietudine: il caso Seveso torna in Cassazione* [The price of worry: the Seveso case goes back to the [Court of] Cassation]. It should be noted that in the Statement of Reasons for sentence 2515/2002, the Cassation rejected the reason of blame brought up by the Defendant Company that complained about the erroneous application of Article 2697 of the Civil Code specifying that in the trial the Plaintiff had brought forward several medical tests suitable for documenting his state of psychological suffering and that, therefore, the Judge of First Instance, "instead of stopping at considerations of general character had properly <u>personalized</u> the investigation of the damaged individual".

9

The above **ITALIAN** into **ENGLISH** translation was completed May 18, 2006, by **1ST METROPOLITAN TRANSLATION SERVICES, INC.**, located at *30 S. Wacker Dr., 22nd Floor, Chicago, IL 60606, (312) 621-1500.*

aspiration of the compensation to materialize, must prove the existence of a correlation between the pollution of the environment and the inconveniences that he had to suffer"[9].

**e) The Vioxx Case: The Prospects of Protection in Italy in Light of the Seveso Case**

12. In conclusion, in light of the aforesaid opinion, it is possible to think that with respect to the compensation of the so called multi-person stress damage, the Italian jurisprudence moves in two directions:

- the direction portrayed by the sentencing of the Milan Court of Appeals in which the Judge has recognized that damages, <u>even if presumptive</u>, could take place potentially the same for all (that is the damages necessarily suffered by all the citizens of the polluted zones, who, because of the unlawful event, have become medically subjected to risk and as such, have limitations in their own living habits), but has believed that the recourse to the presumptive proof and the probative flaw with respect to the particular individual disturbances suffered by each person as a result of the unlawful event allows only the settlement of what is defined as "<u>minimal moral damage</u>" that is quantified with a derisory sum[10]:

- the direction portrayed by the sentencing of the Court of Cassation-United Sections, that, in order to recognize a compensation, tangible proof of the psychological disturbances suffered by the single individuals is required.

13. *Mutatis mutandis*, [changes have been made] in this particular case if the individuals included in the *medical monitoring subclass* would take legal action in Italy, their protection prospects would very likely be worse than those recognized in the Seveso case.

In fact, this tragedy gave rise to legal action for damages with co-litigants, or in any event, the various actions were coordinated and agreed upon in advance by the injured persons because they had formed an association and devised a common strategy: all of this was made possible due to the fact that the victims of the accident were all and the only inhabitants of a zone relatively small and well defined geographically. This allowed to base cooperation between the injured persons, on one hand, on preexisting relationships of kinship, relatives, friendships, acquaintances, or

---

[9]A. PALMIERI, note to Sezione Un [Unified Division], February 21, 2002, No. 2515, in *Foro Italiano* [Italian Bar], 2002, I, 999.

[10]RIGHI AND VERARDI, *Disastro ambientale e danno morale collettivo* [Environmental disaster and joint stress damage], *Corriere Giuridico*, 1994, 8, 1006, in which is noted that, "the statements of the Court concerning proof are reflected in the quantification of the damages".

The above **ITALIAN** into **ENGLISH** translation was completed May 18, 2006, by 1ST METROPOLITAN TRANSLATION SERVICES, INC., located at 30 S. Wacker Dr., 22nd Floor, Chicago, IL 60606, (312) 621-1500.

other reasons; on the other hand, on the ease with which persons that live close to each other are able to coordinate activities, and finally, on the "sense of belonging" of the group that had been formed in consideration of the public (and political) importance of the case.

On the contrary, in the Vioxx case, the injured persons don't know each other, live far from each other and probably aren't aware of the fact that others have also suffered damage to their health caused by the same medication, and finally, have different pathologies: it certainly is not possible to expect that persons so distant (not only in the geographical sense) from each other could achieve coordination in order to carry out a legal action with co-litigants.

Therefore, it can be reasonably concluded that all that can be expected are actions of "one against one", in which every person would have to provide proof of the causal connection between the action of the medication and the injury, proof certainly extremely complex, expensive and, besides, with the risk that the said causal connection would be considered to exist in certain cases and not in others.

14. It is not possible to believe that the Seveso case and the basic denial affirmed concerning compensation in the absence of individual proof of damages represents a precedent susceptible to drastic changes.

The directions briefly addressed above are representative of principles firmly connected to our law[11]. They are a direct and necessary consequence of our system of protection trial that since do not provide for legislation equivalent to the *class action* of the American model, as will be shown in the remarks that will be made later, really cannot allow alternatives to the Judge.

## III. LIMITATIONS OF THE TRIAL DEVICES AVAILABLE IN ITALY

### a) Protection of Multi-Person Positions in Italy

1. Currently in Italy there is no legislation equivalent to the American *class action* for legal protection against damages individually suffered by several persons by means of a joint action[12].

---

[11]Principles such as the need, for whoever takes legal action, to prove the facts that are its basis (Article 2697 of the Civil Code) and the *res judicata* of the judgment is limited to the parts (Article 2909 of the Civil Code)

[12]Concerning the nonexistence in Italy of legislation comparable to the American *class action*, compare with GIUSSANI, *Studi sulle "class action"* [Studies on "class action"], Padua, 1996, 358: "….in Italy exists [legal] devices directed to in some way favor joint action in some well defined categories of cases - for instance, in the presence of penal crimes or anti-labor union activities - while for the disputes of a

11

In fact, at the base of the Italian trial system is the principle according to which the standing to sue is as a rule granted to the individual personally involved with the subjective situation inferred thereon (ordinary legitimization), while the cases in which the legitimization to take legal action is granted to a person different than the above (extraordinary legitimization) represent exceptions to this principle. Such is the content of Article 81 of the Code of Civil Procedure which states that, "except for the cases foreseen by law, nobody can assert somebody else's rights on his own behalf".

More precisely, there are cases, mostly derived from implementation of directives of the European community, in which our legal system, which is mostly in the process of assimilating instructions from the [European] community, has introduced possibilities of civil actions in which the standing to sue is granted to an institution of collective importance for the protection of an interest shared by the entire category that it represents. Nevertheless, it has been correctly pointed out that the collective interest shared by the entire category to which the individual laws refer to each time does not necessarily coincide with and does not represent the true summation of those same individual interests, to whose protection the American *class action* is aimed[13].

---

general nature are applied, the usual trial rules that were conceived for the individual personal situations, without considering the number of the interested parties: in conclusion, a truly general branch of law applicable to trials that are of interest to large numbers of persons is missing".

[13]For instance, see Law No. 218, of July 30, 1998, which anticipates that the associations for the consumers and users can undertake judicial and extrajudicial actions against behaviors that harm an interest common to various persons, exclusively with the purpose of inhibiting the injurious behavior, to adopt measures that eliminate the harmful effects caused by the verified violations and to make arrangements for the publication in newspapers with national circulation of the provision, where the publication is able to contribute to reducing or correcting the effects of the violation. However, "the extension of the trial legitimization to an indistinct category of individuals by means of the related association of category does not include the economic request of compensation for the damages that is available to the single individuals on the basis of the normal trial rules of our system". This is what RESCIGNO states in *Sulla compatibilità tra il modello processuale della class action ed i principi fondamentali dell'ordinamento giuridico Italiano* [On the compatibility between the trial model of the class action and the basic principles of the Italian legal system], *Giurisprudenza Italiana* [Italian Jurisprudence], 2002, II, 2225. About the first projects to introduce in Italy, but only limited to certain sectors, a *class action* based on the American model, see CONSOLO, *Fra nuovi riti civili e riscoperta*

12

2. Having said that, Prof. Gambaro correctly observes that, in this case, and under the present conditions, the most convenient way to act in Italy would be the initiation of a legal action through permissive joinder of parties, in accordance with Article 103 of the Code of Civil Procedure, that allows several parts to act in the same trial, when among the proposed cases there is a connection of title between the claims on which they are based, and when the decision depends, totally or partially, from the resolution of identical matters.

What has not been studied in sufficient depth, however, is the impact that this different trial device could have on the prospects of the protection to be achieved by the plaintiffs.

