**d) Seveso - il processo: il danno va provato al di là di ogni ragionevole dubbio**

8. La Corte d'Appello non si è limitata ad accordare un risarcimento irrisorio, ma ha fatto ben di più: nelle motivazioni della sentenza ha precisato che, in mancanza di una prova specifica di particolari sofferenze morali subite da un soggetto in conseguenza del fatto illecito, l'equa quantificazione minima del danno, spettante a ciascuno per il solo fatto di doversi sottoporre a dei controlli medici e di esserne conseguentemente condizionato, sia di soli due milioni di lire.

Come se la Corte, subito dopo aver aperto la strada al riconoscimento di un risarcimento collettivo, uguale per tutti, (almeno nei casi di questo genere) avesse voluto sottolineare che un tale risarcimento sarebbe comunque di serie b (anche nell'ammontare liquidato) in quanto accordato anche in mancanza di un'individuale allegazione e da una specifica dimostrazione del titolo su cui si fonda la specifica pretesa risarcitoria di ciascun soggetto.

Tra le righe si legge l'affermazione di come in Italia, continui ad essere imprescindibile una concezione assolutamente privatistica ed individualista della responsabilità civile.

9. Tale orientamento della nostra giurisprudenza non è stato smentito da successive sentenze, anzi, allo stato si può ritenere che le pronunce della Corte d'Appello di Milano sopra ricordate rappresentino uno dei massimi momenti di apertura della giurisprudenza al riconoscimento di un risarcimento di un danno non patrimoniale e super-individuale da stress.

Infatti, successivamente a tali pronunce ed intervenendo sullo stesso tema, la Cassazione, con due pronunce gemelle, ha addirittura ritenuto che il danno non patrimoniale fosse risarcibile solo se conseguenza di una menomazione dell'integrità psico-fisica o di un altro evento produttivo di danno patrimoniale[7].

10. Solo di recente, nel 2002, le Sezioni Unite della Cassazione, pronunciandosi nuovamente sul caso Seveso, hanno affrontato nuovamente la questione, riconoscendo che il danno morale soggettivo sia risarcibile autonomamente, anche in mancanza di una

---

parti partecipanti al giudizio, mentre i soggetti che si fossero trovati nella medesima situazione soggettiva delle parti in causa avrebbero dovuto promuovere un autonomo giudizio, valorizzando l'eventuale precedente pronuncia favorevole, che peraltro, in Italia, non avrebbe avuto effetto vincolante.

lesione all'integrità psico-fisica o di altro evento produttivo di danno patrimoniale, ma affermando a chiare lettere che tale risarcimento spetta solo ai soggetti *"che provino in concreto di avere subito un turbamento psichico (sofferenze e patemi d'animo) di natura transitoria a causa dell'esposizione a sostanze inquinanti e delle conseguenti limitazioni del normale svolgimento della loro vita"*[8].

11. Con tale sentenza le Sezioni Unite, pur riconoscendo il risarcimento a coloro che hanno patito un danno per le preoccupazioni e le gravi limitazioni alla sfera di libertà conseguenti alla necessità di sottoporsi a continui controlli medici, ha preteso l'allegazione e la prova dello specifico danno psicofisico subito da ciascuno.

In sostanza, le Sezioni Unite non hanno proseguito sulla strada del riconoscimento di un danno non patrimoniale collettivo ed uguale per tutti.

Come è stato osservato, in tale sentenza "si è al cospetto di una sommatoria di distinte ed autonome posizioni di pregiudizio individuale; a tale stregua, chi si professa vittima, non può limitarsi ad allegare di essere domiciliato ovvero di svolgere attività lavorativa nei luoghi inquinati, ma è tenuto, se vuole concretizzare la sua aspirazione al risarcimento, a dimostrare la sussistenza di una correlazione tra la compromissione dell'ambiente e la situazione di disagio che egli ha dovuto sopportare"[9].

**e) Il caso Vioxx: le aspettative di tutela in Italia alla luce del caso Seveso**

12. In sostanza, alla luce delle predette pronunce, è possibile ritenere che due siano gli orientamenti della giurisprudenza italiana in materia di risarcimento del cd. danno da stress multi-soggettivo:

---

[7] Trattasi di Cass. 24 maggio 1997, n. 4631 e Cass. 20 giugno 1997, n. 5530, pubblicate entrambe in *Resp. Civ. e Prev.*, 1997, 1059.

[8] Sez. Un. Civ., 21 febbraio 2002, n. 2515 in *Resp. Civ. e Prev.*, 2002, 726, con nota di D. FEOLA, *Il prezzo dell'inquietudine: il caso Seveso torna in Cassazione*. Si noti che nella motivazione della sentenza 2515/2002, la Cassazione ha rigettato il motivo di censura sollevato dalla società convenuta che lamentava alla falsa applicazione dell'art. 2697 c.c. precisando che l'attore aveva prodotto in causa numerosi accertamenti sanitari atti a documentare il suo stato di sofferenza psichica e che quindi il Giudice di prime cure "lungi dal fermarsi a considerazioni di carattere generale, aveva correttamente personalizzato l'accertamento nei confronti del soggetto offeso".

[9] A. PALMIERI, nota a Sez. Un. 21 febbraio 2002, n. 2515, in *Foro It*, 2002, I, 999.

- orientamento rappresentato nelle sentenze della Corte d'Appello milanese, in cui il Giudice ha riconosciuto che sia configurabile anche in via presuntiva un danno per tutti tendenzialmente uguale (ossia il pregiudizio subito necessariamente da tutti i cittadini delle zone contaminate, che, in conseguenza del fatto illecito, sono divenuti soggetti sanitariamente a rischio e, come tali, condizionati nella proprie abitudini di vita) ma ha ritenuto che il ricorso alla prova presuntiva ed il difetto probatorio in ordine alle specifiche sofferenze individuali subite da ciascuno in conseguenza del fatto illecito consentano solo la liquidazione di quello che viene definito il "danno morale minimo", quantificato con una somma irrisoria[10]:

- orientamento rappresentato dalla Sentenza delle Sezioni Unite della Corte di Cassazione, che, per riconoscere un risarcimento, richiede la prova in concreto del turbamento psichico subito dai singoli individui.

13. *Mutatis mutandis,* nel caso di specie, qualora i soggetti rientranti nella *medical monitoring subclass* agissero in Italia, avrebbero verosimilmente delle prospettive di tutela anche inferiori a quelle riconosciute nel caso Seveso.

Quella tragedia, infatti, diede luogo ad azioni di danni litisconsortili e comunque coordinate tra loro e precedentemente concordate tra i soggetti danneggiati perché questi si erano costituiti in associazione ed avevano elaborato una strategia comune: ma tutto ciò fu certamente reso possibile solo dal fatto che vittime dell'incidente furono tutti e solo gli abitanti di una zona geograficamente ben delimitata e relativamente ristretta, il che permise di fondare la collaborazione tra soggetti danneggiati da un lato su preesistenti rapporti di parentela, amicizia, conoscenza o altro, dall'altro sulla facilità di coordinamento tra persone che vivono una accanto all'altra, infine sul "senso di appartenenza" al gruppo che si era creato anche in considerazione della dimensione pubblica (e politica) del caso.

Al contrario, nel caso Vioxx i danneggiati non si conoscono, vivono lontani l'uno dall'altro, sono probabilmente ignari del fatto che altri hanno sofferto danni alla salute causati dallo stesso farmaco, ed infine hanno patologie diverse: non si può certo

---

[10] RIGHI E VERARDI, *Disastro ambientale e danno morale collettivo, Corr. Giur.* 1994, 8, 1006, ove si è osservato che "le affermazioni della Corte in tema di prova si riflettono sul fronte della quantificazione del danno".

pretendere che soggetti così distanti (in senso non soltanto geografico) l'uno dall'altro si coordinino per esperire un'azione litisconsortile.

