Dixon

**TT's Affirmative Designations:**

· transcript includes:
1. D's objections
2. TT's responses
3. Court's rulings in Irvin 2.

dixon (Multi-clip)
wd001    18:8-20:16

18: 8    Q.    Good morning, Dr. Dixon.  My name is
18: 9  Sol Weiss.  How are you this morning?
18:10    A.    Fine, thank you.  Good morning.
18:11    Q.    Would you give me a brief description
18:12  of your educational background.
18:13    A.    Sure.  I did my undergraduate,
18:14  master's and Ph.D. at Cambridge University in
18:15  England.
18:16    Q.    And what was your Ph.D. in?
18:17    A.    It was in plant enzymology,
18:18  biochemistry.
18:19    Q.    And when did you complete your Ph.D.?
18:20    A.    1979.
18:21    Q.    And could you give us a synopsis of
18:22  your work history and experience.
18:23    A.    My work history.  I first joined
18:24  SmithKline & French in 1979 and -- in the R&D group,
18:25  and then moved into project management at
18:ESQUIRE DEPOSITION SERVICES
19: 19
19: 1  SmithKline.
19: 2         I was in regulatory affairs at
19: 3  SmithKline, then was in business development, and
19: 4  then in marketing, and left SmithKline in 1989, I
19: 5  believe, 1989.
19: 6         And then I joined Centocor, where I
19: 7  was for -- until 1992, and I was in charge of
19: 8  establishing their business in Europe.
19: 9         And in 1992 -- I'm just trying to
19:10  think -- in 1993, I joined a company called
19:11  OsteoTech, and I can't remember the dates exactly.
19:12         And then I joined a company called
19:13  the West Company.
19:14         And then in 1996, I joined Merck.
19:15    Q.    And when did you leave Merck?
19:16    A.    I left Merck in 2001, November of
19:17  2001, and joined Bristol-Myers Squibb.
19:18    Q.    And in 1996, what were you hired to
19:19  do at Merck?
19:20    A.    I was hired as vice president of
19:21  marketing for the US Human Health business.
19:22    Q.    And you held that job until you left?
19:23    A.    Essentially I received a promotion a
19:24  couple of years later.  I can't exactly remember the
19:25  dates.  But I essentially had -- I was vice
19:ESQUIRE DEPOSITION SERVICES
20: 20
20: 1  president and senior vice president of marketing.
20: 2  And the various products I had responsibility for
20: 3  changed a little bit over that period of time.
20: 4    Q.    In 1996, what products were you

Page 1

Dixon

20: 5   responsible for at Merck?
20: 6        A.      I had responsibility for a number of
20: 7   products that were on the market, and those products
20: 8   were Pepcid, Proscar, Trusopt.  And then I had
20: 9   responsibility for a number of products that were
20:10   going to be coming to the market a year or so later:
20:11   Singulair, Maxalt, Propecia, Cosopt and Aggrastat, I
20:12   believe.  And then I had responsibility for another
20:13   group that was tracking and looking at and
20:14   understanding the very early new compounds.  And
20:15   there's a whole range of early compounds within
20:16   Phase I, Phase II clinical testing.

wd002    20:25-21:4

20:25        Q.      Why did you leave Merck?
20:ESQUIRE DEPOSITION SERVICES
21: 21
21: 1        A.      I had an opportunity, a great
21: 2   opportunity, at Bristol-Myers Squibb.  It was a more
21: 3   senior position, and it was a great opportunity for
21: 4   me to have a more senior position.

wd003    25:20-26:4

25:20        Q.      And when you came to Merck, Vioxx was
25:21   in the pipeline, correct?
25:22        A.      That is correct.
25:23        Q.      And one of the reasons you were hired
25:24   at Merck was to help bring Vioxx to the marketplace
25:25   and launch it?
25:ESQUIRE DEPOSITION SERVICES
26: 26
26: 1        A.      It was to launch the product, that's
26: 2   correct.
26: 3        Q.      Is that the primary reason you were
26: 4   hired at Merck?

wd004    26:7-26:12

26: 7             THE WITNESS:  No.  I was hired at
26: 8   Merck to be responsible for a number of products
26: 9   that were on the market and to launch, I think, a
26:10   total of six products.  I listed some of those when
26:11   you asked me the earlier question, like Singulair,
26:12   et cetera.

wd005    31:17-32:1

31:17        Q.      Vioxx was not the first coxib on the
31:18   market, correct?
31:19        A.      That is correct.
31:20        Q.      And it came to market six months
31:21   after Celebrex had been approved?
31:22        A.      Actually five months, I believe, yes.

Page 2

Dixon

31:23    Q.    And so in the race to capture the
31:24    attention of the prescribing physician, Vioxx was at
31:25    a disadvantage because Celebrex had already been on
31:ESQUIRE DEPOSITION SERVICES
32: 32
32: 1    the market, correct?

wd006    32:4-32:5

32: 4          THE WITNESS: It was definitely a
32: 5    disadvantage to come second to market.

wd007    32:7-33:8

32: 7    Q.    And that's a disadvantage you were
32: 8    well aware of in your role as vice president of
32: 9    marketing?
32:10    A.    Yes.
32:11    Q.    And you helped devise strategies to
32:12    overcome that disadvantage?
32:13    A.    Yes, that's fair.
32:14    Q.    The coxibs were not the only
32:15    prescription drug on the market to alleviate acute
32:16    pain, correct?
32:17    A.    That is correct.
32:18    Q.    You had Motrin?
32:19    A.    Correct.
32:20    Q.    Voltaren?
32:21    A.    Correct.
32:22    Q.    OxyContin?
32:23    A.    I don't know whether that was on the
32:24    market at the time.
32:25    Q.    Aspirin?
32:ESQUIRE DEPOSITION SERVICES
33: 33
33: 1    A.    Correct.
33: 2    Q.    Opiate derivatives?
33: 3    A.    Correct.
33: 4    Q.    And at the time that Vioxx was
33: 5    launched, there were no data that allowed Merck to
33: 6    tell doctors, who were going to prescribe the drug,
33: 7    that Vioxx was any more effective in reducing pain
33: 8    than any other drug on the market, correct?

wd008    33:11-33:11

33:11          THE WITNESS: That's correct.

wd009    33:13-33:17

33:13    Q.    And that also then was an obstacle to
33:14    overcome to have a successful launch of Vioxx,
33:15    correct, over all the other competitors for pain
33:16    relief in the market?
33:17    A.    No.

