П's Affirmative Designations
  · transcript includes:
    1. Δ's objections
    2. П's responses
  · No rulings were made in Term 2.

Nies 3-2-05

Nies 3-2-05 (Multi-clip)
an 4023    40:23-41:5

40:23        Q.    You are aware sitting here today that
40:24    Jerry Avorn and Dr. Solomon did a study for Merck;
40:25    correct?
40:ESQUIRE DEPOSITION SERVICES
41: Confidential - Subject to Protective Order  41
41: 1        A.    No.
41: 2        Q.    You are not aware of that?  Are you
41: 3    not aware that they did a study that found that
41: 4    Vioxx increased the risk of heart attack over
41: 5    Celebrex and other NSAIDs?

Δ's objections: Examiner testifying;
               No Foundation

П's response: Permissible cross-examination;
             R 607

an 4107    41:7-41:8

41: 7           THE WITNESS:  This may have happened
41: 8    after I was there.

an 4314    43:14-44:9

43:14        Q.    Do you know who Eric Topol is,
43:15    Doctor?
43:16        A.    Yes.
43:17        Q.    Do you know he's a scientist at the
43:18    Cleveland Clinic?  You've heard of the Cleveland
43:19    Clinic; correct?
43:20        A.    Yes.
43:21        Q.    Are you aware that Dr. Topol also was
43:22    an author on a study in 2001 that basically
43:23    concluded the same thing, that Vioxx increased the
43:24    risk of heart attack in people taking it.  Are you
43:25    aware of that?
43:ESQUIRE DEPOSITION SERVICES
44: Confidential - Subject to Protective Order  44
44: 1        A.    I knew he had published.
44: 2        Q.    You didn't know that was his
44: 3    conclusion?
44: 4        A.    Well, I knew that was his -- that's
44: 5    what he thought.
44: 6        Q.    The Cleveland Clinic is a pretty
44: 7    reputable place, correct, Doctor?
44: 8        A.    Yes, thought to be.  I've never been
44: 9    there.

Δ's objections: Examiner testifying;
  No Foundation; non-responsive

П's response: Permissible cross-examination.
             R 607.

an 7307    73:7-73:10

73: 7        Q.    Vioxx also increases your risk for a
73: 8    heart attack; correct?
73: 9        A.    If it's taken in a certain way over a
73:10    certain period of time, it appears to increase risk.

an 11216    112:16-113:10

Nies 3-2-05

112:16     Q.     Doctor, you received a letter from
112:17  another doctor by the name of John Oates in 1997.
112:18  Do you recall that?
112:19     A.     Yes.
112:20     Q.     Would you tell us just briefly who
112:21  John Oates is?
112:22     A.     John Oates at that time was professor
112:23  of medicine and pharmacology at Vanderbilt
112:24  University.
112:25     Q.     You know Dr. Oates actually very
112:ESQUIRE DEPOSITION SERVICES
113: Confidential - Subject to Protective Order 113
113: 1  well; don't you?
113: 2     A.     Yes, I do.  I was in -- I worked with
113: 3  him when I was at Vanderbilt University.
113: 4     Q.     Was he senior to you while you were
113: 5  at Vanderbilt?
113: 6     A.     Yes.
113: 7     Q.     You actually have published a number
113: 8  of articles where the two of you have collaborated;
113: 9  correct?
113:10     A.     Yes, some anyway.  Yes.

an 11523   115:23-116:22

115:23     Q.     Seeing this now, do you recall
115:24  reading it at this time, November 5th, 1997?
115:25     A.     Yes.
115:ESQUIRE DEPOSITION SERVICES
116: Confidential - Subject to Protective Order 116
116: 1     Q.     Dr. Oates says, "I'm writing in
116: 2  follow up of our discussion regarding the effect of
116: 3  MK966."  Just for the ease of reading, whenever it
116: 4  says MK-966, I'm going to substitute that going
116: 5  forward with Vioxx.  Are you comfortable with that,
116: 6  Doctor?
116: 7     A.     Yes.
116: 8     Q.     "Writing in follow up of our
116: 9  discussion regarding the effect of Vioxx on
116:10  prostacyclin biosynthesis."  Did I read that
116:11  correctly?
116:12     A.     Yes.
116:13     Q.     It says, "To pursue these findings in
116:14  a meaningful way, it would seem important to focus
116:15  further research at the level of the vascular
116:16  endothelium and its interaction with platelets."
116:17  Did I read that correctly?
116:18     A.     Yes.
116:19     Q.     Then at the end of that paragraph he
116:20  says, "It may be that prostacyclin is most important
116:21  in situations that stimulate COX-2 gene
116:22  transcription and enzyme synthesis."

an 11702   117:2-117:12

Nies 3-2-05

117: 2      Q.   I'll read it again just to make sure
117: 3  that I haven't misread it. "It may be that
117: 4  prostacyclin is most important in situations that
117: 5  stimulate COX-2 gene transcription and enzyme
117: 6  synthesis." That sentence there, Doctor, what
117: 7  meaning does that have to you?
117: 8      A.   What he's saying is that if the gene
117: 9  is turned on, if you will, the COX-2 gene, that is,
117:10  for COX-2, that may be the situation where
117:11  prostacyclin is important, where the prostacyclin
117:12  made by COX-2 would be important.

an 11723   117:23-119:6

117:23       And then in the next paragraph where
117:24  he says, "Based on these and other considerations,
117:25  it would seem appropriate to focus the further
117:ESQUIRE DEPOSITION SERVICES
118: Confidential - Subject to Protective Order 118
118: 1  investigations of the implications of Vioxx
118: 2  inhibition of prostacyclin biosynthesis on
118: 3  experimental models in which there is exaggerated
118: 4  platelet activation and platelet-vessel wall
118: 5  interaction." Did I read that correctly?
118: 6      A.   Yes.
118: 7      Q.   And then he goes on to propose a
118: 8  model, in fact, where smokers, people who smoke,
118: 9  would be studied; correct?
118:10      A.   Yes.
118:11      Q.   And in his own words, if you look at
118:12  Paragraph 1, it says, "Cigarette smoking by normal
118:13  humans produces vascular injury that is associated
118:14  with a substantial increase in total body
118:15  thromboxane B2 production and an increase in
118:16  prostacyclin biosynthesis."
118:17      A.   Yes.
118:18      Q.   "The increase in prostacyclin
118:19  biosynthesis could well be associated with COX-2
118:20  induction in response to the vascular toxicity
118:21  resulting from cigarette smoking." Did I read that
118:22  correctly?
118:23      A.   You read it correctly.
118:24      Q.   So, again, the issue here is that
118:25  where you've got vascular injury, in this case
118:ESQUIRE DEPOSITION SERVICES
119: Confidential - Subject to Protective Order 119
119: 1  caused by smoking in certain people, he wants to
119: 2  look at the effect of COX-2 inhibition on those
119: 3  individuals; correct?
119: 4      A.   Yes.
119: 5      Q.   Was that study, to your knowledge,
119: 6  ever done by Merck?

an 11910   119:10-119:19

Nies 3-2-05

119:10    Q.    The study proposed by Dr. Oates here,
119:11    that is, giving Vioxx to cigarette smokers, was that
119:12    ever done by Merck?
119:13    A.    Not to my knowledge.
119:14    Q.    If you wanted a study like that done,
119:15    Doctor, while you were involved with the Vioxx
119:16    project, could you have asked for that?  Did you
119:17    have the ability to do that?
119:18    A.    Did I have the ability to ask for
119:19    such a project?  Yes, yes, I would have.


an 12313    123:13-123:21


123:13    This is another letter by Dr. Oates;
123:14    correct?
123:15    A.    Yes.
123:16    Q.    This is from Dr. Oates to Barry
123:17    Gertz; correct?
123:18    A.    Yes.
123:19    Q.    Dr. Gertz reported to you at Merck
123:20    during this period of time; didn't he?
123:21    A.    Yes.


an 12511    125:11-126:9


125:11    Q.    Then it says, this letter says,
125:12    "Further to our discussion regarding the origin of
125:13    the beta-oxidation metabolite of prostacyclin,
125:14    enclosed is an evaluation of the regional and
125:15    cellular localization of prostacyclin synthase."
125:16    Now, that particular evaluation, do you recall what
125:17    that was?
125:18    A.    I'm sorry.  Do I recall what?
125:19    Q.    Dr. Oates references an "evaluation
125:20    of the regional and cellular localization of
125:21    prostacyclin" which he purports to enclose with this
125:22    letter.  Do you see that in the first sentence?
125:23    A.    Yes.  I see that sentence.
125:24    Q.    Do you recall receiving that
125:25    attachment or enclosure?
125:ESQUIRE DEPOSITION SERVICES
126: Confidential - Subject to Protective Order 126
126: 1    A.    No.  I don't recall receiving the
126: 2    attachment.
126: 3    Q.    He says, "This is similar to the
126: 4    results in other species and indicates a predominant
126: 5    localization of prostacyclin synthase in the
126: 6    vasculature, other smooth muscle such as bronchus,
126: 7    and other fibroblast cells in several organs."  Did
126: 8    I read that correctly?
126: 9    A.    Yes.


an 12617    126:17-127:9


126:17    Q.    Finally, Doctor, there's a third

Page 4

Nies 3-2-05

126:18  letter from Dr. Oates.  Am I right?
126:19      A.    This is a letter from Dr. Oates.
126:20      Q.    This letter this time is addressed to
126:21  Ed Scolnick; correct?
126:22      A.    Yes.
126:23      Q.    And Dr. Scolnick is, as identified in
126:24  this letter, he's the president of Merck; correct?
126:25      A.    He's actually president of Merck
126:ESQUIRE DEPOSITION SERVICES
127: Confidential - Subject to Protective Order 127
127: 1  Research Laboratories.
127: 2      Q.    Well, that's a fair correction.  This
127: 3  letter says Merck & Company, but he's the president
127: 4  of Merck Research Laboratories; correct?
127: 5      A.    Yes.
127: 6      Q.    That's the division that you were in
127: 7  yourself?
127: 8      A.    Yes, yes.
127: 9      Q.    So, he was your boss?

an 12710    127:10-127:10

127:10      A.    Yes.  Ultimately.

an 12821    128:21-129:17

128:21  this letter goes to Dr. Scolnick and it encloses a
128:22  description of three patients in Celebrex clinical
128:23  trials.  Is that true?
128:24      A.    There are three patients.  I don't
128:25  know if they are in clinical trials or not.
128:ESQUIRE DEPOSITION SERVICES
129: Confidential - Subject to Protective Order 129
129: 1      Q.    These are three patients on Celebrex?
129: 2      A.    Right.  And it was on the market at
129: 3  that time, so, I don't know that it was in clinical
129: 4  trials.
129: 5      Q.    But before he sends this letter to
129: 6  Dr. Scolnick, he had discussed these three patients
129: 7  with you; correct?
129: 8      A.    You know, I don't recall that he has.
129: 9      Q.    It says in the last sentence of the
129:10  first paragraph, "I have communicated the first two
129:11  cases informally to Alan Nies by phone and now I
129:12  want to make all of you aware of the expanded
129:13  information."
129:14      A.    Okay.
129:15      Q.    Does that refresh your recollection,
129:16  sir?
129:17      A.    Yes.  I assume he did that.

an 13001    130:1-130:5

130: 1          He discusses three patients that have
130: 2  suffered cardiovascular events while taking another

Page 5

Nies 3-2-05

130:3   COX-2 inhibitor, which is Celebrex.  That's the drug
130:4   we discussed earlier; correct?
130:5        A.   Yes.

an 13301    133:1-133:17

133:1        Q.   At the bottom of the second page of
133:2   this letter, he says, and you tell me if you can
133:3   find this, he says -- let's start with the beginning
133:4   of the paragraph.
133:5             "Given that this reflects three
133:6   thrombotic incidents in a disease in which
133:7   thrombosis is a characteristic complication, the
133:8   problems experienced by these three patients may
133:9   only be coincidentally related to the COX-2
133:10  inhibitor."  I read that correctly, right?
133:11       A.   Yes.
133:12       Q.   Then he says, "However, the
133:13  occurrence of the thrombotic complications so
133:14  quickly after initiation of the drug raises the
133:15  possibility of causality."  Did I read that
133:16  correctly?
133:17       A.   Yes.

