Weiner

Jan Weiner (Multi-clip)
Weiner 1510    15:10-15:13

15:10    Q.    You're currently employed by Merck?
15:11    A.    Yes.
15:12    Q.    Okay.  When did you start with Merck?
15:13    A.    October of 1989.

Weiner 1812    18:12-20:24

18:12          Tell me, when you started with Merck
18:13 in 1989, what was your first job?
18:14    A.    My title was director of information
18:15 services and I worked in the public affairs
18:16 department for the US business.  And my job
18:17 generally was to work on communications related to
18:18 Merck's products.
18:19    Q.    How long did you have that direct --
18:20 what was your title?
18:21    A.    My title was director of information
18:22 services.
18:23    Q.    Okay.  How long did you have that
18:24 title?
18:25    A.    A couple of years.
19: Page 19
19: 1    Q.    Until about '91 or so?
19: 2    A.    '91, '92.
19: 3    Q.    Okay.  And did your job change after
19: 4 that?
19: 5    A.    My title changed to senior director,
19: 6 and some of the responsibilities -- the
19: 7 responsibilities were generally the same.
19: 8    Q.    Was it considered a promotion?
19: 9    A.    Yes, it was.
19:10    Q.    Okay.  And how long did you have that
19:11 job?
19:12    A.    I had that job for, I guess, about
19:13 five years.
19:14    Q.    Until like '97, '98, something like
19:15 that?
19:16    A.    Yeah.
19:17    Q.    Okay.  And in 1998, what job did you
19:18 take?
19:19    A.    At that point the title was executive
19:20 director, public affairs, for US -- for the US
19:21 business, and it was the -- it was a higher title,
19:22 more responsibility.  I had responsibility for all
19:23 of the products and some of the issues that were
19:24 current in the media at the time.
19:25    Q.    Okay.  For just domestic
20: Page 20
20: 1 responsibilities?
20: 2    A.    Yes, just -- just domestic.
20: 3    Q.    Okay.  And how long did you hold that

T's Affirmative Designations
• transcript includes:
  1. Δ's objections
  2. π's response
  3. Ct's rulings in Irvin 2.

_____

π's omnibus response to
Merck's objections re:
relevance:

1. Merck's marketing efforts
go to heart of π's
failure to warn claim.

2. Merck's marketing efforts
"framed" the public discourse
regarding Vioxx, among
Consumers and in the
medical community.

3. Merck's marketing efforts
show their state of mind.

4. Merck's marketing efforts
show how Merck circumvented
FDA and reports of CV
risks by use of press releases
standing statements,
websites & DTC advertising.

5. Weiner was an expert
at getting out Merck's
"message" and can
provide opinions how
effective it was.

Weiner

20: 4 title -- or that job?
20: 5    A.    That job where it was focused
20: 6 strictly on domestic was until somewhere 2000; 2000,
20: 7 2001.  I'm having some trouble with the dates,
20: 8 but --
20: 9    Q.    Your best estimate.
20:10    A.    Yes.  The job and how we organized
20:11 that work changed for one year about that time.
20:12    Q.    So around 2000, 2001, did your job --
20:13 job title change?
20:14    A.    Executive director, global product
20:15 communications.
20:16    Q.    Okay.  And how long did you hold that
20:17 job?
20:18    A.    Until April of 2003.
20:19    Q.    Then what job did you have?
20:20    A.    Executive director of public affairs
20:21 for Asia, Japan, Australia and New Zealand.
20:22    Q.    So you had no more domestic
20:23 responsibilities at that point?
20:24    A.    That is correct.

Weiner 2204     22:04-23:13

22: 4    Q.    Approximately when were your first
22: 5 responsibilities for Vioxx?  When did you first take
22: 6 on those responsibilities?
22: 7    A.    '97, '98.  That's -- that's the best
22: 8 I can do on timing.
22: 9    Q.    During the '97, 1998 time frame, what
22:10 were your responsibilities as it related to the drug
22:11 Vioxx?
22:12    A.    The responsibilities were primarily
22:13 to develop communications plans for -- for the drug
22:14 and then also to develop news releases and other
22:15 materials related to scientific presentations and
22:16 publications about the drug.
22:17    Q.    Did those responsibilities change at
22:18 all over time as it relates to the drug Vioxx?
22:19    A.    Those remained the primary
22:20 responsibilities.
22:21    Q.    Regardless of job title?
22:22    A.    Yes.
22:23    Q.    And were your responsibilities as
22:24 related to the drug Vioxx always focused on the US
22:25 market?
23: Page 23
23: 1    A.    They were until I -- I held the title
23: 2 of global product communications.
23: 3    Q.    And that was like 2000, executive
23: 4 director of global product communications?
23: 5    A.    If you give me a minute, I can
23: 6 reconstruct in my head the timing on that.
23: 7    Q.    Go ahead.  Take your time.
23: 8    A.    The global product communications job

Page 2

Weiner

23: 9 was during the calendar year of 2002.
23:10      Q.     So up to 2002, your responsibilities
23:11 as it related to the drug Vioxx were limited to the
23:12 United States?
23:13      A.     That is correct.

Weiner 3104      31:04-31:07

31: 4      Q.     Okay.  And the press releases that
31: 5 were issued to the news media, who -- what audience
31: 6 was it that you -- you ultimately intended to reach
31: 7 out to?

Weiner 3109      31:09-32:05

31: 9            THE WITNESS:  The news releases were
31:10 designed to be reviewed by news reporters who would
31:11 make judgment as to whether the information was
31:12 worthy of news coverage.  And then it would be a
31:13 matter of who the audience is of any particular
31:14 media organization.
31:15 BY MR. PLACITELLA:
31:16      Q.     Okay.  You understood when those
31:17 press releases were issued that the information you
31:18 supplied could eventually be read or seen by people
31:19 taking Vioxx, correct?
31:20      A.     Yes, we understood that.
31:21      Q.     As well as doctors?
31:22      A.     Yes.
31:23      Q.     And as well as people who were not
31:24 currently taking Vioxx but who might be candidates
31:25 for taking Vioxx?
32: Page 32
32: 1      A.     You're really talking about the
32: 2 audience for the general media in the country?
32: 3      Q.     Correct.
32: 4      A.     And that's the general population who
32: 5 was consumers of news media.

