Cannuscio

TT's Affirmative Designations

• transcript includes —

1. D's objections

2. TT's response

3. Ct's ruling in
   Item 2.

Cannuscio (Multi-clip)
cc 0909    9:9-9:11

9: 9     Q.   Dr. Cannuscio, will you
9:10 state your name, please?
9:11     A.   Carolyn Christa Cannuscio.

CC002    13:14-13:23

13:14     Q.   You're currently employed by
13:15 Merck?
13:16     A.   I am.
13:17     Q.   And what's the position you
13:18 hold today?
13:19     A.   I'm a senior epidemiologist.
13:20 And I'm currently working only one day a
13:21 week as I'm -- I've actually begun a new
13:22 job outside of Merck, and I'm -- I'm
13:23 completing some of my tasks at Merck.

CC003    14:7-14:16

14: 7     Q.   When did your status as a
14: 8 full-time employee of Merck change?
14: 9     A.   Well, while I was pregnant
14:10 last summer, so a year ago, not just this
14:11 past summer, I went down to part time
14:12 status.  And then I went on maternity
14:13 leave at the end of January.  My baby was
14:14 born on January 31st.  So I was then on
14:15 maternity leave for about seven months
14:16 and then returned just after Labor Day.

CC004    14:22-15:11

14:22     Q.   How many senior
14:23 epidemiologists were working on
14:24 Vioxx-related projects at that time?
15: Page 15
15: 1     A.   How many senior
15: 2 epidemiologists?
15: 3     Q.   Yes.
15: 4     A.   I was the -- I was the
15: 5 primary one.  And I may have been --
15: 6 there may have been others.  But I
15: 7 didn't -- I didn't interact with any
15: 8 other senior epidemiologists on a regular
15: 9 basis regarding Vioxx.  There may be
15:10 other people who handle specific tasks.
15:11 I'm not sure.

CC_defense1    31:19-32:20

31:19     Q.   Who were the outside

Page 1

Cannuscio

31:20 consultants that you generally referred
31:21 Vioxx issues to while you were senior
31:22 epidemiologist at Merck?
31:23     A.   So who did I ask for help as
31:24 an epidemiologist or who did Merck ask
32: Page 32
32: 1 for help?
32: 2     Q.   We'll take them one at a
32: 3 time.
32: 4          Who did you ask for help?
32: 5     A.   So in these collaborations
32: 6 i've talked to you about, for instance,
32: 7 the Ingenix United HealthCare study,
32: 8 Dr. Alex Walker works for Ingenix and
32: 9 is -- is an epidemiologist who I would
32:10 ask for help in methodological issues,
32:11 for instance.  And I mentioned to you Dr.
32:12 Mary Chester Wasko and Dr. Mark Genovese
32:13 who are rheumatologists.
32:14          So most of the people I --
32:15 in my role who I would recommend would --
32:16 would have been, you know, like Dr. Alex
32:17 Walker, an epidemiologist, to bring
32:18 methods or expertise or a clinician,
32:19 because I'm not a clinician, to provide
32:20 that kind of perspective.

Δ's objections    Compound, foundation, speculation

→

π's response:  Witness understood questions & answered them.  No speculation.  Witness recounts her personal experience.

Irwin 2 ruling:  Not applicable

---

CC_defense2    48:21-50:9

48:21     Q.   Following the Solomon study,
48:22 did you recommend that Merck withdraw
48:23 Vioxx from the market?
48:24     A.   Following the publication of
49: Page 49
49: 1 the -- of the Solomon study in
49: 2 Circulation, no, I did not recommend that
49: 3 Merck withdraw Vioxx from the market.
49: 4     Q.   Following the completion of
49: 5 the study, but I guess that's about five
49: 6 months before its publication or six
49: 7 months, did you recommend that Merck
49: 8 withdraw Vioxx from the market?
49: 9     A.   As I've said, no, I did not
49:10 recommend to the corporation that -- that
49:11 Vioxx be withdrawn from the market.
49:12     Q.   Did Dr. Solomon?
49:13     A.   To me?
49:14     Q.   To Merck.
49:15     A.   I -- well, in my
49:16 conversations, Dr. Solomon did not
49:17 recommend to me that -- that Merck remove
49:18 Vioxx from the market, no.
49:19     Q.   Did any other authors of the
49:20 paper in Circulation recommend to Merck
49:21 that it withdraw Vioxx from the market at

→

Δ's objections:  foundation; speculation; argumentative; prejudicial; misleading

π's response:  Witness recounts personal knowledge & experience.  No speculation.

Irwin 2 ruling:  Not applicable.

Cannuscio

49:22 that time?
49:23    A.   I don't know about any
49:24 communications the co-authors may have
50: Page 50
50: 1 had with other people at Merck.  If there
50: 2 were any, I am not aware of them.  But --
50: 3 but Dr. Solomon, Dr. Avorn, they did not
50: 4 recommend to me as an individual that --
50: 5 that Vioxx be removed from the market,
50: 6 nor did they ask me to tell Merck that
50: 7 Vioxx should be removed from the market.
50: 8    Q.   They concluded it was
50: 9 dangerous?

*objections + response on previous page.*

CC_defense3    50:14-51:22

50:14    Q.   Correct?
50:15    A.   I -- I think that -- well,
50:16 you -- you're asking me for their
50:17 interpretation of the data.  They came to
50:18 relative risks that we could speak about
50:19 in detail if you -- if you wanted me to
50:20 look at the paper with you.
50:21        But to make a -- I as an
50:22 epidemiologist was trained that one
50:23 epidemiological study does not prove
50:24 anything, that it can add to a
51: Page 51
51: 1 discussion, that we can make
51: 2 observations, but that there's not proof
51: 3 as a result of an observational study.
51: 4 So that's -- I don't know what their
51: 5 conclusion was overall about -- about
51: 6 Vioxx, but they did -- they definitely
51: 7 did not say to me Merck should remove
51: 8 Vioxx from the market.  They definitely
51: 9 did not.
51:10    Q.   And in none of your
51:11 discussions with them working on the --
51:12 working with them on the project and
51:13 analyzing the data did they say this
51:14 drug's dangerous, it's a safety problem?
51:15    A.   They may have said we have
51:16 an elevated relative risk.  And -- and
51:17 they did not say to me, though, you know,
51:18 definitively this solves it, this means
51:19 that the drug is dangerous and should be
51:20 removed from the market.  No, they did
51:21 not.  They -- Dr. Solomon and Dr. Avorn
51:22 did not say that to me.

