Π's Affirmative Designations:

· transcript contains:

1. Δ's objections

2. Π's responses

3. Ct's previous rulings in Irvin 2.

Carroll

Carroll (Multi-clip)
JC001    15:11-15:19

15:11      Q.   Mr. Carroll, state your name
15:12 for the record, please.
15:13      A.   J. Martin Carroll.
15:14      Q.   Mr. Carroll, where are you
15:15 employed now?
15:16      A.   Boehringer Ingelheim.
15:17      Q.   What do you do with that
15:18 company?
15:19      A.   I'm president and CEO.

JC002    17:6-17:13

17: 6      Q.   And then how long have you
17: 7 been president and CEO of that company?
17: 8      A.   Just over three years.
17: 9      Q.   And before then, how many
17:10 years had you been employed in the area
17:11 of pharmaceuticals in any capacity?
17:12      A.   I was at Merck just over 25
17:13 years.

JC003    18:21-20:4

18:21      Q.   Now, sir, would you describe
18:22 what you're looking at here?
18:23      A.   It's an organizational
18:24 chart.
19: Page 19
19: 1      Q.   And in that organization,
19: 2 you have -- describe what you're looking
19: 3 at as far as where you fall in that
19: 4 organization from that chart.
19: 5      A.   The top of the chart is
19: 6 David Anstice, listed as president, The
19: 7 Americas, and I'm in one of the boxes
19: 8 underneath that, listed as J. Martin
19: 9 Carroll, Executive Vice President,
19:10 Primary Care Sales & Managed Care.
19:11      Q.   And how long did you hold
19:12 that position?
19:13      A.   I held that position about
19:14 three years.
19:15      Q.   And tell us what your role
19:16 was in that position.
19:17      A.   My role in the position was
19:18 primary care sales, which would have been
19:19 part of the sales group, not all of the
19:20 sales groups.  There was also a managed
19:21 care group that I led.
19:22      Q.   How many years did you do
19:23 that?

Carroll

19:24    A.   About three years.
20: Page 20
20: 1    Q.   And before then, what did
20: 2 you do with Merck?
20: 3    A.   Before then, I led the
20: 4 managed care group for about three years.

JC004    44:5-44:9

44: 5    Q.   It's important that once a
44: 6 sales organization goes out, that the
44: 7 sales organization certainly talk about
44: 8 issues that are known or knowable in the
44: 9 company about potential dangers; correct?

JC005    44:12-45:7

44:12        THE WITNESS: No.  We have
44:13    to be clear here.  A sales
44:14    representative, by policy, has to
44:15    be consistent with the label, and
44:16    there's approaches and processes
44:17    by which science gets submitted to
44:18    the FDA and gets, you know, placed
44:19    in the label.  That's one
44:20    discussion about what sales reps
44:21    do.
44:22        In terms of the company and
44:23    knowledge, I have full confidence
44:24    that this company always studied
45: Page 45
45: 1    drugs on an ongoing basis and
45: 2    always put that information into
45: 3    the public domain in ways that are
45: 4    consistent with how science does
45: 5    that, but that's different from
45: 6    representatives promoting the
45: 7    product.

JC006    95:23-96:15

95:23    Q.   Mr. Carroll, now, you say
95:24 one thing is, the information that you
96: Page 96
96: 1 share with representatives or sales
96: 2 representatives is information that you
96: 3 share so they can pass on to the doctor.
96: 4 We've talked about that concept; right?
96: 5    A.   Yes.
96: 6    Q.   And we just -- I just asked
96: 7 you about the fact, you certainly don't
96: 8 want to take unnecessary risks when
96: 9 you're giving information to the doctors;
96:10 correct?
96:11    A.   We want to make sure that we

Page 2

Carroll

96:12 give the doctors the appropriate
96:13 information consistent with the label.
96:14     Q.    Let me show you Number 8,
96:15 please.

JC007   96:24-98:7

96:24     Q.    Have you ever seen this
97: Page 97
97: 1 before?
97: 2     A.    I recall this.
97: 3     Q.    Take a minute and look at it
97: 4 and see if you are familiar.  This is a
97: 5 CV card, isn't it?  Cardiovascular card
97: 6 is what y'all referred to this as?
97: 7     A.    Yes.  I remember that, yes.
97: 8     Q.    "Cardiovascular Event
97: 9 Profile."  Do you see that on, let's see,
97:10 the third page over?
97:11     A.    Yes, I see that.
97:12     Q.    Do you see where it has the
97:13 third page over, it has that chart there?
97:14     A.    Yes, I've got it.
97:15     Q.    Do you see where it says,
97:16 will have Vioxx 12 milligrams, Vioxx 25
97:17 milligrams, Vioxx 50 milligrams.  Do you
97:18 see that?
97:19     A.    Yes, I do.
97:20     Q.    It has ibuprofen next to it
97:21 and then nabumetone.  Do you see that?
97:22     A.    Yes, I do.
97:23     Q.    Tell me, you have actually
97:24 -- you're familiar with the fact that
98: Page 98
98: 1 salespeople actually use this when they
98: 2 talk to doctors.  You know that, don't
98: 3 you?
98: 4     A.    What I remembered about the
98: 5 CV card was, it was to respond to
98: 6 questions the doctor might have on the CV
98: 7 risk.

JC008   99:19-101:5

99:19     Q.    And then so what you had is,
99:20 you had the CV card, so when the issue
99:21 about CV risk came out, you could tell
99:22 the doctor any information that you have
99:23 about CV risk; correct?
99:24     A.    The purpose of this, because
100: Page 100
100: 1 it was a representative that was
100: 2 promoting it, was to, consistent with the
100: 3 label, go through the cardiovascular risk
100: 4 that was consistent with the label at the

↓
continued

Δ's objections : Irrelevant; prejudicial;
hearsay (CV card)

π's response : Merck's representations
about CV safety of Vioxx are
relevant to π's failure to warn
claim.

Irvin 2 ruling : Overruled.

Δ's objections: Irrelevant;
prejudicial; hearsay (CV card)

π's response: same as above.

Irvin 2 ruling : Overruled.

Page 3

Carroll

100: 5 time.
100: 6      Q.   You see where it says
100: 7 "nabumetone" up to the right there?
100: 8      A.   Yes.
100: 9      Q.   See underneath that, what
100:10 does it say?  It says, "The incidence of
100:11 events was similar among the groups."  Do
100:12 you see that?
100:13      A.   Yes, I see that.
100:14      Q.   I read that right.  It says,
100:15 "The incidence of events" and we're
100:16 talking about cardiovascular events, "was
100:17 similar among the groups."  Correct?
100:18      A.   That's what it says, yes.
100:19      Q.   So, you can assume if that
100:20 was there, written there with this chart,
100:21 that what you're telling doctors is that
100:22 the incidence of cardiovascular events
100:23 was similar between Vioxx and nabumetone;
100:24 correct?
101: Page 101
101: 1      A.   That's what this says, yes.
101: 2      Q.   That's what you had
101: 3 salespeople actually -- that's what you
101: 4 had salespeople actually telling doctors;
101: 5 is that correct?

JC009   101:8-102:23

101: 8          THE WITNESS:  The
101: 9    salespeople had to be consistent
101:10    with the labeling.  And as I
101:11    recall, it's a long time ago, this
101:12    information was consistent with
101:13    the labeling at the time.
101:14 BY MR. PAPANTONIO:
101:15      Q.   But if we're looking at --
101:16 in other words, I don't want to -- I
101:17 don't want to -- I want to make sure
101:18 we're talking about the exact same thing
101:19 here, Mr. Carroll.
101:20          This cardiovascular event
101:21 profile that I'm showing you right now
101:22 where it says, "The incidence of events
101:23 was similar among the groups," do you see
101:24 that?
102: Page 102
102: 1      A.   Yes.
102: 2      Q.   Then above that, right above
102: 3 it, it's comparing Vioxx and nabumetone.
102: 4 Do you see that?
102: 5      A.   Yes.
102: 6      Q.   So, it's saying that the
102: 7 incidence of events was similar among
102: 8 Vioxx and nabumetone; correct?

→ Δ's objections: Irrelevant;
   prejudicial; hearsay (CV card)

П's response: Merck's representations regarding
   CV safety are relevant to
   П's failure to warn claim.

Irvin 2 ruling: Overruled

Carroll

102: 9    A.   Right.
102:10    Q.   So, as a matter of fact,
102:11 it's even saying Vioxx was similar in
102:12 cardiovascular events to placebo;
102:13 correct?
102:14    A.   Correct.
102:15    Q.   And placebo is a sugar pill?
102:16    A.   That's correct.
102:17    Q.   And so what the people in
102:18 the sales force were doing is they were
102:19 going out and telling doctors that the
102:20 incidence of risk is similar between
102:21 Vioxx and placebo, and the cardiovascular
102:22 event was also similar between Vioxx and
102:23 nabumetone.  We can agree to that?

JC011    103:2-103:9

103: 2         THE WITNESS:  What I'm
103: 3    agreeing to is, at the time this
103: 4    card was being used, as far as I
103: 5    recall, the information on the
103: 6    card was consistent with the label
103: 7    for Vioxx.
103: 8         MR. PAPANTONIO:  Would you
103: 9    please show him document 235.

JC013    103:19-108:11

103:19    Q.   Sir, do you see the first
103:20 page on that document?
103:21    A.   Yes.
103:22    Q.   "February 1, 2001."  Do you
103:23 see that?
103:24    A.   Yes.
104: Page 104
104: 1    Q.   And you see where it says,
104: 2 "Name Of Drug" -- well, "MK-0966," you
104: 3 see that?
104: 4    A.   Yes.
104: 5    Q.   "Trade Name:  Vioxx"?
104: 6    A.   Yes.
104: 7    Q.   And that comes -- that
104: 8 memorandum is "Division of Cardio-Renal
104: 9 Drug Products, HFD...Food & Drug
104:10 Administration."  That's the FDA;
104:11 correct?
104:12    A.   That's right.
104:13    Q.   And have you ever seen this
104:14 before me showing this to you?
104:15    A.   I've not seen this before.
104:16    Q.   Now, did you know that the
104:17 FDA actually took a look at comparative
104:18 studies that were done to find out
104:19 whether there were increased

↓
**continued**

→ Δ's objections: Speculation

Π's response: Witness testifying to personal knowledge. No speculation.

Irvin 2 ruling: Overruled.

→ Δ's objections: Speculation;
     lack of Knowledge

Π's response: Witness is in charge of sales for Merck. The fact that he does not know about studies is relevant. FDA document also offered to impeach CV card & the witness.

Irvin 2 ruling: Overruled.

