New Scolnick Complete

π's Affirmative Designations:
· transcript includes:
1. Δ's objections
2. π's responses
3. Court's rulings in Irvin 1 & 2.

Scolnick Part 1 (3-22-05) (Multi-clip)
Scolnick 1505     15:5-15:7

15: 5     Q.  Are you Dr. Ed Scolnick?
15: 6     A.  Yes, I'm Dr. Edward
15: 7  Scolnick.

Scolnick 2213     22:13-22:18

22:13     Q.  Are you the Edward M.
22:14  Scolnick, President of Merck Research
22:15  Labs and then the Executive Vice
22:16  President Science and Technology for
22:17  Merck & Company?
22:18     A.  Yes, I am.

Scolnick 47.2-48.2     47:2-48:2

47: 2     Q.  Well, let me suggest it to
47: 3  you if you'll look at Exhibit Number 4.
47: 4         I'll bet you've seen this
47: 5  e-mail lately getting ready for your
47: 6  deposition, haven't you?
47: 7     A.  I don't recall seeing this
47: 8  e-mail before right now.
47: 9     Q.  You don't recall seeing this
47:10  e-mail before?
47:11     A.  I do not recall seeing this
47:12  e-mail before.
47:13     Q.  All right.  Well, if you'll
47:14  look down at your message dated December
47:15  5th, 2001, it's about an analyst who is
47:16  going to stand up in public and say
47:17  something negative about Vioxx.  And
47:18  you're the fellow who wrote, "David if he
47:19  says this I will boil him in oil at the
47:20  meeting."  That's what you said, isn't
47:21  it?
47:22     A.  That is the e-mail you're
47:23  referring to, yes.
47:24     Q.  Does that mean, yes, you
47:ESQUIRE DEPOSITION SERVICES
48: 48
48: 1  said it?
48: 2     A.  That is my e-mail.

Scolnick 49.1-49.10     49:1-49:10

49: 1         So, you were saying you were
49: 2  going to boil this fellow in oil because
49: 3  this was an analyst who was going to
49: 4  stand up and suggest that maybe Vioxx
49: 5  causes CV events, heart attacks, strokes,
49: 6  things like that; right?
continued →

Δ's objections: Irrelevant; Prejudicial; 801/802

π's response: R. 803 (3) → Hearsay rule does not render inadmissible Dr. Scolnick's statement of his intent. Relevant to show failure to warn. Witness's own evidence.

Irvin 2 ruling: Overruled.

Δ's objections: 401, 402, & 403, 801/802

Supplemental Objection: Mischaracterization of document.

π's response: same response as above.

Irvin 2 ruling: Overruled.

Page 1

New Scolnick Complete

```
49: 7      A.  I don't recall the details
49: 8   of his report.  I have not seen this
49: 9   e-mail, and I don't recall the details of
49:10   this at all.
```

Scolnick 52.2-52.21      52:2-52:21

```
52: 2      Q.  Well, if you'll look behind
52: 3   you'll see what it is that upset you.
52: 4   It was this fellow named somebody, hang
52: 5   on, his name is at the end, Richard
52: 6   Stover, who prepared a reanalysis of
52: 7   Merck's meta-analysis.  Do you see where
52: 8   it says that?
52: 9      A.  That is the title for the
52:10   article that you're referring to.
52:11      Q.  Now, those are a lot of big
52:12   words for nonscientist people.  But just
52:13   between you and me, what this really is
52:14   is it's a stock analyst, someone who
52:15   advises the investment community on
52:16   whether to buy or sell stock, and he's
52:17   basically examining some of what you guys
52:18   had been telling people about the safety
52:19   of your drug, isn't he?
52:20      A.  He's talking about the VIGOR
52:21   study and Vioxx, yes.
```

Scolnick 58.17-58.24      58:17-58:24

```
58:17      Q.  Okay.  And that's why you
58:18   said "David if he says this I will boil
58:19   him in oil at the meeting."  You didn't
58:20   want that kind of talk out there, did
58:21   you?
58:22      A.  I didn't want -- having read
58:23   this memo, I didn't want an inaccurate
58:24   statistical analysis of our data.
```

Scolnick 6803      68:3-68:4

```
68: 3      Q.  I want to show you Scolnick
68: 4   Exhibit Number 7.  We're going to come
```

Scolnick 6811      68:11-68:18

```
68:11      Q.  Do you see your June 1, 1998
68:12   e-mail?
68:13      A.  Yes, I do.
68:14      Q.  You did threaten to quit,
68:15   didn't you?
68:16      A.  I was upset with a
68:17   particular marketing person.  I was --
68:18   and that is the thrust of this e-mail.
```

D's objections: 401, 402 & 403, 801/802, 602

Supplemental objection: Assumes facts not in evidence.

P's response: Witness testifying regarding his own email. Document reveals his state of mind and intent; 803(3) exception.

Irwin 2 ruling: Overruled.

---

D's objections: 401, 402 & 403, 801/802, 611

Supplemental objection: Mischaracterization of document; mischaracterization of testimony

P's response: Relevant to show witness's state of mind & intent to minimize any safety concerns raised about Vioxx. Permissible cross-examination of adverse witness.

Irwin 2 ruling: Overruled.

New Scolnick Complete

Scolnick 69.01-69.15    69:1-69:15

69: 1     Q.  Well, when you said "If you
69: 2  lose I will leave, because I will not be
69: 3  able to have any respect for this
69: 4  company," that's threatening to quit,
69: 5  isn't it?
69: 6     A.  The e-mail is accurate.
69: 7     Q.  No.  That wasn't my
69: 8  question.
69: 9        I said, when you say in your
69:10  e-mail, "If you lose I will leave,
69:11  because I will not be able to have any
69:12  respect for this company," you're
69:13  threatening to quit, aren't you?
69:14     A.  I accept that
69:15  interpretation.

Scolnick 069.23-070.12    69:23-70:12

69:23     Q.  You're saying "Merck
69:24  marketing for once has to compete and
69:ESQUIRE DEPOSITION SERVICES
70: 70
70: 1  win.  If you do not beat Pfizer," which
70: 2  is who Scarle was at the time; right?  If
70: 3  you don't beat Celebrex, that's what it
70: 4  means; right?
70: 5     A.  Yes, that's correct.
70: 6     Q.  "If you do not beat PFIZER
70: 7  2/1 MERCK should throw in the towel and
70: 8  just give up and hand the company over to
70: 9  someone else.  If YOU," all capitals,
70:10  "lose I will leave, because I will not be
70:11  able to have any respect for this
70:12  company."

Scolnick 070.13-071.12    70:13-71:12

70:13  but you were pretty
70:14  upset with them, weren't you?
70:15     A.  It is a pointed e-mail.
70:16     Q.  Because you were upset;
70:17  weren't you?
70:18     A.  That is correct.
70:19     Q.  You were upset also because
70:20  of some study issues, research issues;
70:21  weren't you?
70:22     A.  I don't recall what you're
70:23  referring to.
70:24     Q.  Look at what it says at the
70:ESQUIRE DEPOSITION SERVICES
71: 71
71: 1  start.  You're saying that the reason
71: 2  y'all were three months behind Scarle,



D's objections: Fragment (remove "but"); argumentative; sarcasm

π's response: Not sarcastic. Permissible cross-examination.

Irvin 1 ruling: Sustained in part
Irvin 2 ruling: same objection – no ruling

-continued→    Page 3

New Scolnick Complete

71: 3  the reason you were losing the race is
71: 4  because people in marketing "demanded a
71: 5  label that said we cause no ulcers."
71: 6  And then the budgets were so high that
71: 7  nobody could get the money that they
71: 8  needed for the study. And that's why
71: 9  y'all were behind? That's what you say;
71:10  isn't it?
71:11      A.  That is what the memo says,
71:12  yes.

Scolnick 7807    78:7-78:12

78: 7      Q.  Bottom line is, you were
78: 8  saying marketing needs to stop their
78: 9  demands and just get out there and
78:10  compete and win for once; right?
78:11      A.  That's what my memo
78:12  indicates.

△'s objections: Irrelevant; Prejudicial; Argumentative; sarcastic tone
Supplemental objection: Asked & Answered.

π's response: Relevant to π's claim that Merck was in a race to have first Cox-2 on market. Permissive cross-examination.

Irvin 2 ruling: Overruled.

Scolnick 7906-7911    79:6-79:11

79: 6      Q.  Sir, y'all weren't ready to
79: 7  go to market with your product, with
79: 8  Vioxx, when Celebrex hit the market?
79: 9  Y'all got beat; right?
79:10      A.  Celebrex got to the market
79:11  first. That is correct.

Scolnick 9623    96:23-97:5

96:23      Q.  Well, we looked at an
96:24  exhibit a few minutes ago, the 1998 one
96:ESQUIRE DEPOSITION SERVICES
97: 97
97: 1  where you said that y'all were killing
97: 2  basic research again at Merck, once
97: 3  again. That's because y'all needed more
97: 4  money. You didn't have enough money in
97: 5  the budget; right?

Scolnick 9803    98:3-98:9

98: 3      Q.  All right. So, now you'll
98: 4  agree with me in 1998 y'all didn't have
98: 5  enough money in your budget to do all the
98: 6  research you wanted to do. True?
98: 7      A.  That is true. That is
98: 8  always true of any really productive
98: 9  research laboratory.

△'s objections: Irrelevant; Prejudicial; Lack of Personal Knowledge; misleading.

π's response: Relevant to rebut Merck's claim that Vioxx had been adequately studied prior to being placed on the market. Witness was head of MRL & had personal knowledge of budgets. Witness understood and answered question.

Irvin ruling: Overruled.

Scolnick 10113    101:12-101:20

101:12  BY MR. LANIER:
101:13      Q.  Well, sir, you weren't in

→ continued

Page 4

New Scolnick Complete

101:14  marketing yourself, were you?
101:15      A.  No.
101:16      Q.  Well, why did you keep
101:17  dabbling in the marketing end?  Why were
101:18  you sending broadside e-mails to people,
101:19  because y'all were too slow on the
101:20  marketing?

→ D's objections: Irrelevant; Prejudicial;
Lack of personal knowledge; Argumentative;
Confusing.

π's response:  see previous response.

Irvin ruling:  Overruled.

Scolnick 10123   101:23-102:3

101:23        THE WITNESS: I was
101:24    competitive, and we had a terrific
101:ESQUIRE DEPOSITION SERVICES
102: 102
102: 1    drug, and I wanted the company to
102: 2    present that drug well to
102: 3    physicians.

Scolnick 11503   115:3-115:10

→ D's objections: Mischaracterization of testimony;
Irrelevant; Prejudicial; Argumentative.

π's response: Permissible cross-examination;
relevant to rebut Merck's claim that
it adequately studied Vioxx

Irvin ruling: Overruled.

115:3     Q.  So, you had all the
115:4  resources you needed to do the right
115:5  studies, and if the studies weren't done,
115:6  it was your fault for not doing them
115:7  because you had the money.  Is that what
115:8  you're telling me?
115:9     A.  We had sufficient resources
115:10  to study Vioxx.

Scolnick 11805   118:5-118:11

118:5     Q.  If you thought that there
118:6  was an issue that needed debunking, you
118:7  certainly knew how to order to get a
118:8  study immediately to debunk the issue and
118:9  destroy credibility, didn't you?
118:10      A.  And to find out if we were
118:11  wrong.

Scolnick 11818   118:18-119:3

118:18      Q.  That wasn't my question,
118:19  sir.  I said, you could have done a
118:20  study, and you could have ordered one to
118:21  be done with speed on the issue of
118:22  cardiovascular problems, heart attacks
118:23  and strokes, couldn't you?
118:24      A.  There was no reason to do
118:ESQUIRE DEPOSITION SERVICES
119: 119
119: 1  such a study before Vioxx went to market
119: 2  based on all of the data, huge NDA, over
119: 3  5,000 patients studied.

Scolnick 11910   119:10-119:23

New Scolnick Complete

119:10  question. My question is simple. You
119:11  certainly could have ordered a study for
119:12  risks of heart attacks and strokes before
119:13  you put the Vioxx drug on the market,
119:14  couldn't you?
119:15      A.  If there had been a reason
119:16  to do that, I could have done that.
119:17      Q.  By the same token, any day
119:18  that Vioxx had been on the market, the
119:19  second it occurred to you that there
119:20  might be a problem with heart attacks and
119:21  strokes, you could have ordered
119:22  immediately a speed study to be done;
119:23  couldn't you?

Scolnick 12002    120:2-120:5

120: 2          THE WITNESS: I could have
120: 3          asked or ordered a study to be
120: 4          done if I had thought there was a
120: 5          cardiovascular risk with Vioxx.

Scolnick 12023    120:23-121:23

120:23  to justify selling the drug. I'm asking
120:24  you, did you ever order a specific study
120:ESQUIRE DEPOSITION SERVICES
121: 121
121: 1  about heart attacks and strokes?
121: 2      A.  I did not order a specific
121: 3  study. I urged the group to come up with
121: 4  study designs after VIGOR to further
121: 5  examine the question that was raised by
121: 6  the VIGOR study.
121: 7      Q.  Well, sir, what about VALOR,
121: 8  did you have anything to do with talk
121: 9  about doing the VALOR study?
121:10      A.  VALOR?
121:11      Q.  Yes, sir.
121:12      A.  I don't recognize the term.
121:13  I'm sorry.
121:14      Q.  Did you know that your
121:15  company at one point contemplated and
121:16  actually went pretty far in designing the
121:17  idea of doing a study specifically to
121:18  look at heart attack, strokes, CV risks?
121:19      A.  Yes. Several study designs
121:20  were considered.
121:21      Q.  And one of them had approval
121:22  and was about to be done when it was
121:23  cancelled. Did you know that?

Scolnick 12201    122:1-122:3

D's objections: Irrelevant; Prejudicial

Supplemental objections: Foundation;
Vague; Incomplete.

π's response: Discussions of CV studies
considered are relevant since π was
on drug during this time. Witness
understood & answered questions.

Irwin ruling: Overruled.

New Scolnick Complete

122: 1          THE WITNESS:  One of the
122: 2     studies that I'm aware of was not
122: 3     given final approval.

Scolnick 12205     122:5-122:9

122: 5     Q.   Why not?
122: 6     A.   Because when the study was
122: 7   reviewed, several people objected to the
122: 8   design of the study, that it was not a
122: 9   good scientific study to do.

Scolnick 12801     128:1-128:22

128: 1     Q.   Well, the truth is, the
128: 2   essential study that needed to be done
128: 3   for Vioxx was an outcomes study for heart
128: 4   attacks and strokes; right?
128: 5     A.   The study that would
128: 6   measure, as a predefined endpoint, heart
128: 7   attacks and strokes was an important
128: 8   study for Vioxx.
128: 9     Q.   Not an important.  It was,
128:10   at least in the world of things back in
128:11   2001, the only essential study for Vioxx,
128:12   wasn't it?
128:13     A.   It was an essential study to
128:14   do for Vioxx.
128:15     Q.   That wasn't my question.
128:16          The only essential study;
128:17   true?
128:18     A.   It wasn't the only essential
128:19   study to do.  It was —
128:20     Q.   That's what you said.
128:21     A.   It was a very important
128:22   study.

Scolnick 13609     136:9-136:12

136: 9     Q.   Well, certainly by the year
136:10   2000 you knew that there was an issue
136:11   about heart attacks and strokes, weren't
136:12   you?

Scolnick 13615     136:15-136:17

136:15          THE WITNESS:  The VIGOR
136:16   study was available in the year
136:17   2000.

Scolnick 14109     141:9-142:7

141: 9          MR. LANIER:  We're marking
141:10   that as Exhibit Number 13.
141:11   BY MR. LANIER:

D's objections:  Prejudicial

P's response:  Relevant to P's claim since he was taking Vioxx at that time. Prejudice does not substantially outweigh probative value.

Irwin ruling:  Overruled.

Page 7

New Scolnick Complete

141:12      Q.   If you'll look down at the
141:13   third question, that's the one I want you
141:14   to look at.
141:15      A.   Uh-huh.
141:16      Q.   "Why did Merck undertake
141:17   the," APPROVe, "trial?"
141:18      A.   Uh-huh.
141:19      Q.   Merck prepared an answer to
141:20   that. Nowhere in that answer does it say
141:21   to see if people are having heart attacks
141:22   and strokes, does it?
141:23      A.   The answer to the question
141:24   does not refer to the cardiovascular
141:ESQUIRE DEPOSITION SERVICES
142: 142
142: 1   outcome part of the study.
142: 2      Q.   I'm sorry. That's a long
142: 3   answer. Are you just saying, yes, you're
142: 4   right, it doesn't say heart attacks and
142: 5   strokes?
142: 6      A.   There's nothing about heart
142: 7   attacks and strokes in that answer.

Scolnick 14602    146:2-146:5

146: 2          You, Dr. Scolnick, knew
146: 3   Vioxx was causing heart attacks and
146: 4   strokes by the time of March 2000; true?
146: 5      A.   Not true.

Scolnick 14707    147:7-147:12

147: 7   jury, as of March 2000, you, Edward
147: 8   Scolnick, knew that the CV events, the
147: 9   heart attacks and strokes, were clearly
147:10   there, and you, Edward Scolnick, knew
147:11   that they were mechanism-based with
147:12   Vioxx?

Scolnick 14716    147:16-147:21

147:16      Q.   True?
147:17      A.   That was my very first
147:18   reaction when I saw the data from the
147:19   VIGOR trial.
147:20      Q.   You knew it from the get-go.
147:21   It was your first reaction; right?

Scolnick 14724    147:24-148:2

147:24          THE WITNESS: It was my
147:ESQUIRE DEPOSITION SERVICES
148: 148
148: 1   first reaction before other data
148: 2   was available.

New Scolnick Complete

Scolnick 14817   148:17-148:24

148:17       Q.   Sir, it is in March of 2000;
148:18   isn't it?
148:19       A.   Yes, it is.
148:20       Q.   And you said to everybody,
148:21   Alan Nies, Alise Reicin and Deborah
148:22   Shapiro certain things, didn't you?
148:23       A.   I did.  It says, "I just
148:24   received and went through the data."

Scolnick 14908   149:8-150:2

149:8       Q.   And you don't step out and
149:9   say something unless you know it's true
149:10   and right.  Do you remember that?
149:11       A.   I don't remember saying what
149:12   you've just quoted me as saying.
149:13       Q.   I think your exact words
149:14   were, you hold yourself to a very high
149:15   standard.  Do you remember that?
149:16       A.   Yes, I do remember that.
149:17       Q.   And so you sent this e-mail
149:18   to everybody, and you said that you
149:19   received and you went through the data;
149:20   right?
149:21       A.   Uh-huh.  That's what it
149:22   says.
149:23       Q.   And I'm sure you did that
149:24   thoroughly.  You didn't do a half slop
149:ESQUIRE DEPOSITION SERVICES
150: 150
150: 1   job; did you?
150: 2       A.   I don't think so.

Scolnick 15105   151:5-151:12

151: 5           THE WITNESS:  Excuse me.  If
151: 6       I can just look at the memo for
151: 7       one second.  "Pubs" in this
151: 8       context is talking about
151: 9       perforations, ulcers and bleeds
151:10       associated with the study.
151:11   BY MR. LANIER:
151:12       Q.   Okay.  Thank you.

Scolnick 15113   151:13-151:22

151:13           "There is no doubt about
151:14   the" perforations, ulcers and bleeds
151:15   "data."  Then look at your next sentence.
151:16   "The CV events are," what's that word?
151:17       A.   The sentence reads, "The
151:18   cardiovascular events are clearly there."

Page 9

New Scolnick Complete

151:19      Q.   They're clearly there.  That
151:20   was your choice of words; wasn't it?
151:21      A.   This is my e-mail.  That is
151:22   correct.

Scolnick 15123    151:23-152:16

151:23      Q.   So, after you studied the
151:24   data, you went through it, you sent a
151:ESQUIRE DEPOSITION SERVICES
152:152
152:1   memo out to everybody, even though you
152:2   hold yourself to a high standard, telling
152:3   everybody that the CV events are clearly
152:4   there, and that was March of 2000, wasn't
152:5   it?
152:6      A.   Yes, it is.
152:7      Q.   And you never sent out an
152:8   order at that point in time for a CV
152:9   outcomes study, did you?
152:10     A.   We — I did not send out an
152:11   order for a CV outcomes study.  We took
152:12   many immediate actions to try to
152:13   understand the cardiovascular events,
152:14   since we couldn't conclude what was going
152:15   on in the trial because there was no
152:16   placebo in the trial.

Scolnick 15607    156:7-156:10

156:7         1999, I wrote, "Push Vioxx
156:8   to market by May 22nd or" Merck will be
156:9   "'a different company.'"  That's what you
156:10   said in 1999; right?

Scolnick 15613    156:13-156:19

156:13     THE WITNESS:  It accurately
156:14     reflects our earlier discussion.
156:15   BY MR. LANIER:
156:16     Q.   Then also in 1999 you sent
156:17   out the e-mail that said if we can't beat
156:18   Celebrex two to one, you're going to quit
156:19   or leave the company.  True?

Scolnick 156.21-156.23    156:21-156:23

156:21     THE WITNESS:  You reflected
156:22     my e-mail and some of my
156:23     sentiments in that e-mail.

Scolnick 157.10-157.14    157:10-157:14

157:10     The drug Vioxx did go to
157:11   market in 1999, and y'all marketed it

D's objections: Prejudicial; Irrelevant;
     Asked and answered.

Pl's response: Relevant to Pl's claims
    that Merck failed to warn + that
    Merck had motive to rush to market.

Irvin ruling: Overruled.

Page 10

New Scolnick Complete

157:12  before the VIGOR study was finished;
157:13  true?
157:14      A.   Yes, that's correct.

Scolnick 16010    160:10-160:13

160:10      Q.   I said, very simple
160:11  question, sir. It's a simple note.
160:12  2000, you never did a CV specific study;
160:13  true?

Scolnick 16016    160:16-160:23

160:16          THE WITNESS:  We did not do
160:17  a study where cardiovascular
160:18  outcomes were a primary endpoint.
160:19  We did do a study where
160:20  cardiovascular outcomes were a
160:21  predefined endpoint in our studies
160:22  to gather additional
160:23  cardiovascular outcomes data.

