UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 06-0485 | * | |
| | * | MAGISTRATE JUDGE |
| GERALD D. BARNETT, | * | KNOWLES |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

* * * * * * * * * * * * * * * * * *

**MEMORANDUM IN SUPPORT OF MOTION OF MERCK & CO., INC. ("MERCK")
FOR ORDER EXCLUDING TESTIMONY OF RICHARD A. KRONMAL, PH.D.**

(EXPERT CHALLENGE NO. 3)

Plaintiff has designated Richard A. Kronmal, Ph.D., a professor of statistics and biostatistics at the University of Washington, to testify as an expert witness on general causation. Professor Kronmal may be qualified to discuss statistical associations shown in clinical data. However, as discussed below, he is not qualified to express opinions on causation, because he lacks the medical training to do so. Moreover, he should not be permitted to attach significance to statistically insignificant associations.

Merck also objects to, and seeks preclusion of, Professor Kronmal's testimony on Merck's ethical and moral obligations, Merck's state of mind regarding the alleged risks of

815188v.1

Vioxx®, and the adequacy of Merck's warnings for Vioxx.[1] Under Federal Rule of Evidence 702, Professor Kronmal may not testify as to these matters.[2] Merck therefore seeks an Order in advance of his trial preservation deposition barring such opinion testimony.

First, Professor Kronmal intends to testify that Merck's clinical trials involving Alzheimer's patients should have been terminated because, in Professor Kronmal's view, there was an excess risk of death from using Vioxx. Continuing the study, according to Professor Kronmal, was unethical, and violated the "Helsinki Declaration." He also intends to testify that Merck committed "scientific misconduct or breach of publication ethics" in publishing the VIGOR results. (June 7, 2006 Deposition of Richard A. Kronmal ("Kronmal Dep.") at 146:10-148:8, attached hereto as Ex. A; Addendum to the Expert Report of Richard A Kronmal ("Kronmal Supplemental Rpt.") at 2-3, attached hereto as Ex. B; Expert Report of Richard A. Kronmal ("Kronmal Expert Rpt.") at 13-14, attached hereto as Ex. C.) To the extent these statements, and others like them, are intended as expert opinions on Merck's ethical and normative duties, they are inadmissible. Whether Merck lived up to Professor Kronmal's personal vision of ethical corporate conduct has no bearing whatsoever on whether Merck is legally liable to plaintiff. And to the extent these statements are intended as legal conclusions,

---

[1] Professor Kronmal will not appear live at trial. Plaintiff plans to conduct a trial preservation deposition. The timing of that deposition is an issue currently before the Court.

[2] Although not the focus of this motion, Professor Kronmal begrudgingly admitted to several factual errors in his report that would render some of his statements incorrect. (Kronmal Dep. at 53:22-57:20.) Although he stated that he will make the necessary corrections, he had previous notice of some of the "sloppy" language in a previous report and yet did not correct the mistakes in his current report. ( *Id.* at 163:6-16, 164:22-165:16.) Furthermore, he raised the possibility that his data file, upon which he bases the majority of his testimony, may not be up-to-date or somehow gave different results that would alter his conclusion. (*Id.* at 65:4-68:16.) These issues raise the real possibility that Professor Kronmal's opinions are not reliable because they are based on the wrong data or inaccurate calculations based on the right data. Merck reserves the right to challenge Professor Kronmal's opinions on this additional basis.

they also are inadmissible. Finally, they are irrelevant. Whether or not Merck conducted clinical trials in a manner Professor Kronmal considers ethical does not relate to any issue in this case.

Second, Rule 702 bars expert testimony on Merck's state of mind: specifically, whether Merck knew of the elevated risk associated with Vioxx before it voluntarily withdrew the medication from the market and whether Merck kept that information from the Food and Drug Administration ("FDA"). (*See* Kronmal Supplemental Rpt. at 3.) Professor Kronmal is not an expert on corporate knowledge, decision-making, or behavior. All he can do is interpret the same documentary evidence that will be placed before the jury. It *is* for the jury, not plaintiff's experts, to reach a conclusion based on that evidence.

Finally, Professor Kronmal is not an expert in the labeling and marketing of prescription drugs.[3] Absent the relevant expertise, he can only provide subjective and irrelevant opinions about Merck's ethical obligations and conclusory statements of law – both of which are inadmissible. Plaintiff is not entitled to confuse the jury with "expert" discussion of ethical standards that do not legally govern Merck, or to supplant the judge's and jury's roles by offering witnesses who state legal conclusions.

