UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| This document relates to<br>Case No. 06-0485 | * | JUDGE FALLON |
| | * | MAGISTRATE JUDGE KNOWLES |
| GERALD D. BARNETT,<br>    Plaintiff, | * | |
| v. | * | |
| MERCK & CO., INC.,<br>    Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM IN SUPPORT OF MOTION OF MERCK & CO., INC. ("MERCK")
FOR ORDER EXCLUDING TESTIMONY OF LESLIE CLELAND, M.D.**

**(EXPERT CHALLENGE NO. 5)**

Plaintiff's expert Dr. Leslie Cleland, an Australian rheumatologist, proposes to testify that Merck failed to provide adequate information to prescribing physicians concerning the safety of Vioxx. Merck moves to exclude any testimony from Dr. Cleland about the adequacy of the safety information in the Vioxx® label, marketing materials, or related public disclosures, based on Dr. Cleland's lack of expertise on the subject matter.[1]

Dr. Cleland's opinion on this topic was summarized succinctly at his deposition:

Q: It is not your opinion that after VIGOR, Vioxx should have been withdrawn or Vioxx should not have been used, but what I gather from your report is that prescribers should have been made aware of the data in VIGOR so that they – and their patients could make a reasonable choice; is that correct?

A: Exactly.

---

[1] Further, to the extent Dr. Cleland intends to offer the opinion that Vioxx could cause or accelerate atherosclerosis, Merck hereby incorporates its concurrently-filed Motion for Order Excluding Opinion Testimony by Plaintiff's Experts That Vioxx Accelerates Atherosclerosis.

815175v.1

(*See* Deposition of Leslie Cleland ("Cleland Dep.") at 235:23-236:4, attached hereto as Ex. A; *see also* Expert Report of Leslie Cleland at 22-23, attached hereto as Ex. B.) If any expert could testify to these issues, it is not Dr. Cleland, because he has a complete lack of expertise in the labeling and marketing of prescription drugs in the United States and admits he has not even read the United States label for Vioxx. (Cleland Dep. at 88:13-5 ("Q: Have you ever read the U.S. label pertaining to Vioxx? A: I don't believe so.").) Dr. Cleland has also failed to identify any research or methodology establishing that his opinions on the adequacy of Merck's disclosures concerning the safety of Vioxx are reliable.

## I.   LEGAL STANDARD.

The legal standard for the admission of expert testimony in federal court is set forth at pages 3-4 of the Motion of Defendant Merck & Co., Inc. ("Merck") for Order Excluding Opinion Testimony by Plaintiff's Experts That Vioxx Accelerates Atherosclerosis, filed concurrently herewith and incorporated herein by reference.

## II.   DR. CLELAND IS NOT QUALIFIED TO OPINE THAT THE INFORMATION PROVIDED IN THE LABELING OR MARKETING OF VIOXX WAS INADEQUATE.

Dr. Cleland may not testify about the adequacy of the safety information provided in the labeling or marketing of Vioxx unless plaintiff demonstrates that Dr. Cleland is qualified by his knowledge, skill, experience, training or education to opine on these subjects. *See, e.g., Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1050 (5th Cir. 1998) (holding that the trial court properly excluded property appraisal testimony because the witness was not a licensed appraiser or real estate broker and lacked training or formal schooling in appraisal methods). An expert witness may not testify on matters outside his field of expertise. *Id.* As plaintiffs cannot establish that Dr. Cleland has the requisite expertise to opine on the adequacy of the information provided in Merck's labels or marketing of Vioxx, any testimony he offers on these subjects should be disallowed.

Dr. Cleland is not an expert on the adequacy of warnings provided by pharmaceutical companies in the United States:

Q: Do you consider yourself an expert in the United States FDA regulations for prescription medicines?

A: No.

Q: You've never been employed by the FDA?

A: No.

Q: Never consulted for the FDA?

A: No.

Q: Never been asked by the FDA to participate in an FDA arthritis advisory committee meeting?

A: No.

Q: Any advisory committee meeting?

A: By the FDA?

Q: Yes.

A: No.

Q: Have you worked for a pharmaceutical in the regulatory division?

A: No.

Q: Have you ever read the U.S. regulations regarding prescription medication?

