UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| This document relates to | * | JUDGE FALLON |
| Case No. 06-0485 | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| GERALD D. BARNETT, | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM IN SUPPORT OF MOTION OF MERCK & CO., INC. ("MERCK")
FOR ORDER EXCLUDING TESTIMONY OF CORNELIA PECHMANN, PH.D.**

**(EXPERT CHALLENGE NO. 4)**

Cornelia Pechmann is a marketing professor at the University of California, Irvine who has no previous experience with pharmaceutical marketing. She is not a medical doctor. Her educational background – which includes a bachelor's degree in psychology and Spanish, a master's degree in psychology, an M.B.A., and a Ph.D. in marketing management – notably does not include any academic degrees in any field of science. Nevertheless, Professor Pechmann proposes to testify on liability and general causation issues in this case. Because she has no special expertise that will aid the trier of fact, the Court should exclude her testimony.

**I.   BACKGROUND.**

Plaintiff intends to use Professor Pechmann primarily as a vehicle to put on a "Merck document show" through an expert witness. Plaintiff's lawyers have given her a selected group

of documents – a subset of the ones they intend to offer in evidence – that Professor Pechmann presumably will describe to the jury and from which she will "conclude" that Vioxx® increases cardiovascular risk, that Merck knew it, and that Merck implemented a misleading marketing campaign designed to conceal Vioxx's supposed risks. In this way, if permitted to testify, Professor Pechmann will act as a reader of selected documents chosen and provided to her by plaintiff's attorneys, and will seek to spin those documents to suit plaintiff's purposes. This exercise will not aid the jury. Plaintiff seeks an end-run around the Federal Rules of Evidence, by allowing an expert to testify about documents instead of the Merck employees and scientists who actually wrote and exchanged the documents.

Plaintiff also hopes to use Professor Pechmann to talk about otherwise inadmissible "marketing reports." These are surveys and reports about what certain doctors *other than Mr. Barnett's prescribing physicians* knew about cardiovascular risks or recalled about the information they received from sales representatives. That information is irrelevant and highly prejudicial because Professor Pechmann intends to persuade the jury that they can ascribe the understandings and experiences of these other physicians to Mr. Barnett's doctors, even though Mr. Barnett's doctors have testified otherwise.

In her report, Professor Pechmann provides a brief overview of her testimony:

> My overall opinion on this case can be summarized as follows. In a study called VIGOR completed in March 2000, Merck learned that 5 out of every 1000 patients on Vioxx had a heart attack, as compared to 1 patient out of every 1000 on naproxen. In other words, in the VIGOR study, 4,000 people took Vioxx and 20 of them suffered heart attacks; whereas 4,000 people took naproxen and 4 of them suffered heart attacks. Yet Merck sold about 9.5 billion dollars worth of Vioxx primarily in the U.S. but also worldwide from March 2000 until September 2004 when the drug was removed from the market. In 2001, Vioxx was the 8th best selling prescription drug in the U.S. How did Merck sell so much Vioxx, given Vioxx's significant cardiovascular risk potential? Merck devised and implemented an unprecedented integrated marketing communications campaign for Vioxx. The campaign was highly sophisticated, coordinated, and well funded;

2

> it was a textbook example of an integrated marketing communications campaign. For instance, in 2001, Merck spent $410 million to market Vioxx in the U.S., including $160 million in direct-to-consumer advertising. Merck's integrated marketing communications campaign for Vioxx was perfect, except on the most important dimension of all: The campaign was misleading. Instead of acknowledging Vioxx's cardiovascular risk potential, the campaign was expressly designed to neutralize concerns about Vioxx's cardiovascular risk potential. As a result, Merck's integrated marketing communications campaign for Vioxx created artificially high demand for Vioxx. Demand for Vioxx was inflated by about $437 million per year, or $1.75 billion over four years, based on Merck's own estimates.

(Expert Report of Cornelia Pechmann, Ph.D. ("Pechmann Rpt.") at ¶18, attached hereto as Ex. A.)

This opinion breaks down into three components, each of which must be excluded. The first – upon which the rest is premised – is that the VIGOR study proves that Vioxx increases cardiovascular risks and Merck knew it. Professor Pechmann, of course, lacks the training or experience that would qualify her to opine on the significance of the VIGOR study, or to otherwise opine that Vioxx causes cardiovascular risks. Even if she had the requisite qualifications, the fact that she would jump to that conclusion based on a *single* study, to the exclusion of all the other scientific data and literature, is disqualifying. Further, the jury does not need an expert to tell it what Merck knew.

