UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | **MDL Docket No. 1657** |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| **This document relates to** | * | **JUDGE FALLON** |
| **Case No. 06-0485** | * | |
| | * | **MAGISTRATE JUDGE KNOWLES** |
| **GERALD D. BARNETT,** | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| **MERCK & CO., INC.,** | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### MEMORANDUM IN SUPPORT OF MOTION OF MERCK & CO., INC. ("MERCK") FOR ORDER EXCLUDING TESTIMONY OF DOUGLAS P. ZIPES, M.D.

#### (EXPERT CHALLENGE NO. 7)

Plaintiff has proffered Dr. Douglas Zipes, a cardiologist, as an expert on both general and specific causation.  As explained below, some of the opinions he intends to offer exceed the bounds of his expertise and are not scientifically reliable.  Specifically, this Court should exclude his opinions that Vioxx® causes atherosclerosis and that Vioxx confers a higher cardiovascular risk in certain patients than in others.  Additionally, Dr. Zipes offers "expert" opinion testimony on a number of issues that are either completely irrelevant, unduly prejudicial, or unsupported by fact, including: (i) what Merck knew or should have known; (ii) that other doctors agreed with his belief that Vioxx causes heart attacks; (iii) Merck's compliance with FDA regulations; and (iv) the opinions expressed in the report of another one of plaintiff's experts, Richard Kronmal, Ph.D.  All of this testimony must be excluded under Federal Rule of Evidence 702 and the principles set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).  Finally, the

Court should exclude Dr. Zipes's calculations of Mr. Barnett's risk of heart attack because that opinion was not appropriately disclosed to Merck as required by Federal Rule of Civil Procedure 26.

## I.     LEGAL STANDARD.

The legal standard for the admission of expert testimony in federal court is set forth at pages 3-4 of the Motion of Defendant Merck & Co., Inc. ("Merck") for Order Excluding Opinion Testimony by Plaintiff's Experts That Vioxx Accelerates Atherosclerosis ("Atherosclerosis Motion"), filed concurrently herewith and incorporated herein by reference.

## II.    THE COURT SHOULD EXCLUDE DR. ZIPES'S GENERAL CAUSE OPINIONS RELATING TO ATHEROSCLEROSIS AND THOSE BASED ON IMPROPER SUBGROUP ANALYSIS.

### A.     Dr. Zipes's Opinions On Whether Vioxx Causes Or Accelerates · Atherosclerosis Are Scientifically Unreliable.

In his expert report and deposition testimony, Dr. Zipes opines that Vioxx causes accelerated plaque build-up – and that it did so in Mr. Barnett's case, resulting in severe atherosclerosis. (*See* 22 May 2006 Report of Douglas Zipes, M.D. ("Zipes Rpt.") at 12-13, 36-42, attached hereto as Ex. A; *see also* Deposition of Douglas P. Zipes ("Zipes Dep.") at 89:3-91:12; 104:15-108:8., attached hereto as Ex. B.)  This theory of causation lacks a foundation in reliable science, as explained in Merck's concurrently-filed Atherosclerosis Motion.  Merck incorporates that motion herein by reference, and for the reasons stated in the motion moves to exclude Dr. Zipes's testimony about Vioxx's alleged ability to cause or accelerate atherosclerosis.

### B.     Dr. Zipes's Opinions Based On Improper Subgroup Analyses Are Scientifically Unreliable.

Dr. Zipes admits that he is not an expert in biostatistics, yet he has extracted two numbers from the *post hoc* subgroup analysis of the APPROVe data and attempted to apply them to show

2

that Vioxx causes particular increased cardiovascular risk in (i) persons with prior-atherosclerotic symptoms; and (ii) persons who experienced blood pressure "spikes" while taking Vioxx.[1] (Zipes Dep. at 41:15-21.) Specifically, Dr. Zipes cites the APPROVe study[2] for the proposition that subjects with known atherosclerotic disease had a relative risk of 9.59 for thrombotic events in Vioxx patients versus placebo (Zipes Rpt. at 30), and claims that the APPROVe data also demonstrate a relative risk of 3.82 for myocardial infarction in users who experienced elevations in their blood pressure while on Vioxx. (Zipes Rpt. at 31; Zipes Dep. at 103:5-104:14.) These statistics, however, are based on *post hoc* subgroup analyses from the APPROVe study and, as described below, cannot properly be used for this purpose. Therefore, the scientific evidence does not support Dr. Zipes's argument that Mr. Barnett was at a quantifiably higher risk than other Vioxx users.

