# Report of Douglas P. Zipes, M.D.
# Regarding Gerald Barnett
# 22 May 2006

I.   Background and Qualifications

I received my Bachelor of Arts degree cum laude from Dartmouth College in 1961, and my medical degree (M.D.) cum laude from Harvard Medical School in 1964. I performed post graduate training in internal medicine (1964-1966) and cardiology (1966-1968) at Duke University Medical Center, Durham, North Carolina. From 1968-1970, I was in the United States Navy and discharged with a Letter of Commendation at the rank of Lieutenant Commander. I joined Indiana University School of Medicine as an Assistant Professor of Medicine in 1970, and became Professor of Medicine in 1976. I also became Professor of Pharmacology and Toxicology in 1993. In 1994, I became Distinguished Professor, the university's highest award for academic accomplishment. In 1995, I became Director of the Division of Cardiology at the Krannert Institute of Cardiology, a post I held until 2004, when I became Emeritus. Despite the latter, I continue to see patients and consult with many physicians on difficult patient problems. I attend conferences, teach and interact with members of the Division, and housestaff. (Attached hereto as Exhibit A is a copy of my curriculum vitae.)

My principal areas of research and clinical activities focus on cardiac electrophysiology (heart rhythm problems). However, I also take care of patients with the entire spectrum of cardiac diseases, including hypertension, heart failure, atherosclerosis, acute and chronic myocardial infarction (MI), lipid abnormalities, heart muscle abnormalities, thromboembolic problems, and so forth. Many of my patients are elderly and have various joint problems with the need for therapy.

I have published over 750 medical articles and 18 textbooks. I am the co-editor of Zipes/Jalife Cardiology Electrophysiology, From Cell to Bedside (2004, presently in its fourth edition) and a co-editor of Braunwald's Heart Disease, a Textbook of Cardiovascular Medicine (2005, presently in its seventh edition). Each is regarded as the authoritative text in heart rhythm disorders and in general cardiology, respectively.

I am a member of numerous societies including the American Society for Clinical Investigation and the Association of American Physicians, both of which have very stringent acceptance qualifications. I have been a consultant to the American Medical Association, Department of Drugs, 6 times. I am past president of the Association of University Cardiologists and of the Cardiac Electrophysiology Society. I have consulted for, and been on review committees of, the Veterans Administration, the American Heart Association (AHA), and the National Heart, Lung, and Blood Institute (NHLBI) of the National Institutes of Health (NIH). I have just agreed to serve on the Arrhythmia Advisory Committee to the Director of the NHLBI.



EXHIBIT
A

For the North American Society of Pacing and Electrophysiology (NASPE) [now called the Heart Rhythm Society (HRS)], which is the largest group of heart rhythm experts in the world, I was a founding member in 1980, served in many roles and became President 1989-1990. I am the founding Editor-in-Chief of the HRS journal (see below).

For the American Board of Internal Medicine (ABIM) (the organization that writes all of the examinations for medicine and the sub-specialties which a physician must pass to call him/herself Board Certified), I was chair of the Clinical Cardiac Electrophysiology Test Committee which wrote the first (and subsequent 2) examinations in clinical cardiac electrophysiology; Chair of the Subspecialty Board on Cardiovascular Disease, which wrote the examinations dealing with all of cardiology; Chairman of the Committee on Subspecialty Internal Medicine (dealing with issues of all of internal medicine); and ultimately Chairman of the entire ABIM (2002-2003).

For the American College of Cardiology (ACC) (33,000 cardiology members worldwide), I have held multiple roles since 1975, becoming a member of the Board of Trustees (1992-1997 and again 1999-2005); Chairman of the Nominating Committee on 2 separate occasions; Chairman of the Development Committee; Vice President, President-Elect; and then President (2001-2002). I became a Master of the ACC in 2002 (highest membership category). Presently, I am Co-Chair of the ACC/AHA/European Society of Cardiology (ESC)/HRS Ventricular Arrhythmia and Sudden Cardiac Death Guideline Committee, charged with writing guidelines on how to care for patients with heart rhythm problems. I was also a member of the Ethics Committee and chaired the Task Force on Legal Expert Testimony.

I am a member of the editorial boards of more than 15 cardiology journals; and have reviewed articles for other general medical journals, such as the New England Journal of Medicine (NEJM) and Journal of the American Medical Association. I have been Editor-in-Chief of Progress in Cardiology, and Founding Editor-in-Chief of Contemporary Treatments in Cardiovascular Disease and Cardiology in Review. I was the Founding Editor-in Chief of the Journal of Cardiovascular Electrophysiology (1989-2004), and in 2004, I became Founding Editor-in-Chief of the journal, Heart Rhythm, which is the official journal of the HRS.

I have received many awards, but will mention only a few. From the AHA I received the Distinguished Achievement Award (1989), the Herrick Award (1997), and the Cor Vitae Award (2004). These awards have been for distinguished contributions to our knowledge base of clinical cardiology and patient care. I have received the Distinguished Scientist Award from the NASPE/HRS (1995) and from the ACC (1996). These awards have recognized my research contributions to both basic and clinical cardiology. In 2001, I received the "Sagamore of the Wabash" from the Governor of Indiana, Frank O'Bannon, the highest honor bestowed upon a citizen of Indiana. On June 2, 2004, the Honorable Baron P. Hill, House of Representatives, read a tribute about me into the Congressional Record. To celebrate my tenure as Division Chief, the following were endowed: the Medtronic Zipes Chair in Cardiology, and the Joan and Douglas Zipes Visiting Professorship at Indiana University School of Medicine; the Douglas P. Zipes, M.D. Lectureship given annually at the HRS Sessions; and the Douglas P. Zipes, M.D., Distinguished Young Scientist Award given annually at the ACC Scientific Sessions.

I have lectured all over the world, and have consulted for industry, primarily pharmaceutical and medical device companies.

I have participated in multiple clinical trials, both as an investigator and in a leadership role. I was the Chairman of the Planning Committee, Steering Committee, Executive Committee and principal investigator of the Antiarrhythmics Versus Implantable Defibrillator study for the NHLBI. It is the largest secondary prevention trial comparing implantable cardioverter defibrillators (ICD) with antiarrhythmic drug therapy. I was the Chairman of the Data and Safety Monitoring Board (DSMB) of Atrial Fibrillation Follow-up of Rhythm Management trial (1996-2002) that tested whether drugs to control the heart rate were superior to drugs that maintained sinus rhythm. I was on the Executive Committee of the Sudden Cardiac Death in Heart Failure Trial (SCD-HeFT) (1998-2004) that tested the prophylactic benefit of the ICD versus drugs. I am a member of the External Safety and Efficacy Monitoring Committee of the Atrial Fibrillation and Congestive Heart Failure trial for the Institute de Cardiologie de Montreal (2001-present). I will be the Chairman of the DSMB of an upcoming trial on the Chronicle, a heart failure monitoring device manufactured by Medtronic.

I have published on the impact of prostacyclin generation on arrhythmia development, (Prostaglandins in the Pericardial Fluid Modulate Neural Regulation of Cardiac Electrophysiologic Properties, Circulation Research 66:163,1990; Pericardial Prostaglandin Biosynthesis Prevents the Increased Incidence of Reperfusion-Induced Ventricular Fibrillation Produced by Efferent Sympathetic Stimulation in Dogs, Circulation 82; 1008,1990; Prostaglandin Modulation of Early After Depolarizations and Ventricular Tachyarrhythmia Induced by Cesium Chloride Combined with Efferent Cardiac Sympathetic Stimulation in Dogs, Journal of the American College of Cardiology 16:1287, 1990).

I am a Fellow of the: AHA, HRS, ESC, American College of Physicians, and Master of the American College of Cardiology. In 2007, I will receive an honorary Fellowship of the Argentine Cardiology Association. I am Board Certified in Internal Medicine and Cardiovascular Diseases and was Board Certified (until 2005) in Clinical Cardiac Electrophysiology.

## II.    Summary of Opinions

I was asked to opine whether the available information supported a conclusion that Vioxx significantly increased the risk of cardiovascular events and whether such data were sufficient to make a finding of causality. My opinions are expressed to a reasonable degree of medical certainty, based on my education, clinical practice, research, and experience, literature review, document review, and generally accepted principles of medicine and clinical science. My opinion is also based on a personal interview and examination of Mr. Barnett performed May 2, 2006, at the Krannert Institute of Cardiology, Indiana University School of Medicine. The statement of my prior testimony and rates is attached as Exhibit B.

