## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| *COORDINATION PROCEEDING* | DOCKET NO. 2:06-cv-00485-EEF-DEK |
| SPECIAL TITLE [Rule 1550(b)] | MDL NO. 1657 |
| IN RE VIOXX® CASES | SECTION: L |
| GERALD D. BARNETT and CORINNE BARNETT, | JUDGE FALLON<br>MAG. JUDGE KNOWLES |
| Plaintiffs, | |
| vs. | |
| MERCK & COMPANY, INC., | |
| Defendants. | |

COX-2 Inhibitor Report of
**Lemuel A. Moyé, M.D., Ph.D.**

May 22, 2006



EXHIBIT
A
Blumberg No. 5119

## Table of Contents

PERSONAL VITA

    PERSONAL VITA .................................................................................................................. 5

    DEGREES .............................................................................................................................. 5

    RESEARCH EXPERIENCE .................................................................................................. 5

    CURRENT ACTIVITIES ...................................................................................................... 6

    MANUSCRIPTS ................................................................................................................... 6

    BOOKS .................................................................................................................................. 6

    PRESENTATIONS ................................................................................................................ 7

    TEACHING ............................................................................................................................ 7

    INVITED LECTURES ........................................................................................................... 7

    CONSULTATIONS ............................................................................................................... 7

    GRANT REVIEW ................................................................................................................. 8

    MONITORING BOARDS ..................................................................................................... 8

    FDA APPEARANCES FOR SPONSORS ............................................................................ 8

    FDA SERVICE ..................................................................................................................... 8

    RECENT PUBLICATIONS ................................................................................................... 9

    RISK BENEFIT EXPERIENCE ........................................................................................... 9

    CARDIORENAL COMMITTEE MEETINGS ..................................................................... 9

    FDA SERVICE ................................................................................................................... 10

    EDUCATION ....................................................................................................................... 10

    BASIS OF OPINIONS ........................................................................................................ 10

    FEES .................................................................................................................................... 10

    PREVIOUS TESTIMONY .................................................................................................. 10

SUMMARY OF OPINIONS ...................................................................................................... 11

RISK-BENEFIT ANALYSIS ...................................................................................................... 13

ADVERSE EFFECTS .................................................................................................................. 17

    ROFECOXIB AND STROKE .............................................................................................. 20

    HYPERTENSION ................................................................................................................ 23

    BACKGROUND BIOCHEMISTRY ................................................................................... 24

    BIOCHEMISTRY OF COX-2 INHIBITION ...................................................................... 24

    THE ROLE OF ENZYMES ................................................................................................. 24

    THE PROSTAGLANDIN SYSTEM ................................................................................... 25

COX-1 AND COX-2 ................................................................................................................ 28
INADEQUATE TESTING ...................................................................................................... 32
    CLINICAL STUDIES ........................................................................................................ 37
    THE VIGOR TRIAL ......................................................................................................... 38
    POSSIBLE PROTECTIVE EFFECT OF NAPROXEN ........................................................ 42
    ADVANTAGE ................................................................................................................... 43
    VICTOR ........................................................................................................................... 44
    VIP .................................................................................................................................. 44
    ALZHEIMER STUDIES ................................................................................................... 45
    APPROVE ........................................................................................................................ 45
FAILURE TO WARN ............................................................................................................. 60
    FDA EXPERTISE ............................................................................................................. 60
    ROLE OF FDA ................................................................................................................ 61
    MODERIZATION ACT ..................................................................................................... 62
    COLLABORATION .......................................................................................................... 62
    ADVISORY COMMITTEES ............................................................................................. 63
    DECISION PROCESSES .................................................................................................. 64
    MATERIAL INFORMATION ........................................................................................... 64
    ADVERSE EVENTS ......................................................................................................... 65
    LABELING ....................................................................................................................... 65
MISLEADING THE FDA ....................................................................................................... 70
APPENDIX A: STATISTICAL REASONING IN MEDICINE ................................................... 74
    SAMPLING ERROR AND SIGNIFICANCE TESTING ...................................................... 75
    STATISTICAL POWER ..................................................................................................... 77
    SAMPLE SIZE COMPUTATIONS ..................................................................................... 78
APPENDIX B: DETERMING CAUSALITY IN MEDICINE ...................................................... 79
    LIMITATIONS OF CASE REPORTS ................................................................................ 82
APPENDIX C: DETECTING ADVERSE EVENTS ................................................................... 85
    DETECTING ADVERSE EVENTS: COMPLICATION IN SAFETY MONITORING .......... 85
    STRATEGY 1: MONITOR WIDELY .................................................................................. 88
    STRATEGY 2: ASSESSING UNANTICIPATED ADVERSE EVENTS ................................ 89
APPENDIX D: SUBGROUP ANALYSES .................................................................................. 93
    SUBGROUPS: DEFINITIONS AND BASIC CONCEPTS .................................................. 94
    SUBGROUPS VERSUS SUBGROUP STRATA .................................................................. 94

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                    5/22/2006

SUBGROUPS: INTERPRETATION DIFFICULTIES ............................................................ 95

RANDOM SUBGROUPS ........................................................................................................ 97

PROPER VERSUS IMPROPER SUBGROUPS ...................................................................... 98

INTENTION-TO-TREAT" VERSUS "AS TREATED" SUBGROUP ANALYSES ............... 98

EFFECT DOMINATION PRINCIPLE ................................................................................... 100

MANUSCRIPT INTERPRETATION ................................................................................... 102

REFERENCES ............................................................................................................................ 107

# Personal Vita

1.  *Personal Vita*: My name is Lemuel A. Moyé. I am over twenty-one years of age, am of sound mind, am not a party to this action, have never been convicted of a felony, and am otherwise competent to make this affidavit. I have personal knowledge of all factual statements contained herein, and all such factual statements are true and correct to the best of my knowledge.

2.  *Degrees*: I have a M.D. and a Ph.D. degree in Community Sciences - Biostatistics. I am a licensed physician in the states of Texas and Indiana, and I have actively practiced medicine from 1979-1992. I am a diplomat of the National Board of Medical Examiners. My formal training has included many courses in mathematical statistics, epidemiology, and biostatistics. I am currently a Professor of Biostatistics at the University of Texas School of Public Health in Houston, where I hold a full time faculty position in biostatistics.

3.  *Research Experience*: I have carried out cardiovascular research for nineteen years and continue to be involved in the design, execution and analysis of clinical trials. I have been Principal Investigator on a grant from Schering-Plough and have been Co-Principal Investigator on two grants from Bristol Myers-Squibb. In these studies, I was responsible for the design, execution, and analysis of these experiments. In one case, the experiment involved over 2000 patients who were followed for 3.5 years, and in the other case, 4159 patients were followed for five years. In each of these enterprises, an important component of my responsibility was the reporting of adverse events from physicians. In one of these trials, I supervised the collection of adverse events that were reported to both the Sponsor and to the Federal Food and Drug Administration (F.D.A.). Each of these clini-

cal trials has resulted in several articles that were published in the Journal of the Medical .
Association and The New England Journal of Medicine, as well as other journals in the
peer reviewed medical literature.

4.  *Current Activities*: I am currently Principle Investigator and in charge of the biostatistics
group that is carrying out research on the treatment of strokes, funded by the National In-
stitute of Neurologic Disorders and Strokes. I am also a co researcher on a federally
funded grant that is examining the influence of behavioral modification of risk factors for
atherosclerotic disease.

5.  *Manuscripts*: I have published over one hundred and twenty manuscripts in peer-
reviewed literature that reflect my experience in the design, execution and analysis of
clinical trials. Included among these manuscripts are papers that provide the mathemati-
cal development of tools that improve both the design and the execution of large-scale
clinical trials

6.  *Books*: I am the author of six books. I am the sole author of the book *Statistical Reason-
ing in Medicine—The Intuitive P value Primer*, published by Springer-Verlag in 2000.
Marcel-Dekker published a second book, entitled *Difference Equations with Public
Health Applications*, co-authored with a colleague, in October 2000. A third book of
which I am sole author, entitled *Multiple Analysis in Clinical Trials: Fundamentals for
Investigators*, was published by Springer-Verlag and appeared in the summer 2003. A
fourth book titled *Finding Your Way in Science* was published in August 2004. A fifth
book entitled *Mathematical Statistics with Applications* appeared in 2005. A sixth book
entitled *Statistical Monitoring of Clinical Trials: Fundamentals for Investigators*; was re-
leased in the fall, 2005. The second edition of *Statistical Reasoning in Medicine—The In-*

*tuitive P value Primer* will appear in the summer of 2006. I am currently writing a book *Elementary Bayesian Biostatistics* to be published by Taylor and Francis, to appear during the summer of 2007. In addition I have authored invited book chapters and contributed articles to scientific encyclopedias.

