UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| This document relates to | * | JUDGE FALLON |
| Case No. 06-0485 | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| GERALD D. BARNETT, | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| Defendant. | * | |
| | * | |

* * * * * * * * * * * * * * * * * *

**MEMORANDUM IN SUPPORT OF MOTION OF MERCK & CO., INC. ("MERCK")
FOR ORDER EXCLUDING TESTIMONY OF JOHN W. FARQUHAR, M.D.**

**(EXPERT CHALLENGE NO. 6)**

Dr. John Farquhar has submitted all-purpose reports on medical causation that the PSC intends to use in multiple trials in this MDL. Plaintiff in this case designated him as an expert witness. Dr. Farquhar's reports contain both general and specific causation opinions. They also show that he is poised to offer opinions on Merck's state of mind, including what Merck knew about Vioxx at given times, and to give his views on the appropriateness or propriety of Merck's conduct. For the reasons set forth below and in Merck's briefing in *Plunkett v. Merck* that addressed Dr. Farquhar's proposed testimony, which Merck incorporates here by reference,[1] Dr.

---

[1] Dr. Farquhar's initial report, dated Sept. 26, 2005, purports to address general causation issues only.  (*See* Expert Report of John W. Farquhar, M.D. ("Initial Report"), attached hereto as Ex. A.)  Merck addressed why the Court should exclude opinions expressed in the Initial Report in its memorandum in support of its Motion To Exclude Testimony Of John W. Farquhar, M.D., filed in *Plunkett v. Merck* on Oct. 21, 2005, and in its reply memorandum in support of that

(*footnote continued next page*)

815167v.1

Farquhar's opinions should be excluded. He is not a statistician, and the Court should not permit Dr. Farquhar to parrot conclusions of other plaintiffs' experts who are themselves not testifying at trial. His opinions in both his Initial Report and Supplemental Report are not scientifically reliable as required by *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). In many instances they address matters that are irrelevant or excludable under Federal Rule of Evidence 403.

I. **LEGAL STANDARD.**

The legal standard for the admission of expert testimony in federal court is set forth at pages 3-4 of the Motion of Defendant Merck & Co., Inc. ("Merck") for Order Excluding Opinion Testimony by Plaintiff's Experts That Vioxx Accelerates Atherosclerosis, filed concurrently herewith and incorporated herein by reference.

II. **DR. FARQUHAR MAY NOT GIVE TESTIMONY THAT AMOUNTS TO PARROTING CONCLUSIONS OUTSIDE HIS AREA OF EXPERTISE THAT HAVE BEEN REACHED BY OTHER INDIVIDUALS WHO CANNOT BE CROSS-EXAMINED AT TRIAL.**

   A. **The Court Should Preclude Dr. Farquhar From Giving Opinions Based On Professor Jewell's Statistical Work With Data From The APPROVe, VICTOR, And VIP Trials.**

Dr. Farquhar's Supplemental Report is heavily dependent upon certain Kaplan-Meier graphs prepared by Nicholas Jewell. Professor Jewell is a statistician and a non-testifying

---

motion filed Nov. 9, 2005. Dr. Farquhar subsequently submitted a supplemental report on general causation dated May 22, 2006 ("Supplemental Report", attached hereto as Ex. B), and a report on causation specific to Gerald Barnett, also dated May 22, 2006 ("Specific Causation Report", attached hereto as Ex. C.) The Court in *Plunkett* denied Merck's motion as to causation opinions but reserved ruling on whether Dr. Farquhar could testify about Merck's alleged knowledge and state of mind. The Court did not specifically address whether Dr. Farquhar could give testimony amounting to value judgments about Merck's conduct. (*See* Order and Reasons, filed in *Plunkett v. Merck* Nov. 18, 2005 (Record Docket No. 1516).) Plaintiff in *Plunkett v. Merck* did not call Dr. Farquhar as a witness in the first trial and did not designate him as an expert witness in connection with the retrial.

consulting expert for plaintiffs. Professor Jewell provided Dr. Farquhar a report purportedly based on data from Protocol 203. (*See* Supplemental Report at ¶¶ 5-6, 11-16, 17-18, 20-21; Analysis Of Vioxx Data From The APPROVe, VICTOR, And VIP STUDIES – Protocol 203 ("Jewell Report"), Exhibit A to the Supplemental Report, attached hereto as Ex. D.)[2]  Dr. Farquhar also relies on Professor Jewell's analysis of a subgroup of "high-risk" patients in APPROVe who took Vioxx. (Supplemental Report at ¶ 11.)

