IN RE VIOXX PRODUCTS LIABILITY   )  MDL No. 1657
LITIGATION               )
                                 )

## SUPPLEMENTAL EXPERT REPORT OF JOHN W. FARQUHAR, M.D.
### THIS DOCUMENT APPLIES TO ALL CASES

### A. Introduction and Summary of Opinions

1.     This Report is submitted to supplement the opinions provided in my Report dated September 26, 2005, based on review of the additional materials referenced herein. The opinions provided herein are stated to a reasonable degree of medical and scientific probability. In summary, the Supplemental Report includes the following:

- Protocol 203: Merck's pre-specified analysis of data from three pooled studies (APPROVe, VICTOR and ViP), known as "Protocol 203," shows early and continuous excess risk of cardiac adverse events, statistically significant at 18 months and at all times thereafter, thereby refuting Merck's hypothesis that no excess risk appears until after 18 months of exposure.

- High-Risk Patients: Data from the APPROVe and VIGOR studies are analyzed, showing greater relative risks and rapid onset of excess cardiovascular events among patients at higher background risk; that is, the level of the cardiovascular (CV) risk before using Vioxx.

- Hypertension: Data from the APPROVe and VIGOR studies are displayed, showing early, continuous and statistically significant excess risk of hypertension due to Vioxx, compared to both placebo and naproxen. Also, data from the APPROVe study show



EXHIBIT
B

significantly greater incidence of both "Stage 2" (more severe) hypertension and thrombotic events among Vioxx patients who suffered Stage 2 hypertension. No such increase in CV event risk appeared among placebo patients who experienced Stage 2 hypertension. supporting the conclusion that there was a synergistic interaction between hypertension and Vioxx use.

- APPROVe "extension" data: According to documents submitted to the FDA by Merck in May 2006, the excess risk of CV events, including myocardial infarction ("MI") and ischemic stroke, remains statistically significant when data from a one-year off-drug follow-up were combined with the previously published data. For the extension period alone, there was a 64% increased risk of thrombotic events in the Vioxx group.

- Biological Mechanism: Recent publications support Cox-2 inhibition as the cause of hypertension and thrombosis.

## B.   Protocol 203 Shows Early and Continuous Risk of Excess Cardiac Events Among Vioxx Patients.

2.     In 2002, following the VIGOR study, Merck prepared a plan to analyze CV adverse events in a pooled analysis of 3 large placebo controlled studies: APPROVe, VICTOR and ViP. The plan, known as "Protocol 203," was submitted to the FDA for its response. On December 19. 2002, FDA Medical Officer Lawrence Goldkind responded to Merck's proposal. indicating general acknowledgment that Protocol 203 would provide "clinically important safety information" about the risk of Vioxx. (Letter, Goldkind to Braunstein, 12/19/02. at p. 1.) Merck proceeded to implement Protocol 203.

3.     Merck's Protocol 203 Data Analysis Plan ("DAP") stated a purpose "to provide increased precision on estimates of the comparability between

- 2 -

535305.1

rofecoxib and placebo on the incidence of thrombotic cardiovascular serious adverse experiences" (SAEs). (MRK-AFL0015451-484, at 454). The Protocol commented that the larger data set would be more accurate than data from any single one of the three studies. The DAP stated that the findings of Protocol 203 would allow "generalization of the results to other populations" who used Vioxx, including arthritic patients, because the study populations were of similar age and had risk factors for CV events. (Id.)

4. The endpoints defined in the Protocol 203 included "Cardiac" (MI, Sudden Death, Unstable Angina, etc.), and "Cerebrovascular" (Ischemic Stroke, Transient Ischemic Attack) events. (MRK-AFL0015463). The DAP for Protocol 203 also called for Kaplan-Meier (KM) cumulative incidence graphs to compare the risk of Vioxx versus placebo for CV events over time. (MRK-AFL0015474-75). To the best of my knowledge, Merck has never presented these analyses for Protocol 203, but instead has claimed support for the "18-month hypothesis" based only on the KM curve for "all thrombotic events" in the APPROVe study, which was only one of the 3 studies to be included in the pre-specified analysis.

5. Following preparation of my Report dated September 26, 2005, data produced by Merck became available to calculate the RR and prepare the KM cumulative incidence curve for Vioxx versus placebo from the Protocol 203 studies. The Protocol 203 data were analyzed and KM cumulative incidence graphs were prepared by Nicholas Jewell, Ph.D., a renowned biostatistician at the University of California at Berkeley School of Public Health, who applied generally accepted methods. Professor Jewell's report on Protocol 203 is attached as Exhibit A.

6. Based upon this larger and statistically more reliable data set, Protocol 203 directly refutes Merck's hypothesis that no excess risk appears until after 18 months of Vioxx use. To the contrary, the RR of cardiac events (MI, Sudden Cardiac Death and Unstable Angina) in the Vioxx population was 2.68 after 30 days, and 2.37 ($p<0.001$, 95% CI 1.43-3.91) at the end of the study. There was a statistically significant

- 3 -

535398.1

excess risk by 18 months, and continuously thereafter until the end of the study. As seen in **Figure 1**, below, the rate of cardiac events in the Vioxx population exceeded placebo from the first month through the end of the study. Further, statistical analysis shows that there was <u>no</u> significant difference in the RR of cardiac events over time. (Jewell Report, at pp. 1-2).



Month

**Figure 1:** Kaplan – Meier Estimation of cumulative cardiac events. The inset in the upper left corner of the Figure presents an expanded scale for the 0-6 month period, to better illustrate the early separation of the incidence curves.

      7.     The scientific method is largely based upon testing of hypotheses which are specified before a study is conducted. To prevent manipulation of the results, an essential element of this method is that the data must be analyzed according to the plan made at the outset. That was not done by Merck or its consultants in this case. The DAP did <u>not</u> call for a KM curve of CV event data over time for APPROVe alone. (MRK-18940080858-928, at 875-876); nevertheless, Merck has promulgated the "18-month" hypothesis based on that single study, which was underpowered to detect differences in the rate of events over time. Conversely, the DAP for Protocol 203 did specify that a KM curve would be prepared from the larger data set of the 3 combined studies, but Merck

- 4 -

has failed to perform such an analysis. The results of that pre-specified plan show early and persistent excess risk of CV events, with the risk due to Vioxx significantly greater than placebo at 18 months and all later periods (see Figure 1, above), refuting the " no risk for 18-months" hypothesis. The scientific method does not prohibit conducting exploratory analyses that were not pre-specified, and such analyses may provide important information. However, such exploratory analyses are not an acceptable substitute for those that were planned in advance.

8.      Since all of the Protocol 203 studies were terminated on the same date (9/30/04), there was no apparent impediment to simultaneously collecting the data and presenting the pooled analysis of CV risk for all three trials, as pre-specified. Indeed, a November 12, 2004, draft version of the subsequently published APPROVe study acknowledged the pre-specified Protocol 203 plan, as follows: "Assessment of cardiovascular safety was not the primary purpose of this study [APPROVe] and there was no pre-specified hypothesis concerning this endpoint for this study alone. However, an analysis of combined cardiovascular data from this study and the data from two other studies was planned." (RBRES-001054-1079, at 1066). The authors deleted such references from later drafts (e.g., 1/26/05 Draft, MRK-AHD0075201-234, at 75209), and no reference to Protocol 203 appeared in the final draft submitted for peer review on February 6, 2005.

9.      At his deposition in November 2005, New England Journal of Medicine (NEJM) Editor Gregory Curfman testified that NEJM had not been informed of the plan to combine APPROVe with two other studies; that the existence of the related studies should have been disclosed; and that clinical trial registration is intended to prevent "bad news" from being "buried away" by the sponsor. (Depo. of Curfman, 11/21/05, at 136-141).

10.      I agree with Dr. Curfman that the related studies of Protocol 203 should have been made known to the editors of NEJM. The scientific method and the

- 5 -

538398.1

interests of the medical community required disclosure of results of the pre-specified data analysis of all three pooled studies, and not only the results of APPROVe. Such disclosure is particularly important where the undisclosed. pre-specified analysis contradicts the substitute analysis offered by the sponsor, as in the case of the "18-month" hypothesis based on APPROVe alone, which is refuted by the complete Protocol 203 data.

## C.  Patients in APPROVe Who Were at High Risk for CV Events at Baseline Had Higher Relative Risks of CV Events Due to Vioxx, Supporting the Synergistic and Multiplicative Effect of Vioxx and Baseline High-Risk Status.

11.  Data from Merck's APPROVe Cardiovascular Safety Report (CSR), filed with the FDA in June 2005. in conjunction with data provided by Merck in this litigation, were used by Professor Jewell to evaluate RRs of thrombotic events among patients at "high cardiovascular risk," compared to patients with lower risk status. Merck defined the "high cardiovascular risk" category to include those with "a history of symptomatic atherosclerotic cardiovascular disease [SACVD] or the presence of at least two of the following risk factors for coronary artery disease:  a history of hypertension, a history of hypercholesterolemia, a history of diabetes, or current cigarette use." (Bresalier. 352 NEJM at 1097). Patients identified as diabetics were included in the "high-risk" analysis. based on well-established epidemiologic evidence that the CV adverse event risk conferred by diabetes is equivalent to the CV risk for patients with coronary heart disease (CHD). See. e.g., Third Report of the National Cholesterol Education Program (NCEP) Expert Panel on Detection, Evaluation, and Treatment of High Blood Cholesterol in Adults (Adult Treatment Panel III). NIH Publication No. 02-5215, Bethesda. MD. National Institutes of Health 2002 ("ATP III"), which designated diabetes as a CHD risk equivalent.

12.  The data show not only that Vioxx use caused statistically significant excess risk of CV events, but also that Vioxx interacts synergistically with

- 6 -

high baseline CV risk status to more than multiply the RR of thrombotic events in high-risk patients. Because interaction tests divide the population into subgroups for comparison, the power to detect important differences is reduced. Therefore, tests of significant interaction may be appropriately set at levels greater than the "p=0.05" level commonly established for significance testing of primary effects. See, Jewell. N., Statistics for Epidemiology (Chapman and Hall, New York 2003) at 159 (setting level of significant interaction at $\leq 0.2$ has "the desired effect of drawing attention to important variations that might be missed by inappropriately fixating on the standard 0.05 level of significance"). The results of this analysis are discussed at paragraphs 13-15, and presented graphically in Figure 2, below:



**Figure 2:** Summary Incidence rate of Confirmed Cardiac and Cerebrovascular Events in the APPROVe Study by Baseline Risk Status and Treatment Group.
Relative Risks (RR) and p-values based on Proportional Hazard Model

13. These data from APPROVe reveal a statistically significant increased risk of cardiac plus cerebrovascular events in the high-risk Vioxx group v. high-risk placebo group, RR = 3.83 (95% CI 1.67-8.77), p = 0.001. For the lower-risk Vioxx group v. lower-risk placebo group, the RR = 1.43. Comparison of the high-risk RR (3.83) to the lower-risk RR (1.43) yields a p value of 0.086, indicating significant

538398.1

interaction between baseline risk and Vioxx use, that is, the higher RR is due to the synergistic effect of CV risk due to both Vioxx and to baseline risk status.

14.     For a second category of outcomes, "all thrombotic" events, for the high-risk Vioxx group v. high-risk placebo group, the RR = 2.87 (95% CI 1.40-5.86), p = 0.004. For the lower-risk Vioxx group v. lower-risk placebo group, the RR = 1.15. An interaction p value of 0.07 for the comparison of high-risk RR (2.87) to low risk RR (1.15) provides strong evidence of the synergistic relationship between baseline risk and Vioxx use, consistent with the findings cited above (see ¶ 13).

