## TABLE OF AUTHORITIES

FEDERAL CASES:

1.    Barrow v. Bristol Myers Squibb, No. 96-689-cv-ORL-19B
      (M.D. Fla. Oct 29, 1998)................................................................................................12

2.    Bobby Jones Garden Apartments Inc. v. Suleski, 391 F.2d 172 (5th Cir. 1968).........16

3.    Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981)................................5

4.    Crowe v. Coleman, 113 F.3d 1536, 1541 (11th Cir. 1992) ....................................5,15

5.    DeAguilar v Boeing Co., 47 F.3d 1404, 1410-11 (5th Cir. 1995)..........................4

6.    Estate of Ayers v. Beaver, 48 F. Supp. 2d 1335, 1341 (M.D. Fla. 1999)...................11

7.    Freeport-McMoran, Inc. v. KN Energy, Inc., 498 U.S. 426, 428(1991) .....................4

8.    Hernandez v. Merck & Co. 6:05-CV-00211-ORL-31 (M.D. Fla May 3, 2005).......13

9.    Hildebrand v. Wyeth-Ayerst Laboratories
      99-2240-CIV-T-26B (M.D. Fla. Dec. 29, 1999) ……………………….......…16

10.   Hroncoch v. Wyeth Ayerst Laboratories, Inc. et al
      2:03-CV-659-FTM-29SPC (M.D. Fla Jan. 12, 2004)……………………………17

11.   In re Rezulin Prod. Liab. Litig. 133 F.Supp 2d 272 (S.D.N.Y)……………….......6

12.   Irvin v Merck, Case No. 03-80514-civ-Hurley (S.D. Fla. Oct 9, 2003)....................15

13.   Kozik v Merck, Case No. 8:04-CV-324-T-27TBM (Aug 2004)……………….3,15,16

14.   Legg v Wyeth, 8:05-cv-01541 JSM-TGW (N.D. Alabama, October 25, 2005).….....7

15.   Little v Wyeth Ayerst Labs, Inc., No. 99-2244-civ-T-17F, slip op. at 6
      (M.D. Fla. Dec 9, 1999)..........................................................................................…11

16.   Martin v. Wyeth-Ayerst Laboratories, Inc. et al.
      99-2454-CIV-T-26A (M.D. Fla. Dec. 29, 1999)………………………………16

17.   Merced-Torres v. Merck & Co., Inc.  6:05-CV-449-ORL-19DAB.......................13

18.   Morris v. Wyeth-Ayerst Laboratories, Inc., et.al
      99-2381-CIV-T-26C (M.D. Fla. Dec. 29, 1999)..........................................16

19.   Palmer v. Hospital Authority of Randolph County,
      22 F.3d 1559, 1564( (11th Cir. 1994) ..............................................................4

20.   Parent v. Wyeth-Ayerst Laboratories, Inc., et al.
      2:03-CV-626-FTM-29SPC (M.D. Fla. Dec. 19, 2003)..................................17

21.   Parks v. New York Times Co., 308 F.2d 474 (5th Cir. 1962) ......................5

22.   Snell v. Wyeth Ayerst Laboratories Inc.,
      99-2253-CIV-T-26A (M.D. Fla. Dec. 29, 1999) .........................................16

23.   Stern v Wyeth 02: 80620-CIV-:MARRA (S.D. Fla. Jan 22, 2003).......................6

24.   Tomlin v Merck & Co., Inc., 04:14335-CIV-MOORE (S.D. Fla. Feb. 18, 2005).......3

25.   Triggs v. John Crump Toyota Inc., 154 F.3d 1284, 1287-1288
      (11th Cir. 1998)..........................................................................3,5

26.   Univ. of So. Alabama v. The American Tobacco Co.,
      168 F.3d 405, 410 (11th Cir. 1999) ..............................................................5

27.   Ware v G.D. Searle,  05: 0659 (M.D. Ala., Oct. 25, 2005)................................3

28.   Wrisley v. Wyeth- Ayerst Laboratories Inc.
      99-2246-civ-T-26c (M.D. Fla. Dec 29, 1999) ...........................................16

FEDERAL STATUTE:

29.   28 U.S.C. Section 1332.....................................................................2,3

30.   28 U.S.C. Section 1447(c) ..............................................................................1

STATE CASES:

31.   Albertson v. Richardson-Merrell, Inc.,
      441 So. 2d 1146 (Fla. 4th DCA 1983)..........................................11

32.   Florida Specialty, Inc. v. H 2 Ology, Inc., 742 So. 2d 523, 525 & 527
      (Fla. 1st DCA 1999).......................................................................12

33.     Gilchrist Timber Co. v. ITT Rayonier, Inc., 696 So.2d 336, 339 (Fla. 1997) ...........12

34.     Greenberg v. Post, 19 So. 2d 49 (Fla. 4th DCA 1967) .................................................12

35.     Kerry's Brombelia Nursery, Inc. v. Reiling,
        561 So.2d 1305, 1306 (Fla. 3d DCA 1990) ...............................................................12

36.     Orlovsky v. Solid Surf, Inc., 405 So.2d 1363, 1364 (Fla. 4th DCA 1987)................. 12

37.     White-Wilson Medical Center v. Dayta Consultants, Inc.,
        486 So.2d 659, 661 (Fla. 1st DCA 1986) ...................................................................12

# EXHIBIT    A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 04-14335-CIV-MOORE

MARK TOMLIN and APRIL TOMLIN,

    Plaintiffs,

vs.

MERCK & CO., INC.,KEVIN BEDELL,
and WALGREEN CO. d/b/a Walgreens,

    Defendants.

**ORDER**

**CLOSED
CIVIL
CASE**

      THIS CAUSE came before the Court upon Plaintiffs' Motion to Remand (DE #4) and

Merck's Motion to Stay (DE #9).

      UPON CONSIDERATION of the Motions, the pertinent portions of the record, and being

otherwise fully advised in the premises, the Court enters the following Order.

### MOTION TO STAY

      Merck argues that the Court should stay all proceedings, including Plaintiffs' Motion to

Remand, pending a decision by the Judicial Panel on Multi-district Litigation ("MDL") regarding

whether to establish an MDL Court to hear all Vioxx related cases.[1]  Plaintiffs oppose the Motion

to Stay, and ask this Court to rule on their Motion to Remand before deciding whether a stay is

appropriate.  While the Court acknowledges that it has discretion to either resolve Plaintiffs'

Motion to Remand, or to decline to decide the Motion to Remand and grant Merck's Motion to

Stay, the Court chooses to reach the merits of Plaintiffs' Motion.  In doing so the Court notes that

other, factually similar cases removed by Merck to federal court based on fraudulent joinder have

been remanded.  See Irvin v. Merck & Co., Inc., Case No. 03-80514-CIV-HURLEY; Kozic v.

---

[1]Merck argues that a stay is appropriate because five other Vioxx cases have already been stayed in the Southern
District of Florida, and that these decisions "make clear the necessity of a stay here." Mot. to Stay at 6-7.  However,
it appears from a review of those cases that one of them is a class action, and that the plaintiffs in the other four
cases did not oppose a stay.  Therefore, contrary to Merck's contentions, these cases do not make clear the necessity
of a stay because they present different factual circumstances than the instant case.

Merck & Co., Inc., Case No. 8:04-CV-324-T-27TBM (M.D. Fla. Aug. 9, 2004). Merck attempts to

distinguish these cases by arguing that, at the time they were remanded, no MDL had been

requested. This attempt is disingenuous at best, and only serves to obscure the real issue before

this Court of whether Merck should have removed this case based on fraudulent joinder in light of

the prior remands in factually similar cases. Accordingly, Merck's Motion to Stay is DENIED and

the Court will address the merits of Plaintiffs' Motion to Remand.

## MOTION TO REMAND

### I.    BACKGROUND

Plaintiff originally filed this case on November 5, 2004, in the Circuit Court of the

Nineteenth Judicial Circuit in and for St. Lucie County, Florida, Case No. 56-2004-CA-001523.

Merck filed a Notice of Removal on December 1, 2004, alleging diversity of citizenship pursuant

to 28 U.S.C. § 1332, on the basis that Plaintiffs had fraudulently joined defendant Kevin Bedell,

and therefore his Florida citizenship should be ignored for purposes of diversity jurisdiction.

Plaintiffs then filed a Motion to Remand, arguing that the joinder of Bedell was not fraudulent, and

consequently, this Court lacks subject matter jurisdiction to hear the case.

### II.   LEGAL STANDARD

#### A.    Motion to Remand

A federal district court must remand to state court any case that was removed improperly or

without the necessary jurisdiction. Campos v. Sociedad Aeronautica De Medellin Consolidada,

S.A., 882 F. Supp. 1056, 1057 (S.D. Fla. 1994). In deciding a motion to remand, a district court

"must evaluate the factual allegations in the light most favorable to the plaintiff and must resolve

any uncertainties about state substantive law in favor of the plaintiff." Crowe v. Coleman, 113

F.3d 1536, 1539 (11th Cir. 1997). "If there is even a possibility that a state court would find that

the complaint states a cause of action against any one of the resident defendants, the federal court

2

must find that the joinder was proper and remand the case to state court." <u>Cooker v. Amoco Oil Co.</u>, 709 F. 2d 1433, 1440 (11th Cir. 1983). This strict construction of removal statutes prevents "exposing the plaintiff to the possibility that they may win a final judgement in federal court, only to have it determined that the court lacked jurisdiction..." <u>Crowe</u>, 113 F. 3d at 1538.

### B.     Fraudulent Joinder

Merck's removal of this case to federal court was based upon its claim of fraudulent joinder. When a case is removed based on fraudulent joinder, the " removing party bears the burden of proving that the joinder of the resident defendant was fraudulent." <u>Cabalceta v. Standard Fruit Co.</u>, 883 F.2d 1553, 1561 (11th Cir.1989)(citations omitted). The burden on the defendant is a "heavy one." <u>Crowe</u>, 113 F.3d at 1538. In order to satisfy this burden, the defendant must establish either that the jurisdictional facts were fraudulently alleged, or that there is "no possibility that plaintiff can establish any cause of action against the resident defendant." <u>Id</u>. "The fact that the plaintiffs may not ultimately prevail against the individual [non-diverse] defendants ... does not mean that the plaintiffs have not stated a cause of action for purposes of the fraudulent joinder analysis." <u>Pacheco de Perez v. AT&T Co.</u>, 139 F.3d 1368, 1380 (11th Cir. 1998). Furthermore, in a fraudulent joinder inquiry, the court is not to weigh the merits of the plaintiffs' claims "... beyond determining whether it is an arguable one under state law." In this analysis, the court is to look at plaintiff's pleadings at the time of removal. <u>Cabalceta</u>, 883 F.2d 1553, 1561.

### III.    DISCUSSION

Plaintiffs argue that a remand is necessary because they have a valid cause of action under Florida law against Bedell, and therefore his citizenship cannot be disregarded. In response, Merck argues that the "issue present here... is whether the pleading was sufficient to allege misrepresentations." Resp. at 18. Accordingly, Merck's arguments against remand, and in support

3

of removal, are based on the viability of Plaintiffs' complaint, rather than on whether Florida law generally provides for a cause of action against pharmaceutical sales representatives.[2]  As a result, in deciding whether a remand is appropriate, the Court must determine whether Plaintiffs have provided sufficient allegations within their complaint to support any of the claims against Bedell.

Plaintiffs' complaint asserts three causes of action against the non-diverse defendant, Bedell: Count II for negligence, Count III for negligent misrepresentation, and Count IV for fraud. In order for Plaintiffs to prevail on their Motion to Remand, it is only necessary that they state one viable claim under Florida law against Bedell.  Estate of Ayres v. Beaver, 48 F. Supp. 2d 1335, 1342 (M.D. Fla. 1999).

Plaintiffs' negligence claim against Bedell includes the following allegations: (1) that Bedell was a sales representative, detail person, or sales manager employed by Merck to promote, sell, distribute and encourage physicians, including Plaintiff's physician, to prescribe Vioxx;(2) that Bedell had a continuing duty to warn Plaintiff and/or Plaintiff's physician in a timely manner about the potential risks and complications associated with Vioxx; (3) that Bedell knew or should have known that Vioxx caused unreasonably dangerous risks and side effects; (4) that Bedell failed to adequately and appropriately warn prescribing physicians of the significant risks of cardiovascular events associated with the use of Vioxx; (5) that Plaintiff suffered a heart attack in December of 2003; and (6) that such heart attack was the direct and legal result of the negligence of Bedell.  See Pl. Compl. at 2-12.[3]

---

[2]Under Florida law, a pharmaceutical sales representative can be held liable for damages resulting from a patients use of a drug.  See Albertson v. Richardson-Merrell, Inc., 441 So. 2d 1146 (Fla. Dist. Ct. App. 1983)(holding that drug manufacturer and individual who promoted drug to medical profession could be held liable for damages resulting from patients use of drug).

[3] Plaintiffs' complaint contains several additional allegations regarding claims for negligent misrepresentation and fraud.  However, because the complaint contains sufficient allegations to support their negligence claim against Bedell, the Court need not address the sufficiency of the additional claims.

In light of these allegations, Plaintiffs have stated an arguable claim for negligence under Florida law against Bedell. As a result, Merck has failed to meet its burden of proving that the joinder of Bedell was fraudulent. Therefore, because Bedell and Plaintiffs are Florida residents, there is not complete diversity and this Court lacks jurisdiction to hear this case.

## IV.   CONCLUSION

Based on the foregoing it is ORDERED AND ADJUDGED as follows:

1) Merck's Motion to Stay (DE #9) is **DENIED**;

2) Plaintiffs' Motion to Remand (DE #4) is **GRANTED,** based on lack of subject matter jurisdiction;

3) This case is remanded to the Circuit Court of the Nineteenth Judicial Circuit in and for St. Lucie County, Florida;

4) In light of Merck's prior notice that Plaintiffs' claim against a pharmaceutical representative was viable under Florida law, Plaintiffs may, pursuant to 28 U.S.C. § 1447(c), move this Court for costs and expenses incurred as a result of Merck's removal;

5) This case is **CLOSED.**

DONE AND ORDERED in Chambers at Miami, Florida, this ___ day of February, 2005.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

cc:    All counsel of record

5

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

REFIC KOZIC,

                Plaintiff,

vs.                                            Case No. 8:04-CV-324-T-27TBM

MERCK & CO., INC., GENA GHAZZI,
and JOHN E. (JACK) KILKELLY,

                Defendants.
_____/

## ORDER ON PLAINTIFF'S MOTION FOR REMAND

       **BEFORE THE COURT** is Plaintiff's Motion for Remand  (Dkt. 6).  Upon consideration, Plaintiff's motion is granted.

### Introduction

       Plaintiff sued Defendants Merck & Co., Inc. ("Merck") and two sales representatives employed by Merck, Gena Ghazzi and John E. (Jack) Kilkelly alleging that he suffered a heart attack as a result of ingesting Merck's drug, Vioxx. (Dkt. 2). In the Complaint, Plaintiff further alleges that Ghazzi and Kilkelly negligently and fraudulently misrepresented the safety and effectiveness of Vioxx to Plaintiff's physicians. (Dkt. 2). The Complaint, initially filed in Florida state court, was removed to federal court on the grounds that Ghazzi and Kilkelly was fraudulently joined in this action. (Dkt. 1). Plaintiffs seek to remand the case to Florida state court. (Dkt. 6).

