**Exhibit A - MIL re Warning Letters**

**• Exhibit A**

[1:1] - [1:19] 5/3/2006 McCaffrey, Michael, M.D.

page 1

0001

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: VIOXX * MDL Docket No. 1657
PRODUCTS LIABILITY *
LITIGATION * Section L
*
THIS DOCUMENT RELATES TO: * Judge Fallon
GERALD BARNETT v. MERCK * Mag. Judge Knowles

***************************

VIDEOTAPE
DEPOSITION OF:MICHAEL McCAFFREY, MD

DATE: May 3, 2006

TIME: 1:04 PM

LOCATION: Strand Regional Specialty Assoc.
8170 Rourk Street
Myrtle Beach, SC

TAKEN BY: Counsel for Defendant

REPORTED BY: TERRI L. BRUSSEAU,
Registered Professional
Reporter, CP, CRR

[26:23] - [27:11] 5/3/2006 McCaffrey, Michael, M.D.

page 26

Q. During what period of time did you prescribe Vioxx, sir?
A. From the time it was released to the

page 27

time it was recalled.
Q. Why did you prescribe Vioxx to your patients?
A. It was a very excellent medication for the treatment of osteoarthritis and rheumatoid arthritis.
Q. Did you and your colleagues, sir, who focus on pain relief consider COX-2 inhibitors and Vioxx to be a major advance in the treatment of pain?
A. Yes, sir.

[61:19] - [64:9] 5/3/2006 McCaffrey, Michael, M.D.

page 61

Q. When you were prescribing Vioxx to your patients, was that because you were a speaker who was compensated on occasion for your speaks -- speeches?
A. I don't understand the question.
Q. It didn't make sense, that's why.
Your decision to prescribe Vioxx to

page 62

your patients, was that based on your judgment that that was the best medication for your patients or

EXHIBIT
A
Blumberg No. 5119

**Exhibit A - MIL re Warning Letters**

• **Exhibit A**

was that because you were speaking on behalf of Merck?
A. I thought it was the best medication for my patients.
Q. While you were a speaker for Merck during the time that Vioxx was on the market, did you also prescribe traditional NSAIDs?
A. Yes, I did.
Q. Which other NSAIDs did you prescribe?
A. Well, the -- at the time, the traditional NSAID that had a long-acting form was Voltaren XR. That's a once-a-day 100 milligram pill. Also ibuprofen and Naprosyn were the top three that I would prescribe.
Q. During the time that Vioxx was on the market, did you also occasionally prescribe Relafen?
A. Very little.
Q. Did you sometimes prescribe Ultram?
A. Yes, sir.
Q. Did you sometimes prescribe Mobic?
A. Yes, sir.
Q. Did you sometimes prescribe nabumetone

page 63

during the time that Vioxx was on the market?
A. Is that Relafen?
Q. Yes.
A. Yes, very little.
Q. During the time that Vioxx was on the market, did you also prescribe other COX-2 inhibitors?
A. Yes, sir.
Q. Which?
A. Bextra and Celebrex.
Q. Do you know of the three COX-2 inhibitors that you prescribed which ones you prescribed the most often?
A. Probably Bextra and Vioxx.
Q. Which pharmaceutical company manufactured Bextra?
A. Pfizer. Well, Pfizer has the -- or had the drug at the time. I think they were the manufacturers.
Q. Have you been a speaker for Pfizer as well?
A. Yes, I have.
Q. Can you estimate, Dr. McCaffrey, how many prescriptions you wrote for either traditional NSAIDs or for COX-2 inhibitors other than Vioxx

page 64

while Vioxx was on the market?
A. I'd probably say it's -- greater than 50 percent of my prescriptions would have been COX-2 inhibitors.
Q. Were different -- withdrawn.
Did you prescribe to many of your patients Celebrex or Bextra if you thought it was in their best interest to receive that medication?
A. Yes, I did.

[109:14] - [109:22] 5/3/2006 McCaffrey, Michael, M.D.

page 109

Q. Have you ever attended an audio conference or a presentation that was moderated by somebody named Dr. Peter Holt?
A. No, sir.
Q. Whatever Dr. Holt had to say about Vioxx in an audio presentation, did that play any role in your decision to prescribe Vioxx to Mr. Barnett?

• **Exhibit A**

A. No, sir.

[203:22] - [204:5] 5/3/2006 McCaffrey, Michael, M.D.

page 203

Q. Did the sales calls that you received by sales reps influence your decision to prescribe Vioxx to Mr. Barnett?

A. No, sir.

page 204

Q. Why did you describe -- decide to prescribe Vioxx to Mr. Barnett on December 30th of 1999?

A. I thought it was a very good and safe medication.

[241:1] - [241:24] 5/3/2006 McCaffrey, Michael, M.D.

page 241

CERTIFICATE OF REPORTER

I, Terri L. Brusseau, Registered Professional Reporter and Notary Public for the State of South Carolina at Large, do hereby certify that the foregoing transcript is a true, accurate, and complete record.

I further certify that I am neither related to nor counsel for any party to the cause pending or interested in the events thereof.

Witness my hand, I have hereunto affixed my official seal this 5th day of May, 2006 at Charleston, Charleston County, South Carolina.

________________________

Terri L. Brusseau,
Registered Professional
Reporter, CP, CRR
My Commission expires
May 7, 2006.

**Exhibit B - MIL re Warning Letters**

• **Exhibit B**

[1:] - [1:25] 4/25/2006 Mikola, Michael

page 1
0001

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: VIOXX * MDL Docket No. 1657
PRODUCTS LIABILITY *
LITIGATION * Section L
*
THIS DOCUMENT RELATES TO: * Judge Fallon
GERALD BARNETT v. MERCK * Mag. Judge Knowles

****************************

VIDEOTAPE
DEPOSITION OF:MICHAEL MIKOLA, MD

DATE: April 25, 2006

TIME: 8:27 AM

LOCATION: Law Offices of
Motley Rice, LLC
28 Bridgeside Boulevard
Mt. Pleasant, SC

TAKEN BY: Counsel for Plaintiff

REPORTED BY: TERRI L. BRUSSEAU,
Registered Professional
Reporter, CP, CRR

GOLKOW LITIGATION TECHNOLOGIES
Four Penn Center, Suite 1210
1600 John F. Kennedy Blvd.
Philadelphia, PA 19103
877.DEPS.USA

[29:5] - [29:10] 4/25/2006 Mikola, Michael

page 29

Q. And I'm not going to go through the records with you, the records speak for themselves and the dates of the prescription will speak for themselves, but what did you prescribe Vioxx for?
A. For osteoarthritis, the pain associated with osteoarthritis.

[55:14] - [57:9] 4/25/2006 Mikola, Michael

page 55

Q. What generally do you -- can you tell us about the sales rep discussions regarding Naproxen?
MR. GOLDMAN: Object to the form.
THE WITNESS: Generally -- let me back up and say that my wife was a sales rep and she's worked for different companies over the years. Generally the detailing from the reps, I try to get my medical education from journal articles. Usually I've requested the reps give me the actual articles or reprints of the articles versus detailing so they would generally call on me -- if

page 56

**Exhibit B - MIL re Warning Letters**

- **Exhibit B**

I had questions, they would answer them or refer -- make a referral for a request from their company for further information, but generally they didn't do a lot of detailing.

BY MR. ROBINSON:

Q. Okay. But did you have discussions routinely with the reps concerning this Naproxen issue?

MR. GOLDMAN: Objection, asked and answered.

THE WITNESS: I don't believe I did routinely, no, sir.

BY MR. ROBINSON:

Q. No, did you have any discussion -- strike that.

You did have some discussions with -- about the Naproxen issue with reps, is that correct?

MR. GOLDMAN: Object to the form. He said three times --

MR. ROBINSON: Well, wait. You're talking now. You're not allowed to do that.

THE WITNESS: I'm not certain. We would see 10 to 15 reps from different companies a day five days a week and this was two, three, four

page 57

years ago. I can't honestly say I recall the specific comments.

BY MR. ROBINSON:

Q. Well, do you remember having discussions, any discussions with the reps regarding Naproxen?

MR. GOLDMAN: Objection, asked and answered three times.

THE WITNESS: I don't honestly recall.

[340:25] - [341:21] 4/25/2006 Mikola, Michael

page 340

Q. Have you ever attended an audio

page 341

conference or presentation moderated by Dr. Peter Holt about Vioxx?

A. Not that I recall.

Q. Whatever Dr. Holt said about Vioxx played no role in your decision to prescribe Vioxx to Mr. Barnett, did it?

MR. WACKER: Objection, calls for speculation to the extent that he doesn't know what -- where the information Holt said went to.

BY MR. GOLDMAN:

Q. I'm asking about your decision to prescribe Vioxx to Mr. Barnett, okay?

A. Not to my recollection.

Q. Did anything that Dr. Holt say at some audio conference or presentation play any role in your decision to prescribe Vioxx to Mr. Barnett?

MR. WACKER: Objection, assumes facts not in evidence to the extent that the foundation has not been laid as to where that information that Dr. Holt presented was circulated to.

THE WITNESS: Not to my recollection.

[414:1] - [414:18] 4/25/2006 Mikola, Michael

page 414

CERTIFICATE OF REPORTER

I, Terri L. Brusseau, Registered Professional Reporter and Notary Public for the State of South Carolina at Large, do hereby certify that the foregoing transcript is a true, accurate,

**Exhibit B - MIL re Warning Letters**

• **Exhibit B**

and complete record.

I further certify that I am neither related to nor counsel for any party to the cause pending or interested in the events thereof.

Witness my hand, I have hereunto affixed my official seal this 1st day of May, 2006 at Charleston, Charleston County, South Carolina.

Terri L. Brusseau,
Registered Professional Reporter, CP, CRR
My Commission expires May 7, 2006.

**Exhibit C - MIL re Warning Letters**

• **Exhibit C**

[1156:] - [1156:25] 12/5/2005 Irvin Plunkett Trial

page 1156

1156

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: VIOXX PRODUCTS LIABILITY LITIGATION * MDL DOCKET NO. 1657
*
*
THIS DOCUMENT RELATES TO CASE NO. 05-4046: * HOUSTON, TEXAS
*
*
EVELYN IRVIN PLUNKETT, ET AL * DECEMBER 5, 2005
*
VERSUS *
* 8:30 A.M.
MERCK & CO., INC. *
* * * * * * * * * * * * * * * * *

VOLUME VI
JURY TRIAL BEFORE THE
HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF: BEASLEY ALLEN CROW METHVIN PORTIS & MILES
BY: JERE LOCKE BEASLEY, ESQ.
ANDY D. BIRCHFIELD, JR., ESQ.
LEIGH O'DELL, ESQ.
J. PAUL SIZEMORE, ESQ.
FRANK WOODSON, ESQ.
234 COMMERCE STREET
POST OFFICE BOX 4160
MONTGOMERY, ALABAMA 36103

FOR THE PLAINTIFF: ROBINSON, CALCAGNIE & ROBINSON
BY: MARK P. ROBINSON, JR., ESQ.
620 NEWPORT CENTER DRIVE
NEWPORT BEACH, CALIFORNIA 92660

[1446:9] - [1450:1] 12/5/2005 Irvin Plunkett Trial

page 1446

MR. BIRCHFIELD: YOUR HONOR, WE ALSO OFFER PLAINTIFF'S EXHIBIT 1.0006. IT'S THE WARNING LETTER THAT'S FROM THE FDA, DDMAC DIVISION, TO RAY GILMARTIN, THE CEO OF MERCK, IN SEPTEMBER OF 2001. WE HAVE AN AGREEMENT THAT WE DO NOT NEED TO OFFER A WITNESS IN ORDER TO ESTABLISH THE FOUNDATION FOR THAT DOCUMENT. WE HAVE A DISAGREEMENT AS TO ITS ADMISSIBILITY.

MR. BECK: YES, YOUR HONOR. I AGREED WITH MR. BIRCHFIELD THAT WE WOULD ABIDE BY YOUR HONOR'S RULING ON ADMISSIBILITY, ALTHOUGH I WANTED TO BE HEARD BRIEFLY ON THAT. I ALSO HAD AN AGREEMENT WITH MR. BIRCHFIELD THAT IF YOUR HONOR DETERMINED THAT IT WAS ADMISSIBLE AND RELEVANT IN THE CASE, IT COULD COME IN WITHOUT THE NECESSITY OF A WITNESS LAYING A FOUNDATION. MR. BIRCHFIELD, IN RETURN, AGREED THAT IF YOUR HONOR RECEIVES IT INTO EVIDENCE THAT HE WILL NOT HAVE ANY OBJECTION TO HAVING THE RESPONSE TO THAT FROM MERCK AND THE FDA'S REPLY TO MERCK INTRODUCED IN EVIDENCE. WE'LL FIGURE OUT

page 1447

THE NUMBERS LATER. SO, YOUR HONOR, IF I COULD TAKE JUST ONE MINUTE?

THE COURT: SURE.

EXHIBIT
C
Blumberg No. 5119

**Exhibit C - MIL re Warning Letters**

• **Exhibit C**

MR. BECK: I KNOW YOUR HONOR HAS THOUGHT ABOUT IT BEFORE AND NOW YOU HAVE HEARD A LITTLE MORE CONTEXT IN THE TRIAL. THIS IS A SEPTEMBER 2001 LETTER FROM THE FDA. IT IS FIVE OR SIX MONTHS AFTER MR. IRVIN PASSED AWAY. IT IS HEARSAY. IT'S NOT A FINAL AGENCY ACTION. WHILE IT MIGHT GO TO STATE OF MIND, IN AN APPROPRIATE CASE, TO WHAT SOMEBODY HAD NOTICE OF, IT DOESN'T GO TO STATE OF MIND IN THIS CASE BECAUSE IT CAME FIVE OR SIX MONTHS AFTER MR. IRVIN'S DEMISE. THEREFORE, THERE'S NO EXCEPTION TO THE HEARSAY RULE FOR IT. IT IS IRRELEVANT IN THIS CASE, YOUR HONOR, BECAUSE IT CAME TO US AFTER MR. IRVIN HAD ALREADY USED VIOXX AND HAD PASSED AWAY.

