UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 JUN 16  AM 10: 02

LORETTA G. WHYTE
CLERK

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| Gerald Barnett v. Merck & Co, Inc. | * | CASE NO. 02:06CV00485 |

<u>Motion in Limine No. 8</u>

**PLAINTIFF'S MOTION IN LIMINE TO PRECLUDE MERCK WITNESSES FROM TESTIFYING ABOUT THE ANNUAL NUMBER OF DEATHS ATTRIBUTABLE TO NSAID GASTROINTESTINAL TOXICITY WITHOUT APPROPRIATE QUALIFICATIONS AND SCIENTIFIC SUPPORT**

## Introduction

In previous Vioxx trials, Merck has offered opinion testimony about the number of deaths annually attributed to the gastrointestinal ("GI") toxicity of nonsteroidal anti-inflammatory drugs ("NSAIDS"). Merck offers this "evidence" to support its claim that Vioxx, which was designed to be safer for the GI tract than non-selective NSAIDS, offered a benefit to patients. The numbers cited by Merck bear little relation to current medical and scientific literature. Indeed, these estimates are typically offered without any support or citation whatsoever. Rather, a speculative number of events--the larger the better--is bandied about in an attempt to inflate the perceived benefit provided by Vioxx.

___ Fee_____
___ Process_____
_X_ Dktd_____
___ CtRmDep_____
___ Doc. No_____

1

A notable example of this practice occurred in the trial of *Frederick Humeston, et al., v. Merck & Co., Inc., et al.*, (ATL-L-2272-03MT ), when Merck employee Dr. Briggs Morrison volunteered on direct examination that:

> ...it was understood that that side effect [GI toxicity] was common to all the NSAIDs, and it was estimated that somewhere between two and 4 percent of patients who take these medications on a chronic basis would suffer one of these events. And it was estimated that probably in the United States alone on the order of 20,000 people a year -- between 10 and 20,000 people a year die from this complication of NSAIDs.

(*See* transcript of *Frederick Humeston, et al., v. Merck & Co., Inc., et al.*, October 6, 2005, p. 3184, attached hereto as Exhibit "A").

While Merck offered this testimony as evidence of Vioxx's benefit, Dr. Morrison omitted to share with the jury and the court the basis of this wide-ranging estimate. He likewise failed to clarify precisely *when* it was "estimated" that 20,000 people died annually in the U.S. because of GI toxicity. He cited to no medical or scientific literature as support for this opinion and counsel for Merck made no attempt to lay any foundation. Still, the number--<u>20,000 deaths annually</u>--came tripping off Dr. Morrison's tongue as lightly as if he was reporting his address.

In truth, along the continuum between fantasy and reality, Dr. Morrison's estimate rests closer to the category of "wild guess" than to "reasoned hypothesis." This should come as no surprise. Dr. Morrison is an oncologist by training. He is neither a gastroenterologist nor an epidemiologist. If he has any training in biostatistics, he has kept that a secret from the Plaintiff. His opinion about deaths secondary to NSAID gastropathy was in keeping with Merck's general practice of bootlegging expert opinion through unqualified fact witnesses.

In the trial of this matter, Merck may once again seek to offer an inflated estimate regarding the numbers of deaths reported annually in association with NSAID GI-toxicity. To the extent that this number is offered--as it has been in the past--without any support from medical or scientific literature, and by a witnesses who lack the necessary skill, training, experience and education to render such an opinion, it should be excluded by the Court.

### I. Merck Intentionally Overestimates the Number of Annual Deaths Attributed to NSAID Gastropathy in Order to Bolster the Image of Vioxx

Dr. Morrison's previous testimony about NSAID gastropathy deaths betrays a blissful and, frankly, convenient ignorance of recent medical literature. It is possible that this ignorance is responsible for the profound divergence between his opinion about the rate of deaths and the estimates of actual experts in the field of NSAID gastropathy. For example, in 1997, it was estimated that the annual number of GI deaths attributed to NSAIDS in United States was 7,600 (about a third of Dr. Morrison's highest guess). (*See* Tamblyn R, Berkson L, Dauphinee WD, Gayton D, Grad R, Huang A, Isaac L, McLeod P, Snell L. (1997) Unnecessary prescribing of NSAIDs and the management of NSAID-related gastropathy in medical practice. *Ann Intern Med*. 127(6):429-38, attached hereto as Exhibit "B"). Notably, this estimate predates Vioxx's introduction to the U.S. market. Thus, if Dr. Morrison's conjecture about 20,000 annual deaths is accurate and current, then apparently Vioxx has contributed to a nearly three-fold *increase* in the number of deaths associated with NSAID gastropathy.

