## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | **MDL Docket No. 1657** |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| | * | **JUDGE FALLON** |
| **This document relates to** | * | |
| **Case No. 06-0485** | * | |
| | * | **MAGISTRATE JUDGE** |
| **GERALD D. BARNETT,** | * | **KNOWLES** |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| **MERCK & CO., INC.,** | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM IN SUPPORT OF MOTION OF MERCK & CO., INC. ("MERCK") FOR ORDER EXCLUDING TESTIMONY OF DAVID GRAHAM, M.D.

### (MOTION IN *LIMINE* NO. 6)

Merck files this memorandum in support of its Motion for Order Excluding Testimony of David Graham, M.D. (Motion in *Limine* No. 6), filed June 9, 2006. Merck's specific objections to plaintiff's designations of Dr. Graham's testimony are detailed in Merck's concurrently-filed objections. By way of this motion, Merck addresses specific categories of inadmissible testimony, including:  (i) opinions Dr. Graham had never vocalized publicly prior to his deposition; (ii) testimony and opinions by Dr. Graham that are entirely irrelevant to this litigation and are unduly prejudicial; (iii) testimony criticizing the FDA; and (iv) evidence of or reference

to Dr. Graham's estimate of the number of excess heart attacks and deaths allegedly caused by Vioxx.

When this Court ordered the deposition of Dr. David Graham, it was on the basis that it would be limited "to matters relevant to this litigation and to which Dr. Graham has previously addressed." *See In re Vioxx Prods. Liab. Litig.*, No. MDL 1657, 2006 U.S. Dist. LEXIS 10477, at \*43 (E.D. La. Mar. 13, 2006). In disregard of this Court's order, Dr. Graham testified to matters beyond the permitted scope. Dr. Graham's deposition testimony also repeats and elaborates on his anti-FDA messages, which are preempted by *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 350 (2001). This testimony as well as Dr. Graham's unreliable testimony about the excess number of heart attacks and deaths allegedly caused by Vioxx should be excluded.

## I. DR. GRAHAM'S TESTIMONY THAT WENT BEYOND THE SCOPE OF THIS COURT'S ORDER AND THAT IS IRRELEVANT, UNDULY PREJUDICIAL, AND PREEMPTED SHOULD BE EXCLUDED.

### A. Opinions That Dr. Graham Expressed For The First Time During His Deposition Should Be Excluded.

This Court specifically ordered that Dr. Graham's deposition would "be limited to matters relevant to this litigation and to which Dr. Graham has previously addressed." *In re Vioxx Prods. Liab. Litig.*, 2006 U.S. Dist. LEXIS 10477, at \*43. Accordingly, Merck reviewed the topics Dr. Graham had previously addressed and for which he had offered opinion in preparation for its one and only opportunity to cross-examine Dr. Graham. At the deposition, however, Dr. Graham testified to opinions that he had never before vocalized. Such testimony should be excluded on the grounds that it violates this Court's order and would unduly prejudice Merck. Specifically, the Court should exclude the following opinions, which plaintiff hopes to

2

offer in this trial[1]:

- **Merck "Dragged Its Feet" in Implementing the Post-VIGOR Label Change.**[2] (Deposition of David Graham, M.D. ("Graham Dep.") at 510:5-14 ("The two-year period for coming up with the revised label for a problem as serious as high risk of heart attacks with Vioxx, this is an extraordinary long period of time, and the only explanation based on my long experience at FDA is that there was foot dragging by the company."), attached hereto as Ex. A.)

- **FDA Medical Officer, Sheri Targum, Recommended that Vioxx Contain a Warning for CV Risk.** (*Id.* at 517:21-518:14 ("Could I add one other thing since we're talking about labeling. Shari Targum, whose review we talked about earlier, in the very conclusion of her review, I was really stunned, I *only saw this recently in rereading the review*, she wrote basically that this – that Vioxx should have warnings. And she said 'at least warnings.' And so I think reading that and looking at her review, the fact that here's the expert who reviewed the drug, thought that it should have been in warnings, and then eventually we have it came out that it's sort of, you know, buried in the fine print, I was actually fairly surprised because I hadn't realized that Dr. Targum had actually stated that." (emphasis added)).)

- **Merck Could and Should Have Done a "Really Huge" CV Outcomes Trial After VIGOR.** (*Id.* at 223:11-224:5.)

- **Vioxx Should Have Never Been Approved by the FDA as Safe and Effective.**[3] (*Id.* at 64:6-16 ("It is my professional opinion, based on the evidence that I've looked at, that Vioxx should not have been approved at the time that it was approved, that there were substantial areas of concern relating to cardiovascular safety that should have been explored more fully and more thoroughly prior to consideration of an approval.").)

At the beginning of Dr. Graham's deposition, Merck's counsel made clear that, based on

this Court's order, "we've done our best to review Dr. Graham's public statements on various

issues and . . . if he talks in an area where he hasn't spoken publicly before, we want to raise the

---

[1] Dr. Graham offered several additional opinions he had never before vocalized, but plaintiff is not attempting to put those opinions before the jury in this case.

