### Exhibit A - Graham Deposition Excerpts

• Graham Motion

[1:] - [1:20]        5/9/2006      Graham, David - (MDL)

page 1
    0001
1               UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
2                           -  -  -
        IN RE:  VIOXX        :  MDL DOCKET NO.
3       LITIGATION           :  1657
4       --------------------------------------------
        SUPERIOR COURT OF THE STATE OF CALIFORNIA
5               COUNTY OF LOS ANGELES
                  CENTRAL CIVIL WEST
6
        VIOXX CASES           :  JCCP NO. 4247
7                             :  ASSIGNED TO HON
                              :  VICTORIA CHENEY
8                           -  -  -
                        CONFIDENTIAL
9               SUBJECT TO PROTECTIVE ORDER
                          -  -  -
10                       May 9, 2006
                          -  -  -
11              Videotape deposition of DAVID J.
12      GRAHAM, M.D., M.P.H, held at The
13      Renaissance Mayflower Hotel, 1127
14      Connecticut Avenue, N.W., Washington,
15      D.C. 20036, commencing at 9:23 a.m., on
16      the above date, before Linda L. Golkow, a
17      Federally-Approved Registered Diplomate
18      Reporter and Certified Shorthand
19      Reporter.
                          -  -  -
20


[25:9] - [25:24]      5/9/2006      Graham, David - (MDL)

page 25
9               MR. BECK:  The reason for
10      that is because we've done our
11      best to review Dr. Graham's public
12      statements on various issues and
13      feel like we have a decent handle
14      on them.  If he talks in an area
15      where he hasn't spoken publicly
16      before, we want to raise the
17      objection, and then if we can be
18      corrected and directed to where
19      he's raised this before, then I'll
20      want to cross-examine him on it.
21      But if not, then I won't.  So,
22      that's the reason why in that area
23      I may have an objection along the
24      way.


[37:18] - [37:22]      5/9/2006      Graham, David - (MDL)

page 37
18      Q.      You also said, "The FDA, its
19      Center for Drug Evaluation and Research,
20      are broken."  Did you make that
21      statement, sir?
22      A.      Yes, I did.


[64:7] - [64:16]      5/9/2006      Graham, David - (MDL)

page 64
7       A.      It is my professional
8       opinion, based on the evidence that I've


6/19/2006  10:11 AM



Exhibit A - Graham Deposition Excerpts

• **Graham Motion**

9   looked at, that Vioxx should not have
10  been approved at the time that it was
11  approved, that there were substantial
12  areas of concern relating to
13  cardiovascular safety that should have
14  been explored more fully and more
15  thoroughly prior to consideration of an
16  approval.

[64:17] - [64:21]        5/9/2006       Graham, David - (MDL)

page 64
17              MR. BECK:   At this point I
18      would interpose an objection on
19      the ground that this is beyond
20      public statements that Dr. Graham
21      has previously made.

[64:23] - [65:3]         5/9/2006       Graham, David - (MDL)

page 64
23      Q.      The statements that you —
24  the statement that you just made, sir, is
page 65
1   that something that in one way, shape or
2   form you have said in some public forum?
3       A.      Yes.

[85:4] - [86:9]          5/9/2006       Graham, David - (MDL)

page 85
4       Q.      Tell the members of the jury
5   what the basis is for that statement.
6       A.      Well, all you have to do
7   sort of to see it crystal clear is to
8   look at the drugs that have come off the
9   market.  These are drugs where FDA
10  approved them, and by approving them said
11  the drugs were safe and effective, and
12  then at some later date they come off the
13  market because, a-ha, they're not safe or
14  they are not as safe as we thought they
15  were.  If we examine how long it takes
16  from when the signal of the problem
17  emerges to when the drug comes off the
18  market, you will see that that is
19  measured in years, sometimes in decades.
20              With phenylpropanolamine,
21  PPA, a drug product present in virtually
22  every cough/cold preparation in the
23  country, it was in over-the-counter diet
24  aids to help people lose weight, was
page 86
1   associated with hemorrhagic stroke
2   primarily in young women, and this was
3   known since 1984.  However, it wasn't
4   until about 2000 or 2001 that FDA finally
5   removed that product from the market.  In
6   the meantime, the company that made PPA
7   or the companies that made PPA continued
8   to make profits, and patients continued
9   to be harmed.

[95:22] - [96:1]         5/9/2006       Graham, David - (MDL)

page 95
22  renewal.  The impact of this in my own
23  experience has been that the preapproval
24  people look for reasons to say yes to a
page 96

## Exhibit A - Graham Deposition Excerpts

• **Graham Motion**

1   drug.  So, I've been in internal meetings

[97:4] - [97:17]        5/9/2006        Graham, David - (MDL)

page 97
4               These are remarks that have
5   been passed in internal meetings that I
6   have been present at.  And other
7   colleagues of mine have had similar
8   experiences.  And since I have gone
9   public with my Senate testimony, I have
10  been approached now by probably 10 or 15
11  medical reviewers from different
12  components of CDER with stories of being
13  pressured to change their reviews where
14  they thought a drug should not be
15  approved, but where management was
16  telling them you must now say yes to that
17  drug.

[110:22] - [111:3]      5/9/2006        Graham, David - (MDL)

page 110
22          A.      We've talked about it
23  before.  FDA views industry as its
24  primary customer, as its client.  And
page 111
1   this gets transmitted to the management.
2   That's how management gets selected, by
3   how well they get along with industry.

[111:8] - [111:11]      5/9/2006        Graham, David - (MDL)

page 111
8   with industry.  These are phrases that
9   are frequently used within FDA to
10  describe the relationship that is desired
11  between the regulator and the regulated.

[112:2] - [112:8]       5/9/2006        Graham, David - (MDL)

page 112
2   about.  And so they pick people who they
3   know from the field and frequently can
4   talk with those people, will talk with
5   those people about upcoming Advisory
6   Committee meetings and the type of
7   direction that they wish that advisory
8   meeting to go in.

[112:9] - [112:14]      5/9/2006        Graham, David - (MDL)

page 112
9               If you look at the Advisory
10  Committees in terms of their financial
11  attachments to industry, it's been in the
12  newspapers quite a bit that a third of
13  FDA committee members have financial ties
14  to industry, some large number.  And if

[119:1] - [119:22]      5/9/2006        Graham, David - (MDL)

page 119
1           A.      Right.  I was trying to get
2   the Senators to understand the statistics
3   of the matter, and I gave the analogy of
4   a gun with 100 chambers.  And I said,
5   let's play Russian roulette.  Now, we're
6   going to put 95 bullets in the gun, so we

Exhibit A - Graham Deposition Excerpts

• Graham Motion

```
7    are 95 percent certain that this drug
8    causes whatever adverse reaction we're
9    talking about. Let's just say this drug
10   causes liver failure.  This drug causes
11   heart attacks.  We're 95 percent certain.
12        Q.    That's the current test?
13        A.    Right.  So, we put 95
14   bullets in, and we play Russian roulette.
15   And at that point, the FDA says, we
16   believe you, the gun is loaded, the drug
17   isn't safe.  Let's take five bullets out
18   of the chamber.  Now we have 90 bullets
19   in the chamber.  So there's only 90
20   percent chance that when I pull the
21   trigger, a bullet is going to come out of
22   the gun.  FDA says the gun is not loaded.
```

[124:4] - [124:10]        5/9/2006        Graham, David - (MDL)

```
page 124
4         A.    I was trying to convey the
5    message that FDA is not functioning in
6    the independent and objective interests
7    of what's best for the public, that it is
8    really functioning first and foremost for
9    a service of its primary customer and
10   client, the industry.
```

[152:21] - [154:1]        5/9/2006        Graham, David - (MDL)

```
page 152
21                 I want to go back to the
22   general question that was on the table at
23   the time, which was, as to your statement
24   about the Kaiser study, in the Kaiser
page 153
1    study that 88 to 140,000 excess cases of
2    serious coronary heart disease probably
3    occurred in the United States over the
4    life of the drug Vioxx.  And I had
5    interrupted you.
6                 What is the answer to that
7    question as to why you make that
8    statement, if you haven't already
9    explained it?
10        A.    Right.
11        Q.    You started off saying it's
12   unsafe at any dose.  It starts at the
13   initial dose.  Are there other factors?
14        A.    Well, just that --
15               MR. BECK:  Object to form.
16   BY MR. KLINE:
17        Q.    Please, sir.
18        A.    Just that it has wide use;
19   that lower doses and higher doses
20   increase the risk; that there's typical
21   patients who are going to get the drugs
22   have relatively high background rates for
23   heart disease.  And you take these
24   factors together and you multiply them
page 154
1    out, and you end up with large numbers.
```

[175:10] - [175:21]        5/9/2006        Graham, David - (MDL)

```
page 175
10        A.    Oh, here what I was talking
11   about was trying to make a little joke
12   about Yogi Berra and deja vu, but what I
13   was trying to talk about here is the
```

Exhibit A - Graham Deposition Excerpts

• Graham Motion

```
14  evidence that was accruing on Vioxx and
15  heart attack risks and FDA's response,
16  which in my experience has been to
17  downplay or ignore those risks and to let
18  things get worse in a sense to, let the
19  problem continue unabated. So, that's
20  basically what I was, I think, trying to
21  convey there.
```

[194:17] - [194:22]          5/9/2006      Graham, David - (MDL)

```
page 194
17        Q.    Was that unusual, that it
18  was peer reviewed twice and by that many
19  people?
20        A.    It was unusual, but it was
21  necessitated by efforts by the FDA to
22  suppress publication of the paper.
```

[203:9] - [205:6]          5/9/2006      Graham, David - (MDL)

```
page 203
9   is slightly increased.  It confers about
10  a ten percent increase in heart attack
11  risk.
12        Q.    Not a decrease?
13        A.    Not a decrease.
14        Q.    And — okay, now.  If you
15  look at the Advisory Committee meeting,
16  your PowerPoint number 1 — let's see,
17  it's 114, Page 114.  We'll put it up very
18  briefly and try to work through this
19  stuff in our waning moments.
20              I see here, "Risk of AMI
21  with Celecoxib Or Rofecoxib."  I want to
22  focus on Vioxx, rofecoxib.  Okay?
23        A.    Uh-huh.
24        Q.    What you did here was to
page 204
1   collect the data from the various
2   studies, correct?
3         A.    Correct.
4         Q.    At all doses, just focusing
5   on the "all doses," your study showed an
6   increased risk of — what are you showing
7   increased risks of here to be clear?
8   What are you characterizing it?
9         A.    We showed an increased risk
10  of heart attack and sudden cardiac death
11  as a — sort of considering those
12  together.
13        Q.    By the way, sir, and I hate
14  to do it this way, but I forgot earlier.
15  When you gave me your figures of 88,000
16  to 140,000 excess cases of serious
17  coronary heart disease in the life of
18  Vioxx in the United States, how many of
19  those — did you do a calculation of how
20  many of those were deaths?
21        A.    Yes.  It's about 40 percent.
22  So, if you multiply .4 by each of the
23  numbers, you come up with a range that's
24  somewhere in the neighborhood of 40,000
page 205
1   to 60,000.
2         Q.    40,000 to 60,000 excess
3   deaths over those that would have been
4   if —
5         A.    Patients had not used
6   rofecoxib, had not used Vioxx.
```

Exhibit A - Graham Deposition Excerpts

**• Graham Motion**
[223:11] - [224:5]    5/9/2006    Graham, David - (MDL)

page 223
11          And at that point, intensive study
12          at the lower doses should have
13          been enacted with a very large
14          clinical trial done in a very
15          short space of time to nail down
16          the question. And I'm not talking
17          about an APPROVe-like study that
18          takes four or five years to do and
19          has only five or six heart attacks
20          in six months. I'm talking about
21          a really huge study that gives you
22          the opportunity, the power, to
23          answer the question definitively.
24          And that was not done.
page 224
1    BY MR. KLINE:
2        Q.    Everything of what you just
3    said, sir, was it within the resources
4    and capability of Merck & Company?
5        A.    Yes, it was.

[277:20] - [278:17]    5/9/2006    Graham, David - (MDL)

page 277
20        Q.    And the outcome that you
21    were looking at was something that you
22    called serious coronary heart disease; is
23    that right?
24        A.    That is correct.
page 278
1        Q.    And serious coronary heart
2    disease was a category that you used, and
3    it combined myocardial infarctions or
4    heart attacks, right?
5        A.    Yes.
6        Q.    Plus it included another
7    category of events called sudden cardiac
8    death, right?
9        A.    Yes. Because that's one of
10    the leading presentations of heart
11    attack, is basically sudden death. So,
12    we combined the two.
13        Q.    And in your study at least,
14    you did not break down the analysis into
15    heart attacks on the one hand and sudden
16    cardiac death on the other hand, right?
17        A.    No, we did not.

[402:20] - [405:11]    5/9/2006    Graham, David - (MDL)

page 402
20        Q.    Before our break, Dr.
21    Graham, we started to discuss this
22    estimate of yours of excess heart attacks
23    and sudden cardiac deaths, your number of
24    88,000 to 139,000.
page 403
1          And I think we covered this,
2    but am I correct that even though you
3    published this in your Kaiser study, the
4    numbers did not come from the work that
5    you did with the Kaiser information?
6        A.    That's correct.
7        Q.    And did you say that they
8    came from the VIGOR study and the APPROVe
9    study?
10        A.    Correct.
11        Q.    In fact, you had to take

## Exhibit A - Graham Deposition Excerpts

• Graham Motion

```
12   some numbers from VIGOR and APPROVe and
13   then apply them to other numbers from
14   still other studies in order to come up
15   with this estimate, didn't you?
16          A.      We took the numbers from
17   VIGOR and APPROVe, which were the risks,
18   the estimates of relative risk, the five
19   for the high dose and two for the low
20   dose, and we applied that to the
21   estimates of how many people had high
22   dose or low dose.  And in the formula
23   that you use, you also need background
24   rates for what is the background rate in
page 404
1    the population that you are dealing with.
2          Q.      When you did the background
3    rates, you took background rates from
4    still other studies, some of which didn't
5    have anything to do with Vioxx, right?
6          A.      We took background rates
7    from the CLASS study, using their control
8    group because they had an unexposed
9    control group, and so what we could do
10   is, is by doing that, we could get a
11   handle on the types of patients who might
12   be prescribed a COX-2 inhibitor and look
13   to see what their experience of heart
14   attacks were.
15                 We didn't have that in the
16   VIGOR study, because the VIGOR study
17   compared two active treatments.
18                 We also, because people who
19   get enrolled in clinical trial are, as a
20   rule, healthier than the patients who
21   ultimately get the drugs, we also took a
22   background incidence rate from another
23   study with a somewhat sicker population,
24   and so then we had a range.  And it was
page 405
1    because of the range in those two
2    background rates that we end up with
3    ultimately the 88,000 and the 139 or the
4    140,000, that they relate to those rates.
5          Q.      At least one of the studies
6    that you picked the background rate from
7    didn't even involve Vioxx, right?
8          A.      That's correct.  But it
9    involved the types of patients who we had
10   every reason to believe would be
11   prescribed Vioxx in the real world.
```

[410:1] - [410:23]          5/9/2006        Graham, David - (MDL)

```
page 410
1          Q.      You indicated before that
2    there were two specific FDA employees
3    that you had suggested as peer reviewers,
4    right?
5          A.      Correct.
6          Q.      And I think it was Dr. Bruce
7    Stadel and Dr. Bob O'Neill?
8          A.      Stadel, yes.
9          Q.      Stadel is how to pronounce
10   it?
11         A.      Yes.
12         Q.      And they, in fact, looked at
13   your manuscript, the one that had the
14   27,000 number in it, Vioxx versus
15   Celebrex, as part of their peer review,
16   right?
17         A.      Correct.
```

