# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **In re: VIOXX** | |
| **PRODUCTS LIABILITY LITIGATION** | **MDL DOCKET NO. 1657** |
| **This document relates to Case No. 06-0485** | **SECTION L** |
| | **JUDGE FALLON** |
| **GERALD D. BARNETT** | **MAGISTRATE JUDGE KNOWLES** |
| Plaintiff, | **Merck & Co., Inc.'s Notice of Filing Deposition Testimony of Edward Scolnick** |
| **v.** | |
| **MERCK & CO., INC.,** | **Exhibit A** |
| Defendant. | |

Merck hereby submits the following deposition testimony of Edward Scolnick for the Court's consideration and pre-trial rulings:

    1.    Merck's Affirmative Designations with Plaintiff's Objections, and Merck's Responses and the Court's prior rulings, where applicable;

    2.    Plaintiff's Counter-Designations with Merck's Objections

By June 20, 2006, Merck will submit a notebook for the Court with these designations and objections, as well as copies of the exhibits referenced herein. Merck's Affirmative Designations appear in blue, while Plaintiff's Counter-Designations appear in red.

The Court has previously ruled in the Plunkett case on many of the Plaintiff's objections to Merck's Affirmative Designations for Dr. Scolnick. For the instances where the Court previously overruled Plaintiff's objections, Merck did not include a specific response and respectfully requests that the Court stand by its previous ruling. Merck did, however, include


EXHIBIT
A

responses for Plaintiff's objections that were (1) sustained in the Plunkett cases or (2) were not previously addressed by the Court.

As the Court may know, Plaintiff has filed a separate transcript for Dr. Scolnick, which contains the Plaintiff's Affirmative Designations, Merck's Objections to them, Merck's Counter-Designations, and Plaintiff's Objections to Merck's Counter-Designations.  While there is some overlap between Plaintiff's and Merck's affirmative designations of Dr. Scolnick, there is also additional testimony in Merck's filing.  If the Court prefers, Merck would be happy to work with Plaintiff to provide the Court one complete transcript with all of the Scolnick designations from both parties.

**Gerald Barnett v. Merck & Co., Inc.**
**Deposition Designations of Edward Scolnick**
**Defendant's Designations are in Blue.  Plaintiff's Designations are in Red**

| | | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|---|
| 819:21 | - | 820:1 | Scolnick, Edward 2005-06-01 | |
| | 819: 21 | Q:  Good morning, Dr. Scolnick. Would | Pltf Obj: Cumulative. | |
| | 819: 22 | you please tell us your full name? | Dr. Scolnick will al- | |
| | 819: 23 | A:  Edward M. Scolnick. | ready have been intro- | |
| | 819: 24 | Q:  Dr. Scolnick, are you currently | duced to the jury. | |
| | 819: 25 | employed by Merck? | | |
| | 820: 1 | A:  No, I am not. | | |
| 820:5 | - | 822:9 | Scolnick, Edward 2005-06-01 | |
| | 820: 5 | Q:  Why are you no longer employed by | Pltf Obj:  R. 401, | |
| | 820: 6 | Merck? | R. 403,  R. 404 | |
| | 820: 7 | A:  I retired from Merck September 1st, | Def Resp:  Giving some | |
| | 820: 8 | 2004. | background information | |
| | 820: 9 | Q:  Can you tell us the reasons that you | about who the witness is | |
| | 820: 10 | retired from Merck in September of 2004? | is relevant and proper. | |
| | 820: 11 | A:  Yes. I retired to pursue other | Additionally, Plaintiff is | |
| | 820: 12 | interests that I've developed in the field of severe | attacking the witness's | |
| | 820: 13 | mental illness, specifically schizophrenia and | character and motives | |
| | 820: 14 | bipolar disorder. | and this background | |
| | 820: 15 | Q:  Where are you pursuing those | information is therefore | |
| | 820: 16 | interests right now? | even more relevant. | |
| | 820: 17 | A:  I'm pursuing interests at a | | |
| | 820: 18 | newly-formed genome institute called the Broad | | |
| | 820: 19 | Institute at MIT and Harvard, in the Harvard | | |
| | 820: 20 | hospitals. | | |
| | 820: 21 | Q:  What prompted your interest in this | | |
| | 820: 22 | field? | | |
| | 820: 23 | A:  My interests have been prompted by | | |
| | 820: 24 | unfortunate illnesses in some family members, | | |
| | 820: 25 | because of that, interactions that I've had in | | |
| | 821: 1 | service organizations that help families with family | | |
| | 821: 2 | members beset by either of these two illnesses. | | |
| | 821: 3 | Q:  Dr. Scolnick, can you just describe | | |
| | 821: 4 | for us generally the type of work you're currently | | |
| | 821: 5 | doing in this project? | | |
| | 821: 6 | A:  Yes. We have organized a new | | |
| | 821: 7 | initiative in this field to try to find the genetic | | |
| | 821: 8 | basis for these illnesses. It is well known for | | |
| | 821: 9 | many years that there's a heavy genetic basis for | | |
| | 821: 10 | both schizophrenia and bipolar disorder. The | | |

| | **Objection/Response in Barnett** | **Ruling in Plunkett** |
|---|---|---|

| | |
|---|---|
| 821: 11 | have not been found in this institute, which is |
| 821: 12 | world class in genetics, is interested in the |
| 821: 13 | problem, and I thought it was a wonderful |
| 821: 14 | opportunity to try to really make a difference in |
| 821: 15 | this field. |
| 821: 16 | Q:  Dr. Scolnick, are you married? |
| 821: 17 | A:  Yes, I am. |
| 821: 18 | Q:  How long have you been married? |
| 821: 19 | A:  Since 1965. 41 years. |
| 821: 20 | Q:  Do you have children? |
| 821: 21 | A:  Yes, three. |
| 821: 22 | Q:  Any grandchildren? |
| 821: 23 | A:  One. |
| 821: 24 | Q:  Granddaughter or grandson? |
| 821: 25 | A:  Granddaughter, recent vintage, about |
| 822: 1 | six months old. |
| 822: 2 | Q:  Where do you currently live? |
| 822: 3 | A:  We live in Wayland, Massachusetts. |

| | |
|---|---|
| 822: 4 | Q:  Dr. Scolnick, would you please tell |
| 822: 5 | us over what time period you were employed by |
| 822: 6 | A:  Yes. I started working at Merck in |
| 822: 7 | July 1982, and retired in September 1st, 2004. |
| 822: 8 | Q:  What was your role in the development |
| 822: 9 | of the drug Vioxx? |

**822:12  -  822:20**          Scolnick, Edward 2005-06-01

| | |
|---|---|
| 822: 12 | THE WITNESS:  During the development |
| 822: 13 | of Vioxx, I was president of the research |
| 822: 14 | laboratories and had the basic research group |
| 822: 15 | clinical groups, therefore, reporting to me, who |
| 822: 16 | initiated and carried out the project. |
| 822: 17 | BY MR. RABER: |
| 822: 18 | Q:  What were your general duties and |
| 822: 19 | responsibilities as the president of the Merck |
| 822: 20 | Research Lab? |

**822:23  -  823:4**          Scolnick, Edward 2005-06-01

| | |
|---|---|
| 822: 23 | THE WITNESS:  My general |
| 822: 24 | responsibilities were to oversee the quality of the |
| 822: 25 | science and clinical science and basic science |
| 823: 1 | was conducted by members of the laboratories. |
| 823: 2 | BY MR. RABER: |
| 823: 3 | Q:  During what period of time were you |
| 823: 4 | the president of the Merck Research Lab? |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

**823:7**   -   **823:9**                  Scolnick, Edward 2005-06-01

823: 7    THE WITNESS:  I was president of the
823: 8    laboratories from, it's either from late April or
823: 9    early May 1985 through January 1st, 2003.

**823:15**   -   **823:17**                  Scolnick, Edward 2005-06-01

823: 15   Q:  Can you tell us generally the
823: 16   backgrounds of the people who worked at MRL,
823: 17   Research Labs, while you were president?

**823:19**   -   **824:9**                  Scolnick, Edward 2005-06-01

823: 19   THE WITNESS:  We had people of
823: 20   varying scientific backgrounds, many people with
823: 21   medical degrees, training in various aspects of
823: 22   cellular and biochemical science, physiology,
823: 23   toxicology, drug metabolism, clinical research,
823: 24   statistics, a whole variety of disciplines.
823: 25   BY MR. RABER:
824: 1    Q:  About how many doctors and scientists
824: 2    worked within the Merck Research Labs division?
824: 3    A:  At the time I retired, the total
824: 4    number of persons in the laboratory and science
824: 5    close to 10,000. I think it was around 3,000 when I
824: 6    started.
824: 7    Q:  What type of research is done at
824: 8    Merck Research Labs and was done while you
824: 9    president of the division?

**824:11**   -   **825:4**                  Scolnick, Edward 2005-06-01

824: 11   THE WITNESS:  Most of the research
824: 12   was focused on finding new treatments or new
824: 13   preventions for serious medical illnesses that
824: 14   really had poor treatments or no treatments. That
824: 15   was the clear mantra of the laboratory.
824: 16   BY MR. RABER:
824: 17   Q:  Are there different types of research
824: 18   that are done in a research lab like MRL?
824: 19   A:  Yes. There's very basic research,
824: 20   which is sometimes described as discovery
824: 21   There's chemistry that goes on associated with
824: 22   There's also so-called development research,
824: 23   is the testing for safety and then clinical safety
824: 24   and efficacy of the compounds or vaccines that
824: 25   brought into development as potential new

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

|  |  |  |
|---|---|---|
| | 825: 1 | or preventions. |
| | 825: 2 | Q:  When you mentioned clinical efficacy, |
| | 825: 3 | is that another way to say that a drug works the |
| | 825: 4 | it's supposed to work or intended to work? |

**825:6**  -  **825:12**        Scolnick, Edward 2005-06-01

| | 825: 6 | THE WITNESS:  Clinical efficacy is -- |
|---|---|---|
| | 825: 7 | it means the testing in people to see whether the |
| | 825: 8 | drug works or does not work as you think it's |
| | 825: 9 | to, or sometimes it works even better than you |
| | 825: 10 | it is going to or not quite as well as you think it |
| | 825: 11 | is going to. It is trying to gather the clinical |
| | 825: 12 | data to see what a drug does in patients. |

**826:3**  -  **826:6**        Scolnick, Edward 2005-06-01

| | 826: 3 | Q:  During your time as the president of |
|---|---|---|
| | 826: 4 | Merck Research Labs, was there ever a time |
| | 826: 5 | did not have enough money or resources to do |
| | 826: 6 | development research for safety and efficacy? |

**826:9**  -  **826:12**        Scolnick, Edward 2005-06-01

| | 826: 9 | THE WITNESS:  No. We always had |
|---|---|---|
| | 826: 10 | sufficient resources to do anything clinical in |
| | 826: 11 | development with a drug to prove its efficacy and |
| | 826: 12 | safety. |

**829:1**  -  **829:6**        Scolnick, Edward 2005-06-01

| | 829: 1 | Q:  About how many new drugs were |
|---|---|---|
| | 829: 2 | developed during the time that you were the |
| | 829: 3 | president of Merck Research Labs? |
| | 829: 4 | A:  The numbers range from somewhere in |
| | 829: 5 | the range of 25 to 29, adding vaccines, drugs and |
| | 829: 6 | new combination treatments. |

**830:21**  -  **831:16**        Scolnick, Edward 2005-06-01

| | 830: 21 | Q:  I want to change the subject very |
|---|---|---|
| | 830: 22 | briefly here. |
| | 830: 23 | Dr. Scolnick, is there a division at |
| | 830: 24 | Merck that is responsible for the sales and |
| | 830: 25 | marketing of Merck's drugs? |
| | 831: 1 | A:  Yes, there are marketing divisions at |
| | 831: 2 | Merck responsible for the sales of Merck's drugs. |
| | 831: 3 | Q:  As president of the Merck Research |
| | 831: 4 | Labs, were you a part of that division? |
| | 831: 5 | A:  No, I was not a part of that |
| | 831: 6 | division. |

| | | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|---|
| | 831: 7 | Q: In what area is your field of medical | | |
| | 831: 8 | expertise? | | |
| | 831: 9 | A: My original training was in internal | | |
| | 831: 10 | medicine. I subsequently was trained in | | |
| | 831: 11 | biochemistry and genetics, and then extensive | | |
| | 831: 12 | training in cancer research and virus research. | | |
| | 831: 13 | After coming to Merck, learned many | | |
| | 831: 14 | new fields, pharmacology, some aspects of | | |
| | 831: 15 | research and the variety of disciplines that it | | |
| | 831: 16 | takes to develop -- discover and develop a drug. | | |
| 831:20 - 832:6 | | Scolnick, Edward 2005-06-01 | | |
| | 831: 20 | Q: Where did you go to college and where | | |
| | 831: 21 | did you go to medical school? | | |
| | 831: 22 | A: Went to Harvard College and Harvard | | |
| | 831: 23 | Medical School between 1957 and 1965. | | |
| | 831: 24 | Q: Why did you decide that you wanted to | | |
| | 831: 25 | go to medical school? | | |
| | 832: 1 | A: I decided in my college life that I | | |
| | 832: 2 | wanted to do something that was important, that | | |
| | 832: 3 | would help people, was interested in science, and | | |
| | 832: 4 | thought I could better satisfy my desires by going | | |
| | 832: 5 | to medical school than in going into pure basic | | |
| | 832: 6 | research. | | |
| 832:20 - 833:13 | | Scolnick, Edward 2005-06-01 | | |
| | 832: 20 | Q: Let's talk a little bit about what | | |
| | 832: 21 | you did after you graduated from medical school | | |
| | 832: 22 | Harvard. What did you do next? | | |
| | 832: 23 | A: After I graduated from medical school | | |
| | 832: 24 | at Harvard, I was two years of internal medicine | | |
| | 832: 25 | training at the Mass General internship and a first | | |
| | 833: 1 | year residency at the Mass General Hospital. | | |
| | 833: 2 | Q: Tell us what you did in general | | |
| | 833: 3 | during the time you were an intern and a resident. | | |
| | 833: 4 | A: Responsibilities were to take care of | | |
| | 833: 5 | any sick patient who came in the doors through | | |
| | 833: 6 | Mass General Hospital. The hospital was open to | | |
| | 833: 7 | patient, indigent or ability to pay. The hospital | Pltf Obj: R. 403, R. 404 | |
| | 833: 8 | staff and the trainees, as I was, were proud of the | Def. Resp: Giving some | |
| | 833: 9 | fact that we could take care of absolutely anybody | background information | |
| | 833: 10 | who walked in the door without asking any | about who the witness is | |
| | 833: 11 | and it was just a wonderful place to train and learn | is relevant and proper. | |
| | 833: 12 | medicine and how to take care of really sick | Additionally, Plaintiff is | |

| | | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|---|
| | 833: 13 | patients. | attacking the witness's | |
| 833:17 - 834:11 | | Scolnick, Edward 2005-06-01 | character and motives | |
| | 833: 17 | Q: When you finished your internship and | and this background | |
| | 833: 18 | residency at Massachusetts General, what did you | information is therefore | |
| | 833: 19 | next? | even more relevant. | |
| | 833: 20 | A: We moved to Maryland, I joined the | | |
| | 833: 21 | National Institutes of Health, in specific, the | | |
| | 833: 22 | National Heart, Lung and Blood Institute, where I | | |
| | 833: 23 | did basic genetics research for about two or three | | |
| | 833: 24 | years. | | |
| | 833: 25 | Q: What is the National Institute of | | |
| | 834: 1 | Health? | | |
| | 834: 2 | A: The National Institute of Health is a | | |
| | 834: 3 | government organization. It is part, I think, of | | |
| | 834: 4 | the Department of Health & Human Services, and | | |
| | 834: 5 | both conducts internal research in medical areas | | |
| | 834: 6 | try to improve the benefit of medicine for people, | | |
| | 834: 7 | and it also sponsors with grants and contracts a | | |
| | 834: 8 | great deal of extramural, so-called, outside of the | | |
| | 834: 9 | NIH, in university-based research, to try to find | | |
| | 834: 10 | the causes and insights into diseases that affect | | |
| | 834: 11 | people. | | |
| 834:15 - 837:7 | | Scolnick, Edward 2005-06-01 | | |
| | 834: 15 | Q: You mentioned NIH. Do people | | |
| | 834: 16 | sometimes refer to the National Institutes of | | |
| | 834: 17 | as NIH? | | |
| | 834: 18 | A: Yes. | | |
| | 834: 19 | Q: Why did you pursue this area of | | |
| | 834: 20 | genetics at NIH? | | |
| | 834: 21 | A: Genetics has been really a driving | | |
| | 834: 22 | force for medicine since the discovery of the | | |
| | 834: 23 | structure of DNA in 1953. It has always captivated | | |
| | 834: 24 | me as being the very essence of life, and by | | |
| | 834: 25 | studying it, you could learn about how life occurs | | |
| | 835: 1 | and how people develop. The laboratory I was | Pltf Obj: R. 401, R. 403, R. 404 | |
| | 835: 2 | fortunate enough to go to was a pioneer in | | |
| | 835: 3 | deciphering the so-called genetic code with | Def Resp: Giving | |
| | 835: 4 | Niremberg, and I was fortunate to be accepted to | some background | |
| | 835: 5 | lab. He was a terrific teacher and mentor, and it | information about who | |
| | 835: 6 | really stimulated my research scientific career. | the witness is | |
| | 835: 7 | Q: How long did you spend working in | is relevant and proper. | |
| | 835: 8 | that lab at NIH? | Additionally, Plaintiff is | |

| | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| 835: 9 | A: I worked for Dr. Niremberg for not | attacking the witness's | |
| 835: 10 | quite three years and finished my work there and | character and motives & | |
| 835: 11 | went on to the National Cancer Institute in either | this background | |
| 835: 12 | late '69 or '70, I don't recall. | information is therefore | |
| 835: 13 | Q: Is the National Cancer Institute | even more relevant. | |
| 835: 14 | affiliated in any way with NIH? | | |
| 835: 15 | A: Yes. It's one of the institutes | | |
| 835: 16 | within the National Institutes of Health, within | | |
| 835: 17 | NIH. | | |
| 835: 18 | Q: All right. Why did you decide to go | | |
| 835: 19 | work at the National Cancer Institute? | | |
| 835: 20 | A: Well, at the time, the underlying | | |
| 835: 21 | molecular causes of cancer were really completely | | |
| 835: 22 | unknown. This goes back to the late '60s and | | |
| 835: 23 | '70s. People who were more senior than I in | | |
| 835: 24 | felt strongly that the way to figure out what cancer | | |
| 835: 25 | was about was to try to use a genetic approach to | | |
| 836: 1 | it. And there were approaches using genetics | | |
| 836: 2 | available and there were one or two laboratories in | | |
| 836: 3 | the National Cancer Institute taking these | | |
| 836: 4 | approaches, and since I was interested in the | | |
| 836: 5 | general field and, again, wanted to do something | | |
| 836: 6 | important, chose that field to go into at that | | |
| 836: 7 | point. | | |
| 836: 8 | Q: How long did you spend working at the | | |
| 836: 9 | National Cancer Institute for NIH? | | |
| 836: 10 | A: I worked at the National Cancer | | |
| 836: 11 | Institute for about a dozen years, studying genes | | |
| 836: 12 | and viruses that cause cancer during that dozen | | |
| 836: 13 | years. | | |
| 836: 14 | Q: Can you tell us about any of the | Pltf Obj: R. 401, R. | Overruled |
| 836: 15 | research achievements of your group at NIH? | 403, R. 404 | |
| 836: 16 | A: Yes. I think the hallmark | | |
| 836: 17 | achievement was the discovery of a gene called | | |
| 836: 18 | oncogene, that is a gene that causes cancer that | | |
| 836: 19 | discovered in basic research we did, and | | |
| 836: 20 | the genetics, the biochemistry, the biochemical | | |
| 836: 21 | pathways in which it worked. And then the real | | |
| 836: 22 | piece de resistance discovery was made late in | | |
| 836: 23 | time at NIH, in 1982, when in collaboration with a | | |
| 836: 24 | laboratory at MIT we discovered that this gene | | |
| 836: 25 | altered in human bladder cancer, and it was the | | |
| 837: 1 | first example ever of an oncogene, a mutated | | |

| | | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|---|
| | 837: 2 | oncogene being identified as a cause of human | | |
| | 837: 3 | cancer, and it totally transformed the cancer field. | | |
| | 837: 4 | Thousands of people came into the field after that | | |
| | 837: 5 | and many, many important discoveries and | | |
| | 837: 6 | have emanated as a result of this very important | | |
| | 837: 7 | discovery. | | |
| **837:11** - **838:10** | | Scolnick, Edward 2005-06-01 | | |
| | 837: 11 | Q:  When did you end your time working at | | |
| | 837: 12 | the National Cancer Institute? | | |
| | 837: 13 | A:  It was in late June of 1982. | | |
| | 837: 14 | Q:  What did you do then? | | |
| | 837: 15 | A:  Moved to Merck. I had been recruited | | |
| | 837: 16 | there by Dr. Vagelos and Dr. Hillerman, who has | | |
| | 837: 17 | passed away, to build a molecular group in the | | |
| | 837: 18 | vaccine department that Dr. Hillerman was so | | |
| | 837: 19 | competently overseeing at that point. | | |
| | 837: 20 | Q:  What position did you take when you | | |
| | 837: 21 | joined Merck in 1982? | | |
| | 837: 22 | A:  I was recruited as an executive | | |
| | 837: 23 | director in the vaccine department. | | |
| | 837: 24 | Q:  Why did you decide to join Merck in | Pltf Obj:  R. 401 | Overruled |
| | 837: 25 | 1982? | R. 403 | |
| | 838: 1 | A:  I knew the reputation of the company | R. 404:  Merck's | |
| | 838: 2 | and what it had done in the past in discovering | "Good Acts" evidence | |
| | 838: 3 | medicines. I saw the opportunity that had been | is improper. | |
| | 838: 4 | discussed with me by Dr. Vagelos and Dr. | | |
| | 838: 5 | that I could apply my basic science background | Subject to Motion in | |
| | 838: 6 | interest in applying that to medicine by going there | Limine | |
| | 838: 7 | in ways that I could never have done staying at | | |
| | 838: 8 | and so I took that opportunity. | | |
| | 838: 9 | Q:  What was new or different to the | | |
| | 838: 10 | approach you had about dealing with viruses? | | |
| **838:12** - **839:11** | | Scolnick, Edward 2005-06-01 | | |
| | 838: 12 | THE WITNESS:  Well, we were used to | | |
| | 838: 13 | studying viruses from a very molecular | | |
| | 838: 14 | as how they grew, how they reproduced | | |
| | 838: 15 | how they cause disease, and up until that point in | | |
| | 838: 16 | the vaccine department, the major approach, | | |
| | 838: 17 | in fact, had been very successful, was to make | | |
| | 838: 18 | so-called live virus vaccines, that is, examples of | | |
| | 838: 19 | that are the mumps vaccine, the measles vaccine, | | |
| | 838: 20 | rubella vaccine called MMR that so many children | | |

| | | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|---|
| | 838: 21 | get. And their approach was consistent over a | | |
| | 838: 22 | number of years in that they would grow these | | |
| | 838: 23 | viruses outside humans in cultured cells, so that | | |
| | 838: 24 | they no longer caused disease, but they could still | | |
| | 838: 25 | replicate when put back into people and cause | | |
| | 839: 1 | of an antibody response to protect the people | | |
| | 839: 2 | the real disease. That was a technology they | | |
| | 839: 3 | developed and perfected. | | |
| | 839: 4 | It was now clear in the world of | | |
| | 839: 5 | science that you could make vaccines in more | | |
| | 839: 6 | molecular ways without using live attenuated | | |
| | 839: 7 | viruses, and that was the difference in approaches | | |
| | 839: 8 | we took when I came to Merck. | | |
| | 839: 9 | BY MR. RABER: | | |
| | 839: 10 | Q: You then were promoted to the | | |
| | 839: 11 | president of MRL in 1985; is that correct? | | |
| 839:14 | - 839:19 | Scolnick, Edward 2005-06-01 | | |
| | 839: 14 | THE WITNESS: Yes. I was promoted in | | |
| | 839: 15 | order to head of the department of vaccine | | |
| | 839: 16 | a year after I came to Merck, six months after that | | |
| | 839: 17 | to be head of basic discovery research, and then | | |
| | 839: 18 | year-and-a-half or so roughly after that I became | | |
| | 839: 19 | president of MRL. | | |
| 852:15 | - 852:18 | Scolnick, Edward 2005-06-01 | | |
| | 852: 15 | Q: Dr. Scolnick, would it be fair to say | | |
| | 852: 16 | that Vioxx was an important new drug for Merck at | | |
| | 852: 17 | that time? | | |
| | 852: 18 | A: Yes. | | |
| 852:20 | - 854:1 | Scolnick, Edward 2005-06-01 | | |
| | 852: 20 | THE WITNESS: Yes, it definitely was | | |
| | 852: 21 | an important new drug for Merck. | | |
| | 852: 22 | BY MR. RABER: | | |
| | 852: 23 | Q: Would you call it a potential | | |
| | 852: 24 | blockbuster for Merck? | | |
| | 852: 25 | A: Yes, I would. We knew it would be | | |
| | 853: 1 | medically very important, and drugs that are | | |
| | 853: 2 | medically important usually turn out to be | | |
| | 853: 3 | blockbusters. | | |
| | 853: 4 | Q: Was it important for Merck to have a | | |
| | 853: 5 | blockbuster drug at that time? | | |
| | 853: 6 | A: Yes, it was. | | |
| | 853: 7 | Q: Why is that? | | |

|  |  | **Objection/Response in Barnett** | **Ruling in Plunkett** |
|---|---|---|---|

| | | |
|---|---|---|
| 853: 8 | A:  Merck faced the expiration of patents | |
| 853: 9 | like Mevacor and Zocor around the turn of the | |
| 853: 10 | -- I'm sorry, Mevacor and Vasotec -- not Zocor, | |
| 853: 11 | Mevacor and Vasotec around the turn of the | |
| 853: 12 | and Vioxx was an important drug because of that. | |
| 853: 13 | Q:  Dr. Scolnick, did there come a point | |
| 853: 14 | where you learned that there was a competing | |
| 853: 15 | out there, in other words, another COX-2 inhibitor | |
| 853: 16 | that was being developed? | |
| 853: 17 | A:  Yes. Somewhere in the mid-'90s, I | |
| 853: 18 | don't recall the exact time, we learned that | |
| 853: 19 | competing -- another company had a competing | |
| 853: 20 | product. | |
| 853: 21 | Q:  What was the name of that company? | |
| 853: 22 | A:  I think it was Searle. I'm not sure | |
| 853: 23 | if it was Monsanto or Searle at that point, and the | |
| 853: 24 | competing product turned out to be Celebrex. | |
| 853: 25 | Q:  Did Merck want to be the first one to | |
| 854: 1 | come to market? | |

**854:4    -    854:10**          Scolnick, Edward 2005-06-01

| | |
|---|---|
| 854: 4 | THE WITNESS:  Yes, we did. We |
| 854: 5 | clearly wanted to be the first to come to market. |
| 854: 6 | BY MR. RABER: |
| 854: 7 | Q:  Why is that? |
| 854: 8 | A:  Because the first to come to market |
| 854: 9 | usually has the greatest chance of having their |
| 854: 10 | be the most successful and the most widely used. |

**855:9    -    855:23**          Scolnick, Edward 2005-06-01

| | |
|---|---|
| 855: 9 | Q:  Dr. Scolnick, what role did your |
| 855: 10 | desire to have Vioxx be the first drug to market |
| 855: 11 | play in your decisions about safety? |
| 855: 12 | A:  Despite the fact we wanted to be |
| 855: 13 | first, we wanted to be sure what the dosing was |
| 855: 14 | because of the issues of hypertension and |
| 855: 15 | we wanted to prove unambiguously the improved |
| 855: 16 | profile by endoscopy before we went to market. |
| 855: 17 | Although it was widely known and in a sense |
| 855: 18 | ahead of time that COX-2 inhibitors would be |
| 855: 19 | for the stomach, we wanted the proof that we |
| 855: 20 | get by the endoscopy studies. So, we took the |
| 855: 21 | to very, very carefully do that so that we could |
| 855: 22 | document that as part of the initial submission for |

| | | | | **Objection/Response in Barnett** | **Ruling in Plunkett** |
|---|---|---|---|---|---|
| | 855: 23 | | the drug. | | |
| 856:2 | - | 856:11 | Scolnick, Edward 2005-06-01 | | |
| | 856: 2 | | Q: Which drug came to market first, | | |
| | 856: 3 | | Celebrex or Vioxx? | | |
| | 856: 4 | | A: Celebrex came to market first. | | |
| | 856: 5 | | Q: Why is that? | Pltf Obj: R. 404, | Overruled |
| | 856: 6 | | A: I don't know the details of why it | R. 602: lack of personal | |
| | 856: 7 | | came to market first. I always felt that it was | knowledge and | |
| | 856: 8 | | because we had spent the time on these | speculative "I don't | |
| | 856: 9 | | safety studies and other studies that I described to | know the details." | |
| | 856: 10 | | you in order to have really meticulous clinical | | |
| | 856: 11 | | data. | | |
| 856:23 | - | 858:16 | Scolnick, Edward 2005-06-01 | | |
| | 856: 23 | | Q: Can you please tell us what was your | | |
| | 856: 24 | | view about patient safety as president of Merck | | |
| | 856: 25 | | Research Labs? | | |
| | 857: 1 | | A: My view on patient safety was well | | |
| | 857: 2 | | known to every scientist in the laboratory, | | |
| | 857: 3 | | repeatedly told people that patient safety came | | |
| | 857: 4 | | first, that if we had a drug that was ready to go | | |
| | 857: 5 | | into the clinic and undergoing animal safety | | |
| | 857: 6 | | or was in the clinic already and had gone through | | |
| | 857: 7 | | stages of animal safety testing, that if any serious | | |
| | 857: 8 | | event occurred in animals or in people in such a | | |
| | 857: 9 | | program, that I wanted to be the first or among the | | |
| | 857: 10 | | very first who would know about that so that I | | |
| | 857: 11 | | participate in the decision of potentially stopping | | |
| | 857: 12 | | such a program. | | |
| | 857: 13 | | Q: How did your view about patient | | |
| | 857: 14 | | safety influence your management style? | | |
| | 857: 15 | | A: I was very demanding on that point to | | |
| | 857: 16 | | people. I was a perfectionist in that regard. I | | |
| | 857: 17 | | often reiterated that. I wanted people to present | | |
| | 857: 18 | | all of the data that they had whenever a safety | | |
| | 857: 19 | | issue came up, analyze it in every which way, and | | |
| | 857: 20 | | constantly would go back over it even after first | | |
| | 857: 21 | | presentations to make sure that whatever had | | |
| | 857: 22 | | said and whatever had been presented was | | |
| | 857: 23 | | and was there more that we could do to reassure | | |
| | 857: 24 | | ourselves. | | |
| | 857: 25 | | Q: As the president of Merck Research | | |
| | 858: 1 | | Labs how did you attempt to ensure the integrity of | | |

| | **Objection/Response in Barnett** | **Ruling in Plunkett** |
|---|---|---|

| | | |
|---|---|---|
| 858: 2 | the data from Merck studies? | |
| 858: 3 | A:  I tried to ensure the integrity by, | |
| 858: 4 | A, emphasizing that we would not tolerate | |
| 858: 5 | but authentic data; and, secondly, by the | |
| 858: 6 | appointments I made to critical positions in | |
| 858: 7 | clinical development. The people that headed | |
| 858: 8 | clinical research, regulatory affairs and | |
| 858: 9 | biostatistics who were present during most of my | |
| 858: 10 | time as president were honest, hard working, | |
| 858: 11 | meticulous people who I felt that I could trust | |
| 858: 12 | completely to tell me if there was a safety problem | |
| 858: 13 | about something in the areas that they were | |
| 858: 14 | with, and the same true of the head of safety | |
| 858: 15 | assessment at Merck, who reported to me for a | |
| 858: 16 | of years while I was president of MRL. | |

**860:7   -   860:14**   Scolnick, Edward 2005-06-01

| | | |
|---|---|---|
| 860: 7 | Q:  Did you encourage scientific debate | |
| 860: 8 | within Merck? | |
| 860: 9 | A:  I demanded it. I had no tolerance | |
| 860: 10 | for people who didn't understand their data, hadn't | |
| 860: 11 | analyzed their data, and couldn't discuss the pros | |
| 860: 12 | and cons of projects that they were in charge of, | |
| 860: 13 | the good things, the bad things, what the issues | |
| 860: 14 | were. I actually demanded that from everybody. | |

**860:17   -   860:22**   Scolnick, Edward 2005-06-01

| | | |
|---|---|---|
| 860: 17 | Q:  Dr. Scolnick, did you ever make any | |
| 860: 18 | decisions as president of Merck Research Labs to | |
| 860: 19 | stop the development of a drug? | |
| 860: 20 | A:  Yes, of course. | |
| 860: 21 | Q:  What kinds of considerations were in | |
| 860: 22 | play in those decisions? | |

**860:24   -   863:6**   Scolnick, Edward 2005-06-01

| | | |
|---|---|---|
| 860: 24 | THE WITNESS:  Sometimes programs were | |
| 860: 25 | stopped due to lack of efficacy of the compound at | |
| 861: 1 | the clinic that didn't work, and often they were | |
| 861: 2 | stopped because of safety problems that arose | |
| 861: 3 | in animals on a promising drug or occasionally in | |
| 861: 4 | trials in humans. | |
| 861: 5 | BY MR. RABER: | |
| 861: 6 | Q:  Can you give us any examples of a | |
| 861: 7 | situation where you terminated the development | |
| 861: 8 | drug over safety concerns? | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

861: 9    A: Yes. I can give you several examples
861: 10   of that.
861: 11   One of the most painful ones was a
861: 12   precursor to Singulair, a compound for the
861: 13   for asthma, that almost got as far as a Phase III
861: 14   study in humans. The drug was working well, and
861: 15   very small number or percentage of patients
861: 16   developed abnormalities of liver function, and we
861: 17   terminated the program because we recognized
861: 18   was a signal in people and that we didn't want that
861: 19   risk.
861: 20   We stopped the development of a
861: 21   special dosage form of Zocor, which was our
861: 22   cholesterol-lowering drug in competition with
861: 23   atorvastatin, and we were trying to develop a
861: 24   special formulation for a higher dose of Zocor and
861: 25   found in humans, despite the excitement about
862: 1    dosage form, that it caused side effects in people,
862: 2    and we immediately stopped the program. People,
862: 3    fact, who were in charge of the program, knowing
862: 4    that I would want to know, actually called me in
862: 5    England to tell me about this and to tell me they
862: 6    were stopping the program, they thought it was so
862: 7    important, and they knew I would want to know
862: 8    it.
862: 9    We stopped development in the late
862: 10   '90s of a very, very promising compound in the
862: 11   psychiatric area that would have been a dramatic
862: 12   improvement over a class of drugs called
862: 13   benzodiazepines, which are used to treat anxiety
862: 14   problems and psychosis in humans. This drug
862: 15   much more selective for the receptors in that
862: 16   pharmacology field. It produced all the benefits
862: 17   and lacked most of the significant deficits and
862: 18   problems associated with those drugs, and it was
862: 19   very painful in that it was just a whisper of
862: 20   potential for this drug to alter the structure of
862: 21   DNA, to be a mutagen, and I decided it was not
862: 22   that risk because the data was real, although the
862: 23   evidence was slight, and we stopped the
862: 24   of that drug. And there are two or three examples.
862: 25   Q: Why did you stop the development of
863: 1    those drugs when the safety was called into

|  |  | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| 863: 2 | question? | | |
| 863: 3 | A:  Because I looked at myself first as a | | |
| 863: 4 | physician in my position, and I always wanted to | | |
| 863: 5 | look out for the patient safety as well as the way | | |
| 863: 6 | our drugs worked and benefited patients. | | |

**876:16    -    878:3**          Scolnick, Edward 2005-06-01

| 876: 16 | Q:  Dr. Scolnick, are you familiar with |
|---|---|
| 876: 17 | something called an FDA Advisory Committee? |
| 876: 18 | A:  Yes. |
| 876: 19 | Q:  What is an FDA Advisory Committee? |
| 876: 20 | A:  An FDA Advisory Committee is a group |
| 876: 21 | of outside scientists with various disciplines |
| 876: 22 | convened solely by the FDA, composition |
| 876: 23 | solely by the FDA, that they call upon to review |
| 876: 24 | many new drug applications that come to them, |
| 876: 25 | especially on any new drug that would have a new |
| 877: 1 | mechanism of action, and it's a province of the |
| 877: 2 | It's been there for a very, very long period of |
| 877: 3 | time. |
| 877: 4 | Q:  Was there an FDA Advisory Committee |
| 877: 5 | meeting that occurred relating to the approval of |
| 877: 6 | Vioxx? |
| 877: 7 | A:  Yes, definitely. |
| 877: 8 | Q:  Was that meeting open to the public? |
| 877: 9 | A:  Oh, yes. |
| 877: 10 | Q:  Can you tell us generally what |
| 877: 11 | occurred at that meeting? |
| 877: 12 | A:  Yes. What occurs at that meeting is |
| 877: 13 | the same that occurs at all meetings of the |
| 877: 14 | Committee. The sponsor submits a background |
| 877: 15 | to the FDA that they give to the Advisory |
| 877: 16 | The FDA prepares its own review of the |
| 877: 17 | which it gives to the committee ahead of time. The |
| 877: 18 | sponsor then comes and makes a presentation on |
| 877: 19 | data, quizzed for as long and as extensively as the |
| 877: 20 | Advisory Committee wants on any question about |
| 877: 21 | data. Has to answer it. The FDA presents their |
| 877: 22 | interpretation of the data, their analysis of the |
| 877: 23 | data. Again, the committee gets a chance to |
| 877: 24 | questions, ask questions, get them answered. |
| 877: 25 | goes on for several hours, and then eventually the |
| 878: 1 | committee is asked to vote on questions that the |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

|  |  |
|---|---|
| 878: 2 | gives them that relate to the safety, efficacy and |
| 878: 3 | approvability of the drug. |

**878:7** - **878:12**   Scolnick, Edward 2005-06-01

| 878: 7 | Q:  The process that you've just |
| 878: 8 | described, did that occur with respect to Vioxx |
| 878: 9 | before Vioxx was approved? |
| 878: 10 | A:  Oh, yes. |
| 878: 11 | Q:  I would like to show you a document |
| 878: 12 | that we'll mark as Exhibit 102. |

**878:21** - **879:24**   Scolnick, Edward 2005-06-01

| 878: 21 | Q:  Dr. Scolnick, can you identify |
| 878: 22 | Exhibit 102, please? |
| 878: 23 | A:  Yes. It's a letter to Dr. Robert |
| 878: 24 | Silverman, who was a senior director in the Merck |
| 878: 25 | Research Lab, regulatory affairs department. It is |
| 879: 1 | a letter that comes to him from Dr. Robert DeLap, |
| 879: 2 | M.D., Ph.D., who is director of drug evaluation at |
| 879: 3 | the FDA, and it relates to the new drug application |
| 879: 4 | of Vioxx. |
| 879: 5 | Q:  Dr. Scolnick, what is the date of |
| 879: 6 | this letter from the FDA? |
| 879: 7 | A:  I believe it's May 20, 1999. |
| 879: 8 | Q:  Sir, I would like you to take a look, |
| 879: 9 | if you would, at the first page of Exhibit 102, and |
| 879: 10 | I'm going to ask you, if you would, please, to read |
| 879: 11 | out loud the fourth paragraph of this letter. |
| 879: 12 | A:  The one that begins 'We have'? |
| 879: 13 | Q:  Yes. |
| 879: 14 | A:  The paragraph says, 'We have |
| 879: 15 | completed the review of this application, as |
| 879: 16 | amended, and have concluded that adequate |
| 879: 17 | information has been presented to demonstrate |
| 879: 18 | the drug product is safe and effective for use as |
| 879: 19 | recommended in the enclosed labeling text. |
| 879: 20 | Accordingly, the application is approved effective |
| 879: 21 | on the date of this letter.' |
| 879: 22 | Q:  Is this letter what is known as the |
| 879: 23 | approval letter for Vioxx? |
| 879: 24 | A:  Yes, I believe so. |

**885:25** - **886:6**   Scolnick, Edward 2005-06-01

| 885: 25 | Did there come a point in time when |
| 886: 1 | you saw the results from the VIGOR study? |

| | | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|---|
| | 886: 2 | A: Yes. | | |
| | 886: 3 | Q: When did that occur? | | |
| | 886: 4 | A: March 9, 2000. | | |
| | 886: 5 | Q: Were you among the first people at | | |
| | 886: 6 | Merck to see those results? | | |
| **886:9** - **886:16** | | Scolnick, Edward 2005-06-01 | | |
| | 886: 9 | THE WITNESS: I think I was shown the | | |
| | 886: 10 | data or sent the data after the project team | | |
| | 886: 11 | initially saw it and analyzed it, so, in that sense, | | |
| | 886: 12 | I was among the first, but I was not in the very | | |
| | 886: 13 | first group. | | |
| | 886: 14 | BY MR. RABER: | | |
| | 886: 15 | Q: What was your initial reaction to the | | |
| | 886: 16 | VIGOR results? | | |
| **886:19** - **887:4** | | Scolnick, Edward 2005-06-01 | | |
| | 886: 19 | THE WITNESS: I was extremely pleased | | |
| | 886: 20 | at the GI outcomes which were much better for | | |
| | 886: 21 | than naproxen, even the 50 milligrams of Vioxx, | | |
| | 886: 22 | I was stunned and surprised at the cardiovascular | | |
| | 886: 23 | differences seen in the trial between naproxen | | |
| | 886: 24 | Vioxx. I did not expect to see such a result. | | |
| | 886: 25 | BY MR. RABER: | | |
| | 887: 1 | Q: Did you ever put down that initial | | |
| | 887: 2 | reaction in writing? | | |
| | 887: 3 | A: Yes, I did. I sent an e-mail to some | | |
| | 887: 4 | members of the project team stating that. | | |
| **887:19** - **889:9** | | Scolnick, Edward 2005-06-01 | | |
| | 887: 19 | Q: Dr. Scolnick, is Exhibit 14 in front | | |
| | 887: 20 | of you, the e-mail that you just referred to? | | |
| | 887: 21 | A: Yes, it is. | | |
| | 887: 22 | Q: In your e-mail you write: 'To all: | | |
| | 887: 23 | I just received and went through the data. Thank | | |
| | 887: 24 | you for sending it to me. There is no doubt about | | |
| | 887: 25 | the pub data. Very very strong. As expected.' Do | | |
| | 888: 1 | you see that? | | |
| | 888: 2 | A: Yes, I do. | | |
| | 888: 3 | Q: What is the 'pub data'? | | |
| | 888: 4 | A: PUB is shorthand for perforations, | | |
| | 888: 5 | ulcers and bleeds. Those were the serious side | | |
| | 888: 6 | effects of prior nonsteroidals that everyone | | |
| | 888: 7 | to know about. | | |
| | 888: 8 | Q: When you say 'Very very strong. As | | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

888: 9     expected,' what were you referring to?

888: 10    A:  I was referring to the fact that the

888: 11    first look at the data, there seemed to be a

888: 12    dramatic increase in the number of those

888: 13    naproxen in the study.

888: 14    Q:  You go on to say: 'General safety is

888: 15    better than could hope for in this patient

888: 16    population. Incidences of hypertension, renal

888: 17    anything, edema, liver, all great - very safe.

888: 18    Very, very safe.' Do you see that?

888: 19    A:  Yes, I do.

888: 20    Q:  When you are talking about 'better

888: 21    than could hope for in this patient population,'

888: 22    what does that refer to?

888: 23    A:  These patients were patients who had

888: 24    rheumatoid arthritis, a very serious illness. Many

888: 25    of them would be on steroids in addition to

889: 1     nonsteroidal anti-inflammatories, some other

889: 2     medications also, and a somewhat fragile patient

889: 3     population in that regard. Therefore, whenever

889: 4     tests any kind of drug in a patient population

889: 5     that's sick to begin with, as these patients were,

889: 6     one worries that one might see side effects that

889: 7     would show up in an unexpected way, and those

889: 8     not seen and not detected in the trial, and I was

889: 9     very pleased about that.

**889:18    -    890:11**          Scolnick, Edward 2005-06-01

889: 18    Q:  Dr. Scolnick, you then go to say,

889: 19    'The CV events are clearly there.' Do you see

889: 20    A:  Yes, I do.

889: 21    Q:  What does that refer to?

889: 22    A:  What I was referring to was the

889: 23    reports of the cardiovascular events in the two

889: 24    of the trial and that the two curves were different,

889: 25    the incidence of curves were clearly

890: 1     distinguishable.

890: 2     Q:  There was a difference in the number

890: 3     of CV events between the Vioxx group and the

890: 4     naproxen group. Is that what you're saying?

890: 5     A:  Yes, that's exactly what I'm saying.

890: 6     Q:  Further down you say, 'it is

890: 7     mechanism based as we worried it was.' Do you

| | | | **Objection/Response in Barnett** | **Ruling in Plunkett** |
|---|---|---|---|---|
| | 890: 8 | that? | | |
| | 890: 9 | A:  Yes, I do. | | |
| | 890: 10 | Q:  What does it mean when you say 'it is | | |
| | 890: 11 | mechanism based'? What were you referring to? | | |
| **890:14** - **894:13** | | Scolnick, Edward 2005-06-01 | | |
| | 890: 14 | THE WITNESS:  Well, as part of my | | |
| | 890: 15 | initial reaction, as I've described many times, I | | |
| | 890: 16 | hadn't expected these results, and my very first | | |
| | 890: 17 | reaction was that Vioxx had elevated the rate as | | |
| | 890: 18 | opposed to naproxen lowering the rate, and my | | |
| | 890: 19 | connection was to the prostacyclin hypothesis, | | |
| | 890: 20 | was my set of first thoughts when I saw the data. | | |
| | 890: 21 | That's what I was talking about, since COX-2 | | |
| | 890: 22 | inhibitors had been shown to lower prostacyclin in | | |
| | 890: 23 | the urine. | | |
| | 890: 24 | BY MR. RABER: | | |
| | 890: 25 | Q:  You go on to say at the end of this | | |
| | 891: 1 | e-mail 'We have a great drug' and you say 'The | | |
| | 891: 2 | will do well.' Do you see those references? | | |
| | 891: 3 | A:  Yes, I do. | | |
| | 891: 4 | Q:  What did you mean by that? | | |
| | 891: 5 | A:  Well, that even if these results were | | |
| | 891: 6 | caused by Vioxx as opposed to not being caused | | |
| | 891: 7 | Vioxx, the incidence was low, we could change | | |
| | 891: 8 | label to reflect the results, the drug still had a | | |
| | 891: 9 | significant benefit to patients, and people and we | | |
| | 891: 10 | would learn how to use it safely in people and still | | |
| | 891: 11 | produce the benefit with an articulation of what | | |
| | 891: 12 | could have been a known risk at that point -- what | | |
| | 891: 13 | thought was a known risk at that point. | | |
| | 891: 14 | Q:  Dr. Scolnick, did there come a time | | |
| | 891: 15 | when members of the Vioxx team informed you | | |
| | 891: 16 | there might be another explanation for the | | |
| | 891: 17 | difference in the CV events between Vioxx and | | |
| | 891: 18 | naproxen? | | |
| | 891: 19 | A:  Yes. Subsequently to this, and I | | |
| | 891: 20 | don't recall whether it was this evening or the next | | |
| | 891: 21 | day, members of the team told me they, in fact, | | |
| | 891: 22 | thought there was a very plausible and more likely | | |
| | 891: 23 | explanation for the differences in the event rates | | |
| | 891: 24 | in the two arms of the trial. | | |
| | 891: 25 | Q:  What did you instruct the Vioxx team | | |

| | **Objection/Response in Barnett** | **Ruling in Plunkett** |
|---|---|---|
| 892: 1 | members to do at that point? | |
| 892: 2 | A:  Well, they told me point that because | |
| 892: 3 | naproxen was at this dose twice a day, 500 | |
| 892: 4 | milligrams twice a day, had potent anti-platelet | |
| 892: 5 | activity, that the more plausible explanation was | |
| 892: 6 | that naproxen had actually lowered the CV event | |
| 892: 7 | in the trial. So, I said to them, well, that sounds | |
| 892: 8 | good, but what other evidence is there to support | |
| 892: 9 | that? So, let's look back at all of our clinical | |
| 892: 10 | trial data and see if there's any other evidence for | |
| 892: 11 | that, and what other evidence can you find that | |
| 892: 12 | naproxen or drugs like naproxen couldn't be | |
| 892: 13 | cardioprotective. | |
| 892: 14 | Q:  Did the Vioxx team present you with | |
| 892: 15 | any evidence of naproxen's ability to inhibit | |
| 892: 16 | platelets the way that they had described? | |
| 892: 17 | A:  Yes. They told me about it and I | |
| 892: 18 | believe showed me a graph which showed that | |
| 892: 19 | 500 milligrams twice a day was potent, had a | |
| 892: 20 | anti-platelet effect throughout the day and | |
| 892: 21 | that to ibuprofen and diclofenac, two other | |
| 892: 22 | of the class which did not in their usual dosage | |
| 892: 23 | regimens have that kind of effect, and, therefore, | |
| 892: 24 | naproxen was unique as a prototypical | |
| 892: 25 | anti-inflammatory drug. | |
| 893: 1 | Q:  That data about naproxen that you | |
| 893: 2 | were shown, was that data that had been obtained | |
| 893: 3 | a Merck-related study? | |
| 893: 4 | A:  The biochemistry data I'm talking | |
| 893: 5 | about in people, I think, was in a Merck study, yes, | |
| 893: 6 | clinical pharmacology study. | |
| 893: 7 | Q:  That data, were you aware of that | |
| 893: 8 | data when you wrote your e-mail on March 9, | |
| 893: 9 | A:  No. I had not been aware of it. I | |
| 893: 10 | was very surprised at this data and had not heard | |
| 893: 11 | about the naproxen effect before they told me | |
| 893: 12 | it. | |
| 893: 13 | Q:  In your words, what did that data | |
| 893: 14 | about naproxen suggest to you at that point? | |
| 893: 15 | A:  Well, at that point, my thinking, I | |
| 893: 16 | thought, well, they have a plausible hypothesis | |
| 893: 17 | here. This is certainly -- based on the | |
| 893: 18 | anti-platelet activity, they could be seeing a | |

19

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

893: 19    naproxen-protective effect. I wanted them to look

893: 20    at all our other clinical trial data again and was

893: 21    really struggling with trying to find a way to get

893: 22    more placebo-controlled data. Because in this

893: 23    trial, what we had from our database at that point

893: 24    was, on the one hand we had Vioxx versus all the

893: 25    nonsteroidals which had been tested in our trials,

894: 1    Phase IIb/III trials and extensions where we had

894: 2    seen no difference in cardiovascular event rates.

894: 3    Then now we had a trial where at 50 milligrams of

894: 4    Vioxx versus naproxen we had a difference, and

894: 5    were two different databases, neither of which had

894: 6    placebo against it. So, their interpretation based

894: 7    on the anti-platelet activity was naproxen had

894: 8    lowered the heart attack rate consistent with the

894: 9    fact that it was different biochemically from other

894: 10    nonsteroidals and Vioxx was not different from

894: 11    in CV events. I said the tie breaker here has to be

894: 12    placebo data, and how much placebo data do we

894: 13    see if Vioxx is different from placebo.

**894:16   -   895:25**    Scolnick, Edward 2005-06-01

894: 16    Q:  Before we get to placebo data, did

894: 17    the Vioxx project team provide you with any other

894: 18    biochemical or pharmacological information that

894: 19    suggested a drug like naproxen could inhibit

894: 20    platelets like aspirin?

894: 21    A:  Yes. They actually told me about and

894: 22    then subsequently sent me a paper on a drug

894: 23    flurbiprofen, which is a very potent nonsteroidal.

894: 24    In the doses given in the trials they cited to me,

894: 25    it blocks platelets like naproxen. It had been

895: 1    tested in a very high risk patient population in

895: 2    which patients had their arteries open, something

895: 3    called angioplasty today, and then followed for six

895: 4    months with and without flurbiprofen treatment to

895: 5    see if flurbiprofen lowered the restenosis,

895: 6    reclotting rate of these opened arteries. And lo

895: 7    and behold, flurbiprofen had a dramatic benefit to

895: 8    those patients that dropped the restenosis rate,

895: 9    rethrombosis rate dramatically in those patients.

895: 10    Subsequently they told me about a

895: 11    drug called indobufen which had even more data

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

| | |
|---|---|
| 895: 12 | associated with it. It had two other clinical |
| 895: 13 | situations. It had an actual heart bypass graft |
| 895: 14 | where it blocked the stenosis, subsequent clotting |
| 895: 15 | of that, and yet another situation, patients who |
| 895: 16 | have a rhythm disturbance in their atrium which |
| 895: 17 | them up to have clots, called atrial fibrillation, |
| 895: 18 | and giving those patients indobufen reduced the |
| 895: 19 | incidence of their thrombotic events. |
| 895: 20 | So, they had three pieces of |
| 895: 21 | information with drugs like naproxen, which was |
| 895: 22 | strong clinical evidence to support the biochemical |
| 895: 23 | evidence that we had with naproxen at that point. |
| 895: 24 | Q:  I would like to show you a document |
| 895: 25 | that we'll mark as Exhibit 103. |

**896:13   -   899:11**          Scolnick, Edward 2005-06-01

| | |
|---|---|
| 896: 13 | Q:  Dr. Scolnick, can you identify |
| 896: 14 | Exhibit 103, please? |
| 896: 15 | A:  Yes. Exhibit 103 is a paper from the |
| 896: 16 | European Heart Journal published in 1993. The |
| 896: 17 | of the paper is 'Evaluation of flurbiprofen for |
| 896: 18 | prevention of reinfarction and reocclusion after |
| 896: 19 | successful thrombolysis or angioplasty in acute |
| 896: 20 | myocardial infarction.' |
| 896: 21 | Q:  Is this Exhibit 103, the flurbiprofen |
| 896: 22 | data or paper that you referred to earlier in your |
| 896: 23 | testimony? |
| 896: 24 | A:  Yes, it is. |
| 896: 25 | Q:  Were you aware of the data contained |
| 897: 1 | in this paper on flurbiprofen when you wrote your |
| 897: 2 | e-mail on March 9, 2000? |
| 897: 3 | A:  No, I was not. |
| 897: 4 | Q:  Similarly, were you aware of the data |
| 897: 5 | regarding the drug indobufen when you wrote your |
| 897: 6 | e-mail on March 9, 2000? |
| 897: 7 | A:  No, I was not. |
| 897: 8 | Q:  You mentioned a few minutes ago |
| 897: 9 | something about placebo data. Can you tell us |
| 897: 10 | else you and your team looked at to answer the |
| 897: 11 | question of whether the difference in the CV rates |
| 897: 12 | between naproxen and Vioxx was due to |
| 897: 13 | A:  During the discussion of trying to |
| 897: 14 | figure out a way to look at placebo data, someone, |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 897: 15 don't recall who, reminded us that we had an | | |
| 897: 16 trial in patients with Alzheimer's disease. This | | |
| 897: 17 trial compared placebo to 25 milligrams of Vioxx, | | |
| 897: 18 and I don't recall whether it was a treatment trial | | |
| 897: 19 or a prevention trial, but it was attempting to | | |
| 897: 20 improve the lot, the clinical benefit to patients | | |
| 897: 21 with Alzheimer's. The reason this trial was | | |
| 897: 22 was there was a theory, again a hypothesis, that | | |
| 897: 23 such an anti-inflammatory would improve the | | |
| 897: 24 condition or prevent the progression of | | |
| 897: 25 disease based on literature post hoc epidemiology | | |
| 898: 1 data, but it was only a hypothesis. | | |
| 898: 2 And it was now regarded that Vioxx | | |
| 898: 3 was safe enough on the stomach to test this | | |
| 898: 4 in patients with Alzheimer's compared to placebo. | | |
| 898: 5 No drug had ever been shown to retard the | | |
| 898: 6 progression of Alzheimer's, so, it was perfectly | | |
| 898: 7 ethical to do the study versus placebo, it was a | | |
| 898: 8 fairly large study. And the group thought very | | |
| 898: 9 sharply, they figured out that -- there were only | | |
| 898: 10 two arms in the trial, treatment arm A and | | |
| 898: 11 arm B. They were blinded, but during any trial, | | |
| 898: 12 including this one, we always record immediately | | |
| 898: 13 our database adverse experience reports that | | |
| 898: 14 during the course of the trial, and, therefore, this | | |
| 898: 15 database had potentially in it cardiovascular | | |
| 898: 16 adverse experience reports from the Alzheimer's | | |
| 898: 17 trial, an old population presumably with some | | |
| 898: 18 underlying heart disease. | | |
| 898: 19 So, we said, terrific, is there a way | | |
| 898: 20 without unblinding the whole trial that we can look | | |
| 898: 21 at this safety data, column A and column B. And it | | |
| 898: 22 was clear, made clear by the statistics group to | | |
| 898: 23 that we could do that without compromising the | | |
| 898: 24 by just aggregating the data under treatment A | | |
| 898: 25 treatment B, and they would enumerate the | | |
| 899: 1 cardiovascular side effects. | | |
| 899: 2 And I said that's just terrific, go | | |
| 899: 3 do it right away. I want to know the minute you | | |
| 899: 4 know the answer to this. So, they did all the | | |
| 899: 5 things necessary to do this legally, and they | | |
| 899: 6 enumerated all the data, they called me 48 hours | | |
| 899: 7 later in the evening on a Sunday night and told me | | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

899: 8     that there was no difference in the event rates in
899: 9     treatment A and treatment B arm. That was
899: 10    reassuring.
899: 11    Q:  Why was that significant to you?

**899:14   -   900:10**          Scolnick, Edward 2005-06-01

899: 14    THE WITNESS:  That was significant to
899: 15    me because it was in my mind the critical piece of
899: 16    information to accept the naproxen hypothesis
899: 17    the group had put forward. We knew naproxen
899: 18    be potentially cardioprotective based on all the
899: 19    data I've talked to you about, but I wanted to see
899: 20    data versus Vioxx, because if they were right,
899: 21    versus placebo should not have been different.
899: 22    when I was told this data, I was reassured, but I
899: 23    then asked the statistician who called me, I want
899: 24    know not just the grouped data that that you've
899: 25    given me, I want to know all the categories of
900: 1     cardiovascular events in both treatment arms, A
900: 2     B. And he read me those on the phone and,
900: 3     they were no different. And so I was really
900: 4     relieved and reassured, and thought, well, they
900: 5     right, I was wrong, and the naproxen hypothesis is
900: 6     the explanation for this.
900: 7     BY MR. RABER:
900: 8     Q:  Did Merck do anything to look at the
900: 9     osteoarthritis data that it was continuing to
900: 10    collect at that point?

**900:12   -   901:1**          Scolnick, Edward 2005-06-01

900: 12    THE WITNESS:  Yes. We continually
900: 13    looked at that data, as more and more patients
900: 14    accrued from different trials, updated it, did large
900: 15    meta-analyses of the trials comparing Vioxx to the
900: 16    other comparators, continually looking to see if
900: 17    there was a signal, and there was no signal.
900: 18    Q:  All right.
900: 19    Dr. Scolnick, then after you
900: 20    considered the data about naproxen, after you
900: 21    considered the data about flurbiprofen and the
900: 22    about indobufen and the data from the
900: 23    trials comparing Vioxx with placebo, what did you
900: 24    conclude was the best explanation for the
900: 25    differences in CV events that occurred in the

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

901: 1     study?

**901:3**    -    **901:6**     Scolnick, Edward 2005-06-01

901: 3     THE WITNESS:  I concluded the team
901: 4     had been right and I had been wrong, that the
901: 5     naproxen arm was lower than the Vioxx arm
901: 6     naproxen had been cardioprotective.

**905:1**    -    **907:16**     Scolnick, Edward 2005-06-01

905: 1     Can you identify the e-mail that
905: 2     appears towards the bottom of this exhibit?
905: 3     A:  Yes, I can. It's an e-mail from
905: 4     myself on February 8th to Douglas Greene, Alise
905: 5     Reicin, Alan Nies, Harry Guess, Deborah Shapiro
905: 6     Thomas Simon, and the subject is 'Today.'
905: 7     Q:  Doctor, your e-mail reads 'To ALL.'
905: 8     Well, let me back up. What was the context of
905: 9     sending this e-mail to those individuals on this
905: 10     day?
905: 11     A:  The context was to congratulate them
905: 12     for the wonderful job they had done in presenting
905: 13     the data to the committee, answering all the
905: 14     questions in great detail, being prepared for the
905: 15     details that the Advisory Committee wanted on
905: 16     additional questions, and I thought they had just
905: 17     done a fantastic job, and I wanted to encourage
905: 18     and tell them what a great job it was.
905: 19     Q:  Your E-mail reads: 'To ALL. I bit
905: 20     my nails all day. You all were FANTASTIC. You
905: 21     them look like grade d high school students and
905: 22     won big huge and completely. You should be
905: 23     happy and exhausted. Enjoy and bask in the
905: 24     of having done an impossible job superbly/Ed.' Do
905: 25     you see that?
906: 1     A:  Yes, I do.
906: 2     Q:  Can you explain to us your reference
906: 3     there to making someone look like grade D high
906: 4     school students?
906: 5     A:  Yes. I was trying to praise the team
906: 6     in a way that was simply an analogy to something
906: 7     that had that happened several years ago during
906: 8     Crixivan NDA review.
906: 9     Q:  What had happened there?
906: 10     A:  When we presented Crixivan at a

| | | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|---|
| | 906: 11 | comparable FDA Advisory Committee meeting, | | |
| | 906: 12 | don't recall the exact year this was, it was in the | | |
| | 906: 13 | earlier '90s, we had come -- it was a two-day | | |
| | 906: 14 | meeting on protease inhibitors. Another sponsor | | |
| | 906: 15 | presented theirs on the first day, and we were | | |
| | 906: 16 | presenting on the second day. Our presentation | | |
| | 906: 17 | finished by the physician who made it, and when | | |
| | 906: 18 | finished, the first hand up from the Advisory | | |
| | 906: 19 | Committee was from someone on the committee | | |
| | 906: 20 | to our presenter, that was fantastic. You made | | |
| | 906: 21 | look like grade D high school students. And that | | |
| | 906: 22 | was all I was referring to here. It was a laudatory | | |
| | 906: 23 | comment by a member of this past Advisory | | |
| | 906: 24 | and I was sort of reminding them of that comment | | |
| | 906: 25 | a kind of jovial way when I was so proud of them | | |
| | 907: 1 | what they had done. | | |
| | 907: 2 | Q:  You refer later on in this e-mail to | | |
| | 907: 3 | your team 'having done an impossible job | | |
| | 907: 4 | Do you see that? | | |
| | 907: 5 | A:  Yes, I do. | | |
| | 907: 6 | Q:  What's the 'impossible job' that | | |
| | 907: 7 | you're referring to? | | |
| | 907: 8 | A:  Well, I thought that having a public | | |
| | 907: 9 | discussion about cardiovascular events was a | | |
| | 907: 10 | difficult subject to handle and that they did it in | | |
| | 907: 11 | an unemotional way where it was carried out in a | | |
| | 907: 12 | completely rational discussion with full disclosure | | |
| | 907: 13 | of all the data without anyone becoming emotional | | |
| | 907: 14 | about it either on our side or the committee side, | | |
| | 907: 15 | so that all the data could be considered rationally, | | |
| | 907: 16 | and a most rational decision could be made. | | |
| **919:2** | **-**   **919:4** | Scolnick, Edward 2005-06-01 | | |
| | 919: 2 | Q:  Before the VIGOR results came out, | Pltf Obj:  R. 401, 403 | Initially sustained, but |
| | 919: 3 | had you used Vioxx personally? | Will be subject to | later overruled. |
| | 919: 4 | A:  Yes. | Motion Limine. | |
| **919:7** | **-**   **919:18** | Scolnick, Edward 2005-06-01 | | |
| | 919: 7 | Q:  For what condition? | Def Resp:  This | |
| | 919: 8 | A:  I have a chronic sciatic nerve | testimony is highly relevant | |
| | 919: 9 | problem due to a disc and a back fusion that was | because Plaintiff claims | |
| | 919: 10 | done in the late '70s. | Merck scientists, including | |
| | 919: 11 | Q:  How often did you take Vioxx before | Dr. Scolnick, knew about | |
| | 919: 12 | the VIGOR results came out? | risks that they did not | |

| | | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|---|
| | 919: 13 | A: On the average, once or twice a week. | disclose. Personal use | |
| | 919: 14 | Sometimes several days in a row when I traveled, | of Vioxx is relevant | |
| | 919: 15 | on the average, once or twice a week. | to combat that suggestion. | |
| | 919: 16 | Q: After the VIGOR results came out and | See also, Merck's | |
| | 919: 17 | showed a difference between Vioxx and | response to Motion in | |
| | 919: 18 | you stop taking Vioxx? | Limine. | |
| **919:20** - **919:21** | | Scolnick, Edward 2005-06-01 | | |
| | 919: 20 | THE WITNESS: No. I used it in the | | |
| | 919: 21 | same way. | | |
| **920:10** - **920:24** | | Scolnick, Edward 2005-06-01 | | |
| | 920: 10 | Q: Did you ever share your thoughts | | |
| | 920: 11 | after you had seen all the data relating to | | |
| | 920: 12 | and Vioxx and placebo, did you ever share your | | |
| | 920: 13 | feeling that you believed there was no safety | | |
| | 920: 14 | problem with Vioxx? | | |
| | 920: 15 | A: Yes. I told people that all the | | |
| | 920: 16 | evidence we had was completely consistent with | | |
| | 920: 17 | fact that naproxen was cardioprotective, that one | | |
| | 920: 18 | could not exclude any effect of Vioxx, because | | |
| | 920: 19 | was trying to prove a negative, and that was very | | |
| | 920: 20 | difficult to do in science, and those were the kinds | | |
| | 920: 21 | of statements I would make to people. | | |
| | 920: 22 | Q: Dr. Scolnick, I want to show you a | | |
| | 920: 23 | document we'll mark as Exhibit 105. It has the | | |
| | 920: 24 | numbers MRK-ACT0009918. | | |
| **921:6** - **922:4** | | Scolnick, Edward 2005-06-01 | | |
| | 921: 6 | Q: Can you identify for us the e-mail | | |
| | 921: 7 | that appears in the middle of the page on Exhibit | | |
| | 921: 8 | 105? | | |
| | 921: 9 | A: Yes. It is an e-mail from myself to | | |
| | 921: 10 | Alan Nies, Alise Reicin and Harry Guess. The | | |
| | 921: 11 | subject is: 'A word of Praise.' | | |
| | 921: 12 | Q: What is the date of this e-mail? | | |
| | 921: 13 | A: February 4, 2001. | | |
| | 921: 14 | Q: What was the context for sending this | | |
| | 921: 15 | e-mail to that group on February 4 of 2001? | | |
| | 921: 16 | A: I believe they were getting close to | | |
| | 921: 17 | the FDA Advisory Committee on the VIGOR | | |
| | 921: 18 | I wanted to tell them that they had done a terrific | | |
| | 921: 19 | job, and I was no longer worried about the safety | | |
| | 921: 20 | the drug and all the issues that we've covered | | |
| | 921: 21 | again, thank them for the enormous amount of | | |

| | | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|---|
| | 921: 22 | they had done so well. They were extremely | | |
| | 921: 23 | thorough. | | |
| | 921: 24 | Q:  Your e-mail says towards the middle | | |
| | 921: 25 | 'We all worried to death about the CV events last | | |
| | 922: 1 | Spring.' Then it says: 'But I was sick at the | | |
| | 922: 2 | thought we might be doing harm to patients.' Do | | |
| | 922: 3 | see that? | | |
| | 922: 4 | A:  Yes, I do. | | |
| **922:8** | -   **923:9** | Scolnick, Edward 2005-06-01 | | |
| | 922: 8 | Q:  What is that referring to? | | |
| | 922: 9 | A:  It is referring to my major concern | | |
| | 922: 10 | which was, as I told you earlier, I always regarded | | |
| | 922: 11 | myself as a physician first and as president of | | |
| | 922: 12 | second. And the thought that I had initially that | | |
| | 922: 13 | Vioxx might be harming patients was really quite | | |
| | 922: 14 | upsetting to me, and we worried about it, we | | |
| | 922: 15 | for whether it was the case or not, and as I've | | |
| | 922: 16 | stated here, I told them that, I knew that they all | | |
| | 922: 17 | thought the same way, and told them that I was no | | |
| | 922: 18 | longer worried, that we had done so much | | |
| | 922: 19 | and had so much other data that I had been | | |
| | 922: 20 | that the drug was safe. | | |
| | 922: 21 | Q:  Your e-mail goes on to say: 'I KNOW | | |
| | 922: 22 | each of you well enough to know you felt the | | |
| | 922: 23 | way. With all the data now available I am no | | |
| | 922: 24 | worried.' Do you see that? | | |
| | 922: 25 | A:  Yes, I do. | | |
| | 923: 1 | Q:  Did that reflect your state of mind | | |
| | 923: 2 | about the safety of Vioxx as of February 4, 2001? | | |
| | 923: 3 | A:  Yes. That's what I said in the | | |
| | 923: 4 | e-mail. | | |
| | 923: 5 | Q:  Did Merck continue to study and | | |
| | 923: 6 | analyze data relating to Vioxx? | | |
| | 923: 7 | A:  Yes. Again, other ongoing trials | | |
| | 923: 8 | were done. They were all analyzed in the same | | |
| | 923: 9 | with the same standard operating procedure. | | |
| **951:13** | -   **951:22** | Scolnick, Edward 2005-06-01 | | |
| | 951: 13 | Q:  Dr. Scolnick, can you please identify | | |
| | 951: 14 | Exhibit 111? | | |
| | 951: 15 | A:  Yes. It is an e-mail from myself to | | |
| | 951: 16 | Dr. Alise Reicin. It is November 7, 2001. The | | |
| | 951: 17 | subject is 'Comfort.' | | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 951: 18    Q: Dr. Scolnick, in looking at this | | |
| 951: 19    e-mail, does this refresh your memory as to | | |
| 951: 20    you told any of your colleagues at Merck near the | | |
| 951: 21    end of 2001 that you were comfortable with the | | |
| 951: 22    and felt you didn't have any problems with Vioxx? | | |
| **951:24 - 952:12**    Scolnick, Edward 2005-06-01 | | |
| 951: 24    THE WITNESS: I don't recall this | | |
| 951: 25    memo, but it's clear I wrote it. | | |
| 952: 1    BY MR. RABER: | | |
| 952: 2    Q: Can you read to us what it says, | | |
| 952: 3    please? | | |
| 952: 4    A: 'Alise Thanks for the update today. | | |
| 952: 5    The rates in the Alzheimer's study and the large | | |
| 952: 6    numbers of patients included make me very | | |
| 952: 7    comfortable with the data and that we do not have | | |
| 952: 8    any problems. Many thanks again/ Ed.' | | |
| 952: 9    Q: Does this e-mail that you wrote on | Pltf Obj: R. 401: Irrelevant; R. 701: Improper opinion testimony; R. 801: Hearsay. | Overruled |
| 952: 10    November 7, 2001 accurately reflect your state of | | |
| 952: 11    mind about the safety of Vioxx at that time? | | |
| 952: 12    A: Yes, it does. | | |

28

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

In re: VIOXX

**PRODUCTS LIABILITY LITIGATION**

**This document relates to
Case No. 06-0485**

**GERALD D. BARNETT**

Plaintiff,

v.

**MERCK & CO., INC.,**

Defendant.

**MDL DOCKET NO. 1657**

**SECTION L**

**JUDGE FALLON**

**MAGISTRATE JUDGE KNOWLES**

**Merck & Co., Inc.'s Notice of Filing Deposition
Testimony of Susan Baumgartner**

**Exhibit B**

Merck hereby submits the following deposition testimony of Susan Baumgartner for the Court's consideration and pre-trial rulings:

1. Merck's Affirmative Designations with Plaintiff's Objections, Merck's Responses and the Court's prior rulings, where applicable.

By June 20, 2006, Merck will submit a notebook for the Court with these designations and objections, as well as copies of the exhibits referenced herein. Plaintiff did not file Counter-Designations for Ms. Baumgartner.

The Court has previously ruled in the Plunkett case on many of the Plaintiff's objections to Merck's Affirmative Designations for Ms. Baumgartner. For the instances where the Court previously overruled Plaintiff's objections, Merck did not provide a specific response on the transcript and respectfully requests that the Court to stand by its previous ruling. Merck did,



EXHIBIT
B
Blumberg No. 5119

however, include responses for Plaintiff's objections that were (1) sustained in the Plunkett cases

or (2) were not previously addressed by the Court.

As the Court may know, Plaintiff filed affirmative designations for Ms. Baumgartner

during the second phase of the deposition designation process.  The Plaintiff has not yet

submitted a transcript to the Court for Ms. Baumgartner.  If the Court prefers, Merck would be

happy to work with Plaintiff to provide the Court one complete transcript with all of the

Baumgartner designations from both parties.

**Gerald Barnett v. Merck &Co., Inc.**
**Deposition Designations for Susan Baumgartner**
**Defendant's Designations in Blue.  Plaintiff's Designations in Red**

| | | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|---|
| **498:2** | **-** | **501:12**    Baumgartner, Susan 2005-09-30 | | |
| | 498: 2 | Q: Okay, Ms. Baumgartner, you | Pltf Obj:  Sidebar | Overruled |
| | 498: 3 | are on camera. I'm George Tsougarakis. | 401, 402 | |
| | 498: 4 | I think everybody in the room would agree | Predatory comment | |
| | 498: 5 | it is a good thing that I'm not on | | |
| | 498: 6 | camera, but you should address your | Def Resp:  Withdrawn | |
| | 498: 7 | remarks to the camera. I represent Merck | | |
| | 498: 8 | & Company, and I'm going to ask you a few | | |
| | 498: 9 | questions. | | |
| | 498: 10 | Let's begin by introducing | | |
| | 498: 11 | yourself to the jury. Can you tell the | | |
| | 498: 12 | jury where you were born and raised? | | |
| | 498: 13 | A:  My name is Susan Lynn | | |
| | 498: 14 | Baumgartner. I was born in DeLand, | | |
| | 498: 15 | Florida and raised in Gainesville, | | |
| | 498: 16 | Florida where I went to high school at | | |
| | 498: 17 | would Buchholz High School. | | |
| | 498: 18 | Spent a couple of years | | |
| | 498: 19 | doing prepharmacy work at the University | | |
| | 498: 20 | of Florida in Tampa, Florida, and then | | |
| | 498: 21 | did five years of work to obtain my | | |
| | 498: 22 | Doctor of Pharmacy degree and Master of | | |
| | 498: 23 | Business Administration degree from the | | |
| | 498: 24 | University of Florida in Gainesville. | | |
| | 499: 1 | Q:  Can you tell the jury what | | |
| | 499: 2 | year you graduated with your joint degree | | |
| | 499: 3 | in pharmacy and your M.B.A.? | | |
| | 499: 4 | A:  I graduated in 1996. | | |
| | 499: 5 | Q:  In 1996, did you become | | |
| | 499: 6 | employed? | | |
| | 499: 7 | A:  I did. In August of 1996, I | | |
| | 499: 8 | was employed by Merck & Company. | | |
| | 499: 9 | Q:  Can you tell the jury a | Pltf Obj:  401, 402 | Overruled |
| | 499: 10 | little bit about -- firstly, why did you | | |
| | 499: 11 | choose a career in pharmacy? | | |
| | 499: 12 | A:  The main reason I chose a | | |
| | 499: 13 | career in pharmacy is that my father is a | | |
| | 499: 14 | pharmacist, and I wanted to follow in his | | |
| | 499: 15 | footsteps. I wanted to be involved in | | |

1

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 499: 16 healthcare because I believe it's an<br>499: 17 important part of life, and I believe<br>499: 18 pharmacy is a very noble profession. | | |
| 499: 19 Q:  Can you tell the jury in<br>499: 20 1996 when you graduated with your degree<br>499: 21 in pharmacy and your M.B.A., how is it<br>499: 22 that you became employed by Merck?<br>499: 23 A:  I was actually recruited by<br>499: 24 an individual within Merck who was aware<br>500: 1 of the dual Doctor of Pharmacy and Master<br>500: 2 of Business Administration degree<br>500: 3 program, and asked one of my teachers at<br>500: 4 the time about -- one of the faculty<br>500: 5 members there about the program. I<br>500: 6 talked with them, I had a number of<br>500: 7 different opportunities that I was<br>500: 8 exploring and did a lot of research about<br>500: 9 the company and talked with a lot of<br>500: 10 different individuals who had experiences<br>500: 11 with the company, and I felt it was a<br>500: 12 great opportunity. | | |
| 500: 13 Q:  Can you tell the jury when<br>500: 14 you were researching what issues were<br>500: 15 important to you in choosing a career?<br>500: 16 A:  It was important to me that<br>500: 17 I was with a company that had ethics and<br>500: 18 values that were similar to my own. I<br>500: 19 had just finished training as a<br>500: 20 pharmacist, so, it was important that the<br>500: 21 company had good products that<br>500: 22 represented medical advances and<br>500: 23 breakthroughs. It was important to me<br>500: 24 how they communicated information about<br>501: 1 the products and the use of their<br>501: 2 products to produce good outcomes in<br>501: 3 patients. And their financial<br>501: 4 information was very good. Their<br>501: 5 opportunities in terms of career were<br>501: 6 good as well. And their reputation and<br>501: 7 scientific integrity and everything they<br>501: 8 stood for was also very strong.<br>501: 9 Q:  Can you tell the jury what<br>501: 10 you learned in your research about | Pltf Obj:  401, 402<br>403, 602 - Lack of<br>Foundation.<br><br>Pltf Obj:  Improper opinion<br>and character testimony<br>of Merck.<br><br>Def Resp: Witness is<br>simply providing background<br>testimony regarding how<br>she picked a career, and<br>background about Merck. | Overruled |

| | | | **Objection/Response in Barnett** | **Ruling in Plunkett** |
|---|---|---|---|---|
| | 501: 11 | Merck's ethics in the scientific | | |
| | 501: 12 | integrity? | | |
| **501:20** - **501:23** | | Baumgartner, Susan 2005-09-30 | | |
| | 501: 20 | A: I learned that Merck's | | |
| | 501: 21 | mission from the very beginning was to | | |
| | 501: 22 | help patients, and their ethics were very | | |
| | 501: 23 | strong. They did the right thing. | | |
| **503:12** - **508:18** | | Baumgartner, Susan 2005-09-30 | | |
| | 503: 12 | THE WITNESS:  The decisions | Pltf Obj: 401, 402, 403, 602 - Lack of foundation. | Overruled |
| | 503: 13 | that were made, I felt, were | | |
| | 503: 14 | consistent with values, scientific | | |
| | 503: 15 | integrity, presenting information | Pltf Obj: Improper opinion of Merck character. | |
| | 503: 16 | to allow prescribers to make | | |
| | 503: 17 | decisions, making decisions with a | | |
| | 503: 18 | patient in mind. Those were all | | |
| | 503: 19 | very important to me, and I felt | | |
| | 503: 20 | Merck exemplified that. | | |
| | 503: 21 | BY MR. TSOUGARAKIS: | | |
| | 503: 22 | Q:  How was your experience at | Pltf Obj:  401, 402, 403, 602 -Lack of foundation. | Overruled |
| | 503: 23 | Merck compared to the research you did | | |
| | 503: 24 | before you joined Merck? | | |
| | 504: 1 | A:  My experience with Merck has | | |
| | 504: 2 | been very positive, and it has exceeded | | |
| | 504: 3 | the expectations that I had before I came | | |
| | 504: 4 | in to the company. | | |
| | 504: 5 | Q:  When did you first get | | |
| | 504: 6 | responsibility for Vioxx? | | |
| | 504: 7 | A:  I joined the market | | |
| | 504: 8 | integration team for Vioxx in the middle | | |
| | 504: 9 | of 1998. | | |
| | 504: 10 | Q: How many years of experience | | |
| | 504: 11 | did you have at Merck when you joined the | | |
| | 504: 12 | marketing team for Vioxx? | | |
| | 504: 13 | A:  Just under two years -- | | |
| | 504: 14 | well, just under two years. | | |
| | 504: 15 | Q:  During the time you had | Pltf Obj:  Leading | Overruled |
| | 504: 16 | responsibility for marketing of Vioxx, | | |
| | 504: 17 | who was the most junior member of that | | |
| | 504: 18 | team? | | |
| | 504: 19 | A:  I was. | | |
| | 504: 20 | Q: How many people reported to | | |
| | 504: 21 | you, Ms. Baumgartner, when you were on | | |

| | | **Objection/Response in Barnett** | **Ruling in Plunkett** |
|---|---|---|---|
| 504: 22 | the marketing team for Vioxx? | | |
| 504: 23 | A:  No individuals reported to | | |
| 504: 24 | me. | | |
| 505: 1 | Q:  Can you tell the jury what | | |
| 505: 2 | your responsibilities were for Vioxx | | |
| 505: 3 | while you were on the marketing team? | | |
| 505: 4 | A:  My responsibilities included | | |
| 505: 5 | interacting with physicians, and the | | |
| 505: 6 | majority of my time was spent in | | |
| 505: 7 | coordinating advisory board meetings and | | |
| 505: 8 | consultant meetings. And by that I mean | | |
| 505: 9 | setting up the logistics of those | | |
| 505: 10 | programs, putting together agendas, | | |
| 505: 11 | inviting presenters or Merck scientists | | |
| 505: 12 | or external physicians and thought | | |
| 505: 13 | leaders to present information at those | | |
| 505: 14 | meetings, and inviting physicians to | | |
| 505: 15 | those meetings and facilitating the | | |
| 505: 16 | gathering of the information and the | | |
| 505: 17 | reporting of the data within Merck. | | |
| 505: 18 | Those meetings were primarily designed to | | |
| 505: 19 | understand the perspective of physicians, | | |
| 505: 20 | understand what they thought. We had a | | |
| 505: 21 | product that we were marketing and | | |
| 505: 22 | communicating information about. We | | |
| 505: 23 | wanted to understand how physicians were | | |
| 505: 24 | receiving it and what they thought of it, | | |
| 506: 1 | and so we brought groups together. And | | |
| 506: 2 | my role was around the things -- the | | |
| 506: 3 | activities that I mentioned in putting | | |
| 506: 4 | together those meetings. | | |
| 506: 5 | Q:  I want to be very clear as | Pltf Obj:  Sidebar - | Overruled |
| 506: 6 | to your role. | Object speculation. | |
| 506: 7 | Can you tell the ladies and | | |
| 506: 8 | gentlemen of the jury, when putting | | |
| 506: 9 | together those consultant meetings and | | |
| 506: 10 | advisory board meetings, what exactly it | | |
| 506: 11 | is that you did? | | |
| 506: 12 | A:  When organizing the | | |
| 506: 13 | meetings, I usually worked with a | | |
| 506: 14 | third-party company to help with some of | | |
| 506: 15 | the tasks, but my responsibilities | | |
| 506: 16 | included identifying the location for the | | |

| | | **Objection/Response in Barnett** | **Ruling in Plunkett** |
|---|---|---|---|
| 506: 17 | meeting, extending invitations to | | |
| 506: 18 | attendees, and determining who was going | | |
| 506: 19 | to attend that meeting, putting together | | |
| 506: 20 | an agenda and working with others to | | |
| 506: 21 | decide what questions we had, what | | |
| 506: 22 | feedback we wanted, and, therefore, what | | |
| 506: 23 | presentations -- what presenters we | | |
| 506: 24 | needed to invite to present information | | |
| 507: 1 | about different topics. I extended the | | |
| 507: 2 | invitation to those presenters and | | |
| 507: 3 | brought them in. And the presenters put | | |
| 507: 4 | together the content of the slides that | | |
| 507: 5 | were presented there, and the -- I helped | | |
| 507: 6 | with the logistics, the location and the | | |
| 507: 7 | organization of the day, and actual | | |
| 507: 8 | implementation of the meeting. | | |
| 507: 9 | Q:  Who is responsible for the | | |
| 507: 10 | presentation -- the decision of what | | |
| 507: 11 | scientific data to present and the | | |
| 507: 12 | presentation of that scientific data at | | |
| 507: 13 | those meetings? | | |
| 507: 14 | A:  Each of the presenters was | | |
| 507: 15 | responsible for the data, the scientific | | |
| 507: 16 | data and information that was presented | | |
| 507: 17 | during that meeting. | | |
| 507: 18 | Q:  Did you take the time to | Pltf Obj:  Leading | Overruled |
| 507: 19 | become intimately familiar with all the | | |
| 507: 20 | data that was presented at those | | |
| 507: 21 | meetings? | | |
| 507: 22 | A:  No, I did not. The | | |
| 507: 23 | presenters were the ones responsible for | | |
| 507: 24 | content and who had access to those data | | |
| 508: 1 | and information. | | |
| 508: 2 | Q:  Now, can you tell the jury a | | |
| 508: 3 | little bit more about the consultants | | |
| 508: 4 | meetings and the advisory board meetings | | |
| 508: 5 | that you had responsibility for? What | | |
| 508: 6 | were the purposes of those meetings? | | |
| 508: 7 | A:  The purpose of those | | |
| 508: 8 | meetings were to conduct market research, | | |
| 508: 9 | and what that means is just understanding | | |
| 508: 10 | what those physicians thought about new | | |
| 508: 11 | scientific data, about the current | | |

| | **Objection/Response in Barnett** | **Ruling in Plunkett** |
|---|---|---|
| 508: 12   market, about the use of pain medicines, | | |
| 508: 13   about our product Vioxx. So, it was | | |
| 508: 14   really a chance for us to get insight | | |
| 508: 15   into what these doctors thought about and | | |
| 508: 16   what these experts in their areas thought | | |
| 508: 17   about the product and the data and the | | |
| 508: 18   information that was out there. | | |

**509:6   -   515:3**         Baumgartner, Susan 2005-09-30

| | **Objection/Response in Barnett** | **Ruling in Plunkett** |
|---|---|---|
| 509: 6   Q:  Can you tell the ladies and | Pltf Obj:  Non-responsive | Overruled |
| 509: 7   gentlemen of the jury what the methods of | | |
| 509: 8   communicating -- Merck had communicating | | |
| 509: 9   the benefits and limitations of its | | |
| 509: 10   products to the medical community? | | |
| 509: 11   A:  I wouldn't consider | | |
| 509: 12   consultants meetings or advisory board | | |
| 509: 13   meetings a vehicle for communicating | | |
| 509: 14   information. We did have to present | | |
| 509: 15   information to get their responses and | | |
| 509: 16   feedback, but there were many mechanisms, | | |
| 509: 17   many vehicles for communication that were | | |
| 509: 18   used to communicate with physicians, such | | |
| 509: 19   as scientific sessions, publications, the | | |
| 509: 20   sales representatives, the professional | | |
| 509: 21   information requests that were physician | | |
| 509: 22   to physician communications, educational | | |
| 509: 23   programs. There were many vehicles that | | |
| 509: 24   were used by Merck to communicate with | | |
| 510: 1   the scientific community and the medical | | |
| 510: 2   community. | | |

| | | |
|---|---|---|
| 510: 3   Q:  Do you know how many doctors | | |
| 510: 4   were potential prescribers of Vioxx | | |
| 510: 5   during the time you had responsibility | | |
| 510: 6   for marketing Vioxx? | | |
| 510: 7   A:  I do not know. | | |
| 510: 8   Q:  Did you invite all the | | |
| 510: 9   doctors who were potential prescribers of | | |
| 510: 10   Vioxx to your consultants meetings and | | |
| 510: 11   advisory board meetings? | | |
| 510: 12   A:  No. They were samples of | | |
| 510: 13   the physicians. They were smaller groups | | |
| 510: 14   of those physicians that represented the | | |
| 510: 15   views of the universe. So, they were | | |

| | **Objection/Response in Barnett** | **Ruling in Plunkett** |
|---|---|---|
| 510: 16   small groups of physicians that were | | |
| 510: 17   assembled to understand their | | |
| 510: 18   perspectives. | | |
| 510: 19   Q:  Who did you invite to the | | |
| 510: 20   consultant meetings or advisory board | | |
| 510: 21   meetings? | | |
| 510: 22   A:  Our advisory board group was | | |
| 510: 23   a set group of about 15 individuals who | | |
| 510: 24   met with us on a quarterly basis. So, | | |
| 511: 1    they were a fixed group that met with us | | |
| 511: 2    at regular times throughout the marketing | | |
| 511: 3    of the product. The consultants meetings | | |
| 511: 4    were more of a one-time activity where we | | |
| 511: 5    identified a group of attendees and | | |
| 511: 6    consulted with them on specific research | | |
| 511: 7    questions and on specific things that we | | |
| 511: 8    wanted feedback on. | | |
| 511: 9    Q:  We've heard the term | | |
| 511: 10   'thought leaders.' Can you tell the | | |
| 511: 11   ladies and gentlemen of the jury what a | | |
| 511: 12   thought leader is? | | |
| 511: 13   A:  A thought leader is someone | | |
| 511: 14   who leads thought. It is a physician who | | |
| 511: 15   is an expert in a specific area as | | |
| 511: 16   determined by his or her peers. So, this | | |
| 511: 17   is not Merck deciding that someone is a | | |
| 511: 18   thought leader, but actually the medical | | |
| 511: 19   community or scientific community | | |
| 511: 20   determining that someone is an expert or | | |
| 511: 21   has expertise or knowledge in a given | | |
| 511: 22   area. | | |
| 511: 23   Q:  Did you invite thought | | |
| 511: 24   leaders to participate on your advisory | | |
| 512: 1    boards and consultants meetings? | | |
| 512: 2    A:  Yes. We included thought | | |
| 512: 3    leaders in both of those meetings. | | |
| 512: 4    Q:  Were the participants that | | |
| 512: 5    you invited to be on your advisory boards | | |
| 512: 6    and to your consultants meetings, were | | |
| 512: 7    they all supporters of Merck? | | |
| 512: 8    A:  No. It was important for us | | |
| 512: 9    to get feedback from all of the | | |
| 512: 10   individuals out there. We didn't just | | |

| | **Objection/Response in Barnett** | **Ruling in Plunkett** |
|---|---|---|
| 512: 11   want individuals who were supportive of | | |
| 512: 12   our views. We wanted to hear from those | | |
| 512: 13   who were not supportive as well. So, we | | |
| 512: 14   invited physicians who had a range of | | |
| 512: 15   levels of support for the product and the | | |
| 512: 16   company. | | |
| 512: 17   Q:  Did you invite to your | Pltf Obj:  Non-responsive. | Overruled |
| 512: 18   consultants meetings and advisory boards | | |
| 512: 19   physicians who were critical of Merck or | | |
| 512: 20   Vioxx? | | |
| 512: 21   A:  The -- by the nature of the | | |
| 512: 22   meetings, we did want feedback on the | | |
| 512: 23   product, we did include physicians who | | |
| 512: 24   were not supportive of the product and | | |
| 513: 1   who were critical, but that was important | | |
| 513: 2   because the purpose of the meeting was to | | |
| 513: 3   understand their thoughts and views, and | | |
| 513: 4   that to the extent that they didn't agree | | |
| 513: 5   with the conclusions that the Merck | | |
| 513: 6   scientists arrived at, we wanted to hear | | |
| 513: 7   why and understand their perspectives. | | |
| 513: 8   Q:  Was scientific data | | |
| 513: 9   presented at these advisory board | | |
| 513: 10   meetings and consultant meetings? | | |
| 513: 11   A:  Yes, it was. | | |
| 513: 12   Q:  And what was the purpose of | | |
| 513: 13   presenting data at these meetings? | | |
| 513: 14   A:  The purpose was to present | | |
| 513: 15   information that the physicians in | | |
| 513: 16   attendance could respond to in or react to | | |
| 513: 17   and to serve as a basis for the | | |
| 513: 18   discussion that we had and the questions | | |
| 513: 19   that we wanted to ask them. | | |
| 513: 20   Q:  Did you solicit feedback | | |
| 513: 21   from the attending physicians on the data | | |
| 513: 22   presented at these meetings? | | |
| 513: 23   A:  Yes. That was a primary | | |
| 513: 24   purpose of the meeting, to present | | |
| 514: 1   scientific information and to have them | | |
| 514: 2   respond, react, give us their thoughts, | | |
| 514: 3   ask any questions, and also help us | | |
| 514: 4   communicate that ultimately to others. | | |
| 514: 5   Q:  And in your experience in | Pltf Obj:  Vague and | |

| | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| 514: 6 | soliciting feedback from the physicians | ambiguous. | |
| 514: 7 | who attended the consultant meetings and | Def Resp: The testimony | |
| 514: 8 | the advisory board meetings, did those | is clear. | |
| 514: 9 | groups of physicians reach unanimity on | | |
| 514: 10 | any issue that you presented? | | |
| 514: 11 | A: I can't remember an instance | Pltf Obj: Hearsay, 801, | Overruled |
| 514: 12 | where the physicians in attendance | 802 | |
| 514: 13 | reached unanimity, and it's probably | | |
| 514: 14 | consistent with other forums for | | |
| 514: 15 | scientific discussion and debate. There | | |
| 514: 16 | were physicians who held different views, | | |
| 514: 17 | and that was the purpose of that meeting, | | |
| 514: 18 | to express that and to discuss and debate | | |
| 514: 19 | the different views on the product and on | | |
| 514: 20 | the information in general. | | |
| 514: 21 | Q: During the time that you | | |
| 514: 22 | had -- what was the period that you had | | |
| 514: 23 | responsibility for the marketing of | | |
| 514: 24 | Vioxx? | | |
| 515: 1 | A: I was actually on the | | |
| 515: 2 | marketing team from mid-1999 through the | | |
| 515: 3 | third quarter of 2001. | | |
| **516:4** - **522:3** | Baumgartner, Susan 2005-09-30 | | |
| 516: 4 | BY MR. TSOUGARAKIS: | | |
| 516: 5 | Q: And during the time you had | | |
| 516: 6 | responsibility for Vioxx, did you learn | | |
| 516: 7 | the results of the VIGOR study? | | |
| 516: 8 | A: Yes, I did. | | |
| 516: 9 | Q: Can you tell the ladies and | | |
| 516: 10 | gentlemen of the jury what you learned | | |
| 516: 11 | about the results of the VIGOR study? | | |
| 516: 12 | A: The VIGOR study was designed | | |
| 516: 13 | to look at stomach problems for Vioxx | | |
| 516: 14 | compared to naproxen, and it was a | | |
| 516: 15 | landmark study of over 8,000 patients. | | |
| 516: 16 | And the results of that study were that | | |
| 516: 17 | Vioxx showed a lower number of stomach | | |
| 516: 18 | problems than naproxen. | | |
| 516: 19 | Q: Were there also | | |
| 516: 20 | cardiovascular results of that VIGOR | | |
| 516: 21 | study? | | |
| 516: 22 | A: Yes, there were. | | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 516: 23  Q: Can you tell the ladies and<br>516: 24  gentlemen of the jury what the<br>517: 1  cardiovascular results of the study were?<br>517: 2  A: In that study, there was a<br>517: 3  five-fold difference in the rate of<br>517: 4  cardiovascular events between Vioxx and<br>517: 5  naproxen. | | |
| 517: 6  Q: Did Merck disclose the VIGOR<br>517: 7  data?<br>517: 8  A: Yes. | Pltf Obj: Vague - What part of VIGOR dates and where? | |
| 517: 9  Q: Can you tell the jury how<br>517: 10  Merck disclosed the VIGOR data and what<br>517: 11  the timing of it was?<br>517: 12  A: The VIGOR data was disclosed<br>517: 13  starting -- I'm not sure when the actual<br>517: 14  first disclosure took place, but after<br>517: 15  the results were received in March of<br>517: 16  2000, Merck communicated that information<br>517: 17  through press release, through<br>517: 18  professional information requests that<br>517: 19  our representatives had available in the<br>517: 20  event there were questions about the<br>517: 21  product and that specific study.<br>517: 22  There were numerous<br>517: 23  scientific sessions starting in May of<br>517: 24  2000. There was a big gastroenterology<br>518: 1  meeting in May of 2000 at which Merck<br>518: 2  presented the scientific data in a<br>518: 3  scientific session. There were numerous<br>518: 4  other scientific sessions at which the<br>518: 5  data was discussed and throughout the<br>518: 6  rest of 2000 as well.<br>518: 7  There were advisory board<br>518: 8  meetings and consultant meetings at which<br>518: 9  we communicated the information to obtain<br>518: 10  physicians' views and thoughts on those<br>518: 11  data. And there were publications,<br>518: 12  support for CME programs, there were<br>518: 13  communications with investigators, and,<br>518: 14  obviously, within the company there was<br>518: 15  communication as well. | Def Resp: The testimony is clear, and the Plaintiff could have objected at the deposition but chose not to.<br><br>Pltf Obj: 602, assumes facts not in evidence. | Overruled |
| 518: 16  Q: Based on your experience, do<br>518: 17  you have a view as to whether or not | Pltf Obj: 702, 703, 602, Assumes facts not in | Overruled |

| | | **Objection/Response in Barnett** | **Ruling in Plunkett** |
|---|---|---|---|
| 518: 18 | Merck's efforts to disclose the data were | evidence. | |
| 518: 19 | successful? | | |
| 518: 20 | A:  In my view, Merck's efforts | Pltf Obj: Improper opinion | |
| 518: 21 | were very successful. I think it was | testimony, speculation, | |
| 518: 22 | widely communicated, and I know in my | vague as to "successful" | |
| 518: 23 | research, physicians were aware of the | Def Resp:  The answer is | |
| 518: 24 | study, aware of the results, and it | based on the witness's | |
| 519: 1 | was -- there were many, many different | extensive experience at Merck. | |
| 519: 2 | communication vehicles and multiple | "Successful" is not a vague term | |
| 519: 3 | communication vehicles used in order to | & Pltf coud have asked for | |
| 519: 4 | communicate that. | clarification at the deposition | |
| 519: 5 | Q:  Were you ever provided with | | |
| 519: 6 | an explanation of the results, the | | |
| 519: 7 | cardiovascular results of the VIGOR | | |
| 519: 8 | trial? | | |
| 519: 9 | A:  Yes. | | |
| 519: 10 | Q:  What was that explanation? | | |
| 519: 11 | A:  The explanation for the | | |
| 519: 12 | results of the VIGOR study was that | | |
| 519: 13 | naproxen was acting as a cardioprotective | | |
| 519: 14 | agent in the study due to its platelet | | |
| 519: 15 | effect. It was acting similar to | | |
| 519: 16 | aspirin. | | |
| 519: 17 | Q:  And who provided you that | Pltf Obj:  Hearsay, 801, | Overruled |
| 519: 18 | explanation or what group provided you | 802 | |
| 519: 19 | with that explanation? | | |
| 519: 20 | A:  The Merck scientists arrived | | |
| 519: 21 | at that conclusion after reviewing the | | |
| 519: 22 | available data. | | |
| 519: 23 | Q:  Was the VIGOR data ever the | Pltf Obj:  602 - | Overruled |
| 519: 24 | subject of any consultants meetings or | Assumes facts not | |
| 520: 1 | advisory board meetings? | in evidence. | |
| 520: 2 | A:  Definitely. We had many | | |
| 520: 3 | discussions with our advisors as well as | | |
| 520: 4 | at consultants meetings following the | | |
| 520: 5 | presentation of the information to get | | |
| 520: 6 | views on those data. | | |
| 520: 7 | Q:  Were the cardiovascular | | |
| 520: 8 | results of the VIGOR study presented to | | |
| 520: 9 | these groups of physicians? | | |
| 520: 10 | A:  Yes. | | |
| 520: 11 | Q:  What was the purpose to | | |
| 520: 12 | provide the cardiovascular results of the | | |

| | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| 520: 13 | VIGOR study to these physicians at the | | |
| 520: 14 | consultants meetings and the advisory | | |
| 520: 15 | board meetings? | | |
| 520: 16 | A:  The purpose of presenting | | |
| 520: 17 | the information was to, as I mentioned, | | |
| 520: 18 | understand the thoughts of the | | |
| 520: 19 | physicians, understand their | | |
| 520: 20 | interpretation of the data in light of | | |
| 520: 21 | all the other data available for the | | |
| 520: 22 | coxibs and for Vioxx and the NSAIDs and | | |
| 520: 23 | for naproxen. So, the purpose was to | | |
| 520: 24 | present that information and also to see | | |
| 521: 1 | if external thought leaders, people | | |
| 521: 2 | outside of the company, experts and | | |
| 521: 3 | thought leaders in different specialties | | |
| 521: 4 | came to the same conclusion as the Merck | | |
| 521: 5 | scientists did, so, kind of a check for | | |
| 521: 6 | the interpretation that our own | | |
| 521: 7 | scientists had of those data. | | |
| 521: 8 | Q:  Did the Merck scientists who | Pltf Obj:  Leading, 801, 802 | Overruled |
| 521: 9 | presented the data to these physicians | | |
| 521: 10 | present only data that supported Merck's | | |
| 521: 11 | conclusions? | | |
| 521: 12 | A:  No. They presented all of | | |
| 521: 13 | the data in all of the possible -- or all | | |
| 521: 14 | of the discussions that were taking place | | |
| 521: 15 | in the medical community and debate that | | |
| 521: 16 | was taking place. They tried to frame | | |
| 521: 17 | all of that up in order to discuss and | | |
| 521: 18 | debate all of the different angles that | | |
| 521: 19 | were being taken outside of the company | | |
| 521: 20 | on the data. | | |
| 521: 21 | Q:  Did you solicit feedback | | |
| 521: 22 | from these physicians as to their | | |
| 521: 23 | reactions to the cardiovascular results | | |
| 521: 24 | of the VIGOR study? | | |
| 522: 1 | A:  Yes. | | |
| 522: 2 | Q:  Can you tell the jury what | | |
| 522: 3 | you learned in soliciting that feedback? | | |

**522:8   -   522:22**          Baumgartner, Susan 2005-09-30

| | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| 522: 8 | A:  The consensus from those | Pltf Obj:  Hearsay, 801, 802 | Sustained |
| 522: 9 | advisory board meetings and consultant | | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 522: 10   meetings were that the conclusion that<br>522: 11   Merck reached, the Merck scientists<br>522: 12   reached about naproxen being<br>522: 13   cardioprotective and that being the<br>522: 14   explanation for the results in VIGOR was<br>522: 15   the explanation for that result in light<br>522: 16   of the other data that was available on<br>522: 17   the product. | Plft Obj: Assumes facts not in evidence.<br><br>Def Resp: This testimony is not offered for the truth, it is offered solely to show Merck's state of mind. | |
| 522: 18   Q:  Do you recall whether the<br>522: 19   physicians were unanimous in believing<br>522: 20   that the most plausible explanation was<br>522: 21   that naproxen was acting<br>522: 22   cardioprotectively? | | |
| **523:5   -   524:20**          Baumgartner, Susan 2005-09-30 | | |
| 523: 5   A:  I can't recall any meeting<br>523: 6   where there was a unanimous view on the<br>523: 7   data. There were a vast majority whose<br>523: 8   conclusion was that naproxen was acting<br>523: 9   as a cardioprotective agent in that<br>523: 10   study. Naproxen was cardioprotective in<br>523: 11   that study. And there were some who<br>523: 12   could not arrive at a conclusion based on<br>523: 13   the data that was available. And there<br>523: 14   were some who felt that it could have<br>523: 15   been caused by Vioxx. | Pltf Obj:  Hearsay, 801, 802<br>Pltf Obj: Assumes facts not in evidence. | Overruled |
| 523: 16   MR. TSOUGARAKIS:  Let me<br>523: 17   show you what we'll mark as<br>523: 18   Baumgartner Exhibit 1.<br>523: 19   - - -<br>523: 20   (Whereupon, Deposition<br>523: 21   Exhibit Baumgartner-1, Market<br>523: 22   research report, February 2001,<br>523: 23   was marked for identification.)<br>523: 24   - - -<br>524: 1   BY MR. TSOUGARAKIS: | | |
| 524: 2   Q:  I ask you to identify that,<br>524: 3   please.<br>524: 4   A:  This is a market research<br>524: 5   report from a national rheumatology<br>524: 6   consultants meeting that took place in<br>524: 7   February of 2001.<br>524: 8   Q:  If I can direct your | Pltf Obj:  Lack of foundation.<br><br>Def Resp: The witness is on the e-mail on the first page of the document, showing she received it during her work at Merck. | |

| | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| 524: 9 | attention to Page 6 of that report, and I | | |
| 524: 10 | would ask you to read the sentence under | | |
| 524: 11 | cardiovascular CV outcomes that begins | | |
| 524: 12 | with the word 'The consensus.' Can you | | |
| 524: 13 | read that into the record, please? | | |
| 524: 14 | A: 'The consensus seemed to be | | |
| 524: 15 | that coxibs did not pose an increased | | |
| 524: 16 | risk for cardiovascular or | | |
| 524: 17 | cerebrovascular thromboembolic events.' | | |
| 524: 18 | Q: Is that consistent with your | | |
| 524: 19 | recollection at other meetings with | | |
| 524: 20 | consultants and advisory boards? | | |
| **524:24  -  525:16** | Baumgartner, Susan 2005-09-30 | | |
| 524: 24 | THE WITNESS: It was | Pltf Obj: Hearsay, 801, 802, 602. Assumes facts not in evidence. | Overruled |
| 525: 1 | definitely consistent with what I | | |
| 525: 2 | saw in the many meetings that I | | |
| 525: 3 | attended. | | |
| 525: 4 | BY MR. TSOUGARAKIS: | | |
| 525: 5 | Q: Ms. Baumgartner, in your | Pltf Obj: Speculation - depends upon receiver of communication | |
| 525: 6 | time at Merck, did you ever intimidate or | | |
| 525: 7 | threaten any physicians? | | |
| 525: 8 | A: No, I did not. | Def Resp: The witness is asked about whether she did something while at Merck. It is not speculation. | |
| 525: 9 | Q: In your time at Merck, did | | |
| 525: 10 | you ever improperly influence any | | |
| 525: 11 | physicians? | | |
| 525: 12 | A: No, I did not. | | |
| 525: 13 | Q: During the time of your | Pltf Obj: 702, 703, Lay opinion, improper expert opinion. | Overruled |
| 525: 14 | responsibility for Vioxx, did you believe | | |
| 525: 15 | that Vioxx could cause heart attacks? | | |
| 525: 16 | A: No. | | |

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

In re: VIOXX

**PRODUCTS LIABILITY LITIGATION**

This document relates to
Case No. 06-0485

**GERALD D. BARNETT**

        Plaintiff,

v.

**MERCK & CO., INC.,**

        Defendant.

**MDL DOCKET NO. 1657**

**SECTION L**

**JUDGE FALLON**

**MAGISTRATE JUDGE KNOWLES**

<u>**Merck & Co., Inc.'s Notice of Filing Deposition**</u>
<u>**Testimony of Gregory Curfman**</u>

<u>**Exhibit C**</u>

       Merck hereby submits the following deposition testimony of Gregory Curfman for the

Court's consideration and pre-trial rulings:

       1.     Merck's Affirmative Designations with Plaintiff's Objections and Merck's

Responses and the Court's prior rulings, where applicable;

       2.     Plaintiff's Counter-Designations with Merck's Objections

       By June 20, 2006, Merck will submit a notebook for the Court with these designations

and objections, as well as copies of the exhibits referenced herein.  Merck's Affirmative

Designations appear in blue, while Plaintiff's Counter-Designations appear in red.

       The Court has previously ruled in the Plunkett case on many of the Plaintiff's objections

to Merck's Affirmative Designations for Dr. Curfman.  For the instances where the Court

previously overruled Plaintiff's objections, Merck did not provide a specific response and



EXHIBIT
C

respectfully requests that the Court stand by its previous rulings.  Merck did, however, include responses for Plaintiff's objections that were (1) sustained in the Plunkett cases or (2) were not previously addressed by the Court.

As the Court may know, Plaintiff filed affirmative designations for Dr. Curfman during the second phase of the deposition designation process.  Plaintiff has not yet submitted a transcript to the Court for Dr. Curfman.  If the Court prefers, Merck would be happy to work with the Plaintiff to give the Court one complete transcript with all of the Curfman designations from both parties.

**Gerald Barnett v. Merck &Co., Inc.**
**Deposition Designations for Gregory Curfman**
**Defendant's Designations in Blue.  Plaintiff's Designations in Red**

| | | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|---|
| **12:13** | **-** | **12:14** | Curfman 11/21/2005 | | |
| | 12: 13 | Q. Good morning, Dr. Curfman. | | |
| | 12: 14 | A. Good morning. | | |
| **13:11** | **-** | **13:15** | Curfman 11/21/2005 | | |
| | 13: 11 | Q. And what is your current employment, sir? | | |
| | 13: 12 | A. I am the executive editor of The New | | |
| | 13: 13 | England Journal of Medicine. | | |
| | 13: 14 | Q. How long have you held that position? | | |
| | 13: 15 | A. Since July of 2000. | | |
| **16:6** | **-** | **16:11** | Curfman 11/21/2005 | | |
| | 16: 6 | Q. Do you have a background in any particular | | |
| | 16: 7 | field of medicine? | | |
| | 16: 8 | A. I am a board-certified internist.  I was | | |
| | 16: 9 | board-certified in 1974, and I am a board-certified | | |
| | 16: 10 | physician in cardiovascular medicine, cardiology, | Def. Obj: Add 16:12-18 | Overruled |
| | 16: 11 | board-certified in 1977. | per F.R.C.P. 32 (a)(4) | |
| **20:22** | **-** | **22:14** | Curfman 11/21/2005 | | |
| | 20: 22 | Is it -- how would you characterize the | | |
| | 20: 23 | role you had in the review process concerning the | | |
| | 20: 24 | VIGOR study in the year 2000? | | |
| | 21: 1 | A. Well, each manuscript that is submitted to | | |
| | 21: 2 | The Journal is assigned to an editor, an associate | | |
| | 21: 3 | editor, who's job it is to handle that article | | |
| | 21: 4 | through the review process. | | |
| | 21: 5 | In addition, that associate editor is | | |
| | 21: 6 | teamed with a deputy editor.  So there are two | | |
| | 21: 7 | editors who work in tandem to handle the article | | |
| | 21: 8 | through the review process. | | |
| | 21: 9 | I was not either the associate editor | | |
| | 21: 10 | nor the deputy editor on the VIGOR article. | | |
| | 21: 11 | During the time that the VIGOR | | |
| | 21: 12 | manuscript was being handled in our office, between | | |
| | 21: 13 | May and July, I was still a deputy editor. | | |
| | 21: 14 | In July, I became the executive editor. | | |
| | 21: 15 | So it was during the time that the VIGOR article | | |
| | 21: 16 | was being reviewed that I had a change in my | | |
| | 21: 17 | position. | | |
| | 21: 18 | I did, however, attend all of the | | |
| | 21: 19 | editorial meetings where the VIGOR article was | | |

1

| | **Objection/Response in Barnett** | **Ruling in Plunkett** |
|---|---|---|

21: 20        discussed.  I was a part of those discussions.

21: 21              I had the opportunity to express

21: 22        opinions about the manuscript and the data, and so

21: 23        I was a part of the process in that sense, but I

21: 24        was not the primary editor who was responsible for

22: 1         taking that article through the process.

22: 2         Q. Could you describe the role that you had in

22: 3         the review process concerning the APPROVe study?

22: 4         A. For the APPROVe article, I was the primary

22: 5         in-house editor responsible for taking that article

22: 6         through the process.

22: 7              So I selected the reviewers,

22: 8         communicated with the reviewers, had the article

22: 9         reviewed, communicated back with the

22: 10        author, Dr. John Baron.  I had many discussions

22: 11        with Dr. Baron about the article.

22: 12              I carried it through the revision

22: 13        process and carried it to the point of presenting

22: 14        it to the editor-in-chief for final approval.

**23:2    -    24:12**              Curfman 11/21/2005

23: 2         Q. Dr. Curfman, marked as Exhibit 2 is a

23: 3         document bearing the heading of "The New England

23: 4         Journal of Medicine," entitled "Information For

23: 5         Authors," dated January 6, 2000.

23: 6              Are you familiar with this document?

23: 7         A. Yes, I am.

23: 8         Q. Does this document express the policy of

23: 9         The New England Journal of Medicine as of the year

23: 10        2000?

23: 11        A. Yes, that's correct, in terms of the

23: 12        submission of manuscripts.

23: 13        Q. Directing your attention to the second full

23: 14        paragraph on the left-hand side under the heading

23: 15        "Manuscripts," there is a statement, "A covering

23: 16        letter signed by all authors should identify the

23: 17        person, with the address and telephone number,

23: 18        responsible for negotiations concerning the

23: 19        manuscript.  The letter should make it clear that

23: 20        the final manuscript has been seen and approved by

23: 21        all authors and that they have taken due care to

23: 22        ensure the integrity of the work ."

23: 23              Was that part of the policy of The New

23: 24        England Journal of Medicine in the year 2000?

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

24: 1     A. Yes.

24: 2     Q. And with respect to that quoted language,

24: 3     what does the phrase "ensure the integrity of the

24: 4     work" mean?

24: 5     A. "The integrity of the work" refers to the

24: 6     accuracy of the work, the completeness of the data,

24: 7     and the conclusions flowing from the data being

24: 8     appropriate and accurate.

24: 9     Q. Does the phrase "ensure the integrity of

24: 10    the work" include ensuring that the actual data are

24: 11    accurately presented in the manuscript?

24: 12    A. Yes.

**26:3 - 26:10**          Curfman 11/21/2005

26: 3     Q. Does The Journal, as any peer-review

26: 4     journal, rely on the honesty and candor of authors

26: 5     with respect to the veracity of their findings in a

26: 6     manuscript submitted for review?

26: 7     A. Absolutely.

26: 8     Q. Can you please explain the statement in

26: 9     this editorial concerning the best interests of

26: 10    sick patients?

**26:17 - 27:4**          Curfman 11/21/2005

26: 17    A. The ultimate purpose of our journal, the

26: 18    mission of our journal is to provide information to

26: 19    the healthcare community so that they can take care

26: 20    of people that are sick.

26: 21           Very much in the back of our minds

26: 22    every day that we do our work is that we are

26: 23    dealing with people who are ill.  We are dealing

26: 24    with illnesses.  We are dealing with human lives.

27: 1     Human suffering.  That's all in the background of

27: 2     our thinking, and our mission is to try to publish

27: 3     information that is going to be helpful to people

27: 4     who are sick.

**27:5 - 27:11**          Curfman 11/21/2005

27: 5     Q. Does that mission make it important for the

27: 6     information in The Journal to be accurate?

27: 7     A. It is essential that it be accurate and

27: 8     complete and free of errors.

27: 9           Errors can be harmful to patients.  So

27: 10    it's a very meticulous operation that we try to

27: 11    run.

3

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

**44:1 - 45:11**                    Curfman 11/21/2005

44: 1    Q. Doctor, Exhibit 8 is from The New England
44: 2     Journal of Medicine, Volume 336.  It's got a
44: 3     copyright "1997" in the lower right.
44: 4    A. Right.
44: 5    Q. The page is entitled "Uniformed
44: 6     Requirements For Manuscripts Submitted to
44: 7     Biomedical Journals."
44: 8         Is this a document you are familiar
44: 9     with?
44: 10   A. Yes.  This is an earlier version of the
44: 11    document that we were just -- that you were just
44: 12    reading from.
44: 13        So it has gone through a number of
44: 14    iterations over the years.  This would, I believe,
44: 15    have been the document in place at the time of the
44: 16    consideration of the VIGOR trial.
44: 17   Q. And this again is a joint statement of The
44: 18    International Committee of Medical Journal Editors
44: 19    that The New England Journal has adopted for its
44: 20    own policies; is that right?
44: 21   A. That's right.
44: 22   Q. Turning to Page 315, underneath the heading
44: 23    "Sending the Manuscript to the Journal," there is a
44: 24    statement that, "Manuscripts must be accompanied
45: 1     a covering letter, signed by all co-authors," and
45: 2     underneath that there is Subparagraph C that states
45: 3     the following:  "A statement that the manuscript
45: 4     has been read and approved by all the authors, that
45: 5     the requirements for authorship as stated earlier
45: 6     in this document have been met, and that each
45: 7     author believes that the manuscript represents
45: 8     honest work."
45: 9         Did that establish the policy of The
45: 10    New England Journal from 1997 forward?
45: 11   A. Yes.

**45:17 - 46:3**                    Curfman 11/21/2005

45: 17   Q. Dr. Curfman, Exhibit 9 is a copy of a
45: 18    letter date May 18, 2000 from Claire Bombardier and
45: 19    to Robert Utiger, Deputy Editor, New England
45: 20    Journal of Medicine, dated May 18, 2000.
45: 21        Have you seen this letter before?
45: 22   A. Yes, I have.

| | | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|---|
| | 45: 23 | Q. Is it correct that The New England Journal | | |
| | 45: 24 | received a draft manuscript of the VIGOR study from | | |
| | 46: 1 | Claire Bombardier, along with that letter dated May | | |
| | 46: 2 | 18, 2000? | | |
| | 46: 3 | A. That's correct. | | |
| **46:8** - **46:24** | | Curfman 11/21/2005 | | |
| | 46: 8 | Q. The letter itself, Dr. Curfman, is | | |
| | 46: 9 | consecutively Bates numbered at Page 2000 NEMJ 1 | | |
| | 46: 10 | and 2, is that correct, in the document that you | | |
| | 46: 11 | have? | | |
| | 46: 12 | A. Yes, uh-huh. | | |
| | 46: 13 | Q. And are the pages marked ending in the | | |
| | 46: 14 | numbers 5, 7 and 16 the author statements signed by | | |
| | 46: 15 | Drs. Bombardier, Alise Reicin -- that's R-E-I-C-I-N | | |
| | 46: 16 | -- and Deborah Shapiro that were submitted with the | | |
| | 46: 17 | manuscript? | | |
| | 46: 18 | A. Correct. | | |
| | 46: 19 | Q. In those letters, each of the signatories | | |
| | 46: 20 | attested that they had fulfilled the authorship | | |
| | 46: 21 | criteria of the uniform requirements that we read a | | |
| | 46: 22 | few moments ago from the 1997 standards; is that | | |
| | 46: 23 | right? | | |
| | 46: 24 | A. That is right. | | |
| **47:1** - **48:8** | | Curfman 11/21/2005 | | |
| | 47: 1 | Q. Doctor, how long after The New England | | |
| | 47: 2 | Journal received the draft with the May 18, 2000 | | |
| | 47: 3 | letter were you assigned in any capacity to the | | |
| | 47: 4 | review process? | | |
| | 47: 5 | A. I was not assigned to handle this | | |
| | 47: 6 | manuscript through the review process. | | |
| | 47: 7 | So my colleagues Dr. Utiger, Dr. Kaplan | | |
| | 47: 8 | and Dr. Steinbrook were the three editors who | | |
| | 47: 9 | handled this manuscript through the review process. | | |
| | 47: 10 | Dr. Utiger and Dr. Steinbrook are | | |
| | 47: 11 | deputy editors, and Dr. Steinbrook was the primary | | |
| | 47: 12 | deputy editor.  When he was away, Dr. Utiger would | | |
| | 47: 13 | step in for him in that capacity; and Dr. Kaplan, | | |
| | 47: 14 | Marshall Kaplan, was the associate editor who was | | |
| | 47: 15 | primarily responsible for selecting the reviewers | | |
| | 47: 16 | and taking the manuscript through the review | | |
| | 47: 17 | procedures. | | |
| | 47: 18 | Q. Was the VIGOR article sent for external | | |

| | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| | 47: 19 | review? | |
| | 47: 20 | A. Oh, yes. | |
| | 47: 21 | Q. Was there a standard as to how many | |
| | 47: 22 | reviewers you would send an article to? | |
| | 47: 23 | A. Well, in this particular case, the article | |
| | 47: 24 | was sent to two outside reviewers.  It was also | |
| | 48: 1 | reviewed by a statistical consultant who works in | |
| | 48: 2 | that capacity for The Journal. | |
| | 48: 3 | It would have also been read very | |
| | 48: 4 | carefully by Dr. Kaplan, by Dr. Steinbrook, by | |
| | 48: 5 | Dr. Utiger; and then toward the end of the process, | |
| | 48: 6 | I also read the manuscript before it was finally | |
| | 48: 7 | approved, and then accepted by Dr. Jeffrey Drazen, | |
| | 48: 8 | the editor-in-chief. | |
| **55:16 - 55:21** | | Curfman 11/21/2005 | |
| | 55: 16 | Q. Dr. Curfman, the diskette was received | |
| | 55: 17 | shortly after August 20, 2000; is that right? | |
| | 55: 18 | A. Yes.  The original diskette. | |
| | 55: 19 | This would be a copy, but that original | |
| | 55: 20 | diskette was received with this letter | Def Obj: Add 55:22-56:24 |
| | 55: 21 | (indicating). | per F.R.C.P. 32 (a)(4) |
| **59:8 - 59:22** | | Curfman 11/21/2005 | |
| | 59: 8 | Q. Dr. Curfman, please take a look at what has | |
| | 59: 9 | been marked as Exhibit 14, that has been Bates- | |
| | 59: 10 | stamped 2000 NEJM 000235 through 282, and can | |
| | 59: 11 | tell me if this is an accurate copy of the May 2000 | |
| | 59: 12 | draft of the VIGOR study that you observed at the | |
| | 59: 13 | time you reviewed the contents of the diskette in | |
| | 59: 14 | October 2004, as you've testified earlier? | |
| | 59: 15 | A. Yes, it is. | |
| | 59: 16 | Q. You'll notice that we talked a little | |
| | 59: 17 | before the break about the word "tracked changes." | |
| | 59: 18 | Do tracked changes show when deletions | |
| | 59: 19 | or insertions are made to a manuscript? | |
| | 59: 20 | A. That's correct. | |
| | 59: 21 | Q. Do they show, with manipulation of the | |
| | 59: 22 | program, who made them and when? | |
| **59:24 - 59:24** | | Curfman 11/21/2005 | |
| | 59: 24 | A. Yes, it can do that. | |
| **60:1 - 61:2** | | Curfman 11/21/2005 | |

6

| | **Objection/Response in Barnett** | **Ruling in Plunkett** |
|---|---|---|

60: 1    Q. And is that done by using the mouse to
60: 2      hover over a specific insertion or deletion --
60: 3    A. Yes.
60: 4    Q. -- until some information appears on the
60: 5      screen showing that a particular insertion or
60: 6      deletion was made at a particular time by a
60: 7      particular person?
60: 8    A. Right.  So it tracks the change and also
60: 9      the individual and the time and date when the
60: 10     change was made.
60: 11   Q. Now, when you observed this document on
60: 12     screen in October 2004, did you observe that there
60: 13     had been deletions with respect to the text that we
60: 14     looked at earlier?
60: 15         In particular, if you look at Page 251,
60: 16     under the general "Safety Heading," do you see that
60: 17     there is a reference to "Deleted:  8 and 0 patients
60: 18     with myocardial infarction in the rofecoxib and
60: 19     naproxen treatment groups respectively"?
60: 20   A. Yes.
60: 21   Q. And do you see that in the next sentence
60: 22     the information that was deleted refers to the
60: 23     absolute numbers of myocardial infarctions in the
60: 24     nonaspirin indicated group, 9 for rofecoxib and 4
61: 1      for naproxen?
61: 2    A. Yes, I do.

**61:10   -   61:11**                 Curfman 11/21/2005
61: 10   Q. Okay.  Let's look at the Table 5 on the
61: 11     last page, that's 282.

**61:18   -   62:2**                 Curfman 11/21/2005
61: 18   Q. And does this Table 5 on the last page,
61: 19     282, show "deleted" at the top?
61: 20   A. Yes, it does.
61: 21   Q. And does it show tracked change indicating
61: 22     that the deletion was made by Merck?
61: 23   A. That's correct.
61: 24   Q. Does it show that the deletion was made by
62: 1      Merck on May 16, 200 at 8:02 p.m.?
62: 2    A. Correct.

**62:17   -   62:19**                 Curfman 11/21/2005
62: 17   Q. And in particular, Table 5 referred to
62: 18     cardiovascular events; is that correct?

| | | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|---|
| | 62: 19 | A. That's the title of the events, yes. | | |
| **62:20** - **63:10** | | Curfman 11/21/2005 | | |
| | 62: 20 | Q. The legend beneath what would have been | | |
| | 62: 21 | Table 5 states that it "Includes sudden death, | | |
| | 62: 22 | unknown cause of the death, fatal MI, fatal stroke | | |
| | 62: 23 | (hemorrhagic or ischemic), fatal subarachnoid | | |
| | 62: 24 | hemorrhage, fatal primary intracranial hemorrhage | | |
| | 63: 1 | and fatal GI bleeding episode," correct? | | |
| | 63: 2 | A. That's right. | | |
| | 63: 3 | Q. And underneath that, Footnote 2 states, | | |
| | 63: 4 | "Includes serious adjudicated fatal and nonfatal | | |
| | 63: 5 | MI," correct? | | |
| | 63: 6 | A. Right. | | |
| | 63: 7 | Q. And underneath that, "Includes serious | | |
| | 63: 8 | adjudicated fatal and nonfatal ischemic | | |
| | 63: 9 | cerebrovascular accidents." | | |
| | 63: 10 | A. Correct. | | |
| **66:7** - **66:17** | | Curfman 11/21/2005 | | |
| | 66: 7 | Do you see, looking at Exhibit 15, the | | |
| | 66: 8 | deleted and inserted text that the, "8 and 0 | | |
| | 66: 9 | patients with myocardial infarctions in the | | |
| | 66: 10 | rofecoxib and naproxen groups," states, "Merck, May | | |
| | 66: 11 | 17, 2000, 11:20 a.m., deleted"? | | |
| | 66: 12 | A. Yes, I do. | | |
| | 66: 13 | Q. And is that something that you are able to | | |
| | 66: 14 | see by manipulating the mouse in a similar fashion | | |
| | 66: 15 | when the computer screen showed you this -- these | | |
| | 66: 16 | tracked changes? | | |
| | 66: 17 | A. That's right. | | |
| **66:18** - **66:23** | | Curfman 11/21/2005 | | |
| | 66: 18 | EXHIBIT NO. 16 MARKED | | |
| | 66: 19 | Q. And, Doctor, on Exhibit 16, do you see that | | |
| | 66: 20 | there's similar reference to the tracked change | | |
| | 66: 21 | deleting the absolute numbers 9 and 4 that states, | | |
| | 66: 22 | "Merck, May 17, 2000, 11:21 a.m., deleted"? | | |
| | 66: 23 | A. Yes. | | |
| **67:6** - **67:19** | | Curfman 11/21/2005 | | |
| | 67: 6 | Q. Is Exhibit 9 the letter that initially sent | | |
| | 67: 7 | the VIGOR article -- | | |
| | 67: 8 | A. Yes, that's correct, May 18, 2000. | | |
| | 67: 9 | Q. Does that indicate to you that the | | |

| | | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|---|
| | 67: 10 | deletions that we just looked at, referring to | | |
| | 67: 11 | Table 5, and the absolute numbers of data, were | | |
| | 67: 12 | made on May 16 and 17, one day or two days before | | |
| | 67: 13 | the manuscript was sent to you for review? | | |
| | 67: 14 | A. That's correct. | | |
| | 67: 15 | Q. If someone were to testify that any of | | |
| | 67: 16 | these deletions were made at the request of The New | | |
| | 67: 17 | England Journal, that would not be correct, would | | |
| | 67: 18 | it? | | |
| | 67: 19 | A. That would not be correct. | | |
| 67:20 - 67:24 | | Curfman 11/21/2005 | Def Obj: | Overruled |
| | 67: 20 | Q. Did Table 5 include a wider array of events | Leading/improper | |
| | 67: 21 | relating to the cardiovascular system and | question-assumes facts | |
| | 67: 22 | cerebrovascular system than the reference to | not in evidence.  Table 5 | |
| | 67: 23 | myocardial infarctions in the version that was | did not contain any data | |
| | 67: 24 | submitted to The Journal and ultimately published? | (see 62:11-16). | |
| 68:2 - 68:6 | | Curfman 11/21/2005 | Q/A is misleading | |
| | 68: 2 | A. Yes.  It is a wider array of cardiovascular | | |
| | 68: 3 | endpoints that was included in the text. | | |
| | 68: 4 | Q. Would the information about those endpoints | | |
| | 68: 5 | have been of interest to The New England Journal's | | |
| | 68: 6 | readers? | | |
| 68:9 - 68:11 | | Curfman 11/21/2005 | | |
| | 68: 9 | A. Yes.  This would have been of interest to | | |
| | 68: 10 | The New England Journal readers. | | |
| | 68: 11 | Q. Why is that? | | |
| 68:13 - 68:22 | | Curfman 11/21/2005 | | |
| | 68: 13 | A. All of these endpoints relate in one way or | | |
| | 68: 14 | another to the cardiovascular system, and the data | | |
| | 68: 15 | in the text relate to a segment of the | | |
| | 68: 16 | cardiovascular system; namely, the coronary | | |
| | 68: 17 | arteries; but one that thinks about the vascular | | |
| | 68: 18 | system would also want to know about other parts of | | |
| | 68: 19 | the vascular system in relation to these endpoints. | | |
| | 68: 20 | Q. Was that information referenced in Table 5 | | |
| | 68: 21 | relevant to the consideration of the risks and | Def. Obj:  Assumes | Overruled |
| | 68: 22 | benefits of the drug? | facts not in evidence; | |
| 68:24 - 69:1 | | Curfman 11/21/2005 | misleading. | |
| | 68: 24 | A. Yes.  My judgment would be that it would be | Table 5 did not contain | Overruled |
| | 69: 1 | relevant. | data | |
| 69:3 - 69:5 | | Curfman 11/21/2005 | | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

69: 3    Q. Dr. Curfman, the exhibit marked No. 17 is a
69: 4      draft of the VIGOR study with the Bates pages
69: 5      MRK-AAB 0109378 through 411.

**69:22  -  70:1**          Curfman 11/21/2005

69: 22    Q. Do you see at Page 9402 that Table 5,
69: 23      "Cardiovascular Events," was actually part of this
69: 24      draft?
70: 1     A. Yes, I see that.

**70:2  -  70:23**          Curfman 11/21/2005

70: 2     Q. And do you see that Table 5 includes the
70: 3       same legend beneath the table for the events that
70: 4       were being included, such as sudden death, unknown
70: 5       cause of the death, fatal MI, fatal stroke,
70: 6       et cetera?
70: 7     A. Yes, I do.
70: 8     Q. Now, do you see that the cardiovascular --
70: 9       first of all, do you see, for MI in the rofecoxib
70: 10      versus naproxen group, the totals were 17 versus 4?
70: 11    A. Right.
70: 12    Q. And do those totals match up to the
70: 13      absolute numbers that had been deleted; namely, 8
70: 14      versus 0 in the aspirin-indicated and 9 versus 4 in
70: 15      the nonaspirin-indicated?
70: 16    A. That's correct.
70: 17    Q. Do you see that the difference in 95
70: 18      percent confidence interval are stated in an
70: 19      inverted fashion rather than a relative risk of
70: 20      Vioxx greater than naproxen?  It is stated
70: 21      inversely, with the relative risk of naproxen less
70: 22      than Vioxx?
70: 23    A. That's correct.

**71:1  -  71:7**          Curfman 11/21/2005

71: 1     Q. And with that inverted format, is it
71: 2       correct that according to the way scientists
71: 3       interpret statistical significance, if the upper
71: 4       bound of the confidence interval does not include
71: 5       1.0, that would be interpreted as a significant
71: 6       finding; is that correct?
71: 7     A. That's correct.

**71:9  -  71:18**          Curfman 11/21/2005

71: 9     Q. Is it correct then that the 17 versus 4
71: 10      with the 0.3 and 0.07 to 0.57 would be considered a

| | **Objection/Response in Barnett** | **Ruling in Plunkett** |
|---|---|---|

71: 11    significant -- statistically significant result?

71: 12    A. Correct.

71: 13    Q. Going one line above that, to the total of

71: 14    cardiovascular deaths, nonfatal MI or CVA,

71: 15    cerebrovascular accident, do you see that the

71: 16    totals there 32 for rofecoxib or Vioxx versus 17

71: 17    for naproxen?

71: 18    A. Yes.

**71:19   -   72:1**          Curfman 11/21/2005

71: 19    Q. And then in -- the difference in 95 percent

71: 20    confidence interval, do you see that the result is

71: 21    0.4 with the confidence interval of 0.01 to 0.73?

71: 22    A. Yes, I see that.

71: 23    Q. And, again, is that a statistically

71: 24    significant result with the upper bounds lower than

72: 1    1.0?

**72:3   -   72:8**          Curfman 11/21/2005

72: 3    A. Yes.

72: 4    Q. I take it you have never seen the data in

72: 5    this Table 5 before today?

72: 6    A. No.

72: 7    Q. You have not?

72: 8    A. I have not, correct.

**72:9   -   73:13**          Curfman 11/21/2005

72: 9    Q. Now, if you refer to Page 12 of this

72: 10    draft --

72: 11    A. Could I make a comment, Attorney Arbitblit?

72: 12         In looking at this table, I just would

72: 13    like to point out the right-hand column designated

72: 14    "Difference" with 95 percent confidence intervals.

72: 15    Q. Yes, sir.

72: 16    A. What is actually being displayed here is

72: 17    the difference between -- if look at the

72: 18    cardiovascular deaths, nonfatal MIs or CVAs, as an

72: 19    example, it is the difference between the .8 and

72: 20    the .4, and that's where the .4 comes for the

72: 21    difference, and then the 95 percent confidence

72: 22    interval is the bounds for the .4, for the

72: 23    difference.

72: 24         So this is not actually the relative

73: 1    risk.  And when you asked me about statistical

73: 2    significance, I kind of answered, yes; but now that

11

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 73: 3    I look at this, I can't really determine | | |
| 73: 4    statistical significance from the data in this | | |
| 73: 5    particular table because we don't have a relative | | |
| 73: 6    risk and the confidence limits around the relative | | |
| 73: 7    risk. | | |
| 73: 8         So I think that I really did misspeak | | |
| 73: 9    when I commented about the statistical significance | | |
| 73: 10   here.  We would need, I think, a statistical test | | |
| 73: 11   to determine that. | | |
| 73: 12        It's a technical point, but I just | | |
| 73: 13   wanted to make that point. | | |
| **73:14  -  73:18**       Curfman 11/21/2005 | | |
| 73: 14   Q. Would it be consistent with your | | |
| 73: 15   understanding to state that the test applied here | | |
| 73: 16   shows a statistically significant result for the | | |
| 73: 17   difference between Vioxx and naproxen? | | |
| 73: 18   A. Yes. | | |
| **73:21  -  73:23**       Curfman 11/21/2005 | | |
| 73: 21   Q. With respect to the two categories you | | |
| 73: 22    testified to previously? | | |
| 73: 23   A. That's correct, yes. | | |
| **73:24  -  74:24**       Curfman 11/21/2005 | | |
| 73: 24   Q. In particular, to make the record clear, is | | |
| 74: 1    it correct that Table 5 shows a statistically | | |
| 74: 2    significant result for the difference between Vioxx | | |
| 74: 3    and naproxen for myocardial infarction? | | |
| 74: 4    A. Right. | | |
| 74: 5    Q. Is it -- does the Table 5 show a | | |
| 74: 6    statistically significant result for the difference | | |
| 74: 7    between Vioxx and naproxen for the composite | | |
| 74: 8    endpoints of cardiovascular deaths, nonfatal MI or | | |
| 74: 9    CVA? | | |
| 74: 10   A. Correct. | | |
| 74: 11   Q. I believe I was about to direct your | | |
| 74: 12   attention to Page 12 of this draft, which has the | | |
| 74: 13   Bates Page 9389 at the end. | | |
| 74: 14   A. Right. | | |
| 74: 15   Q. And do you see that in the -- about six or | Def. Obj: Asked & answered; misleading | Overruled |
| 74: 16   seven lines down, there is the same reference to | | |
| 74: 17   the text that we have seen previously about the | | |
| 74: 18   percentages of myocardial infarctions, but that | | |
| 74: 19   there is a reference to Table 5 following that | | |

| | | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|---|
| | 74: 20 | sentence? | | |
| | 74: 21 | A. Yes. | | |
| | 74: 22 | Q. And that was later deleted, correct, before | | |
| | 74: 23 | you saw it? | | |
| | 74: 24 | A. Before we saw it, yes. | | |
| 75:21 - 75:22 | | Curfman 11/21/2005 | | |
| | 75: 21 | A. Yes.  I would have wanted to see these | Def. Obj:  Strike answer | |
| | 75: 22 | data. | without question. | |
| 75:24 - 76:6 | | Curfman 11/21/2005 | | |
| | 75: 24 | Q. Now, Doctor, Exhibit 18 is a memo from | Def Obj:  Foundation. | Overruled as to |
| | 76: 1 | Deborah Shapiro to Alise Reicin and others dated | Counsel takes witness | 611; non-responsive |
| | 76: 2 | July 5, 2000. | through a string of docs | objection |
| | 76: 3 | Do you recognize the names of Shapiro | & uses the witness as | |
| | 76: 4 | and Reicin as the two Merck authors on the VIGOR | a prop to discuss or read | |
| | 76: 5 | study? | in docs with which he | |
| | 76: 6 | A. Yes, I do. | is unfamiliar.  No foundation | |
| 76:18 - 77:1 | | Curfman 11/21/2005 | that Dr. Curfman has | |
| | 76: 18 | Q. Could you take a look at Table 7, which is | anything to do with these | |
| | 76: 19 | on Pages 9 and 10 of the document.  You have to | documents or any knowledge | |
| | 76: 20 | the column headings from Page 9 to follow the | of them. See 285:20-24. | |
| | 76: 21 | information onto Page 10. | This applies to 75:24-81:9 | |
| | 76: 22 | But do you see that there is | | |
| | 76: 23 | information in this document dated July 5, 2000 | | |
| | 76: 24 | concerning the number of patients with different | | |
| | 77: 1 | adverse events? | | |
| 77:4 - 78:17 | | Curfman 11/21/2005 | | |
| | 77: 4 | A. Yes, sorry. | | |
| | 77: 5 | Q. And under the "Aspirin Indicated" row on | | |
| | 77: 6 | Page 9, do you see the MI listing of 8 versus 0 for | | |
| | 77: 7 | rofecoxib versus naproxen? | | |
| | 77: 8 | A. Yes, I do. | | |
| | 77: 9 | Q. And there, do you see that the -- on Page | | |
| | 77: 10 | 10, the "Aspirin Not Indicated" group MI row shows | | |
| | 77: 11 | 12 for Vioxx and 4 for naproxen? | | |
| | 77: 12 | A. That's correct. | | |
| | 77: 13 | Q. Now, the data that had been in the deleted | | |
| | 77: 14 | text from the May 2000 version showed 9 versus 4 | | |
| | 77: 15 | for the nonaspirin-indicated; is that correct? | | |
| | 77: 16 | A. That's correct. | | |
| | 77: 17 | Q. And by July 5, 2000, the data of the Merck | | |
| | 77: 18 | authors showed that those numbers were 12 versus | | |
| | 77: 19 | is that correct? | | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

77: 20    A. That's correct.

77: 21    Q. Now, in the manuscript, it was stated that

77: 22    the incidence difference was .2 versus .1 for the

77: 23    nonaspirin-indicated for MI; do you recall that?

77: 24    A. Yes, I do.

78: 1    Q. Does the increase from 9 to 4 to 12 to 4

78: 2    increase the relative risk to 3?

78: 3    A. Yes.  It is indicated here as .33 because,

78: 4    again, it is being looked at in the reverse way

78: 5    that you mentioned, but the relative risk estimate

78: 6    is .33 as opposed to .2.

78: 7    Q. And you are looking for the relative risk

78: 8    column on the right-hand side of Pages 9 and 10 of

78: 9    the July 5th, 2000 memo where there is a relative

78: 10    risk for each of the adverse events?

78: 11    A. Right.

78: 12    Q. And so the relative risk there is listed as

78: 13    0.33, which would translate into 3 to 1 if the

78: 14    number were inverted --

78: 15    A. If they were inverted.

78: 16    Q. -- for Vioxx versus naproxen?

78: 17    A. That's right.

**80:20    -    81:3**            Curfman 11/21/2005

80: 20    Q. Considering the severity of the endpoint,

80: 21    myocardial infarction, and the fact that there was

80: 22    additional data showing a larger number than

80: 23    initially represented in the manuscript submitted

80: 24    to The Journal, would it have been of interest to

81: 1    readers of The Journal to know that the results for

81: 2    the nonaspirin-indicated group achieved a level

81: 3    that was at least borderline significant?

**81:5    -    81:9**            Curfman 11/21/2005

81: 5    A. Oh, absolutely.

81: 6        The difference between 9 MIs and 12 MIs

81: 7    is absolutely of importance and quite relevant, and

81: 8    I certainly would have wanted to have access to

81: 9    these data, absolutely.

**84:14    -    84:18**            Curfman 11/21/2005

84: 14    Q. Exhibit 20 is a letter dated July 7th,

84: 15    2000, with attachment, from Bombardier to

84: 16    Dr. Kaplan.

84: 17        Have you seen this before?

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

84: 18  A. Yes, I have.

**85:13 - 86:2**    Curfman 11/21/2005

85: 13  Q. Now, at the page ending with 037 under

85: 14  heading 6, there's a reference -- does this appear

85: 15  to be the alternating -- the reviewer's comments

85: 16  and the author's responses?

85: 17  A. That's right.  The reviewer's comments are

85: 18  in italics and the author's responses are in the

85: 19  Roman type.

85: 20  Q. Does Paragraph 6 of the author -- of the

85: 21  reviewer comment refer to Table 6 for GI symptoms,

85: 22  and go on to state, "I do not see a Table 6"?

85: 23  A. That's correct.

85: 24  Q. And then the authors state, "We apologize

86: 1  for the confusion created by the inadvertent

86: 2  reference to Table 6, which never existed."

**87:1 - 87:18**    Curfman 11/21/2005

87: 1  Q. Sir, do you see at Page 13 of Exhibit 17 in

87: 2  the first full paragraph the GI endpoints are

87: 3  referenced to a Table 6?

87: 4  A. Right.

87: 5  Q. And then if you look at Page 26 of document

87: 6  which is Merck MRK-AAB 010940, does Table 6 and

87: 7  data appear on that page?

87: 8  A. Yes.

87: 9  Q. And then go back to 14, Exhibit 14.

87: 10  Exhibit 14.

87: 11  A. 14.

87: 12  Q. At Page 252, do you recall from earlier

87: 13  this morning looking at the first full paragraph

87: 14  where Table No. 6, the number "6" was deleted and

87: 15  was replaced with Table 5?

87: 16  A. Right.

87: 17  Q. So it would not be accurate to state on

87: 18  July 17th that Table 6 never existed, would it?

**87:20 - 87:21**    Curfman 11/21/2005

87: 20  A. It would not be accurate to make that

87: 21  statement, yes.

**88:6 - 89:15**    Curfman 11/21/2005

88: 6  In fact, Table 6 existed until it was

88: 7  changed into Table 5, when Table 5 was deleted, is

88: 8  that your understanding?

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 88: 9  A. That's right.  And that's why the reviewer | | |
| 88: 10  here was confused, because there was still an | | |
| 88: 11  allusion to Table 6. | | |
| 88: 12  Q. Now, at Pages 37 and 38 of the document, | | |
| 88: 13  going over in response to Comment No. 7 from the | | |
| 88: 14  reviewer, the authors reiterated and slightly | | |
| 88: 15  modified the text concerning myocardial infarctions | | |
| 88: 16  in the ASA and non-ASA-indicated populations. | | |
| 88: 17      Do you see that?  It's Page 9 and 10 of | | |
| 88: 18  the document ending in 3738 for the Bates range. | | |
| 88: 19  A. Right. | | |
| 88: 20  Q. And this document -- if you look at Exhibit | | |
| 88: 21  18 and compare Exhibit 18, is the July 5 document | | |
| 88: 22  showing the updated information with 12 events | | |
| 88: 23  versus 4 rather than the 9 versus 4 previously used | | |
| 88: 24  that were deleted from the May version, correct? | | |
| 89: 1  A. Correct. | | |
| 89: 2  Q. And the July 17th letter from the authors | | |
| 89: 3  12 days after this July 5 memo does not anywhere | | |
| 89: 4  inform The New England Journal of the 12 versus 4 | | |
| 89: 5  figures, does it? | | |
| 89: 6  A. That's correct. | | |
| 89: 7  Q. Now, is it The Journal's policy to rely on | Def. Obj:  Asked & answered at 26:3-7 | Overruled |
| 89: 8  the manuscript authors to submit true and accurate | | |
| 89: 9  statements of the data? | | |
| 89: 10  A. Yes.  That is imperative. | | |
| 89: 11  Q. Do The Journal's readers rely on the truth | Def. Obj:  602; witness speculating; 403 | Overruled |
| 89: 12  and accuracy of the authors' statements of the data | | |
| 89: 13  in making decisions as to treatment of their | | |
| 89: 14  patients? | | |
| 89: 15  A. Yes, they do. | | |
| **89:17  -  90:23**      Curfman 11/21/2005 | | |
| 89: 17  Q. Is it The Journal's policy to require | | |
| 89: 18  authors to correct the statements in drafts of the | | |
| 89: 19  articles on the basis of information that becomes | | |
| 89: 20  known after an initial draft has been submitted? | | |
| 89: 21  A. Our expectation is that if there is an | | |
| 89: 22  important relevant update to a piece of data during | | |
| 89: 23  the review process, that we would be informed about | | |
| 89: 24  that update, yes. | | |
| 90: 1  Q. Is it correct that the authors did not | Def. Obj:  Asked & answered; 403; | Overruled |
| 90: 2  inform The New England Journal as to the change | | |
| 90: 3  from 9 versus 4 to 12 versus 4 in the nonaspirin- | Dr. Curfman's answer is | |

|  | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| 90: 4 | indicated patients for Vioxx versus naproxen at any | non-responsive | |
| 90: 5 | time prior to the publication of the article? | | |
| 90: 6 | A. Well, not only did they not inform us that | | |
| 90: 7 | the 9 was actually a 12, but you'll recall, | | |
| 90: 8 | Attorney Arbitblit, that none of those data were in | | |
| 90: 9 | the manuscript at all, none of the raw numbers of | | |
| 90: 10 | heart attacks appeared in any version of the | | |
| 90: 11 | manuscript, and therefore, are not in the published | | |
| 90: 12 | article either. | | |
| 90: 13 | So 9 versus 4 was not in there; 8 | | |
| 90: 14 | versus 0 was not there; 17 versus 4 was not in | | |
| 90: 15 | there; and certainly 20 versus 4 was not in there. | | |
| 90: 16 | Q. Now, on the basis of the difference between | Def. Obj:  611; 701-703; | Overruled |
| 90: 17 | the data in the July 5 memo and the published | leading; improper expert | |
| 90: 18 | article, would you agree that physicians who read | opinion | |
| 90: 19 | The Journal for accurate information about efficacy | | |
| 90: 20 | and toxicity did not receive accurate information | | |
| 90: 21 | about the relative risk of MI and other | | |
| 90: 22 | cardiovascular events in the Vioxx patients | | |
| 90: 23 | compared to naproxen? | | |

**91:1  -  92:9**   Curfman 11/21/2005

| 91: 1 | A. Yes.  The risk would have appeared lower | | |
|---|---|---|---|
| 91: 2 | than the real data would support. | | |
| 91: 3 | Q. Now, looking at Exhibit 18, the Shapiro | Def Obj:  Foundation. | Overruled as to |
| 91: 4 | memo of July 5, at Page 3, Table 2, do you see that | Counsel takes witness | 611; non-responsive |
| 91: 5 | the memo includes data in a category of confirmed | through a string of docs | objection |
| 91: 6 | adjudicated serious thromboembolic AEs, or adverse | & uses the witness as | |
| 91: 7 | events, in VIGOR patients with rheumatoid | a prop to discuss or read | |
| 91: 8 | arthritis? | in docs with which he | |
| 91: 9 | A. Yes. | is unfamiliar.  No foundation | |
| 91: 10 | Q. Now, going to the published article -- | that Dr. Curfman has | |
| 91: 11 | A. Got it. | anything to do with these | |
| 91: 12 | Q. -- do you see the statement at the bottom | documents or any knowledge | |
| 91: 13 | left side of Page 1521, going on to the right-hand | of them.  See 285:20-24. | |
| 91: 14 | column, "Because highly selective cyclooxygenase-2 | This applies to 91:3-9 | |
| 91: 15 | inhibitors do not inhibit platelet aggregation, | | |
| 91: 16 | which is mediated by cyclooxygenase-1, there was a | | |
| 91: 17 | possibility that the incidence of thrombotic | | |
| 91: 18 | cardiovascular events would be lower among patients | | |
| 91: 19 | treated with nonselective cyclooxygenase inhibitors | | |
| 91: 20 | than amongst those treated with cyclooxygenase-2 | | |
| 91: 21 | selected inhibitors.  Therefore, cardiovascular | | |
| 91: 22 | events were also assessed for a future | | |

|  |  | **Objection/Response in Barnett** | **Ruling in Plunkett** |
|---|---|---|---|
| | 91: 23    meta-analysis by independent committees whose | | |
| | 91: 24    members were unaware of the patients' treatment | | |
| | 92: 1    assignments." | | |
| | 92: 2          Are you familiar with that quote? | | |
| | 92: 3    A. Yes, I am, uh-huh. | | |
| | 92: 4    Q. Now, in plain English, does -- would it be | | |
| | 92: 5    a fair characterization of that text to -- for a | | |
| | 92: 6    reader to interpret that the rationale for the | | |
| | 92: 7    review procedure of cardiovascular events was the | | |
| | 92: 8    possibility of lower CV event rates with COX-1 | | |
| | 92: 9    inhibitors? | | |
| **92:11** - **92:17** | Curfman 11/21/2005 | | |
| | 92: 11    A. That's correct, yes. | | |
| | 92: 12    Q. Is that the interpretation that you gave to | | |
| | 92: 13    it at the time as an editor, consistent with what | | |
| | 92: 14    you just said, that what was being said here was | | |
| | 92: 15    that they started a review procedure because there | | |
| | 92: 16    was a possibility that you would have a lower CV | | |
| | 92: 17    event with a COX-1 inhibiter? | | |
| **92:19** - **93:2** | Curfman 11/21/2005 | | |
| | 92: 19    A. Well, that was their stated rationale, yes. | | |
| | 92: 20    Q. Now, did the authors ever inform The | | |
| | 92: 21    Journal, anywhere in the documents, that the reason | | |
| | 92: 22    they began cardiovascular event review was that | | |
| | 92: 23    Merck had found an imbalance of prostacyclin and | | |
| | 92: 24    thromboxane in a premarketing study of Vioxx that | | |
| | 93: 1    gave rise to a concern over possible increased | | |
| | 93: 2    thrombotic events on Vioxx? | | |
| **93:4** - **93:20** | Curfman 11/21/2005 | | |
| | 93: 4    A. No.  They never made that point to The | | |
| | 93: 5    Journal. | | |
| | 93: 6    Q. Would such information about a possible | | |
| | 93: 7    mechanism for higher cardiovascular event rates | | |
| | 93: 8    have been relevant to you as an editor of The | | |
| | 93: 9    Journal? | | |
| | 93: 10    A. Yes. | | |
| | 93: 11    Q. And why? | | |
| | 93: 12    A. Prostacyclin is a powerful protector of the | | |
| | 93: 13    inside of blood vessels, the vascular endothelium, | | |
| | 93: 14    and a drug that basically knocks that substance out | | |
| | 93: 15    could theoretically result in higher incidences of | | |

| | | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|---|
| | | thrombosis in a blood vessel. | | |
| 93: 16 | | thrombosis in a blood vessel. | | |
| 93: 17 | | So that would be the biologic rationale | | |
| 93: 18 | | for thinking about the possibility of an increase | | |
| 93: 19 | | in risk with a COX-2 inhibitor as opposed to a | | |
| 93: 20 | | reduction in risk with a nonselective NSAID. | | |

| 93:23 | - | 94:2 | Curfman 11/21/2005 | | |
|---|---|---|---|---|---|

| 93: 23 | Q. Would the information about a possible | Def. Obj:  602; witness | Overruled |
|---|---|---|---|
| 93: 24 | mechanism for higher cardiovascular event rates | answer is non-responsive; | |
| 94: 1 | have been relevant to the readers of The New | 403 | |
| 94: 2 | England Journal of Medicine? | | |

| 94:4 | - | 95:1 | Curfman 11/21/2005 | | |
|---|---|---|---|---|---|

| 94: 4 | A. Yes.  I think, in general, that the |
|---|---|
| 94: 5 | published article would have been a better |
| 94: 6 | statement if it had acknowledged both |
| 94: 7 | possibilities. |
| 94: 8 | Again, I get back to the point that I |
| 94: 9 | made earlier that, without a placebo arm in this |
| 94: 10 | trial, scientifically you really can't know the |
| 94: 11 | reason for the difference between the naproxen |
| 94: 12 | group and the rofecoxib group in MI rate.  You know |
| 94: 13 | there is a difference, but you can't really know -- |
| 94: 14 | you can't dissect out the reason. |
| 94: 15 | So the discussion section would have |
| 94: 16 | been a better discussion section in the published |
| 94: 17 | article if, instead of making the baldface |
| 94: 18 | statement that naproxen was protective, that -- |
| 94: 19 | that could be mentioned as one possibility, but an |
| 94: 20 | equally plausible possibility is that rofecoxib |
| 94: 21 | increased the risk of heart attack; and as I said |
| 94: 22 | earlier, both things theoretically could have been |
| 94: 23 | going on simultaneously.  So the discussion section |
| 94: 24 | would have been best framed, I think, if it had |
| 95: 1 | said that. |

| 95:14 | - | 95:15 | Curfman 11/21/2005 | | |
|---|---|---|---|---|---|

| 95: 14 | Q. Now, looking back to the table in the | Def Obj:  Foundation. | Overruled as to |
|---|---|---|---|
| 95: 15 | Shapiro memo.  Is that 18? | Counsel takes witness | 611; non-responsive |

| 95:18 | - | 97:11 | Curfman 11/21/2005 | through a string of docs | |
|---|---|---|---|---|---|
| | | 95: 18 | Sorry, let's look at Table 4 on Page 6 of the | & uses the witness as | |
| | | 95: 19 | document, which is MRK-NJ 0272451. | a prop to discuss or read | |
| | | 95: 20 | Do you see that there is a "Summary of | in docs with which he | |
| | | 95: 21 | Adjudicated Thromboembolic Serious Adverse | is unfamiliar.  No foundation | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

| | | |
|---|---|---|
| 95: 22    in Selected Subgroups of Patients With Rheumatoid | that Dr. Curfman has | |
| 95: 23    Arthritis in VIGOR, Safety Update Report," and this | anything to do with these | |
| 95: 24    is part of the July 5, 2000 data set, correct? | documents or any knowledge | |
| 96: 1    A. Correct. | of them.  See 285:20-24. | |
| 96: 2    Q. Do you see for all patients there were 45 | This applies to 95:14-97:14 | |
| 96: 3    events in that category for Vioxx versus 19 for | | |
| 96: 4    naproxen? | | |
| 96: 5    A. That's correct. | | |
| 96: 6    Q. The relative risk and 95 percent confidence | | |
| 96: 7    interval are stated, and those numbers are | | |
| 96: 8    statistically significant, correct? | | |
| 96: 9    A. That's correct. | | |
| 96: 10    Q. You now the aspirin-indicated row that | | |
| 96: 11    follows shows 15 events in the Vioxx group versus 3 | | |
| 96: 12    in the naproxen group. | | |
| 96: 13         Do you see that? | | |
| 96: 14    A. Yes, I do. | | |
| 96: 15    Q. With again a relative risk of .20, or 5 to | | |
| 96: 16    1, if it were stated inversely? | | |
| 96: 17    A. Right. | | |
| 96: 18    Q. And the relative risk is again | | |
| 96: 19    statistically significance, correct? | | |
| 96: 20    A. Correct. | | |
| 96: 21    Q. Then in the aspirin-not-indicated group, | | |
| 96: 22    the patients with events are 30 for Vioxx versus 16 | | |
| 96: 23    for naproxen. | | |
| 96: 24         Do you see that? | | |
| 97: 1    A. Yes, I do. | | |
| 97: 2    Q. And again the relative risk is stated and | | |
| 97: 3    the 95 percent confidence interval is statistically | | |
| 97: 4    significance, correct? | | |
| 97: 5    A. Yes, it is. | | |
| 97: 6    Q. Is the finding of significant increased | | |
| 97: 7    risk in both the aspirin-indicated and not-aspirin- | | |
| 97: 8    indicated patients in VIGOR materially different | | |
| 97: 9    from the assertion in the published article that | | |
| 97: 10    there was a significant difference only in the | | |
| 97: 11    high-risk unprotected group? | | |
| **97:13   -   97:14**         Curfman 11/21/2005 | | |
| 97: 13    A. Maybe we should turn to that statement in | | |
| 97: 14    the article. | | |
| **98:8   -   98:19**         Curfman 11/21/2005 | | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

|  |  |  |
|---|---|---|
| 98: 8 | Q. But do you see that the -- Page 1523 refers | |
| 98: 9 | to the difference in the rate of myocardial | |
| 98: 10 | infarction between the aspirin-indicated and the | |
| 98: 11 | nonaspirin-indicated subgroups? | |
| 98: 12 | A. Right. | |
| 98: 13 | Q. And as to the nonaspirin-indicated | |
| 98: 14 | subgroups, the information is provided that the | |
| 98: 15 | difference was not significant; is that right? | |
| 98: 16 | A. I am trying to find that here. | |
| 98: 17 | Q. It's under "General Safety" about -- | |
| 98: 18 | A. Right. | |
| 98: 19 | Q. -- two-thirds of the way down. | |

**98:23   -   99:23**                  Curfman 11/21/2005

| | | |
|---|---|---|
| 98: 23 | A. Yes.  In other words, the difference in the | |
| 98: 24 | rate of myocardial infarction between groups was | |
| 99: 1 | not significant, yep. | |
| 99: 2 | Q. Is it correct to say that the authors never | |
| 99: 3 | even told The New England Journal that they were | |
| 99: 4 | collecting data on an endpoint that they described | |
| 99: 5 | as set forth in the July 5 memo as confirmed | |
| 99: 6 | adjudicated serious thromboembolic adverse events? | |
| 99: 7 | A. Yes.  To my knowledge, we were never | |
| 99: 8 | informed about that, and we never saw this Table 4 | |
| 99: 9 | in the memo. | |
| 99: 10 | Q. Is that information you would have wanted | |
| 99: 11 | to see in your role as an editor at The New England | |
| 99: 12 | Journal in the year 2000? | |
| 99: 13 | A. Yes. | |
| 99: 14 | Q. Why? | |
| 99: 15 | A. It provides more complete information about | |
| 99: 16 | the issue of cardiovascular toxicity; and although | |
| 99: 17 | the VIGOR trial was designed as a gastrointestinal | |
| 99: 18 | trial -- that was the primary focus of the study -- | |
| 99: 19 | the heart is a very important organ; and if there | |
| 99: 20 | is potential toxicity here that was emerging from | |
| 99: 21 | the data, it would be highly relevant to present | |
| 99: 22 | that and to tell that part of the story in this | |
| 99: 23 | article. | |

**100:1   -   101:8**                  Curfman 11/21/2005

| | | |
|---|---|---|
| 100: 13 | Q. Yes.  Do you see any indication in the | |
| 100: 14 | August 20, 2000 letter that the authors took | |
| 100: 15 | advantage of the opportunity of corresponding with | |

| | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| 100: 16 | the editors to advise them of the new data and the | | |
| 100: 17 | increase from 9 events to 12 events versus 4 in the | | |
| 100: 18 | nonaspirin-indicated group? | | |
| 100: 19 | A. No.  I think the only reference in the | | |
| 100: 20 | letter to cardiovascular events is on the top of | | |
| 100: 21 | Page 2 where they again refer to the analysis | | |
| 100: 22 | showing a reduced rate of cardiovascular events in | | |
| 100: 23 | the naproxen group compared with the rofecoxib | | |
| 100: 24 | group. | | |
| 101: 1 | Q. Did the authors take the opportunity on | | |
| 101: 2 | August 20, 2000 in corresponding to The Journal to | | |
| 101: 3 | inform The Journal that they had compiled the | | |
| 101: 4 | events for naproxen and Vioxx in the serious | | |
| 101: 5 | thromboembolic category as shown in the July 5 | | |
| 101: 6 | on Table 6 showing a statistically significant | | |
| 101: 7 | increased risk for Vioxx? | | |
| 101: 8 | A. No. | | |

| 111:2 - 112:7 | Curfman 11/21/2005 | | |
|---|---|---|---|
| 111: 23 | Q. Let's look at -- Exhibit 27 is a | | |
| 111: 24 | Kaplan-Meyer figure showing the shape of the curve | | |
| 112: 1 | for cardiovascular events dated June 20, 2000. | | |
| 112: 2 | Do you see that? | | |
| 112: 3 | A. Yes, I do. | | |
| 112: 4 | Q. Is the shape of the cardiovascular risk | | |
| 112: 5 | curve similar to the gastrointestinal benefit | | |
| 112: 6 | curve, only inverted so that the risk with Vioxx is | | |
| 112: 7 | higher? | | |

| 112:9 - 112:12 | Curfman 11/21/2005 | | |
|---|---|---|---|
| 112: 9 | A. The display, the shapes of the curve, rough | | |
| 112: 10 | curves look similar; but the axis, the vertical | | |
| 112: 11 | axis is different.  The cumulative incidences would | | |
| 112: 12 | be different, but, yes, the shapes are similar. | | |

| 112:2 - 113:5 | Curfman 11/21/2005 | | |
|---|---|---|---|
| 112: 23 | Q. Did the authors provide The New England | | |
| 112: 24 | Journal with both the GI-benefit curve and the | | |
| 113: 1 | cardiovascular-increased-risk curve, or only the | | |
| 113: 2 | GI-benefit curve? | | |
| 113: 3 | A. Only the GI-benefit curve. | | |
| 113: 4 | Q. And would the Vioxx-increased-risk curve | Def. Obj:  602 | Overruled |
| 113: 5 | have been of interest to your readers? | | |

| 113:7 - 113:17 | Curfman 11/21/2005 | | |
|---|---|---|---|
| 113: 7 | A. Yes. | | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 113: 8   Q. Why is that? | | |
| 113: 9   A. Well, of course, these are data that we | | |
| 113: 10   would -- if we had received them, we would have had | | |
| 113: 11   to review them for validity and accuracy; but in | | |
| 113: 12   assessing a drug, one needs to look not only at its | | |
| 113: 13   benefits but also the adverse events, especially | | |
| 113: 14   such important ones as cardiovascular adverse | | |
| 113: 15   events; and so that a doctor prescribing a drug | | |
| 113: 16   needs to know both sides of the story, not just one | | |
| 113: 17   side of the story. | | |
| **119:4  -  120:13**   Curfman 11/21/2005 | | |
| 119: 4   Q. Doctor, Exhibit 28 is a document consisting | | |
| 119: 5   of an e-mail from John Baron to Jeff Drazen, dated | | |
| 119: 6   February 6, 2005, with an attached draft | | |
| 119: 7   manuscript, and the text of the e-mail states, | | |
| 119: 8   "Here is a version for review," with the subject | | |
| 119: 9   line of "APPROVe Cardiovascular." | | |
| 119: 10   Is this the first manuscript that was | | |
| 119: 11   submitted to The New England Journal concerning | | |
| 119: 12   APPROVe study? | | |
| 119: 13   A. Yes.  This appears that this is the first | | |
| 119: 14   version. | | |
| 119: 15   Q. And you testified earlier that you were | | |
| 119: 16   aware that Vioxx was withdrawn from the market on | | |
| 119: 17   September 30, 2004, correct? | | |
| 119: 18   A. That's correct. | | |
| 119: 19   Q. Shortly after that, did you learn anything | | |
| 119: 20   about the manufacturer's intention to submit an | | |
| 119: 21   article of some kind about APPROVe to The New | | |
| 119: 22   England Journal? | | |
| 119: 23   A. Dr. Drazen had communications with | | |
| 119: 24   Dr. Baron, that I was not personally involved with, | | |
| 120: 1   but that he told me about, that they were trying to | | |
| 120: 2   work out a mechanism whereby the cardiovascular | | |
| 120: 3   events in the APPROVe trial with be submitted to | | |
| 120: 4   The New England Journal. | | |
| 120: 5   So Dr. Drazen took it upon himself to | | |
| 120: 6   enter into those discussions with Dr. Baron.  I | | |
| 120: 7   don't know exactly when they began, but it was | | |
| 120: 8   certainly several months before the actual date of | | |
| 120: 9   submission of the manuscript. | | |
| 120: 10   Q. When did you first enter into the process | | |
| 120: 11   in any capacity? | | |

23

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

120: 12        A. Dr. Drazen asked me to handle this
120: 13        manuscript as the editor.

**121:1    -    122:6**        Curfman 11/21/2005
121: 16        When did you actually first see the
121: 17        manuscript?
121: 18        A. I would have seen it February 7th.  It
121: 19        would have to be logged into our computer system
121: 20        and given a manuscript number; and since I knew
121: 21        that it was coming, we had a review process set up
121: 22        and ready to activate.
121: 23        Q. Had you selected reviewers -- of course not
121: 24        naming any names -- but you had gone through the
122: 1        process of identifying who should review the
122: 2        manuscript because you were expecting it?
122: 3        A. That's right.  We had gone through a
122: 4        process of trying to determine who would be good
122: 5        reviewers for this work.  So we had them lined up
122: 6        in advance.

**125:2    -    126:1**        Curfman 11/21/2005
125: 2        Q. Now, following receipt of the manuscript,
125: 3        what was your role in the review process?
125: 4        A. Well, I supervised the review process, and
125: 5        the first thing I did was to read the manuscript
125: 6        myself and to do that as quickly as possible, and
125: 7        then sent it out for review to four outside
125: 8        experts.  Four experts outside of our office.
125: 9        You'll recall that with the VIGOR
125: 10        manuscript, that was reviewed by two outside
125: 11        experts.  I felt that we needed more opinions here,
125: 12        given the high stakes; and I had selected four
125: 13        outside experts who I already communicated with,
125: 14        and who had agreed to review this within about a
125: 15        48-hour time frame.  In fact, some of them did it a
125: 16        little faster than that.
125: 17        We also -- I also at the same time sent
125: 18        the manuscript to one of our statistical
125: 19        consultants who reviewed it during that same time
125: 20        interval.
125: 21        So within, roughly, I am estimating,
125: 22        36, 48 hours, we had four outside reviews and the
125: 23        statistical consultant review, their written
125: 24        comments, that were e-mailed in to our office, and

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

|  |  |  |
|---|---|---|
| 126: 1 | we had all that information. | |

**126:3 - 126:15** Curfman 11/21/2005

126: 3    Q. Doctor, Exhibit 29 appears to be a letter
126: 4    dated February 9, 2005 at 2005 NEJM 13 and 14, to
126: 5    which a set of suggestions for transmittal to
126: 6    authors are attached at Pages 270 to 285, and
126: 7    finally, a financial disclosure and authorship form
126: 8    at 2005 NEJM 8, at the last page.
126: 9    A. Right.
126: 10    Q. With respect to the letter, is that your
126: 11    signature on the second page?
126: 12    A. Yes, it is.
126: 13    Q. Did you write this letter and send it to
126: 14    John Baron on February 9th?
126: 15    A. Yes, I did.

**127:2 - 127:22** Curfman 11/21/2005

127: 2    How do the specific comments of the
127: 3    reviewers and the overall letter that you wrote
127: 4    yourself relate to each other in terms of what The
127: 5    Journal's expectations are?
127: 6    A. Right. The covering letter is really a
127: 7    short summary of some of the really essential
127: 8    points that need to be transmitted to the authors.
127: 9    But the comments of the reviewers, in
127: 10    this case, I felt were just spectacular, very
127: 11    comprehensive; and there was duplication among the
127: 12    reviews.
127: 13    The only purpose of my letter was to
127: 14    bring together some of the essential points; but in
127: 15    making revisions to the manuscript, the authors
127: 16    also need to go through the comments of the
127: 17    reviewers, and that's why they spend so much time
127: 18    writing these up, so we can transmit them to the
127: 19    authors.
127: 20    To summarize, the letter is not a
127: 21    stand-alone. The letter goes in conjunction with
127: 22    the comments to the reviewers.

**128:6 - 128:13** Curfman 11/21/2005

128: 6    Q. Doctor, we are going to mark this as
128: 7    Exhibit 30.
128: 8    Looking at the Exhibit 29, the letter
128: 9    of February 9, 2005, on Page 2, underneath the

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 128: 10   Paragraph No. 8 there is a statement, "You will | | |
| 128: 11   also find editorial comments in tracking changes in | | |
| 128: 12   the version of the manuscript being returned to | | |
| 128: 13   you." | | |

**128:1  -  128:21**          Curfman 11/21/2005

128: 15   A. Right, yes, uh-huh.
128: 16   Q. My question is, with respect to Exhibit 30
128: 17   that has been handed to you, is this document the
128: 18   tracked-changes version that was returned to the
128: 19   authors?
128: 20   A. Yes.  This is the version that was returned
128: 21   to them.

**141:2  -  143:14**          Curfman 11/21/2005

| | Objection/Response | Ruling |
|---|---|---|
| 141: 20   Q. Now, going on to some of the specific | Def Obj:  801/802, | Overruled |
| 141: 21   comments in your letter of February 9, there is a | hearsay & hearsay w/in | |
| 141: 22   No. 7 on Page 2, which states, "Remove assertion | hearsay. | |
| 141: 23   that increased risk was observed only after 18 | Comments were made by | |
| 141: 24   months, because event curves for other adverse | secret reviewers whom | |
| 142: 1   events separate early.  Also the focus on the first | Merck has not had the | |
| 142: 2   18 months was not pre-specified and is a post-hoc | opportunity to cross- | |
| 142: 3   analysis." | examine (141:20-143:14) | |
| 142: 4          Do you see that reference? | | |
| 142: 5   A. Yes, I do. | | |
| 142: 6   Q. Now, going on to the comments of Reviewer C | | |
| 142: 7   at Page 276 of the attachment, there is a parallel | | |
| 142: 8   reference to the 18-month hypothesis that I want to | | |
| 142: 9   ask you about. | | |
| 142: 10          Are you at Page 276? | | |
| 142: 11   A. Yes, I am, uh-huh. | | |
| 142: 12   Q. Under the subheading "Specific Comments," | | |
| 142: 13   do you see, No. 1, "The 18-month hypothesis.  The | | |
| 142: 14   MS" -- does that stand for "manuscript"? | | |
| 142: 15   A. Yes. | | |
| 142: 16   Q. "The MS aggressively promotes the safety of | | |
| 142: 17   up to 18 months of use of rofecoxib.  This goes | | |
| 142: 18   beyond the data of the study.  The analysis by | | |
| 142: 19   duration of use is an example of a post-hoc | | |
| 142: 20   subgroup analysis, because the variation of the | | |
| 142: 21   effect by duration was not an a priori hypothesis | | |
| 142: 22   and the 18-month cutpoint was chosen by inspection | | |
| 142: 23   of the data.  Yusuf and colleagues (JAMA, 1991, | | |
| 142: 24   266:93) warn about the danger of over-interpreting | | |

| | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| | 143: 1   such subgroup analyses in clinical trials, noting | | |
| | 143: 2   that low power is of particular concern," and then | | |
| | 143: 3   a quote from the Yusuf article is provided: | | |
| | 143: 4   "Generally, trials adequate for detecting an | | |
| | 143: 5   overall treatment effect cannot be expected to | | |
| | 143: 6   detect effects within even relatively large | | |
| | 143: 7   subgroups," and that's the end of the quote. | | |
| | 143: 8          Did you mean for your comment in the | | |
| | 143: 9   letter of February 9 to, in a summary fashion, | | |
| | 143: 10   address the concerns of Reviewer C that were just | | |
| | 143: 11   read? | | |
| | 143: 12   A. Yes. | | |
| | 143: 13   Q. Do you agree with those concerns? | | |
| | 143: 14   A. Absolutely. | | |
| 143:2   -   144:2 | Curfman 11/21/2005 | | |
| | 143: 24          Was there general agreement at The New | Def Obj:  Improper expert testimony (701-703); 602 | Overruled |
| | 144: 1   England Journal among the editors that the 18-month | | |
| | 144: 2   hypothesis was not credible? | | |
| 144:4   -   144:20 | Curfman 11/21/2005 | | |
| | 144: 4   A. Yes.  And again at the point that I wrote | | |
| | 144: 5   my letter, you know, I was the editor sort of | | |
| | 144: 6   driving this process.  So I never believed that the | | |
| | 144: 7   separation of 18 months displayed in the figure | | |
| | 144: 8   (indicating), that was displayed in the original | | |
| | 144: 9   submission of the manuscript, I never believed that | | |
| | 144: 10   that was a stable finding. | | |
| | 144: 11          The reviewers -- and you just quoted | Def Obj:  801-802 | Overruled |
| | 144: 12   from one of the reviewers -- didn't believe it.  We | | |
| | 144: 13   thought that if you had repeated the study in | | |
| | 144: 14   exactly the same way, it would be very unlikely you | | |
| | 144: 15   would see that kind of sharp separation at 18 | | |
| | 144: 16   months. | | |
| | 144: 17          So we were very skeptical about it, and | | |
| | 144: 18   I worked with Dr. Baron to try to get them to back | | |
| | 144: 19   away from this contention, and a significant amount | | |
| | 144: 20   of our communication was focused on that point. | | |
| 151:1   -   152:24 | Curfman 11/21/2005 | | |
| | 151: 10   Q. Doctor, is Exhibit 32 the published APPROVe | | |
| | 151: 11   study by Bressalier, et al., as it appeared in the | | |
| | 151: 12   print version published in Volume 352 on March 17, | | |
| | 151: 13   2005? | | |
| | 151: 14   A. That's correct. | | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 151: 15  Q. Now, in comparing the tracked-changes | | |
| 151: 16  version at Page 14 under the discussion, which is | | |
| 151: 17  Page 332, with the first paragraph under the | | |
| 151: 18  discussion in the published article at 1098, the | | |
| 151: 19  sentence from the original manuscript reads, "The | | |
| 151: 20  increased relative risk was observed beginning | | |
| 151: 21  after approximately 18 months of treatment." | | |
| 151: 22  In the published version, it reads, "In | | |
| 151: 23  post-hoc analyses, the increased relative risk of | | |
| 151: 24  adjudicated thrombotic events was first observed | | |
| 152: 1  after approximately 18 months of treatment." | | |
| 152: 2  Was that a change that you as editor | | |
| 152: 3  insisted on? | | |
| 152: 4  A. Yes. | | |
| 152: 5  Q. And was the addition of the phrase "in | | |
| 152: 6  post-hoc analyses" intended to convey to the reader | | |
| 152: 7  that the 18-month hypothesis was only a hypothesis? | | |
| 152: 8  A. Yes, that's correct. | | |
| 152: 9  And, Attorney Arbitblit, since you are | | |
| 152: 10  at this paragraph, I would also point out the last | | |
| 152: 11  sentence in that paragraph, which I can read, "In | | |
| 152: 12  addition, there was an increased frequency of | | |
| 152: 13  investigator-reported events such as hypertension, | | |
| 152: 14  edema and congestive heart failure which occurred | | |
| 152: 15  much earlier in the study." | | |
| 152: 16  Now that's an important point, because | | |
| 152: 17  we can get into this more, perhaps, but there were | | |
| 152: 18  other endpoints where the separation of the curves | | |
| 152: 19  occurred almost immediately on initiation of the | | |
| 152: 20  study, and one of my tasks as editor was to ensure | | |
| 152: 21  that those data were presented in this article. | | |
| 152: 22  Q. Well, let's follow up on that point. | | |
| 152: 23  A. Because they establish that the 18-month | | |
| 152: 24  cutpoint is not a stable cutpoint. | | |

**164:2  -  164:24**  Curfman 11/21/2005

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 164: 20  Q. Were you aware that your requests for | Def Obj:  Assumes facts not in evidence; misleading; prejudicial, 403 | Overruled |
| 164: 21  information to complete the review process of the | | |
| 164: 22  APPROVe study were being filtered through Merck | | |
| 164: 23  executives who were deciding what to provide and | | |
| 164: 24  what not to provide? | | |

**165:3  -  165:3**  Curfman 11/21/2005

| | | |
|---|---|---|
| 165: 3  A. I was not aware of that, no. | | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| **165:5 - 165:20** Curfman 11/21/2005 | | |
| 165: 5  Q. Exhibit 35 is an e-mail from Ned Braunstein | | |
| 165: 6  to Janet Van Adelsberg at Merck, subject:  "DO NOT | | |
| 165: 7  FORWARD.  NEJM letter on APPROVe study." | | |
| 165: 8       "Janet, please do not forward.  We need | | |
| 165: 9  to consider that all of the issues raised in this | | |
| 165: 10  letter will be questions that come up at the ACM. | | |
| 165: 11  We need K-M plots for hypertension, congestive | | |
| 165: 12  heart failure and all of the safety data from | | |
| 165: 13  APPROVe, but you should not mix with CV | | |
| 165: 14  events." | | |
| 165: 15       Do you see that? | | |
| 165: 16  A. Yes, I do. | | |
| 165: 17  Q. You were now aware that Ned Braunstein was | Def Obj:  Same objection assumes facts not in evidence; misleading; prejudicial | Overruled |
| 165: 18  calling the shots on what information you would or | | |
| 165: 19  wouldn't get in response to your requests to the | | |
| 165: 20  sponsor for data; is that right? | | |
| **165:2 - 166:14** Curfman 11/21/2005 | | |
| 165: 23  A. No. | | |
| 165: 24  Q. "No," you were not aware of it? | | |
| 166: 1  A. I was not aware of it. | | |
| 166: 2  Q. Now, is it correct that you believe a | | |
| 166: 3  composite curve would have been something you | | |
| 166: 4  wanted to see? | | |
| 166: 5  A. Beyond the one that we saw? | | |
| 166: 6  Q. Yes. | | |
| 166: 7  A. Yes.  If they had prepared one, yes. | | |
| 166: 8       Again, I'm not sure we would have | | |
| 166: 9  published it, but I would have wanted to see it. | | |
| 166: 10  Q. As far as the comment by Reicin and | Def Obj: Mischarac-misleading; document; leading | Overruled |
| 166: 11  Braunstein that these are apples and oranges, do | | |
| 166: 12  you think these are more like apples and apples in | | |
| 166: 13  terms of they are being serious cardiovascular | | |
| 166: 14  endpoints? | | |
| **166:1 - 167:12** Curfman 11/21/2005 | | |
| 166: 16  A. I was a little confused by what he meant | | |
| 166: 17  there. | | |
| 166: 18       If he means that congestive heart | | |
| 166: 19  failure shouldn't be displayed in the same graph or | | |
| 166: 20  pooled into a graph with, let's say, myocardial | | |
| 166: 21  infarction, I would disagree with that.  Those are | | |
| 166: 22  all apples, okay. | | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

166: 23      I mean, the most common cause of heart

166: 24      failure is coronary heart disease.  So I think it's

167: 1      legitimate to combine those to take a look at that.

167: 2      The hypertension may be a bit different

167: 3      in kind, and one might make an argument to separate

167: 4      that out.

167: 5      Q. While you are on the subject of

167: 6      hypertension, just briefly, did the authors of the

167: 7      APPROVe study inform you at any time that they had

167: 8      conducted a statistical analysis of the relative

167: 9      risk of Vioxx versus placebo for confirmed

167: 10      thrombotic events among patients who had suffered

167: 11      elevated blood pressure above 160 systolic or 100

167: 12      diastolic?

**167:1  -  168:23**      Curfman 11/21/2005

167: 14      A. They did not tell me that in those specific

167: 15      terms.

167: 16      What we did display in the APPROVe

167: 17      article on hypertension is in Table 4, where their

167: 18      hypertension events, at the top of the table, and

167: 19      then as subcategory serious events, what they call

167: 20      "serious events" where they are 11 in rofecoxib and

167: 21      one in placebo, and I don't know if maybe that's

167: 22      what they are referring to here.

167: 23      I mean, we are talking about serious

167: 24      hypertension, but that's as far as we went in the

168: 1      APPROVe article.  We didn't get down to 160 or that

168: 2      kind of thing.  We didn't get down to those

168: 3      numbers.

168: 4      Q. In the -- well, does the 160 level for

168: 5      systolic or the 100 level for diastolic have any

168: 6      particular -- in terms of the stages of

168: 7      hypertension in your field?

168: 8      A. Yes.  That would be a more advanced stage

168: 9      of hypertension.  You would want to deal with that.

168: 10      Q. And if you look at Page 1100 of the

168: 11      published APPROVe study, there is a discussion of

168: 12      mean arterial pressure in the middle of the last

168: 13      paragraph on the left that says, "Mean arterial

168: 14      pressure did not appear to have a significant

168: 15      association with confirmed thrombotic events."

168: 16      Do you see that?

168: 17      A. Yes, I do.

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

168: 18   Q. Would it be relevant to the editors to know
168: 19   that another analysis was conducted of the
168: 20   thrombotic events that did show a significant
168: 21   association among patients who had elevated blood
168: 22   pressure of the 160 or greater systolic or 100 or
168: 23   greater diastolic level?

**169:1  -  169:9**   Curfman 11/21/2005
169: 1   A. Yes.  One of -- one, of course, of the
169: 2   mechanisms of concern in terms of vascular disease
169: 3   would be hypertension as a substrate leading to
169: 4   vessel damage.
169: 5   So that would be -- if such analysis
169: 6   existed, it would be very appropriate to include
169: 7   that.
169: 8   Q. And that would have been of interest, not
169: 9   only to the editors, but also to readers?

**169:1  -  169:11**   Curfman 11/21/2005
169: 11   A. Yes.

**187:2  -  187:23**   Curfman 11/21/2005
187: 2   Q. Doctor, what is the total number of
187: 3   reprints of the Bombardier VIGOR study that have
187: 4   been distributed from 2000 to the present?
187: 5   A. The total is 929,400.
187: 6   Q. And how many were distributed in the year
187: 7   2000?
187: 8   A. 246,000.
187: 9   Q. And that was published on November 23,
187: 10   2000?
187: 11   A. Yes.
187: 12   Q. And in 2001, how many were there?
187: 13   A. 125,900.
187: 14   Q. And how many in 2002?
187: 15   A. 549,500.
187: 16   Q. How many in 2003?
187: 17   A. 7,500.
187: 18   Q. And in 2004?
187: 19   A. 500.
187: 20   Q. And in 2005?
187: 21   A. None in 2005.
187: 22   Q. Again, the total is 929,400?
187: 23   A. Correct.

**190:1  -  191:4**   Curfman 11/21/2005

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

190: 15    Q. Generally speaking, what's the purpose of
190: 16    the peer-review process at The New England
190: 17    A. There are two general purposes:  The first
190: 18    is for us to have a process for selecting that
190: 19    research among a huge body of medical research
190: 20    we and our reviewers believe will have the highest
190: 21    impact on the practice of medicine and healthcare;
190: 22    and secondly, to try to present that information in
190: 23    the clearest manner, the most accurate manner, to
190: 24    our readers.
191: 1          So there is a selection part of the
191: 2    process, and there is an editing part of the
191: 3    process; and in the broadest frame, those are the
191: 4    two parts of our procedures.

**191:1   -   191:21**          Curfman 11/21/2005

191: 13          And there are quite a few steps to the
191: 14    peer-review process at The New England Journal; is
191: 15    that fair?
191: 16    A. Yes.
191: 17    Q. One of the things that that means is that
191: 18    there are a lot of different people, both at The
191: 19    Journal and outside The Journal, who see drafts of
191: 20    manuscripts before they are ever published in The
191: 21    New England Journal?

**191:2   -   192:10**          Curfman 11/21/2005

191: 23    A. That's correct.
191: 24    Q. And I believe -- and you can feel free to
192: 1    refer to this if it is helpful -- is the first step
192: 2    in that process that the editor-in-chief, or the
192: 3    executive editor if the editor-in-chief is not
192: 4    available, reviews each manuscript as it comes in
192: 5    briefly?
192: 6    A. Yes.
192: 7    Q. And do you know whether that occurred with
192: 8    the VIGOR manuscript?
192: 9    A. I have to assume.  I wasn't in the room.
192: 10    So I can't -- but it must have, yes.

**192:1   -   193:2**          Curfman 11/21/2005

192: 18    Q. And what is the purpose of that initial
192: 19    review conducted by the editor-in-chief?
192: 20    A. The editor-in-chief is trying to, first of
192: 21    all, make a determination if it is an article that

|  | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

192: 22          we want to review at all.

192: 23                    Then, if it is, which editor is the

192: 24          most appropriate editor to be the point person on

193: 1          that manuscript, and then to assign that manuscript

193: 2          to that editor.

**193:1  -  195:9**                    Curfman 11/21/2005

193: 14          Q. And how is the -- I think you mentioned

193: 15          that the editor-in-chief will try to select an

193: 16          appropriate editor.

193: 17                    How is that selection made?

193: 18          A. Primarily based on the topic of the article

193: 19          in question.

193: 20          Q. And do you know who the associate editor

193: 21          was who was selected with respect to the VIGOR

193: 22          manuscript?

193: 23          A. Yes, I do.

193: 24          Q. Who was that?

194: 1          A. Dr. Marshall Kaplan.

194: 2          Q. And do you know, Dr. Kaplan is a medical

194: 3          doctor?

194: 4          A. He is a medical doctor, and his training is

194: 5          in gastroenterology; and since the primary focus of

194: 6          the VIGOR trial was a gastrointestinal endpoint,

194: 7          the manuscript was assigned to Dr. Kaplan to

194: 8          handle.

194: 9          Q. Okay.  And what -- I believe your article

194: 10          states that the associate editor, at least

194: 11          initially, is assessing the value and the validity

194: 12          of the manuscript; is that right?

194: 13          A. Yes.  The associate editor would then take

194: 14          another read.  It might be a fairly quick read.

194: 15          Again, to determine in his or her mind if it was

194: 16          something that would be appropriate for The New

194: 17          England Journal; and if so, go on to identify the

194: 18          outside reviewers for the manuscript.

194: 19          Q. Okay.  And if it -- if at that step the

194: 20          associate editor determines that the piece is not

194: 21          valid or the piece is not fairly written, does --

194: 22          can the associate editor at that point reject the

194: 23          piece?

194: 24          A. Yes.

195: 1          Q. And I think your article, I think your

195: 2          article mentions that, should the associate editor

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

195: 3    determine that the piece is not appropriate, it
195: 4    could go to a deputy editor for a second opinion;
195: 5    is that correct?
195: 6    A. Yes.  Our general procedure is that we
195: 7    don't reject manuscripts with only one pair of eyes
195: 8    having seen it.  We like two pairs of eyes to have
195: 9    seen it.

**195:1   -   196:10**    Curfman 11/21/2005

195: 12    Did Dr. Kaplan on his initial
195: 13    assessment of the value and validity of the piece
195: 14    determine that it should be further reviewed, or
195: 15    did Kaplan reject the piece and therefore require a
195: 16    second opinion from a deputy editor?
195: 17    A. No.  He determined that it was worthy of
195: 18    review, and then went ahead and assigned the
195: 19    reviewers.
195: 20    Q. And so that is -- that is the next step, as
195: 21    your article mentioned -- mentioned, and as you
195: 22    just testified, that Dr. Kaplan would assign the
195: 23    manuscript to outside reviewers; is that correct?
195: 24    A. That's correct.
196: 1    Q. And there can be -- there can be two
196: 2    reviewers with certain manuscripts?
196: 3    A. Oh, sure.
196: 4    Q. And I believe -- I believe VIGOR actually
196: 5    received a review from three viewers; is that
196: 6    correct?
196: 7    A. Yes.  Two of the reviewers were outside
196: 8    reviewers, and one of the reviewers was a
196: 9    statistical consultant who is a part-time member of
196: 10    our staff.

**196:1   -   197:17**    Curfman 11/21/2005

196: 17    Q. And what is the -- what's the purpose of
196: 18    the review conducted by the external reviewers as
196: 19    well as the statistical consultant?
196: 20    A. The external reviewers are asked to
196: 21    carefully read and evaluate the manuscript and give
196: 22    us their opinion on its suitability for publication
196: 23    in terms of the novelty of the research, the
196: 24    accuracy and the validity of the research, the
197: 1    composition of the manuscript -- how it is written,
197: 2    how the data are displayed -- and the overall

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

197: 3    interest to the readership of The New England
197: 4    Journal of Medicine.  So there are four categories
197: 5    of evaluation that they are asked to make.
197: 6         Reviewers serve as advisors to the
197: 7    editors.  We ask them for a judgment on the
197: 8    suitability for the publication of the manuscript
197: 9    in The New England Journal, but the final decision
197: 10   is really made by the editors, collectively.
197: 11        We meet together, discuss the
197: 12   manuscript in quite a lot of detail.  All of the
197: 13   editors are there.  The statistical consultants are
197: 14   there, and we have an opportunity then to take the
197: 15   reviewers' comments and put them into a larger
197: 16   context, a larger discussion, with input from all
197: 17   the editors.

**198:4  -  198:7**          Curfman 11/21/2005
198: 4    Q. And does The New England Journal make an
198: 5    effort to assign manuscripts to reviewers who have
198: 6    expertise in the fields relevant to that particular
198: 7    manuscript?

**198:9  -  200:6**          Curfman 11/21/2005
198: 9    A. We maintain a computerized database of many
198: 10   thousands of medical experts around the world, and
198: 11   we use that database to try to match up the content
198: 12   of article with the expertise of the reviewers, and
198: 13   we ask the reviewers to categorize their own
198: 14   reviewing interest.
198: 15        So we maintain that in the database,
198: 16   and we are able to do a search of the database to
198: 17   find those reviewers whose interests match up with
198: 18   the content of the article, and so that's how we
198: 19   select the reviewers.
198: 20   Q. Okay.  Let's just -- let's just break down
198: 21   some of the -- some of the types of things that the
198: 22   reviewers can do when they get -- when they review
198: 23   a manuscript.
198: 24        Can the reviewers, if they feel
199: 1    additional data would appropriate, request that the
199: 2    authors provide additional data that was not
199: 3    provided in the manuscript?
199: 4    A. Yes.
199: 5    Q. And if the reviewers believe that data --

35

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 199: 6     data are presented inappropriately or in a | | |
| 199: 7     misleading way in the manuscript, is that something | | |
| 199: 8     the reviewers are permitted to comment on? | | |
| 199: 9     A. Yes. | | |
| 199: 10     Q. And similarly, separate from the data, but | | |
| 199: 11     with the conclusions and the interpretations that | | |
| 199: 12     are drawn from that data, if the reviewers believe | | |
| 199: 13     those invalid or inappropriate, the reviewers have | | |
| 199: 14     the right to comment on that as well? | | |
| 199: 15     A. That's right. | | |
| 199: 16     Q. Now, I believe you mentioned that the next | | |
| 199: 17     step, once the reviewers return their reviews to | | |
| 199: 18     The New England Journal, is that the associated | | |
| 199: 19     editor, who has control of the manuscript or has | | |
| 199: 20     been assigned to the manuscript, has the | | |
| 199: 21     opportunity to discuss the reviews and the | | |
| 199: 22     manuscript with the entire editorial board; is that | | |
| 199: 23     correct? | | |
| 199: 24     A. Yes. | | |
| 200: 1     Q. And mentioned in the case of the VIGOR | | |
| 200: 2     manuscript, I believe you said that that was the | | |
| 200: 3     stage at which you first became involved, was | | |
| 200: 4     during these discussions with the entire editorial | | |
| 200: 5     board; is that right? | | |
| 200: 6     A. Yes.  That's correct. | | |
| **204:7 - 206:10**      Curfman 11/21/2005 | | |
| 204: 7     Q. So you had -- is it fair to say that you, | | |
| 204: 8     therefore, received the input of medical doctors | | |
| 204: 9     and at least one statistical consultant that had | | |
| 204: 10     expertise in a variety of different fields? | | |
| 204: 11     A. Correct. | | |
| 204: 12     Q. I think you mentioned before, Doctor, that | | |
| 204: 13     you're board-certified in internal medicine and | | |
| 204: 14     cardiology; is that correct? | | |
| 204: 15     A. That's right. | | |
| 204: 16     Q. Are there other cardiologists, to your | | |
| 204: 17     knowledge, that participated in the review of the | | |
| 204: 18     VIGOR manuscript, with the exception, of course, of | | |
| 204: 19     the anonymous reviewers? | | |
| 204: 20     A. Yes.  Dr. Lagakos is a board-certified | | |
| 204: 21     cardiologist, and he would have had an opportunity | | |
| 204: 22     to weigh in as well. | | |
| 204: 23     Q. And ultimately -- ultimately, after this | | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 204: 24    group deliberates, the editors have to determine | | |
| 205: 1    ultimately that a piece is appropriate for | | |
| 205: 2    publication before it is published in The New | | |
| 205: 3    England Journal; is that correct? | | |
| 205: 4    A. That's correct. | | |
| 205: 5    Q. But usually there is an intervening step, | | |
| 205: 6    which there was here, which is that the paper is | | |
| 205: 7    sent back to the authors for some revision based on | | |
| 205: 8    the comments of reviewers and perhaps the editors | | |
| 205: 9    as well; is that right? | | |
| 205: 10    A. That's right. | | |
| 205: 11    Q. And I think I said this, but that actually | | |
| 205: 12    did happen with the VIGOR paper? | | |
| 205: 13    A. Correct. | | |
| 205: 14    Q. And, in fact, there can be multiple | | |
| 205: 15    requests for revisions where the paper is sent to | | |
| 205: 16    the authors for revision, and the authors make | | |
| 205: 17    certain revisions, and the editors determine that | | |
| 205: 18    more revisions are appropriate; is that correct? | | |
| 205: 19    A. That's correct. | | |
| 205: 20    Q. And, again, that did -- that did in fact | | |
| 205: 21    happen with the VIGOR manuscript? | | |
| 205: 22    A. Yes. | | |
| 205: 23    Q. And so what -- what that means is that on | | |
| 205: 24    more than one occasion editors at The Journal sent | | |
| 206: 1    the paper back to the authors of the manuscript and | | |
| 206: 2    told them that changes would be required before it | | |
| 206: 3    could be published in The New England Journal, and | | |
| 206: 4    the authors then made changes and sent it back to | | |
| 206: 5    the editors for review; is that right? | | |
| 206: 6    A. That's right. | | |
| 206: 7    Q. Is it fair to say that The New England | | |
| 206: 8    Journal has one of the most rigorous peer-review | | |
| 206: 9    processes of any peer-review journal? | | |
| 206: 10    A. It's rigorous. | | |
| **219:7  -  220:16**      Curfman 11/21/2005 | | |
| 219: 7    Q. Doctor, I would ask you to take a look at | | |
| 219: 8    the Bombardier article as it was published, which | | |
| 219: 9    was marked as Exhibit 11 earlier today, and for now | | |
| 219: 10    I am just going to be looking at the first page of | | |
| 219: 11    the article. | | |
| 219: 12    First of all, looking at the top of the | | |
| 219: 13    page, it appears that there are 12 authors listed | | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

219: 14          as authors of this article right under the title;

219: 15          is that correct?

219: 16          A. Correct.

219: 17          Q. And, in fact, is -- The New England Journal

219: 18          has a limit of 12 authors that can be listed in

219: 19          that position on the page right below the title; is

219: 20          that correct as well?

219: 21          A. At that time there was a limit.  There is

219: 22          no longer a limit.

219: 23          Q. And if you look down at the bottom of this

219: 24          page in the footnote, in the very last two lines,

220: 1          there is note that Arthur Weaver, M.D. from the

220: 2          Arthritis Center of Lincoln, Nebraska was another

220: 3          author.

220: 4                    Do you see that?

220: 5          A. Yes, I do.

220: 6          Q. He is listed down there rather than above

220: 7          because of the rule at the time that you mentioned

220: 8          that there could only be 12 listed at the top of

220: 9          page; is that correct?

220: 10          A. That's correct.

220: 11          Q. And the footnote at the -- or not the

220: 12          footnote, but the smaller text at the bottom of the

220: 13          page describes where the authors -- the various

220: 14          authors are from.

220: 15                    Do you see that?

220: 16          A. Yes, I do.

**221:3   -   224:24**                    Curfman 11/21/2005

221: 3          Q. And if you look at the bottom of the page,

221: 4          these doctors come from a variety of institutions.

221: 5                    For example, the lead author, Claire

221: 6          Bombardier, is listed as coming from the Institute

221: 7          For Work and Health as well as Mount Sinai Hospital

221: 8          and the University Health Network of Toronto.

221: 9                    Do you see that?

221: 10          A. Yes, I do.

221: 11          Q. The second author, Loren Laine, is from the

221: 12          gastrointestinal Division, Department of Medicine

221: 13          at the University of Southern California School of

221: 14          Medicine in Los Angeles.

221: 15                    Do you see that as well?

221: 16          A. Yes.

221: 17          Q. And then there is the notation that two of

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

221: 18         the authors, Dr. Alise Reicin and Dr. Deborah
221: 19         Shapiro, are from Merck.
221: 20             Do you see that?
221: 21         A. Yes.
221: 22         Q. Those are the only two of the 12 authors --
221: 23         13 if you count Dr. Weaver -- that are actually
221: 24         from Merck.  All of the other -- all of the other
222: 1         authors are from outside institutions; is that
222: 2         correct?
222: 3         A. That's correct.
222: 4         Q. And I won't go through all of them, in the
222: 5         interest of time, but they are from a variety of
222: 6         respected institutions, both within the United
222: 7         States and around the world, including, just for
222: 8         example, the University of Texas, Houston School of
222: 9         Public Health; the Division of Rheumatology and
222: 10         Clinical Immunology at the University of Maryland
222: 11         in Baltimore; the Office of Clinical Research and
222: 12         Training at Northwestern University School of
222: 13         Medicine in Chicago, just as examples.
222: 14             Do you see those?
222: 15         A. Yes.  Those are U.S. examples.
222: 16         Q. I named the U.S. examples, yes; and there
222: 17         are also examples from Australia, Brazil, Mexico
222: 18         and other countries around the world; is that
222: 19         right?
222: 20         A. That's right.
222: 21         Q. Now, in order to be an author on the New
222: 22         England -- on a paper within The New England
222: 23         Journal of Medicine, there are certain requirements
222: 24         that The New England Journal has; is that correct?
223: 1         A. That's correct.
223: 2         Q. One of those requirements is that each of
223: 3         the authors must sign a statement that attests that
223: 4         they have met certain requirements that The New
223: 5         England Journal imposes in order to be an author on
223: 6         the paper; is that right?
223: 7         A. Correct.
223: 8           MR. FITZPATRICK:  I am going to mark
223: 9         another document.
223: 10           EXHIBIT NO. 45 MARKED
223: 11         Q. And, Doctor, do you recognize this as the
223: 12         signed statements by the authors on the VIGOR

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

223: 13          publication?

223: 14          A. Yes, I do.

223: 15          Q. And these came from your files.

223: 16                    They are all submitted as part of The

223: 17          New England Journal's requirement that these

223: 18          attestations be submitted before someone can

223: 19          as an author on the article; is that correct?

223: 20          A. That's correct.

223: 21          Q. And just taking a look at the language of

223: 22          the attestation, each of these doctors attest that

223: 23          they have done several things in order to fulfill

223: 24          the authorship criteria of what are known as the

224: 1          uniform requirements; is that correct?

224: 2          A. That's correct.

224: 3          Q. And those include stating that they have

224: 4          made substantial contributions to (A) the

224: 5          conception and design and/or analysis and

224: 6          interpretation of the data.

224: 7                    That's one of the -- that's one the

224: 8          substantial contributions, correct?

224: 9          A. Correct.

224: 10          Q. And, two, they have made substantial

224: 11          contributions to drafting the article or revising

224: 12          it critically for important intellectual content;

224: 13          is that correct?

224: 14          A. That's correct.

224: 15          Q. And the third requirement that they have to

224: 16          attest to is that they have made substantial

224: 17          contributions to the final approval of the version

224: 18          of the article to be published; is that correct?

224: 19          A. Correct.

224: 20          Q. And each of the -- each of the authors that

224: 21          appeared as an author in The New England Journal

224: 22          for the VIGOR manuscript signed these statements

224: 23          attesting to each of those facts; is that correct?

224: 24          A. That's correct.

**225:1   -   225:22**          Curfman 11/21/2005

225: 11          Q. Do you have Exhibit 46, Doctor?

225: 12          A. Yes, I do.

225: 13          Q. And you recognize this as the letter that

225: 14          you spoke about this morning, which was the May 18,

225: 15          2000 letter which submitted the original VIGOR

225: 16          manuscript to The New England Journal; is that

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

225: 17          correct?

225: 18          A. That's correct.

225: 19          Q. And I think you mentioned the letter is

225: 20          from Dr. Bombardier, who is a medical doctor and is

225: 21          also at the University of Toronto?

225: 22          A. That's correct.

**226:2   -   229:5**          Curfman 11/21/2005

226: 23                  If you turn to the -- just moving down

226: 24          to the next sentence, it reads, "Given that NSAIDs

227: 1          are among the most commonly used medications in

227: 2          world and the significant benefit for patients from

227: 3          the reduction in gastrointestinal morbidity, we ask

227: 4          that you please consider this manuscript for an

227: 5          expedited review."

227: 6                  Do you see that sentence?

227: 7          A. I do.

227: 8          Q. You would agree in that sentence

227: 9          Dr. Bombardier is asking that The Journal give this

227: 10          manuscript an expedited review?

227: 11          A. That's correct.

227: 12          Q. Does The Journal have a specific procedure

227: 13          whereby it can give a manuscript an expedited

227: 14          review?

227: 15          A. Yes, we do.

227: 16          Q. And what is that procedure?

227: 17          A. Requests for expedited review are

227: 18          considered by the editors based on the substance of

227: 19          the research; and in particular, as I have alluded

227: 20          to earlier, it's our estimation of the overall

227: 21          impact on the health of the public and whether

227: 22          people in our society and around the world will be

227: 23          immediately impacted, immediately impacted in an

227: 24          important way in terms of their health.

228: 1                  In addition, the other qualifying

228: 2          factor is:  Can this research be reviewed

228: 3          adequately in an expedited fashion, or are there

228: 4          other complexities that will need to be dealt with

228: 5          in the review process that will take more time?

228: 6                  So those are the two considerations

228: 7          that go into a determination of whether we will do

228: 8          an expedited review.

228: 9          Q. And is the effect of an expedited review,

228: 10          if it is granted and the piece is in fact

41

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

228: 11        published, that the manuscript would be published

228: 12        faster than it would in the normal -- in the

228: 13        ordinary course of peer review?

228: 14        A. Yes.

228: 15        Q. And so what Dr. Bombardier was requesting

228: 16        was an expert review that, if granted, would have

228: 17        resulted in a faster publication of the VIGOR

228: 18        results than had expedited review not been granted?

228: 19        A. Correct.

228: 20        Q. Was expedited review in fact granted for

228: 21        the VIGOR manuscript?

228: 22        A. No, it was not.  And I guess I should

228: 23        qualify my answers to your questions about

228: 24        expedited review.

229: 1              What we -- what we commit ourselves to,

229: 2        if we agree to expedited review, is an expedited

229: 3        review.  We do not commit to publication,

229: 4        necessarily.  We commit to a review process that

229: 5        will take less time.

**236:2    -    238:5**                Curfman 11/21/2005

236: 22        Q. And, Doctor, do you have Exhibit 47 in

236: 23        front of you?

236: 24        A. I do, uh-huh.

237: 1        Q. Could you identify that, please.

237: 2        A. This is a letter written by the deputy

237: 3        editor primarily responsible for the VIGOR

237: 4        manuscript, Dr. Robert Steinbrook, to Dr. Claire

237: 5        Bombardier, asking for some additional information,

237: 6        pretty early on in the process, about the efficacy

237: 7        of the two drugs in the treatment of rheumatoid

237: 8        arthritis, and those data, in his mind, had not

237: 9        been really very clearly displayed in the first

237: 10        version of the manuscript, and he wanted to know

237: 11        about that.

237: 12        Q. Okay.  So Dr. Steinbrook basically wanted

237: 13        to know some additional data about the efficacy of

237: 14        rofecoxib or Vioxx in the treatment of rheumatoid

237: 15        arthritis, and he requested that Dr. Bombardier

237: 16        provide that data to him; is that fair?

237: 17        A. Right.  And then an additional question had

237: 18        to do with prior history of gastrointestinal events

237: 19        and proton-pump-inhibitor therapy or misoprostol

237: 20        therapy, yes.

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 237: 21         So these are issues he wanted more | | |
| 237: 22     information about as the editor. | | |
| 237: 23     Q. And is that -- is that a fairly common | | |
| 237: 24     practice, if a deputy editor or an associated | | |
| 238: 1     editor wants additional information from the | | |
| 238: 2     authors of a manuscript, that he or she can request | | |
| 238: 3     that information from the authors? | | |
| 238: 4     A. Yes.  It is fairly common practice.  It is, | | |
| 238: 5     yes. | | |
| **238:7   -   239:4**        Curfman 11/21/2005 | | |
| 238: 7     A. I think what I would like to say in | Def Obj:  Non-responsive; witness is speaking out of turn | Overruled |
| 238: 8     addition to that is that there is also an | | |
| 238: 9     expectation on the part of the editors that there | | |
| 238: 10     is a sense of fairness in the scholarly community | | |
| 238: 11     that authors have a pretty good sense of what | | |
| 238: 12     information they have at their disposals.  Editors | | |
| 238: 13     don't. | | |
| 238: 14        If the expectation is that if an editor | | |
| 238: 15     doesn't ask for it, you as an author don't have to | | |
| 238: 16     provide it, that's not fair. | | |
| 238: 17     Q. No, absolutely. | Def Obj: not a question; 403 | Overruled |
| 238: 18     A. That's not the way the scholarly community | | |
| 238: 19     has functioned for hundreds of years. | | |
| 238: 20        There has to be an expectation that the | | |
| 238: 21     researcher is going to provide the information that | | |
| 238: 22     they know they have there, not necessarily without | | |
| 238: 23     having to be asked by an editor. | | |
| 238: 24        Now these were issues that | | |
| 239: 1     Dr. Steinbrook wanted more information about, | | |
| 239: 2     that's fair; but to carry that too far and to say | | |
| 239: 3     if an editor didn't ask for it, then I don't have | | |
| 239: 4     to give it, is not a level playing field. | | |
| **240:2   -   241:5**        Curfman 11/21/2005 | | |
| 240: 2        MR. FITZPATRICK:  I am going to mark | | |
| 240: 3     the response to Dr. Steinbrook's request for data. | | |
| 240: 4        EXHIBIT NO. 48 MARKED | | |
| 240: 5     Q. Doctor, do you have Exhibit 48 in front of | | |
| 240: 6     you? | | |
| 240: 7     A. Yes, I do. | | |
| 240: 8     Q. And does this appear to be Dr. Bombardier | | |
| 240: 9     response to Dr. Steinbrook's letter that we just | | |
| 240: 10     looked at? | | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

240: 11　　A. Yes, it does.

240: 12　　Q. And just looking, just looking generally at

240: 13　　this response, does it appear to provide a fair bit

240: 14　　of detail on the efficacy data requested by

240: 15　　Dr. Steinbrook in his letter?

240: 16　　A. Yes.

240: 17　　Q. For example, Dr. Bombardier provides,

240: 18　　although they are not very clear in this copy, what

240: 19　　appear to be several -- several figures depicting

240: 20　　various measurements of efficacy in the treatment

240: 21　　of rheumatoid arthritis; is that correct?

240: 22　　A. That's correct.

240: 23　　Q. And so it is fair to say that when

240: 24　　Dr. Steinbrook did request this specific piece of

241: 1　　data, specifically the efficacy data in the

241: 2　　treatment of rheumatoid arthritis, Dr. Bombardier

241: 3　　was responsive and cooperative in providing that

241: 4　　data; is that fair?

241: 5　　A. Yes.

**241:6　-　245:12**　　　Curfman 11/21/2005

241: 6　　Q. Doctor, if you could take a look at what

241: 7　　was marked this morning as Exhibit 19.

241: 8　　　　Do you have Exhibit 19, Doctor?

241: 9　　A. Yes, I do.

241: 10　　Q. And I believe you already described this

241: 11　　document this morning.

241: 12　　　　Is it correct that this is a June 30

241: 13　　letter from Dr. Kaplan at The New England Journal

241: 14　　to Dr. Bombardier?

241: 15　　A. Yes.

241: 16　　Q. And this letter discusses the -- among

241: 17　　other things, it discusses some of the comments of

241: 18　　the reviewers to the VIGOR manuscript?

241: 19　　A. Correct.

241: 20　　Q. And I apologize, I think you told us

241: 21　　before, but who is Dr. Kaplan?

241: 22　　A. He is the associate editor who was

241: 23　　responsible for handling this manuscript, and he is

241: 24　　a gastroenterologist by background.

242: 1　　Q. Does this letter reflect the stage of the

242: 2　　peer-review process where the associate editor

242: 3　　contacts the authors and requires revisions -- that

242: 4　　revisions be made in order for the piece to be

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

242: 5          considered for publication?

242: 6          A. Yes.  Again, this is meant to be a summary,

242: 7          not necessarily an exhaustive repetition of all of

242: 8          the reviewers' comments, but some attempt at

242: 9          prioritizing them, focusing the authors on some of

242: 10         the more important issues in Dr. Kaplan's mind.

242: 11         Q. And as Dr. Kaplan writes, "While the

242: 12         editors are interested in your manuscript" -- and

242: 13         then he gives the title of the manuscript -- "we

242: 14         could not accept it for publication without

242: 15         substantial revision"; is that correct?

242: 16         A. That's correct.

242: 17         Q. And so Dr. Kaplan is basically saying that

242: 18         unless the comments of the reviewers and the

242: 19         editors are addressed to the editors' satisfaction,

242: 20         the manuscript will not be published in The New

242: 21         England Journal of Medicine; is that correct?

242: 22         A. Correct.

242: 23         Q. Okay.  And the letter also goes through a

242: 24         variety of requirements for a manuscript in order

243: 1          to be published in The Journal, generally speaking,

243: 2          and in addition to the comments of the specific

243: 3          reviewers; is that correct?

243: 4          A. Yes.

243: 5          Q. I will just refer you as soon as I find it

243: 6          specifically to the second paragraph on Page 2 of

243: 7          the letter.

243: 8                One of the requirements is a firm limit

243: 9          that the manuscript should be no longer than 3,000

243: 10         words of text; is that correct?

243: 11         A. Right.

243: 12         Q. And The Journal also requires a total of no

243: 13         more than five figures and tables; is that correct?

243: 14         A. That's a target that we shoot for, but we

243: 15         are flexible.  Typically, we are flexible on that.

243: 16                It depends the data.  If there is

243: 17         another piece of display data that is very, very

243: 18         important, we will add additional figures and

243: 19         tables; but we like to give the authors a target

243: 20         because we don't want to end up with 30 tables that

243: 21         we really can't published in print.

243: 22         Q. And it's fair to say that a great deal of

243: 23         the information that sometimes appears in figures

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

243: 24     can be adequately addressed in the text of the
244: 1     article; is that correct?
244: 2     A. Sometimes, yes.
244: 3     Q. And specifically, in this letter Dr. Kaplan
244: 4     gave some specific instructions regarding figures
244: 5     in the next paragraph, figures and tables.
244: 6     He stated that Table 1 should be an
244: 7     appendix. All of the figures should be deleted and
244: 8     summarized in the text as needed, and then
244: 9     Tables 2, 3, 4 and 5 should be maintained and an
244: 10     additional table about efficacy should be added; is
244: 11     that correct?
244: 12     A. Right.
244: 13     Q. And that would -- that would meet the
244: 14     target of five figures and tables that The Journal
244: 15     had set?
244: 16     A. That's correct.
244: 17     Q. And the information that had previously
244: 18     been in other figures would not be removed from the
244: 19     manuscript, but rather it would be summarized in
244: 20     the text as needed according to Dr. Kaplan's
244: 21     suggestions; is that correct?
244: 22     A. Right.
244: 23     Q. Going down a few paragraphs to the
244: 24     paragraph that starts, "Please provide appropriate
245: 1     references."
245: 2     Do you see that?
245: 3     A. Yes, uh-huh.
245: 4     Q. The last sentence of that paragraph reads,
245: 5     "All numerical data should be rounded to a
245: 6     reasonable number of significant figures in
245: 7     accordance with the precision of the data."
245: 8     Do you see that sentence?
245: 9     A. Yes, I do.
245: 10     Q. Is that standard practice in The New
245: 11     England Journal?
245: 12     A. Yes, it is.

**250:1   -   251:1**     Curfman 11/21/2005

250: 19     Q. Okay. Okay. I don't need to show you the
250: 20     letter, Doctor, but this morning we did look at the
250: 21     letter from Dr. Drazen to Dr. Bombardier in which
250: 22     Dr. Drazen, as the editor-in-chief of The New
250: 23     England Journal, accepted the VIGOR manuscript for

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 250: 24     publication; is that correct? | | |
| 251: 1     A. Yes, uh-huh. | | |

**255:9  -  255:19**        Curfman 11/21/2005

255: 9     Q. Okay.  Let's take a look again at the
255: 10     published article, which is Exhibit 11.  If you
255: 11     could get that, please, Doctor, and, Doctor, I
255: 12     would likes to take a look at some of the data that
255: 13     are presented in this article, and first I would
255: 14     ask you to just take a look at the abstract on the
255: 15     first page of the article.
255: 16          Is it fair to say that, generally
255: 17     speaking, the abstract is meant to be a summary of
255: 18     the important information in the article?
255: 19     A. Yes.

**259:4  -  259:19**        Curfman 11/21/2005

259: 4     Q. Then if you go a little further down in the
259: 5     "Results" section of the abstract on the first
259: 6     page, it reads, "The incidence of myocardial
259: 7     infarction was lower among patients in the naproxen
259: 8     group than among those in the rofecoxib group, 0.1
259: 9     percent versus 0.4 percent; relative risk, 0.2.  95
259: 10     percent confidence interval, 0.1 to 0.7."
259: 11          Do you see that?
259: 12     A. I do.
259: 13     Q. So based on that, if a person read -- if a
259: 14     reader of this article read the first -- just the
259: 15     first page of this article, they would see that
259: 16     there was a -- there was a difference in lower
259: 17     incidences of heart attacks in the patient taking
259: 18     naproxen than in the patient taking Vioxx; is that
259: 19     correct?

**259:2  -  261:9**        Curfman 11/21/2005

259: 21     A. Well, that's what it says, yes.
259: 22     Q. And I would like to ask you specifically a
259: 23     few questions about the way the data are presented
259: 24     there, and specifically the relative risk
260: 1     presentation there of 0.2.
260: 2          Could you describe what a relative risk
260: 3     of 0.2 means?
260: 4     A. The relative risk is a measure of the risk
260: 5     of one therapy versus another with respect to this
260: 6     particular endpoint.

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

260: 7      The confidence intervals reflect the

260: 8      variation on that point estimate of .2.  So the

260: 9      point estimate of .2 means that the risk of having

260: 10      a myocardial infarction with naproxen was only 20

260: 11      percent that of taking naproxen --

260: 12      Q. Than taking Vioxx; is that right?  I'm

260: 13      sorry, Doctor, I think you may have misspoken.

260: 14      A. Oh, did I?

260: 15      Q. The relative risk of naproxen was 20

260: 16      percent --

260: 17      A. Of rofecoxib.

260: 18      Q. Of rofecoxib?

260: 19      A. Yeah.

260: 20      Q. I'm sorry.  Go ahead.

260: 21      A. That's okay.  Go ahead.

260: 22      Q. So that's another way of saying, if someone

260: 23      read this, that's another way of saying that the

260: 24      rate of heart attacks on naproxen was one-fifth the

261: 1      rate of heart attacks on Vioxx, roughly; is that

261: 2      correct?

261: 3      A. Yes.

261: 4      Q. And, conversely, and I think we discussed

261: 5      this this morning, that's another way of saying

261: 6      that the relative risk -- that the risk of

261: 7      myocardial infarctions on Vioxx was five times that

261: 8      of the relative risk -- sorry, the risk of heart

261: 9      attacks on naproxen; is that correct?

**261:1   -   262:4**      Curfman 11/21/2005

261: 11      A. Yeah, it doesn't say that here.  The

261: 12      authors chose and the editors allowed to go through

261: 13      the statement that naproxen was protective.

261: 14      So that is the way it is stated here in

261: 15      this summary, but it doesn't acknowledge the other

261: 16      hypothesis here in the abstract.

261: 17      Q. Well --

261: 18      A. The other hypothesis being just what you

261: 19      said:  That the risk of heart attack is five times

261: 20      greater with naproxen -- with rofecoxib than with

261: 21      naproxen.

261: 22      Q. Well, it's fair to say, isn't it, Doctor,

261: 23      that neither hypothesis is really discussed in this

261: 24      abstract?

262: 1      What is discussed in the abstract is

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 262: 2   that the incidence on naproxen was lower than that | | |
| 262: 3   on the Vioxx and that the magnitude of that | | |
| 262: 4   difference was about fivefold; is that fair? | | |
| **262:6  -  262:9**        Curfman 11/21/2005 | | |
| 262: 6   A. Yes.  But again, that's only one | Def Obj: Non-responsive; | Overruled |
| 262: 7   possibility.  The implication here is that naproxen | improper expert | |
| 262: 8   is protective.  Now, of course, we know -- we know | testimony | |
| 262: 9   now that that is not true at all. | | |
| **262:1  -  263:10**        Curfman 11/21/2005 | | |
| 262: 12   A. It's not true at all, okay? | | |
| 262: 13   Q. Yes.  But specifically, at least anyone | | |
| 262: 14   reading this first page of this article would know | | |
| 262: 15   that there was a fivefold difference between the | | |
| 262: 16   incidence of heart attacks on Vioxx and naproxen. | | |
| 262: 17   Whether that was a result of a protective effect of | | |
| 262: 18   naproxen or some effect of Vioxx, they would know | | |
| 262: 19   from reading this first page that there was a | | |
| 262: 20   fivefold difference in heart attacks? | | |
| 262: 21   A. No.  I disagree with that. | | |
| 262: 22        They are being told that there are | | |
| 262: 23   fewer events with naproxen.  The clear implication | | |
| 262: 24   there is that naproxen is protective and not that | | |
| 263: 1   rofecoxib is deleterious. | | |
| 263: 2   Q. Right.  I understand -- and I understand | Def Obj:  Atty sidebar | Overruled |
| 263: 3   that that is your view, Doctor, but my question is | | |
| 263: 4   just, specifically, they wouldn't -- a person | | |
| 263: 5   reading the first page of this article would know | | |
| 263: 6   that there was a fivefold difference between the | | |
| 263: 7   two -- that there were different rates of heart | | |
| 263: 8   attacks on naproxen and rofecoxib?  They wouldn't | | |
| 263: 9   have had to read past the abstract to understand | | |
| 263: 10   that particular fact? | | |
| **263:1  -  263:17**        Curfman 11/21/2005 | | |
| 263: 12   A. Yes.  They would know that particular fact, | | |
| 263: 13   but they would also take away the secondary fact | | |
| 263: 14   that the clear implication is that naproxen is | | |
| 263: 15   protective. | | |
| 263: 16   Q. Okay. | | |
| 263: 17   A. And we know now that that is not true. | Def Obj: Non-responsive | Overruled |
| **263:2  -  264:16**        Curfman 11/21/2005 | | |
| 263: 21        The further -- the "Results" section | | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

263: 22    goes on further to state that, "The overall
263: 23    mortality rate and the rate of death from
263: 24    cardiovascular causes were similar in the two
264: 1     groups."
264: 2         Do you see that?
264: 3     A. Yes, I do.  With very low statistical
264: 4     power, that doesn't say that there, but I think we
264: 5     should bring into this that this study was not even
264: 6     close to be powered for cardiovascular mortality.
264: 7     Q. Right.  The study -- this study was powered
264: 8     with respect to its primarily endpoint of
264: 9     gastrointestinal bleeding; is that correct?
264: 10    A. Yes.
264: 11    Q. And the same -- the same really holds true
264: 12    with all of the cardiovascular events that are
264: 13    being discussed here.  We are talking about low
264: 14    number of events, and there is fairly low power to
264: 15    make any determinations about the cardiovascular
264: 16    events in this study; is that correct?

**264:1  -  265:7**         Curfman 11/21/2005
264: 18    A. No.  I wouldn't agree with that.
264: 19         It's true that cardiovascular endpoints
264: 20    were not the primary endpoints in the trial; but
264: 21    the numerical data that we went through this
264: 22    morning, I think that valid conclusions about
264: 23    cardiac toxicity can be drawn from those data.
264: 24         It's not that there are too few of them
265: 1     that we can't say anything about it, that we can't
265: 2     validly assess cardiovascular toxicity from all of
265: 3     those tables of data that we reviewed this morning.
265: 4         There is very important information in
265: 5     those tables of data that indicate a very clear
265: 6     signal about the cardiac toxicity of rofecoxib, and
265: 7     we shouldn't sweep that under the rug.

**267:1  -  269:6**         Curfman 11/21/2005
267: 15         Doctor if you could also take a look at
267: 16    Exhibit 16, which -- I'm sorry -- 17, which is one
267: 17    of the exhibits we looked at this morning, and I
267: 18    would refer you specifically to Page 25 of that
267: 19    exhibit, which is one -- which is the table that
267: 20    you talked about this morning.
267: 21         Are you there, Doctor?

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

267: 22    A. Yes, I am.

267: 23    Q. Okay.  Thanks.

267: 24         Just taking a look at this table, this

268: 1    was the table that you talked about this morning,

268: 2    and this table did not ultimately appear in the

268: 3    final published VIGOR article as a table, correct?

268: 4    A. That's correct.

268: 5    Q. I just want to go over some of the -- I

268: 6    just want to go over the percentages that appear in

268: 7    that table and confirm that those percentages do in

268: 8    fact appear in the text of the final VIGOR article

268: 9    with you.

268: 10         Specifically, if you look at the first

268: 11    row on Table 5 on Page 25, you have all deaths and

268: 12    the percentages there are 0.5 percent and 0.4

268: 13    percent.

268: 14         Do you see those?

268: 15    A. Yes, I do.

268: 16    Q. And if you look at the second sentence

268: 17    under "General Safety" it states that, "The

268: 18    mortality rate was 0.5 percent in the rofecoxib

268: 19    group and 0.4 percent in the naproxen group."

268: 20         Do you see that?

268: 21    A. Yes.

268: 22    Q. So those percentage were disclosed in the

268: 23    text of the article; is that correct?

268: 24    A. That's correct.

269: 1    Q. And then if you go to the -- back to Page

269: 2    25 of Exhibit 17, if you look at cardiovascular

269: 3    deaths, the percentages are 0.2 percent and 0.2

269: 4    percent.

269: 5         Do you see that?

269: 6    A. Yes, I do.

**269:7   -   269:16**         Curfman 11/21/2005

269: 7    Q. And in the next sentence, moving to the

269: 8    next sentence of the published VIGOR article, it

269: 9    states, "The rate of death from cardiovascular

269: 10    causes was 0.2 percent in both groups"; is that

269: 11    correct?

269: 12    A. Correct.

269: 13    Q. So, again, the percentage of cardiovascular

269: 14    deaths from Table 5 do appear in the text of the

269: 15    final published VIGOR article; is that correct?

| | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| 269: 16 | A. The percentages do, yes. | | |
| **269:1 - 270:6** | Curfman 11/21/2005 | | |
| 269: 19 | Q. Then if you go to -- I am going to skip the | | |
| 269: 20 | third row, which is composite endpoint, and go to | | |
| 269: 21 | the next row, which is myocardial infarction, and | | |
| 269: 22 | that has -- the percentages from the table are 0.4 | | |
| 269: 23 | percent and 0.1 percent; is that correct? | | |
| 269: 24 | A. Right. | | |
| 270: 1 | Q. The corresponding sentence in the published | | |
| 270: 2 | paper states that, "Myocardial infarctions were | | |
| 270: 3 | less common in the naproxen group than in the | | |
| 270: 4 | rofecoxib group, 0.1 percent versus 0.4 percent," | | |
| 270: 5 | and then gives the 95 percent confidence interval | | |
| 270: 6 | and relative risk; is that correct? | | |
| **270:8 - 274:1** | Curfman 11/21/2005 | | |
| 270: 8 | A. Yes, uh-huh. | | |
| 270: 9 | Q. So, again, the percentages of the | | |
| 270: 10 | myocardial infarction that occurred in both the | | |
| 270: 11 | Vioxx arm and the naproxen arm of the study from | | |
| 270: 12 | this Table 5 here do appear in the text of the | | |
| 270: 13 | final published VIGOR article; is that correct? | | |
| 270: 14 | A. The percentages do, yes. | | |
| 270: 15 | You breezed by the third entry on the | Def Obj: Non-responsive | Overruled |
| 270: 16 | table. | | |
| 270: 17 | Q. Yes.  No.  I will come back to that. | | |
| 270: 18 | A. You will come back to that? | | |
| 270: 19 | Q. I will.  Yes. | | |
| 270: 20 | And the final row of Table 5 is | | |
| 270: 21 | ischemic cerebrovascular accidents, which are | | |
| 270: 22 | essentially a type of stroke; is that correct, | | |
| 270: 23 | Doctor? | | |
| 270: 24 | A. Correct. | | |
| 271: 1 | Q. And the percentages in that table are 0.2 | | |
| 271: 2 | percent on Vioxx and 0.2 percent in the naproxen. | | |
| 271: 3 | Do you see that? | | |
| 271: 4 | A. Yes, I do. | | |
| 271: 5 | Q. And I think I skipped this sentence before. | | |
| 271: 6 | It's above the prior one in the final published | | |
| 271: 7 | article, but it states, "Ischemic cerebrovascular | | |
| 271: 8 | events occurred in 0.2 percent of the patients in | | |
| 271: 9 | each group"; is that correct? | | |
| 271: 10 | A. Yes. | | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 271: 11 Q. So, again, the percentages of stroke in | | |
| 271: 12 both the Vioxx arm -- the percentage of patients | | |
| 271: 13 who suffered from a stroke in both the Vioxx arm | | |
| 271: 14 and the naproxen arm that were in this table also | | |
| 271: 15 appeared in the text of the final published | | |
| 271: 16 article; is that correct? | | |
| 271: 17 A. The percentages did, yes. | | |
| 271: 18 Q. And then the -- you mentioned the composite | | |
| 271: 19 endpoint, which was the -- which was the third row | | |
| 271: 20 on the table, and the specific percentages in that | | |
| 271: 21 table do not appear in the final published article; | | |
| 271: 22 is that correct? | | |
| 271: 23 A. That's correct. | | |
| 271: 24 Q. But what those -- what that composite | | |
| 272: 1 endpoint reflects is an addition of the percentages | | |
| 272: 2 of cardiovascular deaths, nonfatal heart attacks | | |
| 272: 3 and strokes; is that correct? | | |
| 272: 4 A. That's correct. | | |
| 272: 5 And what you are asking the reader to | Def Obj: Non-responsive | Overruled |
| 272: 6 do is do the addition for himself or herself rather | | |
| 272: 7 than presenting it in a nice clear way, and of | | |
| 272: 8 course, that's exactly what the percentages do, | | |
| 272: 9 too. | | |
| 272: 10 In presenting percentages without raw | | |
| 272: 11 numbers, you are asking the reader then to do the | | |
| 272: 12 math, to go back to the total number of patients | | |
| 272: 13 and take .2 percent of that number and go through a | | |
| 272: 14 lot of calculations that almost no reader would do. | | |
| 272: 15 It's -- in other words, the data in the | | |
| 272: 16 text are summary percentages data, but they are | | |
| 272: 17 rather lacking in total clarity by not having the | | |
| 272: 18 actual patient numbers there. | | |
| 272: 19 In my opinion, the Table 5 that you're | | |
| 272: 20 asking us to look at is a much clearer presentation | | |
| 272: 21 of these data, much more helpful; and if I had to | | |
| 272: 22 do it over, I think that this is the way we would | | |
| 272: 23 have wanted to display these particular data. | | |
| 272: 24 Q. But to be fair, in order to figure out | | |
| 273: 1 roughly the number of patients with each of these | | |
| 273: 2 events, all you have to do is multiply the | | |
| 273: 3 percentage times the number of patients in the | | |
| 273: 4 study; is that correct? | | |
| 273: 5 A. And as an editor, if you are -- if that's | Def Obj:  Non-responsive | Overruled |

53

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 273: 6    the way you're going to run your journal, I'm not | | |
| 273: 7    going to subscribe to your journal, because you are | | |
| 273: 8    asking the reader to do too much. | | |
| 273: 9        You are asking the reader to do the | | |
| 273: 10    math.  You should do the math, and it is your job | | |
| 273: 11    -- it is my job as editor to make sure that readers | | |
| 273: 12    don't have to do the math, that for important | | |
| 273: 13    endpoints that the data are very clearly presented | | |
| 273: 14    so that the reader doesn't have to go through and | | |
| 273: 15    do these calculations. | | |
| 273: 16        It's the job of those writing the | | |
| 273: 17    paper, and in fairness, I am taking some | | |
| 273: 18    responsibility myself, responsibility of the | | |
| 273: 19    editors is to ensure that such data are presented | | |
| 273: 20    in a way that that kind of additional step on the | | |
| 273: 21    part of a reader wouldn't be necessary. | | |
| 273: 22    Q. And in this particular case, neither The | Def Obj: Non-responsive; 403 | Overruled |
| 273: 23    Journal nor the reviewer requested that authors | | |
| 273: 24    provide actual numbers as opposed to percentages; | | |
| 274: 1    is that correct? | | |

**274:3   -   275:17**                Curfman 11/21/2005

| | | |
|---|---|---|
| 274: 3    A. I go back to the statement I made earlier, | | |
| 274: 4    Attorney Fitzpatrick, that if, the expectation on | Def Obj: eliminate atty names | |
| 274: 5    the part of editors and journals is that if you | | |
| 274: 6    don't ask for it, it's your tough luck.  That's not | | |
| 274: 7    fair. | | |
| 274: 8    Q. I understand. | | |
| 274: 9    A. There aren't enough editors in the world to | | |
| 274: 10    ask all of the questions that would have to be | | |
| 274: 11    asked to pull together a whole article. | | |
| 274: 12    Q. Right. | | |
| 274: 13    A. There aren't enough editors in the world to | | |
| 274: 14    ask all those questions.  There is expectation in | | |
| 274: 15    the scholarly community that there will be an | | |
| 274: 16    honest and comprehensive providing of the data in a | | |
| 274: 17    submitted manuscript.  That's the expectation. | | |
| 274: 18    Q. I understand.  And I am just saying, | | |
| 274: 19    assuming in this particular case that the authors, | | |
| 274: 20    the 12 authors from the various institutions around | | |
| 274: 21    the world, believed that this was an appropriate | | |
| 274: 22    way to present the data, no one at New England | | |
| 274: 23    Journal or none of the reviewers appeared to | | |
| 274: 24    disagree with this type of presentation and | | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 275: 1    required them to do another type of presentation | | |
| 275: 2    and present the raw numbers; is that correct? | | |
| 275: 3    A. That is a correct statement, but it still | | |
| 275: 4    doesn't make it right.  It still doesn't make it | | |
| 275: 5    right. | | |
| 275: 6         You can't conclude from what you just | | |
| 275: 7    said that the presentation of the cardiovascular | | |
| 275: 8    data in the VIGOR trial were an appropriate way of | | |
| 275: 9    presenting the data. | | |
| 275: 10        Another perfectly valid conclusion is | | |
| 275: 11    that both the authors and the editors slipped up. | | |
| 275: 12    Q. Okay.  But someone who is reading the | | |
| 275: 13    general safety section would be able to glean at | | |
| 275: 14    least the percentages of the patients in each group | | |
| 275: 15    that had the various types of events that are | | |
| 275: 16    described here, including heart attacks and | | |
| 275: 17    strokes; is that correct? | | |
| **275:1   -   277:8**         Curfman 11/21/2005 | | |
| 275: 19    A. The percentages, yes. | | |
| 275: 20    Q. And if the reader wanted to do the -- | | |
| 275: 21    wanted to figure out the rough number of patients | | |
| 275: 22    in each group that had these events, they could do | | |
| 275: 23    the multiplication problem and determine that | | |
| 275: 24    number of events. | | |
| 276: 1         If they -- if they believed it would be | | |
| 276: 2    more helpful to them to know the numbers rather | | |
| 276: 3    than the percentages, they could do that from the | | |
| 276: 4    information that's provided in the paper; is that | | |
| 276: 5    correct? | | |
| 276: 6    A. It's always more helpful to know the | | |
| 276: 7    numbers.  Always.  And I go back to what I said | | |
| 276: 8    earlier, that it would have been difficult to do | | |
| 276: 9    this math.  You would have to figure out:  What am | | |
| 276: 10    I multiplying together?  It's not entirely clear | | |
| 276: 11    what you would multiply the .2 by to get the | | |
| 276: 12    answer. | | |
| 276: 13        Do you know? | | |
| 276: 14    Q. Well -- | Def Obj:  Non-responsive; | Overruled |
| 276: 15    A. Can you tell me? | improper Q&A; witness | |
| 276: 16    Q. Yes.  You multiply it by the number of | is argumentative | |
| 276: 17    patients -- | | |
| 276: 18    A. What is that number?  What is that number? | | |
| 276: 19    Q. It's approximately 4,000. | | |

| | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| | 276: 20 | A. Well, approximate isn't going to be good | |
| | 276: 21 | enough. | |
| | 276: 22 | You have -- what I am saying is that | |
| | 276: 23 | even you, you know, you have been studying this | |
| | 276: 24 | stuff, you would have to go through and find those | |
| | 277: 1 | total numbers of patients and then do the | |
| | 277: 2 | multiplication; and what I am saying is that that | |
| | 277: 3 | is making it hard for the reader to get the answer. | |
| | 277: 4 | The whole point of publishing journal | |
| | 277: 5 | articles is to make it easy for readers to get to | |
| | 277: 6 | the answer.  That's what we spend a lot of our time | |
| | 277: 7 | doing, and we need the help and cooperation of the | |
| | 277: 8 | authors to do that. | |
| **279:1** - **280:23** | | Curfman 11/21/2005 | |
| | 279: 15 | Q. And, Doctor, just continuing with our | |
| | 279: 16 | discussion of some of the data that were presented | |
| | 279: 17 | in the "General Safety" section of the VIGOR study, | |
| | 279: 18 | which is 1523 of Exhibit 11. | |
| | 279: 19 | Are you there? | |
| | 279: 20 | A. Yes. | |
| | 279: 21 | Q. After the data we talked about, the article | |
| | 279: 22 | describes that four percent of the study subjects | |
| | 279: 23 | met the criteria of the FDA for the use of aspirin | |
| | 279: 24 | for secondary cardiovascular prophylaxis -- and | |
| | 280: 1 | then it describes that indication -- but were not | |
| | 280: 2 | taking low-dose aspirin therapy. | |
| | 280: 3 | Do you see that? | |
| | 280: 4 | A. Yes. | |
| | 280: 5 | Q. And the article states that these patients | |
| | 280: 6 | accounted for 38 percent of the patients in the | |
| | 280: 7 | study who had myocardial infarctions, or heart | |
| | 280: 8 | attacks; is that correct? | |
| | 280: 9 | A. Yes. | |
| | 280: 10 | Q. And then the article goes on to describe | |
| | 280: 11 | the difference that was seen in the patients who | |
| | 280: 12 | were not indicated for low-dose aspirin, and states | |
| | 280: 13 | that, "In the other patients, the difference in the | |
| | 280: 14 | rate of myocardial infarction between groups was | |
| | 280: 15 | not significant, 0.2 percent in the rofecoxib group | |
| | 280: 16 | and 0.1 percent in the naproxen group." | |
| | 280: 17 | Do you see that? | |
| | 280: 18 | A. Yes. | |
| | 280: 19 | Q. So you -- would you agree, at least, that | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 280: 20   the fact that there was still a difference, albeit | | |
| 280: 21   not statistically significant, in the rate of heart | | |
| 280: 22   attacks among the nonaspirin-indicated patients is | | |
| 280: 23   disclosed in the article? | | |
| **281:1 - 281:8**          Curfman 11/21/2005 | | |
| 281: 1   A. Well, your clients held back three of the | Def Obj:  Non-responsive; | Overruled |
| 281: 2   heart attacks. | prejudicial; 403 | |
| 281: 3   Q. Yes. | | |
| 281: 4        But my question, Doctor, was | | |
| 281: 5   specifically, is the fact that there is a | | |
| 281: 6   difference in the rate of heart attacks in the | | |
| 281: 7   patients who were not indicated for low-dose | | |
| 281: 8   aspirin disclosed in the article; is that correct? | | |
| **281:1 - 281:16**          Curfman 11/21/2005 | | |
| 281: 10   A. Your client withheld three of the heart | Def Obj:  Same objection | Overruled |
| 281: 11   attacks, and therefore, these numbers are not | (including portion of | |
| 281: 12   really the final accurate numbers. | question on 281:13-14) | |
| 281: 13   Q. When you say -- when you say Merck withheld | | |
| 281: 14   heart attacks, you are -- you are not stating Merck | | |
| 281: 15   withheld any of the heart attacks from the FDA, are | | |
| 281: 16   you? | | |
| **281:1 - 283:1**          Curfman 11/21/2005 | | |
| 281: 18   A. No. | | |
| 281: 19   Q. In fact, Merck disclosed those heart | | |
| 281: 20   attacks to the FDA, as far as you can tell; is that | | |
| 281: 21   correct? | | |
| 281: 22   A. That's the way I learned about them. | | |
| 281: 23   Q. Right.  And that's how you learned about | | |
| 281: 24   them -- | | |
| 282: 1   A. After this was published. | | |
| 282: 2   Q. Right.  I understand.  But so Merck did -- | | |
| 282: 3   A. I am the responsible editor and I find out | | |
| 282: 4   after -- | | |
| 282: 5   Q. Right. | | |
| 282: 6   A. -- it was published. | | |
| 282: 7   Q. But we do -- we are in agreement that Merck | | |
| 282: 8   did disclose the three heart attacks that you are | | |
| 282: 9   referring to to the FDA; is that correct? | | |
| 282: 10   A. To the FDA, but not to us. | | |
| 282: 11   Q. Right. | | |
| 282: 12        And are you aware, Doctor, that this -- | | |
| 282: 13   that the analysis that was presented of the data | | |

| | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| 282: 14 | that was given to The New England Journal of | | |
| 282: 15 | Medicine was an analysis of the events that had | | |
| 282: 16 | occurred as of a certain date? | | |
| 282: 17 | A. I am very well aware of that, and I also | Def Obj:  Non-responsive; 403 | Overruled |
| 282: 18 | think that, regardless of that arbitrary date, that | | |
| 282: 19 | we are talking about peoples lives, and one trumps | | |
| 282: 20 | the other. | | |
| 282: 21 | Q. No.  I understand. | Def Obj:  Atty sidebar | |
| 282: 22 | Are you aware that the date cutoff that | | |
| 282: 23 | I mentioned was pre-specified in the protocol as | | |
| 282: 24 | the primary analysis of safety that would be done | | |
| 283: 1 | in the study? | | |

**283:3   -   283:14          Curfman 11/21/2005**

| | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| 283: 3 | A. Yes.  And that I still contend is a minor | Def Obj:  Non-responsive; 403 | Overruled |
| 283: 4 | technicality compared to the overriding importance | | |
| 283: 5 | of these sorts of data to the health of the public. | | |
| 283: 6 | Q. Right. | Def Obj:  Attysidebar | |
| 283: 7 | And you don't dispute that the data | | |
| 283: 8 | that's in this article is an accurate portrayal of | | |
| 283: 9 | the data, at least as of that cutoff point? | | |
| 283: 10 | I understand that you disagree with the | | |
| 283: 11 | use of that cutoff point, but as of that pre- | | |
| 283: 12 | specified primary cutoff point, you agree that the | | |
| 283: 13 | data presented in this article is accurate; is | | |
| 283: 14 | that? | | |

**283:1   -   284:16          Curfman 11/21/2005**

| | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| 283: 16 | A. The article didn't even include the numbers | | |
| 283: 17 | of patients.  So the percentages were accurate as | | |
| 283: 18 | of that time but didn't even include the numbers of | | |
| 283: 19 | patients. | | |
| 283: 20 | Q. Right.  But we agree -- | | |
| 283: 21 | A. And -- | | |
| 283: 22 | Q. I'm sorry. | | |
| 283: 23 | A. And the question that you are posing is | | |
| 283: 24 | really off point. | | |
| 284: 1 | I don't care what the situation was as | Def Obj:  Non-responsive; witness is argumentative & this is improper Q&A; 403 | Overruled |
| 284: 2 | of that date, wherever it was -- I can't remember | | |
| 284: 3 | -- the cutoff date that was supposedly | | |
| 284: 4 | pre-specified. | | |
| 284: 5 | That really doesn't matter when further | | |
| 284: 6 | data of extreme importance to the interpretation of | | |
| 284: 7 | this very important health matter was at stake. | | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 284: 8    The data should have been provided The Journal, | | |
| 284: 9    they weren't provided to The Journal, and that's | | |
| 284: 10    where the story ends -- | | |
| 284: 11    Q. Right.  I understand. | | |
| 284: 12    A. -- for me. | | |
| 284: 13    Q. I understand. | | |
| 284: 14    A. As the responsible editor, not to have been | | |
| 284: 15    provided with those data just is not right.  There | | |
| 284: 16    is something not right about that. | | |
| **284:1  -  285:1**            Curfman 11/21/2005 | | |
| 284: 19    Q. And just to state my question again, I | | |
| 284: 20    understand that you might not feel this is the | | |
| 284: 21    appropriate question, but you do agree, at least as | | |
| 284: 22    of the pre-specified cutoff date, the percentages | | |
| 284: 23    of events that occurred in each arm of the study is | | |
| 284: 24    presented accurately in this article; is that | | |
| 285: 1    correct? | | |
| **285:4  -  285:14**            Curfman 11/21/2005 | | |
| 285: 4    A. The data that came after that were not, and | | |
| 285: 5    those data are critical, critical to the | | |
| 285: 6    interpretation of -- | | |
| 285: 7    Q. Yes. | | |
| 285: 8    A. -- this study. | | |
| 285: 9    Q. I understand. | | |
| 285: 10        But can you -- can you answer my | | |
| 285: 11    question with respect to the data that existed | | |
| 285: 12    prior to the pre-specified cutoff point, and were | | |
| 285: 13    in fact the percentages presented accurately with | | |
| 285: 14    respect to that? | | |
| **285:1  -  285:24**            Curfman 11/21/2005 | | |
| 285: 17    A. They were, but I don't think that's the | | |
| 285: 18    relevant question. | | |
| 285: 19    Q. Fair enough. | | |
| 285: 20    A. You are talking to a doctor and a | Def Obj:  Non-responsive; | Overruled |
| 285: 21    cardiologist who cares and who has cared for many | witness is volunteering | |
| 285: 22    patients with heart attacks, and to withhold three | statements without a | |
| 285: 23    of them like that is wrong. | question pending; 403 | |
| 285: 24    Q. I understand. | | |
| **286:3  -  286:14**            Curfman 11/21/2005 | | |
| 286: 3        When you're referring to withholding, | | |
| 286: 4    you are referring to what was submitted to editors | | |
| 286: 5    of The New England Journal, but these heart attacks | | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 286: 6        were in fact disclosed to the FDA. | | |
| 286: 7        A. Are we not important? | Def Obj:  Same objections. | Overruled |
| 286: 8        Q. Of course not.  No, of course not, Doctor. | Non-responsive; improper | |
| 286: 9        A. Is The New England Journal not important? | Q&A; witness speaking | |
| 286: 10       Q. Of course not.  We are in agreement. | out of turn; 403 | |
| 286: 11       A. Then why weren't we given the data? | | |
| 286: 12       Q. We are in agreement about the importance | | |
| 286: 13       of -- | | |
| 286: 14       A. Why weren't we given the data? | | |

**287:1   -   287:14**          Curfman 11/21/2005

287: 11       Q. So, Doctor, my specific question now is the
287: 12       data you are referring to, the myocardial
287: 13       infarction data from VIGOR, was disclosed to the
287: 14       FDA; is that correct?

**287:1   -   287:16**          Curfman 11/21/2005

287: 16       A. Yes.  They are on the FDA Website, yes.

**288:4   -   289:1**          Curfman 11/21/2005

288: 4        Q. Doctor, could you turn to the "Discussion"
288: 5        section of the VIGOR manuscript, which begins on
288: 6        Page 1525, and just as a general matter, is it fair
288: 7        to say that the "Discussion" section is where the
288: 8        authors include their interpretation and analysis
288: 9        of the data that they have presented in the study?
288: 10       A. It's their interpretation of the data.  The
288: 11       data analysis is presented in the "Results"
288: 12       section.
288: 13       Q. Okay.  Thank you.
288: 14              So the authors' interpretation of the
288: 15       data appears in the "Discussion" section; is that
288: 16       correct?
288: 17       A. That's correct.
288: 18       Q. Okay.  And if you could, Doctor, please
288: 19       turn to Page 1526 of the "Discussion" section, and
288: 20       specifically looking at the right-hand column, and
288: 21       the one, two, three, fourth paragraph down, the
288: 22       paragraph that begins with, "The overall mortality
288: 23       rate was similar in the two groups."
288: 24              Do you see that?
289: 1        A. Yes, I do.

**289:9   -   289:24**          Curfman 11/21/2005

289: 9        Q. Sure.  This paragraph here contains a

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 289: 10    discussion of some data that we had been talking | | |
| 289: 11    about before, including another reference to the | | |
| 289: 12    significantly lower rate of myocardial infarctions | | |
| 289: 13    in the naproxen group, and again gives the | | |
| 289: 14    percentages as 0.1 percent versus 0.4 percent; is | | |
| 289: 15    that correct? | | |
| 289: 16    A. That's correct. | | |
| 289: 17    Q. Then if we move down to the next paragraph, | | |
| 289: 18    this paragraph discusses some of the basic science | | |
| 289: 19    surrounding naproxen, including the fact that it | | |
| 289: 20    inhibits the production of thromboxane by 95 | | |
| 289: 21    percent and aggregation by 88 percent, and that | | |
| 289: 22    effect is maintained throughout the dosing | | |
| 289: 23    interval. | | |
| 289: 24         Do you see that? | | |
| **290:2  -  290:2**         Curfman 11/21/2005 | | |
| 290: 2    A. I do see that. | | |
| **290:1  -  290:14**         Curfman 11/21/2005 | | |
| 290: 11    Q. All I am asking at this point is, does the | | |
| 290: 12    document in fact say, "Therefore, the events of the | | |
| 290: 13    regular use of naproxen may be similar to those of | | |
| 290: 14    aspirin"; is that correct? | | |
| **290:1  -  290:20**         Curfman 11/21/2005 | | |
| 290: 16    A. It's correct, what you have read.  That's | | |
| 290: 17    what it says there, yes. | | |
| 290: 18    Q. And is it fair to say that this represented | | |
| 290: 19    the interpretation of the authors of this data at | | |
| 290: 20    that time; is that correct? | | |
| **290:2  -  290:22**         Curfman 11/21/2005 | | |
| 290: 22    A. Of the authors, yes. | | |
| **291:3  -  291:7**         Curfman 11/21/2005 | | |
| 291: 3         Is it fair to say that none of the | | |
| 291: 4    outside reviewers who reviewed the manuscript took | | |
| 291: 5    issue with this particular section of the | | |
| 291: 6    discussion at this point? | | |
| 291: 7    A. That's correct. | | |
| **291:8  -  291:13**         Curfman 11/21/2005 | | |
| 291: 8    Q. And it's also true that the editors of The | | |
| 291: 9    New England Journal at least felt it was | | |
| 291: 10    appropriate to allow the authors to include this | | |
| 291: 11    interpretation of the data in the discussion | | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 291: 12   section and to be published in The New England | | |
| 291: 13   Journal? | | |
| **291:1  -  291:17**   Curfman 11/21/2005 | | |
| 291: 15   A. Yeah, we signed off on this, and I have | | |
| 291: 16   many times had second thoughts about having done | | |
| 291: 17   that. | | |
| **292:2  -  293:5**   Curfman 11/21/2005 | | |
| 292: 24   What I am asking specifically right now | | |
| 293: 1   is limited to at that time, and my question is just | | |
| 293: 2   specifically that at that time the editors believed | | |
| 293: 3   it was appropriate to allow the authors to include | | |
| 293: 4   this interpretation of the data in the "Discussion" | | |
| 293: 5   section; is that fair? | | |
| **293:8  -  294:6**   Curfman 11/21/2005 | | |
| 293: 8   A. There were no changes made by the editors | | |
| 293: 9   to this part of the "Discussion" section. | | |
| 293: 10   Q. Okay.  And similarly, at that time in 2000, | | |
| 293: 11   when the editors, with the review of one of The | | |
| 293: 12   Journal statistical consultants, believed that it | | |
| 293: 13   was appropriate to allow the authors to include | | |
| 293: 14   percentage data with respect to the cardiovascular | | |
| 293: 15   events, as opposed to exact numerical data; is that | | |
| 293: 16   correct?  And again at that time. | | |
| 293: 17   A. Today we saw what display data were really | Def Obj:  Non-responsive; witness is not answering the question | Overruled |
| 293: 18   available at that time for the first time for me; | | |
| 293: 19   and having seen those data, which the authors of | | |
| 293: 20   the article had at that time, I would have wanted | | |
| 293: 21   to have been informed about those data, which were | | |
| 293: 22   available at that time, but I saw for the first | | |
| 293: 23   time today.  I would have been -- I would have | | |
| 293: 24   wanted to have seen those data. | | |
| 294: 1   Q. To be fair, Doctor, when you are talking | | |
| 294: 2   about the actual number of events as opposed to the | | |
| 294: 3   percentages, it's not surprising that the authors | | |
| 294: 4   had the actual number of events as opposed to the | | |
| 294: 5   percentages?  You would need that number in order | | |
| 294: 6   to calculate the percentages; is that fair? | | |
| **294:8  -  294:13**   Curfman 11/21/2005 | | |
| 294: 8   A. Yes.  And I would have wanted to see that | | |
| 294: 9   Table 5 where the actual numbers were. | | |
| 294: 10   I would have also wanted to have been | Def Obj:  Non-responsive; 403 | Overruled |
| 294: 11   informed about the three additional heart attacks | | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 294: 12    that were totally omitted from any consideration, | | |
| 294: 13    including the calculations of the percentages. | | |

**305:3   -   306:2**                Curfman 11/21/2005

305: 3    Q. Okay.  Doctor, if you could take a look at

305: 4    Exhibit 29, which I think is the last exhibit we

305: 5    are looking at.

305: 6    A. Right.

305: 7    Q. And, specifically, if you look at Point

305: 8    No. 3.  This is one of the suggestions you made to

305: 9    Dr. Baron, and you were, I believe you testified,

305: 10    consolidating some of the comments that the

305: 11    reviewers had made in review of the APPROVe

305: 12    manuscript; is that correct?

305: 13    A. That's correct.

305: 14    Q. And as your letter reads, the suggestion is

305: 15    to "show the Kaplan-Meyer curves for all serious CV

305: 16    events to demonstrate the early separation.  These

305: 17    curves should become Figure 2A, while the current

305: 18    Kaplan-Meyer curve should become Figure 2B"; is

305: 19    that correct?

305: 20    A. That's correct.

305: 21    Q. Your point here, and the reviewer's point

305: 22    here was to include other cardiovascular events

305: 23    besides the adjudicated thrombotic events that had

305: 24    appeared in the original manuscript, events such as

306: 1    congestive heart failure; is that correct?

306: 2    A. Right.

**306:1   -   308:5**                Curfman 11/21/2005

306: 10        And the authors followed your

306: 11    suggestion and included what became Figure 3 in the

306: 12    final published paper which included investigator-

306: 13    reported congestive heart failure, pulmonary edema

306: 14    and cardiac failure events, correct?

306: 15    A. That's correct.

306: 16    Q. And as you said, when you look at those

306: 17    events, the lines separate almost immediately,

306: 18    certainly near the beginning of the study; is that

306: 19    correct?

306: 20    A. Yeah, I would say immediately.  Yes,

306: 21    uh-huh.

306: 22    Q. Okay.  And these data were presented to

306: 23    your satisfaction and the editors of The Journal's

|  | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 306: 24      satisfaction in the final published article; is | | |
| 307: 1      that correct? | | |
| 307: 2      A. Based on what we were given at that time, | | |
| 307: 3      we thought that we had the story we needed to have. | | |
| 307: 4            Now, of course, today, we know there is | | |
| 307: 5      more to the story, that I just found out today, | | |
| 307: 6      that I didn't know then. | | |
| 307: 7      Q. Well, isn't what - isn't what you saw today | | |
| 307: 8      essentially just what would have been Figure 2 | | |
| 307: 9      combined with Figure 3?  It would have been the | | |
| 307: 10      adjudicated events plus the investigator-reported | | |
| 307: 11      congestive heart failure, PE and cardiac failure | | |
| 307: 12      events? | | |
| 307: 13      A. I don't have that curve in front of me | | |
| 307: 14      anymore, but I thought that it included even more | | |
| 307: 15      data than that.  I would have to see that curve -- | | |
| 307: 16      Q. Okay.  Well, if -- | | |
| 307: 17      A. -- but I don't have it here. | | |
| 307: 18      Q. No.  That's fine.  We don't need to go into | | |
| 307: 19      that level of detail, but -- | | |
| 307: 20      A. It's a curve that I would have wanted to | | |
| 307: 21      have had the opportunity to see during the course | | |
| 307: 22      of the review process. | | |
| 307: 23            It would have been helpful to have seen | | |
| 307: 24      that during the course of the review process, based | | |
| 308: 1      on my recollection of what I saw earlier today. | | |
| 308: 2      Q. But if in fact that curve was basically | | |
| 308: 3      just combining the data from these two curves, then | | |
| 308: 4      you would agree that you believe that data were -- | | |
| 308: 5      those data were presented satisfactorily -- | | |
| **308:7   -   308:8**            Curfman 11/21/2005 | | |
| 308: 7      Q. -- in these two figures, and that's making | | |
| 308: 8      the assumption that that is what that curve was? | | |
| **308:1   -   309:2**            Curfman 11/21/2005 | | |
| 308: 10      A. I am not sure your assumption is correct. | | |
| 308: 11            I think there were other events in | | |
| 308: 12      there; but in any event, a reader shouldn't have to | | |
| 308: 13      somehow in their mind combine the two curves.  That | | |
| 308: 14      is asking too much of a reader and certainly too | | |
| 308: 15      much of an editor. | | |
| 308: 16            Again, I'm not saying that we would | | |
| 308: 17      have necessarily published that additional Kaplan- | | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 308: 18   Meyer curve that we saw earlier today, but we | | |
| 308: 19   certainly would have liked to have seen it, so that | | |
| 308: 20   we could have considered it along with the two | | |
| 308: 21   other figures that we did publish and try to make a | | |
| 308: 22   judgment, our best judgment, as to whether or not | | |
| 308: 23   it would have added additional information in a way | | |
| 308: 24   that would have made it important to publish. | | |
| 309: 1         But we never saw it.  I never saw it | | |
| 309: 2   until today. | | |
| **309:1  -  310:9**         Curfman 11/21/2005 | | |
| 309: 19         The third paragraph from the bottom | | |
| 309: 20   states, "The editors recognize that we are asking | | |
| 309: 21   for extensive changes, but we hope you will be able | | |
| 309: 22   to complete the revisions very soon, given the | | |
| 309: 23   timely nature and the public health importance of | | |
| 309: 24   the topic." | | |
| 310: 1         Do you see that? | | |
| 310: 2   A. I do. | | |
| 310: 3   Q. And the authors did in fact complete the | | |
| 310: 4   revision very quickly, did they not? | | |
| 310: 5   A. They did. | | |
| 310: 6   Q. And the paper ultimately was published by | | |
| 310: 7   the target date that The Journal had hoped to have | | |
| 310: 8   in The Journal? | | |
| 310: 9   A. That's correct. | | |
| **320:2  -  322:21**         Curfman 11/21/2005 | | |
| 320: 2   Q. Okay.  If you could just take a look at | | |
| 320: 3   Exhibit 8.  It's one of the exhibits from this | | |
| 320: 4   morning, Doctor. | | |
| 320: 5         Do you have Exhibit 8, Doctor? | | |
| 320: 6   A. I do. | | |
| 320: 7   Q. And I think you testified this morning that | | |
| 320: 8   this was an earlier version of the requirements | | |
| 320: 9   that we had looked at previously; is that correct? | | |
| 320: 10   A. This is the uniform requirements from The | | |
| 320: 11   International Committee of Medical Journal Editors. | | |
| 320: 12   This is not our information for authors. | | |
| 320: 13   Q. Okay.  And this -- was this the version of | | |
| 320: 14   this document that existed at the time of the VIGOR | | |
| 320: 15   study? | | |
| 320: 16   A. As far as I know, this is the fifth | | |
| 320: 17   edition, the 1997 edition. | | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 320: 18 Q. And does this -- this particular document | | |
| 320: 19 does not state that there is a requirement that | | |
| 320: 20 absolute numbers be given instead of percentage | | |
| 320: 21 numbers; is that correct? | | |
| 320: 22 A. Well, I have to read through it. | | |
| 320: 23 I don't know.  Do you want to take the | | |
| 320: 24 time to read it? | | |
| 321: 1 Q. No.  I don't want to take -- | | |
| 321: 2 A. It's a number of pages. | | |
| 321: 3 Q. -- the time to do that.  That's fair, | | |
| 321: 4 but -- | | |
| 321: 5 A. Requirement or not, it's something that we | | |
| 321: 6 expect from authors for a fair and accurate | | |
| 321: 7 presentation of data sets. | | |
| 321: 8 I would say most data sets require a | | |
| 321: 9 great majority of data sets, in order to be | | |
| 321: 10 accurately and fairly presented, do require the | | |
| 321: 11 actual numbers of patients to be there and not just | | |
| 321: 12 percentages. | | |
| 321: 13 From time to time, we will allow | | |
| 321: 14 percentages data to be presented, but not very | | |
| 321: 15 often. | | |
| 321: 16 Q. And did you allow it in the instance of the | | |
| 321: 17 VIGOR manuscript, correct? | | |
| 321: 18 And to be fair, you allowed the authors | | |
| 321: 19 of the paper to present the percentage data, is | | |
| 321: 20 that correct, in the VIGOR manuscript? | | |
| 321: 21 A. The authors decided on their own not to | Def Obj:  Non-responsive;   Dr. Curfman is argumentative & his comments are prejudicial | Overruled. |
| 321: 22 give us the raw numbers.  They deleted them from | | |
| 321: 23 the pre-submission version of the manuscript.  They | | |
| 321: 24 were deleted from the manuscript -- | | |
| 322: 1 Q. Doctor -- | | |
| 322: 2 A. -- and for the first time we saw that -- | | |
| 322: 3 those numbers. | | |
| 322: 4 Q. Right.  The authors -- the authors | | |
| 322: 5 presented in the manuscript the percentages, and | | |
| 322: 6 after the peer-reviewed process, the editors | | |
| 322: 7 allowed the authors to present the data in that | | |
| 322: 8 form; is that correct? | | |
| 322: 9 A. And, again, I come back to the fact that | | |
| 322: 10 the -- | | |
| 322: 11 Q. Would you just tell me whether that part is | | |
| 322: 12 correct.  I understand if you have additional -- | | |

| | | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|---|
| | 322: 13 | A. No, that's not correct.  "Allow" is not the | Def Obj:  Witness | Overruled |
| | 322: 14 | right word here. | interrupts question; | |
| | 322: 15 | We did accept the paper, but we expect | same objections | |
| | 322: 16 | authors to provide us with the information.  As I | | |
| | 322: 17 | said earlier, we can't be in a position where we | | |
| | 322: 18 | have to ask for every little thing and drag every | | |
| | 322: 19 | little thing out of the authors.  We can't do that. | | |
| | 322: 20 | That is an expectation that's unreasonable in the | | |
| | 322: 21 | scholarly community. | | |
| 18:21   -   19:4 | | Curfman 01/24/2006 | | |
| | 18: 21 | Q.  Dr. Curfman, are you | | |
| | 18: 22 | currently actively practicing medicine? | | |
| | 18: 23 | A.  A very small fraction of my | | |
| | 18: 24 | time is in medical practice in teaching, | | |
| | 19: 1 | but my main responsibility is I'm the | | |
| | 19: 2 | executive editor of the New England | | |
| | 19: 3 | Journal of Medicine, which is a full-time | | |
| | 19: 4 | job. | | |
| 20:8   -   21:7 | | Curfman 01/24/2006 | | |
| | 20: 8 | Q.  I'd like to take a few | | |
| | 20: 9 | minutes and just establish with you, sir, | | |
| | 20: 10 | a basic chronology of some of the key | | |
| | 20: 11 | events that we'll be talking about. | | |
| | 20: 12 | You recall that the VIGOR | | |
| | 20: 13 | manuscript was submitted to the New | | |
| | 20: 14 | England Journal of Medicine in May of | | |
| | 20: 15 | 2000; is that right? | | |
| | 20: 16 | A.  Well, it was submitted -- it | | |
| | 20: 17 | was received into our system on May 23rd | | |
| | 20: 18 | of 2000.  For the record, I think it's | | |
| | 20: 19 | important that we note that the letter of | | |
| | 20: 20 | transmission from the corresponding | | |
| | 20: 21 | author was dated May 18th. | | |
| | 20: 22 | Q.  Do you remember that the | | |
| | 20: 23 | authors asked for expedited treatment of | | |
| | 20: 24 | the VIGOR manuscript? | | |
| | 21: 1 | A.  Yes, I do. | | |
| | 21: 2 | Q.  Do you remember that the New | | |
| | 21: 3 | England Journal of Medicine determined | | |
| | 21: 4 | not to grant the expedited treatment? | | |
| | 21: 5 | A.  Yes.  The editor who made | | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

|  21: 6 | that decision decided that it was not | | |
|  21: 7 | indicated in that case, yes. | | |

**21:20  -  21:24**              Curfman 01/24/2006
|  21: 20 | Q.  Again, because we'll be |
|  21: 21 | referring to it during the deposition, do |
|  21: 22 | you recognize Exhibit 1 as a copy of the |
|  21: 23 | VIGOR manuscript as it eventually was |
|  21: 24 | published in November of 2000? |

**22:21  -  22:21**              Curfman 01/24/2006
|  22: 21 | A.  Okay. |

**23:23  -  24:19**              Curfman 01/24/2006
|  23: 23 | Q.  Continuing with the |
|  23: 24 | chronology, do you recall that in |
|  24: 1 | February 2001 the FDA convened an |
|  24: 2 | Advisory Committee? |
|  24: 3 | A.  Yes.  I did not have that |
|  24: 4 | information in February, but I did learn |
|  24: 5 | about that at a later time, later in |
|  24: 6 | 2001, yes. |
|  24: 7 | Q.  Do you remember when you |
|  24: 8 | learned in 2001 that the FDA had convened |
|  24: 9 | an Advisory Committee? |
|  24: 10 | A.  To the best of my |
|  24: 11 | recollection, it was in August or perhaps |
|  24: 12 | September of 2001 that I first learned |
|  24: 13 | about that. |
|  24: 14 | Q.  And did you learn that the |
|  24: 15 | FDA had information that they had posted |
|  24: 16 | on their website concerning VIGOR? |
|  24: 17 | A.  Yes.  I learned about that |
|  24: 18 | from a colleague, again, it was perhaps |
|  24: 19 | late August or September of 2001, and |

**26:23  -  27:3**              Curfman 01/24/2006
|  26: 23 | Q.  Eventually, did you read a |
|  26: 24 | memorandum that was part of the FDA's |
|  27: 1 | file on this that was posted on line |
|  27: 2 | called the Targum memorandum? |
|  27: 3 | A.  That's right. |

**27:14  -  27:24**              Curfman 01/24/2006
|  27: 14 | Q.  Is Exhibit 2, does that |
|  27: 15 | appear to you to be a copy of the Targum |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

27: 16  memorandum?
27: 17  A.  (Witness reviewing
27: 18  document.)
27: 19  Yes, it does.
27: 20  Q.  When did you first read the
27: 21  Targum memorandum?
27: 22  A.  I first became aware of the
27: 23  data on the FDA website in late August or
27: 24  perhaps September of 2001.

**28:23  -  30:1**  Curfman 01/24/2006
28: 23  Q.  Continuing in the
28: 24  chronology, in 2004, did you learn that
29: 1  Merck had voluntarily withdrawn Vioxx
29: 2  from the marketplace?
29: 3  A.  That's correct.
29: 4  Q.  And when in 2004 did you
29: 5  learn that?
29: 6  A.  I believe that the date was
29: 7  September 30th, 2004, plus or minus a day
29: 8  or two.
29: 9  Q.  Did you learn around that
29: 10  time or soon after the withdrawal that
29: 11  the FDA was convening another Advisory
29: 12  Committee?
29: 13  A.  Right.
29: 14  Q.  And you understood that this
29: 15  Advisory Committee would be looking at
29: 16  all COX-2 inhibitors; is that right?
29: 17  A.  Right.
29: 18  Q.  As well as other NSAIDs.
29: 19  Did you understand that?
29: 20  A.  Yes.
29: 21  Q.  Did the New England Journal
29: 22  of Medicine ask the people who were
29: 23  writing up the APPROVe study to submit it
29: 24  to the New England Journal of Medicine
30: 1  for possible publication?

**30:23  -  31:23**  Curfman 01/24/2006
30: 23  A.  There were discussions
30: 24  between our editor-in-chief and one of
31: 1  the authors about that possibility, yes,
31: 2  but I honestly don't know who made the

| | | | **Objection/Response in Barnett** | **Ruling in Plunkett** |
|---|---|---|---|---|
| | 31: 3 | first phone call.  I was not involved in | | |
| | 31: 4 | those conversations. | | |
| | 31: 5 | Q.  Was it the case that even | Pltf Obj:  Rule 611-leading | Overruled? |
| | 31: 6 | though Vioxx had been voluntarily | question - improper. | |
| | 31: 7 | withdrawn from the market, the New | Dr. Curfman is an | |
| | 31: 8 | England Journal of Medicine was | independent 3rd party | |
| | 31: 9 | interested in publishing the APPROVe | not an adverse/hostile | |
| | 31: 10 | study so that it would be available to | witness. | |
| | 31: 11 | the public before the Advisory Committee | | |
| | 31: 12 | met? | | |
| | 31: 13 | A.  I don't recall that.  I | | |
| | 31: 14 | think that we were interested in | | |
| | 31: 15 | publishing the data, because it seemed to | | |
| | 31: 16 | us to be an important data set, very | | |
| | 31: 17 | informative data set, that would inform | | |
| | 31: 18 | physicians and the rest of the medical | | |
| | 31: 19 | community about this drug and this class | | |
| | 31: 20 | of drugs, but I don't recall anything | | |
| | 31: 21 | about trying to publish it before an | | |
| | 31: 22 | Advisory Committee.  I don't recall that | | |
| | 31: 23 | at all. | | |
| **32:23** - **33:3** | | Curfman 01/24/2006 | | |
| | 32: 23 | Q.  Did there come a time when | Pltf Obj: 801; 802; | Overruled |
| | 32: 24 | people in the medical community began | hearsay; vague | |
| | 33: 1 | criticizing the New England Journal of | | |
| | 33: 2 | Medicine for the way that it handled the | | |
| | 33: 3 | VIGOR publication? | | |
| **33:10** - **35:1** | | Curfman 01/24/2006 | | |
| | 33: 10 | I can't recall exactly criticism.  I do | Pltf Obj: 801; 802; | Overruled |
| | 33: 11 | recall discussions. There wasn't a lot | hearsay; vague | |
| | 33: 12 | of discussion, but I'm not sure that I | | |
| | 33: 13 | would have recognized it as criticism. | | |
| | 33: 14 | Q.  By the middle of 2005, was | | |
| | 33: 15 | the senior editorial group at the New | | |
| | 33: 16 | England Journal of Medicine meeting on a | | |
| | 33: 17 | regular basis with a public relations | | |
| | 33: 18 | firm? | | |
| | 33: 19 | A.  Excuse me?  Could you repeat | | |
| | 33: 20 | that? | | |
| | 33: 21 | Q.  Sure. | | |
| | 33: 22 | By the middle of 2005, was | | |
| | 33: 23 | the New England Journal of Medicine | | |

| | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| 33: 24 | editorial folks, you and the other senior | | |
| 34: 1 | editors, were you meeting on a regular | | |
| 34: 2 | basis with a public relations firm? | | |
| 34: 3 | A.  I personally did attend some | | |
| 34: 4 | meetings with a public relations firm, | | |
| 34: 5 | yes. | | |
| 34: 6 | Q.  Was one of the subjects that | | |
| 34: 7 | you discussed in late 2005 continuing | | |
| 34: 8 | into early 2006, one of the subjects that | | |
| 34: 9 | you discussed with the public relations | | |
| 34: 10 | firm was how to deal with criticism of | | |
| 34: 11 | the New England Journal of Medicine for | | |
| 34: 12 | the way it handled the VIGOR publication? | | |
| 34: 13 | A.  Well, I don't recall that as | | |
| 34: 14 | being the focus of discussion myself.  I | | |
| 34: 15 | think the topic of COX-2 inhibitors, that | | |
| 34: 16 | topic probably did come up, but I don't | | |
| 34: 17 | recall that we were talking about -- I | | |
| 34: 18 | don't think so. | | |
| 34: 19 | Q.  So, you don't remember that | Pltf Obj:  Assumes facts not in evidence.  Asked & answered.  Omits answer. | Overruled |
| 34: 20 | in November and December, in fact, you | | |
| 34: 21 | were communicating almost on a daily | | |
| 34: 22 | basis with this PR firm on subjects | | |
| 34: 23 | including the criticisms of the New | | |
| 34: 24 | England Journal of Medicine concerning | | |
| 35: 1 | how they handled the VIGOR publication? | | |
| **35:11  -  35:18** | Curfman 01/24/2006 | | |
| 35: 11 | Q.  Do you -- are you saying | Pltf Obj:  Argumentative | Overruled |
| 35: 12 | that as you sit here today that you don't | | |
| 35: 13 | know that the New England Journal of | | |
| 35: 14 | Medicine in November and December was | | |
| 35: 15 | communicating with this PR firm on almost | | |
| 35: 16 | a daily basis about criticisms of the New | | |
| 35: 17 | England Journal of Medicine on how it | | |
| 35: 18 | handled the VIGOR publication? | | |
| **36:19  -  36:23** | Curfman 01/24/2006 | | |
| 36: 19 | THE WITNESS:  Well, all I | | |
| 36: 20 | can do is tell you that I was not | | |
| 36: 21 | talking with people at a PR firm | | |
| 36: 22 | about, what did you say, how to | | |
| 36: 23 | handle the VIGOR article or -- | | |
| **37:22  -  38:6** | Curfman 01/24/2006 | | |

| | | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|---|
| | 37: 22 | Q.  My question to you, sir, is, | Pltf Obj:  Argumentative; | Overruled |
| | 37: 23 | is it your testimony today that you don't | asked & answered | |
| | 37: 24 | know that back in November and December, | | |
| | 38: 1 | the New England Journal of Medicine was | | |
| | 38: 2 | communicating on a regular basis with a | | |
| | 38: 3 | PR firm about how to handle criticism of | | |
| | 38: 4 | the manner in which the New England | | |
| | 38: 5 | Journal of Medicine handled the VIGOR | | |
| | 38: 6 | publication? | | |
| **38:12** - **39:5** | | Curfman 01/24/2006 | | |
| | 38: 12 | A.  Okay.  To the best of my | | |
| | 38: 13 | recollection, to the best of my memory, | | |
| | 38: 14 | there was a member of the, what you call | | |
| | 38: 15 | the PR firm, Morrissey & Company, that | | |
| | 38: 16 | would provide us with e-mail updates | | |
| | 38: 17 | about articles in the media that would be | | |
| | 38: 18 | of interest to the New England Journal of | | |
| | 38: 19 | Medicine, to the editors, other staff | | |
| | 38: 20 | members at the journal.  And I would be | | |
| | 38: 21 | copied on these e-mails.  I have to say | | |
| | 38: 22 | that I didn't open all of them, but I did | | |
| | 38: 23 | open some.  They would contain sometimes | | |
| | 38: 24 | copies of articles in the media that | | |
| | 39: 1 | relate to journal activities, and some of | | |
| | 39: 2 | those, I'm sure, related to rofecoxib, | | |
| | 39: 3 | other COX-2 inhibitors, and this general | | |
| | 39: 4 | topic which was being written about in | | |
| | 39: 5 | the media at that time.  So, that's the | | |
| **40:1** - **40:6** | | Curfman 01/24/2006 | | |
| | 40: 1 | Q.  Don't you remember that they | Pltf Obj:  Rule 611, leading | Overruled |
| | 40: 2 | coached you on what to say to the media | question improper.  Dr. | |
| | 40: 3 | when the media asked any questions that | Curfman is an independent | |
| | 40: 4 | might be critical of the way that the New | 3rd party not an adverse/ | |
| | 40: 5 | England Journal of Medicine handled the | hostile witness.  Argumentative. | |
| | 40: 6 | VIGOR publication? | Asked & answered | |
| **40:13** - **40:16** | | Curfman 01/24/2006 | | |
| | 40: 13 | THE WITNESS:  Well, I don't | | |
| | 40: 14 | recall specifically receiving any | | |
| | 40: 15 | coaching about how to handle the | | |
| | 40: 16 | VIGOR publication.  Now, I do | | |
| **42:17** - **42:22** | | Curfman 01/24/2006 | | |
| | 42: 17 | Q.  And then moving on with our | | |

| | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| | 42: 18    chronology, did you and your colleagues, | | |
| | 42: 19    Dr. Morrissey and Dr. Drazen, prepare and | | |
| | 42: 20    post on your website a document called an | | |
| | 42: 21    "Expression of Concern"? | | |
| | 42: 22    A.   That's correct. | | |
| **43:17   -   44:3** | Curfman 01/24/2006 | | |
| | 43: 17    Is that a copy of the | | |
| | 43: 18    Expression of Concern? | | |
| | 43: 19    A.   (Witness reviewing | | |
| | 43: 20    document.) | | |
| | 43: 21    Yes, it is. | | |
| | 43: 22    Q.   What date did you release | | |
| | 43: 23    this and post it on your website? | | |
| | 43: 24    A.   I believe it was December | | |
| | 44: 1    8th or 9th, somewhere in that area. | | |
| | 44: 2    Q.   I think we'll see as we go | | |
| | 44: 3    forward that it was December 8. | | |
| **44:9   -   45:3** | Curfman 01/24/2006 | | |
| | 44: 9    Q.   And do you remember that on | Pltf Obj:  Argumentative. Assumes facts not in evidence. Rule 611- Leading question improper. Dr. Curfman is an independent 3rd party not an adverse/hostile witness. | Overruled |
| | 44: 10    December 8th, Thursday, the day that you | | |
| | 44: 11    decided to release this Expression of | | |
| | 44: 12    Concern, that that was the day of closing | | |
| | 44: 13    argument and submission to the jury of | | |
| | 44: 14    the case called the Irvin case? | | |
| | 44: 15    A.   Well, I certainly know that | | |
| | 44: 16    a case was going on.  I'm not familiar | | |
| | 44: 17    with the term "Irvin case," but I know | | |
| | 44: 18    that a case is going on.  But I honestly | | |
| | 44: 19    didn't know exactly what was going on in | | |
| | 44: 20    the case on that particular day. | | |
| | 44: 21    Q.   Did you know that there was | | |
| | 44: 22    a case being tried in Federal Court in | | |
| | 44: 23    Houston in early December? | | |
| | 44: 24    A.   Yes. | | |
| | 45: 1    Q.   And, in fact, you got daily | Pltf Obj: Rule 611-Leading question, improper. Dr. Curfman is an inependent 3rd party not an adverse/hostile witness | Overruled |
| | 45: 2    updates on that trial, didn't you, from | | |
| | 45: 3    your PR team and the others? | | |
| **45:6   -   45:9** | Curfman 01/24/2006 | | |
| | 45: 6    THE WITNESS:  I don't -- I | Argumentative | Overruled |
| | 45: 7    don't know if they were daily | | |
| | 45: 8    updates.  I think that there were | | |
| | 45: 9    updates from time to time. | | |

|  |  | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| **45:11 - 46:18** | Curfman 01/24/2006 | | |
| 45: 11 | Q.  And -- | | |
| 45: 12 | A.  Newspaper articles. | | |
| 45: 13 | Q.  And when you released the | | |
| 45: 14 | Expression of Concern -- | | |
| 45: 15 | A.  Uh-huh. | | |
| 45: 16 | Q.  -- which I think you'll | | |
| 45: 17 | agree was critical of the authors of the | | |
| 45: 18 | VIGOR study, is that a fair statement? | | |
| 45: 19 | A.  That was not the purpose of | | |
| 45: 20 | the Expression of Concern. | | |
| 45: 21 | Q.  Whether it was its purpose | Pltf Obj: Rule 611-Leading | Overruled |
| 45: 22 | or not, would you agree that the | question improper.  Dr. | |
| 45: 23 | Expression of Concern was critical of the | Curfman is an independent | |
| 45: 24 | authors of the VIGOR study? | 3rd party not an adverse/ | |
| 46: 1 | A.  The Expression of Concern | hostile witness. | |
| 46: 2 | was focused on an article that was | | |
| 46: 3 | published in the New England Journal of | | |
| 46: 4 | Medicine, a document, scientific document | | |
| 46: 5 | that we had obtained evidence that made | | |
| 46: 6 | us concerned about the procedures that | | |
| 46: 7 | led to the publication of that document. | | |
| 46: 8 | And our Expression of Concern was focused | | |
| 46: 9 | on the scientific document in order to | | |
| 46: 10 | correct the scientific record.  It was | | |
| 46: 11 | not focused on individuals. | | |
| 46: 12 | Q.  Well, do you remember that | Pltf Obj: Argumentative | Overruled |
| 46: 13 | you went out and gave a bunch of | Rule 611-Leading question | |
| 46: 14 | interviews after the Expression of | improper.  Dr. Curfman is | |
| 46: 15 | Concern was published where you were | an independent 3rd party | |
| 46: 16 | critical of the authors of the VIGOR | not and adverse/hostile | |
| 46: 17 | study? | witness. | |
| 46: 18 | A.  I did not -- | | |
| **46:21 - 47:6** | Curfman 01/24/2006 | | |
| 46: 21 | THE WITNESS:  I did not go | | |
| 46: 22 | out and give a bunch of | | |
| 46: 23 | interviews. | | |
| 46: 24 | BY MR. BECK: | | |
| 47: 1 | Q.  You didn't? | Pltf Obj: Asked & answered | Overruled |
| 47: 2 | A.  No, I did not. | Interrupts witness. | |
| 47: 3 | Q.  How many did you give? | Argumentative. | |
| 47: 4 | A.  The way the -- | | |

| | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| 47: 5 | Q.  Can you just answer how many | | |
| 47: 6 | you gave? | | |

**47:11   -   48:1**          Curfman 01/24/2006

| 47: 11 | THE WITNESS:  The way the -- |
| 47: 12 | we were surprised that there were |
| 47: 13 | so many press calls.  We did not |
| 47: 14 | issue a press release about the |
| 47: 15 | Expression of Concern.  We posted |
| 47: 16 | it on our website, and after it |
| 47: 17 | was posted, we began to receive |
| 47: 18 | calls from the media.  I was |
| 47: 19 | surprised that they were |
| 47: 20 | interested in this.  For us -- |
| 47: 21 | this was standard editorial |
| 47: 22 | procedure for us.  We have issued |
| 47: 23 | a total of three Expressions of |
| 47: 24 | Concern since 2002, and we were |
| 48: 1 | following standard procedures. |

**48:24   -   49:2**          Curfman 01/24/2006

| 48: 24 | and my question was, how many interviews |
| 49: 1 | did you give?  Can you answer that |
| 49: 2 | question? |

**49:7   -   49:11**          Curfman 01/24/2006

| 49: 7 | THE WITNESS:  I can't |
| 49: 8 | really.  Probably more than four |
| 49: 9 | and less than ten.  I don't know. |
| 49: 10 | I didn't count the number of |
| 49: 11 | telephone calls that came in. |

**49:13   -   49:23**          Curfman 01/24/2006

| | | Pltf Obj: Argumentative | Overruled |
|---|---|---|---|
| 49: 13 | Q.  When you said under oath a | Rule 611 - Leading question | |
| 49: 14 | minute ago that you did not issue a press | improper.  Dr. Curfman is | |
| 49: 15 | release, in fact, the New England Journal | an independent 3rd party | |
| 49: 16 | of Medicine sent out an e-mail alert to | not an adverse/hostile | |
| 49: 17 | the media -- | witness. | |
| 49: 18 | A.  Right. | | |
| 49: 19 | Q.  -- informing the media that | | |
| 49: 20 | this Expression of Concern that you say | | |
| 49: 21 | was routine was going to be posted later | | |
| 49: 22 | that day? | | |
| 49: 23 | A.  Yes. | | |

**50:10   -   50:14**          Curfman 01/24/2006

| | | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|---|
| | 50: 10 | Q.  And are you claiming that the New England Journal of Medicine treated this Expression of Concern as a routine matter, nothing out of the ordinary? | Pltf Obj:  Argumentative. Rule 611 - Leading question improper.  Dr. Curfman is an independent 3rd party not an adverse/hostile witness. | Overruled |
| | 50: 11 | | | |
| | 50: 12 | | | |
| | 50: 13 | | | |
| | 50: 14 | | | |
| 50:23 - 50:24 | | Curfman 01/24/2006 | | |
| | 50: 23 | THE WITNESS:  I didn't say that. | | |
| | 50: 24 | | | |
| 51:6 - 51:10 | | Curfman 01/24/2006 | Pltf Obj:  Asked & answered- Argumentative. Rule 611 - Leading question improper.  Dr. Curfman is an independent 3rd party not an adverse/hostile witness. | Overruled |
| | 51: 6 | Q.  Are you claiming that the New England Journal of Medicine treated this Expression of Concern as a routine matter that was nothing out of the ordinary? | | |
| | 51: 7 | | | |
| | 51: 8 | | | |
| | 51: 9 | | | |
| | 51: 10 | | | |
| 51:13 - 51:17 | | Curfman 01/24/2006 | | |
| | 51: 13 | THE WITNESS:  This is part of the responsibility of editors. It's part of our job that when, after an article has been published in a journal, and it's | | |
| | 51: 14 | | | |
| | 51: 15 | | | |
| | 51: 16 | | | |
| | 51: 17 | | | |
| 51:20 - 52:9 | | Curfman 01/24/2006 | | |
| | 51: 20 | published in a journal and at a later time new evidence comes to light that causes the editors to be concerned about some aspect of that article, the process by which it was published, the data, the content, issuing an Expression of Concern is part of the standard operating procedure.  It's set down in the uniform requirements of the International Committee of Medical Journal Editors of which the New England Journal is one of the founding members. | | |
| | 51: 21 | | | |
| | 51: 22 | | | |
| | 51: 23 | | | |
| | 51: 24 | | | |
| | 52: 1 | | | |
| | 52: 2 | | | |
| | 52: 3 | | | |
| | 52: 4 | | | |
| | 52: 5 | | | |
| | 52: 6 | | | |
| | 52: 7 | | | |
| | 52: 8 | | | |
| | 52: 9 | | | |
| 53:8 - 53:8 | | Curfman 01/24/2006 | | |
| | 53: 8 | Q.  What's Exhibit 4? | | |
| 54:17 - 55:1 | | Curfman 01/24/2006 | | |
| | 54: 17 | To the best of my recollection, when the Expression of Concern was posted on the | | |
| | 54: 18 | | | |
| | 54: 19 | | | |

|  |  |  | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|---|
|  | 54: 20 | website, I believe that this may |  |  |
|  | 54: 21 | have been a statement that was |  |  |
|  | 54: 22 | placed below it or next to it, |  |  |
|  | 54: 23 | below it, I guess, to provide |  |  |
|  | 54: 24 | additional explanation for why it |  |  |
|  | 55: 1 | was being released. |  |  |
| 55:3 - 55:13 |  | Curfman 01/24/2006 |  |  |
|  | 55: 3 | Q.  So, this was a statement | Pltf Obj:  Improper compound | Overruled |
|  | 55: 4 | issued by the New England Journal of | question.  Assumes facts not |  |
|  | 55: 5 | Medicine on December 8th, the same day as | in evidence.  Rule 611- |  |
|  | 55: 6 | the Expression of Concern, and it | Leading question improper. |  |
|  | 55: 7 | accompanied the Expression of Concern on | Dr. Curfman is an |  |
|  | 55: 8 | the New England Journal of Medicine's | independent 3rd party not |  |
|  | 55: 9 | website?  Isn't that true? | an adverse/hostile witness. |  |
|  | 55: 10 | A.  Well, if you tell me -- to |  |  |
|  | 55: 11 | the best of my recollection -- it doesn't |  |  |
|  | 55: 12 | say that here, but that's the best of my |  |  |
|  | 55: 13 | recollection.  If you tell me that's |  |  |
| 55:15 - 55:17 |  | Curfman 01/24/2006 | Pltf Obj: Rule 611-Leading | Overruled |
|  | 55: 15 | Q.  And you'd never done that | question improper. Dr. Curfman |  |
|  | 55: 16 | before in connection with an Expression | is an independent 3rd party not |  |
|  | 55: 17 | of Concern, had you? | an adverse/hostile witness |  |
| 55:20 - 55:21 |  | Curfman 01/24/2006 |  |  |
|  | 55: 20 | THE WITNESS:  I don't | Pltf Obj: Assumes facts | Overruled |
|  | 55: 21 | recall.  I don't recall. | not in evidence |  |
| 55:23 - 56:3 |  | Curfman 01/24/2006 |  |  |
|  | 55: 23 | Q.  Well, you don't recall one | Pltf Obj:  Asked | Overruled |
|  | 55: 24 | way or another whether you issued a | and answered. |  |
|  | 56: 1 | one-page statement accompanying either |  |  |
|  | 56: 2 | one of those other two Expressions of |  |  |
|  | 56: 3 | Concern that you talked about? |  |  |
| 56:13 - 56:24 |  | Curfman 01/24/2006 |  |  |
|  | 56: 13 | helpful, because I didn't write |  |  |
|  | 56: 14 | this statement, and I do remember |  |  |
|  | 56: 15 | being informed that, would it be |  |  |
|  | 56: 16 | advisable to provide some |  |  |
|  | 56: 17 | explanation given the technical |  |  |
|  | 56: 18 | nature of the Expression of |  |  |
|  | 56: 19 | Concern, would it be advisable to |  |  |
|  | 56: 20 | have such a statement?  And I |  |  |
|  | 56: 21 | remember discussing that, and |  |  |

| | | **Objection/Response in Barnett** | **Ruling in Plunkett** |
|---|---|---|---|
| | 56: 22      so -- but I did not write the | | |
| | 56: 23      statement.  I remember discussing | | |
| | 56: 24      it. | | |
| **57:2  -  57:24** | Curfman 01/24/2006 | | |
| | 57: 2      Q.  You said before that you | Pltf Obj:  Interrupts witness. | Overruled |
| | 57: 3      handled this Expression of Concern the | | |
| | 57: 4      same way you handled the other two? | | |
| | 57: 5      A.  Yes.  In terms of -- | | |
| | 57: 6      Q.  And my question for you, | | |
| | 57: 7      sir, is, in either one of the other two | | |
| | 57: 8      Expressions of Concern, did the New | | |
| | 57: 9      England Journal of Medicine release a | | |
| | 57: 10      statement that accompanied the Expression | | |
| | 57: 11      of Concern? | | |
| | 57: 12      A.  Again, I don't recall the | | |
| | 57: 13      answer to that, but what I was referring | | |
| | 57: 14      to was the -- in terms of handling the | | |
| | 57: 15      Expression of Concern, what I was talking | | |
| | 57: 16      about is the steps that we took, how | | |
| | 57: 17      the -- how we made the decision to write | | |
| | 57: 18      an Expression of Concern, how that | | |
| | 57: 19      Expression of Concern was written, who | | |
| | 57: 20      read it and reviewed it, and when it was | | |
| | 57: 21      released.  Those kinds of steps were the | | |
| | 57: 22      same steps that we followed in each of | | |
| | 57: 23      these three cases.  And that's what I was | | |
| | 57: 24      referring to. | | |
| **58:1  -  58:14** | Curfman 01/24/2006 | | |
| | 58: 1      Q.  Now, you say that you did | Pltf Obj:  Improper compound question. | Overruled |
| | 58: 2      not write this statement, Exhibit 4, that | | |
| | 58: 3      was posted on the website.  Did Dr. | | |
| | 58: 4      Morrissey write it?  He was one of the | | |
| | 58: 5      co-authors with you of the Expression of | | |
| | 58: 6      Concern, right? | | |
| | 58: 7      A.  Yes, he was. | | |
| | 58: 8      Q.  Did Dr. Morrissey write this | | |
| | 58: 9      statement that was posted on your | | |
| | 58: 10      website? | | |
| | 58: 11      A.  I don't know who wrote this | Pltf Obj (58:13-14) Argumentative Assumes facts not in evidence. | Overruled |
| | 58: 12      statement, to be honest with you. | | |
| | 58: 13      Q.  Well, don't you know, in | Rule 611-Leading question improper. | |
| | 58: 14      fact, that it was written by your PR guy? | Dr. Curfman is an independent 3rd | |

| | | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|---|
| **58:17** - **59:9** | | Curfman 01/24/2006 | party not an adverse/hostile witness. | |
| | 58: 17 | THE WITNESS:  No, I don't | | |
| | 58: 18 | know who wrote the statement. | | |
| | 58: 19 | BY MR. BECK: | | |
| | 58: 20 | Q.  Did you have a chance to | | |
| | 58: 21 | spend some time reviewing this statement | | |
| | 58: 22 | before it was posted on behalf of the New | | |
| | 58: 23 | England Journal of Medicine on your | | |
| | 58: 24 | website? | | |
| | 59: 1 | A.  I believe I saw it briefly, | | |
| | 59: 2 | but I did not spend a lot of time with | | |
| | 59: 3 | it, no. | | |
| | 59: 4 | Q.  Do you remember that you | Pltf Obj:  Rule 611-Leading question improper.  Dr. Curfman is an independent 3rd party not an adverse/hostile witness. | Overruled |
| | 59: 5 | weren't even shown this statement that | | |
| | 59: 6 | was posted on your website until the day | | |
| | 59: 7 | it was posted? | | |
| | 59: 8 | A.  I think that's certainly | | |
| | 59: 9 | possible, yes. | | |
| **59:23** - **60:4** | | Curfman 01/24/2006 | | |
| | 59: 23 | Q.  Ed, do you remember Ed? | | |
| | 59: 24 | A.  Ed? | | |
| | 60: 1 | Q.  The PR guy named Ed?  Do you | Pltf Obj: Assumes facts not in evidence. | Overruled |
| | 60: 2 | remember a PR guy named Ed that you | | |
| | 60: 3 | talked with almost every day during this | | |
| | 60: 4 | period? | | |
| **60:15** - **60:20** | | Curfman 01/24/2006 | | |
| | 60: 15 | THE WITNESS:  You mean Ed | | |
| | 60: 16 | Cafasso?  Is that who you mean, Ed | | |
| | 60: 17 | Cafasso? | | |
| | 60: 18 | BY MR. BECK: | | |
| | 60: 19 | Q.  Yes.  The PR guy, Ed. | | |
| | 60: 20 | A.  Yes. | | |
| **61:20** - **62:2** | | Curfman 01/24/2006 | | |
| | 61: 20 | Q.  During early December, were | Pltf Obj:  Argumentative Rule 611-Leading question improper.  Dr. Curfman is an independent 3rd party not an adverse/hostile witness. | Overruled |
| | 61: 21 | the senior editors of the New England | | |
| | 61: 22 | Journal of Medicine following the trial | | |
| | 61: 23 | down there in Houston so closely that | | |
| | 61: 24 | they were actually reading or being | | |
| | 62: 1 | informed of the contents of the testimony | | |
| | 62: 2 | that was coming in during that trial? | | |
| **62:5** - **62:7** | | Curfman 01/24/2006 | | |

| | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| | 62: 5   THE WITNESS:  I can really | | |
| | 62: 6   only speak for myself, and the | | |
| | 62: 7   answer is unequivocally no. | | |
| **62:15** - **62:16** | Curfman 01/24/2006 | | |
| | 62: 15   Q.  I'm handing you what we've | | |
| | 62: 16   marked as Exhibit 5. | | |
| **62:19** - **64:10** | Curfman 01/24/2006 | | |
| | 62: 19   Q.  Do you see here, sir, that | Pltf Obj: | Overruled |
| | 62: 20   this is an e-mail, internal e-mail from | R. 801 | |
| | 62: 21   or among the senior editors of the New | R. 802 | |
| | 62: 22   England Journal of Medicine? | Hearsay | |
| | 62: 23   A.  Yes. | | |
| | 62: 24   Q.  And it's from Dr. Drazen; | | |
| | 63: 1   right? | | |
| | 63: 2   A.  Well, there are two e-mails | | |
| | 63: 3   here.  Are you talking -- | | |
| | 63: 4   Q.  The one on the top. | | |
| | 63: 5   A.  The one on the top.  Yes. | | |
| | 63: 6   From Dr. Drazen, yes. | | |
| | 63: 7   Q.  He's the editor-in-chief of | | |
| | 63: 8   the New England Journal of Medicine, | | |
| | 63: 9   right? | | |
| | 63: 10   A.  Yes, he is. | | |
| | 63: 11   Q.  It's dated Saturday, | | |
| | 63: 12   December 3rd; correct? | | |
| | 63: 13   A.  Right. | | |
| | 63: 14   Q.  And it's to you, right? | | |
| | 63: 15   A.  Uh-huh. | | |
| | 63: 16   Q.  And to Dr. Morrissey, | | |
| | 63: 17   correct? | | |
| | 63: 18   A.  Right. | | |
| | 63: 19   Q.  And you would be the three | | |
| | 63: 20   top editors of the New England Journal of | | |
| | 63: 21   Medicine, right? | | |
| | 63: 22   A.  We're three of the top | | |
| | 63: 23   editors, yes. | | |
| | 63: 24   Q.  And do you see here where | | |
| | 64: 1   the editor-in-chief of the New England | | |
| | 64: 2   Journal of Medicine is reporting to you | | |
| | 64: 3   concerning the contents of the deposition | | |
| | 64: 4   testimony of Dr. Reicin? | | |

| | | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|---|
| | 64: 5 | A.  Uh-huh. | | |
| | 64: 6 | Q.  Why was the editor-in-chief | Pltf Obj:  Omits answer. | Overruled |
| | 64: 7 | of the New England Journal of Medicine | | |
| | 64: 8 | giving you updates concerning the | | |
| | 64: 9 | contents of Dr. Reicin's testimony down | | |
| | 64: 10 | there in the Houston trial? | | |
| 65:9 | - 65:10 | Curfman 01/24/2006 | | |
| | 65: 9 | Q.  And I will read it into the | Pltf Obj:  R. 801 | Overruled |
| | 65: 10 | record. | R. 802 | |
| 65:13 | - 65:20 | Curfman 01/24/2006 | | |
| | 65: 13 | Q.  "Steve and Greg, in her | Pltf Obj:  Not a question. | Overruled |
| | 65: 14 | depositional testimony Reicin says that | | |
| | 65: 15 | there were also GI events that were not | | |
| | 65: 16 | recorded but came in late.  We should | | |
| | 65: 17 | make this clear in the note of concern | | |
| | 65: 18 | and ask them to provide full reporting of | | |
| | 65: 19 | all data they had on or before October | | |
| | 65: 20 | 13, 2000." | | |
| 66:20 | - 67:18 | Curfman 01/24/2006 | | |
| | 66: 20 | Q.  You know there are | Pltf Obj:  Counsel testifying.  Improper mention of previous Irvin I trial | Overruled |
| | 66: 21 | depositions, then there are trials. | | |
| | 66: 22 | You're in a deposition now.  The thing | | |
| | 66: 23 | that was going down in Houston with a | | |
| | 66: 24 | jury was a trial. | | |
| | 67: 1 | Now, when you read this, did | | |
| | 67: 2 | you understand it to refer to trial | | |
| | 67: 3 | testimony by Dr. Reicin or deposition | | |
| | 67: 4 | testimony or which? | | |
| | 67: 5 | A.  Well, I'll have to be very | | |
| | 67: 6 | honest with you.  I only vaguely remember | | |
| | 67: 7 | this e-mail message.  I remember that it | | |
| | 67: 8 | was on a Saturday late in the morning.  I | | |
| | 67: 9 | was working at my desk in my home. | | |
| | 67: 10 | Q.  Actually, it says 11:31 p.m. | | |
| | 67: 11 | A.  Oh, p.m., I'm sorry. | | |
| | 67: 12 | Q.  Almost midnight he's telling | | |
| | 67: 13 | you about this testimony, right? | | |
| | 67: 14 | A.  I don't think I was awake | | |
| | 67: 15 | then.  I try to be in bed earlier than | | |
| | 67: 16 | that.  So, I think that I got it perhaps | | |
| | 67: 17 | the next morning, maybe it was actually | | |
| | 67: 18 | Sunday morning, I was working at my desk. | | |

| | | | **Objection/Response in Barnett** | **Ruling in Plunkett** |
|---|---|---|---|---|
| **68:14** | **-** | **69:8** | Curfman 01/24/2006 | |
| | 68: 14 | Q.  When you released the | Pltf Obj:  Improper | Overruled |
| | 68: 15 | editorial on December 8th, I think you | mention of previous Irvin | |
| | 68: 16 | indicated before you didn't know, you | I trial. | |
| | 68: 17 | say, precisely what was going on in the | | |
| | 68: 18 | trial down in Houston.  Is that right? | | |
| | 68: 19 | A.  Right. | | |
| | 68: 20 | Q.  You knew that the trial was | | |
| | 68: 21 | still going on down in Houston? | | |
| | 68: 22 | A.  Yes. | | |
| | 68: 23 | Q.  You also knew, obviously, | | |
| | 68: 24 | that Vioxx was not being prescribed and | | |
| | 69: 1 | sold on December 8th, 2005; right? | | |
| | 69: 2 | A.  Yes.  That's right.  We | | |
| | 69: 3 | generally -- we have referred to it as | | |
| | 69: 4 | rofecoxib, but, yes, that's right. | | |
| | 69: 5 | Q.  And so on December 8th, when | | |
| | 69: 6 | you released this Expression of Concern, | | |
| | 69: 7 | there was no public health emergency -- | | |
| | 69: 8 | A.  No. | | |
| **71:11** | **-** | **72:17** | Curfman 01/24/2006 | |
| | 71: 11 | Q.  You've got what we've marked | Pltf Obj:  R. 801 | Overruled |
| | 71: 12 | as Defendant's Exhibit 6 in front of you, | R. 802 | |
| | 71: 13 | right? | Hearsay | |
| | 71: 14 | A.  Right.  Uh-huh. | | |
| | 71: 15 | Q.  And do you see that the | | |
| | 71: 16 | first page of Defendant's Exhibit 6 is an | | |
| | 71: 17 | e-mail string of e-mails from December | | |
| | 71: 18 | 8th? | | |
| | 71: 19 | A.  Right. | | |
| | 71: 20 | Q.  And the first one is from | | |
| | 71: 21 | Karen Pedersen -- | | |
| | 71: 22 | A.  Pedersen, yes. | | |
| | 71: 23 | Q.  Pederson to you? | | |
| | 71: 24 | A.  Right. | | |
| | 72: 1 | Q.  With a copy to Dr. | | |
| | 72: 2 | Morrissey? | | |
| | 72: 3 | A.  That's right. | | |
| | 72: 4 | Q.  And it says she's forwarding | | |
| | 72: 5 | something called talking points; right? | | |
| | 72: 6 | A.  Yes.  That's what I referred | | |
| | 72: 7 | to earlier. | | |

| | | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|---|
| | 72: 8 | Q.  And Karen Pedersen, is she | Pltf Obj:  Rule 611-Leading question improper.  Dr. Curfman is an independent 3rd party not an adverse/ hostile witness. | Overruled |
| | 72: 9 | an internal PR person for the New England | | |
| | 72: 10 | Journal of Medicine? | | |
| | 72: 11 | A.  She's the manager of media | | |
| | 72: 12 | relations.  We don't call her a PR | | |
| | 72: 13 | person, but she is our interface with the | | |
| | 72: 14 | media. | | |
| | 72: 15 | Q.  And she's forwarding on | Pltf Obj:  Omits answer, if any. | Overruled |
| | 72: 16 | talking points that were sent to her by | | |
| | 72: 17 | Ed Cafasso; right? | | |
| 73:2 | -   73:20 | Curfman 01/24/2006 | | |
| | 73: 2 | Q.  But do you see right | Pltf Obj.  R. 801 R. 802 | Overruled |
| | 73: 3 | underneath the first e-mail -- | | |
| | 73: 4 | A.  Yeah. | | |
| | 73: 5 | Q.  -- that we looked at, which | | |
| | 73: 6 | would have been the most recent e-mail, | | |
| | 73: 7 | there's an e-mail -- she's forwarding the | | |
| | 73: 8 | thing that she got right below from Ed | | |
| | 73: 9 | Cafasso to her -- | | |
| | 73: 10 | A.  Right. | | |
| | 73: 11 | Q.   -- "Subject:  Talking | | |
| | 73: 12 | points," "Importance:  High"? | | |
| | 73: 13 | A.  Uh-huh.  Yep. | | |
| | 73: 14 | Q.  And Ed Cafasso, he's the | | |
| | 73: 15 | outside PR guy; right? | | |
| | 73: 16 | A.  Yes. | | |
| | 73: 17 | Q.  So, he's attaching the | | |
| | 73: 18 | talking points and the Q&A, he says; | | |
| | 73: 19 | correct? | | |
| | 73: 20 | A.  Right. | | |
| 74:3 | -   74:14 | Curfman 01/24/2006 | | |
| | 74: 3 | Q.  Are you on the page that has | | |
| | 74: 4 | at the top the title "Expression of | | |
| | 74: 5 | Concern: Key Points and Q&A." | | |
| | 74: 6 | A.  Right. | | |
| | 74: 7 | Q.  Are these the kind of | | |
| | 74: 8 | talking points that you referred to | | |
| | 74: 9 | earlier in your testimony that people | | |
| | 74: 10 | would give you to use? | Pltf Obj: (74:12-13) Rule 611-Leading question improper.  Dr. Curfman is an independent 3rd party not an adverse/hostile | Overruled |
| | 74: 11 | A.  Sometimes they would, yes. | | |
| | 74: 12 | Q.  And they did this time; | | |
| | 74: 13 | right? | | |

| | | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|---|
| | 74: 14 | A.  They did.  I can't say that | witness. | |
| 74:17 - 75:9 | | Curfman 01/24/2006 | | |
| | 74: 17 | Q.  Well, let's take a look down | | |
| | 74: 18 | at the one that says "Why Did we Release | | |
| | 74: 19 | this Today?" | | |
| | 74: 20 | A.  Uh-huh. | | |
| | 74: 21 | Q.  And the talking point says, | Pltf Obj:  R. 801 | Overruled |
| | 74: 22 | "We felt it was important to release this | R. 802 | |
| | 74: 23 | information as soon as we understood how | Hearsay | |
| | 74: 24 | it impacted the conclusions of the paper | | |
| | 75: 1 | we had published.  We felt we should | | |
| | 75: 2 | announce this once we had completed our | | |
| | 75: 3 | investigation of the data, which included | | |
| | 75: 4 | a statistical analysis, and had raised | | |
| | 75: 5 | our concerns with the authors." | | |
| | 75: 6 | Did you follow that talking | | |
| | 75: 7 | point when members of the media asked you | | |
| | 75: 8 | why you released the Expression of | | |
| | 75: 9 | Concern when the jury was out in Houston? | | |
| 75:15 - 75:15 | | Curfman 01/24/2006 | | |
| | 75: 15 | THE WITNESS:  I don't -- | | |
| 76:1 - 76:11 | | Curfman 01/24/2006 | | |
| | 76: 1 | Q.  Is it still your testimony | | |
| | 76: 2 | that you didn't know on December 8th when | | |
| | 76: 3 | you released the Expression of Concern | | |
| | 76: 4 | that the jury was out in Houston? | | |
| | 76: 5 | A.  I don't know how I could | | |
| | 76: 6 | have known that.  I mean, you know, it's | | |
| | 76: 7 | not something that I would have known. | | |
| | 76: 8 | Q.  Did you use this talking | | |
| | 76: 9 | point when you answered questions from | | |
| | 76: 10 | the media about why you released that | | |
| | 76: 11 | Expression of Concern on that date? | | |
| 76:16 - 76:21 | | Curfman 01/24/2006 | | |
| | 76: 16 | Q.  Well, you were asked about | Pltf Obj: Rule 611-Leading | Overruled |
| | 76: 17 | why in the media, weren't you? | question improper.  Dr. | |
| | 76: 18 | A.  I don't recall, but what I | Curfman is an independent | |
| | 76: 19 | can say is that I didn't use this talking | 3rd party not an adverse/ | |
| | 76: 20 | point because I didn't need to use this | hostile witness. | |
| | 76: 21 | talking point.  Because the truth -- | | |
| 77:1 - 77:17 | | Curfman 01/24/2006 | | |

| | | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|---|
| | 77: 1 | THE WITNESS:  The truth of | | |
| | 77: 2 | the matter is that we released the | | |
| | 77: 3 | Expression of Concern when we had | | |
| | 77: 4 | all of the data assembled, when we | | |
| | 77: 5 | had deliberated, we had the facts | | |
| | 77: 6 | in hand.  We very carefully | | |
| | 77: 7 | deliberated.  The editors had come | | |
| | 77: 8 | together, reviewed all the | | |
| | 77: 9 | information that we had, including | | |
| | 77: 10 | information that we obtained on | | |
| | 77: 11 | November 21st, 2005.  We made our | | |
| | 77: 12 | best judgment as editors of the | | |
| | 77: 13 | New England Journal of Medicine | | |
| | 77: 14 | with many years of experience | | |
| | 77: 15 | collectively, and we sat down and | | |
| | 77: 16 | wrote the document, the Expression | | |
| | 77: 17 | of Concern.  We worked very hard | | |
| **78:1** | -  **78:6** | Curfman 01/24/2006 | | |
| | 78: 1 | over things for us.  And when we | Pltf Obj:  Incomplete | Overruled |
| | 78: 2 | finally reached what we considered | answer.  All of witness's | |
| | 78: 3 | to be a final version after going | answer should be included. | |
| | 78: 4 | through many versions of the | | |
| | 78: 5 | Expression of Concern we released | | |
| | 78: 6 | it, which is our responsibility as | | |
| **80:17** | -  **80:19** | Curfman 01/24/2006 | | |
| | 80: 17 | Q.  We've been looking at the | | |
| | 80: 18 | December 8 talking points.  Let me show | | |
| | 80: 19 | you Exhibit 7. | | |
| **81:7** | -  **81:10** | Curfman 01/24/2006 | | |
| | 81: 7 | BY MR. BECK: | | |
| | 81: 8 | Q.  Do you see that this | | |
| | 81: 9 | document is the December 5th version of | | |
| | 81: 10 | the talking points? | | |
| **81:15** | -  **81:16** | Curfman 01/24/2006 | | |
| | 81: 15 | Q.  Down at the bottom it says, | Pltf Obj: No answer to | Overruled |
| | 81: 16 | "Why Did We Release This When We Did?" | question.  Include answer. | |
| **82:15** | -  **83:7** | Curfman 01/24/2006 | | |
| | 82: 15 | Q.  I apologize.  I've got the | Pltf Obj:  R. 611 - leading | Overruled |
| | 82: 16 | date wrong.  So, now we're talking about | question. | |
| | 82: 17 | after it's been released and out there in | | |
| | 82: 18 | the public for a while; right? | | |

| | | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|---|
| | 82: 19 | A.  Right.  Uh-huh. | | |
| | 82: 20 | Q.  And so this was a later | | |
| | 82: 21 | version of the talking points.  And down | | |
| | 82: 22 | at the bottom it says "Why Did We Release | | |
| | 82: 23 | This When We Did?"  Could you read for me | | |
| | 82: 24 | the first sentence -- | | |
| | 83: 1 | A.  Sure. | | |
| | 83: 2 | Q.  -- of the talking points? | | |
| | 83: 3 | A.  Sure.  "We made this | | |
| | 83: 4 | information public as soon as we could, | | |
| | 83: 5 | without regard to the trial." | | |
| | 83: 6 | Q.  Now, that statement in the | Pltf Obj: R. 611 - leading question. | Overruled |
| | 83: 7 | talking points was false, wasn't it? | | |
| 83:11 - 83:15 | | Curfman 01/24/2006 | | |
| | 83: 11 | Q.  In fact, when you were | | |
| | 83: 12 | planning the release of the Expression of | | |
| | 83: 13 | Concern, you were planning it to coincide | | |
| | 83: 14 | with specific events of the trial down in | | |
| | 83: 15 | Houston.  Isn't that true? | | |
| 83:22 - 84:2 | | Curfman 01/24/2006 | | |
| | 83: 22 | You were planning to release | | |
| | 83: 23 | the Expression of Concern based on | Pltf Obj: Compound question. | Overruled |
| | 83: 24 | specific events that you had been told | | |
| | 84: 1 | would take place down in the trial in | | |
| | 84: 2 | Houston, isn't that true, sir? | | |
| 84:6 - 84:6 | | Curfman 01/24/2006 | | |
| | 84: 6 | THE WITNESS:  No. | | |
| 84:14 - 84:14 | | Curfman 01/24/2006 | | |
| | 84: 14 | Q.  What is Exhibit 8? | | |
| 84:18 - 84:22 | | Curfman 01/24/2006 | | |
| | 84: 18 | THE WITNESS:  Right.  This | Pltf Obj:  R. 801 and R. 802; Hearsay. | Overruled |
| | 84: 19 | is some e-mail from December 8th | | |
| | 84: 20 | among the various editors of the | | |
| | 84: 21 | Journal about the Expression of | | |
| | 84: 22 | Concern. | | |
| 84:24 - 85:18 | | Curfman 01/24/2006 | | |
| | 84: 24 | Q.  And on the bottom, which | Pltf Obj: R. 611 - all leading questions.  Dr. Curfman is an independent 3rd party not an adverse witness. | Overruled |
| | 85: 1 | would be the earliest of the three | | |
| | 85: 2 | e-mails printed on this page; is that | | |
| | 85: 3 | correct? | | |
| | 85: 4 | A.  Yes.  December 7th, right. | | |

| | | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|---|
| | 85: 5 | Q.  And it's December 7th, 6:00 | | |
| | 85: 6 | p.m. from Tad Campion.  Who is Tad | | |
| | 85: 7 | Campion? | | |
| | 85: 8 | A.  He's the senior deputy | | |
| | 85: 9 | editor at the journal. | | |
| | 85: 10 | Q.  Then it says to -- and it | | |
| | 85: 11 | has Lisa Scott, Karen Pedersen, Sandra | | |
| | 85: 12 | Jacobs, Andrea Graham and Julie Mooza. | | |
| | 85: 13 | Are they all employees of the New England | | |
| | 85: 14 | Journal of Medicine? | | |
| | 85: 15 | A.  This is the web team, yes. | | |
| | 85: 16 | Q.  And then cc, that means | | |
| | 85: 17 | copies; right? | | |
| | 85: 18 | A.  That's right. | | |
| **87:6** - **88:2** | | Curfman 01/24/2006 | | |
| | 87: 6 | Q.  And then you're copied on | Pltf Obj:  R. 611 - all | Overruled |
| | 87: 7 | this December 7th 6:00 p.m. e-mail; | leading questions. | |
| | 87: 8 | right? | | |
| | 87: 9 | A.  Yes. | | |
| | 87: 10 | Q.  Dr. Drazen, the | | |
| | 87: 11 | editor-in-chief is also copied; correct? | | |
| | 87: 12 | A.  Correct. | | |
| | 87: 13 | Q.  Then the subject, what does | | |
| | 87: 14 | the subject line read? | | |
| | 87: 15 | A.  "Probable Early Release | | |
| | 87: 16 | Tomorrow P.M.," is that what you're | | |
| | 87: 17 | referring to? | | |
| | 87: 18 | Q.  Yes.  Underneath where it | | |
| | 87: 19 | says "Probable Early Release Tomorrow | | |
| | 87: 20 | P.M.," there's a line that says | | |
| | 87: 21 | "Importance," and what did Mr. Campion | | |
| | 87: 22 | say was the importance of this e-mail? | | |
| | 87: 23 | A.  It says "High." | | |
| | 87: 24 | Q.  Then the e-mail says, | | |
| | 88: 1 | "Steve."  Who would that be?  Is that | | |
| | 88: 2 | Steve Morrissey? | | |
| **88:4** - **88:5** | | Curfman 01/24/2006 | | |
| | 88: 4 | THE WITNESS:  That would | | |
| | 88: 5 | probably be Dr. Morrissey, yes. | | |
| **88:7** - **89:3** | | Curfman 01/24/2006 | | |
| | 88: 7 | Q.  "Steve wants us to know | Pltf Obj:  R. 801and 802; | Overruled |
| | 88: 8 | that we need to get ready to post as an | Hearsay | |

| | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| | 88: 9   early release the Expression of Concern | | |
| | 88: 10   that is scheduled for the editorial pages | | |
| | 88: 11   of the December 29th issue." | | |
| | 88: 12   Let me ask you first, as of | Pltf Obj:  R. 611 - leading question. | Overruled |
| | 88: 13   December 7 at 6 p.m., in fact, the | | |
| | 88: 14   Expression of Concern had been scheduled | | |
| | 88: 15   to be printed on December 29th with the | | |
| | 88: 16   regular edition of the journal, right? | | |
| | 88: 17   A.   Yes. | Pltf Obj:  R. 801 and R. 802; Hearsay. | Overruled |
| | 88: 18   Q.   And then it says, "The | | |
| | 88: 19   reason," that's the reason for this early | | |
| | 88: 20   release; right? | | |
| | 88: 21   A.   Right. | | |
| | 88: 22   Q.   "The reason is that | | |
| | 88: 23   tomorrow's testimony in the Vioxx trial | | |
| | 88: 24   may involve part of a deposition that | | |
| | 89: 1   Greg gave about the NEJM and the VIGOR | | |
| | 89: 2   trial."  "Greg" is you; right? | | |
| | 89: 3   A.   That's right. | | |
| **89:4  -  89:16** | Curfman 01/24/2006 | | |
| | 89: 4   Q.   And then it says, "If so, | Pltf Obj: R. 801 and 802 Hearsay | Overruled |
| | 89: 5   there will be press attention, and we | | |
| | 89: 6   want the press to know about the official | | |
| | 89: 7   NEJM statement.  That is being laid out | | |
| | 89: 8   and needs to be ready to go" on the | | |
| | 89: 9   website "as an early release."  Right? | | |
| | 89: 10   A.   Correct. | | |
| | 89: 11   Q.   "Steve or Greg or I will | Pltf Obj:  R. 801 and 802 Hearsay | Overruled |
| | 89: 12   let you know when it's time to go. | | |
| | 89: 13   Things in a trial can always get pushed | | |
| | 89: 14   back a day or two, so we cannot yet be | | |
| | 89: 15   positive."  Right? | | |
| | 89: 16   A.   Uh-huh. | | |
| **89:20  -  90:15** | Curfman 01/24/2006 | | |
| | 89: 20   Q.   And that's what you were | Pltf Obj: R. 801 and R. 801; Hearsay. | Overruled |
| | 89: 21   told on December 7, 6:00 p.m.; correct? | | |
| | 89: 22   A.   Right. | | |
| | 89: 23   Q.   Then earlier you said that | | |
| | 89: 24   you were surprised at the press reaction | | |
| | 90: 1   to the -- | | |
| | 90: 2   A.   Yes. | | |
| | 90: 3   Q.   -- Expression of Concern? | | |

88

| | | | **Objection/Response in Barnett** | **Ruling in Plunkett** |
|---|---|---|---|---|
| | 90: 4 | A.  Yes, I was. | | |
| | 90: 5 | Q.  Do you see the last line, it | | |
| | 90: 6 | says, "It will be essential to notify the | Pltf Obj: R. 801 and | Overruled |
| | 90: 7 | press and make it prominent on the press | R. 802; Hearsay. | |
| | 90: 8 | site"?  Do you see that? | | |
| | 90: 9 | A.  Yes, I do. | Pltf Obj:  R. 611 - Leading | Overruled |
| | 90: 10 | Q.  Now, how is it that you and | question; Argumentative | |
| | 90: 11 | your colleagues at the New England | | |
| | 90: 12 | Journal of Medicine knew that the | | |
| | 90: 13 | plaintiffs' lawyers were hoping to play | | |
| | 90: 14 | your deposition on the next day, December | | |
| | 90: 15 | 8, as is reflected in this e-mail? | | |
| **90:19  -  90:22** | | Curfman 01/24/2006 | | |
| | 90: 19 | THE WITNESS:  I don't -- you | | |
| | 90: 20 | know, Dr. Campion didn't tell me | | |
| | 90: 21 | where he got the information, so, | | |
| | 90: 22 | I can't answer that. | | |
| **90:24  -  92:5** | | Curfman 01/24/2006 | | |
| | 90: 24 | Q.  Well, do you know who it was | | |
| | 91: 1 | from the New England Journal of Medicine | | |
| | 91: 2 | who was gathering information about what | | |
| | 91: 3 | was expected to be done down there in the | | |
| | 91: 4 | Houston trial and when it was expected to | | |
| | 91: 5 | happen? | | |
| | 91: 6 | A.  I don't know who was | | |
| | 91: 7 | collecting that, no. | | |
| | 91: 8 | Q.  Do you know whether somebody | | |
| | 91: 9 | at the New England Journal of Medicine | | |
| | 91: 10 | was in communication with the plaintiffs' | | |
| | 91: 11 | lawyers to find out what they were | | |
| | 91: 12 | planning to do each day? | | |
| | 91: 13 | A.  I certainly am not aware of | | |
| | 91: 14 | that, no. | | |
| | 91: 15 | Q.  Well, did you ever ask Tad | | |
| | 91: 16 | Campion how he came to know that the | | |
| | 91: 17 | plaintiffs' lawyers were hoping to play | | |
| | 91: 18 | your deposition on December 8th? | | |
| | 91: 19 | A.  I didn't ask him, no.  I | | |
| | 91: 20 | received the e-mail, and that was really | | |
| | 91: 21 | the extent of the communication. | | |
| | 91: 22 | Q.  Did you ever tell any of the | Pltf Obj.  Compound | Overruled |
| | 91: 23 | newspaper or broadcast media folks that | question; Argumentative | |

|  |  |  | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|---|
|  | 91: 24 | you gave interviews to that, in fact, the |  |  |
|  | 92: 1 | reason that you released the Expression |  |  |
|  | 92: 2 | of Concern on December 8th instead of |  |  |
|  | 92: 3 | waiting until December 9th was because of |  |  |
|  | 92: 4 | what you expected was going to happen |  |  |
|  | 92: 5 | down in the Vioxx trial? |  |  |
| 92:8 - 92:11 | | Curfman 01/24/2006 |  |  |
|  | 92: 8 | THE WITNESS: I don't recall |  |  |
|  | 92: 9 | getting that question or giving |  |  |
|  | 92: 10 | that kind of answer. I don't |  |  |
|  | 92: 11 | recall. |  |  |
| 92:13 - 92:21 | | Curfman 01/24/2006 |  |  |
|  | 92: 13 | Q. Did you ever tell anybody | Pltf Obj: Compound question; assumes facts not in evidence; argumentative. | Overruled |
|  | 92: 14 | that the reason that you released the |  |  |
|  | 92: 15 | Expression of Concern in the middle of |  |  |
|  | 92: 16 | the trial in Houston was because you'd |  |  |
|  | 92: 17 | been told that they were planning on |  |  |
|  | 92: 18 | playing your testimony, and you wanted to |  |  |
|  | 92: 19 | coordinate the release of the Expression |  |  |
|  | 92: 20 | of Concern with the playing of your |  |  |
|  | 92: 21 | testimony in Houston? |  |  |
| 93:13 - 93:14 | | Curfman 01/24/2006 |  |  |
|  | 93: 13 | THE WITNESS: Could you |  |  |
|  | 93: 14 | repeat the question? |  |  |
| 93:16 - 94:1 | | Curfman 01/24/2006 |  |  |
|  | 93: 16 | Q. Sure. |  |  |
|  | 93: 17 | Did you ever tell anybody | Pltf Obj: Compound questions; assumes facts not in evidence; argumentative. | Overruled |
|  | 93: 18 | that the reason you released the |  |  |
|  | 93: 19 | Expression of Concern in the middle of |  |  |
|  | 93: 20 | the trial in Houston was because you'd |  |  |
|  | 93: 21 | been told that they were planning on |  |  |
|  | 93: 22 | playing your testimony, and you wanted to |  |  |
|  | 93: 23 | coordinate the release of the Expression |  |  |
|  | 93: 24 | of Concern with the playing of your |  |  |
|  | 94: 1 | testimony down in Houston? |  |  |
| 94:5 - 95:4 | | Curfman 01/24/2006 |  |  |
|  | 94: 5 | THE WITNESS: Well, I |  |  |
|  | 94: 6 | can't -- I can't imagine that I |  |  |
|  | 94: 7 | would have said that because Dr. |  |  |
|  | 94: 8 | Campion articulates very precisely |  |  |
|  | 94: 9 | in his e-mail what the issue was |  |  |

| | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| | 94: 10 | with respect to my testimony.  And | |
| | 94: 11 | the issue with respect to my | |
| | 94: 12 | testimony was that my testimony | |
| | 94: 13 | consisted, as it does today, with | |
| | 94: 14 | a series of questions and answers. | |
| | 94: 15 | And I did the best that I could in | |
| | 94: 16 | that deposition of November 21st | |
| | 94: 17 | to answer the questions.  But it | |
| | 94: 18 | was not a written, an official | |
| | 94: 19 | written statement of the journal. | |
| | 94: 20 | It was testimony, it was oral | |
| | 94: 21 | testimony. | |
| | 94: 22 | We believed that in order to | |
| | 94: 23 | make sure that the Expression of | |
| | 94: 24 | Concern was clearly understood by | |
| | 95: 1 | those who would be interested in | |
| | 95: 2 | the public, that we needed to have | |
| | 95: 3 | our official statement out before | |
| | 95: 4 | the deposition was played. | |
| **96:4** - **96:8** | | Curfman 01/24/2006 | |
| | 96: 4 | Q.  Well, do you now admit that | Pltf Obj:  R. 611: Leading | Overruled |
| | 96: 5 | the timing of the release of the | question.  Dr. Curfman is | |
| | 96: 6 | Expression of Concern was, in fact, | a 3rd party not an adverse | |
| | 96: 7 | dictated by what was happening down in | witness.  Argumentative. | |
| | 96: 8 | the Houston trial? | |
| **96:11** - **96:19** | | Curfman 01/24/2006 | |
| | 96: 11 | THE WITNESS:  Well, that's | |
| | 96: 12 | not what -- as I just said, as far | |
| | 96: 13 | as the trial is concerned, I was | |
| | 96: 14 | not following the trial closely. | |
| | 96: 15 | The issue was my personal | |
| | 96: 16 | testimony and when that would be | |
| | 96: 17 | played and how that might be | |
| | 96: 18 | interpreted or misinterpreted by | |
| | 96: 19 | members of the media. | |
| **96:24** - **97:8** | | Curfman 01/24/2006 | |
| | 96: 24 | THE WITNESS:  So, yeah, it's | |
| | 97: 1 | not a matter of admitting to | |
| | 97: 2 | anything.  It's what I have just | |
| | 97: 3 | said and said a moment ago.  I | |
| | 97: 4 | think the explanation is quite | |
| | 97: 5 | clear and coherent, and that's my | |

| | | | **Objection/Response in Barnett** | **Ruling in Plunkett** |
|---|---|---|---|---|
| | 97: 6 | answer to your question.  I can't | | |
| | 97: 7 | really say any more about it than | | |
| | 97: 8 | that. | | |
| 97:10 | - 97:14 | Curfman 01/24/2006 | | |
| | 97: 10 | Q.  Well, do you remember | Pltf Obj:  Misstates Dr. | Overruled |
| | 97: 11 | earlier this morning saying that the | Curfman's testimony. | |
| | 97: 12 | Expression of Concern, the timing of its | | |
| | 97: 13 | release had nothing to do with what was | | |
| | 97: 14 | going on in the trial in Houston? | | |
| 97:16 | - 98:1 | Curfman 01/24/2006 | | |
| | 97: 16 | THE WITNESS:  Well, what I | | |
| | 97: 17 | recall is that you asked, you | | |
| | 97: 18 | know, did it have something to do | | |
| | 97: 19 | with the trial.  And it did have | | |
| | 97: 20 | something to do with my testimony. | | |
| | 97: 21 | But it turned out that my | | |
| | 97: 22 | testimony was not part of the | | |
| | 97: 23 | trial at all anyway.  It never was | | |
| | 97: 24 | played, and, therefore, was not | | |
| | 98: 1 | part of the trial. | | |
| 98:3 | - 98:18 | Curfman 01/24/2006 | | |
| | 98: 3 | Q.  But you released the | Pltf Obj:  R. 611: | Overruled |
| | 98: 4 | Expression of Concern early anyway -- | Leading questions. | |
| | 98: 5 | A.  Yes, we did. | Argumentative | |
| | 98: 6 | Q.  -- even though there was no | | |
| | 98: 7 | need to in order to have the record | | |
| | 98: 8 | straight concerning your deposition; | | |
| | 98: 9 | right? | | |
| | 98: 10 | A.  Yes.  But we were prepared, | | |
| | 98: 11 | and as I explained to you, according to | | |
| | 98: 12 | the uniform requirements, and that's an | | |
| | 98: 13 | important word, "requirements," of the | | |
| | 98: 14 | International Committee of Medical | | |
| | 98: 15 | Journal Editors, this is what was | | |
| | 98: 16 | expected of us as editors.  We had the | | |
| | 98: 17 | information put together, and we released | | |
| | 98: 18 | it. | | |
| 99:16 | - 100:15 | Curfman 01/24/2006 | | |
| | 99: 16 | Q.  Dr. Curfman, is it your | Pltf Obj:  R. 611 - Leading | Overruled |
| | 99: 17 | testimony that the New England Journal of | questions.  Dr. Curfman is | |
| | 99: 18 | Medicine did not do anything out of the | not adverse witness but | |
| | 99: 19 | ordinary in terms of press relations with | 3rd party. | |

| | | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|---|
| | 99: 20 | the Expression of Concern concerning the | | |
| | 99: 21 | VIGOR article compared to what it did | | |
| | 99: 22 | with those other two Expressions of | | |
| | 99: 23 | Concern you mentioned? | | |
| | 99: 24 | A.  Well, in fact, one of those | | |
| | 100: 1 | three Expressions of Concern was released | | |
| | 100: 2 | last Friday, and there was some media | | |
| | 100: 3 | attention given to that Expression of | | |
| | 100: 4 | Concern as well.  So, the first one that | | |
| | 100: 5 | we released back in 2002, my | | |
| | 100: 6 | recollection, did not generate as much | | |
| | 100: 7 | media attention. | | |
| | 100: 8 | Q.  Looking still at Exhibit 8, | Pltf Obj:  R. 801 and R. 802; Hearsay. | Overruled |
| | 100: 9 | we were looking at the bottom of the | | |
| | 100: 10 | three e-mails, which would have been the | | |
| | 100: 11 | earliest.  If you look up to the middle | | |
| | 100: 12 | one, you see that that's from Dr. Drazen | | |
| | 100: 13 | at 6:57 a.m. on December 8th to several | | |
| | 100: 14 | people, including you? | | |
| | 100: 15 | A.  Right. | | |
| **100:2** - **101:5** | | Curfman 01/24/2006 | | |
| | 100: 20 | Q.  And Dr. Drazen says "All," I | Pltf Obj:  R. 801 and R. 802; Hearsay. | Overruled |
| | 100: 21 | guess that means to everybody whose name | | |
| | 100: 22 | appears on the e-mail; right? | | |
| | 100: 23 | A.  Right. | | |
| | 100: 24 | Q.  And he says, "I think it | | |
| | 101: 1 | would make sense for me to contact" and | | |
| | 101: 2 | then there's a name I can't pronounce. | | |
| | 101: 3 | Can you pronounce that name? | | |
| | 101: 4 | A.  Yes.  Her name is Snigdha | | |
| | 101: 5 | Prakash. | | |
| **101:1** - **101:20** | | Curfman 01/24/2006 | | |
| | 101: 14 | Q.  Who is Snigdha Prakash, and | Pltf Obj:  Compound questions; harassing witness. | Overruled |
| | 101: 15 | how did you learn how to pronounce that | | |
| | 101: 16 | name so well? | | |
| | 101: 17 | A.  Snigdha Prakash is a | | |
| | 101: 18 | reporter for National Public Radio. | | |
| | 101: 19 | Q.  She follows the Vioxx | | |
| | 101: 20 | litigation? | | |
| **101:2** - **101:24** | | Curfman 01/24/2006 | | |
| | 101: 22 | THE WITNESS:  I think she | | |
| | 101: 23 | follows a lot of things.  She | | |

| | | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|---|
| | 101: 24 | probably follows that too, yes. | | |
| **102:2** - **102:4** | | Curfman 01/24/2006 | | |
| | 102: 2 | Q.  Well, as you know, it's not | Pltf Obj:  R. 611 - | Overruled |
| | 102: 3 | just probably.  You know that she follows | Leading question | |
| | 102: 4 | it quite closely, don't you? | Argumentative | |
| **102:9** - **102:11** | | Curfman 01/24/2006 | | |
| | 102: 9 | THE WITNESS:  She's done | | |
| | 102: 10 | stories on NPR about the | | |
| | 102: 11 | litigation, yes. | | |
| **102:1** - **102:16** | | Curfman 01/24/2006 | | |
| | 102: 13 | Q.  And she's quoted people from | Pltf Obj:  R. 611 | Overruled |
| | 102: 14 | the New England Journal of Medicine about | Leading question. | |
| | 102: 15 | the litigation, hasn't she? | | |
| | 102: 16 | A.  I believe she has. | | |
| **102:2** - **103:13** | | Curfman 01/24/2006 | | |
| | 102: 24 | Q.  In any event, here is the | Pltf Obj:  R. 801 and | Overruled |
| | 103: 1 | editor-in-chief asking whether it makes | R. 802; Hearsay | |
| | 103: 2 | sense in connection with the probable | | |
| | 103: 3 | early release of the Expression of | | |
| | 103: 4 | Concern to contact this reporter from | | |
| | 103: 5 | National Public Radio; right? | | |
| | 103: 6 | A.  Uh-huh. | | |
| | 103: 7 | Q.  And then if we look up to | | |
| | 103: 8 | the next e-mail, you see that that's from | | |
| | 103: 9 | you? | | |
| | 103: 10 | A.  That's right. | | |
| | 103: 11 | Q.  To Dr. Drazen and others; | | |
| | 103: 12 | right? | | |
| | 103: 13 | A.  Correct. | | |
| **103:1** - **104:1** | | Curfman 01/24/2006 | | |
| | 103: 15 | Read what you said in your | | |
| | 103: 16 | e-mail back to Dr. Drazen about | | |
| | 103: 17 | contacting the NPR reporter in connection | | |
| | 103: 18 | with the early release of the Expression | | |
| | 103: 19 | of Concern. | | |
| | 103: 20 | A.  "I have some concerns about | | |
| | 103: 21 | giving her an exclusive.  Langreth has | | |
| | 103: 22 | been following the situation closely.  I | | |
| | 103: 23 | think that maybe both of them could be | | |
| | 103: 24 | called at the time the media e-mail is | | |
| | 104: 1 | sent out." | | |

|  |  |  | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|---|
| 104:1 - 104:16 | | Curfman 01/24/2006 | | |
| | 104: 10 | Q.  Did the New England Journal | | |
| | 104: 11 | of Medicine send out a media e-mail | | |
| | 104: 12 | alerting members of the media to the | | |
| | 104: 13 | Expression of Concern? | | |
| | 104: 14 | A.  That's our routine for any | | |
| | 104: 15 | kind of early web release, to inform | | |
| | 104: 16 | people that it's there, yes. | | |
| 108:2 - 108:23 | | Curfman 01/24/2006 | | |
| | 108: 2 | Q.  Certainly it's not part of | Pltf Obj:  R. 611 | Overruled |
| | 108: 3 | the regular procedure with Expressions of | Leading question. | |
| | 108: 4 | Concern to call up individual members of | | |
| | 108: 5 | the media and give them exclusive | | |
| | 108: 6 | interviews, is it? | | |
| | 108: 7 | A.  Well, we've only done three | | |
| | 108: 8 | Expressions of Concern since 2002, so, we | | |
| | 108: 9 | don't have a big track record with these. | | |
| | 108: 10 | Q.  Your e-mail referred to | | |
| | 108: 11 | Langreth.  Who's Langreth? | | |
| | 108: 12 | A.  Robert Langreth is a | | |
| | 108: 13 | reporter with Forbes magazine. | | |
| | 108: 14 | Q.  Is he also someone who | | |
| | 108: 15 | followed the Vioxx litigation closely? | | |
| | 108: 16 | A.  Well, I learned that he did. | | |
| | 108: 17 | Yes. | | |
| | 108: 18 | Q.  In fact, that's what you | Pltf Obj:  R. 611 - | Overruled |
| | 108: 19 | meant when you said that "Langreth has | leading question. | |
| | 108: 20 | been following the situation closely." | | |
| | 108: 21 | Isn't that right? | | |
| | 108: 22 | A.  That's right.  I learned | | |
| | 108: 23 | that he was. | | |
| 110:9 - 110:14 | | Curfman 01/24/2006 | | |
| | 110: 9 | Q.  How about Ms. Prakash, did | | |
| | 110: 10 | you give her an interview? | | |
| | 110: 11 | A.  I believe so.  You can | | |
| | 110: 12 | probably show me -- I think I did.  I | | |
| | 110: 13 | think so.  Yes, I think I did.  I think | | |
| | 110: 14 | that may have been on the second day. | | |
| 110:1 - 110:22 | | Curfman 01/24/2006 | | |
| | 110: 19 | Q.  When did you tell the | Pltf Obj:  Omits Answer. | Overruled |
| | 110: 20 | authors of the VIGOR manuscript that you | | |
| | 110: 21 | intended to release the Expression of | | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 110: 22    Concern earlier than December 29th? | | |

**111:8 - 111:24**       Curfman 01/24/2006

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 111: 8    Q.  Did you personally tell Dr. | | |
| 111: 9    Bombardier that you were going to have an | | |
| 111: 10    early release of the Expression of | | |
| 111: 11    Concern rather than wait until December | | |
| 111: 12    29th? | | |
| 111: 13    A.  I don't recall personally | | |
| 111: 14    talking with her about that.  The | | |
| 111: 15    conversations that we had, I think, were | | |
| 111: 16    earlier and went over the fact that we | | |
| 111: 17    would be releasing this and that we would | | |
| 111: 18    be sending a series of questions to her | | |
| 111: 19    that she could respond to at a later time | | |
| 111: 20    at her leisure. | | |
| 111: 21    Q.  Don't you remember that you | Pltf Obj:  R. 611 - leading question. | Overruled |
| 111: 22    told her when you first talked with her | | |
| 111: 23    that you were scheduling the Expression | | |
| 111: 24    of Concern for December 29th? | | |

**112:1 - 112:10**       Curfman 01/24/2006

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 112: 1    A.  Well, my colleague, Dr. | | |
| 112: 2    Morrissey, does all the scheduling for | | |
| 112: 3    the Journal, and so perhaps he said | | |
| 112: 4    something, but I don't recall saying | | |
| 112: 5    anything myself. | | |
| 112: 6    Q.  Do you recall when it was | | |
| 112: 7    that the New England Journal of Medicine | | |
| 112: 8    notified Dr. Bombardier -- and what's the | | |
| 112: 9    correct pronunciation of her name? | | |
| 112: 10    A.  That would be Bombardier. | | |

**112:1 - 113:11**       Curfman 01/24/2006

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 112: 13    Q.  Do you recall when it was | | |
| 112: 14    that the New England Journal of Medicine | | |
| 112: 15    notified Dr. Bombardier that the | | |
| 112: 16    Expression of Concern was going to be | | |
| 112: 17    subject to this early release on December | | |
| 112: 18    8, 2005? | | |
| 112: 19    A.  I don't recall. | | |
| 112: 20    Q.  Do you recall whether they | | |
| 112: 21    gave her more than three hours' notice, | | |
| 112: 22    "they" being the New England Journal of | | |
| 112: 23    Medicine, that this thing was going to be | | |

| | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| 112: 24 | released early? | | |
| 113: 1 | A.  I don't know. | Pltf Obj:  R. 801 and R. 802; Hearsay. | Overruled |
| 113: 2 | Q.  Do you remember that when | | |
| 113: 3 | Merck learned of your plans for an early | | |
| 113: 4 | release on December 8 that Merck asked | | |
| 113: 5 | you to consider some information to | | |
| 113: 6 | perhaps include in the Expression of | | |
| 113: 7 | Concern? | | |
| 113: 8 | A.  If you have a document that | | |
| 113: 9 | you can show me, that might jog my | | |
| 113: 10 | memory, but I am a little foggy about | | |
| 113: 11 | that. | | |
| **114:4   -   114:5** | Curfman 01/24/2006 | | |
| 114: 4 | MR. BECK:  I'm now handing | | |
| 114: 5 | you what I've marked as Exhibit 9. | | |
| **114:1   -   114:16** | Curfman 01/24/2006 | | |
| 114: 14 | Q.  This is another e-mail | Pltf Obj:  R. 801 and R. 802; Hearsay. | Overruled |
| 114: 15 | string; correct? | | |
| 114: 16 | A.  Right. | | |
| **114:2   -   114:24** | Curfman 01/24/2006 | | |
| 114: 22 | Q.  And there's an e-mail to you | | |
| 114: 23 | and Dr. Morrissey; right? | | |
| 114: 24 | A.  Right. | | |
| **115:1   -   115:4** | Curfman 01/24/2006 | | |
| 115: 1 | Q.  And he is basically | Pltf Obj:  R. 801 and R. 802; Hearsay. | Overruled |
| 115: 2 | attaching an e-mail that he got from a | | |
| 115: 3 | lawyer for Merck, right? | | |
| 115: 4 | A.  Mr. Fitzpatrick. | | |
| **115:8   -   115:21** | Curfman 01/24/2006 | | |
| 115: 8 | Q.  And then there are some -- | Pltf Obj:  R. 801 and R. 802; Hearsay. | Overruled |
| 115: 9 | he says, "Paul," that's Mr. Shaw, "Please | | |
| 115: 10 | see the points below concerning the | | |
| 115: 11 | proposed editorial," and then there's | | |
| 115: 12 | three points made.  And without going | | |
| 115: 13 | through each one in detail, do you now | | |
| 115: 14 | remember -- | | |
| 115: 15 | A.  Yes, I now remember.  Thank | | |
| 115: 16 | you. | | |
| 115: 17 | Q.     -- that, in fact, Merck | | |
| 115: 18 | did ask you to consider some points | | |
| 115: 19 | before you released -- made the early | | |

| | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| 115: 20 | release of the Expression of Concern? | | |
| 115: 21 | A.  Yes. | | |
| **116:1  -  116:18** | Curfman 01/24/2006 | | |
| 116: 12 | Q.  You say that you've | | |
| 116: 13 | considered these points? | | |
| 116: 14 | A.  Well, I read the points, | | |
| 116: 15 | yes. | | |
| 116: 16 | Q.  Do you see that you received | | |
| 116: 17 | this e-mail from Mr. Shaw at 2:59 p.m.? | | |
| 116: 18 | A.  Uh-huh. | | |
| **117:1  -  117:14** | Curfman 01/24/2006 | | |
| 117: 13 | Q.  I'm handing you what we've | | |
| 117: 14 | marked as Exhibit 10. | | |
| **117:1  -  118:6** | Curfman 01/24/2006 | | |
| 117: 17 | Q.  This is an e-mail -- let me | Pltf Obj:  R. 801 and | Overruled |
| 117: 18 | state that your name is not on this one. | R. 802; Hearsay. | |
| 117: 19 | A.  Right. | | |
| 117: 20 | Q.  -- from Karen Pedersen. | | |
| 117: 21 | That's the in-house, I think you had | | |
| 117: 22 | something other than PR person, right? | | |
| 117: 23 | A.  Media relations. | | |
| 117: 24 | Q.  Media relations? | | |
| 118: 1 | A.  Media relations specialist. | | |
| 118: 2 | Q.  So, the media relations | | |
| 118: 3 | specialist is sending it to the outside | | |
| 118: 4 | PR person's, "Subject:  For talking | | |
| 118: 5 | points."  Do you see that? | | |
| 118: 6 | A.  Right. | | |
| **119:1  -  120:6** | Curfman 01/24/2006 | | |
| 119: 16 | Q.  Then at the bottom, it says, | Pltf Obj:  R. 801 and | Overruled |
| 119: 17 | "Also, Paul Shaw called and said the | R. 802; Hearsay. | |
| 119: 18 | Merck attorney (Fitzpatrick) who | | |
| 119: 19 | cross-examined Greg e-mailed him saying | | |
| 119: 20 | he knows we're releasing a statement at 3 | | |
| 119: 21 | and he wants to send some information for | | |
| 119: 22 | us to consider including in the | | |
| 119: 23 | statement, which we're not going to do, | | |
| 119: 24 | regardless of what it says, of course." | | |
| 120: 1 | Did you talk with Karen | Pltf Obj:  Compound | Overruled |
| 120: 2 | Pedersen about this subject and about | question. | |
| 120: 3 | whether you would refuse to consider the | | |
| 120: 4 | information regardless of what it said? | | |

| | | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|---|
| | 120: 5 | A.  I don't recall talking with | | |
| | 120: 6 | Karen Pedersen about this, but as I | | |
| 121:6 - | 122:8 | Curfman 01/24/2006 | | |
| | 121: 6 | Q.  You mentioned before the | | |
| | 121: 7 | standards for -- that you say you | | |
| | 121: 8 | followed, and I think you said they were | | |
| | 121: 9 | the standards of some organization? | | |
| | 121: 10 | A.  The International Committee | | |
| | 121: 11 | of Medical Journal Editors.  We sometimes | | |
| | 121: 12 | call it the ICMJE. | | |
| | 121: 13 | Q.  They have standards that | | |
| | 121: 14 | you're supposed to follow in connection | | |
| | 121: 15 | with things like Expressions of Concern? | | |
| | 121: 16 | A.  Well, the uniform | | |
| | 121: 17 | requirements is a fairly lengthy | | |
| | 121: 18 | document, the uniform requirements for | | |
| | 121: 19 | the preparation of manuscripts, and it's | | |
| | 121: 20 | a document that deals with guidelines | | |
| | 121: 21 | about a whole range of issues relating to | | |
| | 121: 22 | medical publication.  So, I believe -- | | |
| | 121: 23 | it's probably about a 25 or 30-page | | |
| | 121: 24 | document.  It's contained on the website. | | |
| | 122: 1 | And among other things, it does deal with | | |
| | 122: 2 | retractions and Expressions of Concern. | | |
| | 122: 3 | That is one part of a much larger | | |
| | 122: 4 | document. | | |
| | 122: 5 | Q.  So, the answer is yes, they | Pltf Obj:  Asked and | Overruled |
| | 122: 6 | do have standards on Expressions of | answered; Argumentative. | |
| | 122: 7 | Concern? | | |
| | 122: 8 | A.  Yes, that's right. | | |
| 122:2 - | 123:1 | Curfman 01/24/2006 | | |
| | 122: 22 | Do you recognize this as a | | |
| | 122: 23 | printout of the ICMJE standards that you | | |
| | 122: 24 | were referring to? | | |
| | 123: 1 | A.  Right. | | |
| 123:1 - | 123:24 | Curfman 01/24/2006 | | |
| | 123: 16 | Q.  And I just want to take a | | |
| | 123: 17 | few minutes walking you through some of | | |
| | 123: 18 | these. | | |
| | 123: 19 | The first sentence says, | | |
| | 123: 20 | "Editors must assume initially that | | |
| | 123: 21 | authors are reporting work based on | | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

123: 22    honest observations."  You agree that

123: 23    that's appropriate; right?

123: 24    A.  Yes, indeed.

**125:1   -   125:24**    Curfman 01/24/2006

125: 15    Continuing on then with that

125: 16    paragraph, it says, "If substantial

125: 17    doubts arise about the honesty or

125: 18    integrity of work, either submitted or

125: 19    published, it is the editor's

125: 20    responsibility to ensure that the

125: 21    question is appropriately pursued,

125: 22    usually by the authors' sponsoring

125: 23    institution."  Right?

125: 24    A.  Yes.

**126:1   -   127:1**    Curfman 01/24/2006

126: 11    Q.  So, this procedure says then

126: 12    it's the editors, that would be the New

126: 13    England Journal's editors' --

126: 14    A.  Right.

126: 15    Q.  -- "responsibility to ensure

126: 16    that the question is appropriately

126: 17    pursued, usually by the authors'

126: 18    sponsoring institution."  So, in the case

126: 19    of Dr. Bombardier, for example, who would

126: 20    the sponsoring institution be?

126: 21    A.  Her university in Toronto.

126: 22    Q.  But you did not follow the

126: 23    procedure of referring this matter to her

126: 24    university to pursue in the first

127: 1    instance, did you?

**127:1   -   127:19**    Curfman 01/24/2006

127: 17    THE WITNESS:  We have been

127: 18    in touch with her superiors at the

127: 19    University of Toronto, yes.

**129:1   -   129:21**    Curfman 01/24/2006

129: 16    Q.  Before you published your

129: 17    conclusions in your Expression of Concern

129: 18    on December 8th, did you give the

129: 19    university a chance to conduct its own

129: 20    investigation?

129: 21    A.  No.

| | | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|---|
| **131:1** - **131:14** | | Curfman 01/24/2006 | | |
| | 131: 10 | Q.  Before you published your | | |
| | 131: 11 | conclusions in the Expression of Concern, | | |
| | 131: 12 | did you give any of the authors an | | |
| | 131: 13 | opportunity to respond to what you were | | |
| | 131: 14 | proposing to publish? | | |
| **131:1** - **132:1** | | Curfman 01/24/2006 | | |
| | 131: 19 | THE WITNESS:  Yes, we did. | | |
| | 131: 20 | But their response follows the | | |
| | 131: 21 | publication of the Expression of | | |
| | 131: 22 | Concern.  But we did discuss with | | |
| | 131: 23 | them before we published it that | | |
| | 131: 24 | they would have an opportunity to | | |
| | 132: 1 | respond.  Yes. | | |
| **132:3** - **132:18** | | Curfman 01/24/2006 | | |
| | 132: 3 | Q.  Actually, what you told them | Pltf Obj:  R. 611-Leading; | Overruled |
| | 132: 4 | before when you first contacted them was | R. 602 - Lack of | |
| | 132: 5 | that they would have an opportunity to | foundation. | |
| | 132: 6 | comment before you published the | | |
| | 132: 7 | Expression of Concern, isn't that true? | | |
| | 132: 8 | A.  I don't -- I can't imagine | | |
| | 132: 9 | that's true because that's not the | | |
| | 132: 10 | protocol for an Expression of Concern. | | |
| | 132: 11 | Q.  Didn't you tell Dr. | Pltf Obj: Improper | Overruled |
| | 132: 12 | Bombardier that you -- didn't you send | compound question. | |
| | 132: 13 | her a copy of the draft Expression of | R. 611 - Leading. | |
| | 132: 14 | Concern ask her for her comments to be | | |
| | 132: 15 | received in a couple of weeks so that | | |
| | 132: 16 | they could accompany any publication of | | |
| | 132: 17 | the Expression of Concern? | | |
| | 132: 18 | A.  No. | | |
| **133:2** - **133:15** | | Curfman 01/24/2006 | | |
| | 133: 2 | Did the New England Journal | Pltf Obj:  Improper | Overruled |
| | 133: 3 | of Medicine, when it first communicated | compound question. | |
| | 133: 4 | with Dr. Bombardier about this, tell her | | |
| | 133: 5 | that you had a draft Expression of | | |
| | 133: 6 | Concern that you were planning on | | |
| | 133: 7 | publishing it on December 29, that you | | |
| | 133: 8 | asked for her comments in response in | | |
| | 133: 9 | advance of December 29th so that they | | |
| | 133: 10 | could be considered in connection with | | |
| | 133: 11 | the publication of the Expression of | | |

| | | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|---|
| | 133: 12 | Concern? | | |
| | 133: 13 | A.  No.  Because the response | | |
| | 133: 14 | from the authors is intended to follow | | |
| | 133: 15 | the Expression of Concern. | | |
| **133:2** - **134:19** | | Curfman 01/24/2006 | | |
| | 133: 23 | Q.  What is Exhibit 12? | | |
| | 133: 24 | MR. SHAW:  If you know. | | |
| | 134: 1 | THE WITNESS:  (Witness | | |
| | 134: 2 | reviewing document.) | | |
| | 134: 3 | This is -- on the bottom of | | |
| | 134: 4 | Page 1 and the top of Page 2 is an | | |
| | 134: 5 | e-mailed letter that I and Dr. | | |
| | 134: 6 | Morrissey and Dr. Drazen sent to | | |
| | 134: 7 | Dr. Bombardier on December 5th | | |
| | 134: 8 | informing her about the Expression | | |
| | 134: 9 | of Concern, and I believe we | | |
| | 134: 10 | attached to this a series of | | |
| | 134: 11 | questions that we wanted her to | | |
| | 134: 12 | address in her response. | | |
| | 134: 13 | And then above that, a | | |
| | 134: 14 | couple of days later is a response | | |
| | 134: 15 | saying that she and Dr. Loren | | |
| | 134: 16 | Laine, who was her co -- | | |
| | 134: 17 | corresponding author on the VIGOR | | |
| | 134: 18 | trial, wanted to have a conference | | |
| | 134: 19 | call.  And we then set that up. | | |
| **134:2** - **135:16** | | Curfman 01/24/2006 | | |
| | 134: 21 | Q.  Focusing on the e-mail from | Pltf Obj:  R. 801 and | Overruled |
| | 134: 22 | you and your colleagues to Dr. | R. 802; Hearsay. | |
| | 134: 23 | Bombardier -- | | |
| | 134: 24 | A.  Yes. | | |
| | 135: 1 | Q.  -- the first sentence says | | |
| | 135: 2 | you're writing concerning the VIGOR | | |
| | 135: 3 | study; correct?  And then the second | | |
| | 135: 4 | sentence says, "Recently we obtained new | | |
| | 135: 5 | information that has led us to be | | |
| | 135: 6 | concerned about the accuracy of certain | | |
| | 135: 7 | data and conclusions in your article. | | |
| | 135: 8 | The specific points at issue are" | | |
| | 135: 9 | addressed "in the attached Expression of | | |
| | 135: 10 | Concern, which we plan to publish in an | | |
| | 135: 11 | upcoming issue of the Journal." | | |

| | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| | 135: 12          As of December 5th, 2005, | | |
| | 135: 13     the plan was to publish this in the | | |
| | 135: 14     December 29th edition of the Journal; | | |
| | 135: 15     correct? | | |
| | 135: 16     A.  Yes. | | |
| **136:6   -   136:14** | Curfman 01/24/2006 | | |
| | 136: 6     Q.  And then in the next | | |
| | 136: 7     sentence, you ask her to submit a | | |
| | 136: 8     correction for publication in the | | |
| | 136: 9     Journal, and you ask her to do that by | | |
| | 136: 10     December 22nd; right? | | |
| | 136: 11     A.  That's right. | | |
| | 136: 12     Q.  So, a few weeks after this | | |
| | 136: 13     e-mail; right? | | |
| | 136: 14     A.  Correct. | | |
| **137:7   -   137:13** | Curfman 01/24/2006 | | |
| | 137: 7     Q.  You talked before about two | | |
| | 137: 8     earlier or two other Expressions of | | |
| | 137: 9     Concern. | | |
| | 137: 10     A.  Yes. | | |
| | 137: 11     Q.  And let me ask you to take a | | |
| | 137: 12     look at Exhibit 12 -- or am I on 13 now? | | |
| | 137: 13          Exhibit 13. | | |
| **138:5   -   139:5** | Curfman 01/24/2006 | | |
| | 138: 5     Q.  Is that one of the | | |
| | 138: 6     Expressions of Concern that you were | | |
| | 138: 7     talking about? | | |
| | 138: 8     A.  Yes, it is. | | |
| | 138: 9     Q.  Would you agree with me that | | |
| | 138: 10     this one is different in kind from what | | |
| | 138: 11     you published concerning VIGOR? | | |
| | 138: 12     A.  Oh, I think it's very | | |
| | 138: 13     different in kind, yes. | | |
| | 138: 14     Q.  And in this one, you report | | |
| | 138: 15     in a single paragraph that concerns were | | |
| | 138: 16     raised concerning the data published in | | |
| | 138: 17     one of your articles, right? | | |
| | 138: 18     A.  Correct. | | |
| | 138: 19     Q.  And you say, "We have | | |
| | 138: 20     informed the director of Dr. Subdo's" -- | | |
| | 138: 21     A.  Subdo. | | |
| | 138: 22     Q.  -- "Subdo's institution... | | |

| | | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|---|
| | 138: 23 | and await the results of his | | |
| | 138: 24 | investigation."  Correct? | | |
| | 139: 1 | A.   Correct. | | |
| | 139: 2 | Q.   And you do not set forth any | | |
| | 139: 3 | conclusions that you reached in advance | | |
| | 139: 4 | of hearing from the author's institution; | | |
| | 139: 5 | right? | | |
| **139:8** - **139:11** | | Curfman 01/24/2006 | | |
| | 139: 8 | THE WITNESS:  Oh, there are | | |
| | 139: 9 | preliminary conclusions in this | | |
| | 139: 10 | paragraph, yes, that I had | | |
| | 139: 11 | reached, yes. | | |
| **139:1** - **140:10** | | Curfman 01/24/2006 | | |
| | 139: 13 | Q.   Well, the paragraph says, | | |
| | 139: 14 | "In the issue of April 26, 2001, we | | |
| | 139: 15 | published a study by John Sudbo.  Figure | | |
| | 139: 16 | 3B and Figure 3C of that article, which | | |
| | 139: 17 | purport to represent two different | | |
| | 139: 18 | patients and stages of oral" -- what's | | |
| | 139: 19 | the next word? | | |
| | 139: 20 | A.   -- "epithelial dysplasia." | | |
| | 139: 21 | Q.   -- "are in fact different | | |
| | 139: 22 | magnifications of the same | | |
| | 139: 23 | photomicrogram." | | |
| | 139: 24 | A.   That's right. | | |
| | 140: 1 | Q.   "Because the results of | | |
| | 140: 2 | another study of Dr. Sudbo, published in | | |
| | 140: 3 | the issue of April 1, 2004 were derived | | |
| | 140: 4 | from the same subjects followed through | | |
| | 140: 5 | the same database, we have similar | | |
| | 140: 6 | concerns."  Then you say, "We have | | |
| | 140: 7 | informed the director...and [we] await | | |
| | 140: 8 | the results of his investigation." | | |
| | 140: 9 | Right? | | |
| | 140: 10 | A.  Uh-huh. | | |
| **141:6** - **142:15** | | Curfman 01/24/2006 | | |
| | 141: 6 | Q.  Do you have in front of you | | |
| | 141: 7 | the document that I've marked as Exhibit | | |
| | 141: 8 | 14? | | |
| | 141: 9 | A.  Yes. | | |
| | 141: 10 | Q.  Was this the other | | |
| | 141: 11 | Expression of Concern that you testified | | |

| | | **Objection/Response in Barnett** | **Ruling in Plunkett** |
|---|---|---|---|
| 141: 12 | about earlier? | | |
| 141: 13 | A.  This is one of the three, | | |
| 141: 14 | yes. | | |
| 141: 15 | Q.  Okay. | | |
| 141: 16 | And we talked about the one | | |
| 141: 17 | concerning VIGOR, we just talked about | | |
| 141: 18 | the one concerning Dr. Sudbo, and this is | | |
| 141: 19 | the third; right? | | |
| 141: 20 | A.  That's right. | | |
| 141: 21 | Q.  This concerns an article by | | |
| 141: 22 | Dr. Schiff; is that right? | | |
| 141: 23 | A.  Schiffl. | | |
| 141: 24 | Q.  Schiffl.  I'm sorry.  What | | |
| 142: 1 | it says is that it has come to your | | |
| 142: 2 | attention that there was an "ongoing | | |
| 142: 3 | investigation into potential scientific | | |
| 142: 4 | misconduct" concerning this article that | | |
| 142: 5 | you published? | | |
| 142: 6 | A.  (Witness nods.) | | |
| 142: 7 | Q.  And you said you will inform | | |
| 142: 8 | your readers of the outcome of the | | |
| 142: 9 | investigation when it's complete.  Right? | | |
| 142: 10 | A.  That's right. | | |
| 142: 11 | Q.  And that investigation that | | |
| 142: 12 | you referred to was the investigation by | | |
| 142: 13 | Dr. Schiffl's sponsoring institution; | | |
| 142: 14 | correct? | | |
| 142: 15 | A.  Correct. | | |

**142:1  -  142:21**            Curfman 01/24/2006

| | | | |
|---|---|---|---|
| 142: 16 | Q.  And then later on they told | | |
| 142: 17 | you that they had not found sufficient | | |
| 142: 18 | evidence of misconduct, and you, | | |
| 142: 19 | therefore, retracted the Expression of | | |
| 142: 20 | Concern, right? | | |
| 142: 21 | A.  Right. | | |

**143:6  -  143:6**            Curfman 01/24/2006

| | | | |
|---|---|---|---|
| 143: 6 | Q.  Do you recognize Exhibit 15? | | |

**143:1  -  143:21**            Curfman 01/24/2006

| | | | |
|---|---|---|---|
| 143: 11 | THE WITNESS:  Yes, I do. | | |
| 143: 12 | BY MR. BECK: | Pltf Obj:  R. 801 and | Overruled |
| 143: 13 | Q.  Is this a message from you | R. 802; Hearsay. | |
| 143: 14 | and Dr. Morrissey to Dr. Bombardier | | |

| | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| | 143: 15    informing her of the early release of the | | |
| | 143: 16    Expression of Concern? | | |
| | 143: 17    A.  It's an e-mail from me and | | |
| | 143: 18    Dr. Morrissey to Dr. Bombardier regarding | | |
| | 143: 19    the release, yes. | | |
| | 143: 20    Q.  What's the date and time of | | |
| | 143: 21    your e-mail to Dr. Bombardier? | | |
| **144:8  -  144:16** | Curfman 01/24/2006 | | |
| | 144: 8    A.  December 8 at 11:59 a.m. | | |
| | 144: 9    Q.  When do you tell her that | | |
| | 144: 10    the Expression of Concern is going to be | | |
| | 144: 11    released? | | |
| | 144: 12    A.  At 3:00. | | |
| | 144: 13    Q.  So, you gave her three hours | | |
| | 144: 14    and one minute notice? | | |
| | 144: 15    A.  Of the exact release time, | | |
| | 144: 16    yes. | | |
| **146:4  -  146:12** | Curfman 01/24/2006 | | |
| | 146: 4    Q.  I guess in between 11:59 | Pltf Obj:  Hearsay | Overruled |
| | 146: 5    a.m. when you first told her you were | | |
| | 146: 6    going to do it and 3:00 when you did it, | | |
| | 146: 7    did she tell you that that didn't give | | |
| | 146: 8    her time to respond? | | |
| | 146: 9    A.  Well, I don't recall.  I | | |
| | 146: 10    don't think I spoke with her.  I don't | | |
| | 146: 11    recall anything about that.  But -- | | |
| | 146: 12    Q.  Please look at Exhibit 16. | | |
| **147:7  -  147:24** | Curfman 01/24/2006 | | |
| | 147: 7    Q.  This is an e-mail from Dr. | Pltf Obj:;  R. 801 and | Overruled |
| | 147: 8    Bombardier to Mr. Morrissey. | R. 802; Hearsay. | |
| | 147: 9    A.  Dr. Morrissey. | | |
| | 147: 10    Q.  Dr. Morrissey, excuse me. | | |
| | 147: 11         It says, "Dr. Morrissey, | | |
| | 147: 12    Thank you for sending this in advance, | | |
| | 147: 13    given the nature of your expression of | | |
| | 147: 14    concern, we want the opportunity to | | |
| | 147: 15    respond but as you can well imagine it | | |
| | 147: 16    will not be possible to respond by the | | |
| | 147: 17    deadline of 3:00 p.m. this afternoon." | | |
| | 147: 18         Did Dr. Morrissey | | |
| | 147: 19    communicate to you this message from Dr. | | |
| | 147: 20    Bombardier? | | |

| | | **Objection/Response in Barnett** | **Ruling in Plunkett** |
|---|---|---|---|
| | 147: 21   A.  Yes, he did. | Pltf Obj:  R. 611-Leading | Overruled |
| | 147: 22   Q.  But you went ahead with the | | |
| | 147: 23   publication anyway at 3 p.m., didn't you? | | |
| | 147: 24   A.  Yes, we did. | | |
| **149:1  -  149:16** | Curfman 01/24/2006 | | |
| | 149: 12   Q.  Did you personally decide to | Pltf Obj:  Improper | Overruled |
| | 149: 13   go ahead with the publication, even | compound question. | |
| | 149: 14   though she had told you, the New England | | |
| | 149: 15   Journal of Medicine, that she wanted an | | |
| | 149: 16   opportunity to respond in advance? | | |
| **149:1  -  150:1** | Curfman 01/24/2006 | | |
| | 149: 19   THE WITNESS:  The final | | |
| | 149: 20   decision -- the final decision, as | | |
| | 149: 21   is always the case at the New | | |
| | 149: 22   England Journal about any | | |
| | 149: 23   decisions, comes from the | | |
| | 149: 24   editor-in-chief.  And I'm not the | | |
| | 150: 1   editor-in-chief. | | |
| **150:2  -  150:24** | Curfman 01/24/2006 | | |
| | 150: 20   Q.  Later on, were you involved | | |
| | 150: 21   in sending Dr. Bombardier a seven-point | | |
| | 150: 22   letter telling her what points the New | | |
| | 150: 23   England Journal of Medicine wanted her to | | |
| | 150: 24   make when she responded? | | |
| **151:1  -  151:16** | Curfman 01/24/2006 | | |
| | 151: 1   A.  Yes.  She had -- my | | |
| | 151: 2   recollection is that she had asked for | | |
| | 151: 3   additional clarification from us about | | |
| | 151: 4   what specifically we wanted her to | | |
| | 151: 5   respond to.  Up until that time, we had | | |
| | 151: 6   only given her a copy of the Expression | | |
| | 151: 7   of Concern itself.  And she wanted more | | |
| | 151: 8   guidance from us about our points of | | |
| | 151: 9   concern.  And in response to that | | |
| | 151: 10   request, I believe Dr. Morrissey and I | | |
| | 151: 11   were the authors of that seven-point | | |
| | 151: 12   document that you mentioned.  And we | | |
| | 151: 13   tried to bring out in that document some | | |
| | 151: 14   additional explanation of our reasons for | | |
| | 151: 15   concern about the article so that that | | |
| | 151: 16   could focus her response more directly. | | |

| | | **Objection/Response in Barnett** | **Ruling in Plunkett** |
|---|---|---|---|
| **151:2** - **152:1** | Curfman 01/24/2006 | | |
| 151: 24 | Q.  Please look at Exhibit 17. | | |
| 152: 1 | Do you recognize that? | | |
| **152:4** - **152:16** | Curfman 01/24/2006 | | |
| 152: 4 | Well, this, I think, begins | Pltf Obj:  R. 801 and | Overruled |
| 152: 5 | with an e-mail from Dr. Bombardier to me | R. 802; Hearsay. | |
| 152: 6 | and Dr. Morrissey along the lines of what | | |
| 152: 7 | I just said, requesting some | | |
| 152: 8 | additional -- I mean, we can read this. | | |
| 152: 9 | Q.  We could, but what you had | Pltf Obj: Improper compound | Overruled |
| 152: 10 | said was she asked you for guidance about | question; R. 611-Leading | |
| 152: 11 | how she should respond.  In fact, if you | question improper; Dr. | |
| 152: 12 | read this, what she asks you for is a | Curfman is an independent | |
| 152: 13 | copy of the information that you referred | 3rd party not and adverse/ | |
| 152: 14 | to in your Expression of Concern so that | hostile witness. | |
| 152: 15 | she could write her own response.  Isn't | | |
| 152: 16 | that true? | | |
| **153:2** - **154:17** | Curfman 01/24/2006 | | |
| 153: 2 | THE WITNESS:  Okay.  Well, | | |
| 153: 3 | what she says is that "You | | |
| 153: 4 | requested a submission from the | | |
| 153: 5 | authors of that study that | | |
| 153: 6 | addresses the additional data and | | |
| 153: 7 | the issues set forth in the | | |
| 153: 8 | Expression of Concern that you | | |
| 153: 9 | published this week, and I agreed | | |
| 153: 10 | to your request as lead author of | | |
| 153: 11 | that study. | | |
| 153: 12 | "We have already started on | | |
| 153: 13 | that task, and I seek your | | |
| 153: 14 | assistance for the project.  In | | |
| 153: 15 | order for us to fully and properly | | |
| 153: 16 | evaluate the data and the issues, | | |
| 153: 17 | we will need to have copies of all | | |
| 153: 18 | the materials that the New England | | |
| 153: 19 | Journal of Medicine has that you | | |
| 153: 20 | referred to in your telephone call | | |
| 153: 21 | as well as those to which the | | |
| 153: 22 | Expression of Concern referred. | | |
| 153: 23 | While you suggested earlier that | | |
| 153: 24 | we obtain these materials from | | |
| 154: 1 | Merck, in light of the questions | | |

| | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| | 154: 2 | that you have raised about | |
| | 154: 3 | confidence in the provenance of | |
| | 154: 4 | data and information, we believe | |
| | 154: 5 | that it is essential for us to | |
| | 154: 6 | obtain such materials directly | |
| | 154: 7 | from the New England Journal of | |
| | 154: 8 | Medicine in order to ensure that | |
| | 154: 9 | the material we are reviewing is | |
| | 154: 10 | in fact the same data that is | |
| | 154: 11 | referred to in your Expression of | |
| | 154: 12 | Concern." | |
| | 154: 13 | BY MR. BECK: | |
| | 154: 14 | Q.  You agree, sir, that all she | Pltf Obj:  R. 611 - Leading. | Overruled |
| | 154: 15 | asked you for here was a copy of the data | | |
| | 154: 16 | and the materials that you referenced in | | |
| | 154: 17 | your Expression of Concern? | | |
| **154:2**  -  **154:22** | | Curfman 01/24/2006 | | |
| | 154: 22 | A.  Yes. | | |
| **156:2**  -  **156:4** | | Curfman 01/24/2006 | | |
| | 156: 2 | Q.  So, point number 7 of your | | |
| | 156: 3 | seven-point letter to her basically said | | |
| | 156: 4 | get these from the Merck lawyer; right? | | |
| **156:5**  -  **158:20** | | Curfman 01/24/2006 | | |
| | 156: 5 | A.  Yes.  And I think that it's | | |
| | 156: 6 | fairly explicit. | | |
| | 156: 7 | Q.  Yes, I agree. | Pltf Obj:  Argumentative. R. 611 - Leading. | Overruled |
| | 156: 8 | But now what you also did is | | |
| | 156: 9 | you and Dr. Morrissey attempted to | | |
| | 156: 10 | dictate to Dr. Bombardier the content of | | |
| | 156: 11 | her response? | | |
| | 156: 12 | A.  We did not attempt to | | |
| | 156: 13 | dictate.  We attempted to articulate or | | |
| | 156: 14 | provide additional explanation of points | | |
| | 156: 15 | of our concern.  We are the editors.  We | | |
| | 156: 16 | had concerns.  It's not a matter of | | |
| | 156: 17 | dictating.  It's a matter of expressing | | |
| | 156: 18 | what the concerns were so that she could | | |
| | 156: 19 | respond to those concerns.  That's what | | |
| | 156: 20 | an Expression of Concern is.  That's why | | |
| | 156: 21 | it's called an Expression of Concern. | | |
| | 156: 22 | It's an expression of our concern that | | |
| | 156: 23 | then we ask her to address.  We thought | | |

| | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| 156: 24 | this would be helpful to her in framing a | | |
| 157: 1 | response. | | |
| 157: 2 | Q.  Didn't you tell her "We will | Pltf Obj:  Hearsay | Overruled |
| 157: 3 | explain herein what we expect this | | |
| 157: 4 | correction to include"? | | |
| 157: 5 | A.  Uh-huh. | | |
| 157: 6 | Q.  The very first point you | | |
| 157: 7 | say, "You should acknowledge."  Then you | | |
| 157: 8 | go on to tell her what she's supposed to | | |
| 157: 9 | acknowledge in her response, right?  Is | | |
| 157: 10 | that right? | | |
| 157: 11 | A.  That's the way the sentence | | |
| 157: 12 | reads, yes. | | |
| 157: 13 | Q.  And then basically you tell | Pltf Obj:  Argumentative | Overruled |
| 157: 14 | her that she's supposed to say she's | | |
| 157: 15 | sorry, don't you? | | |
| 157: 16 | MR. SHAW:  Objection to | | |
| 157: 17 | form. | | |
| 157: 18 | BY MR. BECK: | | |
| 157: 19 | Q.  Point number 6.  You're | Pltf Obj:  Hearsay; Argumentative | Overruled |
| 157: 20 | telling the author of this study that, | | |
| 157: 21 | number 6, "These omissions and | | |
| 157: 22 | inaccuracies are regrettable, and this | | |
| 157: 23 | should be acknowledged in your | | |
| 157: 24 | statement."  You're telling her to | | |
| 158: 1 | apologize for her article, aren't you? | | |
| 158: 2 | A.  We asked her for a response, | Pltf Obj:  Argumentative; Hearsay. | Overruled |
| 158: 3 | and -- | | |
| 158: 4 | Q.  And you told her what you | | |
| 158: 5 | wanted -- | | |
| 158: 6 | A.  She -- | | |
| 158: 7 | Q.  -- it to include? | | |
| 158: 8 | A.  She can respond in any way | | |
| 158: 9 | that she wishes.  We were laying out our | | |
| 158: 10 | concerns.  And one of our concerns was | | |
| 158: 11 | that there were omissions and | | |
| 158: 12 | inaccuracies that were regrettable.  And | | |
| 158: 13 | we had evidence to back it up.  And she | | |
| 158: 14 | can respond to that statement in any way | | |
| 158: 15 | that she wants. | | |
| 158: 16 | Q.  And she did, in fact, | | |
| 158: 17 | respond to that statement, did she not? | | |
| 158: 18 | A.  She did, yes. | | |

| | | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|---|
| | 158: 19 | Q.  And she told you that you | | |
| | 158: 20 | were wrong, right? | | |
| **159:2** - **159:3** | | Curfman 01/24/2006 | | |
| | 159: 2 | THE WITNESS:  I don't | | |
| | 159: 3 | recall. | | |
| **159:5** - **159:16** | | Curfman 01/24/2006 | | |
| | 159: 5 | Q.  You don't recall -- | | |
| | 159: 6 | A.  No, I don't. | | |
| | 159: 7 | Q.  -- what she said in her | | |
| | 159: 8 | response? | | |
| | 159: 9 | A.  No. | | |
| | 159: 10 | Q.  Have you looked at her | | |
| | 159: 11 | response? | | |
| | 159: 12 | A.  Only very cursorily at this | | |
| | 159: 13 | point.  We just received the response, | | |
| | 159: 14 | and, in fact -- | | |
| | 159: 15 | Q.  Well, you received it more | | |
| | 159: 16 | than a week ago, didn't you? | | |
| **159:1** - **159:24** | | Curfman 01/24/2006 | | |
| | 159: 19 | THE WITNESS:  We didn't | | |
| | 159: 20 | receive one response, and part of | | |
| | 159: 21 | the complexity now of the issue is | | |
| | 159: 22 | that we received two separate | | |
| | 159: 23 | responses from two different | | |
| | 159: 24 | groups of authors, and -- | | |
| **160:1** - **160:19** | | Curfman 01/24/2006 | | |
| | 160: 18 | Q.  My question is, you received | Pltf Obj:  Asked and | Overruled |
| | 160: 19 | it more than a week ago, didn't you? | answered. | |
| **161:1** - **161:12** | | Curfman 01/24/2006 | | |
| | 161: 10 | A.  We received two responses, | | |
| | 161: 11 | and I don't remember the exact dates of | | |
| | 161: 12 | receipt. | | |
| **161:2** - **161:23** | | Curfman 01/24/2006 | | |
| | 161: 23 | Q.  What is Exhibit 18? | Pltf Obj:  R. 801, R. 802; | Overruled |
| **162:7** - **162:9** | | Curfman 01/24/2006 | Hearsay. | |
| | 162: 7 | Q.  Is this some transmittal | | |
| | 162: 8 | e-mail and then the response from Dr. | | |
| | 162: 9 | Bombardier? | | |
| **162:1** - **162:20** | | Curfman 01/24/2006 | | |
| | 162: 13 | Q.  Dr. Bombardier responded on | | |

| | | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|---|
| | 162: 14 | behalf of herself and the other nine | | |
| | 162: 15 | authors who were not Merck employees; | | |
| | 162: 16 | right? | | |
| | 162: 17 | A.  Yes. | | |
| | 162: 18 | Q.  And in this response, these | | |
| | 162: 19 | ten non-Merck authors told you that you | | |
| | 162: 20 | were wrong; right? | | |
| **162:2** - **163:5** | | Curfman 01/24/2006 | | |
| | 162: 24 | A.  No.  I don't read it that | | |
| | 163: 1 | way.  But, again, I want to make it clear | | |
| | 163: 2 | that I have not had an opportunity to go | | |
| | 163: 3 | through this, and I'm not prepared to | | |
| | 163: 4 | discuss this document.  I wasn't -- we | | |
| | 163: 5 | have read these documents, and, again, I | | |
| **163:2** - **164:9** | | Curfman 01/24/2006 | | |
| | 163: 20 | Q.  Now, are you telling me -- | Pltf Obj:  Argumentative | Overruled |
| | 163: 21 | you've certainly known that your | R. 611 - Leading | |
| | 163: 22 | deposition was going to be taken in | | |
| | 163: 23 | connection with the Expression of | | |
| | 163: 24 | Concern.  You've known that for certainly | | |
| | 164: 1 | over a week, right? | | |
| | 164: 2 | A.  Right. | | |
| | 164: 3 | Q.  And you've had the answer | | |
| | 164: 4 | from the ten non-Merck authors -- | | |
| | 164: 5 | A.  Right. | | |
| | 164: 6 | Q.  -- to your Expression of | | |
| | 164: 7 | Concern, and you say you haven't read it | | |
| | 164: 8 | carefully enough to be prepared to | | |
| | 164: 9 | discuss it? | | |
| **165:2** - **165:5** | | Curfman 01/24/2006 | | |
| | 165: 2 | A.  My answer to your question | | |
| | 165: 3 | -- yes.  My answer to your question is, I | | |
| | 165: 4 | have not had time to adequately digest | | |
| | 165: 5 | this.  And one of the key issues in | | |
| **166:1** - **166:24** | | Curfman 01/24/2006 | | |
| | 166: 16 | Q.  Do you recognize Exhibit 21 | Pltf Obj:  R. 801; R. 802; | Overruled |
| | 166: 17 | to be a response on behalf of Drs. Reicin | Hearsay. | |
| | 166: 18 | and Shapiro who are both affiliated with | | |
| | 166: 19 | Merck? | | |
| | 166: 20 | A.  Right.  It's being | | |
| | 166: 21 | communicated by a medical communications | | |
| | 166: 22 | person. | | |

| | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| 166: 23 | Q.  Right. | | |
| 166: 24 | A.  Right. | | |
| **170:2  -  170:16** | Curfman 01/24/2006 | | |
| 170: 2 | Q.  And you had not only Dr. | Pltf Obj:  Improper compound question; argumentative. | Overruled |
| 170: 3 | Bombardier's response on behalf of the | | |
| 170: 4 | ten non-Merck authors for over a week | | |
| 170: 5 | before today, you also had Dr. Reicin's | | |
| 170: 6 | response on behalf of herself and Dr. | | |
| 170: 7 | Shapiro, the Merck authors, for over a | | |
| 170: 8 | week before today, right? | | |
| 170: 9 | A.  If you say so.  I'll take | | |
| 170: 10 | your word for it.  Sure. | | |
| 170: 11 | Q.  And here you are, you know | Pltf Obj:  Argumentative; omits answer. | Overruled |
| 170: 12 | this is the only chance that I get to ask | | |
| 170: 13 | you questions about the Expression of | | |
| 170: 14 | Concern, and you didn't take the time to | | |
| 170: 15 | read either one of these to comment on | | |
| 170: 16 | their substance? | | |
| **171:1  -  171:23** | Curfman 01/24/2006 | | |
| 171: 14 | Q.  My question is simply that | | |
| 171: 15 | knowing that your deposition was going to | | |
| 171: 16 | be taken today and that the main subject | | |
| 171: 17 | was your Expression of Concern, and | | |
| 171: 18 | having the responses filed by both the | | |
| 171: 19 | non-Merck lawyer -- the non-Merck authors | | |
| 171: 20 | and the Merck authors for over a week, | | |
| 171: 21 | it's your testimony that you didn't take | | |
| 171: 22 | the time to read them so that you could | | |
| 171: 23 | talk about the substance of them? | | |
| **172:2  -  172:16** | Curfman 01/24/2006 | | |
| 172: 2 | THE WITNESS:  Our response | | |
| 172: 3 | to these documents will require | | |
| 172: 4 | very careful deliberation. | | |
| 172: 5 | Editors of journals don't do | | |
| 172: 6 | things on a knee jerk.  We can't | | |
| 172: 7 | afford to do that.  I did not set | | |
| 172: 8 | the date for this deposition, and, | | |
| 172: 9 | in fact, we received these when we | | |
| 172: 10 | received them.  And we will need | | |
| 172: 11 | time to very carefully digest the | | |
| 172: 12 | situation, and then we'll have an | | |
| 172: 13 | official response to it.  I'm not | | |

| | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| | 172: 14    prepared to do that now.  We do | | |
| | 172: 15    things carefully in our office. | | |
| | 172: 16    That's how we do things.  That's | | |
| **172:2  -  173:9** | Curfman 01/24/2006 | | |
| | 172: 22    Q.  Have you looked at these two | Pltf Obj:  Compound question. | Overruled |
| | 172: 23    responses enough to know whether they're | | |
| | 172: 24    in basic agreement or whether there's any | | |
| | 173: 1    points of disagreement? | | |
| | 173: 2    A.  No.  I can't really comment | | |
| | 173: 3    about that. | | |
| | 173: 4    Q.  So, it's not just that you | Pltf Obj:  Improper compound question; argumentative; sarcastic. | Overruled |
| | 173: 5    haven't had, you know, conferences with | | |
| | 173: 6    your colleagues to talk it all through, | | |
| | 173: 7    you just haven't read them carefully in | | |
| | 173: 8    advance of your deposition.  Is that your | | |
| | 173: 9    testimony? | | |
| **173:1  -  174:1** | Curfman 01/24/2006 | | |
| | 173: 12    THE WITNESS:  I'm saying | | |
| | 173: 13    that we -- documents of this kind | | |
| | 173: 14    will demand careful deliberation | | |
| | 173: 15    among the editors at the New | | |
| | 173: 16    England Journal of Medicine, and | | |
| | 173: 17    we have not gone through that | | |
| | 173: 18    process yet.  And anything that I | | |
| | 173: 19    might say today might not be fully | | |
| | 173: 20    accurate because we've not gone | | |
| | 173: 21    through this process of | | |
| | 173: 22    deliberating together and | | |
| | 173: 23    interpreting these two documents. | | |
| | 173: 24    And that's all I can say about | | |
| | 174: 1    this. | | |
| **174:3  -  174:7** | Curfman 01/24/2006 | | |
| | 174: 3    Q.  Well, getting back to your | Pltf Obj:  Improper compound question. | Overruled |
| | 174: 4    Expression of Concern, you indicated it | | |
| | 174: 5    got a lot of media attention, and you and | | |
| | 174: 6    your outside PR people followed the media | | |
| | 174: 7    attention pretty closely, didn't you? | | |
| **174:1  -  174:13** | Curfman 01/24/2006 | | |
| | 174: 12    THE WITNESS:  No.  I | Pltf Obj:  Interrupts Dr. Curfman. | Overruled |
| | 174: 13    certainly didn't.  I mean -- | | |
| **175:1  -  175:6** | Curfman 01/24/2006 | | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 175: 1  Q.  Did the people at the New | Pltf Obj:  Argumentative; | Overruled |
| 175: 2  England Journal of Medicine monitor at | Sarcastic | |
| 175: 3  least the major newspapers to see how | | |
| 175: 4  they were reporting on the Expression of | | |
| 175: 5  Concern and whether there were any errors | | |
| 175: 6  that should be corrected? | | |

**175:9  -  175:22**   Curfman 01/24/2006

| | | |
|---|---|---|
| 175: 9  THE WITNESS:  Our media | | |
| 175: 10  relations specialist always | | |
| 175: 11  monitors the news.  That's what | | |
| 175: 12  her job is.  She does that every | | |
| 175: 13  day about everything that we | | |
| 175: 14  publish to see what the media is | | |
| 175: 15  writing about it.  That's what her | | |
| 175: 16  job is.  And part of it is to make | | |
| 175: 17  sure that they're reporting | | |
| 175: 18  accurately on articles that we | | |
| 175: 19  publish, not just the Expression | | |
| 175: 20  of Concern.  This happens every | | |
| 175: 21  day for every article.  We get | | |
| 175: 22  news updates every day. | | |

**176:1  -  177:1**   Curfman 01/24/2006

| | | |
|---|---|---|
| 176: 16  Q.  Dr. Curfman, you were quoted | Pltf Obj:  Rule 611 - Leading | |
| 176: 17  in the Forbes article as saying you were | question.  Improper.  Dr. | |
| 176: 18  somewhere between surprised and stunned | Curfman is an independent 3rd | |
| 176: 19  that some cardiovascular data that was in | party, not an adverse/hostile | |
| 176: 20  a presubmission draft, a draft that was | witness. | |
| 176: 21  prepared before it was submitted to the | Def. Resp: The question is | |
| 176: 22  New England Journal of Medicine, had been | not leading, and the witness | |
| 176: 23  deleted before the draft was submitted. | was not an independent 3rd | |
| 176: 24  Do you remember that and were you | party.  He was a hostile | |
| 177: 1  accurately quoted? | witness. | |

**177:1  -  177:24**   Curfman 01/24/2006

| | | |
|---|---|---|
| 177: 10  THE WITNESS:  Well, I can | Pltf Obj:  Rule 611 - | |
| 177: 11  tell you what I was somewhere | Leading question improper. | |
| 177: 12  between surprised and stunned | Dr. Curfman is an | |
| 177: 13  about, and that was the document | independent 3rd party not | |
| 177: 14  that was presented to me for the | an adverse/hostile witness. | |
| 177: 15  first time on November 21st, 2005, | | |
| 177: 16  Exhibit 18, among the exhibits on | | |
| 177: 17  that day, which was an internal | | |
| 177: 18  memorandum dated July 5th, 2000, | | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 177: 19  which contained an extensive body | | |
| 177: 20  of data on the cardiovascular | | |
| 177: 21  adverse events in VIGOR that I had | | |
| 177: 22  never seen before.  And that put | | |
| 177: 23  me somewhere between surprised and | | |
| 177: 24  stunned. | | |
| **179:2  -  180:4**  Curfman 01/24/2006 | | |
| 179: 22  My question is, from your | Rule 602 - Lack of Foundation. | |
| 179: 23  review of the materials, are you aware | | |
| 179: 24  that all of the data that was collected | Def. Resp: The witness was asked | |
| 180: 1  in the July 2000 memorandum and including | if he was aware, | |
| 180: 2  the tables and the statistical analyses, | and answered "Yes." | |
| 180: 3  that all of that was communicated to the | That laid the foundation.N9544 | |
| 180: 4  FDA in the fall of 2000? | | |
| **180:8  -  180:10**  Curfman 01/24/2006 | | |
| 180: 8  THE WITNESS:  Yes.  I'm | | |
| 180: 9  aware that it was communicated to | | |
| 180: 10  the FDA.  It was not posted by the | | |
| **183:2  -  183:18**  Curfman 01/24/2006 | | |
| 183: 2  Q.  How about in the materials | Pltf Obj:  Rule 602 - Lack of Foundation. | |
| 183: 3  communicating the information to the FDA, | | |
| 183: 4  was there a mention there of a | Def. Resp:  No foundation is | |
| 183: 5  prespecified cutoff date? | necessary.  The | |
| 183: 6  A.  I don't recall.  It's a big | witness is asked | |
| 183: 7  document, and I'd have to go back through | whether something | |
| 183: 8  it. | is contained in | |
| 183: 9  Q.  How about in the FDA | certain materials and | |
| 183: 10  materials prepared by people within the | responds "I don't | |
| 183: 11  FDA, is there an indication in the FDA | recall" and "I don't | |
| 183: 12  materials that this additional | know." | |
| 183: 13  information that was transmitted to them | | |
| 183: 14  in October had come in after a | | |
| 183: 15  prespecified cutoff date that was used in | | |
| 183: 16  the VIGOR study? | | |
| 183: 17  A.  Well, I don't know.  I don't | | |
| 183: 18  know about that.  What I can tell you is | | |
| **185:5  -  185:12**  Curfman 01/24/2006 | | |
| 185: 5  Q.  Did you ever look at the | Pltf Obj:  Improper compound question. | |
| 185: 6  Targum memo that we talked about earlier, | | |
| 185: 7  that internal FDA memo that analyzes | Def. Resp:  Plaintiff's | |
| 185: 8  data?  Did you ever look at the Targum | counsel objected at | |
| 185: 9  memo to see whether it explains that that | 185:13-15, so | |

| | | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|---|
| | | 185: 10   information that was provided in the fall | Mr. Beck asked the | |
| | | 185: 11   of 2000 had come in after a prespecified | question again at | |
| | | 185: 12   cutoff date for the VIGOR study? | 185:17-18. | |
| **185:1** | **-** | **185:19**   Curfman 01/24/2006 | | |
| | | 185: 17   Q.  Did you ever look at the | | |
| | | 185: 18   Targum memo to see that? | | |
| | | 185: 19   A.  Yes, I did. | | |
| **192:1** | **-** | **193:12**   Curfman 01/24/2006 | | |
| | | 192: 10   Q.  Let me turn to another | Pltf Obj:  Side bar - | |
| | | 192: 11   subject that is addressed in your | Counsel testifying. | |
| | | 192: 12   Expression of Concern, and that is | Def. Resp: Mr. Beck | |
| | | 192: 13   information that was in a draft before | is simply telling | |
| | | 192: 14   the draft was submitted to the New | the witness what | |
| | | 192: 15   England Journal of Medicine, but then was | topic is coming up. | |
| | | 192: 16   taken out in the draft that was submitted | | |
| | | 192: 17   to the New England Journal of Medicine. | | |
| | | 192: 18        Do you understand what topic | | |
| | | 192: 19   I'm talking about? | | |
| | | 192: 20   A.  Right. | | |
| | | 192: 21   Q.  Now, this is not the three | | |
| | | 192: 22   MIs, right? | | |
| | | 192: 23   A.  No.  This has nothing to do | | |
| | | 192: 24   with the three MIs. | | |
| | | 193: 1   Q.  Okay. | Pltf Obj:  Rule 611 - | |
| | | 193: 2        And this has to do with a | Leading question improper. | |
| | | 193: 3   table that at least the shell or the form | Dr. Curfman is an | |
| | | 193: 4   of the table was in an electronic version | independent 3rd party not | |
| | | 193: 5   of the manuscript that you could see that | an adverse/hostile witness. | |
| | | 193: 6   it had been in the draft before it had | Def. Resp: Curfman | |
| | | 193: 7   been submitted to the New England Journal | is not an independent | |
| | | 193: 8   of Medicine, but that had been taken out | 3rd party and therefore | |
| | | 193: 9   before the submission was actually made; | leading questions are | |
| | | 193: 10   is that right? | permissible | |
| | | 193: 11   A.  Well, that's part of the | | |
| | | 193: 12   story. | | |
| **194:3** | **-** | **194:7**   Curfman 01/24/2006 | | |
| | | 194: 3        Am I correct that the New | | |
| | | 194: 4   England Journal of Medicine requested the | | |
| | | 194: 5   authors of the VIGOR manuscript to | | |
| | | 194: 6   provide an electronic version to the New | | |
| | | 194: 7   England Journal? | | |

| | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| **194:1 - 194:20** | Curfman 01/24/2006 | | |
| | 194: 10 THE WITNESS: I don't know | | |
| | 194: 11 whether we requested it or not. | | |
| | 194: 12 They did send it. I'd have to -- | | |
| | 194: 13 you know, you can show me a | | |
| | 194: 14 document with a sentence in there, | | |
| | 194: 15 but they provided the disk. | | |
| | 194: 16 BY MR. BECK: | | |
| | 194: 17 Q. Okay. | | |
| | 194: 18 And they provided the disk | | |
| | 194: 19 in August of 2000, right? | | |
| | 194: 20 A. Yes. | | |
| **194:2 - 195:4** | Curfman 01/24/2006 | | |
| | 194: 23 Q. And when they provided you | Pltf Obj: Improper com- question. Leading. | |
| | 194: 24 with this disk, the electronic version, | | |
| | 195: 1 they gave it to you with a feature called | Def. Resp: Not compound | |
| | 195: 2 track changes that was turned on when | Dr. Curfman was not an | |
| | 195: 3 they gave it to you, right? | independent witness & | |
| | 195: 4 A. Yes. | therefore leading is | |
| **195:6 - 195:18** | Curfman 01/24/2006 | permissible. | |
| | 195: 6 And this disk, little | Pltf Obj: Rule 611- | |
| | 195: 7 computer disk, had three versions of the | Leading and improper. | |
| | 195: 8 VIGOR manuscript on it; is that right? | Curfman is independent | |
| | 195: 9 A. That's correct. | 3rd party. Not hostile wit. | |
| | 195: 10 Q. So that you could compare, | Def. Resp: Not | |
| | 195: 11 if you wanted to, you know, how the | compound. Dr. Curfman is | |
| | 195: 12 versions evolved over time? | not an independent witness | |
| | 195: 13 A. Yes, you could. | and leading is permissible | |
| | 195: 14 Q. And even within a single | | |
| | 195: 15 version with the track changes feature | | |
| | 195: 16 turned on, or it's sometimes called a red | | |
| | 195: 17 lining feature, are you familiar with | | |
| | 195: 18 that term? | | |
| **195:1 - 195:23** | Curfman 01/24/2006 | | |
| | 195: 19 A. Sure. | Pltf Obj:Rule 611 -Leading | |
| | 195: 20 Q. And you can see, because the | question improper. Dr. | |
| | 195: 21 computer keeps track of any language or | Curfman in an independent | |
| | 195: 22 tables or data that was taken out during | 3rd party not an adverse/ | |
| | 195: 23 the drafting process; correct? | hostile witness. | |
| **196:2 - 197:3** | Curfman 01/24/2006 | Def. Resp: Same as above | |
| | 196: 22 With the track changes | Pltf Obj: Rule 611-Leading | |

| | | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|---|
| | 196: 23 | feature turned on, within a single | question improper. Dr. | |
| | 196: 24 | version of the manuscript you can see, | Curfman is an independent | |
| | 197: 1 | because the computer keeps track of what | 3rd party not an adverse/ | |
| | 197: 2 | language or data is added and what | hostile witness. | |
| | 197: 3 | language or data is taken out, right? | Def Resp: Same as above | |
| **197:6** - **197:6** | | Curfman 01/24/2006 | | |
| | 197: 6 | THE WITNESS:  Right. | | |
| **201:1** - **201:24** | | Curfman 01/24/2006 | | |
| | 201: 18 | Q.   And my question is, when you | Pltf Obj:  Assumes facts | Overruled |
| | 201: 19 | wrote that Expression of Concern focusing | not in evidence. | |
| | 201: 20 | on the fact that the table was taken out, | | |
| | 201: 21 | did you take into account the fact that | | |
| | 201: 22 | the authors showed you that when they | | |
| | 201: 23 | gave you the electronic version with the | | |
| | 201: 24 | track changes feature turned on? | | |
| **202:3** - **202:4** | | Curfman 01/24/2006 | | |
| | 202: 3 | THE WITNESS:  Yes.  We took | | |
| | 202: 4 | that into consideration.  The | | |
| **204:9** - **205:4** | | Curfman 01/24/2006 | | |
| | 204: 9 | Q.   Now, even though the authors | Pltf Obj:  Improper compound question. Leading. | |
| | 204: 10 | gave you the electronic version with the | | |
| | 204: 11 | track changes turned on back in August of | | |
| | 204: 12 | 2000, am I correct from your Expression | Def. Resp:  Not compound. Permissible to lead because Curfman was not an independent witness. | |
| | 204: 13 | of Concern that it looked like you never | | |
| | 204: 14 | looked at the electronic version until | | |
| | 204: 15 | sometime in the fall of 2004; is that | | |
| | 204: 16 | right? | | |
| | 204: 17 | A.   That's right. | | |
| | 204: 18 | Q.   Now, did you ever tell, | Pltf. Obj:  Improper compound question. Leading. | |
| | 204: 19 | "you" being Dr. Curfman, covering you, | | |
| | 204: 20 | personally, first, back during the | | |
| | 204: 21 | editorial process in 2000, when the | Def. Resp:  Not compound. Permisslbe to lead because Curfman was not an independent witness. | |
| | 204: 22 | authors gave you the electronic version | | |
| | 204: 23 | with the track changes turned on, did you | | |
| | 204: 24 | communicate in any way to them that you | | |
| | 205: 1 | and your colleagues were not going to | | |
| | 205: 2 | look at the electronic version, "you," | | |
| | 205: 3 | personally, now? | | |
| | 205: 4 | A.   Yeah, no. | | |
| **205:1** - **206:4** | | Curfman 01/24/2006 | | |
| | 205: 15 | Q.   In terms of tables in | | |

| | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| 205: 16 | articles published in the New England | | |
| 205: 17 | Journal of Medicine, is there some kind | | |
| 205: 18 | of guideline or limit on the number of | | |
| 205: 19 | tables that are supposed to be included? | | |
| 205: 20 | A.  There's a guideline. | | |
| 205: 21 | There's not a limit. | | |
| 205: 22 | Q.  What does the guideline say | | |
| 205: 23 | as to the number of tables? | | |
| 205: 24 | A.  We generally go for five or | | |
| 206: 1 | six tables in the print version.  We can | | |
| 206: 2 | publish additional information on our | | |
| 206: 3 | website, or sometimes we will publish | | |
| 206: 4 | additional tables in print as well. | | |
| **206:9   -   206:17** | Curfman 01/24/2006 | | |
| 206: 9 | Q.  You say there's a guideline | Pltf Obj:  Rule 611 - | |
| 206: 10 | of five or six.  You know that that's not | Leading question improper. | |
| 206: 11 | true, don't you?  You know the guideline | Dr. Curfman is an | |
| 206: 12 | is five, right? | independent 3rd party not | |
| 206: 13 | A.  Well, the guideline in that | an adverse/hostile witness. | |
| 206: 14 | information of authors at that time | Def. Resp: Dr. Curfman | |
| 206: 15 | probably said five. | is not an independent | |
| 206: 16 | Q.  Well, you know it said five, | 3rd party. He was a hostile | |
| 206: 17 | don't you? | witness | |
| **207:3   -   207:10** | Curfman 01/24/2006 | | |
| 207: 3 | THE WITNESS:  The letter | | |
| 207: 4 | that I send out to the authors at | | |
| 207: 5 | the moment says five or six. | | |
| 207: 6 | BY MR. BECK: | | |
| 207: 7 | Q.  How about back in 2000 when | Pltf Obj:  Asked and | |
| 207: 8 | VIGOR was written, what was the guideline | answered. | |
| 207: 9 | then? | | |
| 207: 10 | A.  It was probably five then. | | |
| **209:2   -   209:3** | Curfman 01/24/2006 | | |
| 209: 2 | Q.  The next exhibit is Exhibit | | |
| 209: 3 | Number 19. | | |
| **211:1   -   212:6** | Curfman 01/24/2006 | | |
| 211: 19 | And do you see here in the | | |
| 211: 20 | very middle of the page that the VIGOR | | |
| 211: 21 | authors -- up at the top it says, | | |
| 211: 22 | "Suggestion for Transmittal to Authors." | | |
| 211: 23 | Right?  Right? | | |
| 211: 24 | A.  Yes. | | |

| | | **Objection/Response in Barnett** | **Ruling in Plunkett** |
|---|---|---|---|
| | 212: 1  Q.   Assuming that the suggestion<br>212: 2  was followed, right there in the middle<br>212: 3  of the page, it says, "The total number<br>212: 4  of figures plus tables should not total<br>212: 5  more than five."  Do you see that?<br>212: 6  A.   Yes. | Pltf Obj:  Improper compound question.<br><br>Def Resp: The question is "Do you see that?". That is not a compound question. | |
| **214:1  -  214:3** | Curfman 01/24/2006<br>214: 1      So, look through Exhibit 1<br>214: 2  and tell the jury how many tables there<br>214: 3  were in the VIGOR article. | | |
| **214:6  -  214:8** | Curfman 01/24/2006<br>214: 6      There were five tables and<br>214: 7  one figure for a total of six pieces of<br>214: 8  documentation. | | |
| **217:5  -  218:11** | Curfman 01/24/2006 | | |
| | 217: 5  Q.   Look at Exhibit 20.  Is<br>217: 6  Exhibit 20 some comments by a reviewer,<br>217: 7  or is this a direct communication from an<br>217: 8  editor of the New England Journal of<br>217: 9  Medicine to the lead author of the VIGOR<br>217: 10  publication?<br>217: 11  A.   It is a letter from<br>217: 12  associate editor Marshall Kaplan to the<br>217: 13  corresponding author of the VIGOR<br>217: 14  article, correct. | Pltf Obj:  Rule 611 - Leading question improper. Dr. Curfman is an independent 3rd party not an adverse/hostile witness.  Improper compound question.<br><br>Def. Resp: Dr. Curfman is a hostile witness.  Leading is permissible | |
| | 217: 15  Q.   And Marshall Kaplan, in<br>217: 16  terms of this time frame in June of<br>217: 17  2000 --<br>217: 18  A.   Right.<br>217: 19  Q.   -- in terms of<br>217: 20  communications with Dr. Bombardier,<br>217: 21  Marshall Kaplan was really the voice of<br>217: 22  the New England Journal of Medicine,<br>217: 23  right?<br>217: 24  A.   He was the associate editor, | Pltf Obj:  Rule 611 - Leading question improper. Dr. Curfman is an independent 3rd party not an adverse/hostile witness.<br><br>Def. Resp: Dr. Curfman is a hostile witness.  Leading is permissible | |
| | 218: 1      yes. | | |
| | 218: 2  Q.   But he was the one who was<br>218: 3  in charge of communicating the views and<br>218: 4  instructions --<br>218: 5  A.   In this particular letter. | Pltf Obj:Rule 611-Leading question improper.  Dr. Curfman is an independent 3rd party not an adverse/hostile witness. | |
| | 218: 6  Q.   -- of the New England<br>218: 7  Journal of Medicine to the author, Dr. | Def. Resp: Dr. Curfman is a hostile witness.  Leading | |

| | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| | | is permissible | |
| | 218: 8 | Bombardier -- | |
| | 218: 9 | A.  He wrote this letter, yes. | |
| | 218: 10 | Q.  -- Dr. Bombardier; right? | |
| | 218: 11 | A.  Yes.  Uh-huh. | |
| **219:1** - **219:24** | | Curfman 01/24/2006 | |
| | 219: 18 | Q.  And why don't you read the | |
| | 219: 19 | rest of that sentence that talks about | |
| | 219: 20 | how it should be no longer than 3,000 | |
| | 219: 21 | words.  What does it say right after | |
| | 219: 22 | that? | |
| | 219: 23 | A.  "With a total of no more | |
| | 219: 24 | than five figures and tables."  And I | |
| **221:1** - **221:15** | | Curfman 01/24/2006 | |
| | 221: 10 | Q.  Doctor, on the subject of | Pltf Obj:  R. 801; R. 802; | Overruled |
| | 221: 11 | the significance of the deletion of Table | Hearsay. | |
| | 221: 12 | 5, did Dr. Drazen tell you that he | | |
| | 221: 13 | thought that that whole subject did not | | |
| | 221: 14 | even have enough significance to be | | |
| | 221: 15 | mentioned in the Expression of Concern? | | |
| **221:1** - **221:19** | | Curfman 01/24/2006 | |
| | 221: 18 | THE WITNESS:  Not to my | |
| | 221: 19 | knowledge. | |
| **222:3** - **223:6** | | Curfman 01/24/2006 | |
| | 222: 3 | Q.  I've handed you Exhibit 22. | |
| | 222: 4 | Do you see that this is an e-mail from | |
| | 222: 5 | Dr. Drazen, the editor-in-chief, to you | |
| | 222: 6 | and Dr. Morrissey, "Subject: Expression | |
| | 222: 7 | of Concern"? | |
| | 222: 8 | A.  I do, yes. | |
| | 222: 9 | Q.  And it's dated December 4th. | |
| | 222: 10 | Was that pretty early in the drafting of | |
| | 222: 11 | the Expression of Concern? | |
| | 222: 12 | A.  That was still pretty early, | |
| | 222: 13 | yes. | |
| | 222: 14 | Q.  Okay. | |
| | 222: 15 | And do you see here on the | |
| | 222: 16 | e-mail he's attached a document.  And | |
| | 222: 17 | when explaining his attachment, he says, | |
| | 222: 18 | "I attach another edited version of the | |
| | 222: 19 | expression.  The biggest change is the | |
| | 222: 20 | deletion of the stuff about Table 5.  I | |
| | 222: 21 | think it attributes more to this table | |

| | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| 222: 22 | than it deserves and the numbers speak | | |
| 222: 23 | for themselves.  This piece is cleaner | | |
| 222: 24 | without it." | | |
| 223: 1 | So, does that refresh your | | |
| 223: 2 | recollection that the editor-in-chief of | | |
| 223: 3 | the New England Journal told you that he | | |
| 223: 4 | didn't think that the stuff about Table 5 | | |
| 223: 5 | was even significant enough to be | | |
| 223: 6 | included in the Expression of Concern? | | |
| **223:9  -  223:17** | Curfman 01/24/2006 | | |
| 223: 9 | THE WITNESS:  He changed his | | |
| 223: 10 | mind. | | |
| 223: 11 | BY MR. BECK: | | |
| 223: 12 | Q.  Well, my question is, does | | |
| 223: 13 | this refresh your recollection that, in | | |
| 223: 14 | fact, he told you, at least on December | | |
| 223: 15 | 4th, that this whole table 5 stuff was | | |
| 223: 16 | not even a big enough deal to be included | | |
| 223: 17 | in the Expression of Concern? | | |
| **224:1  -  224:22** | Curfman 01/24/2006 | | |
| 224: 19 | A.  Yes.  That's what he said. | | |
| 224: 20 | I, frankly, don't exactly remember this | | |
| 224: 21 | e-mail because he changed his mind, and | | |
| 224: 22 | we did include the material on Table 5. | | |
| **225:1  -  226:19** | Curfman 01/24/2006 | | |
| 225: 18 | Q.  And I will show you Exhibit | | |
| 225: 19 | 23, which is the attachment to the e-mail | | |
| 225: 20 | that we just looked at. | | |
| 225: 21 | A.  Yes. | | |
| 225: 22 | Q.  And this is kind of a | Pltf Obj:  Improper compound question. | Overruled |
| 225: 23 | printed out version of that track changes | | |
| 225: 24 | feature that we talked about, isn't it? | | |
| 226: 1 | This is a draft of the Expression of | | |
| 226: 2 | Concern, and you can see on the right | | |
| 226: 3 | things that have been deleted and things | | |
| 226: 4 | that have been added? | | |
| 226: 5 | A.  Right.  Yep. | | |
| 226: 6 | Q.  Okay. | | |
| 226: 7 | And do you see over here on | Pltf Obj:  R. 801; R. 802; Hearsay. | Overruled |
| 226: 8 | this attachment to the editor-in-chief's | | |
| 226: 9 | e-mail to you that that last square over | | |
| 226: 10 | there that shows what was deleted, at | | |

| | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| | 226: 11 least as of December 4, he wanted to take | | |
| | 226: 12 out the entire paragraph having to do | | |
| | 226: 13 with Table 5, right? | | |
| | 226: 14 A.  Yes, at that time.  And then | | |
| | 226: 15 he changed his mind.  That was an early | | |
| | 226: 16 version.  And we went through many | | |
| | 226: 17 versions of this document and a lot of | | |
| | 226: 18 editing was done.  The final version, of | | |
| | 226: 19 course, did include that material. | | |
| 236:1  -  236:19 | Curfman 01/24/2006 | | |
| | 236: 14 Q.  Let me hand you the next | Pltf Obj:  Rule 801, R. 802. | |
| | 236: 15 document, Exhibit 26.  Now, again, this | | |
| | 236: 16 is a series of e-mails, and you see that | Def. Resp: Not hearsay. | |
| | 236: 17 you're on these first two at least on | Nothing is being offered | |
| | 236: 18 Page 1. | "for truth of the matter | |
| | 236: 19 A.  Right. | asserted" | |
| 237:4  -  237:7 | Curfman 01/24/2006 | | |
| | 237: 4 So, let's go to Page 3 of | | |
| | 237: 5 this exhibit, and this is an e-mail that | | |
| | 237: 6 you got a copy of from Caryn Sandrew on | | |
| | 237: 7 behalf of Dr. Drazen.  Do you see that? | | |
| 237:8  -  237:10 | Curfman 01/24/2006 | | |
| | 237: 8 A.  Yes, I do. | | |
| | 237: 9 Q.  And it's, again, to Ms. | | |
| | 237: 10 Prakash of NPR; right? | | |
| 237:1  -  237:11 | Curfman 01/24/2006 | | |
| | 237: 11 A.  Right. | | |
| 239:1  -  239:21 | Curfman 01/24/2006 | | |
| | 239: 15 Q.  Let's go down to the very | Pltf Obj:  No question | |
| | 239: 16 bottom where he says, "It is generally | Def. Resp:  Directing | |
| | 239: 17 inappropriate to mine a data set for | the witness where to | |
| | 239: 18 endpoints that were not pre- specified in | look on a page is not | |
| | 239: 19 the research protocol." | objectionable. | |
| | 239: 20 A.  Yes.  The problem is that in | | |
| | 239: 21 a safety study, that does not apply. | | |
| 240:1  -  240:21 | Curfman 01/24/2006 | | |
| | 240: 14 Q.  My focus is, he's making a | Pltf Obj:  No question | |
| | 240: 15 general observation about whether it is | Def. Resp: The | |
| | 240: 16 appropriate or not to mine a data set for | witness interrupted | |
| | 240: 17 endpoints that were not prespecified in | Mr. Beck, then | |
| | 240: 18 the research protocol. | Mr. Beck asked a | |

| | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| 240: 19 | A.  Except for safety endpoints. | question. | |
| 240: 20 | Q.  But he doesn't say that, | | |
| 240: 21 | does he? | | |

**241:1  -  242:13**  Curfman 01/24/2006

| | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| 241: 10 | Q.  Does he go on to say to the | Pltf Obj:  Rule 801; R. 802. | |
| 241: 11 | NPR author, "Such a fishing expedition | | |
| 241: 12 | can lead to misleading conclusions, both | Def. Resp: Not offered for truth. Offered to show that the statement was made. | |
| 241: 13 | positive and negative"? | | |
| 241: 14 | A.  They could, but he had never | | |
| 241: 15 | seen this document.  And this is a | | |
| 241: 16 | critical document that no editor or | | |
| 241: 17 | physician would ever overlook, the | | |
| 241: 18 | importance of this document.  These are | | |
| 241: 19 | critical safety endpoints, safety | | |
| 241: 20 | endpoints.  And safety endpoints are | | |
| 241: 21 | often not prespecified in a protocol. | | |
| 241: 22 | Q.  But, in fact, when he made | Pltf Obj:  R. 602; R. 611 R. 801; R. 802; Assumes facts not in evidence. | |
| 241: 23 | that observation about how that's | | |
| 241: 24 | inappropriate and it's a fishing | | |
| 242: 1 | expedition, he was talking about the | Def. Resp:  Leading permissible because hostile witness.  Not hearsay because not offered for the truth. Does not assume facts not in evidence | |
| 242: 2 | safety endpoints of the VIGOR article, | | |
| 242: 3 | was he not, sir? | | |
| 242: 4 | A.  He was not -- he was not | | |
| 242: 5 | privy to this document. | | |
| 242: 6 | Q.  Was he talking about the | | |
| 242: 7 | safety endpoints of the VIGOR article | | |
| 242: 8 | when he said that "It is generally | | |
| 242: 9 | inappropriate to mine a data set for | | |
| 242: 10 | endpoints that were not pre-specified to | | |
| 242: 11 | the research protocol.  Such a fishing | | |
| 242: 12 | expedition can lead to misleading | | |
| 242: 13 | conclusions, both positive and negative"? | | |

**242:1  -  242:23**  Curfman 01/24/2006

| | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| 242: 17 | A.  It's not clear from this. | Pltf Obj:  R. 801; R. 802; Hearsay. | |
| 242: 18 | It's a new paragraph. | | |
| 242: 19 | Q.  The entire subject of the | Def. Resp: Not offered for the truth. | |
| 242: 20 | NPR article was the safety endpoints -- | | |
| 242: 21 | A.  The words don't say that. | | |
| 242: 22 | MR. BECK:  No more | | |
| 242: 23 | questions. | | |

**248:1  -  249:10**  Curfman 01/24/2006

| | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| 248: 12 | Q.  Doctor, you had your | | |

|  | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 248: 13 deposition taken on November 21st, 2005? | | |
| 248: 14 A.  Yes. | | |
| 248: 15 Q.   Did you have any intention | | |
| 248: 16 of writing an Expression of Concern about | | |
| 248: 17 the VIGOR study before that date? | | |
| 248: 18 A.   No, we did not. | | |
| 248: 19 Q.   Did you formulate an | | |
| 248: 20 intention to write an Expression of | | |
| 248: 21 Concern on or after November 21st, 2005? | | |
| 248: 22 A.   At 8:30 in the morning on | | |
| 248: 23 November 22nd, Dr. Morrissey and I | | |
| 248: 24 initiated discussions about some kind of | | |
| 249: 1 editorial intervention, and then we | | |
| 249: 2 continued those discussions in the | | |
| 249: 3 subsequent days, leading eventually to an | | |
| 249: 4 Expression of Concern. | | |
| 249: 5 Q.   Now, the Expression of | | |
| 249: 6 Concern itself has previously been marked | | |
| 249: 7 as Exhibit 3, and do you have that in | | |
| 249: 8 front of you? | | |
| 249: 9 A.  I can get that.  Yes, I have | | |
| 249: 10 it. | | |
| **260:1  -  261:13** Curfman 01/24/2006 | | |
| 260: 14 Q.   Doctor, in the Expression of | | |
| 260: 15 Concern, did you state the relative risks | | |
| 260: 16 in terms of an increase in risk with | | |
| 260: 17 rofecoxib or Vioxx, rather than a | | |
| 260: 18 decrease in risk with naproxen? | | |
| 260: 19 A.  Yes, that's correct. | | |
| 260: 20 Q.   Why did you do that? | | |
| 260: 21 A.   Well, the original VIGOR | | |
| 260: 22 article presented the relative risks in | | |
| 260: 23 the opposite direction, the implication | | |
| 260: 24 being from that presentation that | | |
| 261: 1 naproxen was protective against | | |
| 261: 2 cardiovascular disease, not that | | |
| 261: 3 rofecoxib increased the risk of heart | | |
| 261: 4 disease. | | |
| 261: 5 We now know that that is not | | |
| 261: 6 the case, and in order to set the record | | |
| 261: 7 straight, we made the decision in this | | |
| 261: 8 Expression of Concern to express the | | |
| 261: 9 relative risks as if rofecoxib increased | | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

261: 10          the risk of cardiovascular disease.

261: 11                    And, again, it was our

261: 12          interest here to correct the scientific

261: 13          record on this important point.

**263:2   -   264:11**                    Curfman 01/24/2006

263: 21          Q.  Now, compared to the way

263: 22          that you have presented the relative risk

263: 23          of 5 in Table 2 of the Expression of

263: 24          Concern versus the .4 versus the .1

264: 1          presented in the published VIGOR article,

264: 2          is it correct that there's a 20 percent

264: 3          higher relative risk of the way you've

264: 4          presented the data with all the MIs

264: 5          counted?

264: 6          A.  Yes.  Approximately 20

264: 7          percent, 19, 20 percent.

264: 8          Q.  Can you please look at the

264: 9          document marked as Exhibit 17 earlier

264: 10          today which consists of the NEJM 000011

264: 11          through 14, and the last two pages.

**264:1   -   264:23**                    Curfman 01/24/2006

264: 19                    THE WITNESS:  Right.

264: 20          BY MR. ARBITBLIT:

264: 21          Q.  The last two pages being the

264: 22          letter to Dr. Bombardier.

264: 23          A.  Right.  I've got it.

**265:2   -   265:18**                    Curfman 01/24/2006

265: 2          Q.  Now, could you look at

265: 3          Paragraph 1 of your letter to Dr.

265: 4          Bombardier at page NEJM 13.

265: 5                    Does that paragraph reflect

265: 6          your expectation that the authors would

265: 7          correct the understatement of the

265: 8          cardiovascular risk of rofecoxib as set

265: 9          forth in the Expression of Concern?

265: 10          A.  Yes.  That was our request,

265: 11          based on our judgment.

265: 12          Q.  And does your statement to

265: 13          Dr. Bombardier, "the higher relative risk

265: 14          had important public health implications

265: 15          because of the large number of patients

265: 16          taking rofecoxib," comport with your

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

265: 17    testimony a moment ago as to why that

265: 18    difference was important?

**265:2    -    270:3**                    Curfman 01/24/2006

265: 20          THE WITNESS:  Yes.  That's

265: 21          exactly what I meant.  I don't

265: 22          know if it was a close quote of

265: 23          what I said.

265: 24    BY MR. ARBITBLIT:

266: 1    Q.  Now, going on to Paragraph 2

266: 2    of your letter to Dr. Bombardier, could

266: 3    you please read the first sentence of

266: 4    Paragraph 2?

266: 5    A.  "Inclusion of the three

266: 6    myocardial infarctions would have

266: 7    invalidated your claim in the article

266: 8    that there was a difference in the risk

266: 9    of myocardial infarction only in

266: 10    high-risk patients (i.e., those in the

266: 11    aspirin indicated group)."

266: 12    Q.  Can you explain what you

266: 13    mean by that?

266: 14    A.  The authors in the VIGOR

266: 15    article concluded that the difference in

266: 16    rate of myocardial infarction between the

266: 17    two treatment groups was present only in

266: 18    high-risk patients, high risk for heart

266: 19    disease, but not in low-risk patients,

266: 20    low risk for heart disease.

266: 21          If you add in the three

266: 22    additional heart attacks that were not

266: 23    reflected in the data and do the

266: 24    appropriate statistical analysis for

267: 1    interaction, this conclusion in the

267: 2    article is no longer sustained, and

267: 3    that's what this point is about.

267: 4    Q.  Can you explain what a test

267: 5    for interaction means?

267: 6    A.  There are two variables, the

267: 7    drug variables, rofecoxib versus

267: 8    naproxen; and second variable, aspirin

267: 9    indicated high-risk group, aspirin not

267: 10    indicated low-risk group.  And an

267: 11    interaction means that these two terms

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 267: 12　will interact statistically, and the | | |
| 267: 13　appropriate test involves a determination | | |
| 267: 14　of whether there's an interaction. | | |
| 267: 15　Q.   And was such a test | | |
| 267: 16　performed by a statistician at your | | |
| 267: 17　request in connection with the Expression | | |
| 267: 18　of Concern? | | |
| 267: 19　A.   Yes, it was. | | |
| 267: 20　Q.   Can you summarize the result | | |
| 267: 21　of that test? | | |
| 267: 22　A.   The test indicated that the | | |
| 267: 23　risk -- the increased risk of | | |
| 267: 24　cardiovascular disease associated with | | |
| 268: 1　the use of rofecoxib or Vioxx was found | | |
| 268: 2　in both the high risk and the low-risk | | |
| 268: 3　groups, and it was not restricted to the | | |
| 268: 4　high-risk group. | | |
| 268: 5　Q.   Now, could you read the | | |
| 268: 6　sentence in Paragraph 2 beginning with | | |
| 268: 7　the word "Furthermore." | | |
| 268: 8　A.   "Furthermore, data listed in | | |
| 268: 9　Table 4 of the July 5, 2000 memorandum | | |
| 268: 10　(Exhibit 18 in Dr. Curfman's deposition) | | |
| 268: 11　on 'Adjudicated Thromboembolic Serious | | |
| 268: 12　Adverse Events,' directly contradict your | | |
| 268: 13　assertion that there was a difference in | | |
| 268: 14　risk only in patients for whom aspirin | | |
| 268: 15　was indicated." | | |
| 268: 16　Q.   Could you please take a look | Def Obj:  Foundation. Counsel takes witness through a string of docs and uses the witness as a prop to discuss or read in docs with which he is unfamiliar. No foundation that Dr. Curfman has anything to do with these documents or any knowledge of them.  See 285:20-24. This applies to 268:16-274:16 | Overruled as to 611; non-responsive objection |
| 268: 17　at the July 5th memorandum, July 5, 2000 | | |
| 268: 18　memorandum, I believe it's been marked | | |
| 268: 19　today as Exhibit 24 -- | | |
| 268: 20　A.   Right. | | |
| 268: 21　Q.   -- but it also has the | | |
| 268: 22　exhibit sticker 18 from the previous | | |
| 268: 23　deposition. | | |
| 268: 24　A.   Right. | | |
| 269: 1　Q.   Is this the table you're | | |
| 269: 2　referring to in Paragraph 2 of the letter | | |
| 269: 3　to Dr. Bombardier? | | |
| 269: 4　A.   Yes.  It's Table 4.  This is | | |
| 269: 5　what I was referring to. | | |
| 269: 6　Q.   Does this table indicate a | | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

269: 7     statistically significant increased risk
269: 8     of Vioxx in both aspirin indicated and
269: 9     aspirin not indicated patients?
269: 10     A.  Yes, it does.  Again, in
269: 11     this particular table, the relative risks
269: 12     are indicated in the reverse direction.
269: 13     But the fact is that this table clearly
269: 14     indicates that the increase in risk
269: 15     associated with the use of rofecoxib was
269: 16     present and statistically significant in
269: 17     both the aspirin indicated, the high-risk
269: 18     patients, high risk for heart disease,
269: 19     and the lower risk group for heart
269: 20     disease in whom aspirin was not
269: 21     indicated.
269: 22        So, the risk is present in
269: 23     both groups.  When you look at the
269: 24     totality of the adjudicated
270: 1     thromboembolic serious adverse events,
270: 2     the conclusion in the article is not
270: 3     sustained by this table.

**272:1   -   273:5**     Curfman 01/24/2006
272: 19     Q.  Was Figure 2 at Page 13 one
272: 20     of the documents that you considered as
272: 21     part of the data of which the authors
272: 22     were aware as of July 5, 2000 that was
272: 23     not submitted to the New England Journal?
272: 24     A.  Yes, that is correct.
273: 1     Q.  Is it correct also that the
273: 2     cumulative incidence of 2.5 percent as
273: 3     indicated in Figure 2 is greater than the
273: 4     incidence of cardiovascular events
273: 5     reported in the VIGOR article?

**273:1   -   274:16**     Curfman 01/24/2006
273: 12     THE WITNESS:  Yes.  These
273: 13     data were not reported at all in
273: 14     the VIGOR article.  The only data
273: 15     on the cardiovascular events on
273: 16     VIGOR article were summary
273: 17     percentage data for myocardial
273: 18     infarctions, excluding the three
273: 19     heart attacks that we've

| | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| 273: 20 | discussed. | | |
| 273: 21 | These data here include a | | |
| 273: 22 | variety of serious thromboembolic | | |
| 273: 23 | adverse events involving four | | |
| 273: 24 | different vascular systems in the | | |
| 274: 1 | body.  So, it's a much more | | |
| 274: 2 | comprehensive expression of the | | |
| 274: 3 | adverse event experiences in the | | |
| 274: 4 | VIGOR trial and include not just | | |
| 274: 5 | the coronary artery bed in the | | |
| 274: 6 | heart, but also the | | |
| 274: 7 | cerebrovascular bed perfusing the | | |
| 274: 8 | brain, the peripheral arterial bed | | |
| 274: 9 | perfusing the legs and the arms, | | |
| 274: 10 | and the peripheral venous bed, the | | |
| 274: 11 | venous system in the legs. | | |
| 274: 12 | So, there are four vascular | | |
| 274: 13 | systems that would be reflected in | | |
| 274: 14 | this graph, and these data were | | |
| 274: 15 | not submitted to the New England | | |
| 274: 16 | Journal of Medicine. | | |
| **276:9   -   282:8** | Curfman 01/24/2006 | | |
| 276: 9 | Q.  Now, in the letter to Dr. | | |
| 276: 10 | Bombardier, you reference in Paragraph 3 | | |
| 276: 11 | the issue of a cutoff date; is that | | |
| 276: 12 | correct? | | |
| 276: 13 | A.  Yes. | | |
| 276: 14 | Q.  Did you ever see any | | |
| 276: 15 | document during the review process that | | |
| 276: 16 | indicated a cutoff date for the | | |
| 276: 17 | cardiovascular events? | | |
| 276: 18 | A.  No.  There was no document | | |
| 276: 19 | or no mention of this fact at all.  The | | |
| 276: 20 | editors knew nothing about this.  The | | |
| 276: 21 | reviewers knew nothing about this. | | |
| 276: 22 | Q.  I want to focus your | Def Obj:  Foundation. | Overruled as to |
| 276: 23 | attention on some testimony that you gave | Counsel takes witness | 611; |
| 276: 24 | earlier today about the meaning of | through a string of docs | non-responsive |
| 277: 1 | prespecified, and I'd like you to take a | and uses the witness as | objection |
| 277: 2 | look at the actual data analysis plan for | a prop to discuss or read | |
| 277: 3 | the VIGOR study which has been marked as | in docs with which he | |
| 277: 4 | Exhibit 28. | is unfamiliar.  No foundation | |
| 277: 5 | - - - | that Dr. Curfman has | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 277: 6        (Whereupon, Deposition | anything to do with these | |
| 277: 7      Exhibit Curfman-28, "Vioxx | documents or any knowledge | |
| 277: 8      Gastrointestinal Outcomes | of them.  See 285:20-24. | |
| 277: 9      Research (VIGOR) Data Analysis | The objection applies to: | |
| 277: 10     Plan (Protocols 088 and 089)" | 276:22-286:23 | |
| 277: 11      MRK-NJ0243297 - MRK-NJ0243377, | | |
| 277: 12      was marked for identification.) | | |
| 277: 13        - - - | | |
| 277: 14   BY MR. ARBITBLIT: | | |
| 277: 15   Q.  It's a lengthy document. | | |
| 277: 16   You can take as much time as you'd like | | |
| 277: 17   to look at it, but I will direct your | | |
| 277: 18   attention, when you're ready, to a | | |
| 277: 19   particular portion of the document. | | |
| 277: 20      And this bears a date of | | |
| 277: 21   August 24, 1999 in the lower right-hand | | |
| 277: 22   corner.  It starts at Bates Number | | |
| 277: 23   MRK-NJ0243297 and continues to 377.  It's | | |
| 277: 24   entitled the "Vioxx Gastrointestinal | | |
| 278: 1   Outcomes Research (VIGOR) Data Analysis | | |
| 278: 2   Plan (Protocols 088 and 089)."  Do you | | |
| 278: 3   see that? | | |
| 278: 4   A.  Yes, I do. | | |
| 278: 5      MR. WEINBERG:  I'm sorry, is | | |
| 278: 6     that 28? | | |
| 278: 7      MR. ARBITBLIT:  Exhibit 28. | | |
| 278: 8     (Witness reviewing | | |
| 278: 9     document.) | | |
| 278: 10   BY MR. ARBITBLIT: | | |
| 278: 11   Q.  Now, Doctor, do you see that | | |
| 278: 12   there is an executive summary on the | | |
| 278: 13   first three pages of text? | | |
| 278: 14   A.  Right. | | |
| 278: 15   Q.  If you look at the bottom of | | |
| 278: 16   the second page bearing the last three | | |
| 278: 17   Bates pages 302, there is a paragraph | | |
| 278: 18   that starts, "According to the | | |
| 278: 19   prespecified plan, a total of two formal | | |
| 278: 20   analyses (one interim and one final) will | | |
| 278: 21   be performed for this study."  Do you see | | |
| 278: 22   that? | | |
| 278: 23   A.  Yes, I do. | | |
| 278: 24   Q.  And do you see going over on | | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

279: 1          to the next page that, the "interim

279: 2          analysis is scheduled when 60 patients

279: 3          experience confirmed PUB events, and the

279: 4          final analysis is planned when 120

279: 5          patients experience confirmed PUB events,

279: 6          40 patients experience confirmed

279: 7          complicated PUB events, or 6 months after

279: 8          the last patient was randomized,

279: 9          whichever comes last."  Do you see that?

279: 10         A.  Yes, I do.

279: 11         Q.  Now, if you'd look back to

279: 12         the second page at the top, the meaning

279: 13         of PUB is given.

279: 14         A.  Right.

279: 15         Q.  Do you see that?

279: 16         A.  Yes.

279: 17         Q.  Is that a gastrointestinal

279: 18         endpoint?

279: 19         A.  That is a gastrointestinal

279: 20         endpoint.

279: 21         Q.  Was that the primary aim of

279: 22         the VIGOR study, to evaluate

279: 23         gastrointestinal endpoints?

279: 24         A.  Yes.

280: 1          Q.  And do you see any reference

280: 2          in the statement of when the final

280: 3          analysis would be done to a prespecified

280: 4          cutoff date?

280: 5          A.  No.  This is based on the

280: 6          number of cumulative events.  And when a

280: 7          certain number of cumulative events would

280: 8          be tabulated, that would be the stopping

280: 9          point rather than a particular date.  So,

280: 10         they wanted to be sure they had enough

280: 11         observations, and that is the gist of

280: 12         this.

280: 13         Q.  Now, that would be enough

280: 14         observations to evaluate the primary

280: 15         endpoint.  Is that what you mean?

280: 16         A.  Yes.  For statistical

280: 17         analysis.

280: 18         Q.  The next document is Exhibit

280: 19         29, and I'll identify it for the record

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 280: 20          while you're looking at it. | | |
| 280: 21                     - - - | | |
| 280: 22                  (Whereupon, Deposition | | |
| 280: 23              Exhibit Curfman-29, Letter | | |
| 280: 24              12-20-99, MRK-AAX0002759, was | | |
| 281: 1               marked for identification.) | | |
| 281: 2                  - - - | | |
| 281: 3                  THE WITNESS:  Uh-huh. | | |
| 281: 4                  MR. ARBITBLIT:  It is a | | |
| 281: 5              letter from Michael Weinblatt, | | |
| 281: 6              M.D., dated December 20, 1999 to | | |
| 281: 7              Alise Reicin of Merck. | | |
| 281: 8          BY MR. ARBITBLIT: | | |
| 281: 9          Q.   And are you there with me | | |
| 281: 10         now? | | |
| 281: 11         A.   Yes, uh-huh. | | |
| 281: 12         Q.   The document says, "Dear Dr. | | |
| 281: 13         Reicin:  We are aware that the VIGOR | | |
| 281: 14         trial is in its final stages.  We are | | |
| 281: 15         also aware that there is an adjudication | | |
| 281: 16         committee reviewing serious vascular | | |
| 281: 17         adverse experiences in the entire Vioxx | | |
| 281: 18         program.  Due to the interest about COX-2 | | |
| 281: 19         inhibitors and their potential role in | | |
| 281: 20         vascular events, we recommend that an | | |
| 281: 21         analysis plan be developed to analyze | | |
| 281: 22         adjudicated serious vascular events in | | |
| 281: 23         the VIGOR trial separately from any other | | |
| 281: 24         planned analyses of these data.  It will | | |
| 282: 1          be important that these events [be] | | |
| 282: 2          adjudicated blinded."  Have I read that | | |
| 282: 3          correctly? | | |
| 282: 4          A.   Yes. | | |
| 282: 5          Q.   Does this letter indicate | | |
| 282: 6          any prespecified cutoff point for the | | |
| 282: 7          cardiovascular events that the DSMB | | |
| 282: 8          wanted evaluated? | | |
| **282:1   -   283:17**              Curfman 01/24/2006 | | |
| 282: 16         Q.   Do you see any reference to | | |
| 282: 17         a prespecified cutoff point in this | | |
| 282: 18         letter, Doctor? | | |
| 282: 19         A.   No.  There's no reference to | | |
| 282: 20         a prespecified cutoff point because there | | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 282: 21   never was one, as far as we knew.  The | | |
| 282: 22   DSMB here is asking that an analysis plan | | |
| 282: 23   be developed for the first time for the | | |
| 282: 24   cardiovascular events.  That had never | | |
| 283: 1   been done up to this point, dated | | |
| 283: 2   December 20, 1999 on the letter. | | |
| 283: 3           - - - | | |
| 283: 4           (Whereupon, Deposition | | |
| 283: 5           Exhibit Curfman-30, "Changes to | | |
| 283: 6           the VIGOR Data Analysis Plan | | |
| 283: 7           12/21/99," MRK-NJ0120246 - | | |
| 283: 8           MRK-NJ0120247, was marked for | | |
| 283: 9           identification.) | | |
| 283: 10           - - - | | |
| 283: 11   BY MR. ARBITBLIT: | | |
| 283: 12   Q.  Doctor, do you see Exhibit | | |
| 283: 13   30, which has a title "Changes to the | | |
| 283: 14   VIGOR Data Analysis Plan," December 21st, | | |
| 283: 15   1999, with the Bates Number MRK-NJ0120246 | | |
| 283: 16   and 247, that's marked as Exhibit 30? | | |
| 283: 17   A.  Yes, I have it. | | |
| **285:2  -  285:24**           Curfman 01/24/2006 | | |
| 285: 20           Doctor, before you finish | | |
| 285: 21           reading this, have you ever seen | | |
| 285: 22           this before? | | |
| 285: 23           THE WITNESS:  Not to my | | |
| 285: 24           knowledge, no. | | |
| **286:1  -  286:18**           Curfman 01/24/2006 | | |
| 286: 15   Q.  The question is, do you see | | |
| 286: 16   any reference to any prespecified cutoff | | |
| 286: 17   points in the "Changes to the VIGOR | | |
| 286: 18   Analysis Plan" dated December 21st, 1999? | | |
| **286:2  -  288:17**           Curfman 01/24/2006 | | |
| 286: 21           THE WITNESS:  No.  I don't | | |
| 286: 22           see any prespecified cutoff dates. | | |
| 286: 23   BY MR. ARBITBLIT: | | |
| 286: 24   Q.  Doctor, could you please | | |
| 287: 1   take a look at Exhibit 31, which I'll | | |
| 287: 2   identify for the record while you're | | |
| 287: 3   looking at it. | | |
| 287: 4           - - - | | |
| 287: 5           (Whereupon, Deposition | | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 287: 6      Exhibit Curfman-31, E-mail | | |
| 287: 7      12-10-05, NEJM001013, was marked | | |
| 287: 8      for identification.) | | |
| 287: 9      - - - | | |
| 287: 10      MR. ARBITBLIT:  It is an | | |
| 287: 11      e-mail.  The name of the sender is | | |
| 287: 12      redacted, and you and Drs. | | |
| 287: 13      Morrissey and Drazen are the | | |
| 287: 14      recipients.  And the Bates page at | | |
| 287: 15      the bottom is NEJM 001013. | | |
| 287: 16   BY MR. ARBITBLIT: | | |
| 287: 17   Q.  Do you see that? | | |
| 287: 18   A.  Yes, I do. | | |
| 287: 19   Q.  And is this an e-mail that | | |
| 287: 20   you received on or about December 10, two | | |
| 287: 21   days after the Expression of Concern was | | |
| 287: 22   published? | | |
| 287: 23   A.  Right. | | |
| 287: 24   Q.  Now, I'll have some | | |
| 288: 1   questions about other aspects of the | | |
| 288: 2   document, but for the moment, I want to | | |
| 288: 3   focus your attention on the last | | |
| 288: 4   paragraph where the author refers to the | | |
| 288: 5   cutoff date.  Do you see that? | | |
| 288: 6   A.  Yes. | | |
| 288: 7   Q.  Do you see that the author | | |
| 288: 8   says, "Finally, it would be important to | | |
| 288: 9   get a clear understanding of what this | | |
| 288: 10   'cut off date' means"?  Do you see that? | | |
| 288: 11   A.  Yes, I do. | | |
| 288: 12   Q.  Do you agree with that | | |
| 288: 13   statement? | | |
| 288: 14   A.  Yes. | | |
| 288: 15   Q.  Is that something that you | | |
| 288: 16   are evaluating as part of the process of | | |
| 288: 17   Expression of Concern and correction? | | |
| **290:7  -  290:17**      Curfman 01/24/2006 | | |
| 290: 7   Q.  Is there a process of | | |
| 290: 8   Expression of Concern followed by | | |
| 290: 9   response of the authors leading toward a | | |
| 290: 10   potential correction in the publication? | | |
| 290: 11   A.  Well, there'll be a further | | |
| 290: 12   response from the editors at some future | | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|

290: 13          time, yes.

290: 14          Q.   And as part of that process,

290: 15          is it important to you to understand what

290: 16          this cutoff date means as set forth in

290: 17          the e-mail marked as Exhibit 31?

**290:2   -   293:24**          Curfman 01/24/2006

290: 20              THE WITNESS:  Yes.  It's

290: 21          very important, because we've

290: 22          never been able to understand it.

290: 23          It, to us, seemed very unorthodox

290: 24          to have separate cutoff times for

291: 1          one set of adverse events, as

291: 2          compared with another set of

291: 3          adverse events.  They should be

291: 4          counted for the same duration of

291: 5          time so that the safety profile of

291: 6          the drug can be validly assessed.

291: 7              If you cut off one set of

291: 8          endpoints prematurely and give

291: 9          them less time to accumulate, then

291: 10          the playing field is not level in

291: 11          terms of assessing the overall

291: 12          safety profile of the drug.  So,

291: 13          we are at a complete loss about

291: 14          this prespecified cutoff point and

291: 15          were never told about it in the

291: 16          first place.

291: 17              So, we're doubly confused,

291: 18          and we hope to get some kind of

291: 19          clarification from the authors as

291: 20          to why this was done, since we --

291: 21          I've been at the New England

291: 22          Journal 20 years, handling many

291: 23          clinical trials, I've never seen

291: 24          it before, and so I don't

292: 1          understand it.  I don't understand

292: 2          the rationale, and we've given the

292: 3          authors a chance to address that

292: 4          question.

292: 5          BY MR. ARBITBLIT:

292: 6          Q.   At the bottom of the same

292: 7          paragraph, could you read the last

292: 8          question in that paragraph?

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 292: 9    A.  "That" -- you mean, "That | | |
| 292: 10    was news to me and needs to be tied | | |
| 292: 11    down - when and how was that date arrived | | |
| 292: 12    at?" | | |
| 292: 13    Q.   And then following with the | | |
| 292: 14    last question. | | |
| 292: 15    A.  "If true why were these | | |
| 292: 16    three cases in the FDA analysis?" | | |
| 292: 17    Q.   Do you agree with the | | |
| 292: 18    question that -- I'll withdraw that. | | |
| 292: 19         What do you understand the | | |
| 292: 20    author to have been saying to you about | | |
| 292: 21    this issue? | | |
| 292: 22    A.  Well, in the first question | | |
| 292: 23    that I read, what he is saying is | | |
| 292: 24    basically what I just said, that we need | | |
| 293: 1    to try, if we can, to understand why | | |
| 293: 2    there were separate cutoff times for the | | |
| 293: 3    two sets of adverse events, which seems | | |
| 293: 4    extremely unusual to us, and we don't | | |
| 293: 5    understand it. | | |
| 293: 6         And the second question, "if | | |
| 293: 7    true, why were these three cases in the | | |
| 293: 8    FDA analysis," is also very puzzling to | | |
| 293: 9    me.  The three events, the three heart | | |
| 293: 10    attacks were included in the July 5 memo | | |
| 293: 11    that was prepared by the chief | | |
| 293: 12    statistician for the VIGOR article, and | | |
| 293: 13    yet despite the fact that she felt that | | |
| 293: 14    it was appropriate to include them among | | |
| 293: 15    the data in this memo that she generated, | | |
| 293: 16    and despite the fact that this memo is | | |
| 293: 17    dated July 5, 2000, early in the summer | | |
| 293: 18    and early in the review process of the | | |
| 293: 19    VIGOR article, they weren't included in | | |
| 293: 20    the VIGOR article.  So why are they | | |
| 293: 21    included here and not in the VIGOR | | |
| 293: 22    article?  It's confusing to me what the | | |
| 293: 23    rationale -- what could be the rationale | | |
| 293: 24    for that disconnection. | | |
| **296:5**  -  **296:10**        Curfman 01/24/2006 | Def Obj:  Foundation. | Overruled |
| 296: 5    Q.  Doctor, Exhibit 32 has been | Counsel takes witness | as to 611; |
| 296: 6    handed to you, and it is a memorandum | through a string of docs | non-responsive |

| | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|
| | 296: 7    from Deborah Shapiro to Drs. Bjorkman, | and uses the witness as | objection |
| | 296: 8    Neaton, Silman and Sturrock, dated | a prop to discuss or read | |
| | 296: 9    January 24th, 2000.  Do you see that? | in docs with which he | |
| | 296: 10   A.  Yes. | is unfamiliar.  No foundation | |
| **297:1  -  297:15** | Curfman 01/24/2006 | that Dr. Curfman has | |
| | 297: 12        So, I would ask on voir | anything to do with these | |
| | 297: 13        dire, sir, have you ever seen this | documents or any knowledge | |
| | 297: 14        document before today, Exhibit 32? | of them.  See, 85:20-24. | |
| | 297: 15        THE WITNESS:  No. | This applies to 296:5-317:19 | |
| **298:1  -  298:15** | Curfman 01/24/2006 | | |
| | 298: 10   Q.  Do you see that in this | | |
| | 298: 11   document Dr. Shapiro is conveying that | | |
| | 298: 12   the Merck management requested that "a | | |
| | 298: 13   separate analysis of the VIGOR data not | | |
| | 298: 14   be performed"?  Do you see that | | |
| | 298: 15   statement? | | |
| **298:1  -  299:2** | Curfman 01/24/2006 | | |
| | 298: 17        THE WITNESS:  Yes, I do. | | |
| | 298: 18   BY MR. ARBITBLIT: | | |
| | 298: 19   Q.  And do you see that "In this | | |
| | 298: 20   case VIGOR would be pooled with all other | | |
| | 298: 21   rheumatoid arthritis trials for analysis | | |
| | 298: 22   at a later date"? | | |
| | 298: 23   A.  Right. | | |
| | 298: 24   Q.  Do you see that "They also | | |
| | 299: 1    requested that the adjudication take | | |
| | 299: 2    place after data base unblinding"? | | |
| **299:4  -  299:8** | Curfman 01/24/2006 | | |
| | 299: 4         THE WITNESS:  Yes, I do. | | |
| | 299: 5    BY MR. ARBITBLIT: | | |
| | 299: 6    Q.  Do you see any reference to | | |
| | 299: 7    a prespecified cutoff point in this | | |
| | 299: 8    document? | | |
| **299:1  -  299:18** | Curfman 01/24/2006 | | |
| | 299: 16        THE WITNESS:  This document | | |
| | 299: 17    does not reference a prespecified | | |
| | 299: 18    cutoff point. | | |
| **300:1  -  300:16** | Curfman 01/24/2006 | | |
| | 300: 10   Q.  Exhibit 33 is a letter to | | |
| | 300: 11   Dr. Reicin from Dr. Weinblatt, and it is | | |
| | 300: 12   MRK-AAX0002760.  Do you see that Dr. | | |

|  | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 300: 13  Weinblatt writes to Dr. Reicin that he | | |
| 300: 14  spoke to Dr. Shapiro, the author of the | | |
| 300: 15  memo you looked at just a moment ago? | | |
| 300: 16  A.  Right. | | |

**300:2   -   301:15**          Curfman 01/24/2006

| | | |
|---|---|---|
| 300: 23  Q.  Do you see that in the | | |
| 300: 24  document, sir? | | |
| 301: 1  A.  Yes. | | |
| 301: 2  Q.  This is not a document | | |
| 301: 3  you've seen before; right? | | |
| 301: 4  A.  No. | | |
| 301: 5  Q.  And Merck has not -- | | |
| 301: 6          MR. SHAW:  What's the date | | |
| 301: 7      of the letter you are referencing? | | |
| 301: 8          MR. ARBITBLIT:  January 24, | | |
| 301: 9      2000. | | |
| 301: 10  BY MR. ARBITBLIT: | | |
| 301: 11  Q.  And Merck has not provided | | |
| 301: 12  you with this letter in connection with | | |
| 301: 13  its claims of a prespecified cutoff date, | | |
| 301: 14  has it? | | |
| 301: 15  A.  No. | | |

**305:2   -   305:23**          Curfman 01/24/2006

| | | |
|---|---|---|
| 305: 20  Q.  Doctor, do you see any | | |
| 305: 21  reference to a prespecified cutoff date | | |
| 305: 22  in the exchange between Dr. Shapiro, Dr. | | |
| 305: 23  Reicin and Dr. Weinblatt? | | |

**306:1   -   307:11**          Curfman 01/24/2006

| | | |
|---|---|---|
| 306: 12  A.  There is no mention of a | | |
| 306: 13  prespecified cutoff point in this second | | |
| 306: 14  request for a data analysis plan for the | | |
| 306: 15  VIGOR cardiovascular data. | | |
| 306: 16          - - - | | |
| 306: 17          (Whereupon, Deposition | | |
| 306: 18      Exhibit Curfman-34, Letter | | |
| 306: 19      2-7-00, with attachments, | | |
| 306: 20      MRK-NJ0243715 - MRK-NJ0243718, | | |
| 306: 21      was marked for identification.) | | |
| 306: 22          - - - | | |
| 306: 23  BY MR. ARBITBLIT: | | |
| 306: 24  Q.  Now, Doctor, are you | | |
| 307: 1  familiar with the claim by the authors | | |

|  | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 307: 2  that there was a cutoff date of February |  |  |
| 307: 3  10 for cardiovascular events, February |  |  |
| 307: 4  10, 2000? |  |  |
| 307: 5  A.  I am now, yes. |  |  |
| 307: 6  Q.  Please take a look at |  |  |
| 307: 7  Exhibit 34, which is a letter from Alise |  |  |
| 307: 8  Reicin to Michael Weinblatt.  I take it |  |  |
| 307: 9  you haven't seen this one either; is that |  |  |
| 307: 10  correct? |  |  |
| 307: 11  A.  That's correct. |  |  |
| **308:1  -  309:13**  Curfman 01/24/2006 |  |  |
| 308: 11  Q.  Do you see that there's a |  |  |
| 308: 12  reference to a cutoff date for reporting |  |  |
| 308: 13  of these events to Merck will be February |  |  |
| 308: 14  10th? |  |  |
| 308: 15  A.  I do. |  |  |
| 308: 16  Q.  And do you consider that a |  |  |
| 308: 17  prespecified cutoff date? |  |  |
| 308: 18  A.  Well, let's just say that |  |  |
| 308: 19  the letter is dated February 7th, and the |  |  |
| 308: 20  cutoff date is designated February 10th, |  |  |
| 308: 21  and this is called prespecified?  Not |  |  |
| 308: 22  according to any definition of |  |  |
| 308: 23  prespecified that I've ever heard, which, |  |  |
| 308: 24  as I said earlier in testimony, involves |  |  |
| 309: 1  specifying the item in advance of the |  |  |
| 309: 2  beginning of the trial. |  |  |
| 309: 3       So, I haven't ever heard of |  |  |
| 309: 4  a definition of prespecified that would |  |  |
| 309: 5  come that late in the trial.  That's |  |  |
| 309: 6  three days shy of when they want to shut |  |  |
| 309: 7  down tabulation of the endpoints. |  |  |
| 309: 8  Q.  Underneath the heading, |  |  |
| 309: 9  "Timing & Logistics," do you see the |  |  |
| 309: 10  statement, "Any events which are reported |  |  |
| 309: 11  after February 10th will be adjudicated, |  |  |
| 309: 12  however they will not be included in the |  |  |
| 309: 13  initial analyses"? |  |  |
| **309:2  -  311:5**  Curfman 01/24/2006 |  |  |
| 309: 22  Q.  "Timing & Logistics.  A |  |  |
| 309: 23  cut-off date for reporting of these |  |  |
| 309: 24  events to Merck will be February 10th |  |  |

|  | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 310: 1 | (the Termination date for the study). | |
| 310: 2 | Our goal is to have final packages | |
| 310: 3 | retrieved from the sites by the time that | |
| 310: 4 | frozen file is achieved in late April. | |
| 310: 5 | It is likely that due to logistical | |
| 310: 6 | purposes, the adjudication of some of | |
| 310: 7 | these events will take place after | |
| 310: 8 | unblinding of the database has occurred; | |
| 310: 9 | however, all individuals involved in the | |
| 310: 10 | adjudication process will remain blinded | |
| 310: 11 | to individual patient treatment.  We will | |
| 310: 12 | do our best to ensure that events are | |
| 310: 13 | adjudicated and analyses are completed | |
| 310: 14 | prior to submission of VIGOR data to | |
| 310: 15 | regulatory agencies.  Any events which | |
| 310: 16 | are reported after February 10th will be | |
| 310: 17 | adjudicated, however, they will not be | |
| 310: 18 | included in the initial analyses." | |
| 310: 19 | Did I read that correctly? | |
| 310: 20 | A.  Yes. | |
| 310: 21 | Q.  Do you see any reference to | |
| 310: 22 | not including events reported after | |
| 310: 23 | February 10th in final analyses? | |
| 310: 24 | A.  No. | |
| 311: 1 | Q.  Now, do you see in the first | |
| 311: 2 | paragraph that the "Merck management has | |
| 311: 3 | again met to discuss the plans for | |
| 311: 4 | accelerating the adjudication and | |
| 311: 5 | analysis procedures"?  Do you see that? | |

| **311:2  -  313:7** | Curfman 01/24/2006 | |
|---|---|---|
| 311: 24 | Q.  "I want to share with you | |
| 312: 1 | Merck's plan for analyzing serious | |
| 312: 2 | thromboembolic & embolic cardiovascular | |
| 312: 3 | adverse experiences from the VIGOR study. | |
| 312: 4 | Subsequent to your conversation with Dr. | |
| 312: 5 | Shapiro on January 21, 2000, Merck | |
| 312: 6 | management has again met to discuss the | |
| 312: 7 | plans for accelerating the adjudication | |
| 312: 8 | and analysis procedures.  The plan that | |
| 312: 9 | was decided upon in these most recent | |
| 312: 10 | meetings should I believe address the | |
| 312: 11 | requests" that "you have made in your | |
| 312: 12 | letter to me dated January 24, 2000." | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 312: 13     Did I read that correctly? | | |
| 312: 14   A.  Yes. | | |
| 312: 15   Q.  As of February 7, 2000, | | |
| 312: 16   there had been no submission to the New | | |
| 312: 17   England Journal about the VIGOR study, | | |
| 312: 18   had there? | | |
| 312: 19   A.  No. | | |
| 312: 20   Q.  And certainly the New | | |
| 312: 21   England Journal had not asked Merck or | | |
| 312: 22   its employees to accelerate adjudication | | |
| 312: 23   and analysis, had it? | | |
| 312: 24   A.  No. | | |
| 313: 1   Q.  Now, if you look at the | | |
| 313: 2   attachment to the February 7th letter, | | |
| 313: 3   MRK-NJ0243717, there's a timeline there. | | |
| 313: 4   Do you see that at the top of the page, | | |
| 313: 5   "projected major VIGOR milestones are as | | |
| 313: 6   follows"? | | |
| 313: 7   A.  Yes. | | |

**313:1  -  313:22**          Curfman 01/24/2006

| | | |
|---|---|---|
| 313: 16   Q.  Do you see what the June | | |
| 313: 17   30th, 2000 culmination of the VIGOR | | |
| 313: 18   milestones is? | | |
| 313: 19   A.  "SNDA Filing." | | |
| 313: 20   Q.  Do you know what an sNDA is? | | |
| 313: 21   A.  It's a supplementary new | | |
| 313: 22   drug application. | | |

**316:1  -  317:19**          Curfman 01/24/2006

| | | |
|---|---|---|
| 316: 1   MR. BECK:  Yes.  This is | | |
| 316: 2   Bates Number ending 3717.  So, the | | |
| 316: 3   first page of the attachment, the | | |
| 316: 4   portion about midway down where it | | |
| 316: 5   says, "The following dates are in | | |
| 316: 6   effect: 2/10/00.  Cut-off date | | |
| 316: 7   for eligible events to be included | | |
| 316: 8   in the analysis.  Events for which | | |
| 316: 9   the WAES (Worldwide Adverse Event | | |
| 316: 10   Reporting System) Report has an | | |
| 316: 11   'initial report date' following | | |
| 316: 12   this date will be adjudicated, but | | |
| 316: 13   not included in the analysis. | | |
| 316: 14   Events reported by" February 10, | | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 316: 15   2000 "but for which the WAES | | |
| 316: 16   Report initially contains an SAE | | |
| 316: 17   term that is not eligible for | | |
| 316: 18   adjudication, and which is | | |
| 316: 19   subsequently revised after this | | |
| 316: 20   date to a term that is eligible | | |
| 316: 21   for adjudication, will be | | |
| 316: 22   adjudicated but not included in | | |
| 316: 23   the analysis." | | |
| 316: 24        MR. ARBITBLIT:  Are you | | |
| 317: 1   done? | | |
| 317: 2        MR. BECK:  Yes. | | |
| 317: 3   BY MR. ARBITBLIT: | | |
| 317: 4   Q.  Now, do you see, Dr. | | |
| 317: 5   Curfman, that the cutoff date from which | | |
| 317: 6   counsel just read is part of a document | | |
| 317: 7   bearing a date in the upper right-hand | | |
| 317: 8   corner of February 10, 2000? | | |
| 317: 9   A.  Yes. | | |
| 317: 10   Q.  Is February 10, 2000 the | | |
| 317: 11   same date that's created as a cutoff | | |
| 317: 12   date? | | |
| 317: 13   A.  That's correct. | | |
| 317: 14   Q.  Now, is a cutoff date that's | | |
| 317: 15   created on the termination date of the | | |
| 317: 16   study a prespecified cutoff date? | | |
| 317: 17   A.  Not according to any | | |
| 317: 18   definition of prespecified cutoff date | | |
| 317: 19   that I have ever seen. | | |
| **318:1  -  319:21**        Curfman 01/24/2006 | | |
| 318: 17   Q.  Doctor, in the Expression of | | |
| 318: 18   Concern, one of the points that you made | | |
| 318: 19   was that until November of 2005, you | | |
| 318: 20   believed that the three MIs were late | | |
| 318: 21   events that were not known to the authors | | |
| 318: 22   in time to be included in the article | | |
| 318: 23   published on November 23rd, 2000; | | |
| 318: 24   correct? | | |
| 319: 1   A.  Yes. | | |
| 319: 2   Q.  Can you please take a look | | |
| 319: 3   at the document marked as Exhibit 36, | | |
| 319: 4   which is a memorandum to Alise Reicin | | |
| 319: 5   from Linda Nelson dated May 26, 2000, | | |

| | | | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|---|---|
| | | 319: 6    "Subject:  Adjudication results for 11 | | |
| | | 319: 7    events after 2/10/2000."  Do you see this | | |
| | | 319: 8    document? | | |
| | | 319: 9    A.  Right. | | |
| | | 319: 10   Q.  If you could turn to the | | |
| | | 319: 11   second page, do you see that there are | | |
| | | 319: 12   three myocardial infarctions with the | | |
| | | 319: 13   report dates of February 22nd, 2000, | | |
| | | 319: 14   February 17, 2000 and February 16, 2000? | | |
| | | 319: 15   A.  Right. | | |
| | | 319: 16   Q.  At any time during the | | |
| | | 319: 17   review process for the VIGOR manuscript, | | |
| | | 319: 18   did Alise Reicin inform you that she knew | | |
| | | 319: 19   the confirmed status of the three MIs | | |
| | | 319: 20   reported after February 10, 2000 no later | | |
| | | 319: 21   than May 26, 2000? | | |
| **319:2** | **-** | **320:2**    Curfman 01/24/2006 | | |
| | | 319: 24      THE WITNESS:  None of the | | |
| | | 320: 1    authors informed the Journal about | | |
| | | 320: 2     the three myocardial infarctions. | | |
| **320:2** | **-** | **322:8**    Curfman 01/24/2006 | | |
| | | 320: 24   Q.  Doctor, what is Exhibit 37? | Def Obj:  Hearsay. | Overruled |
| | | 321: 1    A.  This is a series of three | Plaintiff is attempting to | as to 611; |
| | | 321: 2    e-mail messages involving our media | get inadmissible doc | non-responsive |
| | | 321: 3    specialist Karen Pedersen, myself and Dr. | in through the back door | objection |
| | | 321: 4    Drazen and some of the other editors.  It | by  having witness read a | |
| | | 321: 5    has to do with an editorial that was | large chunk of the email | |
| | | 321: 6    published in the Washington Post in early | into the record. | |
| | | 321: 7    January that Karen Pedersen brought to | This objection applies to | |
| | | 321: 8    our attention because she thought that it | pages 320:24-323:16 | |
| | | 321: 9    might contain some factual inaccuracies | | |
| | | 321: 10   and is asking us if we wanted to perhaps | | |
| | | 321: 11   respond in some way. | | |
| | | 321: 12   Q.  And did Ms. Pedersen send | | |
| | | 321: 13   you an e-mail suggesting four points that | | |
| | | 321: 14   you might make in response to the | | |
| | | 321: 15   editorial? | | |
| | | 321: 16   A.  Right. | | |
| | | 321: 17   Q.  Just to back up and identify | | |
| | | 321: 18   it for the record, it's dated January | | |
| | | 321: 19   3rd, 2006, NEJM 000280. | | |
| | | 321: 20      Doctor, did you respond to | | |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 321: 21   Ms. Pedersen's e-mail concerning point | | |
| 321: 22   number 2 which stated, "The 3 MIs are a | | |
| 321: 23   trivial amount of the total data | | |
| 321: 24   withheld"? | | |
| 322: 1   A.  Yes.  I think that she | | |
| 322: 2   wasn't correct about that, and I wanted | | |
| 322: 3   to give her some feedback about that so | | |
| 322: 4   we could correct that statement. | | |
| 322: 5   Q.  Could you read the first | | |
| 322: 6   paragraph, the e-mail that you sent to | | |
| 322: 7   Ms. Pedersen on January 3rd, 2006 into | | |
| 322: 8   the record, please? | | |
| **322:1  -  323:16**            Curfman 01/24/2006 | | |
| 322: 14   A.  "The only comment I have is | | |
| 322: 15   about # 2.  I would not characterize the | | |
| 322: 16   3 MIs as trivial exactly.  It is never | | |
| 322: 17   appropriate to withhold data, under any | | |
| 322: 18   circumstances, and we don't want to | | |
| 322: 19   appear as if we are endorsing that | | |
| 322: 20   practice.  It's just that they were | | |
| 322: 21   withheld" -- "that they withheld not only | | |
| 322: 22   3 MI's, but 9 tables and two figures of | | |
| 322: 23   additional data, all of which, in total, | | |
| 322: 24   painted a very ominous picture regarding | | |
| 323: 1   cardiovascular toxicity of Vioxx.  They | | |
| 323: 2   never revealed these data to the editors, | | |
| 323: 3   and therefore readers never saw them. | | |
| 323: 4   They were disclosed to FDA, but not | | |
| 323: 5   posted on the FDA website until 2001, | | |
| 323: 6   months after the New England Journal of | | |
| 323: 7   Medicine VIGOR article was published.  In | | |
| 323: 8   any case, the FDA Web site does not | | |
| 323: 9   constitute publication in the usual | | |
| 323: 10   sense; doctors don't read the FDA Web | | |
| 323: 11   site - they read journals.  The cardiac | | |
| 323: 12   toxicity data from VIGOR have never been | | |
| 323: 13   published in any medical journal.  The | | |
| 323: 14   company wanted to keep the Journal | | |
| 323: 15   article pristine for purposes of | | |
| 323: 16   marketing.  And it worked - for a while." | | |
| **325:6  -  325:7**            Curfman 01/24/2006 | | |
| 325: 6   MR. BECK:  I'm going to ask | Pltf Obj:  Sidebar | Overruled |

| | Objection/Response in Barnett | Ruling in Plunkett |
|---|---|---|
| 325: 7          one question, and if it's not | | |
| **325:1** - **326:17**          Curfman 01/24/2006 | | |
| 325: 19     Q.  My question, whether you | Pltf Obj:  Argumentative; | Overruled |
| 325: 20     choose to answer it or not, sir, is, you | Improper compound | |
| 325: 21     testified about various matters that you | question; Misstates | |
| 325: 22     said you could not understand concerning | testimony. | |
| 325: 23     the prespecified cutoff date and the | | |
| 325: 24     rationale for it.  Did you make any | | |
| 326: 1      effort to look at what the authors said | | |
| 326: 2      and their response to the Expression of | | |
| 326: 3      Concern to understand their reasoning for | | |
| 326: 4      using the prespecified cutoff date? | | |
| 326: 5      A.  Well, we will be looking | | |
| 326: 6      very carefully at their responses to that | | |
| 326: 7      question to see if we learn any new | | |
| 326: 8      information.  So far, as of today, we | | |
| 326: 9      haven't learned any new information.  But | | |
| 326: 10     we will be looking very, very carefully | | |
| 326: 11     at that crucial point to see what their | | |
| 326: 12     response is. | | |
| 326: 13     Q.  So, in terms of your | Pltf Obj:  Asked and | Overruled |
| 326: 14     testimony about what you cannot | answered. | |
| 326: 15     understand, you haven't tried to take | | |
| 326: 16     into account yet the responses of the | | |
| 326: 17     authors; is that right? | | |
| **326:2** - **326:23**          Curfman 01/24/2006 | | |
| 326: 22     THE WITNESS:  You said one | | |
| 326: 23          question. | | |

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

In re: VIOXX

**PRODUCTS LIABILITY LITIGATION**

**This document relates to**
**Case No. 06-0485**

**GERALD D. BARNETT**

Plaintiff,

v.

**MERCK & CO., INC.,**

Defendant.

MDL DOCKET NO. 1657

SECTION L

JUDGE FALLON

MAGISTRATE JUDGE KNOWLES

**Merck & Co., Inc.'s Notice of Filing Deposition**
**Testimony of Raymond Gilmartin**

**Exhibit D**

Merck hereby submits the following deposition testimony of Raymond Gilmartin for the Court's consideration and pre-trial rulings:

1.     Merck's Affirmative Designations with Plaintiff's Objections and Merck's Responses;

2.     Plaintiff's Counter-Designations with Merck's Objections

By June 20, 2006, Merck will submit a notebook for the Court with these designations and objections, as well as copies of the exhibits referenced herein.  Merck's Affirmative Designations appear in blue, while Plaintiff's Counter-Designations appear in red.

In the Plunkett case, the Court did not rule on Plaintiff's objections to Merck's Affirmative Designations for Mr. Gilmartin.  Therefore, Merck has included responses to each of Plaintiff's objections to Merck's designations of Mr. Gilmartin.



EXHIBIT
D

# Gerald Barnett v. Merck & Co., Inc.
## Deposition Designations of Raymond Gilmartin
### Defendant's Designations are in Blue.  Plaintiff's Designations are in Red

| | Objection/Response in Barnett |
|---|---|
| **17:21  -  17:23**     Gilmartin, Raymond 2005-03-24 | |
| 17: 21   Mr. Gilmartin, you started with the | |
| 17: 22   company in 1994; correct? | |
| 17: 23   A:  That's correct. | |
| **21:16  -  21:17**     Gilmartin, Raymond 2005-03-24 | |
| 21: 16   Q:  Let me just show you what I've marked | Def Obj:  Foundation, 602 |
| 21: 17   as Gilmartin Exhibit 1 -- | Also 401, 402, 403. |
| **22:1  -  22:14**     Gilmartin, Raymond 2005-03-24 | Information about sales |
| 22: 1   Q:  For the record, it's MRK-ABG0002902 | is irrelevant and |
| 22: 2   through 03, and when I do that, Mr. Gilmartin, you | prejudicial in |
| 22: 3   can ignore that. That's just to identify the | compensatory phase. |
| 22: 4   document for the stenographic record. | |
| 22: 5   A:  Okay. | |
| 22: 6   Q:  At the top it says, 'Key Messages.' | |
| 22: 7   A:  Right. | |
| 22: 8   Q:  Do you see where it says 'Vioxx' and | |
| 22: 9   then '2000 worldwide'? It says 'Gross Sales' -- | |
| 22: 10   A:  Right. | |
| 22: 11   Q:  -- in the billions? | |
| 22: 12   A:  Right. | |
| 22: 13   Q:  $2.2 billion; correct? | |
| 22: 14   A:  That's correct. | |
| **22:18  -  24:7**     Gilmartin, Raymond 2005-03-24 | |
| 22: 18   Q:  So, it would also be fair to | |
| 22: 19   characterize Vioxx at the time it came on the market | |
| 22: 20   as a critically important product for Merck; | |
| 22: 21   correct? | |
| 22: 22   A:  Yes. It was an important drug for | |
| 22: 23   us. | |
| 22: 24   Q:  At that time, also you had -- and | |
| 22: 25   when I say 'at that time,' let me try and nail down | |
| 23: 1   the time frame. In early 2000, 2000/2001, you had | |
| 23: 2   several products that were important to Merck going | |
| 23: 3   off patent; right? | |
| 23: 4   A:  Exactly. | |
| 23: 5   Q:  Mevacor was a very important product | |
| 23: 6   going off? | |

| | | **Objection/Response in Barnett** |
|---|---|---|
| 23: 7 | A: That's correct. | |
| 23: 8 | Q: That was also what we'd call a | |
| 23: 9 | blockbuster product; correct? | |
| 23: 10 | A: Yes. In excess of a billion dollars. | |
| 23: 11 | Q: In excess of a billion a year? | |
| 23: 12 | A: Right. | |
| 23: 13 | Q: Prilosec, that was another important | |
| 23: 14 | product that was going off patent? | |
| 23: 15 | A: That's correct. | |
| 23: 16 | Q: Just so the jury understands, because | |
| 23: 17 | things like patent I'm not sure everybody gets, but | |
| 23: 18 | that means that you were really losing the exclusive | |
| 23: 19 | rights to those drugs; right? | |
| 23: 20 | A: Exactly. | |
| 23: 21 | Q: Pepcid, another important product for | |
| 23: 22 | Merck going off patent? | |
| 23: 23 | A: Absolutely. Right. | |
| 23: 24 | Q: And Vasotec? | |
| 23: 25 | A: And Vasotec. | |
| 24: 1 | Q: And each and every one of these drugs | |
| 24: 2 | generated, if not a billion, close to a billion | |
| 24: 3 | dollars in revenue for Merck? | |
| 24: 4 | A: That's correct. | |
| 24: 5 | Q: All going off patent around the same | |
| 24: 6 | time frame, 2000, 2001, 2002; correct? | |
| 24: 7 | A: That's correct. | |

| 46:10 - 46:15 | Gilmartin, Raymond 2005-03-24 | |
|---|---|---|
| 46: 10 | Q: Sir, who is Dr. Scolnick? | |
| 46: 11 | A: Dr. Scolnick was our former head of | |
| 46: 12 | research. | |
| 46: 13 | Q: He was an important man at Merck | |
| 46: 14 | during the Vioxx years; correct? | |
| 46: 15 | A: That's right. | |

| 46:19 - 46:25 | Gilmartin, Raymond 2005-03-24 | |
|---|---|---|
| 46: 19 | Q: He was the top scientist in the | |
| 46: 20 | company? | |
| 46: 21 | A: He was the top scientist in the | |
| 46: 22 | company, exactly. | |
| 46: 23 | Q: And he reported directly to you; | |
| 46: 24 | correct? | |
| 46: 25 | A: Yes. He reported directly to me. | |

| 47:17 - 47:23 | Gilmartin, Raymond 2005-03-24 | |

|  | **Objection/Response in Barnett** |
|---|---|

| | |
|---|---|
| 47: 17   Q: Mr. Gilmartin, let me ask you to take | Def Obj: 602 - No |
| 47: 18   a look at what we've just marked as Gilmartin number | foundation - Mr. Gilmartin |
| 47: 19   2. For the record, it is MRK-ABH0015578. I'll also | is not on the e-mail, and |
| 47: 20   identify this for the record as an e-mail from Dr. | says he has never seen |
| 47: 21   Scolnick. Do you see that, Mr. Gilmartin, at the | the e-mail before. |
| 47: 22   top? | |
| 47: 23   A: Yes, I do. | |

**49:6   -   49:7**        Gilmartin, Raymond 2005-03-24

49: 6   Q: Could I just focus your attention on
49: 7   the second paragraph?

**49:21   -   50:22**        Gilmartin, Raymond 2005-03-24

49: 21   Q: Second paragraph where it says, 'On a
49: 22   plane yesterday.' Do you see where I'm reading?
49: 23   A: Yes.
49: 24   Q: I'm going to read a little more than
49: 25   I need to. I'm really focusing more on the second
50: 1   part of this paragraph, but I'll read the whole
50: 2   thing just for context. He's telling David Blois
50: 3   and Bonnie Goldmann: 'I read an article about 10
50: 4   top sports dynasties of all time. Number one was
50: 5   listed as Boston Celtics when Bill Russell was
50: 6   Center. In the article it noted the following: 14
50: 7   times in his career his team went into the playoff
50: 8   series into game 7. All on the line game 7. Win or
50: 9   lose! 14 times they won! I could not help but
50: 10   think about the number 14-14 products YOU have
50: 11   registered since 1995.' Then this part I'd like to
50: 12   focus you on. 'No one will remember any of those if
50: 13   Vioxx label comes out as it is now or is late
50: 14   because we cannot agree with them by May 22nd. And
50: 15   Merck WILL become a completely different company.'
50: 16   Did I read that correctly?
50: 17   A: Yes, you did.
50: 18   Q: So, Dr. Scolnick never shared his
50: 19   views with you that he believed that if the Vioxx
50: 20   label wasn't as you needed it and the product wasn't
50: 21   launched when you needed it to, that Merck would
50: 22   become a completely different company?

**51:14   -   51:20**        Gilmartin, Raymond 2005-03-24

51: 14   THE WITNESS: Well, I guess the first
51: 15   thing I would answer is that I hadn't seen this
51: 16   e-mail before.

| | | **Objection/Response in Barnett** |
|---|---|---|
| | 51: 17   BY MR. SEEGER:   : | |
| | 51: 18   Q:  But he hasn't shared those views with | |
| | 51: 19   you? | |
| | 51: 20   A:  No, not in this sense. | |
| **52:14** - **52:25** | Gilmartin, Raymond 2005-03-24 | |
| | 52: 14   Q:  I just marked this as Gilmartin-3. | |
| | 52: 15   I'm sorry. I'm not intentionally falling short | |
| | 52: 16   there. I'm just having a hard time getting it all | |
| | 52: 17   the way to you. | |
| | 52: 18   For the record I'll identify this as | Def Obj:  801, 802 - |
| | 52: 19   MRK-ACW0000498 through 503. | Wall Street Journal |
| | 52: 20   A:  Right. | article is hearsay, and it |
| | 52: 21   Q:  You recognize this document, don't | is being read into the |
| | 52: 22   you, sir? | record and discussed. |
| | 52: 23   A:  This is a Wall Street Journal article | |
| | 52: 24   of some time ago. I'm not exactly sure of the date | |
| | 52: 25   of it. | |
| **58:11** - **58:16** | Gilmartin, Raymond 2005-03-24 | |
| | 58: 11   Q:  Sir, on the following page, it talks | |
| | 58: 12   about how when you came to Merck, you took a step | |
| | 58: 13   that maybe 30, 40 years ago in Merck would have been | |
| | 58: 14   a little controversial. You brought marketing and | |
| | 58: 15   science together. Do you see where it says that at | |
| | 58: 16   the top of the article? | |
| **59:9** - **60:1** | Gilmartin, Raymond 2005-03-24 | |
| | 59: 9   Q:  It's the second paragraph from the | |
| | 59: 10   top. | |
| | 59: 11   A:  What I'm reading in the second | |
| | 59: 12   paragraph is that 'For decades, Merck's marketers | |
| | 59: 13   hadn't been allowed near scientific-planning | |
| | 59: 14   meetings. Mr. Gilmartin's predecessor, P. Roy | |
| | 59: 15   Vagelos, started to change this, persuading | |
| | 59: 16   scientists to accept marketers in their midst by | |
| | 59: 17   promising,' and then it goes on. | |
| | 59: 18   Q:  Could you read the rest of the | |
| | 59: 19   sentence? | |
| | 59: 20   A:  Sure. 'By promising that they | |
| | 59: 21   wouldn't speak. Then, speaking was allowed but not | |
| | 59: 22   encouraged. Under Mr. Gilmartin, however, the | |
| | 59: 23   marketers have become deeply involved in many of the | |
| | 59: 24   scientists' development decisions, though they still | |
| | 59: 25   have no involvement in early-stage research issues.' | |

| | | | Objection/Response in Barnett |
|---|---|---|---|
| | 60: 1 | So, what I did is -- | |
| **60:4** - **60:8** | | Gilmartin, Raymond 2005-03-24 | |
| | 60: 4 | My question, though, is, does that | |
| | 60: 5 | accurately reflect changes you made in Merck since | |
| | 60: 6 | 1994? | |
| | 60: 7 | A:  That accurately reflects changes that | |
| | 60: 8 | I made since 1994. | |
| **63:19** - **63:20** | | Gilmartin, Raymond 2005-03-24 | |
| | 63: 19 | Q:  Mr. Gilmartin, let me show you what I | |
| | 63: 20 | have now marked as Gilmartin-4. | |
| **64:3** - **64:8** | | Gilmartin, Raymond 2005-03-24 | |
| | 64: 3 | Q:  Could you just tell us who David | |
| | 64: 4 | Anstice is? | |
| | 64: 5 | A:  David Anstice is on my management | |
| | 64: 6 | committee, reporting to me, and is responsible for | |
| | 64: 7 | one of our major regions in marketing and sales at | |
| | 64: 8 | this point. | |
| **65:7** - **65:12** | | Gilmartin, Raymond 2005-03-24 | |
| | 65: 7 | Q:  When you say 'region,' in the United | |
| | 65: 8 | States I'm focusing on just now, who was the top | |
| | 65: 9 | marketing person for Merck in the United States? | |
| | 65: 10 | A:  Yes. In the United States, David | |
| | 65: 11 | Anstice was the head of that whole area and, | |
| | 65: 12 | therefore, the top marketing sales executive. | |
| **66:24** - **67:8** | | Gilmartin, Raymond 2005-03-24 | |
| | 66: 24 | Q:  Mr. Anstice tells these marketing | Def Obj: 602 - Mr. |
| | 66: 25 | people, I'll quote from his e-mail: 'Battle is now | Gilmartin never saw this |
| | 67: 1 | joined with Pfizer in another major therapeutic area | e-mail before, he has no |
| | 67: 2 | and one which is CRITICAL...from 2000 onwards.' Did | personal knowledge. |
| | 67: 3 | I read that correctly? | |
| | 67: 4 | A:  That's correct. | |
| | 67: 5 | Q:  He says to his marketing people: 'We | |
| | 67: 6 | should assume Pfizer will promote Celebra | |
| | 67: 7 | everywhere.' And that's really Celebrex; correct? | |
| | 67: 8 | A:  That's correct. | |
| **79:1** - **79:3** | | Gilmartin, Raymond 2005-03-24 | |
| | 79: 1 | Q:  Now, we talked a little bit about the | Def Obj:  401, 402, 403 |
| | 79: 2 | importance of Vioxx to Merck earlier; correct? | Irrelevant and prejudicial, |
| | 79: 3 | A:  That's correct. | especially in compensatory |
| **79:20** - **80:1** | | Gilmartin, Raymond 2005-03-24 | phase. |
| | 79: 20 | finances. You personally stood to gain if Vioxx was | |

| | **Objection/Response in Barnett** |
|---|---|
| 79: 21   a big blockbuster and a success for Merck, didn't | |
| 79: 22   you? | |
| 79: 23   A:  Yes. But also stood to gain if the | |
| 79: 24   company as a whole did well -- | |
| 79: 25   Q:  Right. | |
| 80: 1   A: -- not just around Vioxx. | |

| **82:17   -   83:8**      Gilmartin, Raymond 2005-03-24 | |
|---|---|
| 82: 17   Your salary as we sit here today is | Def Obj:  401, 402, 403 |
| 82: 18   what? | Irrelevant and prejudicial, |
| 82: 19   A:  About a million-and-a-half dollars a | especially in compensa- |
| 82: 20   year. | tory phase. |
| 82: 21   Q:  $1.5 million; correct? | |
| 82: 22   A:  Right. | |
| 82: 23   Q:  Since 1995 you've earned at least a | |
| 82: 24   million or more in just salary; correct? | |
| 82: 25   A: That's correct. | |
| 83: 1   Q:  You've received pretty significant | |
| 83: 2   bonuses also as the CEO of Merck; correct? | |
| 83: 3   A:  That's correct. | |
| 83: 4   Q:  In fact, last year -- I mean this | |
| 83: 5   year -- no, I'm sorry. Let me go back. 2004 you | |
| 83: 6   received a bonus of what? | |
| 83: 7   A:  About a million and-a-half dollars | |
| 83: 8   also. | |

| **83:11   -   83:14**      Gilmartin, Raymond 2005-03-24 | |
|---|---|
| 83: 11   Q:  Each and every year that you've been | |
| 83: 12   with the company you've received stock options; | |
| 83: 13   correct? | |
| 83: 14   A:  That's correct. | |

| **83:20   -   83:24**      Gilmartin, Raymond 2005-03-24 | |
|---|---|
| 83: 20   You get options as part of your | |
| 83: 21   compensation that entitles you to buy the stock of | |
| 83: 22   Merck or convert those options into Merck stock; | |
| 83: 23   correct? | |
| 83: 24   A:  That's correct. | |

| **90:16   -   90:25**      Gilmartin, Raymond 2005-03-24 | |
|---|---|
| 90: 16   Q:  You actually sold stock -- you sold a | |
| 90: 17   lot of stock in February of 2004, didn't you? | |
| 90: 18   A:  Well, to be precise, I exercised an | |
| 90: 19   option that I received when I joined the company in | |
| 90: 20   1994. It was due to expire in February of 2004, so, | |
| 90: 21   I exercised that option and then converted that into | |

**Objection/Response in Barnett**

| | |
|---|---|
| 90: 22    stock that I held on to. So, I sold enough stock to | |
| 90: 23    cover the cost of the option and the taxes, and then | |
| 90: 24    retained the rest of the value in terms of Merck | |
| 90: 25    stock. | |
| **91:21 - 92:1**      Gilmartin, Raymond 2005-03-24 | |
| 91: 21    Q: How much cash did you realize out of | |
| 91: 22    this transaction that you did in February of 2004? | |
| 91: 23    A: Actually, in terms of cash, really | |
| 91: 24    not anything of any material amount. It was really | |
| 91: 25    -- what I realized out of the transaction was a | |
| 92: 1    bigger position in Merck stock. | |
| **94:14 - 94:17**      Gilmartin, Raymond 2005-03-24 | |
| 94: 14    Q: So, you were left with how much stock | |
| 94: 15    in Merck at that point after that transaction? | |
| 94: 16    A: Well, it would be in the vicinity of | |
| 94: 17    $15 or $18 million as well. | |
| **94:21 - 94:23**      Gilmartin, Raymond 2005-03-24 | |
| 94: 21    Q: So, that stock now goes into your | |
| 94: 22    account, and you own that stock at that point? | |
| 94: 23    A: That's correct. | |
| **97:3 - 97:8**      Gilmartin, Raymond 2005-03-24 | |
| 97: 3    Q: And you're also aware at this time | |
| 97: 4    with regard to Vioxx that there were a number of | |
| 97: 5    observational studies that were highly critical of | |
| 97: 6    the drug; correct? | |
| 97: 7    A: That's correct. There were | |
| 97: 8    observational studies. | |
| **109:24 - 110:21**      Gilmartin, Raymond 2005-03-24 | |
| 109: 24    Q: Now, there is one observational study | |
| 109: 25    that you should be familiar with because it was paid | |
| 110: 1    for my Merck that I want to ask you about. It was | |
| 110: 2    one that was done by some scientists at Harvard, led | |
| 110: 3    up by Dr. Dan Solomon. You're aware of that study; | |
| 110: 4    correct? | |
| 110: 5    A: Yes, I am. | |
| 110: 6    Q: You knew that this study which Merck | |
| 110: 7    paid for, paid, you know, I believe, hundreds of | |
| 110: 8    thousands of dollars, there's testimony, to do this | |
| 110: 9    study, you're aware that that came out against | |
| 110: 10    Vioxx; correct? | |
| 110: 11    A: I'm aware that came out against | |

| | | | Objection/Response in Barnett |
|---|---|---|---|
| | 110: 12 | Vioxx, correct. | |
| | 110: 13 | Q:  You were aware of that actually right | Def Obj:  401, 402, 403 |
| | 110: 14 | before the time you actually sold this stock in | Irrelevant and prejudicial, |
| | 110: 15 | February of 2004, weren't you? | especially in |
| | 110: 16 | A:  I'm not sure that I was. It may have | compensatory phase. |
| | 110: 17 | been out in the public, but I'm not sure about that. | |
| | 110: 18 | Q:  I mean, you knew it was a big deal in | |
| | 110: 19 | the company because you had a doctor who | |
| | 110: 20 | participated in that study by the name of Dr. | |
| | 110: 21 | Cannuscio. You know that; right? | |
| **110:24  -  111:6** | | Gilmartin, Raymond 2005-03-24 | |
| | 110: 24 | THE WITNESS:  There was a Merck | |
| | 110: 25 | scientist that did participate in that study. | |
| | 111: 1 | BY MR. SEEGER:   : | |
| | 111: 2 | Q:  And the results of this study come in | |
| | 111: 3 | sometime around the second half of 2003, at least to | |
| | 111: 4 | Merck they come in, and Merck had some serious | |
| | 111: 5 | concerns about that study being published, didn't | |
| | 111: 6 | they? | |
| **111:8  -  111:21** | | Gilmartin, Raymond 2005-03-24 | |
| | 111: 8 | THE WITNESS:  They did not have any | |
| | 111: 9 | serious concerns about that study being published. | |
| | 111: 10 | The concerns were about some of the analyses and the | |
| | 111: 11 | conclusions drawn in that study. | |
| | 111: 12 | BY MR. SEEGER:   : | |
| | 111: 13 | Q:  Well, the study that you don't have | |
| | 111: 14 | any concerns about, you had a scientist that worked | |
| | 111: 15 | on it and you took her name off that study, didn't | |
| | 111: 16 | you? | |
| | 111: 17 | A:  Yes, we did. | |
| | 111: 18 | Q:  And you took her name off that study | |
| | 111: 19 | because you didn't want Merck's name being on a | |
| | 111: 20 | study that was actually going to come out negative | |
| | 111: 21 | against your product; correct? | |
| **112:13  -  112:19** | | Gilmartin, Raymond 2005-03-24 | |
| | 112: 13 | THE WITNESS:  No. That's not | |
| | 112: 14 | correct. We -- as a company, we withdrew our | |
| | 112: 15 | scientist's name from it because there were analyses | |
| | 112: 16 | in that study that we did not agree with. | |
| | 112: 17 | But at the same time, we completely | |
| | 112: 18 | supported the publishing of that study. No way did | |
| | 112: 19 | we prevent that at all. | |

8

**Objection/Response in Barnett**

| | |
|---|---|
| **114:6** - **114:8**      Gilmartin, Raymond 2005-03-24 | |
| 114: 6    Q: Now, you know who Dr. Cannuscio is, | |
| 114: 7    correct, Mr. Gilmartin? | |
| 114: 8    A: Yes, I do. | |

| | |
|---|---|
| **114:15** - **114:17**     Gilmartin, Raymond 2005-03-24 | |
| 114: 15    Q: Are you aware that she testified that | Def Obj: 801, 802 |
| 114: 16    she had no idea her name was taken off that study? | |
| 114: 17    A: I'm not aware of that. | |

| | |
|---|---|
| **115:9** - **115:13**     Gilmartin, Raymond 2005-03-24 | |
| 115: 9    Q: Now, these scientists that you found | |
| 115: 10    to do the study at Harvard, these are all very | |
| 115: 11    highly respectable scientists; correct? | |
| 115: 12    A: These are well-known scientists, | |
| 115: 13    that's correct. | |

| | |
|---|---|
| **117:11** - **117:21**     Gilmartin, Raymond 2005-03-24 | |
| 117: 11    Q: When you learned about the study | |
| 117: 12    results in the Solomon study, the Harvard study, did | |
| 117: 13    you contact Dr. Solomon or Dr. Avorn to discuss the | |
| 117: 14    results with them? | |
| 117: 15    A: No, I did not. | |
| 117: 16    Q: Did you personally call anybody into | |
| 117: 17    your office to discuss the results, anybody at | |
| 117: 18    Merck, to discuss the results of that study? | |
| 117: 19    A: No, I did not. | |
| 117: 20    Q: But you were aware of it; correct? | |
| 117: 21    A: Yes, I was aware of it. | |

| | |
|---|---|
| **123:1** - **123:7**     Gilmartin, Raymond 2005-03-24 | |
| 123: 1    You're aware that in the VIGOR study, | |
| 123: 2    the difference between cardiovascular events between | |
| 123: 3    naproxen and Vioxx were seen within a matter of two | |
| 123: 4    or three months. You know that; right? | |
| 123: 5    A: I'm not sure. Yes. Probably that is | |
| 123: 6    the case. But I have not looked at the data | |
| 123: 7    recently. I can't confirm exactly how many months. | |

| | |
|---|---|
| **136:8** - **136:18**     Gilmartin, Raymond 2005-03-24 | |
| 136: 8    Q: Now, Mr. Gilmartin, you'd agree with | |
| 136: 9    this statement, right, that you have a duty to be | |
| 136: 10    honest with the medical doctors who prescribe your | |
| 136: 11    drugs? | |
| 136: 12    A: Yes, absolutely. | |
| 136: 13    Q: And you had a duty to be open and | |

**Objection/Response in Barnett**

| | |
|---|---|
| 136: 14 | honest regarding Vioxx; didn't you? |
| 136: 15 | A:  That's correct. |
| 136: 16 | Q:  You have a duty to be open and honest |
| 136: 17 | with the FDA; correct? |
| 136: 18 | A:  Absolutely. |

**139:4  -  139:7**         Gilmartin, Raymond 2005-03-24

| | |
|---|---|
| 139: 4 | When you talk about being open and |
| 139: 5 | honest, you mean it's also as bad not just -- it's |
| 139: 6 | as bad to make a misrepresentation of a fact as it |
| 139: 7 | is to leave an important fact out; correct? |

**139:9  -  139:17**         Gilmartin, Raymond 2005-03-24

| | |
|---|---|
| 139: 9 | THE WITNESS:  It's very important in |
| 139: 10 | communicating the benefits of our drug that we also |
| 139: 11 | talk about the side effects as well, because we're |
| 139: 12 | talking about safety and effectiveness at all times. |
| 139: 13 | BY MR. SEEGER:    : |
| 139: 14 | Q:  And leaving out important |
| 139: 15 | information, an omission, is as important as |
| 139: 16 | misrepresenting important information; correct? |
| 139: 17 | A:  That's correct. |

**169:1  -  169:14**         Gilmartin, Raymond 2005-03-24

| | |
|---|---|
| 169: 1 | Well, let me ask you, I understand |
| 169: 2 | you are not a scientist, sir, but you are the head |
| 169: 3 | of a big pharmaceutical company. You know that |
| 169: 4 | people who are obese are at risk for heart disease; |
| 169: 5 | correct? You can accept that, can't you? |
| 169: 6 | A:  Yes, I can. |
| 169: 7 | Q:  You know that people who smoke |
| 169: 8 | chronically are at increased risk for heart disease? |
| 169: 9 | You accept that; right? |
| 169: 10 | A:  Yes, I can. |
| 169: 11 | Q:  People who are diabetics have |
| 169: 12 | increased risk for heart disease. You agree with |
| 169: 13 | that; right? |
| 169: 14 | A:  That's correct. |

**170:11  -  170:20**         Gilmartin, Raymond 2005-03-24

| | |
|---|---|
| 170: 11 | Q:  You have got to tell doctors about |
| 170: 12 | the risks that are associated with your drug; right? |
| 170: 13 | A:  Yes. Absolutely. In fact, we intend |
| 170: 14 | to tell doctors about the risks. It's not only you |
| 170: 15 | have to. |
| 170: 16 | Q:  So, if it goes back on the market, |

Def Obj:  401, 402, 403

| | Objection/Response in Barnett |
|---|---|
| 170: 17   you, Raymond Gilmartin, CEO of Merck, you're going | Irrelevant and unfairly pre- |
| 170: 18   to make sure that doctors understand the | judicial.  Also speculative and |
| 170: 19   cardiovascular risks of Vioxx; correct? | hypothetical. |
| 170: 20   A:  That's correct. | |

**176:17   -   176:25**        Gilmartin, Raymond 2005-03-24

176: 17   Before you acknowledge that a drug
176: 18   causes a side effect, you don't need in the
176: 19   development stage conclusive evidence? You could
176: 20   have a signal; correct?
176: 21   A:  We could have a signal, yes.
176: 22   Q:  In fact, a signal in the
176: 23   pharmaceutical industry means something. It means
176: 24   maybe not a side effect, but we see something going
176: 25   on with the drug with regard to safety; correct?

**177:2   -   177:7**        Gilmartin, Raymond 2005-03-24

177: 2   THE WITNESS:  Well, to be precise on
177: 3   this, is that in terms of really seeing whether or
177: 4   not there's a side effect or even if there's a
177: 5   benefit to the drug, you have to really be able to
177: 6   prove it, and so that effect isn't just simply due
177: 7   to chance.

**177:20   -   177:24**        Gilmartin, Raymond 2005-03-24

177: 20   Q:  Right. And if there's a safety
177: 21   problem early in development, you have a duty and an
177: 22   obligation to research it and to determine what that
177: 23   safety problem is; correct?
177: 24   A:  Absolutely.

**178:3   -   178:11**        Gilmartin, Raymond 2005-03-24

178: 3   Q:  When we're talking about signals, is
178: 4   it fair to say that one of the reasons that even
178: 5   small signals in clinical trials are important is
178: 6   because when you do a clinical trial at Merck, you
178: 7   take generally healthy people to test the drug in;
178: 8   correct?
178: 9   A:  When we're talking generally healthy
178: 10   people, that's in the first phase of testing the
178: 11   drug, yes.

**179:21   -   179:25**        Gilmartin, Raymond 2005-03-24

179: 21   Q:  The largest trial that you have to
179: 22   date, the largest single clinical trial is the VIGOR
179: 23   trial; correct? 8,000 people?

| | Objection/Response in Barnett |
|---|---|
| 179: 24   A: I'm not sure about the thing, but | |
| 179: 25   that is a large clinical trial. | |

**183:13 - 183:15**     Gilmartin, Raymond 2005-03-24

| | |
|---|---|
| 183: 13   The fact is, you excluded people who | |
| 183: 14   had significant, were at significant risk for | |
| 183: 15   cardiovascular disease in the VIGOR trial; correct? | |

**183:18 - 183:19**     Gilmartin, Raymond 2005-03-24

| | |
|---|---|
| 183: 18   THE WITNESS: What I said is we | |
| 183: 19   excluded people that had cardiovascular disease. | |

**183:21 - 183:24**     Gilmartin, Raymond 2005-03-24

| | |
|---|---|
| 183: 21   Q: And people who were taking aspirin | |
| 183: 22   prophylactically, you excluded them as well? | |
| 183: 23   A: It was people with cardiovascular | |
| 183: 24   disease that were also taking aspirin. | |

**187:24 - 188:18**     Gilmartin, Raymond 2005-03-24

| | |
|---|---|
| 187: 24   So, on this group that we've just | Def Obj: Calls for |
| 187: 25   agreed on, people who have cardiovascular disease | speculation, no |
| 188: 1   and are on low-dose aspirin, that would also include | foundation laid. |
| 188: 2   people who are obese; correct? | |
| 188: 3   A: I'm not sure -- it could, but I would | |
| 188: 4   only speculate on that. | |
| 188: 5   Q: Also, people who smoke would be | |
| 188: 6   people who have cardiovascular disease and are on | |
| 188: 7   low-dose aspirin; correct? | |
| 188: 8   A: It's possible. | |
| 188: 9   Q: People with diabetes who are at risk | |
| 188: 10   for heart disease and who are on low-dose aspirin, | |
| 188: 11   they wouldn't be in the VIGOR trial; correct? | |
| 188: 12   A: The way you said that, the | |
| 188: 13   distinction I would make is that in your question, | |
| 188: 14   you said 'at risk.' | |
| 188: 15   Q: Diabetics who have cardiovascular | |
| 188: 16   disease and are on low-dose aspirin would not have | |
| 188: 17   been in the VIGOR trial? | |
| 188: 18   A: That's correct. | |

**189:2 - 189:7**     Gilmartin, Raymond 2005-03-24

| | |
|---|---|
| 189: 2   Q: When the drug was marketed and sold | Def Obj. Incomplete; |
| 189: 3   to 21 million people, there's nothing in the label | must include 189:9-190: |
| 189: 4   that said if you have cardiovascular disease and | 22 for completeness. |
| 189: 5   you're on low-dose aspirin, do not take Vioxx? | |
| 189: 6   A: No, it did not say that in the | |

| | **Objection/Response in Barnett** |
|---|---|
| 189: 7    initial label -- | |

**191:2  -  191:5**        Gilmartin, Raymond 2005-03-24

191: 2    The truth is, before you marketed the drug in 1999,
191: 3    you knew that Vioxx had at least the potential to
191: 4    cause cardiovascular problems; didn't you?
191: 5    A:  There was a hypothesis.

**191:23  -  192:1**        Gilmartin, Raymond 2005-03-24

191: 23    Q:  In fact, you saw that hypothesis came
191: 24    out of testing that you did early; correct?
191: 25    I'll show you what I have just marked
192: 1    as Gilmartin Exhibit 8.

**192:4  -  192:21**        Gilmartin, Raymond 2005-03-24

| | |
|---|---|
| 192: 4    Do you see at the top of this | Def Obj:  602 - No |
| 192: 5    document, Mr. Gilmartin, it says, 'Merck Research | foundation.  Witness name |
| 192: 6    Laboratories' on the first page? | not on the document, no |
| 192: 7    A:  That's correct. | evidence he ever saw it. |
| 192: 8    Q:  It's dated September 12, 1996; right? | |
| 192: 9    A:  Right. | |
| 192: 10    Q:  And it's to the Project Team Members; | |
| 192: 11    correct? | |
| 192: 12    A:  That's correct. | |
| 192: 13    Q:  And MK-966 means Vioxx; doesn't it? | |
| 192: 14    A:  That's correct. | |
| 192: 15    Q:  Could you just turn to Page 6? It's | |
| 192: 16    E. Under where it says 'Rheumatoid Arthritis | |
| 192: 17    Studies,' do you see where it says at the top: | |
| 192: 18    'Another SAE'? SAE means serious adverse event; | |
| 192: 19    right? | |
| 192: 20    A:  Yes. I'm just trying to find my | |
| 192: 21    place on the document. | |

**192:25  -  193:6**        Gilmartin, Raymond 2005-03-24

192: 25    Q:  And the words there are 'Another SAE
193: 1    of unstable angina was reported in extension RA
193: 2    study.' I know there's some handwriting here so I'm
193: 3    trying to read through that.
193: 4    Next sentence says: 'Vascular AEs,'
193: 5    adverse events, when 'COX-1 is not inhibited.' Did
193: 6    I read that correctly?

**193:12  -  193:14**        Gilmartin, Raymond 2005-03-24

193: 12    Q:  'Vascular AEs are expected since'
193: 13    'since' -- thanks, I like that correction -- 'COX-1

13

| | **Objection/Response in Barnett** |
|---|---|
| 193: 14    is not inhibited.' | |

**193:18   -   193:20**          Gilmartin, Raymond 2005-03-24

| | |
|---|---|
| 193: 18    Q: I read that correctly, now, right, | |
| 193: 19    Mr. Gilmartin? | |
| 193: 20    A: Yes. | |

**195:1   -   196:2**          Gilmartin, Raymond 2005-03-24

| | |
|---|---|
| 195: 1    Q: Take a look at what I've just marked | Def Obj:  602- No |
| 195: 2    as 9. That's MRK-ABC0048699 through 4706. | foundation.  No evidence |
| 195: 3    At the top of this on the first page | witness ever saw the |
| 195: 4    it says 'Research Management Committee NO. 96-10,' | document. |
| 195: 5    and it says 'Blue Bell.' Under that it says | |
| 195: 6    'Thursday, October 10, 1996.' | |
| 195: 7    If you go to the last page, this is a | |
| 195: 8    1996 document, and it says 'MK-966 Update.' That's | |
| 195: 9    Vioxx update; correct? | |
| 195: 10    A: That's correct. | |
| 195: 11    Q: And do you see in the first paragraph | |
| 195: 12    it's talking about a clinical trial protocol, and | |
| 195: 13    it's 017? | |
| 195: 14    A: Right. | |
| 195: 15    Q: In the next paragraph it says, | |
| 195: 16    'Adverse events of most concern were in the | |
| 195: 17    cardiovascular system,' and then 'e.g.,' for | |
| 195: 18    example, 'MI,' which is myocardial infarction; | |
| 195: 19    right? | |
| 195: 20    A: Right. | |
| 195: 21    Q: 'Unstable angina, rapid fall in | |
| 195: 22    hemoglobin and hematocrit in some subjects, and a | |
| 195: 23    small increase in blood pressure).'  And then it | |
| 195: 24    says, 'We plan to evaluate MK-966,' Vioxx, 'in a | |
| 195: 25    study where subjects are also given low dose | |
| 196: 1    aspirin.' Did I read that correctly? | |
| 196: 2    A: Yes, you did. | |

**197:16   -   197:20**          Gilmartin, Raymond 2005-03-24

| | |
|---|---|
| 197: 16    Simply put, the hypothesis was | |
| 197: 17    commonly referred to as the prostacyclin hypothesis; | |
| 197: 18    correct? | |
| 197: 19    A: That's correct. That's the agent | |
| 197: 20    involved. | |

**198:4   -   198:10**          Gilmartin, Raymond 2005-03-24

| | |
|---|---|
| 198: 4    Q: Let me ask you this. The concern in | Def Obj:  Incomplete |
| 198: 5    the hypothesis is that if you suppress the COX-2 | without 198:11-13. |

| | Objection/Response in Barnett |
|---|---|
| 198: 6    enzyme that produces prostacyclin without any | |
| 198: 7    suppression of the COX-1 enzyme that produces | |
| 198: 8    thromboxane, you'd have too much thromboxane in | |
| 198: 9    system which could cause sticky platelets; correct? | |
| 198: 10    A:  That's the hypothesis. | |
| **198:14**  -  **198:18**        Gilmartin, Raymond 2005-03-24 | |
| 198: 14    Q:  So, you know this hypothesis is | |
| 198: 15    actively being discussed within Merck at this time, | |
| 198: 16    '96 through '98; correct? | |
| 198: 17    A:  I'm not sure exact time frame, but | |
| 198: 18    around '97/'98 is my understanding. | |
| **201:17**  -  **201:23**        Gilmartin, Raymond 2005-03-24 | |
| 201: 17    Q:  Are you aware of a study that was | |
| 201: 18    done by Merck which is referred to as protocol 023? | |
| 201: 19    A:  Not by that -- no. | |
| 201: 20    Q:  I'll tell you, it was a study that | |
| 201: 21    was done with the involvement of Dr. FitzGerald. Do | |
| 201: 22    you know who Dr. FitzGerald is? | |
| 201: 23    A:  Yes, I do. | |
| **202:3**  -  **202:12**        Gilmartin, Raymond 2005-03-24 | |
| 202: 3    Q:  Dr. FitzGerald is a respected member | |
| 202: 4    of the scientific community. Isn't that fair to | |
| 202: 5    say? | |
| 202: 6    A:  That's correct. | |
| 202: 7    Q:  He's somebody that Merck relies upon | |
| 202: 8    often; correct? | |
| 202: 9    A:  Yes. Exactly. | |
| 202: 10    Q:  He's actually been a paid consultant | |
| 202: 11    to Merck for a number of years? | |
| 202: 12    A:  That's correct. | |
| **202:21**  -  **203:1**        Gilmartin, Raymond 2005-03-24 | |
| 202: 21    Q:  Now, you're aware that Dr. Nies and | Def Obj:  602 - No |
| 202: 22    Dr. Morrison were told by Dr. FitzGerald in October | foundation or personal |
| 202: 23    of 1997 that they needed to do special testing to | knowledge.  801, 802 - |
| 202: 24    discover whether there was anything behind this | hearsay. |
| 202: 25    prostacyclin hypothesis. You are aware of that; | |
| 203: 1    correct? | |
| **203:4**  -  **203:5**        Gilmartin, Raymond 2005-03-24 | |
| 203: 4    THE WITNESS:  No, I'm not aware of | |
| 203: 5    that specific conversation. | |
| **207:21**  -  **207:24**        Gilmartin, Raymond 2005-03-24 | |

| | | | **Objection/Response in Barnett** |
|---|---|---|---|
| | 207: 21 | Q:  Are you aware that both Dr. Morrison | Def Obj:  602 - No |
| | 207: 22 | and Dr. Nies have testified that these tests that | foundation or personal |
| | 207: 23 | were recommended by Dr. FitzGerald were never | knowledge.  801, 802 |
| | 207: 24 | implemented in your clinical trial program? | hearsay. |
| **208:1** - **208:2** | | Gilmartin, Raymond 2005-03-24 | |
| | 208: 1 | THE WITNESS:  Yes.  I'm not aware of | |
| | 208: 2 | their testimony. | |
| **208:4** - **208:9** | | Gilmartin, Raymond 2005-03-24 | |
| | 208: 4 | Q:  Well, are you aware that Dr. | |
| | 208: 5 | FitzGerald -- well, no, let me ask you this.  Has | |
| | 208: 6 | anybody in Merck come to you and said we | |
| | 208: 7 | these testing protocols that were recommended by Dr. | |
| | 208: 8 | FitzGerald? | |
| | 208: 9 | A:  No, they have not. | |
| **219:13** - **219:19** | | Gilmartin, Raymond 2005-03-24 | |
| | 219: 13 | Q:  Mr. Gilmartin, tell the jury who Dr. | |
| | 219: 14 | John Oates is. | |
| | 219: 15 | A:  Dr. John Oates is a | |
| | 219: 16 | physician/scientist at Vanderbilt. | |
| | 219: 17 | Q:  Dr. Oates is also a paid consultant | |
| | 219: 18 | to Merck; correct? | |
| | 219: 19 | A:  That's correct. | |
| **220:1** - **220:6** | | Gilmartin, Raymond 2005-03-24 | |
| | 220: 1 | Q:  He's also a very highly respected | |
| | 220: 2 | scientist in his field, isn't he? | |
| | 220: 3 | A:  That's right. | |
| | 220: 4 | Q:  He's somebody whose advice you and | |
| | 220: 5 | the scientists at Merck would rely upon? | |
| | 220: 6 | A:  Yes. | |
| **220:23** - **222:4** | | Gilmartin, Raymond 2005-03-24 | |
| | 220: 23 | Q:  Now, Mr. Gilmartin, you're aware that | Def Obj:  602 - No |
| | 220: 24 | Dr. Oates, in fact, had proposed studies to people | foundation, no personal |
| | 220: 25 | -- directly to Merck scientists with how to test | knowledge. |
| | 221: 1 | this prostacyclin hypothesis theory out?  You're | |
| | 221: 2 | aware of that, aren't you? | |
| | 221: 3 | A:  Not specifically.  He may have. | |
| | 221: 4 | Q:  Nobody brought to your attention that | |
| | 221: 5 | he had proposed a study to Alan Nies in October of | |
| | 221: 6 | 1997? | |
| | 221: 7 | A:  Not that I recall. | |
| | 221: 8 | Q:  To refresh your recollection, do you | |

| | **Objection/Response in Barnett** |
|---|---|
| 221: 9    recall being told about a study where he proposed to | |
| 221: 10    give Vioxx to smokers, people who smoke cigarettes | |
| 221: 11    chronically? | |
| 221: 12    A:  No, I don't recall that. | |
| 221: 13    Q:  Would it refresh your recollection if | |
| 221: 14    I told you that the purpose of the study was to -- | |
| 221: 15    that smokers suffer typically from vascular disease, | |
| 221: 16    and that one way of testing the prostacyclin | |
| 221: 17    hypothesis would be to give Vioxx to smokers and see | |
| 221: 18    what happens with prostacyclin in their system? | |
| 221: 19    A:  I don't recall that. | |
| 221: 20    Q:  That letter that I'm talking about, | |
| 221: 21    which was written on October 27, 1997, Dr. Nies you | |
| 221: 22    know in his deposition had testified that he | |
| 221: 23    received it. Had that been brought to your | |
| 221: 24    attention? | |
| 221: 25    A:  No, it has not been. | |
| 222: 1    Q:  Dr. Nies also testified that the | |
| 222: 2    study in smokers had not been done by Merck. Are | |
| 222: 3    you aware of that? | |
| 222: 4    A:  No, I'm not. | |

| 223:3   -   223:8 | Gilmartin, Raymond 2005-03-24 | |
|---|---|---|
| 223: 3    Q:  Are you aware that, in fact, that Dr. | | Def Obj:  602 - No |
| 223: 4    Oates wrote another letter in November of 1997 to | | foundation, no personal |
| 223: 5    Barry Gertz also suggesting, making recommendations | | knowledge. |
| 223: 6    with the testing out of the prostaglandin | | |
| 223: 7    hypothesis? | | |
| 223: 8    A:  I don't recall it either. | | |

| 225:13   -   225:17 | Gilmartin, Raymond 2005-03-24 | |
|---|---|---|
| 225: 13    Q:  Now, the Board of Scientific Advisors | | |
| 225: 14    that we talked about, this is a board, I would | | |
| 225: 15    imagine, that you put a lot of confidence and trust | | |
| 225: 16    in. Is that true, Mr. Gilmartin? | | |
| 225: 17    A:  That's correct. | | |

| 226:2   -   226:12 | Gilmartin, Raymond 2005-03-24 | |
|---|---|---|
| 226: 2    Q:  They are structurally important | | |
| 226: 3    because they advise your scientists from an | | |
| 226: 4    outsider's perspective on studies and science and | | |
| 226: 5    things of that nature; correct? | | |
| 226: 6    A:  That's correct. | | |
| 226: 7    Q:  Were you aware that there was a | | |
| 226: 8    meeting of the Board of Scientific Advisors in May | | |

| | Objection/Response in Barnett |
|---|---|

| | |
|---|---|
| 226: 9    of 1998 that was chaired by Dr. Oates where they | |
| 226: 10   discussed the prostacyclin hypothesis? | |
| 226: 11   A:  I can't remember specifically, but it | |
| 226: 12   would be possible during that time frame. | |

**229:20   -   230:1**          Gilmartin, Raymond 2005-03-24

| | |
|---|---|
| 229: 20   Q:  Mr. Gilmartin, were you aware that | Def Obj:  602 - No |
| 229: 21   specifically being discussed by your Board of | foundation or personal |
| 229: 22   Scientific Advisors was the idea that by removing | knowledge. |
| 229: 23   prostacyclin, by suppressing prostacyclin, which is | |
| 229: 24   a potent inhibitor of platelet aggregation, that the | |
| 229: 25   probability of a coronary plaque rupture leading to | |
| 230: 1    a heart attack would be enhanced? | |

**230:5   -   230:13**          Gilmartin, Raymond 2005-03-24

| | |
|---|---|
| 230: 5    Q:  Were you ever advised specifically in | |
| 230: 6    1998 that's what was being discussed by your board | |
| 230: 7    of advisors? | |
| 230: 8    A:  I wasn't advised specifically of | |
| 230: 9    that, but I will say again that around that period | |
| 230: 10   of time certainly I was aware of this hypothesis | |
| 230: 11   that we had discussed earlier, that came about with | |
| 230: 12   the work with Merck scientists and also Dr. | |
| 230: 13   FitzGerald. | |

**232:2   -   232:6**          Gilmartin, Raymond 2005-03-24

232: 2    Q:  I mean, isn't it fair to characterize
232: 3    that what's going on within Merck in '97 and '98 is
232: 4    a concern about this prostacyclin hypothesis?
232: 5    A:  Yes, it would be proper to
232: 6    characterize it that way. That's absolutely right.

**243:8   -   243:11**          Gilmartin, Raymond 2005-03-24

243: 8    Q:  Sir, who is Dr. Carlo Patrono? Is
243: 9    that a name that means anything to you?
243: 10   A:  Just in general in terms of someone
243: 11   who's an outside person.

**243:17   -   244:3**          Gilmartin, Raymond 2005-03-24

243: 17   Q:  But you know he's a respected
243: 18   scientist; correct?
243: 19   A:  Yes.
243: 20   Q:  And he is from a prestigious
243: 21   university in Rome, you know that; correct?
243: 22   A:  Yes.
243: 23   Q:  And he's world renowned in his field?

| | **Objection/Response in Barnett** |
|---|---|
| 243: 24   Is that a fair characterization of Dr. Patrono? | |
| 243: 25   A:  I think he's well known in the field. | |
| 244: 1   Q:  Another Merck consultant, I think you | |
| 244: 2   said yes to that before? | |
| 244: 3   A:  Yes, I believe so. | |

**244:5  -  244:9**        Gilmartin, Raymond 2005-03-24

| | |
|---|---|
| 244: 5   Are you aware that Dr. Patrono wrote | Def Obj:  602 - No |
| 244: 6   a letter to a person by the name of Dr. Martino | foundation, no personal |
| 244: 7   Laurenzi at Merck on September 9, 1998? Has that | knowledge. |
| 244: 8   been brought to your attention? | |
| 244: 9   A:  Not that I remember. | |

**244:24  -  245:2**        Gilmartin, Raymond 2005-03-24

| | |
|---|---|
| 244: 24   Q:  Are you aware that Dr. Patrono on | |
| 244: 25   September 9, 1998 wrote a letter to Dr. Martino | |
| 245: 1   Laurenzi and proposed to do studies to test the | |
| 245: 2   prostacyclin hypothesis? | |

**245:6  -  245:7**        Gilmartin, Raymond 2005-03-24

| | |
|---|---|
| 245: 6   THE WITNESS:  Yes. I don't remember | |
| 245: 7   that letter. | |

**245:15  -  245:19**        Gilmartin, Raymond 2005-03-24

| | |
|---|---|
| 245: 15   Q:  Nobody prior to today has -- the | |
| 245: 16   defense lawyers or anybody within Merck has brought | |
| 245: 17   to your attention the fact that a letter exists from | |
| 245: 18   Dr. Patrono offering to do additional studies to | |
| 245: 19   test the prostacyclin hypothesis? | |

**245:21  -  245:22**        Gilmartin, Raymond 2005-03-24

| | |
|---|---|
| 245: 21   THE WITNESS:  I have no knowledge of | |
| 245: 22   that letter. It was not brought to me. | |

**246:20  -  246:24**        Gilmartin, Raymond 2005-03-24

| | |
|---|---|
| 246: 20   Q:  Well, are you aware that Dr. Oates | Def Obj:  602 - No |
| 246: 21   had called one of your scientists, Dr. Nies, in | foundation, no personal |
| 246: 22   September of 1998 proposing yet again additional | knowledge.  801, 802 |
| 246: 23   studies on the prostacyclin hypothesis? | hearsay. |
| 246: 24   A:  I'm not aware of that. | |

**247:25  -  248:19**        Gilmartin, Raymond 2005-03-24

| | |
|---|---|
| 247: 25   Q:  Mr. Gilmartin, I have marked | Def Obj:  602 - No |
| 248: 1   Gilmartin 17, which for the record is | foundation, no personal |
| 248: 2   MRK-ABK0311068. For the record, it's a handwritten | knowledge.  No evidence |
| 248: 3   note which has been authenticated by Dr. Alan Nies | witness has ever seen |
| 248: 4   in his deposition as being his, and it reads -- it's | the document before. |
| 248: 5   September 29, 1998. Do you see the date there, Mr. | |

|  | **Objection/Response in Barnett** |
|---|---|
| 248: 6    Gilmartin? | |
| 248: 7    A:  Yes, I do. | |
| 248: 8    Q:  It says 'FYI,' and then it is cc'd | |
| 248: 9    Barry, Reynold and Beth. It says: 'Attached is a | |
| 248: 10   letter from C. Patrono about the PGI-M issue. His | |
| 248: 11   thoughts are similar to those of John Oates who | |
| 248: 12   called me a couple of weeks ago wanting to study | |
| 248: 13   Vioxx in patients with atherosclerosis and | |
| 248: 14   hyperlipidemia and elevated thromboxane metabolite | |
| 248: 15   excretion. I told John we would not be doing any | |
| 248: 16   clinical studies at this time. When these drugs are | |
| 248: 17   available, many investigators will probably do such | |
| 248: 18   studies with or without our consent. Alan.' Did I | |
| 248: 19   read that correctly? | |

**248:23  -  248:25**        Gilmartin, Raymond 2005-03-24

| 248: 23   Q:  Did I read that more or less | |
| 248: 24   correctly? | |
| 248: 25   A:  Yes. | |

**249:7  -  249:10**        Gilmartin, Raymond 2005-03-24

| 249: 7    Q:  Well, the date of this handwritten | |
| 249: 8    note from Dr. Nies to Barry, Reynold and Beth is | |
| 249: 9    September 29, 1998; correct? | |
| 249: 10   A:  Yes. | |

**249:22  -  250:6**        Gilmartin, Raymond 2005-03-24

| 249: 22   Q:  It's the second to last sentence | |
| 249: 23   where it says, 'I told John,' that being John Oates, | |
| 249: 24   'we would not be doing any clinical studies at this | |
| 249: 25   time.' | |
| 250: 1    A:  Right. I see that. | |
| 250: 2    Q:  Now, 'this time' that he's referring | |
| 250: 3    to, September 29, 1998, is two months before you | |
| 250: 4    asked the FDA for permission to sell the drug to the | |
| 250: 5    public; correct? | |
| 250: 6    A:  Yes. | |

**279:10  -  279:22**        Gilmartin, Raymond 2005-03-24

| 279: 10   Q:  Sir, let me ask you this. Would you | Def Obj:  602 - No |
| 279: 11   take a look at what I've just marked I believe as | foundation, no personal |
| 279: 12   18? | knowledge. |
| 279: 13   A:  Yes. | |
| 279: 14   Q:  Could you please just -- for the | |
| 279: 15   record, let me identify it. At the top it says | |
| 279: 16   'Vioxx, Excerpts From Primary Review of NDA | |

| | **Objection/Response in Barnett** |
|---|---|
| 279: 17    21-042-Osteoarthritis.' Did I read that correctly? | |
| 279: 18    A: Yes. | |
| 279: 19    Q: At the very bottom is the name of a | |
| 279: 20    medical review officer. It's M.L. Villalba, MO. | |
| 279: 21    Did I read that correctly? | |
| 279: 22    A: Yes. | |

**280:15  -  280:21**        Gilmartin, Raymond 2005-03-24

280: 15    Q: You do understand that when an NDA
280: 16    goes into the FDA, they assign that to a medical
280: 17    review officer who takes responsibility; correct?
280: 18    A: Yes, I do. Right.
280: 19    Q: You do know Dr. Villalba was the
280: 20    medical review officer?
280: 21    A: No, I was not aware of that.

**281:23  -  282:4**        Gilmartin, Raymond 2005-03-24

281: 23    Q: 18. Would you please turn to table
281: 24    52 on this document? I don't have page numbers,
281: 25    because this was taken off the FDA website, I
282: 1    believe. So, it is table 52, and it is about seven
282: 2    or eight pages from the back.
282: 3    Are you there?
282: 4    A: Yes, I am.

**282:14  -  282:25**        Gilmartin, Raymond 2005-03-24

282: 14    Q: 'In summary: With the available
282: 15    data, it is impossible to answer with complete
282: 16    certainty whether the risk of cardiovascular and
282: 17    thromboembolic events is increased in patients on
282: 18    rofecoxib. A larger database will be needed to
282: 19    answer this and other safety comparison questions.'
282: 20    Did I read that correctly, sir?
282: 21    A: That's correct.
282: 22    Q: Now, if you go to the first page, the
282: 23    very first page of this document, what's the review
282: 24    date on that?
282: 25    A: The review date is December 1998.

| **286:22  -  286:25**        Gilmartin, Raymond 2005-03-24 | |
|---|---|
| 286: 22    Q: Now, let me ask you this, Mr. | Def Obj:  Incomplete, |
| 286: 23    Gilmartin. At the time you sold the drug to the | leaves out the answer at |
| 286: 24    public, you knew that the problem with Vioxx was a | 287:2 |
| 286: 25    mechanism-based problem, didn't you? | |

| **287:4  -  287:10**        Gilmartin, Raymond 2005-03-24 | |
|---|---|

| | Objection/Response in Barnett |
|---|---|
| 287: 4    Q: Well, you know what mechanism-based | Def Obj:  Incomplete |
| 287: 5    means; don't you? | without 287:11-19 |
| 287: 6    A: That's correct. | |
| 287: 7    Q: What does mechanism-based mean? | |
| 287: 8    A: It means there's something inherent | |
| 287: 9    actually in the mechanism of COX-2 inhibition. | |
| 287: 10    That's what is referred to as a mechanism. | |
| **287:22  -  287:25**    Gilmartin, Raymond 2005-03-24 | |
| 287: 22    Let's talk about VIGOR for a second. | |
| 287: 23    You got the results of the VIGOR trial in March of | |
| 287: 24    2000; right? | |
| 287: 25    A: That's correct. | |
| **288:8  -  288:12**    Gilmartin, Raymond 2005-03-24 | |
| 288: 8    Q: There's no single clinical trial that | |
| 288: 9    Merck conducted that was larger than VIGOR to date; | |
| 288: 10    correct? | |
| 288: 11    A: I don't know that specifically. It | |
| 288: 12    was a very large trial. | |
| **288:19  -  288:25**    Gilmartin, Raymond 2005-03-24 | |
| 288: 19    Q: And the result of that was, and | |
| 288: 20    you'll have an explanation for why I know, Mr. | |
| 288: 21    Gilmartin, but the result of that was when you | |
| 288: 22    looked at the people who took Vioxx and you looked | |
| 288: 23    at the people who took naproxen, there were five | |
| 288: 24    times as many heart attacks in people taking Vioxx; | |
| 288: 25    correct? | |
| **289:3  -  289:4**    Gilmartin, Raymond 2005-03-24 | |
| 289: 3    THE WITNESS:  Yes, in terms of in | |
| 289: 4    that study, yes, that was the difference. | |
| **290:7  -  290:9**    Gilmartin, Raymond 2005-03-24 | |
| 290: 7    Q: Now, Dr. Scolnick told you that he | |
| 290: 8    believed that the problem you saw in VIGOR was | |
| 290: 9    mechanism-based and caused by Vioxx, didn't he? | |
| **290:11  -  290:14**    Gilmartin, Raymond 2005-03-24 | |
| 290: 11    THE WITNESS:  I think it's fair to | |
| 290: 12    say that his initial reaction on the day he received | |
| 290: 13    the results is that he was concerned that it was | |
| 290: 14    caused by Vioxx, yes. | |
| **291:1  -  291:5**    Gilmartin, Raymond 2005-03-24 | |
| 291: 1    Q: You've seen this before, haven't you, | Def Obj:  602 - No |
| 291: 2    Mr. Gilmartin? For the record, it is | foundation, no personal |

| | **Objection/Response in Barnett** |
|---|---|
| 291: 3     MRK-ABH0016219. | knowledge. |
| 291: 4     A:   (Witness reviewing document.) | |
| 291: 5     I don't believe so. | |

**292:9  -  293:1**          Gilmartin, Raymond 2005-03-24

292: 9     Q:  Let me just show you, let's go back

292: 10    and talk about what Dr. Scolnick thought on March 9,

292: 11    2000. Now, March 9, 2000 is the day you learned

292: 12    about the VIGOR results; right?

292: 13    A:  That's correct.

292: 14    Q:  If you look down on this, do you see

292: 15    it's about -- it's on the third line to the right,

292: 16    it starts 'The CV events.' Third line down starting

292: 17    to the right.

292: 18    A:  Right. I see that.

292: 19    Q:  'The CV events are clearly there.

292: 20    Since no obvious correlate right now, ie not

292: 21    steroids, maybe smoking and prior,' I don't know

292: 22    what that means, 'a bit, this is real. It is

292: 23    important to find out about the cases that Oates

292: 24    told us about,' and that's John Oates, isn't that,

292: 25    Mr. Gilmartin?

293: 1     A:  I would -- yes.

**293:5  -  293:14**          Gilmartin, Raymond 2005-03-24

293: 5     He then goes on and says -- let's

293: 6     look down four or five sentences. I will read it to

293: 7     you, and you can try to catch up with me. It is

293: 8     about four lines up from the bottom of that

293: 9     paragraph.

293: 10    'It is a shame but it is a low

293: 11    incidence and it is mechanism based as we worried it

293: 12    was. Oates and Alan and Barry were right about the

293: 13    metabolite meanings and urine PG data.' Did I read

293: 14    that correctly?

**293:25  -  293:25**          Gilmartin, Raymond 2005-03-24

293: 25    A:  Yes, you did.

**297:9  -  297:14**          Gilmartin, Raymond 2005-03-24

| 297: 9     Q:  Mr. Gilmartin, let me ask you a | Def Obj:  Incomplete - |
| 297: 10    question. Could you tell the jury right now, | cut off his answer.  Must |
| 297: 11    sitting here today, if there is one | include 297:15-298:2 |
| 297: 12    placebo-controlled study that proves naproxen is | |
| 297: 13    cardioprotective? Does that exist in the world? | |
| 297: 14    A:  No, it doesn't. In fact, we were | |

| | | | **Objection/Response in Barnett** |
|---|---|---|---|
| **300:7** - **300:9** | Gilmartin, Raymond 2005-03-24 | | |
| 300: 7 | This has been marked as Exhibit | | Def Obj:  602 - No |
| 300: 8 | Gilmartin-21. It's Bates stamped MRK-AEE0000552 | | foundation, no personal |
| 300: 9 | through 558. | | knowledge.  Witness |
| **300:14** - **301:19** | Gilmartin, Raymond 2005-03-24 | | says at 300:13 that he |
| 300: 14 | Q:  Sir, it is, if you look at the top, | | does not recognize the |
| 300: 15 | it says, 'Forward to: Patent department.' Do you | | document. |
| 300: 16 | see that? | | |
| 300: 17 | A:  Right. | | |
| 300: 18 | Q:  It says, 'Confidential memorandum of | | |
| 300: 19 | invention.' | | |
| 300: 20 | A:  Right. | | |
| 300: 21 | Q:  If you go to the second page of this | | |
| 300: 22 | document, it tells you what this patent application | | |
| 300: 23 | covers. It says, 'The invention covers the | | |
| 300: 24 | combination of Rofecoxib (VIOXX) and other COX-2 | | |
| 300: 25 | inhibitors,' that you are making, 'in combination | | |
| 301: 1 | with either a thromboxane receptor antagonist or a | | |
| 301: 2 | thromboxane synthase inhibitor or dual blocker and | | |
| 301: 3 | any other method of blocking platelet function.' | | |
| 301: 4 | Did I read that correctly, more or less? I left out | | |
| 301: 5 | the parenthetical. | | |
| 301: 6 | A:  Yes. | | |
| 301: 7 | Q:  Could you go toward the bottom? | | |
| 301: 8 | A:  Right. | | |
| 301: 9 | Q:  It's five lines up, all the way to | | |
| 301: 10 | the right. I'm going to start with, 'The increase | | |
| 301: 11 | in thromboxane relative to prostacyclin may cause | | |
| 301: 12 | increased risk of cardiac and cerebral adverse | | |
| 301: 13 | events. Treatment with a thromboxane receptor | | |
| 301: 14 | antagonist or a thromboxane synthase inhibitor or | | |
| 301: 15 | dual blocker (receptor antagonist/enzyme inhibitor) | | |
| 301: 16 | would reduce this risk by inhibiting thromboxane | | |
| 301: 17 | synthesis or thromboxane action.' Did I read that | | |
| 301: 18 | correctly? | | |
| 301: 19 | A:  Yes, you did. | | |
| **307:22** - **308:4** | Gilmartin, Raymond 2005-03-24 | | |
| 307: 22 | Q:  Mr. Gilmartin, what is a thromboxane | | |
| 307: 23 | receptor antagonist? | | |
| 307: 24 | A:  It would be something that would | | |
| 307: 25 | enable the receptor. | | |
| 308: 1 | Q:  A thromboxane synthase inhibitor | | |

| | | **Objection/Response in Barnett** |
|---|---|---|
| 308: 2 | would do the same thing. It would actually stop | |
| 308: 3 | platelets from clumping together; correct? | |
| 308: 4 | A:  Right. | |

**308:17   -   308:21**          Gilmartin, Raymond 2005-03-24

| 308: 17 | Q:  Now, are you aware that Merck had | Def Obj:  602 - No |
| 308: 18 | plans, whether it was to patent them or not, to | personal knowledge. |
| 308: 19 | reformulate Vioxx with aspirin or some type of an | No foundation. |
| 308: 20 | agent to prevent platelets from clumping? | |
| 308: 21 | A:  I was not. | |

**310:10   -   310:20**          Gilmartin, Raymond 2005-03-24

| 310: 10 | Q:  At the time of this discussion in | Def Obj: 602 - No |
| 310: 11 | March of 2000, you know, we looked at the e-mail | personal knowledge.  No |
| 310: 12 | from Dr. Scolnick, do you recall that, where Dr. | foundation - asking him |
| 310: 13 | Scolnick says on March 9 of 2000 it is | about e-mails he had |
| 310: 14 | mechanism-based? Do you recall that discussion? | never seen before, and |
| 310: 15 | A:  I recall that discussion, yes. | about events the witness |
| 310: 16 | Q:  Would it surprise you to know that | is not aware of. |
| 310: 17 | the company, by March 30th, only a matter of days | |
| 310: 18 | later, 2000, has plans in the works to reformulate | |
| 310: 19 | Vioxx with some type of an agent that would prevent | |
| 310: 20 | platelets from clumping? | |

**310:22   -   310:23**          Gilmartin, Raymond 2005-03-24

| 310: 22 | THE WITNESS:  I don't think we were | |
| 310: 23 | in the process of working on reformulating Vioxx. | |

**311:13   -   311:23**          Gilmartin, Raymond 2005-03-24

| 311: 13 | Q:  Mr. Gilmartin, do you recall I showed | |
| 311: 14 | you a document that was marked today as Exhibit 21? | |
| 311: 15 | A:  Yes, I do. | |
| 311: 16 | Q:  It was a patent application, it | |
| 311: 17 | appeared to be; correct? | |
| 311: 18 | A:  That's correct. | |
| 311: 19 | Q:  Does that refresh your recollection | |
| 311: 20 | about Merck's plans on March 30th of 2000 to | |
| 311: 21 | reformulate Vioxx with aspirin or some other type of | |
| 311: 22 | antiplatelet inhibitor? | |
| 311: 23 | A:  It does not. | |

**319:18   -   320:23**          Gilmartin, Raymond 2005-03-24

| 319: 18 | Q:  Sir, let me just show you what I've | Def Obj:  602 - No |
| 319: 19 | marked as Exhibit 23, we've just marked as | foundation, no personal |
| 319: 20 | MRK-AEG0003239. | knowledge.  Asking him |
| 319: 21 | Sir, this is also two e-mails; | about e-mails he had |

| | | **Objection/Response in Barnett** |
|---|---|---|
| 319: 22 | correct? | never seen. |
| 319: 23 | A: That's correct. | |
| 319: 24 | Q: And the first one is from Dr. | |
| 319: 25 | Scolnick, and it is to an Anthony Ford-Hutchinson. | |
| 320: 1 | A: Right. | |
| 320: 2 | Q: Do you know who that is? | |
| 320: 3 | A: Yes. He's in research. | |
| 320: 4 | Q: How about Robert Gould? | |
| 320: 5 | A: Yes. In research also. | |
| 320: 6 | Q: It says, 'Tony and Robert, this is an | |
| 320: 7 | economy of e-mail notes.' It says, 'Robert, please | |
| 320: 8 | plan out and begin as soon as possible animal and | |
| 320: 9 | invitro studies to address the issue of Vioxx being | |
| 320: 10 | procoagulant.' Now, what is procoagulant? What | |
| 320: 11 | does procoagulant mean? | |
| 320: 12 | A: I guess what it says, procoagulant. | |
| 320: 13 | Q: Why don't you help us, for some of us | |
| 320: 14 | who that aren't that good with these big words? | |
| 320: 15 | A: Right. Promoting coagulation. | |
| 320: 16 | Q: Clotting? | |
| 320: 17 | A: Clotting. | |
| 320: 18 | Q: What's the date of this e-mail? | |
| 320: 19 | A: This is April 30, 2000. | |
| 320: 20 | Q: Well, does that help you out that by | |
| 320: 21 | at least April 30th, 2000 you hadn't sorted out | |
| 320: 22 | whether naproxen was the cause or Vioxx was the | |
| 320: 23 | cause; correct? | |
| **320:25  -  321:5** | Gilmartin, Raymond 2005-03-24 | |
| 320: 25 | THE WITNESS: If I may take a minute | |
| 321: 1 | to read the e-mail, but I will answer your question | |
| 321: 2 | directly by saying by the end of March, within a few | |
| 321: 3 | weeks within March, we had sorted out clearly the | |
| 321: 4 | question in our minds about what was going on in the | |
| 321: 5 | VIGOR study. | |
| **321:22  -  322:4** | Gilmartin, Raymond 2005-03-24 | |
| 321: 22 | My next question to you, though, is | |
| 321: 23 | when you testified earlier that by the end of March, | Def Obj:  602 - No |
| 321: 24 | by the time this patent application was being worked | foundation, no personal |
| 321: 25 | up on March 30, 2000, you had already made up your | knowledge, referring to |
| 322: 1 | minds that it was naproxen and not Vioxx that was | the e-mail the witness |
| 322: 2 | the difference. Does this e-mail help you remember | has not seen.  Also |
| 322: 3 | that, in fact, that was not a settled question | incomplete without |
| 322: 4 | within Merck on April 30, 2000? | 322:13-23. |

| | **Objection/Response in Barnett** |
|---|---|
| **322:7** - **322:11**   Gilmartin, Raymond 2005-03-24 | |
| 322: 7   THE WITNESS:  Yes. It was a settled | |
| 322: 8   question by the end of March in terms of both what | |
| 322: 9   we said from Ed Scolnick, as well as the | |
| 322: 10   understanding within the company. So, that was a | |
| 322: 11   settled question. | |
| **350:15** - **350:24**   Gilmartin, Raymond 2005-03-24 | |
| 350: 15   Q:  I'll show you what I have just marked | Def Obj:  602 - No |
| 350: 16   as Exhibit 27. For the record, it is MRK-NJ0025217 | foundation, no personal |
| 350: 17   through 254. | knowledge.  801, 802 - |
| 350: 18   Do you see at the top it says, 'Merck | also reading from a |
| 350: 19   Research Laboratories'? | document that is hearsay. |
| 350: 20   A:  Yes. | |
| 350: 21   Q:  Now, just to remind you, we're going | |
| 350: 22   to talk for a few minutes about naproxen. Okay, | |
| 350: 23   sir? | |
| 350: 24   A:  Okay, fine. | |
| **351:3** - **352:5**   Gilmartin, Raymond 2005-03-24 | |
| 351: 3   Q:  It is dated July 10, 2000. Do you | |
| 351: 4   see that? | |
| 351: 5   A:  Yes, I do. | |
| 351: 6   Q:  It says, 'Attached for your | |
| 351: 7   information is a copy of the Human Health Chairman's | |
| 351: 8   Report submitted by Dr. John Oates (Human Health | |
| 351: 9   Chairman)   for the Merck Board of Scientific Advisors | |
| 351: 10   meeting held April 2000.' Did I read that | |
| 351: 11   correctly? | |
| 351: 12   A:  That's correct. | |
| 351: 13   Q:  Excuse me. Let me just find my point | |
| 351: 14   here. I'm sorry. One second here. | |
| 351: 15   Would you go to page 5, please, at | |
| 351: 16   the bottom. Now, do you see where it says, 'The | |
| 351: 17   strategy for addressing the greater risk of | |
| 351: 18   cardiovascular events during treatment with Vioxx | |
| 351: 19   versus naproxen'? Do you see that there? | |
| 351: 20   A:  I see that heading, yes. | |
| 351: 21   Q:  Right below it says, 'An | |
| 351: 22   investigative approach in two phases is proposed for | |
| 351: 23   consideration. The first should determine whether | |
| 351: 24   adding aspirin to Vioxx increases the risk of | |
| 351: 25   gastrointestinal toxicity. The second would | |
| 352: 1   evaluate whether adding aspirin and/or another | |

| | Objection/Response in Barnett |
|---|---|

352: 2    antiplatelet agent to Vioxx would reduce the

352: 3    cardiovascular event rate in rheumatoid arthritis to

352: 4    the rates seen with naproxen.' Do you see that?

352: 5    A:  Yes, I do.

**353:10   -   354:16**    Gilmartin, Raymond 2005-03-24

353: 10    Q:  Go above on page 5, 2, do you see

353: 11    number 2?

353: 12    A:  Right.

353: 13    Q:  It says, 'Because patients using

353: 14    aspirin were not entered into the VIGOR trial, an

353: 15    important question is whether the excess risk of

353: 16    cardiovascular events, including myocardial

353: 17    infarction, for Vioxx 50 milligrams relative to

353: 18    naproxen is largely or entirely confined to high

353: 19    risk individuals for whom aspirin therapy is known

353: 20    to be indicated.' Did I read that correctly?

353: 21    A:  Yes, you did.

353: 22    Q:  It says, if you skip a sentence, it

353: 23    says -- okay. Skip a sentence. It says, 'Whereas

353: 24    the prevalence of cardiovascular events was greater

353: 25    in persons of higher risk, there was still a

354: 1    numerical trend against Vioxx among persons with no

354: 2    major risk factor.' Did I read that correct?

354: 3    A:  That's correct.

354: 4    Q:  Lastly, '3. Is the greater

354: 5    occurrence of cardiovascular events in the Vioxx

354: 6    versus the naproxen treated patients to be expected

354: 7    with all COX-2 selective inhibitors? All of the

354: 8    evidence points to this being a class effect, based

354: 9    on known mechanisms related to their identical

354: 10    effects on platelet pharmacology.' Did I read that

354: 11    correctly?

354: 12    A:  That's correct.

354: 13    Q:  Here again is John Oates, the head of

354: 14    your scientific board of advisors, and did you see

354: 15    that word mechanism that I just mentioned?

354: 16    A:  That's correct.

**357:22   -   358:4**    Gilmartin, Raymond 2005-03-24

| | |
|---|---|
| 357: 22  Q:  Does Dr. Oates have a big stock | Def Obj:  401, 402, 403 |
| 357: 23  holding in Merck, do you know? | Irrelevant and prejudicial. |
| 357: 24  A:  I have no idea. | |
| 357: 25  Q:  But the scientists at Merck, you do | |
| 358: 1  know, have an interest in Merck and in Merck stock; | |

| | | **Objection/Response in Barnett** |
|---|---|---|
| 358: 2 | correct? | |
| 358: 3 | A:  Merck scientists do have stock, yes, | |
| 358: 4 | exactly. | |

| **359:20** | **-** | **360:16** | Gilmartin, Raymond 2005-03-24 | |
|---|---|---|---|---|
| | 359: 20 | Let me ask you this: Do you know who | Def Obj: 801, 802 - |
| | 359: 21 | Dr. Juni is? | Lawyer is attributing out- |
| | 359: 22 | A:  Yes. | of-court statements to a |
| | 359: 23 | Q:  Dr. Juni is a scientist who published | 3rd party. |
| | 359: 24 | a study after the drug was withdrawn from the market | |
| | 359: 25 | in the Lancet. Does that help refresh your | |
| | 360: 1 | recollection? | |
| | 360: 2 | A:  That's correct. | |
| | 360: 3 | Q:  Are you aware that he, in fact, | |
| | 360: 4 | looked at 19 different clinical trials conducted by | |
| | 360: 5 | Merck? Are you aware of that? | |
| | 360: 6 | A:  Yes. | |
| | 360: 7 | Q:  He also looked at observational | |
| | 360: 8 | studies that were out there that were both for and | |
| | 360: 9 | against; correct? | |
| | 360: 10 | A:  That's correct. | |
| | 360: 11 | Q:  And he concluded that you should have | |
| | 360: 12 | removed the drug -- he and his colleagues concluded | |
| | 360: 13 | you should have removed Vioxx from the market right | |
| | 360: 14 | after the VIGOR trial. You disagree with Dr. Juni; | |
| | 360: 15 | correct? | |
| | 360: 16 | A:  We disagree strongly with Dr. Juni. | |

| **364:23** | **-** | **365:10** | Gilmartin, Raymond 2005-03-24 | |
|---|---|---|---|---|
| | 364: 23 | Let's go back to a little bit, we | |
| | 364: 24 | were talking about naproxen. You recall you get the | |
| | 364: 25 | VIGOR results on March 9, 2000; correct? | |
| | 365: 1 | A:  That's correct. | |
| | 365: 2 | Q:  We showed you that e-mail with Dr. | Def Obj:  602 - Discussing |
| | 365: 3 | Scolnick where he talks about it being | e-mail that witness has |
| | 365: 4 | mechanism-based. Do you remember we had that | no personal knowledge |
| | 365: 5 | discussion? | of. |
| | 365: 6 | A:  Yes, I do. | |
| | 365: 7 | Q:  And then 18 days later -- can we mark | |
| | 365: 8 | this -- Merck issues a press release about the VIGOR | |
| | 365: 9 | results. Do you recall that? | |
| | 365: 10 | A:  Yes, I do. | |

| **365:23** | **-** | **366:7** | Gilmartin, Raymond 2005-03-24 | |
|---|---|---|---|---|
| | 365: 23 | Q:  What I have just marked as Exhibit 28 | Def Obj:  Incomplete |

| | | | Objection/Response in Barnett |
|---|---|---|---|
| | 365: 24 | is MRK-PRL0000114 through 115. | without 366:22-367:19. |
| | 365: 25 | You recognize this as a Merck press | |
| | 366: 1 | release; correct? | |
| | 366: 2 | A:  Yes, I do. | |
| | 366: 3 | Q:  Now, 18 days later you guys go public | |
| | 366: 4 | with a press release that tells the medical | |
| | 366: 5 | community that the reason for the difference between | |
| | 366: 6 | Vioxx and naproxen is naproxen's ability to block | |
| | 366: 7 | platelet aggregation; correct? | |
| **366:10  -  366:12** | | Gilmartin, Raymond 2005-03-24 | |
| | 366: 10 | Q:  Is that what the release says? | |
| | 366: 11 | A:  Yes. Let me take a look at the | |
| | 366: 12 | release a little bit more. | |
| **369:8  -  369:10** | | Gilmartin, Raymond 2005-03-24 | |
| | 369: 8 | Q:  What I'm going to show you now marked | Def Obj:  602 - No |
| | 369: 9 | as Exhibit 29 is a name that we're all familiar with | foundation, no personal |
| | 369: 10 | by now. | knowledge, no evidence |
| **369:17  -  369:19** | | Gilmartin, Raymond 2005-03-24 | witness has ever seen |
| | 369: 17 | Q:  It's an e-mail from Dr. Garret | e-mail before. |
| | 369: 18 | FitzGerald; correct? | |
| | 369: 19 | A:  That's correct. | |
| **369:21  -  370:16** | | Gilmartin, Raymond 2005-03-24 | |
| | 369: 21 | It's to Dr. Nies again; correct? | |
| | 369: 22 | A:  That's correct. | |
| | 369: 23 | Q:  Dr. Nies, again, is the head of the | |
| | 369: 24 | Vioxx project for your company; correct? | |
| | 369: 25 | A:  Right. | |
| | 370: 1 | Q:  Especially on March 24 of 2000 he | |
| | 370: 2 | was. And he says -- he starts off by saying; | |
| | 370: 3 | 'Interesting. Luis paper is in press in | |
| | 370: 4 | epidemiology. I have e-mailed him. Aspirin | |
| | 370: 5 | significantly reduced the risk of first nonfatal MI | |
| | 370: 6 | in these females relative risk' and then he gives | |
| | 370: 7 | some numbers. And then he says, 'All NSAIDs had no | |
| | 370: 8 | effect.' Did I read that correctly? | |
| | 370: 9 | A:  That's correct. | |
| | 370: 10 | Q:  Now, NSAIDs, naproxen is an NSAID; | |
| | 370: 11 | correct? | |
| | 370: 12 | A:  That's correct. | |
| | 370: 13 | Q:  Then it says 'Individual NSAIDs had | |
| | 370: 14 | no significant effect on either fatal, nonfatal or | |
| | 370: 15 | total MIs,' myocardial infarctions; correct? | |

| | | **Objection/Response in Barnett** |
|---|---|---|
| 370: 16 | A: That's what the e-mail says. | |

**385:24  -  385:25**          Gilmartin, Raymond 2005-03-24

| | |
|---|---|
| 385: 24 | Q: Mr. Gilmartin, let me ask you to take |
| 385: 25 | a look at what we've just marked as 31. |

Def Obj:  602 - No
foundation, no personal

**386:8  -  386:12**          Gilmartin, Raymond 2005-03-24

knowledge; no evidence
the witness has ever

| | |
|---|---|
| 386: 8 | Q: I want to bring you back to naproxen |
| 386: 9 | again. We're now going to talk about a name that |
| 386: 10 | we're also familiar with in addition to Dr. |
| 386: 11 | FitzGerald, and that's Dr. Patrono. Okay? |
| 386: 12 | A: Right. |

seen this e-mail before.
801, 802 - also, the
e-mail contains hearsay.

**386:17  -  386:24**          Gilmartin, Raymond 2005-03-24

| | |
|---|---|
| 386: 17 | Q: And there are three e-mails on this |
| 386: 18 | page; correct? The first one is the one I want to |
| 386: 19 | focus your attention on. This is dated March 28, |
| 386: 20 | 2000. Do you see that? |
| 386: 21 | A: Right. |
| 386: 22 | Q: This is from Martino Laurenzi; |
| 386: 23 | correct? |
| 386: 24 | A: Right. |

**387:13  -  388:1**          Gilmartin, Raymond 2005-03-24

| | |
|---|---|
| 387: 13 | And the subject here says 'Carlo |
| 387: 14 | Patrono on VIGOR.' Do you see that? |
| 387: 15 | A: Yes. |
| 387: 16 | Q: It starts: 'Guys, I met with Carlo |
| 387: 17 | Patrono last Saturday in Rome. He had already been |
| 387: 18 | informed by other sources about the results of |
| 387: 19 | VIGOR, and we had an interesting chat about it. |
| 387: 20 | 'He said that he does not think that |
| 387: 21 | the CV effect that we observed can be attributed to |
| 387: 22 | naproxen for a couple of good reasons. First,' he |
| 387: 23 | says, 'there is a weak pharmacological basis and no |
| 387: 24 | epidemiological evidence.' Did I read that part |
| 387: 25 | correctly? |
| 388: 1 | A: That's correct. |

**388:18  -  388:23**          Gilmartin, Raymond 2005-03-24

| | |
|---|---|
| 388: 18 | Q: That's not really my question. I'm |
| 388: 19 | asking you, what is your understanding of those |
| 388: 20 | three words, 'no epidemiological evidence'? Just |
| 388: 21 | tell the jury what you think that means. |
| 388: 22 | A: Hadn't seen studies yet showing a |
| 388: 23 | difference. |

**Objection/Response in Barnett**

**390:3   -   390:16**        Gilmartin, Raymond 2005-03-24

390: 3     Q: So, just to get the sentence
390: 4     straight, he says: 'First there is weak
390: 5     pharmacological basis and no epidemiological
390: 6     evidence for CV protection associated with
390: 7     conventional NSAIDs.' And then he says
390: 8     'Additionally the magnitude of the effect would not
390: 9     be plausible even if the comparator had been aspirin
390: 10    itself.' Did I read that correctly?
390: 11    A: That's correct.
390: 12    Q: So, isn't another fair reading of
390: 13    this that he's saying, even if you were giving
390: 14    aspirin to people in VIGOR versus Vioxx, aspirin
390: 15    could not have accounted for the five times
390: 16    difference? Fair reading of that?

**390:19   -   390:20**        Gilmartin, Raymond 2005-03-24

390: 19    THE WITNESS: That's the opinion he's
390: 20    expressing here, yes.

**390:22   -   391:8**        Gilmartin, Raymond 2005-03-24

390: 22    Q: This opinion being expressed is that
390: 23    of Carlo Patrono, who is an expert for Merck;
390: 24    correct?
390: 25    A: Yes. He's a consultant to us.

391: 1     Q: Now, what's the date of the press
391: 2     release that I marked earlier? Do you have that in
391: 3     front of you? That's March 27, 2000?
391: 4     A: That's correct.

391: 5     Q: And you get -- people in your company | Def Obj: 602 - No
391: 6     get this e-mail reflecting Carlo Patrono's views on | foundation, no personal
391: 7     March 28th. That's a day later; correct? | knowledge.
391: 8     A: Yes, that's correct.

**392:8   -   392:11**        Gilmartin, Raymond 2005-03-24

392: 8     In fact, you're aware that Dr. Patrono and Dr.
392: 9     FitzGerald published a study together, aren't you?
392: 10    You know that, don't you?
392: 11    A: I do not.

**392:19   -   394:3**        Gilmartin, Raymond 2005-03-24

392: 19    Q: Well, let me ask you this: Are you
392: 20    aware that they published a study that said -- and
392: 21    this study, by the way, was published in the New
392: 22    England Journal of Medicine. You've heard of that
392: 23    publication; correct?

| | | **Objection/Response in Barnett** |
|---|---|---|
| 392: 24 | A: Yes, I have. | |
| 392: 25 | Q: In the United States, wouldn't it be | |
| 393: 1 | fair to characterize that as the leading medical | |
| 393: 2 | publication? | |
| 393: 3 | A: It's a very important journal, | |
| 393: 4 | absolutely. | |
| 393: 5 | Q: One of the most prestigious in the | |
| 393: 6 | country? | |
| 393: 7 | A: It is prestigious, yes. | |
| 393: 8 | Q: One of the most prestigious in the | |
| 393: 9 | world actually; right? | |
| 393: 10 | A: Yes. | |
| 393: 11 | Q: This article I'm reading from was | Def Obj: 602 - No |
| 393: 12 | accepted for publication by the New England Journal | foundation for this study. |
| 393: 13 | of Medicine. It's entitled: 'The coxibs selective | No evidence the witness |
| 393: 14 | inhibitors of cyclooxygenase 2,' and I'll read from | ever saw it. |
| 393: 15 | page 439. It says: 'Naproxen has an extended | 801, 802 |
| 393: 16 | half-life and may have completely suppressed the | Also, incomplete as Mr. |
| 393: 17 | capacity of platelets to make thromboxane A2 | Gilmartin's answer was |
| 393: 18 | throughout its dosing interval. Although this | cut-off. If this section is |
| 393: 19 | feature of naproxen has been disputed, there is no | played, must include |
| 393: 20 | convincing evidence from epidemiological studies | 394:4-5. |
| 393: 21 | that NSAIDs including naproxen protect against | |
| 393: 22 | cardiovascular events.' Was this brought to your | |
| 393: 23 | attention by anybody within Merck? | |
| 393: 24 | MR. BUTSWINKAS: You already asked | |
| 393: 25 | him if he was aware of the study and he said no. | |
| 394: 1 | BY MR. SEEGER:  : | |
| 394: 2 | Q: Is that your answer still? | |
| 394: 3 | A: Yes. But the principle that there | |
| **424:15  -  424:19** | Gilmartin, Raymond 2005-04-11 | |
| 424: 15 | Q: Okay. Mr. Gilmartin, sitting here | Def Obj: 401, 402, 403 |
| 424: 16 | today, how much stock do you own in Merck as we sit | Irrelevant and prejudicial, |
| 424: 17 | here now? | especially during |
| 424: 18 | A: I own something on the order of about | compensatory phase. |
| 424: 19 | 100,000 shares. | |
| **425:6  -  425:9** | Gilmartin, Raymond 2005-04-11 | |
| 425: 6 | Q: What is the present value of your | |
| 425: 7 | ownership interest in Merck just based on the stock | |
| 425: 8 | you own? | |
| 425: 9 | A: Something about $30 million or so. | |
| **426:8  -  426:14** | Gilmartin, Raymond 2005-04-11 | |

| | **Objection/Response in Barnett** |
|---|---|
| 426: 8    Q: It is reported in today's Wall Street | |
| 426: 9    Journal that in 2004, it's broken down by sectors, | |
| 426: 10    utilities, healthcare and telecommunications, and | |
| 426: 11    it's reported in The Wall Street Journal that for | |
| 426: 12    2004 you earned $34.8 million. I guess that would | |
| 426: 13    be in cash and stock as well. Is that an accurate | |
| 426: 14    number? | |
| **426:16  -  426:19**    Gilmartin, Raymond 2005-04-11 | |
| 426: 16    THE WITNESS: Based on, you know, I | |
| 426: 17    don't know exactly how they used the valuation, but | |
| 426: 18    it would be on that order, including exercise of a | |
| 426: 19    stock option. | |
| **452:8  -  452:9**    Gilmartin, Raymond 2005-04-11 | |
| 452: 8    Q: Mr. Gilmartin, take a look at what | Def Obj:  602 - No |
| 452: 9    I've just marked as Gilmartin-34. | foundation, no personal |
| **453:18  -  453:20**    Gilmartin, Raymond 2005-04-11 | knowledge, no evidence |
| 453: 18    Q: Do you see at the very top there, | Mr. Gilmartin has ever |
| 453: 19    it's an e-mail from Dr. Scolnick to Peter Kim? | seen this before.  Lawyer |
| 453: 20    A: Yes. | just reading e-mail into |
| **454:11  -  454:15**    Gilmartin, Raymond 2005-04-11 | the record.  Also |
| 454: 11    Q: Would you take a look on the e-mail | contains hearsay, |
| 454: 12    that's written on October 2nd, 2004, which, by the | 801, 802. |
| 454: 13    way, it's only a few days after Vioxx was taken off | |
| 454: 14    the market; correct? | |
| 454: 15    A: That's correct. | |
| **455:13  -  455:23**    Gilmartin, Raymond 2005-04-11 | |
| 455: 13    Q: This is Dr. Scolnick talking to Dr. | |
| 455: 14    Kim; correct? | |
| 455: 15    A: That's right. This is an e-mail, | |
| 455: 16    right. | |
| 455: 17    Q: It said, 'When science dominated in | |
| 455: 18    the past we won over and over again. It will take a | |
| 455: 19    new CEO - you or someone who allows you the same | |
| 455: 20    leniency I was once allowed to help Merck become | |
| 455: 21    reborn. It is doable absolutely doable.' Did I | |
| 455: 22    read that correctly? | |
| 455: 23    A: Yes, you have. | |
| **456:9  -  456:13**    Gilmartin, Raymond 2005-04-11 | |
| 456: 9    Q: And he's saying in the e-mail to | |
| 456: 10    Peter, 'The Times said this was marketing triumphing | |
| 456: 11    over science.' And then his comment, 'When science | |

| | Objection/Response in Barnett |
|---|---|
| 456: 12   dominated in the past we won over and over again.' | |
| 456: 13   Correct? He says that? | |
| **456:17   -   456:20**         Gilmartin, Raymond 2005-04-11 | |
| 456: 17   Q:  That is what Dr. Scolnick says here | |
| 456: 18   in this e-mail? | |
| 456: 19   MR. BUTSWINKAS:  You've confirmed | |
| 456: 20   that he read -- that you read it correctly. | |
| **457:20   -   457:25**         Gilmartin, Raymond 2005-04-11 | |
| 457: 20   You'll agree with me, wouldn't you, | |
| 457: 21   Mr. Gilmartin, that the issue of whether Vioxx | |
| 457: 22   caused heart attacks in VIGOR or naproxen reduced | |
| 457: 23   MIs was an important scientific issue in March of | |
| 457: 24   2000; correct? | |
| 457: 25   A:  That's correct. | |
| **459:15   -   459:20**         Gilmartin, Raymond 2005-04-11 | |
| 459: 15   Q:  Let's go with your words. Let's say | |
| 459: 16   at the point VIGOR comes out, the conclusion by | |
| 459: 17   Merck is, Vioxx raises the risk of heart attack. | |
| 459: 18   For people taking the drug, that's an important | |
| 459: 19   thing to know; correct? | |
| 459: 20   A:  That's correct. | |
| **460:21   -   461:1**         Gilmartin, Raymond 2005-04-11 | |
| 460: 21   Q:  With respect to this important | |
| 460: 22   life-threatening issue about whether it was either | |
| 460: 23   Vioxx causing heart attacks or naproxen lowering the | |
| 460: 24   risk of heart attack, Merck had a duty to be open | |
| 460: 25   and to be honest about the science and its thinking on | |
| 461: 1   that issue; correct? | |
| **461:3   -   461:9**         Gilmartin, Raymond 2005-04-11 | |
| 461: 3   THE WITNESS:  Yes. We had a duty to | |
| 461: 4   be open and to do the investigation and to arrive at | |
| 461: 5   a conclusion, yes. | |
| 461: 6   BY MR. SEEGER: | |
| 461: 7   Q:  Right. And you said in your words -- | |
| 461: 8   and to do the investigation, you had a duty to be | |
| 461: 9   thorough also; correct? | |
| **461:11   -   461:11**         Gilmartin, Raymond 2005-04-11 | |
| 461: 11   THE WITNESS:  Yes. We had a duty to | Def Obj:  Incomplete, cuts off |
| **461:14   -   461:15**         Gilmartin, Raymond 2005-04-11 | answer-should include 461:12 |
| 461: 14   Q:  And a duty to disclose all the good | |
| 461: 15   and all the bad on that issue; correct? | |

**Objection/Response in Barnett**

| | |
|---|---|
| **461:17  -  461:17**   Gilmartin, Raymond 2005-04-11 | |
| 461: 17    THE WITNESS:  Yes. We had a duty to | Def Obj: Incomplete, cuts off |
| **462:14  -  462:16**   Gilmartin, Raymond 2005-04-11 | answer - must include 461:18-19 |
| 462: 14    You're not required by the FDA to | |
| 462: 15    only disclose safety risks where you have confirmed | |
| 462: 16    100 percent scientifically that they exist; right? | |
| **462:18  -  462:22**   Gilmartin, Raymond 2005-04-11 | |
| 462: 18    THE WITNESS:  When we have | |
| 462: 19    information/data that would indicate a safety risk, | |
| 462: 20    such as an adverse event with people that are taking | |
| 462: 21    the drug, we disclose that with regard -- without | |
| 462: 22    regard to whether or not it was causation or not. | |
| **470:8  -  470:13**   Gilmartin, Raymond 2005-04-11 | |
| 470: 8    Exhibit 32, Dane, an e-mail that I marked and read | |
| 470: 9    to you, another one from Dr. Scolnick, where Dr. | |
| 470: 10    Scolnick claims it is impossible to prove that | |
| 470: 11    naproxen was sufficiently cardioprotective to make | |
| 470: 12    up for the difference in VIGOR? Do you recall | |
| 470: 13    questions about that e-mail? | |
| **470:15  -  470:21**   Gilmartin, Raymond 2005-04-11 | |
| 470: 15    THE WITNESS:  I remember questions | |
| 470: 16    about that e-mail, yes. | |
| 470: 17    BY MR. SEEGER: | |
| 470: 18    Q:  And if you take a quick look at it, | |
| 470: 19    in fact, do you see the language I'm talking about | |
| 470: 20    there where it's all capitalized? | |
| 470: 21    A: Yes, I do. | |
| **472:9  -  472:22**   Gilmartin, Raymond 2005-04-11 | |
| 472: 9    Q:  -- could you just read that for the | |
| 472: 10    jury? | |
| 472: 11    A:   'IT IS IMPOSSIBLE TO PROVE THIS; IT | |
| 472: 12    IS IMPOSSIBLE TO KNOW THIS WITH CERTAINTY.' | |
| 472: 13    Q: The 'this' that he's talking about | |
| 472: 14    there, that's the naproxen theory, it being | |
| 472: 15    cardioprotective; right? | |
| 472: 16    A:  What he is saying here is there's no | |
| 472: 17    way to prove that in patients with rheumatoid | |
| 472: 18    arthritis, that all the differences between Vioxx | |
| 472: 19    and naproxen is due to the benefit of naproxen. He | |
| 472: 20    is -- but the implication of this, what he's talking | |
| 472: 21    about, is that there is no clinical-controlled trial | |

36

| | | **Objection/Response in Barnett** |
|---|---|---|
| | 472: 22   that's been run. | |
| **479:9** - **479:12**   Gilmartin, Raymond 2005-04-11 | | |
| | 479: 9   Is there any way for a patient or a | |
| | 479: 10   doctor to know Dr. Scolnick's views, president of | |
| | 479: 11   Merck Research Labs, on March 9th, 2000 without | |
| | 479: 12   Merck telling them? | |
| **479:14** - **479:22**   Gilmartin, Raymond 2005-04-11 | | |
| | 479: 14   THE WITNESS:  They would not have | |
| | 479: 15   access to Dr. Scolnick's e-mail at that time. No, | |
| | 479: 16   they would not. | |
| | 479: 17   BY MR. SEEGER: | |
| | 479: 18   Q:  And they wouldn't have access to Dr. | Def Obj:  801, 802 - hearsay. |
| | 479: 19   FitzGerald's views that he expresses in the e-mail | |
| | 479: 20   that we talked about earlier, that there was no | |
| | 479: 21   clinical support for naproxen being | |
| | 479: 22   cardioprotective; correct? | |
| **479:24** - **480:23**   Gilmartin, Raymond 2005-04-11 | | |
| | 479: 24   THE WITNESS:  Well, what Dr. | |
| | 479: 25   FitzGerald said is that there was no studies that he | |
| | 480: 1   could -- you know -- or the studies that he had | |
| | 480: 2   looked at that, that there was any significant | |
| | 480: 3   differences in the NSAIDs. So, they would not have | |
| | 480: 4   access to that e-mail either. | |
| | 480: 5   BY MR. SEEGER: | |
| | 480: 6   Q:  So, more or less, Merck decided to | |
| | 480: 7   selectively give out information with regard to | |
| | 480: 8   naproxen being cardioprotective 18 days after it | |
| | 480: 9   learned of heart attacks in VIGOR; correct? | |
| | 480: 10   A:  That's not correct, no. This was | |
| | 480: 11   looking at all the data taken together, that the | |
| | 480: 12   conclusion was, and the conclusion today is, that | |
| | 480: 13   the weight of the evidence supported that naproxen | |
| | 480: 14   had a lower rate of cardiovascular events. | |
| | 480: 15   Q:  Mr. Gilmartin, when you put this | |
| | 480: 16   statement out 18 days after the VIGOR results, did | |
| | 480: 17   you ever consider the implications of you being | |
| | 480: 18   wrong? | |
| | 480: 19   A:  We looked at all the data taken | |
| | 480: 20   together and drew the conclusion that naproxen had a | |
| | 480: 21   lower rate of cardiovascular events. This was after | |
| | 480: 22   extensive study, and that was the conclusion that we | |
| | 480: 23   drew. | |

| | **Objection/Response in Barnett** |
|---|---|
| **483:20** - **484:3**     Gilmartin, Raymond 2005-04-11 | |
| 483: 20    Q:  When you issued the press release,<br>483: 21    did you consider the millions of people taking the<br>483: 22    drug or the billions of dollars in revenue being<br>483: 23    generated by the drug?<br>483: 24    A:  We considered the millions of people<br>483: 25    taking the drug.<br>484: 1    Q:  I mean, this is really just another<br>484: 2    example of marketing over science, isn't it, Mr.<br>484: 3    Gilmartin? | Def Obj:  403 -<br>Prejudicial, argumentative.<br>Reference to billions of<br>dollars not appropriate in<br>compensatory phase. |
| **484:5** - **484:11**     Gilmartin, Raymond 2005-04-11 | |
| 484: 5    THE WITNESS:  Absolutely not.<br>484: 6    BY MR. SEEGER:<br>484: 7    Q:  Did you ever issue a press release or<br>484: 8    write a letter to doctors at least discussing the<br>484: 9    fact that there's a scientific debate going on<br>484: 10    whether naproxen was cardioprotective?<br>484: 11    A:  No, we did not. | |
| **485:1** - **485:5**     Gilmartin, Raymond 2005-04-11 | |
| 485: 1    Let me ask it this way.<br>485: 2    For you to make a statement about a<br>485: 3    drug's benefits or risks, for you, Merck, they have<br>485: 4    to be supported by controlled clinical trials;<br>485: 5    correct? | Def Obj:  Incomplete<br>without 485:14-18,<br>485:22, 485:25-486:6 |
| **485:7** - **485:13**     Gilmartin, Raymond 2005-04-11 | |
| 485: 7    THE WITNESS:  Yes, that's correct.<br>485: 8    BY MR. SEEGER:<br>485: 9    Q:  All right. You didn't have<br>485: 10    controlled clinical trials supporting the naproxen<br>485: 11    theory; right? We've established that?<br>485: 12    A:  We did not have those, and we pointed<br>485: 13    that out. | |
| **490:10** - **490:21**     Gilmartin, Raymond 2005-04-11 | |
| 490: 10    Q:  Do you recognize -- just for the<br>490: 11    record, it's MRK-ABI0003228 through 29.<br>490: 12    You recognize this to be another<br>490: 13    press release issued by Merck?<br>490: 14    A:  Yes, I do.<br>490: 15    Q:  And do you see the date of this?<br>490: 16    It's May 22nd, 2001?<br>490: 17    A:  Right.<br>490: 18    Q:  Just for the jury, could you read the | Def Obj: 401, 402, 403,<br>602.  Press release is<br>irrelevant and prejudicial<br>since there is no evidence<br>that the plaintiff or his<br>doctors saw this press<br>release.<br>Also, if the Court allows<br>this testimony, it is |

| | | **Objection/Response in Barnett** |
|---|---|---|
| 490: 19 | title of this press release? | currently incomplete and |
| 490: 20 | A:  Yes. 'Merck Confirms Favorable | should include |
| 490: 21 | Cardiovascular Safety Profile of Vioxx.' | 491:24-492:9. |

**491:12  -  491:23**        Gilmartin, Raymond 2005-04-11

| 491: 12 | Q:  All right. Do you see halfway down |
| 491: 13 | this paragraph where it says, 'This is the first |
| 491: 14 | time this effect on naproxen of cardiovascular |
| 491: 15 | events has been observed in a clinical study'? |
| 491: 16 | A:  Yes. |
| 491: 17 | Q:  Do you see that language where I am? |
| 491: 18 | A:  Yes. |
| 491: 19 | Q:  Then it goes on and it says, 'Other |
| 491: 20 | potential explanations were advanced by the FDA |
| 491: 21 | reviewer and were discussed with the Advisory |
| 491: 22 | Committee.' Did I read that correctly? |
| 491: 23 | A:  That's correct. |

**492:13  -  492:15**        Gilmartin, Raymond 2005-04-11

| 492: 13 | My question to you is, one of the |
| 492: 14 | possible explanations given by the FDA was that |
| 492: 15 | Vioxx could have been prothrombotic; correct? |

**492:17  -  493:1**        Gilmartin, Raymond 2005-04-11

| 492: 17 | THE WITNESS:  I'm not sure about |
| 492: 18 | that, that that's what the FDA put forward. |

| 492: 19 | MR. SEEGER:  Let me mark another |
| 492: 20 | exhibit. |

| 492: 21 | BY MR. SEEGER: | Def Obj:  401, 402, 403, |
| 492: 22 | Q:  You're aware, in fact, that you | 801, 802.  FDA warning |
| 492: 23 | received a Warning Letter from the FDA that | letter is irrelevant and |
| 492: 24 | specifically relates to this press release, aren't | prejudicial; also contains |
| 492: 25 | you, Mr. Gilmartin? | hearsay. |
| 493: 1 | A:  Yes, I am. |

**493:9  -  493:23**        Gilmartin, Raymond 2005-04-11

| 493: 9 | Q:  I'll mark that for you so you can get |
| 493: 10 | it in front of you as Gilmartin-36. For the record, |
| 493: 11 | it's identified as MRK-ABA0000775 through 782. |
| 493: 12 | Now, Mr. Gilmartin, let's first talk |
| 493: 13 | about what we've just marked as, what is that, 36? |
| 493: 14 | A:  Right. |
| 493: 15 | Q:  The Warning Letter from the FDA? |
| 493: 16 | A:  Right. |
| 493: 17 | Q:  This is written to you; correct? |
| 493: 18 | A:  That's correct. |

**Objection/Response in Barnett**

493: 19    Q:  And you received it?

493: 20    A:  Yes, I did.

493: 21    Q:  And you looked at it, and you read it

493: 22    at the time you got it; correct?

493: 23    A:  That's correct.

**495:8   -   495:11**        Gilmartin, Raymond 2005-04-11

495: 8    Q:  Well, Mr. Gilmartin, my question to

495: 9    you is, do you know, was anybody disciplined as a

495: 10    response of this letter going to you?

495: 11    A:  I do not know.

**496:10   -   497:20**        Gilmartin, Raymond 2005-04-11

496: 10    Q:  You are aware that one of the

496: 11    criticisms in here is that press release that we

496: 12    were just talking about; correct?

496: 13    A:  That's correct.

496: 14    Q:  In fact, if you go to Page 6 of this

496: 15    letter, Mr. Gilmartin --

496: 16    A:  Right.

496: 17    Q:  -- right at the bottom in bold

496: 18    letters it says 'Press Release.' Do you see that?

496: 19    A:  Yes.

496: 20    Q:  Do you see where it says in the

496: 21    letter written to you from the FDA, it says, 'We

496: 22    have identified a Merck press release entitled

496: 23    'Merck Confirms Favorable Cardiovascular Safety

496: 24    Profile of Vioxx' dated May 22, 2001'? That is the

496: 25    press release we were just looking at; correct?

497: 1    A:  That's correct.

497: 2    Q:  There's no confusion on that; right?

497: 3    A:  That's correct.

497: 4    Q:  Okay. It says, 'that is also false

497: 5    or misleading.' Now, your understanding of the

497: 6    words 'false or misleading' is what?

497: 7    A:  What that says, false or misleading.

497: 8    Q:  Well, if something is 'false,' it's

497: 9    not true?

497: 10    A:  That's what false means, yes.

497: 11    Q:  And 'misleading' means if you say it,

497: 12    it mischaracterizes information? Is that a fair way

497: 13    to --

497: 14    A:  That's a fair way, correct.

497: 15    Q:  'That is also false or misleading for

497: 16    similar reasons stated above. Additionally, your

| | | | **Objection/Response in Barnett** |
|---|---|---|---|
| | 497: 17 | claim in the press release that Vioxx has a | |
| | 497: 18 | 'favorable cardiovascular safety profile,' is simply | |
| | 497: 19 | incomprehensible.' Now, those are pretty strong | |
| | 497: 20 | words from the FDA; correct? | |
| **497:22** - **497:22** | | Gilmartin, Raymond 2005-04-11 | |
| | 497: 22 | THE WITNESS:  Yes, they are. | |
| **501:24** - **502:6** | | Gilmartin, Raymond 2005-04-11 | |
| | 501: 24 | Q:  Let's take a look at -- do you know | Def Obj:  602 - No |
| | 501: 25 | who Dr. Holt is, Mr. Gilmartin? | foundation, no personal |
| | 502: 1 | A:  Not off the top of my head. | knowledge of Dr. Holt, or |
| | 502: 2 | Q:  Well, Dr. Holt is one of the speakers | the allegations relating |
| | 502: 3 | that Merck is being criticized by the FDA for. Do | to him.  Also, no |
| | 502: 4 | you recall that from the letter? Take a minute if | personal knowledge of |
| | 502: 5 | you'd like to look at it. | Dr. Patrono's e-mail; |
| | 502: 6 | A:  Sure. | Also, 401, 402, 403 - |
| **503:5** - **503:21** | | Gilmartin, Raymond 2005-04-11 | irrelevant to this case |
| | 503: 5 | Q:  Now, you get a letter with these | since no one involved |
| | 503: 6 | conferences that have been arranged by Merck | heard Dr. Holt speak. |
| | 503: 7 | indicating that this doctor is putting out 'false | |
| | 503: 8 | and misleading' information; correct? That's what | |
| | 503: 9 | this says? | Also incomplete if this |
| | 503: 10 | A:  That's what this letter says. | testimony is allowed. |
| | 503: 11 | Q:  It says he makes 'unsubstantiated | Must also include full |
| | 503: 12 | superiority claims.' Correct? | answer at 508:23-509:1. |
| | 503: 13 | A:  I believe that's -- I haven't picked | |
| | 503: 14 | this out specifically. | |
| | 503: 15 | Q:  It says that. That is what it says. | |
| | 503: 16 | And it also says that Merck arranged | |
| | 503: 17 | for the conferences and that he was presenting | |
| | 503: 18 | information on behalf of Merck. So, it's clear the | |
| | 503: 19 | FDA thinks Merck is responsible for Dr. Holt's | |
| | 503: 20 | conduct; right? | |
| | 503: 21 | A:  That's correct. | |
| **504:4** - **504:24** | | Gilmartin, Raymond 2005-04-11 | |
| | 504: 4 | Q:  Take a look at Page 3. | |
| | 504: 5 | A:  Okay. | |
| | 504: 6 | Q:  Are you there? | |
| | 504: 7 | A:  Right. | |
| | 504: 8 | Q:  Do you see the indented paragraph | |
| | 504: 9 | which is the statement made by Dr. Holt? Do you see | |
| | 504: 10 | that paragraph there? | |
| | 504: 11 | A:  Yes. | |

<u>**Objection/Response in Barnett**</u>

504: 12    Q:  Right below it. Actually, the
504: 13    statement that Dr. Holt makes is that 'Naprosyn on
504: 14    the other hand is a wonderful platelets inhibitor,
504: 15    prolongs bleeding time and inhibits platelet
504: 16    identically to aspirin.' Correct? Do you see that
504: 17    in the middle of the indented paragraph?
504: 18    A:  Yes. Correct.
504: 19    Q:  Again, below that is the FDA
504: 20    criticism where he says it 'is not at all clear'
504: 21    that that's true. Is that a fair characterization?
504: 22    A:  That's right. It says, 'There are
504: 23    no,' as we've said before, 'well-controlled studies
504: 24    of naproxen.'

**505:13   -   505:20**          Gilmartin, Raymond 2005-04-11

505: 13    Q:  Now, do you recall Dr. Patrono's
505: 14    e-mail to Merck where he also says that even aspirin
505: 15    would not account for the magnitude of difference in
505: 16    heart attacks between naproxen in VIGOR?
505: 17    A:  That is what was in his e-mail, yes.
505: 18    Q:  So, there's a consistency between
505: 19    these criticisms with the FDA and the statement made
505: 20    by Dr. Patrono; correct?

**505:23   -   506:7**          Gilmartin, Raymond 2005-04-11

505: 23    THE WITNESS:  Yes. The statement
505: 24    being made by the FDA here is criticizing Dr. Holt's
505: 25    specific presentation and the way he's
506: 1    characterizing this.
506: 2    BY MR. SEEGER:
506: 3    Q:  Well, and they're criticizing Dr.
506: 4    Holt's presentation, but they're criticizing Merck
506: 5    because Merck supported the presentation; correct?
506: 6    A:  That's correct. We're responsible
506: 7    for the speaker.

**506:25   -   507:3**          Gilmartin, Raymond 2005-04-11

506: 25    Q:  Are you aware of anybody was fired at
507: 1    Merck over this, these allegations from the FDA?
507: 2    A:  Yes. I'm not aware that anyone was
507: 3    fired.

**507:18   -   507:21**          Gilmartin, Raymond 2005-04-11

507: 18    If you go to Page 7 of the letter,
507: 19    under the title, 'Oral Representations.' Tell me
507: 20    when you're there.

|  | | | **Objection/Response in Barnett** |
|---|---|---|---|
| | 507: 21 | A: Right. | |

| **508:3** | **-** | **508:13** | Gilmartin, Raymond 2005-04-11 |
|---|---|---|---|

508: 3    Q:  Just to be clear on something, Mr.
508: 4    Gilmartin, this letter is written to you in
508: 5    September of 2001; right?
508: 6    A:  I'm just checking the date here.
508: 7    Q:  It would be at the bottom. See that
508: 8    fax line?
508: 9    A:  Yes, right.
508: 10   Q:  And the criticism here, part of the
508: 11   criticism, one of the criticisms, rather, is that
508: 12   Merck is supporting presentations where they are
508: 13   saying that naproxen is cardioprotective; correct?

| **508:15** | **-** | **508:22** | Gilmartin, Raymond 2005-04-11 |
|---|---|---|---|

508: 15   THE WITNESS:  A speaker that we were
508: 16   responsible for was making these remarks which they
508: 17   were criticizing, yes, a speaker that we terminated.
508: 18   BY MR. SEEGER:
508: 19   Q:  And you're still making those
508: 20   statements today, that naproxen is cardioprotective,
508: 21   aren't you?
508: 22   A:  Yes. Today -- well, today we're

| **509:2** | **-** | **509:5** | Gilmartin, Raymond 2005-04-11 |
|---|---|---|---|

509: 2    Q:  That's exactly the same statement you
509: 3    made in the press release of March 27th of 200;
509: 4    correct?
509: 5    A:  That's correct.

| **529:1** | **-** | **529:7** | Gilmartin, Raymond 2005-04-11 |
|---|---|---|---|

529: 1    Q:  Mr. Gilmartin, I just want you to
529: 2    take a look at what we've just marked as 38. For
529: 3    the record, it's MRK-ABI0007213 through 7215.
529: 4    Do you see this? It's a memo, an
529: 5    internal memo from Susan Baumgartner to Lou
529: 6    Sherwood. Do you see that?
529: 7    A:  Yes, I do.

Def Obj:  602 - No personal knowledge, no foundation, no evidence witness has seen this before.  Also, 410, 402 403 because Dr. Singh, Dr. Fries, and Dr. Sherwood have nothing to do with Mr. Barnett or his doctors or issues that are directly relevatn to their prescribing practices.

| **529:14** | **-** | **529:20** | Gilmartin, Raymond 2005-04-11 |
|---|---|---|---|

529: 14   Q:  For the jury's benefit, what does the
529: 15   subject read?
529: 16   A:  'Gurkipal Singh.'
529: 17   Q:  Now, you understand this to be the
529: 18   same Dr. Singh that's referenced in Dr. Fries's

<u>**Objection/Response in Barnett**</u>

| | |
|---|---|
| 529: 19    letter; correct? | |
| 529: 20    A: Yes. | |

**533:8 - 533:12**      Gilmartin, Raymond 2005-04-11

533: 8    Q: So, getting back to this exhibit, you
533: 9    see here that Dr. Sherwood, in fact, had, in
533: 10    essence, a file on Dr. Singh. Does it now surprise
533: 11    you to know that nobody even asked to take a look at
533: 12    this file?

**533:14 - 534:2**      Gilmartin, Raymond 2005-04-11

533: 14    THE WITNESS: No. Actually, I'm not
533: 15    sure that Dr. Sherwood did have the file. I just
533: 16    see a memo here in which he apparently asked for
533: 17    just basically all our interactions as Merck with
533: 18    Dr. Singh.
533: 19    BY MR. SEEGER:
533: 20    Q: Do you keep these kind of
533: 21    interactions? There's about -- there's probably
533: 22    over 20 notations of Dr. Singh speaking at various
533: 23    events here; correct?
533: 24    A: That's correct.
533: 25    Q: And they range over a three-year
534: 1    period; correct?
534: 2    A: From the end of -- yes, right.

**534:25 - 535:5**      Gilmartin, Raymond 2005-04-11

534: 25    Q: But this is a listing where Dr. Singh
535: 1    actually expresses concerns about Merck or Vioxx,
535: 2    correct, most of these entries?
535: 3    A: Well, there are areas, that's
535: 4    correct, where he is -- yes, where he is making
535: 5    statements that are negative to Merck.

**540:2 - 540:4**      Gilmartin, Raymond 2005-04-11

540: 2    You do know that the company has been
540: 3    accused in the past of a policy of attempting to
540: 4    neutralize and discredit doctors; right?

**540:6 - 540:24**      Gilmartin, Raymond 2005-04-11

540: 6    THE WITNESS: No, I'm not aware of
540: 7    that.
540: 8    BY MR. SEEGER:
540: 9    Q: That's never been brought to your
540: 10    attention?
540: 11    A: No.

| | **Objection/Response in Barnett** |
|---|---|
| 540: 12   - - - | |
| 540: 13   (Whereupon, Deposition Exhibit | |
| 540: 14   Gilmartin-39, List, MRK-AFI0201416 - | |
| 540: 15   MRK-ABI0201442, was marked for | |
| 540: 16   identification.) | |
| 540: 17   - - - | |
| 540: 18   BY MR. SEEGER: | |
| 540: 19   Q:  Let me show you what we've just | Def Obj:  602 - No |
| 540: 20   marked as 39. For the record, it's Bates stamped | foundation, no personal |
| 540: 21   MRK-AFI0201416 through 442. | knowledge.  Witness |
| 540: 22   Mr. Gilmartin, have you ever heard | has never seen document |
| 540: 23   the term 'neutralized' used within Merck? | before and is not aware |
| 540: 24   A:  No, I have not. | of its contents. |

| | |
|---|---|
| **541:11  -  542:1**          Gilmartin, Raymond 2005-04-11 | 401, 402, 403 - The |
| 541: 11   Let me ask you to turn to the page | document is also |
| 541: 12   that's Bates stamped, and I'm sorry to do this to | irrelevant and prejudicial |
| 541: 13   you, but there's no other numbering, but the last | because it does not |
| 541: 14   three numbers are 434. | relate to Mr. Barnett or |
| 541: 15   A:  These are down at the bottom here? | any of his doctors. |
| 541: 16   Q:  Yes. Right-hand corner, right below | |
| 541: 17   the chart. The numbers are small. | |
| 541: 18   A:  Okay. Right. | |
| 541: 19   Q:  Could you also put the Fries letter | |
| 541: 20   in front of you in case you want to refer to it? | |
| 541: 21   I would ask you just, if you could | |
| 541: 22   just, first, with the Fries letter, turn to Page 3. | |
| 541: 23   I'm sorry. Okay. Top of Page 3. | |
| 541: 24   Do you see the name 'Dr. James | |
| 541: 25   McMillen' at the top of Page 3? | |
| 542: 1   A:  Yes, I do. | |

| | |
|---|---|
| **542:9  -  542:11**          Gilmartin, Raymond 2005-04-11 | |
| 542: 9   You understand from the letter you | |
| 542: 10   looked at that he's one of the scientists that Dr. | |
| 542: 11   Fries is complaining on behalf of? | |

| | |
|---|---|
| **542:13  -  543:7**          Gilmartin, Raymond 2005-04-11 | |
| 542: 13   THE WITNESS:  Well, he's -- | |
| 542: 14   basically, he's mentioned in this letter as you're | |
| 542: 15   pointing out, yes. | |
| 542: 16   BY MR. SEEGER: | |
| 542: 17   Q:  Yes. How is he being mentioned in | |
| 542: 18   that letter? What's your understanding of that? | |
| 542: 19   A:  Well, what he says here is that 'Dr. | |

**Objection/Response in Barnett**

|  |  |
|---|---|
| 542: 20 | McMillen believes that his VCF appointment at |
| 542: 21 | Hershey was revoked because of these accusations.' |
| 542: 22 | Q:  Right. Now, would you take a look at |
| 542: 23 | the exhibit I have in front of you. I put in front |
| 542: 24 | of you what I just recently marked. I think we |
| 542: 25 | marked it as 39. |
| 543: 1 | A:  Right. |
| 543: 2 | Q:  Do you see the name 'James MacMillan' |
| 543: 3 | on that list? |
| 543: 4 | A:  Yes, I do. |
| 543: 5 | Q:  What words do you see written in bold |
| 543: 6 | print, all capitals, right below his name? |
| 543: 7 | A:   'DISCREDIT.' |

**543:12   -   543:14**          Gilmartin, Raymond 2005-04-11

| 543: 12 | Q:  Were you aware that Merck had a |
| 543: 13 | policy of discrediting scientists that disagreed |
| 543: 14 | with it? |

**543:16   -   543:18**          Gilmartin, Raymond 2005-04-11

| 543: 16 | THE WITNESS:  Yes. I don't -- Merck |
| 543: 17 | does not have a policy of discrediting scientists |
| 543: 18 | who disagrees with us. |

**543:23   -   544:6**          Gilmartin, Raymond 2005-04-11

| 543: 23 | Q:  Well, how would you know -- I mean, |
| 543: 24 | this is a Merck-produced document. How do you know |
| 543: 25 | that, in fact, that isn't going on right under your |
| 544: 1 | nose? |
| 544: 2 | A:  Well, first of all, because of the |
| 544: 3 | procedures and the policies that we have in place |
| 544: 4 | and the kind of training that we do and the kind of |
| 544: 5 | followup that we do, if we learn something that is |
| 544: 6 | inconsistent with our policy. |

**546:3   -   546:8**          Gilmartin, Raymond 2005-04-11

| 546: 3 | Q:  Do you see the reference to the |
| 546: 4 | words, 'Visit from Lou Sherwood might be useful'? |
| 546: 5 | A:  Right. |
| 546: 6 | Q:  Is that how Dr. Sherwood was used, to |
| 546: 7 | go visit thought leaders and try to persuade them to |
| 546: 8 | see things Merck's way? |

**546:10   -   546:16**          Gilmartin, Raymond 2005-04-11

| 546: 10 | THE WITNESS:  Yes. I'm not |
| 546: 11 | specifically aware of what this visit, you know, |

| | Objection/Response in Barnett |
|---|---|
| 546: 12   might entail. | |
| 546: 13   BY MR. SEEGER: | |
| 546: 14   Q:  Well, is Dr. Sherwood, you know, like | |
| 546: 15   an enforcer of some sort? | |
| 546: 16   A:  No, he's not. | |
| **547:3   -   547:7**   Gilmartin, Raymond 2005-04-11 | |
| 547: 3   Q:  Mr. Gilmartin, let me ask you to take | |
| 547: 4   a look at -- you would never condone a policy of | |
| 547: 5   discrediting doctors, would you? | |
| 547: 6   A:  I would never condone that policy, | |
| 547: 7   right. | |
| **548:4   -   548:6**   Gilmartin, Raymond 2005-04-11 | |
| 548: 4   Q:  It's marked as Exhibit 40. It's | Def Obj:  602 - No |
| 548: 5   Bates stamped MRK-AAR0019773 through 786. This is | personal knowledge, no |
| 548: 6   the infamous Dodge Ball document; correct? | foundation.  Witness had |
| **548:12   -   548:14**   Gilmartin, Raymond 2005-04-11 | never seen it before the |
| 548: 12   Q:  Mr. Gilmartin, this is the infamous | litigation. |
| 548: 13   Dodge Ball document; correct? | 401, 402, 403 - also |
| 548: 14   A:  This is the Dodge Ball document. | irrelevant and prejudicial |
| **552:11   -   552:17**   Gilmartin, Raymond 2005-04-11 | in this case because Mr. |
| 552: 11   Q:  Now, are you aware that this | Barnett's doctors |
| 552: 12   document, this Dodge Ball document is one of those | testified no Merck sales |
| 552: 13   documents that was used in connection with training | rep ever tried to dodge |
| 552: 14   your sales reps? | a question. |
| 552: 15   A:  Yes, I am. | Also, if the Court |
| 552: 16   Q:  You are aware of that? | determines to allow this |
| 552: 17   A:  Right. | testimony, it is currently |
| **554:12   -   554:20**   Gilmartin, Raymond 2005-04-11 | incomplete.  Should |
| 554: 12   What are the questions called in this | include 552:18-553:2, |
| 554: 13   document? Could you turn the page? What's a | 553:9-554:5; 560:7-14. |
| 554: 14   question called? | Additionally, no |
| 554: 15   A:  You're looking at the middle? | foundation for this |
| 554: 16   Q:  Number one, for example, there's a | discussion regarding |
| 554: 17   word next to it? | low dose aspirin. |
| 554: 18   A:  'Obstacle.' | This objection applies |
| 554: 19   Q:  'Obstacle' you understand is the word | to 548:4 - 567:10 |
| 554: 20   that's used within Merck for a question; right? | |
| **554:22   -   555:4**   Gilmartin, Raymond 2005-04-11 | |
| 554: 22   THE WITNESS:  Obstacle is -- would be | |
| 554: 23   a question or an issue raised by a physician. | |
| 554: 24   BY MR. SEEGER: | |

**Objection/Response in Barnett**

| | |
|---|---|
| 554: 25 | Q: The use of the word 'obstacle' for a |
| 555: 1 | doctor's question, do you find that unusual? |
| 555: 2 | A: It's viewed more as something -- as a |
| 555: 3 | reason why a doctor would be concerned about |
| 555: 4 | prescribing the drug. |

**558:16   -   559:15**        Gilmartin, Raymond 2005-04-11

| | |
|---|---|
| 558: 16 | Q: What about this document shows us |
| 558: 17 | that questions are being asked and answered |
| 558: 18 | factually? What about this tells us that? |
| 558: 19 | A: This is a document that only has |
| 558: 20 | questions. |
| 558: 21 | Q: Do you know where the document is |
| 558: 22 | with the answers? |
| 558: 23 | A: I do not. |
| 558: 24 | Q: Is there anything about this document |
| 558: 25 | that indicates to us or the jury looking at it that |
| 559: 1 | questions are being answered in a factual way? |
| 559: 2 | A: Not with this document, but you would |
| 559: 3 | have to look at the totality of the game and the |
| 559: 4 | exercise and the training exercise and the material |
| 559: 5 | that goes along with that in terms of what the |
| 559: 6 | answers are to these questions. |
| 559: 7 | Q: Did you ever do that? |
| 559: 8 | A: I have not. |
| 559: 9 | Q: So, the answer you gave about your |
| 559: 10 | understanding of this game comes from where? |
| 559: 11 | A: It comes from within our |
| 559: 12 | organization. |
| 559: 13 | Q: Who within your organization told you |
| 559: 14 | about it? |
| 559: 15 | A: My general counsel. |

**560:15   -   560:18**        Gilmartin, Raymond 2005-04-11

| | |
|---|---|
| 560: 15 | Q: I mean, the real focus of this |
| 560: 16 | document and the game is to answer questions in a |
| 560: 17 | way that will persuade doctors to prescribe the |
| 560: 18 | drug; correct? |

**560:20   -   560:24**        Gilmartin, Raymond 2005-04-11

| | |
|---|---|
| 560: 20 | THE WITNESS: The purpose of the |
| 560: 21 | exercise is to answer questions in a clear and |
| 560: 22 | factual way, in a balanced way. And only by being |
| 560: 23 | able to answer in a clear and balanced way would a |
| 560: 24 | doctor be convinced to prescribe the drug. |

| | Objection/Response in Barnett |
|---|---|

**561:20  -  562:3**          Gilmartin, Raymond 2005-04-11

561: 20   Well, sir, what document would you

561: 21   specifically refer us to that was used in this game

561: 22   that we can go and find to determine that sales reps

561: 23   were trained to give answers appropriately? Can you

561: 24   refer us to that document?

561: 25   A:  I can't refer you to a specific

562: 1   document, but there is, as I understand it,

562: 2   documentation around this about how to answer these

562: 3   questions appropriately.

**564:10  -  565:1**          Gilmartin, Raymond 2005-04-11

564: 10   Q:  When you look at this document, there

564: 11   are no answers on it, just what you call obstacles;

564: 12   correct?

564: 13   A:  That's correct.

564: 14   Q:  Just to be clear so we can

564: 15   characterize it properly, 'Obstacle 1,' for example,

564: 16   would be a doctor's question; right?

564: 17   A:  That's correct.

564: 18   Q:  And it says, 'I am concerned with the

564: 19   potential edema that occurs with Vioxx.' Correct?

564: 20   I read that correctly?

564: 21   A:  That's the question, yes.

564: 22   Q:  Edema is a cardiovascular event;

564: 23   isn't it?

564: 24   A:  It's extra fluid.

564: 25   Q:  But it's also -- it's considered a

565: 1   cardiovascular event, isn't it?

**565:3  -  565:22**          Gilmartin, Raymond 2005-04-11

565: 3   THE WITNESS:  Yes, I mean, it's an

565: 4   extra fluid, buildup of fluid.

565: 5   BY MR. SEEGER:

565: 6   Q:  Obstacle number 2, 'I am concerned'

565: 7   with high dose -- I'm sorry. 'I am concerned with

565: 8   dose-related increases in hypertension with Vioxx.'

565: 9   Do you see that? Do you see that on Page 2?

565: 10   A:  Yes, I do.

565: 11   Q:  Hypertension is a cardiovascular

565: 12   event; isn't it?

565: 13   A:  That's correct.

565: 14   Q:  Then 3, Obstacle 3, 'Can Vioxx be

565: 15   used in patients using low dose aspirin?' Do you

<u>**Objection/Response in Barnett**</u>

| | | |
|---|---|---|
| 565: 16 | see that? | |
| 565: 17 | A:  Yes, I do. | |
| 565: 18 | Q:  You're aware, in fact, that if Vioxx | |
| 565: 19 | was used with low-dose aspirin with regard to | |
| 565: 20 | gastrointestinal events, it was really no better | |
| 565: 21 | than ibuprofen or any of the other standard NSAIDs; | |
| 565: 22 | correct? | |

**565:24   -   566:23**      Gilmartin, Raymond 2005-04-11

| | | |
|---|---|---|
| 565: 24 | THE WITNESS:  That's not -- I don't | |
| 565: 25 | think that there's any studies to that effect. | |
| 566: 1 | Using it with low-dose aspirin would have some | |
| 566: 2 | effect on its ability to protect the GI tract. | |
| 566: 3 | BY MR. SEEGER: | |
| 566: 4 | Q:  Well, you know -- | |
| 566: 5 | A:  Because low-dose aspirin basically | |
| 566: 6 | causes stomach bleeding. | |
| 566: 7 | Q:  Well, you know that, in fact, Merck | |
| 566: 8 | did a study using Vioxx and low-dose aspirin; | |
| 566: 9 | correct? | |
| 566: 10 | A:  Just generally aware of that. | |
| 566: 11 | Q:  Just generally? You don't have any | |
| 566: 12 | specific knowledge of that? | |
| 566: 13 | A:  Right. I don't have any specific | |
| 566: 14 | knowledge. | |
| 566: 15 | Q:  You didn't have any discussions in | |
| 566: 16 | the company with anybody who conducted a low-dose | |
| 566: 17 | aspirin study? | |
| 566: 18 | A:  Not that I recall, in terms of -- | |
| 566: 19 | Q:  Do you recall any discussions, just | |
| 566: 20 | to try to help you refresh your recollection, that | |
| 566: 21 | if you used Vioxx with low-dose aspirin, it was no | |
| 566: 22 | better than ibuprofen with regard to stomach | |
| 566: 23 | effects? | |

**566:25   -   567:10**      Gilmartin, Raymond 2005-04-11

| | | |
|---|---|---|
| 566: 25 | THE WITNESS:  Yes. I don't recall | |
| 567: 1 | whether it was no better than ibuprofen, but | |
| 567: 2 | certainly we were aware that adding aspirin to Vioxx | |
| 567: 3 | would reduce its ability to protect the GI tract. | |
| 567: 4 | BY MR. SEEGER: | |
| 567: 5 | Q:  When you say 'reduce,' do you recall | |
| 567: 6 | specifically what you're talking about? I mean, you | |
| 567: 7 | had a discussion with Dr. Scolnick about that; | |
| 567: 8 | correct? | |

| | **Objection/Response in Barnett** |
|---|---|
| 567: 9   A: I could have. | |
| 567: 10  Q: Let me find something to help us out. | |

**567:18** - **567:19**    Gilmartin, Raymond 2005-04-11

567: 18   Q: I hand you what I've just marked as
567: 19   Gilmartin-41.

**568:2** - **568:8**    Gilmartin, Raymond 2005-04-11

568: 2   Q: Do you see the e-mail from Dr.
568: 3   Scolnick on November 19, 2001?
568: 4   A: Right.
568: 5   Q: Do you see who it went to?
568: 6   A: Yes.
568: 7   Q: Who is it?
568: 8   A: To me and to David Anstice.

**568:24** - **570:20**    Gilmartin, Raymond 2005-04-11

568: 24  Q: All right. Well, just for the jury's
568: 25  benefit, it's written to you and David Anstice;
569: 1   correct?
569: 2   A: Right.
569: 3   Q: And it says, 'Not a good result.
569: 4   low-dose aspirin and Vioxx equal almost ibuprofen.'
569: 5   Correct?
569: 6   A: That's correct. That's right.
569: 7   Q: Does that refresh your recollection
569: 8   that if you use Vioxx with low-dose aspirin it's
569: 9   equal to ibuprofen?
569: 10  A: Well, he said 'equal almost,' but,
569: 11  you know, my sense was just what the sense of this
569: 12  memo is, but I couldn't recall this study
569: 13  specifically.
569: 14  Q: Well, maybe more significantly about
569: 15  the e-mails --
569: 16  A: Right.
569: 17  Q: -- if you look at the next sentence
569: 18  where it says, 'higher than asa alone.' That's
569: 19  aspirin; right?
569: 20  A: Where is that?
569: 21  Q: Right after the sentence I read where
569: 22  it says, 'ibuprofen.'
569: 23  A: Right.
569: 24  Q: Now, just so the jury understands,
569: 25  ibuprofen is in Motrin and common over-the-counter
570: 1   NSAIDs; correct?

| | | **Objection/Response in Barnett** |
|---|---|---|
| 570: 2 | A:  That's correct. | |
| 570: 3 | Q:  All right. | |
| 570: 4 | And then you see right next to it | |
| 570: 5 | where it says if you take Vioxx and aspirin | |
| 570: 6 | together, it's -- you have more GI problems than | |
| 570: 7 | just taking aspirin alone. Correct? | |
| 570: 8 | A:  That's what this memo says, 'higher | |
| 570: 9 | than asa alone.' That's what this e-mail says. | |
| 570: 10 | Q:  And this memo is written to you? You | |
| 570: 11 | understood it to be saying that when you got it; | |
| 570: 12 | correct? | |
| 570: 13 | A:  That's what that data in that study | |
| 570: 14 | said, yes. | |
| 570: 15 | Q:  You understood when you got this | |
| 570: 16 | e-mail in November of 2001 that Dr. Scolnick was | |
| 570: 17 | telling you that if you take Vioxx with low-dose | |
| 570: 18 | aspirin, you're going to have higher GI events than | |
| 570: 19 | if you just took aspirin alone; correct? | |
| 570: 20 | A:  That's what this e-mail says, yes. | |

**571:17  -  571:23**        Gilmartin, Raymond 2005-04-11

| | | |
|---|---|---|
| 571: 17 | Q:  Well, the salespeople who were | Def Obj:  602 - No |
| 571: 18 | trained to use that Dodge Ball document, do you know | personal knowledge, no |
| 571: 19 | if an answer to the obstacle 'Can Vioxx be used in | foundation.  Witness had |
| 571: 20 | patients with low-dose aspirin,' do you know what | never seen it before the |
| 571: 21 | part of the answer was? If you do, you'll have as | litigation. |
| 571: 22 | many GI side effects as you will by taking | 401, 402, 403 - also |
| 571: 23 | ibuprofen? | irrelevant and prejudicial |

**571:25  -  572:25**        Gilmartin, Raymond 2005-04-11

| | | |
|---|---|---|
| 571: 25 | THE WITNESS:  I'm sorry. Repeat that | in this case because Mr. |
| 572: 1 | question. | Barnett's doctors |
| 572: 2 | BY MR. SEEGER: | testified no Merck sales |
| 572: 3 | Q:  Obstacle 3 we were talking about -- | rep ever tried to dodge |
| 572: 4 | A:  Right. | a question. |
| 572: 5 | Q:  -- from the Dodge Ball. | |
| 572: 6 | A:  Right. | |
| 572: 7 | Q:  Do you see the question there -- the | |
| 572: 8 | question being asked by the doctor is, 'Can Vioxx be | |
| 572: 9 | used in patients using low-dose aspirin?' | |
| 572: 10 | A:  Right. | |
| 572: 11 | Q:  Do you know if the answer that was | |
| 572: 12 | provided to doctors in the context of that question | |
| 572: 13 | was, yes, but if you do, it'll be no better than | |
| 572: 14 | taking ibuprofen with regard to GI benefits? | |

| | **Objection/Response in Barnett** |
|---|---|
| 572: 15   A: And I don't know just what the | |
| 572: 16   specifics were around that. And like I say, this is | |
| 572: 17   just one study, so, I don't what this indicates when | |
| 572: 18   you look at the totality of the data around aspirin | |
| 572: 19   and Vioxx. | |
| 572: 20   Q: Well, it's just one study, but it's a | |
| 572: 21   Merck study; correct? | |
| 572: 22   A: That's correct. | |
| 572: 23   Q: And it's not an observational study, | |
| 572: 24   it's a clinical trial; correct? | |
| 572: 25   A: Right. | |

**575:2   -   575:14**          Gilmartin, Raymond 2005-04-11

575: 2   Q: Let me ask you this, and this was
575: 3   part of the statement you made to the Senate
575: 4   committee when you testified. You said since the
575: 5   time of your release of the VIGOR study data 'it was
575: 6   a healthy scientific discussion of the safety of
575: 7   Vioxx and other COX-2 inhibitors. This discussion
575: 8   has occurred within Merck's laboratories and
575: 9   external scientific forums. Merck supported that
575: 10   discussion.' Do you recall giving that testimony?
575: 11   A: Yes, I do.

| 575: 12   Q: Do you believe that Merck seriously | Def Obj: Argumentative, |
|---|---|
| 575: 13   supported scientific discussion when it sought to | assumes facts not in |
| 575: 14   discredit doctors that criticized this drug? | evidence. |

**575:16   -   575:19**          Gilmartin, Raymond 2005-04-11

575: 16   THE WITNESS: First of all, we did
575: 17   continue to engage in scientific discussion, and
575: 18   I -- you know, I don't have any knowledge, nor do I
575: 19   accept that we were discrediting doctors.

**576:11   -   576:14**          Gilmartin, Raymond 2005-04-11

576: 11   Do you think Merck supported
576: 12   scientific discussion when it issued a press release
576: 13   claiming that Vioxx was safe from a cardiac
576: 14   perspective?

**576:16   -   576:20**          Gilmartin, Raymond 2005-04-11

576: 16   THE WITNESS: We issued a press
576: 17   release that basically laid out the results of the
576: 18   VIGOR trial in terms of what we'd observed and what
576: 19   our conclusions were about that, so, we did do that.
576: 20   Yes, that is promoting a scientific discussion.

| | Objection/Response in Barnett |
|---|---|
| **578:9** - **578:13**  Gilmartin, Raymond 2005-04-11 | |
| 578: 9    In the warning letter that the FDA | Def Obj:  401, 402, 403 - |
| 578: 10   wrote you in response to the press release that you | Warning letter is |
| 578: 11   say promotes scientific discussion, Merck was | irrelevant and prejudicial |
| 578: 12   criticized for making false and misleading claims; | in this case. |
| 578: 13   correct? | |
| **578:15** - **579:7**  Gilmartin, Raymond 2005-04-11 | |
| 578: 15   THE WITNESS:  The FDA wrote us a | |
| 578: 16   warning letter, yes, criticizing us, but when we | |
| 578: 17   responded to the FDA and talked about the context in | |
| 578: 18   which the press release was issued, they required no | |
| 578: 19   further action or no corrective action on our part. | |
| 578: 20   BY MR. SEEGER: | |
| 578: 21   Q:  What do you mean, they didn't tell | |
| 578: 22   you to stop making those claims? | |
| 578: 23   A:  They -- well, in the case of the | |
| 578: 24   other things that were criticized in the letter, | |
| 578: 25   such as the speaker or take all criticism of our | |
| 579: 1    sales representatives, we sent out letters to | |
| 579: 2    doctors who may have heard those comments or that | |
| 579: 3    speaker basically laying out the fact of more | |
| 579: 4    balanced information that the FDA requested. So, in | |
| 579: 5    terms -- so, they asked us to take corrective | |
| 579: 6    actions. In the case of the press release, they did | |
| 579: 7    not require any corrective action. | |
| **582:10** - **583:2**  Gilmartin, Raymond 2005-04-11 | |
| 582: 10   Q:  Mr. Gilmartin, when you make the | |
| 582: 11   statement that you weren't asked to do anything | |
| 582: 12   further, I want to refer you to Page 7 of the | |
| 582: 13   warning letter. | |
| 582: 14   A:  Right. | |
| 582: 15   Q:  Why don't we start with right above | |
| 582: 16   where it says, 'Due to the seriousness of these | |
| 582: 17   violations.' Do you see that? | |
| 582: 18   A:  Yes. | |
| 582: 19   Q:  'And the fact that your violative | |
| 582: 20   promotion of Vioxx has continued despite our prior | |
| 582: 21   written notification regarding similar violations, | |
| 582: 22   we request that you provide a detailed response to | |
| 582: 23   the issues raised in this Warning Letter on or | |
| 582: 24   before October 1, 2001.' You did that; right? | |
| 582: 25   A:  Yes, we did. | |

| | | | **Objection/Response in Barnett** |
|---|---|---|---|
| 583: 1 | Q: So, you took that action; correct? | | |
| 583: 2 | A: That's correct. | | |

**602:25 - 603:9** Gilmartin, Raymond 2005-04-11

| | | Def Obj: 602 - No |
|---|---|---|
| 602: 25 | Q: Mr. Gilmartin, let me just show you | foundation, no personal |
| 603: 1 | what I've marked as 42. For the record, it's | knowledge, no evidence |
| 603: 2 | MRK-ACT0018064. The first e-mail at the bottom is | this witness ever saw |
| 603: 3 | from Dr. Scolnick; correct? | this. |
| 603: 4 | A: Yes, that's correct. | Lawyer just reading a |
| 603: 5 | Q: President of Merck Research Labs, and | document witness |
| 603: 6 | he's written this to Doug Greene. Who is Doug | has never seen. |
| 603: 7 | Greene, Mr. Gilmartin? | The document is also |
| 603: 8 | A: Doug Greene was involved in our | irrelevant and prejudicial. |
| 603: 9 | regulatory activities. | |

**603:24 - 604:20** Gilmartin, Raymond 2005-04-11

| | |
|---|---|
| 603: 24 | Q: The subject is 'Today.' Now, do you |
| 603: 25 | recognize the date on this e-mail? Does that |
| 604: 1 | coincide with the meeting of the FDA Advisory |
| 604: 2 | Committee? |
| 604: 3 | A: It's February 2001, so, I would |
| 604: 4 | assume that it does, right. |
| 604: 5 | Q: This is at 9 p.m. he writes this; |
| 604: 6 | correct? |
| 604: 7 | A: Right. |
| 604: 8 | Q: For the jury's benefit, we'll read |
| 604: 9 | it. It says: 'TO ALL: I bit my nails all day. |
| 604: 10 | You all were FANTASTIC. You made them look like |
| 604: 11 | grade d high school students and you won big huge |
| 604: 12 | and completely. You should be proud, happy |
| 604: 13 | and...exhausted. Enjoy and bask in the warmth of |
| 604: 14 | having done an impossible job superbly.' Did I read |
| 604: 15 | that correctly, sir? |
| 604: 16 | A: Yes, you did. |
| 604: 17 | Q: Is this accurately reflecting the |
| 604: 18 | view of Merck, at least Merck management, with |
| 604: 19 | regard to those FDA Advisory Committee members? |
| 604: 20 | A: No, it isn't. |

**609:6 - 609:16** Gilmartin, Raymond 2005-04-11

| | |
|---|---|
| 609: 6 | Q: All right, sir. Let me ask you this: |
| 609: 7 | Is it Merck's goal to make FDA |
| 609: 8 | Advisory Committee members look like grade D high |
| 609: 9 | school students? |
| 609: 10 | A: No, it is not. |

**Objection/Response in Barnett**

| | |
|---|---|
| 609: 11 | Q:  Okay. |
| 609: 12 | Is it something to be proud of if |
| 609: 13 | your people, in fact, make them look like grade D |
| 609: 14 | high school students? |
| 609: 15 | A:  Well, I'm not sure that this is |
| 609: 16 | accurate that that's actually what happened. |

**610:2  -  610:10**        Gilmartin, Raymond 2005-04-11

| | |
|---|---|
| 610: 2 | Q:  -- and this is your head scientist |
| 610: 3 | writing this e-mail; correct? |
| 610: 4 | A:  That's correct. |

| | |
|---|---|
| 610: 5 | Q:  So, with regard to those scientific |
| 610: 6 | discussions, let's talk about the important issues |
| 610: 7 | being discussed at this FDA Advisory Committee |
| 610: 8 | meeting. One of them is the cardiovascular events |
| 610: 9 | witnessed in VIGOR; correct? |
| 610: 10 | A:  That is correct. |

**612:21  -  613:15**        Gilmartin, Raymond 2005-04-11

| | |
|---|---|
| 612: 21 | Q:  Now, one of the things discussed, we |
| 612: 22 | said, was a label change; correct? |
| 612: 23 | A:  That's correct. |
| 612: 24 | Q:  And the FDA wanted a cardiovascular |
| 612: 25 | warning in the warnings section of the Vioxx label. |
| 613: 1 | You know that; correct? |
| 613: 2 | MR. BUTSWINKAS:  Objection to the |
| 613: 3 | form. |
| 613: 4 | THE WITNESS:  That was a proposal or |
| 613: 5 | that was -- at one time by the FDA. |
| 613: 6 | BY MR. SEEGER: |
| 613: 7 | Q:  Now, let's just talk about this for a |
| 613: 8 | second. I mean, you're the CEO of a company that |
| 613: 9 | makes and sells drugs to doctors. You know what a |
| 613: 10 | warning is; right? |
| 613: 11 | A:  That's correct. |
| 613: 12 | Q:  And you know that in terms of level |
| 613: 13 | of importance on a label, a warning is more |
| 613: 14 | important than a precaution; correct? |
| 613: 15 | A:  That is correct. |

**613:24  -  614:13**        Gilmartin, Raymond 2005-04-11

| | |
|---|---|
| 613: 24 | Q:  The warning is the place in the label |
| 613: 25 | where you would convey to doctors risks about your |
| 614: 1 | drug and the seriousness or the possibility that |
| 614: 2 | those risks could occur? |

| | **Objection/Response in Barnett** |
|---|---|
| 614: 3   A:  That's correct. | |
| 614: 4   Q:  It's your understanding, isn't it, | |
| 614: 5   Mr. Gilmartin, that doctors understand the | |
| 614: 6   difference between a warning and a precaution? | |
| 614: 7   A:  Yes. | |
| 614: 8   Q:  They also understand what a | |
| 614: 9   contraindication is, for example? | |
| 614: 10   A:  Yes. | |
| 614: 11   Q:  These are all important things in the | |
| 614: 12   label; correct? | |
| 614: 13   A:  That's correct. | |

**617:7  -  617:10**          Gilmartin, Raymond 2005-04-11

| | Def Obj:  Calls for |
|---|---|
| 617: 7   Q:  If you had added a cardiovascular | speculation. |
| 617: 8   warning in the warnings section of the label after | |
| 617: 9   VIGOR, what do you think would have happened to the | |
| 617: 10   market that Vioxx held at that point? | |

**617:13  -  617:15**          Gilmartin, Raymond 2005-04-11

617: 13   THE WITNESS:  It is hard for me to
617: 14   speculate on that, and so I really can't answer that
617: 15   question directly.

**618:10  -  618:15**          Gilmartin, Raymond 2005-04-11

618: 10   Q:  So, if you've got Celebrex on the
618: 11   market, let's say, in 2001, and it doesn't have a
618: 12   cardiovascular warning, and Vioxx gets a
618: 13   cardiovascular warning, you would fully expect more
618: 14   doctors to gravitate towards Celebrex at that point;
618: 15   correct?

**618:17  -  618:20**          Gilmartin, Raymond 2005-04-11

618: 17   THE WITNESS:  Well, I would say that
618: 18   clearly having a cardiovascular warning against
618: 19   Celebrex with no warning would be a disadvantage,
618: 20   yes.

**620:8  -  620:13**          Gilmartin, Raymond 2005-04-11

620: 8   Q:  Mr. Gilmartin, let me ask you this:
620: 9   Of the 20, 21 million people that ultimately took
620: 10   the drug, it's fair to say that a substantial
620: 11   portion of those people who have osteoarthritis
620: 12   probably also had risk factors for heart disease;
620: 13   correct?

**620:16  -  620:20**          Gilmartin, Raymond 2005-04-11

620: 16   THE WITNESS:  I don't have those

| | **Objection/Response in Barnett** |
|---|---|
| 620: 17    statistics. | |
| 620: 18    BY MR. SEEGER: | |
| 620: 19    Q:  Forget about statistics. It's a fair | |
| 620: 20    assumption, isn't it? | |

**620:23   -   621:20**        Gilmartin, Raymond 2005-04-11

| | |
|---|---|
| 620: 23    THE WITNESS:  Well, I can't make that | |
| 620: 24    assumption. I don't know what the statistics are | |
| 620: 25    around that. | |
| 621: 1    BY MR. SEEGER: | |
| 621: 2    Q:  Well, we know that the average person | |
| 621: 3    in your osteoarthritis clinical trials was around | |
| 621: 4    62, 63 years old; right? | |
| 621: 5    A:  I'm not sure what the age was, but | |
| 621: 6    people of that condition tend to be older. | |
| 621: 7    Q:  Tend to be older. | |
| 621: 8    A:  Right. | |
| 621: 9    Q:  And you know that the leading risk | |
| 621: 10    factor for heart disease is age; right? | |
| 621: 11    A:   I -- | |
| 621: 12    Q:  You'd concede that? | |
| 621: 13    A:  Well, certainly, I think the risk | |
| 621: 14    factors -- you'd expect older people to have more | |
| 621: 15    risk factors. | |
| 621: 16    Q:  And you didn't have a warning telling | |
| 621: 17    doctors at any point that if you're prescribing to a | |
| 621: 18    person with diabetes, don't take Vioxx; right? You | |
| 621: 19    didn't have that warning? | |
| 621: 20    A:  That's correct. | |

**628:25   -   629:4**        Gilmartin, Raymond 2005-04-11

| | |
|---|---|
| 628: 25    Q:  I'm also going to mark Gilmartin-44, | |
| 629: 1    which is the April 2002 label. | |
| 629: 2    Let's just start with what I marked | Def Obj:  602 - No |
| 629: 3    as 43, Mr. Gilmartin. | foundation, no personal |
| 629: 4    A:  Yes. | knowledge.  Witness |

**629:22   -   629:25**        Gilmartin, Raymond 2005-04-11

| | has not seen e-mail. |
|---|---|
| 629: 22    Q:  Do you recognize -- if you look at | |
| 629: 23    this e-mail or you look at the first page, do you | |
| 629: 24    recognize this to be the label, the proposed label | |
| 629: 25    from the FDA to Merck? | |

**631:5   -   631:11**        Gilmartin, Raymond 2005-04-11

| | |
|---|---|
| 631: 5    Q:  Do you recognize this to be the | |
| 631: 6    initial label? | |

| | **Objection/Response in Barnett** |
|---|---|

631: 7    A: Then up at the top is: 'Forward:
631: 8    Vioxx Draft Label.'
631: 9    Q: Right. The people at the top are all
631: 10    Merck people; correct?
631: 11    A: That's correct.

**631:24   -   632:10**    Gilmartin, Raymond 2005-04-11

631: 24    Q: In fact, on the second sentence of
631: 25    the e-mail from David Blois to -- I'm sorry, from
632: 1    Robert Silverman to David Blois and others, it says:
632: 2    'The plan is to provide a response to FDA by no
632: 3    later than Monday and then offer to meet with them
632: 4    to review the date and/or move forward with label
632: 5    negotiations.' Did I read that correctly?
632: 6    A: That's correct.
632: 7    Q: So, we had a discussion before, you
632: 8    didn't want to describe the process as negotiations,
632: 9    but it is commonly referred to within Merck when
632: 10    you're changing a label as a negotiation; correct?

**632:12   -   632:15**    Gilmartin, Raymond 2005-04-11

632: 12    THE WITNESS: It is described as a
632: 13    negotiation, but in the sense that we discussed
632: 14    negotiation before, not sort of winning and losing,
632: 15    but really arriving at the best outcome.

**633:9   -   633:12**    Gilmartin, Raymond 2005-04-11

| | |
|---|---|
| 633: 9    Q: Now, you're aware in the context of<br>633: 10    label negotiations that your senior scientists don't<br>633: 11    have a lot of faith or confidence in the average FDA<br>633: 12    medical reviewer, aren't you? | Def Obj: Argumentative,<br>assumes facts not in<br>evidence. Also, 602 -<br>no foundation. |

**633:15   -   634:2**    Gilmartin, Raymond 2005-04-11

633: 15    THE WITNESS: I'm not aware of that.
633: 16    BY MR. SEEGER:
633: 17    Q: In fact, it was Dr. Scolnick's policy
633: 18    to go over the head of the medical review officers
633: 19    and go right to the senior management at the FDA?
633: 20    Is that something you're aware of?
633: 21    A: No, I'm not aware that was his
633: 22    policy.
633: 23    Q: Were you aware that he viewed the FDA
633: 24    as dysfunctional, 'weak and dysfunctional' were his
633: 25    words?
634: 1    A: No, I'm not aware that that's his
634: 2    view.

| | Objection/Response in Barnett |
|---|---|
| **635:6 - 635:10**      Gilmartin, Raymond 2005-04-11 | |
| 635: 6    Q: Would you take a look at what I've | Def Obj: 602 - No |
| 635: 7    marked as 45, and we'll get the context. You can | personal knowledge, |
| 635: 8    see here the subject says 'Vioxx US circular.' Do | witness had not seen |
| 635: 9    you see that? | e-mail before. |
| 635: 10    A: Yes. | |
| **635:13 - 635:23**      Gilmartin, Raymond 2005-04-11 | |
| 635: 13    This is from Dr. Scolnick again; | |
| 635: 14    correct? | |
| 635: 15    A: Correct. | |
| 635: 16    Q: To Dave Blois. Who's Dave Blois? | |
| 635: 17    A: He's a scientist. | |
| 635: 18    Q: And Bonnie Goldmann? | |
| 635: 19    A: And Bonnie Goldmann as well. | |
| 635: 20    Q: Do you see the language where it's in | |
| 635: 21    all caps again set off from the rest of the e-mail. | |
| 635: 22    It says, 'THIS GROUP IS DYSFUNCTIONAL AND | |
| 635: 23    RESPOND TO YOU NOT IN PERSON TELECONS.' It | |
| **636:17 - 637:7**      Gilmartin, Raymond 2005-04-11 | |
| 636: 17    Q: Now, tell us who Murray Lumpkin is. | |
| 636: 18    A: My understanding, Murray Lumpkin is | |
| 636: 19    someone at FDA -- | |
| 636: 20    Q: You understood -- | |
| 636: 21    A: -- or was at FDA. | |
| 636: 22    Q: You understood for a time he was | |
| 636: 23    actually the director of the FDA; correct? | |
| 636: 24    A: I'm not clear on that, but I know | |
| 636: 25    that I associate the name Lumpkin with the FDA. | |
| 637: 1    Q: You understood him to be a senior FDA | |
| 637: 2    official; correct? | |
| 637: 3    A: Yes, exactly. | |
| 637: 4    Q: And you see here, a reading of this | |
| 637: 5    is Dr. Scolnick telling, 'go there and involve.' | |
| 637: 6    He's describing what he did with Vasotec; correct? | |
| 637: 7    A: That's correct. | |
| **637:24 - 638:2**      Gilmartin, Raymond 2005-04-11 | |
| 637: 24    Q: Does that help in any way refresh | |
| 637: 25    your recollection of the attitudes held within Merck | |
| 638: 1    toward FDA people? | |
| 638: 2    A: No, it does not. | |
| **638:12 - 638:14**      Gilmartin, Raymond 2005-04-11 | |

**Objection/Response in Barnett**

| | |
|---|---|
| 638: 12   Q:  That's clearly not unintentional. | |
| 638: 13   He's directing people to go above the heads of the | |
| 638: 14   medical review officers; correct? | |

**638:16  -  638:22**          Gilmartin, Raymond 2005-04-11

638: 16   THE WITNESS:  This says -- he is --
638: 17   let me just read this again, please, just in terms
638: 18   of what he says. 'If I am right I think the ONLY
638: 19   way to handle is to GO THERE AND INVOLVE
638: 20   word by word agree,' you know, and so that's what
638: 21   he's saying, 'the ONLY way.' It doesn't necessarily
638: 22   mean that anybody did that.

**639:1  -  639:4**          Gilmartin, Raymond 2005-04-11

639: 1   Q:  Mr. Gilmartin, do you agree with Dr.
639: 2   Scolnick's characterization as the FDA as being
639: 3   'dysfunctional'?
639: 4   A:  No, I don't.

**639:8  -  639:19**          Gilmartin, Raymond 2005-04-11

639: 8   Q:  Do you agree with the group that was
639: 9   working on Vioxx for the FDA as being
639: 10   'dysfunctional'?
639: 11   A:  I don't have any -- I would not agree
639: 12   with that either. I don't think that was the view
639: 13   of the company either.

| | |
|---|---|
| 639: 14   Q:  Dr. Scolnick reported directly to | |
| 639: 15   you; right? | |
| 639: 16   A:  That's correct. | |
| 639: 17   Q:  Mr. Anstice, your head of marketing, | |
| 639: 18   also reported directly to you; correct? | |
| 639: 19   A:  That's correct. | |

**640:5  -  640:11**          Gilmartin, Raymond 2005-04-11

640: 5   Q:  Did both Dr. Scolnick and Mr. Anstice
640: 6   make clear to you that when they received this label
640: 7   on October 15, the proposal from the FDA, that there
640: 8   was no way they were going to accept the changes
640: 9   proposed?
640: 10   A:  They may have. I don't recall
640: 11   specifically.

**640:20  -  640:24**          Gilmartin, Raymond 2005-04-11

| | |
|---|---|
| 640: 20   Q:  And upon receiving this label change | Def Obj:  602 - No |
| 640: 21   proposed by the FDA, in fact, Dr. Scolnick described | foundation, no personal |
| 640: 22   the FDA as 'bastards.' Is that something he had | knowledge.  Witness has |

| | Objection/Response in Barnett |
|---|---|
| | **Objection/Response in Barnett** |

640: 23    ever done in your presence?

640: 24    A:  No, he had not.

**642:4   -   643:2**        Gilmartin, Raymond 2005-04-11

642: 4    Q:  I'll show you what I've just marked

642: 5    as 46. For the record, it's MRK-ABW0004799, and the

642: 6    first e-mail you see is just between Mr. Anstice and

642: 7    Dr. Scolnick. Do you see that?

642: 8    A:  Yes.

642: 9    Q:  And that's October 15, 2001; right?

642: 10   A:  Right.

642: 11   Q:  Dr. Scolnick says to David, who is

642: 12   David Anstice: 'Be assured we will not accept this

642: 13   label. If we need...we will go to an advisory

642: 14   committee meeting.' And then you see in the

642: 15   second -- I'm sorry, in the third e-mail. I'm

642: 16   sorry. Let's read all three of them.

642: 17   A:  Right.

642: 18   Q:  The second one reads, and this is

642: 19   David Anstice back to Dr. Scolnick: 'Ed, Thanks.

642: 20   I just received a copy 5 minutes ago and will digest

642: 21   tonight. We knew it would be UGLY and it is.' Did

642: 22   I read that correctly?

642: 23   A:  Yes, you did.

642: 24   Q:  And then what is Dr. Scolnick's

642: 25   response at the top? Could you read that?

643: 1    A:  He said 'It is ugly cubed' and

643: 2    misspelled, but 'They are bastards.'

**644:10   -   644:12**        Gilmartin, Raymond 2005-04-11

644: 10   In one e-mail we have Dr. Scolnick

644: 11   referring to the FDA as weak and dysfunctional;

644: 12   correct?

**644:15   -   644:20**        Gilmartin, Raymond 2005-04-11

644: 15   THE WITNESS:  An earlier e-mail that

644: 16   you showed me, he said weak and dysfunctional.

644: 17   BY MR. SEEGER:

644: 18   Q:  In another e-mail in the context of

644: 19   an important thing like a label change, he said the

644: 20   FDA are bastards; correct?

**644:23   -   645:6**        Gilmartin, Raymond 2005-04-11

644: 23   THE WITNESS:  In this e-mail he

644: 24   responds to David Anstice and says 'they are

644: 25   bastards.'

Objection/Response column:

not seen e-mail before.
Document is also
irrelevant and prejudicial.

Def Obj:  Additionally,
lawyer is
summarizing other
e-mails this witness had
never seen.

| | Objection/Response in Barnett |
|---|---|
| 645: 1    BY MR. SEEGER: | |
| 645: 2    Q:  And in the context of the FDA | |
| 645: 3    Advisory Committee meeting that met on February of | |
| 645: 4    2001, he complimented -- I'm sorry, he criticized | |
| 645: 5    the FDA Advisory Committee members as being grade | |
| 645: 6    high schoolers; correct? | |

**645:9  -  645:11**          Gilmartin, Raymond 2005-04-11

| | |
|---|---|
| 645: 9    THE WITNESS:  He described them -- he | |
| 645: 10    said in complimenting his team that they made the | |
| 645: 11    FDA look like d grade high schoolers. | |

**645:25  -  646:3**          Gilmartin, Raymond 2005-04-11

| | |
|---|---|
| 645: 25    Q:  But those are documents written by | |
| 646: 1    Dr. Scolnick; correct? | |
| 646: 2    A:  Those are documents written by Dr. | |
| 646: 3    Scolnick. | |

**646:11  -  646:17**          Gilmartin, Raymond 2005-04-11

| | |
|---|---|
| 646: 11    Q:  Mr. Gilmartin, let's take a look at | Def Obj:  602 - No |
| 646: 12    what was considered objectionable by Mr. Anstice and | foundation. |
| 646: 13    Dr. Scolnick. Okay? Could you please turn to the | |
| 646: 14    page of the proposed label that's Bates stamped 565 | |
| 646: 15    in the lower right-hand corner. I want to ask you | |
| 646: 16    some questions, and if at any point you want to | |
| 646: 17    refer to your April 2002 label, feel free to do it. | |

**648:21  -  649:24**          Gilmartin, Raymond 2005-04-11

| | |
|---|---|
| 648: 21    Q:  Go to Page 570 -- I'm sorry. Go to | |
| 648: 22    Page 572. | |
| 648: 23    Now, just to be clear, and you may | |
| 648: 24    have to go to 570 to identify this, we're going to | |
| 648: 25    be looking at the Warnings section of the proposed | |
| 649: 1    label sent to you from the FDA. If you go to 570, | |
| 649: 2    you'll see where it starts. | |
| 649: 3    A:  Right. | |
| 649: 4    Q:  Do you see that? | |
| 649: 5    A:  Yes. | |
| 649: 6    Q:  That's the Warnings; right? | |
| 649: 7    A:  Right. | |
| 649: 8    Q:  Now, if you go back to Page 572. | |
| 649: 9    A:  Right. | |
| 649: 10    Q:  At the very top, do you see the | |
| 649: 11    shaded language? | |
| 649: 12    A:  Yes. | |
| 649: 13    Q:  It says, 'Vioxx should be used with | |

| | Objection/Response in Barnett |
|---|---|
| 649: 14    caution in patients at risk of developing | |
| 649: 15    cardiovascular thrombotic events such as those with | |
| 649: 16    a history of myocardial infarction and angina and in | |
| 649: 17    patients with preexistent hypertension and | |
| 649: 18    congestive heart failure.' You see that language, | |
| 649: 19    right, Mr. Gilmartin? | |
| 649: 20    A: Yes, I do. Right. | |
| 649: 21    Q: Is that language, the language I just | |
| 649: 22    read, is that in the Warnings section of the April | |
| 649: 23    2002 label? | |
| 649: 24    A: I don't believe so. | |
| **651:5 - 651:9**      Gilmartin, Raymond 2005-04-11 | |
| 651: 5    Q: Now, it's pretty clear when we look | Def Obj: Calls for |
| 651: 6    at the Warnings section of the proposed FDA label | speculation. 602 - No |
| 651: 7    that the part that Dr. Scolnick referred to as ugly | foundation. |
| 651: 8    are these warnings here. Isn't that true, Mr. | |
| 651: 9    Gilmartin? | |
| **651:12 - 651:16**      Gilmartin, Raymond 2005-04-11 | |
| 651: 12    THE WITNESS: Specifically, what he | |
| 651: 13    says, 'We will not accept this label,' Anstice | |
| 651: 14    responds, it's 'ugly,' and he responds, 'It is ugly | |
| 651: 15    cubed,' but I don't know what section, what he's | |
| 651: 16    referring to specifically in these e-mails. | |
| **652:13 - 652:15**      Gilmartin, Raymond 2005-04-11 | |
| 652: 13    Q: Well, you ultimately did fight and | |
| 652: 14    you got the label you wanted, you were happy with | |
| 652: 15    the ultimate label; correct? | |
| **652:18 - 652:23**      Gilmartin, Raymond 2005-04-11 | |
| 652: 18    THE WITNESS: We ended up with a | |
| 652: 19    label that we thought was a fair representation of | |
| 652: 20    the data and spoke to the data. | |
| 652: 21    BY MR. SEEGER: | |
| 652: 22    Q: And your billion dollar product | Def Obj: 401, 402, 403 - |
| 652: 23    remained on the market; correct? | irrelevant and prejudicial, |
| **653:1 - 653:6**      Gilmartin, Raymond 2005-04-11 | especially in compensa- |
| 653: 1    THE WITNESS: The billion dollar | tory phase. |
| 653: 2    product, yes, was still being prescribed and sold. | |
| 653: 3    BY MR. SEEGER: | |
| 653: 4    Q: And the sales remained strong in | |
| 653: 5    2001/2002; correct? | |
| 653: 6    A: They still were doing well, yes. | |

| | | | Objection/Response in Barnett |
|---|---|---|---|
| **655:1** - **655:2** | | Gilmartin, Raymond 2005-04-11 | |
| | 655: 1 | Q: Mr. Gilmartin, the label you got was | Def Obj: Argumentative. |
| | 655: 2 | really nothing short of a miracle, wasn't it? | |
| **655:5** - **655:11** | | Gilmartin, Raymond 2005-04-11 | |
| | 655: 5 | THE WITNESS: No, I would not | |
| | 655: 6 | characterize it that way. I think that it reflected | |
| | 655: 7 | the data that we had showing reduction in GI events | |
| | 655: 8 | and also reflected the data that we had on | |
| | 655: 9 | cardiovascular events both from the placebo | |
| | 655: 10 | comparisons, as well as the comparison against | |
| | 655: 11 | naproxen. | |
| **655:20** - **655:21** | | Gilmartin, Raymond 2005-04-11 | |
| | 655: 20 | Q: You're aware Dr. Scolnick described | Def Obj: 602 - No |
| | 655: 21 | it as nothing short of a miracle; correct? | foundation. No personal |
| **656:3** - **657:7** | | Gilmartin, Raymond 2005-04-11 | knowledge. Witness |
| | 656: 3 | Q: Have you ever seen this e-mail | has never seen e-mail |
| | 656: 4 | before, the one I just marked as Gilmartin-47? | before. |
| | 656: 5 | A: No, I have not. | |
| | 656: 6 | Q: Do you see it's another e-mail | |
| | 656: 7 | written by Dr. Scolnick? | |
| | 656: 8 | A: That's correct. | |
| | 656: 9 | Q: And it's to Peter Kim, who replaced | |
| | 656: 10 | Dr. Scolnick; correct? | |
| | 656: 11 | A: Yes. | |
| | 656: 12 | Q: Dr. Greene and Dr. Goldmann; correct? | |
| | 656: 13 | A: That's correct. | |
| | 656: 14 | Q: And this is 2/25/2002, right before | |
| | 656: 15 | the actual changed label was published; correct? | |
| | 656: 16 | A: That's correct. | |
| | 656: 17 | Q: And he says 'TO ALL: If you get this | |
| | 656: 18 | label it will be an Al Michaels quote.' Do you know | |
| | 656: 19 | who Al Michaels is, Mr. Gilmartin? | |
| | 656: 20 | A: Sports commentator? | |
| | 656: 21 | Q: Exactly. | |
| | 656: 22 | He said, "Do you believe in | |
| | 656: 23 | miracles?" That's quoted from Dr. Scolnick's | |
| | 656: 24 | e-mail; correct? | |
| | 656: 25 | A: That's correct. | |
| | 657: 1 | Q: Do you know what reference he's | |
| | 657: 2 | making there, "Do you believe in miracles?" | |
| | 657: 3 | A: Would you repeat that? I'm not sure | |
| | 657: 4 | exactly -- | |

| | | **Objection/Response in Barnett** |
|---|---|---|
| | 657: 5   Q:  Do you see the quote there, where it<br>657: 6   says, "Do you believe in miracles?"<br>657: 7   A:  Right. | |
| **658:8  -  658:14** | Gilmartin, Raymond 2005-04-11 | |
| | 658: 8   Q:  The label that was sent to you in<br>658: 9   October of 2001 by the FDA, that label was never<br>658: 10   sent to prescribing doctors; correct?<br>658: 11   A:  That's correct.<br>658: 12   Q:  That label would have never been sent<br>658: 13   to patients, they wouldn't have had the advantage of<br>658: 14   reading that as a package insert, would they? | |
| **658:17  -  658:17** | Gilmartin, Raymond 2005-04-11 | Def. Obj:  Incomplete,<br>add 658:18. |
| | 658: 17   THE WITNESS:  No. It is just a draft | |
| **682:5  -  682:7** | Gilmartin, Raymond 2005-04-11 | Def Obj:  Incomplete,<br>cuts off answer; should<br>include 682:12-15. |
| | 682: 5   If Merck wanted to, it could have<br>682: 6   done a cardiovascular safety study prior to selling<br>682: 7   the drug in May of 1999, correct? | |
| **682:10  -  682:11** | Gilmartin, Raymond 2005-04-11 | |
| | 682: 10   THE WITNESS:  We could have done<br>682: 11   that, but we would have -- in order to decide to do | |
| **682:19  -  682:22** | Gilmartin, Raymond 2005-04-11 | Def Obj:  801, 802 |
| | 682: 19   Q:  Mr. Gilmartin, let me ask you this:<br>682: 20   In 2001, there was a lot of noise in the financial<br>682: 21   community about Vioxx having cardiovascular<br>682: 22   problems; correct? | |
| **683:1  -  683:4** | Gilmartin, Raymond 2005-04-11 | |
| | 683: 1   Q:  It was being discussed?<br>683: 2   A:  It was being discussed broadly after<br>683: 3   the results -- after we had put out the information<br>683: 4   about the VIGOR trial. | |
| **683:20  -  683:23** | Gilmartin, Raymond 2005-04-11 | |
| | 683: 20   Q:  Well, did you feel the need in<br>683: 21   2001/2002 to at least satisfy whatever concerns were<br>683: 22   out there by actually doing a cardiovascular study?<br>683: 23   A:  Yes. | |
| **684:7  -  684:12** | Gilmartin, Raymond 2005-04-11 | |
| | 684: 7   Q:  All right. Well, on December 7,<br>684: 8   2001, are you aware that Merck had issued a press<br>684: 9   release saying that it was to conduct a<br>684: 10   cardiovascular outcomes trial? I'll mark it and | |

**Objection/Response in Barnett**

| | | |
|---|---|---|
| 684: 11 | give it to you so you don't have to guess at it. | |
| 684: 12 | A: Okay. | |

**684:24  -  685:6**          Gilmartin, Raymond 2005-04-11

| | |
|---|---|
| 684: 24 | Q: You recognize this as a Merck press |
| 684: 25 | release; correct? |
| 685: 1 | A: Yes, I do. |
| 685: 2 | Q: You see December 7, 2001 it's dated? |
| 685: 3 | A: Right. |
| 685: 4 | Q: The title there, it says, 'Merck to |
| 685: 5 | Conduct Cardiovascular Outcomes Trial.' |
| 685: 6 | A: Yes. Right. |

**685:25  -  686:5**          Gilmartin, Raymond 2005-04-11

| | |
|---|---|
| 685: 25 | Q: Again, if you go to Page 2 at the |
| 686: 1 | very top where it says, 'Merck scientists believe |
| 686: 2 | the weight of evidence supports the theory that |
| 686: 3 | naproxen decreased the heart attack rate,' do you |
| 686: 4 | see that there? |
| 686: 5 | A: Yes, I do. |

**690:10  -  690:13**          Gilmartin, Raymond 2005-04-11

| | |
|---|---|
| 690: 10 | The time that you issued the press |
| 690: 11 | release on December 7, 2001, the truth is, within |
| 690: 12 | Merck, there really was no intention to do a |
| 690: 13 | cardiovascular study; isn't that right? |

**690:17  -  690:19**          Gilmartin, Raymond 2005-04-11

| | |
|---|---|
| 690: 17 | THE WITNESS: Yes. That is not |
| 690: 18 | correct. There was an intention to do a |
| 690: 19 | cardiovascular outcomes trial. |

**690:25  -  692:19**          Gilmartin, Raymond 2005-04-11

| | |
|---|---|
| 690: 25 | Mr. Gilmartin, it's what I marked |
| 691: 1 | earlier as Gilmartin-41. |
| 691: 2 | A: Right. |
| 691: 3 | Q: Now, if you'd look all the way at the |
| 691: 4 | bottom of this e-mail -- |
| 691: 5 | A: Right. |
| 691: 6 | Q: -- which has been marked, I |
| 691: 7 | believe -- what's the Exhibit Number, sir, at the |
| 691: 8 | top? Is it 41? |
| 691: 9 | A: 41. |
| 691: 10 | Q: For the record it's Exhibit 41. |
| 691: 11 | Now, the date of this press release |
| 691: 12 | we're talking about is December 7, 2001; correct? |

| | Objection/Response in Barnett |
|---|---|
| 691: 13   That's the one that we just looked at? | |
| 691: 14   A:  That's correct. | |
| 691: 15   Q:  The date of this e-mail that I'm | |
| 691: 16   reading from at the bottom is November 21, 2001, | |
| 691: 17   just a couple of weeks before this; right? | |
| 691: 18   A:  That's correct. | |
| 691: 19   Q:  This is an e-mail from David Anstice | |
| 691: 20   to Dr. Scolnick, and you're on this e-mail also as a | |
| 691: 21   cc; correct? | |
| 691: 22   A:  That's correct. | |
| 691: 23   Q:  And then, I'm sorry. Actually, I did | |
| 691: 24   it again. The e-mail I actually want to focus on is | |
| 691: 25   the one on the second page at the bottom. That's | |
| 692: 1   dated November 19, 2001. Do you see that? | |
| 692: 2   A:  Right. | |
| 692: 3   Q:  That's directed to you? | |
| 692: 4   A:  Yes, right. | |
| 692: 5   Q:  This is where you're informed that it | |
| 692: 6   wasn't -- the study with Vioxx and aspirin did not | |
| 692: 7   come back with a good result. Do you recall this? | |
| 692: 8   A:  That's right. Well, this is the | |
| 692: 9   e-mail that we discussed earlier. | |
| 692: 10   Q:  Now, on November 19, 2001, Dr. | |
| 692: 11   Scolnick says, 'I do not think we should announce | |
| 692: 12   the CV outcomes study since now I am not at all sure | |
| 692: 13   what the design should be.' Do you see that? | |
| 692: 14   A:  Yes, I do. | |
| 692: 15   Q:  You're telling the jury that in a | |
| 692: 16   matter of three weeks that issue, again, was | |
| 692: 17   sufficiently resolved in order to go out and tell | |
| 692: 18   the medical community that you were going to do a | |
| 692: 19   cardiovascular study? Is that your testimony? | |
| **692:22   -   693:6**        Gilmartin, Raymond 2005-04-11 | |
| 692: 22   THE WITNESS:  Well, I'm not aware of | |
| 692: 23   what the conversations were that were held between | |
| 692: 24   this and the announcement, but the implication of | |
| 692: 25   this e-mail is that we should have the study design | |
| 693: 1   decided upon before we announce it. At the time | |
| 693: 2   that we did announce it, we were still in this stage | |
| 693: 3   about how to go about designing the study. So, this | |
| 693: 4   doesn't indicate a desire not to do this study, it | |
| 693: 5   is a question of when is the right time to announce | |
| 693: 6   the study. | Def Obj: Incomplete, should |

| | | | **Objection/Response in Barnett** |
|---|---|---|---|
| 695:13 - 695:15 | Gilmartin, Raymond 2005-04-11 | | also add 694:4-24 |
| | 695: 13 | Q: This was put out for marketing | Def Obj: Argumentative |
| | 695: 14 | concerns, Mr. Gilmartin. Why wouldn't you just | |
| | 695: 15 | acknowledge that? | |
| 695:18 - 695:22 | Gilmartin, Raymond 2005-04-11 | | |
| | 695: 18 | THE WITNESS: See, I don't believe | |
| | 695: 19 | this was put out for marketing concerns. This is Ed | |
| | 695: 20 | Scolnick basically pursuing a CV outcomes study, and | |
| | 695: 21 | what is the right design for that outcomes study, | |
| | 695: 22 | and that was important for the public to know. | |
| 697:2 - 697:6 | Gilmartin, Raymond 2005-04-11 | | |
| | 697: 2 | Q: So, at this time, three weeks later | |
| | 697: 3 | you issue a press release telling the medical | |
| | 697: 4 | community you're going to do a study, and you're | |
| | 697: 5 | saying that that is not a marketing-driven press | |
| | 697: 6 | release; correct? | |
| 697:10 - 697:12 | Gilmartin, Raymond 2005-04-11 | | |
| | 697: 10 | Q: That's your testimony? | Def Obj: Incomplete, |
| | 697: 11 | A: That is not a marketing-driven press | cuts off answer, should |
| | 697: 12 | release, and at this point we see Ed having received | include 697:13-17 |
| 697:18 - 697:19 | Gilmartin, Raymond 2005-04-11 | | |
| | 697: 18 | Q: Mr. Gilmartin, let me ask you to take | Def Obj: 602 - No |
| | 697: 19 | a look at what I've marked as Exhibit 49. | foundation, no personal |
| 698:4 - 698:9 | Gilmartin, Raymond 2005-04-11 | | knowledge. Witness |
| | 698: 4 | Q: Who's Wendy Dixon? | did not receive e-mail. |
| | 698: 5 | A: Wendy Dixon was in marketing. | |
| | 698: 6 | Q: She was in marketing. Do you see the | |
| | 698: 7 | e-mail toward the top, it's the second to the top, | |
| | 698: 8 | dated September 17, 2001, 9:09 a.m.? | |
| | 698: 9 | A: Yes, I do. | |
| 698:18 - 699:5 | Gilmartin, Raymond 2005-04-11 | | |
| | 698: 18 | Q: Let's take a look at what Wendy Dixon | |
| | 698: 19 | says. | |
| | 698: 20 | A: Sure. | |
| | 698: 21 | Q: 'I believe that we need to do a | |
| | 698: 22 | study.' It's not the only -- it's not the only. | |
| | 698: 23 | I'm sorry. 'It is the only way we can eventually | |
| | 698: 24 | put to rest all the noise in the market by doing a | |
| | 698: 25 | definitive study in high CV risk patients. The | |
| | 699: 1 | results will not be available for some time but | |
| | 699: 2 | handled correctly there is some positive PR we can | |

| | **Objection/Response in Barnett** |
|---|---|
| 699: 3    gain from saying we are conducting a study.' Isn't<br>699: 4    that exactly what this press release was, an attempt<br>699: 5    to get a positive PR spin? | |
| **699:8 - 699:15**      Gilmartin, Raymond 2005-04-11 | |
| 699: 8    THE WITNESS:  No, I do not believe<br>699: 9    that's the purpose of that press release. The<br>699: 10    purpose of the press release to announce the fact<br>699: 11    that we intended to do an outcomes study.<br>699: 12    BY MR. SEEGER:<br>699: 13    Q:  You don't think it has anything to do<br>699: 14    with a marketing person saying that we need to get a<br>699: 15    press release done so we can buy some time? | |
| **699:18 - 699:22**      Gilmartin, Raymond 2005-04-11 | |
| 699: 18    THE WITNESS:  I don't think it has<br>699: 19    anything to do -- the ultimate decision to issue a<br>699: 20    press release is to announce the fact that we are<br>699: 21    doing an outcomes study. This is an opinion<br>699: 22    expressed by one individual at a point in time. | |
| **712:2 - 712:16**      Gilmartin, Raymond 2005-04-11 | |
| 712: 2    Q:  Was Vioxx any better than Aleve plus<br>712: 3    Prilosec?<br>712: 4    A:  The study data that we had was only<br>712: 5    against naproxen, and it had pain -- so, therefore,<br>712: 6    it was superior to naproxen as far as GI bleeds, and<br>712: 7    it was similar to other NSAIDs in terms of pain<br>712: 8    relief.<br>712: 9    Q:  So, it was not superior to any NSAID<br>712: 10    in terms of pain relief; correct?<br>712: 11    A:  In terms of how pain relievers are<br>712: 12    typically taken, yes, it was similar to other pain<br>712: 13    relievers.<br>712: 14    Q:  But, my question is, it was not<br>712: 15    superior to any other pain relievers; correct?<br>712: 16    A:  That's correct. | |
| **712:21 - 712:23**      Gilmartin, Raymond 2005-04-11 | |
| 712: 21    Q:  Certainly more expensive than those<br>712: 22    pain relievers, though; correct?<br>712: 23    A:  Yes, it is more expensive. | Def Obj:  Irrelevant and<br>prejudicial. |
| **716:8 - 716:10**      Gilmartin, Raymond 2005-04-11 | |
| 716: 8    Is it correct that you never<br>716: 9    established that Vioxx was safer than any other pain | |

**Objection/Response in Barnett**

716: 10    reliever, putting aside naproxen?

**716:13  -  716:23**    Gilmartin, Raymond 2005-04-11

716: 13    THE WITNESS:  We were able to

716: 14    establish that -- in terms of the extensive studies

716: 15    we did to get the drug approved, we established

716: 16    there was no difference in cardiovascular events

716: 17    against ibuprofen and other NSAIDs that we studied

716: 18    including placebo. The only drug that we studied GI

716: 19    safety against was naproxen.

716: 20    BY MR. SPECTER:

716: 21    Q:  Sir, 'no difference' also means no

716: 22    better; correct?

716: 23    A:  It also means no worse.

**722:3  -  722:5**    Gilmartin, Raymond 2005-04-11

722: 3    Q:  Mr. Gilmartin, would it be contrary

722: 4    to Merck's practices to sell a drug that's no better

722: 5    than what's on the market currently?

**722:7  -  722:11**    Gilmartin, Raymond 2005-04-11

722: 7    THE WITNESS:  In terms of our

722: 8    practice in terms of having a drug that brings

722: 9    important medical benefit, our goal is to have a

722: 10    drug that provides a benefit over drugs that are on

722: 11    the market, yes.

**731:8  -  733:7**    Gilmartin, Raymond 2005-04-11

| | |
|---|---|
| 731: 8  Q:  Well, sir, this meeting, we'll hand | Def Obj:  602 - No |
| 731: 9  it over to you, has meeting minutes. You're | personal knowledge of |
| 731: 10  familiar with meeting minutes, aren't you? | document, no foundation. |
| 731: 11  A:  Yes, I am. | |
| 731: 12  Q:  I'm going to point you to the bottom | |
| 731: 13  of Page 5, top of Page 6 in this meeting minutes. | |
| 731: 14  I'm going to give a copy to your attorney. I've | |
| 731: 15  marked this as Exhibit Gilmartin-50. | |
| 731: 16  - - - | |
| 731: 17  (Whereupon, Deposition Exhibit | |
| 731: 18  Gilmartin-50, 'MK-0966  (COX-2 Inhibitor) | |
| 731: 19  Consultants' Meeting Phase III | |
| 731: 20  Monitoring of GI Clinical Events and | |
| 731: 21  Design of a GI Outcomes Mega-Trial,' | |
| 731: 22  9-28-96, Meeting Minutes, MRK-NJ02528901 | |
| 731: 23  - MRK-NJ02528908, was marked for | |
| 731: 24  identification.) | |
| 731: 25  - - - | |

| | Objection/Response in Barnett |
|---|---|

732: 1    (Witness reviewing document.)

732: 2    BY MR. SPECTER:

732: 3    Q:  Do you see at the bottom where it

732: 4    says 'Dr. Strom'?

732: 5    A:  Yes.

732: 6    Q:  'Dr. Strom suggested that MK-0966' --

732: 7    that's Vioxx; correct, sir?

732: 8    A:  That's correct.

732: 9    Q:  -- 'be compared against drugs

732: 10    perceived to be the safest (for example,

732: 11    acetaminophen and ibuprofen).'   You know those are

732: 12    Tylenol and Motrin; correct?

732: 13    A:  That's correct.

732: 14    Q:  And then there's discussion about

732: 15    that issue. And at the end of the paragraph which

732: 16    appears at the next page, it says, 'Dr. Silverman

732: 17    and Mr. Khanna questioned the advisability of an

732: 18    acetaminophen arm,' that would be a Tylenol arm;

732: 19    correct?

732: 20    A:  That's correct.

732: 21    Q:  That would be comparing Tylenol

732: 22    against Vioxx; correct?

732: 23    A:  That's correct.

732: 24    Q:  When you say 'an arm,' that means

732: 25    there is at least two arms in every study; correct?

733: 1    A:  That's correct.

733: 2    Q:  It says here: 'Dr. Silverman and Mr.

733: 3    Khanna questioned the advisability of an

733: 4    acetaminophen arm, because the findings could

733: 5    highlight favorable properties of acetaminophen.'

733: 6    That's Tylenol; correct?

733: 7    A:  That's what it says in this document.

**735:13  -  736:6**        Gilmartin, Raymond 2005-04-11

735: 13    Q:  Right. You would figure that this

735: 14    would be a meeting where you'd have scientists get

735: 15    together and try to figure out what would be the

735: 16    appropriate studies to do? Would that be fair?

735: 17    A:  That's correct.

735: 18    Q:  You'd be a little surprised to see

735: 19    people from marketing in that meeting, wouldn't you,

735: 20    sir?

735: 21    A:  Not necessarily.

735: 22    Q:  Yes. Mr. Khanna, one of the fellows

| | **Objection/Response in Barnett** |
|---|---|
| 735: 23   that said we shouldn't test Vioxx against Tylenol | |
| 735: 24   because it could highlight the favorable properties | |
| 735: 25   of Tylenol, do you know what department he's in, | |
| 736: 1   sir? | |
| 736: 2   A:  He's in marketing. | |
| 736: 3   Q:  Right. He's in marketing. | |
| 736: 4   And Dr. Silverman, he's not in Merck | |
| 736: 5   Research Laboratories, is he, sir? | |
| 736: 6   A:  He is. He was in regulatory. | |

**743:7  -  743:12**         Gilmartin, Raymond 2005-04-11

| | |
|---|---|
| 743: 7   Q:  So, sometime between March 9th and | |
| 743: 8   March 27th, Dr. Scolnick told you that he was | |
| 743: 9   satisfied that naproxen's so-called cardioprotective | |
| 743: 10   -- naproxen's cardioprotective effects were | |
| 743: 11   responsible for the results of the VIGOR trial? Is | |
| 743: 12   that what you're saying? | |

**743:15  -  743:19**         Gilmartin, Raymond 2005-04-11

| | |
|---|---|
| 743: 15   THE WITNESS:  Sometime at that point | |
| 743: 16   I think that, yes, the answer is. | |
| 743: 17   MR. SPECTER:  Now, marking as P-51 an | Def Obj:  602 - No |
| 743: 18   e-mail from Dr. Scolnick to Dr. Reicin of April 12, | foundation, no personal |
| 743: 19   2000. | knowledge of this e-mail. |

**744:15  -  744:18**         Gilmartin, Raymond 2005-04-11

| | |
|---|---|
| 744: 15   Q:  Do you see this is an e-mail from Dr. | |
| 744: 16   Scolnick to Dr. Reicin at 10:42 at night on | |
| 744: 17   Wednesday, April 12, 2000? Correct? | |
| 744: 18   A:  That's correct. | |

**744:25  -  746:4**         Gilmartin, Raymond 2005-04-11

| | |
|---|---|
| 744: 25   Q:  He says, 'I will tell you my worry | |
| 745: 1   quotient is high. I actually am in minor agony.' | |
| 745: 2   Correct? | |
| 745: 3   A:  Yes. | |
| 745: 4   Q:  This e-mail regards 'rheumatoid | |
| 745: 5   arthritis and CV mortality,' and the importance of | |
| 745: 6   the e-mail is marked as being 'high.' Correct? | |
| 745: 7   A:  In terms of your first statement | |
| 745: 8   where you say rheumatoid arthritis, it is marked | |
| 745: 9   'Importance: High,' but the other statement you | |
| 745: 10   made, where is that in this? | |
| 745: 11   Q:  Subject matter of the e-mail. | |
| 745: 12   A:  Oh, yes, 'RA and CV mortality,' yes. | |
| 745: 13   Q:  Am I correct? | |

**Objection/Response in Barnett**

745: 14    A:  You're correct, yes.

745: 15    Q:  And rheumatoid arthritis and CV

745: 16    mortality, that relates to the VIGOR trial; correct?

745: 17    A:  I would make that assumption --

745: 18    Q:  Right.

745: 19    A:  I don't know specifically, but I'd

745: 20    make that assumption.

745: 21    Q:  So, you have Dr. Scolnick, who is the

745: 22    president of Merck Research Labs, and he is saying

745: 23    on April 12, 2000, 16 days after your press release

745: 24    went out telling the country that the CV results in

745: 25    VIGOR were the result of a cardioprotective effect

746: 1    of naproxen, he's saying to his colleague at Merck,

746: 2    another high ranking scientist, that his 'worry

746: 3    quotient is high' and he is 'in minor agony.'

746: 4    Correct?

**746:7   -   746:21**         Gilmartin, Raymond 2005-04-11

746: 7    THE WITNESS:  This is what the e-mail

746: 8    says.

746: 9    BY MR. SPECTER:

746: 10    Q:  And what he really wants to do is 'a

746: 11    10,000 versus 10,000 patient study in mild-moderate

746: 12    osteoarthritis' with half the group taking Tylenol

746: 13    and half taking Vioxx with low-dose aspirin as

746: 14    needed; correct?

746: 15    A:  That's what he's saying here, right.

746: 16    Q:  And he says, and he puts this all in

746: 17    capital letters: 'WE WILL NOT KNOW FOR SURE

746: 18    GOING ON UNTIL WE DO THIS STUDY. PLEASE

746: 19    ABOUT THE DESIGN BEFORE THE PAC MEETING.'

746: 20    quote that correctly?

746: 21    A:  You've quoted that correctly, yes.

**748:17   -   748:21**         Gilmartin, Raymond 2005-04-11

748: 17    Q:  Is this e-mail consistent with

748: 18    concluding that a cardioprotective effect of

748: 19    naproxen is the cause of the results in VIGOR and

748: 20    that that was the firm conclusion of the writer of

748: 21    the e-mail?

**748:24   -   749:12**         Gilmartin, Raymond 2005-04-11

748: 24    THE WITNESS:  The -- I think this

748: 25    e-mail is consistent with that, in that given the

749: 1    fact that we didn't have a randomized controlled

**Objection/Response in Barnett**

| | | |
|---|---|---|
| 749: 2 | clinical trial, and given Ed, and the approach that | |
| 749: 3 | we followed was to continue to study the drug. | |
| 749: 4 | BY MR. SPECTER: | |
| 749: 5 | Q:  You have told me a couple of times | |
| 749: 6 | that you had no test of naproxen versus placebo; | |
| 749: 7 | correct? | |
| 749: 8 | A:  Yes. No test of naproxen versus | |
| 749: 9 | placebo, that is correct. | Def Obj.If the Court decides |
| 749: 10 | Q:  Merck could have tested naproxen | to allow this testimony, |
| 749: 11 | against placebo if it had wanted to; correct? | 750:5-6 should be |
| 749: 12 | A:  Yes, but it would be -- | included for completeness. |

**14:20  -  14:22**     Gilmartin, Raymond 2005-04-18

| | | |
|---|---|---|
| 14: 20 | Q:  You run Merck, don't you? | |
| 14: 21 | A:  Yes, I have the most senior | |
| 14: 22 | position. | |

**15:7  -  15:14**     Gilmartin, Raymond 2005-04-18

| | | |
|---|---|---|
| 15: 7 | Q:  Merck had a lot of ethical | Deb Obj:  Argumentative, |
| 15: 8 | problems the way it handled Vioxx, isn't | assumes facts not in |
| 15: 9 | that true? | evidence. |
| 15: 10 | MR. BUTSWINKAS:  Objection | |
| 15: 11 | to form. | |
| 15: 12 | THE WITNESS:  No, that's not | |
| 15: 13 | true. I think we handled it in a | |
| 15: 14 | very ethical way. | |

**16:2  -  16:11**     Gilmartin, Raymond 2005-04-18

| | | |
|---|---|---|
| 16: 2 | Q:  I mean, you give speeches on | Def Obj:  Irrelevant and |
| 16: 3 | ethics, don't you? | prejudicial. |
| 16: 4 | A:  Yes, I do. | |
| 16: 5 | Q:  Not just speeches, when you | |
| 16: 6 | came over to Merck, you put in an ethics | |
| 16: 7 | department, didn't you? | |
| 16: 8 | A:  That's right, in 1995. | |
| 16: 9 | Q:  You put a code of conduct in | |
| 16: 10 | for Merck's ethics, didn't you? | |
| 16: 11 | A:  Yes, I did. | |

**17:11  -  17:20**     Gilmartin, Raymond 2005-04-18

| | | |
|---|---|---|
| 17: 11 | Q:  But if your employees don't | |
| 17: 12 | follow the code of conduct, that's a | |
| 17: 13 | violation of your ethics, isn't it? | |
| 17: 14 | A:  That's correct. If they | |
| 17: 15 | don't follow the code of conduct, that is | |
| 17: 16 | a violation. | |

| | | Objection/Response in Barnett |
|---|---|---|
| | 17: 17    Q:  And that even applies to big | |
| | 17: 18    guys like Dr. Ed Scolnick, doesn't it? | |
| | 17: 19    A:  Well, it applies to everyone | |
| | 17: 20    within the company. | |
| **18:14  -  20:6** | Gilmartin, Raymond 2005-04-18 | |
| | 18: 14    Q:  Well, let's look at some of | Def Obj:  Irrelevant and |
| | 18: 15    the ethical areas where I believe you | prejudicial. |
| | 18: 16    failed, and you tell me why I'm wrong. | |
| | 18: 17    Okay? | |
| | 18: 18    A:  I will do that. | |
| | 18: 19    Q:  Let's start with Gilmartin | |
| | 18: 20    Exhibit Number 1. | |
| | 18: 21    - - - | |
| | 18: 22    (Whereupon, Deposition | |
| | 18: 23    Exhibit Gilmartin-1, Code of | |
| | 18: 24    Conduct, 25 pages, was marked for | |
| | 19: 1    identification.) | |
| | 19: 2    - - - | |
| | 19: 3    BY MR. LANIER:   : | |
| | 19: 4    Q:  I'm going to hand you that, | |
| | 19: 5    sir. That's your ethical code, isn't it? | |
| | 19: 6    A:  Yes, it is. | |
| | 19: 7    Q:  And in this you give kind of | |
| | 19: 8    a decision tree on how to decide what | |
| | 19: 9    y'all should or shouldn't do, a decision | |
| | 19: 10    test; right? | |
| | 19: 11    A:  The decision test you're | |
| | 19: 12    referring to is where? | |
| | 19: 13    Q:  It's on Page 5, sir. It's a | |
| | 19: 14    big, bold box that says, 'Decision Test.' | |
| | 19: 15    Do you see that? | |
| | 19: 16    A:  Yes, I do. | |
| | 19: 17    Q:  The decision test is | |
| | 19: 18    basically a set of questions you ask | |
| | 19: 19    yourself to decide how to act; right? | |
| | 19: 20    A:  That's correct. | |
| | 19: 21    Q:  The first thing is: 'Is | |
| | 19: 22    your 'action legal?' That's the first | |
| | 19: 23    question; right? | |
| | 19: 24    A:  That's correct. | |
| | 20: 1    Q:  Look at the fourth question. | |
| | 20: 2    Do you see it on there? | |
| | 20: 3    A:  Yes. | |

| | Objection/Response in Barnett |
|---|---|
| 20: 4  Q: 'How would it look in the | |
| 20: 5  newspaper?' Did I read that right? | |
| 20: 6  A: Yes, you did. | |
| **20:12 - 20:15** Gilmartin, Raymond 2005-04-18 | |
| 20: 12  Q: Y'all have done a lot of | Def Obj:  Irrelevant and |
| 20: 13  things that haven't looked too good once | prejudicial. |
| 20: 14  they've finally been written up in the | |
| 20: 15  newspaper; isn't that true? | To the extent the Court |
| **20:18 - 20:19** Gilmartin, Raymond 2005-04-18 | allows this testimony, |
| 20: 18  THE WITNESS:  No, that's not | must include 20:20-21. |
| 20: 19  true. Not everything that's in | |
| **20:23 - 20:24** Gilmartin, Raymond 2005-04-18 | |
| 20: 23  Q:  Well, a lot of it is, isn't | |
| 20: 24  it? | |
| **21:3 - 21:9** Gilmartin, Raymond 2005-04-18 | |
| 21: 3  THE WITNESS:  No, I don't -- | |
| 21: 4  I wouldn't agree with that. | |
| 21: 5  BY MR. LANIER:   : | |
| 21: 6  Q:  You weren't embarrassed by | |
| 21: 7  the USA Today writeup about how Dr. | |
| 21: 8  Sherwood was manipulating and | |
| 21: 9  intimidating medical doctors on Vioxx? | |
| **21:12 - 21:15** Gilmartin, Raymond 2005-04-18 | |
| 21: 12  THE WITNESS:  Well, I don't | |
| 21: 13  believe that Dr. Sherwood was | |
| 21: 14  intimidating or manipulating | |
| 21: 15  doctors around Vioxx. | |
| **23:17 - 23:22** Gilmartin, Raymond 2005-04-18 | |
| 23: 17  You don't have firsthand | Def Obj:  Irrelevant. |
| 23: 18  knowledge of whether it's true or not | Incomplete, must include |
| 23: 19  because you delegated out to others the | 23:23-24:9. |
| 23: 20  investigation; true? | |
| 23: 21  A:  I delegated -- yes, it is | |
| 23: 22  true I delegated out the investigation. | |
| **24:23 - 25:4** Gilmartin, Raymond 2005-04-18 | |
| 24: 23  If, in fact, the data given | Def Obj:  Irrelevant, |
| 24: 24  to you is wrong and if, in fact, Dr. | prejudicial, argumentative. |
| 25: 1  Sherwood was intimidating doctors around | Also incomplete, must |
| 25: 2  the country on the Vioxx issue, that | include 25:7-9. |
| 25: 3  violates your code of conduct, doesn't | |
| 25: 4  it? | |

| | Objection/Response in Barnett |
|---|---|
| **25:10** - **25:12**    Gilmartin, Raymond 2005-04-18 | |
| 25: 10    intimidating scientists would be a | |
| 25: 11    violation of our code of conduct, | |
| 25: 12    absolutely, but I don't believe | |
| **26:4** - **26:12**    Gilmartin, Raymond 2005-04-18 | |
| 26: 4    Q:  Ethics are important, not | |
| 26: 5    just because it's right and wrong, though | |
| 26: 6    that alone makes them very important; | |
| 26: 7    right? | |
| 26: 8    A:  That's correct. | |
| 26: 9    Q:  But ethics are important | |
| 26: 10    because lives depend upon your company | |
| 26: 11    being ethical; true? | |
| 26: 12    A:  That is true. | |
| **30:9** - **30:18**    Gilmartin, Raymond 2005-04-18 | |
| 30: 9    Q:  So, the information you give | |
| 30: 10    to your customers needs to be accurate, | |
| 30: 11    doesn't it? | |
| 30: 12    A:  Yes. The information we | |
| 30: 13    give to physicians and scientists has to | |
| 30: 14    be accurate. | |
| 30: 15    Q:  And it needs to be supported | |
| 30: 16    by scientific evidence, doesn't it? | |
| 30: 17    A:  Yes, that's very important | |
| 30: 18    to be supported by scientific evidence. | |
| **31:11** - **31:13**    Gilmartin, Raymond 2005-04-18 | |
| 31: 11    Q:  Show me one piece of | |
| 31: 12    scientific evidence that says naproxen is | |
| 31: 13    cardioprotective. | Def Obj:  Incomplete and |
| **31:16** - **31:21**    Gilmartin, Raymond 2005-04-18 | must include 30:19-31:5. |
| 31: 16    THE WITNESS:  There is | |
| 31: 17    scientific evidence that shows | |
| 31: 18    that naproxen is anti-platelet, | |
| 31: 19    has an aspirin-like effect, which, | |
| 31: 20    given those characteristics, would | |
| 31: 21    make naproxen cardioprotective. | |
| **35:9** - **35:15**    Gilmartin, Raymond 2005-04-18 | |
| 35: 9    Q:  Yes. And the history of | Def Obj:  Incomplete, |
| 35: 10    naproxen as a drug no one has ever been | cuts off answer, must |
| 35: 11    able to come up with one study of any | include 35:16-21. |
| 35: 12    human being in the entire planet that | |

| | | | Objection/Response in Barnett |
|---|---|---|---|
| | 35: 13 | shows naproxen is cardioprotective; true? | |
| | 35: 14 | A: I'm not aware that a study, | |
| | 35: 15 | a specific study has been done. What I | |
| **41:3** - **41:15** | | Gilmartin, Raymond 2005-04-18 | |
| | 41: 3 | It makes it very important | |
| | 41: 4 | that y'all present honest communication, | |
| | 41: 5 | doesn't it? | |
| | 41: 6 | A: Yes, it does. | |
| | 41: 7 | Q: It makes it very important | |
| | 41: 8 | that you produce fair communication, | |
| | 41: 9 | balanced communication; true? | |
| | 41: 10 | A: That is true. | |
| | 41: 11 | Q: It means when you promote a | Def Obj: Incomplete, |
| | 41: 12 | product like Vioxx, your company has a | cut off answer, must |
| | 41: 13 | responsibility to the public to give a | include 41:19-42:20. |
| | 41: 14 | summary of all possible side effects, | |
| | 41: 15 | precautions, warnings; true? | |
| **41:18** - **41:18** | | Gilmartin, Raymond 2005-04-18 | |
| | 41: 18 | THE WITNESS: Yes. When we | |
| **42:22** - **43:22** | | Gilmartin, Raymond 2005-04-18 | |
| | 42: 22 | Q: Would you turn, please, to | Def Obj: Irrelevant. |
| | 42: 23 | Page 6 of your code of conduct. If you | |
| | 42: 24 | look down on, 'Honest Communication,' in | |
| | 43: 1 | the right column. | |
| | 43: 2 | A: Right. | |
| | 43: 3 | Q: At the bottom of that very | |
| | 43: 4 | first paragraph it says you're supposed | |
| | 43: 5 | to provide, 'a summary of all side | |
| | 43: 6 | effects.' It doesn't just say side | |
| | 43: 7 | effects on the label; does it? | |
| | 43: 8 | A: I'm sorry. Would you point | |
| | 43: 9 | out to me where? | |
| | 43: 10 | Q: Yes, sir. On the right | |
| | 43: 11 | side -- | |
| | 43: 12 | A: Right. | |
| | 43: 13 | Q: -- the very top paragraph, | |
| | 43: 14 | the very last sentence of that top | |
| | 43: 15 | paragraph, it says after the parenthesis, | |
| | 43: 16 | it 'must also include (unless otherwise | |
| | 43: 17 | required by law or regulation)   a summary | |
| | 43: 18 | of all side effects.' Do you see that? | |
| | 43: 19 | You don't see that, do you? | |

| | | | **Objection/Response in Barnett** |
|---|---|---|---|
| | 43: 20 | A: I'm looking at it now. | Def Obj: |
| | 43: 21 | That's correct. That refers to what's in | Incomplete - must also |
| | 43: 22 | the label. | include 43:24-44:16. |
| **46:7** - **46:24** | | Gilmartin, Raymond 2005-04-18 | |
| | 46: 7 | Q: Well, no. Look, sir, in | Def Obj: Irrelevant |
| | 46: 8 | this thing it talks about 'Lives depend | |
| | 46: 9 | not only on the quality of our products | |
| | 46: 10 | and services, but also on the quality of | |
| | 46: 11 | information we provide to the medical | |
| | 46: 12 | community and general public.' Do you | |
| | 46: 13 | see that? | |
| | 46: 14 | A: Yes, I do. | |
| | 46: 15 | Q: All right. So, this isn't | |
| | 46: 16 | talking just about what salesmen say to | |
| | 46: 17 | doctors, this is talking about all the | |
| | 46: 18 | information your company provides on its | |
| | 46: 19 | drugs; true? | |
| | 46: 20 | A: That's correct. And there's | |
| | 46: 21 | a variety of ways in which we do that. | |
| | 46: 22 | Q: Your company is supposed to | |
| | 46: 23 | talk about all the possible side effects; | |
| | 46: 24 | isn't it? | |
| **47:3** - **47:12** | | Gilmartin, Raymond 2005-04-18 | |
| | 47: 3 | THE WITNESS: All possible | |
| | 47: 4 | side effects and -- 'supported by | |
| | 47: 5 | scientific evidence where | |
| | 47: 6 | relevant, and presented honestly, | |
| | 47: 7 | fairly and by proper means.' | |
| | 47: 8 | Absolutely. | |
| | 47: 9 | BY MR. LANIER:    : | |
| | 47: 10 | Q: Full disclosure. That's | |
| | 47: 11 | what your company ought to be doing, | |
| | 47: 12 | shouldn't it? | |
| **47:15** - **47:16** | | Gilmartin, Raymond 2005-04-18 | |
| | 47: 15 | THE WITNESS: And that's | |
| | 47: 16 | what we strive to do, yes. | |
| **487:16** - **487:24** | | Gilmartin, Raymond 2005-04-18 | |
| | 487: 16 | Q: 100 largest companies, how | Def Obj: Irrelevant and |
| | 487: 17 | they get paid, did you know you made that | prejudicial, especially |
| | 487: 18 | list? | during compensatory |
| | 487: 19 | A: This in USA Today? | phase. |
| | 487: 20 | Q: Yes, sir. | |

| | Objection/Response in Barnett |
|---|---|

487: 21    A:  I haven't seen that.
487: 22    Q:  Did you know you made the
487: 23    list?
487: 24    A:  I did not know.

**488:17  -  489:8**          Gilmartin, Raymond 2005-04-18
488: 17    Q:  According to this, in 2004,
488: 18    your total compensation package was $40.7
488: 19    million.
488: 20    - - -
488: 21    (Whereupon, Deposition
488: 22    Exhibit Gilmartin-23, 'CEO pay at
488: 23    100 of the largest companies,'
488: 24    USA Today 3-31-05  (1 page),   was
489: 1    marked for identification.)
489: 2    - - -
489: 3    BY MR. LANIER:   :
489: 4    Q:  Exhibit Number 23, we'll
489: 5    attach the original to the deposition.
489: 6    Did you know about that? I
489: 7    guess you did, you got it.
489: 8    A:  I haven't seen this paper.

**489:22  -  489:24**          Gilmartin, Raymond 2005-04-18
489: 22    Q:  Sir, your pay is based on
489: 23    your company making a lot of money; isn't
489: 24    it?

**490:3  -  490:7**          Gilmartin, Raymond 2005-04-18
490: 3    THE WITNESS:  My pay is
490: 4    based on the company's
490: 5    performance, and my pay is based
490: 6    on its performance over a long
490: 7    period of time, of the company.

**490:20  -  490:23**          Gilmartin, Raymond 2005-04-18
490: 20    Q:  And you've known that ever
490: 21    since you went to work for the company in
490: 22    '94; right?
490: 23    A:  That's correct.

**861:13  -  862:20**          Gilmartin, Raymond 2005-06-17
861: 13    Q:  Would you please introduce yourself
861: 14    to the jury.
861: 15    A:  Yes. I'm Ray Gilmartin.
861: 16    Q:  Mr. Gilmartin, where do you live?

| | | **Objection/Response in Barnett** | |
|---|---|---|---|
| 861: 17 | A: I live in Park Ridge, New Jersey. | | |
| 861: 18 | Q: I want to ask you some questions | | |
| 861: 19 | about your background. Where are you from? | | |
| 861: 20 | A: I'm from Sabael, Long Island, which | | |
| 861: 21 | is a small town about 50 miles from New York City. | | |
| 861: 22 | Q: Are you married? | Pltf Obj:  R. 401; R. 403 | |
| 861: 23 | A: Yes, I am. I've been married for 40 | Def. Resp: Small amount | |
| 861: 24 | years. | of personal background | |
| 861: 25 | Q: What's your wife's name? | information is relevant | |
| 862: 1 | A: My wife's name is Gladys, or she is | and not prejudicial. | |
| 862: 2 | known as Gladdie. | Important for jury to get | |
| 862: 3 | Q: Do you have any children? | brief understanding of | |
| 862: 4 | A: Yes. I have three children, two | Mr. Gilmartin's back- | |
| 862: 5 | daughters and a son. | ground particularly since | |
| 862: 6 | Q: Are they grown children? | Plaintiff alleges Mr. | |
| 862: 7 | A: Yes, they are. My oldest is 34, the | Gilmartin & Merck | |
| 862: 8 | next daughter is 33, and my son is 29. | concealed information | |
| 862: 9 | Q: Do you have any grandchildren? | | |
| 862: 10 | A: We just have a new grandchild, born | | |
| 862: 11 | last weekend, a grandson. | | |
| 862: 12 | Q: Congratulations. | | |
| 862: 13 | Where did you go to college? | | |
| 862: 14 | A: I went to college in Union College in | | |
| 862: 15 | Schenectady, New York, which is in upstate New York. | | |
| 862: 16 | Q: Did your parents go to college before | Pltf Obj:  R .401; R. 403 | |
| 862: 17 | you? | Resp applies only to | |
| 862: 18 | A: No. I'm the only person in the | 862:16-20: Small amount | |
| 862: 19 | family to go to college for some time. My younger | of personal background | |
| 862: 20 | sister went later in life. | information is relevant and | |

| | | not prejudicial.  Important | |
|---|---|---|---|
| **863:22 - 865:18** | Gilmartin, Raymond 2005-06-17 | for jury to get brief | |
| 863: 22 | Q: Did you earn your degree from Union | understanding of | |
| 863: 23 | College? | Mr. Gilmartin's background, | |
| 863: 24 | A: Yes, I did, a Bachelor of Science in | particularly since plf | |
| 863: 25 | electrical engineering. | alleges Gilmartin & Merck | |
| 864: 1 | Q: What year was that? | concealed information. | |
| 864: 2 | A: That was in 1963. | | |
| 864: 3 | Q: After you graduated from Union | | |
| 864: 4 | College in 1963, did you get a job? | | |
| 864: 5 | A: Yes, I did. I went to work for | | |
| 864: 6 | Eastman Kodak in Rochester, New York. I worked in | | |
| 864: 7 | the manufacturing division in Kodak Park in | | |
| 864: 8 | Rochester. | | |
| 864: 9 | Q: What was your job? | | |

| | Objection/Response in Barnett |
|---|---|
| 864: 10   A:  It was called development engineer, | |
| 864: 11   and it was a position that reported to the | |
| 864: 12   manufacturing management in which we were the link, | |
| 864: 13   if you will, between the central engineering at | |
| 864: 14   Eastman Kodak and the production operations. | |
| 864: 15   Q:  How long did you work at Eastman | |
| 864: 16   Kodak? | |
| 864: 17   A:  I worked there for three years from | |
| 864: 18   1963 to 1966. | |
| 864: 19   Q:  Did you ever serve in the military? | Pltf. Obj:  R. 401: Irrelevant; R. 403: Probative value is substantially outweighed by unfair prejudice; R. 404(a): Improper character evidence. |
| 864: 20   A:  Yes, I did. When I was in Rochester, | |
| 864: 21   I joined the Army National Guard in an artillery | |
| 864: 22   unit. | |
| 864: 23   Q:  How long were you in the Army | |
| 864: 24   National Guard? | |
| 864: 25   A:  I did my six months active duty and | |
| 865: 1   then the five-and-a-half years of weekend drills. | Def Resp: Small amount of personal background information is relevant & is not prejudicial. Important for jury to get brief understanding of Mr. Gilmartin's background, particularly since Plaintiff alleges Mr. Gilmartin & Merck concealed information. |
| 865: 2   Q:  What was your rank when you left the | |
| 865: 3   National Guard? | |
| 865: 4   A:  I went in -- enlisted initially. I | |
| 865: 5   was an enlisted man, and then I went through an | |
| 865: 6   officer's program and came out as a first | |
| 865: 7   lieutenant. | |
| 865: 8   Q:  What were the years that you were in | |
| 865: 9   the Army National Guard? | |
| 865: 10   A:  So, that would be, say, from 1964 | |
| 865: 11   through 1969. | |
| 865: 12   Q:  You said you left Kodak in 1966? | |
| 865: 13   A:  That's correct. | |
| 865: 14   Q:  What was the next job that you took | |
| 865: 15   on? | |
| 865: 16   A:  I left Kodak to go to graduate | |
| 865: 17   school, and I went to Harvard Business School to | |
| 865: 18   study for an M.B.A. | |

**866:7   -   876:17**        Gilmartin, Raymond 2005-06-17

| 866: 7   Q:  What did your parents think about | Pltf Obj:  R. 401; R. 403 |
|---|---|
| 866: 8   this idea of going off to Harvard Business School? | Def Resp: Small amount of personal background information is relevant & not prejudicial. Important for jury to get brief understanding of Mr. Gilmartin's back- |
| 866: 9   A:  Well, they were, I would say, | |
| 866: 10   somewhat surprised. As far as they were concerned, | |
| 866: 11   that -- you know, I was an engineer, I was working | |
| 866: 12   for a big company, Eastman Kodak, well known, | |
| 866: 13   married shortly thereafter, so, they were really | |
| 866: 14   puzzled about what this was all about because they | |

| | **Objection/Response in Barnett** | |
|---|---|---|
| 866: 15    didn't really know what a business school was per | ground, particularly | |
| 866: 16    se. | since Plaintiff alleges | |
| 866: 17    Q:  Having left your job at Eastman | Mr. Gilmartin & Merck | |
| 866: 18    Kodak, how did you pay for business school? | concealed information. | |
| 866: 19    A:  I was fortunate enough also to get a | | |
| 866: 20    full-tuition fellowship, and then my wife worked to | | |
| 866: 21    cover the rest of our expenses. | | |
| 866: 22    Q:  Did you get your degree at Harvard? | | |
| 866: 23    A:  Yes, I did. 1968 I got my M.B.A. | | |
| 866: 24    degree. | | |
| 866: 25    Q:  Where did you work after you received | | |
| 867: 1    your M.B.A.? | | |
| 867: 2    A:  I went from there to a consulting | | |
| 867: 3    firm, Arthur D. Little, in Cambridge, Massachusetts | | |
| 867: 4    and worked there for another eight years. | | |
| 867: 5    Q:  What kind of work did you do at | Pltf Obj:  R. 401; R. 403 | |
| 867: 6    Arthur Little? | Def Resp: Background | |
| 867: 7    A:  There I was working on consulting | information about Mr. | |
| 867: 8    projects primarily in manufacturing initially in | Gilmartin's business | |
| 867: 9    terms of helping with productivity improvements and | career is relevant and is | |
| 867: 10    production scheduling, things like that. And then | not prejudicial. | |
| 867: 11    as I became more senior, became more involved in | | |
| 867: 12    strategy and sort of overall helping management | | |
| 867: 13    setting directions for companies. | | |
| 867: 14    Q:  What were the different titles that | | |
| 867: 15    you held while you were at Arthur Little? | | |
| 867: 16    A:  They really didn't have much of a | | |
| 867: 17    hierarchy. So, I started out as a consultant, and I | | |
| 867: 18    think by the time that I left, I was labeled as a | | |
| 867: 19    senior consultant. But I was -- ran a small group | | |
| 867: 20    that was involved in consulting around strategy and | | |
| 867: 21    business practices. | | |
| 867: 22    Q:  What year did you leave there? | | |
| 867: 23    A:  I left there in 1976. | | |
| 867: 24    Q:  Where did you go next? | | |
| 867: 25    A:  I went to work for Becton Dickinson, | | |
| 868: 1    which is a company in New Jersey that's in the | | |
| 868: 2    business of medical devices, things like disposable | | |
| 868: 3    needles and syringes and diagnostic products such as | | |
| 868: 4    doing microbiology testing. | | |
| 868: 5    Q:  Would you describe the work that you | Pltf Obj:  R. 401; R. 403 | |
| 868: 6    did there? | Def Resp: Background | |
| 868: 7    A:  I started out as vice president of | information about Mr. | |

| | | Objection/Response in Barnett | |
|---|---|---|---|
| 868: 8 | strategic planning and was in that position for | Gilmartin's business | |
| 868: 9 | about five years. My job in being in strategic | career is relevant and is | |
| 868: 10 | planning was to be a facilitator really in terms of | not prejudicial. | |
| 868: 11 | running the strategic planning process for the | | |
| 868: 12 | company. | | |
| 868: 13 | Q:  What did you do next? | | |
| 868: 14 | A:  Then the next job that I had was the | | |
| 868: 15 | president of the disposable needle and syringe | | |
| 868: 16 | division that was located in East Rutherford, New | | |
| 868: 17 | Jersey. | | |
| 868: 18 | And then from there, after about | | |
| 868: 19 | three or four years, I became a group president of | | |
| 868: 20 | the medical division, which had medical -- | | |
| 868: 21 | of a medical group which had several medical | | |
| 868: 22 | divisions. | | |
| 868: 23 | Q:  When did you leave that company? | | |
| 868: 24 | A:  I left the company in 1994. I had | | |
| 868: 25 | gone through a series -- you know, through the 18 | | |
| 869: 1 | years I was with Becton, Dickinson, I had gone | | |
| 869: 2 | through a series of executive positions, and then | | |
| 869: 3 | became president and then CEO and then finally | | |
| 869: 4 | chairman of Becton, Dickinson, and then left there | | |
| 869: 5 | in 1994 to go to Merck. | | |
| 869: 6 | Q:  When you joined Merck in 1994, what | Pltf Obj: R. 401; R. 403; | |
| 869: 7 | were the positions that you took on? | R. 404 | |
| 869: 8 | A:  When I joined Merck in '94, I came in | Def Resp: What jobs | |
| 869: 9 | as President and Chief Executive Officer, and then | Mr. Gilmartin had at | |
| 869: 10 | became Chairman the following November when -- I | Merck are relevant & are | |
| 869: 11 | joined in June, and the following November became | not prejudicial or | |
| 869: 12 | chairman when my predecessor retired. | improper | |
| 869: 13 | Q:  I have some questions about your | | |
| 869: 14 | tenure at Merck that I'll ask in a few moments. | | |
| 869: 15 | First I would like to know, have you | | |
| 869: 16 | ever performed any public service? | | |
| 869: 17 | A:  Yes. You know, in terms of personal | | |
| 869: 18 | involvement in the community, I've been active in my | | |
| 869: 19 | church and also active with the local hospital in my | | |
| 869: 20 | community that I lived in until recently, which was | | |
| 869: 21 | in Ridgewood, New Jersey. So, I was on the board of | | |
| 869: 22 | the Valley Hospital, which is a nonprofit community | | |
| 869: 23 | hospital. | | |
| 869: 24 | Q:  What was your work there? | | |
| 869: 25 | A:  Well, as a member of the board, you | | |

| | |
|---|---|
| 870: 1 | are really concerned with ensuring that the hospital |
| 870: 2 | has adequate financial support from the community, |
| 870: 3 | and so, therefore, can continue to invest in new |
| 870: 4 | equipment, as well as through the monthly meetings |
| 870: 5 | just basically overseeing, as a board does, the |
| 870: 6 | governance of the hospital and how it is performing |
| 870: 7 | and functioning. |
| 870: 8 | Q:  Have you performed any other public |
| 870: 9 | service in the area of healthcare? |
| 870: 10 | A:  Yes. In terms of -- also involved in |
| 870: 11 | the Healthcare Leadership Council, which is an |
| 870: 12 | organization located in Washington. Also in the |
| 870: 13 | Health Care Institute of New Jersey. |
| 870: 14 | Q:  How long have you been working with |
| 870: 15 | the Healthcare Leadership Council? |
| 870: 16 | A:  Working with the Healthcare |
| 870: 17 | Leadership Council since the late '80s when it was |
| 870: 18 | founded. |
| 870: 19 | Q:  What's the work of that group? |
| 870: 20 | A:  The work of that group has been |
| 870: 21 | concerned with how to improve quality and access and |
| 870: 22 | affordability of the healthcare system, and |
| 870: 23 | currently involved in how do we deal with helping |
| 870: 24 | get coverage for the uninsured in the U.S. |
| 870: 25 | Q:  Have you performed any public service |
| 871: 1 | in the area of business? |
| 871: 2 | A:  Yes. I guess two examples of that |
| 871: 3 | would be, I'm a member of the Council on |
| 871: 4 | Competitiveness, and also I was appointed by |
| 871: 5 | President Bush to the President's Export Council. |
| 871: 6 | Q:  Which is the Council on |
| 871: 7 | Competitiveness? |
| 871: 8 | A:  The Council on Competitiveness is a |
| 871: 9 | group of universities and businesses and also with |
| 871: 10 | some labor union representatives that come together |
| 871: 11 | to talk about what advocacy and what policies can we |
| 871: 12 | follow to make America more competitive in global |
| 871: 13 | markets. |
| 871: 14 | Q:  How long have you been doing that? |
| 871: 15 | A:  I have been involved in that, I |
| 871: 16 | think, something on the order of about seven or |
| 871: 17 | eight years. |
| 871: 18 | Q:  What is the President's Export |

**Objection/Response in Barnett**

871: 19 Council?

871: 20 A:  The President's Export Council is a

871: 21 group of business people appointed by the President,

871: 22 in this case, President Bush, to advocate also

871: 23 policies about how to improve America's exports to

871: 24 the rest of the world.

871: 25 Q:  Do you serve on any committees in

872: 1 that organization?

872: 2 A:  Yes. I was asked to be the chairman

872: 3 of the subcommittee on stewardship, corporate

872: 4 stewardship

872: 5 Q:  Who oversees the work of that

872: 6 Council?

872: 7 A:  That's overseen by the Secretary of

872: 8 Commerce. When I was appointed initially, it was

872: 9 Secretary Evans, Don Evans.

872: 10 Q:  Mr. Gilmartin, have you performed any

872: 11 public service in the area of education?

872: 12 A:  Yes. One thing is that I'm -- as a

872: 13 graduate of Harvard Business School, I currently am

872: 14 on the dean's board of advisors, and also I'm

872: 15 currently Chairman of the Board of Trustees for the

872: 16 United Negro College Fund.

872: 17 Q:  What is your work there?

872: 18 A:  Well, for the UNCF, that is an

872: 19 organization that's concerned with raising funds to

872: 20 support historically black colleges.

872: 21 Q:  How long have you been on that board?

872: 22 A:  I've been on that board since the

872: 23 early '90s, and I currently serve as chairman of

872: 24 that. I just finished my first term.

872: 25 Q:  You mentioned some of your public

873: 1 service and community activities. What are your

873: 2 principal community activities?

873: 3 A:  Well, in terms of community

873: 4 activities, I've been active in my church. Ever

873: 5 since I've lived in New Jersey, I've been with the

873: 6 same church. And also served on the Council for the

873: 7 Boy Scouts of America in the county in which I live.

873: 8 Q:  Have you served on any boards of

873: 9 directors besides Merck?

873: 10 A:  Yes. I serve currently on the board

873: 11 of Microsoft and also on the board of General Mills.

<u>**Objection/Response in Barnett**</u>

| | |
|---|---|
| 873: 12 | Q: I want to turn back to your tenure |
| 873: 13 | with Merck. For what period of time did you hold |
| 873: 14 | the position of CEO, President and Chairman of the |
| 873: 15 | Board? |
| 873: 16 | A: I held that position until just a few |
| 873: 17 | weeks ago when I handed over the reins to my |
| 873: 18 | successor. |
| 873: 19 | Q: What were your responsibilities in |
| 873: 20 | those positions? |
| 873: 21 | A: Well, as president and CEO and |
| 873: 22 | chairman of the company is that I have been |
| 873: 23 | responsible for setting the overall direction of the |
| 873: 24 | company in terms of its strategy, ensuring that we |
| 873: 25 | have the proper talent and the proper organizational |
| 874: 1 | structure and processes in place to be successful in |
| 874: 2 | implementing that strategy or fundamentally what the |
| 874: 3 | mission of the company is, which is to discover |
| 874: 4 | novel medicines, and to continue to ensure that |
| 874: 5 | we're invested behind research and generate the |
| 874: 6 | resources to do that. |
| 874: 7 | Q: Do you still hold a position with the |
| 874: 8 | company today? |
| 874: 9 | A: Yes, I do. Currently I have a title |
| 874: 10 | of special adviser to the executive committee of the |
| 874: 11 | board of directors. |
| 874: 12 | Q: Did you step down from your prior |
| 874: 13 | positions? |
| 874: 14 | A: Yes, I did. |
| 874: 15 | Q: Why was that? |
| 874: 16 | A: Well, we have a mandatory retirement |
| 874: 17 | policy of 65, and I'm 64, so, I'm in my final year, |

| | | |
|---|---|---|
| 874: 18 | and because of that, the board and I have had a | Pltf Obj: R. 401; R. 403 |
| 874: 19 | process underway to find a successor, to name a | Def. Resp: Why Mr. |
| 874: 20 | successor. | Gilmartin stepped down |
| 874: 21 | Q: Did you participate in that process? | is relevant and is not |
| 874: 22 | A: Yes, I did, although the board does | prejudicial. |
| 874: 23 | have the primary responsibility for that. | |
| 874: 24 | And we basically decided upon an | |
| 874: 25 | internal candidate, after looking outside as well, | |
| 875: 1 | Dick Clark, to be my successor. | |

| | |
|---|---|
| 875: 2 | Q: What are your current |
| 875: 3 | responsibilities? |
| 875: 4 | A: Well, the current responsibilities |

| | **Objection/Response in Barnett** | |
|---|---|---|
| 875: 5    are as special adviser to stay engaged in the | | |
| 875: 6    initiatives that we have around HIV-AIDS in the | | |
| 875: 7    developing world, the healthcare policy issues here | | |
| 875: 8    in the U.S. | | |
| 875: 9    Q:  Mr. Gilmartin, what is the mission of | Pltf Obj:  R. 403; R. 404 | |
| 875: 10    the Merck company? | *Will be subject of | |
| 875: 11    A:  Our mission really is to discover | Motion in Limine. | |
| 875: 12    novel medicines, so, particularly in areas where | Def Resp:Not prejudicial | |
| 875: 13    there are no treatments or the treatments aren't | or improper.  The former | |
| 875: 14    adequate and treatments that would make a major | CEO of Merck is | |
| 875: 15    difference in people's lives either in quality of | describing what Merck | |
| 875: 16    life or saving lives. | does | |
| 875: 17    Q:  Can you give the jury some examples? | | |
| 875: 18    A:  Yes. If I look back over the history | | |
| 875: 19    of the company, because this is the consistent | | |
| 875: 20    message, mission, is that we have been very active | | |
| 875: 21    in vaccines such as childhood vaccines, such as | | |
| 875: 22    measles, mumps, rubella, more recently chickenpox; | | |
| 875: 23    as part of our history, is that the first dose of | | |
| 875: 24    penicillin that was delivered in the early '40s here | | |
| 875: 25    in the U.S. came out of our facility in Rahway, New | | |
| 876: 1    Jersey. | | |
| 876: 2    And more recently we have medicines | | |
| 876: 3    such as a drug for controlling asthma, it's a | | |
| 876: 4    once-a-day pill, it's called Singulair, that reduces | | |
| 876: 5    the use of an inhaler or eliminates it completely. | | |
| 876: 6    We also, just to give you an idea of | | |
| 876: 7    the variety of drugs, we have a drug called Emend, | | |
| 876: 8    which is for people on chemotherapy to deal with the | | |
| 876: 9    problem of what's called delayed nausea and | | |
| 876: 10    vomiting, which occurs three or four days after | | |
| 876: 11    chemotherapy is administered. And before we | | |
| 876: 12    introduced this drug a few years ago, there was no | | |
| 876: 13    treatment for that. | | |
| 876: 14    And also a drug for osteoporosis, | | |
| 876: 15    which is -- women past menopause lose bone mass, | | |
| 876: 16    this builds back bone mass and prevents the risk of | | |
| 876: 17    fracture. So, these are all very novel medicines. | | |

**876:21   -   876:23**      Gilmartin, Raymond 2005-06-17

876: 21    Q:  Are there any guiding principles that
876: 22    the company uses in its efforts to carry out its
876: 23    mission?

**876:25   -   877:6**      Gilmartin, Raymond 2005-06-17

| | **Objection/Response in Barnett** | |
|---|---|---|
| THE WITNESS: Yes. Basically, what<br>876: 25 | | |
| 877: 1 has been key to our success and what we use as our | | |
| 877: 2 guidepost is, first of all, that patients come | | |
| 877: 3 first; secondly, that we're committed to scientific | | |
| 877: 4 excellence; and finally, we're committed to | | |
| 877: 5 conducting ourselves to the highest standards of | | |
| 877: 6 ethics and integrity. | | |

**884:12 - 884:21**     Gilmartin, Raymond 2005-06-17

884: 12   Q: Mr. Gilmartin, I would like to turn
884: 13   to the Vioxx testing and approval at Merck. Was
884: 14   that drug developed and brought to the market while
884: 15   you were CEO of the company?
884: 16   A: Well, its development was completed,
884: 17   and it was brought to the market while I was CEO of
884: 18   the company, yes.

884: 19   Q: Did the guiding principles that you     Pltf Obj: R. 403; R 404;
884: 20   mentioned earlier in your testimony guide the     R. 704: Improper
884: 21   company's efforts with respect to Vioxx?     opinions regarding an
    ultimate issue of fact.

**884:24 - 885:1**     Gilmartin, Raymond 2005-06-17     Def Resp: Mr. Gilmartin

884: 24   THE WITNESS: Absolutely. The thing     was the CEO of Merck
884: 25   is that this drug was -- took ten plus years to     when Vioxx was brought
885: 1   develop, it required extensive testing.     to market. It is not

**885:13 - 885:15**     Gilmartin, Raymond 2005-06-17     prejudicial or otherwise

885: 13   Q: Mr. Gilmartin, can you explain to me     improper for him to
885: 14   the principles that guided the company in developing     testify about this.
885: 15   Vioxx?

**885:17 - 886:7**     Gilmartin, Raymond 2005-06-17

885: 17   THE WITNESS: Well, they are the
885: 18   fundamental principles of the company, which are
885: 19   basically patients first, commitment to scientific
885: 20   excellence, which means rigorous science, and also a
885: 21   commitment to the highest standards of ethics and
885: 22   integrity. So, in carrying out that program, as we
885: 23   do all programs, not just the Vioxx program, is that
885: 24   in terms of patients, is to have a drug that's safe
885: 25   and effective, and in order to demonstrate that to
886: 1   ourselves and demonstrate that to the FDA and to
886: 2   physicians who ultimately may want to prescribe it
886: 3   requires extensive testing.
886: 4   So, over a ten-year period, we had
886: 5   something on the order of about 70 studies with
886: 6   about 10,000 patients in them, and that was the

| | | | Objection/Response in Barnett | |
|---|---|---|---|---|
| | 886: 7 | basis on which we applied for approval to the FDA. | | |
| **886:11** - **886:13** | | Gilmartin, Raymond 2005-06-17 | | |
| | 886: 11 | Q:  Can you tell me whether Merck | | |
| | 886: 12 | considered Vioxx to be, I think you mentioned the | | |
| | 886: 13 | term, 'novel medicine'? | | |
| **886:15** - **887:12** | | Gilmartin, Raymond 2005-06-17 | | |
| | 886: 15 | THE WITNESS:  Yes, it is novel | | |
| | 886: 16 | medicine in our definition. Novelty to us means | Pltf Obj:  R. 403; R. 601 | |
| | 886: 17 | that it is based on new knowledge about a disease | & R. 602:  Lack of | |
| | 886: 18 | pathway. In this case the new knowledge was about | foundation. | |
| | 886: 19 | the fact that if you inhibited something called a | Def Resp: Mr. Gilmartin | |
| | 886: 20 | COX-2 enzyme and inhibited only that, that you could | was the CEO of Merck | |
| | 886: 21 | get a reduction in pain and also inflammation | & he has the foundation | |
| | 886: 22 | associated with diseases such as osteoarthritis or | to talk about whether | |
| | 886: 23 | rheumatoid arthritis, and you could do that without | Merck considered Vioxx | |
| | 886: 24 | having as much impact on the stomach lining or GI | to be novel.  Also not | |
| | 886: 25 | lining as other pain relievers do. So, that was the | prejudicial | |
| | 887: 1 | novel aspect of it, that we could just inhibit this | | |
| | 887: 2 | one enzyme. | | |
| | 887: 3 | BY MR. BUTSWINKAS: | | |
| | 887: 4 | Q:  Why is the stomach problem a | Pltf Obj:  R. 602: Lack of foundaton; | |
| | 887: 5 | significant issue? | R. 701: Lack of qualifications; inadmissible | |
| | 887: 6 | A:  Well, the stomach problem is a very | opinion. *Will be subject of | |
| | 887: 7 | significant issue because something on the order of | Motion in Limine | |
| | 887: 8 | about 16 or 17,000 people die each year of | Def Resp: Mr. Gilmartin was the CEO | |
| | 887: 9 | spontaneous bleeding. Many of them experience -- | of Merck & has foundation to talk at a | |
| | 887: 10 | you know, have that without any warning signs. So, | high level about the stomach problems | |
| | 887: 11 | this is a very serious side effect of the | caused by traditional NSAIDS | |
| | 887: 12 | traditional pain relievers. | | |
| **887:21** - **889:21** | | Gilmartin, Raymond 2005-06-17 | | |
| | 887: 21 | Q:  How long was the development process | Pltf Obj:  R. 403, cumulative/asked | |
| | 887: 22 | of this drug? | & answered - p. 885:4-7 | |
| | 887: 23 | A:  Well, drugs take a long time to | Def Resp: It is not prejudicial to ask how | |
| | 887: 24 | develop, and this particular one was about ten years | long it took to develop Vioxx.  Also this | |
| | 887: 25 | or a little bit more than ten years. | question was not asked at 885:4-7. | |
| | 888: 1 | Q:  Would you give a general overview of | | |
| | 888: 2 | the process for the jury? | | |
| | 888: 3 | A:  Yes. For any drug that we discover | | |
| | 888: 4 | and develop, there's a preclinical phase where you | | |
| | 888: 5 | are really looking for compounds that are able to | | |
| | 888: 6 | hit the target that you are trying to get at. So, | | |
| | 888: 7 | for example, in this case we are trying to inhibit | | |

**Objection/Response in Barnett**

888: 8    the COX-2 enzyme, and so therefore, the first phase
888: 9    of it is how do you have a compound that does that
888: 10   effectively but also isn't toxic. So, that requires
888: 11   extensive work and testing initially in animals to
888: 12   come up with a compound that is safe.
888: 13   But then the next phase is to go into
888: 14   what's called Phase I, which is in a number of
888: 15   healthy individuals, is to test the drug to see if
888: 16   you find any side effects.
888: 17   The next phase after that is called
888: 18   Phase II, in which it is a little larger trial, but
888: 19   in this case you are looking to determine whether or
888: 20   not the drug works as you expect it would, does it
888: 21   have efficacy, is it working, and also looking, once
888: 22   again, for any side effects. And also you are
888: 23   looking for what is the right dose level. It is
888: 24   called dose ranging studies.
888: 25   Then the third phase, which is a very
889: 1    large clinical trial, is then to demonstrate through
889: 2    this large trial that you do have an efficacious
889: 3    drug and what the safety profile of the drug is.
889: 4    And that's on that data, through
889: 5    those phases. And you are working with the FDA all
889: 6    along through this process in terms of the
889: 7    protocols. Then you submit to the FDA a new drug
889: 8    application for approval.
889: 9    Q:  When was this medicine approved?
889: 10   A:  This was approved in May of 1999.
889: 11   Q:  Before May of 1999, how many studies
889: 12   had Merck conducted with respect to this medicine?
889: 13   A:  Well, I think when you take them all
889: 14   together, it was something on the order of about
889: 15   close to 70 studies.
889: 16   Q:  How many patients?
889: 17   A:  And it would involve something on the

| | |
|---|---|
| 889: 18   order of 10,000 patients. It was a very big study, | Pltf Obj: R. 403; R. 602: Lack of personal |
| 889: 19   one of the largest studies, I think, compared to how | knowledge. |
| 889: 20   most drugs are developed and how many patients are | Def Resp applies only to 889:18-21: |
| 889: 21   in these trials. | Not prejudicial to say how many |
| **890:1  -  890:13**      Gilmartin, Raymond 2005-06-17 | patients were involved in a study. |
| 890: 1    Q:  Who conducts these studies? | Gilmartin was CEO of Merck and |
| 890: 2    A:  These studies are done by clinical | has foundation to talk about |
| 890: 3    investigators, many in the U.S., but also around the | certain studies at a high level. |

**Objection/Response in Barnett**

| | |
|---|---|
| 890: 4　world, that we select. We submit the names of these | |
| 890: 5　clinical investigators to the FDA for their review. | |
| 890: 6　Q:  Are the people that conduct the | |
| 890: 7　studies, these clinical investigators, are they | |
| 890: 8　Merck employees? | |
| 890: 9　A:  They are not Merck employees. No, | Pltf Obj:  R. 403 |
| 890: 10　they are independent. | Def Resp applies only to 890:9-10: |
| 890: 11　Q:  Are the results of all these studies | Not prejudicial to give truthful |
| 890: 12　submitted to the FDA? | answer to a non-objectionable |
| 890: 13　A:  Yes. | question. |

**890:15  -  890:18**　Gilmartin, Raymond 2005-06-17

890: 15　THE WITNESS:  This is an important
890: 16　part of the process, every study that you do, every
890: 17　study that we do, and we submit that data to the
890: 18　FDA.

**890:20  -  890:22**　Gilmartin, Raymond 2005-06-17

| | |
|---|---|
| 890: 20　Q:  Did these studies show whether or not | Pltf Obj:R. 701: Witness |
| 890: 21　Vioxx as a medicine posed a cardiovascular threat or | not qualified to give |
| 890: 22　not? | opinion. |

**890:24  -  891:5**　Gilmartin, Raymond 2005-06-17

| | |
|---|---|
| 890: 24　THE WITNESS:  We didn't see an | Def Resp: Mr. Gilmartin |
| 890: 25　indication of that. We had extensive studies | was the CEO of Merck |
| 891: 1　against placebo or sugar pills. We had studies | and has the ability to give high |
| 891: 2　against other NSAIDs, as they are called, | level testimony about this. |
| 891: 3　nonsteroidal anti-inflammatory drugs, and through | |
| 891: 4　these extensive studies we did not see that there | |
| 891: 5　was a risk of cardiovascular events. | |

**891:9  -  891:11**　Gilmartin, Raymond 2005-06-17

891: 9　Q:  Did Merck evaluate cardiovascular
891: 10　risk in these studies before the medicine went on
891: 11　the market?

**891:13  -  891:19**　Gilmartin, Raymond 2005-06-17

891: 13　THE WITNESS:  Yes, we did. In terms
891: 14　of the standard protocol that you follow, you are
891: 15　monitoring for any side effects or adverse events,
891: 16　that as part of that standard protocol, you are also
891: 17　looking for cardiovascular events as well.
891: 18　BY MR. BUTSWINKAS:
891: 19　Q:  What did Merck's evaluation show?

**891:21  -  891:25**　Gilmartin, Raymond 2005-06-17

891: 21　THE WITNESS:  Putting all of our

**Objection/Response in Barnett**

891: 22   studies together and looking at the data against
891: 23   placebo, against other drugs, other NSAIDs like
891: 24   ibuprofen, we saw no difference in cardiovascular
891: 25   events between Vioxx and those other agents.

**892:2   -   893:23**          Gilmartin, Raymond 2005-06-17

892: 2    Q:  After the medicine went on the
892: 3    market, did Merck stop or continue to consider
892: 4    cardiovascular risk?
892: 5    A:  We continued to consider
892: 6    cardiovascular risk.
892: 7    Q:  What did Merck do?
892: 8    A:  Well, in 1998, and then implemented
892: 9    in 1999, we specified a protocol specifically for
892: 10   looking at cardiovascular risk --
892: 11   Q:  What do you mean 'protocol'?
892: 12   A:  -- for studies.
892: 13   Well, it was basically, at the outset
892: 14   of the study, defining what we were looking at of
892: 15   cardiovascular events to ensure that we would pick
892: 16   up anything, any kind of signal of an issue with the
892: 17   drug.
892: 18   Q:  What did that evaluation show?
892: 19   A:  Well, we applied that to studies.
892: 20   So, the next study in which that was applied was
892: 21   what was called the VIGOR study, which was a study
892: 22   that we undertook to demonstrate one of the original
892: 23   reasons of developing the drug is that we could
892: 24   actually prove it through an outcomes study that we
892: 25   could reduce serious GI bleeds.
893: 1    Q:  How many patients were in the VIGOR
893: 2    study?
893: 3    A:  I think it was about 8,000 patients,
893: 4    and so you would have 4,000 in each arm, as it says,
893: 5    one with Vioxx, and then we were comparing it
893: 6    against naproxen in the other arm.
893: 7    Q:  When did the results of that study
893: 8    become available to the company?
893: 9    A:  That became available in March of
893: 10   2000.
893: 11   Q:  What were the results?
893: 12   A:  Well, first of all, we did
893: 13   demonstrate that we could reduce GI, serious GI
893: 14   events such as GI bleeds, perforations and ulcers by

| | | **Objection/Response in Barnett** | |
|---|---|---|---|
| | 893: 15   over 50 percent, which was, you know, a very | | |
| | 893: 16   positive outcome. But we also in those results saw | | |
| | 893: 17   a disparity or a difference between cardiovascular | | |
| | 893: 18   events between Vioxx and naproxen. So, then it | | |
| | 893: 19   became a question of does Vioxx have a higher rate | | |
| | 893: 20   of cardiovascular events or did naproxen have a | | |
| | 893: 21   lower rate of cardiovascular events. | | |
| | 893: 22   Q: Did Merck provide the results of the | | |
| | 893: 23   VIGOR study to the Food & Drug Administration? | | |
| **893:25   -   895:1** | Gilmartin, Raymond 2005-06-17 | | |
| | 893: 25   THE WITNESS: Yes, we did. In March, | | |
| | 894: 1   when we got these results, we issued a press release | | |
| | 894: 2   to the general public and also submitted the | | |
| | 894: 3   preliminary data in March to the FDA. Then we | | |
| | 894: 4   submitted final data to the FDA in the following | | |
| | 894: 5   June of 2000. | | |
| | 894: 6   BY MR. BUTSWINKAS: | | |
| | 894: 7   Q: How did you first learn about the | | |
| | 894: 8   results of the VIGOR study? | | |
| | 894: 9   A: I can't remember the exact setting or | | |
| | 894: 10   circumstances, but our head of research, our | | |
| | 894: 11   president of Merck Research Laboratories, Dr. Ed | | |
| | 894: 12   Scolnick, called me to tell me about these results, | | |
| | 894: 13   both the fact that we had shown we could reduce GI | | |
| | 894: 14   events, but also to inform me that we also saw this | | |
| | 894: 15   disparity between Vioxx and naproxen as far as | | |
| | 894: 16   cardiovascular events as well. | | |
| | 894: 17   Q: What were Dr. Scolnick's | | |
| | 894: 18   responsibilities at the company? | | |
| | 894: 19   A: Dr. Scolnick was president of Merck | | |
| | 894: 20   Research Laboratories, which in a sense made him, | | |
| | 894: 21   and since he's an M.D., the head physician, as well | | |
| | 894: 22   as the lead scientist or the senior scientist in the | | |
| | 894: 23   company. And he oversaw all of the Merck research | | |
| | 894: 24   activities. | | |
| | 894: 25   Q: Can you tell the jury whether or not | Pltf Obj: R. 401; R. 403; | |
| | 895: 1   you felt comfortable relying on Dr. Scolnick? | R. 404 | |
| **895:3   -   895:15** | Gilmartin, Raymond 2005-06-17 | Def Resp: Plaintiff | |
| | 895: 3   THE WITNESS: I felt very comfortable | attacks Dr. Scolnick | |
| | 895: 4   relying on Dr. Scolnick, and for a number of | and it is therefore | |
| | 895: 5   reasons. | relevant, proper and not | |
| | 895: 6   One, he is clearly recognized as an | prejudicial to ask his | |
| | 895: 7   outstanding scientist; and secondly, all the | boss if he was | |

| | | **Objection/Response in Barnett** | |
|---|---|---|---|
| 895: 8 | experience that I had with Dr. Scolnick in terms of, | comfortable relying on | |
| 895: 9 | not only around Vioxx, but also with other drugs, | Dr. Scolnick. | |
| 895: 10 | his total commitment as a physician to patient | | |
| 895: 11 | safety. Also on top of that, Ed is a very | | |
| 895: 12 | passionate and very dedicated and relentless | | |
| 895: 13 | scientist and physician in terms of, you know, | | |
| 895: 14 | always driving for collecting the data and driving | | |
| 895: 15 | for answers and what's the truth here. | | |

**895:19   -   897:8**         Gilmartin, Raymond 2005-06-17

| | | | |
|---|---|---|---|
| 895: 19 | Q:  When Dr. Scolnick reported the | Pltf Obj: R. 602:  Lack | |
| 895: 20 | results of the VIGOR study to you, what did you say | of knowledge - "can't | |
| 895: 21 | to him? | recall" | |
| 895: 22 | A:  Well, once again, I can't remember | Def Resp: The witness | |
| 895: 23 | specifically my response, but as I recall, he said, | had a general recollection | |
| 895: 24 | you know, we've seen these results, now the next | which he set forth here. | |
| 895: 25 | thing is to answer this question about what's going | | |
| 896: 1 | on here, why do we see this difference. | | |
| 896: 2 | Q:  This difference in? | | |
| 896: 3 | A:  The difference between cardiovascular | | |
| 896: 4 | events between Vioxx and naproxen. As I said, the | | |
| 896: 5 | question, does Vioxx cause more of a problem, does | | |
| 896: 6 | naproxen have less of a rate, and so, therefore, | | |
| 896: 7 | what he informed me, he was -- you know, they are | | |
| 896: 8 | going to start the process of understanding what was | | |
| 896: 9 | going on here and trying to find out what would | | |
| 896: 10 | explain that difference. | | |
| 896: 11 | Q:  What was the conclusion? | | |
| 896: 12 | A:  The conclusion was that because of | | |
| 896: 13 | the anti-platelet effect of naproxen, which is an | | |
| 896: 14 | aspirin-like effect, combined with the fact that we | | |
| 896: 15 | hadn't seen any difference between Vioxx and placebo | | |
| 896: 16 | against sugar pills in terms of cardiovascular | | |
| 896: 17 | events, the conclusion was that naproxen in this | | |
| 896: 18 | study had a lower rate of cardiovascular events. | | |
| 896: 19 | Q:  Do you know what the basis of that | Pltf Obj:  R. 701: | |
| 896: 20 | conclusion was? | Witness not qualified to | |
| 896: 21 | A:  Yes. Well, first of all, the | give opinion. | |
| 896: 22 | significant event we did as soon as possible was to | Def Resp: Mr. Gilmartin | |
| 896: 23 | unblind two Alzheimer's studies that we had | was the CEO of Merck | |
| 896: 24 | underway, two studies of Vioxx to see if we could | and is qualified to give | |
| 896: 25 | delay or prevent Alzheimer's. It was important to | high level testimony | |
| 897: 1 | look at those studies because it was Vioxx against | on the issues. | |
| 897: 2 | placebo or Vioxx against a sugar pill. And we | Especially here where | |

| | | | **Objection/Response in Barnett** |
|---|---|---|---|
| | 897: 3 | looked at those studies, we saw no difference in | he is simply being |
| | 897: 4 | cardiovascular events between Vioxx and the sugar | asked if he knew the |
| | 897: 5 | pills or placebo. Scientists also went back and | basis for a particular |
| | 897: 6 | looked at all the data we had from all our previous | conclusion. |
| | 897: 7 | studies as well -- | |
| | 897: 8 | Q:  What did that show? | |

**897:11** - **897:22**        Gilmartin, Raymond 2005-06-17

| | 897: 11 | THE WITNESS:  -- to look at that. |
| | 897: 12 | BY MR. BUTSWINKAS: |
| | 897: 13 | Q:  What did that show? |
| | 897: 14 | A:  That showed no difference either. |
| | 897: 15 | And so given this large body of data that we had |
| | 897: 16 | against other NSAIDs like ibuprofen, diclofenac, |
| | 897: 17 | against sugar pills where we saw no difference in |
| | 897: 18 | cardiovascular events, and given the fact that |
| | 897: 19 | naproxen is known to have antiplatelet or |
| | 897: 20 | aspirin-like effect, that the best scientific |
| | 897: 21 | explanation in the study was that naproxen had a |
| | 897: 22 | lower rate of cardiovascular events. |

**898:1** - **898:5**        Gilmartin, Raymond 2005-06-17

| | 898: 1 | Q:  So, at the time of the VIGOR study |
| | 898: 2 | and this analysis that you described, did you |
| | 898: 3 | believe that Vioxx increased the risk of heart |
| | 898: 4 | attacks or strokes? |
| | 898: 5 | A:  No, I did not believe that. |

**898:8** - **898:14**        Gilmartin, Raymond 2005-06-17

| | 898: 8 | Q:  Why not? |
| | 898: 9 | A:  Well, we had all this extensive data |
| | 898: 10 | against placebo, and we had all this extensive data |
| | 898: 11 | against other NSAIDs other than naproxen that showed |
| | 898: 12 | no differences. |
| | 898: 13 | Q:  Mr. Gilmartin, did Merck make an |
| | 898: 14 | attempt to hide the results of the VIGOR study? |

**898:16** - **899:4**        Gilmartin, Raymond 2005-06-17

| | 898: 16 | THE WITNESS:  No, absolutely not. As |
| | 898: 17 | soon as we had these results in March, during the |
| | 898: 18 | month of March, we undertook a number of things to |
| | 898: 19 | disclose these results. First of all, we issued a |
| | 898: 20 | press release. We submitted this data, the |
| | 898: 21 | preliminary data to the FDA within the same month. |
| | 898: 22 | We submitted the final data to them the following |
| | 898: 23 | June, this is in 2000 I'm talking about. We also |

**Objection/Response in Barnett**

|  |  |  |
|---|---|---|
| 898: 24 | submitted the data to a medical journal, the New |
| 898: 25 | England Journal of Medicine. That was published in |
| 899: 1 | the fall of 2000. So, the results of the VIGOR |
| 899: 2 | study were widely disclosed to other scientists, to |
| 899: 3 | physicians, and to the public at large through the |
| 899: 4 | press release. |

**904:9   -   904:10**        Gilmartin, Raymond 2005-06-17

| 904: 9 | Q:  Were the results of the VIGOR study |
|---|---|
| 904: 10 | ever included in the label for the Vioxx medicine? |

**904:12   -   904:14**        Gilmartin, Raymond 2005-06-17

| 904: 12 | THE WITNESS:  Yes. The results were |
|---|---|
| 904: 13 | included in the label in 2002, in April of 2002 is |
| 904: 14 | when they were included. |

**904:16   -   907:19**        Gilmartin, Raymond 2005-06-17

| 904: 16 | Q:  Once that happened, did Merck stop or |
|---|---|
| 904: 17 | continue to evaluate and study the medicine? |
| 904: 18 | A:  No. We continued to study the |
| 904: 19 | medicine in that we continued to look at the value |
| 904: 20 | of Vioxx in other indications such as prevention of |
| 904: 21 | cancer. And we also decided, given the questions |
| 904: 22 | that had been raised about cardiovascular events, to |
| 904: 23 | also study specifically whether or not there was an |
| 904: 24 | increase of cardiovascular events in addition to all |
| 904: 25 | of the other data that we already had. |
| 905: 1 | Q:  What did the company do in that |
| 905: 2 | regard? |
| 905: 3 | A:  Well, after looking at a variety of |
| 905: 4 | ways of answering the question, is there an |
| 905: 5 | increased risk of cardiovascular events, finally |
| 905: 6 | decided upon a protocol that we also discussed with |
| 905: 7 | the FDA in which we took three studies that were |
| 905: 8 | either already underway or about to get underway and |
| 905: 9 | prespecified them to look for cardiovascular risk. |
| 905: 10 | After evaluating a variety of ways of doing it, this |
| 905: 11 | was an equally valid way than anything else in terms |
| 905: 12 | of answering that question. It also had the added |
| 905: 13 | advantage for the fact that one of the trials that |
| 905: 14 | we were including in this, which would be very large |
| 905: 15 | in terms of numbers of patients, one of the trials |
| 905: 16 | called APPROVe had already started in February of |
| 905: 17 | 2000 before we even had -- the month before we even |
| 905: 18 | had the VIGOR results. So, therefore, the advantage |

**Objection/Response in Barnett**

| | |
|---|---|
| 905: 19 | of using this approach is that given a long-term |
| 905: 20 | study, that we could answer the question, you know, |
| 905: 21 | and have the data in about the shortest possible |
| 905: 22 | time. |
| 905: 23 | Q:  What was the name of that study that |
| 905: 24 | had begun in February of 2000? |
| 905: 25 | A:  The name of the study that began in |
| 906: 1 | February of 2000 was a study called APPROVe. |
| 906: 2 | Q:  What was that study about? |
| 906: 3 | A:  That study was designed to see if we |
| 906: 4 | could prevent the recurrence of colon polyps, which |
| 906: 5 | would be precursors to colon cancer. |
| 906: 6 | Q:  Did you learn anything about that |
| 906: 7 | issue? |
| 906: 8 | A:  Yes. As a matter of fact, |
| 906: 9 | subsequently we learned and had published or not |
| 906: 10 | published, but have basically put in the public |
| 906: 11 | domain that we actually did reduce colon polyps by |
| 906: 12 | about 25 percent or so. So, it did achieve the |
| 906: 13 | benefit that we were looking for. |
| 906: 14 | Q:  When did you learn any other results |
| 906: 15 | of the APPROVe study? |
| 906: 16 | A:  Well, the other results of the |
| 906: 17 | APPROVe study were the fact that we did have an |
| 906: 18 | increased risk of cardiovascular events against |
| 906: 19 | placebo. |
| 906: 20 | Q:  When did you learn that? |
| 906: 21 | A:  I learned of that when Dr. Peter Kim |
| 906: 22 | called me on September 24th of 2004, it was a |
| 906: 23 | Friday, it was about midday, in which he told me |
| 906: 24 | that we had received a call from our outside |
| 906: 25 | investigators on the APPROVe trial, who recommended |
| 907: 1 | that we discontinue the trial because they had seen |
| 907: 2 | an increased rate of cardiovascular events in the |
| 907: 3 | trial. And he had received the data, and he and his |
| 907: 4 | other scientists had reviewed the data that morning, |
| 907: 5 | and although they couldn't answer the question |
| 907: 6 | definitively, as far as what they saw at that point, |
| 907: 7 | they saw that the issue was real. |

| | | |
|---|---|---|
| 907: 8 | Q:  What did he tell you the results | Pltf Obj:  R. 801 & 802: |
| 907: 9 | were? | Hearsay |
| 907: 10 | A:  Well, he told me that there was an | Def Resp: Not being |
| 907: 11 | increased risk of cardiovascular events against | offered for the truth, |

| | | Objection/Response in Barnett |
|---|---|---|

907: 12   placebo which, you know, is something that

907: 13   was totally unexpected, because this was the first

907: 14   time we had seen an increased risk of cardiovascular

907: 15   events against a comparator other than naproxen,

907: 16   against other -- we hadn't seen it against other

907: 17   NSAIDs, we hadn't seen it against sugar pills. So,

907: 18   this really was totally unexpected.

907: 19   Q: Was it an immediate --

**907:23 - 908:16**   Gilmartin, Raymond 2005-06-17

907: 23   Q: -- increased risk?

907: 24   A: No. As he went over the data with me

907: 25   the following Monday, after they had studied it over

908: 1   the weekend and so on, is that for the first 18

908: 2   months, and this was what was unusual about it, for

908: 3   the first 18 months, there was no difference in

908: 4   cardiovascular risk between Vioxx and placebo, which

908: 5   was consistent with all the other data that we had,

908: 6   all the other studies that we had. But at 18

908: 7   months, there started to be a departure or a

908: 8   widening, if you will, of the curves between Vioxx

908: 9   and placebo. And it wasn't until about 30 months

908: 10   that this difference became statistically

908: 11   significant. Now, the number of events we are

908: 12   talking about, of cardiovascular events, are pretty

908: 13   low incidence, as the FDA pointed out in their own

908: 14   press release when we subsequently voluntarily

908: 15   withdrew the drug, but nonetheless, there was an

908: 16   increased risk.

**908:21 - 909:8**   Gilmartin, Raymond 2005-06-17

908: 21   Q: What did you tell Dr. Kim to do when

908: 22   he reported these results from the APPROVe study to

908: 23   you?

| | |
|---|---|
| 908: 24   A: Well, what I said to him right away | Pltf Obj: R. 403; R. 404 |
| 908: 25   was, Peter, whatever decision we make here is going | Def Resp: It is not |
| 909: 1   to be based on the science and what's in the best | prejudicial or improper |
| 909: 2   interests of the patients. So, as you look at this | to state the actual, true |
| 909: 3   data and as we think about what to do, don't worry | basis for a decision. |
| 909: 4   about that. Just think about that. We're going to | |
| 909: 5   make the decision in the best interests of the | |
| 909: 6   patient. | |

909: 7   Q: Was it obvious that you needed to

909: 8   withdraw the drug from the market?

**Objection/Response in Barnett**

909:10  -  910:24        Gilmartin, Raymond 2005-06-17

| | | |
|---|---|---|
| 909: 10 | THE WITNESS:  No, it was not obvious. | |
| 909: 11 | BY MR. BUTSWINKAS: | |
| 909: 12 | Q:  Why not? | |
| 909: 13 | A:  Well, first of all, over the course | |
| 909: 14 | of the weekend, after we looked at all of this data, | |
| 909: 15 | we, or I should say specifically Dr. Kim and his | |
| 909: 16 | scientists consulted with outside people, outside | |
| 909: 17 | experts in the field, and we really -- about given | |
| 909: 18 | we have this data, what should we do, what should be | |
| 909: 19 | our next step, and it really fell into three | |
| 909: 20 | different groups. | |
| 909: 21 | One group said that, given what Merck | Pltf Obj:  R. 801 & 802: Hearsay |
| 909: 22 | is all about and what your commitment to patient | |
| 909: 23 | safety is, we recommend you withdraw the drug. | Def Resp: Not offered for the truth.  It is offered to show what different groups said, which is relevant for understand- ing the decision-making process |
| 909: 24 | There was another group, though, that | |
| 909: 25 | said, look, this is an important drug, and it | |
| 910: 1 | helps -- it is benefiting a lot of people, we | |
| 910: 2 | recommend that what you do is you go to the FDA with | |
| 910: 3 | this new data, get the label changed, which lays all | |
| 910: 4 | this out about the fact that you've seen the | |
| 910: 5 | difference, but keep the drug on the market. | |
| 910: 6 | And the third group said, this is | |
| 910: 7 | really very difficult, and we don't really have a | |
| 910: 8 | recommendation, we're not sure what you should do | |
| 910: 9 | going forward. | |
| 910: 10 | Q: Did Dr. Kim make a recommendation to | |
| 910: 11 | you? | |
| 910: 12 | A:  Yes. So, when Dr. Kim came to see me | |
| 910: 13 | on Monday with all of this information, he | |
| 910: 14 | recommended to me that we voluntarily withdraw the | |
| 910: 15 | drug, but he was very clear at the time they made | |
| 910: 16 | that recommendation that we were under no obligation | |
| 910: 17 | to do that, that they believed at MRL that it would | |
| 910: 18 | be possible, MRL being Merck Research Laboratories, | |
| 910: 19 | that it would be possible to go to the FDA and ask | |
| 910: 20 | for a label revision and still be able to keep the | |
| 910: 21 | drug on the market. But his recommendation was that | |
| 910: 22 | we voluntarily withdraw the drug, which is a pretty | |
| 910: 23 | conservative approach and consistent with what we | |
| 910: 24 | are about as a company. | |

911:3  -  913:11        Gilmartin, Raymond 2005-06-17

| | | |
|---|---|---|
| 911: 3 | Q:  What was your conclusion and why? | |

**Objection/Response in Barnett**

| | |
|---|---|
| 911: 4    A:  My conclusion was that we should | |
| 911: 5    voluntarily withdraw the drug. | |
| 911: 6    Q:  Why did you conclude that? | |
| 911: 7    A:  And I concluded that, and the | |
| 911: 8    recommendation was based on the fact that we had | |
| 911: 9    identified a known risk with the drug that, although | |
| 911: 10   the risk was small, it was still a risk, where the | |
| 911: 11   incidence was small, and, therefore, at the time, | |
| 911: 12   given the data that we had, we believed there were | |
| 911: 13   alternative therapies available, and so, therefore | |
| 911: 14   in the overall interest of patients in terms of | |
| 911: 15   patient safety, that the best course of action, the | |
| 911: 16   most responsible course of action, was to | |
| 911: 17   voluntarily withdraw the drug. So, that's how we | |
| 911: 18   made that decision. | |
| 911: 19   Q:  Mr. Gilmartin, who made the final | |
| 911: 20   decision to withdraw this medicine from the market? | |
| 911: 21   A:  I made the final decision. It was my | |
| 911: 22   decision. | |
| 911: 23   Q:  Did the FDA force you to withdraw | Pltf Obj:  R. 401; R. 403; |
| 911: 24   this medicine? | R. 404 |
| 911: 25   A:  No, they did not. We made -- and in | *Will be subject of |
| 912: 1    terms of the sequence of events, we made this | Motion in Limine. |
| 912: 2    decision on a Monday afternoon. We discussed it | Def Resp: Relevant and |
| 912: 3    with our board of directors on Tuesday, this is the | is not prejudicial or |
| 912: 4    regularly scheduled board meeting just by chance, | improper |
| 912: 5    and we also informed the FDA of our decision on | |
| 912: 6    Tuesday afternoon as well. | |
| 912: 7    Q:  Can you explain to the jury how Merck | Pltf Obj:  R. 401 |
| 912: 8    implemented its decision to withdraw this medicine | Def Resp: How Merck |
| 912: 9    from the market? | withdrew the drug is |
| 912: 10   A:  Yes. Well, first of all, we got the | relevant |
| 912: 11   information from the outside investigators on a | |
| 912: 12   Thursday evening. On Friday, the 24th, Peter Kim | |
| 912: 13   informed me about the fact that we had a | |
| 912: 14   recommendation to voluntarily -- to stop the trial. | |
| 912: 15   We consulted with others over the weekend. We | |
| 912: 16   looked at more data. We made a decision on that | |
| 912: 17   Monday, the following Monday, to voluntarily | |
| 912: 18   withdraw the drug. We informed the FDA on Tuesday. | |
| 912: 19   On Wednesday we prepared for a press conference on | |
| 912: 20   Thursday morning in which we announced the voluntary | |
| 912: 21   withdrawal of the drug. During that Wednesday, we | |

| | | **Objection/Response in Barnett** |
|---|---|---|
| 912: 22 | also prepared as to how we would inform physicians | |
| 912: 23 | and also how we would be able to respond to patient | |
| 912: 24 | questions about the drug as well. So, from | |
| 912: 25 | basically Friday, when we had the data, we moved | |
| 913: 1 | quickly to Thursday morning, the following Thursday | |
| 913: 2 | morning, to voluntarily withdraw the drug. | |
| 913: 3 | Q:  What did Merck tell physicians and | |
| 913: 4 | patients? | |
| 913: 5 | A:  What we told physicians and patients, | |
| 913: 6 | first of all is, that we had this finding and that | |
| 913: 7 | they should discontinue the use of the drug and seek | |
| 913: 8 | alternative therapies. | |

| | | |
|---|---|---|
| 913: 9 | Q:  Up until that time, did you have a | |
| 913: 10 | view about the safety of the medicine? | |
| 913: 11 | A:  Yes. | |

**913:13   -   914:5**        Gilmartin, Raymond 2005-06-17

| | | |
|---|---|---|
| 913: 13 | THE WITNESS:  Yes. Up until that | |
| 913: 14 | time, because as this was totally unexpected because | |
| 913: 15 | of all of this extensive data that we had in which | |
| 913: 16 | we had not seen any difference in cardiovascular | |
| 913: 17 | risk against placebo, against other NSAIDs other | |
| 913: 18 | than that naproxen study, that, you know, this was | |
| 913: 19 | totally unexpected. And what was unusual about this | |
| 913: 20 | particular study, the APPROVe trial, is the fact | |
| 913: 21 | that for 18 months of continuous use, there was | |
| 913: 22 | still no difference in cardiovascular events or risk | |
| 913: 23 | against placebo, which was consistent with all the | |
| 913: 24 | data that we had. So, we had this unusual outcome | |
| 913: 25 | of this separation of the curves which didn't, once | |
| 914: 1 | again, until after 30 months of continuous use, | |
| 914: 2 | become statistically significant. So, this was | |
| 914: 3 | totally unexpected. So, we took, I think, the right | |
| 914: 4 | course, conservative course in voluntarily | |
| 914: 5 | withdrawing the drug. | |

**914:9   -   915:21**        Gilmartin, Raymond 2005-06-17

| | | |
|---|---|---|
| 914: 9 | Q:  Did you or anybody in your family | Pltf Obj:  R. 401; R. 403; *Subject of Motion in Limine |
| 914: 10 | ever take Vioxx? | |
| 914: 11 | A:  Yes. My wife was using Vioxx up | Def Resp: Relevant because shows Merck executives who were aware of all the |
| 914: 12 | until the time that we withdrew it. | |
| | | studies didn't believe there was increased risk. |

| | | |
|---|---|---|
| 914: 13 | Q:  Has there been any additional review | Pltf Obj:  R. 401; R. 403 |
| 914: 14 | of the data surrounding this medicine since your | R. 801 & 802 |

**Objection/Response in Barnett**

| | | |
|---|---|---|
| 914: 15 | decision to withdraw it from the market? | Def. Resp: Relevant be- |
| 914: 16 | A: Yes. Subsequent to our decision to | cause this showed a |
| 914: 17 | voluntarily withdraw the drug, the FDA then convened | "class effect." Not |
| 914: 18 | an advisory panel or committee to look at the data | prejudicial either. |
| 914: 19 | of all the drugs in the class, all the COX-2s. | Hearsay exception |
| 914: 20 | Q: What is an advisory panel? | 803(6) or 803(8) |
| 914: 21 | A: An advisory panel is made up of | |
| 914: 22 | experts, of physicians and scientists who have | |
| 914: 23 | experience in the field, in this case, of either | |
| 914: 24 | cardiovascular disease or also rheumatoid arthritis, | |
| 914: 25 | osteoarthritis. So, it would be a panel of experts | |
| 915: 1 | that would be assembled to consider the data. So, | |
| 915: 2 | this is a session in which all of the data from each | |
| 915: 3 | of the drugs in the class, the other two, Bextra and | |
| 915: 4 | Celebrex, were also presented as well. | |
| 915: 5 | Q: So -- | |
| 915: 6 | A: So, the FDA undertook a thorough | |
| 915: 7 | review of the entire class based on the fact that we | |
| 915: 8 | had this APPROVe trial, had this new finding, and | |
| 915: 9 | they started the process of determining what is | |
| 915: 10 | happening here. | |

| | | |
|---|---|---|
| 915: 11 | Q: Has additional data been generated? | Pltf Obj: R. 403; R. 601 |
| 915: 12 | A: Yes. As a matter of fact, it turns | & 602: Lack of know- |
| 915: 13 | out that the other COX-2s in the class also had | ledge & lack of foundation. |
| 915: 14 | studies, when people went back and looked at the | Def Resp: Not prejudicial |
| 915: 15 | data, that showed an increased risk of | to point out relevant |
| 915: 16 | cardiovascular events. And even subsequent to that | FDA findings. The wit- |
| 915: 17 | advisory panel, the FDA, in looking at all the data, | ness was the CEO of |
| 915: 18 | has concluded that not only the COX-2 class has | Merck and has founda- |
| 915: 19 | increased cardiovascular events, but the class of | tion to discuss the FDA's |
| 915: 20 | NSAIDs or pain relievers in general also shows the | findings on this issue. |
| 915: 21 | same effect. | |

**915:25 - 916:2**     Gilmartin, Raymond 2005-06-17

| | |
|---|---|
| 915: 25 | Q: What has the review of the Advisory |
| 916: 1 | Committee shown? |
| 916: 2 | A: Well, first of all -- |

**916:4 - 916:24**     Gilmartin, Raymond 2005-06-17

| | |
|---|---|
| 916: 4 | THE WITNESS: -- the conclusions of |
| 916: 5 | the advisory panel were, first of all, that in |
| 916: 6 | what's called the COX-2 class, Celebrex, Bextra and |
| 916: 7 | Vioxx as part of that class, is that all three drugs |
| 916: 8 | had an increased rate of cardiovascular events. |

| | **Objection/Response in Barnett** | |
|---|---|---|
| 916: 9 The second thing that they determined | | |
| 916: 10 was in the case of Vioxx, that the benefits of Vioxx | | |
| 916: 11 were such that it offset the risk, and so, | | |
| 916: 12 therefore, that Vioxx could be on the market. | | |
| 916: 13 BY MR. BUTSWINKAS: | | |
| 916: 14 Q:  Is that something that Merck would | | |
| 916: 15 consider? | | |
| 916: 16 A:  Yes.  I mean, we haven't made any | | |
| 916: 17 decisions about that, but we are in discussions with | | |
| 916: 18 the FDA at this time as to whether or not the drug | | |
| 916: 19 should be brought back and under what circumstances | | |
| 916: 20 it should be brought back. | | |
| 916: 21 Q:  Mr. Gilmartin, I just have a couple | | |
| 916: 22 more questions for you. | | |
| 916: 23 Did Merck race Vioxx to market for | | |
| 916: 24 profits and disregard patient safety? | | |

**917:1  -  918:6**        Gilmartin, Raymond 2005-06-17

| | | |
|---|---|---|
| 917: 1 THE WITNESS:  Absolutely not. | | |
| 917: 2 BY MR. BUTSWINKAS: | | |
| 917: 3 Q:  How can you say that? | Pltf Obj:  R. 403; R. 404; | |
| 917: 4 A:  Well, first of all, we studied the | R. 704:  Improper | |
| 917: 5 drug for ten years with a large number of clinical | opinion as to an ultimate | |
| 917: 6 trials, as I said before, close to 70 trials, we had | issue of fact. | |
| 917: 7 large numbers of patients in this trial, around | | |
| 917: 8 10,000 patients, so, the drug was studied | Def Resp: Not prejudicial | |
| 917: 9 extensively. | or improper for Merck's | |
| 917: 10 Secondly, you know, our success as a | CEO to answer a | |
| 917: 11 company depends upon our credibility with physicians | question about whether | |
| 917: 12 and with regulators, and frankly, credibility with | Merck rushed Vioxx to | |
| 917: 13 our own people in terms of are we doing the right | market and disregarded | |
| 917: 14 thing.  So, therefore, we have never and would never | patient safety.  That is | |
| 917: 15 do anything to compromise that credibility, which is | the Plaintiff's theory and | |
| 917: 16 based on the fact that we are concerned about | Merck must be able to | |
| 917: 17 patients, we put patients first, we study our drugs | ask its former CEO if it is | |
| 917: 18 extensively, we disclose the information about it, | true. | |
| 917: 19 and, you know, this is a long-term business. It | | |
| 917: 20 takes a long time to discover a drug. We've | | |
| 917: 21 discovered many drugs in the past. We've introduced | | |
| 917: 22 17 or 18 new medicines and vaccines in a five-year | | |
| 917: 23 period from '95 through 2000 along with Vioxx, and | | |
| 917: 24 we have a number of important drugs in our pipeline | | |
| 917: 25 going forward. So, we're not -- the success of our | | |
| 918: 1 company is based on our behavior in terms of looking | | |

| | | **Objection/Response in Barnett** | |
|---|---|---|---|
| | 918: 2 | for the long-term and putting patients first. And | |
| | 918: 3 | our reputation, our credibility is very important to | |
| | 918: 4 | our success, and we are not going to do anything and | |
| | 918: 5 | we have not done anything to compromise that | |
| | 918: 6 | credibility. | |
| **918:10 - 920:4** | | Gilmartin, Raymond 2005-06-17 | |
| | 918: 10 | Q:  Do you personally, Mr. Gilmartin, | Pltf Obj:  R. 401; R. 403; R. 404 |
| | 918: 11 | stand behind the decisions that Merck made, the | |
| | 918: 12 | important decisions with respect to this medicine? | Def Resp: It is relevant & not prejudicial or improper to hear whether Merck's former CEO stands behind the decisions Merck made regarding Vioxx. |
| | 918: 13 | A:  Absolutely. I mean, you know, if I | |
| | 918: 14 | look back over all the events that occurred and the | |
| | 918: 15 | major decisions that were made along the way here, | |
| | 918: 16 | first of all, in terms of how to study the drug and | |
| | 918: 17 | to study the drug extensively in terms of the large | |
| | 918: 18 | number of studies that we did, the large number of | |
| | 918: 19 | patients that were in it, in fact, compared to most | |
| | 918: 20 | drugs, 10,000 patients -- that are under | |
| | 918: 21 | development, 10,000 patients is a very large number | |
| | 918: 22 | of people to study the drug in. | |
| | 918: 23 | Secondly, we continued to monitor the | |
| | 918: 24 | drug in terms of its safety profile. And when we | |
| | 918: 25 | had data, new data about the drug, we disclosed that | |
| | 919: 1 | data to the public, to physicians, to scientists, | |
| | 919: 2 | and we continue to study the drug. | |
| | 919: 3 | Finally, when we found out something | |
| | 919: 4 | new, when we had this unexpected result for the | |
| | 919: 5 | first time seeing an increased rate of | |
| | 919: 6 | cardiovascular events against placebo as in the | |
| | 919: 7 | APPROVe trial, that even though the number of | |
| | 919: 8 | incidents were small, and that's what the FDA said | |
| | 919: 9 | in their press release on the day we announced the | |
| | 919: 10 | voluntary withdrawal, we took the conservative | |
| | 919: 11 | course. And based on the information we had at the | |
| | 919: 12 | time, we said we have a known risk, there are other | |
| | 919: 13 | alternative therapies available, we believed, and, | |
| | 919: 14 | therefore, in the overall interests of patient | |
| | 919: 15 | safety, we're going to voluntarily withdraw the | |
| | 919: 16 | drug. | |
| | 919: 17 | We're now in a circumstance where new | |
| | 919: 18 | information has come available about the other drugs | |
| | 919: 19 | in the class and about pain relievers in general, | |
| | 919: 20 | and we find ourselves in the circumstance where we | |
| | 919: 21 | apparently do not have a unique risk, that all the | |

**Objection/Response in Barnett**

| | |
|---|---|
| 919: 22    other drugs have a risk of cardiovascular events, | |
| 919: 23    but we do have a unique benefit, because the VIGOR | |
| 919: 24    trial did show, and we're the only drug that has | |
| 919: 25    shown that we can reduce serious GI bleeds. So, for | |
| 920: 1    the same reason, in the interest of patient safety, | |
| 920: 2    we're talking to the FDA about whether or not we | |
| 920: 3    should bring Vioxx back to the market, although at | |
| 920: 4    this point no decision has been made. | |

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

In re: VIOXX

**PRODUCTS LIABILITY LITIGATION**

**This document relates to
Case No. 06-0485**

**GERALD D. BARNETT**

Plaintiff,

v.

**MERCK & CO., INC.,**

Defendant.

**MDL DOCKET NO. 1657**

**SECTION L**

**JUDGE FALLON**

**MAGISTRATE JUDGE KNOWLES**

**Merck & Co., Inc.'s Notice of Filing Deposition
Testimony of Malachi Mixon**

**Exhibit E**

Merck hereby submits the following deposition testimony of Malachi Mixon for the
Court's consideration and pre-trial rulings:

1.    Merck's Affirmative Designations with Plaintiff's Objections, and Merck's
Responses;

2.    Plaintiff's Counter-Designations with Merck's Objections

By June 20, 2006, Merck will submit a notebook for the Court with these designations
and objections, as well as copies of the exhibits referenced herein.  Merck's Affirmative
Designations appear in blue, while Plaintiff's Counter-Designations appear in red.

The Court ruled in the Plunkett case on many of the Plaintiff's objections to Merck's
Affirmative Designations for Mr. Mixon.  For the instances where the Court previously
overruled Plaintiff's objections, Merck did not include a specific response and respectfully
requests that the Court stand by its previous ruling.  Merck did, however, include responses for



EXHIBIT

E

Plaintiff's objections that were (1) sustained in the Plunkett cases or (2) were not previously addressed by the Court.

**Gerald Barnett v. Merck & Co., Inc.**
**Deposition Designations of Malachi Mixon**
**Defendant's Designations are in Blue.  Plaintiff's Designations are in Red**

| | Objection/Response in Barnett |
|---|---|

**16:2   -   16:10**          Mixon 01/25/2006

16: 2      Q.  Good afternoon, sir.

16: 3      A.  Good afternoon.

16: 4      Q.  Could you please state your name for the

16: 5           record?

16: 6      A.  My name is Aaron Malachi Mixon, The Third.

16: 7      Q.  Mr. Mixon, my name is Andy Goldman and I

16: 8           represent Merck in the Vioxx litigation.  You

16: 9           and I have not met before today, have we?

16: 10     A.  Not to my recollection.

**16:11   -   16:14**          Mixon 01/25/2006

16: 11     Q.  Do you understand, Mr. Mixon, that you have

16: 12          been subpoenaed here by Merck to testify in

16: 13          the Vioxx litigation?

16: 14     A.  Yes.

**17:14   -   19:14**          Mixon 01/25/2006

17: 14     Q.  Mr. Mixon, do you understand that the reason

17: 15          that Merck has subpoenaed your presence

17: 16          today is because of testimony that Dr. Topol

17: 17          has given in this case concerning a

17: 18          conversation he says you had with Ray

17: 19          Gilmartin?

17: 20     A.  Yes.

17: 21     Q.  Before we talk about your conversation with

17: 22          Mr. Gilmartin, sir, I just have a few

17: 23          questions about your background.  Where do

17: 24          you live and work, sir?

17: 25     A.  I live in Hunting Valley, Ohio, and I'm

18: 1           chairman and CEO of Invacare Corporation,

18: 2           which is located in Elyria, Ohio.

18: 3      Q.  Can you describe the business of Invacare?

18: 4      A.  Invacare is the world's largest manufacturer

18: 5           and distributor of home medical products.

18: 6           Our sales are approximately 1.6 billion, and

18: 7           we're listed on the New York Stock Exchange

18: 8           under the symbol IVC.

18: 9      Q.  Do you do any business with Merck, sir?

18: 10     A.  No.

18: 11     Q.  Are you associated in some way, Mr. Mixon,

18: 12          with The Cleveland Clinic?

**Gerald Barnett v. Merck & Co., Inc.**
**Deposition Designations of Malachi Mixon**
**Defendant's Designations are in Blue.  Plaintiff's Designations are in Red**

| | Objection/Response in Barnett |
|---|---|

18: 13 A. Yes.

18: 14 Q. How so?

18: 15 A. I am chairman of the board of trustees.

18: 16 Q. Can you briefly describe what The Cleveland
18: 17      Clinic is and a little bit about your role as
18: 18      the chairman of the board of trustees?

18: 19 A. Well, The Cleveland Clinic is one of the most
18: 20      prestigious teaching hospitals in the world.
18: 21      U.S. News & World Report now rank us as the
18: 22      fourth -- No. 4 hospital in the world in some
18: 23      areas.  We're ranked No. 1 such as in the
18: 24      heart, area of the heart.  And I was elected
18: 25      to the board some years ago, and later asked
19: 1      to serve as chairman of the board.  And it's
19: 2      certainly been a great honor for me to be
19: 3      associated with the great doctors there in
19: 4      The Clinic, and it sort of -- it's a civic
19: 5      position.  There's no compensation as
19: 6      chairman of the board, and I gladly serve in
19: 7      that position.

19: 8 Q. Do you know that Dr. Topol is the head of
19: 9      cardiology at The Cleveland Clinic?

19: 10 A. Yes.

19: 11 Q. Are you aware, Mr. Mixon, that Dr. Topol gave
19: 12      a deposition in the Vioxx litigation back in
19: 13      November of 2005?

19: 14 A. Yes.

**19:15  -  19:19**      Mixon 01/25/2006

19: 15 Q. Are you aware, sir, that Dr. Topol offered a
19: 16      number of opinions about Merck and about
19: 17      Vioxx, including an opinion about a
19: 18      conversation Dr. Topol says you had with
19: 19      Mr. Gilmartin?

**19:25  -  20:8**      Mixon 01/25/2006

19: 25 A. I did not read Dr. Topol's deposition, and my
20: 1      first knowledge of that matter was when I
20: 2      read it in the -- read it -- essentially read
20: 3      it in the newspaper.

20: 4 Q. Have you come to learn, Mr. Mixon, that Dr.
20: 5      Topol offered an opinion in his deposition

**Gerald Barnett v. Merck & Co., Inc.**
**Deposition Designations of Malachi Mixon**
**Defendant's Designations are in Blue.  Plaintiff's Designations are in Red**

| | | | **Objection/Response in Barnett** |
|---|---|---|---|
| | 20: 6 | about a conversation that he says you had | |
| | 20: 7 | with Ray Gilmartin? | |
| | 20: 8 | A. Yes. | |
| **20:9 - 20:16** | | Mixon 01/25/2006 | Plf. Obj:  Counsel giving speech, character- |
| | 20: 9 | Q. I'm going to show you a portion of Dr. | izing Dr. Topol's testimony.  Dr. Topol's |
| | 20: 10 | Topol's deposition in a minute, but I want to | Dr. Topol's testimony speaks for itself.  In |
| | 20: 11 | ask you a few specific questions about it. | addition, plaintiff objects to the showing of |
| | 20: 12 | Dr. Topol testified that in October of 2004 | Dr. Topol's testimony as cumulative testimony |
| | 20: 13 | Ray Gilmartin contacted you about editorials | . |
| | 20: 14 | that Dr. Topol wrote concerning Merck in the | Def. Resp: This is necessary background |
| | 20: 15 | New York Times and the New England Journal | to explain why Merck's counsel is asking the |
| | 20: 16 | Medicine. | question.  No suggestion by Plaintiff's |
| **20:18 - 20:25** | | Mixon 01/25/2006 | counsel that Merck has mischaracterized |
| | 20: 18 | Q. Is it true, sir, that Ray Gilmartin contacted | Topol's testimony. |
| | 20: 19 | you concerning Dr. Topol's editorials? | |
| | 20: 20 | A. No, he did not. | |
| | 20: 21 | Q. Dr. Topol also testified that during your | |
| | 20: 22 | conversation with Mr. Gilmartin, | |
| | 20: 23 | Mr. Gilmartin was, quote, very upset and | |
| | 20: 24 | asked you, quote, what has Merck ever done to | |
| | 20: 25 | The Cleveland Clinic to warrant this? | |
| **21:2 - 21:15** | | Mixon 01/25/2006 | |
| | 21: 2 | Q. During your conversation with Mr. Gilmartin, | |
| | 21: 3 | was he very upset, sir? | |
| | 21: 4 | A. Well, we haven't established that -- yet that | |
| | 21: 5 | we had a conversation. | |
| | 21: 6 | Q. And I will get into that in one minute.  My | |
| | 21: 7 | question is, based on your recollection of | |
| | 21: 8 | that conversation with Mr. Gilmartin in | |
| | 21: 9 | October of 2004, do you remember whether he | |
| | 21: 10 | was very upset? | |
| | 21: 11 | A. He was not upset. | |
| | 21: 12 | Q. Did Mr. Gilmartin -- | |
| | 21: 13 | A. But if I could just make a statement on the | |
| | 21: 14 | record.  I said he did not call me, but I did | |
| | 21: 15 | call him.  So there was a conversation. | |
| **21:18 - 26:5** | | Mixon 01/25/2006 | |
| | 21: 18 | During your conversation with | |
| | 21: 19 | Mr. Gilmartin in October of 2004, did | |

**Gerald Barnett v. Merck & Co., Inc.**
**Deposition Designations of Malachi Mixon**
**Defendant's Designations are in Blue.  Plaintiff's Designations are in Red**

| | | Objection/Response in Barnett |
|---|---|---|
| 21: 20 | Mr. Gilmartin ever say to you, "What has | |
| 21: 21 | Merck ever done to The Cleveland Clinic to | |
| 21: 22 | warrant this?" | |
| 21: 23 | A.  Let me say that it was a brief conversation. | |
| 21: 24 | I don't specifically recall the exact words | |
| 21: 25 | that were said, and I can only characterize | |
| 22: 1 | the nature of the conversation and generally | |
| 22: 2 | what was said in the conversation and what | |
| 22: 3 | the intention of the call was, but I can not | |
| 22: 4 | remember the exact words that anyone used. | |
| 22: 5 | But I will say that to answer your | |
| 22: 6 | question, Mr. Gilmartin in no way criticized | |
| 22: 7 | The Clinic, criticized Dr. Topol, or had any | |
| 22: 8 | derogatory statement to make about The | |
| 22: 9 | Cleveland Clinic in that conversation. | |
| 22: 10 | Q.  Can you tell us, Mr. Mixon, exactly what you | |
| 22: 11 | remember about your telephone conversation | |
| 22: 12 | with Ray Gilmartin in October of 2004 | |
| 22: 13 | starting with who initiated the call? | |
| 22: 14 | A.  I initiated the call, and the basic basis of | |
| 22: 15 | the call was that I had read a number of | |
| 22: 16 | newspaper accounts of comments that Dr. | |
| 22: 17 | had made about Merck, and as chairman of the | |
| 22: 18 | board, I felt it was my -- I thought it was | |
| 22: 19 | important that communication be made with | |
| 22: 20 | Merck from this -- the following point of | |
| 22: 21 | view:  That Dr. Topol was criticizing the | |
| 22: 22 | pharmaceutical itself, but I felt he also | |
| 22: 23 | stepped beyond that to criticize the FDA, to | |
| 22: 24 | criticize the company Merck, to criticize the | |
| 22: 25 | internal practices of Merck.  And as chairman | |
| 23: 1 | of the board, I was concerned that The | |
| 23: 2 | Cleveland Clinic would damage its -- might | |
| 23: 3 | damage its reputation and relationship with | |
| 23: 4 | Merck.  And I called Ray to let him know that | |
| 23: 5 | our doctors have a lot of freedom, and that | |
| 23: 6 | Dr. Topol was expressing his own views, but | |
| 23: 7 | they were not the views of The Cleveland | |
| 23: 8 | Clinic, and wanted him to know that this was | |
| 23: 9 | not the official -- the statements about | |

4

**Gerald Barnett v. Merck & Co., Inc.**
**Deposition Designations of Malachi Mixon**
**Defendant's Designations are in Blue.  Plaintiff's Designations are in Red**

| | | Objection/Response in Barnett |
|---|---|---|
| 23: 10 | Merck, the statements about the FDA, the | |
| 23: 11 | statements about how you carried out your | |
| 23: 12 | tests or how Merck carried out their tests | |
| 23: 13 | and so forth were not the official position | |
| 23: 14 | of The Cleveland Clinic. | |
| 23: 15 | To the best of my recollection Ray | |
| 23: 16 | said, "Mal, I really appreciate the call.  I | |
| 23: 17 | have a very, very high regard for the | |
| 23: 18 | Cleveland Clinic.  I have a high regard for | |
| 23: 19 | Dr. Topol."  And I said something like, "I | |
| 23: 20 | know you're not having a very good day.  I | |
| 23: 21 | know when a CEO has those kinds of | |
| 23: 22 | that it's very, very frustrating."  And he | |
| 23: 23 | said something like, "You know, Mal, you're | |
| 23: 24 | absolutely right.  It's really a tough time | |
| 23: 25 | I'm going through, and you really don't know | |
| 24: 1 | how much I appreciate you calling me, and | |
| 24: 2 | clarifying this matter."  And it was a very | |
| 24: 3 | brief, I would say no more than two minutes | |
| 24: 4 | phone call.  There was no -- nothing | |
| 24: 5 | derogatory said about The Cleveland Clinic or | |
| 24: 6 | Dr. Topol.  And my interests as chairman were | |
| 24: 7 | to maintain a good relationship with Merck. | |
| 24: 8 | These things happen over time, and I'm | |
| 24: 9 | interested in the perpetual relationship with | |
| 24: 10 | Merck and all -- and other pharmaceutical | |
| 24: 11 | companies because, you know, the hospitals | |
| 24: 12 | like The Cleveland Clinic are on the leading | |
| 24: 13 | edge of developing medicine and new | |
| 24: 14 | and new techniques, and I thought it was | |
| 24: 15 | important that as chairman that we maintain a | |
| 24: 16 | sound relationship with Merck and let, you | |
| 24: 17 | know, let the process of litigation occur and | |
| 24: 18 | let the courts decide, you know, about that | |
| 24: 19 | situation.  So it was just a very brief and | |
| 24: 20 | very professional conversation. | |
| 24: 21 | Q.  Was anybody else on the phone call with you | |
| 24: 22 | and Mr. Gilmartin? | |
| 24: 23 | A.  Yes. | |
| 24: 24 | Q.  Who was that? | |

**Gerald Barnett v. Merck & Co., Inc.**
**Deposition Designations of Malachi Mixon**
**Defendant's Designations are in Blue.  Plaintiff's Designations are in Red**

| | | **Objection/Response in Barnett** | |
|---|---|---|---|
| 24: 25 | A. Dr. Cosgrove. | | |
| 25: 1 | Q. Who is Dr. Cosgrove? | | |
| 25: 2 | A. Dr. Cosgrove is CEO and president of The | | |
| 25: 3 | Cleveland Clinic. | | |
| 25: 4 | Q. Is Dr. Cosgrove Dr. Topol's boss? | | |
| 25: 5 | A. Yes. | | |
| 25: 6 | Q. Who did most of the talking on the call, was | | |
| 25: 7 | it you or was it Dr. Cosgrove? | | |
| 25: 8 | A. I can't recall specifically.  I will tell you | | |
| 25: 9 | that it was my suggestion that we make the | | |
| 25: 10 | call, and I -- and I talked to Dr. Cosgrove | | |
| 25: 11 | and felt as a new CEO that he ought to join | | |
| 25: 12 | me on the call because I can't say everything | | |
| 25: 13 | exactly what The Clinic's position is, and I | | |
| 25: 14 | don't recall which of us said what, but I, | | |
| 25: 15 | again, generally characterizing the | | |
| 25: 16 | conversation, we both wanted Ray or | | |
| 25: 17 | Mr. Gilmartin to know that -- just what I've | | |
| 25: 18 | already testified to. | | |
| 25: 19 | Q. Did Mr. Gilmartin say anything else on your | | |
| 25: 20 | call with him in October of 2004 other than | | |
| 25: 21 | the fact that he appreciated your call, that | | |
| 25: 22 | he has a high regard for the Cleveland Clinic | | |
| 25: 23 | and its doctors, and really appreciated you | | |
| 25: 24 | will clarifying the matter. | | |
| 25: 25 | A. To the best of my recollection you've | | |
| 26: 1 | characterized it as consistent with what I | | |
| 26: 2 | said. | | |
| 26: 3 | Q. Did Mr. Gilmartin say anything like, "What | Plf. Obj:  Asked and | |
| 26: 4 | has Merck ever done to The Cleveland Clinic | answered, cumulative | |
| 26: 5 | to warrant this," sir? | (see 21:18-22:9) | |
| **26:8** - **26:17** | Mixon 01/25/2006 | Def. Resp:  Not | |
| 26: 8 | A. Again, to my recollection he made no negative | asked & answered | |
| 26: 9 | comment of anything approaching those kinds | or cumulative | |
| 26: 10 | of words. | | |
| 26: 11 | Q. Have you told us everything, Mr. Mixon, that | | |
| 26: 12 | you remember about your conversation with | | |
| 26: 13 | Gilmartin in October of 2004? | | |
| 26: 14 | A. To the best of my recollection. | | |
| 26: 15 | Q. If you'll bear with me, sir, I'm going to | | |

**Gerald Barnett v. Merck & Co., Inc.**
**Deposition Designations of Malachi Mixon**
**Defendant's Designations are in Blue.  Plaintiff's Designations are in Red**

| | | | Objection/Response in Barnett |
|---|---|---|---|
| | 26: 16 | play an excerpt of Dr. Topol's deposition, | |
| | 26: 17 | and ask you a question about it. | |
| **26:21** - **29:8** | | Mixon 01/25/2006 | |
| | 26: 21 | A. It's over here?  Yes. | |
| | 26: 22 | "Q   Did the Cleveland -- it raises the | Plf. Obj:  Asked and |
| | 26: 23 | question that has anyone from Merck -- | answered, cumulative |
| | 26: 24 | A. I can't hear it.  Oh, yeah. | Def. Resp:  Not |
| | 26: 25 | "Q   -- to your knowledge either | asked & answered |
| | 27: 1 | contacted anyone at the Cleveland Clinic | or cumulative |
| | 27: 2 | or your colleagues or anyone relating to | |
| | 27: 3 | your writings or your public statements | |
| | 27: 4 | relating to Vioxx in any way?  And if | |
| | 27: 5 | so, what is it, if anything? | |
| | 27: 6 | "A   I was told by a colleague here at | |
| | 27: 7 | The Clinic on October 14th, the chairman | |
| | 27: 8 | of the board of trustees, Mr. Mal Mixon, | |
| | 27: 9 | was contacted. | |
| | 27: 10 | "Q   His name is? | |
| | 27: 11 | "A   Mal, Malachi, Mixon, chairman of | |
| | 27: 12 | the board of trustees. | |
| | 27: 13 | "Q   Current? | |
| | 27: 14 | "A   Yes, of the Cleveland Clinic. | |
| | 27: 15 | That he was contacted directly by | |
| | 27: 16 | Raymond Gilmartin in October of 2004, | |
| | 27: 17 | and that he, that Mr. Gilmartin said to | |
| | 27: 18 | Mr. Mixon, "What has Merck ever done to | |
| | 27: 19 | The Cleveland Clinic to warrant this?" | |
| | 27: 20 | And this was relayed by a colleague who | |
| | 27: 21 | spoke to Mr. Mixon. | |
| | 27: 22 | "Q   Who is that colleague, sir? | |
| | 27: 23 | "A   His name is Richard Rudick. | |
| | 27: 24 | "Q   And who is he? | |
| | 27: 25 | "A   He is the director of clinical | |
| | 28: 1 | research.  R U D I C K, yes. | |
| | 28: 2 | "Q   Rudick was told by Mixon that | |
| | 28: 3 | Mixon was contacted by Gilmartin, is | |
| | 28: 4 | that what you're telling me? | |
| | 28: 5 | "A   Yes.  That he was further told | |
| | 28: 6 | that Mr. Gilmartin and Mr. Mixon were | |
| | 28: 7 | colleagues together at Harvard MBA | |

**Gerald Barnett v. Merck & Co., Inc.**
**Deposition Designations of Malachi Mixon**
**Defendant's Designations are in Blue.  Plaintiff's Designations are in Red**

<u>Objection/Response in Barnett</u>

| | |
|---|---|
| 28: 8 | school, they were old friends, and that |
| 28: 9 | Mr. Mixon understood that Mr. Gilmartin |
| 28: 10 | was very upset when he called in October |
| 28: 11 | 04.  This was relayed on October 14th to |
| 28: 12 | Dr. Rudick.  I don't know exactly what |
| 28: 13 | date.  I believe it was the day prior, |
| 28: 14 | October 13th, but I can't know for sure. |
| 28: 15 | "Q    And where does October 14th hit in |
| 28: 16 | our chronology, what event does that |
| 28: 17 | relate to? |
| 28: 18 | "A    That was eight days after the New |
| 28: 19 | England Journal paper of my editorial, |
| 28: 20 | and about 13 or 12 days after the New |
| 28: 21 | York Times op/ed. |
| 28: 22 | "Q    And from your perspective, |
| 28: 23 | assuming we pin all of that down that |
| 28: 24 | that indeed happened -- now, first of |
| 28: 25 | all, you believe that if called to |
| 29: 1 | testify that's what Dr. Rudick would |
| 29: 2 | tell us, is that what you're saying? |
| 29: 3 | "A    Yes, I confirmed this with Dr. |
| 29: 4 | Rudick, yes. |
| 29: 5 | "Q    And what -- how do you view all of |
| 29: 6 | this, this event that you just described |
| 29: 7 | for me? |
| 29: 8 | "A    I find it entirely repulsive." |

**30:17    -    31:5**    Mixon 01/25/2006

| | |
|---|---|
| 30: 17 | Mr. Mixon, if Dr. Topol had wanted to |
| 30: 18 | know what actually happened during your |
| 30: 19 | telephone conversation with Mr. Gilmartin, |
| 30: 20 | could he have asked you? |
| 30: 21 | A.  Yes. |
| 30: 22 | Q.  Has Dr. Topol ever asked you about your |
| 30: 23 | telephone conversation with Mr. Gilmartin? |
| 30: 24 | A.  No. |

| | |
|---|---|
| 30: 25 | Q.  Before testifying under oath that |
| 31: 1 | Mr. Gilmartin's comments were, quote, |
| 31: 2 | entirely repulsive, did Dr. Topol contact you |
| 31: 3 | to ask whether Mr. Gilmartin actually made |
| 31: 4 | those comments? |

Plf. Obj:  Form, and counsel mischaracterizing Dr. Topol's testimony.

Def Resp: Form is proper.  Also proper characterization of Dr. Topol's testimony.  "Entirely repulsive" is direct quote from Topol's

**Gerald Barnett v. Merck & Co., Inc.**
**Deposition Designations of Malachi Mixon**
**Defendant's Designations are in Blue.  Plaintiff's Designations are in Red**

| | | | Objection/Response in Barnett |
|---|---|---|---|
| | 31: 5 | A. No. | deposition on 11/22/05 at 296:8-9. |
| **32:5** - **32:8** | | Mixon 01/25/2006 | Plf. Obj:  Form, and hypothetical and |
| | 32: 5 | Q. Mr. Mixon, if Dr. Topol had tried to contact | purely speculative testimony. |
| | 32: 6 | you to try to confirm what he says | Def. Resp: Form is proper.  Asking for what |
| | 32: 7 | Mr. Gilmartin told you in October of 2004, | witness' personal understanding of what |
| | 32: 8 | what would you have told Dr. Topol? | he would have done regarding an |
| **32:14** - **33:5** | | Mixon 01/25/2006 | important issue. |
| | 32: 14 | A. I would have told Dr. Topol exactly what I | |
| | 32: 15 | recollected about the conversation.  I | |
| | 32: 16 | made -- I made no attempt to hide the | |
| | 32: 17 | conversation, I openly discussed with my | |
| | 32: 18 | executive committee that I had made the call, | |
| | 32: 19 | I commented on it to a number of people.  I | |
| | 32: 20 | don't remember who I talked to about it. | |
| | 32: 21 | There was nothing to hide about the | |
| | 32: 22 | conversation.  And so if he -- if Dr. Topol | |
| | 32: 23 | had called me I would have told him exactly | |
| | 32: 24 | what the conversation was and why I made the | |
| | 32: 25 | call, and that's my answer. | |
| | 33: 1 | Q. Did you feel, Mr. Mixon, that Mr. Gilmartin's | |
| | 33: 2 | comments during your telephone conversation | |
| | 33: 3 | with him were inappropriate or repulsive in | |
| | 33: 4 | any way? | |
| | 33: 5 | A. No. | |
| **33:19** - **33:24** | | Mixon 01/25/2006 | |
| | 33: 19 | Q. Sir, good afternoon, how are you? | |
| | 33: 20 | A. Fine. | |
| | 33: 21 | Q. My name is Tom Kline.  I represent through | Def. Obj:  Irrelevant, 401, |
| | 33: 22 | the MDL thousands of patients who have | 402, prejudicial, 403, |
| | 33: 23 | against Merck for injuries including death | lawyer speech |
| | 33: 24 | relating to the drug Vioxx.  You are aware of | |
| **34:10** - **35:4** | | Mixon 01/25/2006 | |
| | 34: 10 | Q. Sir, the fact of the matter is that you had | |
| | 34: 11 | met with Eric Topol some four days after you | |
| | 34: 12 | had this conversation with Ray Gilmartin, | |
| | 34: 13 | correct?  Regardless of who made the call, | |
| | 34: 14 | you met with him four -- you met with Topol | |
| | 34: 15 | four days later, correct? | |
| | 34: 16 | A. I don't recall such a meeting. | |

**Gerald Barnett v. Merck & Co., Inc.**
**Deposition Designations of Malachi Mixon**
**Defendant's Designations are in Blue.  Plaintiff's Designations are in Red**

| | Objection/Response in Barnett |
|---|---|

| | | |
|---|---|---|
| 34: 17 | Q. You do -- please finish your answer.  I'm | |
| 34: 18 | awfully sorry for talking over you. | |
| 34: 19 | A. I say I don't recall such a meeting. | |
| 34: 20 | Q. You don't?  You don't recall a meeting, sir, | |
| 34: 21 | where you, Mr. -- Dr. Topol; Dr. Cosgrove; | |
| 34: 22 | Dave Rowan, the general counsel of The | |
| 34: 23 | Cleveland Clinic; Rob Kay, Cleveland Clinic | |
| 34: 24 | chief of staff; a Jones Day lawyer by the | |
| 34: 25 | name of Patrick McCartan were all present | |
| 35: 1 | approximately four days after you had the | |
| 35: 2 | discussion with Ray Gilmartin, you don't even | |
| 35: 3 | recall that meeting? | |
| 35: 4 | A. I do recall that meeting. | |

**37:11  -  37:15**          Mixon 01/25/2006

| | |
|---|---|
| 37: 11 | Q. Sir, there was a meeting with Dr. Topol four |
| 37: 12 | days after you had your discussion or so, |
| 37: 13 | after you had your discussion with Ray |
| 37: 14 | Gilmartin, do you remember that meeting? |
| 37: 15 | A. I remember something about it. |

**38:19  -  38:23**          Mixon 01/25/2006

| | |
|---|---|
| 38: 19 | Let me ask you this, at that meeting |
| 38: 20 | did you have any -- did you tell Dr. Topol at |
| 38: 21 | that meeting anything about your discussion |
| 38: 22 | with Ray Gilmartin four days earlier? |
| 38: 23 | A. No. |

**39:9  -  39:10**          Mixon 01/25/2006

| | |
|---|---|
| 39: 9 | Q. Don't you think you owed him a duty to do |
| 39: 10 | that, sir? |

**39:14  -  39:15**          Mixon 01/25/2006

| | |
|---|---|
| 39: 14 | A. I didn't feel any duty to report my |
| 39: 15 | conversation with Ray Gilmartin to Dr. Topol. |

**40:5  -  40:25**          Mixon 01/25/2006

| | |
|---|---|
| 40: 5 | Q. You did tell Dr. Rudick about the |
| 40: 6 | conversation with Ray Gilmartin, correct? |
| 40: 7 | A. I don't recall the specific conversation. |
| 40: 8 | Q. Who was -- |
| 40: 9 | A. As I testified earlier, I spoke about it |
| 40: 10 | openly, and it was -- I don't remember who I |
| 40: 11 | talked to. |

**Gerald Barnett v. Merck & Co., Inc.**
**Deposition Designations of Malachi Mixon**
**Defendant's Designations are in Blue.  Plaintiff's Designations are in Red**

| | Objection/Response in Barnett |
|---|---|

| | |
|---|---|
| 40: 12 | Q. I didn't ask you if you spoke openly, I |
| 40: 13 | simply asked you a question as to whether you |
| 40: 14 | recall telling Dr. Rudick, a Dr. Rudick at |
| 40: 15 | The Cleveland Clinic, about your conversation |
| 40: 16 | with Dr. -- or with Mr. Gilmartin? |
| 40: 17 | A. I don't specifically recall a conversation. |
| 40: 18 | Q. Have you ever seen any documentation of that |
| 40: 19 | conversation by Dr. Rudick? |
| 40: 20 | A. I have not. |
| 40: 21 | Q. Doctor -- who is Dr. Rudick? |
| 40: 22 | A. Dr. Rudick runs the Mellen Center, which |
| 40: 23 | deals with multiple sclerosis. |
| 40: 24 | Q. Is he an important person at The Cleveland |
| 40: 25 | Clinic? |

**41:2  -  41:7**          Mixon 01/25/2006

| | |
|---|---|
| 41: 2 | A. He is a, as many of the physicians are at The |
| 41: 3 | Clinic, he's certainly an expert in his |
| 41: 4 | field.  I know Dr. Rudick.  I've been -- I've |
| 41: 5 | actually served on his board at the Mellen |
| 41: 6 | Center, and he does great, great, wonderful |
| 41: 7 | work in his field, and he's a fine doctor. |

**41:10  -  41:13**          Mixon 01/25/2006

| | |
|---|---|
| 41: 10 | Q. Is he a reliable individual? |
| 41: 11 | A. I'm not sure what you mean by "reliable". |
| 41: 12 | Q. Is he someone who you generally would put |
| 41: 13 | your faith and trust in, sir? |

**41:15  -  41:21**          Mixon 01/25/2006

| | |
|---|---|
| 41: 15 | A. Yes. |
| 41: 16 | Q. Now, the fact of the matter is -- fact of the |
| 41: 17 | matter is that you received a telephone call |
| 41: 18 | from Mr. Gilmartin rather than the other way |
| 41: 19 | around as you just told us under oath, |
| 41: 20 | correct? |
| 41: 21 | A. Would you restate the question? |

**42:6  -  43:4**          Mixon 01/25/2006

| | |
|---|---|
| 42: 6 | Q. The fact of the matter, sir, is Ray Gilmartin |
| 42: 7 | called you? |
| 42: 8 | A. I called Ray Gilmartin. |
| 42: 9 | Q. Are you sure about that? |

**Gerald Barnett v. Merck & Co., Inc.**
**Deposition Designations of Malachi Mixon**
**Defendant's Designations are in Blue.  Plaintiff's Designations are in Red**

| | | **Objection/Response in Barnett** |
|---|---|---|
| 42: 10 | A. Absolutely. | |
| 42: 11 | Q. Okay. | |
| 42: 12 | A. Ray Gilmartin did not call me.  I called Ray | |
| 42: 13 | Gilmartin.  I testified to that already. | |
| 42: 14 | Q. Well, you said that you didn't have very good | |
| 42: 15 | recollection of a conversation, correct? | |
| 42: 16 | A. I generally characterized the conversation. | |
| 42: 17 | Q. Yes, but my question is a different one.  You | |
| 42: 18 | generally don't have a very good recollection | |
| 42: 19 | of a conversation, correct? | |
| 42: 20 | A. You can characterize my testimony anyway you | |
| 42: 21 | like.  I've testified to the best of my | |
| 42: 22 | recollection what the conversation -- | |
| 42: 23 | occurred.  I'm 100 percent certain that the | |
| 42: 24 | call was placed by me, and Ray Gilmartin has | |
| 42: 25 | never, to my recollection, has never called | |
| 43: 1 | me in his life. | |
| 43: 2 | Q. The fact of the matter is you told Dr. Rudick | |
| 43: 3 | the exact opposite, correct?  The exact | |
| 43: 4 | opposite. | |

**43:7 - 43:9**      Mixon 01/25/2006

| | | |
|---|---|---|
| 43: 7 | A. Dr. Rudick is -- would have to testify on his | |
| 43: 8 | own as to what he thought I said or what I | |
| 43: 9 | said.  I can't comment on that. | |

**43:13 - 43:15**      Mixon 01/25/2006

| | | |
|---|---|---|
| 43: 13 | Dr. Topol was only reporting, | Def. Obj:  Leading, 611( c ) |
| 43: 14 | according to what you heard, what he says Dr. | |
| 43: 15 | Rudick told him, correct? | |

**43:18 - 43:25**      Mixon 01/25/2006

| | | |
|---|---|---|
| 43: 18 | Q. That's what you heard on that video screen? | |
| 43: 19 | A. That's what I heard, right. | |
| 43: 20 | Q. Yeah.  He wasn't saying he had firsthand | |
| 43: 21 | knowledge, correct? | |
| 43: 22 | A. That's correct. | |
| 43: 23 | Q. So the thing boils down to Dr. Rudick and | |
| 43: 24 | what he believes or what would know from you, | |
| 43: 25 | correct? | |

**44:5 - 44:7**      Mixon 01/25/2006

| | | |
|---|---|---|
| 44: 5 | A. I don't know what it boils down to.  I can | |

**Gerald Barnett v. Merck & Co., Inc.**
**Deposition Designations of Malachi Mixon**
**Defendant's Designations are in Blue.  Plaintiff's Designations are in Red**

| | | Objection/Response in Barnett |
|---|---|---|
| | 44: 6        only testify to what I said and what I | |
| | 44: 7        remember about the conversation. | |
| | 44: 8     Q   If the conversation were, I know that you | Def. Obj:  Calls for |
| | 44: 9     dispute that the conversation was what it | speculation, no foundation, |
| | 44: 10     was, but if that conversation had taken | 602 |
| | 44: 11     place, if the conversation that Eric Topol | |
| | 44: 12     describes took place, that conversation would | |
| | 44: 13     be repulsive, if that conversation took | |
| | 44: 14     place, correct? | |
| **44:17**   -   **44:19** | Mixon 01/25/2006 | |
| | 44: 17   A.  That's certainly a judgment that someone can | |
| | 44: 18          make.  If you want to characterize that, | |
| | 44: 19          that's certainly your prerogative. | |
| **49:4**   -   **49:20** | Mixon 01/25/2006 | |
| | 49: 4          Ray Gilmartin was a friend of yours, correct? | |
| | 49: 5     A.  Not a friend. | |
| | 49: 6     Q.  Someone you knew from -- | |
| | 49: 7     A.  An acquaintance, an acquaintance. | |
| | 49: 8     Q.  An acquaintance?  Did you go to school | |
| | 49: 9          together? | |
| | 49: 10   A.  We attended Harvard business school in the | |
| | 49: 11          same class, and I knew Ray as -- strictly as | |
| | 49: 12          an acquaintance.  We were by no means close | |
| | 49: 13          friends or anything like that. | |
| | 49: 14   Q.  How many times have you talked to him about | |
| | 49: 15          Topol? | |
| | 49: 16   A.  Once. | |
| | 49: 17   Q.  And that conversation had Dr. Cosgrove on the | |
| | 49: 18          line in that one conversation; is that | |
| | 49: 19          correct? | |
| | 49: 20   A.  That's correct. | |
| **50:1**   -   **50:4** | Mixon 01/25/2006 | |
| | 50: 1          It would be a fair characterization to | |
| | 50: 2     say that Mr. Gilmartin complained to you | |
| | 50: 3     about Dr. Topol in that conversation, | |
| | 50: 4     correct? | |
| **50:6**   -   **50:20** | Mixon 01/25/2006 | |
| | 50: 6     A.  To the best of my recollection he did not | |

**Gerald Barnett v. Merck & Co., Inc.**
**Deposition Designations of Malachi Mixon**
**Defendant's Designations are in Blue.  Plaintiff's Designations are in Red**

| | Objection/Response in Barnett |
|---|---|
| 50: 7    complain about Dr. Topol in that | |
| 50: 8    conversation. | |
| 50: 9   Q. So he didn't make the call, and he also | |
| 50: 10    didn't complain, correct? | |
| 50: 11   A. To the best of my recollection that's the | |
| 50: 12    case. | |
| 50: 13   Q. And as you understand it, that's sort of the | |
| 50: 14    two key elements here in your -- in what you | |
| 50: 15    have to say in your deposition? | |
| 50: 16       MR. SOZIO:      Objection. | |
| 50: 17       MR. KLINE:      Let me answer | |
| 50: 18    it. | |
| 50: 19   Q. That he didn't call and that he didn't | |
| 50: 20    complain, correct? | |
| **50:25   -   52:2**       Mixon 01/25/2006 | |
| 50: 25   A. To the best of my recollection Dr. Cosgrove | |
| 51: 1    and I did most of the talking. | |
| 51: 2   Q. I didn't ask you who did most of the talking. | |
| 51: 3    I'm asking you -- | |
| 51: 4   A. Well, you characterized what were the two | |
| 51: 5    main points of the conversation.  That's a | |
| 51: 6    conclusion you reached as to what the two | |
| 51: 7    most important things were.  All I did was | |
| 51: 8    characterize the nature of the conversation, | |
| 51: 9    and I'll let anyone decide what they think | |
| 51: 10    the important points of the conversation | |
| 51: 11    were. | |
| 51: 12       The important point to me was that I | |
| 51: 13    was trying to separate comments about the | |
| 51: 14    pharmaceutical which Dr. Topol made, and | |
| 51: 15    comments that he made about Merck. | |
| 51: 16   Q. Yeah. | |
| 51: 17   A. And to separate the two and to let him know | |
| 51: 18    very clearly this was not the position of The | |
| 51: 19    Cleveland Clinic, and that we as The Clinic | |
| 51: 20    didn't think it was appropriate to comment on | |
| 51: 21    Merck's testing procedures and the company | |
| 51: 22    a whole and things that we would have no | |
| 51: 23    access to. | |
| 51: 24   Q. You wanted to make sure that, in the | |

**Gerald Barnett v. Merck & Co., Inc.**
**Deposition Designations of Malachi Mixon**
**Defendant's Designations are in Blue.  Plaintiff's Designations are in Red**

| | Objection/Response in Barnett |
|---|---|

| | |
|---|---|
| 51: 25  conversation, that you were smoothing what | |
| 52: 1  could be any ruffled feathers at Merck | |
| 52: 2  relating to The Cleveland Clinic, correct? | |

**52:9   -   53:5**        Mixon 01/25/2006

| | |
|---|---|
| 52: 9  A. My objection was to clarify the situation | |
| 52: 10  that I've spoken twice about already, and to | |
| 52: 11  hopefully have Ray understand that we, The | |
| 52: 12  Cleveland Clinic, would want to sustain a | |
| 52: 13  relationship far beyond the particular | |
| 52: 14  pharmaceutical and the issues surrounding it | |
| 52: 15  right now, in the hopes of doing and | |
| 52: 16  continuing future research and good | |
| 52: 17  relationships with Merck. | |
| 52: 18  Q. That's because Merck was important to The | |
| 52: 19  Cleveland Clinic because Merck funded | |
| 52: 20  significant research of The Clinic, correct? | |
| 52: 21  A. Because Merck and all future companies that | |
| 52: 22  we deal with would -- or would be | |
| 52: 23  scrutinizing what our doctors do and what | |
| 52: 24  they say.  And I think it's important that it | |
| 52: 25  be clarified what our position of The Clinic | |
| 53: 1  was. | |

| | |
|---|---|
| 53: 2  Q. You were more concerned about how Merck | Def. Obj:  Leading - |
| 53: 3  other pharmaceutical companies would view | 611( c ), argumentative |
| 53: 4  Cleveland Clinic than you were about your own | |
| 53: 5  chief academic officer and provost, correct? | |

**53:23   -   54:6**        Mixon 01/25/2006

| | |
|---|---|
| 53: 23  A. I care about all our physicians, I care about | |
| 53: 24  Dr. Topol, I care about everything that goes | |
| 53: 25  on at The Clinic.  And as chairman of the | |
| 54: 1  board and in this particular case I felt a | |
| 54: 2  clarification call to Mr. Gilmartin was very | |
| 54: 3  important.  I've testified why I made the | |
| 54: 4  call, I've testified generally what was said, | |
| 54: 5  and I'm being redundant and repetitive to say | |
| 54: 6  it over and over. | |

**54:14   -   54:20**        Mixon 01/25/2006

| | |
|---|---|
| 54: 14  Q. You are as the -- let me understand your | |
| 54: 15  position before I show you the document. | |

**Gerald Barnett v. Merck & Co., Inc.**
**Deposition Designations of Malachi Mixon**
**Defendant's Designations are in Blue.  Plaintiff's Designations are in Red**

| | | | Objection/Response in Barnett |
|---|---|---|---|
| | 54: 16 | You're chairman of the board, correct? | |
| | 54: 17 | A. Of The Cleveland Clinic. | |
| | 54: 18 | Q. That gives you, in the end, ultimate | |
| | 54: 19 | oversight responsibility for The Cleveland | |
| | 54: 20 | Clinic and its operations, correct? | |
| **54:22** - **54:23** | | Mixon 01/25/2006 | |
| | 54: 22 | A. I have the responsibilities that are spelled | |
| | 54: 23 | out as chairman of the board. | |
| **55:9** - **58:12** | | Mixon 01/25/2006 | |
| | 55: 9 | Q. Do you have general oversight as the board | |
| | 55: 10 | and the chairman of the board? | |
| | 55: 11 | A. We are a not-for-profit organization; we have | |
| | 55: 12 | a charter; and we have the normal fiduciary | |
| | 55: 13 | responsibilities that a company -- such an | |
| | 55: 14 | assignment and such a responsibility. | |
| | 55: 15 | Q. Good enough. | |
| | 55: 16 | - - - - - | |
| | 55: 17 | (Plaintiffs' Exhibit No. 1 was marked.) | |
| | 55: 18 | - - - - - | |
| | 55: 19 | Q. Here's a document marked P-1, sir.  I'll show | Def. Obj:  Object to the |
| | 55: 20 | a copy to you, I'll show a copy to your | document and all of the |
| | 55: 21 | counsel, I'll show a copy to Merck's counsel | questions relating to the |
| | 55: 22 | who is anxious to see it, and I'll show a | document.  There is no |
| | 55: 23 | copy to Cleveland Clinic counsel who I think | foundation - no evidence |
| | 55: 24 | has seen this document before.  And I will | that Mr. Mixon had ever |
| | 55: 25 | ask you or turn your attention to Paragraph | seen the document, and |
| | 56: 1 | 3. | no foundation laid during |
| | 56: 2 | MR. GOLDMAN:     Can you give | the deposition.  Also, there |
| | 56: 3 | the witness a minute to read it? | was no authentication as |
| | 56: 4 | MR. SOZIO:     Wait, wait. | the document was not |
| | 56: 5 | Q. Yes.  I'm focusing -- you can certainly read | produced in the litigation. |
| | 56: 6 | the full one page document, but I'm in | Therefore, it is improper |
| | 56: 7 | particular looking at the third paragraph of | to use the document or |
| | 56: 8 | the document which I'll identify is a | show the jury questions |
| | 56: 9 | document which bears a signature of Richard | relating to the document. |
| | 56: 10 | Rudick, M.D., topic:  Eric Topol, M.D., dated | This objection applies to |
| | 56: 11 | January 11, 2005. | 55:19 - 67:17 |
| | 56: 12 | Do you see it, sir? | |
| | 56: 13 | A. I do. | |
| | 56: 14 | Q. Dr. Rudick -- and again, what is his exact | |

**Gerald Barnett v. Merck & Co., Inc.**
**Deposition Designations of Malachi Mixon**
**Defendant's Designations are in Blue.  Plaintiff's Designations are in Red**

| | **Objection/Response in Barnett** |
|---|---|
| 56: 15          title, sir? | |
| 56: 16     A. I don't know his exact title.  He runs the | |
| 56: 17          Mellen Center, which is the major treatment | |
| 56: 18          center for multiple sclerosis. | |
| 56: 19     Q. Dr. Rudick, I understood that he was the | |
| 56: 20          chief or the chair of clinical trials or | |
| 56: 21          clinical studies at the institution. | |
| 56: 22     A. Many of the physicians have multiple duties | |
| 56: 23          and I know that he's involved in some | |
| 56: 24          research as well. | |
| 56: 25     Q. He says, "I informed -- " last paragraph. | |
| 57: 1     A. Yes. | |
| 57: 2     Q. "I informed Dr. Topol that Mal Mixon had | |
| 57: 3          mentioned to me on Thursday, October 14, at | |
| 57: 4          Dr. Cosgrove's CEO inaugural address, that he | |
| 57: 5          received a phone call --" and during this | |
| 57: 6          deposition we'll be showing those words on | |
| 57: 7          the screen, "-- that he received a phone call | |
| 57: 8          from his friend Ray Gilmartin, the CEO at | |
| 57: 9          Merck, complaining about Dr. Topol's | |
| 57: 10          pronouncements on Vioxx, a Merck product. | |
| 57: 11             "Mr. Mixon's comment was made in a | |
| 57: 12          casual fashion.  He didn't indicate what his | |
| 57: 13          response to Mr. Gilmartin was.  And I forgot | |
| 57: 14          about the remark until I heard Dr. Topol's | |
| 57: 15          account of the events."  Do you see that, | |
| 57: 16          sir? | |
| 57: 17     A. Yes. | |
| 57: 18     Q. Okay.  Dr. Rudick says that you told him on | |
| 57: 19          Thursday, October 14th, some things which | |
| 57: 20          we'll get to at Dr. Cosgrove's CEO inaugural | |
| 57: 21          event.  First address, first question, do you | |
| 57: 22          recall Dr. Cosgrove's CEO inaugural address? | |
| 57: 23     A. Yes. | |
| 57: 24     Q. Were you there? | |
| 57: 25     A. I was. | |
| 58: 1     Q. Was Dr. Rudick there? | |
| 58: 2     A. To the best of my recollection. | |
| 58: 3     Q. Okay.  Do you recall speaking to Dr. Rudick | |
| 58: 4          at that time now that you have a document in | |

**Gerald Barnett v. Merck & Co., Inc.**
**Deposition Designations of Malachi Mixon**
**Defendant's Designations are in Blue.  Plaintiff's Designations are in Red**

<u>**Objection/Response in Barnett**</u>

| | |
|---|---|
| 58: 5 | front of you to refresh your recollection? |
| 58: 6 | A.  I do not. |
| 58: 7 | Q.  Well, he says that you told him at that event |
| 58: 8 | that you received a phone call, not that you |
| 58: 9 | made a phone call.  He says "received a phone |
| 58: 10 | call".  Would he be incorrect? |
| 58: 11 | A.  I've testified previously that -- |
| 58: 12 | Q.  Would he be incorrect is my question? |

**58:17  -  58:25**          Mixon 01/25/2006

| | |
|---|---|
| 58: 17 | Q.  My direct question, was he incorrect, yes, or |
| 58: 18 | no, sir? |
| 58: 19 | A.  I did not receive a phone call from |
| 58: 20 | Mr. Gilmartin. |
| 58: 21 | Q.  Then to the extent that Dr. Rudick wrote this |
| 58: 22 | memo, signed it, and put it in his file, as |
| 58: 23 | to your telling him that you received, not |
| 58: 24 | made a phone call, Dr. Rudick would be wrong, |
| 58: 25 | am I correct? |

**59:5  -  59:10**          Mixon 01/25/2006

| | |
|---|---|
| 59: 5 | A.  I don't know what I said to Dr. Rudick.  I |
| 59: 6 | would have characterized the conversation as |
| 59: 7 | I told you earlier.  I wasn't trying to hide |
| 59: 8 | the conversation, and I spoke to a number of |
| 59: 9 | people about it. |
| 59: 10 | Q.  Is he wrong, sir?  That's all I want to know. |

**59:21  -  59:24**          Mixon 01/25/2006

| | |
|---|---|
| 59: 21 | A.  If you want me to say he's wrong, I -- |
| 59: 22 | Q.  Yes, if he's wrong, he's wrong. |
| 59: 23 | A.  Well, then he's wrong, because Mr. Gilmartin |
| 59: 24 | did not call me. |

**61:2  -  61:8**          Mixon 01/25/2006

| | |
|---|---|
| 61: 2 | Q.  The next thing is, he says here that you told |
| 61: 3 | him you received a call from, look at the |
| 61: 4 | next words.  He says, "Mr. Mixon told me he |
| 61: 5 | received a phone call from his friend Ray |
| 61: 6 | Gilmartin."  Did you tell him Ray Gilmartin |
| 61: 7 | was your friend as he wrote it here in the |
| 61: 8 | document, sir, yes or no? |

**62:11  -  62:15**          Mixon 01/25/2006

**Gerald Barnett v. Merck & Co., Inc.**
**Deposition Designations of Malachi Mixon**
**Defendant's Designations are in Blue.  Plaintiff's Designations are in Red**

| | Objection/Response in Barnett |
|---|---|
| 62: 11  Q. You told him, sir, as he records it in this | |
| 62: 12      document that you received a phone call from | |
| 62: 13      someone you characterized as your friend Ray | |
| 62: 14      Gilmartin, correct? | |
| 62: 15  A. I testified -- | |

| | |
|---|---|
| **62:17  -  63:14**         Mixon 01/25/2006 | |
| 62: 17  Q. Simple question. | |
| 62: 18  A. I don't recall a specific conversation I had | |
| 62: 19      with him, and I've previously testified that | |
| 62: 20      Ray Gilmartin is an acquaintance of mine, we | |
| 62: 21      were in school together.  Whether I used the | |
| 62: 22      word "friend" or not, I don't -- if I had the | |
| 62: 23      conversation, I don't know if I used the word | |
| 62: 24      "friend", but certainly I've seen Ray at | |
| 62: 25      trade meetings over the years and we've had | |
| 63: 1      small conversations and shake hands, and I've | |
| 63: 2      been very -- certainly in our class he's one | |
| 63: 3      of the most successful people in our class. | |
| 63: 4      And we've been -- you know, we've been very | |
| 63: 5      cordial to each other when we see each other, | |
| 63: 6      and that's why I felt I could call him in the | |
| 63: 7      first place and he would receive my call.  So | |
| 63: 8      if I used the word "friend", it's possible I | |
| 63: 9      used the word "friend".  I don't know if I | |
| 63: 10      used the word "friend", but he's certainly an | |
| 63: 11      acquaintance.  And so I hope that I've | |
| 63: 12      answered it to the best of my ability. | |

| | |
|---|---|
| 63: 13  Q. You have.  Now you've told me that you may | Def. Obj:  Irrelevant and |
| 63: 14      have said he was your friend.  Next question. | prejudicial lawyer speech |

| | |
|---|---|
| **64:21  -  65:12**         Mixon 01/25/2006 | |
| 64: 21  Q. My next question, Dr. Rudick, if you look at | |
| 64: 22      the next thing, sir, says that you uses a | |
| 64: 23      specific -- let's see, I N G is a part of a | |
| 64: 24      verb, what's that?  A -- | |
| 64: 25          MR. GOLDMAN:     Participle. | |
| 65: 1          MR. KLINE:       Participle. | |
| 65: 2      That's what I thought. | |
| 65: 3  Q. He uses the word participle "complaining". | |
| 65: 4      He says, his friend Ray Gilmartin, he | |
| 65: 5      received a phone call from his friend Ray | |

**Gerald Barnett v. Merck & Co., Inc.**
**Deposition Designations of Malachi Mixon**
**Defendant's Designations are in Blue.  Plaintiff's Designations are in Red**

<u>Objection/Response in Barnett</u>

| | |
|---|---|
| 65: 6 | Gilmartin complaining about Dr. Topol's |
| 65: 7 | pronouncements.  Again, sir, a very simple |
| 65: 8 | question.  Does this refresh your |
| 65: 9 | recollection that Dr. Gilmartin actually in |
| 65: 10 | the conversation was, as Dr. Rudick says you |
| 65: 11 | told him, was, quote, complaining about Dr. |
| 65: 12 | Topol?  Does it refresh your recollection? |

**65:16  -  66:4**          Mixon 01/25/2006

| | |
|---|---|
| 65: 16 | A. First of all, I testified I don't recall the |
| 65: 17 | conversation with Dr. Rudick, and I |
| 65: 18 | previously testified that, to the best of my |
| 65: 19 | recollection, Dr. Gilmartin never made any |
| 65: 20 | derogatory or negative comment about Dr. |
| 65: 21 | Topol or The Cleveland Clinic in that two |
| 65: 22 | minute conversation that we had. |
| 65: 23 | Q. Is it possible that your recollection was |
| 65: 24 | fresher back on January -- back in October |
| 65: 25 | the 14th, which would have been a day or so |
| 66: 1 | after you had the conversation with Ray |
| 66: 2 | Gilmartin than it is today?  Wouldn't your |
| 66: 3 | conversation have been fresher then than it |
| 66: 4 | is now a year and a half later? |

**66:6  -  66:15**          Mixon 01/25/2006

| | |
|---|---|
| 66: 6 | A. Is it possible?  I suppose anything is |
| 66: 7 | possible. |
| 66: 8 | Q. Well, I didn't ask you if anything was |
| 66: 9 | possible.  Wouldn't it make sense, sir, that |
| 66: 10 | the recollection that you had a day or so |
| 66: 11 | after a conversation with Ray Gilmartin, if |
| 66: 12 | it was accurately recorded by someone like |
| 66: 13 | Dr. Rudick, that that recollection would be |
| 66: 14 | fresher than it is today sitting here in the |
| 66: 15 | end of January 2006? |

**66:19  -  67:6**          Mixon 01/25/2006

| | |
|---|---|
| 66: 19 | A. Well, you've created a scenario that if I had |
| 66: 20 | had a conversation with him, and if I had |
| 66: 21 | talked with him, and -- |
| 66: 22 | Q. Well, you did. |
| 66: 23 | A. I've talked with Dr. -- I've talked with Dr. |

## Gerald Barnett v. Merck & Co., Inc.
## Deposition Designations of Malachi Mixon
### Defendant's Designations are in Blue.  Plaintiff's Designations are in Red

| | | | Objection/Response in Barnett |
|---|---|---|---|
| | 66: 24 | Rudick many times.  You know, I don't recall | |
| | 66: 25 | every conversation I've had with him.  I feel | |
| | 67: 1 | relaxed around him, I've gone to basketball | |
| | 67: 2 | games with him, I've served on his board, I | |
| | 67: 3 | have a very high regard for him, I consider | |
| | 67: 4 | him a physician I know.  So I may well have | |
| | 67: 5 | had a conversation with him.  I wasn't trying | |
| | 67: 6 | to hide anything. | |

| **67:12** - **67:17** | | Mixon 01/25/2006 | |
|---|---|---|---|
| | 67: 12 | A. And I think normally any human being has a | |
| | 67: 13 | better recollection shortly after something | |
| | 67: 14 | happened than later.  So if you're asking me | |
| | 67: 15 | would I have been a little more specific | |
| | 67: 16 | about the conversation two days after I had | |
| | 67: 17 | it, I probably could have been. | |

| **70:21** - **70:24** | | Mixon 01/25/2006 | |
|---|---|---|---|
| | 70: 21 | Q. Yeah.  And who con -- who did you talk to | |
| | 70: 22 | first about having this deposition?  Did any | |
| | 70: 23 | Merck lawyer call you, sir, or any lawyer on | |
| | 70: 24 | behalf of Merck contact you directly? | |

| **71:3** - **71:3** | | Mixon 01/25/2006 | |
|---|---|---|---|
| | 71: 3 | A. We were contacted by Merck to be deposed. | |

| **73:23** - **74:10** | | Mixon 01/25/2006 | Def. Obj:  Object to the |
|---|---|---|---|
| | 73: 23 | it in a different form.  Do you have | document and all of the |
| | 73: 24 | Plaintiff's Exhibit 1 in front of you? | questions relating to the |
| | 73: 25 | A. Yes. | document.  There is no |
| | 74: 1 | Q. Do you see on there where it talks about | foundation - no evidence |
| | 74: 2 | Mr. Gilmartin calling you? | Mr. Mixon had ever seen |
| | 74: 3 | A. Yes. | document, no foundation |
| | 74: 4 | Q. Do you see on there where it talks about | laid during the deposition. |
| | 74: 5 | Mr. Gilmartin complaining about Eric Topol? | Also, there was no |
| | 74: 6 | A. Yes. | authentication as the |
| | 74: 7 | Q. That characterization of Mr. Gilmartin is | document as not produced |
| | 74: 8 | different than what you've told us happened, | in the litigation.  Therefore |
| | 74: 9 | right? | it is improper to use the |
| | 74: 10 | A. Yes. | document or show the |
| | | | jury questions re the |
| | | | document. |

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **In re: VIOXX** | |
| **PRODUCTS LIABILITY LITIGATION** | **MDL DOCKET NO. 1657** |
| **This document relates to Case No. 06-0485** | **SECTION L** |
| | **JUDGE FALLON** |
| **GERALD D. BARNETT** | **MAGISTRATE JUDGE KNOWLES** |
| Plaintiff, | **Merck & Co., Inc.'s Notice of Filing Deposition Testimony of Alan Nies** |
| **v.** | |
| **MERCK & CO., INC.,** | **Exhibit F** |
| Defendant. | |

Merck hereby submits the following deposition testimony of Alan Nies for the Court's consideration and pre-trial rulings:

1.    Merck's Affirmative Designations with Plaintiff's Objections, and Merck's Responses and the Court's prior rulings, where applicable;

2.    Plaintiff's Counter-Designations with Merck's Objections

By June 20, 2006, Merck will submit a notebook for the Court with these designations and objections, as well as copies of the exhibits referenced herein.  Merck's Affirmative Designations appear in blue, while Plaintiff's Counter-Designations appear in red.

Because the designations for Dr. Nies were withdrawn in the *Plunkett* case, the Court has not yet ruled on Plaintiff's objections to Merck's affirmative designations or Merck's objections to Plaintiff's counter-designations.



EXHIBIT
F

As the Court may know, Plaintiff has filed a separate transcript for Dr. Nies, which contains Plaintiff's Affirmative Designations, Merck's Objections to them, Merck's Counter-Designations, and the Plantiff's Objections to Merck's Counter-Designations.  While there is some overlap between Plaintiff's and Merck's affirmative designations of Dr. Nies, there is also additional testimony in Merck's filing.  If the Court prefers, Merck would be happy to work with Plaintiff to provide the Court one complete transcript with all of the Nies designations from both parties.

**Gerald Barnett v. Merck & Co., Inc.**
**Deposition Designations of Alan Nies**
**Defendant's Designations are in Blue.  Plaintiff's Designations are in Red**

| | Objection/Response in Barnett |
|---|---|
| **39:10 - 39:25**  Nies, Alan 2005-03-02 | |
| 39: 10   Q:  A heart attack, would that be | |
| 39: 11   considered by you a serious side effect? | |
| 39: 12   A:  A heart attack? | |
| 39: 13   Q:  Yes. If it were caused by a drug. | |
| 39: 14   A:  If that were true, I guess that would | |
| 39: 15   be true. | |
| 39: 16   Q:  So, if a drug caused a side effect | |
| 39: 17   that was a heart attack, you would also call that a | |
| 39: 18   serious side effect? That's not a trick question. | Def. Obj:  Side bar, lawyer |
| 39: 19   You are looking at me like I asked you a trick | speech |
| 39: 20   question. | |
| 39: 21   A:  Yes. I don't know of drugs causing | |
| 39: 22   heart attacks. | |
| 39: 23   Q:  Do you know if Vioxx causes heart | |
| 39: 24   attacks? | |
| 39: 25   A:  No. | |
| **40:1 - 40:10**  Nies, Alan 2005-03-02 | |
| 40: 1   Q:  Vioxx does not cause heart attacks? | |
| 40: 2   A:  No. | |
| 40: 3   Q:  Does it cause cardiovascular | |
| 40: 4   problems? | |
| 40: 5   A:  No. | |
| 40: 6   Q:  It doesn't? Sitting here today, | |
| 40: 7   that's your opinion, is it doesn't cause any | |
| 40: 8   cardiovascular problem? | |
| 40: 9   A:  It increases the risk, it looks like, | |
| 40: 10   after a period of 18 months, but no. | |
| **364:1 - 366:12**  Nies, Alan 2005-04-01 | |
| 364: 16   Q:  Good morning, Dr. Nies. Would you | |
| 364: 17   please introduce yourself to the jury. | |
| 364: 18   A:  I'm Alan Nies, M.D. | |
| 364: 19   Q:  Dr. Nies, are you employed by Merck? | |
| 364: 20   A:  I was. I'm now retired. | |
| 364: 21   Q:  When did you retire from Merck? | |
| 364: 22   A:  I retired in September of 2002. | |
| 364: 23   Q:  Why did you retire then? | |
| 364: 24   A:  I had reached age 65, which at Merck | |

1

| | Objection/Response in Barnett | |
|---|---|---|
| 364: 25    is a mandatory retirement age for executives. | | |
| 365: 1    Q:  Where do you live now, Dr. Nies? | | |
| 365: 2    A:  I live outside of Houston, a town | | |
| 365: 3    called Richmond. | | |
| 365: 4    Q:  Do you have any children? | | |
| 365: 5    A:  I have two children. | | |
| 365: 6    Q:  Any grandchildren? | | |
| 365: 7    A:  I have four grandchildren. | | |
| 365: 8    Q:  And you're married? | | |
| 365: 9    A:  And I'm married. | | |
| 365: 10    Q:  How long have you been married? | | |
| 365: 11    A:  43 years. 44 -- 43 years. | | |
| 365: 12    Q:  43 years. Okay. | | |
| 365: 13    Dr. Nies, can you tell us, what was | | |
| 365: 14    your role in the development of the drug Vioxx? | | |
| 365: 15    A:  I was head of the project team during | | |
| 365: 16    its development. | | |
| 365: 17    Q:  During what time frame were you head | | |
| 365: 18    of the project team? | | |
| 365: 19    A:  From the early part of its clinical | | |
| 365: 20    development through its approval. | | |
| 365: 21    Q:  Can you give us an idea of the years | | |
| 365: 22    that that involved? | | |
| 365: 23    A:  In the range of about '94 to '98 -- | | |
| 365: 24    '99. | | |
| 365: 25    Q:  Dr. Nies, you're a medical doctor? | | |
| 366: 1    A:  Yes. | | |
| 366: 2    Q:  What is your specialty? | | |
| 366: 3    A:  I'm a clinical pharmacologist. | | |
| 366: 4    Q:  Can you please explain to us what a | | |
| 366: 5    clinical pharmacologist does? | | |
| 366: 6    A:  A clinical pharmacologist is a person | | |
| 366: 7    who specializes, does research in drugs in humans, | | |
| 366: 8    the effects of drugs in humans. | | |
| 366: 9    Q:  Why did you decide to become a | Plf. Obj:  401, 402 | |
| 366: 10    doctor? | Def. Resp:  Relevant background | |
| 366: 11    A:  I come from a medical family. My | information, and relevant because | |
| 366: 12    father was a general -- excuse me. | plaintiff alleges Merck and its | |
| **366:1**  -  **377:5**        Nies, Alan 2005-04-01 | scientists like Dr. Nies intentionally | |
| 366: 16    My father was a family physician, and | concealed information that harmed | |
| 366: 17    my older brother had gone to medical school. I was | people. | |
| 366: 18    always interested in science and in chemistry. I | | |

**Objection/Response in Barnett**

| | |
|---|---|
| 366: 19 | thought that medicine was a profession which was |
| 366: 20 | only an honorable profession, but one I could pursue |
| 366: 21 | my interests in. |
| 366: 22 | Q:  Dr. Nies, let's talk a little bit, if |
| 366: 23 | we can, about your formal education. First of all, |
| 366: 24 | where did you go to college? |
| 366: 25 | A:  I went to Stanford University. |
| 367: 1 | Q:  What kind of a degree did you get |
| 367: 2 | from Stanford? |
| 367: 3 | A:  A Bachelor of Science in chemistry. |
| 367: 4 | Q:  After you graduated from Stanford, |
| 367: 5 | what did you do next? |
| 367: 6 | A:  I went to medical school at Harvard. |
| 367: 7 | Q:  How long is the medical school |
| 367: 8 | program at Harvard, how many years? |
| 367: 9 | A:  It's a four-year program. |
| 367: 10 | Q:  After you graduated from Harvard |
| 367: 11 | Medical School, what did you do next? |
| 367: 12 | A:  I did an internship and residency in |
| 367: 13 | internal medicine in Seattle. |
| 367: 14 | Q:  Can you tell us generally what you |
| 367: 15 | did while you were an intern and a resident in |
| 367: 16 | Seattle? |
| 367: 17 | A:  During an internship, it's a person's |
| 367: 18 | first real responsibility for patients, and we had |
| 367: 19 | responsibility for all types of patients. I worked |
| 367: 20 | at a county hospital, and we worked in an emergency |
| 367: 21 | room, we worked in surgery, we worked in psychiatry, |
| 367: 22 | we worked on the medicine wards, so, basically get a |
| 367: 23 | broad experience in hospital patients. |
| 367: 24 | Q:  How long did that internship last? |
| 367: 25 | A:  The internship is a year. |
| 368: 1 | Q:  Then tell us about what you did |
| 368: 2 | generally during your residency. |
| 368: 3 | A:  Well, the residency is -- gives more |
| 368: 4 | specialized training in internal medicine, which is, |
| 368: 5 | again, a very general specialty of adult medicine. |
| 368: 6 | And you have a clinic where you see outpatients, but |
| 368: 7 | most of your time is spent in the hospital admitting |
| 368: 8 | and treating patients who are admitted to the |
| 368: 9 | hospital. |
| 368: 10 | Q:  How many years did your internship |
| 368: 11 | and your residency in Seattle last? |

| | | **Objection/Response in Barnett** | |
|---|---|---|---|
| 368: 12 | A:  Three years. | | |
| 368: 13 | Q:  Did you have any more medical | | |
| 368: 14 | training after you finished your internship and | | |
| 368: 15 | residency? | | |
| 368: 16 | A:  Then I did a fellowship in clinical | | |
| 368: 17 | pharmacology in the University of California in San | | |
| 368: 18 | Francisco. | | |
| 368: 19 | Q:  What's a fellowship? | | |
| 368: 20 | A:  A fellowship is further training, | | |
| 368: 21 | largely, in clinical and research areas. In my case | | |
| 368: 22 | it was research, but we also had a clinical | | |
| 368: 23 | consultation service. | | |
| 368: 24 | Q:  Why did you decide to do a fellowship | | |
| 368: 25 | after completing your internship and residency? | | |
| 369: 1 | A:  I wanted to get additional training | | |
| 369: 2 | in pharmacology and clinical pharmacology. | | |
| 369: 3 | Q:  How long did your fellowship last? | | |
| 369: 4 | A:  That was two years. | | |
| 369: 5 | Q:  After you completed your internship, | | |
| 369: 6 | your residency and your fellowship, did you go into | | |
| 369: 7 | private practice as a doctor at that point? | | |
| 369: 8 | A:  No. At that time I went into the | | |
| 369: 9 | Army. This was in 1968, and most everybody was | | |
| 369: 10 | going into the Army in one way or another at that | | |
| 369: 11 | point. | | |
| 369: 12 | Q:  What did you do during your time in | Plf. Obj:  403 | |
| 369: 13 | the Army? | Def. Resp: Nothing prejudicial about | |
| 369: 14 | A:  I was at Walter Reed Army Institute | helpful background information about | |
| 369: 15 | of Research. I was there because they were having | this witness. | |
| 369: 16 | problems with drug-resistant malaria in Southeast | | |
| 369: 17 | Asia. One of the urgent problems the Army had was | | |
| 369: 18 | to try to develop drugs that would be useful for | | |
| 369: 19 | drug-resistant malaria. | | |
| 369: 20 | Q:  Did you have any success in | | |
| 369: 21 | developing drugs for resistant forms of malaria? | | |
| 369: 22 | A:  We made a lot of progress. We got | | |
| 369: 23 | close to getting a drug developed that is -- that | | |
| 369: 24 | has continued to be used since then. It's a drug | | |
| 369: 25 | called mefloquine. It turned out to be quite useful | | |
| 370: 1 | for the chloroquine-resistant malaria. | | |
| 370: 2 | Q:  Who were you making the drug for? | | |
| 370: 3 | A:  This was part of the Army drug | | |
| 370: 4 | development program, so, it was the Army. | | |

| | |
|---|---|
| 370: 5 | Q: How long did you spend in the Army? |
| 370: 6 | A: I was on active duty for two years. |
| 370: 7 | Q: After you completed your active duty |
| 370: 8 | requirements, what did you do next? |
| 370: 9 | A: I was recruited to the faculty at |
| 370: 10 | Vanderbilt University. |
| 370: 11 | Q: Into what position? |
| 370: 12 | A: Assistant professor of medicine and |
| 370: 13 | pharmacology in the clinical pharmacology division. |
| 370: 14 | Q: Why did you decide at that point to |
| 370: 15 | become a medical school professor? |
| 370: 16 | A: I wanted to continue doing research, |
| 370: 17 | but I didn't want to give up entirely patient care |
| 370: 18 | and teaching, which I enjoyed. So, I thought that a |
| 370: 19 | university position would give me the options to do |
| 370: 20 | all of those. |
| 370: 21 | Q: Were you promoted along the way at |
| 370: 22 | Vanderbilt? |
| 370: 23 | A: Yes. I was promoted from assistant |
| 370: 24 | professor up to professor in six years. |
| 370: 25 | Q: How long did you stay at Vanderbilt? |
| 371: 1 | A: I stayed there for seven years. |
| 371: 2 | Q: What did you do after you left |
| 371: 3 | Vanderbilt? |
| 371: 4 | A: I was recruited to the University of |
| 371: 5 | Colorado to head a division of clinical pharmacology |
| 371: 6 | at the medical school in Denver. |
| 371: 7 | Q: Why did you decide to leave |
| 371: 8 | Vanderbilt for Colorado? |
| 371: 9 | A: I thought it was a good opportunity |
| 371: 10 | for me to head my own division. I was part of a |
| 371: 11 | division in Vanderbilt and thought it would be a |
| 371: 12 | good opportunity to head my own. |
| 371: 13 | Q: What was your title when you joined |
| 371: 14 | the faculty at the University of Colorado? |
| 371: 15 | A: I was professor of medicine and |
| 371: 16 | professor of pharmacology. |
| 371: 17 | Q: Describe for us what you did during |
| 371: 18 | your time at the University of Colorado in general. |
| 371: 19 | A: Well, I had three responsibilities. |
| 371: 20 | I did research, I had patient care responsibilities, |
| 371: 21 | and I did teaching. So, I taught in the |
| 371: 22 | pharmacology course, I taught the fourth year |

| | **Objection/Response in Barnett** |
|---|---|
| 371: 23 medical students, and I taught residents. I | |
| 371: 24 attended on the medical wards where I was | |
| 371: 25 responsible for patients that had been admitted, and | |
| 372: 1 I did research in a variety of areas, including, | |
| 372: 2 relevant to what we're talking about here, the | |
| 372: 3 cyclooxygenase inhibitors. | |
| 372: 4 Q: Can you tell us what cyclooxygenase | |
| 372: 5 inhibitors are? | |
| 372: 6 A: The cyclooxygenase inhibitors are a | |
| 372: 7 group of drugs commonly called NSAIDs or | |
| 372: 8 nonsteroidal anti-inflammatory drugs, that's been | |
| 372: 9 abbreviated to NSAIDs, and these are drugs that | |
| 372: 10 people use for pain and inflammation. Some are | |
| 372: 11 available over-the-counter, such as Aleve and | |
| 372: 12 Motrin, and others are available by prescription. | |
| 372: 13 Q: During your academic career -- well, | |
| 372: 14 let me back up. | |
| 372: 15 How long did you stay at the | |
| 372: 16 University of Colorado? | |
| 372: 17 A: I was there 15 years. | |
| 372: 18 Q: What year does that take us up to? | |
| 372: 19 A: '92. | |
| 372: 20 Q: During your career as a medical | |
| 372: 21 school professor, did you ever visit any other | |
| 372: 22 universities and teach? | |
| 372: 23 A: Yes. I was a visiting professor at | |
| 372: 24 several places. The most prolonged time was a | |
| 372: 25 better part of a year in western Australia. But I | |
| 373: 1 spent a couple of months in the UK going to various | |
| 373: 2 medical schools in the UK. And in the US, I visited | |
| 373: 3 schools in Chicago, in Mobile, Alabama, Augusta, | |
| 373: 4 Georgia, a variety of places that would ask me to | |
| 373: 5 come and spend a week and teach. | |
| 373: 6 Q: Dr. Nies, when did you come to work | |
| 373: 7 at Merck? | |
| 373: 8 A: In mid-1992. | |
| 373: 9 Q: After all those years as a medical | Plf. Obj: 403 |
| 373: 10 school professor, why did you decide to make that | |
| 373: 11 career change? | |
| 373: 12 A: I was -- being a clinical | |
| 373: 13 pharmacologist, I was really interested in drug | |
| 373: 14 development in humans, and I thought that after | |
| 373: 15 spending all this time in academic medicine, I would | |

| | | **Objection/Response in Barnett** | |
|---|---|---|---|
| 373: 16 | really enjoy being part of the industry that does | | |
| 373: 17 | that, that makes drugs for humans. And I was hoping | | |
| 373: 18 | we could make a contribution. | | |
| 373: 19 | Q:  Did you contact Merck or did Merck | | |
| 373: 20 | contact you? | | |
| 373: 21 | A:  Merck called me. | | |
| 373: 22 | Q:  What happened after Merck called you? | | |
| 373: 23 | A:  Well, I initially decided I would | | |
| 373: 24 | take a look. I came out, and then I was somewhat | | |
| 373: 25 | interested. But after two or three looks coming | | |
| 374: 1 | back and meeting people, I became even more | | |
| 374: 2 | interested and decided to switch into that career. | | |
| 374: 3 | Q:  What caught your interest about Merck | Plf. Obj:  401, 402, 403 | |
| 374: 4 | when you were looking at the company? | Def. Resp: Important background | |
| 374: 5 | A:  Well, I thought the quality of the | information about an important witness. | |
| 374: 6 | people was outstanding, this is the scientists that | Relevant and not prejudicial. | |
| 374: 7 | I met, and those are really the only people I met at | | |
| 374: 8 | the company, and that these were people from the | | |
| 374: 9 | head of the MRL, Ed Scolnick on down. And I was | | |
| 374: 10 | impressed with all of them. | | |
| 374: 11 | Q:  Were you offered a job to join Merck? | | |
| 374: 12 | A:  Yes. | | |
| 374: 13 | Q:  And you accepted it? | | |
| 374: 14 | A:  Yes. | | |
| 374: 15 | Q:  What position did you accept when you | | |
| 374: 16 | joined Merck? | | |
| 374: 17 | A:  I was executive director and head of | | |
| 374: 18 | the department of clinical pharmacology. | | |
| 374: 19 | Q:  What were your duties and | | |
| 374: 20 | responsibilities in that job? | | |
| 374: 21 | A:  I was overseeing the entire clinical | | |
| 374: 22 | pharmacology division, which basically at Merck, all | | |
| 374: 23 | of the drugs that are developed initially go through | | |
| 374: 24 | what's called Phase I, it's the early clinical | | |
| 374: 25 | trials, and that's all done by clinical | | |
| 375: 1 | pharmacology. So, we saw every drug that came | | |
| 375: 2 | through Merck at that time. | | |
| 375: 3 | Q:  Are there different stages of | | |
| 375: 4 | research and testing of drugs at Merck? | | |
| 375: 5 | A:  Yes. | | |
| 375: 6 | Q:  Can you take us through the very | | |
| 375: 7 | beginning stage and walk us through the process of | | |
| 375: 8 | studying and testing potential new drugs at Merck | | |

| | **Objection/Response in Barnett** |
|---|---|
| 375: 9    starting at the very beginning? | |
| 375: 10    A:  Well, at the very beginning, there's | |
| 375: 11    people in what they call basic science who are | |
| 375: 12    actually trying to discover a chemical that could | |
| 375: 13    possibly be a drug, and they have a target in mind, | |
| 375: 14    and in this case, the target was the | |
| 375: 15    cyclooxygenase-2 enzyme. They screen compounds | |
| 375: 16    against this target, and if they come up with | |
| 375: 17    something that looks like it might be affecting the | |
| 375: 18    target, then that's called a hit. And these | |
| 375: 19    chemicals are then modified chemically to make | |
| 375: 20    more potent, to make -- to give them the properties | |
| 375: 21    that might make them a drug, that is, that they | |
| 375: 22    would get into the body, they would last a certain | |
| 375: 23    period of time in the body and that sort of thing. | |
| 375: 24    Once that's done -- and that can take | |
| 375: 25    a period of years. Once that's done, a compound is | |
| 376: 1    put into animal testing, and this is both for | |
| 376: 2    efficacy in the animal or at least the effects in | |
| 376: 3    the animals and safety testing, which is the most | |
| 376: 4    important part of the animal testing. | |
| 376: 5    Q:  Is there a name for that stage of the | |
| 376: 6    research when you're testing drugs in animals? | |
| 376: 7    A:  That's usually called preclinical. | |
| 376: 8    Q:  And assuming that a drug makes it | |
| 376: 9    through the preclinical phase successfully, what | |
| 376: 10    happens after that? | |
| 376: 11    A:  Then if it's made it through all the | |
| 376: 12    animal safety studies, it will go into humans. | |
| 376: 13    Q:  What's the name of that stage? | |
| 376: 14    A:  That's Phase I. | |
| 376: 15    Q:  Can Merck or any drug company start | |
| 376: 16    Phase I studies without informing the FDA? | |
| 376: 17    A:  Not in the United States. | |
| 376: 18    Q:  What do you do to inform the FDA that | |
| 376: 19    you're going to begin Phase I studies? | |
| 376: 20    A:  You file what's called an IND, an | |
| 376: 21    investigational new drug application with the Food & | |
| 376: 22    Drug Administration, which is basically a summary of | |
| 376: 23    everything that you've done in terms of the animal | |
| 376: 24    safety up to the point that you want to put it into | |
| 376: 25    humans. And you send them also the protocol or the | |
| 377: 1    study design of the first study that you want to | |

| | **Objection/Response in Barnett** |
|---|---|

377: 2    use.

377: 3    Q:  Can you describe for us the kinds of

377: 4    studies that are done in Phase I, and what kinds of

377: 5    things are looked at?

**377:8  -  377:12**    Nies, Alan 2005-04-01

377: 8    Q:  Are you familiar with the process for

377: 9    Phase I studies?

377: 10    A:  Yes.

377: 11    Q:  Can you describe for us what happens

377: 12    in Phase I studies?

**377:1  -  378:4**    Nies, Alan 2005-04-01

377: 16    A:  As I said, Phase I is the earliest

377: 17    trials in humans and are generally done in normal

377: 18    volunteers. And so what is done is people are given

377: 19    very small doses, and these doses are much below

377: 20    what is thought to have any either efficacy or

377: 21    safety issues, and so these -- and you would start

377: 22    with very small doses, and then in small groups of

377: 23    patients, of volunteers, you would increase the dose

377: 24    until you get up into a range where you think that

377: 25    you are in the range that you want to be for

378: 1    efficacy.

378: 2    Q:  Do you collect data about drug safety

378: 3    during Phase I testing?

378: 4    A:  Yes. Phase I, that's -- it's very --

**378:7  -  378:17**    Nies, Alan 2005-04-01

378: 7    THE WITNESS:  It's very intensive.

378: 8    These volunteers are in a research unit, and so you

378: 9    have constant observation of them. They have lab

378: 10    tests. Very frequently they're questioned daily or

378: 11    more often for their adverse experiences, and so

378: 12    you're always looking for safety issues. That is

378: 13    actually a prime reason for doing Phase I.

378: 14    BY MR. RABER:   :

378: 15    Q:  Does the safety data that's collected

378: 16    and analyzed in Phase I include data about heart

378: 17    attacks and strokes?

**378:1  -  394:20**    Nies, Alan 2005-04-01

378: 19    THE WITNESS:  It includes all data

378: 20    that one might gather. If someone were to have an

378: 21    incident such as a stroke or heart attack, yes, of

| | |
|---|---|
| 378: 22 | course. It's anything that happens during that |
| 378: 23 | time. |
| 378: 24 | BY MR. RABER:   : |
| 378: 25 | Q:  Now, what's the next step in the |
| 379: 1 | process after the Phase I studies are completed? |
| 379: 2 | A:  We're not quite -- let me continue |
| 379: 3 | with Phase I a little longer. |
| 379: 4 | Q:  Okay. |
| 379: 5 | A:  Because you go in small groups of |
| 379: 6 | patients up to a certain dose, and then you would |
| 379: 7 | expand your normal -- I'm sorry. I'm talking about |
| 379: 8 | normal volunteers. Expand the group of normal |
| 379: 9 | volunteers so that you would get longer experience |
| 379: 10 | at a dose that you think might be efficacious. And |
| 379: 11 | you also measure drug in the blood, you look at how |
| 379: 12 | long it lasts in the blood and that sort of thing. |
| 379: 13 | That is what you do in the Phase I. |
| 379: 14 | Then after that -- is that what |
| 379: 15 | you're asking? |
| 379: 16 | Q:  Right. After you finish Phase I, |
| 379: 17 | assuming that everything is satisfactory, what |
| 379: 18 | happens next? |
| 379: 19 | A:  Then it goes into the next phase, |
| 379: 20 | which is Phase II. And Phase II are the first |
| 379: 21 | studies in patients. |
| 379: 22 | Q:  Can you describe for us generally |
| 379: 23 | what kinds of things are done during the Phase II |
| 379: 24 | studies? |
| 379: 25 | A:  In Phase II, you repeat some of what |
| 380: 1 | you did in Phase I in normal volunteers, but usually |
| 380: 2 | at the doses that you think are going to be |
| 380: 3 | efficacious in the patient. So, you want to get the |
| 380: 4 | blood levels, you want to see how well it's |
| 380: 5 | absorbed, what the half -- how long the drug stays |
| 380: 6 | in the body and that sort of thing. |
| 380: 7 | You also look for any evidence of |
| 380: 8 | adverse effects, and you look for any evidence of |
| 380: 9 | efficacy. And eventually in Phase II you want to be |
| 380: 10 | able to find a dose that you want to take further. |
| 380: 11 | Q:  Does the data that you collect for |
| 380: 12 | side effects or adverse events include |
| 380: 13 | cardiovascular data? |
| 380: 14 | A:  Of course. |

**Objection/Response in Barnett**

380: 15    Q:  After Phase II is completed, what's

380: 16    the next step in the process?

380: 17    A:  The next step is Phase III.

380: 18    Q:  What is different about Phase III

380: 19    from Phase II?

380: 20    A:  There's a couple of differences.

380: 21    These are also in patients. Phase III is larger.

380: 22    You want to get more experience both for efficacy

380: 23    and safety issues. And Phase III is less

380: 24    restrictive. Patients are -- there are fewer

380: 25    exclusions for the studies.

381: 1    Q:  What kinds of things do you do during

381: 2    the Phase III studies?

381: 3    A:  These are studies in patients who

381: 4    have an illness, and you want to determine whether

381: 5    the drug is working, has an effect on the illness,

381: 6    and also you collect all safety data. Again, you

381: 7    are very intensively monitoring these patients.

381: 8    They're not in the hospital all the time, they may

381: 9    be outpatients, but every time you see them, they're

381: 10    questioned for adverse events, they get lab work

381: 11    done.

381: 12    Q:  Do you ever compare the possible new

381: 13    Merck drug with other drugs during Phase III

381: 14    studies?

381: 15    A:  Yes. I think the standard for many

381: 16    drugs in Phase III is to compare against a sugar

381: 17    pill, a placebo. But also, you may want to compare

381: 18    against a standard drug as a benchmark for one

381: 19    purpose. Or you may want to compare it against a

381: 20    marketed drug for competitive reasons.

381: 21    Q:  Dr. Nies, what stage was your group

381: 22    at Merck responsible for with Vioxx?

381: 23    A:  Well, my responsibilities changed

381: 24    during that time. So, during the time that it

381: 25    started, I was responsible for Phase I. But as

382: 1    Vioxx moved along, I became responsible for all of

382: 2    the phases.

382: 3    Q:  Phases I through III?

382: 4    A:  Yes.

382: 5    Q:  About how many potential new drugs

382: 6    are identified each year during this basic science

382: 7    process that you described?

| | |
|---|---|
| 382: 8 | A:  Well, there might be 15 or 20, I |
| 382: 9 | suppose, that would go into the animal testing. |
| 382: 10 | Q:  Out of those 15 or 20, about how many |
| 382: 11 | of those potential new drugs actually make it |
| 382: 12 | through Phase III? |
| 382: 13 | A:  Maybe one or none. |
| 382: 14 | Q:  Now, you've taken us into Phase III. |
| 382: 15 | Can you tell us what happens in the process after a |
| 382: 16 | drug successfully makes it through Phase III |
| 382: 17 | testing? |
| 382: 18 | A:  Once you've gone through Phase III |
| 382: 19 | testing and you're convinced that the drug has the |
| 382: 20 | efficacy that you were looking for and is safe, then |
| 382: 21 | you would compile all the data to submit to the FDA |
| 382: 22 | for approval for marketing. |
| 382: 23 | Q:  Is there a name for the data that's |
| 382: 24 | compiled for the FDA? |
| 382: 25 | A:  Yes. It's called an NDA, a new drug |
| 383: 1 | application. |
| 383: 2 | Q:  Does the new drug application include |
| 383: 3 | any of the research and studies that were done in |
| 383: 4 | Phases I through III? |
| 383: 5 | A:  It includes everything. It includes |
| 383: 6 | also the preclinical data. |
| 383: 7 | Q:  Dr. Nies, did the development of |
| 383: 8 | Vioxx follow the process that you've just described? |
| 383: 9 | A:  Yes. Yes, it did. |
| 383: 10 | Q:  Let's talk some more about Vioxx, if |
| 383: 11 | we can. Can you tell us generally, what was the |
| 383: 12 | idea behind Vioxx? |
| 383: 13 | A:  Well, Vioxx is in that class of |
| 383: 14 | cyclooxygenase inhibitors that I mentioned earlier. |
| 383: 15 | And the standard cyclooxygenase inhibitors that were |
| 383: 16 | present at the time Vioxx was being developed had a |
| 383: 17 | number of adverse effects. And the idea was -- the |
| 383: 18 | hope was that by developing a drug like Vioxx, which |
| 383: 19 | is a specific inhibitor of only one of the -- |
| 383: 20 | there's at least two cyclooxygenase enzymes, and |
| 383: 21 | Vioxx only hits one of them -- that by inhibiting |
| 383: 22 | only one of the enzymes, you would have less |
| 383: 23 | effects than you would if you hit both of the |
| 383: 24 | enzymes. |
| 383: 25 | Q:  Dr. Nies, we're going to put in front |

**Objection/Response in Barnett**

384: 1     of you a document that's been premarked as Nies
384: 2     Exhibit 1001.
384: 3     - - -
384: 4     (Whereupon, Deposition Exhibit
384: 5     Nies-1001, 'Theory of Cox-2 Inhibitors,'
384: 6     (1 page),   was marked for
384: 7     identification.)
384: 8     - - -
384: 9     BY MR. RABER:   :
384: 10    Q:  Would this exhibit be helpful in
384: 11    explaining the theory behind COX-2 inhibitors?
384: 12    A:  Yes, I think it would.
384: 13    Q:  Okay. Can you please have a look at
384: 14    Exhibit 1001 and explain to us the theory behind
384: 15    Vioxx and why it might result in fewer adverse
384: 16    effects?
384: 17    A:  Well, as I said, these NSAIDs, these
384: 18    nonsteroidal anti-inflammatory drugs that are
384: 19    standard block both cyclooxygenase, and on this
384: 20    diagram it's called COX -- cyclooxygenase is called
384: 21    COX, so, COX-1 and COX-2. So, the NSAIDs hit
384: 22    of these enzymes.
384: 23    Now, an enzyme is a type of
384: 24    biological factory that converts one substance to
384: 25    another substance. The COX-1 and COX-2 enzymes
385: 1     forming substances called prostaglandins.
385: 2     The prostaglandins are made in a lot
385: 3     of cells and have a variety of functions. The COX-1
385: 4     pathway is the pathway that is present in many cells
385: 5     and works kind of without -- it's always present.
385: 6     And it is thought to have a function to protect the
385: 7     stomach. That's one of its major functions.
385: 8     The COX-2 pathway is thought to be
385: 9     something that is what they call inducible. It
385: 10    comes up when there is a reason for it, and that
385: 11    reason is often pain and inflammation. And so the
385: 12    COX-2 comes up during pain and inflammation and
385: 13    actually causes some of the pain and inflammation.
385: 14    So, it was thought that by blocking COX-2 you could
385: 15    block the pain and inflammation without blocking the
385: 16    protection of the stomach that COX-1 produced.
385: 17    Q:  Can you give us some common examples
385: 18    of COX-1 -- well, let's see.

| | **Objection/Response in Barnett** | |
|---|---|---|
| 385: 19  Looking at Exhibit 1001, we see where | | |
| 385: 20  it says 'NSAID,' -- | | |
| 385: 21  A:  Yes. | | |
| 385: 22  Q:  -- N-S-A-I-D, and I take it that | | |
| 385: 23  blocks both COX-1 and COX-2? | | |
| 385: 24  A:  Right. | | |
| 385: 25  Q:  Can you give us some common every day | | |
| 386: 1  examples of traditional NSAIDs? | | |
| 386: 2  A:  Motrin is one, Aleve is one. There's | | |
| 386: 3  a drug called Voltaren or diclofenac, which is one. | | |
| 386: 4  There are quite a number of them. And several of | | |
| 386: 5  them are available over-the-counter. So, I think | | |
| 386: 6  everyone is quite familiar with these drugs. | | |
| 386: 7  Q:  Can you describe for us generally the | | |
| 386: 8  kinds of GI side effects that have been observed | | |
| 386: 9  with the COX-1 and COX-2 NSAIDs? | | |
| 386: 10  A:  The side effects range from just | | |
| 386: 11  stomach upset to massive bleeding ulcers and | | |
| 386: 12  perforations that are serious medical problems. | | |
| 386: 13  Q:  How serious are those problems? | Plf. Obj:  702, lack of foundation, undisclosed expert opinion. | |
| 386: 14  A:  Well, obviously, it can lead to | | |
| 386: 15  death. And it's thought that there are probably in | Def. Resp: Witness is a medical doctor/clinical pharmacologist who taught, worked & studied in field for 4 decades.  Was executive director & head of Merck's clinical pharmacology dept. & | |
| 386: 16  excess of 100,000 hospitalizations every year for | | |
| 386: 17  this problem in the United States and in excess of | | |
| 386: 18  16,000 deaths from these complicated ulcers. | | |
| 386: 19  Q:  How would Vioxx address that | also was head of Vioxx project team during development. | |
| 386: 20  situation? | | |
| 386: 21  A:  Well, the theory was that Vioxx, by | | |
| 386: 22  not hitting the cyclooxygenase-1, would allow the | | |
| 386: 23  prostaglandins that protect the stomach to remain | | |
| 386: 24  formed, and, therefore, you would not have this | | |
| 386: 25  problem with ulcers. | | |
| 387: 1  Q:  Let's talk now about the new drug | | |
| 387: 2  application for Vioxx. How long had Merck studied | | |
| 387: 3  Vioxx in humans before filing the new drug | | |
| 387: 4  application with the FDA? | | |
| 387: 5  A:  It was four to five years. | | |
| 387: 6  Q:  How long had Vioxx been studied in | | |
| 387: 7  the lab and in animals before that? | | |
| 387: 8  A:  Three or four years. | | |
| 387: 9  Q:  What did all of those studies tell | Plf. Obj:  702, lack of foundation, undisclosed expert opinion. | |
| 387: 10  you about Vioxx as a potential new drug when the | | |
| 387: 11  drug application was filed? | Def. Resp: Witness is a medical doctor/clinical | |

| | Objection/Response in Barnett |
|---|---|
| 387: 12   A:  Well, I think at the time we compiled | pharmacologist who taught, worked & studied in |
| 387: 13   all the data that we'd gotten during Phase III, we | field for 4 decades.  Was executive director & |
| 387: 14   were convinced that the drug had good efficacy on | head of Merck's clinical pharmacology dept. & |
| 387: 15   pain, that it was a good pain reliever, and we also | also was head of Vioxx project team during |
| 387: 16   had pretty substantial data, we thought, that it was | development. |
| 387: 17   sparing the stomach, that it was not causing the | |
| 387: 18   problems that the standard NSAIDs cause. | |
| 387: 19   Q:  I'd like to ask you, Dr. Nies, some | |
| 387: 20   questions about one Vioxx study in particular. It's | |
| 387: 21   a study known as protocol 023, and it involved a Dr. | |
| 387: 22   Garret FitzGerald. Are you familiar with that | |
| 387: 23   study? | |
| 387: 24   A:  Yes. Yes. | |
| 387: 25   Q:  I'd like to show you a document that | Plf. Obj:  801, 802, hearsay |
| 388: 1   has been premarked as Nies Exhibit 1002. | not within - 803.18, witness |
| 388: 2   - - - | is not an expert |
| 388: 3   (Whereupon, Deposition Exhibit | Def. Resp:  This is the Fitzgerald |
| 388: 4   Nies-1002, 'Effects of Specific | urine study that is not being offered |
| 388: 5   Inhibition of Cyclooxygenase-2 on Sodium | for truth.  It is also a learned treatise. |
| 388: 6   Balance, Hemodynamics, and Vasoactive | Not offered for the truth. |
| 388: 7   Eicosanoids,' The Journal of | |
| 388: 8   Pharmacology and Experimental | |
| 388: 9   Therapeutics 289:735-741, 1999, | |
| 388: 10   (Catella-Lawson, et al.),   was marked for | |
| 388: 11   identification.) | |
| 388: 12   - - - | |
| 388: 13   BY MR. RABER:   : | |
| 388: 14   Q:  Can you identify this exhibit, | |
| 388: 15   please? | |
| 388: 16   A:  This is a publication in the Journal | |
| 388: 17   of Pharmacology and Experimental Therapeutics in | |
| 388: 18   1999. It's entitled, 'Effects of Specific | |
| 388: 19   Inhibition of Cyclooxygenase-2 on Sodium Balance, | |
| 388: 20   Hemodynamics and Vasoactive Eicosanoids.' | |
| 388: 21   Q:  Is this the protocol 023 Dr. | |
| 388: 22   FitzGerald study that you're familiar with? | |
| 388: 23   A:  This is the publication of that | |
| 388: 24   study. | |
| 388: 25   Q:  Who is Dr. Garret FitzGerald? | |
| 389: 1   A:  He is a professor of pharmacology at | |
| 389: 2   University of Pennsylvania. | |
| 389: 3   Q:  Are you familiar with Dr. | |
| 389: 4   FitzGerald's reputation in the field? | |

15

| | **Objection/Response in Barnett** |
|---|---|
| 389: 5    A:  Yes, I am. | |
| 389: 6    Q:  What is his reputation? | |
| 389: 7    A:  He's well respected as a | |
| 389: 8    cardiovascular pharmacologist. | |
| 389: 9    Q:  Were any of the co-authors of this | |
| 389: 10   FitzGerald study employed by Merck as scientists? | |
| 389: 11   A:  Yes, a number of them. Briggs | |
| 389: 12   Morrison, Barry Gertz both worked with me, and Hui | |
| 389: 13   Quan was a statistician. | |
| 389: 14   Q:  Who provided the funding for this | |
| 389: 15   study? | |
| 389: 16   A:  This was Merck funded. This was | |
| 389: 17   actually part of our Phase II/III development. So, | |
| 389: 18   it was funded by Merck. | |
| 389: 19   Q:  Can you tell us, what was the purpose | Plf. Obj:  602, witness did |
| 389: 20   of this FitzGerald study? | not participate in study |
| 389: 21   A:  The main purpose of this study was to | Def. Resp:  Witness was head of Vioxx |
| 389: 22   look at the effects of Vioxx on the kidney in | project develop team & head of Merck's |
| 389: 23   elderly individuals and compare that with no | clinical pharmacology dept. and is |
| 389: 24   treatment or with a standard NSAID. | intimately familiar with the Fitzgerald |
| 389: 25   Q:  Why did you want to test the kidneys? | urine study. |
| 390: 1    A:  Well, it had been known for a long | |
| 390: 2    time that the standard NSAIDs had effects on the | |
| 390: 3    kidney to cause salt and water retention, that is, | |
| 390: 4    the body to retain salt and water. | |
| 390: 5    Q:  What was the general design of this | |
| 390: 6    particular study? | |
| 390: 7    A:  Individuals were put on a fixed diet | |
| 390: 8    where they got a certain sodium intake, and these | |
| 390: 9    were basically healthy elderly individuals. Their | |
| 390: 10   sodium intake was measured every day, their sodium | |
| 390: 11   output in the urine was measured every day, and we | |
| 390: 12   then wanted to see what changes occurred during | |
| 390: 13   various therapies, and the therapies were the -- was | |
| 390: 14   a placebo, which is a sugar pill, Vioxx, or | |
| 390: 15   indomethacin, which is a standard NSAID. | |
| 390: 16   Q:  When you refer to a placebo as a | |
| 390: 17   sugar pill, is there any active drug in a placebo? | |
| 390: 18   A:  No. | |
| 390: 19   Q:  It's like taking no medicine at all? | |
| 390: 20   A:  Yes, essentially taking no medicine | |
| 390: 21   at all. The reason it's done that way is so that no | |
| 390: 22   one, the investigators nor the volunteers or | |

|  |  | **Objection/Response in Barnett** |  |
|---|---|---|---|
| 390: 23 | patients, know whether or not they're getting an |  |  |
| 390: 24 | active medication. |  |  |
| 390: 25 | Q:  Dr. Nies, how did you actually | Plf. Obj:  602, witness did |  |
| 391: 1 | measure the effects of the different drugs on the | not participate in study |  |
| 391: 2 | kidneys of the patients in this study? | Def. Resp:  Witness was head of |  |
| 391: 3 | A:  We measured the amount of sodium that | Vioxx project develop team & head |  |
| 391: 4 | they were taking in, and we measured the amount | of Merck's clinical pharmacology |  |
| 391: 5 | was coming out in the urine. That's basically the | dept. and is intimately familiar with |  |
| 391: 6 | way it was done. | the Fitzgerald urine study. |  |
| 391: 7 | Q:  What were your findings with regard |  |  |
| 391: 8 | to the effects of Vioxx and indomethacin on kidneys? |  |  |
| 391: 9 | A:  We found that Vioxx and indomethacin |  |  |
| 391: 10 | had essentially the same effect on the kidney, that |  |  |
| 391: 11 | is, both drugs cause salt and water retention about |  |  |
| 391: 12 | equivalently. |  |  |
| 391: 13 | Q:  Were there any other things that you | Plf. Obj:  801, 802, hearsay |  |
| 391: 14 | found in this FitzGerald study? | not within - 803.18, not an |  |
| 391: 15 | A:  Well, since we were doing all of this | expert witness, 702, 703 |  |
| 391: 16 | urine collection, we had also decided that we would | Def. Resp:  Not an out-of-court statement. |  |
| 391: 17 | look at some of the metabolites of prostaglandins in | Asking the witness what he found out. |  |
| 391: 18 | the body, and so we measured metabolites of |  |  |
| 391: 19 | thromboxane, which is a prostaglandin made by |  |  |
| 391: 20 | platelets and a metabolite of a compound called |  |  |
| 391: 21 | prostacyclin, which is made by a variety of tissues |  |  |
| 391: 22 | in the body. |  |  |
| 391: 23 | Q:  What did you find when you looked at |  |  |
| 391: 24 | thromboxane and prostacyclin? |  |  |
| 391: 25 | A:  Well, with the placebo, as you would |  |  |
| 392: 1 | expect, there was no change. With the indomethacin, |  |  |
| 392: 2 | the standard NSAID, there was a reduction in both |  |  |
| 392: 3 | thromboxane and prostacyclin metabolites. With the |  |  |
| 392: 4 | Vioxx, there was a reduction only in the |  |  |
| 392: 5 | prostacyclin metabolite. |  |  |
| 392: 6 | Q:  What did that finding about |  |  |
| 392: 7 | prostacyclin mean? |  |  |
| 392: 8 | A:  Well, I guess we didn't know exactly |  |  |
| 392: 9 | what it meant. The hypothesis that was generated |  |  |
| 392: 10 | from these data was that since -- let me just |  |  |
| 392: 11 | explain a little bit more about thromboxane and |  |  |
| 392: 12 | prostacyclin so this makes sense. |  |  |
| 392: 13 | Thromboxane is made by platelets and |  |  |
| 392: 14 | causes platelets to aggregate, so, it also is a |  |  |
| 392: 15 | vasoconstrictor, it causes blood vessels to |  |  |

**Objection/Response in Barnett**

| | |
|---|---|
| 392: 16 | constrict. |
| 392: 17 | Prostacyclin is made, as I said, by a |
| 392: 18 | variety of tissues, but it has -- at least one of |
| 392: 19 | its functions is to inhibit platelets from |
| 392: 20 | aggregating and to cause vasodilation, that is, that |
| 392: 21 | the blood vessels would open up. |
| 392: 22 | So, the hypothesis was that if you |
| 392: 23 | altered the balance between thromboxane and |
| 392: 24 | prostacyclin at the level of the vessel wall, at the |
| 392: 25 | lining of the vessel, that you would produce an |
| 393: 1 | imbalance there that would cause thromboxane to |
| 393: 2 | dominate, which might cause platelet aggregation, |
| 393: 3 | might cause vasoconstriction. |

| | |
|---|---|
| 393: 4 | Q:  Is platelet aggregation another way |
| 393: 5 | of saying a clot? |
| 393: 6 | A:  It's a kind of clot, yes. It's the |
| 393: 7 | way platelets clump together. |
| 393: 8 | Q:  You mentioned the word 'hypothesis.' |
| 393: 9 | Can you tell us what a hypothesis is? |
| 393: 10 | A:  A hypothesis is basically just a |
| 393: 11 | conceptual theory of what might happen. |

| | |
|---|---|
| 393: 12 | Q:  Did the findings about prostacyclin |
| 393: 13 | being reduced mean that Vioxx causes heart attacks |
| 393: 14 | and stroke? |
| 393: 15 | A:  No. |
| 393: 16 | Q:  I'd like you, if you would, to please |
| 393: 17 | turn to Page 740 of Exhibit 1002. About halfway |
| 393: 18 | down the page in the left-hand column, the |
| 393: 19 | FitzGerald study says, 'Presently, the implications |
| 393: 20 | of prostacyclin suppression in vivo are unclear.' |
| 393: 21 | A:  Yeah. |
| 393: 22 | Q:  Do you see that? |
| 393: 23 | A:  Yes. |
| 393: 24 | Q:  What does that mean? |
| 393: 25 | A:  Well, I think it means that we don't |
| 394: 1 | know what this biochemical result means in terms of |
| 394: 2 | any clinical implications. |
| 394: 3 | Q:  When you're referring to 'clinical |
| 394: 4 | implications,' what do you mean by that? |
| 394: 5 | A:  Whether it has any effects either on |
| 394: 6 | the efficacy or the adverse effects of the drug. |

Plf. Obj:  801, 802, hearsay not within - 803.18, not a timely disclosed expert witness, 702, 703

Def. Resp:  only applies to 393:12-394:6:  Not offering an out-of-court stmt for its truth.  Even if offered for truth, 803(18) applies.  Witness is a medical doctor and clinical pharmacologist who taught, worked, and studied in field for 4 decades.  Was executive director and head of Merck's clinical pharmacology dept, and also was head of Vioxx project team during development.

| | |
|---|---|
| 394: 7 | Q:  Dr. Nies, what was your reaction to |
| 394: 8 | the FitzGerald hypothesis about the possible |

| | **Objection/Response in Barnett** | |
|---|---|---|
| 394: 9    imbalance between prostacyclin and thromboxane? | | |
| 394: 10    A:  We thought it was an unexpected | | |
| 394: 11    finding both to FitzGerald and to us, and so, we | | |
| 394: 12    were quite interested in it and wanted to try to | | |
| 394: 13    find out more about it. | | |
| 394: 14    Q:  Were you concerned about it? | | |
| 394: 15    A:  We wanted to investigate the -- you | | |
| 394: 16    know, to see whether the prostacyclin was coming | | |
| 394: 17    from the blood vessel wall or not, and also to try | | |
| 394: 18    to assess the implications. 'Concerned' to the | | |
| 394: 19    extent that we wanted to further our investigations, | | |
| 394: 20    yes. | | |

**394:2   -   398:23**          Nies, Alan 2005-04-01

| | | |
|---|---|---|
| 394: 25    Q:  Well, if prostacyclin was being | Plf. Obj:  702, 703, | |
| 395: 1    reduced, why wouldn't that be enough to cause this | previously undisclosed | |
| 395: 2    imbalance problem? | expert opinion | |
| 395: 3    A:  Well, in the prostaglandin area, with | Def Resp:  Witness is a medical doctor | |
| 395: 4    the thromboxane and with prostacyclin, you generally | and clinical pharmacologist | |
| 395: 5    have to inhibit their formation by more than 90 | who taught, worked, and | |
| 395: 6    percent in order to have an effect. This is true | studied in field for 4 | |
| 395: 7    for thromboxane on the platelets, it has to be a 95 | decades.  Was executive | |
| 395: 8    percent inhibition. And it's been estimated that | director and head of | |
| 395: 9    it's also true for prostacyclin, that is, 10 percent | Merck's clinical | |
| 395: 10    of the normal amount will allow the body to function | pharmacology dept, and | |
| 395: 11    normally. And the reduction in this metabolite in | also was head of Vioxx | |
| 395: 12    the urine, which is a very indirect way of looking | project team during development. | |
| 395: 13    at what's going on, was in the range of 50 to 60 | | |
| 395: 14    percent. So, we were nowhere near an inhibition | | |
| 395: 15    that would cause something that would normally be a | | |
| 395: 16    concern. | | |
| 395: 17    Q:  Let me ask you this. | | |
| 395: 18    You mentioned earlier that urine was | | |
| 395: 19    tested. | | |
| 395: 20    A:  Yes. | | |
| 395: 21    Q:  Did that have any effect on your | Plf. Obj:  702, 703, previously undisclosed | |
| 395: 22    reaction to these results? | expert opinion | |
| 395: 23    A:  Well, when you're testing urine, it's | Def. Resp: Witness is a medical doctor | |
| 395: 24    fairly indirect, and so all you can do is try to | and clinical pharmacologist | |
| 395: 25    infer what's happening in the body. And I think | who taught, worked, and | |
| 396: 1    that it wasn't at all clear that the blood vessel | studied in field for 4 | |
| 396: 2    was the source of the prostacyclin that we were | decades.  Was executive | |
| 396: 3    seeing, the metabolite we were seeing in the urine. | director and head of | |

| | **Objection/Response in Barnett** |
|---|---|
| 396: 4    Q:  Why was that important? | Merck's clinical |
| 396: 5    A:  Well, because if the prostacyclin is | pharmacology dept, and |
| 396: 6    not coming from the lining of the blood vessel where | also was head of Vioxx |
| 396: 7    the interaction with the platelets is occurring, if | project team during development. |
| 396: 8    that's not being affected, then the hypothesis that | |
| 396: 9    there would be an imbalance is false. | |
| 396: 10    Q:  Are there any other systems or | |
| 396: 11    mechanisms in the body that act to oppose the | |
| 396: 12    effects of thromboxane? | |
| 396: 13    A:  Yes. There are several. The best | |
| 396: 14    known is a substance called nitric oxide that is | |
| 396: 15    made by the endothelium and has similar effects on | |
| 396: 16    the platelets and on the blood vessel as | |
| 396: 17    prostacyclin. | |
| 396: 18    Q:  Is the mechanism that produces nitric | |
| 396: 19    oxide affected in any way by prostacyclin levels? | |
| 396: 20    A:  No. | |
| 396: 21    Q:  How did that affect your reaction to | |
| 396: 22    the FitzGerald hypothesis? | |
| 396: 23    A:  Well, I mean, we know that the body | |
| 396: 24    had several mechanisms by which to keep platelets | |
| 396: 25    from clotting or clumping together. And at most, | |
| 397: 1    the Vioxx would have been hitting only the | |
| 397: 2    prostacyclin part of that, not the nitric oxide. | |
| 397: 3    So, it would still be present. | |
| 397: 4    Q:  Did any patients in the FitzGerald | Plf. Obj:  801, 802, hearsay |
| 397: 5    study have a heart attack? | not within - 803.18, not an |
| 397: 6    A:  No. | expert witness, not timely |
| 397: 7    Q:  Did any patients in the FitzGerald | disclosed expert, 702, 703 |
| 397: 8    study have a stroke? | Def. Resp:  See below |
| 397: 9    A:  No. | |
| 397: 10    Q:  Did Dr. FitzGerald suggest any | Plf. Obj:  801, 802, hearsay |
| 397: 11    studies as a followup to this study? | Def. Resp: 803(18) |
| 397: 12    A:  Yes, he did. | |
| 397: 13    Q:  I'd like to show you a document that | Def Resp:  applies to |
| 397: 14    has been premarked as Nies Exhibit 1003. | 397:4-9: 803(18) is exception |
| 397: 15    - - - | to hearsay rule.  Witness is |
| 397: 16    (Whereupon, Deposition Exhibit | a medical doctor and clinical |
| 397: 17    Nies-1003, E-mails, MRK-NJ0051533 - | pharmacologist who taught |
| 397: 18    MRK-NJ0051534, was marked for | worked, and studied in |
| 397: 19    identification.) | field for 4 decades.  Was |
| 397: 20    - - - | exec dir. and head of |
| 397: 21    BY MR. RABER:   : | Merck's clinical pharmacology |

| | Objection/Response in Barnett |
|---|---|

dept, and also head of Vioxx

project team during development.

| | |
|---|---|
| 397: 22 | Q:  Can you identify this exhibit? |
| 397: 23 | A:  This is an e-mail that was sent to me |
| 397: 24 | by Garret FitzGerald in October '97, October 24th, |
| 397: 25 | '97. |
| 398: 1 | Q:  Dr. Nies, what was the nature of your |
| 398: 2 | relationship with Dr. FitzGerald at that time? |
| 398: 3 | A:  Dr. FitzGerald was -- well, his |
| 398: 4 | laboratory is the one that did this 023 study. He |
| 398: 5 | was a consultant to Merck, and he was a friend of |
| 398: 6 | mine. |
| 398: 7 | Q:  How long had you known him? |
| 398: 8 | A:  I'd known him for, I don't know, 15 |
| 398: 9 | or more years, probably more like 20 years at that |
| 398: 10 | point. I had known him at Vanderbilt where he had |
| 398: 11 | come as a fellow when I was on the faculty. |
| 398: 12 | Q:  Were you involved in helping train |
| 398: 13 | Dr. FitzGerald while he was a fellow? |
| 398: 14 | A:  Yes. |
| 398: 15 | Q:  Let's look at his e-mail message to |
| 398: 16 | you. Can you tell us what he was doing in this |
| 398: 17 | e-mail? |
| 398: 18 | A:  He's throwing out some ideas in order |
| 398: 19 | to -- sort of the kinds of things that he's been |
| 398: 20 | thinking about in terms of where to go from here, in |
| 398: 21 | terms of the study -- the findings that he'd found. |
| 398: 22 | And I think what he's really trying to do here is |
| 398: 23 | sort of establish a research program in this area. |

**399:3   -   399:5**          Nies, Alan 2005-04-01

| | |
|---|---|
| 399: 3 | Q:  Dr. Nies, based on reading this |
| 399: 4 | e-mail that Dr. FitzGerald sent to you, what did you |
| 399: 5 | understand he was trying to do in this e-mail? |

**399:1   -   400:14**          Nies, Alan 2005-04-01

| | |
|---|---|
| 399: 10 | A:  He was -- well, what he was -- he was |
| 399: 11 | trying to get Merck to fund some of these studies |
| 399: 12 | for him. |
| 399: 13 | Q:  Did Merck do any of the specific |
| 399: 14 | studies that are suggested in this e-mail? |
| 399: 15 | A:  We didn't do these, and not at this |
| 399: 16 | time did we do these at all. |
| 399: 17 | Q:  Why not? |
| 399: 18 | A:  Well, we thought this -- these were |
| 399: 19 | more indirect ways of looking at things like urine |

| | | **Objection/Response in Barnett** | |
|---|---|---|---|
| 399: 20 | or these genetically modified animals that really | | |
| 399: 21 | wasn't going to help us assess the risks and the | | |
| 399: 22 | benefits of our drug in patients. | | |
| 399: 23 | Q:  Why wouldn't these particular studies | | |
| 399: 24 | that are suggested answer that question? | | |
| 399: 25 | A:  Well, because they're not on -- | | |
| 400: 1 | they're not asking that question. They are not | | |
| 400: 2 | asking what are the risks and benefits. They're | | |
| 400: 3 | basically looking at the urinary metabolites of | | |
| 400: 4 | prostaglandins in humans, and we have the same | | |
| 400: 5 | assumptions that we have to make that we can't | | |
| 400: 6 | really get around by any of these studies. | | |
| 400: 7 | In the animals, the relevance of | | |
| 400: 8 | those two to human disease is certainly not | | |
| 400: 9 | established, and whereas they might be academically | | |
| 400: 10 | interesting, we didn't think they'd really help us | | |
| 400: 11 | assess risk in patients. | | |
| 400: 12 | Q:  Did you discuss Dr. FitzGerald's | | |
| 400: 13 | suggestions with him? | | |
| 400: 14 | A:  Yes, we did. | | |

**401:1  -  401:18**          Nies, Alan 2005-04-01

| | | | |
|---|---|---|---|
| 401: 10 | Q:  Can you tell us what you said and | | |
| 401: 11 | what Dr. FitzGerald said when you discussed what | | |
| 401: 12 | in his e-mail? | | |
| 401: 13 | A:  Well, we had a lot of discussions. | | |
| 401: 14 | In fact, Dr. FitzGerald remains a consultant to | | |
| 401: 15 | Merck to this day, and we had a lot of discussions | | |
| 401: 16 | with Dr. FitzGerald about these issues. | | |
| 401: 17 | Q:  Did you tell him that you thought his | | |
| 401: 18 | studies were too indirect or words to that effect? | | |

**401:2  -  401:24**          Nies, Alan 2005-04-01

| | | | |
|---|---|---|---|
| 401: 20 | THE WITNESS:  I told him what I just | | |
| 401: 21 | had told you, that we didn't feel that this was | | |
| 401: 22 | going to assess the risks in patients. | | |
| 401: 23 | BY MR. RABER:    : | | |
| 401: 24 | Q:  What was his response to that? | | |

**402:1  -  403:12**          Nies, Alan 2005-04-01

| | | | |
|---|---|---|---|
| 402: 1 | THE WITNESS:  Well, I mean, you have | Plf. Obj:  801, 802, hearsay | |
| 402: 2 | to agree with that, because none of these studies -- | Def Resp:  Not offered for truth. | |
| 402: 3 | he had to agree with that, because none of these | Offered to show that | |
| 402: 4 | studies address that. These were academic studies | this is what Fitzgerald | |
| 402: 5 | that he was interested in doing. | said to him. | |

| | | **Objection/Response in Barnett** | |
|---|---|---|---|
| 402: 6 | BY MR. RABER:   : | | |
| 402: 7 | Q:  Dr. Nies, did you discuss the | | |
| 402: 8 | FitzGerald prostacyclin theory with anyone else | | |
| 402: 9 | outside of Merck? | | |
| 402: 10 | A:  We discussed this with a number of | | |
| 402: 11 | people, but probably one of our major consultants | | |
| 402: 12 | also at that time was John Oates. | | |
| 402: 13 | Q:  Can you tell us who John Oates is? | | |
| 402: 14 | A:  John Oates, at that time, was | | |
| 402: 15 | professor of pharmacology and medicine at | | |
| 402: 16 | University. | | |
| 402: 17 | Q:  I'd like to show you a document that | | |
| 402: 18 | has been premarked as Exhibit 1004. | | |
| 402: 19 | - - - | | |
| 402: 20 | (Whereupon, Deposition Exhibit | | |
| 402: 21 | Nies-1004, Letter, 10-27-97, | | |
| 402: 22 | MRK-ABC0002113 - MRK-ABC0002114, was | | |
| 402: 23 | marked for identification.) | | |
| 402: 24 | - - - | | |
| 402: 25 | BY MR. RABER:   : | | |
| 403: 1 | Q:  Can you identify that? | | |
| 403: 2 | A:  This is a letter from John Oates to | | |
| 403: 3 | myself, and it's dated October 27, 1997. | | |
| 403: 4 | Q:  Dr. Nies, the first sentence of this | | |
| 403: 5 | document says, 'I'm writing in follow up of our | | |
| 403: 6 | discussion regarding the effect of MK-966 on | | |
| 403: 7 | prostacyclin biosynthesis.' Do you see that? | | |
| 403: 8 | A:  Yes. | | |
| 403: 9 | Q:  What is MK-966? | | |
| 403: 10 | A:  That's Vioxx. | | |
| 403: 11 | Q:  What did you understand Dr. Oates was | | |
| 403: 12 | doing with this letter to you? | | |
| **403:1   -   403:21** | Nies, Alan 2005-04-01 | | |
| 403: 15 | Q:  Let me back up. | | |
| 403: 16 | A:  Okay. | | |
| 403: 17 | Q:  Dr. Nies, did you receive this letter | | |
| 403: 18 | from Dr. Oates? | | |
| 403: 19 | A:  Yes. | | |
| 403: 20 | Q:  What did you understand Dr. Oates to | | |
| 403: 21 | be doing in this letter? | | |
| **404:4   -   413:1** | Nies, Alan 2005-04-01 | | |
| 404: 4 | A:  Yeah. We had discussed -- as he | Plf. Obj: 801, 802, hearsay, | |

| | | **Objection/Response in Barnett** | |
|---|---|---|---|
| 404: 5 | said, this is to follow up on the discussions we'd | 602, speculation | |
| 404: 6 | had, and he had been thinking about those issues. | Def Resp:  Not speculation | |
| 404: 7 | And he suggested a couple of studies that were kind | because Dr. Nies | |
| 404: 8 | of similar, in a way, to what FitzGerald was | discussed issue with | |
| 404: 9 | suggesting, that is, collecting more urine in | Dr. Oates.  Not hearsay | |
| 404: 10 | different kinds of patients to see whether -- see | because not offered | |
| 404: 11 | what happened and to do an animal study. | for truth. | |
| 404: 12 | Q:  How did this letter from Dr. Oates | | |
| 404: 13 | relate to the prostacyclin study that FitzGerald had | | |
| 404: 14 | done? | | |
| 404: 15 | A:  This was -- we had discussed the | | |
| 404: 16 | results of the prostacyclin study, the 023, with Dr. | | |
| 404: 17 | Oates, and that is what he is addressing in this | | |
| 404: 18 | letter. | | |
| 404: 19 | Q:  Did Merck do either of the specific | | |
| 404: 20 | studies that are described by Dr. Oates in this | | |
| 404: 21 | letter? | | |
| 404: 22 | A:  We didn't do these studies, no. | | |
| 404: 23 | Q:  Why not? | | |
| 404: 24 | A:  Well, it's the same thing that we had | | |
| 404: 25 | with FitzGerald. That is, these studies, again, are | | |
| 405: 1 | not going to help us assess the risks and benefits | | |
| 405: 2 | in patients. These are indirect measures of urinary | | |
| 405: 3 | metabolites of substance that we don't know exactly | | |
| 405: 4 | where it's being made, and I think that it's very | | |
| 405: 5 | difficult to make any specific inferences from the | | |
| 405: 6 | results that you find, and so I think that we'd get | | |
| 405: 7 | data that we wouldn't be able to interpret any | | |
| 405: 8 | better than the original data. | | |
| 405: 9 | Q:  So, you didn't do the specific | Plf. Obj:  Asked and | |
| 405: 10 | studies suggested by Dr. FitzGerald, and you didn't | answered, leading | |
| 405: 11 | do the specific studies suggested by Dr. Oates. Did | Def Resp:  Not asked and | |
| 405: 12 | you just choose to ignore them? | answered.  Ultimate | |
| 405: 13 | A:  No, no. | question not leading. | |
| 405: 14 | Q:  Well, what impact did their | | |
| 405: 15 | suggestions have? | | |
| 405: 16 | A:  Well, we, of course, wanted to | | |
| 405: 17 | continue to talk with them about this and discuss | | |
| 405: 18 | this with them, but what we really wanted to do is | | |
| 405: 19 | look at risks and benefits in patients. And so we | | |
| 405: 20 | went back to all of our data that we had collected, | | |
| 405: 21 | and at this time we had -- we were well into Phase | | |
| 405: 22 | III, and so we had a large -- a fairly large amount | | |

**Objection/Response in Barnett**

| | |
|---|---|
| 405: 23 | of clinical data, and we had -- I had an |
| 405: 24 | epidemiologist take a look at all the data in order |
| 405: 25 | to try to assess whether there was a signal that |
| 406: 1 | Vioxx was causing heart attacks or strokes. |
| 406: 2 | Q:  You mentioned then -- we're finished |
| 406: 3 | with that exhibit. |
| 406: 4 | Dr. Nies, you used the word |
| 406: 5 | 'epidemiologist.' What is an epidemiologist? |
| 406: 6 | A:  That is a scientist that's been |
| 406: 7 | trained to look at large groups of data that have |
| 406: 8 | usually been collected by others for different |
| 406: 9 | reasons, and to look at that data to see if they can |
| 406: 10 | come up either with hypotheses or conclusions |
| 406: 11 | relating to a question that they may be asking. |
| 406: 12 | Q:  Dr. Nies, I'd like to show you a |
| 406: 13 | document that's been premarked as Nies Exhibit |
| 406: 14 | - - - |
| 406: 15 | (Whereupon, Deposition Exhibit |
| 406: 16 | Nies-1005, 'MRL Epidemiology Department |
| 406: 17 | Technical Report No. EP07006.005.98, |
| 406: 18 | Final Results of an Analysis of the |
| 406: 19 | Incidence of Cardiovascular SAEs in the |
| 406: 20 | Phase IIb/III Vioxx Osteoarthritis |
| 406: 21 | Clinical Trials,' 2-2-98 (Doug Watson), |
| 406: 22 | MRK-NJ0272249 - MRK-NJ0272272, was |
| 406: 23 | marked for identification.) |
| 406: 24 | - - - |
| 406: 25 | BY MR. RABER:    : |
| 407: 1 | Q:  Can you take a look at that and |
| 407: 2 | identify that for us, please. |
| 407: 3 | A:  This is a final report of an analysis |
| 407: 4 | done by Dr. Doug Watson, who is a Merck employee. |
| 407: 5 | And this is the analysis of a study that I just |
| 407: 6 | mentioned, that is, the epidemiologic look at our |
| 407: 7 | Phase IIb/III data. |
| 407: 8 | Q:  What was your role in this report |
| 407: 9 | being done? |
| 407: 10 | A:  As head of the project team, I had |
| 407: 11 | assigned Doug the responsibility to do this. |
| 407: 12 | Q:  Did this report relate in any way to |
| 407: 13 | the findings from FitzGerald's study? |
| 407: 14 | A:  Well, it was triggered by those |
| 407: 15 | findings, because we wanted to do a direct look at |

<u>**Objection/Response in Barnett**</u>

| | |
|---|---|
| 407: 16 | our patients to see whether we could identify any |
| 407: 17 | risk. |
| 407: 18 | Q:  What is the date of this report from |
| 407: 19 | Dr. Watson? |
| 407: 20 | A:  February 1998. |
| 407: 21 | Q:  Did you receive a copy of it? |
| 407: 22 | A:  Yes. |
| 407: 23 | Q:  Dr. Nies, I'm going to ask you to |
| 407: 24 | turn to Page 14 of this exhibit, and I'd like to |
| 407: 25 | focus your attention to the paragraph where it says |
| 408: 1 | 'Summary and Recommendation.' Do you see that? |
| 408: 2 | A:  Yes. |
| 408: 3 | Q:  It says, 'Based on this analysis, the |
| 408: 4 | CVD SAE incidence rates' -- before I go further, |
| 408: 5 | what is 'CVD' and what is 'SAE'? |
| 408: 6 | A:  CVD is cardiovascular disease, which |
| 408: 7 | would include myocardial infarctions, heart attacks |
| 408: 8 | and strokes. |
| 408: 9 | Q:  What is SAE? |
| 408: 10 | A:  Serious adverse events. |
| 408: 11 | Q:  Back to this paragraph. It says, |
| 408: 12 | 'Based on this analysis, the CVD SAE incidence |
| 408: 13 | in trials of Vioxx appear roughly consistent with |
| 408: 14 | what would be expected in the general population, |
| 408: 15 | and there is no clear evidence of consistently |
| 408: 16 | elevated risk compared to age-adjusted placebo |
| 408: 17 | controls from Proscar and Fosamax trials.' Do you |
| 408: 18 | see that? |
| 408: 19 | A:  Yes. |
| 408: 20 | Q:  What did that mean to you as it |
| 408: 21 | related to Dr. FitzGerald's hypothesis? |
| 408: 22 | A:  Well, based on the data in |
| 408: 23 | approximately 5,000 patients at this time, there |
| 408: 24 | wasn't a signal that indicated that the drug was |
| 408: 25 | causing a risk of heart attacks or strokes. |
| 409: 1 | Q:  Dr. Nies, did Merck seek advice from |
| 409: 2 | any outside advisors relating to the FitzGerald |
| 409: 3 | hypothesis? |
| 409: 4 | A:  Well, we talked to John Oates, as I |
| 409: 5 | mentioned, and we also had a standing board of |
| 409: 6 | advisors, Board of Scientific Advisors, which meets |
| 409: 7 | every year in the spring. And we presented the data |
| 409: 8 | all to them. |

| | Objection/Response in Barnett |
|---|---|
| 409: 9  Q: Can you tell us a little bit more | |
| 409: 10  about your Board of Scientific Advisors? | |
| 409: 11  A: These are mostly M.D.s, but there are | |
| 409: 12  also some statisticians on the board. They vary in | |
| 409: 13  their training from cardiovascular, clinical | |
| 409: 14  pharmacology, general medicine, a variety of types | |
| 409: 15  of training, and they are, for the most part, | |
| 409: 16  professors of medicine at various universities. | |
| 409: 17  Q: Are they employed by Merck? | |
| 409: 18  A: They're not employed by Merck. | |
| 409: 19  Q: Who was the chairman of the Board of | |
| 409: 20  Scientific Advisors? | |
| 409: 21  A: The chairman at that time was John | |
| 409: 22  Oates. | |
| 409: 23  Q: Is that the same Dr. Oates who had | |
| 409: 24  made a couple of suggestions about studies -- | |
| 409: 25  A: Yes. | |
| 410: 1  Q: -- relating to FitzGerald? | |
| 410: 2  A: Right. That's the same one that | |
| 410: 3  wrote that letter to me. | |
| 410: 4  Q: I'd like to show you a document that | |
| 410: 5  has been premarked as Nies Exhibit 1006. | |
| 410: 6  - - - | |
| 410: 7  (Whereupon, Deposition Exhibit | |
| 410: 8  Nies-1006, 'Attachment #1 Dr. Alan Nies' | |
| 410: 9  Writeup for Meeting of Board of | |
| 410: 10  Scientific Advisors,' MRK-NJ0162361 - | |
| 410: 11  MRK-NJ0162371, was marked for | |
| 410: 12  identification.) | |
| 410: 13  - - - | |
| 410: 14  BY MR. RABER:   : | |
| 410: 15  Q: Dr. Nies, would you please identify | |
| 410: 16  this exhibit? | |
| 410: 17  A: This is a writeup that I did for the | |
| 410: 18  Board of Scientific Advisors in 1998, and this was | |
| 410: 19  to be sent to the board prior to the meeting that | |
| 410: 20  they had. | |
| 410: 21  Q: What is the date of your writeup for | |
| 410: 22  the board? | |
| 410: 23  A: The date on here is April 13, 1998, | |
| 410: 24  and this is -- it's actually been attached to one of | |
| 410: 25  the project team minutes for Vioxx. | |
| 411: 1  Q: Was this writeup sent to the Board of | |

**Objection/Response in Barnett**

411: 2    Scientific Advisors?

411: 3    A:  Yes.

411: 4    Q:  Why did you prepare this memo for

411: 5    them?

411: 6    A:  Well, as part of their meeting, in

411: 7    order for them to have a productive meeting, they

411: 8    get a background package, and they discuss various

411: 9    things during their meeting. One of the things

411: 10    during this meeting was this -- was Vioxx. And so

411: 11    this background was given to them prior to the

411: 12    meeting so that they could be thinking about it.

411: 13    Q:  Looking at page 10 of your memo to

411: 14    the board, near the top in bold type there's a

411: 15    heading that says 'Prostacyclin Metabolism.' Do you

411: 16    see that?

411: 17    A:  Yes, I do.

411: 18    Q:  What did that refer to?

411: 19    A:  This basically referred to that 023

411: 20    study, because that was the data we had on

411: 21    prostacyclin.

411: 22    Q:  That's the FitzGerald study?

411: 23    A:  Right.

411: 24    Q:  And looking at the bottom of Page 10,

411: 25    the last paragraph, it says, 'To assess the

412: 1    potential implication of these biochemical findings

412: 2    on cardiovascular health, the clinical team and

412: 3    epidemiology have analyzed the blinded Vioxx

412: 4    database for serious cardiovascular events. The

412: 5    analysis does not suggest a concern.' Do you see

412: 6    that?

412: 7    A:  Yes.

412: 8    Q:  What was that referring to?

412: 9    A:  That's referring to the study that --

412: 10    the epidemiologic study that Doug Watson did,

412: 11    looking at all of our data at that time.

412: 12    Q:  Did you ever meet with the Board of

412: 13    Scientific Advisors to discuss these things?

412: 14    A:  We did. And that was in May of '98.

412: 15    Q:  Was there any discussion during that

412: 16    meeting about how Vioxx might affect the risk of

412: 17    heart attack and stroke?

412: 18    A:  We spent a lot of time on that during

412: 19    the meeting, in fact, I think the majority of the

| | **Objection/Response in Barnett** |
|---|---|

412: 20    meeting. It's unusual to spend that much time on
412: 21    one topic, but this was an important topic.
412: 22    Q:  Were there differences of opinion on
412: 23    that topic?
412: 24    A:  There were differences of opinion,
412: 25    right.
413: 1    Q:  Can you describe those differences?

**413:4  -  413:22**    Nies, Alan 2005-04-01

413: 4    THE WITNESS:  There were part of the
413: 5    board that felt that the imbalance between
413: 6    thromboxane and prostacyclin could lead to a risk of
413: 7    platelet aggregation and heart attacks and strokes.
413: 8    And then there was a number of individuals who felt
413: 9    that because the atherosclerosis, which is the
413: 10    hardening of the arteries that basically causes
413: 11    heart attacks and strokes, was an inflammatory
413: 12    process, that an anti-inflammatory drug like Vioxx
413: 13    might be actually useful to impair atherogenesis to
413: 14    reduce the incidence of heart attacks and strokes.
413: 15    So, there were two camps which were opposed to
413: 16    other.
413: 17    BY MR. RABER:   :
413: 18    Q:  Was there any discussion of the
413: 19    studies that had been suggested by Dr. FitzGerald
413: 20    and Dr. Oates?
413: 21    A:  There was some discussion of those
413: 22    studies and --

**414:1  -  414:11**    Nies, Alan 2005-04-01

414: 1    Q:  You may continue.
414: 2    A:  -- and the board made their own
414: 3    discussion -- their own suggestions.
414: 4    Q:  Did the Board of Scientific Advisors
414: 5    recommend that Merck do any of the specific studies
414: 6    that had been suggested by either Dr. FitzGerald or
414: 7    Dr. Oates?
414: 8    A:  I don't think so. None of the
414: 9    urinary metabolite -- I don't believe they suggested
414: 10    actually continuing in that vein because they felt
414: 11    that that was also indirect.

**414:1  -  415:19**    Nies, Alan 2005-04-01

414: 15    Q:  What did the board of advisors
414: 16    recommend?

| | Objection/Response in Barnett | |
|---|---|---|
| 414: 17   A:  Their main recommendation was to set | | |
| 414: 18   up a procedure whereby we could collect heart attack | | |
| 414: 19   and stroke information in a standardized way from | | |
| 414: 20   all studies from that point on so that we could | | |
| 414: 21   combine the data in a rolling fashion. As the data | | |
| 414: 22   came in, we could combine it to see whether there | | |
| 414: 23   was a signal coming from our clinical studies. | | |
| 414: 24   Q:  Did you already have data relating to | | |
| 414: 25   heart attacks and strokes at that point? | | |
| 415: 1   A:  Well, we already had data in our | | |
| 415: 2   Phase IIb/III, we had data of heart attacks and | | |
| 415: 3   strokes, but it had not been collected in the same | | |
| 415: 4   way they wanted to collect it going on. The data we | | |
| 415: 5   had was the investigator saying, this person had a | | |
| 415: 6   heart attack, this person had a stroke. | | |
| 415: 7   Q:  Okay. | | |
| 415: 8   A:  Going forward, they wanted to have | | |
| 415: 9   all of the data compiled in sort of a central place | | |
| 415: 10   so that a committee of experts could look at it and | | |
| 415: 11   agree that this was a heart attack and this was a | | |
| 415: 12   stroke. | | |
| 415: 13   Q:  What did your clinical data show | Plf. Obj:  602, lack of | |
| 415: 14   about the risk of heart attacks and strokes as of | foundation, 702, 703, | |
| 415: 15   May of 1998? | undisclosed expert opinion | |
| 415: 16   A:  That there was no signal for a risk. | Def Resp:  applies to 415:13-19. | |
| 415: 17   And it was comparing it to a placebo or comparing it | There is foundation. | |
| 415: 18   to the comparator NSAIDs that we used in | Nies in charge of Vioxx | |
| 415: 19   III. | project team and knows | |
| **415:2  -  416:17**      Nies, Alan 2005-04-01 | clinical data.  Also, | |
| 415: 20   Q:  I want to show you a document that | witness is a medical doctor | |
| 415: 21   has been marked as Nies Exhibit 1007. | and clinical pharmacologist | |
| 415: 22   - - - | who taught, worked, and | |
| 415: 23   (Whereupon, Deposition Exhibit | studied in field for 4 | |
| 415: 24   Nies-1007, E-mail 6-8-98, with | decades.  Was executive | |
| 415: 25   attachments, 'Minutes for May's MK-0966 | director and head of | |
| 416: 1   (Vioxx)  PT Meeting,' MRK-ABH0014141 - | Merck's clinical | |
| 416: 2   MRK-ABH0014192, was marked for | pharmacology dept, and | |
| 416: 3   identification.) | also was head of Vioxx | |
| 416: 4   - - - | project team during development. | |
| 416: 5   BY MR. RABER:    : | | |
| 416: 6   Q:  Can you identify Nies Exhibit 1007? | | |
| 416: 7   A:  This is a copy of the minutes from | | |

| | |
|---|---|
| 416: 8 | the Vioxx project team of May in '98. |
| 416: 9 | Q:  Did you receive a copy of these |
| 416: 10 | minutes? |
| 416: 11 | A:  Yes. |
| 416: 12 | Q:  I'd like, if you would, to turn to |
| 416: 13 | Page Number 5 of this exhibit. There is a heading, |
| 416: 14 | the letter G, and it says, 'Review of Vioxx |
| 416: 15 | presentation at the 5/98 Board of Scientific |
| 416: 16 | Advisors Meeting.' Do you see that? |
| 416: 17 | A:  Yes. |

**416:2   -   417:9**          Nies, Alan 2005-04-01

| | |
|---|---|
| 416: 23 | Q:  This exhibit below that heading says, |
| 416: 24 | 'Alan Nies presented all data available on Vioxx at |
| 416: 25 | the time of the meeting, along with all of the |
| 417: 1 | potential problems (e.g., effects on renal function, |
| 417: 2 | ulcer healing, bone and prostacyclin metabolism, |
| 417: 3 | etc).   The consultants considered the data, and the |
| 417: 4 | potential problems, and offered the following |
| 417: 5 | suggestions for future studies (postfiling).' Do |
| 417: 6 | you see that? |
| 417: 7 | A:  Uh-huh. |
| 417: 8 | Q:  Yes? |
| 417: 9 | A:  Yes, I do. |

**417:1   -   417:23**          Nies, Alan 2005-04-01

| | |
|---|---|
| 417: 15 | Q:  Let me ask you this: |
| 417: 16 | What did the prostacyclin metabolism |
| 417: 17 | statement there relate to? |
| 417: 18 | A:  I presented to them the data that we |
| 417: 19 | had on the urinary metabolites of prostacyclin, and |
| 417: 20 | those data came from the FitzGerald study. |
| 417: 21 | Q:  Now, I'd like to have you turn the |
| 417: 22 | page and look at the recommendation that came |
| 417: 23 | the board. |

**418:1   -   418:12**          Nies, Alan 2005-04-01

| | |
|---|---|
| 418: 1 | Q:  The first bullet point there, can you |
| 418: 2 | read what that says? |
| 418: 3 | A:  'Begin from this point onward to |
| 418: 4 | systematically collect data on CV,' that would be |
| 418: 5 | cardiovascular, 'events in all clinical trials (for |
| 418: 6 | Vioxx and MK-0663)   utilizing predefined endpoints |
| 418: 7 | for MCI,' which is myocardial infarction, 'stroke, |
| 418: 8 | TIA,' which is transient ischemic attack, 'unstable |

| | | **Objection/Response in Barnett** | |
|---|---|---|---|
| 418: 9 | angina, et cet.' | | |
| 418: 10 | Q: Why did the board of advisors believe | | |
| 418: 11 | that establishing this standard operating procedure | | |
| 418: 12 | was the best course to take? | | |
| **418:1 - 418:25** | Nies, Alan 2005-04-01 | | |
| 418: 16 | THE WITNESS: They felt that by | Plf. Obj: 602, lack of | |
| 418: 17 | setting up this procedure, one was then able to take | foundation, 801, 802, | |
| 418: 18 | from various studies the cardiovascular endpoints | hearsay | |
| 418: 19 | that would be found in those studies and combine | Def. Resp: Dr. Nies was closely | |
| 418: 20 | them. No one study would likely be big enough to be | involved with Board of | |
| 418: 21 | able to make conclusions. And so they felt by | Advisors. Not offered for the truth but | |
| 418: 22 | combining studies using the same definitions in each | rather to show state of mind. | |
| 418: 23 | study, you could validly do that and then have | | |
| 418: 24 | enough power, enough people, enough endpoints to | | |
| 418: 25 | able to make some conclusion. | | |
| **419:6 - 419:7** | Nies, Alan 2005-04-01 | | |
| 419: 6 | Q: Were you present at the meeting when | | |
| 419: 7 | the board made this recommendation? | | |
| **419:9 - 419:17** | Nies, Alan 2005-04-01 | | |
| 419: 9 | THE WITNESS: Yes. | | |
| 419: 10 | BY MR. RABER:   : | | |
| 419: 11 | Q: Was there discussion about why they | Plf. Obj: Hearsay | |
| 419: 12 | believed that the SOP, standard operating procedure, | Def Resp: Not offered for truth. | |
| 419: 13 | was the best course to take? | Offered to show state | |
| 419: 14 | A: Yes. | of mind. Offered to | |
| 419: 15 | Q: Dr. Nies, did Merck follow this | show it was discussed. | |
| 419: 16 | recommendation? | | |
| 419: 17 | A: Yes, they did. | | |
| **420:4 - 420:20** | Nies, Alan 2005-04-01 | | |
| 420: 4 | Q: Dr. Nies, did you agree with the | | |
| 420: 5 | recommendation to establish a standard operating | | |
| 420: 6 | procedure as described by the Board of Scientific | | |
| 420: 7 | Advisors? | | |
| 420: 8 | A: Yes, I did. | | |
| 420: 9 | Q: Why did you agree that that was the | | |
| 420: 10 | best approach? | | |
| 420: 11 | A: Well, we were addressing a very | | |
| 420: 12 | important issue. We had a large amount of Phase III | | |
| 420: 13 | data at that time, and that hadn't shown any signal. | | |
| 420: 14 | But I felt that it was really important to continue | | |
| 420: 15 | to develop -- get more data to reassure ourselves | | |

| | | **Objection/Response in Barnett** | |
|---|---|---|---|
| 420: 16 | that there really was no issue. And so I think that | | |
| 420: 17 | we decided that all of our trials going forward, we | | |
| 420: 18 | would do what the board had suggested. | | |
| 420: 19 | Q:  Were you in a position to hear what | | |
| 420: 20 | other members of the board believed about the | | |
| **420:2 - 421:2** | Nies, Alan 2005-04-01 | | |
| 420: 24 | Q:  Yes or no? | | |
| 420: 25 | A:  Yes. | | |
| 421: 1 | Q:  Was it your sense that they were in | Plf. Obj:  Hearsay | |
| 421: 2 | agreement with your view? | Def Resp: Not out-of-court stmt. | |
| **421:4 - 421:4** | Nies, Alan 2005-04-01 | Asking witness about | |
| 421: 4 | THE WITNESS:  Yes. | his view. | |
| **423:1 - 425:2** | Nies, Alan 2005-04-01 | | |
| 423: 16 | Q:  Dr. Nies, I'd like to show you a | | |
| 423: 17 | document that has been like as Nies Exhibit 1008. | | |
| 423: 18 | - - - | | |
| 423: 19 | (Whereupon, Deposition Exhibit | | |
| 423: 20 | Nies-1008, 'Standard Operating Procedure | | |
| 423: 21 | for the Surveillance, Monitoring, and | | |
| 423: 22 | Adjudication of Acute Thromboembolic | | |
| 423: 23 | Vascular Events in Clinical Trials of | | |
| 423: 24 | COX-2 Specific Inhibitors,' 8-30-99, | | |
| 423: 25 | MRK-NJ0089972 - MRK-NJ0090021, was | | |
| 424: 1 | marked for identification.) | | |
| 424: 2 | - - - | | |
| 424: 3 | BY MR. RABER:   : | | |
| 424: 4 | Q:  Can you identify this exhibit, | | |
| 424: 5 | please. | | |
| 424: 6 | A:  This is a 'Standard Operating | | |
| 424: 7 | Procedure For Surveillance Monitoring and | | |
| 424: 8 | Adjudicating of Acute Thromboembolic | | |
| 424: 9 | Events in Clinical Trials of COX-2 Specific | | |
| 424: 10 | Inhibitors.' | | |
| 424: 11 | Q:  Was this the standard operating | | |
| 424: 12 | procedure that was recommended by the Board of | | |
| 424: 13 | Scientific Advisors? | | |
| 424: 14 | A:  Yes. | | |
| 424: 15 | Q:  Dr. Nies, after this standard | Plf. Obj:  602, lack of foundation | |
| 424: 16 | operating procedure was established, did Merck | Def. Resp:  Dr. Nies was head of Vioxx | |
| 424: 17 | follow it for all Vioxx trials? | project development team. | |
| 424: 18 | A:  Yes, they did. | | |
| 424: 19 | Q:  Did you ever discuss with Dr. John | | |

| | **Objection/Response in Barnett** | |
|---|---|---|
| 424: 20    Oates whether the standard operating procedure was | | |
| 424: 21    an appropriate response to the FitzGerald study? | | |
| 424: 22    A:  Yes. I had discussed with him | | |
| 424: 23    personally, as well as at the Board of Scientific | | |
| 424: 24    Advisors, where this was discussed and initiated. | | |
| 424: 25    Q:  What was Dr. Oates' opinion as to | | |
| 425: 1    whether the standard operating procedure was an | | |
| 425: 2    appropriate response? | | |
| **425:5  -  425:8**         Nies, Alan 2005-04-01 | Plf. Obj:  Hearsay | |
| 425: 5    THE WITNESS:  Dr. Oates told me that | Def. Resp: Not offered for truth.  Offered to | |
| 425: 6    he thought that this was the way to go in terms of | show Dr. Oates said it. Witness is permitted | |
| 425: 7    getting true clinical additional data on risks of | to testify about what he heard. | |
| 425: 8    the drug. | | |
| **430:2  -  433:5**         Nies, Alan 2005-04-01 | | |
| 430: 24    Q:  Sir, I'd like you to return, if we | | |
| 430: 25    could, to Exhibit 1006. This is your writeup for | | |
| 431: 1    the Board of Scientific Advisors; correct? | | |
| 431: 2    A:  Okay, yes. | | |
| 431: 3    Q:  Did your writeup to the scientific | | |
| 431: 4    advisors in April of 1998 refer in any way to those | | |
| 431: 5    studies that were being done up in Montreal? | | |
| 431: 6    A:  Yes. | | |
| 431: 7    Q:  Can you tell us where that is? | | |
| 431: 8    A:  It's in that area where we said | | |
| 431: 9    prostacyclin metabolism. It's about halfway down. | | |
| 431: 10    It says, 'Experiments are being performed by Merck | | |
| 431: 11    Frosst and Safety Assessment to determine whether, | | |
| 431: 12    1)  the effect on,' and there's a variety of things | | |
| 431: 13    that they were doing. | | |
| 431: 14    Q:  Can you tell us, who is 'Merck | | |
| 431: 15    Frosst' and 'Safety Assessment'? | | |
| 431: 16    A:  Merck Frosst is the Merck subsidiary | | |
| 431: 17    in Canada. Safety Assessment are the people who | | |
| 431: 18    the animal studies at Merck at West Point. | | |
| 431: 19    Q:  Why didn't the animal studies support | Plf. Obj:  702, 703, improper expert | |
| 431: 20    the FitzGerald hypothesis? | opinion, undisclosed expert | |
| 431: 21    A:  There was never any evidence that the | Def Resp: Witness is a medical doctor | |
| 431: 22    lining of the blood vessel -- there was good | and clinical pharmacologist | |
| 431: 23    evidence it makes prostacyclin, but there was never | who taught, worked, and | |
| 431: 24    any evidence that the lining of the blood vessel | studied in field for 4 | |
| 431: 25    making prostacyclin was dependent upon the COX-2 | decades.  Was executive | |
| 432: 1    enzyme. | director and head of | |

| | | **Objection/Response in Barnett** | |
|---|---|---|---|
| 432: 2 | Q:  So, how would that relate to Vioxx? | Merck's clinical | |
| 432: 3 | A:  Well, Vioxx is a COX-2 inhibitor. | pharmacology dept, and | |
| 432: 4 | So, if the COX-2 is not involved in the production | also was head of Vioxx | |
| 432: 5 | of that prostacyclin at the junction between the | project team during development. | |
| 432: 6 | platelets and the blood vessel, then Vioxx would | | |
| 432: 7 | have no effect on that interaction. | | |
| 432: 8 | Q:  Dr. Nies, after reviewing the Doug | | |
| 432: 9 | Watson analysis and seeing the results of the | | |
| 432: 10 | studies we've just described, what was your view | | |
| 432: 11 | about whether a reduction of prostacyclin would | | |
| 432: 12 | cause heart attacks and strokes in humans? | | |
| 432: 13 | A:  Would you repeat that one? | | |
| 432: 14 | Q:  Yes. | | |
| 432: 15 | After reviewing the Watson analysis | | |
| 432: 16 | that we saw earlier -- | | |
| 432: 17 | A:  Right. | | |
| 432: 18 | Q:  -- and seeing the results of the | | |
| 432: 19 | animal studies that we've just described, what was | | |
| 432: 20 | your view about whether a reduction in prostacyclin | | |
| 432: 21 | would cause heart attacks and strokes in humans? | | |
| 432: 22 | A:  Well, the evidence was becoming less | | |
| 432: 23 | for that hypothesis, so, that the hypothesis was not | | |
| 432: 24 | being supported. | | |
| 432: 25 | Q:  Did you believe that it would cause | | |
| 433: 1 | heart attacks and strokes? | | |
| 433: 2 | A:  No, no. | | |
| 433: 3 | Q:  Did Dr. FitzGerald himself ever say | Plf. Obj:  Hearsay | |
| 433: 4 | anything about whether there was evidence to | Def Resp:  Not offered for truth. | |
| 433: 5 | his hypothesis? | Offered to show Dr. | |
| **433:7   -   434:17**        Nies, Alan 2005-04-01 | | Fitzgerald said it. | |
| 433: 7 | THE WITNESS:  I think he agreed at | Witness can testify | |
| 433: 8 | that time that there was not enough evidence to | about what he heard. | |
| 433: 9 | support that hypothesis. | | |
| 433: 10 | BY MR. RABER:   : | | |
| 433: 11 | Q:  I'd like to show you a document that | | |
| 433: 12 | we have like as Nies Exhibit 1010. | | |
| 433: 13 | - - - | | |
| 433: 14 | (Whereupon, Deposition Exhibit | | |
| 433: 15 | Nies-1010, 'Cardiovascular Pharmacology | | |
| 433: 16 | of Nonselective Nonsteroidal | | |
| 433: 17 | Anti-Inflammatory Drugs and Coxibs: | | |
| 433: 18 | Clinical Considerations,' The American | | |

| | Objection/Response in Barnett |
|---|---|
| 433: 19   Journal of Cardiology  89(6A)   March 21, | |
| 433: 20   2002, 26D-32D, (Garret FitzGerald), was | |
| 433: 21   marked for identification.) | |
| 433: 22   - - - | |
| 433: 23   BY MR. RABER:   : | |
| 433: 24   Q:  Dr. Nies, can you please identify | |
| 433: 25   this exhibit? | |
| 434: 1   A:  This is a publication by Garret | |
| 434: 2   FitzGerald in the American Journal of Cardiology in | |
| 434: 3   2002 on the 'Cardiovascular Pharmacology of | |
| 434: 4   Nonselective Nonsteroidal Anti-inflammatory Drugs | |
| 434: 5   and Coxibs: Clinical Considerations.' | |
| 434: 6   Q:  What does this article deal with? | |
| 434: 7   A:  This article deals with the | |
| 434: 8   prostacyclin hypothesis that we've talked about and | |
| 434: 9   also the clinical data that exists at the time of | |
| 434: 10   this article to determine whether the hypothesis was | |
| 434: 11   valid. | |
| 434: 12   Q:  Dr. Nies, I'd ask you, if you would, | |
| 434: 13   please, to turn to page 31D of this exhibit. | |
| 434: 14   A:   (Witness complies.) | |
| 434: 15   Okay. | |
| 434: 16   Q:  About halfway down the page in the | |
| 434: 17   left-hand column, it says, 'However' -- | |

**434:2 - 434:22**     Nies, Alan 2005-04-01

| 434: 20   Q:  -- 'for the present, the perception | |
| 434: 21   of a cardiovascular hazard in humans exceeds the | |
| 434: 22   evidential basis for this notion.' Do you see that? | |

**434:2 - 435:1**     Nies, Alan 2005-04-01

| 434: 24   THE WITNESS: Yes. | |
| 434: 25   BY MR. RABER:   : | |
| 435: 1   Q:  What does that mean? | Plf. Obj:  702, 703, improper expert opinion undisclosed expert opinion |

**435:3 - 435:22**     Nies, Alan 2005-04-01

| 435: 3   THE WITNESS:  It means to me reading | Def.  Resp: applies only to 435:1-6: |
| 435: 4   this article that there was -- that the evidence for | Witness is a medical doctor |
| 435: 5   cardiovascular hazard wasn't there, didn't exist, | and clinical pharmacologist |
| 435: 6   that the perception was greater than the evidence. | who taught, worked, and |
| 435: 7   BY MR. RABER:   : | studied in field for 4 |
| 435: 8   Q:  Dr. Nies, can you tell from looking | decades.  Was executive |
| 435: 9   at this what month in 2002 this was published? | director and head of |
| 435: 10   A:  It was published in March of 2002. | Merck's clinical |
| 435: 11   Q:  Was that before or after the results | |

| | | **Objection/Response in Barnett** | |
|---|---|---|---|
| 435: 12 | of the VIGOR study had come out? | pharmacology dept, and | |
| 435: 13 | A:  It was -- well, it was after the | also was head of Vioxx | |
| 435: 14 | results of the VIGOR study. | project team during development. | |
| 435: 15 | Q:  Let's go back, if we can. I want to | | |
| 435: 16 | take you back in time to the new drug application | | |
| 435: 17 | for Vioxx. When did Merck file its new drug | | |
| 435: 18 | application for Vioxx? | | |
| 435: 19 | A:  At the end of 1998. | | |
| 435: 20 | Q:  How did the number of studies and the | | |
| 435: 21 | amount of data for Vioxx compare with the new drug | | |
| 435: 22 | applications for other Merck drugs? | | |

**436:2   -   437:4**          Nies, Alan 2005-04-01

| | | | |
|---|---|---|---|
| 436: 2 | THE WITNESS:  At the time, it was the | | |
| 436: 3 | largest NDA that Merck had -- in terms of numbers of | | |
| 436: 4 | patients on drug and time of patients on drug that | | |
| 436: 5 | Merck had ever submitted to the FDA. | | |
| 436: 6 | BY MR. RABER:   : | | |
| 436: 7 | Q:  Were you the head of the Vioxx | | |
| 436: 8 | project team when the new drug application was | | |
| 436: 9 | submitted -- | | |
| 436: 10 | A:  Yes. | | |
| 436: 11 | Q:  -- to the FDA? | | |
| 436: 12 | A:  Yes, I was. | | |

| | | | |
|---|---|---|---|
| 436: 13 | Q:  About how many studies were included | Plf. Obj:  602, lack of foundation | |
| 436: 14 | in the new drug application that was submitted to | Def Resp:  Witness is a medical doctor | |
| 436: 15 | the FDA? | and clinical pharmacologist | |
| 436: 16 | A:  There's close to 70, between 60 and | who taught, worked, and | |
| 436: 17 | 70 studies. | studied in field for 4 | |
| 436: 18 | Q:  About how many patients were included | decades.  Was executive | |
| 436: 19 | in those studies? | director and head of | |
| 436: 20 | A:  Well, patients and volunteers in the | Merck's clinical | |
| 436: 21 | studies would be close to 10,000. | pharmacology dept, and | |
| 436: 22 | Q:  How long did the studies that were | also was head of Vioxx | |
| 436: 23 | included in the new application last? What was the | project team during development. | |
| 436: 24 | range in time of those studies? | | |
| 436: 25 | A:  Well, they went up to a | | |
| 437: 1 | year-and-a-half. The studies actually went for a | | |
| 437: 2 | year, but some of the patients continued on drug | | |
| 437: 3 | beyond the end of the study. And some of the | | |
| 437: 4 | studies were short, of course. | | |

**437:9   -   439:14**          Nies, Alan 2005-04-01

| | | | |
|---|---|---|---|
| 437: 9 | Q:  How short, on the short end of the | | |

| | Objection/Response in Barnett | |
|---|---|---|
| 437: 10   studies that were submitted? | | |
| 437: 11   A: Well, in Phase I, when you're looking | | |
| 437: 12   at small doses of drug, the studies will be a week, | | |
| 437: 13   couple weeks. | | |
| 437: 14   Q: Dr. Nies, can you tell us what kind | | |
| 437: 15   of doses were used in the studies that were | | |
| 437: 16   submitted with the new drug application, the range? | | |
| 437: 17   A: We studied doses up to over 1,200 | | |
| 437: 18   milligrams a day. | | |
| 437: 19   Q: What was the most common dosage for | | |
| 437: 20   Vioxx after it was approved? | | |
| 437: 21   A: 25 milligrams. | | |
| 437: 22   Q: A little while ago we talked about | | |
| 437: 23   this FitzGerald prostacyclin study at some length. | | |
| 437: 24   Was that study given to the FDA with the new drug | | |
| 437: 25   application? | | |
| 438: 1   A: Yes. | | |
| 438: 2   Q: What about the remaining 65, 67 | | |
| 438: 3   studies, were they given to the FDA, too? | | |
| 438: 4   A: All of the studies were given to the | | |
| 438: 5   FDA, yes, all of the data and the studies. | | |
| 438: 6   Q: Dr. Nies, I'd like to show you a | | |
| 438: 7   document that has been like as Nies Exhibit 1011. | | |
| 438: 8   - - - | | |
| 438: 9   (Whereupon, Deposition Exhibit | | |
| 438: 10   Nies-1011, 'E. Clinical Safety,' MK-0966 | | |
| 438: 11   Clinical Documentation, (E-1 - E331), | | |
| 438: 12   was marked for identification.) | | |
| 438: 13   - - - | | |
| 438: 14   BY MR. RABER:   : | | |
| 438: 15   Q: Dr. Nies, can you identify Exhibit | | |
| 438: 16   1011? | | |
| 438: 17   A: This is what is called an integrated | | |
| 438: 18   summary of safety. It's part of the NDA. It's part | | |
| 438: 19   of the summary of the NDA, and it summarizes | | |
| 438: 20   results. | | |
| 438: 21   Q: Was this integrated summary of safety | | |
| 438: 22   for Vioxx provided to the FDA with the new drug | | |
| 438: 23   application? | | |
| 438: 24   A: Yes. This is part of it. | | |
| 438: 25   Q: What was the purpose of preparing the | | |
| 439: 1   integrated summary of safety? | | |
| 439: 2   A: Well, the purpose is to pull together | | |

| | **Objection/Response in Barnett** | |
|---|---|---|
| 439: 3　all of the studies from all of the patients in the<br>439: 4　studies and to look at the consolidated or the<br>439: 5　integrated experience to determine whether there are<br>439: 6　any signals in terms of safety that need to be<br>439: 7　raised to FDA's concern.<br>439: 8　Q:  Is there any portion of this<br>439: 9　integrated summary of safety that analyzes the data<br>439: 10　for the risk of heart attack and stroke?<br>439: 11　A:  Yes. I think because of the issues<br>439: 12　that we've talked about, it's not always true in all<br>439: 13　drugs that we would have a separate area for heart<br>439: 14　attacks and stroke, but for this drug we did. | | |
| **439:2  -  439:22**　　　Nies, Alan 2005-04-01 | | |
| 439: 21　In this integrated summary of safety,<br>439: 22　were the results of each specific study analyzed? | | |
| **439:2  -  443:9**　　　Nies, Alan 2005-04-01 | | |
| 439: 24　THE WITNESS:  The purpose of this<br>439: 25　document is to consolidate those results so that one<br>440: 1　doesn't look at each small study individually, but<br>440: 2　consolidates the data so that one can get an overall<br>440: 3　picture of what's happening.<br>440: 4　BY MR. RABER:   :<br>440: 5　Q:  Why did you do it that way?<br>440: 6　A:  Well, because each study, the numbers<br>440: 7　of events are not large enough to make any<br>440: 8　conclusions, regardless of which way they look. You<br>440: 9　need to get the consolidated data in order to get a<br>440: 10　bigger picture and more power. | | |
| 440: 11　Q:  Can you give us an idea about how the<br>440: 12　entire body of data that went with the new drug<br>440: 13　application compared to this integrated summary of<br>440: 14　safety in terms of volume?<br>440: 15　A:  Oh, this is a tiny part of it. There<br>440: 16　are literally a truckload of documents. Every piece<br>440: 17　of raw data that is -- every piece of data goes to<br>440: 18　the FDA so they can do all of their own analyses as<br>440: 19　well. | Plf. Obj:  602, lack of<br>foundation, 403 "truckload"<br><br>Def Resp: applies only to<br>440:11-19:  "Truckload" is not<br>a prejudicial term.<br>Witness is a medical doctor<br>and clinical pharmacologist<br>who taught, worked, and<br>studied in field for 4 | |
| 440: 20　Q:  Returning back to Exhibit 1011, what<br>440: 21　did the data show about the risks of heart attack<br>440: 22　and stroke for Vioxx?<br>440: 23　A:  The data presented in the NDA did not<br>440: 24　show an increased risk with Vioxx when compared | decades.  Was executive<br>director and head of<br>Merck's clinical<br>pharmacology dept, and<br>also was head of Vioxx | |

project team during development.

| | |
|---|---|
| 440: 25 | either to placebo or to the nonsteroidal |
| 441: 1 | anti-inflammatory drugs that were used as |
| 441: 2 | comparators in studies. |
| 441: 3 | Q:  What were the nonsteroidal |
| 441: 4 | anti-inflammatory drugs that Vioxx was compared to |
| 441: 5 | in this analysis? |
| 441: 6 | A:  The major ones were diclofenac and |
| 441: 7 | ibuprofen. |
| 441: 8 | Q:  Was there also data comparing Vioxx |
| 441: 9 | against placebo? |
| 441: 10 | A:  Yes, there's data against placebo. |
| 441: 11 | Q:  What did that data show? |
| 441: 12 | A:  Well, the data also against placebo |
| 441: 13 | also did not show any increased risk. Although |
| 441: 14 | there was less data against placebo than with the |
| 441: 15 | comparators. |
| 441: 16 | Q:  Did the FDA approve Vioxx for sale in |
| 441: 17 | the United States? |
| 441: 18 | A:  Yes, it did. |
| 441: 19 | Q:  When did that happen? |
| 441: 20 | A:  That happened in May of '99. |
| 441: 21 | Q:  What were the approved uses for Vioxx |
| 441: 22 | at that time? |
| 441: 23 | A:  Vioxx was approved for |
| 441: 24 | osteoarthritis, the treatment of osteoarthritis, for |
| 441: 25 | treatment of acute pain and for menstrual cramps. |
| 442: 1 | Q:  Dr. Nies, I want to change the |
| 442: 2 | subject here, and I want to talk about something |
| 442: 3 | called a GI outcomes trial. Okay? |
| 442: 4 | A:  Uh-huh. |
| 442: 5 | Q:  I want to show you a document that |
| 442: 6 | has been like as Nies Exhibit 1012. |
| 442: 7 | A:  Right. |
| 442: 8 | - - - |
| 442: 9 | (Whereupon, Deposition Exhibit |
| 442: 10 | Nies-1012, Memo, 11-21-96, 'Anticipated |
| 442: 11 | consequences of NSAID antiplatelet |
| 442: 12 | effects on cardiovascular events and |
| 442: 13 | effects of excluding low-dose aspirin |
| 442: 14 | use in the Cox-2 GI Outcomes Megatrial,' |
| 442: 15 | MRK-NJ0084764 - MRK-NJ0084771, was |
| 442: 16 | marked for identification.) |
| 442: 17 | - - - |

| | Objection/Response in Barnett |
|---|---|

442: 18    BY MR. RABER:   :

442: 19    Q:  Dr. Nies, can you please identify

442: 20    this exhibit?

442: 21    A:  This is a memo, it's dated November

442: 22    21st, 1996, to Beth Friedman, myself and Reynold

442: 23    Spector from Tom Musliner.

442: 24    Q:  Did you receive this memo at or about

442: 25    that time?

443: 1    A:  Yes.

443: 2    Q:  What is the subject of this memo?

443: 3    A:  This memo is titled, the 'Anticipated

443: 4    consequences of NSAID antiplatelet effects on

443: 5    cardiovascular events and effects of excluding

443: 6    low-dose aspirin use in the COX-2 GI Outcomes

443: 7    Megatrial.'

443: 8    Q:  Why did the memo talk about excluding

443: 9    low-dose aspirin from the GI outcomes trial?

**443:1   -   444:5**            Nies, Alan 2005-04-01

443: 12    THE WITNESS:  The GI outcomes trial,

443: 13    what that trial was meant to look at was the effects

443: 14    of a COX-2 inhibitor on the stomach, whether it

443: 15    caused ulcers, bleeds, perforations, and comparing

443: 16    that with a standard NSAID, and the hypothesis being

443: 17    that Vioxx would be safer than the standard NSAID.

443: 18    If aspirin was included in the trial,

443: 19    aspirin has effects on the stomach to cause ulcers,

443: 20    bleeds. And so that would confound the data and

443: 21    would not make a clean study. So, for a clinical

443: 22    study of trying to look at the effects of Vioxx on

443: 23    the stomach, if you had aspirin in there, you

443: 24    wouldn't be able to tell for sure what Vioxx alone

443: 25    was doing.

444: 1    BY MR. RABER:   :

444: 2    Q:  Dr. Nies, what does the reference to

444: 3    'Anticipated consequences of NSAID antiplatelet

444: 4    effects on cardiovascular events' mean? What does

444: 5    that mean?

**444:8   -   445:19**            Nies, Alan 2005-04-01

444: 8    THE WITNESS:  The NSAIDs have

444: 9    anti-platelet effects, and some of them have effects

444: 10    that are, in some ways, similar to aspirin. And

444: 11    were those effects to be present in this study and

<u>**Objection/Response in Barnett**</u>

444: 12   the patients -- it was known at that time that
444: 13   aspirin was beneficial to prevent heart attacks, and
444: 14   the subject here is that NSAIDs could have that
444: 15   effect. And so, if one were to compare Vioxx versus
444: 16   an NSAID, the NSAIDs might reduce the incidence of
444: 17   heart attack, and that might give a, you know,
444: 18   misimpression when you looked at the two data that
444: 19   Vioxx was actually increasing the risk of heart
444: 20   attack.
444: 21   BY MR. RABER:   :
444: 22   Q:  Dr. Nies, I'd ask you, if you would,
444: 23   please, to turn to Page 4.
444: 24   A:   (Witness complies.)
444: 25   Q:  About two-thirds down the page, it
445: 1   says, 'Assumptions underlying these numbers
445: 2   the following: (a) Patients treated with standard
445: 3   NSAIDs will experience antiplatelet effects and
445: 4   resultant CV protection similar to that produced by
445: 5   aspirin. (There are good theoretical arguments, as
445: 6   well as limited clinical data to support this
445: 7   assumption.)
445: 8   '(b)  The degree of reduction in fatal
445: 9   and non-fatal CV events in the NSAID group will be
445: 10   comparable to that observed with aspirin treatment
445: 11   (i.e., 25%  -- see above).
445: 12   '(c)  Patients treated with the
445: 13   selective COX-2 inhibitor will experience neither a
445: 14   reduction nor an increase in CV events associated
445: 15   with this therapy.'
445: 16   Do you see that?
445: 17   A:  Yes.
445: 18   Q:  What is the selective COX-2 inhibitor
445: 19   that he was referring to?

**445:2   -   445:22**       Nies, Alan 2005-04-01
445: 22   THE WITNESS:  Vioxx.

**445:2   -   445:25**       Nies, Alan 2005-04-01
445: 24   Q:  What does 'CV' mean where it says,
445: 25   'CV protection,' 'CV events'?

**446:2   -   446:2**       Nies, Alan 2005-04-01
446: 2   THE WITNESS:  Cardiovascular.

**446:5   -   448:3**       Nies, Alan 2005-04-01

| | **Objection/Response in Barnett** | |
|---|---|---|
| 446: 5   Q:  Are we talking about heart attacks<br>446: 6   and strokes there?<br>446: 7   A:  Yes. | | |
| 446: 8   Q:  Dr. Nies, after looking at this memo,<br>446: 9   what was your understanding of Dr. Musliner's<br>446: 10   conclusion about the CV risks of Vioxx?<br>446: 11   A:  Well, he had said that the Vioxx, he<br>446: 12   had assumed would be neutral, that is, that it would<br>446: 13   not have a pro or anti effects to affect the<br>446: 14   cardiovascular risk. | Plf. Obj:  Hearsay, 602, 702, 703<br><br>Def Resp: Memo was sent to Dr. Nies<br>at time.  Not offered for truth.<br>Offered to show witness's<br>understanding.  Not<br>improper expert opinion since<br>Dr. Nies is an expert in this area | |
| 446: 15   Q:  Besides a GI outcomes trial, did<br>446: 16   Merck ever do any studies to show the GI benefits of<br>446: 17   Vioxx?<br>446: 18   A:  Well, at the time of filing, we had<br>446: 19   what we thought was pretty convincing data, even at<br>446: 20   that time, that Vioxx was safer for the stomach.<br>446: 21   Those data included endoscopy trials where we had<br>446: 22   looked directly at the stomach comparing treating<br>446: 23   with Vioxx versus an NSAID, an aspirin, showing big<br>446: 24   differences in terms of ulcers and bleeds. We also<br>446: 25   had the clinical data from all of our combined Phase<br>447: 1   IIb/III data, which were one of the adverse<br>447: 2   experiences that would happen during these studies<br>447: 3   would be ulcers, and there was fewer ulcers or<br>447: 4   bleeds or serious events in the Vioxx group versus<br>447: 5   the NSAID group.<br>447: 6   Q:  Exactly what is an endoscopy study?<br>447: 7   A:  Well, endoscopy is where one can put<br>447: 8   a tube down through the mouth looking directly into<br>447: 9   the stomach with a camera. And what was done in<br>447: 10   those studies is that individuals would be given<br>447: 11   drug for a certain period of time, whether it be an<br>447: 12   NSAID or aspirin or Vioxx, and at the end of that<br>447: 13   period of time or during that period of time, one<br>447: 14   could look down into the stomach and see what the<br>447: 15   effects directly in the stomach were. | | |
| 447: 16   Q:  What did those endoscopy studies show<br>447: 17   about Vioxx and GI risks?<br>447: 18   A:  Well, Vioxx was very close to placebo<br>447: 19   in those studies and very different from the NSAIDs,<br>447: 20   from the other nonselective NSAIDs.<br>447: 21   Q:  Better or worse?<br>447: 22   A:  Well, it was more like placebo. It | Plf. Obj:  602, lack of<br>foundation, 702, 703,<br>improper/undisclosed<br>expert opinion<br><br>Def Resp:  No lack of foundation.<br>Dr. Nies was head of<br>Vioxx project development team | |

| | **Objection/Response in Barnett** | |
|---|---|---|

447: 23    was safer.

447: 24    Q: Well, when the FDA approved Vioxx,

447: 25    did they allow Merck to say in its label that Vioxx

448: 1    was safer for the stomach than the other pain

448: 2    relievers?

448: 3    A: No. They would not allow that.

**448:9 - 448:9**      Nies, Alan 2005-04-01

448: 9    Q: Did they ever tell you why not?

**448:1 - 448:11**      Nies, Alan 2005-04-01

448: 11    THE WITNESS: Yes.

**448:1 - 448:23**      Nies, Alan 2005-04-01

448: 16    THE WITNESS: They thought that --

448: 17    well, they thought the endoscopy trials were

448: 18    surrogate markers, that is, it wasn't real clinical

448: 19    data. Even though it is in patients and you're

448: 20    looking directly at the stomach, it wasn't clinical

448: 21    bleeding, people, you know, vomiting blood, that

448: 22    sort of thing. And so they thought that we should

448: 23    do -- that that just wasn't going to be enough.

**448:2 - 449:2**      Nies, Alan 2005-04-01

448: 25    Q: Did the FDA make any suggestions

449: 1    about what would be necessary if Merck wanted to

449: 2    in its label that Vioxx was better for the stomach?

**449:5 - 449:12**      Nies, Alan 2005-04-01

449: 5    THE WITNESS: When we first met with

449: 6    them, they did not have such suggestions. We had

449: 7    suggested doing a large GI outcomes trial. They

449: 8    didn't feel at that time that even that would allow

449: 9    them to do anything about the label.

449: 10    BY MR. RABER:  :

449: 11    Q: Did the FDA's view change at some

449: 12    point?

**449:1 - 450:22**      Nies, Alan 2005-04-01

449: 15    THE WITNESS: In our continuing

449: 16    dialogue with the FDA, they did change, and they

449: 17    decided after a while that Merck was correct, that

449: 18    is, we should be doing an outcomes trial.

449: 19    BY MR. RABER:  :

449: 20    Q: What did Merck do then?

449: 21    A: Merck did a GI outcomes trial.

449: 22    Q: What was the name of that GI outcomes

| | | **Objection/Response in Barnett** | |
|---|---|---|---|
| 449: 23 | trial? | | |
| 449: 24 | A:  It was called VIGOR. | | |
| 449: 25 | Q:  Now, Dr. Nies, were patients in the | Plf. Obj:  Leading | |
| 450: 1 | VIGOR trial allowed to take aspirin? | Def Resp:  N4148Not leading -- that is an | |
| 450: 2 | A:  No, they weren't. | open-ended question. | |
| 450: 3 | Q:  What was the patient population of | | |
| 450: 4 | the people who were in the VIGOR study? | | |
| 450: 5 | A:  It was a study in patients with | | |
| 450: 6 | rheumatoid arthritis. | | |
| 450: 7 | Q:  What were the doses of those | | |
| 450: 8 | medications in the study? | | |
| 450: 9 | A:  Vioxx was given at a dose of 50 | | |
| 450: 10 | milligrams a day, that is, and naproxen, which was | | |
| 450: 11 | the comparator NSAID in the study, was given at a | | |
| 450: 12 | dose of 500 milligrams twice a day. | | |
| 450: 13 | Q:  How did the dose of Vioxx of 50 | | |
| 450: 14 | milligrams compare with the recommended long-term | | |
| 450: 15 | dose? | | |
| 450: 16 | A:  The recommended long-term dose of | | |
| 450: 17 | Vioxx when it was approved was 12-and-a-half to 25 | | |
| 450: 18 | milligrams. | | |
| 450: 19 | Q:  Did Merck collect data for heart | | |
| 450: 20 | attacks and strokes under the standard operating | | |
| 450: 21 | procedure in the VIGOR trial? | | |
| 450: 22 | A:  Yes. | | |
| **451:1  -  453:3** | Nies, Alan 2005-04-01 | | |
| 451: 11 | Q:  Dr. Nies, was the FDA consulted as to | | |
| 451: 12 | the design of the VIGOR study? | | |
| 451: 13 | A:  Yes. | | |
| 451: 14 | Q:  When did Merck receive the results of | | |
| 451: 15 | the VIGOR study? | | |
| 451: 16 | A:  In 2000. | | |
| 451: 17 | Q:  Did Merck send the results of the | | |
| 451: 18 | VIGOR trial to the FDA? | | |
| 451: 19 | A:  Yes. | | |
| 451: 20 | Q:  When? | | |
| 451: 21 | A:  Basically as soon as they were | | |
| 451: 22 | analyzed. | | |
| 451: 23 | Q:  Let's talk first about the GI stomach | | |
| 451: 24 | results. What did those results show? | | |
| 451: 25 | A:  VIGOR -- the trial showed that the | | |
| 452: 1 | incidence of complicated ulcers, that is, those that | | |

| | **Objection/Response in Barnett** | |
|---|---|---|
| 452: 2   bleed or perforate, was significantly less in the | | |
| 452: 3   Vioxx group versus the naproxen group. | | |
| 452: 4   Q: What was your reaction to those | | |
| 452: 5   results? | | |
| 452: 6   A: Oh, it was -- this actually supported | | |
| 452: 7   the hypothesis of the whole COX-2 development | | |
| 452: 8   program. | | |
| 452: 9   Q: What were the results with regard to | | |
| 452: 10   cardiovascular events in the VIGOR trial? | | |
| 452: 11   A: The cardiovascular -- there was a | | |
| 452: 12   disparity in the groups in terms of cardiovascular | | |
| 452: 13   events, and there was -- in the naproxen group, a | | |
| 452: 14   reduced number -- or there were less cardiovascular | | |
| 452: 15   events in the naproxen group than in the Vioxx | | |
| 452: 16   group. | | |
| 452: 17   Q: What was your reaction to those | | |
| 452: 18   cardiovascular results? | | |
| 452: 19   A: Well, it was something that we needed | Plf. Obj: Hearsay | |
| 452: 20   to explore, because this was something that, | Def Resp: Not offered for truth. | |
| 452: 21   although not entirely unexpected, Tom Musliner had | Offered to show it was said and the | |
| 452: 22   actually predicted this might happen. We wanted to | basis for Merck's belief in the | |
| 452: 23   make sure that he was correct, that is, that it was | Naproxen hypothesis. | |
| 452: 24   the naproxen that was reducing the events rather | | |
| 452: 25   than Vioxx increasing the events. | | |
| 453: 1   Q: Did you worry about this? | | |
| 453: 2   A: We wanted to find out whether Vioxx | | |
| 453: 3   increased cardiovascular events. | | |
| **453:7 - 454:1**     Nies, Alan 2005-04-01 | | |
| 453: 7   Q: Were you concerned about it? | Plf. Obj: Non-responsive | |
| 453: 8   A: We were concerned, yeah. We wanted | Def Resp: The question was "were you | |
| 453: 9   to know. Patient safety was our primary concern. | concerned about it," and the witness says yes. | |
| 453: 10   Q: What did you do to deal with those | | |
| 453: 11   concerns? | | |
| 453: 12   A: At this time now, we're a year after | | |
| 453: 13   our filing or more, and we had already set up some | | |
| 453: 14   other clinical studies which we also had used the | | |
| 453: 15   SOP, the cardiovascular monitoring SOP, and these | | |
| 453: 16   studies were in patients who had Alzheimer's or | | |
| 453: 17   pre-Alzheimer's. They were elderly and they were -- | | |
| 453: 18   in that study, we were able to give Vioxx, which | | |
| 453: 19   there was some evidence that it might help, that | | |
| 453: 20   NSAIDs or Vioxx might help Alzheimer's at the time, | | |

| | | **Objection/Response in Barnett** | |
|---|---|---|---|

453: 21    there was evidence for that, and we were able to
453: 22    compare it with placebo. So, we had data in those
453: 23    studies of Vioxx versus placebo, and in those
453: 24    studies we had prespecified our definitions for
453: 25    cardiovascular events and collected cardiovascular
454: 1    events. So, we looked at those studies.

**454:9   -   454:10**    Nies, Alan 2005-04-01

454: 9    Q:  Let me ask you this.
454: 10    Did you review the Alzheimer's data?

**454:1   -   456:18**    Nies, Alan 2005-04-01

454: 14    Q:  Shortly after the VIGOR study?
454: 15    A:  I was part of the team that was
454: 16    involved in all of these discussions. The review
454: 17    was actually done by the epidemiology department.
454: 18    Q:  Are you familiar with what the
454: 19    Alzheimer's data showed at that time?
454: 20    A:  At that time, it did not show that
454: 21    Vioxx was different from placebo in terms of
454: 22    cardiovascular risk, that is, heart attacks and
454: 23    strokes. So, comparing over the time period of
454: 24    VIGOR, that is, nine months or longer in these
454: 25    patients, there wasn't evidence that Vioxx was
455: 1    increasing cardiovascular events.
455: 2    Q:  Why was that significant?
455: 3    A:  Well, from VIGOR, you can't tell what
455: 4    is going on because it had been predicted that the
455: 5    NSAIDs could reduce the incidence of heart attacks,
455: 6    it had been hypothesized that Vioxx might increase
455: 7    heart attacks, and so in VIGOR, we had this
455: 8    disparity, and yet, there's no way, because of only
455: 9    the two arms that are there, the naproxen versus
455: 10    Vioxx, that would allow a definitive conclusion.
455: 11    So, the only way to really look at
455: 12    that would be to compare with the placebo. And the
455: 13    biggest placebo database that we had were those
455: 14    Alzheimer's studies.

| | |
|---|---|
| 455: 15  Q:  Other than looking at the placebo | Plf. Obj:  602, lacks |
| 455: 16  data, what else did Merck do to deal with its | foundation, hearsay |
| 455: 17  concerns or its reaction to the VIGOR results? | Def Resp:  There is foundation |
| 455: 18  A:  We actually compiled all of our data | because witness was |
| 455: 19  again, looked at all of the data, including the | head of Vioxx project |
| 455: 20  Phase IIb/III data, comparing with other NSAIDs | development team.  Not |

| | | | **Objection/Response in Barnett** | |
|---|---|---|---|---|
| 455: 21 | other than naproxen, and that didn't show any signal | | hearsay.  Witness is | |
| 455: 22 | either. We then looked at our data that we had with | | describing what he and | |
| 455: 23 | naproxen that we'd developed on its anti-platelet | | his team actually did. | |
| 455: 24 | effects and -- | | | |
| 455: 25 | Q:  What did that show? | | | |
| 456: 1 | A:  Naproxen had anti-platelet effects | | | |
| 456: 2 | that were the equivalent to aspirin, if it was taken | | | |
| 456: 3 | at 500 milligrams twice a day. | | | |
| 456: 4 | Q:  Is that how it was taken during the | | | |
| 456: 5 | VIGOR trial? | | | |
| 456: 6 | A:  That's how it was taken during the | | Plf. Obj:  Non-responsive, | |
| 456: 7 | VIGOR trial. And when taken that way, it suppressed | | cumulative | |
| 456: 8 | the platelet function and the production of | | Def Resp:  It is responsive | |
| 456: 9 | thromboxane equivalently to aspirin. | | | |
| 456: 10 | Q:  Dr. Nies, what conclusions did you | | Plf. Obj:  Hearsay - what | |
| 456: 11 | reach after reviewing all of that data that you've | | data?  702, 703, improper/undisclosed | |
| 456: 12 | just described? | | expert opinion. | |
| 456: 13 | A:  Well, when we reviewed all of the | | Def Resp: applies only to | |
| 456: 14 | clinical data and also had the pharmacologic | | 456:10-18:  Not hearsay. | |
| 456: 15 | foundation of naproxen acting like aspirin, we | | He's being asked what | |
| 456: 16 | concluded that the weight of the evidence was that | | conclusions he reached. | |
| 456: 17 | naproxen was actually protecting rather than Vioxx | | Witness is a medical doctor | |
| 456: 18 | causing an increase in risk. | | and clinical pharmacologist | |
| **457:1** - **457:21** | Nies, Alan 2005-04-01 | | who taught, worked, and | |
| 457: 1 | Q:  Dr. Nies, let me ask you this: | | studied in field for 4 | |
| 457: 2 | Were there any controlled clinical | | decades.  Was executive | |
| 457: 3 | trials showing that naproxen protects the heart as | | director and head of | |
| 457: 4 | well as aspirin at that time? | | Merck's clinical | |
| 457: 5 | A:  No. | | pharmacology dept, and | |
| 457: 6 | Q:  Did that raise doubts in your mind | | also was head of Vioxx | |
| 457: 7 | that naproxen was the explanation for the VIGOR | | project team during development. | |
| 457: 8 | results? | | | |
| 457: 9 | A:  Well, no. | | | |
| 457: 10 | Q:  Why not? | | | |
| 457: 11 | A:  No trials had ever been done, so, | | | |
| 457: 12 | there was no evidence one way or another on that. | | | |
| 457: 13 | Q:  Why didn't the absence of controlled | | Plf. Obj:  Hearsay - what evidence? 702, | |
| 457: 14 | clinical trials on this question raise doubts? | | 703, undisclosed/improper expert opinion | |
| 457: 15 | A:  Well, because we had the other pieces | | Def Resp:  Not hearsay. No out-of-court | |
| 457: 16 | of evidence that I talked about, that is, that Vioxx | | statement offered for truth.  Same response | |
| 457: 17 | compared to placebo did not have an effect, and, | | as above re witness is a medical doctor… | |
| 457: 18 | therefore, it seemed clean in that setting, and we | | and dep was also taken 1 year ago, so | |

| | | **Objection/Response in Barnett** | |
|---|---|---|---|
| 457: 19 | had the pharmacologic data on naproxen that it | not clear what Plaintiff means when argues | |
| 457: 20 | looked like aspirin, and so we felt that the | "undisclosed expert opinion" | |
| 457: 21 | evidence really did support the naproxen hypothesis. | | |
| **457:2 - 458:2** | Nies, Alan 2005-04-01 | | |
| 457: 25 | Q: Did you feel that way? | Plf. Obj: Cumulative | |
| 458: 1 | A: I felt that way. It's the royal 'we' | Def Resp: It is not cumulative | |
| 458: 2 | that I'm using here. | | |
| **458:7 - 458:21** | Nies, Alan 2005-04-01 | | |
| 458: 7 | Q: Dr. Nies, let me ask you this. | Plf. Obj: 403, 401, 402, relevance | |
| 458: 8 | Before the VIGOR trial, had you ever | | |
| 458: 9 | taken Vioxx? | Def Resp: Relevant because plf | |
| 458: 10 | A: Yes. | claims Nies and Merck | |
| 458: 11 | Q: For what condition? | believed Vioxx was | |
| 458: 12 | A: I have an old back injury, and I have | dangerous. Relevant | |
| 458: 13 | chronic low back pain. | to show Nies' mental | |
| 458: 14 | Q: What type of usage did you have with | state. Also, not | |
| 458: 15 | Vioxx? | prejudicial. | |
| 458: 16 | A: I would take it -- I would take 25 | | |
| 458: 17 | milligrams a day for a period of maybe a month to | | |
| 458: 18 | six weeks. And when the back pain no longer was | | |
| 458: 19 | aggravating as much, I would actually stop it. So, | | |
| 458: 20 | I would take it sort of intermittently, I guess | | |
| 458: 21 | you'd say. | | |
| **459:4 - 459:6** | Nies, Alan 2005-04-01 | | |
| 459: 4 | Q: Dr. Nies, after the VIGOR results | | |
| 459: 5 | came out, did you stop taking Vioxx? | | |
| 459: 6 | A: No. | | |
| **459:7 - 459:21** | Nies, Alan 2005-04-01 | | |
| 459: 7 | Q: Dr. Nies, did you discuss the theory | | |
| 459: 8 | about naproxen acting to protect the heart with any | | |
| 459: 9 | experts in the field? | | |
| 459: 10 | A: Yes, we did. | | |
| 459: 11 | Q: With whom? | | |
| 459: 12 | A: Well, we discussed this with Garret | | |
| 459: 13 | FitzGerald, with John Oates, Carlo Patrono, the | | |
| 459: 14 | people I've talked about before. | | |
| 459: 15 | Q: Can you please remind us who Dr. | | |
| 459: 16 | Patrono is? | | |
| 459: 17 | A: Patrono is the Italian pharmacologist | | |
| 459: 18 | that is an expert in platelets. | | |
| 459: 19 | Q: Are you familiar with what Dr. | | |

| | **Objection/Response in Barnett** | |
|---|---|---|
| 459: 20  Patrono's first reaction was to the VIGOR results as<br>459: 21  far as naproxen is concerned? | | |
| **459:2 - 460:2**  Nies, Alan 2005-04-01 | | |
| 459: 24  THE WITNESS:  He didn't believe that<br>459: 25  that was a likely explanation.<br>460: 1  BY MR. RABER:   :<br>460: 2  Q:  What did he believe? | | |
| **460:4 - 460:10**  Nies, Alan 2005-04-01 | | |
| 460: 4  THE WITNESS:  His primary explanation<br>460: 5  for the results was that this was -- there was a<br>460: 6  small number of events, and this was chance.<br>460: 7  BY MR. RABER:   :<br>460: 8  Q:  How did you know that that was his<br>460: 9  view?<br>460: 10  A:  He told us that. | Plf. Obj:  Hearsay<br><br>Def Resp: Not being offered for<br>truth.  Offered simply to show that<br>is what Patrono said. | |
| **460:1 - 461:25**  Nies, Alan 2005-04-01 | | |
| 460: 15  Q:  Did Dr. Patrono do a study to<br>460: 16  determine whether his initial reaction about<br>460: 17  naproxen was right or wrong?<br>460: 18  A:  He has subsequently looked at this,<br>460: 19  yes.<br>460: 20  Q:  I'd like to show you a document that<br>460: 21  has been like as Nies Exhibit 1013.<br>460: 22  - - -<br>460: 23  (Whereupon, Deposition Exhibit<br>460: 24  Nies-1013, 'Clinical Pharmacology of<br>460: 25  Platelet, Monocyte, and Vascular<br>461: 1  Cyclooxygenase Inhibition by Naproxen<br>461: 2  and Low-Dose Aspirin in Healthy<br>461: 3  Subjects,' (Capone, et al.),<br>461: 4  Circulation.2004;109:1468-1471, Reprint,<br>461: 5  was marked for identification.)<br>461: 6  - - -<br>461: 7  BY MR. RABER:   :<br>461: 8  Q:  Dr. Nies, can you identify this<br>461: 9  exhibit, please?<br>461: 10  A:  This is a publication in the journal<br>461: 11  Circulation in 2004 by the Italian investigators,<br>461: 12  including Dr. Patrono.<br>461: 13  Q:  What is Circulation?<br>461: 14  A:  Circulation is a journal that's<br>461: 15  published by the American Heart Association, and it | | |

**Objection/Response in Barnett**

| | |
|---|---|
| 461: 16    is a cardiovascular journal. | |
| 461: 17    Q:  Dr. Nies, what is the date of this | |
| 461: 18    study? | |
| 461: 19    A:  It's 2004. I don't know that I | |
| 461: 20    have -- March 2004. | |
| 461: 21    Q:  Dr. Nies, would you please look at | |
| 461: 22    the first page of Exhibit 1013. | |
| 461: 23    A:  Okay. Yes. | |
| 461: 24    Q:  And read for us what it says about | |
| 461: 25    the background of this study. | |

**462:7   -   462:20**         Nies, Alan 2005-04-01

| | |
|---|---|
| 462: 7    THE WITNESS:  'Background. The | |
| 462: 8    current controversy on the potential | |
| 462: 9    cardioprotective effect of naproxen prompted us to | |
| 462: 10    evaluate the extent and duration of platelet, | |
| 462: 11    monocyte, and vascular cyclooxygenase inhibition by | |
| 462: 12    naproxen compared with low-dose aspirin.' | |
| 462: 13    BY MR. RABER:   : | |
| 462: 14    Q:  Is that what was being debated about | |
| 462: 15    the VIGOR results when the VIGOR results came | |
| 462: 16    A:  Yes. | |
| 462: 17    Q:  Dr. Nies, would you please look at | |
| 462: 18    the 'Conclusions' paragraph on the first page and | |
| 462: 19    read for us the first sentence of what Dr. Patrono's | |
| 462: 20    conclusions were after this study. | |

**462:2   -   463:7**         Nies, Alan 2005-04-01

| | |
|---|---|
| 462: 24    THE WITNESS:  'Conclusions - The | |
| 462: 25    regular administration of naproxen 500 milligrams | |
| 463: 1     BID,' that means twice a day, 'can mimic the | |
| 463: 2     antiplatelet COX-1 effects of low-dose aspirin.' | |
| 463: 3     BY MR. RABER:   : | |

| | |
|---|---|
| 463: 4    Q:  Dr. Nies, did you understand that | Plf. Obj:  Hearsay, 602, |
| 463: 5    conclusion by Dr. Patrono in March of 2004 to be the | lack of foundation |
| 463: 6    same as his initial reaction about naproxen or | Def Resp:  Asking for witness's |
| 463: 7    different? | understanding. |

**463:1   -   463:11**         Nies, Alan 2005-04-01

| | |
|---|---|
| 463: 10    THE WITNESS:  I didn't think it was | |
| 463: 11    the same. It looks like he's changed his mind. | |

**463:1   -   463:17**         Nies, Alan 2005-04-01

| | |
|---|---|
| 463: 13    Q:  Sir, were there any newspaper | Plf. Obj:  602, lack of foundation, speculative, |
| | best evidence. |
| 463: 14    articles about the VIGOR results? | Def Resp: Nies was head of Vioxx product |

| | | | **Objection/Response in Barnett** | |
|---|---|---|---|---|
| | 463: 15 | A:  I think so. | development so there is foundation | |
| | 463: 16 | Q:  Was there scientific debate about the | Plf Obj: 602, lack of foundation | |
| | 463: 17 | meaning of the VIGOR results? | Def Resp: Nies was head of | |
| **463:1   -   464:13** | | Nies, Alan 2005-04-01 | Vioxx product development | |
| | 463: 19 | THE WITNESS:  Yes. The results were | so there is foundation. | |
| | 463: 20 | presented at scientific meetings and were published. | | |
| | 463: 21 | BY MR. RABER:   : | | |
| | 463: 22 | Q:  Was the FDA a party to any of that | | |
| | 463: 23 | debate? | | |
| | 463: 24 | A:  Yes, they were. | | |
| | 463: 25 | Q:  Dr. Nies, what is an FDA Advisory | | |
| | 464: 1 | Committee? | | |
| | 464: 2 | A:  The FDA appoints advisors who are | | |
| | 464: 3 | external to the FDA to come periodically to meet and | | |
| | 464: 4 | advise them on various issues. | | |
| | 464: 5 | Q:  Who participates in an FDA Advisory | | |
| | 464: 6 | Committee? | | |
| | 464: 7 | A:  The committee itself is usually made | | |
| | 464: 8 | up of often academic, sometimes practicing | | |
| | 464: 9 | physicians, a variety of other people. But during | | |
| | 464: 10 | the meeting, it's an open meeting, so that there are | | |
| | 464: 11 | reporters there, there are lawyers there, there are | | |
| | 464: 12 | normal people there. Basically, it's an open | | |
| | 464: 13 | meeting. | | |
| **464:1   -   464:22** | | Nies, Alan 2005-04-01 | | |
| | 464: 17 | Dr. Nies, was there an FDA Advisory | | |
| | 464: 18 | Committee that related to the VIGOR study? | | |
| | 464: 19 | A:  Yes, there was. | | |
| | 464: 20 | Q:  When did that happen? | | |
| | 464: 21 | A:  That was in February, I think, of | | |
| | 464: 22 | 2002  -- 2001. 2001. | | |
| **465:9   -   466:5** | | Nies, Alan 2005-04-01 | | |
| | 465: 9 | Q:  I don't want you to guess. Did you | | |
| | 465: 10 | play any role at the FDA Advisory Committee | | |
| | 465: 11 | A:  Yes. I presented to the FDA. | | |
| | 465: 12 | Q:  Did you attend the FDA Advisory | | |
| | 465: 13 | Committee? | | |
| | 465: 14 | A:  Yes. | | |
| | 465: 15 | Q:  What was on the agenda, let's say, of | | |
| | 465: 16 | the FDA Advisory Committee? | | |
| | 465: 17 | A:  Well, the agenda was to discuss both | | |
| | 465: 18 | the efficacy and the risks of COX-2 inhibitors, and | | |

|  | **Objection/Response in Barnett** |  |
|---|---|---|
| 465: 19   at that Advisory Committee, there was a drug called |  |  |
| 465: 20   Celebrex, as well as Vioxx, that was being |  |  |
| 465: 21   discussed. |  |  |
| 465: 22   Q: In general terms, who attended the |  |  |
| 465: 23   Advisory Committee in February of 2001? |  |  |
| 465: 24   A: Well, there was a lot of Merck people |  |  |
| 465: 25   there, and the room was full. I don't know who they |  |  |
| 466: 1   all were, but the room was full. |  |  |
| 466: 2   Q: Was it open to the public? |  |  |
| 466: 3   A: It's open to the public, yes. |  |  |
| 466: 4   Q: Were there experts in various medical |  |  |
| 466: 5   fields in attendance? |  |  |
| **466:8** - **466:15**   Nies, Alan 2005-04-01 |  |  |
| 466: 8   THE WITNESS: Well, certainly on the |  |  |
| 466: 9   Advisory Committee, there were cardiologists and |  |  |
| 466: 10   rheumatologists who made up the Advisory |  |  |
| 466: 11   I can't really address who was in the audience. |  |  |
| 466: 12   BY MR. RABER: : |  |  |
| 466: 13   Q: Dr. Nies, at the end of the Advisory | Plf. Obj: Hearsay, best |  |
| 466: 14   Committee, what advice was given by the FDA | evidence, 602, lack of |  |
| 466: 15   to the VIGOR study? | foundation |  |
| **466:2** - **468:23**   Nies, Alan 2005-04-01 | Def Resp: Not offered for truth. |  |
| 466: 22   THE WITNESS: The advisors felt that | Offered to show it was |  |
| 466: 23   the labeling of Vioxx should be changed to reflect | said and for mental |  |
| 466: 24   the positive GI effects, that is, the beneficial | state. Foundation |  |
| 466: 25   effects on GI, and they also felt that the labeling | because Nies was there |  |
| 467: 1   should be changed to include the data on the | and presented. |  |
| 467: 2   cardiovascular events that occurred in the trial. |  |  |
| 467: 3   BY MR. RABER: : |  |  |
| 467: 4   Q: Dr. Nies, after the FDA Advisory | Plf. Obj: Leading |  |
| 467: 5   Committee in February 2001, did Merck stop | Def Resp: Not leading. The |  |
| 467: 6   collecting or analyzing data about Vioxx? | question did not |  |
| 467: 7   A: No, no, no. We had studies -- other | suggest an answer. |  |
| 467: 8   studies ongoing, and we had that SOP ongoing. |  |  |
| 467: 9   Q: I'd like to show you a document that |  |  |
| 467: 10   has been like as Nies Exhibit 1014. |  |  |
| 467: 11   - - - |  |  |
| 467: 12   (Whereupon, Deposition Exhibit |  |  |
| 467: 13   Nies-1014, 'Cardiovascular Thrombotic |  |  |
| 467: 14   Events in Controlled, Clinical Trials of |  |  |
| 467: 15   Rofecoxib,' (Konstam, et al.) |  |  |
| 467: 16   Circulation.2001;104:2280-2288, was |  |  |

|  | **Objection/Response in Barnett** |
|---|---|
| 467: 17  marked for identification.) | |
| 467: 18  - - - | |
| 467: 19  BY MR. RABER:    : | |
| 467: 20  Q:  Dr. Nies, can you identify Exhibit | |
| 467: 21  1014? | |
| 467: 22  A:  This is a publication, again, in | |
| 467: 23  Circulation in 2001 by Marvin Konstam and others. | |
| 467: 24  Q:  Is Marvin Konstam employed by Merck? | |
| 467: 25  A:  No, he's not. | |
| 468: 1  Q:  Are there any Merck employees who are | |
| 468: 2  listed as co-authors on this study? | |
| 468: 3  A:  Yes. There's Alise Reicin, Deborah | |
| 468: 4  Shapiro, Rhoda Sperling, Eliav Barr and Barry Gertz. | |
| 468: 5  Q:  Can you look at this exhibit and tell | |
| 468: 6  us -- strike that. | |
| 468: 7  Move to the third page of this | |
| 468: 8  exhibit, if you would. At the top there it says, | |
| 468: 9  'November 6, 2001.' Do you see that? | |
| 468: 10  A:  Yes. | |
| 468: 11  Q:  What does that date refer to? | |
| 468: 12  A:  That's the publication date. | |
| 468: 13  Q:  Dr. Nies, how many studies -- strike | |
| 468: 14  that. | |
| 468: 15  What did this publication address? | |
| 468: 16  A:  This was a consolidation of all of | |
| 468: 17  the data to date in controlled trials, that is, | |
| 468: 18  trials where there was -- where Vioxx was given and | |
| 468: 19  something else was given. So, you could compare | |
| 468: 20  two arms. This was a publication that consolidated | |
| 468: 21  all of the data that was present at the time. | |
| 468: 22  Q:  How many studies were included in | |
| 468: 23  this analysis? | |

| **469:1  -  469:2** | Nies, Alan 2005-04-01 |
|---|---|
| 469: 1  THE WITNESS:  It says 23 Phase IIb to | |
| 469: 2  v studies, yes. | |

| **469:4  -  469:5** | Nies, Alan 2005-04-01 |
|---|---|
| 469: 4  Q:  About how many patients were included | |
| 469: 5  in this analysis? | |

| **469:8  -  469:9** | Nies, Alan 2005-04-01 |
|---|---|
| 469: 8  THE WITNESS:  More than 28,000 | |
| 469: 9  patients, it says. | |

| | **Objection/Response in Barnett** | |
|---|---|---|
| **469:1 - 470:5**    Nies, Alan 2005-04-01 | | |
| 469: 11    Q:  Dr. Nies, have you ever heard the | | |
| 469: 12    term 'peer-reviewed journal'? | | |
| 469: 13    A:  Yes. | | |
| 469: 14    Q:  What does that mean? | | |
| 469: 15    A:  It means that articles that are | | |
| 469: 16    published in the journal, before they're published, | | |
| 469: 17    the manuscripts are sent out to external referees, | | |
| 469: 18    often experts in the field of the general field of | | |
| 469: 19    the article, and these referees review the article | | |
| 469: 20    and determine in their opinion whether it needs to | | |
| 469: 21    be -- it should be published, and if so, should it | | |
| 469: 22    be changed in some way before it's published. | | |
| 469: 23    Q:  Was this exhibit that we're looking | | |
| 469: 24    at here, Exhibit 1014, published in a peer-reviewed | | |
| 469: 25    journal? | | |
| 470: 1    A:  Yes. Circulation is the premier | | |
| 470: 2    cardiovascular journal. | | |
| 470: 3    Q:  Dr. Nies, would you please read the | | |
| 470: 4    conclusions that were reached based on the analysis | | |
| 470: 5    of this data? | | |
| **470:7 - 470:14**    Nies, Alan 2005-04-01 | | |
| 470: 7    THE WITNESS:  'This analysis provides | | |
| 470: 8    no evidence for an excess of CV events,' | | |
| 470: 9    cardiovascular events, 'for rofecoxib,' which is | | |
| 470: 10    Vioxx, 'relative to either placebo or the | | |
| 470: 11    non-naproxen NSAIDs that were studied. Differences | | |
| 470: 12    observed between rofecoxib and naproxen are likely | | |
| 470: 13    the result of the antiplatelet effects of the latter | | |
| 470: 14    agent.' | | |
| **470:1 - 471:11**    Nies, Alan 2005-04-01 | | |
| 470: 16    Q:  Dr. Nies, you mentioned that this | Plf. Obj:  Leading | |
| 470: 17    exhibit was a combination of a number of studies | Def. Resp:  Not leading.  Question | |
| 470: 18    that had been done. Let me ask you this question: | does not suggest | |
| 470: 19    Did Merck ever do one large single | an answer. | |
| 470: 20    study to show that Vioxx does not cause heart | | |
| 470: 21    attacks and strokes? | | |
| 470: 22    A:  No, we did not. | | |
| 470: 23    Q:  Did Merck try to design such a study? | Plf. Obj:  Non-responsive | |
| 470: 24    A:  We had lots of discussions amongst | Def. Resp: Is it responsive | |
| 470: 25    ourselves, and we had outside experts in and we had | | |
| 471: 1    several meetings, too, to talk about what might be | | |

55

| | | **Objection/Response in Barnett** | |
|---|---|---|---|
| 471: 2 | done to address that issue. | | |
| 471: 3 | Q:  What type of a study would that be | | |
| 471: 4 | called? | | |
| 471: 5 | A:  A cardiovascular outcomes trial, I | | |
| 471: 6 | guess. | | |
| 471: 7 | Q:  Did Merck do a cardiovascular | | |
| 471: 8 | outcomes trial, as you've described it there? | | |
| 471: 9 | A:  We never did a single large study. | | |
| 471: 10 | Q:  Why not? | | |
| 471: 11 | A:  Well -- | | |
| **471:1 - 473:16** | Nies, Alan 2005-04-01 | | |
| 471: 14 | THE WITNESS:  During this time | | |
| 471: 15 | period, we had already started some studies that | | |
| 471: 16 | were ongoing comparing Vioxx with placebo in | | |
| 471: 17 | patients with colon polyps, and we had planned to do | | |
| 471: 18 | studies also in some patients who had had colon | | |
| 471: 19 | cancer and prostate cancer. And we felt that since | | |
| 471: 20 | the real question can only be answered when | | |
| 471: 21 | comparing with a placebo, that this would be an | | |
| 471: 22 | actually more time efficient way than trying to | | |
| 471: 23 | design a new cardiovascular outcomes trial to get | | |
| 471: 24 | the data. So, we would combine -- what we would do | | |
| 471: 25 | is take those trials, using our standard operating | | |
| 472: 1 | procedure, and have a protocol that allowed the | | |
| 472: 2 | combination of those trials into something that you | | |
| 472: 3 | could call a cardiovascular outcomes trial. | | |
| 472: 4 | BY MR. RABER:   : | | |
| 472: 5 | Q:  About how many patients did you | | |
| 472: 6 | expect to be studied in that combined protocol | | |
| 472: 7 | you've just described? | | |
| 472: 8 | A:  About 25,000 patients. | | |
| 472: 9 | Q:  Can you tell us what a protocol is? | | |
| 472: 10 | A:  A protocol is a plan for the study | | |
| 472: 11 | that basically outlines what you're going to do in | | |
| 472: 12 | the study, what are the endpoints. | | |
| 472: 13 | Q:  Did Merck create a protocol to | | |
| 472: 14 | combine the three cancer studies? | | |
| 472: 15 | A:  Yes. | | |
| 472: 16 | Q:  Was that protocol shared with the | | |
| 472: 17 | FDA? | | |
| 472: 18 | A:  Yes. | | |
| 472: 19 | Q:  Did that protocol make sense to you? | | |

| | **Objection/Response in Barnett** |
|---|---|
| 472: 20   A:  Yes. | |
| 472: 21   Q:  Why? | |
| 472: 22   A:  Well, this would give real clinical | |
| 472: 23   data compared with placebo on Vioxx that would be | |
| 472: 24   patients who, although not having arthritis, would | |
| 472: 25   be similar to the population of patients with | |
| 473: 1   arthritis in terms of age range, et cetera. | |
| 473: 2   Q:  Were there any other benefits to | |
| 473: 3   pooling existing studies with planned studies? | |
| 473: 4   A:  One gets -- well, we had already | |
| 473: 5   started the one study. So, it was timing benefits, | |
| 473: 6   that we'd be getting -- it would be kind of a | |
| 473: 7   rolling thing. We'd get the data from each study, | |
| 473: 8   and then we'd combine it as they occurred to | |
| 473: 9   increase our power. So, we already had one study | |
| 473: 10   ongoing. | |
| 473: 11   Q:  Did you feel like you would get data | |
| 473: 12   sooner or later if you combined trials versus | |
| 473: 13   starting a new large trial? | |
| 473: 14   A:  We thought we could get data more | |
| 473: 15   efficiently and sooner with the -- combining the | |
| 473: 16   trials. | |

**473:1  -  474:12**          Nies, Alan 2005-04-01

| | |
|---|---|
| 473: 17   Q:  Let's go back to the attempts to | |
| 473: 18   design one large CV outcomes trial. Were there any | |
| 473: 19   problems you encountered in doing that? | |
| 473: 20   A:  Well, there were a number of | |
| 473: 21   suggestions we got, and one of the ones that was | |
| 473: 22   more popular for some people was to take individuals | |
| 473: 23   who had unstable coronary disease, that is, they | |
| 473: 24   were what's called in the jargon acute coronary | |
| 473: 25   syndromes. These are people who are sort of on the | |
| 474: 1   verge of a heart attack or have bad coronary | |
| 474: 2   disease. The idea was this would be maybe a quicker | |
| 474: 3   way to get an answer, because you could give Vioxx | |
| 474: 4   to one group and nothing to another group, and you | |
| 474: 5   could just count the problems that occurred during | |
| 474: 6   this trial. | |
| 474: 7   Q:  Did Merck pursue that type of a | |
| 474: 8   study? | |
| 474: 9   A:  Well, we didn't do it, but we did | |
| 474: 10   talk about it a lot, and we talked about it with our | |

**Objection/Response in Barnett**

| | |
|---|---|
| 474: 11 | consultants. |
| 474: 12 | Q: Why didn't you do it? |

**474:1  -  475:6**          Nies, Alan 2005-04-01

| | |
|---|---|
| 474: 15 | THE WITNESS: Well, I thought, along |
| 474: 16 | with others, that the problems were so great that |
| 474: 17 | they would not allow us to either draw conclusions, |
| 474: 18 | and it might actually be ethically not correct to do |
| 474: 19 | such a study. |
| 474: 20 | BY MR. RABER:   : |
| 474: 21 | Q: Why not? |
| 474: 22 | A: Well, we knew that the NSAIDs, the |
| 474: 23 | nonsteroidal -- and we had shown with Vioxx that it |
| 474: 24 | caused salt and water retention. And we also knew |
| 474: 25 | from our clinical studies with the NSAIDs and with |
| 475: 1 | Vioxx that the drugs cause some increase in blood |
| 475: 2 | pressure. Both of these things would be highly |
| 475: 3 | disadvantageous, really not good for people with |
| 475: 4 | acute coronary syndromes, and so we didn't think |
| 475: 5 | that it made sense from that point of view. |
| 475: 6 | We also -- |

**475:2  -  476:19**          Nies, Alan 2005-04-01

| | |
|---|---|
| 475: 24 | Q: Do you want to finish? |
| 475: 25 | A: Yes, sure. |
| 476: 1 | The other problem that we saw with |
| 476: 2 | those studies is that these people with acute |
| 476: 3 | coronary syndromes are all on anti-platelet |
| 476: 4 | therapies. They're on aspirin and/or other |
| 476: 5 | anti-platelet therapies. And so if there was no |
| 476: 6 | difference in the two groups, people could say, |
| 476: 7 | well, you know, you wouldn't expect anything |
| 476: 8 | everybody was on aspirin. And so, we didn't think |
| 476: 9 | that it really addressed -- if the hypothesis is |
| 476: 10 | really based on the fact that there's unopposed |
| 476: 11 | thromboxane, these people don't have unopposed |
| 476: 12 | thromboxane because they're already on aspirin. So, |
| 476: 13 | it really wouldn't address even the hypothesis. So, |
| 476: 14 | we thought there were ethical issues, as well as |
| 476: 15 | completely confounding issues in terms of |
| 476: 16 | interpretation. |
| 476: 17 | Q: Dr. Nies, why didn't Merck just do a |
| 476: 18 | big study with arthritis patients and compare Vioxx |
| 476: 19 | against placebo? |

| | **Objection/Response in Barnett** | |
|---|---|---|

**476:2   -   477:6**          Nies, Alan 2005-04-01

476: 24     THE WITNESS:  Arthritis patients have
476: 25     pain. And any such study to look at cardiovascular
477: 1      outcomes would have to be a long-term study,
477: 2      the events don't occur all that frequently, and so
477: 3      one would have to have patients who are having pain
477: 4      on placebo for a long period of time, and that is
477: 5      not felt by anyone to be an ethical-type thing to
477: 6      do.

**482:1   -   484:13**          Nies, Alan 2005-04-01

482: 12     Q:  What did Merck do to find out the
482: 13     answer to whether the difference in CV rates in
482: 14     VIGOR was mechanism based?
482: 15     A:  Well, from VIGOR itself, you can't
482: 16     tell, because there's only naproxen and the Vioxx
482: 17     arm, and you can't tell whether the mechanism for
482: 18     the difference is related to naproxen's mechanism or
482: 19     whether Vioxx was having an adverse effect. And so
482: 20     we went to other studies that were ongoing which
482: 21     included the placebo-controlled studies in
482: 22     Alzheimer's disease and in pre-Alzheimer's disease
482: 23     where we had a fair amount of data over the period
482: 24     of time of the nine months that the VIGOR trial had
482: 25     been done so we could compare the same time
483: 1      And comparing Vioxx with placebo in those studies,
483: 2      we did not see any evidence that Vioxx caused heart
483: 3      attacks or strokes.

| | |
|---|---|
| 483: 4      Q:  Was the rate of heart attacks and<br>483: 5      strokes, when you compared Vioxx to placebo,<br>483: 6      different?<br>483: 7      A:  They were statistically the same. In<br>483: 8      fact, they were slightly less in the Vioxx arm. | Plf. Obj:  Hearsay - results not offered, not basis for hearsay exception<br><br>Def Resp: Not discussing an out-of-court "statement" so this is not hearsay. |

483: 9      Q:  I'm sorry. What else, then, other
483: 10     than looking at the Alzheimer's data, did you do --
483: 11     A:  Well, we went --
483: 12     Q:  -- to answer this question?
483: 13     A:  We went back again and looked at all
483: 14     of our accumulated data in other studies against
483: 15     other nonsteroidal anti-inflammatory drugs, and,
483: 16     again, we did not see any increase in the Vioxx
483: 17     group versus the nonsteroidal anti-inflammatory
483: 18     drug.

**Objection/Response in Barnett**

| | |
|---|---|
| 483: 19    Q:  When you say you 'did not see any | |
| 483: 20    increase,' do you mean there was no difference or | |
| 483: 21    something else? | |
| 483: 22    A:  No. I mean that there was no | |
| 483: 23    difference. | |
| 483: 24    Q:  Other than looking at the placebo | |
| 483: 25    data against Alzheimer's, looking at the existing | |
| 484: 1    data you had against other NSAIDs, what else did | |
| 484: 2    Merck do to answer the question of whether the rates | |
| 484: 3    in VIGOR were mechanism based? | |
| 484: 4    A:  We looked at the pharmacologic | |
| 484: 5    effects of the drugs on platelets, and naproxen -- | |
| 484: 6    of course, Vioxx had no effect on the platelets, as | |
| 484: 7    we predicted. But naproxen -- we had already done | |
| 484: 8    these studies actually, but we looked at the data. | |
| 484: 9    Naproxen inhibited platelet activity by greater than | |
| 484: 10    90 percent and reduced thromboxane production by | |
| 484: 11    that amount. And it was equivalent to -- when given | |
| 484: 12    in the doses in VIGOR, 500 milligrams twice a day, | |
| 484: 13    it was equivalent to what aspirin would produce. | |

**485:8  -  485:18**       Nies, Alan 2005-04-01

| | |
|---|---|
| 485: 8    Q:  After reviewing all the data that you | |
| 485: 9    just described, what was your feeling about the idea | |
| 485: 10    that any difference in CV events from VIGOR was a | |
| 485: 11    mechanism-based effect of Vioxx? | |
| 485: 12    A:  My feeling was that the weight of the | |
| 485: 13    evidence was that naproxen was protective and that | |
| 485: 14    Vioxx did not cause an increase in cardiovascular | |
| 485: 15    risk. | |

| | |
|---|---|
| 485: 16    Q:  Did anyone else at Merck tell you | |
| 485: 17    that they felt the same way as you did after | |
| 485: 18    reviewing the data? | |

**485:2  -  485:23**       Nies, Alan 2005-04-01

| | |
|---|---|
| 485: 21    THE WITNESS:  Yes, yes. | Plf. Obj:  Hearsay |
| 485: 22    BY MR. RABER:    : | Def. Resp: Not offered for truth. |
| 485: 23    Q:  Who was that? | Offered to show it was |

**486:1  -  487:12**       Nies, Alan 2005-04-01

| | |
|---|---|
| 486: 1    THE WITNESS:  Well, Dr. Scolnick is | said, and for mental |
| 486: 2    one of those. | state purposes. |

| | |
|---|---|
| 486: 3    BY MR. RABER:    : | |
| 486: 4    Q:  I'd like to show you a document that | |
| 486: 5    has been like as Exhibit Nies 1015. | |

| | Objection/Response in Barnett | |
|---|---|---|
| 486: 6    - - - | | |
| 486: 7    (Whereupon, Deposition Exhibit | | |
| 486: 8    Nies-1015, E-mails, MRK-ACT0009918, was | | |
| 486: 9    marked for identification.) | | |
| 486: 10    - - - | | |
| 486: 11    BY MR. RABER:   : | | |
| 486: 12    Q:  Dr. Nies, can you identify this | | |
| 486: 13    exhibit, please? | | |
| 486: 14    A:  This is an e-mail from Edward | | |
| 486: 15    Scolnick to myself, Alise Reicin and Harry Guess in | | |
| 486: 16    February 4th of 2001. | | |
| 486: 17    Q:  What were the general circumstances | | |
| 486: 18    of Dr. Scolnick sending this e-mail to you at that | | |
| 486: 19    time? | | |
| 486: 20    A:  This was just prior to the Advisory | | |
| 486: 21    Committee for VIGOR. | | |
| 486: 22    Q:  Did you receive this e-mail? | | |
| 486: 23    A:  Yes. | | |
| 486: 24    Q:  Dr. Nies, I'm looking at Scolnick's | | |
| 486: 25    e-mail to you. About halfway in the body of it, it | | |
| 487: 1    says, 'We all worried to death about the CV events | | |
| 487: 2    last Spring. Merck is of course always an issue. | | |
| 487: 3    But I was sick at the thought we might be doing harm | | |
| 487: 4    to patients. I KNOW each of you well enough to know | | |
| 487: 5    you felt the same way. With all the data now | | |
| 487: 6    available I am no longer worried.' Do you see that? | | |
| 487: 7    A:  Yes. | | |
| 487: 8    Q:  Did you agree with Dr. Scolnick's | | |
| 487: 9    sentiment at that time in February of 2001? | | |
| 487: 10    A:  Yes. | | |
| 487: 11    Q:  Dr. Nies, are you familiar with Dr. | | |
| 487: 12    Scolnick's views about patient safety? | | |
| **487:1**  -  **487:20**        Nies, Alan 2005-04-01 | | |
| 487: 15    THE WITNESS:  Patient safety is | Plf. Obj:  Hearsay | |
| 487: 16    really utmost in his mind all the time. | Def Resp: Not an out-of-court | |
| 487: 17    BY MR. RABER:   : | statement, so not | |
| 487: 18    Q:  Will you please describe for us Dr. | hearsay. | |
| 487: 19    Scolnick's views about patient safety based on your | | |
| 487: 20    experiences with him? | | |
| **487:2**  -  **488:4**        Nies, Alan 2005-04-01 | | |
| 487: 23    THE WITNESS:  Dr. Scolnick wants to | Plf. Obj:  602, lack of | |
| 487: 24    hear about everything that has to do with patient | foundation | |

| | **Objection/Response in Barnett** | |
|---|---|---|
| 487: 25   safety in our studies and would get very upset if | Def Resp:  Drs. Nies & Scolnick | |
| 488: 1   anything was withheld from him. | worked together, so | |
| 488: 2   BY MR. RABER:    : | there is foundation. | |
| 488: 3   Q:  How did Dr. Scolnick's views about | | |
| 488: 4   patient safety affect the way he did things? | | |

**488:1  -  488:14**       Nies, Alan 2005-04-01

488: 11   A:  Well, he made it very clear that he
488: 12   wanted -- any time anyone had an issue relating to
488: 13   safety, that he wanted to hear about it. And he
488: 14   said that many times.

**557:2  -  557:23**       Nies, Alan 2005-04-01

557: 2   Q:  Right.
557: 3   You also talked earlier about, you
557: 4   said there was no evidence -- this is your
557: 5   testimony. There was no evidence in the VIGOR trial
557: 6   that Vioxx increased cardiovascular events. Was
557: 7   that your testimony?
557: 8   A:  What I said is when we -- that in the
557: 9   VIGOR trial itself, you can't tell. So, you have to
557: 10   look at other data.
557: 11   Q:  You are aware in looking at the VIGOR
557: 12   data after the fact? You did see the VIGOR data
557: 13   after the trial was concluded; correct?
557: 14   A:  Yes.
557: 15   Q:  You are aware that the lines with
557: 16   regard to people who are on placebo -- I'm sorry, on
557: 17   naproxen, and the people taking Vioxx began to
557: 18   separate within the first two months with regard to
557: 19   cardiovascular events? You know that; don't you?
557: 20   A:  Yes.
557: 21   Q:  And there was a substantial
557: 22   separation at around a month-and-a-half, two
557: 23   correct?

**557:2  -  558:2**       Nies, Alan 2005-04-01

557: 25   THE WITNESS:  Yes. I don't recall
558: 1   the magnitude of the separation at various time
558: 2   points.

**565:1  -  565:22**       Nies, Alan 2005-04-01

| 565: 17   Q:  I think I may have asked you this on | Def. Obj:  801, 802, Hearsay | |
|---|---|---|
| 565: 18   day one. Do you know who Wayne Ray is? | | |
| 565: 19   A:  Yes. | | |

| | Objection/Response in Barnett |
|---|---|
| 565: 20   Q:  He's also an epidemiologist at | |
| 565: 21   Vanderbilt; correct? | |
| 565: 22   A:  Yes. | |
| **566:1  -  566:9**        Nies, Alan 2005-04-01 | |
| 566: 1   prove that any NSAIDs, including naproxen, was | |
| 566: 2   cardioprotective; correct? | |
| 566: 3   A:  Yes. He had done an epidemiologic | |
| 566: 4   study. | |
| 566: 5   Q:  So, when you say that the weight of | |
| 566: 6   the evidence supported Merck's naproxen theory, all | |
| 566: 7   these things I'm just mentioning to you, you're | |
| 566: 8   taking all of this into account; right? | |
| 566: 9   A:  Yes. | |
| **573:1  -  574:1**        Nies, Alan 2005-04-01 | |
| 573: 12   Q:  Now, you also talked earlier about | |
| 573: 13   the article that was published by Dr. Konstam. Do | |
| 573: 14   you recall that? | |
| 573: 15   A:  Yes. | |
| 573: 16   Q:  Now, Dr. Konstam, he's a paid | Def. Obj:  602, witness |
| 573: 17   consultant for Merck; right? | lacks knowledge, |
| 573: 18   A:  I don't know. | speculation |
| 573: 19   Q:  Well, you know he has been a paid | |
| 573: 20   consultant for Merck; right? | |
| 573: 21   A:  Yes. I think he has attended some | |
| 573: 22   meetings where he was probably paid to advise | |
| 573: 23   yes. | |
| 573: 24   Q:  You're not aware sitting here right | |
| 573: 25   now that he's been a continuously paid consultant | |
| 574: 1   for Merck over the last several years? | |
| **574:3  -  574:3**        Nies, Alan 2005-04-01 | |
| 574: 3   THE WITNESS:  I'm not. | |
| **574:5  -  577:15**        Nies, Alan 2005-04-01 | |
| 574: 5   Q:  You've heard of the APPROVe study; | |
| 574: 6   haven't you, Dr. Nies? | |
| 574: 7   A:  Yes, I've heard of it. | |
| 574: 8   Q:  You're aware that Dr. Konstam sat on | Def. Obj:  602, witness |
| 574: 9   the DSMB for APPROVe, aren't you? | lacks knowledge |
| 574: 10   A:  No. | |
| 574: 11   Q:  Well, let me ask you, who is Matthew | |
| 574: 12   Weir? | |
| 574: 13   A:  I think he's a renal doctor in | |

| | | **Objection/Response in Barnett** |
|---|---|---|
| 574: 14 | Maryland. | |
| 574: 15 | Q:  Now, as you were asked by Mr. Raber, | |
| 574: 16 | there are several Merck employees that appeared on | |
| 574: 17 | this article that was published by Dr. Konstam; | |
| 574: 18 | right? | |
| 574: 19 | A:  Yes. | |
| 574: 20 | Q:  Alise Reicin is a Merck employee, | |
| 574: 21 | Deborah Shapiro? | |
| 574: 22 | A:  Yes. | |
| 574: 23 | Q:  Rhoda Spurling, Eliav Barr, Barry | |
| 574: 24 | Gertz, all Merck employees; correct? | |
| 574: 25 | A:  Yes. | |
| 575: 1 | Q:  Basically, Dr. Konstam published this | |
| 575: 2 | article taking a look at, I think you said 23 | |
| 575: 3 | clinical trials that Merck did on Vioxx; correct? | |
| 575: 4 | A:  Yes. | |
| 575: 5 | Q:  And concluded there was no | |
| 575: 6 | cardiovascular danger; right? | |
| 575: 7 | A:  Yes. | |
| 575: 8 | Q:  Have you read a study by Dr. Juni? | |
| 575: 9 | A:  I've seen it, yes. You're talking | |
| 575: 10 | about which study? | |
| 575: 11 | Q:  It's a recent study, and if I can | |
| 575: 12 | pull it out in front of me, I'll have it for you in | |
| 575: 13 | two seconds. It was published in Lancet in 2004, I | |
| 575: 14 | believe, after the drug was taken off the market. | |
| 575: 15 | Does that refresh your recollection? | |
| 575: 16 | A:  Okay. Yes. | |
| 575: 17 | Q:  I have it here somewhere. Now, | Def. Obj:  602, witness |
| 575: 18 | you're aware that Dr. Juni, he's not a paid | lacks knowledge |
| 575: 19 | consultant for Merck; right? | |
| 575: 20 | A:  I don't know. | |
| 575: 21 | Q:  Have you actually seen this study | |
| 575: 22 | yourself, Dr. Nies? | |
| 575: 23 | A:  Have I seen the manuscript -- | |
| 575: 24 | Q:  Yes. | |
| 575: 25 | A:  -- or the published article? Yes, I | |
| 576: 1 | have at one point. | |
| 576: 2 | Q:  You didn't recognize any of the names | |
| 576: 3 | of anybody on that study being a Merck employee; | |
| 576: 4 | correct? | |
| 576: 5 | A:  I don't even remember if I read all | |
| 576: 6 | the names, but. | |

| | **Objection/Response in Barnett** |
|---|---|
| 576: 7    Q: Well, Peter Juni is not somebody you | |
| 576: 8    recognize as a paid Merck consultant or an | |
| 576: 9    correct? | |
| 576: 10    A: I don't recognize him as that. | |
| 576: 11    Q: And you don't recognize Linda Nartey | |
| 576: 12    as a paid consultant or a Merck employee; do you? | |
| 576: 13    A: No. | |
| 576: 14    Q: How about Stephan Reichenbach, is | |
| 576: 15    that somebody you'd recognize as a -- | |
| 576: 16    A: Never heard of him. | |
| 576: 17    Q: -- an employee. | |
| 576: 18    No? | |
| 576: 19    Rebekka Sterchi, is that somebody you | |
| 576: 20    recognize, a name you recognize as a Merck | |
| 576: 21    A: No. | |
| 576: 22    Q: Paul Dieppe, D-I-E-P-P-E, is that a | |
| 576: 23    name that you recognize as a Merck employee? | |
| 576: 24    A: No. | |
| 576: 25    Q: Matthias Egger, E-G-G-E-R, that's | |
| 577: 1    somebody you also do not recognize as a Merck | |
| 577: 2    employee; right? | |
| 577: 3    A: That's correct. | |
| 577: 4    Q: Now, you're aware Dr. Juni also took | Def. Obj: 801, 802, |
| 577: 5    a look at Merck's clinical trials, aren't you? | hearsay |
| 577: 6    A: Yes. | |
| 577: 7    Q: And he, in fact, looked at 22 Merck | |
| 577: 8    clinical trials. Do you remember what Dr. Juni's | |
| 577: 9    conclusions were with regard to Vioxx? | |
| 577: 10    A: I don't recall exactly. | |
| 577: 11    Q: Well, under the heading | |
| 577: 12    'Interpretation,' it says, 'Our findings indicate | |
| 577: 13    that rofecoxib should have been withdrawn several | |
| 577: 14    years earlier than it actually was.' You're aware | |
| 577: 15    of that, aren't you? | |
| **577:1 - 577:17**    Nies, Alan 2005-04-01 | |
| 577: 17    THE WITNESS: I'm aware of what? | |
| **577:1 - 578:5**    Nies, Alan 2005-04-01 | |
| 577: 19    Q: Are you aware that what I just | |
| 577: 20    read -- | |
| 577: 21    A: That he wrote that? | |
| 577: 22    Q: Yes. | |
| 577: 23    A: I'm aware that he wrote that. | |

| | Objection/Response in Barnett |
|---|---|
| 577: 24   Q:  You are aware. | |
| 577: 25   Again, sitting here today, when you | |
| 578: 1    were talking about Dr. Konstam's article as | |
| 578: 2    supporting the drug as being safe, you did that | |
| 578: 3    knowing about Dr. Juni's article, and you took this | |
| 578: 4    into consideration also, didn't you? | |
| 578: 5    A:  Yes. | |