UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | JUDGE FALLON |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| Gerald Barnett v. Merck & Co, Inc. | * | CASE NO. 02:06CV00485 |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF
MOTION TO EXCLUDE THE OPINION TESTIMONY
OF NICHOLAS FLAVAHAN, Ph.D.**

TO THE HONORABLE JUDGE ELDON E. FALLON:

PLAINTIFF, Gerald Barnett, files this Memorandum in Support of Motion to Exclude the Opinion Testimony of Nicholas Flavahan, Ph. D., and in support thereof shows:

## I. INTRODUCTION

Merck & Co. has designated Dr. Nicholas Flavahan, Ph. D., a vascular cell biologist, to provide opinions "regarding the pharmacological effects of COX-2 inhibitors (in particular Vioxx) on the blood vessel wall and endothelium of human beings."[1] Dr. Flavahan is a Professor of Internal Medicine at Ohio State University in Columbus, Ohio.[2] Dr. Flavahan is not a medical doctor.[3]

---

[1] Expert Report of Nicholas Flavahan, Ph. D. at 1 (Ex. A).
[2] Dep. of Nicholas Flavahan, Ph. D., at 8 (Ex. B).
[3] Expert Report of Nicholas Flavahan, Ph. D. at 1.

1

According to his report and deposition, Dr. Flavahan will seek to testify to the following opinions: (1) The chief source of systematic prostacyclin synthesis is COX-1, not COX-2;[4] (2) Fitzgerald's imbalance theory artificially focuses on the role of COX-1 and COX-2 in regulating thrombotic and vascular mechanisms, and fails to address important roles played by numerous COX-independent mediators."[5]; (3) There is no scientific evidence that selective COX-2 inhibitors pathologically disrupt this vascular homeostatic balance in humans, and considerable evidence that they do not increase platelet or thrombotic activity.[6]; and (4) "COX-2 inhibitors should not accelerate the atherothrombotic process, and would be expected to provide a stabilizing influence on atherosclerotic lesions."[7]

Dr. Flavahan's opinions are subject to the requirements of *Daubert*, *Kumho Tire* and the Federal Rules of Evidence. As a result, Dr. Flavahan should not be permitted to offer speculative and conjectural testimony, to testify to opinions that he is not qualified to render, and to testify to opinions which are without sufficient factual bases and are unreliable.

## II.   STATEMENT OF THE FACTS

This action for personal injuries arises from Plaintiff Gerald Barnett's use of Vioxx, which caused a heart attack on September 6, 2002, and resulting damage to his heart, necessitating coronary artery bypass surgery four days later. Mr. Barnett was approximately 56 years old when he was prescribed Vioxx by his physician in December of 1999, and he had been taking the drug for approximately 32 months at the time of his heart attack.

---

[4] Expert Report of Dr. Nicholas Flavahan, Ph. D., at 7-8.
[5] *Id.* at 8.
[6] *Id.* at 12.
[7] *Id.* at 17.

2

It is Plaintiff's contention that his heart attack was caused by a clot in one of his coronary arteries which resulted from a plaque rupture as well as the acceleration of atherogenesis due to Vioxx use.

Mr. Barnett's treating doctors have testified that had Merck disclosed the known risks of Vioxx they would not have prescribed him Vioxx. However, because his physicians were unaware of the risks of Vioxx, and Merck failed to disclose and warn what it knew regarding the dangers of Vioxx, Mr. Barnett continued to take the drug even after his heart attack, until a few weeks before it was removed from the market.

Before his heart attack, Mr. Barnett had retired from the FBI, where he had worked as a special agent for 27 years, including a period of time in an anti-terrorist unit. He has been married to his wife, Corinne, since he started with the FBI, and the couple have lived in Myrtle Beach, South Carolina since his retirement.

As a result of the heart attack and 5-way bypass surgery at the early age of 58, Mr. Barnett suffers from permanent damage to his heart, which has reduced his life expectancy. In addition, he is now at a much greater risk of suffering another heart attack, and the bypass surgery has placed him at a greater risk for heart failure.

