Nicholas A. Flavahan, Ph.D.

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF LOS ANGELES
Coordination Proceeding Special Title (Rule 1550(b))

----------------------------------------------------

This Document Applies to All
VIOXX CASES            CASE NO. JCCP NO. 4247

----------------------------------------------------

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

----------------------------------------------------

In Re:  VIOXX            MDL Docket No. 1657
PRODUCTS LIABILITY       Case:  2:06-cv-00485-EEF-DK
LITIGATION

THIS DOCUMENT RELATES TO:
GERALD BARNETT V. MERCK

----------------------------------------------------

ROBERT MCFARLAND,        SUPERIOR COURT OF NEW JERSEY
                         LAW DIVISION:  ATLANTIC COUNTY
        Plaintiff,       DOCKET NO.:  ATL-L-0199-04-MT
v.                       VIOXX LITIGATION
MERCK & CO., INC.,       CASE CODE NO. 619

        Defendant.

----------------------------------------------------

PATRICIA HATCH,          SUPERIOR COURT OF NEW JERSEY
Administrator of the     LAW DIVISION:  ATLANTIC COUNTY
Estate of STEPHEN
HATCH, Deceased and      DOCKET NO.:  ATL-L-0403-05-MT
PATRICIA HATCH,          VIOXX LITIGATION
In Her Own Right,
                         CASE CODE NO. 619
        Plaintiffs,
v.
MERCK & CO., INC.
        Defendant.

----------------------------------------------------

VIDEOTAPED DEPOSITION OF
NICHOLAS A. FLAVAHAN, Ph.D.
Taken on June 7, 2006
Commencing at 9:39 a.m.
REPORTED BY:  NANCY G. GISCH, RMR
Golkow Litigation Technologies
Four Penn Center, Suite 1210
Philadelphia, PA 19103
877.DEPS.USA

PLAINTIFF'S
EXHIBIT
tabbies
B

d2b9f24b-cedb-443c-88de-1a0602890c3b

# Nicholas A. Flavahan, Ph.D.

Page 2

1  The videotaped deposition of NICHOLAS A.
2  FLAVAHAN, Ph.D., taken on June 7, 2006, commencing
3  at approximately 9:39 a.m., taken at Fulbright &
4  Jaworski, 80 South 8th Street, Minneapolis,
5  Minnesota, before Nancy G. Gisch, Registered Merit
6  Reporter, a notary public in and for the State of
7  Wisconsin:
8
9      A P P E A R A N C E S
10
  JOHN W. HORNBECK, ESQ.
11  The Brandi Firm
  44 Montgomery Street
12  Suite 1050
  San Francisco, California 94104
13  415-989-1800
14
  SOL H. WEISS, ESQ.
15  Anapol, Schwartz
  1900 Delancey Place
16  Philadelphia, Pennsylvania 19103
  215-735-2098
17
18  PAUL SIZEMORE, ESQ.
  Beasley, Allen
19  234 Commerce Street
  Montgomery Alabama 36104
20  334-269-2343
21
  RONN B. KREPS, ESQ.
22  ANDRE HANSON, ESQ.
  Fulbright & Jaworski, LLP
23  2100 IDS Center
  80 South Eighth Street
24  Minneapolis, Minnesota 55402
  612-321-2810
25

Page 3

1      SHAYNA S. COOK, ESQ.
  Bartlit, Beck, Herman,
2      Palenchar & Scott, LLP
  Courthouse Place
3      54 West Hubbard Street
  Chicago, Illinois 60610
4      312-494-4465
5
6
  Also Present:
7
  DAN BURTON, Court Videographer
8
9      NOTE:  The original transcript will be
  delivered to Mr. Hornbeck pursuant to the applicable
10  Rules of Civil Procedure.
11
...
25

Page 4

1      I N D E X
2  THE WITNESS:
3  NICHOLAS A. FLAVAHAN, Ph.D.
4
5  EXAMINATION BY:                PAGE
6  Mr. Hornbeck          8, 173
7  Mr. Weiss             129
8  Mr. Sizemore          203
9
10  DEPOSITION EXHIBITS MARKED:
11  No. 1                 6
12   - Curriculum Vitae
13  No. 2                 26
14   - Expert Report of N. Flavahan, Ph.D.
15  No. 3                 49
16   - Joint Meeting of the Arthritis Advisory
      Committee and the Drug Safety and Risk
17      Management Advisory Committee 2/18/05
18  No. 4                 99
19   - New England Journal of Medicine Article
20  No. 5                 112
21   - Joint Meeting of the Arthritis Advisory
      Committee and the Drug Safety and Risk
22      Management Advisory Committee 2/16/05
23  No. 6                 113
24   - Mechanism Based Adverse Cardiovascular Events
      and Specific Inhibitors of COX-2
25

Page 5

1  No. 7                 130
2   - Invoice for Consulting
3  No. 8                 140
4   - Evaluation of CardioGrip
5  No. 9                 144
6   - The Science Behind CardioGrip
7  No. 10                150
8   - Comparison of Upper Gastrointestinal Toxicity
      of Rofecoxib and Naproxen in Patients with
9      Rheumatoid Arthritis
10  No. 11                156
11   - Biological Basis for the Cardiovascular
      Consequences of COX-2 Inhibition: Therapeutic
12      Challenges and Opportunities
13  No. 12                185
14   - Coxibs and Cardiovascular Disease
15  No. 13                195
16   - Cyclooxygenase Inhibition and
      Cardiovascular Risk
17
18
19
20  (Original exhibits attached to original transcript;
21  copies to counsel.)
22
23
24
25

Nicholas A. Flavahan, Ph.D.

Page 6

PROCEEDINGS

1
2
3     (Deposition Exhibit Number 1 was marked for
4   identification.)
5         THE VIDEOGRAPHER: Here begins the
6   videotaped deposition of Nicholas Anthony Flavahan,
7   tape one, in the matter of Rudy Arrigale and Stewart
8   Grossberg versus Merck, in the Los Angeles Superior
9   Court, Case JCCP 4247. Today's date is June 7,
10  2006, and the time on this screen is 9:39 a.m.
11        The video operator today is Dan Burton,
12  representing Court Videographer Services, located at
13  121 South Eighth Street, Suite 1190, in Minneapolis,
14  Minnesota. The court reporter is Nancy Gisch, from
15  Paradigm Reporting.
16        Today's deposition is being taken on behalf
17  of the plaintiff and is taking place at -- man, get
18  this -- 80 South Eighth Street, in Minneapolis,
19  Minnesota.
20        Will counsels please introduce yourselves
21  and state whom you represent.
22        MR. HORNBECK: John Hornbeck,
23  representing Rudy Arrigale and Stewart Grossberg and
24  California litigation.
25        MR. WEISS: My name is --

Page 7

1         MR. SIZEMORE: Paul Sizemore
2   representing the plaintiff, Barnett, and the various
3   MDL plaintiffs.
4         MR. WEISS: My name is Sol Weiss. And
5   I represent the estate of Steven Hatch, deceased.
6   And I believe the other plaintiff is McFarland,
7   which has been cross-noticed, Thomas McFarland, into
8   this deposition from New Jersey.
9         MR. KREPS: I'm Ronn Kreps, at
10  Fulbright and Jaworski, representing Merck in all
11  cases.
12        And before we get started, I do want to make
13  it clear that this has been cross-noticed, as
14  counsel just mentioned, not only in the case that
15  the videographer mentioned, but also in the MDL and
16  Eastern District of Louisiana, MDL docket number
17  1657. And in the Robert McFarland -- McFarland
18  versus Merck and the Patricia Hatch versus Merck
19  cases, case code number 619 in New Jersey.
20        MR. HANSON: Andre Hansen representing
21  Merck and Company.
22        MR. HORNBECK: Shayna Cook, Bartlit
23  Beck, representing Merck.
24        THE VIDEOGRAPHER: Will the court
25  reporter please swear in the witness.

Page 8

1         NICHOLAS A. FLAVAHAN, Ph.D.,
2   duly sworn, was examined and testified as follows:
3         EXAMINATION
4   BY MR. HORNBECK:
5         Q. Would you please spell -- announce your full
6   name and spell it, please -- your last name.
7         A. Nicholas Anthony Flavahan, F-L-A-V-A-H-A-N.
8         Q. And you are a doctor, is that correct?
9         A. Yes.
10        Q. What is your professional address,
11  Doctor Flavahan?
12        A. I'm at the Heart and Lung Research
13  Institute, the Ohio State University, Columbus,
14  Ohio.
15        Q. What is your current position there, sir?
16        A. Professor of cardiology and internal
17  medicine.
18        Q. Are you a medical doctor?
19        A. No.
20        Q. Do you diagnose or treat patients for any
21  medical condition, including heart conditions?
22        A. No.
23        Q. Doctor Flavahan, you have had your
24  deposition taken on previous occasions, is that
25  true?

Page 9

1         A. Yes.
2         Q. And how many times have you had a deposition
3   in litigation, sir?
4         A. Perhaps five times, I think.
5         Q. Have these depositions involved
6   pharmaceutical products alleged to have caused
7   injury to patients?
8         A. Yes.
9         Q. Since you have had previous experience with
10  deposition, I will dispense with the usual rules and
11  regulations of depositions.
12        The one thing we will try to do here today,
13  since the court reporter is taking your testimony
14  and since there is a videotape -- I will try and
15  make my questions simple and understandable. Should
16  you not understand a question, please ask me and
17  I'll be happy to repeat that question.
18        The other admonition for both of us is that
19  we should not try to talk over one another. And
20  we'll do everything possible that I will finish my
21  question, I will wait for you to finish your answer,
22  so that the reporter can have a clear transcript.
23        Is that agreeable with you?
24        A. Sounds great.
25        Q. Okay. Sir, we have marked today for

Golkow Litigation Technologies - 1.877.DEPS.USA

d2b9f24b-cadb-443c-88de-1a0602890c3b

Nicholas A. Flavahan, Ph.D.

Page 10

1   Exhibit 1 a curriculum vitae, which is the -- in
2   front of you as Exhibit 1.
3        Is this curriculum vitae a complete,
4   accurate, and current record of your background and
5   your research?
6      A. Yes.
7      Q. Are there any other papers that you are
8   working on currently that may impact any COX-1,
9   COX-2 discussion today?
10     A. That I'm personally authoring, you mean?
11     Q. Yes, sir.
12     A. No.
13     Q. Doctor, what is your primary research
14  interest at Ohio State?
15     A. Basically a vascular cell biologist. So I'm
16  interested in mechanisms that regulate the blood
17  vessel wall, not only during healthy conditions, but
18  also during a vascular disease.
19     Q. Sir, you have spent a great deal of research
20  time in smooth muscle physiology, is that true?
21     A. Basically all aspects of the blood vessel
22  wall.
23     Q. Okay. Have you done any special research in
24  prostaglandin function in cardiovascular disease?
25     A. Yeah, we have done quite a lot of work

Page 11

1   relating to how the blood vessels change during
2   cardiovascular disease, which includes the role of
3   prostaglandins and other mediators.
4      Q. Very specifically, sir, have you done
5   specific research that has resulted in any published
6   papers that involve prostaglandin synthesis --
7   synthesis in cardiovascular disease?
8      A. Yes.
9      Q. And what -- what are those papers, sir, if
10  you could show us that in Exhibit 1?
11     A. Well, if we just work our way through
12  the -- list of manuscripts --
13         MR. WEISS: John, could you have the
14  witness tell us what date he has on that CV, since I
15  have a couple different versions.
16         MR. HORNBECK: Okay. That's -- I'm
17  sorry.
18     Q. (By Mr. Hornbeck, continuing) Is there a
19  date on the CV that we have marked as Exhibit 1?
20     A. I don't put dates on my CV. If -- if you
21  give me the copy you have, I can let you know which
22  ones we're working off.
23         MR. WEISS: Well, this one came from
24  your web site.
25         THE WITNESS: That would be old.

