Nicholas A. Flavahan, Ph.D.

Page 94

1  A. That's basically your two options, yes.
2  Q. Okay. Is there any other way to make
3  prostacyclin?
4  A. I'm not aware of any.
5  Q. Okay. Now, low-dose aspirin is a selective
6  COX-1 inhibitor, correct?
7  A. Correct.
8  Q. Okay. And you state that "the increased
9  urinary secretion of -- of PGI-M in atherosclerotic
10 patients was significantly inhibited, by
11 approximately 50 percent, by low doses of aspirin."
12      Is that correct?
13 A. That's correct.
14 Q. Okay. If aspirin is a -- low-dose aspirin
15 is a selective COX-1 inhibitor, and it reduced the
16 urinary excretion of the prostacyclin metabolite in
17 atherosclerotic patients, does that mean that in
18 that patient the other 50 percent of the
19 prostacyclin is due to COX-2?
20 A. You have to determine -- first of all, the
21 low doses of aspirin are COX-1 selective. And the
22 endothelial cells are completely taken out of the
23 COX-1. We'd have to do the analysis. To some of
24 it -- was left after low-dose aspirin may still be
25 COX-1. But you're right, it suggests that some

Page 95

1  component of that PGI-M is COX-2.
2  Q. Well, it actually suggests 50 percent or a
3  little less is COX-2, correct?
4      MR. KREPS: Object to form.
5  A. (Continuing) If we're getting close to
6  complete inhibition of COX-1 with that low-dose
7  aspirin, then you could suggest that, yes.
8  Q. Okay. You then discuss -- let me -- strike
9  that.
10     Does the urinary metabolite PGI-M go down
11 with Vioxx administration?
12 A. The studies have been done. Yes, Vioxx does
13 reduce the PGI-M.
14 Q. Okay. You've discussed various forms
15 of -- of PGI-2, PGE-2, PGD, et cetera.
16     Did -- do you recall that in your paper?
17 A. Yes. In the introductory paragraph, you
18 mean?
19 Q. Yeah, I believe so.
20 A. Yeah.
21 Q. Tell me, what -- going to start a question
22 with -- with looking at -- at just prostaglandins in
23 general and without trying to differentiate where
24 they may come from or not. We're going to get to
25 that.

Page 96

1  But for prostacyclin what biologic role does
2  it play in thrombosis formation?
3  A. It's thought to contribute to the inhibitory
4  effect of the endothelium against platelet
5  aggravation and thrombosis.
6  Q. What is its biologic role regarding vessel
7  constriction?
8  A. It's thought, again, to contribute somewhat
9  to vasodilation. As we said before, in some blood
10 vessels you don't get much response; some blood
11 vessels actually contract it.
12 Q. I'm talking -- let's -- there's a difference
13 in COX-2 expression, if you're looking at what's
14 normal endothelium, as opposed to inflammatory
15 states, such as atherosclerosis, correct?
16 A. There's a difference in COX-2 expression
17 between those blood vessels, yeah.
18 Q. Okay. Is there also a difference in
19 prostacyclin levels between normal endothelial
20 vessels and inflammatory vessels such as in
21 atherosclerosis?
22 A. Yeah, there appears to be a decreased
23 ability of the atherosclerotic blood vessels to
24 generate prostacyclin.
25 Q. Could you tell me, what are the biologic

Page 97

1  roles of PGE-2 with regard to thrombosis for --
2  formation in vessel constriction that may lead to
3  certain disease states?
4  A. PGE-2 -- again, it will vary depending on
5  the blood vessel. Human coronary arteries, which
6  obviously play a role here, actually vasoconstrict
7  in response to PGE-2. With regard to platelets,
8  PGE-2 can activate -- I think it's the EP3 receptor
9  to increase the aggravation of platelets.
10 Q. Does PGE-2 have both prothrombotic, as well
11 as antithrombotic actions?
12 A. At low concentrations it works through the
13 EP3 receptor to increase aggregation. At high
14 concentrations it can actually be thought of as
15 activating the prostacyclin to inhibit platelet
16 activity.
17 Q. The PGD -- what -- what is the biologic role
18 of PGD in thrombosis formation, vessel constriction,
19 that might lead to a disease state?
20 A. PGD-2 is not really -- is not that prominent
21 within the blood vessel wall. And I'm -- I'm not up
22 to date with regard to its actions.
23 Q. Have you ever seen any scientific literature
24 that discusses a role of PD -- PGD 2 in plaque
25 stability?

Nicholas A. Flavahan, Ph.D.

Page 98

1  A. I've seen manuscripts dealing with PGD2's
2  metabolite with regard to inflammation.
3  Q. And what is that information, whether it's
4  helpful or unhelpful in plaque stability?
5       MR. KREPS: Object to form of the
6  question.
7  A. (Continuing) Again, there's metabolite --
8  working on the numbers, PGJ2 metabolite is thought
9  to be involved in potentially inhibiting
10 inflammation.
11 Q. Sorry?
12 A. Potentially inhibiting inflammation.
13 Q. Are there any other of the prostaglandins
14 that we haven't mentioned that you've discussed as
15 having biologic roles for thrombosis formation,
16 vessel constriction that might lead to a disease
17 state?
18 A. The major prosta -- prostanoids, the
19 prostaglandins, are the D2, I2 thromboxane.
20 Q. Okay. So they're the -- they are the main
21 players that you've discussed, is that right?
22 A. Yes.
23 Q. I want to show you another exhibit. We'll
24 have it marked. Excuse me. See if I have another
25 copy. I think I saw --

Page 99

1       (Deposition Exhibit Number 4 was marked for
2  identification.)
3       MR. WEISS: Exhibit 4, John?
4       MR. HORNBECK: Yes.
5       MR. WEISS: Bresalier?
6  Q. (By Mr. Hornbeck, continuing) Exhibit 4 is
7  an article -- first author, Bresalier.
8       Have you seen this article before,
9  Doctor Flavahan?
10 A. Yeah. I read it a long time ago.
11 Q. Okay. And do you know how long ago you read
12 it?
13 A. Most recently has been a -- a few months.
14 Q. Did you read this article before writing
15 your expert report?
16 A. I would have, yes.
17 Q. Did you consider any of the information in
18 this article in terms of your opinions in your
19 expert report?
20 A. Again, as we've discussed earlier, I didn't
21 look at it from the standpoint of the design or
22 interpretation or the results of the -- the trial.
23 I looked at it from the standpoint of whatever
24 mechanisms they may have been discussing.
25 Q. Well, let -- let -- let's look at the

Page 100

1  paragraphs under the discussion section. There's a
2  discussion section.
3       Do you see that?
4  A. Yes.
5  Q. And under the discussion section, beginning
6  with the second full paragraph, beginning with
7  "Thromboxane."
8       That is a discussion of mechanism of action,
9  isn't it?
10 A. It appears to be describing mediators, yeah,
11 which could be getting to mechanism.
12 Q. Okay. Halfway down that paragraph it says,
13 "COX-2 is the chief source of systemic prostacyclin
14 synthesis."
15      Do you see that?
16 A. Yep.
17 Q. And is that scientifically wrong, in your
18 opinion?
19 A. It's an extension of an interpretation.
20 It's based on the basal release or excretion of that
21 PGI-M that you were talking about under vaso-
22 conditions from -- from individuals.
23 Q. You were looking at the citation. And
24 that -- that citation is 20 -- is number 25. That's
25 the McAdams, Cetella-Lawson, Garrett FitzGerald

Page 101

1  paper in 1999, correct?
2  A. Right.
3  Q. Do you have any approximation how many times
4  that paper has been cited in the scientific
5  literature since 1999?
6  A. I haven't looked it up, no.
7  Q. Do you have any information that the data
8  and conclusions of that paper have been rejected in
9  the scientific community?
10 A. We'd need to look at the paper to look at
11 the conclusions from it.
12 Q. Well, you -- you've read that paper, have
13 you not?
14 A. I've read the paper, yeah.
15 Q. And you cited it in your report, correct?
16 A. Correct.
17 Q. In citing it in the report did you do any
18 MedLine of that paper?
19 A. You mean, did I do a citation check of it?
20 Q. Yeah. Did you see whether or not
21 it's -- it's ever been criticized as -- as being
22 scientifically unfounded now in 2006?
23 A. Again, I'm not arguing against the data.
24 Q. Okay.
25 A. I'm specifically referring to your comment

Page 102

1 regarding the conclusions of the paper.
2   Q. Okay.
3   A. In order for me to comment on the
4 conclusions of the paper I need to look at what the
5 actual conclusions are.
6   Q. Okay. Well, let's --
7   A. I -- I have no argument --
8   Q. Okay. Sorry.
9   A. -- with the data.
10   Q. Okay. Let's get back to the question I
11 asked.
12       When Merck sites "COX-2 is the chief source
13 of systemic pros -- prostacyclin synthesis" in the
14 Bresalier paper, is that scientifically wrong --
15       MR. KREPS: Object to form of the
16 question.
17   Q. (By Mr. Hornbeck, continuing) -- in your
18 opinion?
19   A. It's an interpretation based on that PGI-M
20 secretion. So under basal conditions the majority
21 of that PGI-M appears to be coming from COX-2. And
22 I agree with that.
23   Q. Well, it says it's the source of systemic
24 prostacyclin synthesis.
25       Do you also agree with that, that the chief

Page 103

1 source of systemic prostacyclin synthesis is from
2 COX-2?
3   A. The source of that PGI-M has not been
4 determined. We don't know where that prostacyclin
5 is coming from. The PGI-M is also the source of the
6 PGI-M itself. And where the metabolism of the
7 prostacyclin to PGI-M -- is also not known.
8   Q. Well, Doctor, in your report you -- you
9 state that -- that COX-1 is the chief source of
10 systemic prostacyclin. Do you not?
11   A. No.
12   Q. Okay. That's not -- that's not your
13 opinion?
14   A. You have to separate PGI-M from the vascular
15 endothelial production of prostacyclin.
16   Q. Does the endothelial production of
17 prostacyclin come from COX-1 or COX-2?
18   A. Appears to come predominantly from COX-1.
19   Q. Okay. That's your opinion, correct? In
20 your --
21   A. That's in the report, yes.
22   Q. Okay. Does this statement, "COX-2 is the
23 chief source of systemic prostacyclin synthesis,"
24 contradict your opinion?
25   A. No, because my opinion is addressing the

