UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| | * | |
| Gerald Barnett v. Merck & Co, Inc. | * | CASE NO. 02:06CV00485 |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE ARGUMENT OR OPINION TESTIMONY THAT THE APPROVE STUDY AND PROTOCOL 203 CANNOT BE GENERALIZED TO OTHER POPULATIONS, AND TO EXCLUDE OPINIONS CONCERNING "INDIVIDUAL CONFIDENCE INTERVALS"**

**TO THE HONORABLE JUDGE FALLON:**

PLAINTIFF, GERALD BARNETT, files this Memorandum in Support of Motion to Exclude Argument or Opinion Testimony to the Effect that the APPROVe study and Protocol 203 Cannot Be Generalized to Other Populations, and to Exclude Opinions Concerning "Individual Confidence Intervals," and in support thereof shows:

**I.   INTRODUCTION**

Defendant Merck should be precluded from arguing or offering expert testimony to the effect that the results of the APPROVe study and Protocol 203 cannot be generalized to other populations. Plaintiffs anticipate that Merck witnesses will testify, and counsel will argue, that because the APPROVe study participants had colon polyps, the results of the study apply only to colon polyp patients, and not to individuals like Mr. Barnett who have not had colon polyps

1

diagnosed. Such argument or testimony, in addition to being misleading and scientifically baseless, is contrary to Merck's own previous position stated in the Protocol 203 Data Analysis Plan of January 2004, that the data for CV events from APPROVe and related studies could be generalized for all populations with respect to cardiovascular safety. Furthermore, *in 2005 when* the authors of the APPROVe study raised the contention in a draft manuscript submitted for peer review, that the APPROVe population might be particularly susceptible, the peer-reviewers rejected that claim as "unwarranted speculation."

In addition, Plaintiffs anticipate that Merck experts will testify, and counsel will argue, that the elevated relative risk (RR) and statistically significant confidence interval reported for the APPROVe study is not applicable to Plaintiff Gerald Barnett, and that, instead, there is a wide "individual confidence interval" that is somehow applicable. Merck should be precluded from offering testimony about an "individual confidence interval", since Merck's expert has admitted that such a concept is related only to continuous outcome variables (e.g., head size of a newborn), rather than binary outcome variables such as MI, which are "all or nothing" events.

## II.   **FACTUAL BACKGROUND**

This action for personal injuries arises from Plaintiff Gerald Barnett's use of Vioxx, which caused a heart attack on September 6, 2002, and resulting damage to his heart, necessitating coronary artery bypass surgery four days later. Mr. Barnett was approximately 56 years old when he was prescribed Vioxx by his physician in December of 1999, and he had been taking the drug for approximately 32 months at the time of his heart attack.

It is Plaintiff's contention that his heart attack was caused by a clot in one of his coronary arteries which resulted from a plaque rupture as well as the acceleration of atherogenesis due to Vioxx use. Plaintiff's treating doctor has testified that had Merck disclosed the known risks of Vioxx he would not have prescribed him Vioxx. However, because his physicians were unaware

2

of the risks of Vioxx, and Merck failed to disclose and warn what it knew regarding the dangers of Vioxx, Mr. Barnett continued to take the drug even after his heart attack, until a few weeks before it was removed from the market.

Before his heart attack Mr. Barnett had retired from the FBI, where he had worked as an agent for 27 years, including a period of time in an anti-terrorist unit. He has been married to his wife Corinne since he started with the FBI, and the couple have lived in Myrtle Beach, South Carolina since his retirement. As a result of the heart attack and 5-way bypass surgery at the early age of 58, Mr. Barnett suffers from permanent damage to his heart, which has reduced his life expectancy. In addition, he is now at a much greater risk of suffering another heart attack, and the bypass surgery has placed him at a greater risk for heart failure.

### III.    LEGAL STANDARDS

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Rule 702 is in effect a codification of the United States Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In *Daubert*, the Supreme Court held that trial courts should serve as the gatekeeper for expert testimony and should not admit such testimony without first determining that the testimony is both "reliable" and "relevant." *Id.* at 589, 113 S.Ct. 2786.

