UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | JUDGE FALLON |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| Gerald Barnett v. Merck & Co, Inc. | * | CASE NO. 02:06CV00485 |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF
MOTION TO EXCLUDE CERTAIN OPINION TESTIMONY
OF FOSTER CURTIS BRYAN, II, M.D.**

TO THE HONORABLE JUDGE FALLON:

PLAINTIFF, Gerald Barnett, files this Memorandum in Support of Motion to Exclude Certain Opinion Testimony of Foster Curtis Bryan, II, M.D., and in support thereof shows:

## I.  INTRODUCTION

Dr. Bryan is a treating doctor whose deposition was set as a <u>percipient witness</u>. As such the scope of his testimony should be limited to his percipient observations. He was not designated by any party as an expert witness, and the deadline for designating experts and providing expert reports has passed. Merck should not be permitted to use his deposition as a means of putting additional expert testimony before the jury. Moreover, even if Dr. Bryan had

1

been properly and timely designated as an expert witness for Merck, his testimony would still be subject to the requirements of *Daubert*, *Kumho Tire* and the Federal Rules of Evidence, and he cannot be permitted to render speculative and conjectural testimony, nor opinions which are without sufficient factual bases and unreliable.

Dr. Bryan, a cardiovascular surgeon who performed coronary artery bypass graft surgery on Mr. Barnett, was deposed June 6, 2006. Although he had never treated or seen the Plaintiff until September 9, 2002, three days after his heart attack, counsel for Merck sought to obtain his opinions on Mr. Barnett's condition prior to his heart attack. Merck also asked Dr. Bryan to speculate regarding the degree of plaque that was present in Mr. Barnett's coronary arteries as of January 2000, 32 months before he ever saw him. Additionally, even though Dr. Bryan has not seen Mr. Barnett since October of 2002, he was asked to opine as to his current heart condition, based upon documents he had never seen prior to his deposition.

Dr. Bryan's opinions in this regard should be excluded. He has insufficient facts and data to render such opinions, and they are therefore unreliable and based upon speculation and conjecture. Additionally, he was not designated as an expert, and admits he knows very little regarding Vioxx. Merck should not be permitted to use this witness to place unreliable, speculative and previously undisclosed opinions before the jury.

## II. FACTUAL BACKGROUND

This action for personal injuries arises from Plaintiff Gerald Barnett's use of Vioxx, which caused a heart attack on September 6, 2002, and resulting damage to his heart, necessitating coronary artery bypass surgery four days later. Mr. Barnett was approximately 56 years old when he was prescribed Vioxx by his physician in December of 1999, and he had been taking the drug for approximately 32 months at the time of his heart attack.

2

It is Plaintiff's contention that his heart attack was caused by a clot in one of his coronary arteries which resulted from a plaque rupture as well as the acceleration of atherogenesis due to Vioxx use. Plaintiff's treating doctor has testified that had Merck disclosed the known risks of Vioxx he would not have prescribed him Vioxx. However, because his physicians were unaware of the risks of Vioxx, and Merck failed to disclose and warn what it knew regarding the dangers of Vioxx, Mr. Barnett continued to take the drug even after his heart attack, until a few weeks before it was removed from the market.

Before his heart attack Mr. Barnett had retired from the FBI, where he had worked as an agent for 27 years, including a period of time in an anti-terrorist unit. He has been married to his wife Corinne since he started with the FBI, and the couple have lived in Myrtle Beach, South Carolina since his retirement. As a result of the heart attack and 5-way bypass surgery at the early age of 58, Mr. Barnett suffers from permanent damage to his heart, which has reduced his life expectancy. In addition, he is now at a much greater risk of suffering another heart attack, and the bypass surgery has placed him at a greater risk for heart failure.

### III.   **LEGAL STANDARDS**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Rule 702 is in effect a codification of the United States Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In *Daubert*, the Supreme Court held that trial courts should serve as the gatekeeper for expert testimony and should not admit such testimony without first determining that the testimony is both "reliable" and "relevant." *Id.* at 589, 113 S.Ct. 2786.

