UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| Gerald Barnett v. Merck & Co, Inc. | * | CASE NO. 02:06CV00485 |

### PLAINTIFF'S PRELIMINARY OPPOSITION TO DEFENDANT'S MOTION IN LIMINE FOR ORDER EXCLUDING THE FRIES LETTER

*(Plaintiff's Opposition to Defendant's Motion in Limine No. 3)*

Plaintiff Gerald Barnett hereby opposes Defendant's Motion in Limine to exclude the Fries letter from the trial of this case.[1] The Fries letter is relevant and not unduly prejudicial. The letter falls within the Federal Rule of Evidence 803(6) hearsay exception. As such, Merck's motion should be denied.

**ARGUMENT**

At issue is a letter from Dr. James Fries ("Fries letter"), a California physician and professor at Stanford University's School of Medicine, to then-Merck CEO, Raymond V. Gilmartin. *See* P. 1.0176 (Exhibit A). The letter expresses Dr. Fries' concerns that Merck was failing to disclose Vioxx safety data and was attacking academics that question the drug's safety. *See id.* at 4. Similarly, Dr. Fries relates his impressions of a telephone call with a Merck

---

[1] The deposition of Dr. James Fries was taken just a few days ago on Friday, June 16, 2006. Plaintiff has listed Dr. Fries on his witness list and has affirmatively designated his deposition testimony. As of this date, counsel for Plaintiff have not yet received a copy of the transcript, but intend to utilize relevant portions of that transcript in a supplemental opposition to Merck's motion when the transcript becomes available.

___ Fee_____
___ Process_____
_X_ Dktd_____
___ CtRmDep_____
___ Doc. No_____

employee, Dr. Louis Sherwood, during which he felt threatened and intimidated. *See id.* at 1-3. Additionally, Dr. Fries reported the results of his own investigation into Merck's conduct, through which he learned of similar incidents that were reported to him by other academics. *See id.*

## I. The Fries Letter Should Be Admitted Because it Is Not Hearsay or in the Alternative, Is Admissible under an Hearsay Exception

The Fries letter is not hearsay because Plaintiff does not offer it for the truth of the matters asserted but to show that: a) Merck had notice that Dr. Fries had concerns about the safety of Vioxx and that he felt Merck was not being forthcoming with physicians and the public about Vioxx safety data, and b) Merck had notice that certain physicians from influential medical schools felt threatened and intimidated by a senior Merck employee. Regardless of whether the concerns of these physicians were baseless—as Merck now suggests—the letter is admissible because it put Merck on notice that physicians were concerned about Merck's lack of full disclosure regarding the safety of Vioxx and that the conduct of its employees was perceived as threatening.

In the alternative, if the Court finds that the letter is hearsay, Plaintiff submits that the letters is admissible under the business record exception to the hearsay rule. Fed.R.Evid. 803(6). Under Rule 803(6), records of regularly conducted activity such as reports or letters are admissible if: 1) the memorandum or report is made at or near the time the information was transmitted; 2) by a person with knowledge; 3) if kept in the regular course of business; and 4) it was the regular practice of the business activity to make such a letter.

The letter was written at or near the time of observation, by a person with actual knowledge. Clearly, Dr. Fries had personal knowledge of the information contained in the letter; indeed, the information contained in the letter was obtained as a result of his own personal

2

investigation. Plaintiff assumes that Dr. Fries kept the letter in his ordinary course of business. The letter was written on the Stanford School of Medicine letterhead and, as such, bears the indicia of correspondence regularly written and maintained in the academic, medical community. Merck does not dispute that deans, department heads, and noted physicians from medical schools correspond with drug companies all the time.

Whether evidence is admissible under Rule 803(6) is "chiefly a matter of trustworthiness." *Mississippi River Grain Elevator, Inc. v. Bartlett & Co. Grain,* 659 F.2d 1314, 1319 (5th Cir.1981); see also *United States v. Morrow,* 177 F.3d 272, 295 (5th Cir.) (per curiam), *cert. denied,* 120 S.Ct. 333 (1999); *United States v. Box,* 50 F.3d 345, 355-356 (5th Cir.1995); *United States v. Veytia-Bravo,* 603 F.2d 1187, 1188-1189 (5th Cir.1979), *cert. denied,*100 S. Ct. 686 (1980). Plainly, the letter is trustworthy, comes from a credible source, and was not written in anticipation of litigation. Indeed, in support of its claims that the Fries letter is confidential, Merck has previously submitted an affidavit from Dr. Fries that attested to the fact that he wrote the letter with the intention that Merck would be on notice of his concerns and respond accordingly.