*In fact, although in the last few years we have seen significant developments in the substantive law and jurisprudential applications in the area of the manufacturer's liability not specified in the*

---

*delle class action, alla ricerca di una "giusta" efficienza* [In the middle of new civil procedures and the rediscovery of class action, in search of a "fair" efficiency], *Corriere Giuridico*, 2004, 5, 567.  Proposal 3839 confers to the consumer associations the standing to sue to no longer propose only inhibitory actions, but also legal actions having the purpose of obtaining compensation for the damages suffered by the members of a given category:  however, *the standing of the association is limited to declaratory* judgments. As a result of the collective judgment, and therefore only after the sentence that verifies the liability becomes final (that is after lustrums), the initiative would pass onto the consumers who are members of the class and who would then be empowered to contest the sentence unfavorable (but only in the case of evidence of "inequity in the realization of their rights"), or, in order to benefit from the effects of a favorable sentence, they should act <u>one by one</u> to inquire about the requirements for being linked with the single plaintiff, as theoretically already singled out in the joint action, and for the quantification of the *quantum debeatur* [how much is deserved] in relation to one's damage.  There would then be a plan for a law concerning (Letta-Pinza), more similar to the model of the American class action, for the protection of investors, in which it is anticipated that, *on the basis of a motion included in the* introductory proceedings of the trial, the judge could authorize the plaintiff to also assert the rights of *other persons against the same defendant* provided that such rights have not already been argued in another judgment and the defendant has violated them through the same usual behavior.  Besides, up to the limit of jurisdiction for amount of the Justice of the Peace, the plaintiff could avoid having to identify by name the other injured persons that are protected by him, even without their consent. This plan would have the advantage in comparison to the referenced 3839 of not passing through the intermediary stage of a kind of declaratory judgment.

---

The above **ITALIAN** into **ENGLISH** translation was completed May 18, 2006, by 1ˢᵀ **METROPOLITAN TRANSLATION SERVICES, INC.,** located at 30 S. Wacker Dr., 22ⁿᵈ Floor, Chicago, IL 60606, (312) 621-1500.

contract, "the absence of [legal] construction devices of the multi-person part during the trial"[14], continues to imply some deep reduction in the degree of efficiency of the protection, not only for the greater cost of access to the justice, but also for the greater defensive effort required from the part in order to provide a sufficient proof of the damages.

**b. Protection Opportunities Offered by Class Action:**

  **b.1. A Strategy of Joint Attack for Taking Advantage (Even by the Active Part) of the Economies of Scale for Mass Offenses I**

1.  The joint disputes can be described according to two models[15]:  on one hand, the "joint model", and on the other, the model of the entity class.

On the first, which is the one traditionally adopted in the United States to account for the *class actions* phenomenon, *the joint actions are viewed as a permissive joinder device, whose* beginning is left to the choice of the single individual, who can use them to obtain the advantages that result from them (for example, increased "weight" of the joint claims or the reduction of the individual cost to be sustained as part of the dispute).

Instead, the protagonist of the second model, which has only recently surfaced in the literature[16], is a class considered independently from the members that form part of it and therefore, as a corporate body, is endowed with personality.

---

[14]GIUSSANI, *Le "mass tort class action negli StatiUniti"* [Mass tort class action in the United States], in *Rivista Critica di Diritto Privato* [Private Law Critical Review], 1988, 356.

[15]SHAPRIO, *Class actions:  the class as a party and client,* 73 Notre Dame l. rev. 913, 919 (1998).

[16]The possibility to configure the class as a customer of the defendant had, in truth, already surfaced in the most prominent doctrine of overseas, but had received scarce in-depth study and had been put aside as unsatisfactory:  above all see Note, *Developments in the law - conflicts of interest,* 94 Harvard Law Review 1244, 1447 and following, (1981).  The first contribution in which the proposal of the class as a party receives adequate in depth study and favorable consideration is the one - moreover largely ignored - by CHAYES, *Public law litigation* cited.  The proposal of the class as a party has resurfaced a decade after, in the contributions (also apparently broadly neglected by the North American doctrine) by CONSOLO, in *Class actions fuori dagli USA?* [Class actions [sic] outside the USA?], *Rivista di Diritto Civile* [Civil Law Review], 1993, 609, 641 and following, and still earlier in CAPPALLI – CONSOLO, *Class actions for continental Europe?  A preliminary enquiry,* 6 Temple International and Comparative Law Journal 217 (1993).  A bit afterwards, amongst other things, this proposal has had new good luck in the land of the United States:  the first Author to propose it again was COOPER, in *Rule 23:  challenges to the rulemaking*

14

The above ITALIAN into ENGLISH translation was completed May 18, 2006, by 1ST METROPOLITAN TRANSLATION SERVICES, INC., located at 30 S. Wacker Dr., 22nd Floor, Chicago, IL 60606, (312) 621-1500.

2. According to the traditional model, in a *class action* we have a multiplicity of injured individuals, one of which (the *class representative*) takes legal action to assert the claims of everybody and the sentence addresses each of them individually.

Nevertheless, to fully understand the protection potential connected with the *class action* device, the second construction model is surely more congenial.

In fact, the model that considers the class as a part permits to emphasize that a *class action* is not simply a legal action in which are argued the claims of a multiplicity of persons, but, on the contrary, something more and different, that is an action in which the claim of a group is argued as a whole, with a precise and separate identity with regard to the individual persons that form part of it (the majority of which, in truth, remains unknown during the entire dispute and doesn't play any role in its management)[17].

The person who takes legal action is the class itself (although in the person of one of his representatives who is usually also a member of the class), so that as the *res in judicium deducta*

---

*process,* 71 New York University School of Law – Law Review 13 (1996), followed by SHAPIRO, *Class Actions* cited, and lastly by MOORE, N., *Who should regulate class action lawyers?*, 5 University of Illinois Law Review 101 (2003).

A partly different discussion applies to the *class actions* in the examples of paragraph (b) (2) whose subjects are cases of discrimination, for example, racial or sexual (that constitute the typical proposal of this subsection of the R. 23): with respect to these, it has been openly recognized that the class existed, on a social level, earlier and independently of joint action. *"in this area of law, courts do not find a class by molding an aggregate of numerous individuals into a group litigant by the factual identity of their claims against the defendant. [...] the policy against discrimination carries with it an implicit conception of class as to social entity. This 'entity class' is an a priori class that has an autonomous identity apart and prior to any jural relationship created between the class members and an opposing party by the latter's conduct. The distinct class entity is predicated on characteristics possessed by all its members, such as race or sex, which defines persons as class members".* Note, *Antidiscrimination class actions under the federal rules of civil procedure: the transformation of rule 23 (b) (2)*, 88 Yale Law Journal 868, 884-86 (1979).

[17]COOPER, *Rule 23: challenges to the rulemaking process*, 71 New York University School of Law – Law Review 13, 1996, page 16. "The class [...] is an entity apart from those who volunteer (or may be coerced) to speak for it. It is, to be sure, a juridically created entity, and must speak through people just as corporations must speak through people".

The above **ITALIAN** into **ENGLISH** translation was completed May 18, 2006, by 1ST METROPOLITAN TRANSLATION SERVICES, INC., located at 30 S. Wacker Dr., 22nd Floor, Chicago, IL 60606, (312) 621-1500.

[matter argued in the trial] must be identified as the only claim that the class is handling, and instead, not as the sum of the individual rights of the single members.

Therefore, the sentence will dwell only on the joint claim asserted by the class while, in order to merge with the class claim, in the trial the individual situations of the various *class members* will lose their individuality.

3. Based upon the petition of the *class representative*, the birth of the entity-class is sanctioned by the judge[18] by means of his decision to grant the *certification*, that he confers to the class in the way identified in the measure, having limited individuality, by means of which it becomes a part of the trial.

Nevertheless, the description of the class acted upon by the Judge is simply a "certification" in line with a trial situation that, in some measure, has its own life (although only at the social and/or economic level and absolutely not as part of the basic law) before and of the trial: mass offense.

In other words, the claims of the individual *class members* are not joined for the first time during the trial because they had been handled at the same time within the *class action*: before the trial they already share a common origin that in many aspects renders them homogeneous and joint and just, and due to this fact, subjected to be disputed jointly by the person in charge of the *mass tort*.

4. In fact, the close association between the class action *class* in the trial and a "class offense" (in the substantive sense) is more easily noted from the point of view of the part that opposes the action. Experience indicates that the person responsible for a multi-offense infraction or for a series of similar offenses, in legal actions that could be taken by single persons, victims of a *mass tort* would adopt a strategy of a joint "wide range" defense, regardless to the extent of the individual or joint action in which he has to respond to.

First of all, with the prospect of a cross-examination bound to be repeated with few changes in the various disputes of the injured individuals, the person in charge would prepare in advance some defensive material well studied and always reusable. Furthermore, in the management of the said individual disputes, he would never lose sight of the plurality of his action: being aware that a possible unfavorable precedent could cause a "chain series" of sentences in favor of the injured persons; he would, therefore, be prepared to invest a lot, in terms of time and money, in the trial.

---

[18] CONSOLO, *Class actions* cited, page 642 and COOPER, *Rule 23* cited, page 16 *("the class [...] defined in the end only by judicial fiat")*.

The above **ITALIAN** into **ENGLISH** translation was completed May 18, 2006, by 1ST **METROPOLITAN TRANSLATION SERVICES, INC.,** located at 30 S. Wacker Dr., 22nd Floor, Chicago, IL 60606, (312) 621-1500.