Si può dunque ragionevolmente concludere che tutto ciò che è lecito aspettarsi sono azioni "uno contro uno", nelle quali ogni soggetto sarebbe tenuto a dare la prova del nesso causale tra azione del farmaco e lesione, prova certo estremamente complessa e dispendiosa, con il rischio – tra l'altro – che detto nesso causale venisse ritenuto esistente in certi casi e non in altri.

14. Non è possibile ritenere che il caso Seveso e la sostanziale negazione – in esso affermata - di un risarcimento in mancanza di prova individuale del danno, rappresenti un precedente suscettibile di drastiche virate.

Gli orientamenti sopra brevemente ripercorsi, infatti, riflettono principi saldamente ancorati ai nostri principi di diritto[11], e sono diretta e necessaria conseguenza del nostro sistema di tutela processuale, che, non contemplando un istituto analogo alla *class action* sul modello americano, di fatto non può consentire alternative al Giudice, come risulterà alla luce delle osservazioni che si verranno di seguito ad esporre.

## III. LIMITI DEGLI STRUMENTI PROCESSUALI DISPONIBILI IN ITALIA

### a) La tutela delle posizioni multi-individuali in Italia

1. Attualmente non esiste, in Italia, un istituto analogo alla *class action* americana per la tutela giurisdizionale contro il pregiudizio individualmente subito da più soggetti per effetto di un'azione unitaria[12].

---

[11] Principi quali la necessità, per chiunque agisca in giudizio, di provare i fatti che ne stanno a fondamento (art. 2697 c.c) e l'efficacia del giudicato limitata alle parti (art. 2909 c.c).

[12] Sull'inesistenza, in Italia, di un istituto paragonabile alla *class action* americana cfr. GIUSSANI, *Studi sulle "class action"*, Padova, 1996, 358: "…in Italia esistono strumenti diretti a favorire in qualche modo l'azione collettiva solo in alcune ben determinate categorie di fattispecie – ad esempio in presenza di reati penali o di condotte antisindacali – mentre per la generalità delle controversie si applicano le norme processuali ordinarie, concepite per le situazioni soggettive individuali, senza tener conto della consistenza numerica degli interessati: manca del tutto insomma, una vera disciplina generale per quelle cause che interessino ampie classi di soggetti".

Alla base del sistema processuale italiano, infatti, sta il principio per cui la legittimazione ad agire in giudizio è di regola attribuita al titolare della situazione soggettiva ivi dedotta (legittimato ordinario), mentre i casi in cui è concessa la legittimazione ad agire ad un soggetto diverso da detto titolare (legittimato straordinario) rappresentano eccezioni a questo principio. Tale è il contenuto dell'art. 81 c.p.c. in cui si prevede che "fuori dai casi previsti dalla legge, nessuno può fare valere in nome proprio un diritto altrui".

Più precisamente, vi sono casi in cui il nostro ordinamento giuridico, prevalentemente in sede di recepimento delle direttive comunitarie, ha introdotto ipotesi di azione civile in cui la legittimazione attiva è accordata ad un ente a rilevanza collettiva per la tutela di un interesse condiviso dall'intera categoria che l'associazione rappresenta. Tuttavia, è stato correttamente osservato che l'interesse collettivo proprio dell'intera categoria alla quale di volta in volta le singole leggi si riferiscono non coincide necessariamente con, e non rappresenta la mera sommatoria, di quegli interessi individuali omologhi, alla cui tutela è finalizzata la *class action* americana[13].

---

[13] Si veda ad esempio la L. 30 luglio 1998, n. 218, nel cui art. 1 si prevede che le associazioni dei consumatori e degli utenti possano intraprendere azioni giudiziali e stragiudiziali contro comportamenti che ledano un interesse comune a più soggetti, ma esclusivamente al fine di inibire la condotta lesiva, adottare misure di eliminazione degli effetti dannosi cagionati dalle violazioni accertate e disporre la pubblicazione su giornali a diffusione nazionale del provvedimento, ove la pubblicazione sia in grado di contribuire ad limare o correggere gli effetti della violazione, mentre "la estensione della legittimazione processuale ad una categoria indistinta di soggetti, per il tramite della relativa associazione di categoria, non comprende la richiesta economica di ristoro dei danni, che resta possibile ai singoli individui in base alle normali regole processuali del nostro ordinamento" così RESCIGNO, *Sulla compatibilità tra il modello processuale della class action ed i principi fondamentali dell'ordinamento giuridico italiano, Giur. It.* 2002, II, 2225. Circa i primi progetti per introdurre anche in Italia, limitatamente a certi settori, una *class action* sul modello americano si veda CONSOLO, *Fra nuovi riti civili e riscoperta delle class action, alla ricerca di una "giusta" efficienza, Corr. Giur.*, 2004, 5, 567. Nella proposta 3839 si conferisce alle associazioni dei consumatori la legittimazione a proporre, non più solo azioni inibitorie, ma anche azioni dirette ad ottenere un risarcimento dei danni subiti dai dagli appartenenti ad una certa categoria: tuttavia la legittimazione dell'associazione è limitata ad una azione di mero accertamento. All'esito del

2. Ciò premesso, correttamente il prof. Gambaro osserva che, nel caso di specie, il sistema più conveniente per agire in Italia sarebbe, allo stato, l'introduzione di un'azione litisconsortile dal lato attivo, ai sensi dell'art. 103 c.p.c., che consente a più parti di agire nello stesso processo, quando tra le cause che si propongono esiste una connessione per il titolo dal quale dipendono, e quando la decisione dipende, totalmente o parzialmente, dalla risoluzione di identiche questioni.

Ciò che non risulta sufficientemente approfondito, tuttavia, sono le implicazioni che questo differente strumento processuale potrebbe avere sulle prospettive di tutela conseguibili dagli attori.

Infatti, anche se negli ultimi anni si è assistito ad un notevole sviluppo del diritto sostanziale e delle applicazioni giurisprudenziali in tema di responsabilità extracontrattuale del produttore, "l'assenza di strumenti di costruzione della parte collettiva in sede processuale"[14], continua a comportare delle profonde riduzioni sul grado di effettività della tutela, non solo per i maggiori costi di accesso alla giustizia, ma anche per il maggior sforzo difensivo richiesto alla parte per fornire una sufficiente prova del danno.

---

giudizio collettivo, e quindi solo dopo il passaggio in giudicato della sentenza che accerta la responsabilità (cioè dopo lustri), l'iniziativa passerebbe ai singoli consumatori appartenenti alla classe, che avrebbero il potere di impugnare la pronuncia sfavorevole alla classe (solo in caso si dimostrazione dell' "iniquità di attuazione dei loro diritti", o, per beneficiare degli effetti di una condanna favorevole, dovrebbero agire ad uno ad uno per l'accertamento, dei requisiti, in capo al singolo attore, quali in astratto già individuati nel provvedimento collettivo, e per la determinazione del *quantum debeatur* in relazione al proprio pregiudizio. Vi sarebbe poi un progetto di legge delega (Letta-Pinza) più simile al modello delle class action americane, per la tutela dei risparmiatori, in cui si prevede che il giudice possa autorizzare l'attore, su istanza contenuta nell'atto introduttivo del giudizio, a far valere anche i diritti altrui contro lo stesso convenuto, quando tali diritti non siano già stati dedotti in latro giudizio e il convenuto li abbia violati tramite la stessa condotta abituale. Inoltre, fino al limite di competenza per valore del giudice di pace, l'attore potrebbe esimersi dall'identificare nominativamente gli altri danneggiati da lui tutelati, pur senza il loro consenso. Questo progetto avrebbe il vantaggio, rispetto al cit. 3839 di non passare attraverso lo stadio intermedio di una sorta di condanna generica.

[14] GIUSSANI, Le *"mass tort class action negli Stati Uniti"*, in *Riv. Crit. Dir. Priv.*, 1988, 356.