Page 3

Dixon

wd010    33:20-34:4

33:20      Q.    Why not?
33:21      A.    Because superior efficacy was
33:22  actually not the main focus for the premise behind
33:23  Vioxx. It was -- it was important to have strong
33:24  efficacy, but we were making no claim, from what I
33:25  can recall, of superior efficacy against some of
33:ESQUIRE DEPOSITION SERVICES
34: 34
34: 1  those drugs that you just mentioned.
34: 2      Q.    What was the claim?
34: 3      A.    Powerful efficacy and a single -- a
34: 4  single pill, simple dosing, from what I can recall.

wd011    34:11-34:14

34:11      Q.    So as I understand your testimony,
34:12  you knew when Vioxx was launched that it was no more
34:13  effective in reducing pain than all the other drugs
34:14  we talked about, correct?

wd012    34:17-34:17

34:17          THE WITNESS: Correct.

wd013    62:25-63:8

62:25          What was so critical about your
62:ESQUIRE DEPOSITION SERVICES
63: 63
63: 1  position in the launch of Vioxx?
63: 2      A.    I was the person who oversaw the
63: 3  Vioxx team. I also had responsibility for other
63: 4  teams: Singulair, for example. We had launched
63: 5  Singulair, so now I was being asked to make sure, in
63: 6  my overall prioritization of my activities, that I
63: 7  gave good attention to the work that the Vioxx team
63: 8  was doing.

wd014.1    145:15-146:2

145:15      Q.    On October 1, 2001, you sent an
145:16  e-mail to David Anstice, your superior. At the time
145:17  you were head of the WBST, urging him to have Merck
145:18  announce that they were going to do a cardiovascular
145:19  outcome trial before the FDA pushes you to do it,
145:20  correct?
145:21      A.    That is correct, yes.
145:22      Q.    And the advisory meeting was in
145:23  February of 2001?
145:24      A.    That is correct.
145:25      Q.    Were you advocating ever since
145:ESQUIRE DEPOSITION SERVICES

Page 4

Dixon

```
146: 146
146: 1   February of 2001 to have that study done?
146: 2        A.   Pretty much, yes, in my recollection.

wd015    147:2-147:5

147: 2        Q.   In May of 2000 – May 22nd, 2001, a
147: 3   press release went out that Merck confirms the
147: 4   cardiovascular safety profile of Vioxx. And it is
147: 5   ABI 0003228 to 30. And I'm going to give you my

wd016    147:14-148:20

147:14        Q.   Did you see that press release
147:15   before?
147:16        A.   I've seen a number of press releases.
147:17   I'm not sure I've seen this exact one, but I've seen
147:18   a number of press releases.
147:19        Q.   You had -- you approved the final
147:20   copy, correct?
147:21        A.   I would have been one of the people
147:22   who approved this, yes.
147:23        Q.   Now, this press release went out
147:24   after the advisory committee, true?
147:25        A.   Yes.
147:ESQUIRE DEPOSITION SERVICES
148: 148
148: 1        Q.   With your approval?
148: 2        A.   As I said, I was one of several
148: 3   people to approve the press release.
148: 4        Q.   And Merck is telling the public about
148: 5   the favorable cardiovascular safety profile of
148: 6   Vioxx; at the same time it doesn't even have
148: 7   together a protocol for doing a cardiovascular
148: 8   outcome trial, correct?
148: 9        A.   That is correct.
148:10        Q.   Can you tell me how many million
148:11   prescriptions of Vioxx were written by physicians
148:12   from March of 2000 until you left the company in
148:13   November of 2001?
148:14        A.   I'm afraid I don't know that number.
148:15        Q.   Multiple millions, correct?
148:16        A.   I don't know.
148:17        Q.   There were $2 billion in sales of
148:18   Vioxx in 2000, correct?
148:19        A.   I don't recall the exact number, but
148:20   that's in the ballpark, yes.

wd017    150:5-150:11

150: 5        Q.   And if -- and if the hypothesis that
150: 6   Naprosyn was cardioprotective was in error, and if,
150: 7   in fact, Vioxx was prothrombotic and increased the
150: 8   risk for heart attack or stroke, do you know how
150: 9   many patients were unnecessarily exposed to Vioxx
```

D's objections: lack of foundation (5/22/01 press release); irrelevant; prejudicial

Π's response: Press release issued while Mr. Barnett is taking Vioxx & predates his heart attack. The press release is clearly relevant to Plaintiff's failure to warn claim.

Irvin 2 ruling: Overruled.

D's objections: same as above.

Π's response: same.

Irvin 2 ruling: overruled as to 148: 1-3. No objection previously to 147:14-25.

D's objections: lack of foundation; calls for speculation.

Π's response: Witness approved the press release and has knowledge of its contents. No speculation; witness is testifying to her personal knowledge

Irvin 2 ruling: Overruled.

* next page.

Page 5

Dixon

150:10   from March of 2000 to the time you left the company
150:11   in November of 2001?

D's objection: Lack of foundation; calls for speculation

I's response: Witness testifies to her personal knowledge. No speculation.