an 13713    137:13-138:6

137:13       Q.   Do you see where it says "Among the
137:14  options open to Merck are several"?
137:15       A.   Yes.
137:16       Q.   The first one is you can take "a wait
137:17  and see attitude with no action."  Do you see that?
137:18       A.   Yes.
137:19       Q.   Second one he says is you can make a
137:20  label change.  His exact wording is "This could be
137:21  viewed as a real complication that occurs in a rare
137:22  disease and it could be so stated in the labeling."
137:23  Did I read that correctly?
137:24       A.   That's read correctly.
137:25       Q.   Then he says at the end of that
137:ESQUIRE DEPOSITION SERVICES
138: Confidential - Subject to Protective Order 138
138:1   paragraph, "Moreover, the attention drawn to any
138:2   revision in the labeling would certainly have a
138:3   psychological ripple effect into the thinking of
138:4   physicians about the thrombotic complications of
138:5   atherosclerosis."  Did I read that correctly?
138:6        A.   Yes.

an 14002    140:2-140:23

140:2        Q.   Then the third alternative is he says
140:3   you could reformulate rofecoxib, which is what he
140:4   calls it here, that's Vioxx, too; right?
140:5        A.   Yes.
140:6        Q.   He says you could reformulate your

Page 6

Nies 3-2-05

140: 7    drug and add aspirin to it.  Isn't that what he says
140: 8    in there?
140: 9        A.    Let's go through that.
140:10        Q.    He says -- I'll read it just so we
140:11    have the exact wording.
140:12            "An alternative formation of
140:13    rofecoxib could be developed that contained 30-50
140:14    milligrams of aspirin, the lowest doses that
140:15    effectively block platelet thromboxane
140:16    biosynthesis." Did I read that correctly?
140:17        A.    Yes.
140:18        Q.    What does aspirin do again with
140:19    regard to thromboxane?
140:20        A.    It inhibits platelet production.
140:21        Q.    Which is also another way of saying
140:22    it will stop the platelets from clumping together;
140:23    correct?

an 14101    141:1-141:10

141: 1        Q.    Correct, doctor?
141: 2        A.    That's what aspirin is taken for in
141: 3    low dose.
141: 4        Q.    Just to be clear, Merck did not
141: 5    reformulate Vioxx with aspirin; correct?
141: 6        A.    No.  Merck did not reformulate Vioxx
141: 7    with aspirin.
141: 8        Q.    Merck did not change the label to
141: 9    warn about thrombotic complications of people with
141:10    atherosclerosis at this point in time; did it?

Δ's objections: Misleading - mischaracterize exhibit; no foundation

Π's response: Permissible cross-examination. R.607. Witness was Senior V.P. of Clinical Pharmacology

an 14112    141:12-141:17

141:12            THE WITNESS:  Merck did not change
141:13    the label.
141:14    BY MR. SEEGER:
141:15        Q.    At no point in time did Merck change
141:16    the label to warn people with complications relating
141:17    to atherosclerosis; correct?

Δ's objections: Misleading - mischaracterizes exhibit; no foundation

Π's response: Permissible cross-examination. R.607. Witness was Merck Senior V.P of Clinical Pharmacology.

an 14119    141:19-141:21

141:19            THE WITNESS:  It wasn't in the
141:20    original label, I know that.  I don't know about
141:21    after that.  I wasn't involved in labeling.

Δ's objections: Misleading & Mischaracterizes exhibit; no foundation

Π's response: same as above.

an 14309    143:9-144:21

143: 9        Q.    Can I ask you to turn to the
143:10    signature page of this letter, Doctor.  In the very
143:11    last paragraph where it says, "In summary, I am
143:12    conveying information on three patients with the
143:13    anti-phospholipid syndrome who had onset of a
143:14    thrombotic episode very soon after initiating
143:15    treatment with celecoxib."  Did I read that

Nies 3-2-05

143:16  correctly?
143:17      A.    Yes.
143:18      Q.    Celecoxib, again, just to be clear,
143:19  is a COX-2 inhibitor; correct?
143:20      A.    Yes.
143:21      Q.    "Because thrombosis is a part of a
143:22  natural history of the antiphospholipid syndrome,
143:23  these occurrences may be purely coincidental," he
143:24  says; correct?
143:25      A.    Yes.
143:ESQUIRE DEPOSITION SERVICES
144: Confidential - Subject to Protective Order 144
144: 1      Q.    "However, the temporal relationship
144: 2  as well as the biological plausibility at least
144: 3  raise the question of whether there may be
144: 4  causality." Did I read that correctly?
144: 5      A.    Yes.
144: 6      Q.    Tell us and the jury what biological
144: 7  plausibility is.
144: 8      A.    It means that there's some -- that it
144: 9  makes some sense based on what other information
144:10  that you might know.
144:11      Q.    Another way of saying it biologically
144:12  makes sense, it could happen?
144:13      A.    It could happen.
144:14      Q.    Then the next sentence, he says, "I
144:15  convey these to you with full knowledge of the fate
144:16  that often befalls the messenger." Did I read that
144:17  correctly?
144:18      A.    That's what it says.
144:19      Q.    You know what that fate is, right,
144:20  Doctor? What happens to the messenger that brings
144:21  bad information?

an 14424    144:24-145:3

144:24      Q.    Have you heard the phrase "don't
144:25  shoot the messenger"?
144:ESQUIRE DEPOSITION SERVICES
145: Confidential - Subject to Protective Order 145
145: 1      A.    Yes. I guess that's what he's
145: 2  talking about, but it doesn't make much sense here
145: 3  actually.

an 14505    145:5-145:19

145: 5            So, at this point in time, Doctor, in
145: 6  1999, it has to be clear to you that there's at
145: 7  least the potential for this drug to cause
145: 8  cardiovascular events or thrombotic events?  Is that
145: 9  fair to say?
145:10      A.    Well, I won't say that we weren't
145:11  concerned about the possibility, yes.
145:12      Q.    But you didn't do -- you didn't
145:13  implement Dr. FitgGerald's protocols for measuring

Page 8

Nies 3-2-05

145:14    the metabolite in urine; correct?
145:15        A.    That's correct.
145:16        Q.    And you didn't do a study as
145:17    suggested by one of your consultants, Dr. Oates, in
145:18    smokers; correct?
145:19        A.    That's correct.

an 19016    190:16-191:1

190:16        Q.    Doctor, would you please take a look
190:17    at what I've just marked as Exhibit 10.  Bates range
190:18    is MRK-ABC0015053 through 5214.
190:19            Do you see on the cover, this is a
190:20    description of another clinical trial.  This is
190:21    protocol 034; correct?
190:22        A.    Yes.
190:23        Q.    In this trial, Vioxx is being
190:24    compared to another NSAID by the name of diclofenac;
190:25    correct?
190:ESQUIRE DEPOSITION SERVICES
191: Confidential - Subject to Protective Order 191
191: 1        A.    Yes.

an 19112    191:12-191:15

191:12        Q.    Now, if you take a look at table 44,
191:13    which is on page at the top, 129.  It's a very big
191:14    document, so we've taken the pages out of it, but at
191:15    the top of the page it is 129.

an 19122    191:22-192:10

191:22        Q.    Table 44, are you there, Doctor?
191:23        A.    Yes.
191:24        Q.    And the title is "Number" and then it
191:25    says "(%) of Patients With Specific Clinical Adverse
191:ESQUIRE DEPOSITION SERVICES
192: Confidential - Subject to Protective Order 192
192: 1    Experiences By Body System."  Do you see where I
192: 2    read?
192: 3        A.    Yes.
192: 4        Q.    Then beneath that it says "Drug
192: 5    Related."  Did I read that correctly?
192: 6        A.    Yes.
192: 7        Q.    What does it mean to be drug related?
192: 8        A.    That's a term that is assigned by the
192: 9    investigator as being possibly or probably related
192:10    to the drug.

an 19223    192:23-193:8

192:23        Q.    And if you go back to Exhibit 7, I
192:24    believe it is, or 8, rather -- no, it's 7.  Let me
192:25    try to help you with this, Doctor.  7.  If you go
192:ESQUIRE DEPOSITION SERVICES

Nies 3-2-05

193: Confidential - Subject to Protective Order 193
193: 1    back to Page 10 at the bottom of the page.  Keep
193: 2    them both in front of you, please.  At the very
193: 3    bottom you discuss in the attachment, Vioxx studies
193: 4    versus diclofenac.  Correct?
193: 5        A.    Yes.
193: 6        Q.    And this study was Vioxx versus
193: 7    diclofenac also; correct?
193: 8        A.    Yes.

an 19607    196:7-197:2

196: 7    on Exhibit 10.  Do you see the column entitled
196: 8    "Cardiovascular system"?
196: 9        A.    Yes.
196:10        Q.    And there are 11 cardiovascular
196:11    system events in the 12-and-a-half milligram dose of
196:12    Vioxx; correct?
196:13        A.    Yes.
196:14        Q.    And there's 10 in the 25 milligram
196:15    dose of Vioxx; correct?
196:16        A.    Yes.
196:17        Q.    And three for diclofenac?
196:18        A.    Yes.
196:19        Q.    And then, again, you were addressing
196:20    hypertension before.  If you go down to the section
196:21    on hypertension, there's eight events in the
196:22    12-and-a-half Vioxx milligram arm; correct?
196:23        A.    Yes.
196:24        Q.    And there's five events in the
196:25    25-milligram arm of Vioxx; correct?
196:ESQUIRE DEPOSITION SERVICES
197: Confidential - Subject to Protective Order 197
197: 1        A.    Yes.  I was wondering what that
197: 2    footnote was.

an 19712    197:12-197:19

197:12        Q.    Five events for the 25 milligram arm?
197:13        A.    Yes.
197:14        Q.    And only one for diclofenac; correct?
197:15        A.    Yes.
197:16        Q.    So, even when you are comparing Vioxx
197:17    at least in this one study to diclofenac, diclofenac
197:18    fares better with regard to cardiovascular events
197:19    and hypertension; correct?

an 19721    197:21-197:22

197:21            THE WITNESS:  Yes.  It appears to.
197:22    You see those first three items there.

an 19812    198:12-198:23

198:12        Q.    And 12-and-a-half milligram dose was

Nies 3-2-05

198:13  the minimal amount sold by Merck; correct? That was
198:14  the smallest dose?
198:15      A.     The 12-and-a-half milligrams of
198:16  Vioxx --
198:17      Q.     Yes.
198:18      A.     -- was the smallest dose.
198:19      Q.     And the most common dose prescribed
198:20  was the 25-milligram dose while it was on the
198:21  market; correct?
198:22      A.     Yes. That's my understanding, yes.
198:23  That's what I've heard.

an 20011    200:11-200:14

200:11      Q.     Doctor, let me ask you to take a look
200:12  at what I've just marked as Exhibit 11. For the
200:13  record, I'll identify it as MRK-AEI0002734 through
200:14  2746.

an 20024    200:24-201:12

200:24      Q.     Doctor, let me ask you to turn to
200:25  Page 11. Let me just further identify this quickly
200:ESQUIRE DEPOSITION SERVICES
201: Confidential - Subject to Protective Order 201
201: 1  for the record. At the top it says "Scientific
201: 2  Advisors Meeting," dated May 3rd through May 6,
201: 3  1998. Underneath it says "Programmatic Review," and
201: 4  then below that it says "Vioxx Program."
201: 5           Would you take a look at Page 11,
201: 6  please. Do you see the section at the top where it
201: 7  says "Cardiovascular Pathophysiology"?
201: 8      A.     Yes.
201: 9      Q.     Now, when the meetings occur, are you
201:10  in the room with the board of scientific advisors at
201:11  the time the discussions are going on?
201:12      A.     Yes.