Weiner 3209      32:09-32:17

32: 9      Q.     How did public affairs integrate with
32:10 marketing?
32:11      A.     We -- we worked with marketing as one
32:12 of the sources of information that -- that we had at
32:13 our disposal and we worked with them.  They had the
32:14 opportunity, like our scientists, like investor
32:15 relations, to review the news release and the Q and
32:16 A, and we worked with them side by side as -- as
32:17 departments do within a company.

Weiner 3703      37:03-37:11

37: 3      Q.     And what was Alise Reicin's primary
37: 4 function as it related to Vioxx and public

Page 3

Weiner

```
37: 5 relations?
37: 6     A.    She -- she often was the person that
37: 7 we would go to either to obtain information or data
37: 8 on which we based our news releases and materials,
37: 9 and then she would often be the point person within
37:10 MRL clinical to whom we would submit our materials
37:11 for review and clearance.
```

Weiner 4309     43:09-43:21

```
43: 9     Q.    Okay.  The material that you used
43:10 to -- as tools for public relations, they would
43:11 include press releases, correct?
43:12     A.    Yes.
43:13     Q.    Would they include standby
43:14 statements?
43:15     A.    Yes.
43:16     Q.    What is a standby statement?
43:17     A.    A standby statement is the company's
43:18 position on an issue that is used by people in
43:19 public affairs, typically, to respond to questions
43:20 in cases where we are not going to be issuing a news
43:21 release.
```

Weiner 4507     45:07-45:14

```
45: 7     Q.    Okay.  What is the reason why some
45: 8 press releases were submitted to the FDA and others
45: 9 were not?
45:10     A.    Merck's practice had been to send to
45:11 the FDA news releases related to regulatory actions
45:12 as part of a launch campaign.  The FDA typically
45:13 likes to see launch campaigns, and so a news release
45:14 as part of a launch campaign was sent to the FDA.
```

Weiner 4523     45:23-46:11

```
45:23     Q.    I don't want to get anybody in
45:24 trouble here.  So you can just tell me what your
45:25 understanding was for the reason why some press
46: Page 46
46: 1 releases were sent to the FDA and others were not,
46: 2 your understanding?
46: 3     A.    That the FDA liked to see launch
46: 4 materials.  The news release was part of the launch.
46: 5 And on the basis of that, it was submitted to the
46: 6 FDA.
46: 7     Q.    Okay.  So other than that, generally
46: 8 speaking, the news releases were not submitted to
46: 9 the FDA?
46:10     A.    Generally speaking.  There were
46:11 exceptions.
```

Weiner 4703     47:03-47:12

D's objections: Irrelevant, prejudicial

- Supplemental objections: Foundation;
  lack of personal knowledge;
  misleading

P's response: Omnibus response.
Witness is asked to testify to
her personal knowledge. Permissible
cross-examination.

Irwin 2 ruling: Overruled.

Weiner

47: 3    Q.    So every press release or video news
47: 4 release was submitted to the FDA after it was
47: 5 issued?
47: 6    A.    Those releases related to products,
47: 7 yes.
47: 8    Q.    When you say "related to products,"
47: 9 what do you mean by that?
47:10    A.    Well, news releases that the company
47:11 would issue about sales and earnings, for instance,
47:12 would not be submitted to the FDA.

Weiner 4713    47:13-47:15

47:13    Q.    Okay.  Were you aware, as executive
47:14 director of public affairs, that the press releases
47:15 were governed by the FDA labeling requirements?

Weiner 4717    47:17-47:21

47:17        THE WITNESS:  Yes.
47:18 BY MR. PLACITELLA:
47:19    Q.    Were standby statements ever reviewed
47:20 by the FDA?
47:21    A.    I don't recall that.

Weiner 4916    49:16-50:10

49:16    Q.    Okay.  I think I left off with Q and
49:17 As, questions and answers.  Did public affairs
49:18 prepare Q and As as they related to Vioxx?
49:19    A.    Yes.
49:20    Q.    Can you tell us what a Q and A is and
49:21 what its function was related to Vioxx?
49:22    A.    A Q and A is prepared to answer
49:23 questions that we may receive from reporters that
49:24 would not be covered in a news release.  Sometimes
49:25 you can't put absolutely everything in a news
50: Page 50
50: 1 release and you know there are going to be
50: 2 additional questions, and so that's where you put
50: 3 the questions that you expect to receive and what
50: 4 the answers would be.
50: 5    Q.    Okay.  Were Q and As reviewed by the
50: 6 FDA at any point in time concerning Vioxx?
50: 7    A.    To the best of my knowledge, no.
50: 8    Q.    Okay.  Before you mentioned video
50: 9 news releases.  Can you tell us what a video news
50:10 release is?

Weiner 5014    50:14-50:25

50:14    A.    A video news release is prepared for
50:15 television stations, and it basically takes the
50:16 story in a print press release and puts it in a
50:17 format and form that television stations can choose

Page 5

Δ's objections: Irrelevant; prejudicial
- Supplemental objections: Foundation

π's response: Omnibus response; Question seeks
witness's personal knowledge.

Irvin 2 ruling: Overruled.

Δ's Objections: Irrelevant; prejudicial
- Supplemental objections: Foundation

π's response: Omnibus response; witness
relays that she does not know. In fact
that she does not know is relevant.

Irvin 2 ruling: Overruled.

Weiner

50:18 to use if they want to.  And there are several
50:19 different ways of preparing them.  And the way that
50:20 I thought about it was, you give a television
50:21 station the ingredients to do a story if they choose
50:22 to do it.  You give them additional background
50:23 footage.  You'll give them additional quotes so they
50:24 can tailor it, if they choose to do a story on that
50:25 particular subject.

Weiner 5508     55:08-55:10

55: 8          Did Merck distribute video news
55: 9 releases concerning Vioxx to the media without going
55:10 to the FDA first?