Δ's objection: Foundation, misleading, calls for speculation, hearsay

π's response: No speculation. Witness is testifying to her personal knowledge. Not hearsay – not offered for truth of matter asserted.

Irvin 2 ruling: Not applicable.

CC005    60:22-61:2

60:22    Q.   As a result of the excess
60:23 MIs in the VIGOR study, there was a very

* Next page

Page 3

60:24 real question at Merck as to whether or
61: Page 61
61: 1 not it was their drug that caused the
61: 2 deaths.  Right?

Cannuscio

CC007    61:6-62:21

61: 6        THE WITNESS:  First of all,
61: 7     I cannot remember -- I cannot
61: 8     remember if in the VIGOR study the
61: 9     outcome was deaths from MI or if
61:10     it w s nonfatal MIs.  So that --
61:11     that part I cannot recall about
61:12     the VIGOR study.  And I can't
61:13     remember what other elements were
61:14     in the end point, too.
61:15        But the question was raised
61:16     and discussed among scientists,
61:17     not just at Merck, but in the
61:18     broader scientific community, too.
61:19     The broader scientific community
61:20     was also asking the question, is
61:21     naproxen cardioprotective; is
61:22     Vioxx associated with increased
61:23     risk; is there some combination of
61:24     those two things.  And let's
62: Page 62
62: 1     invest in trying to get to the
62: 2     bottom of this.  And that was my
62: 3     job.  I was -- I was hired and
62: 4     asked to devote myself to pursuing
62: 5     that question.
62: 6 BY MS. LEWIS:
62: 7     Q.   And at the same time you
62: 8 were pursuing that question, Vioxx was
62: 9 being promoted and sold.  Correct?
62:10     A.   Correct.
62:11     Q.   And do you know how many
62:12 Vioxx prescriptions, for example, had
62:13 been filled by the end of the VIGOR
62:14 study?
62:15     A.   No, I have no idea.  I have
62:16 no idea.
62:17     Q.   You don't know how many
62:18 additional prescriptions were filled
62:19 after those results but before it was
62:20 taken off the market, do you?
62:21     A.   No.  I have no idea.

CC_defense4    64:7-64:11

64: 7     Q.   What we can agree on here
64: 8 perhaps is that it surely wasn't known at
64: 9 Merck at that time that Vioxx wasn't what
64:10 caused the heart attacks in the VIGOR

Δ's objection: misleading; foundation;
calls for speculation

π's response: Relevant. Sufficient foundation
to answer. Witness testifying
about her personal knowledge.

Irvin 2 rulings:   60:22 - 61:2   Overruled.
61:6 - 62:5   Overruled.
62:7 - 62:10   No ruling.
62:11 - 62:21   Sustained.

* see objection & response on next page.

Page 4

Cannuscio

64:11 study?

CC_defense5    64:16-65:2

64:16        THE WITNESS:  I think it was
64:17     an open question whether it --
64:18     whether Vioxx was a cause of heart
64:19     attacks in patients taking it.  I
64:20     think it was.
64:21 BY MS. LEWIS:
64:22      Q.   And with that open question,
64:23 do you believe it ethical as an
64:24 epidemiologist, based on your training,
65: Page 65
65: 1 for a company to continue to sell the
65: 2 product?

CC_defense6    65:10-66:18

65:10        THE WITNESS:  I personally
65:11     listening to the scientific
65:12     discussions that went on and --
65:13     and talking to people who were
65:14     experts in the field, for
65:15     instance, in pharmacoepidemiology,
65:16     for instance, talking to Dr.
65:17     Walker who used to be the chair of
65:18     epidemiology at Harvard and who's
65:19     widely respected in the field, he
65:20     engaged in a study with us to try
65:21     to understand whether or not Vioxx
65:22     was associated with increased
65:23     cardiovascular risk.
65:24        And I -- and I trust him so
66: Page 66
66: 1     completely, I trusted Dr. Guess
66: 2     and still trust Dr. Guess and
66: 3     Dr. Santanello so completely to do
66: 4     the right thing and -- and had
66: 5     full confidence that these people
66: 6     who -- with whom I was working
66: 7     also believed it truly to be an
66: 8     open question.  And -- and also,
66: 9     you know, institutional review
66:10     boards, reviewing clinical trials
66:11     and the FDA, I -- I had to trust
66:12     that -- that all of these systems
66:13     and all of these people who were
66:14     looking at all the available
66:15     evidence also shared my view that
66:16     it was an open question and that
66:17     it was, in fact, appropriate to
66:18     continue studies of the matter.

CC_defense7    66:20-66:21

Δ's objections: Foundation. Calls
for improper opinion
testimony.

π's response: Witness is an
epidemiologist & able to
offer a lay opinion
under R. 701 as to
what would have been an
ethical course of action
following VIGOR.

Irvin 2 ruling: Not applicable.

Cannuscio

66:20    Q.    And in your view, it was
66:21 most definitely an open question?

CC_defense8    67:1-67:2

67: 1         THE WITNESS: I saw it as an
67: 2    open question.

Δ's objections: Vague and ambiguous;
                foundation.

Π's response: Witness testifying to her own
               state of mind following the
               publication of VIGOR. No
               speculation.

Irvin 2 ruling: Not applicable.

CC010    76:23-77:2

76:23    Q.    Are you familiar with the
76:24 Kaiser Permanente August 25, 2004 study?
77: Page 77
77: 1    A.    I saw press reports of the
77: 2 Graham study I think you're referring to.