Page 5

Carroll

104:20 cardiovascular events when we compared
104:21 people taking Vioxx and people taking
104:22 placebo and people taking nabumetone?
104:23 Did you know that?
104:24      A.   I'm not familiar with those
105: Page 105
105: 1 particular studies or submission to the
105: 2 FDA.
105: 3      Q.   Well, could you go to Page
105: 4 24 of that document?  The page number is
105: 5 going to be down in the bottom right-hand
105: 6 corner.
105: 7      A.   I see it.  Thank you.  Okay.
105: 8      Q.   Do you see it says,
105: 9 "Comments:  This is a large comparative
105:10 study using rofecoxib 50 mg daily and
105:11 naproxen 1000 mg daily in patients with
105:12 rheumatoid arthritis."  Now, if you'll
105:13 read this with me now, it says, "A
105:14 significant difference is seen in the
105:15 composite of stroke, myocardial
105:16 infarction, and cardiac death which is
105:17 unfavorable for rofecoxib; consistent
105:18 with this result are the time-to-event
105:19 tables, and myocardial infarction,
105:20 and...cardiovascular death events."
105:21         Now, I want to ask you
105:22 something.  What's rofecoxib?  It's
105:23 Vioxx, isn't it?
105:24      A.   I believe that's the generic
106: Page 106
106: 1 name or the generic for Vioxx, yes.
106: 2      Q.   And the words here say, "A
106: 3 significant difference is seen in the
106: 4 composite of stroke, myocardial
106: 5 infarction, and cardiac death which is
106: 6 unfavorable for" Vioxx or "rofecoxib."
106: 7 Do you see that?
106: 8      A.   Yes.
106: 9      Q.   Do you see where it says
106:10 "Study 085" right up underneath there?
106:11      A.   Yes, I see that.
106:12      Q.   You'd never study 085 during
106:13 the time that you were talking to
106:14 salespeople; is that right?
106:15      A.   Not to my knowledge, no.
106:16      Q.   Let's describe -- Study 085
106:17 is "A Randomized Placebo-Controlled
106:18 Parallel Group, Double Blind Study to
106:19 Evaluate the Efficacy and Safety of
106:20 MK-0966 12 mg vs. Nabumetone 1000 mg in
106:21 Patients with Osteoarthritis of the
106:22 Knee." Do you see that?
106:23      A.   Yes, I do.
106:24      Q.   Then it goes on to say -- do

↓
Continued

Page 6

Carroll

107: Page 107
107: 1 you see where it says "Results" there up
107: 2 underneath the very next thing?
107: 3     A.   Yes.  I've got it.
107: 4     Q.   "1459 patients were
107: 5 screened."  It talks about the study of
107: 6 these patients.  And then it has down at
107: 7 the bottom, you can see they're actually
107: 8 comparing 12 milligrams, you see, of
107: 9 Vioxx --
107:10          MR. TSOUGARAKIS:
107:11     12-and-a-half.
107:12 BY MR. PAPANTONIO:
107:13     Q.   -- 12-and-a-half milligrams
107:14 of Vioxx with 1,000 milligrams of
107:15 nabumetone.  Do you see that?
107:16     A.   I do.
107:17     Q.   Now, sir, would you then go
107:18 over to Page 28 of that same document?
107:19     A.   Okay.
107:20     Q.   Do you see where it says
107:21 "Comments"?
107:22     A.   Yes.
107:23     Q.   It says, "Because of the
107:24 smaller sample size and event rates, the
108: Page 108
108: 1 results of this study do not convince
108: 2 this reviewer that there is no safety
108: 3 issue with rofecoxib.  Furthermore, the
108: 4 dose of rofecoxib 12.5 mg, is lower than
108: 5 that used in the rofecoxib treatment arm
108: 6 in the VIGOR study.  An increased in
108: 7 cardiovascular events at higher doses of
108: 8 rofecoxib cannot be excluded."
108: 9          Now, what was the typical
108:10 milligrams that was prescribed to
108:11 patients using Vioxx?

JC014    108:14-109:4

108:14          THE WITNESS:  I just know
108:15     the two milligram doses that were
108:16     available, I think, were
108:17     12-and-a-half and 25.
108:18 BY MR. PAPANTONIO:
108:19     Q.   12-and-a-half and 25?
108:20     A.   As far as I remember.
108:21     Q.   Now, this next -- do you see
108:22 where it says "Study 090"?
108:23     A.   I'm sorry.  You're on
108:24 page --
109: Page 109
109: 1     Q.   Same page.
109: 2     A.   Yes.
109: 3     Q.   "Study 090."

↓
continued

→ Δ's Objections: Speculation;
    lack of Knowledge

π's response:  Witness responsible for
    marketing at Merck.  His lack of
    Knowledge regarding studies is
    relevant.

Irvin 2 ruling:  Overruled.

Page 7

Carroll

109: 4     A.   I'm sorry.  I'm just --

JC016    109:14-112:4

109:14     Q.   Study 090.  This is another
109:15 study that nobody has talked to you
109:16 about, have they?
109:17     A.   I'm not familiar with it,
109:18 no.
109:19     Q.   It says, "Title:  A
109:20 randomized, placebo-controlled,
109:21 parallel-group, double-blind study to
109:22 evaluate the efficacy and safety of
109:23 MK-0966 (Rofecoxib) 12.5 mg versus
109:24 Nabumetone 1000."  Do you see that?
110: Page 110
110: 1     A.   Yes.
110: 2     Q.   So, we're talking about a
110: 3 similar kind of study; right?
110: 4     A.   Yes.
110: 5     Q.   Would you please go then to
110: 6 Page 34, and let's see what they had to
110: 7 say about that study.
110: 8     A.   Okay.
110: 9     Q.   Up at the top on that study
110:10 it says, "In this particular study," here
110:11 are -- "there are numerically more
110:12 myocardial infarctions in the rofecoxib
110:13 group, compared with" the "nabumetone"
110:14 group "and placebo.  There are also more
110:15 cardiovascular adverse experiences and
110:16 discontinuations due to
110:17 cardiovascular...experiences in the
110:18 rofecoxib group; this can be partly
110:19 accounted for the incidence of
110:20 hypertension.  As with 085, this study
110:21 has a smaller sample...and cardiovascular
110:22 event rate compared with VIGOR."
110:23          Now, do you see right up
110:24 underneath that it says that number 2 --
111: Page 111
111: 1 see paragraph number 2 there?
111: 2     A.   Yes.
111: 3     Q.   It says, "Evaluation of CV
111: 4 events in other rofecoxib studies that
111: 5 allowed ASA" -- do you see that?
111: 6     A.   Yes.
111: 7     Q.   -- "(085 and 090) Despite
111: 8 lower dose, smaller sample size and
111: 9 aspirin use, the trend is against
111:10 rofecoxib."  Do you see that?
111:11     A.   Yes.
111:12     Q.   Now, you understand why I
111:13 just read that to you, don't you, sir?
111:14 Do you understand why I just read that to

→ D's Objections: Speculation;
   lack of knowledge

   π's response: same as previous response

   Irwin's ruling: Overruled.

↓
continued

Page 8

Carroll

111:15 you?
111:16    A.   No.
111:17    Q.   Because we just looked at a
111:18 document just a minute ago where you had
111:19 salespeople using the CV event card
111:20 telling that the incidents are similar.
111:21 Do you remember that?
111:22    A.   I do.
111:23    Q.   That would not be true if we
111:24 believe what this has to say.  This says
112: Page 112
112: 1 the trend is against rofecoxib.  It
112: 2 doesn't say that they're similar when you
112: 3 compare Vioxx to placebo or nabumetone;
112: 4 right?  That's what they that says?

JC017    112:7-112:21

112: 7          THE WITNESS:  That's what
112: 8ᵀ        that says.
112: 9 BY MR. PAPANTONIO:
112:10    Q.   Let's look at the further
112:11 paragraph underneath there.  Again,
112:12 remember as we're going through this
112:13 document that I just showed you, a CV
112:14 card that salespeople were using to talk
112:15 to doctors, and in that CV card
112:16 salespeople were representing to doctors
112:17 that when they compared Vioxx with
112:18 nabumetone and placebo, that the
112:19 incidence of cardiovascular events were
112:20 similar.  Remember?
112:21    A.   Yes.

→ Δ's objections: Mischaracterizes
the document; repetitive

П's response: Description consistent with
witness's testimony

Irvin 2 ruling: Overruled.

JC018    113:6-113:24

113: 6    Q.   "The sponsor claims that the
113: 7 difference in myocardial infarctions
113: 8 between the two groups is primarily due
113: 9 to the antiplatelet effect of naproxen.
113:10 This hypothesis is not supported by any
113:11 prospective placebo-controlled trials
113:12 with naproxen.  One can further argue
113:13 that, no matter what the attribution, the
113:14 results (from a cardiovascular
113:15 standpoint) are favorable for naproxen."
113:16          Now, do you remember telling
113:17 salespeople that when doctors asked about
113:18 CV events in the VIGOR study, that
113:19 salespeople were supposed to tell the
113:20 doctor that, no, it was -- that the
113:21 difference was that one group was
113:22 naproxen and the other group was not
113:23 naproxen?  Do you remember talking about
113:24 the naproxen issue at all --

→ Δ's objections: Hearsay (FDA
advisory report); speculation;
lack of knowledge; irrelevant

П's response: 803(8). Permissible
cross-examination.

Irvin 2 ruling: Unclear.

Page 9

Carroll

**JC019    114:4-114:21**

114: 4    Q.    -- with salespeople?
114: 5    A.    What I mentioned when we
114: 6 talked about it earlier is from a
114: 7 salesperson's point of view, they have to
114: 8 be consistent with the label.  So, as
114: 9 they went out and spoke to doctors in a
114:10 promotional setting, they had to be
114:11 consistent with the label.  From a
114:12 doctor's point of view, there were other
114:13 channels available, and you mentioned the
114:14 VIGOR trial, and there were numerous
114:15 channels, and doctors were highly
114:16 interested in the VIGOR trial for that
114:17 information to be available to
114:18 physicians.  But the sales
114:19 representatives would not be able to
114:20 promote VIGOR until it was approved by
114:21 the FDA.

**JC020    120:9-120:15**

120: 9    Q.    Sir, had you seen the
120:10 document I just showed you prior to me
120:11 showing it to you?
120:12    A.    No.  The FDA report, no.
120:13    Q.    Had you seen this document?
120:14        MR. PAPANTONIO:  Please give
120:15    him 1084.

→ Δ's Objections: Hearsay (FDA advisory report); speculation; lack of knowledge; irrelevant

Π's response: FDA document is being used to impeach Merck document & witness. Relevant to failure to warn. 803(8).

Irvin 2 ruling: Overruled.

**JC021    121:3-123:21**

121: 3    Q.    See the first page on that
121: 4 document?  It says, "Advisory Committee
121: 5 Briefing Document...Vioxx."  Do you see
121: 6 it's Vioxx?
121: 7    A.    Yes.
121: 8    Q.    It says "February 8, 2001."
121: 9 Do you see that?
121:10    A.    Yes.
121:11    Q.    Now, sir, again, just to be
121:12 fair with you, you've never seen that?
121:13    A.    No, I have not seen that.
121:14    Q.    Would you go to Page 17?
121:15    A.    Yes.
121:16    Q.    Where it says, down at the
121:17 bottom it says, "Study 102."  Do you see
121:18 that?
121:19    A.    Yes.
121:20    Q.    It says, "12-week,
121:21 randomized, double blind active
121:22 controlled study of rofecoxib 25 mg/day
121:23 and naproxen" -- do you see that?