Scolnick 16120    161:20-161:23

161:20      Q.   Okay. That's my point. So,
161:21  you never did, never, one single study
161:22  where the primary outcome was, does it
161:23  cause heart attacks or strokes; right?

D's objection: Asked and answered.

P's question: Permissible cross-examination
   to clarify witness's testimony.

Irvin ruling: Overruled.

Scolnick 16202    162:2-162:3

162: 2          THE WITNESS:  You're
162: 3  correct.

Scolnick 16223    162:23-163:8

162:23      Q.   Sir, simple question. Did
162:24  you change your warning label and tell
162:ESQUIRE DEPOSITION SERVICES
163: 163
163: 1  people about the VIGOR results in the
163: 2  year 2000? Yes or no?
163: 3      A.   We told people about the
163: 4  VIGOR results immediately after they
163: 5  became available to us.
163: 6      Q.   Okay.
163: 7      A.   And we submitted an NDA to
163: 8  the FDA to change our label.

Scolnick 22606    226:6-226:10

226: 6      Q.   Do you have Exhibit 18 in
226: 7  front of you?
226: 8      A.   Yes, I do.
226: 9      Q.   It's the day before your "to

Page 11

New Scolnick Complete

226:10   do" list, isn't it, the 13th?

Scolnick 22615    226:15-226:17

226:15           THE WITNESS: Yes. It's the
226:16   day before this memo on the "to
226:17   do" list.

Scolnick 22707    227:7-227:9

227: 7     Q.   Four days away from your
227: 8   initial conclusion that Vioxx was causing
227: 9   heart attacks and strokes; right?

D's objections: Assumes facts not in evidence;
Asked and answered.

T's response: Facts are in evidence. Permissible
cross-examination to outline time
frame.

Irvin ruling: Overruled.

Scolnick 22711    227:11-228:14

227:11           THE WITNESS: Four days from
227:12   my initial memo with my initial
227:13   conclusion, yes.
227:14 BY MR. LANIER:
227:15   Q.   All right.
227:16           Now, already by four days
227:17   later, you have got Ms. Reicin scouring
227:18   the medical literature trying to find a
227:19   study somewhere that indicates that
227:20   NSAIDs helped your heart; right?
227:21     A.   That was one of the
227:22   questions that I asked the team when they
227:23   suggested that NSAIDs could be
227:24   cardioprotective.
227:ESQUIRE DEPOSITION SERVICES
228: 228
228: 1     Q.   And the only study she was
228: 2   able to find -- by the way, it is
228: 3   singular, there was only one study she
228: 4   could find; true?
228: 5     A.   That's what the e-mail says,
228: 6   yes.
228: 7     Q.   In fact, why don't you read
228: 8   that sentence where I've highlighted
228: 9   "Only study."
228:10     A.   "Alan and Ed: Below is
228:11   attached the abstract from the only study
228:12   I could find which assessed the potential
228:13   cardioprotective effects of an NSAID.
228:14   AJise."

Scolnick 22902    229:2-229:8

229: 2     Q.   Did it occur to you that
229: 3   people were taking the drug that could be
229: 4   having these heart attacks, or is that
229: 5   what you meant when you said it's sad or
229: 6   it's a shame, but it's a low incidence,
229: 7   you just didn't figure there would be

D's objections: Compound; Argumentative.

T's response: Permissible cross-examination

Irvin ruling: Overruled.

Page 12

New Scolnick Complete

229: 8   that many of them?

Scolnick 22911     229:11-229:19

229:11            THE WITNESS:  As I've
229:12    stated, my initial conclusion was
229:13    that Vioxx was causing heart
229:14    attacks in patients.  After
229:15    discussions of this article and
229:16    extensive other data that we had
229:17    available to ourselves in our own
229:18    trials, I concluded that I was not
229:19    correct in my initial conclusion.

Scolnick 23021     230:21-230:23

230:21        Q.   I'm going to hand you a
230:22    document marked Exhibit 19.  Do you have
230:23    it in front of you?

Scolnick 23120     231:20-233:5

231:20        Q.   First of all, this
231:21    well-respected Carlo Patrono said that he
231:22    does not think that you can attribute the
231:23    increase in heart attacks and strokes to
231:24    the fact that the other people were
231:ESQUIRE DEPOSITION SERVICES
232: 232
232: 1    taking naproxen, and it must be good for
232: 2    your heart.  Fair to say?
232: 3        A.   That's what he writes, yes.
232: 4    That's what the person reflects on his
232: 5    comments.
232: 6        Q.   And then there are a number
232: 7    of reasons given why it can't be that
232: 8    naproxen is good; right?
232: 9        A.   What it says is, he
232:10    questions whether the magnitude of the
232:11    effects seen in VIGOR is consistent with
232:12    naproxen being cardioprotective.
232:13        Q.   Well, he said, first of all,
232:14    "There is a weak pharmacological basis."
232:15    Do you see where it said that?
232:16        A.   Yes, I do.
232:17        Q.   What that means to you and
232:18    me and folks who read this stuff more
232:19    than we probably should is that there's
232:20    really not a good medical science
232:21    pharmacy reason for saying it's naproxen.
232:22    That's what that means, doesn't it?
232:23        A.   It refers to the
232:24    pharmacology of the drug, and that's his
232:ESQUIRE DEPOSITION SERVICES
233: 233

Page 13

New Scolnick Complete

233: 1  interpretation.
233: 2      Q.   And then it says, "No
233: 3  epidemiological evidence." Do you see
233: 4  where it says that?
233: 5      A.   Yes, I do.

Scolnick 23314    233:14-234:3

233:14      Q.   Well, do you see the word
233:15  "no"?
233:16      A.   I do see that.
233:17      Q.   How many are there, if it
233:18  says there's no evidence? How much
233:19  evidence is there?
233:20      A.   I see his comment. I don't
233:21  know the details of his review that he
233:22  refers to here.
233:23      Q.   Well, when he says there's
233:24  no evidence, don't you think that means
233:ESQUIRE DEPOSITION SERVICES
234: 234
234: 1  zero?
234: 2      A.   I think that's a plausible
234: 3  explanation, yes.

Scolnick 23404    234:4-234:18

234: 4      Q.   Otherwise you think he'd use
234: 5  the word "some" or "a little" or "few" or
234: 6  "lots"?
234: 7      A.   He's talking about
234: 8  conventional nonsteroidals as part of his
234: 9  sentence. And we actually agree with
234:10  that except for naproxen.
234:11      Q.   So, but you agree with the
234:12  statement even for naproxen, that there's
234:13  no epidemiological evidence that naproxen
234:14  is safe; right? I mean, not safe, good
234:15  for the heart?
234:16      A.   There had been no prior data
234:17  to suggest that naproxen was
234:18  cardioprotective.

Scolnick 23420    234:20-235:5

234:20  next sentence. He says, "Additionally"
234:21  which I guess means another reason, yet
234:22  another reason; right?
234:23      A.   Yes.
234:24      Q.   "Additionally the magnitude
234:ESQUIRE DEPOSITION SERVICES
235: 235
235: 1  of the effect," in other words, how many
235: 2  more heart attacks you were causing,
235: 3  "would not be plausible even if" you'd

→ D's objections: Argumentative; Foundation.

P's response: Permissible cross-examination;
Witness understands & answers questions.

Irwin ruling: Overruled (234:24 - 235:17)
No objection to 234:4-23

Page 14

→ continued

New Scolnick Complete

235: 4  been comparing it to aspirin.  He says
235: 5  that; doesn't he?

Scolnick 23507    235:7-235:17

235: 7          THE WITNESS:  He talks about
235: 8    the aspirin, yes, the comparator
235: 9    to aspirin.
235:10  BY MR. LANIER:
235:11      Q.   He says, "In fact,
235:12  in...three different trials, aspirin has
235:13  shown no effect on the primary prevention
235:14  of stroke, while we have seen a 50% lower
235:15  incidence of stroke in the naproxen arm
235:16  of VIGOR"; right?
235:17      A.   That's what he says.

Scolnick 23613    236:13-236:23

236:13      Q.   Well, you were hoping
236:14  naproxen helped the heart just like
236:15  aspirin did; right?
236:16      A.   We weren't hoping anything.
236:17  We were concluding based on this study
236:18  that you've referred to and all the other
236:19  analysis versus placebo and other NSAIDs,
236:20  that except for this naproxen study,
236:21  there was no evidence for an imbalance of
236:22  cardiovascular events attributable to
236:23  Vioxx.

Scolnick 23703    237:3-237:7

237: 3.     Q.   Sir, what y'all were putting
237: 4  forth there as an idea was that naproxen
237: 5  helps the heart just like aspirin does;
237: 6  right?
237: 7      A.   Or — yes, that's correct.

Scolnick 268.13-268.17    268:13-268:17

268:13      Q.   Just make sure we're on the
268:14  same page.  If we look at Exhibit 23, you
268:15  even sent a memo to this to the CEO and
268:16  to the president of Merck back in January
268:17  of 2001, didn't you?

Scolnick 26901a    269:1-269:21

269: 1      A.   Yes.
269: 2      Q.   You said you "want to point
269: 3  out to all of you at one time that, 1.
269: 4  there is no way to prove that in patients
269: 5  with rheumatoid arthritis that ALL of the
269: 6  difference between Vioxx and naproxen is

Page 15

New Scolnick Complete

```
269: 7  due to the benefit of naproxen."  That's
269: 8  what you said, isn't it?
269: 9      A.   That's right.  And all is
269:10  capitalized.
269:11      Q.   And then you capitalize this
269:12  whole next phrase.  "IT IS IMPOSSIBLE TO
269:13  PROVE THIS."  Didn't you?
269:14      A.   That's what the e-mail says.
269:15      Q.   That's what you said, isn't
269:16  it?
269:17      A.   Yes, it is.  It is.
269:18      Q.   Then you capitalize for
269:19  emphasis this next sentence.  "IT IS
269:20  IMPOSSIBLE TO KNOW THIS WITH CERTAINTY."
269:21      A.   That's exactly what I said.
```

Scolnick Part 2 (4-29-05) (Multi-clip)
Scolnick 1014   10:14-10:16

```
10:14      Q.   You retired from Merck Research Labs
10:15  in 2003; correct?
10:16      A.   That is correct.
```

Scolnick 2714a   27:14-27:17

```
27:14           In the late '80s and early '90s, you
27:15  were also the president of Merck Research Labs;
27:16  right?
27:17      A.   Yes.
```

Scolnick 2824   28:24-29:2

```
28:24      Q.   At that point in time you did have
28:25  some concerns about what the prospects would be for
28:ESQUIRE DEPOSITION SERVICES
29: Confidential - Subject to Protective Order  29
29: 1  Merck in the late '90s and 2000 as several drugs
29: 2  were coming off patent; right?
```

Scolnick 2904   29:4-29:6

```
29: 4           THE WITNESS:  I had concerns.  It was
29: 5  a way off, but, yes, I certainly remember vague
29: 6  thoughts about that.
```

Scolnick 2913   29:13-29:16

```
29:13      Q.   You have to anticipate that drugs
29:14  would be coming off patent maybe ten years down the
29:15  road and seek to have new drugs to fill the drugs
29:16  that were once proprietary of the company?
```

Scolnick 2918a   29:18-30:4

Δ's objections: Irrelevant; Prejudicial

π's response: Relevant to π's claim that Merck put profits over people because it marketed Vioxx to fill need for blockbuster drug.

Irwin ruling: Overruled.

→ continues

New Scolnick Complete

29:18          THE WITNESS: That is correct.
29:19  BY MR. BUCHANAN:
29:20          Q.    Because once a drug becomes generic
29:21  or goes off patent, then other competitors can enter
29:22  the market and seek to take market share; correct?
29:23          A.    That's correct.
29:24          Q.    Okay.  So, in the early '90s you knew
29:25  that beginning in 2000 and 2001, Merck would have
29:ESQUIRE DEPOSITION SERVICES
30: Confidential - Subject to Protective Order  30
30: 1  several drugs going off patent; correct?
30: 2          A.    The one that comes to mind
30: 3  immediately is Mevacor, but I don't recall the other
30: 4  drugs at this point.

Scolnick 3213    32:13-33:20

32:13          All these drugs were significant
32:14  drugs for Merck?
32:15          A.    Yes.
32:16          Q.    Several of these were blockbuster
32:17  drugs for Merck; right?
32:18          A.    They were large selling drugs, yes.
32:19          Q.    Well, "blockbuster" has a meaning or
32:20  a connotation in the industry, doesn't it?
32:21          A.    "Blockbuster" means usually a very
32:22  large drug, very large sales drug.
32:23          Q.    Traditionally it meant more than a
32:24  billion dollars in sales; true?
32:25          A.    That is one interpretation given to
32:ESQUIRE DEPOSITION SERVICES
33: Confidential - Subject to Protective Order  33
33: 1  it.
33: 2          Q.    So, several of these drugs were
33: 3  blockbuster drugs.  You'd agree with that?
33: 4          A.    Yes.
33: 5          Q.    Okay.
33: 6          Several of these drugs, even if you''
33: 7  can't remember all of them, were going off patent in
33: 8  2000, 2001, 2002; correct?
33: 9          A.    I'm not sure which ones, but some
33:10  drugs were going off patent at that point.
33:11          Q.    Well, you recall being concerned
33:12  about what the future will hold in 2000/2001 when
33:13  all these drugs were going off patent; correct?
33:14          A.    Yes.
33:15          Q.    You were concerned about that in the
33:16  early '90s?
33:17          A.    Yes.
33:18          Q.    And you were trying to design new
33:19  drugs to fill the void that would be left by these
33:20  drugs when they went off patent?

Scolnick 3324    33:24-33:25

→ continued

New Scolnick Complete

```
33:24        THE WITNESS:  We were trying to
33:25   develop and discover new drugs that would do that.
```

Scolnick 3408a   34:8-34:17

```
34: 8      Q.    One of the drugs that was going to be
34: 9   filling the void left by these other drugs when they
34:10   went off patent was Vioxx; true?
34:11      A.    Vioxx was going to fill the void, but
34:12   in the early '90s, Vioxx -- I believe Vioxx was not
34:13   even on the Merck radar screen.  I don't even think
34:14   we had thought of the project at that point.  I
34:15   don't -- I don't recall the date when the Vioxx
34:16   project started.
34:17          - - -
```

Scolnick 3613a   36:13-36:18

```
36:13      Q.    There's a reference to Dr. Peppi
36:14   Prasit.  Do you see that?
36:15      A.    Dr. Peppi Prasit.
36:16      Q.    Prasit.  He was a scientist at your
36:17   labs in Montreal; correct?
36:18      A.    Yes, a chemist.
```

Scolnick 3711   37:11-37:18

```
37:11      Q.    You see the date referenced here.
37:12   It's July 1992; correct?
37:13      A.    Yes, I do.
37:14      Q.    Does that refresh your recollection
37:15   as to when Merck started considering investigating
37:16   selective NSAIDs?
37:17      A.    Yes, it does.  I had not recalled we
37:18   started this project this early.
```

Scolnick 4206   42:6-42:9

```
42: 6          So, you put a lot of resources within
42: 7   Merck Research Labs onto this particular project;
42: 8   correct?
42: 9      A.    Yes, that is correct.
```

Scolnick 43.11   43:11-43:19

```
43:11      Q.    And you encouraged Dr. Prasit and his
43:12   staff to pursue the Vioxx project with all resources
43:13   that were available at Merck Frosst; true?
43:14      A.    That is correct.
43:15      Q.    Okay.
43:16          You knew how important this drug
43:17   could be for the company; right?
43:18      A.    I knew that this could be a very
43:19   important project, yes.
```

Δ's objections: Irrelevant; Prejudicial
π's response: Relevant to prove when Merck began process of working on a Cox-2 & how that fit into need to fill void created by drugs coming off patent.
Irvin ruling: Overruled.

Δ's objections: Irrelevant; Prejudicial
π's response: Relevant to show Vioxx was important to Merck's profitability.
Irvin ruling: Overruled.

Δ's objections: Irrelevant; prejudicial
π's response: Relevant to show Merck needed blockbuster to remain profitable.
Irvin ruling: Overruled.

Page 18

New Scolnick Complete

Scolnick 47.06    47:6-47:8

47: 6    Q.    You wanted to be the first to market
47: 7    with this selective COX-2 inhibitor; correct?
47: 8    A.    Yes.

Scolnick 8703    87:3-87:9

87: 3    Q.    All right, sir. I want to get back
87: 4    to something. I want to turn back to 1998. I want
87: 5    to talk about the period prior to the time when
87: 6    Merck had Vioxx approved. Okay? Do you remember
87: 7    when Vioxx was approved?
87: 8    A.    I believe it was late 1999, middle of
87: 9    1999.

Scolnick 9806    98:6-98:10

98: 6         For the record, it is an e-mail from
98: 7    you to a series of individuals, Alan Nies, Beth
98: 8    Seidenberg, Tom Simon, Robert Silverman. Sir, are
98: 9    all of those people Merck employees?
98:10    A.    Yes, they were.

Scolnick 9922a    99:22-100:13

99:22    Q.    So, what you did here was you sent
99:23    these folks on your Vioxx development team and some
99:24    regulatory personnel an analyst report; correct?
99:25    A.    That appears to be correct.
99:ESQUIRE DEPOSITION SERVICES
100: Confidential - Subject to Protective Order 100
100: 1    Q.    Okay.
100: 2         You sent it with high importance?
100: 3    A.    That's what it's marked.
100: 4    Q.    It was real important they saw this
100: 5    analyst report?
100: 6    A.    It's marked high importance.
100: 7    Q.    Do you make it a practice, sir, to
100: 8    send Wall Street analyst reports to employees who
100: 9    are on projects within Merck?
100:10    A.    I sent a variety of information to
100:11    them, sometimes analyst reports which had relevant
100:12    information, sometimes scientific articles. I send
100:13    a variety of things to my employees.

Scolnick 11222    112:22-112:24

112:22         So, it is, in fact, accurate to state
112:23    that in 1998 Merck had declining sales in several of
112:24    its key franchises; correct?

Scolnick 11301    113:1-113:13

113: 1         THE WITNESS: I've answered your    → continued.

Page 19

Δ's objections: Irrelevant; Prejudicial;
Cumulative.

π's response: Relevant to show Merck
emphasis on profits & the need for Merck
blockbuster to boost stock.

Irvin ruling: Overruled.

New Scolnick Complete

113: 2   question.
113: 3   BY MR. BUCHANAN:
113: 4       Q.     I would like you to answer that
113: 5   question, please.
113: 6       A.     Some of its franchises had declining
113: 7   sales.
113: 8       Q.     And they were key franchises?
113: 9       A.     And some of them were key.
113:10      Q.     Okay.
113:11             You also had several drugs going off
113:12   patent in the near future; right?
113:13      A.     Correct.

Scolnick 11517a      115:17-116:11

115:17      Q.     You thought it was important to tell
115:18   your employees that Merck's base business was
115:19   eroding?
115:20      A.     Yes.
115:21      Q.     You thought it was important to tell
115:22   them that Merck had several products going off
115:23   patent?
115:24      A.     They knew that.  This was to
115:25   reemphasize that.
115:ESQUIRE DEPOSITION SERVICES
116: Confidential - Subject to Protective Order 116
116: 1      Q.     You thought it was important to tell
116: 2   them that several of the recently launched products
116: 3   had not been as successful as anticipated?
116: 4      A.     I wanted to provide them the
116: 5   information in this document, yes, that's correct.
116: 6      Q.     You thought it was important to tell
116: 7   them that several of the recently launched products
116: 8   weren't as successful as you anticipated they'd be;
116: 9   right?
116:10      A.     That's what's in here, and I wanted
116:11   to provide them that information.

Scolnick 11718      117:18-118:3

117:18      Q.     They are the people who you would
117:19   hope would be able to facilitate a speedy approval
117:20   of your drug; correct?
117:21      A.     That is part of their responsibility.
117:22   Part of their jobs, yes.
117:23      Q.     And that's part of why you provided
117:24   this e-mail to them; right?
117:25      A.     Yes.
117:ESQUIRE DEPOSITION SERVICES
118: Confidential - Subject to Protective Order 118
118: 1      Q.     You wanted them to know how important
118: 2   it was that this drug proceed quickly through the
118: 3   regulatory approval process; right?

Scolnick 11806      118:6-118:9

Δ's objections: Irrelevant;
Prejudicial

π's response: Relevant to
show Merck's motive to
rush Vioxx to market b/c
needed a blockbuster
drug to replace drugs
going off patent & to offset
drugs that were not
selling in accordance w/
projections.

Court ruling: Overruled.

→ continued

New Scolnick Complete

118: 6         THE WITNESS:  Yes.
118: 7  BY MR. BUCHANAN:
118: 8         Q.    It was essential to the financial
118: 9  success of the firm; right?

> see previous page for
> objection + response.

Scolnick 11811     118:11-118:18

118:11         THE WITNESS:  It was essential to
118:12  Merck.  It was important to Merck, yes.
118:13  BY MR. BUCHANAN:
118:14         Q.    Okay.
118:15         And, in fact, it was not only
118:16  essential, but Vioxx's success was necessary to
118:17  preserve Merck and Merck Research Labs period;
118:18  correct?

Scolnick 11821     118:21-118:22

118:21         THE WITNESS:  That is what I said in
118:22  my e-mail.

Scolnick 11824     118:24-119:1

118:24         Q.    That's true; right?
118:25         A.    I believe it is an exaggeration, but
118:ESQUIRE DEPOSITION SERVICES
119: Confidential - Subject to Protective Order 119
119: 1   it has some truth.

Scolnick 12217     122:17-123:7

122:17         Well, at this point in time, October
122:18  1998, what did you know about Vioxx's potential to
122:19  cause cardiovascular risks or cardiovascular
122:20  problems?
122:21         A.    I don't recall exactly what we knew
122:22  at this point.  There was no evidence at all in the      -
122:23  Vioxx development program at this point that Vioxx
122:24  caused cardiovascular risks.
122:25         Q.    What do you mean by that, "caused
122:ESQUIRE DEPOSITION SERVICES
123: Confidential - Subject to Protective Order 123
123: 1   cardiovascular risks"?
123: 2         A.    There was no evidence to say that
123: 3   Vioxx caused a cardiovascular risk.
123: 4         Q.    Well, you're not saying that in
123: 5   individual trials preapproval that you didn't see
123: 6   imbalances between cardiovascular risks in Vioxx and
123: 7   the comparator drugs, are you?