I.   **LEGAL STANDARD.**

The legal standard for the admission of expert testimony is set forth at pages 3-4 of the Motion of Defendant Merck & Co., Inc. ("Merck") for Order Excluding Opinion Testimony by Plaintiff's Experts That Vioxx Accelerates Atherosclerosis, filed concurrently herewith and incorporated herein by reference.

---

[3] Professor Kronmal opines that the post-VIGOR label should have been stronger. (Kronmal Dep. at 139:14-17.)

## II. AS A BIOSTATISTICIAN, PROFESSOR KRONMAL MAY TESTIFY ABOUT STATISTICAL ASSOCIATION – BUT HE MAY *NOT* OPINE ON CAUSATION.

The Fifth Circuit has held that epidemiologic studies,[4] including clinical trials, are "[u]ndoubtedly . . . the most useful and conclusive type of evidence" of causation. *See, e.g., Allen v. Penn. Eng'g Corp.* 102 F.3d 194, 197 (5th Cir. 1996); *Brock v. Merrell Dow Pharms., Inc.*, 874 F.2d 307, 311, *reh'g denied*, 884 F.2d 166 (5th Cir. 1989); *see also Chambers v. Exxon Corp.*, 81 F. Supp. 2d 661, 664-65 (M.D. La. 2000). In order to be admissible on the issue of causation, epidemiological studies must be statistically significant and show more than a doubling of the risk. *Brock*, 874 F.2d at 313 (reversing verdict in Bendectin litigation given plaintiff's failure to present statistically significant epidemiological proof); *LeBlanc v. Merrell Dow Pharms., Inc.*, 932 F. Supp. 782, 784 (E.D. La. 1996) (granting summary judgment in Bendectin litigation given absence of "statistically significant epidemiological studies"); *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1321 (9th Cir. 1995); *Deluca v. Merrell Dow Pharms., Inc.*, 911 F.2d 941, 958-59 (3d Cir. 1990; *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 717-23 (Tex. 1997) (statistically significant epidemiological studies showing doubling of risk required to prove causation); *See, e.g.*, Saks *et al.*, Federal Judicial Center, ANNOTATED REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (2d ed. 2005-2006) ("Reference Manual on Scientific Evidence") at 529.

Regardless of whether the purported findings of epidemiological studies are statistically significant and show more than a doubling of the risk, however, such studies cannot prove causation in the absence of *additional* reliable scientific evidence supporting the causal inference

---

[4] There are two types of epidemiological studies – randomized clinical trials and observational studies. Data from blinded, randomized, placebo-controlled clinical trials are the "gold standard for determining the relationship of an agent to a disease or health outcome." REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 484.

to be drawn from the studies. It is a well-established tenet of scientific research that association alone is not causation. *See, e.g.*, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 480 ("[I]t should be emphasized that *an association is not equivalent to causation.*") An association identified in an epidemiologic study may or may not be causal. *Havner*, 953 S.W.2d at 718 ("[E]pidimeological studies only show association. There may in fact be no causal relationship even if the relative risk is high."). Sir Bradford Hill proposed a model for considering causality from data, which includes factors such as temporality, dose-response, consistency, biologic plausibility, strength of association, analogy, experimental evidence, coherence and specificity. (A. Bradford Hill, *The Environment and Disease: Association or Causation?*, 58 Proc. Royal Soc'y Med. 295 (1965)). The Bradford Hill factors "guide epidemiologists in making judgments about *causation.*" REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 527 (emphasis added). In particular, plaintiffs in a case such as this are required to demonstrate the biological plausibility of the causal inference they seek to draw from epidemiological studies. *Id.* at 532 ("Biological plausibility is not an easy criterion to use and depends upon existing knowledge about the mechanism by which the disease develops."); *Havner*, 953 S.W.2d at 718-719. "In the end, deciding whether associations are causal is not a matter of statistics, but a matter of good scientific judgment . . . ." REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 232-33.

Professor Kronmal, however, conflates statistical association with causation. He intends to testify that statistical association in a single study proves causation. For example, at the *Humeston v. Merck* trial, Professor Kronmal testified that the VIGOR study showed a statistically significant increased incidence of hypertension among patients on Vioxx as compared to naproxen. On the basis of the statistical association alone, he concluded that Vioxx

causes hypertension, even though he is unaware of any plausible biological mechanism by which Vioxx could cause high blood pressure:

> That it clearly is a drug that has severe effects on the vascular system. What the mechanism is by which it causes hypertension, I don't know and I don't think anyone does, but it clearly does that.