A: No.

Q: Have you read U.S. prescription regulations related to label?

A: No.

Q: Have you ever helped write a label for a prescription medication to be dispensed in the United States?

A: No.

Q: Have you ever – I guess since you never sat in an advisory committee meeting, you never sat on those to discuss label, correct?

A: That's fair.

Q: And have you been part of the investigational new drugs process to – for a

> prescription drug to be dispensed?
>
> A: No.
>
> Q: Have you ever been part of a new drug application process for a new drug to be dispensed in the United States?
>
> A: No.
>
> Q: Have you ever advised a company how to meet regulatory requirements in the U.S. for prescription drugs?
>
> A: No.

(Cleland Dep. at 59:11-61:4). Nor can Dr. Cleland attest to any expertise in U.S. requirements concerning the marketing of pharmaceutical products:

> Q: Are you familiar with the United States regulations regarding marketing of prescription medications?
>
> A: No.
>
> Q: You cannot say when you have to have FDA approval for use of a marketing material and when you don't, fair?
>
> A: Correct.
>
> Q: Do you know what division in the FDA regulates the marketing of prescription medication in the United States?
>
> A: No.

(Cleland Dep. at 61:5-16.) None of Dr. Cleland's published articles deal with proper labeling or marketing of prescription drugs, or even with the conduct of pharmaceutical companies generally.

Plainly, Dr. Cleland is unqualified to testify about the adequacy of either the Vioxx label or the adequacy of the information provided in the marketing of Vioxx. To the extent his testimony seeks to convey his opinions on these subjects it should be excluded.

### III. DR. CLELAND'S TESTIMONY ON VIOXX'S LABELING IS NOT SUPPORTED BY RELIABLE EVIDENCE.

Before expert testimony may be admitted under Federal Rule of Evidence 702, the proponent of the testimony must demonstrate that the opinion is based on reliable evidence. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). That is, even if plaintiff could

establish that Dr. Cleland actually had expertise to opine on the adequacy of the warnings Merck provided concerning Vioxx, he must then "demonstrate that the expert's findings and conclusions are based on the scientific method, and, therefore, are reliable." *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir.1998) (en banc). The testimony Dr. Cleland proffers cannot withstand this basic level of scrutiny.

It is not clear whether Dr. Cleland is even aware of what information was actually provided, whether in labels or marketing, to prescribing doctors or the public. In fact, Dr. Cleland admits that he has never even read the U.S. label for Vioxx, even though he opines it did not adequately warn of risks. (Cleland Dep. at 88:8-15.) In reality, Merck provided the VIGOR data to the FDA and the medical community promptly after the results were available. On March 23, 2000, two weeks after it received the unblended VIGOR data, Merck faxed a summary of the results to the FDA. On March 27, 2000, Merck issued a press release disclosing both the gastrointestinal and cardiovascular findings. Merck presented the VIGOR data at major medical conferences held in May, June, and October 2000, and Merck participated in the November 2000 publication of the VIGOR study results in the *New England Journal of Medicine*.[2] In July 2000, Merck sent the FDA a proposed label change incorporating the VIGOR results.

Moreover, one of Mr. Barnett's own prescribing doctors, Dr. McCaffrey, has testified that he did not find that Merck sales representatives were simply telling him that the VIGOR study's cardiovascular results were explained by the effects of naproxen. (*See* Deposition of Michael McCaffrey, M.D. at 231:10-232:8, attached hereto as Ex. C.) Indeed, he felt that the sales representatives were leaving it up to him to decide what was the appropriate interpretation of the VIGOR study. *Id.* Another of Barnett's prescribing doctors, Dr. Mikola, testified that when he was prescribing Vioxx to Mr. Barnett in April of 2002, he was familiar with the

---

[2] See Bombardier CC., et al., *Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis*, N. ENGL. J. MED. 2000; 343(21):1520-28

information in the Vioxx package insert, including the VIGOR study description and results in that package insert, but he continued to prescribe Vioxx to Mr. Barnett after balancing the risks. (*See* Deposition of Dr. Michael Mikola, M.D. at 322:21-333:15, attached hereto as Ex. D.) It is difficult to understand how Dr. Cleland's concern that "prescribers should have been made aware of the data in VIGOR so that they -- and their patients could make a reasonable choice" could have been better met. (Cleland Dep. at 235:23-236:4.)