The second part of Professor Pechmann's opinion is that Merck intentionally misled consumers and physicians through its marketing program. To form this opinion, Professor Pechmann reviewed other documents selected by plaintiff's attorneys and summarized their contents. Additionally, Professor Pechmann reviewed marketing studies conducted on Merck's behalf. These studies are irrelevant and consist entirely of hearsay – evidence that should never come before the jury. Professor Pechmann's opinion regarding the nature of Merck's marketing consists of nothing more than an attempt to bring before the jury evidence that would otherwise

be inadmissible and to provide an improper summary of the documents that the plaintiffs actually hope to present to the jury.

Third, Professor Pechmann intends to testify – without even having spoken to Mr. Barnett or his physicians – that they were tricked into prescribing Vioxx by Merck's marketing campaign. She intends to offer this opinion even though it is contrary to the witnesses' testimony. Ignoring the actual testimony of Mr. Barnett's treating physicians is not a reliable scientific method under *Daubert*. Moreover, it is not the proper subject of expert testimony. The jury can judge for itself whether Mr. Barnett's prescribers were under the influence of Merck's marketing.

Finally, although not mentioned in her summary quoted above, Professor Pechmann intends to testify about FDA advertising regulations. She is unqualified to do so.

Professor Pechmann's opinions should be excluded in their entirety. She lacks even the most minimal qualifications to offer an expert opinion regarding the science in this case. Yet her opinions are based on a question of science: whether Vioxx causes increased cardiovascular risk and whether that could be determined solely from the VIGOR study. To the extent that Professor Pechmann seeks to offer opinions unrelated to the science, these opinions are irrelevant. As such, Professor Pechmann's opinion is incompetent, and fails to assist the jury in determining any fact in question. Professor Pechmann's testimony should therefore be excluded. Plaintiffs' arguments to the jury regarding the meaning of documents should be left to closing argument, where this type of summary properly belongs.

## II.    LEGAL STANDARD.

The legal standard for the admission of expert testimony in federal court is set forth at pages 3-4 of the Motion of Defendant Merck & Co., Inc. ("Merck") for Order Excluding Opinion

4

Testimony by Plaintiff's Experts That Vioxx Accelerates Atherosclerosis, filed concurrently herewith and incorporated herein by reference.

### III. PROFESSOR PECHMANN IS NOT QUALIFIED TO OPINE ON CAUSATION.

Professor Pechmann's report demonstrates that she is not qualified to opine on causation issues in this litigation. In the body of her report, at paragraph 16, she says:

> Appendix A to my report discusse[s] in greater detail my opinion regarding what Merck's marketing executives knew or should have known about Vioxx's potential cardiovascular risk and my bases for that opinion. To form that opinion, I reviewed thousands of pages of documents provided by the law firm of Robinson, Calcagnie & Robinson on Vioxx's potential cardiovascular risk, some of which are cited in Appendix A.

(Pechmann Rpt. at ¶ 16.) In Appendix A, she opines that "Merck's marketing executives knew or should have known that Vioxx posed a potential cardiovascular risk. I form this opinion based in part on the documents [*i.e.*, the documents provided by plaintiff's counsel] discussed below." (*Id.* at Appendix A, ¶ 1.)

In the first numbered paragraph of Appendix A, Professor Pechmann discusses the VIGOR study. She states that VIGOR found that rheumatoid arthritis patients taking Vioxx had a heart attack rate that was four times greater than those taking the comparator drug, naproxen, and that the difference was primarily due to the higher rate of heart attacks among the 4% of the study population with the greatest risk of heart attack. From this, Professor Pechmann concludes, "Merck knew or should have known that Vioxx posed a potential cardiovascular risk to all patients, and that Vioxx's risk potential was greatest among patients with pre-existing cardiovascular problems." (*Id.*)

Of course, there is no dispute that Merck was aware, as a result of VIGOR, of the "potential" that Vioxx might pose a cardiovascular risk – in the sense that the VIGOR results raised a question about whether Vioxx might pose such risks. As Professor Pechmann notes in

5

her report, at the time the VIGOR results became available, it was unclear whether the difference in the heart attack rate was due to some adverse effect of Vioxx, a cardioprotective effect of naproxen, the play of chance, or some combination. Professor Pechmann concedes that one interpretation of the VIGOR results could be that naproxen was cardioprotective, not that Vioxx was harmful. (Deposition of Cornelia Pechmann, Ph.D. ("Pechmann Dep.") at 261:7-14 ("That was a possible explanation, yes."), attached hereto as Ex. B.) Thus, VIGOR did not establish that Vioxx increases cardiovascular risk. To investigate this issue, Merck reviewed existing data (which did not show an increased cardiovascular risk due to Vioxx) and monitored additional trials for signs of increased cardiovascular risk.