Several recent scientific articles specifically addressing cardiological clinical trials indicate that subgroup analyses – examinations of partitioned pieces of an entire dataset – are unreliable even in large data sets.[3] There is scientific consensus that such analyses must be conducted and interpreted with great caution. (Parker 2006 at 580; *see* also Sleight at 1

---

[1] Dr. Zipes renders this opinion despite admitting that, prior to having been retained in this case, he had neither diagnosed a person as having had a heart attack caused by Vioxx, nor had he even prescribed Vioxx to his patients. (Zipes Dep. at 44:11-19, 45:16-24.)

[2] Bresalier R., et al., *Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial*, N. ENGL. J. MED 2005 Mar. 17; 352(11):1092-102.

[3] *See* Hernandez AV, et al., *Subgroup analyses in therapeutic clinical trials: Are most of them misleading?*, AM. HEART J. 2006; 151:257-64; Lagakos SW, *The Challenge of Subgroup Analyses - Reporting without Distorting*, N. ENGL. J. MED. 2006; 354:1667-69; Parker AB, Naylor CD, *Interpretation of subgroup results in clinical trial publications: Insight from a survey of medical specialists in Ontario, Canada*, AM. HEART J. 2006; 151:580-8; Parker AB, Naylor CD, *Subgroups, treatment effects, and baseline risks: some lessons from major cardiovascular trials*, AM. HEART J. 2000; 139:952-61; Sleight P., *Debate: Subgroup analyses in clinical trials - fun to look at, but don't believe them!*, CURR. CONTROL TRIALS CARDIOVASC. MED. 2000;1:25-27.

("Analysis of subgroup results in a clinical trial is surprisingly unreliable, even in a large trial.").)
When subgroup analyses are not prespecified, their results should be regarded as merely
hypotheses, requiring confirmation in subsequent studies. (Parker 2006 at 580; *see also*
Hernandez at 260 ("subgroup analysis is a secondary, hypothesis-generating exercise to stimulate
further research"); Lagakos at 1668 ("Post hoc subgroup analyses undertaken because of an
intriguing trend seen in the results or selective reporting of certain subgroup analyses can be
especially misleading.").)

Moreover, a *post hoc* analysis cannot prove a causal relationship.[4] Again, it is simply a
tool to generate hypotheses for future study. (*See* Elliott H.L., *Post hoc analysis: use and
dangers in perspective*, J. OF HYPERTENSION 1996, 14 (suppl 2):S21-S25 at S21 ("Post hoc
analysis is of major importance in the generation of hypotheses. However, the hypothesis is
created by the analysis and has not been proved by any 'experiment'.").) Here, the *post hoc*
analysis of patients who experienced high blood pressure simply creates the hypothesis that such
patients are at higher risk of cardiovascular events on Vioxx than the general population – it does
nothing to prove it. Similarly, the *post hoc* analysis of persons with symptomatic atherosclerotic
cardiovascular disease cannot prove that the risks were higher for these patients. Indeed, if such
analyses were sufficient, every spurious finding in every clinical trial would be self-proving.

"The results of a post hoc analysis should be viewed with considerable skepticism and, in
advance of confirmation by other appropriately designed prospective studies, should not be
regarded as definitive proof." *Id.* at S21. Indeed, the APPROVe CSR warns against relying on
potentially spurious subgroup analyses, "Caution must be exercised when interpreting these post

---

[4] In fact, "[e]mploying the results of group-based studies of risk to make a causal determination
for an individual plaintiff is beyond the limits of epidemiology." *See* Fed. Judicial Ctr.,
REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 338 (2d ed. 2005) at 481.

hoc results." (APPROVe CSR at 1390, attached hereto as Ex. C.)  For Dr. Zipes to argue that the

subgroup analysis in APPROVe proves that patients with prior symptomatic atherosclerotic

disease or those who experienced elevated blood pressure are at an increased risk from Vioxx

distorts the data in a way that is scientifically improper and creates a significant risk that the jury

will be confused and misled.  The Court should exclude all such evidence or argument.

## III.   DR. ZIPES'S IRRELEVANT AND UNDULY PREJUDICIAL OPINIONS MUST BE EXCLUDED.

### A.   Dr. Zipes's Opinions About What Merck Knew And What Merck Should Have Done Are Beyond Dr. Zipes's Knowledge And Unduly Prejudicial.

Dr. Zipes purports to know what Dr. Scolnick and Merck knew, at various times, about

the risks allegedly associated with Vioxx.  (Zipes Rpt. at 23; *see also* Zipes Dep. at 78:13-79:7.)

In addition, Dr. Zipes opines that Merck should have conducted clinical trials designed to study

the alleged cardiovascular risks of Vioxx.  Testimony on both of these subjects is grounded

neither in Dr. Zipes's personal knowledge nor his expertise.  Moreover, it is unduly prejudicial

and will not assist the jury.  The Court should exclude all of this opinion testimony in accordance

with the authorities that are briefed in Merck's concurrently-filed Motion for Order Excluding

Testimony of Jerry Avorn, M.D.