I first became aware of the potential health problem caused by Vioxx sometime after the publication of the Vioxx Gastrointestinal Outcomes Research (VIGOR) trial in November, 2000, probably in 2001, as it concerned patients taking Vioxx. Thereafter, I followed the medical

literature as more articles were published about Vioxx and cardiovascular events. I have discussed these issues with my medical colleagues. In my work reviewing and analyzing the case of Mr. Barnett and the medical issues regarding Vioxx, I have spent literally hundreds of hours reading published articles and Merck internal documents relating to Vioxx. I have read each of the Randomized Clinical Trials (RCTs) and many of the observational studies regarding Vioxx. I have reviewed a group of depositions that were taken in the Vioxx-related cases.

It is my opinion, based upon my review of the extensive literature on cyclooxygenase (COX) compounds, COX-1 and COX-2 function and inhibition, the pharmacology and molecular biology of these compounds, as well as the clinical trials and other information, that COX-2 inhibition caused by rofecoxib (Vioxx) causes thrombus and plaque rupture and cardiovascular disease, including heart attacks, strokes, transient ischemic attacks (TIA), peripheral edema, congestive heart failure, and hypertension. The supporting clinical evidence comes primarily from RCTs, the gold standard for evidenced-based conclusions, but is also supported by epidemiologic studies. In addition to the clinical information from the aforementioned sources, both clinical and basic studies establish biologic plausibility. That is, the mechanism of action of COX-2 inhibition and the cascade of physiologic and pathophysiologic events that follow, provide the scientific foundation that supports the clinical evidence. In addition, this body of evidence supports the conclusion that in animal models and in clinical patients who have some degree of abnormality of their coronary vessels or who have hypertension, the time course for the pathophysiologic impact of COX-2 inhibition leading to acceleration of atherogenesis and arteriosclerosis and its effects are made more severe.

For reasons that will be set forth fully in this report, it is my opinion that Mr. Barnett's cardiovascular injuries were caused by his use of Vioxx.

### III.   Summary of the Health Issues of Mr. Gerald Barnett

Mr. Gerald Barnett, born January 30, 1944, is a retired career Special Agent of the Federal Bureau of Investigation (FBI). His application physical examination June 16, 1971, indicated at that time his height was 5' 9½", weight 166 lbs., and blood pressure 116/76 mmHg. Blood chemistries, urine analysis, blood count and electrocardiogram (ECG) were normal, and he qualified for strenuous physical exertion. Subsequent to that he had regular thorough physical examinations to make certain he could meet the extraordinarily high standards of physical fitness required by the FBI. These established his general good health. For example, May 25, 1977, his weight was 160 lbs. and blood pressure 108/80 mmHg. He did have indigestion-type pain and on July 28, 1977, he had an evaluation for this type of discomfort present over the last 6 years, along with some sharp midsternal pain upon exertion. The pain increased shortly after the death of his father of an MI at age 68. He had a stress test at that time with good exercise tolerance, indicative of his maintaining physical fitness, and no evidence of ischemia. He continued to undergo regular and thorough physical examinations to be certain that he met the physical fitness standards of the FBI. A stress test on July 15, 1988, was normal with an exercise time of 14 minutes without ischemia. Another stress test on March 3, 1995, was normal and he exercised 14 minutes.

4

He took exemplary care of himself both during his years of active service and in retirement, as he exercised regularly, never smoked, drank in moderation, and maintained his weight in the near ideal range. In fact, his weight hit a high of 184 lbs. (fully dressed) on only 3 occasions prior to his MI in September, 2002. His family history of coronary disease is a bit unclear as he is not certain whether his father had his first MI at age 55 or at 62 years, before dying of his second MI at age 68. His father had an episode of slurred speech either at age 55 or in his early 60s that may have been a TIA. His mother is 90 years old and had 4 TIAs beginning at age 81, but has no history of coronary disease. His sister had a TIA (or TIAs) at age 45. He has 4 brothers without heart disease. His father's brother may have had heart disease. Mr. Barnett does not have diabetes.

Mr. Barnett indicated that many days as an FBI agent were stressful, but overall he enjoyed his work. His past medical history is remarkable for being involved in a motor vehicle accident occurring in 1979, and a history of gastroesophageal reflux disease. Upper endoscopy on September 23, 1997, revealed a 4 cm hiatal hernia and a Schatzki's ring (an abnormal ring of tissue at the esophageal-stomach junction) requiring dilation. The residual effect of the motor vehicle accident was chronic pain from presumed cervical disc disease that also caused numbness in his left hand. Additionally, he had low back pain with sciatic nerve involvement. For these complaints he took Feldene (piroxicam), a nonsteroidal anti-inflammatory drug (NSAID) starting in the mid 1980's (he stopped taking it briefly in mid 1996 replacing it temporarily with ibuprofen). He started taking Feldene again in 1998 and continued taking it with Prilosec until December 30, 1999. Feldene has very weak COX-2 inhibitory actions. The package insert for Feldene was changed in response to the April 6, 2005, memorandum from John K. Jenkins, M.D., Director, Office of New Drugs and Paul J. Seligman, M.D., M.P.H, Office of Pharmacoepidemiology and Statistical Science, Federal Drug Administration (FDA) to indicate that "NSAIDS may cause an increased risk of serious cardiovascular thrombotic events, MI, and stroke, which can be fatal" and "Feldene is contraindicated for the treatment of peri-operative pain in the setting of coronary artery bypass graft (CABG) surgery." However, there have been no RCTs that I am aware of indicating that Feldene is associated with increased risk of cardiovascular thrombotic events. The previous package insert stated "…Feldene should be used with caution in patients with fluid retention, hypertension, or heart failure" and under "Warnings," listed "edema" as the only cardiovascular problem. On October 22, 1999, Dr. Mikola noted Mr. Barnett was doing well on Feldene. In December, 1999, after playing golf he experienced shoulder pain. After not playing golf for 2 weeks, his pain seemed to resolve. On December 30, 1999, Dr. McCaffrey switched him from Feldene to Vioxx. Mr. Barnett relates that Dr. McCaffrey encouraged him to take Vioxx rather than Celebrex.

Forty-two (42) consecutive blood pressure measurements from June 16, 1971, until January 4, 2000, were all normal, with 4 exceptions, each of which occurred during treatment for a sore throat/upper respiratory infection: on January 25, 1999, blood pressure 142/78 mmHg; on June 16, 1999, blood pressure 140/90 mmHg; on June 29, 1999, blood pressure 130/90 mmHg; and on January 4, 2000, blood pressure 150/80 mmHg. Dr. McCaffrey noted in his handwritten record of December 30, 1999, that he gave Mr. Barnett 4 samples of Vioxx. In my experience, it is not unusual that after 6 years a patient would not remember taking samples. It is therefore more likely than not that Mr. Barnett took the 4 samples just before his blood pressure rose to 150/90 mmHg on January 4, 2000. This appears to be, even with an upper respiratory infection,

5

his highest blood pressure ever as of that date. In fact, Dr. McCaffrey testified about a group of his patients in whom Vioxx caused blood pressure spikes. Dr. McCaffrey prescribed the first 2 years of Vioxx taken by Mr. Barnett. The first prescription was filled on January 7, 2000, by Merck-Medco, and Mr. Barnett testified he would have taken the first prescribed Vioxx pill on January 10, 2000.

On January 19, 2000, within the first 3 weeks of Mr. Barnett taking Vioxx, his blood pressure was 162/95 mmHg, the highest recorded blood pressure in his life until that time. Because of acute onset of left-sided precordial chest discomfort which progressed during the day and was not relieved with antacids, he was seen as an outpatient. By that time, the pain had resolved and the ECG did not show ischemic changes. He was given sublingual nitroglycerin to take as needed, and that evening while dancing, the pain recurred and was promptly relieved with nitroglycerin. Upon returning home from dancing, the chest pain returned and he took another nitroglycerine tablet. The pain was temporarily relieved. He took a third nitroglycerine tablet and went to the Emergency Room (ER). Upon admission to the ER, he was given nitroglycerine via transdermal paste. His chest pain returned but was relieved with sublingual nitroglycerine, according to the ER nursing notes.

Mr. Barnett underwent a Cardiolite nuclear isotope scan on January 24, 2000. He exercised 15 minutes (17 metabolic equivalents), attaining the same high workload as he had in previous stress tests, indicating no change in his exercise tolerance. His left ventricular function was completely normal. For the first time, however, the test result indicated the presence of coronary artery disease. Mr. Barnett had no chest pain but manifested T-wave inversion on the ECG, a nonspecific finding. However, the nuclear scan showed decreased perfusion in the lateral wall, evidence of lateral wall ischemia.