7. *Presentations:* I have been an Investigator on four grants from the National Institutes of Health, involving the design, execution, and analysis of clinical trials and epidemiologic studies. Each of these has led to publications in the peer-reviewed literature. I have presented results of clinical research at over twenty different professional meetings, including a presentation in 2001 to the Drug Information Agency and a separate presentation at the International Joint Statistical Meetings. I have presented results at the International Joint Statistical Meetings in 2003, 2004, and 2005.

8. *Teaching*: I have consistently taught courses in biostatistics since my full-time appointment as a faculty member in 1987 at the University of Texas School of Public Health. In these courses, I have taught experimental design in clinical research studies, the statistical methodology that supports these design principles, the statistical analysis of clinical research programs, and the role of epidemiology in interpreting the conclusions from these clinical research programs. For 18 years, I have been a supervisory professor for students training in epidemiology, biostatistics, and other areas of public health.

9. *Invited Lectures*: I have given over thirty invited guest lectures on research methodology topics.

10. *Consultations*: I have served as a clinical trial consultant to Berlex, Proctor and Gamble, Marion Merrill Dow, Pfizer, Hoechst Roussel, Aventis, Key Pharmaceuticals, Coromed,

DuPont, Bristol Myers-Squibb, Novartis, Medtronics, Astra-Zeneca, CryoCor and . Vasogen.

11. *Grant Review*: I have reviewed grants and/or data on over fifty different occasions on be-half of government research programs.

12. *Monitoring Boards*: I have served on three Data Monitoring Committees (DMC) that oversee the conduct of clinical trials, and most recently have been the chairman of a Data, Safety, and Monitoring Committee of a study sponsored by Bristol-Meyer-Squibb and Key Pharmaceuticals. I currently serve on three DMC's, one privately sponsored and two on NIH sponsored studies.

13. *FDA Appearances for Sponsors*: I have appeared before the F.D.A. on behalf of spon-sors on several occasions.

14. *FDA Service*: In addition to serving as a consultant with the pharmaceutical industry for seventeen years, I have also directly and overtly supported the F.D.A. I have served as a statistician/epidemiologist for four years on the Cardiovascular and Renal Drug Advisory Committee to the Food and Drug Administration. In this capacity, I have reviewed the data provided by pharmaceutical companies and an analysis of that data by the FDA to render opinions about the safety and effectiveness of these medical interventions being considered for FDA approval. In this capacity, I have formally reviewed over twenty clinical trial programs of private sponsors and commented in public testimony that is part of the Federal Registry. In some instances, a component of this review was direct evalua-tion, criticism and comment on the proposed product label by the Sponsor. I currently serve as a statistical consultant to the F.D.A., and most recently have been to a two-year term on the F.D.A. Pharmacy Sciences Advisory Committee.

15. *Recent Publications*: I have published manuscripts as the sole author in each of the following journals: *Controlled Clinical Trials*, and *Statistics in Medicine*. This work has promulgated the philosophy (while advancing the supporting mathematics) that clinical research interpretation must be disciplined and must explicitly hold the highest regard for community protection from dangerous, false, and misleading results from clinical research. I have been featured in health care articles in both *Money* magazine (December 1998) and *US News and World Report* (January 11, 1999). In 2000, an article, on which I am the sole author, appeared in *Statistics in Medicine*, and it has generated important published commentary in the peer-reviewed literature.

16. *Risk Benefit Experience*: I have taken part in research studies that have been both observational and experimental. In each of these studies, functioning as an investigator, I have participated in discussions assessing the safety and effectiveness of the medication. This assessment has not been based on complicated economic arguments, but instead places emphasis on balancing the health advantages the therapy offers against the disadvantages its use produces. I have published an article that computed the effectiveness and safety of various strategies in the treatment of essential hypertension.

17. *CardioRenal Committee Meetings*: During the thrice-yearly meetings of the Cardio-Renal Advisory Committee to the F.D.A., I, along with the other committee members, have been asked to weigh the advantages and disadvantages of the medications presented to us for approval. This assessment was not economic but a collective appraisal by physicians and health care researchers of the relative clinical strengths and clinical weaknesses of the intervention.

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                    5/22/2006

18. *FDA Service:* My service on the F.D.A. Advisory Committees, as well as my service to
    drug manufacturers, has given me specialized knowledge and experience concerning the
    F.D.A. policies, procedures and regulations as well as the corresponding duties of a rea-
    sonable and prudent drug manufacturer. In my service on behalf of sponsors to the
    F.D.A., and my service to the F.D.A. at Advisory Committee meetings, I have developed
    expertise, knowledge, education, training and experience in F.D.A. matters.

19. *Education*: My education consists of the following:

    | Year | Degree | School |
    |------|--------|--------|
    | 1987 | Ph.D. Community Sciences -Biometry | University of Texas |
    | 1981 | M.S.  Statistics | Purdue University |
    | 1978 | M.D. | Indiana University |
    | 1974 | B.A. Mathematical Sciences | Johns Hopkins |

20. *Basis of Opinions*: I have gained scientific, technical, and specialized knowledge of bio-
    statistics, epidemiology, and risk/benefit assessment. The basis for my opinions is derived
    from my education, training, research, experience, expertise, and review of the peer-
    reviewed medical literature.

21. *Fees*: My fees are $400 per hour for review of literature, documents, and $500 for depo-
    sitions and trial testimonies.

22. *Previous testimony*: A list of previous testimony is attached as Appendix E.

# Summary of Opinions

23.  The Cox-2 inhibitor rofecoxib, designed to reduce pain while avoiding gastrointestinal effects, was a therapy with a foreseeable design defect, and whose risks exceeded its benefits. Several studies, carried out both before and after rofecoxib was approved by the FDA, demonstrated that rofecoxib's analgesic effect was no better than commonly used, inexpensive nonsteroidal anti-inflammatory drugs. In addition, other studies demonstrated the harmful gastrointestinal effects of rofecoxib produced more gastrointestinal disease than placebo therapy. Thus, when released, Cox-2 inhibitors were not superior to commonly used pain relievers for analgesia, nor were they free of gastrointestinal adverse effects. Thus there was minimal benefit of these agents above and beyond the available, inexpensive alternatives.

24.  Rofecoxib excites the production of cardiovascular disease. It produces this disease through two mechanisms. First, rofecoxib's propensity to produce elevations in blood pressure adds to the force of atherosclerotic disease development. In addition, its mechanism of action, i.e., the selective inhibition of the Cox-2 prostanoid synthesis destabilizes the blood's delicate clotting balance, producing catastrophic thrombotic events in the heart, and other end organ vasculature. This adverse effect causes angina pectoris, nonfatal heart attacks, fatal heart attacks, and the fatal syndrome known as sudden death.

25.  Rofecoxib is unsafe at any dose/duration combination in any patient regardless of their underlying risk for cardiovascular disease. The harmful cardiovascular effects of rofecoxib have been demonstrated repeated. These dangerous adverse consequences occur in patients on both low dose and high dose rofecoxib. They occur in short durations of ther-

apy, as well as in patients exposed for many months to the drug. In addition, these cardiovascular side effects occur in patients who are at low risk for cardiovascular disease, as well as in patients who are at high risk for cardiovascular disease. Rofecoxib is a defective product. In addition, based on the data, it is more reasonable than not that rofecoxib causes cerebrovascular accidents or strokes.

26. The use of rofecoxib is unjustified in patients who suffer from the chronic pain of rheumatoid arthritis or osteoarthritis. Although each of these chronic conditions produces substantial pain, they are not deadly. The use of a medication that causes death through its combined thrombotic, hypertensive effects is unjustified in patients who suffer from the painful, chronic, but non-lethal illnesses which are the drug's indications. These patients, because of their age and high background risk of atherosclerotic cardiovascular illness are at greater risk of vessel-occlusive attack by this drug. Merck Laboratories was aware of a signal of its cardiotoxic effects of rofecoxib in 1998, a year before the drug was approved. In the presence of increased numbers of adverse cardiovascular effects, Merck allowed the FDA to approve a product that it knew was cardiotoxic. During the appearance of study after study, which confirmed pre-approval suspicions that rofecoxib would be dangerous for the cardiovascular system, Merck continued to defend the drug's use with a scientifically incredulous argument, with no additional warnings for its profound cardiovascular effects.

## Risk-Benefit Analysis

27. All medication have risks that must be 1) balanced by the benefits to the population to re-
ceive the therapy, and 2) must be promulgated to physicians, pharmacists, and patients,
so that these prescriber, dispensers, and users can exercise their independent right to de-
termine if the therapy's benefits outweigh its risks. A fair assessment of the contribution
of rofecoxib to the public health requires a fair assessment of its benefits and risks.

28. Benefits of COX inhibition: The *raison dêtre* of COX-2 inhibition is that selective block-
ing of the COX-2 pathway blocks pain generation while permitting continued gastrointes-
tinal protection. Thus, the medical community expected superior analgesia to be deliv-
ered while the safety of the stomach's protective mucosal lining was preserved.