Plaintiff's counsel retained Professor Jewell to perform this analysis. (June 8, 2006 Deposition of John W. Farquhar, M.D. ("6/8/06 Farquhar Dep.") at 32:7-12, attached hereto as Ex. E.) But this analysis does not appear in any peer-reviewed literature and constitutes work done solely for this specific litigation – attributes that clearly weigh against finding this evidence reliable and admissible. *See Daubert*, 509 U.S. at 593-94.

Dr. Farquhar himself is not a statistician and thus is not qualified to perform or to testify about the preparation of statistical analyses. (Oct. 10, 2005 Deposition of John W. Farquhar, M.D. ("10/10/05 Farquhar Dep.") at 12:19-14:10, attached hereto as Ex. F; 6/8/06 Farquhar Dep. at 31:12-20.) And even if he were qualified as a general matter to do so, in *this* case he is unable

---

[2] Merck intended Protocol 203 to be a combined analysis of thrombotic cardiovascular events in the APPROVe, VICTOR, and ViP studies, which were randomized, placebo-controlled clinical studies of patients at risk of developing, respectively, adenomatous colon polyps (APPROVe), recurrent colon cancer (VICTOR), or prostrate cancer (ViP). All three studies were designed to run for several years, but were terminated prematurely in September 2004 when Merck withdrew Vioxx from the market. As Dr. Farquhar acknowledges, this meant that VICTOR and ViP, both of which began later than APPROVe, ran only for short periods of time, ten months in the case of VICTOR, and five months in the case of ViP. (*See* Initial Report at ¶¶ 129, 131.) It thus is misleading for Dr. Farquhar and Professor Jewell to assert that the Jewell statistical work was based on Protocol 203 or is simply following Merck's pre-specified analysis. (*See., e.g.,* Supplemental Report at ¶ 1.) The Merck Data Analysis Plan for Protocol 203 contemplated that a combined analysis of cardiac events in all three studies would be conducted only when each study had run its full pre-specified course. Professor Jewell and Dr. Farquhar have in fact engaged in a *post hoc* analysis, not, as they attempt to suggest, the combined analysis that was pre-specified when the studies were designed.

to provide any meaningful testimony about the validity of the Jewell analyses that are a significant basis for his opinions on causation. He did not have any hand in preparing the analyses, nor did he review the data files Professor Jewell used. (6/8/06 Farquhar Dep. at 63:11-13.) In his recent deposition, Dr. Farquhar could not answer even basic questions about the data used in the Jewell Report.[3] Dr. Farquhar also refused to answer questions about the Jewell Report's statistical validity. (*E.g., id.* at 86:7-10, 86:20-23, 141:9-150:14.) Instead, time and time again, he simply reiterated that he had complete confidence in Professor Jewell's work. (*E.g., id.* at 143:7-144:2.) In relying on the Jewell analysis, therefore, Dr. Farquhar is prepared to do no more than simply parrot the work of another expert.

Professor Jewell, for his part, will not testify at trial, and plaintiffs refused to make him available for a deposition during discovery.[4] The Fifth Circuit has noted that "to admit the hearsay opinion of an expert not subject to cross-examination goes against the natural reticence of courts to permit expert opinion unless the expert has been qualified before the jury to render

---

[3] Dr. Farquhar's inability to define what VICTOR data Professor Jewell used in his "Protocol 203" analysis is significant because he is demonstrably wrong in his assertion that, when the studies were terminated in 2004, "there was no apparent impediment to simultaneously collecting the data and presenting the pooled analysis of cardiovascular risks for all three trials, as pre-specified." (Supplemental Report at ¶ 8.) In fact, the VICTOR data have always been under the control of Oxford University, the outside institution that conducted the study, not under Merck's control. Indeed, available data were only recently released, subject to a protective order, in response to discovery in the MDL. (*See* Order Regarding Production Of Data From The VICTOR Study, filed May 4, 2006 (Record Docket No. 4573).)