15.     This synergistic interaction is supported by consistent results when RRs are compared for "high risk" and "lower-risk" Vioxx patients. The RR for high-risk Vioxx patients is significantly higher than for low-risk Vioxx patients, RR = 4.36, 95% CI (2.38-7.99), p < 0.001 for "all thrombotic events"; RR = 4.35, 95% CI (2.32-8.14) p < 0.001 for cardiac plus cerebrovascular events. These data again support interaction between Vioxx use and baseline risk, since high-risk status plus Vioxx resulted in a significantly greater RR than lower-risk status and baseline risk.

16.     A KM cumulative incidence curve for the "high-risk" APPROVe

patients shows early separation for the outcome category of cardiac plus cerebrovascular

events, with the Vioxx rate above placebo, and a doubling of risk in the first 18 months;

overall RR = 3.83, P < 0.001 (95% CI, 1.67-8.77), as set forth in **Figure 3**, below:



**Figure 3:** Comparison of the Kaplan-Meier Estimates of Confirmed Cardiac + Cerebrovascular Events by Treatment Group Restricted to the High Risk Subgroups of VIGOR and APPROVe Studies

### D.     VIGOR Analysis Shows Similarly Higher Relative Risk and Rapid Onset of CV Disease in Vioxx Patients v. Naproxen.

17.     In my previous Report, data from the VIGOR study were

presented, showing, among other things, a greater RR of thrombotic events in the Vioxx

subgroup of aspirin-indicated patients versus the naproxen subgroup of aspirin-indicated

patients, RR = 4.89, p = 0.012, 95% CI (1.44-16.88) compared to the non-aspirin-

indicated (lower-risk) Vioxx v. naproxen subgroup, RR = 1.88, p = 0.04, 95% CI (1.02-

3.44). FDA Medical Officer Review, 3/30/01, p. 5. Professor Jewell has prepared a KM

curve (**Figure 3**, above) using Merck's data, showing that the high-risk VIGOR

population on Vioxx experienced very rapid onset of CV thrombotic events, immediately

and continuously in excess of the naproxen group, and statistically significant after a

study of only 8 months mean exposure duration.

18. These data are not explained by a "protective effect" of naproxen. If Vioxx were harmless and the VIGOR results were explained by a naproxen "protective effect," then the Vioxx cardiac event rate would have come out "even" with the rate for the harmless placebo given in APPROVe and Protocol 203. Instead, the Vioxx event rates were significantly worse than placebo, and particularly elevated for high-risk patients. Thus, the data from APPROVe and Protocol 203 confirm the refutation of the cardioprotection theory advanced by Merck to explain VIGOR's results.

19. As noted by Cox-2 researcher Garret FitzGerald in the aftermath of the removal of Vioxx from the market, "[t]he higher a patient's intrinsic risk of cardiovascular disease, the more likely it would be that such a hazard [of Cox-2 inhibition] would manifest itself rapidly in the form of a clinical event"(FitzGerald, "Coxibs and Cardiovascular Disease," NEJM 2004; 351:1709-1711). The elevated RRs of the high-risk status patients from APPROVe and VIGOR, as shown above, are consistent with FitzGerald's assessment of the increased likelihood of events in patients on Vioxx with high background risk.

E. Vioxx Causes Significant Increased Hypertension, Including Severe "Stage 2" Hypertension That Was Strongly Associated With Thrombotic Events in APPROVe.

20. In both APPROVe and VIGOR, Vioxx caused large and statistically significant increased incidence of hypertension. Figure 4, below, presents the KM for hypertension in VIGOR, prepared by Professor Jewell from Merck's data, along with the KM curve for hypertension in APPROVe from Merck's "Figure 9" in the "General Safety Report," (GSR), Reference P122, Appendix 2.1.1 (MRK-AFV0426229).



**Figure 4:** Comparison of Cumulative Incidence Rates of Hypertension Adverse Events in the VIGOR and APPROVe Studies.

21.     These figures demonstrate a remarkably consistent, statistically significant, approximate doubling of hypertension in Vioxx patients, at both 25 mg. versus placebo (APPROVe) and at 50 mg. versus naproxen (VIGOR). Also, the data show a disturbing, continuously increased cumulative incidence of hypertension-related adverse events (AEs) due to Vioxx suffered by approximately 30% of the patients in the APPROVe study by the end of 3 years' use of Vioxx at the standard therapeutic dose. In APPROVe, there were 377 (29.3%) hypertension AEs in the Vioxx patients compared to 219 (16.99%) on placebo (Table 32; MRK-AFV0426227). Merck reported the "Difference in Percentage Points" (12.4%) and the 95% CI for that difference (9.2, 15.6), a highly significant result. In the VIGOR study, Professor Jewell used Merck's data to calculate the RR = 1.83, P < 0.0001, 95% CI 1.55-2.16. Of further interest, in APPROVe, Merck analyzed the hypertension-related AEs based on "Common Toxicity Criteria" of the National Cancer Institute, graded 0 (no event) through 4 (most severe). (Table 33, MRK-AFV0426228). The Vioxx group had more than double the incidence

of "Grade 2"[1] hypertension (8.08% v. 3.77%) and "Grade 3"[2] hypertension (5.67% v. 2.69%), and the p-value for treatment based on a logistic regression model was "0.000," i.e., a less than 1 in 1,000 possibility that the result was due to chance. (Id.)

22.    Additional unpublished APPROVe data demonstrate increased risk of more severe "Stage 2" hypertension on Vioxx versus placebo. As can be seen in Table 39 below, reproduced from the Merck GSR (MRK-AFV0426242), the Vioxx and placebo populations had essentially identical prevalence of Stage 2 hypertension at baseline (before the study). However, as seen in Table 40 from the GSR, below (MRK-AFV0426243), the Vioxx population experienced a large and highly statistically significant increased incidence of both systolic and diastolic blood pressure increases exceeding the threshold for Stage 2 hypertension. For patients who developed both Systolic Blood Pressure (SBP) ≥ 160 and Diastolic Blood Pressure (DBP) ≥ 100, the RR was 2.14 $p < 0.001$ (95% CI 1.57, 2.92), that is, more than double the risk that Vioxx patients would develop this severe form of hypertension.

**Table 39**

**Summary of Baseline or Screening Stage II Hypertension**

| Blood Pressure | Rofecoxib 25 mg n/N(%) | Placebo n/N(%) |
|---|---|---|
| DBP ≥100 | 26 / 1287 (2.02) | 29 / 1299 (2.23) |
| DBP ≥100 and SBP≥160 | 14 / 1287 (1.09) | 13 / 1299 (1.00) |
| DBP ≥100 or SBP≥160 | 141 / 1287 (10.96) | 143 / 1299 (11.01) |
| SBP ≥160 | 132 / 1287 (10.26) | 128 / 1299 (9.85) |

Data Source. [4.2]

---

[1] "Grade 2": "recurrent or persistent symptomatic increase by > 20mmHg (diastolic) or to > 150/100 if previously within normal limits (WNL); not requiring treatment." Id.
[2] "Grade 3": "requiring therapy or more intensive therapy than previously."

- 12 -

Table 40

Analysis of Stage II Hypertension

| | Rofecoxib 25 mg (N=1267) | Placebo (N=1266) | Comparison | | |
|---|---|---|---|---|---|
| De-Treatment Blood Pressure (mmHg) | Events/Patient-years (rate/100) | Events/Patient-years (rate/100) | Difference (95% CI) | Relative Risk (95% CI) | P-Value |
| DBP ≥ 105 | 162/2749 (6.11) | 111/3085 (3.59) | 2.59 (1.13, 3.44) | 1.51 (1.24, 1.99) | 0.000 |
| DBP ≥ 100 and SBP ≥ 160 | 116/2823 (4.18) | 81/3179 (1.97) | 2.26 (1.34, 3.13) | 2.14 (1.57, 2.93) | 0.000 |
| DBP ≥ 100 or SBP ≥ 160 | 419/2541 (17.50) | 365/2732 (11.06) | 6.52 (4.50, 8.53) | 1.57 (1.35, 1.82) | 0.000 |
| SBP ≥ 160 | 384/2396 (16.02) | 262/2823 (9.23) | 6.75 (4.79, 8.71) | 1.68 (1.43, 1.96) | 0.000 |

Data Source: [4.2]

23. Several unpublished documents from Merck's files demonstrate the strong association between Stage 2 hypertension and thrombotic events in APPROVe:

a. On February 20, 2004, APPROVe External Safety Monitoring Board (ESMB) Chair James Neaton, Ph.D., wrote an email to other members of the ESMB, which made the following points:

- The data so strongly indicated cardiac toxicity that Dr. Neaton raised the possibility of stopping the APPROVe study at that time, over 7 months before it was actually terminated. (MRK-AG00000394).

- Some of the statistical results of the study were unlikely to change before the planned termination date, and, if they remained unchanged, they would be "interpreted as very damning to the drug." (Id.).

- As one of the "alternatives" to stopping the APPROVe trial in February 2004, Dr. Neaton proposed "that treatment be discontinued if Stage 2 hypertension develops" because a disproportionately large percentage of the confirmed CV events in the Vioxx group occurred among patients who had Stage 2 hypertension. As of that time, 20 of the 38 events (53%) in the Vioxx group had occurred among 390 patients who developed Stage 2 hypertension (30% of the Vioxx treatment population).

- 13 -

538398.1

(Id.) Another alternative proposed by Dr. Neaton was to "[s]top
the study for the subgroup of patients likely to develop Stage 2
hypertension" (Id.).

b.    On March 4, 2004, two weeks later, Dr. Neaton wrote a
letter informing Merck of the ESMB's recommendation that patients with "uncontrolled
hypertension" (>165mm Hg systolic or >95 mm Hg diastolic) should be removed from
the APPROVe study. (MRK-AF00262446). In contrast, the Vioxx label did not include
a warning to discontinue such patients from Vioxx therapy. Dr. Neaton's letter
comments that it is "well-known that NSAIDs and Cox-2 inhibitors raise blood
pressures" (id.), while Merck's own unpublished data showed that Vioxx caused a
statistically significant doubling of the risk of hypertension exceeding predefined limits
of change, compared to Celebrex (Protocol 112; see my Report, 9/26/05, ¶ 150, p. 67).[3]
A letter prepared by Merck to send to APPROVe investigators perpetuated the mistaken
impression that Vioxx effects on blood pressure were simply an example of a class effect,
without mentioning the adverse data when Vioxx was compared to Celebrex (MRK-
AF00262435).

c.    On November 11, 2004, Merck's James Bolognese
prepared an "Assessment of rofecoxib TCVSAE [Total Confirmed Cardiovascular
Adverse Experiences] results by Systolic BP spike occurrence," which reported as
follows:

---

[3] "In 2001, Merck itself had conducted a head-to-head trial of Vioxx versus Celebrex and placebo, known
as Protocol 112, which supported Whelton's conclusion that Vioxx was associated with a greater degree of
hypertension. Protocol 112 was a 6-week controlled study of 1,521 patients in four treatment groups.
Vioxx 12.5 mg, Vioxx 25 mg, Celebrex 200 mg., and placebo. (MRK-AIN0001240). The Merck
Statistical Report showing analyses as of January 9, 2001, indicates that approximately 10% of the subjects
in each of the Vioxx 12.5 mg. and 25 mg. arms of the study had increased systolic blood pressure greater
than 20 mm and absolute value of over 140 mm, exceeding the pre-defined limits of change, compared to
5.3% in the Celebrex arm and 4.8% in placebo. The increased hypertension on Vioxx 25 mg. versus
Celebrex 200 mg. was highly statistically significant, $p = 0.004$, and also statistically significant versus
placebo (p = 0.046). (MRK-AIN0001608-609). Id. However, Merck did not publish the data from
Protocol 112". Report of John W. Farquhar, 9/26/05 at 67.