### Applicable Standards

       An action may be removed to federal court even if all of the parties are not diverse if the joinder of the non-diverse party was fraudulent.  Triggs v. John Crump Toyota, Inc., 154 F.3d 1284,

1287 (11th Cir. 1998). "Fraudulent joinder is a judicially created doctrine that provides an exception to the requirement of complete diversity." Id. at 1287. Fraudulent joinder is established by showing either (1) there is no possibility the plaintiff can establish any cause of action against the resident defendant, or (2) the plaintiff has fraudulently pled jurisdictional facts in order to bring the resident defendant into state court. Crowe v. Coleman, 113 F. 3d 1536 (11th Cir. 1997); Cabalceta v. Standard Fruit Co., 883 F. 2d 1553 (11th Cir. 1989). The removing defendant has the burden of proving fraudulent joinder. Crowe, 113 F.3d at 1538.

In addressing whether a party has been fraudulently joined, the Court must "pierce the pleadings" to determine whether, under controlling state law, the plaintiff has a possible or arguable claim against the non-diverse defendant, or whether, on the other hand, it is clear there can be no recovery. See Crowe, 113 F. 3d at 1538; Bobby Jones Garden Apartments, Inc. v. Suleski, 391 F. 2d 172 (5th Cir. 1968). All factual issues and questions of controlling law are evaluated in favor of the plaintiff. Cabalceta, 883 F. 2d at 1561.

Discussion

In the Complaint, Plaintiff alleges that Defendants Ghazzi and Kilkelly negligently and fraudulently misrepresented material information regarding the safety and effectiveness of Vioxx. (Dkt. 2, ¶¶ 22-50). To establish a cause of action for fraud, Plaintiff must prove:

> (1) a misrepresentation of material fact: (2) [a] a knowledge of the representor of the misrepresentation, or [b] representations made by the representor without knowledge as to either truth or falsity, or [c] representations made under circumstances in which the representor ought to have known, if he did not know, of the falsity thereof; (3) an intention that the representor induce another to act on it: and (4) resulting injury to the party acting in justifiable reliance on the representation.

2

Albertson v. Richardson-Merrell, Inc., 441 So. 2d 1146 (Fla. 4th DCA 1983). In Albertson, the court concluded that the plaintiff could state a claim against a drug sales representative for making fraudulent statements to plaintiff's physician regarding the safety and efficacy of a drug. 441 So. 2d 1146.

Here, Plaintiff has alleged that Defendant sales representatives made misrepresentations concerning the safety and effectiveness of Vioxx and concealed or understated its dangerous side effects. (Dkt. 1, ¶¶ 10, 26, 38). Defendant sales representatives allegedly "knew or should have known that their drug product had defects, dangers, and characteristics that were other than what the Defendants had represented to prescribing doctors or other dispensing entities, the FDA and the consuming public, including Plaintiff herein." (Dkt. 1, ¶¶ 30, 43). Plaintiff further alleges that the misrepresentations were made with the "intention and specific desire that Plaintiff, Plaintiff's prescribing physician or other dispensing entities and the consuming public would rely on such information in selecting, requesting, or prescribing treatment." (Dkt. 1, ¶¶ 28, 41). According to the Complaint, Plaintiff suffered serious injuries as a result of Plaintiff's reliance on the alleged misrepresentations concerning the safety of Merck's drug Vioxx. (Dkt. 1, ¶¶ 37, 50).

Plaintiff can state a cause of action against Defendant sales representatives Ghazzi and Kilkelly and has done so in accordance with Albertson and Fed. R. Civ. P. 8 and 9. As such, they were not fraudulently joined in this action and their citizenship cannot be disregarded. Ghazzi and Kilkelly's status as Defendants and their Florida citizenship prevents this Court from exercising jurisdiction. It is, therefore,

ORDERED AND ADJUDGED that Plaintiff's Motion for Remand (Dkt. 6) is GRANTED. This case is remanded to the Circuit Court of the Thirteenth Judicial Circuit in and for Hillsborough

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

RUBY WHITE,

    Plaintiff,

v.                                                    CASE NO: 8:05-cv-243-T-26MSS

MERCK & CO., INC., GENA ORTEGA f/k/a
GENA GHAZZI and JOHN E. (JACK) KILKELLY,

    Defendants.

_____/

### O R D E R

Before the Court are Plaintiff's Motion to Re-open Case and for Reconsideration
of Judge's Order Granting Defendants' Motion to Stay (Dkt. 10) and Plaintiff's Motion to
Remand (Dkt. 9).[1] After careful consideration of the Motions, the pleadings and papers
on file, and an almost identical case handled by the Honorable James D. Whittemore, the
Court concludes that this case should be re-opened and remanded to the state court.

Plaintiff correctly argues that this Court lacks jurisdiction based on diversity of
citizenship because, contrary to the assertions of Defendant Merck in its notice of
removal and in its arguments in <u>Kozic v. Merck,</u> the two drug sales representatives were

---

[1]  The Court does not need a response from Defendant Merck because of the
extensive argument in the Notice of Removal (Dkt. 1) and the arguments already
presented to the Honorable James D. Whittemore in <u>Kozic v. Merck & Co., Inc., Ghazzi
and Kilkelly,</u> No. 8:04-cv-324-T-27TBM.

not fraudulently joined. This Court must review the pleadings to determine whether there

is a reasonable basis for predicting that a state court might impose liability on the resident

defendants. See Crowe v. Coleman, 113 F.3d 1536, 1542 (11th Cir. 1997). A review of

the Complaint[2] leaves no doubt that it states a cause of action under Florida law as to the

two individual Defendant sales representatives.[3] See Albertson v. Richardson-Merrell,

Inc., 441 So.2d 1146 (Fla.Dist.Ct.App. 1983). Because Defendants Ortega and Kilkelly

are citizens of Florida, capable of being sued for the non-fraudulent and non-frivolous

causes of action alleged in Counts II, III, and IV, this Court is without subject matter

jurisdiction to hear this case.

It is therefore **ORDERED AND ADJUDGED** as follows:

(1)     Plaintiff's Motion to Re-open Case and for Reconsideration of Judge's

        Order Granting Defendants' Motion to Stay (Dkt. 10) is **GRANTED**. The

        Clerk shall re-open this case for the Court's reconsideration of the order

        entered February 9, 2005. (Dkt. 7). The Order granting a stay (Dkt. 7) is

        hereby **VACATED**.

---

[2]   The Complaint filed in state court (Dkt. 2) seeks compensatory damages for the Plaintiff's ingestion of Vioxx for pain over a prolonged time. Defendant Merck & Co., Inc. (Merck) is a foreign corporation authorized to do business in Florida. Defendants Ortega and Kilkelly, both residents of Florida, were sales representatives for Merck who sold Vioxx to prescribing physicians. Counts II, III, and IV seek relief against Merck, Ortega and Kilkelly for negligence, negligent misrepresentation, and fraud, respectively, in failing to warn prescribing physicians of the significant risks involved with the use of Vioxx.

[3]   The Complaint also comports with Federal Rules of Civil Procedure 8 and 9.

(2)     Plaintiff's Motion to Remand (Dkt. 9) is **GRANTED**.

(3)     The Clerk is directed to remand this case to the Circuit Court of the Twelfth

Judicial Circuit in and for Sarasota County, Florida.  Once remand is

effectuated, the Clerk is directed to close this case.

**DONE AND ORDERED** at Tampa, Florida, on February 14, 2005.


_____s/_____
**RICHARD A. LAZZARA**
**UNITED STATES DISTRICT JUDGE**


<u>COPIES FURNISHED TO</u>:
Counsel of Record

-3-

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 03-80514-CIV-HURLEY

EVELYN IRVIN, as personal representative of
the Estate of RICHARD IRVIN, JR.,
    plaintiff,

vs.

MERCK & CO., INC. , JOE GHEZZI and
CHRIS METROPULOS,
    defendants.

_____/

FILED by _____ D.C.

OCT 19 2003

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

### ORDER REMANDING CASE TO FIFTEENTH JUDICIAL CIRCUIT
### IN AND FOR PALM BEACH COUNTY, FLORIDA
### and CLOSING FILE

THIS CAUSE is before the court upon plaintiff's motion for remand for lack of subject

matter jurisdiction [DE# 6], the defendants' response in opposition [DE#17] and the plaintiff's

reply [DE#19].  For reasons stated below, the court will grant the motion  and remand this case

to the state court in which it was originally filed.

### I. BACKGROUND

Plaintiff originally filed suit against defendants in state court on May 14, 2003 in the

Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida, alleging

state common law  tort claims arising out of the wrongful death of plaintiff's decedent in

consequence of his ingestion of the prescription drug Vioxx,  a product  manufactured  and

marketed by defendant Merck & Co., Inc. According to the complaint, Joe Ghezzi and Chris

Metropulos, both Florida residents, were  sales  representatives or sales managers employed by

1

Merck to promote, distribute and sell this prescription drug  to physicians in the State of  Florida, including the plaintiff's decedent's physician.

The  defendant Merck filed  a  notice of removal  in  this  court on June 6, 2003  [DE#1] asserting   diversity jurisdiction under 28 U.S.C. §1332 on  theory that the two non-diverse individual defendants, Ghezzi and Metropulos, were fraudulently joined to defeat  the jurisdiction of  this court that  would otherwise exist.

## II. DISCUSSION

Fraudulent joinder is  a  judicially created  doctrine that  provides  an  exception  to  the requirement of complete diversity in three instances: (1) where  there is no possibility that the plaintiff can prove a cause  of  action  against the resident (non diverse) defendant; (2) where there is outright fraud in the plaintiff's pleading of jurisdictional facts; and (3) where a diverse defendant is joined with a non-diverse defendant as to whom there is no joint, several, or alternative liability and where the claim against the diverse defendant has no real connection to the claim against the non-diverse defendant. *Triggs v John Crump Toyota, Inc.*, 154 F.3d 1284, 1287 (11th Cir. 1998).

The burden of  establishing fraudulent joinder is a  heavy one.  The determination must be based upon the plaintiff's pleadings at the time of removal, supplemented by any affidavit and deposition transcripts submitted by the parties, with all factual allegations construed  in the light most favorable to the plaintiff, with any uncertainties about the applicable law resolved in the plaintiff's favor.  *Pacheco de Perez  v AT & T Co.*, 139 F.3d 1368 (11th Cir. 1998).   If even a colorable claim against a non-diverse defendant is stated, joinder is proper and the case should be remanded to state court. *Id.*

2

In this case, plaintiff has asserted   facts which state potential causes of action against the individual Florida defendants, having specifically alleged that these defendants were personally involved in the marketing of the prescription drug Vioxx to Florida physicians, including the plaintiff's decedent's physician. In opposing remand, defendants have filed affidavits of the individual defendants who both aver that their sales territory encompasses Broward and Palm Beach County, Florida, but not St. John's County. "Presuming" that plaintiff's decedent and relevant treating physician resided and worked in St. John's County— the alleged county of the plaintiff's residence-- from here the defendant urges the inference that there can be no causal connection between the marketing activities of these defendants and the alleged injury to plaintiff's decedent; thus, defendants contends that plaintiff can state  no viable cause of action against the non-diverse defendants, and that they are therefore fraudulently joined.

It is not appropriate for the court, in passing on a motion for remand, to make a fact finding on causation drawn from an inference upon an inference. Reminded that the court is "not to weigh the merits of a plaintiff's claim beyond determining whether it is an arguable one under state law, *Crowe v Coleman*, 113 F.3d 1536, 1538 (11th Cir. 1997), the court  concludes that the defendants in this case have failed to carry their burden of establishing that plaintiff can state no colorable claim against the non-diverse defendants who are therefore not fraudulently joined. Because their presence as party defendants defeats complete diversity among the parties, this court does not have subject matter jurisdiction to hear this case.

3

It is accordingly **ORDERED and ADJUDGED** :

1.     Because the court lacks subject matter jurisdiction over this case, this action is

**REMANDED** to the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County,

Florida.

2.     The clerk of the court shall **CLOSE** this case, **DENY** any pending motions as

**MOOT** and send a certified copy of this order to the Clerk of the Fifteenth Judicial Circuit in

and for Palm Beach County, Florida pursuant to 28 U.S.C. §1447.

**DONE and SIGNED** in Chambers in West Palm Beach, Florida this _____ day of

October, 2003.

Daniel T K Hurley
United States District Judge

copies to:

Philip L. Valente, Jr., Esq.
Angelo Patacca, Jr., Esq.
David Miceli, Esq
Sharon Kegerreis, Esq.

4

NOV-13-2003 12:51PM   FROM-

T-913   P.001/001   F-019

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 03-80514-CIV-HURLEY/LYNCH

EVELYN IRVIN, as Personal Representative
of the Estate of Richard Irvin, Jr.,
    plaintiff,

vs.

MERCK & CO., INC., JOE GHEZZI and
CHRIS METROPULOS,
    defendants.



FILED by _____ D.C.

NOV - 7 2003

CLARENCE MADDOX
CLERK U.S. DIST CT
S.D. OF FLA - W.P.B.

## ORDER DENYING DEFENDANT'S MOTION FOR RECONSIDERATION

    **THIS CAUSE** is before the court upon the defendant Merck & Co.'s motion for reconsideration of this Court's order of remand entered October 9, 2003. Having reviewed the defendant's motion, together with plaintiff's response in opposition, it is herewith

    **ORDERED AND ADJUDGED:**

    1. The defendant's motion for reconsideration is DENIED.

    **DONE AND ORDERED** in Chambers at West Palm Beach, Florida this _6th_ day of November, 2003.

                    Daniel T. K. Hurley
                    United States District Judge

cc.
Lori J. Caldwell, Esq.
David Miceli, Esq.
Philip Valente, Jr., Esq.
Sharon L. Kegcrreis, Esq.