EQUALLY IMPORTANT, YOUR HONOR, THE SUBJECT OF THE LETTER, WHICH I KNOW THAT YOU'RE FAMILIAR WITH, DEALS WITH PROMOTIONAL ACTIVITIES BY MERCK THAT HAVE NOTHING TO DO WITH THIS CASE. DR. SCHIRMER TESTIFIED THE OTHER DAY THAT HE DID NOT RECEIVE ANY OF THESE MATERIALS THAT ARE THE SUBJECT OF THE LETTER AND THAT HE WAS NEVER DETAILED OR VISITED BY ANY MERCK REPRESENTATIVE CONCERNING VIOXX, SO THAT NONE OF THOSE PROMOTIONAL ACTIVITIES TOUCHED ON THE PRESCRIBING DOCTOR IN ANY WAY. IT IS IRRELEVANT. THEN, YOUR HONOR, ANY ARGUABLE RELEVANCE WOULD BE SO ATTENUATED THAT IT WOULD BE OUTWEIGHED BY THE PREJUDICIAL EFFECT UNDER RULE 403.

page 1448

THE COURT: OKAY.

MR. BIRCHFIELD: YOUR HONOR, LET ME ADDRESS THOSE IN ORDER. FIRST, IN REGARD TO THE HEARSAY EXCEPTION, IT IS AN EXCEPTION TO THE HEARSAY RULE UNDER 803(B). THE COURT HAS, OVER OBJECTION, ALLOWED INTO EVIDENCE SEVERAL FDA DOCUMENTS ON THAT GROUND, INCLUDING DOCUMENTS THAT MERCK HAS OFFERED TO SAY THAT VIOXX IS SAFE AND EFFECTIVE.

IN REGARDS TO THE FACT THAT IT WAS ISSUED IN SEPTEMBER OF 2001, THAT IS TRUE THAT COMES AFTER DICKY IRVIN'S DEATH, BUT THE TOPIC OF THAT WARNING LETTER TO MERCK SPANS A PERIOD OF NEARLY TWO YEARS, A YEAR AND A HALF, CERTAINLY ENCOMPASSING THE TIME LEADING UP TO DICKY IRVIN'S DEATH. IT INCLUDES NOT ONLY PROBLEMS, PROMOTIONAL ACTIVITIES THAT ARE DIRECTED SPECIFICALLY TO A DOCTOR, BUT IT INCLUDES THEIR PRESS RELEASES. IT INCLUDES THEIR ACTIVITIES TO MINIMIZE THE SERIOUS CARDIOVASCULAR EFFECTS OF VIOXX.

WHILE DR. SCHIRMER DID SAY THAT HE DID NOT RECALL ANY SPECIFIC, DETAILED ENCOUNTERS REGARDING VIOXX, HE DID TALK TO HIS PEERS ABOUT VIOXX. THAT'S THE WAY DOCTORS WORK AND GETS THAT VALUABLE INFORMATION. SO IT'S NOT AS THOUGH THERES NO NEXUS BETWEEN MERCK'S ACTIVITIES AND THE EVENTS OF THIS CASE AND IT CLEARLY IS EVIDENCE. IT SHOWS THE STATE OF MIND OF MERCK BECAUSE IT INVOLVES ACTIVITIES THAT ARE GOING ON PRIOR TO DICKY IRVIN'S DEATH WHERE THEY ARE ENGAGING IN FALSE AND MISLEADING CONDUCT, ACCORDING TO THE FDA, THAT MINIMIZES

page 1449

THE SERIOUS CARDIOVASCULAR EFFECTS OF VIOXX.

THE COURT: I DO UNDERSTAND THE ISSUE. WITH REGARD TO HEARSAY, I DON'T SEE ANY PROBLEM. IT'S AN 803(8) QUESTION, THAT IS AN EXCEPTION TO THE HEARSAY RULES. COUNSEL MAKES A POINT, HOWEVER, WITH REGARD TO THE FACT THAT IT COMES AFTER THE INCIDENT.

THE DIFFICULTY IN THIS PARTICULAR CASE TO SLICE THAT CLOSELY IS THAT A LOT OF THE DOCUMENTS THAT MAY COME AFTERWARD REALLY HAVE TO DO WITH CONDUCT THAT PRECEDED THE DOCUMENT. WE SEE THAT OFTEN IN THIS CASE WITH REGARD TO MEDICAL PERIODICALS THAT HAVE BEEN WRITTEN SUBSEQUENT TO THE INCIDENT, BUT THEY RECORD AND BASE THEIR FINDINGS ON MATTERS THAT PREDATED THE INCIDENT.

IN THIS PARTICULAR CASE, PART OF THE PLAINTIFF'S POSITION IS THAT VIOXX WAS RUSHED TO THE MARKET, THAT THERE WAS AN INTEREST IN GETTING IT OUT THERE QUICKLY AND THAT THERE WAS A LOT OF DISCUSSION AND, ACCORDING TO THEM, PRESSURE PUT ON THE FDA AND OTHERS TO GET THIS DONE. I THINK IT'S RELEVANT TO THAT ASPECT OF THE CASE, BUT I DO THINK THAT WE OUGHT TO PUT EVERYTHING IN. I THINK THE DEFENDANT OUGHT TO HAVE A RIGHT TO CONTEXTUALIZE IT AND SEE WHAT HAS GONE ON SINCE THE WARNING HAS COME OUT. I THINK IT'S PART OF THE WHOLE MATTER. I'VE LOOKED AT IT. I FEEL THAT, IN THE INTEREST OF JUSTICE, IT IS RELEVANT

   - **Exhibit C**

UNDER 401. I THINK WHEN YOU GET BOTH SIDES OF IT AND PUT IT CONTEXTUALLY, IT WILL NOT BE PREJUDICIAL UNDER 403. SO I WILL

page 1450

ALLOW IT, PROVIDED THAT THE WHOLE MATTER COMES IN.

# Chapter 10
# OTHER PROCEDURES

This chapter (revised June 14, 2005) includes the following sections:

| Section | Topic | Page |
|---|---|---|
| 10-1 | PRIOR NOTICE | 10-1 |
| 10-2 | REGULATORY MEETINGS | 10-3 |
| 10-3 | ESTABLISHMENT INSPECTION REPORT (EIR) CONCLUSIONS AND DECISIONS | 10-4 |
| 10-4 | INTERSTATE TRAVEL PROGRAM (ITP) CLASSIFICATIONS AND ADMINISTRATIVE ACTIONS | 10-4 |
| 10-5 | REPORTING AND MONITORING | 10-4 |
| 10-6 | AD HOC COMMITTEE | 10-4 |
| 10-7 | APPEAL PROCESS | 10-7 |
| 10-8 | EXPERT SUPPORT FOR CASES | 10-9 |
| 10-9 | TESTIMONY; PRODUCTION OF RECORDS; CERTIFICATION OF RECORDS | 10-12 |
| 10-10 | APPLICATION INTEGRITY POLICY | 10-30 |
| 10-11 | EXHIBITS | 10-30 |

## 10-1 PRIOR NOTICE

### 10-1-1 Purpose

This section defines "prior notice" and establishes uniform criteria to determine if adequate prior notice has been provided.

### 10-1-2 Background

Except in a few specifically defined areas, the Food and Drug Administration (FDA) has no legal obligation to warn firms or individuals that they, their practices, or their products are in violation of the law prior to taking formal enforcement action. However, a basic principle of FDA's enforcement policy is the belief that the majority of persons will voluntarily comply with the law when given information as to what is required, what violations appear to exist, and, in the case of violations of regulatory significance, that failure to comply may result in the initiation of enforcement action.

### 10-1-3 Policy

When it is consistent with the public protection responsibilities of the agency and if a violative situation does not present a danger to health or does not constitute intentional, gross or flagrant violations, it is FDA's policy to afford individuals and firms an opportunity to voluntarily take appropriate and prompt corrective action prior to the initiation of enforcement action. If voluntary correction is not achieved, documentation that adequate prior notice was provided strengthens the agency's position in enforcement actions by establishing that responsible individuals

EXHIBIT
D

Blumberg No. 5119

continued violating the law despite having been warned by the agency.
The following factors should be considered in evaluating the adequacy of prior notice (prior warning):

1. The conduct, condition, practice, or product violates the laws enforced by FDA.
2. The notice (warning) adequately identified the violative conduct, condition, practice or product. (Note: Similar violations do not need separate prior notices, for example, separate prior notices are not necessary for each unapproved new drug shipped.)
3. Notice (warning) was provided to the firm and the most responsible individuals.
4. The firm was afforded a reasonable amount of time to implement corrections. Corrections may include halting shipments, recalling product in violation, or changing procedures and controls.
5. Consider if situations have occurred that may affect the adequacy of prior notice, such as a change in ownership or responsible management. For example, consider what is known by the new management, and if the "firm" received notice.

Note: Prior Notice may be provided orally or in writing. Where there is no dispute as to what is required to comply with the law, adequate notice may well be the Investigator's discussion of objectionable conditions with responsible management at the conclusion of the inspection. If, however, the violative conduct involves a controversial area, an area in which policy is still emerging, or one that has not been pervasively regulated in the past, written notice (usually in the form of a Warning Letter) may be required prior to the initiation of further enforcement action.

Consideration of these factors will facilitate meeting the prior notice requirements for civil and certain criminal actions.

### 10-1-4 Procedures

Warning Letters are the principal means by which the agency provides prior notice of violations and of achieving voluntary compliance. See RPM Chapter 4, Advisory Actions. However, Prior Notice may be provided by means of a civil suit, administrative action, or other less formal ways, including the following:

1. Enforcement action or notification by State, municipal or other Federal agencies involving the same or similar violations.
2. Issuance of the FDA-483, List of Observations, at the conclusion of an inspection. Issuance of a copy of the FDA-483 to a firm's most responsible person(s) must follow guidance in Field Management Directive 120.
3. Discussion with management by an FDA investigator, documented in the EIR.
4. Recall Classification Notification Letters.
5. Properly documented meetings or telephone conversations between agency officials and a firm's top management (see section on Regulatory Meetings in this chapter).
6. Properly documented advisory communications by FDA Center personnel concerning critical scientific issues.

Note: For further information related to "properly documented" telephone conversations and meetings, see Staff Manual Guide, External Relations, Guide 2126.2, Memoranda of Telephone Conversations and Meetings with Non-FDA Persons, on the OIRM Intranet site.

# Chapter 4
# ADVISORY ACTIONS

This chapter (revised January 3, 2006) defines and establishes uniform guidance and procedures for Warning Letters and Untitled Letters.

This chapter includes the following sections:

| Section | Topic | Page |
|---|---|---|
| 4-1 | WARNING LETTERS | 4-2 |
| 4-1-1 | Warning Letter Procedures | 4-2 |
| 4-1-2 | Warning Letters To Government Agencies | 4-3 |
| 4-1-3 | Issuing Warning Letters - Factors to Consider | 4-4 |
| 4-1-4 | Center Concurrence And Letters Issued By Centers | 4-6 |
| 4-1-5 | Letters For Illegal Promotional Activities | 4-10 |
| 4-1-6 | Multiple Center Review | 4-10 |
| 4-1-7 | Time Frames | 4-10 |
| 4-1-8 | Warning Letter Follow-Up | 4-11 |
| 4-1-9 | Firm Profile Updates in FACTS | 4-12 |
| 4-1-10 | Warning Letter Format | 4-13 |
| 4-1-11 | Warning Letter Distribution | 4-14 |
| 4-1-12 | Warning and Untitled Letters Addressed to Importers, Customs Brokers, and Foreign Firms | 4-15 |
| 4-1-13 | Freedom of Information (FOI) | 4-16 |
| 4-1-14 | Center For Biologics Evaluation And Research (CBER) | 4-17 |
| 4-1-15 | Center For Drug Evaluation And Research (CDER) | 4-18 |
| 4-1-16 | Center For Devices And Radiological Health (CDRH) | 4-21 |
| 4-1-17 | Center For Food Safety And Applied Nutrition (CFSAN) | 4-24 |
| 4-1-18 | Tracking | 4-24 |
| 4-2 | UNTITLED LETTERS | 4-24 |
| 4-2-1 | Policy | 4-24 |
| 4-3 | EXHIBIT | 4-25 |

Blumberg No. 5119
EXHIBIT
E

# 4-1 WARNING LETTERS

## 4-1-1 Warning Letter Procedures

When it is consistent with the public protection responsibilities of the agency and depending on the nature of the violation, it is the Food and Drug Administration's (FDA's) practice to give individuals and firms an opportunity to take voluntary and prompt corrective action before it initiates an enforcement action. Warning Letters are issued to achieve voluntary compliance and to establish prior notice. (Prior notice is discussed in Chapter 10.) The use of Warning Letters and the prior notice policy are based on the expectation that most individuals and firms will voluntarily comply with the law.

The agency position is that Warning Letters are issued only for violations of regulatory significance. Significant violations are those violations that may lead to enforcement action if not promptly and adequately corrected. A Warning Letter is the agency's principal means of achieving prompt voluntary compliance with the Federal Food, Drug, and Cosmetic Act (the Act).