Dr Morrison is similarly, and regrettably, unfamiliar with the work of Dr. James Fries of Stanford, who studied the Arthritis, Rheumatism, and Aging Medical Information System database specifically to determine how the rates of hospitalizations secondary to NSAID gastropathy have

3

changed in the past two decades.[1] (*See* Fries JF, Murtagh KN, Bennett M, Zatarain E, Lingala B, Bruce B. (2004) The rise and decline of nonsteroidal anti-inflammatory drug-associated gastropathy in rheumatoid arthritis. *Arthritis Rheum*. 50(8):2433-40, attached hereto as Exhibit "D").

Dr. Fries and his colleagues followed 5,598 consecutively enrolled rheumatoid arthritis patients for nearly two decades, using systematic outcome assessment protocols. Id. at 2433. They sought to examine trends in the incidence of NSAID gastropathy over time. Id. at 2434. Dr. Fries observed that the rate of GI-related hospitalizations first increased from 0.6% per year in 1981 to a peak of 1.5% in 1992, and then decreased to 0.5% in 2000. Id. These trends over the period of rise and the period of decline were highly statistically significant. Id.

Critically, Dr. Fries' results show that the percentage of patients with GI hospitalizations <u>fell 80% from 1992 to 1998</u>, a period time when Vioxx was not even on the market. Id. at 2435. This would suggest that the 1997 estimate of 7,600 annual GI deaths related to NSAIDS decreased as well. Interestingly, the incidence of GI hospitalizations actually increased following the introduction of Vioxx. Id. at 2435. Dr. Fries and his colleagues attribute the decrease in NSAID related GI hospitalizations to a number of factors, most of which had nothing to do with the advent of Vioxx, including: 1) decreased doses of aspirin and ibuprofen; 2) increased use of less GI-toxic NSAIDS, like nabumetone, etodolac and Arthrotec; and 3) the increased use of proton-pump inhibitors.[2] Id. at

---

[1] This is the same Dr. Fries who, in 2001, wrote to Merck's CEO, Ray Gilmartin, detailing eight reports of "Merck damage control by intimidation" and noting that Merck has "not been forthcoming with data" concerning the "unusual side effect pattern of Vioxx." (*See* Plaintiff's Exhibit 1.0176, attached hereto as Exhibit "C").

[2] Merck obviously was aware that the use of proton pump inhibitors ("ppi") was superior to selective inhibition of COX-2 when dealing with the issue of NSAID gastropathy. After the withdrawal of Vioxx, a Merck researcher acknowledged that most problems caused by GI-upset secondary to NSAIDS could be avoided by using "Naproxen plus a generic PPI." (*See* Plaintiff's Exhibit 1.0726, attached hereto as Exhibit "E").

2438. The unmistakable intent of offering an inflated estimate about NSAID related deaths is to convince to the jury that Vioxx was designed and marketed specifically to address an epidemic. But not even Merck's own experts support Dr. Morrison's conjecture about the number of deaths.

Following the completion of the VIGOR trial, Merck produced a series of "video news releases" about the study. These short clips amount to little more than tightly controlled "interviews" of Merck employees and paid experts, and tout the drugs alleged GI protective effect with no mention of cardiovascular risk. During one remarkable exchange, Merck expert and investigator Dr. Loren Laine, a gastroenterologist and author of the VIGOR study, is encouraged to gloss over the fact that Merck's GI death estimate is an exaggeration.

When Dr. Laine reads through his script initially, he balks at perpetuating the Merck charade, telling the company's representative that "...those numbers, by the way, are totally incorrect and they're based on just extreme totally incorrect data. Everybody uses them because they sound good. They sound good, but it's the same person that keeps putting them out." *See* Transcript of Video News Release Outtakes, (Plaintiff's Exhibit "F") 1889, 41:2-8. Of course, the importance of making such an inflated claim is not lost on the good doctor, who observes: "There's about five different reasons why those numbers are totally bogus, but I agree. It's out there in the common realm and everybody uses those numbers. I know, because it's a very impressive sound byte." Id. at 41:16-21

Undaunted, the Merck representative wondered aloud whether the clever wording in the script would protect Dr. Laine from being patently untruthful, asking: "Does it help that we're using the word associated with NSAIDs; does that sort of water it down a little bit?" Id. at 41:22 - 42:2. But this does not entirely soothe his conscience. "No. I mean because the issue is -- part of the issue is the -- you just don't have an idea. I'm not saying it's actually wrong. The death rate is probably

5

wrong. The hospitalizations may be right. Just the death rate is probably wrong, but anyway..." 42:3-11.