[2] Dr. Graham's opinion that Merck is to blame for why the VIGOR label change wasn't implemented earlier also constitutes inadmissible speculation. *See* FED. R. EVID. 602.

[3] Although plaintiff tried to cure Merck's objection that Dr. Graham's opinion went beyond "public statements that Dr. Graham ha[d] previously made" (Graham Dep. at 64:17-21) by asking Dr. Graham to agree that he had previously offered this opinion "in one way, shape or form . . . in some public forum" (*id.* at 64:23-65:3), Merck would challenge plaintiff to provide an offer of proof, which should be easily done, if Dr. Graham's affirmation were true.

objection . . . ." (Graham Dep. at 25:9-24)  To allow plaintiff to offer this testimony would unduly prejudice Merck because, in anticipation that this Court's Order would be obeyed, it did not have the chance to adequately cross-examine Dr. Graham on these newly-vocalized opinions.

## B.   The Court Should Exclude Other Irrelevant and Unduly Prejudicial Testimony.

In addition to Dr. Graham's newly-vocalized opinions, Dr. Graham also testified to matters that are entirely irrelevant to the Vioxx litigation. This testimony should be excluded under Federal Rules of Evidence 401, 402, and 403.

### 1.   This Case is not about the Drug PPA, and Merck Should not be Forced to Litigate when the FDA Knew about Risks Associated with PPA.

The basis for Dr. Graham's opinion that "there is an institutional bias in the FDA which prevents the FDA from protecting Americans against unsafe drugs" is that the FDA took over a decade to pull another prescription drug, phenylpropanolamine ("PPA"), off the market:

Q: Tell the members of the j ury what the basis is for that statement.

A: Well, all you have to do . . . to see it crystal clear is to look at the drugs that have come off the market. These are drugs where FDA approved them, and by approving them said the drugs were safe and effective . . . If we examine how long it takes from when the signal of the problem emerges to when the drug comes off the market, you will see that that is measured in years, sometimes in decades. With phenylpropanolamine, PPA, a drug product present in virtually every cough/cold preparation in the country, it was in over-the-counter diet aids to help people lose weight, was associated with hemorrhagic stroke primarily in young women, and this was known since 1984. However, it wasn't until about 2000 or 2001 that FDA finally removed that product from the market. In the meantime, the company that made PPA or the companies that made PPA continued to make profits, and patients continued to be harmed.

(*Id.* at 85:4-86:9.) This type of irrelevant testimony must be excluded. This case is not about PPA and Merck should not be forced to litigate whether the FDA "knew since 1984" that PPA was associated with hemorrhagic stroke. FED. R. EVID. 401-03.

2.  Dr. Graham's Belief that Congress' Enactment of the Prescription Drug User Fee Act Caused the FDA to Favor the Pharmaceutical Industry Should be Excluded.

Dr. Graham's discussion and characterization of the Prescription Drug User Fee Act ("PDUFA"), which was enacted by Congress in 1992, is likewise irrelevant and unduly prejudicial. PDUFA requires pharmaceutical companies to pay fees when it submits, for example, a new drug application or requests other services from the FDA.[4] *See* 21 U.S.C. § 379h. Dr. Graham believes that PDUFA has caused "the preapproval people [to] look for reasons to say yes to a drug." (Graham Dep. at 95:22-96:1.) This testimony must be excluded for three distinct reasons.

First, Dr. Graham's opinion constitutes improper state of mind testimony as to the group of people who decide whether a drug is safe and effective. *See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004) (rejecting expert testimony "on the intent, motives or states of mind of corporations, regulatory agencies and others" because they "have no basis in any relevant body of knowledge or expertise"); *In re Diet Drugs Prods. Liab. Litig.*, MDL No. 1203, 2000 U.S. Dist. LEXIS 9037, at *28-29 (E.D. Pa. June 20, 2000). Second, this testimony is based on inadmissible hearsay. Dr. Graham is not involved with the approval of drugs and testified that his belief that "preapproval people look for reasons to say yes to a drug" is based on the alleged statements of other FDA employees:

> These are remarks that have been passed in internal meetings that I have been present at. . . . And since I have gone public with my Senate testimony, I have *been approached now by probably 10 or 15 medical reviewers from different components of CDER with stories of* being pressured to change their reviews

---

[4] In 1992, Congress enacted PDUFA to address the FDA's staffing needs so it could process the paperwork it received in a timely manner. 102 P.L. 571, 102 (findings by Congress that PDUFA should be enacted because "the public health will be served by making additional funds available for the purpose of augmenting the resources of the Food and Drug Administration").

where they thought a drug should not be approved, but where management was telling them you must now say yes to that drug.

(*See* Graham Dep. at 97:4-17 (emphasis added).) Last, this type of testimony is a criticism of the

FDA that is preempted by *Buckman*. *See infra* Part I(C).

> 3. Analogizing Vioxx to a Loaded Gun and Referring to the FDA's Use of Generally-Accepted Statistical Methods as Russian Roulette Is Improper and Inflammatory.

On the grounds that it is improper and inflammatory, this Court should exclude Dr.