• Graham Motion

```
18      Q.      And they told you, as part
19 of the people that you suggested as peer
20 reviewers, they told you that they didn't
21 think you should include that comparison
22 as a matter of sound science, right?
23      A.      That's correct.  And in the
```

[419:12] - [422:11]        5/9/2006        Graham, David - (MDL)

```
page 419
12      Q.      And, in fact, by the time we
13 finally get to the published article in
14 Lancet, the only numbers that you include
15 were these 88 to 139,000 numbers that you
16 first came up with in the revised-revised
17 manuscript, right?
18      A.      That's correct.
19      Q.      Now, I want to see if we can
20 understand a little better how you came
21 up with them.  I think you said that you
22 used the relative risks from the VIGOR
23 study and the APPROVe study, right?
24      A.      That is correct.
page 420
1       Q.      And the relative risk for
2 VIGOR was 5, right?
3       A.      Correct.
4               MR. BECK:  Somebody on the
5       phone is either going to have to
6       stop making noise or we're going
7       to hang up on you here.
8               MR. KLINE:  And I support
9       Mr. Beck.
10 BY MR. BECK:
11      Q.      And the relative risk from
12 APPROVe was 2.0, right?
13      A.      Correct.
14      Q.      And then you took those
15 relative risks and applied them to
16 background rates that you got from other
17 studies, right?
18      A.      Yes.  Actually, if we refer
19 to the document in my report, the method
20 is described there.  The numbers are
21 different because we used different
22 background rates, but the method is
23 described there.
24      Q.      Well, it is a completely
page 421
1 different comparison, too.  It's —
2       A.      No.  But the underlying
3 method is described, so that I can tell
4 you accurately what it is that we did.
5       Q.      Well, in your article, you
6 state that "The background rate for acute
7 myocardial infarction among control
8 groups from studies of cardiovascular
9 risk and NSAID users varied from 7.9 per
10 1,000 person years in CLASS," one of the
11 studies you referred to, to 12.4 per
12 1,000 person years in what was called the
13 TennCare study, right?
14      A.      Correct.
15      Q.      So, the background rate that
16 you used when doing your calculation was
17 this range of 7.9 to 12.4, right?
18      A.      Correct.
19      Q.      And by "background rate,"
20 what we mean is people who aren't taking
21 any medicine at all.  For every 1,000
22 person years of people not taking
```

Exhibit A - Graham Deposition Excerpts

• Graham Motion

```
23   medicine, 7.9 to 12.4 people are going to
24   have an adverse cardiovascular event,
page 422
1    right?
2         A.    Right. Within the age
3    groups that those populations came from,
4    right.
5         Q.    So, that's sort of what
6    you'd expect from someone taking no
7    medicine at all, is somewhere between 8
8    to 12 or so people per thousand are going
9    to have heart attacks just because that's
10   what happens in life, right?
11        A.    That's what happens.  Right.
```

[421:5] - [421:18]       5/9/2006       Graham, David - (MDL)

```
page 421
5         Q.    Well, in your article, you
6    state that "The background rate for acute
7    myocardial infarction among control
8    groups from studies of cardiovascular
9    risk and NSAID users varied from 7.9 per
10   1,000 person years in CLASS," one of the
11   studies you referred to, to 12.4 per
12   1,000 person years in what was called the
13   TennCare study, right?
14        A.    Correct.
15        Q.    So, the background rate that
16   you used when doing your calculation was
17   this range of 7.9 to 12.4, right?
18        A.    Correct.
```

[423:17] - [424:24]       5/9/2006       Graham, David - (MDL)

```
page 423
17        Q.    And if you would go to, it
18   looks like Page 13, if I'm reading that
19   right.  13 of 37.
20        A.    Uh-huh.
21        Q.    In this FDA report, and this
22   is a memorandum about the VIGOR analysis,
23   right, about the VIGOR study?
24        A.    I believe it is.  Yes, it
page 424
1    is.
2         Q.    Okay.
3               And does it say on this page
4    that the MI rate for Vioxx was .74?
5         A.    Yes, but I don't know what
6    the units are.
7         Q.    Okay.
8               If you go to the next page,
9    you'll see under the second footnote,
10   under the —
11        A.    Okay.
12              "Per 100 person years."
13        Q.    Okay.
14              And —
15        A.    So, that would be equivalent
16   to 7.4 per thousand person years.
17        Q.    So, the rate for myocardial
18   infarctions, heart attacks —
19        A.    Uh-huh.
20        Q.    — for people who were
21   taking the high-dose Vioxx in the VIGOR
22   study was 7.4 per hundred — per thousand
23   person years, right?
24        A.    Yes.
```

## Exhibit A - Graham Deposition Excerpts

• Graham Motion

[425:1] - [425:14]    5/9/2006    Graham, David - (MDL)

page 425
1          Q.    And what you said before is
2     the normal population not taking any
3     medicine at all, the background rate that
4     you used was 7.9 heart attacks per
5     thousand person years, right?
6          A.    Yes.  And the patients
7     enrolled in the VIGOR study were selected
8     to be patients who were unlikely to have
9     cardiovascular disease.  So, there were a
10    number of exclusions that would exclude
11    patients who were at higher risk of
12    having myocardial infarction.  Those
13    patients weren't excluded from the CLASS
14    study.

[427:6] - [428:12]    5/9/2006    Graham, David - (MDL)

page 427
6          Q.    Have you seen Exhibit 31
7     before?
8          A.    Yes, I have read this paper
9     before.
10         Q.    And I'll put it on the
11    screen.  Well, let's just you and I go to
12    Table 2 over on the fourth page.
13              Is this a paper that deals
14    with the APPROVe study?
15         A.    Yes.
16         Q.    Okay.
17              And in looking at Table 2,
18    can you see there that there were 21
19    heart attacks out of 3,059 person years?
20         A.    I don't see where you are
21    getting the person years from, but I --
22         Q.    Look in the little footnote
23    underneath the table.
24         A.    Oh, okay.  Yes.  Uh-huh.
page 428
1          Q.    And if you -- in order to
2     come up with an equivalent number that
3     we've been talking about here for event
4     rates, you would divide 21 by that 3,000
5     -- or 3,059, right?
6          A.    Right.  The 3,059 multiplied
7     by a thousand or the 3.0, yes.
8          Q.    And when you did it the
9     right way, you would come up with an
10    event rate in APPROVe of 6.9; is that
11    right?
12         A.    I'll trust your arithmetic.

[428:13] - [428:19]    5/9/2006    Graham, David - (MDL)

page 428
13         Q.    And, again, the real life
14    heart attack rate in both VIGOR and
15    APPROVe was lower than what you say is
16    the normal background rate for people who
17    are not taking any medicine at all,
18    right?
19         A.    That's correct.  But

[429:24] - [430:3]    5/9/2006    Graham, David - (MDL)

page 429
24              But background rates are
page 430

Exhibit A - Graham Deposition Excerpts

• Graham Motion

```
1    important because at the end of the day,
2    the background rate is what drives what
3    that actual estimate of numbers is.
```

[430:6] - [430:15]        5/9/2006        Graham, David - (MDL)

```
page 430
6    of affected bodies.  And we put a number
7    in our paper, and what we were more
8    concerned with was the public health
9    impact of Vioxx exposure than we were
10   with what were the particular numbers,
11   recognizing that the particular numbers
12   could be different than the range that we
13   gave, but that was our best estimate at
14   what we thought was likely to be the
15   case.
```

[430:16] - [431:11]       5/9/2006        Graham, David - (MDL)

```
page 430
16         Q.     Now, the patients involved
17   in the VIGOR study, these were rheumatoid
18   arthritis patients, right?
19         A.     Yes.
20         Q.     And rheumatoid arthritis
21   patients have a higher risk of heart
22   attack, all other things being equal,
23   than people who don't have rheumatoid
24   arthritis, right?
page 431
1          A.     Some studies have found
2    that, and other studies have found that
3    there's no increase in risk.
4          Q.     Now, you mentioned that
5    CLASS was one of the studies that you
6    used to come up with your range.  Those
7    people had osteoarthritis, right?
8          A.     That's correct.
9          Q.     And that is not associated
10   with a higher heart attack risk, right?
11         A.     Not that we're aware of.
```

[432:22] - [433:1]        5/9/2006        Graham, David - (MDL)

```
page 432
22         Q.     But even with all of that,
23   VIGOR and APPROVe both had lower rates
24   than your background rates, correct?
page 433
1          A.     Yes.
```

[463:5] - [463:10]        5/9/2006        Graham, David - (MDL)

```
page 463
5          Q.     First of all, are they lower
6    than some other folks' estimates of the
7    number of increased cardiovascular, both
8    deaths and incidents, that have occurred
9    as a result of the drug Vioxx?
10         A.     Yes, they are.
```

[510:5] - [510:14]        5/9/2006        Graham, David - (MDL)

```
page 510
5                 THE WITNESS:  The two-year
6    period for coming up with the
7    revised label for a problem as
8    serious as high risk of heart
```

Exhibit A - Graham Deposition Excerpts

• Graham Motion

```
9     attacks with Vioxx, this is an
10    extraordinary long period of time,
11    and the only explanation based on
12    my long experience at FDA is that
13    there was foot dragging by the
14    company.  I've seen this countless
```

[566:1] - [566:19]    5/9/2006    Graham, David - (MDL)

```
page 566
1          CERTIFICATE
2
3          I, LINDA L. GOLKOW, a Notary
     Public and Certified Shorthand Reporter
4    of the State of New Jersey, do hereby
     certify that prior to the commencement of
5    the examination, DAVID J. GRAHAM, M.D.,
     MPH was duly sworn by me to testify to
6    the truth, the whole truth and nothing
     but the truth.
7
8          I DO FURTHER CERTIFY that the
     foregoing is a verbatim transcript of the
9    testimony as taken stenographically by
     and before me at the time, place and on
10   the date hereinbefore set forth, to the
     best of my ability.
11
12         I DO FURTHER CERTIFY that I am
     neither a relative nor employee nor
13   attorney nor counsel of any of the
     parties to this action, and that I am
14   neither a relative nor employee of such
     attorney or counsel, and that I am not
15   financially interested in the action.
16
17
18
19   _____
          LINDA L. GOLKOW, CSR
```

# Risk of acute myocardial infarction and sudden cardiac death in patients treated with cyclo-oxygenase 2 selective and non-selective non-steroidal anti-inflammatory drugs: nested case-control study

*David J Graham, David Campen, Rita Hui, Michele Spence, Craig Cheetham, Gerald Levy, Stanford Shoor, Wayne A Ray*

Published online January 25, 2005 http://image.thelancet.com/extras/05art1005web.pdf

Office of Drug Safety, Center for Drug Evaluation and Research, Food and Drug Administration, Rockville, MD, USA (D J Graham MD); The Permanente Medical Group (D Campen MD, S Shoor MD), Pharmacy Outcomes Research Group (R Hui PharmD, M Spence PhD, C Cheetham PharmD), and Southern California Permanente Medical Group (G Levy MD), Kaiser Permanente, Oakland, CA, USA; Department of Preventive Medicine and Center for Education and Research on Therapeutics, Vanderbilt University School of Medicine, Nashville, TN, USA (Prof W A Ray PhD); and Geriatric Research, Education, and Clinical Center, Nashville Veterans Administration Medical Center, Nashville, TN, USA (Prof W A Ray)

Correspondence to: Dr David J Graham GRAHAMD@cder.fda.gov

## Summary

**Background** Controversy has surrounded the question about whether high-dose rofecoxib increases or naproxen decreases the risk of serious coronary heart disease. We sought to establish if risk was enhanced with rofecoxib at either high or standard doses compared with remote non-steroidal anti-inflammatory drug (NSAID) use or celecoxib use, because celecoxib was the most common alternative to rofecoxib.

**Methods** We used data from Kaiser Permanente in California to assemble a cohort of all patients age 18–84 years treated with a NSAID between Jan 1, 1999, and Dec 31, 2001, within which we did a nested case-control study. Cases of serious coronary heart disease (acute myocardial infarction and sudden cardiac death) were risk-set matched with four controls for age, sex, and health plan region. Current exposure to cyclo-oxygenase 2 selective and non-selective NSAIDs was compared with remote exposure to any NSAID, and rofecoxib was compared with celecoxib.

**Findings** During 2 302 029 person-years of follow-up, 8143 cases of serious coronary heart disease occurred, of which 2210 (27·1%) were fatal. Multivariate adjusted odds ratios versus celecoxib were: for rofecoxib (all doses), 1·59 (95% CI 1·10–2·32, p=0·015); for rofecoxib 25 mg/day or less, 1·47 (0·99–2·17, p=0·054); and for rofecoxib greater than 25 mg/day, 3·58 (1·27–10·11, p=0·016). For naproxen versus remote NSAID use the adjusted odds ratio was 1·14 (1·00–1·30, p=0·05).

**Interpretation** Rofecoxib use increases the risk of serious coronary heart disease compared with celecoxib use. Naproxen use does not protect against serious coronary heart disease.

## Introduction

Cyclo-oxygenase 2 (COX2) selective non-steroidal anti-inflammatory drugs (NSAIDs) are prescribed for the treatment of arthritis and other musculoskeletal complaints because of the reduced occurrence of gastrointestinal toxic effects compared with non-selective NSAIDs.[1,2] Questions about cardiovascular risk with these COX2-selective drugs were raised by the finding of a five-fold difference in incidence of acute myocardial infarction between patients treated with rofecoxib 50 mg/day and naproxen 1000 mg/day in a large randomised clinical trial (Vioxx Gastrointestinal Outcomes Research; VIGOR),[2] and by a meta-analysis of clinical trials of celecoxib and rofecoxib.[3] Because the VIGOR trial did not have a placebo group, its findings could have suggested either an adverse effect of rofecoxib, an adverse effect of coxibs in general, or a hitherto unrecognised protective effect of naproxen.[4,5] In view of the high use of COX2 drugs in the USA, even a small increase in adverse cardiovascular events would have substantial public-health effects.

Several observational studies have sought to clarify the findings of the VIGOR trial. High-dose rofecoxib (>25 mg/day) has been reported to enhance the risk of adverse cardiovascular events relative to non-users of any NSAID[6] or users of celexoxib.[7] In one study, no increased risk was noted with rofecoxib compared with other NSAIDs, but high-dose rofecoxib was not assessed separately.[8] Studies investigating the effect of naproxen on cardiovascular risk have yielded conflicting results. In three cohort studies, no reduction in risk was reported with naproxen use,[6,7,9] whereas a cardioprotective effect was noted in three other studies.[10–12] We sought to address these important questions about the cardiovascular effects of NSAIDs.

## Methods

Kaiser Permanente is a national integrated managed care organisation providing comprehensive health care to more than 6 million residents in the state of California.[13] The enrolled population varies with respect to age, educational attainment, family income, and ethnic origin. The organisation maintains computer files of eligibility for care, outpatient visits, admissions, medical procedures, emergency room visits, laboratory testing, and outpatient drug prescriptions for all its members. Mortality status, including underlying cause of death as recorded on death certificates, is periodically updated with data obtained from the California Department of Health, Center for Health Statistics. This study was approved by the institutional review boards of both the northern and southern divisions of Kaiser Permanente in California.

Blumberg No. 5110 EXHIBIT B

For personal use. Only reproduce with permission from Elsevier Ltd

We assembled a cohort of NSAID-treated patients to undertake a nested case-control study. From Jan 1, 1999, to Dec 31, 2001, we identified all individuals age 18–84 years who filled at least one prescription for a COX2 selective (celecoxib or rofecoxib) or non-selective (all other) NSAID. Those with at least 12 months of health plan coverage before the date of that first NSAID prescription were entered into the cohort if they had no diagnoses of cancer, renal failure, liver failure, severe respiratory disease, organ transplantation, or HIV/AIDS during the screening interval. We followed up cohort members from this entry date until the end of the study period (December, 2001) or until occurrence of an acute myocardial infarction or death, whichever came first.