### III.   LEGAL STANDARDS

The *Daubert* trilogy cases, *Daubert v. Merrell Dow Pharmaceuticals*, 113 S. Ct. 2786 (1993), *General Electric Co. v. Joiner*, 118 S.Ct. 512, 517-519 (1997) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), have made the district judge the "gatekeeper who must pass

3

on the reliability and relevance of proffered evidence pursuant to Federal Rule of Evidence 702."[8] Rule 702 takes into account the trilogy and provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experiences, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. This Rule establishes general standards for the judge to use in determining the reliability of expert testimony. The Rule "not only requires that the testimony be relevant, but also that it be based on sufficient facts or data, that it be the product of reliable principles and methods, and that the witness applied those principles and methods reliably to the facts of the case."[9]

Scientific testimony is reliable only if "the reasoning or methodology underlying the testimony is scientifically valid," meaning that such testimony is based on recognized methodology and supported by appropriate validation based on what is known. *Daubert*, 113 S. Ct. at 2786. In *Daubert*, the Supreme Court set forth a non-exclusive list of factors to consider in determining the scientific reliability of expert testimony. *Id.* These factors are: (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error; (4) whether standards and controls exist and have been maintained with respect to the technique; and (5) the general acceptance of the methodology in the scientific community. *Id.* Whether some or all these factors apply in a particular case

---

[8] Manual for Complex Litigation. 472 (4th ED. 2004)
[9] *Id.* at 484.

depends on the facts, the expert's particular expertise, and the subject of his testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 138 (1999).

In addition to the five factors laid out in *Daubert*, a trial court may consider additional factors in assessing the scientific reliability of expert testimony. *Black v. Food Lion, Inc.*, 171 F.3d 308, 312 (5th Cir.1999). Some of these factors may include: (1) whether the expert's opinion is based on incomplete or inaccurate dosage or duration data; (2) whether the expert has identified the specific mechanism by which the drug supposedly causes the alleged disease; (3) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (4) whether the expert has adequately accounted for alternative explanations; and (5) whether the expert proposes to testify about matters growing directly out of research he or she has conducted independent of the litigation. *See, e.g., id.* at 313; *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 278-79 (5th Cir.1998); *Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1114 (5th Cir.1991); *Newton v. Roche Labs., Inc.*, 243 F.Supp.2d 672, 678 (W.D.Tex.2002). Scientific testimony is relevant only if the expert's reasoning or methodology can be properly applied to the facts in issue, meaning that there is an appropriate fit between the scientific testimony and the specific facts of the case. *Daubert*, 113 S. Ct. at 2786. Scientific evidence is irrelevant, however, when there is too great an analytical gap between the data and the opinion proffered. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

The person seeking to admit expert testimony bears the burden of proving reliability and relevance by a preponderance of the evidence. *Moore v. Ashland Chemical, Inc.*, F.3d 269, 276 (5th Cir. 1998) (en banc). The focus is not on the result or conclusion, but on the methodology. *Id.*

## IV. ARGUMENT

Dr. Flavahan is unqualified to testify regarding Vioxx. Dr. Flavahan is unfamiliar with clinical studies and other data relevant to Vioxx and its safety profile. Dr. Flavahan should not be permitted to offer speculative and conjectural testimony.

During previous pre-trial and trial proceedings, the Court has stated that in order for an expert to testify he must be qualified not only in his field of expertise but be knowledgeable about Vioxx and scientific and clinical trials conducted to study the drug. Dr. Flavahan's deposition testimony clearly reveals that he is not familiar with major clinical trials and studies of Vioxx.

Dr. Flavahan, a "vascular cell biologist,"[10] has little experience with Vioxx. Dr. Flavahan did not begin to focus on Vioxx until after December 2005 when he was hired by Merck to serve as an expert witness.[11]

Dr. Flavahan has not performed basic science research in relation to Vioxx or other COX-2 inhibitors. Dr. Flavahan has not performed any clinical research on Vioxx, or COX-2 inhibitors generally.[12] Dr. Flavahan has not published any scientific articles related specifically to Vioxx; he has not published any scientific papers relating to whether prostacyclin originates from COX-1 or COX-2.[13] Dr. Flavahan has not published any studies supporting his conclusion that Vioxx is not proatherogenetic and that it does not increase atherosclerotic lesion formation.[14]

---

[10] Flavahan dep. at 10.
[11] Flavahan dep. at 27-28, 263.
[12] Flavahan dep. at 252.
[13] Flavahan dep at 15, 265.
[14] Flavahan dep. at 265.

Dr. Flavahan has not reviewed the results of any internal studies executed by Merck but left unpublished.[15] Dr. Flavahan did not review or consider Merck's personal preclinical pharmacology data in forming his opinions.[16] Dr. Flavahan has not reviewed any internal documents from Merck.[17]

Dr. Flavahan purports to have reviewed all of the relevant medical literature associated with Vioxx and other COX-2 inhibitors. Dr. Flavahan's testimony, however, reveals that he is unable to answer basic questions regarding the literature:

> Q.  When did you first review the results of the VIGOR trial, Doctor Flavahan?
> A.  I can't recall.
> Q.  Did you re -- review the results of the VIGOR trial prior to being engaged in -- by Merck in litigation?
> A.  I can't recall.
> Q.  Did you review the results of the APPROVe trial? The published results?
> A.  I have reviewed the manuscripts. And I can't recall when I did that.
> . . . .
>
> Q.  And what's the -- the principal author of that manuscript involving the published results of the approved trial?
> A.  I don't recall at this point.
> Q.  What's the name of the principal author of the publication in -- involving the results of the VIGOR trial?
> A.  I can't recall.
> Q.  Do you know where the results of the VIGOR trial were published?
> A.  Pretty sure it was New England Journal of Medicine, but --[18]
> . . . . .
>
> Q.  Sir, my -- my understanding of your testimony before was that you looked at the New England Journal publication of the VIGOR study, correct?
> A.  As I said, I read the papers.
> Q.  Okay. When you looked at it did you notice that there was a five-fold excess of MIs with Vioxx versus Naproxen?
> A.  To be honest with you, I concentrated on the introduction and the discussion. I was looking at it from a mechanism-based standpoint. I did not review carefully the design, the results, or the interpretation of the studies.[19]

---

[15] Flavahan dep. at 29.
[16] *Id.*
[17] Flavahan dep. at 34.
[18] Flavahan dep. at 17-18.
[19] Flavahan dep. at 60-61.

7

Dr. Flavahan testifies that Vioxx is not cardiotoxic.[20] In outlining his opinion, Dr. Flavahan refuses to discuss the outcomes of the clinical trials and repeatedly stated that he did not rely on any clinical trials to form the basis of his opinions. Furthermore, he testifies that he only scanned the published clinical trials "early on in the process" and did not analyze them.

> Q. Okay. And there's no mention of any of the published literature on clinical trials in -- involving Vioxx in your report. Is that also true?
> A. I'm not sure if any of the clinical trials actually are referenced in the report, no.
> Q. Did you reference the publication of the VIGOR report in your expert opinions?
> A. I don't think it's in there, no.
> Q. Did you reference the APPROVe publication in your report?
> A. I don't think it's in there.
> Q. Did you reference the intention to treat data that has recently been submitted by Merck within the last couple of weeks regarding the approved trial patients?
> A. I don't think that's in there, no.
> Q. Have you reviewed any of the intention-to-treat data that has been released by Merck in the last two weeks?
> A. No.
> Q. Do you know what is meant by intention to treat?
> A. No.
> Q. Sir, do you -- strike that. You have not commented in your report about statistically significant excess cardiovascular events, including heart attacks, in any of the randomized clinical trials involving Vioxx. Is that true?
> A. I have not commented on the results of any of the clinical trials, that's right.
> . . . .
>
> Q. Sir, do you have the expertise to deny that Vioxx has caused statistically significant increased cardiovascular events, including MIs, in several of their randomized clinical trials?
> MR. KREPS: Object to the form of the question.
> A. (Continuing) I've looked at the clinical trials. **Actually scanned them early on in this process.** And my participation in these events is actually to look at mechanisms, pharmacological action of Vioxx, the role of COX-2 within the blood vessel wall. So I -- I have the ability to discuss what may be happening in the blood vessel with regard to atherosclerosis. I am not involved in the design or assessment or analysis of clinical trials. And so I will not be discussing the clinical trials. But I will be discussing the action of these agents in the blood vessel wall and the role of COX-2 in the blood vessel wall.

---

[20] Flavahan dep. at 194-195.

8

. . . .

> Q. My question was: Do you deny that there were statistically significant excess of CV events including MIs in randomized clinical trials involving Vioxx, including VIGOR and APPROVe?
> A. As I said, I'm not here to discuss the results or interpretation of the clinical trials.[21]
>
> . . . . .
>
> Q. My question is a simple one. In forming your opinions that are contained in the expert report of May 31, 2006 did you look at, consider in any way the results of the randomized clinical trials involve -- involving Vioxx?
> A. I looked to the clinical trials manuscripts to see what mechanisms they were discussing within the studies. **I did not analyze them. I did not review the interpretations of the studies.** [22]

Dr. Flavahan further testified that *Naproxen's capacity to inhibit platelet aggregation is similar to low-dose aspirin.*[23] In doing so, he is unable to outline the studies he puts forward in support of this proposition:

> Q. Okay. With regard to Naproxen, what study or studies did you look at to determine whether or not Naproxen has an aspirin-like cardioprotective effect?
> A. The -- the data that's contained in the references there includes *analysis of the inhibitory effects of Naproxen on platelet aggregation and -- as well as the release of thromboxane from the platelets at various times during its therapeutic administration. And it -- it basically provides the same degree or similar degree of inhibition as low-dose aspirin.*
>
> . . . .
>
> Q. Is the -- there any study, other than -- than the Van Hecken study, that attempts to measure the platelet-derived thromboxane inhibition by Naproxen?
> A. Yeah, there's a few there. We can go through the references, if you want me to find them.
> Q. Okay. Did you review the Van Hecken study?
> A. I read the Van Hecken study, yeah.
> Q. Okay. Did the Van Hecken study describe a mean of platelet inhibition or did -- or did they describe individual patients?
> A. We'd have to look at the paper.
> Q. I'm wondering if you can recall that, as we sit here now.
> A. I can't recall.