Page 12

1          MR. WEISS: That's like a year before
2   the one that was attached --
3          THE WITNESS: Yeah.
4          MR. WEISS: -- to your report.
5          THE WITNESS: So the one attached to
6   the report should be the most recent one.
7          MR. HORNBECK: And Exhibit 1 should be
8   the one attached to the report.
9          MR. WEISS: That is the one attached to
10  your report?
11         THE WITNESS: Yep.
12         MR. WEISS: Okay. Thank you.
13     Q. (By Mr. Hornbeck, continuing) Doctor, is the
14  question still in your mind?
15     A. Yeah. So if we go to page 13 and start
16  working our way through it.
17     Q. All right.
18     A. Okay. And so the first one is M-107, which
19  was looking at COX-2 and the blood vessel wall.
20         M-103, as well. M-99, M-98.
21         MR. WEISS: Well, I'm sorry, Doctor.
22  Where are you referring to?
23         THE WITNESS: Starting on page 13 from
24  the resume that you have with --
25         MR. WEISS: The resume I have has

Page 13

1   "M-97" at the top.
2          MR. HORNBECK: He has -- he has a
3   different copy.
4          MR. WEISS: That's the copy that was
5   attached to the report that was served by Merck. So
6   that's why I'm asking you whether it's an updated
7   resume or not.
8          MR. HORNBECK: I'm not sure which
9   report you're talking about, if you're talking about
10  the federal MDL or the New Jersey case or what.
11         Here, here's a copy.
12         MR. WEISS: Same page.
13         MR. HORNBECK: Okay.
14         MR. WEISS: This is a report in Hatch
15  and McFarland.
16         MR. KREPS: Here is a copy of what he's
17  looking at. Go ahead.
18         MR. WEISS: Sorry. It's different is
19  the reason I asked.
20         MR. HORNBECK: All right.
21         MR. WEISS: Okay. Yeah, John, no
22  problem.
23         MR. HORNBECK: That's all right.
24     Q. (By Mr. Hornbeck, continuing)
25  Doctor Flavahan, you have identified four articles

4 (Pages 10 to 13)

d2b9f24b-cedb-443c-88de-1a0602890c3b

Nicholas A. Flavahan, Ph.D.

Page 14

1  which you state have references to prostacyclin
2  synthesis in relation to cardiovascular disease, is
3  that correct?
4      A. Well, some of them relate to normal
5  cardiovascular functions, some of them relate to
6  potential role in cardiovascular disease. And I'm
7  still working my way through the list.
8      Q. Okay. I'm sorry. When you're-- when you're
9  finished, please let me know.
10     A. No problem.
11        Again, M-75, I think M-74, M-67, M-65, M-63,
12  M-60, M-56, M-47, M-46, potentially M-45, M-42. I
13  think they are probably the main ones.
14     Q. Okay. In any of the papers that you have
15  identified as dealing with COX-1, COX-2 inhibition
16  in cardiovascular disease, have any of these papers
17  discussed the so-called imbalance theory that is
18  referenced in your report of -- concerning the
19  possible inhibition of prostacyclin by COX-2 in
20  cardiovascular disease states?
21        MR. KREPS: Object to the form of the
22  question. Misstates his -- misstates the witness's
23  testimony.
24        Go ahead.
25     A. (Continuing) None of them have analyzed the

Page 15

1  imbalance there.
2      Q. Have any of your papers that you --
3      A. Let me correct that. None -- none of them
4  have discussed the imbalance there.
5      Q. Have any of the papers you referenced as
6  involving COX-2 inhibition and cardiovascular states
7  discussed the source of prostacyclin, i.e., whether
8  it comes from a COX-1 or COX-2?
9      A. I don't think so, no.
10     Q. Okay. Have you ever published an abstract,
11  lectured, presented any scientific information on
12  the source of prostacyclin coming from COX-1 or
13  COX-2 in cardiovascular disease states?
14     A. I don't think so.
15     Q. Have you, prior to litigation, kept up to
16  speed with the papers and research involving
17  specific COX-2 inhibitors such as Vioxx and
18  Celebrex?
19     A. I don't know what you would define as "up to
20  speed."
21     Q. Let me -- let me define that for you. This
22  is exactly a good point. Since my question wasn't
23  clear, you've asked me to clarify it. And so
24  I'm -- I'm happy to do that. That's a -- that's a
25  good thing.

Page 16

1      Did you maintain, prior to litigation, a
2  personnel file on specific COX-2 inhibitors such as
3  Vioxx and Celebrex?
4      A. I kept up to date with regards to the
5  generalities of COX-1 and COX-2. And specifically
6  with regard to Vioxx I'm not sure. It would have
7  been contained within a folder I had describing the
8  function of COX-2 and the potential modifications
9  using COX-2 inhibitors.
10     Q. Did you keep a personal folder prior to
11  litigation of clinical trial results of Vioxx?
12     A. I would not have, no.
13     Q. Have you a personnel file, as we sit here
14  today, of clinical trial published results of Vioxx?
15     A. No.
16     Q. Have you, as of today, received any
17  information from Merck about their clinical trial
18  program involving Vioxx?
19     A. I've received some information from the
20  Merck lawyers. And I'm sure you're going to get
21  access to that. I haven't looked through all the
22  data they've given me, so I'm not sure.
23     Q. My question specifically would be, Doctor,
24  as you sit here today have you received clinical
25  trial publications from the Merck lawyers which you

Page 17

1  have reviewed?
2      A. I have looked to some of the clinical trial
3  papers. I think I looked at them independently of
4  anything that the Merck lawyers gave me. There may
5  be similar papers within the -- the documents that
6  you see -- or that you received from them, but
7  I -- I -- I looked at it independently.
8      Q. When did you first review the results of the
9  VIGOR trial, Doctor Flavahan?
10     A. I can't recall.
11     Q. Did you re -- review the results of the
12  VIGOR trial prior to being engaged in -- by Merck in
13  litigation?
14     A. I can't recall.
15     Q. Did you review the results of the APPROVe
16  trial? The published results?
17     A. I have reviewed the manuscripts. And I
18  can't recall when I did that.
19     Q. And what's the -- the principal author of
20  that manuscript involving the published results of
21  the approved trial?
22     A. I don't recall at this point.
23     Q. What's the name of the principal author of
24  the publication in -- involving the results of the
25  VIGOR trial?

Golkow Litigation Technologies - 1.877.DEPS.USA

d2b9f24b-cedb-443c-88de-1a0602890c3b

Nicholas A. Flavahan, Ph.D.

Page 18

1    A. I can't recall.
2    Q. Do you know where the results of the VIGOR
3  trial were published?
4    A. Pretty sure it was New England Journal of
5  Medicine, but --
6    Q. Correct.
7       And do you know approximately when it was
8  published?
9    A. I can't recall.
10    Q. If I give you the date of November 2001,
11  does that square with your memory or would it just
12  be a guess?
13       MR. KREPS: Objection to form.
14    A. (Continuing) It was back there sometime.
15    Q. Okay. Did you review the results of the
16  VIGOR trial at some point following its publication
17  in the New England Journal?
18    A. It would have had to have been, yes.
19    Q. Okay. Was it within the -- the year after,
20  within the last six months? If you can just give us
21  some kind of an indication.
22    A. I have no idea.
23    Q. Have you, in your research, been involved in
24  the development of a pharmaceutical drug?
25    A. We've been involved in identifying targets

Page 19

1  that would then be addressed or targeted by our
2  pharmaceutical compound, but we -- I have not been
3  involved in designing or -- or making
4  pharmaceuticals.
5    Q. Okay. Is -- just to make sure that I
6  understand your answer, is there any pharmaceutical
7  drug now on the market in which you were a
8  researcher consulting and paid by a drug company in
9  that development?
10    A. No.
11    Q. Is there any compound that was being
12  advanced by a drug company that did not reach the
13  approval process in which your research was directly
14  contracted for by the drug company?
15    A. Well, drug companies have used our research
16  to direct development of compounds. And at this
17  point none of them have -- have made it to market,
18  as far as I'm aware.
19    Q. Could you tell us what drug companies you
20  have -- provide consultation for with regard to
21  compounds that were being considered for market?
22    A. The main ones are Pfizer and Otsuka.
23    Q. Okay. And when did you consult for Pfizer
24  in the development of a potentially marketable drug?
25    A. It's been in the last couple of years. It

Page 20

1  probably heads back to about 2001.
2    Q. Okay. And you were referencing a particular
3  research paper. You -- or perhaps I missed that.
4    A. I was checking back to the patent that was
5  involved with that development, which is listed in
6  my CV.
7    Q. Okay. Would you direct me to that page,
8  please.
9    A. Page 6.
10    Q. All right. And the patent is what, sir?
11    A. The last thing on page 6 that refers to US
12  patent number 6,444,681.
13    Q. Okay. And was that patent then purchased by
14  Pfizer for development of a drug using that patent
15  research?
16    A. Pfizer was involved in the actual
17  application for the patent, I think. And they were
18  interested in developing the alpha 2C-Adrenergic
19  blockers and therapy for Raynaud's and scleroderma.
20    Q. Okay. Have you maintained since 2002 a
21  contract with Pfizer for the development of a
22  potential drug using this patent information?
23    A. No. When that current project ended with
24  Pfizer, that was the end of the arrangement with
25  them.

Page 21

1    Q. Okay. So how many months, years were you
2  involved with Pfizer in the potential development of
3  a compound?
4    A. I think it was potentially two to three --
5  three years.
6    Q. Okay. You mentioned one other
7  pharmaceutical company and a potential compound
8  that --
9    A. That was --
10    Q. -- has not been marked?
11    A. That was Otsuka.
12    Q. And when was that, sir?
13    A. That was right in about the same time. They
14  also happened to be interested in those two disease
15  processes at the same time.
16    Q. Did that arrangement with Otsuka involve the
17  same information contained in the -- the patent
18  you've ref -- referenced on page 6?
19    A. They were interested in the same mechanisms,
20  the same research that we were doing, but Pfizer was
21  slightly ahead of Otsuka, so I wasn't directly
22  involved with Otsuka.
23    Q. Okay. So at no time have you been involved
24  in the development of the drug that has come to
25  market. Is that a fair statement?

Golkow Litigation Technologies - 1.877.DEPS.USA

d2b9f24b-cedb-443c-88de-1a0602890c3b

Nicholas A. Flavahan, Ph.D.

Page 22

1    A. Not directly involved, that's correct.
2    Q. Okay. Have you ever been asked by any drug
3  company to provide research -- research for the
4  development of a specific COX-2 inhibitor?
5    A. No.
6    Q. Sir, in your -- your research is it
7  generally true that you develop a hypothesis and
8  then you go about attempting to test that
9  hypothesis?
10   A. Generally a lot of people think we -- we
11 generate hypotheses and then go and test them.
12 Generally what we have are questions. And so we go
13 and answer the questions. And you get the answer to
14 the question you asked, but you generate more
15 questions. And then you go and find answers to
16 them.
17   Q. Have you ever participated in human clinical
18 trials?
19   A. No.
20   Q. Is the ultimate goal of the research you've
21 been involved in to determine the effects of a -- a
22 particular process in the vasculature as it relates
23 to the human being?
24   A. Yeah, the -- the goal of kind of all
25 translational research is to provide some relevance

Page 23

1  to normal -- not only what happens in the normal,
2  healthy individual, but also what triggers and
3  progresses vascular disease.
4    Q. So the research that you do on a cellular
5  level, that you do in tissue in vitro, is all aimed
6  ultimately at discovering what the implication would
7  be for human beings, is that true?
8    A. The ultimate goal is to have some clinical
9  relevance, yes.
10   Q. Okay. Have you ever been on a DSMB for a
11 clinical trial involving a pharmaceutical?
12   A. No.
13   Q. Have you ever been asked by a pharmaceutical
14 company to do some research after the marketing of a
15 drug? That is, in the post-marketing phase?
16   A. We may have been approached to look at other
17 effects of a currently marketed drug, but I -- I
18 can't recall at this point.
19   Q. Have you ever been a member of an advisory
20 committee of the FDA?
21   A. No.
22   Q. Have you ever provided expert testimony or
23 an expert presentation to an advisory committee of
24 the FDA?
25   A. No.