Page 104

1 endothelial production of prostacyclin. The PGI-M
2 is referring to some source of prostacyclin which is
3 converted into PGI-M and is excreted in the urine.
4   Q. Okay. Is it your opinion that the
5 prostacyclin that is represented by PGI-M is both
6 renal and extrarenal?
7   A. Again, we don't know. There's evidence that
8 it can be -- PGI-M can be formed within the liver.
9 There's evidence that PGI-M can be formed within the
10 kidney.
11   Q. Okay. The rest of that sentence says, "And
12 COX-2 inhibitors may increase the cardiovascular
13 risk by shifting the functional balance of these
14 vasoactive eicosanoids toward the promotion of
15 thrombosis or atherogenesis."
16       Do you see that?
17   A. Yes.
18   Q. Does that sound to you like this is the
19 imbalance theory?
20   A. It does, yes.
21   Q. Okay. Is this publication by Merck
22 scientifically wrong?
23       MR. KREPS: Object to form of the
24 question.
25   Q. (By Mr. Hornbeck, continuing) In your

Page 105

1 opinion?
2   A. I think the interpretation of that
3 data -- that statement is wrong.
4   Q. Okay. Have you ever told Merck that this
5 particular Bresalier publication on the APPROVe
6 contains scientifically unfounded statements such as
7 we have just looked at?
8   A. It's an incorrect interpretation of data.
9       And, again, I have not spoken to anyone
10 directly from Merck. I have spoken to Merck's
11 lawyers.
12   Q. Well, when you -- when you read this
13 statement, when you reviewed this months ago, before
14 your draft, did you say to Merck, you know, this is
15 wrong scientifically? You've put this in the
16 New England Journal. And it's wrong.
17       MR. KREPS: Objection.
18   Q. (By Mr. Hornbeck, continuing) Did you say
19 anything like that?
20       MR. KREPS: Objection to form.
21   A. (Continuing) You've told me that the
22 lawyers -- represent Merck are Merck. So in a sense
23 I would have told them that that interpretation is
24 incorrect.
25   Q. Did -- is it your testimony today that you

Page 106

1  specifically told a Merck lawyer, when you read the
2  Bresalier article, that this sentence is
3  scientifically wrong?
4      A. I've told the lawyers, as you can see
5  through the report, that the imbalance theory is
6  unfounded and is not accurate.
7          MR. HORNBECK: Motion to strike.
8      Q. (By Mr. Hornbeck, continuing) My question
9  was: After reading the Bresalier article, did you
10 tell the Merck lawyers the statement in the
11 discussion of the imbalance theory that Merck has in
12 this manuscript is wrong?
13     A. I don't know if I specifically addressed
14 that statement within the Bresalier manuscripts, but
15 I told them that the imbalance theory, as I said,
16 is -- is incorrect.
17     Q. Okay. Have you been a reviewer for the
18 New England Journal?
19     A. Yes.
20     Q. Okay. Have you reviewed any article that
21 was published that discusses the imbalance theory?
22     A. No.
23     Q. Have you reviewed any article that has to do
24 with COX-1, COX-2 inhibition?
25     A. Yes.

Page 107

1      Q. Did any of those articles discuss the
2  imbalance theory?
3      A. No.
4      Q. Did any of those articles -- articles
5  discuss the source of COX-2 prostacyclin?
6      A. What do you mean, the source of --
7      Q. Whether it's derived from COX-1 or COX-2.
8      A. I just said it was COX-2, so it has to be
9  COX-2.
10     Q. Okay. Did you ever --
11         MR. KREPS: Well, hold on.
12         MR. HORNBECK: Yeah, that's not going
13 to be clear.
14         MR. KREPS: He's trying to clarify your
15 question.
16     Q. (By Mr. Hornbeck, continuing) That's not
17 going to be clear. I'm going to -- I'm going to
18 re-ask the question.
19     In any of the peer review articles that
20 you've looked at, what -- did you ever discuss
21 prostacyclin as being derived from COX-1 or COX-2?
22     A. I don't think that was in any of the
23 articles I reviewed, no.
24     Q. Okay. Let's look at the next column. It
25 starts with "A recent meta-analysis."

Page 108

1      You see that?
2      A. What page?
3      Q. It's the next column. Same page, on the
4  discussion.
5      A. No. You're on a different page.
6      Q. I must have a different --
7          MR. WEISS: No. It's on page 7.
8          MR. KREPS: You handed him a different
9  version, I guess.
10         MR. WEISS: Here you go. Here is the
11 order.
12         MR. HORNBECK: Okay. Well, maybe
13 I've --
14         MR. WEISS: Counsel would pass that
15 over to you.
16         MR. HORNBECK: Sorry. I didn't know we
17 had different versions.
18         MR. KREPS: Exhibit 4, which the court
19 reporter marked as the Exhibit 4, has a -- slightly
20 different than the one that you handed --
21         MR. HORNBECK: Okay. Why don't you use
22 Exhibit 4 then, if they are different. If they are
23 not --
24     A. (Continuing) Yeah, this is different.
25     Q. Okay. Let's -- let's look --

Page 109

1          MR. WEISS: Exhibit 4 that I've handed
2  you comes directly downloaded from the New England
3  Journal of Medicine.
4          MR. HORNBECK: Okay.
5          MR. KREPS: Yeah, but that's not
6  Exhibit 4. What you're -- what you're holding is
7  different than Exhibit 4.
8          MR. HORNBECK: All right. We're --
9  we're going to be fine here.
10     Q. (By Mr. Hornbeck, continuing) You're looking
11 at Exhibit 4, correct, Doctor?
12     A. This -- this is the publication.
13     Q. Doctor, are you looking at Exhibit 4? Let's
14 make sure this record is clear.
15     A. This is the manuscript that's published in
16 the New England Journal.
17     Q. Okay. Got you.
18         Now, page 7, right under Figure 3?
19     A. Yeah.
20     Q. Do you see, "A recent meta-analysis
21 suggested that the magnitude of any cardioprotective
22 effect of Naproxen is unlikely to account entirely
23 for these findings."
24         Did you see that?
25     A. Yes.

Page 110

1  Q. And did you see it at the time you read this
2  article?
3  A. I presume so.
4  Q. Okay. Did that influence your thinking at
5  all into the cardioprotective nature, if any, of
6  Naproxen?
7  A. Again, you're asking me to interpret
8  clinical trials. And I'm -- that's -- that's not
9  why I'm here.
10  Q. Okay. So the answer would be no, it didn't
11  influence you. Is that true?
12  A. The answer is no, I didn't review or assess
13  or interpret clinical trials.
14  Q. Okay. Let's look at Table 2 of this
15  article. It's on page 5.
16  A. See Table 2. Yes.
17  Q. Talks about cardiac events?
18  A. Yes.
19  Q. As myocardial -- myocardial infarction,
20  fatal MI, sudden death, unstable angina?
21  A. Yeah.
22  Q. Is that the acute coronary syndrome that you
23  discussed on page 3 of your report that we've
24  discussed today?
25  A. Yes.

Page 111

1  Q. Okay. And do you see that -- that the
2  events with acute coronary syndrome is 31 to 12?
3  A. The -- as described as cardiac events? Yes.
4  Q. Yes, sir.
5     And do you see the hazard ratio of 2.80?
6  A. Yes.
7  Q. And the confidence limits are more than
8  one -- exceed one, correct?
9  A. Yes.
10  Q. That would be statistically significant,
11  correct?
12  A. Again, I did not review, interpret, design
13  clinical trials. So, you know --
14  Q. I'm just asking you if it's statistically
15  significant.
16     You deal with statistic significance all the
17  time, don't you?
18  A. I -- I'm not a biostatistician.
19  Q. Okay.
20  A. I don't use coincidence intervals.
21  Q. Do you use P values?
22  A. I use P values.
23  Q. Okay. Doctor, let me show you what
24  hopefully we're going to mark as Exhibit 5.
25     MR. HORNBECK: May I hand that to you,

Page 112

1  please. May I hand that to you. And -- might need
2  another copy.
3     (Deposition Exhibit Number 5 was marked for
4  identification.)
5     Q. (By Mr. Hornbeck, continuing) Tell you what.
6  May I trade you and give you the official exhibit so
7  in case there is any discrepancy --
8     MR. WEISS: Could you describe what
9  Exhibit 25 is?
10     MR. HORNBECK: I'm -- I'm going to do
11  that right now.
12  Q. (By Mr. Hornbeck, continuing) Doctor,
13  Exhibit 5, as you see on the cover, is the Joint
14  Meeting of the Arthritis Advisory Committee, the
15  Drug Safety and Risk Management Advisory Committee,
16  Volume I, dated Wednesday, February 6 -- 16, 2005.
17     Do you see that?
18  A. February 16, yep.
19  Q. Okay. And my understanding from your
20  previous testimony is that you have not reviewed any
21  of the presentations before the -- the joint
22  committee of the advisory to the FDA, correct?
23  A. That's correct.
24  Q. Do you know what an advisory committee is?
25  Aside from the obvious?

Page 113

1  A. I don't know how they function, though.
2  Q. Okay. You -- and -- and I know you've said
3  you've never been a part of the committee. You've
4  never read any presentations to an advisory
5  committee. Is that correct?
6  A. To advisory committees to the FDA?
7  Q. Yes, sir.
8  A. No.
9     MR. HORNBECK: Okay. Going to make
10  this a separate exhibit, Exhibit 6.
11     (Deposition Exhibit Number 6 was marked for
12  identification.)
13  Q. (By Mr. Hornbeck, continuing) And we're
14  going to allow you to have the official copy.
15     I would represent to you, Doctor Flavahan,
16  that -- that Exhibit 6 is part of the presentation
17  of Garrett FitzGerald to the advisory committee of
18  the FDA on February 16, 2005.
19     Again, I assume you've never seen this
20  before. Is that correct?
21  A. That is correct.
22  Q. Okay. The -- well, let's -- let's back up.
23     Do you know Garrett FitzGerald personally?
24  A. I've met him a few times. We're not close
25  associates, but I know -- do know him, yes.