Scientific testimony is reliable only if "the reasoning or methodology underlying the testimony is scientifically valid," meaning that such testimony is based on recognized methodology and supported by appropriate validation based on what is known. *Id.* at 592-93, 113 S.Ct. 2786. In *Daubert,* the Supreme Court set forth a non-exclusive list of factors to consider in determining the scientific reliability of expert testimony. *Id.* at 593-95, 113 S.Ct. 2786. These factors are: (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error; (4) whether standards and

controls exist and have been maintained with respect to the technique; and (5) the general acceptance of the methodology in the scientific community. *Id.* Whether some or all these factors apply in a particular case depends on the facts, the expert's particular expertise, and the subject of his testimony. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 138, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

In addition to the five factors laid out in *Daubert,* a trial court may consider additional factors in assessing the scientific reliability of expert testimony. *Black v. Food Lion, Inc.,* 171 F.3d 308, 312 (5th Cir.1999). Some of these factors may include: (1) whether the expert's opinion is based on incomplete or inaccurate dosage or duration data; (2) whether the expert has identified the specific mechanism by which the drug supposedly causes the alleged disease; (3) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (4) whether the expert has adequately accounted for alternative explanations; and (5) whether the expert proposes to testify about matters growing directly out of research he or she has conducted independent of the litigation. *See, e.g., id.* at 313; *Moore v. Ashland Chem., Inc.,* 151 F.3d 269, 278-79 (5th Cir.1998); *Christophersen v. Allied-Signal Corp.,* 939 F.2d 1106, 1114 (5th Cir.1991); *Newton v. Roche Labs., Inc.,* 243 F.Supp.2d 672, 678 (W.D.Tex.2002). Scientific testimony is relevant only if the expert's reasoning or methodology can be properly applied to the facts in issue, meaning that there is an appropriate fit between the scientific testimony and the specific facts of the case. *Daubert,* 509 U.S. at 593, 113 S.Ct. 2786. Scientific evidence is irrelevant, however, when there is too great an analytical gap between the data and the opinion proffered. *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

The party seeking to introduce the expert testimony bears the burden of demonstrating that the testimony is both relevant and reliable. *Moore*, 151 F.3d at 275-76. The focus is not on the result or conclusion, but on the methodology. *Id.* The proponent need not prove that the expert's testimony is correct, but must prove by a preponderance of the evidence that the methodology used by the expert was proper. *Id.*

The trial court is the gatekeeper of scientific evidence. *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786. It has a special obligation to ensure that any and all expert testimony meets these standards. *Id.* Accordingly, it must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether the reasoning or methodology can be properly applied to the facts in issue. *Id.* at 592-93, 113 S.Ct. 2786. In making this assessment, the trial court need not take the expert's word for it. *Joiner*, 522 U.S. at 147, 118 S.Ct. 512. Instead, when expert testimony is demonstrated to be speculative and lacking in scientific validity, trial courts are encouraged to exclude it. *Moore*, 151 F.3d at 279.

## IV. ANY TESTIMONY THAT THE APPROVE STUDY CANNOT BE GENERALIZED TO OTHER POPULATIONS SHOULD BE EXCLUDED

Defendant Merck should be precluded from arguing or offering testimony to the effect that the results of the APPROVe study and Protocol 203 cannot be generalized to other populations. Such testimony would mislead the jury into believing that because the APPROVe study participants had colon polyps, the evidence of increased risk based on that study would not be applicable to Mr. Barnett, who has not been diagnosed with colon polyps. Any such testimony or argument should be excluded, since it is speculative, based on unreliable methodology, and contrary to the prevailing scientific consensus that Vioxx imposes increased risk on a broad spectrum of patients.

5

First, in the draft APPROVe article submitted for peer review, Merck employees and consultants attempted to promote the notion that the results of the APPROVe study might be attributable to the type of patients in that clinical trial. However, the peer-reviewers insisted that it be removed. See, Exhibit A, 2005 NEJM 000284, "Page 17.: Remove the unwarranted speculation that 'It is conceivable that the risk for cardiovascular events associated with rofecoxib may be more pronounced in the adenoma patients recruited for this study,...' The authors complied with that directive, and the "unwarranted speculation" was deleted from the APPROVe article. Now Merck is trying to foist such speculation on the Court and jury, and the Court should issue the same ruling as the peer-reviewers.