Scientific testimony is reliable only if "the reasoning or methodology underlying the testimony is scientifically valid," meaning that such testimony is based on recognized

methodology and supported by appropriate validation based on what is known. *Id.* at 592-93, 113 S.Ct. 2786. In *Daubert,* the Supreme Court set forth a non-exclusive list of factors to consider in determining the scientific reliability of expert testimony. *Id.* at 593-95, 113 S.Ct. 2786. These factors are: (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error; (4) whether standards and controls exist and have been maintained with respect to the technique; and (5) the general acceptance of the methodology in the scientific community. *Id.* Whether some or all these factors apply in a particular case depends on the facts, the expert's particular expertise, and the subject of his testimony. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 138, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

In addition to the five factors laid out in *Daubert,* a trial court may consider additional factors in assessing the scientific reliability of expert testimony. *Black v. Food Lion, Inc.,* 171 F.3d 308, 312 (5th Cir.1999). Some of these factors may include: (1) whether the expert's opinion is based on incomplete or inaccurate dosage or duration data; (2) whether the expert has identified the specific mechanism by which the drug supposedly causes the alleged disease; (3) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (4) whether the expert has adequately accounted for alternative explanations; and (5) whether the expert proposes to testify about matters growing directly out of research he or she has conducted independent of the litigation. *See, e.g., id.* at 313; *Moore v. Ashland Chem., Inc.,* 151 F.3d 269, 278-79 (5th Cir.1998); *Christophersen v. Allied-Signal Corp.,* 939 F.2d 1106, 1114 (5th Cir.1991); *Newton v. Roche Labs., Inc.,* 243 F.Supp.2d 672, 678 (W.D.Tex.2002). Scientific testimony is relevant only if the expert's reasoning or methodology can be properly applied to the facts in issue, meaning that there is an appropriate fit between the scientific

testimony and the specific facts of the case. *Daubert*, 509 U.S. at 593, 113 S.Ct. 2786. Scientific evidence is irrelevant, however, when there is too great an analytical gap between the data and the opinion proffered. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

The party seeking to introduce the expert testimony bears the burden of demonstrating that the testimony is both relevant and reliable. *Moore*, 151 F.3d at 275-76. The focus is not on the result or conclusion, but on the methodology. *Id.* The proponent need not prove that the expert's testimony is correct, but must prove by a preponderance of the evidence that the methodology used by the expert was proper. *Id.*

The trial court is the gatekeeper of scientific evidence. *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786. It has a special obligation to ensure that any and all expert testimony meets these standards. *Id.* Accordingly, it must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether the reasoning or methodology can be properly applied to the facts in issue. *Id.* at 592-93, 113 S.Ct. 2786. In making this assessment, the trial court need not take the expert's word for it. *Joiner*, 522 U.S. at 147, 118 S.Ct. 512. Instead, when expert testimony is demonstrated to be speculative and lacking in scientific validity, trial courts are encouraged to exclude it. *Moore*, 151 F.3d at 279.

## IV. ARGUMENT

### A. Merck Should Not Be Permitted to Elicit Speculative, Unfounded and Unreliable Opinions from Dr. Bryan Concerning the Plaintiff's Medical Condition Prior to His Heart Attack.

Foster Curtis Bryan, II, M.D., is a cardiovascular surgeon who performed coronary artery bypass graft surgery on Mr. Barnett on September 10, 2002 at Grand Strand Hospital. He first

saw Mr. Barnett on September 9, 2002. The following is a chronology of Mr. Barnett's relevant medical history:

- 1/24/00: Mr. Barnett has a Cardiolite/Exercise Stress Test which is interpreted by Dr. Vaishali Swami.
- 9/6/02: Mr. Barnett suffers his heart attack and is admitted to Grand Strand Regional Medical Center. Dr. Mark Karavan, a cardiologist, sees Mr. Barnett for the first time.
- 9/9/02: Mr. Barnett undergoes Cardiac Catheterization and the results are read by Dr. Karavan, who requests a cardiovascular surgical consult. Dr. Bryan first examines Mr. Barnett and the decision is made to proceed with a coronary artery bypass graft.
- 9/10/02: Mr. Barnett undergoes surgery by Dr. Bryan, who then sees him post-operatively.
- 10/10/02: Dr. Bryan examines Mr. Barnett for the last time.
- 7/18/03: Mr. Barnett undergoes another Cardiolite/Stress Test, read by Dr. Vaishali Swami. A report is sent to Dr. Karavan.
- 6/6/06: Dr. Bryan is deposed.