Merck claims that both the Fries letter is irrelevant if offered to show that Merck was "attacking" critics of its drug, Vioxx. In making this argument, Merck fails to disclose the full nature of the documents. First, the Fries letter is a four-page document which makes no mention of "attacks" by Merck employees until the last page. The letter is primarily devoted to alerting Merck of the serious concerns Dr. Fries and other notable research physicians have about the company's disclosure of Vioxx clinical data. The letter gives specific examples regarding the lack of information Merck has provided about the safety of Vioxx following the VIGOR study and

3

explains that several investigators and speakers have felt harassed by Merck employees when they raised safety concerns with respect to the drug.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Campbell v. Keystone Aerial Surveys, Inc.*, 138 F.3d 996, 1004 (5th Cir. 1998); *U.S. v. Chavful*, 100 Fed.Appx. 226, 231 (5th Cir. 2004); Fed.R.Evid. 401. "Thus, if probative of <u>any</u> fact that is of consequence to the determination of the action, evidence is relevant within the meaning of the Federal Rules, and is therefore admissible." *Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.*, 630 F.2d 250, 267 (5th Cir. 1980) (internal quotation omitted) (emphasis added). To say that evidence is irrelevant in the sense that it lacks probative value therefore means that it does not justify *any* reasonable inference as to the fact in question. See McCormick on Evidence, § 185 at 544 (3rd dd. 1984) (emphasis added). Conversely, if evidence does support the existence of a specific fact, even obliquely, it is relevant.

The question is whether Merck had a duty to warn people like Mr. Barnett and his physicians, whether Merck knew the safety information was not reaching its target audience and whether Merck directly or indirectly placed misinformation about the risks associated with Vioxx into the marketplace. With respect to failure to warn, the duty arises when the Defendant knew or should have known of the need to issue a warning. See *GHR Energy Corp. v. Carboline Co.*, 744 F. Supp. 1405, 1407 (E.D. La. 1990). To establish duty to warn, the plaintiff must prove a manufacturer had knowledge of the harmful and dangerous nature of the drug. See *id.* Plaintiff anticipates Merck will defend this case by arguing it fully discharged its duty to warn. As such, Plaintiff should be permitted to offer evidence showing that Merck was on notice that members of the medical community thought Merck was failing to disclose safety data related to Vioxx and

4

that the safety data was not reaching the people who needed it to make informed prescribing decisions. The Fries letter demonstrates that Merck was on notice. The letter is relevant, fits within the 803(6) exception to the hearsay rule, and should be admitted into evidence.

## II. The Fries Letter Will Not Cause Unfair Prejudice, Jury Confusion, or Undue Delay

The Fries Letter is not unduly prejudicial under Federal Rules of Evidence 403. Evidence is unduly prejudicial only when "its probative value is *substantially* outweighed by the danger of unfair prejudice." *U.S. v. Delgado*, 903 F.2d 1495, 1503-04 (11th Cir. 1990); see also *U.S. v. Cerullo*, 435 F.2d 142, 143 (5th Cir. 1970). "'Unfair prejudice' cannot be simplistically defined as evidence having adverse effects on a party's case; rather, it is an undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one." See *Cauchon v. United States*, 824 F.2d 908, 914 (11th Cir. 1987) (citations omitted); see also *Delgado*, 903 F.2d at 1504. The letter's probative value is not outweighed by the danger of unfair prejudice. Moreover, "Rule 403 rulings are best made at the time of trial when the Court may balance relevant factors before it." *Minshew v. Brown*, NO. 95-2507, 1996 WL 601436 (E.D. La. 1996) (Fallon, J.).

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Merck's motion.