5. Facing an opposing party ready to finance and articulate a "repetitive" defense rendered possible by the characteristics of the *mass tort*, the individual dispute brought forth by the victims could result in nothing else than a dull weapon, very expensive, and therefore, inefficient.

   A true view of the protection would be possible only in visualizing the overall cost of all of the disputes generated by the single offense.

   In one word, as the defendant responsible for the offense, the plaintiff victim of the offense must also have at his disposal trial devices suitable for the preparation of his defensive strategy exploiting the overall scope of the offense and the resulting economies of scale made possible by the structure of the *mass tort*.

6. Therefore, the reconstruction of the class as a part does not have a simple value, definite or systematic: on the contrary, the model allows to prove right and understand fully the different mechanisms of protection offered by the *class action* in comparison to the normal trial actions, whether individual or with co-litigants, as those that could be initiated in Italy by the injured persons in the case at hand.

   In cases of *mass tort*, the extensive potential of the class action accrues not only from the stand point of the legitimization to take legal action and of the joint defensive strategy, but also as far as it pertains to establishing the injurious effect and the quantification of the compensation.

**b.2. The Impersonal Approach in Establishing the Harmful Effect and the Compensation**

7. Once the *class action* is initiated and certified and the adequacy of the representative is verified by the Judge, the other members of the class could be allowed to intervene without for this reason in any way widening the subject of the trial, but really helping the petition of the joint entity that already incorporates their claims and actions with an intervention of the adhesive dependent type.

   Beside the possibility of intervention, while the *class action* is still pending, the persons once more included in the class identified by the judge, whose rights have been recognized and by now already jointly argued in the trial, could not assert them individually in a separate trial. In fact takes place a phenomenon of absorption and moderation, if indeed not of straight or temporary basic *merger* of the rights of individuals and the claim of the entity.

   *It is the still available choice of opting out that allows the individuals to carry out an exit option in order to avoid suffering the effects of the sentence related to the petition of the class*[19]. This

---

[19]It is common knowledge that when the *class members* have not received a *notice* conforming to the constitution, they can assert their right to be extraneous to the trial stating that they were not given the possibility of carrying out the *opting out* option *(Phillips Petroleum Co. v. Shutts, 105 S. Ct. 2965 (1985).*

The above **ITALIAN** into **ENGLISH** translation was completed May 18, 2006, by 1ST **METROPOLITAN TRANSLATION SERVICES, INC.,** located at 30 S. Wacker Dr., 22nd Floor, Chicago, IL 60606, (312) 621-1500.

choice has the effect of reducing the combining ability, in both the real and individual sense, of the class which, in fact, is defined as an entity with a composition that changes with time that, after the initial certification can undergo some changes because of the exit options of the members or of the new decisions of the judge.

In every case the sentence explains its effects always and only concerning the class (for whatever little it can summarize, based on the activity of the exit options) and the defendant whether he is a loser or winner[20].

---

In this case it is carried out an *ex post* [after the fact] of the *opting out* in which effects the relationship between claim of the individual and claim of the class must be resolved in light of the considerations discussed above (see CONSOLO, *Class actions* cited, p. 644).

[20]For a brief description of the working of the class action legislation, it is of help the definition given by GIUSSANI in *La transazione collettiva per i danni futuri: economia processuale, conflitti di interessi e deterrenza delle condotte illecite nella disciplina delle class actions* [The joint settlement for future damage: trial savings, conflicts of interest and deterrence of illegal behavior in the class action discipline], *Foro Italiano* [Italian Bar], 1998, IV, 175: "The Judge, by means of a measure called certification, permits to a member of a class, whose scope he defines at the same time, to assert in court together with his claim also the ones, of the other members, that are similar. During the procedure the Judge continually verifies that this representative of the class is suitable, meaning that he is not in conflict of interest with the representatives and that his judiciary action doesn't proceed in an inaccurate or even collusive way...the representatives can contest the sentence (especially showing that their rights have not been adequately asserted) or they can exclude themselves (opt out) within a timeframe specified in the same *certification*". See also GIUSSANI, *Sulla compatibilità...* [On the compatibility...], cited, 2227, in which, in connection with the exit option it is clarified that the American Judge has means of notification suitable to see to it that each member of the class can exercise his right to exclude himself in order to avoid the effects of a trial in which they didn't intend to participate. In this regard, the author notes that a notification by means of public proclamations addressed to a whole class would be in contrast with Article 150 of our system, and therefore, could give rise to doubts concerning the validity of the summons because according to the interpretation of the jurisprudence, such form of notification differentiates itself from the other ones, "for the manner in which is performed, but not for the fact that all the individuals form part of it must not be mentioned. In fact there are doubts concerning the validity of a notification by means of public proclamations that do not specify the first and last name of all the individuals who contradict and are called to participate in the trial."

18

---

8.  Such mechanism has some very important corollaries about the type of protection that can be achieved by means of a class action.

First of all, the sentence of acceptance of the *class action damages* contains the pronouncement of a sentence directly in favor of the class, but since the petition and the resulting *certification* do not identify in any way the individual members of the *class* (and the decision does not provide this identification either), in the class action it is adopted an impersonal approach concerning the determination of the injurious effect of the *mass tort* and of the corresponding amount of the compensation due without identification of the specific and individual "creditor parties".

This is possible precisely because the *res in judicium deducta* [matter argued in the trial] is the credit of the entire class and, even before that, the related debt of the responsible party rather than the rights of the individual injured persons.

9.  After the sentence, with the payment to the representative of the winnings class (possibly also in the form of a trust fund) settled *all the debts of the persons who at that time are members of the* class. The apportionment among the injured individuals of the "active mass wealth" acquired as compensation will basically take place as an administrative matter on the basis of the bond originated by the certification of the *class action* and of the requirement of affiliation to it and of the subsequent final sentence.

10. Such impersonal approach when determining the damages and in the resulting sentence would be particularly appropriate in the present case as protection for the claims of the persons included in the *medical monitoring subclass*, in that such device would allow the persons (that using a definition by Giussani, could be termed "dormant or potential victims"[21]) to obtain a compensation not only for the actual psychological trouble (the so called stress damage) due to the awareness of being at risk, but also the compensation and reimbursement for the care and the medical monitoring that would be necessary to prevent the still dormant future damage.

This would be possible in that in the *class action* the responsible party can be sentenced to refund not only for the damages alleged and specifically proven by the *single individuals* (whether they are biological or physical), but also damages suffered or being suffered by an entire class of persons even though the individual *class members* cannot yet be identified by name.

11. The *expedient that allows this result consists* specifically in the possibility of sentencing the responsible party to establish a [trust] fund in favor of the class, managed under the supervision

---

[21]GIUSSANI, *La transazione collettiva per i danni futuri...* [The joint settlement for future damage...], cited 186.

The above **ITALIAN** into **ENGLISH** translation was completed May 18, 2006, by 1ˢᵀ **METROPOLITAN TRANSLATION SERVICES, INC.**, located at 30 S. Wacker Dr., 22ⁿᵈ Floor, Chicago, IL 60606, (312) 621-1500.

of the Court. In this way, as it should be, the responsible party has to indemnify for the damages even when it would not be still possible to identify the individual *class members* to whom should be distributed the amount obtained as the compensation, nor the amount of compensation due to each.

12. This kind of compensation is typical of the so called fluid classes, of those classes in which the persons that can benefit from the conviction sentence pronounced against the party that opposes the group can be other than those whose claims have been asserted in the trial. "The main result of the fluid definition of the class in the compensation action is the utilization of a particular system of apportionment of the sums paid by the defendant after the sentence, termed *fluid class recovery*: a separate fund is constituted, administered by third parties appointed by the judge under his supervision and used to benefit the fluid class not only by dividing the money amongst the *class members*, but also, as an example…to sustain the public organizations that spare no effort in the protection of the affairs that can be classified as proper of the group of victims"[22].

The characteristics of the *trust fund* that acts as an agency of assistance and insurance in favor of the individuals at risk has been broadly analyzed by the American doctrine with reference to the induced injuries that result in long periods of dormancy[23].

In the present case it would be more correct to refer to fluidity in a wide sense because the composition of the classes of the actual victims and those that have to undergo medical monitoring does not vary with time, but rather with the status of their members, who could pass from the *medical monitoring subclass* to the *personal injury subclass*.

As noted by GIUSSANI, "the reasons that have driven the jurisprudence of the United States to allow the protection of the virtual classes[24] granting types of reimbursement even prior to the

---

[22]As GIUSSANI notes in *La transazione collettiva per i danni futuri…* [The joint settlement for future damage…], cited 186.

[23]As a reference, see GIUSSANI, *Le mass tort class actions negli Stati Uniti* [Mass tort class actions [sic] in the United States], cited 349, No. 55.