**b. Le possibilità di tutela offerte dall'azione di classe:**

   **b.1. una strategia di attacco unitaria per sfruttare (anche dal lato attivo) le economie di scala degli illeciti di massa.**

1. Le controversie collettive possono essere descritte secondo due modelli[15] da un lato, il "modello aggregato", dall'altro, il modello della classe-ente.

   Nel primo, che è quello tradizionalmente adottato negli Stati Uniti per dar conto del fenomeno delle *class actions*, le azioni collettive sono viste come ipotesi di litisconsorzio facoltativo attivo, la cui instaurazione è rimessa alla scelta del singolo individuo, che potrà servirsene per ottenere i vantaggi che ne conseguono (ad es. l'accresciuto "peso" delle pretese aggregate, o l'abbattimento dei costi individuali da sostenere nell'ambito della controversia).

   Del secondo modello, emerso solo di recente nella letteratura[16], è invece protagonista la classe, considerata indipendentemente dai membri che ne fanno parte e quindi come ente dotato di soggettività.

---

[15] SHAPIRO, *Class actions: the class as a party and client*, 73 Notre Dame l. rev. 913, 919 (1998).

[16] La possibilità di configurare la classe come cliente del difensore era, per vero, già emersa nella dottrina d'oltreoceano più risalente, ma aveva ricevuto scarsi approfondimenti ed era stata liquidata come insoddisfacente: v. soprattutto Note, *Developments in the law – conflicts of interest*, 94 Harv. l. rev. 1244, 1447 ss. (1981). Il primo contributo in cui l'ipotesi della classe come parte riceve adeguato approfondimento e viene considerata con favore è quello – peraltro largamente ignorato - di CHAYES, *Public law litigation* cit. L'ipotesi della classe come parte è poi riemersa un decennio dopo, nei contributi (anch'essi, a quanto pare, ampiamente trascurati dalla dottrina nordamericana) di CONSOLO, in *Class actions fuori dagli USA?*, Riv. dir. civ. 1993, 609, 641 ss., e prima ancora in CAPPALLI – CONSOLO, *Class actions for continetal Europe? A preliminary enquiry*, 6 Temple int'l & comp. L. J. 217 (1993). Poco dopo, peraltro, questa ipotesi ha conosciuto nuova fortuna in terra statunitense: il primo Autore a (ri)proporla è stato COOPER, in *Rule 23: challenges to the rulemaking process*, 71 N. Y. U. L. Rev. 13 (1996), seguito da SHAPIRO, *Class actions* cit., da ultimo MOORE, N., *Who should regulate clas action lawyers?*, 5 U. Ill. L. Rev. 101 (2003). Un discorso in parte diverso va fatto per le *class actions* ex par. (b) (2) aventi ad oggetto casi di discriminazione p. es. razziale o sessuale (che costituiscono l'ipotesi tipica di questa sottosezione della R. 23): riguardo a queste, si è riconosciuto apertamente che la classe esiste, a

2. Secondo il paradigma tradizionale, in una *class action* abbiamo una pluralità di soggetti lesi, uno dei quali (il *class representative*) agisce in giudizio per far valere le pretese di tutti, e il giudicato si forma distintamente su ognuna di esse.

Tuttavia, per comprendere appieno le potenzialità di tutela connesse allo strumento della *class action* è sicuramente più congeniale il secondo modello ricostruttivo.

Il modello della classe come parte, infatti, consente di evidenziare che la *class action* non è semplicemente un'azione in cui vengono dedotte le pretese di una pluralità di individui, bensì qualcosa di più e di diverso, ossia un'azione in cui viene dedotta la pretesa di un gruppo nel suo complesso, con un'identità precisa e differenziata rispetto ai singoli soggetti che ne fanno parte (la maggioranza dei quali resta, per la verità, ignota durante tutta la controversia e non gioca alcun ruolo nella conduzione della stessa) [17].

Il soggetto che agisce in giudizio è la classe stessa (ancorché nella persona di un suo rappresentante, che di solito ne è anche membro), così come la *res in judicium deducta* va individuata nell'unica pretesa di cui è titolare la classe e non invece nella somma dei diritti individuali dei singoli membri.

Il giudicato si formerà quindi solo sulla pretesa unitaria fatta valere dalla classe mentre le situazioni soggettive dei vari *class members* perderanno nel processo la loro individualità, per confluire nella pretesa di classe.

---

livello sociale, prima e indipendentemente dall'azione collettiva. *"in this area of law, courts do not find a class by molding an aggregate of numerous individuals into a group litigant by the factual identity of their claims against the defendant. [...] the policy against discrimination carries with it an implicit conception of class as a social entity. This 'entity class' is an a priori class that has an autonomous identity apart and prior to any jural relationship created between the class members and an opposing party by the latter's conduct. The distinct class entity is predicated on characteristic possessed by all its members, such as race or sex, which defines persons as class members"*. Note, *Antidiscrimination class actions under the federal rules of civil procedure: the transformation of rule 23 (b) (2)*, 88 Yale L. J. 868, 884-86 (1979).

[17] COOPER, *Rule 23: challenges to the rulemaking process*, 71 N.Y.U.L., Rev. 13, 1996., p. 16. "The class [...] is an entity apart from those who volunteer (or may be coerced) to speak for it. It is, to be sure, a juridically created entity, and must speak through people just as corporations must speak through people"

3. La nascita dell'ente/classe è sancita dal giudice[18], su istanza del *class representative*, mediante la sua decisione di concedere la *certification*, che conferisce alla classe, così come individuata nel provvedimento, una limitata soggettività, valendosi della quale essa assume la veste di parte nel processo

Tuttavia la descrizione della classe operata dal Giudice è semplicemente "certificazione"sul piano processuale di una situazione che, in qualche misura, ha una sua esistenza (sebbene soltanto a livello sociale e/o economico e assolutamente non di diritto sostanziale) prima e fuori del processo: l'illecito di massa.

In altre parole, le pretese dei singoli *class members* non vengono accomunate per la prima volta in giudizio, per il fatto di essere trattate contemporaneamente all'interno della *class action*: già prima esse condividono un'origine comune che le rende sotto molti aspetti omogenee ed unitarie, e proprio per questo passibili di essere unitariamente contestabili dal responsabile del *mass tort*.

4. Lo stretto legame tra azione di classe (sul piano processuale) ed "illecito di classe" (sul piano sostanziale) si coglie infatti più facilmente ponendosi nella prospettiva della controparte della classe. E' dato di esperienza che il responsabile di un illecito plurioffensivo, o di una serie di illeciti isomorfi, nelle azioni che venissero introdotte dai singoli individui vittime di un *mass tort*, adotterebbe una strategia di difesa unitaria "a tutto campo", e ciò a prescindere dalla portata individuale o collettiva dell'azione cui replicare.

Innanzitutto, di fronte alla prospettiva di un contraddittorio destinato a ripetersi, con poche variazioni, nelle varie controversie con i singoli danneggiati, il responsabile predisporrebbe degli argomenti difensivi ben studiati e sempre riutilizzabili; inoltre, nella gestione di dette controversie individuali, non perderebbe mai di vista la dimensione plurale della sua azione: nella consapevolezza che un eventuale precedente sfavorevole potrebbe comportare una serie "a catena" di sentenze in favore dei danneggiati; sarebbe disposto ad investire molto – in termini di tempo e di denaro –nel giudizio.

5. Di fonte ad una controparte pronta a finanziare e ad articolare una difesa "a ripetizione" - resa possibile proprio per le caratteristiche del *mass tort* - la controversia individuale

---

[18] CONSOLO, *Class actions* cit., p. 642 e COOPER, *Rule 23* cit., p. 16 ("*the class [...] defined in the end only by judicial fiat*").

promossa dalle vittime non potrebbe che risultare un'arma spuntata, troppo dispendiosa e quindi inefficiente.

Una vera prospettiva di tutela sarebbe possibile solo nella prospettiva globale del costo dell'insieme delle controversie generate dall'unico atto illecito.