Irwin 2 ruling: Not applicable.

wd018   150:14-151:4

150:14       THE WITNESS:  I think it's important
150:15   to state that the reason why Merck wanted to do a
150:16   cardiovascular outcomes trial is they felt that they
150:17   had data already against placebo that showed that
150:18   Vioxx did not cause heart attacks, and they had the
150:19   body of evidence about naproxen being
150:20   cardioprotective.  And the -- I think, even after
150:21   the February 2001 FDA advisory committee, my
150:22   understanding is that the Merck scientists continued
150:23   to believe their conclusion that Vioxx did not cause
150:24   heart attacks and that the plan and the desire to do
150:25   a cardiovascular outcomes trial was to confirm that
150:ESQUIRE DEPOSITION SERVICES
151:151
151:1    Vioxx didn't cause heart attacks.  And so I just
151:2    provide that perspective because it's a little
151:3    different from the way you portrayed things a moment
151:4    ago.

wd019   151:22-152:9

151:22      Q.   And you, therefore, approved press
151:23   releases that went out to the public expressing your
151:24   scientists' views on the results of the VIGOR trial?
151:25      A.   I did.  And as I've said on a number
151:ESQUIRE DEPOSITION SERVICES
152:152
152:1    of occasions, this is not a press release that came
152:2    out from marketing.  It was a press release that had
152:3    sign-off from the clinical group, the legal group,
152:4    the regulatory group and then senior management.  So
152:5    this was the company's position.  And I had been,
152:6    you know, taken through the data and understood the
152:7    Merck scientists' conclusions, and that was
152:8    reflected in these press releases that I signed off
152:9    on.

wd020   152:25-153:13

152:25      Q.   And you, at Merck, expected
152:ESQUIRE DEPOSITION SERVICES
153:153
153:1    prescribing physicians who saw the press releases or
153:2    read the articles to rely on the accuracy of those
153:3    statements about the results of the VIGOR trials,
153:4    correct?
153:5       A.   What Merck always did was they
153:6    actually presented the data so that the physicians
153:7    could see, sort of in a sense, the raw percentages,
153:8    which showed a difference between Vioxx and

x continues
Page 6 p.7 →

D's objections: lack of foundation; assumes facts not in evidence.

I's response: Witness understands and answers question. Witness's answer clearly affirms basis of question that Merck intended for physicians to rely on accuracy of statements in press releases.

Irwin 2 ruling: Not applicable.

Dixon

153: 9  naproxen. And then, in addition to the raw data,
153:10  Merck presented its conclusion on the interpretation
153:11  of the data. So a physician would see those two and
153:12  they could draw their own conclusions as to whether
153:13  they would agree with that interpretation.

wd021  153:17-153:20

153:17     Q.   You expected physicians who saw the
153:18  data as portrayed in the press releases and in the
153:19  Konstam articles and others to rely on the accuracy
153:20  of the information they were receiving?

wd022  153:23-153:25

153:23     THE WITNESS: Certainly -- certainly
153:24  the information in the press releases were accurate
153:25  to the best of the Merck scientists' knowledge.

wd022.1  180:3-180:21

180: 3     Q.   In September of 2001, it was your
180: 4  opinion that "I believe we need to do a study,"
180: 5  that's a CV study. "It is the only way we can
180: 6  eventually put to rest all the noise in the market
180: 7  by doing a definitive study in high CV risk
180: 8  patients. The results will not be available for
180: 9  some time, but handled correctly, there is some
180:10  positive PR we can gain from saying we are
180:11  conducting a study (there are industry examples of
180:12  other products who benefited in this way). I think
180:13  the consensus is the study should be on Viol,"
180:14  V-I-O-L. "There are risks depending on study
180:15  design, especially re: GI effects, but we must do
180:16  one."
180:17     Do you recall that?
180:18     A.   I think you're reading from an
180:19  e-mail, so I'd like to see it.
180:20     MR. WEISS: There you go. Let's mark
180:21  the next e-mail.

wd022.2  181:5-181:6

181: 5     THE WITNESS: Yes. You read from
181: 6  this e-mail. Thank you.

wd023  238:14-239:17

238:14     Q.   I'm just going to show you -- I'm
238:15  showing you what has been marked as Exhibit 25. It
238:16  indicates -- it's an e-mail from David Anstice,
238:17  that's your boss, correct?
238:18     A.   That is correct.
238:19     Q.   Okay. And, actually, it's an e-mail
238:20  to David Anstice, correct? I correct myself.

Page 7

Δ's objections: lack of foundation;
lack of personal knowledge.

π's response: Witness was responsible
for reviewing press releases,
was familiar with how they
were used, as well as their
purpose.

Irvin 2 ruling: Overruled.

Dixon

238:21    A.    That is correct.
238:22    Q.    Okay.  And it says -- it indicates
238:23  here it was received by you October 17, 2001,
238:24  correct?
238:25    A.    Correct.
238:ESQUIRE DEPOSITION SERVICES
239: 239
239: 1    Q.    Okay.  And the top says -- and this
239: 2  is from Scolnick, right?
239: 3    A.    That's correct.
239: 4    Q.    And just for the record, Scolnick is
239: 5  who?
239: 6    A.    Dr. Scolnick was the overall
239: 7  president for Merck Research Labs, the R&D group.
239: 8    Q.    Now, he's -- he is the -- one of the
239: 9  physicians that you relied upon in -- concerning the
239:10  issue of heart risk and Vioxx at Merck, correct?
239:11    A.    Yes, Dr. Scolnick was the top guy
239:12  responsible for all of the clinical groups, and he
239:13  was one of the people who I obtained my information
239:14  around their conclusion on the VIGOR data.
239:15    Q.    Okay.  So Dr. Scolnick, he's the top
239:16  banana in terms of doctors working for Merck on this
239:17  issue, correct?

wd024    239:20-239:21

239:20        THE WITNESS:  He's the president of
239:21  R&D, yes.