an 20122    201:22-202:17

201:22      Q.     At the top of this page here, it says
201:23  "The Board addressed the potential for either
201:24  benefits or adverse consequences of selective
201:25  inhibition of COX-2 on coronary heart disease. The
201:ESQUIRE DEPOSITION SERVICES
202: Confidential - Subject to Protective Order 202
202: 1  possible effects of COX-2 inhibition on three
202: 2  separate components of the process leading to
202: 3  coronary ischemic events were considered." What are
202: 4  coronary ischemic events, Doctor?
202: 5      A.     Coronary ischemic events means where
202: 6  the heart becomes ischemic, and such events would be
202: 7  angina, unstable angina, heart attack.
202: 8      Q.     And then it says -- and then it lists
202: 9  some of them. One of the separate components of the

Page 11

Nies 3-2-05

202:10  process leading to coronary ischemic events are,
202:11  one, it says "The development of lipid-rich coronary
202:12  plaques."
202:13      A.   Right.
202:14      Q.   What are "lipid-rich coronary
202:15  plaques"?
202:16      A.   It is what we earlier had talked
202:17  about, atherogenesis.

an 20312    203:12-204:4

203:12          Further down on the page in the
203:13  middle of the paragraph, it says, "There is a
203:14  growing body of evidence indicating that
203:15  inflammatory disease is a risk factor for myocardial
203:16  infarction, and such inflammatory processes almost
203:17  certainly are accompanied by the release of
203:18  cytokines" --
203:19      A.   Cytokines.
203:20      Q.   --"cytokines that affect cells in
203:21  the monocytic series in general, and COX-2
203:22  expression in particular." Did I read that
203:23  correctly?
203:24      A.   Yes.
203:25      Q.   Just to be go back over this
203:ESQUIRE DEPOSITION SERVICES
204: Confidential - Subject to Protective Order 204
204: 1   discussion, the board here is contemplating the
204: 2   effects of a COX-2 inhibitor in people who have
204: 3   already got sort of the buildup of coronary plaque;
204: 4   correct?

an 20406    204:6-204:10

204: 6          THE WITNESS:  They are discussing
204: 7   basically it looks like the whole process, the
204: 8   development, the destabilization and the final
204: 9   thrombosis, those three points that we went over
204:10  earlier.

an 20412    204:12-204:15

204:12      Q.   They are looking at whether the COX-2
204:13  inhibitors like Vioxx had any effect at all in that,
204:14  beneficial or adverse; correct?
204:15      A.   That was their discussion.

an 20907    209:7-211:1

209: 7      Q.   Then if you turn to Page 13, Doctor,
209: 8   which is the next page, if you go down to the middle
209: 9   of the page where it says, "On this background." It
209:10  says, "On this background of information regarding
209:11  the anti-platelet and anti-fibrillatory effects of
209:12  prostacyclin and its vascular localization, it has

Nies 3-2-05

209:13 been found that Vioxx reduces the urinary excretion
209:14 of the prostacyclin metabolite," and then it
209:15 describes the metabolite, which if I say it, no one
209:16 is going to understand it anyway. "This is
209:17 important data but it is not a basis for any
209:18 conclusion. Rather, it should be taken as a basis
209:19 for hypotheses that should be actively pursued."
209:20 Did I read that correctly?
209:21       A.    Yes.
209:22       Q.    Then look further down if you look at
209:23 the next paragraph in the last sentence there, it
209:24 says, "By removing this potent inhibitor of platelet
209:25 aggregation," which is prostacyclin, I'm adding
209:ESQUIRE DEPOSITION SERVICES
210: Confidential - Subject to Protective Order 210
210: 1 that, "the probability that a coronary plaque
210: 2 rupture would lead to myocardial infarction or
210: 3 ischemic ventricular fibrillation is enhanced." Did
210: 4 I read that correctly?
210: 5       A.    Yes.
210: 6       Q.    Finally, Doctor, if we go to the next
210: 7 page, at the top of that page it says
210: 8 "Recommendations."
210: 9       A.    Yes.
210:10      Q.    It says, "It is unlikely that any of
210:11 the individual trials with Vioxx will have
210:12 sufficient power to determine whether coronary
210:13 events are increased or decreased by COX-2
210:14 inhibition." What does that mean, "sufficient power
210:15 to determine"? It means they're not large enough;
210:16 right?
210:17      A.    Yes. Power -- it depends on the
210:18 magnitude of the effect and the number of people in
210:19 the trial.
210:20      Q.    Then they go on with the
210:21 recommendation, and it says, "It is therefore
210:22 proposed that coronary events be predetermined
210:23 endpoints in all future controlled trials with Vioxx
210:24 and the 'back-up' COX-2 inhibitors." Did I read
210:25 that correctly?
210:ESQUIRE DEPOSITION SERVICES
211: Confidential - Subject to Protective Order 211
211: 1       A.    Yes.

an 21708     217:8-218:3

217: 8      Q.    Who is Carlo Patrono?
217: 9      A.    Carlo Patrono is a professor in
217:10 Italy.
217:11     Q.    And what's his specialty or practice
217:12 area?
217:13     A.    Well, he's a pharmacologist. He's
217:14 interested in platelets.
217:15     Q.    He's a Merck consultant from time to
217:16 time; correct?

Page 13

---

Δ's objections: Misleading - (selectiv
and incomplete portions of exhibit
read into record)

Π's response: Witness understands and
answers questions. Permissible
cross-examination. Impeaching
witness with document. R. 607 &
R. 612.

Nies 3-2-05

217:17     A.    From time to time.  Yes.
217:18     Q.    And he consulted on Vioxx; didn't he?
217:19     A.    Yes.
217:20     Q.    And Dr. Patrono is somebody who is
217:21 respected by you or you respect him, rather, another
217:22 way of asking it?
217:23     A.    Yes, yes.
217:24     Q.    And would you say he's a scientist
217:25 that's widely respected in his profession, in your
217:ESQUIRE DEPOSITION SERVICES
218: Confidential - Subject to Protective Order 218
218: 1  profession?
218: 2     A.    He's well known, yes, widely
218: 3  respected.

an 22514     225:14-225:22

225:14          Doctor, can you identify what I've
225:15 just handed you as Exhibit 14?
225:16     A.    Yes.  It says a memo from Alan S.
225:17 Nies.
225:18     Q.    Who is it signed by?
225:19     A.    Myself.
225:20     Q.    You recognize that to be your
225:21 handwriting?
225:22     A.    Yes, I do.

an 22611     226:11-226:18

226:11     Q.    It says, "Attached is a letter from
226:12 C. Patrono about the PGIM issue.  His thoughts are
226:13 similar to those of John Oates who called me a
226:14 couple of week ago wanting to study Vioxx in
226:15 patients with atherosclerosis, hyperlipidemia and
226:16 elevated thromboxane metabolite excretion."  Did I
226:17 read that correctly?
226:18     A.    Yes.

an 22718     227:18-228:12

227:18     Q.    The study that he proposes of
227:19 "patients with unstable angina with biochemical and
227:20 clinical endpoints is feasible and I wonder whether
227:21 Merck & Company would be interested," do you know
227:22 what the answer was from Merck to Dr. Patrono on
227:23 that?  It was no; right?
227:24     A.    Merck never did such a study.
227:25     Q.    In fact, in your handwritten note you
227:ESQUIRE DEPOSITION SERVICES
228: Confidential - Subject to Protective Order 228
228: 1  say, "I told John," I assume you mean John Oates
228: 2  there.  "I told John" -- after you describe Oates,
228: 3  who proposed another study involving -- let me back
228: 4  up, Doctor.
228: 5          Your handwritten note says, "His,"

Page 14

Δ's objections:  Misleading (selective
and incomplete portions of exhibit read
into record); potential confusion of
issues

Π's response:  Witness is being questioned about
a document he wrote.  He understands
and answers the questions.  R. 612 & R. 602.

Nies 3-2-05

228: 6   · meaning Carlo Patrono's "thoughts are similar to
228: 7   those of John Oates who called me a couple of weeks
228: 8   ago to study Vioxx in patients with atherosclerosis,
228: 9   hyperlipidemia and elevated thromboxane" levels.
228:10   Those studies weren't done either, correct, those
228:11   studies proposed by John Oates?
228:12         A.     Those studies were not done.

*objections and response
on previous page.

an 24301   243:1-243:11

243: 1         Q.     What do you think of Dr. Scolnick?
243: 2         A.     I think he's a very smart person.
243: 3         Q.     Do you have a good relationship with
243: 4   him?
243: 5         A.     Yes.
243: 6         Q.     Did you while you were an employee?
243: 7         A.     Yes.
243: 8         Q.     Is he somebody you trust?
243: 9         A.     He's somebody that you have to know
243:10   in order to interact with him. He's not what you
243:11   would call a steady person.

Δ's objections:  Irrelevant

Π's response:  Relevant to Dr. Scolnick's
                    credability.

an 26403   264:3-264:8

264: 3         Q.     Now, Doctor, tell me, sitting here
264: 4   today, what's the mechanism of action?  What is it
264: 5   that after 18 months that happens to somebody taking
264: 6   Vioxx that causes them to have -- could cause them
264: 7   or increase their risk for a cardiovascular event?
264: 8         A.     I don't know.

an 26423   264:23-264:25

264:23         Q.     Who is Douglas Greene?
264:24         A.     Douglas Greene is an endocrinologist
264:25   who was a Merck employee at one point.

an 26508   265:8-265:10

265: 8         A.     Yes.
265: 9         Q.     Please take a look at what I've just
265:10   marked as Exhibit 19. For the record, it is marked

an 26524   265:24-266:13

265:24         Q.     You see at the top here be writes --
265:25   well, the first e-mail is from you to Dr. Greene,
265:ESQUIRE DEPOSITION SERVICES
266: Confidential - Subject to Protective Order 266
266: 1   Kim and Scolnick; correct?
266: 2         A.     Yes.
266: 3         Q.     And the last sentence says: "I have
266: 4   already given my input to the CV outcomes discussion
266: 5   at DMC last week. Barry and Doug can cover SARC.
266: 6   OK with you?" "CV outcomes discussion," did that

Page 15

Nies 3-2-05

266: 7  have anything to do with VALOR?
266: 8      A.      I don't know.  It had to do with we
266: 9  were having discussions about trials at that time.
266:10      Q.      And then Dr. Greene writes to you, he
266:11  says, "Agree.  We can (hopefully) handle the CV
266:12  outcomes.  FYI, Ed wants John Oates to be in the
266:13  loop during HHPAC."  What is HHPAC?

an 26617   266:17-266:24

266:17      Q.      Let me reread it.  Thank you for the
266:18  correction.  "We can (hopefully) handle the CV
266:19  outcomes.  FYI, Ed wants John Oates to be in the
266:20  loop during HHPAC."  Can you tell us what HHPAC is?
266:21      A.      I can't remember what it stands for,
266:22  but it was a meeting, a high-level meeting where the
266:23  heads of manufacturing, marketing and clinical were
266:24  together.

an 26714   267:14-268:13

266:14      Q.      Then, Doctor, the next sentence says,
267:15  "If you recall, John's view right after the VIGOR
267:16  data rolled out was that we had to do another VIGOR
267:17  trial with ASA, but Ed pooh-poohed it at that time."
267:18  Did I read it correctly?
267:19      A.      You read it correctly.
267:20      Q.      The ASA is aspirin.  We talked about
267:21  that earlier; right?
267:22      A.      Yes.
267:23      Q.      So, what this is saying is that John
267:24  Oates' view was to redo VIGOR, this time allowing
267:25  patients to take aspirin; correct?
267:ESQUIRE DEPOSITION SERVICES
268: Confidential - Subject to Protective Order 268
268: 1      A.      That's what this says.
268: 2      Q.      And John Oates was the head of the
268: 3  scientific advisors board at Merck as we established
268: 4  earlier; correct?
268: 5      A.      Yes.
268: 6      Q.      And that trial was never done, was
268: 7  it, to your knowledge?
268: 8             Strike that.
268: 9             A trial was never done the size of
268:10  VIGOR --
268:11             The VIGOR trial was not redone as
268:12  requested by Dr. Oates where patients were allowed
268:13  to take low-dose aspirin; was it?

an 27414   274:14-277:1

274:14      Q.      What I've just marked as 21, and its
274:15  Bates range is MRK-AEF0000025 through 26.  This,
274:16  again, is a series of e-mails; correct?
274:17      A.      Yes.