Weiner 5516     55:16-55:18

55:16          THE WITNESS:  I don't remember all of
55:17 the video news releases that we did on Vioxx, so I
55:18 really can't answer your question.

Weiner 6209     62:09-62:15

62: 9     Q.    Did you ever use the PR Newswire?
62:10     A.    We used PR Newswire and BusinessWire
62:11 for distribution of press releases.
62:12     Q.    And would you distribute those news
62:13 releases ever electronically over the PR Newswire on
62:14 the Internet?
62:15     A.    Oh, now I see.  Okay.  Yes.

Weiner 6307     63:07-63:11

63: 7     Q.    Okay.  Did you understand that when
63: 8 you distributed press releases on the PR Newswire or
63: 9 BusinessWire over the Internet that those press
63:10 releases were likely to appear on various web sites
63:11 throughout the Internet?

Weiner 6313     63:13-63:13

63:13          THE WITNESS:  Yes.

Weiner 7423     74:23-75:01

74:23     Q.    Okay.  Can you tell me the physicians
74:24 that you recall that were charged with
74:25 responsibility of reviewing Vioxx press – press
75: Page 75
75: 1 releases?

Weiner 7507     75:07-75:13

75: 7          THE WITNESS:  I can remember Dr.
75: 8 Reicin reviewing releases.  I know that Ed Scolnick

Δ's Objection: Irrelevant
- Supplemental objections: Foundation
  lack of personal Knowledge; misleading
П's response: Omnibus response; Permissible
  cross-examination. Her lack of Knowledge is
  relevant. Overruled.
Irvin 2 ruling: Overruled.

Δ's Objection: Irrelevant
- Supplemental objections: Foundation;
  lack of personal Knowledge; misleading
П's response: same as above.
Irvin 2 ruling: Overruled.

Weiner

75: 9 in one case reviewed a news release. I know that
75:10 there were other people on Dr. Reicin's staff who
75:11 reviewed news releases related to their
75:12 presentations and publications, but those would be
75:13 names I don't recall at this point.

Weiner 7918    79:18-79:21

79:18     Q.    Sure. When is the first time you
79:19 learned that there were respected scientists that
79:20 were concerned that Vioxx might have a role in
79:21 causing heart attacks?

Weiner 7923    79:23-80:11

79:23          THE WITNESS: I remember that there
79:24 was a publication from Garret FitzGerald that raised
79:25 questions about COX-2 inhibitors. That's what I
80: Page 80
80: 1 remember.
80: 2 BY MR. PLACITELLA:
80: 3     Q.    And when was that -- when was that
80: 4 publication, before or after VIGOR?
80: 5     A.    I believe it was before.
80: 6     Q.    Before. Okay. And what were the
80: 7 circumstances that -- well, strike that.
80: 8          Garret FitzGerald was an occasional
80: 9 paid advisor to -- medical advisor, to Merck. Were
80:10 you aware of that?
80:11     A.    No, I was not.

Weiner 8016    80:16-80:18

80:16     Q.    Okay. What were the circumstances
80:17 under which you learned about the Garret FitzGerald
80:18 publication related to heart attacks and COX-2s?

Weiner 8020    80:20-81:04

80:20          THE WITNESS: We received a question
80:21 from a reporter based upon that publication, and
80:22 through the question we learned about the
80:23 publication and prepared a standby statement and a Q
80:24 and A.
80:25 BY MR. PLACITELLA:
81: Page 81
81: 1     Q.    Okay. So the question that was asked
81: 2 by the reporter concerning the publication of Garret
81: 3 FitzGerald was what?
81: 4     A.    I don't remember.

Weiner 8109    81:09-81:11

81: 9     Q.    Who decided that a stand boy -- a
81:10 standby statement and Q and A was necessary in

Page 7

Weiner

81:11 relation to the Garret FitzGerald publication?

Weiner 8113    81:13-81:17

81:13        THE WITNESS: I don't know who
81:14 specifically made that decision, but if you have a
81:15 question from a reporter and you need to develop an
81:16 answer, the usual mechanism is to develop a quick
81:17 standby statement and Q and A.

Weiner 8222    82:22-83:05

82:22    Q.    Okay. And, for the record, you were
82:23 concerned about the question as it related to COX-2
82:24 because Vioxx was a COX-2, correct?
82:25    A.    That is correct.
83: Page 83
83: 1    Q.    Now, do you recall what Merck was
83: 2 prepared to tell the press in response to the
83: 3 FitzGerald article that was incorporated into the
83: 4 standby statement and Q and A at that point in time?
83: 5    A.    I don't recall.

Weiner 10215    102:15-103:15

102:15        I think you had it marked. Her
102:16 personnel file, December 31, 1997, is the cover
102:17 page.
102:18        I'm going to show you what has been
102:19 marked Weiner Exhibit 2, and I'll make sure that
102:20 we're on the same page, so I'm going to give you the
102:21 page 3. Take a look, see where it says under Vioxx,
102:22 and the third or fourth sentence down, it says,
102:23 "Strong media outreach contributed to the most
102:24 successful launch in Merck history." Do you see
102:25 that?
103: Page 103
103: 1    A.    Yes, I see that.
103: 2    Q.    Okay. "Vioxx was highlighted in
103: 3 articles reaching a total of more than two
103: 4 billion-almost ten times per person." Did I read
103: 5 that correctly?
103: 6    A.    Yes, you did.
103: 7    Q.    Okay. Does that refresh your
103: 8 recollection as to what the reach was of your media
103: 9 campaign in the year 1999?
103:10    A.    Somewhat.
103:11    Q.    Okay. "Of this total, there were 1.4
103:12 billion impressions for Vioxx alone and an
103:13 additional 700 million highlighting both agents."
103:14 That meaning -- that is Celebrex, correct?
103:15    A.    Yes.

Weiner 10404    104:04-104:08

Weiner

104: 4     Q.    Would you agree with me, generating
104: 5 enough stories to reach ten times per person all the
104: 6 people in the United States is an extraordinary
104: 7 media outreach?
104: 8     A.    I would say it was very successful.