CC_defense9    77:3-77:15

77: 3    Q.    Yes.
77: 4    A.    But I don't — I don't know
77: 5 about it in detail.  Again, I was still
77: 6 on maternity leave when that study was —
77: 7 was presented.  And I didn't attend the
77: 8 scientific meeting where it was
77: 9 presented.
77:10    Q.    Generally speaking, you know
77:11 it to be a large nested, case control
77:12 study?
77:13    A.    I don't know any of the
77:14 details about the study.  I just know
77:15 that it received press attention.

CC011    77:16-77:19

77:16    Q.    Do you know that it showed a
77:17 three times increase in the — the rate
77:18 of an acute cardiac event for people on
77:19 50 milligrams of Vioxx?

Δ's objections: Foundation; mischaracteriza-
                tion; hearsay

Π's response: Proper cross-examination
               regarding witness's personal
               knowledge as a Merck
               epidemiologist.

Irvin 2 ruling: Overruled.

CC012    77:24-80:5

77:24         THE WITNESS: I — I don't
78: Page 78
78: 1    know about the exact results of
78: 2    the Graham study, and I'm not
78: 3    familiar with the design of the
78: 4    study or the population in which
78: 5    it was done.
78: 6 BY MS. LEWIS:
78: 7    Q.    Given your involvement with
78: 8 Vioxx and your continued role as a senior
78: 9 epidemiologist, you didn't review even
78:10 the newspaper information about the
78:11 Kaiser Permanente study?

* next page.

Page 6

Cannuscio

78:12     A.   I – I briefly read reports
78:13 of it.  But remember, I was on maternity
78:14 leave when it came out, and I was also
78:15 preparing to begin a new job, which I
78:16 have begun.  And I am taking care of my
78:17 child, so I was not the person
78:18 responsible for following that.  In my
78:19 absence, Dr. Watson was taking care of my
78:20 responsibilities in the epidemiology
78:21 department.  And my responsibilities at
78:22 home in August were -- weren't about
78:23 epidemiology.  They were about being a
78:24 mother.
79: Page 79
79: 1     Q.   I understand.  Do you
79: 2 understand that the authors in that study
79: 3 concluded that Vioxx increased the risk
79: 4 of acute myocardial infarction and sudden
79: 5 cardiac death at doses greater than
79: 6 25 milligrams?
79: 7     A.   I – I didn't know about the
79: 8 dose-specific findings from that study.
79: 9 I – I am not familiar with the specific
79:10 data or results from that study.  I am
79:11 just aware of the press reports that
79:12 there was an observation of increase in
79:13 relative risk.
79:14     Q.   Are you familiar with the
79:15 press reports that said that even at
79:16 lower doses, Vioxx appeared to have a
79:17 stronger association with heart problems
79:18 than Celebrex?
79:19     A.   From the -- from the Graham
79:20 study?
79:21     Q.   Yes.
79:22     A.   No, I'm not familiar with
79:23 that comparison with celecoxib.
79:24     Q.   Have you reviewed the recent
80: Page 80
80: 1 projection based on the Graham study of
80: 2 some 27,785 heart attacks and sudden
80: 3 cardiac deaths that would have been
80: 4 avoided if Celebrex had been used instead
80: 5 of Vioxx?

cc 8009   80:9-80:24

80: 9      THE WITNESS:  I haven't read
80:10    about that projection.
80:11 BY MS. LEWIS:
80:12     Q.   You have not seen those
80:13 numbers?
80:14     A.   You just named a
80:15 27,000-something.  No, I have not heard
80:16 that number before.

Page 7

---

Δ's objections: Foundation; argumentative;
    mischaracterizes evidence/record.

П's response: Permissible cross-examina-
    tion. Witness testifying
    regarding her personal lack
    of knowledge.  Rule 803 (18)
    as to 79:1 - 79:13.

Irvin 2 rulings:   77:24 - 78:5    Overruled.
                   78:7 - 78:24    Overruled.
                   79:1 - 79:13    Sustained.
                   79:14 - 80:5    Sustained.

Δ's objections: 801/802; 401 - 403;
    602; 411.

П's response: Permissible cross-
    examination about witness's
    knowledge. Lack of knowledge
    is relevant to her skill
    & competence as Merck scientist

Irvin 2 ruling:  Sustained.



Cannuscio

80:17      Q.   At any juncture, when you
80:18 first arrived at Merck or after any study
80:19 by Merck or anyone else that reported a
80:20 health risk with Vioxx, did you take any
80:21 steps on behalf of Merck to determine how
80:22 many heart attacks or sudden deaths would
80:23 have been avoided if patients hadn't been
80:24 taking Vioxx?

cc 8104    81:4-82:3

81: 4          THE WITNESS:  In other
81: 5      words, did I extrapolate from any
81: 6      available studies and make that
81: 7      kind of calculation?
81: 8 BY MS. LEWIS:
81: 9      Q.   Yes.
81:10      A.   I personally did not do
81:11 that.  I don't know if other people did
81:12 that.
81:13      Q.   You didn't see any such
81:14 calculation at Merck?
81:15      A.   No.
81:16      Q.   You weren't a part of any
81:17 such discussion?
81:18      A.   No.
81:19      Q.   At any juncture while you
81:20 were there, from when you first got there
81:21 right after VIGOR, you know, to date,
81:22 were you a part of any discussion
81:23 following a Merck study or someone else's
81:24 that showed a safety issue with Vioxx of
82: Page 82
82: 1 projected deaths or serious injuries that
82: 2 could be avoided if people no longer took
82: 3 Vioxx?

D's objections:  411; 401-403;  asked and
   answered;  foundation.

T's response:  withdrawn.

cc 8206    82:6-82:12

82: 6          THE WITNESS:  I think you're
82: 7      asking me if I ever calculated
82: 8      numbers like that or if I ever saw
82: 9      numbers like that calculated?
82:10 BY MS. LEWIS:
82:11      Q.   Yes.
82:12      A.   And the answer is no.

T:  withdraws testimony.