→ Δ's Objections: Hearsay (FDA advisory report); speculation; lack of knowledge; irrelevant

Π's Response: same as above

Irvin 2 ruling: Overruled.

↓
continued

Page 10

Carroll

121:24     A.   Yes.
122: Page 122
122: 1     Q.   -- "1000 mg/day in
122: 2 approximately 5500 patients with OA" --
122: 3 osteoarthritis.  Is that what -- you
122: 4 understand what osteoarthritis is?
122: 5     A.   Yes.
122: 6     Q.   -- "who were allowed low
122: 7 dose ASA" -- which is an aspirin;
122: 8 correct?
122: 9     A.   Yes.
122:10     Q.   You know that?
122:11          -- "patients taking low dose
122:12 ASA were 12.1% and 12.8%."  Do you see
122:13 that?
122:14     A.   Yes.
122:15     Q.   All right?
122:16          So, we're talking about
122:17 study 102, and in that study, the amount
122:18 of Vioxx that was given to people is 25
122:19 milligrams a day.  Do you see that?  And
122:20 those people are actually given aspirin,
122:21 right, ASA, you saw that?
122:22     A.   Yes.
122:23     Q.   And do you see the next --
122:24 go to the very next page.
123: Page 123
123: 1     A.   Page 19?
123: 2     Q.   Page 18.
123: 3     A.   18, I've got it.
123: 4     Q.   It says -- do you see down
123: 5 at the bottom it says, "Serious CV
123: 6 events:  Preliminary results."  It says,
123: 7 "There were 6 myocardial infarctions (MI)
123: 8 in the rofecoxib 25 mg group and one MI
123: 9 in the naproxen 1000 mg group.  Of the 6
123:10 MI in the rofecoxib group, 3 were in
123:11 patients taking low ASA for
123:12 cardiovascular prophylaxis.  The patient
123:13 with MI in the naproxen group was a
123:14 non-ASA user."
123:15          Now, read this with me, if
123:16 you would.  It says, "A trend towards an
123:17 excess of MI's in the rofecoxib 25 mg
123:18 group in a 12 week study is noted.  This
123:19 observation is consistent with the
123:20 pattern seen in VIGOR."  Do you see that?
123:21     A.   Uh-huh.

JC022    124:11-126:17

124:11     Q.   The CV card says --
124:12          MR. PAPANTONIO:  Underline
124:13 this, please.
124:14 BY MR. PAPANTONIO:

↓
continued

→ Δ's objections: Hearsay (CV card);
mischaracterizes the doc;
lack of knowledge

Page 11

P's response: FDA document being used to impeach
witness + Merck document (CV card).

Irwin 2 rulings: Overruled.

Carroll

124:15    Q.   "The incidence of events was
124:16 similar among the groups." Do you see
124:17 that? In other words, do you see this is
124:18 a chart where we have compared placebo,
124:19 we've compared nabumetone, we've compared
124:20 it to Vioxx? Do you see that? You were
124:21 actually out telling people, the
124:22 salespeople -- I don't know if Marty
124:23 Carroll was, but salespeople were saying,
124:24 doc, this is what we have found is the
125: Page 125
125: 1 similarities of incidence of events
125: 2 similar among patient groups; right?
125: 3    A.   No.  The marketplace at the
125: 4 time had -- VIGOR was in the marketplace
125: 5 because physicians were extremely
125: 6 interested in that study, and there was
125: 7 enormous discussion and interest in the
125: 8 study.  There were channels available for
125: 9 that study to become available for
125:10 physicians.  There was conferences, there
125:11 was publications, there was consultant
125:12 meetings.  When they requested the study,
125:13 which most of them did, they could get
125:14 that.
125:15    Q.   So, doctors were extremely
125:16 interested in this relationship between
125:17 cardiovascular events and Vioxx? You
125:18 just said that; right?
125:19    A.   There was a lot of interest
125:20 in the marketplace on VIGOR because of
125:21 two things:  One, protection of the
125:22 stomach and; two, the cardiovascular
125:23 findings.
125:24    Q.   So, doctors were
126: Page 126
126: 1 interested -- you'll agree with this.
126: 2 Doctors were interested in the
126: 3 relationship between cardiovascular
126: 4 events and Vioxx? Yes?
126: 5    A.   Yes.
126: 6    Q.   Okay.
126: 7    A.   Along with the other parts
126: 8 of the VIGOR study.
126: 9    Q.   So, what are these -- these
126:10 studies we've just reviewed, 085, do you
126:11 remember the one we just did, 090 --
126:12    A.   Right.
126:13    Q.   -- those were studies that
126:14 were designed to look at the relationship
126:15 between Vioxx and cardiovascular events;
126:16 right?
126:17    A.   Right.

JC024    126:21-127:2

Carroll

126:21    Q.   Okay.  You didn't have
126:22 anything -- well, let's go on with this.
126:23 This study I just showed you, 102, what
126:24 is that study?
127: Page 127
127: 1    A.   I'm not familiar with study
127: 2 102.

JC025    127:22-127:24

127:22    Q.   Had you ever heard of study
127:23 102?
127:24    A.   No.

JC026    128:8-129:2

128: 8    Q.   Did you share this
128: 9 information with the doctors since they
128:10 were interested in cardiovascular events?
128:11 Do you know whether the sales force
128:12 shared this information?
128:13    A.    Again, and we've covered it,
128:14 the sales force would not be involved in
128:15 this information.  This information would
128:16 be for research, to share with the FDA,
128:17 to do the appropriate analysis.  The
128:18 sales force is in a position where they
128:19 promote what's in the circular.
128:20    Q.   Well, if they're not in the
128:21 position to share information with
128:22 doctors, then why do we have this
128:23 document that I've been talking about
128:24 where it says the incidence of events
129: Page 129
129: 1 among the groups is similar?  You just
129: 2 said they don't share this with doctors?

JC027    129:5-129:23

129: 5    THE WITNESS:  That
129: 6    information was consistent with
129: 7    the circular approved by the FDA
129: 8    at that time.  That's what
129: 9    representatives could promote.
129:10    The other information that you're
129:11    referencing that I'm not familiar
129:12    with is studies that would go
129:13    through a process of review with
129:14    the FDA and ultimately impact a
129:15    change in the circular if that was
129:16    warranted.
129:17 BY MR. PAPANTONIO:
129:18    Q.   Sir, just so we know what
129:19 we're talking about, maybe you're not

Carroll

129:20 understanding what I'm talking about
129:21 here.  Would you look where it says
129:22 "Cardiovascular Event Profile" on that
129:23 document?  Do you see that?

JC028   130:3-130:12

130: 3      Q.   On 08 CV card,
130: 4 "Cardiovascular Event Profile."  Do you
130: 5 see that?  And it says "Cardiovascular
130: 6 thromboembolic adverse events in the OA
130: 7 clinical trials."  What is the OA
130: 8 clinical trials?
130: 9      A.   As far as I recall, the OA
130:10 clinical trials were the trials that were
130:11 submitted for the initial approval of
130:12 Vioxx.

→ Δ's Objection: Hearsay (CV card)

Π's response: Business record 803(6).

Irvin 2 ruling: Not applicable. No objection previously.

JC029   130:24-132:23

130:24      Q.   Have you ever heard -- have
131: Page 131
131: 1 you even ever heard of this profile of
131: 2 the OA trial 102?  You'd never heard of
131: 3 it, had you?
131: 4      A.   No.
131: 5      Q.   Had you ever heard of OA
131: 6 trial number 085?  Never heard of it, had
131: 7 you?
131: 8      A.   I'm not familiar with all of
131: 9 those trials.
131:10      Q.   What did we see in both of
131:11 those trials?  We saw that the trend was
131:12 against Vioxx, didn't we?
131:13      A.   I'm not an expert on that
131:14 data.
131:15      Q.   No, sir.  You're not.  I
131:16 understand.  But you were responsible for
131:17 giving information to the sales force so
131:18 they could be honest with doctors about
131:19 the dangers of Vioxx?  That is something
131:20 Marty Carroll -- the buck stopped with
131:21 Marty Carroll, didn't it?
131:22      A.   And I'm confident that every
131:23 bit of information we gave the
131:24 representatives was appropriate and it
132: Page 132
132: 1 was in the marketplace.  There are other
132: 2 studies that are available through the
132: 3 FDA, and there was the VIGOR study which
132: 4 was available on the marketplace.
132: 5      Q.   I just showed you a card
132: 6 that you gave to salespeople to represent
132: 7 to doctors that when we looked at the OA
132: 8 studies, which are osteoarthritis

→ Δ's Objection: lack of knowledge

Π's response: Witness's lack of familiarity with document is relevant. Permissible cross-examination.

Irvin 2 ruling: Overruled.

↓
continued

Page 14

Carroll

132: 9 clinical studies, that when we looked at
132:10 all those studies, that the incidence of
132:11 events was similar in the groups when we
132:12 compared the incidence of cardiovascular
132:13 events of Vioxx to cardiovascular events
132:14 of nabumetone even to placebo.  You were
132:15 telling – you were allowing people in
132:16 the field to tell doctors that there was
132:17 a similar incidence; correct?
132:18      A.   And this was consistent with
132:19 the label at the time that that card was
132:20 used.
132:21      Q.   The first time that you even
132:22 saw these OA trials is when I started
132:23 showing them to you today; correct?

JC029a    133:3-133:19

133: 3      Q.   First time -- you've never
133: 4 seen these trials that I'm going over.
133: 5 102 you'd never seen; correct?
133: 6      A.   (Witness shakes head.)
133: 7      Q.   085, you'd never seen;
133: 8 correct?
133: 9      A.   I've answered that I haven't
133:10 seen those trials.  It wouldn't be
133:11 something I would normally see in my
133:12 role.
133:13      Q.   Why don't you go to Page 19
133:14 in the document I just gave you, which
133:15 was 1084.  Go to Page 19, and I'll show
133:16 you something else and ask you if you've
133:17 seen that.  You see this says, "Data from
133:18 the original NDA."  Right?
133:19      A.   Yes.

JC 13407    134:7-134:9

134: 7      Q.   Had you ever seen study
134: 8 number 069?
134: 9      A.   No.

JC030    134:17-135:11

134:17      Q.   Now, you see -- let me --
134:18 let's cut through some of this.  You can
134:19 read any part you want.  It says, "These
134:20 studies were" different from -- "These
134:21 studies were of different duration (from
134:22 6 weeks to 86 months).  Most patients
134:23 were exposed for less than 6 months."  It
134:24 says, "The Division has serious concerns
135: Page 135
135: 1 with a combined analysis of studies of
135: 2 different length and dosing regimens.

↓
continued

→ Δ's objection: Lack of
   Knowledge

π's response: Permissible cross-examination.
   witness's lack of knowledge relevant.

Irwin 2 ruling: Overruled.

→ Δ's objection: Lack of Knowledge

π's response: same as above

Irwin 2 ruling: Overruled.

→ Δ's objections: Lack of Knowledge;
   hearsay (FDA review)

Page 15

π's response: Witness's lack of knowledge is
   relevant to failure to warn.  FDA document
   being used to impeach & is not offered
   for truth.  No. 803(8).