Scolnick 12309a     123:9-123:14

123: 9         THE WITNESS:  Before the drug was
123:10  approved?

New Scolnick Complete

123:11   BY MR. BUCHANAN:
123:12       Q.     Yes.
123:13       A.     I don't recall any such data.  So, if
123:14   it was there, I certainly don't recall it.

Scolnick 13005     130:5-130:11

130: 5       Q.     But you did conduct a clinical trial
130: 6   in 1997 with an individual named Garret FitzGerald;
130: 7   correct?
130: 8       A.     Yes.
130: 9       Q.     And he ran a clinical trial that
130:10   showed that Vioxx suppressed the urinary metabolites
130:11   of prostacyclin; correct?

Scolnick 13013     130:13-130:17

130:13               THE WITNESS:  Yes.
130:14   BY MR. BUCHANAN:
130:15       Q.     One of the conclusions that was drawn
130:16   by your consultants was that Vioxx was suppressing
130:17   systemic prostacyclin; correct?

Scolnick 13020a    130:20-130:22

130:20               THE WITNESS:  I don't believe they
130:21   drew that conclusion.  I think they raised that
130:22   question.

Scolnick 13109     131:9-131:11

131: 9               And if that was happening, there was
131:10   a risk that Vioxx could cause thrombotic events in
131:11   humans; true?

Scolnick 13113a    131:13-131:20

131:13               THE WITNESS:  There was a theory that
131:14   that could occur with no evidence ever garnered to
131:15   substantiate or refute that theory.
131:16   BY MR. BUCHANAN:
131:17       Q.     Now, that theory was put forth after
131:18   the drug was marketed or before the drug was
131:19   marketed?
131:20       A.     Long before Vioxx ever existed.

Scolnick 14123     141:23-142:1

141:23       Q.     You weren't allowed to go out and
141:24   tell doctors through your sales representatives that
141:25   Vioxx reduced the serious clinical side effects
141:ESQUIRE DEPOSITION SERVICES
142: Confidential - Subject to Protective Order 142
142: 1   associated with traditional NSAIDs; right?

New Scolnick Complete

Scolnick 14205    142:5-142:9

142: 5        THE WITNESS:  Serious
142: 6   gastrointestinal side effects?
142: 7   BY MR. BUCHANAN:
142: 8       Q.    Yes.
142: 9       A.    That is correct.

Scolnick 15117    151:17-152:4

151:17       Q.    If you had conducted a CV outcomes
151:18   trial in 1998, started it in 1998, that would have
151:19   slowed down the approval process for the drug; true?
151:20       A.    That is true.
151:21       Q.    If you had told the FDA, we're
151:22   concerned, we may have a potential cardiovascular
151:23   issue with the drug, we'd want to do a CV safety
151:24   study, that would have slowed down the approval
151:25   process?
151:ESQUIRE DEPOSITION SERVICES
152: Confidential - Subject to Protective Order 152
152: 1       A.    That would have.  We gave the FDA all
152: 2   of the data, including Garret FitzGerald's data, in
152: 3   the NDA and all the other analyses we did
152: 4   preapproval.

Scolnick 15212    152:12-152:13

152:12       Q.    You didn't give them the results from
152:13   a CV outcomes trial preapproval, did you?

Scolnick 15215a    152:15-152:24

152:15       THE WITNESS:  There was no -- we did
152:16   not do a separate CV outcomes trial preapproval.
152:17   BY MR. BUCHANAN:
152:18       Q.    So, you couldn't give them the data
152:19   from such a trial?
152:20       A.    I've answered your question.
152:21       Q.    You couldn't give them the data from
152:22   such a trial?  Could you answer that?
152:23       A.    Yes.
152:24       Q.    Thank you.

Scolnick 17405    174:5-174:17

174: 5   what's the Data Safety Monitoring Board, sir, in
174: 6   general terms?
174: 7       A.    In general terms, it's an external
174: 8   group that monitors the safety of the Merck trials,
174: 9   for all trials or many trials.
174:10       Q.    And you have a different group for
174:11   each trial or the same group for all trials?
174:12       A.    I think it's a different group for
174:13   each trial because the clinical expertise is —

Δ's objection: Asked and answered.

Π's response: Permissible cross-examination of an adverse witness. Attempting to clarify witness's testimony.

Irvin ruling: Overruled.

Page 23

New Scolnick Complete

174:14   different clinical trials, different clinical
174:15   expertise.
174:16      Q.    Did the VIGOR trial have a DSMB?
174:17      A.    Yes, it did.

Scolnick 17421    174:21-175:9

174:21      Q.    To be clear in the DSMB's function,
174:22   the DSMB has access to unblinded data during the
174:23   conduct of clinical trials if they want it; correct?
174:24      A.    Yes, I believe that's true.
174:25      Q.    Because their function is to ensure
174:ESQUIRE DEPOSITION SERVICES
175: Confidential - Subject to Protective Order 175
175: 1   the safety of patients in those clinical trials, at
175: 2   least one of their functions; true?
175: 3      A.    Yes.
175: 4      Q.    Okay.
175: 5            Do you recall that the DSMB in the
175: 6   VIGOR trial sent a letter to Merck stating that they
175: 7   wanted the cardiovascular events in the VIGOR trial
175: 8   separately analyzed as compared to other safety
175: 9   analyses the company was doing?

Scolnick 17516a    175:16-175:17

175:16            THE WITNESS:  I became aware of that
175:17   memo long after it was sent to people at MRL.

Scolnick 17804    178:4-178:7

178: 4      Q.    When you saw that letter from Dr.
178: 5   Weinblatt to Dr. Reicin, did that letter suggest to
178: 6   you that Merck may have a cardiovascular issue with
178: 7   Vioxx?

Scolnick 17809a    178:9-178:13

178: 9            THE WITNESS:  When I saw that letter,
178:10   I wondered what had been in Dr. Weinblatt's mind
178:11   when he sent the letter, and that's what I wondered.
178:12   I hadn't seen the letter.  I don't know what was in
178:13   his mind.

Scolnick 17902    179:2-179:12

179: 2      Q.    You've never spoken to him?
179: 3      A.    I don't recall speaking to Dr.
179: 4   Weinblatt.
179: 5      Q.    Never called him up after you got the
179: 6   results of the VIGOR trial and asked what concerned
179: 7   you and the data you were looking at during the
179: 8   conduct of the trial?
179: 9      A.    No, I never called Dr. Weinblatt.
179:10      Q.    Never asked Dr. Weinblatt why you

Page 24

⟶ Continued

New Scolnick Complete

179:11    allowed the trial to continue in the face of the
179:12    cardiovascular events in the trial?

Scolnick 17914    179:14-179:16

179:14            THE WITNESS:  No.  I didn't.  I
179:15    didn't know what data he had.  I never dealt
179:16    directly with DSMBs.

D's objections:  401, 402, 403; Argumentative

P's response:  Permissible cross-examination.
Merck's response to DSMB is clearly relevant
to the CV dangers revealed by VIGOR.

Irvin ruling:  Overruled.

Scolnick 20322    203:22-204:20

203:22        Q.    Before our break, we were talking
203:23    about -- at least a few moments before our break we
203:24    were talking about your March 9, 2000 e-mail.  Do
203:25    you recall that testimony?
203:ESQUIRE DEPOSITION SERVICES
204: Confidential - Subject to Protective Order 204
204: 1        A.    Yes, I do.
204: 2        Q.    That was the e-mail where you
204: 3    identified that the CV events were "clearly there."
204: 4    Right?
204: 5        A.    Yes.
204: 6        Q.    That it appeared to be "mechanism
204: 7    based" as you "worried it was."  Right?
204: 8        A.    That's what the e-mail says, yes.
204: 9        Q.    And you said it was also "real."
204:10    Right?
204:11        A.    Yes.
204:12        Q.    Then we talked about what Merck and
204:13    you did in response to your initial concerns about
204:14    the CV issues with Vioxx; right?
204:15        A.    Yes.
204:16        Q.    Now, over a period of weeks, you
204:17    reached the conclusion, contrary to your March 9th
204:18    e-mail, that it wasn't Vioxx that was causing the
204:19    problems, it was naproxen that was protecting
204:20    against the problems; is that right?

D's objections:  Cumulative ; asked and
answered.

P's response:  Necessary context &
Cumulative to questions that
follow.

Irvin ruling:  Overruled.

Scolnick 20422    204:22-205:10

204:22            THE WITNESS:  That's correct.
204:23    BY MR. BUCHANAN:
204:24        Q.    You reached that conclusion in, what,
204:25    18 days?
204:ESQUIRE DEPOSITION SERVICES
205: Confidential - Subject to Protective Order 205
205: 1        A.    Within that period of time.
205: 2        Q.    Well, Merck issued a press release to
205: 3    the public on March 27, 2000 letting them know about
205: 4    the CV events in the trial as well as the GI events
205: 5    in the trial; correct?
205: 6        A.    Yes.
205: 7        Q.    And you stated at that point in time
205: 8    that you believed that the explanation for the
205: 9    difference between the two arms was the

Page 25

New Scolnick Complete

205:10   cardioprotective effect of naproxen; correct?

Scolnick 20517    205:17-205:18

205:17          THE WITNESS:  Yes, that's basically
205:18   what the press release said.

Scolnick 20706    207:6-207:8

207: 6     Q.    So, within 18 days, you had made a
207: 7   complete 180 in your view as to the cause of the CV
207: 8   events in the VIGOR trial; right?

Scolnick 207.12-207.15    207:12-207:15

207:12     A.    Yes.  I thought the explanation which
207:13   best explained the results was naproxen's
207:14   cardioprotective activity based on data analysis,
207:15   literature analysis, as I've stated.

Scolnick 20908    209:8-209:11

209: 8     Q.    Did you bring in anybody who wasn't
209: 9   on the Merck payroll to look at the data from the
209:10   VIGOR trial before you reached the decision that
209:11   naproxen was cardioprotective?

→ Δ's objections: Foundation; Irrelevant; Prejudicial; Cumulative

π's response: Testimony goes to heart of π's claim that the naproxen hypothesis was a constructed by Merck so that VIGOR results would not hinder sales.

Irwin ruling: Overruled.

Scolnick 20914a    209:14-210:3

209:14          THE WITNESS:  As I've stated, 1
209:15   didn't bring in an outside consultant.  I do not
209:16   know who the team might have consulted as outside
209:17   investigators.
209:18   BY MR. BUCHANAN:
209:19     Q.    But you're pretty sure, though, if
209:20   you had told your team, I want to get this data
209:21   looked at by somebody independent of Merck, they
209:22   could have done that; right?
209:23     A.    They could have done it.  1 don't
209:24   know whether — I don't that they didn't do it.
209:25     Q.    But you do know you didn't tell them
209:ESQUIRE DEPOSITION SERVICES
210: Confidential - Subject to Protective Order 210
210: 1   to do it?
210: 2     A.    I did not.  I did not, that is
210: 3   correct.

Scolnick 231.17    231:17-232:4

231:17     Q.    Did you consider the implications to
231:18   the sales of the drug if your initial conclusion was
231:19   the final conclusion?
231:20     A.    Of course.  And that was not part of
231:21   my reason for reaching my conclusion.
231:22     Q.    What was the implication to sales of

Page 26

→ Continued.

New Scolnick Complete

231:23   the drug if your initial conclusion was, in fact,
231:24   the final conclusion?
231:25       A.    Sales of the drug would be
231:ESQUIRE DEPOSITION SERVICES
232: Confidential - Subject to Protective Order 232
232: 1   significantly curtailed. The sales of the drug
232: 2   would be curtailed. Even with the publicly
232: 3   available information, sales of the drug would be
232: 4   curtailed.

Scolnick 23208     232:8-232:11

232: 8       Q.    Did you ever tell the public your
232: 9   initial conclusion?
232:10       A.    I did not because I thought it was an
232:11   error.

Scolnick 23221a     232:21-233:9

232:21       Q.    Did you ever send an e-mail at the
232:22   end of March 2000 saying, boy, I was way off on
232:23   this --
232:24       A.    No, I did --
232:25       Q.    -- I feel very comfortable with the
232:ESQUIRE DEPOSITION SERVICES
233: Confidential - Subject to Protective Order 233
233: 1   data now?
233: 2       A.    I did not send that in an e-mail like
233: 3   that, no.
233: 4       Q.    In fact, at the end of March, you
233: 5   were still worried, weren't you?
233: 6       A.    Yes, I was, even though I had reached
233: 7   what I thought was the right conclusion. I always
233: 8   worried about the safety of our drugs, and I
233: 9   continued to worry about it.

Scolnick 23323     233:23-234:2

233:23       Q.    Did you tell the FDA you were
233:24   worried?
233:25       A.    I didn't speak to the FDA, and I
233:ESQUIRE DEPOSITION SERVICES
234: Confidential - Subject to Protective Order 234
234: 1   don't know what the regulatory affairs people told
234: 2   the FDA.

Scolnick 23523     235:23-236:1

235:23       You don't think the FDA or the
235:24   medical community would have been interested in what
235:25   you, Ed Scolnick, were worried about with respect to
235:ESQUIRE DEPOSITION SERVICES
236: Confidential - Subject to Protective Order 236
236: 1   Vioxx?                                    → continued

Page 27

New Scolnick Complete

Scolnick 23603    236:3-236:8

236: 3        THE WITNESS: if the FDA had wanted
236: 4    to ask me, they would have asked me, and I
236: 5    communicated with members of the medical community
236: 6    in consultants' meetings. I don't know what the
236: 7    medical community as a whole or the public as a
236: 8    whole would have liked to know.

→  D's objections: Foundation; calls
   for speculation

   Π's response: Witness not speculating
   but describing his colleagues to
   show his worries with FDA.

   Irvin ruling: Overruled.

Scolnick 23618    236:18-236:24

236:18        Q.    So, you're saying that if the FDA had
236:19    wanted to figure out what you were thinking in terms
236:20    of concerns about Vioxx, they could have asked you?
236:21    Is that it?
236:22        A.    The FDA could have asked me any time
236:23    if they wanted to. They had all the data available
236:24    to them.

Scolnick 23720b    237:20-238:8

237:20        Q.    Well, ultimately there was an
237:21    Advisory Committee held in February 2001; right?
237:22        A.    I think that date is correct.
237:23        Q.    And it was to consider certain of the
237:24    clinical trial data from VIGOR; right?
237:25        A.    Yes.
237:ESQUIRE DEPOSITION SERVICES
238: Confidential - Subject to Protective Order 238
238: 1        Q.    And in particular, GI safety; right?
238: 2        A.    Yes.
238: 3        Q.    As well as CV safety; true?
238: 4        A.    Correct.
238: 5        Q.    GI being gastrointestinal?
238: 6        A.    Yes.
238: 7        Q.    CV being cardiovascular?
238: 8        A.    Correct.

Scolnick 24004a    240:4-240:9

240: 4        Q.    You never told the FDA at any point
240: 5    in time to the best of your knowledge that your
240: 6    initial conclusion was that the CV events seen in
240: 7    the VIGOR trial were mechanism based and
240: 8    attributable to Vioxx?
240: 9        A.    I never told them that.

→  D's objections: Asked and answered.

   Π's response: Permissible cross-examination.
   Clarifying witness's testimony.

   Irvin ruling: Overruled.

Scolnick 24218    242:18-242:21

242:18        Q.    Merck submitted a proposed label to
242:19    FDA sometime in 2000; right?
242:20        A.    Yes. I believe within three months
242:21    of having the VIGOR data.

Scolnick 24322    243:22-244:14

New Scolnick Complete

243:22          So, at the end of March of 2000,
243:23   Merck issues a press release and tells the world the
243:24   favorable properties of Vioxx found in the VIGOR
243:25   trial as it relates to GI effects; correct?
243:ESQUIRE DEPOSITION SERVICES
244: Confidential - Subject to Protective Order 244
244: 1       A.     That is correct.
244: 2       Q.     Also discloses that there's an
244: 3   increased number of -- excuse me -- a decreased
244: 4   number of cardiovascular effects in the naproxen arm
244: 5   of the VIGOR trial; right?
244: 6       A.     That's correct.
244: 7       Q.     You didn't tell the public that there
244: 8   was an increased number of cardiovascular events in
244: 9   the Vioxx arm; right?
244:10       A.     The press release was not worded that
244:11   way, that is correct.
244:12       Q.     Okay. Because that would have
244:13   suggested that Vioxx had actually increased the
244:14   risk; right?

Scolnick 24416    244:16-244:17

244:16          THE WITNESS: It might have suggested
244:17   that, and we didn't believe that.

Scolnick 24504    245:4-245:7

245: 4       Q.     You were trying to convey to people
245: 5   that it was, in fact, naproxen that was reducing the
245: 6   risk of cardiovascular events in the VIGOR trial;
245: 7   true?

Scolnick 24509    245:9-245:10

245: 9          THE WITNESS: True. That's the way
245:10   the press release was worded, as I stated before.

Scolnick 24517    245:17-245:25

245:17       Q.     Doctor, before we go on, even two
245:18   weeks after you issued the press release, you,
245:19   Merck, issued the press release announcing the VIGOR
245:20   results, Dr. Ed Scolnick was still personally
245:21   worried about what the results from VIGOR really
245:22   meant; true?
245:23       A.     That's correct.
245:24       Q.     And you were worried that Vioxx was
245:25   actually causing cardiovascular events; true?

Scolnick 24602    246:2-247:19

246: 2          THE WITNESS: I was worried that we
246: 3   couldn't exclude an effect of Vioxx, although the

Page 29

New Scolnick Complete

246: 4    major effect, I was convinced, was due to naproxen.
246: 5    BY MR. BUCHANAN:
246: 6        Q.    And you actually told your staff that
246: 7    you personally were actually in minor agony over the
246: 8    issue; true?
246: 9        A.    True.
246:10        Q.    And you told your staff that we're
246:11    not going to know the answer until we do an outcomes
246:12    trial; right?
246:13        A.    That we were not going to know -- we
246:14    were not going to be able to exclude an effect of
246:15    Vioxx until we did an outcomes trial.
246:16        Q.    You told your staff, your project
246:17    team, we will not know for sure what is going on
246:18    until we do an outcomes trial; true?
246:19        A.    True.
246:20        Q.    And you wanted to do a big outcomes
246:21    trial; right?
246:22        A.    Yes.  That's correct.
246:23        Q.    Not some pooled analysis; right?
246:24        A.    That's correct.
246:25        Q.    You wanted to do a 10,000 patient
246:ESQUIRE DEPOSITION SERVICES
247: Confidential - Subject to Protective Order 247
247: 1    study on Vioxx, 10,000 people on a comparator agent;
247: 2    true?
247: 3        A.    True.  That's correct.
247: 4        Q.    You were advocating using Tylenol as
247: 5    the comparator agent; right?
247: 6        A.    That was my idea, yes.
247: 7        Q.    You wanted to do a 20,000 person
247: 8    study in April of 2000 to evaluate the
247: 9    cardiovascular safety of Vioxx; right?
247:10        A.    Correct.
247:11        Q.    It was going to be a head-to-head
247:12    trial, Tylenol on one arm, Vioxx on the other;
247:13    right?
247:14        A.    That's correct.
247:15        Q.    And when did you run that trial?
247:16        A.    The project team told me that was a
247:17    trial that could not be done because patients
247:18    couldn't be kept on Tylenol who had osteoarthritis
247:19    for that long a period of time.

Scolnick 25209a     252:9-253:18

252: 9            Let's look at this e-mail, then, from
252:10    April 12, 2000 from you to Dr. Reicin.  You wrote
252:11    this late at night; right?
252:12        A.    Yes.  It's dated 10:42 p.m.
252:13        Q.    You sent it with high importance;
252:14    true?
252:15        A.    True.
252:16        Q.    And you wrote:  "Hi Alise.  I have
252:17    been trading e-mails with Doug Greene in real time."

Page 30

New Scolnick Complete

252:18  Who is Doug Greene?
252:19      A.   Doug Greene at the time was head of
252:20  the clinical, regulatory and statistics department
252:21  at Merck, which is usually referred to as
252:22  development.
252:23      Q.   "We all are online too late.  I will
252:24  tell you my worry quotient is high.  I actually am
252:25  in minor agony."  Do you see that?
252:ESQUIRE DEPOSITION SERVICES
253: Confidential - Subject to Protective Order 253
253: 1      A.   I do.
253: 2      Q.   You wrote that?
253: 3      A.   I did.
253: 4      Q.   You meant it?
253: 5      A.   I did.
253: 6      Q.   "What I really want to do is a 10000
253: 7  versus 10000 patient study in mild - moderate OA
253: 8  Tylenol versus Vioxx with PRN" -- is that
253: 9  preventative?
253:10      A.   No.  It means use if you need.
253:11      Q.   "With PRN low dose ASA."  Is that
253:12  aspirin?
253:13      A.   Yes.
253:14      Q.   "For those judged to need it."
253:15          Sir, are you telling me that you
253:16  couldn't do a long-term study in patients with even
253:17  mild osteoarthritis, Tylenol versus Vioxx?
253:18      A.   That's what my team told me.


Scolnick 25325    253:25-254:4

253:25      Q.   You continue.  "WE WILL NOT KNOW FOR
253:ESQUIRE DEPOSITION SERVICES
254: Confidential - Subject to Protective Order 254
254: 1  SURE WHAT IS GOING ON UNTIL WE DO THIS STUDY.
254: 2  PLEASE THINK HARD ABOUT THE DESIGN BEFORE THE PAC
254: 3  MEETING."  You wrote that in all caps; right?
254: 4      A.   I did.


Scolnick 26323    263:23-264:8

263:23      Q.   Sir, I'm passing you over what we
263:24  just marked as exhibit, I think it's 7, to your
263:25   deposition.  It's entitled, "VIOXX Outcomes Study
263:ESQUIRE DEPOSITION SERVICES
264: Confidential - Subject to Protective Order 264
264: 1  Potential Designs."  For the record, it is
264: 2  MRK-ABT0014818 to 827.  Do you recognize this as a
264: 3  slide set, sir?
264: 4      A.   That's what it looks like it is.
264: 5      Q.   Okay.  It's entitled, "VIOXX Outcomes
264: 6  Study Potential Designs."  It is a PowerPoint
264: 7  printout.  Is that what it looks like to you?
264: 8      A.   More or less.