(September 22, 2005 Testimony of Richard A. Kronmal in the *Humeston* Trial, ("Kronmal *Humeston* Test.") at 1525:4-7, attached hereto as Ex. D.)

After considering the *Daubert* factors, trial courts may consider additional factors when assessing the scientific reliability of expert testimony. *Black v. Food Lion, Inc.*, 171 F.3d 308, 312 (5th Cir. 1999). For example, in pharmaceutical and toxic tort cases, the court should consider whether the expert has identified the specific mechanism by which the drug supposedly causes the alleged disease. *Propulsid*, 261 F. Supp. 2d at 617 (citing *Black*, 102 F.3d at 314).

Professor Kronmal does not limit his testimony to hypertension. Instead, based solely on purported statistical associations, he claims that Vioxx "can cause" heart attack, sudden death, congestive heart failure, and hypertension. (Kronmal Expert Rpt. at 10; Kronmal *Humeston* Test., at 1510:19-1514:2.)

Professor Kronmal conflates statistical association with causation even though he knows better:

> Q: And you told us this morning that if you had a statistically significant result in a placebo-controlled trial, that that means there's causation; true?
>
> A: It's evidence of causation. It doesn't mean there were, because it could be chance.
>
> Q: But it's statistically significant.
>
> A: I know. It still could be chance. Statistically significant results occur by chance.

(Kronmal Dep. at 212:12-21.)

None of Professor Kronmal's testimony on "causation" should be permitted. It does not meet the relevant legal standard and would confuse the jury into thinking that statistical association alone is sufficient to prove causation.

### III. PROFESSOR KRONMAL SHOULD NOT BE PERMITTED TO ATTACH SIGNIFICANCE TO STATISTICALLY INSIGNIFICANT DATA.

Professor Kronmal frequently attaches significance to statistically *insignificant* data. The Court should preclude such testimony.

For example, in the *Humeston* case, Professor Kronmal purported to attach significance to statistically insignificant associations between Vioxx use and congestive heart failure (as compared to patients on naproxen), and "all-cause mortality" of patients in the Vioxx arm (as compared to the naproxen arm). (Deposition of Richard A. Kronmal in *Humeston v. Merck* ("Kronmal *Humeston* Dep.") at 1525:8-1527:6; 1531:24-1533:17, attached hereto as Ex. E.)  He relied, in part, on those statistically insignificant associations to conclude that VIGOR created "an overall extraordinary picture of a drug that was not safe." (*Id.* at 1539:20-1540:13.)

It is "unreasonable as a matter of law" for an expert to base causation opinions on statistically insignificant data. *Kelly v. Am. Heyer-Sculte Corp.*, 957 F. Supp. 873, 878 (W.D. Tex 1997).[5]  Professor Kronmal does it anyway:

---

[5] *See also, Brock,* 874 F.2d at 313; *Burleson v. Texas Dep't of Crim. Justice,* 393 F.3d 577, 585-86 (5th Cir. 2004) (excluding testimony of plaintiff's expert, who offered "no studies which demonstrate a statistically significant link between thorium dioxide exposure in dust or fumes and [plaintiff's] type of lung or throat cancer"); *Allen,* 102 F.3d at 195 (excluding testimony of plaintiff's expert as scientifically unreliable in part because "no epidemiological study has found a statistically significant link between EtO exposure and human brain cancer"); *Babin v. Ecolab, Inc.,* No. 2:04-CV-1595, 2005 WL 1629947, at *3, *5 (W.D. La. July 5, 2005) (study failed to support conclusion of plaintiff's expert that exposure to glycol ethers causes anencephaly where "no statistically significant association . . . was found"); *Cano v. Everest Minerals Corp.,* 362 F. Supp. 2d 814 (W.D. Tex. 2005) (in case involving exposure to uranium ore, holding that, "to support causation, an epidemiological study must be statistically significant"); *In re Norplant Contraceptive Prods. Liab. Litig.,* 215 F. Supp. 2d 795, 831 (E.D. Tex. 2002) (in case involving prescription contraceptive device, holding that "epidemiological data that is not 'statistically

> Q: And when you have differences that are not statistically significant, it's inappropriate to make causal inferences?
>
> A: That's correct. If it was not statistically significant, it would be inappropriate. That's what I said there, and I still say it.

(Kronmal Dep. at 261:6-11.)