Dr. Cleland also does not have any knowledge of industry standards, research or a methodology to support his assertion that Merck's label or marketing was inadequate. The creation or modification of a pharmaceutical warning label is simply not an area for those without specific expertise. Indeed, the FDA itself has repeatedly discussed the complexities and potential pitfalls involved in crafting an appropriate label. For example, the FDA recently noted that "labeling that includes theoretical hazards . . . can cause meaningful risk information to lose its significance . . . . Overwarning, just like underwarning, can similarly have a negative effect on patient safety and public health." 71 Fed. Reg. 3922, 3935 (Jan. 24, 2006) (internal quotation marks and citations omitted). Based on its expertise in this area, the FDA appropriately believes it is the best arbiter of what should and should not be included in a warning label. As the FDA recently stated:

> Another misunderstanding of the act encouraged by State law actions is that FDA labeling requirements represent a minimum safety standard. According to many courts, State law serves as an appropriate source of supplementary safety regulation for drugs by encouraging or requiring manufacturers to disseminate risk information beyond that required by FDA under the act. In fact, FDA interprets the act to establish both a "floor" and a "ceiling," such that additional disclosures of risk information can expose a manufacturer to liability under the act if the additional statement is unsubstantiated or otherwise false or misleading. Given the comprehensiveness of FDA regulation of drug safety, effectiveness, and labeling under the act, additional requirements for the disclosure of risk information are not necessarily more protective of patients. Instead, they can erode and disrupt the careful and truthful representation of benefits and risks that prescribers need to make appropriate judgments about drug use. Exaggeration of risk could discourage appropriate use of a beneficial drug.

*Id.* at 3934-35 (citations omitted). These statements by the FDA in the Federal Register constitute an advisory opinion that is entitled to great deference. *See* 21 C.F.R. § 10.85(d)(1) and (e); *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844, 865 (1984); *NVE Inc. v. Dep't of Health & Human Servs.*, 436 F.3d 182, 196 (3d Cir. 2006) (overturning trial court's refusal to give "normal" deference to the "legal and factual determinations the FDA made during rulemaking"). The FDA regarded the VIGOR data as inconclusive. In April 2002, it approved Vioxx as safe and effective for treatment of rheumatoid arthritis and revised the precaution section of the label – not the warning section – to read that the "significance of the [VIGOR and Alzheimer's cardiovascular data] is unknown." (*See* Vioxx Label No. 9183810, attached hereto as Ex. E.)

As Dr. Cleland offers no reliable evidence – and certainly no industry standard – as a basis for his opinion, it should be excluded as unsupported by reliable evidence. *See, e.g. Dillon v. Crown Controls Corp.*, 269 F.3d 865, 870 (7th Cir. 2001) (excluding expert testimony on inadequate warnings because the expert had not tested the effectiveness of alternative warning); *Jaurequi v. Carter Mfg. Co.*, 173 F.3d 1076, 1084 (8th Cir. 1999) (excluding expert testimony on inadequate warnings because the expert had provided no basis for his belief that such warnings would be effective).

## IV.  CONCLUSION.

Dr. Cleland lacks the necessary qualifications to testify about the adequacy of Merck's labeling or marketing of Vioxx. Moreover, his proposed testimony on the warning issue is not supported by reliable evidence. Accordingly, Merck respectfully requests that the Court exclude Dr. Cleland's testimony on this subject.

Respectfully submitted,

/s/ *Dorothy H. Wimberly*
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone: 504-581-3200
Fax:     504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Andrew Goldman
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois 60610
Phone: 312-494-4400
Fax:     312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Phone: 202-434-5000
Fax:     202-434-5029

And

Brian Currey
Catalina J. Vergara
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone: 213-430-6000
Fax:     213-430-6407

Attorneys for Merck & Co., Inc.

815175v.1

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Memorandum in Support of Motion of Merck for Order Excluding Testimony of Leslie Cleland, M.D. has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Mark Robinson by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 16th day of June, 2006.

/s/ Dorothy H. Wimberly

815175v.1