### A. To The Extent Professor Pechmann Intends Only To Testify That Merck Knew Of A *Potential* Risk, Her Testimony Is Irrelevant.

A drug manufacturer has a duty to warn only of *known* risks, not potential risks. *Livingston v. Noland Corp.*, 362 S.E.2d 16, 18 (S.C. 1987) (manufacturer may only be liable for failing to warn of risks that are reasonably known). To the extent Professor Pechmann's testimony is that Merck failed to disclose a "potential" but unproven risk, it is irrelevant and should be excluded on that basis. In addition, it should be excluded under Rule 403 as prejudicial, because to allow the testimony might give the jury the misimpression that failure to disclose an unknown risk creates liability.

### B. Professor Pechmann Is Not Qualified To Opine That VIGOR Proved An Actual Increased Risk.

Professor Pechmann is not qualified to opine on causation. Her training and experience is in marketing. She is not a doctor and has no medical training. She has never published or done any research on the medical risks of prescription drugs. (*Id.* at 118:7-10.) In fact, she has never published any scientific research outside of the field of marketing. (*Curriculum Vitae* of Cornelia Pechmann, Ph.D., attached hereto as Ex. C.) Indeed, she concedes she is not qualified:

6

> Q: Would you agree that you are not an expert in the following areas: assessing medical risks associated with prescription drugs?
>
> A: Yes, I agree I am not an expert.

(Pechmann Dep. at 120:13-16.) The Court should thus preclude Dr. Pechmann from testifying on causation. She is grossly unqualified to opine on the subject.

### C. Merck's Knowledge And State Of Mind Are Not Proper Topics For Expert Testimony.

As discussed more fully in Merck's concurrently-filed Motion for Order Excluding Testimony of Jerry Avorn, M.D., incorporated herein by reference, expert witnesses are routinely prohibited from providing testimony regarding the "intent, motives or states of mind of corporations, regulatory agencies and others," because they "have no basis in any relevant body of knowledge or expertise." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004). Professor Pechmann has no special expertise that enables her to determine Merck's state of mind and therefore her opinions concerning Merck's knowledge about the cardiovascular risks of Vioxx (and its intent with respect to marketing Vioxx) must be excluded as improper subjects for expert testimony.

### D. Professor Pechmann's Opinions About Merck's Knowledge Will Not Assist The Trier Of Fact.

In reaching her opinion regarding Merck's knowledge, Professor Pechmann performed a limited review of an incomplete set of documents. Her conclusions based on these documents are nothing more then a presentation of the plaintiff's interpretations. Professor Pechmann's testimony therefore will not assist the jury and must be excluded.

Professor Pechmann's review of documents was so limited that any conclusions she may have reached will fail to assist the jury. Not only was her review limited almost exclusively to documents selected for her by the plaintiff's attorneys (Pechmann Dep. at 136:22-137:2), but this

7

review also omitted key documents, making any conclusions she has drawn incomplete and distorted. For example, although Professor Pechmann relies heavily on FDA reports in forming her opinion, she has no recollection of having reviewed the materials Merck submitted to the FDA – which are the materials on which the FDA reports were based. (Pechmann Dep. at 129:4-20.) Professor Pechmann argues that a review of these documents is unnecessary for determining what Merck actually knew about potential risks associated with Vioxx. (*Id.*) Yet, without having conducted her own review of the underlying documents, Professor Pechmann cannot possibly claim to know what Merck knew about the possible risks of Vioxx. Instead, she offers nothing more then her personal opinion of how the FDA documents should be interpreted.

Moreover, the documents Professor Pechmann uses in forming her opinion are understandable to the average layperson and thus are within the province of the jury. FED. R. EVID. 702; *see also United States v. Garcia*, 994 F.2d 1499, 1506 (10th Cir. 1993) (excluding expert testimony regarding the phrase "your old man" as it could easily be understood by the jury). The jury is just as capable as Professor Pechmann to view the documents in question. It can decide for itself what Merck knew or should have known about the alleged CV risks associated with Vioxx. Professor Pechmann's conclusions are exactly the type of opinion testimony cautioned against in *In re Rezulin Products Liability Litigation*, where the court warned:

> A practice reminiscent of wager of law has become fashionable among some well-financed litigants – the engagement of "expert" witnesses whose intended role is more to argue the client's cause from the witness stand than to bring to the fact-finder specialized knowledge or expertise that would be helpful in resolving the issues of fact presented by the lawsuit. These "experts" thus are loosely analogous to compurgators, also known as oath helpers, in that they lend their credentials and reputations to the party who calls them without bringing much if any relevant knowledge to bear on the facts actually at issue.