First, the Court should exclude Dr. Zipes's opinion testimony about Merck's state of

mind.  At his deposition, Dr. Zipes admitted that he does not know anything about this issue –

but in the next breath stated that he may testify on the subject anyway:

A:   You are asking me to interpret what Merck's thinking was and I cannot do that.

Q:   You are not going to come to trial and state what is Merck's state of mind or motivation; right?

A:   I don't know.  It would depend on the questions that I am asked.

(Zipes Dep. at 68:21-69:1.)

Dr. Zipes bases his opinions about Merck's "state of mind" on a selective set of internal Merck documents given to him by plaintiff's counsel. (Zipes Dep. at 76:20-24; 79:4-7.) From these documents, he draws inferences about the state of Merck's and Dr. Scolnick's knowledge about the cardiovascular risks allegedly associated with Vioxx. For example, he opines that Merck "was actually aware" of the prostacyclin/thromboxane theory as early as 1997, and that Dr. Scolnick accepted this theory as an explanation for the excess cardiovascular events in VIGOR. (Zipes Rpt. at 23.) As noted in Merck's Motion for Order Excluding Testimony of Jerry Avorn, M.D., examining and drawing factual inferences from the evidence are roles left properly to the trier of fact. The jury does not need Dr. Zipes's assistance in carrying out that responsibility.

Second, the Court should exclude Dr. Zipes's opinion that, based on what he claims Merck knew in 2000, "Merck should have initiated a trial powered to conclusively test the safety of Vioxx in a population that would be representative of the subjects who were using the drug, i.e., those with multiple risk factors for cardiovascular disease." (Zipes Rpt. at 23.) Evidence relating to studies that were never performed is not probative of any issue of consequence in this case. The outcome of any such study is completely a matter of conjecture. The same is true of any testimony offered to show that the clinical studies that were completed should have been designed differently. All such testimony lacks a reliable foundation, and would result in undue prejudice to Merck, juror confusion, and delay if admitted.

**B.     Dr. Zipes's Testimony Regarding His Meetings With Other Cardiologists Must Be Excluded As Hearsay And Unduly Prejudicial.**

Dr. Zipes intends to offer testimony that, after he was retained as an expert, he had various meetings with other doctors all of whom he claims agreed with his opinions. Specifically, first, Dr. Zipes claims that he met with six other cardiologists and plaintiff's

6

counsel over the course of two days to discuss the alleged cardiovascular risks of Vioxx and that all six of these doctors agreed with him that Vioxx increases the risk of heart attack. (Zipes Dep. at 31:11-36:14.) Second, on the day before his deposition, he spoke with a Canadian doctor who Dr. Zipes claims helped support his theory and discredit one of Merck's experts, Dr. Flavahan. (Zipes Dep. 18:24-19:22; 21:20-24:15.) Third, Dr. Zipes states that he met with a cardiologist named Dr. O'Bryan on the day before his deposition whom he claims "reaffirmed" his opinions concerning Mr. Barnett's stress tests. (Zipes Dep. at 9:22-11:18.) Any testimony regarding what these other doctors said or thought about Vioxx is hearsay. FED. R. EVID. 802. Merck has not had any opportunity to cross-examine these individuals and there is no independent evidence as to what they thought or if they indeed agreed with Dr. Zipes about the risks of Vioxx, Dr. Flavahan's report, and Mr. Barnett's stress tests. There is no proper purpose for this testimony, and it appears to be an attempt by the plaintiff to bolster Dr. Zipes's testimony. Admitting Dr. Zipes's hearsay testimony that these other doctors all agreed with him would be unduly prejudicial to Merck and therefore must be excluded. FED. R. EVID. 403.

## C.   Any Testimony From Dr. Zipes Relating To Merck's Compliance With FDA Regulations Should Be Excluded As Outside Of Dr. Zipes's Expertise.

In his deposition, Dr. Zipes explained that he believes he is an expert on FDA regulations and that he is prepared, if asked, to give opinions about the approval of Vioxx. (Zipes Dep. at 41:22-42:13.) But his only alleged qualification to give this testimony is that he has "dealt with the FDA on numerous occasions." *Id.* This minimal showing is insufficient to qualify Dr. Zipes to give opinions about the adequacy of Merck's warnings or whether Merck complied with FDA regulations. *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1050 (5th Cir. 1998) (trial court properly excluded testimony where witness lacked training or schooling necessary to qualify as an expert in the subject).