A nuclear isotope scan is typically used to detect the presence of coronary artery disease with greater sensitivity than a traditional stress test. However, the nuclear scan does not show ventricular wall motion as detailed as an ECG. The nuclear isotope is injected into the blood stream at peak exercise and travels wherever the blood goes. In a normal heart, the isotope is then taken up into the myocardium itself, and the radioactivity is detectable with a specialized camera, yielding a "picture" of the heart. The images obtained immediately following exercise are compared to those taken after recovery when blood flow is normal, and areas that are not receiving equal blood during exercise show a lack of isotope distribution (defect). Inhomogeneous flow occurring with exercise usually indicates a degree of coronary atherosclerosis. The extent and severity of the defects are roughly proportional to the extent and severity of the atherosclerosis. In subjects with disease affecting a single coronary artery, one would see a single region with reduced radioactivity during exercise compared to rest. Additionally, the test allows one to measure the change in ventricular volume from systole to diastole, thereby allowing the calculation of the "ejection fraction" (EF), the percentage of blood the left ventricle pumps with each beat. This is a value that has been strongly tied to survival in patients with heart disease, and most laboratories report an EF of 50% or greater as normal. While it may be possible that the presence of diffuse coronary artery disease can reduce radioisotope uptake uniformly in all areas of the myocardium without one area showing greater reduction, it is important to stress that these imaging findings are used in conjunction with other information from the exercise test such as the duration of exercise, the presence of symptoms,

6

and whether there were electrocardiographic changes suggestive of decreased blood flow, i.e., ischemia.[1] Mr. Barnett's EF was normal. Thus, in the presence of significant diffuse coronary artery disease causing uniform reduced isotope uptake, the patient would more likely than not manifest other changes such as chest pain during the test, reduced exercise time, ventricular dilation, or ECG changes indicative of advanced atherosclerosis. He exercised for 15 minutes, had no chest pain, ventricular dilation, or ST segment ECG changes.

The finding of a "mild lateral area of hypoperfusion" indicates that Mr. Barnett's coronary arteries were not normal, however, but that in at least one (1) coronary artery, there was sufficient atherosclerosis to induce inhomogeneous blood flow. Mr. Barnett's doctors (Drs. Mikola and Swami) appropriately initiated anti-lipid therapy with atorvastatin (Lipitor) based on guidelines suggesting that individuals with evidence of coronary disease should lower their LDL cholesterol level to 100 mg/dl.

Mr. Barnett had a history of abnormal lipids with the total cholesterol recorded on April 22, 1998, of 251 mg/dl; LDL ("bad" cholesterol) 198 mg/dl; HDL ("good"" cholesterol) 37 mg/dl; and triglycerides 81 mg/dl; he also had a total cholesterol 250 mg/dl on March 24, 2000. However, until his stress test showing ischemia, his doctors chose to treat him with diet alone. A few months after he began taking Lipitor, on July 18, 2000, his total cholesterol was 161 mg/dl; HDL 47 mg/dl; LDL 95 mg/dl; and triglycerides 93 mg/dl, all excellent values. He continued with excellent lipid control, and on December 11, 2000 (186 mg/dl), June 27, 2001 (160 mg/dl), February 7, 2002 (166 mg/dl), and August 5, 2002 (166 mg/dl), his lipids were about the same normal values. Thus, since his stress test on January 24, 2000, showing mild lateral wall ischemia, he had complete control of his abnormal lipids for a period of 15 or more months until he presented with an acute MI on September 6, 2002.

Importantly, he had several blood pressure spikes (exceeding his past blood pressure elevations during upper respiratory infections) after starting Vioxx, to 164/100 mmHg on October 24, 2000; 150/90 mmHg on September 8, 2001; 154/78 mmHg on December 2, 2001; 170/92 mmHg on February 18, 2002; and 152/90 mmHg on August 20, 2002.

On August 20, 2002, he was begun on Sporanox (itraconazole) for tinea unguium (onychomycosis, fungus of nail beds) because a trial with Lamisil was not effective. The drug is contraindicated in patients with evidence of ventricular dysfunction such as congestive heart failure due to its negative inotropic effects (depresses heart contractility). Mr. Barnett had no evidence of ventricular dysfunction and this drug caused no cardiac effects. Additionally, the drug has no known interaction with the action or metabolism of Vioxx.

On September 6, 2002, 32 months after starting Vioxx, he was sitting at his computer and had the onset of pain in the center of his chest. He checked his blood pressure twice and it was elevated to 189/111 mmHg and 194/104 mmHg, so he called 911. En route to the Grand Strand Regional Hospital he received sublingual nitroglycerin and the pain disappeared, lasting a total of about 30 minutes. He had a second episode of chest pain in the ER lasting 5 minutes, relieved by nitroglycerin and was admitted to the hospital. The chest pain proved to be due to a MI, (also known as a "heart attack") and the September 7, 2002, ECG showed nonspecific ST-T wave changes without an abnormal Q wave (compared with the September 11, 2002, ECG which

showed a definite Q wave). Troponin was 0.87 and 1.4 (normal <0.04) on September 6, 2002, while CKMB peaked at 21.1 (normal 0-3.6) on September 7, 2002. The general size of a MI can be assessed by serial measurements of the cardiac enzymes. While CK and CKMB peaked at 288 and 21.1 respectively, at 0400 hours on September 7, 2002, the troponin was not measured after 1640 hours on September 6, 2002.

A coronary angiogram was performed on September 9, 2002. Based upon my review of this angiogram and ventriculogram there is coronary atherosclerosis involving the left anterior descending (LAD) coronary artery, circumflex system and right coronary artery system. The right coronary artery has luminal irregularities and the posterior descending artery (PDA) shows a total occlusion approximately 4-5 mm into the vessel. The leading edge of the PDA occlusion has a curvilinear shape which shows an intravascular filling defect that is most likely thrombus. The appearance of the PDA is consistent with recent total thrombotic occlusion of the vessel. The injections into the left coronary artery provide collateral vessels that fill the PDA branch distal to the occlusion. Those collaterals fill the PDA and there is retained contrast media in the PDA branch forming a stain on the inferior surface. This appearance is also consistent with recent total thrombotic occlusion and myocardial damage creating cell death and edema in the capillary bed precluding runoff from the posterior descending branch. The ventriculogram shows abnormal contractility of the inferior diaphragmatic wall. This is in the distribution of the PDA branch and is again consistent with the recent thrombotic occlusion of the PDA.

I note, based upon my review of the cardiac catheterization report of September 9, 2002, the cardiologist reported 50% occlusion of the left main coronary artery, and total occlusion of the PDA. Additionally, there was an 80% blockage of his LAD, 90% blockage of the circumflex, 80% occlusion of a ramus intermedius branch, and an 80% blockage of a posterolateral branch of the right coronary artery. In his deposition the cardiologist who performed this catheterization testified that he, too, observed a "recent" thrombus in the PDA.

Mr. Barnett was referred for CABG surgery, based in part on the presence of left main coronary artery involvement, as medical therapy in patients with left main stenosis is associated with a significantly shorter survival compared to surgical therapy.[2] His EF was 50%, but there was clear evidence of reduced heart function in the area perfused by the PDA that showed inferior wall hypokinesis. On September 10, 2002, he underwent a 5 vessel bypass that included left internal mammary graft to the LAD coronary artery, saphenous vein graft to the second diagonal branch of the LAD, saphenous vein graft to the ramus intermedius and a Y-saphenous vein graft to the PDA and left ventricular branches of the right coronary artery.

On September 11, 2002, Mr. Barnett complained of chest pain and required morphine for pain relief. An ECG was recorded at 04:12:43 in the morning and showed a diagnostic Q wave in the inferior leads. The development of the Q wave is consistent with the evolution of his infarction from ischemia, followed by necrosis and early fibrosis (scarring). The development of a Q wave attendant to his MI suggests the infarct resulted from a total thrombotic occlusion of the PDA resulting in tissue damage of sufficient size to produce the abnormal Q wave.

8

Mr. Barnett was discharged home from the hospital on September 14, 2002. His post operative medications included Lopressor 50 mg daily; Lipitor 20 mg daily; Prilosec 20 mg daily; aspirin; vitamin B; Foltx, 1 daily; Plavix 75 mg daily; and Vioxx 25 mg daily. Niaspan was added later. He attended outpatient cardiac rehabilitation as ordered by his physicians. Therein, it was noted repeatedly by the nurse on November 29, 2002; December 23, 2002; and January 3, 2003, that he had a small Q wave with intraventricular conduction defect (IVCD) on his ECG.