29. However, rofecoxib-generated analgesia was quite ordinary, demonstrated to be of no
greater magnitude than medications currently on the market. A striking example was the
comparison of rofecoxib to nabumeton in Protocol 090. In this study, 12.5 mg rofecoxib
was compared to 1000 mg of nabumeton, Merck's own scientists anticipated that pain re-
lief (as measured by the Patient Global Assessment Response to Therapy (PGART) was
anticipated to be 15 percentage points greater than that of the comparator drug nabume-
ton, a well established, commonly used NSAID. However, rofecoxib did not reach this
prospectively determined goal. In fact, the difference between the two therapies was not
15 points, but 7-8 points (50.4% versus 43.3%). Thus rofecoxib was not more effective
than commonly used, already available pain medications, according to the criteria set by
Merck's own scientists.

30. In addition, rofecoxib produces clinically significant gastrointestinal distress. In the Hip-
pisley-Cox study [1] a nested case-control analysis involving almost 100,000 participants,

the relationship between gastrointestinal disease and the use of Cox-2 inhibitors was
evaluated. This examination revealed that rofecoxib was associated with an elevated risk
of adverse gastrointestinal event, with a relative risk of 1.56 (95% confidence interval of
1.30-1.87) for patients with recent exposure to rofecoxib. These findings reflect a 56%
increase in gastrointestinal adverse events in patients exposed to rofecoxib versus placebo
drug use. Rofecoxib was no more effective than standard, inexpensive NSAIDS, and it-
self was associated with increased gastrointestinal adverse effects when compared to pla-
cebo. However, evidence suggests that both minor symptoms of GI disease (e.g. dyspep-
sia) and endoscopically detected lesions are not good predictors of future, complicated GI
disease. Also, in the APPROVe trial, rofecoxib at the standard 25 mg dose was associated
with approximately a four-fold, statistically significant excess of gastrointestinal adverse
events compared to placebo. Further, in the VIGOR trial, the authors reported that gastro-
intestinal mortality was "similar" for the rofecoxib and comparator NSAID, naproxen.
Taken together, these studies show that rofecoxib was harmful to the GI system.

31. Also, while it is clear that non-selected NSAIDS produce gastrointestinal disease, it is
unclear which component of COX-1 inhibition (anti-aggregatory propensity or absence of
GI protection) produces the serious GI complications associated with these therapies
(e.g., perforations, bleedings, and obstructions). In fact, it was quite possible that the
COX-1 inhibition produced by the nonselective NSAIDS was not related to gastric pro-
tection, but generated by some other mechanism, e.g., direct gastric mucosal injury. It the
latter was the case, then it was unlikely that COX-2 inhibitors would provide any gastro-
intestinal protection. Thus, it was necessary to carry out large-scale clinical studies com-
paring NSAIDS with COX-2 inhibitor therapy.

32. Balancing Benefit and Risk: All medication have risks that must be 1) balanced by the
    benefits to the population to receive the therapy, and 2) must be promulgated to physi-
    cians, pharmacists, and patients, so that these prescriber, dispensers, and users can exer-
    cise their independent right to determine if the therapy's benefits outweigh its risks.
    When a drug's benefit is large, it is reasonable to accept a larger risk for the use of the
    drug. Examples may be found in oncology, where the combined use of the cancer chemo-
    therapeutic agents, bleomycin, cisplatin, and vinblastine produced cardiac toxicity. How-
    ever, their use is tolerated because they prolong the lives of patients who would soon die
    from their cancer. The greater the benefit, the more willing is the medical community to
    accept harmful side effects.

33. Alternatively, therapies associated with reduced benefits, must be accompanied by mini-
    mal level of adverse effects to be accepted by the medical community. However, the
    benefits of rofecoxib are no better than well-established, low-cost alternatives, and the GI
    protection offered by rofecoxib does not make it a safe drug. Therefore the adverse ef-
    fects caused by rofecoxib must be minimal for it to be acceptable to the medical commu-
    nity. However, rofecoxib's dangerous effects dramatically exceed this low threshold.

34. Rofecoxib causes thrombotic events by mechanisms discussed by Merck in 1998, before
    the therapy was approved. The measure of the adverse effects of the drug is measured by
    an odds ratio, and the ARE.

35. Relative risks and odds ratios measure the strength of association between an exposure
    and an illness. The computations are based on the fundamental principle that is an expo-
    sure causes a disease, and that one would naturally expect there to be greater disease in
    the exposed group than the unexposed group. Relative risks measure the occurrence of

disease in the exposed group to the control group over a period of time, and is used when   .
one follows patients in the exposed and unexposed group forward in time to compute the
occurrence of disease in each of the two groups. Odds ratios are used in circumstances
when the ability to follow patients is impaired by the study design (for example, the in-
vestigator takes an epidemiologic snapshot of a cohort, measuring the extent of exposure
in a collection of people, and comparing the extent of disease in the exposed and unex-
posed groups. A relative risk (or odds ratio) of one indicates an equal extent of disease in
each group. The larger the relative risk (or odds ratio) the greater the extent of disease.

36.  The attributable risk exposed (*ARE*) is the excess risk of disease produced by an expo-
sure. Developed in the 1970's [2, 3] the *ARE* is a useful quantity that calculates the frac-
tion of events that are attributable to one causative agent when several possible explana-
tions may be available. It is computed as

$$ARE = \frac{OR-1}{OR}.$$

where *ARE* is the attributable risk exposed and *OR* is the odds ratio. It may also be com-
puted as

$$ARE = \frac{RR-1}{RR}.$$

where *RR* is the relative risk.

37.  Risk of Coronary Artery Disease: The concept of odds ratios and ARE can be applied to
established risk factors for coronary artery disease (Table 1).

Table 1. Odds Ratios for Coronary Heart Disease Relative Risk[4]

| Risk Factor | Odds Ratio (Men) | Attributable Risk Exposed |
|---|---|---|
| Age | 1.05 | 4.7% |
| High Normal BP | 1.32 | 24.2% |
| Hypertension Stage 1 | 1.73 | 42.2% |
| Hypertension Stage 2 | 1.84 | 45.6% |
| Cigarette Smoking | 1.68 | 40.5% |
| Diabetes(Yes/No) | 1.50 | 33.3% |
| Severe LDL Elevation | 1.74 | 42.5% |
| Very Low HDL | 1.46 | 31.5% |

These are the odds ratio for the risk of developing coronary heart disease in ten years.

38. The attributable risk exposed reveals the excess risk for coronary heart disease attributable to each of these risk factors. For example, cigarette smoking produces 40.5% excess risk of coronary heart disease, i.e., after all other risks are considered, the risk is 40.5% greater on top of that baseline risk in subjects who smoke cigarettes. These risks will be compared to the rofecoxib's risk of cardiac toxicity.

# Adverse Effects

39. *Cardiovascular Toxicity.* The overall risk of cardiovascular events in the VIGOR trial data (discussed later in this affidavit) as reported to the FDA, with a relative risk of 5.0, a risk that translates to an ARE of 80%. This holds for short term and long-term use. This is a greater risk of atherosclerotic disease than any of the known risk factors.

40. A succinct summary of cardio toxicity provided by Merck reveals the cardiovascular dan-
    gers posed by rofecoxib. The report VIOXX Preliminary Cardiovascular Meta-Analysis
    by Dr. Deborah Shapiro provides a crisp summary of the findings from several of
    Merck's sponsored trials. In the table entitled MI Endpoints, rofecoxib vs. NSAIDS the
    following data is depicted.

| Study | Relative Risk of Myocardial Infarction |
|-------|----------------------------------------|
| Overall | 2.02 |
| ViGOR | 5.0 |
| Advantage | 2.95 |
| RA | 1.82 |
| nonRA | 1.68 |
| OA-069 | 0.55 |

A similar table entitled MI endpoint- rofecoxib versus placebo shows an overall hazard
for rofecoxib as well. Since there is no credible scientific body of evidence suggesting that
NSAIDS are cardio protective, it is no surprise that the two tables convey the same clear mes-
sage.

41. The cardiovascular damage produced by rofecoxib in low doses was clearly portrayed in
    Protocol 090. Table 37 of that report demonstrates a relative risk of 3.0 and an ARE of
    66%. . Thus, in this study, excess cardio toxicity was reported in the absence of efficacy,
    a clear warning that the therapy could be no more effective than standard pain therapy,
    but increase the cardiac disease event rate.

42. Rofecoxib's harmful effect in short duration of therapy was demonstrated in Protocol 201
    (VIP study) The average follow-up study for a median follow-up period of 4 months. The

rofecoxib dose evaluated in this study was 25 mg. From Table 1-6 (from the P201 Clinical Study Report), focusing on drug related adverse events, there were 13 cardiac disorders (9 in the rofecoxib group, and 4 in the placebo group. There were four episodes of coronary artery occlusion, myocardial infarction, and myocardial ischemia in the rofecoxib group and none in the placebo group. When the classification is broadened to examine specific serious clinical adverse events, there were 30 seen in the rofecoxib group and 23 in the placebo group. There were 13 myocardial infarctions in VIP that met this classification, 7 in the rofecoxib group, six in the placebo group (Table 1-7).