[4] Merck requested Professor Jewell's deposition before the close of fact discovery, and plaintiff refused. PSC member Don Arbitblit repeatedly stated that Professor Jewell is a non-testifying expert. After Dr. Farquhar's deposition, Merck again asked to depose Professor Jewell to discover his methods. Now, Mr. Arbitblit says Professor Jewell is preparing a "rebuttal report." Professor Jewell is not an identified expert in the *Barnett* case, and cannot provide a "rebuttal report." Merck will take Professor Jewell's deposition as to Dr. Farquhar's reliance. But the Court should not allow Plaintiff to convert him into a testifying expert when plaintiff refused to make him available for a deposition during expert discovery and repeatedly called him a non-testifying expert.

4

815167v.1

an opinion." *Bryan v. John Bean Div. of FMC Corp.*, 566 F.2d 541, 546 (5th Cir. 1978) (opinions of nontestifying experts should have been excluded in part because "the excerpts proffered by plaintiff's counsel from the [nontestifying experts'] reports lacked any independent guarantee of trustworthiness that would justify dispensing with cross-examination"). *Cf. Soden v. Freightliner Corp.*, 714 F.2d 498, 503-05 (5th Cir. 1983) (upholding trial court's exclusion of expert testimony based on statistics of questionable validity given to expert by a third party). As a matter of fundamental fairness, plaintiff should not be allowed to put an expert witness on the stand who effectively cannot be cross-examined because he is simply passing on opinions of an out-of-court declarant that he cannot explain, amplify, or comment on in any meaningful fashion.[5]

      **B.    The Court Should Preclude Dr. Farquhar From Relating The Conclusions Of Richard Kronmal About The Elevated Risk of Cardiovascular Events From Vioxx Allegedly Shown In The Clinical Trials Involving Patients With Alzheimer's Disease.**

For similar reasons, Dr. Farquhar should not be permitted to offer any opinion that two Merck-conducted randomized clinical trials involving patients with Alzheimer's disease, Protocol 078 and Protocol 091, showed any significant difference in adverse cardiovascular events among patients taking Vioxx versus those on placebo. (*See* Initial Report at ¶¶ 132-137, 156.) Dr. Farquhar made it clear in his recent deposition that he relies solely on reports from Richard Kronmal, another expert hired by plaintiff's counsel, for his opinion based on the Alzheimer's studies. (6/8/06 Farquhar Dep. at 212:4-18.) He has not looked at the peer-

---

[5] Professor Jewel's Kaplan-Meier graphs purport to show relative risks plotted against different time intervals from the start of APPROVe to up to three years. (*See* Jewell Report, Figures 1-9.) Given Mr. Barnett's long-term usage of Vioxx, Merck assumes that in this case plaintiff will not rely on the graphs for the shorter time periods and thus reserves discussion of that aspect of Professor Jewell's analysis for a different case in which the plaintiff may rely on it more extensively.

reviewed articles on these two studies, and he cannot say how Professor Kronmal's analysis differs from that of the investigators who conducted the trials. (*Id.* at 217:7-10 ("At this point, I have to say that my conclusions about Alzheimer's are based on Kronmal. I didn't put time into assessing the literature beyond what Kronmal had.") Professor Kronmal, like Professor Jewell, is a paid plaintiff's expert. Professor Kronmal's analysis, like that of Professor Jewell, has not been published in any peer-reviewed journal.

At this juncture, it is unclear whether Professor Kronmal will appear at trial. If he does not testify, Merck's counsel will not only be unable to cross-examine Professor Kronmal himself but also will be deprived of any meaningful opportunity to test the validity of the opinions of Dr. Farquhar that are based on Professor Kronmal's work. Since he himself cannot address Professor Kronmal's work in any detail, it is apparent that once again Dr. Farquhar is poised simply to present to the jury the opinions of an out-of-court expert in such a way as to make these opinions effectively immune to challenge. The Court should prohibit him from doing so.