538398.1

........ ............  ....... ...... .......... .

- In APPROVe, "examination of the results split by systolic BP (SBP) $\geq$ 160 mmHg on at least one occasion during the study revealed a striking relationship" to the occurrence of confirmed thrombotic events. (MRK-AGO0074496; emphasis added).

- "The interaction between SBP spike (y/n) and treatment in TCVSAE [total confirmed cardiovascular events] was statistically significant [p =0.0471]. In the patients with no SBP spike, the RR was close to 1, but in those with at least one SBP spike, the RR was close to 4. These data suggest that nearly all of the excess CV events observed on rofecoxib versus placebo were in patients with at least one SBP spike. However, in the placebo group, the occurrence of SBP spike showed no increase in rate of TCVSAE's." (Id.; emphasis added).

- When the data were analyzed according to a new "at risk" status as of the date when the SBP spike was first recorded, "the interaction . . . was highly significant (p = 0.0043), indicating strong dependence of the treatment effect (hazard ratio) on whether there was a previous SBP spike or not." (MRK-AGO0074497; emphasis added).

- A comparable analysis of data from the Alzheimer's trials showed a "numerically similar" relationship between SBP spikes in relation to TCVSAE's, but the interaction was not statistically significant. (Id.)

    d.    Between November 2004 and January 2005, drafts of the APPROVe study included references to the SBP spike data that were considered for inclusion in the manuscript to be submitted to NEJM for publication (e.g., MRK-AHD0075212). However, the data were not submitted to NEJM, nor ever disclosed in

- 15 -

the scientific literature. Instead, the APPROVe authors reported increases of
approximately 3 to 4 mmHg in "mean arterial pressure" in the Vioxx group, along with
the inaccurate statement that the BP changes did not explain the excess risk of CV events
in the Vioxx population. (Bresalier, 352 NEJM at 1100).

        e.    At his deposition on November 21, 2005, Dr. Curfman of
NEJM testified that the editors were never informed that Merck had analyzed the CV
events for patients with BP spikes or Stage 2 hypertension, nor that a statistically
significant relationship existed between those conditions. Dr. Curfman testified that such
data would have been relevant to the editors and readers, because "one, of course, of the
mechanisms of concern in terms of vascular disease would be hypertension as a substrate
leading to vessel damage. So that would be — if such an analysis existed, it would be
very appropriate to include that." (Curfman Depo., 11/21/05, at 167-169).

        24.    I agree with Dr. Curfman that the analysis of Stage 2 hypertension
was highly relevant to the excess CV risk, and that it should have been included in the
published article. Where the internal documents acknowledge a "striking relationship," a
"highly significant interaction," and the suggestion that "nearly all of the excess CV
events" on Vioxx occurred among patients with SBP spikes, it was misleading to delete
references to such effects, to disclose only the mean arterial pressure changes, and to
deny the clearly apparent relationship between Stage 2 hypertensive changes and
thrombotic adverse events.

        25.    Abundant literature in the fields of cardiology and epidemiology
supports the conclusion that blood pressure changes of the magnitude reported for Vioxx
contributed substantial excess risk of CV events. See, e.g., SHEP Cooperative Research
Group: Prevention of Stroke by Anti-hypertensive Drug Treatment in Patients with
Isolated Systolic Hypertension: Final Results of the Systolic Hypertension in the Elderly
Program (SHEP). JAMA 1991: 265:3255-3264. In numerous clinical trials of
antihypertensive medications, including Merck's principal drug in this class

- 16 -

(Cozaar/Losartan), reductions of even a few mm of Hg resulted in significantly lower incidence of stroke and coronary heart disease (CHD). (Dahlof, B, Cardiovascular Morbidity and Mortality in the Losartan Intervention for Endpoint Reduction in Hypertension Study (LIFE): a randomized trial against atenolol. Lancet 2002; 359:995-1003). Further, it is well known that the larger the increase in blood pressure, the greater the increased risk, and that each mm increase in blood pressure imposes greater risk at a higher baseline. Merck's own internal documentation shows awareness of these principles as of December 26, 2000 (MRK-NJO281966; Memo from Rush to Dixon). The "striking" interaction between Vioxx and Stage 2 hypertension magnifies the Relative Risk of adverse CV events attributable to hypertension alone, as seen in the APPROVe data discussed above. Thus, the high incidence of increased BP of > 20 mmHg or more, and of absolute values exceeding 160 mm probably contributed substantial excess risk of MI and stroke among the subpopulation of Vioxx users who experienced such significant worsening of hypertension.

F.    Recent Literature Supports the Biological Plausibility of Increased Risk of Thrombosis Due to Both High Blood Pressure and the Interaction of Cox-2 Inhibition with Increased Blood Pressure.

26.    As noted in my prior Report, blood pressure is known to be a cause of plaque rupture that can result in thrombus and MI. In an authoritative recent article, it was noted that the " vulnerability to rupture depends on ... blood flow characteristics, particularly the impact of flow on the proximal aspect of the plaque...." Fuster, V., et al., "Atherothrombosis and High-Risk Plaque." J. Am. Coll. Cardiol. 2005; 46:937-54 at 945. Chronic and acute blood pressure increases magnify the "impact of flow" that results in plaque rupture. Increased blood pressure begins when Vioxx use begins, resulting in immediate increased risk of plaque rupture and resulting MI.

27.    In an article published in April 2006, noted Cox-2 researcher Garret FitzGerald and colleagues reported on animal data supporting the conclusion that

- 17 -

Cox-2 inhibition is the cause of both elevated blood pressure and thrombosis. Cheng,
et al., Cyclooxygenase, Microsomal Prostaglandin E Synthase-1. and Cardiovascular
Function. J. Clin. Invest., 2006; doi:10:1172/JCI27540. This finding further supports the
biological plausibility of the high relative risks of MI for Vioxx users, especially those
who had both high background CV risk, or on-drug Stage 2 hypertension, or both.

        28.     In a recent review article in Circulation. the peer-reviewed journal
of the American Heart Association, Antmann, et al. concluded that the effects of COX-2
inhibition differ between the normal and atherosclerotic conditions. In the former, the
effects of COX-2 suppression have "only a marginal effect on the net anti-thrombotic
imbalance owing to the importance of COX-1 as a source of PGI2 in the normal state. In
the setting of atherosclerosis. however, COX-2 plays a greater role as a source of PGI2
and more TxA2 is produced; thus, inhibiting COX-2 has a more profound effect on
prostanoid balance, favoring TxA2 production and promoting platelet-dependent
thrombosis." Antmann, Cyclooxygenase Inhibition and Cardiovascular Risk, Circulation
2005; 112:759-770, at 764. Such a differential effect of COX-2 inhibition helps to
explain the greater RR among patients who have atherosclerosis and are at greater

baseline risk of CV events due to that condition. **Figure 4 of the Antmann article**,

describing this phenomenon, is reproduced below:

764    *Circulation*    August 2, 2005



Figure 4. Consequences of COX inhibition for prostacyclin and thromboxane $A_2$ production in normal and atherosclerotic arteries. Endothelial cells are shown as a source of prostacyclin ($PGI_2$) and platelets as a source of thromboxane $A_2$ ($TxA_2$) under untreated conditions (top row) or treated with low-dose aspirin (middle row) or a coxib (bottom row) in the normal (left column) and atherosclerotic artery (right column) for comparison. COX-1 is the only isoenzyme expressed in platelets; endothelial cells express both COX-1 and COX-2. In the normal artery, the balance between $PGI_2$ and $TxA_2$ production favors $PGI_2$ and inhibition of platelet-dependent thrombus formation. In the atherosclerotic artery, both $PGI_2$ and $TxA_2$ production is increased, owing in part to increased platelet activation with compensatory $PGI_2$ formation via both COX-1 and COX-2 in endothelial cells; the net effect is an imbalance favoring $TxA_2$ production and platelet-dependent thrombus formation. Low-dose aspirin selectively impairs COX-1–mediated $TxA_2$ production in platelets, restoring the net antithrombotic balance. Coxib use suppresses COX-2-dependent $PGI_2$ production in endothelial cells, which has only a marginal effect on the net antithrombotic balance owing to the importance of COX-1 as a source of $PGI_2$ in the normal state. In the setting of atherosclerosis, however, COX-2 plays a greater role as a source of $PGI_2$ and more $TxA_2$ is produced; thus, inhibiting COX-2 has a more profound effect on prostanoid balance, favoring $TxA_2$ production and promoting platelet-dependent thrombosis.

### G. Merck's Recent APPROVe "Extension" Data Confirm Excess CV Risk of Vioxx

29.     In a document submitted to the FDA in May 2006, Merck reported the results of the APPROVe study on an "Intention to Treat" basis, which includes adverse events that occurred both on the drug and after the discontinuation of the drug. According to Merck's summary, the overall data showed a statistically significant increase of risk of MI, 31 Vioxx events v. 15 placebo events, p=0.017. There was also a statistically significant increased risk of ischemic stroke, 17 Vioxx events v. 6 placebo events, p=0.024. These data therefore continue to support the conclusion that Vioxx causes excess risk of CV events, including MI and stroke. The data show, for the first time, that the increased incidence of stroke in the Vioxx group has now exceeded the threshold for a statistically significant effect of Vioxx.

30.     The ITT analysis negates Merck's claim that there is no difference in CV thrombotic event rates between Vioxx and placebo for the first 18 months of use, in two ways. First, the KM graph of cumulative incidents of confirmed events is changed by the addition of data from the ITT analysis. Merck claimed that the original KM graph, presented as "Figure 2" of the published APPROVe article, supported the hypothesis of no effect for 18 months, because the incidence curves did not sharply diverge until after that point in time.[4]

31.     However, the KM graph submitted to the FDA for the ITT analysis in May 2006 (Figure B1, reprinted below), shows that the curve for Vioxx (rofecoxib) separates from placebo at about 3 to 4 months, and remains above placebo for the rest of the study. According to Steven Nissen, M.D., interim Chairman of Cardiovascular Medicine at the Cleveland Clinic and a member of the FDA Advisory Committee on Cox-2 inhibitors, the claim of no effect for 18 months of treatment "makes the drug look

---

[4] A number of flaws in that reasoning have been described in my September 2005 report, and in the preceding portion of this Supplemental Report.

a lot safer than it was." Dr. Nissen stated, "If you wanted to construct a legal defense that says nothing happens for 18 months, this is how you would cut the data." (New York Times, "Why the Data Diverge on the Dangers of Vioxx," May 22, 2006 (p. 1 of 6). Alastair Wood, M.D., Chairman of the FDA advisory committee that reviewed Cox-2 inhibitors in February 2005, criticized the omission of off-day events, noting that "People may drop out because they had chest pain and then weeks later they had a heart attack." (Id. at p. 3 of 6).