1

For updated court information, visit unofficial Web site at http://us.geocities.com/usdc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 03-80514-CIV-HURLEY

EVELYN IRVIN, as personal representative of
the Estate of RICHARD IRVIN, JR.,
        plaintiff,

vs.

MERCK & CO., INC. , JOE GHEZZI and
CHRIS METROPULOS,
        defendants.
_____/

FILED by _____ D.C.

OCT · 9 2003

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. · W.P.B.

ORDER REMANDING CASE TO FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA
and CLOSING FILE

THIS CAUSE is before the court upon plaintiff's motion for remand for lack of subject
matter jurisdiction [DE# 6], the defendants' response in opposition [DE#17] and the plaintiff's
reply [DE#19].  For reasons stated below, the court will grant the motion  and remand this case
to the state court in which it was originally filed.

## I. BACKGROUND

Plaintiff originally  filed  suit against  defendants  in  state  court  on May 14, 2003  in the
Circuit Court of the Fifteenth Judicial  Circuit in and  for Palm Beach County, Florida, alleging
state  common  law  tort claims arising out of the wrongful death of plaintiff's decedent in
consequence of his ingestion of the prescription drug Vioxx,  a product  manufactured  and
marketed by defendant Merck & Co., Inc. According to the complaint, Joe Ghezzi and Chris
Metropulos, both Florida residents, were  sales  representatives or sales managers employed by

1

Merck to promote, distribute and sell this prescription drug to physicians in the State of Florida, including the plaintiff's decedent's physician.

The defendant Merck filed a notice of removal in this court on June 6, 2003 [DE#1] asserting diversity jurisdiction under 28 U.S.C. §1332 on theory that the two non-diverse individual defendants, Ghezzi and Metropulos, were fraudulently joined to defeat the jurisdiction of this court that would otherwise exist.

## II. DISCUSSION

Fraudulent joinder is a judicially created doctrine that provides an exception to the requirement of complete diversity in three instances: (1) where there is no possibility that the plaintiff can prove a cause of action against the resident (non diverse) defendant; (2) where there is outright fraud in the plaintiff's pleading of jurisdictional facts; and (3) where a diverse defendant is joined with a non-diverse defendant as to whom there is no joint, several, or alternative liability and where the claim against the diverse defendant has no real connection to the claim against the non-diverse defendant. *Triggs v. John Crump Toyota, Inc.*, 154 F.3d 1284, 1287 (11th Cir. 1998).

The burden of establishing fraudulent joinder is a heavy one. The determination must be based upon the plaintiff's pleadings at the time of removal, supplemented by any affidavit and deposition transcripts submitted by the parties, with all factual allegations construed in the light most favorable to the plaintiff, with any uncertainties about the applicable law resolved in the plaintiff's favor. *Pacheco de Perez v AT & T Co.*, 139 F.3d 1368 (11th Cir. 1998). If even a colorable claim against a non-diverse defendant is stated, joinder is proper and the case should be remanded to state court. *Id.*

2

In this case, plaintiff has asserted facts which state potential causes of action against the individual Florida defendants, having specifically alleged that these defendants were personally involved in the marketing of the prescription drug Vioxx to Florida physicians, including the plaintiff's decedent's physician. In opposing remand, defendants have filed affidavits of the individual defendants who both aver that their sales territory encompasses Broward and Palm Beach County, Florida, but not St. John's County. "Presuming" that plaintiff's decedent and relevant treating physician resided and worked in St. John's County-- the alleged county of the plaintiff's residence-- from here the defendant urges the inference that there can be no causal connection between the marketing activities of these defendants and the alleged injury to plaintiff's decedent; thus, defendants contends that plaintiff can state no viable cause of action against the non-diverse defendants, and that they are therefore fraudulently joined.

It is not appropriate for the court, in passing on a motion for remand, to make a fact finding on causation drawn from an inference upon an inference. Reminded that the court is "not to weigh the merits of a plaintiff's claim beyond determining whether it is an arguable one under state law, *Crowe v Coleman*, 113 F.3d 1536, 1538 (11th Cir. 1997), the court concludes that the defendants in this case have failed to carry their burden of establishing that plaintiff can state no colorable claim against the non-diverse defendants who are therefore not fraudulently joined. Because their presence as party defendants defeats complete diversity among the parties, this court does not have subject matter jurisdiction to hear this case.

3

It is accordingly **ORDERED and ADJUDGED** :

1.   Because the court lacks subject matter jurisdiction over this case, this action is **REMANDED** to the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida.

2.   The clerk of the court shall **CLOSE** this case, **DENY** any pending motions as **MOOT** and send a certified copy of this order to the Clerk of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida pursuant to 28 U.S.C. §1447.

**DONE and SIGNED** in Chambers in West Palm Beach, Florida this ___ day of October, 2003.

Daniel T K Hurley
United States District Judge

copies to:

Philip L. Valente, Jr., Esq.
Angelo Patacca, Jr., Esq.
David Miceli, Esq
Sharon Kegerreis, Esq.

4

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

RUBY WHITE,

     Plaintiff,

v.                        CASE NO: 8:05-cv-243-T-26MSS

MERCK & CO., INC., GENA ORTEGA f/k/a
GENA GHAZZI and JOHN E. (JACK) KILKELLY,

     Defendants.

_____/


O R D E R

Before the Court are Plaintiff's Motion to Re-open Case and for Reconsideration

of Judge's Order Granting Defendants' Motion to Stay (Dkt. 10) and Plaintiff's Motion to

Remand (Dkt. 9).[1] After careful consideration of the Motions, the pleadings and papers

on file, and an almost identical case handled by the Honorable James D. Whittemore, the

Court concludes that this case should be re-opened and remanded to the state court.

Plaintiff correctly argues that this Court lacks jurisdiction based on diversity of

citizenship because, contrary to the assertions of Defendant Merck in its notice of

removal and in its arguments in Kozic v. Merck, the two drug sales representatives were

---

[1] The Court does not need a response from Defendant Merck because of the
extensive argument in the Notice of Removal (Dkt. 1) and the arguments already
presented to the Honorable James D. Whittemore in Kozic v. Merck & Co., Inc., Ghazzi
and Kilkelly, No. 8:04-cv-324-T-27TBM.

not fraudulently joined. This Court must review the pleadings to determine whether there

is a reasonable basis for predicting that a state court might impose liability on the resident

defendants. See Crowe v. Coleman, 113 F.3d 1536, 1542 (11th Cir. 1997). A review of

the Complaint[2] leaves no doubt that it states a cause of action under Florida law as to the

two individual Defendant sales representatives.[3] See Albertson v. Richardson-Merrell,

Inc., 441 So.2d 1146 (Fla.Dist.Ct.App. 1983). Because Defendants Ortega and Kilkelly

are citizens of Florida, capable of being sued for the non-fraudulent and non-frivolous

causes of action alleged in Counts II, III, and IV, this Court is without subject matter

jurisdiction to hear this case.

It is therefore **ORDERED AND ADJUDGED** as follows:

(1)    Plaintiff's Motion to Re-open Case and for Reconsideration of Judge's

       Order Granting Defendants' Motion to Stay (Dkt. 10) is **GRANTED**. The

       Clerk shall re-open this case for the Court's reconsideration of the order

       entered February 9, 2005. (Dkt. 7). The Order granting a stay (Dkt. 7) is

       hereby **VACATED**.

---

[2]  The Complaint filed in state court (Dkt. 2) seeks compensatory damages for the Plaintiff's ingestion of Vioxx for pain over a prolonged time. Defendant Merck & Co., Inc. (Merck) is a foreign corporation authorized to do business in Florida. Defendants Ortega and Kilkelly, both residents of Florida, were sales representatives for Merck who sold Vioxx to prescribing physicians. Counts II, III, and IV seek relief against Merck, Ortega and Kilkelly for negligence, negligent misrepresentation, and fraud, respectively, in failing to warn prescribing physicians of the significant risks involved with the use of Vioxx.

[3]  The Complaint also comports with Federal Rules of Civil Procedure 8 and 9.

(2)     Plaintiff's Motion to Remand (Dkt. 9) is **GRANTED**.

(3)     The Clerk is directed to remand this case to the Circuit Court of the Twelfth

Judicial Circuit in and for Sarasota County, Florida.  Once remand is

effectuated, the Clerk is directed to close this case.

**DONE AND ORDERED** at Tampa, Florida, on February 14, 2005.


_____s/_____

**RICHARD A. LAZZARA**
**UNITED STATES DISTRICT JUDGE**


<u>**COPIES FURNISHED TO**</u>:
Counsel of Record

-3-

# EXHIBIT B

## *Vioxx Target List*



| Key For Messages | Key For Resouces | Key For HEL |
|---|---|---|
| 1. Efficacy in Acute pain | 14. Cannon Reprint | 19. Colloquia |
| 2. OA efficacy | 15. Vigor Study (PIR) | 20. Customer focus Group |
| 3. Safety in Elderly | 16. Celebrex vs Vioxx comparison | 21. National Speaker Forum |
| 4. GI Risk and Safety Messages | 17. Laine Reprint | 22. Regional Seaker Forum |
| 5. Call to action - Close | 18. Ruben Data (PIR) | 23. Regional Speaker |
| 6. 25mg more potent greater than 200mg q.d. | | Round table |
| 7. 12.5mg is the recommended starting dose for OA | | 24. Clinical Discussion Group |
| 8. 12.5 mg is comparable to 2400 mg Ibubrofen | | 25. Vioxx Tuesday's !!!!!! |
| 9. Medium time till rescue medication was 9.6 hrs | | 26. FMC lunches |
| 10. Superior pain relief over codeine max dose | | |
| 11. Rate of Hypertention and Edema | | |
|    comparable to other NSAIDS | | |
| 12. Narcotic tapering Data | | |
| 13. Comparable dosing 25mg = 400mg celebrex | | |



Top 10 - Rx Share Chg
Bottom 10 - Rx Share Chg

Mock Ruting

Customer

Total Market

VIOXX TOTAL

Share (RCG)

Rx Share Chg

Celebrex(RCG)

Rx Share (RCG)

Rx Share Chg

Rx Share (RCG)

TS = Redacted -- trade secret

MRK-KOZ0012243

# EXHIBIT C



# VIOXX®
## (rofecoxib)



# DODGE!

P1.0007

MRK-AAR0019773





"I am concerned with the potential edema that occurs with Vioxx."

MRK-AAR0019774



# VIOXX®
## (rofecoxib)



"I am concerned with dose-related
increases in hypertension
with Vioxx."

MRK-AAR0019775





"Can Vioxx be used in patients
using low dose aspirin?"

MRK-AAR0019776





"I am concerned about the cardiovascular effects of Vioxx?"

MRK-AAR0019777





"The competition has been in my
office telling me that the incidence
of heart attacks is greater with
Vioxx than Celebrex."

MRK-AAR0019778





"There is no difference between Vioxx and Celebrex, why should I use Vioxx?"

MRK-AAR0019779





"Vioxx cannot be used for longer than five days when treating patients for acute pain?"

MRK-AAR0019780





"I use Celebrex.  I'm concerned
about the safety profile with Vioxx?"

MRK-AAR0019781



# VIOXX®
## (rofecoxib)



**OBSTACLE 2**

"I understand the new COXIB, Mobic, was just approved."

MRK-AAR0019782





"Searle/Pfizer just presented me with data which showed Celebrex 800 mg daily did not exhibit dose dependent increases in side effects compared to the OA and RA doses, and that Vioxx exhibited dose dependent increases in side effects with the 50 mg dose."

MRK-AAR0019783





"The new narcotic data looks great,
now I'll use Vioxx for all my acute
pain patients."

MRK-AAR0019784



# VIOXX®
## (rofecoxib)



"I can't use Vioxx because the HMO's require the patients to be on generic NSAIDS first."

MRK-AAR0019785





**DODGE!**

MRK-AAR0019786

# EXHIBIT    D

ONE HUNDRED NINTH CONGRESS

# Congress of the United States
## House of Representatives
COMMITTEE ON GOVERNMENT REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

http://reform.house.gov

## MEMORANDUM

### May 5, 2005

To:          Democratic Members of the Government Reform Committee

From:      Rep. Henry A. Waxman

Re:          The Marketing of Vioxx to Physicians

On November 9, 2004, the Committee on Government Reform requested that Merck provide the Committee with a wide range of documents related to the anti-inflammatory drug Vioxx. The request expressly sought "all presentations, training sessions, or materials given to Merck employees and agents who marketed Vioxx" and "all records of communication provided to healthcare providers and pharmacists concerning the safety and efficacy of the drug."[1] In response to this request, Merck provided the Committee with over 20,000 pages of internal company documents, including course curricula, bulletins to the field, training manuals, company talking points, memoranda among senior executives, and promotional materials for use with physicians. The Committee also received documents from FDA related to Vioxx.

These documents provide an extraordinary window into how Merck trained its sales representatives and used them to communicate to physicians about Vioxx and its health risks. In fact, the documents may offer the most extensive account ever provided to Congress of a drug company's efforts to use its sales force to market to physicians and overcome health concerns.

To assist members in their preparation for the May 5, 2005, hearing on FDA and Vioxx, this memorandum summarizes the key documents received by the Committee. It assesses how Merck trained its sales representatives, whether this training was consistent with a primarily educational purpose for contacts with physicians, and whether Merck's sales representatives were instructed to discuss fairly and accurately the cardiovascular risks of Vioxx with physicians.

---

[1] Letter from Chairman Tom Davis to Merck Chief Executive Officer Ray Gilmartin (Nov. 9, 2004).