The Warning Letter was developed to correct violations of the statutes or regulations. Also available to the agency are enforcement strategies which are based on the particular set of circumstances at hand and may include sequential or concurrent FDA enforcement actions such as recall, seizure, injunction, administrative detention, civil money penalties and/or prosecution to achieve correction. Despite the significance of the violations, there are some circumstances that may preclude the agency from taking any further enforcement action following the issuance of a Warning Letter. For example, the violation may be serious enough to warrant a Warning Letter and subsequent seizure; however, if the seizable quantity fails to meet the agency's threshold value for seizures, the agency may choose not to pursue a seizure. In this instance, the Warning Letter would document prior warning if adequate corrections are not made and enforcement action is warranted at a later time.

Responsible officials in positions of authority in regulated firms have a legal duty to implement whatever measures are necessary to ensure that their products, practices, processes, or other activities comply with the law. Under the law such individuals are presumed to be fully aware of their responsibilities. Consequently, responsible individuals should not assume that they would receive a Warning Letter, or other prior notice, before FDA initiates enforcement action.

FDA is under no legal obligation to warn individuals or firms that they or their products are in violation of the law before taking enforcement action, except in a few specifically defined areas. When acting under the authority of Subchapter C - Electronic Product Radiation Control (formerly the Radiation Control for Health and Safety Act of 1968) of Chapter V of the Act, FDA is required by law to provide a written notification to manufacturers when the agency discovers products that fail to comply with a performance standard or that contain a radiation safety defect. Because of the legal requirements of Subchapter C, minor variations in the procedures may occur.

A Warning Letter is informal and advisory. It communicates the agency's position on a matter, but it does not commit FDA to taking enforcement action. For these reasons, FDA does not consider Warning Letters to be final agency action on which it can be sued.

There are instances when issuing a Warning Letter is not appropriate, and, as previously stated, a Warning Letter is not a prerequisite to taking enforcement action. Examples of situations where the agency will take enforcement action without necessarily issuing a Warning Letter include:

1.  The violation reflects a history of repeated or continual conduct of a similar or substantially similar nature during which time the individual and/or firm has been notified of a similar or substantially similar violation;

2.  The violation is intentional or flagrant;

3.  The violation presents a reasonable possibility of injury or death;

4.  The violations, under Title 18 U.S.C. 1001, are intentional and willful acts that once having occurred cannot be retracted. Also, such a felony violation does not require prior notice. Therefore, Title 18 U.S.C. 1001 violations are not suitable for inclusion in Warning Letters; and,

5.  When adequate notice has been given by other means and the violations have not been corrected, or are continuing. See Chapter 10, Prior Notice, for other methods of establishing prior notice.

In certain situations, the agency may also take other actions as an alternative to, or concurrently with, the issuance of a Warning Letter. For example:

1.  The product is adulterated under Section 402(a)(3) or 402(a)(4) of the Act;

2.  There is a violation of CGMP;

3.  The product contains illegal pesticide residues; or

4.  The product shows short contents, subpotency, or superpotency.

Additional instructions for Warning Letters in specific product areas are found in compliance program guidance and in compliance policy guides.

Also, see Exhibit 4-1, the agency's "Procedures for Clearing FDA Warning Letters and Untitled Letters." All agency components responsible for issuing Warning Letters and Untitled Letters must follow these procedures. Developed to facilitate review of all Warning Letters and Untitled Letters by the Office of Chief Counsel (OCC), the procedures provide instructions for submitting such letters to OCC, and include timeframes and routing information.

## 4-1-2   Warning Letters To Government Agencies

Government establishments should be held to the same standards as nongovernment establishments. The public health standards are identical; however, the method used to ensure compliance with these standards may vary. FDA believes that government establishments will achieve and maintain a higher rate of voluntary compliance with FDA regulations compared with nongovernment establishments. Efforts to obtain voluntary

David W. Anstice
President
Human Health - The Americas

Merck & Co., Inc.
UG4A-01
351 North Sumneytown Pike
P.O. Box 1000
North Wales PA 19454
E-Mail: david_anstice@merck.com
Tel 267 305 6612
Fax 267 305 0194

MERCK

October 1, 2001

BY FAX AND
FEDERAL EXPRESS

Thomas W. Abrams, R.Ph., M.B.A.
Director
Division of Drug Marketing,
Advertising and Communications
Food and Drug Administration
Rockville, MD 20857

Re: NDA No. 21-042 VIOXX (rofecoxib) tablets
MACMIS ID #9456

Dear Mr. Abrams:

This will acknowledge receipt of DDMAC's Warning Letter, dated September 17, 2001, voicing concern over a series of audio conferences, a press release, and statements allegedly made by certain Merck professional representatives at two medical meetings. We have enclosed as Attachment I an action plan addressing the points raised on page 7 of DDMAC's Letter.

While Merck has prepared an action plan as requested, it is important for DDMAC to understand that the Company strongly disagrees with a number of assertions in the Letter, including the assertion that Merck has "engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study" and the assertion that the press release dated May 22, 2001 is false or misleading. Merck considers patient safety to be of paramount importance and believes that these assertions are incorrect.

**The Cardiovascular Profile of Vioxx.**

The views expressed in the Letter appear to be based solely on a review of the cardiovascular event rates in VIGOR, rather than on a review of all available data that bear on the interpretation of them. Important additional data were submitted to FDA in the VIGOR Supplemental New Drug Application as well as in the Safety Update Report. While we do not intend to exhaustively recount them here, we do consider it important to point out several key pieces of relevant data previously submitted to FDA in order to provide the appropriate context for the Company's response.

EXHIBIT
F

*VIGOR:* VIGOR was a gastrointestinal (GI) safety study that compared Vioxx 50 mg once daily to naproxen 500 mg twice daily in over 8000 patients with rheumatoid arthritis. The dose of Vioxx is twice the maximum recommended chronic dose; the dose of naproxen is an approved dose for rheumatoid arthritis. In order to avoid confounding the study's primary endpoint (development of confirmed upper GI perforations, ulcers, or bleeding events [PUBs]), patients taking aspirin chronically were excluded from the study.

VIGOR was not designed to prospectively evaluate differences in cardiovascular effects. Unexpectedly, in the VIGOR study, there was a significant between-group difference in the incidence of acute myocardial infarction: 0.1% for naproxen and 0.5% for Vioxx.[1] While the Company recognizes that there are at least three possible explanations for this finding – an effect of naproxen, an effect of Vioxx, or chance – the weight of evidence clearly supports the position that the difference reflects a cardioprotective effect of naproxen. This evidence includes, but is not limited to, the following:

*Meta-analysis:* Prior to initiation of VIGOR, Merck implemented a pre-specified, blinded adjudication program of potentially serious thromboembolic cardiovascular adverse experiences in clinical trials of Vioxx. The VIGOR study was included in the prospective portion of this adjudication program. A cardiovascular meta-analysis of serious thromboembolic events was performed across all Phase IIb through V studies of Vioxx of at least four weeks' duration, excluding those performed in healthy volunteers, that included a placebo and/or nonselective NSAID control. For studies initiated after institution of the event monitoring program, such as VIGOR, adjudicated data were used; for earlier studies (e.g., studies included in the original NDA), investigator-reported assessments, based on adverse experience term were used. The primary end point for the analysis was the composite of cardiovascular or unknown death, stroke, or myocardial infarction – the widely accepted endpoint of Anti-Platelet Trialists' Collaboration (APTC) events. The analysis included over 28,000 patients, with over 14,000 patient-years at risk.

If present, a prothrombotic effect of COX-2 inhibition would best be detected in head-to-head trials against placebo. Of note, *no* statistically significant or clinically meaningful differences in APTC event rates were detected for Vioxx versus placebo (relative risk for Vioxx vs. placebo [4617 patient years], 0.93 [95% CI: 0.57, 1.53]. Furthermore, no statistically significant or meaningful differences in APTC event rates were detected for Vioxx versus non-naproxen NSAIDs (relative risk for Vioxx vs. non-naproxen NSAIDs [3951 patient years], 0.84 [95% CI: 0.45, 1.63]). The *only* comparison in which a

[1] In the analysis of VIGOR that was based on a pre-specified cut-off date of February 2000, the rate of MI was 0.4% among patients taking Vioxx and 0.1% among those not indicated for aspirin for prophylaxis. This analysis was submitted to FDA in June 2000. In a subsequent analysis which included data after the February 2000 cut-off, the rate was 0.5% in the total population taking Vioxx and 0.2% among those not indicated for aspirin prophylaxis. This analysis was also submitted to FDA.

significant difference was observed in APTC event rates was between Vioxx and naproxen, (relative risk for Vioxx vs. naproxen, 1.69 [95% CI: 1.07, 2.69]). These results do not suggest any prothrombotic potential of selective COX-2 inhibition. Rather, the results from these clinical outcome data suggest that naproxen, unlike other NSAIDs in the analysis, has a cardioprotective effect. This distinction is consistent with differences in the observed effects on platelet function between naproxen and the other NSAIDs in the analysis.

*Effects on platelets:* Aspirin, a well-recognized antiplatelet agent, is effective in decreasing the risk of acute thromboembolic cardiovascular events. Aspirin's antiplatelet effect is mediated through its near complete, irreversible inhibition of platelet COX-1 activity. It is thought that to impart meaningful cardioprotective benefits, an agent must cause near complete (>90%) inhibition of platelet function, sustained over time. Several studies have demonstrated that nonselective NSAIDs (with inhibitory effects on both COX-1 and COX-2) vary in the magnitude and time course of their effects on platelet function.

Naproxen achieves inhibition of platelet aggregation similar to aspirin, effecting greater than 90% inhibition of platelet aggregation sustained across its dosing interval. In contrast, ibuprofen shows an approximately 90% peak inhibition of platelet aggregation, but does not maintain this level of inhibition throughout its dosing interval; diclofenac shows a substantially smaller effect on platelet function. Neither Vioxx nor placebo inhibits platelet aggregation.

Thus, naproxen differs from the other NSAIDs in the meta-analysis by effecting >90% inhibition of platelet aggregation sustained across its dosing interval. Notably, published data on NSAIDs with anti-platelet properties similar to naproxen, indobufen and flurbiprofen, suggest a cardioprotective effect in the post-myocardial infarction and angioplasty settings.

In summary, the available data are consistent with a cardioprotective effect of naproxen. There is both biologic plausibility and pharmacodynamic data to support this line of reasoning. Most importantly, the results of the meta-analysis -- encompassing studies of a broad and representative patient population – showed that the risks of serious cardiovascular events were similar with Vioxx and placebo and with Vioxx and the non-naproxen NSAIDs. Such findings are consistent with naproxen exerting a cardioprotective benefit in VIGOR.

**The Audio Conferences.**

Merck is well aware of FDA's position, expressed in its 1997 Guidance for Industry, that "the programs and materials performed and disseminated by companies are subject to the labeling and advertising provisions of the Federal Food, Drug, and Cosmetic Act." Merck further understands the Agency's position that "the constraints on advertising and

labeling, when applied to scientific and educational activities, can restrict the freedom of participants to discuss their data or express their views. In particular, discussions of unapproved uses, which can be an important component of scientific and educational activities, are not permissible in programs that are or can be . . . subject to substantive influence by companies that market products related to the discussion." Upon publication of the final Guidance, the Company instituted policies and procedures designed to ensure compliance with it.

Merck policies specifically instruct its employees that, for all speaker programs, all materials, whether written or verbally communicated, shall be consistent with, and not contrary to, the labeling for Merck products and those of its competitors. Printed materials distributed to the audience (including invitations) for such programs must be approved through the headquarters review process (i.e., a Medical/Legal Board). For programs such as those identified in the Letter, speakers are required to use and to follow slide sets that are approved by the appropriate Medical/Legal Board. Product circulars for all Merck products discussed at such programs must be offered to all attendees. Merck attendees are to notify headquarters if any Merck-supported speaker fails to give a balanced presentation or one that is not consistent with the product circular.

Speakers for such programs are required to enter into a written agreement with Merck. The agreements specifically direct that if they discuss products, they are to keep their comments consistent with, and not contrary to, the labeling for Merck products and competing products, that they must provide fair balance in their presentations, and that comparisons of safety or efficacy can be based only on the overall body of adequate and well-controlled studies.

We are not in a position to make a detailed, point by point response to the other assertions made by DDMAC regarding the regulatory compliance of the audio conferences. As we explained in our January 5, 2001 response, Merck does not have a tape or a transcript of any of the audio conferences. We have, however, determined that Dr. Holt, who had signed a speaker contract, did not use slides approved by the Medical/Legal Board and did discuss the results of VIGOR during the teleconferences. We have further determined that the Merck employees in attendance did not report that information to headquarters. These actions were in violation of Company policy. Merck has discontinued using Dr. Holt as a speaker.

**The Press Release.**

Merck strongly disagrees with DDMAC's comments regarding the May 22, 2001 press release for several reasons. First, DDMAC's Letter does not acknowledge the fact that Merck's press release was issued in response to media and analyst activity and was not proactively issued to promote the cardiovascular safety profile of Vioxx. Second, the Letter appears to create an affirmative obligation to disclose alternative explanations for data in a communication whose very purpose is to respond to and debate those same

alternative explanations. Third, the Letter does not acknowledge the fact that substantial balance, including the existence of alternative hypotheses, was included in that press release. Finally, we note that while DDMAC criticizes the press release for reasons "similar" to the audio conference, many of the reasons do not apply to the press release.

Merck recognizes that DDMAC regards press releases as promotional labeling, and the Company makes significant efforts to ensure that its releases comply with generally applicable labeling requirements. Merck's standards for press releases in regard to compliance with these requirements are well above industry norms.