Eventually, though, Dr. Laine relents, and agrees to finesse the delivery so as to lend support to a number he clearly knows is wrong, because--as he himself has noted--"it's a very impressive sound byte." "As long as we say it's estimated or reported, it's not me saying it," Dr. Laine rationalizes. Id. at 42:14-16.

Compounding Merck's quasi-scientific fraud is the fact that, whatever the number of GI-related NSAID deaths, a sizeable portion are attributable to the use of aspirin for cardiovascular prophylaxis. In a recent study of hospitals serving more than seven million patients, researchers concluded that as many as one third of all NSAID/aspirin related GI deaths are associated with the use of *low-dose aspirin*. (*See* Lanas A, Perez-Aisa MA, Feu F, Ponce J, Saperas E, Santolaria S, Rodrigo L, Balanzo J, Bajador E, Almela P, Navarro JM, Carballo F, Castro M, Quintero E. (2005)) A nationwide study of mortality associated with hospital admission due to severe gastrointestinal events and those associated with nonsteroidal anti-inflammatory drug use. *Am J Gastroenterol.* 100(8):1685-93). Plainly, Vioxx would have no effect on these events as it is not a substitute for low-dose aspirin.

Lastly, Dr. Morrison's carefree guess elides the controversy surrounding estimates of GI-related NSAID fatalities. (*See* Tsokos M, Schmoldt A. (2001) Contribution of nonsteroidal anti-inflammatory drugs to deaths associated with peptic ulcer disease: a prospective toxicological analysis of autopsy blood samples. *Arch Pathol Lab Med.* 125(12):1572-4, acknowledging that "controversy exists about the number of death resulting from peptic ulcers that are attributable to the use of NSAIDS" at 1573).

In light of the foregoing, is it disingenuous for Merck to throw out an inflated number of GI-related deaths, suggest that Vioxx was safer, and then hope for the jury to conclude that Vioxx was a necessary, life-saving drug in the fight against fatal NSAID gastropathy. In truth the numbers likely were never as high as Dr. Morrison suggested, and they were decreasing significantly before Vioxx was introduced, because of cheaper and safer alternatives in pain management. If Merck wished to present evidence about an epidemic of NSAID related fatalities, and Vioxx's benefit as an alternative to non-selective NSAIDS, it should have identified a qualified expert and provided disclosure about any opinions to be offered. But Merck ought not be permitted to parade before the jury the conjecture of an unqualified fact witness to support claims about their product.

### II.    Merck Should Be Precluded from Offering Opinion Testimony about Annual Estimates of Deaths Attributed to NSAID Gastropathy Unless it Has Previously Disclosed this Opinion to Plaintiff and Unless the Opinion Is Admissible under F.R.E. 702 and Daubert

Dr. Morrison is obviously unqualified to opine about the number of deaths reported annually in association with NSAID gastropathy. But Merck should be cautioned that *no* witness will be permitted to spitball about annual estimates of deaths unless he or she is qualified to offer an opinion, and unless this opinion has previously been disclosed to the Plaintiff.

The opinion of an expert witness is only admissible if: 1) it is based upon sufficient facts or data; 2) it is the product of reliable principles and methods; and 3) the expert has applied the principles and methods reliably to the facts of the case. Fireman's Fund Ins. Co. v. Canon U.S.A., Inc., 394 F.3d 1054, 1057 (8th. Cir 2005), *citing* Fed.R.Evid. 702.

The Supreme Court has construed Rule 702 as imposing on the district court a "gate-keeping" responsibility which must be performed before admitting expert scientific testimony. Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 589 (1993). The Court performs this function in order to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but

7

reliable." Id. Thus, before considering whether the testimony "will assist the trier of fact to understand or determine a fact in issue," a district court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid." Id. at 592-93.