Graham testimony analogizing Vioxx to a loaded gun and the FDA's use of standard confidence

intervals in its risk-benefit analysis to a game of Russian Roulette:

> A: [L]et' s play Russian roulette. Now, we're going to put 95 bullets in the gun, so we are 95 percent certain that this drug causes whatever adverse reaction we're talking about. Let's just say this drug causes liver failure. This drug causes heart attacks. We're 95 percent certain.
>
> Q: That 's the current test?
>
> A: Right. So, we put 95 bullets in, and we play Russian roulette. And at that point, the FDA says, we believe you, the gun is loaded, the drug isn't safe. Let's take five bullets out of the chamber. Now we have 90 bullets in the chamber. So there's only 90 percent chance that when I pull the trigger, a bullet is going to come out of the gun. FDA says the gun is not loaded.

(Graham Dep. at 119:1-22.) In rejecting the 95% confidence interval employed by the FDA and

the scientific community at large to assess statistical significance, Dr. Graham likened drug

safety to Russian roulette. Statistical significance is a measure of whether the results of a test or

experiment may be due to chance. This testimony does not explain the concept of drug safety,

which requires an analysis of the drug's benefits in relation to its risks. Moreover, in discussing

this generally-accepted statistical concept, there is no place for equating percentage points to

bullets in a gun. It would be improper to allow plaintiff to inject an emotional element into this

generally-accepted statistical concept. Accordingly, this testimony should be excluded. *See*

FED. R. EVID. 401-03.

6

**C.     This Trial Is Not The Proper Forum To Present Dr. Graham's Disapproval of the FDA.**

Much of Dr. Graham's testimony is an elaboration of why and how he believes the FDA

is "broken." (Graham Dep. at 37:18-22.) However, Congress (not the jury) is the *only* body that

can address Dr. Graham's concerns that:

- "FDA views industry as its primary customer, as its client.  And this gets transmitted to the management. *That's how management gets selected, by how well they get along with industry*."  (Graham Dep. at 110:22-111:3 (emphasis added).)

- The division directors within the Office of New Drugs "*pick people* [to serve on Advisory Committees] who they know from the field and frequently [they] will talk with those people[5] about upcoming Advisory Committee meetings and the type of direction that they wish that advisory meeting to go in." (*Id.* at 112:2-8; *see also id.* at 194:17-22 (claiming the FDA tried to "suppress publication of [his] paper.").)

- "FDA is not functioning in the independent and objective interests of what's best for the public, that it is really functioning first and foremost for a service of its primary customer and client, the industry." (*Id.* at 124:4-10 (describing the message behind two of Dr. Graham's cartoons criticizing the FDA); *see also* 175:10-21 (testifying about the "FDA's response, which in my experience has been to downplay or ignore those risks and to let things get worse"); 85:1-86:9 (same).)

Any suggestion that the FDA was not sufficiently rigorous in its evaluation and approval of

Vioxx would infringe on the carefully-constructed regulatory scheme for drug approval protected

by *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001).  Pursuant to *Buckman*, all of

this testimony is preempted under federal law, and for good reason.  There are real dangers in

permitting state-court juries to impose their judgments on the adequacy of the drug approval

---

[5] This testimony must also be excluded on the ground that it constitutes inadmissible hearsay. (*See also id.* at 111:8-11 ("These are phrases that are frequently used within FDA to describe the relationship that is desired between the regulator and the regulated.").)  For the same reason, Dr. Graham's testimony about the "financial attachments [the FDA Advisory Committee has] to industry" must be excluded. (*Id.* at 112:9-14 ("it's been in the newspaper quite a bit that a third of FDA Committee members have financial ties to industry").)

process under state-law standards. Such a system "would exert an extraneous pull on the scheme established by Congress" to protect the public. *Id.* at 353.

In addition, this testimony is irrelevant and should be excluded under Federal Rule of Evidence 403. It is Merck that is the defendant in these cases, not the FDA. Dr. Graham's disdain for his employer ought to be irrelevant. His criticism of the adequacy of its conduct would serve only to prejudice the jury against Merck. In addition, it would divert their attention from a fair evaluation of the pertinent factual and legal issues they must decide in this case. *See* FED. R. EVID. 401-03.

## II.    THE COURT SHOULD EXCLUDE ANY EVIDENCE OF OR REFERENCE TO DR. GRAHAM'S ESTIMATE OF THE NUMBER OF EXCESS HEART ATTACKS AND DEATHS ALLEGEDLY ATTRIBUTABLE TO VIOXX USE.