The study outcome was incident serious coronary heart disease, defined as acute myocardial infarction requiring admission or sudden cardiac death. We identified acute myocardial infarction requiring admission with the international classification of diseases, 9th revision, clinical modification (ICD-9-CM) code 410 (acute myocardial infarction) or 411·1 (intermediate coronary syndrome, as long as laboratory documentation was available of acute myocardial infarction—ie, raised creatine kinase MB fraction or troponin I). We classified outpatient deaths as sudden cardiac death if the underlying cause of death listed hypertensive heart disease, ischaemic heart disease, conduction disorders, dysrhythmias, heart failure, atherosclerotic heart disease, sudden death, or death from an unknown cause.[6,7] In validation studies of computerised hospital data, a principal diagnosis code for acute myocardial infarction has a positive predictive value between 92%[14] and 95%[15] and a sensitivity of 94%.[16] Furthermore, we used computerised laboratory data, from which we noted that 87·4% of patients admitted with acute myocardial infarction had cardiac enzyme concentrations that confirmed diagnosis. Although there is probably more misclassification of the out-of-hospital sudden cardiac deaths, their inclusion is important (and routine in clinical trials), because coronary artery disease frequently manifests as sudden death outside of the hospital.[14]

For every case, we randomly selected four controls from individuals under observation in the study cohort on the date of the case event (index date), and matched them for age (year of birth), sex, and health plan region (north or south).[17] A given cohort member selected as a control for a case on one date could become a control for another case occurring on a later index date, as long as he or she remained in the study cohort and was therefore also at risk of becoming a case. Thus, a control could subsequently become a case. We excluded potential cases and controls if they were not enrolled on the index date and for at least 11 of the 12 preceding months. During the study period, pharmacy benefits persisted for enrolment lapses of up to 1 calendar month.

We established the NSAID exposure status of cases and controls at the case index date. We based exposure classification on the duration, or days of drug supply, dispensed in the NSAID prescription. Patients were current users if the duration of the NSAID prescription closest to and preceding the index date overlapped with the index date. Remote users were those whose drug supply ended more than 60 days before the index date. We judged these patients unlikely to be taking the prescription NSAID on the index data and thus they were the reference category in several analyses. Recent users were individuals whose NSAID prescriptions ended between 1 and 60 days before the index date. We classified these patients separately for several reasons. The effects of NSAIDs on cardiovascular risk might persist a short time after the last dose. Because of dosing as required or incomplete compliance, some recent users might have been taking the drug after the nominal end of the dispensed supply. Thus, we created a separate category to avoid the misclassification that would arise by regarding these patients as either current or remote users.

We initially classified rofecoxib exposure as either standard (≤25 mg/day) or high (>25 mg/day) dose on the basis of the dispensed tablet strength. However, review of computerised patients' prescription histories showed inconsistencies between the instructions for use, days supply, and frequency of refills. For example, some patients dispensed the 25 mg strength were taking two tablets per day, whereas others who were dispensed the 50 mg strength were taking a half tablet per day. To address this potential misclassification, computerised printouts of all NSAID prescriptions for all rofecoxib-treated patients, covering the entire study period, were reviewed by a panel masked to case or control status (DC, RH, MS, CC). We reclassified patients with respect to rofecoxib dose status only if there was unanimous consensus among panel members.

For the 365-day period before the index date, we obtained data for potential risk factors for the occurrence of serious coronary heart disease. These included: cardiovascular admissions, as defined by diagnosis-related group coding (acute myocardial infarction, coronary revascularisation, angina, congestive heart failure, other ischaemic heart disease, cardiac arrhythmias, cerebrovascular accidents, peripheral vascular disease); emergency room visits for cardiovascular reasons and outpatient diagnoses for tobacco use, as defined by ICD 9-CM coding; and cardiovascular prescription drug use (thiazide diuretics, loop diuretics, angiotensin-converting-enzyme inhibitors or angiotensin-receptor blockers, calcium-channel blockers, β blockers, digoxin, nitrates, antiarrhythmics, 3-hydroxy-3-methyl-glutaryl coenzyme A reductase inhibitors, fibrates, nicotinic acid, antiplatelet drugs [ticlopidine, clopidogrel], anticoagulants [warfarin, low molecular weight heparin], insulin, oral hypoglycaemics). We also obtained data for non-cardiovascular admissions and emergency room visits, same-day admissions for medical procedures, outpatient diagnoses of alcohol dependence, rheumatoid arthritis,

For personal use. Only reproduce with permission from Elsevier Ltd

and prescription use of hormone replacement therapy, oral prednisone (>1000 mg in the past year) or disease-modifying antirheumatic drugs.

To control for potential differences in cardiovascular disease between study exposure groups, we calculated a cardiovascular risk score for cases and controls.[6,16-20] The score was estimated from a logistic regression analysis of the effects of the above factors on the odds of serious coronary heart disease for unexposed (remote or recent use) patients. We used the coefficients from this regression to calculate every participant's predicted probability of serious coronary heart disease as their risk score. This score then was categorised into ten values, with the lowest value representing patients with no diagnosed or treated cardiovascular disease and the remaining nine representing approximate quantiles of the controls. A 12·1-fold difference in risk was present between the lowest (0) and highest (9) value of the score, with a progressive increase in risk with every increasing score value. The results thus obtained were virtually identical to those from more complex models that included the individual components of the risk score. For example, the odds ratio for recent users, the largest exposure group in our study, was 1·140 (95% CI 1·062–1·223) with the complex model and 1·109 (1·034–1·190) with the cardiovascular risk score, a difference of 0·031. Similarly, for ibuprofen users, the largest currently exposed drug group in our study, the odds ratio with the complex models was 1·074 (0·969–1·191) and with the score-based model is 1·059 (0·956–1·174), a difference of 0·015, less than 2%. Of note, the risk score produced slightly more conservative point estimates and lower bounds for the CIs than did the complex models.

We used conditional logistic regression to compare current exposure to a specific NSAID with remote exposure to any NSAID. We obtained estimates of the odds ratio and 95% CIs from the regression. An a-priori aim of the study was to compare current exposure to either standard-dose or high-dose rofecoxib with current exposure to celecoxib. The same regression model was rerun with celecoxib as the reference to obtain odds ratio estimates for standard-dose and high-dose rofecoxib. We did analyses with Stata version 7.0 (College Station, TX, USA).

To assess the potential for confounding from low-dose aspirin use, over-the-counter NSAID use, smoking history, and family history of acute myocardial infarction, we undertook a standardised telephone survey of a random sample of controls currently exposed to celecoxib, ibuprofen, naproxen, or rofecoxib, or controls with remote exposure to a NSAID.

### Role of the funding source

A document describing portions of this study was prepared for the US Food and Drug Administration (FDA) by the lead author (DG), and the FDA posted this on its website on Nov 2, 2004.[21] This document was preliminary,

| | Cases (n=8143) | Controls (n=31 496) |
|---|---|---|
| Age (years) | 66.8 (11.6) | 67.0 (11.5) |
| Men | 5031 (62%) | 19 399 (62%) |
| Cardiovascular admission in past year* | 1153 (14%) | 962 (3%) |
| Myocardial infarction or revascularisation | 202 (2%) | 133 (<1%) |
| Angina | 230 (3%) | 271 (1%) |
| Heart failure | 287 (4%) | 106 (<1%) |
| Other ischaemic heart disease | 354 (4%) | 197 (1%) |
| Cardiac arrhythmia | 186 (2%) | 204 (1%) |
| Peripheral vascular disease | 45 (1%) | 35 (<1%) |
| Stroke | 123 (2%) | 143 (<1%) |
| Cardiovascular drug use in past year* | 6526 (80%) | 18 274 (58%) |
| Angiotensin-converting-enzyme inhibitor | 2839 (35%) | 6287 (20%) |
| Angiotensin-receptor blocker | 377 (5%) | 596 (2%) |
| Antiarrhythmic drug | 219 (3%) | 345 (1%) |
| Anticoagulant drug | 494 (6%) | 1014 (3%) |
| β blocker | 3162 (39%) | 6929 (22%) |
| Calcium-channel blocker | 2196 (27%) | 4483 (14%) |
| Digitalis glycoside | 808 (10%) | 1126 (4%) |
| Hypoglycaemic drug | 2196 (27%) | 3735 (12%) |
| Lipid-lowering drug | 2800 (34%) | 6069 (19%) |
| Loop diuretic | 1714 (21%) | 2214 (7%) |
| Nitrate | 2382 (29%) | 2658 (8%) |
| Platelet inhibitor | 432 (5%) | 434 (1%) |
| Thiazide diuretic | 2038 (25%) | 6752 (21%) |
| Other medical care in past year | | |
| Non-cardiovascular admission | 1368 (17%) | 2514 (8%) |
| Cardiovascular emergency room visit* | 337 (4%) | 276 (1%) |
| Non-cardiovascular emergency room visit‡ | 2778 (34%) | 6931 (22%) |
| Oestrogen use by women | 1167 (14%) | 5125 (16%) |
| Smoking-related diagnosis | 552 (7%) | 1013 (3%) |
| Alcohol dependence | 63 (1%) | 161 (1%) |
| Treated by rheumatologist | 166 (2%) | 574 (2%) |
| Diagnosis of rheumatoid arthritis | 55 (1%) | 139 (<1%) |
| Disease-modifying antirheumatic drug use | 191 (2%) | 536 (2%) |
| Prednisone use (>1000 mg) | 378 (5%) | 691 (2%) |

Data are mean (SD) or number of participants (%). *Totals lower than the sum of the contributing subcategories because patients could contribute to more than one subcategory. †Visits not resulting in admission.

Table 1: Characteristics of cases and matched controls from a base population of 1 394 764 users of COX2 selective and non-selective NSAIDs, 1999–2001

and has been a source of controversy within the FDA. With respect to the study described here, which has been revised from that previously posted to correctly apply enrolment criteria for cases and controls, Kaiser Permanente and FDA management had no role in study design, data collection, data analysis, data interpretation, or writing of the report. The corresponding author had full access to all the data in the study and had final responsibility for the decision to submit for publication.

### Results

A total of 1 394 764 people contributed 2 302 029 person-years of observation time to the study cohort of NSAID users. Patients received various NSAIDs, including celecoxib (n=40 405), ibuprofen (991 261), naproxen (435 492), and rofecoxib (26 748). From this cohort, we identified 8199 cases of serious coronary heart disease and 32 796 matched controls. Of these, we excluded 56 cases and 1300 controls who did not meet the enrolment criteria, resulting in 8143 cases and 31 496 controls.

For personal use. Only reproduce with permission from Elsevier Ltd

3

Articles

| | Celecoxib (n=491) | Ibuprofen (n=2573) | Naproxen (n=1409) | Rofecoxib (n=196) | Remote use (n=18 720) |
|---|---|---|---|---|---|
| Age (years) | 73·4 (8·5) | 66·9 (11·3) | 68·4 (10·9) | 72·1 (9·9) | 66·4 (11·7) |
| Men | 245 (50%) | 1591 (62%) | 801 (57%) | 91 (46%) | 11 807 (63%) |
| Cardiovascular risk score | 4·21 (3·24) | 3·11 (3·14) | 3·22 (3·15) | 3·14 (3·16) | 2·91 (3·16) |
| Cardiovascular admissions in past year | 31 (6%) | 59 (2%) | 51 (4%) | 5 (3%) | 581 (3%) |
| Cardiovascular drug use in past year | 373 (76%) | 1535 (60%) | 876 (62%) | 129 (66%) | 10 388 (55%) |
| Angiotensin-converting-enzyme inhibitor | 140 (29%) | 512 (20%) | 301 (21%) | 43 (22%) | 3555 (19%) |
| Angiotensin-receptor blocker | 29 (6%) | 33 (1%) | 28 (2%) | 2 (1%) | 348 (2%) |
| Antiarrhythmic drug | 11 (2%) | 29 (1%) | 19 (1%) | 2 (1%) | 214 (1%) |
| Anticoagulant drug | 46 (9%) | 38 (1%) | 27 (2%) | 15 (8%) | 674 (4%) |
| β blocker | 159 (32%) | 589 (23%) | 318 (23%) | 50 (26%) | 3974 (21%) |
| Calcium-channel blocker | 111 (23%) | 351 (14%) | 231 (16%) | 31 (16%) | 2532 (14%) |
| Digitalis glycoside | 40 (8%) | 74 (3%) | 44 (3%) | 9 (5%) | 679 (4%) |
| Hypoglycaemic drug | 78 (16%) | 324 (13%) | 182 (13%) | 18 (9%) | 2197 (12%) |
| Lipid-lowering drug | 130 (26%) | 489 (19%) | 287 (20%) | 48 (24%) | 3505 (19%) |
| Loop diuretic | 82 (17%) | 165 (6%) | 122 (9%) | 19 (10%) | 1239 (7%) |
| Nitrate | 64 (13%) | 243 (9%) | 128 (9%) | 23 (12%) | 1463 (8%) |
| Platelet inhibitor | 9 (2%) | 27 (1%) | 19 (1%) | 1 (1%) | 278 (1%) |
| Thiazide diuretic | 127 (26%) | 605 (24%) | 357 (25%) | 56 (29%) | 3658 (20%) |
| Other medical care in past year | | | | | |
| Non-cardiovascular admission | 49 (10%) | 176 (7%) | 97 (7%) | 15 (8%) | 1524 (8%) |
| Non-cardiovascular emergency room visit* | 100 (20%) | 537 (21%) | 248 (18%) | 36 (18%) | 4162 (22%) |
| Oestrogen use by women | 107 (22%) | 434 (17%) | 322 (23%) | 52 (27%) | 2779 (15%) |
| Smoking-related diagnoses | 8 (2%) | 88 (3%) | 40 (3%) | 2 (1%) | 610 (3%) |
| Treated by rheumatologist | 18 (4%) | 39 (2%) | 39 (3%) | 17 (9%) | 239 (1%) |
| Disease-modifying antirheumatic drug use | 28 (6%) | 60 (2%) | 46 (3%) | 9 (5%) | 218 (1%) |
| Prednisone use (>1000 mg) | 22 (4%) | 56 (2%) | 39 (3%) | 12 (6%) | 368 (2%) |

Data are mean (SD) or number of controls (%). *Visits not resulting in admission.

Table 2: Characteristics of controls currently exposed to celecoxib, ibuprofen, naproxen or rofecoxib, or remotely exposed to an NSAID.