---

[21] Flavahan dep. at 45-47, 48.
[22] Flavahan dep. at 56-58.
[23] Flavahan dep. at 82.

9

> . . . .
>
> Q.  Okay. Do you recall any subsequent studies to Van Hecken in which there was individual patient variability in terms of the Naproxen effect of inhibiting platelets at whatever percentage it did?
> A.  It may be contained within the references I have in the report, but **I can't recall that here.**[24]

Though Dr. Flavahan may be an able cell biologist, he appears to have little knowledge about Vioxx and the clinical trials that have been conducted to evaluate the drug. He has performed no research on Vioxx or other COX-2 inhibitors. He has published no articles in this area. According to his testimony, Dr. Flavahan only became "focused" on Vioxx when he was hired by Merck in December 2005. In short, Dr. Flavahan is not qualified to offer expert opinions regarding Vioxx in the trial of this case.

## IV. CONCLUSION

For these reasons, Dr. Flavahan's opinions do not meet the standards for expert testimony. Plaintiff respectfully requests that the Court issue an order precluding Dr. Flavahan from offering expert opinion in this case, and for such other and further relief to which Plaintiff may be entitled.

---

[24] *Id.*

Date: June 14, 2006

        Respectfully submitted,

By _____
    Andy D. Birchfield, Jr.
    P. Leigh O'Dell
    BEASLEY, ALLEN, CROW,
    METHVIN, PORTIS & MILES, P.C.
    P.O. Box 4160
    234 Commerce Street
    Montgomery, Alabama 36103-4160
    Telephone: (334) 269-2343
    Facsimile: (334) 954-7555

    Mark P. Robinson, Jr.
    Kevin F. Calcagnie
    Carlos A. Prietto, III
    Ted B. Wacker
    Lexi W. Myer
    ROBINSON, CALCAGNIE & ROBINSON
    620 Newport Center Dr., 7th Floor
    Newport Beach, California 92660
    Telephone: (949) 720-1288

    **Counsel for Plaintiff**

Russ M. Herman
Leonard A. Davis
Stephen J. Herman
HERMAN HERMAN KATZ
& COTLER, LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70013
Telephone: (504) 581-4892
Facsimile: (504) 561-6024

Christopher A. Seeger
SEEGER WEISS
One William Street
New York, New York 10004
Telephone: (212) 584-0700
Facsimile: (212) 584-0799
**Co-Lead Counsel**

**PLAINTIFFS' LIAISON COUNSEL**

Richard J. Arsenault
NEBLETT, BEARD & ARSENAULT
220 Bonaventure Court
P.O. Box 1190
Alexandria, Louisiana 71301-1190
Telephone: (318) 487-9874
Facsimile: (318) 561-2591

Carlene Rhodes Lewis
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, Texas 77002
Telephone: (713) 650-0022
Facsimile: (713) 650-1669

Elizabeth Cabraser
LIEFF, CABRESER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, California 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Drew Ranier, Esq.
RANIER, GAYLE & ELLIOT, LLC
1419 Ryan Street
Lake Charles, Louisiana 70601
Telephone: (337) 494-7171
Facsimile: (337) 494-7218

Thomas Kline
KLINE & SPECTER, P.C.
1525 Locust St., 19th Floor
Philadelphia, Pennsylvania 19102
Telephone: (215) 772-1000
Facsimile: (215) 772-1371
Arnold Levin, Esq.
LEVIN FISHBEIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19106-3875
Telephone: (215) 592-1500
Facsimile: (215) 592-4663

Mark P. Robinson, Jr.
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Dr., 7th Fl
Newport Beach, California 92660
Telephone: (949) 720-1288
Facsimile: (949) 720-1292
Christopher V. Tisi Esq.
ASHCRAFT & GEREL
2000 L Street, NW, Suite 400
Washington, DC 20036-4914
Telephone: (202) 783-6400
Facsimile: (307) 733-0028

**PLAINTIFFS' STEERING COMMITTEE**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Defendants' Liaison Counsel, Phillip A. Wittmann, Merck's Counsel, Andrew L. Goldman, and Plaintiffs' Liaison Counsel, Russ Herman, by U.S. Mail and e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced, in accordance with Pretrial Order No. 8, on this 16th day of June, 2006.

*P. Hugh O'Dell*