Page 24

1    Q. Have you ever provided expert testimony or
2  consultation for any FDA body or -- or division?
3    A. No.
4    Q. Were you ever consulted by Merck with regard
5  to the development of Vioxx?
6    A. Attended a Merck consultant conference once,
7  but it wasn't specifically related to -- to Vioxx or
8  COX-2.
9    Q. When was the conference in -- in which you
10 were invited to participate by Merck?
11   A. I don't keep track of it in my -- my resume,
12 so I don't remember.
13   Q. Would it be fair to say it was not within
14 the last five years?
15   A. No. Yeah. It's fair to say that.
16   Q. Okay. Okay.
17       Were you consulted by Merck at any point --
18 and I'm excluding litigation -- after the withdrawal
19 of Vioxx in September of 2004?
20   A. No.
21   Q. Did you attend any meetings of consultants
22 sponsored by Merck to discuss the results and
23 implications of the withdrawal of the drug in
24 September 2004?
25   A. No.

Page 25

1    Q. Were you ever asked by Merck to provide any
2  consultation for Merck's presentation to the
3  advisory committee of the FDA in February of 2005?
4    A. No.
5    Q. Were you ever asked to review, by Merck, the
6  advisory committee minutes and presentations of
7  February 16 through 18 of 2005?
8    A. No.
9    Q. As we sit here today, have you reviewed the
10 presentation by experts, as well as Merck
11 presenters, to the advisory committee during
12 February 16 to 18, 2005?
13   A. No.
14   Q. Have you read any reports or have any
15 information about the presentations made to the
16 advisory committee of the FDA in February 2005?
17   A. No.
18       MR. KREPS: Object -- note the
19 objection, form of the question.
20   Q. (By Mr. Hornbeck, continuing) All right.
21 Let me ask you, Doctor, then, to take a look at what
22 has been furnished to us, which is the expert report
23 of Nicholas Flavahan. I'm going to mark that as
24 Exhibit 2 for today.
25       MR. HORNBECK: Ronn, do you have a

7 (Pages 22 to 25)

d2b9f24b-cadb-443c-88de-1a0602890c3b

Nicholas A. Flavahan, Ph.D.

## Page 26

1 copy?
2        MR. KREPS: I think I do.
3        MR. HORNBECK: Okay. Because I would
4 either give you a copy or Sol, if you want a copy.
5        MR. WEISS: I have a --
6        THE WITNESS: I've got a copy here.
7        MR. HORNBECK: He's all set.
8        MR. KREPS: One needs to be marked, so
9 keep that.
10        MR. WEISS: Can we go off the record
11 for a second?
12        MR. HORNBECK: Yes.
13        THE VIDEOGRAPHER: Going off the record
14 at 10:07.
15        (Recess from 10:07 a.m. to 10:08 a.m.)
16        (Deposition Exhibit Number 2 was marked for
17 identification.)
18        THE VIDEOGRAPHER: We're back on the
19 record at 10:08 a.m.
20        Q. (By Mr. Hornbeck, continuing) Okay.
21 Doctor Flavahan, we're looking at Exhibit 2 marked
22 today, which is an expert report of Nicholas A
23 Flavahan, Ph.D., May 31, 2006.
24        Is this the last generation of your expert
25 report?

## Page 27

1        A. Yes.
2        Q. When were you first contacted by either a
3 Merck employee or by lawyers for Merck and asked to
4 look at Vioxx as a specific COX-2 inhibitor?
5        A. I was approached -- it would have been, I
6 think, December of 2005.
7        Q. Okay. And who approached you, sir?
8        A. It would have been Ronn Kreps from Fulbright
9 and Jaworski.
10        Q. Okay. And in the course of -- of your
11 consulting, how many meetings have you had with
12 Mr. Kreps or other attorneys from Merck?
13        A. I actually don't recall. Potentially maybe
14 four -- three or four.
15        Q. Okay. When you were first contacted by
16 Merck attorneys what were you asked to do?
17        A. I was asked to look at the potential role of
18 COX-2 in the blood vessel wall and also the
19 pharmacological mechanisms of the action of -- of
20 Vioxx.
21        Q. What information, documents of any sort,
22 were you given in order to answer those two issues?
23        A. I don't recall the specific documents that I
24 was given. You, I think, have gotten a copy of
25 whatever documents I received.

## Page 28

1        I basically was free to go and get my own
2 documentation through the -- the literature.
3        Q. Okay. There has been represented today that
4 there is a -- a CD containing all the documents
5 referenced in your report, as well as those physical
6 documents themselves.
7        You're aware of that?
8        A. Yes.
9        Q. Okay. Is there any list of the documents
10 referenced in your report that would separate out
11 what you were given by attorneys for Merck and
12 documents that you retrieved yourself?
13        A. I retrieved everything in this report
14 myself. Well, there is also a duplication with the
15 stuff that Merck gave me. You'll just have to check
16 those two lists.
17        Q. Okay. Is it -- is it your understanding
18 that there is a list of materials Merck gave to you,
19 as well as a list of materials that you personally
20 re -- reviewed and -- and acquired?
21        A. That is my understanding.
22        Q. Okay. Did your role -- consulting role
23 change at all from the initial consultation question
24 of the role of COX-2 and the pharmacologic
25 metabolism of Vioxx?

## Page 29

1        MR. KREPS: Object to the form of the
2 question.
3        A. (Continuing) That was the pharmacological
4 mechanism of action of Vioxx.
5        Q. Sorry.
6        A. It has stayed the same.
7        Q. I'm sorry?
8        A. It has stayed the same.
9        Q. Okay. Have you received from Merck the
10 results of their personal preclinical pharmacology?
11        A. All I've reviewed are the published
12 literature, so I haven't received anything
13 from -- from Merck.
14        Q. Did -- did you ask Merck if they had any
15 reports of preclinical studies, results, and
16 opinions?
17        A. I haven't spoken directly to anyone from
18 Merck.
19        Q. Okay. Is the preclinical information
20 conducted by Merck that was not part of the
21 published literature something that you would be
22 interested in seeing to form opinions?
23        A. No.
24        Q. Okay. Have you ever asked Merck if they had
25 any preclinical information that raised the

Nicholas A. Flavahan, Ph.D.

Page 30

1  potential for cardiovascular risk with Vioxx?
2      A. No.
3      Q. Have you ever asked Merck if they had
4  outside consultants who raised with them the
5  potential for excess cardiovascular events with
6  Vioxx?
7      A. As I said, I haven't spoken to anyone from
8  Merck and I haven't asked them for any data.
9      Q. Well, when I say "Merck" I'm including their
10  attorneys, because under our system the attorneys
11  can be asked and they can go get company documents.
12  So my question would -- when I say "Merck," would
13  encompass the attorneys, as well.
14     A. Right.
15     Q. Is your answer the same?
16     A. The same.
17     Q. Were you ever given the record of the
18  meeting of the scientific advisors to Merck on Vioxx
19  in May 1998?
20     A. No.
21     Q. Do you know who were outside consultants for
22  Merck prior to the drug being approved in 1999?
23     A. No.
24     Q. Are you familiar by reputation with John
25  Oates?

Page 31

1      A. I've read some of his manuscripts.
2      Q. Is he a well-respected authority in COX-1,
3  COX-2 inhibition?
4      A. I this he's a very respected scientist, yes.
5      Q. Garrett FitzGerald, same question. Is he a
6  well-respected scientist in the area of COX-1, COX-2
7  inhibition?
8      A. I think he's considered a good scientist,
9  yes.
10     Q. Carlo Patrono. Do you know him?
11     A. Again, I know his manuscripts.
12     Q. Okay. Is he considered by reputation, in
13  your view, to be an expert in COX-1, COX-2
14  inhibition?
15     A. Again, he's written a lot of manuscripts in
16  the area and I think he would be considered an
17  expert, yes.
18     Q. Have -- until I mentioned these names today,
19  were you ever informed by Merck that these three
20  individuals who you've described as expert
21  scientists were, in fact, consultants to Merck prior
22  to the approval of the drug and continuing
23  thereafter?
24         MR. KREPS: Objection to form.
25     A. (Continuing) I don't recall.

Page 32

1      Q. Have you ever been given any written
2  documents that would involve any or all of these
3  three researchers, specifically with regard to their
4  views on the COX-2 inhibition and mechanism of
5  action of Vioxx?
6         MR. KREPS: Objection to form.
7      A. (Continuing) As you'll see from the report,
8  I've retrieved references from all three individuals
9  with regard to Vioxx and COX-2. And whether that
10  was duplicated in any documents I received from
11  Merck's lawyers, I'm not sure.
12     Q. The references that you have in your report
13  are all published literature, correct?
14     A. That's correct.
15     Q. My question would be: Any internal
16  documents that Doctors Oates, Patrono, FitzGerald
17  would have that -- strike that.
18         My question goes to any internal Merck
19  documents that reflect conversations with Patrono,
20  Oates, FitzGerald relative to the mechanism of
21  action of Vioxx?
22     A. As far as I'm aware I haven't received any
23  unpublished comments or documents with those
24  authors, no.
25     Q. Are you aware of any proposals by Doctors

Page 33

1  Patrono, Oates, FitzGerald relative to specific
2  research projects suggested to Merck to ascertain
3  the mechanism of action of Vioxx?
4      A. No.
5      Q. Would you be interested in -- interested in
6  seeing those proposals from those researchers?
7      A. No.
8      Q. Doctor, is it your view that expert
9  consultants to a drug company should be followed or
10  not followed in terms of their --
11         MR. KREPS: Objection.
12     Q. (By Mr. Hornbeck, continuing) -- terms of
13  their proposals for research?
14         MR. KREPS: Object to form, vague,
15  ambiguous, lacks specificity.
16     A. (Continuing) Yeah. I mean, they should be
17  listened to. Whether they should be followed or not
18  is a -- they are obviously there to give advice.
19  And depends on the -- the -- how good the advice is.
20  I mean, the advice presumably has to be weighed with
21  advice from other agents.
22     Q. Okay. Do you know whether or not there were
23  specific research proposals given to Merck that were
24  aimed at better understanding the role of Vioxx in
25  the initiation and progression of atherosclerotic

# Nicholas A. Flavahan, Ph.D.

Page 34

1 disease?
2    A. I have no idea what proposals were given to
3 Merck.
4    Q. Have you seen any documents relating to the
5 internal research by Merck into whether or not Vioxx
6 can initiate or accelerate the development of
7 atherosclerotic disease?
8    A. I have seen no internal documents.
9    Q. In the meetings that you had with Merck
10 attorneys, approximately how many hours have you
11 spent total in those three to four meetings you've
12 identified?
13    A. Usually the meetings would last about a day,
14 a working day. So if I had three to four meetings,
15 that would be roughly 24, 32 hours.
16    Q. Were the meetings at your office in Columbus
17 or were they here or divided?
18    A. Divided.
19    Q. Did you meet anyplace other than Columbus or
20 Minneapolis?
21    A. Yes.
22    Q. And where was that?
23    A. In Chicago and, also, D.C.
24    Q. All of those meetings happened between
25 December 2005 and today, according to what you've

Page 35

1 previously said, correct?
2    A. Yes. From the start of this -- these
3 proceedings until -- until today, yeah.
4    Q. Okay. At any of the meetings that you've
5 described were there any Merck personnel present?
6    A. No.
7    Q. Other than attorneys.
8    A. No, no.
9    Q. Were there any other consultants present at
10 any of these meetings?
11    A. No.
12    Q. Did you take any notes at these meetings?
13    A. No.
14    Q. Did you prepare any written material for the
15 attorneys for these meetings?
16    A. Only these reports. Outside of the reports,
17 nothing.
18    Q. When -- and when you say "these reports,"
19 you're -- you're referring to this specific report
20 we've marked as Exhibit 2, correct?
21    A. Yes.
22       MR. KREPS: Well, you're -- just so
23 we're clear, Counsel, he has, in addition to
24 Exhibit 2 -- which, by the way, on the court
25 reporter's copy here with the tag on it doesn't

Page 36

1 have -- is missing one of the pages. So we have
2 to -- have to clarify that.
3       MR. HORNBECK: That would be fine.
4       MR. KREPS: But he did reports in two
5 earlier New Jersey cases.
6       MR. HORNBECK: Okay. I'm going
7 to -- I'll get into that. Thanks.
8    Q. (By Mr. Hornbeck, continuing) The record we
9 have in front of us today as Exhibit 2 is dated
10 May 31, 2006.
11       May I ask you when the first draft of the
12 expert report that we've now marked as Exhibit 2 was
13 done?
14    A. I have no idea.
15    Q. If you were first contacted in
16 December 2005 --
17    A. Right.
18    Q. -- can you give us any approximation of when
19 the first draft was done?
20    A. Well, the first report was submitted -- that
21 should be on record when that was submitted. So you
22 can presumably say that was the first draft and this
23 is the -- the most recent one.
24    Q. So the -- the draft -- strike that.
25       The report that you submitted in the

Page 37

1 New Jersey litigation was the first and only draft
2 of the report, is that the testimony?
3    A. I think the New Jersey case, yes.
4    Q. When you wrote the first expert report that
5 was filed in New Jersey, was any previous draft of
6 that report submitted to attorneys for Merck for
7 comment or review?
8    A. I don't think so, no.
9    Q. How long did it take you to write the
10 report?
11    A. I think writing the report didn't take that
12 long. There was a -- obviously a lot of manuscripts
13 to read, so I'm not sure.
14    Q. Well, can you give me an estimate, if -- if
15 you prepared the first draft that was actually the
16 final report, as well, submitted in New Jersey, how
17 long did it take to you write that report?
18    A. I have no idea.
19    Q. Can you give me some indication? Hours?
20 Days?
21    A. I'm not sure.
22       MR. WEISS: John, under our rules, he's
23 supposed to be producing a bill today for his time.
24       MR. HORNBECK: I'm -- we're getting
25 -- we're getting to that. Next question.