Nicholas A. Flavahan, Ph.D.

Page 114

1  Q. Okay. Have you been at scientific meetings
2  with Doctor FitzGerald?
3  A. I've seen him at scientific meetings. I
4  didn't go with him, no.
5  Q. Did you listen to any presentation by
6  Doctor FitzGerald at scientific meetings?
7  A. I think I've been present at one.
8  Q. Did -- could you tell us what that meeting
9  was and where it was, to the best of your
10 recollection?
11 A. It was in San Francisco earlier this year.
12 In April, I think.
13 Q. Okay. And what was the nature of the
14 meeting?
15 A. It was a meeting of the Federation of
16 American Society of Experimental Biologists, FASEB.
17 Q. FASEB?
18     And what presentation did Doctor FitzGerald
19 give?
20 A. It was a presentation on -- the symposium
21 was on the cyclooxygenase 2. And Garrett gave a
22 presentation on COX-2.
23 Q. And did he, in that presentation, go through
24 the potential biological mechanisms of COX-2
25 inhibition on cardiovascular disease?

Page 115

1  A. I can't recall the details of the talk, but
2  yes, he went through his data. And basically
3  looking at the effect of COX-2 inhibitors.
4  Q. Okay. Did you present at that conference?
5  A. No, I did not.
6  Q. Did you at any time tell Doctor FitzGerald
7  that his imbalance theory of prostacyclin and
8  thromboxane as a consequence of COX-2 inhibition was
9  scientifically wrong?
10 A. I have never discussed the imbalance theory
11 with him. It was a busy conference. We didn't get
12 to talk.
13 Q. Okay. Did anyone at that conference present
14 a contrary view to Doctor FitzGerald in terms of his
15 data and opinions on the biological mechanisms of
16 COX-2 inhibition by Vioxx or similar drugs?
17     MR. KREPS: Objection to form of the
18 question.
19 A. (Continuing) I didn't stay for the whole
20 conference. I'm not sure. There may have been.
21 Q. Okay. You got a -- a brochure of scheduled
22 presentations, correct?
23 A. It was an unlined brochure that you went
24 through.
25 Q. Okay. But you got a brochure anyway,

Page 116

1  correct?
2  A. Well, there was -- it's a huge meeting.
3  There were 20,000 scientists at it, so --
4  Q. Were -- were there abstracts at this meeting
5  presented?
6  A. There was oral communications and poster
7  presentations.
8  Q. Were there any poster presentations that
9  took an opposite view from Doctor FitzGerald as to
10 the biologic mechanisms of COX -- specific COX-2
11 inhibitors?
12 A. There may have been.
13 Q. Well, when you say "may have been," I want
14 to know if you have any memory of -- of any such
15 contrary data or opinions.
16 A. I didn't attend the whole meeting, as I said
17 before.
18 Q. Okay. All right.
19 A. Specifically with regard to that meeting I
20 don't know what was presented. There were abstracts
21 associated with that subsymposium that we discussed.
22 And there is considerable data in the literature
23 which counters Doctor FitzGerald's hypothesis.
24 Q. Well, whether it counters it or not, I'm
25 asking you specifically, as we sit here today,

Page 117

1  Doctor, if there were abstracts, to your knowledge,
2  presented at the FASEB meeting that took an opposite
3  view from Doctor FitzGerald.
4  A. And specifically with regard to that
5  meeting, I'm -- I cannot recall.
6  Q. Okay. Let's look at Exhibit 6. First page
7  is Mechanism Based Cardiovascular Hazard-1.
8      Would you -- do you agree or disagree with
9  the power points under Mechanism Based
10 Cardiovascular Hazard-1?
11     MR. KREPS: Objection to form of the
12 question.
13 A. (Continuing) Well, you need to explain that
14 first bullet point, "Hemodynamic induction of
15 endothelial COX-2-derived prostacyclin."
16     I think I know what it means. I don't know
17 if -- might need Garrett here to actually describe
18 what he means here.
19 Q. Well, we actually have his testimony, in
20 addition to the slides, but what -- give me your
21 understanding of -- of -- of what this means.
22 A. I think it goes to something which is in the
23 report, which is Garrett's hypothesis that -- that
24 constant exposure of arterial endothelial cells to
25 blood flow or shear stress will induce COX-2 enzyme

Nicholas A. Flavahan, Ph.D.

Page 118

1  within the endothelial cells.
2      Q. And is there scientific support for that
3  proposition in the literature?
4      A. The totality of the data suggests that it's
5  not correct.
6      Q. Okay. Do you have an opinion to a
7  reasonable scientific certainty that that first
8  point is incorrect?
9      A. Yes.
10     Q. Okay.
11     A. Well, again, the first point doesn't
12 actually say that. We're interpreting it to say
13 that. But if the first point is referring to that
14 theory, then yes, the theory is wrong.
15     Q. Okay. Now, when you say "the theory is
16 wrong," Doctor, do you understand that -- that
17 Garrett FitzGerald has put forth this -- a series of
18 hypotheses regarding COX-2 inhibition to be tested
19 in various ways, from clinical trials to
20 experimental animals, that kind of thing?
21         MR. KREPS: Object to form of the
22 question.
23     A. (Continuing) Again, you haven't defined what
24 theory you're actually specifically referring to.
25     Q. Okay.

Page 119

1      A. But if you're specifically referring to the
2  shear stress theory, I address it quite effectively
3  in the -- in the report.
4      Q. Okay. The second point, "Prostacyclin
5  constraint platelet activation and thrombogenesis
6  in vivo."
7          Do you have an opinion -- and all your
8  opinions, Doctor, if you have them to a reasonable
9  medical certainty -- if -- if something is possible,
10 say it's possible; if it's more likely than not, say
11 that, if you would, so I don't have to keep
12 repeating that whole thing?
13     A. Yeah.
14         MR. KREPS: Let him ask the question.
15     Q. (By Mr. Hornbeck, continuing) So second
16 point, "Prostacyclin constrains platelet activation
17 and thrombogenesis in vivo."
18         Do you have an opinion as to whether that is
19 scientifically supported or not?
20     A. As we discussed earlier, prostacyclin is one
21 of the endothelial mechanisms for inhibiting
22 platelet activity.
23     Q. So you would agree with that?
24     A. Agree with what I just said.
25     Q. And -- and is -- and with the second point

Page 120

1  here?
2      A. It depends how Garrett explains that.
3      Q. Okay.
4      A. I wasn't at this presentation. I don't know
5  the answer -- the interpretation that Garret was
6  putting on that phrase.
7      Q. Okay.
8      A. As to my interpretation which I just
9  described, I agree with that.
10     Q. Okay. Third, "Suppression of prostacyclin
11 does not cause spontaneous thrombosis, but augments
12 the response to thrombo -- thrombogenic stimuli in
13 vivo."
14         "Augments" means increase, correct?
15     A. Correct.
16     Q. Okay. Do you have an opinion as to whether
17 you agree that that statement has scientific
18 support?
19     A. Again, it depends on the circumstances and
20 the stimuli and the state of the blood vessel, but
21 since prostacyclin is one of the restraints on
22 platelet activity you could develop a scenario where
23 inhibiting that prostacyclin could amplify a
24 thrombotic event, yes.
25     Q. Okay. The next is the "Hazard -- Hazard

Page 121

1  from coxibs, particularly in those otherwise
2  predisposed to thrombosis."
3          Do you know -- strike that.
4          Do you have an opinion as to whether or not
5  there is an increased hazard from COX -- specific
6  COX-2 inhibitory drugs with those who already are
7  predisposed to thrombosis?
8      A. There is already data within the literature
9  which basically goes against this point. That
10 coxibs do not increase the thrombotic risk. And
11 particularly Vioxx does not increase the thrombotic
12 risk.
13     Q. Doctor, in the VIGOR study was there an
14 increased relative risk in those patients who were
15 ASA, or aspirin indicated, as opposed to those who
16 were not?
17     A. Again, I'm not here to discuss, interpret,
18 assess clinical trials.
19     Q. Doctor, did you understand from the
20 Bresalier article in the New England Journal on the
21 APPROVe data that for symptomatic atherosclerotic
22 disease the relative risk was nine and a half times
23 that of placebo?
24         Did you understand that?
25     A. Again, I'm not here to interpret -- analyze,

31 (Pages 118 to 121)

Page 122

1  interpret clinical trials.
2      Q. Doctor, do you agree that for a scientific
3  hypothesis to have validity, it should be
4  predicted -- predictive of future events?
5      Does that make sense or should I rephrase
6  that?
7      A. You should rephrase that.
8      Q. Okay. Is a scientific principle -- if you
9  have a hypothesis, one way to test whether the
10 hypothesis is valued or not is whether it has
11 predictive value; that is, what the hypothesis says
12 is likely to happen, in fact, happens in people?
13     A. There's already data, and the references are
14 contained in the report, that demonstrate the Vioxx
15 and the other COX-2 inhibitors do not increase
16 thrombotic risk.
17     Q. In -- in intact human beings?
18     A. In -- in human beings.
19     Q. Show -- tell me that reference, Doctor.
20     A. Well, basically it's the whole -- from pages
21 4 through -- pages 4 through 7.
22     Q. Tell me the specific --
23     A. Not, in fact -- 4 through 8.
24     Q. Okay.
25     A. Oh, no.