Second, Merck itself stated in the Data Analysis Plan (DAP) for Protocol 203, which included the APPROVe trial and two others, that the patients in those studies were comparable to real world users, so that the Protocol would allow for "an assessment in patients with a spectrum of cardiovascular risk. Furthermore, patients in these studies will be comparable in age to patients with osteoarthritis or rheumatoid arthritis, <u>allowing generalization of the results of this analysis to other populations, including those with osteoarthritis or rheumatoid arthritis</u>." (Exhibit B, DAP, MRK-AFL0015454, 119104 (emphasis added).) Merck wrote the rules in the DAP; now that the score has come back against them, they are trying to change those rules. The Defendant should be estopped from making this contention, since Merck originally claimed that data could be generalized to other populations, and there is no doubt that Merck would have made that claim if the results had shown absence of increased risk.

It is important that "generalization" was built into the design of Protocol 203; it did not appear by accident. Merck proposed Protocol 203 to the FDA as a "cardiovascular outcomes study," stating that the three component studies would represent "a typical spectrum of patients

at risk for thrombotic cardiovascular events." Hopeful of a favorable outcome, Merck asked for the FDA's approval to use the results in product labeling. (Letter, Goldkind to Merck, 12/19/02, pp. 2-3, Exhibit C.) The FDA did not commit to the sufficiency of the study to justify a label change, but agreed that the results would provide "clinically important safety information" about CV risk of Vioxx. (Id. at 1.) Thus, the fundamental purpose of analyzing CV data from APPROVe and the other components of Protocol 203 was to provide generalizable data that Merck hoped would advance its interest in eliminating the label statement that "prospective studies" of CV risk had not been done. This, in turn, was hoped to make the product more appealing to doctors and their "real world" patients with osteoarthritis and rheumatoid arthritis. Neither Merck nor the FDA said the results would only apply to polyp patients before the study was done, and it is only after the adverse findings were known that Merck has sought to rewrite the history books.

Furthermore, Merck has offered no evidence as to what might make the effects of Vioxx worse for patients with adenomas than those with arthritis. Highlighting the speculative nature of Merck's claim, Dr. Kim, Merck's expert, admitted at his deposition that he could not identify a single condition that would cause polyp patients to have a *different or greater* CV risk than arthritis patients exposed to Vioxx.[1] Indeed, the highest RR for any reported Vioxx study occurred in the VIGOR trial, which consisted of rheumatoid arthritis patients (5.0 for MI), effectively refuting the contention that only polyp patients are at risk.

Finally, on February 18, 2005, the expert Advisory Committee (AC) appointed by the FDA voted 32 to 0 that Vioxx "significantly increases the risk of serious cardiovascular events." (Transcript, 2/18/05, pp. 326-327. Exhibit D) No qualifications or limitations to patients with

---

[1] Transcript excerpts to be provided upon receipt from court reporter.

7

polyps were stated, nor could they be fairly implied from the transcript of the AC's deliberations. Merck has previously admitted that the AC considered "the entire existing body of scientific research on coxibs" before the votes were taken, and such evidence included not only APPROVe, VIGOR, Alzheimer's, and osteoarthritis studies, but also included Merck's "Background Package," which assured that the AC was fully aware of Merck's interpretation of the various studies (Merck Memorandum Regarding Vioxx Science Issues, 10/21/05, at 18-19 Exhibit E). Thus, the AC appointed for the purpose of determining the risk of Vioxx unanimously rejected the limitations Merck suggests, after reviewing all of the data.

Merck's recent effort to spin the APPROVe study is 'litigation science' at its worst. Merck should not be allowed to present this fabricated hypothesis by couching it in the form of expert opinion testimony.

## V.    "INDIVIDUALIZED CONFIDENCE INTERVALS" DO NOT APPLY TO MI

Merck's expert Dr. Kim stated in his Report dated June 1, 2006 (Exhibit F) that, while there was a statistically significant confidence interval for the APPROVe study as a whole (RR=1.92, 95% CI 1.19-3.11), an individual within the study would be subject to a wider confidence interval than that applicable to the population as a whole. However, at his deposition, Dr. Kim admitted that the concept of an "individual confidence interval" has only been applied in the scientific literature to continuous outcome variables, and the sole example he offered was the head circumference of newborns. In contrast, Dr. Kim admitted that MI is a binary outcome variable, that is, you either have it or you don't, and that he had never seen a single textbook nor peer-reviewed article that had ever applied the idea of an "individual confidence interval" to MI, nor to any binary outcome variable. (footnote—transcript excerpts to be provided upon receipt).