In Dr. Bryan's recent deposition, counsel for Merck asked him to speculate about Mr. Barnett's condition prior to his heart attack. Counsel for Merck also asked him regarding the degree of plaque that was present in Mr. Barnett's coronary arteries as of January 2000, (Bryan Depo. 102:11-23, Exhibit A) based upon the results of the Cardiolite Stress Test that was performed on January 24, 2000. The purpose behind this is to attempt to show that Mr. Barnett

already had significant coronary artery disease in 2000, which continued to progress until the heart attack almost 3 years later.

Any attempt by Merck to refer to or elicit Dr. Bryan's testimony as to the degree and progression of coronary plaque build-up in Mr. Barnett should be precluded, as such opinions are unreliable, without sufficient facts and data, and based upon speculation and conjecture. First of all, Dr. Bryan had only first met Mr. Barnett on September 9, 2002 (79:2-5), and he had not reviewed any of Mr. Barnett's medical records prior to his first involvement. (14:9-21, and 15:22-25)

Dr. Bryan did not review or ever interpret the actual diagnostic films, (171:22-25 - 172:1) and he was relying on the diagnostic impressions of Dr. Swami, who performed and read the report. As such, the results of this test did not impact the care and treatment he rendered to Mr. Barnett in 2002. (27:13-29:6) Moreover, Dr. Bryan admitted that he does not have a "real description of what went on in 2000." (182:6-16). He has also testified that he is not an interventional cardiologist. (73:5-16) His testimony addressing Mr. Barnett's condition at that time is patently speculative:

```
                    101
      19  Q. In order to have ischemia, Dr. Bryan, do
      20  you know about how much percentage-wise of an artery
      21  needs to be blocked with plaque in order to reduce
      22  blood flow and lead to a diagnosis of ischemia?
      23       MS. SHERBANEE: Objection. Vague and
      24  ambiguous and it's an incomplete hypothetical.
      25       THE WITNESS: A 50 percent stenosis


                    102
      1  results in a 75 percent reduction in diameter, which
      2  can lead to ischemia. I would say that, clinically
      3  speaking, that most people have at least a 50 to 60
      4  percent stenosis before an artery usually gives them
      5  pain.
```

7

```
 6  BY MR. GOLDMAN:
 7     Q.  When you say 50 to 60 percent stenosis, is
 8  that another way of saying 50 to 60 percent of
 9  blockage in the artery of plaque?
10     A.  Correct. Correct.
11     Q.  So we know that Mr. Barnett had at least
12  50 to 60 percent blockage in his arteries on -- in
13  January of 2000, right?
14         MS. SHERBANEE: Object. Objection.
15  Misstates his testimony.
16  BY MR. GOLDMAN:
17     Q.  True?
18     A.  What the -- what this demonstrates is that
19  **we know that in one region of his heart there was a**
20  **stenosis, the degree of which you don't know.** You
21  would **presume** that it's at least 50, 60 percent,
22  **maybe** worse in one area of his heart that resulted
23  in ischemia. (emphasis added)
(101:19-102:23)
```

He also testified that he has no opinion on the degree of blockage Mr. Barnett had approximately 2 years prior to his heart attack, and that 'there is just no way to know.':

```
                               107
 1     Q.  Are these percentages, sir, consistent
 2  with what your understanding was of Mr. Barnett's
 3  arteries in September of 2002?
 4     A.  Yes.
 5     Q.  Does this reflect, as you testified a
 6  minute ago, that Mr. Barnett had balanced ischemia
 7  throughout his arteries?
 8     A.  He does -- he does have a fairly balanced
 9  degree of stenosis.
10     Q.  Would it be your expectation, sir, based
11  on the amount of blockage that Mr. Barnett had in
12  September of 2002 multi-vessel coronary artery
13  disease with branches that were also blocked, that
14  two years earlier he had at least moderate to severe
15  coronary artery disease?
16         MS. SHERBANEE: Objection. Calls for
17  speculation.
18         THE WITNESS: I would have no opinion
19  on -- on that.
```

20  BY MR. GOLDMAN:

21    Q.  Okay. Let me ask it this way. Do you
22  know, sir, whether coronary artery disease takes a
23  while to build up?
24    A.  It typically does.
25