Date: June 19, 2006

Respectfully submitted,

By _____
Mark P. Robinson, Jr.
Kevin F. Calcagnie
Carlos A. Prietto, III
Ted B. Wacker

5

Lexi W. Myer
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Dr., 7th Floor
Newport Beach, California 92660
Telephone: (949) 720-1288
Facsimile: (949) 720-1292

Andy D. Birchfield, Jr.
P. Leigh O'Dell
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, Alabama 36103-4160
Telephone: (334) 269-2343
Facsimile: (334) 954-7555

Donald C. Arbitblit
LIEFF, CABRASER, HEIMANN and
BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, California 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Counsel for Plaintiff

Russ M. Herman
Leonard A. Davis
Stephen J. Herman
HERMAN HERMAN KATZ
& COTLER, LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70013
Telephone: (504) 581-4892
Facsimile: (504) 561-6024

Christopher A. Seeger
SEEGER WEISS
One William Street
New York, New York 10004
Telephone: (212) 584-0700
Facsimile: (212) 584-0799
**Co-Lead Counsel**

**PLAINTIFFS' LIAISON COUNSEL**

Richard J. Arsenault
NEBLETT, BEARD & ARSENAULT
220 Bonaventure Court
P.O. Box 1190
Alexandria, Louisiana 71301-1190
Telephone: (318) 487-9874
Facsimile: (318) 561-2591

Shelly Sanford
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, Texas 77002
Telephone: (713) 650-0022
Facsimile: (713) 650-1669

Elizabeth Cabraser
LIEFF, CABRESER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, California 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Drew Ranier, Esq.
RANIER, GAYLE & ELLIOT, LLC
1419 Ryan Street
Lake Charles, Louisiana 70601
Telephone: (337) 494-7171
Facsimile: (337) 494-7218

Thomas Kline
KLINE & SPECTER, P.C.
1525 Locust St., 19th Floor
Philadelphia, Pennsylvania 19102
Telephone: (215) 772-1000
Facsimile: (215) 772-1371

Mark P. Robinson, Jr.
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Dr., 7th Fl
Newport Beach, California 92660
Telephone: (949) 720-1288
Facsimile: (949) 720-1292

Arnold Levin, Esq.
LEVIN FISHBEIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19106-3875
Telephone: (215) 592-1500
Facsimile: (215) 592-4663

Christopher V. Tisi Esq.
ASHCRAFT & GEREL
2000 L Street, NW, Suite 400
Washington, DC 20036-4914
Telephone: (202) 783-6400
Facsimile: (307) 733-0028

**PLAINTIFFS' STEERING COMMITTEE**

CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Defendants' Liaison Counsel, Phillip A. Wittmann, Merck's Counsel, Andrew L. Goldman, and Plaintiffs' Liaison Counsel, Russ Herman, by U.S. Mail and e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced, in accordance with Pretrial Order No. 8, on this 19th day of June, 2006.

_____
MARK P. ROBINSON, JR.
State Bar No. 054426
Attorney for Plaintiff
Robinson, Calcagnie & Robinson

**EXHIBIT "A"**

FEB-02-2001  13:37  FROM                    TO              ANSTICE    P.001/004



STANFORD UNIVERSITY MEDICAL CENTER
STANFORD, CALIFORNIA 94305

Confidential Document

PRIVILEGE REDACTION

STANFORD UNIVERSITY SCHOOL OF MEDICINE
DEPARTMENT OF MEDICINE
Division of Immunology and Rheumatology
1000 Welch Road, Suite 203
Palo Alto, CA 94304
(650) 723-6003
(650) 723-9656 (Fax)

RAYMOND V. GILMARTIN

PRIVILEGE REDACTION

JAN 19 2001

January 9, 2001

Mr. Raymond Gilmartin
Chief Executive Officer
Merck and Co.
One Merck Drive
Whitehouse Station, New Jersey 08889

Dear Dr. Gilmartin,

A series of serious events involving certain employees of, and possibly a policy of, Merck & Co. has come to my attention rather accidentally and I wanted to relay these events which might have substantial implications and complications. The result is harmful to the traditionally very fine Merck public image and is counter-productive to the Vioxx sales effort. My perspective is that of the Principal Investigator of ARAMIS (Arthritis, Rheumatism, and Aging Medical Information System). This NIH-funded national data bank first identified and quantitated the stealth epidemic of NSAID gastropathy, quantitated differences in toxicity among NSAIDs, and ARAMIS investigators have worked hard for a long time to find and implement ways of reducing the frequency of serious GI adverse events with NSAIDs. I believe that the Cox-1 sparing agents are our best approach toward better drug safety in this area.