[24]Giussani uses the term virtual class when referring to the class that includes individuals that cannot be classified, as for instance the persons exposed to factors likely to induce health problems characterized by periods of dormancy. In the case on hand it seems correct to believe that the virtual class is also the *monitoring subclass*, that is the class composed of those dormant victims, that, to avoid the onset of trouble must undergo medical treatments and care, whose costs must immediately fall on the real party responsible for the injury to them. In this case too we would deal with putting forth a protection, even if

20

onset of the disease are of two kinds.  In the first place they notice genuine need for real protection concerning the guarantee of the action:  the time necessary for the onset of health trouble could render, as a fact or also legally, the right to compensation impossible to realize:  for example, because of the  unexpected insolvency of the responsible party...in second place they notice goals of  balancing the chances of  winning  for each party:  the notion of a single trial for the present and future claims [in our case of preventive protection] of the members of the class permits to either dispose of ample portions of the dispute, thus minimizing the cost of the settlement, or to redistribute the risk that otherwise would rest in full on the victims, of uncertainties about the verification of the elements that constitute the right to compensation, usually very difficult to demonstrate, such as that of the causal connection, because the collective resolution of the dispute permits to consider the statistic proof of such fact ..."[25].

13. In Italy such needs of protection for the virtual class (that is for the *monitoring subclass* in our case) would not be met adequately.

As it has been seen above, in Italy there would not be the possibility of a joint sentence in favor of all the individuals who, because they belong to a certain group, are exposed to the risk of contracting an illness, but only in favor of the persons that immediately were able to demonstrate a specific damage, biological or physical, resulting from the injurious behavior.

---

preventive, of a future damage, a kind of detailed compensation (to sentence the responsible party to pay the cost for the care necessary to avoid that the subjects become sick and in considering such prevention, the case at hand appears possible).

[25]In some cases the American jurisprudence has declared itself against a class action that would act to protect the rights of the members of its a class composed of both present and future victims (cfr. for instance, Supreme Court of the United States of the America ruling of June 25, 1997, in *Foro Italiano* [Italian Bar], 1998, IV, 175), but as Giussani notes in commenting on the decision, there have been numerous other models in which the jurisprudence has accepted the notion of a single trial of both the present and future claims.  The author notes that the decision of the Supreme Court is consistent with these other decisions, but limits itself to specify that the protection of the virtual class is possible if and only if it is possible to assure the *adequacy of the representation* of the persons with the basic claims by means of the definition of the related subwhole (*subclassing*) and to entrust the representation to persons other than those that represent the bearers of the claims already processed.

The above **ITALIAN** into **ENGLISH** translation was completed May 18, 2006, by 1ST METROPOLITAN TRANSLATION SERVICES, INC., located at 30 S. Wacker Dr., 22nd Floor, Chicago, IL 60606, (312) 621-1500.

In second place, as Prof. Gambaro notes, a petition for reimbursement of the cost to bear for care and preventive medical monitoring would not be feasible in Italy due to lack of interest to take action because in Italy there is a National Public Medical System that would bear the cost for the necessary medical care.

Besides, such result would not be representative of real justice in that it would not burden the real responsible party with the cost due to the injurious behavior consisting of having caused an increase in the incidence of certain troubles.

Therefore, even under these circumstances, *class action* would appear to represent the only system fit to burden the actual responsible party with the economical effect of its own behavior, thus achieving a fair justice.

**b.3. Proof of the Etiological Connection**

14. Another very notable difference in terms of the effectiveness of protection between individual and collective action, is the different burden of proof for the causal connection between injurious behavior and damage.

   As seen by the doctrine, in fact, for purposes of oversight in the adequacy of the representation, the class is defined "on the basis of the characteristics of the injured group in its entirety, in the sense that its members are all the persons potentially injured because of their affiliation with the group, therefore including all the persons that would also have been injured even in the presence of a faultless behavior of the defendant": for instance, the class of those persons that have taken a harmful medication and have shown cardiac troubles also includes those persons that, because of their own predisposition, would have complained of similar cardiac troubles in any event. Thus, the class of the persons at risk of contracting cardiac troubles because of the medication also includes the persons that would be at risk of similar troubles due to their own predisposition without even having taken the medication.

15. Such trial mechanism has some significant implications concerning the proof, especially in cases as the present, in which during the trial, the plaintiff-consumer argues concerning his request for compensation for the risk of a nondescript damage[26] asserted to be due to the injurious behavior of the manufacturer.

---

[26]The peculiar troubles that develop in the absence of a certain factor noted (for example, asbestosis, strictly related to asbestos) are extremely rare. In the other cases, the "etiology ulti-factor" of the damages brings about serious problems with respect to the proof of casual derivation of the injurious behavior attributed to the defendant manufacturer (cfr. for related references of this definition, see

22

In the hypothetical case of nonspecific discomfort, the impossibility of proving the *specific cause* of the trouble could prove especially difficult for the single plaintiffs that act individually and in giving proof of the causal connection between the injurious behavior and damages.

16. In fact, in the individual action to verify the causal connection, in the best of cases, there would be applied the rule of prevalence. This means that in order to establish if the trouble shown by the single individual was due to an harmful product or a random chance event, it should be taken into consideration if the difference between the percentage of confirmed victims and the percentage of expected victims is greater or smaller than 50% (this means that, in the individual actions, the manufacturing enterprise would have to indemnify the injuries only when the use of a certain product would have involved an increase of injuries greater than 100% and it could then be concluded that insofar that more than 50% of the persons struck by a certain trouble would not be possible to attribute the trouble to random chance events).

   In proposing a *class action* instead, the possibility of modulating the sentence in proportion to the harmful incidence of the manufacturer's injurious behavior would allow the plaintiffs to obtain a compensation even for those health conditions in which the recorded increase was less than 100%.

17. To better understand this mechanism, it is of help the example provided by Giussani, in his contribution about the statistic proof in *class action*. In that work, the author notes that, "if an expert considered credible affirms that 30% of the cases of mesotheliom that happened in a certain zone, on the basis of statistics cannot be blamed on random chance, the individual action must then be rejected because the probability that the single sick person is part of the *30% deserving compensation is less than the probability that he forms part of the remaining 70%*. On the other hand, a petition in representative form can be approved by emphasizing the fluidity of the class, that for the purpose of verifying the adequacy of the representation and of the legitimization of the request for the execution of the measure, is defined with reference to the group of the residents in its totality and, for the purpose of determining the amount of the compensation, *with regard to only 30% of the victims*"[27]

---

GIUSSIANI, *La prova statistica nelle class actions* [The statistic proof in class actions], in *Rivista di Diritto Precedurale* [Procedural Law Review], 1989, 1036, No. 15.

[27]GIUSSANI, *La prova statistica nelle class actions* [The statistic proof in class actions], cited 1989, 1041.

The above **ITALIAN** into **ENGLISH** translation was completed May 18, 2006, by 1ˢᵀ **METROPOLITAN TRANSLATION SERVICES, INC.**, located at 30 S. Wacker Dr., 22ⁿᵈ Floor, Chicago, IL 60606, (312) 621-1500.

18. This is of particular importance with respect to the damages resulting from a mass tort, as the single persons, so far not identified that complained of some cardiac trouble in Italy, would have to demonstrate the causal connection between taking the product and the damage, and could obtain compensation only for the trouble related to the medication in base to a criterion of probability, not always easy to demonstrate, even for the great impact that, with the passing of time could be blamed on concomitant causes.

On the contrary, the recourse to the *class action*, by litigating in a single trial all damages due to the medication would permit to resolve once and for all and in a definitive manner the dispute originated by the injurious behavior of the defendant by condemning the responsible party to pay a compensation not only to the present, but also to the dormant victims (through the financing of a program of preventive medical monitoring) for all the troubles potentially blamed on the medication based upon the statistical method described above.

**b.4: The Role of the Lawyer in *Class Action***

19. Another very important opportunity for ulterior protection offered by *class action* with respect to the actions that can be proposed in Italy consists of a very different role that the lawyer plays in the American system, and especially in hypothetical cases of *mass tort class action*.

In fact, in the American system, from a realistic point of view, the lawyer really is the effective tactical opponent of the defendant, certainly not in the sense that he holds rights against the defendant, but because the lawyer is the one who, after having found a member of the class that grants him the right of entering in the juridical sphere of the defendant, in compliance with Rule 23, consciously pursues a personal economic interest and, as a rule, bears the cost of the trial, giving incentives and sustaining financially the client for the purpose of obtaining the generous earnings made possible by the system of payment that provides the possibility of collecting a percentage of the sum received for the class plaintiff (termed *contingent fee*).

In substance, in the American trial, the lawyer acts as a type of entrepreneur specializing in legal affairs that pursues his own economic interest and who usually bears the cost for the trial and that, for this reason, makes some real investments searching for clients and promising business.