In una parola, come il convenuto responsabile dell'illecito, così anche l'attore vittima dell'illecito deve poter disporre di strumenti processuali adeguati per organizzare la sua strategia difensiva sfruttando la dimensione collettiva dell'illecito, e le conseguenti economie di scala rese possibili dalla struttura del *mass tort*.

6. La ricostruzione della classe come parte, quindi, non ha una semplice valenza definitoria o sistematica: al contrario il modello consente di dare ragione e di comprendere appieno i diversi meccanismi di tutela offerti dalla *class action* rispetto alle normali azioni processuali individuali, anche litisconsortili, come quelle che sarebbero proponibili in Italia dai soggetti lesi nel caso di specie.

Le diverse potenzialità della class action nei casi di *mass tort* si colgono non solo sotto il profilo della legittimazione ad agire e di strategia difensiva unitaria, ma anche per quanto concerne la determinazione dell'effetto dannoso e la quantificazione del risarcimento.

## b.2.  L'approccio impersonale nella determinazione dell'effetto dannoso e del risarcimento

7. Una volta iniziata e certificata la *class action*, nonché quindi riscontrata dal Giudice l'adeguatezza del rappresentante, gli altri membri della classe potrebbero essere ammessi ad intervenire senza con ciò allargare in alcun modo l'oggetto del giudizio, ma in sostanza aiutando la domanda dell'ente collettivo, che già incorpora le loro pretese ed azioni; con un intervento di tipo adesivo dipendente.

A parte la possibilità di intervento, mentre pende la *class action* i soggetti ricompresi nella classe individuata dal giudice, i cui diritti sono stati attratti e da essa ormai congiuntamente dedotti in giudizio, non potrebbero invece far valere singolarmente in un separato processo. Si verifica infatti un fenomeno di assorbimento e di continenza, se non addirittura di temporaneo *merger* sostanziale di diritti dei singoli nella pretesa dell'ente.

17

Rimane la facoltà di *opt out*, che consente ai soggetti di effettuare un'opzione di uscita per non subire gli effetti del giudicato sulla domanda della classe[19]. Tale facoltà ha l'effetto di contrarre la capacità conglobatrice sul piano oggettivo e soggettivo della classe, definita, infatti, un ente a composizione variabile nel tempo, che, dopo la certificazione iniziale, può subire delle modifiche per effetto delle opzioni di uscita dei membri o delle rideterminazioni del giudice.

Il giudicato, in ogni caso, spiega i suoi effetti sempre e solo nei confronti della classe (per quel tanto o poco che essa compendia, in base al gioco delle opzioni di uscita) e del convenuto, sia esso soccombente o vincitore[20].

---

[19] E' noto che, ove i *class members* non abbiano ricevuto una *notice* costituzionalmente adeguata, essi potranno far valere la propria estraneità al giudicato, lamentando di non essere stati posti in condizione di esercitare la facoltà di *opt out* (*Phillips Petroleum Co. v. Shutts*, 105 S. Ct. 2965 (1985) In questo caso si concreta un esercizio *ex post* del diritto di *opt out*, i cui effetti sul rapporto tra pretesa del singolo e pretesa della classe vanno risolti alla luce delle considerazioni sopra svolte (v. CONSOLO, *Class actions* cit., p. 644).

[20] Per una descrizione sommaria del funzionamento dell'istituto della *class action*, soccorre la definizione data da GIUSSANI in *La transazione collettiva per i danni futuri:economia processuale, conflitti di interessi e deterrenza delle condotte illecite nella disciplina delle class actions, Foro It*, 1998, IV, 175: "Il Giudice, tramite un provvedimento detto *certification*, permette ad un componente di una classe – di cui contestualmente definisce l'ambito – di far valere in giudizio, insieme alla sua pretesa, anche quelle isomorfe negli altri componenti; nel corso del procedimento il Giudice controlla continuativamente che questo rappresentante della classe sia adeguato, e cioè che non si trovi in conflitto di interessi con *i rappresentati e che la* sua azione giudiziaria non si svolga in modo inaccurato o addirittura collusivo...i rappresentati possono impugnare la sentenza (specialmente dimostrando che i loro diritti non sono stati fatti valere in modo adeguato) ovvero autoescudersi (*opt out*) dal giudizio, entro un termine stabilito nella stessa *certification*". Cfr anche GIUSSANI, *Sulla compatibilità..., cit.*, 2227, in cui, circa l'esercizio dell'opzione di uscita, si chiarisce che il Giudice americano dispone dei mezzi di notificazione idonei affinché ogni membro della classe possa esercitare il proprio di diritto di autoescludersi per sottrarsi agli effetti di un giudizio cui non intendeva partecipare. L'Autore nota in proposito come una notifica per pubblici proclami rivolta ad un'intera classe si scontrerebbe, nel nostro ordinamento, con l'art. 150, e potrebbe quindi far dubitare sulla regolarità della citazione, in quanto, secondo l'interpretazione della giurisprudenza, tale forma di notifica si differenzia dalle altre "per la modalità in cui viene eseguita, ma non per il fatto che

8. Tale meccanismo ha degli importantissimi corollari circa il tipo di tutela conseguibile attraverso un'azione di classe.

Innanzitutto, la sentenza di accoglimento della *damages class action* contiene la pronuncia di una condanna direttamene a favore della classe, ma poiché la domanda e la conseguente *certification* non identificavano affatto i singoli componenti della *class* ( e neppure la decisione provvede a tale identificazione) nella *class action* si addotta un approccio impersonale per la determinazione dell'effetto dannoso del *mass tort* e della corrispondente quantità del risarcimento dovuto, senza individuazione delle specifiche ed individuali "partite creditorie".

Ciò è possibile appunto perché *la res in iudicium deducta* è il credito dell'intera classe e prima ancora il debito nei suoi confronti del responsabile e non i diritti dei singoli soggetti lesi.

9. Con il pagamento del rappresentante post sentenza della classe vittoriosa (eventualmente anche in forma di trust) si estinguono tutti i debiti dei soggetti che in quel momento fanno parte della classe. La ripartizione tra i singoli danneggiati della "massa attiva di ricchezza" così acquista a titolo risarcitorio avverrà in forme sostanzialmente amministrative, sulla base del vincolo nascente dalla certificazione della *class action* e dei requisiti di appartenenza ad essa e dal conseguente giudicato finale.

10. Tale approccio impersonale nella determinazione del danno e nella conseguente condanna risulterebbe particolarmente appropriato nel caso di specie, a tutela delle pretese di quei soggetti.rientranti nella *medical monitoring subclass*, in quanto tale strumento consentirebbe ai soggetti (che usando una definizione di Giussani, potremmo chiamare "vittime latenti o potenziali"[21]) di ottenere non solo il risarcimento per il disagio psicologico attuale (il cd. danno da stress) derivante dalla consapevolezza di essere soggetti a rischio, ma anche il risarcimento e il rimborso delle cure e dei monitoraggi medici che sarebbero necessari per prevenire i danni futuri ancora latenti.

Ciò sarebbe possibile in quanto nella *class action* il responsabile può essere condannato a risarcire non solo i danni allegati e specificamente provati dai singoli soggetti (siano

---

non debbano essere menzionati tutti i soggetti che ne sono parti. Si dubita infatti sulla validità di una notifica per pubblici proclami che non specifichi nome e cognome di tutti i contraddittori chiamati a partecipare al giudizio."

[21] GIUSSANI, *La transazione collettiva per i danni futuri...*, *cit.* 186

essi danni biologici o esistenziali) ma anche i danni subiti o subendì da un intera classe di soggetti, anche quando i singoli *class members* non sono ancora individuabili nominativamente.

11. L'espediente che consente tale risultato consiste proprio nella possibilità di condannare il responsabile alla costituzione di un fondo a favore della classe, gestito sotto il controllo della Corte. In questo modo il responsabile sarà tenuto – com'è giusto – a risarcire il danno anche quando non sarebbe ancora possibile individuare i singoli *class members* cui dovrebbe essere distribuita la somma conseguita a titolo di risarcimento, né l'ammontare del risarcimento spettante a ciascuno.