wd025    239:23-240:14

239:23    Q.    Okay.  And he says to your boss, with
239:24  respect to the Vioxx label, "It is ugly cubed.  They
239:25  are bastards."  Who is "they are bastards"?  Who is
239:ESQUIRE DEPOSITION SERVICES
240: 240
240: 1  "they"?
240: 2    A.    I think he's referring to the FDA.
240: 3    Q.    So the head doctor in charge of Vioxx
240: 4  is calling the FDA bastards after they give them
240: 5  their proposed warning label?
240: 6    A.    I'm sorry, is that a question?
240: 7    Q.    Yes.
240: 8    A.    That's what he writes in this memo.
240: 9    Q.    Does that offend you?
240:10    A.    It's pretty strong.
240:11    Q.    It doesn't offend you?
240:12    A.    I said it's pretty strong.
240:13    Q.    Okay.  So your answer is it offends
240:14  you?

wd026    240:18-240:25

240:18    Q.    Yes, the language.  Calling the FDA

Page 8

continues →

Δ's objections: lack of foundation;
    calls for speculation; prejudicial.

Ts response: Email was received by
    witness after being sent to
    her by her boss, David Anstice.
    Testimony is relevant to rebut
    Merck's defense that it
    cooperated with the FDA.

Irvin 2 ruling: Overruled.

Δ's objections: Irrelevant; prejudicial.

Ts response: same as above ↑

Irvin 2 ruling: Overruled.

Dixon

```
240:19   bastards, does that offend you, by the head doctor
240:20   that you relied upon?
240:21       A.    It's strong wording.  I agree.
240:22       Q.    Okay.  And this is -- the doctor who
240:23   is calling the FDA bastards, he's the one that you
240:24   put all your faith in concerning the conclusion that
240:25   Vioxx does not cause heart attacks, correct?
```

wd027   241:3-241:8

```
241: 3           THE WITNESS:  Dr. Scolnick was the
241: 4   head physician in the company, and he was one of the
241: 5   people who -- well, he was leading the clinical
241: 6   group, and their conclusion was that Vioxx did not
241: 7   cause heart attacks.  And that was the information
241: 8   that I was reassured was the correct interpretation.
```

wd028   242:4-242:7

```
242: 4       Q.    And he's the -- also the very same
242: 5   doctor, the doctor that called the FDA bastards,
242: 6   he's the same doctor who gave you the theory about
242: 7   naproxen being cardioprotective, isn't he?
```

wd029   242:10-242:16

```
242:10           THE WITNESS:  He certainly -- I heard
242:11   him speak about it many times.  I don't know whether
242:12   he was the first person who put together the data.
242:13   More likely his group summarized the information.
242:14   But he certainly had concluded that Vioxx was not --
242:15   did not cause heart attacks and that naproxen is
242:16   cardioprotective, that's correct.
```

wd030   242:18-243:8

```
242:18       Q.    And then we'll just look down at the
242:19   bottom of this e-mail where it says -- and this is
242:20   again from Dr. Scolnick, correct, David?  That's
242:21   your boss, right?
242:22       A.    That's correct.
242:23       Q.    "Be assured we will not accept this
242:24   label," correct?
242:25       A.    You're reading it correctly, yes.
242:ESQUIRE DEPOSITION SERVICES
243: 243
243: 1       Q.    Okay.  "If we need to, we will ask to
243: 2   go to an advisory board meeting.  Ed."  Right?
243: 3   That's him, Ed Scolnick, right?
243: 4       A.    That's correct, yes.
243: 5       Q.    Okay.  Now, if Merck made statements
243: 6   publicly or under oath that they cooperated with the
243: 7   FDA in putting a label on their product, this would
243: 8   be contrary to that, wouldn't it?
```

Page 9

---

Δ's objections: Irrelevant; prejudicial.

Π's response: same as above.
Permissible cross based on 239:11-14.

Irvin 2 ruling: Overruled.

---

Δ's objections: Irrelevant; prejudicial

Π's response: Permissible cross - examination. Dr. Scolnick is the most senior MRL executive. Witness relied on Dr. Scolnick to provide information.

Irvin 2 ruling: Overruled.

---

Δ's objections: Irrelevant; prejudicial.

Π's response: Relevant to rebut Merck's defense/claim that it cooperated with the FDA regarding a CV warning.

Irvin 2 ruling: overruled.

---

Δ's objections: Question was withdrawn.

Π's response: withdrawn.

Dixon

wd031     243:13-243:17

243:13     Q.     Would it be proper to say that you
243:14  cooperated with the FDA in the labeling of Vioxx
243:15  when your head doctor is calling the FDA bastards
243:16  when he gets the label from the FDA to put on the
243:17  Vioxx product?

D's objections: Irrelevant; prejudicial; lack of foundation; calls for speculation.

T's response: Relevant to rebut Merck's claim/defense that it cooperated with the FDA. Witness testifies about her personal knowledge.

Irvin 2 ruling: overruled.

wd032     243:20-244:6

243:20          THE WITNESS:  At this point, I know
243:21  that the labeling team who took the label that came
243:22  from the FDA and went through it line by line, they
243:23  sent that back, and that would have been signed off
243:24  by Dr. Scolnick and others, including myself, I
243:25  believe.  That was then sent to the FDA towards the
243:ESQUIRE DEPOSITION SERVICES
244: 244
244: 1  end, if not the very end or early – end of October
244: 2  or perhaps even early November.  What happened after
244: 3  that in terms of negotiations back and forth between
244: 4  the FDA I have no idea, because I left the company
244: 5  before the label got finally negotiated and approved
244: 6  the following year.

D's objections: Irrelevant; prejudicial; lack of foundation.

T's response: same as above.

Irvin 2 ruling: Overruled.

wd033     247:1-247:4

247: 1          If Merck told the public that they
247: 2  cooperated with the FDA in the labeling of Vioxx,
247: 3  that would not be true based upon this label, would
247: 4  it -- on this e-mail, would it?

D's objections: Irrelevant; prejudicial; lack of foundation; calls for speculation.

T's response: same as above.