Page 16

Δs objections:  No foundation;
                hearsay

TT's response:  Witness being questioned about
a document he received.  Business
record - 803(6).

Nies 3-2-05

274:18    Q.    You are on this e-mail as well?  You
274:19  are in the list of people who received the first one
274:20  from Ned Braunstein; correct?
274:21    A.    Yes.
274:22    Q.    This is dated January 26, 2002, and
274:23  the subject is "Article of Interest - Relationship
274:24  between COX-2 expression and PGI2 synthesis."  And
274:25  importance, it says "High."  Did I read that
274:ESQUIRE DEPOSITION SERVICES
275: Confidential - Subject to Protective Order 275
275: 1  correctly?
275: 2    A.    Yes.
275: 3    Q.    Were you involved in the discussion
275: 4  regarding this article, do you recall?
275: 5    A.    I don't recall.
275: 6    Q.    Do you know any of the authors of
275: 7  this article that's being discussed, Dr. Caughey?
275: 8    A.    No.
275: 9    Q.    Cleland?
275:10    A.    No.  I don't know any of them.
275:11    Q.    Who is Ned Braunstein?
275:12    A.    Ned Braunstein is a Merck employee
275:13  who was in regulatory.
275:14    Q.    If you'd just look at the last
275:15  sentence of this article -- well, first of all, it
275:16  was published in the Journal of Immunology.  Do you
275:17  see that there, Doctor?
275:18    A.    Yes.
275:19    Q.    And at the bottom -- that's a
275:20  peer-reviewed journal; isn't it?
275:21    A.    It is not a journal I read.  I think
275:22  it must be.
275:23    Q.    At the bottom it says, the authors
275:24  say, "Addition of the selective COX-2 inhibitor,"
275:25  and I don't know what they are referring to here,
275:ESQUIRE DEPOSITION SERVICES
276: Confidential - Subject to Protective Order 276
276: 1  but it is a COX-2 inhibitor, "almost completely
276: 2  abolished PG" --
276: 3    A.    Where are you now?
276: 4    Q.    At the bottom.  I'm sorry.
276: 5    A.    Here?  (Indicating.)
276: 6    Q.    Yes.  "Addition of the selective
276: 7  COX-2 inhibitor."  Do you see that?  NS?
276: 8    A.    NS.
276: 9    Q.    398?
276:10    A.    Yes.
276:11    Q.    "Almost completely abolished PGI2 and
276:12  PGE2 synthesis, but had little effect on thromboxane
276:13  A2 synthesis.  The up-regulation of COX-2 by IL" and
276:14  then "-1beta was accompanied by specific
276:15  up-regulation of PGI synthase and PGE synthase, but
276:16  not thromboxane synthase."  Did I read that more or
276:17  less correctly?
276:18    A.    Yes.

Page 17

Nies 3-2-05

276:19      Q.      Then the last sentence. "These
276:20   findings have particular importance with regard to
276:21   the potential for cardiovascular consequences of
276:22   COX-2 inhibition." Did I read that correctly?
276:23      A.      Yes.
276:24      Q.      Do you have any recollection at all
276:25   about discussions going on within Merck about this
276:ESQUIRE DEPOSITION SERVICES
277: Confidential - Subject to Protective Order 277
277: 1   article?

an 27702   277:2-277:7

277: 2      A.      I don't recall this article.
277: 3      Q.      Do you recall any discussions about
277: 4   it? I know you said earlier you didn't recall
277: 5   seeing it.
277: 6      A.      We had had discussions about
277: 7   prostacyclin for years.

an 28009   280:9-280:13

280: 9.      Q.      Now, let's talk for a minute about
280:10   naproxen. Are you aware sitting here today of any
280:11   placebo-controlled trial that supports the fact that
280:12   naproxen is cardioprotective?
280:13      A.      There are none.

an 28115   281:15-282:11

281:15      Q.      You spoke with Dr. FitzGerald about
281:16   it; didn't you?
281:17      A.      Yes.
281:18      Q.      And Dr. FitzGerald did not believe
281:19   that naproxen was cardioprotective, at least not
281:20   sufficiently cardioprotective to make up for the
281:21   difference you saw in VIGOR; isn't that true?
281:22      A.      Dr. FitzGerald thought that there
281:23   could be -- he couldn't tell from the VIGOR data.
281:24   He was not dismissive of that entirely. He also
281:25   thought chance could play a role, and he thought
281:ESQUIRE DEPOSITION SERVICES
282: Confidential - Subject to Protective Order 282
282: 1   that Vioxx might have had a role.
282: 2      Q.      By the way, when your experts told
282: 3   you that, are you aware of Merck at any point
282: 4   writing a letter to physicians after VIGOR saying,
282: 5   we don't really quite know what happened, it could
282: 6   be chance, it could be the drug, it could be
282: 7   naproxen? Are you aware of any communication at all
282: 8   that went out to doctors?
282: 9      A.      I think Merck did put out a press
282:10   release. I don't recall if there was a letter to
282:11   physicians or not.

Page 18

Nies 3-2-05

an 28301   283:1-283:25

283: 1        Q.    Doctor, what I have just marked as
283: 2   Exhibit 23, is that the press release you are
283: 3   talking about?  It's Bates stamped MRK-ABI0003228
283: 4   through 30.
283: 5        A.    Yes.
283: 6        Q.    This is a press release dated May
283: 7   22nd, 2001, correct, Doctor, at the top?
283: 8        A.    Yes.
283: 9        Q.    The title, could you please for the
283:10   jury read the title of that?
283:11        A.    "Merck Confirms Favorable
283:12   Cardiovascular Safety Profile of Vioxx."
283:13        Q.    Now, was this document shown to you
283:14   in preparation for your deposition today?
283:15        A.    It might have.  I don't recall.  It
283:16   might have.
283:17        Q.    Let me just ask you this, Doctor.
283:18   There are many ways to communicate with the medical
283:19   community.  One way would be a press release,
283:20   correct, as Merck did here?
283:21        A.    Yes.  This is communicated to the
283:22   medical community as one of the consumers here, I
283:23   would guess.
283:24        Q.    Another way would be through the
283:25   label and other things we talked about; correct?

an 28402   284:2-284:11

284: 2        THE WITNESS:  Yes.
284: 3   BY MR. SEEGER:
284: 4        Q.    Now, let me ask you this:  Are you
284: 5   aware of what the FDA's response was to this press
284: 6   release that we're talking about?
284: 7        A.    Yes.  I don't know what -- if we sent
284: 8   it through them or not.
284: 9        Q.    Well, you'd think that a press
284:10   release would be at a very minimum consistent with
284:11   the drug's label, things of that nature; correct?

Δ's objections: Examiner testifying;
No Foundation; misleading
TT's response: Witness states he is aware of
press release. Permissible cross-examination
R.607.

an 28414   284:14-285:11

284:14        THE WITNESS:  You know, I'm not
284:15   involved in making up press releases.  I don't know
284:16   what the regulations are.  I really don't know.
284:17   BY MR. SEEGER:
284:18        Q.    This press release, it's pretty clear
284:19   that this press release is talking about, among
284:20   other things, but primarily the VIGOR trial results;
284:21   correct?  Do you see that, the references here?  It
284:22   starts, "In response to news and analyst reports of
284:23   data the Company first released a year ago, Merck &
284:24   Company today reconfirmed the favorable
284:25   cardiovascular safety profile of Vioxx."  Now, one

Δ's objections: Examiner testifying; No
Foundation; misleading
TT's response: same response as above.

Page 19

Nies 3-2-05

284:ESQUIRE DEPOSITION SERVICES
285: Confidential - Subject to Protective Order 285
285: 1   year prior to this date, Doctor, would have been May
285: 2   of 2000.  That's around the time the VIGOR trial
285: 3   results came out; right?
285: 4        A.   Yes.
285: 5        Q.   Further down, do you see where it
285: 6   mentions the Vioxx Gastrointestinal Research study?
285: 7   That's VIGOR; correct?
285: 8        A.   Yes.
285: 9        Q.   Then even further down the next few
285:10   paragraphs, it talks about the VIGOR trial; correct?
285:11        A.   Yes.

*objections and response on previous page.*

an 28519    285:19-285:22

285:19        Q.   Doctor, has anybody, any of the Merck
285:20   attorneys or anybody, shown you the document that I
285:21   have just marked as Exhibit 24?
285:22        A.   Yes.  Or I heard about it.

Δ's objections: Irrelevant; hearsay
                        (warning letter)

π's response: Question relevant to learn if
witness has personal knowledge of
the document. Government document.
R. 803 (8)

an 28612    286:12-289:2

286:12        Q.   Were you also shown this at the time
286:13   it was written and sent to Ray Gilmartin or sometime
286:14   around that time in September of 2001?
286:15        A.   I don't recall whether I was sent
286:16   this or not.  Possibly.
286:17        Q.   Do you recall anybody from the
286:18   company; anybody at all, around that time frame
286:19   bringing this to your attention?
286:20        A.   I think there was discussion about
286:21   that, but it's not -- dealings with the regulators
286:22   was not something that I was involved with.
286:23        Q.   I understand.  I was just wondering
286:24   whether anybody in the company brought to your
286:25   attention, hey, we got this letter from the FDA?
286:ESQUIRE DEPOSITION SERVICES
287: Confidential - Subject to Protective Order 287
287: 1        A.   I'm pretty sure that I did hear about
287: 2   that.
287: 3        Q.   Could you turn to Page 6, please,
287: 4   Doctor.
287: 5             Do you see the section down at the
287: 6   bottom called "Press Release"?
287: 7        A.   Yes.
287: 8        Q.   Do you see where it says, "We have
287: 9   identified a Merck press release entitled," and then
287:10   they quote, "'Merck Confirms Favorable
287:11   Cardiovascular Safety Profile of Vioxx,' dated May
287:12   22, 2001"?  Do you see that right there?
287:13        A.   Yes.
287:14        Q.   Would you just satisfy yourself that
287:15   what I've marked as Exhibit 23 is in fact the same
287:16   press release?  It's right there.  It's right under

Δ's objections: Irrelevant; hearsay
                        (warning letter)

π's response: Relevant to π's
failure to warn claim. Government
document - R. 803 (8).

Page 20

Nies 3-2-05

287:17  your left hand.
287:18      A.    Oh, okay.  Yes.
287:19      Q.    The date, do you see that?
287:20      A.    Uh-huh.
287:21      Q.    It says, "That is also false or
287:22  misleading for similar reasons stated above.
287:23  Additionally, your claim in the press release that
287:24  Vioxx has a 'favorable cardiovascular safety
287:25  profile,' is simply incomprehensible, given the rate
287:ESQUIRE DEPOSITION SERVICES
288: Confidential - Subject to Protective Order 288
288: 1   of MI and serious cardiovascular events compared to
288: 2   naproxen."  Did I read that correctly?
288: 3      A.    Yes.
288: 4      Q.    Does that help refresh your
288: 5   recollection as to any discussions you might have
288: 6   had within the company about this letter from the
288: 7   FDA?
288: 8      A.    No.
288: 9      Q.    How about Page 1 of this where it
288:10  says, the last paragraph, "Although the exact reason
288:11  for the increased rate of MIs observed in the Vioxx
288:12  treatment group is unknown, your promotional
288:13  campaign selectively presents the following
288:14  hypothetical explanation for the observed increase
288:15  in MIs.  You assert that Vioxx does not increase the
288:16  risk of MIs and that the VIGOR finding is consistent
288:17  with naproxen's ability to block platelet
288:18  aggregation like aspirin.  That is a possible
288:19  explanation, but you fail to disclose that your
288:20  explanation is hypothetical, has not been
288:21  demonstrated by substantial evidence, and that there
288:22  is another reasonable explanation, that Vioxx may
288:23  have pro-thrombotic properties."  Did I read that
288:24  correctly?
288:25      A.    Yes.
288:ESQUIRE DEPOSITION SERVICES
289: Confidential - Subject to Protective Order 289
289: 1      Q.    Doctor, let me ask you this.  Take a
289: 2   look at what I have marked as Exhibit 22.

an 28909     289:9-290:10

289: 9      Q.    We've talked a lot today about Garret
289:10  FitzGerald.  Do you recall receiving this e-mail
289:11  from Dr. FitzGerald in March of 2000?  It's stamped
289:12  MRK-NJ0284590.
289:13      A.    Yes.  I kind of remember this.
289:14      Q.    Do you see where it says -- well, it
289:15  is from him to you; correct?
289:16      A.    Yes.
289:17      Q.    March 24th, 2000.  He writes,
289:18  "Interesting.  Luis paper is in press in
289:19  Epidemiology.  I have e-mailed him."  Who is Luis?
289:20      A.    I don't know.