Weiner 10617     106:17-106:20

106:17          So the two billion impressions means
106:18 that, based on Merck's calculations, their message
106:19 would have reached people in the United States two
106:20 billion times?

→ △'s Objection: Lack of foundation
- Supplemental objections: misleading;
  prejudicial
π's response: Omnibus.
Irvin 2 ruling: overruled.

Weiner 10623     106:23-107:07

106:23          THE WITNESS:  It would have meant
106:24 that two -- two billion people over the course of
106:25 the year potentially would have seen the message.
107: Page 107
107: 1 BY MR. PLACITELLA:
107: 2     Q.    Okay.  But we don't have two billion
107: 3 people in the United States?
107: 4     A.    That is correct.
107: 5     Q.    So to break down the math, it would
107: 6 mean that every person in the United States would
107: 7 have seen your message at least ten times?

→ △'s Objection: Lack of foundation
- Supplemental objections: misleading;
  prejudicial
π's response: Omnibus response; Witness testifies to
     her personal knowledge.
Irvin 2 ruling: Overruled.

Weiner 10710     107:10-107:16

107:10    Q.    Correct?
107:11    A.    That is the way the math would work.
107:12    Q.    So if every person in the United
107:13 States would have seen your message ten times in a
107:14 given year, it would be extremely important to be
107:15 sure that the information contained in the message
107:16 was accurate and truthful in every respect?

→ △'s Objection: Lack of foundation
~ Supplemental objections: Misleading;
  prejudicial
π's response: same as above     Irvin 2: overruled

Weiner 10721     107:21-107:21

107:21    A.    I would agree with that.

△'s Objection: Lack of foundation
- Supplemental objections: Misleading;
  prejudicial
π's response: same     Irvin 2: Overruled.

Weiner 14816     148:16-148:23

148:16    Q.    And this press release says, in its
148:17 headline, "Merck confirms favorable cardiovascular
148:18 safety profile of Vioxx."  Did I read that
148:19 correctly?
148:20    A.    Yes, you did.
148:21    Q.    Would the reader reading that
148:22 headline believe that Vioxx had the potential to
148:23 hurt your heart?

→ △'s Objection: Lack of foundation
- Supplemental objections: Misleading;
  prejudicial; calls for speculation
π's response: Permissible cross-examination. Not
     Omnibus response.
Irvin 2 ruling: Overruled.

Weiner 14825     148:25 - 149:02

148:25          THE WITNESS:  I don't know what the

↓
continued

Page 9

Weiner

149: Page 149
149: 1 average person reading that would necessarily take
149: 2 away from the headline.

Weiner 14912    149:12-149:21

149:12    Q.    Okay. It says in the first sentence,
149:13 "In response to speculative news reports, Merck &
149:14 Company, Inc., today confirmed the favorable
149:15 cardiovascular safety profile of Vioxx, its medicine
149:16 that selectively inhibits COX-2." Did I read that
149:17 correctly?
149:18    A.    Yes, you did.
149:19    Q.    What did Merck do on April 28, 2000,
149:20 to confirm that Vioxx was safe from a cardiovascular
149:21 standpoint?

Weiner 14923    149:23-150:8

149:23    THE WITNESS: The word "confirm"
149:24 there is used in a news release context. You could
149:25 have said today commented on, today announced, today
150: Page 150
150: 1 said. It's -- it's used in terms of -- it's a news
150: 2 release type term as opposed to some other type
150: 3 meaning.
150: 4 BY MR. PLACITELLA:
150: 5    Q.    Well, doesn't the average person,
150: 6 when they hear "confirm," think that that means that
150: 7 somebody checked something and now stands behind it?
150: 8 Isn't that what "confirms" means?

Weiner 15010    150:10-150:13

150:10    THE WITNESS: That is another way in
150:11 which the -- the word is used. But, again, you look
150:12 at the total of the news release, not just the one
150:13 sentence.

Weiner 15509    155:09-155:21

155: 9    Q.    Okay. Is there any mention in this
155:10 press release concerning an alternate explanation
155:11 for the heart attack findings in VIGOR, i.e., that
155:12 Vioxx could be the cause of the heart attack
155:13 imbalance in the VIGOR study?
155:14    A.    The specific language that you
155:15 suggested is not in this particular news release.
155:16    Q.    Is there any indication whatsoever
155:17 anywhere in this press release by Merck that one of
155:18 the explanations for the VIGOR results is that Vioxx
155:19 was causing the heart attacks?
155:20    A.    That specific language is not in the
155:21 news release.

Page 10

Δ's objection: Lack of foundation
- supplemental objections: Misleading;
prejudicial

Π's response: Omnibus response. Witness's
response is relevant to failure to warn
claims.

Irvin 2 ruling: Overruled.

Weiner

Weiner 18007    180:7-180:7

180: 7 out a little bit.  I want to show you P-Weiner-19.

→ Δ's Objection: Incomplete
π's response: only playing what is needed.
Irvin 2 ruling: Overruled.

Weiner 18008    180:8-180:8

180: 8 Okay.  You have before you an e-mail of 5/25/2000.

→ Δ's Objection: Incomplete
π's response: only playing what is needed.
Irvin 2 ruling: Overruled

Weiner 18013    180:13-180:14

180:13 Alise Reicin -- I mean, this e-mail is to Alise
180:14 Reicin, copy to Edward Scolnick, correct?

→ Δ's Objections: Lack of foundation;
witness has no knowledge of
document (email to A. Reicin)
π's response: see response below.
Irvin 2 ruling: Overruled.

Weiner 18015    180:15-180:22

180:15    A.    Right.
180:16    Q.    Edward Scolnick at this point is on
180:17 the Merck management committee, true?
180:18    A.    Yes.
180:19    Q.    And Alise Reicin is the person that
180:20 you relied upon to tell you the truth and to steer
180:21 you into doing the right thing when you issued press
180:22 releases, correct?

→ Δ's Objections: Lack of foundation;
witness has no knowledge of
document (email to A. Reicin)
π's response: Omnibus response; witness
testifying not to document but from whom
she received information re: Vioxx.
Irvin 2 ruling: Overruled.