CC_defense10    82:13-82:15

82:13      Q.   You were never a part of any
82:14 discussion about deaths that could be
82:15 avoided if Vioxx were not prescribed?

D's objections:  Foundation;  prejudicial;
   misleading.

T's response:  withdrawn.

CC_defense11    82:20-83:18

Page 8

Cannuscio

```
82:20      THE WITNESS: The -- the
82:21      supposition you're making is that
82:22      at some other point it was
82:23      determined that Vioxx was causally
82:24      related to heart attacks, and then
83: Page 83
83: 1      a step was taken then to project,
83: 2      then, based on that causal
83: 3      interpretation. And as I've said
83: 4      before, until this recent removal
83: 5      of Vioxx from the market, it was
83: 6      my understanding that nobody in
83: 7      the scientific community at Merck
83: 8      had come to that conclusion, while
83: 9      taking into account the advice
83:10      from -- from experts as well and
83:11      from the FDA as well.
83:12         So -- and I've said -- no, I
83:13      was not part of any conversation
83:14      about projections based on
83:15      available data, projections in --
83:16      in excess cardiovascular events,
83:17      no. Not that I can remember,
83:18      anyway.
```

→ D's objections: Foundation; prejudicial misleading.

π's response: withdrawn.

CC025   83:20-84:3

```
83:20      Q.   You knew at every juncture
83:21      that if Vioxx was causing heart attacks,
83:22      the more people that took it, the more
83:23      heart attacks you'd see.  Right?
83:24      A.   If -- if it were known to be
84: Page 84
84: 1      causal, it would follow that -- that
84: 2      there would be elevated risk in -- in
84: 3      people who were taking it.
```

→ D's objections: 401/402 ; 403; 611; 602.

π's response: Permissible cross-examination. Witness's knowledge of CV risk associated with Vioxx is relevant to Merck's knowledge and to Merck's failure to warn.

Irvin 2 rulings: Sustained.

CC_defense12   84:23-85:3

```
84:23      Q.   Maybe we can get at it this
84:24      way.
85: Page 85
85: 1         The risks that Vioxx will
85: 2      cause a heart attack didn't just begin on
85: 3      September 30, 2004.  Correct?
```

CC_defense13   85:7-85:24

```
85: 7      THE WITNESS: I'm trying --
85: 8      I'm trying to -- your question is,
85: 9      did the risk with exposure begin
85:10      on -- on September whatever, the
85:11      end of September.  And now
85:12      retrospect -- retroactively going
85:13      back and looking at all the
```

→ D's objections: Foundation; misleading; argumentative; hearsay.

π's response: withdrawn.

Page 9

Cannuscio

```
85:14     available data today, we can make
85:15     that interpretation, that -- that
85:16     yes, there -- there was an
85:17     elevation in risk to people who
85:18     had taken it before.  But we
85:19     didn't have that kind of data
85:20     available prior to now.  And the
85:21     available data prior to that was
85:22     understood to leave the question
85:23     as an open one about whether or
85:24     not there was increased risk.
```

CC026    87:9-87:13

```
87: 9     Q.  Given the studies you've
87:10 seen over your four years at Merck,
87:11 you'll agree that some of the estimated
87:12 20 million persons who took Vioxx have
87:13 suffered heart attacks as a result?
```

CC027    87:17-87:21

```
87:17        THE WITNESS:  Today, using
87:18     the data available to us now.
87:19 BY MS. LEWIS:
87:20     Q.  Yes.
87:21     A.  That's probably true.
```

CC029    99:23-102:10

```
99:23     Q.  As the senior epidemiologist
99:24 at Merck, you're familiar with the May
100: Page 100
100: 1 29, 2004 Mamdani study in the Lancet?
100: 2     A.  First of all, I'm not the
100: 3 senior epidemiologist at Merck.  I'm not.
100: 4 I'm --
100: 5     Q.  As a --
100: 6     A.  I'm a junior scientist, and
100: 7 I'm -- the title happens to be senior
100: 8 epidemiologist.
100: 9        So -- and I know that
100:10 Mamdani did publish a study about --
100:11 about coxibs, yes.  So I'm not the senior
100:12 epidemiologist.
100:13     Q.  I meant to say a senior
100:14 epidemiologist.  I know you report to
100:15 Dr. Santanello.
100:16     A.  And the title -- I report to
100:17 Dr. Santanello, right.
100:18     Q.  Okay.  And in that article,
100:19 he reported a higher risk of congestive
100:20 heart failure among Vioxx users.
100:21 Correct?
100:22     A.  Oh, I -- I did not remember
```

Δ's objections:  401/402, 403, 611, 602 (vague
and ambiguous; misleading;
prejudicial)

Supplemental objection: improper
opinion testimony; foundation.

π's response: Question seeks witness's  personal
knowledge.  Witness understood
& answered question.  Relevant to
π's failure to warn claim.
Permissible to lead adverse witness.

Irwin 2 ruling: overruled.

→ see next page.

Cannuscio

100:23 that result from the Mamdani study.
100:24    Q.   You'll agree with me that
101: Page 101
101: 1 congestive heart failure is a serious
101: 2 safety issue?
101:3    A.   I -- I would agree that
101:4 cardio -- that -- that congestive heart
101:5 failure is a serious medical condition.
101: 6    Q.   Upon reviewing the study,
101: 7 did you or anyone at Merck undertake to
101: 8 determine how many episodes of congestive
101: 9 heart failure among Vioxx users would
101:10 have been prevented had Vioxx not been
101:11 used?
101:12    A.   So I think you're asking two
101:13 questions there.  Was there any effort to
101:14 investigate congestive heart failure
101:15 among Vioxx users?  It sounds like that's
101:16 the first part of your question.  And --
101:17 and the second part, did anyone
101:18 extrapolate from those data?  Is that
101:19 what you're asking?
101:20    Q.   I think it will get us to
101:21 the same place, yes.
101:22    A.   So my understanding is that
101:23 during any clinical trials, for instance,
101:24 if someone has a -- what's called a
102: Page 102
102: 1 serious adverse event, that it would be
102: 2 tracked, investigated and reported to the
102: 3 FDA.
102: 4    So I would assume that that
102: 5 would hold true for congestive heart
102: 6 failure, although I personally did not do
102: 7 research on congestive heart failure.
102: 8 And with regard to the second part, I'm
102: 9 not familiar with any projections about
102:10 congestive heart failure.