Irwin 2 ruling: Overruled.

Carroll

135: 3 Furthermore, combining multiple different
135: 4 drugs within a single comparator arm may
135: 5 not be reflective of the risk of any one
135: 6 drug.  These concerns were discussed
135: 7 extensively."  Do you see that?
135: 8     A.   Yes.
135: 9     Q.   Do you see where it says,
135:10 "This database" -- do you see that?
135:11     A.   Yes.

JC031   136:4-136:13

136: 4     Q.   So, sir, when we're talking
136: 5 about what we've seen now, we've actually
136: 6 seen study 085, we've seen 090, we've
136: 7 seen 0 -- I mean, we've seen study 102.
136: 8 We've seen study 069.  Do you see that?
136: 9 And all of those were OA studies; right?
136:10     A.   They appear to be, yes.
136:11     Q.   And when they took all the
136:12 OA studies, they said the trend was
136:13 against Vioxx; true?

→ Δ's objection: Lack of knowledge

π's response: Permissible cross-examination.

Irvin 2 ruling: Overruled.

JC032   136:16-136:17

136:16     Q.   Do you remember seeing that?
136:17 Do you want to go back and read it again?

→ Δ's objection: Lack of knowledge

π's response: Permissible cross-examination
Irvin 2 ruling: Overruled.

JC033   136:20-137:19

136:20         THE WITNESS:  In the context
136:21     of this note, that's what that
136:22     sentence said.
136:23 BY MR. PAPANTONIO:
136:24     Q.   Let's go back and make sure
137: Page 137
137: 1 I read it right.  It says, "A trend" --
137: 2 do you see the page right before, Page
137: 3 18?
137: 4     A.   Yes.
137: 5     Q.   It says, "A trend towards an
137: 6 excess of MI's in the rofecoxib 25 mg
137: 7 group in a 12-week study is noted."  Do
137: 8 you see that?
137: 9     A.   Yes.
137:10     Q.   But when we pull out the CV
137:11 card that you were talking to doctors
137:12 about, it says, "The incidence of events
137:13 was similar among the groups."  Correct?
137:14     A.   That's what it says, yes.
137:15     Q.   And that is what -- that's
137:16 what you had salespeople talking to
137:17 doctors about, the CV events?  That card
137:18 they carried around with them every day,
137:19 didn't they?

→ Δ's objections: Lack of knowledge;
hearsay (FDA review; CV card);
asked and answered; speculation

π's response: Permissible cross-examination.
R. 403. Relevant to π's failure to warn
claim. FDA document - 803(8); not
offered for truth. CV Card = business
record - 803(6).

Irvin 2 ruling: Overruled.

Page 16

Carroll

JC035   137:22-137:24

137:22        THE WITNESS:  That card was
137:23     part of what the sales
137:24     representatives had.

Δ's objection: speculation

Π's response: Witness asked question directly
related to his duties at Merck & this is
his response.  No speculation.

Irwin 2 ruling: Overruled.

JC036   138:8-138:15

138: 8    Q.   So, it was important when
138: 9 they asked that you shared as much
138:10 information at least as the company had
138:11 about the dangers of CV events; correct?
138:12    A.   And I think we did.
138:13    Q.   But you think you did, but
138:14 you had never seen any of the information
138:15 I just covered with you, had you?

JC037   138:19-138:24

138:19    Q.   Yes or no?  Just go back
138:20 through it again, that you'd never seen
138:21 any information I just covered with you
138:22 on these protocols?
138:23    A.   I hadn't seen the
138:24 information.

JC038   142:22-143:16

142:22    Q.   That's brand new stuff to
142:23 you, isn't it?
142:24    A.   I'm not a science guy.
143: Page 143
143: 1    Q.   So, in other words, not
143: 2 being a science guy, you could only pass
143: 3 on what you were told; right?
143: 4    A.   No.  Let's step back again.
143: 5 I have full confidence that what we were
143: 6 working with the sales reps was accurate.
143: 7 It went through a lot of internal
143: 8 policies and procedures to make sure of
143: 9 that.  And regarding all the studies and
143:10 the scientists, I have full trust in the
143:11 scientists at Merck.  You'd have to
143:12 understand the scientists at Merck.
143:13 Their integrity around the science was
143:14 always there, and I fully trust that that
143:15 information was shared with the FDA and
143:16 all the appropriate channels.

JC042   170:10-170:11

170:10    Q.   In other words, sales were
170:11 unimportant to you?  In other words, you

Page 17

Carroll

JC043    170:17-170:21

170:17        MR. PAPANTONIO:  Would you
170:18     please give him 1258.
170:19 BY MR. PAPANTONIO:
170:20        Q.   Is that what you're telling ,
170:21 me, Mr. Carroll?

JC044    170:23-172:5

170:23        THE WITNESS:  First of all,
170:24     sales are important on all
171: Page 171
171: 1     products, but myself and the sales
171: 2     force would always do the right
171: 3     thing with integrity, talk about
171: 4     the products' benefits and risks
171: 5     consistent with the approved
171: 6     label.
171: 7 BY MR. PAPANTONIO:
171: 8     Q.   All right.
171: 9        Well, I think we've heard
171:10 that answer, but have you seen this
171:11 document, "U.S. Long Range Operating Plan
171:12 Franchise: Analgesic & Anti-Inflammatory
171:13 Products: Vioxx."  Do you see that?
171:14     A.   I see it.
171:15     Q.   Date, "July, 2001."
171:16     A.   Right.
171:17     Q.   Where was Mr. Carroll in
171:18 2001?
171:19     A.   I was still with Merck.
171:20     Q.   Still there.  You were still
171:21 in sales, weren't you?
171:22     A.   That's correct.
171:23     Q.   And you'd seen this document
171:24 back then where they analyzed what was
172: Page 172
172: 1 going to happen if we told people about
172: 2 -- if we had a label, CV warning, we knew
172: 3 what was going to happen with sales.
172: 4 You've seen this document before, haven't
172: 5 you?

Δ's objections: Irrelevant;
prejudicial; speculation

Π's response: Relevant to about Merck's
claims that it put patients over profits.

Irwin 2 ruling: Overruled.

JC045    172:8-172:9

172: 8        THE WITNESS:  I've got to be
172: 9     refreshed.

JC047    173:23-174:19

173:23 party.  But I'm asking you, Vioxx from
173:24 the standpoint of Marty Carroll in sales,
174: Page 174
174: 1 was important for Merck?

Δ's objections: Irrelevant;
prejudicial; speculation

Π's response: Same as above.

Irwin 2 ruling: Overruled.

Page 18

Carroll

174: 2     A.   Yes.
174: 3     Q.   Right.  When we look at this
174: 4 chart here, we've got -- do you see where
174: 5 it says "Upside 25% in '06"?
174: 6     A.   Yes.
174: 7     Q.   It says "CV Labeling" Minor?
174: 8         MR. TSOUGARAKIS:  Milder.
174: 9 BY MR. PAPANTONIO:
174:10     Q.   "Milder," excuse me.  Do you
174:11 see that?
174:12     A.   Yes.
174:13     Q.   You knew that if the
174:14 cardiovascular event label where you're
174:15 warning people about cardiovascular
174:16 events, you knew if it was a milder label
174:17 that you would have more sales?  You knew
174:18 that back when you were in charge of
174:19 sales; right?

Δ's objections: Speculation;
irrelevant; prejudicial

Π's response: Permissible cross-examination.
R. 407. Directly related to his role at Merck.
Relevant to show motive for Merck's failure
to warn.

Irwin 2 ruling: Overruled.

JC048   174:22-175:7

174:22         THE WITNESS:  I think the
174:23     purpose of this was to forecast
174:24     different potential outputs from
175: Page 175
175: 1     the FDA.
175: 2 BY MR. PAPANTONIO:
175: 3     Q.   Right.  You heard my -- can
175: 4 you answer my question?  You knew that if
175: 5 there was a CV label that was milder,
175: 6 less stringent, that it would be better
175: 7 for sales, right?  You knew that?

Δ's objections: speculation;
irrelevant; prejudicial

Π's response: Same as above.

Irwin 2 ruling: Overruled.

JC050   175:9-176:5

175: 9         THE WITNESS:  That's what
175:10     this particular analysis -- again,
175:11     it ranges from upside to downside
175:12     depending on the different
175:13     circular potentials that could
175:14     occur.
175:15 BY MR. PAPANTONIO:
175:16     Q.   "Circular potentials" being
175:17 information that doctors are given and
175:18 patients are given about the potential
175:19 dangers of Vioxx?  Yes or no?
175:20     A.   Yes.  But it doesn't predict
175:21 any outcome of that.  It just suggests on
175:22 a forecasting basis what it might be.
175:23     Q.   So, if you had a milder CV
175:24 event, a CV label, then you were going to
176: Page 176
176: 1 make $2.5 billion that year, but if you
176: 2 had a label that had a CV warning, then
176: 3 you were only going to make $1.5 billion

Δ's objections: speculation;
irrelevant; prejudicial

Π's response: Same as above.

Irwin 2 ruling: Overruled.

↓
continued

Page 19

Carroll

176: 4 dollars that year.  That's what that
176: 5 chart shows, doesn't it?

JC051   176:8-176:14

176: 8        THE WITNESS:  According to
176: 9     this analysis.
176:10 BY MR. PAPANTONIO:
176:11     Q.   So, there's a billion
176:12 dollar, one billion dollar difference
176:13 with the CV label and without the CV
176:14 label; correct?

Δ's objections: speculation;
irrelevant; prejudicial;
fragment does not include an
answer

Π's response: same response as previous page.

Irwin 2 ruling: Overruled.

JC053   176:18-177:9

176:18     Q.   According to that chart?
176:19     A.   The people who are
176:20 responsible for forecasting did an
176:21 analysis that said, based on different
176:22 outcomes from the FDA, there could be
176:23 different ranges.
176:24     Q.   And you knew from the
177: Page 177
177: 1 standpoint of Vioxx being important that
177: 2 it was important to Merck from a money
177: 3 standpoint?  You knew Vioxx could -- if
177: 4 Vioxx could be sold without CV warnings,
177: 5 cardiovascular event warnings, without
177: 6 talking about increased deaths among the
177: 7 elderly, that sales would be better?  You
177: 8 knew that?  When you were in charge of
177: 9 sales, Marty Carroll knew that; correct?

Δ's objections: speculation;
irrelevant; prejudicial; repetitive

Π's response: same response as above.

Irwin 2 ruling: Overruled.

JC054   177:12-177:19

177:12        THE WITNESS:  What we knew
177:13     was not knowing what the outcome
177:14     of the circular discussions would
177:15     be, there could be a range of
177:16     forecast.  All this was was
177:17     predicting what the range
177:18     potential could be depending on
177:19     what the label was changed to.

Δ's objections: speculation; irrelevant;
prejudicial

Π's response: same response as above.

Irwin 2 ruling: Overruled.