Page 31

New Scolnick Complete

Scolnick 26421    264:21-265:13

```
264:21      Q.    This document summarizes several
264:22   different outcomes studies concerning cardiovascular
264:23   issues that were being considered in or around April
264:24   of 2000; true?
264:25      A.    Yes.
264:ESQUIRE DEPOSITION SERVICES
265: Confidential - Subject to Protective Order 265
265: 1      Q.    One of the outcomes studies that was
265: 2   being considered was the Vioxx versus Tylenol study;
265: 3   true?
265: 4      A.    Yes.
265: 5      Q.    There's some pros and cons listed
265: 6   there; right?
265: 7      A.    Yes.
265: 8      Q.    One of the pros is, "This study
265: 9   directly addresses the question of the CV safety of
265:10   COX-2 inhibitors." Do you see that?
265:11      A.    Yes.
265:12      Q.    I read that right; correct?
265:13      A.    Yes.
```

Scolnick 26625    266:25-267:17

```
266:25      Q.    Okay.  There's two cons that are
266:ESQUIRE DEPOSITION SERVICES
267: Confidential - Subject to Protective Order 267
267: 1   listed here; right?
267: 2      A.    Yes.
267: 3      Q.    One is, "Demonstration of a CV
267: 4   difference would likely be due to a COX-2 CLASS
267: 5   effect but would put VIOXX at extreme disadvantage
267: 6   to celebrex and negate existing OA and Alzheimers
267: 7   data." Do you see that?
267: 8      A.    I do.
267: 9      Q.    The next point was there was a
267:10   possibility that you detect "small differences from
267:11   Tylenol in GI safety," and that would be of concern;
267:12   true?
267:13      A.    That's what it says.
267:14      Q.    Okay.  You were concerned that if you
267:15   went head-to-head Vioxx versus Tylenol, you might
267:16   highlight some favorable GI safety properties of
267:17   Tylenol.  Isn't that right?
```

Scolnick 26719    267:19-268:1

```
267:19           THE WITNESS:  That's what this says.
267:20   I wasn't concerned about that.  That's what this
267:21   says.
267:22   BY MR. BUCHANAN:
267:23      Q.    Okay.
267:24           There was also a possibility that you
267:25   might be wrong, and the cardiovascular effects seen
```

Page 32

New Scolnick Complete

267:ESQUIRE DEPOSITION SERVICES
268: Confidential - Subject to Protective Order 268
268: 1   in VIGOR was really due to Vioxx; right?

Scolnick 26803b    268:3-268:4

268: 3              THE WITNESS:  That's what this says
268: 4   as a con for the study.

Scolnick 26816    268:16-268:21

268:16              So, it wouldn't have been unethical
268:17   to do a trial of Vioxx versus Tylenol?
268:18      A.    What I said is it would be undoable
268:19   based on other input people gave me because Tylenol
268:20   would not relieve pain enough to be monotherapy in
268:21   such a trial.

Scolnick 27002a    270:2-270:17

270: 2              Now, apart from just asking your
270: 3   internal folks and thinking about yourself what type
270: 4   of CV study could be done, you actually consulted
270: 5   with some people from outside Merck; right?
270: 6      A.    Several.
270: 7      Q.    Okay.  You asked them whether a CV
270: 8   study could be designed to evaluate the
270: 9   cardiovascular safety of Vioxx, didn't you?
270:10      A.    I asked them what kind of study could
270:11   be designed, yes.
270:12      Q.    You actually spoke with a John Oates
270:13   about whether a trial could be done to test the CV
270:14   safety of Vioxx; right?
270:15      A.    I don't remember all the people that
270:16   our group talked to.  Dr. Oates was one of our
270:17   consultants on our board of advisors.

Scolnick 27110    271:10-271:24

271:10      Q.    Wasn't it Dr. Oates' view right after
271:11   the VIGOR data was released that you had to do
271:12   another trial comparing Vioxx with aspirin and
271:13   naproxen to see whether Vioxx was cardiotoxic?
271:14      A.    I don't remember.  I really don't
271:15   remember.
271:16      Q.    Do you remember that study design
271:17   being proposed?
271:18      A.    I remember that among several study
271:19   designs, yes.
271:20      Q.    Did you ever do that study?
271:21      A.    That study was not done.
271:22      Q.    You never did a study like that;
271:23   right?
271:24      A.    That study was not done.

New Scolnick Complete

Scolnick 27521    275:21-275:25

275:21    Q.    Do you remember Merck dealing with
275:22    Dr. Topol in 2001 concerning the design of a CV
275:23    outcome trial?
275:24    A.    I believe Merck research scientists
275:25    dealt with Dr. Topol, yes.

Scolnick 27606    276:6-276:11

276: 6    Q.    You'd agree he's a respected
276: 7    cardiologist?
276: 8    A.    He has a significant reputation in
276: 9    cardiology.
276:10    Q.    He's a respected cardiologist, sir?
276:11    A.    He has a significant reputation.

Scolnick 27620    276:20-276:22

276:20    Q.    Do you respect Dr. Topol?
276:21    A.    I think there are some things he's
276:22    done in science which have not held up to be true.

Scolnick 27804    278:4-278:6

278: 4    So, one of the things that you based
278: 5    your mixed view of Dr. Topol on is the negative
278: 6    study he published concerning Vioxx; correct?

Scolnick 27808a    278:8-279:5

278: 8    THE WITNESS:  Base it not on the
278: 9    negative study, base it on the methods which he used
278:10    to do the methods -- the negative study.
278:11    BY MR. BUCHANAN:
278:12    Q.    Let's be clear about what we're
278:13    talking about.
278:14    In August of 2001, Dr. Topol
278:15    published a study in the Journal of the American
278:16    Medical Association; true?
278:17    A.    True.
278:18    Q.    That study was raising caution about
278:19    the potential for COX-2 inhibitors like Vioxx and
278:20    Celebrex to cause cardiovascular events; true?
278:21    A.    That's what that study claimed to
278:22    have shown.
278:23    Q.    And you're saying that you have
278:24    spoken to statisticians that challenge the work of
278:25    Dr. Topol in terms of its statistical rigor.  Is
278:ESQUIRE DEPOSITION SERVICES
279:Confidential - Subject to Protective Order 279
279: 1    that what you're saying?
279: 2    A.    That's exactly what I'm saying.
279: 3    Q.    Did you tell Dr. Topol that?
279: 4    A.    I've never discussed anything

Page 34

New Scolnick Complete

279: 5   directly with Dr. Topol.

Scolnick 27910      279:10-279:12

279:10      Q.   Well, did you know that some of your
279:11   scientists went out to talk to Dr. Topol about that
279:12   article even before it was published?

*D's objectives: Irrelevant;
Prejudicial; Foundation;
Calls for speculation*

Scolnick 27914a      279:14-279:23

279:14           THE WITNESS:  I believe that Dr.
279:15   Reicin told me that she and Dr. Demopoulos, who was
279:16   a cardiologist by training, were going out to see
279:17   him to discuss the article.
279:18   BY MR. BUCHANAN:
279:19      Q.   And they went out to see him before
279:20   the article in the Journal of the American Medical
279:21   Association was published; right?
279:22      A.   I believe they did.  I believe that's
279:23   what Dr. Reicin told me.

*Pl's response: Evidence that Merck
sought to intimidate Dr. Topol,
changing his conclusions to the
JAMA study & is relevant to
Pl's failure to warn claim.*

*Irvin ruling: Overruled.*

Scolnick 28009      280:9-280:14

280: 9      Q.   And the objective was that Dr. Topol
280:10   would not publish the article in the form it
280:11   currently existed because that was negative to
280:12   Vioxx; true?
280:13      A.   Because it was inaccurately done
280:14   statistically.

Scolnick 28202      282:2-282:16

282: 2      Q.   Well, the Journal of the American
282: 3   Medical Association has editors; right?
282: 4      A.   Yes, it does.
282: 5      Q.   I mean, Dr. Topol just didn't just
282: 6   publish this article in JAMA by himself; right?
282: 7      A.   That is correct.
282: 8      Q.   There were editors at JAMA who
282: 9   reviewed the article; right?
282:10      A.   I don't know who reviewed the
282:11   article.
282:12      Q.   Well, in your experience, sir, in the
282:13   peer-reviewed medical literature, there are editors
282:14   at medical journals; true?
282:15      A.   There are, but I don't know how that
282:16   article was reviewed or who reviewed it.

Scolnick 28301      283:1-283:5

283: 1      Q.   You would agree, sir, that it would
283: 2   be unusual for a journal like JAMA not to have an
283: 3   article like that peer reviewed?
283: 4      A.   It would be unusual, but I don't know
283: 5   what they did.

Page 35

New Scolnick Complete

Scolnick 28311    283:11-283:13

283:11          In fact, Merck actually issued a
283:12   press release preemptively to challenge the results
283:13   from that JAMA article, didn't they?

*D's objections: Irrelevant; prejudicial; lack of personal knowledge*

Scolnick 28316a    283:16-283:17

283:16          THE WITNESS: I don't recall at all
283:17   whether that was done.

*P's response: Witness testifying to his personal knowledge regarding the exchange of scientific opinion through medical literature. Relevant because provides context to Merck's actions in relation to Topol article.*

Scolnick 28405    284:5-284:17

284: 5   if we can get that out.  The peer-reviewed medical
284: 6   literature is the vehicle through which -- is a
284: 7   vehicle through which scientific opinion is
284: 8   exchanged; true?
284: 9      A.   Correct.
284:10      Q.   And the standard way of responding to
284:11   scientific opinion expressed in scientific
284:12   literature is to respond in scientific literature to
284:13   that particular issue raised; true?
284:14      A.   True.
284:15      Q.   It is not standard practice to
284:16   respond to an opinion in a medical article with a
284:17   press release disparaging an article; true?

*Irvin ruling: Overruled.*

Scolnick 28420    284:20-285:15

284:20          THE WITNESS: That's not the usual
284:21   practice.  I don't recall what Merck did.
284:22   BY MR. BUCHANAN:
284:23      Q.   Is that a practice you endorse?
284:24      A.   Absolutely not.
284:25      Q.   The appropriate way to respond is in
284:ESQUIRE DEPOSITION SERVICES
285: Confidential - Subject to Protective Order 285
285: 1   the medical journal itself; true?
285: 2      A.   That is an appropriate way to
285: 3   respond.
285: 4      Q.   You could write a letter to the
285: 5   editor; right?
285: 6      A.   Yes, correct.
285: 7      Q.   You can submit your own article?
285: 8      A.   Correct.
285: 9      Q.   Or you can publish a competing
285:10   article in another journal; right?
285:11      A.   Correct.
285:12      Q.   But one of the things that you think
285:13   would be unusual is to issue a press release to
285:14   respond to an article in the medical literature;
285:15   true?

Scolnick 28517    285:17-285:20

Page 36

New Scolnick Complete

285:17         THE WITNESS: It would be unusual.
285:18 BY MR. BUCHANAN:
285:19     Q.    And just not right?
285:20     A.    It would be --

Δ's objections: Irrelevant; Prejudicial; Lack
     of personal Knowledge

This response: same as previous response

Irwin ruling: Overruled.

Scolnick 28522     285:22-286:1

285:22         THE WITNESS: It is not a standard
285:23 way of doing it.
285:24 BY MR. BUCHANAN:
285:25     Q.    And certainly nothing you'd endorse?
285:ESQUIRE DEPOSITION SERVICES
286: Confidential - Subject to Protective Order 286
286: 1     A.    That is correct.

Δ's objections: Irrelevant; prejudicial; lack
     of personal Knowledge

Π's response: Witness testifying regarding
     his personal Knowledge based on his
     experiences and as a scientist & President
     of Merck Research; Relevant to
     Mercks activities to suppress truth
     and drown out those who were
     attempting to warn of Vioxx CV
     risks.

Irwin ruling: Overruled.

Scolnick 29311     293:11-293:20

293:11     Q.    But May of 2001, you were still
293:12 interested in a trial to evaluate the CV safety of
293:13 Vioxx; true?
293:14     A.    That is true. I constantly wanted to
293:15 garner additional data to what we already had to
293:16 further prove what we had concluded.
293:17     Q.    And nobody had come up with an idea
293:18 by 2001 of a CV study that could be done to evaluate
293:19 the cardiovascular safety of Vioxx? That's your
293:20 testimony?

Scolnick 29323     293:23-294:2

293:23         THE WITNESS: As the discussions
293:24 evolved, what everybody focused on was a study
293:25 versus placebo, and no placebo-controlled trial had
293:ESQUIRE DEPOSITION SERVICES
294: Confidential - Subject to Protective Order 294
294: 1 yet been brought forth that people were satisfied
294: 2 with the design on.

Scolnick 29608     296:8-296:9

296: 8     Q.    Do you remember the VALOR trial, sir?
296: 9     A.    I don't remember that name, no.

Scolnick 29625     296:25-297:19

296:25     Q.    Dr. Scolnick, I just passed you over
296:ESQUIRE DEPOSITION SERVICES
297: Confidential - Subject to Protective Order 297
297: 1 what we marked as Exhibit 10 to your deposition. It
297: 2 is Bates stamped MRK-ABA0003490 to 3491. It is a
297: 3 letter from a Carlo Patrono; correct?
297: 4     A.    Yes. It's from Dr. Patrono.
297: 5     Q.    Ever seen this before?
297: 6     A.    I don't recall.

→ continued.

Page 37

New Scolnick Complete

```
297: 7    Q.    Who is Dr. Braunwald?
297: 8    A.    Braunwald is a well-known
297: 9  cardiologist at Peter Bent Brigham Hospital.
297:10    Q.    Here in Massachusetts?
297:11    A.    Yes.
297:12    Q.    That's affiliated with Harvard; is
297:13  that right?
297:14    A.    Yes, it is.
297:15    Q.    Merck was actually speaking to
297:16  Dr. Braunwald about running a VALOR trial; right?
297:17    A.    That's what this letter suggests. I
297:18  remember Dr. Braunwald making suggestions, but I
297:19  don't remember the details involved.
```

D's objections: 403; relevance;
lack of personal Knowledge

Π's response: Evidence related to a
potential Merck CV study is relevant
to Π's defect & failure to warn claims.

Irwin ruling: Overruled.

Scolnick 29824    298:24-299:11

```
298:24    Q.    Well, do you recall at the end of
298:25  2001 there was increased urgency to do a
298:ESQUIRE DEPOSITION SERVICES
299: Confidential - Subject to Protective Order 299
299: 1  cardiovascular study; true?
299: 2    A.    There was, because a number of
299: 3  people, scientists and others, still were
299: 4  questioning whether Vioxx had been a contributor in
299: 5  the VIGOR trial as opposed to naproxen being
299: 6  beneficial.
299: 7    Q.    People were still worried about
299: 8  whether Vioxx was causing cardiovascular events;
299: 9  true?
299:10    A.    There were some people who still were
299:11  raising that question.
```

Scolnick 30012    300:12-301:10

```
300:12          I may have asked you this, but did
300:13  you run the VALOR trial?
300:14    A.    No, I don't think the VALOR trial was
300:15  run.
300:16    Q.    Why not?
300:17    A.    I don't remember why the VALOR trial
300:18  wasn't run. This sounds like a pretty complicated
300:19  trial to me, and I don't remember why it wasn't run.
300:20    Q.    Was money an issue?
300:21    A.    I don't remember why the VALOR trial
300:22  wasn't run. As I said, this seems like a fairly
300:23  complicated paragraph here from Dr. Patrono to Dr.
300:24  Braunwald, so, I'm not able to figure this out
300:25  quickly.
300:ESQUIRE DEPOSITION SERVICES
301: Confidential - Subject to Protective Order 301
301: 1    Q.    Do you see the third paragraph? It
301: 2  reads, "I have serious reservations about the role
301: 3  of the Sponsor." The sponsor would be Merck?
301: 4    A.    Presumably.
301: 5    Q.    "I have serious reservations about
```

D's objections: Lack of personal
Knowledge

Π's response: Witness is President of
MRL. His knowledge or lack of knowledge
about a CV study of Vioxx is relevant

Irwin ruling: Overruled.

→ continued.

Page 38

New Scolnick Complete

301: 6   the role of the Sponsor in monitoring and
301: 7   termination of the study, as well as in the
301: 8   statistical analysis of the results."  Do you see
301: 9   that?
301:10      A.   I do.

Scolnick 30515a   305:15-305:19

305:15         Following the Advisory Committee in
305:16   2001, a series of negotiations took place with FDA
305:17   concerning the label for Vioxx; right?
305:18      A.   Yes, a very long time before we
305:19   actually got a label from them.

Scolnick 31121   311:21-313:3

311:21      Q.   I want to pass you over what we just
311:22   marked as Exhibit 11 to your deposition. It's an
311:23   e-mail dated January 31st, 2001 from you to Mr.
311:24   Gilmartin and Mr. Anstice. The subject is "Monday
311:25   MC." Do you see that?
311:ESQUIRE DEPOSITION SERVICES
312: Confidential - Subject to Protective Order 312
312: 1      A.   Yes.
312: 2      Q.   "MC" refers to management committee?
312: 3      A.   Yes.
312: 4      Q.   It is Bates stamped MRK-ACR0008985.
312: 5         You write, I guess it's the second
312: 6   sentence or so: "The Vigor meeting is next
312: 7   thursday. On Monday I will show you the essence, an
312: 8   update, of the data that supports Vioxx is safe in
312: 9   the Cv sense. But I want to point out to all of you
312:10   at one time that 1. there is no way to prove that in
312:11   patients with rheumatoid arthritis that," and you
312:12   put this in all caps, "ALL of the difference between
312:13   Vioxx and naproxen is due to the benefit of
312:14   naproxen." Do you see that.
312:15      A.   I do.
312:16      Q.   Then you continue. "IT IS IMPOSSIBLE
312:17   TO PROVE THIS." That's all caps; right?
312:18      A.   Yes.
312:19      Q.   And you continue further. "IT IS
312:20   IMPOSSIBLE TO KNOW THIS WITH CERTAINTY." That's
312:21   what you wrote; right?
312:22      A.   I did.
312:23      Q.   And that was -- that was your feeling
312:24   as of January 31st, 2001?
312:25      A.   Yes. That's just what I've just told
312:ESQUIRE DEPOSITION SERVICES
313: Confidential - Subject to Protective Order 313
313: 1   you again.
313: 2      Q.   A week before the Advisory Committee?
313: 3      A.   Yes.

Scolnick 31325a   313:25-314:15

Δ's objections: Irrelevant;
prejudicial; argumentative;
misleading

π's response: Witness testifying
about own document. Not
misleading & goes to
Irwin ruling: Overruled.

heart of π's
claims.

continues.

Page 39

New Scolnick Complete

313:25      Q.      You continue, "Knowing what is about
313:ESQUIRE DEPOSITION SERVICES
314: Confidential - Subject to Protective Order 314
314: 1    to happen, managing the short term fall out, and
314: 2    facing and managing any longer term consequences."
314: 3    "Short term fall out," what are you thinking about
314: 4    there?
314: 5      A.      When all the data is presented again,
314: 6    people will raise questions whether we can prove the
314: 7    negative completely and, therefore, will question
314: 8    whether they should use Vioxx or not.
314: 9      Q.      "Short term fall out" also refers to
314:10    potential impact on Merck stock; right?
314:11      A.      I don't know. I think I had in mind
314:12    just the effects on Vioxx.
314:13      Q.      Well, the effects of Vioxx would
314:14    include decreased sales of Vioxx; true?
314:15      A.      Yes.

Scolnick 31511    315:11-315:24

315:11      Q.      Well, did you think that negative
315:12    labeling for Vioxx would have an adverse effect on
315:13    Vioxx sales?
315:14      A.      Certainly.
315:15      Q.      Did you think that if there was a CV
315:16    warning for Vioxx, that that would have a negative
315:17    effect on Vioxx sales?
315:18      A.      Certainly, but I didn't expect a CV
315:19    warning based on the data.
315:20      Q.      Did you think that if there was a CV
315:21    warning on Vioxx, that would also have an effect on
315:22    Merck stock?
315:23      A.      Certainly. But as I've said, I did
315:24    not expect a CV warning.

Scolnick 32206    322:6-325:17

322: 6      Q.      And you really thought it was a ···
322: 7    challenge in your team to convince the FDA and the
322: 8    Advisory Committee that Vioxx didn't have a
322: 9    cardiovascular problem; true?
322:10      A.      We had all the data which said that
322:11    we didn't have a problem, and we wanted to make sure
322:12    we could present all that data, sure.
322:13      Q.      But it wasn't just a challenge, it
322:14    was almost impossible; right?
322:15      A.      It was impossible to prove the
322:16    negative, which I pointed out in my e-mail note. It
322:17    was possible to present all the data which supported
322:18    our position.
322:19      Q.      Well, the Advisory Committee went
322:20    well from your perspective; true?
322:21      A.      Yes. Quite well.

Continued

Δs objections: Irrelevant;
Prejudicial; Argumentative;
Asked & Answered.

Πs response: Permissible cross-
examination. Testimony
rebuts Merck's claim that
it cooperated fully w/ the
FDA.

Irwin ruling: Overruled.