### IV. PROFESSOR KRONMAL MAY NOT TESTIFY THAT MERCK HAS VIOLATED ETHICAL OR LEGAL OBLIGATIONS.

Professor Kronmal intends to present the jury with his conclusions that Merck failed to meet some largely undefined standard of corporate responsibility. Sometimes the standards appear to derive from ethical principles, as when Professor Kronmal criticizes Merck for not having a Data Safety Monitoring Board (DSMB) for study 078 on Alzheimer's patients or states that Merck "violated the informed consent provisions of the Declaration of Helsinki." (Kronmal Supplemental Rpt. at 2-3.) At other times, Professor Kronmal might be referring to legal obligations, as when he opines that Merck's conduct "devia[ted] from accepted clinical trial practice" (Kronmal Supplemental Rpt. at 2), or that certain findings of the VIGOR study "posed an unacceptable risk." (Kronmal Expert Rpt. at 10.) Whether these opinions address Merck's supposed ethical duties or its legal obligations, they are not the proper subject of expert opinion testimony and must be excluded.

#### A. Professor Kronmal's Testimony Concerning Merck's Ethics Is Improper.

Professor Kronmal's views on Merck's conduct are simply personal and subjective opinions. In most instances, Professor Kronmal provides no indication that his ethics opinions

---

significant' cannot provide a scientific basis for an opinion on causation"); *Chambers*, 81 F. Supp. 2d at 664-65 (excluding expert's causation testimony in benzene exposure case based on absence of "statistically significant epidemiological data"); *Thomas v. Hoffman-LaRoche, Inc.*, 731 F. Supp. 224, 228 (N.D. Miss. 1989) (testimony of plaintiff's experts in case involving prescription acne medication amounted to "speculation" because "there is a total absence of any statistically significant study to assist the jury in its determination of the issue of causation").

are based on anything other than his personal beliefs. (Kronmal Dep. at 92:05-93:25, 94:22-25.) The personal and subjective views of witnesses do not constitute the kind of "knowledge" that may be admitted under Rule 702. Moreover, all of this testimony is irrelevant. Professor Kronmal is entitled to rely on the data from Merck's clinical trials. But whether those trials were conducted ethically has no bearing on the issues to be decided in this case. To the extent Professor Kronmal's testimony concerns Merck's ethical duties it is inadmissible. For example:

- Alzheimer's 078 study would have resulted in a DSMB stopping the trial if Merck had formed a DSMB. (Kronmal Supplemental Rpt. at 1-2.)

- Merck violated the Declaration of Helsinki in not terminating study 078 early. (*Id.* at 2.)

- Merck was not forthcoming with the New England Journal of Medicine regarding the results of the VIGOR trial. (*Id.* at 13-14.)

- Merck was not forthcoming with physicians regarding the results of the APPROVe trial. (*Id.* at 36.)

### B. Professor Kronmal's Testimony Concerning Legal Conclusions Is Improper.

To the extent that Professor Kronmal seeks to opine that Merck violated *legal* standards, his testimony would "usurp ... the role of the trial judge in instructing the jury as to the applicable law [and] the role of the jury in applying that law to the facts before it." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 557 (S.D.N.Y. 2004); *see also United States. v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("When an expert undertakes to tell the jury what result to reach, this does not aid the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's"). In some instances, it is difficult to tell whether Professor Kronmal is accusing Merck of ethical or legal lapses; in either event, any such testimony should be excluded. For example:

- Merck violated patient consent standards when enrolling patients for study 078. (Kronmal Supplemental Rpt. at 2-3.)

- The VIGOR trial "posed an unacceptable risk" to patients. (*Id.* at 10.)

- "Merck's failure to notify the appropriate organizations of the possible excess risk of death from taking rofecoxib [as referenced in the Chen memo] sharply deviates from accepted clinical practice and constitutes *gross scientific misconduct*." (*Id.* at 22 (emphasis added).)

## V. PROFESSOR KRONMAL MAY NOT TESTIFY REGARDING MERCK'S STATE OF MIND.

Professor Kronmal plans to offer his views on Merck's state of mind, and specifically, on what Merck knew about the alleged risks of Vioxx. Professor Kronmal will opine that Merck either was actually aware of, or should have been aware of, the potential vascular risks associated with Vioxx because the "cardiovascular risk was apparent" after the VIGOR trial. (Kronmal Expert Rpt. at 3-4.) He has opined that, as of 2001, "Merck was aware that there might be a serious mortality risk in the elderly associated with taking rofecoxib." (*Id.* at 33.) He has also opined that an "increased risk of myocardial infarction [ ] should have been evident to Merck at least as early as the spring of 2000." (*Id.* at 41-42.) Courts routinely exclude opinion testimony concerning motive and intent, and this Court should do the same.