*In re Rezulin Prods. Liab. Lit.*, 309 F. Supp. 2d at 538.

Plaintiff's counsel will have their opportunity during closing arguments to argue to the jury how they believe the documents should be interpreted. But they should not be allowed to do so under the guise of expert testimony. Professor Pechmann should therefore be excluded from offering her opinion regarding the state of Merck's knowledge.

## IV. PROFESSOR PECHMANN'S OPINIONS REGARDING THE ALLEGEDLY MISLEADING NATURE OF MERCK'S ADVERTISING ARE INADMISSIBLE.

Professor Pechmann's opinions regarding Merck's marketing must be excluded on the additional grounds that they are irrelevant. Plaintiff's claims for negligent misrepresentation and deceit-by-concealment require proof of detrimental reliance on a material misrepresentation or false statement. *See, e.g., Redwend Ltd. P'ship v. Edwards*, 581 S.E.2d 496, 504 (S.C. Ct. App. 2003) (negligent misrepresentation); *Regions Bank v. Schmauch*, 582 S.E.2d 432, 444-45 (S.C. Ct. App. 2003) (deceit by concealment). There is no evidence that plaintiff's physicians were actually misled by Merck's marketing. Professor Pechmann's opinions regarding the nature of the marketing are therefore irrelevant.

Moreover, the jury does not need Professor Pechmann to determine whether Merck's marketing was misleading. Not once in her report or deposition does Professor Pechmann discuss any theory or "science" of marketing as it relates to Merck's marketing campaign. This is despite her repeated assertions that the jury needs her expertise. (*See e.g.* Pechmann Dep. at 186:16-20; 212:4-12.) Instead of focusing on the science of marketing, Professor Pechmann's opinions consist of collections of quotes taken from various documents, accompanied by Professor Pechmann's interpretation of their meaning. For example, Professor Pechmann quotes extensively from press releases, promotional pieces, and letters sent to doctors. (*See, e.g.*, Pechmann Rpt. at ¶¶ 25(b), 26(c), 34(c).) The jury is capable of examining these documents and determining for itself if the marketing was misleading.

9

To the extent that Professor Pechmann seeks to explain the marketing research that was conducted on behalf of Merck, her opinions are unnecessary to assist the jury. The marketing research that Professor Pechmann seeks to explain to the jury falls into the following general categories: (i) numbers of visits by sales representatives to physicians; (ii) sales data; (iii) perceptions of physicians and consumers; and (iv) the copy testing of promotional material. (Pechmann Dep. at 295:20-296:17.) Each of these categories of studies is inadmissible hearsay, irrelevant and highly prejudicial; it could not be presented to the jury directly. By offering Professor Pechmann to testify about the contents of these documents, plaintiffs are attempting to perform an end run around the rules of evidence. The Court should see through this ploy and exclude Professor Pechmann's testimony.

And, to the extent that Merck's internal marketing studies may be admissible, Professor Pechmann's recital of their contents and conclusions to the jury will not assist them in deciding any pertinent facts. Professor Pechmann does not dispute the accuracy or competence of this research and admits in sworn testimony that it is "very good." (Pechmann Dep. at 116:9-16.) Nor is Professor Pechmann questioning conclusions drawn in this research. In fact, all that Professor Pechmann offers the jury regarding these studies is a parroting of the conclusions – conclusions written in plain English and that can be easily understood. As Professor Pechmann does not offer any additional insight on the research, the jury is just as capable as she is of drawing its own conclusions from these reports.

## V. PROFESSOR PECHMANN MAY NOT TESTIFY THAT PLAINTIFF OR HIS DOCTORS WERE MISLED BY THE MARKETING.

Professor Pechmann will attempt to offer the opinion that Merck's marketing misled plaintiffs and their physicians. (Pechmann Rpt. at ¶¶ 21-23.) But her opinion contradicts their sworn testimony. For instance, Professor Pechmann opines that Dr. McCaffrey was confused by