## D.    Dr. Zipes's Testimony About Dr. Kronmal's Report Must Be Excluded.

In proffering his "expert" opinions, Dr. Zipes relies on the expert report of another one of plaintiff's retained experts, Dr. Kronmal.[5]   (*See* Zipes Dep. at 79:13-80:9;  231:22-232:6.) Whether Dr. Kronmal testifies at trial or not, Dr. Zipes must be precluded from putting Dr. Kronmal's conclusions into evidence.  If Dr. Kronmal does not appear at trial, allowing Dr. Zipes to rely on Dr. Kronmal's untested conclusions would be manifestly unfair and prejudicial to Merck. *See Polythane Sys. v. Marina Ventures Int'l, Ltd.*, 993 F.2d 1201, 1208 (5th Cir. 1993) (holding that testimony relating to a nontestifying expert's report must be excluded because "[t]here was no opportunity to cross-examine [the expert] regarding the methodology he employed, statistical discrepancies in his report, or any other matters which might illuminate shortcomings in his work").  If Dr. Kronmal does appear at trial, any testimony from Dr. Zipes about Dr. Kronmal's conclusions will be duplicative and unnecessary. *United States v. Sanchez*, 325 F.3d 600, 604 (5th Cir. 2003) (holding that the court has discretion to exclude duplicative evidence).  Indeed, because Dr. Zipes has not made any attempt to verify the accuracy of Dr. Kronmal's findings or calculations, his testimony would simply be a regurgitation of Dr. Kronmal's opinions.  (Zipes Dep. at 79:13-80:9.)  If plaintiff seeks to have Dr. Kronmal's conclusions put before the jury it is Dr. Kronmal – not Dr. Zipes – who should testify about the contents of his report, so that Merck has an adequate opportunity to cross-examine him concerning his methods and conclusions.

---

[5] Merck has fully set out the reasons why Dr. Kronmal's calculations are scientifically unreliable and prejudicial in its Motion for Order Excluding Testimony of Richard Kronmal, Ph.D., and hereby incorporates those arguments by reference.

**E.      Dr. Zipes's Testimony About Mr. Barnett's Risk Of A Subsequent Myocardial Infarction Is Inadmissible Because It Was Not Properly Disclosed.**

Finally, the Court should exclude Dr. Zipes's deposition testimony purporting to calculate the risk that Mr. Barnett will suffer a myocardial infarction, based on his risk factors as of January 2000. (*See* Zipes Dep. at 260:6-263:11.) This testimony was not properly disclosed to Merck in Dr. Zipes's expert report. *Heidtman v. County of El Paso*, 171 F.3d 1038, 1040 (5th Cir. 1999). Thus, Merck did not have an opportunity to have the testimony reviewed by other experts or to secure additional experts to counter it. In his supplemental report, Dr. Zipes relies on the "ACC/AHA/SCAI 2005 Guidelines Update for Percutaneous Coronary Intervention" for the proposition that Mr. Barnett was in the lowest Canadian Cardiovascular Society classification and therefore did not require any percutaneous intervention at that time. (*See* Supplement Report of Douglas P. Zipes, M.D. 30 May 2006 at 1, attached hereto as Ex. E.) But in his deposition, Dr. Zipes purported to take this opinion a step further and actually predict Mr. Barnett's risk of heart attack or stroke. (Zipes Dep. at 260:14-262:9.) He does this by citing additional studies which had not previously been disclosed as part of his report or supplement. These calculations must be excluded as beyond the scope of Dr. Zipes's report. FED. R. CIV. PROC. 26; *see also Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 572 (5th Cir. 1996) (Rule 37 allows a court to exclude undisclosed expert testimony); *Avondale Indus. v. Tyco Valves & Controls, Inc.*, 2003 U.S. Dist. LEXIS 20792 (E.D. La. 2003) (expert opinions not properly disclosed under Rule 26 should be excluded).

**IV.      CONCLUSION.**

For the reasons stated above, Merck respectfully requests that this Court grant Merck's Motion for Order Excluding Testimony of Douglas Zipes, M.D.

9

Respectfully submitted,

*/s/ Dorothy H. Wimberly*

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone: 504-581-3200
Fax: 504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Andrew Goldman
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois 60610
Phone: 312-494-4400
Fax: 312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Phone: 202-434-5000
Fax: 202-434-5029

And

Brian Currey
Catalina J. Vergara
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone: 213-430-6000
Fax: 213-430-6407

Attorneys for Merck & Co., Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that the above and forgoing Memorandum in Support of Motion of Merck for Order Excluding Testimony of Douglas P. Zipes, M.D. has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Mark Robinson by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 16th day of June, 2006.

/s/ Dorothy H. Wimberly