On February 28, 2003, Mr. Barnett was admitted to the ER for chest pain. His blood pressure was 150/80 mmHg. He was admitted to the hospital, but an acute MI was ruled out.

On March 24, 2003, he was given a prescription for Sporanox for tinea unguium. He asked Dr. Mikola about the safety of Celebrex versus Vioxx and was told neither drug was cardioprotective nor that either was likely to increase his risk of heart disease (per Dr. Mikola's deposition).

He had atypical chest pain on July 18, 2003, and had another Cardiolite stress test that showed mild decreased apical perfusion. Left ventricular ejection fraction was 58% with normal wall motion, and excellent exercise tolerance. Apical thinning was noted. The exercise stress test was submaximal for heart rate, in that he achieved 66% of age-predicted maximum heart rate.

On July 24, 2004, Mr. Barnett was again admitted to the ER with complaints of chest pain and dyspnea. He was discharged home with instructions to follow-up with his primary care physician and return to the ER with complaints of increased chest pain or shortness of breath.

Mr. Barnett discontinued taking Vioxx in late September, 2004, after taking it for 56 months.

He last saw his cardiologist on December 20, 2005, where Mr. Barnett reported he was not as aggressive with his exercise as he used to be, but had no exertional chest discomfort. His weight was 188 lbs., and his blood pressure was 120/80 mmHg. He was told to take the least amount of NSAIDs as he could to avoid any potential thrombotic effect.

On May 2, 2006, I saw Gerald Barnett, who is a 62-year old white male referred for evaluation of cardiovascular status. The patient's past history is well documented in his medical records. Briefly, in January, 2000, he had chest pain and a Cardiolite stress test demonstrated mild reduced left ventricular lateral wall perfusion. On September 6, 2002, he had 30 minutes of chest pain relieved by nitroglycerin. Subsequently, he had 5 minutes of chest pain in the ER, also relieved by nitroglycerin. He was admitted to the hospital where enzymes demonstrated the presence of an MI. On September 9, 2002, he had coronary catheterization which demonstrated severe coronary disease involving 6 vessels. The following day he underwent a 5 vessel CABG, using the left internal mammary artery to his LAD and venous grafts for the other bypasses. On September 11, 2002, an ECG demonstrated a QS pattern in lead III, Q wave in AVF and diffuse ST segment elevation consistent with an injury current, possibly pericarditis. However, the

9

development of the Q wave is indicative of an acute inferior wall transmural MI. The patient was discharged on September 14, 2002, and subsequently had several episodes of chest pain, with one (1) evaluated by Cardiolite stress test showing reduced apical perfusion.

Beginning in February, 2006, he began exercising 6 times per week, which includes 45 minutes on the treadmill, finishing up with several minutes at 4 mph and a 4% grade. He also uses light weights for ½ hour. He has had several episodes of chest discomfort. On April 17, 2006, he was running through an airport to catch a plane and became dizzy with shortness of breath and heart pounding, and transient left chest pain. On April 20, 2006, during his deposition, he had an episode of heart fluttering and 2 episodes of short lived left precordial chest pain, followed by soreness over his left chest. On April 29, 2006, finishing his treadmill exercise, he had left chest pain and became lightheaded. The pain lasted several minutes. He carries nitroglycerin, but has not had to take it. He also notes transient shortness of breath and dyspnea on exertion. The exertion can be relatively mild and still cause the shortness of breath which lasts 1 to 2 minutes and he has noted it most prominently during the last week or so.

Finally, he has postural dizziness that comes on when he raises from a squat or sitting position to an upright posture. He sleeps with his head elevated because of his neck injury. He does not have paroxysmal nocturnal dyspnea. He has nocturia about once each night.

He notes left lower leg and ankle swelling ever since his surgery. No other edema. He is allergic to molds and spores. He sleeps somewhat restlessly during the night, but this is unchanged. He has had erectile dysfunction ever since his surgery. He does not wish to take Viagra.

Mr. Barnett's past history, family history, and social history are well covered in his medical records.

Present medications include:
1) Lipitor 80 mg qd
2) Plavix 75 mg qd
3) Lopressor 50 mg bid
4) Aspirin 81 mg qd
5) Zetia 10 mg qd
6) Niaspan 500 mg qd
7) Foltx 2-2.6-25 mg qd
8) Mobic 15 mg qd
9) Nexium 40 mg qd
10) Omega-3 fish oil tablets 3 qd
11) Multivitamins 1 qd
12) Glucosamine 500 mg 3 qd

Physical examination demonstrates him to be healthy looking and in no acute distress. Blood pressure was 110/66 mmHg in the left arm sitting.   Pulse was 47 and regular. Respirations and temperature normal.  Height 5'8".  Weight 171 lbs.  Skin color good.  Neck veins flat.  Carotids full without bruits.  Thyroid not enlarged.  Fundi normal.  Chest clear. Cardiac exam shows normal heart sounds.   No murmurs, gallops, or rubs.   Abdomen unremarkable.  Extremities show no edema or clubbing.  Femoral arteries full without bruits. Strong posterior tibial pulses were palpated bilaterally.

ECG demonstrates a small non-diagnostic Q wave in lead II, a QS pattern in lead III, and a small, non-diagnostic Q wave in AVF, about 30 msec in duration.   V1 demonstrates RSR prime.  Possible left atrial enlargement.  Sinus bradycardia.  ECG changes consistent with old inferior wall MI.

Blood chemistries showed normal thyroid function, normal hemoglobin and hematocrit, but slightly reduced red blood cell count, normal BUN, non-fasting blood sugar slightly elevated at 118 mg/dl; total bilirubin elevated at 1.7 mg/dl; AST elevated at 67 mg/dl; ALT elevated at 50 mg/dl; total cholesterol 115 mg/dl; triglycerides 29 mg/dl; HDL 49 mg/dl; and LDL 60 mg/dl, consistent with extremely well controlled lipids.

Treadmill SPECT Myocardial Perfusion Study Report:  Post-stress images demonstrate a medium sized area of mildly reduced tracer uptake in the inferior segments which appears almost completely reversible on rest images.  The remainder of the myocardium demonstrates normal homogenous tracer uptake. Post Exercise resting LVEF: 60 %.  LV Size & Function: Normal. LV Regional Function: Septal motion consistent with post-op state.  Subtle basal inferior hypokinesis.  Global RV systolic function appears to be at lower limits of normal.  Impression is abnormal myocardial perfusion at rest and post-stress.   Moderate area of mildly reduced perfusion in the inferior and basal inferolateral segments which is partially reversible on rest images suggestive of mild stress induced ischemia.   Preserved left ventricular global systolic function.  Septal motion consistent with post-op state.  Subtle basal inferior hypokinesis.  The patient exercised for 9 minutes, 30 seconds to 13.1 METS, peak heart rate of 106 and peak blood pressure of 150/78 mmHg.  Peak heart rate was 67.1 percent predicted maximal heart rate.  Time of exercise at peak MET workload was 102 seconds.  ECG Interpretation of ST segment response was normal.

ECHOCARDIOGRAPHIC REPORT:  Normal global left ventricular systolic function. Abnormal (paradoxical) septal motion consistent with postoperative state.  Regional wall motion abnormalities noted (see diagram).  Left circumflex wall motion abnormalities.   RCA wall motion abnormalities.  Abnormal left ventricular diastolic filling pattern for age.  Left atrial dilatation.  Normal right ventricular global systolic function.  Thickened aortic valve without stenosis.  Minimal mitral regurgitation.  Mild tricuspid regurgitation.  Right ventricular systolic pressure estimated to be 30-35 mmHg.  Mild pulmonic regurgitation (normal variant). Hypokinetic mid lateral, and basal lateral segments of the left ventricle; severe hypokinesis - basal posterior and basal inferior segments of the left ventricle.

11

In summary, it is my opinion that Vioxx caused accelerated plaque build-up in Mr. Barnett's coronary arteries and a thrombus in the PDA that occluded this vessel and caused the heart attack. In addition, Vioxx caused plaque build-up that led to the CABG surgery and to his present cardiovascular state. It is important to remember Mr. Barnett remained on Vioxx daily for 2 years after his heart attack and CABG surgery. It is my opinion that Vioxx continued to accelerate plaque build-up in his vessels during the 2 years after the heart attack.

Mr. Barnett has significant myocardial damage despite an EF of 60%. The basal segments of his heart show abnormal contractile patterns from his previous MI that are likely permanent. Further, he only exercised 9½ minutes during the stress test compared to 14 minutes in the past. In addition, despite the CABG, the nuclear imaging test showed a moderate area of mildly reduced perfusion in the inferior and basal inferolateral segments of the left ventricle which is partially reversible on rest images suggestive of mild exercise-induced ischemia.