43. In addition, the Advantage study following patients treated with either rofecoxib (25 mg) or naproxen for osteoarthritis for only twelve weeks. The medical reviewer's report (MRK-AFV0341732) revealed that total mortality was higher in the rofecoxib group (n = 5) than in the placebo group (n=4) (Page 21). Significantly, three of the five deaths in the rofecoxib group were sudden death. There were no cardiovascular deaths in the naproxen group. There were five myocardial infarctions, two anginal events, and three sudden deaths in the rofecoxib group and one MI and two anginal events (no sudden deaths) in the placebo group (page 10). In addition, more patients (40 versus 21) discontinued rofecoxib than naproxen therapy for cardiovascular related adverse events (page 10). In addition, 15 versus 7 patients discontinued for hypertension related events, and 19 versus 12 patients discontinued therapy for edema related events. The increase in number of cardiovascular events is particularly striking since the study was only a twelve-week trial and 25 mg of rofecoxib (half the dose used in VIGOR) was used. The FDA Reviewer stated (page 12) "the CV findings are of concern…"

## Rofecoxib and Stroke

44. Cerebrovascular accidents (CVA's or strokes) are abrupt interruptions of blood flow to the brain. These interruptions lead to massive brain cell death, producing paralysis, loss of cognitive function, and, in extreme cases, coma and death.

45. Stroke is the number one cause of adult disability in the United States and the third leading cause of death. In the United States, stroke mortality fell by 15.1% from 1988 to 1998, but the actual number of stroke deaths rose 5.3% [5,6]. Approximately 600,000 people have a new or recurrent stroke each year in the US. Of these 500,000 are first attacks, and 100,000 are recurrent attacks. More men than women have strokes [5].

46. In many respects, strokes are similar to heart attacks. Atherosclerosis, the pathological process underling the majority of strokes, occurs throughout the arterial blood system. It can produce loss of function in the heart, peripheral vascular system, or kidneys as well as in the central nervous system.

47. Both strokes and heart attacks commonly have the same mechanism of production, i.e., the initiation and development of atherosclerotic plaques in major arteries that supply these two end organs (the brain and the heart) with nutrient and oxygen rich blood. The athermanous gruel grows over time, fed by lipid rich macrophages, aggravated by high vascular pressures, and the vasoactive affects of smoking. The creation of a fissure in the plaque can activate the intricate collection of clotting mechanisms that leads to the rapid development of a thrombus, further narrowing the lumen of the blood vessels, leading to death of the supplied tissue.

48. The risk factors for stroke (older age, hypertension, unfavorable lipid panels, smoking) are closely related to those of heart attacks. In addition, treatment is the same. The first

treatment, prevention, requires the modulation of risk factor levels. A second is the iden-

tification of major blood vessels that are at risk (carotid vessels for the brain, coronary ar-

teries for the heart) including bypassing the lesions or endarterectomy. Finally, acute

treatment for each includes the use of clot lysis therapy including tissue plasminogen ac-

tivator or tPA. In each case, the lysis therapy must begin as quickly as possible after the

onset of the heart attack or stroke. Thus, stroke and heart attacks and sister symptomatic

manifestations of the same underlying disease – atherosclerosis.

49. Thus the introduction of new risk factor for the development of thromboembolic disease

would naturally suggest the risk factor would affect not just the occurrence of heart at-

tacks, but the occurrence of strokes as well. Because of the same underlying pathophysi-

ology, the warnings received by Merck outlining the potential dangers of rofecoxib ap-

plied to the occurrence of stroke as well.

50. The relatively small number of strokes complicates the epidemiology of risk factor identi-

fication and stroke. Therefore, when the a priori warning about cardiovascular adverse

events associated with rofecoxib was sounded by Fitzgerald, Oates, and Patrono, the

search for stroke adverse events must be especially sensitive diligent since the occurrence

of strokes are themselves not common.

51. In the 1998 Watson report. Table 1 of that report reveals that cerebral infarction, and

cerebral vascular accident, were included as cardiovascular serious adverse events. In the

words of the report (Page 3; C: Cardiovascular Serious Adverse Events). The SAE's cho-

sen were felt to have a high likelihood of representing acute thrombotic events. Table 6

and 7 of that report demonstrate a greater incidence of CV SAE cases in men (relative

risk 1.28) and women (relative risk 2.16). Appendix C of that report reveals that there
was at least one patient who had a CVA.

52. Preliminary rofecoxib meta-analysis by Dr. Deborah Shapiro (October 18, 2000) there
were 8 cerebral accidents in the rofecoxib group and 9 in the control group (including one
hemorrhagic and one lacunar stroke). However, in that same report, an evaluation of the
effect of rofecoxib versus NSAIDS, there were 23 CVA's in the rofecoxib group (11
CVA, 2 hemorrhagic strokes, 9 cerebral vascular strokes, and 1 lacunar stroke) versus
only 9 in the NSAIDS group. (7 CVA, 1 hemorrhagic stroke, and 8 ischemic cerebrovas-
cular strokes). This is a remarkably strong signal of rofecoxib-stroke hazard, given the
paucity of stroke events.

53. IN VIP (Table 1.12 of the Clinical Study Synopsis), There were five strokes on treatment
or within 14 days of study drug discontinuation. However, Table 1.6, which lists events,
believed to be related to the drug, there was only one infarction (lacunar) in the rofecoxib
group and none in the placebo group. This is unquestionably a small number of events,
but it is enhanced sensitivity to these rare events that the sponsor is obligated to pay when
there has been adequate *a priori* warning.

54. In the Alzheimer studies (protocol 091, 078, and 126), three fatal strokes occur, versus
one in the placebo groups. (Table 2, FDA Cardiovascular data in Alzheimer's studies).
This occurred in relatively short-term studies, again manifesting a small but clear in-
creased stroke hazard in patients taking rofecoxib.

55. In the Victor protocol, as stated in the Overview of Cardiovascular Events in the
VICTOR Study (Table 1 Summary of Confirmed Thrombotic Cardiovascular Serious
AE's by Class of Terms Rofecoxib 25 mg vs. Placebo). There were four ischemic cardio-

vascular strokes observed, 3 in the rofecoxib, and 1 on placebo. The combined endpoint analysis including APTC events revealed the same division (3 in the rofecoxib group and 1 in the placebo group) again, an excess number of strokes attributable to rofecoxib therapy.

56. The published APPROVe study, revealed 22 cerebrovascular events (Table 2, Incidence of Adjudicated Thrombotic Adverse Events). Of these 22 CVA's 15 were in the rofecoxib group, and 7 in the placebo group (hazard ratio 2.32: 95% CI 0.89 – 6.74). The notion of statistical significance means little in this underpowered environment. The only fatal stroke occurred in the patients receiving rofecoxib.

57. While the identification of excess risk can be complex when the number of events is small, a review of the available data reveals consistent excess risk from several Merck sponsored studies. Given the similarities between the pathophysiology of stroke and CVA, a review of the data, consistent with well-established epidemiologic principles reveals that it is more reasonable than not that rofecoxib causes strokes.

## Hypertension

58. The rofecoxib group had a greater proportion of patients with hypertension-related and edema-related events, with early separation of the curves. The relative risk of these events was 4.61 with a 95% confidence interval of 1.50 to 18.83. The risk for hypertension was 2.02 (95% confidence interval 1.71 to 2.38) and for edema was 1.57 (1.17 to 2.10). In the ADVANTAGE study, there were more 15 patients versus 7 patients who discontinued therapy for ischemia hypertension-related adverse events, and 19 versus 12 patients discontinued therapy for edema related events. In addition, in the APPROVe clinical trial, the rofecoxib group had a greater proportion of patients with hypertension

related and edema-related events, with early separation of the curves. The relative risk of these events was 4.61 with a 95% confidence interval of 1.50 to 18.83. The risk for hypertension was 2.02 (95% confidence interval 1.71 to 2.38) and for edema was 1.57 (1.17 to 2.10).

## Background Biochemistry

59. *Biochemistry of COX-2 inhibition*: COX stands for cyclooxgenase. It is an enzyme system that expedites, and accelerates a particular type of chemical reaction in the body. Many chemical actions and reactions in the body must be facilitated in order to proceed. Before we can discuss the role of COX inhibition, we must first understand what enzymes do, and specifically, the remarkable degree of control their presence gives the organism.

60. *The Role of Enzymes*: While people and governments conduct the affairs of business using money, the body conducts its affairs of living through chemistry. Chemical reactions permit it to feed itself, to grow, to move, to defend itself, and to reproduce. This chemistry is intense and complex.