### III. DR. FARQUHAR'S UNSUPPORTED OPINIONS ABOUT THE ALLEGED HYPERTENSIVE EFFECT OF VIOXX SHOULD BE EXCLUDED.

The Court should exclude any testimony by Dr. Farquhar to the effect that Vioxx is the most hypertensive of the NSAIDs. (*See* Initial Report at ¶ 42 (calling Vioxx "the most dangerous drug in its class").) It is irrelevant whether or not Vioxx causes more severe hypertension or causes or worsens hypertension more often than other NSAIDs. More fundamentally, Dr Farquhar's deposition testimony established that he has *no* reliable scientific basis for his assertion that Vioxx is the "most dangerous" drug in its class. Time and again he testified that it was his "guess" or "suspicion" that Vioxx had a greater propensity to cause hypertension than any other NSAID. (*E.g.,* 6/8/06 Farquhar Dep. at 244:18-246:14.) For example, he stated, "At the moment, I suspect that Vioxx stands out among all the NSAIDs in its

6

blood pressure effect.  But at the moment, I cannot be certain whether valdecoxib and a few others might be similarly disposed." (6/8/06 Farquhar Dep. at 245:25-246:4.)  Yet he admitted that he had seen evidence comparing Vioxx's hypertensive effect to only five other NSAIDs (diclofenac, ibuprofen, indomethacin, Celebrex®, and naproxen), not to all of the prescription drugs in this class available in the United States.  He had seen no clinical study comparing the hypertensive effect of the following prescription NSAIDs to that of Vioxx: diflunisal, etodolac, fenoprofen, flubiprofen, ketoprefen, mefanamic acid, meloxicam (Mobic®), nabumetrine (Relafen®), oxaprozin (Daypro®), piroxicam (Feldene®), sulindac (Clinoril®), and tolmetin. (6/8/06 Farquhar Dep. at 289:25-292:23.)  *See* Center for Drug Evaluation and Research, United States Food and Drug Administration, *Medication Guide for Non-Steroidal Anti-Inflammatory Drugs* (*NSAIDs*), available at http://www.fda.gov/cder/drug/infopage/COX2/NSA/medguide.htm.  Significantly, two of these, Feldene and Mobic, are prescription NSAIDs that Mr. Barnett himself has taken. (*See* Report of Douglas P. Zipes, M.D. Regarding Gerald Barnett at 5, 10, attached to Merck's Motion for Order Excluding Testimony of Douglas P. Zipes, M.D. at Ex. A.)  Dr. Farquhar's speculative assertion that Vioxx is worse than all other such drugs in this respect cannot be considered scientifically reliable and should be excluded on that basis.  It should also be excluded under Rule 403 as it would plainly be unfairly prejudicial for the jury to hear his unsupported belief, given the absence of any probative value in his view of the dangers of Vioxx relative to other drugs in its class.

**IV.    DR. FARQUHAR'S OPINIONS BASED ON THE IMPROPER ANALYSIS OF CARDIOVASCULAR EVENTS IN A SUBGROUP OF APPROVE PARTICIPANTS DO NOT CONSTITUTE SCIENTIFICALLY RELIABLE PROOF OF CAUSATION.**

   **A.    Dr. Farquhar May Not Promote A *Post Hoc* Subgroup Analysis As Proof Of Causation.**

In his Supplemental Report, Dr. Farquhar opines that APPROVe participants who were at high risk for cardiovascular events at the start of the study had a higher relative risk of cardiovascular events from taking Vioxx. (*See* Supplemental Report at ¶¶ 1, 11-16 and Figure 3.) He bases this opinion on Professor Jewell's *post hoc* analysis primarily of data from a subgroup analysis of APPROVe participants contained in the Cardiac Safety Report ("CSR") that Merck submitted to the FDA in June 2005. (*See id.* at ¶ 11.) APPROVe participants were categorized as being at "high cardiovascular risk" either because they had symptomatic atherosclerotic cardiovascular disease ("SACVD") at the start of the study or at least two specified risk factors for coronary artery disease. He testified that, in his view, Mr. Barnett would be in this high risk group primarily because he allegedly exhibited SACVD shortly after taking Vioxx. (6/8/06 Farquhar Dep. at 152:25-154:1, 154:19-156:13.)

Subgroup analyses often serve a useful purpose. They can be used, for example, to generate hypotheses or identify subjects for further study. As a recent *New England Journal of Medicine* article noted, however, overstating a subgroup analysis can misinform. *See* Lagakos S.W., *The Challenge of Subgroup Analyses – Reporting without Distorting*, NEW ENG. J. MED. April 2006; 354:16; 1667-1169 at 1669. That is what has happened here. Whatever their utility in other contexts, subgroup analyses cannot supply scientifically reliable evidence of medical causation – a fundamental burden that plaintiff must carry in this action to establish liability. Any testimony by Dr. Farquhar that relies on the *post hoc* analysis of the SACVD subgroup of patients on Vioxx in APPROVe should be excluded.