Figure B1   All Patients – Confirmed Thrombotic Cardiovascular Events – Week 210 Censoring - Kaplan Meier Plot



32.     According to the New York Times article, Merck says it was "simply adhering to the study's original design, and that the more recent chart reflects data that were not available to analyze in early 2005." (Id.). However, neither of these statements is correct. First, as mentioned above (¶ 7), the original design for the APPROVe Data Analysis Plan (DAP) did not include any KM curves at all, nor any analyses of potential differences in the rate of events over time. Instead, the KM curve portion of the analysis was "borrowed" from the DAP for Protocol 203, which combined the APPROVe study with two other trials, to form a substantially larger database of events for which such analyses would be more reliable. Second, to the extent that Merck

- 21 -

borrowed from the DAP for Protocol 203, it did so selectively. In particular, the Protocol 203 DAP prespecified the use of a "modified intention-to-treat" ("mITT") analysis that included all randomized patients in the trials. The DAP stated, "As a sensitivity analysis, reports of confirmed events that occur after randomization and within 28 days of study drug discontinuation will also be examined." (MRK-AFL0015464). The DAP further noted that "there are limitations using a per-protocol analysis in the face of a very high dropout rate. Thus, both the per-protocol and mITT analyses will be considered when interpreting the results. If differing conclusions arise, then further analyses will be conducted to try to understand the reason for the difference and which analyses are most appropriate." (Id. at MRK-AFL0015465; (emphasis added)).

33.     To the best of my knowledge, Merck did not present the mITT analysis to the FDA in February 2005, nor to the New England Journal of Medicine reviewers when the draft APPROVe article was submitted on February 6, 2005. However, a Cardiovascular Safety Report ("CSR") prepared by Merck prior to February 2005 did include the mITT events up to 28 days after the last dose of study therapy (Table 28, pgs. MRK-AHD0075823-824). There were six such events in the Vioxx treatment group, versus three events in the placebo group. Notably, four of the events among the Vioxx patients listed in Table 28 occurred within the first 18 months after the study start (Patient No. 91247, event on day 86; Patient No. 92718, event on day 203; Patient No. 90070, event on day 351; and Patient No. 90310, event on day 413). According to the New York Times article, Merck claims that "new data" for events after the original 14 day cutoff showed 26 events in the Vioxx group and 21 in the placebo group in the first 18 months, compared to 22 versus 20 in the "old analysis," a difference of four events in the Vioxx group (New York Times, Why the Data Diverge on the Dangers of Vioxx, May 22, 2006 at p. 3). The description of Table 28, above, shows that these four events were not new data, but were known to Merck at the time the original analysis was presented. Thus, an ITT analysis of data known to Merck in February 2005

- 22 -

538398.1

would have shown the early separation of the incidence curves during the 0 to 18 month period, which appears in Merck's May 2006 submission to the FDA.

34.    Further. Merck has submitted to the FDA a new statistical analysis for the "proportionality" test. indicating a p value of 0.748 (MRK-S0420112037; Figure B2, reproduced below). This non-significant result means that there is no evidence of variation in the rate of events over time. Thus, the ITT analysis contradicts the claim made by Merck in FDA submissions and in the published APPROVe article that there was a statistically significant difference in the rate of events between the 0 to 18 month and 18 to 36 month periods of the APPROVe study.

Figure B2   All Patients – Confirmed Thrombotic Cardiovascular Events – Week 210 Censoring - Hazard Rate



35.    Data from the off-drug period of the APPROVe extension study are also of interest. During the off-drug period alone. Merck reported that there were 28 thrombotic events in those who had taken Vioxx, compared to 16 in the placebo group. RR=1.64. Merck has stated that these data are "insufficient to conclude that there was an

increased relative risk of confirmed thrombotic events following discontinuation of the
therapy." (Press Release, 5/11/06, p. 1). However, three well-respected independent
commentators have stated their disagreement with Merck's interpretation of the data.

   (a) Steven Nissen, M.D., mentioned in ¶ 31 above, stated "You
have to look at the big picture. The big picture is that the hazard stays the same." (Wall
Street Journal, 5/12/06, p. A16). Dr. Nissen further stated, "Merck misrepresented the
results of this study." (AP Press Release, 5/12/06). The 64 percent higher risk in the
extension study "has rather important scientific implications, because it suggests that
there was some kind of permanent or longstanding injury to the artery that makes it
susceptible to these kinds of continuing events. (New York Times, May 13, 2006).

   (b) According to Curt Furberg, M.D., a member of the U.S.
FDA Drug Safety and Risk Management Safety Committee, "It may be that Vioxx is
causing permanent damage to the cardiovascular system, accelerating atherosclerosis or a
sustained increase in blood pressure." Reuters, May 18, 2006. Dr. Furberg stated, "for a
while we assumed Vioxx caused temporary problems, and here it is more than that,"
referring to the occurrence of 7 strokes and 2 "mini-strokes" or TIAs in the Vioxx group
after discontinuing treatment, compared with no such incidents in the placebo group
during one year off-drug. (Id.)

   (c) Bruce Psaty, M.D., a distinguished cardiologist from
University of Washington who testified in Congress on COX-2's inhibitors, stated that
the 64% higher overall event rate was "closer to a persistent finding than not." (New
York Times, May 13, 2006).

   36. I agree with Drs. Nissen, Furberg and Psaty that the increased RR
of thrombotic events in the Vioxx group after discontinuing the drug is "closer to a
persistent finding than not," and that the lack of statistical significance does not decide
this issue. The off-drug period alone constitutes a subgroup that is not adequately

- 24 -

535398.1

powered to detect such differences to a statistically significant degree. Given the limitations due to the smaller number of events and the time off drug, the 64% increase is an impressive indicator that the risk of Vioxx probably does not end when exposure is discontinued.

37.   I reserve the right to add to these comments in the event that future data becomes available.

## II.   CONCLUSION

38.   A consensus exists in the scientific community that Vioxx significantly increases the risk of adverse events, including MI, as noted by the unanimous agreement of 32 FDA Advisory Committee Members. Protocol 203, the analysis pre-specified by Merck for precise estimation of CV effects of Vioxx, shows that this increased risk appears within the first 30 days and persists throughout exposure. Protocol 203 refutes the "18-month" notion advanced by Merck through a "post hoc" hypothesis based on a single, underpowered study. Patients at elevated baseline risk have a statistically significant higher RR of CV events than lower-risk patients, due to a synergistic and multiplicative interaction of Vioxx and baseline risk factors such as SACVD. Stage 2 Hypertension while on Vioxx is also a strong risk factor for CV events. Data from the APPROVe extension study confirm the excess risk of MI and stroke due to Vioxx, and it is likely that the risk persists after Vioxx exposure ends.

_5/22/06_
  Date

_John W. Jarquhar, MD_

John W. Farquhar, M.D.

538398.1

## REPORT OF JOHN W. FARQUHAR AS TO GERALD BARNETT

1.    This Report pertains to plaintiff Gerald Barnett. My Report of
September 2005 and Supplemental Report of May 2006, are incorporated by reference.
For the purpose of this Report, I have reviewed a summary of the medical history of
Gerald Barnett prepared by Douglas Zipes, M.D.

2.    Mr. Barnett began Vioxx use in approximately January 2000.
Shortly thereafter, on January 19, 2000, Mr. Barnett had an episode of chest pain,
characterized in the records by his treating physicians as "atypical." However, a nuclear
imaging stress test revealed mild lateral wall ischemia, characteristic of an inadequate
blood supply to that part of the heart due to atherosclerosis of at least one coronary artery,
which had not been indicated in his prior records. The chest pain is best characterized as
new-onset angina.

3.    According to Dr. Zipes' review, Mr. Barnett had normal blood
pressure from 1971-2000, except for a few mildly abnormal readings. On January 19,
2000, Mr. Barnett's records show the highest blood pressure that he had ever had, 162
systolic (SBP)/ 95 diastolic (DBP). These blood pressures are in the range defined as
Stage 2 hypertension, which is more severe than lower degrees of elevated blood
pressure. Between January 19, 2000 and his MI in September 2002, Mr. Barnett had
additional spikes as high as 170 SBP while on Vioxx.

4.    Both the new onset angina and the blood pressure spikes were
probably caused by Vioxx use. As described in my prior reports, such conditions are
strongly associated with Vioxx exposure, particularly among the most susceptible to
cardiovascular (CV) toxicity. Mr. Barnett was at significant baseline risk for adverse CV
effects of Vioxx, because of his underlying condition of atherosclerotic disease as
indicated by the stress test. This degree of disease, although milder than the state to
which he progressed during use of Vioxx, took a number of years to develop. Vioxx

-1-

EXHIBIT
C
Blumberg No. 5119

exposure then resulted in a multiplicative and synergistic increased risk of MI, as indicated initially by the new episode of stage 2 hypertension and new-onset angina; and, subsequently, by rapidly increased atherosclerosis and MI.

5.      As a result of his BP spike and angina on January 19, 2000, Mr. Barnett was in the highest risk categories of patients likely to experience a heart attack due to Vioxx. Mr. Barnett's unstable angina made his risk status comparable to the category defined in the APPROVe study as "symptomatic atherosclerotic cardiovascular disease" (SACVD). As stated in Section C of my Supplemental Report, the relative risk for cardiac events among the "high-risk" patients, including those similar to Mr. Barnett, is 3.83, compared to the analogous high-risk placebo group. Also, by virtue of his spike in blood pressure exceeding 160 systolic on January 19, 2000, and the spike of 170/92 on February 18, 2002, Mr. Barnett is comparable to the Stage 2 hypertensive category of the APPROVe study, for whom a statistically significant RR of 3.82 was reported.

6.      These consistently elevated RRs due to multiple risk factors strongly support the conclusion that Mr. Barnett's risk of MI following January 19, 2000 was at least 3.8 times higher than if he had not been taking Vioxx. Based upon a standard formula for calculation of the attributable proportion of risk (APR), Mr. Barnett's APR was $\frac{3.8 - 1}{3.8}$ = 74%. The APR is a measure of the incidence of disease due to the risk factor in question—in this case, Vioxx—as opposed to all other possible causes. Thus, there is at least a 74% likelihood that Mr. Barnett's MI on September 6, 2002 was caused by Vioxx. It is highly likely that, but for his use of Vioxx, Mr. Barnett would not have suffered an MI on September 6, 2002.

7.    Figure 1, below, is a representation of the 74% APR applicable to

individuals in Mr. Barnett's risk category, who were exposed to Vioxx. This figure

graphically demonstrates the high likelihood that Mr. Barnett's MI resulted from his

Vioxx exposure.

**Figure 1:** Attributable Proportion of Risk of Thrombotic Event for Gerald Barnett, based
on (1) High Risk Status and/or (2) Blood Pressure Spikes > 160 SBP:



74% of Thrombotic Events
Caused by Vioxx

26% of Thrombotic Events
Attributable to Non-Vioxx causes

Figure 2, below, reproduced from my Supplemental Report, graphically shows that individuals with Mr. Barnett's baseline risk conditions who were *not* exposed to Vioxx had a significantly lower risk of MI, reinforcing the conclusion that Vioxx acted in a synergistic and multiplicative manner to cause the MI that he suffered.