The Committee did not receive documents from Pfizer related to its anti-inflammatory drugs Celebrex and Bextra, nor has the Committee received or reviewed documents from other drugs companies related to the marketing of other drugs. Thus, this memorandum cannot assess whether Merck's practices are better or worse than or the same as those of other drug companies.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## TABLE OF CONTENTS

EXECUTIVE SUMMARY ............................................................................................2

I.   INTRODUCTION ...........................................................................................4

II.  HOW MERCK TRAINED ITS SALES REPRESENTATIVES ............................................7
     A. General Sales Techniques ............................................................................7
     B. Specific Marketing Strategies ......................................................................12

III. COMMUNICATIONS ABOUT VIOXX AND ITS RISKS ...............................................16
     A. The VIGOR Trial .......................................................................................16
     B. The FDA Advisory Committee Meeting............................................................20
     C. The *New York Times* Article .......................................................................23
     D. *JAMA* Study ............................................................................................25
     E. Changes to the Vioxx Label ..........................................................................26

IV.  CONCLUSION................................................................................................29

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## EXECUTIVE SUMMARY

By the time Merck voluntarily withdrew the anti-inflammatory drug Vioxx from the market in September 2004, more than 100 million prescriptions had been dispensed in the United States. Yet the vast majority of these prescriptions were written by physicians after evidence of Vioxx's risks had already surfaced. Even as evidence mounted that use of Vioxx was associated with heart attacks and strokes, physicians continued to prescribe Vioxx to millions of patients. How could this have happened?

A partial answer may be found by examining the strategies that Merck used to market Vioxx to physicians. Based on a review of the Merck documents, it appears that Merck sent over 3,000 highly trained representatives into doctor's offices and hospitals armed with misleading information about Vioxx's health risks. The documents indicate that Merck instructed these representatives to show physicians a pamphlet indicating that Vioxx might be 8 to 11 times safer than other anti-inflammatory drugs, prohibited the representatives from discussing contrary studies (including those financed by Merck) that showed increased risks from Vioxx, and launched special marketing programs — named "Project XXceleration" and "Project Offense" — to overcome the cardiovascular "obstacle" to increased sales.

The documents reveal that Merck exhaustively trained its representatives on how to persuade doctors to prescribe Vioxx and other Merck products. No interaction with physicians appears to have been too insignificant for instruction. Merck representatives were taught how long to shake physicians' hands (three seconds), how to eat their bread when dining with physicians ("one small bitesize piece at a time"), and how to use "verbal and non-verbal" cues when addressing a physician to "subconsciously raise[] his/her level of trust." Merck instructed its representatives on the various personality types of doctors (including "technical," "supportive," and "expressive") and recommended targeted sales techniques for each type. And Merck rewarded its sales force with thousands of dollars in cash bonuses for meeting sales goals. The company assigned individual doctors a "Merck potential" and graded them on how often they prescribed Merck products.

The documents describe in detail how Merck used this highly trained sales force to respond to reports of Vioxx's safety risks. The first public indication that Vioxx posed a heightened risk of heart attack and stroke came in March 2000, when Merck's VIGOR study showed a five-fold increase in the risks of heart attacks in patients on Vioxx compared to patients on naproxen. This study was followed by cautionary discussions of the cardiovascular risks of Vioxx at a meeting of an advisory committee to the Food and Drug Administration in February 2001, in a *New York Times* article in May 2001, and in a paper in the Journal of the American Medical Association in August 2001.

After each of these developments, Merck sent bulletins or special messages to its sales force, directing them to use highly questionable information to assuage any physician concerns.

For example, the Merck documents show:

3

- After Merck's VIGOR study reported increased heart attack risks, Merck directed its sales force to show physicians a "Cardiovascular Card" that made it appear that Vioxx could be 8 to 11 times safer than other anti-inflammatory drugs. This card omitted any reference to the VIGOR findings and was based on data FDA considered to be inappropriate for a safety analysis.

- After the FDA advisory committee voted that physicians should be informed about the risks found in the VIGOR study, Merck sent a bulletin to its sales force that advised: "DO NOT INITIATE DISCUSSIONS ON THE FDA ARTHRITIS COMMITTEE ... OR THE RESULTS OF THE ... VIGOR STUDY." If physicians asked about the VIGOR study, Merck representatives were directed to respond, "I cannot discuss the study with you."

- After the *New York Times* reported on the cardiovascular dangers of Vioxx, Merck instructed its field staff to tell physicians that patients on other anti-inflammatory medications were eight times more likely to die from cardiovascular causes than patients on Vioxx. The Merck bulletin told its sales force to show physicians the Cardiovascular Card and state: "Doctor, As you can see, Cardiovascular Mortality as reported in over 6,000 patients was Vioxx .1 vs. NSAIDS .8 vs. Placebo 0."

After extensive negotiations, FDA and Merck agreed on a label change for Vioxx in April 2002 that mentioned the cardiovascular findings from the VIGOR study. The final label included the statement that the significance of these findings were "unknown." According to the documents, Merck instructed its representatives to emphasize this statement on new label to counter physician safety concerns.

Drug companies maintain publicly that their representatives play a vital role in the health care system by educating physicians about new drugs and ongoing research. But the Merck documents reveal another side to company marketing efforts. The documents show that Merck trained its representatives to capitalize subtly on every interaction with physicians to promote Merck products. When concerns about Vioxx's safety arose, Merck appeared to use this highly trained force to present a misleading picture to physicians about the drug's cardiovascular risks. Merck's promotional efforts appear to explain in part why Vioxx sales remained strong even as the evidence of the drug's dangers mounted.

## I.    INTRODUCTION

On September 30, 2004, Merck & Co, Inc., announced that in a major clinical trial, patients on the anti-inflammatory drug Vioxx had experienced significantly more heart attacks and strokes than those on a placebo. On the same day, Merck voluntarily withdrew Vioxx from the market.[2]

---

[2] Merck, *Merck Announces Voluntary Worldwide Withdrawal of Vioxx* (Sept. 30, 2004) (online at http://www.vioxx.com/vioxx/documents/english/hcp_notification_physicians.pdf).

4

At the time of Vioxx's withdrawal, more than 2 million patients around the world were taking the drug.[3]  Since May 1999, when Vioxx was approved by the Food and Drug Administration, more than 100 million prescriptions had been dispensed in the United States alone.[4]  Vioxx is considered safer for the stomach than aspirin and other anti-inflammatory drugs.  Yet recent research indicates many, if not most, patients on Vioxx were at low or very low risk of stomach problems and would have done well on standard medications.[5]

When exposure to a drug is so widespread, even a small safety problem can have major public health consequences.  A recent study estimated that as many as 88,000 to 140,000 Americans may have suffered Vioxx-related heart attacks, strokes, and other serious medical complications.[6]

The vast majority of Vioxx prescriptions were written after serious safety questions were first raised.  In March 2000, less than a year after approval, Merck announced the results of a clinical trial in which Vioxx was associated with significantly more heart attacks and strokes than another anti-inflammatory drug.[7]  Paradoxically, following the announcement of these results, Vioxx's sales soared.  The drug reached $2 billion in sales faster than any other drug in Merck's history.[8]

Vioxx sales remained strong even as other reports of Vioxx's dangers emerged.  These included new data presented at an FDA advisory committee in February 2001,[9] a major exposé in the *New York Times* in May 2001,[10] an article in the *Journal of the American Medical*

---

[3] *Merck:  Vioxx Withdrawal a Harsh Blow to Drug Giant*, Chicago Tribune (Oct. 3, 2004).

[4] D. Graham et al., *Risk of Acute Myocardial Infarction and Sudden Cardiac Death in Patients Treated with Cyclo-oxygenase 2 Selective and Non-Selective Non-Steroidal Anti-Inflammatory Drugs: Nested Case-Control Study*, Lancet, 475–481 (Feb. 5, 2005).

[5] Carolanne Dai, Randall S. Stafford, G. Caleb Alexander, *National Trends in Cyclooxygenase-2 Inhibitor Use Since Market Release*, Archives of Internal Medicine, 171-177 (Jan. 24, 2005).

[6] *Id.*

[7] *Merck Informs Investigators of Preliminary Results of Gastrointestinal Outcomes Study with VIOXX(R)*, PR Newswire (Mar. 27, 2000).

[8] Merck, *Merck Annual Report 2001, We're Strengthening Our Arthritis Franchise* (2002) (online at http://www.anrpt2001.com/4.htm).

[9] Food and Drug Administration, *Arthritis Advisory Committee* (Feb. 8, 2001) (online at http://www.fda.gov/ohrms/dockets/ac/01/briefing/3677b2.htm).

[10] *Doubts Are Raised on the Safety of Two Popular Arthritis Drugs*, New York Times (May 22, 2001).

*Association* in August 2001,[11] and changes to the Vioxx label in April 2002.[12] Despite growing concern over Vioxx's dangers, sales in 2003 reached $2.5 billion.[13]

This memorandum summarizes key Merck documents that shed light on why clinicians continued to prescribe so much Vioxx even as evidence of harm began to mount. Based on a review of over 20,000 pages of internal company documents, it focuses on an aspect of the drug industry that has historically been hidden from public view: promotional activities directed at physicians.[14]

Promotions targeting physicians account for the majority of drug industry spending on marketing and promotion. In 2003, pharmaceutical companies spent $9 billion on marketing and promotion. Of this amount, $5.7 billion (over 60%) was aimed at physicians.[15] As many as ninety thousand sales representatives meet with physicians about their companies' products every day.[16]

Vioxx was no exception. According to Merck, the company assigned over 3,000 company representatives across the country to engage in face-to-face discussions with physicians about Vioxx.[17]

According to the Pharmaceutical Research and Manufacturers Association of America, an industry trade group, the efforts of pharmaceutical representatives are "essential for

---

[11] D. Mukherjee, S. Nissen, and E. Topol, *Risk of Cardiovascular Events Associated with Selective Cox-2 Inhibitors*, Journal of the American Medical Association, 954–9 (Aug. 22–29, 2001).

[12] Food and Drug Administration, *FDA Approves New Indication and Label Changes for the Arthritis Drug, Vioxx*, FDA Talk Paper (Apr. 11, 2002).

[13] *Merck Withdraws Arthritis Medication*, Washington Post (Oct. 1, 2004).

[14] Other factors beyond the scope of this report have been cited as contributors to robust Vioxx sales. These include Merck's $300 million direct-to-consumer advertising campaign and FDA's failure to strongly and promptly warn the public and physicians of cardiovascular risks. *See New Study Criticizes Painkiller Marketing*, Washington Post (Jan. 25, 2005); Daniel H. Solomon, Jerry Avorn, *Coxibs, Science, and the Public Trust*, Archives of Internal Medicine, 158-160 (Jan. 24, 2005);

[15] According to the Pharmaceutical Research and Manufacturers Association, drug companies spent $5.7 billion on office promotion, hospital promotion, and journal advertising in 2003, compared to $3.3 billion in direct-to consumer advertising. They also spent an additional $16.3 billion in providing samples of medications to physicians. PhRMA, *Pharmaceutical Research and Promotion* (Nov. 2004).

[16] *It's All in the Detail*, Med Ad News (Oct. 1, 2004).

[17] Teleconference briefing by Merck for staff of the Government Reform Committee (Apr. 25, 2005).

physicians, allowing physicians to have sufficient information about new drugs so they can prescribe them appropriately."[18]  The trade group also has stated, "Many physicians learn about new drugs — indeed, about ongoing research in their areas of specialization — largely through information provided by the companies that market new products."[19]

In fact, the documents suggest that Merck's sales representatives did not appropriately educate physicians about the research showing Vioxx's cardiovascular risks.  To the contrary, it appears that Merck's highly trained sales force was instructed not to address the new research findings, but to emphasize outdated and misleading data that indicated Vioxx was safer than alternatives.  The documents thus raise serious questions about the role played by Merck's representatives in physician prescribing of a risky drug.

## II.    HOW MERCK TRAINED ITS SALES REPRESENTATIVES

The documents reveal that the 3,000-person sales force Merck used to promote Vioxx to physicians was extraordinarily well trained.  Virtually every possible interaction with physicians — from the act of shaking hands to navigating through complex hospital power struggles — is addressed in some portion of the Merck materials.  The overriding goal of the training appears clear:  to maximize sales of Merck products.

This part of the memorandum describes the general training Merck provided to its sales representatives.  This training instructed the representatives in techniques thought to enhance "professional presence" and "captivate the customer."  It also addressed sensitive subjects such as medical reprints, physician targeting, hospital dynamics, and physician education.  Although not addressed here, Merck representatives were also required to attend numerous courses and exercises covering a variety of medical topics, including pharmacology, anesthesiology, rheumatology, and pain management.[20]

The next part of this memorandum (part III) examines how Merck used this highly trained sales force to communicate with physicians about the risks of Vioxx.

### A.    General Sales Techniques

Merck provided its representatives with extensive training in sales techniques.  This training emphasized that "gaining access and building relationships ... are key to providing you

---

[18] PhRMA, *Marketing and Promotion of Pharmaceuticals* (Oct. 23, 2000) (online at http://www.phrma.org/publications/quickfacts/23.10.2000.184.cfm).

[19] *Id.*

[20] *See, e.g.,* Merck, *Analgesic and Anti-Inflammatory Training,* Modules 1-8 (undated).

the opportunity to influence your customers' behaviors."[21]  Merck's sales staff were instructed that a successful career can depend upon "how you present yourself professionally."[22]

Some of the training materials addressed the basic elements of a visit with physicians. For example, the course *Selling Skills* instructed representatives to begin by "painting a word picture that describes a patient type that can benefit from the Merck product."  *Selling Skills* then advised that representatives ask "strategic questions" about the physician's approach to the patient that "help you influence and control the discussion," which should be followed by a transition to a "compelling message" for the Merck product.  The fourth step in the process involved "obstacle handling," which addresses overcoming physician concerns about the product.  Finally, *Selling Skills* instructed representatives that the last step of a visit is "closing," which involves summarizing "the point(s) you want the customer to remember," checking for agreement, asking for "a specific, realistic, measurable action," and "follow-up to ensure action."[23]

Other training materials taught more sophisticated and subtle techniques.  For example, one Merck course, entitled "Access Success," advised representatives to master nonverbal cues to communicate effectively with doctors.[24]  See Figure 1.

Figure 1:   Merck Instruction on Face-to-Face Communication

| Verbal (7%) | Vocal (38%) | Visual (55%) |
|---|---|---|
| *What someone says when listening. . .* | *How they say something when listening. . .* | *What they're doing when listening. . .* |
| ▪ Hmmm, Yes, Okay, I see | ▪ Sound interested | ▪ Nod head |
| ▪ Acknowledge | ▪ Mimic or match vocal behavior of speaker | ▪ Eye contact |
| ▪ Ask questions | ▪ Use voice inflection and energy | ▪ Smile (if appropriate) |
| ▪ Summarize | ▪ Use empathetic voice | ▪ Don't interrupt |
| ▪ Stay open to ideas | | ▪ Take notes |
| ▪ Short periods of silence | | ▪ Openness in gestures |

---

[21] Merck, *Professional Presence* (undated).