While DDMAC regulates press releases as promotional labeling, DDMAC must recognize the context in which a given press release is issued, particularly when – as here – it responds to substantial media coverage of an alternative hypothesis. Sources such as newspaper reports and securities analysts are not regulated by FDA and therefore have no obligation to comply with DDMAC rules regarding substantial evidence or fair balance. This inherently creates an unlevel playing field when responsible regulated entities attempt to respond to such press and analyst reports. The First Amendment protects Merck's right to respond under these circumstances with information that is truthful and not misleading, as well as the public's right to hear both sides of the story.

DDMAC also must appreciate the special need in such press releases to provide a heading that summarizes the Company's position. Without such a heading, the release will not be picked up by the media and the Company's voice will not be heard in a meaningful way. Recognizing again the need for fair balance, it is necessary that the highly technical standards governing print advertisements in medical journals be applied reasonably to such press releases, taking into account the need for flexibility, proportionality, and common sense appropriate to the circumstances.

Under the circumstances, Merck regards the May 22, 2001 press release as fully compliant. It presented the Company's position in a truthful, balanced, and non-promotional manner, accurately summarized the data, and noted the existence of alternative hypotheses (hypotheses which were, of course, detailed in the materials to which the press release was responding). As noted below, it also provided extensive risk information regarding the drug. It did all of this in the context of responding to extensive media coverage of one alternative hypothesis, as detailed below.

*April – May 2001:* In late April, Richard Stover, a senior analyst for Arnhold and S. Bleichroeder, issued a report entitled "COX-2 Inhibitor Outlook: Cardiovascular Safety Issues Raised in FDA Advisory Committee Meetings" (Attachment II). Mr. Stover reached three conclusions, which he reported on the cover of his report: First, "public disclosures from the FDA Advisory Committee meetings contain disturbing data, showing marked differences between naproxen and Merck's Vioxx in the incidence of serious cardiovascular events;" second, "CLASS patients taking Celebrex without aspirin experienced a very low incidence of serious cardiovascular (CV) events, allaying

theoretical concerns that unopposed COX-2 specific inhibition might be pro-thrombotic"; and third that "our analysis suggests that naproxen did not show cardioprotection in the VIGOR trial. In fact, in an apples-to-apples comparison, Celebrex-treated patients in the CLASS trial had an incidence of CV death, heart attack, and cerebrovascular events comparable to naproxen-treated patients in the VIGOR trial." Mr. Stover thus put forth his view that naproxen was not cardioprotective and that the difference in CV rates reflected a concern only for Vioxx and not for Celebrex.

On the morning of May 22, 2001, *The New York Times* ran the article "Doubts Are Raised on the Safety of 2 Popular Arthritis Drugs" (Attachment III) on the front page of its business section. The article began with the lead that "Doctors are beginning to worry that Vioxx and Celebrex, two wildly popular arthritis drugs, may not be as safe as they were initially believed to be. Research presented to the Food and Drug Administration earlier this year showed that patients taking Vioxx, a Merck & Company drug, had a higher, but still relatively low, risk of heart attacks than patients taking an older pain reliever. The study received little public attention at the time, but the F.D.A. is considering whether to add information on possible cardiovascular side effects to both drugs' labels." The article acknowledged Merck's position that the difference observed in the study was consistent with an effect of naproxen, but put substantial focus on the alternative explanation. The article cited Dr. Maria Lourdes Villalba, a medical officer at the Agency, who was noted to have "said that because there were not studies that proved Merck's theory that naproxen worked like aspirin to decrease heart attacks, the F.D.A. was concerned that the higher rate of heart attacks found with Vioxx might have been caused by the drug's producing blood clots."

The story was picked up by a number of early morning news programs. Among these was CNN, which reported, "Watch shares of arthritis drug makers Pharmacia and Merck today. A report in the New York Times says Celebrex and Vioxx may not be as safe as previously thought. The Food and Drug Administration is considering whether to add information on possible cardiovascular side effects to the labels on both drugs."

Merck issued its press release that afternoon, noting that it was being issued "*in response to* news and analyst reports of data the Company first released a year ago". Later that afternoon, Pharmacia issued a press release in which it advanced the argument "that molecular differences between the COX-2 specific inhibitors may account for the cardiovascular and renal safety differences seen between Celebrex and Vioxx."

The story continued to receive coverage the next day, with reports over the newswires, on national and local television, and in local newspapers. For example, CBS Morning News reported "Mounting concern over the safety of the popular arthritis drugs Vioxx and Celebrex stems from a single study done by Merck, the maker of Vioxx. The study found that patients taking Vioxx had four times as many heart attacks as those taking a different class of arthritis painkiller, a non-steroidal anti-inflammatory drug, or NSAID, called naproxen. Dr. Michael Wolfe was on the FDA advisory panel reviewing the drugs. Dr.

Wolfe: 'Was Vioxx causing heart attacks, or was the comparator naproxen preventing heart attacks? And that's a question that hasn't been answered yet.'"

Merck issued the press release in response to substantial media and analyst coverage of and commentary on the cardiovascular event rates observed in VIGOR. The Company must be permitted under those circumstances to issue a truthful press release setting forth its position on the data. Moreover, the media understood that the press release set forth Merck's position on the data, as reflected in the reporting that followed issuance of the release.

*The Release:* Even when considered without regard to these events, Merck believes there is no basis for the assertion in the Letter that the press release is false and misleading. DDMAC appears to reach this conclusion solely on the basis of the use of the word "favorable" in the heading. Such an analysis fails to acknowledge the fact that the release was not promotional in tone, specifically pointed out that Vioxx is not indicated for rheumatoid arthritis, and included extensive fair balance and dosing information under the heading "Important information about Vioxx." Further, it applies an interpretation to a word in the heading without regard to the text of the release, which included the results of the meta-analysis described above, as well as the results of VIGOR. With respect to the specific cardiovascular issues raised in DDMAC's letter, we note that the release disclosed "this is the first time this effect of naproxen on cardiovascular events has been observed in a clinical study" and that "other potential explanations were advanced by the FDA reviewer and were discussed with the Advisory Committee." The release also made no direct comparison between the cardiovascular event rates in VIGOR and CLASS. The release was accompanied by the full prescribing information for the drug (a practice that most in the industry fail to follow) and also included a toll-free number to call for that information.

**Oral Representations**

Merck takes seriously its obligation to comply with both the letter and the spirit of FDA regulations. Accordingly, Merck has extensive and long-standing written policies that govern the activities of all field-based personnel. Field-based employees receive training on these policies when they are hired and on an ongoing basis.

In response to DDMAC's letter, we initiated a thorough investigation of the allegations. Our investigation is currently ongoing. Upon completion of that investigation and consistent with the findings of it, we will take disciplinary action as appropriate.

**Prior DDMAC Action**

Merck further believes there is no basis to link the activities cited in this Letter and those "promotional materials" cited in DDMAC's untitled letter in December, 1999. The

"promotional materials" cited in December 1999 were actually two homemade detail pieces, each distributed by a single Representative.

* * *

Given that it has now been sixteen months since we submitted the sNDA for VIGOR, we anticipate receiving draft labeling from FDA shortly. We believe it would be appropriate to finalize that labeling first and then incorporate it into a "Dear Healthcare Provider" letter. This will allow FDA's final views of the data to serve as the basis for the communication.

After DDMAC has had the opportunity to review our action plan, we would welcome the opportunity to meet with you.

Very truly yours,

Margaret H. McGlynn for David W. Anstice

David W. Anstice

Attachments

cc: Mr. Raymond V. Gilmartin (w/attach.)

Thomas M. Casola
Executive Director
Office of Medical/Legal
U.S. Human Health

Merck & Co., Inc.

November 19, 2001
*(Via Fax and Federal Express)*

Thomas W. Abrams, R.Ph., M.B.A.
Director
Division of Drug Marketing,
Advertising and Communications
Food and Drug Administration
Rockville, MD 20857

Re: NDA No. 21-042 VIOXX (rofecoxib) tablets
MACMIS ID #9456

Dear Mr. Abrams:

This letter confirms that Merck has mailed the attached letters as agreed in our November 14, 2001, teleconference with DDMAC and subsequent telefax and telephone communications. All of the letters were mailed on Monday, November 19, 2001. I am attaching two (2) copies each of both letters. Both letters are also being submitted separately to DDMAC on Form 2253.

Attachment 1 was mailed to 105 Health Care Providers who attended any of a series of promotional teleconferences presented on behalf of Merck by Dr. Peter Holt.

Attachment 2 was mailed to 125 Health Care Providers who attended the 119th Annual Meeting of the Maryland Pharmacists Association (MPhA) in Ocean City, Maryland from June 9 – June 12, 2001, as well as 1,165 Health Care Providers who attended the Annual Meeting of the American Society of Health-Systems Pharmacists (ASHP) in Los Angeles, California, from June 3 – June 6, 2001. In both cases, lists of attendee names and addresses were provided to Merck by the headquarters office of the respective association.

Please call if you have any questions.

Sincerely,

Thomas M. Casola
Executive Director
Office of Medical/Legal

CASOLA
EXHIBIT NO. 8
5-21-03
H. KRAUSS

Attachments 1-2
cc: J. Lahner, Counsel, Merck & Co., Inc.

MRK-CAL0098776

Confidential—Disclosure to Unauthorized Persons forbidden by Order of the United States District Court for the Southern District of Illinois

EXHIBIT
G

M00440792

MERCK
Merck & Co., Inc.
P.O. Box 4
West Point, PA 19486-0004

*Attachment 1*

FIRST CLASS MAIL
U.S. POSTAGE PAID
MERCK

**IMPORTANT**
CORRECTION
OF DRUG
INFORMATION

DR SAMPLE
STREET ADDRESS
CITY ST ZIP

MRK-CAL0098777

M004407993

November 2001

Merck & Co., Inc.
P.O. Box 4
West Point, PA 19486-0004

# IMPORTANT CORRECTION OF DRUG INFORMATION

MERCK

Dear Healthcare Provider:

This letter is being sent to you at the request of the U.S. Food and Drug Administration ("FDA"). The FDA's Division of Drug Marketing, Advertising, and Communications has notified Merck & Co., Inc., ("Merck") that it considered audioconferences that you attended concerning Vioxx (rofecoxib) tablets, given on behalf of Merck by a physician speaker, to be false or misleading in violation of the Federal Food, Drug, and Cosmetic Act.

Specifically, the FDA has objected to claims made by the speaker that FDA asserts were misleading about the significant cardiovascular findings in the Vioxx Gastrointestinal Outcomes Research ("VIGOR") study. The speaker presented as fact only one of several possible explanations for why in VIGOR 0.5% of patients on Vioxx had a myocardial infarction compared to 0.1% of patients on the comparator drug, naproxen. Additionally, the FDA has objected to other statements made by the speaker.

Therefore, the FDA has requested that we correct these promotional messages.

- **Alternative interpretations have been proposed for the difference in the rates of myocardial infarctions (MI) in the Vioxx treatment group in comparison with the naproxen treatment group. Possible explanations include that Vioxx increased the MI rate or naproxen decreased the MI rate.** The underlying reason for the difference has not been established in prospectively designed clinical studies.
- **Anticoagulant activity should be monitored, particularly in the first few days after initiating or changing Vioxx therapy in patients receiving warfarin or similar agents,** since these patients are at an increased risk of bleeding complications. In post-marketing experience, **bleeding events have been reported predominantly in the elderly,** in association with increases in prothrombin time in patients receiving Vioxx concurrently with warfarin.
- **Serious gastrointestinal toxicity** such as bleeding, ulceration, or perforation of the stomach, small intestine, or large intestine, **can occur at any time, with or without warning symptoms,** in patients treated with NSAIDs, including Vioxx.

- **Vioxx (rofecoxib) is contraindicated in patients who have experienced asthma, urticaria, or allergic-type reactions after taking aspirin or other NSAIDs.** Severe, rarely fatal, anaphylactic-like reactions to NSAIDs have been reported in such patients. Vioxx is also contraindicated in patients with known hypersensitivity to rofecoxib or any other component of Vioxx.
- **Vioxx has not been proven to be safer or have fewer side effects than other NSAIDs on measures of overall safety.**
- Vioxx is indicated ONLY for relief of the signs and symptoms of osteoarthritis, management of acute pain in adults, and treatment of primary dysmenorrhea.

If you have any questions about the use of Vioxx, please refer to the enclosed full prescribing information.

Sincerely,

Louis M. Sherwood

Louis M. Sherwood, M.D.
Senior Vice President,
U.S. Medical & Scientific Affairs

MRK-CAL0098779

© 2001 Merck & Co., Inc.
All rights reserved.

20112247(2)-11/01-VIO

Printed in USA
Minimum 10% Recycled Paper

M00440795



MERCK & CO., INC.
Whitehouse Station, NJ 08889, USA

# /IOXX®

**ofecoxib tablets and oral suspension)**

**ESCRIPTION**

VIOXX* (rofecoxib) is described chemically as 4-[4-(methylsulfonyl)phenyl]-3-phenyl-2(5H)-furanone. It has the following chemical structure:

Rofecoxib is a white to off-white to light yellow powder. It is sparingly soluble in acetone, slightly soluble in methanol and isopropyl acetate, very slightly soluble in ethanol, practically insoluble in octanol, and insoluble in water. The empirical formula for rofecoxib is $C_{17}H_{14}O_4S$, and the molecular weight is 314.36.

Each tablet of VIOXX for oral administration contains either 12.5 mg, 25 mg, or 50 mg of rofecoxib and the following inactive ingredients: croscarmellose sodium, hydroxypropyl cellulose, lactose, magnesium stearate, microcrystalline cellulose, and yellow ferric oxide. The 50 mg tablets also contain red ferric oxide.