The gatekeeping requirement imposed by Daubert is critically important. As the Supreme Court observed in Kumho Tire: "[T]he objective of that requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999). The district court's gate-keeping role is particularly significant because the expert's opinion "can be both powerful and quite misleading because of the difficulty in evaluating it." Daubert, 509 U.S. at 595. "Indeed, no other kind of witness is free to opine about a complicated matter without any firsthand knowledge of the facts in the case, and based upon otherwise inadmissible hearsay..." U.S. v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004).

For reasons discussed above, Merck's assertion that there were 20,000 death annually attributable to NSAID GI gastropathy is both powerful and misleading. It prompts the jury to conclude that before Vioxx was marketed, there was an epidemic of NSAID related fatalities that Merck's new wonder drug was going to cure. It is precisely this kind of opinion testimony that Rule 702 was designed to exclude. In previous trials, Merck has offered this opinion without support and without first disclosing it to Plaintiff. This practice contravenes Federal rules of admissibility and evidence, and is not in keeping with the orders of this Court, which require prior notice of all expert opinions. As such, Merck should be precluded from offering any such opinion without first showing that it is admissible under F.R.E. 702 and Daubert.

8

## Conclusion

For the foregoing reasons, Plaintiff respectfully requests that the Court enter an order precluding Defendant Merck & Co., Inc., from offering any expert testimony regarding estimates of annual deaths attributable to NSAID gastropathy from witnesses who lack the necessary expertise, where these opinions have not previously been disclosed to Plaintiff, and where they lack adequate support under the Federal Rules of Evidence and appropriate case law.

Date: June 9, 2006

Respectfully submitted,

By _/s/ Mark P. Robinson_
Mark P. Robinson, Jr.
Kevin F. Calcagnie
Carlos A. Prietto, III
Ted B. Wacker
Lexi W. Myer
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Dr., 7th Floor
Newport Beach, California 92660
Telephone: (949) 720-1288
Facsimile: (949) 720-1292

Andy D. Birchfield, Jr.
P. Leigh O'Dell
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, Alabama 36103-4160
Telephone: (334) 269-2343
Facsimile: (334) 954-7555

Counsel for Plaintiff

Russ M. Herman
Leonard A. Davis
Stephen J. Herman
HERMAN HERMAN KATZ
& COTLER, LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70013
Telephone: (504) 581-4892
Facsimile: (504) 561-6024

Christopher A. Seeger
SEEGER WEISS
One William Street
New York, New York 10004
Telephone: (212) 584-0700
Facsimile: (212) 584-0799
**Co-Lead Counsel**

**PLAINTIFFS' LIAISON COUNSEL**

Richard J. Arsenault
NEBLETT, BEARD & ARSENAULT
220 Bonaventure Court
P.O. Box 1190
Alexandria, Louisiana 71301-1190
Telephone: (318) 487-9874
Facsimile: (318) 561-2591

Carlene Rhodes Lewis
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, Texas 77002
Telephone: (713) 650-0022
Facsimile: (713) 650-1669

Elizabeth Cabraser
LIEFF, CABRESER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, California 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Drew Ranier, Esq.
RANIER, GAYLE & ELLIOT, LLC
1419 Ryan Street
Lake Charles, Louisiana 70601
Telephone: (337) 494-7171
Facsimile: (337) 494-7218

Thomas Kline
KLINE & SPECTER, P.C.
1525 Locust St., 19th Floor
Philadelphia, Pennsylvania 19102
Telephone: (215) 772-1000
Facsimile: (215) 772-1371

Mark P. Robinson, Jr.
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Dr., 7th Fl
Newport Beach, California 92660
Telephone: (949) 720-1288
Facsimile: (949) 720-1292

Arnold Levin, Esq.
LEVIN FISHBEIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19106-3875
Telephone: (215) 592-1500
Facsimile: (215) 592-4663

Christopher V. Tisi Esq.
ASHCRAFT & GEREL
2000 L Street, NW, Suite 400
Washington, DC 20036-4914
Telephone: (202) 783-6400
Facsimile: (307) 733-0028

**PLAINTIFFS' STEERING COMMITTEE**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Defendants' Liaison Counsel, Phillip A. Wittmann, Merck's Counsel, Andrew L. Goldman, and Plaintiffs' Liaison Counsel, Russ Herman, by U.S. Mail and e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced, in accordance with Pretrial Order No. 8, on this 9th day of June, 2006.

*/s/ Mark P. Robinson, Jr.*
MARK P. ROBINSON, JR.