Finally, the Court should exclude Dr. Graham's testimony about the alleged excess number of myocardial infarctions or deaths in the general population that are allegedly attributable to Vioxx use. In an article published last year, Dr. Graham purported to derive an estimate of this number through a statistical extrapolation of data from four unrelated studies.[6] In that article, Dr. Graham estimates that Vioxx caused some 88,000 to 140,000 excess cases of "serious coronary heart disease" – a composite endpoint that includes heart attacks and sudden cardiac deaths. (Graham Study at 6; Graham Dep. at 144:2-144:18; 277:20-278:17.)   Dr. Graham's estimate is irrelevant and unduly prejudicial, and it will only confuse and mislead the

---

[6] David J. Graham et al., *Risk of acute myocardial infarction and sudden cardiac death in patients treated with cyclo-oxygenase 2 selective and non-selective non-steroidal anti-inflammatory drugs:    nested case-control study, available at* http://image.thelancet.com/ extras/05art1005web.pdf (Jan. 25, 2005) (hereinafter the "Graham Study") at 1, attached hereto as Ex. B.

jury. In addition, his estimate is scientifically unreliable and simply wrong. The Court should exclude any evidence or reference to it.[7]

## A. The Court Should Exclude Any Evidence Of Or Reference To Dr. Graham's Excess Event Estimate Because It Is Irrelevant, Unduly Prejudicial, And Unduly Confusing.

The Graham Study is a retrospective observational study that *failed* to find an increased risk of cardiovascular adverse events associated with Vioxx at the 25 mg dose – the only dose at issue in this case – when compared with Celebrex or the "remote" use of NSAIDs.[8] (Graham Study at 4, Table 3.) Despite this finding, Dr. Graham claims that Vioxx use caused some 88,000 to 140,000 excess cases of serious coronary heart disease in the United States when compared to the use of other NSAIDs, and that approximately 44% of these excess cases were fatal. (*Id.* at 6; Graham Dep. at 203:9-205:6.) The Court should exclude any evidence of or reference to Dr. Graham's excess event estimate on the ground that it is irrelevant, unduly prejudicial and unduly confusing and would only waste the Court's and the jury's time.[9]

---

[7] For similar reasons, the Court should exclude any evidence of or reference to any other excess event estimates regarding Vioxx. In his deposition, for example, Dr. Graham testified that his estimate is lower than the estimates of "some other folks." (Graham Dep. at 463:5-10.) Dr. Graham, however, did not identify who these "other folks" were or how they derived their estimates. At any rate, the Court should exclude all such testimony for the reasons set forth in this motion.

[8] "Remote" use refers to patients who have not taken traditional NSAIDs in the past 60 days. It is akin to a placebo comparator.

[9] At this juncture, Merck has not sought to exclude all reference to Dr. Graham's study. Instead, Merck has sought to exclude reference only to the excess event estimate that Dr. Graham inserted in the next to last paragraph of his study. Dr. Graham's study and the excess event estimate included in it are entirely unrelated. Indeed, Dr. Graham's study was based on an analysis of data from Kaiser Permanente's California database. (Graham Study at 1.) Based on his analysis of that data, Dr. Graham found that the use of Vioxx at the 25 mg dose – *i.e.*, the only dose at issue in this case – was not associated with an increased risk of cardiovascular events such as heart attacks. (*Id.* at 4, Table 3.) By contrast, Dr. Graham's excess event estimate is not based on any analysis of the Kaiser Permanente data, nor is it connected in any way to the findings of his study. Instead, Dr. Graham derived his excess event estimate through a series of *(footnote continued next page)*

9

First, Dr. Graham's excess event estimate is irrelevant. It has no tendency in reason to prove that plaintiff's use of Vioxx caused *his* alleged heart attack. *See Lowry v. Seaboard Airline R. Co.*, 171 F.2d 625, 627 (5th Cir. 1948) (noting risks of diversion posed by litigating facts of prior unrelated incidents and observing that "[f]ixing the blame in another case would not fix it in this one"). In addition, Dr. Graham found *no* statistically significant increased risk of heart attacks or deaths associated with the use of Vioxx at the 25 mg dose. (Graham Study at 4, Table 3.) Mr. Barnett claims to have used Vioxx before his alleged heart attack at the 25 mg dose only. (April 20, 2006 Deposition of Gerald Barnett ("Barnett Dep.") at 136:1-18; 138:24-139:2, attached hereto as Ex. C; *see also* Deposition of Michael Mikola ("Mikola Dep.") at 288:11-15, attached hereto as Ex. D.) Because "[d]ose is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect," *see McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1242 (11th Cir. 2005), Dr. Graham's excess event estimate has no relevance to this case. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 278 (5th Cir. 1998) (excluding opinion of expert who "offered no scientific support for his general theory that exposure to Toluene solution at any level could cause RADS" and who "had no support for the theory that the level of chemicals to which Moore was exposed caused RADS"); *Allen v. Penn. Eng'g Corp.* 102 F.3d 194, 199 (5th Cir. 1996) ("Scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiff's burden in a toxic tort case."); *see also McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co.*, 938 F.2d 1544, 1549 (2d Cir. 1991) (holding that clinical studies, to be admissible, must compare drug at issue in comparable doses).

---

manipulative calculations based on data from four *different* studies. (*See infra* Part II(B).)