Of the 8143 cases of serious coronary heart disease, 6635 were admitted with acute myocardial infarction and 1508 had sudden cardiac death. Laboratory confirmation (raised creatine kinase MB fraction or troponin I) was present in 5799 (87%) patients admitted with acute myocardial infarction. Of all admitted cases, 702 (11%) died. As expected, the prevalence of previous cardiovascular admission, emergency room visits, and drug use was uniformly increased in cases (table 1).

| | Cases | Controls | Unadjusted odds ratio (95% CI) | Adjusted* odds ratio (95% CI) | p |
|---|---|---|---|---|---|
| Compared with remote use | | | | | |
| Remote use | 4658 | 18 720 | 1·00 | 1·00 | |
| Recent use | 1720 | 6258 | 1·12 (1·05–1·20) | 1·11 (1·03–1·19) | 0·004 |
| Current use | | | | | |
| Celecoxib | 126 | 491 | 1·05 (0·86–1·28) | 0·84 (0·67–1·04) | 0·12 |
| Ibuprofen | 670 | 2573 | 1·07 (0·98–1·18) | 1·06 (0·96–1·17) | 0·27 |
| Naproxen | 367 | 1409 | 1·07 (0·95–1·21) | 1·14 (1·00–1·30) | 0·05 |
| Rofecoxib (all doses) | 68 | 196 | 1·39 (1·05–1·83) | 1·34 (0·98–1·82) | 0·066 |
| Rofecoxib ≤25 mg/day | 58 | 188 | 1·23 (0·91–1·66) | 1·23 (0·89–1·71) | 0·21 |
| Rofecoxib >25 mg/day | 10 | 8 | 5·03 (1·98–17·76) | 3·00 (1·09–8·31) | 0·03 |
| Other NSAIDs | 534 | 1849 | 1·19 (1·07–1·32) | 1·13 (1·01–1·27) | 0·03 |
| Compared with celecoxib use | | | | | |
| Celecoxib use | 126 | 491 | 1·00 | 1·00 | |
| Remote use | 4658 | 18 720 | 0·95 (0·78–1·16) | 1·11 (0·96–1·48) | 0·12 |
| Recent use | 1720 | 6258 | 1·07 (0·87–1·31) | 1·32 (1·06–1·65) | 0·015 |
| Current use | | | | | |
| Ibuprofen | 670 | 2573 | 1·02 (0·82–1·27) | 1·26 (1·00–1·60) | 0·054 |
| Naproxen | 367 | 1409 | 1·02 (0·81–1·28) | 1·36 (1·06–1·75) | 0·016 |
| Rofecoxib (all doses) | 68 | 196 | 1·32 (0·94–1·85) | 1·59 (1·10–2·32) | 0·015 |
| Rofecoxib ≤25 mg/day | 58 | 188 | 1·17 (0·82–1·67) | 1·47 (0·99–2·17) | 0·054 |
| Rofecoxib >25 mg/day | 10 | 8 | 4·78 (1·85–12·38) | 3·58 (1·27–10·11) | 0·016 |
| Other NSAIDs | 534 | 1849 | 1·13 (0·91–1·41) | 1·35 (1·06–1·72) | 0·015 |

*Adjusted for age, sex, and health plan region, cardiovascular risk score, admission for non-cardiac-related disorders and same-day procedures, emergency room visits for non-cardiac reasons, hormone replacement therapy, and high-dose prednisone.

Table 3: Risk of acute myocardial infarction with use of selected NSAIDs compared with remote use of a NSAID or with current use of celecoxib

To establish if risk factors for cardiovascular disease varied by NSAID use, we investigated the distribution of these factors in controls (table 2). Controls exposed to ibuprofen or naproxen, and those with remote exposure to any NSAID, were similar with respect to age, sex, and most covariates, although anticoagulant drug use was more common in the remotely exposed group than in the other groups. Rofecoxib-exposed controls were older, more likely to be women and to be treated by a rheumatologist, and more likely to have used anticoagulants or oral prednisone than controls exposed to ibuprofen, naproxen, or a remote NSAID. Celecoxib-treated controls had more cardiovascular admissions in the preceding year and had a higher frequency of use for various cardiovascular drugs than those exposed to rofecoxib. Cardiovascular risk scores were significantly greater for controls treated with celecoxib than for those from all other groups including rofecoxib (p=0·0001, rofecoxib vs celecoxib).

When all current users of rofecoxib were compared with remote users of NSAIDs, the risk of serious coronary heart disease was enhanced 1·34-fold (p=0·066; table 3). Risk fell slightly with celecoxib (odds ratio 0·84) and rose a little with standard-dose rofecoxib

For personal use. Only reproduce with permission from Elsevier Ltd.

| | Celecoxib use (n=169) | Ibuprofen use (n=190) | Naproxen use (n=192) | Rofecoxib use (n=81) | Remote use (n=185) | Total (n=817) | p |
|---|---|---|---|---|---|---|---|
| Aspirin use | 32 (19%) | 43 (23%) | 53 (28%) | 19 (23%) | 44 (24%) | 191 (23%) | 0·43 |
| Over-the-counter NSAID use (≥2 days a week for ≥1 year) | 26 (15%) | 18 (9%) | 23 (12%) | 11 (14%) | 24 (13%) | 102 (12%) | 0·55 |
| Smoking history | | | | | | | |
| Current | 15 (9%) | 17 (9%) | 22 (11%) | 6 (7%) | 20 (11%) | 80 (10%) | 0·80 |
| Past | 72 (43%) | 100 (53%) | 78 (41%) | 35 (43%) | 89 (48%) | 374 (46%) | 0·14 |
| Family history of acute myocardial infarction | | | | | | | |
| First-degree relative | 65 (38%) | 90 (47%) | 89 (46%) | 34 (42%) | 84 (45%) | 362 (44%) | 0·45 |
| First-degree at early age* | 27 (16%) | 34 (18%) | 34 (18%) | 13 (16%) | 29 (16%) | 137 (17%) | 0·97 |

Data are number of controls (%). *Men age ≤55 years, women age ≤60 years.

*Table 4:* Aspirin use, over-the-counter NSAID use, smoking history, and family history of acute myocardial infarction in 817 randomly selected controls with remote NSAID exposure or current exposure to celecoxib, ibuprofen, naproxen, or rofecoxib

(1·23). When all current users of rofecoxib were compared with current users of celecoxib, risk was increased 1·59-fold (p=0·015, table 3). For high-dose rofecoxib, the odds ratio was 3·58 (p=0·016) and for standard-dose rofecoxib it was 1·47 (p=0·054). Compared with remote use, risk of serious coronary heart disease was amplified with recent use of any NSAID, current use of naproxen, and current use of other NSAIDs. The increased odds ratio for other NSAIDs was attributable to the effects of diclofenac (odds ratio 1·60 [95% CI 0·92–2·79]; p=0·09) and indometacin (1·30 [1·06–1·59]; p=0·01).

A random sample of 1015 controls with current exposure to celecoxib, ibuprofen, naproxen, or rofecoxib or with remote exposure to a NSAID was contacted by telephone to complete a brief questionnaire; 817 (80%) participated. Controls were generally comparable with respect to cardiovascular disease risk factors, although low-dose aspirin use was somewhat lower in celecoxib-exposed controls than in the other groups (table 4).

## Discussion

The data from the present study provide further evidence that rofecoxib increases the risk of serious coronary heart disease.

Our study has several limitations. NSAID exposure was established from records of filled prescriptions and thus would not include data for drugs obtained over the counter. A telephone survey of a random sample of controls established that use of over-the-counter NSAIDs did not differ by prescription NSAID use status. Therefore, any misclassification of exposure should be non-differential and would not account for the study findings.

Although we adjusted for a wide range of recognised and potential cardiovascular risk factors, we did not have information on important factors such as smoking, family history of myocardial infarction, and use of low-dose aspirin. However, the findings of the telephone survey showed these factors were not differentially distributed with respect to NSAID exposure and thus such confounding is unlikely to account for study findings. These survey results accord with those of other

studies, in which low-dose aspirin use[22–24] or smoking behaviour[22,24] did not differ by specific NSAID. In an analysis of data from a nationwide in-home survey of US Medicare beneficiaries, patients treated with celecoxib, rofecoxib, or non-selective NSAIDs did not differ with respect to body-mass index, smoking behaviour, aspirin use, or educational level.[7]

Although we studied serious coronary heart disease in a population of 6 million people, sample size was limited for some comparisons. Relatively few people in the study base were exposed to high-dose rofecoxib. Nevertheless, the sample size was sufficient to show a substantially higher risk for high-dose use than for either remote NSAID use or celecoxib use. Our findings accord with those of two other published epidemiological studies that have analysed use of rofecoxib in doses greater than 25 mg.[6,7]

Because of limited power, we were unable to fully address whether the cardiovascular risk associated with rofecoxib varied by duration of use. This issue arose after interpretation of data for a study of 2586 patients randomly allocated either rofecoxib 25 mg/day or placebo, who were followed up for 3 years for the development of colon polyps (Adenomatous Polyp Prevention on Vioxx; APPROVe).[25] 25 cardiovascular events arose in the placebo group and 45 in the rofecoxib group, and the difference in incidence became significant only after 18 months on the drug.[25] An entirely plausible explanation for these results is insufficient statistical power before 18 months of study time. Indeed, inadequate sample size and low power of tests of interaction make it unlikely that true differences could be found when assessing the subgroup of events occurring early in the study.[26]

In our study, the mean duration of use before occurrence of a study event was 113 days (range 4–688) with standard-dose rofecoxib and 112 days (8–262) with high-dose use (p=0·96), consistent with the idea that risk begins early in treatment. Furthermore, analysis by the FDA of data from the VIGOR trial showed that the survival curve for acute myocardial infarction risk with high-dose rofecoxib began to diverge from the naproxen curve after 1 month of rofecoxib use.[27] The absence of divergence during the first month could be attributable to the few events in either study group, leading to inadequate

For personal use. Only reproduce with permission from Elsevier Ltd

statistical power.[16] Thus, these results cannot be viewed as evidence that the first month is free of risk. Indeed, in this same FDA review, analysis of a Merck-sponsored postapproval randomised clinical trial (study 090) of very short-term use of the 12·5 mg rofecoxib dose showed substantial differences in cardiovascular risk between rofecoxib and nabumetone or placebo.[17] Moreover, findings of three reports—two large nested case-control studies[7,18] and a cumulative meta-analysis of rofecoxib clinical trials[7]—strongly suggest that cardiovascular risk begins early with both standard-dose and high-dose rofecoxib treatment.

The present study provides data relevant to several other active controversies about the cardiovascular safety of NSAIDs. In current users of celecoxib, a slightly reduced risk of serious coronary heart disease was noted; in other studies, a similar diminished risk with celecoxib was seen.[1-4] Indeed, in several studies,[20,21] potentially beneficial effects of celecoxib on endothelial function and coronary-artery blood flow have been reported, and findings of a case-control study published online in December, 2004,[2a] showed that celecoxib protected against the occurrence of non-fatal myocardial infarction compared with non-use of NSAIDs or rofecoxib use. However, the US National Cancer Institute halted its Adenoma Prevention with Celebrex (APC) trial[12] after the data safety monitoring board reported a 2·5-fold greater risk of acute myocardial infarction and stroke in patients treated with celecoxib 400 mg/day and a 3·4-fold increase in risk with 800 mg/day.

Findings of other studies raise concerns about a COX2 class effect. Higher rates of acute myocardial infarction, stroke, and death have been recorded in patients treated with valdecoxib after coronary-artery bypass surgery than in those given opioid treatment for postoperative pain.[33] These increases were not significant but the study was small. The manufacturer of valdecoxib announced the results of a second study,[34] in which an increased risk of serious coronary heart disease was again noted in patients treated with the drug after bypass surgery. In a large clinical trial,[17] the rate of acute myocardial infarction was increased in individuals treated with another COX2-selective drug, lumiracoxib, compared with naproxen, especially in those not taking low-dose aspirin. This difference was not significant and was not present when compared with ibuprofen use. Additional data from clinical trials in patients with baseline cardiovascular disease would be useful.[16]

After publication of the VIGOR trial findings, considerable speculation arose that naproxen reduced the risk of coronary heart disease.[2] However, our findings, like those of some[2-9] but not all[10-12] others, suggest this drug does not have cardioprotective effects. Indeed, the present data show the possibility of a small increased risk of serious coronary heart disease, and a US National Institutes of Health trial was stopped after preliminary analysis suggested a 50% increase in risk of acute

myocardial infarction and stroke in patients treated with naproxen.[17] The lack of a protective effect of naproxen is important, because the drug frequently is a comparator in clinical trials of new coxibs.[2,15] Thus, findings from such studies showing that the new drug has an increased risk of cardiovascular disease relative to naproxen should alert doctors and patients to potential cardiotoxic effects.

While this report was in preparation, rofecoxib was withdrawn from the market by the manufacturer.[34] Many would argue that, in view of the findings of the VIGOR trial[2] and subsequent observational studies,[6,7] withdrawal or restriction of rofecoxib should have happened much earlier.[75,36]

We should assess the potential public-health effects of failure to take earlier action. From 1999 to September, 2004, an estimated 106·7 million rofecoxib prescriptions were dispensed in the USA, of which 17·6% were high-dose.[37] In two Merck-sponsored randomised clinical trials,[2,17] relative risks for acute myocardial infarction of 5 for high-dose rofecoxib and 2 for the standard dose were recorded. The background rate for acute myocardial infarction among control groups from studies of cardiovascular risk in NSAID users varied from 7·9 per 1000 person-years in CLASS[1] to 12·4 per 1000 person-years in TennCare.[6] Using the relative risks from the above-mentioned randomised clinical trials and the background rates seen in NSAID risk studies, an estimated 88000–140000 excess cases of serious coronary heart disease probably occurred in the USA over the market-life of rofecoxib.[40] The US national estimate of the case-fatality rate (fatal acute myocardial infarction plus sudden cardiac death) was 44%,[41] which suggests that many of the excess cases attributable to rofecoxib use were fatal.

In the future, when trials such as VIGOR show that a new treatment confers a greater risk of a serious adverse effect than a standard treatment, we must be much more careful about allowing its unrestrained use.

Contributors
D J Graham had the idea for the study, was responsible for protocol development, study supervision, statistical analysis, data interpretation, and survey design, and wrote the first draft of the manuscript. D Campen shared in study conception and contributed to protocol development, study supervision, data interpretation, and critical revision of the manuscript. R Hui and M Spence contributed to protocol development, data extraction, quality assurance, data interpretation, and critical revision of the manuscript. C Cheetham contributed to protocol development, survey design and execution, quality assurance, data interpretation, and critical revision of the manuscript. G Levy and S Shoor contributed to protocol development, data analysis, data interpretation, and critical revision of the manuscript. W A Ray contributed to protocol development, statistical analysis, data interpretation, quality assurance, and critical revision of the manuscript.

Conflict of interest statement
WAR served as a consultant to Pfizer and to plaintiffs' attorneys regarding rofecoxib. SS has undertaken research funded by Amgen and is on the speakers' bureau for Abbott Laboratories. All other authors declare that they have no conflict of interest.

Acknowledgments
We thank Prof Gurkirpal Singh for helpful suggestions relating to data analysis. This work was supported by Kaiser Permanente, CA, USA, and

For personal use. Only reproduce with permission from Elsevier Ltd

a contract with FDA. WAR was supported by cooperative agreements from the FDA (FD-U-001641) and the Agency for Healthcare Research and Quality, Centers for Education and Research in Therapeutics (HS1–0384). The views expressed are those of the authors and do not necessarily reflect those of the FDA.

References

1   Silverstein FE, Faich G, Goldstein JL, et al. Gastrointestinal toxicity with celecoxib vs nonsteroidal anti-inflammatory drugs for osteoarthritis and rheumatoid arthritis: the CLASS study—a randomized controlled study. JAMA 2000; 284: 1247–55.

2   Bombardier C, Laine L, Reicin A, et al. Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis. N Engl J Med 2000; 343: 1520–28.

3   Mukherjee D, Nissen SE, Topol EJ. Risk of cardiovascular events associated with selective COX-2 inhibitors. JAMA 2001; 286: 954–59.

4   Weir MR, Sperling RS, Reicin A, Gertz BJ. Selective COX-2 inhibition and cardiovascular effects: a review of the rofecoxib development program. Am Heart J 2003; 146: 591–604.

5   Konstam MA, Weir MR, Reicin A, et al. Cardiovascular thrombotic events in controlled, clinical trials of rofecoxib. Circulation 2001; 104: 2280–88.