10 (Pages 34 to 37)

d2b9f24b-cedb-443c-88de-1a0602890c3b

# Nicholas A. Flavahan, Ph.D.

Page 38

1    MR. WEISS: That's what -- okay.
2    Q. (By Mr. Hornbeck, continuing) Did you keep
3 any journal of time spent as a consultant in Vioxx
4 litigation?
5    A. Not specifically a journal; there are
6 invoices that have been submitted.
7    Q. Do the invoices reflect the work done per
8 billing period?
9    A. They would, yes.
10    Q. So your invoices would reflect the time it
11 took you to write the first draft, which became the
12 final report in the New Jersey litigation, is that
13 true?
14    MR. KREPS: Object to form of the
15 question.
16    A. (Continuing) When you see the invoices,
17 you'll see that I gave time. And then designation
18 is usually just a genetic reviewing, so I never
19 broke it down to reading and writing.
20    Q. Looking at the report we've marked as -- as
21 Exhibit 2, it reflects a date of May 31, 2006,
22 correct?
23    A. Correct.
24    Q. And have there been any major changes from
25 the report filed in New Jersey until the report

Page 39

1 dated May 31, 2006, which is Exhibit 2?
2    MR. KREPS: Objection to form.
3    A. (Continuing) I think there's been a few
4 cosmetic changes. The only major section that was
5 added was -- I think the -- the biggest change has
6 been the addition of the section on page 11.
7    Q. That would be COX-2 inhibitors in human
8 circulatory homeostasis, is that correct?
9    A. That's correct.
10    Q. And were you requested to add that section
11 to the report?
12    A. Nope.
13    Q. That was something that you just decided to
14 do on your own volition, is that true?
15    A. I had thought about it when I had submitted
16 the report for New Jersey. I didn't have time to
17 include it at that point.
18    Q. Okay. Does your expert report contain all
19 the opinions that you have in the Vioxx litigation?
20    A. They contain my core opinions and everything
21 that I'm relying on at this point.
22    Q. Okay. Well, if -- if the opinion is not in
23 the report, you may be precluded at trial from
24 advancing any additional opinions. Is -- has that
25 been explained to you?

Page 40

1    MR. KREPS: Object to form of the
2 question.
3    A. (Continuing) I understand, yes.
4    Q. Okay. So in order for us to prepare for
5 trial in California, I need to know that the
6 opinions that you may present at trial are contained
7 in the report to the best of your knowledge as you
8 sit here today.
9    MR. KREPS: I'll object to the form of
10 the question.
11    A. (Continuing) Yeah. This is -- I'm not sure
12 where the discussions will go. And so I've
13 obviously read a lot of manuscripts. I also have a
14 lot of experience within the blood vessel walls, so,
15 you know, depending on where discussions go and
16 where your questions go, I may have to process and
17 come up with additional studies to address that.
18    As we sit here today, this is my core
19 opinions and the -- and the -- the case. And this
20 is what I'm relying on.
21    Q. Is there any work you're doing now, after
22 this opinion has been filed, that may or may not
23 influence your testimony at trial?
24    MR. KREPS: Object to form of the
25 question.

Page 41

1    A. (Continuing) Obviously I continue to read,
2 but this still represents the -- the core opinions
3 in the case.
4    Q. Well, tell me what you've read since the
5 report of May 31, 2006 that reflect upon your
6 opinions that are contained in Exhibit 2.
7    A. Just general reading of the literature as it
8 pertains to my own research that we're doing in the
9 blood vessel wall.
10    Q. I'm asking you specifically, Doctor, to
11 identify for us any particular literature, any work
12 that you're currently doing that would impact your
13 opinions that are contained in Exhibit 2.
14    A. There's nothing that adds majorly to the
15 opinions within the report. There are potentially
16 additional references that consolidate and agree
17 with it, but, as we sit here today, this is a good
18 representation of my core opinions.
19    Q. All right. As we sit here today you can't
20 identify for me any specific additional literature
21 or documents that you may -- that you've read since
22 your report that may impact your opinions, is that
23 true?
24    MR. KREPS: Object to form of the
25 question. I'm not sure what you mean, Counsel, by

d2b9f24b-cedb-443c-88de-1a0602890c3b

Nicholas A. Flavahan, Ph.D.

Page 42

1  "literature or documents."
2        We have given him now, for example,
3  Doctor Plunkett's report, Doctor Halpern's
4  deposition for the California proceeding. He hasn't
5  had a chance to look at those yet, but obviously
6  we -- as we said in the designation in the
7  California cases, we anticipate that he may well
8  have testimony relevant to their opinions.
9        Q. (By Mr. Hornbeck, continuing) Doctor, you've
10  heard your -- your counsel give us some additional
11  depositions of two witnesses in the plaintiff's
12  case.
13        Other than those two depositions, have you
14  received any other written information that reflects
15  on your opinions in Exhibit 2?
16        A. You mean from the time of this report?
17        Q. May 31 until we're sitting here today.
18        A. I don't think I've received anything else
19  from the attorneys, although I just -- as I said, I
20  continue to read the scientific literature because
21  that's -- that's what I do.
22        Q. Okay. Doctor, you have no opinions in your
23  report on case-specific matters involving individual
24  plaintiffs, is that true?
25        A. That's correct.

Page 43

1        Q. And I assume from that, sir, you will be
2  offering no case-specific opinions with regard to
3  individual plaintiffs, is that true?
4        A. I -- I don't think so. It's not my normal
5  course of work to review patient records. Whether
6  the ideas expressed in this report will be
7  integrated into a more comprehensive analysis within
8  individual patients, I'm not sure. But at this
9  point I don't think there's any plans for me to go
10  into patient records or to review case-specific
11  details.
12        Q. All right. Well, just so we're -- we're
13  very clear about this, we -- we would object to any
14  opinions that you might want to proffer, if you come
15  to California to testify, with regard to specific
16  plaintiffs. Is that understood?
17        A. That's understood.
18        Q. Okay. Sir, have you agreed to come to
19  California to testify in person?
20        A. I haven't been asked yet.
21        Q. Do you know when the trial is?
22        A. I have a rough idea.
23        Q. Can you give me a rough?
24        A. I think it's the end of July, beginning of
25  August. Is that right?

Page 44

1        Q. Okay. That's actually the MDL trial.
2        A. All right.
3        Q. Have you been asked to testify in person at
4  the MDL trial?
5        A. I don't -- as far as I know, there's no
6  arrangements and I haven't been specifically invited
7  or asked yet.
8        Q. Okay. Have you sufficient time and
9  references in your report so that you're comfortable
10  with the witness that you have in the expert report,
11  which is Exhibit 2?
12        MR. KREPS: Object to the form of the
13  question.
14        A. (Continuing) I mean, yes. I mean, I think
15  the references, although they potentially may
16  increase -- I'm still reading manuscripts -- the
17  manuscripts I'm reading consolidate this and -- but,
18  yes, the -- the references that are contained in the
19  report support the -- the ideas within the report.
20        Q. All right. Is there any information that
21  you have requested and not received prior to filing
22  this report of May 31, 2006?
23        A. No.
24        Q. As you sit here today, are there -- do you
25  know of any specific references that you would add

Page 45

1  to this report?
2        A. I know there are references that consolidate
3  the ideas in the report. I can't give you them just
4  now.
5        Q. Okay. Sir, there are no opinions in your
6  report that relate to the findings in any of the
7  published Vioxx clinical trials. Is that true?
8        A. There's nothing specifically related to the
9  analysis assessment of those clinical trials, that's
10  right.
11        Q. Okay. And there's no mention of any of the
12  published literature on clinical trials in --
13  involving Vioxx in your report. Is that also true?
14        A. I'm not sure if any of the clinical trials
15  actually are referenced in the report, no.
16        Q. Did you reference the publication of the
17  VIGOR report in your expert opinions?
18        A. I don't think it's in there, no.
19        Q. Did you reference the APPROVe publication in
20  your report?
21        A. I don't think it's in there.
22        Q. Did you reference the intention to treat
23  data that has recently been submitted by Merck
24  within the last couple of weeks regarding the
25  approved trial patients?

12 (Pages 42 to 45)

d2b9f24b-cedb-443c-88de-1a0602890c3b

Nicholas A. Flavahan, Ph.D.

Page 46

1    A. I don't think that's in there, no.
2    Q. Have you reviewed any of the
3  intention-to-treat data that has been released by
4  Merck in the last two weeks?
5    A. No.
6    Q. Do you know what is meant by intention to
7  treat?
8    A. No.
9    Q. Sir, do you -- strike that.
10      You have not commented in your report about
11  statistically significant excess cardiovascular
12  events, including heart attacks, in any of the
13  randomized clinical trials involving Vioxx. Is that
14  true?
15    A. I have not commented on the results of any
16  of the clinical trials, that's right.
17    Q. I take it you do not intend to offer any
18  opinions about the statistical significant excess
19  cardiovascular events, including heart attacks, in
20  any of the randomized clinical trials involving
21  Vioxx. Is that true?
22      MR. KREPS: Object to form of the
23  question.
24    A. (Continuing) I don't think anyone will be
25  asking my opinion of the clinical trials, that's

Page 47

1  right.
2    Q. Sir, do you have the expertise to deny that
3  Vioxx has caused statistically significant increased
4  cardiovascular events, including MIs, in several of
5  their randomized clinical trials?
6      MR. KREPS: Object to the form of the
7  question.
8    A. (Continuing) I've looked at the clinical
9  trials. Actually scanned them early on in this
10  process. And my participation in these events is
11  actually to look at mechanisms, pharmacological
12  action of Vioxx, the role of COX-2 within the blood
13  vessel wall. So I -- I have the ability to discuss
14  what may be happening in the blood vessel with
15  regard to atherosclerosis. I am not involved in the
16  design or assessment or analysis of clinical trials.
17  And so I will not be discussing the clinical trials.
18  But I will be discussing the action of these agents
19  in the blood vessel wall and the role of COX-2 in
20  the blood vessel wall.
21    Q. Sir, do you disagree that randomized
22  clinical trials involving Vioxx, including VIGOR and
23  APPROVe, produced a statistically significant
24  increase of cardiovascular events including heart
25  attacks?