Page 123

1      Q. Tell --
2      A. 4 through 7 and then page 11.
3      Q. Is there any paper that you cite that looks
4  at Vioxx administered to patients versus a
5  comparator?
6      A. Yes, for sure I think they are in there.
7      Q. Okay. Are -- but -- it does not include any
8  randomized clinical trials of Vioxx administered to
9  patients versus comparators. Is that true?
10     A. I've referenced, as part of this, clinical
11 studies or clinical experiments performed in
12 individuals that were placebo-controlled and
13 analyzed the activity of Vioxx and other COX-2
14 inhibitors in human volunteers. I did not reference
15 and did not analyze the clinical trials that you are
16 referring to.
17     Q. Tell me, what is the reference that -- that
18 you rely on to show that patients administered Vioxx
19 did not have an increase in CV events?
20     A. No. We were talking about thrombotic
21 events.
22     Q. Okay. I'll make "CV" thrombotic events.
23     A. Okay. All right. If we go to -- well,
24 first of all, the -- the whole basis for the
25 argument underlying the imbalance theory is

Page 124

1  addressed with studies in human beings and in human
2  tissue in pages 4, 5, 6, 7, addressing the
3  implausibility of the theory.
4      And then specifically with regard to
5  the -- some studies in humans looking at the
6  imbalance theory -- they are defined, also, on
7  page 11.
8      Q. Okay.
9      A. So if the imbalance theory were correct,
10 then the COX-2 inhibitors should increase platelet
11 activity, should increase thrombosis, right?
12     Q. Well, Doctor, my question was -- was, I
13 think, a little more precise. I thought --
14 let -- let me see if I can make it very precise.
15     I want your references in intact human
16 beings where Vioxx administered to patients versus
17 a -- a comparator does not increase excess CV
18 thrombotic events.
19     MR. KREPS: Object to form of the
20 question.
21     A. (Continuing) Within page 11 there are
22 studies looking at individuals both healthy and with
23 apparent increased thrombotic activity given Vioxx
24 or given other COX-2 inhibitors.
25     Q. Doctor, I'm talking very specifically about

Page 125

1  a patient on Vioxx, versus a com -- versus a
2  comparator who had a CV thrombotic event. I'm not
3  asking for platelet inhibition or anything. I want
4  the events that you -- and a cite that you rely on.
5      A. You're talking about thrombotic events.
6  Now, a thrombotic event involves platelet activity
7  and platelet aggravation. That is addressed
8  specifically on page 11.
9      Q. Doctor, do any of the citations on page 11
10 involve patients administered Vioxx against a
11 comparator and a review or comparison of CV
12 thrombotic events in the two groups?
13     A. Again, you need to -- to define your CV
14 thrombotic events.
15     Q. Doctor, could you --
16     A. No, no. Let me finish.
17     This is directly analyzing the activity of
18 platelets within living human beings and is
19 therefore analyzing the activity of Vioxx and the
20 other inhibitors of COX-2 on that platelet activity.
21 And so it's directly relevant to what you're saying.
22     If you have some other concept of CV
23 thrombotic events, then you need to define them.
24     Q. Well, Doctor, I understand why you may think
25 it would be relevant. I'm asking you an endpoint.

Nicholas A. Flavahan, Ph.D.

Page 126

1   You understand what an endpoint is in a
2   study, don't you?
3       A. Everything is an endpoint.
4       Q. Okay.
5       A. This is an endpoint.
6       Q. Here -- here is the endpoint I'm looking at.
7   In a actual adverse cardiovascular thrombotic event
8   comparison between Vioxx-administered patients and
9   compare.
10      A. I think what you're looking for is a
11  clinical trial. And I told you --
12      Q. I'm just --
13      A. Well, this is -- you're looking at the
14  endpoint of platelet activity, which is the level of
15  thromboxane and other platelet mediators within
16  human beings with or without Vioxx in individuals
17  that are both healthy and also in individuals
18  which -- which have an increased activity of the
19  platelets and an increased risks for thrombosis.
20  And the levels are the same. Vioxx doesn't affect
21  them.
22      Q. Not asking for the levels, Doctor. I'm
23  asking for actual CV events in human beings.
24      A. But these --
25          MR. KREPS: Wait. You've -- that

Page 127

1   wasn't a question. That was a statement. If there
2   is a question --
3           MR. HORNBECK: No.
4       Q. (By Mr. Hornbeck, continuing) I said I am
5   asking about your reference for a comparison of CV
6   thrombotic events in patients administered Vioxx
7   against a comparator?
8       A. And I --
9           MR. KREPS: Object to -- to form. It's
10  been asked and answered several times. You're
11  asking if he has a clinical trial.
12          MR. HORNBECK: No, I --
13          MR. KREPS: And he's told you he
14  doesn't.
15          MR. HORNBECK: No, I'm not. No, I'm
16  not.
17      A. (Continuing) I think what you're asking for
18  is a different endpoint than the endpoint I'm giving
19  you.
20      Q. Okay. All right.
21      A. This endpoint that's described here is an
22  endpoint that reflects the activity of platelets and
23  therefore reflects the activity of CV thrombotic
24  events.
25      Q. Well, Doctor --

Page 128

1           MR. WEISS: Move to strike the answer
2   as nonresponsive because the question repeatedly
3   was, "In any of these studies were patients given
4   Vioxx or another COX-2 inhibitor."
5           That was the question. And you haven't
6   answered it yet, Doctor. So I'm moving to strike
7   it. The whole line.
8       Q. (By Mr. Hornbeck, continuing) Doctor, is it
9   true that if your opinions on page 11 were relevant
10  to whether or not Vioxx was -- was cardiotoxic, the
11  proof would be in the randomized clinical trials and
12  whether that -- there's statistically significant
13  increased CV events on Vioxx versus a comparator?
14  Isn't that right?
15          MR. KREPS: Object to form.
16      A. (Continuing) The studies that -- referenced
17  within the report were all done on humans -- humans.
18          You're asking me to interpret clinical
19  trials again. And that's -- I'm not here to do
20  that.
21          MR. HORNBECK: Okay, motion to strike.
22  We'll just keep going.
23          MR. KREPS: Well, Counsel, let's talk
24  about timing here. You've been going for three
25  hours.

Page 129

1           MR. HORNBECK: Oh, I didn't see that.
2   Okay. You're right, let's -- let's take a break
3   now. And we'll -- there must be a place to eat very
4   close by.
5           MR. KREPS: Sure. Let's go off the
6   record.
7           MR. HORNBECK: Huh?
8           MR. KREPS: Sure. Let's go off the
9   record.
10          MR. HORNBECK: Yeah, you're right.
11          THE VIDEOGRAPHER: Going off the
12  record. The time is 12:35 p.m.
13          (Recess from 12:35 p.m. to 1:21 p.m.)
14          THE VIDEOGRAPHER: We are back on the
15  record. The time is 1:21 p.m.
16              EXAMINATION
17  BY MR. WEISS:
18      Q. Doctor Flavahan, my name is Sol Weiss. And
19  I'm here representing New Jersey plaintiffs. And I
20  appreciate the courtesy of allowing me to get an
21  hour in before I have to catch a plane.
22          I want to mark as Exhibit 7 a copy of the
23  bill which was presented to us today.
24          MR. WEISS: Ask the court reporter,
25  could you please put a sticker on it.

Nicholas A. Flavahan, Ph.D.

Page 130

1    (Deposition Exhibit Number 7 was marked for
2    identification.)
3    Q. (By Mr. Weiss, continuing) Now, according to
4    this exhibit, Exhibit 7, the first time you started
5    doing work was in December of 2005.
6    A. That seems to be correct, yes.
7    Q. Okay. And you had 30 and a half hours in
8    the month of December?
9    A. Yep.
10   Q. And that was used to generate a report in
11   the case called Cona/McDarby. Is that a fair
12   statement?
13   A. I'm not sure. The next page refers to
14   Cona/McDarby.
15   Q. Okay. And there's 143 hours shown between
16   January 2, 2006, through February 13, 2006.
17      Now, how much of the time was spent in
18   preparing the report for Cona/McDarby on the second
19   page?
20   A. I'm sure if it's billed to the Cona/McDarby,
21   then I would assume that all the time was spent on
22   Cona/McDarby.
23   Q. Well, the report was due in January, sir, of
24   2006. And you have time in February of 2006.
25      Were you present at the trial in Atlanta

Page 131

1    County, New Jersey?
2       MR. KREPS: Object to form of the
3    question. Object to the preamble. I don't think
4    the report is dated in January. I think it's dated
5    in February.
6    Q. (By Mr. Weiss, continuing) Was all this time
7    spent in generating the report?
8    A. Again, there's time that's spent generating
9    the report and there's time that's spent reviewing
10   the literature.
11   Q. Well, let's break it down.
12   A. I obviously -- but I --
13   Q. I'm sorry.
14      Is it your testimony that your report was
15   generated on or about February 13, 2006?
16   A. I would have reports records when I
17   submitted the reports, so I can get you an exact
18   date, but I'm not --
19   Q. Well, we'd like to have that.
20      And you also took a trip to Philadelphia
21   according to this?
22   A. Appear to be, yep.
23   Q. And what was the purpose of going to
24   Philadelphia?
25   A. I can't recall the trip. Imagine it was to

Page 132

1    meet with counsel.
2    Q. Was that before or after you had your report
3    drafted?
4    A. I can find that out for you.
5    Q. Do you have any recollection about that?
6    A. I don't recall the exact date I submitted
7    the report, no.
8    Q. And now there is another page, if you go to
9    the third page, called Elaine Doherty. And you
10   spent 58 hours on that case.
11      Do you see that?
12   A. Yes.
13   Q. Did you produce a report in the Doherty
14   case?
15   A. I think so, yes.
16   Q. Is it different than the report that was
17   marked today, dated May 31, 2006?
18   A. I'm not sure.
19   Q. I don't see any time spent for Hatch or
20   McFarland.
21      Do you have a bill you haven't submitted
22   yet?
23   A. I know there is time that I haven't put
24   together into an invoice, yeah.
25   Q. And why not?