The Federal Judicial Center Reference Manual on Scientific Evidence makes clear that the key concepts for interpretation of epidemiologic evidence are the Relative Risk(RR) and the

8

Attributable Risk (AR). The AR provides a calculated result indicating the proportion of patients who experienced an outcome due to their exposure to the risk factor in question, as opposed to all other causes that make up the background rate (Id., at 352). Dr. Kim performed this calculation at his deposition, with the result that 78 percent of the thrombotic cardiovascular events in the APPROVe population exposed for more than 18 months were caused by Vioxx. (footnote—transcript excerpt to be provided). Merck's unsubstantiated reference to a purported "individual confidence interval," which does not appear in the Reference manual nor in any reported decision, is merely a vain attempt to deflect attention from the judicially recognized concept of attributable risk.

## VI. CONCLUSION

For the reasons set forth above, Plaintiff requests that the Court preclude Defendant Merck from arguing or offering expert testimony (1) that the results of the APPROVe study and Protocol 203 cannot be generalized to other populations, and (2) that there is an "individual confidence interval" applicable to the probability that Plaintiff Barnett's MI was caused by Vioxx.

Date: June 16, 2006

Respectfully submitted,

By *[signature]* Mark P. Robinson, Jr.
Mark P. Robinson, Jr.
Kevin F. Calcagnie
Carlos A. Prietto, III
Ted B. Wacker
Lexi W. Myer
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Dr., 7th Floor
Newport Beach, California 92660
Telephone: (949) 720-1288
Facsimile: (949) 720-1292

9

Andy D. Birchfield, Jr.
P. Leigh O'Dell
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, Alabama 36103-4160
Telephone: (334) 269-2343
Facsimile: (334) 954-7555

Donald C. Arbitblit
LIEFF, CABRASER, HEIMANN and
BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, California 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Counsel for Plaintiff

Russ M. Herman
Leonard A. Davis
Stephen J. Herman
HERMAN HERMAN KATZ
& COTLER, LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70013
Telephone: (504) 581-4892
Facsimile: (504) 561-6024

Christopher A. Seeger
SEEGER WEISS
One William Street
New York, New York 10004
Telephone: (212) 584-0700
Facsimile: (212) 584-0799
**Co-Lead Counsel**

**PLAINTIFFS' LIAISON COUNSEL**

Richard J. Arsenault
NEBLETT, BEARD & ARSENAULT
220 Bonaventure Court
P.O. Box 1190
Alexandria, Louisiana 71301-1190
Telephone: (318) 487-9874
Facsimile: (318) 561-2591

Shelly Sanford
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, Texas 77002
Telephone: (713) 650-0022
Facsimile: (713) 650-1669

Elizabeth Cabraser
LIEFF, CABRESER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, California 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Drew Ranier, Esq.
RANIER, GAYLE & ELLIOT, LLC
1419 Ryan Street
Lake Charles, Louisiana 70601
Telephone: (337) 494-7171
Facsimile: (337) 494-7218

Thomas Kline
KLINE & SPECTER, P.C.
1525 Locust St., 19th Floor
Philadelphia, Pennsylvania 19102
Telephone: (215) 772-1000
Facsimile: (215) 772-1371

Mark P. Robinson, Jr.
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Dr., 7th Fl
Newport Beach, California 92660
Telephone: (949) 720-1288
Facsimile: (949) 720-1292

Arnold Levin, Esq.
LEVIN FISHBEIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19106-3875
Telephone: (215) 592-1500
Facsimile: (215) 592-4663

Christopher V. Tisi Esq.
ASHCRAFT & GEREL
2000 L Street, NW, Suite 400
Washington, DC 20036-4914
Telephone: (202) 783-6400
Facsimile: (307) 733-0028

**PLAINTIFFS' STEERING COMMITTEE**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Defendants' Liaison Counsel, Phillip A. Wittmann, Merck's Counsel, Andrew L. Goldman, and Plaintiffs' Liaison Counsel, Russ Herman, by U.S. Mail and e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced, in accordance with Pretrial Order No. 8, on this 16th day of June, 2006.

_____
MARK P. ROBINSON, JR.
State Bar No. 054426
Attorney for Plaintiff
Robinson, Calcagnie & Robinson