### 108

1    Q.  So typically, would a patient like
2  Mr. Barnett who has this much occlusion or blockage
3  take years and years to develop it?
4        MS. SHERBANEE: Objection. Calls for
5  speculation.
6        THE WITNESS: I would say the majority of
7  people, it takes years to develop this -- this much,
8  you know, these -- this degree of stenoses.
9  BY MR. GOLDMAN:
10    Q.  And by years, do you mean decades?
11        MS. SHERBANEE: Doctor, did you finish
12  your answer?
13        MR. GOLDMAN: I'm gonna let him finish.
14        THE WITNESS: I've seen it in two, three,
15  four years. I've seen it in decades. It varies
16  from patient to patient. There are people who
17  have -- that I've operated on who've had what was
18  considered moderate disease at one time and three
19  years later we're seeing severe stenoses in an
20  artery that was called 50 percent. It's, you know,
21  80 or 90 later. So, you know, three or four years
22  later.
23    It's -- it's hard to say.  **All I can say**
24  **about him is I don't know what his--what he had in**
25  **2000. I mean, I just -- there's no cath. There's**

### 109
1  **no way to know.** (emphasis added)
(107:1-109:1)


Merck should not be permitted to use this witness to speculate about the level of plaque

Mr. Barnett had back in January 2000, some 32 months before he ever met or talked to him. Dr.

Bryan never looked at the cardiolite exam in January 2000. He was shown insufficient data at

9

his deposition and asked to speculate about the Plaintiff's condition in January 2000, and in July 2003, nine months after he had last seen him. The only records he was shown were his own surgery records and the cath report, and was asked to speculate from those, as well as documents that he had never seen before.

Additionally, Dr. Bryan also testified that if Mr. Barnett had had chest pain or had come to see him a few months before the heart attack he would have recommended bypass surgery anyway (77:1-7) and that based on the fact that Mr. Barnett has a strong family history of heart disease, and a history of high cholesterol, Mr. Barnett's heart attack can be explained by conventional risk factors. (155:10-25 to 156:1-5) Again, Dr. Bryan is offering opinions based upon his speculation as to Mr. Barnett's medical condition at a time before he ever saw him.

### B. Merck Should Not Be Permitted to Offer Opinions from Dr. Bryan Concerning Mr. Barnett's Present Medical Condition.

Dr. Bryan was also asked to render an opinion as to Mr. Barnett's present condition based upon the surgery he performed in 2002 and the results of diagnostic testing performed in July 2003 and May 2006. (163:21-25 to 164:1-5, 168:21-25 and 169:1). Despite the fact he has not seen Mr. Barnett in almost four years, he offered a positive opinion:

```
                            168
    21  Q.  Okay.  Dr. Bryan, based on your surgery of
    22  Mr. Barnett and what you've seen today, do you
    23  believe that his heart condition is doing well?
    24      A.  Based on what I've seen, I believe he's
    25  doing -- the heart -- from what we know, it -- it

                            169
    1  seems to be doing well.
```

This opinion, in addition to being vague and ambiguous, lacks foundation and is pure speculation. Dr. Bryan's only exposure to Mr. Barnett was in 2002. He admittedly has no understanding of Mr. Barnett's current health status (15:5-25), and has had no interaction with

10

him or his care since the last time he saw him in 2002. (66:19-25 to 67:1-23) He typically does not follow patients past 3-4 weeks and so he cannot comment on long-term outcomes. (122:3-22). He has also testified that he deferred the post-operative management of Mr. Barnett's lipid levels to Dr. Mikolojcyk. (64:2-14).

Moreover, Dr. Bryan has not interpreted the Cardiolite test that was done in July 2003, almost 10 months after he operated on Mr. Barnett, and he testified that he would defer to a cardiologist in this regard (14:22-25 to 15:1-4, and 123:2-23 to 124:1-18) As to the diagnostic testing done in 2006, Dr. Bryan had never seen, nor had the opportunity to review these findings until he was shown them at the deposition.