My accidental involvement: On Saturday October 28th I received a call at home from Dr. Louis Sherwood of Merck Pharmaceuticals. Dr. Sherwood complained that Dr. Gurkirpal Singh of our group had an anti-Merck bias and was giving lectures that were irresponsibly anti-Merck and specifically anti-Vioxx. Dr. Singh was held to have used a slide which depicted a person hiding data under the covers, had called Merck the "Firestone of the drug industry", and had requested data from Merck which was not appropriate for him to have. Dr. Sherwood suggested that if this continued Dr. Singh would "flame out" and there would be consequences for myself and for Stanford. Dr. Sherwood had previously called Dr. Judith Swain, Chair of our Department, and subsequently called Dr. Edward Harris, Chair of our Division, with similar complaints. I agreed to look into the matter and to take appropriate action and indicated that it is not our policy to bias any presentation in any direction. I asked him to provide me with full details of any such transgression that occurred after this date.

P1.0176

MRK-ABO0000250

Confidential Document

I spoke with Dr. Singh and reviewed the slides of his presentation. The talk was mainly about the frequency and severity of NSAID Gastropathy and secondly about the advantages of the new Cox-1 sparing agents, of which Vioxx is one. Equal numbers of slides were devoted to Celebrex and to Vioxx. The talk was strongly in favor of broad use of the new Cox-1 sparing agents. Data were mainly from the standard studies, although three slides were from a presented but not yet published randomized renal toxicity study of Celebrex and Vioxx by Andrew Whelton comparing side-by-side renal and cardiovascular toxicity which was not in favor of Vioxx. The little man under the covers was not in the sequence, having been removed when Dr. Singh succeeded in getting the requested data (again not favorable to Vioxx), from Merck. Dr. Singh clearly did not understand the "Firestone" reference and indicated that he had not made the statement. I asked Dr. Singh to be certain to be rigorously balanced in future presentations and he agreed, although stressing that he had also been balanced in the past. I talked with three people who had been in Dr. Singh's audience; one thought the presentation contained humor directed at Merck but that the data were balanced and the other two found the presentations completely unremarkable.

The much broader issues, which surfaced at the American College of Rheumatology meetings, were most disturbing and involve suppression of data by Merck and a consistent pattern of intimidation of investigators by Merck staff, principally Dr. Sherwood but also others on his staff.

A number of physicians have concerns that Vioxx may have some serious and under-emphasized drug toxicity problems, particularly at the 50 mg dose approved for pain control—these concerns are shared by the FDA renal reviewer. Vioxx has been reported to have more frequent peripheral edema problems, more aggravated hypertension, more congestive heart failure, and more heart attacks than other NSAIDs, especially Celebrex. Some 0.4 % of Vioxx subjects had heart attacks compared with 0.1 % in the naproxen arm in the Merck-sponsored VIGOR study and this was statistically significant. Some of these data have been described in the Wall Street Journal and may have affected stock prices but there has been little information presented to date in the medical literature. Merck presented two posters on the VIGOR trial at the recent ACR meetings which did not contain data on the side effects of interest; the posters were very well attended, with everyone wanting to know about the data on these points, but it was not available. I tried unsuccessfully to get the data myself; it is hard to judge these areas without the numerical details. Yet, one could not avoid the conclusion that because of the interest in these issues the data would have been presented had they been favorable. There was a lot of muttering and a lot of people with concerns. The publication of the VIGOR trial recently in the NEJM did not contain the data on edema and fluid retention at all, and dismissed the heart attack data with weak arguments.

Even worse were the allegations of Merck damage control by intimidation, often with a pattern of going to the Dean or Department Head with complaints of anti-Merck bias and always alleging unbalanced anti-Vioxx presentations. This has happened to at least eight investigators: Dr. Singh; Dr. Peter Lipsky, now research chief at the Arthritis Institute;

MRK-ABO0000251

Confidential Document

Dr. Andrew Whelton of Hopkins; Dr. Michelle Petri of Hopkins; Dr. David Yocum of Tucson, currently head of the FDA advisory panel; Dr. Lee Simon of Harvard; Dr. James McMillen; and Dr. Thomas Stillman. I suppose I was mildly threatened myself, although I have never spoken or written on these issues.