20. In Italy, instead, the economic risk of the trial rests on the parties: as a basic rule, the cost is to be paid by the party that loses, who reimburses the other party for the expenses of the trial and the fees of the lawyers in its defense, which are fixed in advance by public rates and settled by the judge in the sentencing (with quantification definitive, but often of a rather small amount, and that does not bind in the least the contractual relationship between the winning party and his legal representative).

24

In every case in Italy, any agreement that, as remuneration, grants the lawyer a portion of the entire amount obtained from the trial would be illegal.

But beyond these aspects, the crucial difference rests in the very important role that the injured person plays within the trial in the Italian system.

Our trial is built around the injured person while the lawyer is assigned only a function of technical patronage, and certainly not of representation in the sentence or even of direct interest.

Therefore, what creates the difference between our system and the American system is the profit and entrepreneurial spirit of the American civil trial lawyer (also confirmed by the rule on the potentially non-refunding of the legal expenses to the winner) that makes him an especially sharp and efficient tool in comparison to the trial that would be possible in Italy.[28]

21. Without wanting to pass judgment on the merits of the two different models, and the different values implied by each, it is a fact that the American system would be particularly suitable to face with adequate means the entrepreneurial and, to use the expression of Giussani, repeat player opposite party summoned in the case on hand.

In fact, even the victims of the medication (real and potential) would have the opportunity to be adequately structured and organized, borrowing the entrepreneurial organization of the law office that they considered convenient for handling their defense.

In the Italian trial, differently, would remain the single plaintiffs, the persons directly interested, and the true protagonists of the action, on the basis of a principle that it theoretically could be considered more respectful of the centrality of the person of the injured individual, in actuality could involve a real reduction of the protection, especially in comparison with the organized opposite party[29].

---

[28]For more extensive information on the topic, see CONSOLO, *Class action fuori dagli USA?* [Class action outside the USA?], cited 653.

[29]GIUSSIANI, *Studi sulle "class action"* [Studies on "class action"], cited, 166 and following, in which the author explains how the American doctrine has for some time shown the numerous advantages which the organized party, defined *repeat player* (habitual litigant), enjoys in comparison to the occasional litigants (*one-shot dealers*), noting that the usual party enjoys economies of scale in the expenses related to the litigation, has much higher stakes than the opposite party because it is interested in avoiding the onset of unfavorable precedents, and therefore, is prepared to invest a lot in the defense, thus practically rendering each single serial claim a case that cannot be defended individually.  The author on page 361 and following shows how the same unbalance between the usual and occasional parties are also present in

25

**b.5: Protection of the Potential Victims in Italy in the Absence of Trial Legislation Such as *Class Action*:**

22. The sum of the considerations addressed above allows us to give the reason of why, in Italy, the potential victims could not obtain adequate protection (at least until it is introduced a device of joint action similar to American class actions).

    In Italy, as has been said, in the absence of legislation such as that of the American *trust fund* which would be of help for this purpose, there would not be the possibility of condemning the manufacturer to pay compensation for damages in favor of persons that as yet cannot be specifically identified.

    The Italian Judge could grant only compensation for real damages, alleged and proven, by persons who can be identified by name.

    Therefore, the persons that form part of the *medical monitoring subclass*, (that is, still potential victims) in Italy could not obtain a joint compensation that would include all the persons forming part of the class, irrespective of the tangible demonstration of the damages individually suffered by each one.  However, as shown by the sentences related to recognizing the damage to life due to stress, in order to obtain a significant compensation, and not a merely symbolic one, everybody should allege, and prove, the specific damage suffered as a result of the harmful behavior.  The related consequences would be associated with severe difficulty in proving the connection of causality and the high cost of individual action (a cost that, in Italy, the plaintiff would have paid in advance without the certainty of later recovering it due to the tendency of the judges to offset, entirely or partially, the expenses when it is not obvious that one of the parties loses the case).

23. To be sure, this deficiency is strictly connected to the absence of trial legislation similar to *class action*.

    To render more explicitly this interdependence between the trial devices of protection available in Italy and the possible content of the decisions suffices what follows.

    In the USA, the Judge faces two classes:  a representative of persons with impaired health and a representative of persons whose health troubles are still dormant.  The American sentence will apply to all potential *members* of each class (except in the isolated cases of *opt out*).

    Therefore, this system allows the Judge to make decisions once and for all and in a single trial concerning all damages due to the injurious behavior of the manufacturer, balancing in a rational

Italy where, however, there is no help from legislation, such as the class action, suitable for reestablishing the balance.

26

The above **ITALIAN** into **ENGLISH** translation was completed May 18, 2006, by 1ˢᵀ **METROPOLITAN TRANSLATION SERVICES, INC.**, located at 30 S. Wacker Dr., 22ⁿᵈ Floor, Chicago, IL 60606, (312) 621-1500.

manner the sums owed as compensation to the two classes of persons already sick and those with dormant diseases.

24. Instead in Italy, the Judge is in a different position: he could condemn only for the compensation specifically argued and proven in observance of the principle of real damages on the basis of which, "the obligation of the compensation must conform to the damages really suffered by the creditor who must receive neither more nor less of what is needed to remove the negative economic effects of the offense", while, "so called punitive damages are not allowed because the notion that the compensation for damages could have a distressing effect on whoever causes the damage is extraneous to our system"[30]. Therefore, the Judge could not pass a joint sentence in favor of all the members of a given class, including the ones that still cannot be identified, because in that way he would risk ruling in favor of granting compensation, even to persons who in reality would not have suffered any damages imputable to the medication, merely due to their affiliation to the class.

And in fact, even when the Italian Judge has tried to recognize a joint damage equal for all persons forming part of a certain group, as in the sentencing of the Court of Appeals in the Seveso case, he has not granted a significant amount of relief because he could not establish a compensation fund for all the possible members bonded by the characteristic of forming part of that group, but could reach decisions only concerning individual cases submitted for his attention, because he could not pass a sentence having legal effect and binding for all the members of the class.

Perhaps this limitation also renders the Italian Judge particularly cautious in recognizing types of relief to the secondary victims (as in the compensation of damages due to stress) to avoid that the unpredictably increasing petition for compensation for such victim would be detrimental to the persons that suffered a real health damage[31]. This risk would not have existed if, as in *class*

---

[30]BIANCA, *Diritto Civile* [Civil Law], *Vol. V., La responsabilità* [Liability], Milan, 1996, 127.

[31]Cfr. D. FEOLA, "*Il caso Seveso e la risarcibilità dei danni non patrimoniali alla collettività vittima di un disastro ambientale*" ["The Seveso case and the compensability of non-property damage to the community that is the victim of an environmental disaster"], *Responsabilità Civile e Previdenza* [Civil Liability and Social Security], 1995, 153: "then, on a plan of mere policy, we may ask ourselves if it is fair to offer monetary relief for the mental reflexes of a crime that takes shape at the same harmful time of the physical integrity and of the patrimony of a large number of persons, apart from everything else in

The above **ITALIAN** into **ENGLISH** translation was completed May 18, 2006, by 1ST **METROPOLITAN TRANSLATION SERVICES, INC.,** located at 30 S. Wacker Dr., 22nd Floor, Chicago, IL 60606, (312) 621-1500.

*action,* the sentence to a certain compensation sum would settle all claims of the persons forming part of that class.

26. The situation in Italy would be even more serious for the persons that meant to take action merely for reimbursement of the cost borne for the purchase of the harmful medication.  This would involve a typical action that cannot be undertaken individually because of the obvious disparity between the reimbursement that could be obtained and the cost of the defense.

In fact, class action favors access to justice even in "cases for the protection of consumers in which the value of the single individual claims is less than the cost of access to justice (so called *individually unrecoverable claims*):  in such cases, the subject of litigation would never be argued during the trial by the interested individuals, but, "conversely, the economies of scale allowed by the process in representative form render reasonable a judiciary initiative that includes the sum of all claims"[32].

Thus if, as Prof. Gambaro notes, the right to obtain reimbursement of the purchase cost of Vioxx would exist at the substantive level, thanks to the expectation of the undeserved restitution or of the enrichment without a just cause, however, these considerations should be completed by noting that because of the difference between the value of the claim and the cost of access to justice, it is very unlikely that individual persons would initiate a legal action to demand the above reimbursement.

Such obstacle would be less severe in the case of a proposal of *class action*, where the mechanisms of the class process illustrated in Part III and the small costs of access to justice would permit to again balance the position of the usual litigant and occasional litigants.

Another legislation peculiar to class action and not envisioned in the Italian trial system that could increase the convenience of taking action for the members of the *reimbursement subclass*, exists in the opportunity to prepare a *fluid class recovery*.

This has to do with an adopted distribution mechanism for the compensation when it is impossible or economically not convenient to distribute the sum recognized as compensation amongst the individual *class members* in accordance with the damages suffered by each[33].

---

a severe way…the patrimony of the civil person in charge is not boundless:  isn't there the risk that the more severe damage that will take place in the future will be left without satisfaction?".