12. Tale forma risarcitoria è tipica delle classi cd. fluide, ossia di quelle classi in cui i soggetti che possono fruire della sentenza di condanna nei confronti della controparte del gruppo possono essere diversi da coloro le cui pretese sono state fatte valere in giudizio. "La conseguenza principale della definizione fluida della classe nell'azione risarcitoria consiste nella utilizzazione di un particolare sistema di distribuzione delle somme versate dal convenuto in seguito alla condanna, detto *fluid class recovery*: viene costituito un fondo separato, amministrato da terzi nominati dal giudice sotto la sua supervisione, ed impiegato a beneficio della classe fluida, non solo ripartendo il denaro tra i *class members,* ma anche, ad esempio,...sostenendo gli organismi pubblici che si adoperano per la tutela di interessi qualificabili come propri del gruppo delle vittime"[22].. La figura del *trust found* che operi come ente previdenziale ed assicurativo a favore dei soggetti a rischio è stata ampiamente elaborata dalla dottrina americana con riferimento alle lesioni indotte che presentino lunghi periodi di latenza[23].

Nel caso di specie, si dovrebbe parlare più precisamente di una fluidità in senso lato, in quanto la composizione delle classi delle vittime attuali e di quelle che dovranno sottoporsi a monitoraggi medici non varia nel tempo, varia piuttosto la qualità dei loro componenti, i quali potrebbero passare dalla *medical monitoring subclass* alla *personal injuring subclass.*

---

[22] Come rileva GIUSSANI, in *La transazione collettiva per i danni futuri..., cit.* 186.

[23] Per riferimenti vedi GIUSSANI, Le mass tort class actions negli Stati Uniti, cit., 349, n. 55.

Come nota Giussani, "le ragioni che hanno spinto la giurisprudenza statunitense ad ammettere la tutela delle classi virtuali[24], concedendo forme di risarcimento anche prima che si manifesti la malattia, sono di due ordini. In primo luogo rilevano schiette esigenze di protezione effettiva della garanzia dell'azione: il decorso del tempo necessario perché il disturbo alla salute si manifesti può rendere – di fatto o anche giuridicamente – inattuabile il diritto al risarcimento: per esempio per effetto della sopravvenuta insolvenza del responsabile...in secondo luogo rilevano obiettivi di riequilibrio delle opportunità di vincere tra le parti:la cognizione in un unico giudizio delle pretese attuali e future [nel nostro caso di tutela preventiva] dei componenti della classe permette sia di smaltire ampie porzioni del contenzioso minimizzando i costi transattivi, sia di ridistribuire il rischio, altrimenti gravante per intero sulle vittime, delle incertezze in ordine all'accertamento degli elementi costitutivi del diritto al risarcimento di solito assai difficili da dimostrare, come quello del nesso di causalità, perché la risoluzione della controversia in via collettiva permette di considerare sufficiente la prova statistica di tale fatto..."[25].

---

[24] Propriamente Giussani parla di classe virtuale per riferirsi alla classe comprendente soggetti non designabili, come ad esempio i soggetti esposti a fattori di rischio suscettibili di provocare disturbi alla salute caratterizzati da periodi di latenza. Nel caso di specie, tuttavia, pare corretto ritenere che classe virtuale sia anche la *monitoring subclass*, ossia la classe formata da quelle vittime latenti, che, per scongiurare l'insorgenza dei disturbi, dovranno sottoporsi a trattamenti e cure mediche, i cui costi dovranno ricadere sull'effettivo responsabile del danno dagli stessi subito. Anche in questo caso si tratterebbe di attuare un tutela – seppur preventiva - di un danno futuro, una sorta di risarcimento in forma specifica (condannare il responsabile a sostenere i costi per le cure necessarie ad evitare che i soggetti si ammalino, visto che tale prevenzione, nel caso di specie, sembrerebbe possibile).

[25] La giurisprudenza americana in certi casi si è pronunciata a sfavore di una class action in cui si voglia agire a tutela dei diritti dei componenti di una classe formata sia da vittime attuali sia da vittime future (cfr. ad es. Corte Suprema degli stati Uniti d'America, sentenza 25 giugno 1997, in *Foro It.*, 1998, IV, 175), ma come nota Giussani a commento della sentenza, vi sono state numerose altre ipotesi in cui, al contrario, la giurisprudenza ha ammesso la cognizione in un unico giudizio della pretese attuali e di quelle future. L'autore, osserva che la pronuncia della Suprema Corte ha un senso coerente con queste altre pronunce in quanto si limita a precisare che la tutela della classe virtuale e possibile se e solo se si può assicurare *l'adeguacy of*

13. Tali esigenze di protezione della classe virtuale (ossia della *monitoring subclass* nel caso di specie), in Italia non sarebbero adeguatamente tutelate.

In Italia come sopra si è visto, non ci sarebbe la possibilità di una condanna collettiva a favore di tutti i soggetti che – per il fatto di appartenere ad un certo gruppo - si trovino esposti al rischio di poter contrarre una malattia, ma solo a favore di quei soggetti che fossero in grado di dimostrare un danno specifico, biologico o esistenziale, derivante dalla condotta lesiva.

In secondo luogo, come nota il professor Gambaro, una domanda di risarcimento dei costi da sostenere per cure e monitoraggi medici preventivi sarebbe non proponibile in Italia per carenza di interesse ad agire, essendovi in Italia un Sistema Sanitario Nazionale Pubblico, su cui graverebbero i costi per le cure mediche necessarie.

Tale risultato, tuttavia, non attuerebbe una giustizia effettiva, in quanto non farebbe ricadere sull'effettivo responsabile i costi derivanti dalla condotta lesiva consistente nell'aver cagionato un aumento nell'incidenza di certi disturbi.

Anche sotto tale profilo, pertanto, la *class action* sembrerebbe l'unico sistema idoneo a far sopportare all'effettivo responsabile le conseguenze economiche della propria condotta, attuando una giusta giustizia.

**b.3. La prova del nesso eziologico**

14. Un'altra notevolissima differenza in termini di effettività di tutela, tra azione individuale e azione collettiva, sta nel diverso regime di prova del nesso causale tra condotta dannosa e danno.

Come osservato dalla dottrina, infatti, la classe, ai fini del controllo sull'adeguatezza della rappresentanza viene definita "sulla base delle caratteristiche del gruppo leso nella sua globalità, nel senso che ne fanno parte tutti i soggetti potenzialmente lesi in virtù della loro appartenenza al gruppo, compresi quindi coloro che sarebbero stati lesi anche in presenza di una condotta irreprensibile del convenuto": ad esempio, la classe di coloro che hanno assunto un farmaco dannoso ed hanno manifestato disturbi cardiaci, comprende anche coloro che avrebbero comunque accusato simili disturbi cardiaci, per propria predisposizione, e così la classe di coloro che rischiano di contrarre disturbi

---

*representation* dei titolari delle pretese sostanziali, attraverso la definizione del relativo sottoinsieme (*subclassing*) e l'affidamento della sua rappresentanza a soggetti diversi da quelli che rappresentano i titolari delle pretese già maturate.

cardiaci a causa del farmaco, comprende anche quei soggetti che correrebbero il rischio di simili disturbi, per propria predisposizione, anche senza aver assunto il farmaco.

15 Tale meccanismo processuale ha delle notevoli implicazioni in tema di prova, soprattutto nei casi, come quello di specie, in cui l'attore-consumatore deduca in giudizio la domanda di risarcimento per il rischio di un danno aspecifico[26], asseritamente derivante dalla condotta lesiva del produttore.

Nelle ipotesi di aspecificità del malessere, l'impossibilità di provare la *specific causation* del disturbo, potrebbe rendere particolarmente difficile per il singoli attori che agissero individualmente, dare la prova del nesso causale tra condotta lesiva e il danno.