Irvin 2 ruling: Not applicable

wd034     247:7-247:14

247: 7          THE WITNESS:  My sense is this is an
247: 8  emotional exchange after Dr. Scolnick sees the label
247: 9  for the first time.  What I know is that there is a
247:10  large group of scientists who had direct
247:11  responsibility for interacting with the FDA on a
247:12  more day-to-day basis, and I don't know whether this
247:13  tone is consistent with the way they interacted with
247:14  the FDA.

D's objections : Irrelevant; prejudicial; lack of foundation; speculative.

T's response: same as above.

Irvin 2 ruling: Not applicable.

wd035     250:25-251:6

250:25     Q.     Okay.  And do you know how you got
250:ESQUIRE DEPOSITION SERVICES
251: 251
251: 1  this e-mail originally?
251: 2     A.     This is David Anstice's writing on
251: 3  here.  So he asked his assistant to just photocopy
251: 4  it and send me a copy, my offices.
251: 5     Q.     Why would he want you to know what
251: 6  they were thinking about the label?

D's objections: Irrelevant; prejudicial; calls for speculation.

T's response: Witness has personal knowledge of how & why she received email. Relevant to show her state of mind in reviewing press releases & other communicatio

Irvin 2 ruling: Overruled.



wd036    251:9-251:10

251: 9           THE WITNESS:  It had to do with
251:10    Vioxx.

wd037    251:12-251:14

251:12       Q.    Because it would impact your
251:13    business, true, if the label – if they accepted the
251:14    label as provided by the FDA?  True?

wd038    251:18-251:20

251:18       Q.    And he wanted to let you know that
251:19    they were going to fight and fight hard because the
251:20    FDA are bastards, right?

wd039    251:23-252:3

251:23           THE WITNESS:  I'm sure David wanted
251:24    to see -- me to see this interchange here.  He
251:25    copied – he similarly did this for lots of
251:ESQUIRE DEPOSITION SERVICES
252: 252
252: 1    documents.  It wasn't unusual for him to send
252: 2    something on.  And, clearly, as you say, he wanted
252: 3    me to see this interchange between he and Ed.

wd040    252:13-252:15

252:13           "Question:  And he wanted to let you
252:14    know that they were going to fight and fight hard
252:15    because the FDA are bastards, right?")

wd041    252:18-252:20

252:18           THE WITNESS:  All I can tell you is
252:19    that he wanted me to read this memo, which contained
252:20    those statements.

wd042    253:13-253:15

253:13    holding your job, I meant in doing your job.  It was
253:14    going to affect how you did your job if Merck
253:15    accepted the FDA label as given?

wd043    253:20-254:2

253:20           THE WITNESS:  I mean, I -- you know,
253:21    I'm sorry, this is sort of several years ago now.  I
253:22    can't exactly say I can recall what David intended
253:23    by this.  I certainly can tell you that, by him
253:24    sending this to me, he certainly wanted me to know
253:25    about Ed's position and him, in a sense, agreeing
253:ESQUIRE DEPOSITION SERVICES

Dixon

Page 11

* see next page.

Δ's objections: Irrelevant; speculative.
π's response: See previous response.
Irvin 2 ruling: Not applicable.

Δ's objection: Witness did not answer question.
π's response: Witness answered at 251:23-252:3.
Irvin 2 ruling: Overruled.

Δ's objections: Prejudicial; lack of foundation; calls for speculation.
π's response: Witness is not speculating but clearly knows why she received email. See 251:23-252:3
Irvin 2 ruling: Overruled.

Δ's objections: Prejudicial; lack of foundation; speculative.
π's response: Same as previous response
Irvin 2 ruling: Overruled.

Δ's objections: Prejudicial; lack of foundation; calls for speculation.
π's response: Permissible to cross witness w/ Merck statement.
Irvin 2 ruling: Overruled.

Δ's objections: Prejudicial; lack of foundation; speculative.
π's: Permissible cross-examination.
Irvin 2 ruling: Overruled.

Δ's objections: Prejudicial; lack of foundation; speculative.
π's response: Permissible cross.
Irvin 2 ruling: overruled.

Dixon

254: 254
254: 1   with Ed's position.  That's all I can definitively
254: 2   conclude from this.

△'s objections: Prejudicial; lack of
foundation; speculative.

T's response: Witness testifies to her
personal knowledge.  Witness
knows Anstice wanted her to
receive email.  No speculation.

Irwin 2 ruling:   Overruled.

wd051   416:1-417:7

416: 1        If you turn to page 112, please, in
416: 2   terms of the Bates pages.
416: 3        A.   Yes.  I've got it.
416: 4        Q.   In the top left of the table -- well,
416: 5   it says "Template F, Investment By Major Marketing
416: 6   Programs," correct?
416: 7        A.   Yes, it does.
416: 8        Q.   And then it's fuzzy on the copy.  It
416: 9   looks like "Investment By Primary Target
416:10   Audiences/marketing" something.
416:11        A.   It says "Marketing Mix."
416:12        Q.   "Marketing Mix."
416:13        A.   I believe.
416:14        Q.   Okay.  So let's talk about the things
416:15   that are listed under "Marketing Mix."  "Rep" -- is
416:16   it "Rep-centered materials"?  Can you read that, or
416:17   do you know what that would be?
416:18        A.   I think you're right.  It says -- I
416:19   think it is "Rep-centered materials."
416:20        Q.   And if we look to the right a little
416:21   bit, the next column, it talks about the money, how
416:22   much money is in each of these elements of the
416:23   marketing mix, correct?
416:24        A.   Yes.
416:25        Q.   And there -- and it looks like, at
416:ESQUIRE DEPOSITION SERVICES
417: 417
417: 1   least with respect to the ones we're looking at
417: 2   here -- I don't know how you quantify that.  Under
417: 3   "Rep-centered materials," it's 28 plus million
417: 4   dollars, correct?
417: 5        A.   That is correct.
417: 6        Q.   What's the next one that's listed?
417: 7             MR. TSOUGARAKIS:  Going down?