*Objections and response
on previous page*

Page 21

Nies 3-2-05

289:21    Q.    It says, "ASA," which is aspirin,
289:22  "significantly reduced the risk of first nonfatal MI
289:23  in these females," and I believe that means -- is
289:24  that relative risk, "RR"?
289:25    A.    Yes.
289:ESQUIRE DEPOSITION SERVICES
290: Confidential - Subject to Protective Order 290
290: 1    Q.    ".56. All NSAIDs had no effect."
290: 2  Did I read that correctly?
290: 3    A.    Yes.
290: 4    Q.    So, what's your understanding of what
290: 5  that means?
290: 6    A.    That they did some sort of an
290: 7  epidemiologic study, and they looked at patients who
290: 8  had been on aspirin or on NSAIDs. And when they
290: 9  lumped all the NSAIDs together, they did not see an
290:10  effect to change the incidence of MI.

an 29107    291:7-293:11

291: 7    Q.    Doctor, let me just show you what
291: 8  I've marked as 25.
291: 9    A.    This, of course, doesn't rule out the
291:10  fact -- in fact, it sort of supports naproxen.
291:11    Q.    Sort of. Except we're going to get
291:12  to that.
291:13      Please take a look at what I've
291:14  marked as 25. It's Bates ranged MRK-NJ0189508
291:15  through 509. This is, again, a communication
291:16  reflecting a discussion with Carlo Patrono. Do you
291:17  see that?
291:18    A.    Uh-huh.
291:19    Q.    Again, it is Martino Laurenzi. Do
291:20  you see him there?
291:21    A.    Yes.
291:22    Q.    Dated March 28, 2000?
291:23    A.    Uh-huh.
291:24    Q.    And this in fact is forwarded from
291:25  Alise Reicin to you and Barry Gertz; correct?
291:ESQUIRE DEPOSITION SERVICES
292: Confidential - Subject to Protective Order 292
292: 1    A.    Yes.
292: 2    Q.    Do you recall receiving this around
292: 3  that time?
292: 4    A.    Yes.
292: 5    Q.    Dr. Laurenzi says, "Guys, I met with
292: 6  Carlo Patrono last Saturday in Rome. He had already
292: 7  been informed by other sources about the results of
292: 8  VIGOR, and we had an interesting chat about it.
292: 9      "He said he does not think that the
292:10  CV effect that we observed can be attributed to
292:11  naproxen for a couple of good reasons." He says,
292:12  "First there is a weak pharmacological basis and no
292:13  epidemiological evidence for CV protection
292:14  associated with conventional NSAIDs. Additionally,

Δ's objections: No foundation;
calls for speculation

Π's response: Witness received document.
Permissible cross-examination. R.407 &
R.612.

Page 22

Nies 3-2-05

292:15  the magnitude of the effect would not be plausible
292:16  even if the comparator had been aspirin itself."
292:17  Did I read that correctly?
292:18      A.    Yes.
292:19      Q.    What does it mean to say that
292:20  "there's weak pharmacological basis"?
292:21      A.    He's, I guess -- well, you know, I
292:22  don't know exactly what he's talking about; but if I
292:23  have to guess, I would say it means that he didn't
292:24  think it had the effects on platelets that we had
292:25  claimed that it had.
292:ESQUIRE DEPOSITION SERVICES
293: Confidential - Subject to Protective Order 293
293: 1      Q.    Right.  "No epidemiological
293: 2  evidence."  What do you think that refers to?
293: 3      A.    That refers to there -- I think it
293: 4  may refer to this study he was talking about before.
293: 5  Luis or whoever that is.
293: 6      Q.    It says, "Additionally, the magnitude
293: 7  of the effect would not be plausible even if the
293: 8  comparator had been aspirin itself."  Isn't it fair
293: 9  to read that as meaning that even if aspirin were
293:10  being compared to Vioxx, aspirin could not account
293:11  for the five time difference in heart attacks?

*objections and responses on previous page*

an 29314    293:14-293:17

293:14      Q.    Is that a fair inference from that
293:15  sentence there?
293:16      A.    That's what it says.  It would not be
293:17  plausible even if it had been aspirin itself, yes.

an 30319    303:19-304:4

303:19      Q.    I was going to show you at the break
303:20  a document we're marking as Nies-28, which is an FDA
303:21  briefing document.  It is not Bates stamped.
303:22          If you look at the front, it says,
303:23  "FDA Advisory Committee Briefing Document" on the
303:24  first page, Doctor.  Do you see that?
303:25      A.    Yes.
303:ESQUIRE DEPOSITION SERVICES
304: Confidential - Subject to Protective Order 304
304: 1      Q.    Dated February 8th, 2001?
304: 2      A.    Yes.
304: 3      Q.    If you go to Page 11 of this
304: 4  document --

Δ's objection:  Hearsay

π's response:  Not hearsay.  Witness
being questioned about Merck
document.  Document is a
business record – 803(6).

an 30409    304:9-306:8

304: 9      Q.    Toward the bottom.  See where it
304:10  says, "The sponsor explanation"?
304:11      A.    Yes.
304:12      Q.    It says, "The sponsor explanation for
304:13  the excess of cardiovascular thrombotic events in

Page 23

Nies 3-2-05

304:14 the VIGOR study is the potent antiplatelet
304:15 aggregation effect of naproxen. However, unopposed
304:16 thromboxane production leading to an increase in CV
304:17 thrombotic events can not be discarded as a
304:18 potential explanation for the VIGOR findings." Did
304:19 I read that correctly?
304:20      A.    Yes.
304:21      Q.    "There are several arguments against
304:22 the beneficial naproxen effect being the sole
304:23 explanation for these findings. A, there are no
304:24 prospective placebo-controlled trials with naproxen
304:25 to support to support" -- yes, it does say it twice
304:ESQUIRE DEPOSITION SERVICES
305: Confidential - Subject to Protective Order 305
305: 1   -- "the assumption that naproxen transient
305: 2 inhibition of platelet aggregation is effective in
305: 3 decreasing the risk of cardiovascular events." Do
305: 4 you see that?
305: 5      A.    Yes.
305: 6      Q.    Then it says on (b) on the next page,
305: 7 "The effect size of naproxen in reducing CV
305: 8 thrombotic events relative to rofecoxib in the VIGOR
305: 9 study (58%) exceeds the effect size of ASA,"
305:10 aspirin, "compared to placebo in other trials." Did
305:11 I read that correctly?
305:12      A.    Yes.
305:13      Q.    So, it is saying that to believe
305:14 naproxen would make up for the difference in VIGOR,
305:15 it would have to be more cardioprotective than
305:16 aspirin; correct?
305:17      A.    Not necessarily.
305:18      Q.    How do you read that?
305:19      A.    It just says it exceeds the effect
305:20 size of aspirin.
305:21      Q.    That doesn't mean it would have to be
305:22 more cardioprotective?
305:23      A.    VIGOR was a relatively small number
305:24 of events, so, there's a lot of play in that number.
305:25      Q.    Are you aware at any point after
305:ESQUIRE DEPOSITION SERVICES
306: Confidential - Subject to Protective Order 306
306: 1 Merck started saying naproxen was cardioprotective
306: 2 if the makers of naproxen ever made that claim on
306: 3 the label of the drug?
306: 4      A.    I'm not aware that they did.
306: 5      Q.    Are you aware if Merck ever put the
306: 6 fact that naproxen was cardioprotective in the Vioxx
306: 7 label?
306: 8      A.    I'm not aware that they did.

A's objection:   Hearsay

Π's response: Witness being cross-examined
with Merck document. Document
is a business record. Not
withstanding, the document is not
being offered for truth but to
for show what information
was being communicated to FDA.

Total Length - 00:47:30

Nies 4-1-05

Nies 4-1-05 (Multi-clip)
an 49815    498:15-499:3

498:15          Protocol 023 which we talked about --
498:16    by the way, protocol 023 was a relatively small
498:17    clinical trial; right?
498:18    A.    Yes.
498:19    Q.    It had about 36 people?
498:20    A.    Yes.
498:21    Q.    I think it only went for a few weeks?
498:22    A.    Yes.
498:23    Q.    Because you were asked, one of your
498:24    questions on your direct was, you didn't see any
498:25    MIs, and you didn't see any strokes.  You didn't
498:ESQUIRE DEPOSITION SERVICES
499: Confidential - Subject to Protective Order 499
499: 1    expect to see a profound result like an MI or a
499: 2    stroke in a 36-person trial that only went a few
499: 3    weeks; correct?

an 49905    499:5-499:6

499: 5          THE WITNESS:  We certainly weren't
499: 6    expecting that.

an 49908    499:8-501:20

499: 8    Q.    Right.  That's not something you
499: 9    expected, and that really would have been a profound
499:10    finding, to have people suffer a heart attack in a
499:11    very small study where they're only taking the drug
499:12    for a few weeks, wouldn't it have been?
499:13    A.    Yes.  It would have been something
499:14    that you obviously take note of.
499:15    Q.    Right.  Okay.  But you do the study,
499:16    and you do have this result, and it generates a
499:17    hypothesis which we've all been calling the
499:18    prostacyclin hypothesis; correct?
499:19    A.    Yes.
499:20    Q.    Dr. FitzGerald, at that point he
499:21    writes you an e-mail and he says to you, hey, why
499:22    don't you take these little tests I'm suggesting and
499:23    implement them in your clinical trial protocols?
499:24    Isn't that basically what he was suggesting by that
499:25    e-mail?
499:ESQUIRE DEPOSITION SERVICES
500: Confidential - Subject to Protective Order 500
500: 1    A.    No.
500: 2    Q.    What was he suggesting by that
500: 3    e-mail?  Let me ask you fairly what you think he was
500: 4    saying.  What is your understanding of what he was
500: 5    suggesting?
500: 6    A.    He was suggesting doing additional
500: 7    studies in animals and in genetically modified mice

Δ's objections:  Misleading-mischaracterize
exhibit; argumentative

Π's response:  Permissible cross-examination.
Witness is being questioned about
a document that he received.
R. 607 ? R. 412.

Page 1

Nies 4-1-05

500: 8   and in humans to -- it would basically repeat kind
500: 9   of what we'd already done, looking at urinary
500:10   metabolites.
500:11       Q.    But one of the phrases he uses, he
500:12   says if you really want to "nail the site of drug
500:13   impact," do these studies.  Do you recall that from
500:14   the e-mail?
500:15       A.    I don't remember that phrasing.
500:16       Q.    Let me see if I can find it just to
500:17   move it along.
500:18           This has been marked today as Nies
500:19   1003.  I think if you look, it's number 1 on that
500:20   e-mail, at the very end of that paragraph.  Do you
500:21   see where he says that?
500:22       A.    Right.
500:23       Q.    Okay.
500:24       A.    He says, "Here are suggestions of
500:25   things that we would like to do (with your help) to
500:ESQUIRE DEPOSITION SERVICES
501: Confidential - Subject to Protective Order 501
501: 1   investigate the COX2 PGI phenomenon."  I don't think
501: 2   that says this nails the site of --
501: 3       Q.    No.  It's the next paragraph.  Sorry,
501: 4   Dr. Nies.  It's Paragraph Number 1, I had said, and
501: 5   at the very last sentence, if you look at the last
501: 6   sentence of Paragraph 1, it says, "This would nail
501: 7   the site of drug impact on PGI as cleanly as you can
501: 8   hope to do in a patient population."
501: 9       A.    Yes.  That caveat at the end, "as
501:10   cleanly as you can hope to do" means that you can't
501:11   do it.  You cannot do it in that kind of a study.
501:12   It's an indirect way of measurement.
501:13       Q.    So, Dr. FitzGerald is a buffoon?
501:14       A.    I didn't say he's a buffoon.
501:15       Q.    You don't have a lot of respect --
501:16       A.    You said it.
501:17       Q.    I don't even know the man.  The truth
501:18   is, Dr. Nies, he says you can nail the site cleanly,
501:19   and you're saying that's not true, so, he doesn't
501:20   know what he's talking about; right?