Weiner 18024    180:24-181:22

180:24          THE WITNESS:  Alise -- I mean, Alise
180:25 was not the only person in MRL.  She was primary,
181: Page 181
181: 1 but she was clearly not the only person in MRL we
181: 2 relied on.
181: 3 BY MR. PLACITELLA:
181: 4    Q.    But she was one of the main people?
181: 5    A.    She was one of the main people.  That
181: 6 is fair.
181: 7    Q.    And the note says, "Alise, attached
181: 8 are 2 analyst reports which most clearly demonstrate
181: 9 the success of our efforts to defuse the CV risk
181:10 issue for Vioxx.  You played a major role in making
181:11 this happen, along with Brian and I know many others
181:12 supporting you in MRL.  I wanted to personally thank
181:13 you for all of your efforts and the tremendous
181:14 support you provided for the marketing
181:15 organization."
181:16          Did I read that correctly?
181:17    A.    Yes, you did.
181:18    Q.    Okay.  But this wasn't sent to you?
181:19    A.    No, it was not.
181:20    Q.    Okay.  So Alise, the person that you
181:21 relied upon, was getting congratulated for defusing
181:22 the CV risk issue for Vioxx, correct?

→ Δ's Objections: Lack of foundation;
witness has no knowledge of
document (email to A. Reicin)
π's response: Permissible cross-examination.
Shows contrast b/t marketing "message"
and internal knowledge about serious
CV hazards associated w/ Vioxx. Relevant
to failure to warn.
Irvin 2 ruling: Overruled.

Weiner 18124    181:24-181:25

181:24          THE WITNESS:  That's what the e-mail

↓
Continued

Page 11

→ Δ's objections: Lack of foundation;
witness has no knowledge of document
(email to A. Reicin); irrelevant; prejudicial
π's response: same response as above.
Irvin 2 ruling: Overruled.

181:25 says.                                    Weiner

Weiner 29119    291:19-292:04

291:19    Q.    Now, on -- in the next month,
291:20 November 2000, the VIGOR study was published in the
291:21 Journal of the American Medical Association. Do you
291:22 recall that?
291:23    A.    I believe it was published in the New
291:24 England Journal of Medicine.
291:25    Q.    You're right. You're correct.
292: Page 292
292: 1          And did you have press activities
292: 2 around that publication?
292: 3    A.    We issued a news release around that
292: 4 publication.

Weiner 29216    292:16-292:19

292:16    Q.    Okay. And you also issued a video
292:17 news release, correct?
292:18    A.    I don't -- I don't recall whether we
292:19 did or not.

> Δ's objections: Irrelevant; prejudicial;
lack of foundation

Π's response: Omnibus response.

Irvin 2: Overruled.

Weiner 29223    292:23-293:01

292:23    Q.    I'm going to show you a video news
292:24 release and then we'll talk about it.
292:25    A.    Okay.
293: Page 293
293: 1          (Video clip shown.)

> Δ's objections: Irrelevant; prejudicial;
lack of foundation

Π's response: Omnibus response

Irvin 2 ruling: Overruled.

Weiner 29303    293:3-293:13

293: 3    Q.    Now, I've stopped the video news
293: 4 release in the beginning. It says, "In a study of
293: 5 Vioxx published in the New England Journal of
293: 6 Medicine, Vioxx significantly reduced the risk of
293: 7 serious gastrointestinal side effects by half
293: 8 compared to naproxen. TV news feed: DWJ
293: 9 Television."
293:10          Have you ever seen this video news
293:11 release before?
293:12    A.    I'm certain that I saw it at the
293:13 time.

Weiner 29322    293:22-293:22

293:22          (Video clip shown as follows:

Weiner 29417    294:17-295:5

> Δ's objections: Irrelevant; prejudicial;
lack of foundation

Π's response: Omnibus

Irvin 2 ruling: Overruled.

294:17    Q.    Do you recognize the individual on
294:18 this news release, the doctor?
294:19    A.    I recognize the name. I have never

↓
Continued

Page 12

Weiner

294:20 met the man, so seeing him, I assume that's who
294:21 it is.
294:22   Q.   And who is that?
294:23   A.   His name is Dr. Loren Laine.
294:24   Q.   And what was his relationship with
294:25 Merck?
295: Page 295
295: 1       He was involved in the VIGOR study.
295: 2 I do not know his specific role in that study.
295: 3   Q.   Okay.  Was he paid by Merck?
295: 4   A.   If he was an investigator in the
295: 5 study, there would have been a contract.

→ Δ's objections: Irrelevant; prejudicial;
lack of foundation

π's response: omnibus response

Irvin 2 ruling: Overruled.

Weiner 29623   296:23-296:25

296:23   Q.   Okay.  Now, in that video news
296:24 release, was there any mention of the heart attack
296:25 findings of VIGOR?

→ Δ's objections: Irrelevant; prejudicial;
lack of foundation
- Supplemental objection: video clip is
incomplete

π's response: Omnibus; relevant to how
communicated "message" to public.

Irvin 2 ruling: Overruled.

Weiner 29703   297:03-297:21

297: 3       THE WITNESS:  In the cut piece that
297: 4 we just saw, there was no mention of cardiovascular.
297: 5 BY MR. PLACITELLA:
297: 6   Q.   Now, when you say "cut piece," what
297: 7 do you mean by that?
297: 8   A.   The video package, as we typically
297: 9 put them together, had several different elements.
297:10 At the beginning you had the full news release, then
297:11 you have what we call, and the term in television is
297:12 cut piece, and that is the part that's put together
297:13 that we just saw, then you have the additional
297:14 background footage and other choices that the
297:15 television editors can use in putting together their
297:16 own pieces, and then we had full labeling at the
297:17 end.
297:18   Q.   Okay.  And any of the video connected
297:19 to this video news release, including the B-roll
297:20 portions, was there ever any mention of the heart
297:21 attack findings in VIGOR?

→ Δ's objections: Irrelevant; prejudicial;
lack of foundation
- Supplemental objection: video clip
is incomplete

π's response: same as above.

Irvin 2 ruling: Overruled.