D's objections: Foundation; mischaracterizes record & evidence; irrelevant; calls for speculation.

TIS response: withdrawn.

CC033    102:13-102:20

102:13    Q.   You know that in May of
102:14 2004, Circulation published a study by
102:15 Dr. Daniel Solomon, Dr. Jerry Avorn and
102:16 others.
102:17    A.   I do.
102:18    Q.   And that was about four
102:19 months prior to the recall of Vioxx.
102:20 Correct?

CC035    102:24-103:15

102:24    THE WITNESS:  Right, about
103: Page 103
103: 1    four months prior to the recall.

Page 11

Cannuscio

103: 2 BY MS. LEWIS:
103: 3      Q.   Do you have any idea of the
103: 4 number of people that took Vioxx between
103: 5 May 2004 and September 30th?
103: 6      A.   I -- again, I'm not familiar
103: 7 with prescription data, so no, I don't
103: 8 know the numbers.
103: 9      Q.   At least initially you were
103:10 identified as an author on that study.
103:11 Right?
103:12      A.   Correct.
103:13      Q.   And Merck's senior
103:14 management made a decision to remove you
103:15 as an author of that study.  Right?

CC037    103:19-104:5

103:19        THE WITNESS:  I -- I
103:20      understand that my supervisor,
103:21      Dr. Santanello, made a decision
103:22      that it would be appropriate for
103:23      me to be removed as an author.
103:24 BY MS. LEWIS:
104: Page 104
104: 1      Q.   Is she Merck senior
104: 2 management?
104: 3      A.   I don't know what -- who's
104: 4 included in the formal definition of the
104: 5 term.  She's senior to me, certainly.

CC038    108:3-109:24

108: 3      Q.   As of the time you went on
108: 4 maternity leave, you were to be named as
108: 5 an author on the paper?
108: 6      A.   The discussion had come up
108: 7 before that at various points of whether
108: 8 or not I should be included as a
108: 9 co-author.  But I believe that when I
108:10 went out on maternity leave -- when I
108:11 went out on maternity leave, I don't
108:12 think I was thinking about whether or not
108:13 I was going to be an author on the paper.
108:14 But I -- but if someone had asked me, I
108:15 would have probably thought that I would
108:16 have been an author on the paper at that
108:17 time.
108:18      Q.   You had done a lot of work?
108:19      A.   I had done a lot of work.  I
108:20 had really done a lot of work, yes.
108:21      Q.   Was your name on the
108:22 abstract that went to the FDA?
108:23      A.   I don't know if the author's
108:24 names were included on the abstract that
109: Page 109

Page 12

Cannuscio

109: 1 went to the FDA, but it was included in
109: 2 the abstract that was presented at the
109: 3 American College of Rheumatology meeting.
109: 4      Q.   And was there a poster
109: 5 involved in that as well?
109: 6      A.   I'm sure there -- well, it
109: 7 might have been a presentation, actually,
109: 8 rather than a poster.
109: 9      Q.   And your name was included
109:10 in that?
109:11      A.   I -- I would assume so.  I
109:12 would hope so.  But I don't --
109:13      MR. PATRYK:  I caution you
109:14 not to speculate, Doctor.              → *objection should be removed.*
109:15      THE WITNESS:  Yeah.  I
109:16 haven't seen the front page of
109:17 that.  But my name was definitely
109:18 on the abstract.  But -- and
109:19 that's usually what people use as
109:20 the reference for these meetings.
109:21 BY MS. LEWIS:
109:22      Q.   Is it fair to say the
109:23 decision to remove you as an author was
109:24 over your objection?

CC040   110:4-110:16

110: 4      THE WITNESS:  I -- I was
110: 5 disappointed in the decision and
110: 6 had hoped to be included as an
110: 7 author on the paper.
110: 8 BY MS. LEWIS:
110: 9      Q.   What were the reasons given
110:10 to you for removing your name as an
110:11 author on the paper?
110:12      A.   It was my understanding that
110:13 the paper didn't adequately discuss the
110:14 limitations of the data, for instance.
110:15      Q.   That was the position of
110:16 Drs. Watson, Guess and Ms. Lahner?

CC041   110:20-111:10

110:20      THE WITNESS:  I can't speak
110:21 for all of them, but -- but
110:22 Dr. Santanello held the view and I
110:23 think still holds the view that
110:24 the paper didn't adequate --
111: Page 111
111: 1 adequately discuss or address the
111: 2 limitations of this study.
111: 3 BY MS. LEWIS:
111: 4      Q.   The final version of that
111: 5 article that doesn't have your name
111: 6 anywhere, it implies that there's no

Cannuscio

111: 7 contribution from any Merck employee in
111: 8 study design, statistical analysis or
111: 9 preparation of the manuscript, doesn't
111:10 it?

CC042    111:14-112:12

111:14        THE WITNESS: Well,
111:15    ironically, my name is actually in
111:16    the manuscript in -- in a
111:17    footnote. So it actually is on
111:18    the manuscript. So there is --
111:19    there is a mention in there that a
111:20    Merck epidemiologist was involved.
111:21    I don't know if it says that I'm
111:22    an epidemiologist, but it does say
111:23    in a footnote Dr. Cannuscio, an
111:24    employee of Merck.
112: Page 112
112: 1 BY MS. LEWIS:
112: 2     Q.   Did that footnote remain in
112: 3 the published article?
112: 4     A.   It did.
112: 5     Q.   Have you seen the published
112: 6 article?
112: 7     A.   I've seen photocopies of the
112: 8 published article.
112: 9     Q.   Who told you that the
112:10 footnote with your name in it remained on
112:11 the final published article in
112:12 Circulation?