JC055   179:5-179:17

179: 5     Q.   So, Mr. Carroll, if sales --
179: 6        MR. PAPANTONIO:  Give him
179: 7     402, please.
179: 8 BY MR. PAPANTONIO:
179: 9     Q.   So, we just looked at a
179:10 document -- as you're going through
179:11 there, we just looked at a document that
179:12 showed -- to put everything back on the
179:13 record and in perspective, we looked at a

Δ's objections: mischaracterizes
the document

Π's response: Permissible cross-examination.
R. 607.

Page 20

Irwin 2 ruling: Overruled.

↓
continued

Carroll

179:14 document that showed that sales would
179:15 decrease by $1 billion with the stronger
179:16 CV label.  You saw that.  Remember that
179:17 document we just talked about?

JC056   179:20-180:17

179:20        THE WITNESS:  That document
179:21        didn't say that.  All we know is,
179:22        we have a document that provided
179:23        forecasts on different scenarios.
179:24        We don't know what would have
180: Page 180
180:1        happened.
180: 2 BY MR. PAPANTONIO:
180:3     Q.   Well, somebody thought it
180: 4 was a billion dollar difference, Mr.
180: 5 Carroll, didn't they?  Do you want to
180: 6 look at it again?  If you want to pull it
180: 7 out again?  We'll go over it again if you
180: 8 want to.  But somebody showed that if you
180: 9 put a CV warning on that was a strong CV
180:10 warning, that the company would lose $1
180:11 billion in sales.  Look at it again and
180:12 tell me if there's anything else that
180:13 that page there shows.
180:14     A.   Remind me of the page.
180:15 Sorry.
180:16        MR. TSOUGARAKIS:  I have
180:17        Page 17.

JC058   180:23-182:16

180:23     Q.   2.5 billion, you see there?
180:24     A.   I see it.
181: Page 181
181: 1     Q.   And 1.5 billion?
181: 2     A.   Right.
181: 3     Q.   Subtract 1.5 billion from
181: 4 2.5 billion, and what number do you get,
181: 5 Mr. Carroll?
181: 6     A.   And all I'm saying is, that
181: 7 this is a forecast by marketing that goes
181: 8 to different scenarios in the label.
181: 9        MR. PAPANTONIO:  Put this
181:10 up.  This is document -- what's
181:11 the document number?
181:12        MS. LUNSFORD:  1258.
181:13        MR. PAPANTONIO:  1258, put
181:14 1258 back up there again, and I
181:15 want to go to Page 17.
181:16 BY MR. PAPANTONIO:
181:17  · ·Q.   Now, what statement do you
181:18 want to make about this?
181:19        MR. PAPANTONIO:  First of

Δ's objections: Mischaracterizes the document; prejudicial; repetitive; harassing

Π's response: Permissible cross-examination. Rule 607. Witness is denying content of document.

Irvin 2 ruling: Overruled.

Δ's objections: Prejudicial; repetitive; harassing

Π's response: Same answer as above.

Irvin 2 ruling: Overruled.

↓
continued

Page 21

Carroll

181:20     all, underline $2.5 billion.
181:21     Right here.  2.5 billion.
181:22 BY MR. PAPANTONIO:
181:23     Q.   Do you see that?
181:24          MR. PAPANTONIO:  And then
182: Page 182
182: 1     underline 1.5 billion.
182: 2 BY MR. PAPANTONIO:
182: 3     Q.   When you subtract 1.5
182: 4 billion from 2.5 billion, what do you
182: 5 get?
182: 6     A.   That's a billion.
182: 7     Q.   $1 billion.
182: 8          And just so we can be
182: 9 abundantly clear, it says -- at the top
182:10 of it, it says, "Upside/Downside Sales
182:11 Forecast."  Do you see that?
182:12     A.   Yes.
182:13     Q.   And it says, "Upside."  Do
182:14 you see that?  Okay.
182:15          So, is there anything else
182:16 you want to add about this document?

JC059    182:19-183:20

182:19          THE WITNESS:  Again, my
182:20     point is this is a forecast.
182:21     There was pending changes to the
182:22     label, and the marketing group was
182:23     merely forecasting different
182:24     ranges that would occur depending
183: Page 183
183: 1     on that change.
183: 2 BY MR. PAPANTONIO:
183: 3     Q.   And that didn't -- you
183: 4 weren't concerned about sales, sir?  You
183: 5 weren't concerned about -- you were not
183: 6 concerned --
183: 7          If I'm hearing what you said
183: 8 earlier, you weren't concerned that
183: 9 labeling of CV events were going to
183:10 affect sales?  Is that what you're
183:11 telling me --
183:12     A.   What I'm telling --
183:13     Q.   -- Marty Carroll?
183:14     A.   What I'm telling you is that
183:15 when the label is informed by all the
183:16 data and the FDA, you take that to the
183:17 marketplace, and what happens, happens.
183:18 That's not the primary view.  The primary
183:19 view is appropriately taking the product
183:20 to the marketplace with the circular.

JC060    190:19-192:3

→ Δ's objections: Prejudicial;
   repetitive; harassing

Π's response : Permissible cross-examination.
   R. 407. Clarifying witness's testimony.

Irwin 2 rulings: Overruled.

Carroll

190:19     Q.   You knew, sir, didn't you,
190:20 that if there was a product insert or a
190:21 label that talked about CV events, that
190:22 sales would drop, didn't you?  You knew
190:23 that all the way back to 2001?
190:24     A.   Again, I've got the
191: Page 191
191: 1 document, but what are you referencing in
191: 2 the document?
191: 3     Q.   Well, let's look at the
191: 4 front of the document.  What does it say?
191: 5     A.   The one I have is "2001
191: 6 Profit Plan for Vioxx."
191: 7     Q.   Let's look at the first page
191: 8 there.
191: 9         MR. PAPANTONIO:  Put that up
191:10     there.
191:11 BY MR. PAPANTONIO:
191:12     Q.   "2001 Profit Plan for
191:13 Vioxx."
191:14     A.   Right.
191:15     Q.   Did you participate in this?
191:16 Is this something you participated in?
191:17     A.   I can't recall, but most
191:18 likely, I would have been involved in
191:19 some way.
191:20     Q.   All right.
191:21         And you were also involved
191:22 in the product insert process, weren't
191:23 you?
191:24     A.   No.  I wasn't involved in
192: Page 192
192: 1 direct product insert process.  That was
192: 2 regulatory, marketing, and the people who
192: 3 dealt with the FDA.

JC062    192:13-193:2

192:13     Q.   Let's look at Page 38 on
192:14 this, and let's see what the whole thing
192:15 about labeling and product insert had to
192:16 do with.  Okay?
192:17     A.   (Witness reviewing
192:18 document.)
192:19     Q.   You were concerned, Marty
192:20 Carroll was concerned that there was a
192:21 safety issue that was looming over Vioxx
192:22 all the way back to 2001; correct?
192:23     A.   I was not concerned at all
192:24 about that.
193: Page 193
193: 1     Q.   You didn't know anything
193: 2 about it?

JC063    193:5-193:23

Δ's objections: speculation;
lack of knowledge; irrelevant

Π's response: 2001 Profit Plan clearly relevant
to claims in this case as Mr. Barnett was
taking Vioxx at that time. Witness
testifies that he would have been involved
with document in some way. Relevant to
show motive to minimize CV risks –
failure to warn.

Irvin 2 ruling: overruled.

Δ's objections: Lack of foundation

Π's response: same as above.

Irvin 2 ruling: Overruled.

Carroll

193: 5        THE WITNESS: I knew about
193: 6    the information that we had
193: 7    through VIGOR and the label, and I
193: 8    wasn't concerned about safety.
193: 9 BY MR. PAPANTONIO:
193:10    Q.   We're talking about 2001
193:11 here in this document.
193:12    A.   I see that.
193:13    Q.   You were there with the
193:14 company; correct?
193:15    A.   Yes.
193:16    Q.   And you knew that there was
193:17 an issue about safety in relationship to
193:18 CV events, cardiovascular events, heart
193:19 attack, stroke, thrombo process, blood
193:20 clots, you knew all of those issues were
193:21 safety issues that folks at Merck were
193:22 concerned about with Vioxx?  You knew
193:23 that in 2001; right?

Δ's Objections: Compound;
  argumentative

Π's response:  Permissible cross-examination.
      R. 407.

Irvin 2 ruling: Overruled.

JC065    194:3-195:4

194: 3        THE WITNESS:  What I knew is
194: 4    that we had a lot of data that was
194: 5    being shared into the marketplace
194: 6    and with the FDA.  That's what I
194: 7    knew.  And I also knew that Merck
194: 8    at that time had no safety
194: 9    concerns on Vioxx.
194:10 BY MR. PAPANTONIO:
194:11    Q.   Oh, they had no safety
194:12 concerns?
194:13    A.   No.
194:14    Q.   Would you take a look at
194:15 that chart right there?
194:16    A.   Yes.
194:17    Q.   Would you look at the last
194:18 -- do you see that last box at the front
194:19 where it says, "Assumptions"?  It says,
194:20 "Assumptions."  "Vioxx is unable to
194:21 neutralize safety" -- what does that say?
194:22    A.   "Safety/tolerability."
194:23    Q.   -- "safety/tolerability
194:24 issues."  What in your mind is
195: Page 195
195: 1 safety/tolerability issues, sir, if it's
195: 2 not safety?  What is it?  How is that
195: 3 different from the question I just asked
195: 4 you?

Δ's Objections: compound;
  argumentative

Π's response:  Permissible cross-examination.
      R. 407.

Irvin 2 ruling: Overruled.

JC066    195:8-196:19

195: 8    Q.   I just asked you whether or
195: 9 not the folks at Merck were concerned

↓
continued

Page 24

Carroll

195:10 about safety issues, didn't I, just 30
195:11 seconds ago?  I said, Mr. Carroll, were
195:12 the folks at Merck in 2001 concerned
195:13 about safety issues?  What did you tell
195:14 me?
195:15    A.   I said no.
195:16    Q.   They weren't?
195:17    A.   They were not.
195:18    Q.   What does this say right
195:19 here?
195:20    A.   This?
195:21    Q.   Vioxx -- let's read it
195:22 again.  "Vioxx is unable to neutralize"
195:23 -- an assumption.  "Vioxx is unable to
195:24 neutralize safety/tolerability issues."
196: Page 196
196: 1 Right?  Go out to the side.  Do you see
196: 2 -- go out to the side.  Do you see what
196: 3 the number is right there?  $437 million.
196: 4       Do you know what they're
196: 5 talking about here, Mr. Carroll?  They're
196: 6 saying in 2001 -- Marty Carroll was in
196: 7 charge in 2001, weren't you?
196: 8    A.   Yes.
196: 9    Q.   In 2001, and you say you've
196:10 never seen this document; is that right?
196:11    A.   I said I can't recall the
196:12 documents.
196:13    Q.   Yeah.
196:14    A.   It's four or five years ago.
196:15    Q.   And in 2001, they're already
196:16 talking about, if Vioxx is unable to
196:17 neutralize their safety/tolerability
196:18 issues, then it's going to cost them just
196:19 in sales for 2001 $437 million; right?