Page 40

New Scolnick Complete

322:22   Q.   Your team did a fantastic job; true?
322:23   A.   Yes.
322:24   Q.   And they made the FDA look like
322:25   "grade d high school students." Isn't that what you
322:ESQUIRE DEPOSITION SERVICES
323: Confidential - Subject to Protective Order 323
323: 1   said?
323: 2   A.   I did in an e-mail note, yes. I
323: 3   regret those words, but we did a good job.
323: 4   Q.   You meant them when you wrote it?
323: 5   A.   It was -- I meant them. It was an
323: 6   allusion to something that had happened a few years
323: 7   ago, but I did write those words.
323: 8   Q.   This is the same FDA that you
323: 9   respect?
323:10   A.   Yes.
323:11   Q.   This is the same FDA that's
323:12   responsible for the public safety?
323:13   A.   That's correct.
323:14   Q.   This is the same FDA that's
323:15   responsible for evaluating the cardiovascular data
323:16   concerning your drug?
323:17   A.   Yes.
323:18   Q.   And you were proud that your team
323:19   made the FDA look like grade D high school students;
323:20   true?
323:21   A.   I wrote those words. I regret the
323:22   choice of words. I wrote those words.
323:23          MR. BUCHANAN: Let's mark as Exhibit
323:24   12, I think, the e-mail you were referring to, sir.
323:25          - - -
323:ESQUIRE DEPOSITION SERVICES
324: Confidential - Subject to Protective Order 324
324: 1          (Whereupon, Deposition Exhibit
324: 2          Scolnick-12, E-mails, MRK-ACT0018064,
324: 3          was marked for identification.)
324: 4          - - -
324: 5          THE WITNESS: Yes.
324: 6   BY MR. BUCHANAN:
324: 7   Q.   Dr. Scolnick, I just passed you over
324: 8   Exhibit 12 to your deposition. It is an e-mail, two
324: 9   e-mails, the earliest of which is an e-mail from you
324:10   to several folks, subject, "Today." It's Bates
324:11   stamped MKR-ACT0018064. It's dated Thursday,
324:12   February 8, 2001, 9:10 p.m. is the time. Do you see
324:13   that?
324:14   A.   Yes, I do.
324:15   Q.   You wrote this the day of the
324:16   February 2001 Advisory Committee?
324:17   A.   I don't remember the date of the
324:18   meeting.
324:19   Q.   You wrote "To ALL" --
324:20   A.   It looks like it is the same day.
324:21   Q.   "To ALL: I bit my nails all day."
324:22   You're referring to you listening to the Advisory

Page 41          continued →

New Scolnick Complete

324:23   Committee?
324:24        A.      Either listening or being there. I
324:25   don't remember whether I was there or I viewed it.
324:ESQUIRE DEPOSITION SERVICES
325: Confidential - Subject to Protective Order 325
325: 1        Q.      If you didn't go, you did listen?
325: 2        A.      Yes.
325: 3        Q.      You said, "You all were FANTASTIC."
325: 4   You wrote that in all caps; right?
325: 5        A.      Yes.
325: 6        Q.      You then wrote that "You made them
325: 7   look like grade d high school students." Right?
325: 8        A.      That's what the memo says.
325: 9        Q.      You say, "and you won big huge and
325:10   completely." True?
325:11        A.      That's what I said.
325:12        Q.      You wrote that?
325:13        A.      Yes.
325:14        Q.      You note at the end of this that your
325:15   team should, "enjoy and bask in the warmth of having
325:16   done an impossible job superbly." Is that right?
325:17        A.      That's what I wrote.

Scolnick 32607    326:7-326:10

326: 7            You agree it is not very flattering
326: 8   to refer to the agency responsible for protecting
326: 9   the public health as it relates to drugs as "grade d
326:10   high school students."

Scolnick 32612a    326:12-326:16

326:12            THE WITNESS:  No, it is not
326:13   flattering. As I said, it came from an allusion to
326:14   an earlier event related to the crux of an Advisory
326:15   Committee meeting, and it was inappropriate in this
326:16   context.

Scolnick 32910a    329:10-329:24

329:10        Q.      So, after this Advisory Committee in
329:11   February of 2001, you got a letter from the FDA
329:12   saying that they were conditionally approving
329:13   Merck's supplemental new drug application; right?
329:14        A.      At some point we got a letter back
329:15   from them, yes.
329:16        Q.      You didn't like the tone of the
329:17   letter, though, did you?
329:18        A.      We didn't like the tone, and we
329:19   didn't like the content. As I said earlier, they
329:20   ignored all the GI data. They completely left it
329:21   out. They left out the Alzheimer's data, and they
329:22   had a warning, despite what had happened at the
329:23   Advisory Committee, where no warning was suggested
329:24   based on all the data, or voted for.

Page 42

Δ's objections: Prejudicial;
        Asked and answered;
        argumentative.

π's response: Permissible cross-
        examination.

Irwin ruling: Overruled.

New Scolnick Complete

Scolnick 33109a    331:9-331:18

331: 9          MR. PERSCHETZ: Is this 13?
331:10          MR. BUCHANAN: Yes.
331:11   BY MR. BUCHANAN:
331:12          Q.    For the record, Dr. Scolnick, I've
331:13   just passed you what we've marked as Exhibit 13 to
331:14   your deposition. It's a two-page series of e-mails
331:15   Bates stamped MRK-ACR0009151 to 9152. Doctor, you
331:16   are, in fact, an author and recipient on several of
331:17   these e-mails; true?
331:18          A.    Yes.

Scolnick 33209    332:9-332:25

332: 9          Q.    You didn't like the tone of the
332:10   approvable letter you got from Merck's supplemental
332:11   NDA; true?
332:12          A.    That's correct. I don't remember
332:13   what was in it at this point, so, it's very hard to
332:14   respond to your question.
332:15          Q.    I'll just read the first sentence.
332:16   "To ALL: I am sure you imagine my reaction to the
332:17   tone of the letter. The open ended request for
332:18   safety updates is a filibuster." Do you see that?
332:19          A.    Yes.
332:20          Q.    What's a filibuster?
332:21          A.    It's a delaying tactic.
332:22          Q.    So, you thought the FDA was trying to
332:23   delay approval of your supplemental NDA request to
332:24   get safety information?
332:25          A.    That's what I wrote.

Scolnick 33311    333:11-334:12

333:11          Q.    You viewed this is as a delay tactic
333:12   by the FDA? Is that your testimony?
333:13          A.    That's what I was worried about.
333:14          Q.    Then you state, "When will you find
333:15   out what they have done for our competitor? If by
333:16   any chance we get a better label now and we are
333:17   asked for this much more data, I will be in Janet's
333:18   office the next day." Do you see that?
333:19          A.    Yes.
333:20          Q.    Your competitor would be Celebrex?
333:21          A.    Yes.
333:22          Q.    The manufacturer of Celebrex?
333:23          A.    Yes.
333:24          Q.    Okay.
333:25                You were concerned that the
333:ESQUIRE DEPOSITION SERVICES
334: Confidential - Subject to Protective Order 334
334: 1   manufacturers of Celebrex were going to get an
334: 2   approved label before Vioxx was going to get an

→ D's objections: Irrelevant; Prejudicial

T's response: Relevant to T's claims
that Merck refused to cooperate
+ man-handled the FDA.

Irvin ruling: Overruled.

continued →

Page 43

approved label?

A. For GI outcomes, yes, that's what I think I was concerned about.

Q. And if that happened, you were going to go down there to the FDA and see Janet the next day; is that right?

A. That is what I said in the memo.

Q. Who is Janet?

A. Janet was Janet Woodcock, who was, I believe, the head of the drug part of the FDA.

Scolnick 33420 334:20-334:24

Q. So, you felt you could go down there to Janet's office, and you could tell her to straighten things out and make sure that Merck's label got approved on the terms you wanted it approved on?

Δ's objections: Compound; Argumentative; Confusing

π's response: Witness understood and answered question. Question accurately re-phrases document.

Irvin ruling: Not applicable.

Scolnick 33501 335:1-335:4

THE WITNESS: I don't know exactly what I was thinking. I certainly wanted to advocate on Merck's behalf if this were to happen. That's what this memo says.

Scolnick 33512 335:12-335:15

Q. Sir, is that the way it's supposed to work, when you want to address a labeling request with the FDA, you go down, and you go into Janet Woodcock's office to address it?

Scolnick 33518 335:18-335:25

THE WITNESS: The head of the drug office can be involved in labeling negotiations.

BY MR. BUCHANAN:

Q. Is that who Janet Woodcock was?

A. I believe at the time she was head of the drug approval part of the FDA as opposed to vaccines and other parts of the FDA, I believe, but I'm not certain.

Δ's objections: Argumentative; Compound; Calls for speculation

π's response: Witness understands question and testifies to his personal knowledge.

Irvin ruling: Not applicable.

Scolnick 33601a 336:1-336:8

Q. So, in other words, if the FDA perchance decided to give the Celebrex manufacturers the label they had sought before you got it, you were going to go down to the, what's this, the head of drug approval and complain? Is that your testimony?

A. That was -- that's what this note implies.

Δ's objections: Mischaracterization of testimony; argumentative; Irrelevant; prejudicial

π's response: Same as previous objections

Irvin ruling: Overruled.

New Scolnick Complete

Scolnick 34024    340:24-341:5

340:24    Q.    You said that you weren't just going
340:25    to stop with Janet; right?
340:ESQUIRE DEPOSITION SERVICES
341: Confidential - Subject to Protective Order 341
341: 1    A.    That's what this says.
341: 2    Q.    You said you'd go beyond if you
341: 3    needed to with other contacts you'd made in HHS;
341: 4    right?
341: 5    A.    That's what this says.

Scolnick 34117    341:17-341:20

341:17            So, you'd go over Janet's head if you
341:18    needed to?
341:19    A.    In order to make scientific points
341:20    which I felt strongly about.

D's objection: Asked and answered.

Π's response: Cross-examination seeks to clarify
witness's testimony.

Irvin ruling: overruled.

Scolnick 34301    343:1-343:11

343: 1            I see the last sentence here you say,
343: 2    "I have never seen being nice to the FDA-except on
343: 3    rare occasions-pay off."  You wrote that?
343: 4    A.    Yes.
343: 5    Q.    You meant it?
343: 6    A.    Yes.
343: 7    Q.    It's a true statement?
343: 8    A.    It was my feeling.
343: 9    Q.    True statement when you wrote it,
343:10    sir?
343:11    A.    It is my feeling when I wrote it.

D's objections: Irrelevant; prejudicial

Π's response: Appropriate to cross-examine
witness as to content of own document.
R.612.

Irvin ruling: Overruled.

D's objections: Asked and answered; 401-403

Π's response: Permissible cross-examination
to clarify witness's testimony.

Irvin ruling: Overruled.

Scolnick 35312a    353:12-353:25

353:12    Q.    Then you say, "One cannot deal with
353:13    them in a rational way."  Right?
353:14    A.    That's what I said.
353:15    Q.    And rational way was your way; right?
353:16    A.    No. Rational way was the way we had
353:17    been trying to deal with them when we submitted the
353:18    supplemental NDA, with all of the data that was
353:19    supported at the Advisory Committee meeting.
353:20    Q.    Right.
353:21            To be clear, what the FDA was asking
353:22    for was additional safety information in their
353:23    approvable letter; true?
353:24    A.    That's what the memo implies.  I do
353:25    not know nor recall what was in that request.

D's objections: Argumentative; prejudicial
401-403; oldobar.

Π's response: Appropriate to cross-exam
witness with his own document.
R.612.

Irvin ruling: Overruled.

Scolnick 35415    354:14-354:19

354:14    BY MR. BUCHANAN:
354:15    Q.    The bottom line is that the FDA,
354:16    looking for additional data on Vioxx in connection

New Scolnick Complete

354:17  with your supplemental NDA request, jeopardized your
354:18  ability to get the label you wanted in the
354:19  marketplace; true?

Scolnick 35421    354:21-355:5

354:21          THE WITNESS:  They were retarding the
354:22  process in my opinion.
354:23  BY MR. BUCHANAN:
354:24      Q.    And you needed that process to move
354:25  quickly; right?
354:ESQUIRE DEPOSITION SERVICES
355: Confidential - Subject to Protective Order 355
355: 1      A.    That was our goal.  We wanted it to
355: 2  move quickly.  We had submitted our application very
355: 3  quickly, and it still had been almost a year after
355: 4  the application was submitted, and we didn't yet
355: 5  have a label back.

Scolnick 35516    355:16-355:19

355:16          You were concerned that in the COX-2
355:17  market, the company that had the better label for
355:18  its drug would sell more of that drug; true?
355:19      A.    True, if the data supported that.

Scolnick 35523a    355:23-356:10

355:23      Q.    You did get a label at some point in
355:24  time in connection with your supplemental new drug
355:25  application for Vioxx; true?
355:ESQUIRE DEPOSITION SERVICES
356: Confidential - Subject to Protective Order 356
356: 1      A.    Yes.
356: 2      Q.    You got that in the fall of 2001?
356: 3      A.    I don't recall the exact date.  It
356: 4  was certainly after this in 2001.
356: 5      Q.    Had a CV warning?
356: 6      A.    Yes.
356: 7      Q.    CV means cardiovascular; right?
356: 8      A.    Yes.
356: 9      Q.    In the warnings section of the label?
356:10      A.    Yes.

Scolnick 35704    357:4-357:17

357: 4      Q.    The label you got from the FDA had a
357: 5  cardiovascular warning in the warnings section;
357: 6  true?
357: 7      A.    I believe so.
357: 8      Q.    You thought it was ugly?
357: 9      A.    I did.
357:10      Q.    You thought it was ugly cubed?
357:11      A.    I did.
357:12      Q.    That's ugly times ugly times ugly;

Page 46

continued →

D's objections: Irrelevant; Prejudicial
Cummulative.

P's response: Witness being cross-examined
regarding his own document. Relates
to Merck's claim it cooperated with
FDA.

Irvin ruling: Overruled.

New Scolnick Complete

357:13    right?
357:14        A.    Ugly cubed is exactly what you've
357:15    stated.
357:16        Q.    Ugly three times over; right?
357:17        A.    Right.

Scolnick 36022    360:22-361:4

360:22        Q.    Sir, I'm going to pass over what
360:23    we've just marked as Exhibit 14 to your deposition.
360:24    It is a series of e-mails, three of them in
360:25    particular, from October 2001.  For the record, it
360:ESQUIRE DEPOSITION SERVICES
361: Confidential - Subject to Protective Order 361
361: 1    is Bates stamped MRK-ABW0004799.
361: 2            Sir, you've seen this document
361: 3    before; right?
361: 4        A.    Yes, I have.

Scolnick 36114    361:14-362:12

361:14        Q.    It is from October 15th, 2001?
361:15        A.    Yes.
361:16        Q.    You said --
361:17        A.    October 16th.
361:18        Q.    You said, "David."  That's David
361:19    Anstice; right?
361:20        A.    Yes.
361:21        Q.    He's the president of U.S. human
361:22    health?
361:23        A.    Yes.
361:24        Q.    That was the group within Merck
361:25    responsible for all the marketing of Vioxx?
361:ESQUIRE DEPOSITION SERVICES
362: Confidential - Subject to Protective Order 362
362: 1        A.    The domestic marketing of Vioxx.
362: 2        Q.    You told him, "Be assured we will not
362: 3    accept this label."  Right?
362: 4        A.    That's what my memo says.
362: 5        Q.    David was concerned about this label;
362: 6    right?
362: 7        A.    Yes.
362: 8        Q.    Okay.
362: 9            Thought it put you at a competitive
362:10    disadvantage; right?
362:11        A.    Yes.  And it didn't accurately
362:12    reflect our data.

Scolnick 36213    362:13-363:2

362:13        Q.    You were telling David that I'm going
362:14    to do what I can to make sure we don't get that
362:15    label; right?
362:16        A.    Yes.
362:17        Q.    I'm going to do what I can to make

→ continued

Page 47

Δ's objections: Repetitive; asked
and answered; mischaracterize
documents

Π's response: Permissible cross-examin
ation to clarify witness's
testimony. 612.

Irvin ruling: Overruled.

New Scolnick Complete

362:18   sure there's no CV warning in the Vioxx label;
362:19   right?
362:20       A.    That isn't what this says.  It says,
362:21   "We will not accept this label" and "if we need to
362:22   we will go to an Advisory Committee meeting" to get
362:23   them to review what our label should look like, a
362:24   scientific process to resolve the potential -- a
362:25   potential disagreement between the FDA and Merck.
362:ESQUIRE DEPOSITION SERVICES
363: Confidential - Subject to Protective Order 363
363: 1       Q.    So, you rejected the label you got
363: 2   from the FDA that had the CV warning; true?

Scolnick 36304a   363:4-363:18

363: 4           THE WITNESS:  We rejected this label
363: 5   in its totality.  It had a CV warning, and it
363: 6   ignored the GI data that we had garnered in VIGOR.
363: 7   BY MR. BUCHANAN:
363: 8       Q.    David responded to you, "We knew it
363: 9   would be UGLY and it is."  Right, he said that to
363:10   you?
363:11       A.    Yes.
363:12       Q.    He also said, "We'll fight back and
363:13   see where we get."  Right?
363:14       A.    Yes.  That's what he said.
363:15       Q.    And he again said, we'll "ask for an
363:16   advisory committee" if we can't make headway with
363:17   the FDA; right?
363:18       A.    That's what he said.

D's objections: Irrelevant; Prejudicial;
Repetitive.

Pl's response: Witness being cross-
examined on own
document, specifically as to
portions he has not testified to.

Irwin ruling: Overruled.

Scolnick 36412   364:12-365:12

364:12       Q.    You then say here in the final one,
364:13   your final e-mail from October 16, 2001, "It is ugly
364:14   cubed."  Right?
364:15       A.    Yes.
364:16       Q.    You say, "thye," that should be they;
364:17   right?
364:18       A.    Yes.
364:19       Q.    "Thye are bastards."  True?
364:20       A.    That's what the e-mail says.
364:21       Q.    That's what you wrote?
364:22       A.    That's what I wrote.
364:23       Q.    You meant it when you wrote it?
364:24       A.    I was very upset when I wrote the
364:25   e-mail.
364:ESQUIRE DEPOSITION SERVICES
365: Confidential - Subject to Protective Order 365
365: 1       Q.    So, this particular group within the
365: 2   FDA was devious and antagonistic; true?
365: 3       A.    That's what I wrote.
365: 4       Q.    They were bastards?
365: 5       A.    That reflected my emotional
365: 6   unhappiness with their label.

→ continued

New Scolnick Complete

365: 7    Q.    They had the ability of grade D high
365: 8  school students; true?
365: 9    A.    That's what I wrote.
365:10    Q.    And if you wanted to get anything
365:11  done with them, you couldn't treat them with
365:12  respect; true?

Scolnick 36514    365:14-365:22

365:14          THE WITNESS:  I wrote all of these
365:15  things, and I felt that we were not getting a fair
365:16  process from this division.
365:17  BY MR. BUCHANAN:
365:18    Q.    The FDA was pretty insistent this
365:19  drug needed a cardiac warning, weren't they?
365:20    A.    They presented this label to us, so,
365:21  they must have felt that way.  This division felt
365:22  that way.

Scolnick 36603    366:3-366:9

366: 3    Q.    You took from that the FDA at
366: 4  least was concerned about the potential
366: 5  cardiovascular implications of your drug; true?
366: 6    A.    Yes.
366: 7    Q.    And they wanted to warn the American
366: 8  public about the potential cardiovascular
366: 9  implications of Vioxx; true?

Scolnick 36611b    366:11-366:13

366:11          THE WITNESS:  Yes, despite the
366:12  Advisory Committee meeting, which had not felt that
366:13  way.

Scolnick 37115a    371:15-371:23

371:15          Dr. Scolnick, I just passed you what
371:16  we marked as Exhibit 15 to your deposition.  It's a
371:17  three e-mail sequence from November 8, 2001.  The
371:18  subject here says "History lesson."  Do you see
371:19  that?
371:20    A.    Uh-huh, yes, I do.
371:21    Q.    It's an exchange between initially
371:22  from you to Doug Greene and Bonnie Goldmann; true?
371:23    A.    Yes.

Scolnick 37218    372:18-373:3

372:18    Q.    You said, "Doug and Bonnie twice in
372:19  my life I've had to say to FDA 'That label is
372:20  unacceptable, we will not under any circumstances
372:21  accept it.'"  Do you see that?
372:22    A.    Yes, I do.
372:23    Q.    You continue there and you say, "You

Δ's objections:  Lack of personal
                              knowledge.

π's response:  Witness testifying to his
                    personal knowledge about the
                    content of label.

Irvin ruling:  Overruled.

New Scolnick Complete

372:24  WILL," in all caps, will, "have to do that on the
372:25  cardiac warning for Vioxx. 1 assure you that you
372:ESQUIRE DEPOSITION SERVICES
373: Confidential - Subject to Protective Order 373
373: 1  will." That's what you wrote; right?
373: 2       A.     1 did. You skipped an intervening
373: 3  sentences.

Scolnick 37312a    373:12-374:2

373:12       Q.    Paragraph continues where 1 was
373:13  before, "You WILL," in all caps will, "have to do
373:14  that on the cardiac warning for Vioxx. 1 assure you
373:15  that you will." Did I read that right?
373:16       A.    Yes, you did.
373:17       Q.    You put "will" in emphasis to these
373:18  people; right?
373:19       A.    Yes, I did.
373:20       Q.    And these were the people who were
373:21  dealing with the FDA in connection with the label
373:22  negotiations; right?
373:23       A.    Yes.
373:24       Q.    You told them, "And I assure you I
373:25  will NOT," and again in all caps, "NOT sign off on
373:ESQUIRE DEPOSITION SERVICES
374: Confidential - Subject to Protective Order 374
374: 1  any label that had a cardiac warning." True?
374: 2       A.    That's what the e-mail says.

Scolnick 37610    376:10-376:15

376:10       Q.    So, you negotiated with the FDA over
376:11  this label concerning cardiac and GI warnings from
376:12  October of 2001 until April of 2002; true?
376:13       A.    That's correct. Because we believed
376:14  that the drug did not justify having a cardiac
376:15  warning based on our data.

Scolnick 381.11-382.02    381:11-382:2

381:11       Q.    Doctor, I passed you over what we
381:12  marked as Exhibit 16 to your deposition. It is a
381:13  relatively brief e-mail, Bates stamped
381:14  MRK-ACR0009297 dated February 25th, 2002 from you
381:15  again to this same team of people working on the
381:16  negotiations over the Vioxx label; true?
381:17       A.    Yes.
381:18       Q.    You wrote, "To ALL: If you can get
381:19  this label it will be an Al Michaels quote: 'Do you
381:20  believe in miracles?'" What are you referring to
381:21  there?
381:22       A.    I'm referring to Al Michael's quote
381:23  when the U.S. Olympic team beat the Russians in
381:24  whatever year it was in ice hockey.
381:25       Q.    It was like an impossible task;

→ Handwritten note:
D's objection: Asked & answered.
П's response: Witness being questioned regarding statement in own document. 612.
Irwin ruling: Overruled.