Rule 702 allows for introduction of "scientific, technical, or other specialized knowledge" that will "assist the trier of fact." Professor Kronmal does not have any qualifications or "specialized" expertise in divining corporate knowledge or state of mind. That is precisely why expert testimony concerning a defendant's intent or state of mind is typically inadmissible. *In re Rezulin*, 309 F. Supp. 2d at 546 (rejecting expert testimony "on the intent, motives or states of mind of corporations, regulatory agencies and others" because they "have no basis in any relevant body of knowledge or expertise").

As the court in another failure-to-warn case against a pharmaceutical manufacturer reasoned in the course of rejecting similar expert testimony:

815188v.1

> The witnesses are qualified in particular scientific disciplines. These disciplines do not include knowledge or even experience in the manner in which corporations and the pharmaceutical marketplace react, behave or think regarding their nonscientific goals of maintaining a profit-making organization that is subject to rules, regulations, standards, customs and practices among competitors and influenced by shareholders or public opinion.

*In re Diet Drugs Products Liability*, No. MDL 1203, 2000 U.S. Dist. LEXIS 9037, at *28-29 (E.D. Pa. June 20, 2000).

To the extent that evaluation of the evidence requires a credibility determination about Merck, it is especially important that that judgment be reserved for the jury and not supplanted by a paid "expert." *See Sec. & Exch. Comm'n v. Lipson*, 46 F. Supp. 2d 758, 763 (N.D. Ill. 1998) (expert accountant was not "specially equip[ped] to divine what [defendant] truly believed" about reliability of financial reports; any opinions offered in that regard are "at worst, rank speculation" and at best, "credibility choices that are within the province of the jury"). Professor Kronmal's opinions on Merck's state of mind, and that of its executives, therefore should be excluded.

Similarly, to the extent that Professor Kronmal suggests that Merck attempted to conceal or manipulate scientific data, that testimony must also be excluded. For example:

- Merck failed to give necessary information to the DSMB in the VIGOR trial because once a clinical trial is underway, "if there is an observation of an excess risk for any kind of end point that's important to the health and welfare of the patients, that has to be communicated to the DSMB." (Kronmal *Humeston* Test., at 1493:8-20.)

- Merck's statisticians knew, as of April 2001, "that there was a significant excess mortality associated with the use of VIOXX." (*Id.* at 1572:2-1573:1.)

- "[O]f course, they [Merck] knew that they had an excess risk as early as 2001." (*Id.* at 1583:24-1584:6.)

- That Merck had evidence it was "killing people" but did not disclose the

11

information. (*Id.* at 1573:5-25.)[6]

As this Court explained in its *In re Rezulin* decision, purported "expert" testimony on data-suppression, like testimony on state-of-mind generally, "pertain[s] to lay matters which a jury is capable of understanding and deciding without the expert's help." 309 F. Supp. 2d at 554 (internal quotation marks omitted). Professor Kronmal has no "first-hand knowledge of the circumstances underlying [any] charge of data-suppression" (*see id.* at 554), and nothing to add to the jury's own consideration of the documentary evidence. Accordingly, he may not testify that Merck attempted to conceal scientific data.

## VI. PROFESSOR KRONMAL MAY NOT TESTIFY THAT MERCK'S WARNING LABELS WERE INADEQUATE.

Professor Kronmal opines that Merck's warning labels for Vioxx were "inconsistent with the overall clinical trial results" and "had the potential to mislead physicians about the frequency, character, severity, and spectrum of cardiovascular events associated with rofecoxib." (Kronmal Expert Rpt. at 5.) He further opines that the labels for Vioxx were "inaccurate and incomplete." (*Id.* at 42.) Professor Kronmal has also testified that the 2002 amended label for Vioxx was

---

[6] Specifically, Professor Kronmal testified that:

> In April of 2001, they should have stopped that trial [study 078]. It was scientifically, totally wrong not to have stopped that trial. They had evidence that they were potentially killing people, and they let that trial go on for another two years, to 2003. Had there been a DSMB, that trial would have been stopped. There is absolutely no question in my mind.
>
> They had an obligation to report that finding to the FDA, and they had an obligation to report it to the IRBs from the individual institutions.
>
> They put at risk the people who were still in that trial and the people who stayed in it from then on, as well as tens of thousands of people who were taking the drug who were elderly in the general population. They did not do that.
>
> To me, that was scientific misconduct.