10

the sales representatives about the safety of Vioxx. (Pechmann Rpt. at ¶ 21(e).) Yet, Dr. McCaffrey has testified that he does not rely on sales representatives for safety information and that he felt the sales representatives allowed him to interpret the VIGOR study for himself. (Deposition of Michael McCaffrey, M.D. at 99:13-17, 231:19-23, attached hereto as Ex. D.) Similarly, Professor Pechmann opines that Dr. Mikola was misled by Merck's marketing. (Pechmann Rpt. at ¶ 22.) However, Dr. Mikola has testified that: "Generally not only Merck but most of the pharmaceutical reps I would typically prefer not to be detailed to extent and generally I would ask them for copies of the original articles from which they drew their detail pieces . . . that I could read [it] and draw my own conclusion." (Deposition of Michael Mikola, M.D. at 180:6-23, attached hereto as Ex. E.) And, despite Professor Pechmann's opinion to the contrary, Mr. Barnett has testified that in making the decision to start taking Vioxx he relied solely on the opinion of his doctor. (April 20, 2006 Deposition of Gerald Barnett at 129:23-25 ("Q: You didn't rely on any advertisement for Vioxx or Celebrex® in deciding to use Vioxx; correct? A: No, no. He – that's his [Dr. McCaffrey's] decision."), attached hereto as Ex. F.)

Professor Pechmann believes she can determine the effect of Merck's marketing on specific individuals based on a statistical analysis of how people generally were affected. (Pechmann Dep. at 104:23-105:4.) In other words, if a study suggests that most doctors believed something as a result of Merck's advertising, Professor Pechmann will say plaintiff's doctors must also have believed it. She offers this opinion even after testifying that different people react to the same advertisement differently. (*Id.* at 95:10-13.) She also claims to know of factors that entered into specific prescription decisions that even the prescribing physicians do not know. (*Id.* at 113:8-22.) The jury can decide for itself whether Mr. Barnett's prescribing physicians were under the influence of Merck's marketing.

11

## VI. PROFESSOR PECHMANN'S TESTIMONY ABOUT HOW MUCH MERCK SPENT ON MARKETING OR HOW MUCH MONEY IT MADE SELLING VIOXX ARE IRRELEVANT.

Professor Pechmann's proposed testimony about how much Merck spent on marketing and its revenue and profit from Vioxx is not the proper subject of expert testimony. The dollar amounts Merck spent on marketing are the subject of extensive testimony from David Anstice and others. Plaintiff will no doubt proffer this testimony at trial. No expert is needed to explain the facts of how much Merck spent on anything, including marketing.

## VII. THE COURT SHOULD PRECLUDE PROFESSOR PECHMANN FROM OFFERING EXPERT TESTIMONY REGARDING REGULATORY MATTERS.

Professor Pechmann has testified that she considers herself an expert on the FDA regulations that govern prescription drugs. (Pechmann Dep. at 86:15-17.) However, she does not have the education or experience necessary to proffer expert opinions on this topic. She has never written on FDA regulations as they relate to pharmaceutical advertising. (*Id.* at 160:21-24.) She has never presented publicly on FDA regulations as they relate to pharmaceutical advertising. (*Id.* at 161:5-9.) In fact, her only experiences that implicate FDA regulations at all consists of consulting work on tobacco regulations, listening to FDA speakers at professional conferences, and reviewing papers that relate to the FDA. (*Id.* at 88:1-9, 88:23-89:8.) As Professor Pechmann lacks the relevant qualifications to opine as an expert on FDA regulations, she should be prevented from offering these opinions at trial.

Moreover, to the extent Dr. Pechmann offers legal opinions on what these regulations mean, or how they apply to Merck, her testimony is improper because an expert may not offer "testimony as to legal conclusions that will determine the outcome of the case." *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) ("The proffered testimony was largely on purely legal matters and made up solely of legal conclusions, such as

conclusions that the city's actions violated the FHAA. The district court correctly ruled that expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible.").

## VI. CONCLUSION.

For the reasons stated above, Merck respectfully request that the Court grant Merck's Motion for Order Excluding Testimony of Cornelia Pechmann, Ph.D.

Respectfully submitted,

*/s/ Dorothy H. Wimberly*
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone: 504-581-3200
Fax: 504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Andrew Goldman
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois 60610
Phone: 312-494-4400
Fax: 312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Phone: 202-434-5000
Fax: 202-434-5029

And

Brian Currey
Catalina J. Vergara
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone:  213-430-6000
Fax:    213-430-6407

Attorneys for Merck & Co., Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that the above and forgoing Motion of Merck to Exclude the Testimony of Cornelia Pechmann, Ph.D. has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Mark Robinson by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 16th day of June, 2006.

/s/ Dorothy H. Wimberly