In January, 2000, Mr. Barnett had sufficient atherosclerosis in one of his coronary arteries to induce mild lateral hypoperfusion. In other words, his vessels were not normal at that time. Mr. Barnett kept his total cholesterol in the 160-166 range (except for one 186 reading) from July, 2000, through September, 2002. (Figure 1.)



**Figure 1. Mr. Barnett's weight and cholesterol plotted over his adult life.**

However, in just 32 months, he developed severe 6 vessel atherosclerosis. He did this while keeping his cholesterol in the 160 to 180 area. By 2002, he was only 58 years old, and was maintaining a good diet and steady exercise. The development of this extreme atherosclerosis is unexplainable by his conventional risk factors. During the same 32-month period, he took Vioxx on a daily basis. As will be explained below, Vioxx accelerates atherosclerotic disease when it is taken in the presence of pre-existing baseline atherosclerosis. Such accelerated atherosclerosis causes increased risk of MI.

IV.   Vioxx Causes Heart Attacks

The mechanism by which Vioxx works has been the subject of intense investigation. Vioxx is a specific inhibitor of the COX-2 enzyme. This enzyme represents the inducible isoform of COX, and is distinct from COX-1 in terms of structure and location. Both COX-1 and COX-2 act to metabolize arachidonic acid, a ubiquitous molecule, into the prostaglandins $PGG_2$ and $PGH_2$.[3] $PGG_2$ and $PGH_2$ are then metabolized into different molecules depending on the cell type involved. (Figure 2.) In the platelet, they are converted exclusively into thromboxane $A_2$ ($TXA_2$), a vasoconstricting compound that is highly active in aggregating platelets and promoting clot formation. In the endothelial lining of the blood vessel, the major product is prostacyclin ($PGI_2$), which binds to its receptor to cause dilation of the blood vessel, and directly antagonizes the constricting, pro-coagulant effects of $TXA_2$.



Nature Reviews | Drug Discovery

Figure 2. The diversity of arachidonic acid-cyclooxygenase products depends on the cell type and their complement of tissue specific isomerases. Endothelial cells produce predominately $PGI_2$ while platelets produce almost exclusively $TXA_2$.

The motivation for the development of COX inhibitors was the observation that $PGI_2$, as well as the related $PGE_2$, were also involved in the body's inflammatory response to injury. Conventional NSAIDs are predominately COX-1 inhibitors (and to a variable extent COX-2 inhibitors; as mentioned above, Feldene has very minor COX-2 inhibitory component). They relieve pain by reducing the production of $PGI_2$ and $PGE_2$, which are thought to increase swelling and other painful events at the site of inflammation.[4][5] An undesired side effect caused by COX-1 inhibition is increased bleeding due in part to the protective effect of COX-1 on gastric and duodenal mucosa. Also, the suppression of platelet $TXA_2$ clearly increases bleeding time due to inhibition of platelet aggregation. In the 1990s a number of laboratories identified the existence of COX-2, and found that unlike COX-1 which is constitutively (i.e., continuously) expressed, COX-2 expression was induced by inflammation as well as by stimuli that would be expected to lead to initiation of cancerous lesions.[6] These exciting discoveries led to hopes that a specific inhibitor of COX-2, i.e., one that did not inhibit COX-1 as well, could be a "magic bullet" that would suppress the pathologic effects of prostaglandins without leaving the subject vulnerable to increased bleeding. In addition, since COX-1 was the source of the prostaglandins that protected the gastric mucosa, as noted above, it was hoped that inhibiting COX-2 without inhibiting COX-1 would prevent gastric ulceration found in some patients after taking NSAIDs that inhibited COX-1. Thus, it was hoped that subjects with arthritis, who typically rely on NSAIDs for pain relief, would be able to take COX-2 inhibitors (COXIBs) without fear of increased bleeding from the stomach and small intestine, a common and sometimes life-threatening complication.

Importantly, however, it was known for over a decade that the "balance" between endothelial $PGI_2$ and platelet $TXA_2$ were critical in cardiovascular disease. Aspirin, one of the most effective treatments for the prevention and treatment of MI, had been shown to prevent platelet clumping primarily through suppression of COX-1 in platelets.[7] Low dose aspirin was used widely from the late-1980s based on work showing that suppression of $TXA_2$ without elimination of $PGI_2$ could be achieved. This therapeutic effect was eventually demonstrated to be due to the ability of low dose aspirin to irreversibly block platelet COX-1 without suppressing endothelial COX-2 activity, thus resulting in virtually total $TXA_2$ elimination while sparing $PGI_2$.[8] FitzGerald showed that Vioxx had the opposite effect to aspirin. That is, it suppressed the urinary clearance of the hydrolysis product of $PGI_2$ (by 75%).[9] Furthermore, the inhibition of COX-2 had no tendency to inhibit the aggregation of platelets, the principal benefit of aspirin.[28] Therefore, COX-2 inhibition critically upset the balance between $PGI_2$ and $TXA_2$. Furthermore, it was recognized by the Merck Scientific Advisory panel that both $TXA_2$ and $PGI_2$ were significantly increased in smokers and subjects with atherosclerotic disease.[10][11] Since these individuals were at greatest risk for thrombotic events driven by platelet accumulation, the risk of altering the ratio between $PGI_2$ and $TXA_2$ in favor of the latter could be increased: "By removing this potent inhibitor of platelet aggregation, the probability that a coronary plaque rupture would lead to MI or ischemic ventricular fibrillation is enhanced."[12] (Figure 3.)

# Coxibs are not platelet inhibitors



*20 µM arachdonic acid as agonist.

McAdam et al. *Proc Natl Acad Sci USA*. 1999;96:272.

**Figure 3. Inhibition of COX-2 does not inhibit platelet aggregation, unlike inhibition of COX-1. Platelet inhibition is a critical mechanism for preventing heart attacks.**

As emphasized in Figure 4, taken from Antman, DeMets, and Loscalzo, 2005, "COX-1 is the only isoenzyme expressed in platelets; endothelial cells express both COX-1 and COX-2. In the normal artery, the balance between $PGI_2$ and $TXA_2$ production favors $PGI_2$ and inhibition of platelet-dependent thrombus formation. In the atherosclerotic artery, both $PGI_2$ and $TXA_2$ production is increased, owing in part to increased platelet activation with compensatory $PGI_2$ formation via both COX-1 and COX-2 in endothelial cells; the net effect is an imbalance favoring $TXA_2$ production and platelet-dependent thrombus formation. Low-dose aspirin selectively impairs COX-1-mediated $TXA_2$ production in platelets restoring the net antithrombotic balance. COXIB use suppresses COX-2 dependent $PGI_2$ production in endothelial cells, which has only a marginal effect on the net antithrombotic balance owing to the importance of COX-1 as a source of $PGI_2$ in the normal state. In the setting of atherosclerosis, however, COX-2 plays a greater role as a source of $PGI_2$ and more $TXA_2$ is produced; thus, inhibiting COX-2 has a more profound effect on prostanoid balance, favoring $TXA_2$ production and promoting platelet-dependent thrombosis." (Figure 4.)



**Figure 4.** "Consequences of COX inhibition for prostacyclin and thromboxane $A_2$ production in normal and atherosclerotic arteries. Endothelial cells are shown as a source of prostacyclin ($PGI_2$) and platelets as a source of thromboxane $A_2$ ($TXA_2$) under untreated conditions (top row) or treated with low-dose aspirin (middle row) or a COXIB (bottom row) in the normal (left column) and atherosclerotic artery (right column) for comparison."

The Merck advisors explicitly drew attention to this point, and recommended that Merck test Vioxx in these high-risk groups, fearing that specific COX-2 inhibition, in the absence of COX-1 inhibition, would expose vulnerable patients to increased risks for cardiovascular events. An alternative explanation for these data was offered by the advisory panel: perhaps the metabolite of $PGI_2$ measured in the FitzGerald laboratory (2,3-dinor-6-keto-$PGF_1$a) did not reflect a true suppression of vascular $PGI_2$ production, but instead altered metabolism of $PGI_2$ by Vioxx. Additionally, they commented that because this compound might be produced primarily in the nephron of the kidney, they suggested that a different metabolite, 9,1 1-dihydroxy,6,15-diketo-2,3-dinor-prostane-l,20-dioic acid, be measured instead, since this was unlikely to be produced by the kidney.[i]

---

[i] It is unclear whether these alternative hypotheses were ever examined. Years later, in 2005, Dr. Oates published a paper in Circulation without Merck funding that again relied on the measurement of 2,3-dinor-6-keto-$PGF_{1\alpha}$. In this paper, he found that both $PGI_2$ and $TXA_2$ were increased in smokers, and that Vioxx significantly reduced $PGI_2$ but surprisingly also $TXA_2$, albeit to a much lesser extent, so that the balance is still tipped in favor of thromboxane by Vioxx. The paper therefore again supports the notion that $PGI_2$ is predominantly derived from endothelial COX-2, but also suggesting that some non-platelet $TXA_2$ is also COX-2 derived.