61. Just as fiscal flow, critical in societal interaction, must be carefully balanced and regulated, so too the intricate chemistry of life must be controlled and monitored. The fact is that chemical reactions, left to their own, would quickly consume all reagents and generate products in unproductive amounts at unhelpful times. Frequently, chemical reactions necessary for life would not take place at all because the chemical environment in the cell or tissue where the reaction is to take place is wrong. (e.g., too little reagent, or not enough acid). In order to bring order to this chemical chaos, the body, over tens of thousands of years, has developed reaction-facilitators. These facilitators are called enzymes.

Specifically, an enzyme is a complex molecule that expedites a chemical reaction. The
enzyme is neither consumed nor produced by the reaction. The reaction is facilitated by
the mere presence and interaction of the enzyme.

62. The human body has tens of thousands (and perhaps many more) of such enzyme com-
plexes. Many of these systems have been studied for generations, e.g., the Kreb cycle,
which is the process by which glucose (sugar) is converted in the presence of oxygen to
chemical energy, with water and carbon dioxide as byproducts. There are over ten differ-
ent chemical reactions that must take place and each of them is facilitated by enzyme sys-
tem.* Without it, organized energy production in living tissue would fail.

63. *The Prostaglandin System*: A prostaglandin is a molecule. Specifically, it is a collection
of fatty acids (approximately twenty of them) attached to a five-membered ring. Their
main function (as best understood at this time) is to function as messengers; their pres-
ence initiates a series of other chemical reactions. For example, one signal that pros-
taglandins send is the need for an inflammatory response. The injured body part notifies
its constituency that a self-protective, inflammatory reaction is necessary by synthesizing
prostaglandins. Inflammation is commonly and most productively a protective response
of the organism, commonly producing increased blood flow to the site of inflammation,
an immune response, and pain.

64. A second function of prostaglandins is to mediate the propensity of blood to clot. The
tendency of blood to clot must be carefully balanced. Blood that does not clot loses the
ability to repair damaged blood vessels that are commonly injured or worn down in the

---

* Some of these enzymes are hexokinase, aldolase, dihydrolipoyl dehydrogenase, pyruvate kinase, and dihydrolipoyl
transacetylase.

process of daily living.[*] Blood that does not clot quickly enough leads to a painfully debilitating and short life, as revealed by the natural history of patients with untreated hemophilia. Alternatively, blood that is too likely to clot (i.e., it exists in a hypercoagulable state) leads to blood clots forming where they are neither required nor helpful. Such clots can break off, be carried though the blood stream, and lodge in small (and sometimes large) vessels. The blockage of blood flow leads to death of the tissue that relies on the blood flow, now impeded by the clot. The results of these clots are pulmonary embolisms (if the arteries to the lungs are blocked), and heart attacks (if a coronary artery, a vessel supplying the cardiac muscles own blood supply is blocked) or strokes (if the blood supply to the brain is blocked). Platelet aggregation is one of the precipitating mechanisms in producing a myocardial infarction by producing a blood clot in a vessel that directly supplies the heart with oxygen. This pro-clotting process can trigger the cascade of events that produces a heart attack.

65. The mechanism by which blood clots is one of most studied and complex biochemical mechanisms known, and a detailed discussion of this complicated system, involving literally hundreds of reagents, enzymes, and coenzymes is beyond the scope of this report. The relevant component here is the compound thromboxane $A_2$. One effect of prostaglandins are that they stimulate hemostasis through up-regulation of thromboxane $A_2$, increasing platelet adhesion and aggregation. Thus the production of prostaglandin, according to this theory, increases the coagulability of the blood.

66. In addition, prostaglandins control the protection of the sensitive stomach lining from an attack on it by the acids and caustic digestive juices produced by the stomach needed to

---

[*] The body has over 100,00 miles of blood vessels, most of them too small to see. There are frequently hourly tears in these blood vessels that must be immediately repaired.

digest food. Prostaglandins are involved in the regulation of these systems (and most .
likely, many, many more).

67. Prostaglandin production is controlled in part by the cyclooxgenase, (COX) enzyme sys-
tem. By stimulating COX, *ceteris paribus** prostaglandin synthesis is increased. Repress-
ing or inhibiting COX decreases prostaglandin synthesis.[†] We might then expect that a
COX inhibitor, by down regulating COX and thereby reducing prostaglandin synthesis
would 1) decrease pain and inflammation, 2) reduce blood coagulability (since pros-
taglandins up regulate thromboxane $A_2$), and 3) decrease the ability of the stomach to
protect itself. This is precisely what the traditional non-steroidal inflammatory agents
(NSAIDS) do.

68. These NSAIDS, (e.g. ibuprofen and naproxen) are general or nonselective COX inhibi-
tors[‡] and have been available for approximately thirty years. They have well known clini-
cal characteristics. While widely accepted as having generally effective analgesia, or pain
control. However, since the mechanism of pain control is based on inhibiting COX, and
thereby reducing prostaglandin synthesis, they reduce gastric mucosal protection. This
reduction is associated with the production of gastric ulcers, gastric obstruction, and gas-
trointestinal bleeding, all symptoms of erosion of the gastric mucosa. It has been esti-
mated (MK-966 Cox-2 inhibitor product development plan stage 0 review MRK-
NJ0220388 page 8, Introduction and Program hypothesis ) 76,000 patients are hospital-

---

* This is a critical insertion. In a complicated biochemical system, any assertion about the response of a system when
a component is changes assumes everything else in the system is constant.
† Aspirin controls pain and inflammation because it blocks prostaglandin synthesis. With a reduction in pros-
taglandin synthesis, the inflammation signal is not sent, and the production of pain is reduced.
‡ We will see later that even these broad COX inhibitors have different abilities to repress different aspects of the
COX system.

ized each year, and that over 7,600 patients die each year in the United States alone as a .
result of NSAID associated gastrointestinal events.

69.   However, there is a huge population of patients who have been exposed to the traditional
NSAIDS for over thirty-five years. The number of patients with severe gastrointestinal
illnesses and deaths is actually a relatively small proportion of patients taking traditional
NSAIDS.

70.   *COX-1 and COX-2*: Continued research on the COX system led to the identification of a
bifurcated system. It is now believed that there is not one but two COX systems regulat-
ing the production of prostaglandins, identified as COX-1 and COX-2. Each metabolize
arachidonic acid to prostaglandin $PGH_2$, which is the intermediate step in the synthesis of
prostaglandins and related compounds known as prostanoids.

71.   It is important to understand the role of these two COX systems to appreciate the advan-
tage and difficulties produced by differential COX inhibition. The currently accepted
view is that the COX-1 system is a constitutive system, i.e., it is always active, with the
enzyme present in high concentrations within tissues including platelets, vascular endo-
thelium (the special cells that make up the inner layer of blood vessels), gastric epithelial
cells, and cells in the kidney (renal parenchyma). The prostanoids produced by the COX-
1 system increase stomach-lining protection, and increase the coagulability of the blood.

72.   Alternatively, the COX-2 system is not always active, but is induced by inflammation. It
produces the prostaglandin that sends the inflammatory signal, thereby inducing the cycle
of increase blood flow, immune response and pain. It has also been learned that COX-2
also produces prostacyclin $PGI_2$ that is an anti-aggregator and a vasodilator.

73. Thus, it was believed, that just as NSAIDS were developed to block all COX activity, that further refinement of medical therapy could produce a COX-2 inhibitor. Such a therapy, it was felt, would reduce the inflammatory response, while leaving vascular coagulability unchanged and the protective gastrointestinal lining intact.

74. Early Investigation of the COX-2 inhibitors: The true effects of a therapy emerge over time, where the speed at which knowledge is gained is related to the experience of the medical community with the therapy. Pre-approval studies of the COX-2 inhibitors revealed definite efficacy, but minimal benefit above and beyond the medications that were already available. However, when evidence of harm emerges, however inconsistently, regardless of whether it appears in either the pre-marketing or post-marketing environment, the burden of proof shifts. Specifically, the appearance of harm requires that the sponsor 1) look for definitive evidence of harm in an ethical way and 2) acknowledge that the risk-benefit balance is beginning to change as evidence of new risk emerges. This requires greater efficacy to offset the greater risk. The threshold of significance for harmful effects is much less extreme than that for determining efficacy.

75. Undoubtedly, exploratory analyses demonstrating harm may not be generalizable. However, the ethical credo of "First do no harm," requires a patient protective response to this potential new hazard. An appropriate response includes but is not limited to 1) additional analyses that can, in an ethical fashion, determine if the initial finding represents a result that can be generalized to the population at large, and 2) an immediate recalibration of the risk-benefit balance, tipping this balance in the direction of greater harm.

76. The requirement of these ethical responses neutralizes the assertion that exploratory analyses demonstrating harm can be ignored. The need to protect populations from harmful effects must not be blocked by concerns for statistical significance.

77. What is most convincing is the consistency of findings across the breath of studies involving rofecoxib. The repeated findings of elevations of cardiovascular thrombotic events associated with rofecoxib use, regardless of dose or duration of use, that strengthen the argument that rofecoxib causes these serious adverse events.