It is a fundamental scientific principle that a *post hoc* analysis cannot prove a causal relationship. Instead, it is a tool to generate hypotheses for future study. "Post hoc analysis is of major importance in the generation of hypotheses. However, the hypothesis is created by the analysis and has not been proved by any 'experiment'." *See* Elliott H.L., *Post hoc analysis: use and dangers in perspective*, J. OF HYPERTENSION 1996, 14 (suppl 2):S21-S25 at S21. Here, the *post hoc* analysis of patients who were in the "high risk" group at most creates the hypothesis that such patients are at higher risk of cardiovascular events on Vioxx than the general population. It does not prove it.

Not only is Dr. Farquhar's subgroup analysis subject to skepticism because of its *post hoc* nature and the small numbers involved, it is also subject to the problem of data dredging. The Merck CSR from which Professor Jewell and Dr. Farquhar took data about "high risk" participants contained thirteen subgroup analyses for thrombotic cardiovascular events in APPROVe. (*See* APPROVe Cardiovascular Safety Report at 277, attached hereto as Ex. G.) Again according to a recent *New England Journal of Medicine* article, there is nearly a 50% chance of at least one false positive result from this many subgroup analyses. *See* Lagakos at 1668-69 ("[W]hen treatments have identical efficacy, the probability of finding at least one "statistically significant" interaction test when 10 independent interaction tests are undertaken is 40 percent"). The reason is simple: the subgroup analyses in APPROVe accepted a 5% error rate when identifying a relative risk as statistically significant. (*See* APPROVe CSR at 277 (using a 95% confidence interval).) But a 5% error risk repeated 13 times amounts to a 49% risk of finding a false "significant" relative risk in one of the subgroups. The scientifically and statistically proper evaluation for such a subgroup analysis would use at least a 99% confidence interval (1% error rate) for each subgroup to correct for the data dredging problem. *See id.*

9

In short, expert testimony that presents a *post hoc* subgroup analysis as proof of causation should be excluded because that is not a scientifically valid use of such data, and because it would be confusing to the jury and unfairly prejudicial to Merck.[6]

## V. DR. FARQUHAR MAY NOT PROPERLY TESTIFY ABOUT THE STATE OF MERCK'S KNOWLEDGE OR EXPRESS VALUE JUDGMENTS ABOUT MERCK'S CONDUCT.

In both his Initial Report and his Supplemental Report, Dr. Farquhar has not confined himself to opinions on medical causation. He is also poised to give his personal views on the state of Merck's knowledge and understanding of alleged risks associated with Vioxx. (*See, e.g.,* Initial Report at ¶¶ 21, 185-199.) And both reports are rife with value judgments on the appropriateness or propriety of Merck's actions. As just one example of the latter, in his Supplemental Report he asserts: "I agree with Dr. Curfman that the related studies of Protocol 203 *should have been made known* to the editors of the NEJM." (Supplemental Report at ¶ 10 (emphasis added); *see also id.* at ¶ 24; Initial Report at ¶¶ 191-194, 196-197, 199.)

Plaintiff may respond, as the plaintiff did in *Plunkett*, that there is no intention to elicit value judgments and testimony about Merck's alleged knowledge and state of mind from Dr. Farquhar. However, the content of Dr. Farquhar's various reports strongly suggests that that is exactly what he intends to testify about, either explicitly or in the guise of giving medical or scientific testimony. He should be precluded from giving any such testimony, even if the Court permits him to testify on issues of medical causation. Dr. Farquhar possesses no expertise or

---

[6] One of plaintiff's attorneys moved two of the APPROVe participants who had been in the diabetes subgroup in Merck's CSR analysis into the "high risk" group so that the data for those two individuals could be analyzed along with the data for the participants in the subgroup as originally constituted in the CSR. (6/8/06 Farquhar Dep. at 123:20-133:6.) Dr. Farquhar's protestations to the contrary, this did not enhance the trustworthiness or reliability of the analysis, but instead had the opposite effect.