Figure 2:



**Figure 2.** Summary incidence rate of Confirmed Cardiac and Cerebrovascular Events in the APPROVe Study by Baseline Risk Status and Treatment Group

Relative Risks (RR) and p-values based on Proportional Hazard Model

8.      Mr. Barnett is similar to the APPROVe population in other relevant ways. Mr. Barnett was 58 years old when he suffered his MI, and this is essentially identical to the mean age (59) of the patients in the APPROVe study. (Bresalier, 352 NEJM at 1094). Also, 62% of the APPROVe population was male. These similarities further support the conclusion that Mr. Barnett is sufficiently comparable to the APPROVe population that the results of that study are applicable to his circumstances and fairly characterize the high likelihood that his MI was caused by Vioxx.

_5/11/06_
Date

_John W. Farquhar, M.D._
John W. Farquhar, M.D.

## ANALYSIS OF VIOXX DATA FROM THE APPROVe, VICTOR & ViP STUDIES---PROTOCOL 203

The analyses here pool the data from the three studies and consider cardiac events only. There are 71 events recorded after commencement of follow-up. The pooled Kaplan-Meier estimates of the survival curves for the Vioxx and Placebo groups yield cumulative incidence proportions that are plotted against days of follow-up in Figure 9.

The apparent difference between these two curves cannot be attributed to chance variation (p-value = 0.001, using the log rank test). The estimate of the Relative Risk is 2.37 with a 95% confidence interval of (1.43, 3.91). Thus Vioxx patients were exposed to a more than doubling of the risk for a cardiac event over the observed entire time period. This estimate of the Relative Risk is essentially unchanged (RR = 2.36) if we account for different levels of risk in the three studies since there is little difference in proportions of patients on Vioxx in the three studies. As it happens there is no (statistically) significant difference in risk across the three studies, although quantitatively the ViP study shows the highest event rate, with Approve exhibiting only a very slightly smaller rate, and the VICTOR study showing only 79% of the risk as compared to ViP.

We can consider different periods of follow-up in looking at the cumulative incidence plots or Relative Risk estimates. In particular, for different periods of follow-up the estimated Relative Risks (with 95% confidence intervals) are:

From 0 to 1 month (30 days—Figure 1):  RR = 2.68 (0.71, 10.12)

From 0 to 2 months (60 days—Figure 2):  RR = 3.36 (0.92, 12.21)

From 0 to 4 months (120 days—Figure 3):  RR = 1.42 (0.63, 3.19)

From 0 to 6 months (180 days—Figure 4):  RR = 1.35 (0.64, 2.86)

From 0 to 1 year (365 days—Figure 5):  RR = 1.51 (0.82, 2.80)

From 0 to 1½ years (540 days—Figure 6):  RR = 1.76 (1.01, 3.06)

From 0 to 2 years (730 days—Figure 7):  RR = 2.08 (1.22, 3.56)

From 0 to 3 years (1095 days—Figure 8):  RR = 2.33 (1.41, 3.85)



EXHIBIT
D
Blumberg No. 5118

1

Finally, the overall Relative Risk "averages" the Relative Risks over sub-intervals although the number of events in smaller time periods is associated with much greater variability. However, for reference, the estimated Relative Risk (with 95% confidence intervals) for different time intervals are as follows:

From 0 to 1 month (11 events): RR = 2.68 (0.71, 10.12)

From 1+ to 6 months (17 events): RR = 0.91  (0.35, 2.36)

From 6+ to 12 months (14 events): RR = 1.91  (0.64, 5.71)

From 12+ to 24 months (18 events): RR = 5.50 (1.59, 18.99)

From 24+ to 36 months (11 events): RR = 5.02  (1.08, 23.24)   (No ViP data)

As can be seen and allowing for high variability, there is a reasonably consistent Relative Risk, reflecting consistently higher risk in the Vioxx patients over time. In addition, statistically the data is somewhat compatible with a constant Relative Risk over the five different time intervals (p-value = 0.13 when testing null hypothesis of constant Relative Risks against time varying Relative Risks).

Focusing on the first 18 months, the Relative Risk 1.76, significantly greater than 1.0, as noted above, indicating strong evidence of a considerably higher risk in the Vioxx patients.  Carrying out a similar test of constant Relative Risk over four time intervals over the first 18 months (0--1 month, 1—6 months, 6—12 months, and 12—18 months) gives a p-value of 0.36. Thus the data shows significantly higher risk in the first 18 months, associated with exposure to Vioxx, and supports the fact that this elevated risk is consistently higher over this entire time period.

**FIGURE 1**

**Protocol 203 Cardiac Events: 0—30 days of Follow-up**



Relative Risk, comparing Vioxx to Placebo patients (95% CI) = 2.68 (0.71, 10.12)

**FIGURE 2**

**Protocol 203 Cardiac Events: 0—60 days of Follow-up**



Relative Risk, comparing Vioxx to Placebo patients (95% CI) = 3.36 (0.71, 10.12)

4

**FIGURE 3**

**Protocol 203 Cardiac Events: 0—120 days of Follow-up**



Relative Risk, comparing Vioxx to Placebo patients (95% CI) = 1.42 (0.63, 3.19)

**FIGURE 4**

**Protocol 203 Cardiac Events: 0—6 months of Follow-up**



Relative Risk, comparing Vioxx to Placebo patients (95% CI) = 1.35 (0.64, 2.86)

**FIGURE 5**

**Protocol 203 Cardiac Events: 0—1 year of Follow-up**



Relative Risk, comparing Vioxx to Placebo patients (95% CI) = 1.51 (0.82, 2.80)

7

## FIGURE 6

### Protocol 203 Cardiac Events: 0—18 months of Follow-up



Relative Risk, comparing Vioxx to Placebo patients (95% CI) = 1.76 (1.01, 3.06)
(p-value = 0.04)

## FIGURE 7

**Protocol 203 Cardiac Events: 0—2 years of Follow-up**



Relative Risk, comparing Vioxx to Placebo patients (95% CI) = 2.08 (1.22, 3.56)
(p-value = 0.007)

## FIGURE 8

**Protocol 203 Cardiac Events: 0—3 years of Follow-up**



Relative Risk, comparing Vioxx to Placebo patients (95% CI) = 2.33 (1.41, 3.85)
(p=value = 0.001)

10

## FIGURE 9

### Protocol 203 Cardiac Events—All Follow-up Data



Relative Risk, comparing Vioxx to Placebo patients (95% CI ) = 2.37 (1.43, 3.91)
(p-value = 0.001)

Exhibit E - Farquhar 6/8/06 Deposition Excerpts

• Barnett Expert Motions

[1:] - [1:25]          6/8/2006      Farquhar, John W., M.D.

page 1
    0001
1                    UNITED STATES DISTRICT COURT
2                    EASTERN DISTRICT OF LOUISIANA
3
4         In re:  VIOXX
          PRODUCTS LIABILITY
5         LITIGATION
6
7         GERALD BARNETT and CORRINE            )
          BARNETT,                              )
8                                               )MDL Docket No. 1657
                   Plaintiffs,                  )
9                                               )
          vs.                                   )
10                                              )
          MERCK & CO., INC.,                    )
11                                              )
                   Defendant.                   )
12                                              )
                                                )
13
14
15
16        VIDEOTAPED DEPOSITION OF JOHN W. FARQUHAR, M.D.
17                  San Francisco, California
18                       June 8, 2006
19
20
21
22
23
24        Reported by:
          DARCY J. BROKAW
25        RPR, CRR, CSR No. 12584
          Job No. 69492


[31:12] - [31:20]      6/8/2006      Farquhar, John W., M.D.

page 31
12       Q    Dr. Farquhar, you are not a
13  biostatistician, correct?
14       A    That's correct.
15       Q    You don't have a degree in statistics,
16  correct?
17       A    Correct.
18       Q    You don't have a degree in biostatistics,
19  correct?
20       A    Yes.


[32:7] - [32:12]       6/8/2006      Farquhar, John W., M.D.

page 32
7        Q    Dr. Farquhar, did you hire Dr. Jewell to
8   work on this case?
9        A    No.
10       Q    Plaintiffs' attorneys hired Dr. Jewell, to
11  the best of your knowledge; isn't that right?
12       A    Correct.


[63:11] - [63:13]      6/8/2006      Farquhar, John W., M.D.

page 63
11            So Professor Jewell is the individual who
12  performed that analysis for me, or for us, to the
13  extent that he's part of the report.  And his --



EXHIBIT
E

Exhibit E – Farquhar 6/8/06 Deposition Excerpts

**• Barnett Expert Motions**

[86:7] - [86:10]        6/8/2006        Farquhar, John W., M.D.

```
page 86
7        Q    The only person that knows what data
8   Dr. Jewell used in his Protocol 203 analysis is
9   Dr. Jewell, correct?
10       A    Yes, that's ultimately correct.
```

[86:20] - [86:23]        6/8/2006        Farquhar, John W., M.D.

```
page 86
20       Q    I would have to ask Dr. Jewell what data
21  he used for his Protocol 203?
22       A    Correct.  And where he got it, and when he
23  received it.
```

[123:20] - [133:6]        6/8/2006        Farquhar, John W., M.D.

```
page 123
20       Q    Turn to the next page.  The next page, Dr.
21  Farquhar, is a chart and it's titled at the top:
22  "Excerpts of Merck database showing diabetics with
23  thrombotic events had 2 or more risk factors."
24            Do you see that?
25       A    Yes.
page 124
1        Q    Who prepared this chart?
2        A    Ms. Gross.
3        Q    Ms. Gross prepared this chart, correct?
4        A    Correct.
5        Q    This chart shows a series of patients and
6   purports to show the diabetics with thrombotic
7   events in APPROVe?
8        A    Correct.
9        Q    Next to two of the patients is an
10  asterisk.  Do you see that?
11       A    Yes.
12       Q    And underneath there's an explanation of
13  the asterisk that says:  "AN numbers 91512 and 93522
14  had two or more risk factors, i.e. diabetes plus
15  hypertension, as shown in the adverse event reports
16  for these patients."
17            Do you see that?
18       A    Yes.
19       Q    Ms. Gross went and looked at the adverse
20  event reports for these patients and determined that
21  they had hypertension?
22       A    Yes.
23       Q    You relied on a plaintiff's lawyer looking
24  at adverse event reports to know whether or not
25  these two patients had hypertension?
page 125
1             MR. ARBITBLIT:  Object to form.
2             THE WITNESS:  Well, I relied on it and I
3   was happy to have someone who had the skill and
4   ability at the time to go over all of those.  It's
5   tedious work and I trust the results.
6   BY MR. MORTARA:
7        Q    You yourself did not go over the adverse
8   event reports for these patients, correct?
9        A    Correct.
10       Q    You relied on Ms. Gross, a plaintiff's
11  lawyer, to tell you whether or not these two
12  patients had hypertension?
13       A    Yes, I did.
14       Q    Is Ms. Gross a medical doctor?
15       A    I don't know her curriculum vitae, so I
16  don't know all her attributes.
17       Q    Have you ever heard Ms. Gross referred to
18  as "Dr. Gross"?
19            MR. ARBITBLIT:  Object to form.
```