[22] *Id.*

[23] Merck, *Selling Skills for Hospital Representatives & HIV Specialists* (undated).

[24] Merck, *Access Success* (Apr. 2000).

8

Similarly, the course "Captivating the Customer" recommended that field staff learn nonverbal techniques involving the eyes, head, fingers and hands, legs, overall posture, facial expression, and mirroring.[25] Curriculum notes for leaders of the course explained the last concept further:

> Mirroring is the matching of patterns; verbal and non-verbal, with the intention of helping you enter the customer's world. It's positioning yourself to match the person talking. It subconsciously raises his/her level of trust by building a bridge of similarity.[26]

In a course entitled "Champion Selling," Merck sought to teach staff to "employ a variety of selling skills and techniques to more effectively handle challenging selling situations."[27] One such technique was to analogize the "defining moments" of selling Merck drugs to critical points in the lives of "champions" in other fields, including Helen Keller, Martin Luther King, Tiger Woods, and even George Washington.[28] See Sidebar.

Another important technique emphasized in "Champion Selling" was to assess the personality of doctors in order to determine what type of information would be most convincing to them. For a doctor with a "technical" personality, sales representatives were taught to "use figures, percentages" in their pitches; for a doctor with a "supportive personality," representatives were advised to "focus on benefits to patients"; and for a doctor with an "expressive personality," representatives were told to "show enthusiasm; appeal to his/her ego."[29]

---

[25] Merck, *Captivating the Consumer* (June 2001).

[26] *Id.*

[27] Merck, *Champion Selling: Milestone Leader's Guide* (Jan. 2002).

[28] *Id.*

[29] *Id.*

---

**Sidebar:  Analogies in Champion Selling**

*Champion Selling* instructed that when faced with a doctor who does not have time to talk about a Merck product, field staff should recall that "it's those defining moments that distinguish all champions." Course leaders were asked to remind trainees:

- Helen Keller could have felt sorry for herself when she went blind and deaf.
- Martin Luther King could have laid low when his home was firebombed.
- Tiger Woods could have avoided the pressure by not turning pro as young as he did.
- George Washington could have finished his years with a comfortable life without the challenges of taking on the presidency.*

\* Merck, *Champion Selling: Milestone Leader's Guide* (Jan. 2002).

---

Merck paid special attention to teaching its field representatives how to "refocus a conversation from non-business subjects to business subjects."[30] In one curriculum, sales representatives were asked to judge sample responses to statements from doctors such as "What a nice restaurant! I hear that the food is wonderful," "I love coming to this restaurant, my husband I come here a lot," "What a great football game yesterday," and "So what plans do you have for the holidays?"[31] One response suggested for discussion to the last question was:

> Well, my wife and I are going to visit my grandmother. It should be a lot of fun though I feel so bad for her. She really has advanced osteoporosis and can't travel at all. She wasn't on any treatment plan for the longest time. Physician, what do you think the reasons are that some physicians don't do much about osteoporosis until it's in its advanced stages and nearly too late?[32]

Another curriculum instructed representatives to use a "respond→ advance" model to move conversation gradually from general topics to selling Merck products.[33] See Figure 2.

---

[30] Merck, *Planning, Conducting & Following up Successful HEL Programs* (1999).

[31] *Id.*

[32] *Id.*

[33] Merck, *Ensuring Rewarding HEL Programs* (Apr. 2000).

10

Figure 2:  Instructions on Transitioning Topics



The documents show that Merck trained its sales staff on minute details of encounters with physicians.  One Merck training course, entitled "Professional Presence," even provided detailed instructions on handshakes.[34]  See Figure 3.  The curriculum advised representatives to shake hands when "someone offers his/her hand to you," when "first meeting someone," when "greeting guests,"  when "greeting your host/hostess," when "renewing an acquaintance," and when "saying good-bye."[35]

---

[34] Merck, *Professional Presence* (undated).

[35] *Id.*

11

Figure 3:  Merck Instruction on Handshake Technique



The Proper Shake...

· Comes with Eye Contact
· Is Firm but Painless
· Lasts about 3 seconds
· Starts and stops crisply
· Does not continue through
  the entire introduction

USH *Professional Development System*
*The Touchstone Tool*

     Another section of the same course instructed representatives on where to sit and how to eat when dining with physicians.  For example, the curriculum stated:  "Bread should be eaten one small bitesize piece at a time.  Break off and butter bread one single piece at a time.  Bread dipped in olive oil should also be broken off and eaten one single piece at a time."[36]

### B.  Specific Marketing Strategies

     In addition to training its staff in general sales techniques, the documents show that Merck provided its sales representatives with detailed instructions on a range of sensitive subjects specific to the marketing of drugs.  The subjects covered in these materials included selectively using reprints from the medical literature that supported Merck products, tracking detailed prescribing behavior of each clinician in their territory, modeling how to get Merck drugs on hospital formularies, and fostering contact between representatives and key opinion leaders.

     **Medical Reprints.**  Merck representatives were trained to use reprints of medical journal articles in sales discussions, but only when those articles presented Merck products in a favorable light.  One course workbook instructed participants that medical journal articles relating to Merck drugs fell into two categories:  "approved" and "background."  "Approved" articles were those to be discussed with doctors because they "provide solid evidence as to why [doctors] should prescribe Merck products for their appropriate patients."[37]  In contrast, "background" articles were not approved for use with physicians.[38]  According to the workbook,

---

[36] *Id.*

[37] Merck, *Join the Club* (Mar. 2001).

[38] *Id.*

12

"These articles may contain valuable background information, but this information cannot be used, and the articles cannot be referenced, during sales discussions with your customers."[39]  In fact, discussing unapproved background articles with physicians "is a clear violation of Company Policy."[40]  Merck instructed representatives to refer any questions about these articles to the medical services department.[41]

**Physician Prescribing Patterns.**  The documents reveal that Merck provided its representatives with highly detailed information on individual doctors' prescribing habits and that this data was used to target physicians to increase their prescribing of Merck drugs.  Merck purchased this prescribing data from an outside company, which obtained the data from pharmacy records of filled prescriptions.[42]  Based on this data, representatives would be given access to monthly reports on each doctor in their territory.  For each doctor, the reports showed the number of filled prescriptions for Merck and competitor products.  They also showed each doctor's "market share" by calculating the percentage of Merck versus competitor product prescriptions.  An important concept was each doctor's "Merck potential," which Merck defined as a "dollar estimate of each prescriber's total prescribing volume that can realistically be converted to Merck prescriptions."[43]

Based on the data for individual doctors, Merck's software could compile monthly reports on overall sales and market share for each representative's territory.  Representatives were told that their bonuses would be based on these overall sales figures, and representatives could see estimates of their bonus along with the data.[44]  Thus, representatives could see a direct correlation between the number of prescriptions they convinced doctors to write each month and their bonuses.

Merck also told the sales representatives that doctors would be given grades from D to A+ for each product category depending on how often they prescribed a Merck product and what percentage of their prescriptions were for the Merck product.[45]  See Figure 4.

---

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] Merck, *Data Sources* (May 2003).

[43] Merck, *Basic Training Participant Guide* (Jan. 2002).

[44] *Id.*; Merck, *Foundations Reference Guide, Business Management Field Sales Performance Report* (undated).

[45] Merck, *Basic Training Participant Guide* (Jan. 2002); Merck, *Role of the National Account Executive* (undated).

13

Figure 4: Example of Merck Tracking of Physician Prescribing



Hospital Formularies. Other instruction provided by Merck addressed approaches for getting Merck drugs onto hospital formularies, which are the lists of the drugs easiest for local physicians to access. These strategies included an elaborate simulation in which representatives played an entire cast of hospital staff, including departments of pharmacy, orthopedic surgery, emergency medicine, rheumatology, endocrinology, a pain clinic, internal medicine, anesthesiology, cardiology, nursing, and oncology. The simulation instructions described the "power structures that existed in each department."[46]

Interactions with hospital staff in the simulation were designed to reveal lessons for representatives such as "the importance of leaving no stone unturned and the fact that all personnel in the hospital are potentially useful to you."[47] The simulation also showed how doctors' ambitions could be used to gain formulary support. In one scenario, a doctor described as an "ambitious Attending Physician" wants "sponsorship to enable him to attend a major symposium in Sydney, Australia. . . . He was willing to act as a sponsor for Vioxx if you offered

---

[46] Merck, *Hospital Strategy Simulation: Roleplayers Guide* (Sept. 2000).

[47] *Id.*

14

to help him attend the meeting."[48]  In another scenario the fact that two doctors play golf together is used to gain a sponsor.[49]

Departmental power structures were explored in a scene where a senior trauma nurse is "seen by many as running the department" and does not get along with a new "ambitious young Attending Physician."[50]  The nurse sees the young doctor as "'rocking the boat,'" while he does not like "the power she wield[s]," so the representative in the simulation must turn to a more senior doctor who gets along with the nurse rather than asking the new young doctor for formulary support.[51]  In general, the representatives in the simulation learn to gauge who is influential, ambitious, or a potential informer in a given department and to use this knowledge to maximum benefit in the campaign to achieve formulary status.

**Physician Education.**  Merck's extensive training also addressed how sales representatives could use speaker programs and other educational events as opportunities to enhance sales of Merck products.  These speaker programs, sometimes referred to as Health Education Learning (HEL) programs, often take the form of a dinner and featured speaker or panel of speakers on a topic of medical interest.  Merck advised its representatives to invite speakers based in part on whether they viewed Merck products favorably and whether they were influential among their peers.[52]  One curriculum ranked potential speakers as follows:

> A preferred speaker is a qualified advocate who is willing and able to conduct multiple HEL programs.  Preferred speakers should have outstanding delivery and provide favorable yet balanced HEL presentations. . . . A recommended speaker is a qualified advocate who is willing and able to conduct multiple HEL programs.  Recommended speakers also deliver favorable, scientifically balanced programs, however they may not be as strong of a speaker, or as willing to do talks. . . . A speaker classified as "Other" . . . could be one of your speakers in-development, who can deliver favorable, scientifically balanced HEL programs.[53]

In a training for specialty representatives, Merck explained how to create an "Advocate Action Plan" that would help them "sell through the science, by combining scientific data and marketing to create meaningful messaging."[54]  Representatives were provided detailed instructions on how to identify and cultivate a "thought leader" who can "[i]nfluence colleagues

---

[48] *Id.*

[49] *Id.*

[50] *Id.*

[51] *Id.*

[52] Merck, *Specialty Foundations Participant Self-Study Workbook:  Specialty Representative Advocate Development* (May 2001)

[53] *Id.* (emphasis added).

[54] *Id.*

15

through peer-to-peer relationships" and "is very familiar with the prescribing information for the Merck product(s) and understands and supports the medically/legally approved materials for available for the product(s)."[55]

Merck told its representatives that fees and honoraria for speakers could range from $250 to $2,000 per engagement.[56]

The Merck documents indicate that education of physicians was not the only barometer of a successful event. Using the abbreviation of "Rx" for prescribing, one curriculum instructed representatives to tally the "% of attendees whose Rx of program-related Merck products increased."[57]

## III.   COMMUNICATIONS ABOUT VIOXX AND ITS RISKS

Merck's meticulous approach to marketing to physicians is reflected in its communications to physicians about Vioxx and its risks. Beginning in March 2000, a series of studies and news reports raised serious questions about the safety of Vioxx. The Merck documents reveal that the company gave its highly trained representatives detailed instructions for responding to these developments. These instructions had a common theme: reassure physicians about the safety of Vioxx by providing highly questionable information about cardiovascular risks. At the same time, Merck continued to use an array of incentives and messages to inspire its staff to market Vioxx aggressively to physicians.

### A.   The VIGOR Trial

After a major study showed a five-fold increase in the risk of heart attacks for patients on Vioxx, Merck instructed its field staff to show doctors a pamphlet suggesting that Vioxx was 8 to 11 times safer than other anti-inflammatory drugs. This pamphlet summarized studies that were not appropriate for an analysis of cardiovascular safety.

At issue was a clinical trial known as Vioxx Gastrointestinal Outcomes Research (VIGOR), whose results were announced to the public on March 27, 2000,[58] and published in the *New England Journal of Medicine* on November 23, 2000.[59] The study randomly assigned more than 8,000 patients with rheumatoid arthritis into two groups. One group received 50 mg per day

---

[55] *Id.*

[56] Merck, *Business Management, HEL Programs* (undated).

[57] Merck, *Planning, Conducting & Following up Successful HEL Programs* (1999).

[58] *Merck Informs Investigators of Preliminary Results of Gastrointestinal Outcomes Study with VIOXX(R)*, PR Newswire (Mar. 27, 2000).

[59] C. Bombadier et al., *Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis*, New England Journal of Medicine, 1520–8 (Nov. 23, 2000).

of Vioxx for approximately nine months, while the other received the anti-inflammatory drug naproxen. According to Merck's press release, the patients receiving Vioxx had fewer gastrointestinal problems, while the patients receiving naproxen suffered fewer heart attacks and strokes.[60] The actual data from the study showed that patients in the VIGOR study on Vioxx were five times more likely to suffer a heart attack than those on naproxen.[61]

Soon after the release of these results, physicians began asking Merck representatives whether Vioxx could cause heart attacks. On April 28, 2000, in a bulletin to "all field personnel with responsibility for Vioxx," Merck provided a "new resource" "to ensure that you are well prepared to respond to questions about the cardiovascular effects of Vioxx."[62] The resource was the "Cardiovascular Card."

The Cardiovascular Card was a tri-fold pamphlet containing data that supported the safety of Vioxx. One panel, featuring the headline "Overall Mortality Rates," indicated that patients on Vioxx were 11 times less likely to die than patients on standard anti-inflammatory drugs, and 8 times less likely to die from heart attacks and strokes.[63] See Figure 5. Another panel indicated that the rate of heart attack among patients on Vioxx was less than half of the rate of patients receiving placebo and virtually identical to that of patients receiving other anti-inflammatory drugs.[64]

Figure 5: Selection from the Cardiovascular Card

**Overall mortality and cardiovascular mortality**[.1]

Events per 100 Patient-Years

|  | VIOXX N=3,595 | NSAIDs[1] N=1,565 | Placebo N=783 |
|---|---|---|---|
| Total mortality | 0.1 | 1.1 | 0.0 |
| Cardiovascular mortality | 0.1 | 0.8 | 0.0 |

---

[60] Merck took the position that the study's cardiovascular results showed the cardioprotective effect of naproxen, not the dangers of Vioxx. *Merck Informs Investigators of Preliminary Results of Gastrointestinal Outcomes Study with VIOXX(R)*, PR Newswire (Mar. 27, 2000).