Each 5 mL of the oral suspension contains either 12.5 or 25 mg of rofecoxib and the following inactive ingredients: citric acid (monohydrate), sodium citrate (dihydrate), sorbitol solution, strawberry flavor, xanthan gum, and purified water. Added as preservatives are sodium methylparaben 0.13% and sodium propylparaben 0.02%.

**CLINICAL PHARMACOLOGY**

*Mechanism of Action*

VIOXX is a nonsteroidal anti-inflammatory drug that exhibits anti-inflammatory, analgesic, and antipyretic activities in animal models. The mechanism of action of VIOXX is believed to be due to inhibition of prostaglandin synthesis, via inhibition of cyclooxygenase-2 (COX-2). At therapeutic concentrations in humans, VIOXX does not inhibit the cyclooxygenase-1 (COX-1) isoenzyme.

*Pharmacokinetics*

*Absorption*

The mean oral bioavailability of VIOXX at therapeutically recommended doses of 12.5, 25, and 50 mg is approximately 93%. The area under the curve (AUC) and peak plasma level ($C_{max}$) following a single 25-mg dose were 3286 (±843) ng·hr/mL and 207 (±111) ng/mL, respectively. Both $C_{max}$ and AUC are roughly dose proportional across the clinical dose range. At doses greater than 50 mg, there is a less than proportional increase in $C_{max}$ and AUC, which is thought to be due to the low solubility of the drug in aqueous media. The plasma concentration-time profile exhibited multiple peaks. The median time to maximal concentration ($T_{max}$), as assessed in nine pharmacokinetic studies, is 2 to 3 hours. Individual $T_{max}$ values in these studies ranged between 2 to 9 hours. This may not reflect rate of absorption as $T_{max}$ may occur as a secondary peak in some individuals. With multiple dosing, steady-state conditions are reached by Day 4. The $AUC_{0-24hr}$ and $C_{max}$ at steady state after multiple doses of 25 mg rofecoxib was 4018 (±1140) ng·hr/mL and 321 (±104) ng/mL, respectively. The accumulation factor based on geometric means was 1.67.

VIOXX Tablets 12.5 mg and 25 mg are bioequivalent to VIOXX Oral Suspension 12.5 mg/5 mL and 25 mg/5 mL, respectively.

*Food and Antacid Effects*

Food had no significant effect on either the peak plasma concentration ($C_{max}$) or extent of absorption (AUC) of rofecoxib when VIOXX Tablets were taken with a high fat meal. The time to peak plasma concentration ($T_{max}$), however, was delayed by 1 to 2 hours. The food effect on the suspension formulation has not been studied. VIOXX tablets can be administered without regard to timing of meals.

There was a 13% and 8% decrease in AUC when VIOXX was administered with calcium carbonate antacid and magnesium/aluminum antacid to elderly subjects, respectively. There was an approximate 20% decrease in $C_{max}$ of rofecoxib with either antacid.

*Distribution*

Rofecoxib is approximately 87% bound to human plasma protein over the range of concentrations of 0.05 to 25 mcg/mL.

*Registered trademark of MERCK & CO., Inc.
Whitehouse Station, New Jersey, USA
COPYRIGHT © MERCK & CO., Inc., 1998
All rights reserved

MRK-CAL0098780

The apparent volume of distribution at steady state ($V_{ss}$) is approximately 91 L following a 12.5-mg dose and 86 L following a 25-mg dose.

Rofecoxib has been shown to cross the placenta in rats and rabbits, and the blood-brain barrier in rats.

*Metabolism*

Metabolism of rofecoxib is primarily mediated through reduction by cytosolic enzymes. The principal metabolic products are the cis-dihydro and trans-dihydro derivatives of rofecoxib, which account for nearly 56% of recovered radioactivity in the urine. An additional 8.8% of the dose was recovered as the glucuronide of the hydroxy derivative, a product of oxidative metabolism. The biotransformation of rofecoxib and this metabolite is reversible in humans to a limited extent (<5%). These metabolites are inactive as COX-1 or COX-2 inhibitors.

Cytochrome P450 plays a minor role in metabolism of rofecoxib. Inhibition of CYP 3A activity by administration of ketoconazole 400 mg daily does not affect rofecoxib disposition. However, induction of general hepatic metabolic activity by administration of the non-specific inducer rifampin 600 mg daily produces a 50% decrease in rofecoxib plasma concentrations. (Also see *Drug Interactions*.)

*Excretion*

Rofecoxib is eliminated predominantly by hepatic metabolism with little (<1%) unchanged drug recovered in the urine. Following a single radiolabeled dose of 125 mg, approximately 72% of the dose was excreted into the urine as metabolites and 14% in the feces as unchanged drug.

The plasma clearance after 12.5- and 25-mg doses was approximately 141 and 120 mL/min, respectively. Higher plasma clearance was observed at doses below the therapeutic range, suggesting the presence of a saturable route of metabolism (i.e., non-linear elimination). The effective half-life (based on steady-state levels) was approximately 17 hours.

*Special Populations*

*Gender*

The pharmacokinetics of rofecoxib are comparable in men and women.

*Geriatric*

After a single dose of 25 mg VIOXX in elderly subjects (over 65 years old) a 34% increase in AUC was observed as compared to the young subjects. Dosage adjustment in the elderly is not necessary; however, therapy with VIOXX should be initiated at the lowest recommended dose.

*Pediatric*

VIOXX has not been investigated in patients below 18 years of age.

*Race*

Meta-analysis of pharmacokinetic studies has suggested a slightly (10-15%) higher AUC of rofecoxib in Blacks and Hispanics as compared to Caucasians. No dosage adjustment is necessary on the basis of race.

*Hepatic Insufficiency*

A pharmacokinetic study in mild (Child-Pugh score ≤6) hepatic insufficiency patients indicated that rofecoxib AUC was similar between these patients and healthy subjects. Limited data in patients with moderate (Child-Pugh score 7-9) hepatic insufficiency suggest a trend towards higher AUC (about 69%) of rofecoxib in these patients, but more data are needed to evaluate pharmacokinetics in these patients. Patients with severe hepatic insufficiency have not been studied.

*Renal Insufficiency*

In a study (N=6) of patients with end stage renal disease undergoing dialysis, peak rofecoxib plasma levels and AUC declined 18% and 9%, respectively, when dialysis occurred four hours after dosing. When dialysis occurred 48 hours after dosing, the elimination profile of rofecoxib was unchanged. While renal insufficiency does not influence the pharmacokinetics of rofecoxib, use of VIOXX in advanced renal disease is not recommended at present because no safety information is available regarding the use of VIOXX in these patients.

*Drug Interactions* (Also see PRECAUTIONS, *Drug Interactions*.)

*General*

In human studies the potential for rofecoxib to inhibit or induce CYP 3A4 activity was investigated in studies using the intravenous erythromycin breath test and the oral midazolam test. No significant difference in erythromycin demethylation was observed with rofecoxib (75 mg daily) compared to placebo, indicating no induction of hepatic CYP 3A4. A 30% reduction of the AUC of midazolam was observed with rofecoxib (25 mg daily). This reduction is most likely due to increased first pass metabolism through induction of intestinal CYP 3A4 by rofecoxib. *In vitro* studies in rat hepatocytes also suggest that rofecoxib might be a mild inducer for CYP 3A4.

Drug interaction studies with rofecoxib have identified potentially significant interactions with rifampin, methotrexate and warfarin. Patients receiving these agents with VIOXX should be appropriately monitored. Drug interaction studies do not support the potential for clinically important interactions between antacids or cimetidine with rofecoxib. Similar to experience with other nonsteroidal anti-inflammatory drugs (NSAIDs), studies with rofecoxib suggest the potential for interaction with ACE inhibitors. The effects of rofecoxib on the pharmacokinetics and/or pharmacodynamics of ketoconazole, prednisone/prednisolone, oral contraceptives, and digoxin have been studied *in vivo* and clinically important interactions have not been found.

**CLINICAL STUDIES**

*Osteoarthritis (OA)*

VIOXX has demonstrated significant reduction in joint pain compared to placebo. VIOXX was evaluated for the treatment of the signs and symptoms of OA of the knee and hip in placebo- and active-controlled clinical trials of 6 to 86 weeks duration that enrolled approximately 3900 patients. In patients with OA, treatment with VIOXX 12.5 mg and 25 mg once daily resulted in improvement in patient and physician global assessments and in the WOMAC (Western Ontario and McMaster Universities) osteoarthritis questionnaire, including pain, stiffness, and functional measures of OA. In six studies of pain accompanying OA flare, VIOXX provided a significant reduction in pain at the first determination (after one week in one study, after two weeks in the remaining five studies); this continued for the duration of the studies. In all OA clinical studies, once daily treatment in the morning with VIOXX 12.5 and 25 mg was associated with a significant reduction in joint stiffness upon first awakening in the morning. At doses of 12.5 and 25 mg, the effectiveness of VIOXX was shown to be comparable to ibuprofen 800 mg TID and diclofenac 50 mg TID for treatment of the signs and symptoms of OA. The ibuprofen studies were 6-week studies; the diclofenac studies were 12-month studies in which patients could receive additional arthritis medication during the last 6 months.

*Analgesia, Including Dysmenorrhea*

In acute analgesic models of post-operative dental pain, post-orthopedic surgical pain, and primary dysmenorrhea, VIOXX relieved pain that was rated by patients as moderate to severe. The analgesic effect (including onset of action) of a single 50-mg dose of VIOXX was generally similar to 550 mg of naproxen sodium or 400 mg of ibuprofen. In single-dose post-operative dental pain studies, the onset of analgesia with a single 50-mg dose of VIOXX occurred within 45 minutes. In a multiple-dose study of post-orthopedic surgical pain in which patients received VIOXX or placebo for up to 5 days, 50 mg of VIOXX once daily was effective in reducing pain. In this study, patients on VIOXX consumed a significantly smaller amount of additional analgesic medication than patients treated with placebo (1.5 versus 2.5 doses per day of additional analgesic medication for VIOXX and placebo, respectively).

*Special Studies*

*Upper Endoscopy in Patients with Osteoarthritis*

Two identical (U.S. and Multinational) endoscopy studies in a total of 1516 patients were conducted to compare the percentage of patients who developed endoscopically detectable gastroduodenal ulcers with VIOXX 25 mg daily or 50 mg daily, ibuprofen 2400 mg daily, or placebo. Entry criteria for these studies permitted enrollment of patients with active *Helicobacter pylori* infection, baseline gastroduodenal erosions, prior history of an upper gastrointestinal perforation, ulcer, or bleed (PUB), and/or age ≥65 years. However, patients receiving aspirin (including low-dose aspirin for cardiovascular prophylaxis) were not enrolled in these studies. Patients were 50 years of age and older with osteoarthritis and who had no ulcers at baseline were evaluated by endoscopy after weeks 6, 12, and 24 of treatment. The placebo-treatment group was discontinued at week 16 by design.

Treatment with VIOXX 25 mg daily or 50 mg daily was associated with a significantly lower percentage of patients with endoscopic gastroduodenal ulcers than treatment with ibuprofen 2400 mg daily. However, the studies cannot rule out at least some increase in the rate of endoscopic gastroduodenal ulcers when comparing VIOXX to placebo. See Figures 1 and 2 and the accompanying tables for the results of these studies.

**Figure 1**

**COMPARISON TO IBUPROFEN**

**Life-Table Cumulative Incidence Rate of Gastroduodenal Ulcers ≥ 3mm** (Intention-to-Treat)

† p < 0.001 versus Ibuprofen 2400 mg
** Results of analyses using a ≥ 5mm gastroduodenal ulcer endpoint were consistent.
*** The primary endpoint was the cumulative incidence of gastroduodenal ulcer at 12 weeks.

M004407996

**TABLE 1**
**Endoscopic Gastroduodenal Ulcers at 12 weeks**
**U.S. Study**

| Treatment Group | Number of Patients with Ulcers/Total Number of Patients | Cumulative Incidence Rate* | Ratio of Rates vs. Placebo | 95% CI on Ratio of Rates |
|---|---|---|---|---|
| Placebo | 11/[illegible] | [illegible] | - | - |
| VIOXX 25 mg | [illegible] | 4.1% | [illegible] | [illegible] |
| VIOXX 50 mg | [illegible] | 7.3% | [illegible] | [illegible] |
| Ibuprofen | [illegible] | 27.7% | 2.78 | [illegible] |

*by life table analysis

**Figure 2**
**COMPARISON TO IBUPROFEN**
**Life-Table Cumulative Incidence Rate of Gastroduodenal Ulcers ≥ 3mm** ** **(Intention-to-Treat)**

† p < 0.001 versus ibuprofen 2400 mg
** Results of analyses using a ≥ 5mm gastroduodenal ulcer endpoint were consistent.
*** The primary endpoint was the cumulative incidence of gastroduodenal ulcer at 12 weeks.

**TABLE 2**
**Endoscopic Gastroduodenal Ulcers at 12 weeks**
**Multinational Study**

| Treatment Group | Number of Patients with Ulcers/Total Number of Patients | Cumulative Incidence Rate* | Ratio of Rates vs. Placebo | 95% CI on Ratio of Rates |
|---|---|---|---|---|
| Placebo | [illegible] | [illegible] | - | - |
| VIOXX 25 mg | [illegible] | [illegible] | [illegible] | [illegible] |
| VIOXX 50 mg | [illegible] | [illegible] | [illegible] | [illegible] |
| Ibuprofen | [illegible] | [illegible] | [illegible] | [illegible] |

*by life table analysis

The correlation between findings of endoscopic studies, and the relative incidence of clinically serious upper GI events that may be observed with different products, has not been fully established. Serious clinically significant upper GI bleeding has been observed in patients receiving VIOXX in controlled trials, albeit infrequently (see WARNINGS, *Gastrointestinal (GI) Effects - Risk of GI Ulceration, Bleeding, and Perforation*). Prospective, long-term studies required to compare the incidence of serious, clinically significant upper GI adverse events in patients taking VIOXX versus comparator NSAID products have not been performed.