Case 2:05-md-01657-EEF-DEK   Document 5340   Filed 06/19/06   Page 11 of 22

Second, even if Dr. Graham's excess event estimate had some relevance – and it has *none* – the Court still should exclude any evidence of or reference to it on the ground that it is unduly prejudicial and confusing. Plaintiff's only purpose in seeking the admission of this evidence is to inflame the jury's passions against Merck. Indeed, plaintiff apparently hopes that if the jury learns that Vioxx supposedly caused tens of thousands of excess heart attacks and related deaths, then it will conclude that Vioxx must have caused plaintiff's alleged heart attack as well.

Federal Rule of Evidence 403 was designed to prevent such tactics. Under Rule 403, evidence is unfairly prejudicial, and thus inadmissible, if it "appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, triggers other mainsprings of human action, or may cause a jury to base its decision on something other than the established propositions of the case." *Moore v. Ashland Chem., Ind.*, 126 F.3d 679, 692 (5th Cir. 1997). Courts are advised to exclude as unduly prejudicial evidence that has an "undue tendency to suggest decision on an improper basis, commonly . . . an emotional one." Fed. R. Evid. 403, advisory committee's note. That is the case here.

If jurors are allowed to hear Dr. Graham's opinion that Vioxx resulted in 88,000 to 140,000 excess cases of heart attacks, 40% of them supposedly fatal, they might be inclined to believe – without regard to the specific facts of plaintiff's medical history or claimed Vioxx use – that plaintiff's use of Vioxx must have caused his alleged heart attack. That would be a manifestly unfair result since, as explained above, Dr. Graham's estimate in fact has no tendency in reason to prove that Vioxx caused or contributed to *plaintiff's* alleged injuries. Moreover, Dr. Graham did not purport to find an increased risk of serious coronary heart disease associated with the use of Vioxx at the 25 mg does – the only dose at issue in this case. And Mr. Barnett did not die as a result of his alleged injuries.

If jurors are presented with evidence of Dr. Graham's estimate, there is a real and substantial risk that they will improperly divert their attention from the only issue that matters in this case – *i.e.*, whether the dosage and duration at which plaintiff claims to have used Vioxx could have resulted and did result in his alleged heart attack. His testimony thus has no place in this trial. To the contrary, expert testimony is admissible *only* if it "would assist the trier of fact." *See* FED. R. EVID 702. Evidence of or reference to Dr. Graham's excess event estimate would not assist the trier of fact to decide any issue that is relevant to this case. Rather, it would serve only to inflame the jury's emotions and foster resentment of Merck.

For the foregoing reasons, the Court can and should exclude any evidence of or reference to Dr. Graham's excess event estimate. *Lowry*, 171 F.2d at 627; *see also Mobil Exploration & Producing v. A-Z/Grant Int'l Co.*, CIV. A. Nos. 91-3124, 91-4056, 1996 WL 194931, at *5 (E.D. La. Apr. 22, 1996) (excluding evidence of prior unrelated incidents because such evidence addressed problems with no apparent connection to plaintiff's case and if admitted would lead to a mini-trial, confuse the jury, and waste time).

**B.    The Court Should Exclude Any Evidence Of Or Reference To Dr. Graham's Excess Event Estimate Because It Is Scientifically Unreliable.**

Not only is Dr. Graham's excess event estimate irrelevant and unduly prejudicial, it is scientifically unreliable. In fact, it is simply wrong. The Court can and should exclude any evidence of or reference to it on this additional basis. *See Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 670-71 (5th Cir. 1999) ("any step that renders the analysis unreliable . . . *renders the expert's testimony inadmissible*" (emphasis in original; citation and internal quotation marks omitted).

1.     Dr. Graham cannot ensure the accuracy of his excess event estimate.

As an initial matter, Dr. Graham cannot ensure the accuracy of his excess event estimate.

Indeed, notwithstanding his claim that it represents his "best estimate," he all but conceded that it

may not reflect a real number:

> And we put a number in our paper, and what we were more concerned with was
> the public health impact of Vioxx exposure than we were with what were the
> particular numbers, *recognizing that the particular numbers could be different*
> *than the range that we gave,* but that was our best estimate at what we thought
> was likely to be the case.

(Graham Dep. at 430:6-15 (emphasis added).)  Because Dr. Graham cannot ensure the accuracy

of his excess event estimate, the Court should exclude any evidence of or reference to it.[10]

*Moore,* 151 F.3d at 279 (courts "are encouraged" to exclude expert testimony that is speculative

and lacking in scientific validity); *In re: Propulsid Prods. Liab. Litig.,* 261 F. Supp. 2d 603, 616

(E.D. La. 2003) (court is not bound by expert's *ipse dixit*).

2.     Dr. Graham's excess event estimate is based on a flawed methodology.

In addition, Dr. Graham's excess event estimate is based on a flawed methodology.  Dr.