6   Ray WA, Stein CM, Daugherty JR, Hall K, Arbogast PG, Griffin MR. COX-2 selective non-steroidal anti-inflammatory drugs and risk of serious coronary heart disease. Lancet 2002; 360: 1071–73.

7   Solomon DH, Schneeweiss S, Glynn RJ, et al. Relationship between selective cyclooxygenase-2 inhibitors and acute myocardial infarction in older adults. Circulation 2004; 109: 2068–73.

8   Mamdani M, Rochon P, Juurlink DN, et al. Effect of selective cyclooxygenase-2 inhibitors and naproxen on short term risk of acute myocardial infarction in the elderly. Arch Intern Med 2003; 163: 481–86.

9   Ray WA, Stein CM, Hall K, Daugherty JR, Griffin MR. Non-steroidal anti-inflammatory drugs and risk of serious coronary heart disease: an observational study. Lancet 2002; 359: 118–23.

10  Solomon DH, Glynn RJ, Levin R, Avorn J. Nonsteroidal anti-inflammatory drug use and acute myocardial infarction. Arch Intern Med 2002; 162: 1099–104.

11  Watson DJ, Rhodes T, Cai B, Guess HA. Lower risk of thromboembolic cardiovascular events with naproxen among patients with rheumatoid arthritis. Arch Intern Med 2002; 162: 1105–10.

12  Rahme E, Pilote L, LeLorier J. Association between naproxen use and protection against acute myocardial infarction. Arch Intern Med 2002; 162: 1111–15.

13  Sidney S, Petitti DB, Soff GA, Cundiff DL, Tolan KK, Quesenberry CP. Venous thromboembolic disease in users of low-estrogen combined estrogen-progestin oral contraceptives. Contraception 2004; 70: 3–10.

14  Fisher ES, Whaley FS, Krushat WM, et al. The accuracy of Medicare's hospital claims data: progress has been made, but problems remain. Am J Public Health 1992; 82: 243–48.

15  Rawson NSB, Malcolm E. Validity of the recording of ischaemic heart disease and chronic obstructive pulmonary disease in the Saskatchewan health care datafiles. Stat Med 1995; 14: 2627–43.

16  Friesinger GC, Hurst JW. The natural history of atherosclerotic coronary heart disease: an historical perspective. In: Alexander RW, Schlent RC, Fuster V, O'Rourke RA, Roberts R, Sonnenblick EH, eds. Hurst's the heart, 9th edn. New York: McGraw-Hill Medical Publishing Division, 1998: 1127–38.

17  Rothman KJ, Greenland S. Case-control studies. In: Rothman KJ, Greenland S, eds. Modern epidemiology, 2nd edn. Philadelphia: Lippincott-Raven Publishers, 1998: 93–114.

18  Ray WA, Meredith S, Thapa PB, Meador KG, Hall K, Murray KT. Antipsychotics and the risk of sudden cardiac death. Arch Gen Psychiatry 2001; 58: 1161–67.

19  Ray WA, Meredith S, Thapa PB, Hall K, Murray KT. Cyclic antidepressants and risk of sudden cardiac death. Clin Pharmacol Ther 2004; 75: 234–41.

20  Ray WA, Murry KT, Meridith S, Narasimhulu SS, Hall K, Stein CM. Oral erythromycin and the risk of sudden death from cardiac causes. N Engl J Med 2004; 351: 1089–96.

21  Graham DJ. Memorandum to the Acting Director of the Office of Drug Safety, Center for Drug Evaluation and Research, US Food and Drug Administration. http://www.fda.gov/cder/drug/infopage/vioxx/vioxxgraham.pdf (accessed Nov 8, 2004).

22  Griffin MR, Piper JM, Daugherty JR, Snowden M, Ray WA. Nonsteroidal anti-inflammatory drug use and increased risk for peptic ulcer disease in elderly persons. Ann Intern Med 1991; 114: 257–63.

23  Smalley WE, Ray WA, Daugherty J, Griffin MR. Nonsteroidal anti-inflammatory drug use and colorectal cancer incidence: a population-based study. Arch Intern Med 1999; 159: 161–66.

24  Griffin MR, Yared A, Ray WA. Nonsteroidal anti-inflammatory drugs and acute renal failure in elderly persons. Am J Epidemiol 2000; 151: 488–96.

25  American College of Rheumatology. Vioxx cardiovascular safety data from the APPROVe study. http://www.rheumatology.org/annual/press/APPROVesession_announce.asp (accessed Nov 10, 2004).

26  Yusuf S, Wittes J, Probstfield J, Tyroler HA. Analysis and interpretation of treatment effects in subgroups of patients in randomized clinical trials. JAMA 1991; 266: 93–98

27  Targum SL. Review of cardiovascular safety database for Vioxx, Feb 1, 2001. http://www.fda.gov/ohrms/dockets/ac/01/briefing/3677b1_06_cardio.pdf (accessed Nov 10, 2004).

28  Kimmel SE, Berlin JA, Reilly M, et al. Patients exposed to rofecoxib and celecoxib have different odds of nonfatal myocardial infarction. Ann Intern Med 2004; 142. Published early online Dec 7, 2004. http://www.acponline.org/journals/annals/myo_infar.pdf (accessed Dec 10, 2004).

29  Juni P, Nartey L, Reichenbach S, Sterchi R, Dieppe PA, Egger M. Risk of cardiovascular events and rofecoxib: cumulative meta-analysis. Lancet 2004; 364: 2021–29.

30  Chenevard R, Hurlimann D, Bechir M, et al. Selective COX-2 Inhibition improves endothelial function in coronary artery disease. Circulation 2003; 107: 405–09.

31  Hermann M, Camici G, Fratton A, et al. Differential effects of selective cyclooxygenase-2 inhibitors on endothelial function in salt-induced hypertension. Circulation 2003; 108: 2308–11.

32  Kaufman M. Celebrex trial halted after finding of heart risk: FDA chief urges patients to ask about alternatives. Washington Post, Dec 18, 2004: A1.

33  Ott E, Nussmeier NA, Duke PC, et al. Efficacy and safety of the cyclooxygenase-2 inhibitors parecoxib and valdecoxib in patients undergoing coronary artery bypass surgery. J Thorac Cardiovasc Surg 2003; 125: 1481–92.

34  Pfizer. Pfizer provides information to health care professionals about its COX-2 medicine Bextra (valdecoxib). http://www.pfizer.com/are/news_releases/2004pr/mn_2004_1015.html (accessed Oct 15, 2004).

35  Farkouh ME, Kirshner H, Harrington RA, et al. Comparison of lumiracoxib with naproxen and ibuprofen in the Therapeutic Arthritis Research and Gastrointestinal Event Trial (TARGET), cardiovascular outcomes: randomised controlled trial. Lancet 2004; 364: 675–84.

36  Topol EJ. Failing the public health-rofecoxib, Merck and the FDA. N Engl J Med 2004; 351: 1707–09.

37  Harris G. Drug links a fourth painkiller to an increase in heart problems. New York Times Dec 21, 2004: A1.

38  Merck. Merck announces voluntary worldwide withdrawal of Vioxx. http://www.merck.com/newsroom/press_releases/product/2004_0930.html (accessed Sept 30, 2004).

39  IMS Health. National Prescription Audit Plus Time period 1999 to September 2004, extracted October 2004. Plymouth Meeting, PA, 2004.

40  McAlister FA, Straus SE, Guyatt GH, Haynes RB, for the Evidence-Based Medicine Working Group. Users' guide to the medical literature: XX. Integrating research evidence with the care of the individual patient. JAMA 2000; 283: 2829–36.

41  American Heart Association. Heart disease and stroke statistics: 2004 update. http://www.americanheart.org/downloadable/heart/1079736729696HDSStats2004UpdateREV3–19–04.pdf (accessed Oct 19, 2004).

For personal use. Only reproduce with permission from Elsevier Ltd

**Exhibit C - Barnett Deposition Excerpts**

• **Graham Motion**

[1:1] - [1:25]       4/20/2006     Barnett, Gerald

page 1

```
1              UNITED STATES DISTRICT COURT
2             EASTERN DISTRICT OF LOUISIANA
3    In re: VIOXX           *  MDL Docket No. 1657
     PRODUCTS LIABILITY     *
4    LITIGATION             *  SECTION L
                            *
5                           *
                            *  JUDGE FALLON
6    This document relates to  *
                            *  MAGISTRATE JUDGE
7    GERALD BARNETT          *  KNOWLES
                            *
8              Plaintiff,   *
                            *
9    v.                     *
                            *
10   MERCK & CO., INC.,     *
                            *
11                          *
            Defendant.      *
12                          *
     Civil Action No. 2:06cv485  *
13
     * * * * * * * * * * * *
14
           CROSS NOTICED IN VARIOUS OTHER ACTIONS
15                   * * *
         CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
16                   * * *
                 April 20, 2006
17          Deposition of GERALD D. BARNETT
18
19                   * * *
20        GOLKOW LITIGATION TECHNOLOGIES
                 Four Penn Center
21         1600 John F. Kennedy Boulevard
                   Suite 1210
22         Philadelphia, Pennsylvania  19103
                 877.DEPS.USA
23
24
25
```

[136:1] - [136:18]       4/20/2006     Barnett, Gerald

page 136

```
1       Q.   Do you see, Mr. Barnett, in this medical
2    record that Dr. McCaffrey indicates he's going to
3    empirically start you on Vioxx 25 milligrams for
4    your neck pain discomfort?
5       A.   Where is this?  Number --
6       Q.   Number 1.
7       A.   Number 1.  Okay.  Examination showed
8    decreased sensation, will check -- for this
9    discomfort -- and by "this discomfort," he's talking
10   about the neck pain, I guess.
11      Q.   You understood, sir, in December of 1999
12   that when Dr. McCaffrey was suggesting you go on
13   Vioxx it was because he thought it would help your
14   neck pain more than Feldene; correct?
15      A.   Well, I -- this is what I understood:  That
16   it would help both neck, upper back, and lower back
17   pain.
18      Q.   Okay.
```



EXHIBIT
C

Blumberg No. 5119

1

Exhibit C - Barnett Deposition Excerpts

• Graham Motion
[138:22] - [139:2]          4/20/2006     Barnett, Gerald

page 138
22      Q.      Before you had your heart attack in
23  September of 2002, do you remember having any
24  discussions with Dr. Mikola about potential side
25  effects of Vioxx?
page 139
1       A.      I don't remember any specific
2   conversations, no.

[256:1] - [256:22]          4/20/2006     Barnett, Gerald

page 256
1                   C E R T I F I C A T E
2       I, DEBBY M. GLADISH, CSR No. 9803, do hereby certify
3   that GERALD D. BARNETT, appeared before me at the
4   time and place mentioned in the caption herein; that
5   the witness was by me first duly sworn on oath, and
6   examined upon oral interrogatories propounded by
7   counsel; that said examination, together with the
8   testimony of said witness, was taken down by me in
9   stenotype and, by computer-aided transcription,
10  thereafter reduced to typewriting; and that the
11  foregoing transcript constitutes a full, true and
12  accurate record of said examination of and testimony
13  given by said witness, and of all other proceedings
14  had during the taking of said deposition, and of the
15  whole thereof, to the best of my ability.
16  Witness my hand at San Diego, California, this 24th day of
17  April, 2006.
18
19
20      _____
            Debby M. Gladish
21          Certified Shorthand Reporter #9803
            Registered Professional Reporter
22          Certified LiveNote Reporter

Exhibit D - Mikola Deposition Excerpts

• Graham Motion

[1:] - [1:25]        4/25/2006    Mikola, Michael

```
page 1
    0001
1                   IN THE UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF LOUISIANA
2
3
4       IN RE:  VIOXX               * MDL Docket No. 1657
        PRODUCTS LIABILITY          *
5       LITIGATION                  * Section L
                                    *
6       THIS DOCUMENT RELATES TO:   * Judge Fallon
        GERALD BARNETT v. MERCK     * Mag. Judge Knowles
7
        ***************************
8
9
10      VIDEOTAPE
        DEPOSITION OF:MICHAEL MIKOLA, MD
11
        DATE:        April 25, 2006
12
        TIME:        8:27 AM
13
        LOCATION:    Law Offices of
14                   Motley Rice, LLC
                     28 Bridgeside Boulevard
15                   Mt. Pleasant, SC
16      TAKEN BY:    Counsel for Plaintiff
17      REPORTED BY: TERRI L. BRUSSEAU,
                     Registered Professional
18                   Reporter, CP, CRR
19
20
21           GOLKOW LITIGATION TECHNOLOGIES
22             Four Penn Center, Suite 1210
               1600 John F. Kennedy Blvd.
23              Philadelphia, PA 19103
                    877.DEPS.USA
24
25
```

[288:11] - [288:15]    4/25/2006    Mikola, Michael

```
page 288
11         Q.    Did Mr. Barnett use 50 milligrams of
12   Vioxx?
13         A.    No, sir.
14         Q.    What did he use?
15         A.    I believe it was 25 milligrams.
```

[414:1] - [414:23]    4/25/2006    Mikola, Michael

```
page 414
1                    CERTIFICATE OF REPORTER
2         I, Terri L. Brusseau, Registered
3    Professional Reporter and Notary Public for the
4    State of South Carolina at Large, do hereby certify
5    that the foregoing transcript is a true, accurate,
6    and complete record.
7         I further certify that I am neither related
8    to nor counsel for any party to the cause pending
9    or interested in the events thereof.
10        Witness my hand, I have hereunto affixed my
11   official seal this 1st day of May, 2006 at
12   Charleston, Charleston County, South Carolina.
13
14
```



EXHIBIT
D
Blumberg No. 5119

Exhibit D - Mikola Deposition Excerpts

• Graham Motion

|    |                         |
|----|-------------------------|
| 15 |                         |
| 16 | _____       |
|    | Terri L. Brusseau,      |
| 17 | Registered Professional |
|    | Reporter, CP, CRR       |
| 18 | My Commission expires   |
|    | May 7, 2006.            |
| 19 |                         |
| 20 |                         |
| 21 |                         |
| 22 |                         |
| 23 |                         |

## MEMORANDUM

| | |
|---|---|
| **DATE:** | April 6, 2005 |
| **FROM:** | John K. Jenkins, M.D. |
| | Director, Office of New Drugs (OND) |
| | |
| | and |
| | |
| | Paul J. Seligman, M.D., M.P.H |
| | Director, Office of Pharmacoepidemiology and Statistical Science |
| | (OPaSS) |
| **THROUGH:** | Steven Galson, M.D., M.P.H. |
| | Acting Director, Center for Drug Evaluation and Research |
| **TO:** | NDA files 20-998, 21-156, 21-341, 21-042 |
| **SUBJECT:** | Analysis and recommendations for Agency action regarding non-steroidal anti-inflammatory drugs and cardiovascular risk |

### Executive Summary

Following a thorough review of the available data we have reached the following conclusions regarding currently approved COX-2 selective and non-selective non-steroidal anti-inflammatory drugs (NSAIDs)[1] and the risk of adverse cardiovascular (CV) events:[2]

- The three approved COX-2 selective NSAIDs (i.e., celecoxib, rofecoxib, and valdecoxib) are associated with an increased risk of serious adverse CV events compared to placebo. The available data do not permit a rank ordering of these drugs with regard to CV risk.
- Data from large long-term controlled clinical trials that have included a comparison of COX-2 selective and non-selective NSAIDs do not clearly demonstrate that the COX-2 selective agents confer a greater risk of serious adverse CV events than non-selective NSAIDs.