Page 48

1      MR. KREPS: Objection, form of the
2  question.
3    A. (Continuing) My primary concern in looking
4  at the manuscripts and those clinical trial
5  transcripts was to look at the mechanisms that were
6  being discussed within the papers. I did not
7  address the statistical significance or the actual
8  interpretation of the data.
9    Q. My question was: Do you deny that there
10  were statistically significant excess of CV events
11  including MIs in randomized clinical trials
12  involving Vioxx, including VIGOR and APPROVe?
13    A. As I said, I'm not here to discuss the
14  results or interpretation of the clinical trials.
15    Q. And I take it by that, sir, you -- you do
16  not disagree with the proposition that there were
17  statistically significant excess cardiovascular
18  events, including MIs, in randomized clinical trials
19  involving Vioxx?
20      MR. KREPS: Objection, form of the
21  question.
22    A. (Continuing) I'm not here to discuss or
23  interpret the clinical trials.
24    Q. You have no opinion one way or the other,
25  based on randomized clinical trials of Vioxx,

Page 49

1  whether or not Vioxx causes excess cardiovascular
2  events, including MIs. Is that your testimony?
3      MR. KREPS: Objection, form of the
4  question.
5    A. (Continuing) I have opinions with regard
6  to -- Vioxx does within humans and within blood
7  vessels. I have no opinions regarding the con --
8  conduct or interpretation of the clinical trials.
9      MR. HORNBECK: Let's look at -- mark
10  Exhibit 3, please.
11      (Deposition Exhibit Number 3 was marked for
12  identification.)
13    Q. (By Mr. Hornbeck, continuing)
14  Doctor Flavahan, Exhibit 3 is the vote by the
15  advisory committee in February 2005 on the question
16  of whether or not there is evidence that Vioxx
17  increases the risk of cardiovascular disease.
18      Do you see the question that is presented to
19  the panel?
20    A. There's part of a question that's answered,
21  yes.
22    Q. And that -- would you read that question,
23  sir.
24    A. Do the available data support a conclusion
25  that rofecoxibs significantly increases the risk of

13 (Pages 46 to 49)

d2b9f24b-cedb-443c-88de-1a0602890c3b

Nicholas A. Flavahan, Ph.D.

Page 50

1 cardiovascular events?
2    Q. Would you examine the participants in the
3 advisory committee who voted, sir, and see if you
4 recognize the names of those advisory committee
5 experts? You don't have to read them out -- out
6 loud, all of them, but the ones you recognize, sir,
7 I would appreciate hearing.
8      MR. KREPS: Objection, form.
9      What -- what's the question? Just if he
10 recognizes names?
11      MR. HORNBECK: The question of -- is
12 whether or not Doctor Flavahan recognizes names of
13 the 32 consultants forming the advisory committee
14 panel in February 2005.
15      MR. KREPS: Well, objection to form.
16    A. (Continuing) I think I recognize some of
17 them.
18    Q. Do you recognize a Doctor Steve Nissen?
19    A. He's at the Cleveland Clinic, right?
20    Q. Correct.
21      Is he a well-respected cardiologist and
22 expert in cardiovascular disease?
23    A. We move in different circles. I'm not sure
24 I can answer that.
25    Q. Do you recognize Doctor Curt Furberg from

Page 51

1 Wake Forest?
2    A. No.
3    Q. Sir, have you ever seen this -- the
4 information that's contained in this document?
5    A. No.
6    Q. Do you understand, from reading this
7 document, that the vote to the question about -- of
8 to -- as to whether or not Vioxx increases the risk
9 of cardiovascular events was 35 to zero?
10      MR. KREPS: Objection to form. Calls
11 for speculation.
12    A. (Continuing) The last thing it says is the
13 vote is 32, yes, so I assume that means your
14 interpretation is right.
15    Q. Okay. Sir, do you agree or disagree with
16 the question as posed to the ACM panel that voted 32
17 to zero?
18    A. I don't know what this question pertains to.
19 This is obviously page 326 of some document. It
20 doesn't ask the degree of risk. It doesn't ask what
21 the events potentially are. It is -- my opinion is
22 that Vioxx, Rofecoxib does not cause -- is not a
23 cardiotoxic agent.
24    Q. And what is -- what is the -- do you have
25 that opinion in your report, sir?

Page 52

1    A. I think that is the -- basically the -- the
2 final kind of sum total of my comments in the
3 report.
4    Q. Do you state in your report that Vioxx is
5 not cardiotoxic?
6    A. I think that anyone who reads the report
7 will get that sentiment from it.
8    Q. Well, sir, with all due respect, that's --
9 that's not really that clear.
10      My question is: Do you state in your report
11 that Vioxx is not cardiotoxic?
12    A. I can't remember if I use that specific
13 terminology.
14    Q. Why don't you look at your report, sir. And
15 if you can find that terminology, would you please
16 point that out to me.
17    A. Basically says that. We're using different
18 terminology, but that specific term is not in the
19 report.
20    Q. And that opinion was not specifically in the
21 report, as well. Is that true?
22      MR. KREPS: Objection to form.
23    A. (Continuing) I think the opinion is in the
24 report -- the report.
25    Q. Sir, is it your testimony that Vioxx has not

Page 53

1 been shown to cause a statistically significant
2 increase in cardiovascular events, including MI, in
3 randomized clinical trials?
4    A. Again, you're -- you're asking my
5 interpretation of clinical trials. I'm not here to
6 discuss the clinical trials. The -- the available
7 evidence suggests that Vioxx and inhibition of COX-2
8 will not cause an increase in atherothrombosis.
9    Q. Isn't the gold standard for the effects of a
10 drug, beneficial or adverse, a randomized
11 placebo-controlled clinical trial?
12    A. Everything has its place. One of the most
13 important things to do is understand the mechanisms
14 of how key mediators work within the body and how
15 pharmacological agents interfere with those
16 mechanisms.
17    Q. My question, Doctor, is: In the hierarchy
18 of science-based evidence for the beneficial or
19 adverse effects of a drug, is the placebo-randomized
20 clinical trial the gold standard for determining
21 that question?
22      MR. KREPS: Objection to form of the
23 question.
24    A. (Continuing) As I said, everything has its
25 place. Placebo-controlled trials, if conducted

14 (Pages 50 to 53)

d2b9f24b-cedb-443c-88de-1a0602890c3b

Nicholas A. Flavahan, Ph.D.

Page 54

1 correctly, give important information.
2      It is also important to understand, as I
3 said, the mechanisms actually happening within the
4 human body.
5      Q. Doctor, isn't it true that for many drugs
6 science doesn't know what the actual mechanism is --
7 of action?
8      MR. KREPS: Object to form.
9      A. (Continuing) Maybe that was true a long time
10 ago, but nowadays most therapy is mechanism-based.
11      Q. Okay. And isn't it true that a randomized
12 clinical trial with placebo as comparator is the way
13 in which science determines whether or not a drug
14 has a positive or negative effect?
15      A. It is of one of the components of designing
16 therapy, yes.
17      Q. Sir, in the hierarchy of -- of science in
18 any textbook that you want to look at in clinical
19 pharmacology, isn't a randomized placebo-controlled
20 trial considered to be the gold standard for
21 determining the positive and negative effects of a
22 drug?
23      MR. KREPS: Objection to form.
24      A. (Continuing) Within the clinical realm I
25 think it's one of the most important ways of

Page 55

1 analyzing cause and effect within medical science,
2 as part -- as one component of -- of how we do
3 things. And one of the most important things is to
4 define the mechanisms of how things work.
5      Q. Sir, if a mechanism is defined as the best
6 scientists can do, that mechanism still must be
7 tested in the human being in randomized clinical
8 trials in order to determine the ultimate effect,
9 isn't it?
10      A. There's many ways of analyzing how agents
11 and mechanisms work in humans. You can do clinical
12 studies to -- to find out what things are happening.
13 You can do clinical trials.
14      Q. Do you understand that the FDA requires
15 randomized clinical trials before they will approve
16 a drug?
17      A. I have -- I have not any experience with FDA
18 regulations.
19      Q. Well, sir, do -- do you have any idea
20 whether or not a drug can be approved for human
21 consumption unless there are randomized clinical
22 trials?
23      A. As I said, I -- I'm not involved in the FDA
24 process. We covered that earlier.
25      Q. Can you give me one reference that states

Page 56

1 that randomized placebo-controlled clinical trials
2 are not the gold standard for determining the
3 beneficial or adverse effects of a drug?
4      MR. KREPS: Objection to form of the
5 question.
6      A. (Continuing) Again, as I said earlier, I'm
7 not involved in designing or interpreting clinical
8 trials.
9      Q. Sir, give me a reference that says that
10 randomized placebo-controlled clinical trials are
11 not the gold stand for science-based evidence of a
12 drug's action.
13      MR. KREPS: Same objection.
14      Q. (By Mr. Hornbeck, continuing) Can you do
15 that?
16      A. (Continuing) As I said, this is not an area
17 that I work in. I do not plan or interpret clinical
18 trials.
19      Q. Okay. Sir, if a scientist like yourself has
20 a theory of mechanism of action of a drug, that the
21 drug is not harmful, but in randomized clinical
22 trials it turns out that in human beings the drug is
23 harmful, is the human being experience in randomized
24 clinical controls -- in randomized clinical trials
25 the best evidence of whether or not your mechanism

Page 57

1 of action is correct?
2      MR. KREPS: Objection to form of the
3 question.
4      A. (Continuing) Medicine involves collaboration
5 between basic science and clinical science. The
6 reason why I'm in a division of cardiology and I'm a
7 Ph.D. is because of that collaboration.
8      If both sets of data aren't coming out the
9 same, then there has to be a discussion between the
10 clinic -- clinicians and the scientists to find out,
11 you know, what -- what is happening and how things
12 should be changed to adequately test hypotheses.
13      Q. Doctor, in your opinion of Vioxx, do you
14 consider at all the results of the randomized
15 clinical trials involving Vioxx?
16      A. As I said, I am not involved in the design
17 or the interpretation of clinical trials. My role
18 in these proceedings is to discuss the mechanisms of
19 COX-2 action within the blood vessel wall and the
20 pharmacological action of Vioxx and other COX-2
21 inhibitors.
22      Q. I understand. What my question is -- is
23 your opinion or opinions regarding the plausible
24 mechanisms of Vioxx mechanism of action entirely
25 independent of any evidence produced in the

d2b9f24b-cedb-443c-88de-1a0602890c3b

Nicholas A. Flavahan, Ph.D.

Page 58

1 randomized clinical trials involving Vioxx?
2    A. As far as I'm aware, the randomized clinical
3 trials were not getting at mechanism. Now, I have
4 not analyzed the results of the clinical trials.
5 It's not what I do. That -- my role in these
6 proceedings is to look at the mechanisms of COX
7 activity within the blood vessel wall in the action
8 of the -- of the inhibitors.
9    Q. I understand that, Doctor.
10    My question is a simple one. In forming
11 your opinions that are contained in the expert
12 report of May 31, 2006 did you look at, consider in
13 any way the results of the randomized clinical
14 trials involve -- involving Vioxx?
15    A. I looked to the clinical trials manuscripts
16 to see what mechanisms they were discussing within
17 the studies. I did not analyze them. I did not
18 review the interpretations of the studies.
19    Q. Doctor, did the statistically significant
20 excess of cardiovascular events, including MIs,
21 found in VIGOR and APPROVe from any part of your
22 consideration of the plausible biological mechanism
23 of action of Vioxx?
24    MR. KREPS: Objection to form of the
25 question.

Page 59

1    A. (Continuing) As I said, I did not review or
2 assess the interpretation of those clinical trials.
3    Q. So would the answer be yes, those clinical
4 trials were not part -- or considered by you
5 in -- in developing an opinion about the plausible
6 biological mechanism of action of Vioxx?
7    A. My answer is that I looked to the -- the
8 clinical trials to look at them with regard to
9 mechanisms. I did not review the design of the
10 clinical trials or the interpretations contained
11 within the clinical trials.
12    Q. Doctor --
13    A. It's not what I do.
14    Q. I --
15    A. As I said -- is on the mechanisms.
16    Q. I understand that, Doctor.
17    MR. WEISS: The answer is not
18 responsive to the question.
19    Q. (By Mr. Hornbeck, continuing) Doctor, I
20 understand your answer. What I'm simply trying to
21 get is a "yes" or "no" as to whether or not the
22 randomized clinical trials including VIGOR and
23 APPROVe were considered by you at all in reaching
24 any opinions as to the biological mechanism of
25 Vioxx, those opinions contained in Exhibit 2?