Page 133

1    A. I generally run a month behind.
2    Q. Well, the Doherty report, I suspect, was
3    submitted in May of 2006?
4    A. Again, I can get you an exact date for that.
5    Q. And you took a trip to Detroit for the
6    Doherty case.
7       What were you doing in Detroit?
8    A. Again, I imagine that was meeting with the
9    lawyers again.
10   Q. Which lawyers did you meet in Detroit?
11   A. I can't remember.
12   Q. You indicated to us that you took a trip to
13   Washington, D.C. and Chicago. And I don't see them
14   in the bills at all.
15   A. I -- they were the recent trips. I can't
16   remember the trip to Detroit. I don't remember the
17   trip to Philadelphia very well, either.
18   Q. Did you meet the same lawyers every time you
19   went out?
20   A. The -- the people at the meetings have
21   varied. Some people have been the same. But I -- I
22   can't remember who specifically was at Detroit and
23   who specifically was in Philadelphia.
24   Q. But your testimony is, as I understand it,
25   that you never once met with a Merck employee, only

Page 134

1  a Merck lawyer. Is that correct?
2     A. Yep. As far as I'm aware I've never met
3  with a Merck employee.
4     Q. And you never met with another expert who
5  was consulting for Merck?
6     A. And, again, I don't know the experts
7  consulting with Merck. I have not knowingly met
8  with any of the experts from Merck.
9     Q. Now, the literature that is contained in
10 the -- or referenced in the report submitted to the
11 MDL on May 31, 2006 -- when was that gathered?
12    A. It -- some of it I've known since the
13 publication date. Some of it's been gathered since
14 I -- I was involved in the litigation.
15    Q. Well, did you have 95 percent of the
16 literature gathered by the time you tendered a
17 report on Cona/McDarby in February of 2006?
18    A. Again, I would need to see when I submitted
19 the report on Cona/McDarby and compare the two
20 reports. And then we can get the answer.
21    Q. Now, if you take a look at your
22 bibliography -- or excuse me -- the listing of all
23 the -- the reports you relied on, how many of those
24 articles were published after January of 2006?
25    A. Within this --

Page 135

1     Q. Yes, sir.
2     A. -- report?
3     Q. There's a listing.
4     A. Right. Do you want me --
5     Q. Yeah.
6     A. Do you want me to check through?
7     Q. Yeah, real quick.
8        Isn't there a separate document that lists
9  all the -- there you go.
10    A. Uh-huh. So we'll assume if it's 2006, that
11 it's after January 2006.
12    Q. Right. Absolutely.
13    A. Well, there's one Ciabattoni, Number 26.
14    Q. Right.
15    A. There's one Cipollone -- Cipollone,
16 Number 32.
17    Q. Uh-huh.
18    A. Also, some of them, I may not have had
19 access. They may have been published in late 2005.
20 So --
21    Q. Would you agree with me that most of the
22 articles were available to you prior to January of
23 2006?
24    A. Again, we would need to check the reports,
25 when they were submitted, and compare them, when I

Page 136

1  actually read the articles. It would appear that
2  most of them were published prior to 2006.
3     Q. And did -- how many of those articles did
4  you personally find as opposed to being given to you
5  to read by Merck's lawyers?
6     A. I think I found every last one of these by
7  myself.
8     Q. So you didn't get any of the articles from
9  Merck's lawyers. Is that your testimony?
10    A. I may have gotten them from Merck's lawyers.
11 We talked about this morning -- there may have been
12 duplication. You'd need to check the list of
13 articles they give you.
14    Q. But your testimony is that the overwhelming
15 majority of those articles that were cited you
16 personally found in the literature?
17    A. Yes.
18    Q. And didn't rely on Merck's lawyers to give
19 them to you, correct?
20    A. Correct.
21    Q. Now, is it fair to state that you have never
22 been published for peer review any article dealing
23 with COX-2 inhibitors?
24    A. We have published with COX-2 and COX-2
25 inhibitors.

Page 137

1     Q. And there's only one I saw. And it was a
2  manuscript waiting to be approved.
3     A. No. Again, maybe your copy of the CV was
4  different.
5     Q. That's why I asked this morning because when
6  I looked at my copy of the CV I only saw one. And
7  that was M-104.
8     A. This is the most recent copy?
9     Q. So it's M-107.
10    A. I think that is probably the one you were
11 referring to.
12    Q. Right. And that's -- has that been approved
13 for publication?
14    A. That's published. There may be
15 published -- when it says "Epub," it's been
16 published online.
17    Q. April 27.
18    A. And I think it's due for print publication
19 this month.
20    Q. All right. And who sponsored that
21 publication?
22    A. You mean who provided the funds to do --
23    Q. Yes, sir.
24    A. -- the study?
25       That would be the National Institutes of

Page 138

1  Health.
2     Q. And when did you get that grant?
3     A. We can check the -- the CV. Most of the
4  grants I have were obtained within the last few
5  years.
6     Q. And what was the purpose for the grant?
7     A. The grants are generally to study vascular
8  mechanisms as they relate to potential mechanisms
9  that control blood vessels under healthy conditions
10 and also control them during the development of
11 disease.
12    Q. Did you ever receive a grant to study
13 hypertension?
14    A. I've received a grant to study hypertensive
15 mechanisms.
16    Q. And who gave you that grant?
17    A. The National Institute of Health.
18    Q. And when was that grant?
19    A. First -- so if you look at the research
20 funding, page 3 of my CV --
21    Q. Okay.
22    A. -- Grant Number 3 was related to
23 hypertension. The title, "Redox Regulation of
24 Arteriole Function."
25       You should be able to get the abstract off

Page 139

1  the NIH web site. Describes what we were proposing
2  to do.
3     Q. When was the time of that grant?
4     A. It runs from the 4/1/01 to 1/31/07.
5     Q. So you're still --
6     A. We're still -- we're still working on it.
7     Q. And --
8     A. And hang on. Just seeing if there's any
9  others.
10       There was another grant somewhere related to
11 pulmonary hypertension a long time ago. It wasn't
12 systemic hypertension.
13    Q. And what was that for?
14    A. That was looking at the response to hypoxia
15 in the pulmonary circulation. That was back in
16 19 -- again, National Institutes of Health, 1994 to
17 1999.
18    Q. And you did publish an abstract?
19    A. Again, you'll be able to get the abstract of
20 that grant from the NIH cite.
21    Q. You've also worked for a company called
22 CardioGrip.
23       Remember that company?
24    A. Actually, I didn't work for CardioGrip.
25    Q. You did prepare an evaluation of CardioGrip

Page 140

1  as a therapeutic intervention in hypertension of
2  vascular disease?
3     A. That wasn't -- I wasn't actually working for
4  CardioGrip. That was to evaluate a grant
5  application from CardioGrip that was submitted to
6  a -- an Ohio government OSU-sponsored funding
7  agency.
8     Q. You did do an evaluation, though, of
9  CardioGrip as a therapeutic in -- intervention in
10 hypertension and vascular disease?
11    A. No. I did an evaluation of whether the
12 funding should go forward and whether they should
13 continue to evaluate the -- the device.
14       MR. WEISS: Let's mark as Exhibit 8 the
15 evaluation.
16       (Deposition Exhibit Number 8 was marked for
17 identification.)
18    Q. (By Mr. Weiss, continuing) You are the
19 Nicholas A. Flavahan, Ph.D. --
20    A. Yes.
21    Q. -- that appears?
22       It does say it's an "Evaluation of
23 CardioGrip as a Therapeutic Intervention in
24 Hypertension and Vascular Disease"?
25    A. Yes.

Page 141

1     Q. You wrote this?
2     A. I don't know when I wrote it, but yes, I
3  wrote this.
4     Q. And the information that you -- is contained
5  in this is accurate?
6     A. I need to read through it again, but it was
7  an evaluation of a grant application. And so that
8  was what it was designed for.
9     Q. Well, let's go to the first paragraph.
10       "Hypertension is prevalent in all
11 westernized societies, affecting 15 to 25 percent of
12 the adult population."
13       That's a statement you made?
14    A. I borrowed it from a review, yes.
15    Q. Is that accurate?
16    A. I'm not sure.
17    Q. Would you write something in an article that
18 you're not sure whether it's true or not?
19    A. This was not to be -- well, from the small
20 amount of review I did at the time, it was accurate
21 back then. I don't know when I wrote this.
22    Q. It goes on to say, "The risks associated
23 with long-standing hypertension are multiple and
24 increase in a continuous manner with increasing
25 blood pressure."

Page 142

1    Is that statement accurate?
2    A. Again, this would have taken from a --
3    review articles. And I would assume it's accurate,
4    yes.
5    Q. "However, the reduction in risks for both
6    stroke and coronary heart disease associated with
7    the control of hypertension through the use of
8    antihypertensive medications is equally impressive."
9        Statement you agree with?
10   A. I think it was correct at the time. And I
11   think it's still correct, yes.
12   Q. "For example, a pharmacological reduction in
13   blood pressure of three to five milligrams" --
14   A. Millimeters.
15   Q. -- "of mercury" -- "millimeters of mercury
16   decreases the risk of stroke by 42 percent and the
17   risk of coronary heart disease by 14 percent."
18       Is that data that you relied on?
19   A. That's data that came from obviously
20   Reference 1, which is "Exercise and Hypertension;
21   Facts and Uncertainties." It was published in the
22   British Journal of Sports Medicine.
23   Q. Is that information correct, sir?
24   A. I retrieved -- this was obviously an
25   exercise device.

Page 143

1    I retrieved this from a sports medicine
2    journal, which I dare say can hardly be considered
3    the most definitive subject or publication in the
4    control of blood pressure, but it appeared to be
5    true at the time.
6    Q. Well, you've also done grants and you're
7    still doing grant for NIH regarding hypertension,
8    right?
9    A. Right, that's correct.
10   Q. And that's a correct statement, that a
11   decrease in blood pressure three to five millimeters
12   of mercury decreases the risk of stroke by
13   42 percent and the risk of coronary heart disease by
14   14 percent."
15       That's a -- still a true statement today,
16   correct?
17   A. I retrieved it from the article that's
18   referenced there.
19   Q. And --
20   A. I did not know the up-to-date
21   recommendations and effects or influences of changes
22   in blood pressure.
23   Q. But you put this in a writing --
24   A. Correct.
25   Q. -- that people rely on, correct?