Dr. Bryan should not be permitted to give any opinions regarding the Plaintiff's current condition. He saw the plaintiff on September 9-14, 2002 and during a brief follow-up visit on October 10, 2002. He was not privy to the chart of Barnett's treating doctors, Dr. Mikola's records from 1999-2004, nor Dr. Karavan's chart from 9/02 to 12/05. He never saw the cardiolite stress test films or exam for 1/24/00 or 7/18/03 or 5/2/06. Yet he was asked 2 hours of questions by counsel for Merck as if he were designated expert who had reviewed all of the medical records for the Plaintiff. The mere fact that this doctor was willing to look at a couple of medical records and give speculative opinions for 2 hours in a deposition should not elevate his testimony to admissible status.

He was not a designated expert, he did not read the chart, and the Defendant is polluting the record with opinions which say, in essence, as far as Dr. Bryan knows, after his bypass surgery four years ago Mr. Barnett was fine. He may have been stable on 10/10/02 but that date should be the outer boundary for this witnesses opinions regarding Mr. Barnett's medical

condition. To allow anything else would be pure speculation and a violation of the rules of evidence.

## V. **CONCLUSION**

For the reasons stated herein, Dr. Bryan's opinions do not meet the standards for expert testimony. Plaintiff respectfully requests that the Court issue an order precluding testimony from Dr. Bryan on the matters set forth above, and for such other and further relief to which Plaintiff may be entitled.

Date: June 16, 2006

Respectfully submitted,

By _____
Mark P. Robinson, Jr.
Kevin F. Calcagnie
Carlos A. Prietto, III
Ted B. Wacker
Lexi W. Myer
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Dr., 7th Floor
Newport Beach, California 92660
Telephone: (949) 720-1288
Facsimile: (949) 720-1292

Andy D. Birchfield, Jr.
P. Leigh O'Dell
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, Alabama 36103-4160
Telephone: (334) 269-2343
Facsimile: (334) 954-7555

Donald C. Arbitblit
LIEFF, CABRASER, HEIMANN and
BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, California  94111
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Counsel for Plaintiff

Russ M. Herman
Leonard A. Davis
Stephen J. Herman
HERMAN HERMAN KATZ
& COTLER, LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70013
Telephone: (504) 581-4892
Facsimile: (504) 561-6024

Christopher A. Seeger
SEEGER WEISS
One William Street
New York, New York 10004
Telephone: (212) 584-0700
Facsimile: (212) 584-0799
**Co-Lead Counsel**

**PLAINTIFFS' LIAISON COUNSEL**

Richard J. Arsenault
NEBLETT, BEARD & ARSENAULT
220 Bonaventure Court
P.O. Box 1190
Alexandria, Louisiana 71301-1190
Telephone: (318) 487-9874
Facsimile: (318) 561-2591

Shelly Sanford
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, Texas 77002
Telephone: (713) 650-0022
Facsimile: (713) 650-1669

Elizabeth Cabraser
LIEFF, CABRESER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, California 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Drew Ranier, Esq.
RANIER, GAYLE & ELLIOT, LLC
1419 Ryan Street
Lake Charles, Louisiana 70601
Telephone: (337) 494-7171
Facsimile: (337) 494-7218

Thomas Kline
KLINE & SPECTER, P.C.
1525 Locust St., 19th Floor
Philadelphia, Pennsylvania 19102
Telephone: (215) 772-1000
Facsimile: (215) 772-1371

Mark P. Robinson, Jr.
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Dr., 7th Fl
Newport Beach, California 92660
Telephone: (949) 720-1288
Facsimile: (949) 720-1292

Arnold Levin, Esq.
LEVIN FISHBEIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19106-3875
Telephone: (215) 592-1500
Facsimile: (215) 592-4663

Christopher V. Tisi Esq.
ASHCRAFT & GEREL
2000 L Street, NW, Suite 400
Washington, DC 20036-4914
Telephone: (202) 783-6400
Facsimile: (307) 733-0028

**PLAINTIFFS' STEERING COMMITTEE**

CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Defendants' Liaison Counsel, Phillip A. Wittmann, Merck's Counsel, Andrew L. Goldman, and Plaintiffs' Liaison Counsel, Russ Herman, by U.S. Mail and e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced, in accordance with Pretrial Order No. 8, on this 16 day of June, 2006.

*/s/ Mark P. Robinson, Jr.*
MARK P. ROBINSON, JR.
State Bar No. 054426
Attorney for Plaintiff
Robinson, Calcagnie & Robinson