I documented the intimidation of the individuals listed above by personally speaking with each of them. Dr. Simon believes that one of his two academic appointments has been jeopardized. Dr. McMillen believes that his VCF appointment at Hershey was revoked because of these accusations. Dr. Petri had a speaking engagement unprofessionally cancelled by Merck and an unrenowned speaker substituted; he was also bothered by phone calls from Merck persons alleging unbalanced presentations. Dr. Singh had a speaking engagement cancelled and the audience was told that he had been fired. Dr. David Yocum had similar experiences. Dr. Lipsky, while at Southwestern, was forced to do a slide by slide justification of a CME program felt to be critical of Vioxx. These are respected investigators with long experience and high integrity. I also spoke with several past Merck employees who asked to remain anonymous but who confirmed the existence of a pattern of intimidation through the Department Chairs or the equivalent, often with the hint of loss of Merck funding to the institution.

An ironic result of all this is that Vioxx is getting more scrutiny of its salt and water toxicity than if the data had been clearly presented, and Merck is taking a big public relations hit among rheumatologists. The investigators whose balance was criticized are prominent and several advise the FDA—a role not often given to unbalanced presenters. In the view of most rheumatologists including myself, Vioxx (and Celebrex) represent a major medical advance in terms of improving GI safety, which is the dominant toxicity of NSAIDs and is the most common serious adverse event of NSAIDs. These drugs should on balance, save a substantial number of lives. The fluid retention and related problem data are actually not all that bad, and the cover-up is a worse problem than the side effects of fluid retention and hypertension and CHF, which could be handled by stronger labeling for at risk patients, or by other means. Else, there is a risk of case reports of seriously complicated congestive heart failure or other serious adverse reactions, which could threaten the drug approval. The heart attack data, of course, need to be confirmed or refuted by further study, as do the data on comparative renal toxicity between Cox-1 sparing agents.

I spoke with Dr. Sherwood at length on November 22 and aired the above concerns directly. He defended by saying that Merck was a great company and, therefore, could not be doing anything inappropriate. He said that he had been with Merck for 13 years and had never noticed anything that was not appropriate. He noted that he had previously been a Department Chair and that he knew what was appropriate and what was not, and that he knew how to get things done through the network. He said that if he heard about something that was alleged to be anti-Vioxx that it was his right to call anyone he wanted to about it. When told that each of the investigators maintained that presentations had been balanced he said he didn't want to get into "he said, she said" kinds of discussions. He said that there weren't any problems with the drug and that anyway they only occurred at high dose. When told that an ex-Merck employee had quoted him as saying

MRK-ABO0000252

Confidential Document

"we only have three problems, Whelton, Simon, and McMillen, and Simon has been taken care of" there was a long pause and then he said that he "did not remember" saying that. When told that while both I and the people I had talked with had often had differences in viewpoint with one or another drug firm, none of us had ever heard of harassment of investigators through their institutions he did not have a response but said that he "heard me."

From the discussions above I make three conclusions. First, some investigators at some times probably do make statements that may seem seriously unbalanced to those vested or instructed in opposite opinions and that close attention to strict impartiality is essential for any person making presentations on any such subject. Second, Merck has been attempting to systematically downplay some unusual side effect patterns of Vioxx. I would hesitate to use the term "hiding data" but Merck has certainly not been forthcoming with data and has made access to the data difficult. Finally, and most importantly, Merck employees have systematically attacked those investigators or speakers who expressed what Merck staff felt were critical opinions in a manner which seriously impinges on academic freedom.

I believe that these are serious matters and that Merck should take care of them internally, in its own interest, and in the interest of patients. I will appreciate your response to the issues raised here and to learning about actions which have been taken.

Sincerely,

*James F. Fries, MD/jr*

James F. Fries, M. D.
Professor of Medicine

cc: Mr. David Anstice, President Merck U. S. Human Health
    Dr. Ed Skolnick, President Merck Research Labs

TOTAL P.004

MRK-ABO0000253