[32] GIUSSANI, *Studi sulle "class action"* [Studies on "class action"], cited, 165 and following.

[33] Giussani, *Studi sulle class actions* [Studies on class actions [sic]], pages 272 and following.

The above **ITALIAN** into **ENGLISH** translation was completed May 18, 2006, by 1ˢᵀ **METROPOLITAN TRANSLATION SERVICES, INC.**, located at 30 S. Wacker Dr., 22ⁿᵈ Floor, Chicago, IL 60606, (312) 621-1500.

Thanks to this opportunity and in regards to the Vioxx case, in the event that it is concluded that the amount of damages suffered by the *reimbursement subclass* was too small to make it economically convenient, (the distribution of funds to the individual injured persons) in such case, the Judge could recognize a form of reimbursement, for instance, deciding that the money be used to finance a reduction in the cost of another medication equivalent to Vioxx that those persons presumably must take.  It is clear that amongst the persons benefiting from this provision there could be some that have not suffered property damage that consists of the disbursement borne by the purchase of Vioxx, as it is also clear that some of the persons that have suffered such damage will not profit by the provision due to the fact that they no longer take the medication, but this would fall within the opportunity offered in a *class action*.

**IV. On the Recognizability, in Italy, of American Sentences Resulting from a *Class Action*:**

1.  The last point to consider pertains to the recognizability, in Italy, of an American sentence pronounced in a *class action*.

    As noted by Prof. Gambaro, this aspect is not of great importance concerning the goal of the possible execution in Italy of this foreign sentence due to the fact that the defendant company is located in the USA (comp. statement by Prof. Gambaro, page 11).

    The point, however, is important with regard to the applicability of Article 7 of Law 218/1995, regarding the international simultaneous pendency of two identical suits where it is foreseen that in the assumption in which during the course of a trial in Italy would be acknowledged the pendency between the same parts of a petition with the same subject and the same before a foreign Judge, the Italian Judge, if he thinks that the foreign provision can affect the Italian system, will suspend the trial.

    In light of this norm, in the event that in Italy individual persons injured from taking Vioxx initiate an individual or co-litigant action in an attempt to obtain compensation for damages, the decision of the Italian Judge regarding the possible suspension of the trial would be dependant on the prognostic judgment regarding the possibility of recognition of the American sentence in Italy, regarding the requirements outlined in Article 64 of Law 218/1995.

    Amongst those requirements is one addressing the respect of the basic rights of the defense and in respects of the Italian public order that gives every person the right to take legal action for the protection of his rights and legitimate interests (Article 24 of the Constitution).

The above **ITALIAN** into **ENGLISH** translation was completed May 18, 2006, by 1ST **METROPOLITAN TRANSLATION SERVICES, INC.**, located at 30 S. Wacker Dr., 22nd Floor, Chicago, IL 60606, (312) 621-1500.

According to the opinion of Rescigno[34], "although no jurisprudential precedents have been found on the matter, it does not seem plausible that a sentence pronounced in connection with a clause of a *class action* can be recognized directly effective in Italy and that the Italian Judge in Italian territory could suspend a trial (that has as its subject the same dispute pending in the USA under the guise of a *class action*) that hinges on a subject that forms part of the same class that in a parallel fashion takes action before a Court in the United States of America".

This is so because, according to the author, the Italian system demands that all the parties are assured the real exercising of their right of defense, that in the American *class action* would not be adequately guaranteed, in as much as the individual persons would not be assured of suitable ways of participating in the trial.

According to the author, for the same reasons it would not be possible to also extend the *res judicata* effect of the sentence pronounced in a class action to the persons that had not participated in the trial because this would be in conflict with the Italian public order that renders the right of the individual citizen to take legal action in Italy for the protection of his inalienable rights.[35]

2. In light of such considerations, we share the opinion of Prof. Gambaro, according to which it would be difficult for the defendant company to invoke recognition in Italy of the American sentence that has become final for the purpose of precluding to those persons that had suffered health damages because of having taken Vioxx and the possibility of taking legal action in Italy.

This is certainly valid for health damages, in view of the centrality that in the Italian system covers the defense of the inherent subjective rights of the human person so that it would be necessary to guarantee every individual effective exercise to the right of defense.

Concerning the compensation due to the members of the *medical monitoring* and of the *reimbursement class members*, it has been seen that in Italy these persons could not obtain an effective and timely protection of their position.

---

[34]RESCIGNO, *Sulla compatibilità tra il modello processuale della class action e i principi fondamentali dell'ordinamento giuridico Italiano* [On the compatibility between the trial model of the class action and the basic principles of the Italian legal system], wk cited 2228.

[35]RESCIGNO, *Sulla compatibilità tra il modello processuale della class action e i principi fondamentali dell'ordinamento giuridico Italiano* [On the compatibility between the trial model of the class action and the basic principles of the Italian legal system], wk cited 2228.

The above ITALIAN into ENGLISH translation was completed May 18, 2006, by 1ST METROPOLITAN TRANSLATION SERVICES, INC., located at 30 S. Wacker Dr., 22nd Floor, Chicago, IL 60606, (312) 621-1500.

In the case of the *medical monitoring subclass*, the American action promoted as a *class action* would probably be the only way to assure that the liability for the damages, which basically consists of having provoked an increase in the incidence of the disease, reverts to the manufacturer and to allow a fair internalization of the related cost on the real responsible party.[36]

In Italy, a similar result would be strongly undermined by the impossibility to obtain compensation in the absence of a specific proof of the damages suffered by the single individual. The uncertainty concerning the result of action should be united in the great cost of individual action in comparison to the action and absence of the incentives that, as it has been seen, connote the American *class action* (see the considerations discussed above concerning the different role of the lawyer).

Such factors would certainly have a strong and effective deterrent on the decision to institute the trial in Italy.

In other words, the American sentence that would recognize the reimbursement for medical treatments and monitoring for the *medical monitoring subclass*, or that would recognize the reimbursement for the cost of purchasing the medication for the *reimbursement subclass* would not clash with the principle peculiar to the Italian system that guarantees to every person the right to take legal action for the protection of his rights and legitimate interest, but would permit to the persons that are *members* of those subclasses to obtain a protection different and additional to what they could not obtain or more accurately could not <u>conveniently</u> obtain.

Therefore, the recognition of such a sentence in Italy would not at all clash with Article 24 of the Constitution, but if anything, would conform to an evolutionary interpretation of Article 111 of the Constitution because an inefficient trial would not be considered a fair trial. This is a principle of which the same Italian legislator has shown to be aware of in recent projects of law tending to introduce even in Italy types of trials similar to *class action*.

---

[36]As noted by GIUSANI, *Le mass tort class actions negli Stati Uniti* [Mass tort class action in the United States], cited, 348, the super individual magnitude of the criteria in the determination of the damages and their distribution to the class allows to see to it that the enterprise bears the cost of the increased rate of incidence of the disease.

The above **ITALIAN** into **ENGLISH** translation was completed May 18, 2006, by 1ˢᵗ **METROPOLITAN TRANSLATION SERVICES, INC.**, located at 30 S. Wacker Dr., 22ⁿᵈ Floor, Chicago, IL 60606, (312) 621-1500.

Being acquainted with the laws of the United States of America concerning the penalties for false certifications, I state that, according to my informed opinion, the above is truthful and correct.

Verona, May 15, 2006                                         s/ Prof. Claudio Consolo, Esq.

32

TRANSLATION CERTIFICATION                                    Chicago, Illinois, May 18, 2006

I hereby certify with my signature that the above translation from **ITALIAN** into **ENGLISH** was completed under my administration by a competent translator fluent in both of these languages and to the best of my knowledge and understanding it is a true and complete translation of the corresponding original document.

Signature ___Shannon Ewasiuk___            Title ___Shannon Ewasiuk, PRESIDENT___

Subscribed and sworn to before me, a Notary Public, in and for Cook County, Illinois, on the 18th day of May, 2006.

Signature ___



OFFICIAL SEAL
JAMES BRADLEY AULL
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:11/12/08

1ST METROPOLITAN TRANSLATION SERVICES, INC.
30 S. Wacker Dr. – 22nd Floor
Chicago, IL 60606                    (312) 621-1500

# CLASS ACTIONS E RESPONSABILITA' PER DANNO DA FARMACO

## Le diverse prospettive di tutela

## nell'ordinamento italiano e in quello americano

## I. INTRODUZIONE

1. Il presente parere viene redatto ad integrazione e, per molti aspetti, doverosa replica e rettifica della dichiarazione in data 13 dicembre 2005 redatta dal Prof. Gambaro, in relazione al procedimento instaurato avanti la *United States District Court for the Northen District of Illinois* da un numero di attori residenti in Italia, per ottenere il risarcimento dei danni subiti in conseguenza dell'assunzione del farmaco Vioxx, prodotto dalla società convenuta *Merck & Co.*, con sede nello stato del *New Jersey* (USA).