16. Nell'azione in via individuale infatti, per accertare il nesso causale, si applicherebbe, nel migliore dei casi, la regola della preponderanza, ossia per stabilire se il disturbo manifestato dal singolo soggetto fosse effetto del prodotto dannoso o effetto del caso, si dovrebbe valutare se la differenza tra la percentuale di vittime verificatesi in concreto e la percentuale di vittime attesa, fosse superiore o inferiore al 50% (ciò significa che, nelle azioni in via individuale, l'impresa produttrice sarebbe tenuta a risarcire le lesioni solo quando l'uso di un certo prodotto avesse comportato un incremento delle lesioni superiore al 100%, e si potesse pertanto concludere che più del 50% delle persone colpite da un certo disturbo non sarebbe attribuibile al caso).

In caso di proposizione di *class action*, invece, la possibilità di modulare la condanna in ragione dell'incidenza lesiva della condotta del produttore, consentirebbe agli attori di conseguire un risarcimento anche per quelle lesioni alla salute per cui si fosse registrato un incremento inferiore al 100%.

17. Per comprendere meglio tale meccanismo, soccorre l'esempio fornito da Giussani nel suo contributo sulla prova statistica nella *class action*. Il tale opera nota l'Autore che "se l'esperto ritenuto credibile afferma che il 30% dei casi di mesotelinoma verificatosi in una certa zona non può, su basi statistiche, essere attribuito al caso, l'azione in via

---

[26] Sono specifici i disagi che si verificano estremamente di rado in assenza di un certo fattore rilevate (es. l'asbestosi, strettamente collegata all'amianto), negli altri casi "l'eziologia multifattoriale" del danno comporta maggiori problemi nella prova della sua derivazione causale dalla condotta lesiva attribuita al produttore convenuto (cfr. per tale definizione e relativi riferimenti GIUSSANI, *La prova statistica nelle class actions*, in *Riv. Dir. Proc.*, 1989, 1036, n. 15.

individuale deve essere rigettata, perché la probabilità che il singolo malato faccia parte di quel 30% risarcibile sono inferiori alla probabilità che questi rientri nel residuo 70%, mente la domanda in forma rappresentativa può essere accolta facendo leva sulla fluidità della classe, definita, ai fini del controllo sull'adeguatezza della rappresentanza e della legittimazione a chiedere l'esecuzione del provvedimento, con riferimento al gruppo dei residenti nella sua globalità e, ai fini della determinazione dell'ammontare del risarcimento, con riguardo al solo 30% delle vittime"[27].

18. Ciò ha particolare valore con riferimento ai danni derivanti da un mass tort, in quanto i singoli soggetti, ad oggi non ancora individuabili, che accusassero dei disturbi cardiaci, in Italia dovrebbero dimostrare il nesso causale tra assunzione del prodotto e danno, e potrebbero ottenere il risarcimento solo per quei disturbi riconducibili al farmaco in base ad un criterio di probabilità, non sempre facile da dimostrare, anche per la maggior incidenza che, con il decorso del tempo, potrebbe essere attribuita alle concause.

Il ricorso alla *class action*, al contrario, attraverso la deduzione in un unico processo di tutti i danni derivanti dal farmaco, consentirebbe di risolvere una volta per tutte e in via definitiva il contenzioso generato dalla condotta lesiva del convenuto, condannando il responsabile al risarcimento non solo delle vittime attuali, ma anche delle vittime latenti (mediante il finanziamento di u programma di monitoraggio medico preventivo) per tutti i disturbi potenzialmente riconducibili al farmaco in base al metodo statistico sopra descritto.

**b.4: il ruolo dell'avvocato nelle *class action***

19. Un'altra importantissima possibilità di tutela ulteriore offerta dalla *class action* rispetto alle azioni proponibili in Italia, consiste nel ben diverso ruolo che riveste l'avvocato nel sistema americano, ed in particolare in ipotesi di *mass tort class action*.

Nel sistema americano, infatti, è proprio l'avvocato, dal punto di vista realistico, l'effettivo antagonista tattico del convenuto, non certo nel senso che lo stesso sia titolare di alcun diritto contro il convenuto, ma in quanto l'avvocato è colui che – dopo aver trovato un componente della classe che gli attribuisca la facoltà di ingerirsi nella sfera giuridica del convenuto ai sensi della Rule 23 - persegue coscientemente un *proprio interesse economico* e di regola ne sopporta i costi processuali, incentivando e sostenendo finanziariamente il cliente, al fine di conseguire i generosi guadagni resi

---

[27] GUSSANI, *La prova statistica nelle class actions*, cit., 1989, 1041.

possibili dal sistema di pagamento che prevede la possibilità di prelevare una percentuale della somma totale ottenuta per la classe attrice (cd. *contingent fee*)

In sostanza, l'avvocato nel processo americano, si configura come una sorta di imprenditore specializzato in affari legali, che persegue il proprio interesse economico e di norma ne sopporta i costi processuali, e che, a tal fine, attua dei veri e propri investimenti alla ricerca di clienti ed affari promettenti.

20. In Italia, diversamente, il rischio economico del processo grava sulle parti: il costo è, per regola tendenziale, posto a carico della parte soccombente, che rimborsa all'altra parte le spese e gli onorari di difesa dei suoi avvocati, stabiliti preventivamente da tariffe pubbliche e liquidati dal giudice con la sentenza (con quantificazione definitiva nei rapporti esterni tra le parti, ma spesso in misura piuttosto bassa e che non vincola minimamente nel rapporto contrattuale tra la parte vincitrice e il suo legale).

In ogni caso, in Italia, sarebbe illecito un patto che riconoscesse all'avocato, quale compenso, una quota dell'intera somma ottenuta dalla causa.

Ma al di là di questi aspetti, la differenza cruciale rimane la centralità che, nell'ordinamento italiano, assume il ruolo della persona lesa nell'ambito del processo.

Il nostro processo è costruito intorno alla persona del danneggiato, mentre all'avocato è ricociuto solo una funzione di patrocinio tecnico, e non certo di rappresentanza pena o addirittura di co- interessanza diretta.

Ciò che fa la differenza tra il nostro sistema e quello americano è quindi lo spirito lucrativo ed imprenditoriale del processo civile americano (confermato anche dalla rule sulla tendenziale non rifusione delle spese legali al vincitore) che lo rende uno strumento particolarmente acuminato ed efficiente rispetto al processo che sarebbe possibile in Italia[28].

21. Senza voler dare alcun giudizio di valore sui due diversi modelli, e sui diversi valori sottesi a ciascuno, sta di fatto che il processo americano sarebbe particolarmente adatto per fronteggiare con adeguatezza di mezzi la controparte imprenditoriale e - per usare l'espressione di Giussani - abituale, citata in giudizio nel caso di specie.

---

[28] Per più diffuse considerazioni sul tema si veda CONSOLO, *Class action fuori dagli Usa?*, cit. 653.

Infatti, anche le vittime del farmaco (attuali e potenziali) avrebbero la possibilità di essere adeguatamente strutturate ed organizzate, mutuando l'organizzazione imprenditoriale dello studio legale che ritenesse conveniente attivarsi per la loro difesa.

Nel processo italiano, differentemente, resterebbero i singoli attori i diretti interessati e i veri protagonisti dell'azione, in base ad un principio che, se in astratto può essere ritenuto più rispettoso della centralità della persona del soggetto leso, in concreto può comportare un'effettiva diminuzione della tutela, specie nei confronti di una controparte organizzata[29].

**b.5: la *tutela delle vittime potenziali* in Italia, in mancanza di un istituto processuale come la *class action*:**

22. La somma delle considerazioni sopra svolte consentono di dare ragione anche del perché, in Italia, le potenziali vittime non potrebbero conseguire un adeguata tutela (almeno finché non si introduca uno strumento di azione collettiva simile alle azioni di classe americane).