△'s objections: Irrelevant; prejudicial.

T's response: Witness is knowledgeable of
document & was knowledgeable
about the reason it was prepared
Permissible to cross-examine witness
with Merck document.

Irwin 2 ruling:   Overruled.

wd052   417:12-418:4

417:12        A.   Down.  "Peer-influence resources," it
417:13   says.
417:14        Q.   "Peer-influence"; is that right?
417:15        A.   That's what it says.
417:16        Q.   What do you understand that to mean?
417:17        A.   I'd have to refresh myself on the
417:18   terminology of Merck's business plans.
417:19        Q.   Okay.
417:20        A.   Let me just look at the other
417:21   segments here.  I think it means resources provided
417:22   to the sales organization for them to arrange the
417:23   speaking meetings we talked about earlier.

→ see next page.

Page 12

Dixon

417:24     Q.     Would it also have to do with having
417:25   scientists do studies or write papers regarding your
417:ESQUIRE DEPOSITION SERVICES
418: 418
418: 1   data?
418: 2     A.     I don't know.
418: 3     Q.     Well, that's something that was done
418: 4   at Merck, isn't it?

wd053   418:6-418:8

418: 6          THE WITNESS:  Our clinical group
418: 7   worked with investigators and people involved in the
418: 8   studies to write papers, yes.

wd054   418:10-418:24

418:10     Q.     Now, can you tell me how much money
418:11   in the next column was budgeted in the marketing mix
418:12   for peer-influence resources under the heading
418:13   Vioxx?
418:14     A.     I think it says -- I think it says
418:15   either 83 or $93 million.
418:16     Q.     I think it says 93, but you're not
418:17   sure?
418:18     A.     Yeah.  I'm not sure, but I said both
418:19   to be transparent.
418:20     Q.     It's a lot of money?
418:21     A.     I agree.
418:22     Q.     Can we agree that it's more money
418:23   than Merck ever spent in conducting a CV trial
418:24   regarding Vioxx?

wd055   419:2-419:5

419: 2          THE WITNESS:  I don't know the cost
419: 3   of the trials that they were planning after I left
419: 4   the company.  I know the cost of the VIGOR trial,
419: 5   which was like $125 million.

wd056   419:7-419:17

419: 7     Q.     VIGOR was not a CV study, was it,
419: 8   ma'am?
419: 9     A.     It was a GI outcome study.
419:10     Q.     So that's correct, it wasn't a CV
419:11   study?
419:12     A.     Correct.
419:13     Q.     Merck spent exponentially more money
419:14   trying to influence the messages that were getting
419:15   out there regarding cardiovascular risks than Merck
419:16   spent in actually testing for cardiovascular risks;
419:17   isn't that true?

wd057   419:23-420:1

Page 13

---

Δ's objections: Irrelevant; prejudicial.

π's response: Relevant to show that
    Merck was spending more money on
    marketing than research on CV risks.
    Also, relevant to show Merck
    manipulated the publication of scientific
    literature.

Irvin 2 ruling: Overruled.

---

Δ's objections: Irrelevant; prejudicial
π's response: same as previous response
Irvin 2 ruling: Overruled.

---

Δ's objections: Lack of foundation;
    irrelevant; prejudicial
π's response: same as above.
Irvin 2 ruling: Overruled.

---

Δ's objections: Lack of foundation;
    speculative.
π's response: Relevant to show
    Merck spending more money
    on marketing than research
    on CV risks associated with Vioxx.
Irvin 2 ruling: Overruled.

Dixon

419:23      Q.     Well, ma'am, this is for the 2001
419:24    Profit Plan, and you were there for 11 months of
419:25    2001, weren't you?
419:ESQUIRE DEPOSITION SERVICES
420: 420
420: 1      A.     That is correct.

wd058    420:2-420:4

420: 2      Q.     And if the question is, how much
420: 3    during those 11 months was spent on a CV study, the
420: 4    answer is zero, correct?

wd059    420:6-420:8

420: 6            THE WITNESS: I agree for the year
420: 7    2001. My comment was I didn't know how much they
420: 8    subsequently spent.

wd060    423:25-424:3

423:25      Q.     You spent nearly $56 million giving
423:ESQUIRE DEPOSITION SERVICES
424: 424
424: 1    out free samples of Vioxx for patients, right, or to
424: 2    doctors to dispense to patients?
424: 3      A.     That is correct.

wd070    767:19-771:25

767:19      Q.     One of the responsibilities you had
767:20 -- one of the products you had responsibility for
767:21 was Vioxx?
767:22      A.     Yes.
767:23      Q.     Can you tell the jury what your
767:24 responsibilities were in general as to marketing
767:25 Vioxx.
768: Page 768
768: 1      A.     Well, marketing of Vioxx, Vioxx was
768: 2 one of, I don't know, seven or eight different
768: 3 products reported to me, and so I had dedicated
768: 4 teams responsible for each individual product. So,
768: 5 I oversaw the marketing activities of a range of
768: 6 products including Vioxx. And, generally -- so, I
768: 7 was sort of at the strategic overall management
768: 8 level. But marketing a pharmaceutical product such
768: 9 as Vioxx or Singulair, you know, our role was to do
768:10 market research, to understand the marketplace, to
768:11 understand the problems with existing products, what
768:12 would be helpful products for patients in the
768:13 future, and then to launch these products and market
768:14 these products. So, we would work with scientists
768:15 to understand the clinical data, do market research
768:16 to test the data so that it could be summarized in a

Δ's objections: Irrelevant; prejudicial

Π's response: Relevant to show that
         Merck spent more on marketing
         than studying the CV risks
         associated with Vioxx.

Irwin 2 ruling: Overruled.