*objections and responses
on previous page*

an 50122    501:22-501:23

501:22           THE WITNESS:  This is a point of
501:23   debate with him.

an 50125    501:25-502:11

501:25       Q.    It is a debate he lost, because you
501:ESQUIRE DEPOSITION SERVICES
502: Confidential - Subject to Protective Order 502
502: 1   didn't care to follow up on it; right?
502: 2       A.    We did not do those studies.
502: 3       Q.    Now, let's talk about Dr. Oates.  Dr.
502: 4   Oates also is a colleague of yours, correct,

*→ Δ's objections: Misleading-mischaracterizes
exhibit; argumentative*

*π's response: Permissible cross-examination. R. 602.
Merck's failure to adequately study the CV
risks of Vioxx caused by Cox-2 inhibition
is central to π's claims.*

Page 2

Nies 4-1-05

502: 5    somebody you know well?
502: 6        A.    Yes.
502: 7        Q.    Dr. Oates writes a letter in 1997,
502: 8    and he writes a very detailed letter that says if
502: 9    you want to assure yourself of the safety of this
502:10    drug, why don't you do this test I recommend.  Is
502:11    that a fair characterization of that letter?

*objections + responses on
previous page

an 50220    502:20-505:13

502:20          For the record, it's marked as Nies
502:21    1004.  The language I just was talking about, just
502:22    so you don't think I'm making it up, is on Page 2 at
502:23    the top of this letter where he says -- it actually
502:24    starts at the bottom of Page 1.  "Determination of
502:25    the effects of Vioxx on thromboxane and prostacyclin
502:ESQUIRE DEPOSITION SERVICES
503: Confidential - Subject to Protective Order 503
503: 1    biosynthesis in cigarette smokers could reassure one
503: 2    regarding safety if it were found that thromboxane
503: 3    metabolite levels fall in both normal volunteers and
503: 4    cigarette smokers."  That's a study you didn't do
503: 5    either; right?
503: 6        A.    That's right.
503: 7        Q.    You weren't concerned with reassuring
503: 8    yourself about the safety of the drug?  Is that what
503: 9    was going on?
503:10        A.    No.  We wanted to have real data.
503:11        Q.    You wanted to have real data, but
503:12    now, Dr. Oates, he's somebody you respect, you said
503:13    you respected him?
503:14        A.    Oh, yes.
503:15        Q.    He's not a buffoon?
503:16        A.    No.
503:17        Q.    In fact, when you go and you get
503:18    outside consultants to come in -- you guys at Merck
503:19    are pretty smart, Dr. Nies.  I mean, you would
503:20    describe the scientists at Merck as smart people;
503:21    right?
503:22        A.    Yes.
503:23        Q.    You, yourself, I will say, must be a
503:24    very smart guy because I read your CV, and it goes
503:25    on for like a hundred pages.  You've done a lot
503:ESQUIRE DEPOSITION SERVICES
504: Confidential - Subject to Protective Order 504
504: 1    yourself in terms of research, haven't you?
504: 2        A.    Yes.
504: 3        Q.    When somebody like you calls in
504: 4    outsiders to come in and give them advice, don't you
504: 5    listen to it?
504: 6        A.    Of course.
504: 7        Q.    Why didn't you listen to Dr. Oates
504: 8    and Dr. FitzGerald?
504: 9        A.    Oh, we listened.
504:10        Q.    You listened and you rejected what

Page 3

Δ's objections: Examiner
testifying; No
Foundation

π's response: Permissible cross-examination
of witness with document that
he received + has personal
knowledge of.  R.607 ± 612.

Nies 4-1-05

*objections and responses
on previous page

504:11   they proposed; correct?
504:12       A.   We listened, we continued to discuss
504:13   with him.  Dr. Oates, as you know, was head of our
504:14   Advisory Committee.  We presented all of this data
504:15   to them.
504:16       Q.   Well, let's talk about that, but let
504:17   me ask you something.
504:18           Sitting here today, Dr. FitzGerald
504:19   and Dr. Oates were right, you should have done those
504:20   studies; isn't that true?
504:21       A.   No.
504:22       Q.   That was the first response of Dr.
504:23   Scolnick on March 9, 2000 when he got the VIGOR
504:24   results.  He said, you guys were right on this
504:25   prostacyclin theory, didn't he?
504:ESQUIRE DEPOSITION SERVICES
505: Confidential - Subject to Protective Order 505
505: 1       A.   That's what he said.
505: 2       Q.   He said that then on March 9, 2000
505: 3   when the results came in, his first reaction as the
505: 4   head scientist at Merck was, Alan Nies, you and John
505: 5   Oates were right about this prostacyclin thing;
505: 6   correct?
505: 7       A.   That's what he said.
505: 8       Q.   And this other e-mail that you read
505: 9   to the jury today, that your lawyer asked you to
505:10   read, which I believe was to suggest that somehow
505:11   now there's been a reversal of Dr. Scolnick's
505:12   position, do you recall the exhibit, the e-mail you
505:13   read from?

an 50515    505:15-505:17

505:15           THE WITNESS:  I recall it, yes.  I
505:16   don't know if I can recall it word for word.  If you
505:17   want me to look at it.

an 50519    505:19-506:18

505:19       Q.   I'd like you to look at it, and the
505:20   exhibits are here, and maybe your attorney can hand
505:21   them to you, because they are kind of far.  It's
505:22   Exhibit 1015.
505:23       A.   Okay.
505:24       Q.   Do you remember he had you read from
505:25   the bottom there --
505:ESQUIRE DEPOSITION SERVICES
506: Confidential - Subject to Protective Order 506
506: 1       A.   Yes.
506: 2       Q.   -- and he said, I think the language
506: 3   he asked you to read were, "We all worried to death
506: 4   about the CV events last Spring.  Merck is of course
506: 5   always an issue.  But I was sick at the thought we
506: 6   might be doing patients harm."  He said, "I KNOW
506: 7   each of you well enough to know you felt the same

Page 4

Nies 4-1-05

506: 8    way. With all the data now available I am no longer
506: 9    worried." Correct? That's what he had you read;
506:10    right?
506:11        A.    Yes.
506:12        Q.    Let's read the beginning of that
506:13    e-mail. Let's read the part that Mr. Raber didn't
506:14    read. It says, "I want one more time to thank you
506:15    for the fantastic effort you have all made preparing
506:16    for the meeting this week." Did I see that
506:17    correctly? Did I read that correctly?
506:18        A.    Yes.

an 50621    506:21-507:23

506:21        Q.    Now, "the meeting this week," let's
506:22    talk about that. That's the Advisory Committee
506:23    meeting he's talking about; right?
506:24        A.    I believe so.
506:25        Q.    That was a big event in the life of
506:ESQUIRE DEPOSITION SERVICES
507: Confidential - Subject to Protective Order 507
507: 1    this drug, because if the FDA thought the VIGOR
507: 2    results warranted it, they could have asked you to
507: 3    take the drug off the market; right?
507: 4        A.    The advisors -- the Advisory
507: 5    Committee only advises the FDA. They don't have
507: 6    that kind of power.
507: 7        Q.    But the FDA listens to what the
507: 8    Advisory Committee says, right?
507: 9        A.    In general.
507:10        Q.    So, if the Advisory Committee says,
507:11    big problem, black box this drug, or take it off the
507:12    market, the FDA typically follows that
507:13    recommendation, won't they?
507:14        A.    I think typically, yes.
507:15        Q.    So, Dr. Nies, if you read the next
507:16    sentence, "I have NEVER seen better preparation for
507:17    an Advisory meeting. As I said the other day and as
507:18    I have told Ray and MC, no matter what the ultimate
507:19    outcome you have distinguished yourselves." I don't
507:20    think I need to read this word for word. What Dr.
507:21    Scolnick is talking about in this e-mail is the
507:22    Advisory Committee meeting; right? What's the
507:23    purpose of that e-mail?

an 50801    508:1-508:2

508: 1        Q.    To say good job; right?
508: 2        A.    I think so.

an 51210    512:10-512:25

512:10        Q.    There was also another letter written
512:11    by Dr. Oates in 1999 to Dr. Scolnick; correct? Do
512:12    you recall that one?

Page 5

Nies 4-1-05

512:13      A.   I remember that.  You showed that to
512:14  me before.  Is that what you're talking about?
512:15      Q.   Yes.  It was just to remind you, and
512:16  if you want to see it, if it's here, we'll show it
512:17  to you, but that was the one where he says, here are
512:18  three cases of people who are taking the drug
512:19  Celebrex who suffered adverse cardiovascular events.
512:20  Do you recall that letter?
512:21      A.   Yes.
512:22      Q.   That letter, too, is also mentioned
512:23  in that March 9th e-mail by Dr. Scolnick.  You
512:24  recall that, don't you?  Do you recall the part
512:25  where he's --

an 51305    513:5-515:1                                    → A objection :  Misleading-
                                                                        Mischaracterizes
513: 5      Q.   I'm talking about Dr. Scolnick's                           exhibit
513: 6  March 9th e-mail where he says, Barry, John Oates
513: 7  and Alan Nies were right, it's mechanism based as we
513: 8  thought.  Do you recall that e-mail?
513: 9      A.   I remember that e-mail.                        Π's response: Witness ~~assumed~~ has personal
513:10      Q.   Do you remember in that e-mail he                 knowledge of email.  Permissible
513:11  also says, hey, I'd like to take a look at those            cross-examination to impeach
513:12  three cases that were sent to us by John Oates?            witness with document.  R.407 &
513:13      A.   He may have said that in there.  I                R.612.
513:14  don't remember.
513:15      Q.   When the three cases were referred to
513:16  you guys at Merck by John Oates, did anybody take a
513:17  look at them back in 1999?
513:18      A.   I don't know what you mean by "take a
513:19  look at them."
513:20      Q.   Well, he sent you descriptions of
513:21  three patients who had complicated medical
513:22  histories, I think one or two had lupus and other
513:23  type of vascular problems, they were given the drug
513:24  Celebrex, which is a COX-2 inhibitor; correct?
513:25      A.   Right.
513:ESQUIRE DEPOSITION SERVICES
514: Confidential - Subject to Protective Order 514
514: 1      Q.   And they suffered cardiovascular
514: 2  events.  And he sends those three cases to you
514: 3  saying, hey, you ought to take a look at them.  Do
514: 4  you recall that letter?
514: 5      A.   I don't recall that that's what he
514: 6  said.  He sent the three cases.
514: 7      Q.   Well, why do you think he sent you
514: 8  the three cases?
514: 9      A.   Because these were cases that he
514:10  thought were important for Celebrex, I guess.
514:11      Q.   You think that John Oates sent you
514:12  these three cases to look at because he thought they
514:13  were important for Celebrex?
514:14      A.   Well, Celebrex being a COX-2
514:15  inhibitor, I think that --
514:16      Q.   Doesn't Celebrex share that quality

Page 6

Nies 4-1-05

514:17   with Vioxx?  They're both COX-2 inhibitors; correct?
514:18       A.     Which quality?
514:19       Q.     That they're COX-2 inhibitors.
514:20       A.     Yes.
514:21       Q.     So, you don't think that it makes
514:22   sense that John Oates sent you those three patients
514:23   because you made a COX-2 inhibitor and --
514:24       A.     No.
514:25       Q.     That's why; right?
514:ESQUIRE DEPOSITION SERVICES
515: Confidential - Subject to Protective Order 515
515:1        A.     Yes.