Weiner 29724   297:24-298:05

297:24       THE WITNESS:  We have not reviewed
297:25 the full package.  We haven't looked at the
298: Page 298
298: 1 background footage.
298: 2 BY MR. PLACITELLA:
298: 3   Q.   Okay.
298: 4   A.   So I don't -- I can't answer your
298: 5 question.

→ Δ's objections: Irrelevant; prejudicial;
lack of foundation
- Supplemental objection: video clip is
incomplete

π's response: same as above

Irvin 2 ruling: Overruled.

Weiner 29809   298:09-298:17

298: 9       (Video clip shown.)

↓
continued

Page 13

Weiner

298:10 BY MR. PLACITELLA:
298:11    Q.    This is a section without ambient
298:12 sound, meaning it's just photos, correct?
298:13    A.    It's just visuals.
298:14    Q.    Okay. And you use this in case
298:15 somebody wants to do a lead-in or a fade-out or
298:16 something like that when they're doing the story?
298:17        (Video clip shown as follows:

→ Δ's objections: Irrelevant; prejudicial;
lack of foundation
π's response: Omnibus response; relevant to
show how Merck gets "message" out to public.
Irvin 2: Overruled.

Weiner 29904    299:4-299:7

299: 4    Q.    So far, have you seen anything from
299: 5 Dr. Laine to indicate that he was telling the
299: 6 viewers that one of the findings in VIGOR was that
299: 7 people on Vioxx had more heart attacks?

→ Δ's objections: Irrelevant; prejudicial;
lack of foundation
π's response: same    Irvin 2: Overruled.

Weiner 29909    299:9-299:11

299: 9        THE WITNESS:  There's no — there's
299:10 no information that I have heard related to
299:11 cardiovascular.

→ Δ's objections: Irrelevant; prejudicial;
lack of foundation
π's response: same    Irvin 2: Overruled.

Weiner 29922    299:22-299:25

299:22    Q.    Do you see any language on this part
299:23 of the video news release telling people that one of
299:24 the findings in VIGOR was that the people on Vioxx
299:25 had more heart attacks?

→ Δ's objections: Irrelevant; prejudicial;
lack of foundation
- supplemental objection: incomplete-
witness answer 300:6-300:7 has
not been designated
π's response: Will add 300:6-7.
Otherwise, omnibus response.
Irvin 2: overruled.

Weiner 30006    0:0-0:0

300: 6        THE WITNESS:  I have not seen the
300: 7 information related to cardiovascular.
300: 8        MR. PLACITELLA:  Okay.

Weiner 30025    300:25-301:09

300:25    Q.    Now, what we're watching now is a
301: Page 301
301: 1 B-roll and a B-roll is typically silent, correct?
301: 2    A.    It can be either way, with ambient
301: 3 sound or without.
301: 4    Q.    But it's really there just as
301: 5 background, filler material, for people running the
301: 6 story, right?
301: 7    A.    They have a visual to accompany
301: 8 whatever sound they wish to add to it.
301: 9    Q.    Okay.

→ Δ's objections: Irrelevant; prejudicial;
lack of foundation
π's response: Omnibus response. Relevant
to Merck's strategy to get out "message".
Irvin 2: Overruled.

Weiner 30112    301:12-301:15

301:12    Q.    While we're watching this silent
301:13 part, can you tell us whether this video news
301:14 release was submitted to the FDA before it was
301:15 issued?

→ Δ's objections: Irrelevant; prejudicial;
lack of foundation; assumes facts not
in evidence; witness did not answer
the question
π's response: Omnibus response. Question
addresses witness's job responsibilities.
Irvin 2: Overruled.

Page 14

Weiner

Weiner 30119    301:19-302:1

301:19     Q.    Do you know whether this was ever
301:20 submitted to the FDA before November 23rd, 2000?
301:21     A.    It would -- it is unlikely that it
301:22 would have been submitted because our practice was
301:23 to submit for pre-clearance those items generally
301:24 that related to regulatory actions.  This is a
301:25 study -- this is a study publication.  Again, I
302: Page 302
302: 1 don't -- I don't know if this was ever issued.

→ Δ's objections: Irrelevant; lack of foundation
π's response: same as previous response
Irwin 2: Overruled.

Weiner 30203    302:03-302:08

302: 3         (Video clip shown.)
302: 4 BY MR. PLACITELLA:
302: 5     Q.    Anywhere on this video news release
302: 6 did you hear mentioned that one of the findings in
302: 7 VIGOR was that the people on Vioxx had more heart
302: 8 attacks than the people on naproxen?

→ Δ's objections: Irrelevant; prejudicial; lack of foundation
π's response: Omnibus
Irwin 2: Overruled.

Weiner 30211    302:11-302:18

302:11          THE WITNESS:  I did not hear that in
302:12 the video news release.
302:13 BY MR. PLACITELLA:
302:14     Q.    Did the -- any of the spokespeople in
302:15 this video news release tell the audience that one
302:16 of the significant findings in VIGOR was that people
302:17 on Vioxx had more heart attacks than people on
302:18 naproxen?

→ Δ's objections: Irrelevant; prejudicial; lack of foundation
π's response: ~~overruled~~ Omnibus
Irwin 2: Overruled.

Weiner 30220    302:20-303:10

302:20          THE WITNESS:  There was no verbal
302:21 statement given related to the cardiovascular
302:22 findings in VIGOR.
302:23 BY MR. PLACITELLA:
302:24     Q.    Why not?
302:25     A.    I don't know.
303: Page 303
303: 1     Q.    Did medical/legal clear these -- this
303: 2 video news release?
303: 3     A.    If this video news release were
303: 4 issued, it would have gone through the Merck review
303: 5 process, and it would have been seen and reviewed by
303: 6 a number of people.
303: 7     Q.    When is it proper to issue press
303: 8 materials, including a video news release, that
303: 9 includes some significant findings of a study but
303:10 not others?

→ Δ's objections: Irrelevant; prejudicial; lack of foundation
π's response: Omnibus
Irwin 2: Overruled.

Weiner 30312    303:12-303:16

303:12        THE WITNESS:  When a video news
303:13 release is prepared, there will be decisions about
303:14 what is included and not included.  I do not know
303:15 the discussions or the decisions that were made in
303:16 this case.  I don't recall.