CC044    112:18-112:24

112:18        THE WITNESS: So I haven't
112:19    picked up the edition of
112:20    Circulation, but I've -- I've had
112:21    either printed PDF files or
112:22    photocopies. And in the versions
112:23    I've seen, at least, my name is in
112:24    a footnote.

CC045    113:15-114:18

113:15    Q.   Will you confirm with me in
113:16 Exhibit 8 that your name is not in the
113:17 footnote?
113:18    A.   This sentence that says,
113:19 "Other than Dr. Cannuscio, an employee of
113:20 Merck, no authors have direct personal
113:21 financial relationship with any
113:22 pharmaceutical company." And that's on
113:23 the version in Exhibit 7 where I'm not
113:24 listed as an author. So it refers to me
114: Page 114

Note: Plaintiff's Ex. 1.1466 appears
on screen.

Page 14

Cannuscio

114: 1 as an author although I'm not listed as
114: 2 an author.  And then in this copy that
114: 3 you've given me, which you said you
114: 4 downloaded —
114: 5     Q.   I downloaded Exhibit 7.
114: 6     A.   And then this one you —
114: 7     Q.   Is the published copy.
114: 8     A.   From the journal itself?
114: 9     Q.   Yes.
114:10     A.   Okay.  So in that version,
114:11 the sentence that I just read is no
114:12 longer there.  But I wasn't aware that
114:13 that's the way it looks in the magazine,
114:14 the journal itself.  I've only seen this
114:15 version prior to right now.
114:16     Q.   Do you know who from Merck
114:17 called Circulation to get that footnote
114:18 out of the article?

CC046   114:22-115:12

114:22        THE WITNESS:  I — I didn't
114:23     know that it was removed.  So no,
114:24     I didn't know if a Merck person
115: Page 115
115: 1     called Circulation to have it
115: 2     removed or that a Merck person
115: 3     called to have it removed.  I — I
115: 4     didn't know it was removed.
115: 5 BY MS. LEWIS:
115: 6     Q.   The statement in the final
115: 7 published article that says, "No authors
115: 8 have direct personal financial
115: 9 relationships with any pharmaceutical
115:10 company" is somewhat misleading, given
115:11 your role in this work and drafting this
115:12 article, isn't it?

CC047   116:3-116:11

116: 3     Q.   It's certainly true that at
116: 4 the time you did your work on the Solomon
116: 5 study and worked on authoring the Solomon
116: 6 paper, you had a financial relationship
116: 7 with Merck?
116: 8     A.   Right.  I was an employee of
116: 9 Merck while I was working with Dr.
116:10 Solomon — while I was working with him
116:11 in — in doing the study.

CC048   124:21-124:24

124:21     Q.   And did you participate
124:22 actively in the study design of the
124:23 Solomon studies?

Page 15

Note: Plaintiff's Ex. 2.0017 appears on screen.

Δ's objections: Foundation; misleading; 401-403; cell.

π's response: Leading permissible since an adverse witness. The fact that the witness's name was removed as an author of the article is relevant to π's failure to warn claim. Also, relevant to Merck's knowledge of defect.

Irvin 2 ruling: Overruled.

Δ's objections: cell; 401-403.

Supplemental objection: Question w/o answer; misleading; argumentative.

π's response: Same response as above. Answer appears at 116:8-11. Relevant to Merck's pattern of manipulating or attempting to manipulate scientific subsequent publications to knowledge of the CV risks associated with ingesting Vioxx. Relevant to π's failure to warn claim.

Cannuscio

124:24    A.  I did. I did. Absolutely.

CC049    125:13-126:8

125:13    Q.  And you did statistical
125:14 analysis and you interpreted data, didn't
125:15 you?
125:16    A.  I assisted with -- I
125:17 assisted with the study design, the data
125:18 analysis, interpretation and reviews of
125:19 the manuscript. I -- I participated in
125:20 all of those things. There's no question
125:21 whatsoever about whether or not I
125:22 participated in those things.
125:23    Q.  There's an acknowledgment on
125:24 the last page of Exhibit 8 that says, "We
126: Page 126
126: 1 want to thank an epidemiologist who
126: 2 participated actively in the study
126: 3 design, statistical analysis and
126: 4 interpretation of the data, and
126: 5 preparation of the manuscript."
126: 6    Are you that epidemiologist?
126: 7    A.  I would say you're welcome.
126: 8 That's -- I think that's probably me.

CC051    127:1-128:7

127: 1    Q.  While you were on maternity
127: 2 leave, did you notice the quote of the
127: 3 JAMA editor, Dr. DeAngelis, about the
127: 4 exclusion of your name from the list of
127: 5 authors?
127: 6    A.  I remember her being quoted,
127: 7 but could you read the quote to me?
127: 8    Q.  If the people up there in
127: 9 the list of authors aren't responsible
127:10 for everything in the article,
127:11 something's wrong. It's completely
127:12 unethical.
127:13    Do you recall that?
127:14    A.  I remember that.
127:15    Q.  Do you recall reading that
127:16 she wondered whether or not Merck was
127:17 looking for the truth?
127:18    A.  Can you read me that quote?
127:19 I -- I remember her being quoted, but I
127:20 don't remember the words that she used.
127:21    Q.  Aren't they seeking truth?
127:22    Do you recall that?
127:23    A.  Oh, now -- yeah, I recall
127:24 it. And I was. I was hired to look for
128: Page 128
128: 1 answers. And that was my job. And I was
128: 2 participating in this study and others to

Δ's objections:  401 - 403

Supplemental objection: Hearsay;
               Foundation.

Π's response:  The fact that the witnesses
name was removed as an
author on the article is relevant
both to Π's failure to warn
claim & to Merck's knowledge
of the defective nature of Vioxx.
Statement of Dr. DeAngelis
offered for notice not truth
of matter.

Irvin 2 ruling:  overruled.

→ Continued.