JC068    197:7-198:7

197: 7    Q.   That's the question.  That's
197: 8 what it says.
197: 9    A.   In the context of the
197:10 document, I don't know what the author
197:11 meant.  I don't know -- I don't know.
197:12    Q.   But you did -- you were
197:13 willing to tell me just a minute ago that
197:14 there were no concerns about safety of
197:15 Vioxx around Merck.  Isn't that what you
197:16 told me a minute ago?
197:17    A.   That's because there was
197:18 not.
197:19    Q.   So, who might have put this
197:20 in here, "Vioxx is unable to neutralize
197:21 safety/tolerability issues"?  That is
197:22 2001.  They're talking about
197:23 safety/tolerability issues; right?

↓ continued

→ Δ's Objections: compound;
argumentative; asked and
answered; speculation

π's response: Permissible cross-examination.
R. 407 & R. 412.

Irwin 2 ruling: Overruled.

→ Δ's Objections: speculation;
argumentative; asked and
answered

π's response: same as above

Irwin 2 ruling: Overruled.

Page 25

Carroll

197:24    A.   I don't know the context.  1
198: Page 198
198: I mean, was the context as the FDA reviewed
198: 2 data with the label change?  I don't know
198: 3 the context.
198: 4    Q.   Sir, you were in charge of
198: 5 sales.  Mike Papantonio was nowhere
198: 6 around the Merck sales department in
198: 7 2001, but Marty Carroll was; right?

JC070    199:7-200:1

199: 7    Q.   In 2001, sir, you were in
199: 8 charge of sales.  Yes or no?
199: 9    A.   Yes.
199:10    Q.   In 2001 you told -- in 2005,
199:11 today, you told me that in 2001 nobody
199:12 around Merck was concerned about safety
199:13 issues?
199:14    A.   We were not concerned about
199:15 safety issues.
199:16    Q.   But then I showed you this
199:17 document that says, written in 2001, that
199:18 Vioxx is unable -- if Vioxx is unable to
199:19 neutralize -- what does the word
199:20 "neutralize" mean to you, sir?
199:21    A.   I don't know the context
199:22 that the person used it.  It could mean a
199:23 lot of different things.
199:24    Q.   Give me your shot.  What
200: Page 200
200: 1 does "neutralize" mean to you?

Δ's objections: speculation;
argumentative; irrelevant

π's response: Permissible cross-examination.
R.607 & R.612.

Irvin 2 ruling: overruled

JC072    200:4-200:10

200: 4       THE WITNESS:  Balance.
200: 5 BY MR. PAPANTONIO:
200: 6    Q.   Okay.
200: 7       So, if Vioxx is unable to
200: 8 balance safety/tolerability issues, you
200: 9 see it's going to cost them $437 million;
200:10 right?

Δ's objections: speculation;
irrelevant; prejudicial

π's response: same as above.
Irvin 2 ruling: overruled.

JC073    200:13-201:5

200:13    Q.   That's what it says.  Do you
200:14 see where it says, "Revenue Impact" up
200:15 there at the very top?
200:16    A.   Yeah.
200:17    Q.   What does that word mean,
200:18 "Revenue Impact"?  What does the word
200:19 "revenue" mean to you?
200:20    A.   Range of different options.
200:21    Q.   And what does -- when you
200:22 put an MM out to the side of it, what

Δ's objections: speculation;
irrelevant; prejudicial

π's response: Same as above
Irvin 2 ruling: overruled.

↓
continued

Page 26

Carroll

200:23 does that mean?  Millions, isn't it?
200:24      A.   That's correct.
201: Page 201
201: 1      Q.   So, revenue impact of Vioxx
201: 2 being unable to neutralize
201: 3 safety/tolerability is going to cost
201: 4 Merck $437 million, and you're telling me
201: 5 you've never seen this document?

JC074   201:9-201:10

201: 9         THE WITNESS:  I don't recall
201:10      the document.

Δ's objections: speculation; irrelevant; prejudicial
π's response: same as previous response
Irwin 2 ruling: Overruled.

JC075   201:19-201:24

201:19      Q.   And you were in charge of
201:20 sales?
201:21      A.   Yes.
201:22      Q.   That's talking about revenue
201:23 impact, isn't it?
201:24      A.   That's correct.

Δ's objections: speculation; irrelevant; prejudicial
π's response: Permissible cross-examination. R.407.
Irwin 2 ruling: Overruled.

JC076   294:16-294:17

294:16         MR. PAPANTONIO:  Give me
294:17      1504, please.  Can you give him a

Δ's objections: Not a question; No answer
π's response: Presenting Exhibit.      Irwin 2: No prior objection.

JC077   295:3-295:9

295: 3      Q.   Do you see your name at the
295: 4 top there, to Marty Carroll?
295: 5      A.   I do.
295: 6      Q.   Who is Karen Hinckley?
295: 7      A.   Karen Hinckley was a sales
295: 8 vice president at the time probably in
295: 9 the Northeast U.S.

Δ's objections: Irrelevant; hearsay (6/20/01 email from K. Hinckley)
π's response: Relevant to failure to warn claim. Business record - 803(6).
Irwin 2 ruling: Overruled.

JC078   295:12-295:22

295:12      Q.   It says, "Hi Ron and Bob,
295:13 attached are Kristin's slides from her
295:14 meeting.  I like them because there is
295:15 one performance slide, the message slide
295:16 is very, very specific and the remaining
295:17 data, to be quite honest, we don't even
295:18 use."
295:19         Now, do you see where it
295:20 says "My suggestion for the agenda is as
295:21 follows"?  Do you see that?
295:22      A.   Yes.

Δ's objections: Irrelevant; hearsay (6/20/01 email from K. Hinckley)
π's response: same as above.
Irwin 2 ruling: Overruled.

JC079   297:1-298:11

297: 1         Do you see down where it

↓
continued

Page 27

Carroll

297: 2 says, "Talk about the main" -- almost the
297: 3 second to the last paragraph, it says,
297: 4 "Talk about the 4 main components of the
297: 5 Vioxx Message." Do you see that? "4
297: 6 main components of the Vioxx Message:
297: 7 Efficacy," you see, "in acute pain?"
297: 8     A.   Yes.
297: 9     Q.   "Transitioning to OA."  What
297:10 does that mean?
297:11     A.   I'm not sure what that
297:12 means.
297:13     Q.   You don't know about these
297:14 four main components?
297:15     A.   I don't recall them.
297:16     Q.   "GI safety."  Do you see
297:17 that?
297:18     A.   I see that.
297:19     Q.   Do you know what GI safety
297:20 is?
297:21     A.   Yes.
297:22     Q.   What is it?
297:23     A.   The GI safety profile of the
297:24 drug.
298: Page 298
298: 1     Q.   And then "QD efficacy," what
298: 2 does that mean?
298: 3     A.   Once a day -- QD is once a
298: 4 day.
298: 5     Q.   So this person says, "Talk
298: 6 about the 4 main components of the Vioxx
298: 7 Message."  Now, in there, is any of the
298: 8 components of the Vioxx message any
298: 9 mention about CV risk, cardiovascular
298:10 event risk?  Do you see that in the four
298:11 main components of the message?

→ Δ's objections: Irrelevant;
hearsay (6/20/01 email from
K. Hinckley); lack of knowledge;
last portion is just question
without an answer

π's response: Relevant to failure to warn.
  Business record - 803 (6). Witness
  received document.

Irvin 2 ruling: Overruled.

JC080   298:21-300:5

298:21       In those four main
298:22 components, you see he was talking about
298:23 four main components of the Vioxx
298:24 message --
299: Page 299
299:1     A.   Yes.
299:2     Q.   -- "efficacy in acute pain,
299: 3 transitioning to OA, GI safety, and QD
299: 4 efficacy." Did you find anywhere in there
299: 5 that one of the components of the message
299: 6 should be what is the cardiovascular
299: 7 event safety?
299: 8     A.   First of all, I'm not
299: 9 familiar with the memo, so, I don't
299:10 recall it specifically, so, I'm going to
299:11 suggest that the word "GI safety" from my
299:12 interpretation would include the CV

→ Δ's objections: Irrelevant;
hearsay (6/20/01 email from
K. Hinckley); lack of knowledge;
argumentative

π's response: Same as above.

Irvin 2 ruling: Overruled.

↓
continued

Carroll

299:13 information.
299:14    Q.   What does "GI" mean,
299:15 gastrointestinal?
299:16    A.   Right.
299:17    Q.   What does gastrointestinal
299:18 have to do with cardiovascular?
299:19    A.   Well, then, I'm going to say
299:20 that I don't know the purpose of the
299:21 note, other than it looks like a note
299:22 preparing for an internal meeting, and
299:23 I'm not sure what the total components of
299:24 that meeting would be.
300: Page 300
300: 1    Q.   Your name is on this; right?
300: 2    A.   As a cc, yes.
300: 3    Q.   Did you just try to tell me
300: 4 that GI safety was the same thing as
300: 5 cardiovascular event safety?

JC081   300:8-301:7

300: 8         THE WITNESS:  I misread
300: 9    that, yes.
300:10 BY MR. PAPANTONIO:
300:11    Q.   So, there's no mention in
300:12 here about cardiovascular safety, is
300:13 there?  If you find it, please point it
300:14 out.
300:15    A.   What I'm saying is, I can't
300:16 answer that, because in the context of a
300:17 meeting, I don't know what else would be
300:18 done at the meeting.  There could be
300:19 other sections, other segments.  So, this
300:20 note is referring to one person and how
300:21 they might have a section of the meeting
300:22 and how they might go about that.
300:23    Q.   Do you see it says, "Talk
300:24 about the four main components of the
301: Page 301
301: 1 Vioxx Message," four main components.  We
301: 2 went through them, and in none of those
301: 3 four main components is there one word,
301: 4 not any mention whatsoever in the Vioxx
301: 5 message of cardiovascular events,
301: 6 correct, strokes, MI, blood clot, nothing
301: 7 in there; right?

JC082   301:11-303:12

301:11    Q.   So, point it out if it's
301:12 there.
301:13    A.   First of all, I said that I
301:14 don't know in the context of this note
301:15 what the total meeting was and what other
301:16 sections would be.  I also would point

→ Δ's objections: Irrelevant;
hearsay (6/20/01 email from
K. Hinckley); argumentative

Π's response: same as previous page.

Irvin 2 ruling: Overruled.

↓
Continued

Page 29

Carroll

301:17 out that every Merck sales rep into the
301:18 marketplace always provided balance
301:19 around benefits and safety for all the
301:20 drugs, not just Vioxx.
301:21    Q.  Point out in this document
301:22 where it says anything about the sales
301:23 rep talking about cardiovascular safety.
301:24 Where is that?
302: Page 302
302: 1    A.  I'm saying this document is
302: 2 a separate document, and in the context
302: 3 of not knowing what else was at the
302: 4 meeting, I can't suggest that this is
302: 5 what the meeting was about.
302: 6    Q.  But somebody told Marty
302: 7 Carroll the meeting was going to take
302: 8 place, didn't they?
302: 9    A.  Yes, somebody --
302:10    Q.  It has your name on top of
302:11 it, right?  And it says, you see, "Put up
302:12 a message slide and discuss Vioxx mantra.
302:13 What does the word "mantra" mean to you?
302:14    A.  In the context of this, I
302:15 don't know.
302:16    Q.  After you got this, did you
302:17 say, well, gee, you got four main
302:18 components, those four main components
302:19 are efficacy, GI safety, transitioning
302:20 and QD.  Where is something in there
302:21 about safety?  You didn't write them back
302:22 and say, where is something about safety,
302:23 did you?
302:24    A.  I don't recall.
303: Page 303
303: 1    Q.  About cardiovascular safety?
303: 2    A.  I don't recall.  I might
303: 3 have, I might not have.
303: 4    Q.  It's not in that -- you
303: 5 think you might have, that you might have
303: 6 written back and said, hey, you know, one
303: 7 of our components needs to be
303: 8 cardiovascular safety when we talk about
303: 9 this product?  Did you remember doing
303:10 that?
303:11    A.  I'm saying I don't recall
303:12 one way or the other.