→ Handwritten note:
D's objections: Irrelevant; prejudicial.
П's response: same response as above.
Irwin ruling: Overruled.

→ continued.

Page 50

New Scolnick Complete

381:ESQUIRE DEPOSITION SERVICES
382: Confidential - Subject to Protective Order 382
382: 1   right?
382: 2        A.     It certainly appeared to be.


Scolnick Part 3 (5-17-05) (Multi-clip)
Scolnick 41512     415:12-415:15

415:12        Q.     Sir, passing over what we just marked
415:13        as Exhibit 18 to your deposition.  For the record,
415:14        it's a January 28, 2001 e-mail from yourself to Eve
415:15        Slater.

Scolnick 41524     415:24-416:1

415:24        Q.     Okay.  Do you see your e-mail at the
415:25        top?
416: page 416
416: 1        A.     Yes, I do.

Scolnick 416.06-416.12     416:6-416:12

416: 6        Q.     Then you continue, "This Fries
416: 7        incident is a disaster for Merck."  Do you see that?
416: 8        A.     Yes, I do.
416: 9        Q.     You wrote that?
416:10        A.     I did.
416:11        Q.     You believed it at the time?
416:12        A.     I did.


Scolnick 41621     416:21-417:5

416:21        Q.     Then you continued.  "Worse than
416:22        Vigor results themselves."  Do you see that?
416:23        A.     Yes.
416:24        Q.     The VIGOR results were also a
416:25        disappointment for Merck; true?
417: page 417
417: 1        A.     Some of them were surprising, as you
417: 2        know, and some of them were excellent.
417: 3        Q.     Okay.
417: 4               And the ones that were surprising
417: 5        were the cardiovascular effects of Vioxx; true?

Scolnick 41708     417:8-418:6

417: 8               THE WITNESS:  The difference between
417: 9        naproxen and Vioxx was surprising in the VIGOR
417:10        results.
417:11        BY MR. BUCHANAN:
417:12        Q.     Well, you said, "Worse than Vigor
417:13        results themselves."  That's what you wrote; right,
417:14        sir?
417:15        A.     I did.

Page 51

Δ's objections: Objection to Ex. 18 : all questions about document (Irrelevant. Prejudicial)

π's response: Witness being cross-examined with his own document. 612. Testimony relevant to show that VIGOR results were negative to Vioxx and showed increased risk of CV adverse events.

Irvin ruling: Overruled.


Δ's objections: Irrelevant; Prejudicial

π's response: same as above

Irvin ruling: Overruled.


Δ's objections: Lack of personal Knowledge; Incomplete designation 412-403.

π's response: same as above.

Irvin ruling: Overruled.


Δ's objections: Asked & Answered; repetitive

π's response: same as above

Irvin ruling: Overruled.

→ continued

New Scolnick Complete

417:16     Q.     You were implying that the VIGOR
417:17  results were disappointing in some way; true?
417:18     A.     I was implying that the difference
417:19  between the Vioxx and naproxen arms were surprising
417:20  and created an issue which we had dealt with and
417:21  come up with what we thought was the best
417:22  explanation based on all the other data.
417:23     Q.     Well, sir, you didn't write "more
417:24  surprising" than the VIGOR results themselves when
417:25  you wrote this e-mail, did you?
418: page 418
418: 1     A.     No, I did not.
418: 2     Q.     You wrote, "Worse than VIGOR
418: 3  results"?
418: 4     A.     That's what I wrote.  It's a very
418: 5  short e-mail.  That's what I wrote.
418: 6     Q.     I understand.

Scolnick 46512    465:12-465:22

465:12     Q.     You'd agree with me, sir, wouldn't
465:13  you, that if you were wrong in your final conclusion
465:14  about Vioxx, and the problem was mechanism based,
465:15  that there could have been horrible public health
465:16  consequences to the folks who were taking Vioxx in
465:17  the general population; true?
465:18     A.     If we had been wrong, there would
465:19  have been serious consequences, yes.
465:20     Q.     Tens of thousands of people in the
465:21  general population taking Vioxx could have suffered
465:22  heart attacks as a result of your drug; true?

Δ's objections: Irrelevant; Prejudicial

Π's response: Testimony relevant to Merck's failure to warn.

Irvin ruling: Overruled.

Scolnick 46601    466:1-466:3

466: 1     THE WITNESS:  If we had been wrong,
466: 2  there would have been negative consequences for
466: 3  public health.  We did not believe we were wrong.

Δ's objections: Irrelevant; prejudicial

Π's response: Same as above.

Irvin ruling: Overruled.

Scolnick 46722    467:22-467:25

467:22     Q.     Merck has the skilled employees
467:23  necessary to estimate what the public health
467:24  consequences could be of a drug that it made that
467:25  caused cardiovascular side effects; true?

Scolnick 46802    468:2-468:9

468: 2     THE WITNESS:  Merck can estimate what
468: 3  the consequences would be if the drug were thought
468: 4  by Merck to cause cardiovascular consequences.
468: 5  BY MR. BUCHANAN:
468: 6     Q.     And in March of 2000, no such
468: 7  analysis was done?
468: 8     A.     Correct.  Because we didn't believe
468: 9  the drug caused those events.

New Scolnick Complete

Scolnick 46915    469:15-469:18

469:15         You agree with the decision by Merck
469:16    not to analyze the potential public health
469:17    consequences to continuing to sell Vioxx in March of
469:18    2000?

*D's objections: Argumentative; 602*

*T's response: Witness is testifying to his personal knowledge. Permissible cross-examination.*

Scolnick 46921    469:21-469:22

469:21         THE WITNESS: Yes, I do, because we
469:22    believed the drug was safe.

*Irvin ruling: Overruled.*

Scolnick 47101a    471:1-472:11

471:1    Q.    Sir, I just passed you a document we
471:2    marked as Exhibit 19 to your deposition.
471:3         - - -
471:4         (Whereupon, Deposition Exhibit
471:5    Scolnick-19, "Vioxx Preliminary
471:6    Cardiovascular Meta-Analysis," Slide
471:7    Set, 10-18-00 (Shapiro), MRK-NJ0070364 -
471:8    MRK-NJ0070397, was marked for
471:9    identification.)
471:10        - - -
471:11   BY MR. BUCHANAN:
471:12   Q.    For the record, it's a document by
471:13   Deborah Shapiro. Who is Deborah Shapiro?
471:14   A.    Deborah Shapiro was a statistician in
471:15   the Merck Research Laboratories.
471:16   Q.    She was the unblinded statistician in
471:17   the VIGOR trial; right?
471:18   A.    Yes, she was.
471:19   Q.    She's the statistician you contacted
471:20   to get an early look at the VIGOR data; right?
471:21   A.    To look at the data first when the
471:22   trial is completed. That is correct.
471:23   Q.    For the record, the document is
471:24   entitled "Vioxx Preliminary Cardiovascular
471:25   Meta-Analysis," and it is Bates stamped
472: page 472
472:1    MRK-NJ0070364 through 397.
472:2         So, your testimony is that the
472:3    company conducted a meta-analysis preapproval? That
472:4    was the first time; right?
472:5    A.    Yes.
472:6    Q.    In March of 2000; right?
472:7    A.    Yes.
472:8    Q.    And then again in October of 2000;
472:9    correct?
472:10   A.    As I said, I don't remember the dates
472:11   of all the other meta-analyses.

Scolnick 47322    473:22-474:16

Page 53

New Scolnick Complete

473:22      Q.    Okay. I would like to direct your
473:23  attention to Page NJ0070394.
473:24      A.    (Witness reviewing document.)
473:25           Yes.
474: page 474
474: 1      Q.    This is a "meta-analysis" that
474: 2  describes the "Relative Risk of MIs," that's heart
474: 3  attacks?
474: 4      A.    Yes.
474: 5      Q.    The "MI Endpoint with 95% CI."
474: 6  What's "CI" mean?
474: 7      A.    Confidence interval.
474: 8      Q.    What does confidence interval
474: 9  represent, sir?
474:10      A.    It's a term that describes the bounds
474:11  in which to analyze statistical significance.
474:12      Q.    And if the confidence interval is
474:13  greater than 1 or if the confidence -- if the
474:14  confidence interval doesn't encompass 1, it
474:15  indicates that the finding is statistically
474:16  significant; true?

Scolnick 47419a    474:19-474:19

474:19           THE WITNESS: I believe that's true.

Scolnick 47512    475:12-476:12

475:12           At the bottom of the page it says
475:13  "Total Cohort." Do you see that?
475:14      A.    Yes, I do.
475:15      Q.    What's a cohort?
475:16      A.    A cohort is a group of patients
475:17  that's been studied in this meta-analysis.
475:18      Q.    And then to the right it says "2.02."
475:19  Do you see that?
475:20      A.    Uh-huh.
475:21      Q.    That's the relative risk --
475:22      A.    Yes, I do, I'm sorry.
475:23      Q.    That's the relative risk of heart
475:24  attacks among all studies for NSAIDs versus Vioxx;
475:25  true?
476: page 476
476: 1      A.    That is, I think, what this plots,
476: 2  non-naproxen and naproxen NSAIDs.
476: 3      Q.    That's right.
476: 4           And the confidence interval, again,
476: 5  is what, sir?
476: 6      A.    The confidence interval for 2.0?
476: 7      Q.    For the 2.02.
476: 8      A.    Is 1.14 to 3.55.
476: 9      Q.    And the fact that the confidence
476:10  interval does not go below 1 indicates that the 2.02
476:11  relative risk is statistically significant; true?
476:12      A.    Yes. This, I believe, aggregates

→ Δ's objection: Lack of personal knowledge;
outside scope of deposition; (lay
opinion evidence)

π's response: Witness is head of Merck
Research Labs. Question is so clearly
within scope of his knowledge and
responsibility.

Irvin ruling: Overruled.

Page 54

New Scolnick Complete

Scolnick 47618     476:18-477:5

476:18          Q.     What does statistical significance
476:19     refer to, sir?
476:20          A.     That 95 times out of 100, the result
476:21     is an accurate one and not by chance.  There's only
476:22     a 5 percent chance that the result is a fluke.
476:23          Q.     Okay.
476:24                 And a relative risk of 2.02 in this
476:25     total cohort indicates a doubling of the risk of
477: page 477
477: 1     heart attacks among all of Merck's studies --
477: 2          A.     What you --
477: 3          Q.     -- comparing NSAIDs to Vioxx; true?
477: 4          A.     Comparing all NSAIDs including
477: 5     naproxen to Vioxx.  That's what this plots, yes.

Scolnick 47707     477:7-477:18

477: 7                 If you'd turn the page, sir, you see
477: 8     an additional chart.  Again, "MI Endpoint," that's
477: 9     heart attack endpoint; right?
477:10          A.     Yes.
477:11          Q.     It says "Rofecoxib versus NSAIDS."
477:12     Vioxx is rofecoxib; right?
477:13          A.     Yes.
477:14          Q.     And again reflects 2.02 being the
477:15     relative risk for all patients compared rofecoxib to
477:16     NSAIDs; true?
477:17          A.     To all NSAIDs.  As I've said,
477:18     naproxen and non-naproxen.

Scolnick 47821a     478:21-478:25

478:21          Q.     Well, sir, would you endorse a
478:22     decision not to give an MI-only meta-analysis to the
478:23     FDA?
478:24          A.     That should be part of any
478:25     submission.

Scolnick 48009     480:9-480:18

480: 9          Q.     And you wouldn't endorse a decision
480:10     not to give unfavorable safety data to the FDA,
480:11     would you?
480:12          A.     I would endorse that all of the data
480:13     be submitted to the FDA.
480:14          Q.     Did you become aware of the results
480:15     of Merck's meta-analysis?
480:16          A.     I was shown summaries of
480:17     meta-analyses, yes, but I don't recall the details
480:18     of what was in those summaries at this point.

Scolnick 48115     481:15-482:8

New Scolnick Complete

481:15      Q.   Okay.  Sir, let me pass over to you
481:16  what we just marked as Exhibit 20 to your
481:17  deposition.
481:18              - - -
481:19              (Whereupon, Deposition Exhibit
481:20              Scolnick-20, Letter 1-8-01, with
481:21              attachment, "IND 46,894: VIOXX
481:22              (rofecoxib)" "Interim Cardiovascular
481:23              Meta-Analysis," MRK-NJ0267715 -
481:24              MRK-NJ0267777, was marked for
481:25              identification.)
482: page 482
482: 1              - - -
482: 2  BY MR. BUCHANAN:
482: 3      Q.   For the record, sir, I just passed
482: 4  you what we've marked as Exhibit 20 to your
482: 5  deposition.  It's a January 8, 2001 letter from a
482: 6  Robert Silverman, Senior Director of Regulatory
482: 7  Affairs to somebody at the FDA; is that right, sir?
482: 8      A.   Yes, correct.


Scolnick 48301     483:1-483:9

483: 1      Q.   It's a transmittal of information to
483: 2  the FDA?
483: 3      A.   Yes, it is.
483: 4      Q.   Transmittal of information to the FDA
483: 5  concerning Vioxx?
483: 6      A.   Yes.
483: 7      Q.   Transmittal of the "Interim
483: 8  Cardiovascular Meta-Analysis" for Vioxx; true?
483: 9      A.   Yes.  Yes, that's correct.


Scolnick 48517     485:17-487:4

485:17      Q.   Is there an MI meta-analysis in the
485:18  submission to the FDA?
485:19      A.   The meta-analysis done in this
485:20  document I do not see in this document.  I do see,
485:21  and it is important to point out, all of the data on
485:22  the four pages I cited to you.
485:23      Q.   And what you're trying to highlight,
485:24  sir, is that certain MI information was encompassed
485:25  within the APTC endpoint; right?
486: page 486
486: 1      A.   That is what I'm trying to point out,
486: 2  yes.
486: 3      Q.   But Merck did a specific analysis
486: 4  looking at the incidence of heart attacks across all
486: 5  of its trials; true?
486: 6      A.   That is indicated in this document,
486: 7  in the first document that you showed me in this
486: 8  discussion.
486: 9      Q.   That document is Exhibit 19; right?

New Scolnick Complete

486:10      A.    Yes, it is.
486:11      Q.    Merck did an MI meta-analysis in
486:12   October 2000; true?
486:13      A.    Yes, that's true.
486:14      Q.    And didn't give it to the FDA in
486:15   January 2001; true?
486:16      A.    The specific figures are not included
486:17   in the submission to the FDA.  The data is included.
486:18      Q.    Well, not only the figures, sir, the
486:19   MI meta-analysis is not in that submission to the
486:20   FDA; correct?
486:21      A.    That is correct.
486:22      Q.    There might be some heart attack data
486:23   in that submission to the FDA; right?
486:24      A.    There is heart attack data in this
486:25   submission.
487: page 487
487: 1      Q.    But there's not an MI meta-analysis
487: 2   in Exhibit 20; right?
487: 3      A.    Not that I could find, no.  It does
487: 4   not -- it's not there.

Scolnick 48712    487:11-487:20

487:11   BY MR. BUCHANAN:
487:12      Q.    Is it your testimony that you were
487:13   never consulted by regulatory within Merck Research
487:14   Labs as to whether to give the MI meta-analysis or
487:15   not to give it to the FDA?
487:16      A.    That is my testimony.  I was never
487:17   consulted on that point.
487:18      Q.    Do you endorse the decision not to
487:19   give that MI meta-analysis to the FDA in January
487:20   2001?

Scolnick 48723a    487:23-487:25

487:23          THE WITNESS:  I would have had no
487:24   objection to their submitting all of the
487:25   meta-analyses.

Scolnick 48903    489:3-489:14

489: 3      Q.    So, if your group didn't consult --
489: 4   if your group didn't submit this information to the
489: 5   FDA, they disregarded your standard operating
489: 6   procedure?
489: 7      A.    The standard operating procedure in
489: 8   the labs is to submit all data to the FDA.  All the
489: 9   data is in here.  The specific meta-analysis is not
489:10   included in this document.
489:11      Q.    You say all the data is in there,
489:12   sir, but there's not an MI meta-analysis in that
489:13   document; right?
489:14      A.    That is correct.

New Scolnick Complete

Scolnick 49006     490:6-490:9

490: 6          Q.     Yeah, but the one thing we can agree
490: 7     is, there's not an MI meta-analysis reflected in
490: 8     that particular document, the January 2001
490: 9     submission to the FDA; right?

Scolnick 49012     490:12-490:17

490:12          THE WITNESS: There's no -- there's
490:13     no MI meta-analysis that I can find in the January
490:14     8th document.
490:15     BY MR. BUCHANAN:
490:16          Q.     And you didn't give it to the
490:17     Advisory Committee in February 2001 either, did you?

Scolnick 49021     490:21-491:2

490:21          THE WITNESS: I don't recall what was
490:22     in the presentation.  I don't recall ever having
490:23     seen this first document, Exhibit 19, and I don't
490:24     recall ever having seen the second document which
490:25     was submitted.  I had an excellent group, and they
491: page 491
491: 1     handled the submissions to the FDA and the
491: 2     preparation for the Advisory Committees.

Scolnick 49918a     499:18-500:22

499:18          The company ultimately published a
499:19     meta-analysis concerning cardiovascular events in
499:20     the peer-reviewed literature, didn't it?
499:21          A.     Yes.  I believe it did in Circulation
499:22     or another cardiovascular journal.
499:23          Q.     Fall of 2001.  Does that sound right?
499:24          A.     Sounds approximately right.  I don't
499:25     remember the date.
500: page 500
500: 1          - - -
500: 2          (Whereupon, Deposition Exhibit
500: 3          Scolnick-21, "Cardiovascular Thrombotic
500: 4          Events in Controlled, Clinical Trials of
500: 5          Rofecoxib," (Konstam et al.),
500: 6          Circulation 2001;104:2280-2288,
500: 7          MRK-NJ0074693 - MRK-NJ0074701, was
500: 8          marked for identification.)
500: 9          - - -
500:10     BY MR. BUCHANAN:
500:11          Q.     Dr. Scolnick, I just passed you over
500:12     what we marked as Exhibit 21 to your deposition.  Is
500:13     this the publication of the meta-analysis you were
500:14     just referring to?
500:15          A.     I think it was the one you were just
500:16     referring to.  It is one of the ones I recall.  It

D's objection: Repetitive; Asked
and answered.

TT's response: Permissible cross-
examination to clarify
witness's testimony.

Irwin ruling: Overruled.

Page 58

New Scolnick Complete

500:17   is one I recall.  I don't recall whether others were
500:18   published.
500:19      Q.     And to be clear, this is an October
500:20   2001 article published in the journal Circulation;
500:21   correct?
500:22      A.     Yes.  Correct.

Scolnick 50716     507:16-507:18

507:16      Q.     So, you were testing the drug in
507:17   Alzheimer's patients; right?
507:18      A.     Yes.

Scolnick 50903a     509:3-509:19

509: 3      Q.     When your team was before the
509: 4   Advisory Committee that was convened to evaluate the
509: 5   safety of Vioxx in February 2001, that team cited
509: 6   the Alzheimer's data as data that was reassuring on
509: 7   the safety of the drug; true?
509: 8      A.     Yes.  The Advisory Committee was
509: 9   convened to go over the gastrointestinal data, and
509:10   as part of that, all of the data on Vioxx.
509:11      Q.     But, in fact, there was a significant
509:12   excess of deaths in patients taking Vioxx versus
509:13   patients taking placebo in the Alzheimer's trials;
509:14   isn't that true?
509:15      A.     I don't recall.  What I seem to
509:16   recall is -- I recall that vaguely.  I believe that
509:17   there wasn't -- those deaths were not related to
509:18   cardiovascular events, but I don't recall the
509:19   details.

Δ's objection: Lack of personal Knowledge

TT's response: Witness is clear on what he recalls and what he does not.

Irvin ruling: Overruled.

Scolnick 51224     512:24-513:6

512:24      Q.     Were you involved in the decision not
512:25   to look at Alzheimer's data as it related to death
513: page 513
513: 1   in the fall of 2000?
513: 2      A.     Not to the best of my knowledge, no,
513: 3   or recollection.
513: 4      Q.     You don't recall any conversation
513: 5   like that?
513: 6      A.     I don't recall.

Δ's objection: Lack of personal; foundation

TT's response: same response as above.

Irvin ruling: Overruled.

Scolnick 51510a     515:10-515:17

515:10      Q.     Well, shortly after the Advisory
515:11   Committee in February 2001, the company did look at
515:12   the death data from one of the Alzheimer's trials;
515:13   isn't that true?
515:14      A.     Again, I've told you I can't recall
515:15   the dates in which various looks at the Alzheimer's
515:16   trials were done, so, I can't verify or not verify
515:17   your question.

Page 59

Δ's objection: Lack of personal Knowledge; foundation

TT's response: same as above

Irvin ruling: Overruled.

New Scolnick Complete

Scolnick 51607a     516:7-516:12

516: 7      Q.    Sir, I'm passing you over what we
516: 8   just marked as Exhibit 22 to your deposition.  For
516: 9   the record, it's Bates stamped MRK-ABP016650.  It
516:10   runs through Page 677.  It is a document entitled
516:11   "Vioxx AD Program."  Do you see that heading, sir?
516:12      A.    Yes, I do.  Yes.

Scolnick 51907     519:7-519:8

519: 7      Q.    "AD" is Alzheimer's disease?
519: 8      A.    Yes.

Scolnick 52302     523:2-523:11

523: 2      Q.    Now, if the company had a drug that
523: 3   would prevent the onset of Alzheimer's disease, that
523: 4   would be a significant medical discovery.  You would
523: 5   agree with that?
523: 6      A.    Yes, it would.
523: 7      Q.    And a significant revenue opportunity
523: 8   for the company; correct?
523: 9      A.    They would go together.  It would be
523:10   a magnificent discovery for medical and for
523:11   patients.

Scolnick 52914     529:14-529:21

529:14      Q.    Okay.  That's the APPROVe trial
529:15   that's being referenced there, isn't it?
529:16      A.    Yes, I believe so.
529:17      Q.    You'd agree with me, sir, that those
529:18   three paragraphs don't say anything about that trial
529:19   being conducted to test the cardiovascular safety of
529:20   Vioxx?
529:21      A.    Yes, I'd agree with that.