(Kronmal *Humeston* Test. at 1573:5-25.)

"carefully crafted by Merck to make sure that people did not know what the safety profile of this drug [Vioxx] was." (Kronmal *Humeston* Test. at 1722:20-23.)

Professor Kronmal's testimony on the adequacy of Merck's warning labels must be excluded. Professor Kronmal is not an expert in the labeling, marketing, or testing of prescription drugs. Nor has he provided any supporting research or methodology that would qualify his views as proper expert testimony in this area.

### A.  Professor Kronmal Is Not Qualified To Opine On Merck's Warnings.

It is clear that Professor Kronmal does not qualify as an expert on the warnings provided by Merck in connection with Vioxx. Professor Kronmal is a biostatistician; he is not a medical doctor, for whom prescription drug warning labels are intended. In addition, none of Professor Kronmal's published articles focuses on the proper labeling of prescription drugs. Professor Kronmal is not an expert in FDA regulation, nor does he know what the FDA's regulations are. (Kronmal *Humeston* Test., at 1691:20-25.) His sole connection to the FDA appears to be a stint as a member of the FDA's Advisory Committee on Cardiovascular and Renal Diseases from 1979-1983. (Kronmal Expert Rpt. at 2; *Curriculum Vitae* of Richard A. Kronmal, attached hereto as Ex. F.)

### B.  Professor Kronmal's Proffered Testimony Is Not Reliable.

Before expert opinion testimony may be admitted under Rule 702, the proponent of the testimony must demonstrate that the evidence is reliable, which includes identifying the factual bases for the conclusions, explaining the methodology, and demonstrating that the factual bases and methodology are scientifically reliable. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1988). The testimony proffered by Professor Kronmal cannot withstand this scrutiny.

Professor Kronmal does not present any methodology, research, or standard against which the Court could assess the reliability of his opinion that Merck's warning label was

13

inappropriate. These opinions are therefore inadmissible "net opinions." *Daubert*, 43 F.3d at 1319 ("We've been presented with only the experts' qualifications, their conclusions and their assurances of reliability. Under *Daubert*, that's not enough.").

That Professor Kronmal's "net opinion" is inadmissible is hardly unusual. Unsupported opinions on the adequacy of warnings are routinely excluded in this type of litigation. *See Dillon v. Crown Controls Corp.*, 269 F.3d 865, 870 (7th Cir. 2001) (expert testimony regarding inadequate warnings excluded where expert had not tested effectiveness of alternative warning); *Jaurequi v. Carter Mfg. Co.*, 173 F.3d 1076, 1084 (8th Cir. 1999) (expert testimony regarding inadequate warnings excluded where expert provided no basis for belief that such warnings would be effective); *Masters v. Hesston Corp.*, No. 99 C 50279, 2001 U.S. Dist. LEXIS 6732, at *24-25 (N.D. Ill. May 23, 2001) (expert's warning failed reliability test because expert conducted no tests or analyses to determine effectiveness).

### C. The Proffered Expert Testimony By Professor Kronmal Is Irrelevant.

Lacking relevant expertise or any substantive basis for his opinions, Professor Kronmal relies for his views on Merck's warnings on the same subjective opinions about ethical norms and conclusions of law that render other portions of his testimony inadmissible. Professor Kronmal asserts, for example, that Merck should have included certain clinical trial data for Vioxx and that the post-VIGOR label should have had a stronger warning. (Kronmal Dep. at 139:14-17.) Although it is unclear whether Professor Kronmal believes these obligations to derive from ethical or legal norms, such testimony must be excluded as irrelevant and subjective opinion that violates the province of this Court and the jury.

### VII. CONCLUSION.

For the reasons stated above, Merck respectfully requests that this Court grant Merck's Motion for Order Excluding Testimony of Richard A. Kronmal, Ph.D.

Respectfully submitted,


*/s/ Dorothy H. Wimberly*
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Andrew Goldman
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone: 312-494-4400
Fax:     312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone: 202-434-5000
Fax:     202-434-5029

And

Brian Currey
Catalina J. Vergara
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone: 213-430-6000
Fax:     213-430-6407

Attorneys for Merck & Co., Inc.

15

815188v.1

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Motion of Merck for Order Excluding Certain Testimony of Richard A. Kronmal, Ph.D. has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Mark Robinson by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 16th day of June, 2006.

/s/ *Dorothy H. Wimberly*

815188v.1