16

It is important to emphasize, as noted above, that $PGI_2$ and $TXA_2$ are mutual antagonists, and it is the ratio between them and not their absolute values that is important. $PGI_2$ is the most potent inhibitor of platelet aggregation, and $TXA_2$ is the most potent pro-aggregatory compound. Decreasing $PGI_2$ to a greater extent than $TXA_2$, therefore, tips this balance in favor of platelet clumping and thrombus formation. (Figure 5.) As noted by FitzGerald in his recent review: "During the course of drug development, we found that both celecoxib and rofecoxib suppressed urinary 2,3-dinor-6-keto $PGF_{1a}$, a stable $PGI_2$ metabolite, to a degree comparable to that attained by treatment with structurally tNSAIDs ("traditional NSAIDs", my inclusion). While the latter drugs inhibited platelet aggregation ex vivo transiently at the time of peak action, the COXIBs had no such effect, compatible with the absence of COX-2 from mature human platelets. Unlike the tNSAID comparators in these studies, ibuprofen and indomethacin, neither celecoxib nor rofecoxib inhibited COX-1 derived $TXA_2$ coincident with its impact on $PGI_2$. Thus, the cardiovascular effects of $TXA_2$ would be expected to be exaggerated."



**Figure 6**
Discordant dose-response relationships for inhibition of platelet COX-1 (A) and vascular COX-2 (B). Derived from data reported in ref. 28.

**Figure 5. Inhibition of thromboxane must be >95% in order to realize a beneficial effect on platelets, while much smaller amounts of $PGI_2$ inhibition entail significant risks. Grosser T, Fries S, FitzGerald GA. Biological basis for the cardiovascular consequences of COX-2 inhibition: therapeutic challenges and opportunities. J Clin Invest. 2006 Jan;116 (1):4-15.**

The FitzGerald findings regarding the suppression of $PGI_2$ metabolites were part of a Protocol "023" using the rofecoxib compound. These findings appeared to raise significant concerns within the development team. As noted above, from May 3 through May 6, 1998, Merck convened a panel of Scientific Advisors including Dr. Garett FitzGerald and 2 other pharmacologists working in the area of COX inhibition, Carlo Patrono and John Oates. A memorandum entitled "Programmatic Review" of the Vioxx program, provides insight into the safety concerns. The advisors made a number of concrete recommendations to Merck to evaluate the potential dangers (as well as benefits) of COX-2 inhibition with Vioxx, including the following:

A.        That "coronary events be predetermined endpoints in all future controlled trials with Vioxx and the 'back-up' COX-2 inhibitors." They recommended uniform criteria for endpoints to enable meta-analyses. "Knowledge that this plan is in place should be reassuring to the FDA as they consider the prostacyclin biosynthesis question."

B.        Assess   whether   Vioxx   also   reduces   a   different   metabolite, 9,11-dihydroxy,6,I 5-diketo-2,3-dinor-prostane-l, 20-dioic acid.  Merck would have had to have a deuterium-labeled standard synthesized.

C.        Investigate the effect of Vioxx in the Folts model of subtotal coronary occlusion in which cyclic variation in coronary blood flow occurs despite a low grade blockage in an artery.  These occur due to platelet accumulation and are $PGI_2$ dependent. As they pointed out, Merck had already used this model in the testing of another drug, Aggrastat.

D.        Test the effect of Vioxx on atherosclerosis in an animal model of atherogenesis.  The apo E knockout model was suggested as one possible example.

E.        "Evaluation of possible effect of COX-2 inhibition on the stability of lipid-rich atheromatous plaques presents more of an experimental challenge, and we are not sure whether animal models exist that would provide robust evidence regarding the effect of COX-2 inhibition of plaque rupture..."

F.        Sustained activation of platelets and increased thromboxane production occurs in a number of "vessel wall diseases in humans, including hypercholesterolemia, cigarette smoking, scleroderma, and ischemic limb disease. Prostacyclin biosynthesis is also increased in these conditions, suggesting that COX-2 may be induced.  Assessment of the effect of COX-2 inhibition on in vivo platelet activation in one of these vessel wall diseases would provide valuable information on the consequence of loss of prostacyclin in a condition of platelet activation.  If this does occur, Merck Research Laboratories should be the first to know, and thereby be able to take the lead in developing the obvious strategy of the combination of very low dose aspirin (30-40 mg daily) with a COX-2 inhibitor."[13]

The advisors concluded this cardiovascular section of their report by stating that the above investigations into "hypothetical adverse effects and potential unexpected therapeutic benefits of Vioxx are part of the scientific intelligence gathering appropriate to the development of any truly novel pharmacological entity."

The remainder of my report will focus on the experimental and clinical evidence that demonstrate that Scientific Advisors concerns expressed in 1998 were wholly justified.

V.    Results of Randomized Clinical Trials

A.    General Comments

The scientific method requires that the scientist make a prediction regarding a phenomenon and then test that prediction in some form of experiment. Experiments can be performed in isolated pieces of tissues or cells or cellular components, in intact animals, computer models, or in humans. The RCT is the gold standard for scientific, evidence-based clinical studies. In a typical RCT, adequate numbers of subjects with relatively homogeneous medical conditions are randomized to an active treatment arm versus a control treatment arm. The control arm can be an active drug or a placebo. Subjects are then observed over time for development of a change in status, such as cure or death. This state change is referred to as an "endpoint" because it represents the factor that the investigator is interested in achieving (or avoiding). In order to exclude a significant beneficial or toxic effect on a particular endpoint, clinical studies need to include a sufficient number of subjects who experience that endpoint. If insufficient numbers in either arm have an endpoint, then it is impossible to know whether an intervention has had any effect. Clinical trialists use statistical models to estimate how many subjects are needed in a study to exclude or validate a given effect based on the expected number of endpoints anticipated in a study population.[14] The ability of a study to definitively answer the question is indexed by its "power," and while predictions of power can be made, ultimately it is a function of the number of endpoints occurring in the study.

In addition, RCTs must have an independent DSMB to assure that the study is carried out ethically, with adequate human subject protection. Such studies should have an independent Event Adjudication Committee to define endpoints free from bias. Finally, analysis should be performed based on an intention to treat. In such an analysis, endpoints experienced by subjects who stopped taking a therapy are still counted under that therapy. Other analyses may be performed, but an "intention to treat" approach should be provided as it gives the most conservative evaluation of a drug's benefits and toxicities and avoids the biases inherent in only counting subjects who successfully completed a study taking the therapy they were assigned.[15]

While a number of early Merck studies testing the efficacy of Vioxx were performed, none were designed with sufficient power to detect statistically significant differences in the rates of a cardiovascular endpoints such as MI or cardiovascular death. In addition, Vioxx clinical trials were designed to exclude those with the most severe types of cardiovascular disease, such as patients with stroke or TIA in the past 2 years, MI within the past year, angina or congestive heart failure with symptoms at rest or minimal activity, and uncontrolled hypertension. These exclusions would have tended to decrease the number of endpoints and hence the power of any trial to detect an increase in MI or other cardiovascular endpoint. Additionally, according to the meta-analysis of 18 RCTs and 11 observational studies published by Juni, et al., external endpoint review committees were only a part of 8 studies: Bombardier. et al.; Geba, et al., Kivitz, et al., Lisse, et al., Truitt, et al., Geusens, et al., Hawkey, et al., and Katz, et al., allowing Merck

employees to determine whether an MI or other event occurred. To quote Juni, et al., "The inclusion of an independent endpoints committee should be the rule, and exceptions to this rule should be justified." An external committee is much less susceptible to bias in its interpretation of events. It should be pointed out that simply blinding the members of an endpoint review committee to a subject's treatment assignment is not sufficient to eliminate bias. Given that the power of a study to detect a difference between 2 treatments is dependent on the number of endpoints, this type of a committee could reduce the likelihood of finding an increase in MIs by re-classifying events as other than MI. Therefore even if the adjudicators did not know which study arm a subject was in, by re-classifying an event as "unconfirmed," or "non-thrombotic," they would reduce the total number of endpoints and with it the power to find a difference between arms. In fact, Juni, et al., found that the relative risk (RR) of MI with Vioxx was 3.88 (1.88-8.02) in Merck studies that had an external endpoint committee versus 0.79 (0.29-2.13) p=0.011 for interaction, in those that did not or were unclear. (In dealing with pacemaker/implantable defibrillator issues, I have supported the need for independent review committees to review industry data because industry has an inherent bias unavoidable in reviewing their data [report to be published from the HRS and presently on their web site].)