78. The identification of compounds that have an increased differential inhibition of COX-2 was heralded as a major step forward in pain control, allowing the patient to obtain effective analgesia while avoiding the difficulties long known to be associated with COX-1 inhibition. However, it was also recognized early in the development of COX-2 inhibitors that, by not inhibiting the COX-1 system, a pro-aggregatory effect might be produced. Even though, early in vitro studies showed that the COX-2 inhibitor rofecoxib did not inhibit platelet aggregation or prolong bleeding time when administered to health volunteers, the 1998 Scientific Advisory Committee served notice to Merck that the effect of Cox-2 inhibitors on the cardiovascular system might be harmful. Findings supported the idea that the COX-2 inhibitors were not necessarily thrombogenic.

79. However, although 800 mg of celecoxib (a COX-2 inhibitor), did not alter levels of either serum $TXA_2$ or its urinary metabolites, a modest reduction in serum $TXB_2$ (a metabolite of $TXA_2$) was observed, suggesting that COX-2's might engender a coagulable state (i.e., make the blood more likely to clot). The balance between TXA2 (a platelet aggregator promoted by COX-1) and $PGI_2$ (which counteracts platelet aggregation, modulated by COX-2) requires attention at this point. The difference can be elucidated by the effect of

aspirin. COX-1 is selectively inhibited by low-dose aspirin in activated platelets.[*] However, since COX-2 activity is preserved in the presence of aspirin, and the produced $PGI_2$ decreases blood coagulability, the effect of aspirin is to shift the haemostatic balance to an anti-thrombotic state.

80. Thus, inhibition of COX 2 suppresses $PGI_2$ formation, blocking the anti-aggregatory effect of $PGI_2$, making the blood more coagulable. This effect should attenuate the anti-aggregatory effect of aspirin. In mechanistic animal studies, the beneficial effect of aspirin was blocked by celecoxib. In addition, the vasodilator effect of $PGI_2$ derived from the endothelium of the coronary vessel and vasodilatory response to application of arachidonic acid was reduced significantly when compared to controls [7]. Because of these results, the authors expressed concern regarding the possibility of an increased risk of acute vascular events in patients receiving COX-2 inhibitors, especially in individuals with underling inflammatory disorders, including coronary artery disease. This bolstered the theoretical argument that COX-2 inhibitors might increase the likelihood of serious thrombotic adverse events.

81. The scientific motivation for this prescient concern is clear. COX-2 inhibition would reduce the anti-thrombotic effect of PGI2. By not suppressing COX-1, the thromboxane $A_2$ activity would proceed, tipping the hemostatic balance to a procoagulation state. However, the interaction between the COX enzyme system and hemostasis is complicated by the different potencies that the COX-2 inhibitory agents have on COX- inhibition, i.e., COX-2 inhibitors can also be COX-1 inhibitors. In one study, the COX inhibitors were directly evaluated for their differential COX-1/COX-2 inhibitory activity. The main aim

---

[*] This occurs by acetylation of the hydroxyl group of a serin residue near the COX active site. Aspirin's COX-1 inhibitory action persists for the lifetime of the platelet. Recovery of the effect is strictly a function of platelet turnover.

of this investigation was to clarify the possible effect that various COX-2 inhibitors might have on the aggregatory propensity of blood. The researchers found that the COX-2 inhibitors had widely variable selectivity for COX-1 inhibition. Rofecoxib as well as the newer agent etoricoxib (brand name Arcoxia®) have the smallest effect against COX-1. Hence they are closer to "pure COX-2 inhibitors". Alternatively, celecoxib (brand name Celebrex®) had more COX-1 inhibitory activity, and is a less pure COX-2 inhibitor.

82. In addition an effect of platelet aggregation with possible clinical significance was suggested by observations of elevated prothrombin times and bleeding episodes with concomitant use of celecoxib and warfarin in a patient with pre-exiting cardiovascular disease [8]. In addition, there were reports of patients with connective tissue disorder who developed arterial thrombosis after initiation of celecoxib therapy [9]. An FDA assessment of the pre-approval data led to their acknowledgement that there was a possibility that COX-2 inhibitors could cause thromboembolic disease. The conclusions from these pharmacological studies and other experimental evidence lent credence to the view that selective COX-2 inhibition reduces synthesis of $PGI_2$ and may promote a pro-aggregatory state before rofecoxib was approved.

## Inadequate Testing

83. The potential cardiovascular risks of Vioxx were apparent well before the drug was approved, and Merck was aware of these dangers. Their testing program was inadequate.

84. On September 12, 1996, before rofecoxib was approved, a memo from Dr. Randall to the Cox-2 Team, on page 6 stated, "Another SAE (severe adverse event) of unstable angina was reported in extension to RA (rheumatoid arthritis) study. The vascular AE's are expected since COX-1 is not inhibited". This memo demonstrates that Merck appreciated

not just that cardiovascular serious adverse events could be anticipated with rofecoxib, but that they understood the mechanism by which they would be produced. They accepted the causal link between rofecoxib and cardiothrombotic adverse events before the drug was approved.

85.  On Thursday, October 10, 1996, before rofecoxib was approved, a review of protocol 017 was described (MRK-ABC0048706). In this review the following statement appears "Adverse events of most concern were in the cardiovascular system (e.g., MI, unstable angina, rapid fall in hemoglobin and hematocrit in some subjects, and a small increase in blood pressure), documenting the potential for cardiovascular adverse effects caused by rofecoxib."

86.  On November 11, 1996, before rofecoxib was approved, Dr. Musliner anticipated that there would be 25% more adverse cardiovascular events with rofecoxib (Memo: Subject-Anticipated consequences of NSAID anti-platelet effects on cardiovascular events and effects of excluding low-dose aspirin use in the Cox-2 GI Outcomes Megatrial – Page 5.). Dr, Musliner also stated the rofecoxib-induced increased cardiovascular event rate might be expected "due to the absence of anti-platelet effect for the selective Cox-2 inhibitor," and "would create a negative aspect to the results and leave open the question (reasonable or unreasonable) whether the drug might in some other way be contributing to such events." The concern about an increased cardiovascular adverse event profile was well established years before the drug was approved, requiring adequate testing.

87.  However, rather than design a clinical trial that was designed to fully elaborate the risks and benefits of rofecoxib, Merck designed VIGOR to underestimate the true risk rofecoxib for increasing cardiovascular events. A concern about possibility of rofecoxib

caused an increase in CV events and "you will get more thrombotic events and kill .
drug." a prescient concern that time demonstrated was the fact of the matter. Dr. Reicin in
a later email that day provided an unethical solution, actively considering "the idea of ex-
cluding high risk cardiovascular patients, i.e., those that have already had an MI, CABG,
and PTCA. This may decrease the CV event rate so that a difference between the two
groups would not be evident" This was a deliberate attempt to confuse the medical com-
munity about the potential cardiovascular risk associated with rofecoxib. The only con-
cern about this unethical thought process was not that the medical community would be
mislead, but "would we be able to recruit any patients?"   A following email form Brian
Daniels (February 26, 1997) stated "It is clear to me that the program will be severely
hurt if a megatrial shows a win in PUB's and a loss in MI/CVA." Thus VIGOR was de-
signed not to demonstrate the true benefits and risks of the therapy, but to understate the
risks while magnifying the benefits. VIGOR's configuration was crippled, designed to
deceive the medical community.

88. On October 24, 1997, before rofecoxib was approved, Dr. Fitzgerald emailed Dr. Nies, in
    which Dr. Fitzgerald made specific recommendations for further cardiovascular studies
    based on the concerns for the effects of Cox-2 inhibitor therapy.

89. On October 27, 1997, in a letter from Dr Oates to Dr. Nies, Dr. Oates warned of the
    mechanism by which Vioxx could produce adverse events and proposed additional test-
    ing. Specifically, Dr. Oates made suggestions on how to study the effects of rofecoxib on
    prostacyclin biosynthesis in order to determine whether an imbalance is created between
    prostacyclin and thromboxane-A2.

90. On February 2, 1998, before rofecoxib was approved, Dr. Watson's final results on the analysis of cardiovascular SAE's in the Phase IIb/III Vioxx osteoarthritis clinical trials was received. This was a detailed analysis demonstrating that rofecoxib produced more cardiovascular events in the VIOXX program This analysis demonstrated that the incidence ratio of cardiovascular serious adverse events was 19.4/1000 in men and 15.5/1000 in women. The overall incidence rate for women was elevated when compared to FOSAMAX controls with a relative risk of 2.16 and a 95% confidence interval of 1.14 – 3.94. On page 2, the description of the results of protocol 023 states, "These findings raised concern about the potential for VIOXX to predispose to thrombotic cardiovascular (CV events) page 2. In fact, risk for cardiovascular events was elevated for two of the three age groups in men and three of the four age groups in women (Table 6). The report states that the VIOXX 125 mg and 25 mg treatment groups also had more clinical cardiovascular AE's than the placebo group in protocol 010 (page 1 following executive summary). The next sentence which states there is no evidence of an increased incidence of such events ignores the findings from protocol 010. This analysis revealed a signal to Merck that the thromboembolic events whose occurrence was anticipated by the understanding by which rofecoxib worked. Given the *a priori* concern about the relationship between rofecoxib and cardiovascular events, this was clear signal that Merck missed.