specialized knowledge and no foundation in personal knowledge that qualifies him to address Merck's knowledge or state of mind.  He repeatedly draws inferences from his review of internal Merck documents selected by plaintiff's counsel, many of which may be the same documents that are admitted into evidence and that the jury will see.  In doing this, he has invaded the exclusive province of the jury, yet at the same time, his personal conclusions will not assist the jury in any respect.  Similarly, whether or not Dr. Farquhar agrees with Dr. Curfman or any other individual is irrelevant in this action, and the expressions of agreement[7] and the other value judgments he is eager to make will again not assist the jury.  The Court should exclude all such opinion testimony in accordance with the authorities that are briefed in Merck's concurrently-filed Motion for Order Excluding the Testimony of Jerry Avorn, M.D., and in Merck's prior briefing on Dr. Farquhar's proposed testimony in *Plunkett v. Merck*.[8]

## VI. THE COURT SHOULD EXCLUDE DR. FARQUHAR'S OPINION ON SPECIFIC CAUSATION AS IT IS CUMULATIVE WITH THAT OF DR. ZIPES.

Plaintiff has designated Dr. Douglas Zipes, a cardiologist, as an expert on specific causation issues.  (*See* Pl.'s List of Witnesses for Trial.)    Dr. Zipes conducted a physical examination of  Mr. Barnett and issued a detailed report with his opinions.  (*See generally* Expert Report of Douglas Zipes, M.D, attached to Merck's Motion for Order Excluding Testimony of Douglas Zipes, M.D. at Ex. A.)

---

[7] In his zeal to depict Merck in as bad a light as possible, Dr. Farquhar included two paragraphs in his Supplemental Report accusing Merck of concealing data from the New England Journal of Medicine and the FDA in 2005 that Merck provided in its recently-released study of APPROVe extension data. (*See* Supplemental Report at ¶¶ 32-33.).  Dr. Farquhar subsequently withdrew those two paragraphs and admitted that he did not consider the charges he made "to be backed up by the facts" and that they were "false."  (6/8/06 Farquhar Dep. at 251: 10-21.)

[8] To avoid duplicative briefing, Merck incorporates by reference its concurrently-filed memorandum on the testimony of Dr. Avorn and the memoranda on the testimony of Dr. Farquhar that it filed in *Plunkett v. Merck*.

Dr. Farquhar also issued a report on specific causation. He did not perform an examination of Mr. Barnett, and his conclusions are based on his review of the summary of Mr. Barnett's medical records prepared by Dr. Zipes. (*See* Specific Causation Report at ¶ 1.) Dr. Farquhar's "me too" testimony on specific causation at trial would be entirely cumulative and wasteful of the Court's time and resources. *See* FED. R. EVID. 403. "It is well established that evidence which is merely repetitious and cumulative of testimony already introduced may be excluded by the court." *Meadows & Walker Drilling Co. v. Phillips Petroleum Co.*, 417 F.2d 378, 382 (5th Cir. 1969). The Fifth Circuit has noted that "[w]e do want to discourage attorneys from parading additional experts before the court in the hope that the added testimony will improve on some element of testimony by the principal expert." *Leefe v. Air Logistics, Inc.*, 876 F.2d 409, 410-11 (5th Cir. 1989) (affirming the district court's exclusion of a medical expert's testimony on the ground that the testimony was cumulative). Here too, no valid purpose would be served by a parade of plaintiff's experts who simply repeat the same conclusions. The Court should exclude Dr. Farquhar's opinion on specific causation because it is cumulative with the testimony of Dr. Zipes.

**VII.   CONCLUSION.**

For the reasons stated above and in Merck's prior briefing on Dr. Farquhar's proposed testimony in *Plunkett v. Merck*, Merck respectfully requests that the Court exclude the testimony of Dr. Farquhar that Merck has addressed in its submissions.

Respectfully submitted,

*/s/ Dorothy H. Wimberly*
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone: 504-581-3200
Fax: 504-581-3361
Defendants' Liaison Counsel

Philip S. Beck
Andrew Goldman
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois 60610
Phone: 312-494-4400
Fax: 312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Phone: 202-434-5000
Fax: 202-434-5029

And

Brian Currey
Catalina J. Vergara
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone: 213-430-6000
Fax: 213-430-6407

Attorneys for Merck & Co., Inc.

815167v.1

**CERTIFICATE OF SERVICE**

I hereby certify that the above and forgoing Memorandum in Support of Motion of Merck for Order Excluding Testimony of John W. Farquhar, M.D. has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Mark Robinson by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 16th day of June, 2006.

/s/ Dorothy H. Wimberly

815167v.1