Exhibit E - Farquhar 6/8/06 Deposition Excerpts

• Barnett Expert Motions

```
20          THE WITNESS:  No, I have not.
21  BY MR. MORTARA:
22     Q     It's your understanding that Ms. Gross,
23  the plaintiff's lawyer, reclassified these two
24  patients as having two or more risk factors based on
25  adverse event reports, correct?
page 126
1          MR. ARBITBLIT:  Object to form.
2          THE WITNESS:  Well, reclassified -- I
3  think she simply discovered that they had been
4  incorrectly classified because their hypertension
5  had been missed in the database accumulation,
6  keeping in mind that those are done with people
7  punching numbers in and pressing a button on a
8  computer and it spills out and occasionally
9  something will be missed, and that's an example.
10     Q     And it's your understanding that Ms.
11  Gross, the plaintiff's lawyer, when she did this
12  work, looked at adverse event reports, correct?
13     A     Yes.
14     Q     What's an adverse event report?
15     A     You want to know specifically for APPROVe
16  or do you want to know it in general for all
17  studies?
18     Q     In general is fine.
19     A     An adverse event report is a report of --
20  sorry, it sounds weird -- a report of an adverse
21  event.  Now, what is an adverse event?  It's highly
22  variable, and it depends on what the investigators
23  and the data safety and managing board or external
24  review boards have decided is an adverse event.
25          So, you know, the compilation of adverse
page 127
1  events is something that is prespecified.
2     Q     Adverse event reports get generated after
3  treatment has begun and there's an adverse event,
4  correct?
5     A     Right.
6     Q     And an adverse event report will show
7  medical information about the patient who had the
8  adverse event, correct?
9     A     That's right.
10     Q     And that medical information in the
11  adverse event report will reflect the condition of
12  the patient at the time he had the adverse event,
13  correct?
14     A     The adverse event report may be generated
15  sometime after the event occurs, but the date of the
16  event is there.  So the answer is yes.
17     Q     Why would an adverse event report for a
18  patient in the APPROVe study tell you anything about
19  his baseline hypertension?
20          MR. ARBITBLIT:  Object to form.
21          THE WITNESS:  You have to have the data.
22  BY MR. MORTARA:
23     Q     Do you know if the data on baseline blood
24  pressure is present in adverse event reports in the
25  APPROVe study?
page 128
1     A     I haven't seen the adverse event reports
2  of the APPROVe study, so I don't know what is
3  included and what is excluded.  But if you're going
4  to do your job, you have an adverse event and you
5  want to follow Table 19 and look for the
6  relationship of baseline factors, the adverse event,
7  then you have to generate the baseline data, which
8  as I say, may or may not be on the adverse event
9  report.
10     Q     You don't know how Ms. Gross decided to
11  take these two patients, who are listed as not
12  having any of the risk factors in the database, and
13  decide they had an additional risk factor in
```

Exhibit E - Farquhar 6/8/06 Deposition Excerpts

• Barnett Expert Motions

```
14   addition to being diabetic, correct?
15           MR. ARBITBLIT:  Object to form.
16           THE WITNESS:  I think I've already
17   answered how she did it.
18   BY MR. MORTARA:
19       Q    Do you know if she looked at baseline risk
20   factors or at risk factors that were present in the
21   adverse event report at the time the adverse event
22   occurred?
23           MR. ARBITBLIT:  Object to form.
24           THE WITNESS:  Well, what I've already said
25   I'll repeat, is she had the adverse event report
page 129
1    data and in addition, she had the baseline data.
2    And how she got those together in one form, I wasn't
3    told about that.  But yes, she had both of those
4    bits of data.
5    BY MR. MORTARA:
6        Q    That's not what it says after the
7    asterisk, does it?  It says: "AN numbers 91512 and
8    93522 had 2 or more risk factors, i.e. diabetes plus
9    hypertension, as shown in the adverse event reports
10   for these patients."
11       A    Well, that means that the adverse event
12   reports included the baseline factors.
13       Q    If the adverse event reports don't include
14   the baseline factors, then Ms. Gross did it wrong
15   and you didn't know about it, correct?
16           MR. ARBITBLIT:  Object to form.
17           THE WITNESS:  Well, correct, correct.  I
18   mean, this question is leading towards mistrust of
19   Ms. Gross's work, and I don't mistrust it.  So I'm
20   reluctant to answer your question with anything
21   other than that I trust the work that she has done.
22   BY MR. MORTARA:
23       Q    You trust that the adverse event reports
24   that Ms. Gross looked at to do this risk factor
25   analysis for you had baseline risk factor
page 130
1    information in them?
2            MR. ARBITBLIT:  Object to form.
3            THE WITNESS:  I will hold to my previous
4    answer.
5    BY MR. MORTARA:
6        Q    If I show you at trial that these adverse
7    event reports do not in fact have baseline risk
8    factor information in them, that means this whole
9    chart, this whole page is incorrect, correct?
10           MR. ARBITBLIT:  Object to form.
11           THE WITNESS:  The material that Ms. Gross
12   had indicated that these two diabetics had
13   hypertension in addition to their state of diabetes.
14   The information she had included that information.
15   BY MR. MORTARA:
16       Q    Dr. Farquhar, you relied on Ms. Gross,
17   plaintiff's lawyer, to tell you who was in and not
18   in your increased CV risk category, correct?
19           MR. ARBITBLIT:  Object to form.  Asked and
20   answered.
21           THE WITNESS:  We're talking about two
22   individuals out of 30 events.  The data can be
23   recalculated without those two and would give
24   essentially the same answers.
25           My statement is that I have increased the
page 131
1    precision of the analysis by following predetermined
2    rules of inclusion of the category of increased
3    cardiovascular risk.
4    BY MR. MORTARA:
5        Q    Because of Ms. Gross's work, moving
6    patients from the just diabetic group into the two
7    or more risk factors group, you managed to add two
```

Exhibit E - Farquhar 6/8/06 Deposition Excerpts

• Barnett Expert Motions

```
 8   more people to the increased CV risk category,
 9   didn't you?
10           MR. ARBITBLIT:  Object to form.
11   Argumentative.  Misstates the record.
12           MR. MORTARA:  I'll withdraw the question
13   and ask it again.
14   BY MR. MORTARA:
15       Q   Dr. Farquhar, the prespecified increased
16   CV risk category for Protocol 203 consists only of
17   items 1 and 2 on page 1 of Exhibit 7, correct?
18       A   Yes.
19       Q   It does not include diabetics, the
20   prespecified increased CV risk category?
21       A   That's correct, if they are only diabetic
22   and have no other risk factors.  Most of them, you
23   know, we start by thinking diabetics have multiple
24   risk factors in addition to the state of diabetes.
25       Q   The result of Ms. Gross's, the plaintiff's
page 132
 1   lawyer's, reclassification of these two patients was
 2   that you added two more patients to your increased
 3   CV risk analysis, correct?
 4           MR. ARBITBLIT:  Object to form.  Asked and
 5   answered.
 6           THE WITNESS:  Two out of 30 have been
 7   added and that has increased the precision of the
 8   resulting analysis.
 9   BY MR. MORTARA:
10       Q   If they shouldn't have been added, it
11   didn't increase the precision, did it?
12           MR. ARBITBLIT:  Object to form.
13           THE WITNESS:  They should have been added
14   and they were and it increased the precision.
15   BY MR. MORTARA:
16       Q   The only basis you have for saying that
17   these two patients should have been added to your
18   increased CV risk group is your trust in the
19   plaintiff's lawyer, Ms. Gross, correct?
20           MR. ARBITBLIT:  Object to form.
21           THE WITNESS:  I've already answered the
22   query.
23   BY MR. MORTARA:
24       Q   You performed no independent check on
25   whether Ms. Gross was correct in her
page 133
 1   reclassification of these two patients, correct?
 2           MR. ARBITBLIT:  Object to form.
 3           THE WITNESS:  Well, you know, the meaning
 4   of words, I have looked over the data and explored
 5   its origins.  And so in that sense, I have added a
 6   verification step.
```

[141:9] - [150:14]      6/8/2006      Farquhar, John W., M.D.

```
page 141
 9       Q   Dr. Farquhar, I'm asking you about the
10   second page of Professor Lagakos' essay where he's
11   discussing the problem of multiple subgroup analyses
12   and the possibility of false positives.  The first
13   sentence of the last paragraph of the first column
14   of that page says:  "One way to correct for the
15   inflated false positive rate when multiple subgroup
16   analyses are conducted is to apply a stricter
17   criterion than the usual P equals 0.05 for judging  '
18   the significance of each interaction test."
19           Do you see that?
20       A   I see that.
21           MR. ARBITBLIT:  Objection to form.
22           THE WITNESS:  And this --
23   BY MR. MORTARA:
24       Q   Dr. Farquhar -- the question is do you see
```

Exhibit E - Farquhar 6/8/06 Deposition Excerpts

• Barnett Expert Motions

25  that?
page 142
1            MR. ARBITBLIT:  Don't interrupt him.
2            THE WITNESS:  I see that.  As I said, I
3   see everything that's in here.  And this entire
4   paragraph, and all the implications of it, are grist
5   for the mill of a discussion with Professor Jewell.
6   Professor Jewell has his way of looking at life and
7   he may or may not agree with this paragraph.  I
8   can't say since I am not a biostatistician.  This is
9   statistician language.
10  BY MR. MORTARA:
11       Q    You rely on Professor Jewell for
12  information of this character, correct?
13            MR. ARBITBLIT:  Object to form.
14            THE WITNESS:  I rely on Professor Jewell
15  currently as my colleague in not only this
16  consultation on Vioxx but on other issues.
17            And I also -- well, I'll just add that the
18  previous colleague, who is now no longer with us,
19  was one of the individuals who trained Professor
20  Jewell.  And so there's a long legacy of my
21  connection to Jewell and a long legacy of my trust
22  in his skill, ability and wisdom.
23            And what I am saying to you now is this
24  long paragraph on the second page here, he would
25  need to be asked how he interprets that and whether
page 143
1   or not it's in contradiction to what he has put in
2   his text; and if so, how would he handle what's been
3   done in the APPROVe study and in our particular
4   analyses of the 203.
5            I shouldn't have said APPROVe; I should
6   have said 203, and APPROVe as well.
7       Q    Dr. Farquhar, the plaintiffs' attorneys
8   are not going to let me ask questions of Dr. Jewell,
9   unfortunately.  You have relied on Dr. Jewell and
10  written things about significant interaction in your
11  report, and I'm asking you what your understanding
12  of Professor Lagakos' essay is with respect to what
13  the appropriate p-value for interaction is to use
14  when multiple subgroup analyses are performed.
15            Do you understand what Professor Lagakos
16  is talking about?
17            MR. ARBITBLIT:  Object to form.
18            THE WITNESS:  Well, you know, about six
19  answers ago, I said the entire topic of subgroup
20  analyses has been around for a long time, and I
21  return to this answer, and then I think I'll want to
22  say I've answered the questions regarding this topic
23  by saying I rely fully on Professor Jewell's
24  attitudes and concepts and beliefs and opinion about
25  this paragraph and how it applies to our analyses on
page 144
1   203 and APPROVe and of VIGOR and of any of the other
2   studies that we've analyzed.
3   BY MR. MORTARA:
4       Q    Have you ever asked Professor Jewell what
5   he thinks of Professor Lagakos' views?
6            Did you say no?
7       A    Well --
8            MR. ARBITBLIT:  Object to form.
9            THE WITNESS:  I told you that I haven't
10  seen the Lagakos article, so I can't have discussed
11  this specific article with him.  I have had
12  discussions on topics related to interaction tests.
13  BY MR. MORTARA:
14       Q    Your report says on page 7 of your
15  supplemental report:  "Tests of significant
16  interaction may be appropriately set at levels
17  greater than P equals 0.05," correct?
18       A    Well, we discussed that some time ago and