[61] Merck, *Bulletin for Vioxx: New Obstacle Response* (May 1, 2000).

[62] Merck, *Bulletin for Vioxx: NEW RESOURCE: Cardiovascular Card* (Apr. 28, 2000).

[63] Merck, *Cardiovascular System*, 4 (2000).

[64] *Id* at 3.

17

Merck gave its representatives specific instructions on how to use the Cardiovascular Card. According to these instructions, Merck's representatives were to refer to the mortality data and "use this page to show physicians that in terms of mortality, which is most important to the physician and their patients, the rate for total mortality and cardiovascular mortality was low."[65]

The data presented in the Cardiovascular Card appears to have little or no scientific validity. The card did not present actual numbers of events or any statistical tests of significance, which are standard in medical communications. It also did not contain any information from the VIGOR study, the most recent study of cardiovascular safety in rheumatoid arthritis patients.[66]

Instead, the card presented pooled data from clinical trials conducted prior to the drug's approval in osteoarthritis patients. For several reasons, however, these studies were not appropriate for an overall analysis of cardiovascular safety. For example:

- Vioxx's pre-approval studies involved few patients taking the doses of Vioxx that were linked to heart problems. According to FDA, fewer than 300 patients in these studies took as much as 50 mg per day of Vioxx for more than 6 months,[67] compared to approximately 4,000 patients in the VIGOR study.[68] As a result, the studies were not nearly as sensitive as VIGOR in detecting a possible problem with the drug.

- The pre-approval studies had been conducted to test the efficacy of the drug to treat pain, not to assess whether the drug caused heart attacks and strokes. None of these early studies had included an expert assessment of whether adverse events were related to the cardiovascular system.[69] Such an "adjudication" process improves the quality of the data and was part of the VIGOR study.

- The pre-approval studies varied widely, involving different doses, different patient populations, and different comparator drugs. In 1999, prior to Vioxx's approval, FDA had expressed serious concerns about combining these disparate studies in a single safety analysis.[70]

---

[65] Merck, *Bulletin for Vioxx: NEW RESOURCE: Cardiovascular Card* (Apr. 28, 2000).

[66] Merck, *Cardiovascular System* (2000).

[67] Food and Drug Administration, *FDA Advisory Committee Briefing Document, NDA 21-042, s007, VIOXX Gastrointestinal Safety*, 19 (Feb. 8, 2001).

[68] *Id.* at 5.

[69] Telephone briefing between Merck and minority staff, Government Reform Committee (Apr. 28, 2005).

[70] In 1999, Merck attempted to combine the pre-approval studies to advance a position on Vioxx's gastrointestinal safety. FDA made a special presentation to the advisory committee on the problems with combining these different studies. Food and Drug Administration, Arthritis Advisory Committee, *Review of NDA #21-042, Vioxx (Rofecoxib) Merck Research Laboratories*, 162–167 (Apr. 20, 1999).

18

The analyses presented in the Cardiovascular Card were not drawn from a scientific paper.[71] The card's two references included "data on file" at Merck and a brief research abstract from a 1999 meeting of the American College of Rheumatology.[72]

When given the opportunity, FDA scientists have expressed "serious concerns" about using the data summarized on the Cardiovascular Card to address cardiovascular safety.[73] One FDA medical reviewer, in a briefing this week with Committee staff, said that the relevance of Vioxx's pre-approval studies to the drug's cardiovascular safety was "nonexistent" and that it would be "ridiculous" and "scientifically inappropriate" to present mortality comparisons from these trials to physicians.[74]

On May 1, 2000, Merck sent another bulletin to "all field personnel with responsibility for Vioxx."[75] This bulletin instructed the sales force how to respond to a competitor's argument that "Vioxx has an increased incidence of heart attacks compared to Celebrex."[76] This response again involved advice to representatives to respond to physicians by "guiding them through the Cardiovascular Card."[77]

Notwithstanding the results of the VIGOR study, Merck's employees were given new financial incentives to sell Vioxx. In the spring of 2000, Merck launched the "2000 Field

---

[71] A pooled analysis of a subset of the studies included in the card was published in the January 15, 2002, issue of the *American Journal of Cardiology*. This analysis did not provide any data on mortality and did not present data on strokes and heart attacks as presented in the Cardiovascular Card. A. Reicin et al., *Comparison of Cardiovascular Thrombotic Events in Patients with Osteoarthritis Treated with Rofecoxib Versus Nonselective Nonsteroidal Anti-Inflammatory Drugs (Ibuprofen, Diclofenac, and Nabumetone)*, American Journal of Cardiology, 204–9 (Jan. 15, 2002).

[72] When compared against the abstract, the Cardiovascular Card appears to substantially overstate the amount of data used for the analysis of mortality. According to the abstract, this analysis was based on data from 3,595 patients on Vioxx treated for an average of 5.5 months each. By contrast, the Cardiovascular Card indicates that the mortality analysis was based upon 3,595 "person-years" of data on Vioxx. This would be the equivalent of 3,595 patients treated for an average of 12 months each. Brian Daniels and Beth Seidenberg Rahway, *Cardiovascular Safety Profile of Rofecoxib in Controlled Clinical Trials*, Arthritis and Rheumatism, S143 (1999).

[73] Food and Drug Administration, *FDA Advisory Committee Briefing Document, NDA 21-042, s007, VIOXX Gastrointestinal Safety*, 19 (Feb. 8, 2001).

[74] FDA briefing for staff of the Government Reform Committee (May 3, 2005).

[75] Merck, *Bulletin for Vioxx: New Obstacle Response* (May 1, 2000).

[76] *Id.*

[77] *Id.*

19

Incentive Plan for Vioxx."[78]  This plan promised rewards to the company's hospital representatives, specialty representatives, and other sales representatives if the Vioxx share of the market for exceeded certain thresholds.  As a bulletin to field staff explained:

1.   Hit 51% . . . for at least one month by March 2000 and get $2,000!
2.   Hit 55% . . . for at least one month between April and December 2000 and get $2,000!
3.   Hit 61% . . . for at least one month between April and December 2000 and get $2,000![79]

To achieve this sales growth, in mid-2000, Merck set a basic strategy for outreach to physicians.  The plan was for field representatives to highlight Vioxx's effectiveness against pain and to transition quickly from any discussion with doctors on safety back to efficacy.  As a memo to company vice presidents dated July 28, 2000, stated:

In order to win the on-going . . . battle, many of you agree our sales force needs to STOP defending Vioxx against the outrageous claims from our competitors, and START offensively selling the core benefit of this product . . . EFFICACY.[80]

**B.     The FDA Advisory Committee Meeting**

Attention to the cardiovascular risks of Vioxx surged in February 2001 as the result of a meeting of the FDA Arthritis Advisory Committee.  After FDA scientists raised serious concerns about the drug's safety, the Committee voted that doctors should be informed about the data from the VIGOR study.  The next day, however, Merck instructed its field representatives not to discuss the VIGOR results with doctors and instead reassure physicians using the Cardiovascular Card.

In advance of the advisory committee meeting, FDA scientists provided the Committee with an analysis of all studies on Vioxx conducted to date.[81]  FDA's assessment covered:

- The VIGOR study, which found a substantial and statistically significant increase in all serious thrombotic events, including heart attack and stroke, in patients on Vioxx compared to patients on naproxen;[82]

---

[78] Merck, *Bulletin for Vioxx:  2000 Field Incentive Plan for Vioxx* (Apr. 5, 2000).

[79] *Id.*

[80] Merck, *Memo re:  Offensive Positioning for Vioxx* (July 28, 2000).

[81] Food and Drug Administration, *FDA Advisory Committee Briefing Document, NDA 21-042, s007, VIOXX Gastrointestinal Safety,* 19 (Feb. 8, 2001).

[82] *Id.* at 9–12.

20

- Another study, called the Advantage study, which showed a trend toward excess heart attacks in osteoarthritis patients in the Vioxx group, compared to naproxen;[83] and

- Two new studies, 085 and 090, which, according to FDA, appeared to "follow the pattern observed in the VIGOR study." These studies were conducted in patients with osteoarthritis.[84]

FDA also addressed whether Vioxx's pre-approval studies, which were the basis of the Cardiovascular Card, could be used to assess the drug's cardiovascular safety. The agency informed the committee that the studies should not be used for a safety analysis. Regarding the pre-approval study 058, the FDA reviewer wrote:

Because of the small size and short duration, this study is inadequate to detect differences in clinically relevant adverse events between rofecoxib [Vioxx] and nabumetone [another anti-inflammatory drug].[85]

Regarding study 069, which contained data on a set of other pre-approval studies, the reviewer stated:

The Division has serious concerns with a combined analysis of studies of different length and dosing regimens. The database overall included short term, low doses of rofecoxib [Vioxx]. . . . None of the studies were powered to detect differences in serious CV [cardiovascular] thrombotic events compared to the active comparator.[86]

The Arthritis Advisory Committee heard from FDA, the public, and Merck.[87] The Committee then concluded that clinicians should be informed that VIGOR study showed "an excess of cardiovascular events in comparison to naproxen."[88]

---

[83] *Id.* at 18.

[84] *Id.* at 17.

[85] *Id.* at 19.

[86] *Id.*

[87] At the meeting, Merck presented a large pooled analysis of all Vioxx trials. In response, FDA told the advisory committee that combining so many different studies to assess safety was fundamentally flawed. Bonnie Goldmann, Regulatory Affairs, Merck Research Laboratories, *FDA Arthritis Advisory Committee* (Feb. 8, 2001); Quan Li, *Advisory Committee Presentation on Vioxx: Discussion on the Metaanalysis for Cardiovascular Risk Assessment* (Feb. 8, 2001).

[88] Food and Drug Administration, *Transcript of Meeting of Arthritis Advisory Committee, NDA # 21-042/s007, Vioxx (Rofecoxib, Merck)*, 206 (Feb. 8, 2001).

21

The next day, Merck sent a bulletin to "all field personnel with responsibility for Vioxx."[89] The bulletin instructed the sales force to "stay focused on the EFFICACY messages for VIOXX."[90] Contrary to the Committee's recommendation, the bulletin advised:

> DO NOT INITIATE DISCUSSIONS ON THE FDA ARTHRITIS ADVISORY COMMITTEE ... OR THE RESULTS OF THE ...VIGOR STUDY.[91]

To respond to doctors who asked about these topics, Merck instructed its field representatives to take three steps.

First, Merck told representatives to say that "because the study is not in the label, I cannot discuss the study with you."[92] This position did not accurately reflect FDA regulations. Under the law, pharmaceutical representatives are permitted to discuss evidence of safety concerns with doctors, even if such data are not on the drug's label.[93]

Second, Merck told the representatives to advise physicians to submit written questions to the company's medical services department. Responses to these questions described the same highly questionable data used in the Cardiovascular Card data before discussing VIGOR and other studies. For example, one response to a clinician contained the same mortality table used in the Cardiovascular Card, but without the column for "placebo." The text stated, "Both the overall mortality . . . and the cardiovascular mortality was lower in the rofecoxib [Vioxx] group compared to the NSAID group."[94]

Third, Merck told representatives to refer to the Cardiovascular Card.[95] Staff were apparently instructed not to leave this pamphlet with physicians.[96]

FDA's advisory committee meeting did not slow Merck's marketing of Vioxx. Early in 2001, Merck launched "Project A&A XXceleration" to reach sales goals through "revised

---

[89] Merck, *Bulletin for Vioxx: FDA Arthritis Advisory Committee Meeting for Vioxx* (Feb. 9, 2001).

[90] *Id.*

[91] *Id.*

[92] Merck, *Bulletin for Vioxx: FDA Arthritis Advisory Committee Meeting for Vioxx* (Feb. 9, 2001).

[93] 21 CFR 202.1

[94] Letter from Jeffrey M. Melin, Associate Director, Medical Services to Dr. Joseph Torg (Mar. 16, 2001).

[95] Merck, *Bulletin for Vioxx: FDA Arthritis Advisory Committee Meeting for Vioxx* (Feb. 9, 2001).

[96] It was a "non leave" sales aid. *Id.*

22

targeting, messaging and advocate development."[97]  "A&A" refers to arthritis and analgesia, two clinical indications for Vioxx.  The slogan for Project A&A XXceleration was apparently "In It to Win It."[98]

As part of this effort, in an April 2001 bulletin for office-based field staff, Merck instructed that each salesperson make a list of his or her "top 50" physicians who were considered "high volume targets."[99]

On April 27, 2001, Merck executive Jo Jerman left a voice mail for field staff involved in Project A&A XXceleration.  She stated:

The most recent performance numbers show a continued trend upward … the share of VIOXX in the A&A market is up to 17.2% — that's an all time high — and the share of VIOXX in the Coxib market 51.2% — another all-time high.  Woo doggie!  That is exciting.[100]

She concluded:

The only thing left is to put "Project A&A XXceleration" into overdrive … the time is now and I wouldn't want anyone on the task but all of you.  Last, but certainly not least, you've got some extra dollars to shoot for as well.  As you recall from our incentive program, if you hit those 2–4 share point increases, you'll be rewarded handsomely . . . . Go get em guys, Good luck and Great selling![101]

## C.   The *New York Times* Article

On May 22, 2001, a long article on the front page of the business section of the *New York Times* raised questions about the cardiovascular safety of Vioxx.  Merck responded by instructing representatives to read favorable data on the Cardiovascular Card directly to physicians.

The *New York Times* article described a pharmaceutical industry analyst who "was warning his clients, many of them institutional investors who hold Merck shares, that they should

---

[97] Merck, *Bulletin for Vioxx: ACTION REQUIRED—"Project A&A Accleration": Top 50 Targeting* (Apr. 20, 2001).

[98] Merck, *MVX for Vioxx: Jo Jerman, Audience—Field Sales, April 27, 2001, Topic: Project A&A XXceleration, Length—approx 1 min 30 Sec* (Apr. 27, 2001).

[99] Merck, *Bulletin for Vioxx: ACTION REQUIRED—"Project A&A Accleration": Top 50 Targeting* (Apr. 20, 2001).

[100] Merck, *MVX for Vioxx: Jo Jerman, Audience—Field Sales, April 27, 2001, Topic: Project A&A XXceleration, Length—approx 1 min 30 Sec* (Apr. 27, 2001).