*Assessment of Fecal Occult Blood Loss in Healthy Subjects*

Occult fecal blood loss associated with VIOXX 25 mg daily, VIOXX 50 mg daily, ibuprofen 2400 mg per day, and placebo was evaluated in a study utilizing $^{51}$Cr-tagged red blood cells in 67 healthy males. After 4 weeks of treatment with VIOXX 25 mg daily or VIOXX 50 mg daily, the increase in the amount of fecal blood loss was not statistically significant compared with placebo-treated subjects. In contrast, ibuprofen 2400 mg per day produced a statistically significant increase in fecal blood loss as compared with placebo-treated subjects and VIOXX-treated subjects. The clinical relevance of this finding is unknown.

*Platelets*

Multiple doses of VIOXX 12.5, 25, and up to 375 mg administered daily up to 12 days had no effect on bleeding time relative to placebo. Similarly, bleeding time was not altered in a single dose study with 500 or 1000 mg of VIOXX. There was no inhibition of ex vivo arachidonic acid- or collagen-induced platelet aggregation with 12.5, 25, and 50 mg of VIOXX.

**INDICATIONS AND USAGE**

VIOXX is indicated:

For relief of the signs and symptoms of osteoarthritis.

For the management of acute pain in adults (see CLINICAL STUDIES).

For the treatment of primary dysmenorrhea.

**CONTRAINDICATIONS**

VIOXX is contraindicated ...

VIOXX should not be given to patients who have experienced asthma, urticaria, or allergic-type reactions after taking aspirin or other NSAIDs. Severe, rarely fatal, anaphylactic-like reactions to NSAIDs have been reported in such patients (see WARNINGS, *Anaphylactoid Reactions* and PRECAUTIONS, *Preexisting Asthma*).

**WARNINGS**

*Gastrointestinal (GI) Effects - Risk of GI Ulceration, Bleeding and Perforation*

Serious gastrointestinal toxicity such as bleeding, ulceration, and perforation of the stomach, small intestine or large intestine, can occur at any time, with or without warning symptoms, in patients treated with nonsteroidal anti-inflammatory drugs (NSAIDs). Minor upper gastrointestinal problems, such as dyspepsia, are common and may also occur at any time during NSAID therapy. Therefore, physicians and patients should remain alert for ulceration and bleeding, even in the absence of previous GI tract symptoms. Patients should be informed about the signs and/or symptoms of serious GI toxicity and the steps to take if they occur. The utility of periodic laboratory monitoring has not been demonstrated, nor has it been adequately assessed. Only one in five patients who develop a serious upper GI adverse event on NSAID therapy is symptomatic. It has been demonstrated that upper GI ulcers, gross bleeding or perforation, caused by NSAIDs, appear to occur in approximately 1% of patients treated for 3-6 months, and in about 2-4% of patients treated for one year. These trends continue, thus increasing the likelihood of developing a serious GI event at some time during the course of therapy. However, even short-term therapy is not without risk.

It is unclear, at the present time, how the above rates apply to VIOXX (see CLINICAL STUDIES, *Special Studies, Upper Endoscopy in Patients with Osteoarthritis*). Among 3357 patients who received VIOXX in controlled clinical trials of 6-weeks to one-year duration (most were enrolled in six-month or longer studies) at a daily dose of 12.5 mg to 50 mg, a total of 4 patients experienced a serious upper GI event, using protocol-derived criteria. Two patients experienced an upper GI bleed within three months (at day 62 and 87, respectively) (0.06%). One additional patient experienced an obstruction within six months (Day 130) and the remaining patient developed an upper GI bleed within 12 months (Day 322) (0.12%). Approximately 23% of these 3357 patients were in studies that required them to be free of ulcers at study entry. It is unclear if this study population is representative of the general population. Prospective, long-term studies required to compare the incidence of serious, clinically significant upper GI adverse events in patients taking VIOXX vs comparator NSAID products have not been performed.

NSAIDs should be prescribed with extreme caution in patients with a prior history of ulcer disease or gastrointestinal bleeding. Most spontaneous reports of fatal GI events are in elderly or debilitated patients and therefore special care should be taken in treating this population. To minimize the potential risk for an adverse GI event, the lowest effective dose should be used for the shortest possible duration. For high risk patients, alternate therapies that do not involve NSAIDs should be considered.

Studies have shown that patients with a *prior history of peptic ulcer disease and/or gastrointestinal bleeding* and who use NSAIDs, have a greater than 10-fold higher risk for developing a GI bleed than patients with neither of these risk factors. In addition to a past history of ulcer disease, pharmacoepidemiological studies have identified several other co-therapies or co-morbid conditions that may increase the risk for GI bleeding such as: treatment with oral corticosteroids, treatment with anticoagulants, longer duration of NSAID therapy, smoking, alcoholism, older age, and poor general health status.

*Anaphylactoid Reactions*

As with NSAIDs in general, anaphylactoid reactions have occurred in patients without known prior exposure to VIOXX. In post-marketing experience, rare cases of anaphylactoid reactions and angioedema have been reported in patients receiving VIOXX. VIOXX should not be given to patients with the aspirin triad. This symptom complex typically occurs in asthmatic patients who experience rhinitis with or without nasal polyps, or who exhibit severe, potentially fatal bronchospasm after taking aspirin or other NSAIDs (see CONTRAINDICATIONS and PRECAUTIONS, *Preexisting Asthma*). Emergency help should be sought in cases where an anaphylactoid reaction occurs.

*Advanced Renal Disease*

No safety information is available regarding the use of VIOXX in patients with advanced kidney disease. Therefore, treatment with VIOXX is not recommended in these patients. If VIOXX therapy must be initiated, close monitoring of the patient's kidney function is advisable (see PRECAUTIONS, *Renal Effects*).

*Pregnancy*

In late pregnancy VIOXX should be avoided because it may cause premature closure of the ductus arteriosus.

**PRECAUTIONS**

*General*

VIOXX cannot be expected to substitute for corticosteroids or to treat corticosteroid insufficiency. Abrupt discontinuation of corticosteroids may lead to exacerbation of corticosteroid-responsive illness. Patients on prolonged corticosteroid therapy should have their therapy tapered slowly if a decision is ...

VIOXX® (rofecoxib tablets and oral suspension)

MRK-CAL0098781

M00440797

VIOXX® (rofecoxib tablets and oral suspension)

diagnostic signs in detecting infectious complications of presumed noninfectious, painful conditions.

*Hepatic Effects*

Borderline elevations of one or more liver tests may occur in up to 15% of patients taking NSAIDs, and notable elevations of ALT or AST (approximately three or more times the upper limit of normal) have been reported in approximately 1% of patients in clinical trials with NSAIDs. These laboratory abnormalities may progress, may remain unchanged, or may be transient with continuing therapy. Rare cases of severe hepatic reactions, including jaundice and fatal fulminant hepatitis, liver necrosis and hepatic failure (some with fatal outcome) have been reported with NSAIDs, including VIOXX. In controlled clinical trials of VIOXX, the incidence of borderline elevations of liver tests at doses of 12.5 and 25 mg daily was comparable to the incidence observed with ibuprofen and lower than that observed with diclofenac. In placebo-controlled trials, approximately 0.5% of patients taking rofecoxib (12.5 or 25 mg QD) and 0.1% of patients taking placebo had notable elevations of ALT or AST.

A patient with symptoms and/or signs suggesting liver dysfunction, or in whom an abnormal liver test has occurred, should be monitored carefully for evidence of the development of a more severe hepatic reaction while on therapy with VIOXX. Use of VIOXX is not recommended in patients with moderate or severe hepatic insufficiency (see *Pharmacokinetics, Special Populations*). If clinical signs and symptoms consistent with liver disease develop, or if systemic manifestations occur (e.g., eosinophilia, rash, etc.), VIOXX should be discontinued.

*Renal Effects*

Long-term administration of NSAIDs has resulted in renal papillary necrosis and other renal injury. Renal toxicity has also been seen in patients in whom renal prostaglandins have a compensatory role in the maintenance of renal perfusion. In these patients, administration of a nonsteroidal anti-inflammatory drug may cause a dose-dependent reduction in prostaglandin formation and, secondarily, in renal blood flow, which may precipitate overt renal decompensation. Patients at greatest risk of this reaction are those with impaired renal function, heart failure, liver dysfunction, those taking diuretics and ACE inhibitors, and the elderly. Discontinuation of NSAID therapy is usually followed by recovery to the pretreatment state. Clinical trials with VIOXX at daily doses of 12.5 and 25 mg have shown renal effects (e.g., hypertension, edema) similar to those observed with comparator NSAIDs; these occur with an increased frequency with chronic use of VIOXX at doses above the 12.5 to 25 mg range. (See ADVERSE REACTIONS.)

Caution should be used when initiating treatment with VIOXX in patients with considerable dehydration. It is advisable to rehydrate patients first and then start therapy with VIOXX. Caution is also recommended in patients with pre-existing kidney disease (see WARNINGS, *Advanced Renal Disease*).

*Hematological Effects*

Anemia is sometimes seen in patients receiving VIOXX. In placebo-controlled trials, there were no significant differences observed between VIOXX and placebo in clinical reports of anemia. Patients on long-term treatment with VIOXX should have their hemoglobin or hematocrit checked if they exhibit any signs or symptoms of anemia or blood loss. VIOXX does not generally affect platelet counts, prothrombin time (PT), or partial thromboplastin time (PTT), and does not inhibit platelet aggregation at indicated dosages (see CLINICAL STUDIES, *Special Studies, Platelets*).

*Fluid Retention and Edema*

Fluid retention and edema have been observed in some patients taking VIOXX (see ADVERSE REACTIONS). VIOXX should be used with caution, and should be introduced at the lowest recommended dose in patients with fluid retention, hypertension, or heart failure.

*Preexisting Asthma*

Patients with asthma may have aspirin-sensitive asthma. The use of aspirin in patients with aspirin-sensitive asthma has been associated with severe bronchospasm which can be fatal. Since cross reactivity, including bronchospasm, between aspirin and other nonsteroidal anti-inflammatory drugs has been reported in such aspirin-sensitive patients, VIOXX should not be administered to patients with this form of aspirin sensitivity and should be used with caution in patients with preexisting asthma.

*Information for Patients*

VIOXX can cause discomfort and, rarely, more serious side effects, such as gastrointestinal bleeding, which may result in hospitalization and even fatal outcomes. Although serious GI tract ulcerations and bleeding can occur without warning symptoms, patients should be alert for the signs and symptoms of ulcerations and bleeding, and should ask for medical advice when observing any indicative signs or symptoms. Patients should be apprised of the importance of this follow-up (see WARNINGS, *Gastrointestinal (GI) Effects - Risk of GI Ulceration, Bleeding and Perforation*).

Patients should promptly report signs or symptoms of gastrointestinal ulceration or bleeding, skin rash, unexplained weight gain, or edema to their physicians.

Patients should be informed of the warning signs and symptoms of hepatotoxicity (e.g., nausea, fatigue, lethargy, pruritus, jaundice, right upper quadrant tenderness, and "flu-like" symptoms). If these occur, patients should be instructed to stop therapy and seek immediate medical therapy.

9183909
VIOXX® (rofecoxib tablets and oral suspension)

Patients should also be instructed to seek immediate emergency help in the case of an anaphylactoid reaction (see WARNINGS).

In late pregnancy VIOXX should be avoided because it may cause premature closure of the ductus arteriosus.

*Laboratory Tests*

Because serious GI tract ulcerations and bleeding can occur without warning symptoms, physicians should monitor for signs or symptoms of GI bleeding.

*Drug Interactions*

*ACE Inhibitors:* Reports suggest that NSAIDs may diminish the antihypertensive effect of Angiotensin Converting Enzyme (ACE) inhibitors. In patients with mild to moderate hypertension, administration of 25 mg daily of VIOXX with the ACE inhibitor benazepril, 10 to 40 mg for 4 weeks, was associated with an average increase in mean arterial pressure of about 3 mm Hg compared to ACE inhibitor alone. This interaction should be given consideration in patients taking VIOXX concomitantly with ACE inhibitors.

*Aspirin:* Concomitant administration of low-dose aspirin with VIOXX may result in an increased rate of GI ulceration or other complications, compared to use of VIOXX alone. At steady state, VIOXX 50 mg once daily had no effect on the anti-platelet activity of low-dose (81 mg once daily) aspirin, as assessed by ex vivo platelet aggregation and serum $TXB_2$ generation in clotting blood. VIOXX is not a substitute for aspirin for cardiovascular prophylaxis.

*Cimetidine:* Co-administration with high doses of cimetidine (800 mg twice daily) increased the $C_{max}$ of rofecoxib by 21%, the $AUC_{0-120hr}$ by 23% and the $t_{1/2}$ by 15%. These small changes are not clinically significant and no dose adjustment is necessary.

*Digoxin:* Rofecoxib 75 mg once daily for 11 days does not alter the plasma concentration profile or renal elimination of digoxin after a single 0.5 mg oral dose.

*Furosemide:* Clinical studies, as well as post-marketing observations, have shown that NSAIDs can reduce the natriuretic effect of furosemide and thiazides in some patients. This response has been attributed to inhibition of renal prostaglandin synthesis.

*Ketoconazole:* Ketoconazole 400 mg daily did not have any clinically important effect on the pharmacokinetics of rofecoxib.