Graham manufactured this estimate through a series of complicated calculations.  One of those

calculations involved multiplying the relative risk of heart attacks among Vioxx users as reported

---

[10] The fact that Dr. Graham published his article in a peer-reviewed journal does *not* ensure its
admissibility. *See, e.g., Allison v. McGhan Med. Corp.,* 184 F.3d 1300, 1316 (11th Cir. 1999)
("[S]crutiny by one's peers does not insure admissibility.  Again, it is well established that
'publication . . . is not a sine qua non of admissibility.'") (citing *Daubert v. Merrell Dow
Pharms.,* 509 U.S. 579, 593 (1993)); *Jones v. United States.,* 933 F. Supp. 894, 899 & n.8 (N.D.
Cal. 1996) (rejecting expert's reliance on statistically insignificant data to prove causation
notwithstanding that articles reporting such data were published in peer-reviewed journals).
Indeed, Dr. Graham's peer reviewers at the FDA urged him to take the excess event calculation
out of his article. (Graham Dep. at 410:1-23.)  In addition, as explained above, Dr. Graham's
claim that Vioxx use is associated with an excess number of heart attacks and related deaths is
*not* based on any original research that he performed; rather, it is based on a manipulation of data
collected by others. (*See supra* n.4.)

13

in the VIGOR[11] and APPROVe[12] studies by the rate of heart attacks in other patients receiving

other therapies, which he derived from data reported in the CLASS study and a 2002

observational study performed by plaintiff's expert Professor Wayne A. Ray.[13] He then applied

an overall fatality rate associated with heart attacks in the general population. (Graham Dep. at

152:21-154:1, 402:20-405:11; 419:12-422:11; Graham Study at 6.) Dr. Graham's estimate is

flawed in multiple respects.

First, Dr. Graham's conclusions do not follow from the data on which he relies. As

explained above, Dr. Graham purports to estimate the excess number of cases of serious

coronary heart disease – *i.e.*, a composite endpoint consisting of both heart attacks *and* sudden

cardiac deaths. To derive this number, however, he relies almost entirely on data relating *only* to

heart attacks. Indeed, the data that Dr. Graham relied on from the VIGOR, APPROVe and

CLASS studies related to heart attacks *only*, not to heart attacks *and* sudden cardiac deaths.

(Graham Dep. at 421:5-18, 423:17-424:1, 427:6-428:12.) Dr. Graham cannot reasonably rely on

heart attack data to estimate the number of excess cases of serious coronary heart disease or

sudden cardiac deaths supposedly attributable to Vioxx. After all, while sudden cardiac deaths

may result from heart attacks, they can and do occur for a variety of other, unrelated reasons. It

---

[11] Bombardier et al., *Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis* (hereinafter "Bombardier"), N ENGL J MED 343:1520 (2000).

[12] Bresalier et al., *Cardiovascular Events Associated with Rofecoxib in Colorectal Adenoma Chemoprevention Trial*, N ENGL J MED. 352:1092 (2005) (hereinafter "Bresalier").

[13] The CLASS study compared Celebrex to ibuprofen and diclofenac, two traditional NSAIDs. (*See* F.E. Silverstein et al., *Gastrointestinal toxicity with celecoxib vs nonsteroidal anti-inflammatory drugs for osteoarthritis and rheumatoid arthritis: the CLASS study – a randomized controlled study* (hereinafter the "Class Study"), JAMA 2000, 284: 1247-55.) The Ray study compared Vioxx to other NSAIDs. (*See* W.A. Ray et al., *COX-2 selective non-steroidal anti-inflammatory drugs and risk of serious coronary heart disease* (hereinafter the "Ray Study"), LANCET 2002, 360: 1071-73.)

14

is scientifically inappropriate to rely on data regarding an agent's ability to cause one type of harm in order to show that the agent can and did cause a *different* type of harm. *See, e.g., Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2002) ("[E]vidence . . . suggest[ing] that [a chemical] may cause ischemic stroke does not apply to situations involving hemorrhagic stroke. This is 'a leap of faith' supported by little more than the fact that both conditions are commonly called strokes."). As the court stated in *Rider*, "scientific evidence must 'fit' the plaintiff's theory of causation," and unless the evidence "fits," it is not relevant to the plaintiff's claims. *Id.* (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).)

Second, even if Dr. Graham's reliance on heart attack data to derive an estimate of serious coronary heart disease was methodologically defensible – and it is *not* – his excess event estimate is flawed for an additional reason: it is based on a misleading calculation that is unwarranted by the underlying data on which he relies. To construct his estimate, Dr. Graham multiplied the relative risk of heart attacks among Vioxx users in the VIGOR and APPROVe studies by the rate of heart attacks for patients in the control group of the CLASS study and for all patients in the Ray study, which Dr. Graham referred to as the "background rate."[14] But Dr. Graham had no legitimate basis to engage in this calculation. Indeed, as Dr. Graham conceded – and as the chart below demonstrates – the actual rate of heart attacks among Vioxx users in the VIGOR and APPROVe studies from which he derived the multipliers for his calculation was *lower* than the rate of heart attacks reported for the patients in the CLASS and Ray studies,

---

[14] Dr. Graham's use of a comparator heart attack rate from studies other than VIGOR and APPROVe was critical to his calculation: the higher that comparator rate, the higher Dr. Graham's excess event estimate would be after he multiplied it by the relative risk reported for Vioxx users in VIGOR and APPROVe. As Dr. Graham conceded, "background [*i.e.*, comparator] rates are important because at the end of the day, the background rate is what drives what that actual estimate of numbers is." (Graham Dep. at 429:24-430:3.)