---

[1] A list of the non-selective NSAIDs is available on http://www.fda.gov/cder/drug/infopage/cox2/default.htm.
[2] The degree of COX-2 selectivity for any given drug has not been definitively established, and there is considerable overlap in *in-vitro* COX-2 selectivity between agents that have been generally considered to be COX-2 selective (e.g., celecoxib, rofecoxib, valdecoxib, parecoxib, lumiracoxib, etoricoxib) and older NSAIDs that have been considered to be non-selective (e.g., diclofenac, ibuprofen, naproxen). For purposes of simplicity of discussion and comparisons, this document maintains the traditional separation between COX-2 selective and non-selective agents, but our use of this nomenclature should not be considered as FDA endorsement of such designations.



EXHIBIT

E

Blumberg No. 5119

1

- Long-term placebo-controlled clinical trial data are not available to adequately assess the potential for the non-selective NSAIDs to increase the risk of serious adverse CV events.
- Pending the availability of additional long-term controlled clinical trial data, the available data are best interpreted as being consistent with a class effect of an increased risk of serious adverse CV events for COX-2 selective and non-selective NSAIDs.
- Short-term use of NSAIDs to relieve acute pain, particularly at low doses, does not appear to confer an increased risk of serious adverse CV events (with the exception of valdecoxib in hospitalized patients immediately post-operative from coronary artery bypass (CABG) surgery).
- Controlled clinical trial data are not available to rigorously evaluate whether certain patients derive greater relief of pain and inflammation from specific NSAIDs compared to others or after failing to respond to other NSAIDs.
- The three approved COX-2 selective drugs reduce the incidence of GI ulcers visualized at endoscopy compared to certain non-selective NSAIDs.  Only rofecoxib has been shown to reduce the risk of serious GI bleeding compared to a non-selective NSAID (naproxen) following chronic use.  The overall benefit of COX-2 selective drugs in reducing the risk of serious GI bleeding remains uncertain, as does the comparative effectiveness of COX-2 selective NSAIDs and other strategies for reducing the risk of GI bleeding following chronic NSAID use (e.g., concomitant use of a non-selective NSAID and a proton pump inhibitor).
- Valdecoxib is associated with an increased rate of serious and potentially life-threatening skin reactions (e.g., toxic epidermal necrolysis, Stevens-Johnson syndrome, erythema multiforme) compared to other COX-2 selective agents and is the only NSAID with a boxed warning for this adverse event in its approved package insert.  In the absence of any demonstrated advantage over other NSAIDs, the overall benefit versus risk profile for valdecoxib is unfavorable for marketing.

Based on these conclusions, we recommend the following regulatory actions to further improve the safe and effective use of these drugs by prescribers, patients, and consumers:

- The agency should ask Pfizer to voluntarily withdraw Bextra (valdecoxib) from the U.S. market.  In the event Pfizer does not agree to a voluntary withdrawal, the agency should initiate the formal withdrawal procedures; i.e., issuance of a Notice of Opportunity for Hearing (NOOH).
- The professional labeling for all prescription NSAIDs should be revised to include a boxed warning highlighting the potential increased risk of serious adverse CV events. The boxed warning should also include the well described NSAID class risk of serious, and often life-threatening, GI bleeding, which is currently contained in a bolded warning.
- Pending the availability of additional data, the labeling for all prescription NSAIDs should include a contraindication for use in patients immediately post-operative from CABG surgery.

- A class NSAID Medication Guide should be developed to inform patients of the potential increased risk of serious adverse CV events and the risk of serious GI bleeding.
- The labeling for non-prescription NSAIDs should be revised to include more specific information about potential CV and GI risks and information to assist consumers in the safe use of these drugs.
- The boxed warning for Celebrex (celecoxib) should specifically reference the available data that demonstrate an increased risk of serious adverse CV events and other sections of the labeling should be revised to clearly reflect these data.
- The agency should carefully review any proposal from Merck for resumption of marketing of Vioxx (rofecoxib). We recommend that such a proposal be reviewed by the FDA Drug Safety Oversight Board and an advisory committee before a final decision is reached.
- The agency should request that all sponsors of non-selective NSAIDs conduct and submit for FDA review a comprehensive review and analysis of available controlled clinical trial databases to further evaluate the potential for increased CV risk.
- The agency should work closely with sponsors and other interested stakeholders (e.g., NIH) to encourage additional long-term controlled clinical trials of non-selective NSAIDs to further evaluate the potential for increased CV risk.

## Background

Vioxx (rofecoxib) was voluntarily withdrawn from the market by Merck in September 2004 following the observation of an increased risk of serious adverse CV events compared to placebo in a long-term controlled clinical trial. Subsequent to that action, reports of additional data from controlled clinical trials became available for other COX-2 selective NSAIDs that also demonstrated an increased risk of serious adverse CV events compared to placebo. These new data prompted the agency to conduct a comprehensive review of the available data and to present the issue for review at a joint meeting of FDA's Arthritis and Drug Safety and Risk Management Advisory Committees on February 16-18, 2005.

Following the joint meeting, CDER conducted a thorough internal review of the available data regarding cardiovascular (CV) safety issues for COX-2 selective and non-selective non-steroidal anti-inflammatory drugs (NSAIDs). This memorandum summarizes the major issues considered in that review, our conclusions regarding the interpretation of the available data, and our recommendations for regulatory actions necessary to further improve the safe and effective use of these drugs by prescribers, patients, and consumers.

Participants in the CDER review included staff from the Division of Anti-Inflammatory, Analgesic, and Ophthalmologic Drug Products, the Division of Over-the-Counter Drug Products, the Offices of Drug Evaluation II and V, the Office of New Drugs, the Office of Drug Safety, the Office of Biostatistics, the Office of Pharmacoepidemiology and Statistical Science, the Office of Medical Policy, the Office of Regulatory Policy, and the Office of the Center Director. Materials reviewed included the regulatory histories and the NDA and postmarketing databases of the various NSAIDs, FDA and sponsor background documents prepared for the Advisory Committee meeting, all materials and data submitted by other

3

stakeholders to the Advisory Committee meeting, presentations made at the Advisory
Committee meeting, the discussions held by the Committee members during the meeting,
and the specific votes and recommendations made by the joint Committee.

## Summary of available data

The most persuasive evidence in support of an increased risk of serious adverse CV effects
of the COX-2 selective NSAIDs is derived from a small number of long-term placebo- and
active-controlled clinical trials in patients with arthritis or in the disease prevention setting.
We will briefly summarize the available data from the long-term controlled clinical trials for
the three approved and two investigational COX-2 selective agents. We will also briefly
summarize the available data from long-term controlled clinical trials to assess the potential
for increased CV risk for the non-selective NSAIDs. Finally, we will briefly summarize the
available data from observational studies that have sought to assess the potential for
increased CV risk for NSAIDs. We will focus our discussion on the combined endpoint of
death from CV causes, myocardial infarction (MI), and stroke, as that is a widely accepted
endpoint in assessing the benefits and risks of a drug for CV outcomes. It should be noted
that the exact definitions and adjudication procedures for this combined endpoint vary to
some degree across the trials discussed below.

### Celecoxib

The strongest data in support of an increased risk of serious adverse CV events for celecoxib
comes from the National Cancer Institute's Adenoma Prevention with Celecoxib (APC) trial
in patients at risk for recurrent colon polyps. In the APC trial a 2-3 fold increased risk of
adverse CV events was seen for celecoxib compared to placebo after a mean duration of
treatment of 33 months. There was evidence of a dose response relationship, with a hazard
ratio[3] of 2.5 for celecoxib 200 mg twice daily and 3.4 for celecoxib 400 mg twice daily
compared to placebo for the composite endpoint of death from CV causes, myocardial
infarction (MI), or stroke.

The results from the APC trial were not replicated, however, in the nearly identical
Prevention of Spontaneous Adenomatous Polyps (PreSAP) trial. Based on preliminary,
unpublished data presented by the PreSAP investigators at the AC meeting, the hazard ratio
was 1.1 for celecoxib 400 mg once daily compared to placebo for the composite endpoint of
death from CV causes, MI, or stroke. It is worth noting that the dosing interval differed
between the APC trial (twice daily) and the PreSAP trial (once daily), although both trials
included a total daily dose of celecoxib of 400 mg. It remains unclear what, if any, role this
difference in dosing interval may have played in the disparate findings between the two
trials.

Another long-term controlled clinical trial of celecoxib versus placebo, the National Institute
of Aging's Alzheimer's Disease Anti-Inflammatory Prevention Trial (ADAPT) in patients at

---

[3] The hazard rate is a measure of risk per unit of time in an exposed cohort (e.g., the event rate per month).
The hazard ratio is the ratio of the hazard rates from the treatment group relative to the control group, and is
often used to represent the relative risk when the relative risk is constant over time.

risk for Alzheimer's disease, also does not appear to have shown an increased risk for celecoxib 200 mg twice daily compared to placebo for the composite endpoint of death, MI, or stroke. Preliminary, unpublished data shared with FDA by the ADAPT investigators showed no increased relative risk for celecoxib compared to placebo.[4] Finally, there was a small one-year trial comparing celecoxib 200 mg twice daily to placebo in patients with Alzheimer's disease that did not demonstrate a significantly increased risk of serious adverse CV events, but did show a trend toward more CV events in the celecoxib treatment arm.

The only available data from a long-term comparison of celecoxib to non-selective NSAIDs come from the Celebrex Long-Term Arthritis Safety Study (CLASS) in which celecoxib 400 mg twice daily was compared to diclofenac and ibuprofen in approximately 8000 patients with osteoarthritis or rheumatoid arthritis. No differences were observed for serious adverse CV events between celecoxib and the two non-selective NSAID comparators in this trial.

The ADAPT trial also included naproxen as an active control and will provide an additional comparison of celecoxib to a non-selective NSAID when the final study results become available. Preliminary, unpublished data shared with FDA by the ADAPT investigators showed that celecoxib was intermediate between placebo (lowest incidence) and naproxen (highest incidence) for the composite endpoint of death, MI, or stroke.

Rofecoxib

The strongest data from a long-term placebo-controlled trial for an increased risk of serious adverse CV events with rofecoxib come from the Adenomatous Polyp Prevention on Vioxx (APPROVe) trial in which rofecoxib 25 mg once daily was compared to placebo for up to three years. A relative risk of approximately two was seen for rofecoxib compared to placebo for serious adverse CV events. It is noteworthy that the rofecoxib and placebo CV event curves in a Kaplan-Meier plot did not appear to begin to separate until after approximately 18 months of treatment. In contrast to the results seen in APPROVe, two long-term placebo-controlled trials in patients with early Alzheimer's disease, including up to four years of treatment in a small number of patients, did not show a significant difference in CV events between rofecoxib 25 mg once daily and placebo.

The only long-term controlled clinical trial comparison of rofecoxib to a non-selective NSAID comes from the Vioxx GI Outcomes Research (VIGOR) trial in which rofecoxib 50 mg once daily was compared to naproxen for up to 12 months. In VIGOR, rofecoxib was associated with a hazard ratio of approximately two compared to naproxen based on the composite endpoint of death, MI, or stroke. In contrast to the findings in APPROVe, in VIGOR the Kaplan-Meier CV event curves for rofecoxib and naproxen began to separate after approximately two months of treatment.

Valdecoxib

---

[4] Relative risk is defined as the cumulative risk in the treatment group (e.g., number of events per the number of individuals in this group) divided by the cumulative risk in the control group. The term relative risk is often used interchangeably with the hazard ratio.

5

No long-term controlled clinical trials have been conducted comparing valdecoxib to either placebo or non-selective NSAIDs. Data are available from two short-term placebo-controlled trials of early dosing with intravenous parecoxib (a pro-drug for valdecoxib) followed by oral valdecoxib in patients immediately post-operative from coronary artery bypass graft (CABG) surgery. In both studies, valdecoxib was associated with an approximately two-fold increased risk of serious adverse CV events compared to placebo. In contrast, a short-term placebo-controlled trial of intravenous parecoxib followed by oral valdecoxib in patients undergoing various types of non-vascular general surgical procedures showed no differences for serious adverse CV events.

Investigational COX-2 Selective Agents

Data from long-term controlled clinical trials are also available for two investigational COX-2 selective agents (lumiracoxib and etoricoxib), and were presented at the AC meeting. These data are summarized here as they provide further insights regarding the issue of CV risk for COX-2 selective agents and the comparison of CV risks between COX-2 selective drugs and non-selective NSAIDs.

The Therapeutic COX-189 Arthritis Research and Gastrointestinal Event Trial (TARGET) compared lumiracoxib 400 mg once daily to naproxen and ibuprofen for one year in approximately 18,000 patients with osteoarthritis. TARGET was designed as two sub-studies and the planned primary analysis was to be the combined lumiracoxib groups compared to the combined naproxen and ibuprofen groups. The study design, however, did not clearly reflect this intent since randomization occurred at the sub-study level rather than across the entire study. For reasons that are not entirely clear, but possibly related in part to the randomization schema, the event rates for serious adverse CV events in the lumiracoxib groups in the two sub-studies were very different, i.e., 1.1 events per 100 patient years in the naproxen sub-study versus 0.58 events per 100 patient years in the ibuprofen sub-study. The event rates for serious adverse CV events for naproxen and ibuprofen were very similar in the two sub-studies; i.e., 0.76 events per 100 patient years for naproxen and 0.74 events per 100 patient years for ibuprofen.

The pre-specified primary analysis of TARGET found no difference in serious adverse CV events between the combined lumiracoxib groups and the combined naproxen and ibuprofen groups. The validity of combining the two lumiracoxib groups for purposes of the primary analysis is debatable, however, given the study design and the very different lumiracoxib event rates in the two sub-studies. It is unfortunate that the study design did not call for randomization of treatment assignment across the entire study, which would have allowed for a much more powerful comparison of lumiracoxib to the two non-selective NSAIDs.

Given the study design, the data from TARGET have also been analyzed by sub-study. In the naproxen sub-study, a hazard ratio of 1.44 was observed for the comparison of lumiracoxib and naproxen for serious adverse CV events. In the ibuprofen sub-study, a hazard ratio of 0.79 was observed for the comparison of lumiracoxib and ibuprofen for

serious adverse CV events. The observed differences between lumiracoxib and the NSAID comparators were not statistically significantly different in either sub-study.

Depending on which analysis of the TARGET study one considers, the conclusions may be very different. The pre-specified primary analysis would suggest that lumiracoxib, a highly COX-2 selective agent, is indistinguishable from two non-selective agents with regard to the risk of serious adverse CV effects. The sub-study results, however, would suggest that lumiracoxib may be associated with a slightly increased CV risk compared to naproxen and a slightly decreased CV risk compared to ibuprofen. The cross sub-study comparison of naproxen and ibuprofen, however, would suggest no difference in CV risk for these non-selective NSAIDs. Overall, this study does not support a clear distinction between lumiracoxib and the non-selective NSAIDs.

The Etoricoxib versus Diclofenac Sodium Gastrointestinal Tolerability and Effectiveness Trial (EDGE) compared etoricoxib 90 mg once daily versus diclofenac for up to 16 months in approximately 7100 patients with osteoarthritis. The relative risk for serious adverse CV events was 1.07 for the comparison of etoricoxib to diclofenac (not significantly different). EDGE, therefore, is another large controlled clinical trial that did not distinguish COX-2 selective and non-selective NSAIDs with regard to CV risk.

### Non-selective NSAIDs

Long-term placebo- and active-controlled trials are generally not available for the non-selective NSAIDs, with the exception of the studies noted above where certain non-selective NSAIDs were used as active controls in studies of COX-2 selective drugs.