Page 60

1    MR. KREPS: Objection to form. It's
2 been asked and answered about four times.
3    Q. (By Mr. Hornbeck, continuing) "Yes" or "no"?
4    A. I look at the clinical trial manuscripts
5 from a mechanism standpoint to try and understand
6 that aspect of the studies. I did not review the
7 design or the interpretation of the studies.
8    Q. Did you look at the results of VIGOR, the
9 results of APPROVe?
10    A. As I said, I did not review how they were
11 designed and the interpretation of the results, no.
12    Q. Okay. Did you understand that there was a
13 five-fold excess in myocardial infarctions in the
14 VIGOR study with VIGOR 20, Naproxen 4?
15    MR. KREPS: Objection.
16    Q. (By Mr. Hornbeck, continuing) Do you
17 understand a five-fold increase?
18    MR. KREPS: Objection, form of the
19 question.
20    A. (Continuing) As I said, I did not review the
21 design or the interpretation of the studies.
22    Q. Sir, my -- my understanding of your
23 testimony before was that you looked at the
24 New England Journal publication of the VIGOR study,
25 correct?

Page 61

1    A. As I said, I read the papers.
2    Q. Okay. When you looked at it did you notice
3 that there was a five-fold excess of MIs with Vioxx
4 versus Naproxen?
5    A. To be honest with you, I concentrated on the
6 introduction and the discussion. I was looking at
7 it from a mechanism-based standpoint. I did not
8 review carefully the design, the results, or the
9 interpretation of the studies.
10    Q. Is the answer to my question, no, you did
11 not see the five-fold increase?
12    A. My answer to your question is that that was
13 not -- I was looking at the manuscripts from a
14 standpoint of mechanism-based studies.
15    MR. HORNBECK: Motion to strike.
16    MR. WEISS: Move to strike the answer
17 as nonresponsive.
18    Q. (By Mr. Hornbeck, continuing) I'm going to
19 repeat the question because of -- I have a motion to
20 strike, which has legal implications.
21    My question is: Doctor, did you notice --
22 comprehend that there was a five-fold excess of MIs,
23 heart attacks in the Vioxx population compared to
24 Naproxen?
25    MR. KREPS: Objection -- objection,

Nicholas A. Flavahan, Ph.D.

Page 62

1  form of the question, Asked and answered.
2      A. (Continuing) And my answer is --
3          COURT REPORTER: Excuse me. Excuse me.
4      MR. KREPS: Let me finish the
5  objection --
6          THE WITNESS: I'm sorry.
7      MR. KREPS: -- before you answer. Note
8  the objection. Asked and answered and form of the
9  question.
10     Q. (By Mr. Hornbeck, continuing) Yes, sir, you
11 may answer.
12     A. Again, my answer is I read -- reviewed the
13 papers, in particular looking at the standpoint of
14 mechanisms that were discussed in the manuscripts.
15 I did not review the design results or the
16 interpretation of those clinical trials.
17     Q. Was it unimportant to you, Doctor, in
18 forming your opinions as to the mechanism --
19 mechanism of action of Vioxx, whether or not there
20 was any excess of heart attacks in Vioxx versus
21 Naproxen?
22     A. In my job I review mechanisms, I review how
23 things work within the blood vessel wall, within the
24 cardiovascular system. It is not my normal area of
25 work to design, review, interpret clinical trials.

Page 63

1  And so I did not do it.
2      Q. Okay. Let's go to the APPROVe trial.
3  What -- what do you understand the design of the
4  APPROVe trial was, Doctor?
5      A. As you would take it from my previous
6  answers, I am not involved in the design of clinical
7  trials. And so --
8      Q. Well, Doctor, did you understand that Merck
9  withdrew Vioxx from the market in September 2004
10 based on the results of the approved study?
11     A. I have no idea of -- I do not know the
12 reasons why Vioxx was removed. I do not know the
13 internal discussions within Merck.
14     Q. Well, sir, it was in all the newspapers and
15 medical journals in September 2004 up through today.
16 Isn't that true? The reason why Vioxx was withdrawn
17 from the market?
18         MR. KREPS: Objection to form of the
19 question.
20     A. (Continuing) As we discussed earlier, I did
21 not have any access to internal Vioxx documents. I
22 do not know the specific reasons why the -- Merck
23 came to that decision.
24     Q. Sir, is it your testimony that in
25 September 2004, in any time up to and including

Page 64

1  today, you have read nothing, know nothing about
2  whether or not the results of APPROVe were the
3  reason given by Merck for withdrawing Vioxx from the
4  market?
5      A. I have seen commentaries on withdrawal which
6  discuss the potential risk of cardiovascular events,
7  yes.
8      Q. And did you understand in those commentaries
9  that you reviewed that the APPROVe trial was the
10 placebo-controlled randomized clinical trial that
11 produced the ex -- the statistically significant
12 excess of CV events, including MIs, in the APPROVe
13 trial that led to the withdrawal?
14     A. Again, I have not carefully reviewed those
15 clinical trials.
16     Q. Okay. Was it important to your opinion
17 contained in Exhibit 2 whether or not there was, in
18 fact, a statistically significant increase of CV
19 events, including MIs, in APPROVe trial against
20 placebo?
21     A. As I said, I looked to those manuscripts
22 from a standpoint of mechanism of action. I did not
23 look at them from the standpoint of the design
24 results or the interpretation of the -- trial.
25     Q. Sir, when you reviewed the manuscript that

Page 65

1  was the publication of the APPROVe results, did you
2  notice, while you were looking for the mechanism of
3  action discussion, that there was a statistically
4  significant excess of CV events, including MIs,
5  against Vioxx?
6          MR. KREPS: Objection, form of the
7  question.
8      A. (Continuing) As I said, when I was reviewing
9  them I was concentrating on basically the
10 introduction in the discussion sections. I was
11 looking at them from a standpoint of mechanisms that
12 were being discussed within the studies.
13     Q. Is --
14     A. I can't --
15     Q. Sorry.
16     A. I cannot recall the data that was in them
17 and I cannot comment on the design, the results, and
18 the interpretation of them.
19     Q. Okay. Is it true, Doctor, that the opinions
20 that you have today in Exhibit 2 have -- were --
21 strike that.
22         Is it -- is it your testimony that the
23 opinions you've developed about Vioxx in your expert
24 report are without any reference at all to the
25 results of the VIGOR study?

d2b9f24b-cedb-443c-88de-1a0602890c3b

Nicholas A. Flavahan, Ph.D.

Page 66

1    A. Obviously the -- the opinions within the
2  report have impact for interpretation of clinical
3  trials, but I am not the individual who is involved
4  in the design of them or interpretation of clinical
5  trials.
6    Q. Well, Doctor --
7        MR. WEISS: Move to strike the answer
8  as nonresponsive.
9        MR. SIZEMORE: Same objection.
10   Q. (By Mr. Hornbeck, continuing) Just as a
11  general rule of scientific principles, is it your
12  testimony that any opinion that you have with regard
13  to the plausible biologic mechanism of Vioxx has
14  absolutely nothing to do with any of the results of
15  the randomized clinical trials?
16       MR. KREPS: Objection to the form of
17  the question.
18   A. (Continuing) As I said to you before,
19  medical science involves a collaboration between
20  clinicians and scientists. I'm a basic scientist.
21  I'm not involved in designing or interpreting
22  clinical trials. What we need is a -- a
23  collaboration here between clinicians who do that on
24  a regular basis and are able to do that with the
25  basic science and mechanism-based report that I've

Page 67

1  given you here.
2    Q. Doctor, you haven't put into your report
3  your opinion as to what the -- what the mechanism of
4  action is at a cellular level of Vioxx, have you?
5    A. I think we -- I think the report discusses
6  what COX-2 inhibitors do within the blood vessel
7  wall.
8        I don't know what you mean.
9    Q. Okay. Does anything that you discuss in
10  your report correlate with the statistically
11  significant excess CV events, including MIs, in any
12  of the randomized clinical trials involving --
13  involving Vioxx, including VIGOR and APPROVe?
14       MR. KREPS: Objection to form of the
15  question. Misstates the results of the clinical
16  trials.
17   Q. (By Mr. Hornbeck, continuing) Do you want me
18  to --
19   A. Repeat that.
20   Q. Yeah. The question wasn't clear.
21       All right. Doctor, you -- your testimony is
22  that you've provided a -- a biologic mechanism of
23  action for Vioxx in your report. Is that -- is that
24  true?
25   A. The report describes the mechanisms of

Page 68

1  action of Vioxx and the role and regulation of COX-2
2  within the blood vessel wall.
3    Q. Does anything in your report correlate with
4  the statistically significant excess CV events,
5  including MI, found in the randomized clinical
6  trials, including VIGOR and APPROVe?
7        MR. KREPS: Objection to form of the
8  question. Misstates the randomized clinical trials.
9    A. (Continuing) Again, excluding interpretation
10  of data within the clinical trials, as you can see
11  from the report, it basically goes through the
12  potential activity of COX-2 and COX-2 inhibitors
13  within the blood vessel wall. And basically comes
14  to the conclusion that COX-2 inhibitors and Vioxx,
15  in particular, will not cause or accelerate the
16  atherothrombotic process.
17   Q. Well, we -- the atherothrombotic process is
18  another issue that we'll get into. Let's just talk
19  about clotting and MIs and thrombotic events.
20       Is there any opinion that you've expressed
21  in your expert report that would correlate with the
22  findings of statistically significant cardiovascular
23  events, including MIs, in VIGOR and APPROVe?
24       MR. KREPS: Same objection and
25  objection to the preamble.

Page 69

1    A. (Continuing) That's the same question.
2  That's the same answer.
3    Q. Well, that -- I don't think it's the same
4  question. I understand it's the same answer.
5        Doctor, don't you agree, as a scientist,
6  there should be some correlation scientifically
7  between a biologically plausible mechanism of action
8  and the actual results of randomized clinical
9  trials? Shouldn't they line up?
10       MR. KREPS: Objection to form.
11   A. (Continuing) There needs to be a discussion
12  between the clinicians and the scientists with
13  regard to the mechanisms underlying and observations
14  in humans, yes.
15   Q. Sir, do any opinions that you've expressed
16  in Exhibit 2 as to the potential biologic mechanism
17  of action of Vioxx square, line up, predict the
18  findings in the human clinical trials of VIGOR and
19  APPROVe?
20       MR. KREPS: Same objections.
21   A. (Continuing) Based on the mechanism of
22  action of Vioxx and the role of COX-2 within the
23  blood vessel wall, Vioxx should not increase
24  atherothrombotic events.
25   Q. Now, Doctor, you're changing the question.

Nicholas A. Flavahan, Ph.D.