Page 144

1    A. I put it in the evaluation of a application
2    for a grant.
3    Q. And I'm going to mark as Exhibit 8 a web
4    site for CardioGrip.
5        COURT REPORTER: Would this be 9?
6        MR. WEISS: Huh?
7        COURT REPORTER: Would this be 9?
8        MR. WEISS: 9, I'm sorry. I apologize.
9        MR. KREPS: 9, yes. The other one
10   was 8.
11       (Deposition Exhibit Number 9 was marked for
12   identification.)
13   Q. (By Mr. Weiss, continuing) I show you what
14   has been gotten off the web on June 2, 2006, when we
15   Googled your name.
16       Have you seen this before?
17   A. Nope.
18   Q. This talks about "The Science Behind
19   CardioGrip, published medical studies, university
20   research reports, numerous white papers support the
21   science behind CardioGrip."
22       Do you see that, sir?
23   A. Yes.
24   Q. And if you take a look at the clinical
25   documents, the last one is the one we marked as

Page 145

1    Exhibit 8, correct?
2    A. That seems to be true, yes.
3    Q. And --
4        MR. KREPS: Let me see that.
5    Q. (By Mr. Weiss, continuing) That was put on
6    the web site without your permission?
7    A. Obviously, since I've never seen the web
8    site before.
9    Q. Well, have you ever bothered to take a look
10   at what comes up when you put your name in for a
11   Google search?
12   A. I've never Googled myself.
13   Q. It's listed on the first page of the
14   items from Google.
15   A. Is that --
16   Q. Yes, sir.
17       Now, you have no scientific studies that
18   refute that a reduction in blood pressure of three
19   to five millimeters of mercury doesn't decrease the
20   risk of stroke by 42 percent and the risk of
21   coronary heart disease by 14 percent, do you?
22   A. This is a single reference. I haven't
23   reviewed that literature extensively, as you can see
24   from one reference that's put there.
25   Q. Would you just rely on one reference without

Nicholas A. Flavahan, Ph.D.

Page 146

1  checking the accuracy of that reference in -- in
2  publishing or preparing an evaluation?
3      A. This was an evaluation to determine whether
4  this company should receive a grant to further
5  develop this CardioGrip. And the conclusion of this
6  short report was, yes, to go ahead and -- and
7  provide the funding to see what data these
8  individuals could generate.
9      Q. And --
10     A. So it was never designed as a definitive
11 review of the area.
12     Q. Well, it was certainly designed to leave an
13 impression with the reader that if you reduce blood
14 pressure by three to five millimeters of mercury,
15 that it would reduce the risk of stroke by
16 42 percent and the risk of coronary heart disease by
17 14 percent?
18        MR. KREPS: Object to form.
19     Q. (By Mr. Weiss, continuing) Correct?
20     A. I think it's referencing one article in a
21 sports medicine journal which came up with that
22 number.
23        As I said, I didn't review extensive --
24 extensively the literature on the topic.
25     Q. You don't disagree with that statement as

Page 147

1  being accurate, do you?
2      A. I don't think it is accurate, if you -- if
3  you go and review the totality of the data that's
4  out there. I think it's one paper on sports
5  medicine.
6      Q. And that's -- so you're saying that you put
7  something in a paper --
8      A. It's not --
9      Q. -- to evaluate a device that wasn't
10 completely accurate?
11     A. No. I'm telling you that this was not
12 paper. This was an internal document for a funding
13 agency which was one of many experts analyzing
14 whether this funding should go forward. And the
15 data was restricted to sports medicine because this
16 was a -- an exercise device that was not an
17 extensive review of the literature at the time.
18     Q. Well, you're not going to deny that
19 hypertension is a known risk for stroke or heart
20 attacks, are you?
21     A. No. It -- it definitely is.
22     Q. And you're not going to deny, are you, that
23 Vioxx increases blood pressure?
24     A. The studies that have been done with
25 Vioxx -- the actual clinical experiments that were

Page 148

1  performed and referenced in the report pretty much
2  came up with the observation that there's minimal
3  effects of Vioxx on blood pressure, but, as with
4  other NSAIDs, there tends to be maybe a one- to
5  two-millimeter increase in blood pressure.
6      Q. You just told --
7         MR. HORNBECK: I'm sorry. I -- I
8  didn't hear that answer. What was the last part of
9  it? Excuse me.
10        MR. KREPS: Please read that back.
11        MR. HORNBECK: Just let the reporter --
12 I'm sorry. I just didn't hear you. No. Let the
13 reporter read it.
14        THE WITNESS: All right.
15        MR. HORNBECK: I'm sorry.
16        MR. KREPS: She'll read it back.
17        (Requested portion read.)
18     Q. (By Mr. Weiss, continuing) And I thought you
19 testified this morning that you didn't read any of
20 the clinical trial data that Merck had on Vioxx.
21        Didn't you say that this morning?
22     A. That's exactly right.
23     Q. So how do you know it was only one to two
24 millimeters increase in blood pressure?
25     A. I've read a lot of reviews. And I've read a

Page 149

1  lot of clinical experiments that were performed with
2  Vioxx.
3      Q. You don't know, do you, sir, what Merck
4  found with regard to increase of blood pressure with
5  people who are taking Vioxx, do you? You -- you
6  didn't see their internal documents?
7         MR. KREPS: Object to form.
8      A. (Continuing) As I said this morning, I'm not
9  relying on any internal documents.
10     Q. So if Merck knew, for example, that Vioxx
11 and -- raised the blood pressure by five
12 milligrams -- millimeters of mercury, that would be
13 significant to you, wouldn't it?
14        MR. KREPS: Object to form.
15     A. (Continuing) Again, I don't know what
16 Merck -- or Merck didn't find. I didn't get access
17 to the internal documents. I'm relying on the
18 published manuscripts and the published studies with
19 Vioxx.
20     Q. Well, let's just see what you're relying on.
21 I'm going to mark as the next exhibit, which I think
22 is 10, the New England Journal of Medicine article,
23 the Comparison of Upper Gastrointestinal Toxicity
24 and Rofecoxib and Naproxen in Patients with
25 Rheumatoid Arthritis. The Bombardier -- Bombardier

Page 150

1  article.
2      (Deposition Exhibit Number 10 was marked for
3  identification.)
4      Q. (By Mr. Weiss, continuing) You read that
5  before, didn't you, sir?
6      A. As I said this morning, yes, I did read it.
7      Q. All right. And you'll agree with me that
8  there's no information in this article at all about
9  hypertension and Vioxx, correct?
10     A. It's been a while since I read this article.
11 I would need to read through to see what you're
12 getting at with that question. If you want me to do
13 that, I can go ahead.
14     Q. Well, I want you to just accept for what I'm
15 telling you -- that there is no data in this article
16 that talks about hypertension.
17         MR. KREPS: Object to form.
18     Q. (By Mr. Weiss, continuing) Now, do you know
19 who Loren Laine is?
20     A. No.
21     Q. Loren Laine is the second listed author of
22 this article.
23         Now, what does it normally mean when someone
24 is second listed in a peer-reviewed article
25 published in the New England Journal of Medicine?

Page 151

1      A. I know what determines authorship of basic
2  science manuscripts. I'm not sure what determines
3  authorship in clinical trials.
4      Q. You have no reason to doubt that Loren Laine
5  was not a lead investigator for Merck with regard to
6  the VIGORs trial?
7      A. I don't know what it means to -- to be
8  second author in a clinical trial.
9      Q. Well, if you take a look, it discloses who
10 Doctor Laine is. And I want you to accept for the
11 purpose of my question that that's who Doctor Laine
12 was, that he was the principal clinical investigator
13 for Merck.
14         MR. KREPS: Object -- object to form.
15     I think he's trying to find out where you're
16 telling him to look at, Counsel.
17     Q. (By Mr. Weiss, continuing) Take a look at
18 1527, the last page. Next-to-last page. I guess it
19 is the next-to-the-last page.
20     A. Yep.
21     Q. "Doctor Laine has received clinical research
22 support from Merck."
23         See that?
24     A. Yes.
25     Q. Now -- and a list -- where all the authors

Page 152

1  have received grants before, correct?
2      A. Correct.
3      Q. Now, would it surprise you, sir, if I told
4  you that Doctor Laine has admitted that Merck
5  intentionally omitted putting any information about
6  the hypertensive data in this report?
7          MR. KREPS: Object to form.
8          MR. WEISS: That surprise you?
9      A. (Continuing) Again, as we went over this
10 morning, I'm not involved in designing,
11 interpreting, writing up clinical trials. I'm not
12 sure what rules apply with data. And with -- I
13 can't give an answer to that.
14     Q. You testified this morning that when you
15 write an article for a journal, that you provide all
16 the data, the good and the bad, correct?
17     A. That's correct.
18     Q. And that's what the standard is, provide the
19 good and the bad?
20     A. That's what the standard is. And with
21 regard to basic science, I'm not sure how clinical
22 trials are designed and therefore how the data
23 gathering of -- is determined and whether it makes
24 it into man -- manuscript form. I -- this is not my
25 area. It's not what -- what I do.

Page 153

1      Q. No. But hypertension is one of your areas,
2  because you received a grant from NIH, correct?
3      A. We work on mechanisms of hypertension, yes.
4      Q. And you did a -- a feasibility study for
5  CardioGrip having to do with hypertension, correct?
6      A. No. It was having to do with exercise, yep.
7      Q. And reducing hypertension?
8      A. Reducing blood pressure, yep.
9      Q. And -- which reduces the risk of heart
10 attack and stroke, correct?
11     A. Correct.
12     Q. And you don't know the mechanism of action
13 necessarily for why a person who is hypertensive has
14 a heart attack or stroke. You can't tell us that,
15 can you?
16     A. We can talk about mechanisms and what
17 hypertension does to your blood vessels and blood
18 vessel walls that can affect the mechanisms in the
19 blood vessel.
20     Q. And I didn't see any reference in the
21 May 31, 2006 report submitted to the MDL or in the
22 report submitted in our case, McFarland and Hatch,
23 where it talks about a COX-2 inhibitor increasing
24 blood pressure over a period of time that could
25 cause a heart attack or stroke.

Nicholas A. Flavahan, Ph.D.