Di fronte all'eccezione di *forum non conveniens* proposta dalla società convenuta, il Professor Gambaro è stato incaricato di illustrare alla Corte adita quale normativa sostanziale e quali strumenti processuali di tutela potrebbero assistere gli attori italiani, se svolgessero la loro azione in Italia, e quali potrebbero essere gli effetti di un'eventuale sentenza americana in Italia.

Ho avuto modo di esaminare l'*Italian class action complain*, datato 9 maggio 2005, con cui gli attori chiedono alla Corte la certificazione di una *class*e costituita da "*All italian person...who were prescribed, purchased, used and or ingested the drug Vioxx, manufactured, disstribuited and or sold by Defendant*".

2. All'interno di tale classe, gli attori individuano **tre distinte *subclasses***:

 ➢ *personal injury subclass*, costituita dalle persone che hanno già sofferto danni conclamati alla salute in conseguenza dell'assunzione del farmaco;

 ➢ *medical monitoring subclass*, costituita dalle persone che, non avendo ancora subito un danno attuale alla salute in conseguenza dell'assunzione del medicinale, chiedono il rimborso per i continui trattamenti e le cure mediche cui dovranno sottoporsi, secondo un programma di monitoraggio predefinito, al fine di prevenire l'insorgere dei disturbi;

 ➢ *reimbursement subclass*, costituita dalle persone che chiedono il rimborso del prezzo d'acquisto del farmaco;

1

3. Ritengo che la chiara distinzione tra le diverse domande riconducibili a ciascuna sottoclasse debba essere costantemente tenuta presente alla fine di pervenire ad una chiara illustrazione delle ben diverse potenzialità di tutela offerte dall'ordinamento italiano e da quello americano.

4. Con il presente parere, infatti, si cercherà di dimostrare alla Corte come solo una delle sopradette istanze di tutela potrebbe ottenere, in Italia, un'adeguata forma di riconoscimento – seppur dopo ingenti spese consulenziali e legali, formalismi inutili ed un'attesa di circa 5-10 anni per la durata verosimile di un processo così complesso - ossia la domanda azionata da quegli individui che fossero in grado di dimostrare dei veri e propri conclamati danni alla salute - con conseguenti danni personali, patrimoniali e non patrimoniali - casualmente ricollegabili all'assunzione del Vioxx e solo di esso.

Oltre a ciò, le pretese che potremmo dire minori, ossia la pretesa al risarcimento del danno derivante dalla necessità di sottoporsi a continui controlli medici, o la pretesa al rimborso del costo del farmaco, in Italia, non potrebbero avvantaggiarsi di un adeguato processo che, in Italia, sarebbe impervio e affidato soprattutto ad una cd. consulenza tecnica d'ufficio, cui il Giudice, in caso di responsabilità da accertare su base scientifica, rimette pressoché integralmente la decisione sulle questioni di fatto.

Anche tali pretese, così, assai verosimilmente resterebbero prive di un'effettiva tutela, anche dopo lunga e costosa attesa.

5. Tali deficit di tutela sono riconducibili almeno ad un duplice ordine di motivi che si andranno ad illustrare: innanzitutto, all'inadeguatezza – unanimemente riconosciuta[1] -

---

[1] Sui limiti del nostro sistema processuale in funzione della tutela di interessi diffusi si vedano CONSOLO, *Class action fuori dagli Usa?*, in *Riv. dir. civ.*, 1993, I, 609, GIUSSANI, *Le mass tort class action negli stati Uniti*, in *Riv. crit. dir. priv.* 1988, 331, Id., *La prova statistica nelle class actions*, in *Riv. dir. proc.* 1989, 1029, Id, *Studi sulle "class action"*, Padova, 1986. Sulle difficoltà di introdurre un istituto processuale assimilabile alla class action in Italia si veda RESCIGNO, *Sulla compatibilità tra il modello processuale delle class action ed i principi fondamentali dell'ordinamento giuridico italiano*, in *Giur. It.*, 2000, 2224. Quanto all'ormai raggiunta consapevolezza, da parte del legislatore italiano, circa l'inadeguatezza nel nostro sistema processuale per la tutela di diritti super individuali si vedano le recenti iniziative parlamentari volte a colmare le lacune di tutela presenti nel nostro ordinamento e rese più gravi ed evidenti a seguito delle recenti evoluzioni delle relazioni economiche e sociali: si tratta delle proposte di legge n. 3838 e 3839, in relazione alle quali si vedano i commenti di FAVA, *Class*

degli strumenti processuali disponibili in Italia per perseguire la tutela di situazioni giuridiche mutli-individuali; in secondo luogo a ragioni di natura sostanziale, ossia alla resistenza, manifestata dalla giurisprudenza italiana, ad abbandonare una visione strettamente privatistica, e di lite *"one to one"*, della responsabilità civile, per approdare a delle forme di risarcimento non solo del danno patito dal singolo attore presente in giudizio, ma anche del danno globalmente prodotto dal convenuto all'intero gruppo di individui danneggiati da una certa condotta.

## II. LIMITI DI NATURA SOSTANZIALE:

### a) La responsabilità per danno multi-individuale in Italia: il necessario confronto con la giurisprudenza

1. Il prof. Gambaro, nella propria illustrazione circa il diritto sostanziale italiano in materia di responsabilità per prodotti difettosi e in materia di danno da farmaco, dà una completa descrizione delle norme su cui potrebbe fondarsi, in Italia, la domanda di risarcimento del danno, nonché delle singole voci di danno che in Italia potrebbero trovare risarcimento[2].

   Tuttavia, in tale parere, non sembra essersi dato sufficiente rilievo alle concrete applicazioni che la giurisprudenza ha fatto di tali norme.

   Una tale analisi appare invece imprescindibile, al fine di pervenire ad una valutazione completa circa le concrete prospettive di tutela che si profilerebbero agli attori, qualora intendessero proporre un'azione in Italia.

---

*action all'italiana: paese che vai , usanza che trovi*, in *Corr. Giur.* 3/2004, 1, e CONSOLO, *Fra nuovi riti civili e riscoperta delle class action, alla ricerca di una "giusta" efficienza*, in *Corr. Giur.* 5/2004, 565

[2] Cfr. dichiarazione del Prof. Gambaro, pagg. 7 e 8, in cui si illustra che la domanda di risarcimento del danno in Italia potrebbe fondarsi sulla clausola generale di cui all'art. 2043 c.c., sulle norme di cui al d.p.r. 224/88, oggi trasfuse nel D. Lgs. 206/2005, o sull'art. 2050 c.c., e che, sulla base di tali domande, gli attori potrebbero ottenere il risarcimento del danno patrimoniale in senso stretto (nella sua duplice accezione del danno emergente, consistente nei costi per le spese mediche, e del lucro cessante, consistente nella diminuita capacità di produrre reddito) del danno alla salute e del danno morale (o più in generale non patrimoniale, alla luce della recente sentenza della Cass. 31 maggio 2003, n. 8828, cfr. nota 3).

2. In particolare, alla luce di una breve disamina della giurisprudenza in materia di danno alla salute, è possibile notare che in Italia difficilmente potrebbero ottenere un'effettiva tutela quei soggetti che - non potendo ancora lamentare un danno attuale alla salute derivante dall'assunzione del farmaco difettoso - agissero al più limitato fine di conseguire un risarcimento per fatto in sé di essere esposti al rischio di un danno futuro (ossia i soggetti rientranti nella *medical monitoring subclass*).

La giurisprudenza italiana che si è pronunciata su casi simili riconosce che tali soggetti abbiano subito un danno non patrimoniale[3] consistente nella limitazione della loro libertà d'azione e di vita per la necessità di sottoporsi a controlli sanitari e per la costante soggezione allo stress e alla paura di essere colpiti, in futuro, da seri disturbi alla salute, tuttavia ha dimostrato forti resistenze ad accordare una seria od anche minima forma di ristoro per tali danni.

3. Un esempio paradigmatico di come la giustizia italiana tende a giudicare fattispecie di responsabilità per danni non patrimoniali "multi-individuali"del tipo di quelli lamentati dalla *medical monitoring subclass*, può ricavarsi dal noto caso Seveso, per certi aspetti assimilabile alla presente causa, anche se avente ad oggetto il risarcimento di danni alla salute derivanti da un disastro ambientale, avvenuto in Lombardia (a nord di Milano) 30 anni fa.

4. L'incidente ambientale di Seveso risale a trent'anni fa, tuttavia, pare utile ripercorrere brevemente la vicenda – giudizialmente conclusa solo da poco! - per cogliere le strette analogie con il caso di specie e constatare tristemente come, in quell'occasione, pur tanto più famosa e seguita dai mass media, i cittadini non abbiano affatto ottenuto dalla giustizia italiana la sperata e doverosa soddisfazione delle loro legittime aspettative, nonostante avessero impiegato tutti i loro sforzi per adattare gli spuntati strumenti processuali a disposizione nel nostro ordinamento.