Come si è detto, non vi sarebbe in Italia la possibilità di condannare il produttore al risarcimento di danni a favore di soggetti non ancora specificamente individuabili, non soccorrendo, allo scopo, un istituto quale il *trust found* americano.

Il Giudice italiano potrebbe accordare solo il risarcimento dei danni attuali, allegati e dimostrati da soggetti nominativamente identificabili.

I soggetti rientranti nella *medical monitoring subclass*, pertanto, (ossia le vittime ancora potenziali) in Italia non potrebbero ottenere un risarcimento collettivo, che comprendesse tutti i soggetti rientranti nella classe, a prescindere dalla concreta

---

[29] GIUSSANI, *Studi sulle "class action"*, cit., 166 e segg., in cui l'autore illustra come la dottrina americana abbia messo in luce già da tempo i numerosi vantaggi di cui la parte organizzata, definita *repeat player* (litigante abituale) gode nei confronti dei litiganti occasionali (*one-shot dealers*), rilevando come la parte abituale fruisce di economie di scala nella spesa del contenzioso, ha una posta in gioco assai più alto di controparte, per l'interesse ad evitare il formarsi di precedenti sfavorevoli, ed è quindi disposta ad investire molto nella difesa, rendendo di fatto ogni singola pretesa seriale una causa indifendibile singolarmente. L'Autore a pag. 361 e segg. illustra come lo stesso squilibrio tra parti abituali e occasionali si riscontri anche in Italia, ove tuttavia non soccorre un istituto, quale la class action, atto a riequilibrarlo.

dimostrazione del danno individualmente subito da ciascuno, ma – come dimostrano le sentenze in tema di riconoscimento del danno esistenziale da stress – per ottenere un ristoro serio e non puramente simbolico, ciascuno dovrebbe allegare e dimostrare lo specifico danno subito, in conseguenza della condotta dannosa, con le relative conseguenze in ordine alla maggior difficoltà di provare il nesso di causalità, e ai maggiori costi dell'azione individuale, (costi che in Italia dovrebbero essere anticipati dall'attore, senza sicurezza di poterli in seguito recuperare, per la tendenza dei giudici a compensare, in tutto o in parte, le spese, quando non vi sia una evidente soccombenza di una delle parti).

23. Tale deficit, a ben vedere, è strettamente collegato alla mancanza di un istituto processuale analogo alla *class action*.

Per esplicitare meglio questa interdipendenza tra strumenti processuali di tutela disponibili in Italia e contenuto possibile delle pronunce, basti osservare quanto segue.

In Usa, il Giudice si trova di fronte due classi: una rappresentativa dei soggetti lesi nella salute, ed una rappresentativa dei soggetti i cui disturbi sono ancora latenti. La sentenza americana avrà valore per tutti i potenziali *members* di ciascuna classe (salvi i casi isolati di *opt out*).

Tale sistema consente quindi al Giudice di decidere una volta per tutte e in un unico processo su tutti i danni derivanti dalla condotta lesiva del produttore, bilanciando razionalmente le somme dovute a titolo di risarcimento alle due classi dei già malati e dei malati latenti.

24. In Italia, invece, il Giudice si trova in un'altra posizione: potrebbe condannare solo al risarcimento dei danni che fossero specificamente dedotti e provati, in osservanza del principio del danno effettivo in base al quale "l'obbligo del risarcimento deve adeguarsi al danno effettivamente subito dal creditore, il quale non deve ricevere né più né meno di quanto necessario per rimuovere gli effetti economici negativi dell'illecito", mentre "non sono ammessi i cd. danni punitivi, essendo estranea al nostro ordinamento l'idea che il risarcimento del danno possa avere una funzione afflittiva per il danneggiante"[30]. Non potrebbe quindi emettere una condanna collettiva a favore di tutti gli appartenenti ad una certa classe, compresi quelli ancora non individuabili, in quando in tal modo rischierebbe di accordare un risarcimento anche a favore di soggetti, che, in

---

[30] BIANCA, *Diritto Civile, vol. V, La responsabilità*, Milano, 1996, 127.

concreto, non avrebbero subito alcun danno ascrivibile al farmaco, e ciò in virtù della loro semplice appartenenza alla classe.

Ed infatti, anche quando il Giudice italiano ha tentato di riconoscere un danno collettivo, uguale per tutti i soggetti appartenenti ad un certo gruppo, come nella sentenza della Corte D'Appello del caso Seveso, non ha accordato una seria forma di ristoro, in quanto non poteva istituire un fondo a risarcimento di tutti i possibili membri accumulati dalla caratteristica di appartener a quel gruppo, ma poteva decidere solo sui casi singoli sottoposti alla sua attenzione, non potendo emettere una condanna con efficacia vincolante per tutti i membri della classe.

Forse anche questo limite rende il Giudice italiano particolarmente cauto nel riconoscere forme di ristoro alle vittime minori (come nel risarcimento del danno da stress) per evitare che l'imprevedibile moltiplicazione delle domande di risarcimento da parte di tali vittime vada a scapito di coloro che fossero colpiti da un danno effettivo alla salute[31]. Rischio che non ci sarebbe se, come nella *class action*, la condanna ad un certa somma di risarcimento potesse esaurire tutte le pretese dei soggetti appartenenti a quella classe.

26. La situazione in Italia sarebbe ancor più grave per coloro che intendessero agire semplicemente per il risarcimento dei costi sopporti per l'acquisto del farmaco dannoso.

Si tratterebbe infatti di una tipica azione non azionabile in via individuale, per l'evidente disparità tra il risarcimento che potrebbe essere conseguito e i costi della difesa.

L'azione di classe, infatti, favorisce l'accesso alla giustizia anche nelle "cause a tutela dei consumatori, in cui il valore delle singole pretese individuali è inferiore al costo dell'accesso alla giustizia (cd. *individually unrecoverable claims*): in tali fattispecie l'oggetto del contendere non verrebbe mai dedotto in causa dai singoli interessati, ma

---

[31] Cfr. D. FEOLA, "*Il caso Seveso e la risarcibilità dei danni non patrimoniali alla collettività vittima di un disastro ambientale*", Resp. Civ. e Prev., 1995, 153: "*su un piano poi di mera politica del diritto ci si può chiedere se sia equo offrire un ristoro pecuniario ai riflessi di ordine psichico di un reato che si configura nel contempo lesivo dell'integrità fisica e del patrimonio di un gran numero di soggetti, oltre tutto in modo grave...il patrimonio del responsabile civile non è illimitato: non c'è il rischio che siano lasciati senza soddisfazione quei più gravi danni che si verificheranno in futuro?*".

"le economie di scala permesse dal procedimento in forma rappresentativa rendono, per converso, ragionevole un'iniziativa giudiziaria comprendente la somma di tutte le pretese" [32].

Pertanto, se, come rileva il Prof. Gambaro, il diritto ad ottenere il rimborso del costo di acquisto del Vioxx sarebbe esistente sul piano sostanziale, grazie alla previsione della restituzione dell'indebito o dell'arricchimento senza giusta causa, tuttavia tali considerazioni vanno completate con la notazione che assai inverosimilmente una tale domanda sarebbe di fatto azionata dai singoli soggetti, vista la sproporzione tra il valore della pretesa e il costo dell'accesso alla giustizia.

Tale ostacolo risulterebbe meno grave in caso di proposizione di *class action*, ove, i meccanismi del processo di classe illustrati sub punto III e i minori costi dell'accesso alla giustizia consentirebbero di riequilibrare la posizione del litigante abituale e dei litiganti occasionali.

Un altro istituto proprio della *class action*, e non contemplato nel sistema processuale italiano, che potrebbe aumentare la convenienza ad agire per gli appartenenti alla *reimbursement subclass* consiste nella possibilità di disporre un *fluid class recovery*.

Si tratta di un  meccanismo di distribuzione del risarcimento adottato quando sia impossibile, o economicamente non conveniente, distribuire la somma riconosciuta a titolo di risarcimento tra i singoli *class members* secondo il danno sofferto da ognuno [33].