Page 14

Dixon

768:17 way that was succinct and comprehensible for the
768:18 physicians to be able to understand so they could
768:19 take it into consideration as they were learning
768:20 about the products. So, we were communicating,
768:21 summarizing data, educating physicians. That was
768:22 kind of a summary of what marketing would do.
768:23          Marketing in the pharmaceutical
768:24 industry because we're dealing with medicines is a
768:25 very regulated industry. So, it actually is very --
769: Page 769
769: 1 there are similarities, but there are big
769: 2 differences to other -- you know, marketing of other
769: 3 products like candy, for example. So, everything
769: 4 that a pharmaceutical marketer has to do has to
769: 5 be -- it has to be within the FDA regulations and is
769: 6 basically driven by everything that was in the label
769: 7 for the product. So, internally, you know, there
769: 8 are very established procedures and review
769: 9 committees and things to ensure that marketing
769:10 materials are consistent with the label and they are
769:11 being used appropriately and consistent with FDA
769:12 regulations.
769:13     Q.     And were those procedures that you
769:14 just outlined to ensure compliance with the label
769:15 and FDA regulations followed with respect to the
769:16 promotional materials for Vioxx?
769:17     A.     Absolutely.
769:18     Q.     Can you tell the jury what the
769:19 purpose behind marketing a product like Vioxx is or
769:20 actually what was the purpose to marketing Vioxx to
769:21 the physicians --
769:22     A.     Right.
769:23     Q.     -- and patients?
769:24     A.     Well, the idea behind Vioxx was that
769:25 the -- there's tens of millions of people with pain,
770: Page 770
770: 1 you know, all kinds of different types of pain. I
770: 2 seem to remember a number like 74 million people
770: 3 with pain, and something like, you know, hundreds of
770: 4 thousands of physicians around the country treat
770: 5 patients in pain. And nonsteroidal
770: 6 anti-inflammatories like ibuprofen, which is Motrin,
770: 7 or nabumetone, which is Relafen, these drugs are
770: 8 very effective in treating pain, whether it's pain
770: 9 from osteoarthritis or pain from, you know, hurting
770:10 yourself, injuring yourself, and these drugs are
770:11 really good for treating pain. But when they're
770:12 taken sometimes even in short term, but certainly
770:13 when they were taken longer term, they -- because of
770:14 the mechanism, they also could have very bad effects
770:15 on the person's stomach, so, they could cause
770:16 stomach bleeding, stomach ulcers, and there were a
770:17 number of people each year who would actually die
770:18 from these stomach ulcers and bleeding. So, the
770:19 scientific hypothesis behind the development of

Page 15

Dixon

770:20 Vioxx was to show that it had equivalent efficacy
770:21 and safer GI stomach side effects so that the
770:22 patient could take the appropriate doses they needed
770:23 to get pain relief, but without having to worry
770:24 about dying from a bleeding ulcer.
770:25          And the reason why you don't just
771: Page 771
771: 1 develop the drug, but you also need to market it, is
771: 2 that there are so many physicians and patients who
771: 3 might consider using that product, that just
771: 4 publishing the data or having it approved by the FDA
771: 5 is not an effective way of communicating. As I
771: 6 said, our role was to condense the scientific
771: 7 information and present it in ways that we had done
771: 8 market research testing, to ensure that it was being
771: 9 presented in ways that made it understandable to
771:10 physicians and provide this information to the sales
771:11 representatives who would then interface with
771:12 physicians one on one. And we also sponsored
771:13 congress -- symposia and provided grants to study
771:14 the drug further and provided grants to -- for
771:15 continuing medical education. So, our role was to
771:16 make sure the information got communicated to
771:17 physicians so they could make their choices about
771:18 whether to use, in this particular instance, Vioxx,
771:19 but you could say the same thing for Singulair or
771:20 Zocor, or any of the other products that Merck
771:21 marketed and sold.
771:22      Q.    In communicating with physicians, did
771:23 Merck communicate the benefits and limitations of
771:24 Vioxx?
771:25      A.    Absolutely.

wd071    778:13-779:25

778:13      Q.    In addition to those public
778:14 disclosures, did Merck include any information about
778:15 the VIGOR data in its promotional materials?
778:16      A.    No, it did not.
778:17      Q.    Why is that?
778:18      A.    As I mentioned earlier, when we were
778:19 talking about pharmaceutical marketing in general,
778:20 the marketing group was only allowed to prepare
778:21 marketing materials for the sales representatives to
778:22 use using information from the label. And so
778:23 marketing was not allowed to do anything about VIGOR
778:24 until VIGOR was in the label. We did arrange for
778:25 the medical department to allow the representatives
779: Page 779
779: 1 to hand out letters which gave the details of the
779: 2 VIGOR study when physicians asked, and we know we --
779: 3 we were asked to hand out hundreds of thousands of
779: 4 those letters. So, marketing could do a very
779: 5 limited role, but the company did a very
779: 6 comprehensive role in providing information to

Dixon

779: 7 hundreds of thousands of physicians and the public
779: 8 through its press releases and letters and all the
779: 9 media attention that was out there.
779:10      Q.      In response to questions, did the
779:11 sales representatives have any information about the
779:12 cardiovascular event rates in the VIGOR trial to
779:13 provide to doctors?
779:14      A.      They did. They had what was called a
779:15 PIR, professional information response, I think PIR
779:16 stands for. And it was basically a scientific
779:17 letter prepared by, you know, doctors at Merck who
779:18 wrote these letters. And the representatives were
779:19 allowed to hand these letters to the physicians in
779:20 response to their questions because the
779:21 representatives were not allowed by the regulations
779:22 to discuss the VIGOR data in detail because it
779:23 wasn't in the label, but they were allowed to
779:24 facilitate, to make sure doctors got the answers to
779:25 their questions as quickly as possible.

wd072    782:3-782:8

782: 3      Q.      Ms. Dixon, at any time when you had
782: 4 responsibility for Vioxx, did you have any personal
782: 5 concerns about the cardiovascular safety of Vioxx?
782: 6      A.      No, I did not. I took Vioxx and
782: 7 continued to take Vioxx for a couple of years, so,
782: 8 no.