*objections and responses
on previous pages*

an 51522   515:22-517:4

515:22       Q.     I'll show it to you.  I only have one
515:23   copy.  It says, "I have communicated the first three
515:24   cases informally to Alan Nies by phone and I want to
515:25   make all of you aware of the expanded information."
515:ESQUIRE DEPOSITION SERVICES
516: Confidential - Subject to Protective Order 516
516:1        A.     Okay.
516:2        Q.     That does that help refresh your
516:3    recollection?
516:4        A.     Yes.
516:5        Q.     And he sends three cases of people on
516:6    Celebrex; right?
516:7        A.     Yes.
516:8        Q.     Wouldn't you say the purpose for
516:9    doing that is to make you aware of three people with
516:10   complicated medical conditions taking a COX-2
516:11   inhibitor having cardiovascular events while on the
516:12   drug?
516:13       A.     That's why he sent the letter, yes.
516:14       Q.     At that time, did you, Dr. Scolnick,
516:15   or anybody at Merck, to the extent you know, say,
516:16   hey, let's stop and take a look at those three --
516:17   get what we can on those three patients and find out
516:18   as much as we can about these three studies -- these
516:19   three cases?  I apologize.  Did anybody do that?
516:20       A.     We talked to John Oates about all of
516:21   these cases, yes.
516:22       Q.     You talked to John Oates, but you
516:23   never asked for the information on the cases, the
516:24   specific information you had on those cases?
516:25       A.     I don't recall whether we did or not.
516:ESQUIRE DEPOSITION SERVICES
517: Confidential - Subject to Protective Order 517
517:1        Q.     It wouldn't make sense that you did,
517:2    because Dr. Scolnick on March 9, 2000 says, hey,
517:3    we'd better take a look at those three cases that
517:4    John Oates sent us.  Do you recall that?

→ Δ's objection:  No Foundation

π's response:  Permissible to cross-exam
  witness with document that he
  has personal knowledge of.  R. 607
  & 611.
  & less 612.

an 51711   517:11-517:24

Page 7

Nies 4-1-05

517:11      Q.    I will mark it just so you won't have
517:12  as hard a time as I did finding it, but it was
517:13  previously marked as Nies-16, Doctor.  Do you see
517:14  the language there?  And because you have the only
517:15  copy, if you wouldn't mind just reading that
517:16  language?
517:17      A.    It says, "It is important to find out
517:18  about the cases that oates told us about."
517:19      Q.    Wouldn't you agree -- did you read
517:20  it?
517:21      A.    Yeah.
517:22      Q.    Wouldn't you agree it was just as
517:23  important to find out about those cases in August of
517:24  1999 when he wrote you the letter?

Δ's objection : No Foundation

Π's response: Permissible cross-examina-
tion with document of which
witness has personal knowledge.
R. 607 & R. 612.

an 51801    518:1-518:3

518: 1          THE WITNESS:  He told us about the
518: 2  cases.  I don't understand what you're saying, find
518: 3  out about them.

an 51805    518:5-518:13

518: 5      Q.    Well, are you just going to accept
518: 6  his description, or as a scientist would you like to
518: 7  go and actually look at that patient's medical
518: 8  records, find out how much they were taking of
518: 9  Celebrex?
518:10      A.    I mean, he had told us that summary,
518:11  and it seemed to me that that's plenty of
518:12  information.  We're not going to gain much more by
518:13  looking at all those medical records.

an 51902    519:2-519:6

519: 2      Q.    Now, you talked about the scientific
519: 3  board of advisors, and I'll pull that out now just
519: 4  in case we need them.  That's the committee that
519: 5  John Oates chaired for Merck; correct?
519: 6      A.    Yes.

an 52005    520:5-521:17

520: 5      Q.    Doctor, would you take a look at
520: 6  what's been previously marked as Nies-11?
520: 7      A.    Yes.
520: 8      Q.    You recall seeing this document;
520: 9  correct?
520:10      A.    Yes.
520:11      Q.    Now, you were asked a lot of
520:12  questions today about this particular meeting;
520:13  right?
520:14      A.    About this meeting, but not this
520:15  document.
520:16      Q.    Exactly right.  Yes.

Page 8

Nies 4-1-05

520:17          I'd like you to take a look at Page
520:18    13. Now, in the discussions about the prostacyclin
520:19    hypothesis -- let me back up.
520:20          You say that the prostacyclin
520:21    hypothesis was specifically discussed at this
520:22    scientific board of advisors meeting; correct?
520:23      A.    Yes.
520:24      Q.    At that point, isn't it true that
520:25    they tell you -- one of the many things they say is,
520:ESQUIRE DEPOSITION SERVICES
521: Confidential - Subject to Protective Order 521
521: 1    it's a hypothesis that needs to be actively pursued?
521: 2      A.    Yes. I think they said that. I was
521: 3    wondering if you were reading from something here.
521: 4      Q.    No, no, no. I'm not reading at this
521: 5    point. I'm just talking to you.
521: 6      A.    That they said that that was one
521: 7    of -- they talk about an alternative hypothesis.
521: 8    There were several hypotheses that they presented.
521: 9      Q.    I think you described it as the board
521:10    was split, half the board thought, you know, maybe
521:11    some cause for concern, the other half said it could
521:12    be a beneficial effect. Fair enough?
521:13      A.    That's right.
521:14      Q.    But either way, in 1998, before the
521:15    drug was sold to 21 million people, there's a clear
521:16    consensus on actively pursuing this prostacyclin
521:17    hypothesis; isn't that right?

an 52119     521:19-522:16

521:19          THE WITNESS: Well, there's a
521:20    suggestion that we continue to look at this, yes.
521:21    BY MR. SEEGER:
521:22      Q.    Continue to look at it and study it.
521:23    So the jury understands when you say "look at," you
521:24    mean look at and study?
521:25      A.    I mean study. They suggested this
521:ESQUIRE DEPOSITION SERVICES
522: Confidential - Subject to Protective Order 522
522: 1    standard operating procedure, which we did.
522: 2      Q.    One of the things that comes out of
522: 3    this meeting is it says on page -- I'm sorry, I'll
522: 4    find it for you. Under the "Recommendations," they
522: 5    tell you to begin to incorporate -- let me use their
522: 6    language. They say, "It is...proposed that coronary
522: 7    events be predetermined endpoints in all future
522: 8    controlled trials with Vioxx and the 'back-up' COX-2
522: 9    inhibitors." Correct? You recall that?
522:10      A.    Yes.
522:11      Q.    That is not what Merck did; correct?
522:12      A.    That's exactly what Merck did.
522:13      Q.    No. That is not what Merck did,
522:14    Doctor. In fact, what Merck did was they started a
522:15    cardiovascular standard operating procedures

Page 9

A's objections: No Foundation;
                              Argumentative

Π's response: Witness has personal knowledge
of document. Permissible cross-
examination to impeach witness
regarding Merck's failure to properly
study the CV risks associated with
Vioxx. R.607 & R.612.

Nies 4-1-05

522:16   program; right?

*objections and responses on previous page

an 52218   522:18-523:19

```
522:18        THE WITNESS: Are you saying the same
522:19  thing as you just said before?
522:20  BY MR. SEEGER:
522:21     Q.   No. I think I'm saying something
522:22  else, but I'll ask the question again because it's
522:23  not clear to you.
522:24        You came out of this meeting, you
522:25  looked at that Pemrick memo you read from earlier.
522:ESQUIRE DEPOSITION SERVICES
523: Confidential - Subject to Protective Order 523
523: 1  Do you recall that?
523: 2     A.   Yes.
523: 3     Q.   You instruct Dr. Watson to go ahead
523: 4  and begin to implement procedures for looking at
523: 5  cardiovascular events; correct?
523: 6     A.   Yes.
523: 7     Q.   You did that?
523: 8     A.   Yes.
523: 9     Q.   That's not what you were told to do
523:10  by the Advisory Committee, though; was it?
523:11     A.   No, that was what we were told to do.
523:12     Q.   You were told to make as
523:13  predetermined endpoints in clinical trials
523:14  cardiovascular events?
523:15     A.   That's what that means.
523:16     Q.   That is not what that means, is it,
523:17  Doctor?
523:18     A.   Yes, it is what it means.  It's
523:19  exactly what it means.
```

A's objections: No foundation; Argumentative

T's response: Permissible cross-examination. R 607 + 612.

an 52918   529:18-530:22

```
529:18        May of 1998 you're told to analyze
529:19  cardiovascular data by the committee. I'll put
529:20  aside what we're discussing about whether it's
529:21  predetermined endpoints or the operating procedures.
529:22  Right? That's the instruction you get?
529:23     A.   Yes.
529:24     Q.   Analyze CV data, they say; right?
529:25  May of 1998. And shortly after that, you give that
529:ESQUIRE DEPOSITION SERVICES
530: Confidential - Subject to Protective Order 530
530: 1  project to Doug Watson; right?
530: 2     A.   Well, I give him the project of
530: 3  setting up this systematic review.
530: 4     Q.   And when is this systematic review
530: 5  actually implemented?
530: 6     A.   It's implemented -- the first study
530: 7  that was done after that was VIGOR.
530: 8     Q.   In fact, those operating procedures
530: 9  that you had asked to be set up are, in fact, not
```

Page 10

Nies 4-1-05

530:10 even finalized until around September of 1999; isn't
530:11 that right?
530:12     A.    I'm not sure about those dates.
530:13     Q.    Would you have any reason to believe
530:14 it was done any sooner than that or you just don't
530:15 know one way or another?
530:16     A.    You know, the final details as to who
530:17 is on the various committees and that sort of thing
530:18 may not have been finalized.
530:19     Q.    So, those are standard operating
530:20 procedures. Now, in the meantime, is the only
530:21 clinical trial going on at this point, is it VIGOR
530:22 within Merck?

an 53025    530:25-532:5

530:25     Q.    Let me just give you the time frame
530:ESQUIRE DEPOSITION SERVICES
531: Confidential - Subject to Protective Order 531
531: 1 to help you. I'm talking from May of 1998 to the
531: 2 time VIGOR begins. Is that the only clinical trial
531: 3 that's ongoing at Merck?
531: 4     A.    Well, I don't recall. Certainly it
531: 5 was the biggest.
531: 6     Q.    And I am talking about just as to
531: 7 Vioxx, obviously. VIGOR was the biggest?
531: 8     A.    Yes. I understood it to mean that,
531: 9 yes.
531:10     Q.    But you don't know one way or another
531:11 sitting here right now if there were other clinical
531:12 trials going on between May of 1998 and September of
531:13 1999, do you?
531:14     A.    I don't recall.
531:15     Q.    So, these operating procedures are
531:16 put in place. And let me ask you this, Doctor.
531:17 What's a DSMB?
531:18     A.    It stands for data safety -- Data and
531:19 Safety Monitoring Board.
531:20     Q.    And the VIGOR trial had a DSMB;
531:21 correct?
531:22     A.    Yes.
531:23     Q.    What's the purpose of a DSMB?
531:24     A.    A DSMB – trials are blinded to
531:25 Merck. So, Merck does not know what is going on in
531:ESQUIRE DEPOSITION SERVICES
532: Confidential - Subject to Protective Order 532
532: 1 the trial, who is on what drug. The DSMB is set up
532: 2 usually in large trials to monitor the trial, and
532: 3 they can be unblinded and look at the population to
532: 4 determine whether or not there's any issues related
532: 5 to safety in the trial.

an 55310    553:10-555:7

553:10     Q.    Now, we talked also earlier about

Page 11

Nies 4-1-05

Δ's objection: No Foundation

П's response: Permissible cross-examination of witness who is Senior V.P. of Clinical Pharmacology. He understands questions regarding the study and has no difficulty answering questions.