Weiner

Δ's objections: Irrelevant; prejudicial;
lack of foundation
π's response: Omnibus     Irvin 2: Overruled.

Weiner 30407     304:07-304:09

304: 7    Q.    Do you recall you or any of your
304: 8 staff raising objection to this news release on not
304: 9 including all of the significant findings of VIGOR?

Δ's objections: Irrelevant; prejudicial;
lack of foundation
π's response: Omnibus     Irvin 2 ruling:
                                           Overruled

Weiner 30411     304:11-304:15

304:11        THE WITNESS:  I don't recall.
304:12 BY MR. PLACITELLA:
304:13    Q.    Okay.  This video news release did
304:14 not include any information from the heart attack
304:15 meta-analysis done by Merck a month before, correct?

Δ's objections: Irrelevant; prejudicial;
lack of foundation
π's response: Omnibus     Irvin 2: Overruled.

Weiner 30417     304:17-304:20

304:17        THE WITNESS:  It -- it did not
304:18 include cardiovascular information.  It did not
304:19 include cardiovascular information in the spoken
304:20 part of the video news release.

Δ's objections: Irrelevant; prejudicial;
lack of foundation
π's response: Omnibus     Irvin 2: Overruled

Weiner 42703     427:03-427:09

427: 3    Q.    Now, in conjunction with the press
427: 4 release that you issued concerning the Topol
427: 5 article, you also constructed and issued a video
427: 6 news release, correct?
427: 7    A.    My recollection is that we put
427: 8 together a video package but not a video news
427: 9 release per se.

Δ's objections: Irrelevant; prejudicial;
lack of foundation
π's response: Relevant to science
                while π taking Vioxx before MI.
Irvin 2: Overruled.

Weiner 42802     428:2-428:13

428: 2    Q.    Okay.  And they could cut and paste
428: 3 whatever they wanted and stick it in their news
428: 4 story, correct?
428: 5    A.    Essentially, yes.
428: 6    Q.    Was the video package presented to
428: 7 the FDA before it was aired?
428: 8    A.    I don't believe so.  That would not
428: 9 have been normal practice.
428:10    Q.    Okay.  Now I'm going to show you
428:11 what's been produced to us by Merck's counsel
428:12 concerning the Topol article in August 2001.
428:13    A.    Okay.

Δ's objections: Irrelevant; prejudicial;
lack of foundation
π's response: Omnibus
Irvin 2: Overruled.

Weiner 42815     428:15-428:20

428:15        (Video clip shown.)

            ↓
      Continued

Page 6

Δ's objections: Irrelevant; prejudicial;
lack of foundation
π's response: Omnibus
Irvin 2: Overruled.

Weiner

428:16 BY MR. PLACITELLA:
428:17    Q.    All right.  Before we move forward,
428:18 did you see that was from August 21, 2001?
428:19    A.    I glanced at it.
428:20    Q.    All right.  Let me go back.

Weiner 42822    428:22-428:22

428:22         THE WITNESS:  I see August 21.

Weiner 42903    429:03-429:10

429: 3    Q.    Okay.  And this material, according
429: 4 to this, includes source disclosure, news release,
429: 5 super information.  What's super information?
429: 6    A.    It's the name and title of the people
429: 7 who are on the screen.
429: 8    Q.    Okay.  Soundbites, B-roll and
429: 9 prescribing information, correct?
429:10    A.    That is correct.

Weiner 43024    430:24-431:06

430:24         THE TAPE:  ...the kind of extensive
430:25 data that...suggests that patients receiving Vioxx
431: Page 431
431: 1 are not at an increased risk for heart attack or
431: 2 other cardiovascular event.)
431: 3 BY MR. PLACITELLA:
431: 4    Q.    What is it that Laura Demopoulos just
431: 5 told the world about Vioxx and cardiovascular
431: 6 events?

Weiner 43114    431:14-431:17

431:14         THE WITNESS:  That there is -- that
431:15 there is an extensive body of evidence that would
431:16 tend to suggest that patients receiving.  Vioxx are
431:17 not at an increased risk of cardiovascular events.

Weiner 43411    434:11-434:15

434:11    Q.    Okay.  To be fair, in the fullest
434:12 sense, what I'm going to do is play the entire thing
434:13 through, and then we'll go back and take pieces,
434:14 rather than have you guess what's coming.  Okay?
434:15 Because that may not be a fair way to approach this.

Weiner 43617    436:17-436:21

436:17    Q.    Does Dr. Demopoulos tell people who
436:18 are watching this video that Merck ran a study
436:19 called VIGOR, that one of the theories was that
436:20 there was at least four times as many heart attacks
436:21 for people on Vioxx versus naproxen?

Page 17

Δ's objections: irrelevant; prejudicial; lack of foundation
π's response: Omnibus        Irvin 2: Overruled

Δ's objections: irrelevant; prejudicial; lack of foundation
π's response: Omnibus        Irvin 2: Overruled.

Δ's objections: irrelevant; prejudicial; lack of foundation
π's response: Omnibus        Irvin 2: Overruled

Δ's objections: irrelevant; prejudicial; lack of foundation
π's response: Omnibus        Irvin 2: Overruled

Δ's objections: No answer; sidebar
π's response: Orienting witness so jury can understand.
Irvin 2: Overruled.

Δ's objections: irrelevant; prejudicial
π's response: Omnibus
Irvin 2: Overruled.

Weiner

Weiner 43623    436:23-437:02

436:23        THE WITNESS: That particular sound
436:24 bite does not make reference to that statement.
436:25 BY MR. PLACITELLA:
437: Page 437
437: 1     Q.     In fact, her statement is that Vioxx
437: 2 does not cause heart attacks, correct?

Δ's objections: Irrelevant; prejudicial,
mischaracterizes video
π's response: Permissible cross-examination.
R. 407.
Irvin 2: Overruled.

Weiner 43705    437:05-437:06

437: 5        THE WITNESS: I think -- I think her
437: 6 statement -- her statement is quite clear.