Cannuscio

128: 3 try to get to the bottom of the question
128: 4 that existed about the safety of the
128: 5 COX-2 inhibitors and NSAIDs. So I, as a
128: 6 scientist, and my colleagues I think were
128: 7 actually wanting to know.

CC052   130:18-132:5

130:18       You were going to be listed
130:19 as an author, and I assumed you were in
130:20 agreement with the conclusions expressed
130:21 there.
130:22    A.   Well, I -- I agree that the
130:23 data accurately represent the protocol
130:24 that we had put together and the analysis
131: Page 131
131: 1 that we had done together. And I agree
131: 2 that those accurately reflect -- that the
131: 3 data accurately reflects the analysis
131: 4 that had been done.
131: 5    Q.   You don't share Dr.
131: 6 Solomon's feelings that Merck should have
131: 7 withdrawn the product two years before?
131: 8    A.   Did Dr. Solomon say that?
131: 9    Q.   Do you know that Dr. Solomon
131:10 stopped giving Vioxx to his patients two
131:11 years earlier?
131:12    A.   Now that you say that, I
131:13 think I remember this week reading
131:14 something like that in the newspaper.
131:15    Q.   Were you the sole Merck
131:16 epidemiologist involved in the Solomon
131:17 study?
131:18    A.   No; but I was the main
131:19 epidemiologist involved in the study.
131:20    Q.   I take it Drs. Santanello,
131:21 Guess and Watson would have in some way
131:22 helped you design the study?
131:23    A.   I consulted them.
131:24    Q.   And that study showed an
132: Page 132
132: 1 increase of heart attack among Vioxx
132: 2 users. Correct?
132: 3    A.   The relative risks for some
132: 4 of the comparisons were greater than
132: 5 1.00.

D's objections: Foundation; calls for
                 speculation; prejudicial;
                 hearsay

Π's response: Witness answering fact
               questions within her personal
               knowledge. No speculations.
               No out-of-court statements at issue
               Witness understood questions & answered

Irvin 2 ruling: overruled.

Total Length - 00:28:31

Barnett Merck Counter Designations- Cannuscio         Π's objectives: None.

[31:19] - [32:20]     6/2/2006     Cannuscio, Carolyn 10/08/04 corrected

• Barnett~ Merck Counter Designations

page 31
19          Q.     Who were the outside
20   consultants that you generally referred
21   Vioxx issues to while you were senior
22   epidemiologist at Merck?
23          A.     So who did I ask for help as
24   an epidemiologist or who did Merck ask
page 32
          CONFIDENTIAL - SUBJECT TO PROTECTIVE OR32R
1    for help?
2          Q.     We'll take them one at a
3    time.
4                 Who did you ask for help?
5          A.     So in these collaborations
6    I've talked to you about, for instance,
7    the Ingenix United HealthCare study,
8    Dr. Alex Walker works for Ingenix and
9    is -- is an epidemiologist who I would
10   ask for help in methodological issues,
11   for instance.  And I mentioned to you Dr.
12   Mary Chester Wasko and Dr. Mark Genovese
13   who are rheumatologists.
14                So most of the people I --
15   in my role who I would recommend would --
16   would have been, you know, like Dr. Alex
17   Walker, an epidemiologist, to bring
18   methods or expertise or a clinician,
19   because I'm not a clinician, to provide
20   that kind of perspective.

[48:21] - [50:9]     6/2/2006     Cannuscio, Carolyn 10/08/04 corrected

• Barnett~ Merck Counter Designations

page 48
21          Q.     Following the Solomon study,
22   did you recommend that Merck withdraw
23   Vioxx from the market?
24          A.     Following the publication of
page 49
          CONFIDENTIAL - SUBJECT TO PROTECTIVE OR49R
1    the -- of the Solomon study in
2    Circulation, no, I did not recommend that
3    Merck withdraw Vioxx from the market.
4          Q.     Following the completion of
5    the study, but I guess that's about five
6    months before its publication or six
7    months, did you recommend that Merck
8    withdraw Vioxx from the market?
9          A.     As I've said, no, I did not
10   recommend to the corporation that -- that
11   Vioxx be withdrawn from the market.
12          Q.     Did Dr. Solomon?
13          A.     To me?
14          Q.     To Merck.
15          A.     I -- well, in my
16   conversations, Dr. Solomon did not
17   recommend to me that -- that Merck remove
18   Vioxx from the market, no.
19          Q.     Did any other authors of the
20   paper in Circulation recommend to Merck
21   that it withdraw Vioxx from the market at
22   that time?
23          A.     I don't know about any
24   communications the co-authors may have
page 50
          CONFIDENTIAL - SUBJECT TO PROTECTIVE OR50R
1    had with other people at Merck.  If there
2    were any, I am not aware of them.  But --

Barnett Merck Counter Designations- Cannuscio

```
3   but Dr. Solomon, Dr. Avorn, they did not
4   recommend to me as an individual that --
5   that Vioxx be removed from the market,
6   nor did they ask me to tell Merck that
7   Vioxx should be removed from the market.
8       Q.    They concluded it was
9   dangerous?
```

[50:14] - [51:22]        6/2/2006        Cannuscio, Carolyn 10/08/04 corrected

• Barnett~ Merck Counter Designations

```
page 50
14      Q.    Correct?
15      A.    I -- I think that -- well,
16  you -- you're asking me for their
17  interpretation of the data.  They came to
18  relative risks that we could speak about
19  in detail if you -- if you wanted me to
20  look at the paper with you.
21          But to make a -- I as an
22  epidemiologist was trained that one
23  epidemiological study does not prove
24  anything, that it can add to a
page 51
        CONFIDENTIAL - SUBJECT TO PROTECTIVE OR51R
1   discussion, that we can make
2   observations, but that there's not proof
3   as a result of an observational study.
4   So that's -- I don't know what their
5   conclusion was overall about -- about
6   Vioxx, but they did -- they definitely
7   did not say to me Merck should remove
8   Vioxx from the market.  They definitely
9   did not.
10      Q.    And in none of your
11  discussions with them working on the --
12  working with them on the project and
13  analyzing the data did they say this
14  drug's dangerous, it's a safety problem?
15      A.    They may have said we have
16  an elevated relative risk.  And -- and
17  they did not say to me, though, you know,
18  definitively this solves it, this means
19  that the drug is dangerous and should be
20  removed from the market.  No, they did
21  not.  They -- Dr. Solomon and Dr. Avorn
22  did not say that to me.
```