JC084    418:15-418:20

418:15    Q.  Well, one thing Marty
418:16 Carroll has already told us today is that
418:17 money was not the motivation for Vioxx;
418:18 right?
418:19    A.  I don't believe money was
418:20 the motivation for any medicine.

→ Δ's Objections: Irrelevant;
lack of Knowledge; hearsay
(6/20/01 email from K. Hinckley)
argumentative; asked and
answered

TTs response: Witness's claims are being
   impeached. R. 607. Permissible
   cross-examination. Witness received
   document.
Irwin's ruling: Overruled.

Page 30

Carroll

JC085    419:8-419:20

419: 8        MR. PAPANTONIO:  Show him
419: 9    1004, please.
419:10            - - -
419:11        (Whereupon, Deposition
419:12    Exhibit P1.1004, Confidential
419:13    Memo, June 21, 1999,
419:14    MRK-ABL0000609 - MRK-ABL0000654,
419:15    was marked for identification.)
419:16            - - -
419:17 BY MR. PAPANTONIO:
419:18        Q.   Now, you were at the company
419:19 on June 21st, 1999, weren't you?
419:20        A.   Yes.

JC086    420:6-420:16

420: 6        Q.   Do you see this document
420: 7 that says, "Memo Confidential" at the top
420: 8 of it?
420: 9        A.   Yes.
420:10        Q.   What does that mean when you
420:11 get a document that says, "Confidential"?
420:12 What does that mean within the family of
420:13 Merck?  What is that supposed to mean?
420:14        A.   It generally means it's
420:15 confidential vis-a-vis outside the
420:16 company.

JC087    420:21-421:3

420:21        Q.   Now, I want to ask you
420:22 whether anybody had ever told you that
420:23 money was important for the people at
420:24 Merck as far as sales of Vioxx.  Has
421: Page 421
421: 1 anybody told you that money was
421: 2 important, that that was a big factor for
421: 3 them?

JC088    421:7-423:1

421: 7        THE WITNESS:  Again, I think
421: 8    what's important is patients and
421: 9    the benefit to patients.  Business
421:10    is important and Merck is a
421:11    business of marketing and selling
421:12    and research.  And, yes, business
421:13    performance would be important,
421:14    but not to the detriment of
421:15    patients.
421:16 BY MR. PAPANTONIO:
421:17        Q.   You never would want to

Continued

Page 31

Carroll

421:18 cause a detriment to patients, would you?
421:19     A.   No.
421:20     Q.   No.  It wouldn't be good.
421:21 You want to do what is best for the
421:22 patient, don't you?
421:23     A.   You do.
421:24     Q.   That's a good policy, isn't
422: Page 422
422: 1 it?
422: 2     A.   Yes.
422: 3     Q.   How about flipping over to
422: 4 Page 38 of that document?  Top of the
422: 5 page says, "Vioxx Alternate Shape Tablet
422: 6 and Alternate" Formulas "(12.5, 25 & 50
422: 7 mg doses)."  Do you see that?
422: 8     A.   Yes.
422: 9     Q.   It says, "Marketing
422:10 Rationale.  The current 25 mg and 50 mg
422:11 tablets for Vioxx can be broke in half by
422:12 patients and can easily be cut by a pill
422:13 cutter.  This represents a revenue
422:14 threat...to the flat pricing strategy for
422:15 Vioxx.  The objective is to identify a
422:16 modified tablet shape for the 25 mg and
422:17 50 mg tablets to make the tablets more
422:18 difficult to break by hand in the short
422:19 term.  In the long term, we should pursue
422:20 alternative formulation options...to
422:21 minimize tablet splitting."
422:22           Did you know, sir -- did I
422:23 read that right, first of all?  Does that
422:24 look right?
423: Page 423
423: 1     A.   Yes.

JC090     424:24-426:5

424:24           Do you see "Technical
425: Page 425
425: 1 Assessment"?  See where it says, the
425: 2 second paragraph, "Worldwide Human Health
425: 3 Marketing has suggested that some
425: 4 patients may be encouraged by their
425: 5 physicians to sub-divide the higher dose
425: 6 strength Vioxx tablets in order to
425: 7 provide multiple doses from a single
425: 8 tablet.  Because of the flat pricing
425: 9 structure for Vioxx tablets this option
425:10 might be attractive to patients who are
425:11 motivated to save money on prescription
425:12 charges.  To date there has been no
425:13 suggestion that Vioxx suspension"
425:14 formulas -- "formulations might be
425:15 subjected to the same sub-division by
425:16 patients."

↓
Continued

→ Δ's Objections: Irrelevant;
   prejudicial; argumentative

   Π's response: Relevant to failure to warn
      claim as well as defect. Permissible
      cross-examination. R. 407.

   Irvin 2 ruling: Overruled.

→ Δ's Objections: Irrelevant;
   prejudicial; argumentative

   Π's response: same as above

   Irvin 2 ruling: Overruled.

Page 32

Carroll

425:17        Now, do you see the next
425:18 paragraph?  Your company, sir, is
425:19 actually trying to figure out how to
425:20 prevent people from splitting your pills
425:21 in half so they can save money.  Do you
425:22 see it?
425:23        "The best way to discourage
425:24 sub-division of pharmaceutical dosage
426: Page 426
426: 1 forms (tablets or suspensions) is to
426: 2 market doses which are not exact
426: 3 multiples and to avoid linear pricing
426: 4 wherever possible."
426: 5        Do you see that?

JC091    426:11-426:13

426:11        Q.   Do you see that language?
426:12 Yes.
426:13        A.   I see that language, yes.

JC092    426:23-427:24

426:23        Q.   Did you ever know that?  Is
426:24 this the first time you've ever seen
427: Page 427
427: 1 this?
427: 2        A.   A couple things.  This is
427: 3 the first time I've seen this.  In the
427: 4 context of the document, it says
427: 5 "alternate."  It could be an alternate
427: 6 strategy, it could be a thought process.
427: 7        And again, in terms of
427: 8 tablet splitting, there is a lot of
427: 9 debate about that.  Some physicians and
427:10 pharmacists will be uncomfortable with
427:11 tablet splitting because the appropriate
427:12 dose is not being achieved.
427:13        Q.   That's not what this says.
427:14 This doesn't say anything about
427:15 appropriate dose.  This says, "The
427:16 current 25 and 50 milligram tablets for
427:17 Vioxx can be broke in half and can easily
427:18 be cut by a pill cutter.  This," read
427:19 this with me, just so there's no question
427:20 that this ain't about patients.  "This
427:21 represents a revenue threat."  Do you see
427:22 that?  It doesn't say a patient threat.
427:23 It says a "revenue threat."  What is
427:24 revenue?

JC093    428:4-428:16

428: 4        Q.   What is revenue, Mr.
428: 5 Carroll?

Δ's objections: Irrelevant; prejudicial;
argumentative
π's response: Permissible cross-examination. R.407.
Irwin 2 ruling: Not applicable. No objection.

Δ's objections: Irrelevant;
prejudicial; argumentative;
lack of knowledge; no answer
included to last lawyer's speech
π's response: Permissible cross-examination.
R.407 & R.612.
Irwin 2 ruling: Overruled.

Page 33

carroll plaintiff affirmatives 1_21.txt

10  might be attractive to patients who are
11  motivated to save money on prescription
12  charges.  To date there has been no
13  suggestion that  Vioxx suspension"
14  formulas -- "formulations might be
15  subjected to the same sub-division by
16  patients."
17          NOW, do you see the next
18  paragraph?  Your company, sir, is
19  actually trying to figure out how to
20  prevent people from splitting your pills
21  in half so they can save money.  Do you
22  see it?
23          "The best way to discourage
24  sub-division of pharmaceutical dosage
page 426
1  forms (tablets or suspensions) is to
2  market doses which are not exact
3  multiples and to avoid linear pricing
4  wherever possible."
5          DO you see that?

[426:23] - [427:24] 1/21/2006 Marty Carroll   Dep. Date  10-27-05

page 426
23      Q.      Did you ever know that?  Is
24  this the first time you've ever seen
page 427
1  this?
2      A.      A couple things.  This is
3  the first time I've seen this.  In the
4  context of the document, it says
5  "alternate."  It could be an alternate
6  strategy, it could be a thought process.
7          And again, in terms of
8  tablet splitting, there is a lot of
9  debate about that.  Some physicians and
10  pharmacists will be uncomfortable with
11  tablet splitting because the appropriate
12  dose is not being achieved.
13      Q.      That's not what this says.
14  This doesn't say anything about
15  appropriate dose.  This says, "the
16  current 25 and 50 milligram tablets for
17  Vioxx can be broke in half and can easily
18  be cut by a pill cutter.  This," read
19  this with me, just so there's no question
20  that this ain't about patients.  "This
21  represents a revenue threat."  Do you see
22  that?  It doesn't say a patient threat.
23  It says a "revenue threat."  What is
24  revenue?

[428:4] - [429:5] 1/21/2006 Marty Carroll   Dep. Date  10-27-05

page 428
4      Q.      What is revenue, Mr.
5  Carroll?
6      A.      Revenue would be sales of a
              Page 34

*(handwritten)* sustained
4/0?

carroll plaintiff affirmatives 1 21.txt

```
 7  product.
 8       Q.    And that's what you were in
 9  charge of, is sales of the product;
10  right?
11       A.    I had responsibility for the
12  sales organization.
13       Q.    And that was revenue?
14       A.    Everybody in the
15  organization had responsibility for
16  revenue.
17       Q.    And it says the ability to
18  be able to split these pills "represents
19  a revenue threat." Do you see it? Where
20  in that paragraph -- would you please
21  point out where in that paragraph it
22  shows that this company, Merck, is
23  concerned about the patient splitting
24  this and it's not all about revenue?
page 429
 1  where in that paragraph is it?
 2       A.    Let's go back to the fact --
 3       Q.    No, sir. I'm asking you a
 4  question. I don't want to go back to
 5  anything.
```

*(handwritten)* Sarcastic Argumentative — Impeaching Previous Claims.