D's objection: Foundation ; 602.

π's response: Witness understands
   question and testifies to his
   personal knowledge.

Irvin ruling: Overruled.

Scolnick 53020     530:20-531:2

530:20      Q.    Sir, the page continues and it
530:21   discusses the Alzheimer's disease trials; true?
530:22      A.    Yes.
530:23      Q.    Okay.
530:24            Merck is telling its shareholders
530:25   here that it is in the process of testing Vioxx in
531: page 531
531: 1   Alzheimer's patients; true?
531: 2      A.    Yes.

Scolnick 53113a     531:13-531:20

531:13      Q.    Okay.
531:14            And just getting back now to where we

New Scolnick Complete

531:15  were, a treatment for Alzheimer's disease presented
531:16  a significant revenue opportunity for Merck if Vioxx
531:17  was able to demonstrate a reduction in the incidence
531:18  of Alzheimer's disease; true?
531:19      A.   Yes.  And as we said, an important
531:20  medical finding.

Scolnick 53815    538:15-538:16

538:15      Q.   Okay.  Let's take a step forward and
538:16  understand the death data in the Alzheimer's trials.

Scolnick 53901a    539:1-539:9

539: 1      Q.   Sir, I'm passing over what we just
539: 2  marked as Exhibit 24 to your deposition.  It is a
539: 3  multi-page memo to you from a Dr. Gilbert Block.
539: 4          For the record, it is Bates stamped
539: 5  MRK-NJ0333225 to 35.  I don't know if I indicated
539: 6  this, but it is dated March 21st, 2001?
539: 7          Doctor, have you seen this before?
539: 8      A.   I don't recall seeing it.  It is
539: 9  addressed to me.

Scolnick 54308    543:8-543:18

543: 8      Q.   I think what we're looking at here,
543: 9  sir, right, is that 14 people died on Vioxx, 3 died
543:10  in placebo in this trial; true?
543:11      A.   Yes, that's true.
543:12      Q.   And 95 times out of 100, when you ran
543:13  this trial, you'd get the same result; right?
543:14      A.   That's what statistical significance
543:15  implies, yes.
543:16      Q.   So, 95 out of 100 times, if you reran
543:17  this trial, 14 would die on Vioxx, 3 would die on
543:18  placebo?

Scolnick 54324    543:24-544:6

543:24      Q.   So, in this particular trial, 11
543:25  people died on Vioxx more than died on placebo;
544: page 544
544: 1  true?
544: 2      A.   Yes, that's correct.
544: 3      Q.   Did you tell old people around the
544: 4  country who were taking this drug, we have this
544: 5  trial, 11 excess deaths were found in this trial,
544: 6  sir?

Scolnick 54408a    544:8-544:9

544: 8          THE WITNESS:  I don't recall what
544: 9  information was disseminated on the trial.

Page 61

Δ's objection: Irrelevant; prejudicial; lack of personal knowledge;

π's response: Relevant to π's claim that Vioxx is unreasonably dangerous + Merck failed to warn of its dangers.

Irvin ruling: Overruled.

Δ's objections: Argumentative; 401-403, 602.

π's response: same as above

Irvin ruling: Overruled.

New Scolnick Complete

Scolnick 54604     546:4-546:7

546: 4        Q.    So, the 11 patients who died
546: 5    unnecessarily in protocol 091 as compared to the
546: 6    placebo arm, died and they got no benefit from Vioxx
546: 7    in this trial; true?

→ Δ's objectives: Lack of personal
        knowledge; 401 - 403.

Scolnick 54610     546:10-546:13

546:10            THE WITNESS: There were 11 patients
546:11    who died in the trial more than in placebo.  The
546:12    aggregate group did not benefit from Vioxx based on
546:13    the statistical efficacy of the trial.

π's response:  see previous response

Irvin ruling:  Overruled.

Scolnick 55115     551:15-552:15

551:15            Apart from the 091 trial, we also
551:16    know there was a second progression trial, that's
551:17    the 126 trial.  We established that this morning;
551:18    right?
551:19        A.    Yes.
551:20        Q.    Okay.
551:21            There was also an Alzheimer's disease
551:22    prevention trial; true?
551:23        A.    Yes.
551:24        Q.    Okay.
551:25            The folks in Merck Research Labs
552: page 552
552: 1    looked at the incidence of death in that trial, too,
552: 2    didn't they?
552: 3        A.    I don't recall the categories they
552: 4    looked at.  Death would be collected in any trial.
552: 5        Q.    Well, you see in the memo we were
552: 6    just looking at from Dr. Block, it says, "All deaths
552: 7    in the ongoing prevention trial...and the terminated
552: 8    second progression trial...will be unblinded and
552: 9    evaluated."  Do you see that?
552:10        A.    Yes, I do.
552:11        Q.    Okay.
552:12            So, it's your understanding that the
552:13    deaths in the other trials were also looked at;
552:14    true?
552:15        A.    That's what this implies.

Scolnick 55304a     553:4-553:5

553: 4        Q.    Sir, I've just passed you over what
553: 5    we have marked as Exhibit 25 to your deposition.

Scolnick 55321     553:21-556:14

553:21            Do you agree with me, sir, that this
553:22    document is a combined intention to treat and
553:23    on-drug analysis of the death data in both protocol
553:24    091 and protocol 078?

New Scolnick Complete

553:25      A.     Yes, that's what the summary document
554: page 554
554: 1      -- the summary page on the front page states, yes.
554: 2      Q.     Okay.
554: 3             If you'd turn to the next page, sir,
554: 4  it identifies the mortality analysis or the death
554: 5  analysis for the 091 and 078 trials on an
554: 6  intent-to-treat basis.  Do you see that at the
554: 7  bottom of the first page?
554: 8      A.     It does it for both protocols, yes.
554: 9      Q.     Number of deaths on Vioxx, 13.  Do
554:10  you see that?
554:11      A.     Yes.
554:12      Q.     Number of deaths on placebo, 3?
554:13      A.     Yes.  That's the trial we were
554:14  looking at.
554:15      Q.     Okay.
554:16             It is about what, four times as high,
554:17  a little more than four?
554:18      A.     Yes.
554:19      Q.     Okay.  Go down to the ITT analysis
554:20  for protocol 078.  Do you see that below it?
554:21      A.     Yes.
554:22      Q.     Okay.
554:23             Number of deaths on Vioxx, 21; right?
554:24      A.     Yes.
554:25      Q.     Number of deaths on placebo, 9;
555: page 555
555: 1  right?
555: 2      A.     Yes.
555: 3      Q.     And there's a rate next to each of
555: 4  those numbers; right?
555: 5      A.     There is.
555: 6      Q.     And the rate for Vioxx is what, a
555: 7  little under two-and-a-half times greater than the
555: 8  rate for placebo?
555: 9      A.     Yes.
555:10      Q.     And what that means is that
555:11  two-and-a-half times as many people died taking
555:12  Vioxx in the 078 trial as of this point in time as
555:13  compared to placebo; true?
555:14      A.     Yes.
555:15      Q.     Okay.
555:16             If you'd turn to Page 755, internal
555:17  numbering, 4, Bates number, 755.
555:18      A.     Just a moment, please.
555:19      Q.     Feel free.
555:20      A.     (Witness reviewing document.)
555:21             Okay.  Thank you.
555:22             Where do you want me to turn, 755?
555:23      Q.     I'm sorry.  756.
555:24      A.     Excuse me, I want to look at one
555:25  other thing.
556: page 556
556: 1      Q.     There's calculations of something

Page 63

New Scolnick Complete

556: 2    called a "hazard ratio." Do you see that?
556: 3         A.    Just a moment.
556: 4         (Witness reviewing document.)
556: 5         On 756. 756?
556: 6         Q.    Yeah. There's a paragraph in between
556: 7    the charts. It says, "From the mortality frequency
556: 8    and incident rate charts for protocol 091." Do you
556: 9    see that?
556:10         A.    Yes, yes.
556:11         Q.    And there's a hazard ratio
556:12    calculation in the last sentence for the 091 trial.
556:13    Do you see that?
556:14         A.    Yes, I do.

Scolnick 55707    557:7-558:2

557: 7              4.43 would he the relative increased
557: 8    risk of death on Vioxx compared to placebo; true?
557: 9         A.    The relative increase in risk, yes.
557:10         Q.    Okay.
557:11              So, folks on Vioxx in the 091 trial
557:12    were 4.4 times more likely to die compared to those
557:13    on placebo; true?
557:14         A.    It's a hazard ratio. I think that's
557:15    true.
557:16         Q.    Okay.
557:17              If you'd turn the page, sir, you look
557:18    at the results for the 078 trial, paragraph
557:19    beginning, "From the mortality frequency and
557:20    incident rate charts for protocol 078." Do you see
557:21    that?
557:22         A.    Yes.
557:23         Q.    Then it says at the end, "After
557:24    adjusting for Age and Gender, the hazard ratio
557:25    between" Vioxx "and placebo was 2.55." Do you see
558: page 558
558: 1    that sentence?
558: 2         A.    Yes.

Scolnick 558.9-558.22    558:9-558:22

558: 9         Q.    That indicates that folks on Vioxx
558:10    were 2.55 times more likely to die than patients on
558:11    placebo; true?
558:12         A.    Yes.
558:13         Q.    Okay. So, let me understand, sir.
558:14    As of this point in time, April 8, 2001, the company
558:15    has two independent placebo-controlled trials
558:16    demonstrating a statistically significant increase
558:17    in the risk of death; true?
558:18         A.    Yes.
558:19         Q.    Okay. In the one trial, 091, there
558:20    was a four times greater risk of death on Vioxx
558:21    compared to placebo; true?
558:22         A.    Yes.

Δ's objection: Calls for speculation.

Π response: Witness is President of
MRL and an experienced
clinical trials expert. The
question is well within his knowledge
& does not call for speculation

Irvin ruling: Overruled.

Δ's objection: lack of foundation;
misleading; prejudicial.

Π's response: Relevant to defect &
failure to warn. Witness understood
questions and answered.

Irvin ruling: Overruled.

Page 64

New Scolnick Complete

Scolnick 56025      560:25-561:13

560:25          Well, you'd agree that mortality data
561: page 561
561: 1   is important; right?
561: 2          A.      Yes, it is.
561: 3          Q.      That's the kind of data that a
561: 4   physician should know; right?
561: 5          A.      Yes, they should.
561: 6          Q.      Any doubt in your mind that
561: 7   physicians would like to know whether your drug,
561: 8   Merck's drug, increased the risk of death?
561: 9          A.      It's data that should have -- a
561:10   physician should know.
561:11          Q.      Any doubt that the FDA would have
561:12   wanted to know right after you knew this that Vioxx
561:13   increased the risk of death?

Scolnick 56118      561:18-561:20

561:18          THE WITNESS:  I don't know when -- I
561:19   don't know that this data was not submitted to the
561:20   FDA.  I don't know what was done with this data.

Scolnick 56221      562:21-562:25

562:21          The conclusions that were reached
562:22   within Merck concerning the statistically
562:23   significant increased risk of death should have been
562:24   shared with FDA no later than 15 days after this
562:25   analysis; right?

Scolnick 56302      563:2-563:13

563: 2          THE WITNESS:  That's the usual
563: 3   reporting time for data like this.
563: 4   BY MR. BUCHANAN:
563: 5          Q.      Did Merck send out a "Dear Doctor"
563: 6   letter telling physicians around the country that
563: 7   we've got these two trials, and we've got a
563: 8   statistically significant increased risk of death?
563: 9          A.      I don't recall them sending out a
563:10   "Dear Doctor" letter, no.
563:11          Q.      Did Merck issue a press release
563:12   telling doctors the same information?
563:13          A.      I don't recall a press release.

Scolnick 56316      563:16-564:2

563:16          Did Merck publish a letter in the New
563:17   England Journal of Medicine telling physicians about
563:18   the findings from these two trials?
563:19          A.      I don't recall such a letter.
563:20          Q.      Publish a letter anywhere in the

Δ's objection: Lack of personal knowledge; calls for speculation.

Π's response: Permissible cross-examination. Witness clear about what he knows & doesn't know.

Irvin ruling: Overruled.

Δ's objection: Asked and answered.

Π's response: Permissible cross-examination to clarify testimony.

Irvin ruling: Overruled.

New Scolnick Complete

```
563:21    medical literature to get word out promptly that old
563:22    people are at a substantially increased risk of
563:23    death on the drug?
563:24        A.    I don't recall a letter being written
563:25    about these trials in the way you're asking the
564: page 564
564: 1    question.
564: 2        Q.    This was all on your watch; right?
```

Scolnick 56404     564:4-565:4

```
564: 4            THE WITNESS:  This occurred while I
564: 5    was president of research, yes.
564: 6    BY MR. BUCHANAN:
564: 7        Q.    Right.  And the responsibility for
564: 8    communicating the scientific messages learned from
564: 9    clinical trials in Merck Research Labs was
564:10    ultimately yours; true?
564:11        A.    Yes.  I was not shown this data.
564:12        Q.    Is that your position now, you were
564:13    not shown this data?
564:14        A.    I don't recall having seen this data.
564:15        Q.    Are you disavowing you had any
564:16    knowledge of the statistically significant increased
564:17    risk in death in the 078 and 091 trials in April of
564:18    2001?
564:19        A.    I don't recall anything about 078.
564:20    What I've told you is what I recall about 091 is what I've
564:21    said, that there was an imbalance of events and that
564:22    they weren't due to cardiovascular -- an excess of
564:23    cardiovascular events.  That is all I recall about
564:24    the Alzheimer's data.
564:25        Q.    Well, the one thing we do know and
565: page 565
565: 1    you know now looking at this memo is that there were
565: 2    statistically significant increased numbers of
565: 3    deaths on Vioxx compared to placebo as of April
565: 4    2001; true?
```

Scolnick 56506     565:6-565:10

```
565: 6            THE WITNESS:  The analyses that are
565: 7    here indicate that, yes.
565: 8    BY MR. BUCHANAN:
565: 9        Q.    And you don't think that was due to
565:10    chance?
```

Scolnick 56515     565:15-565:17

```
565:15        A.    It was statistically significant.
565:16        Q.    And you don't think that was due to
565:17    chance?
```

Scolnick 56519a     565:19-565:20

New Scolnick Complete

565:19          THE WITNESS:  Therefore, it was not
565:20    likely due to chance.

Scolnick 56612    566:12-566:21

566:12          Q.    Sir, I'm passing you over what we
566:13    just marked as Exhibit 26 to your deposition.  It's
566:14    an e-mail, a series of e-mails beginning with an
566:15    e-mail to you from Dr. Gilbert Block.  Do you see
566:16    that?
566:17          A.    Where are we?  We are starting at the
566:18    bottom?
566:19          Q.    Starting at the bottom.  That would
566:20    be the earliest in time e-mail; correct?
566:21          A.    Yes.

Scolnick 56806    568:6-568:9

568: 6          Q.    And you wrote, "Doug, When I read
568: 7    this note about 30 minutes ago I tried to call you
568: 8    at home."  Do you see that?
568: 9          A.    I do.

Scolnick 56818    568:18-568:22

568:18          Q.    You were upset that Dr. Block shared
568:19    this information before a committee meeting before
568:20    he shared it with you; isn't that right?
568:21          A.    I don't remember what I was upset
568:22    about.

Scolnick 56912    569:12-570:7

569:12          You then get a response from Dr.
569:13    Greene; right?
569:14          A.    Yes.
569:15          Q.    He notes in the middle of his
569:16    response that you're going to be before the FDA on
569:17    April 11th to discuss labeling issues; right?
569:18          A.    Yes.
569:19          Q.    He then notes, "I expect that we will
569:20    need to inform them of this in some way since we
569:21    have included the CV events from the AD trials."  Do
569:22    you see that?
569:23          A.    Yes.
569:24          Q.    CV events are cardiovascular events?
569:25          A.    Yes.
570: page 570
570: 1          Q.    And the AD trials, that's Alzheimer's
570: 2    disease again; right?
570: 3          A.    Yes.
570: 4          Q.    And what he's saying is, you're going
570: 5    to have to talk to the FDA about the mortality data;
570: 6    right?
570: 7          A.    He says cardiovascular events, yes.

New Scolnick Complete

Scolnick 57123     571:23-572:3

571:23                Well, sir, is it your testimony that
571:24     the folks in regulatory who went down to talk to the
571:25     FDA on April 11th about labeling issues would not
572: page 572
572: 1     have checked with you before going to determine what
572: 2     message should be communicated about Alzheimer's
572: 3     data?


Scolnick 57206     572:6-572:19

572: 6                THE WITNESS:  Yes.  They wouldn't
572: 7     necessarily have discussed with me the details of
572: 8     what they talked to with FDA.
572: 9     BY MR. BUCHANAN:
572:10          Q.    So, if the folks from Merck who went
572:11     down and talked to FDA on labeling issues on April
572:12     11th didn't disclose any of the mortality data, that
572:13     was their decision and not yours?  That's what
572:14     you're saying?
572:15          A.    I don't know what they disclosed, but
572:16     I did not give them any instructions, to the best of
572:17     my recollection, on what to disclose or not to
572:18     disclose to the FDA.  And I think most of the
572:19     content of this e-mail indicates that.


Scolnick 57304     573:4-574:7

573: 4          Q.    Sir, I'm going to pass you over what
573: 5     we're marking as Exhibit 27 to your deposition.  For
573: 6     the record, it's a document titled, "FDA - MRL
573: 7     Meeting."  "MRL," that's Merck Research Labs?
573: 8          A.    Yes.
573: 9          Q.    Okay.
573:10                Then it's got an NDA number.  That's
573:11     the NDA number for VIGOR?
573:12          A.    That's what it seems to indicate.
573:13          Q.    Okay.
573:14                April 11, 2001.  Do you see that?
573:15          A.    Yes, I do.
573:16          Q.    That's the date Doug Greene was
573:17     stating that you were going to be -- excuse me,
573:18     Merck was going to be before the FDA to discuss
573:19     labeling issues; right?
573:20          A.    Yes.
573:21          Q.    Take a quick look at the document,
573:22     sir.  Do you see any reference to two trials
573:23     demonstrating statistically significant increased
573:24     rates of death in the report of this particular
573:25     meeting?
574: page 574
574: 1          A.    (Witness reviewing document.)
574: 2                I don't see a comment about that in

Page 68

New Scolnick Complete

574: 3    this summary.
574: 4         Q.    So, folks from Merck Research Labs
574: 5    and the regulatory group within Merck went down to
574: 6    the FDA on April 11, 2001 to talk about labeling for
574: 7    Vioxx; true?

Scolnick 57410    574:10-574:15

574:10            THE WITNESS: There was a meeting on
574:11    labeling of Vioxx on April 11th, yes.
574:12    BY MR. BUCHANAN:
574:13         Q.    That was the meeting where Doug
574:14    Greene suggested we should report this Alzheimer's
574:15    death data from the 091 trial; right?

Scolnick 57418    574:18-575:2

574:18            THE WITNESS: I haven't had a chance
574:19    to read his e-mail to me, so, he says in the e-mail,
574:20    "I expect that we will need to inform them of this
574:21    in some way since we have included the CV events
574:22    from the AD trials." Yes, I think he is suggesting
574:23    that.
574:24    BY MR. BUCHANAN:
574:25         Q.    Well, did you tell him not to do
575: page 575
575: 1    that?
575: 2         A.    Absolutely not.

Scolnick 57512    575:11-575:15

575:11    BY MR. BUCHANAN:
575:12         Q.    Do you endorse the decision not to
575:13    disclose two trials that have statistically
575:14    significant doubling in the rates of death to the
575:15    FDA?

Scolnick 57520    575:20-575:21

575:20            THE WITNESS: I do not endorse that
575:21    decision, if that's what was done.

Scolnick 59501    595:1-595:14

595: 1         Q.    Dr. Scolnick, we're going to shift
595: 2    gears a little bit. I want to talk about your role
595: 3    in the marketing of Vioxx. Okay?
595: 4         A.    Uh-huh.
595: 5         Q.    You did have a role in the marketing
595: 6    of Vioxx; correct, sir?
595: 7         A.    Not a direct role, no.
595: 8         Q.    You assisted the marketing function
595: 9    within Merck in connection with the marketing of
595:10    Vioxx; true?
595:11         A.    Only in the initial data discussions

Page 69

New Scolnick Complete

595:12   with marketing about what the data was in the file.
595:13   I did not prepare marketing information or approve
595:14   it or see it before it was used.

Scolnick 59614     596:14-597:12

596:14              Well, the document I just passed you
596:15   and we marked as Exhibit 30 to your deposition is a
596:16   memo from Wendy Dixon to you dated May 8th, 2000;
596:17   right?
596:18        A.     Yes.
596:19        Q.     Bates stamped MRK-ABI0002126 to 2128.
596:20   I take it you've seen this before, sir?
596:21        A.     I don't remember.  Perhaps.  I don't
596:22   specifically recall it.
596:23        Q.     Well, sir, do you have any reason to
596:24   doubt that you received the memo from Wendy Dixon
596:25   from May of 2000 that was sent to your attention and
597: page 597
597: 1   your attention alone?
597: 2        A.     No, I don't have any reason to doubt
597: 3   it, but I don't recall at the moment, except I'm
597: 4   reading it now.
597: 5        Q.     The subject line of this particular
597: 6   memo is, "Renal and Cardiovascular Issues for
597: 7   VIOXX." True?
597: 8        A.     Yes.
597: 9        Q.     Okay.
597:10              In fact, Wendy Dixon was in charge of
597:11   the marketing effort for Vioxx; true?
597:12        A.     Yes, I believe that's true.

Scolnick 59802     598:2-598:10

598: 2        Q.     Well, if you'd turn to the last page
598: 3   of the document, sir, it's Bates stamped ABI
598: 4   0002128.  Do you see the paragraph beginning, "David
598: 5   mentioned"?
598: 6        A.     Last page?  Oh, yes, I do.
598: 7        Q.     In fact, you offered to Mr. Anstice
598: 8   to assist in developing responses to the competitive
598: 9   messages that were out on the market concerning
598:10   Vioxx and Celebrex; true?