In general, the early trials performed by Merck were brief in duration with very short follow up periods, thus excluding events that occurred more than 14 days after a subject stopped taking Vioxx. This would reduce the likelihood of detecting endpoints due to accelerated atherosclerosis that was not manifested until after the 14 days. Very importantly, even before the recent publication of the APPROVe extension data (discussed below), FitzGerald called for long term follow up information of subjects in the APPROVe trial.

Merck performed an "intention to treat" analysis in 2 published RCTs (APPROVe and Protocol 078). Under this analysis, subjects who were randomized to a treatment are followed and any endpoint or adverse experience is attributed to the original treatment (whether active or control), even if the subject stopped taking it. This approach is standard in clinical trials, and (among many advantages) allows one to detect unexpected benefits or toxicities that appear after drug cessation. To quote Gibaldi and Sullivan, "Intention to treat analysis seems particularly important when evaluating effectiveness in a trial that has many deviations in protocol resulting from side effects. Adverse effects may be more common in one treatment group than the other and occur to a greater extent in patients who suffer from a more severe form of the illness or who are older than the average participant. Removing them from the analysis may leave the groups seriously unbalanced regarding their initial characteristic."[16] [Emphasis added.] A drug may be terminated because of a minor adverse event, and in the absence of an intention to treat strategy, a subsequent major event will be missed. In the case of Vioxx, many subjects were discontinued because they developed asymptomatic hypertension, but due to the short follow up and lack of ITT analysis, a stroke or MI occurring 15 days later would not have been detected.

Despite these drawbacks, several of the Vioxx clinical trials detected a significant increase in MI, hypertension, and heart failure. The fact that a signal emerged in these 3 critical areas despite inadequate power, screened populations, short duration, and short follow up is a function of a very significant toxic effect due to Vioxx.

B.      Specific Trials

. 1.      VIGOR - In this RCT performed in rheumatoid arthritis patients (>50 years), 8076 patients were randomized to 50 mg of Vioxx daily versus naproxen 500 mg twice daily. Aspirin use was not permitted as the primary endpoint was gastrointestinal toxicity. They were followed for a median period of 8 months, and events were collected for up to 14 days following drug termination. Despite the short duration of the trial and follow up, thrombotic events began 4 to 6 weeks after exposure, and a significant increase in MI was reported with a RR for naproxen of 0.2 (CI 0.1-0.7). This is equivalent to an increased RR for MI for Vioxx of 5, and should have been reported in that fashion rather than as a RR of 0.2 for naproxen. It has subsequently been determined that the authors omitted 3 MIs in the Vioxx arm from their NEJM manuscript, although they were reported to the FDA. This discovery led to the publication of an "Expression of Concern" and "Expression of Concern Reaffirmed" by the editors of the NEJM, who stated that "More than four months before the article was published, at least two of the authors were aware of critical data on an array of cardiovascular events that were not included in the VIGOR article." They further state that "...conclusions regarding the safety of Rofecoxib were misleading."[17]  In addition, in the original publication, the authors attempted to explain the discrepancy in MIs as being attributable to cardioprotective effects of naproxen, despite the fact that naproxen has not been tested in a RCT compared to placebo. Indeed, in a meta-analysis of naproxen studies by Juni, et al., comprising 8 case-control and 3 retrospective cohort studies, the benefit of naproxen was found to be real but small (RR for MI, 0.86, CI 0.75-0.99). Further, even if naproxen provided a protective effect equivalent to aspirin, it still could not account for the RR of 5 in the VIGOR study for MIs. Other authors, including Merck's own scientific advisor, Carlo Patrono, did not support the claim that naproxen's cardioprotective effect could explain all of the difference in MI seen in VIGOR (email from Patrono to Martino Laurenzi at Merck, April 3, 2000). Importantly, 28 subjects discontinued Vioxx due to hypertensive responses versus 6 in the naproxen group, for a RR 4.67, and there was a trend toward increased risk of heart failure in the Vioxx arm. These differences are even more striking since, by virtue of the exclusion criteria into the study, the patients were not considered to be at high risk of a cardiovascular event. The RR for developing a confirmed adjudicated cardiovascular thrombotic event was 2.38 (CI 1.39-4.0). The RR among the aspirin-indicated group was 4.89 (CI 1.41-16.88). There was no difference in death between both groups. (Figure 6.)



**Figure 6. Kaplan-Meier curve showing the incidence of MI over time in the two treatment groups. Taken from the report of Richard Kronmal, Ph.D.**

      2.      Protocol 090 and Protocol 085 - Protocol 090, concluded at approximately the same time as VIGOR, randomized 978 subjects with osteoarthritis of the knee to 12.5 mg per day of Vioxx versus nabumetone (1000 mg per day) versus placebo. Although the results were never published, Merck made them available to the FDA. In this small study there were 6 serious cardiovascular events in the Vioxx arm versus 2 in the nabumetone and one (1) in the placebo. This increase in cardiovascular adverse events compared to placebo would be concerning by itself, but when combined with the results of VIGOR, represents the replication of the danger signal. Additionally, the naproxen cardioprotection hypothesis was inapplicable to Protocol 090, because there was an increase in events compared to placebo, which was not prevented by the use of aspirin. In general, when trying to establish the efficacy of a new therapy, scientific consensus panels look for replication of effects in more than one RCT. Data replication is a necessary condition to giving a strong recommendation in favor (or against) a given therapy, and a cornerstone of evidence based medicine.

      As an example, for the document of which I am co-chair, "ACC/AHA/ESC Guidelines for the Management of Patients with Ventricular Arrhythmias and the Prevention of Sudden Cardiac Death," we assign various confidence levels to the evidence supporting a particular recommendation. The highest level, A, comes from "Data derived from multiple randomized clinical trials or meta analyses". Level B comes from "Data derived from a single

randomized trial or nonrandomized studies," while level C comes from "Only consensus opinions of experts, case studies, or standard of care."

The evidence of cardiovascular toxicity observed in Protocol 090 represents the validation of the danger signal seen in VIGOR, increasing the strength of the evidence from level B to A, the highest level. It should also be noted that with respect to toxicity, regulators and scientists frequently do not insist on level "A" evidence before designating a treatment harmful, particularly when the signal is biologically plausible, mechanistically based, and associated with serious toxicity. In March, 2000, Merck's Scientific Director, Dr. Edward Scolnick, apparently had little skepticism regarding the results of VIGOR: "The CV events are clearly there." Nor did he harbor doubts about the mechanism "Oates and Alan and Barry (sic) were right about the metabolite meanings, i.e., the urine pg data."[18] That is, the prostacyclin-thromboxane imbalance, known by Merck since 1997, was accepted by Dr. Scolnick as the explanation for the excess cardiovascular events on Vioxx in the VIGOR study. With the completion of Protocol 090, Merck was in receipt of level "A" evidence of toxicity that was convincing and mechanism-based.

Protocol 085 was similar to Protocol 090 and randomized 1042 subjects with osteoarthritis of the knee to 12.5 mg Vioxx or 1000 mg nabumetone or placebo. It found one (1) cardiovascular event in the Vioxx group, 2 in nabumetone group and none in the placebo group. These inconclusive findings from an underpowered Protocol (085) do not diminish the importance of the signal found in a companion Protocol (090) that did show a statistically significant increased risk of cardiovascular events despite short duration and relatively small size. Thus, the data from Protocol 090, along with the outcome of VIGOR, should have been sufficient for Merck to recognize that the cardiovascular risk of Vioxx was real. At a minimum, Merck should have initiated a trial powered to conclusively test the safety of Vioxx in a population that would be representative of the subjects who were using the drug, i.e., those with multiple risk factors for cardiovascular disease. Such a study (VALOR) was designed by Merck, but never performed.

3.      ADVANTAGe - This was a 3 month osteoarthritis trial comparing gastrointestinal safety of 25 mg Vioxx versus 500 mg naproxen twice a day. Adverse events were followed while the patient was on study treatment or within 14 days of discontinuation of study treatment. The study permitted low dose aspirin and included patients with more cardiovascular risk factors than VIGOR: "Our study sample included elderly patients with comorbid conditions. Forty-nine percent had hypertension, 60% had a history of cardiovascular events."