91. The inappropriate interpretation of the Watson report reveals a substantial, persistent inconsistency in Merck's philosophy toward rofecoxib-induced cardiovascular events. From 1996-98, their were well documented points at which Merck receives advice about the likelihood that rofecoxib produces cardiovascular events. Clearly Merck absorbed this message because it was repeated by key Merck personnel. Merck's understanding of this

threat to rofecoxib was complete enough for them to distort the design of VIGOR, ex-
cluding patients who were at high risk of cardiovascular events. However, when the
threat becomes reality, as in the Watson report, where almost all age-gender groups mani-
fest excess cardiovascular serious adverse events in patients taking rofecoxib, revealing
the relationship that Merck has been educated to fear, its scientists turn a blind eye to the
results. It is this reaction that governs Merck's perspective on the rofecoxib-CV event re-
lationship.

92. From May 3 – May 6, 1998, the Science Advisory Committee to Merck reviewed the Vi-
oxx program. They wrote that there were significant safety risks with Vioxx. On page 11,
they stated that the possible harmful effects of Cox-2 inhibition could be produced by a
combination of three mechanisms 1) development of lipid-rich plaques in the coronary
arteries, 2) plaque cap destabilization, making them rupture prone, and 3) thrombotic oc-
clusion of the vessel at the rupture site. They further warned Merck, before rofecoxib was
approved, that more information is needed to address these questions related to the possi-
ble influences of a COX-2 inhibitor on coronary morbidity and mortality.

93. On May 20, 1998, before rofecoxib was approved, Dr. Watson convened a meeting of the
Cox-2 cardiovascular SAE Surveillance Task Force. During the introduction to the meet-
ing, he states, "these findings raised concern about the potential for VIOXX to predispose
to thrombotic cardiovascular (CV events).

94. On September 9, 1998, before rofecoxib was approved, Dr. Patrono wrote a letter to Dr.
Laurenzi at Merck, in which Dr. Patrono warned of potential CV issues with rofecoxib,
suggesting that more tests are required. Specifically, he said (page 1), speaking about
Cox-2 inhibitor effect, "I would like to emphasize that this is likely to be but one of sev-

eral facets of the potential cardiovascular implications of Cox-2 expression and inhibi-
tion." In addition, he said (page 2), "Because companies making non-selective Cox-2 in-
hibitors are likely to emphasize the cardiovascular implications of specific Cox-2 inhibi-
tors, I would suggest that it would be in the best interest of Merck to look into these is-
sues as quickly and thoroughly as possible."

95.  On September 29, 1998, before rofecoxib was approved, Dr. Nies penned a handwritten
note in which he tells Dr. Oates and Dr. Patrono that Merck will not do the kinds of stud-
ies that the two experts have proposed to explore the cardiovascular risks of rofecoxib.
He anticipated that the drugs would become available without the need for the safety test-
ing Drs. Oates and Patrono warned were so necessary.

96.  This body of information demonstrates that before rofecoxib was approved, the mecha-
nism by which it produced harmful cardiovascular events had been elucidated, and sig-
nals of cardiovascular events had occurred. Merck's pre approval testing program was in-
complete.

97.  On May 20, 1999, the month Vioxx was approved, the FDA Medical Officer Review re-
flected concern about rofecoxib's cardiovascular risk. He noted that the cardiovascular
trends and that a larger databases was needed to assess CV safety. He also commented on
the relatively small number of patients that Merck exposed to Vioxx prior to approval.

## Clinical Studies

98.  Clinical Studies: When considering the evidence to support or disprove a hypothesis, one
must consider the quality of evidence available on the subject matter. Randomized con-
trolled trials are generally accepted as the gold standard for assessing efficacy of medi-
cines, a justifiable conclusion assuming that the clinical trials were well conducted and

executed according to their prospective plan However, not all hazards can be identified
from these types of studies, or from studies conducted before the compound receives final
regulatory approval.

99.  Rofecoxib was approved by the FDA based on several pivotal, short-term studies. These
short-term studies followed patients for three to six months. Furthermore, these studies
did not study definitive clinical endpoints (gastric ulceration that was visualized using
endoscope.) Additionally, these short-term studies made no important contribution to the
understanding of the long-term hazards of these drugs. In the absence of this information,
large post marketing efficacy studies have become the foundation of the assessment of
the long-term hazard produced by COX-2 inhibition.

100. The concern that increased cardiovascular risk may be associated with use of COX-2 in-
hibitors arose from two sources; case reports of patients with connective tissue disease
who developed arterial thrombi after starting celecoxib, and a small clinical study (Proto-
col 090) which confirmed the suspicions of the 1998 Merck Scientific Advisory Panel.
The presaging comments of the Scientific Advisory Panel are critical. Presence of cardio-
toxic effects that appears in subsequent clinical trials carries greater weight in the pres-
ence of the prospective statement that the risk may be present. The *a priori* concerns
about the possibility of risk does not permit the researcher do discard the result as a ran-
dom, non-meaningful, and non-generalizable one based only on sampling error.

101. *The VIGOR Trial*: The VIGOR trial was designed to evaluate the effect of rofecoxib ver-
sus the competing NSAID naproxen on the event rate of serious gastrointestinal disease.
In the manuscript describing its results [10], the investigators examined just over 8000
patients with rheumatoid arthritis who were assigned to either of these two agents ran-

domly. The primary endpoint for the principal analysis of the study was the combined  .
endpoint of perforation, obstruction and severe upper gastrointestinal bleeding.

102. The evaluation of this endpoint demonstrated 121 confirmed upper gastrointestinal events
in the naproxen group (3.0%) and 56 (1.4%) in the rofecoxib group, reflecting a 50% re-
duction, with a $p$-value < 0.001. This trial demonstrated using acceptable methodology
that the COX-2 inhibitor rofecoxib could reduce the incidence of upper gastrointestinal
events compared to a nonselective COX inhibitor.

103. The rate of myocardial infarction was greater in the rofecoxib group than in the naproxen
group (0.4 percent to 0.1 percent, relative risk 0.2, 95 percent confidence interval 0.1 to
0.7). This bald reversal in the computation of the relative risk[*] fails to hide the fact that
rofecoxib was associated with a substantially greater incidence of myocardial infarction.
Additionally, thirty eight percent of these patients should have been taking aspirin based
on clinical indications; this subset of patients was an increased risk of having a myocar-
dial infarction.[†]

104. Fortunately, a separate analysis of adjudicated cardiovascular events from the VIGOR
study [11] provided a detailed evaluation of the overall serious adverse events data
(death, hospitalization or extension of hospitalization, and/or any life-threatening events
or serious disability). This evaluation revealed that the majority of the thrombotic events

---

[*] At this juncture, it must be pointed out that the reporting of these adverse event results in VIGOR was unusually insipid. The benefit of therapy was stated in a way that was beneficial to the sponsor (i.e. relative risk for GI injury is less than 1, illustrating a benefit of rofecoxib), yet the harmful effect of rofecoxib on the myocardial infarction rate is stated not as an elevated relative risk, but again as a relative risk less than one. This is inconsistent, mislead-ing, and produces unnecessary and predictable confusion if one tries to weigh risk vs. benefit of rofeoxib in this population. In addition, the numbers of patients with heart attacks are not reported, a frankly glaring and shocking omission in a manuscript purporting to make a contribution to the modern clinical literature. The investigators were supported by Merck as stated on page 1527 of the manuscript) and all parties must share responibility for this singu-larly misleading and meretricious description of cardiovascular adverse events.

[†] Patients were permitted to take low dose aspirin when this result was revealed at the end of the study.

were myocardial infarctions (MI) (rofecoxib 20, versus naproxen 4). This produces a relative risk of 5. Of the serious vascular adverse events meeting criteria for adjudication, twice as many cases were reported for rofecoxib than for naproxen (n=65 1.6% versus 33 (0.8%). Stratification according to aspirin (indicated or not indicated) and use of the standard APTC combined endpoint revealed a higher risk of MI in the rofecoxib group when compared to naproxen (the use of combined endpoints in clinical trials is expatiated in the Appendix). Additionally, the risk of serious thrombotic events was greater in the rofecoxib group than the naproxen group. The examination of time to event was particularly revealing, demonstrating a clear divergence of the survival curves after starting treatment (within 2 months), persisting during the remainder of the study period (log rank test result not reported).