Exhibit E - Farquhar 6/8/06 Deposition Excerpts

• Barnett Expert Motions

19  I said this is Professor Jewell's view and I hold to
20  his views.
21      Q   Whereas Professor Lagakos says: "One way
22  to correct for the inflated false positive rate when
23  multiple subgroup analyses are conducted is to apply
24  a stricter criterion than the usual P equals 0.05."
25          That means Professor Lagakos thinks you
page 145
1  should go lower than 0.05 but Professor Jewell
2  thinks you can be higher than 0.05, correct?
3          MR. ARBITBLIT:  Object to form.  Assumes
4  facts not in evidence.
5          THE WITNESS:  Return to the fact that
6  Jewell has his beliefs and his way of analyzing data
7  and he may or may not have a fundamental difference
8  of opinion with Lagakos.  And I submit that a single
9  article taken out of context cannot answer that
10  question of whether there is a wide disparity
11  between those two gentlemen.
12  BY MR. MORTARA:
13      Q   Dr. Farquhar, the first full sentence in
14  the second column on that same page says:  "For
15  example, if 10 tests are conducted, each one should
16  use 0.005 as the threshold for significance."
17          Do you see that?
18          MR. ARBITBLIT:  Object to form.
19          THE WITNESS:  I see the whole article and
20  I return to -- I prefer to rely on Professor Jewell
21  and any subsequent dissection of this article, my
22  answer is that I trust Professor Jewell's views on
23  all items.
24  BY MR. MORTARA:
25      Q   Do you recall earlier telling me you
page 146
1  thought at least ten subgroup analyses had been
2  performed in the APPROVe study?
3          MR. ARBITBLIT:  Object to form.
4          THE WITNESS:  Ten subgroup analyses have
5  not been performed on the 203 study.  And --
6  BY MR. MORTARA:
7      Q   Dr. Farquhar, could you turn to page 6 of
8  your report.  And the Section C is entitled:
9  "Patients in APPROVe."
10          Do you see that?
11      A   Yes.
12      Q   Section C of your supplemental report is
13  not about Protocol 203, is it?
14      A   No.
15      Q   Dr. Farquhar, over ten subgroup analyses
16  have been performed on the APPROVe data and
17  Professor Lagakos thinks that you should use at
18  least 0.005 as the threshold for significance, if
19  not something lower; isn't that right?
20          MR. ARBITBLIT:  Object to form,
21  mischaracterizes the record.  Professor Lagakos has
22  never had anything to say about APPROVe.
23          THE WITNESS:  Boy, oh boy.  You know, my
24  answer is I'm trying to get away from Lagakos and on
25  to Jewell.  So any opinion that Lagakos has
page 147
1  expressed, I'll say again is not -- is out of
2  context, and Professor Jewell has his reasons for
3  picking a certain method of analysis and its
4  interpretation, and I trust his views.  And I do
5  not, at this point, have any opinions to offer about
6  Lagakos.
7  BY MR. MORTARA:
8      Q   You trust Dr. Jewell and the jury's
9  supposed to trust you when you say you trust
10  Dr. Jewell, correct?
11          MR. ARBITBLIT:  Object to form.
12  Argumentative.

Exhibit E - Farquhar 6/8/06 Deposition Excerpts

• Barnett Expert Motions

```
13              MR. MORTARA:  Withdrawn.
14              THE WITNESS:  I'm not concerning myself
15  with juries.  I'm concerning myself with trusting
16  Professor Jewell.
17  BY MR. MORTARA:
18      Q    Dr. Farquhar, do you know if plaintiffs'
19  attorneys are going to allow Dr. Jewell to explain
20  himself and his analysis?
21      A    My belief is that they would, yes.  But I
22  haven't asked the attorneys if they have such a
23  plan.
24      Q    Do you think the plaintiffs' attorneys
25  should allow Dr. Jewell to come to trial and explain
page 148
1   to the jury his analysis and explain, if he can,
2   Professor Lagakos' views?
3               MR. ARBITBLIT:  Object to form.
4               THE WITNESS:  I have no informed opinion
5   on what should happen with juries.  I just don't
6   know anything about that field.  So --
7   BY MR. MORTARA:
8       Q    Dr. Farquhar, I'll withdraw the question
9   and ask you this:  You talk about tests for
10  significant interaction in your report, correct?
11      A    Yes.
12      Q    You rely on Dr. Jewell for that analysis,
13  correct?
14      A    Correct.
15              MR. ARBITBLIT:  Object to form.
16  BY MR. MORTARA:
17      Q    In explaining the tests for significant
18  interaction that you disclose in your report, do you
19  think that Dr. Jewell would do a better job
20  explaining what this means and explaining how
21  Professor Lagakos' essay affects his views?
22      A    Do I think Jewell --
23      Q    Withdrawn.
24              Dr. Farquhar, do you think it's
25  appropriate to have Dr. Jewell explain himself as to
page 149
1   what he meant by the appropriate P for significant
2   interaction that you're relying on?
3       A    Well, I would say if that is something
4   that you and other attorneys would like to do, then
5   fine.  He needs to speak for himself.
6       Q    Dr. Farquhar, you understand that --
7   withdrawn.
8               The last sentence of the first full
9   paragraph on the third column of the second page of
10  the Lagakos essay, says:  "Post hoc subgroup
11  analyses undertaken because of an intriguing trend
12  seen in the results or selective reporting of
13  certain subgroup analyses can be especially
14  misleading."
15              Do you see that?
16              MR. ARBITBLIT:  Object to form.
17              THE WITNESS:  I see that, but please honor
18  my previous statements that anything in the Lagakos
19  paper which is contrary to Professor Jewell's modus
20  operandi and planning for analyses needs to say that
21  Jewell trumps Lagakos.  And I really -- I'm trying
22  to avoid further discussion about Lagakos.
23  BY MR. MORTARA:
24      Q    You're trying to avoid further discussion
25  of Professor Lagakos' essay, correct?
page 150
1               MR. ARBITBLIT:  Object to form.
2               THE WITNESS:  I'm trying to elevate the
3   respect for Professor Jewell.
4   BY MR. MORTARA:
5       Q    Dr. Farquhar, do you agree or disagree
6   that "Post hoc subgroup analyses undertaken because
```

### Exhibit E - Farquhar 6/8/06 Deposition Excerpts

• Barnett Expert Motions

```
                7   of an intriguing trend seen in the results or
                8   selective reporting of certain subgroup analyses can
                9   be especially misleading"?
               10          MR. ARBITBLIT:  Object to form.
               11          THE WITNESS:  I propose that that question
               12   be asked for Professor Jewell and put into the
               13   context of the APPROVe study and the specific
               14   analyses that he and I performed.
```

[152:25] - [154:1]          6/8/2006    Farquhar, John W., M.D.

```
           page 152
           25     Q     Earlier you said that you believe
           page 153
           1    Mr. Barnett is in this increased CV risk group as
           2    you've defined it on Exhibit 7, correct?
           3       A    Yes.
           4       Q    It is Mr. Barnett's membership in this
           5    increased CV risk group that provides the basis for
           6    your opinion that his attributable risk was greater
           7    than 50 percent, correct?
           8          MR. ARBITBLIT:  Objection, misstates the
           9    record.
           10         THE WITNESS:  My specific statement about
           11   Barnett is that his baseline risk factors put him
           12   into a category of increased cardiovascular risk
           13   such that subsequent exposure to Vioxx would
           14   multiply the likelihood that a cardiovascular event
           15   is related to Vioxx and not to chance alone.
           16  BY MR. MORTARA:
           17     Q    Dr. Farquhar, because -- well, what puts
           18  Mr. Barnett in this group that's shown on Exhibit 7?
           19     A    Evidence for the presence of
           20  cardiovascular disease.
           21     Q    What evidence is that?
           22     A    On January 22nd or some date thereabouts,
           23  he had a Cardiolite exam -- excuse me for this
           24  coughing -- and it showed abnormalities consistent
           25  with the presence of at least one coronary artery
           page 154
           1    that was narrowed.
```

[154:19] - [156:13]          6/8/2006    Farquhar, John W., M.D.

```
           page 154
           19     Q    The most important reason, Mr. Barnett, is
           20  in your increased CV risk group that you analyzed
           21  with Professor Jewell is that he had symptomatic
           22  coronary artery disease, correct?
           23     A    Symptomatic arteriosclerotic
           24  cardiovascular disease, yes.
           25     Q    You can't think of any other reason he's
           page 155
           1    in this increased CV risk group, correct?
           2          MR. ARBITBLIT:  Object to form.
           3    BY MR. MORTARA:
           4       Q    Withdrawn.
           5          There's no other reason he's in the
           6    particular increased CV risk group you and Professor
           7    Jewell used to analyze the APPROVe data?
           8          MR. ARBITBLIT:  Object to form.
           9          THE WITNESS:  If we took the point of view
           10   that Vioxx didn't increase blood pressure, around
           11   the date of his Cardiolite exam, he had a blood
           12   pressure elevation greater than what he had had in
           13   the past.  That was known at least.  So one could
           14   use high blood pressure as an additional reason.
           15  BY MR. MORTARA:
           16     Q    That would have been his blood pressure
           17  after he started taking Vioxx, though, correct?
           18     A    Yes.  And you know, really, the presence
```

Exhibit E - Farquhar 6/8/06 Deposition Excerpts

• Barnett Expert Motions

```
19  of evidence for arteriosclerotic cardiovascular
20  disease trumps everything else.  Once a person has
21  evidence of coronary artery disease, even if their
22  risk factors are considered borderline or somewhat
23  normal, it doesn't -- it is the main determinant of
24  that person's future.
25          He might have had an elevated -- he might
page 156
1   have had other risk factors, and, you know, we don't
2   need -- I mean, the various risk factors that he
3   could have that aren't discovered in the normal
4   exam.
5           But the main issue is that the evidence
6   for symptomatic arteriosclerotic cardiovascular
7   disease done on that examination, that's better
8   evidence than people usually have.  I mean, saying
9   that two or more risk factors will be enough, that's
10  not nearly as powerful evidence for the presence of
11  arteriosclerotic cardiovascular disease than what
12  was shown at the time of his examination a certain
13  number of days after he started Vioxx.
```

[212:4] - [212:18]    6/8/2006    Farquhar, John W., M.D.

```
page 212
4        Q    Do you agree that the Alzheimer studies in
5   Vioxx did not replicate the APPROVe findings on
6   adverse cardiovascular events?
7        A    I don't agree at all with that.
8        Q    Would you agree that two long-term,
9   placebo-controlled trials in patients with early
10  Alzheimer's disease, including up to four years'
11  treatment in a small number of patients, did not
12  show a significant difference in CV events between
13  rofecoxib 25 milligrams once daily and placebo?
14       A    I don't agree with that.  And I can give
15  you the basis for that disagreement if you want it.
16       Q    You rely on Dr. Kronmal as the basis for
17  your disagreement with that?
18       A    Correct, I do.  In my September -- I'll
```

[217:7] - [217:10]    6/8/2006    Farquhar, John W., M.D.

```
page 217
7        A    At this point, I have to say that my
8   conclusions about Alzheimer's are based on Kronmal.
9   I didn't put time into assessing the literature
10  beyond what Kronmal had.
```