[101] *Id.*

watch the issue carefully since it could hurt the company's stock price." The article also quoted FDA Arthritis Advisory Committee member Dr. M. Michael Wolfe, who stated, "There must be a warning . . . . The marketing of these drugs is unbelievable . . . . I'm sure there are many people out there who are taking these drugs that should not be."[102]

In response, Merck quickly issued a press release entitled "Merck Confirms Favorable Cardiovascular Safety of Vioxx."[103]  Inside FDA, scientists rejected this conclusion. In a warning letter to the company sent several months later, FDA would cite the title of Merck's press release as "simply incomprehensible" in the face of data from the VIGOR study.[104]

A Merck bulletin to its field representatives also emphasized the drug's safety. The bulletin again advised:

> DO NOT INITIATE DISCUSSIONS ON THE RESULTS OF THE ...VIGOR STUDY, OR ANY OF THE RECENT ARTICLES IN THE PRESS ON VIOXX.[105]

In the case that a physician had further questions, Merck instructed its representatives to display the Cardiovascular Card. The bulletin told field staff to highlight data on the card suggesting that Vioxx might be much safer than other "NSAIDS," non-steroidal anti-inflammatory drugs.[106]  Specifically, Merck advised representatives to state:

> Doctor, As you can see, Cardiovascular Mortality as reported in over 6,000 patients was Vioxx .1 vs. NSAIDs .8 vs. Placebo 0.[107]

---

[102] *Doubts Are Raised on the Safety of Two Popular Arthritis Drugs*, New York Times (May 22, 2001).

[103] Merck, *Merck Confirms Favorable Cardiovascular Safety of Vioxx* (May 22, 2001).

[104] This warning letter contained other examples of inappropriate promotions of Vioxx. These were educational events in 2000 in which a Merck consultant provided false data or made extremely inappropriate comparisons between Vioxx and other products. In response, Merck stated that the events violated company policy and had stopped using the speaker in question. At the request of FDA, Merck also sent letters to physicians who attended the educational events. Letter from Thomas W. Abrams, Director, Division of Marketing, Advertising and Communications, Food and Drug Administration, to Raymond V. Gilmartin, President and CEO, Merck & Co, Inc. (Sept. 17, 2001); Letter from Louis M. Sherwood, Senior Vice President, U.S. Medical & Scientific Affairs, Merck, to Health Care Provider (Nov. 2001).

[105] Merck, *Bulletin for Vioxx: Action Required: Response to New York Times Article* (May 23, 2001).

[106] *Id.*

[107] *Id.*

24

### D.   *JAMA* Study

On August 22, 2001, a study published in the *Journal of the American Medical Association* (*JAMA*) raised serious questions about the safety of Vioxx and other drugs in its class.  In an alert to field representatives about this study, Merck urged them to express confidence in Vioxx's cardiovascular safety and use the Cardiovascular Card.

The *JAMA* paper reviewed new data from VIGOR and other recent studies on the safety of Vioxx and Celebrex, a similar drug.[108]  Authors Dr.  Deborate Mukherjee, Dr. Steven E. Nissen, and Dr. Eric J. Topol from the Cleveland Clinic concluded that there was evidence of a "potential increase in cardiovascular event rates for the presently available COX-2 inhibitors."[109] Until additional studies of safety are conducted, they wrote, "we urge caution in prescribing these agents to patients at risk for cardiovascular morbidity."[110]

One day prior to the *JAMA* paper's release, Merck executive Jo Jerman left a confident and reassuring voice mail for the company's field representatives.  She stated:

> #1.  Stay focused.  Stay focused with your efficacy and GI risk awareness messages and stay focused with your confidence in cardiovascular safety and overall safety of VIOXX.[111]

Ms. Jerman also instructed representatives that "if asked about CV effects, use your CV card."[112]  She continued:  "As your piece shows, CV events and cardiovascular mortality rates between Vioxx and NSAIDS … were similar in [osteoarthritis] studies."[113]  Ms. Jerman then reminded Merck's  field representatives that additional information from the medical services department could be faxed to physicians upon request.[114]

The *JAMA* paper did not lead Merck to moderate its approach to selling Vioxx.  Instead, in the fall of 2001, Merck launched Project Offense, a major new marketing campaign with the

---

[108] D. Mukherjee, S. Nissen, E. Topol, *Risk of Cardiovascular Events Associated with Selective Cox-2 Inhibitor*s, Journal of the American Medical Association, 954–9 (Aug. 22–29, 2001).

[109] *Id.*

[110] *Id.*

[111] Merck, *MVX for Vioxx, Field Sales—USHH, Jo Jerman, August 21, 2001, "JAMA article" FINAL (approx 4 minutes)*, 3  (Aug. 21, 2001).

[112] *Id.*

[113] *Id.*

[114] *Id.*

25

goal of increasing Vioxx's share of the market.[115]  The central message of Project Offense was efficacy.  The company instructed its sales representatives to emphasize that Vioxx demonstrated a potential advantage over narcotics for pain management.

As part of Project Offense, Merck instructed field representatives to deliver the efficacy message multiple times to top prescribers (those physicians who had the highest rates of prescribing Vioxx to their patients).  The representatives were also expected to "quickly and effectively address all physician obstacles and return to the core messages for VIOXX."[116] Merck used the term "obstacles" to refer to concerns physicians might have about prescribing Vioxx.

Project Offense included a decision tree to help address the cardiovascular safety concerns of physicians.  Known as the "CV Obstacle Response," this decision tree began by advising field representatives to tell doctors about the differences between Vioxx and aspirin.[117]

Merck then advised its field representatives to "REVIEW ENTIRE CV CARD" with doctors, including:

- CV thromboembolic Adverse Events per 100 patient years
- Specific CV events
- Overall Mortality
- CV Mortality[118]

The "CV Obstacle Response" concluded:

Doctor, I hope this data has addressed your concern.  Let me show you some new efficacy data for VIOXX.[119]

## E.    Changes to the Vioxx Label

Nearly two years after Merck filed a request for label changes for Vioxx based on the results of the VIGOR study, FDA approved a new label that discussed the cardiovascular risks of the drug.  The extended delay resulted, in part, from FDA's need to convene an advisory committee meeting and conduct extra analyses.  It also was due to a series of disputes between the agency and the company.  Under the Food, Drug and Cosmetic Act, FDA and manufacturers must agree on label changes.  For approximately six months, Merck resisted a variety of FDA's

---

[115] Merck, *Project* OFFENSE *MEETING AGENDA & CONTENT:  Representative Meetings* (2001).

[116] *Id.*

[117] *Id.*

[118] *Id.*

[119] *Id.*

proposals, leading to an extended series of conference calls to negotiate differences. Throughout this period, Merck continued to use the Cardiovascular Card with physicians. Eventually, it appears that FDA officials conceded on several key points of dispute.

FDA initially requested that the label warn physicians that Vioxx could cause heart attacks and other cardiovascular problems. FDA proposed that the warning state:

> VIOXX should be used with caution in patients at risk of developing cardiovascular thrombotic events such as those with a history of myocardial infarction and angina and in patients with pre-existent hypertension and congestive heart failure.
>
> The risk of developing myocardial infarction in the VIGOR study was five fold higher in patients treated with VIOXX 50 mg (0.5%) as compared to patients treated with naproxen (0.1%). . . . This finding was consistent in a smaller and shorter study using VIOXX 25 mg that allowed the use of low dose ASA [aspirin]. Prospective, well powered, long-term studies required to compare the incidence of serious CV events in patients taking VIOXX versus NSAID comparators other than naproxen have not been performed.[120]

This warning was unacceptable to Merck, which sought to move information on the VIGOR study to the "precautions" section.[121]

Merck sought to add additional data to the label from other studies, including results from ongoing studies in Alzheimer's Disease.[122]  FDA initially advised against including these studies, saying that the studies should be completed and their findings incorporated in the label later.[123]

On February 15, 2002, FDA proposed to Merck that the label include a special graphic called a Kaplan-Meier curve to show a worsening of cardiovascular risks on Vioxx for those with the longest exposure to the drug.[124]  During a teleconference, FDA officials stated that the "best way to display the data is the Kaplan Meier curve."[125]  FDA's minutes of the call add, "Note: The time devoted to how to best display cardiovascular safety from VIGOR reflects how important the Agency considers the topic of clear labeling of safety information."[126]  Merck objected to the idea.[127]

---

[120] Merck, *FDA Text of 15 Oct 2001 with Merck Proposals Shown with Revision Marks* (2001).

[121] *Id.*

[122] Food and Drug Administration, *Telecon Minutes* (Jan. 30, 2002).

[123] *Id.*

[124] Food and Drug Administration, *Telecon Minutes* (Mar. 7, 2002).

[125] *Id.*

[126] *Id.*

[127] *Id.*

27

By the end of the negotiation, FDA gave ground on several key issues. Two Alzheimer's studies, which showed no increase in cardiovascular events, were noted in the label. The Kaplan-Meier curve was not included. The cardiovascular risk was listed not as a "warning," but as a "precaution." And perhaps most important to Merck, the label included the statement that "the significance of the cardiovascular findings of these 3 studies (VIGOR and 2 placebo-controlled studies) is unknown."

But Merck did not get everything it wanted in the label. The company had sought to include in the label data from Vioxx's pre-approval studies — the same studies summarized in the Cardiovascular Card that the company's representatives had been showing to physicians for two years.[128] FDA rejected Merck's proposal. According to the agency, the analysis of pre-approval data was "not adequately informative to warrant inclusion in the label" because the analysis included "trials of different design, size, and duration, using different doses of VIOXX and different comparators."[129]

After the label change, Merck altered its instructions to field representatives regarding cardiovascular risk. The new instructions still prohibited representatives from initiating discussion on any new cardiovascular data. But the instructions now drew heavily from the language in the label that emphasized uncertainty about the cardiovascular risk of the drug.

For example, on September 17, 2003, Merck sent a bulletin to its sales representatives about a pending abstract to be presented at a meeting of the American College of Rheumatology. The abstract, which was based on epidemiological research funded by Merck, reported a higher risk of heart attack in patients on Vioxx compared to those on its competitor Celebrex or placebo.[130]  Merck instructed its representatives:

DO NOT INITIATE DISCUSSIONS ON ANY OF THE UPCOMING ABSTRACTS ON VIOXX THAT WILL BE PRESENTED AT THIS YEAR'S AMERICAN COLLEGE OF RHEUMATOLOGY MEETING.[131]

The bulletin contained an "obstacle response" to be used in case a physician asked a Merck representative about the study. The response instructed representatives to review selected portions of the label and then say, "As stated here in the label, the significance of the cardiovascular findings ... is unknown."[132]

---

[128] Food and Drug Administration, *Telecon Minutes* (Feb. 8, 2002).

[129] *Id.*

[130] Merck, *Bulletin for VIOXX:  Upcoming Abstracts for VIOXX at the 2003 American College of Rheumatology Meeting and Obstacle Response for Observational Analysis by Solomon, et. al.* (Sept. 17, 2003).

[131] *Id.*

[132] *Id.*

Similar instructions were given to representatives in response to other research showing an elevated risk of cardiovascular complications with Vioxx.[133]

Meanwhile Merck's promotional efforts continued. In 2003, Merck launched "Project Power Play" with the objectives to "gain or extend coxib leadership," "play offense on efficacy," and "stay on strategy."[134]

## IV.     CONCLUSION

A review of over 20,000 pages of Merck documents suggests that the company used its sales force of thousands to counter growing evidence of concern over the safety of Vioxx. These efforts involved providing highly questionable information to physicians and pursuing aggressive marketing strategies. Merck's promotional activities appear to help explain robust sales of Vioxx despite mounting evidence of risk.

---

[133] Merck, *Bulletin for Vioxx: Action Required: Observational Analysis by Graham et al.* (Aug. 24, 2004).

[134] Merck, *Bulletin for VIOXX: Project Power Play Teleconferences* (Apr. 4, 2003).

29

# EXHIBIT    E

No. COX 00-028
Apr 28, 2000

| Bulletin for VIOXX®: |
| NEW RESOURCE: Cardiovascular Card |

TO:

All Field Personnel with Responsibility for VIOXX®        ACTION REQUIRED

Background

The presentation of information regarding the VIGOR and CLASS trials has led to some misunderstanding in the field, as well as with physicians, regarding the cardiovascular effects of VIOXX.

To ensure that you are well prepared to respond to questions about the cardiovascular effects of VIOXX, Team VIOXX has developed a new resource, the Cardiovascular Card. The Cardiovascular Card will allow you to set the record straight with your physicians regarding the cardiovascular profile of VIOXX and how this profile compared to other NSAIDs in OA clinical trials with VIOXX. The Cardiovascular Card is an obstacle handling piece and should only be used with physicians in response to their questions regarding the cardiovascular effects of VIOXX. This bulletin contains a draft version of the Cardiovascular Card and a roadmap to explain the content of the Cardiovascular Card and how to use it to address obstacles from your physicians. This is for your background only. You may not use the Cardiovascular Card or the roadmap with your physicians. You will receive the final printed version of this resource to use with your physicians by Federal Express on Monday.

Draft of Cardiovascular Card (Note: The Cardiovascular Card is a tri-fold similar to the Renal Profile Card)



The Cardiovascular Card is a resource which will allow you to address your HI COXIB or HI NSAID physician's concerns regarding the cardiovascular effects of VIOXX. The Cardiovascular Card contains the following information:

- Page 2 shows that patients who were at risk for cardiovascular disease were not excluded from the OA studies with VIOXX. In fact, many patients who were included in the study had risk factors for cardiovascular disease.
- Page 3 shows that the number of cardiovascular thromboembolic events that occurred in OA clinical trials with VIOXX was low and similar to ibuprofen, diclofenac, and nabumetone. Page 3 breaks the information down even further, specifically for MI, stroke, and angina, and shows that VIOXX was similar to comparator NSAIDs and placebo for all these CV events.
- Page 4 shows that the overall and CV mortality rates from the OA clinical trials with VIOXX were low.
- Page 6 shows that in OA clinical trial with VIOXX, the discontinuation rates for patients with hypertension was low, <0.1%. It also shows that the incidence of hypertension in these patients was 3.5% for VIOXX, which was similar to the comparator NSAIDs, diclofenac and ibuprofen.

Confidential - Subject To Protective Order

MRK-AAR0038843

Please read the attached roadmap for this card. It will help you understand how to use this card to address physician's questions regarding the CV effects of VIOXX.

"CV Roadmap.doc"

If you have any questions regarding this bulletin, please contact the Merck National Service Center at 1-800-NSC-MERCK.