*Lithium:* NSAIDs have produced an elevation of plasma lithium levels and a reduction in renal lithium clearance. In post-marketing experience there have been reports of increases in plasma lithium levels. Thus, when VIOXX and lithium are administered concurrently, subjects should be observed carefully for signs of lithium toxicity.

*Methotrexate:* VIOXX 75 mg administered once daily for 10 days increased plasma concentrations by 23% as measured by $AUC_{0-24hr}$ in patients receiving methotrexate 7.5 to 15 mg/week for rheumatoid arthritis. An equivalent magnitude of reduction in methotrexate renal clearance was observed. At 24 hours postdose, a similar proportion of patients treated with methotrexate alone (94%) and subsequently treated with methotrexate co-administered with 75 mg of rofecoxib (88%) had methotrexate plasma concentrations below the measurable limit (5 ng/mL). The effects of the recommended doses for osteoarthritis (12.5 and 25 mg) of VIOXX on plasma methotrexate levels are unknown. Standard monitoring of methotrexate-related toxicity should be continued if VIOXX and methotrexate are administered concomitantly.

*Oral Contraceptives:* Rofecoxib did not have any clinically important effect on the pharmacokinetics of ethinyl estradiol and norethindrone.

*Prednisone/prednisolone:* Rofecoxib did not have any clinically important effect on the pharmacokinetics of prednisolone or prednisone.

*Rifampin:* Co-administration of VIOXX with rifampin 600 mg daily, a potent inducer of hepatic metabolism, produced an approximate 50% decrease in rofecoxib plasma concentrations. Therefore, a starting daily dose of 25 mg of VIOXX should be considered for the treatment of osteoarthritis when VIOXX is co-administered with potent inducers of hepatic metabolism.

*Warfarin:* Anticoagulant activity should be monitored, particularly in the first few days after initiating or changing VIOXX therapy in patients receiving warfarin or similar agents, since these patients are at an increased risk of bleeding complications. In single and multiple dose studies in healthy subjects receiving both warfarin and rofecoxib, prothrombin time (measured as INR) was increased by approximately 8% to 11%. In post-marketing experience, bleeding events have been reported, predominantly in the elderly, in association with increases in prothrombin time in patients receiving VIOXX concurrently with warfarin.

*Carcinogenesis, Mutagenesis, Impairment of Fertility*

Rofecoxib was not carcinogenic in mice given oral doses up to 30 mg/kg (male) and 60 mg/kg (female) (approximately 5- and 2-fold the human exposure at 25 and 50 mg daily based on $AUC_{0-24}$) and in male and female rats given oral doses up to 8 mg/kg (approximately 6- and 2-fold the human exposure at 25 and 50 mg daily based on $AUC_{0-24}$) for two years.

Rofecoxib was not mutagenic in an Ames test or in a V-79 mammalian cell mutagenesis assay, nor clastogenic in a chromosome aberration assay in Chinese hamster ovary (CHO) cells, in an in vitro and an in vivo alkaline elution assay, or in an in vivo chromosomal aberration test in mouse bone marrow.

Rofecoxib did not impair male fertility in rats at oral doses [illegible]

MRK-CAL0098782

M00440799B

ure at 25 and 50 mg daily based on the $AUC_{0-24}$) and nib had no effect on fertility in female rats at doses up ng/kg (approximately 19- and 7-fold human exposure at 50 mg daily based on $AUC_{0-24}$).

*ancy*

*genic effects: Pregnancy Category C.*

coxib was not teratogenic in rats at doses up to /kg/day (approximately 28- and 10-fold human expo- t 25 and 50 mg daily based on $AUC_{0-24}$). There was a non-statistically significant increase in the overall nce of vertebral malformations only in the rabbit at of 50 mg/kg/day (approximately 1- or <1-fold human ure at 25 and 50 mg daily based on $AUC_{0-24}$). There are dies in pregnant women. VIOXX should be used during ancy only if the potential benefit justifies the potential the fetus.

*ratogenic effects*

coxib produced peri-implantation and post- ntation losses and reduced embryo/fetal survival in rats bbits at oral doses ≥10 and ≥75 mg/kg/day, respectively ximately 9- and 3-fold [rats] and 2- and <1-fold [rabbits] n exposure based on the $AUC_{0-24}$ at 25 and 50 mg daily). changes are expected with inhibition of prostaglandin sis and are not the result of permanent alteration of e reproductive function. There was an increase in the nce of postnatal pup mortality in rats at ≥5 mg/kg/day ximately 5- and 2-fold human exposure at 25 and daily based on $AUC_{0-24}$). In studies in pregnant rats nistered single doses of rofecoxib, there was a ment-related decrease in the diameter of the ductus osus at all doses used (3-300 mg/kg: 3 mg/kg is ximately 2- and <1-fold human exposure at 25 or 50 mg based on $AUC_{0-24}$). As with other drugs known to inhibit aglandin synthesis, use of VIOXX during the third ster of pregnancy should be avoided.

*and delivery*

ecoxib produced no evidence of significantly delayed or parturition in females at doses 15 mg/kg in rats ximately 10- and 3-fold human exposure as measured $AUC_{0-24}$ at 25 and 50 mg). The effects of VIOXX on labor elivery in pregnant women are unknown.

ck & Co., Inc. maintains a registry to monitor the preg- outcomes of women exposed to VIOXX while pregnant. tcare providers are encouraged to report any prenatal ure to VIOXX by calling the Pregnancy Registry at 986-8999.

*g mothers*

coxib is excreted in the milk of lactating rats at concen- ns similar to those in plasma. There was an increase in mortality and a decrease in pup body weight following ure of pups to milk from dams administered VIOXX g lactation. The dose tested represents an approximate nd 6-fold human exposure at 25 and 50 mg based on $_{24}$. It is not known whether this drug is excreted in n milk. Because many drugs are excreted in human milk ecause of the potential for serious adverse reactions in ng infants from VIOXX, a decision should be made ner to discontinue nursing or to discontinue the drug, g into account the importance of the drug to the mother.

*tric Use*

ety and effectiveness in pediatric patients below the age years have not been evaluated.

*tric Use*

he patients who received VIOXX in osteoarthritis clinical 1455 were 65 years of age or older (this included 460 were 75 years or older). No substantial differences in and effectiveness were observed between these sub- and younger subjects. Greater sensitivity of some older duals cannot be ruled out. Dosage adjustment in the y is not necessary; however, therapy with VIOXX should tiated at the lowest recommended dose.

ne of these studies (a six-week, double-blind, random- linical trial), VIOXX 12.5 or 25 mg once daily was admin- d to 174 osteoarthritis patients ≥80 years of age. The profile in this elderly population was similar to that of ger patients treated with VIOXX.

**RSE REACTIONS**

*oarthritis*

roximately 3600 patients with osteoarthritis were d with VIOXX; approximately 1400 patients received for 6 months or longer and approximately 800 patients e year or longer. The following table of adverse experi- lists all adverse events, regardless of causality, occur- n at least 2% of patients receiving VIOXX in nine olled studies of 6-week to 6-month duration conducted tients with OA at the therapeutically recommended (12.5 and 25 mg), which included a placebo and/or ve control group.

Clinical Adverse Experiences occurring in ≥ 2.0% of Patients Treated with VIOXX

| | Placebo | VIOXX 12.5 or 25 mg daily | Ibuprofen 2400 mg daily | Diclofenac 150 mg daily |
|---|---|---|---|---|
| | (N = 783) | (N = 2829) | (N = 847) | (N = 498) |
| **Body As A Whole/Site Unspecified** | | | | |
| Abdominal Pain | 4.1 | 3.4 | 4.6 | 5.8 |
| Asthenia/Fatigue | 1.0 | 2.2 | 2.0 | 2.6 |
| Dizziness | 2.2 | 3.0 | 2.7 | 3.4 |
| Influenza-Like Disease | 3.1 | 2.9 | 1.5 | 3.2 |
| Lower Extremity Edema | 1.1 | 3.7 | 3.8 | 3.4 |
| Upper Respiratory Infection | 7.8 | 8.5 | 5.8 | 8.2 |
| **Cardiovascular System** | | | | |
| Hypertension | 1.3 | 3.5 | 3.0 | 1.6 |
| **Digestive System** | | | | |
| Diarrhea | 6.8 | 6.5 | 7.1 | 10.6 |
| Dyspepsia | 2.7 | 3.5 | 4.7 | 4.0 |
| Epigastric Discomfort | 2.8 | 3.8 | 9.2 | 5.4 |
| Heartburn | 3.6 | 4.2 | 5.2 | 4.6 |
| Nausea | 2.9 | 5.2 | 7.1 | 7.4 |
| **Eyes, Ears, Nose, And Throat** | | | | |
| Sinusitis | 2.0 | 2.7 | 1.8 | 2.4 |
| **Musculoskeletal System** | | | | |
| Back Pain | 1.9 | 2.5 | 1.4 | 2.8 |
| **Nervous System** | | | | |
| Headache | 7.5 | 4.7 | 6.1 | 8.0 |
| **Respiratory System** | | | | |
| Bronchitis | 0.8 | 2.0 | 1.4 | 3.2 |
| **Urogenital System** | | | | |
| Urinary Tract Infection | 2.7 | 2.8 | 2.5 | 3.6 |

The general safety profile of VIOXX 50 mg QD in OA clinical trials of up to 6 months (476 patients) was similar to that of VIOXX at the recommended OA doses of 12.5 and 25 mg QD, except for a higher incidence of gastrointestinal symptoms (abdominal pain, epigastric pain, heartburn, nausea and vomiting), lower extremity edema (6.3%) and hypertension (8.2%).

In the OA studies, the following spontaneous adverse events occurred in >0.1% to 1.9% of patients treated with VIOXX regardless of causality:

*Body as a Whole:* abdominal distension, abdominal tenderness, abscess, chest pain, chills, contusion, cyst, diaphragmatic hernia, fever, fluid retention, flushing, fungal infection, infection, laceration, pain, pelvic pain, peripheral edema, postoperative pain, syncope, trauma, upper extremity edema, viral syndrome.

*Cardiovascular System:* angina pectoris, atrial fibrillation, bradycardia, hematoma, irregular heart beat, palpitation, premature ventricular contraction, tachycardia, venous insufficiency.

*Digestive System:* acid reflux, aphthous stomatitis, constipation, dental caries, dental pain, digestive gas symptoms, dry mouth, duodenal disorder, dysgeusia, esophagitis, flatulence, gastric disorder, gastritis, gastroenteritis, hematochezia, hemorrhoids, infectious gastroenteritis, oral infection, oral lesion, oral ulcer, vomiting.

*Eyes, Ears, Nose, and Throat:* allergic rhinitis, blurred vision, cerumen impaction, conjunctivitis, dry throat, epistaxis, laryngitis, nasal congestion, nasal secretion, ophthalmic injection, otic pain, otitis, otitis media, pharyngitis, tinnitus, tonsillitis.

*Immune System:* allergy, hypersensitivity, insect bite reaction.

*Metabolism and Nutrition:* appetite change, hypercholesterolemia, weight gain.

*Musculoskeletal System:* ankle sprain, arm pain, arthralgia, back strain, bursitis, cartilage trauma, joint swelling, muscular cramp, muscular disorder, muscular weakness, musculoskeletal pain, musculoskeletal stiffness, myalgia, osteoarthritis, tendinitis, traumatic arthropathy, wrist fracture.

*Nervous System:* hypesthesia, insomnia, median nerve neuropathy, migraine, muscular spasm, paresthesia, sciatica, somnolence, vertigo.

*Psychiatric:* anxiety, depression, mental acuity decreased.

*Respiratory System:* asthma, cough, dyspnea, pneumonia, pulmonary congestion, respiratory infection.

*Skin and Skin Appendages:* abrasion, alopecia, atopic dermatitis, basal cell carcinoma, blister, cellulitis, contact dermatitis, herpes simplex, herpes zoster, nail unit disorder, perspiration, pruritus, rash, skin erythema, urticaria, xerosis.

*Urogenital System:* breast mass, cystitis, dysuria, menopausal symptoms, menstrual disorder, nocturia, urinary retention, vaginitis.

The following serious adverse events have been reported rarely (estimated <0.1%) in patients taking VIOXX, regardless of causality. Cases reported only in the post-marketing experience are indicated in italics.

*Cardiovascular:* cerebrovascular accident, congestive heart failure, deep venous thrombosis, myocardial infarction, pulmonary embolism, transient ischemic attack, unstable angina.

*Gastrointestinal:* cholecystitis, colitis, colonic malignant neoplasm, *duodenal perforation*, duodenal ulcer, esophageal ulcer, *gastric perforation*, gastric ulcer, gastrointestinal bleeding, *hepatic failure*, *hepatitis*, intestinal obstruction, *jaundice*, pancreatitis.

*Hemic and lymphatic: agranulocytosis*, *leukopenia*, lymphoma, *thrombocytopenia*.

*Immune System: anaphylactic/anaphylactoid reaction*, *angioedema*, *bronchospasm*, *hypersensitivity vasculitis*.

*Nervous System: aseptic meningitis.*

*Psychiatric: confusion*, *hallucinations*.

*Skin and Skin Appendages: severe skin reactions, including Stevens-Johnson syndrome and toxic epidermal necrolysis.*

*Urogenital System:* acute renal failure, breast malignant neoplasm, *hyperkalemia*, *interstitial nephritis*, prostatic malignant neoplasm, urolithiasis, *worsening chronic renal failure*.

In 1-year controlled clinical trials and in extension studies for up to 86 weeks (approximately 800 patients treated with VIOXX for one year or longer), the adverse experience profile was qualitatively similar to that observed in studies of shorter duration.