which provided the baseline for his computation.[15]   (Graham Dep. at 428:13-19, 432:22-433:1 ("Q:  And, again, the real life heart attack rate in both VIGOR and APPROVe was lower than what you say is the normal background rate for people who are not taking any medicine at all, right?  A:  That's correct. . . .  Q:  . . . VIGOR and APPROVe both had lower rates than your background rates, correct?  A:  Yes.").)

| Comparison of Heart Attack Rates In Studies Relied on by Dr. Graham | | |
|---|---|---|
| Study | Rate (per thousand patient years) | Patient Group |
| VIGOR | 7.4 | 50mg Vioxx users |
| APPROVe | 6.9 | 25mg Vioxx users |
| CLASS | 7.9 | Ibuprofen/diclofenac users |
| Ray[16] | 12.4 | NSAID users and non-users |

In other words, while Dr. Graham purports to find an excess number of heart attacks associated with Vioxx use, the underlying data that he relies on for this proposition show the exact *opposite* – namely, that Vioxx users had *fewer* heart attacks than users of other NSAIDs. Given this data, Dr. Graham had no legitimate basis to perform his misleading calculation.  In short, Dr. Graham's excess event estimate is the product of an improper methodology and is

---

[15] The rate of heart attacks reported for Vioxx users in the VIGOR and APPROVe studies was 7.4 and 6.9 heart attacks per thousand patient years, respectively.  By contrast, the heart attack rate derived from the CLASS study for patients prescribed ibuprofen and diclofenac was 7.9 heart attacks per thousand patient years.  In addition, the rate for all patients in the Ray study – *i.e.*, including those prescribed and not prescribed NSAIDs – was 12.4 heart attacks per thousand patient years.  (Graham Dep. at 421:5-18, 423:17-424:24; Class Study at 1247; Ray Study at 1072.)

[16] The rate reported for the Ray study is for heart attacks and deaths from coronary heart disease.

scientifically indefensible. The Court can and should exclude it. *See, e.g., Joiner*, 522 U.S. at 146 ("[C]onclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *Burleson v. Tex. Dep't of Crim. Justice*, 393 F.3d 577, 587 (5th Cir. 2004) ("A court may rightfully exclude expert testimony where a court finds that an expert has extrapolated data, and there is too great an analytical gap between the data and the opinion proffered." (internal quotation marks omitted)); *see also Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997) ("[A]n expert's testimony is unreliable even when the underlying data are sound if the expert draws conclusions from that data based on flawed methodology. A flaw in the expert's reasoning from the data may render reliance on a study unreasonable and render the inferences drawn therefrom dubious.").

Dr. Graham attempts to defend his methodologically flawed calculation on the ground that the VIGOR study supposedly excluded patients who were likely to develop coronary artery disease whereas the CLASS study did not. (Graham Dep. at 425:1-14.) According to Dr. Graham, the rate of heart attacks reported for Vioxx users in the VIGOR study thus underestimates the "true" rate in the general population. (*Id.*) But this explanation is unavailing. Dr. Graham conceded that the VIGOR study involved rheumatoid arthritis patients, who are at a *higher* risk of heart attacks than the general population, whereas the CLASS study involved

osteoarthritis patients, who are not.[17] (*Id.* at 430:16-431:11.) Because the patient populations in VIGOR and CLASS are different and have different heart attack rates, Dr. Graham cannot conclude to any degree of scientific certainty based on his manipulation of the data that Vioxx use was associated with an excess number of heart attacks or sudden cardiac deaths.[18]

In fact, Dr. Graham's defense of his excess event calculation highlights a central flaw in his methodology: it violates the cardinal rule of epidemiology, which requires the comparison of similarly situated patient populations. *See, e.g., Am. Legion v. Derwinski*, 54 F.3d 789, 792 n.2 (D.C. Cir. 1995) (Epidemiology is "a branch of science and medicine [that] uses studies to 'observe the effect of exposure to a single factor upon the incidence of disease in two otherwise identical populations.'" (quoting *DeLuca v. Merrell Dow Pharms., Inc.*, 911 F.2d 941, 945 (3d Cir. 1990)).) Dr. Graham did not compare similar patient populations. On the contrary, his excess event estimate is the result of a manipulative comparison of *dissimilar* data and studies. Dr. Graham cherry-picked data from four unrelated studies – three of which were clinical trials and one of which was not – that involved different patient populations with different disease endpoints receiving different dosages of different drugs for different durations of time.[19] Dr.

---

[17] Wolfe et al., *The Mortality of Rheumatoid Arthritis, Arthritis & Rheumatism* (08/19/93); Myllykangas-Luosujarvi et al., *Mortality in Rheumatoid Arthritis, Arthritis & Rheumatism* (12/95).

[18] Moreover, the fact that cardiovascular mortality rates have been declining for years – and continued to do so while Vioxx was on the market – highlights the unreliable nature and irrelevance of Dr. Graham's estimate. (*See* American Heart Association, Heart Disease and Stroke Statistics – 2005 Update.)