### Observational studies

Data are available from a number of published and unpublished observational studies to address the issue of increased risk of serious adverse CV events for COX-2 selective and non-selective NSAIDs. These studies have utilized a variety of designs, methods, source databases, and comparison groups, and each study has been characterized by strengths and weaknesses. In most of the observational studies, the estimated relative risks of the COX-2 selective NSAIDs have ranged from 0.8 to 1.5, with many point estimates not achieving statistical significance. These data were presented and discussed in detail at the AC meeting and the committee members generally agreed that the observational data could not definitively address the question of a modestly increased CV risk for the COX-2 selective compared to the non-selective NSAIDs, with the possible exception of data on rofecoxib 50 mg.

Overall, the most consistent finding for increased CV risk was observed for rofecoxib 50 mg, where statistically significant relative risks of approximately 2 and 3 were seen in two studies. The signal for increased CV risk for the 25 mg rofecoxib dose, however, was smaller and did not consistently achieve statistical significance. The relative risks in the seven observational studies for celecoxib ranged from 0.4 to 1.2, with statistical significance observed once for a lowered risk and once for a higher relative risk. The available data for

7

the non-selective NSAIDs from the observational studies are limited, and no consistent signals were observed.

## Analysis and Conclusions

As noted above, the most persuasive evidence in support of an increased risk of serious adverse CV effects of the COX-2 selective NSAIDs is derived from a small number of long-term placebo- and active-controlled clinical trials in patients with arthritis or in the disease prevention setting. The data from these trials, however, are not consistent in demonstrating an increased risk of serious adverse CV effects for COX-2 selective drugs. Perfect replication of study results cannot be expected, and is not required to reach a valid scientific conclusion. However, the degree of inconsistency observed in the data from long-term controlled clinical trials has a considerable impact on our ability to reach valid conclusions about the absolute magnitude of increased risk and to make risk versus benefit determinations for particular doses of specific drugs.

The data from controlled clinical trial comparisons of COX-2 selective and non-selective NSAIDs do not clearly demonstrate an increased relative risk for the COX-2 selective drugs, despite the substantial size of these studies. Only VIGOR clearly indicates such a difference with CLASS and EDGE giving no suggestion of a difference and TARGET giving analysis-dependent results. These findings, and the absence of any long-term placebo- or active-controlled clinical trials for most of the non-selective NSAIDs, make it difficult to conclude that the COX-2 selective drugs as a class have greater CV risks than non-selective NSAIDs. The data from the well-controlled observational trials also have not provided consistent assessments of risk when comparing COX-2 selective and non-selective NSAIDs. The point estimates of the relative risk comparisons from these data are mostly in a range where interpretation may be difficult and influenced by uncontrolled residual confounding or biases often inherent in the design and data limitations of these studies

Despite the limitations of the available data, overall, there is evidence, principally from a small number of placebo-controlled trials, that the approved COX-2 selective NSAIDs (i.e., celecoxib, rofecoxib, valdecoxib) are associated with an increased risk of serious adverse CV events (e.g., MI, stroke, and death). It remains unclear, however, that it is the presence of, or the degree of, COX-2 selectivity that accounts for these observations, as some have hypothesized. As noted above, in various controlled clinical trials, COX-2 selective drugs have been indistinguishable from non-selective NSAIDs (i.e., ibuprofen, diclofenac) in studies of substantial size and duration. Further, although on theoretical grounds the addition of low-dose aspirin (a COX-1 inhibitor) to a COX-2 selective drug should resolve any increased CV risk caused by COX-2 selectivity, this effect has not in fact been observed in several studies in which such comparisons are possible. Taken together, these observations raise serious questions about the so called "COX-2 hypothesis," which suggests that COX-2 selectivity contributes to increased CV risk. It, therefore, remains unclear to what extent the COX-2 selectivity of an individual drug predicts the drug's potential for an increased risk of adverse CV events compared to drugs that are less COX-2 selective.

8

After carefully reviewing all the available data, we believe that the data are sufficient to support a conclusion that celecoxib, rofecoxib, and valdecoxib are associated with an increased risk of serious adverse CV events when compared to placebo. For celecoxib and rofecoxib these conclusions are primarily supported by the data from the APC and APPROVe trials, respectively. However, for celecoxib a nearly identical long-term placebo-controlled trial (the PreSAP trial) and a similarly sized placebo-controlled trial in patients at increased risk for Alzheimer's disease did not replicate these findings. For rofecoxib, other long-term placebo-controlled trials of equal or greater duration (the Alzheimer's treatment trials) did not replicate the APPROVe findings. There are no long-term placebo-controlled trial data for valdecoxib. It is difficult to know how to extrapolate the findings from the parecoxib/valdecoxib CABG trials to the chronic use situation given the significant physiologic and traumatic impact on the coronary vasculature during and following CABG surgery, and the systemic pro-inflammatory response resulting from heart-lung bypass. We believe, however, that it is reasonable from a public health perspective to assume that valdecoxib does not differ from the other COX-2 selective agents with regard to increased CV risk with chronic use pending the availability of data from long-term controlled clinical trials that would indicate otherwise.

The long-term controlled clinical trial data comparing COX-2 selective agents (i.e., celecoxib, rofecoxib, lumiracoxib, etoricoxib) to non-selective NSAIDs are limited in number, but include several trials of very substantial size. They raise significant unresolved questions. First, rofecoxib 50 mg clearly appears to have an increased risk of serious adverse CV events compared to naproxen based on the data from the VIGOR trial.[5] The absence of a placebo arm in the VIGOR trial, however, precludes a determination of whether chronic use of naproxen might also confer an increased risk of serious adverse CV events, albeit at a lower rate than rofecoxib. The VIGOR trial also does not provide a comparison between lower doses of rofecoxib and naproxen. Other controlled clinical trial data have also suggested some increased risk of serious adverse CV events for COX-2 selective agents versus naproxen (i.e., lumiracoxib in the naproxen sub-study in TARGET and etoricoxib in the NDA database); however, these studies also leave unresolved the question of whether naproxen is itself associated with an increased CV risk. The ADAPT trial is the only long-term controlled clinical trial in which a COX-2 selective agent and naproxen have been compared to placebo. The preliminary data from the ADAPT trial, however, do not appear to follow the pattern of the other COX-2 selective versus naproxen trials, showing a trend toward a higher event rate on naproxen compared to celecoxib and placebo (see above). Further, the cross sub-study comparison of naproxen and ibuprofen in TARGET suggests no difference in CV risk between these two non-selective NSAIDs. Taken together these data provide some support for the conclusion that a difference exits in the risk of serious adverse CV events between COX-2 selective agents and naproxen, but they do not provide any assurance that naproxen itself confers no increased CV risk; i.e., we cannot consider naproxen to be equal to or better than placebo.

---

[5] Rofecoxib 50 mg is not recommended for chronic use in the approved labeling for Vioxx. The higher dose of rofecoxib was used in the VIGOR trial to provide a "worst case" estimate of the risk of serious GI bleeding for rofecoxib in comparison to naproxen.

9

The comparisons of COX-2 selective agents to certain other non-selective NSAIDs also raise interesting, and in the end unresolved, questions regarding the relative risk of COX-2 selective drugs compared to non-selective NSAIDs, despite the very large size of some of the trials. Several long-term controlled clinical trial comparisons of COX-2 selective agents to diclofenac have failed to provide evidence that diclofenac has a lower risk of serious adverse CV events than COX-2 selective agents (e.g., versus celecoxib in CLASS, versus etoricoxib in the NDA database, versus etoricoxib in EDGE). Large, long-term controlled clinical trial comparisons of COX-2 selective agents to ibuprofen, an unequivocally non-selective agent, also have failed to suggest a clear separation with regard to the risk of serious adverse CV events (e.g., versus celecoxib in CLASS, versus lumiracoxib in the ibuprofen sub-study in TARGET). While even these large studies cannot rule out a small true difference in CV risk between COX-2 selective agents and diclofenac and ibuprofen, they show no clear trend and are best interpreted as showing that the risk of serious adverse CV events between COX-2 selective agents and either diclofenac and ibuprofen are in fact very similar. The latter interpretation, taken together with the findings of an increased risk of serious adverse CV events from the long-term placebo-controlled clinical trials of COX-2 selective agents, would support a conclusion that at least some of the non-selective NSAIDs are also associated with an increased risk of serious adverse CV events.

The inability to reliably estimate the absolute magnitude of the increased risk of serious adverse CV events for individual COX-2 agents, combined with the inability to reliably draw conclusions about the risk of COX-2 agents compared to one another or to other NSAIDs, highlights the conundrum the Agency faces in making decisions on appropriate regulatory actions. There is an urgent public health need to make appropriate regulatory decisions because the adverse events at issue are serious and a very large number of patients use selective and non-selective NSAIDs to treat chronic pain and inflammation. At the same time, erroneous conclusions and inappropriate actions are themselves potentially harmful to the public health. Although the currently available data are not definitive, the Agency cannot await more definitive data, which may take years to accumulate from studies that have not even begun, before taking action.

In summary, we conclude that the three approved COX-2 selective drugs are associated with an increased risk of serious adverse CV events, at least at some dose, with reasonably prolonged use. We do not believe, however, that the currently available data allow for a rank ordering of the approved COX-2 selective drugs with regard to CV risk. We also believe that it is not possible to conclude at this point that the COX-2 selective drugs confer an increased risk over non-selective NSAIDs in chronic use. Naproxen may be an exception, but the comparative data to COX-2 selective agents are not entirely consistent, we do not have adequate long-term placebo-controlled data to fully assess its potential CV risks, and the cross sub-study comparison to ibuprofen in TARGET does not suggest a lesser CV risk. For the vast majority of non-selective NSAIDs we do not have any data that allow comparisons with COX-2 selective agents for CV risk, and where data exist, primarily from very large studies, they do not consistently demonstrate that the COX-2 agents confer a greater risk. Finally, there are no data from long-term placebo-controlled trials for the non-selective NSAIDs (other than the preliminary data for naproxen from ADAPT) that are analogous to the data available for the COX-2 selective agents.

The absence of long-term controlled clinical trial data for the non-selective NSAIDs significantly limits our ability to assess whether these drugs may also increase the risk of serious adverse CV events. The long marketing history of many of these drugs cannot be taken as evidence that they are not associated with an increased risk of serious adverse CV events since CV events occur fairly commonly in the general population and small increases in common adverse events are impossible to detect from spontaneous reporting systems. The adverse CV risk signal for the COX-2 selective drugs became apparent only from large, long-term controlled clinical trials and large retrospective cohort studies. Similar clinical trials are needed to assess the potential risks of the non-selective NSAIDs.

Given our inability to conclude, based on the available data, that the COX-2 selective agents confer an increased risk of serious adverse CV events compared to non-selective NSAIDs, we believe that it is reasonable to conclude that there is a "class effect" for increased CV risk for all NSAIDs pending the availability of data from long-term controlled clinical trials that more clearly delineate the true relationships. This interpretation of the available data will serve to promote public health by alerting physicians and patients to this class concern and will make it clear that simply switching from a COX-2 selective agent to a non-selective NSAID does not mean that the potential for increased risk of serious adverse CV events has been fully, or even partially, mitigated.

With a "class effect" of NSAIDs on CV risk as a baseline, other factors must be considered in determining the overall risk versus benefit profile for individual drugs within the class and what, if any, regulatory actions are appropriate. Some of the factors that must be considered include any demonstrated benefit of a given drug over other drugs in the class (e.g., superiority claims, effectiveness in patients who have failed on other drugs) and any unique toxicities (or absence of a toxicity) of a given drug over other drugs in the class.

With regard to greater or special effectiveness, while it is widely believed that patients differ in their response to NSAIDs, there are no controlled clinical trial data (e.g., studies in non-responders to a particular NSAID) to support such conclusions. Nonetheless, despite the lack of rigorous evidence, this widely accepted belief is at least in part a valid rationale for maintaining a range of options in the NSAID class from which physicians and patients may choose. In addition, as noted above, there is no basis for concluding that the risk of serious adverse CV events for some NSAIDs is worse than the risk for the others, which supports maintaining a range of options.

With regard to toxicities, the primary goal in developing COX-2 selective agents was to reduce the serious, and often life-threatening, risk of gastrointestinal (GI) bleeding associated with chronic use of all NSAIDs. To date, the only COX-2 selective agent that has demonstrated a reduced risk for serious GI bleeding is rofecoxib, but only in comparison to naproxen. All of the approved COX-2 selective agents have been shown to reduce the incidence of GI ulcers visualized at endoscopy compared to certain non-selective NSAIDs, but the clinical relevance of this finding as a predictor of serious GI bleeding has not been confirmed (e.g., no difference in serious GI bleeding was observed in CLASS). Improved GI tolerability of NSAIDs is an important issue from an individual patient and public health

11

perspective and is, at least in part, a valid rationale for maintaining a range of options in the NSAID class from which physicians and patients may choose. Besides the COX-2 selective NSAIDs, other strategies are available that may reduce the risk of GI bleeding with NSAIDs (e.g., combined use of a non-selective NSAID with misoprostol or a proton pump inhibitor), but data are currently lacking on how these strategies compare to the use of COX-2 selective drugs. With the exception of the comparison of rofecoxib to naproxen, data are not available to confirm a reduced risk of serious GI bleeding for the COX-2 selective agents, though it is widely believed that these agents are better tolerated by many patients.

In addition to the risk of serious and potentially life-threatening GI bleeding, NSAIDs are also associated with other potentially serious adverse effects, including, but not limited to, fluid retention, edema, renal toxicity, hepatic enzyme elevation, and bronchospasm in patients with aspirin-sensitive asthma. Comparative data to differentiate NSAIDs from one another with regard to these adverse effects are generally not available or are inconclusive.

Boxed warnings are currently included in the approved labeling for two single ingredient NSAID products.[6] Bextra (valdecoxib) has a boxed warning for serious and potentially life-threatening skin reactions (i.e., toxic epidermal necrolysis, Stevens-Johnson syndrome, erythema multiforme). Toradol (ketorolac) has a boxed warning emphasizing that it is approved only for short-term ($\leq 5$ days) use in patients with moderately severe acute pain that requires analgesia at the opioid level, usually in a post-operative setting. Toradol is the only NSAID indicated for treatment of pain available for parenteral use (i.e., IV or IM injection); it therefore provides an important therapeutic option for physicians and patients in settings where the patient cannot take analgesics by mouth.[7] This therapeutic advantage favors continued availability of Toradol, despite the need for a boxed warning about the potential for increased frequency of serious adverse reactions with long-term ($\geq 5$ days) use. In contrast, there are no data to support a unique therapeutic benefit for Bextra over other available NSAIDs, which might offset the increased risk of serious and potentially life-threatening skin reactions. While other COX-2 selective and non-selective NSAIDs also have a risk for these rare, serious skin reactions, the reported rate for these serious side effects appears to be greater for Bextra than for other COX-2 agents.[8] To date, the agency has received 7 reports of deaths from serious skin reactions in patients following treatment with Bextra. The occurrence of these serious skin reactions in individual patients is unpredictable, occurring with and without a history of sulfa allergy (valdecoxib is a

---

[6] The package insert for Arthrotec, a combination of diclofenac and misoprostol, includes a boxed warning, but the warning relates to potential toxicities of misoprostol, not diclofenac.

[7] Indomethacin is also available as a parenteral formulation, but is only indicated for parenteral use for treatment of patent ductus arteriosus.

[8] The agency has recently received a Citizens Petition regarding the risk of Stevens-Johnson syndrome with ibuprofen (February 15, 2005). Although the petition is currently under review, and the agency has not reached a decision on the requested actions, based on analyses of data obtained before the petition was submitted, the agency has determined that the labeling for non-prescription NSAIDs should be updated to warn of the potential for skin reactions. Accordingly, along with the changes to the label to address CV risks, the agency will ask manufacturers of non-prescription NSAIDs to make these changes.   After we have completed our review of the petition, we may determine that additional labeling changes with regard to potential skin reactions are warranted.  The risk for serious skin reactions is already included in the labeling for most prescription NSAIDs.

sulfonamide) and after both short- and long-term use, which makes attempts to manage this increased risk difficult.