Page 70

1  I'm talking first about clots. We're going to get
2  to atherosclerosis. Let's stick with the --
3       MR. KREPS: Counsel, he didn't say
4  "atherosclerosis." He said "atherothrombotic
5  events," which I assume you understood that includes
6  clots.
7       MR. HORNBECK: Thank you.
8  Q. (By Mr. Hornbeck, continuing) Did you mean
9  that to include MIs?
10  A. Atherothrombosis, yes.
11  Q. Okay. So, Doctor, is it your testimony
12  today that the opinions you've expressed in your
13  expert report explain the statistically significant
14  findings of the randomized clinical trials involving
15  Vioxx, including VIGOR and APPROVe?
16       MR. KREPS: Same objection to the
17  counsel's continuing misinterpretation and
18  limitation on the randomized clinical trials.
19  A. (Continuing) You keep trying to get me to
20  comment on the interpretation of these clinical
21  trials. And I keep having to tell you that that's
22  not why I'm here.
23  Q. No. I'm saying as a scientist, Doctor, in
24  your research, if you have an hypothesis about a
25  mechanism of action, doesn't that hypothesis have to

Page 71

1  be tested in human beings and then square up
2  the re -- the results with human beings?
3       MR. KREPS: Objection to form.
4  A. (Continuing) You always have to take the
5  data to human beings, yes.
6  Q. Okay. Does anything you've put as an
7  opinion in Exhibit 2 square with the findings of
8  VIGOR and APPROVe?
9  A. Most of the data that is contained in my
10  report was derived from human beings and from
11  studies on human beings. You can already tell from
12  those studies that Vioxx and COX-2 inhibitors will
13  not increase atherothrombotic risk.
14  Q. How could you --
15       MR. SIZEMORE: Move to strike,
16  nonresponsive.
17  Q. (By Mr. Hornbeck, continuing) How do you
18  explain, Doctor, the statistically significant
19  excess of MIs in VIGOR and in APPROVe?
20  A. Again, you're trying to get me to interpret
21  clinical trials. And, again, I have to tell you
22  that's not why I'm here.
23       MR. HORNBECK: Okay. We're going to
24  take a break. Thanks.
25       Incidentally, you should let us know any

Page 72

1  time you need to break. I -- I'm sorry I went over.
2  I didn't mean to --
3       THE VIDEOGRAPHER: Going off the record
4  at 11:06 a.m. This is the end of tape one.
5       (Recess from 11:06 a.m. to 11:23 a.m.)
6       THE VIDEOGRAPHER: We are back on the
7  record. This is the beginning of tape two. Time is
8  11:23 a.m.
9  Q. (By Mr. Hornbeck, continuing)
10  Doctor Flavahan, would you please look at page 13 of
11  your expert report.
12       I want to direct your attention to the last
13  sentence of the first paragraph, which reads,
14  "Plaque rupture is the principal mechanism
15  underlying acute coronary syndromes such as unstable
16  angina, myocardial infarction, and sudden cardiac
17  death."
18       Did I read that correctly?
19  A. Yes.
20  Q. Okay. And your support for that statement
21  is your basic understanding of the literature and
22  work in the field, is that correct?
23  A. Basic understanding of the literature.
24  Q. Would you agree, sir, that when you say
25  "plaque rupture is the principal mechanism in acute

Page 73

1  coronary syndrome" -- would -- would that be true in
2  90 and 95 percent of the cases?
3  A. I am not sure of the percentage, but that is
4  the principal major cause.
5  Q. Okay. Acute coronary syndrome -- is
6  that -- you using that as a word of art to encompass
7  "unstable angina, myocardial infarction, and sudden
8  cardiac death"?
9  A. It's obviously a clinical term that is used
10  to cover those areas, yes.
11  Q. Sir, is it true that all three of those
12  clinical events have the same basic underlying
13  mechanism?
14       MR. KREPS: Object to form.
15  A. (Continuing) They are all related.
16  Q. Would you agree that sudden cardiac death is
17  frequently caused by V-Tack or V-Fib?
18  A. Again, I'm not a clinician. I don't
19  diagnose symptoms within patients, so you'd better
20  ask a cardiologist.
21  Q. Okay. Would you defer to a cardiologist as
22  to whether in the majority of sudden death cases an
23  MI proceeds a V-Tack or V-fib?
24  A. Again, you should talk to the cardiologist,
25  actually.

19 (Pages 70 to 73)

d2b9f24b-cedb-443c-88de-1a0602890c3b

Nicholas A. Flavahan, Ph.D.

Page 74

1    Q. Have you ever been involved in a
2  resuscitation from a cardiac arrest?
3    A. No.
4    Q. Is it your understanding that in cases
5  of -- of sudden cardiac arrest defibrilization is
6  necessary to resuscitate a patient?
7    A. Again, I've never tried to resuscitate a
8  patient.
9    Q. Okay. Have you ever done any research or
10 looked into situations involving, for example, a car
11 accident as -- and looking at whether or not a -- an
12 arhythm -- arrhythmia V-tack or V-Fib preceded that
13 accident?
14   A. I've never looked at that, no.
15   Q. Is it your understanding that that certainly
16 can happen in the real world?
17   A. Never looked at it. I imagine people can
18 have heart attacks and then crash a car, yeah.
19   Q. Based on your research, sir, if someone had
20 a -- an accident and it involved death, is the only
21 way to tell whether or not -- that person had a
22 fatal arrhythmia to do a pathological examination?
23   A. I'm not a clinician, nor a pathologist, so,
24 again --
25   Q. Sir, looking at what is good science, do you

Page 75

1  agree that in a study all data should be reported,
2  whether it supports the conclusion of the study or
3  not?
4        MR. KREPS: Object to form of the
5  question.
6    A. (Continuing) I know why you're asking this
7  question, I think. I mean, in our basic studies we
8  report everything.
9    Q. Okay. So if you had a particular experiment
10 and you used two different methods to investigate a
11 result, if one -- if those methods differed and the
12 results from the methods differed, would you report
13 both methods and results?
14   A. Again, most of our studies involve different
15 methods as a way of getting at mechanisms, so yes,
16 you would report both parts.
17   Q. Do you agree, sir, good science requires
18 transparency in the putting forth of all results,
19 whether supporting the final conclusion or not, in
20 a -- one particular experiment?
21   A. Again, I'm basic science. That's what we do
22 al the time.
23   Q. Have you reviewed any of the scientific
24 papers of Merck to determine whether or not in those
25 papers Merck reported all results, favorable and

Page 76

1  unfavorable?
2    A. Again, I've seen some commentaries that
3  address this issue. I have not looked carefully at
4  them and I've not -- again, not looked to the design
5  or interpretation of the clinical trials.
6    Q. I'm not talking about the clinical trials
7  necessarily, Doctor.
8        As a general statement, would you be
9  critical of Merck if they did not publish in a
10 particular study both beneficial, as well as
11 adverse, results to the conclusion of the study?
12       MR. KREPS: Objection to form of the
13 question.
14   A. (Continuing) And, again, as I said before,
15 I'm not involved in the design or interpretation of
16 clinical trials and so I -- I can't comment on them.
17   Q. Well, sir, if there were preclinical
18 studies, would you agree that Merck should publish
19 all the results, as well as all the methods, even if
20 there's a disagreement in the methods and results?
21   A. Again, I'm not involved in preclinical
22 studies with any of the drug companies. I'm sure
23 there's patent issues that may stop them from
24 publishing data. I -- I mean, I really can't get
25 into it.

Page 77

1    Q. Is it your practice, as a good and
2  responsible scientist, to report all data in a
3  particular study, whether it favors your result or
4  not?
5    A. In all the studies we do, yes, we -- we
6  publish everything, but generally if -- well, yeah,
7  we do.
8    Q. Okay. Sir, let's -- I want to look at page
9  3 for a moment, please.
10   A. Of my report?
11   Q. Yes, sir.
12       This is a discussion of the cardioprotection
13 of aspirin, correct?
14   A. No. It is a discussion of the
15 pharmacological action of drugs interacting with the
16 COX enzymes.
17   Q. Okay. Well, sir, let me look at the -- the
18 middle of the first full paragraph. "The
19 cardioprotective effects of aspirin are thought to
20 result from this prolonged high-level inhibition of
21 platelet COX-1 activity."
22       Do you see that?
23   A. Yes.
24   Q. All right. So that begins a discussion of
25 the cardioprotective nature of aspirin, correct?

20 (Pages 74 to 77)

d2b9f24b-cedb-443c-88de-1a0602890c3b

Nicholas A. Flavahan, Ph.D.

| Page 78 | Page 80 |
|---|---|

**Page 78**

1    A. No. It's --
2         MR. KREPS: Object to form.
3    A. (Continuing) It mentions the
4 cardioprotective effects of aspirin, but I don't
5 think it's anything -- the -- the discussion and
6 the -- the -- the content of that paragraph says
7 pharmacological review of -- of aspirin, NSAIDs, and
8 COX-2 inhibitors.
9    Q. Okay. Sir, is -- is low-dose aspirin
10 recognized by medical science as cardioprotective?
11    A. Again, it's -- it's thought to have
12 cardioprotective function, yes.
13    Q. And is the cardioprotective nature of
14 low-dose aspirin based upon a number of clinical
15 trials replicated over many years in hundreds of
16 thousands of patients?
17    A. Again, it's -- it's mechanism-based. And I
18 think it's also related to clinical studies. I have
19 not reviewed those clinical trials or clinical
20 studies. I have looked at clinical experiments with
21 aspirin. And I think here I'm merely referencing a
22 couple of re -- reviews that describe the
23 cardioprotective action of aspirin.
24    Q. Is it -- is it your view, sir, that -- that
25 the potential biological mechanism of aspirin is its

**Page 79**

1 ability to inhibit thromboxane protection --
2 production?
3    A. Say that again?
4    Q. Yes.
5       Is it your opinion that the cardioprotective
6 nature of low-dose aspirin is based upon its ability
7 to inhibit the production of thromboxane?
8    A. It's thought to be derived from the ability
9 of aspirin to irreversibly inhibit to a major degree
10 the release of thromboxane from platelets, yes.
11    Q. And that mechanism of action was referenced
12 in most of, if not all, the clinical trials that
13 looked at the cardioprotective aspects of low-dose
14 aspirin. Is that true?
15    A. As I said, I -- I didn't look at the
16 clinical trials with low-dose aspirin. I looked at
17 a number of clinical experiments with low-dose
18 aspirin. And so that -- that was where I got that
19 information.
20    Q. Well, Doctor, are -- are you aware that in
21 the last 10 to 20 years there have been multiple
22 randomized clinical trials involving low-dose
23 aspirins and multiple patient populations that
24 confirm this mechanism of action?
25    A. I'm sure there have been, but, as I said

**Page 80**

1 before, I didn't look at them and I didn't review
2 them.
3    Q. Okay. Sir, do you agree that aspirin
4 inhibits production of thromboxane by 95 percent or
5 better?
6    A. Again, it depends on the dose, but
7 the -- the therapeutic dose of low-dose aspirin in
8 its administration is designed to do that, yes.
9    Q. And do you agree that -- that the -- the
10 so-called red zone for inhibition of -- of the
11 capacity of platelets to make COX-1-derived
12 thromboxane is 95 to 98 percent?
13         MR. KREPS: Object to form.
14    A. (Continuing) I don't know what you mean by
15 "red zone," but the -- the attempt is to try and
16 inhibit the platelet release of thromboxane by at
17 least 90 to 95 percent.
18    Q. When I meant [sic] "red zone," I meant
19 the -- the therapeutic zone to be effective.
20    A. Right.
21    Q. Okay. So you would agree with 95 to
22 98 percent?
23    A. The numbers I've seen are 90 to 95. I think
24 95 is the -- is the kind of standard of the work.
25    Q. Okay. You have then mentioned the two

**Page 81**

1 NSAIDs, Naproxen and indobufen, for long-term
2 effective inhibition of platelet COX-1, correct?
3    A. Correct.
4    Q. And is it your view that indobufen inhibits
5 platelet-derived thromboxane by 95 percent or
6 better?
7    A. I reviewed the specific pharmacology and
8 actions of Naproxen in -- in human volunteers.
9       The indobufen -- I got that information from
10 Patrono's review.
11    Q. Okay. Do you know anything about the
12 biologic mechanism of action of indobufen compared
13 to aspirin?
14    A. I think indobufen and Naproxen are both
15 reversible inhibitors, whereas aspirin is an
16 irreversible inhibitor.
17    Q. Is the action of indobufen, even though
18 reversible, similar in nature to the biologic
19 neck -- mechanism of action of low-dose aspirin?
20    A. The mechanism, by virtue of how they act
21 with the enzyme, is going to be different.
22    Q. Okay. With regard to Naproxen, what study
23 or studies did you look at to determine whether or
24 not Naproxen has an aspirin-like cardioprotective
25 effect?