Page 154

1     Your paper was silent, wasn't it?
2     A. Say again.
3     Q. Your paper was silent on that. That was not
4 discussed at all?
5         MR. KREPS: Object to form.
6     Q. (By Mr. Weiss, continuing) Was it?
7     A. I was not aware at the time that
8 hypertension was going to play a role in these
9 proceedings. Had I known, I would have addressed
10 the potential role of hypertension and the effects
11 of Vioxx. In all the clinical trials that I
12 actually looked at for mechanism, hypertension, as
13 far as I'm aware, was not mentioned. So I addressed
14 the mechanisms that were at play in the literature.
15     Q. You were asked this morning whether you
16 had -- all your opinions were expressed in your
17 report. And you said that they were.
18     A. I also said this morning that these were my
19 core opinions and they do not change. And these are
20 the heart of the matter. If you care to bring up
21 additional areas, then I can address them.
22     Q. Well, all I'm trying to do is understand the
23 basis of your opinion, because you also said this
24 morning that today science can basically determine
25 all mechanisms of actions of drugs, right?

Page 155

1     A. I never said that.
2     Q. I thought you said that this morning.
3     A. No. I -- the question asked was surely
4 there's drugs out there that we don't know the
5 mechanism -- mechanisms of. And I said, well, in
6 this day and age most drugs are generated from
7 mechanism-based studies.
8     Q. Well, you're familiar with pulmonary
9 hypertension, aren't you?
10     A. Yes.
11     Q. And you are familiar with a -- a drug was
12 removed from the market, called phenfloramine?
13     A. Yes.
14     Q. And Dexfenfluramine?
15     A. Yes.
16     Q. And you'll agree with me that science has
17 not established what the mechanism of action is for
18 causing vascular heart disease?
19         MR. KREPS: Object to form.
20     Q. (By Mr. Weiss, continuing) Correct?
21     A. I haven't looked at that area, but they have
22 identified mechanisms underlying Fen-Phen's action.
23     Q. There have been multiple mechanisms that
24 possibly are plausible, correct?
25     A. I would need to check the data.

Page 156

1     Q. And there are multiple mechanisms that are
2 plausible for why a COX-2 inhibitor increased the
3 risk of heart attack or stroke, correct?
4     A. It didn't increase the risk of heart attack
5 or stroke.
6     Q. Well, you say they didn't. And other people
7 say they did, like Doctor FitzGerald, correct?
8     A. Well, if you let me see the --
9     Q. Sure.
10     A. -- the data you're talking about.
11     Q. Absolutely. Let me just get that out for a
12 second.
13         You heard Doctor FitzGerald present at a
14 20,000-person lecture group, remember?
15     A. Yes.
16     Q. And you disagreed with what he said in his
17 PowerPoint in some respects, right?
18     A. Correct.
19     Q. This is Exhibit 11, I believe. And this is
20 a peer reviewed publication. Tilo Grosser, Susanne
21 Fries, and Garret A. FitzGerald. "Biological basis
22 for the cardiovascular consequences of COX-2
23 inhibition; therapeutic challenges and
24 opportunities."
25         (Deposition Exhibit Number 11 was marked for

Page 157

1 identification.)
2     Q. (By Mr. Weiss, continuing) You've read this
3 article before, haven't you?
4     A. I've seen the article. I read it a -- a
5 while ago, yes.
6     Q. You didn't list it as one of the articles
7 that you used in preparing your report, did you?
8     A. I don't think it's a reference, no.
9     Q. And what's the date, publication?
10     A. This is January 2006.
11     Q. Why would you exclude this article?
12     A. Because it's -- Garret, as far as I
13 remember, goes over the same ground he had went over
14 before. And I didn't see any new mechanistic
15 insight in the -- in the manuscript.
16     Q. Well, let me -- let's look at the
17 conflict-of-interest portion on the front page.
18         Do you see that?
19     A. No. Yes.
20     Q. Okay. "Garret A. FitzGerald receives
21 financial support for investigated --
22 investigator-initiated research from Bayer," whom
23 you testified as an expert for, correct?
24     A. Yes.
25     Q. But you have never been an investigator for

40 (Pages 154 to 157)

Nicholas A. Flavahan, Ph.D.

Page 158

1  research for Bayer, have you?
2     A. What do you mean?
3     Q. Have you ever been hired by Bayer to
4  initiate research, other than for litigation?
5     A. I've never been -- no. I've never received
6  any grant money from them, if that's what you mean.
7     Q. Let's talk -- the next one is Merck.
8        Do you see that?
9     A. Yes.
10    Q. And -- and Doctor FitzGerald was an
11 investigator, initiated research for Merck in the
12 past, according to this conflict of interest,
13 correct?
14    A. That seems to be correct, yeah.
15    Q. And you never did, did you?
16    A. I've never received grant money from Merck,
17 no.
18    Q. Or for Boehringer -- a Boehringer Ingelheim,
19 right?
20    A. Never received grant money from them,
21 either, no.
22    Q. All right. And Doctor FitzGerald discloses
23 he's a member of steering committee of the
24 Multinational -- I guess it's -- Etoricoxibs and
25 Diclofenac Arthritis Long-Term study, MEDAL, right?

Page 159

1     A. Correct.
2     Q. And you were not a member of that steering
3  committee, were you?
4     A. No.
5     Q. And, in fact, you were not a member of any
6  steering committee that dealt with the investigation
7  of a COX-2 inhibitor, correct?
8     A. That's correct.
9     Q. "The author also" -- that's FitzGerald --
10 "serves as a consultant for Johnson & Johnson,
11 Glaxo, SmithKline, Novartis, and NiCox."
12       You see that?
13    A. I see that, yep.
14    Q. Now, you have never served as a consultant
15 for Johnson & Johnson, have you?
16    A. No.
17    Q. And you've never served as consultant for
18 Glaxo, SmithKline, correct?
19    A. I've visited Glaxo and SmithKline, given
20 talks there, but I've never served in official
21 capacity as consultant, no.
22    Q. And you've never served as a consultant for
23 Novartis?
24    A. Not directly, no.
25    Q. And Novartis was trying to have a -- its own

Page 160

1  COX-2 inhibitor in the market in the United States,
2  correct?
3     A. I have no idea.
4     Q. Lumi -- I think Lumiracoxib, I believe, is
5  the term of that.
6        You ever hear of that one?
7     A. Say again.
8     Q. Lumi -- I think it's called Lumiracoxib.
9     A. I've seen that mentioned, that sort of
10 thing, yeah.
11    Q. Well, that's a Novartis drug.
12       MR. KREPS: Objection to counsel's
13 testimony.
14    Q. (By Mr. Weiss, continuing) And so the best
15 you can say is you disagree with Doctor FitzGerald's
16 hypothesis of how COX-2 inhibitors increase the risk
17 of cardiovascular events, correct?
18       MR. KREPS: Objection to form.
19    A. (Continuing) Need to define his hypothesis.
20 And I go from there.
21    Q. Well, you certainly disagreed with the
22 hypothesis that he presented in the symposium you
23 were at, correct? That counsel showed you the
24 PowerPoint slides?
25    A. That wasn't from the symposium I was present

Page 161

1  at. That was from a separate presentation.
2     Q. All right. You disagreed with that, didn't
3  you.
4     A. If you'd -- describing the imbalance theory,
5  then yes, I do disagree with that.
6     Q. And this paper describes the imbalance
7  theory, among others, doesn't it? Exhibit 11.
8     A. As far as I remember, it does. We need to
9  check them.
10    Q. Well -- and he references 123 articles,
11 correct?
12    A. Correct.
13    Q. As -- about as many as you referenced in the
14 report you tendered in this case, correct?
15    A. Correct.
16    Q. And he didn't prepare this article to
17 testify in litigation. He did this for a scientific
18 purpose, correct?
19       MR. KREPS: Objection to form.
20    A. (Continuing) As published in the scientific
21 journal, so I imagine that was correct.
22    Q. And subject to peer review, correct?
23    A. I'm not sure. Since it's a review and since
24 Doctor FitzGerald's on the editorial board of that
25 journal, I'm not sure.

Nicholas A. Flavahan, Ph.D.

Page 162

1  Q. The journal does have peer review, doesn't
2  it?
3  A. It does, but he's -- this may be considered
4  an editorial, which would then not be peer reviewed.
5  Q. You see where it says "editorial"?
6  A. It's called science and medicine series.
7  It's not -- that doesn't mean it's not.
8  Q. Certainly your opinion that was written --
9  A. Could you give me two seconds?
10 Q. Sure.
11     THE VIDEOGRAPHER: We have to do a tape
12 change in the next five minutes.
13     MR. WEISS: Sure.
14 Q. (By Mr. Weiss, continuing) Can you answer
15 the question whether it was peer reviewed or not?
16 A. Usually journals -- and I'm not sure if JCI
17 does this, but usually journals have an acceptance
18 date and a submission date, which gives you some
19 idea of if the article was peer reviewed and how
20 long the review process took. And that's not
21 identified in the article. Again, you need to check
22 other JCI journal -- journal articles to see if that
23 is a normal occurrence. If it is a normal
24 occurrence, it might suggest that this wasn't peer
25 reviewed.

Page 163

1  Q. Doctor FitzGerald has written on numerous
2  occasions about the imbalance theory, hasn't he,
3  with COX-2 inhibitors?
4  A. I've seen it referenced in a number of his
5  articles, that's right.
6  Q. And is your opinion -- is your testimony
7  that none of those articles were peer reviewed?
8  A. I'm sure a lot of them were peer reviewed.
9  Q. We know for sure that your report in this
10 case wasn't peer reviewed, was it?
11 A. I'm sure it has been read by a lot of
12 people, but it's --
13 Q. Not peer reviewed, was it?
14 A. You need to define "peer reviewed," but it's
15 certainly been well read, I'm sure.
16 Q. And so you just disagree with
17 Doctor FitzGerald's imbalance theory?
18 A. I certainly disagree with
19 Doctor FitzGerald's imbalance theory.
20 Q. And --
21 A. You should also -- I mean, is it
22 Doctor FitzGerald's imbalance theory? I mean, I --
23 I've seen it in his articles.
24 Q. Well, there may be others that embrace it,
25 as well as Doctor FitzGerald, correct?