---

[3] Tale espressione generica viene preferita a quella più specifica di danno morale, alla luce dell'evoluzione giurisprudenziale che ha ricondotto alla fattispecie dell'art. 2059 c.c. tutte le ipotesi di danno non patrimoniale inteso come categoria ampia, comprendente tutte le ipotesi in cui si verifichi un'ingiusta lesione di un valore inerente alla persona, costituzionalmente garantito, dalla quale conseguano pregiudizi non suscettivi di valutazione economica, senza soggezione al limite derivante dalla riserva di legge di cui all'art. 185 c.p. (Cass. Civ. 31 maggio 2003, n. 8828 in *Corr. Giur.* 8/2003, 1024).

La giustizia italiana ha impiegato 25 anni per esprimersi e si è rivelata sorda al danno statistico e ad ogni forma di responsabilità e/o indennizzo da rischio.

**b) Un caso paradigmatico: Seveso – i fatti**

5. La sera del 10 luglio <u>1976</u> si verificò uno scoppio nella fabbrica Icmesa si Seveso, in un reparto ove si produceva triclorofenolo, composto chimico di base per la produzione di cosmetici e disinfettanti ospedalieri. A seguito dello scoppio, il triclorofenolo si trasformò in un composto altamente tossico: la diossina, che comincio a fuoriuscire e a diffondersi nell'aria. I primi sintomi percepiti dalla popolazione furono un forte odore acre ed effetti urticanti sulla pelle.

Solo nove giorni dopo il Laboratorio Provinciale di Igiene e Profilassi cominciò a studiare l'estensione e l'intensità dell'inquinamento e il territorio circostante la zona dell'incidente venne suddiviso in tre zone in base alla concentrazione media di diossina riscontrata.

Con ordinanza del 24 luglio 1976, ossia 14 giorni dopo l'incidente, il Comune di Seveso emanò un'ordinanza che disponeva l'evacuazione della zona A, nonché l'evacuazione di bambini e della donne gravide della aree B e della fascia di rispetto (area R), furono parimenti emanate disposizioni speciali che suggerivano il temporaneo controllo delle nascite, la sospensione dell'allattamento al seno, ma – tra i provvedimenti più gravi – vi fu quello che – quando ancora l'aborto in Italia era considerato un reato in ogni sua forma – autorizzò, per le donne coinvolte nell'incidente, l'interruzione delle gravidanze in corso[4].

Venne istituita una Commissione tecnico-scientifica diretta dall'allora Presidente del Consiglio Superiore della Sanità, e per i successivi 10 anni (fino al 1986) ciascun individuo abitante nella zona inquinata venne assoggettato a sorveglianza clinica. Furono condotti progetti speciali di ricerca per verificare se questi soggetti potessero

---

[4] Lo stato di profonda tensione e di disperazione ingeneratasi a seguito dell'incidente di Seveso culminò con l'assassinio, da parte di un gruppo terroristico, di uno dei dirigenti ritenuti responsabili del disastro. Pur trattandosi di un atto isolato, pare utile ricordarlo in questa sede, quale monito e memento di quanto sia delicato il compito dello Stato, allorché sia chiamato a rendere giustizia su condotte che hanno così duramente colpito i beni di più assoluto rilievo per la persona, quali il diritto alla salute, e il diritto a non essere condannati ad una vita costantemente assoggettata alla paura della morte.

manifestare alterazioni cromosomiche o sviluppare patologie collegate all'esposizione alla diossina. Le conclusioni della Commissione tuttavia sembrarono fugare ogni timore, nella conclusione che l'unica casistica direttamente attribuibile alla diossina fosse l'affezione cutanea denominata cloroacne.

Tuttavia la Commissione dispose in via precauzionale che proseguissero gli studi e i controllo sulla mortalità per patologie tumorali almeno sino al 1997.

Nel frattempo si svilupparono in Europa diversi filoni di studio sugli effetti delle diossine, in parallelo con lo sviluppo degli studi sull'"Agente Orange"[5]a carico dei reduci del Vietnam negli Stati Uniti.

Solo nel 1997, dopo una serie di studi e ricerche a livello mondiale, l'Agenzia Internazionale per la Ricerca sul Cancro presso l'Organizzazione Mondiale della Sanità ha inserito la diossina nell'elenco delle sostanze cancerogene, ma ha concluso che ancora oggi non è possibile ricollegare con certezza alcune patologie tumorali concretamente sviluppatesi in un determinato individuo all'esposizione alla diossina: è certo che l'esposizione aumenta il rischio di cancro, ma sviluppatasi una malattia tumorale, non è ancora possibile sapere se essa è stata causata dalla diossina o da altre cause (predisposizione genetica o famigliare, fattori ambientali o alimentari estranei ...)

**c. Seveso - i diritti delle vittime: due milioni di lire a ciascuno degli attori, dopo 15-20 anni.**

6. Se i fatti sono profondamente tristi e drammatici, ancora più drammatico è constatare l'assoluta mancanza di tutela offerta ai cittadini colpiti, nella salute e nella libera esplicazione della propria libertà, da una così grave catastrofe.

Sulla base delle incerte conclusioni scientifiche sopra descritte, non vi fu spazio, per gli abitanti di Seveso e delle zone limitrofe, per un'azione risarcitoria: ogni tentativo di ricollegare una patologia all'esposizione alla diossina, infatti, non sarebbe parso credibile, per l'ostacolo rappresentato dalla richiesta rigorosa prova individuale del nesso di causalità.

L'unico danno riconoscibile era il danno da forte stress emozionale, collegato all'iniziale mancanza di informazioni sull'accaduto e sui rischi connessi all'esposizione

---

[5] L' "Agente Orange" era un'esfoliante fortemente contaminato da diossina offerto in dotazione ai militari americani impegnati nella guerra del Vietnam, di cui è stata accertata la tossicità e cancerosità.

alla diossina, al successivo e progressivo emergere di timori sempre più definiti e giustificati, alle limitazioni di vita consistenti nella necessità di sottoporsi a continui controlli medici e ai condizionamenti nelle scelte fondamentali di vita, come quelle di non procreare o di trasferirsi altrove.

Eppure anche tale danno venne riconosciuto solo a distanza di anni.

Solo nel 1991 e nel 1994, ossia dopo ben dopo 15-20 anni dall'accaduto, La Corte d'Appello di Milano riconobbe un danno morale da stress agli abitanti di Seveso.

7. Tuttavia, dal tenore di tali sentenze, non si può certo affermare che i cittadini di Seveso abbiano avuto giustizia.

La Corte d'Appello di Milano con sentenza dell'11 luglio 1991, pur premettendo che *"nella vicenda Seveso le prescrizioni e le limitazioni alla libertà d'azione e di vita, i controlli sanitari sostanzialmente coattivi ed il timore per il futuro costituiscono sicuramente ragioni di disturbo e di danno morale"*, ha nondimeno concluso ritenendo *"equo ed apprezzabile il risarcimento di lire due milioni per ciascuno degli attori, in moneta attuale e comprensiva degli interessi.*

Non diversamente la Corte d'Appello milanese ha statuito nella sentenza 15 aprile 1994, in cui ha stabilito che *"il danno morale minimo, che non può farsi a meno di riconoscere a tutti i residenti nel luogo di un disastro ambientale direttamente coinvolti nelle conseguenze dello stesso, i quali si vedano costretti a controlli medici volti a diagnosticare le conseguenze ,allo stato ignote, del contatto subito con sostanze nocive, e si trovino per ciò stesso ad esserne condizionati, può liquidarsi nella somma di lire due milioni"*[6].

---

[6] Per il testo delle sentenze si veda *Responsabilità civile e previdenza*, 1995, 136 e segg. con nota di FEOLA, *Il caso Seveso e la risarcibilità dei danni non patrimoniali alla collettività vittima di un disastro ambientale*, ove si evidenzia che la popolazione si era costituita in associazione per mettere in atto una strategia che riducesse i costi del giudizio, mandando allo scoperto un "gruppo pilota" costituito da una trentina di persone, abitanti nei comuni interessati dalla contaminazione, il quale coltivasse l'azione civile, nella speranza che, ottenuta una sentenza favorevole, questa valesse a convincere la società ad una transazione, risparmiando a danneggianti e danneggiati i costi dei possibili giudizi.

Infatti, a differenza che nella *class action* americana, in cui la somma ottenuta a titolo di risarcimento dalla classe spetterà poi in sede di "riparto" ai vari componenti della *class* stessa, in Italia l'eventuale sentenza favorevole avrebbe spiegato i suoi effetti solo nei confronti delle