Grazie a tale possibilità, nel caso Vioxx, ove si dovesse concludere che l'ammontare del danno subito dalla *reimbursement subclass* fosse troppo esiguo per rendere economicamente conveniente una distribuzione del fondo ai singoli danneggiati, il Giudice potrebbe comunque riconoscere una forma di risarcimento, stabilendo ad esempio che quel denaro venga utilizzato, per finanziare la riduzione di prezzo di un altro farmaco, equipollente al Vioxx, che quei soggetti presumibilmente dovranno assumere: è chiaro che tra i beneficiari di questo provvedimento potranno esservi persone che non hanno subito il danno patrimoniale consistente nell'esborso sopportato per l'acquisto del Vioxx, così come è chiaro che alcuni di coloro che tale danno hanno subito non beneficeranno del provvedimento, perché non assumono più alcun farmaco, ma ciò rientrerebbe nelle possibilità offerte dalla *class action*.

---

[32] GIUSSANI, *Studi sulle "class action"*, *cit.*, 165 e segg.

[33] Giussani, *Studi sulle class actions*, p. 272 ss

**IV. Sulla riconoscibilità, in Italia, di sentenze americane che statuiscano su una *class action*:**

1. L'ultimo punto da considerare concerne la riconoscibilità, in Italia, di una sentenza americana resa su una *class action*.

   Come rilevato dal professor Gambaro, tale aspetto non riveste una grande importanza ai fini dell'eventuale esecuzione in Italia della sentenza straniera, in quanto la società convenuta ha sede in Usa (cfr. dichiarazione del prof. Gambaro, pag. 11).

   Il punto riveste tuttavia importanza ai fini dell'applicabilità dell'art. 7 della legge 218/1995, sulla litispendenza internazionale, ove si prevede che, nell'ipotesi in cui nel corso di un giudizio in Italia, sia eccepita la pendenza tra le stesse parti di una domanda avente il medesimo oggetto ed il medesimo titolo dinanzi al un Giudice straniero, il Giudice italiano, se ritiene che il provvedimento straniero possa produrre effetto per l'ordinamento italiano, sospende il giudizio.

   Alla luce di tale norma, ove fosse promossa in Italia, da singoli soggetti lesi dall'assunzione del Vioxx, un'azione individuale o litisconsortile diretta ad ottenere il risarcimento del danno, la decisione del Giudice italiano circa la sospensione o meno del giudizio dipenderebbe dal giudizio prognostico sulle possibilità di riconoscimento in Italia della sentenza americana, ossia sul rispetto dei requisiti delineati dall'art. 64 della L. 218/1995.

   Tra tali requisiti vi è i rispetto dei diritti essenziali della difesa e il rispetto dell'ordine pubblico italiano, che riconosce a ciascun soggetto il diritto di agire in giudizio per la tutela dei suoi diritti ed interessi legittimi (art. 24 Costituzione).

   Secondo l'opinione di Rescigno[34], "pur non rinvenendosi precedenti giurisprudenziali sull'argomento, non sembra ipotizzabile che una sentenza pronunciata a seguito di una proposizione di una *class action* possa essere riconosciuta direttamente efficace in Italia e che un Giudice italiano possa sospendere un giudizio (avente ad oggetto la medesima controversia pendente negli Usa sottoforma di *class action*) incardinato nel territorio italiano da un soggetto facente parte della stessa classe che parallelamente agisca innanzi ad un Tribunale degli Stati Uniti d'America".

---

[34] RESCIGNO, *Sulla compatibilità tra il modello processuale della class action e i principi fondamentali dell'ordinamento giuridico italiano, op cit.* 2228

Ciò in quanto, secondo l'Autore, l'ordinamento italiano esige che alle parti sia assicurato il reale esercizio del diritto di difesa, che nella *class action* americana non sarebbe adeguatamente garantito, in quanto non sarebbero assicurate ai singoli soggetti delle idonee forme di partecipazione al giudizio.

Per le stesse ragioni, secondo l'Autore, non sarebbe possibile estendere l'efficacia del giudicato reso su un'azione di classe anche ai soggetti che non avessero partecipato al giudizio, in quanto ciò si scontrerebbe con l'ordine pubblico italiano, che rende irrinunciabile il diritto del singolo cittadino ad agire in Italia per la tutela dei propri diritti.[35]

2. Alla luce di tali considerazioni, è da ritenere condivisibile l'opinione del Professor Gambaro, secondo cui sarebbe difficile, per la società convenuta, invocare il riconoscimento in Italia della sentenza americana passata in giudicato al fine di precludere, a coloro che avessero subito danni per l'ingestione del Vioxx, di agire in Italia.

Ciò vale sicuramente per i danni alla salute, vista la centralità che riveste nell'ordinamento italiano la difesa dei diritti soggettivi inerenti alla persona umana, per cui sarebbe necessario garantire a ciascun individuo l'effettivo esercizio del diritto di difesa.

Quanto invece al risarcimento spettante ai *medical monitorig* e ai *reimbursment class members*) si è visto che tali soggetti non potrebbero ottenere, in Italia, un'efficace e tempestiva tutela della loro posizione.

Per la *medical monitoring subclass*, l'azione americana promossa in forma di *class action* sarebbe verosimilmente l'unico sistema per far ricadere sul produttore la responsabilità per il danno in sé consistente nell'aver provocato un aumento dell'incidenza della malattia, e per consentire un'equa internalizzazione dei costi relativi sull'effettivo responsabile[36].

---

[35] RESCIGNO, *Sulla compatibilità tra il modello processuale della class action e i principi fondamentali dell'ordinamento giuridico italiano, op cit.* 2228.

[36] Coma nota GIUSANI, *Le mass tort clas actions negli Stati Uniti, cit.,* 348, le dimensione superindividuale dei criteri di determinazione dei danni e di distribuzione di essi alla classe consente di far sì che l'impresa sopporti il costo dell'aumento del tasso di incidenza della malattia.

Un simile risultato in Italia sarebbe fortemente minato dall'impossibilità di conseguire un risarcimento in mancanza di una specifica prova del danno subito dal singolo individuo. L'incertezza del risultato dell'azione andrebbe unito ai maggiori costi dell'azione individuale rispetto all'azione collettiva e alla mancanza di quegli incentivi all'azione che, come si è visto, connotano la *class action* americana (si vedano le considerazioni sopra svolte sul diverso ruolo dell'avvocato).

Tali fattori avrebbero senz'altro una fortissima efficacia deterrente sulla decisione di instaurare il giudizio in Italia.

In altri termini la sentenza americana che riconoscesse il risarcimento per trattamenti e monitoraggi medici alla *medical monitoring subclass,* o che riconoscesse ai soggetti della *reimbursment subclass* il risarcimento del costo d'acquisto del farmaco, non si scontrerebbe con il principio proprio dell'ordinamento italiano che garantisce a ciascun soggetto il diritto di agire in giudizio per la tutela dei suoi diritti e interessi legittimi, bensì consentirebbe ai soggetti *members* di tali sottoclassi di ottenere una tutela diversa e aggiuntiva, che in via individuale non potrebbero, o meglio, non potrebbero convenientemente conseguire.

Il riconoscimento di tali sentenze in Italia non si scontrerebbe affatto, quindi, con l'art. 24 Cost, ma semmai sarebbe conforme ad un'interpretazione evolutiva dell'art. 111 Cost., visto che un processo inefficiente non sarebbe un giusto processo, principio di cui lo stesso legislatore italiano ha dimostrato di aver preso consapevolezza con i recenti progetti di legge tesi ad introdurre anche in Italia forme di processo analoghe alla *class action.*

Dichiaro, edotto della pena per falsa attestazione secondo le leggi degli Stati Uniti d'America, che quanto sopra esteso corrisponde a verità ed è corretto secondo la mia informata opinione.

Verona, 15 maggio 2006                    Prof. Avv. Claudio Consolo