Total Length - 00:39:20

*π's objections*

**Barnett Merck Counter Designations- Dixon**

[21:5] - [21:20]          Dixon, Wendy 1/19/05

> page 21
> 5        Q.        And what did you do for BMS when you
> 6   went over there?
> 7        A.        My role at BMS was and is to be head
> 8   of global marketing.
> 9        Q.        And while you were at Merck, you were
> 10  head of US marketing?
> 11       A.        No.
> 12       Q.        Who did you report to at Merck?
> 13       A.        David Anstice.
> 14       Q.        And Anstice was the head of US
> 15  marketing?
> 16       A.        David was the head of the US
> 17  business, which included marketing and sales,
> 18  medical affairs and marketing -- a group that was
> 19  called marketing services.  Those are the groups
> 20  that reported to David.

[64:12] - [64:14]          Dixon, Wendy 1/19/05

> page 64
> 12       Q.        Did you actually participate in the
> 13  drafting of the Vioxx label?
> 14       A.        Not in the direct drafting, no.

[64:24] - [65:4]           Dixon, Wendy 1/19/05

> page 64
> 24       Q.        Did you ever work in any other drug
> 25  company where the marketing vice president signed
> page 65
> 1   off on final drafts of product labels?
> 2        A.        Yes.
> 3        Q.        Which company?
> 4        A.        Centocor and SmithKline & French.

[73:5] - [73:10]           Dixon, Wendy 1/19/05

> page 73
> 5                  THE WITNESS:  Yes.  We would ask
> 6   questions about any aspect of the data.  But the
> 7   policies were that the scientists were responsible
> 8   for the safety aspects of the label.  In fact,
> 9   marketing people were not allowed to participate in
> 10  sign-off of safety aspects of the label.

[101:20] - [101:23]        Dixon, Wendy 1/19/05

> page 101
> 20       Q.        Now, back in June of 1998, Merck
> 21  anticipated having to counter an aggressive negative
> 22  campaign by the Celebrex folks, correct?
> 23       A.        Yes, that is correct.

[104:10] - [104:25]        Dixon, Wendy 1/19/05

> page 104
> 10       Q.        And yet you didn't have an outcome
> 11  study that supported that data, correct?
> 12       MR. TSOUGARAKIS:  I'll object to the
> 13  form.
> 14                 THE WITNESS:  We had data that --
> 15  from our -- the data that we had submitted and had
> 16  reviewed by the FDA that was in the label that
> 17  showed that Vioxx, in large numbers, I think it was
> 18  something like 10,000 patients in the original NDA
> 19  for Vioxx, that showed that there's no difference
> 20  between Vioxx and placebo and no difference between
> 21  Vioxx and, I believe, ibuprofen, which is Motrin.  I
> 22  can't remember what the other NSAID was.  And so the

*R.602 - lack of personal knowledge. Speculative.*

**Barnett Merck Counter Designations- Dixon**

```
                23  data against placebo and against ibuprofen was
                24  included in the label and said there was no
                25  difference.
```

[420:10] - [420:25]    Dixon, Wendy 1/20/05

```
                page 420
                10      Q.      A couple of these things that are
                11  listed here, I don't know what they are off the top
                12  of my head or I just haven't deciphered it.  Is that
                13  "CDP studies"?
                14      A.      That's CDP studies.  That stands for
                15  the clinical studies -- the new clinical trials that
                16  the medical affairs department would conduct as
                17  opposed to the clinical studies that were done in
                18  the R&D organization.
                19      Q.      Okay.  Well, so the clinical studies
                20  being done by the medical affairs department are
                21  considered part of the marketing mix?
                22      A.      This was a US Human Health budget
                23  rolled together to reflect all spend on Vioxx in the
                24  human health business.  So this was the budget as it
                25  rolled up to David Anstice.
```

[529:22] - [530:6]    Dixon, Wendy 2/18/05

```
                page 529
                22      Q.      Now, Ms. Dixon, if I recall, you
                23  joined Merck sometime in 1996?
                24      A.      That is correct.
                25      Q.      Okay.  And you were assigned to the
                page 530
                1   Vioxx account as one of your duties?
                2       A.      Yeah.  Actually, at that point, Vioxx
                3   was just a number.  It was a very early compound and
                4   was a very small part of my responsibilities.  I had
                5   a broad range of marketed products and other new
                6   products under my responsibility.
```

*Cummulatvie.*
*Asked and answered*
*during previous*
*depositino testimony*

[568:23] - [569:20]    Dixon, Wendy 2/18/05

```
                page 568
                23      Q.      It was important to you as a marketer
                24  of the product to have a CV outcomes study?
                25      A.      It was important to me because I felt
                page 569
                1   that it was important to get the information on
                2   Vioxx and cardiovascular safety done as clearly as
                3   possible so there could be no questions.
                4       Q.      It was also important to you just as
                5   a human being that you don't want to put a drug out
                6   in the market that may be causing heart attacks,
                7   correct?
                8          MR. TSOUGARAKIS:  Object to the form
                9   of the question.
                10         THE WITNESS:  I wanted to get the
                11  information from a cardiovascular outcomes trial
                12  because we needed to know what -- definitively what
                13  the information was on Vioxx.  At that point in
                14  time, our scientists at Merck were still very firmly
                15  of the opinion that Vioxx was safe, and so my
                16  position was, well, let's do the study so that we
                17  can convince the rest of the world that it's safe.
                18  Nobody, I think, felt that Vioxx -- none of the
                19  scientists felt that Vioxx caused heart attacks at
                20  that time.
```

*R.602 - Witness lacks*
*personal knowledge &*
*is speculating about*
*what others were*
*thinking.*