553:11 animal studies that were done, and I believe your
553:12 testimony was that there were certain studies done
553:13 at Merck Frosst. Is that right?
553:14     A.    Yes.
553:15     Q.    What studies were those specifically
553:16 that you testified to that were done at Merck Frosst
553:17 that gave you comfort that there was no problem with
553:18 the prostacyclin hypothesis?
553:19     A.    There were some studies -- as I said
553:20 before, that there were studies that were looking at
553:21 the source of the prostacyclin that comes from the
553:22 endothelium --
553:23     Q.    Right.
553:24     A.    -- or the lining of the blood vessel
553:25 and whether that source was related to COX-1 or
553:ESQUIRE DEPOSITION SERVICES
554: Confidential - Subject to Protective Order 554
554: 1 COX-2.
554: 2     Q.    Were these studies done before VIGOR,
554: 3 after VIGOR?
554: 4     A.    They were being done -- I don't know
554: 5 when they were actually completed, but they were
554: 6 being done during this time period.
554: 7     Q.    That was the time period also that
554: 8 would include while the drug was on the market;
554: 9 correct?
554:10     A.    Yes.
554:11     Q.    Now, you're aware of studies being
554:12 done at Merck Frosst on African green monkeys;
554:13 right?
554:14     A.    Yes. I know they did some studies on
554:15 African green monkeys.
554:16     Q.    And Briggs Morrison, in fact, was a
554:17 colleague of yours at Merck; correct?
554:18     A.    Yes.
554:19     Q.    And he's somebody who worked on the
554:20 Vioxx project team; right?
554:21     A.    Yes.
554:22     Q.    And you know that Briggs Morrison had
554:23 actually monitored some of these studies being done
554:24 up at Merck Frosst. You know that, don't you?
554:25     A.    No, I don't. I don't know if he —
554:ESQUIRE DEPOSITION SERVICES
555: Confidential - Subject to Protective Order 555
555: 1     Q.    Are you --
555: 2     A.    -- I don't know.
555: 3     Q.    Are you aware -- I'm sorry if you
555: 4 weren't finished.
555: 5          Are you aware that Dr. Morrison
555: 6 concluded that the testing that was done on African
555: 7 green monkeys was not very flattering for Vioxx?

an 55509    555:9-556:16

555: 9          THE WITNESS: No, I'm not. I'm not

Page 12

Nies 4-1-05

555:10  aware of that.
555:11  BY MR. SEEGER:
555:12      Q.    You also testified earlier that when
555:13  you sent the NDA to the FDA, it was a truckload of
555:14  information.  That was your testimony; right?
555:15      A.    Yes.
555:16      Q.    In fact, you did that in the context
555:17  of looking at the summary of the safety data that
555:18  was in front of you at that time.  Do you recall
555:19  that?
555:20      A.    Yes, I do.
555:21      Q.    And your testimony was that the
555:22  actual raw data that goes to the FDA was a
555:23  truckload; right?
555:24          Now, Vioxx was a drug that received
555:25  priority review, didn't it, Doctor?
555:ESQUIRE DEPOSITION SERVICES
556: Confidential - Subject to Protective Order 556
556: 1      A.    Yes.
556: 2      Q.    That means that from the time you
556: 3  filed the NDA, which you described as a truckload of
556: 4  material, until the time it's approved, the FDA has
556: 5  six months to review the drug; right?
556: 6      A.    Yes.
556: 7      Q.    We can agree the FDA does no
556: 8  independent testing and did no independent testing
556: 9  on Vioxx; correct?
556:10      A.    Yes.  I think that's correct.
556:11      Q.    I mean, they didn't run any of their
556:12  own clinical trials or anything like that; right?
556:13      A.    No.
556:14      Q.    Typically, the FDA doesn't run its
556:15  own clinical trials?  Isn't that fair to say?
556:16      A.    That's fair to say.

an 55619    556:19-556:21

556:19          They rely primarily upon the data
556:20  supplied to them by the sponsor of a drug, in this
556:21  case Merck, on behalf of Vioxx; right?

an 55623    556:23-556:25

556:23          THE WITNESS: Yes.  You know, I've
556:24  never been a reviewer at the FDA, but that's what
556:25  they have.

an 55908    559:8-560:4

559: 8      Q.    Now, you also testified that when you
559: 9  got the results of VIGOR in, that you believed that
559:10  the weight of the evidence favored naproxen being
559:11  cardioprotective.  Wasn't that your testimony?
559:12      A.    When we looked at -- yes.  When we
559:13  looked at all the other evidence outside of VIGOR

Page 13

Nies 4-1-05

559:14   and looked at VIGOR, we felt the weight of the
559:15   evidence was that naproxen was cardioprotective.
559:16       Q.    All right. Sir, now, when you tell
559:17   the jury that the weight -- when you talk about the
559:18   weight of evidence, are you taking into account the
559:19   e-mail that you have in March of 2000 describing the
559:20   discussion between one of the Merck employees and
559:21   Carlo Patrono about this issue?
559:22       A.    Is this the e-mail we've talked about
559:23   earlier today?
559:24       Q.    It's the e-mail we've talked about.
559:25   It's the one where Carlo Patrono says there is no
559:ESQUIRE DEPOSITION SERVICES
560: Confidential - Subject to Protective Order 560
560: 1   epidemiologic data and no pharmacological basis for
560: 2   concluding that naproxen was sufficiently
560: 3   cardioprotective to make up the difference in the
560: 4   VIGOR trial.

*D's objection : Misleading ;*
*Mischaracterizes*
*exhibit*

*Π's response: Permissible cross-examination*
*of Merck's position and witness's*
*position that naproxen is*
*cardioprotective. R. 612. R.607.*

an 56007    560:7-560:18

560: 7       Q.    Do you take that into account as you
560: 8   sit here?
560: 9       A.    Yes.
560:10       Q.    Do you also take into account that
560:11   your outside expert, Carlo Patrono, says that the
560:12   magnitude of the effect was -- strike that.
560:13           Do you also take into account the
560:14   fact that Patrono says that naproxen could not
560:15   account for the -- oh, boy.
560:16           Why don't we get the e-mail because
560:17   I'm screwing up what he's saying. I want to get his
560:18   exact language.

an 56024    560:24-561:10

560:24           This is the language. It says, "The
560:25   magnitude of the effect would not be plausible even
560:ESQUIRE DEPOSITION SERVICES
561: Confidential - Subject to Protective Order 561
561: 1   if the comparator had been aspirin itself." Do you
561: 2   take that into consideration when you say the weight
561: 3   of the evidence was in favor of naproxen being
561: 4   cardioprotective? It's in that first paragraph.
561: 5       A.    (Witness reviewing document.)
561: 6           Yes.
561: 7       Q.    Do you also take into account the
561: 8   FDA's position on naproxen not being sufficiently
561: 9   cardioprotective to account for the difference in
561:10   VIGOR?

*D's objection : No Foundation*

*Π's response: Same, as above.*
*response*

an 56113    561:13-561:13

561:13       Q.    Do you take that into consideration?

Page 14

an 56115    561:15-561:16                        Nies 4-1-05

561:15            THE WITNESS: I don't recall a memo
561:16    to me from the FDA.

Δ's objection: No Foundation

π's response: Permissible cross-examination.
R. 407.

an 56118    561:18-561:25

561:18      Q.    Have you seen any documents in this
561:19    case or from attorneys who may have used them to
561:20    refresh your recollection about the FDA's briefing
561:21    document from February of 2001?  Have you seen that?
561:22      A.    I must have seen it at that time, but
561:23    I haven't seen it since.
561:24      Q.    Well, do you recall when you saw it
561:25    that was the FDA's position?

Δ's objection: No Foundation

π's response: Permissible cross-examination
R.607.

an 56202    562:2-562:2

562: 2            THE WITNESS: I don't recall.

an 56204    562:4-562:15

562: 4      Q.    You don't recall if that was the
562: 5    FDA's position or not?
562: 6      A.    No.  I don't recall that the FDA had
562: 7    a position that they shared with me.
562: 8      Q.    Well, you know that you never were
562: 9    able to make the claim that you make now, that
562:10    naproxen was the reason for the difference in VIGOR?
562:11    You couldn't make that claim in the label; right?
562:12      A.    That's right.
562:13      Q.    And you couldn't make that claim in
562:14    the label because it wasn't approved by the FDA;
562:15    isn't that right?

Δ's objections: No Foundation;
hearsay

π's response: No hearsay statements.
Witness testifying to his personal
knowledge. Permissible cross-
examination. R.607.

an 56219    562:19-562:24

562:19      Q.    That naproxen is sufficiently
562:20    cardioprotective to make up the difference in VIGOR.
562:21      A.    You know, I don't know what the FDA's
562:22    motives were, but I think that, as we said before,
562:23    there were no randomized controlled trials on
562:24    naproxen.

an 56304    563:4-563:9

563: 4      Q.    Are you aware sitting here today that
563: 5    the FDA's position was that naproxen -- that you
563: 6    could not make the claim, Merck could not make the
563: 7    claim with the FDA's approval that naproxen was the
563: 8    reason for the five time difference in heart attacks
563: 9    in VIGOR?  You do know that, right, Dr. Nies?

Δ's objections: No Foundation;
hearsay

π's response: Question seeks witness's
personal knowledge, not hearsay.
Permissible cross-examination.
R.607.

an 56311    563:11-563:12

Page 15



Nies 4-1-05

563:11     THE WITNESS: I know we could not put
563:12  that in the label.

A's objection : Hearsay

Π's response: Not hearsay. Witness testifying to personal knowledge.

an 56418    564:18-564:22

564:18     Q.   Do you now agree with me that the FDA
564:19  took the position that there was not sufficient
564:20  evidence to support Merck's claim that naproxen made
564:21  up the difference between the heart attacks in the
564:22  Vioxx group versus the naproxen group of VIGOR?

A's objection : Hearsay

Π's response: same as above.

an 56425    564:25-565:1

564:25     THE WITNESS:  This is a briefing
564:ESQUIRE DEPOSITION SERVICES
565: Confidential - Subject to Protective Order 565
565: 1  document for the Advisory Committee.

A's objection: Hearsay

Π's response: Document is a business record — 803(6).

an 56503    565:3-565:7

565: 3     Q.   That's right.  Right.  And the part
565: 4  in italics is the FDA medical reviewer's commentary?
565: 5     A.   Right.
565: 6     Q.   And you agree with me having just
565: 7  read it that that is their conclusion?

A's objection: Hearsay

Π's response: Document is a business record — 803(6).

an 56511    565:11-565:16

565:11     Q.   That is the medical review officer's
565:12  conclusion in that document that there wasn't
565:13  sufficient evidence to support Merck's claim about
565:14  naproxen being the reason for the difference in
565:15  heart attacks in VIGOR; correct?
565:16     A.   Yes.

A's objection: Hearsay

Π's response: Document is a business record — 803(6).

Total Length - 00:26:59

π's objections: None

**Barnett Merck Counter Designations- Nies**

| [73:11] - [73:15] | 6/2/2006    Nies, Alan 3/02/05 |

• Barnett~ Merck Counter Designations

page 73
```
11        Q.        And the period of time you are
12  referring to, because you talked about it earlier,
13  and we're going to get into this a little later, but
14  it is the APPROVe study you've been relying on?
15        A.        That's what I've been relying on.
```

| [290:11] - [290:24] | 6/2/2006    Nies, Alan 3/02/05 |

• Barnett- Merck Counter Designations

page 290
```
11  "Amongst these INSIGNIFICANT effects, naproxen
12  looked best but was closely followed by Ibuprofen.
13  Diclofenac tended to be worse."  Did I read that
14  correctly?
15        A.        Yes.    That's correct.  Well, you
16  didn't give the numbers.  But naproxen looked best.
17  In fact, it has a point estimate somewhat better
18  than aspirin, and the wide confidence intervals
19  indicates that the power is pretty low here.
20        Q.        Right.    Which means when you say
21  power is pretty low, means it is not really
22  something you should rely too heavily on?
23        A.        You can't rely heavily on it, but the
24  point estimate is probably still your best bet.
```