Δ's objections: Irrelevant
supplemental objection: prejudicial
π: Omnibus       Irvin 2: Overruled.

Weiner 44414    444:14-444:15

444:14     Q.     But Merck knew there was a lot of
444:15 data to the contrary, true?

Δ's objections: Irrelevant; prejudicial;
lack of foundation; asked and answered:
witness testified that she could not
answer the question at 443:21-443:2
π: Omnibus       Irvin 2: Overruled.

Weiner 44417    444:17-444:18

444:17        THE WITNESS: Again, her statements
444:18 went through the Merck review process.

Δ's objections: Irrelevant; prejudicial;
lack of foundation
π: Omnibus       Irvin 2: Overruled.

Weiner 44422    444:22-444:23

444:22        One, Merck had the information from
444:23 the VIGOR study at this point, true?

Weiner 44503    445:03-445:10

445: 3     A.     Yes, Merck had the VIGOR results at
445: 4 that time.
445: 5     Q.     Merck had the results of the
445: 6 ADVANTAGE trial as of this point, true?
445: 7     A.     I believe that's the case.
445: 8     Q.     Merck had the results of the low back
445: 9 pain study, true?
445:10     A.     I don't know that to be a fact.

Weiner 44601    446:1-446:4

446: 1     Q.     Okay. And Merck had in its
446: 2 possession the study -- the analysis that Dr.
446: 3 Shapiro did in October of 2000 concerning heart
446: 4 attacks and Vioxx, true?

Δ's objections: Irrelevant; prejudicial;
lack of foundation
π's response: Omnibus       Irvin 2: Not
designated.

Weiner 44606    446:06-446:11

446: 6        THE WITNESS: We certainly had Dr.
446: 7 Shapiro's analysis.
446: 8 BY MR. PLACITELLA:
446: 9     Q.     And Laura Demopoulos mentioned none
446:10 of that on national television in response to Dr.

Δ's objections: Irrelevant; prejudicial;
lack of foundation
π: Omnibus       Irvin 2: Overruled.

↓
continued

446:11 Topol's article, true?

Weiner

Weiner 44613    446:13-446:14

446:13          THE WITNESS: Her comments do not
446:14 include specific references to those things.

Δ's Objections: Irrelevant; prejudicial;
lack of foundation

π: Omnibus        Irvin 2: Overruled.

Total Length - 00:39:13

Barnett Merck Counter Designations- Weiner                    π : No objections.

[427:10] - [427:21]      5/31/2006    Weiner, Jan 8/11/05

page 427
10        Q.      What's the difference?
11        A.      The difference is a video package
12   gives just the elements, and that is it will be
13   soundbites, if you will, and that is all.  It does
14   not present what is called a cut piece or a
15   pre-prepared total story --
16        Q.      Okay.
17        A.      -- which means that if a television
18   station wants to use it, they're going to have to go
19   in, construct their own story, and pull elements or
20   ingredients from the package that we have prepared
21   for them.


[444:1] - [444:12]      5/31/2006    Weiner, Jan 8/11/05

page 444
1         Q.      And what she tells the world is that
2    it's Merck's position, even as of August 2001,
3    despite whatever Merck knew internally, that Vioxx
4    can't cause heart attacks, true?
5             MR. MAYER:  Objection to the form.     Remove objections.
6    Mischaracterizes her statement.
7             THE WITNESS:  Again, I think what Dr.
8    Demopoulos said on the videotape is -- was quite
9    clear, that -- and, you know, we've talked about it
10   previously, that the data tended to suggest that
11   patients taking Vioxx did not have an increased
12   risk.


[525:21] - [525:23]      5/31/2006    Weiner, Jan 8/12/05

page 525
21        Q.      I'm going to show you a document that
22   we'll mark as Weiner-78 and ask if you can identify
23   it.


[526:4] - [527:3]      5/31/2006    Weiner, Jan 8/12/05

page 526
4              THE WITNESS:  This is the news
5    release that was issued to announce the preliminary
6    results of the VIGOR study.
7    BY MR. MAYER:
8         Q.      Was there media coverage in response
9    to this news release?
10        A.      There was a small amount of media
11   coverage on the day that this particular news
12   release was issued.  But over the coming months,
13   there was a great deal of media coverage about this
14   topic.
15        Q.      Did this news release say anything
16   about the cardiovascular results of the VIGOR study,
17   in particular, the difference in event rates between
18   Vioxx and naproxen?
19        A.      Yes, it does.
20        Q.      What does it say about that?
21        A.      Reading from the release at the
22   beginning of the second paragraph, "In addition,
23   significantly fewer thromboembolic events were
24   observed in patients taking naproxen in this GI
25   outcomes study, which is consistent with naproxen's
page 527
1    ability to block platelet aggregation.  This effect
2    on these events has not been observed previously in
3    any clinical studies for naproxen."

**Barnett Merck Counter Designations- Weiner**

[542:16] - [543:3]          5/31/2006   Weiner, Jan 8/12/05

                            page 542
                            16          Q.      Ms. Weiner, what is an impression?
                            17   From a public affairs point of view, what does that
                            18   word mean?
                            19          A.      An impression is a calculation of the
                            20   potential reach of a news media story.  It is -- in
                            21   the case of a newspaper, it's not just the
                            22   circulation, recognizing that a newspaper can go
                            23   into an office or a home and be seen by other
                            24   people, and so in the case of a newspaper, we will
                            25   obtain from that organization their best estimate of
                            page 543
                            1    the number of people on average who see each issue.
                            2    And so an impression would be the circulation times
                            3    whatever the pass-along factor is.


[543:6] - [543:15]          5/31/2006   Weiner, Jan 8/12/05

                            page 543
                            6               THE WITNESS:  That covers print.  And
                            7    then an impression as it relates to broadcast will
                            8    be their best estimate of the number of people who
                            9    are viewing a program.  The data is much better for
                            10   broadcast than it is for print.
                            11   BY MR. MAYER:
                            12          Q.      Does the calculation of impression,
                            13   for purposes of newspapers mean a person actually
                            14   saw or read a particular item?
                            15          A.      No.