[64:7] - [64:11]        6/2/2006        Cannuscio, Carolyn 10/08/04 corrected

• Barnett~ Merck Counter Designations

```
page 64
7       Q.    What we can agree on here
8   perhaps is that it surely wasn't known at
9   Merck at that time that Vioxx wasn't what
10  caused the heart attacks in the VIGOR
11  study?
```

[64:16] - [65:2]        6/2/2006        Cannuscio, Carolyn 10/08/04 corrected

• Barnett~ Merck Counter Designations

```
page 64
16          THE WITNESS:  I think it was
17  an open question whether it --
18  whether Vioxx was a cause of heart
19  attacks in patients taking it.  I
20  think it was.
21  BY MS. LEWIS:
22      Q.    And with that open question,
23  do you believe it ethical as an
```

Barnett Merck Counter Designations- Cannuscio

```
24  epidemiologist, based on your training,
page 65
        CONFIDENTIAL - SUBJECT TO PROTECTIVE OR65R
1   for a company to continue to sell the
2   product?
```

[65:10] - [66:18]      6/2/2006      Cannuscio, Carolyn 10/08/04 corrected

• Barnett~ Merck Counter Designations

```
page 65
10              THE WITNESS:  I personally
11          listening to the scientific
12          discussions that went on and --
13          and talking to people who were
14          experts in the field, for
15          instance, in pharmacoepidemiology,
16          for instance, talking to Dr. Alex
17          Walker who used to be the chair of
18          epidemiology at Harvard and who's
19          widely respected in the field, he
20          engaged in a study with us to try
21          to understand whether or not Vioxx
22          was associated with increased
23          cardiovascular risk.
24              And I -- and I trust him so
page 66
        CONFIDENTIAL - SUBJECT TO PROTECTIVE OR66R
1           completely, I trusted Dr. Guess
2           and still trust Dr. Guess and
3           Dr. Santanello so completely to do
4           the right thing and -- and had
5           full confidence that these people
6           who -- with whom I was working
7           also believed it truly to be an
8           open question.  And -- and also,
9           you know, institutional review
10          boards, reviewing clinical trials
11          and the FDA, I -- I had to trust
12          that -- that all of these systems
13          and all of these people who were
14          looking at all the available
15          evidence also shared my view that
16          it was an open question and that
17          it was, in fact, appropriate to
18          continue studies of the matter.
```

[66:20] - [66:21]      6/2/2006      Cannuscio, Carolyn 10/08/04 corrected

• Barnett~ Merck Counter Designations

```
page 66
20          Q.    And in your view, it was
21  most definitely an open question?
```

[77:3] - [77:15]      6/2/2006      Cannuscio, Carolyn 10/08/04 corrected

• Barnett~ Merck Counter Designations

```
page 77
3           Q.    Yes.
4           A.    But I don't -- I don't know
5   about it in detail.  Again, I was still
6   on maternity leave when that study was --
7   was presented.  And I didn't attend the
8   scientific meeting where it was
9   presented.
10          Q.    Generally speaking, you know
11  it to be a large nested, case control
12  study?
13          A.    I don't know any of the
14  details about the study.  I just know
15  that it received press attention.
```

**Barnett Merck Counter Designations- Cannuscio**

[82:13] - [82:15]    6/2/2006    Cannuscio, Carolyn 10/08/04 corrected

```
page 82
13            Q.    You were never a part of any
14   discussion about deaths that could be
15   avoided if Vioxx were not prescribed?
```

[82:20] - [83:18]    6/2/2006    Cannuscio, Carolyn 10/08/04 corrected

• Barnett~ Merck Counter Designations

```
page 82
20                   THE WITNESS:  The -- the
21             supposition you're making is that
22             at some other point it was
23             determined that Vioxx was causally
24             related to heart attacks, and then
page 83
         CONFIDENTIAL - SUBJECT TO PROTECTIVE OR83R
1              a step was taken then to project,
2              then, based on that causal
3              interpretation.  And as I've said
4              before, until this recent removal
5              of Vioxx from the market, it was
6              my understanding that nobody in
7              the scientific community at Merck
8              had come to that conclusion, while
9              taking into account the advice
10             from -- from experts as well and
11             from the FDA as well.
12                  So -- and I've said -- no, I
13             was not part of any conversation
14             about projections based on
15             available data, projections in --
16             in excess cardiovascular events,
17             no.  Not that I can remember,
18             anyway.
```

[84:23] - [85:3]    6/2/2006    Cannuscio, Carolyn 10/08/04 corrected

• Barnett~ Merck Counter Designations

```
page 84
23            Q.    Maybe we can get at it this
24   way.
page 85
         CONFIDENTIAL - SUBJECT TO PROTECTIVE OR85R
1                   The risks that Vioxx will
2    cause a heart attack didn't just begin on
3    September 30, 2004.  Correct?
```

[85:7] - [85:24]    6/2/2006    Cannuscio, Carolyn 10/08/04 corrected

• Barnett~ Merck Counter Designations

```
page 85
7                   THE WITNESS:  I'm trying --
8              I'm trying to -- your question is,
9              did the risk with exposure begin
10             on -- on September whatever, the
11             end of September.  And now
12             retrospect -- retroactively going
13             back and looking at all the
14             available data today, we can make
15             that interpretation, that --- that
16             yes, there -- there was an
17             elevation in risk to people who
18             had taken it before.  But we
19             didn't have that kind of data
20             available prior to now.  And the
21             available data prior to that was
22             understood to leave the question
23             as an open one about whether or
```

**Barnett Merck Counter Designations- Cannuscio**

24          not there was increased risk.