*(handwritten)* sidebar

[429:9] - [429:13] 1/21/2006 Marty Carroll   Dep. Date  10-27-05

```
page 429
 9       Q.    You show me in this
10  paragraph where it says anything about
11  patient's concern and not anything about
12  revenue. Where is the patient in this
13  paragraph?
```

*(handwritten)* argumentative asked! answered — Same response,

[429:17] - [429:22] 1/21/2006 Marty Carroll   Dep. Date  10-27-05

```
page 429
17            THE WITNESS: This document,
18  I don't have the context of. It
19  says "alternate." It could have
20  been a strategy plan. It's 1999.
21  And to my knowledge, the product
22  never was changed in any way.
23  BY MR. PAPANTONIO:
24       Q.    It was, wasn't it? You
page 430
 1  don't know that it was changed, but if I
 2  were to tell you it was changed, you
 3  don't know whether that's true or false,
 4  do you?
 5       A.    No. I took the product, so
 6  I would know if it was changed and --
```

*(handwritten)* 602

*(handwritten)* 602 sarcastic

[430:24] - [431:2] 1/21/2006 Marty Carroll   Dep. Date  10-27-05

```
page 430
24       Q.    Well, do you know, sir, how
```

Page 35

Carroll

428: 6     A.   Revenue would be sales of a
428: 7 product.
428: 8     Q.   And that's what you were in
428: 9 charge of, is sales of the product;
428:10 right?
428:11     A.   I had responsibility for the
428:12 sales organization.
428:13     Q.   And that was revenue?
428:14     A.   Everybody in the
428:15 organization had responsibility for
428:16 revenue.

JC094    430:24-431:2

430:24     Q.   Well, do you know, sir, how
431: Page 431
431: 1 they went about changing the pill so it
431: 2 could not be subdivided?

JC097    431:4-431:9

431: 4        THE WITNESS:  If they had
431: 5     done that, which I don't think
431: 6     they did, they would have to
431: 7     reformulate the product.
431: 8 BY MR. PAPANTONIO:
431: 9     Q.   And you know they did?

JC098    432:2-432:5

432: 2        MR. PAPANTONIO:  Give me
432: 3     667, please.  Excuse me, 140.  140
432: 4     first.  While we are on this topic
432: 5     about patient first, show me 140.

JC099    432:13-433:8

432:13     Q.   Were you with the company in
432:14 1998, sir?
432:15     A.   Yes.
432:16        MR. PAPANTONIO:  Show him
432:17     140, please.
432:18 BY MR. PAPANTONIO:
432:19     Q.   Do you see the date up top
432:20 there, 1998?
432:21     A.   Yes.
432:22     Q.   Do you see your name down
432:23 there anywhere?
432:24     A.   I do.
433: Page 433
433: 1     Q.   J.M. Carroll, that's you,
433: 2 isn't it?
433: 3     A.   That's me.
433: 4     Q.   And it's from D.W. Anstice.
433: 5 Tell us who that is.

→ Δ's objections: Assumes facts not in evidence; irrelevant; prejudicial; argumentative

Π's response: Permissible cross-examination. R. 607. Refers to testimony regarding pill-splitting above. Relevant to show Merck was more interested in profits than people.

Irwin 2 ruling: No objection; previously played.

→ Δ's objections: Assumes facts not in evidence; irrelevant; prejudicial; argumentative

Π's response: same as above.

Irwin 2 ruling: No objection; previously played.

→ Δ's objections: Sidebar not a question

Π's response: Introducing document.

Irwin 2 ruling: No ruling. Same objection.

Page 34

Carroll

```
433: 6     A.   David Anstice ran all the
433: 7 marketing and sales group, and he was my
433: 8 boss.
```

JC100    434:6-434:9

```
434: 6     Q.   Okay.
434: 7          This is an organizational
434: 8 chart; right?  It says "David W. Anstice"
434: 9 at the top?
```

JC101    434:16-436:17

```
434:16     Q.   See that?
434:17     A.   Yes, I've got it.
434:18     Q.   And then underneath it says,
434:19 right up underneath it has "Martin
434:20 Carroll."  Do you see that?
434:21     A.   Yes.
434:22     Q.   So, as far as the pecking
434:23 order, David Anstice was the president of
434:24 the Americas.  What does that mean?
435: Page 435
435: 1     A.   That meant Canada, the U.S.
435: 2 and South and Latin America.
435: 3     Q.   So, he was Canada, U.S. and
435: 4 South and Latin America; right?
435: 5     A.   Yes.
435: 6     Q.   And right up underneath him
435: 7 there is Wendy Dixon and then there's
435: 8 Martin Carroll; correct?
435: 9     A.   Yes.
435:10     Q.   Now, this letter that I
435:11 showed you before I showed you that is a
435:12 memo to Martin Carroll from D.W. Anstice;
435:13 correct?
435:14     A.   Yes.  There was a number of
435:15 people on it, but I'm included.
435:16     Q.   And it says, "Subject:
435:17 Vioxx."  "Battle is now joined with
435:18 Pfizer in another major therapeutic area
435:19 and one which is CRITICAL to Merck from
435:20 2000 onward."
435:21          Can you tell me why the
435:22 battle was so critical for Merck?  In
435:23 1998, why was this battle so critical for
435:24 Merck?
436: Page 436
436: 1     A.   Like any new launched
436: 2 product, you want to make sure that you
436: 3 have good marketing positions, good
436: 4 plans, and that you execute well.  In my
436: 5 opinion, David was merely calling to
436: 6 action the team to make sure that we were
436: 7 prepared for the launch of Vioxx.
```

Page 35

Carroll

436: 8     Q.   And did you know that prior
436: 9 to the launch of Vioxx, sir, that there
436:10 had not been one single clinical test
436:11 that was done to try to determine what
436:12 the relationship was between CV events
436:13 and Vioxx?  Did you know that prior to
436:14 the time -- when you got this letter in
436:15 your hand, did you know not one single
436:16 long-term clinical data test had been
436:17 done?

→ Δ's Objections: Argumentative;
misstates the evidence

Π's response: Permissible cross-examination.
Merck never did a CV outcome study.

Irwin 2 ruling: Overruled.

JC102    436:20-437:15

436:20     Q.   Did you know that?
436:21     A.   I don't recall whether I
436:22 knew that or didn't know that back then.
436:23     Q.   But we're not talking about
436:24 data here.  We're talking about the
437: Page 437
437: 1 "Battle is now...with Pfizer in another
437: 2 major therapeutic area and one which is
437: 3 CRITICAL to Merck from 2000 onward."  It
437: 4 goes on to say, "We should assume Pfizer
437: 5 will promote Celebrex everywhere."  And
437: 6 then it says --
437: 7         MR. PAPANTONIO:  Blow that
437: 8     up.
437: 9 BY MR. PAPANTONIO:
437:10     Q.   It says, "We simply CANNOT
437:11 LOSE in any single market in The
437:12 Americas."  Why could you not lose?  Why
437:13 was it so important that you not be able
437:14 to lose in this fight with Pfizer?  Why
437:15 is that so important?

JC103    437:18-439:13

437:18         THE WITNESS:  Any new
437:19     product launch is important.  In
437:20     this particular case, Vioxx was a
437:21     great product, and it was
437:22     important that we take that data
437:23     into the marketplace.  It was
437:24     going to benefit patients.  And
438: Page 438
438: 1     from a marketing and sales point
438: 2     of view, it's David challenging
438: 3     the team to make sure that we're
438: 4     prepared to do that well.
438: 5 BY MR. PAPANTONIO:
438: 6     Q.   Well, did you know, sir --
438: 7 did you know what the financial situation
438: 8 was for Merck at the time that Vioxx was
438: 9 put on the market?  At the time that you
438:10 launched -- at the time -- let me say it

Carroll

438:11 this way.
438:12        At the time that Mr. Anstice
438:13 was talking about how critical this
438:14 battle was for Merck, do you know what
438:15 the financial situation was for Merck at
438:16 that time?
438:17     A.   As far as I remember, it was
438:18 very strong because we had launched a
438:19 number of new products between '95 and
438:20 '99.
438:21     Q.   It's your belief that the
438:22 financial situation was strong?
438:23     A.   That's what I recall.
438:24     Q.   Do you remember being in any
439: Page 439
439: 1 competition with Pfizer on any other
439: 2 products?
439: 3     A.   Absolutely.
439: 4     Q.   Which ones?
439: 5     A.   A lot of them.
439: 6     Q.   Tell me which ones you were
439: 7 in competition with Pfizer with.
439: 8     A.   The one I remember the most
439: 9 was Zocor and Lipitor.
439:10     Q.   Right.
439:11        And they were killing you in
439:12 sales, weren't they?
439:13     A.   Lipitor was doing very well.


JC104    445:1-445:5

445: 1     Q.   You've seen this?
445: 2     A.   No, I haven't seen it.
445: 3 You're refreshing my mind, but I don't
445: 4 specifically recall it, so I am going to
445: 5 quickly scan it.


JC105    445:10-446:8

445:10     Q.   You knew, sir, at the time
445:11 that Vioxx was being launched, that Merck
445:12 needed Vioxx because patents that you had
445:13 on other drugs were getting ready to
445:14 expire? You knew that; right?
445:15     A.   I knew that there was a
445:16 number of patent expirations in 2001, 2
445:17 and 3.
445:18     Q.   Those were Merck drugs?
445:19     A.   Right.
445:20     Q.   And you knew that what that
445:21 would do would open the door to less
445:22 expensive generic versions of the same
445:23 drug; right?
445:24     A.   Which is good for the
446: Page 446

Page 37

Carroll

446: 1 consumer.
446: 2     Q.   Right.
446: 3          But it's not good for Merck?
446: 4     A.   From a business point of
446: 5 view, when you have scientific
446: 6 advancements and they run the course of
446: 7 patents, they run the course of patents,
446: 8 and that's why you have innovation.

JC106    446:17-447:5

446:17     Q.   But it wasn't good for
446:18 Merck, was it?
446:19     A.   Merck needed to make sure
446:20 that it grew the existing brands it had.
446:21     Q.   At the same time, you knew
446:22 there was a slow down that was taking
446:23 place in sales growth of the big
446:24 cholesterol drug franchises.  There was
447: Page 447
447: 1 an actual slow down in that growth, you
447: 2 knew that; right?
447: 3     A.   Zocor was growing, but it
447: 4 was slower because it had competition in
447: 5 the marketplace.

JC107    448:14-449:6

448:14     Q.   And you knew that Merck --
448:15 that Pfizer was already on the market
448:16 with its product Celebrex when y'all came
448:17 along; right?
448:18     A.   Yes.
448:19     Q.   They had beat you to the
448:20 market?
448:21     A.   They were in the market five
448:22 or six months before the approval and
448:23 launch of Vioxx.
448:24     Q.   And because of that, it was
449: Page 449
449: 1 critical that you try to catch up with
449: 2 Celebrex; right?
449: 3     A.   It was critical to launch
449: 4 the product well, and it was critical
449: 5 from a competitive point of view to try
449: 6 to win in that marketplace.

JC108    469:11-469:17

469:11     Q.   Now, why was it so important
469:12 to catch up with Celebrex?  Why was it so
469:13 important that your company was in this
469:14 race with Celebrex?
469:15     A.   I just see this as the usual
469:16 competitive interaction in the

469:17 marketplace.

Carroll

**Total Length - 00:57:33**