Scolnick 59812     598:12-598:13

598:12              THE WITNESS:  That's what the memo
598:13   says, yes.

Scolnick 59910     599:10-599:24

599:10              In particular, you were going to
599:11   assist in responding to the cardiovascular issues
599:12   being addressed by Pfizer as it related to Vioxx;
599:13   true?

Page 70

New Scolnick Complete

599:14     A.     That's what she requests at the
599:15  beginning of the first page of the memo.
599:16     Q.     If you'd look at the third numbered
599:17  paragraph on Page 2 -- well, let me take a step
599:18  back.
599:19            This document is describing in
599:20  particular the steps that are being taken by Wendy
599:21  Dixon on behalf of the marketing department of Merck
599:22  to respond to the competitive challenges that are
599:23  being raised by Pfizer against Vioxx; true?
599:24     A.     That's what it appears to be.

Scolnick 60018     600:18-601:18

600:18            So, she's telling you what materials
600:19  the sales force has to respond to the cardiovascular
600:20  issues concerning Vioxx;.right?
600:21     A.     Yes.
600:22     Q.     The third item there is "A
600:23  cardiovascular card to handle the thromboembolic
600:24  events issue." Do you see that?
600:25     A.     Yes, I do.
601: page 601
601: 1     Q.     It says, "It compares cardiovascular
601: 2  thromboembolic AEs for VIOXX comparator NSAIDs...and
601: 3  placebo." Do you see that?
601: 4     A.     Yes.
601: 5     Q.     And then a bunch of the NSAIDs that
601: 6  are compared across the nine osteoarthritis trials
601: 7  are referenced there; right?
601: 8     A.     Correct.
601: 9     Q.     You've seen that cardiovascular card,
601:10  haven't you?
601:11     A.     I don't recall it.
601:12     Q.     Okay. Well, the next paragraph says,
601:13  "Copies of the renal card, cardiovascular card, and
601:14  the Rossat paper are attached." Do you see that?
601:15     A.     I do. I still don't recall.
601:16     Q.     Any reason to doubt that Ms. Dixon
601:17  was telling the truth when she said she was giving
601:18  you these things for your review?

Scolnick 60120     601:20-601:25

601:20            THE WITNESS: She was giving them to
601:21  me. I don't think I was given them for review. I
601:22  think she says in the paragraph that the
601:23  representatives already have this information. I
601:24  don't recall these cards, and I don't recall
601:25  discussing the cards with her at all.

Scolnick 60220a     602:20-603:5

602:20     Q.     Sir, I'm passing you what we've just
602:21  marked as Exhibit 31 to your deposition. It is a

Page 71

→ Continued.

New Scolnick Complete

602:22   copy of a document entitled "Cardiovascular System,
602:23   Clinical Profile In Osteoarthritis Studies." It's
602:24   Bates stamped MRK-AAR0033237 through 243.
602:25        Do you recall this document, sir?
603: page 603
603: 1    A.   I don't.
603: 2    Q.   Have you ever seen the cardiovascular
603: 3   card before?
603: 4    A.   I don't recall ever having seen the
603: 5   cardiovascular card, as I just finished telling you.

Δ's objections: Lack of personal
  knowledge; foundation;
  irrelevant

π's response: Permissible cross-examine
  tim regarding witness's own documen

Irwin ruling: overruled.

---

Scolnick 61407    614:7-614:11

614: 7    Q.   We can agree that the cardiovascular
614: 8   card you're looking at from April 28, 2000 doesn't
614: 9   have any mortality data from the VIGOR trial; true?
614:10    A.   It certainly doesn't in the table
614:11   you've shown me.

Δ's objections: Irrelevant; prejudicial

π's response: Relevant to π's
  failure to warn claim.

Irwin ruling: Overruled.

---

Scolnick 63006    630:6-630:8

630: 6    Q.   Well, sir, would you expect by the
630: 7   summer of 2001 for that CV card to have been updated
630: 8   to take account of the Alzheimer's data?

---

Scolnick 63010    630:10-630:17

630:10        THE WITNESS: I would think the CV
630:11   card would have updates of all available data. I
630:12   don't know what's on it. I can't tell what this is
630:13   about.
630:14   BY MR. BUCHANAN:
630:15    Q.   Okay.
630:16        Well, you would expect it to include
630:17   the data from VIGOR; right?

Δ's objections: lack of personal
  knowledge; calls for speculation

π's response: Witness is knowledgeable
  about data that should have been
  included in marketing pieces.

Irwin ruling: Overruled.

---

Scolnick 63019a    630:19-630:25

630:19        THE WITNESS: Yes.
630:20   BY MR. BUCHANAN:
630:21    Q.   You'd expect it to include the death
630:22   data from the Alzheimer's trials you took a look at
630:23   in the spring of 2001; right?
630:24    A.   Certainly the CV data, if this is a
630:25   CV card, yes.

Δ's objections: Calls for speculation;
  lack of personal knowledge

π's response: same as above

Irwin ruling: Overruled.

---

Scolnick 63216    632:16-632:20

632:16    Q.   Mortality information, total
632:17   mortality information is important information that
632:18   should have been included in the CV card that was
632:19   used by sales representatives to respond to
632:20   physician inquiries concerning the drug; true?

Δ's objections: Calls for speculation; lack
  of personal knowledge

π's response: Same as above.

Irwin ruling: Overruled.

---

Scolnick 63222a    632:22-633:5

New Scolnick Complete

632:22        THE WITNESS: I think a CV card
632:23    should have contained all cardiovascular-related
632:24    information from the variety of data sources Merck
632:25    has, and --
633: page 633
633: 1    BY MR. BUCHANAN:
633: 2        Q.    Would --
633: 3        A.    -- if there was mortality data
633: 4    associated with those trials, each of the trials and
633: 5    what the data was in each of the trials.

D's objections: Calls for speculation;
lack of personal knowledge

Tt's response: same as previous
responses

Irwin ruling: Overruled.

Scolnick 69925    699:25-700:9

699:25        Q.    Okay. I want to start with you a
700: page 700
700: 1    section on the labeling of the drug and the
700: 2    progression of the labels of the drug. You were
700: 3    intimately involved in that process; correct, sir?
700: 4        A.    I certainly knew what was going on,
700: 5    yes.
700: 6        Q.    When the drug was first brought on
700: 7    the market, it had a standard NSAID GI warning;
700: 8    correct?
700: 9        A.    I believe that's correct.

Scolnick 70221    702:21-703:9

702:21        Now, here we have a label which
702:22    appears to me anyway to be Merck's proposal to the
702:23    FDA post-VIGOR. Am I correct that that's what this
702:24    document represents, Exhibit 39, sir?
702:25        A.    What's the date of this?
703: page 703
703: 1        Q.    It says, "Original Label Submission."
703: 2    I'm working with documents that were produced by
703: 3    Merck, so, I can tell you Bates Numbers and I can
703: 4    tell you what it says, and it says "Original Label
703: 5    Submission for VIGOR."
703: 6        A.    Well, if that's what it says, I
703: 7    assume it is the original submission for VIGOR. The
703: 8    VIGOR study is referenced in this label, so, that's
703: 9    probably what it is.

Scolnick 70322    703:22-704:1

703:22        There's no cardiovascular warning
703:23    that's given on the drug relative to risks of
703:24    cardiovascular events or increase of risk of
703:25    cardiovascular events as was proven in the VIGOR
704: page 704
704: 1    study; correct, sir?

Scolnick 70406    704:6-704:9

Page 73

New Scolnick Complete

704: 6          THE WITNESS: The VIGOR study, as I
704: 7    told you, we did not believe indicated Vioxx
704: 8    increased CV events and, therefore, there was no
704: 9    warning in this label. That is correct.

Scolnick 70417    704:17-704:18

704:17          Q.    When the FDA got this proposal, was
704:18    that their view of the data?

Scolnick 70425    704:25-705:13

704:25          THE WITNESS: The data was presented
705: page 705
705: 1    in an Advisory Committee. That was their view of
705: 2    the data. It was Merck's view of the data. And the
705: 3    FDA chose, I think in their first resubmission to
705: 4    us, to take a different interpretation, yes.
705: 5    BY MR. KLINE:
705: 6          Q.    They did.
705: 7          Did they suggest that there be a
705: 8    warning on the drug, sir, based on the VIGOR data?
705: 9          A.    Yes, they did.
705:10          Q.    And did Merck say, certainly we're
705:11    interested in public safety, and a warning would be
705:12    a good idea on a drug where there might be a
705:13    problem? Is that what Merck said, sir?

Scolnick 70516    705:16-705:19

705:16          THE WITNESS: Merck did not believe
705:17    there was a cardiovascular risk associated with
705:18    Vioxx, and as this warning indicates, there is
705:19    cardiovascular risk, we objected to that label.

Scolnick Part 4 (6-1 to 8-16-05) (Multi-clip)
Scolnick 76713    767:13-767:24

767:13          Q.    Well, do you know, I can only ask you
767:14    what you know today, do you know of any label change
767:15    that was made between March of 2000 and April of
767:16    2002 reporting the VIGOR results in a label to the
767:17    prescribing physicians of this country and around
767:18    the world?
767:19          A.    No, I do not.
767:20          Q.    So, prescribing physicians who were
767:21    going by the label of your drug between March of
767:22    2000 and April of 2002, they're just looking at the
767:23    label, they wouldn't know anything about the VIGOR
767:24    results; correct?

Scolnick 76802    768:2-768:5

768: 2          THE WITNESS: If they were looking

D's objections: Calls for speculation;
lack of personal knowledge

P's response: Subject matter is clearly
one of which witness has personal
knowledge. No speculation.

Irvin ruling: Overruled.

D's objection: sidebar

Irvin ruling: Same objection. No
ruling.

New Scolnick Complete

768: 3   only at the label?
768: 4   BY MR. KLINE:
768: 5       Q.   Yes.

Scolnick 76807      768:7-768:14

768: 7           THE WITNESS:  I don't know what they
768: 8   would be thinking.  The label was not changed on
768: 9   VIGOR until, as you pointed out, April 2002.
768:10   BY MR. KLINE:
768:11       Q.   There is an obligation by a
768:12   responsible pharmaceutical company to keep the label
768:13   both clear and accurate and to timely update it;
768:14   correct?

Scolnick 76816      768:16-768:16

768:16           THE WITNESS:  Yes.

Scolnick_8-16_1138.3-1138.8      1138:3-1138:8

1138:3       Q.   You said in writing, sir, in an
1138: 4   e-mail that for Vioxx, the CV outcomes study is the
1138: 5   only essential study, and you were saying that as of
1138: 6   September 17, 2001, long after the VIGOR results
1138: 7   were known; correct?
1138: 8       A.   That is correct.  And a study to get

Scolnick 124912      1249:12-1250:9

1249:12      Q.   Did Merck Research Labs or Merck ever
1249:13   do a study to evaluate adverse events of most
1249:14   concern, heart attacks and unstable angina, prior to
1249:15   approval, where they gave people aspirin?
1249:16      A.   I'm not aware that that study was
1249:17   done.
1249:18      Q.   Why didn't you do it?
1249:19      A.   I'm unaware of this data, I don't
1249:20   know why, and so the suggestion never came up, and
1249:21   so I can't answer your question.
1249:22      Q.   Did you ever do it?
1249:23      A.   Did we evaluate Vioxx in the presence
1249:24   of aspirin?
1249:25      Q.   Yes.
1250: Page 1250
1250: 1       A.   Yes, we did endoscopy studies with
1250: 2   that.
1250: 3       Q.   When?
1250: 4       A.   After the VIGOR trial.
1250: 5       Q.   You did it after approval; right?
1250: 6       A.   Yes.
1250: 7       Q.   Prior to approval, you didn't let
1250: 8   people take aspirin in your endoscopy studies, did
1250: 9   you?

Δ's objections: Lack of personal
knowledge; foundation

π's response: Witness as Pres. of
MRL clearly understands
what safety information
should be in a drug label.

Irvin ruling: Overruled.

Scolnick_8-16_1250.11-1250.17    1250:11-1250:17

1250:11        THE WITNESS: No. Because we thought
1250:12 aspirin would cloud the results of the endoscopy
1250:13 studies --
1250:14 BY MR. BUCHANAN:
1250:15    Q.    It was worse --
1250:16    A.    -- because aspirin is gastric
1250:17 irritative.

Scolnick_8-16_1250.25-1251.02    1250:24-1251:2

1250:24 BY MR. BUCHANAN:
1250:25    Q.    You didn't want to give people
1251: Page 1251
1251: 1 aspirin because you knew it would eliminate the GI
1251: 2 benefit to the drug?

Scolnick 125104    1251:4-1251:7

1251: 4        THE WITNESS: We did not think --
1251: 5 certainly I didn't think that it would eliminate the
1251: 6 complete GI benefit of the drug. It would simply
1251: 7 make the studies very complicated to interpret.

Scolnick 126623    1266:23-1267:9

1266:23    Q.    Well, let's go through this then,
1266:24 sir.
1266:25        It continues, "Yet, the possibility
1267: Page 1267
1267: 1 of increased CV events is of great concern." Do you
1267: 2 see that?
1267: 3    A.    Yes, I see her comments, yes.
1267: 4    Q.    Then it states, "(I just can't wait
1267: 5 to be the one to present those results to senior
1267: 6 management!)" She gave us another exclamation
1267: 7 point, didn't she?
1267: 8    A.    Yes, she did.
1267: 9    Q.    That's you?

Scolnick_8-16_1267.12-1267.17    1267:12-1267:17

1267:12        THE WITNESS: I am a member of senior
1267:13 management, yes. I'm one of senior management.
1267:14 BY MR. BUCHANAN:
1267:15    Q.    It wouldn't have made you happy to
1267:16 have an outcomes trial that showed that Vioxx
1267:17 increased the rate of CV events, would it?

Scolnick_8-16_1267.19-1268.01    1267:19-1268:1

1267:19        THE WITNESS: Obviously not. If I
1267:20 had known -- obviously, not. No one wanted to see a
1267:21 result where -- a question whether Vioxx elevated or

Page 76

→ D's objections: Lack of personal
   knowledge; foundation

PJ's response: Witness is clearly
   knowledgeable about subject
   of email.

Irwin ruling: Overruled as to
   all. except 1271:4-7
   where there was no
   objection.

→ continued

New Scolnick Complete

1267:22 naproxen lowered the rate of events.
1267:23 BY MR. BUCHANAN:
1267:24      Q.    So, we have a solution, right, in the
1267:25 next sentence? She says how we solve this dilemma,
1268: Page 1268
1268: 1 doesn't she?

Scolnick_8-16_1268.04-1268.15     1268:4-1268:15

1268: 4      Q.    Do you see the next sentence, sir?
1268: 5      A.    I see the next sentence.
1268: 6      Q.    What's she say?
1268: 7      A.    "What about the idea of excluding
1268: 8 high risk CV patients - ie those that have already
1268: 9 had MI, CABG or PTCA? This may decrease the CV
1268:10 event rate so that a difference between the two
1268:11 groups would not be evident. The only problem would
1268:12 be - Would we be able to recruit any patients?"
1268:13 That's the rest of the paragraph.
1268:14      Q.    Her solution is to exclude high risk
1268:15 CV patients, isn't it?

Scolnick_8-16_1268.17-1269.12     1268:17-1269:12

1268:17           THE WITNESS: That's correct, so they
1268:18 wouldn't require low-dose aspirin.
1268:19 BY MR. BUCHANAN:
1268:20      Q.    So you wouldn't see a CV effect?
1268:21      A.    So there wouldn't be a
1268:22 cardioprotective effect of the NSAID that was going
1268:23 to be compared to because it blocked COX-1 and Vioxx
1268:24 did not because aspirin blocks COX-1. That's what
1268:25 she's talking about.
1269: Page 1269
1269: 1      Q.    Why don't we look at the document,
1269: 2 sir?
1269: 3      A.    That's what she's talking about.
1269: 4      Q.    "This may decrease the CV event rate
1269: 5 so that a difference between the two groups would
1269: 6 not be evident." Do you see that?
1269: 7      A.    Yes, I do, and I understand what she
1269: 8 meant by that.
1269: 9      Q.    So, what you're doing here is you're
1269:10 excluding aspirin so that you can see a GI benefit
1269:11 from your outcomes trial; true?
1269:12      A.    That is correct:

Scolnick_8-16_1271.04-1271.07     1271:4-1271:7

1271: 4      Q.    I'm asking you, sir, that in
1271: 5 aspirin-using patients, the results from the VIGOR
1271: 6 trial don't present a GI benefit that extends to
1271: 7 them; isn't that right?

Scolnick_8-16_1271.09-1273.14     1271:9-1273:14

New Scolnick Complete

1271:9        THE WITNESS: You cannot extrapolate
1271:10 the magnitude of the benefit from the nonlow-dose
1271:11 aspirin-using population to a low-dose aspirin
1271:12 population. That is correct.
1271:13 BY MR. BUCHANAN:
1271:14    Q.    In fact, you actually did do a test,
1271:15 Vioxx plus aspirin, compared to traditional NSAIDs
1271:16 after the VIGOR trial, didn't you?
1271:17    A.    We did. We did an endoscopy study.
1271:18    Q.    It didn't show any benefit, did it?
1271:19    A.    The study showed that using aspirin
1271:20 in the presence of Vioxx elevated the rate over
1271:21 aspirin alone, that subsequent studies showed that
1271:22 that rate was still lower than standard NSAID used
1271:23 with low-dose aspirin.
1271:24    Q.    Sir —
1271:25    A.    It still showed a benefit, although
1272: Page 1272
1272:1 not as great a benefit as in the absence of aspirin.
1272:2          - - -
1272:3          (Whereupon, Deposition Exhibit
1272:4          Scolnick-66, E-mails, MRK-ACR0009295 -
1272:5          MRK-ACR0009296, was marked for
1272:6          identification.)
1272:7          - - -
1272:8 BY MR. BUCHANAN:
1272:9    Q.    Sir, I'm passing you over what we
1272:10 just marked as Exhibit 66. I would like you to look
1272:11 at the earliest in time e-mail. This is November
1272:12 19, 2001, the bottom of the first page.
1272:13    A.    Yes.
1272:14    Q.    It's from you to, who is that to?
1272:15    A.    Raymond Gilmartin and David Anstice.
1272:16    Q.    Okay.
1272:17          Mr. Gilmartin is your boss; right?
1272:18    A.    Yes, he was.
1272:19    Q.    You sent it with high importance?
1272:20 You will see it on the next page.
1272:21    A.    Okay. Yes.
1272:22    Q.    It says, "Ray" and it says "dn" you
1272:23 meant "and"?
1272:24    A.    Yes. I don't type well.
1272:25    Q.    "Ray and David. Not a good result.
1273: Page 1273
1273:1 Low dose aspirin and Vioxx equal almost ibuprofen."
1273:2 That's Advil; right?
1273:3    A.    Yes.
1273:4    Q.    "Higher than ASA alone"?
1273:5    A.    Yes.
1273:6    Q.    "It is clear why their class study
1273:7 failed now." That's with the Celebrex study; right?
1273:8    A.    Yes.
1273:9    Q.    What you're saying here is in the
1273:10 Celebrex study, the manufacturers of Celebrex

New Scolnick Complete

1273:11 allowed aspirin users in their study; right?
1273:12    A.    Yes, I believe that's true.
1273:13    Q.    And they showed no GI benefit in
1273:14 terms of PUBs in that outcomes study; right?

Scolnick_8-16_1273.16-1274.25    1273:16-1274:25

1273:16           THE WITNESS:  I think they showed a
1273:17 quantitative benefit, but they did not get
1273:18 statistical significance.
1273:19 BY MR. BUCHANAN:
1273:20    Q.    And if they don't have statistical
1273:21 significance, that's not good enough for the FDA, is
1273:22 it?
1273:23    A.    It will not allow them to make a
1273:24 conclusion that the PUBs are reduced.  That is
1273:25 correct.
1274: Page 1274
1274: 1    Q.    So, what you're saying here is the
1274: 2 reason why they didn't show a statistically
1274: 3 significant benefit on PUBs is because they allowed
1274: 4 aspirin users in; right?
1274: 5    A.    That was how I interpreted their
1274: 6 results seeing our result in this endoscopy study.
1274: 7    Q.    Then you continue and say:  "I do not
1274: 8 think we should announce the CV outcomes study now
1274: 9 since now I am not at all sure what the design
1274:10 should be."  Do you see that?
1274:11    A.    I do.
1274:12    Q.    How do they tie together, sir?
1274:13    A.    I'm not sure what I was thinking
1274:14 because -- I don't know what the design was at this
1274:15 time.  I really can't remember what I was thinking
1274:16 at this point because we went through many, many
1274:17 discussions about different trial designs.
1274:18    Q.    What you were concerned about, sir,
1274:19 is if you did what you wanted to do in your CV
1274:20 outcome trial and allowed aspirin in that trial,
1274:21 there would be a Merck-sponsored clinical trial that
1274:22 would show that Vioxx, in fact, does not prevent
1274:23 PUBs in a population of high risk CV users using
1274:24 aspirin?  That's what you were concerned about,
1274:25 isn't it?

Scolnick_8-16_1275.02-1275.10    1275:2-1275:10

1275: 2           THE WITNESS:  I am not sure what I
1275: 3 was thinking because I don't know what trial designs
1275: 4 were being considered.
1275: 5 BY MR. BUCHANAN:
1275: 6    Q.    Well, you'd agree, sir, that if you
1275: 7 were considering a CV outcome trial that was going
1275: 8 to allow aspirin users, that would also have a
1275: 9 potential negative effect of revealing that Vioxx
1275:10 did not prevent the incidence of PUBs?

New Scolnick Complete

Scolnick_8-16_1275.12-1275.20    1275:12-1275:20

1275:12          THE WITNESS: No. I think that the
1275:13 data without aspirin would show what the maximal
1275:14 potential benefits of Vioxx would be, and that in
1275:15 the presence of aspirin, what the diminution of
1275:16 those benefits would be, and in the subsequent
1275:17 endoscopy studies we did, the magnitude of the ulcer
1275:18 incidence was still less than it was if you used
1275:19 aspirin with another drug, another nonsteroidal that
1275:20 was not selected.


Total Length - 02:03:51