The published study states, ". . . no significant differences were observed in general, cardiovascular, or hypertension related adverse events." Despite this statement, Table 2, at page 544, discloses that the discontinuances due to hypertension in the study were 15 (0.5%) in the Vioxx group versus 6 (0.2%) in

23

the naproxen group. The authors state at page 545: "Although our study was not powered to make definitive conclusions, we used established Antiplatelet Trialists' Collaboration criteria and blinded adjudication of thrombotic events to assess the incidence of thromboembolic adverse events occurring during the trial. The results demonstrated no difference between rofecoxib and naproxen; however, there were too few end points to allow us to make authoritative conclusions about the relative effects of these agents on cardiovascular events (36, 27)."

In order to more completely understand the findings of the study, it was necessary to read the FDA analysis. The medical officer review entitled, Complete response to Approveable letter for 21-042/S 007 and 21-052/S004 in the clinical review section for ADVANTAGe sets forth the data. The data from Table 1 discloses twice the incidence deaths 0.2 Vioxx versus 0.1 naproxen. Additionally, the reviewer notes at comment b: "Consistent with VIGOR, there was a trend of excess in serious cardiac thrombotic events in the rofecoxib 25 mg group, compared to the naproxen group (ten and three events respectively, as per FDA review). There were five myocardial infarction (MI), two anginal events and three sudden deaths in the rofecoxib 25 group and one MI and two angina (no sudden deaths in the naproxen group . . . ."

4. Alzheimer's Studies - Three (3) trials (Protocols 091, 126 and 078) were performed in subjects with Alzheimer's disease to test the hypothesis that Vioxx would prevent the development (Protocols 091 and 126) or progression (078) of dementia. (Protocols 126 and 078 were terminated prior to completion). Protocol 078 randomized 1597 subjects over 65 years of age to Vioxx 25 mg per day versus placebo; subjects with a recent MI or intervention were excluded. Protocol 091 randomized 697 subjects over the age of 50 to 25 mg Vioxx versus placebo. Protocol 126 had a similar design and number of subjects. While these studies did not find a significant increase in MI, there are a number of important points to consider in the interpretation of these results. It is not clear from the publications how the subjects were screened for MI, as these events may be unrecognized clinically, even in non-demented subjects. The trials were not designed to detect cardiovascular endpoints, and given the exclusion of high risk subjects, they were underpowered to detect a difference. After combining the studies, however, as Kronmal demonstrates in his report, while the risk for MI trended higher (RR 1.52, p=0.21),[19] this potentially underestimates the incidence of MI if a significant number of subjects experienced unwitnessed sudden death, which occurs in up to 50% of MIs. In many cardiovascular trials, including the Merck sponsored 4S trial,[20] the combined endpoint of MI plus death is used to circumvent this difficulty. Using data from Merck, Kronmal found a statistically significant increase in the risk for MI plus sudden cardiac death for Vioxx of 1.89 (CI 1.08-3.33, p<0.05) and a very striking increase in coronary heart disease mortality (RR 4.61, CI 1.73-12.3, p<0.002), as well as total mortality (RR 2.13, CI 1.36-3.33, p<0.001).[21] Trial 078 also revealed a significant increase in progression of Alzheimer's disease in the Vioxx arm. Kronmal indicates that

Chen, a Merck statistician, reported in an internal memo for Protocol 091, the RR of death (by ITT analysis) was 4.43 for rofecoxib compared to placebo (CI 1.26-15.53, p<0.01), and for Protocol 078 the RR of death was 2.55 (CI 1.17-5.56, p<0.02). Pooled, 078 and 091 trials had 34 Vioxx deaths compared to 12 placebo deaths (RR 2.99, CI 1.55-5.77, p<0.001). (Figure 7.)

Table 1.2.2 summarize the mortality frequency for the combined ITT data.

Table 1.2.2 Mortality Frequency (Combined ITT Analysis)

| Number of Deaths (%) | MK-0966 (N=1069) | Placebo (N=1078) |
|---|---|---|
| Total * | 34 (3.2) | 12 (1.1) |
| Protocol 091 (AD) ** | 13 (38.2%) | 3 (25%) |
| Protocol 078 ** | 21 (61.8%) | 9 (75%) |
| ' total number of deaths in each treatment arm (% number of patients in the treatment arm) ** number of deaths from individual protocol (% total deaths in the treatment arm) | | |

**Figure 7. Table from page 7 of memorandum from Joshua Chen to Raymond Bain, April 8, 2001. Result of Merck's in-house analysis of mortality in 078 and 091.**

These trials are consistent with the results from VIGOR and Adenomatous Polyp Prevention on Vioxx (APPROVe) in supporting an increase in significant cardiovascular endpoints.

Based on internal Merck memoranda and the Alzheimer's studies, it is now evident these data showing excess death were available to Merck in April of 2001.[22] In January, 2005, Merck continued to maintain that these studies found no difference between Vioxx and placebo.[23]

Merck has suggested that the Alzheimer's studies were a source of reassurance that Vioxx did not represent a cardiovascular risk. Based on the above analysis of MI and death, this opinion seems wholly unjustified.

5.     APPROVe - This trial randomized 2586 subjects with colorectal adenomas to 25 mg of Vioxx versus placebo to test the hypothesis that COX-2 inhibition would prevent recurrence of the adenoma or progression to colon cancer. Subjects were over 40 years of age and up to 20% were allowed to take low-dose aspirin. Subjects with serious heart disease or uncontrolled hypertension were excluded.     The study was terminated early by the External Safety Monitoring Board (ESMB). Approximately 84% of the original study population participated in an extension study which followed patients off-drug as well (results discussed below).  Counting events that occurred on-drug or within 14 days of discontinuation (rather than by intention to treat), the RR for MI was 2.07 (CI 1.00-4.29), which was borderline significant (p=0.05). Cardiac events, defined as MI (fatal or non-fatal), sudden cardiac death, or unstable angina were significantly increased with a RR of 2.80 (1.44-5.45). The combined endpoint of

all death and MI was also increased, RR = 2.17 (1.12-5.45, p<0.025). These results are highly consistent with the previous trials, and Merck agreed to withdraw Vioxx at this point. In the published paper, however, Merck advanced a novel theory that increased cardiovascular risk only appeared after 18 months of treatment: "In a post hoc analysis, the difference between the 2 groups in the incidence of thrombotic events was evident in the second 18 months of the study, whereas the event rates were similar for the first 18 months (Figure 2 and Table 3). The changing pattern of the treatment effect over time was confirmed by a failed test for proportionality of hazards (p=0.01)." Merck has reiterated this claim in several forums, and it needs to be examined thoroughly. There is no evidence that Merck predicted an increase in cardiovascular toxicity at 18 months when they designed the APPROVe trial. If they had, they should have specified in advance that they would test this hypothesis. Instead, they performed a "post hoc" analysis of the data and claimed this apparent effect.

Understanding the distinction between pre-specifying a hypothesis and deriving one post hoc is critical to understanding how randomized clinical trials embody the scientific method and achieve validity in the scientific community. Pre-specifying a hypothesis and then validating it with a clinical trial follows the scientific method and presents strong evidence that the trial designer can claim to understand a phenomenon. It is analogous to designating a specific target before throwing a rock and then hitting it with the rock. In such a case, one has reason to believe that the thrower has the skill to repeat the performance. A post hoc analysis, however, is similar to someone throwing a rock at a group of targets and hitting one of them, then claiming that was the one he was aiming for. One is uncertain whether the thrower is just lucky or can actually hit the same target a second time. Similarly, post hoc analyses are said to be "hypothesis generating" exercises that must be repeated in a prospective manner in order to be fully convincing. Merck has never conducted a study to test the hypothesis that a difference in Vioxx cardiovascular event rates appears only after 18 months, and in fact, substantial data refute that notion.

For example, the investigator-reported cardiovascular events, which were a secondary endpoint in the trial, separated early and remained separate over the duration of the trial (see Figure 8 from the Merck Cardiovascular Safety Report). These investigator-reported events were deleted from drafts of the APPROVe publication, despite the fact that they were a pre-specified secondary endpoint and they show a clear early increase in events. These investigator-reported data include an array of events consistent with the progression of atherosclerosis, such as "Coronary artery disease" and "Coronary artery stenosis." Events in the Vioxx arm outnumbered those in placebo by 77 to 44, and Merck's analysis of the data, deleted from the APPROVe publication drafts, shows that the difference was statistically significant at 18 months and at all points thereafter, thereby contradicting the claim that Vioxx has no effect for the first 18 months of use.