105. The conclusion of the adjudication for the VIGOR study was that a significant difference was seen in the comparison of stroke, MI and cardiac death that was unfavorable for rofecoxib vs. naproxen. The VIGOR study was designed to illuminate the relationship between the use of rofecoxib and the incidence of gastrointestinal illness, and was not planned to be a definitive evaluation of the relationship between rofecoxib and myocardial infarction. However, the demonstration of a potential public health hazard for the millions of patients taking COX-2 inhibitor therapy cannot be lightly dismissed. Thus the findings of VIGOR confirmed the findings of Protocol 90, demonstrating and computing the magnitude of the risk associated with rofecoxib.

106. It should be noted that the drug was approved in 1999 on the basis of data submitted to the FDA, the results of VIGOR were not published until November 2000, one and a half

years after commercial approval had been granted. In addition, the cardiovascular data
reported in that article were incomplete.

107. A clearer evaluation of the VIGOR cardiovascular results is provided in the Merck car-
diovascular update from VIGOR from Deborah Shapiro to Drs. Alise Reicin, Eliav Barr,
and Dennis Erb on July 5, 2000. In addition, Figure 1 of this document demonstrates a
clear separation in the Kaplan- Meier time to event curves for confirmed thromboembolic
cardiovascular serious adverse events in VIGOR demonstrating the increased risk of
thromboembolic events on VIGOR when compared to Naproxen occurred early in fol-
low-up (less than two months of follow-up time). Table 3 demonstrated 47 thrombotic
events in 4047 patients takes rofecoxib (1.2%) versus 20 thrombotic events in 4029 pa-
tients (0.5%), excess risk associated with rofecoxib. A review of adjudicated cardiovascu-
lar events (Table 4, revealed 45 events in 4047 patients (1.67 per 100 patient years) in pa-
tients treated with rofecoxib, 19 in 4029 patients on naproxen (0.70 per 100 patient years.
The relative risk of events in rofecoxib group to those in the naproxen group is $1/0.42 =$
2.38 and 95% CI is $1/0.72 - 1/0.25$. or 1.39 to 4.00, based on the Cox analysis results
from Table 4.

108. Neither the VIGOR authors nor the sponsors updated the data in the article that appeared
in the New *England Journal of Medicine* in November 2000 with the new safety data, a
critical ethical omission. Even if one accepts that the occurrence of the three additional
heart attacks did not occur before a pre-specified data cut-off date, the three events were
known in August 2000, several months before the appearance of the manuscript in the
New England Journal of Medicine in November 23, 2000. It would have been easy for
the investigators to add a statement in this manuscript, acknowledging the three addi-

tional cardiovascular adverse events, and in addition, providing additional computations for the updated risk of cardiovascular events caused by rofecoxib. *The New England Journal of Medicine* was concerned enough about this omission that they published an Expression of Concern [12].

109. Since it is unethical to deliberately expose patients to risk without a clear and overwhelming expectation of benefit, other studies have to be examined for evidence of harm. The best evidence for a harmful effect must come from reproducibility, i.e. consistency of the finding. This is particularly compelling if the mechanism of harm has been clearly elucidated, as has been clearly elaborated in the preapproval evaluations of the COX-2 inhibitors.

110. The overall conclusion from this FDA report was that there was an increased risk of thromboembolic events particularly MI in patients exposed to rofecoxib compared with naproxen. Unfortunately, the absence of a placebo group precluded an assessment of the absolute risk of rofecoxib. Although only the MI result was published in the main paper, the FDA report clearly showed a higher risk of serious thrombotic cardiovascular events for rofecoxib in both aspirin indicated and non-indicated patients when compared with naproxen [13]. It is surprising that the coded cardiovascular analysis was not published in the VIGOR main paper, especially since the coding necessary for cardiovascular adjudication was available to the sponsor before VIGOR was published [14].

111. *Possible Protective Effect of Naproxen*: One possible explanation for the findings of the VIGOR trial was that undue attention was paid to the relationship between rofecoxib and cardiovascular disease. The proponents of this thesis argue that it is not that exposure to

rofecoxib increases the risk of cardiovascular disease, but that the control therapy naproxen decreases the risk of this class of illnesses.

112. However, this idea was not accepted before VIGOR in the many years during which this drug was on the market. Specifically, while data from randomized controlled trials have documented that aspirin is an effective anti-thrombotic agent for primary as well as secondary prevention of thromboembolic events, trials evaluating the effects of nonselective NSAIDS on the occurrence of cardiovascular disease have not affirmed there own purported benefit; the findings are inconclusive. In these trials on nonselective NSAIDS, the question of whether the degree of COX-1 selectivity (known to vary from drug to drug) translated into clinically detectable cardiovascular protection (as is achieved by aspirin with its characteristic irreversible inhibition of COX-1) has not been addressed.

113. A review of four epidemiologic studies with different designs and populations suggesting no overall effect of nonselective NSAIDS including naproxen [15]. The results of this review included prepublication material from Ray which itself was subsequently published in full [16]. The authors concluded that none of the NSAIDS included in the study should be used for cardioprotection.

114. Even though Merck argued that the cardiovascular effect in VIGOR could be explained by the beneficial effect of naproxen, and email from Dr. Reicin to Dr. Scolnick revealed that Dr. Scolnick was in "minor agony" over the issue, and that he wanted a cardiovascular study. Dr. Scolnick was not convinced that naproxen "benefits" explained the VIGOR findings. However, even after outside consultants advised Merck to do a CV study (in an email from DiBasttiste to Exposito on March 9, 2002), the study was not carried out.

115. *ADVANTAGE*: This clinical trial compared the use of rofecoxib 25 mg to naproxen 500 mg bid in patients with osteoarthritis. This twelve week controlled study recruited 2700 patients to each arm of the trial. The study showed no safety advantage of rofecoxib over naproxen, and demonstrated a trend of excess serious cardiac thrombotic events in the rofecoxib group. There were five myocardial infarctions, two anginal events, and three sudden deaths in the rofecoxib group and one MI and two anginal events in the naproxen group. In addition, more patients (40 versus 21) discontinued rofecoxib than naproxen therapy for cardiovascular related adverse events. Finally, 15 versus 7 patients discontinued for hypertension related events, and 19 versus 12 patients discontinued therapy for edema related events. The striking increase in number of cardiovascular events is particularly striking since the study was only a twelve-week trial and 25 mg of rofecoxib (half the dose used in VIGOR) was used. (Villalba ML. Food and Drug Administration – Division of Anti-inflammatory, Analgesic, and Ophthalmic Drug Products HFD-550. Medical Officer Review End of Review Date 11-18-2001.

116. *VICTOR*: The VICTOR Study (Protocol 145), a study designed to determine whether rofecoxib could help prevent the recurrence of colon cancer, recruited and reported on 1217 patients in each of the placebo and rofecoxib groups. In Table 1 of the Overview of the Cardiovascular Events in the VICTOR Study (Reports Received by Merck as of 31-May-2005), there were 14 patients who had confirmed cardiovascular serious adverse events in the rofecoxib group and 4 patients in the placebo group. In Table 2 of the same report, when patients were classified by the occurrence of the APTC endpoint, there were 9 patients who reached the APTC endpoint, and 3 in the placebo group. Most importantly,

the Kaplan-Meier curves demonstrated an early separation between the event rates of .
these events between the two groups.

117. *VIP*: VIP- Protocol 201 was designed to determine if rofecoxib 25 mg could help prevent
prostate cancer. The study recruited 4741 patients of the anticipated 15,000-sample size.
The study was approved on May 4, 2004, but was terminated prematurely due rofe-
coxib's withdrawal from the market. There were 13 myocardial infarctions in this study 7
in the rofecoxib group, six in the placebo group. There were 26 vascular disorders in the
rofecoxib group and 10 in the placebo group, and 19 patients in the rofecoxib group and 2
in the placebo group. When the analysis is restricted to specific drug related clinical ad-
verse experiences (incidence $\geq 0.0\%$ in one or more treatment groups, there were 9 in the
rofecoxib group and 4 in the placebo group. Five cases of coronary artery occlu-
sion/myocardial infarction/ischemia/silent myocardial infarction occurred in the rofe-
coxib group. There were none in the placebo group. There were nine APTC events in the
placebo group and eight in the rofecoxib group, respectively

118. *Alzheimer studies*: The Alzheimer studies (Protocols 078, 091, and 126) revealed excess
deaths in patients on rofecoxib when compared to placebo. In 078, there were 13 deaths
in rofecoxib compared to 7 on placebo. (8 versus 2 cardiovascular deaths on/off drug). In
protocol 091, there were 9 rofecoxib deaths to 2 placebo (6 versus 4 cardiovascular
deaths on/off drug), and in protocol 126 there were 3 rofecoxib deaths versus 3 placebo
(2 rofecoxib cardiovascular deaths, versus 2 placebo on/off drug).

119. *APPROVe*: The APPROVe study [17] must be set apart from VIGOR and CLASS in that
the evaluation of COX-2 inhibitor exposure and cardiovascular disease was prospectively
declared and the analysis prospectively planned. APPROVe was designed to provide a