[244:18] - [246:14]    6/8/2006    Farquhar, John W., M.D.

```
page 244
18       Q    If you don't know whether ibuprofen causes
19  hypertension, how can you know whether Vioxx stands
20  out amongst NSAIDs?
21       A    Well, I start an answer to that with
22  greater certainty that against placebo and against
23  naproxen that Vioxx stands out.  The rest of it, I
24  have to take the data that exists, and I come up
25  with a suspicion that Vioxx is a special case
page 245
1   amongst the NSAIDs.
2        Q    On what basis do you form a suspicion that
3   Vioxx is a special case if you have not looked at
4   data on ibuprofen, diclofenac and other NSAIDs?
5           MR. ARBITBLIT:  Objection to form.
6           THE WITNESS:  So I wasn't able to deflect
7   the questions on this.
8           All right.  I'll try again.
9           I have assessed the information largely
```

## Exhibit E - Farquhar 6/8/06 Deposition Excerpts

• Barnett Expert Motions

```
10  from observational epidemiologic studies, and I come
11  up with a reaffirmation of my belief that Vioxx
12  stands out.
13          But I also have a caveat that a lot of
14  those comparisons are not done in the manner that I
15  would like, a randomized trial.  So my -- what I'm
16  trying to say is that at the moment, I'm certain
17  that Vioxx is worse than placebo, worse than
18  naproxen.  And to be true to trusting randomized
19  trials more than observational epidemiologic
20  studies, I'd say I have greater confidence in that
21  than I would on other assertions.
22          The observational epidemiologic studies
23  give varying results, but they -- they add a
24  certain -- well, the observational studies are
25  admittedly imperfect.  At the moment, I suspect that
page 246
1   Vioxx stands out among all the NSAIDs in its blood
2   pressure effect.  But at the moment, I cannot be
3   certain whether valdecoxib and a few others might be
4   similarly disposed.
5           But you know, here we are, Vioxx is
6   removed from the market, and that's good.  The FDA
7   is struggling with labels and what to say about
8   other NSAIDs.  There's a lot of uncertainty in their
9   mind.
10          So when I say I'm certain of certain
11  aspects of Vioxx and blood pressure, I mean that.
12  When I say I suspect that Vioxx is among the
13  greatest offenders in raising blood pressure, that's
14  based on less convincing data.
```

[276:17] - [277:8]    6/8/2006    Farquhar, John W., M.D.

```
page 276
17          THE WITNESS:  My previous statement was
18  that the assertions in Paragraph 33, I no longer
19  hold to the validity of those assertions.  So --
20  BY MR. MORTARA:
21     Q     To the best of your -- go ahead.
22     A     Well, what I think you want an answer is
23  they are false.  What I'm saying is I am not
24  adequately convinced of their validity; therefore, I
25  do not consider them to be backed up with facts.
page 277
1           Now, the interpretation of that is false,
2   but I'm attempting to soften the word to say that
3   new information came in that indicated to me that
4   these assertions were no longer as valid as I wished
5   them to be and the whole -- the whole issue of the
6   continuation study and how to analyze it and how to
7   connect it to previous publications is under study.
8           So these are false.
```

[289:25] - [292:23]    6/8/2006    Farquhar, John W., M.D.

```
page 289
25     Q     Dr. Farquhar, did you look at any clinical
page 290
1   studies that compared Vioxx to diflunisal for
2   hypertension?
3      A     I've never heard the word diflunisal.
4      Q     Did you look at any clinical studies that
5   compared Vioxx to etodolac for hypertension?
6      A     No, I have not.
7      Q     Did you look at any clinical studies that
8   compared Vioxx to fenoprofen for hypertension?
9      A     I have not.
10     Q     Did you look at any clinical studies that
11  compared Vioxx to fenoprofen for hypertension?
12     A     No.  And may I ask if these are all
```

Exhibit E - Farquhar 6/8/06 Deposition Excerpts

• Barnett Expert Motions

```
13  randomized control trials with a sufficient size to
14  draw conclusions?
15       Q    Any clinical studies of any kind.
16            Did you look at any clinical studies of
17  any kind comparing Vioxx to flurbiprofen for
18  hypertension?
19       A    I have not.
20       Q    Did you look at any clinical studies
21  comparing Vioxx to ketoprofen for hypertension?
22       A    I have not.  But again, I ask -- I'm not
23  allowed to ask, but I would want to know in all of
24  these that you're citing, how many of them are
25  randomized clinical trials with a sufficient sample
page 291
1   size to allow conclusions to be drawn.
2        Q    Any clinical trials of any kind.  Did you
3   look at any clinical trials comparing mefanamic acid
4   to Vioxx for hypertension?
5            MR. ARBITBLIT:  Object to form.
6            THE WITNESS:  Mefanamic acid is a
7   substance that I don't know about, and I would
8   prefer to answer questions about NSAIDs that are
9   currently widely available in the United States.
10            And at the moment, I still submit that
11  Vioxx appears to be the most hypertensive drug ever
12  marketed for chronic disease.  And I've, you know,
13  cited the evidence for that.  You're now bringing up
14  drugs that, to the best of my knowledge, are not
15  widely available as NSAIDs in this country.
16  BY MR. MORTARA:
17       Q    Have you ever reviewed any clinical study
18  of any kind comparing meloxicam or Mobic to Vioxx
19  for hypertension?
20       A    I haven't seen any randomized clinical
21  trial comparing Vioxx to Mobic.
22       Q    Have you ever reviewed any clinical study
23  of any kind comparing nabumetone or Relafen to Vioxx
24  for hypertension?
25       A    There's a nabumetone study somewhere that
page 292
1   I would need to look up, but at the moment I would
2   say I have not seen a randomized clinical trial on
3   nabumetone.
4        Q    Have you ever reviewed a randomized
5   clinical trial or any clinical trial comparing
6   oxaprozin or Daypro to Vioxx for hypertension?
7        A    Oxaprozin or Daypro to Vioxx in a
8   randomized clinical trial, no.
9        Q    Have you ever reviewed any clinical study
10  of any kind comparing piroxicam or Feldene to Vioxx
11  for hypertension?
12       A    I have not reviewed a randomized clinical
13  trial comparing Vioxx to Feldene.
14       Q    Have you ever reviewed any clinical trial
15  of any kind comparing sulindac or Clinoril to Vioxx
16  for hypertension?
17       A    I have not reviewed a randomized clinical
18  trial comparing sulindac to Vioxx.
19       Q    Have you ever reviewed any clinical trial
20  comparing tolmetin to Vioxx for hypertension?
21       A    I have never reviewed a randomized
22  clinical trial comparing tolmetin to Vioxx in
23  respect to hypertension.
```

[298:1] - [298:21]        6/8/2006     Farquhar, John W., M.D.

```
page 298
1   STATE OF CALIFORNIA        )
2   : ss
3   COUNTY OF SAN FRANCISCO  )
4
```

Exhibit E – Farquhar 6/8/06 Deposition Excerpts

• Barnett Expert Motions

```
 5    I, the undersigned, a Certified Shorthand Reporter of the
 6    State of California, do hereby certify:  That the foregoing
 7    proceedings were taken before me at the time and place
 8    herein set forth; that any witnesses in the foregoing
 9    proceedings, prior to testifying, were placed under oath;
10    that a verbatim record of the proceedings was made by me
11    using machine shorthand which was thereafter transcribed
12    under my direction; further, that the foregoing is an
13    accurate transcription thereof.
14    I further certify that I am neither financially interested
15    in the action nor a relative or employee of any attorney of
16    any of the parties.   IN WITNESS WHEREOF, I have this date
17    subscribed my name.
18            Dated: _____
19
20            _____
21                    DARCY J. BROKAW, CSR No. 12584
```

**Exhibit F - Farquhar 10/10/05 Deposition Excerpts**

• **Barnett Expert Motions**

[1:1] - [1:25]          10/10/2005   Farquhar, John (Irvin-Plunkett)

```
page 1
 1                    UNITED STATES DISTRICT COURT
 2                    EASTERN DISTRICT OF LOUISIANA
 3
 4   IN RE:  VIOXX                  )
                                    )
 5   PRODUCTS LIABILITY LITIGATION )
                                    ) MDL No. 1657
 6                                  )
     _____  )
 7
 8
 9
10
11
12
13
14
15                    DEPOSITION OF:
16              JOHN W. FARQUHAR, M.D.
17              MONDAY, OCTOBER 10, 2005
18
19
20
21
22
23
24   Reported by:  MARK I. BRICKMAN, CSR, RPR
                    License No. 5527
25
```

[12:19] - [14:10]          10/10/2005   Farquhar, John (Irvin-Plunkett)

```
page 12
19     Q.      Do you ever the expertise, sir, to
20 individually analyze the SAS files that were presented to
21 you?
22             MR. ARBITBLIT:   Object to form.
23             THE WITNESS:   I think what I have to say
24 about that is the tradition that I have followed from the
25 beginning -- excuse me -- of my scientific career, and
page 13
 1 that is to use my statistician colleagues as individuals
 2 with whom I work closely.  I trust their skills and I
 3 remain one step removed from the data management process.
 4             The way things have developed is that they
 5 are using programs and they set it up and we discuss
 6 together well, what -- what are we going to do, but
 7 they're the ones that, so to speak, press the button on
 8 the computer that then spells it out.
 9             So, for example, I'd be sitting in David
10 Ahn's office, and I can just see it.  He's sitting there
11 and I'm sitting in the chair and he comes out with the
12 data, it appears on his screen.
13             He prints it, he brings it in.  We look at
14 it and we -- we go from there.
15             So it's a -- it's a very close comradeship,
16 but it's one in which I must trust their skills and
17 abilities that extend beyond mine in the details of the
18 management of SAS programs and things of that sort.
19             MR. PARKER:   I understand it was a
20 collaborative process.
21     Q.      Is it correct, however, Doctor that you did
22 not personally review the SAS files, but relied upon as
23 you just explained --
24     A.      Right.
25     Q.      -- the skill and expertise of your
page 14
```

EXHIBIT
F

Exhibit F - Farquhar 10/10/05 Deposition Excerpts

**• Barnett Expert Motions**

```
 1   colleagues?
 2               MR. ARBITBLIT:   Objection to form.
 3               THE WITNESS:   There's some semantic issues
 4   involved in here, Mr. Parker, and I don't want to misstate
 5   it.  I don't want to overstate what I do, but neither do I
 6   wish to understate what I do.
 7               I am intimately involved in the process of
 8   making the decisions on what analytical methods that might
 9   be used and I don't know if I've given you a good enough
10   answer here.  I'm trying to say it correctly.
```

[298:1] - [298:25]     10/10/2005  Farquhar, John (Irvin-Plunkett)

```
page 298
 1   STATE OF CALIFORNIA         )
 2   COUNTY OF SAN FRANCISCO     )
 3               I, the undersigned, hereby certify that the
 4   witness in the foregoing deposition was by me duly sworn
 5   to testify the truth, the whole truth and nothing but the
 6   truth in the within-entitled cause; that said deposition
 7   was taken at the time and place therein stated; that the
 8   foregoing is at the time and place therein stated; that
 9   the foregoing is a full, true and complete record of said
10   testimony; and that the witness was given an opportunity
11   to read and correct said deposition and to subscribe the
12   same.  Should the signature of the witness not be affixed
13   to the deposition, the witness shall not have availed
14   himself/herself of the opportunity to sign or the
15   signature has been waived.
16               I further certify that I am not of counsel or
17   attorney for either or any of the parties in the foregoing
18   deposition and caption names, or in any way interested in
19   the outcome of the cause names in said action.
20
21               IN WITNESS WHEREOF I have hereunto set my hand
22   this ____ day of _____, 2005.
23
24
                                          _____
25                                         MARK I. BRICKMAN CSR 5527
```