Confidential - Subject To Protective Order

MRK-AAR0038844

**A Roadmap to the CV Card**



The CV Card will assist you with addressing your HI COXIB or HI NSAID physician's questions about the cardiovascular effects of VIOXX. Use this resource as an obstacle handling tool only, when your physicians ask you about the cardiovascular effects of VIOXX or express concern regarding the cardiovascular effects of VIOXX based on the VIOXX GI Outcomes Research trial (VIGOR).



Use page 2 to show your physicians that patients who were at risk for cardiovascular disease were not excluded from the OA studies with VIOXX. In fact, many patients who were included in the study had risk factors for cardiovascular disease. For example, 39% of patients had hypertension prior to their enrollment in the study.

Confidential – Subject To Protective Order

MRK-AAR0038845



Use page 3 of the CV Card to show physicians the number of cardiovascular thromboembolic adverse events that were seen per 100 patient years in OA clinical trials with VIOXX, comparator NSAIDs, and placebo.

(NOTE: Per 100 Patient Years of follow-up is a statistical calculation used to summarize results of multiple studies that are of different durations. It can be explained as the number of events that would be expected, if a group of patients were followed collectively for a total of 100 years. For example, it could be 100 patients each followed for one year, 20 patients each followed for 5 years, or any other combination totaling 100 years)

Using the table on page 3, explain to the physician that the rates were low in all studies and for all groups, and were comparable to placebo. The event rates were comparable for all doses of VIOXX, 12.5mg, 25mg, and 50mg, and these rates were comparable to Ibuprofen 2400mg, diclofenac 150mg, and nabumetone 1500mg.

Use the chart on the bottom of page 3 to drill down further. Show physicians the rate of specific cardiovascular thromboembolic events (MI, stroke or mini-stroke, and angina) and explain that for each of these specific events, the rate for VIOXX was similar to comparator NSAIDs and placebo. For example, the rate of MI was 0.6 for VIOXX, 0.5 for NSAIDs, and 1.4 for placebo.

Confidential - Subject To Protective Order



Page 4 of the CV card relates to the overall mortality rates seen in OA clinical trials with VIOXX, NSAID comparators, and placebo. Use this page to show physicians that in terms of mortality, which is most important to the physician and their patients, the rate for total mortality and cardiovascular mortality was low.



Use the top of page 6 of the CV Card to show physicians that in OA clinical trials with VIOXX, at the approved 12.5mg and 25mg dose, the discontinuation rates for patients with hypertension was low, <0.1%. You can then show physicians that the incidence of hypertension in these patients was 3.5% for VIOXX, which was similar to the comparator NSAIDs, ibuprofen and diclofenac.

Ensure that the physician agrees that the cardiovascular events seen with VIOXX in OA clinical trials were low and similar to diclofenac and nabumetone. Return to your Top 5

Confidential – Subject To Protective Order

MRK-AAR0038847

HI COXIB messages by beginning with message #1-VIOXX provides ONCE DAILY POWER in chronic osteoarthritis (OA) pain and POWERFUL RELIEF in the moderate to severe acute pain of post-orthopedic surgery. Remember, the comparators used in the clinical trials which support this message were diclofenac and ibuprofen, the same comparators referred to in the CV Card.

MRK-AAR0038848

Confidential - Subject To Protective Order

# EXHIBIT    F

No. COX 00-029
May 01, 2000

**Bulletin for VIOXX®:**
**New Obstacle Response**

<u>TO:</u>
All field personnel with responsibility for VIOXX®                    Action Required

<u>PURPOSE:</u>

To provide you with a new obstacle response relating to the press release and
Searle/Pfizer's promotion that VIOXX has an increased incidence of heart attacks
compared to Celebrex, based on the VIOXX GI Outcomes Trial compared to Celebrex in
the CLASS trial.

<u>Obstacle Response #38:</u>

> **38.** "The competition has been in my office ~~telling me that the incidence of heart~~
> ~~attacks [or cardiovascular events] is greater~~
> ~~I just read [or heard] a news story stating that VIOXX has a higher incidence of heart~~
> ~~attacks than Celebrex?"~~

"Doctor, there are no head-to-head studies comparing the cardiovascular profile of the two drugs. As a
result, you cannot compare the drugs and conclude that one drug had fewer events than the other.  What you
may be referring to is press reports of the incidence rates in two separate studies. In the VIOXX GI
Outcomes Trial (VIGOR), the incidence of MI was 0.5% with VIOXX and 0.1% with naproxen. In a
separate GI outcomes trial of Celebrex, the CLASS study, Searle has reported that the incidence of MI was
0.5% with Celebrex, 0.3% with diclofenac, and 0.5% with ibuprofen. Again, doctor, I want to emphasize
that the results of two different studies can't be compared, and that's particularly true here when you have
studies of differing duration and in different patient populations."

If needed, continue to address the physicians concerns with the cardiovascular effects of VIOXX by guiding
them through the Cardiovascular Card as outlined in Roadmap for the CV Card.

Return to the appropriate HI NSAID or HI COXIB Top 5 Messages for VIOXX.

NOTE: There will be an additional PIR to address these issues available shortly.

If the doctor asks you further for the incidence of MI from the OA studies presented in the package
inserts for VIOXX tell them:

"In the clinical OA trials for VIOXX reported in our package insert, the incidence of MI was less than 0.1%
with VIOXX."

If needed, continue to address the physician's concerns with the cardiovascular effects of VIOXX by
guiding them through the Cardiovascular Card as outlined in Roadmap for the CV Card.

Confidential - Subject To Protective Order

**MRK-H.3STM001294**

Return to the appropriate HI NSAID or HI COXIB Top 5 Messages for VIOXX.

Remember to provide appropriate balancing information as part of all product discussions.

### ACTION REQUIRED:

1. Review and practice this obstacle response and use it in appropriate discussions on VIOXX® with your physicians:

2. Print the response provided, and add it to your Obstacle Response Guide. As with all other Obstacle Responses, the Response itself should not be shown to or left with physicians.

NOTE:  All responses are available under the Obstacle Response Guide on the website for VIOXX® on the FSNet.

Remember to provide appropriate balancing information as part of all product discussions.

IF YOU HAVE ANY QUESTIONS CONCERNING THIS BULLETIN, PLEASE CONTACT THE MERCK NATIONAL SERVICE CENTER AT 1-800-NSC-MERCK.

Confidential - Subject To Protective Order

MRK-H.3STM001295

# EXHIBIT   G

No. COX 01-007
Feb 09, 2001

Bulletin for VIOXX®:
FDA Arthritis Advisory Committee Meeting for VIOXX®

TO:

All field personnel with responsibility for VIOXX®       Action Required
National Account Executives                              Background Information
and Customer Managers (All Segments)

*DO NOT INITIATE DISCUSSIONS ON THE FDA ARTHRITIS ADVISORY COMMITTEE (ADVISORY COMMITTEE) REVIEW OR THE RESULTS OF THE VIOXX® GI OUTCOMES RESEARCH (VIGOR) STUDY. YOU MAY RESPOND TO CUSTOMER INQUIRIES ONLY AS OUTLINED BELOW.*

Introduction:

As previously communicated in June 2000, Merck submitted a supplemental NDA for VIOXX based upon the VIOXX GI Outcomes Research study (VIGOR).  In this study, VIOXX 50mg daily significantly reduced the risk of serious gastrointestinal side effects by 54% vs. naproxen 1000mg daily.  On Thursday, Feb 8, Merck and the FDA reviewed the study with the FDA's Arthritis Advisory Committee.

The purpose of this bulletin is to provide you with important, updated background information based on the results of this meeting and actions required by you.

Action Required:

1.  Stay focused on the EFFICACY messages for VIOXX
2.  Utilize the PIR system to respond to unsolicited physician inquiries
3.  Review the updated background Q&A
4.  Review the updated obstacles and responses for your physicians
5.  Do not initiate discussions or respond to questions, except as outlined below

Stay Focused on Efficacy

It is critical that we remain focused on the 1S HI NSAID and HI COXIB messages for VIOXX with our targeted physicians.  As discussed at your 1S District Meetings, both the OA efficacy data and the new acute pain narcotic efficacy data for VIOXX will continue to solidify the efficacy perception of VIOXX.  Use the new core visual aid for VIOXX and the

Confidential - Subject To Protective Order

OA Efficacy Stock Bottle Challenge program to challenge physicians to gain experience with the 24 hour efficacy of VIOXX.

<u>Physician Inquiries:</u>

In response to <u>unsolicited</u> requests for information regarding VIGOR, Medical Services will make a personalized, faxable PIR available for your customers within 24 hours. In addition, for those customers who request additional information, a separate, more comprehensive PIR packet can be Federal Expressed within 2 days.

Medical Services has made arrangements to extend the hours for the PIR hotline. Representatives should submit unsolicited PIR requests by either telephone or fax options from 2/9 through 2/23 by calling the PIR hotline 800MERCK66 (800-637-2566) during extended hours of 8:30 am to 6:30pm ET. During these hours, a staff member will verbally request the following information from you to process the PIR request from the HCP [After this time, the usual method options of INSIGHT, PIR hotline (800MERCK 66 – hours: 8:30 – 4:30pm ET) and fax can be followed].

<u>Faxable PIR Instructions:</u>

- <u>Your name, field title and RDT</u>
- <u>The requesting HCP's full name and professional degree</u>
- <u>HCP's full mailing address</u>
- <u>HCP's phone number</u>
- <u>HCP's FAX number</u>
- <u>Provide the question(s) asked by the HCP.</u>

PIR Requests may also be sent to Medical Services from 4:30 pm – 8:30am ET by leaving a voice message at 800MERCK66. The information as listed above should be provided in your voice message to Medical Services staff. Additionally, PIR requests may be submitted to Medical Services in writing by sending a fax to 800MERCK66. The information listed above should be included on your fax to Medical Services.

In Summary:

- If requested, a summary of the PIR will be faxed within 24 hours of receiving the request.
- If the physician requests more comprehensive information on the VIGOR study, you may request the comprehensive PIR. This will be sent via Fed EX within 2 days.
- Transition your discussion to the current strategy and messages for VIOXX®.
- <u>Do not proactively discuss the Advisory Committee Meeting or VIGOR.</u>  Respond to questions about the study by requesting a PIR and in accordance with the obstacle-handling guide.

<u>Updated Q&A Guide:</u>

This is background information only.

Confidential - Subject To Protective Order



"VIGOR QA.doc"

Updated Obstacle Responses:



Obstacles.doc

These updated obstacles are provided for your reference and preparation for questions asked by your physicians.

**This information is provided for your background information *only* and is not to be used in discussions with physicians.**

Background Information:

Merck issued a press release summarizing the FDA Advisory Committee Meeting held on Feb 8. The press release is attached below for your background information only:

GAITHERSBURG, Md., Feb. 8, 2001 — The Arthritis Advisory Committee of the Food and Drug Administration today reviewed Merck & Co., Inc.'s application for changes to the prescribing information for Vioxx® (rofecoxib), Merck's medicine for osteoarthritis and acute pain, to reflect results from the Vioxx Gastrointestinal Outcomes Research (VIGOR) study.

The Advisory Committee agreed with Merck and the FDA that results from the study should be included in the labeling for Vioxx. The FDA is not obligated to follow the advice of the Advisory Committee, but usually does. The FDA noted that it will consider all available information, including the information reported and advice received at today's Advisory Committee meeting, before any final decisions are made on Merck's application and other issues discussed by the Committee.

"Merck is confident that the data presented today support the excellent safety profile of Vioxx, and we look forward to further discussions with the FDA to complete the review of our application to modify the labeling for Vioxx," said Eve Slater, M.D., senior vice president, Clinical and Regulatory Development, Merck Research Laboratories.

Vioxx was approved by the FDA in May 1999 to treat osteoarthritis and acute pain. The prescribing information for Vioxx currently contains the standard NSAID Warning about GI side effects. Merck's application to the FDA was based on the 8,000-patient VIGOR

Confidential - Subject To Protective Order

MRK-H.3STM001175

study, which evaluated the GI profile of Vioxx 50 mg compared to the non-selective NSAID naproxen, and on other studies with Vioxx.

In VIGOR, Vioxx 50 mg, a dose two-times the highest chronic dose approved for osteoarthritis, significantly reduced serious GI side effects by half compared to a commonly used dose of naproxen (1,000 mg) in rheumatoid arthritis patients. The Committee recommended that these results be included in the labeling. Vioxx is not indicated for rheumatoid arthritis.

Although the VIGOR study was a GI outcomes study and was not designed to show differences in cardiovascular effects, significantly fewer heart attacks were observed in patients taking naproxen (0.1 percent) compared to the group taking Vioxx 50 mg (0.5 percent) in this study. There was no difference in cardiovascular mortality between the groups treated with Vioxx or naproxen. Patients taking aspirin did not participate in VIGOR.

In extensive discussions, the Advisory Committee explored this finding, other studies of Vioxx and possible explanations for this result in VIGOR. In the completed osteoarthritis trials and on-going clinical trials with Vioxx 12.5 mg, 25 mg and 50 mg in 30,000 patients, there was no difference in the incidence of cardiovascular events, such as heart attacks, among patients taking Vioxx, other NSAIDs and placebo.

Merck scientists said the VIGOR finding is consistent with naproxen's ability to block platelet aggregation by inhibiting COX-1 like aspirin, which is used to prevent second cardiac events in patients with a history of heart attack, stroke or other cardiac events. This is the first time this effect of naproxen on cardiovascular events has been observed in a clinical study. Other explanations were advanced by the FDA reviewer and were discussed with the Advisory Committee. The Committee recommended that the data on cardiovascular events in VIGOR be included in the labeling for Vioxx.

In addition, the Committee agreed that the prescribing information for both Vioxx and Celebrex® (celecoxib) should reflect the fact that neither of these selective NSAIDs confer cardioprotective benefits and are not a substitute for low-dose aspirin. The Committee also recommended that other studies be conducted to further explore the safety of concomitant use of selective NSAIDs and low-dose aspirin.


**Focus:**

**Remain focused on your efficacy messages for VIOXX. Remember that the primary attribute that physicians and patients are seeking is pain relief.**

Confidential - Subject To Protective Order

MRK-H.3STM001176

For questions regarding this bulletin please contact your Business Manager.  For product and service information, call the Merck National Service Center at 1-800-NSC MERCK (1-800-672-6372).

Confidential - Subject To Protective Order

MRK-H.3STM001177