*Analgesia, including primary dysmenorrhea*

Approximately one thousand patients were treated with VIOXX in analgesia studies. All patients in post-dental surgery pain studies received only a single dose of study medication. Patients in primary dysmenorrhea studies may have taken up to 3 daily doses of VIOXX, and those in the post-orthopedic surgery pain study were prescribed 5 daily doses of VIOXX.

The adverse experience profile in the analgesia studies was generally similar to those reported in the osteoarthritis studies. The following additional adverse experience, which occurred at an incidence of at least 2% of patients treated with VIOXX, was observed in the post-dental pain surgery studies: post-dental extraction alveolitis (dry socket).

In 110 patients treated with VIOXX (average age approximately 65 years) in the post-orthopedic surgery pain study, the most commonly reported adverse experiences were constipation, fever, and nausea.

**OVERDOSAGE**

No overdoses of VIOXX were reported during clinical trials. Administration of single doses of VIOXX 1000 mg to 6 healthy volunteers and multiple doses of 250 mg/day for 14 days to 75 healthy volunteers did not result in serious toxicity.

In the event of overdose, it is reasonable to employ the usual supportive measures, e.g., remove unabsorbed material from the gastrointestinal tract, employ clinical monitoring, and institute supportive therapy, if required.

Rofecoxib is not removed by hemodialysis; it is not known whether rofecoxib is removed by peritoneal dialysis.

**DOSAGE AND ADMINISTRATION**

VIOXX is administered orally. The lowest dose of VIOXX should be sought for each patient.

*Osteoarthritis*

The recommended starting dose of VIOXX is 12.5 mg once daily. Some patients may receive additional benefit by increasing the dose to 25 mg once daily. The maximum recommended daily dose is 25 mg.

*Management of Acute Pain and Treatment of Primary Dysmenorrhea*

The recommended initial dose of VIOXX is 50 mg once daily. Subsequent doses should be 50 mg once daily as needed. Use of VIOXX for more than 5 days in management of pain has not been studied (see CLINICAL STUDIES, *Analgesia, including dysmenorrhea*).

VIOXX Tablets may be taken with or without food.

*Oral Suspension*

VIOXX Oral Suspension 12.5 mg/5 mL or 25 mg/5 mL may be substituted for VIOXX Tablets 12.5 or 25 mg, respectively, in any of the above indications. Shake before using.

**HOW SUPPLIED**

No. 3810 — Tablets VIOXX, 12.5 mg, are cream/off-white, round, shallow cup tablets engraved MRK 74 on one side and VIOXX on the other. They are supplied as follows:

NDC 0006-0074-31 unit of use bottles of 30
NDC 0006-0074-28 unit dose packages of 100
NDC 0006-0074-68 bottles of 100
NDC 0006-0074-82 bottles of 1000
NDC 0006-0074-80 bottles of 8000.

No. 3834 — Tablets VIOXX, 25 mg, are yellow, round tablets engraved MRK 110 on one side and VIOXX on the other. They are supplied as follows:

NDC 0006-0110-31 unit of use bottles of 30
NDC 0006-0110-28 unit dose packages of 100
NDC 0006-0110-68 bottles of 100
NDC 0006-0110-82 bottles of 1000
NDC 0006-0110-80 bottles of 8000.

No. 3835 — Tablets VIOXX, 50 mg, are orange, round tablets engraved MRK 114 on one side and VIOXX on the other. They are supplied as follows:

NDC 0006-0114-31 unit of use bottles of 30
NDC 0006-0114-28 unit dose packages of 100
NDC 0006-0114-68 bottles of 100
NDC 0006-0114-74 bottles of 500
NDC 0006-0114-81 bottles of 4000.

No. 3784 — Oral Suspension VIOXX, 12.5 mg/5 mL, is an opaque, white to faint yellow suspension with a strawberry flavor that is easily resuspended upon shaking.

NDC 0006-3784-64 unit of use bottles containing 150 mL (12.5 mg/5 mL).

No. 3785 — Oral Suspension VIOXX, 25 mg/5 mL, is an opaque, white to faint yellow suspension with a strawberry flavor that is easily resuspended upon shaking.

NDC 0006-3785-64 unit of use bottles containing 150 mL (25 mg/5 mL).

*Storage*

*VIOXX Tablets:*

Store at 25°C (77°F), excursions permitted to 15-30°C (59-86°F). [See USP Controlled Room Temperature.]

*VIOXX Oral Suspension:*

Store at 25°C (77°F), excursions permitted to 15-30°C (59-86°F). [See USP Controlled Room Temperature.]

Rx only

MERCK & CO., INC., Whitehouse Station, NJ 08889, USA

Issued July 2001
Printed in USA

MRK-CAL0098783

MO0440799



MERCK
Merck & Co., Inc.
PO Box 4
West Point, PA 19486-0004

Attachment 2

FIRST CLASS MAIL
U.S. POSTAGE PAID
MERCK

# IMPORTANT CORRECTION OF DRUG INFORMATION

99999
SAMPLE
COMPANY
STREET ADDRESS
CITY ST ZIP

November 2001

Merck & Co., Inc
PO Box 4
West Point, PA 19486-0004

# IMPORTANT CORRECTION OF DRUG INFORMATION

MERCK

Dear Healthcare Provider:

This letter is being sent to you at the request of the U.S. Food and Drug Administration ("FDA"). The FDA's Division of Drug Marketing, Advertising, and Communications has notified Merck & Co., Inc., ("Merck") that it considered claims by Merck professional representatives at two medical meetings, at least one of which you attended, concerning Vioxx (rofecoxib) tablets, to be false or misleading in violation of the Federal Food, Drug, and Cosmetic Act.

Specifically, the FDA has objected to claims made by the representatives that FDA asserts were misleading about the significant cardiovascular findings in the Vioxx Gastrointestinal Outcomes Research ("VIGOR") study. The representatives presented as fact only one of several possible explanations for why in VIGOR 0.5% of patients on Vioxx had a myocardial infarction compared to 0.1% of patients on the comparator drug, naproxen.

Therefore, the FDA has requested that we correct these promotional messages.

- **Alternative interpretations have been proposed for the difference in the rates of myocardial infarctions (MI) in the Vioxx treatment group in comparison with the naproxen treatment group. Possible explanations include that Vioxx *increased* the MI rate or naproxen *decreased* the MI rate.** The underlying reason for the difference has not been established in prospectively designed clinical studies.

If you have any questions about the use of Vioxx, please refer to the enclosed full prescribing information.

Sincerely,

Louis M. Sherwood

Louis M. Sherwood, M.D.
Senior Vice President,
U.S. Medical & Scientific Affairs

MRK-CAL0098785

© 2001 Merck & Co., Inc.
All rights reserved.

20118247(4)-11/01-VIO

Printed in USA
Minimum 10% Recycled Paper

M00440800I



MERCK & CO., INC.
Whitehouse Station, NJ 08889, USA

# VIOXX®

(rofecoxib tablets and oral suspension)

## DESCRIPTION

VIOXX* (rofecoxib) is described chemically as 4-[4-(methylsulfonyl)phenyl]-3-phenyl-2(5H)-furanone. It has the following chemical structure:

Rofecoxib is a white to off-white to light yellow powder. It is [illegible] soluble in acetone, slightly soluble in methanol and isopropyl acetate, very slightly soluble in ethanol, practically insoluble in octanol, and insoluble in water. The empirical formula for rofecoxib is $C_{17}H_{14}O_4S$, and the molecular weight is 314.36.

Each tablet of VIOXX for oral administration contains either 12.5 mg, 25 mg, or 50 mg of rofecoxib and the following inactive ingredients: [illegible]

Each 5 mL of the oral suspension contains either 12.5 or 25 mg of rofecoxib and the following inactive ingredients: [illegible] 0.12% and sodium propylparaben 0.02%.

## CLINICAL PHARMACOLOGY

### Mechanism of Action

VIOXX is a nonsteroidal anti-inflammatory drug that exhibits anti-inflammatory, analgesic, and antipyretic activities in animal models. The mechanism of action of VIOXX is believed to be due to inhibition of prostaglandin synthesis, via inhibition of cyclooxygenase-2 (COX-2). [illegible]

### Pharmacokinetics

*Absorption*

[illegible]

*Food and Antacid Effects*

[illegible]

*Distribution*

Rofecoxib is approximately 87% bound to human plasma protein over the range of concentrations of [illegible]

VIOXX* (rofecoxib tablets and oral suspension)

The apparent volume of distribution at steady state ($V_{dss}$) is approximately 91 L following a 12.5-mg dose and 86 L following a 25-mg dose.

Rofecoxib has been shown to cross the placenta in rats and rabbits, and the blood-brain barrier in rats.

*Metabolism*

Metabolism of rofecoxib is primarily mediated through reduction by cytosolic enzymes. [illegible] These metabolites are inactive as COX-1 or COX-2 inhibitors.

Cytochrome P450 plays a minor role in metabolism of rofecoxib. [illegible] (Also see *Drug Interactions*.)

*Excretion*

Rofecoxib is eliminated predominantly by hepatic metabolism with little (<1%) unchanged drug recovered in the urine. [illegible]

The plasma clearance after 12.5- and 25-mg doses was approximately 141 and 120 mL/min, respectively. [illegible] 17 hours.

*Special Populations*

*Gender*

The pharmacokinetics of rofecoxib are comparable in men and women.

*Geriatric*

After a single dose of 25 mg VIOXX in elderly subjects (over 65 years old) a 34% increase in AUC was observed as compared to the young subjects. Dosage adjustment in the elderly is not necessary; however, therapy with VIOXX should be initiated at the lowest recommended dose.

*Pediatric*

VIOXX has not been investigated in patients below 18 years of age.

*Race*

Meta-analysis of pharmacokinetic studies has suggested a slightly (10-15%) higher AUC of rofecoxib in Blacks and Hispanics as compared to Caucasians. No dosage adjustment is necessary on the basis of race.

*Hepatic Insufficiency*

[illegible]

*Renal Insufficiency*

[illegible]

*Drug Interactions* (Also see PRECAUTIONS, *Drug Interactions*.)

*General*

[illegible]

VIOXX* (rofecoxib tablets and oral suspension)

## CLINICAL STUDIES

### Osteoarthritis (OA)

[illegible]

### Analgesia, including Dysmenorrhea

[illegible]

### Special Studies

*Upper Endoscopy in Patients with Osteoarthritis*

[illegible]

**Figure 1**

**COMPARISON TO IBUPROFEN**

Life-Table Cumulative Incidence Rate of Gastroduodenal Ulcers ≥ 3mm** (Intention-to-Treat)

[illegible]

*Registered trademark of MERCK & CO., Inc. [illegible] COPYRIGHT © MERCK & CO., Inc., [illegible] All rights reserved

VIOXX® (rofecoxib tablets and oral suspension)

TABLE 1

Figure 2

COMPARISON TO IBUPROFEN

Multinational Study
Time by Treatment

TABLE 2

WARNINGS

INDICATIONS AND USAGE

CONTRAINDICATIONS

PRECAUTIONS

MRK-CAL0098787

M00440803

VIOXX® (rofecoxib tablets and oral suspension)

*Hepatic Effects*

*Renal Effects*

*Hematological Effects*

*Fluid Retention and Edema*

*Preexisting Asthma*

*Information for Patients*

VIOXX® (rofecoxib tablets and oral suspension)

*Laboratory Tests*

*Drug Interactions*

*Carcinogenesis, Mutagenesis, Impairment of Fertility*

MRK-CAL0098788

MD0440B004

Pregnancy

ADVERSE REACTIONS

OVERDOSAGE

DOSAGE AND ADMINISTRATION

HOW SUPPLIED

Rx only

MERCK & CO., INC., Whitehouse Station, NJ 08889, USA

Issued July 2000

Printed in USA

MRK-CAL0098789

MOD440800S

DEPARTMENT OF HEALTH & HUMAN SERVICES

Public Health Service

Food and Drug Administration
Rockville, MD 20857

**TRANSMITTED BY FACSIMILE**

Thomas M. Casola
Executive Director, Office of Medical/Legal
Merck & Co., Inc.
P.O. Box 1000,UB3BC-10
North Wales, PA 19454-1099

**RE: NDA 21-042 Vioxx (rofecoxib) tablets**
**MACMIS ID# 9456**

Dear Mr. Casola:

This letter responds to your letter dated November 19, 2001, to the Division of Drug Marketing, Advertising and Communications (DDMAC) regarding the dissemination of corrective letters to health care providers who attended promotional teleconferences presented by Dr. Peter Holt on behalf of Merck & Co., Inc (Merck). Corrective letters were also disseminated to 125 health care providers who attended the 119th Annual Meeting of the Maryland Pharmacists Association (MPhA) in Ocean City, Maryland from June 9 – Jun 12, 2001, and the Annual Meeting of the American Society of Health-Systems Pharmacists (ASHP) in Los Angeles, California, from June 3 – June 6, 2001. These corrective letters were issued in response to our Warning Letter to Merck dated September 17, 2001.

DDMAC has reviewed your corrective actions based on the information provided and concludes that this matter has been satisfactorily resolved and is considered closed.

If you have any further questions or comments, write to the Food and Drug Administration, Division of Drug Marketing, Advertising and Communications, HFD-42, Rm. 17B20, 5600 Fishers Lane, Rockville, MD 20857. In all future correspondences regarding this particular matter, please refer to MACMIS ID# 8432 in addition to the NDA number.

Sincerely,

*(See appended electronic signature page)*

Laura Govemale, Pharm.D.
Regulatory Review Officer
Division of Drug Marketing,
Advertising, and Communications

PLAINTIFF'S
EXHIBIT
22

EXHIBIT
H

---

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

---

/s/

---------------------

Laura Governale
1/2/02 12:31:42 PM

MO0063478