[19] The VIGOR Study involved rheumatoid arthritis patients receiving Vioxx at the 50 mg dose or naproxen over an average period of nine months. The APPROVe Study involved patients with a history of colorectal adenomas receiving Vioxx at the 25 mg dose or placebo over an average period of more than two years. The CLASS Study involved osteoarthritis patients receiving either Celebrex at the 400 mg dose or ibuprofen or diclofenac over an average period of six months. And the Ray Study involved patients receiving a variety of NSAID therapies regardless of disease status. (Bresalier at 1092; Bombardier at 1520; Class Study at 1247; Ray Study at *(footnote continued next page)*

Graham then ignored the fact that the rate of heart attacks for one patient population (*i.e.*, Vioxx users) was actually *lower* than that of another patient population (*i.e.*, users of other NSAIDs). The net result of Dr. Graham's manipulative calculation is an excess event estimate that is scientifically unreliable and inadmissible. *See Burleson*, 393 F.3d at 587 (excluding opinion that "was based on speculation, guesswork, and conjecture").

3.     Dr. Graham's excess event estimate is inconsistent with his own findings and the data on which he relies.

In addition to being the product of a flawed methodology, Dr. Graham's excess event estimate is inconsistent with his own findings and the data on which he relies. The Court should exclude any evidence of or reference to Dr. Graham's estimate for these additional reasons.

First, Dr. Graham's estimate is inconsistent with the results of his own study, particularly at the 25 mg dose, which is the only dose at issue in this case. As explained above, Dr. Graham found *no* statistically significant increased risk of heart attacks or deaths associated with the use of Vioxx at the 25 mg dose when compared with Celebrex and the remote use of traditional NSAIDs. (Graham Study at 4, Table 3.) His claim that Vioxx use resulted in an excess number of heart attacks and related deaths is simply at odds with this finding.

Second, Dr. Graham's excess event estimate is inconsistent with the findings of the APPROVe and VIGOR studies – *i.e.*, the very studies on which he bases his estimate. For example, the APPROVe study did not find *any* increased risk of adverse cardiovascular events associated with the continuous use of Vioxx at the 25 mg dose during the first 18 months of use.[20] Furthermore, the APPROVe and VIGOR studies did not find any increased risk of death

---

1071.)

[20] Bresalier at 1092.

19

associated with the use of Vioxx at any dosage or duration.[21] These data are all consistent with the findings of a recent analysis by the FDA regarding NSAIDs and cardiovascular risk, where the FDA concluded that (1) the "short-term" use of COX-2 selective inhibitors like Vioxx "does not appear to confer an increased risk of serious adverse CV events", and (2) even with respect to long-term use, the available epidemiological data – such as the data reported in the Graham Study – "could not definitively address the question of a modestly increased CV risk for the COX-2 selective compared to the non-selective NSAIDs." (Apr. 6, 2005 FDA Memorandum at 2, 7, attached hereto as Ex. C.)

## III. CONCLUSION.

For the reasons stated above, the Court should exclude certain irrelevant, unreliable, and unduly prejudicial portions of Dr. Graham's deposition testimony.

---

[21] Bresalier at 1092; Bombardier at 1523. The VIGOR study has no relevance to this case for two additional reasons. First, it involved the use of *50 mg* Vioxx – twice the highest recommended dose and twice the dose purportedly taken by Mr. Barnett before his alleged injuries. (*See* Bombardier at 1520.) Because "[d]ose is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect," *see McClain*, 401 F.3d at 1242, the results of VIGOR, which involved the use of high-dose Vioxx, cannot and do not provide a generally accepted scientific basis for concluding that the short-term use Vioxx at the *25 mg dose* was capable of causing the plaintiff's claimed heart attack. In addition, because VIGOR compared Vioxx against naproxen rather than placebo (*see* Bombardier at 1520), it cannot be determined whether the relative increase of adverse cardiovascular events seen in the Vioxx arm of the study was attributable to: (1) a cardiovascular risk associated with high-dose Vioxx; (2) a cardio-protective effect associated with naproxen; or (3) chance, either in whole or in part. (*See* Patrono, FitzGerald et al., *Platelet Active Drugs: The Relationships Among Dose, Effectiveness, and Side Effects*, CHEST 2004; 126:234S-264S ("While the cause of the apparent excess risk of MI in [VIGOR] cannot be conclusively established, *a combination of some cardioprotective effect of naproxen and the play of chance does seem to offer a plausible explanation for these unexpected findings*." (emphasis added).)

Respectfully submitted,

*/s/ Dorothy H. Wimberly*
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone: 504-581-3200
Fax:    504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Andrew Goldman
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois 60610
Phone: 312-494-4400
Fax:    312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Phone: 202-434-5000
Fax:    202-434-5029

Brian Currey
Catalina J. Vergara
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone: 213-430-6000
Fax:    213-430-6407
Attorneys for Merck & Co., Inc.

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Memorandum in Support of Merck's Motion for Order Excluding Testimony of David Graham, M.D. has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Andy Birchfield by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 19th day of June, 2006.

*/s/ Dorothy H. Wimberly*