Several non-selective NSAIDs are currently available to consumers without a prescription (e.g., ibuprofen, naproxen, ketoprofen). The non-prescription doses of these products are generally well below the maximum daily prescription doses for the same active ingredient and the duration of treatment without specific alternate instructions from a physician is limited to 10 to 14 days. The applicability of the increased risk of serious adverse CV events as described above from controlled clinical trials to low-dose, short-term use of these non-prescription products for the relief of acute pain is unclear, although any such risk is expected to be minimal. No signal for increased risk of serious adverse CV events has been detected in the short-term controlled clinical trials that supported the approval of these agents for treatment of acute pain. While these studies were primarily designed to evaluate effectiveness, the absence of a signal of increased CV risk provides some reassurance of the safety of short-term use. Further, with the exception of the parecoxib/valdecoxib CABG studies, the increased risk of serious adverse CV events in the controlled clinical trials described above have only become apparent after months to years of treatment. The parecoxib/valdecoxib data also provide support for the safety of short-term use. The two short-term placebo-controlled CABG studies showed an increased risk of serious CV events, but, a short-term placebo-controlled trial in general surgery patients did not show an increased risk. These data may suggest that in the absence of a predisposing condition, such as recent CABG surgery, the CV risk of short-term use of NSAIDs is very small, if any, particularly at low doses and given the typically intermittent nature of use of non-prescription NSAIDs for relief of acute pain.

Aspirin is also an NSAID that is available and widely used without a prescription. However, aspirin has other unique pharmacologic properties, including irreversible inhibition of platelet function, that distinguish it from the rest of the NSAID class. Further, data from long-term controlled clinical trials have clearly demonstrated that aspirin significantly reduces the risk of serious adverse CV events in certain patient populations (e.g., patients with a history of a MI). Aspirin, therefore, is an exception to the apparent "class effect" of increased risk for serious adverse CV events for NSAIDs described above. Data from large, long-term controlled clinical trials clearly showing no increased CV risk or a reduction in CV risk would be necessary before concluding that other NSAIDs are also exceptions to the class risk.

### Recommendations

We summarize below our recommendations for appropriate regulatory actions for the NSAID class and select individual agents.

### NSAIDs as a class

*Boxed Warning and Contraindication*

13

We recommend that the professional labeling (package insert) for all prescription NSAIDs, including both COX-2 selective and non-selective drugs, be revised to include a boxed warning highlighting the potential increased risk of CV events. The boxed warning should also include the well described risks of serious, and often life-threatening GI bleeding. We believe that a boxed warning with regard to potential increased CV risk is an appropriate response to the currently available data and will serve to highlight to physicians and patients that they must carefully consider the risks and benefits of all NSAIDs, as well as other available options, before deciding on a treatment plan for relief of chronic pain and inflammation. If it is determined that chronic use of an NSAID is warranted for an individual patient, the boxed warning will help to emphasize the importance of using the lowest effective dose for the shortest duration possible along with appropriate attention to reduction of other risk factors for cardiovascular disease. The language of the boxed warning should be standardized across the class, with the exception of those situations where specific data or other information is available for an individual drug. In those cases, the standardized class wording should be maintained and the drug specific information added, including the results of any large controlled clinical trials.

The recommendation for a boxed warning for potential increased risk of CV events is supported by the unanimous vote of the Advisory Committees (28 yes) on the question of whether the labeling for the non-selective NSAIDs should be modified to include the absence of long-term controlled clinical trial data to assess the potential CV effects of these drugs.[9] While the AC did not specifically vote on a boxed warning, many of the committee members commented that such a warning would be an appropriate response given the current data. The Advisory Committees also strongly supported boxed warnings for the individual COX-2 selective drugs for increased CV risk.

The recommendation that the boxed warning also include the well recognized serious, and often life-threatening, risk of GI bleeding associated with chronic use of NSAIDs is intended to further reinforce the existing bolded warning. The GI bleeding risk with NSAIDs is clearly consistent with our current approach to the use of boxed warnings, and placing this information in a boxed warning will serve to further emphasize this serious risk and ensure that physicians and patients keep this risk in mind as they are considering options for chronic therapy of pain and inflammation.

We also recommend that the labeling for all NSAIDs include a contraindication for use in patients in the immediate post-operative setting following CABG surgery. Data are only available in this setting from valdecoxib, but we have concluded that this short-term increased CV risk should be extrapolated to long-term use of valdecoxib. It is logical to also extrapolate this finding to other NSAIDs, pending the availability of other data that would suggest otherwise given the serious nature of the adverse events noted in the valdecoxib CABG study and the high-risk nature of the patients undergoing CABG surgery. The contraindication for NSAID use in this setting would NOT apply, however, to aspirin for the reasons noted above.

---

[9] There were 32 voting members of the Advisory Committees, but 4 members had left the meeting by the time this question was discussed.

14

*Medication Guide*

We recommend that the patient labeling for all prescription NSAIDs, including both COX-2 selective and non-selective drugs, include a Medication Guide. The Medication Guide should focus on the potential increased risk of serious adverse CV events and the risks of serious GI bleeding. The Medication Guide will also inform patients of the need to discuss with their doctor the risks and benefits of using NSAIDs and the importance of using the lowest effective dose for the shortest duration possible if treatment with an NSAID is warranted. To avoid confusion and to allow for more rapid implementation, we recommend that the text of the Medication Guide be standardized across the class, following the model that was recently successfully implemented for anti-depressants.

*Comprehensive Data Review and New Studies*

We recommend that the agency request that the sponsors of all non-selective NSAIDs conduct and submit for FDA review a comprehensive review and analysis of all available data from controlled clinical trials to further evaluate the potential risk of serious adverse CV events. The search and analysis strategy should be similar across sponsors and drugs. The agency should carefully review the data as they become available and take any appropriate regulatory actions based on the findings.

The agency should also work closely with sponsors of non-selective NSAIDs and other stakeholders (e.g., NIH, professional associations, patient groups) to encourage the conduct of additional long-term controlled clinical trials of the non-selective NSAIDs to better evaluate the potential for increased risk of serious adverse CV events.

## Non-prescription NSAIDs

We recommend that the NSAIDs that are currently available without a prescription for the short-term treatment of acute pain continue to be available to consumers. While this would apparently represent the first time that products that have a boxed warning in the prescription package insert would also be available for non-prescription use, we believe the available data support a conclusion that short-term use of low doses of the available non-prescription NSAIDs is not associated with an increased risk of serious adverse CV events. The overall benefit versus risk profile for the non-prescription NSAIDs remains very favorable when they are used according to the labeled instructions, and we believe that it is important to maintain a range of therapeutic options for the short-term relief of pain in the OTC market. Further, the other available non-prescription drugs for short-term relief of pain and fever can also be associated with serious, and potentially life-threatening, adverse events in certain settings and patient populations.

To further encourage the safe use of the non-prescription NSAIDs, we believe that the labeling for these products should be revised to include more specific information about the potential CV and GI risks, instructions about which patients should seek the advice of a physician before using these drugs, and stronger reminders about limiting the dose and duration of treatment in accordance with the package instructions unless otherwise advised

by a physician. In addition, as noted earlier, the agency has determined that the labeling for non-prescription NSAIDs should be revised to warn of the potential for skin reactions. We also recommend that the Agency continue its current consumer education efforts regarding the safe and effective use of non-prescription pain relievers and that this new information be highlighted in those campaigns.

## CELEBREX ®, NDA 20-998/NDA 21-156 (celecoxib capsules)

After carefully reviewing all the available data, we conclude that the benefits of celecoxib outweigh the potential risks in properly selected and informed patients. Therefore, we recommend that celecoxib remain available as a prescription drug with the revised labeling described below in addition to the NSAID class boxed warning, contraindication, and Medication Guide described above.

### Boxed warning and other labeling changes

We recommend that the boxed warning for Celebrex include specific reference to the controlled clinical trial data that demonstrate an increased risk of serious adverse CV events (e.g., the APC trial). The text in the box may be brief and include a reference to the CLINICAL PHARMACOLOGY, Clinical Studies section of the labeling where the available long-term controlled clinical trial data should be described in greater detail. Finally, we recommend that the INDICATIONS section of the labeling be revised to clearly encourage physicians to carefully weigh the potential benefits and risks of celecoxib and other treatment options for the condition to be treated before a decision is made to use Celebrex, and to use the lowest effective dose for the shortest duration consistent with individual patient treatment goals.

### Postmarketing study commitment

We strongly recommend that CDER request a written commitment from the sponsor to conduct an additional long-term study (or studies) to address the safety of celecoxib compared to naproxen and other appropriate active controls (e.g., other non-selective NSAIDs, appropriate non-NSAID active comparators). CDER should be actively involved in the design of the trial(s) and insist on aggressive timelines for initiation and completion of the study(ies).

The above recommendations are consistent with the votes and recommendations made by the Advisory Committees for Celebrex. The Advisory Committees were unanimous in their conclusion that an increased risk of cardiovascular adverse events has been demonstrated for celecoxib. After carefully considering all the available data, the Advisory Committees voted 31 yes to 1 no in response to the question: "Does the overall risk versus benefit profile of celecoxib support marketing in the US?" While specific votes were not taken on the issue of what labeling changes and other risk management options would be appropriate, the overwhelming majority of the Advisory Committee member voiced their support for a boxed warning, a Medication Guide, and postmarketing study commitments to further explore the long-term safety of Celebrex in comparison to other appropriate comparators.

16

BEXTRA ®, NDA 21-341 (valdecoxib tablets)

After carefully considering all the available data and risk management options, we have concluded that the overall risk versus benefit profile for Bextra is unfavorable at this time. We therefore recommend that Bextra be withdrawn from the U.S. market. We have concluded, as noted above, that Bextra has been demonstrated to be associated with an increased risk of serious adverse CV events in short-term CABG trials and that it is reasonable from a public heath perspective to extrapolate these findings to chronic use. The increased risk of serious adverse CV events alone, however, would not be sufficient to warrant withdrawal of Bextra since we have no data showing that Bextra is worse than other NSAIDs with regard to CV risk. Our recommendation for withdrawal is based on the fact that, in addition to this CV risk, valdecoxib already carries a boxed warning in the package insert for serious, and potentially life-threatening, skin reactions (e.g., toxic epidermal necrolysis, Stevens-Johnson syndrome, erythema multiforme) and FDA has received 7 spontaneous reports of deaths from these reactions. The reporting rate for these serious skin reactions appears to be greater for Bextra than other COX-2 selective agents. Further, the risk of these serious skin reactions in individual patients is unpredictable, occurring in patients with and without a prior history of sulfa allergy, and after both short- and long-term use, which makes risk management efforts difficult. To date, there have been no studies that demonstrate an advantage of valdecoxib over other NSAIDs that might offset the concern about these serious skin risks, such as studies that show a GI safety benefit, better efficacy compared to other products, or efficacy in a setting of patients who are refractory to treatment with other products.

The recommendation that Bextra be withdrawn is supported, at least in part, by the specific votes and recommendations of the Advisory Committees. The Advisory Committees were unanimous in their conclusion that an increased risk of cardiovascular adverse events has been demonstrated for valdecoxib. In response to the question "Does the overall risk versus benefit profile of valdecoxib support marketing in the US?" the Advisory Committees voted 17 yes and 13 no with 2 abstentions. Several of the advisory committee members who voted no expressed concerns about the strong signal of CV risk from the CABG trials, the absence of long-term controlled trial data to more clearly define the potential CV risks of Bextra, the fact that Bextra already carried a boxed warning for serious skin reactions, and the fact that there were no data to support a conclusion that Bextra offered a therapeutic advantage over NSAIDs.

One potential argument in favor of continued marketing of valdecoxib is that it provides an additional therapeutic option for management of arthritis and that prescribers and patients could be informed of the potential increased risk of CV events and serious GI bleeding, in addition to the potential for serious and possibly life-threatening skin reactions, and be allowed to make individualized treatment decisions. This approach, in fact, was strongly favored by practicing rheumatologists on the Advisory Committee. It is important to note, however, that there are more than 20 other NSAIDs on the market. This range of options diminishes the value of continued marketing of valdecoxib, particularly in the face of an already existing boxed warning regarding serious, and potentially life-threatening, skin

reactions and the fact that there are no data that demonstrate that valdecoxib offers any
therapeutic advantage over other NSAIDs.

We recommend that FDA request that Pfizer voluntarily withdraw Bextra from the U.S.
market. If Pfizer does not agree to that request, we recommend that FDA initiate the formal
withdrawal process by preparing and publishing a Notice of Opportunity for Hearing.

We recommend that FDA remain open to allowing limited access to valdecoxib under an
IND to those patients who believe that it is their best option, if the sponsor proposes such an
IND. If additional clinical trials subsequently demonstrate that valdecoxib does not have an
increased CV risk (or if its risk is significantly less than other available agents) or a
therapeutic advantage for valdecoxib over other NSAIDs, FDA should carefully consider
those data and reassess the current conclusions regarding the overall risks and benefits for
valdecoxib.

### VIOXX ®.   NDA 21-042 (rofecoxib tablets and oral suspension)

VIOXX was voluntarily withdrawn from the U.S. market by the sponsor on September 30,
2004, following the announcement of the results from the APPROVe trial. Therefore, no
regulatory action is warranted at this time. Should the sponsor seek to resume marketing for
rofecoxib, a supplemental NDA with revised labeling will be required. The supplemental
NDA would require FDA review and approval prior to implementation of the new labeling
since the changes would not be of the type allowed under FDA regulations for a "Changes
Being Effected (CBE)" labeling supplement  The supplemental application should
specifically outline the sponsor's proposal for revised labeling designed to provide for safe
and effective use of the drug in populations where the potential benefits of the drug may
outweigh potential risks, and all data and arguments that support resumption of marketing.

We believe that FDA should carefully review any such proposal submitted by the sponsor.
We would also recommend that the FDA Drug Safety Oversight Board (DSB) and an
advisory committee be consulted before a final decision is taken. Our rationale for
recommending review by the DSB and an advisory committee includes the following factors.
First, there is limited precedent for a drug that has been withdrawn from the U.S. market for
safety reasons to be returned to marketing. The only recent example that we can recall was
Lotronex, and that application was reviewed by an advisory committee before FDA reached
a final decision on the sponsor's request.[10]  Second, concerns were expressed at the recent
advisory committee meeting that Vioxx may be associated with a higher risk of increased
blood pressure, fluid retention, and congestive heart failure than other COX-2 selective
NSAIDs. We believe that these additional potential serious risks of Vioxx need to be fully
explored through a public process before a decision is made regarding resumed marketing.
Third, the recent advisory committee meeting was a general issues meeting, not one
specifically devoted to the issue of resumption of marketing of Vioxx. While the
committees narrowly voted in the affirmative that the overall risk versus benefit profile of
rofecoxib supported marketing in the U.S., the committee members expressed a wide variety

---

[10] The FDA Drug Safety Oversight Board had not been established at the time of the review of the Lotronex
resubmission.

of often contradictory opinions on what regulatory actions (e.g., labeling changes, risk management efforts) would be appropriate to allow resumed marketing. Specific votes were not taken on these important issues, and we believe the agency would benefit from the advice of an advisory committee meeting specifically devoted to the resumption of marketing of Vioxx before the FDA reaches a decision on final action. Finally, the withdrawal of Vioxx has been the subject of intense public interest and debate, and we believe that a transparent process for reaching an agency decision on resumption of marketing is needed to ensure public confidence in the agency's decision-making process.