21 (Pages 78 to 81)

d2b9f24b-cedb-443c-88de-1a0602890c3b

## Nicholas A. Flavahan, Ph.D.

Page 82

1   A.  The -- the data that's contained in the
2   references there includes analysis of the inhibitory
3   effects of Naproxen on platelet aggregation and --
4   as well as the release of thromboxane from the
5   platelets at various times during its therapeutic
6   administration.  And it -- it basically provides the
7   same degree or similar degree of inhibition as
8   low-dose aspirin.
9   Q.  Is the -- there any study, other than --
10  than the Van Hecken study, that attempts to measure
11  the platelet-derived thromboxane inhibition by
12  Naproxen?
13  A.  Yeah, there's a few there.  We can go
14  through the references, if you want me to find them.
15  Q.  Okay.  Did you review the Van Hecken study?
16  A.  I read the Van Hecken study, yeah.
17  Q.  Okay.  Did the Van Hecken study describe a
18  mean of platelet inhibition or did -- or did they
19  describe individual patients?
20  A.  We'd have to look at the paper.
21  Q.  I'm wondering if you can recall that, as we
22  sit here now.
23  A.  I can't recall.
24  Q.  Okay.  Do you recall any subsequent studies
25  to Van Hecken in which there was individual patient

Page 83

1   variability in terms of the Naproxen effect of
2   inhibiting platelets at whatever percentage it did?
3   A.  It may be contained within the references I
4   have in the report, but I can't recall that here.
5   Q.  Do you recall, sir, that Doctor FitzGerald
6   presented evidence to the advisory committee in
7   February 2005 that in a study similar in design to
8   Van Hecken there was great variability between
9   patients and a number of the individual patients did
10  not reach a 90 to 95 percentile of platelet
11  inhibition?
12      MR. KREPS:  Objection to the form of
13  the question.
14  A.  (Continuing) Was that a published
15  manuscript?
16  Q.  I believe he referenced a published
17  manuscript, as well as presented the data to the
18  advisory committee.
19      MR. KREPS:  Objection --
20  Q.  (By Mr. Hornbeck, continuing) Are you aware
21  of that or not, Doctor?
22      MR. KREPS:  Objection to form.
23  A.  (Continuing) I'm not aware of
24  Doctor Fitzgerald's communication.
25  Q.  Okay.  Sir, based on the -- the references

Page 84

1   that you've cited of -- of in vitro studies of
2   Naproxen, would you agree that to determine whether
3   or not the in vitro studies are accurate -- strike
4   that.
5      Would you agree that based upon the in vitro
6   studies of Naproxen which you've referenced --
7   referenced, they would predict in human clinical
8   trials the protective nature of Naproxen with regard
9   to cardiovascular events?
10      MR. KREPS:  Objection to form.
11  Misstates the references.
12  A.  (Continuing) The references were actually
13  in vivo/in vitro studies.  So it was both studies
14  that combined them, as well as in vivo studies.
15      And, again, you're asking me to interpret
16  clinical trials, which we've already been through,
17  which I can't do and won't do.
18  Q.  Well, is there -- is there any clinical
19  trial, observational trial that supports the
20  proposition in intact human beings that Naproxen has
21  cardioprotection similar to aspirin?
22  A.  As a reference within the report there are
23  studies and reviews by some of those distinguished
24  authors you mentioned earlier, which propose that
25  the similarities between Naproxen and aspirin could

Page 85

1   account for a cardioprotective effect.
2   Q.  Sir, is -- what -- is there any information
3   in intact human beings that Naprosyn is associated
4   with a reduction in cardiovascular events to the
5   same degree as aspirin?
6   A.  Again, I'm not the person that you should be
7   asking that question to.
8   Q.  Okay.  That's -- that's fine.  If -- if
9   you're not -- if this isn't your area, that's
10  exactly right.  You should tell me.
11      Based on what you've said, Doctor, do you
12  hold an opinion as to the cardioprotective or
13  salvage rate of low-dose aspirin in intact human
14  beings?
15      MR. KREPS:  Object to form of the
16  question.
17  A.  (Continuing) Could you explain what you
18  mean?
19  Q.  Exactly.
20      There are many studies and many references
21  in textbooks that -- that as -- low-dose aspirin has
22  a cardioprotective effect, particularly in -- in
23  heart attacks, of somewhere -- 20 to 25 percent.
24      Does that square with -- with your
25  knowledge?

22 (Pages 82 to 85)

d2b9f24b-cedb-443c-88de-1a0602890c3b

## Nicholas A. Flavahan, Ph.D.

Page 86

1    A. Again, I'm not in the business of looking at
2  relative risks or clinical trials. We can discuss
3  the basic mechanisms underlying how aspirin works.
4    Q. Okay. I take it you're not going to offer
5  an opinion that Naprosyn in intact human beings has
6  the same amount of cardioprotection as low-dose
7  aspirin?
8       MR. KREPS: Object to form of the
9  question.
10    A. (Continuing) Again, I don't think that's my
11  role in these proceedings.
12    Q. Okay. When low-dose aspirin is given to an
13  individual how long does it take for the
14  cardioprotective properties of aspirin to occur?
15    A. Again, you're talking about clinical trials.
16  And I -- I'm not aware of that.
17    Q. Well, sir, just in the -- in the -- in the
18  regular literature that's -- that's available to
19  you, tell -- are you -- are you aware of -- of how
20  long it takes for the cardioprotective effect of
21  aspirin in inhibiting thromboxane to occur?
22    A. That's not what you asked.
23    Q. Okay.
24    A. The mechanism underlying aspirin -- I mean,
25  depending on the dose level, you -- the effect of

Page 87

1  aspirin on platelet COX-1 can be relatively fast or
2  it needs to build up, depending on the dose.
3    Q. Sir, low-dose aspirin, will it -- will it
4  begin its inhibition of thromboxane within a matter
5  of seven to ten minutes?
6    A. It takes -- yeah. It happens very quickly.
7    Q. Okay.
8    A. Depending on the dose, reaching that
9  95 percent inhibition will vary. It could be
10  relatively quick or it could take a couple days.
11    Q. Would you agree that -- that a low-dose
12  aspirin will in -- inhibit platelet function for
13  four to seven days after a single dose?
14    A. Depends on the life span of the platelets.
15  It also depends on what the platelets are doing,
16  because there's been recent data demonstrating that
17  platelets can actually regenerate COX-1. And most
18  of the time if you give aspirin in a dose which
19  completely wipes out COX-1, the platelets recover at
20  the rate of 10 percent each day.
21    Q. Okay. In -- let's look at your page 12,
22  please.
23       And I want to look at the paragraph that's
24  highlighted.
25    A. Yep.

Page 88

1    Q. Let me see if I under -- understand this.
2  And if I don't, that's where we want to discuss.
3       Do you agree that there -- that there is
4  vascular homeostasis between platelet-derived
5  thromboxane and endothelium-derived prostacyclin as
6  one component among several that explain vascular
7  homeostasis?
8    A. Vascular homeostasis involves multiple
9  mediators from platelets and the blood vessel wall.
10    Q. Understood.
11    A. One of those players on one side is
12  thromboxane and one of the players on the other side
13  is prostacyclin.
14    Q. Okay. So when you said that "Furthermore,
15  vascular homeostasis not determined solely by a
16  balance between platelet-derived thromboxane and
17  endothelium-derived prostacyclin" you did not mean
18  to include it as at least one component of vascular
19  homeostasis. Is that true?
20    A. It's two components.
21    Q. Okay. But I was just looking at
22  that -- if -- if -- to make my question more
23  clear -- and you -- you've -- you've shown me that
24  it wasn't clear.
25       In vascular homeostasis -- stasis, one

Page 89

1  component is the balance, the ratio between
2  thromboxane and prostacyclin. Is that true?
3    A. I don't think so, no.
4    Q. Okay. You don't think that the ratio
5  between thromboxane and prostacyclin has anything to
6  do with vascular homeostasis. Is that correct?
7    A. It's an artificial mathematical number.
8  They both contribute, they are both relatively
9  important, but they are both part of the larger
10  picture. And so you have to look at the larger
11  picture.
12    Q. Understood. I'm just asking you to -- to
13  try to separate it out.
14       Is there a component of vascular homeostasis
15  between the balance of thromboxane and prostacyclin?
16    A. They are both components of vascular
17  homeostasis, but dividing one by the other is
18  artificial.
19    Q. Okay. Do you agree that there are drugs
20  that will change the balance of thromboxane and
21  prostacyclin?
22    A. Again, you're talking about balance. There
23  are drugs that affect thromboxane. There are drugs
24  that affect prostacyclin.
25    Q. And in a drug that affects either

d2b9f24b-cedb-443c-88de-1a0602890c3b

Nicholas A. Flavahan, Ph.D.

Page 90

1  thromboxane or prostacyclin, would the ratio of
2  thromboxane and prostacyclin change?
3      MR. KREPS: Object to form.
4      A. (Continuing) What ratio?
5      Q. If thromboxane -- let -- I'll back up.
6          Do thromboxane and prostacyclin have
7  opposite mechanisms of action?
8      A. Pretty much most things we work on have
9  opposite activities.
10     Q. Okay. So the answer is yes, they do?
11     A. It depends on the system. There are systems
12 where they both do the same thing.
13     Q. Okay. Is it recognized as a general
14 scientific matter that thromboxane is pro-platelet
15 agg -- aggregation or clumping?
16     A. It's a platelet stimulus, yeah.
17     Q. Is it also recognized as a general
18 scientific principle that thromboxane is a
19 vasorestrictor?
20     A. Vasoconstrictor.
21     Q. Constrictor.
22     A. Again, yes.
23     Q. Is it also recognized as a general
24 scientific consensus that prostacyclin has the
25 opposite action with regard to vasodilation and

Page 91

1  regard to inhibiting platelet clumping?
2      A. Prostacyclin does inhibit platelets. Some
3  blood vessels actually contract to prostacyclin.
4      Q. Is there a component then that you recognize
5  that a drug would reduce the balance as a component
6  of vascular homeostasis between thromboxane and
7  prostacyclin?
8      A. Again, the two components of homeostasis and
9  drugs affect them -- some can affect both, some can
10 affect one and not the other.
11     Q. Right. And if a drug affects either one,
12 won't the ratio between thromboxane and thromboxane
13 change? You'll have an excess of one over the
14 other?
15     A. We have to get to the relevance of the ratio
16 that you're talking about.
17     Q. Okay. Well, just as a general matter, is it
18 true that if a drug affects -- strike that.
19         Sir, isn't it true that -- that the -- the
20 COX-1 inhibitors and the specific COX-2 inhibitors
21 inhibit different products?
22     A. Are you talking about selective COX-1
23 inhibitors?
24     Q. Yes, sir.
25     A. Well, they obviously interact with two

Page 92

1  different enzymes, right.
2      Q. So if one drug reduces prostacyclin, would
3  that result, at least theoretically, in an increase
4  in the thromboxane relative to the -- the
5  prostacyclin?
6      A. Why would it increase thromboxane?
7      Q. Well, I'm -- excuse me. The rate -- I said
8  "the ratio." In other words, you -- you have -- you
9  have thromboxane and prostacyclin at the same level.
10 If a drug reduces prostacyclin and is -- and does
11 not affect thromboxane, the ratio between
12 thromboxane and prostacyclin changes, doesn't it?
13     A. Then why are you paring off those two
14 compounds?
15     Q. Sir, just -- this question --
16     A. This -- this -- this is potentially the new
17 math. Now, the equation and the balance that you
18 have -- that you're going to have multiple variables
19 on either side.
20     Q. All right.
21     A. So that selecting one of each out doesn't
22 make any sense.
23     Q. Well --
24     A. Unless you're saying that prostacyclin
25 directly affects thromboxane and thromboxane

Page 93

1  directly affects prostacyclin, why focus on those
2  two agents?
3      Q. Well, that's -- that's a question. That's
4  not an answer to my question.
5          Can you answer my question, whether or not
6  what I've stated would be true. The ratio would
7  change -- if a drug acted to inhibit one of either
8  prostacyclin or thromboxane, would the ratio change?
9      A. Inhibiting prostacyclin, per se, would it do
10 anything to thromboxane directly? Is that what
11 you're asking?
12     Q. No. Must not be very clear, so why don't we
13 see if we can get it clear.
14         Let's look at page 16. At the top of the
15 page. You talk about "Human atherosclerosis is
16 associated with the approximate doubling of the
17 urinary excretion of the prostacyclin metabolite
18 PGI-M. As with healthy individuals, the source of
19 this prostacyclin has not been determined."
20         Is that true?
21     A. That's true.
22     Q. Okay. You then go down and talk about the
23 effects of aspirin.
24         For prostacyclin, it is either made via the
25 COX-1 pathway or the COX-2 pathway, is that correct?

Golkow Litigation Technologies - 1.877.DEPS.USA

d2b9f24b-cedb-443c-88de-1a0602890c3b