Page 164

1  A. I'm not sure. I'm not sure if he's the one
2  that first came up with this hypothesis or theory.
3  Q. There are others who share in the
4  hypothesis, other than Doctor FitzGerald. Is that a
5  fair statement?
6  A. The concept is certainly within a lot of
7  Doctor FitzGerald's papers. How widespread it
8  is -- we need to start considering the articles.
9  Q. Now, you -- do you have an opinion that
10 because of the pharmacodynamic profile of Vioxx,
11 Vioxx should be used with caution in patients with a
12 history of ischemic heart disease?
13     MR. KREPS: Object to the form of the
14 question.
15 Q. (By Mr. Weiss, continuing) Do you agree with
16 that?
17 A. I think that Vioxx and other COX-2
18 inhibitors can have a beneficial effect in
19 atherothrombosis.
20 Q. So you disagree with that statement, right?
21     MR. KREPS: Object to the form.
22 Q. (By Mr. Weiss, continuing) You -- you
23 believe that Vioxx could be used with -- doesn't
24 have to be used with caution in patients with a
25 history of ischemic heart disease?

Page 165

1     MR. KREPS: Object to form.
2  A. (Continuing) I think it would be interesting
3  to evaluate if there is a beneficial effect within
4  individuals with atherothrombosis.
5  Q. You have to use caution, though, to
6  determine that, Doctor?
7  A. You have to use caution in all patient
8  groups with all medications.
9  Q. Do you agree that because of the
10 pharmacodynamic profile of COX-2 inhibitors
11 generally they should be used with caution in
12 patients with a history of ischemic heart disease?
13 A. If you're basing it on the initial preamble
14 to that phrase, then, no, I disagree with that
15 statement.
16 Q. Now, you haven't looked at the SAS files,
17 have you? You know what SAS files are?
18 A. No.
19 Q. So you don't -- so you don't know what SAS
20 data is then?
21 A. Obviously not.
22 Q. You haven't looked at the raw data that
23 Merck has with regard to the APPROVe trial, have
24 you?
25 A. As I said earlier this morning, I'm not

Page 166

1  involved in designing, evaluating --
2      Q. Just "yes" or "no."
3      A. -- clinical trials.
4      Q. Have you looked at it?
5      A. I have not looked at any of the data.
6      Q. And you haven't looked at the raw data for
7  VIGOR, correct?
8      A. That's correct.
9      Q. Or Victor?
10     A. Correct.
11     Q. Or VIP.
12     A. Correct.
13     Q. Or the Alzheimer's studies?
14     A. Correct.
15     Q. Or protocol 09 -- 090?
16     A. I've read manuscripts. If the manuscripts
17 were published, I've read the manuscripts. I was
18 looking at them from the standpoint of mechanisms.
19 I was not looking at them from a standpoint of
20 evaluating, interpreting the -- the -- the data
21 contained in them.
22     Q. Well, you have a hypothesis based on your
23 search of literature, correct?
24         MR. KREPS: Object to form.
25     Q. (By Mr. Weiss, continuing) With regard to

Page 167

1  the --
2          MR. KREPS: Sorry. I thought you were
3  finished. Go ahead.
4      Q. (By Mr. Weiss, continuing) -- increase or
5  lack of increased risk of COX-2 inhibitors for heart
6  attacks or strokes?
7          MR. KREPS: Objection to form of the
8  question.
9      A. (Continuing) Again, the report goes over the
10 mechanisms of action of Vioxx, it goes over the role
11 of COX-1 and COX-2 within the blood vessel wall. It
12 reviews a lot of human clinical data with regard to
13 the actions of Vioxx and the role of COX-2. Whether
14 it actually called it a hypothesis of action,
15 I've -- I've reviewed what's been published on the
16 drug.
17     Q. I don't think you answered my question. You
18 looked solely at literature to form your opinions in
19 your report, correct?
20     A. That's correct.
21     Q. You didn't do a single clinical trial?
22     A. I don't do clinical trials.
23     Q. You didn't write a single protocol for any
24 kind of study with respect to COX-2 inhibitors,
25 correct?

Page 168

1      A. I don't write clinical protocols with regard
2  to drugs.
3      Q. You weren't asked to review a -- a -- any
4  clinical protocol, were you?
5      A. That's correct.
6      Q. You weren't asked to review any design of an
7  animal trial to take a look at what affects on the
8  blood vessels COX-2 inhibitor has?
9      A. You need to refine that question.
10     Q. You weren't asked to write a protocol for
11 doing a study with knockout mice and COX-2
12 inhibitors, correct?
13     A. Nobody asked me to do a protocol on that,
14 no.
15     Q. You never did one, did you?
16     A. We've done experiments --
17     Q. No. With --
18     A. -- on COX inhibitors on mice, but --
19     Q. I've asked you specifically. You have never
20 been asked to -- to prepare a protocol or review a
21 protocol for animal studies involving COX-2
22 inhibitors?
23     A. I have reviewed manuscripts for journals
24 that deal with COX -- well, you need to define what
25 you mean by "protocol."

Page 169

1      Q. You have never been asked by a drug company
2  to look at -- to see if what they are designing in
3  an animal study was correct with regard to COX-2
4  inhibitors?
5      A. That's correct.
6      Q. Doctor FitzGerald was, correct?
7      A. I have no idea. You've identified him as a
8  potential consultant for Merck. And he was
9  receiving money from Merck. I have no idea why or
10 what he was doing for Merck.
11     Q. Or Doctor Oates, for that matter, from
12 Vanderbilt. I don't know if he's still there or
13 not.
14         You know Doctor Oates was retained by Merck
15 to look at studies. Aren't you?
16     A. I think he was one of the individuals named
17 by your colleague this morning, yeah.
18     Q. And you never saw any materials that Merck
19 has with regard to what Doctor Oates suggested be
20 done or reviewed, correct?
21     A. That's correct.
22     Q. And the same thing is true with
23 Doctor FitzGerald, correct?
24     A. That's correct.
25     Q. And Doctor Patrono, correct?

Nicholas A. Flavahan, Ph.D.

Page 170

1    A. I have never seen any of the internal Merck
2    documents, no.
3        THE VIDEOGRAPHER: Could we go off the
4    record for a tape change.
5        MR. WEISS: Yep. I have one question
6    and I'm done. Turn back to over to John.
7        VIDEO TECHNICIAN: Two minutes. Going
8    off the record. End of tape two at 2:09 p.m.
9        (Recess from 2:09 p.m. to 2:11 p.m.)
10       THE VIDEOGRAPHER: Back on the record,
11   beginning of tape three. The time is 2:11 p.m.
12   Q. (By Mr. Weiss, continuing) An increase of
13   three to five millimeters of -- of pressure in blood
14   vessels increases the risk for heart attack and
15   strokes, doesn't it?
16       MR. KREPS: Objection to form of the
17   question.
18   A. (Continuing) Again, you should ask a
19   cardiologist that question.
20   Q. I'm asking you, sir, because you've already
21   given opinion about that.
22   A. Farm -- as far as I'm aware, extensive
23   studies have demonstrated that there's a small
24   increase in risk.
25   Q. There is an increased risk, correct?

Page 171

1    A. Small increase in risk.
2    Q. It's not a -- it's much smaller, you're
3    saying today, than what you represented to -- to
4    CardioGrip?
5    A. I'm not --
6        MR. KREPS: Objection to form.
7    A. (Continuing) I never represented anything to
8    CardioGrip. This was -- this was submitted to a
9    grant-funding agency. I'm not sure if that figure
10   that was mentioned in that report is -- has been
11   documented and supported by other studies. That's
12   one reference.
13   Q. You will agree that hypertension increasing
14   blood pressure is a serious risk factor for heart
15   attacks and strokes?
16   A. It's a risk factor for -- for heart disease
17   and strokes, yes.
18   Q. And it's something -- if -- if a company has
19   data on hypertension increases with its drug, that's
20   something that should be published, correct?
21   A. Again, I am not involved in designing,
22   evaluating, and publishing clinical trials. I'm not
23   sure what was defined within those studies. And I
24   can't evaluate or comment on it.
25   Q. And, once again, the opinions expressed

Page 172

1    today are solely for litigation purposes. And
2    you're being paid by Merck, correct?
3        MR. KREPS: Object to form of the
4    question.
5    Q. (By Mr. Weiss, continuing) You're not being
6    paid by NIH to render this opinion today, are you?
7    A. That's correct.
8    Q. And Merck is paying you because you're
9    testifying in its defense in litigation?
10       MR. KREPS: Objection to form of the
11   question.
12   A. (Continuing) Obviously.
13   Q. And you've never, ever been paid as a
14   consultant by Merck for non litigation matters?
15   A. I have attended a -- Merck consultant
16   conferences, so, in a sense, they did pay me.
17   Q. Have they paid you to conduct those
18   conferences?
19   A. No.
20   Q. How much -- how much did you get paid?
21   A. I forget. This was a few years ago.
22   Q. Less than a thousand dollars?
23   A. Probably around about that figure.
24   Q. And you've already billed over a hundred
25   thousand dollars to Merck for the opinions you

Page 173

1    expressed today, correct?
2    A. They paid me to do the research to come up
3    with a report and my findings in this case.
4        MR. WEISS: That's all I have.
5        MR. HORNBECK: Could we go off the
6    record just --
7        THE VIDEOGRAPHER: Yep. Going off the
8    record at 2:14 p.m.
9        (Recess from 2:14 p.m. to 2:29 p.m.)
10       THE VIDEOGRAPHER: We are back on the
11   record. The time is 2:29 p.m.
12          EXAMINATION
13   BY MR. HORNBECK:
14   Q. Doctor Flavahan, let me just hand you
15   Exhibit 8 for -- I think Exhibit 8 is in your
16   stack -- for -- for one or two questions, if I
17   might, please.
18       Yes, that's it.
19   A. Yep, this one.
20   Q. I'd ask if you would turn to the second page
21   and the first sentence in the -- beginning the
22   second paragraph.
23       I believe it reads, "At present, no
24   prospective randomized trial --
25   A. Wait, wait, wait, wait.

44 (Pages 170 to 173)

Golkow Litigation Technologies - 1.877.DEPS.USA